# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| OOOOOO Part 3 | Motion to Exceed Page Limit |

# EXHIBIT OOOOOO PART 3

1     that, they never would have written her up.  We routinely

2     have -- I mean, I'm not saying it's a good idea but that

3     often happens that people have, they pocket one of their

4     pills or what not.  Especially because on our unit the

5     medication that's given for sleep is given at 5:00 in the

6     afternoon.  And you must take it at that time.  It leads to

7     a lot of sleep disturbance for people because they're

8     unconscious by 6:00 and they awake up at 2:00 in the

9     morning and are not allowed to get up.

10          So even though it is not part of the protocol at

11    all, oftentimes people do palm their sleeping medication

12    and save it until night time.

13          Q.   Okay.  Is there trafficking in this kind of pill,

14    Seroquel, within the jail?  Does it have any value?

15          A.   I'm sure there is.  There's a trafficking of

16    everything in the jail, things that we think are

17    ludicrous.  But, with a single pill, it's not -- and a

18    single instance, that wouldn't be a concern to us.

19          Q.   Okay.  So it's a sleep aid that can be used at a

20    later time when you actually want to go to sleep?

21          A.   Yes.

22          Q.   You told us that Wendi was often visibly

23    emotional about other people's problems.  Can you tell me

24    about that?

25          A.   In the cases where Wendi would talk with me about

```
 1   her concerns for other inmates she was very tearful.  Wendi

 2   is a person who is very tearful.  She has a very difficult

 3   time keeping her emotions on the inside.  Usually -- in the

 4   beginning, she tries to keep things down and tries to

 5   present a very cheerful front but that doesn't last very

 6   long.  So, when she would start to explain what a certain

 7   person's problem was or why we needed to give them special

 8   consideration or why we needed to pay attention to them,

 9   she would usually become very tearful.

10       Q.   Did you assess Wendi for behavioral aptitudes?

11       A.   Can you be more specific?

12       Q.   Well, my notes say  you assessed her for

13   behavioral aptitudes, things that she was capable of doing,

14   strengths, weaknesses, those kind of things?

15       A.   Well, going to just behavior aptitude, I think --

16   I'm not exactly sure what you mean by that term.

17       Q.   Well, I have it in my notes.  I'm sorry, if you

18   don't understand that question.  Do you have any sense of

19   it?

20       A.   My senses are you're asking about her behavior

21   and her interaction with other people and her sort of daily

22   interaction with others.  That's the sense of what I'm

23   guessing you're asking me.

24       Q.   Please tell us.

25       A.   As I said before, Wendi is very much a caretaker
```

1   of other people.  Even when it's to her detriment.  She's

2   much more comfortable focusing on what other people need

3   assistance with than on what she needs assistance with.

4   And it's very difficult for Wendi to say no.  She's

5   extremely uncomfortable when she perceives that someone

6   doesn't like her and will go out of her way to either avoid

7   that person, or those people, or will go out of her way to

8   try and prove to that person that there is no problem.

9          For example, when she was written up for the

10  Seroquel pill, there was an officer on our unit that I

11  think was extremely judgmental of her in a way that was not

12  toward other inmates.  And Wendi's way of addressing that

13  problem with the officer was she started staying up all

14  night and sleeping through the officer's shift in the day

15  so she could entirely avoid that person.

16         So there are a lot of issues with avoidance.  For

17  example, when talking to Wendi, things would come up and

18  there would be situations where any person might be angry

19  about an inequity of a situation or being moved or being

20  housed, Wendi had a really hard time saying, "I'm angry

21  with you."  We said you can be angry at us.  There's no

22  problem.  You're not getting sent anywhere.  Could not

23  verbalize, "I am angry."  Very difficult time expressing

24  any negative emotions.  She engages in a lot of avoidance

25  and denial of issues.  Even when you say to her, "How are

1   you?"  "Oh, I'm fine."  And then you sit and talk to her

2   for ten minutes and you'll find out she was entirely not

3   fine.  Unless she was advocating for someone else, then it

4   was an entirely different story.

5        Q.   Okay.  Can you characterized for me her

6   personality?  Was it friendly, amiable, those kinds of

7   things?

8        A.   Wendi's always been extremely cooperative, very

9   forthcoming.  As I said, very pleasant.  She is more likely

10  to try and ask anybody else how they are doing rather than

11  talk about herself.

12       Q.   Is this unusual for persons who spend a great

13  deal of time in custody, in your experience?  Sunny

14  disposition?

15       A.   I think, well, it depends on the person.  What I

16  can tell you is that when people stay -- it has been my

17  experience when people are on the unit and they are

18  constantly being watched and they have people supervising

19  them 24 hours a day, if you are a person who is extremely

20  antisocial, if you are a person who is predatory, if you

21  are a malingering person, a person trying to make good, you

22  cannot maintain that for an ongoing period of time without

23  being found out.  It just doesn't happen.  We see people

24  who are extremely good at deception, extremely good, and

25  they eventually get found out.  Everybody always does.  And

1   there has never been anything that was inconsistent with

2   Wendi's behavior.

3       Q.   Anything about her behavior that led you to

4   believe she was malingering or trying to deceive staff?

5       A.   No.

6       Q.   Have you seen growth and development during the

7   year or so you've worked with Wendi?

8       A.   Yes.

9       Q.   What is that?

10      A.   Wendi became better able to verbalize when she

11  was having a problem with someone.  She became better able

12  to identify the feelings that were there.  In the beginning

13  mostly it was about stress, stress, stress.  So everything

14  was generally about stress.  There wasn't really any sort

15  of distinguishing between I'm angry or I'm sad or I'm

16  afraid.  She became better able to identify the emotions

17  that she was experiencing.  She became better able to

18  problem solve.  She became able to remove herself from

19  circumstances with peers who were having difficulties.  She

20  became better able to define boundaries.

21          But I think that's -- again, I just want to say

22  that on our unit we thought routinely that Wendi was going

23  to trial next month or the month after that or a couple of

24  months later.  So, one of our goals was to help her remain

25  as stable as possible for trial.  And, when you're doing

1    that, you don't start digging around and stirring a lot of

2    stuff up and go into deep background things. You don't do

3    that because it doesn't serve people if you sort of crack

4    open the facade that someone has. You know, you can disarm

5    them and really put them at a disadvantage when they need

6    to be at their most.

7        Q.   But the fact that she is educable and appears to

8    be able to change her behaviors, does that bode well for

9    the time she is about to spend in prison? She is educable

10   and rehabilitable, those kind of things?

11       A.   I believe so. Absolutely.

12       Q.   During the time that you met with Wendi and knew

13   Wendi, did she ever speak badly of Joe Andriano?

14       A.   No. She always referred to him as "my husband,

15   Joe" or "Joe." Absolutely no anger, no resentment. It's as

16   if she was describing someone who was still alive.

17       Q.   Did she ever blame Joe for her circumstances, the

18   fact that she was in custody and a client of yours?

19       A.   No, absolutely not.

20       MR. PATTERSON: Judge, I have no additional

21   questions at this time. Thank you.

22       THE COURT: We'll take our afternoon break at

23   this time. Take 15 minutes. Remember the entire

24   admonition I've given you including do not talk about the

25   case with each other and do not let anyone talk about the

1    case with you.  Keep an open mind.  I'll see you in 15

2    minutes.

3                (Recess taken.)

4                THE COURT:  This is CR2000-096032, State of

5    Arizona versus Wendi Elizabeth Andriano.

6                The record will reflect the presence of the

7    defendant, counsel and the jury.

8                Laura King is on the witness stand with

9    cross-examination by Mr. Martinez.

10

11                      CROSS-EXAMINATION

12   BY MR. MARTINEZ:

13        Q.   Ma'am, one of the things that's striking about

14   your testimony was that it seemed like you didn't have a

15   bad thing to say about the defendant.  That would be fair

16   to say, right?

17        A.   Not as regards to the questions that were asked

18   me.

19        Q.   And not only did you not have a bad thing to say

20   about her, it seemed like you and she became friends,

21   didn't you?

22        A.   No, we did not.

23        Q.   So you didn't really think highly of her at all

24   then, right?

25        A.   I think Wendi has a lot of strengths.

1    There are things about her that I think are admirable.

2    There are some things about her that I do think are

3    admirable and there are things about her that are very

4    likeable.

5        Q.    You think she's admirable.  One of the things is

6    that she's admirable, right?

7        A.    In some ways, yes.

8        Q.    And she's likeable, correct?

9        A.    In some ways, yes.

10       Q.    One of the things you told us was that according

11   to you, she never told any of you a lie, right?

12       A.    No, I didn't say that.

13       Q.    Well, you did indicate to us, didn't you, that

14   when she dealt with the staff, there was nothing

15   inconsistent with Wendi's behavior.  Do you remember

16   telling us that?

17       A.    Correct.

18       Q.    You also told us she never tried to deceive

19   staff.  Do you remember that?

20       A.    Yes, I do.

21       Q.    So you're vouching for her honesty, aren't you?

22       A.    I'm vouching for her behavior for the time she

23   was on our unit.

24       Q.    No, ma'am.  When you say, "never tried to deceive

25   staff," you're not talking about behavior, you're talking

1    about somebody who is either honest or dishonest, wouldn't

2    you agree?

3            MR. PATTERSON:  That's not what she testified to

4    Judge.

5            THE COURT:  Overruled.

6            Go ahead and answer the question if you can.

7            THE WITNESS:  I maintain that Wendi did not

8    engage in behavior or verbalization that was intended to

9    deceive staff.

10        Q.  BY MR. MARTINEZ:  That's what you mean when you

11   said she never tried to deceive staff, right?

12        A.  Correct.

13        Q.  And if she never tried to deceive staff, you're

14   telling us that she was honest in her dealings with staff?

15        A.  I would say for the most part.  I can't say,

16   I -- I can't say equivocally to every word that was spoken.

17        Q.  But your opinion of her is that she's an honest

18   individual in regards to dealing with staff, right?

19        A.  During the period of time she was on our unit, I

20   experienced her as being most honest, yes.

21        Q.  So the answer is yes?

22        A.  Yes.

23        Q.  And the period that you dealt with her was

24   September of 2003 until September of 2004, correct?

25        A.  Correct.

1      Q.    And you did not deal with her when she was in the

2  area in Estrella, did you?

3      A.    No.

4      Q.    And you didn't deal with her before you started

5  -- before she was transferred to your unit, right?

6      A.    No.

7      Q.    And the unit that she was transferred to, I've

8  heard it variously referred to but it's called the psych

9  unit, right?

10      A.    Correct.

11      Q.    But she doesn't have any mental health problems,

12  right?

13      A.    She doesn't have a serious mental illness. She

14  does have mental health issues.

15      Q.    Well, some of those that you indicated were

16  depression, correct?

17      A.    Correct.

18      Q.    Isn't it fair to say that an individual who is

19  facing first-degree murder charges and murder of their

20  husband has a reason to be a little bit depressed?

21      A.    Sure.

22      Q.    Wouldn't it be fair to say that a person who is

23  incarcerated has a reason to be depressed?

24      A.    Absolutely.

25      Q.    And you also mentioned anxiety, right?

1     A.   Correct.

2     Q.   Isn't it true that under the same circumstances

3  somebody who is facing a trial may be anxious about that,

4  right?

5     A.   Correct.

6     Q.   So you're not telling us the reasons why she was

7  depressed, are you?

8     A.   I can't tell you specifically with a bright line

9  exactly what was depressing Wendi or giving Wendi anxiety

10  at any specific given point in time.  The depression and

11  the anxiety certainly, the circumstances it would be

12  entirely and is entirely appropriate to be very upset.

13  However, the degree of impairment, that being

14  depressed or anxious, the degree of coping that a person

15  can muster in response to that depression or anxiety, that

16  is what would be -- that is what would be significant and

17  that is why Wendi remains in our unit.

18     Q.   I'm not asking you why she remained on your

19  unit.  I'm asking you whether you know a reason for her

20  depression or anxiety and the answer to that is no, isn't

21  it?

22     A.   I believe I've given you some of the reasons for

23  her depression and anxiety.

24     Q.   One of them could be that she is facing

25  first-degree murder charges, right?

1      A.   Correct.

2      Q.   One of the them could be that she is in a jail,

3  right?

4      A.   Correct.

5      Q.   One of the other things that you told us was that

6  you didn't conduct any tests, did you?

7      A.   I'm not qualified to do psychology testing.

8      Q.   You're just a social worker, aren't you?

9      A.   I am.

10      Q.   What that means is that you go in there, you try

11  to help, try to help based on your education, the

12  individuals that are transferred to your unit, right?

13      A.   That's correct.   But, actually, I believe in the

14  Arizona Revised Statutes, social work is the practice which

15  includes diagnosis and treatment of mental and emotional

16  disorders.

17      Q.   But you didn't do any tests, right?

18      A.   An assessment does not require -- an assessment

19  does not require specific testing, test instruments.

20      Q.   An assessment is basically you sitting down and

21  talking to her, right?

22      A.   That's part of an assessment, correct.

23      Q.   And then it requires you to vouch for her honesty

24  then, doesn't it?

25      A.   Wendi's honesty is not at issue with regards to

1    an assessment of depression or anxiety.  They're separate

2    things.

3         Q.   Well, you have to sit there and talk to her,

4    don't you?

5         A.   Sure.

6         Q.   And one of the things you told us about when you

7    sat down and talked to her was she was an emotional woman

8    and quick to cry.  Didn't you tell us that?

9         A.   I did.

10        Q.   That is your opinion, isn't it?

11        A.   That is what I observed.

12        Q.   And that is your opinion, right?

13        A.   The fact that she cried many of the times that I

14   sat and talked with her, that is a fact.

15        Q.   It may be a fact, so it leads to your opinion, as

16   you gave it to us, that she is visibly emotional and she is

17   very tearful and has a difficult time keeping emotions

18   inside.  That's your impression of her based on the year

19   that you treated her, right?

20        A.   Correct.

21        Q.   Did you ever view a videotape of her speaking to

22   the police on any occasions shortly after the murder?

23        A.   I did not.

24        Q.   Would it come as, being a social worker, would it

25   come as a surprise to you that she was laughing, flirting

1   with the police officer four hours after she killed her

2   husband?

3       A.   I do not have enough information to be able to

4   address that.   People respond in very different ways to

5   certain circumstances.   From the way you described that, it

6   sounds --

7       Q.   If you don't have --

8       A.   -- it sounds pretty cold.

9       Q.   If you don't have the information, you can't give

10  me an answer as to what was happening, right?

11      A.   Then I can't tell you that I would be surprised.

12      Q.   And the other thing is you don't have the

13  qualifications for that, do you?  You don't have a Ph.D.,

14  do you?

15      A.   I'm sorry, I don't have the qualifications?

16      Q.   To give us the opinion, right?

17      A.   Which opinion is that?

18      Q.   The opinion as to why she would engage in that

19  sort of conduct with a police officer shortly after the

20  killing?

21      A.   I could give you an opinion that would be a

22  professional opinion based on my status as a social

23  worker.   I don't need a Ph.D. to give you an opinion on

24  this issue.

25      Q.   One of the things you told us about her, just so

1   we found out how she is in that psych unit, is that if

2   there was something going on wrong, she would come to you

3   and tell you things about the other inmates, right?

4        A.   At times, yes.

5        Q.   There's a word for that called a "snitch," isn't

6   it?

7        A.   No.

8        Q.   Well, isn't -- let's go over -- you're familiar

9   with the term "snitch," aren't you?

10       A.   I am familiar with the term "snitch."

11       Q.   A snitch is somebody who tells on someone else,

12   don't they?  A figure of authority?

13       A.   A snitch is someone who tells on someone else in

14   order to gain some kind of -- some kind of reward or in

15   order to harm another inmate, in order to gain some kind of

16   favoritism.  Usually those things that are snitched on are

17   things that people are doing that are illegal and will

18   cause them trouble.  A snitch does not relay information in

19   order to be helpful to other people.  So she didn't -- her

20   behavior doesn't meet the definition of snitching.

21       Q.   A snitch is an individual, according to you, who

22   relays information, right?  Yes or no, that's what you

23   said?

24            MR. PATTERSON:  Objection.  That's not what she

25   said.

1          THE COURT:  Sustained.

2      Q.   BY MR. MARTINEZ:  With regard to this individual

3  who was a snitch, you indicated that they do speak to other

4  people about activities that they know about, right?

5          MR. PATTERSON:  Judge --

6          THE WITNESS:  That is part of the action.

7  However, in everyday living --

8          MR. MARTINEZ:  She's not being responsive.

9          THE COURT:  Overruled.  Go ahead and restate the

10  question if you'd like.

11      Q.   BY MR. MARTINEZ:  That's what she was doing, she

12  was providing you information.  Yes or no?

13      A.   If you're asking me if providing information

14  defines her as a snitch, the answer is no.

15      Q.   No, I'm asking you whether or not she was

16  providing you information on other inmates.

17      A.   She did provide information on other inmates,

18  yes.

19      Q.   And that's part of the reason why you liked her,

20  right?

21      A.   It's one of the reasons that she was a

22  stabilizing force on our unit.

23      Q.   And part of the reason why you liked her, right?

24      A.   I did admire the fact that she was looking out

25  after other people that were too fragile to look out after

1  themselves, yes.

2      Q.   So you admire her also in addition to liking her?

3      A.   I admire and like the fact that she was looking

4  out after other inmates.

5      Q.   I'm asking you isn't it true that you admire

6  her?

7      A.   I like the fact that and admire the fact that she

8  was looking out after other inmates.

9      Q.   Are you saying you don't admire her?

10     MR. PATTERSON:  Objection, Judge.

11     THE COURT:  Sustained.  Let's move on.

12     Q.   BY MR. MARTINEZ:  Ma'am, I don't know if you

13  admire her or not.  Can you tell me if you do or not?

14     MR. PATTERSON:  Objection.

15     THE COURT:  Let's move on.  Sustained.

16     Q.   BY MR. MARTINEZ:  Ma'am, when you were in the

17  jail, one of the things that, I guess that happens, is you

18  take notes of what's going on, right?

19     A.   Correct.

20     Q.   Where are your notes?

21     A.   My notes are in the file.

22     Q.   Where is that file, ma'am?  How come the State

23  doesn't have it?

24     A.   Well, you would have to ask -- you would have to

25  ask someone else.  It's not my job to provide the file.

1      Q.    But there are notes, right?

2      A.    Correct.

3      Q.    Now, one of the things that you told us was that

4   there was a suicide attempt, right, with a pencil, right?

5      A.    Yes.

6      Q.    That pencil is not a normal size pencil, is it?

7      A.    No.

8      Q.    That pencil is about this big, about two inches

9   long, isn't it?

10      A.    Correct.

11      Q.    Has a dull -- usually a dull point to it, right?

12      A.    Not if it's been sharpened in a pencil sharpener.

13      Q.    But the pencil sharpeners provided by the jail do

14   not provide for a very long point, they do?  They provide

15   for a very small point, don't they?

16      A.    I don't have specific knowledge of the pencil

17   sharpeners over at Estrella.

18      Q.    You worked there a year, right?

19      A.    No, I worked at the Durango psychiatric unit for

20   three years.

21      Q.    Now, and are you saying that perhaps the pencils

22   that are used at Estrella are different than the ones used

23   at Durango?  Is that what you're saying?

24      A.    At Durango we have a pencil sharpener in the

25   all-purpose room which is available to inmates at the

1    officer's discretion.  It's allows for an extremely sharp

2    point.

3         Q.   But you don't know if that's true with regard to

4    inmates at Estrella, do you?

5         A.   I do not.

6         Q.   This so-called suicide attempt, that got her out

7    of Estrella, didn't it?

8         A.   It did.

9         Q.   It got her out of isolation, didn't it?

10        A.   It did.

11        Q.   Tell me a little bit  -- since we don't have your

12   notes -- tell me a little bit more about the suicide

13   attempt?

14        A.   I was not -- I was not present.

15        Q.   But you had the notes.  You read them, didn't

16   you?

17        A.   Uh-huh.

18        Q.   Is that yes?

19        A.   Yes.

20             THE COURT:  Make sure you give a verbal response

21   ma'am.

22        Q.   BY MR. MARTINEZ:  Tell me what the notes said?

23        A.   The notes said that Wendi inserted a pencil into

24   her arm, that there was a lot of blood loss, that she was

25   taken to the hospital to the emergency room at Maricopa

1    Medical Center and that her arm was sutured.

2        Q.    How many stitches did it require?

3        A.    I do not recall.

4        Q.    Where was the pencil put?

5        A.    I do not know.

6        Q.    Would you agree, if you know this, tell me yes or

7    no, some areas are more vascular than others and result in

8    more bleeding than others?  Would you agree to that or if

9    you don't know, tell me that?

10        A.    I would agree to that.

11        Q.    And do you know what part of her arm she put that

12    pencil in?

13        A.    I do not know, specifically.

14        Q.    So it could have been her shoulder?

15        A.    I believe it was on her forearm.

16        Q.    But you just told me you didn't know?

17        A.    I know that it was somewhere on her forearm.

18        Q.    Is that based on the notes?

19        A.    Correct.

20        Q.    Would that be near her elbow?

21        A.    I don't know.

22        Q.    So you really don't know if it was a real suicide

23    attempt because you don't even know where that pencil went,

24    right?

25        A.    If it had not been -- if there had not been a

1    significant injury, she would not have been transported to

2    the emergency room in Maricopa Medical Center.

3        Q.    You don't make that decision, do you?

4        A.    I don't.  That's just in my experience.

5        Q.    You weren't there, were you?

6        A.    No.

7        Q.    You didn't see how much blood loss there was?

8        A.    I did not.

9        Q.    You can't even tell me what the notes say, right?

10       A.    Not that specifically, no.

11       Q.    You were talking about some of the items that she

12   was caught with and one of the things that you indicated as

13   part of that was that one of the other officers didn't like

14   her.  Do you remember saying that, he was judgemental, I

15   think is what you said?

16       A.    I do.

17       Q.    So it's not Wendi's fault with regards to

18   whatever issue arose, it's his fault because he is being

19   judgmental, right?

20       A.    No.

21       Q.    He was wrong and she was right, correct?

22       A.    No.  I believe what I said was that the issue for

23   which Wendi was written up, in my experience while on the

24   unit, other inmates would not have been written up for that

25   same experience, for the same incident.  I heard the

1   officer on a number of occasions speak about Wendi in a

2   negative way.  And so it was at the officer's discretion to

3   write her up.  It was completely within the boundaries of

4   being appropriate, you know.  They didn't doing anything

5   wrong.

6        Q.   You don't know why he thought negatively of her,

7   do you?

8        A.   I can only tell you according to the things that

9   I heard.

10       Q.   Yes, you can tell us that but you don't know why

11   he acquired this information about her as to why he would

12   believe negative things about her, do you?

13       A.   Well, actually, I kind of do.

14       Q.   Did you see those things with your eyes?  Do you

15   know what he's thinking?

16       A.   No, I can tell you what she said.

17       Q.   You can tell us what she said?

18       A.   Yep.

19       Q.   It's a female guard, correct?

20       A.   It is.

21       Q.   And one of the things that we know is that she

22   had some contraband with her, right?

23       A.   Correct.

24       Q.   And you're trying to tell us that it is no big

25   deal, right?

1      A.   I would say no big deal is a little bit too

2  casual.  But it was not -- it was not -- it was not

3  something that is intended to harm someone else.  It is not

4  something that was intended to harm herself.  It was not

5  something that would have been used in an escape.  So when

6  I say -- so the degree to which it was of concern was not

7  high as sometimes a write-up or disciplinary issue might

8  be.

9      Q.   You don't know what she was going to use those

10  for, do you?  So you can't say it wasn't going to be used

11  for escape or for favor, can you?

12      A.   No, I guess I can't.

13      Q.   And with regard to the items, what were the items

14  that you told us about?

15      A.   I believe there was an eye shadow and a lipstick.

16      Q.   Okay?

17      A.   And a pen.

18      Q.   With regard to the eye shadow, does the

19  commissary sell that?

20      A.   I don't believe they do.

21      Q.   No, they don't, right?  So somehow she was able

22  to get that from the outside world, wasn't she?

23      A.   Yes.

24      Q.   And that's not a good thing, is it?

25      A.   I don't think so, no.

1      Q.   No.  And that's really a violation of security

2    there at the jail, right?

3      A.   I agree.

4      Q.   And this honest person who never tried to deceive

5    the guards was able to surreptitiously get the eye shadow

6    in there, right?

7      A.   I believe that someone brought it in to her who

8    shouldn't have.

9      Q.   So you're saying it's not her fault?

10     A.   I'm not saying it's not her fault.  But, I'm

11   saying -- I'm saying that -- I'm saying there was

12   collusion, I guess.

13     Q.   There was collusion between her and somebody

14   else, right?

15     A.   I guess so.

16     Q.   Well, you said there was collusion.  Collusion

17   implies more than one person, right?

18     A.   Yes.

19     Q.   And she was the one that had it so it was her and

20   somebody else, right?

21     A.   Yes.

22     Q.   Now, what was the other item?

23     A.   A lipstick.

24     Q.   Again, does the commissary sell that?

25     A.   They do but not that lipstick.

1      Q.    And so that one was also smuggled into the jail,

2  right?

3      A.    Correct.

4      Q.    And, again, that implies that there's an issue

5  with security, right?

6      A.    Correct.

7      Q.    And this was during your watch, between September

8  of 2003 and September of 2004, right?

9      A.    Correct.

10      Q.    Even though there was this breach of security,

11  you thought they were not any big deal and so you allowed

12  her to remain there?

13      A.    There is some -- there is -- that's too general a

14  summation.  The fact is that in response to having the

15  contraband items she was transferred to the lower

16  functioning pod for 30 days and had some restrictions.  And

17  I don't think it was not a big deal but when you're looking

18  at all of the different issues that happen in a jail and

19  that take place in a jail and that take place on our unit,

20  that was not -- that particular contraband was not

21  extremely high on the scale.

22           The concern for security was, and absolutely

23  should have been, was to prevent something like that from

24  happening again.  They recognized that their security had

25  been -- there was a security issue and they needed to

1    address that, certainly it was.

2        Q.    In terms of punishment, that wasn't your call,

3    was it?

4        A.    It was a team decision.  We work as a team.  So

5    it was a team.  And then we conferred with detention as

6    well, but I was part of that decision.

7        Q.    It wasn't your call but you were part of that

8    decision?

9        A.    Yes.

10       Q.    The other thing you told us about was a pen,

11   right?

12       A.    Yes.

13       Q.    And, again, that's not something that she's

14   allowed to have, right?

15       A.    No.

16       Q.    And you told us that they are allowed to have

17   pencils but not pens, correct?

18       A.    Correct.

19       Q.    Staff's allowed to have pens on that unit?

20       A.    Yes.

21       Q.    Do you know what kind of pen it was?

22       A.    I believe it was a ball point pen.

23       Q.    And it was the kind you guys use, the staff uses?

24       A.    We don't have a specific single pen.  I mean, the

25   variety of pens is as diverse as it is in the community.

1     Q.   And she could have stolen it from somebody,

2  right?

3     A.   She could have but we don't believe that she did.

4     Q.   You don't believe that she did, right?

5     A.   I don't believe that she did, no.

6     Q.   Because you trust her because she's never been

7  deceptive, right?

8     A.   No, that's because I believe I know who gave her

9  the pen.

10     Q.   And she accepted that pen, right?

11     A.   Yes, she did.

12     Q.   She knew the rules, didn't she?

13     A.   She did.

14     Q.   And the other thing is is that should have caused

15  you great concern, shouldn't it, that she had a pen?

16     A.   It did cause me concern.

17     Q.   No, I mean great concern, is the way I phrased

18  it?

19     A.   Yes, great concern.

20     Q.   And part of the reason that it should have caused

21  you great concern is that you just told us that she used an

22  itty bitty little pen to poke herself in the arm and

23  attempted suicide, right?

24     A.   Yes.

25     Q.   And now she has this big pen and she could have

1  done real damage with it, right?

2      A.   She could have if she'd been suicidal at that

3  point in time.

4      Q.   She could have and more importantly she could

5  have done damage to the staff, right?

6      A.   She could have.

7      Q.   That has metal in it, doesn't it?

8      A.   I think it was a plastic pen.

9      Q.   So the interior of it didn't have any metal in

10  it?

11      A.   I would have to say I don't think so.  I think it

12  was a Bic plastic pen that was without the cap.

13      Q.   And the front of it does not have any metal on

14  it, right?

15      A.   I guess around the nib, maybe it has a little

16  metal bit.

17      Q.   With regard to her being in the Estrella jail,

18  you indicated that's probably the tougher of the two jails

19  to be in, right?

20      A.   I think so, yes.

21      Q.   And so it was sort of a good thing for her, if

22  you will, that she was transferred to Durango because she

23  didn't have to deal with some of the things that happened

24  in the Estrella jail, right?

25      A.   Correct.

1      Q.   And yet she did not technically belong on the

2   psych word, did she?

3      A.   No, that's incorrect.

4      Q.   Well, she didn't have any mental illness that you

5   told us about, right?

6      A.   She didn't have a serious mental illness but she

7   had significant mental health issues.

8      Q.   Those were depression and anxiety right?

9      A.   Those were depression and anxiety, but there was

10   also the fact that she had a very difficult issue with

11   regard to copping skills.  She had, I think, experienced a

12   lot of, I guess I would say traumatization having gone into

13   jail and having been through or committed the actions for

14   which she's been found guilty.  And those things were never

15   dealt with in anyway.

16      Q.   So you're saying she was traumatized because she

17   killed her husband?

18      A.   You bet.

19      Q.   Even though she did it herself?

20      A.   Yes.  Absolutely.

21      Q.   One of the things that you told us was that this

22   was a tougher jail, the Estrella jail.  But you don't know

23   how she got along in that other jail, do you?  Were you

24   there on a daily basis?

25      A.   No.

1      Q.   Did you see how she interacted with the other

2    inmates?

3      A.   No.

4      Q.   You don't know, for example, that she could be,

5    you know, like somebody that is a ring leader as opposed to

6    somebody who is a bully?

7      A.   Absolutely.

8      Q.   You claim she's easily manipulated by others.

9    You told us that, right?

10     A.   I think -- I think I characterized that a little

11   bit differently.  I think she can be gullible and naive.  I

12   think that's different than being easily manipulated.

13     Q.   Ma'am, I wrote it down.  You said, "She is easily

14   manipulated by other inmates."  Did you want to move away

15   from that now?  We'll move on.

16     A.   I would say gullible and naive.  I don't

17   want to -- I'm not trying to be difficult.  I just want to

18   be precise.  In certain circumstances she may be

19   manipulating but I'd say it's more gullible and naive with

20   regards to the way people present things to her.

21     Q.   Did you say, yes or no, she was easily

22   manipulated by other inmates?

23        MR. PATTERSON:  She's not required to say yes or

24   no.  She's explained her answer.

25        THE COURT:  Sustained.  Move on.

1       Q.   BY MR. MARTINEZ:   How do you know she was easily

2   manipulated in the Estrella jail?

3       A.   I couldn't speak to Estrella jail.  I don't have

4   enough information right now to give you anything but a

5   general overview.

6       Q.   One of the things that you told us was that

7   inmates lie.  Do you remember telling us that?

8       A.   Absolutely.

9       Q.   And then, on the other hand, you presented this

10  picture to us of the defendant that, in your view, does not

11  lie, correct?

12      A.   With regards to the things she told us about

13  other inmates, with regards to the information she gave

14  us.  I'm not going to tell you that Wendi never lies.  I

15  mean that's. . .

16      Q.   No.  No, you did indicate to us, didn't you, that

17  she never lied to the staff, wasn't deceptive, didn't you

18  tell us that?

19      A.   I told you she was not deceptive to staff when

20  she told us about other inmates, when she spoke with us.  I

21  don't, you know, she may have -- I would say that lying,

22  more than anything if there would be issues of lying, it

23  would be omission of information.

24      Q.   So what you're telling us is that she, based on

25  what you saw of her that year and based on the information

1   that she's provided, is that she's somebody that's

2   trustworthy to you, right, and that you admire.

3        A.   I would say that in most circumstances, my

4   experiences with her were that she was trustworthy and

5   there were behaviors that she engaged in that I found

6   admirable.

7             MR. MARTINEZ:  I don't have anything else.

8             THE COURT:  Mr. Patterson.

9

10                      REDIRECT EXAMINATION

11   BY MR. PATTERSON:

12        Q.   So we understand what you're telling us,

13   Ms. King, there's a number of items that are classified as

14   contraband in a jail setting?

15        A.   Correct.

16        Q.   Drugs.

17        A.   Correct.

18        Q.   Weapons?

19        A.   Yes.

20        Q.   I gather you're telling us in the continuum of

21   contraband what she was found with is on the lower end on

22   the continuum?

23        A.   Correct.

24        Q.   And she was sanctioned or penalized as a result

25   of having the contraband?

1    A.    Yes.

2    Q.    You said it was 30 days in -- what's the D pod?

3    A.    It was in the lower functioning female pod.  She

4    was on what's called "full restriction."  And that was

5    something the officers wrote up.  They could have chose to

6    put in a request for disciplinary segregation, lock down.

7    Q.    And it was appropriate for the circumstances?

8    A.    Yes.

9    Q.    That was a team decision?

10   A.    It was a team decision with the psychiatric staff

11   and we talked with the officers about it and they thought

12   it was appropriate as well.

13   Q.    So with regards to a team decision?

14   A.    Yes.

15   Q.    You mentioned that there was one guard that had a

16   negative impression or things to say about Wendi.  Was that

17   the only guard in that entire unit that had that position?

18   A.    To that degree, I would say.  One of the issues

19   was a number of the mental health staff felt that -- we

20   felt that it was important that Wendi stay on the unit

21   because we felt that she would benefit from being there.

22   Other officers who where there -- and this is not true with

23   regards to Wendi alone -- many times we have discussed

24   about who should stay and why they should stay.  Sometimes,

25   you know, some people feel that we should only have people

1  who are just completely screaming at the moon and strip

2  naked and that as soon as someone is willing to keep their

3  clothes on they should be shipped back to general

4  population.  So on the unit we have a population that's

5  very mixed.  It really depends on the population of inmates

6  at the time, who's working with whom, what the census is.

7  Depends on a lot of different things.  There's no bright

8  line into who should stay or who should go unless someone

9  is very predatory or is malingering or really, is really

10  making a lot of trouble.  But other than. . .

11     Q.   That wasn't Wendi?

12     A.   No, that wasn't Wendi.

13     Q.   She's not predatory or not malingering or

14  creating difficulties for the staff or other inmates?

15     A.   No.

16     Q.   So this one guard's negative perception is based

17  upon her belief that she should be sent to general

18  population?

19     A.   Correct.

20     Q.   Just so we're clear, essentially, you were

21  employed by the jail or were employed by the jail system

22  back at that time, right?

23     A.   I was employed with Correctional Health

24  Services.  I work within the county jail system.

25     Q.   You have no connection with the officers?

1      A.   No.

2      Q.   And we've not agreed to pay you anything for this

3   testimony?

4           MR. MARTINEZ:   Objection, beyond the scope.

5           THE COURT:   Overruled.

6           Answer the question.

7           THE WITNESS:   I haven't been offered anything,

8   yet.

9      Q.   BY MR. PATTERSON:   You've got a plane ticket to

10  Albuquerque?

11     A.   Yeah.

12     Q.   And lastly, do you know any of Wendi's immediate

13  family?  Are you friends with Alejo Ochoa or Donna Ochoa?

14     A.   I don't know any of those people.

15          MR. PATTERSON:   That's all I have, Your Honor.

16          THE COURT:   Are there any questions for the

17  witness from the jury?  If so, raise your hand.  No one

18  raised a hand.

19          May this witness be excused?

20          MR. MARTINEZ:   I need to review my notes.   Yes.

21          MR. PATTERSON:   Yes, Your Honor.

22          THE COURT:   You may step down.   Thank you.

23          MR. PATTERSON:   Call Dr. Perry.

24          THE COURT:   Please step up here.

25          (Witness sworn.)

1          THE COURT:  Have a seat on the witness stand.

2   Make yourself comfortable on the witness.  Please remember

3   to speak loudly and clearly so everyone can hear you.

4   Please wait until the question is completed before you

5   answer the question.  And please make sure to give a verbal

6   response.

7          Is that agreeable to you?

8          THE WITNESS:  Yes.

9          THE COURT:  Mr. Patterson, you may proceed.

10          MR. PATTERSON:  Thank you, Judge.

11

12                    GERALD PERRY,

13   called as a witness herein, having been first duly sworn,

14   was examined and testified as follows:

15

16                    DIRECT EXAMINATION

17   BY MR. PATTERSON:

18      Q.   Your name, sir?

19      A.   Dr. Gerald Perry.

20      Q.   P-e-r-r-y?

21      A.   That's correct.

22      Q.   And by whom are you employed?

23      A.   Correctional Health Services, Maricopa County.

24      Q.   How long you been with Correctional Health

25   Services?

1       A.    Since October of 2003.

2       Q.    What do you do at Correctional Health Services?

3       A.    I'm a clinical psychologist, the psych unit,

4   basically.  Clinical psychologist is charged with the

5   management of patient assessment, suicide treatment.

6       Q.    Tell us what you did prior to taking a position

7   with Correctional Health Services?

8       A.    Well, for the previous nine years I was in

9   private practice in Philadelphia.

10      Q.    What kind of private practice?

11      A.    General adult practice, specialized in eating

12  disorders, the rest of my practice was general practice for

13  adults.

14      Q.    What educational background do you have for your

15  profession?

16      A.    I have a Doctor of Psychology degree, clinical

17  psychologist from Hahnemann University, Bachelor's of

18  Science.  I went to Penn State University for two years

19  prior to that as a Psychology major.

20      Q.    Can you describe for me in general the

21  psychiatric unit at Durango, what that encompasses?

22      A.    Well, it's male and female.  There are four,

23  what's called "pods" with approximately, maybe 15 or so, 20

24  patients.  Two pods for males and two for females at

25  opposite ends of a large multipurpose room.  There is a

1    wooden area which to goes up to practically, well, probably

2    ten, 15 feet high separating the males and females.

3           And then there is an office area in the back with

4    different counseling offices and that's where the staff

5    works.

6      Q.   Okay.  Is there a second division made between

7    inmates based upon the functioning levels?

8      A.   Yes, somewhat.  There are pods for each males and

9    females and there is one pod usually for actually more

10   severely disturbed inmates and one for more stable inmates.

11     Q.   So is, at some point in time, did Wendi Andriano

12   become a person on your case load?

13     A.   Yes.  Wendi was admitted prior to my being hired

14   there from the general population by Dr. Garcia who had

15   been seeing her in an outpatient department when I came on

16   the D 2, inpatient unit.  I had picked up Wendi's case when

17   Dr. Hofford left, who was my predecessor.

18     Q.   Do you know the facts and circumstances that gave

19   rise to her winding up in the psychiatric unit at Durango?

20     A.   Yes.  I reviewed the chart and I also talked with

21   Dr. Garcia who sent her over and she had a pretty serious

22   suicide attempt while in the general population.  Had cut

23   an artery in her arm and lost significant amount of blood.

24   It was a very serious attempt.  She could have died if she

25   hadn't gotten treatment.

1       Q.    What kind of treatment was rendered for her?

2       A.    She was given medical treatment.  I believe she

3   was sent to the hospital and treated there.  Had sutures,

4   came back and was sent to the psychiatric unit for

5   observation and treatment.

6       Q.    When you acquired her as a patient on your case

7   load, what was your initial efforts in that with regard?

8   What do you do to become familiar with the patient and the

9   patient's needs?

10      A.    We assess and review the chart and talk with

11  Dr. Garcia.  I also met with Wendi and did the basic

12  admission evaluation where I went over her history and did

13  mental status examination and diagnosis and treatment plan.

14      Q.    Okay.  Let's take that incrementally.

15            What's a mental status evaluation?

16      A.    It's basically similar to what medical doctors do

17  which is called a "review of symptoms."  They look at your

18  eyes, your ears and throat and so forth, go through the

19  different parts of the body.  A mental status examination

20  is basically looking at a different area of cognitive and

21  emotional functioning, social functioning and so forth.

22      Q.    Okay.  Have you ever found her to be suffering

23  from a major mental illness?

24      A.    No.

25      Q.    And what -- give me, for example, if you will,

1   what a major mental illness would be?

2       A.   Well, probably the majority of the patients come

3   to a psychotic break with reality.   They don't understand

4   reality as we know it.   They're often paranoid,

5   delusional.   Many of them are hearing voices.   That would

6   be a major mental illness.   Schizophrenia or bipolar with

7   psychotic features.

8       Q.   Wendi didn't suffer from that kind of

9   symptomatology, as we speak today?

10      A.   That's correct.

11      Q.   But she did have a mental health issue?

12      A.   Yes.   The issues that are primarily a response to

13  her situation, the stress of being in general population,

14  the stress of the charge, the stress of being away from her

15  life as she knew it, and it just came to an abrupt kind of

16  ending.   In general population, when she made the suicide

17  attempt, the thing that concerned me was there was no

18  warning.   Usually people will threaten suicide, they will

19  talk about it and so forth and there is no mention of that

20  at all.   And she had been followed by both counseling from

21  the outside, who was coming in to see her on a regular

22  basis, and being followed by one of our counselors in

23  jail.   It happened so abruptly that I think that that

24  certainly concerned me.   She didn't really give a lot of

25  warning.   No signs.

1    Q.   And those that give warning, they're generally

2  less serious about the suicidal effort or can you draw any

3  kind of conclusion in that regard?

4    A.   Well, people that have serious suicides, or

5  suicide attempts, often do threaten suicide before that

6  incident.  It's not accurate that a lot of the people will

7  say, well, if you talk about it maybe you're not going to

8  do it.  That's not true.  People do do it.  But, the thing

9  that's concerning is that there was no barometer for the

10  amount of suicide potential that could exist at any given

11  time.

12    Q.   Okay.  So, I guess what I'm getting at, as a

13  potential you couldn't address it or deal with it or make

14  an effort to preclude its happening, is that what you're

15  telling us?

16    A.   In the sense, well, we did make, I mean, the

17  potential was there, the potential as I said it was for an

18  abrupt suicide attempt, without warning, which is why she

19  stayed on the psychiatric unit and why she was bunking with

20  a cell mate and at the time put on check.

21    Q.   What did you do, then, to help her deal with that

22  suicidal ideation?

23    A.   Well, it seems to have been what I would call a

24  "brittle response to stress" that she just had abruptly

25  took over.  What I had seen in her subsequent is not

1  something that she talked about or was even conscious of.

2  It was something that was on her mind afterwards.  So it's

3  really been much of an issue afterwards.  It is the

4  potential reason, more the issue than actually her talking

5  about it or anything.

6       Q.   What was your treatment methodology you employed

7  to assist her in that regard?

8       A.   I saw Wendi on a weekly basis and she was also

9  seen by a counselor, Ms. King, who I believe testified

10  earlier.  And she was also seen by a psychiatrist and put

11  on medication to help with depression and also with stress.

12       Q.   Okay.  And talk to me about her depression.  Is

13  there depression evident in her situation?

14       A.   I think Wendi has a degree of depression that is

15  not as obvious as it is for many people.  She tends to

16  smile, be pleasant, she's very cooperative and easy to work

17  with and seems to want to please people.  Yet, when I would

18  talk to her and ask her some very basic questions, she'd

19  often break into a stare while she was smiling.  So her

20  feelings are just under the surface beneath this kind of

21  pleasant smiling exterior.  She would cry very easily.

22       Q.   Is she on any medication currently?

23       A.   Yes.  I believe she's on Zoloft, Ativan and

24  Seroquel.

25       Q.   What is Zoloft?

1    A.   An antidepressant.  We have Ativan, which is

2  anxiety and Seroquel is also anxiety medication.   It's also

3  as sedative.

4    Q.   Seroquel is also a sleep aid?

5    A.   It can be used as such.  Such side effect is also

6  common side.

7    Q.   So describe to me Wendi, in terms of mental

8  personality.  Start with intelligence?

9    A.   I didn't test her intellectually but just in

10  getting to know her this past year I would say she's

11  probably above average.  She's articulate.  She's has a

12  good use of vocabulary.  She's able to understand fairly

13  complete sophisticated abstract concepts.

14    Q.   Was she cooperative with the folks in charge

15  there at the psych unit?

16    A.   She's always been cooperative with me and

17  cooperative with the staff that I know of.  She's, as I

18  said, she has a tendency to want to please people and

19  always basically smiling and pleasant.  She's very

20  amiable.

21    Q.   How does she deal with controversy or

22  confrontation?

23    A.   Wendi is not somebody who really deals well with

24  that.  She has or has had at least a passive response to

25  confrontation.  In the past she would often isolate or hold

1   back her feelings.  One of the things, in fact, we worked

2   on her with was learning assertiveness skills so she could

3   deal with confrontation.  The more direct manner would

4   escalate the situation.

5        Q.   And in that regard, what do you teach or counsel

6   with regard to development of assertiveness skills?

7        A.   Well, I don't know how far you want to go into

8   this.  I talked to about doing some assertiveness training

9   exercises with Wendi and I believe she did basically.

10  There's three responses.  There is an aggressive response,

11  passive response and assertive response, which most people

12  have to confrontation.  Assertive, would be to get your

13  point across without escalating the situation or be in any

14  way personally vindictive or damaging and she has a lack of

15  those skills.  First, she would tend to be very passive.

16       Q.   Seen in the jail setting assisting other inmates?

17       A.   Yes.

18       Q.   Tell me about that?

19       A.   Well, she's in the pod that is a more stable

20  pod.  And we nevertheless get people that are very fragile

21  emotionally.  We've had a gal in there who was pregnant and

22  away from her family and going through a lot of emotional

23  stress and she would often be emotionally comforting and

24  help every time to the degree that wasn't good for her.

25  She would say if she would withhold what she felt was more

1   support than enough, she would feel guilty.   No

2   assertiveness to be able to say no to people and not try to

3   meet everybody's needs.

4        Q.   Would she serve as intermediary, if you will,

5   between inmates who had problems but weren't capable of

6   voicing them to the staff and communicating their need with

7   Wendi and she would come to you folks and talk about other

8   inmates needs?

9        A.   Yes.   There were a few occasions where someone

10  had confided in her that they're feeling suicidal or were

11  cutting themselves surreptitiously and she would come to

12  staff and tell us so we could handle the situation.

13       Q.   Did you sense that she is doing that for her own

14  benefit?

15       A.   I had a sense that she was doing it because she

16  would feel guilty if she didn't do it.

17       Q.   If she failed to help these persons in their time

18  of need?

19       A.   Yeah, I think she just thought it was the right

20  thing to do.   I don't think she got anything back for it.

21       Q.   Any compensation?

22       A.   No.

23       Q.   Did you see Wendi assist in terms of clean up,

24  taking care of messy cell situations?

25       A.   Yeah.   Well, one of our rules is that the inmates

1   in there do clean their own pod and own cells.  She would

2   always take -- she's higher functioning than a lot of

3   people would be.  She often takes more of a lead for people

4   who need a little bit of help in structure.

5       Q.   Have you seen any growth and development in Wendi

6   from the point in time you first acquired her as your

7   patient to today?

8       A.   Yes, I have in terms of assertiveness.  We talked

9   about in terms of her not feeling guilty for having to meet

10  everybody's need.  I think she's grown with regard, of

11  course, she's been in jail for four years.  I haven't known

12  her prior.  My experience is limited to the last year.

13      Q.   What I mean is in the period of time you have had

14  contact with her as a patient, have you seen growth and

15  development?

16      A.   Yes, I have.

17      Q.   And educable in terms of accepts instruction and

18  building from it and applies what she's been given from

19  professionals like you?

20      A.   Yeah, she's become very receptive and motivated

21  to anything you presented to her.

22      Q.   Does she manifest any kind of naivete or

23  gullibility?

24      A.   Yeah, to some degree she does.  In fact, one of

25  the stressors for her being in the general population is

1  the majority of the people are repeat offenders who have

2  certain street-wise abilities that Wendi doesn't have.  I

3  think it was hard for her to maintain herself in general

4  population.  But you have to kind of be tough and you have

5  to not cry all of the time and so forth.  I think that it

6  was very difficulty for Wendi.  So that's another stressor

7  in the general population.

8      Q.    Okay.  Were you aware that she was caught with

9  contraband on one occasion?

10     A.    Yes.

11     Q.    Some cosmetics?

12     A.    Yes.

13     Q.    Where did that fall in the psychiatric unit?

14     A.    The contraband on the psychiatric unit is a

15  little bit more serious than it is in general population.

16  We have people who are suicidal.  The general population

17  people, with some compact mirrors, they don't abuse them

18  but in the psychiatric unit, that could be a weapon to help

19  have somebody hurt themselves.

20     Q.    Is that why she was sanctioned for possession

21  that contraband?

22     A.    Yes.

23     Q.    You were involved in that sanctioning decision?

24     A.    No, I don't get involved in that.  The detention

25  officers take care of that.

1       Q.   And, again, you are employed by the Correctional

2   Health Services people?

3       A.   That is correct.

4       Q.   Not employed by the Office of the Public

5   Defender?

6       A.   No.

7       Q.   And you have no expectation of being paid for

8   your testimony today?

9       A.   No.

10           MR. PATTERSON:  That's all I have, Judge.  Thank

11   you.

12           THE COURT:  Mr. Martinez.

13

14                   CROSS-EXAMINATION

15   BY MR. MARTINEZ:

16       Q.   This issue of the contraband, what contraband was

17   it?

18       A.   I believe -- I didn't see it directly but I think

19   I believe the officer said it was a lipstick and compact.

20       Q.   Anything else?

21       A.   No, that's all I'm aware of.

22       Q.   So it was just lipstick and compact?

23       A.   As far as I know.

24       Q.   You indicated that she was not street-wise and

25   that may have contributed to the problem she had in the

131

1   Estrella jail, correct?

2        A.   Yes, I think it increases the stress for her.

3        Q.   But you're not sure of that because you weren't

4   even on staff when she was there, correct?

5        A.   I didn't witness that directly, you're right.

6        Q.   And you don't know how she interacted with the

7   other people, do you?

8        A.   No, I don't.

9        Q.   In other words, she could have been the director

10  of, instead of the person that was, as you put it, bullied

11  around, right?

12       A.   I'm sorry?  I didn't hear you.

13       Q.   She could have been the person who actually was

14  doing the directing rather than her being bullied around,

15  right?

16       A.   It's not consistent with what I know of her.  But

17  as in anything else, I can't talk about what I didn't see.

18       Q.   You can't talk about what you don't know.  In

19  other words, you don't know what actually happened in the

20  Estrella jail, right?

21       A.   That's correct.

22       Q.   And when did you come over to CHS or Correctional

23  Health Services?

24       A.   Was in October of 2003.

25       Q.   Tell me about the suicide attempt.  Where did

1  it -- what was used as a implement?

2       A.   I believe it was a compact mirror had been

3  broken.

4       Q.   And that was used in the suicide attempt, right?

5       A.   Yes.

6       Q.   You know where on this compact mirror she used it

7  on herself?

8       A.   I believe it was on her arm, around the crack of

9  her forearm.

10       Q.   And could it have been somewhere else?

11       A.   No, I don't think so.  I think in that general

12  area.

13       Q.   And the crack of the forearm would be near the

14  elbow?

15       A.   Yeah.

16       Q.   And what kind of -- you indicated there was an

17  artery that was cut, I think?

18       A.   Well, I think the amount of blood that was lost

19  would have probably had to have been arterial.

20       Q.   But there was some blood loss.   You didn't see

21  the scene, right?

22       A.   No, I didn't.

23       Q.   You don't really know how much blood was lost,

24  right?

25       A.   Just what was in the chart.

1    Q.   Was there some indication in the chart that there

2    was blood, right?

3    A.   That's correct.

4    Q.   And after she cut herself with the compact, then,

5    she was taken over to Maricopa Medical Center, right?

6    A.   Yes.

7    Q.   And do you know what kind of treatment she

8    received, if anything?

9    A.   Well, I know she received sutures and I guess --

10   I don't know what else she received, no.

11   Q.   You tell us that this suicide attempt was that

12   she is suffering from stress, right?

13   A.   Yes.

14   Q.   And stress brought on by the charges, I believe

15   you indicated, right?

16   A.   Yes.

17   Q.   The stress brought on by being in the general

18   population, correct?

19   A.   Yes.

20   Q.   And being away from others in her family?

21   A.   Yes.

22   Q.   Then you indicated that once she is transferred

23   over to the psych pod -- see if I have it right -- it is

24   not on her mind any more but after it was done and she's in

25   the psych ward, I got the impression you said she was okay?

1    A.   No, I didn't say she was okay.  What I said was

2    that I didn't think that it was ongoing activity, part of

3    what she was thinking that she was intending to hurt

4    herself.

5    Q.   And from what I understand, it was an isolated

6    incident.  She did suffer some sort of -- she didn't suffer

7    major medical -- not medical.  She didn't have major mental

8    issues, correct?

9    A.   That's correct.

10   Q.   She suffered from, I guess, depression and

11   anxiety?

12   A.   Yes.

13   Q.   That would be fair?

14   A.   Yes, that's fair.

15   Q.   And there was some disagreement about whether she

16   should stay in the psych ward, wasn't there?

17   A.   Yes, there was.

18   Q.   Part of the reason she stayed there was that

19   people liked her, right?

20   A.   Well, I don't think that was -- I mean, people

21   did like her but that wasn't why she stayed.

22   Q.   I guess the impression from you and also from the

23   previous witness that she was a little bit of a favored

24   child.  In other words, she's best in the psych word; is

25   that true?

1    A.   She is the highest functioning, pleasant person

2  that we worked with there, yeah.

3    Q.   And highest.   You didn't test Wendi

4  intelligence.   Just from talking, you indicated whether or

5  not she was above average in intelligence?

6    A.   I would estimate that, yes.

7    Q.   You indicated that her emotions were right

8  underneath the surface, correct?

9    A.   That's correct.

10    Q.   And that if something was really traumatic then

11  they would come to the surface and she would begin to cry?

12    A.   It didn't even have to be traumatic.

13    Q.   So minor stuff, what you consider minor, that

14  would make her cry?

15    A.   If you asked how she was doing, she would cry

16  when she first come over.   I mean, it didn't take much.

17    Q.   How has she been later?

18    A.   Later she still tended to cry easily but not --

19  she wasn't quite as fragile in the sense as she was when

20  she first came in.

21    Q.   Would it still be minor stuff that she would cry

22  over?

23    A.   Not that minor as that example I gave, but, for

24  example, if I asked her, if she started talking about her

25  children, she would cry.

1    Q.   And you were there at the jail when you come on?

2    A.   I'm sorry?

3    Q.   When did you come on as head of CHS?

4    A.   No, no I'm just a clinical psychologist on the

5    inpatient unit.

6    Q.   Did you ever give her any tests or any MMPI or

7    anything like that?

8    A.   No.

9    Q.   That's because it wasn't called for, right?

10   A.   That's correct.

11         MR. MARTINEZ:  And I don't have any further

12   questions.

13         THE COURT:  Redirect.

14         MR. PATTERSON:  I have no further questions.

15         THE COURT:  May this witness be excused?

16         MR. MARTINEZ:  Yes, sir.

17         THE COURT:  No objection, Judge.

18         Mr. Patterson, you may call your next witness.

19         MR. PATTERSON:  Thank you, sir.

20         THE COURT:  Please step forward right here to the

21   clerk.  She will swear you in.

22         (Witness sworn.)

23         THE COURT:  Please have a seat on the witness

24   stand.  Please make yourself comfortable on the witness

25   stand.  Please remember to speak loudly and clearly so

1    everybody can hear.  Please wait until the question is

2    complete before you answer the question.  And please make

3    sure you give a verbal response.

4             Is that agreeable to you?

5         THE WITNESS:  Yes.

6         THE COURT:  Mr. Patterson, you may proceed.

7

8                  JOYCE VAN EVERY,

9    called as a witness herein, having been first duly sworn,

10   was examined and testified as follows:

11

12                 DIRECT EXAMINATION

13   BY MR. PATTERSON:

14        Q.   Would you introduce yourself, ma'am?

15        A.   I'm Joyce Van Every.

16        Q.   Would you spell your last name for us?  It's not

17   a common name like Smith.

18        A.   It's V-a-n, E-v-e-r-y.

19        Q.   By whom are you employed?

20        A.   Maricopa County.

21        Q.   And in what capacity do you work for them?

22        A.   Lead nurse at Durango psychiatric unit.

23        Q.   And how long have you been a person in that job?

24        A.   Well, I've been with Correctional Health for two

25   and a half years.  I've been the lead nurse at Durango unit

1  since January of this year.

2      Q.    What qualifies you to serve as nurse in Durango

3  psych facility?

4      A.    Well, I have B.S. in Nursing.  I have 25 years of

5  psychiatric experience.

6      Q.    Tell me a little bit about your work in the

7  psychiatric nursing business?

8      A.    I started out at Eastern State Hospital in

9  Oklahoma.  I went to another in Missouri.  I worked a

10  32-bed psychiatric unit.  Then I went to a 125 bed

11  psychiatric unit in Oklahoma.  Then I worked eight years in

12  the state hospital here in Arizona.  I worked one year at

13  Perryville State prison, psychiatric nurse.  I was

14  assistant director of nursing in Tennessee.  I then ended

15  up in Correctional Health.

16      Q.    What do you do as a lead nurse at the Durango

17  psych facility?

18      A.    Well, I do scheduling.  I do payroll.  I also

19  have a patient load that I see.  I assist the doctors, both

20  medical and psychological.  Take care of emergencies, man

21  downs.  I do a little bit of everything.

22      Q.    Tell us about the facility there at the Durango

23  jail, the psych unit?

24      A.    The psychiatric unit is known as, we're kind of

25  the kinder, gentler psychiatric unit of the jail.  We do

1 have all female prisoners. There are four pods A, B, C and
2 D. The A, B pods are the males. All males start out in A
3 pod and progress. As they get stable, they go to B pod.
4 The females start on D pod and as they progress they go to
5 C pod.
6     Q. Okay. What then -- well, let's go on then. Is
7 there a patient on your case load or patient load by the
8 name of Wendi Andriano?
9     A. Yes, sir.
10     Q. And it's the lady seated behind me?
11     A. Yet.
12     Q. When did you first acquire Wendi on the patient
13 case load?
14     A. January of this year.
15     Q. When you came on?
16     A. Yes.
17     Q. And what do you do on a daily basis with Wendi
18 Andriano?
19     A. I see her every day that I'm there. Check with
20 her, see how she's doing. At least once a week I sit down
21 with her, have what we call a one-to-one talk about what's
22 going on. How is the medication. How is she feeling.
23     Q. Let's talk, start with the medication, what
24 medication is she currently taking?
25     A. She's taking an antidepressant, Seroquel, and

1    Ativan, antianxiety, and Zoloft.

2        Q.   What exactly is Zoloft?

3        A.   It is a pill to help with the depression.   You

4    have to take it for a while before it helps the depression

5    symptoms.   It doesn't alleviate the depression just helps

6    you kind of manage the depression.

7        Q.   Just deal with it?

8        A.   Yes.

9        Q.   All right.   How about Seroquel?

10       A.   Seroquel has got stronger effects.   It can help

11   calm racing thoughts.   And in Wendi's case, that's probably

12   for what it was used for.

13       Q.   And Ativan?

14       A.   Ativan is antianxiety.

15       Q.   And this group of medications are generally

16   administered to what kinds of a patient?

17       A.   Psychiatric patients.

18       Q.   And patients that manifest certain kinds of

19   symptomatology need some medication, are designed to deal

20   with?

21       A.   Symptoms of depression, symptoms os anxiety, such

22   as crying, sleeplessness, unable to cope.

23       Q.   Have you talked with Wendi at times about her

24   husband, Joe?

25       A.   Yes, I have.

1    Q.   What is her demeanor and her attitude when you

2  talk about Joe?

3    A.   Wendi has been very tearful, has been very

4  depressed.  She would cry during the interview at times.

5    Q.   Did she ever blame Joe for her circumstance?

6    A.   No, sir.

7    Q.   Did you talk about her children?

8    A.   Yes.

9    Q.   What kind of emotional response did you observe

10  at that time?

11    A.   Wendi was extremely emotional about her

12  children.  I've seen her when it was her kids' birthdays

13  and she was crying, very distraught, you know.  This is

14  another birthday she had missed, another passing.

15    Q.   Did she talk to you about Joe's cancer?

16    A.   Yes, sir, she did.

17    Q.   What did she talk about in that regard?

18    A.   We talked about people with cancer.  Having to

19  live with people with chronic illnesses and how difficult

20  that can be.  At the time, she said Joe had talked about

21  suicide.  We talked about that that was common with people

22  with chronic illnesses.  Just how hopeless she felt.

23    Q.   Okay.  Did she feel that helpless in the sense

24  she couldn't help him with his situation?

25    A.   Yes.  She said it was very hard to watch somebody

1   in that situation.

2        Q.   Talk to me about Wendi's interaction with other

3   inmates there at the psych facility.   What did you observe

4   in that regard?

5        A.   Wendi has been almost a model inmate.   She is in

6   C pod.   She attends groups when they are given.   She has

7   acted as a baby-sitter, for lack of a better word, for

8   people that have been suicidal.   We need somebody to kind

9   of watch them besides the staff, somebody that is there all

10  the time.

11            She can be kind of naive about inmates.   She had

12  some problems.   We had a couple of inmates that came in and

13  told us they were pregnant.   And Wendi give away her

14  blanket and gave away food.   And was kind of babying them

15  and they turned out not to be pregnant.   Staff knew that,

16  but you can't break confidentiality.

17       Q.   Is that part of what motivates Wendi is to be

18  helpful in assisting other persons?

19       A.   What I saw with Wendi was she tries to be helpful

20  and she alerts us to problems on the unit with other

21  inmates.   If she notices a change in a peer's behavior, she

22  would tell us about that.   She had a real tendency to

23  mother patients.

24       Q.   Did she receive any benefit from staff, extra

25  commissary, that kind of thing as a result of her

1   assistance to staff?

2       A.   Staff can't do that.

3       Q.   Okay.  The answer?

4       A.   No.

5       Q.   Did Wendi suffer from any serious mental

6   disorder?

7       A.   Are you talking about schizophrenia?

8       Q.   Yeah.

9       A.   Not to my knowledge.

10      Q.   Nothing in the chart?

11      A.   I have seen her depressed.  I have seen her

12  anxious.  And I believe she was diagnosed of that.

13      Q.   Okay.  Would you use the term "naive" to describe

14  Wendi's behaviors?

15      A.   Yes.

16      Q.   Tell me about that.

17      A.   Just she seemed to fall for any sob story.  After

18  you work in the jail for a while, you have repeat offenders

19  that come in almost on a routine basis.  They would tell

20  Wendi, you know, their boyfriend had left her or, you know,

21  like having a baby.  And Wendi would kind of fall for the

22  story.  Like I said, she tended to baby them.  Would gave

23  them extra food.  Food is a very precious item in jail and

24  to share food is very rare.  That's not something that

25  usually you do.  You usually keep your food for yourself.

1  An extra blanket is like gold.  You get one blanket, one

2  sheet.  And if you have an extra blanket, it has to be for

3  a medical condition that you have.  For Wendi to give her

4  blanket up was something special.

5        MR. PATTERSON:  Thank you, Judge, I have nothing

6  additional.

7        THE COURT:  Mr. Martinez.

8

9                    CROSS-EXAMINATION

10 MR. MARTINEZ:

11     Q.   You think the defendant is something special?

12     A.   I think her behavior at times was special, yes.

13     Q.   But aren't we also talking, in the grand scheme

14 of things, she's special to you, right?

15     A.   No.  I said part of her behavior was special in

16 the context that it was something that was not usually done

17 in jail.

18     Q.   And she -- actually, there was a dispute about

19 whether she should be in that psychiatric unit, right?

20     A.   With who?

21     Q.   Amongst the staff?

22     A.   Some felt she should be back in general

23 population.  Others felt not.  As far as I know, there was

24 some detention officers that felt that she should be in

25 general population.  But detention officers do not usually

1   have a say in who stays on the psychiatric unit.

2        Q.   Do you know who Dr. Gerald Perry is?

3        A.   Yes, sir.

4        Q.   Does he work at the same unit that you do?

5        A.   Yes, sir.

6        Q.   Is he privy to generally the same things that you

7   are?

8        A.   Yes, sir.

9        Q.   You indicate that, well, she alerts you as to

10   other inmates, she tells you things about other inmates,

11   right?

12        A.   Yes, sir.

13        Q.   And you said that she didn't receive any benefit

14   for it, right?

15        A.   Not to my knowledge.

16        Q.   She was allowed to stay in the unit, wasn't she?

17        A.   That's because of her condition.  That's not

18   because of her information.

19        Q.   And her condition was that she's anxious and

20   depressed, right?

21        A.   Yes, sir.

22        Q.   Are you familiar -- you work, right?

23        A.   Yes, sir.

24        Q.   People that have a job, they get anxious, don't

25   they?

146

1    A.    Sometimes people do.

2    Q.    If they're in trial they get depressed if they

3    lose, don't they?

4    A.    Usually.

5    Q.    They get anxious when the case is in the middle

6    of it, right?

7    A.    I would think so.

8    Q.    That's what she was suffering from, wasn't it?

9    A.    No, sir.

10   Q.    Something more than that, according to you?

11   A.    Yes, I guess some traumatic event.

12   Q.    The traumatic event was the death of -- not the

13   killing of her husband -- but the death of her husband?

14   A.    I'm never privy -- I'm going on what I know.

15   Q.    You told us she told you that he committed

16   suicide, didn't you tell us that?

17   A.    No, I said he contemplated suicide.

18   Q.    She never told you that he actually carried that

19   out?

20   A.    No, sir.

21   Q.    Indicated that she was tearful during some of the

22   interviews, right?

23   A.    Yes, sir.

24   Q.    Except when talking about the kids, right?

25   A.    Yes.

1      Q.   And specifically about the birth dates, right?

2      A.   Yes.

3      Q.   Do you know that when the daughter, Ashley, was

4   two years old this defendant refused even to give a

5   birthday party because it was no big deal, Ashley wouldn't

6   even remember.  Did she tell you about that?

7      A.   No, sir.

8      Q.   You didn't do any tests on the defendant either,

9   did you?

10      A.   I'm a nurse.

11      Q.   Right.  But the question is: You didn't do any

12   tests, did you?

13      A.   No.

14      Q.   And are you aware of any tests that was done?

15      A.   No, sir.

16      Q.   Are your notes kept?

17      A.   The progress notes.

18      Q.   You've been contacted by someone at the Maricopa

19   County Attorney's Office about this case, weren't you?

20      A.   Yes, sir.

21      Q.   And did you tell all these things that you have

22   told us now?

23      A.   I answered their questions.

24      Q.   Did you say that you told them that she is

25   helpful and that you couldn't tell us any more.  Is that

1   not what you said?

2        A.    No, they sat there and they asked if I remember

3   what her behavior was on the unit.   I said that I knew she

4   was a good inmate.   They said was there anything negative

5   and I said not to my knowledge.

6        Q.    And they asked you for notes, didn't they?

7        A.    No, sir, they did not.

8        Q.    And you have any idea are you -- you prepare

9   notes, right?

10       A.    Excuse me.

11       Q.    When you treated or spoke with the defendant, you

12   prepared notes, right?

13       A.    No.

14       Q.    So you never wrote any notes down anywhere?

15       A.    Are you talking about in the chart?

16       Q.    Yes, in the chart?

17       A.    Oh, yeah.   Those notes were kept in the chart.

18       Q.    Where is the chart kept on the unit and who has

19   access to it?

20       A.    The staff.

21       Q.    Do you know whether or not it's been copied to be

22   provided to the lawyers?

23       A.    I know that the defense attorneys or actually I

24   take that back.   Scott McCloud did ask for a copy of the

25   chart.

149

1    Q.    That's with the defense attorneys, right?

2    A.    Yes.

3    Q.    Do you know when those were turned over to them?

4    A.    I believe he got them today.

5    Q.    Did you ever speak to Mr. Patterson about this or

6    just to Scott?

7    A.    No, I did not speak to Mr. Patterson.

8    Q.    One of the things you also told us is that she is

9    naive, the defendant was naive, right?

10    A.    I felt she was.

11    Q.    And that's based on your observation, talking to

12    her, right?

13    A.    And her behavior.

14    Q.    And that was from January of this year until now,

15    right?

16    A.    Approximately.

17    Q.    Approximately a year, correct?

18    A.    Yes.

19    Q.    Did she ever -- so what you're telling us based

20    on what happened, you spoke to her, you're basically

21    telling us that if she did some special things that you

22    believed what she told you, right?

23    A.    What Wendi told me about other inmates I found to

24    be true.  So, yes, in that sense, I found her to be

25    truthful.

000008627

1     Q.   And people that tell on inmates, they call them

2  "snitches" don't they?

3     A.   Depends if someone's life is in jeopardy and you

4  tell somebody.  I don't call that snitching, no, sir.

5     Q.   One time she would come to talk to you would be

6  when somebody was contemplating suicide, right?

7     A.   Or were taking elicit drugs.

8     Q.   In other words, the other inmate was using

9  drugs?

10     A.   Yes, sir.

11     Q.   That's kind of like snitching, isn't it?

12     A.   I don't consider that snitching, I'm sorry.

13     Q.   Well, she was telling on someone using drugs,

14  isn't that what you just said?

15     A.   Yes.

16          MR. MARTINEZ:  I don't have anything else.

17          MR. PATTERSON:  That's all I have, Judge.  Thank

18  you.

19          THE COURT:  Any further questions of the witness

20  by the jury?  If so please raise your hand.  No one raised

21  their hand.

22          May this witness be excused?

23          MR. MARTINEZ:  Yes, sir.

24          MR. PATTERSON:  Yes, sir.

25          That's all the witnesses I have today.

1           THE COURT:  We are taking the evening recess at

2     this time.  During the recess, remember the entire

3     admonition I have given you including you are not to

4     discuss the case with anyone.  Don't let anyone discuss the

5     case with you.  Do not do any research, investigation,

6     experimentation or testing on your own.  Avoid any and all

7     media coverage.  Keep an open mind.

8           Have a nice evening and we'll see you tomorrow at

9     one p.m.

10          (Jurors exited.)

11          THE COURT:  Please be seated.  This is Cause

12    Number CR2000-096032, State of Arizona versus Wendi

13    Elizabeth Andriano.

14          The record will reflect the presence of the

15    defendant and counsel.  We're outside the presence of the

16    jury.

17          Just a reminder, make sure that we have enough

18    witnesses to fill up the entire time tomorrow.  We don't

19    want to run short.

20          MR. PATTERSON:  Yes, Judge.

21          THE COURT:  Have a nice evening.  See everyone

22    tomorrow at 1 p.m.

23          (Proceedings adjourned.)

24

25

EXHIBIT ZZ

000008630

05-0002
Braccio



IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,           )
                            )
            Plaintiff,      )
                            )
    vs.                     )      No. CR2000-096032
                            )          CR05 0005-AP
WENDI ELIZABETH ANDRIANO,   )
                            )
            Defendant.      )
_____)

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 9, 2004

<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

```
 1

 2

 3                    A P P E A R A N C E S

 4

 5

 6

 7        For the State:

 8                        Mr. Juan M. Martinez

 9                        Deputy County Attorney

10

11

12

13

14        For the Defense:

15                        Mr. Daniel B. Patterson

16                        Mr. G. David Delozier, Jr.

17                        Office of the Public Defender

18

19

20

21

22

23

24

25
```

3

1

2

3                          I N D E X

4    WITNESSES:                                        PAGE

5

6      CHRIS VARGAS

7        Direct Examination by Mr. Martinez            6

8        Cross-Examination by Mr. Martinez             13

9

10     JIMMY GALYON

11       Direct Examination by Mr. Delozier            24

12       Cross-Examination by Mr. Martinez             29

13       Redirect Examination by Mr. Delozier          34

14

15     LINDA GALYON

16       Direct Examination by Mr. Delozier            36

17       Cross-Examination by Mr. Martinez             43

18       Redirect Examination By Mr. Delozier          45

19

20     SHARON MURPHY

21       Direct Examination by Mr. Patterson           47

22       Cross-Examination by Mr. Martinez             67

23       Redirect Examination by Mr. Patterson         82

24

25

4

1

2

3                                    I N D E X (Continued)

4    WITNESSES:                                                      PAGE

5

6       DONNA OCHOA

7          Direct Examination by Mr. Delozier                        85

8          Cross-Examination by Mr. Martinez                         116

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

```
1                    P R O C E E D I N G S

2

3            THE COURT:  This is Cause Number CR2000-096032,

4    State of Arizona versus Wendi Elizabeth Andriano.

5            The record will reflect the presence of the

6    defendant, counsel and the jury.

7            Mr. Delozier.

8            MR. DELOZIER:  Thank you, Your Honor.

9            THE COURT:  Please step forward up here.  Please

10   give the clerk your name and she will swear you in.

11           (Witness sworn.)

12           THE COURT:   Please have a seat on the witness

13   stand.  Please make yourself comfortable.  Pull the

14   microphone close to you.  Please speak loudly and clearly.

15   Also, please wait until the question is complete before you

16   answer the question.  And please make sure that you give a

17   verbal answer.

18           Is that agreeable, sir?

19           Mr. Delozier, you may proceed.

20           MR. DELOZIER:  Thank you, Your Honor.

21

22

23

24

25
```

1          CHRIS VARGAS,

2    called as a witness herein, having been first duly sworn,

3    was examined and testified as follows:

4

5                DIRECT EXAMINATION

6    BY MR. DELOZIER:

7        Q.    Please state your name?

8        A.    Chris Vargas.

9        Q.    What do you do, Mr. Vargas?

10       A.    Chief deputy with Penal County Sheriff's Office.

11       Q.    How long have you had that position?

12       A.    Four years.

13       Q.    What did you do before you became chief deputy of

14   the sheriff's office?

15       A.    Spent about two years working in a justice court

16   of Pinal County and prior to that I was a police officer,

17   police lieutenant for Casa Grande police for 20 years.

18       Q.    Police lieutenant for the Casa Grande police?

19       A.    Yes.

20       Q.    That's the city?

21       A.    Yes, sir.

22       Q.    Are you familiar with the Achoa family, Donna,

23   Alejo and Wendi?

24       A.    Yes, I am.

25       Q.    When did you meet them?

8

1    A.    About 1978.

2    Q.    And what kind of relationship did you have from

3    '78  forward?

4    A.    I met them when I first started going to 91st

5    Psalm Church in Casa Grande.  They were one of the few

6    people I met and became good friends with.

7    Q.    How would you describe your relationship with

8    them?

9    A.    With Donna and Alejo.

10   Q.    Yes?

11   A.    Very close relationship.  I was a new Christian

12   at the time and they played a large role in my, I guess, my

13   Christian upbringing or my Christian walk as far as

14   applying the Bible to my life.

15   Q.    And how about Wendi, when did you first meet her?

16   A.    Same time, about.  She was about eight years old.

17   Q.    And did you have a relationship with Wendi?

18   A.    Just with minor interaction with her parents.

19   There were different church activities I would have contact

20   with her like in children's church.  I played a part

21   there.  She'd be in children's church and I would see her

22   there during activities at the church.

23   Q.    Was there a point in time that you stopped having

24   a day-to-day relationship with them, or a week-to-week

25   relationship with the family?

1      A.   Yes.  Probably around, I want to say

2   approximately '86 and '87 and I stopped going to, well,

3   then it changed names, change to a different pastor,

4   Harvest Family Church.   I stopped attending and attended

5   another church.

6      Q.   So you didn't see them as often after that?

7      A.   Not nearly as often, no.

8      Q.   Were you able to have any chance to observe Wendi

9   during these school -- this school was associated with the

10   church, right?

11      A.   Yes.

12      Q.   And did you have any contact with Wendi through

13   the school activities?

14      A.   Every now and then I'd come in the role as a

15   police officer.   The school principal would ask me to bring

16   my police car and give a talk to the children.   And my

17   children attended the same school.   And I would come and I

18   would see Wendi, how she interacts with the kids and

19   teacher.

20      Q.   What did you see?

21      A.   Very sweet, pleasant young lady, young child.

22   She was very, you know, very happy.   Kind of, I perceived

23   her as kind of laid back or kind of passive, I guess, not

24   really an aggressive-type of a person.

25      Q.   Now, you said '86 so she would be about 16 by

1    that time?

2         A.   I assume so, yes.

3         Q.   And did you see her during these teen years, any

4    impression change from this young person at eight years

5    old?

6         A.   No.  The only time I knew her was from the time I

7    started with the church and I left the church.  And a few

8    years after that I would have contact with her, she seemed

9    the same person to me.

10        Q.   So would you just describe her as meek?

11        A.   Yeah, kind of meek.

12        Q.   Passive?

13        A.   Passive, yes.

14        Q.   Introverted?

15        A.   Not bad but yeah.

16        Q.   Violent?

17        A.   No, never.

18        Q.   You're aware of the proceedings in the court,

19   aren't you?

20        A.   Yes, sir.

21        Q.   Did you find anything unusual about the charge

22   and conviction?

23             MR. MARTINEZ:  Objection.  Lack of foundation.

24   That's the province of the jurors.

25             THE COURT:  Sustained.

1          Rephrase the question.

2          Q.   BY MR. DELOZIER:  Would you consider the kind of

3     thing Wendi's been convicted of out of character for her?

4               MR. MARTINEZ:  Objection.  Lack of foundation.

5     He doesn't know her after he left in 1986.  So how does he

6     know.

7               THE COURT:  Lay some foundation.

8          Q.   BY MR. DELOZIER:  Based on the knowledge you had

9     up until the time you stopped seeing her, approximately

10    when was the last time you saw her?

11         A.   The last time I saw her, I've seen her probably

12    early '90s.  I've had contact with her on and off probably,

13    well, up to around, oh, the more I think about it, the

14    early '90s.

15         Q.   Early '90s?

16         A.   Yes.

17         Q.   Based on the knowledge you had of her during the

18    time you did know her up in the early '90s, do you find

19    this conviction uncharacteristic of the Wendi you knew?

20         A.   Yes, I do.

21         Q.   Did you consider Wendi a friend?

22         A.   Yes, I did.

23         Q.   Okay.  And if you were given the opportunity,

24    would you like to renew that friendship?

25         A.   Oh, yeah.  And when circumstances present itself

1   that you come -- you leave friendships or fall away from

2   friendships, it's always nice to reacquaint yourself with

3   old fiends that you know.

4       Q.   You know the Ochoa family, as you said.   What

5   kind of impact do you think this circumstance is going to

6   have on the Ochoa family?

7           MR. MARTINEZ:   Objection.   Lack of foundation.

8   He hasn't had any contact.

9           THE COURT:   Lay some more foundation.

10      Q.   BY MR. DELOZIER:   Based on your knowledge and

11  experience of the family from 1978 through the early part

12  of 1991, do you have an opinion about what kind of impact

13  that might have on the family?

14      A.   When it comes to my contact with

15  Mr. and Mrs. Ochoa, I probably have contact with them ail

16  the way up to now, on and off.   Maybe once a month I run

17  into them at the stores, stop and talk to them and interact

18  with them.   So based on that, I think they would be

19  devastated by the loss of a daughter by however which

20  means.

21      Q.   Do you have any reason to believe, based on your

22  background and knowledge of Wendi, that she'd be a threat

23  to the community?

24          MR. MARTINEZ:   Objection.   Lack of foundation.

25  He doesn't know.

1       THE COURT:  Overruled.

2       Answer the question if you can.

3       THE WITNESS:  I don't think she's a threat to the

4  community, no.

5       Q.   BY MR. DELOZIER:  If she were an inmate, would

6  you have any concern about there being a threat to the

7  inmate population based on your experience?

8       A.   None, whatsoever.

9       Q.   Do you have an opinion about that fellow inmates

10  may be benefited by her being there?

11       MR. MARTINEZ:  Objection.  Lack of foundation.

12       THE COURT:  I'll sustain the objection.

13       MR. DELOZIER:  That's all for now, Your Honor.

14  Thank you.

15       THE COURT:  Mr. Martinez.

16

17                    CROSS-EXAMINATION

18  BY MR. MARTINEZ:

19       Q.   You indicated that in your view what happened

20  here was uncharacteristic.  Remember telling us that?

21       A.   Yes, sir.

22       Q.   How about having affairs?  Was that

23  uncharacteristic of her?  Do you know that she did that?

24       A.   I have no knowledge of that.

25       Q.   Would that also be uncharacteristic of her?

1      A.    I believe so.

2      Q.    How about lying?  Would that be uncharacteristic

3  of her?

4      A.    Yes.

5      Q.    And this opinion that you've given us, actually,

6  is based on your knowing her from 1978 to about 1986,

7  correct?

8      A.    I'm sorry?

9      Q.    The opinions that you rendered here will largely

10  be based on your having contact with her between 1978 and

11  1986, correct?

12      A.    Not totally.  I've had contact with her after

13  1986.  I just didn't remember contact with her after 1986.

14      Q.    Okay.  The contact that you had after 1986 was

15  sporadic, wasn't it?

16      A.    Yes.

17      Q.    Do you know where she was working in 19 -- let's

18  say '95?

19      A.    I know one time in early 90s.

20      Q.    No, 1995?

21      A.    No, I don't.

22      Q.    Do you know where she was working in 1998?

23      A.    No.

24      Q.    Do you know when the children were born?

25      A.    No.

15

1    Q.  Did you attend her wedding?

2    A.  No.

3    Q.  Did you ever come over to her house for dinner

4  when she and Joe were married -- when she and Joe were

5  still together?

6    A.  No, sir.

7    Q.  Is it fair to say you had the bulk of the contact

8  with her from 1978 to 1986, correct?

9    A.  That would be correct.

10   Q.  And one of the things I think that you indicated

11 to us was that she was part of the church you attended, you

12 were a member of, correct?

13   A.  Correct.

14   Q.  And did you leave the church in 1987?

15   A.  '86, '87.

16   Q.  That's when you sort of didn't see her on that

17 frequent of a basis, then?

18   A.  Yes.

19   Q.  And you also indicated that you had contact with

20 her in the children's church, you saw her during the

21 activities that they had, right?

22   A.  Yes.

23   Q.  Was it in a school setting that you saw her

24 during that period of time between '78 and '96?

25   A.  School setting, church activities setting.  I saw

16

1   her in her own home.  I would frequently be invited over to

2   her home for dinner and I would see her interact in the

3   home setting.

4        Q.   Now, with regard to the church setting, did they

5   teach her there to lie?

6        A.   No, sir.

7        Q.   Did they teach her there to cheat on her husband?

8        A.   Absolutely not.

9        Q.   In fact, it's just the opposite, didn't they?

10       A.   Yes.

11       Q.   And did they teach her to kill?

12       A.   No, sir.

13       Q.   In fact, they teach just the opposite, right?

14       A.   Yes, sir.

15       Q.   And, in fact, if there's a problem, they teach

16   her that there is a place to go to or at least talk to

17   somebody before you take matters into your own hands,

18   right?

19       A.   I would believe so, yes.

20       Q.   And you indicated that with regards to her, that

21   she's not a violent individual.  Do you remember telling us

22   that?

23       A.   I never seen acts of violence out of her, no.

24       Q.   Let me ask you about what you would consider

25   violent or not.  How about an individual who poisons her

1   husband and after about an hour and a half of suffering she

2   takes a stool and hits him 23 times over the head while

3   he's helpless.

4           Do you consider that to be violent?

5   A.   Yes, sir, I do.

6   Q.   How about while he's down there in that same

7   position and unable to defend himself, she's hitting him so

8   that his head rubs up against the carpet, creating carpet

9   burns on his face.

10          Do you consider that violent?

11  A.   Yes, I do.

12  Q.   How about, then, while he's again in the same

13  position, hitting him over the head with a lamp and

14  breaking the lamp.

15          Do you consider that violent?

16  A.   Yes, sir.

17  Q.   How about when he's incapacitated, taking a

18  knife, sticking it in his neck and then wrenching it so the

19  hole is about the size of my hand.

20          Do you consider that violent?

21  A.   Yes, sir.

22  Q.   You indicated that you don't believe that she's a

23  threat to the community, correct?

24  A.   That's correct.

25  Q.   But, would it be fair to say that you don't

1  really know everything about her, starting, let's say about

2  1987, 1988 because you only had sporadic contact with her,

3  right?

4      A.   I wouldn't base it on 1986.  I think my contact

5  with her in the '90s, I think if she had any character

6  changes in her life, I think that I would pick up on that.

7      Q.   But you only saw her, for example, I think you

8  said at the store, places like that, right?

9      A.   Yes, sir.

10      Q.   You would only run into her here and there,

11  right?

12      A.   Yes.

13      Q.   You never had dinner with her, right?

14      A.   No.

15      Q.   You never talked to her about her relationships,

16  right?

17      A.   I talked to her about her relationships.

18      Q.   In 1990?

19      A.   Earlier '90s.  I asked her how she was doing,

20  what her life was about.

21      Q.   Who was she dating in 1991?

22      A.   I don't recall.  That was a long time ago.

23      Q.   Who was she dating in 1998?

24      A.   I don't recall.

25      Q.   Do you know the names of her kids?

1    A.   No, sir.

2    Q.   Do you know how many kids she had?

3    A.   No, sir.

4    Q.   One of the things that your name was brought up

5   in connection with this case, you never served as a

6   security guard for Quail Garden Apartments, did you?

7    A.   Yes.

8    Q.   You did?

9    A.   I worked there while I was with the Casa Grande

10  Police Department.  I worked -- they gave me an apartment

11  in exchange for doing extra security for them.

12   Q.   And when you were at the Quail Garden Apartments

13  you never remember being called over to Wendi Ochoa's

14  apartment, do you?

15   A.   I don't recall that.

16   Q.   You never remember -- When you say you don't

17  recall, you're sort of leaving it open.

18       As you sit here today, you don't recall ever

19  being called over to her apartment, do you?

20   A.   I don't recall that, no.

21   Q.   You did work for the Casa Grande Police

22  Department back then, did you?

23   A.   Yes, sir.

24   Q.   You're familiar with the report writing abilities

25  or requirements, right?

1    A.    Yes, sir.

2    Q.    If there was a call, for example, and somebody

3    makes a call and the person is there, you write that --

4    it's required that they write the name of the person who

5    actually made the call and is there, right?

6    A.    They should, yes.

7    Q.    That's procedure, right?

8    A.    Yes.

9    Q.    They wouldn't leave out the name of the person

10   who actually made the call and saw the crime happen, would

11   they?

12   A.    Can you repeat that?

13   Q.    If the police officer responded and somebody says

14   I saw x do whatever it was they saw, that would be

15   important to put in the report, right?

16   A.    Yes.

17   Q.    And that would be something that would be

18   included, right?

19   A.    Yes.

20   Q.    And it's something that is taught to the police

21   officers that they put important things in the report,

22   right?

23   A.    That's correct.

24   Q.    We read a report from 1991, November of 1991 in

25   which the defendant was involved in an incident.  Do you

1   know anything about that?

2      A.   No.

3      Q.   Your name's not mentioned anywhere in there.

4   Would that be an indication to you that you didn't have

5   anything to do with that report?

6      A.   Not necessarily.

7      Q.   So I just thought you told me that if a person is

8   a reporting person that the officers that are trained with

9   the Casa Grande Police Department, usually write a name

10  down?

11     A.   Usually.  That doesn't mean it always happens.

12     Q.   You're saying if a police officer left that out,

13  that he was, at that point, incompetent?

14     A.   No, sir, I'm not saying that.

15     Q.   You did say that you were a lieutenant with them,

16  right?

17     A.   Yes, sir.

18     Q.   There are classes that they take, right?

19     A.   Yes, sir.

20     Q.   And one of the things they're told in these

21  classes is that if there's a report and somebody saw

22  something, you get the name, right?

23     A.   Yes, sir.

24     Q.   Their social security number?

25     A.   Yes, sir.

1      Q.    And their date of birth, right?

2      A.    That's correct.

3      Q.    Because if charges are going to be filed later

4 those are the people that come in as eyewitnesses, right?

5      A.    That's correct.

6      Q.    And people's memory have a tendency to fade,

7 right?

8      A.    Yes.

9      Q.    Just like your's faded when I asked you about

10 something in the past, right?

11      A.    Absolutely.

12      Q.    And the reports are used to refresh recollection,

13 correct?

14      A.    That's correct.

15      Q.    And if the report doesn't include their name, and

16 knowing the background and experience that you have, it

17 would be a better chance that you weren't there than that

18 the officer committed negligence, right?

19            MR. DELOZIER:  Your Honor, this is largely

20 irrelevant.  Where is he going with it?

21            THE COURT:  Sustained.

22            Move on.

23      Q.    BY MR. MARTINEZ:  Do you ever remember meeting

24 Shawn King at the Gail Garden Apartments?

25      A.    No.

1          MR. MARTINEZ:  I don't have anything else.

2          THE COURT:  Redirect.

3          MR. DELOZIER:  I don't have any questions, Your

4   Honor.

5          THE COURT:  Thank you.  Are there any further

6   questions by the jury?  If so, please raise your hand.  No

7   one raised their hand.

8          May this witness be excused?

9          MR. MARTINEZ:  Yes, sir.

10          MR. DELOZIER:  Yes, sir.

11          THE COURT:  Thank you, sir.  You're excused.

12          THE COURT:  Mr. Delozier, you may call your next

13   witness.

14          MR. DELOZIER:  Thank you, Your Honor.

15          THE COURT:  Please step forward.  Please give the

16   clerk your name and she will swear you in.

17          (Witness sworn.)

18          THE COURT:  Please have a seat on the witness

19   stand.  Please make yourself comfortable there.  Remember

20   to speak loudly and clearly into the microphone so that

21   everyone can hear you.  Also, please wait until the

22   question is complete before you answer the question.  And

23   please make sure you give a verbal response.

24          Is that agreeable to you, sir?

25          THE WITNESS:  Yes, sir.

```
 1            THE COURT:  Mr. Delozier, you may proceed.

 2            MR. DELOZIER:  You may proceed.

 3

 4                      JIMMY GALYON,

 5   called as a witness herein, having been first duly sworn,

 6   was examined and testified as follows:

 7

 8                   DIRECT EXAMINATION

 9   BY MR. DELOZIER:

10       Q.   Please state your name?

11       A.   Jimmy Galyon.

12       Q.   Would you spell your last name?

13       A.   G-a-l-y-o-n.

14       Q.   And where do you live, sir?

15       A.   Tucson, Arizona.

16       Q.   And do you know the Ochoa family?

17       A.   Yes, I do.

18       Q.   And when did you meet them?

19       A.   About 1985.

20       Q.   Again, by what circumstances?

21       A.   We used to go to the same church.  We started

22   going to the same church.

23       Q.   And how did you -- which members of the family,

24   did you meet?

25       A.   I met Wendi and Alejo and also Donna.  All three
```

1   of them.

2        Q.   Were you involved in activities in the church

3   with them?

4        A.   Yes, we were.

5        Q.   Would you describe those activities?

6        A.   We both went to church there and they had Harvest

7   Track Classic every year.  We were involved in that.

8        Q.   What is a Harvest Track Classic?

9        A.   Harvest Track Classic is a track meet they have

10  every year for kids up to 18 years of age.  And we were

11  involved in that.  So was the Ochoa family.

12            And then, our main interaction with them was the

13  church.  But also Wendi did a lot of baby-sitting for us.

14  We had three small children at the time.

15       Q.   Okay.  And how did she -- how often did she

16  baby-sit for you?  I think you said you live in Tucson

17  now.  Did you live in Casa Grande at the time?

18       A.   Yes, we did.  We lived in Casa Grande at the

19  time.  We moved to Tucson in 1990.  She probably baby-sat

20  for us maybe once a week or maybe once every two weeks

21  while we were in Casa Grande.

22       Q.   Did that continue after you move to Tucson?

23       A.   Yes.  She came down summers and baby-sat for us

24  and watched our boys, maybe two, three days at a time.

25       Q.   Can you ask describe the kinds of things she did

1  for your children?

2      A.   Well, having three small boys --

3      Q.   Tell us what ages they were at that time?

4      A.   They were three and four, I believe.  We had

5  because one was born in '88 and the boys were born in '87.

6  She would stay at night.  And she baby-sat for the three of

7  them.

8      Q.   What kinds of things did she do when she

9  baby-sat?

10     A.   She just had complete care of the boys.  We would

11 leave her with them all day.  When I was conducting

12 business with my wife, we were gone all day.  She fed them,

13 clothed them, bathed them.  Just basically took good care

14 of them.

15     Q.   Did you have any problems?

16     A.   No, not at all.

17     Q.   What kind of discipline was she?

18     A.   Well, that's the only problem that my wife had is

19 Wendi would not discipline them.  Wendi was very humble and

20 very kind and she was just wonderful.  She took care of our

21 boys.

22     Q.   Did you see violent behavior of her?

23     A.   Absolutely not.

24     Q.   Did your children ever report any violent

25 behavior of her?

```
 1      A.   No.

 2      Q.   How about anger?

 3      A.   No, sir.

 4      Q.   Did you use the word "humble?"

 5      A.   Yes, sir.

 6      Q.   Are there any other words that come to mind how

 7  you would describe her?

 8      A.   She was very calm and very timid and very quiet.

 9      Q.   When was the last time she helped take care of

10  the children?

11      A.   That's -- I couldn't tell you a date.  I know

12  when Wendi got married she no longer was able to come down

13  and baby-sit for us.  I really don't know.

14      Q.   Okay.  Somewhere prior to her marriage?

15      A.   Yes, sir.

16      Q.   Were you at the wedding?

17      A.   Yes, sir.

18      Q.   And do you remember when that was?

19      A.   No, sir, I don't remember the date.

20      Q.   Okay.  Did you see her as being helpful to

21  people?

22      A.   Yes, in the church.

23      Q.   In what ways was she helpful to people?

24      A.   The church we went to and school, they all have

25  jobs.  In the evening, after school is let out, she was
```

1    very helpful with the other children.  Of course, she was

2    older so she helped some of the smaller children with their

3    jobs and in the church.

4         Q.   So you're aware of this case, obviously?

5         A.   I'm aware of it, yes.

6         Q.   Did this -- based on your experience and

7    knowledge of who Wendi was and how she took care of your

8    children, seem out of sorts for her?

9         A.   I was shocked.  We just couldn't believe it.

10        Q.   Based on your knowledge and experience of Wendi

11   during the time you've known her, does it seem

12   uncharacteristic?

13        A.   Yes.

14        Q.   Do you believe the community would be worse off

15   without her?

16        A.   I do.

17        Q.   You know the Ochoa family.  Can you describe what

18   impact you think it might have on the family?

19        A.   I think it would be a tragedy.

20        Q.   Do you have any reason to believe that Wendi

21   would be a threat to the community?

22        A.   No, I don't.  Not from my experience with her at

23   all.

24        Q.   If she were incarcerated would you believe she

25   would be a threat to the inmate population?

1          MR. MARTINEZ:  Objection.  Lack of foundation.

2          THE COURT:  Overruled.

3          Answer the question if you can.

4          THE WITNESS:  No, I don't think she would at all.

5      Q.   BY MR. DELOZIER:  Think she might even be a

6  benefit to them?

7      A.   Yes, sir.

8          MR. DELOZIER:  I have nothing further, Your

9  Honor.

10         THE COURT:  Mr. Martinez.

11

12                      CROSS-EXAMINATION

13  BY MR. MARTINEZ:

14     Q.   Sir, would it be fair to say you don't know what

15  she does, vis-a-vis or with other inmates, when she's

16  dealing with other inmates, right?

17     A.   No.

18     Q.   In fact, in the four years since this happened,

19  you don't know what she's been doing or anything, do you?

20     A.   No, sir.

21     Q.   You indicated that it would -- and let me do it

22  this way.

23         You indicated that you knew her from 1985 to, I

24  believe, 1990, correct?

25     A.   Somewhere in the early '90s.

1     Q.   And that would be the bulk of the experience that

2   you have with her, correct?

3     A.   Yes, sir.

4     Q.   The opinions -- most of the opinions that you

5   shared today with us are probably formed, in large part, to

6   what you saw back in 1985 through 1991, right?

7     A.   Yes.

8     Q.   Because your contact that you had with her after

9   that was somewhat limited, right?

10    A.   Yes, sir.

11    Q.   And you did see her as part of the church that

12  you attended, correct?

13    A.   Yes.

14    Q.   And the pastor -- who was the pastor when you

15  were there?

16    A.   Tom King.

17    Q.   Did that pastor have the ability to marry people?

18    A.   Yes, sir.

19    Q.   And did that pastor have the ability the bury

20  people?

21    A.   I do not know.

22    Q.   Did he have the two airplanes back then or not?

23         MR. DELOZIER:  Your Honor, I don't know where

24  we're going with that.

25              THE COURT:  Sustained.

1        Q.   MR. MARTINEZ:   Sir, again, the information that

2   you have for us is based from some time ago?

3        A.   Yes.

4        Q.   You don't know what she's been up to since,

5   really, 1991, 1992?

6        A.   No.

7        Q.   You don't know who her friends are, right after

8   1991, 1992?

9        A.   No.

10       Q.   You don't know who she dated?

11       A.   No.

12       Q.   But you do know about the church back then,

13   right?

14       A.   Yes.

15       Q.   They didn't teach people to lie, did they?

16       A.   No.

17       Q.   In fact, that's something that was frowned upon,

18   they were taught not to, right?

19       A.   They were taught basic Bible principles yes.

20       Q.   And that's one of the basic Bible principles,

21   right?

22       A.   Yes.

23       Q.   How about cheating.  Did they teach them to

24   cheat?

25       A.   No.

1     Q.   That's one of the other basic Bible principles,

2 correct?

3     A.   Yes.

4     Q.   How about being unfaithful to one husband?

5 That's not something that was taught by them, was it?

6     A.   No.

7     Q.   So if she did those things, she learned those

8 things, it wasn't as part of the church upbringing, was it?

9     A.   I don't know.

10     Q.   Or maybe she just didn't assimilate the church

11 upbringing?

12     A.   I don't know.

13     Q.   And when you say you don't know, that can also

14 apply to whether or not she's a threat to the inmate

15 population, right?

16     A.   I gave that based on how I knew her.

17     Q.   Back then.

18     A.   Yes, sir.

19     Q.   But you don't know how she is now, do you?

20     A.   No, sir.

21     Q.   So when you gave us that opinion, you really

22 don't know whether or not she would or would not be a

23 threat, right?  Your opinion is incomplete, isn't it?

24     A.   I don't know.

25     Q.   Well, it's based on incomplete information.

1   Wouldn't that be fair?

2       A.   Yes, sir.

3       Q.   And whether or not she would be a threat to the

4   community, again, the same answer, you really don't know,

5   do you?

6       A.   I don't believe she would be.

7       Q.   But you based that on what you knew back in 1985

8   to 1991, right?

9       A.   Yes, sir.

10      Q.   And you indicated that she baby-sat for you in

11  the summers.  Would that be in '88 and '87 and '89 or in

12  '90?

13      A.   My children were born in '87 and '88.  So it had

14  to be after that.

15      Q.   And that's when she would spend the three days

16  out there with you, right?

17      A.   I'm sorry?

18      Q.   That's when she would spend the three days out

19  there with you, baby-sitting?

20      A.   Yes, sir.

21      Q.   Because you guys had to be out.

22           And with regard to how she treated her children,

23  you never saw how she treated her kids, did you?

24      A.   No, sir.

25      Q.   You never even saw her interacting with them, did

1   you?

2       A.   No, sir.

3       Q.   You don't know anything about a paddle that she

4   used to hit Nicholas with, so you?

5       A.   No, sir.

6            MR. MARTINEZ:  I don't have anything else.

7            THE COURT:  Redirect.

8

9                    REDIRECT EXAMINATION

10  BY MR. DELOZIER:

11      Q.   Just to clarify some of the time sequences.

12           Do you know when -- you say you went to the

13  wedding, right?

14      A.   Yes, sir.

15      Q.   Do you know when Wendi met Joe?

16      A.   I met him before the wedding, I'm sure, at

17  church.

18      Q.   You met him at the church, also?

19      A.   Yes, sir.

20      Q.   Do you know when she met him?

21      A.   No, sir, I don't.

22      Q.   When you met him at church, can you give an

23  approximate time when that was?

24      A.   It was before they got married.

25      Q.   Right.

```
 1       A.   I can't give you a date.  I don't know.

 2       Q.   All right.  One last question.

 3            Did -- you were asked a question about did the

 4  church teach this, teach that, a few moments ago.  Do you

 5  remember that?

 6       A.   Uh-huh.

 7       Q.   Is that yes?

 8       A.   Yes, sir.

 9       Q.   Did the church teach the women to obey their

10  husbands?

11       A.   Yes, sir.

12            MR. DELOZIER:  Thank you.  Nothing further, Your

13  Honor.

14            THE COURT:  Are there any further questions of

15  the jury?  If so, please raise your hand.  No one raised a

16  hand.

17            May this witness be excused?

18            MR. MARTINEZ:  Yes, sir.

19            MR. DELOZIER:  Yes, sir.

20            THE COURT:  Thank you.  You're excused.

21            Mr. Delozier, you may call your next witness.

22            THE COURT:  Step forward to the clerk.  Give her

23  your name and she will swear you in.

24            (Witness sworn.)

25            THE COURT:  Please have a seat on the witness
```

1    stand.  Please make yourself comfortable.  Please remember

2    to speak loudly and clearly so everyone can hear.  Also

3    please wait until the question is complete before you

4    answer the question.  And please make sure you give a

5    verbal response.

6              Is that all agreeable to you?

7              THE WITNESS:  Yes.

8              THE COURT:  Mr. Delozier, you may proceed.

9              MR. DELOZIER:  Thank you, Your Honor.

10

11                        LINDA GALYON,

12    called as a witness herein, having been first duly sworn,

13    was examined and testified as follows:

14

15                     DIRECT EXAMINATION

16    BY MR. DELOZIER:

17         Q.   Please state your name for the record?

18         A.   Linda Galyon.

19         Q.   Would you spell your last name?

20         A.   G-a-l-y-o-n.

21         Q.   Are you married?

22         A.   Yes.

23         Q.   To whom?

24         A.   Jimmy Galyon.

25         Q.   And when did you first -- Strike that.

1          Do you know the Ochoa family?

2     A.   Yes, I do.

3     Q.   And what members of the family do you know?

4     A.   Wendi, Alejo and Donna and Brandon.

5     Q.   When did you meet the Ochoa family?

6     A.   Probably in '86.

7     Q.   Okay.  And what circumstances?

8     A.   We went to church together.

9     Q.   Did you live in Casa Grande at the time?

10    A.   Yes.

11    Q.   Where do you live today?

12    A.   Tucson.

13    Q.   Do you have any children?

14    A.   Yes, I do.

15    Q.   How many children?

16    A.   Three.

17    Q.   And what are the birthday years?

18    A.   I have one born in '87 and twins that were born

19 in '88.

20    Q.   All right.  Did you -- was your contacted with

21 the Ochoa family limited to church activities?

22    A.   Wendi also baby-sat for me.

23    Q.   Any other activities besides church and

24 baby-sitting by Wendi?

25    A.   Just church activities.

38

1      Q.    Such as?

2      A.    We used to have track meets where we would go and

3   work at the track meets together.  School functions.

4   Different things that the kids would do at school.  We

5   would go and participate and watch.  I have a stepson that

6   also went to school with Wendi.

7      Q.    All right.  You say she baby-sat for your four

8   children then?

9      A.    Three.

10     Q.    Then she didn't baby-sit for the stepchild?

11     A.    No.

12     Q.    Just the three younger ones?

13     A.    Yes, sir.

14     Q.    When did that start?

15     A.    Probably in '88.

16     Q.    All right.  Right before or after the twins were

17  born?

18     A.    Yes.

19     Q.    So she assisted you when they were first born?

20     A.    Yes.

21     Q.    Do I have it right, you had one child in '87 and

22  the two in '88?

23     A.    Yes.

24     Q.    Did you have any problems with her baby-sitting?

25     A.    No.

1    Q.   What was she allowed to do or what was she

2  required to do as she baby-sat your children?

3    A.   She completely took care of them all day.  She

4  came to my home.  She would be there at eight o'clock in

5  the morning.  She would stay until five o'clock in the

6  afternoon a lot of days.  She would feed them breakfast.

7  She would dress them.  She would bathe them.  She would

8  feed them supper.

9         When we moved to Tucson, she would stay two or

10  three days at a time in our home and take care of them.

11    Q.   All right.  How about discipline?

12    A.   Wendi didn't like to discipline.  She would leave

13  that to me to do when I got home.  She would always just

14  say, "No, I can't do that."

15    Q.   How would you describe Wendi during the time that

16  you knew her?

17    A.   Very pleasant.  Very -- she was just a really

18  good girl.  If I'd seen anything in her that I didn't like,

19  I would never have had her in my home taking care of my

20  children because they're the most precious things to me.

21    Q.   Sure.  When was the last time you saw her?

22    A.   You know, I really don't know the last time I saw

23  her.

24    Q.   Did you go to the wedding?

25    A.   Yes, we went to her wedding and I'd seen her

1    after that at church functions.

2         Q.   All right.  So even though you moved to

3    Tucson -- when did you move to Tucson?

4         A.   1990.

5         Q.   Okay.  So even after you moved to Tucson, you

6    continued to go to the church?

7         A.   They had a track meet every year for the

8    children.  We took our kids down there for the track meet.

9         Q.   How many years after you moved to Tucson did you

10   continue doing that?

11        A.   Maybe up until the last two years.

12        Q.   You mean up until the year 2002?

13        A.   Yeah.

14        Q.   So, did you see Wendi when you went to the track

15   meets?

16        A.   Yes.

17        Q.   Even during the '90s?

18        A.   Yes.

19        Q.   Did you have contact with her at those track

20   meets?

21        A.   Yes.

22        Q.   What kind of contact did you have at those track

23   meets?

24        A.   Her and her mother worked at the station where

25   they handed out the medals to the children.  And my boys

1    would go over and help her and we talked and just be there

2    and just visit.

3        Q.    Do you know if Wendi has any children?

4        A.    Yes.

5        Q.    And do you know how many she has?

6        A.    Two.

7        Q.    Do you know their names?

8        A.    No.

9        Q.    Do you know approximately when they were born?

10       A.    No, I can't answer that.

11       Q.    Did you ever see Wendi with the children?

12       A.    Yes.

13       Q.    What circumstances?

14       A.    Just church functions, track meets.

15       Q.    Did you notice anything that was inappropriate in

16   her care of the children?

17       A.    No.

18       Q.    Did you notice any care at all?

19       A.    She took very good care of her children.

20       Q.    In the time that you saw her?

21       A.    In the time I saw her.

22       Q.    Okay.  You're aware of why you're here today?

23       A.    Yes.

24       Q.    Does the violence that you understand took place

25   seem out of sorts for Wendi?

1      A.   Yes, it does.

2      Q.   Do you think that the community would be worse

3  off without her?

4           Maybe you didn't understand my question.

5      A.   Yeah.

6      Q.   If she is not a member of the community, Casa

7  Grande, Tucson, whatever, do you think that the community

8  would be worse off without her?

9      A.   Yes.

10     Q.   You know the Ochoa family, Donna, Alejo and

11 Brandon?

12     A.   Yes.

13     Q.   Do you know what kind of impact that might have

14 on them?

15     A.   It has to be a terrible impact.  I can't even

16 imagine.

17     Q.   Do you have any reason to believe that Wendi

18 would be a threat to the community?

19     A.   No.

20     Q.   Do you have any reason to believe Wendi has any

21 -- well, let me rephrase that.

22          Do you believe Wendi to be a violent person?

23     A.   No.

24     Q.   Have you ever seen her express any anger?

25     A.   No.

1          MR. DELOZIER:  Nothing further, Your Honor.

2          THE COURT:  Mr. Martinez.

3

4                    CROSS-EXAMINATION

5    BY MR. MARTINEZ:

6          Q.    You attended the Harvest Family Church; is that

7    right?

8          A.    Yes, sir.

9          Q.    One of the things we heard about was their belief

10   that women are subservient to man.  Do you subscribe to the

11   motion?

12         A.    No.

13         Q.    So, you didn't learn at the Harvest Family Church

14   you were supposed be subservient to Jimmy?

15         A.    I learned that, yes.

16         Q.    And you don't agree with that?

17         A.    Not totally.

18         Q.    But do you do that?

19         A.    At times.

20         Q.    That notion that you are to be subservient to the

21   man, does that allow the woman to go out and have affairs?

22         A.    No.

23         Q.    Is that something that you learned in church,

24   part of being a subservient woman is to go out and kiss

25   guys?

44

1    A.   No.

2    Q.   That's contrary to everything that the church

3    teaches, isn't it?

4    A.   Yes.

5    Q.   You indicated that the defendant is not a violent

6    person, correct?

7    A.   Yes.

8    Q.   That is based on your knowledge of when you knew

9    her back when she was younger, right?

10   A.   Yes.

11   Q.   You really don't know what has happened since you

12   basically loss touch about '90, '91, do you?

13   A.   No.

14   Q.   And you did indicate that you saw her with her

15   kids a couple of occasions, right?

16   A.   Yes.

17   Q.   And you don't know that it was her husband that

18   actually bathed the kids before they went to church.  You

19   don't know if that's what happened, do you?

20   A.   No.

21   Q.   You never actually went over to their house, did

22   you?

23   A.   No.

24   Q.   You never saw who bathed the kids, right?

25   A.   No.

1      Q.   You never saw who fed the kids, right?

2      A.   No.

3      Q.   And it's fair to say you don't know who took the

4   kids to the doctor, do you?

5      A.   No.

6      Q.   Your impression, if you will, of the defendant is

7   based on knowing her back around 1990 and years before

8   that, right?

9      A.   Yes.

10     Q.   And when you say that she is good with kids that

11  is based on what you saw her do with your kids back then,

12  right?

13     A.   Yes.

14     Q.   You don't know whether or not she was a good

15  caretaker for her own kids, do you?

16     A.   No.

17          MR. MARTINEZ:  I don't have anything else.

18          THE COURT:  Mr. Delozier.

19          MR. DELOZIER:  Thank you, Your Honor.

20

21                    REDIRECT EXAMINATION

22  BY MR. DELOZIER:

23     Q.   To clarify, you say you saw her taking care of

24  the children at these track meets and other circumstances?

25     A.   Yes.

1      Q.   All the way, all through the '90s?

2      A.   Yes.

3      Q.   And you didn't see any problems with that, did

4  you?

5      A.   No.

6      Q.   You thought she was being a good mother at that

7  time?

8      A.   Yes.

9           MR. DELOZIER:  Nothing further, Your Honor.

10  Thank you.

11          THE COURT:  Are there any further questions of

12  this witness by the jury?  If so, please raise your hand.

13  No one has raised their hand.

14          May this witness be excused?

15          MR. DELOZIER:  Yes.

16          MR. MARTINEZ:  Yes.

17          THE COURT:  Thank you very much.  You are

18  excused.

19          Mr. Patterson, call your next witness

20          THE COURT:  Please step forward.  Please state

21  your name to the clerk and she will swear in.

22          (Witness sworn.)

23          THE COURT:  Please have a seat on the witness

24  stand.  Please make yourself comfortable on the witness

25  stand.  Remember to speak loudly and clearly into the

1    microphone so everyone can hear you.   Please wait until the

2    question is completed before you answer the question.   And

3    make sure that you answer verbally.

4            Is that agreeable to you?

5            THE WITNESS:   Yes.

6            THE COURT:   You may proceed, Mr. Patterson.

7            MR. PATTERSON:   Thank you, Judge

8

9                    SHARON MURPHY,

10    called as a witness herein, having been first duly sworn,

11    was examined and testified as follows:

12

13                    DIRECT EXAMINATION

14    BY MR. PATTERSON:

15        Q.   Give us your name, please?

16        A.   Sharon Murphy.

17        Q.   Are you the same Sharon Murphy that has testified

18    earlier in this trial?

19        A.   Yes.

20        Q.   It's not my intent, Dr. Murphy, to redo or repeat

21    everything you talked about previously.   The Judge will

22    instruct the jury to consider what you already testified to

23    in this proceeding, as well.   I just want to go over some

24    fundamental opinions and then we'll move on to another

25    area.

1          Do you still have an opinion whether or not Wendi

2    was the victim of domestic violence?

3          A.   Yes, I do have an opinion.

4          Q.   What is that opinion?

5          A.   That she is, in fact, a victim of domestic

6    violence at the hands of Joseph.

7          Q.   Do you believe that there were components of

8    emotional abuse in that domestic violence?

9          A.   Yes, I do.

10          Q.   Do you believe there were components of sexual

11   abuse in that relationship?

12          A.   Yes, I do.

13          Q.   And do you believe there were elements of

14   physical abuse in that relationship?

15          A.   Yes, I do.

16          Q.   Okay.  Now, the opinions that you testified to in

17   the first part of this trial were based upon circumstances

18   up to about October 7th, 2000, correct?

19          A.   Correct.

20          Q.   We didn't really talk about the events of October

21   8, 2000?

22          A.   Correct.

23          Q.   Have you been able to examine the literature and

24   determine whether there is any opinion or theory as to why

25   domestic violence victims sometimes wind up killing the

1    person that's abusing them?

2        A.   Yes.

3        Q.   Okay.  Tell me a bit about the literature that's

4    out there in that regard?

5        A.   MR. MARTINEZ:  Objection.  Relevance to this

6    case.

7             THE COURT:  Overruled.

8             Go ahead and answer the question if you can.

9             THE WITNESS:  There is not a huge literature

10   about this.  But, there are a number of pieces that

11   actually now are quite old in terms of research

12   literature.  Because if you recall from my earlier

13   testimony, the information that we have today about

14   domestic violence really only dates back to '74, '75, '76.

15   So the literature that we have today that talks

16   specifically about why battered women kill really comes

17   from about 1987.

18             There are two pieces that I would call "seminal",

19   meaning the most important pieces.  Cynthia Gilespie's,

20   Justifiable Homicide and Angela Brown's book, When battered

21   Women Kill or Why Battered Women Kill, excuse me.

22             MR. MARTINEZ:  Objection, State versus

23   Christianson.

24             THE COURT:  Let me have you approach.

25             (Bench conference was held outside the hearing of

1   the jury.)

2          THE COURT:  Where are you going with this?

3          MR. PATTERSON:  She was not allowed to testify

4   about the event of October 8, 2000 but Christianson rules

5   no long applies.  This is the penalty phase.  There are no

6   rules.  And she's allowed to opine her opinion, why she may

7   have overreacted, why she may have hit him 23 times, she

8   may have done things on this date that are totally out of

9   character based upon all the evidence you heard from other

10  people in this case.

11         THE COURT:  Mr. Martinez.

12         MR. MARTINEZ:  State versus Christianson still is

13  the law.  It doesn't mean that it goes away just because

14  the rules of evidence are no longer in effect.  That is

15  substantive rule.  There is no case law that allows her to

16  come in and basically vouch for the defendant.  Even though

17  she wasn't there, she is now going to tell us what the

18  defendant was thinking.  And I understand that under 703,

19  the rules of evidence are suspended.  But not the

20  substantive rule.  She can't now opine something that State

21  versus Christianson says she can't.

22         MR. PATTERSON:  That is simply not true.  She's

23  allowed to render her opinion about things that are

24  relevant to life or death decision.  She's allowed to opine

25  in this regard.  She's not going to get inside her mind but

1   she's going to explain why battered women have developed

2   some tolerance of abuse and given provocation on certain

3   days that it's focused, that it's upon the abuser and not

4   likely to be visited upon other members of the community.

5   That she's rehabilitable.  She's mindful what happened

6   caused her to do this.  I think that she's rehabilitative.

7          MR. MARTINEZ:  I think State versus Christianson

8   is controlling.

9          THE COURT:  I'm going to overrule the objection.

10         MR. PATTERSON:  Thank you, Judge.

11         (Bench conference concluded.)

12     Q.  BY MR. PATTERSON:  As we were saying before the

13   objection, you were telling us a bit about the literature

14   that was involved here.  You also have some personal

15   experience with persons on a case load who have committed

16   homicide?

17     A.  In the counseling case load that I used to have,

18   there weren't any homicides.  I had the one case for

19   criminal court.  That was in '97.

20     Q.  What do we see in the literature, start with the

21   Gilespie treatise, what is that all about?  What does that

22   tell us?

23     A.  There is an effort on the part of some

24   researchers, Cynthia Gilespie being one of the first, to

25   try to understand what happens inside that violent

1   relationship because the overwhelming majority of women who

2   have killed their abusive partners had no prior criminal or

3   violent history.

4           So there is something that just didn't make sense

5   here.  So that was the impetus to try to understand what

6   could possibly be happening that would make that the

7   response.

8           In trying to get that kind of information, lots

9   of interviews, obviously, are done with the women serving

10  prison sentences.  And one of the factors that seems to be

11  quite remarkable in both the Gilespie work or the Brown

12  work and after that Lenore Walker, is that in a majority of

13  the cases where women have killed their abusive partners,

14  there seems to have been an increase in frequency and

15  severity over time of the abuse.  But also, and may be even

16  more importantly, in the majority of those cases there was

17  a significant amount, meaning number -- and what's the word

18  I want -- duress around sexual abuse.  Seems to stand out.

19      Q.   So significant factor in those cases?

20      A.   Correct.  So what we know today, to try to sum up

21  the literature that is available, is that typically you

22  find that the violence has escalated over time but that it

23  is accompanied by terror.

24          Some researchers are now saying, okay, we have

25  25, 30 years of literature on domestic violence, it's time

1    now to summarize the different types of violence.  Let's

2    look at this a little bit differently.  Instead of calling

3    everything domestic violence, maybe there are shades inside

4    that.  So one of the phrases that came out in about, I

5    think it was 2000, one of the research pieces is the phrase

6    "intimate terrorism."

7         Q.   Can you describe that for me?

8         A.   When my testimony matter ended in October and the

9    jury had a chance to ask me questions, I remember that one

10   of the questions was about did I believe there was such a

11   thing as mutual combat.

12        The researcher who tried to break down this big

13   term "domestic violence" came up with a title of a type

14   that meant mutual violence.  Just go back to that piece.

15   But this new term "intimate terrorism" is the term that

16   seems to be the one used now that speaks the most clearly

17   about the power and control being at the center and about

18   that phenomenon of the increase in frequency and severity

19   leading to a terror that maybe you and I can't even begin

20   to feel if we haven't experienced it.

21        Q.   It's unique to a domestic violence relationship?

22        A.   It's unique to domestic violence.  It's unique to

23   experiences that we might call traumatic.  So. . .

24        Q.   Regardless of the sort of trauma?

25        A.   Right.  So other people are also trauma victims,

1   not just victims of domestic violence, like soldiers in

2   combat, for example.  But this phrase "intimate terrorism"

3   really speaks to an overriding, over arching fear that

4   envelops the battered woman's life.

5            It's a fear that goes so deep as for her to never

6   know when that next thing is going to happen.  And all of

7   the battered women I've met, many of them seem to need to

8   be able to predict when the next thing is going to happen.

9   Because if you remember from my testimony earlier, I talked

10  a lot about power and control and about how the batterer

11  controls every aspect of the woman's life or many aspects

12  of the woman's life.  This was an area that she

13  feels -- and when I say "she" I mean the proverbial

14  battered woman, not necessarily just Wendi -- that she

15  might have some control.  So she would try to predict when

16  the next thing was going to happen.  The way she could do

17  that was by trying to figure out what would set him off and

18  I'll do the opposite.  We actually have or I actually have

19  in my report Wendi's statements about asking him

20  repeatedly, "What do you want for dinner tonight," so she

21  wouldn't make a mistake.  So that was her effort at trying

22  to control some part of her life by doing things right.

23       Q.   Let's maintain a general approach at this point

24  then we'll tie it in with the particulars of Wendi's

25  circumstance here.

1          Is there a concept of a kind of tolerance level

2    of the abuse that develops?

3          A.    In most cases, the relationship does not start

4    off with some overwhelming form of violence.  It usually

5    starts off rather gradually and usually it starts off more

6    with the power and control issues as opposed to heavy-duty

7    physical or sexual violence.  It usually starts with

8    control and emotional and verbal abuse and then increases.

9          Now, is every single case like that?  No.  That's

10   just the majority and certainly isn't my experience the

11   majority of the time.  What happens is, and we all know

12   this from our own relationships, you get adjusted, you get

13   used to what's happening.  Early on, you don't even believe

14   what's happening.  You know there is -- we have a great

15   system called denial that we work from and we just don't

16   believe what's really happening is happening.  We make all

17   kinds of excuses for it.  Gradually, over time there is

18   some little realization.

19          In many cases, the realization, though, never has

20   a name.  You know, the term "domestic violence" that we

21   throw around so regularly as professionals is not the

22   word.  Those are not words that women use to describe those

23   experiences.  Perhaps if they could, it would be clearer to

24   them what exactly was happening.  So they adjust.  And the

25   emotional and verbal abuse today maybe, maybe six months

1    from now becomes something much more significant and maybe

2    a year from now it's even more significant.  I'm making up

3    those time frames, they absolutely are.  It could be two

4    weeks, you know.  But, yeah, the battered woman adjusts to

5    whatever is happening.

6         Q.   Is there a cumulative effect over time?

7         A.   There's absolutely a cumulative effect.

8         Q.   Tell me about that?

9         A.   I remember in my earlier testimony, talking a lot

10   about the importance of context, needing to understand the

11   acts and the situation in the context in which it

12   occurred.  Every time there is an act, whether it's

13   emotional abuse or verbal abuse or sexual abuse or physical

14   assault, that incident doesn't ever go away.  You don't

15   forget when things like that happen to you.  You might push

16   them back and not allow it to come to consciousness to

17   really think about what this is that just happened.  But it

18   doesn't go away.  So what we have over time is this

19   accumulation of many things that have happened over, in

20   some couples, over a very long period of time.  And so

21   that's the cumulative effect.

22        Q.   Okay.  The accumulation of these incidents, is it

23   important, then, how the abused victim deals with this

24   accumulation of things that impact he or she?  A kind of

25   sub-question:  How they have been taught to cope with

1   stresses or problems in their lives, is that a factor?

2        A.   If I'm not answering the question, tell me.   I'm

3   not exactly sure.

4        Q.   Okay.  Let me rephrase it.

5        A.   Okay.

6        Q.   Do you also need to factor in the coping

7   mechanisms of the way the abused victim deals with the

8   accumulation series of events that are evident in this

9   relationship with the abuser?

10       A.   Yes.

11       Q.   Tell me about that.

12       A.   There are some particular ways, I think, that the

13   majority of battered women go about dealing with their

14   life, the life that they are now leading.  Almost all in my

15   experience begin with that whole process of denial that I

16   mentioned a few minutes ago.  But denial doesn't last

17   forever.  For some people, it can last a very long time.

18   But for others a short time.  That's just very

19   idiosyncratic to the individual person that we're talking

20   about.  But over time, then, that denial will break down.

21   Either because she'll start to recognize it or someone

22   outside of her will recognized it, like a parent or a

23   coworker.  So somebody's going to start mentioning things

24   to her.  So the denial breaks down.  And but you can't

25   remove all of the ways in which she learned to cope.  So,

1    the next thing that might happen is she starts to blame

2    herself.  So she blames herself for what he's doing.  I

3    need to do this better.  If I do this better then he'll

4    stop.  So there's a whole series of things that takes

5    place.  And the point of understanding about the series is

6    that all of that's leading up and has this cumulative

7    traumatic affect on the individual battered woman.

8        Q.   Again, talking about the typical battering

9    scenario, suppose there are no outlets or opportunities to

10   deal with the accumulation of stress that have developed

11   between the two parties.  What can happen?

12       A.   Now by "outlets," do you mean people she can talk

13   to?

14       Q.   Friends, counselors, safe houses, you know.

15   Something to deal with the accumulated stressors you're

16   talking about?

17       A.   Right.  Well, if there is no where for it to go,

18   then it stays inside.  And that accumulation then leads to

19   just greater and greater and greater levels of trauma that

20   she is stuck, now, dealing with.

21       Q.   Let's talk about Wendi, specifically.  Based upon

22   the kind of model or scenario that you described for us,

23   what did you see in Wendi's relationship?  Well, not just

24   with Joe but starting with her early childhood experiences

25   and going up to the point in time when she did develop a

1 relationship with Joe.  What do you see that may be

2 significant to account for the behavior on October 8, 2000?

3      A.   Well, according to Wendi's story -- and I know we

4 don't have proof of this first factor that I'm going to

5 say -- there was information Mother told Wendi that she has

6 reason to doubt or believe or think, that Wendi may have

7 been sexually abused at a very young age.  I think she said

8 very young, meaning like a toddler to age of two.

9      Q.   By whom?

10      A.   I don't remember if it was Father or grandfather

11 but it was a member of the family; a male member of the

12 family.

13      Q.   How is that potentially significant?

14      A.   Well, any form of child sexual abuse is

15 significant in that person's life.  And that's just a setup

16 for difficulties down the road if something doesn't

17 intervene to help change it.  The next thing that I

18 remember was about, she must have been like six, seven,

19 eight, when the family was deeply involved in their

20 church.  There was a male member of the church that exposed

21 himself to her.  I don't know if there was any more than

22 that.  I remember Wendi saying he exposed himself to her.

23      Q.   How is that potentially significant?

24      A.   Well, that's another form of sexual abuse.  So we

25 now have some building blocks here to trauma that goes back

1   to perhaps to age two.  If not two, then this incident at

2   sixish.  All this time, we have the role of the church.

3   That's very important in Wendi' life and in Wendi's

4   family's life.  From her account of the church, it sounds

5   like there might have been some isolating that went on

6   within the church construct.  So that all of the functions

7   that a family or individuals might participating in, just

8   in normal social life, were really confined inside the

9   church.  So that doesn't give you an opportunity to see

10  what's going on outside the world of the church.  So that's

11  from the beginning and ongoing.

12          The next incident that I recall was the incident

13  with the pastor's son that had been her boyfriend.  And

14  when she tried to tell him that she wanted to start seeing

15  the world and dating other people, that's when he took the

16  rock and broke the window in her vehicle, tore the ring off

17  her finger.  So we have an incident that involved a peer.

18  This is the first time that I know of there is a peer

19  involved in some abusive activity.  And then the next thing

20  that I know about would be the beginning of the

21  relationship with Joseph Andriano.

22      Q.   And how, then, is this later developing

23  relationship with Joe Andriano significant in terms of the

24  conduct she might have engaged in on October 8, 2000?

25      A.   How is it significant?

1    Q.    How does it tie in with all the other building

2    blocks you're talking about that may have accounted for

3    some analogous, unusual behaviors that weren't

4    characteristic on October 8, 2000.

5           MR. MARTINEZ:  Objection.

6           THE COURT:  Overruled.

7           Answer the question.

8           THE WITNESS:  Well, what we have now is

9    information about accumulation of things that have happened

10   in her life that I would call "traumatic."  I think

11   everybody in the field would call "traumatic," episodes

12   that are outside of the norm of healthy human experiences.

13   And it may have been a setup.  I don't know, but it may

14   have been a setup for developing relationships with someone

15   who ended up being abusive.

16   Q.    BY MR. PATTERSON:  And then, adding that into the

17   mix, again, what are we seeing here, potentially, that's

18   consistent with the literature you just described?

19   A.    What we know from Wendi about the nature of that

20   relationship -- which, I think was about eight years in

21   length -- is that there was an ongoing pattern of abuse,

22   all the different forms that we talked about earlier from

23   Joe to Wendi.

24           And as far as I know, I don't recall ever hearing

25   that Wendi ever fought back.  She also didn't fight back

1   with the pastor's son.  And at two and six, I don't think

2   she could have fought back.

3            So we have a setup here leading up to the

4   increasingly severe levels of violence and abuse leading up

5   to that night in October.

6       Q.   What do we know about Wendi's responses to the

7   provocation in her life.  What was her general course of

8   conduct?

9       A.   Well, she didn't tell.  She didn't strike back.

10  She didn't do anything really that would be considered

11  fighting back in any way.  We know that.

12      Q.   Do you know of any episode of violent behavior

13  prior to October 8, 2000?

14      A.   On Wendi's part?

15      Q.   Yes?

16      A.   I do not know of any.

17      Q.   Is this -- what we're seeing in

18  Wendi -- consistent with the person you described in this

19  treatise?

20      A.   Yes.

21      Q.   In what regard?

22      A.   In all of these cases, women, either -- they do

23  one of two things -- they either try to fight back and find

24  out that's not such a good idea because all it does is

25  aggravate him further and the violence becomes worse.  Or

1    they don't fight back at all.  That seems to be what

2    happened with Wendi.

3         Q.    Okay.  But I think you told us that women who

4    kill their abusive spouses demonstrate a consistency, they

5    don't have a history of violent behavior up to the point in

6    time when they do the ultimate act?

7         A.    That's correct.

8         Q.    Do you see that here with Wendi's case?

9         A.    That's correct.

10        Q.    How is it then on October 8, 2000 she would have

11   engaged, in your opinion, in conduct that wasn't

12   demonstrated in her history prior to October 8, 2000?

13        A.    At first glance, it's looks like such an anomaly

14   that could this have happened.  The only way that you can

15   understand this is to truly -- to truly understand what

16   domestic violence is all about.

17             You have to remember, that's what we're talking

18   about here.  And it doesn't happen out in front of the

19   family.  For the most part, it's when the doors are

20   closed.  And in particular, sexual violence.  She chooses

21   not to tell people.  That's her choice.  She's made a

22   choice to not tell.  It's shameful.  It's shameful to tell

23   anybody that the person you love and live with and have

24   children with is doing to this to you.  So she chose not to

25   tell.  So what we have now, we have that early accumulation

1   from possibly age two up through this night in October.

2           However, it isn't just an accumulation.  There is

3   more to it than that.  We're talking about terror.  We're

4   talking about a fear that is so intense that the only thing

5   she knows how to do is to stop what's happening.  So, on

6   the face of it, it looks horrible.  The number of times

7   that she hit him with the bar stool looks horrible.  It is

8   horrible.

9           Why would she have done that, a person who never

10  acted violently before?

11      Q.   That's the question.

12      A.   That's the question.  And my response to that is

13  that she felt

14           MR. MARTINEZ:  Objection.  Vouching as to what

15  the defendant felt.

16           THE COURT:  Sustained.

17      Q.   BY MR. PATTERSON:  Can you account for the

18  conduct at this point?

19      A.   Her life was in danger.

20      Q.   Okay.  And how does that precipitate this

21  particular response in your opinion?

22      A.   She was protecting herself by making sure that he

23  couldn't do any more.

24      Q.   Okay.  But, it appeared she may have misperceived

25  the degree of the threat?

1    A.   Correct.

2    Q.   How is that accounted for in your scenario?

3    A.   I think that we have to understand domestic

4 violence in order the really understand why that would

5 happen.  We keep using the words accumulative,

6 accumulation.  They are just really nice big words that

7 don't have a lot of meaning unless you feel it.  You have

8 to try very hard to put yourself in the shoes of the woman

9 who has lived with this for so long to understand the

10 degree of threat to her life that she felt at that moment.

11 And so whether it was five times or twenty times, what she

12 was doing was acting out the trauma, that terror that was

13 in her heart and had probably been in her heart for a

14 really long time, just never talked about.

15    Q.   All right.  In the literature, and your

16 experience, is this outburst, if you will, focused on one

17 particular individual, generally speaking or does she

18 constitute a threat to the community at large having

19 accumulated this series of stressors?

20    A.   I don't know of any case in which a battered

21 woman ever meted out violence towards anyone other than the

22 perpetrator.

23    Q.   So in that sense, she doesn't constitute a danger

24 to fellow community members?

25    A.   Correct.

1     Q.    From the contact you had with Wendi, is she a
2  viable candidate for the rehabilitative process to teach
3  her to cope with these issues in a better or different
4  fashion?

5     A.    I would say yes.

6     Q.    For what reasons?

7     A.    Wendi had no idea --

8           MR. MARTINEZ:  Objection.  Assumes what the
9  defendant is thinking again.

10          THE COURT:  Overruled.

11          Go ahead and answer the question.

12          THE WITNESS:  Wendi had no idea that what her
13  life had been with Joe was called domestic violence.  When
14  I went in and sat down with her, she wasn't using that
15  phrase.  In fact, when she saw one of the tests that I was
16  giving her, it had that language somewhere in it, she
17  wasn't grabbing on to that and using it and running with
18  it.  In fact, she was extremely upset by it.  Didn't want
19  me to use it.  Didn't want those words used.  Would hold
20  her abdomen and say, "this is making me sick.  I'm getting
21  nauseous."  I would think that's what was going to happen
22  from the change in her face.

23          So that was a very gradual progression for Wendi
24  over the course of a long time.

25     Q.    You're not suggesting you talked her into being a

1   domestic violence victim?

2       A.   No, no.

3       Q.   But, after you discussed things with her, things

4   that she thought were innocuous or were not consistent with

5   domestic violence, just normal in her married relationship,

6   in your experience, were, in fact, abusive behaviors?

7       A.   Right.  Over this period of time, now, she sees

8   what life was like in a different way because she now has

9   some language, vocabulary, to put with the acts that

10  happened.  And most recently, has said that some day --

11              MR. MARTINEZ:  Lack of foundation.

12              THE COURT:  Lay some foundation.

13      Q.   BY MR. PATTERSON:  When did you recently?

14      A.   When I testified in October.

15      Q.   Okay.

16      A.   -- said that she hoped that some day, you know,

17  she would be able to work with other victims of domestic

18  violence.

19              MR. PATTERSON:  That's all I have at this point

20  in time.

21              THE COURT:  Mr. Martinez.

22

23                   CROSS-EXAMINATION

24  BY MR. MARTINEZ:

25      Q.   One of the things you talked about was what

1   happened inside Apartment 132 on October 8 of the year

2   2000.  You talked to us about that, didn't you?

3        A.   The apartment, is that what you're saying?

4        Q.   You talked to us about the things that happened

5   in Apartment 132 on October 8, 2000, didn't you?

6        A.   In part, yes.

7        Q.   But you weren't there, were you?

8        A.   No, I was not.

9        Q.   You didn't see what happened, right?

10        A.   Correct.

11        Q.   You don't know what the defendant was thinking,

12   right?

13        A.   Correct.

14        Q.   Well, you said that with some hesitation.  Are

15   you trying to tell us that you knew what the defendant was

16   thinking?

17        A.   I know what she said to me.

18        Q.   Right.  But saying and knowing are two different

19   things, wouldn't you agree?

20        A.   Yes.

21        Q.   You're basing your testimony here on what the

22   defendant told you, right?

23        A.   Correct.

24        Q.   And even if she lied to you, you would still keep

25   the same opinion that she was a victim of domestic

1   violence, wouldn't you?

2       A.   Not if I saw a discrepancy.

3       Q.   Well, we talked about some of those.  Do you

4   remember that we talked about those during your testimony?

5       A.   I'm not sure what in particular you're referring

6   to.

7       Q.   Everything that we talked about.  Do you remember

8   that we talked about things in your report where she had

9   been untruthful?  Do you remember that?

10      A.   I don't remember specific things.

11      Q.   Well, let's start with the -- and I'm just

12  picking out some highlights -- with what happened on the

13  birthday limo issue.  Do you remember that?

14      A.   I remember talking about the birthday.

15      Q.   And do you remember that she told you that her

16  husband had left the kids asleep.  Do you remember that?

17      A.   Yes.

18      Q.   Well, one of the things we know and that she

19  admitted that she was lying about was that's not true.

20  That her husband had not left the kids asleep.  They were,

21  in fact, somewhere else.  That's a lie she said.

22           One of the other things that we know from the

23  people that were there was that on the ride home that night

24  she was kissing another man.  She didn't tell you that.

25  That's a lie by omission.

1      A.   She did not tell me that.

2      Q.   Right.  One of the other things that she didn't

3   tell you, per the witnesses, was that she was the one that

4   night that sort of precipitated the incident by walking

5   after the person, the man that she was with.  She didn't

6   tell you that, did she?

7      A.   No.

8      Q.   And the witnesses said that Mr. Andriano never

9   even grabbed her.  She didn't tell you that, did she?

10     A.   I remember the cell phone and the wine cooler.   I

11  don't remember if it was grabbing her or the objects.

12     Q.   Ma'am, to refresh your recollection, then, you

13  wrote down in your report that he screamed at her and

14  dragged her home.  Does that ring a bell with you?

15     A.   Okay.  Yes.

16     Q.   Per your report, he did drag her, right?

17     A.   Yes.

18     Q.   The people that were there said that that didn't

19  happen.  Did you know that?

20     A.   No.

21     Q.   That actually what happened, according to the

22  people that were there, Mr. Andriano threw the phone down

23  and said, "Wendi, what are you doing," and walked away.

24  Did you know that?

25     A.   No.

1       Q.   And that when he walked away, she was the one

2   that went after him and started saying things like, "Joe,

3   let me explain to you what's going on."  And that she was

4   the one that was trying to talk to him and that he was calm

5   and just walked away.  Did you know that?

6       A.   No.

7       Q.   The other thing that she told us after that was

8   that according to her, he then put her inside of the

9   Tahoe.  She never told you about that, right?

10      A.   I don't believe I know that.

11      Q.   And this was something that she did remember,

12  right?  I mean, she's the one that came forth with the

13  incident to you, right, she related?

14      A.   Yes.

15      Q.   And you give her enough time to relate that

16  incident to you, right?

17      A.   Yes.

18      Q.   She never told you about being in the Tahoe with

19  him that night, did she?

20      A.   No, she did not.

21      Q.   She never told you that after being in the Tahoe

22  that she somehow went into her apartment, jumping over a

23  wall.  She never told you that, did she?

24      A.   No.

25      Q.   Did you know that she actually came into the

1   apartment giggling that night per his sister, Jana Clayton?

2      A.   No.

3      Q.   That's what I'm -- that goes to the point that

4   I'm talking about.  You -- that's not true, per her

5   statement she told you a lie.  That doesn't change your

6   opinion?

7      A.   I'd need an awful lot more than that to change my

8   opinion.

9      Q.   How about the fact that she told you that there

10   was a hitting of some drawers on the night that she went to

11   the softball game.  Do you remember that from your report?

12      A.   If that's the same night where the bed, bottom of

13   the bed was broken, yes, I remember that.

14      Q.   And that happened in connection with the softball

15   game, right?

16      A.   Correct.

17      Q.   Well, she took the stand and said that was a

18   lie.  Did you know that?

19      A.   No, I didn't know that.

20      Q.   She actually told the detectives back on October

21   8th of 2000, that that occurred on the night of the limo.

22   Did you know that?

23      A.   No.

24      Q.   That was something important to you that he used

25   some violence, wasn't it?

1      A.   Yes.

2      Q.   Did you know that we also have -- let's do it

3  this way:

4           You indicated that there was no violent behavior

5  on Wendi's part.  You told us that, ever, in the

6  relationship, right?

7      A.   That is the knowledge I have, yes.

8      Q.   Do you remember that you related in your report a

9  conversation that you had with the defendant about an

10  incident that happened in the farm house where Mr. Anderson

11  became physically violent with items?

12     A.   Yes.

13     Q.   Do you remember that there was a situation, the

14  way you described it, where he grabbed a pot and went to

15  hit her and it hit the wall.  Do you remember that?

16     A.   Well, it wasn't exactly like that.

17     Q.   But it was something like that, right?

18     A.   Something like that, yes.

19     Q.   Tell me what you remember so we'll be on the same

20  field?

21     A.   What I recall is that he held her against the

22  wall and acted as though he were going to hit her with it

23  but instead hit the wall near her head.

24     Q.   But, did you know that what actually happened

25  that night is they had been at a function.  Did you know

1 that? Do you remember that incident?

2  A. I don't recall that.

3  Q. She didn't tell you that, did she?

4  A. I don't think so.

5  Q. And she became upset with Mr. Andriano that night

6 because she thought he was looking at another woman. Did

7 she tell you that?

8  A. No.

9  Q. And because of her jealousy, she called her

10 father to come pick her up from the function. Did she tell

11 you that?

12  A. No.

13  Q. And her father picked her up and she went home

14 and she waited approximately two hours. Did she tell you

15 that?

16  A. No.

17  Q. That when Mr. Andriano arrived home, she wanted

18 to go to sleep. Did she tell you that?

19  A. No.

20  Q. And, in fact, he did go to sleep. Did you know

21 that?

22  A. No.

23  Q. He was intoxicated, she indicated. Did she tell

24 you that?

25  A. I don't think so.

1      Q.   No, she didn't tell you that.   Your report

2   doesn't reflect that.

3           And then what happened is that she said she was

4   mad at him and started to pick a fight.   Did you know that?

5      A.   No.

6      Q.   And that during this process as this happened

7   that she hit him.   Did she tell you that?

8      A.   No.

9      Q.   Just given those three examples that we've talked

10   about, that didn't give you pause to reevaluate your

11   opinion that she's a victim of domestic violence?

12      A.   My report, I believe, spans eight years.

13      Q.   Ma'am, I understand that.   I'm not asking you

14   about your report.   I'm asking you whether or not just

15   those three main events that we're talking about, that fact

16   that she lied to you about those, whether or not that gives

17   you pause to reevaluate your opinion, yes or no?

18      A.   I am not changing my opinion based on those items

19   that you just brought forth.

20      Q.   Well, would you even consider reevaluating your

21   opinion just on those three items?

22      A.   I know you're going to cut me off, so I'm trying

23   to think of how to answer you.

24           I will not take acts out of context when I make a

25   decision.

1    Q.   So what does that mean?

2    A.   I have to look at the whole picture.

3    Q.   The fact that she lied to you about when the

4 dresser may have been hit, that didn't give you pause, did

5 it?

6         MR. PATTERSON:  Objection.

7         THE COURT:  Sustained.

8    Q.   BY MR. MARTINEZ:  The fact that there's an

9 inconsistency as to when the dresser was damaged doesn't

10 give you pause?

11   A.   The date of something happening is not

12 phenomenally significant.

13   Q.   It wasn't a date that you gave us.  Do you

14 remember in your report you didn't give us a date?

15   A.   No, I don't remember.

16   Q.   Remember you gave us an event and that's how you

17 identified it, remember?

18   A.   Okay.

19   Q.   She changed events on you, didn't she?

20   A.   You're saying that those things never happened?

21   Q.   What I'm saying is she indicated to

22 Detective Lucero that they happened at a different event --

23 different from what she told you.

24   A.   Are you saying that the bed post, the bed thing

25 never got broken, he never dumped the Kool-Aid, that he

1  never punched the wall, that he never busted the dresser

2  drawers.  I'm not sure what it is you're saying.

3      Q.  I'm saying that she changed her story as to when

4  those events happened.  And she included things and then

5  lied about other things as part of her narration of those

6  events.

7      A.  I think that it is possible for any human to not

8  get dates totally accurate when you're looking back over

9  time as to whether or not it was '94,'95 or '96.

10     Q.  I just told you it wasn't about dates.  In fact,

11  I told you it was about events.  Do you remember we just

12  had that conversation?

13          MR. PATTERSON:  He's arguing with the witness.

14          THE COURT:  Let's move on.

15     Q.  BY MR. MARTINEZ:  We're talking about events,

16  ma'am.  You keep wanting to say dates.  She never gave you

17  dates, did she, about those events, did she?

18     A.  I don't believe she did.

19     Q.  And she never gave a date to the officer, from

20  what we've been told, but she did switch when things

21  happened.  You don't find that significant?

22     A.  I'm totally confused by what you're saying.  You

23  started by talking about the picture in the farm house and

24  whether or not she provoked that.  I'm not even sure where

25  you were going with that.

EXHIBIT AAA

000008707

05-0002
Braccio

DP

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR2000-096032 |
| | ) | CR05 0005-AP |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 13, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

1

2

3                          A P P E A R A N C E S

4

5

6

7        For the State:

8                          Mr. Juan M. Martinez

9                          Deputy County Attorney

10

11

12

13

14        For the Defense:

15                          Mr. Daniel B. Patterson

16                          Mr. G. David Delozier, Jr.

17                          Office of the Public Defender

18

19

20

21

22

23

24

25

3

1

2

3                          I N D E X

4    WITNESSES:                                          PAGE

5

6       DONNA OCHOA

7          Redirect Examination by Mr. Delozier            6

8          Examination by the Court                       31

9          Recross-Examination by Mr. Martinez            32

10

11

12       LONNIE INSKEEP

13          Direct Examination by Mr. Delozier            37

14          Cross-Examination by Mr. Martinez             43

15          Redirect Examination by Mr. Delozier          46

16

17       GIA PALICKI

18          Direct Examination by Mr. Patterson           48

19          Cross-Examination by Mr. Martinez             59

20          Redirect Examination by Mr. Patterson         68

21

22

23

24

25

4

1

2

3                              I N D E X  (Continued)

4   WITNESSES:                                              PAGE

5

6      BARBARA MITCHELL

7         Direct Examination by Mr. Delozier               70

8         Cross-Examination by Mr. Martinez                74

9         Redirect Examination by Mr. Delozier             78

10        Examination by the Court                          80

11

12      ALEJO OCHOA

13        Direct Examination by Mr. Delozier               81

14        Cross-Examination by Mr. Martinez                89

15

16      JANA ANDRIANO CLAYTON

17        Direct Examination by Mr. Delozier               97

18        Cross-Examination by Mr. Patterson              132

19

20

21

22

23

24

25

5

1
2                  E X H I B I T S
3
4        (Exhibits were marked prior to trial unless
5  indicated.)
6
7  NUMBER:        DESCRIPTION     MARKED   ADMITTED
8    544       Counseling Documents         95
9    545       College Documents            95
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

6

```
 1                    P R O C E E D I N G S

 2

 3           THE COURT:  This is Cause Number CR2000-096032,

 4    State of Arizona versus Wendi Elizabeth Andriano.

 5           The record will reflect the presence of the

 6    defendant and counsel and the jury.

 7           Donna Ochoa is on the witness stand and we'll

 8    begin the redirect examination by Mr. Delozier.

 9           Mr. Delozier.

10           MR. DELOZIER:  Thank you, Your Honor.

11

12                    DONNA OCHOA,

13    called as a witness herein, having been previously duly

14    sworn, was examined and testified as follows:

15

16                  REDIRECT EXAMINATION

17    BY MR. DELOZIER:

18       Q.    Please state your name for the record?

19       A.    My name is Donna Ochoa.

20       Q.    You're the same person who was here on Thursday,

21    last week, testifying?

22       A.    That's correct.

23       Q.    And you're still under oath.

24       A.    Yes, I am.

25       Q.    Okay.  Okay.  There was some discussion during
```

1   your cross-examination by Mr. Martinez of immunization

2   records.   Remember that?

3       A.   Yes.

4       Q.   The testimony on direct was largely about

5   Nicholas; is that right?

6       A.   Yes.

7       Q.   And you really didn't talk about Ashley.   So why

8   don't you tell me a little bit about what happened at

9   Ashley's birth, how things went from that day and we'll get

10  into the immunization records in a bit?

11      A.   Okay.   Ashley is my granddaughter and Ashley was

12  born on September 16th of 1998.   She was a few weeks

13  early.   She was born about three weeks after Joe had his

14  last surgery.   And Wendi had tried to call her dad and I to

15  come over.   And it was like in the middle of the night when

16  she started having labor pains.   We didn't hear the phone

17  because the phone was in the front of the house.

18           MR. MARTINEZ:   Objection.   Relevance.

19           THE COURT:   Overruled.   Go ahead.

20           THE WITNESS:   Okay.   And so, anyway, she got

21  ahold of her cousin who came and knocked on our window and

22  told us Wendi was having the baby, you better get over

23  there.   So we went to the apartment and Wendi was having

24  contractions really close.   This one was going a whole lot

25  quicker than Nicholas.   Nicholas, she had to be induced.

8

1   So we were getting the stuff from Wendi's bag and taking it

2   to the car.  Joe said he wanted to take a shower and have

3   Alejo clean his incision first.

4          So we waited while that happened.  And then, Joe

5   and Wendi and I left and she was supposed to deliver at

6   Desert Sam.  And there was no way she was going to make

7   it.  In the meantime, when we were at Wendi's house I also

8   picked up scissors and floss and gauze and blankets and

9   pillows too and towels.  Because it was getting hard to

10  tell just how long they were, you know, the contractions

11  were apart.  So I just didn't want to take a chance and I

12  have delivered a baby before.

13         And so, we get close to Phoenix and there is no

14  way she's going to make it because, "Mom, I can feel the

15  baby's head." And I'm going, "Please, you know, just keep

16  your legs together.  We'll make this."

17         So, we pulled -- I told Joe to pull into Chandler

18  and we went to Chandler.  And they came out with a chair

19  and the nurse checked her and then they got a stretcher and

20  wheeled her into the labor and delivery room that they have

21  there.  And hit the walls and everything else.  It was like

22  exciting.  I thought, okay, the first one was nice and

23  calm.  We knew when she was going to have it.  And here

24  comes the baby girl, she's in a hurry to get here.

25         So, Ashley was born.  The nurse saw her and she

9

1    looked at her and said, "Have you ever helped?"  And I

2    said, "Yeah, I have a clinical background."  She goes gets

3    the gloves, because the doctor wasn't in there yet.  So

4    someone was going to have to help her.  The doctor made

5    it.  And then put little Ashley -- she was so cute -- put

6    her on the scale and she kind of didn't want to lay on her

7    back.  So they had to put her on her knees.  And she had

8    her little bottom had up.  She was just a beautiful little

9    baby girl.  Being a grandma, I'm a little bit prejudice.

10   But she was a beautiful baby.  And I did get to be involved

11   so much in the birth with both of my grandchildren.

12            And Ashley, again, is one that I told you we used

13   to go on a girls' breakfast.

14            We took Wendi and Joe and Nicholas and Ashley to

15   Lake Tahoe for vacation in '99.

16            MR. MARTINEZ:  Objection.  I don't know the

17   scope.

18            THE COURT:  Sustained.  Ask your next question.

19       Q.  BY MR. DELOZIER:  Give us some idea what happened

20   within the first couple months of Ashley's birth.  This is

21   September of 1998, you said?

22       A.  This is September of 1998.  Ashley was born about

23   six weeks after this surgery, or four weeks.  And Wendi had

24   to go back to work because she had only been working at

25   that position for a few months.  And she went back when

1   Ashley was two months old, or two weeks old.  She took her

2   to the office with her.  She had, you know, a carry thing.

3       Q.   Where was she working at that time?

4       A.   She was working at Courtyard Apartments.  And the

5   office was separate.  It wasn't out where the general

6   public was.  They had a separate office so she was able to

7   nurse Ashley in the office and care for her there.

8            My sister and her husband were also at the

9   apartments.  They helped with Nicholas.  My sister came out

10  from Texas who is an R.N. and helped.

11      Q.   At Ashley's birth, how old was Nicholas?

12      A.   They are 15 months apart.

13      Q.   Okay.

14      A.   So Nicholas wasn't, you know, he wasn't very big

15  either.  There was two babies with diapers and bottles.

16  And Ashley, she's a little fighter.  She would fight for

17  her share of the attention.  She kind of got shoved into

18  the back because of everything going on with Joe and the

19  surgery and all the stuff we had to do.  Little Ashley kind

20  of just got pushed aside a little bit.  And so it is a good

21  thing she got to go the first few weeks with her mom until

22  they found the baby-sitter who was upstairs from their

23  apartment.  And they took care of Ashley.

24      Q.   So the first few weeks when Wendi went back to

25  work, Ashley went with her.  Was that every day?

1    A.   Every day that Wendi worked, yes.

2    Q.   And was it a normal five-day week?

3    A.   Yes.  I believe -- I'm not sure.  She may have

4    worked -- I know she worked one of the days on the weekend

5    and then four days during the week.

6    Q.   All right.  And how long did that continue, for

7    several weeks?  Can you be more specific?

8    A.   Several weeks until she found the baby-sitter.

9    And then after she still would take Ashley with her for a

10   few hours a day because she was, like I said, she was

11   nursing her.  And then it got to where the baby-sitter

12   would bring the baby over to her.

13   Q.   Now, during that several weeks, Nicholas was with

14   your sister?

15   A.   Nicholas was at the apartment.  My sister and

16   brother-in-law were staying there.  And I'm not -- I don't

17   remember if Nicholas -- I know he stayed there while my

18   sister was there.  But then, after a week or two he went

19   over to another baby-sitter that used to be his

20   baby-sitter, if I remember correctly.  But that baby-sitter

21   didn't take babies.  So they were looking for somebody that

22   would take Nicholas and Ashley.

23   Q.   And they found that after several weeks, you say?

24   A.   After a few weeks.

25   Q.   Can you give us an approximate number?

12

1    A.    Probably three or four.

2    Q.    Do you remember that baby-sitter's name?

3    A.    The baby-sitter that ended up -- yes, her name

4  was Mina Mora.

5    Q.    What was Mina's schedule to care for the

6  children?

7    A.    She was supposed to watch them from the time, I

8  think it was eight to five.

9    Q.    Was that Wendi's work day?

10   A.    That was Wendi's work day.  Her husband would be

11  home around five and she hadn't wanted to baby-sit after

12  that.

13   Q.    Who's husband?

14   A.    Mina's husband.

15   Q.    So eight to five on the days that Wendi worked?

16  She kept them from eight to five on the days Wendi worked?

17   A.    Correct.

18   Q.    Was Joe working during that period?

19   A.    No.

20   Q.    How long did Mina help care for the children?

21   A.    Mina baby-sat the children a little over a year.

22  I believe it was a little over a year.

23   Q.    So we're into fall of 1999?

24   A.    Yes.

25   Q.    October, November, December?

1     A.    I think it began in September of '99.

2     Q.    Okay.  And the testimony you gave regarding

3  immunizations, that was largely Nicholas; is that correct?

4     A.    That's correct.  Because with Nicholas, that

5  first year of his birth, Wendi was at home with Nicholas

6  and so, you know, Wendi would be the one that obviously

7  took Nicholas to the doctors.  And I was in Casa Grande.

8  They were on AHCCCS.  And even though he was born in

9  Chandler, AHCCCS wouldn't pay for a pediatrician in

10  Chandler, she had to stay in Casa Grande.

11     Q.    So that was Nicholas they were on AHCCCS at that

12  time.  Were they on AHCCCS with Ashley's birth?

13     A.    No, they were not.

14     Q.    How was that paid for?

15     A.    That was paid for by insurance.

16     Q.    Through the Courtyard?

17     A.    Yes.

18     Q.    Okay.  At the time that Ashley was getting her

19  immunizations that you were asked questions about earlier,

20  where were they living then?

21     A.    I believe the first of her immunizations would

22  have been in Casa Grande.  She would have been living in

23  Casa Grande.  But I believe her doctor and pediatrician

24  were in Chandler.

25     Q.    All right.  So, during the time that Ashley was

1  getting her immunizations, Wendi was working?

2      A.   Yes.   Wendi would have been working in Casa

3  Grande.

4      Q.   Did you have a chance to look at the chart that

5  was shown you the other day?

6      A.   No.

7           MR. DELOZIER:   If I could approach.

8           THE COURT:   Yes.

9      Q.   BY MR. DELOZIER:   Exhibit 543, that we're

10  showing.   Take a few moments to look at it.

11     A.   Okay.

12     Q.   I'm going to put it up on the ELMO for you to

13  take a look at it.

14          What I want to direct your attention specifically

15  to are the dates -- I don't know if you can make those out

16  or not -- but the sort of third column.   Do you see the

17  third column?

18     A.   Yes.

19     Q.   It's one that has handwritten items?

20     A.   Yes.

21     Q.   The first column on the left-hand side, what is

22  that?

23     A.   The type of vaccination or immunization.

24     Q.   The first entry on the first handwritten portion,

25  is what?

15

1    A.   The first entry, the handwritten potion, would be

2  the date that it was administered.

3    Q.   What is the date?

4    A.   Looks like 11/25/98.

5    Q.   Let's go down to the seventh entry on the

6  left-hand side.  Likes look HIV?

7    A.   Uh-huh.

8         THE COURT:  Is that a yes?

9         THE WITNESS:  Yes.

10    Q.   BY MR. DELOZIER:  What's the date of this shot?

11    A.   Looks like 11/20 something.  Looks like pretty

12  much the same date as the one above, 11/25/98.

13    Q.   Let's go down to, skip that group that's vacant

14  there.  See what looks like OPC?  Do you see that one?

15    A.   Yes.

16    Q.   What's the date for that shot?

17    A.   11/25/98.

18    Q.   And moving on down to HVB, Number 1, towards the

19  bottom?

20    A.   Yes.  11/25/98.

21    Q.   Is that actually  HVB, Number 2, isn't it?

22    A.   Yes.

23    Q.   HVB Number 1 was done at that hospital, right?

24    A.   Yes.

25    Q.   If we -- let's go back to the top, then.  We've

16

1  got DPT, Number 2.  See that one?

2       A.   Yes.

3       Q.   What date is that?

4       A.   Looks like 2/3/99.

5       Q.   Okay.  Then come back to HIV Number 2, what date

6  is that?

7       A.   2/3/99.

8       Q.   Come down to OPV, Number 2?

9       A.   2/3/99.

10       Q.   Come down to HVB Number 3 what date is that?

11       A.   That's 3/19/99.

12       Q.   And we'll go back up to the top again.  We've got

13  DPT, Number 3.  What date is that?

14       A.   3/9/99.

15       Q.   Is that 3/9 or 3/29.  You can get up if you need

16  to?

17            THE COURT:  You can get up and move away from the

18  witness stand.  Just remember to speak up when you're away

19  from the witness stand.

20            THE WITNESS:  Okay.

21       Q.   BY MR. DELOZIER:  DPT, Number 3?

22       A.   It could be a 19.

23       Q.   Let me zoom in a little.  Does that help?

24       A.   Yeah, it looks like 29 there.

25       Q.   Okay.  Let's go down to HIV Number 3.  What date

1    is that?

2        A.    3/29/99.

3        Q.    Let's go down to HVB, 3 at the bottom?

4        A.    3/29/99.

5        Q.    So, looks like what happened is they give them

6    three or four shots on the same date, correct?

7        A.    Correct.

8        Q.    Thank you.  You were asked questions about the

9    Ten Commandments and the religious instruction.  Do you

10   remember those?

11       A.    Yes.

12       Q.    What would you do differently?

13             MR. MARTINEZ:  Objection.  Relevance.

14             THE COURT:  Sustained.

15             MR. DELOZIER:  May I approach?  May I have a

16   moment, Judge?

17             I'll come back to that in a minute.

18       Q.    BY MR. DELOZIER:  I want to go back to Exhibit

19   543.  The last column on the right is informed consent.  Do

20   you see that?

21       A.    Yes.

22       Q.    An entry there above the signatures, can you see

23   that?

24       A.    Signature of parent or guardian.  Signature of

25   parent or guardian in response to informed consent

1  statement.

2      Q.   You never signed any of those entries, did you?

3      A.   No.

4      Q.   In fact, they wouldn't have permitted that, would

5  they?

6      A.   No.

7      Q.   If both parents are present, they only require

8  one signature of the parent?

9          MR. MARTINEZ:  Objection.  Lack of foundation as

10  to that date and time.

11          THE COURT:  Sustained.

12      Q.   BY MR. DELOZIER:  Do you know if when the

13  children go for the immunization, if both parents are

14  present are both parents required to sign?

15      A.   No, they're not.

16      Q.   Also, let's go to the signature there, first line

17  on the DPT, Number 1 line, first one all the way across.

18  Are you able to tell whose that signature is?

19      A.   That appears to be Joe.

20      Q.   And the second?

21      A.   Second one appears to be Joe.

22      Q.   And the third one?

23      A.   Wendi.

24      Q.   Okay.  Fourth one?

25      A.   Joe.

19

1    Q.   On the next set?

2    A.   Appears to be Joe on all of those.

3    Q.   How about the next grouping.  Under OPV 1, jump

4  the blank spaces.  What do you see there?

5    A.   It looks like Joe, Joe, Wendi, Joe.

6    Q.   How about the last grouping?

7    A.   Joe, Joe, Wendi.

8    Q.   Let's look at the dates.  On March 9, go to DPT

9  one that's put in on March 9, correct?

10    A.   Looks like a stamp.

11    Q.   If you go across on the column, whose signature

12  is on that one?

13    A.   Joe.

14    Q.   Let's move down to OPV 3, whose signature is on

15  that one there?

16    A.   No.  There is a signature underneath.

17    Q.   Okay.  You think they might have signed the wrong

18  spot?

19         MR. MARTINEZ:  Objection.  Lack of foundation.

20         THE COURT:  Sustained.

21    Q.   BY MR. DELOZIER:  Okay.  So on the same date

22  March 9, we have two different signatures, by two different

23  parents.  Correct?

24         MR. MARTINEZ:  Objection.  That's not what the

25  document says.

20

1          THE COURT:  Sustained.

2     Q.   BY MR. DELOZIER:  Well, I think the document

3  shows March 9, right, for that test?

4     A.   Yes.

5     Q.   For the shots, right?

6     A.   Yes.

7     Q.   And the column for informed consent for the shot

8  is what you say is Joe's signature, correct?

9     A.   Yes.

10    Q.   Then on March 9 we have OPV 3, right?

11    A.   Yes.

12    Q.   And there is no signature on that line, but one

13  right below it, correct?

14    A.   Correct.

15    Q.   And if we go on down to the last entry, March 9,

16  right?

17    A.   Correct.

18    Q.   You go across to the right, there's a signature.

19  Who is that?

20    A.   Wendi.

21    Q.   Thank you.  I started to ask you a question

22  regarding the religious training and background that you

23  were asked about, that you testified a little bit about.

24  And you had experiences with the street ministry, if you

25  call it that, or traveling missionary group, right?

21

1    A.   Yes.

2    Q.   You had then enrolled her in the 91st Psalm later

3    Harvest Christian Academy School where she stayed until she

4    was 18; is that correct?

5    A.   That is correct.

6    Q.   If you had it to do over, what would you change

7    about the kind of religious experiences that you gave her?

8         MR. MARTINEZ:  Objection.  Relevance.

9         THE COURT:  Sustained.

10        MR. DELOZIER:  Can we approach, Your Honor?

11        (Bench conference was held outside the hearing of

12   the jury.)

13        MR. DELOZIER:  There has been continued issues

14   raised about violating the Ten Commandments by

15   Mr. Martinez.  Okay.  And wasn't this part of your church

16   instruction, doesn't she violate that church instructions.

17   And basically criticizing the experiences.  I think this

18   lady needs to have the opportunity to explain the nature of

19   those experiences and what she would change if she did them

20   today.

21        THE COURT:  Mr. Martinez.

22        MR. MARTINEZ:  I think that what we tried to show

23   on Thursday was that her up bringing was exemplar, just the

24   converse of what she's postulating for the Court saying

25   that she'd changed this or that.

22

1          THE COURT:  I'm going to sustain the objection

2     but you made your record.

3               (Bench conference concluded.)

4      Q.   BY MR. DELOZIER:  Mr. Martinez asked you if

5     thought she had an idyllic or perfect childhood or

6     upbringing.  Do you remember that line of questioning?

7      A.   Yes, I do.

8      Q.   Would you wish to clarify your answer on that

9     subject?

10     A.   Yes, I would.  I do not believe that Wendi had an

11    idyllic or perfect childhood.  Yes, we loved her, you know,

12    and I agreed with that.  But as far as a perfect childhood

13    or other, no.

14          I was married to Wendi's biological father and

15    abuse ran rampant in that family.  Her biological father is

16    in prison for child molestation of a retarded

17    stepdaughter.  His father had abused the other

18    granddaughters in the family.  His brother also went to

19    jail for that.

20          I know of a number of people -- I was really

21    young and really naive and when they said, well, you know,

22    your husband has been abusing your nieces, I thought there

23    is no way.  Finally, after Wendi was about three years old

24    I tried to get away from him because he not only abused

25    children, he abused adults.  I was verbally and physically

1 abused.

2       Those are things that I don't like to talk

3 about.  And a lot of other things I didn't admit for a lot

4 of years.  Actually, not until about three years ago.

5       To make things worse, when I left my husband and

6 I was living with my mom, I put Wendi into a nursery school

7 in Phoenix, downtown Phoenix.  And the next thing I knew,

8 they were sending all the kids home because the State was

9 doing abuse charges on them.

10       It was like -- it was just kind of crazy.  And I

11 moved to Casa Grande to get away from, you know, the people

12 that I knew and thought may be it could get better for

13 Wendi.  And I lived with a roommate.  I used to work -- I

14 worked for Pinal Alcohol and Drug Abuse because I'd gone

15 into counseling after I had left.  I had left and got

16 involved in programs.  I had -- I knew how to write grants

17 so we went to work for them writing grants.  And also I

18 worked shifts from Friday nights until Monday morning

19 because if the police brought in drunks off the street then

20 we had, there is a transport that would take them over to

21 the program.  All I had to do was kind of baby-sit the

22 person until transport checked them over.

23       At that time, Wendi was watched by my roommate.

24 Then Alejo and I were married.  And we got hooked up with

25 Rick and Al that were traveling missionaries that had come

24

1   out of an organization.  And for two years we lived in Casa

2   Grande and we had church meetings at the house.

3            There were probably, I think there was one other

4   child that was, you know, at the church, you know, we would

5   call it.

6            And then, one day, you know -- we were tithing

7   really good.  I grew up in the church, you know, it was

8   like hell, fire and brimstone if you didn't do what God

9   told you.  So you were going to go to hell and we got away

10  from all that.  And Rick and Al said you know God wants you

11  guys to go into the ministry and you're supposed to do this

12  and whatever.  We ended up in Wilcox, Arizona.  And for

13  about three months we lived like in a commune with, there

14  was a married couple and single women and single men.

15  There were three children, Wendi and two others.

16           All of a sudden, one day they said we needed to

17  leave.  We were to go to Tucson because Sister So And So

18  has a house in Tucson.  So we did.  We picked up and left.

19  Later on after Alejo and I left the traveling people, this

20  was several years later, I found out why we left Wilcox in

21  such a hurry.  And it was because Al had been or Rick had

22  been charged with child abuse.  And then later in my life I

23  find out about the situation with Rick and what he did to

24  my daughter.

25           We were on the road for all that time, for

1   several years.  We woke up at four o'clock in the morning

2   with Rick and Al, rise and shine.  Then we spent the next

3   about five hours reading in the Bible and doing Bible

4   studies and stuff.  And then as I shared with you guys

5   before and we did classes for Wendi.

6          That's not a normal childhood.  Then we bring her

7   back to Casa Grande and put her in a church school.  And

8   there, again, there was very few kids.  We isolated her.

9   We didn't want her to be sucked into worldly things.

10          You have to remember, it was a mess, those years,

11  living on the road.  The only friends that she had were two

12  single ladies and two married couples.  That's not a normal

13  childhood.  She was taught that you obey them, that they

14  had the rule over you.  You obey those in authority over

15  you.  She wasn't taught that there was a choice.  She

16  didn't have choice.

17          Wives are supposed to be submissive to their

18  husbands.  We taught her a lot of scripture but we didn't

19  ever teach her a balance.  You try so hard do the things

20  that are right.  But you forget that there is a balance.

21  It's like, Alejo and I went from one extreme to another

22  extreme and Wendi was caught in the middle of it.  There

23  were times that we didn't have food.  I mentioned to the

24  prosecutor the other day sometimes the only beans we had

25  were the ones she counted for school.

1    These are things I don't tell people.  Because

2  another thing that I was taught from growing up is that you

3  don't say bad things about people.  And you don't let

4  people know what's going on behind the doors.  I grew up in

5  a family with alcohol problems.  So I'd already learned how

6  to hide secrets.  You just don't talk about those things.

7  You just act like everything is fine.  It will be okay.

8    And I also expected Wendi to do everything that

9  she was told.  Because I had high expectations for myself

10  that I get everything right.  Because if you do everything

11  right, then everything is supposed to work out the way it's

12  supposed to.

13    Basically, I taught her how to, you know, follow

14  my example.  Yes, she learned the Ten Commandments and she

15  could quote scripture, sure.  But just because you know

16  those things, if you don't have them in your heart and know

17  to balance stuff, it's not going to do any good.  You can

18  memorize multiplication tables and it's got to be in your

19  heart.

20    And the times that she did rebel in school when

21  she tried so hard to get kicked out of school because she

22  wanted to go to public school and we wouldn't let her.

23  Like I shared earlier, we made her go out in front of her

24  peers in school and pull weeds for three months, in front

25  of all those people.  And yet we expected her to accept it

1   and just think it was okay.

2          With that kind of expectation from your parents,

3   how in the world would you tell your parents something else

4   is wrong.  She didn't have a chance.  She couldn't have

5   told us if anything was wrong.  She was taught you just

6   love people and things would change.

7          When Alejo would yell and scream at her, we would

8   tell her, dad gets down we'll go on out there and

9   everything will be fine and nice and it will just all go

10  away.  She had no clue how to survive.  No clue at all.

11          THE COURT:  Mr. Delozier, ask your next question.

12          MR. DELOZIER:  Thank you, Your Honor.

13     Q.   BY MR. DELOZIER:  You had some happy times in the

14  last couple of years before October with you and the grand

15  kids and with Wendi and Joe?

16     A.   Yes.  Yes.  We used to -- they used to come over

17  like on Christmas Eve and we'd -- sometimes we'd go ride

18  around and look at the lights and stuff.  And we'd decorate

19  and when the little ones were big enough I'd let them

20  decorate the bottom of the tree and they'd hang little

21  wooden men because they can't break those.

22          And then they'd spend the night and Joe and Wendi

23  and the kids and we'd make cookies and we'd bake.

24          In fact, one of my memories, my husband asked me

25  if I wanted to refinish our kitchen, dining room table,

28

1   Wendi and I -- and I won't do it, now.

2          Wendi and I had decided to make presents for

3   everyone that year.  And we had all the different flavors

4   out and I think it was the almond that spilled and so that

5   I have, like, it takes the finish off in one section of the

6   table and I won't ever refinish it.

7          We used to make ornaments and put the names on

8   them for everybody for each year.  And just had a good

9   time.  And it was especially a good time because when she

10  was young we wouldn't celebrate Christmas.

11         And so when we finally, you know, got our heads

12  together to do that, we really enjoyed it.  But I don't

13  have Christmas any more.  It's too hard.

14         For Easter we used to go, we'd go to church and

15  we and our two families, Alejo and I and Wendi and Joe,

16  first Nicholas and then Ashley, go to church for Easter and

17  then we'd go over to the Francisco Grande and they always

18  had a person dressed up as they were the Easter Bunny and

19  Nicholas hated it.  Nicholas was scared of him.  And he

20  never did like things that dressed up big, old things.  If

21  you're a little one, it would be pretty scary.  The first

22  time that Ashley went, she was only about six, seven months

23  old.  She really liked it.  She wasn't scared of the Easter

24  Bunny.  She wasn't scared of Santa Clause or anything like

25  that.  She's a little fighter.

29

1        She's the one I said, you know, would fight for

2  attention.  When all the bad things that happen and Joe had

3  his surgeries.  She had to fight for their attention.  And

4  now she's one that likes to go on roller coasters and

5  Ferris Wheels and things like that.  She's a little girl.

6  She reminds me of my daughter.

7        MR. DELOZIER:  I have nothing further.

8        THE COURT:  Are there any questions for this

9  witness by the jury.  If so, please raise your hand.

10        (Bench conference was held outside the hearing of

11  the jury.).

12        THE COURT:  Question:  Do you know if Wendi has

13  seen her children since she was arrested?

14        Mr. Delozier.

15        MR. DELOZIER:  I assume she means her

16  grandchildren.  Obviously, she's seen Wendi, she only has

17  one child.

18        THE COURT:  She's talking about Wendi.

19        MR. DELOZIER:  I'm sorry.

20        THE COURT:  Let me read it again.  Do you know if

21  Wendi has seen her children since she was arrested?

22        Mr. Delozier.

23        MR. DELOZIER:  We'll be getting close to being in

24  trouble if we ask that question because of the ruling you

25  made.

30

1          THE COURT:  Mr. Martinez.

2          MR. MARTINEZ:  I agree.  We shouldn't ask that.

3          THE COURT:  Will Wendi have access to her

4   children for visits while in prison?

5          Mr. Delozier.

6          MR. DELOZIER:  I think that's an illegal issue.

7   I don't know that she'd be capable of answering that.

8          MR. MARTINEZ:  I agree.  We shouldn't ask that.

9          THE COURT:  Question: How often do you currently

10   visit Wendi?

11          MR. DELOZIER:  I have no problem with that.

12          MR. MARTINEZ:  I don't see how it is relevant at

13   this stage.

14          THE COURT:  I'll ask that question.

15          THE COURT:  What types of changes have you seen

16   in Wendi since her arrest, if any?

17          Mr. Delozier.

18          MR. DELOZIER:  Yes.

19          MR. MARTINEZ:  I object.  It's beyond the scope.

20          THE COURT:  I'll allow you follow up and allow

21   you to follow up.

22          MR. MARTINEZ:  Okay.

23          (Bench conference concluded.)

24

25

31

EXAMINATION

BY THE COURT:

1
2
3    Q.   I have some additional questions here from the
4  jury.
5         First question reads as follows: How often do you
6  currently visit Wendi?
7    A.   Currently, I try to -- either Alejo goes or I go
8  down every Friday.  It's been difficult because of work.
9    Q.   Either you or Mr. Alejo go down on Friday.
10        Next question reads as follows:  What types of
11  changes have you seen in Wendi since her arrest, if any?
12    A.   I've seen lots of changes.  She was always taking
13  care of people.  And, you know, and I've seen her continue
14  to do that.  Because, like I said, I've gotten letters from
15  people.  I've talked to people and they say I want to tell
16  you what your daughter's done for me.
17        When she very first went in there, she said that
18  was the first time she felt safe in eight years.  I've seen
19  her strengthen.  I've seen her -- She's probably a whole
20  lot more able to handle things than I am.
21        She's gotten strong.  She's survived living with
22  people that might have, you know, like a fourth-grade
23  education and try to help them.
24        One day Wendi called and said she just got
25  finished giving this little lady a bath.  I said, "Are you

32

1   supposed to be doing that?"  She goes, "Well, she is like

2   sixty-some years old.  She can't give herself a bath."

3   And, personally, I grossed out and said, "No, you don't do

4   that."

5            I've had lots of good comments just from when I

6   go to sign up to see her of the guards and staff.  They

7   say, "Hey, you really look like your daughter.  Oh, you

8   have to be Wendi's mom.  You guys look just alike."  Things

9   like that.

10           Stronger, a lot stronger.  A lot stronger.

11           THE COURT:  Are there any further questions of

12  the jury of this witness?  No one has raised their hand.

13  Mr. Delozier, do you have any follow-up questions

14  to the questions asked by the jury?

15           MR. DELOZIER:  No, Your Honor.  Thank you.

16           THE COURT:  Mr. Martinez.

17

18                   RECROSS-EXAMINATION

19  BY MR. MARTINEZ:

20       Q.   You indicated that you and your husband visit her

21  every Friday, correct?

22       A.   We try and visit every Friday.  One or the other

23  of us.  We try to go on the weekends because it's like a

24  six-hour wait before we can see her.

25       Q.   So you and your husband go about every Friday,

33

1   right?

2        A.   Yes.  We try and go every Friday.

3        Q.   That doesn't mean you go every Friday.  In other

4   words, you could alternate between him and you, correct?

5        A.   Oh, that's correct.

6        Q.   So, is it fair to say that you really don't know

7   how often you visited her in the last six months, do you?

8        A.   No, I have probably visited her -- I know it's

9   been less than my husband has but I do talk with her on the

10  phone.

11       Q.   I'm not talking about the phone.  How often do

12  you visit her?

13       A.   I've probably, in the last six months -- I can't

14  give you a count because we've been doing this for four

15  years.

16       Q.   One or two times?

17       A.   Definitely, more than one or two times because I

18  was just down there the other day.

19       Q.   And your assessment of what her changes are, are

20  based on that one-hour conversation that you have with her,

21  correct?

22       A.   No.  Like I said, I talk to her.

23       Q.   In addition to some other things, but it's mainly

24  based on the face-to-face conference, right?

25       A.   Partly.  Not mainly at all.

34

1    Q.   But that's a small part, right?

2    A.   Correct.

3    Q.   And the others are based on, I think you said, in

4    talking to, I guess, guards who make comments, "You look

5    like her?"

6    A.   Oh, they say that, you know, that, "You really

7    look like your daughter.  She's really nice."

8    Q.   But, let me stop you there.  They say that they

9    really like your daughter.  But that doesn't say anything

10   about her changes because she was liked before.  When she

11   was at San Riva, people liked her, didn't they?

12   A.   I wasn't at San Riva.  And, yes, I thought they

13   did.

14   Q.   But you did think they did.  I didn't ask you if

15   you were there.  I asked you whether or not they liked

16   her.  It appeared to you from when you went there they

17   liked her?

18   A.   Yes, it appeared to me.

19   Q.   She's a sociable woman.  She was a sociable woman

20   back then, right?

21   A.   I don't understand where you're coming from.

22   Q.   I'm asking whether or not she was a sociable

23   woman when she was at San Riva?

24   A.   I did not see her very often at San Riva in

25   content with other people.  At several of the parties that

1  they have to give, that she had to be the hostess of, yes,

2  then I saw her sociable there.

3      Q.   And just like you didn't see her being sociable

4  at San Riva, you don't see whether or not she's sociable in

5  the jail, do you?

6      A.   Just from what I overhear or hear from people.

7      Q.   When I asked you about San Riva, you fought me

8  and said, no, I don't know because I didn't see her.  Do

9  you remember telling me that?

10     A.   Yes.

11     Q.   And then I applied it to the jail, you didn't see

12  what's going on behind the bars, do you?

13     A.   No, just from what I hear.

14     Q.   You don't know whether or not she actually gets

15  along with the other inmates, do you?

16     A.   Well, the other inmates are talking to me on the

17  phone and saying that Wendi is friendly.  I would assume

18  she's getting along with them.

19     Q.   Right.  You haven't talked to all of the people

20  that she  --

21     A.   Of course, not.

22     Q.   You don't know whether or not she takes advantage

23  of them, do you, right?

24     A.   I do not know if she does or she doesn't.

25     Q.   You don't know if they have special names that

1   are derogatory for her, do you, the other inmates?

2        A.   No.

3        Q.   So, in terms of the changes, the ones that you

4   want us to consider, those are changes based on your

5   face-to-face conversation which may or may not be minimal,

6   your conversations with her on the telephone, right?

7        A.   Yes.

8        Q.   And what guards may say to you or what someone on

9   the phone may say to you, correct?  Is that what it's based

10  on?

11       A.   Yes.

12            MR. MARTINEZ:  I don't have anything else.  Thank

13  you.

14            THE COURT:  May this witness be excused?

15            MR. MARTINEZ:  Yes, sir.

16            MR. DELOZIER:  Yes, sir.

17            THE COURT:  Thank you.  You're excused.

18            (Witness sworn.)

19            THE COURT:  Please have a seat on the witness

20  stand.  Pull microphone close to you.  Remember to speak

21  loudly and clearly so everyone can hear.  Wait until the

22  question is complete before answer the question.  Please

23  make a verbal response.

24            Is that agreeable to you, sir.

25            THE WITNESS:  Yes, sir.

37

1      THE COURT:  Mr. Delozier, you may proceed.

2      MR. DELOZIER:  Thank you, Your Honor.

3

4                LONNIE INSKEEP,

5  called as a witness herein, having been first duly sworn,

6  was examined and testified as follows:

7

8                DIRECT EXAMINATION

9  BY MR. DELOZIER:

10     Q.   Please state your name for the record?

11     A.   Lonnie Inskeep.

12     Q.   Would you spell it?

13     A.   Lonnie, l-o-n-n-i-e.  Inskeep, I-n-s-k-e-e-p.

14     Q.   Thank you, sir.  And do you know the Ochoa

15  family?

16     A.   Yes, I do.

17     Q.   How long have you known the Ochoa family?

18     A.   I knew the Ochoa family from 1984 to 1990.

19     Q.   Okay.  Are you currently employed?

20     A.   Yes, I am.

21     Q.   Where do you work?

22     A.   I'm a firefighter for Ak Chin fire department.

23  I've been employed with them two and half years.

24     Q.   And what did you do prior to that?

25     A.   I retired from Sea Ray boats after 25 years.

38

1      Q.   How did you come to know the Ochoas?

2      A.   I met the Ochoa family at church.  We went to the

3   same church which was Harvest Church.  And that was the

4   period of time that I knew them.

5      Q.   Okay.  So you began -- you went to the church and

6   met them there, is that what you mean?

7      A.   Yes, I did.

8      Q.   And so you attended the church through to 1990?

9      A.   Yes, through 1990.

10      Q.   Have you had any contact with them since then?

11      A.   Really not.  We met the family one time, maybe at

12   a wedding.  After we saw on the news that --

13                THE COURT:  Hold on a second.

14                After what period of time?  You said the period

15   of time.

16                THE WITNESS:  The period of time?

17      Q.   BY MR. DELOZIER:  The wedding?

18      A.   At the wedding, like 1992.

19      Q.   Would that have been Joe and Wendi's wedding?

20      A.   I don't think we went to that wedding.  I'm not

21   sure.

22      Q.   So it was somebody else's wedding?

23      A.   Yeah, another person at our church's wedding.

24      Q.   You started to say something about a later time?

25      A.   Yes.

39

1      Q.   When was that?

2      A.   After Wendi was on the news, I wrote her some

3  letters in jail.

4      Q.   And did you have any contact with her mother and

5  father during that period of time?

6      A.   Yes, I did.  We went to another wedding, which

7  was an individual, common friends of ours, and we met at

8  that wedding.  That was about, I'm going to say 2001.

9      Q.   Okay.  Was that just hello?

10     A.   Basically, just stuff based on how is everyone

11  doing in their lives.

12     Q.   Okay.  All right.  What was the occasion for not

13  seeing them from 1990 forward?

14     A.   The occasion for not seeing them, the church we

15  were going to, I disagreed with some of the things that was

16  happening at the church.  Me and my wife and our two kids,

17  we decided that we were going to go to a different church.

18  That was pretty much the reason why I had no real contact

19  with them.

20     Q.   All right.  Do you have any recollection of the

21  roles that Alejo or Donna and Wendi played in the church,

22  if any?

23     A.   Yes, I do.

24     Q.   What were they?

25     A.   Wendi was, at the time she was real young, she

40

1   was a youth, I think from age 14 to like 18, somewhere in

2   that area. She was a very active teenager at church. She

3   was involved in the music program. And while she was

4   involved in the music program, sometimes I was also

5   involved with music at church. So she would play the

6   piano. I would play keyboard. She was active in the youth

7   group and their particular music involvement. I really

8   wasn't active in that part of it.

9       Q.   Did Alejo have a role in the church?

10      A.   Yes.

11      Q.   What was that?

12      A.   He was a youth pastor for the younger kids. And

13   I did go camping with the youth group a couple times and

14   Alejo was the leader at that time.

15      Q.   Did you have children that were there?

16      A.   Yes, I did.

17      Q.   What ages were your children during the time you

18   went to this church?

19      A.   I'm guessing they were about eight, nine. My

20   daughter is eight years younger than Wendi. Don't ask me

21   all the dates.

22      Q.   Did they attend the school?

23      A.   Yes, they did.

24      Q.   What role did Donna have in the church, the

25   school, if any?

41

1    A.    Donna was involved, I believe in the school.  And

2  she taught some classes.  And then sometime during that

3  period she took a job and she was not active in the school,

4  what I remember.

5    Q.    How would you describe Wendi during that period

6  of time?  You talked about the piano playing.  How would

7  you generally describe her personality?

8    A.    Wendi, I thought was an unique teenager.  She was

9  very kind and considerate when you talked to her.  She

10  would listen to you.  I never saw her get mad.  She was one

11  of the active teenagers involved.  She was a leader in the

12  group.  And she was just a neat person.  And that's the way

13  I've always remembered her as.

14    Q.    Active in -- do you know if she was active in any

15  of the school's activities?

16    A.    Yes.  The school usually had two or three main

17  activities a year.  And they would go to conventions and be

18  involved in the conventions.  They had different things

19  they participated in.  It was almost like a contest where

20  they would excel in maybe some of the subjects they

21  learned, scripture and memorization, things like that.

22    Q.    Okay.  You say you wrote to Wendi over the last

23  four years?

24    A.    Yes, I have.

25    Q.    About how many times do you think?

42

1    A.    Three times.

2    Q.    Did she respond?

3    A.    Yes, she did.

4    Q.    Did she ever say anything negative about Joe?

5    A.    No.

6    Q.    If Wendi were to be executed, would that have any

7    impact in your life?

8    A.    Yes, it would.

9    Q.    What impact would that be?

10    A.    For me, I remember her as a young lady that had a

11    lot of potential.  And out of the teenagers that I saw in

12    that church, I thought she would excel the most.  And I

13    just was impressed by the way she handled herself at that

14    time.

15         And the other thing is I think you know all of us

16    need to know Jesus Christ as our Lord and Savior.  I think

17    that's important.

18         MR. MARTINEZ:  Objection.  Non-responsive and

19    also lecturing.

20         THE COURT:  Sustained.

21         MR. DELOZIER:  I think he was just trying to

22    explain how it would have an affect on your life.

23         THE WITNESS:  How it impacts me is, you know,

24    none of us like death and I don't like death.  So, it's

25    going to impact me.  And, you know, I'm going through the

43

1  feelings of why did this person die.  Why did this person

2  do this to where she deserves this death.  That's hard to

3  deal with.

4          MR. DELOZIER:  Thank you.  No further questions.

5          THE COURT:  Mr. Martinez.

6

7                      CROSS-EXAMINATION

8  BY MR. MARTINEZ:

9      Q.   You indicated that death upsets you, I think is

10 the way you put it, right?

11     A.   Yes, sir.

12     Q.   Do you know that she poisoned her husband?

13     A.   I've read that in the paper.

14     Q.   Do you know after she poisoned him, she watched

15 him die for about an hour and a half?

16     A.   No, I did not.

17     Q.   Did you know that she then took a stool and hit

18 him over the head 23 times?

19     A.   No, I did not.

20     Q.   And then took a lamp and hit him over the head,

21 did you know that?

22     A.   No.

23     Q.   And she took a knife and stuck it in his throat

24 and wrenched the knife so that the wound was about this

25 wide.  Did you know that?

44

1      A.    No, I did not.

2      Q.    You haven't said anything about Mr. Andriano

3  dying that upset you?

4      A.    I'm sorry?  What did you say?

5      Q.    You never said anything about Mr. Andriano dying

6  that upset you?

7      A.    I did not know Mr. Andriano.

8      Q.    So it doesn't upset you if you don't know him?

9      A.    Yes, it would.

10      Q.    One of the things you told us was that you knew

11  her from 1984 to 1990, correct?

12      A.    Yes.

13      Q.    And so whatever opinions you have of her are

14  based on what you knew about her back then, correct?

15      A.    Exactly.

16      Q.    You don't know anything that she was doing when

17  she was married to her husband, do you?

18      A.    No.

19      Q.    You don't know that she was cheating on him with

20  men, did you?

21      A.    No.

22      Q.    Do you know he was having chemotherapy and the

23  day after chemotherapy she was out with other men.  Did you

24  know that?

25      A.    No, I did not.

1     Q.   So that's different than the normal person that
2  you described to us, isn't it?
3     A.   Yes, it is.
4     Q.   It's different from the one that had a lot of
5  potential, isn't it?
6     A.   Yes, it is.
7     Q.   It's different than the one you were impressed
8  with, correct?
9     A.   Yes, it is.
10    Q.   It is fair to say that when she was growing up
11 she was quite a normal teenager, correct?
12    A.   Yes.
13    Q.   And there wasn't anything that you saw that
14 indicated that there was anything wrong with her home life
15 back there, was there?
16    A.   No.
17    Q.   There wasn't anything that was wrong with the
18 parenting skills of Donna and Alejo, was there?
19    A.   No.
20    Q.   Alejo Ochoa, you indicated was a youth pastor, I
21 think?
22    A.   Yes.
23    Q.   He didn't have the ability to marry people, did
24 he?
25    A.   I don't know.

1    Q.   You did write her a couple of -- I think you said

2  three letters while she was in custody, correct?

3    A.   Yes.

4    Q.   And the reason that you're reaching out to her

5  was based on what you knew about her back then, right?

6    A.   That's part of it.

7    Q.   And when you did write those letters, you didn't

8  know any of the things that I just mentioned to you?

9    A.   No, I did not.

10        MR. MARTINEZ:  I don't have anything else.

11        THE COURT:  Redirect.

12

13                    REDIRECT EXAMINATION

14  BY MR. DELOZIER:

15    Q.   You don't know if what Mr. Martinez asked you

16  were true, do you?

17    A.   No, I don't.

18    Q.   Okay.  So you're entire understanding is based on

19  1984 through 1990 and what you've talk to the

20  parents -- did you talk to the parents?

21    A.   I never talked to them, no.

22    Q.   How did you get the address?

23    A.   I called the church, Harvest Church.

24    Q.   Okay.  So your information about Wendi was

25  obtained from what source?

1      A.    The only thing I've had is maybe there is a few

2    friends and through what the limited stuff is that came out

3    in the paper.

4      Q.    And approximately when did these letters get

5    written?

6      A.    Can I ask when she went into prison or jail?

7      Q.    We're talking about from October 8, forward.

8      A.    Of 2000?

9      Q.    Of 2000.

10     A.    I would say it was within six months of that.

11     Q.    That's when you began writing?

12     A.    Yes.

13     Q.    When did you stop?

14     A.    A year from that time, or a year and a half from

15    that time when I started.

16          MR. DELOZIER:  I have nothing further, Your

17    Honor.

18          THE COURT:  Are there any questions of the

19    witness by the jury?  If so, please raise your hand.   No

20    one has raised a hand.

21          May this witness be excused?

22          MR. MARTINEZ:  Yes, sir.

23          MR. DELOZIER:  Yes, Your Honor.

24          THE COURT:  Thank you very much.  You're

25    excused.

48

1              (Witness sworn.)

2              THE COURT:  Please have a seat on the witness

3    stand.  Please pull the microphone close to you.  Please

4    remember to speak loudly and clearly so everyone can hear

5    you.  Please wait until the question is completed before

6    you answer the question.  And answer in a verbal response.

7              Is that agreeable to you?

8         THE WITNESS:  Yes.

9         THE COURT:  Mr. Patterson, you may proceed

10        MR. PATTERSON:  Thank you, Judge.

11

12                   GIA PALICKI,

13   called as a witness herein, having been first duly sworn,

14   was examined and testified as follows:

15

16                  DIRECT EXAMINATION

17   BY MR. PATTERSON:

18        Q.   Give us your name, ma'am?

19        A.   Gia Palicki.

20        Q.   Have you ever testified in a courtroom before?

21        A.   No.

22        Q.   A little nervous?

23        A.   Yes.

24        Q.   It's pretty simple.  I ask the questions, this

25   gentleman will also ask questions and I will ask some more

49

1   questions.  Just give us your answer, okay?

2        A.    Okay.

3        Q.    Are you in the business of day care?

4        A.    Yes.

5        Q.    And how long you been a day care provider?

6        A.    Probably ten years.

7        Q.    Is it done at your home?

8        A.    Yes.

9        Q.    And is your home in the Mountain Park Ranch

10   Ahwatukee area of Phoenix?

11       A.    Yes.

12       Q.    And are you currently in that business with a

13   friend or associate?

14       A.    I'm in it with a friend.

15       Q.    What is his or her name?

16       A.    Stefanie.

17       Q.    And were you in business -- you say the last ten

18   years -- that would encompass back in 1990, correct?

19       A.    Yes.

20       Q.    And who were you in business with back at that

21   time?

22       A.    I started with a friend, Kim Payne, and then I

23   was on my own.

24       Q.    How many children would you average on a daily

25   basis, in your home providing care services for?

1      A.   Six.

2      Q.   And is there a rule, six or less or six or more

3  require certain licensing?

4      A.   Six per adult.

5      Q.   So six or less children that you monitor on a

6  daily business, you're not required to have a license, kind

7  of thing?

8      A.   No.

9      Q.   Back in 1990, did you begin to provide day care

10  services for Wendi Andriano and her children?

11     A.   Yes.

12     Q.   Do you recall the month that you started?

13     A.   I believe Nicholas started around the end of

14  October, beginning of November.  And then Ashley started

15  maybe a month or so later.

16     Q.   That would be 1999?

17     A.   Yes.

18     Q.   And services were provided in your home?

19     A.   We would started at Kim's house.  She taught

20  preschool and Nicholas came there for preschool.  And I had

21  Ashley in my care and when preschool was over Nicholas and

22  would go to my house.

23     Q.   And what duration in the morning was that

24  preschool component of the day care?

25     A.   I believe preschool started probably at nine

1  until one with lunch.

2      Q.   And so then you would go from your home over to

3  your partner's home and pick Nicholas up and bring him

4  back?

5      A.   I would stay at Kim's house and help her.  When I

6  left, Nicholas and Ashley would come with me.  They would

7  nap at my house and they would get picked up from my house.

8      Q.   Okay.  Did Wendi bring the children over at Kim's

9  house?  Is that how the day would start?

10      A.   Either Joe or Wendi would drop them off.

11      Q.   Both Joe and Wendi were active in taking care of

12  their children in your observation?

13      A.   Yes.

14      Q.   And would they split the chore of bringing the

15  children over for day care on a daily basis?

16      A.   Sometimes.

17      Q.   Okay.  The same with picking them up, in the

18  beginning at least?  Who would generally pick up the

19  children at the end of the day care?

20      A.   In the beginning, I would say Joe would dropped

21  them off and Wendi would come pick them up.

22      Q.   Did that change over the course of time that you

23  provided day care services for them?

24      A.   After a few months, Kim was moving and getting

25  married and everything was strictly at my house and Wendi

1  would usually drop them off and pick them up.

2      Q.   Okay.  How was Wendi as a mother, at least, from

3  your observations during the time she was with her children

4  in your company?

5          MR. MARTINEZ:  Objection.  Lack of foundation.

6  How does she know.

7              THE COURT:  Go ahead and answer the question.

8              THE WITNESS:  I think Wendi was a great mom.

9      Q.   BY MR. PATTERSON:  What things did you observe

10  that led you to this conclusion?

11      A.   Well, I would be there when she dropped them off

12  and picked them up.  And she would always stay and have

13  patience and wait until they were ready for her to go to

14  work.  Or she would come and finish playing or if anybody

15  was sleeping, she would wait for Nicholas to wake up.  She

16  was great to my kids.

17      Q.   Okay.  Let's about how many children did you have

18  also present at the day care at your home?

19      A.   Two.  I have two girls that are there that live

20  with me.

21      Q.   And what are their ages as related to Nicholas'

22  and Ashley's ages?

23      A.   They're school-age, Abby is 11 and Ashley is 15.

24      Q.   So, they were older than Nicholas and Ashley?

25      A.   Yes, like big sisters.

53

1    Q.   Would the children always well clothed when they

2    were brought to day care?

3    A.   Always.

4    Q.   Were they well nourished?  Food provided for

5    them?

6    A.   Always.

7    Q.   Were they clean when they were brought over?

8    A.   Always.

9    Q.   Did she caress them, hug them, touch them

10   appropriately?

11   A.   I believe so.  In fact, my girlfriend and I used

12   the laugh that she never would raise her voice.  She was

13   better than I was.

14   Q.   All right.  That kind of segue into the issue of

15   discipline.  Did you ever see her raise a hand to her

16   children when she was in your presence?

17   A.   No.

18   Q.   How was she, in terms of or what technique did

19   she employ in terms of discipline or correcting her

20   children in your presence?

21   A.   Well, Ashley was so little.  But, my example was

22   when Nicholas did not want to leave or he wanted to tie his

23   shoes -- he was three -- and she'd just talk him out of it,

24   saying, "Come on.  It's okay, Nicholas.  You can stop."

25   "Okay, come on.  Put your shoe on now.  It's okay.  Let's

1   go.  Put your shoe on."  Even if it took twenty minutes.

2       Q.   What length was the time that you served as kind

3   of primary day care provider for Nicholas and Ashley?

4       A.   About a year.

5       Q.   From November until October 8th of 2000?

6       A.   Yes.

7       Q.   During that time frame did you ever see Wendi do

8   anything that would cause you to believe she was a

9   neglectful mother?

10      A.   No.

11      Q.   Were there times when you would go to her

12  apartment at the San Riva complex?

13      A.   Yes.

14      Q.   How frequent did that occur about your one-year

15  time frame you were the principal day care provider?

16      A.   We went over there to swim with the kids a couple

17  times.  I would pick them up sometimes if I was running

18  late or whatever because my daughter was having doctor

19  appointments.  Or she would pick them up, drop them off or

20  just go hang out there for a day.

21      Q.   Okay.  In that one-year period, we're talking

22  once a month, twice a month.  How frequently?

23      A.   Maybe a few times a month.

24      Q.   Okay.  In that environment, that apartment there

25  at San Riva, how was she as a mother dealing with her

1   children from what you observed?

2        A.   Same as everyone.   Same or normal.

3        Q.   And that observation is -- What did you see in

4   terms of her interactions with her children?

5        A.   Well, what I would consider normal, you know.

6   Same thing, if they need something you help them.   They

7   were toddlers, you know.

8        Q.   Did there appear to be toys in the

9   environment --

10        A.   Yeah.

11        Q.   -- for the kids to play with?

12        A.   Yes.

13        Q.   Were there a bunch of toys?

14        A.   A lot of toys.

15        Q.   How about nourishment?   Did there appear to be

16   nourishment in that home environment?

17        A.   Yes.   They were picky eaters but they were good.

18        Q.   And did Wendi minister to the children's

19   nutritional needs from what you could observe the times you

20   were over there?

21        A.   Yes.

22        Q.   Was there a time when you had a change in

23   financial circumstances with the landlord that owned the

24   house where you were providing the day care?

25        A.   In the very beginning, Kim would ask if a couple

1    of her primary care could come to my house, also.  And I

2    was leasing my home and my landlord didn't want me to do

3    that.  There were too many kids.  So she said to me that if

4    I was going to do that, I was only allowed two children.

5    And she was going to raise my rent a hundred dollars a

6    month for insurance or something.  And I told everybody and

7    Wendi said right away that she wanted it to be Nicholas and

8    Ashley.  So she did.

9         Q.   So she agreed to increase her contribution to

10   your household by a hundred bucks a month?

11        A.   She payed an extra hundred.

12        Q.   So how long did she help you in that regard?

13        A.   Probably seven months until October.

14        Q.   Okay.  Wendi, was she a patient mom with her

15   children?

16        A.   Yeah.

17        Q.   Was she affectionate with the children?

18        A.   I think so.

19        Q.   How about diaper changes, those types of things.

20   Would she assist in the process?

21        A.   Well, when she was there when they needed it,

22   then she did it.  When they were in my care, I did it.

23        Q.   But there was never any issue that she refused to

24   do it or anything like that?

25        A.   No.

1      Q.   Was there a time when one of the children was

2   very ill?

3      A.   I have a little girl that's got a chronic

4   illness.

5      Q.   Were there times when she was hospitalized?

6      A.   Yes.

7      Q.   Did Wendi bring her children to come see your

8   sick child in the hospital?

9      A.   Yes or I would take Nicholas and Ashley with me

10   sometimes if I asked and she said yes.

11      Q.   So she encouraged that?

12      A.   Yeah.   They're part of our family.

13      Q.   During the period of time that Wendi was there

14   with her children, would you and she talk about her

15   relationship with Joe?

16      A.   Yes.

17      Q.   Okay.   Did she ever bad mouth or speak anything

18   negatively about Joe during the time you would talk with

19   her?

20      A.   No.

21      Q.   Did she use a term to categorize or characterize

22   what Joe meant to her in their relationship?

23      A.   She would tell us, she would tell me and my

24   girlfriend, Stephanie, that you know it was her best

25   friend.   That's all she knew.

58

1      Q.   Did she express to you that there was some

2  difficulty with regard to her sexual relationship with Joe?

3      A.   She would tell us about their sex life, yeah.

4      Q.   And without going into it in great degree, she

5  says that there was an issue there?

6      A.   She would just talk about the passion part of it

7  or you know, she just mentioned she likes to be kissed and

8  Joe didn't feel comfortable kissing any more.

9      Q.   Okay.  Did she speak to the issue of whether or

10 not there was lack of affection in the relationship?

11     A.   I don't know what you mean.

12     Q.   Hugging, kissing, touching.  That kind of thing?

13     A.   I don't -- I don't think Wendi -- I don't really

14 know how to answer that, actually.

15     Q.   Okay.  I understand.  But you did have

16 discussions with her about that topic in general?

17     A.   Uh-huh.

18     Q.   Is that yes?

19     A.   Yes.

20     Q.   And you came away from those discussions sensing

21 there was some issue there?

22     A.   Yes.

23     Q.   When was the last time that you recall providing

24 dare care services for Joe and Wendi, for their children.

25 Use October 8, 2000, perhaps, as a kind of base line, two

59

1   weeks before that, a week before that?

2       A.   Well, the last work day, would be Friday.

3       Q.   Okay.  Was Joe still going up to the lake in the

4   later part of the time that you were still serving as the

5   day-care provider?

6       A.   Yes.

7       Q.   When was the last weekend that you recall, using

8   October 8, 2000 as kind of a base line, when did you recall

9   Joe going to the lake?

10      A.   Far all I knew, he always went to the lake every

11  weekend, as far as I know.

12          MR. PATTERSON:  Thank you, Judge, I have nothing

13  further at this time.

14          THE COURT:  Mr. Martinez.

15

16                     CROSS-EXAMINATION

17  BY MR. MARTINEZ:

18      Q.   One thing that you told us about was that she

19  confided you a little bit about the relationship with

20  Mr. Andriano, right?

21      A.   Yes.

22      Q.   You indicated that she told you Joe didn't feel

23  comfortable kissing any more, right?

24      A.   Yes.

25      Q.   Did she tell you it was because of the

1  chemotherapy?

2      A.   No.

3      Q.   Did you know he had a tumor in his mouth from the

4  cancer?

5      A.   Yes.

6      Q.   Additionally, you indicated, I guess, the passion

7  was gone, that she may have at least led you to believe

8  that that was the case, right?

9      A.   No, I don't think she said that the passion was

10  gone.  I don't think she -- in my eyes, the passion was

11  gone.  But I don't think Wendi thought it was.  She would

12  come to us confused asking for advise and asking what we

13  thought.

14      Q.   And she would describe certain things, right?

15      A.   Yes.

16      Q.   Now, and these were problems that she had in her

17  life with Joseph, sexually speaking, correct?

18      A.   There would be more confusion on, right, should

19  it be this way.

20      Q.   Confusion, problems, right?  She was seeking your

21  counsel, right?

22      A.   I don't think Wendi thought of it as a problem.

23  I think Wendi --

24      Q.   She talked to you about --

25          MR. PATTERSON:  Can the witness be allowed to the

61

1   question?

2          THE COURT:  Mr. Martinez, ask the question and

3   let her answer.

4          Q.   BY MR. MARTINEZ:  Did she also talk to you about

5   the sex life and problems, yes or no?

6          A.   Yes.

7          Q.   Did she also tell you that she was also going out

8   and having affairs with other men?

9          A.   She told me about going out, yes.

10         Q.   No.  No.  No.  Having affairs, sexual intercourse

11   with other men.  Did she tell you about that?

12         A.   I'm confused.  I don't -- she didn't tell me the

13   physical details.  But I know she went out and saw other

14   men.

15         Q.   I'm asking you whether or not she ever told you

16   she had sexual intercourse with other men while she was

17   still married to Joe?

18         A.   No.

19         Q.   So she didn't go that far?

20         A.   No.

21         Q.   Did she tell you that she would, at least on one

22   occasion that we know, she brought them home to Apartment

23   132 and had sex with another man?  Did she tell you about

24   that?

25         A.   No.

1    Q.   But that she met him at the Rockin' Rodeo and

2  brought him home that night?

3    A.   No.

4    Q.   Did she tell you that when she would go out, at

5  those time, did she tell you she would kiss other men?

6    A.   Yes.

7    Q.   And this was when she would actually go out to

8  bars, right?

9    A.   Yes.

10    Q.   You and she used to also go out socially, didn't

11  you, with her?

12    A.   I didn't hear you.

13    Q.   You and she also used to go out to bars together,

14  socially, didn't you?

15    A.   No.  She went out once with me for my birthday.

16    Q.   Where did you guys go?

17    A.   We went to a restaurant bar that a friend of mine

18  owned one time for my birthday.

19    Q.   What's it called?

20    A.   It's closed now but it was called the End Zone.

21    Q.   And where was that located?

22    A.   On Alma School and Warner.

23    Q.   And Joseph didn't go with you, it was you and

24  her, right?  She didn't bring Joseph along?

25    A.   No, he didn't go.  It was me and Wendi and

63

1   Stephanie and another friend I worked with, about six of

2   us.

3        Q.   And what was Stephanie's last name?

4        A.   Casper.

5        Q.   With a K or with a C?

6        A.   C.

7        Q.   One of the other things that you told us was that

8   there was this issue where your landlord wanted to charge

9   you extra money. That's what you told us?

10       A.   Yes.

11       Q.   And when you told the defendant about it, she

12  decided to pay the money right away, correct?

13       A.   Yes.

14       Q.   She never complained of their having any finance

15  problems, did she?

16       A.   No.

17       Q.   The only thing she talked to you about was their

18  sex life, right?

19            MR. PATTERSON:  Objection.  Asked and answered.

20            THE COURT:  Overruled.

21            Go ahead and answer if you can.

22            THE WITNESS:  Is that the only thing we talked

23  about?

24       Q.   BY MR. MARTINEZ:  Well, by contrast, she did talk

25  to you about their sex life but never spoke to you about

1    financial problems, right?

2        A.    Right.

3        Q.    She never indicated to you that she and Joseph

4    may have been having problems meeting their own

5    obligations, right?

6        A.    No.

7        Q.    Ever in their life, correct?  She never indicated

8    that to you?

9        A.    No.

10        Q.    That was for a whole year that you were

11    baby-sitting the kids, right?

12        A.    Yes.  Right.

13        Q.    One of the things that you told us was that you

14    think that she's a good mother, right?

15        A.    Yes.

16        Q.    And you based that on the fact that she would

17    drop her kids off and pick them up at your house, correct?

18        A.    I base that on that and I spent time with her on

19    weekends with the kids.  And I went out to dinner with her

20    and her family once.  And also, speaking with Joe.  I think

21    he was a great dad.  I saw them every day for, almost every

22    day for a year.

23        Q.    You indicated that you thought Joe was a great

24    dad?

25        A.    Yes.

1      Q.    Why did you say he is a great dad?

2      A.    Because I think for the same reasons, I would see

3  them interact.  He would -- sometimes they would both come

4  pick them up and they would just lay in the bed and wait

5  until Nicholas and Ashley were awake and ready.  And I just

6  believe they were committed to their children.

7      Q.    With regard to when you weren't there in the

8  privacy of their own home, do you know who changed the

9  diapers?

10     A.    When I wasn't there?

11     Q.    Right.

12     A.    No.

13     Q.    So it could have been Joseph that did all the

14  caretaking when you weren't there, right?

15     A.    I don't know.

16           MR. PATTERSON:  Same objection.  Asked and

17  answered.

18           THE COURT:  Sustained.

19     Q.    BY MR. MARTINEZ:  You don't know who gave them

20  baths, do you?

21     A.    I don't know.

22     Q.    One of the things that we talked about, or you

23  talked about with Counsel, was they didn't discipline the

24  kids.  Do you remember that?

25     A.    Yes.

1    Q.   Defendant's mother told us about a paddle that

2  may or may not have been used to discipline the kids.   Do

3  you know anything about that paddle?

4         MR. PATTERSON:   Object to the form of the

5  question.

6         THE COURT:   Sustained.

7         MR. PATTERSON:   May or may not been used.

8         THE COURT:   Sustained.

9    Q.   BY MR. MARTINEZ:   Do you know anything about

10  that?

11    A.   No.

12    Q.   You went over to her house, you said, right?

13    A.   Yes.

14    Q.   Did you see a paddle there?

15    A.   No.

16    Q.   Isn't it also true that you also took care of the

17  kids when the defendant wasn't working on her days off.

18  Sometimes you also took care of the kids, right?

19    A.   No.   I took care of the kids when Wendi was

20  working.

21    Q.   That's the only time you ever took care of the

22  kids?

23    A.   Yes.   Or -- on Friday of the last month or so,

24  Wendi would take the day off and her and Joe would go to

25  the movies and the kids would still come over.   So that

1   would be the only time I know she wasn't working.

2       Q.   And she worked how many days a week, according to

3   your records?

4       A.   Monday through Friday and Saturday, sometimes.

5       Q.   Okay.  So it wasn't Sunday that she worked?  It

6   was actually Monday through Friday and Saturdays?

7       A.   I don't remember exactly if she ever, how many

8   Sundays she worked but --

9       Q.   I'm asking about Saturday?

10      A.   She worked on Saturdays, is that what you're

11  asking me?

12      Q.   Yes.

13      A.   Yes.

14      Q.   And one of the things you told us, even though

15  you take care of kids -- I think you told us that you're

16  not required to be certified, right?

17           MR. PATTERSON:  Certified is a term of art,

18  Judge.

19           THE COURT:  Sustained.  Rephrase the question.

20      Q.   BY MR. MARTINEZ:  Licensed?

21      A.   The State of Arizona doesn't require a license.

22  I am certified, though.

23      Q.   And are you licensed, though, to take care of

24  kids?

25      A.   I don't know if there's a difference between

1  licensing and certified.  I am certified through the

2  State.  So I don't know if that's the same thing or not.

3      Q.   Your certification, does that allow you to take

4  care of more than six kids?

5      A.   The State of Arizona doesn't allow you to take

6  care of more than six kids.

7      Q.   The max you can take care of is six kids?

8      A.   Yes.

9          MR. MARTINEZ:  I don't have anything else.

10          THE COURT:  Redirect.

11

12                    REDIRECT EXAMINATION

13  BY MR. PATTERSON:

14      Q.   Clarification.  There are times when Wendi would

15  work on Saturdays or Sundays.  Do you recall specific days

16  or weekends that she may have worked?

17      A.   Do I recall specific weekends?

18      Q.   Yeah.  Specifically Saturday or specifically a

19  Sunday.  Do you recall what weekend day?

20      A.   It would be more Saturdays than Sundays.  But it

21  wasn't every weekend.

22      Q.   You're talking where both she and Joe would do

23  things together on those occasions you would take care of

24  the children?

25      A.   Yes.

1    Q.    Okay.  Going to the movies you mentioned.

2    A.    They told me that they were going to make a

3  Friday date day and Joe wanted to go to the movies and the

4  kids would come over.

5    Q.    Okay.  And was this in the months right before

6  October of 2000 or earlier, if you remember?

7    A.    This was when Joe started chemotherapy.

8    Q.    So it would be in the months approaching October

9  2000?

10    A.    Yes.

11          MR. PATTERSON:  Thank you, Judge.  I have no

12  further questions of the witness.

13          THE COURT:  Are there any questions by the jury?

14  If so, please raise your hand.  No one has raised their

15  hand.

16          May this the witness be excused?

17          MR. MARTINEZ:  Yes.

18          MR. PATTERSON:  No objection.

19          THE COURT:  Thank you very much.  You're

20  excused.

21          MR. DELOZIER:  Barbara Mitchell.

22          (Witness sworn.)

23          THE COURT:  Please make yourself comfortable on

24  the witness stand.  Speak loudly and clearly into the

25  microphone so that everybody can hear you.  Please wait

1   until the question is completed before you answer the

2   question.  And please make sure you give a verbal

3   response.

4           Is that agreeable to you?

5           THE WITNESS:  Yes.

6           THE COURT:  Mr. Delozier, you may proceed.

7           MR. DELOZIER:  Thank you, Your Honor.

8

9                    BARBARA MITCHELL,

10  called as a witness herein, having been first duly sworn,

11  was examined and testified as follows:

12

13                    DIRECT EXAMINATION

14  BY MR. DELOZIER:

15      Q.   State your name for the record?

16      A.   Barbara Mitchell.

17      Q.   And you testified earlier?

18      A.   Yes, I did.

19      Q.   During the period of time that Wendi was married,

20  so that was 1994, approximately, right?

21      A.   Yes.

22      Q.   Through October of 2000, did you have a chance to

23  witness her with the children?

24      A.   Yes.

25      Q.   Tell us what you observed?

1      A.   Couple times I went to the shop, the home that

2 was her parents -- I'm sorry, his parents.  And Nicholas

3 was a couple months old, maybe four or five months old.

4 And I witnessed Wendi around Nicholas.  Also --

5      Q.   What kind of things did you see?

6      A.   She was doing things around the house.  She was

7 carrying him on her side of her hip.  She was always with

8 him, always with her.  I remember her saying that Nicholas

9 was very curious so he to be facing outward with him;

10 feeding him, cuddling him, holding him, walking, making him

11 giggle.

12     Q.   Bathing?

13     A.   Bathing.  I remember he was a little bit older,

14 eight or nine months old, I remember he was able to hold

15 his head up and just making him laugh, giggle, talking to

16 him and just making him smile.

17     Q.   So how about the earlier years with Nicholas?

18     A.   Didn't see much of that.

19     Q.   How did she handle any problems that came up that

20 might require some corrections?

21     A.   Calmly.  I didn't see too much as far as other

22 than, no, don't do that.  That kind of thing.

23     Q.   Okay.  And this was at the farm house you say?

24     A.   Yes, it was.

25     Q.   At some point they moved from there?

1    A.   Yes.

2    Q.   And what was the next opportunity you had to

3  witness -- before we do that, where with Joe during this?

4    A.   I didn't see Joe around.

5    Q.   So he wasn't there when you were there?

6    A.   No, one particular time I was there he was just

7  in and out.

8    Q.   All right.  Let's go to the next location where

9  they lived that you visited.

10    A.   That would have been the apartment complex in

11  Ahwatukee.

12    Q.   San Riva?

13    A.   Yes.

14    Q.   That was in the fall of '99?

15    A.   Yes.

16    Q.   All right.  And what did you see there?

17    A.   I didn't have too much interaction with them as

18  far as the children and her.  So I didn't witness too much

19  there.

20    Q.   Okay.  Did you have occasions where you were out

21  socially with Joe and Wendi and the children?

22    A.   No.

23    Q.   So there wasn't a whole lot of contact during

24  that last year?

25    A.   No.

73

1    Q.   Did you have any contact with Ashley?

2    A.   No.

3    Q.   Okay.

4    A.   Didn't meet her very much.

5    Q.   I'm sorry?

6    A.   I didn't get a chance to meet her.  I met her

7 baby, that was it.

8    Q.   All right.  The background you have with Wendi is

9 you're related to her in some fashion, right?

10   A.   She's my cousin.

11   Q.   She's your cousin?

12   A.   Yes.

13   Q.   What impact would it have on your life if she was

14 executed?

15   A.   It's hard to describe.

16   Q.   Can you?

17   A.   It's like someone ripping your heart out.  She's

18 been part of my life since I was one.  It's difficult to

19 even think about it.

20   Q.   Would you consider her a good candidate for

21 rehabilitation?

22   A.   Yes.

23        MR. MARTINEZ:  Objection.  Lack of foundation.

24        THE COURT:  Overruled.

25        Go ahead and answer the question.

1    THE WITNESS:  Yes.

2    Q.  BY MR. DELOZIER:  And what do you base that on?

3    A.  She's a caring person.  She cares about people

4    around her.  She's always been giving.  If you needed

5    something she always was willing to help you, whether it

6    be, I mean, it could be anything from comforting you to

7    making you laugh, making you smile, giving you something

8    that was hers.

9    Q.  I understand.  Anything else like that?

10    A.  I have an incident, my grandmother was put in a

11    nursing home about six, seven, eight years ago.  And to

12    help her adjust, Wendi went to the nursing home and made

13    her semiprivate room as if it were her home.  Pictures of

14    the family.  Bedspread.  TV.  Just like it was at home.

15    She helped her adjust.

16    MR. DELOZIER:  I have nothing further Judge.

17    THE COURT:  Mr. Martinez.

18

19    CROSS-EXAMINATION

20    BY MR. MARTINEZ:

21    Q.  One of things you told us was that should the

22    death penalty be imposed you indicated that would have an

23    impact on you.  Do you remember telling us that?

24    A.  Yes.

25    Q.  What impact did Joe Andriano, his death have on

1   you?

2        A.   A lot.

3        Q.   Have you gone to even see the grave?

4        A.   No.

5        Q.   You don't even know where he's buried, do you?

6        A.   Out of state.

7        Q.   But you don't even know where he's buried, right?

8        A.   Oklahoma.

9        Q.   In other words, you don't know specifically where

10  he's buried.  You've never been there, right?

11       A.   No.

12       Q.   You don't call his family, do you?

13       A.   No.

14       Q.   You don't send them cards or anything like that,

15  do you?

16       A.   No.

17       Q.   Do you ever stay up, think about how much Joe

18  suffered before he died?

19       A.   Yes.

20       Q.   Do you think about the one and a half hours that

21  he laid on the carpet after she poisoned him, do you think

22  about that?

23       A.   No.

24       Q.   Do you think about after laying there for an hour

25  and a half, the 23 hits to his head that he took from her.

1   Do you think about that?

2        A.   No.

3        Q.   How she took the knife and stuck it in his

4   throat.  Do you think about that?

5        A.   No.

6        Q.   You grew up with her, correct?

7        A.   Yes, I did.

8        Q.   I think you were pretty close growing up, right?

9        A.   Yes.

10       Q.   But, after she got married, you weren't that

11   close, right?

12       A.   No.

13       Q.   She didn't tell you of the affairs she was

14   having, did she?

15       A.   Yes, she did.

16       Q.   What did she tell you about?

17       A.   His name was Ricky or Rick.

18       Q.   When did she tell you about him?

19       A.   During the Vegas trip, which would have been

20   2000.

21       Q.   In May of 2000?

22       A.   Yes.

23       Q.   Was she happy about the affair she was having?

24       A.   No.

25       Q.   She was just being forced to have an affair, is

1    that what's going on?

2         A.    No.

3         Q.    Subsequent to that, did she ever tell you about

4    any other affair she was having?

5         A.    No.

6         Q.    Did she tell you about Travis Black?

7         A.    No.

8         Q.    Did she tell you about going out and kissing

9    other men while she was out at bars?  Did she tell you

10   about that?

11        A.    No.

12        Q.    You indicated that you and she grew up together.

13   Did you and she ever discuss your virginity?

14        A.    No.

15        Q.    Did you and she ever discuss her virginity?

16        A.    No.

17        Q.    So it's not true that you forced her to lose her

18   virginity, did you?

19        A.    No, I didn't.

20        Q.    When you came to what we're calling the farm

21   house to see, I guess it was Nicholas, you indicated that

22   Joe wasn't there, right?

23        A.    He was in and out.

24        Q.    One time he was in and out, right?

25        A.    Yes.

1      Q.   You don't know if he was working or what he was

2   doing, do you?

3      A.   No.

4           MR. MARTINEZ:  I don't have anything else.  Thank

5   you.

6           THE COURT:  Redirect.

7

8                    REDIRECT EXAMINATION

9   BY MR. DELOZIER:

10      Q.   You were asked if you were close after the

11   marriage, right?

12      A.   Yes.

13      Q.   Why not?

14      A.   We lived in separate towns and we didn't hang out

15   with the same people.

16      Q.   Any other reason?

17      A.   No.

18      Q.   I thought your previous testimony was you were

19   not uncomfortable being around there?

20      A.   Didn't feel like I fit in as far as I wasn't

21   welcome.

22      Q.   Why didn't you feel welcomed?

23      A.   It was like I got the cold shoulder from Joe.

24      Q.   You also said regarding the affair, it was Rick

25   or Ricky?

1    A.   Yes.

2    Q.   You said she was not happy, right?

3    A.   She wasn't happy, no.

4    Q.   What do you mean by that?

5    A.   In her marriage.

6    Q.   Not with the affair, what I understand you to say

7 she wasn't happy with the affair with Rick?

8    A.   She seemed confused.  That's the only way I can

9 describe it as confused.

10    Q.   Confused over what?

11    A.   What she should be doing at this time.

12    Q.   About Ricky or about Joe or about what?

13    A.   About Ricky and Joseph.

14    Q.   So what you're saying is she wasn't happy and she

15 was confused?

16    A.   Yes.

17    MR. DELOZIER:  Thank you, Your Honor.

18    THE COURT:  Are there any further questions of

19 the witness by the jury?

20    THE COURT:  Let me see counsel here at the bench.

21    (Bench conference was held outside the hearing of

22 the jury.)

23    THE COURT:  The question is:  How many times have

24 you visited Wendi in jail?

25    MR. DELOZIER:  No problem.

1          MR. MARTINEZ:  No objection.

2          (Bench conference concluded.)

3

4                        EXAMINATION

5     BY THE COURT:

6          Q.   Ma'am, I have a question here by the jury.  The

7     question reads as follows:  How many times have you

8     visited Wendi in jail?

9          A.   Once.

10          THE COURT:  Are there any further questions of

11    this witness by the jury?  No one has raised a hand.

12          Any follow-up questions to that specific question

13    by Mr. Delozier?

14          MR. DELOZIER:  No, Your Honor.

15          THE COURT:  And Mr. Martinez?

16          MR. MARTINEZ:  No, sir.

17          THE COURT:  May the witness be excused?

18          MR. DELOZIER:  Yes.

19          THE COURT:  Thank you very much.  You're

20    excused.

21          MR. DELOZIER:  Can we approach, Your Honor?

22          THE COURT:  Yes.

23          (Bench conference was held outside the hearing of

24    the jury.)

25          MR. DELOZIER:  It's our last witness.  The last

1  witness is Mr. Ochoa and I wondered if you wanted to take a

2  break now rather than stop at three?

3          THE COURT:  We'll go ahead and continue.

4          (Bench conference concluded.)

5          THE COURT:  Okay.  Sir, please step up to the

6  clerk and she will swear you in.

7          (Witness sworn.)

8          THE COURT:  Sir, please have a seat on the

9  witness stand.  Make yourself comfortable.  Please pull the

10 microphone closer to you.  Please remember to speak loudly

11 and clearly so everybody can hear.  Also please wait until

12 the answer is complete before you answer the question.

13          Is that agreeable to you?

14          THE WITNESS:  Yes.

15          THE COURT:  Mr. Delozier, you may proceed.

16

17                    ALEJO OCHOA,

18 called as a witness herein, having been first duly sworn,

19 was examined and testified as follows:

20

21                  DIRECT EXAMINATION

22 BY MR. DELOZIER:

23     Q.   State your name, please?

24     A.   Alejo Ochoa.

25     Q.   And you're the father of?

1     A.   Wendi.

2     Q.   Okay.  You realize -- we understand you testified

3  previously, correct?

4     A.   Yes.

5     Q.   And we don't want you to necessarily repeat what

6  you've already said.  The jury has heard that.  Okay.  And

7  we're now in a different phase.  You understand that?

8     A.   Yes.

9     Q.   All right.  What impact would it have on you if

10  Wendi was executed?

11          Take your time.

12     A.   It would be devastating.  I tried my best over

13  the years to raise her the way I thought.  And I just know

14  it would be devastating.

15     Q.   Did you have anything else you wanted to add to

16  that?

17     A.   Can we just come back to that in a little bit?

18     Q.   I'd be glad to.

19          Tell me about your observations of Wendi as a

20  mother to Nicholas and Ashley?

21     A.   Very protective.  I thought she was a real good

22  mom.

23     Q.   What kind of things did you see her do with them?

24     A.   Well, I've been married almost 30 years and in a

25  marriage that long, sometimes you have little arguments

1   with your spouse.  One of the main things Wendi would

2   always say is don't argue in front of the children.  Don't

3   raise your voices.  Smart thing.

4          One of the things she was very very adamant about

5   she'd take them to the park, have birthday parties for

6   them.  Take them out to breakfast.  She'd bring them to the

7   house.  We had a Saturday morning ritual where I'd make

8   breakfast for the family.

9       Q.   Was Joe with you during these times with them

10  there?

11      A.   At times, sometimes he would be.  Sometimes he

12  wouldn't be.  Nicholas was hurt when he slipped on a

13  propeller on the back of the Yukon.  And Joe called me to

14  tell me to get to the hospital.  After that couple minutes

15  later Wendi called me, told me to get to the hospital.  So

16  when I got there, Nicholas wanted to come with me and both

17  Joe and Wendi were crying because they couldn't do much

18  anything to help.  And then Donna got there.  But, she

19  didn't like to see them hurt.  She didn't like pain.  She

20  didn't like shots.  She didn't like any of that.

21          When it was time to take them to the dentist, I

22  would go with Wendi and Joe just so Nicholas could sit on

23  my lap so I could hold Nicholas while they did work on

24  them.  I never took them -- went with them to the doctor.

25  My main thing was the dentist.

84

1    Q.   Did the children get bathed in your presence?

2    A.   Oh, yeah.  They were bathed daily, all the time.

3    Q.   Who did the baths when you saw them?

4    A.   Wendi did them.  Whenever I'd go to the house,

5 she was the one that bathed them.  If they spent the night

6 at our house, then, Donna was the one that bathed them.

7    Q.   How about changing diapers?

8    A.   Changing diapers, Donna or Wendi or Brandon.

9 They're the ones that changed the diapers.

10    Q.   When you were there?

11    A.   In my presence, yes.

12    Q.   How about preparing meals?

13    A.   Wendi was always preparing meals.  If she wasn't

14 preparing them she sent out for them bringing something in

15 for the children.

16    Q.   How about preparing clothing?  Washing the

17 clothes and drying them and so forth, getting the kids.

18    A.   Wendi always dressed them.  I don't know who --

19 as far as laundry, I don't know.  I know Donna and Wendi

20 did some.  But I don't know if they send any of the stuff

21 out.  They just did it at home.

22    Q.   Ever see Wendi or Joe mistreat either children?

23         That's two questions, I guess.

24         Did you ever see Wendi mistreat the children?

25    A.   No.

1    Q.    Did you ever have any knowledge of this paddle,

2  some sort of paddle they got from the church.   Do you know

3  anything about that?

4    A.    A paddle.   We had a decorative paddle.   I forget

5  the name of the game.   It's kind of some kind of game.

6    Q.    The paddle or the game?

7    A.    The paddle.

8    Q.    Okay.

9    A.    One of the kids at the school lost one of them.

10  That was just a decorative paddle that they just had

11  hanging up on the wall.

12    Q.    At the church?

13    A.    Yeah, at the church.   And Joe used to spank the

14  children with a spoon.   And he asked somebody -- any way he

15  got the paddle from the church.   I don't know who he asked

16  but I know that's where he got it from.

17    Q.    Did you ever see Wendi use the paddle on the

18  children?

19    A.    Wendi?

20    Q.    Yeah.

21    A.    No.   Wendi never spanked the children.   Joe

22  spanked the children.

23    Q.    Did you ever see Joe use the paddle?

24    A.    I never saw him use the paddle.   He used the

25  spoon.

1   Q.   Any negative parenting that you saw besides the

2   paddling with the spoon from Joe?

3   A.   Can you rephrase that?

4   Q.   Did you see anything that -- you said a moment

5   ago you didn't see anything negative with Wendi's character

6   with the children.   I'm asking the second part of the

7   question then?

8   A.   Oh, Joe, okay.

9   Q.   Yeah.

10   A.   Fine.   I seen him push Nicholas off the bed

11   once.   And he seemed to push, not physically but not have

12   much to do with Ashley.   Nicholas, I felt, was his

13   favorite.   Not that he mistreated her but he just

14   Q.   Right.

15   A.   -- favored Nicholas a lot more.

16   Q.   I think you testified when you were here before

17   that you loved Joe?

18   A.   Yes, I do.

19   Q.   What impact does his death have on you?

20   A.   It was just devastating on me.   I'm dealing with

21   it.   I poured a lot of my life into him.   I think I

22   mentioned once before that I saw a lot of him, a lot of him

23   in me when I was younger.   And I tried to help him through

24   a lot of situations in his life that he was dealing with.

25   It was very devastating to me, very devastating and it

1   still hurts.

2       Q.   How often do you get a chance to visit Wendi

3   while she's been incarcerated since October 8th?

4       A.   I try to see her at least once a week.  Sometimes

5   I can't.  They've had lock-down, something happens.  Like

6   when 9/11 happened they shut down the whole system.

7   Something happens with one of the other inmates, it could

8   be anywhere in the complex, they shut the thing down, do

9   security override.  So I may not be able to see her.  Or

10  she's meeting with one of the attorneys or counselors or

11  she's in medical, you know.  There are times when I can't

12  see her.  But I try to see her at least once a week.

13      Q.   What other forms of communication do you have

14  with her?

15      A.   She calls the house phone.  She calls collect.  I

16  told her to call us as much as she wants.  Sometimes she

17  calls once every two or three days.  Sometimes every day.

18  Sometimes two or three times in a day.  Usually in the

19  evening times.

20      Q.   Come back to the first question, how would her

21  execution affect you?

22           MR. MARTINEZ:  Objection.  Asked and answered.

23           THE COURT:  Overruled.

24           Go ahead and answer the question.

25           THE WITNESS:  I still haven't gotten over the

88

1  death of Joe and still dealing with that.  If I would lose

2  Wendi, too, it would just be very devastating to me.

3  Situations like this, it can either bring a marriage

4  together, stronger or tear it apart.  I feel that it's

5  brought our marriage closer.

6      Q.   You mean your's and Donna's?

7      A.   Mine and Donna's.  I don't know if it could

8  handle any more.  I don't know how much more it could

9  handle.

10      Q.   Do you think Wendi is a good candidate for

11  rehabilitation?

12      A.   Yes, definitely.

13      Q.   What makes you think that?

14      A.   She loves people.  She always loves doing things

15  for people.  Growing up, if we buy her something and she

16  saw another little kid that didn't have a toy, she would

17  give him her toy.  It didn't matter who bought it for her.

18  If she saw a need, she would try to fill it.  She

19  definitely loves to help people.  It's been an ongoing

20  thing since she was a little child.  She never changed.  I

21  know definitely she could be an asset to the community.

22          MR. DELOZIER:  Nothing further, Your Honor.

23  Thank you.

24          THE COURT:  Mr. Martinez.

25

89

CROSS-EXAMINATION

1

2   BY MR. MARTINEZ:

3       Q.   Sir, you indicated that -- it appeared to me that

4   you did the best to you could to raise her, right?

5       A.   At the time, I felt I did.

6       Q.   Sure.  I mean you were always there for her,

7   weren't you?

8       A.   I tried to be.

9       Q.   If, for example, she was married to Joe, she was

10  at a party and he was looking at another woman and she'd

11  call you, you would go pick her up, wouldn't you, if she

12  called you?

13      A.   Yes.

14      Q.   And growing up, if she needed something, you

15  would give it to her, you did, right?

16      A.   If it was within my -- if it was within my

17  ability.  There was certain limitations.

18      Q.   Sure, of course.

19      A.   Just like any parent would.

20      Q.   Okay.  You tried to send her to the school that

21  you knew about, right?

22      A.   Yes.

23      Q.   And if she ever had any problems, you would try

24  to talk to her about it, right?

25      A.   Yeah, I would talk about it.

90

1    Q.   And, in fact, it appears that she was closer to

2  you than she was to Donna, correct?

3    A.   At times, yes.

4    Q.   You did indicate that the only person that ever

5  mistreated the kids was Joseph, correct?

6    A.   I didn't hear you.

7    Q.   You indicated that the only person that

8  mistreated the kids was Joseph, right?

9    A.   I believe he asked me if Wendi or Joseph

10  mistreated the children.

11    Q.   No.  No.

12    A.   Joe was the only I saw mistreat the children.

13    Q.   He's the one that hit them with a spoon, right?

14    A.   I saw him spank the children with the spoon.

15    Q.   Push them off the bed, right?

16    A.   I saw him push Nicholas off the bed once.

17    Q.   Sir, you still maintain that those photographs of

18  the dresser were taken in late August or early September of

19  2000?

20    A.   I thought it was sometime in September.  When you

21  asked me that outside, I was trying to remember.  And

22  that's -- I don't remember.  I thought that was when I took

23  the photographs.

24    Q.   It was definitely before Joseph's death, wasn't

25  it.

000008797

91

1     A.   I believe so.

2     Q.   Well, Joseph's death was a very important factor

3  in your family, wasn't it?

4     A.   Definitely.

5     Q.   So, you did testify on the stand telling us that

6  you took those photographs before his death, didn't you?

7     A.   Yes, I said that, yes.

8     Q.   Could have been late August, could have been

9  early September of 2000?

10     A.   It would have been in August.

11     Q.   You'd do anything for your daughter, wouldn't

12  you, sir?

13     A.   Within my ability.

14     Q.   And that would include coming in and telling us

15  that those photographs were taken early September of 2000

16  late August of 2000, right?

17     A.   I'm sorry?

18     Q.   You would do just about anything for your

19  daughter, right?

20     A.   Yes.

21     Q.   That would include coming in to court and telling

22  us that the photographs of the dresser that had damage on

23  it were taken in early September or late August of 2000,

24  right?

25     A.   If that's when I thought they were taken, yes.

92

1      MR. MARTINEZ:  I don't have anything else.

2      THE COURT:  Mr. Delozier.

3      MR. DELOZIER:  I have nothing further.  Thank

4 you, Your Honor.

5      THE COURT:  Are any further questions of this

6 witness by the jury?  If so, please raise your hand.  No

7 one has raised their hand.

8      Could this witness be excused?

9      MR. DELOZIER:  Yes, you're excused.

10     THE COURT:  We'll take our afternoon break at

11 this time.  Remember the entire admonition I have given

12 you.  Don't discuss the case with each other.  Don't let

13 anyone talk about the case with you.  Keep an open mind.

14     Have a nice break.

15     (Recess taken.)

16     THE COURT:  This is Cause Number CR2000-096032,

17 State of Arizona versus Wendi Elizabeth Andriano.

18     The record will reflect the presence of the

19 defendant and counsel.  We're outside the presence the

20 jury.

21     Mr. Patterson.

22     MR. PATTERSON:  Judge, before I arrest, I've had

23 marked two exhibits, Exhibit 544 and Exhibit 545.  I don't

24 think there is a problem with 545.

25     MR. MARTINEZ:  No objection.

1        There's no objection to 545.

2        MR. PATTERSON:  There is a objection in that

3  sense.  My request to the Court is you made some previous

4  rulings about the admission of certain things on rebuttal.

5  With regard to Exhibit 544, there is a reference to my

6  client's being dismissed from her job in March of 1996.  As

7  a result, that's one of the reasons she went to Casa Grande

8  Valley Counseling Services.  She made reference also to

9  problems she had in her relationship, her marriage.  And

10  there are some Axis I and Axis 4 diagnoses.

11        I intend to move this evidence.  If, by so doing,

12  that opens a door for rebuttal, then I would not move it

13  into evidence.

14        THE COURT:  Mr. Martinez?

15        MR. MARTINEZ:  I believe it does open the door to

16  rebuttal.  Specifically, it did say in one of the

17  statements that she was dismissed from her job on Monday,

18  March 4th.  This is dated March 6, 1996.  What they are

19  referring to is the defendant working for Casa Grande

20  Medical Center and the reason she was fired was because she

21  stole approximately $18,000 worth of money.  And what these

22  records indicate is that as a condition to that matter not

23  been referred to authorities, that they wanted her to

24  attend counseling.

25        One of the things that we talked to the jury

94

1   about was that she has no prior felony convictions.  Well,

2   part of the reason she didn't have a prior felony

3   conviction is because she entered into agreements like

4   this.

5          Additionally, the fact that she was depressed

6   which is what this indicates, this Axis 4, occupational

7   problems.  The reason that she has the occupational

8   problems is because, as I said before, she stole money from

9   them.

10          So, the reason she was depressed or the reason

11   she has the problem is directly related to her being a

12   thief, not because she can't cope.  Not because as a

13   general rule she's depressed, not because she's, as a

14   general rule, subject to anxiety attacks.  The reason for

15   it is rooted somewhere else.  So I ask that I be allowed to

16   bring in why she was dismissed on March 4th of 1996 from

17   the Casa Grande Regional Medical Center.

18          THE COURT:  Anything further, Mr. Patterson?

19          MR. PATTERSON:  Yeah, Judge, I just want it

20   abundantly clear, if he's allowed to argue anything about

21   the business dismissal or bring in any kind of rebuttal

22   evidence, I will not offer it.  I don't want to open that

23   door at all.

24          THE COURT:  Okay.  With regard to Exhibit Number

25   545, I'm going to order that it be admitted into evidence.

95

1          With regard to Exhibit 544, I'm going to allow

2    that admitted to evidence; however, I'm going to preclude

3    the State from bringing in any evidence as to why the

4    defendant was dismissed.

5          (Jurors entered.)

6          THE COURT:  Please be seated.  This is Cause

7    Number CR2000-096032, State of Arizona versus Wendi

8    Elizabeth Andriano.

9          The record will reflect the presence of the

10   defendant, counsel and the jury.

11         Mr. Patterson.

12         MR. PATTERSON:  Yes, Your Honor.  At this time, I

13   would move admission of, formally before the jury, Exhibits

14   544 and 545.

15         THE COURT:  Mr. Martinez?

16         MR. MARTINEZ:  We've already discussed the

17   State's objection.

18         THE COURT:  Okay.  Exhibit Number 544 and Exhibit

19   Number 545 marked for identification are admitted as

20   evidence.

21         MR. PATTERSON:  If I could publish or explain

22   what they are?

23         THE COURT:  You may publish it.

24         MR. PATTERSON:  Okay.

25         THE COURT:  Mr. Patterson.

96

1          MR. PATTERSON:  Your Honor, upon the conclusion

2    of this aspect of the case, we would rest our mitigating

3    evidence.

4          Mr. Martinez.

5          MR. MARTINEZ:  Once they completed, the State

6    will call Jana Clayton.

7          THE COURT:  We can proceed at this time.

8          MR. PATTERSON:  Unless divided attention.

9          THE COURT:  You can pass it around.  Just wait

10   until that's completed.

11         Mr. Martinez.

12         MR. MARTINEZ:  State calls Jana Clayton.

13         THE COURT:  Please step over here and give the

14   clerk your name and she will swear you.

15             (Witness sworn.)

16         THE COURT:  Please have a seat on the witness

17   stand.  Please remember to make yourself comfortable and to

18   pull the microphone close to you.  Please remember to speak

19   loudly and clearly so everyone can hear you.  Also, please

20   wait until the question is completed before you answer the

21   question.  And please make sure you give a verbal response.

22         Is that agreeable to you?

23         THE WITNESS:  Yes.

24         THE COURT:  Mr. Martinez, you may proceed.

25

97

JANA CLAYTON,

1

2   called as a witness herein, having been first duly sworn,

3   was examined and testified as follows:

4

5                           DIRECT EXAMINATION

6   BY MR. MARTINEZ:

7        Q.   State your name, please?

8        A.   Jana Andriano Clayton.

9        Q.   Did you know somebody by the name of Joe or

10  Joseph Andriano?

11       A.   Yes.

12       Q.   Who was he?

13       A.   My brother.

14       Q.   And besides him, do you have any other brothers

15  and sisters?

16       A.   Yes.

17       Q.   Tell me about that?

18       A.   I've an older sister Jeanea.

19       Q.   Her name is what?

20       A.   Jeanea Lambeth.

21       Q.   And?

22       A.   Then also me and Joe was younger than me and then

23  James Andriano.

24       Q.   Were did James Andriano fall, older or younger?

25       A.   He's the youngest.

98

1    Q.   Back in the year 2000, where were you living?

2    A.   In Germantown, Tennessee.

3    Q.   How long have you lived there?

4    A.   About nine months.

5    Q.   Prior to that, where did you live?

6    A.   Bowling Green, Kentucky.

7    Q.   How long had it been since you actually lived in

8    this area?

9    A.   Which area?

10   Q.   I mean Arizona.

11   A.   Prior to living in Bowling Green?

12   Q.   How long -- when did you move from this area

13   here?

14   A.   I moved in 1989 after I graduated from college.

15   Q.   When you moved away, did you have occasion to

16   come in contact with Joseph Andriano?

17   A.   Yes, we talked regularly.

18   Q.   And he was married, correct?

19   A.   Yes.

20   Q.   And he was married to Wendi Andriano, correct?

21   A.   Yes.

22   Q.   Did you attend that wedding?

23   A.   Yes, I did.

24   Q.   After that did you have occasion again to keep in

25   contact with your brother, Joseph Andriano?

99

1    A.   Yes, I did.

2    Q.   And did you learn of his problems with cancer

3  subsequent to that?

4    A.   Yes, I did.

5    Q.   And did you try to help?

6    A.   Of course.

7    Q.   What did you do?

8    A.   Well, I was working in pharmaceutical sales at

9  the time.  So, I asked any doctor and every doctor that

10 would talk to me about it.  And I also researched on the

11 Internet for his specific cancer, adenoid cystic

12 carcinoma.  It's a very rare cancer.  They don't do

13 research.  There's no research studies that the different

14 pharmaceutical companies do.  So I was helping in trying to

15 find any type of treatment that might be available for him.

16    Q.   And during the course of your research did you

17 come across some that were so-called experimental

18 treatments?

19    A.   Yes.

20    Q.   Did you convey those or communicate that to

21 Joseph Andriano?

22    A.   Yes, I did.  We discussed them.

23    Q.   And were those also discussed with Wendi

24 Andriano?

25    A.   Yes.

1      Q.   And one of things that we heard from the

2   defendant was that there was one that was approximately

3   $25,000.  Do you remember something like that about one of

4   the treatments?

5      A.   Yes.

6      Q.   And you were the one that actually conveyed it to

7   them, right?

8      A.   Yes.  When Joe was visiting me we were doing

9   further research.  And that's in September of 2000.

10     Q.   Did you expect that you would help with the

11  treatment or were you just telling him about this

12  treatment.  This is what you need to do and leave it at

13  that.  That didn't you also indicate you would help?

14     A.   I always was willing to help and never would have

15  hung a carrot out there for him to dream about.  I would

16  have always offered help and assistance.  And I talked to

17  both of them about that.

18     Q.   Did you ever send them money from your home?

19     A.   Very frequently.

20     Q.   And when I say very frequently, in the year 2000

21  how often would you say you would send them money?

22     A.   Several times.  I mean, I gave them over the

23  course of his illness several thousand dollars.

24     Q.   With regard to the year 2000, did there come a

25  time when they came to visit you out in Memphis?

1    A.   Yes.

2    Q.   When was that?

3    A.   September, 2000.

4    Q.   Whose idea was it to have this visit, yours or

5  someone else's?

6    A.   It is my idea.  I've lived away from Arizona for

7  so long, I always tried to get any and every family member

8  to come and visit.  And so, when we lived in Bowling Green,

9  I tried to get Joe and his family to come.  They weren't

10  able to.  And so when I seen him in -- I saw Joe in August

11  of 2000, I talked about how it would be great if he and his

12  family could come to Memphis.

13    Q.   Was it a situation where you had a conversation

14  or was it conveyed to you by anybody whether it was Joseph

15  or anybody that the reason he wanted to come -- that he

16  actually wanted to come out, as opposed to you being the

17  person who made the arrangements for him to come out?  In

18  other words, who came up with the idea?

19    A.   I did.

20    Q.   So it wasn't Joseph who said, "I want to come and

21  see you," was it?

22    A.   No.

23    Q.   You indicated that prior to that September 2000,

24  that you also saw him in August of 2000, right?

25    A.   Yes, I did.

102

1    Q.   And tell me how that came about that you saw him

2  in 2000?  How did that come about?

3    A.   Well, Joe, when he started chemotherapy in July,

4  he had lost like 15 pounds the first week of chemotherapy

5  and all the doctors were surprised he lost so much weight

6  that first week.  And so I was quite concerned about his

7  well-being.  And I had several conversations with Wendi

8  over the phone and mentioned her at the beginning of August

9  that if Joe ever got to a point where he was really bad,

10  and that I -- because I wanted to see him before he might

11  die -- that I wanted her to let me know.  And she told me

12  without hesitation, well, if you want to see Joe you need

13  to come now.  And so I came to visit.  It was August 25th,

14  24th or 25th.  And the following weekend was Labor Day.  I

15  didn't even wait until Labor Day weekend.  I made

16  arrangements for my children and I came as soon as I could

17  to Phoenix so I could see my brother and help him.

18    Q.   What day of the week did you arrive?

19    A.   I came in on a Thursday.

20    Q.   And did you stay that Friday?

21    A.   Yes, I did.

22    Q.   Did you stay that Saturday night?

23    A.   I stayed Saturday night.

24    Q.   How about Sunday?  Did you stay Sunday or did you

25  leave Sunday?

1    A.   I left Sunday.

2    Q.   You indicated that when your brother started

3  chemotherapy that he lost a lot of weigh?

4    A.   Yes.

5    Q.   Were there discussions involving the defendant as

6  to who it was that wanted him, him being Mr. Andriano, to

7  start chemotherapy?

8    A.   Yes, there were.

9    Q.   And what was that?

10       MR. PATTERSON:  Judge, date, time, circumstances.

11       THE COURT:  Can you lay more foundation.

12    Q.   BY MR. MARTINEZ:  Was it shortly before the

13  chemotherapy started there were conversations involving the

14  defendant?

15    A.   It was in March of 2000 that there was another

16  trip that my family and I were visiting Arizona.  And Wendi

17  had talked about -- we talked about the lawsuit that they

18  had.  And she wanted Joe to try chemotherapy so that the

19  jury would see that he tried everything that was available.

20    Q.   To increase the value?

21    A.   So they could get more money.

22    Q.   With regard to the treatment for chemotherapy,

23  was there also a treatment where he went to Colorado that

24  you're aware of?

25    A.   Yes.

104

1      Q.   And again, was there a reason that was given per

2   the defendant why that was a good thing to try that

3   treatment?

4              MR. PATTERSON:  Judge, could we have a time

5   frame?

6              THE COURT:  Sustained.  Lay some more foundation.

7      Q.   BY MR. MARTINEZ:  This conversation, who did you

8   speak to about this conversation?

9      A.   About the conversation?

10      Q.   Involving the issue of the homeopathic approach.

11      A.   I spoke with my sister.

12      Q.   What is her name?

13      A.   Jeanea.

14      Q.   Jeanea what?

15      A.   Lambeth.

16      Q.   About when did you talk to her?

17      A.   Several years ago.

18      Q.   Was it right about the time that this was going

19   to happen?

20      A.   Yes.

21      Q.   So what was the discussion about?

22              MR. PATTERSON:  Judge, objection.  A discussion

23   that doesn't involve my client is not relevant.

24              THE COURT:  Overruled

25              Go ahead and answer if you can.

1        THE WITNESS:  About Joe doing the homeopathic

2   treatment and going to Colorado.  He wanted to.  Again,

3   because of the lack of medical information and knowledge of

4   him doing the traditional treatment for cancer the

5   homeopathic treatment was one that would be good for him to

6   try.

7        Q.   BY MR. MARTINEZ:  Do you know whether or not they

8   had to have money out of pocket or do you know how that was

9   paid for?

10       A.   Once Joe was diagnosed with cancer, there were

11  some people involved in the community, some friends of

12  ours, Tom Stevens, a family friend from childhood and Alma

13  Farrell that organized a fund raiding event and I helped

14  them from a distance.  But they organized a fund raising

15  event to assist Joe and his family in any way they might

16  need.  And they arranged this event to be held at the Elk's

17  Club.  About $15,000 was raised for Joe.

18       Q.   So it wasn't like the family had to pay out of

19  pocket for the cost of the homeopathic treatment?

20       A.   That's right.  That treatment wsa paid for from

21  this fund raising event.

22       Q.   You indicated that you flew out here on Thursday,

23  Friday and Saturday -- or Thursday in August and you

24  thought it was either August 24th or August 25th of 2000.

25  Do you remember telling us that?

1    A.   Yes.

2    Q.   When you came out here, where did you stay?

3    A.   I stayed in Wendi and Joe's apartment.

4    Q.   So the Thursday that you stayed, you did stay at

5    their apartment?

6    A.   Yes, I did.

7    Q.   And all the time you were there on the, 24th, 25t

8    and 26th, did you ever see anybody come in, go in and out

9    of the side door that has the wall there?

10   A.   No.

11   Q.   Which was the normal way of coming -- which was

12   the way that people came in and out of that apartment?

13   A.   The front door.

14   Q.   That first Thursday, about what time did you

15   arrive?

16   A.   It was during the work day.  Wendi picked me up

17   from the airport.

18   Q.   And so about what time was it?

19   A.   It was after lunch time, so probably between two

20   and three.

21   Q.   Where did you go?

22   A.   Straight to the apartment, 132.

23   Q.   When you went to the apartment, who was there?

24   A.   Joe.

25   Q.   And was Joe by himself or was anybody else with

1  him?

2      A.   Joe was by himself.

3      Q.   Where were the kids?

4      A.   They were at Gia's house.

5      Q.   Did there come a time when the kids come over to

6  the apartment?

7      A.   Yes.

8      Q.   About what time?

9      A.   After five.

10     Q.   Who brought them?

11     A.   Wendi picked them up.

12     Q.   And did Wendi remain at the apartment after she

13  picked them up and brought them down?

14     A.   No.

15     Q.   Did she leave?

16     A.   Yes.

17     Q.   Do you know where she went?

18     A.   I don't know.

19     Q.   Do you know what time she returned?

20     A.   It was about two o'clock in the morning.

21     Q.   And that night, when the kids came over, and the

22  kid were there, who fed them that night?

23     A.   I did.

24     Q.   And who bathed them that night?

25     A.   I did.  Joe wasn't feeling very good.

1    Q.   The next morning would have been a Friday,

2  correct?

3    A.   Yes.

4    Q.   And about what time did you get up?

5    A.   Early, between six and seven.

6    Q.   And were the kids up when you got up or not?

7    A.   I believe that they were.

8    Q.   And had they already received breakfast?

9    A.   No.  I slept on the couch in the leaving room so

10  I was right there next to the kitchen.

11   Q.   So, did you see the defendant that morning?

12   A.   I did.

13   Q.   And did she stay there that morning or did she go

14  somewhere?

15   A.   She went somewhere.

16   Q.   And so who fed the kids?  Did you feed the kids

17  or did Joe feed the kids?

18   A.   I did.

19   Q.   And when was the next time you saw the defendant

20  that day?

21   A.   It was later in the afternoon, probably about

22  between three and four.

23   Q.   Were the kids taken to the baby-sitter that day,

24  that Friday?

25   A.   I believe that they were.

109

1    Q.    And so what time did the kids get back?

2    A.    They were at the baby-sitter because Wendi had

3 gone into work that day.  They got home -- I didn't see

4 them that evening.  They were taken to Casa Grande.

5    Q.    That was the Friday?

6    A.    Yes.

7    Q.    Do you know who took them to Casa Grande?

8    A.    Wendi did.

9    Q.    Did you see Wendi that evening?

10    A.    Just briefly when she had come home between three

11 and four, she got ready to go out.

12    Q.    When you say "got ready to go out" what are you

13 talking about?  Get ready to go back to work or get ready

14 to go out for something else?

15    A.    She was going out for her birthday.  She had

16 called me to tell me that the girls in the office had

17 gotten a limo to go out for her birthday.  And I thought

18 Joe and I were invited to go.  And so I said, "Well, who's

19 going to take care of the kids."  She said, "Oh, my mom

20 will."  And so she took the kids to Casa Grande.

21    Q.    And that was about three o'clock in the afternoon

22 that you saw her?

23    A.    Yes.

24    Q.    What did you do after that time and who did you

25 do it with, if you did anything?

110

1    A.    Well, I was told that the limo ride was just for

2    the girls.  And that really Joe and I weren't going to be

3    included in that.  And so, we called my mom, Joe and I

4    called my mother and we went out to dinner, the three of us

5    did.

6    Q.    Where did you guys go?

7    A.    We went to Mimi's Cafe.

8    Q.    Where is that located?

9    A.    Chandler Boulevard in Ahwatukee.

10    Q.    And about what time did you get there?

11    A.    Probably about seven.

12    Q.    How long were you there having a meal?

13    A.    About an hour and a half.  It took a little bit

14    of time to get seated.

15    Q.    And then who was there, you, Joseph and who else?

16    A.    My mother, Jeanette Andriano.

17    Q.    And was that it?

18    A.    That was it.

19    Q.    Where did the three of you go after that?

20    A.    We went to -- we tried to see a movie but the

21    movie was sold out.  And so Joe knew how much Wendi liked

22    to read.  He wanted to get her some books for her

23    birthday.  So we went to the Barnes and Noble bookstore.

24    Q.    And was he successful or did he end up buying her

25    some books?

111

1    A.   He did and my mother is also a very avid reader

2   and she has some suggestions for Joe.  She knew the kind of

3   books that Wendi liked to read.

4    Q.   Where did the three of you go after the Barnes

5   and Noble trip or stop?

6    A.   Joe and I went back to the apartment.  And my mom

7   went to the grocery store and then home.

8    Q.   At any time was Joseph expressing any anxiety

9   over the defendant not being there with him or that she

10  might be out?

11   A.   No.

12   Q.   And that evening did you and he do anything other

13  than just sit in the apartment and hang around?

14   A.   We visited.  We talked about just things we used

15  to do when we were growing up.

16   Q.   What was his physical aspect like?

17   A.   He lost his hair and he was very thin.  His skin

18  had started to turn kind of yellow.

19   Q.   Could you tell anything about -- Could you tell

20  anything about his endurance or strength?  Were you able to

21  tell anything?

22   A.   He was weak and he was tired.  He slept a lot.

23  He took a couple naps a day.

24   Q.   So, what happened later on that evening:

25   A.   Joe and I just -- we visited.  We watched TV.  We

1   basically were waiting for Wendi to come home.

2       Q.   And prior to her coming home, did he leave the

3   apartment?

4       A.   He did.

5       Q.   And did he tell you why he left the apartment?

6       A.   He told me he was going to meet Wendi and see if

7   the limousine was back.

8       Q.   About what time was that?

9       A.   I think it was about one clock.

10      Q.   And how long was he gone?

11      A.   About ten minutes.

12      Q.   Was he agitated when he left?  Was he upset?

13      A.   No.

14      Q.   Had he been upset all throughout the night that

15  Wendi had been out?

16      A.   No.  He -- he thought Wendi was out sowing her

17  oats.

18      Q.   When you say that "he thought Wendi was out

19  sowing her oats" what does that mean?

20      A.   He just thought that -- Wendi had told him that

21  she wasn't able to go out and that she didn't get to go out

22  and experience things, like after she got out of high

23  school.  And so she -- so the fact that she wanted to go

24  out was okay with him.  I mean, he wasn't angry with her

25  about it.

113

1      Q.   What time did she come home the night before,

2  which was Thursday?

3      A.   About two o'clock.

4      Q.   So it's about one o'clock he goes outside.   You

5  indicated, I think, that he was gone about ten minutes or

6  how long?

7      A.   Yes, about ten minutes.

8      Q.   And then did he return?

9      A.   Yes.

10     Q.   And which door did he come in through?

11     A.   The front door.

12     Q.   What was his demeanor when he walked in?

13     A.   He just seemed normal.   I mean, he said they were

14  back.

15     Q.   And then, did Wendi come in shortly after that?

16     A.   Yes.

17     Q.   So, it wasn't like they came in together, was it?

18     A.   No.

19     Q.   And when she came in, what was her demeanor?

20     A.   She was just real happy and giggling and

21  laughing.   She said she had a really good time.

22     Q.   And when she came in, where did she go inside the

23  apartment?

24     A.   She sat in the chair in the living room.

25     Q.   And did you and she talk?

114

1    A.   We did.  We talked a little bit.

2    Q.   And what did she tell you?

3    A.   She said she just had to go out.  She just had to

4    do it.

5    Q.   And what did you say to that?

6    A.   I didn't know what to say.  I was overwhelmed

7    with the fact that she was going out without my brother and

8    staying out late.  I didn't respond.

9    Q.   How long did she stay out there in the chair with

10   you, talking then?

11   A.   Ten minutes, 15.

12   Q.   Where was your brother when she was talking to

13   you?

14   A.   He had gone back in the bedroom.

15   Q.   When he was back in the bedroom, did you hear any

16   slamming of drawers or anything that would categorize a

17   loud sort of striking noise?

18   A.   No.

19   Q.   Did you hear any cursing or anything while he was

20   back there in the bedroom?

21   A.   No.

22   Q.   So she decides, she leaves you after about ten to

23   15 minutes.  Where did she go?

24   A.   She went to the bedroom.

25   Q.   Did her demeanor at all change at all during

115

1   doing the ten, 15 minutes from being giggling and happy?

2        A.   No.

3        Q.   Was she intoxicated?

4        A.   Yes.

5        Q.   Then what happened?

6        A.   Then Joe ended up coming back out.

7        Q.   How long was he back there when she was back

8   before he came out?

9        A.   Not very long.  Probably 15 minutes.

10       Q.   While he was back there for 15 minutes, did you

11  hear any loud voices from the back?

12       A.   No.

13       Q.   Did you hear anything striking anything while he

14  was back there?

15       A.   No.

16       Q.   Did you hear anything that -- are you familiar

17  with the sounds that a drawer makes when it's being

18  slammed?

19       A.   Yes.

20       Q.   Did you hear anything like that?

21       A.   No.

22       Q.   When he came out, what was his demeanor?  What

23  was he acting like?

24       A.   He was tired but he couldn't go to sleep.

25       Q.   So?

116

1     A.   He wanted to spend time visiting with me.

2     Q.   What happened?

3     A.   So he sat on the rocking chair, on his chair and

4  we just we talked about his cancer.

5     Q.   Did he ever indicate to you a desire to die or

6  anything like that?

7     A.   No.  He was so optimistic and positive.  At

8  times, it would rub off on me.  I would think, I would be

9  as optimistic as he was.  I really wanted to believe that

10  he -- he believed he was going to live ten more years.

11  That's what he would tell us.  He was going to beat it.  He

12  felt so strong that he was going to beat it.  He wanted to

13  see his kids grow up.

14     Q.   And about what time did you and he finally end up

15  going to bed?

16     A.   It was late, between three and four.

17     Q.   And so that takes us, I guess, to Saturday

18  morning?

19     A.   Uh-huh.

20     Q.   Is that yes?

21     A.   Yes.

22     Q.   That Saturday morning, what time did you get up?

23     A.   Not quite as early because I stayed up so late

24  and the children weren't there.  So, we slept in, maybe ten

25  o'clock.

117

1     Q.   And do you remember the breakfast plans or

2  anything like that?  What happened?

3     A.   There wasn't any meal that was prepared while I

4  stayed there that weekend by Wendi.  I'm not a big

5  breakfast eater so I waited for lunch.

6     Q.   And what time did the children return that

7  Saturday?

8     A.   Yes.

9     Q.   What time did they return?

10    A.   Sometime in the afternoon.  I don't know the

11  exact time.

12    Q.   Do you know if Wendi went to pick them up or if

13  they were brought by somebody?

14    A.   I think Wendi went to pick them up.

15    Q.   What happened that evening?

16    A.   We just hung out at the apartment and watched a

17  movie.  I bathed the children.

18    Q.   Was the defendant there that night?

19    A.   I believe she was.

20    Q.   Even though she was there, you ended up bathing

21  the children?

22    A.   Yes.

23    Q.   How about dinner?  What was done about dinner

24  that night?

25    A.   We must have ordered something out, take out.

118

1    Q.   And then you left the next day, correct?

2    A.   I did.  I wanted -- one of the things I did

3 before leaving, I went to the grocery store and stocked the

4 refrigerator.  I made some casseroles for Joe.  I had a

5 chicken pot pie that he liked that I made.  And I made some

6 things that were in the freezer that would be easy for him

7 to prepare.

8    Q.   Then if we move ahead to September, about when in

9 September did he come out to visit you?

10   A.   September, he came out -- they came out for a

11 week and that was the 15th or 16th.

12   Q.   That would be in 2000?

13   A.   In 2000, it was a Friday.

14   Q.   During that time between September and

15 August -- you obviously were out in the August -- in

16 September that he went out there, did you continue to have

17 contact with Mr. Andriano?

18   A.   Daily.

19   Q.   And ever any indication that he was, you know,

20 not looking forward to the next day, anything like that?

21   A.   No, we were supposed to go to the lake.  He was

22 going to take my kids to the lake.  They'd never been in a

23 boat.  They, I mean, we were, my family was going to be in

24 Arizona for Thanksgiving.  We talked -- his best friend

25 from childhood who he went to kindergarten and graduated

119

1   from high school with him was getting married in November.

2   He was looking forward to Brandon's wedding.

3       Q.   How long were they supposed to stay?

4       A.   A week.

5       Q.   And who came out?

6       A.   Joe, Wendi, Nicholas and Ashley.

7       Q.   Who paid for that trip?

8       A.   I did.

9               MR. PATTERSON:  Judge, approach.

10              (Bench conference was held outside the hearing of

11   the jury.)

12              MR. PATTERSON:  Judge, I object to this line of

13   questions.  It's far afield in terms of rebutting

14   mitigation hearing.  Rebutting allegations that may have

15   been made during the course of the guilt, innocence phase.

16   But he's not restricting her testimony to the issues raised

17   in the mitigation.  So I ask that you cut this off and not

18   allow this.

19              THE COURT:  Mr. Martinez.

20              MR. MARTINEZ:  One of the things she is going to

21   talk about is whether or not she was a good mother.  And

22   that's where I'm headed with this.

23              THE COURT:  If you're headed for it, get to it.

24   I mean, I agree with Mr. Patterson, you're off on other

25   things.  Get to the point of this what Mr. Patterson

120

1   presented in way of mitigation.

2              (Bench conference concluded.)

3         THE COURT:  Mr. Martinez.

4         Q.   BY MR. MARTINEZ:  When they were out there in

5    September, 2000, was there ever -- did you see her interact

6    with her kids?

7         A.   Yes.

8         Q.   And how was she around them?

9         A.   She was always ready to hand them off to somebody

10   else.  Like, Joe, it's your turn, or I can't take this

11   crying any more.

12        Q.   With regard to the birthday, did Ashley have a

13   birthday when they were over at your place?

14        A.   Yes.

15        Q.   And did she want to do a birthday for her or not?

16        A.   Well, it was Ashley's second birthday.  And I

17   said, "Well, let's go get a cake so we can celebrate."  And

18   Wendi told me, "No, we don't need to do that.  She's not

19   going to even know.  She's two."

20        Q.   But, did the birthday go ahead anyway?

21        A.   The birthday went ahead anyway.  My husband

22   Lawrence took her to the store and purchased birthday hats

23   and plates and everything so we could celebrate Ashley's

24   birthday.

25        Q.   This birthday, how was she during this, again,

121

1   during the birthday towards the kids?  Was she primarily

2   taking care and looking over them?

3       A.   She seemed to have her mind on other things and

4   not really -- it seemed like she was trying to figure out a

5   way she could get home.  She was not really interested in

6   being there.

7       Q.   Not being there with the kids?

8       A.   Right.

9       Q.   Did there come a time when she actually did

10  leave?

11      A.   Yes.

12      Q.   Did she leave early?

13      A.   She left early.  I talked to her several times to

14  make sure she was able to get off work for the entire week

15  and she told me that she was.  And she was going to stay

16  the whole week.  And but while we were there, on Sunday she

17  said she was going to have to go back.  They were doing an

18  audit at work and she had to go back for it.

19      Q.   How about the kids.  Did she take them back with

20  her or leave them in Mr. Andriano's care?

21      A.   She took Ashley with.  Joe's energy level was

22  low.  I mean, he had taken a break, he'd taken a week off

23  his chemo treatments.  But, Ashley went with Wendi so Joe

24  had responsibility for Nicholas.

25      Q.   Are you familiar with this paddle that we've been

122

1   talking about?

2       A.   Yes.

3       Q.   And do you know whether or not that paddle had

4   anything inscribed on it?

5       A.   I remember it had a Bible versus or something to

6   that effect.

7       Q.   And where was the paddle when you saw it?

8       A.   I saw it in their apartment.

9       Q.   With regard to this paddle and whether or not it

10  was used as corporal punishment, did you have occasion

11  to -- do you have occasion to know whether or not it was

12  used by the defendant for corporal punishment?

13      A.   Yes, it was.

14      Q.   And describe the situation or circumstance for

15  me?

16           MR. PATTERSON:  Objection, Judge, the basis of

17  the knowledge.

18           THE COURT:  Lay some foundation.

19      Q.   BY MR. MARTINEZ:  Did you speak to your sister,

20  Jeanea Lambeth, about this?

21      A.   Yes, I did.

22      Q.   And did she relate to you about more or less when

23  this occurred?

24      A.   Yes.  She told me Nicholas was --

25           MR. PATTERSON:  Judge, foundational.

123

1          THE COURT:  Okay.  Sustained.  Lay some

2    foundation.

3       Q.  BY MR. MARTINEZ:  When did you have this

4    conversation with her?

5       A.  Oh.  A couple of years ago.

6       Q.  And how old would Nicholas be a couple of years

7    ago?

8       A.  Nicholas?

9       Q.  In other words, this didn't happened when

10   Nicholas -- he's about seven now?

11      A.  Yes.

12      Q.  It wouldn't have happened when he was five,

13   right?

14      A.  No.

15      Q.  This conversation was a couple years ago relating

16   to something that happened when?

17      A.  When Nicholas was three.

18      Q.  And where did this issue with the paddle arise?

19   Where were you?

20      A.  I was at my sister's house, Jeanea's.

21          MR. PATTERSON:  Judge, can we go incrementally

22   here to establish the foundational requirement for this

23   particular area of inquiry?

24          THE COURT:  Sustained.

25          Rephrase the question.

124

1       Q.   BY MR. MARTINEZ:   You were at Jeanea's house when

2   you had this conversation, correct?

3       A.   Yes.

4       Q.   And she was relating an incident to you, correct?

5       A.   Yes.

6       Q.   What was the time frame of the incident that she

7   was relating to you?   In other words, when did it happen?

8       A.   In the summer of 2000.

9       Q.   So in the summer of 2000.   Where did it happen,

10   the Apartment 132?

11       A.   Yes.

12       Q.   And about what time of day was it that it

13   happened?

14       A.   It was probably -- I think -- I believe it was a

15   Saturday morning.

16       Q.   And so, why don't you tell us what she told you

17   about that Saturday morning in the summer of 2000, how it

18   related to the paddle.

19           MR. PATTERSON:   Can we approach, please?

20           (Bench conference was held outside the hearing of

21   the jury.)

22           MR. PATTERSON:   I still don't think he's laid

23   foundation.   This other lady observed this or did she hear

24   this from someone else?   I think we need to establish

25   further foundation before we get hearsay upon hearsay upon

1    hearsay.

2              THE COURT:  Okay.  Lay some foundation.

3              (Bench conference concluded.)

4              THE COURT:  Mr. Martinez.

5        Q.   BY MR. MARTINEZ:  Did Jeanea indicate to you that

6    she actually saw, perceived this event with her own eyes?

7        A.   Yes.

8        Q.   Tell us what she said she perceived.

9        A.   Nicholas was not listening to what Wendi wanted

10   him to do and so she took the paddle and swatted him on the

11   bottom with it.

12       Q.   Subsequent to that, did she ever talk about or

13   brag about that this was a way to discipline kids?

14       A.   Wendi and I had had a discussion.

15       Q.   When did you have this discussion?

16       A.   Spring of 2000, March.

17       Q.   Where did you have this discussion?

18       A.   In her apartment.

19       Q.   Okay.  And what was the nature of that discussion

20   as it relates to what we're talking about?

21       A.   Well, there is a paddle and I kind of was

22   interested in what it was.  And she said it was a paddle

23   that was used that was Brandon's, that their parents had

24   given to them to use.

25       Q.   And did she indicate anything else about that,

1   about being used for discipline?  Is that what it was used

2   for?

3       A.   Yes, she said it was used for discipline.  I

4   just -- I remember it so vividly because of the Bible

5   versus that was on the paddle.

6       Q.   In all the time, did you ever see or did you

7   visit them when any of the kids were in diapers?

8       A.   Yes.

9       Q.   And which one of the kids was in diapers?

10       A.   Both of them.

11       Q.   And when you saw the defendant around Nicholas

12   and he was in diapers, who would change the diapers for

13   Nicholas?

14             MR. PATTERSON:  Objection, Judge.  Point in

15   time.

16             THE COURT:  Sustained.

17             Lay some foundation.

18       Q.   BY MR. MARTINEZ:  When you say that you saw

19   Nicholas when he was in diapers and saw the defendant, when

20   was it?

21       A.   In spring of 2000, when we were visiting in

22   March.

23       Q.   Okay.  Was Ashley also in diapers at that time?

24       A.   Ashley was in diapers.

25       Q.   How long did you stay out here visiting?

127

1      A.   Probably ten days.

2      Q.   Where did you stay?

3      A.   I stayed some at my parents' house.  We stayed,

4   my children and I stayed at Wendi's and Joe's apartment for

5   three days.  And then we stayed at my sister Jeanea's

6   house.

7      Q.   When you stayed at the defendant's house, you

8   indicated that the kids were in diapers.  Did you ever see

9   the defendant change diapers?

10     A.   I did not.

11     Q.   Who was primarily responsible for changing the

12  diapers?

13     A.   Joe was.

14     Q.   And in terms of bathing, who was primarily

15  responsible for that?

16     A.   Joe.

17     Q.   Ever have occasion to talk to the defendant or

18  discuss with the defendant whether or not she wanted Ashley

19  to -- she wanted -- whether or not the decision was hers to

20  have Ashley as a child?

21     A.   Yes, I did have a discussion with Wendi about

22  that.

23     Q.   And when was that?

24     A.   Shortly after she was pregnant with Ashley.  So

25  it would have been in spring of '98.

128

1    Q.   And what did she tell you about that pregnancy?

2    A.   She wasn't planning on being pregnant at that

3    time.  And she just wasn't ready to have another baby.

4    Nicholas was so young, she just wasn't really ready to have

5    another baby.

6    Q.   Did she ever indicate anything about her body?

7    A.   She didn't want to have to get fat again.

8    Q.   Now, one of the things we know is that there was

9    a bar-b-que that was at your parents' house on Saturday

10   October 7th of the year 2000?

11   A.   Yes.

12   Q.   Have you talked to Jeanea Lambeth, your sister

13   about that?

14   A.   Yes.

15   Q.   When did you talk to her about this?

16   A.   October 8th.

17   Q.   About this fish fry or bar-b-que, you talked to

18   her about it on October 8th?

19   A.   Yes.

20   Q.   What time of the day did you talk to her about

21   it?

22   A.   That night.  It was after -- I was notified at

23   about seven o'clock my time so, it was probably eight

24   o'clock when I spoke with Jeanea.

25   Q.   Did you and Jeanea discuss this issue about the

129

1   trailer being hooked up to one of the cars during that

2   conversation?

3        A.   Not that conversation.  The discussion about the

4   bar-b-que came up several times.  That conversation was

5   just the fact of they were all together and couldn't

6   believe what happened.

7        Q.   Was she present at that occasion?

8        A.   Yes.

9        Q.   Did there ever come a situation when you

10  discussed with Jeanea about what happened that night at

11  that bar-b-que?

12       A.   Yes.

13       Q.   And when was that that you had this conversation

14  with Jeanea?

15       A.   Probably like October 10th.  It was later in that

16  week when I came to Phoenix.

17       Q.   And what did she tell you with regard to your

18  brother and this trailer.

19            MR. PATTERSON:  Judge, objection.  Beyond the

20  scope.  Not relevant to mitigation.

21            THE COURT:  Sustained.

22       Q.   BY MR. MARTINEZ:  Did she tell you who was taking

23  care of the kids that night?

24       A.   Yes.

25       Q.   Who was taking care of the kids that night?

130

1    A.    Jeanea, my mom and Joe would go and check on them

2  in between his resting on the sofa.

3    Q.    Did you ever have occasion to want to discuss

4  with your brother plans in the future about you doing this

5  or doing that?  Did you ever do that sort of thing, maybe

6  involving the kids.  May be not involving the kids.  But

7  let's focus on involving the kids.  Did you ever contact

8  him and say, you know, let's do this or that with regard to

9  the kids?

10    A.    Yes.

11    Q.    And what would he say?  What was his response?

12         MR. PATTERSON:  Judge, not relevant to mitigation

13  issue.

14         THE COURT:  Sustained.

15    Q.    BY MR. MARTINEZ:  With regard to that issue, in

16  terms of caring about the kids, did he indicate who

17  was -- during these conversations, did he ever indicate who

18  was the primary caretaker of the kids.

19    A.    He indicated that -- well, I know he took care of

20  them while Wendi was working and going out.  I mean, I was

21  there.  She would go out and Joe was the primary caretaker

22  and then baby-sitter.  He took care of them during the day.

23    Q.    With regard to September 27th of 2000, that was

24  the night that involved Travis Black, do you know where the

25  kids were that night?

1     A.    They were at Jeanea's.

2           MR. PATTERSON:  Objection.

3           THE COURT:  Sustained.  Lay some foundation.

4           MR. MARTINEZ:  Okay.

5     Q.    BY MR. MARTINEZ:  Did you talk to Jeanea Lambeth

6  about September 27 of the year 2000?

7     A.    Yes.

8     Q.    And was she present on September 27th of the year

9  2000?

10    A.    Yes.

11    Q.    And what did she tell you who took care of the

12  kids that night?

13          MR. PATTERSON:  Judge, when was this

14  conversation.

15          THE COURT:  Lay some foundation.

16    Q.    BY MR. MARTINEZ:  When did you have the

17  conversation with Jeanea about what happened on September

18  27th?

19    A.    Several times we've talked about it.  I mean, in

20  the last -- in the last year we've talked several times

21  about it.

22    Q.    And what did she tell you?

23    A.    She told me that Wendi took Joe and the children

24  to her house, to -- took them over there so Jeanea could

25  help take care of them.  And Wendi was there and she went

132

1    into the bathroom at Jeanea's house, borrowed Jeanea's

2    curling iron and tried to get all ready because she was

3    going out.

4        Q.   And who bathed the kids that night?

5        A.   Jeanea did.

6        Q.   Who fed the kids that night?

7        A.   Jeanea did.

8             MR. MARTINEZ:  I don't have anything else.

9             THE COURT:  Mr. Patterson.

10            MR. PATTERSON:  Thank you, Judge.

11

12                      CROSS-EXAMINATION

13   BY MR. PATTERSON:

14       Q.   Ms. Clayton, you're Joe's sister?

15       A.   Yes.

16       Q.   And I understand that you moved from the state of

17   Arizona in 1989, correct?

18       A.   Yes.

19       Q.   And the first place that you relocated was

20   Bowling Green -- wasn't Bowling Green.  What was the first

21   place you relocated at?

22       A.   Raleigh, North Carolina.

23       Q.   Since 1989, you have lived in states other than

24   Arizona, correct?

25       A.   Yes.

133

1    Q.   You come back periodically to visit family,

2    correct?

3    A.   Yes.  I come back regularly.

4    Q.   And how much time since 1989 have you actually

5    spent at the apartment of Joe and Wendi Andriano?

6    A.   In the year 2000 was the only time I stayed at

7    their apartment.  In March I was there three nights.

8    Q.   Wait, let me make a note.  Three nights in March?

9    A.   Yes.  And three nights in August.

10   Q.   Okay.  And then, they spent two days with you in

11   Memphis, correct?

12   A.   Joe spent seven nights.  He spent a week.  Wendi

13   spend two or three nights.

14   Q.   So in terms of actually cohabiting or coexisting

15   with Wendi and Joe in their environment, you spent

16   approximately eight days with them?

17   A.   Yes.

18   Q.   Eight or nine days.  Three in March, three in

19   August and two to three nights in September, correct?

20   A.   Yes.

21   Q.   And the three nights you spent in August were in

22   response to Wendi, basically, telling you that you better

23   get out here if you wanted to see your brother, right?

24   A.   Yes.

25   Q.   And that was a reference, obviously, to the fact

134

1   his condition was changeable, right, as a result of the

2   cancer?

3        A.   That's what I thought it was.

4        Q.   When you got out here, Joe, in fact, in August

5   was sickly, correct?

6        A.   Yes.

7        Q.   And so it was a good thing you came to see Joe in

8   August, correct?

9        A.   I'm glad I did come.  He wasn't quite as

10  much -- I didn't think it was quiet as an emergency as

11  Wendi made it sound.

12       Q.   You told us he lost weigh, he was weak and that

13  he tired easily?

14       A.   Yes.

15       Q.   I mean, he was in pretty bad condition as a

16  result of the cancer, correct?

17       A.   As a result of the chemotherapy.

18       Q.   Well, a combination.  The cancer had taken its

19  toll and the chemotherapy in and of itself was problematic

20  for his health, correct?

21       A.   Yes.

22       Q.   And during the August visit, you and Joe didn't

23  go out with Wendi on her birthday, correct?

24       A.   That's correct.  She didn't want us to.

25       Q.   Joe wasn't feeling too great any way that night,

135

1  was he?

2       A.  But she told us she didn't want us to go.

3       Q.  My question was Joe wasn't feeling too good that

4  night.  You told us he was sickly, he was weak, not feeling

5  to good.

6       A.  He was tired and but he was able to go.  We went

7  to dinner.

8       Q.  I understand.  But he didn't go out.  You and he

9  and mom didn't go out with Wendi that evening, correct?

10      A.  Right.

11      Q.  But you did have an opportunity to sit down with

12  Joe and reminisce about childhood things, right?

13      A.  Yes.

14      Q.  And you got a chance to talk with Joe, right?

15      A.  Yes.

16      Q.  Got a chance to spend some quality time with Joe,

17  right?

18      A.  Yes.

19      Q.  And your mom was there, as well?

20      A.  Yes.

21      Q.  And she had a chance to meet and see you.  She

22  hadn't seen you in a while, I assume, correct?

23      A.  Correct.

24      Q.  And you hadn't seen Joe in a while, correct?  I

25  mean, the last time you actually had face-to-face contact

1  with Joe was in March, right?

2      A.  I think that's correct.  I typically came in the

3  summer but I'm not sure if I came that summer or not.  I

4  seen my mom in July of 2000.

5      Q.  But you told us that you last remember seeing or

6  staying with Joe and Wendi in March of 2000?

7      A.  That's when I stayed in that apartment.

8      Q.  Okay.  And you may have seen him in July?

9      A.  I may have seen Joe and Wendi during that summer.

10     Q.  But you don't recall specifically?

11     A.  I don't.

12     Q.  In any event, it had been at least several months

13 since you last seen Joe face-to-face, right?

14     A.  Yes.

15     Q.  And you hadn't seen him since he started

16 chemotherapy, right?

17     A.  That's correct.

18     Q.  And so this is an opportunity in August to see

19 Joe face-to-face after at least a couple months after he

20 had started his chemotherapy regimen?

21     A.  Right.

22     Q.  And have you had opportunities other than these

23 eight times to see Wendi taking care of her kids?

24     A.  At every family gathering we had.

25     Q.  Any problems in other family gatherings?

1    A.   Well, especially in the later years '99, '98,

2    2000, once there were children, there was definitely any

3    opportunity to have someone else help her with the children

4    was welcome.

5    Q.   Okay.  I mean, she asked for help with the kids.

6    Anything else she did wrong in terms of mothering these two

7    children that you can tell us about?

8        MR. MARTINEZ:  Objection.  He's indicating she

9    said wrong things.

10       THE COURT:  Sustained.

11       Rephrase the question.

12   Q.   BY MR. PATTERSON:  I'm asking you've seen Wendi

13   interacting with her children at the family gatherings, are

14   there other issues other than asking for help?

15   A.   Well, she just seemed disinterested in them.

16   Q.   Okay.  How did that manifest itself?  Would she

17   not hold them, not touch them, would she not talk to them?

18   A.   If one of them was crying, it would be bothersome

19   towards her.  Instead of trying to console the child, she

20   liked to hand him, Nicholas or Ashley, to Joe for Joe to

21   calm them down.

22   Q.   All right.  Anything else that you observed that

23   indicates in your mind a neglectful or problematic mother?

24   A.   Well, just the fact she takes them to the

25   baby-sitter even on her days off.

138

1    Q.   Do you have a problem with day care, personally?

2    A.   No, I don't.

3    Q.   But there's a time and place for day care, right?

4    A.   There is.  But I know for me when I was working

5 and I was off, I spent every hour I could with my

6 children.

7    Q.   Okay.  Do you find women who don't do it your way

8 to be neglectful or problematic mothers?

9    A.   Well, when they do it regularly, I would find

10 that that might be an issue.

11    Q.   Okay.  Do you know for a fact that she regularly

12 dropped her kids off at day care?  At times when she wasn't

13 working or that Joe was at the lake, was there not some

14 meritorious reason for using day care services?

15    A.   When I visited in 2000, the year 2000, the days

16 off that I saw her, that I observed, the children went to

17 the baby-sitter even on her days off.  And those times that

18 I was visiting, Joe did not go to the lake.

19    Q.   Okay.  But we are talking about three nights in

20 August and two to three nights in March, that's what we're

21 talking about?

22    A.   I was there ten days in March but I stayed at

23 their apartment for three days.  Two weekends in March.

24    Q.   So in terms of observing the dynamics between Joe

25 and Wendi and the need, perhaps, for day care, that was

139

1   three nights in March and three nights in August, right?

2       A.   I'm sorry.   I'm not sure what you're asking me.

3       Q.   Well, you're telling us kind of in general that

4   she over used day care services.   Is that what you're

5   telling us, in your estimation?

6       A.   No, I just find it -- I just think that the fact

7   that even on a day off, the fact that the children will go

8   to a baby-sitter instead of spending the time with her that

9   that is something that is to be considered.

10      Q.   That is your judgment, is that what you're

11  telling us?

12      A.   That's my opinion.

13      Q.   Okay.   And that's based upon contact that you had

14  with Joe and Wendi and the children primarily in March and

15  August, right?

16      A.   In the year 2000.

17      Q.   Were there other times in the year 1999 where she

18  abused or over used, in your estimation, day care

19  services?

20      A.   In 1999, they didn't have a regular baby-sitter.

21      Q.   Well, we know Gia started in November or December

22  of '99?

23      A.   They lived at my parent's house until December.

24  And then moved, they moved in December to Ahwatukee.   And

25  when we visited in the summer of '99, I would stay at my

140

1    parents because they were in Casa Grande.

2         Q.   Back, again to my question.  Are there specific

3    incidents where she over used or abused day care services

4    and thus was, in your opinion, a neglectful mother?

5         A.   I felt sorry for Nicholas and Ashley that they

6    didn't get to spend more time.

7         Q.   Okay.  Can you give me specific incidents in that

8    regard?

9         A.   When she would take them to the baby-sitter on

10   Friday when she was off.

11        Q.   Okay.  How frequently did she do that, to your

12   knowledge, in the year 2000?

13        A.   Very frequently.  In discussing -- I was present

14   in March and August.  And my sister has lived here locally

15   and in discussing with Jeanea there were other times that

16   Wendi would take them to the baby-sitter on her day off.

17        Q.   Okay.  And this is information derived from your

18   sister?

19        A.   Yes.

20        Q.   Were there any times you personally observed

21   these things that you're describing for me?

22        A.   Yes.  Because -- yes, I met Gia.  I've been to

23   Gia's house.  I went with them sometimes when they would

24   drop the children off.

25        Q.   Okay.  How frequently?  I'm trying to get a sense

1  for how many times you may have done this.

2      A.   The times in 2000 that's when I was present in

3  Arizona.

4      Q.   Okay.  Again, you're referring back to the March

5  time frame and the August time frame?

6      A.   Yes.

7      Q.   Okay.  All right.  That evening when she went out

8  with the girlfriends, colleagues at work, did you observe

9  Joe and Wendi in the parking lot there at the San Riva

10  Apartments there that evening?

11      A.   No.

12      Q.   Did you ever observe either Joe or Wendi in the

13  Yukon, in the car that evening?

14      A.   No.

15      Q.   Wendi apparently was intoxicated that evening?

16      A.   Yes.

17      Q.   That evening, thereafter, you had a discussion

18  with Joe about his cancer?

19      A.   Yes.

20      Q.   And did he express to you that he had some

21  difficulty breathing or did you observe that in

22  independently?

23      A.   I did not observe him having trouble breathing.

24  He said -- he told me that Wendi talked about that he was

25  coughing more.  But he didn't see himself coughing more or

142

1    a lot.

2        Q.    All right.  The time they were in Memphis, your

3    husband Lawrence took Wendi to the store to purchase items

4    for the party?

5        A.    Yeah.

6        Q.    And did Wendi contribute or pay for the things

7    that were used at that birthday party?

8        A.    I don't know.

9        Q.    All right.  Have you ever seen this paddle with

10   the Bible versus on it?

11       A.    Yes.

12       Q.    Have you ever seen Wendi use it in a disciplinary

13   fashion with either of her two children?

14       A.    I did not.

15       Q.    And the indication you got from your sister was

16   that she had observed Wendi swat Nicholas on the bottom one

17   time.  Was that the substance of the story that she told

18   you?

19       A.    That's the one incident I told you about.

20       Q.    But the substance of the story was one swat on

21   the bottom?

22       A.    Yes.

23       Q.    And then finally, Ms. Clayton, how much time

24   between the delivery of Nicholas, birth of Nicholas, and

25   the conception of Ashley, how much time between the two?

1     A.   Between the birth of Nicholas?

2     Q.   Yes, ma'am.  How much time elapsed before she was

3  once again pregnant with Ashley?

4     A.   They're 15 months apart so. . .

5     Q.   So we have about six months between the birth of

6  Nicholas and the conception of Ashley?

7     A.   Yes.

8     Q.   Was it at or near this time that Wendi expressed

9  some reservations about the pregnancy and that kind of

10  thing?

11     A.   Yeah.

12     Q.   Shortly after the conception of Ashley?

13     A.   It was like February of the year 1998.

14     Q.   Okay.  Help me out in terms of elapsed time from

15  the birth of Nicholas to that conversation, what are we

16  talking about; six months, seven months, eight months?

17     A.   Seven months.

18     Q.   That's when she expressed reservations about

19  having another child, the responsibility of another child,

20  that kind of thing?

21     A.   Yeah.

22          MR. PATTERSON:  Thank you, Judge, I have nothing

23  additional.

24          THE COURT:  We'll go ahead and take our evening

25  recess at this time.  Remember the entire admonition I have

144

1  given you.  Including the fact you are not to discuss this

2  case with anyone.  Do not let anyone discuss the case with

3  you.  Do not do any research, investigation,

4  experimentation or testing on your own.  Avoid any and all

5  media coverage of the case.  Have a nice evening.

6              I will tell you the attorneys have indicated that

7  we'll probably get to the closing arguments on Wednesday.

8  The presentation of evidence should conclude tomorrow.

9  Have a nice evening.  We'll see everyone tomorrow at 1 p.m.

10             (Proceedings adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT BBB

000008852





IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| WENDI ELIZABETH ANDRIANO, | ) |
| | ) |
| Defendant. | ) |

No. CR2000-096032
CR05 0005-AP

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 14, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

1

2

3                          A P P E A R A N C E S

4

5

6

7      For the State:

8                      Mr. Juan M. Martinez

9                      Deputy County Attorney

10

11

12

13

14     For the Defense:

15                      Mr. Daniel B. Patterson

16                      Mr. G. David Delozier, Jr.

17                      Office of the Public Defender

18

19

20

21

22

23

24

25

3

1

2                              I N D E X

3   WITNESSES:                                          PAGE

4

5   JANA CLAYTON

6       Redirect Examination by Mr. Martinez            19

7       Examination by the Court                        22

8

9   TIMOTHY LEE

10      Direct Examination by Mr. Martinez              24

11      Cross-Examination by Mr. Patterson              27

12      Redirect Examination by Mr. Martinez            31

13

14  DAWNA HARRIS

15      Direct Examination by Mr. Martinez              48

16      Cross-Examination by Mr. Patterson              82

17      Redirect Examination by Mr. Martinez            96

18      Examination by The Court                        101

19      Further Redirect Examination by Mr. Martinez    102

20

21  BONNIE LOSE

22      Direct Examination by Mr. Martinez              104

23

24

25

4

1

2

3                          E X H I B I T S

4

5          (Exhibits were marked prior to trial unless

6   indicated.)

7

8   NUMBER:              DESCRIPTION          MARKED      ADMITTED

9    548            Disciplinary Report                    65

10   549            Pencil                                 77

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      P R O C E E D I N G S

2

3         THE COURT:  This is Cause Number CR2000-096032,

4    State of Arizona versus Wendi Elizabeth Andriano.  The

5    record will reflect the presence of the defendant and

6    counsel.  We're outside the presence of the jury.

7              Mr. Patterson, you wanted to bring something up?

8         MR. PATTERSON:  Yes, Your Honor.  I move in

9    limine to preclude in its entirety the testimony of

10   Dr. Bayless or in the alternative to severely limit the

11   scope of the testimony to that which is true rebuttal in

12   this case.

13             By way of factual background, we presented no

14   psychological testimony in our presentation of mitigation.

15   Dr. Murphy is not a psychologist, a point which was made on

16   cross several times by Mr. Martinez.  She did not base her

17   testimony in any fashion on any instruments, psychological

18   tests like an MMPI II or personality projected tests at

19   all.  I would ask, then, that you not allow Dr. Bayless to

20   render any opinion or testimony based upon the imposition

21   of the MMPI II in this case.

22             I also feel that there is a 5th Amendment issue.

23   We previously, in this case, filed a motion to preclude the

24   Government from giving this test to my client because it

25   had no application, we believe, in the context of the

6

1  justification defense, domestic violence defense we

2  raised.  You overruled that motion at the time, directed

3  that she comply and that she, to the extent necessary,

4  waive her 5th Amendment privilege.

5      We so did and we took the MMPI II but it was a

6  limited waiver for purposes of domestic violence issues.

7  He has completely testified in the trial about the domestic

8  violence issues.  And I think that's the extent of his

9  relevant testimony in this case.

10      The proposed testimony that the Government seeks

11  to elicit from this gentleman, they're going to ask him for

12  his opinion with regard to her truthfulness.  They're going

13  to ask questions about future rehabilitation and all these

14  things.  And it is based upon, my belief, the projected

15  test, the MMPI II, that he administered to my client over

16  our objection.

17      So, again, I ask that you completely preclude

18  it.  If you don't, then I ask that you limit it to issues

19  like why she may be depressed, why there may be some

20  benefit moving from one pod to another.  Those kinds of

21  things because he does have a familiarity with the layout

22  of the jail and the Correctional Health Services system.

23  But to allow him to opine beyond that scope and render an

24  opinion based on upon the administration of an MMPI II is

25  error.  I ask you to limit him.

1          THE COURT:  Mr. Martinez.

2          MR. MARTINEZ:  The main thrust of their objection

3  is that he administered an MMPI II and that somehow that

4  was something that is not within the realm of domestic

5  violence.  But if the Court remembers the testimony of

6  Mindy Mechanic, one of the things his expert of all experts

7  who was beyond any expert in this courtroom said that in

8  every single case of domestic violence she does give this

9  MMPI II.  So for them to say, well, it's okay for our

10  expert, who is smarter and better than Dr. Bayless to give

11  this MMPI in every domestic violence case, but it's not

12  okay for a lesser expert to do that.  Well, there is no

13  legal basis for that particular argument.

14          They spent the majority of their remarks to you

15  just now arguing that somehow the MMPI is not relevant to

16  the domestic violence inquiry, when, in fact, their own

17  expert says that it is.  And whatever results they get from

18  that, whatever opinions, or whatever their experience tells

19  them the results of this MMPI II is of value because they

20  submitted to this test because they brought up the issue of

21  domestic violence.  In the area of domestic violence,

22  according to their expert, that is something that, if

23  you're a psychologist, you give.  That's what he did.

24          So I don't, number one, I don't see that that is

25  problematic because their own expert uses it.  Number two,

1   I don't see there is any Constitutional problem with it

2   because, again, their expert opined and their expert said

3   that the MMPI II is something that needs to be given, she

4   gives it in every case.

5           She did indicate that if she needed to cut

6   something, that would be something she would cut.  But she

7   did opine on every case she ever worked in domestic

8   violence, she gave it.  So, I don't believe that that's

9   well taken.

10          Additionally, they claim, well, he's -- this

11  isn't their word -- but he's only a psychologist where ours

12  is a social worker.  That just goes to the weight.  That

13  just goes to the qualification.  It doesn't go to the

14  admissibility of the opinion.  I can, for example, then

15  say, well, he's done more first-degree murder cases.  He's

16  done more cases in court than Sharon Murphy has.  That

17  doesn't necessarily render her opinion invalid.  It just

18  goes to the weight of it.  It doesn't go to admissibility.

19  So, again, I don't think that portion of the argument has

20  any merit.

21          I did provide an overview for the Court what I

22  expected Dr. Bayless to talk about.  One of the things they

23  admitted yesterday was Exhibit 544 in which it indicates

24  that, quote, the defendant reports she signed a release

25  form which was faxed to you even though she was dismissed

1   from her job on Monday, March 4th.  One of things that that

2   packet also includes is an indication that she's suffering

3   from Axis I, major depression.

4           As an expert, no one can doubt that he can give

5   the opinion that part of the reason that she is depressed,

6   or in his opinion, in what he has seen in the past, it's

7   consistent with having been fired from your job or

8   dismissed, whatever term you want to use.  So that it's not

9   unusual for her to have this depression.  And it doesn't

10  necessarily have to do with her husband.  It has to do with

11  the fact that she was dismissed from her job.

12          Additionally, they brought in three witnesses

13  that, I believe, vouched for the defendant.  Basically,

14  they came in and the tenor of their testimony was that they

15  believed the defendant.  They admired her.  They said she

16  was special.  These three individuals were Laura King,

17  social worker, Gerald Perry, a psychologist, and Joyce Van

18  Every who is a registered nurse.  They indicated that they

19  admired the defendant.  That she was special.

20          And especially Laura King indicated that the

21  defendant never tried to deceive the staff.  And when

22  pressed to explain what she meant by that on direct

23  examination, she said, "I'm vouching for her honesty."

24  That's what she said.  "I find her to be honest."  I think

25  that is something we can explore with Dr. Bayless.

1     Additionally, they indicated that there was no

2  benefit to the defendant by being in this pod.  Of course,

3  there are benefits.  He's been there.  He knows what the

4  benefits are.  In fact, they, themselves, alluded to these

5  benefits by saying, well, she never takes a bed that does

6  not -- that is assigned to somebody else.  She never takes

7  anybody else's space who needs it.  Implying, of course, if

8  there was somebody, they would have to remove her and place

9  her in general population.

10     They also talked about how Estrella is one of the

11  toughest places in the women's jail.  So that goes, again,

12  to the benefit that she is garnering by staying in this

13  area.  That is, that she doesn't have to go to the Estrella

14  jail.

15     In all candor, at some point, she indicates that

16  when she is going to be disciplined for the contraband, she

17  indicates, well, is there any way that I could just go back

18  to Estrella.  I'd rather go back to Estrella then serve out

19  my punishment here.  So, again, it shows that to her it

20  indicates there is that benefit here.

21     Also, he'll talk about the fact he agrees with

22  that there is this depression.  But he's going to say this

23  depression is because of her charges or because of the

24  environment.  That it doesn't necessarily have to do with

25  the fact that she's upset about her children or upset about

1   killing her husband.  Although, I have not discussed that,

2   I think that I'm not going to ask him that.

3           Additionally, the issue of the defense witness

4   indicated that the defendant was very tearful.  Every time

5   she was asked a question, she would break down and cry.

6   What he is going to say that because of what he found

7   pursuant to the MMPI and the clinical interview that she

8   has a borderline antisocial personality disorder.  That may

9   by true that she cried but to him those were tears of

10  manipulation rather than tears of anxiety or depression.

11          To him that sort of segues into the next area.

12  And what he's going to talk about is that he's going to say

13  one of the things Sharon Murphy indicated was that she's

14  not a future threat to the community.  And he's going to

15  say, no, based on my examination of things, that's not

16  true.  This attack that Sharon Murphy characterized as

17  PTSD, posttraumatic stress disorder reaction is not that at

18  all.  It's not a battered woman's response at all.  What it

19  is is an antisocial personality disorder.  She is a future

20  threat to the community.  She is not a good candidate for

21  rehabilitation because of those two incidents that have

22  been highlighted to the jury, the one involves her

23  husband.  It is clear that she is a danger.

24          Additionally, when she was involved with another

25  man by the name of Rick Freeland, when things didn't go her

1   way she stood outside, pounded on the door, threatened to

2   get a pass key which is, again, an indication that, number

3   one, she's not a good candidate for rehabilitation and she

4   is a future threat to the community because what's welling

5   underneath is not tears.  What's welling underneath is a

6   propensity for violence.

7         Additionally, because of that, she does not have

8   any remorse.  We have presentation here where the defense

9   asked the jury to reconsider, if you will, its position of

10   domestic violence.  In other words, what they're saying is

11   she's a victim of domestic violence.  If she is a victim of

12   domestic violence, then she didn't do anything wrong.  We

13   haven't seen any remorse from the defendant and he's going

14   to say that a person with a borderline antisocial

15   personality disorder does not have any remorse.

16         The reason they don't have any remorse is because

17   to them it's all about self-gratification.  It's all about

18   manipulation.  It's all about getting what they want which

19   is what we've seen through this trial with this defendant.

20   We've seen she's gotten the poison.  We've seen she's lied

21   to get her ends.  We've seen things like that.  There is no

22   remorse.  And it is one of the components of this

23   disorder.

24         Also, one of the things that Sharon Murphy talked

25   about was that the defendant was cooperative with the

13

1   police department and that's what she said.  The fact she

2   didn't cry was just an indication she is suffering again

3   from battered woman's syndrome, posttraumatic stress

4   disorder.  What Dr. Bayless is going to say and just as

5   plausible an explanation for that is that, again, a person

6   with antisocial personality disorder, somebody who is not

7   cooperating but trying to deceive, trying to manipulate in

8   the case, trying to manipulate the police department into

9   not bucking her or filing charges.

10          Finally, one of the other issues that he is going

11  to address is this issue about the suicide.  He is going to

12  say that he reviewed the reports, he's seen what happened.

13  And, again, based on the tests that he did in his clinical

14  interview that what this was, was nothing more than a

15  manipulation on her part.  The notes are real clear on

16  that.  I could probably testify as to that.  But the notes

17  in the case, she says, you know, I just didn't want to go

18  and do what the D.O. told me.  And so because I didn't want

19  to do what the D.O. told me, this was my way to get around

20  it.  If that's the case, then he can opine and say, well,

21  you know this really wasn't a real suicide.

22          Additionally, he can say afterwards the measures

23  they undertook after she supposedly had this attempted

24  suicide are not consistent.  And if it was really a suicide

25  other than manipulative, then other things would have

1    happened.  And I think that's all that he's going to say.

2              MR. PATTERSON:  Judge, the fundamental issue in

3    this case, we are at the rebuttal of mitigation phase.  And

4    he is limited to witnesses that truly rebut the issue that

5    we raised during the course of mitigation.  We have never

6    advanced a psychological evaluation of our client as

7    mitigation.  We have never presented this jury with

8    psychological bases for her conduct or psychological

9    reasons to show leniency.  We had no psychologist testify

10   in this regard.

11             What the Government is trying to do is tell you

12   they're focused on certain issues raised in mitigation.

13   What they want to do is put a psych eval before the jury

14   which -- and if you look at Dr. Bayless's report, the

15   Government continues to overstate his findings.  The Axis

16   II, he says there is a personality disorder.  And NOS is a

17   significant term in this history.  It means Not Otherwise

18   Specified.  Which means all the criteria are not there for

19   any particular personality disorder.  And he says there are

20   antisocial and borderline traits.  And traits are not

21   disorders.

22             And so what the Government says he has given the

23   test and he is now prepared to testify to a degree of

24   medical certainty or psychological certainty, that the

25   conduct of my client is founded upon results of this MMPI

1  II is overstating his credentials and overstating what he

2  said in this case.

3           With regard to this particulars, he wants to

4  discuss with Dr. Bayless, why depressed.  I don't have any

5  problem talking about, I believe it was Exhibit 545, when

6  she went to Casa Grande and one of the reasons specified

7  was that she was dismissed from her job.  She said she was

8  also having marital problems.  That doctor can say that

9  dismissal from a job would precipitate depressive

10  symptomology in a person, I don't have any problem with

11  that because it's within the scope of his medical or

12  psychological background.

13           But in trying to rebut the detention officer's

14  testimony with his expertise, it's misplaced.  He's

15  bringing in two D.O.s the detention officers to

16  specifically rebut the contention made by Ms. King, Nurse

17  Van Every and Dr. Perry.  Yeah.  And that's fine.  These

18  D.O.s can come in and talk about this setup there in the

19  psych ward, what they think was problematic in retaining

20  her there.  Why they think that the doctor's wrong and why

21  they think the counselor is wrong.  That's squarely

22  rebutting the allegations that we made during the course of

23  mitigation.  But to allow some psychologist to come in and

24  say there are vouching issues here that he's going to rebut

25  is not true rebuttal.  It's beyond the scope of his

1    expertise.

2            He purports to be an expert on the layout of this

3    particular jail and why one would not want to be in

4    Estrella and why one would prefer the psych unit.  That's

5    beyond his ken, that's beyond his scope.  Again, that's the

6    proper subject matter of the two D.O.s that he's bringing

7    in.  And that's appropriate rebuttal with regard to the

8    D.O.s.

9            Depression, there may be other causes.  Again, I

10   think the depression issue is within the scope of his

11   expertise.  He could be allowed to say that there are,

12   through the pendency of the charges, her current

13   circumstances, the fact she's incarcerated, may, in fact,

14   precipitate depression in a patient.  I don't haven't any

15   problem with that.

16           The tears she showed, and his opinion as to why

17   she manifest those tears, again, that's based on the MMPI

18   II.  That is, again, a test that was given over our

19   objection.  And it is not proper rebuttal because we didn't

20   present any psych eval in this particular case.

21           Dr. Murphy testified about the focus threat that

22   the domestic violence victims often, or not often, but do,

23   in fact, rebel against the abuser.  And do engage in

24   contact that is focused on the abuser.  That's why she says

25   that she's not a threat to the other population or citizens

1   of our community.

2            For him to say contrarily, again, is based upon

3   the MMPI II.  That's not proper rebuttal in my estimation.

4            Again, her cooperative attitude.  He's the one

5   that's using PTSD.  We never mentioned posttraumatic stress

6   disorder in mitigation.  We never mentioned it in the

7   case-in-chief.  For them to suggest that is, in fact, what

8   Dr. Murphy was talking about, it's their burden, not ours,

9   Judge, and to allow him to rebut an issue that they create,

10  again, is not proper rebuttal.

11           And finally, the suicide.  I think, may, in fact,

12  be manipulative, he says that he alone can argue that

13  without need for expertise on this particular issue, the

14  facts were so apparent.  Well, he should have elicited

15  these facts through the D.O.s and then argue it.  It's not

16  the kind of subject matter that requires the expertise of

17  an expert and not the kind of subject matter that an expert

18  would assist the finder of fact in resolving this issue.

19           So, again, Judge, he is here basically as a kind

20  of self-proclaimed lie detector who is going to say all the

21  things we presented in mitigation are wrong because she has

22  a condition that he discerns as a result of giving the MMPI

23  II.  It's just inappropriate for him to testify with regard

24  to that scope.

25           THE COURT:  Mr. Martinez, are you plan on calling

1  Dr. Bayless as soon as this witness is concluded that's on

2  the witness stand?

3          MR. MARTINEZ:  Actually, I went outside and

4  talked to my other witnesses, Timothy Lee, Dawna Harris

5  Bonnie Lose.  In terms of time, I would assume no more than

6  five to ten minutes.

7          And I have Ms. Clayton that will take

8  approximately five minutes.  And then I know I have Mr. Lee

9  who includes cross-examination.  I believe we will take at

10  the most 15 minutes so, we're talking 20 minutes.

11          THE COURT:  Let's get started with testimony and

12  then what I'll do, after the witness is concluded, the one

13  that's schedule before Dr. Bayless, we'll take a break and

14  I'll notify you of my decision after the break.

15          Are we ready for the jury?

16          MR. PATTERSON:  Yes.

17          MR. MARTINEZ:  Yes.

18          (Jurors entered.)

19          THE COURT:  Please be seated.  This is Cause

20  Number CR2000-096032, State of Arizona versus Wendy

21  Elizabeth Andriano.

22          The record will reflect the presence of the

23  defendant, counsel and the jury.

24          Yesterday when we took our recess, Jana Clayton

25  was on the witness stand and we'll begin the redirect

1   examination by Mr. Martinez.

2

3                     JANA CLAYTON,

4   called as a witness herein, having been previously duly

5   sworn, was examined and testified as follows:

6

7                 REDIRECT EXAMINATION

8   BY MR. MARTINEZ:

9       Q.   And you are Jana Andriano Clayton?

10      A.   Yes.

11      Q.   You are the same individual that testified

12   yesterday?

13      A.   Yes.

14      Q.   In response to some of the questions on

15   cross-examination, you indicated that as part of your

16   opinion as to how the defendant dealt with her children was

17   based in part on some of the social gatherings that you

18   were privy to in 1998 and 1999?

19      A.   Yes.

20      Q.   Specifically, what were you referring to?

21      A.   One incident was in May of 1998, my daughter

22   Catherine was baptized in Casa Grande and Joe and Wendi and

23   Nicholas had attended that.  And after the baptisms we had

24   luncheon at Serano's restaurant and at that luncheon, Wendi

25   would repeatedly give Nicholas to Joe and asked him to deal

1   with him.

2       Q.   And any other incidents in '99  that you based it

3   on?

4       A.   In 1999 we went to the zoo, my family, Wendi, Joe

5   and Nicholas and Ashley.

6           MR. PATTERSON:  Judge, may we have a month,

7   please?

8           THE WITNESS:  December of 1999.

9           MR. PATTERSON:  Thank you, Judge.

10          THE WITNESS:  And Jeanea Lambeth and her family

11  and Jeanette and Joe Andriano were also there.  And we went

12  to the Phoenix Zoo.  And there were several times that

13  Wendi would say she was tired of listening to the kids

14  would hand them over to Joe for him to deal with them.

15      Q.   One of the things you were asked about was the

16  amount of time that you may have spent with them in 2000.

17  Do you remember those questions?

18      A.   Yes.

19      Q.   And I think you indicated that in March you were

20  out here for ten days, right?

21      A.   Yes.

22      Q.   And then in August you were out here for three

23  nights and four days?

24      A.   Yes.

25      Q.   For those three nights and four days, how many

1   times did Wendi Andriano go out?

2       A.   Two nights.

3       Q.   And during those two nights, who took care of the

4   kids?  One night you already told the parents took care of

5   the kids.  What about the other night?

6       A.   Joe and I did.

7       Q.   But even though you didn't live out here, you

8   would also have occasion to speak to your family about what

9   was going on, who was the primary caretaker, if you will,

10  of the children?

11      A.   Yes.

12      Q.   And who is it that you would have occasion to

13  speak to throughout, let's say, 2000?

14      A.   Joe was the primary caretaker.

15      Q.   Who would you speak to, though?

16      A.   I would speak with -- I spoke with my sister

17  Jeanea.  I spoke with my parents, Jeanette and Joseph

18  Andriano.

19          MR. MARTINEZ:  I don't have any anything else.

20          THE COURT:  Are there any further questions of

21  this witness by the jury.  If so, please raise your hand.

22          (Bench conference was held outside the hearing of

23  the jury.)

24          THE COURT:  Question:  Did you witness your

25  brother changing his children's diapers.  Was this more

1   than just occasionally.

2              MR. MARTINEZ:  No objection.

3              MR. PATTERSON:  No objection.

4              THE COURT:  Next question:  On Friday night,

5   paren birthday, the door Wendi comes in after this limo

6   ride home, did she come in the front door.

7              MR. MARTINEZ:  No objection.

8              MR. PATTERSON:  Well, it's redundant and doesn't

9   have any relevance to the basic issue, so I object.

10             THE COURT:  I agree with you.  It's not relevant

11  to mitigation.

12             So I'll ask the one.

13             (Bench conference concluded.)

14

15                      EXAMINATION

16  BY THE COURT:

17       Q.   I have a question here from the jury.

18            Did you witness your brother changing his

19  children's diapers?

20       A.   Yes.

21       Q.   Was this more than just occasionally?

22       A.   Yes.

23             THE COURT:  Are there any further questions of

24  this witness by the jury?  No one raised their hand.

25             Mr. Martinez, do you have any follow-up questions

1   for this specific question?

2          MR. MARTINEZ:  No, sir.

3          THE COURT:  Mr. Patterson?

4          MR. PATTERSON:  No, Your Honor.  Thank you.

5          THE COURT:  May this witness be excused?

6          MR. MARTINEZ:  Yes, sir.

7          THE COURT:  Thank you very much.  You're excused.

8          THE COURT:  Mr. Martinez?

9          MR. MARTINEZ:  State calls Timothy Lee.

10          THE COURT:  Sir, please step right over here to

11   the clerk and she will swear you in.

12          (Witness sworn.)

13          THE COURT:  Please have a seat on the witness

14   stand.  Please be as comfortable as you can.  Please pull

15   the microphone close to you.  Please speak loudly and

16   clearly so everyone can hear you.  Please wait until the

17   question is complete before you answer the question.  And

18   please remember to give a verbal response.

19          Is that agreeable to you, sir?

20          THE WITNESS:  Yes.

21          Mr. Martinez, you may proceed.

22

23

24

25

24

1                          TIMOTHY LEE,

2      called as a witness herein, having been first duly sworn,

3      was examined and testified as follows:

4

5                          DIRECT EXAMINATION

6      BY MR. MARTINEZ:

7          Q.   Your name, sir?

8          A.   Timothy Lee.

9          Q.   Where are you currently employed?

10         A.   I own and operate Casa Grande Property

11     Management.

12         Q.   Drawing your attention back to 1999, where were

13     you employed?

14         A.   Somac Property Management Mortgage, SPF.

15         Q.   What were your duties back them?

16         A.   I was the vice president of operations and the

17     general area man for the Phoenix, Casa Grande area.

18         Q.   Did you have under your umbrella the Courtyard

19     Apartments?

20         A.   Yes, I did.

21         Q.   Did an individual by the name of Wendy Andriano,

22     again, back in '99 , was she someone that worked for you at

23     the Courtyard Apartments?

24         A.   Yes, she was.

25         Q.   What was her title?

1    A.   She was the property manager, community director.

2    Q.   Was there one occasion in which, that you

3 remember, in which she received a telephone call involving

4 an injury to Nicholas, her son?

5    A.   Yes.

6    Q.   And about when was that in 1999?

7    A.   I don't recollect off hand.

8    Q.   Was it summer?

9    A.   Summerish because the injury was due to a boat

10 prop or boat prop or engine.

11    Q.   If you remember, what were you and she doing when

12 she was notified?

13    A.   Well, traditionally, every Wednesday I was in

14 Casa Grande the entire day to take care of property

15 management duties as we have properties in Casa Grande.

16 And we would have lunch and then we would go to individual

17 properties and I would go over the matters of the business

18 of the property.  And we would do what we needed to do and

19 have discussions of invoices, those kinds of thing.

20    Q.   And during that day when you and she may have

21 been speaking, did she receive a telephone call?

22    A.   Yes, she did.

23    Q.   And who was that telephone call from, do you

24 know?

25    A.   I believe it was her husband, Joe.

1    Q.   And what did he tell her?

2    A.   What was translated to me was after she hung up

3  was that the child had injured himself somehow on a,

4  translated to me, on a boat prop.  And that he had injured

5  himself on his leg.  And that it was a pretty severe

6  injury.

7    Q.   And what was her demeanor, if you will, at the

8  time?

9    A.   Well, as she was on the phone she screwed up her

10  face a little bit.  And, you know, I was concerned.  And

11  then, of course, she hung up.  I mean, I didn't really get

12  the gist of the message until after she hung up.  And she

13  hung up and she transmitted the conversation to me which

14  was that the child had fallen on a boat prop and pretty

15  severely injured his leg.  Her husband would take care of

16  it.

17    Q.   How would you describe her attitude at that

18  point?

19    A.   Very cavalier.

20    Q.   Did you offer to let her go and take care of it?

21    A.   Yes.  Family matters are very important to me and

22  to our company, still are.  And anything that happens to a

23  family member, you know, even when Wendi had the birth of

24  her new child, the child was brought into the office.  It's

25  very important issues, family matters.  So she was told to

1  go and do what she needed to do.  At which point she said,

2  "That's okay.  Joe will take care of it."

3       Q.   Did she ever leave that day?

4       A.   No, not during the time that I was there.

5       Q.   How late were you there?

6       A.   I'm usually in Casa Grande until four o'clock.  I

7  don't recall the exact time, four, 4:30, five o'clock.

8            MR. MARTINEZ:  Thank you.  I have nothing else.

9            THE COURT:  Mr. Patterson.

10           MR. PATTERSON:  Thank you, Judge.

11

12                    CROSS-EXAMINATION

13  BY MR. PATTERSON:

14       Q.   You were Wendi's boss back then?

15       A.   Yes.

16       Q.   And I guess each Wednesday the boss comes to the

17  property site and you go over particulars or issues that

18  are relevant to that particular property site?

19       A.   That's correct.

20       Q.   So this is an important meeting that you're

21  having with the resident manager, correct?

22       A.   Yes, on a weekly basis.

23       Q.   And the information that you're seeking is that

24  which you derive from the resident manager, right?  I mean,

25  her input is important at this particular meeting, right?

1      A.   Well, Yes, it is.  She runs the property.

2      Q.   Yeah.  And she's the one that needs to give you

3   the information about how that property is doing for that

4   particular week, right?

5      A.   Sure.

6      Q.   So, this is an important meeting you're having

7   with her, correct?

8      A.   Well, it's weekly.

9      Q.   I understand.  But it's an important meeting?

10     A.   Business meeting.

11     Q.   It's an important meeting?

12     A.   Yes.

13     Q.   And it's essential that she meets with you to

14   give you the information that you need?

15     A.   Sure.

16     Q.   At some point during the course of this meeting,

17   she received a phone call, correct?

18     A.   Correct.

19     Q.   And of what duration is this phone call?

20     A.   It was very short.

21     Q.   So she got a little bit of information about the

22   condition of her child and the only information she got was

23   as a result of that phone call, right?

24     A.   The information that I talked about is all I

25   know.

1    Q.   I understand.  But the only information she had

2  concerning her child's condition was what she received by

3  telephone?

4    A.   I would imagine so, yes.

5    Q.   Well, was there any other source of information

6  at that point?

7    A.   No, not to my knowledge.

8    Q.   And it was a conversation of very short duration?

9    A.   Correct.

10   Q.   You don't know what Joe said to her in that

11  conversation other than what she reported to you afterward,

12  correct?

13   A.   Correct.

14   Q.   You don't know whether Joe minimized the extent

15  of the injury in the course of the phone call, do you?

16   A.   No, of course not.

17   Q.   And as a result of that phone call, she told you

18  that she felt Joe could handle it?

19   A.   Sure.  That's what she said to me.

20   Q.   And that was based upon a conversation she had

21  with Joe on the phone, right?

22   A.   Yes.

23   Q.   And she'd only been employed by you at that

24  point, what, two months?

25   A.   Oh, Wendi was employed by us.

30

1    Q.   I'm sorry.  A bad question.

2         At the point that the telephone call came in, how

3    long had she been with your business?

4    A.   Since 1998.

5    Q.   And so how long was that?

6    A.   This was 1999.

7    Q.   What month, do you recall exactly?

8    A.   Well, boat month.  I'm not sure.  You know, the

9    child got injured on a boat.  So a boat was out.  Had to be

10   a good boat month.

11   Q.   All right.  So Wendi worked for you.  Do you know

12   exactly how many months?

13   A.   She began with us in the spring of 1998.  This

14   was in the summer of 1999.  It had to be well over a year.

15   Q.   As a supervisor, you're the one to give her an

16   evaluation?

17   A.   Yes.

18   Q.   And those kinds of things.  You say you left the

19   office about four o'clock?

20   A.   I'm not sure.  I normally leave Casa Grande at

21   that time.  I used to leave.  I'm now living in Casa

22   Grande.  But at that time I used to leave between four or

23   five.

24   Q.   She was still on site at the time you were

25   there?

31

1    A.   She lived on site.

2    Q.   I'm sorry.  She was still in the office as of the

3    time you were there; is that correct?

4    A.   At the time I was there, yes.

5    Q.   You don't know where she went after you departed?

6    A.   I have no idea.

7         MR. PATTERSON:  Thank you, I have nothing more,

8    Judge.

9         THE COURT:  Mr. Martinez.

10        THE COURT:  Thank you, sir.

11

12                    REDIRECT EXAMINATION

13   BY MR. MARTINEZ:

14   Q.   You indicated that this was a weekly meeting?

15   A.   Yes, it was.

16   Q.   Was it totally imperative, 100 percent that she

17   stay at this meeting?

18   A.   No, because we normally have group meetings, and

19   then the individual items, we don't want to waste time, the

20   general items were discussed at a group meeting in the

21   morning between 11 and one.  And we discussed general items

22   at that time period.  And then, I would go through the

23   individual, four different properties, and we would discuss

24   things of a nature specific to those properties.

25   Q.   Was it something that could have been

1  rescheduled?

2      A.   Sure, there was an assistant manager there, too,

3  a leasing agent.

4      Q.   Now, one of the things they asked about was the

5  severity of the injury.  What was it that she communicated

6  to you about the injury?

7      A.   That the injury was on the leg and that he had

8  fallen on a boat prop.  That, to me, indicated a pretty

9  serious injury.

10     Q.   And did she ever ask to leave and say, you know,

11  I need to go or anything like that?

12     A.   No.

13     Q.   And what was her attitude?  Was it preoccupied?

14  How would you describe it?

15     A.   She was not preoccupied with it.  It had been

16  filed but continued to do our business.

17          MR. MARTINEZ:  I don't have anything else.

18          THE COURT:  Any further questions of this witness

19  by the jury?  If so, please raise your hand.  No one raised

20  a hand.

21          May this witness be excused?

22          MR. MARTINEZ:  Yes, sir.

23          THE COURT:  Thank you very much.  You're

24  excused.

25          Ladies and gentlemen, I'm going to take a

1    ten-minute break.   Remember the admonition.

2                 (Jurors exited.)

3                 THE COURT:  Please be seated.   This is

4    CR2000-096032, State of Arizona versus Wendy Elizabeth

5    Andriano.

6                 The record will reflect the presence of the

7    defendant and counsel.   We're outside the presence of the

8    jury.

9                 The Court has considered the defendant's oral

10   motion to preclude or in the alternative a motion in limine

11   relating to Dr. Bayless.

12                The Court will note for the record initially it

13   allowed the MMPI testing of the defendant, specifically for

14   the issue of whether or not the defendant's characteristics

15   were consistent with those of domestic violence victims.

16                Therefore, I'm going to order precluding the

17   State from eliciting testimony from Dr. Bayless which

18   relates to the opinion based on the MMPI II testing.   Also

19   about opinions relating to the defendant's honesty and

20   truthfulness and credibility as they are not directly

21   related to the factors listed by the defendant with regard

22   to mitigation.

23                Any questions on the Court's ruling?

24                MR. MARTINEZ:  No, sir.

25                MR. PATTERSON:  No, thank you.

34

1          THE COURT:  Go ahead and notify Dr. Bayless on

2     the Court's ruling.

3          You're ready with your next witness; is that

4     correct?

5          Why don't you notify him of the Court's ruling.

6     I'll let you bring him in and verify that on the record.

7          MR. MARTINEZ:  I'm going to call him.

8          THE COURT:  Mr. Martinez.

9          (Mr. Bayless entered.)

10          MR. MARTINEZ:  I've talked with Dr. Bayless.  He

11     indicated that his opinion can be predicated on just the

12     clinical interview.  Additionally, I think that he and I,

13     or I, need more guidance.  I laid out for the Court the

14     factors that I thought I was going to get into.  And I know

15     that some I can, for example, regional counseling document

16     he can address that.  I think he can also address the

17     suicide.  I think it's borderline.  I do not want to create

18     an issue at this stage of the proceedings as to whether or

19     not he can say whether or not she is a future threat to the

20     community or a good candidate for rehabilitation, remorse

21     or cooperative with the enforcement officers.

22          Additionally, I'm not sure that he will be able

23     to rebut, although he indicated he would be, what Sharon

24     Murphy said.  And you did indicate something about he can't

25     say anything about honesty.  So that would mean, if I read

1   it correctly, that the fact that Laura King admired her, he

2   can't go into that.  The fact that she, Laura King,

3   indicated that the defendant was honest and never tried to

4   deceive anybody, I don't think I can go into that.

5           I do think he may be able to address the issue of

6   benefit.  He may be able to address the issue of secondary

7   gain and whether or not what the motive was.  I'm not sure

8   he can say she didn't have mental issues.  I think that's

9   based in the MMPI.  I don't think he can comment on that

10  but I'm just not sure about that.  I don't want to go

11  forward with that.

12          In terms of tears, her motivation for crying,

13  it's his belief that she is being manipulative.  If that's

14  case, if that goes to honesty then I can't go there.

15          I guess what I'm saying is I'm asking for

16  guidance and in front of Dr. Bayless so we do not run afoul

17  of your order.

18          THE COURT:  So basically from what I've heard, is

19  you would like to bring in some testimony with regard to

20  the benefit of being in a certain pod, correct?

21          MR. MARTINEZ:  Well, that's one of the issues.  I

22  also want to talk about the Casa Grande Medical Center.

23          THE COURT:  The issue as far as depression?

24          MR. MARTINEZ:  Right.  I don't think has -- I may

25  touch on it.  Then, the other thing I want to talk about

36

1  are the factors involving the future threat to the

2  community, a good candidate for rehabilitation, the

3  remorse, whether or not she is cooperative.   And then also

4  the suicide.

5          THE COURT:  With regard to the testimony as far

6  as benefits, being in a certain pod, if there is proper

7  foundation provided, then I may allow that.  I mean based

8  upon Dr. Bayless' experience as far as being in a certain

9  unit.  I may allow that.

10          But with regard to the depression issue at Casa

11  Grande, that's referred to Exhibit Number 445 and I'm not

12  going to allow that.  I believe it goes to being dismissed

13  and related to being dismissed, is that correct?

14          MR. MARTINEZ:  Yes, sir.

15          THE COURT:  Then I'll not allow that.

16          As far as the you mentioned future threat, I'm

17  not sure what Dr. Bayless would be basing his opinion on,

18  whether the defendant is a threat.

19          MR. MARTINEZ:  He indicated that when I spoke to

20  him just now it would be based on the clinical interview.

21  I just want to make sure that he understands what was going

22  on if that's still his position, I would go ahead.

23          THE COURT:  Dr. Bayless?

24          DR. BAYLESS:  My position would be based on, not

25  only my clinical interview but the collateral records that

1   I reviewed in this particular matter as well as the results

2   of the complex sentence and results of Shipley Living

3   Scales, Williamson Sentence Completion Test.

4          THE COURT:  I'll come back to that.  And the

5   other one was remorse?

6          MR. MARTINEZ:  Yes.  Remorse.  And then the other

7   one was cooperative behavior with the police.

8          THE COURT:  Is that all based on your clinical

9   interview?

10          DR. BAYLESS:  And an collateral information.

11          THE COURT:  And then, tell me specifically what

12   your opinion is as far as the suicide attempt.

13          DR. BAYLESS:  What is my opinion about the

14   suicide attempt?

15          THE COURT:  What is your expected testimony on

16   the suicide attempt.

17          DR. BAYLESS:  My expected testimony on that is

18   that, one, there was evidence indicated based on the

19   collateral information in the medical records, that

20   initially there was, it was thought that she stabbed

21   herself with a pencil.  But, based on the cuts and

22   everything else it looks like it was -- there was a compact

23   case that was contraband that would had been sneaked into

24   the jail.  The wound that she sustained was a two

25   centimeter wound that was very superficial and really was

1   not a true suicide attempt.

2           THE COURT:  Based upon reading the records, the

3   medical records and reports about the incident?

4           MR. BAYLESS:  Yes.

5           MR. MARTINEZ:  For purposes of the record that

6   she's taking down, I provided him or he has read a copy of

7   the report from the Maricopa County Medical Center which is

8   where she was taken as well as the, I think they're called

9   progress notes from the jail that were provided to me.

10          THE COURT:  Anything else?

11          MR. MARTINEZ:  The other issue we want to address

12  is this issue of the tears.  One of the things that she

13  said was that she cries all the time.  And my understanding

14  was what he tells me is that she didn't cry at all during

15  the  clinical interview.  In reviewing of the, again, the

16  notes that we have here and based on my experience, he's

17  going to be able to say that the opinion -- I'll let him

18  say what his opinion is going to be.

19          THE COURT:  Dr. Bayless.

20          DR. BAYLESS:  I think that her tears are, in many

21  situations, are manipulative.  That they are used to gain

22  favor and to gain sympathy from others.  That the times

23  when one would expect her to be tearful, she's not.  There

24  is inconsistency.  So I think it's a manipulative attempt

25  to gain favor from others.

39

1          THE COURT:  What do you base that opinion on?

2          DR. BAYLESS:  On the records from the

3    correctional health facility.

4          THE COURT:  And your observations?

5          DR. BAYLESS:  And my observations, correct.

6          THE COURT:  Anything else, Mr. Martinez?

7          MR. MARTINEZ:  He also indicated that without

8    having to apply anything that he used in the MMPI, it is

9    his opinion based, again, on the notes that we have here as

10   well as his clinical interview, that and additionally he

11   believes that Sharon Murphy is wrong when she finds that

12   this is battered women's syndrome.  He indicated to me that

13   battered women's syndrome is nothing more than

14   posttraumatic stress disorder which is something he is very

15   familiar with.  It's not something that is consistent with

16   Ms. Murphy's characterization of what happened inside the

17   apartment with Ms. Andriano.

18          And so, with that, he is then going to say she is

19   a future threat to the community and she is not a good

20   candidate for rehabilitation because she has the propensity

21   for violence.

22          THE COURT:  Anything further?

23          MR. MARTINEZ:  No, I think that's it.

24          THE COURT:  Is I indicated, I'm going to allow

25   Dr. Bayless to testify with regard to the benefits, if any,

1   of being in a certain pond in the unit.  And that if a

2   proper foundation is provided, I'm going to allow him to

3   testify with regard to the issue of depression out of those

4   Casa Grande medical records.  I'm going to allow him to

5   testify about the suicide incident and what Dr. Bayless

6   just related on the record about the suicide incident.

7   That being he indicated in the medical records that they

8   initially thought she was stabbed with a pencil but

9   actually some over -- it was a compact.

10          MR. MARTINEZ:  It appeared to be chards from the

11  compact.

12          THE COURT:  Okay.  And then, now my recollection

13  of Sharon Murphy's testimony the other day was the fact she

14  did bring up this posttraumatic stress disorder.  And she

15  nay not have called it that, but I think she brought it up

16  relating to being a future threat.

17          And are you able to make that opinion, whatever

18  opinion it may be, without basing it upon MMPI II testing?

19          DR. BAYLESS:  Yes, sir.

20          THE COURT:  Just a moment, I just want to check

21  my notes.

22          Dr. Murphy testified -- she didn't use the

23  specific term that I recall, posttraumatic stress disorder,

24  but she did describe events leading up to this outburst.

25  And she described this outburst and the fact that the

41

1   defendant misperceived the magnitude of the threat.   And

2   that she testified that this type of outburst was such that

3   she didn't constitute -- that the defendant did not

4   constitute a danger to fellow community members.   Okay.

5           So I'm going to allow Dr. Bayless, as long as his

6   opinion is not based upon MMPI II testing, to opine in

7   those terms of whether she is a danger to her fellow

8   community members, you know, in direct rebuttal to what

9   Dr. Murphy testified to.   But it's limited to that.

10           MR. MARTINEZ:   One of the things that -- there's

11   two things that Dr. Bayless indicated to me.   He indicated

12   that the reason he can do this is more for purposes of an

13   appeal should there be one.   He indicated that the MMPI was

14   not used to reach the opinion.   That what the MMPI does in

15   this case is confirm his opinion.

16           Additionally, he reminds me that he does have a

17   three o'clock.   So what I want to let the Court know is

18   that I'm going call my other two witnesses.   So I'll ask

19   him to perhaps if he could call up there right now so he

20   could get that.

21           THE COURT:   If he can coordinate with my judicial

22   assistant.   For the record Dr. Bayless, has been I guess

23   ordered or instructed by one of the Superior Court judges

24   in Coconino County to call in.

25           DR. BAYLESS:   They're going be calling me at

1    three o'clock.

2              THE COURT:  Do they have your cell phone number?

3              DR. BAYLESS:  Yes, sir.

4              THE COURT:  And okay.  So for the record, then,

5    Dr. Bayless will be able -- be allowed to testify about the

6    benefits of being in a certain pod, the depression issue

7    relating to the Casa Grande medical records, the suicide

8    attempt, the issue of whether the defendant is a danger to

9    the community in terms, in direct rebuttal to what

10   Dr. Murphy testified to, a building up of this, basically,

11   explosion is what she testified to and how it was probably

12   an isolated incident and it would not cause a threat to the

13   community in the future.  Okay.

14             I will allow you to testify about the -- allow

15   you to testify about the cooperative behavior I think --

16   did she have cooperative behavior in the jail and suicide

17   attempt to gain favorable treatment?  Is that what you

18   said?

19             MR. MARTINEZ:  I was talking about Ms. Murphy

20   indicated that the defendant was cooperative with the

21   authorities.  And she indicated that, well, somebody who is

22   suffering from this battered women's syndrome, one of the

23   things they do is they don't cry or they do cry, I forget

24   what they say.

25             THE COURT:  Well, I will allow Dr. Bayless to

1  testify and opine with regard to the tears as far as using

2  it to gain sympathy and favor.  But not in terms of honesty

3  or truthfulness and credibility.  I think there's a little

4  bit of difference there.

5          MR. MARTINEZ:  One of the things Dr. Bayless

6  indicated to me is that, I don't know, I'm just asking if

7  he could point out the fact his diagnosis, he said, again,

8  the diagnosis is based on the clinical interview and review

9  of the records and that the MMPI just confirms it.  He

10  doesn't know -- I just want to make sure I know whether or

11  not to ask.

12          THE COURT:  What that's specifically?

13          MR. MARTINEZ:  The diagnosis.  In other words,

14  that I think he indicated that she is a borderline

15  antisocial.

16          THE COURT:  Go ahead, Dr. Bayless.

17          DR. BAYLESS:  My diagnosis on her was personality

18  disorder, NOS, with borderline antisocial traits.  The MMPI

19  confirmed my diagnosis.  However -- and I can read to you

20  off the front of the MMPI where it says very clearly, Your

21  Honor, and this is based on what the MMPI says, not based

22  on my opinion, necessarily, but it's based on the cannons

23  of how we utilize this particular instrument and it says

24  very clearly:  The interpretive information contained in my

25  report should be viewed only as one source of hypothesis

1   about the individual being evaluated.  No decision should

2   be based solely on the information contained in this

3   report.  This material should be intergrated with all other

4   sources of information in reaching a professional decision

5   about this individual.  This report is confidential and

6   intended to be used by qualified professionals only.  It

7   should not be released to individuals being evaluated.

8          What this says, basically, is that the MMPI is a

9   tool, a source of information that gives us better

10   confirmation.  But the clinical interview, the experiential

11   process of doing an evaluation and analysis of an

12   individual lies solely in the preview of clinical

13   interview.

14          Now, this is also true with psychiatrists.

15   Psychiatrist do not use MMPI.  And they use their clinical

16   interview.  We, as psychologist, do the same thing.  We

17   have the advantage of utilizing psychological testing to

18   confirm our opinions.

19          However, our opinions are based on our clinical

20   decisions, based on interviews, collateral data, other

21   information, other sources of information as well as

22   psychological testing.  Psychological testing is just one

23   part.  My decisions are not solely based on that.  My

24   clinical decisions or clinical opinion concerning her

25   diagnosis is based on my clinical interview and my

45

1   assessment of her.

2            THE COURT:  Anything further, Mr. Patterson?

3            MR. PATTERSON:  Our position in this case, she

4   has never presented psych eval information to this jury.

5   We're at the mitigation phase of the proceeding.  He is

6   giving, has given already a psych eval.  And one of the

7   continuing parts of the psych eval was the MMPI II which is

8   limited probative with regards to the issue whether or not

9   she's a domestic violence victim.

10           They are attempting now to bootstrap that

11  opportunity they had to talk to my client and allow this

12  gentleman to give psychology opinions that are psych eval

13  opinions which were not the subject matter of our

14  mitigation presentation.

15           And for him to suggest that after a two-hour

16  clinical interview, he came to these conclusions about the

17  disorders my client purportedly had and that the MMPI II is

18  confirmatory rather than a critical essential component of

19  the diagnosis process is disingenuous on this gentleman's

20  part.

21           THE COURT:  What I'm going to do is I'm going to

22  emphasis the Court's ruling that the State is precluded

23  from eliciting testimony from Dr. Bayless about his

24  opinions relating to the defendant's honesty, truthfulness

25  and credibility and the opinions based upon the MMPI II

000008897

1  testing.

2           I'm going to allow Dr. Bayless to testify about

3  the benefits issue being in a certain pod in the unit, the

4  depression issue regarding the Casa Grande medical records,

5  whether or not the defendant is a threat, future threat to

6  the community.  And that is in direct rebuttal to the

7  testimony of Sharon Murphy's.  That line of testimony was

8  essentially that things had been building up.  This was an

9  explosion that was an isolated incident.  That because of

10  that, the defendant is not a threat in the future to the

11  community.

12           I'll allow Dr. Bayless to talk about tearing and

13  not so much in terms of honesty and truthfulness and

14  credibility, but in terms of gain, gaining favor or gaining

15  sympathy.

16           I'll allow law Dr. Bayless to testify about the

17  suicide attempt and his understanding of what that involves

18  based on his reading of the report.

19           As such, I'm going to preclude Dr. Bayless from

20  testifying with regard to any diagnosis of the defendant.

21  Okay.

22           Any questions about the Court's ruling?

23           MR. MARTINEZ:  No, sir.

24           THE COURT:  Why don't we have the bailiff escort

25  Dr. Bayless to the back here and he can, in the next

1   several minutes, wait for his call from Coconino Superior

2   Court.  And then in the meantime, we'll have the other

3   witnesses here.  Thank you.

4              Ready for the jury?

5              MR. MARTINEZ:  Yes.

6              MR. PATTERSON:  Yes.

7              THE COURT:  As soon as the bailiff gets back in

8   here, we'll have the jury brought in.

9              Ready for the Jury?

10             MR. MARTINEZ:  Yes.

11             MR. PATTERSON:  Yes.

12             THE COURT:  Apparently, the jury would like to

13   take a break since they've been in there several minutes.

14   We'll take a 20-minute break at this point in time.

15             (Recess taken.)

16             THE COURT:  This is CR2000-096032, State of

17   Arizona versus Wendi Elizabeth Andriano.

18             The record will reflect the presence of the

19   defendant, counsel and the jury.

20             First of all, let me apologize.  I should never

21   say ten minutes.  Let me apologize.  I think all of you

22   understand that I need to make sure that things are done in

23   a proper manner and in an official manner.  So I apologize

24   for that.  I just want you to know I am aware of how

25   important your time is.  And I tried my best not to abuse

48

1   the time you've given us.

2          Mr. Martinez.

3          MR. MARTINEZ:  State calls Dawna Harris.

4          THE COURT:  Please step forward right up here to

5   the clerk and she will swear you in.

6          (Witness sworn.)

7          THE COURT:  Please have a seat on the witness

8   stand.  Please pull the microphone close to you. Remember

9   to speak loudly and clearly so everyone can hear you.

10  Also, wait until the question is completed before you

11  answer the question.  And please make sure you give a

12  verbal response.

13          Is that all agreeable to you?

14          THE WITNESS:  Yes.

15          THE COURT:  Mr. Martinez, you may proceed.

16

17              DAWNA HARRIS,

18  called as a witness herein, having been first duly sworn,

19  was examined and testified as follows:

20

21              DIRECT EXAMINATION

22  BY MR. MARTINEZ:

23     Q.  State your name, please?

24     A.  Dawna Harris.

25     Q.  And who do you work for?

1    A.    Maricopa County Sheriff's Office.

2    Q.    How long have you been working for the Maricopa

3    County Sheriff's Office?

4    A.    Seventeen years, four months.

5    Q.    And when have you -- with regard -- where do you

6    work at?

7    A.    I'm now at Durango D2.

8    Q.    How long have you been at Durango D2?

9    A.    Four years.

10    Q.    Do you know an inmate by the name of Wendi

11    Elizabeth Andriano?

12    A.    Yes, I do.

13    Q.    Is she in court today?

14    A.    Yes, she is.

15    Q.    Tell me where she is seated and what she is

16    wearing?

17    A.    She's is seated between the two gentlemen at that

18    table, wearing a purple sweater.

19         MR. MARTINEZ:  May the record reflect the

20    identification of the defendant by the witness?

21         THE COURT:  The record will reflect the

22    identification of the defendant by the witness.

23    Q.    BY MR. MARTINEZ:  You indicated that you worked

24    at D2 Durango facility.  Can you tell me a little bit about

25    that facility?

1    A.   It's a psychiatric facility.   It's unique in that

2   it houses both males and females.

3    Q.   And do the males and females get to sleep on the

4   same side?  How does that work?

5    A.   No, it is separated.

6    Q.   And so one side is directed towards males and one

7   side to females?

8    A.   That's correct.

9    Q.   Do they associate or do they socialize during the

10   day hours or how does that work?

11    A.   No.  We try to keep them apart as much as

12   possible.

13    Q.   What are your duties with regard to that facility

14   at Durango?

15    A.   My duties are to keep everyone safe at all times,

16   the facility secure.

17    Q.   And you've been doing that I think you said four

18   years, correct?

19    A.   In that facility, yes.

20    Q.   And how is it -- Is there also a mental health

21   staff that forms a component of the unit there at Durango?

22    A.   Yes, there is.

23    Q.   Is one of the people there somebody by the name

24   of Joyce Van Every?

25    A.   Yes, she is.

1        Q.    How about Gerald Perry, does he also work there?

2        A.    Yes.

3        Q.    And somebody by the name of Laura King, does she

4   work there sometimes?

5        A.    She did but no longer does.

6        Q.    Do you know when she left?

7        A.    I believe it was about three months ago.

8        Q.    They also work for the sheriff's office but they

9   are different than you, correct?

10       A.    They are County Health Service, but yes.

11       Q.    And what is your job in comparison to what they

12  do.  What is it that you do in comparison to what they do?

13       A.    I just keep the place secure and they do

14  counseling therapy and medical services.

15       Q.    How it is that -- is there a specific way in

16  writing that you communicate with them on a day-to-day

17  basis?

18       A.    Yes.

19       Q.    What is that?

20       A.    We have a spiral notebook that we make notations

21  in if we see things are awry or need attention.  And that

22  gets passed along to the staff.

23       Q.    What is your shift?

24       A.    6:30 to two.

25       Q.    Let's say there is an issue that arises, do you

52

1    then go to the spiral notebook during your shift and write

2    whatever is of concern to you?

3        A.   Yes, I do.

4        Q.   How -- and where is this notebook?

5        A.   It's kept in our control booth.

6        Q.   And is it a requirement or policy or custom that

7    the health people then come over and take a look at it?

8    How is it they get the messages that are in that book?

9        A.   Every day they have a meeting at 10:30.   They

10   come into the control booth and get the spiral notebook and

11   take to their staff meeting.

12       Q.   I'm showing you Exhibit 546 and ask you if you

13   recognize what's here.

14       A.   Yes, I do.

15       Q.   And that's referring to an entry back on February

16   25th of 2004 and February 26, 2004, as it relates to Wendi

17   Elizabeth Andriano, correct?

18       A.   Correct.

19       Q.   Did you write those notes?

20       A.   I wrote the bottom one.

21       Q.   And the top one, do you know who wrote that one?

22       A.   That appears to be Officer Lose's handwriting.

23       Q.   But it's part of this same book or same page of

24   the book that we've been talking about, correct?

25       A.   Yes, it is.

000008904

1     Q.    And you were the one that actually made the copy,

2   right?

3     A.    Yes, I am.

4           MR. MARTINEZ:  I move for the admission of

5   Exhibit Number 546.

6           MR. PATTERSON:  Judge, we need to approach.

7           (Bench conference was held outside the hearing of

8   the jury.)

9           MR. PATTERSON:  This is one of the things I just

10  got today.  We made requests for all of the medical and

11  jail records from the county jail.  They never sent this to

12  us.  This apparently is something, a spiral notebook that

13  they keep personally and that had some entries in it that

14  are germane.  They should have disclosed this to us

15  pursuant to the order that you signed weeks ago.  It should

16  have been submitted to us.

17          Secondly, it pertains to an allegation of one

18  inmate having some problems with Wendi and not wishing to

19  be in the same pod.  And it's information that should be

20  more properly presented perhaps by that person rather than

21  through this lady because it injects collateral issues into

22  the case I can't adequately defend against just having been

23  notified this existed today.

24          THE COURT:  Mr. Martinez?

25          MR. MARTINEZ:  She indicated that that's not her

1   personal note because everybody writes in it, including the

2   other D.O.s that are there.  So it's not her own notebook.

3   But additionally with the complaint, we bring in the person

4   that made that comment.  You know, the rules don't require

5   us to do that at this point.

6          Additionally, she said she wrote it.  So she has

7   personal knowledge of it.  Why the jail doesn't give him

8   this information, I don't know.  But that's all I know.

9   After Joyce Van Every testified the next day I just can't

10  remember what the dates were but after she testified, I

11  asked the paralegal to contact Joyce Van Every for the name

12  of the officer that they indicated to us was unhappy or had

13  something to say.  And as a result of that, I just sent

14  them a subpoena and asked them to provide me with all

15  correspondence naming Wendi Andriano.  I received it this

16  morning when they came to court today at ten.

17         THE COURT:  I'm going to allow you to elicit

18  testimony about the information here.  But I'm not going to

19  allow it to be admitted to.  I'll allow you to elicit

20  testimony.

21         MR. MARTINEZ:  Can she read it?

22         THE COURT:  No.  But she can testify about the

23  events.

24         MR. MARTINEZ:  Judge, I think that Rule 703

25  allows me to do that.  I'm not arguing with you.

1          THE COURT:  I'm not allowing you to admit it

2          (Bench conference concluded.)

3      Q.   BY MR. MARTINEZ:  Ma'am, are you the one who made

4   the entries on February 26, 2004?

5      A.   Yes, I am.

6      Q.   Did you write that entry as a result of a

7   conversation that you may have had with someone?

8      A.   Yes.

9      Q.   You had a conversation with whom?

10     A.   Her name is Long Horse.

11     Q.   Is that who?  Is that an inmate?

12     A.   Yes, it is.

13     Q.   And where was this inmate?  Where was she housed?

14     A.   She was housed in D pod.

15     Q.   And you and she had a conversation and what did

16   she tell you?

17     A.   Well, the conversation was initiated because the

18   staff wanted her to move to C pod.

19     Q.   Who is a resident on C pod?  Who is a resident of

20   C pod back then?

21     A.   Andriano.

22     Q.   Go ahead.

23     A.   And when I tried to convince her to move to C

24   pod --

25     Q.   From where was she?

1      A.    D pod.

2      Q.    Go ahead.

3      A.    -- to C pod because that was the staff's wishes,

4  she informed me that she did not, in fact, want to go over

5  there as long as that quote control freak, was still living

6  in that pod.

7      Q.    Which control freak was she talking about?

8      A.    Andriano.

9      Q.    Did she specifically say Andriano or was that

10 something you came up with?

11     A.    She called her Wendi.   There was only one Wendi

12 there at the time.

13     Q.    And did he also indicate that she was willing to

14 put up with any bullying by other members as long as she

15 didn't have to be housed with the defendant?

16     A.    That's correct.

17     Q.    You indicated there is also some more writing at

18 the top.  You indicated that may have been written by

19 someone else.  It may have been Officer Lose, I think you

20 said?

21     A.    Yes.

22     Q.    But it does refer to somebody by the name of

23 Candy Rohde?

24     A.    Yes.

25     Q.    How is Candy Rohde related or associated with the

EXHIBIT BBB

000008909

57

1   defendant?

2      A.   I'm not sure.  For some reason, the staff was

3   allowing this woman to come into the unit to have

4   counseling sessions of some sort with her that were contact

5   visits, which is unprecedented.

6      Q.   When you say "unprecedented" what do you mean?

7      A.   We have a visitation facility and those visits

8   were taking place up there.

9      Q.   Were you under the impression she was a lawyer?

10     A.   I was under the impression she had something to

11  do with legal staff.

12     Q.   And  as a result of one of those visitations did

13  something occur with regards to the defendant?

14     A.   Yes.

15     Q.   Tell me about that?

16     A.   Right after she had a visit with her --

17     Q.   Right after Andriano had a visit with Ms. Rohde?

18     A.   Correct.  We were doing cell searches.

19     Q.   You searched cells?

20     A.   We did at C cell, in C pod.

21     Q.   All right?

22     A.   And when I searched Andriano just lightly, I

23  discovered a compact case in there with a glass mirror.

24     Q.   And this --

25          MR. PATTERSON:  Judge, can we approach, please?

1          (Bench conference was held outside the hearing of

2    the jury.)

3          MR. PATTERSON:  I don't know where she came from

4    but this lady is not a member of my legal staff.  And for

5    her to suggest that she is now associated with my office,

6    and thereafter brought some contraband into our client is

7    just outrageous.

8          THE COURT:  Who is the lady?

9          MR. PATTERSON:  She is a counselor who was hired

10   by the mother to give counseling services to the client.

11   She is not a member of our staff.  There is nothing to do

12   with legal staff.

13         THE COURT:  Okay.

14         MR. PATTERSON:  So could you direct that that be

15   cleared it up so we don't have to -- I don't have to --

16         MR. MARTINEZ:  I stipulate that's not -- I don't

17   have a problem with that.

18         THE COURT:  You both will to stipulate that this

19   person is not associated with?

20         MR. PATTERSON:  Anything to clear this issue up

21   right now.

22         THE COURT:  And her name is Candy Rohde?

23         MR. MARTINEZ:  Candy is the first name.

24   R-o-h-d-e.

25         THE COURT:  And have you both stipulated?

1        MR. PATTERSON:  She is not a member of the public

2  defender's staff, a legal representative and not a lawyer.

3  She has nothing to do with the legal defense of this case

4  or even my staff.

5        MR. DELOZIER:  She's a professional counselor

6  provided by the mother and father.

7        MR. MARTINEZ:  Just not associated.  We don't

8  know who she was hired by.

9        MR. PATTERSON:  But she wasn't hired by my

10  office.  She wasn't hired by his office.

11        THE COURT:  This Candy Rohde is not associated

12  with the public defender's office or staff of either

13  Mr. Delozier or Mr. Patterson's office.

14        MR. PATTERSON:  That's fine.

15        MR. DELOZIER:  Okay.

16        (Bench conference concluded.)

17        THE COURT:  Ladies and gentlemen, the parties

18  stipulate to the following:  That this Candy Rohde that's

19  been mentioned is not associated in any way with the

20  Maricopa County Public Defender's Office or Mr. Patterson's

21  or Mr. Delozier's offices.

22        The parties stipulate that this person that was

23  mentioned, Candy Rohde, is not associated in any way with

24  the Maricopa County Public Defender or with Mr. Patterson's

25  or Mr. Delozier's office.

1          Mr. Martinez.

2          Q.   BY MR. MARTINEZ:   To get back to Ms. Rohde, one

3   of the things you told us was she was getting visitation

4   that was face-to-face, correct?

5          A.   Yes.

6          Q.   That implies that the visitation with everybody

7   else was different or otherwise?

8          A.   Yes.

9          Q.   How is that?   In other words, how does that take

10   place?  Was it through a glass?

11          A.   Well, no, it was in that conversation booth about

12   this size, maybe twice this size, with plexiglas walls and

13   with full vision from our office.

14          Q.   And could the two people touch each other?

15          A.   They could.

16          Q.   In other words, they could just extend and do

17   whatever?

18          A.   That's correct.

19          Q.   Prior to coming to court, did you have occasion

20   beginning in June of 2004 to present, to take a look at the

21   records to determine how many times someone by the name

22   Donna Ochoa had visited the defendant in the last six

23   months?

24          A.   There were four visits total.

25          Q.   And that's beginning in June of 2000?

1      A.   June 1 until December 3rd.

2      Q.   Do you remember what dates those visits were,

3   what month they were?

4      A.   There was one on June 1st, there was another

5   towards the end of October.  Another towards the end of

6   November and then December 3rd was the other one.

7      Q.   One of the things that's in Exhibit 546 that's

8   related to us about indicating something about a control

9   freak.  Did you have occasion to see the defendant, Wendi

10   Andriano, interact with the other inmates in her pod?

11      A.   Yes.

12      Q.   And in terms of the person who was in charge, if

13   you will, do you have an opinion as to who was in charge

14   involving the defendant and the other inmates?

15      A.   I didn't actually see her controlling them.  I

16   got many, many complaints from inmates saying that

17   different things were going on and all of these things seem

18   to come back to Wendi Andriano.

19      Q.   As a result of those complaints and the things

20   that were coming back, did you form an opinion as to who

21   was in charge?

22      A.   Yes.

23      Q.   Who was that?

24      A.   Wendi.

25      Q.   Now, was there also a situation where there was

1    movement in and out of this pod of the inmates that were

2    there?

3        A.    Yes.

4        Q.    Did you then have occasion over the last year

5    let's say, were there many movements in and out of that

6    facility?

7        A.    Several.

8        Q.    And with regard to those movements, did you then

9    question the staff involving Mr. Perry, Laura King,

10   perhaps, Ms. Van Every about what was going on?

11       A.    Yes, I did.

12       Q.    And what is it that they would tell you?

13       A.    They just said they had received information

14   about inmates that led them to believe that that inmate was

15   not conducive for that environment and needed to go back.

16       Q.    Then did you press them on what that information

17   was?

18       A.    I asked where they got the information.

19       Q.    And what did they tell you?

20       A.    They told me Andriano was telling them.

21       Q.    As a result of this information she was

22   providing, people were being moved?

23       A.    That's correct.

24       Q.    We had left off with Ms. Rodhe and we were

25   talking about the compact.  Do you remember that?

1      A.   Yes.

2      Q.   Is a compact something that's allowed in that

3   particular pod?

4      A.   No, it is not.

5      Q.   Is it allowed in the jail-wide facility?

6      A.   No.

7      Q.   Is it something that they can buy from the

8   commissary?

9      A.   No.

10     Q.   Does the compact that you're talking about, did

11  it have glass in it?

12     A.   Yes, it did.

13     Q.   Is that something that is a potential hazard

14  either to this inmate or perhaps to other inmates?

15     A.   Yes, it is.

16     Q.   Why is that?

17     A.   Because anyone could break it out.  It was a

18  psychiatric unit and a lot of people were very emotionally

19  fragile.

20     Q.   It could be used as a weapon, I think that's what

21  you're telling me, right?

22     A.   Yes.

23     Q.   Did you have occasion, at one point, take a

24  disciplinary action against the defendant, Wendi Andriano?

25     A.   Yes, I did.

64

1    Q.   And was that put in writing?

2    A.   Yes, it was.

3    Q.   Let me show you.  This is Exhibit Number 548.

4         Is this a report that you wrote?

5    A.   Yes, it is.

6    Q.   And what's the date on it?

7    A.   12/3 of '03.

8    Q.   And our understanding is that she arrived there

9    about July of '03, is that when she arrived?

10   A.   I don't recall, exactly.  I thought it was

11   September.

12   Q.   And with regard to this, what is it that she did

13   that caused you to write this report?

14   A.   She had tried to conceal various makeup items

15   that had been brought in from the outside.

16   Q.   Is this the same time that we are taking about

17   with the compact that is referenced here on Exhibit Number

18   546 that's dated 2/25/04?

19   A.   Yes.

20   Q.   What's the date of this again?

21   A.   12/3/03.

22   Q.   That appears to be happening -- I see what you're

23   saying.  Okay.

24        I move for the admission of Exhibit 548?

25        MR. PATTERSON:  No objection.

000008917

1          THE COURT:  Exhibit 548 for identification is

2    admitted into evidence.

3          Q.  BY MR. MARTINEZ:  Why don't you read for us the

4    items that were allegedly contraband, that you found to be

5    contraband?

6          A.  Just list the items?

7          Q.  Yes.  The items that you found.

8          MR. PATTERSON:  May I have the exhibit number?

9          THE COURT:  Exhibit 548.

10         MR. PATTERSON:  Thank you, sir.

11         THE WITNESS:  Besides the compact case with glass

12   mirror, were two black pens, new lipstick in a little case,

13   lib gloss and eye liner.  All of them still had the

14   store-brought wrapping on them so they were very new.

15         Q.  Was there an investigation as to how they got in?

16         A.  No.

17         Q.  Any idea how they got in?

18         A.  We believe that Candy Rohde was bringing them in.

19         Q.  That's why on February 25th, '04 was the notation

20   that she's not allowed?

21         A.  That's correct.

22         Q.  Drawing your attention back to mid July of 2004.

23   Did you have occasion to be working double shifts back

24   then, say, July 24th of 2004?

25         A.  I actually worked about two and a half hours

1   over.

2       Q.   And when you were working those two and a half

3   hours over, if you started at two that would have taken you

4   to 4:30?

5       A.   Approximately 4:30.

6       Q.   And did you have occasion, again on July 24th of

7   2004, to speak to somebody by the name of Joyce Van Every?

8       A.   Yes, I did.

9       Q.   Who is she?

10      A.   She's the R.N. for the unit.

11      Q.   When she came up to you, what is -- First of all,

12  tell us what her demeanor was like upon seeing you there.

13      A.   She was agitated.

14      Q.   And then, did she say anything to you?

15      A.   Yes, she did.

16      Q.   What did she say?

17      A.   She asked me when I was going to leave.

18      Q.   And what did you say?

19      A.   I said, "I don't know.  I'll be here for a

20  while.  I may work a double."

21      Q.   And then what happened?

22      A.   She said, "Well, I've got to go in and see Wendi

23  before I go home."

24      Q.   Did she have anything in her possession when she

25  was going to go see Wendi before she went home?

1    A.   Yes, she did.

2    Q.   What did she have?

3    A.   She had a white plastic shopping bag.

4    Q.   And is it the kind that you get like at Fry's or

5  something?

6    A.   Yes, it is.

7    Q.   And was there items in that shopping bag?

8    A.   The bag was probably three quarters full.

9    Q.   So, she takes this bag in and says she needs to

10  see Wendi.  Then what happens?

11    A.   I let her into C pod and she went out of sight of

12  the camera monitor at that point.

13    Q.   How long was she gone before you saw her again?

14    A.   Just minutes.

15    Q.   And then what happened?

16    A.   When she exited the C pod, that bag was better

17  than half empty.

18    Q.   And what conclusion did you draw from that?

19    A.   I decided that she had passed something to the

20  inmate.

21    Q.   Did you then go and check to see what that was?

22    A.   No.  Because by the time we discovered it, it was

23  too late for me to go in.  Plus, I was noncontact at the

24  time because of an accident that happened so I couldn't

25  personally do it.

1    Q.   What does "noncontact" mean?

2    A.   That means I had an injury that left me

3  vulnerable.  So I had no contact, physical contact.

4    Q.   When she came out, did she, I'm talking about

5  Joyce Van Every, did she say anything to you?

6    A.   No.  Just said she's going home and I let her

7  out.

8    Q.   One of the things when the defendant was there,

9  did Joyce Van Every and the defendant have contact on a

10  frequent basis?

11    A.   Daily.

12    Q.   And with regard to the other inmates that were

13  there, did Joyce Van Every have daily contact with them

14  like she did with the defendant?

15    A.   No.

16    Q.   When you say she had daily contact with the

17  defendant, explain that to me?

18    A.   She would go over to C pod and ask us to open the

19  door.  We would open the door and she would have Andriano

20  exit the pod.

21    Q.   And they would sit and talk?

22    A.   Yes.

23    Q.   Where would they talk?

24    A.   Most of the time at the round table just outside

25  of C pod.

1     Q.    Would it be unusual for her to talk to her every

2   day?

3     A.    That is an unusual practice.

4     Q.    Let's say she's talking to her and you perhaps

5   need her for something.  Was it something that she would

6   leave Ms. Andriano and go back to whatever you're talking

7   about or was it something that she would continue talking

8   to Ms. Andriano?

9     A.    She would refer me to someone else.

10     Q.    How about Dr. Perry, do you know whether or not

11   there were any notes kept of what appears to be daily

12   conversations?

13     A.    I don't know.  I wasn't privy to the nurse's

14   notes.

15     Q.    How about Dr. Perry, did he spend some time with

16   the defendant?

17     A.    When he was there and she was there, it was

18   daily.

19     Q.    And, again, is that something that he did with

20   the other inmates?

21     A.    No.

22     Q.    How about Laura King, did she spend some time

23   with her?

24     A.    Yes, she did.

25     Q.    And, again, was it as frequent as it was with

1   Ms. Van Every and Mr. Perry?

2       A.   Yes, it was.

3       Q.   And do you know whether or not they kept notes on

4   that?

5       A.   No, I don't.

6       Q.   What about this issue about -- are books allowed

7   to go into an inmate without you first inspecting them?

8       A.   No.

9       Q.   Why is that?

10      A.   Because in the past things have been hidden

11  within the leaves of the book.

12      Q.   And do you know whether or not the defendant ever

13  was in possession of items, such as books without first

14  having been inspected by you?

15      A.   Yes, I do.

16      Q.   And do you know who brought them in?

17      A.   Both Joyce Van Every and Roberto Escobar.

18      Q.   Who is Roberto Escobar?

19      A.   He's another R.N. on the unit.

20      Q.   Wasn't the defendant there because of a suicide

21  attempt?

22      A.   Yes, she was.

23      Q.   Wouldn't it be possible to hide some sort of a

24  weapon in these books?

25      A.   Yes, it would.

1      Q.    Speaking about books, was there ever a situation

2   or something that came to you about whether or not the

3   defendant was writing a book with Joyce Van Every?

4      A.    I was told that.

5      Q.    And who were you told that by?

6      A.    By Andriano's cell mate, at the time Anthony

7   Gonzales.

8      Q.    Was the defendant present when he told you that?

9      A.    No.

10      Q.    One of the things that we were told about, well,

11   let me ask you, is clothing distributed on a daily basis in

12   this pod?

13      A.    No, once a week.

14      Q.    And when we're talking about clothing, what are

15   we talking about.

16      A.    We're talking about the striped shirt on the top

17   and striped pants on the bottom and underwear, change of

18   socks.

19      Q.    With regard to the items in the uniform, would

20   you give these items to the defendant?

21      A.    I handed them to them, yes.

22      Q.    Was there ever any issues with the defendant

23   involving the garments that you were giving out on a weekly

24   basis?

25      A.    She was very fussy about the colors of the

1    stripes.

2        Q.    What do you mean she was fussy about the color of

3    the stripes?  They are black and white, right?

4        A.    Correct.

5        Q.    What was she fussy about?

6        A.    She was fussy if the top did not match the

7    bottom.  And color as far as density.

8        Q.    So what would happen if you would give her

9    something that doesn't match?

10        A.    She would get upset with me and beg me to give

11    her something that would match.

12        Q.    What did you do?

13        A.    I'd finally just say you show me what matches and

14    I would hand it to her because it would take too long.

15        Q.    Is this something that happens on a weekly basis

16    with her?

17        A.    Yes.

18        Q.    And it still continues?

19        A.    Yes.

20        Q.    We talked a little bit about Donna -- I'm sorry

21    about Laura King.  You know who she was, right?

22        A.    Yes.

23        Q.    Did she seemed to have a somewhat special

24    relationship with the defendant?

25        A.    Yes, she did.

1    Q.    How do you mean that she had a special

2    relationship with the defendant.  How did that manifest

3    itself?

4    A.    They would be seen a lot joking and kidding

5    around and spending a lot of time conversing.

6    Q.    And in anticipation of this trial, do you know

7    whether or not Ms. King would come in in her own time to

8    assist the defendant?

9    A.    Yes, she did.

10    Q.    Explain that to me?

11    A.    She came in in the evening to do her hair and

12    makeup the day before she had to come to trial.

13    Q.    How many times would she do that?

14    A.    I can't be certain of that.

15    Q.    Ma'am, these people that we're talking about,

16    Ms. King, Mr. Perry and Ms. Van Every, are they bound by

17    the same rules of the jail as you are?  In other words, not

18    to bring in items that you don't check, not to bring in

19    contraband, basically, worry about the safety of the

20    inmates as well as themselves?  Are they bound by the

21    policies of the jail?

22    A.    Yes, they are.

23    Q.    It's not like, or is it, that they have their own

24    rules that aren't applied to them?

25    A.    No.

1      Q.    Are you familiar with the policy of CP 2, the

2   code of conduct involving employees of the sheriff's

3   office?

4      A.    Yes, I am.

5      Q.    And, specifically, does that section CP 2, number

6   19, talk about association and fraternization with

7   prisoners?

8      A.    Yes, it does.

9      Q.    Does it talk about employees shall not indulge in

10  undue familiarity with inmates?

11     A.    Yes, it does.

12     Q.    It's forbidden?

13     A.    Yes, it is.

14     Q.    Why?  Do you know it's forbidden?  I know you've

15  been there about 17 years, can you tell us why, if you can,

16  and if you can't, that's okay?

17     A.    Because it puts you in a compromising position.

18     Q.    How does it put you in a compromising position?

19     A.    It puts you in a position where you can be

20  manipulated if you become too familiar.

21     Q.    How about, it also indicates that employees shall

22  not do favors for or accept favors from somebody who is an

23  inmate.  Is that something that you're familiar with?

24     A.    Yes.  This thing with Ms. King coming in and

25  providing this thing with the hair and talking to her and

1   engaging in this conduct with her, is that something that

2   you think is covered by this?

3          MR. PATTERSON:  Objection.  Her opinion.

4          THE COURT:  Sustained.

5      Q.  BY MR. MARTINEZ:  Ma'am, you are charged with

6   keeping order there, aren't you?

7      A.  Yes, I am.

8      Q.  You are charged with enforcing these, aren't you?

9      A.  Yes, I am.

10     Q.  Did you speak to them about this?

11     A.  Yes, I did.

12     Q.  And with regard to Ms. King, what did she say?

13     A.  That it was unimportant, not a problem.

14     Q.  Even though you talked to her about it?

15     A.  Yes.

16     Q.  Even though you perceived it to be a problem?

17         MR. PATTERSON:  Objection.  Leading.

18         THE COURT:  Don't lead.

19     Q.  BY MR. MARTINEZ:  Did you perceive it to be a

20  problem?

21     A.  Yes, I did.

22     Q.  How about with Ms. Van Every, did you perceive

23  the fact that she was bringing in books a problem?

24     A.  Yes, I did.

25     Q.  And did you ever discuss that with her?

1      A.    Yes, I did.

2      Q.    What was her response to that?

3      A.    She said I didn't know what I was talking about.

4      Q.    Is there a policy, for example, that says

5  employees shall not provide inmates with books from outside

6  the jail?

7      A.    Yes, there is.

8      Q.    What's the procedure for getting a book to an

9  inmate?

10      A.    In general population the books have to be

11  donated to the library.  There has been exceptions made in

12  D2 because the staff there has been very insistent on being

13  able to bring in magazines and books for the inmates.  So

14  in order to accommodate them, we have agreed to allow them

15  to bring in paperback books from home as long as they are

16  dropped off in our control booth to at least be sure we are

17  able to check them over for any kind of contraband that may

18  be coming in.

19      Q.    And did Ms. Van Every comply with that modified

20  rule of security?

21      A.    No, she did not.

22      Q.    One of the things that has been raised in this

23  case is that the defendant potentially, possibly, may have

24  attempted suicide sometime in, I guess it was September of

25  2003.  And one of the allegations is that perhaps that she

77

1   may have used a pencil for that.  Are you familiar with the

2   pencils that are given to inmates?

3        A.   Yes.

4        Q.   Were you asked to bring a sample pencil with you?

5        A.   Yes, I was.

6        Q.   Do you have it with you?

7        A.   Yes, I do.

8        Q.   May I take a look at it?

9        A.   (Witness complies.)

10        Q.   Showing you what's been marked for identification

11   as Exhibit Number 549.  Do you recognize it?

12        A.   Yes, I do.

13        Q.   And is that type of pencil -- or you tell me.  Is

14   that the type of pencil the jail used and provided to

15   inmates back in September of 2003?

16        A.   Yes, it is.

17             MR. MARTINEZ:  I move for the admission of

18   Exhibit 548.

19             MR. PATTERSON:  No objection.

20             THE COURT:  Exhibit Number 549 for identification

21   is admitted into evidence.

22        Q.   BY MR. MARTINEZ:  Did you ever have occasion to

23   work outside of what I guess is called the psych ward?

24        A.   Yes, I have.

25        Q.   And were you familiar with these pencils when you

78

1    were out in the psych ward?

2         A.   Yes.

3         Q.   Awe how is it that they were sharpened?  Was

4    there a special sharpener?  Who did the sharpening?  Do you

5    know?

6         A.   There was a pecil sharpener attached to the wall

7    that was provided.

8         Q.   Are you familiar with -- I think you mentioned an

9    R.N. by the name of Escobar.  Do you know who he is?

10        A.   Yes, I do.

11        Q.   What's his first name?

12        A.   Roberto.

13        Q.   Are you familiar with a situation involving him

14   and some shampoo and the defendant?

15        A.   Yes, I am.

16        Q.   Tell me about that?

17        A.   The following day of the incident, my partner

18   told me that --

19        Q.   Your partner is Bonnie?

20        A.   Lose.

21        Q.   Is she the person that's outside?

22        A.   Yes.

23        Q.   Go ahead.

24        A.   And she told me that Roberto was trying to bring

25   in some shampoo for Andriano, specifically for her.

1     Q.   And is that something that the rules allow?

2     A.   No.

3     Q.   What happened when he tried to bring it in?  Did

4  one of the other nurses get wind of it?

5     A.   Yes.  Donna Anderson came to the office and told

6  her what was happening and that she was uncomfortable with

7  it.

8     Q.   And then what happened after this conversation

9  between Donna Anderson and Bonnie Lose?

10     A.   Bonnie told her that she needed to go back to the

11  office and let them know how she felt about it.  And make

12  sure that it did not ever make it into the pod.

13     Q.   What was Escobar's response to that?

14     A.   His response was it's part of her treatment

15  plan.  It will just be our little secret.

16     Q.   Well, if that's their little secret, is that

17  something that, from a security standpoint, that's

18  something that should be countenanced?

19          MR. PATTERSON:  Wait, Judge.  Your Honor, he's

20  using --

21          THE COURT:  Sustained.

22     Q.   BY MR. MARTINEZ:  Is this something that's

23  allowed by the rules to, I guess, secretively give an

24  inmate anything, including hair products?

25     A.   No, these are provided in a generic form.

80

1     Q.   Why is that a security issue?

2     A.   Because if they're doing anything like that

3 secretively, without us knowing, there is no way for us to

4 be able to know what is coming in besides that.

5     Q.   Since the defendant has arrived there, do you

6 have an opinion, based on your observations of her -- how

7 many days a week do you work?

8     A.   Five.

9     Q.   Do you have any observations based on your five

10 days a week that you have there, whether or not the

11 defendant receives preferential treatment in that pod?

12     A.   Yes, she does.

13     Q.   Aid, specifically, who provides her preferential

14 treatment?

15     A.   Dr. Perry, Roberto Escobar and Van Every.

16     Q.   And when Ms. King was there, did she also provide

17 preferential treatment to her?

18     A.   Yes, she did.

19     Q.   Do you remember a situation when -- what was the

20 defendant's -- Anthony Gonzales was the defendant's cell

21 mate?

22     A.   Cell mate, yes.

23     Q.   Was there a situation when the defendant came to

24 you about 8:30 in the morning -- or at least he came to you

25 about using the telephone?

1      A.    Yes.

2      Q.    And what did you tell him as it applied?   What

3   did you tell him?

4      A.    He asked me if he could make a phone call but the

5   phone was not turned on yet.   I said no it was too early.

6      Q.    Then what happened?

7      A.    Then immediately after that --

8      Q.    By immediately, how much time passed?

9      A.    A matter of seconds.

10      Q.    Then what happened?

11      A.    Ms. Andriano came immediately to the window.   She

12   rang the buzzer and told me that she wanted the phone on

13   because she needed to make a legal phone call.

14      Q.    And did you continue to observe Ms. Andriano

15   immediately after her making that request?

16      A.    Yes.

17      Q.    And for how long did you observe her?

18      A.    As often as I could throughout the day.

19      Q.    And at any time throughout the day did you ever

20   see her using that phone?

21      A.    No, I did not.

22      Q.    How about Anthony Gonzales, did you see him using

23   the phone?

24      A.    Yes.   As soon as the power to the phone was on,

25   Anthony made a phone call.

1        MR. MARTINEZ:  I don't have any other questions.

2        THE COURT:  Mr. Patterson.

3        MR. PATTERSON:  Thank you, Judge.

4

5                    CROSS-EXAMINATION

6   BY MR. PATTERSON:

7        Q.    Are you a detention officer or a deputy sheriff?

8        A.    Detention.

9        Q.    And what is your rank at the facility?

10        A.    Detention officer.

11        Q.    Okay.  Do you have supervisors there at that

12   facility?

13        A.    Sometimes.  There are some scheduled there.

14        Q.    And would they be given rank, sergeant, that kind

15   of thing, lieutenant?

16        A.    Sergeant would be the only one that would be in

17   that facility.

18        Q.    And so who is your immediate supervisor, again?

19        A.    Right now?

20        Q.    Yes.  Well, back when -- yeah, currently and at

21   the time that you were in D2?

22        A.    We've had numerous.  But right now it's Sergeant

23   Frank Valenzuela.

24        Q.    The things that you observed that were done by

25   Dr. Perry and Joyce Van Every, Laura King, did you report

1    this conduct to your supervisor?

2         A.    Yes, I did.

3         Q.    Was there ever any disciplinary action commenced

4    against these people for the allegations you made?

5         A.    They're not directly over them and they informed

6    me they had gone to Ms. Van Every's supervisor, who is the

7    Laurie Saint Lewis.

8         Q.    Was she disciplined as a result of this?

9         A.    I don't know.

10        Q.    Was she removed from her position as head

11   psychiatric nurse there?

12        A.    No.

13        Q.    She stills remains today as the head psychiatric

14   nurse?

15        A.    Yes, she does.

16        Q.    Dr. Perry, the complaints that you made that he

17   was visiting with Ms. Andriano or fraternizing, I think you

18   were suggesting, did you make the complaint to the powers

19   that be about Dr. Perry?

20        A.    Yes.

21        Q.    Was he ever disciplined or removed from the

22   staff?

23        A.    No.

24        Q.    And this particular pod that you're in is a

25   medical pod, right?

84

1      A.    No, it's psychiatric.

2      Q.    But it has -- the people are there because they

3 have psychiatric issues, right?

4      A.    Yes.

5      Q.    And these issues the inmates have are dealt with

6 by professionals like Dr. Perry and Counselor Laura King

7 and Psychiatric Nurse Joyce Van Every, right?

8      A.    Yes.

9      Q.    And do you have any kind of medical background or

10 degree that we should be aware of?

11      A.    I've had a number of hours of training for the

12 psychiatric unit.

13      Q.    I know but do you have a doctorate?

14      A.    No.

15      Q.    Do you have a psychiatric degree?

16      A.    No.

17      Q.    Do you have a psychology degree?

18      A.    No.

19      Q.    Do you have a nursing degree?

20      A.    Nope.

21      Q.    So decisions are made by nursing staff and

22 doctors staff that affect these patients that are on that

23 particular unit, correct?

24      A.    That's correct.

25      Q.    There are also issues involving security that

85

1   you're more involved with, correct?

2      A.   Correct.

3      Q.   And it seems to me that there's inherent tension

4   between the security staff and the medical staff, is that a

5   fair statement?

6      A.   Yes.

7      Q.   From what you could observe, Wendi apparently got

8   along very well with the medical staff there in the pod,

9   correct?

10     A.   Most of them.

11     Q.   Well.  Laura King, correct?

12     A.   Yes.

13     Q.   Dr. Perry?

14     A.   Yes.

15     Q.   Joyce Van Every?

16     A.   Yes.

17     Q.   Roberto Escobar?

18     A.   Yes.

19     Q.   Are there other medical staff that she didn't get

20   along with?

21     A.   There are many other people from that staff who

22   complained about what went on.

23     Q.   Okay.

24     A.   There was an R.N. there, Donna Anderson, who did

25   not believe that the activity is ethical.  She expressed

1   that many times.

2        Q.   Has she complained to the powers that be over

3   there?

4        A.   No, because she is an underling to Joyce.

5        Q.   Joyce Van Every is a supervisor there?

6        A.   Yes.

7        Q.   She makes decisions that relate to the patients

8   that are on the pod, correct?

9        A.   Yes.

10       Q.   You may not always agree with those decisions,

11  correct?

12       A.   That's correct.

13       Q.   I suspect she probably doesn't always agree with

14  everything you do in that pod, correct?

15       A.   That's correct.

16       Q.   Okay.  You did write up a report about the

17  incident of December 3, is that correct?

18       A.   Yes, that incident in December.

19       Q.   Exhibit 53 -- Exhibit 548.  Let's talk about some

20  of the things that are on this exhibit.

21            One of the reasons the compact was problematic in

22  this instance is because Wendi had previously made, in your

23  words, "a serious attempt at suicide by cutting?"

24       A.   Yes.

25       Q.   And that's your verbiage and right from the

1    exhibit, right?

2        A.   Yes.

3        Q.   And that's why the compact was problematic?

4        A.   Yes.

5        Q.   She apparently admitted responsibility, correct?

6        A.   I don't recall.

7        Q.   "I've been informed of the offenses listed here

8    on.  I acknowledge receipt of the report and plead," and

9    then there's two check marks available, guilt, not guilty?

10       A.   That would have been between her and the hearing

11   officer.

12       Q.   Let's talk about the exhibit.  You can read the

13   exhibit for us?  Isn't there a spot there it says she's

14   given an opportunity to plead, correct?

15       A.   Yes.

16       Q.   Looks like she admitted responsibility, pled

17   guilty, right?

18       A.   Yes, that's what it says.

19       Q.   And signed it, correct?

20       A.   Yes.

21       Q.   Let's look at it on the ELMO.  It says right

22   here, "I've been informed of the offense listed here on.  I

23   acknowledge receipt of the report and plead, guilty, not

24   guilty".  And looks like the x is on the guilty.

25       A.   Correct.

88

1     Q.   So she accepted responsibility.  You recommended

2  that she receive 30 days full restrictions, right?

3     A.   Yes.

4     Q.   But the hearing office or the person that

5  resolves these things gave her 20 days restriction, right?

6     A.   Yes.

7     Q.   Okay.  So, this person didn't abide by your

8  recommendation, correct?

9     A.   Correct.

10     Q.   You told us about an episode where Joyce Van

11  Every had a shopping bag.  At any point in time did you

12  look inside the shopping bag?

13     A.   No.  She's staff.

14     Q.   You don't know what the contents were in the

15  shopping bag?

16     A.   No.

17     Q.   Did you examine the shopping bag after she left?

18     A.   Only could see that it was much less.

19     Q.   Okay.  Do you know what contents were remaining

20  in the shopping bag?

21     A.   No.

22     Q.   Do you know what contents, if any, were removed

23  from the shopping bag?

24     A.   No.

25     Q.   Do you know where those contents wound up?

1    A.   I saw her walk directly to Andriano's room and

2  leave from Andriano's room.

3    Q.   Did anybody from your staff search that room

4  thereafter in an effort to find what contents may have been

5  left there?

6    A.   No.

7    Q.   So we don't know what, if anything, was left in

8  the room of Ms. Andriano, do we?

9    A.   No.

10    Q.   And were staff available -- I know I told us you

11  had medical issues that precluded you from doing it

12  yourself -- but was there other staff available, security

13  staff, available to go and check the contents that may have

14  been left behind?

15    A.   Not soon enough for it to be effective.

16    Q.   Meaning?

17    A.   Meaning my partner was busy in another pod doing

18  something else for several minutes before I could tell him

19  what happened.

20    Q.   Okay.  So time elapses?

21    A.   Correct.

22    Q.   But even with the elapse of time, there was no

23  effort made to go into the room and see if something was

24  there that shouldn't be there?

25    A.   I don't know.  I was only there a couple hours.

1  I don't know if anything occurred after that.

2      Q.   What I'm trying to understand, if you thought it

3  was of such consequences that something was in her room

4  that could constitute a safety hazard either to herself, to

5  other inmates or to your staff that no one in that building

6  made an effort to try and find out what may be inside that

7  room?

8      A.   I can't make anybody do something they don't want

9  to do.

10      Q.   Well, but, did you make any effort to contact

11  anybody to get someone to go in there and check it out?

12      A.   Yes, I did.

13      Q.   And, what, you asked your partner and she was

14  busy?

15      A.   That's correct.

16      Q.   Did you do anything beyond that?

17      A.   I reported it to my supervisor the next day.

18      Q.   Okay.  Did the supervisor follow up on that?

19      A.   She reported it to her supervisor, Joyce Van

20  Every.

21      Q.   Just kind of kept going on up the ladder?

22      A.   I'm afraid that's the way it happened.

23      Q.   And nobody went to check the room?

24      A.   Not that I'm aware of until the next cell

25  searching were done.

1    Q.   You talk about books being potential contraband

2    issue.

3         Did you ever find Wendi in possession of

4    contraband that had been spirited in, squirreled in, in the

5    books?

6    A.   I have no way of know how that got there.

7    Q.   Did you ever find her in possession of contraband

8    that had been brought by the book?

9    A.   No.

10   Q.   Are you telling us that she has an issue that her

11   top and bottom should match?

12   A.   Yes.

13   Q.   That suggests to me that she has pride in her

14   appearance.  That should not be rewarded in the jail

15   environment?

16   A.   No.

17   Q.   Why does it create a problem for you that she

18   wants her uniform to match?

19   A.   Because it takes too long to accomplish a change

20   out of 25 women when one is going to be very picky.

21   Q.   But you accommodate her, allow her to do it her

22   way, it seems to expedite the process, right?

23   A.   No.  I don't let any inmates handle the clothing

24   personally.  So since I have to do that for her, it does

25   not expedite things.

1      Q.   But if you said to her -- it seems to me if you

2   accommodated her need to have pride in her appearance by

3   saying why don't you pick out two that you want, how does

4   that create a problem for you?

5      A.   I don't like to treat somebody more special than

6   someone else.

7      Q.   Okay.  And when you see other persons in your

8   unit treating inmates specially, that creates a problem for

9   you?

10      A.   It creates a problem in the unit.

11      Q.   And it creates a problem for you personally, it

12   appears?

13      A.   Yes, because of the other problems it creates.

14      Q.   Now, you talked about Inmate Long-Horse.  Is that

15   like a Native American name, Long-Horse?

16      A.   It's a hyphenated name.

17      Q.   Is that Horse, is that last name?

18      A.   Yes.

19      Q.   Now, this person is in D2 because of mental

20   health issue?

21      A.   She is.

22      Q.   And does this inmate have issues with other

23   inmates or patients in the D2 pod?

24      A.   Not to that extent.

25      Q.   But she did have issues with other inmates?

93

1    A.   Yes.

2    Q.   And what she apparently didn't like is that Wendi

3  directed her to do certain things or controlled her

4  behaviors, correct?

5    A.   Yes.

6    Q.   There was no complaint made that she was violent

7  towards her, right?

8    A.   No.

9    Q.   Or that she jeopardized her safety or anything

10  like that, right.

11    A.   No.

12    Q.   Now, you talked about a special visitation

13  arrangements that was enforced as with regard to Ms. Rohde,

14  and Ms. Andriano?

15    A.   Yes.

16    Q.   I assume that special arrangement was approved by

17  the supervisor in your unit, correct?

18    A.   Yes it was.

19    Q.   And I assume it was also authorized or approved,

20  if you will, by the medical staff at the unit, correct?

21    A.   Yes.

22    Q.   You just disagreed with it?

23    A.   We were misinformed as to who she was.  It

24  appeared to be a cover up.

25    Q.   Well, I understand that.  But what you're saying

1    at this point, was the decision was made to allow that

2    arrangement to occur in the jail setting, correct?

3       A.    Correct.

4       Q.    And those decisions were made by supervisory

5    staff at the unit, correct?

6       A.    Based on misinformation.

7       Q.    Okay.  The conduct that you find problematic with

8    Laura King was that at some point during the course of this

9    trial, I guess, Ms. King assisted her with her hair and

10   makeup the night before?

11      A.    Yes.

12      Q.    And that happened on one occasion?

13      A.    I am not aware of how many occasions.  I'm only

14   aware of one.

15      Q.    I assume in the unit there are a host of things

16   that are classified as contraband, correct?

17      A.    Yes.

18      Q.    Weapons?

19      A.    Yes.

20      Q.    Drugs?

21      A.    Yes.

22      Q.    Can you give me other examples of what

23   constitutes contraband in the jail setting?

24      A.    Anything that cannot be purchased from the

25   commissary and anything that is brought in from the outside

1   without been authorized.

2       Q.   Okay.  Was Wendi ever found to be in possession

3   of street drugs, like marijuana?

4       A.   Not that I'm aware of.

5       Q.   Was she ever found to be in possession of any

6   weapons?

7       A.   No.

8       Q.   And you talked about Nurse Escobar attempting to

9   bring the shampoo for Ms. Andriano?

10      A.   Yes.

11      Q.   Was she ever written up for that?

12      A.   No.

13      Q.   Did you ever discuss it with her as to whether or

14  not she knew why Nurse Escobar was doing this kind of thing

15  or trying to do this kind of thing?

16      A.   No.

17      Q.   Didn't get her side of the story?

18      A.   No.

19      Q.   So you have no evidence or indication she was

20  even aware that Nurse Escobar was doing this?

21      A.   No.

22           MR. PATTERSON:  Judge, I have nothing further.

23  Thank you.

24           THE COURT:  Mr. Martinez.

25

1                    REDIRECT EXAMINATION

2    BY MR. MARTINEZ:

3        Q.    With regard to this Nurse Escobar, what is his

4    first name, again?

5        A.    Roberto.

6        Q.    With regard to Roberto Escobar, did you ever find

7    out that he ever brought in shampoo for any other inmates

8    that was in that pod?

9        A.    To my knowledge, he did not.

10       Q.    Did anybody talked about him ever doing that or

11   anything other than the defendant?

12       A.    No.

13       Q.    With regard to Laura King, was there ever another

14   occasion that you know of that she came in to fix another

15   inmate's hair?

16       A.    No.

17       Q.    This Long Harris inmate you talked about.  You

18   did indicate she did not want to be in the same pod as

19   Andriano?

20       A.    Yes.

21       Q.    And what was the term she is used?

22       A.    She called her a control freak.

23       Q.    In terms of your asking about whether or not

24   somebody was written up for the shampoo being brought in by

25   Escobar, you were asked if you wrote her up.  Do you write

1  up nurses for whatever they do or is that someone else's

2  job?

3      A.    All we can do is report it their superiors.

4      Q.    And did you do it that way?

5      A.    Yes.

6      Q.    You also were asked about the clothing and

7  everything and you were asked as long as you do it her way

8  wouldn't it just be more efficient?  Do you remember that

9  question?

10     A.    Yes.

11     Q.    Would it really be more efficient if the jail ran

12  that particular area the defendant's way?

13     A.    No.

14     Q.    Why not?

15     A.    It would be too time consuming if I had a problem

16  with every one of them.

17     Q.    How about if she wants to take a different meal

18  at a different time, would that?

19     A.    That would not be convenient.

20     Q.    Does it, at some point, effect the security of

21  the area?

22     A.    Yes, it does.

23     Q.    Does it make everybody happy if, you know, that

24  somebody is getting preferential treatment?

25     A.    No.

1     Q.   Does it make things more difficult to do your job

2  if somebody is getting preferential treatment?

3     A.   Yes, it does.

4     Q.   How come?

5     A.   Because, they ask for things they should not

6  receive; they know they should not receive.  And I have to

7  tell them no and the general response is why does Wendi get

8  it.

9     Q.   In terms of the bag that Ms. Van Every may have

10  had, you indicated that it appeared three quarters full

11  when she took it in, right?

12     A.   Yes.

13     Q.   Then it appeared to be emptier when she came out?

14     A.   Yes.

15     Q.   How full was it when she came out?

16     A.   I would say a quarter.

17     Q.   And did you report that?

18     A.   Yes, I did.

19     Q.   In terms of treatment, you say that perhaps there

20  may be some tension between treatment and security.  You

21  were asked about that.  Do you remember that?

22     A.   Yes.

23     Q.   And one of the things we know is that she, the

24  defendant, was moved there because of a suicide attempt.

25  Do you remember that?

1      A.    That's correct.

2      Q.    And there being this tension, do you know whether

3   or not the defendant ever was in possession of scissors?

4      A.    Yes, she was.

5      Q.    And were they the scissors that were provided by

6   these people that were providing treatment for attempted

7   suicide?

8      A.    I was told they were medical scissors.

9      Q.    Anyway that -- When people come into the jail, do

10  you know if they are screened?   How is it that it works?

11     A.    As far as?

12     Q.    For visitation.

13     A.    For visitation?

14     Q.    Uh-huh?

15     A.    They go through metal detectors.   They can't take

16  anything in in their hands.

17     Q.    Can't bring in scissors?

18     A.    No, they cannot.

19     Q.    In terms of Exhibit 548, which was the one

20  involving the compact that you wrote up and asked for 30

21  days.   Do you remember that?

22     A.    Yes.

23     Q.    One of the things you were asked about was she

24  only got 20 days instead of 30?

25     A.    Yes.

1    Q.    Does that mean that she wasn't guilty just

2  because she got less than you requested?

3    A.    No.

4    Q.    One of the other issues was that perhaps you were

5  being unduly harsh on the defendant.  In other words, that

6  you may have a problem with her.  If you do have a problem

7  with her, is it related to your job or is it a personal

8  thing?

9    A.    It's related to my job.

10          MR. MARTINEZ:  I don't have anything further.

11          THE COURT:  Does the jury have any questions of

12  the witness?

13          (Bench conference was held outside the hearing of

14  the jury.)

15          THE COURT:  Question:  Is Anthony Gonzales a male

16  or female.

17          If a male, please explain the term used "cell

18  mates."

19          MR. MARTINEZ:  No objection.

20          MR. PATTERSON:  I think he's a transitional

21  person, if you know what I mean.  Undergoing sex change

22  therapy.

23          THE COURT:  I guess we'll find out.

24          Next question:  Do males and females share rooms

25  or cells within the unit?

1          MR. MARTINEZ:  I have no objection.

2          MR. PATTERSON:  Same question.

3          THE COURT:  I'll go ahead and ask that.

4          MR. PATTERSON:  It's the same question.  This

5     goes to the same issue.

6          THE COURT:  Okay.  To what does the term "cell

7     mate"" refer?

8          MR. PATTERSON:  Same question.

9          MR. MARTINEZ:  No objection.

10          THE COURT:  Next question:  When Laura King is

11     not there to assist with Wendi's hair and makeup, does

12     Wendi have access to items herself to do her hair and

13     makeup?

14          MR. MARTINEZ:  No objection.

15          MR. PATTERSON:  That's fine.

16          (Bench conference concluded.)

17

18                        EXAMINATION

19     BY THE COURT:

20     Q.    I have some questions for you.  The first

21     question reads as follows:  Do males and female share rooms

22     or cells within the unit?

23     A.    No.

24     Q.    To what does the term "cell mate"" refer?

25     A.    The person that they share their cell with.

1    Q.   Is Anthony Gonzales a male or female?

2    A.   As this point, a female.

3    Q.   Next question:  When Laura King is not there to

4  assist with Wendi's hair and makeup, does Wendi have access

5  to items herself to do her hair and makeup?

6    A.   She can purchase hair rollers and those kinds of

7  items through the commissary.

8         THE COURT:  Are there any further questions of

9  this witness by the jury?  No one has raised a hand.

10        Any follow-up questions by Mr. Martinez to these

11  specification questions?

12

13              FURTHER REDIRECT EXAMINATION

14  BY MR. MARTINEZ:

15    Q.   The issue involving Anthony Gonzales, was there

16  ever an issue involving the beds of Anthony Gonzales and

17  Wendi Andriano?

18    A.   There were a few times when we had to say

19  something about the beds having been pushed together.  And

20  when Andriano would sit cross-legged with Anthony's head in

21  her lap while she was massaging her head.  That kind of

22  touching is prohibited.

23        MR. MARTINEZ:  I don't have any other questions.

24        THE COURT:  Mr. Patterson?

25        MR. PATTERSON:  No questions.

1          THE COURT:  May this witness be excused?

2          MR. MARTINEZ:  Yes.

3          MR. PATTERSON:  No objection.

4          THE COURT:  Thank you very much.  You're

5   excused.

6          Mr. Martinez?

7          MR. MARTINEZ:  State would call Bonnie Lose.

8          THE COURT:  Please step forward right over here.

9   Give the clerk your name and she will swear you in.

10         (Witness sworn.)

11         THE COURT:  Please have a seat on the witness

12  stand.  Please pull the microphone close to you.  Please

13  remember to speak loudly and clearly so everyone can hear

14  you.  Please wait until the question is complete before you

15  answer the question.  And please make sure you give a

16  verbal answer.

17         Is this agreeable to you?

18         THE WITNESS:  Yes.

19         THE COURT:  Mr. Martinez, you may proceed.

20

21

22

23

24

25

1                           BONNIE LOSE,

2    called as a witness herein, having been first duly sworn,

3    was examined and testified as follows:

4

5                        DIRECT EXAMINATION

6    BY MR. MARTINEZ:

7        Q.   Your name, please?

8        A.   Bonnie Lose.

9        Q.   Who do you work for?

10       A.   The Maricopa County Sheriff's Office.

11       Q.   What do you do for them?

12       A.   Detention officer.

13       Q.   And how long have you been so employed as a

14   detention officer?

15       A.   Fourteen years.

16       Q.   And are you familiar with the psych unit at

17   Durango?

18       A.   Yes, I am.

19       Q.   Are you assigned there?

20       A.   Yes, I am.

21       Q.   How long have you been assigned to that unit?

22       A.   About four years.

23       Q.   What are your hours of work?

24       A.   6:30 in the morning to 2:30 in the afternoon.

25       Q.   Do you work with somebody by the name of Dawna

1  Harris?

2      A.   Yes.

3      Q.   Ma'am, back in September of 2003, an inmate by

4  the name of Wendy Andriano was transferred to the psych

5  unit, right?

6      A.   Yes.

7      Q.   And this was after an appeared, or what could be

8  termed an attempted suicide.  Is that what you were told?

9      A.   Yes.

10      Q.   Did you have occasion to look at where the injury

11  was on the attempted suicide?

12      A.   Yes.

13      Q.   Why don't you, by pointing to your hand, if you

14  would stand up, show us where you saw the injury?

15      A.   (Witness complies.) Left elbow.

16      Q.   You're pointing right, sort of in the crook of

17  the elbow?

18      A.   Yes.

19      Q.   And you were never able to see the actual injury

20  itself, were you?

21      A.   No.

22      Q.   That's where the bandages were, right?

23      A.   Right.

24      Q.   Ma'am, this past Sunday, did you have occasion to

25  see Joyce Van Every and the defendant conversing or looking

1    over some paperwork?

2        A.    No.

3        Q.    Did you have occasion to have her take a look at

4    a letter or something like that, the defendant?

5        A.    She had a letter, yes.

6        Q.    And did you have occasion to see whether or not

7    someone by the name of Escobar was looking at the letter

8    for her?

9        A.    Yes.

10       Q.    What is his name, again?

11       A.    Roberto Escobar.

12       Q.    Is he a registered nurse there?

13       A.    Yes, he is.

14       Q.    And were you able to hear that conversation

15   involving this letter?

16       A.    Part of it.

17       Q.    And what part did you hear?

18       A.    I heard Escobar telling her that she should not

19   read it as it was rehearsed.

20       Q.    What are you talking about, the statement that

21   she had there?

22       A.    Right.

23       Q.    And where was this conversation taking place?

24       A.    Just outside C pod.

25       Q.    Do you know what reading they were talking about

1   that should not be read as rehearsed?

2            MR. PATTERSON:  Can we approach, please.

3            (Bench conference was held outside the hearing of

4   the jury.)

5            MR. PATTERSON:  My sense is that this discussion

6   pertains to her allocution, the statement she's going to

7   make tomorrow.  It's nothing privileged at this point just

8   seems to me that she has a right to some reasonable

9   expectation of privacy when she was talking with people

10  about her legal presentation; albeit not necessarily with a

11  lawyer.  It's just there has to be some limitation where

12  you can go.  These guys were eavesdropping on my client.

13           THE COURT:  Mr. Martinez.

14           MR. MARTINEZ:  The place is a jail.  One of the

15  things they want the jury to believe is that she is this

16  young woman who is absolutely -- I'm going to use the term

17  "angelic" who is to be admired, is a very special person.

18           I just want to show that she is being treated

19  differently.  That's contrary to what their witnesses

20  testified.

21           THE COURT:  You made your point.

22           I'll sustain the objection.

23           (Bench conference concluded.)

24           THE COURT:  Mr. Martinez, ask another question.

25      Q.   BY MR. MARTINEZ:  Did there ever come a time when

1   you also saw some papers being spread out all over the

2   table that were legal papers?  This might have been in July

3   of 2004, involving the defendant?

4       A.   Yes.

5            MR. PATTERSON:  Judge, same objection.

6            THE COURT:  Sustained.  Let's move on.

7       Q.   BY MR. MARTINEZ:  That was a different

8   individual, though, that you saw, not Mr. Escobar?

9       A.   Right.

10      Q.   Was there ever a time when the movie Double

11  Jeopardy was shown to the people in C pod or the psych

12  unit?

13      A.   Yes.

14      Q.   How about the people in the general population,

15  do they get a VCR movie screen shown to them?

16      A.   No.

17      Q.   So it's probably, if you want to watch a movie, I

18  guess -- is the treatment a little bit better in the psych

19  unit than it is in the rest of the facility?

20      A.   They get a few different privileges than the

21  general population.

22      Q.   Such as what, movies, we just talked about.  What

23  else?

24      A.   Movies, they get patio access.

25      Q.   What's patio access?

1      A.    We open up the patio doors and they can go out on

2    the patio for an hour or more.

3      Q.    One of the things we have in front of us the one

4    of the inmate by the name of Long Hair Horace.   Said that

5    she would give up patio, all of the c pod perks.   Patio is

6    going outside?

7      A.    Right.

8      Q.    What other C pod perks are there beside movies?

9      A.    They get groups.   They get to do activities,

10   coloring on paper.

11     Q.    And was there ever a time when Ms. Van Every

12   showed a movie?

13     A.    Yes.

14     Q.    Do you remember the movie, Double Jeopardy?

15     A.    Yes.

16     Q.    What is this movie about?

17     A.    It's about a woman that goes on and kills her

18   husband.

19     Q.    What was Ms. Every's comment after this movie

20   plaid.

21           MR. PATTERSON:  Objection.  Relevancy.

22           THE COURT:  Sustained.  Let's move on.

23     Q.    BY MR. MARTINEZ:  Did it pertain to Ms. Andriano

24   --

25           MR. PATTERSON:  Objection.

1          THE COURT:  Sustained.  Let's move on.

2      Q.  BY MR. MARTINEZ:  In terms of Roberto Escobar and

3  this issue about the shampoo, were you privy to that?

4      A.  No.

5      Q.  In other words, did somebody by the name of Donna

6  Anderson come to you?

7      A.  Yes, she did.

8      Q.  And what did she tell you?

9      A.  She told me that she wanted to speak to me about

10  something.

11      Q.  What was that?

12      A.  She was telling me he brought in some shampoo for

13  Andriano.

14      Q.  Okay.  And?

15      A.  That it was going to be part of her treatment and

16  that it would be their secret.

17      Q.  Why was she coming to you if it was part of the

18  treatment?

19      A.  Because she didn't -- she knew that it shouldn't

20  go in without it going to everybody, not just Andriano.

21      Q.  Was there ever a conversation that you had with

22  Andriano about her writing a book?

23      A.  Yeah.

24      Q.  And what did she say?

25      A.  She said that she was writing a book with Joyce.

1   Q.   Joyce who?

2   A.   Van Every.

3        MR. MARTINEZ:  I don't have anything else.

4        THE COURT:  Mr. Patterson?

5        MR. MARTINEZ:  I have no questions, Judge.  Thank

6   you.

7        THE COURT:  Are there any further questions of

8   the witness by the jury.  If so please raise you hand.  No

9   one has raised their hand.

10        May this witness be excused?

11        MR. MARTINEZ:  Yes, sir.

12        MR. PATTERSON:  Yes, thank you very much.

13        THE COURT:  You are excused.

14        Mr. Martinez.

15        MR. MARTINEZ:  State calls Brad Bayless.

16        Judge, may we approach?

17        (Bench conference was held outside the hearing of

18   the jury.)

19        MR. MARTINEZ:  He was sitting outside.  When I

20   went to get him now he's not there.  I told him to make

21   sure you don't leave.  I checked the bathroom.  I don't

22   know where he is.

23        THE COURT:  Did you check the stalls?

24        MR. MARTINEZ:  Yes, sir.  I went everywhere.  I

25   couldn't find him, sir.

1          MR. MARTINEZ:  I have his cell phone.  I can call

2   him.

3          MR. MARTINEZ:  He was under the impression he

4   would leave to the parking lot and come back each.  It's

5   going ot be five minutes for him to walk up.

6          THE COURT:  Okay how long is he going to be on

7   direct examination?

8          MR. MARTINEZ:  Half an hour to 45 minutes.

9          (Bench conference concluded.)

10          THE COURT:  Ladies and gentlemen, we're going to

11   take our evening recess at this point in time.  During the

12   recess, remember the entire admonition I have given.  Don't

13   discuss the case with anyone.  Don't let anyone discuss

14   with you.  Don't do any research, investigation,

15   experimentation or testing on your own.  Avoid any and all

16   media of this case.  Keep an open mind.

17          We'll see you tomorrow at 1 p.m.

18          I'll stay here with counsel.  Have a nice evening

19   here.

20          (Jurors exited.)

21          THE COURT:  Please be seated.  This is Cause

22   Number CR2000-096032, State of Arizona versus Wendi

23   Elizabeth Andriano.

24          The record will reflect the presence of the

25   defendant and counsel.  We're outside the presence of the

1  jury.

2        I've given counsel yesterday copies of the draft

3  final instructions relating to Phase III.  Was there

4  anything either one of you wanted to put on the record in

5  that regard?

6        MR. MARTINEZ:  Judge, I don't have them with me

7  and quite frankly, I haven't reviewed them.

8        MR. PATTERSON:  My suggestion, Judge, we not do

9  go on the record at this point.  I made notes on your

10 draft.  When we sit informally I'll tell you what I think

11 is appropriate.

12       THE COURT:  That's fine.  We'll go ahead and

13 recess at this point in time.  I'll meet with counsel

14 informally in chambers and then give you a full opportunity

15 to put any objection on the record with regard to

16 instructions.

17       We'll be in recess.

18       (Proceedings adjourned.)

19

20

21

22

23

24

25

EXHIBIT CCC

05-0002
Braccio



IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. CR2000-096032 |
| | ) | CR05 0005-AP |
| WENDY ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

BEFORE:   THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 15, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

1

2

3                         A P P E A R A N C E S

4

5

6

7        For the State:

8                        Mr. Juan M. Martinez

9                        Deputy County Attorney

10

11

12

13

14        For the Defense:

15                        Mr. Daniel B. Patterson

16                        Mr. G. David Delozier, Jr.

17                        Office of the Public Defender

18

19

20

21

22

23

24

25

3

1

2

3                          I N D E X

4  WITNESSES:                                            PAGE

5

6    MICHAEL BRAD BAYLESS

7        Direct Examination by Mr. Martinez          12

8        Cross-Examination by Mr. Patterson          27

9        Redirect Examination by Mr. Martinez        38

10       Recross Examination by Mr. Patterson        44

11       Redirect Examination by Mr. Martinez        46

12       Examination by the Court                    48

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1

2

3                              E X H I B I T S

4

5

6     NUMBER:              DESCRIPTION        MARKED    ADMITTED

7     550                  Photographs                    75

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2

3          THE COURT:  This is Cause Number CR2000-096032,

4   State of Arizona versus Wendy Elizabeth Andriano.

5          The record will reflect the presence of the

6   defendant and counsel.  We're outside the presence of the

7   jury.

8          I provided counsel with the final instructions

9   for Phase III.

10          I just received a few minutes ago, a few moments

11   ago, a written objection to the burden of proof instruction

12   -- I haven't read this -- from Mr. Martinez.

13          I'll hear from counsel.

14          Mr. Martinez.

15          MR. MARTINEZ:  What I'm objecting to is the

16   language that says neither the State nor the defendant has

17   the burden of proving that the weight of the mitigation is

18   or is not sufficient to call for leniency.  I believe that

19   misstates the law.

20          In doing my research, I believe that comes from

21   State versus Strasel (phonetic) in which the Supreme Court

22   was conducting its de novo review.  I believe that's where

23   the plank comes from.  That's where I was able to pick it

24   up from.

25          But the holding with Strasel was not that the

1   burden of proof changes, the burden of proof still stays

2   with the defendant.  And so, I believe that's a

3   misstatement of the law.

4           Otherwise, I guess if that weren't the case, they

5   wouldn't go first and then go last because they still have

6   the burden of proof.  So what I'm saying, I guess, is the

7   procedure reflects the state of the law which is that they

8   have the burden of proof by a preponderance of the evidence

9   to prove that the factors are sufficiently substantial to

10  warrant leniency.

11          THE COURT:  Thank you.

12          Mr. Patterson?

13          MR. PATTERSON:  Judge, I was just presented with

14  this issue.  I was just -- Mr. Delozier did point out an

15  internal apparent inconsistency with the proposed

16  instructions.  If you look at the top of page 6, you do

17  describe the defendant has had the opportunity to prove

18  existence of mitigating circumstances by the preponderance

19  of the evidence.  Then when you go to page 10, it says

20  neither the State nor the defendant has the burden of

21  proving whether the mitigation is sufficiently substantial

22  to call for leniency.

23          So, that does appear to be internally

24  inconsistent.

25          THE COURT:  You know, I think you're -- let me

1   see counsel at the bench for just a moment.      Not on the

2   record.

3              (Bench conference was held outside the hearing of

4   the court reporter.)

5              THE COURT:  Back on the record.

6              Mr. Patterson.

7              MR. PATTERSON:  It seems to me the more I look at

8   it, you may be addressing two different propositions with

9   those two ideas or issues.  One is proving mitigating

10  circumstances.  And then, that may be our burden making

11  proof by a preponderance of the evidence that this

12  mitigating factor exists.

13             The jury then moves to the next step, whether the

14  collective weight of mitigation outweighs or argue, if you

15  will, for a leniency sentence, a life sentence.

16             So, the more I look at it, I don't know if they

17  are internally inconsistent.  I think that they are

18  addressing two different propositions.

19             With regard to the specifics Mr. Martinez was

20  making in terms of his case analysis and the argument he

21  made, I haven't had time to sit down and think about it,

22  Judge.  So, I can't give you a good response to

23  Mr. Martinez at this time having just been presented with

24  this significant legal issue.

25             THE COURT:  Why don't you put on the record

1  whatever else you want to put on the record with regard to

2  the final jury, Mr. Martinez?

3          MR. MARTINEZ:  That's the only issue that I had.

4          THE COURT:  Mr. Patterson?

5          MR. PATTERSON:  Yes, Your Honor.  As we discussed

6  informally yesterday, I'm going to draw upon the old set, I

7  notice that you did eliminate some things.  You did

8  apparently capitalize Defendant as well as State.  That's

9  acceptable.  I'd still like you to uncapitalize

10  first-degree murder.  I would still like you to substitute

11  Wendi Andriano for defendant.  I would like you to

12  substitute life sentence for the concept or term leniency.

13  I would like you to change the phase names from guilt

14  phase, penalty phase, to numerical Phase I and Phase III.

15  You have changed the language from defendant claims the

16  following is mitigation to the mitigating circumstances

17  offered by Wendi Andriano are as follows, although you call

18  her "defendant" and not Wendi Andriano.

19          So, with the exception that I would wish that you

20  substitute her name for "the defendant," that change is

21  acceptable.  You've eliminated the defendant does not

22  need to testify because it's our belief she will exercise

23  her right to allocution.

24          And one final thing I didn't discuss with you

25  informally, I would ask that you remove completely the

1   paragraph that begins on old page 10.  I guess it's still

2   on page 10, Your Honor.  And it's the second line at the

3   second paragraph on that page begins:  If you unanimously

4   find that no mitigation exists then you must return a

5   verdict of death.

6           And all the lines that follow, all the way to the

7   end of that paragraph, I don't believe that that is an

8   accurate recitation of death penalty law.  I don't believe

9   that they need to go through that process.  I don't believe

10  the law requires them to essentially go through those steps

11  in order to achieve a verdict in this case.  And I think

12  it's redundant and it's accumulative instruction.  You've

13  already given them the things they need to do in this case

14  in determining the appropriate penalty at this phase of the

15  proceedings.

16          Again, I would ask you to delete page 10, second

17  paragraph commencing at "If you unanimously find," through

18  the end of that paragraph.

19          THE COURT:  Anything else, Mr. Martinez, you want

20  to place on the record with regard to some of the things

21  Mr. Patterson stated?

22          MR. MARTINEZ:  Yes.  With regard to the issue of

23  what is our page 10, if you unanimously find that

24  mitigation exists and it is sufficiently substantial to

25  call for leniency, you must return a verdict of life.  That

1   is the law.  And so, anything after that I think remains

2   there.

3          I was having some trouble following his pages.

4   But where he mentioned life sentence versus leniency, the

5   statute calls for leniency.  So, I'm comfortable or

6   actually I would request that what the Court has here

7   remain there.  I think the changes he calls for, I don't

8   think are appropriate.  I think the way you have them with

9   State and defendant is appropriate.

10          What he is asking would be akin to represented by

11   Mr. Martinez and Wendi Andriano and that sort of thing.  I

12   don't think that is appropriate here.  So the way you have

13   them with the exception, with the one exception, is

14   appropriate.  They are fine with me.

15          THE COURT:  I'm going to leave the final jury

16   instructions as is except for the issue that Mr. Martinez

17   brought up.  I want to read the written objection and also

18   give Mr. Patterson the opportunity to read that objection

19   and we can discuss it further a little bit later.

20          But in the mean time, I'll take a recess and do

21   whatever you need to do to get set up for the presentation

22   of the evidence, the conclusion of the presentation of

23   evidence to make sure everything is in order with any

24   technical equipment, that type of thing.  We'll begin with

25   the jury at one p.m.

1       I'm looking at the clock.  The clock in the

2  courtroom is off.  So, it's actually a few minutes before

3  one o'clock.  So do whatever you need to do at this point

4  in time and we'll try to get started with the jury promptly

5  at one p.m.  But, check whatever technical equipment, that

6  type thing so we don't have any unnecessary delays.  I'll

7  step off the bench for a few minutes here.

8       (Recess taken.)

9       THE COURT:  This is the trial in Cause Number

10 CR2000-096032, State of Arizona versus Wendi Elizabeth

11 Andriano.

12      The record will reflect the presence of the

13 defendant, counsel and the jury.

14      Mr. Martinez.

15      MR. MARTINEZ:  State calls Michael Bayless.

16      THE COURT:  Sir, please step forward and give

17 your name to the clerk and she will swear you in.

18      (Witness Sworn.)

19      THE COURT:  Please have a seat on the witness

20 stand, sir.  Just as a note, if you're a clock watcher, pay

21 no attention to the clock in the courtroom.  The batteries

22 went out so the time isn't correct on the courtroom clock.

23      Please make yourself comfortable on the witness

24 stand.  Please remember to speak loudly and clearly into

25 the mike so everyone can hear you.  And also please wait

12

1  until the question is complete before you answer the

2  question.   And please make sure that you give a verbal

3  response.

4          Is that agreeable to you, sir?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  Mr. Martinez, you may proceed.

7

8              MICHAEL BRAD BAYLESS,

9  called as a witness herein, having been first duly sworn,

10  was examined and testified as follows:

11

12                DIRECT EXAMINATION

13  BY MR. MARTINEZ:

14      Q.   Your name, sir?

15      A.   Michael Brad Bayless.

16      Q.   You're the same individual that previously

17  testified in this case, correct?

18      A.   That is correct.

19      Q.   My understanding is that you're a psychologist,

20  correct?

21      A.   That is correct.

22      Q.   That you've -- just sort of a refresher -- that

23  you work on hundreds of cases involving defendants in

24  Superior Court, correct?

25      A.   That is correct.

1        Q.   And I think you also told us that you work for

2    both defense and the State, correct?

3        A.   Yes, sir.

4        Q.   Have you ever worked with Mr. Patterson before on

5    cases?

6             MR. PATTERSON:  Relevance, objection.

7             THE COURT:  Overruled.

8             THE WITNESS:  Yes.

9        Q.   BY MR. MARTINEZ:  With regard to the defendant,

10   Wendi Andriano, as part of your work in the case, did you

11   go visit her in the jail?

12       A.   Yes, sir.

13       Q.   Did you conduct a clinical interview?

14       A.   Yes, sir.

15       Q.   Anything unusual happen during that clinical

16   interview between you and her?

17       A.   Other then the fact that, I think that -- well,

18   my initial interview with her was -- I had two

19   psychologists who work for me with me.

20            MR. PATTERSON:  Judge, please, the question is

21   specific and he's going afield.

22            THE COURT:  The objection is sustained.  Answer

23   the question that's asked.

24            Repeat the question.

25       Q.   MR. MARTINEZ:  Did anything unusual happen during

1  your first interview with her?  Just answer yes or no.

2      A.   Yes.

3      Q.   And who was present with you during that

4  interview?

5      A.   Doctor Lopez and Dr. Amico.

6      Q.   Do they work for you?

7      A.   Yes.

8      Q.   And tell me what happened that you considered to

9  be unusual?

10     A.   When we were leaving the interview, Dr. Amico --

11     Q.   No, not what do you think happened.  Tell us what

12  you saw?

13     A.   Okay.  I felt as though Mrs. Andriano was being

14  very flirtatious.

15     Q.   And was this in the course of this interview that

16  you did with her where you were seated just talking about

17  things?

18     A.   Yes.

19     Q.   Was she tearful during that interview?

20     A.   No.

21     Q.   And you indicated that there was two individuals

22  that were present with you.  Did they make a comment about

23  her demeanor as unusual?

24     A.   Yes.

25     Q.   What was that comment?

1       A.    They asked me very quizzically, "Was she flirting

2    with you?"

3       Q.    Have you had occasion to review the notes that,

4    the nurse notes, that are kept at the Correctional Health

5    Services?

6       A.    Yes.

7       Q.    With regard to the area where she is housed,

8    we've been told it's Durango, are you familiar with that

9    area?

10       A.    Very much so.

11       Q.    And why do you say, "very much so?"

12       A.    Over the course of the last 28 years, I've

13    probably been at Durango hundreds of times.  In the old

14    days, we would often do our examinations there on the psych

15    unit which is called D2.  But I've been to every pod in the

16    Durango facility as well as the rest of the facilities in

17    the county jails.

18       Q.    Are you familiar with the Estrella jail?

19       A.    Yes.

20       Q.    Is there a difference, if you will, between D pod

21    and the Estrella jail?

22       A.    Yes.

23       Q.    What's the difference?

24       A.    Well, in the interview room, there is, in

25    Estrella jail, there is a cage between you and the

 1   defendant.  Estrella jail typically, I think, is general

 2   population over there.  Other than that, I can't really say

 3   there's a whole lot of difference in terms of procedure.

 4      Q.   How about in terms of the amount of freedom,

 5   perks, if you will, between the D 2 and let's say general

 6   population.

 7           MR. PATTERSON:  Judge, may we have foundation for

 8   his assessment in this regard?

 9           THE COURT:  Lay some more foundation.

10      Q.   BY MR. MARTINEZ:  Do you know if there is a

11   difference between if there are perks in D2 and Estrella?

12      A.   Yes.

13      Q.   And if so how is it that you acquired that

14   knowledge?

15      A.   As a psychologist working with the correctional

16   health facility, I've been one of the psychologists on the

17   Rule 11 list for over 20 years and have been involved in

18   doing evaluations in the psych unit at Madison and at

19   Durango for over twenty years.  I'm very familiar with the

20   procedures at Durango in the D2 psych unit as opposed to

21   what goes on in general population.

22      Q.   We've been told, for example, that in D2 there

23   are VCR movies and they don't in general population.  Are

24   you familiar with that?

25      A.   I've seen that, yes.

17

1      Q.   And with regard to the D2 pods, some of the --

2   pods, I guess, have a patio where as in Estrella no one

3   gets to go out.

4           MR. PATTERSON:  He's suggesting what the answer

5   is.  He's leading.

6           THE COURT:  Sustained.  Don't lead.

7      Q.   BY MR. MARTINEZ:  Are you familiar with any of

8   the differences?

9      A.   Yes.

10     Q.   What are they?

11     A.   Well, the movement within the D2 pod is much less

12  restrictive.  There's a day room.  There is an outside

13  patio area.  Also, the amount of activity that is allowed

14  to go on in there, for example, oftentimes they're allowed

15  to have more reading material.  There are more programs

16  going on in D2 because it is a psych unit.  It's more

17  comfortable there.  You've got medical staff there.  It's

18  not in general population -- it's not as much of a

19  restrictive environment as it is in general population.

20     Q.   Were you able to take look at the progress notes

21  for the defendant, specifically on December 5 of 2003.  And

22  specifically I want to take a look at the notes from the

23  psychologist, Gerald Perry, number 325, beginning with the

24  word "she."

25          MR. PATTERSON:  May I catch up, please?

1          THE COURT:  Yes.

2          MR. PATTERSON:  Thank you, Judge.

3     Q.    BY MR. MARTINEZ:  Starting with the word "She"

4  what does it say?

5     A.    It says, "Patient asked to see me."

6     Q.    Right.  But if you can go to the, about the --

7  well, read the whole thing?

8     A.    "Patient asked to see me.  Upset and tearful that

9  she was moved to D pod for disciplinary reasons by

10  detention staff secondary found with contraband including

11  makeup mirror and staples.  She asked me to move her to the

12  G P for the 30-day disciplinary period where she knows

13  people."  I can't hardly read this.  "Does not seem to want

14  to acknowledge seriousness potential nature of accepting

15  the contraband."

16     Q.    And this -- before you go any further.  Yesterday

17  we had evidence in the form of Exhibit Number 548 that

18  there was a violation?  Can you just give us the date on

19  that one on the upper right-hand corner?

20     A.    Date and time was 12/3/03.

21     Q.    And this note here is 12/5, correct?

22     A.    That is correct.

23     Q.    So she's asking to be moved from where she is to

24  G P, general population, in lieu of the 30-day disciplinary

25  period, right?

19

1      A.   That's correct.

2      Q.   What do you make of that, using your interview

3   with her, as well as any of the other materials that you

4   have reviewed, including the police report and Sharon

5   Murphy's report, what do you make of that, taking those

6   three things into account?

7      A.   Well, I think she's using her -- and she says it

8   very clearly -- where she knows people.  She wanted to be

9   in an environment where she was more comfortable.  It was a

10  manipulative attempt to get away from the disciplinary

11  process.

12     Q.   Even though it would mean she would have to go

13  back to general population?

14     A.   That's correct.

15     Q.   If you take a look down there at December 6

16  of '03 at 1330 and why don't you read that nurse's note?

17     A.   "The patient states, 'It's hard being on

18  restriction but I've been through this before.'"  O means

19  observation. "Patient was fearful at present.  Was in her

20  room on her bed."   States, "I need a serious attitude

21  adjustment."

22     Q.   It says, "The patient is fairly neat and clean"

23  is that what it says, right?

24     A.   Right.

25     Q.   Now, if we move forward to those same notes to

1   January 27th at 2004 at 1700 hours.  Are you there yet?

2        A.   Yes, sir.

3        Q.   If you could go to the area where it refers to

4   whether or not she -- general population or G P is

5   involved.  Six lines from the bottom paragraph?

6        A.   Said, "Patient torn between requesting to go to G

7   P," meaning general population and.

8        Q.   Remain?

9        A.   Yeah, "remaining on unit while she feels she may

10  be bored here, she does not feel she can tolerate the toxic

11  environment of G P."

12       Q.   Let me ask you this:   We just read a situation

13  or a note indicating that she wants to go to general

14  population.  Now she says that she doesn't want to go.  Can

15  you, again, having spoken to her, having read all the

16  materials that are provided here, do you have an opinion as

17  to that?

18       A.   Yes.

19       Q.   What is that?

20       A.   Well, I think that it was based on what her needs

21  are at the moment and what is, whatever it is that would

22  make her most comfortable at any given time.

23       Q.   Now, about this go to February 13th of 2004 at

24  ten o'clock.  After the S, read to us what the quote is.

25       A.   I'm sorry, I can't find it.  I'm missing February

1   13th.

2       Q.    Okay.  What does it say after the S?

3       A.    "I'm down to 112 pounds.  I'm so happy."  States

4   "Zoloft is helping."

5       Q.    Okay.  I'm going to have some questions about

6   that statement.

7             She indicates that she's happy that she's losing

8   weight, doesn't she?

9       A.    Yes.

10      Q.    Again, we've been talking about her flirting with

11  you.  Now we're talking about wanting to go to general

12  population, not wanting to go to general population and now

13  is happy that her weight is dropped.

14            What does what tell you about her?

15            Again, every question that I ask is prefaced on

16  the interview that you had with her, the clinical interview

17  and the police reports as well as these notes.  What does

18  that tell you?

19            MR. PATTERSON:  Judge, object.  Beyond the scope

20  of your ruling.

21            THE COURT:  Overruled.  Go ahead and answer the

22  question.

23            THE WITNESS:  What that tells me is that there's,

24  just by simply that note alone, it tells me there is some,

25  typically some reason why she wants to be down to 112

1    pounds.  One could speculate --

2       Q.  BY MR. MARTINEZ:  Don't speculate.  But there is

3    a reason why she wants to go down.  That's what it appears

4    to be, right?

5       A.  Yes.

6       Q.  And we don't know the reason, but it appears that

7    there is a secondary motive here, right?

8       A.  Yes.

9           THE COURT:  Don't lead.

10      Q.  BY MR. MARTINEZ:  One of the things that was

11   introduced was Exhibit 544.  In it, it says in part it

12   states March 6 of 1996, it says, "She reports she signed a

13   release form which was faxed to you even though she was

14   dismissed from her job on Monday, March 4th.  She started

15   on antidepressants," and it goes on.  And it also has a

16   provisional diagnosis date of 3/1/96 and it says one of

17   major depression.

18          It basically indicates that she is depressed,

19   right?

20      A.  Yes.

21      Q.  The fact that an individual is dismissed or fired

22   from work, could that lead to depression?

23      A.  Yes.

24      Q.  So just by looking at this, we don't really know

25   what the cause of her depression is, whether it's dismissal

23

1    or something else.

2            Take a look at Exhibit 544.

3        A.    There is an indication in this note for some

4    reason, not from the depression but possibly not having

5    depression.

6        Q.    What is that?

7        A.    She stated that on some antidepressants she

8    started on some but has had bad reactions but plans to

9    recontact her doctor.

10           Typically individuals who are not depressed or

11   who do not have serious depression do not do well on

12   antidepressants.  They're very woozy.  Sometimes they get a

13   negative reaction in terms of feeling dizzy.  Seeming not

14   all there, so to speak.  They complain about it.  And which

15   suggests that possibly their depression is not as one

16   reports.

17       Q.    One of the other things we had in this case was

18   that we had somebody by the name of Sharon Murphy opine

19   with regard to the defendant's behavior when she spoke or

20   gave an interview for the police on October 8th, 2000.  And

21   one of the things she indicated was that as a victim or a

22   battered woman, that could explain why she was being, if

23   you will, just speaking back and forth with the police

24   officer laughing, and not shedding any tears.

25           Is that your opinion based on your experience?

1    A.    No.

2    Q.    And what is your opinion of what was going on

3  there?

4    A.    I think that there really wasn't an attachment as

5  to what really had taken place.  I think there was a,

6  again, a secondary gain to her behavior.

7    Q.    When you say "secondary gain to her behavior"

8  what do you mean?

9    A.    Well, when she had interviewed with the police

10  officers and was talking to them, according to information

11  I read, there seemed there was a relatively calmness and

12  even to the point of her laughing at different times.

13  There also seems like a lack of remorse or any type of

14  anxiety reaction that one would expect in this domestic

15  violence situation where a death occurred.

16    Q.    Additionally, one of the things that Sharon

17  Murphy indicated that in striking Mr. Andriano, that the

18  defendant was manifesting something called "Battered

19  Woman's Syndrome"?

20        MR. PATTERSON:  Objection.  That term was never

21  used by Dr. Murphy.

22        THE COURT:  Sustained.

23        Rephrase the question.

24    Q.    BY MR. MARTINEZ:  She has battered woman.  Are

25  you familiar with the term "battered woman?"

1    A.   Yes.

2    Q.   What is it?

3    A.   "Battered woman" is a term that was actually

4  coined by Dr. Walker.  It is pretty much akin to a symptom

5  picture allegedly as to posttraumatic stress disorder.

6  There are some symptoms that a battered woman may have that

7  does not fit the full criteria for PTSD.  But battered

8  women typically have a symptom picture of intrusive

9  recollections of events.  There may be a psychic numbing

10  process.  There is a tendency to have an exaggerated

11  startle response.  So forth and so on.  There are several

12  symptoms of quote unquote battered women.

13    Q.   In this case, in your review, again, of the

14  materials and what you know about this case, would you

15  concur with Ms. Murphy that that's what was happening here,

16  nothing more than battered woman?

17    A.   No.

18    Q.   Why not?

19    A.   I did not see nor did the materials in which I

20  reviewed nor during my clinical interview substantiate any

21  of those types of symptoms at this type of symptom

22  picture.  I did not see the symptom picture that one would

23  expect to see with battered women.

24    Q.   With regard, other people have indicated that she

25  tears up frequently.  Did she tear up frequently with you

1    when you were doing your clinical interview?

2         A.    No.

3         Q.    Did you touch upon subjects such as her children

4    when you were doing this interview?

5         A.    Yes.

6         Q.    Did you touch upon on her husband when you were

7    doing this interview?

8         A.    Yes.

9         Q.    And through all of that, she did not tear up with

10   you?

11        A.    No.

12        Q.    We have other people, for example, the health

13   care worker she worked with who indicated she teared up

14   frequently.  We also have Sharon Murphy indicated that she

15   tears up frequently.

16             Based on your experience with her and having read

17   the documentation in this case, do you have an explanation

18   as to why she tears up with them and not with you?

19        A.    Again, I believe that's secondary gain.

20        Q.    What does that mean?

21        A.    It means she's going to get something from it.

22   That she is able to use that as a manipulative way to get

23   people to respond to her positively.

24        Q.    The other thing, are you familiar with the

25   documentation involving the supposed attempted suicide in

1   this case?

2      A.   Yes.

3      Q.   And did you read both the materials from the

4   Correctional Health Services nurses notes as well as the

5   report from the Maricopa Medical Center to which she was

6   taken to be treated?

7      A.   Yes.

8      Q.   In your opinion, was that a serious suicide

9   attempt?

10     A.   No.

11          MR. MARTINEZ:  I don't have anything else.

12          THE COURT:  Mr. Patterson.

13          MR. PATTERSON:  Thank you, Judge.

14          If I can ask to have a moment to get organized?

15          THE COURT:  Yes.

16

17                    CROSS-EXAMINATION

18   BY MR. PATTERSON:

19     Q.   You have the medical information there,

20   Dr. Bayless?

21     A.   Correctional Health Services?

22     Q.   Yes, sir.

23     A.   Yes.

24     Q.   There's a note dated 9/27/03, 2210 hours?

25     A.   Yes, sir.

1      Q.   Says "man down", quote, seizure position, close

2   quote?

3      A.   Yes.

4      Q.   It says, "O," which means observation, right?

5      A.   Yes.

6      Q.   "Inmate found lying on floor."  The inmate in

7   this note is Wendi Andriano, correct?

8      A.   I assume that's the case, yes.  It doesn't say

9   here.

10      Q.   These are Wendi Andriano's progress notes, if you

11   look at the top, correct?

12      A.   Yes.

13      Q.   So you have no reason to believe that's not

14   talking about this particular inmate, do you?

15      A.   That's correct.

16      Q.   "Inmate found lying on floor.  D O," detention

17   officer, "is holding pressure over a," quote, "laceration

18   on left hand," close quote, "from 5th digit forward,"

19   correct?  Am I reading it accurately?

20      A.   Says, "from 5th digit to wrist."

21      Q.   "Left hand," right?  LAC is laceration, right?

22      A.   Yes.

23      Q.   So it says, "laceration on left hand from 5th

24   digit forward," correct?

25      A.   No.  It says, "from 5th digit toward wrist."

1    Q.   I'm sorry.  I said forward not toward.

2         "Approximately 200 CCs," right?

3    A.   Yes.

4    Q.   What's EBL?

5    A.   I'm not familiar with that.

6    Q.   "Appears there are 200 CCs of blood on the bed

7  and on the floor."  Is that a fair reading of that note?

8    A.   It says, "EBL on the bed and on floor."  I'm

9  assuming that means blood.

10   Q.   Correct.  How big is a CC?  About a quarter of an

11 inch?

12   A.   One centimeter is about -- yeah, if that.  A

13 little less than a quarter inch.

14   Q.   Squared?

15   A.   Not squared.

16   Q.   Cubic?

17   A.   Well, a quarter of an inch is probably about like

18 that.

19   Q.   But a CC is cubic centimeter, right?

20   A.   Cubic centimeter of volume, yes.

21   Q.   That's what the note says, "Approximately 200

22 CCs"?

23   A.   Yes.

24   Q.   Okay.  So we multiply this dimension by 200?

25   A.   No.

1       Q.   How much is 200 CCs of blood?

2       A.   About that much.

3       Q.   That's quite a bit of blood, don't you think?

4       A.   No, not really.  Depends on -- I mean, wounds are

5   wounds.  You say it's a lot blood, I mean, no.

6       Q.   Okay.  "Inmate is awake, eyes closed and she was

7   stating help me," correct?

8       A.   Yes.

9       Q.   Okay.  "Skin is pale and dry?"

10      A.   Yes.

11      Q.   Looks like, what is that Bucca, is that bucal

12   membrane?

13      A.   Yes.

14      Q.   "Dry and pale?"

15      A.   Yes.

16      Q.   What does that mean?

17           MR. MARTINEZ:  I'm going to object.  Beyond the

18   scope.  He's not a doctor.

19           THE COURT:  Overruled.  Go ahead and answer if

20   you can.

21           THE WITNESS:  I'm not sure.

22      Q.   BY MR. PATTERSON:  Okay.  "Bleeding to left hand

23   controlled with D O pressure something."  Right?  So it

24   appears the D O is holding her hand in an effort to staunch

25   the bleeding?

1      A.   Yes.

2      Q.   Puncture wound, left," it says, "A C area.

3   Bleeding," correct?

4      A.   Yes.

5      Q.   "Open area approximately one centimeter,

6   rounded," correct?

7      A.   That's correct.

8      Q.   So it appears that she has another laceration in

9   the upper area of this left arm, about one centimeter in

10   dimension, correct?

11      A.   That's what it looks like.

12      Q.   Okay.  "Nine-one-one call." What does that

13   suggest?

14      A.   That there is an injury.

15      Q.   An emergency, medical attention is necessary,

16   correct?

17      A.   Yes.

18      Q.   "I M transported in timely manner to Maricopa

19   Medical Center emergency room for evaluation of

20   self-inflicted wound."  Is that what that note says?

21      A.   Yes, sir.

22      Q.   So nine-one-one was called.  Wendi was

23   transported to the Maricopa Mental Center for medical

24   treatment, correct?

25      A.   Yes, sir.

1      Q.    They also found that, below that note, O again

2   that means observation, right?

3      A.    Yes.

4      Q.    "Inmate," again referring to Wendi Andriano, "has

5   written a suicide note which is a top the," -- I can't read

6   that word?

7      A.    Bunk.

8      Q.    "Surrounded by various pictures of children

9   reportedly inmate's children."  Did I read that accurately?

10     A.    Yes.

11     Q.    So left a suicide note, correct?

12     A.    Yes.

13     Q.    And around that note, she apparently placed

14  photographs of her children?

15     A.    Yes.

16     Q.    Okay.  The first note that you read on direct was

17  from 12/3, correct?

18     A.    Yes.

19     Q.    Okay.  I'm sorry.  It was 12/5 I believe was the

20  first note you read from, correct?

21     A.    No, it was 12/3.

22     Q.    Was it 12/3?

23     A.    Yes.  Maybe it was the first note.  I read 12/3

24  too, I'm sorry.  You're accurate.

25     Q.    I think it was 12/5?

1       A.   Yes, you're accurate.

2       Q.   "Patient asked to see me.  Upset and tearful that

3  she was moved to D pod for disciplinary reason by detention

4  staff."  Is that accurate?

5       A.   Yes.

6       Q.    "After being found with contraband including a

7  makeup mirror and staples, she asked me to move her to PG,

8  general population, for the entire 30-day disciplinary

9  period where she knows people."  That's what you read,

10  correct?

11       A.   That's what it looks like to me.

12       Q.   And then you also had, "Does not seem to want to

13  acknowledge serious potential nature of accepting

14  contraband," correct?

15       A.   Yes.

16       Q.   And then reading on it says, "Maintain on D2 as

17  L R E on D pod 30 days.  Not stable for move to general

18  population." Correct?

19       A.   That's correct.

20       Q.   And this was Dr. Perry's notes?

21       A.   Yes.

22       Q.   And it's his assessment on December 5, '03 that

23  she was not stable to move to general population, correct?

24       A.   That's what it says.

25       Q.   And then nursing notes that follow that in

34

1    sequence says, "The patient states, quote, 'It's hard being

2    on restriction but I've been through this before.'"

3            Here the patient is tearful and at present was in

4    her room on her bed.  States, quote, I need a serious

5    attitude adjustment, close quotes.  Yes?

6        A.    Yes.

7        Q.    The next note that you read was January 27, '04,

8    correct?

9        A.    I believe that was the one that Mr. Martinez

10   showed me.  I don't have it in my notes.

11       Q.    Okay.  At the close of that note it says,

12   "Patient benefiting from therapeutic environment."  Do you

13   see that?

14       A.    Again, I don't have that note in my records.

15       Q.    Okay.

16       A.    If you can show it to me.

17       Q.    Yeah.  At the base of that note it says, "Patient

18   appears to be benefiting from the therapeutic environment,"

19   correct?

20       A.    Yes.

21       Q.    And then read the line right above that.  That

22   too has some reference to some medical therapeutic

23   conclusion that the staff is making with regard to that

24   particular patient, doesn't it?

25       A.    I'm sorry, what's the question?

1     Q.    The line above it, would you read that for us,

2  too?

3     A.    "Need for psych stabilization justifies D2 and

4  LRE."

5     Q.    Is that again a confirmation that she had a

6  medical need to remain in that particular unit in the

7  opinion of this note taker?

8     A.    In the opinion of the note taker, that's true.

9     Q.    Okay.  And then the last reference you made to

10  the medical notes were 2/13/04, you have that one, right?

11     A.    Your question?

12     Q.    You have the note before you?

13     A.    On 2/13/04?

14     Q.    At ten o'clock.

15     A.    Yes.

16     Q.    That note was read to you -- that portion was

17  read to you earlier, weekly nursing note, quote, "I'm down

18  to 112 pounds.  I'm so happy."  Is that what you read for

19  us earlier?

20     A.    Yes.

21     Q.    Continuing with that entry it says, states,

22   "Zoloft is helping."

23           What is Zoloft?

24     A.    Antidepressant.

25     Q.    So "I'm so happy" and then states, "Zoloft is

1   helping."  That suggests that the medication is doing what

2   it was designed or intended to do, correct?

3        A.   That's what it says.

4        Q.   Further reading on, it says, "It's allowing her

5   not to obsess over things."  Is that what it says?

6        A.   Correct.

7        Q.   Zoloft appears to be working, correct?

8        A.   Yes.

9        Q.   Reading down -- well, let's read it all.  "Denies

10  problems on unit.  Is medically or med compliant."

11           Again, observations from the nurse.  "Alert,

12  oriented, good hygiene."  Next line says, "remains

13  fragile."

14           What does that mean in a psychological sense?

15       A.   Emotionally fragile.

16       Q.   Can you explain what that means?

17       A.   Hypersensitive.

18       Q.   Reading on, it says, "Easily tearful."  Is that

19  related in some fashion to being emotionally fragile?

20       A.   Yes.

21       Q.   "Social with peers, cooperative, articulate,

22  compliant with treatment."  That's right?  Am I reading

23  that correctly?

24       A.   That's correct.

25       Q.   "Patient continues" -- what's "SVTP" mean?

1     A.   I believe that means continue treatment.

2     Q.   In February of '04, she's on a treatment plan

3  she's taking the Zoloft.  It appears to be working.  But

4  she's still emotionally fragile.  Is that the sum and

5  substance of that note?

6     A.   That's what it says.

7     Q.   Okay.  All right.  You told us that often in your

8  experience patients who resort to tears are often trying to

9  manipulate the observer?

10     A.   No, I don't think I said that.

11     Q.   How are tears germane to anything in this

12  particular case, in your opinion?

13     A.   What I said was that an individual could use

14  tears or use their seemingly fragile state as a means of

15  manipulation.  That's what I said.

16     Q.   Are you saying that's what she's doing?

17     A.   Yes.

18     Q.   But you tell us that she didn't manifest any

19  tears during the period of time you were with her, right?

20     A.   That's correct.

21     Q.   Wouldn't you agree that she had the most to gain

22  in this case from convincing you that she was a victim of

23  domestic violence?

24     A.   How are tears going to convince me of that?

25     Q.   Would you agree with the proposition that she had

38

1 a great deal of gain, potentially, if she could persuade

2 you that she was a victim of domestic violence being the

3 expert retained by the Government on that proposition?

4   A. She certainly told me a lot of things.

5   Q. My question calls for yes or no.  Do you feel she

6 had a great deal to gain from trying to convince you that

7 she was a victim of domestic violence?

8   A. Yes.

9   Q. Did she used any tears in that regard to try and

10 convince you that she was a victim of domestic violence?

11   A. No.

12   MR. PATTERSON:  Thank you, Judge.  That's all I

13 have.

14   THE COURT:  Mr. Martinez.

15

16       REDIRECT EXAMINATION

17 BY MR. MARTINEZ:

18   Q. What did she use to try to convince you?

19   A. She told me a lot of different --

20   Q. Let me be more direct.  Did she flirt with you?

21   A. Yes.

22   Q. Is that a way to manipulate you?

23   A. Yes.

24   Q. Is that a way to try to convince you?

25   A. Yes.

1      Q.   Are tears the only way that people use to

2   manipulate other people?

3      A.   No.

4      Q.   And is flirtation one of the ways that people can

5   manipulate other people?

6      A.   Yes.

7      Q.   And is that something that you run across not

8   only in this case but in other cases?

9      A.   Often.

10     Q.   With regard to the issue of February 13, '04, can

11  you go to that note, please?

12     A.   Okay.

13     Q.   Can you read who wrote that?

14     A.   Looks like Joyce Van Every.  I assume Van Every,

15  E-v-e-r-y.

16     Q.   It does say, "I'm down to 112 pounds.  I'm so

17  happy," right?  Is that what it says?

18     A.   Yes.

19     Q.   Is the issue of the Zoloft part of her quote or

20  is that something that's added by the writer after that?

21     A.   That's added by the writer.

22     Q.   The quote is, "I'm down to 112 pounds.  I'm so

23  happy," right?

24     A.   That is correct.

25     Q.   Did it imply she previously had been unhappy with

1    the amount of weight she had gained?

2         A.   Certainly does.

3         Q.   If we go to 1/27/04, if you have that?

4         A.   I have it.

5         Q.   You do have that?  Who wrote that note?

6         A.   Wow, 1/27?

7         Q.   Let me show you mine.

8         A.   L. King.

9         Q.   In all the times that you have -- how long have

10   you been practicing?

11        A.   Twenty-eight years.

12        Q.   In those 28 years you've been practicing, have

13   you ever made it a special effort to go in on your time to

14   comb somebody's hair?

15             MR. PATTERSON:  Judge, objection.  Beyond the

16   scope

17             THE COURT:  Overruled.

18             You can answer the question.

19             THE WITNESS:  No.

20        Q.   BY MR. MARTINEZ:  Do you have the note from 1/25,

21   from 12/5/05?  Do you have that note?

22        A.   12/5/05?

23        Q.   Yes. '03.  I'm sorry, '03.

24             THE COURT:  12/5/03?

25             MR. MARTINEZ:  Correct.  I'm sorry.

1          THE WITNESS:  Yes, sir.

2     Q.   BY MR. MARTINEZ:  You were asked whether or not

3  it indicates by the writer that she was not stable to move

4  to G P or general population, correct?

5     A.   That's correct.

6     Q.   Even though he feels she's not stable to move to

7  G P, she's still asking for it, isn't she?

8     A.   Yes.

9     Q.   He's saying, "She asked me to move her to G P,

10 general population, for the 30-day disciplinary period

11 where she knows people," right?

12    A.   That's correct.

13    Q.   And she wants to avoid this disciplinary action,

14 right?

15    A.   Correct.

16    Q.   And according to him does not --

17         MR. PATTERSON:  Wait.  Wait.  Objection to the

18 form of the question.  Doesn't suggest that she wants to

19 avoid it.

20         THE COURT:  Sustained.

21         Rephrase the question.

22    Q.   BY MR. MARTINEZ:  Just read what it says before

23 that.  "S O" and than read the part starting "patient."

24    A.   "Patient asked to see me.  Upset and tearful that

25 she was moved to D pod for disciplinary reasons by

42

1   detention staff.  Secondary to being found with contraband

2   including makeup mirror and staples."

3        Q.   Read what continues after that?

4        A.   "She asked me to move her to general population

5   for the 30-day disciplinary period where she knows people."

6        Q.   Go ahead.

7        A.   "Assessment, does not seem to want to acknowledge

8   serious, potential nature of accepting the contraband."

9        Q.   Okay.  That was the point I wanted to make.

10            You were asked about the supposed suicide

11  attempt?

12       A.   Yes.

13       Q.   Take a look at your notes of September 29, '03 at

14  six p.m. by Laura King, September 29.  What did she say

15  about this suicide attempt?  It's 1800 if you have that.

16  Let me point it out to you.  Right there.

17       A.   Says, "I guess I just panicked.  That officer

18  lied to me and I felt trapped.  I knew I would be in lock

19  down during my trial and I just couldn't do it.  I just

20  freaked out."

21       Q.   That's also talked about a suicide note.  Doesn't

22  she also say that it was an impulsive act?

23       A.   Yes.

24       Q.   And, again, is this something that you considered

25  in determining whether or not you considered this to be a

1   real, if you will, suicide?

2       A.   Yes.

3       Q.   And you indicated that you didn't think it was a

4   real suicide.  Why is that?

5       A.   Well, there's many ways to harm yourself.

6   Attempting to kill yourself with a pencil, a leaded pencil

7   in the jail  -- I don't know if you've ever played golf,

8   it's like those golf pencils, a tiny pencil for the golf

9   card.

10      Q.   Take a look at Exhibit 549.  Is that what it is?

11      A.   Yes.  That's very difficult to kill yourself

12  with.  Stab yourself in the arm with that or to -- and I

13  questioned -- if you look at the records on that, I kind of

14  questioned that also because the laceration was not

15  jagged.  The medical record indicate that the laceration

16  was sutured and smooth.  There is no indication of jagged

17  or ripping or tearing.  In order for you to rip your arm, I

18  think there was a two or three centimeter cut.  One would

19  have to put the pencil in and rip the arm.  There is no

20  ripping in this situation.

21      Q.   Additionally, one of the things you were asked

22  about was 200 CCs of blood?

23      A.   Yes.

24      Q.   It does say "approximately," doesn't it?

25      A.   That's correct.

44

1        Q.   Do you know whether or not there was anybody

2   measuring it to see how much blood she actually lost?

3        A.   I questioned that.  You know -- I don't know how

4   they measure that.

5             MR. MARTINEZ:  I don't have any other questions.

6             MR. PATTERSON:  For completeness, can I just read

7   into the record the balance of the note from 9/29/03?

8             THE COURT:  What date?

9             MR. PATTERSON:  9/29/03 was raised the first time

10  on redirect.

11            THE COURT:  That's fine.

12

13                    RECROSS-EXAMINATION

14  BY MR. PATTERSON:

15        Q.   You have the note before you, Dr. Bayless?

16        A.   9/29/03?

17        Q.   Yes.  This is about one, two -- six lines down.

18  Starts, "she came?"  See where I'm reading?

19        A.   9/29/03?

20        Q.   Says 1800 hours.  One you just read from.

21        A.   Okay.  She came to D2.

22        Q.   Yes.  That says, "She came to D2 after panicked

23  and impulsive suicidal gesture which was too successful."

24        A.   Yes.  That's what it says.  I mean, that says

25  "gesture" meaning that --

1     Q.   I understand what it says.  But the word is t-o-o

2  successful, meaning a range or an extreme, so to speak?

3          MR. MARTINEZ:  Objection.  The word speaks for

4  itself.

5          THE COURT:  Sustained.

6     Q.   BY MR. PATTERSON:  As opposed to t-w-o or t-o,

7  correct?

8     A.   I think the operative term here is that she

9  panicked and impulsive suicidal gesture which says in the

10  first place it wasn't a real suicidal attempt.

11     Q.   But this gesture that's described here, according

12  to this note taker, was too successful, t-o-o successful.

13  So it may have started out as a gesture, it had potential

14  consequences, according to this note taker, correct?

15     A.   I'm not sure what you mean by "consequences."

16     Q.   Well, it was an effort that was too successful,

17  according to this note taker?

18     A.   Well, it got other people's attention, that's for

19  sure.  If you look further back at the other notes at the

20  medical center when she went to MCC, the amount of sutures

21  and the care that it took to deal with this was very

22  minimal.

23     Q.   In any event, it says that this effort was "too

24  successful?"

25     A.   That's was, L. King's perception.

1          MR. PATTERSON:  Thank you.

2          THE COURT:  Are there any further questions?

3          MR. MARTINEZ:  Judge, may I complete the

4     thought.

5          THE COURT:  Very briefly.

6

7                    REDIRECT EXAMINATION

8     BY MR. MARTINEZ:

9          Q.   Later on down there doesn't it say, "Patient has

10    degree in accounting and real estate license."

11         MR. PATTERSON:  Wait.  Wait.  That's beyond the

12    scope of --

13         THE COURT:  Let me have counsel approach.

14         (Bench conference was held outside the hearing of

15    the jury.)

16         MR. PATTERSON:  It doesn't relate to suicide.

17         MR. MARTINEZ:  He did raise that part of what she

18    said.  It's right there and mine is at the bottom of the

19    note.

20         THE COURT:  Does it relate to the suicide attempt

21    note, what you're talking about?

22         MR. MARTINEZ:  What I'm saying is that if she is

23    making these observations, too successful, based on

24    information that's erroneous.

25         THE COURT:  I'm going to sustain the objection.

1        (Bench conference concluded.)

2        THE COURT:  Are there any further questions of

3  the witness by the jury?

4        (Bench conference was held outside the hearing of

5  the jury.)

6        THE COURT:  The jury question is:  At any time

7  that you spent with Wendi, did she ever express any remorse

8  or responsibility for what happened to Joe?

9        MR. MARTINEZ:  No objection.

10       MR. PATTERSON:  I object.  At this point it would

11  have not been relevant to his evaluation at the time.

12       THE COURT:  I'll sustain the objection.

13       Next question:  Did Wendi flirt with either of the

14  other two associates on your first meeting?

15       Mr. Martinez.

16       MR. MARTINEZ:  No objection.

17       MR. PATTERSON:  No objection.

18       THE COURT:  Next question:  Could this

19  flirtatious behavior be considered a coping device?

20       MR. MARTINEZ:  No objection.

21       MR. PATTERSON:  No objection.

22       THE COURT:  Is it unusual for an inmate to ask to

23  be returned to a prior prison location?

24       MR. MARTINEZ:  He doesn't know, I don't think.

25       MR. PATTERSON:  It's beyond the scope.

1          THE COURT:  I'm not going to ask that.

2          THE COURT:  Next question:  Was Wendi aware that

3   everything she said to doctors while in prison would be

4   used in court proceedings?

5          MR. MARTINEZ:  Yes.

6          MR. PATTERSON:  That's fair.

7

8                         EXAMINATION

9   BY THE COURT:

10      Q.   Sir, I have some additional questions here from

11   the jury.

12          They read as follows:  Did Wendi flirt with

13   either of the other two associates on your first meeting?

14      A.   They're female, no.

15      Q.   Next question:  Could this flirtatious behavior

16   be considered a coping device?

17      A.   Coping typically refers to a way in which one

18   manages or handles stress.  This was not a way of managing

19   or handling stress.  This was a process of manipulative

20   behavior, so no.

21      Q.   Next question:  Was Wendi aware that everything

22   she said to doctors while in prison would be used in this

23   court proceedings?

24      A.   Yes.  I have -- well, I don't know about the

25   other doctors -- but before I do my examination on any

1   patient or client or inmate, the nature of the service, my

2   role in the service, is completely discussed with the

3   individual.  The purpose of my evaluation is discussed with

4   the individual, her limits of confidentiality.  That

5   information from my evaluation may be things that she tells

6   me and may be memorialized in a report and reported to

7   others.  And I also have them sign that form stating that

8   they themselves are making sure they understand the purpose

9   of the evaluation and their confidentiality rights, which

10  there really are none.

11          THE COURT:  Are there any further questions by

12  the jury?  If so, please raise your hand.  No one raised a

13  hand.

14          Are there any follow-up questions?

15          Mr. Martinez?

16          MR. MARTINEZ:  No, sir.

17          THE COURT:  Mr. Patterson?

18          MR. PATTERSON:  No, Your Honor.  Thank you.

19          THE COURT:  May this witness be excused?

20          MR. MARTINEZ:  Yes, sir.

21          MR. PATTERSON:  Yes, Judge.  Thank.

22          THE COURT:  You're excused.

23          Mr. Martinez.

24          MR. MARTINEZ:  State rests.

25          THE COURT:  Mr. Patterson.

1          MR. PATTERSON:  We have no rebuttal.

2          THE COURT:  Let me see counsel here at the

3   bench.

4          (Bench conference was held outside the hearing of

5   the jury.)

6          THE COURT:  Is she going to make a statement?

7          MR. PATTERSON:  Yes.

8          THE COURT:  Are you going to do it at this time?

9          MR. PATTERSON:  Yes.

10          (Bench conference concluded.)

11          THE COURT:  Mr. Patterson.

12          MR. PATTERSON:  Your Honor, we ask that my client

13   be allowed to make a statement to the jury?

14          THE COURT:  Please step over to the witness

15   stand.

16          MR. PATTERSON:  She prefers to stand.

17          THE COURT:  We need the podium and mike.

18          You can stand here in the middle of the

19   courtroom.

20          THE DEFENDANT:  This is my first opportunity to

21   address you guys.  I've talked to the lawyers and I want to

22   thank you very much for all of your time that you sat here

23   and had to listen to all of this stuff.  The decisions that

24   you had to make are not easy.  I'm sorry that you're in a

25   position to have to do this.

51

1          I want to comment on a couple of things that

2    happened yesterday.  I had two officers that I've known for

3    a year take the stand and say certain things about me but

4    not everything.  In my four years in jail, I've worked or I

5    have been supervised by hundreds of detention officers.

6    And in my four years, they found two that I've had a

7    problem with or they've had a problem with me.

8          Last night I went back to my housing unit and I

9    spoke to the sergeant because I was so upset about that.

10   And the sergeant told me, you know, people have different

11   personalities, they like other inmates, they like this

12   inmate, they don't like that inmate.  That's just the way

13   jail is.  You know that's the way jail is and you just have

14   to deal with it.  And I do and I understand that.

15         Those two officers didn't feel like I belonged on

16   the psychiatric unit and they wanted me out of there.  But

17   they weren't the ones that were giving me counseling.  They

18   weren't the ones that knew my emotional state or what was

19   going on with me.  They just felt that because I was higher

20   functioning and I wasn't a paranoid schizophrenic or

21   hearing voices that I didn't need to be there.  So every

22   effort on their part they tried to get me to go.

23         Even as the notes show, I tried to go because I

24   knew I was going to get write-up after write-up after

25   write-up if I didn't try to get out of there.  That's

1   something that you learn in jail.  If an officer doesn't

2   like you, you just try to remove yourself from there.  You

3   know, get out of their area or whatever.

4           And Dr. Perry wouldn't let me.  He says you're

5   not stable enough to go so you have to stay here.  So

6   during the year, I did my best to put away laundry for

7   them, clean up people's vomit on the floor, go to the cells

8   when the people that are mentally, seriously mentally ill,

9   smeared their feces on the wall, have blood everywhere and

10  I would clean that up for them.  I was just surprised they

11  took the stand and had only negative things to say about me

12  because it wasn't the whole story.

13          It was also mentioned yesterday that my mom had

14  only been to see me four times in a certain period of

15  time.  My mother, most of all, has a hard time coming to

16  see her only daughter in jail.  We have to sit behind

17  glass.  We can't touch each other.  Every word you say is

18  recorded.  And it's difficult.  It's just hard.  And so I

19  tell her to stay home and not to come see me all the time.

20  I'd rather speak to her on the phone.  It's easier.  So I

21  call my mom almost on a daily basis and I talk to her and

22  we share what's going on.

23          I had Officer Baker pull up my visits for the

24  whole four years that I've been in jail to give you a

25  better picture, a complete picture, of what the truth is.

1   And he said he stopped counting at a hundred.  He said I

2   had well over a hundred visits in the four years I've been

3   in jail.  It's been by my mother, my father, my cousin, my

4   aunt, my family members.  Okay?  So, I just wanted you to

5   see the whole picture.  I don't think it's fair that only a

6   part of it is told.

7          I also wanted to discuss the jail environment,

8   how they're portraying that the psych unit is a more

9   privileged or better place to be.  It's not.  You're

10  surrounded by people who hear voices.  They're constantly

11  wanting to commit suicide.  Who make accusations to you

12  that -- because they're delusional, I mean, you can't have

13  a normal conversation with anybody.  So for a year, I've

14  been surrounded by people with serious mental illnesses

15  that I couldn't have a normal conversation with.  All they

16  needed from me was help.  If they were suicidal, I would go

17  to the officers and tell them that.  If they were -- we

18  have a lot of older ladies that wear adult diapers and are

19  embarrassed about it so I go get diapers for them so they

20  don't have to do it.  It's been one of just helping out,

21  filling in where I could.

22          And what I've done for stimulation is read books,

23  you know.  I had my mom and dad mail me books in.  The

24  psych staff has brought me books in.  And, in fact, last

25  night when I arrived there, there was another book from

1   Dr. Perry waiting for me.  And the officers gladly handed

2   it to me.  They had no problem with it.  For some reason,

3   Loris and Harris do have a problem with it.  But the people

4   who supervise the unit, the sergeants, don't have a problem

5   with it.  I'm allowed to have books to read.  There is

6   nothing wrong with it.  There is no harm in it.  It's not

7   violating any law.

8            I was made privy to the fact that this one inmate

9   called me a "control freak."  In C pod there are certain

10  rules we have to abide by because it's a higher functioning

11  pod.  What happens is there's D and there is C.  In D pod

12  you have all the people who are trying to get stabilized on

13  their medication.  Once they get stabilized, they're moved

14  to C pod.  And they are more normal, they're more

15  stabilized and can sweep and mop and clean toilets, things

16  like that.

17           So everyday the sergeant puts up a list of items

18  that need to be accomplished by everybody in the pod and

19  we're supposed to act as a group.  Well, when everybody

20  doesn't have the mental ability to read that note and to

21  carry out the chores that are assigned to us, I would step

22  in and I would tell somebody, well, could you please clean

23  the bathroom, could you do this, that way we're all doing

24  it.  Because it becomes an issue when we don't and then we

25  get put on restriction and it's a mess.  So somebody has to

1   make sure it gets done.  So I was asked by Margaret, the

2   head counselor, if I would do that role.  And so for the

3   one inmate to call me a control freak, that may be how she

4   saw me but I was just following out what I was told to do.

5          I did ask to go back to general population

6   because I knew that as long as I stayed there Harris and

7   Loris would just try to make things difficult for me but

8   Dr. Perry would never let me go back.  He knew the stress

9   that I was under and didn't think it was a wise thing for

10  me to go back to general population.

11         And now I need to say something about

12  Dr. Bayless.  I have never flirted with that man.  In fact,

13  when he came to the jail to visit me, he did have two other

14  females with him.  They told me the purpose of why they

15  were there.  I was advised by my lawyer what I could talk

16  about and what I could not talk about.  I'd never met this

17  man before.  I'd heard lots about him, just never met him.

18  And he said that he was here to interview me and he was

19  going to be giving me some tests and whatever and I was

20  told to cooperate, so I did.  But I had one question for

21  him.  I said, "Is your job here to help Mr. Martinez put me

22  to death?"  And he started laughing.  He said that's his

23  job.

24         From that point on, I did not take our interview

25  seriously.  I had no desire to participate but I had to

1   under court order. And for Dr. Bayless to sit up there and

2   say that I flirted with him is just disgusting.

3           So, I want to address you guys now. I just had

4   to make comments to those things that happened in the last

5   couple days so you can understand everything because it's

6   not right when part of the story is told and not all of it.

7           I'm Wendi Andriano. I'm the wife of Joseph

8   Andriano. I'm the mother of Nicholas, who is seven and

9   Ashley who is six years old now. I've had absolutely no

10  contact with them in the four years that I've been

11  incarcerated.

12          Six years ago, my family was inseparable. We

13  went everywhere together and we did everything together as

14  a family. My babies were attached to my hip. From the

15  minute I come home from work I was holding Ashley and

16  Nicholas was sitting on the counter while I made dinner.

17  And I gave them all of my attention until it was time for

18  bed. I gave them a bath every night. Read to them every

19  night. Put them to bed every night and said prayers with

20  them. I have a wooden rocking chair and I would rock

21  Ashley to sleep because she was still a small baby. And

22  Nicholas would get his turn after that.

23          The references to me being a bad mom are just not

24  true. I love my children more than anything. And they're

25  the ones that have kept me going for four years in this

1  jail.

2         The three of us, we followed in daddy's shadow.

3  But it was a shadow filled with complex emotions that even

4  I, his wife, his confidant, his best friend, could not

5  fully understand.  He had incurable cancer, a history of

6  failed remedies and what he considered the worst:  A

7  complete abandonment by God.

8         We had seen other people healed through prayer.

9  But when he'd go up for prayer, nothing would happen.  So

10  why was God not healing him?  He always asked me why me.

11  Why me.  That question dominated his life.  More than

12  anything in the last years he felt completely hopeless and

13  completely angry at the world.  His life was being taken

14  away from him on a daily basis.  Excuse me.  Excuse me.

15  I'm sorry.

16         I met Joseph on Saint Patrick's Day in 1992.  He

17  was at a table laughing and drinking and having a great

18  time.  And I was instantly drawn to the sparkle in his eye,

19  his boyish charm.  I couldn't help but watch the boy who

20  was the life of the party, his laughter and mischievous

21  eyes, his gorgeous smile.  It brightened my face.  My

22  friend who was with me, Maureen, she'd never seen me like

23  that.  She went over to his table and brought him to the

24  bar.  I was shy.  I'd hoped he couldn't tell how my heart

25  was racing and my palms were moist.  It was funny how we

1  instantly fell into conversation.  It was like we'd known

2  each other for a long time.  We were in a world of our

3  own.  This wasn't the normal, trite, pick-me-up scenario

4  that you see in most bars.  This was different.  We wanted

5  to know everything about each other.  He told me about his

6  failed relationships.  About tragedy in his family.  How he

7  felt like he didn't belong.  And that no one loved him just

8  for him.  That night my heart went out to him.  I wanted to

9  take him in my arms, into the warmth of my family and

10  protect him from any more hurt.

11       And as I look back now, we were two damaged souls

12  who recognized the missing pieces in each other.  That's

13  how we connected.  And because neither one of us had been

14  raised in a healthy environment, it was a perfect match for

15  disaster.  It has taken me four years of counseling to

16  recognize this.

17       Over the four years I've grown emotionally and

18  I've gained wisdom to know that if I'm not healthy inside,

19  then I can't be in a healthy relationship.  It just doesn't

20  work.  So it was very unfair for both of us to get into a

21  relationship with all the problems that we had but we

22  didn't know any better.

23       The next two years we spent dating each other

24  cemented the roles we would live out in our marriage.

25  Excuse me.

000009025

1    As I had all my life with people around me,

2  children and church and school and the orphans in Mexico, I

3  gave my all to Joe.  I loved to pamper and spoil him.

4  Besides the normal housekeeping, I'd give him manicures,

5  massages, plucked his eyebrows and set out his clothes for

6  the next day.  He always joked around and told me he was

7  color blind but I think he just liked me to pick out his

8  clothes.  I'll never forget the time he let me give him a

9  facial peel.  He said it was such a girlie thing and it

10  took me a while to convince him but we had fun that night.

11  I put on one of those cucumber peels and we laughed all

12  night about that because it was just something fun for us.

13    Weekends we spent at the lake with his friends.

14  It was all new and exciting for me.  I wanted to be the

15  best for Joe.  So I found myself responding to his strongly

16  expressed wishes.  I cut and colored my hair.  I bought

17  clothes that he approved of.  I wanted Joe to love me for

18  me.  And that desire motivated me to give more of myself

19  than was healthy.  When he wanted a full-size Chevy truck,

20  I gave him my car.  This left me dependant on him even

21  more.  But you know what, I didn't mind.  I just really

22  wanted him to be happy.

23    Only after he was drinking a few beers was Joe

24  ever able to really open up and share his emotions with me

25  and the one dominating fact, that he missed his grandpa.

1   He would tell me so many stories about being in Oklahoma

2   with him.  His grandpa gave Joe the special attention that

3   every child needs to grow.  Joe was his grandpa's

4   favorite.  Then one terrible day, his grandpa left him.

5   Committed suicide.  That created in Joe a never ending well

6   of pain that lasted throughout his life.

7         I tried to make up for the lack of love in his

8   life.  I would do anything that helped him feel love, to

9   help him succeed in life.  I thought if I could somehow

10  absorb his pain, it would help him heal.  Then, Joe was

11  diagnosed with cancer and my need to be a perfect wife

12  intensified a hundred fold.  The cancer ripped a giant hole

13  in how we pictured our lives to be.  It stole our dreams

14  away.  Joe lost hope in the future and became angry and

15  bitter.  Not just at the world, but at me; the one he was

16  used to taking care of him and solving his problems.  He

17  wanted me to find a cure for his cancer.  I tried but I

18  couldn't.  No one could.

19        Like a pressure cooker, he would let off steam of

20  which I was the recipient.  Every time Joe was hurt by

21  outside influences, he would come home and release his

22  anger on me.  And this became normal in our lives.  But how

23  was I to blame him?  Everyone asked me why didn't you leave

24  him.  Why all this sort of stuff.  He didn't ask for this

25  cancer.  We were stuck in a cycle of emotions and we didn't

61

1    know from one moment to the next if we were going up or we

2    were going down.  And even in the middle of all this chaos,

3    I was told over and over again that what I was doing wasn't

4    good enough.  That I wasn't doing enough.  That I needed to

5    try harder.  I believed him, so I did.

6              The reality of our lives became so painful and

7    distorted that I just went away mentally.  I tried to keep

8    up appearances but things just got worse.  And in the

9    Spring of 2000, I made a terrible and devastating choice:

10   I turned to another man for my emotional needs.  I had no

11   right to do this.  I violated our marriage vows.  I

12   violated our family.  I violated my own morals.  And Joe,

13   I'm so sorry.  I could give you a million excuses but they

14   don't mean anything.  I was wrong.  And, Joe, I wish we

15   could step back in time and do things different.  I know in

16   my heart that if life would have just given us one break,

17   just one, we could have pulled ourselves up and survived.

18   But now our family is torn apart.  Why our family?

19              I keep thinking about the night when we found out

20   that the tumors in his lungs had doubled in size.  We sat

21   on the bed, we had cat scans spread all around us, laughing

22   in our faces.

23              Joe, you asked me to stay strong for our babies

24   and not let them forget you.  Maybe I didn't want to accept

25   that you were saying good-bye.  But today I know that is

1  what you were doing.  From that day forward, you shut off a

2  big part of yourself from me.  You even quit playing with

3  our babies and maybe you thought it would make your passing

4  easier on us.  But, Joseph, it made it worse.  I felt so

5  lost and alone.  The only emotion you showed me was your

6  anger and your depression.  I no longer knew how to make

7  you happy.  So when you asked me about the suicide, I

8  thought you were crazy.  But you wouldn't let it go.  I let

9  my guilt persuade me to help you.  So you sent me on a

10  mission to help end your life.

11          Standing here today, I am so angry at myself.  I

12  am so angry that I agreed to help because life is something

13  to live.  It's not something to take away.  I feel sick

14  about it.  I feel dirty.  I feel stained for participating

15  in that.  How can I put into words the self-loathing that I

16  feel every day.  Joseph, please forgive me.  I only wanted

17  to love you, not to hurt you.  But I made the terrible

18  choice to help.  Joe, you and I needed professional help,

19  not a suicide plan.  I'm sorry for making the wrong choice,

20  for failing you.

21          On October 8th, that night, I saw a man that I

22  had never seen before.  I've been with him for eight

23  years.  I saw a man who I was convinced was intent on

24  killing me.  And I believe that now as I stand before you.

25  And I will believe that for the rest of my life.  I reacted

1   and engaged in conduct that I never in my life thought I

2   was capable of and I have never done since or before that.

3   I've never harmed a sole in my life.  And that night haunts

4   me every single moment of my life.  The picture will never

5   leave my head.  I've never been a violent person.  And when

6   I look back at that night, I'm sickened by what happened.

7   I made a horrible, horrible, horrible choice on that

8   night.  The choice that has forever hurt and changed my

9   family, my babies, and most of all the Andrianos.  I hurt

10  them in a way that nobody deserves.

11            I have only begun to understand why I reacted in

12  violence.  And I need to say that I would give anything to

13  change what happened but I can't.  And I really apologize

14  with all my heart for my actions that night for my

15  participation in the death of my husband.  I can't pretend

16  to fully understand why.  That was conduct so unlike me, so

17  foreign to me.  The only way I know how to make amends is

18  to continue with the counseling and try to live every day

19  that I do have helping others.  I can't give Joe back his

20  life.  All that I can do is give the rest of my life,

21  sharing my experiences with other people who are damaged

22  also and maybe prevent them from something this horrible.

23            Speaking to you right now is the hardest thing

24  I've ever had to do.  You are the 12 people who hold my

25  life in your hands.  You are the 12 people that have heard

1  things about me.  Some of them are true, some of them are

2  outright lies.  And I have to hope and believe that you can

3  find the truth somewhere in the middle of all this drama

4  that has been the main focus of the prosecutor.

5         You have found me guilty of first-degree murder.

6  You decided that my actions that night were not justified.

7  So that brings us to today.  Today you have to decide

8  whether or not you want to kill me or whether or not you

9  want to spare my life.

10         For four years, I have lived in jail, away from

11  my children, away from my loved ones and away from daily

12  life as you know it.  My children, Nicholas and Ashley, are

13  facing life without a mom, without a dad.  They're going to

14  grow up with unanswered questions.  Questions that other

15  family members cannot answer for them.  And when that time

16  comes, when they're old enough to have the questions, I'd

17  like to be able to be there to answer those questions.  I

18  want to tell them all the memories that only I can share,

19  their births, the joy we had over their first steps, first

20  words they ever said.  I want to tell them that even if I

21  was not with them physically, that they were constantly in

22  my thoughts, my prayers and in my dreams.

23         I'm pleading with you for my life, even if it is

24  behind bars.  It's a life unlike anything that you know.  I

25  can never touch my mother's hand, give a hug to my father,

1  see or talk to my children.  I will live with career

2  criminals, wear bright orange suits, be told when I can

3  eat, when I can sleep, when I can go outside.  Every action

4  that I make will be regulated.  But even in the middle of

5  all this, I still want to help in whatever way I can.  It's

6  the only way that I know to maybe make amends for some of

7  the terrible choices that I made; for all of the pain and

8  the hurt that I caused so many families; for ruined

9  Christmases; the loss of their children.

10          I wish with everything in me that I could say the

11  words to express how sorry I am but I can't find the

12  words.  They're just not enough.  I carry this guilt and

13  sadness and the loss with me every day.  It's what

14  motivates me to reach out to other people and help.

15          So I'm asking you to please give me that chance

16  to continue to do this.  It's all I know.  It's the only

17  way I can think of to try to make amends in some small

18  way.  So I'm asking each and every one of you to please

19  spare my life.  I promise to give back, to live in a way

20  that isn't dangerous to people because I'm not a danger to

21  people.  I really am not.  And if I could have the chance

22  to share my experiences with other women and help prevent

23  some of this stuff that went on in my life, that's what I'm

24  asking for.  Thank you.

25          THE COURT:  Mr. Patterson, anything further?

1          MR. PATTERSON:  Not at this time, Your Honor.

2          THE COURT:  At this time we're going to take the

3    afternoon break.  After the afternoon break, you will hear

4    the closing argument of counsel.

5          So during the break remember the entire

6    admonition I have given you including you are not to

7    discuss the case with anyone and do not let anyone discuss

8    the case with.  Keep an open mind.  Have a nice break.  I'm

9    going to stay here with counsel.

10          (jurors exited.)

11          THE COURT:  Please be seated.  This is Cause

12    Number CR2000-096032, State of Arizona versus Wendi

13    Elizabeth Andriano.

14          The record will reflect the presence of the

15    defendant and counsel.  We're outside the presence of the

16    jury.

17          What I'm going to do is I'm going to take a short

18    break here to allow Counsel to read the written objection

19    filed by Mr. Martinez with regard to the burden of proof

20    instruction.  And we'll reconvene in about five minutes and

21    I'll make a ruling on that.  Also, I will give counsel the

22    verdict form to review and we'll discuss that further.

23          We'll be in recess for a few minutes.

24          (Recess taken.)

25          THE COURT:  This is Cause Number CR2000-096032,

1   State of Arizona versus Wendi Elizabeth Andriano.

2          The record will reflect the presence of the

3   defendant and counsel.  We are outside the presence of the

4   jury.

5          Mr. Patterson?

6          MR. PATTERSON:  With regard to the issue raised

7   by Mr. Martinez in his written motion, I would request the

8   Court not modify the final instructions for Phase III in

9   the fashion that he requests.  I think that what you

10  currently have is an accurate statement of the law with

11  regard to burden of proof, with regard to proving

12  mitigating factors.  The issue he raised is not about

13  proving mitigating factors but what weight should be

14  ascribed to the mitigating factors when the jury does its

15  assessment of the appropriate penalty.  So I think what you

16  have is certainly not prejudicial to the Government's

17  position.

18          I have some questions in my own mind about

19  whether you can relieve the State of its burden of not --

20  well, how do I state this.  I believe the proper

21  instruction requires the State to prove that the mitigating

22  circumstances are not sufficiently substantial.  I think

23  they have that burden under the Constitutional system but I

24  don't have a case to support that proposition.

25          THE COURT:  Thank you.

1          Mr. Martinez?

2          MR. MARTINEZ:  That's an improper statement of

3   the law.  I don't have anything to add.

4          THE COURT:  I've had an opportunity to review the

5   State's written objection to the burden of proof

6   instruction.  I do believe it's a correct statement of the

7   law.  I'm going to deny the State's objection to burden of

8   proof instruction.

9          MR. PATTERSON:  Judge, at this time we'd ask to

10  reopen briefly for the purpose of moving into admission a

11  computer time line presentation that Mr. Delozier will

12  incorporate in his close argument.  It includes photographs

13  that were not admitted into evidence.  So I would move at

14  this time to admit a disk of this presentation which we

15  will generate when we get back to the office and add that

16  as part of the record as an exhibit in this case.

17         THE COURT:  What don't you state for the record

18  what the photographs involve.

19         MR. PATTERSON:  Eighteen photographs.  They are

20  of Wendi Andriano at various stages of her life.  They show

21  her in the company of her children.  They show her in the

22  company of Barbara Mitchell who testified earlier.  They

23  show like vacations with the family on a cruise ship.  A

24  holiday.  There is what appears to be a portrait of her in

25  her junior, senior year in high school.  Relatively

1   innocuous photographs.

2          MR. MARTINEZ:  Mr. Martinez?

3          MR. MARTINEZ:  I would object.  First of all, as

4   a matter of procedure, the motion to reopen, I guess, and

5   reopening has to be done in front of the jury.

6          Second of all, I've had no notice.  I haven't

7   seen these photographs.  I think that it's unfair that at

8   this point they spring them on me.  I understand that the

9   rules allow their admission.  If the rules allow their

10  admission then I know the State has an ability to challenge

11  them.  But since they've chosen at this late date to do

12  that, I have no ability to challenge them.

13          MR. PATTERSON:  There's no intent to deceive

14  Mr. Martinez.  I just didn't supervise or oversee the

15  production of the time line by my mitigation specialist,

16  Mr. McCloud.  It just came to my attention ten minutes ago

17  that there was a potential issue here.  I apologize to

18  Mr. Martinez.  There is no intent to deceive him.  I think

19  the photographs are somewhat innocuous.  They would have

20  been admissable had I brought them in at the right time

21  anyway.

22          THE COURT:  What I'm going to de, I'm going to

23  allow Mr. Patterson to reopen formally in front of the jury

24  and admit Exhibit 550 for identification admitted into

25  evidence.

1          And based upon all the circumstances and because

2     of the rules set forth for Phase III, I'm going to allow

3     them to be admitted into evidence.  However, we're going to

4     have to discuss what will be given to the jury as far as

5     the photographs.

6          MR. PATTERSON:  Well, that presents the problem.

7     That's why we didn't expect to make them an exhibit, at

8     least until we discussed this in chambers.  If they can be

9     used as an aid in his presentation and not be made

10    exhibits, it would probably be just cleaner and easier.

11         THE COURT:  Is everybody agreeable?  I know,

12    Mr. Martinez, you object to it that they can be used for

13    demonstrative purposes only during the closing arguments.

14         MR. MARTINEZ:  Well, no.  I have a different

15    objection.  You are denying the defendant a fundamental

16    right, you are showing them exhibits and then you are not

17    allowing the jury to consider them.

18         You're correct, I am unhappy but even my

19    unhappiness, it just seems to me that if we do that and

20    then we don't give it to them, that somebody later on down

21    the road is going to say that there is a problem here if

22    there's a conviction.

23         MR. PATTERSON:  All right.  Kind of thinking out

24    loud here, Judge, we would allow the entire laptop -- may I

25    have a moment?

71

1          It doesn't appear there's any other data on the

2    laptop other than this presentation.

3          MR. MARTINEZ:  That's not true, Judge.  I'm

4    looking at it.  It has writing on it.  If you want to look

5    at it, you can.  It's got statements by him.  That would

6    highlight his statements.  That's not fair.  If you want, I

7    can put in my closing argument to go back with them, too.

8          MR. PATTERSON:  I don't want to quibble about

9    this.  What does the Government think is the best way to

10   get the pictures in?  I don't know what the answer is,

11   Judge.

12         MR. MARTINEZ:  It's not my problem, it's theirs.

13   They can solve it.

14         MR. PATTERSON:  Then I will say we wish to use it

15   as a demonstrative exhibit that will assist in

16   Mr. Delozier's presentation.  I do not choose to make it an

17   exhibit at this time.  And I will state the waiver or

18   whatever is necessary that it's a decision on my part to be

19   used for demonstrative purposes only.

20         MR. MARTINEZ:  Judge, it's a fundamental right

21   they are making a decision now based on all of the

22   photographs.  Obviously, I don't want them to have the

23   photographs but fairness pushes me in the direction of

24   asking you to make sure they do have the photographs.  I

25   know what happens down the road.

72

1          MR. PATTERSON:  The photographs apparently are

2     accessible.

3          THE COURT:  Do you have the photographs?

4          MR. MCCLOUD:  Yes, Judge, I do.  I can take the

5     photographs and copy them to another file on the laptop to

6     which the jury would not see the box that are entered on

7     the time map program.  So they could view the pictures on

8     the laptop without seeing anything I've written or any of

9     my team has written.

10         MR. MARTINEZ:  Judge, the pictures will have

11    writing on them.  That's the problem.  So let's just get

12    to --

13         THE COURT:  What writing?

14         MR. MCCLOUD:  The only writing on the pictures

15    say what the picture is.

16         THE COURT:  Identify yourself for the record.

17         MR. MCCLOUD:  Scott McCloud.  The only things

18    that are on those pictures are identifying what the picture

19    is.  There is no narrative on the picture, whatsoever.  I

20    have the photographs back in my office.

21         THE COURT:  What I'm going to do is I'll allow

22    you to reopen in front of the jury and you move to have the

23    photographs admitted into evidence as Exhibit Number 550.

24    Then we'll deal with it after that.

25         Ready for the jury -- oh, the last thing I wanted

73

1   to ask counsel is this:  I've shared with counsel the forms

2   of verdict, the form of verdict.

3            Any objection from the State?

4            MR. MARTINEZ:  No, sir.

5            THE COURT:  Any objection?

6            MR. PATTERSON:  None, Judge.

7            THE COURT:  Are we ready for the jury?

8            MR. MARTINEZ:  Actually we have an issue about

9   the time.

10           THE COURT:  Go ahead.

11           MR. MARTINEZ:  When we were in chambers the Court

12  indicated I would be restricted to an hour and 15 minutes.

13  I don't think that in a case that is as serious as this,

14  when the defendant has spoken for approximately one hour to

15  the jury, that I should be restricted in time.  I

16  previously indicated to the Court yesterday that I did not

17  think it was going to go over two hours.  I don't think

18  that's unduly on my part to ask that I be given the two

19  hours.

20           THE COURT:  Mr. Patterson, or Mr. Delozier,

21  you're going to be giving closing arguments for your

22  client.

23           MR. DELOZIER:  Yes, sir.

24           THE COURT:  How much time do you anticipate your

25  closing argument will be?

1          MR. DELOZIER:  Both parts, no more than an hour

2   and 15 minutes.

3          THE COURT:  I'm going to restrict both sides to

4   an hour and 15 minutes.

5          Counsel, let me tell you something.  The jury has

6   been sitting here for 16 weeks.  They know the case better

7   than you do.  They've been attentive.  They've been

8   patient.  An hour and 15 minutes is more than enough time

9   to emphasize what you need to emphasize.  That would

10  actually be to your benefit if you get right to the point.

11         I've been watching this jury, they've been

12  attentive.  They know this case.  I'm going to restrict

13  each side to an hour and 15 minutes, then.  That's more

14  than enough time.

15         Ready for the jury?

16         MR. MARTINEZ:  Yes, sir.

17         MR. DELOZIER:  Yes, Your Honor.

18         THE COURT:  We'll bring the jury in in just in

19  just a few moments.

20         (Jurors entered.)

21         THE COURT:  Please be seated.  This is Cause

22  Number CR2000-096032, State of Arizona versus Wendi

23  Elizabeth Andriano.

24         The record will reflect the presence of the

25  defendant, counsel and the jury.

1          Ladies and gentlemen of jury, at this time

2     counsel will have the opportunity to give their closing

3     arguments.

4          Mr. Delozier on behalf of the defendant will have

5     the opportunity to open and close the argument.  Remember

6     what the attorneys say in closing arguments is not evidence

7     but it may help you to understand the law and the

8     evidence.

9          Mr. Delozier.

10          I'm sorry.  I was going to allow Mr. Patterson to

11     reopen.

12          MR. PATTERSON:  Yes, Judge.  I would ask leave of

13     the Court to reopen briefly.  I neglected to introduce the

14     photographs that have been incorporated into the power

15     point presentation, the time line.  I would move the

16     photographs, the actual photographs as an exhibit to

17     supplement the presentation that's going to be made at this

18     time.

19          THE COURT:  Anything further from Mr. Martinez on

20     behalf of the State?

21          MR. MARTINEZ:  I've already made my record with

22     regard to that procedure.

23          THE COURT:  Exhibit 550 for identification is

24     admitted into evidence.

25          Mr. Delozier.

# EXHIBIT DDD

05-0002
Bra0810

DP

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA, )
)
              Plaintiff, )
)
     vs. )      No. CR2000-096032
)         CR05 0005-AP
WENDY ELIZABETH ANDRIANO, )
)
              Defendant. )
)

BEFORE:   THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
December 16, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY

SHARON FLORES
CERTIFIED COURT REPORTER
50374

2

1

2

3                          A P P E A R A N C E S

4

5

6

7       For the State:

8                          Mr. Juan M. Martinez

9                          Deputy County Attorney

10

11

12

13

14      For the Defense:

15                         Mr. Daniel B. Patterson

16                         Mr. G. David Delozier, Jr.

17                         Office of the Public Defender

18

19

20

21

22

23

24

25

3

PROCEEDINGS

1

2

3          THE COURT:  This is CR2000-096032, State of

4   Arizona versus Wendy Elizabeth Andriano.

5          Let the record reflect the presence of the

6   defendant and counsel.  We're outside the presence of the

7   jury.

8          Just a couple things I wanted to bring up.

9   Again, my final review of the final instructions I wanted

10  to be consistent.  And there was, on page 8, we did not cap

11  in part "The Defendant."  So I've corrected that on

12  mitigation rebuttal evidence to make that consistent.

13         Then on page 2, I capped in part "Penalty Phase,

14  Guilt Phase and Aggravation Phase" to be consistent with

15  what was set forth later in final jury instructions.

16         And, then, just a reminder to Mr. Delozier and

17  Mr. Martinez, Mr. Martinez, you have 23 minutes left and

18  Mr. Delozier 33 minutes.  If it gets to the point where you

19  have two minutes left, and it does not appear you're

20  concluding, then I'll remind you.

21         MR. DELOZIER:  Yes.

22         THE COURT:  Are we ready for the jury?

23         MR. MARTINEZ:  Yes.

24         MR. DELOZIER:  Yes, sir.

25         (Jurors entered the courtroom.)

4

1          THE COURT:  Please be seated.

2          Good afternoon.  This is the trial in Cause

3    Number CR2000-096032, State of Arizona versus Wendy

4    Elizabeth Andriano.  The record will reflect the presence

5    of the defendant, counsel and the jury.

6          At this time, we're continuing with the closing

7    arguments of counsel.  And we are in Mr. Martinez',

8    State's, closing argument.

9          Mr. Martinez, you may continue.

10         MR. MARTINEZ:  Where we left off yesterday, we

11   were talking about the so-called mitigating circumstances

12   that were advanced by the defendant in this case.

13         The next set that they wanted you to consider

14   were the ones that involved domestic violence victims,

15   emotional abuse victims and sexual abuse victims.  I group

16   those together because what they're basically talking to

17   you about there is this domestic violence defense.  They

18   advanced it throughout the trial.  They brought in Sharon

19   Murphy to talk about it and they continue to advance it

20   even at this stage.

21         What's important and what should not be forgotten

22   in this particular domestic violence defense and the

23   defendant in this case is that when we brought in

24   Dr. Bayless to talk about his interview with her, one of

25   the things that he told us was that, well, "When I talked

5

1   to her about these events, when I talked to her about what

2   may have happened, she didn't cry."  She had an explanation

3   for you as to why she didn't cry.  It's important to focus

4   on this defense right.  Now, it's important to know that it

5   is the lynch pin of their case right now.  This is what

6   they're hoping that you will sort of hang your hat on and

7   say, "Well, maybe she was the victim of domestic violence."

8          But, one of things that is most telling about

9   that is when the defendant expressed her views to you, when

10  she exercised her right of elocution, and the things she

11  said was, "Yes, I did speak to Dr. Bayless.  And he came

12  over and we had a little bit of a conversation.  But I

13  didn't take it seriously."  Remember that?  She was having

14  an expert come in, somebody who could potentially help

15  her.

16          In other words, somebody who was going to take

17  her story down.  And instead of trying to tell him, trying

18  to let him know what was going on, she decided, no, I'm not

19  going to take it seriously.

20          So why should you?  Why should you if she's not

21  going to cooperate.  If she's just going to sit back and

22  manipulate the way things are, why should you believe her?

23  Why should you believe anything she has to say in light of

24  what she said on the witness stand, in light of what she

25  told the police officer, in light of what she told Sharon

6

1   Murphy.  Why should you?  She doesn't take it serious, so

2   why should you?

3           It's only when things, whenever it pleases her,

4   whenever, somehow she feels better.  And remember, this

5   also goes to rehabilitation.  How rehabilitated is she if

6   she can't even sit down and talk a psychologist and tell

7   him what happened.  Oh, you know, I don't want to talk to

8   you.  You know what, I'm going to be like what I am.  I

9   know I need an attitude adjustment.  But you know what,

10  this is the most crucial issue in this case.  And so what

11  am I going to do?  I'm not going to take it seriously.  I'm

12  just not going to be serious about it.  And you know what,

13  you can try to do your job, then we can come to court.  But

14  you know what, I'm not going to take it seriously.

15          Which leads me to the point of Sharon Murphy.

16  Obviously, the two of them have bonded.  And/or you can

17  look at it another way, you can say that Sharon Murphy is

18  in her corner.  Another way to look at it is to say that

19  she is in the defendant's pocket.  And, basically, that's

20  what you have here.  A defendant who has manipulated the

21  individual who has come out to speak with her.  And I can

22  stand up here and say that to you because we know that

23  Sharon Murphy, when confronted with all of the

24  lies -- they're not inconsistencies, they're not omissions,

25  they're lies -- with all of the lies presented by the

1  defendant, she said, "I wouldn't change my opinion at

2  all."  Sharon Murphy doesn't care about the truth either

3  because she is convinced now that the defendant is a victim

4  of domestic violence.

5           Ethically, she has a duty to consider both

6  sides.  Even when she took the witness stand, and no,

7  uh-huh, I'm not -- you know the only way that I will change

8  my mind and revisit the opinion is if the defendant told me

9  that she was making it up.  There's a fat change that the

10  defendant is ever going to stand up and tell her that.

11  Because this defendant is a manipulating individual who

12  tries to get ahead any way she can.  And that's how she was

13  able to get ahead in these -- in the psych unit because she

14  obviously was the smarter of the bunch, she was able to get

15  along with the staff and she was able to provide them

16  information, curry their favor.  So she then manipulated

17  what happened with her, how she got books and even when

18  she's bored, they try to make life a little bit better for

19  her.  And they did that, of course, at the expense of the

20  other inmates.  But the key factor here with regard to

21  domestic violence, is that, you know what, when she's given

22  the opportunity to participate she said, "You know what, I

23  didn't take it seriously.  That's why I didn't cry."

24           I submit to you the reason she didn't cry is

25  because it didn't fit or at that point she was just angry

8

1   and didn't want to do it and it wasn't true.  So she

2   couldn't generate the tears.

3          So, I submit to you that's not a mitigating

4   factor.  The fact that she chooses not to participate that

5   sort of indicates to you that that's something that doesn't

6   rise to the level of anything.  It was just a defense that

7   was put together for you so that you may have something to

8   think about when you go back there.  But just look, it

9   wasn't a defense in the previous case.  It certainly isn't

10  something for you to consider in this phase of the

11  proceedings.

12         The next factor that they want you to consider

13  involves Joseph Andriano.  They talk about the stress of

14  her husband's cancer, the stress of misdiagnosis of her

15  husband's cancer, and the stress of terminal diagnosis of

16  her husband's cancer.  It's the same thing that we're

17  talking about.

18         For whatever reason, they want to piggyback on

19  Joseph Andriano's illness.  It's not bad enough that she

20  killed him.  It's not bad enough that he knew that she was

21  killing him.  It's not bad enough that she did it in an

22  extremely or especially cruel way.  Now, when we get to

23  this phase, they want to use his illness, the thing that

24  was hurting him physically, something that was ending his

25  life prematurely, even though she ended it even more

1   prematurely than that.

2           And they say you can assign everything to her.

3   Was it really her cancer?  Sure she was affected by it.

4   But how affected was she.  Well, she was affected to the

5   point to say, you know what, I'm going to go out every

6   night or two, to be honest, two nights a week, at least.

7   She was affected to the point that she indicated to another

8   individual that perhaps she was better off with him, Rick

9   Freeland.  Was she affected so much she didn't go out even

10  though her husband had just had a chemo therapy treatment.

11  There is no affect on her.  In fact, she was making

12  statements, "He's gross.  He's skinny.  I don't want to be

13  with him."  Making statements like, "I just wish he would

14  die so I can on with my life."  How stressful is that for

15  her?  Maybe the waiting, if they were to put that up there,

16  is something for you to consider it in mitigation.  She had

17  to wait for him to die and would stop her from being this

18  woman that could go out and fraternize with other men.

19  Maybe.  And, of course, I'm being tongue in cheek when I

20  say that.  But, in this particular case, with these

21  particular factors, there is nothing mitigating about it.

22  This is Joseph Andriano's cross to bear.  She didn't help

23  at all in his, you know, trail of tears, if you will, to

24  death.  He was the one that carried these.  It wasn't her.

25  What was she doing?  Do you think she's carrying that cross

1   out there at the Rockin' Rodeo?  Do you think she was

2   carrying his cross as she was kissing Rick Freeland?  Do

3   you think that she was carrying his cross as she's having

4   sexual intercourse with Travis Black?  Absolutely not.  She

5   was out having a gay old time on her birthday, coming home

6   late even though Jana was there, coming in through the

7   front door, giggling, even though she had just been kissing

8   another guy.  But that's no disrespect.  No disrespect at

9   all.  It may not be disrespectful in her mind, but it also

10  isn't a mitigating factor.

11          On to this they wanted to sort of attach the

12  stress of the economic difficulties.  Nothing could be

13  further from the truth.  The reason that we know that

14  nothing could be further from the truth is because we know

15  that as part of her salary she got to stay in the

16  three-bedroom apartment, where apartments are running as

17  high as $1500.  She was able to stay there with her family

18  for free.  Additionally, all of the utilities were paid.

19  So this issue of a roof over their head is taken care of.

20          In addition, she was bringing home a paycheck.

21  In addition to that, we know that Jana indicated that she

22  sent them money.  Additionally, Donna and Alejo Ochoa both

23  indicated they gave them money.  Everybody was helping them

24  with money.  Additionally, other people were saying, well,

25  you know, we bring food over to them.  So not only do you

11

1   have help in the sense that there is nothing to worry about

2   a roof over their head, they have that.

3          Additionally, people were providing them cars.

4   Donna and Alejo Ochoa provided one of them, the Andrianos

5   provided the other.  Basically, she's bringing in her

6   check.  Mr. Andriano was getting his social security.  The

7   kids were also getting social security and they were

8   covered by insurance.  So where is this stress of economic

9   difficulty?  And if it's so stressful, why is she going out

10  and hanging out at bars.  And I assume there's a cover

11  charge.  I assume the drinks are one, two dollars.  And

12  she's going out there and paying for all of this.  We know

13  that she's having a pretty a good time of her life right

14  then.

15         The only thing that was bothering her wasn't this

16  stress of economic difficulty.  You don't see any sign of

17  that.  The only thing that was bothering her is that Joseph

18  isn't dying quickly enough.  And that, of course, is not a

19  mitigating factor.  The fact that he can't find himself on

20  death's door quick enough is certainly not a mitigating

21  factor.

22         They talk to you that she has no prior felony

23  convictions and no misdemeanor convictions.  Well, that may

24  be true but that doesn't present the whole picture of the

25  defendant.  One of the things you have is Exhibit 472.  The

1   defendant had to pay off a student loan.  And one of the

2   things she wanted was to, I guess, reduce the payment or

3   have something done with the payments.  One of the things

4   that she did is she indicated that she was living at the

5   Courtyard Apartments and that she was paying $585.35 rent.

6   She tries to justify that lie by saying that was the value

7   of the apartment and so I was entitled to claim it.  That

8   way she went ahead and claimed it.  The same way that she

9   does everything, by manipulating things.  She provided you

10  a rent receipt for an account ledger for someone named

11  Montgomery.  That's there.  You can see the amount is all

12  there indicating that's the amount that was being paid.

13          The point of all that is that at the bottom of

14  this particular spreadsheet of paper says:  Warning.  Title

15  18, Section 101 of the U.S. Code.  Whoever knowingly and

16  willfully falsifies, conceals or covers by any trick,

17  scheme or device a material fact or makes any false,

18  fictitious or fraudulent statements or representations

19  shall be fined not more than $10,000 or imprisoned not more

20  than five years or both.

21          It's not that the defendant wasn't engaged in

22  certain actions.  It's just, for whatever reason, the

23  Federal government chose not to proceed with this.  That

24  doesn't mean that you somehow give her a Brownie point

25  because they didn't go forward with this.

1      The other thing that you need to keep in mind

2  with regard to this is that it's expected.  It's the norm.

3  It's the minimum that society excepts or wants from its

4  citizens that they not have any prior felony convictions or

5  misdemeanor convictions.  It's not a situation where you

6  should get Brownie points for doing what is expected of

7  you.  It's akin to saying, well, you know, she gets Brownie

8  points because she graduated from high school which is

9  basically what they're trying to get you to give them.

10  But, she did the minimum number.  And the minimum is she

11  has no felony convictions or prior misdemeanor

12  convictions.  She does, of course, have -- and she did tell

13  Detective Lucero she does have a license that was

14  suspended.  She is driving around with her kids while her

15  license is suspended.  How good of a mother is she if she

16  happens to be stopped by the police officers and her kids

17  are with her by the side of the road and perhaps she is

18  somewhere else that she shouldn't be, i. e. the jail,

19  waiting for someone to come pick up her kids.  So, it's not

20  a situation where this individual should be given extra

21  points just because she doesn't have any prior felony

22  convictions or misdemeanor convictions.

23      One of the other points that they made was that

24  she has remorse.  That's what they want you to believe.

25  You were here yesterday when she stood in front of you.

1   And one of the things that she told you, over and over

2   again, it's not my fault.  I am a victim of domestic

3   violence.  It is a mistake in judgment.  It's not my

4   fault.  Additionally, Mr. Andriano wanted to commit suicide

5   and my mistake was in attempting to help him.  But I am the

6   victim of domestic violence.  If she truly believes that

7   she was the victim of domestic violence, which she appears

8   to do so, and she also believes that, even the evidence

9   shows to the contrary that he attempted suicide, how can

10  she be remorseful.  How can she be remorseful for something

11  she said she didn't do.  Is it that she's attempting to

12  manipulate you?

13          Either way on this one, either you accept

14  responsibility, which she did not do.  When is it that

15  Wendy Andriano is going to stop blaming people for things

16  that are happening around her?  When is she going to stop

17  blaming the guards.  When is she going to stop blaming the

18  Andrianos, specifically Joseph Andriano.  When is she going

19  to stop blaming Mr. Andriano for everything that happened

20  here?  When is she going to accept that she's the person

21  that killed him?  And the only reason that I point that out

22  is because you can't have remorse until you have acceptance

23  of what you've done.  She's never accepted anything and she

24  never will.

25          And that goes to her rehabilitation.  She thinks

1  she's right.  Even to today she thinks she's right.  She

2  can stand in front of you and cry forever and still say, "I

3  didn't do it."  She just doesn't think she did it.  You've

4  seen the photographs.  There is no need to parade them out

5  here.  You've seen the scene, how it is.  There is no need

6  to parade that out here for you.  She did it.  She was the

7  only one that did it.  She also tried to hide it.  She took

8  a shower.  Went out.  Talked to the paramedics and went

9  back in and staged the scene.  No, it's not her fault.  No

10  remorse has ever been expressed in this crime.

11       She spoke to you for approximately 45 minutes.

12  And what did she have to say?  Well, she was upset with the

13  prosecutor.  She was upset with Dr. Bayless.  Said, "You

14  know what, I didn't take anything that he did seriously."

15  She was upset with the guards.  She was upset with the

16  other inmates.  She was upset with everybody.  Did it ever

17  occur to her to look inwardly -- because this is what

18  you're going to have to consider when you go in

19  there -- did it ever occur to her to look inwardly and say,

20  "Maybe I should begin to accept what I did," rather than

21  just automatically pushing the tear button and standing

22  here in front of you so you can decide this case on

23  sympathy.  So that you can be presented on the last day of

24  trial with photographs of her in these posturing with her

25  kids.

1           You know, do you think that when she was out

2    there dancing and kissing men, do you think she was

3    thinking about her kids just like they show here?  Do you

4    think that she was thinking about anyone other than self

5    gratification, making herself feel good?  That's all she

6    cared about.  But when she comes in here, it's all about

7    sympathy.  Even the last minute when they come before you,

8    they want to talk about sympathy.  And the jury

9    instructions have told you that sympathy is not something

10   that you should consider here.  But that is the thrust, if

11   you will, that is what they want you to believe.

12          That's the second lynch pin, that you should feel

13   sorry for her.  I'm going to stand close to you and I'm

14   going to cry so that somehow I will not have to talk about

15   what I did.  I will not have to accept what I did.  She

16   does not want to accept what she did.  She didn't accept

17   what she did and then she cries in front of you.  Why was

18   she crying?  She was crying because she was caught.  She

19   certainly wasn't crying because she was sorry or remorseful

20   for what she did because she never admitted it.

21          It may be very difficult to stand here and watch

22   another human being cry.  That's very difficult.  But think

23   about it this way, how much more difficult is it to watch

24   another human being die after you keep hitting them over

25   and over and over again in the head?  How difficult is

1   that?

2           You know, she indicated, well, you know, my heart

3   broke when, you know, when this happened with Joseph.  No,

4   it didn't.  She took his heart, wrenched it out and stifled

5   the life out of him.  And yet, she has the nerve to stand

6   up in front of you and just, you know, want you to have a

7   heart.  Wants you to have mercy.  Just like the mercy she

8   showed Joseph Andriano that night?  Why didn't she just let

9   the paramedics come in.  Why did she just not give him the

10  poison.  Why didn't she just let nature take its course.

11  Then she wouldn't have anything to be remorseful about.

12  But she didn't do that because it's all about Wendy

13  Andriano.  And it's about instant gratification.  I want to

14  go out now.  I want to get the money now.  I want to go

15  ahead and do what it is that I want to do now.  Bottom line

16  here is it's about Wendy Andriano.

17          The last thing that I want to talk to you about

18  is the age factor.  She was 30 years old.  She's 34 years

19  old now.  This only applies to people who are mentally

20  incompetent, who has issues with their mentality.

21          Again, that goes to at what point is she going to

22  take responsibility for her actions.  She's 30 years old.

23  She's been married.  She has two kids.  She's been to

24  college.  She's graduated high school.  She's gone on a

25  mission.  What more do you need?  Age is not a mitigating

1   factor.  It has nothing to do with this case.

2           At the beginning of my talk with you, I talked a

3   little bit about the voir dire process which means, "to

4   speak the truth."  The reason that I started talking to you

5   about the voir dire process and to speak the truth is

6   because, in this case, the defendant, Wendy Andriano, does

7   not speak the truth to you.  We have example after example,

8   and her life is replete with circumstances where she does

9   not speak the truth.

10          She lied to her husband about what she was

11  doing.  After all of that, after she kills him, what does

12  she do?  She stages the scene.  In other words, she

13  fabricates the scene, moves things around so it's not her

14  fault.  The police then want to get her side of the story

15  and what does she do?  She leads them on a wild goose

16  chase.  She does not speak the truth.

17          She talks to Sharon Murphy, the thing that's the

18  lynch pin of her case, and she doesn't tell her the truth

19  and leaves things out.  When Dr. Bayless goes to talk to

20  her, what does she say, "I don't take him seriously.  So I

21  don't tell him the truth either."  She does not speak the

22  truth.  She is somebody who manipulates what's in front of

23  her when it is to her best advantage.

24          The point that I want to make here is that when

25  she stood before you, everything that she presented to you

1   yesterday and before was to manipulate you.  And I'm asking

2   you not to be manipulated by her tears.  Go back and follow

3   the Judge's instructions, which you have done so far in the

4   previous two proceedings.  And when you see those jury

5   instructions and apply them to these factors you will find,

6   number one, they are not mitigating factors.  And that,

7   number two, that even if one or two are mitigating factors,

8   they are not sufficient to call for leniency.

9           It gives no one pleasure to go through these

10  proceedings.  There is a death here, Joseph Andriano.  But

11  it is something that is the law.  And it's the law that we

12  all swear to follow.  And that's the oath that you took.  I

13  ask you that in the face of the law, in the face of the

14  evidence, do the right thing.  And that is go back there

15  and deliberate and find that death is the appropriate

16  sanction in this case.

17          The last point that I want to make to you is

18  you've been very attentive, it's been a long trial, there's

19  been some delays but it's been four months so I thank you

20  for it.

21          THE COURT:  Mr. Delozier.

22          MR. DELOZIER:  Thank you, Your Honor.

23          Ladies and gentlemen of the jury.  As I said

24  yesterday, life is precious.  Of course, it is.  We had 16

25  weeks or so.  We've had, what I know any way, two deaths

1   and one near death and one birth.  So that we've all

2   experienced life and death.  Wendy's is in your hands and

3   will be shortly.

4           We heard from the State that it wants you to vote

5   death.  You heard it again today.  You heard me say that

6   this was a tragedy when we started.  I repeated it again

7   yesterday.  I think it's time for the tragedy to start to

8   be over.  It can be ended today by your vote for what we've

9   asked you to do and that's life.  Let these families get on

10  with putting this behind them and let them start getting

11  well or as well as possible for the tragedy to both

12  families.

13          I don't understand some of what I heard from the

14  State.  Said something about drama and us telling stories.

15  The only story I remember was Don Quixote.  I don't know

16  what relevance that had to anything other than perhaps to

17  entertain you.  You heard me yesterday.  I mentioned real

18  people, historical people.  Folks that have been recorded

19  in the Bible about having lied yet they're held out to all

20  of us as spiritual giants because they went on to do other

21  things after that experience.

22          So, I'd like to mention one more story that's

23  also been recorded there that we've all heard about, that

24  we've all probably been to the movies to see and that's the

25  story of Exodus and Moses.  Charlton Heston, I think,

1  played the original rule.  But one fact that sometimes

2  isn't mentioned or is easy to miss, if it is, is that

3  Moses, when he was 40 years old, killed an Egyptian in

4  Egypt.  And he stayed somewhere else for about forty years

5  before he came back and began the process of getting the

6  children of Israel to the promised land.  He was 80 years

7  old when he went back.  Something happened to him

8  apparently during that forty years that made him the proper

9  candidate to go back and have that historic role.  We need

10  to give Wendy the chance to have some ability, as small as

11  it might be, to be able to be used in the same way.

12          Now, these people I've mentioned, of course, are

13  not fictional characters.  They are historical characters

14  that are recorded and they were greatly used.

15          The State also continues to tell you about

16  tears.  I'm also confused about this one.  Perhaps, I don't

17  grasp it the way Mr. Martinez does.  Let me tell you the

18  kind of way that I am hearing what I'm hearing.

19          If I heard correctly, Wendy and her mother Donna

20  apparently cry when it's appropriate so they can manipulate

21  whoever they're crying in front of.  Well, when Wendy

22  doesn't cry with Dr. Bayless, that's a form of manipulation

23  as well.  So it appears that when it's useful for the State

24  to say that they're manipulating with tears, they'll use

25  that.  When it's easy for the State to say, no tears, so

22

1  that's obviously manipulation, too, that's what comes out.

2          So, when she saw Dr. Bayless and when she saw

3  Detective Lucero she was manipulating them, according to

4  the State.  And in neither case were there any tears.   In

5  front of you, you saw the tears.  Okay.  Is that

6  manipulating you?

7          Then, of course, you saw something similar as

8  well.  You saw Alejo testify.  You didn't see any tears

9  from him.  Only he must have been manipulating you, too.

10  Was he manipulating you when he said he loved Joe and was

11  devastated by his death and he's still devastated because

12  of his death?  There's something not ringing true here,

13  isn't there.

14          Alejo said, again, as I said yesterday he would

15  be devastated by Wendy's execution.  You might remember at

16  that point in time when he used that word, he turned away

17  from the microphone, unable to continue.  We didn't see any

18  tears, though.

19          So the State twists that to say he's not sincere

20  and really won't have any impact.  Come on.  Not going to

21  have any significant impact on the father that loved this

22  lady for 30 years?  Unbelievable is the only word that

23  comes to mind.

24          This kind of double speak, okay, troubles me.

25  Here's what one my -- a group of my ancestors would have

1  called it, "White man speaks with forked tongue."  Another

2  group of my ancestors would have said -- these guys were

3  hillbillies so pardon me -- "He speaks out of both sides of

4  his mouth."  We don't tell the true?  Wendy's not telling

5  the truth?  Come on.  Which is it, a show of tears is a

6  form of manipulation but a show of no tears is also a form

7  of manipulation?  What am I missing?

8           I don't know if you read it -- some of you may be

9  too young -- but during my younger years there was a book

10  called "1984" that came out.  In that, what happened every

11  time somebody took over, they would rewrite the history

12  books to be written the way they wanted to them to be

13  written.  George Orwell is the author of that one.

14           You've been here.  You don't need to have the

15  truth rewritten for you by these inflammatory, emotional

16  outbursts by the State.  Part of it's, frankly, I think the

17  legal profession's fault, too.  We go to law school.  They

18  teach us to take either side, take by both sides, switch

19  sides.  They teach us to debate each side regardless of

20  what your position is, what we think about the case.  We're

21  told to win, the hell with the truth.

22           The State's taken the position in this case that

23  anything the defense says, anything that the defense's

24  witnesses say can be twisted and be called whatever they

25  want to call it.  No searching for the truth.  The only

1  thing he's doing is argument regardless of its merit.  I

2  ask you please don't buy it.  What you heard from the State

3  is pure emotion, including inflammatory.  And all you have

4  heard in Phase 3 is clearly based on Phase 2, first two

5  phases you've already decided.  You got told the same stuff

6  again and you got told to convict her basically a third

7  time, okay, using the same evidence.

8          The State wants you to use the same emotions, the

9  same inflammatory speech that you used in those two phases

10  to convict her and to totally disregard these 20-some

11  mitigation circumstances that the Judge says we have

12  permission for you to consider.  It's not the law.  It's

13  not the law.

14          We've even been accused of being poetic.  I have

15  no idea what that's about.  I know who Don Quixote was.

16  When I was kid I wrote poetry but I haven't looked at it

17  recently.  I don't know that anybody would be interested in

18  looking at it, including me today.

19          But let's talk about what you've really seen in

20  Phase 3 and start with Dr. Bayless.  I was astonished to

21  say he led you to believe that Wendy was flirting with

22  him.  I know that happens to some middle-aged men.  Did it

23  happen to him?  I don't know.  Wasn't there.  That's what

24  he said.

25          Let's look a little further.  He admitted he had

1   a clinical interview which lasted -- I'm going to be

2   generous, two hours.  And he tested for another two hours.

3   Obviously, he wasn't spending that time with her.  He was

4   giving her the test and he was there.  But let's be

5   generous and say he had four hours.  Okay.

6           Now, think about the people you heard testify,

7   people that work in the psych ward over the last year:

8   Dr. Gerald Perry, a clinical psychologist.  That means that

9   he's got a Ph.D. just like Dr. Bayless.  Laura King, social

10  worker.  Joyce Van Every, nurse.  You heard each of them

11  work eight hours a day or more, five days a week or more.

12          If you multiply simple math, that's forty hours a

13  week, right, minimum.  You got each of them saying that

14  each of them been in that ward at least a year.  So do a

15  little simple math.  Don't take much.  Five times eight is

16  forty times 52 weeks, that's 2080 hours for one of them.

17  Multiply that by three people, that's 6,240 hours.  My math

18  says that's 6,234 hours more than Dr. Bayless spent with

19  her.  To me that's telling.  Okay.

20          But Dr. Bayless who testified that he told her

21  he'd been hired by the State to assist in putting her to

22  death.  So did he have a preconceived notion of why he was

23  going there and what his job was to do?  Of course, he

24  did.  That's what he told her.  These people had daily

25  contact, five days a week, 52 weeks.  Three of them a year.

1          Let's review what they told you.  Laura King who

2   has a master's degree in social work told you that Wendy

3   was consistently helpful.  Mr. Martinez tried to make that

4   look negative.  There was no inconsistency in her.  She

5   told you that staff could spot malingerers and that Wendy

6   was not one of those people.  She told you that Wendy did

7   things for others for no benefit to herself.  That she

8   never spoke ill of Joe.  That she never blamed Joe.  That

9   she was gullible, naive and empathic.  She believed Wendy

10  was distraught and isolated at Estrella.  Obviously, she

11  wasn't at Estrella.  That's what she believes.  She does

12  know that Estrella doesn't have the resources and the

13  guidance that people who have the issues Wendy does need.

14  That Estrella was more borderline and predatory-type

15  inmates.  Those didn't resemble Wendy.

16          Rather than being manipulative, what did she tell

17  you?  That Wendy could be easily manipulated.  Okay.

18  Remember the pregnant woman's story I told you about?  How

19  she gave her a blanket and food to those people believing

20  they were pregnant and she thought they needed it more than

21  she did.  Obviously, you recall too that was not true and

22  how people were taking advantage of her.

23          She said she'd seen some changes in Wendy through

24  counseling in the psych unit.  So you see, she admitted

25  that she had been in counseling while she was in the psych

1  unit.  So she told you yesterday she had been in counseling

2  and that had been helping her.

3          That Wendy had grown a little wiser and a little

4  stronger.  She said that she helped clean the cells, inmate

5  cells.  She helped keep an eye for trouble-some or at-risk

6  people who were in jail with her.  That she built

7  friendships while she was in there and she actually tutored

8  and helped other inmates with things that were going on.

9  Again, no secondary gain.

10          That she often would give her commissary food

11  away to others.  I don't know if you're familiar with that

12  word.  But basically what that is, it's a little store

13  inside the jail that people have to buy whatever they want

14  if they want to supplement what the sheriff's office

15  provides for them.

16          She was not demanding.  Not assuming.  That she

17  stayed in the psych unit at the request of the doctors.

18  She was often visibly emotional about other people's court

19  problems.  She had been a victim of predatory and emotional

20  inmates.  She has poor boundaries and she had a difficult

21  time saying no.  She had a low tolerance for conflicts.

22  And that she worked with her in counseling, on assertive

23  skills.

24          Well, all of that for somebody who spent 2000

25  hours with her, sounds to me like she knew her fairly

1   well.  Sounds to me like she had spent enough time to

2   really see through whatever tears there might have been or

3   whatever facade there might have been or whatever else

4   there might have been.

5           And Dr. Perry.  Remember he's the psych ward

6   doctor.  The psychologist, Ph.D. in clinical psychology.

7   It was his opinion and he stated Wendy had made a serious

8   suicide attempt.  That's his position.  He knew her.  And

9   that she could have died.  Dr. Bayless said, "Nah, it was a

10  fake."  Said there was no warning even though counselors

11  were working with her.  He said that he had her had on

12  medication, Zoloft for depression, Adovan for anxiety,

13  Seroquil to calm her and help her sleep.  He worked with

14  her, counseled with her on confrontation and

15  assertiveness.  Again, same thing.  Said Wendy was passive,

16  helpful.  He had been working with her growth and

17  development to be assertive and on not feeling guilty for

18  saying no.  She was educable.  She was gullible and naive.

19  Good vocabulary.  Well spoken.  Cooperative.  Likes to

20  please.  Hates to offend people.  Avoids controversy and

21  confrontation.  Takes people under her wing.  No immediate

22  secondary gain.

23          How about Joyce Van Every, head nurse.  When

24  Wendy talked of Joe, she was tearful and depressed.  She

25  never blamed Joe.  She was extremely emotional regarding

1  the children.  Joe's cancer and living with people with

2  chronic illness was hard.  Remember a minute ago when you

3  were told that wasn't a stress to her.  That's what this

4  lady said.  Hard to watch Joe die of cancer and couldn't

5  help.  If that isn't stress, I don't know what is.  She's

6  expressing it, not to you, but to this nurse.

7          Model inmate, naive and full of sob stories --

8  would fall for sob stories.  Try to be helpful.  Tendency

9  to mother others.  No benefit for her doing these things.

10  Mentioned the blanket and falls for pregnancy.  She's the

11  one that says blankets are like gold in there.  And it

12  was.  Lots of time it's very cold with only one little thin

13  blanket.

14          Like I said, these three people had at least

15  6,240 hours over the last year.  They said they were good

16  at spotting fakes.  If she was faking and trying to

17  manipulate or otherwise trying to take advantage as has

18  been the story of the State, don't you think the

19  professionals would have been able to catch it?

20          We had two corrections officers testify who are

21  obviously at odds with the psych unit.  One told you of a

22  lady with serious mental health problems called Wendy a

23  control freak.  Wendy told you that that person did not

24  want to pull her fair share of the load and did not like

25  Wendy because she was trying to get everybody to do their

1   jobs.  In there, if your unit isn't maintained, they put

2   the whole unit on restriction.  So there is an incentive

3   for those people who are doing the work, to trying to get

4   help to make sure it gets done.

5        Out of several thousands corrections officers and

6   several thousand inmates compared with the psych testimony,

7   let's use these words, "where is the truth."  Where is the

8   truth.

9        The other way I analyzed this was if I followed

10  this rational according to the State's argument, Wendy must

11  be extremely brilliant and very successful as a manipulator

12  because she fooled everybody except Dr. Bayless.

13       Or, alternatively, you could say, or the State

14  may be saying, that none of the other professionals are

15  very smart and only Dr. Bayless is because she didn't fool

16  him.

17       Let's talk about the State's version of

18  mitigation circumstances.  The other thing that law school

19  teaches us is if the law is on your side, argue the law, if

20  facts are on your side, argue the facts, if neither are,

21  argue emotion.  As I mentioned earlier, the State chose the

22  later, trying to get you to convict Wendy on Phase 3 by

23  using the same arguments they did in Phase 2, the first two

24  phases.  That's not the way it is in your instructions that

25  you'll be given in a few minutes.  Look at those

1   instructions and you decide.

2          But I think here's where it really lost control.

3   There are no facts to support the assertions regarding any

4   of the various mitigating circumstances.  Okay.  He didn't

5   introduce any facts to support those.  Saying what mother

6   would kill the children's father, must not be a good

7   mother.  Remember, that was what you did in Phase 1,

8   convict her of that.

9          It -- you've seen the pictures of the house that

10  night -- if there had been any staging, it could have been

11  done a lot better.  Didn't take one lamp and leave the rest

12  of the stuff there.  There was obviously a fight.  You

13  thought she just went too far in doing whatever she did.

14         Guess what, the EMT people had to wake the

15  children when they got there.  Remember that testimony?

16         The essence of being a good mother, what we

17  presented to you, talked about her being a good mother when

18  we describe it.  What she did on a daily basis, read to

19  them, bathed them, fed them, so forth.

20         Wendy said -- Gia said she would come over there

21  and lay down on the bed and play with them or play on the

22  floor until they got ready to go.  When Nicholas' shoe was

23  not tied, she sat there for 20 minutes until he got it tied

24  and never got upset.  I think that third party ought to

25  tell us something.

32

1       But she also said Joe was a good father.  We

2 haven't -- we don't have any issue with her saying that.

3       Jana was asked or told by Wendy if she wanted to

4 see her brother, she better come now.  Okay.  Because she

5 wasn't sure how long he'd be here.  So Jana came.  But Jana

6 didn't want to visit Wendy.  She came to visit Joe and the

7 children.  Joe didn't want to go to the birthday party.  He

8 wanted to stay home with Jana because she had come to see

9 him.  Wendy simply gave him the opportunity.  But, of

10 course, there's something sinister in that through the eyes

11 of the State.  I don't want you to buy that, either.

12       Being a missionary.  Not relevant since it was a

13 long time ago.  Hey, you can't replace fact.  The fact is

14 she did that.  The fact is that's a mitigating factor,

15 circumstance that you're allowed to consider.  How much

16 weight you give it, that's up to you.  But don't just throw

17 it in the trash because the State asked you to just because

18 it was a few years ago.  She, as a matter of fact, did.

19 That's fact.  That's the way it is.  How much weight,

20 that's your issue.

21       Strongly religious.  State wants you to

22 completely discount that as well simply because she lied

23 and did some of the other things she admitted to.  Not only

24 yesterday, but she also admitted on the stand up there, "I

25 had an affair.  I made a mistake.  I lied.  I shouldn't

1   have done that."  She even went so far yesterday to say, "I

2   shouldn't have cooperated with him on buying the azide."

3   She is admitting a lot of mistakes.

4            Does that mean she's not religious?  Some people,

5   according to those stories I was telling you a minute ago,

6   and the Bible is full of them, became stronger after they

7   made mistakes.  It didn't destroy them.  They became

8   stronger.  They were used greatly in the Lord.  She wants

9   to be able to do that.  The State also has no defense or

10  other argument except emotion on that one.

11           There is no way to deny Wendy is a good student.

12  Received numerous awards.  But that was a long time ago,

13  too, so don't count that.  You can't take away what history

14  is.  Okay.  The records show that's what happened.  If you

15  don't want to give it much weight, again, that's your

16  decision.  But you can't just disregard it.  That's

17  inconsistent with the rules, too.

18           Cooperative with the police.  Well, think about

19  it.  I mentioned yesterday when they finally got there,

20  she's sitting there beside Joe waiting for them to come.

21  She didn't run.  She didn't fee.  She didn't try to hide.

22  She didn't go anywhere.

23           When she was with Detective Lucero, it's been

24  said she was probably in shock.  The only thing she didn't

25  tell Detective Lucero was about the chemical.  She told you

1  that she promised him she wouldn't.  Is that a good idea?

2  I don't know.  I wasn't there.  That was a promise she

3  chose to keep.  Did that hurt her case?  Probably.  Did

4  that keep the detective from being able to look into that

5  early on and not get suspicious of her?  Probably.  But she

6  certainly didn't do anything to prevent them from doing

7  their work.  She didn't hide it or make it difficult for

8  them.  She didn't make them have to go find her in Mexico

9  or where ever.

10         Good candidate for rehabilitation?  Again,

11  Dr. Perry, Laura King, Joyce Van Every spent over 6,000

12  hours with her over the last year.  You heard them.  There

13  was no representation of their facts other than a psycho

14  inmate, okay, called her a control freak.  Who are you

15  going to believe?  Good with other inmates.  Same people

16  mentioned it again.  This is all consistent in their

17  assessment.  They all basically said something of the same

18  words, even.  But, you were told not to buy that.  Okay.

19  No facts to support.  Don't buy it though.

20         No threat to community. , this one, of course,

21  again there are no facts from the State.  State argues once

22  again that killing Joe was evidence that she'd be a threat

23  to the community.  We presented testimony not contested by

24  several witnesses that she has never been violent in any

25  situation including people from the psych unit.  Don't buy

1   the emotional appeal that you saw.

2          But the worst, I guess, exercise of emotion was

3   the impact on family.  Clearly, there's no factor if you

4   hear from Donna, Alejo and Barbara Mitchell.  So the State

5   attempted to minimize their testimony.  Donna sheds tears,

6   she must have been trying to manipulate you, members of the

7   jury.  The State said Donna did not visit Wendy as often as

8   a good mother should.  Of course, standing in line for six

9   hours and then being denied visitation doesn't show on her

10  chart that was allegedly checked.  Also didn't tell you

11  that visitation was on Tuesday and Fridays from 10 to 4.

12  And she work five days a week.  So getting there was not

13  too easy.

14          She did tell you Alejo did go.  He went many

15  times.  But the State wants you to buy the emotional

16  appeal.  That if she wanted to, she would have and she

17  didn't.  So don't give them any credit for that might come

18  from Wendy's execution on her because she didn't go.  It

19  was a big deal for her.  She also told you she called

20  several times a week, sometimes daily three or four times.

21  She wrote letters.  There's different ways you visit with

22  people in jail.

23          The State's since Alejo didn't cry when asked

24  about the effects of Wendy's execution him, that must have

25  been Alejo's attempt to manipulate you.  You might recall

1   as I said a minute ago he was devastated and turned from

2   the microphone, couldn't continue.  We went on to another

3   subject, if you recall, to give him some time to regain his

4   composure.  I found that section of the State's of argument

5   simply abusive.

6          MR. MARTINEZ:  Objection to his views.

7          THE COURT:  Sustained.  Let's move on.

8          MR. DELOZIER:  Next was his area of domestic

9   violence.  And, of course, what he's saying there

10  essentially is pay attention to Dr. Bayless, disregard

11  everything you hear from Dr. Murphy and any of the other

12  people that testified about the violence they saw.

13          You had people tell you they saw things.  Now,

14  were they telling the truth?  That's your job to try to

15  figure whether you believe them or not.  They told you,

16  though, what they saw.  Dr. Bayless didn't have the

17  opportunity to do any of that.  Just because she didn't

18  have an 100 percent complete story, and his opinion with

19  Dr. Murphy, she left out a piece here and piece there, she

20  lied.  No, this is, you know, we're all human.  I remember

21  things today I didn't remember last week.  It's so for all

22  of us.  We tend to not have all the pieces together at one

23  point in time.

24          But Dr. Murphy spent 20 hours with her.  Dr.

25  Bayless spent a few generous four.  Dr. Mechanic came in

1   and told you that the kinds of things that a domestic

2   violence expert does were the identical things that Dr.

3   Murphy did.  Okay.  Dr. Mechanic didn't do anything except

4   review records.  She didn't talk to our client.  She didn't

5   confirm in her opinion, so forth.  But she said that the

6   things that you do in this field that Dr. Murphy is

7   recognized across the country as an expert.  These are one

8   of the things you do.  And she did them all.  Dr. Mechanic

9   told you she gives an MMPI after she has determined whether

10  or not there's been a victim of domestic violence.  For

11  what purpose, treatment.  Not to evaluate whether they are

12  or not.  But after you determine they are, how do you

13  treat?  And that's what Dr. Bayless's business is, is

14  treating people who have already been diagnosed with that

15  problem or other problems.  Okay.

16          The issue of not changing her report, and you

17  heard her testify about this, is that you can't take just

18  one isolated instance, okay, and rewrite a report based on

19  the totality of the circumstances.  Now, you look at the

20  totality of the circumstances and not at a specific event.

21  The totality of the circumstances was that she was a

22  victim.  That's what you were told.

23          Gosh.  Stress of cancer, stress of misdiagnosis,

24  stress of terminal cancer.  We covered those yesterday in

25  sufficient detail in my opinion.  Obviously, these were

1   stress factors for everybody.  Jana flew in from Memphis to

2   come here because these were stress factors for her.  Wendy

3   lived it on a day-to-day basis because she was in the same

4   household.  Okay.  To throw those into the trash can and

5   say they aren't really real is disregarding reality.

6   Okay.  You've got a sick husband or wife, it's going to be

7   stressful for you.  I don't care if it's just a cold.

8   Stressful.  Flu, the worst.  Terminal cancer?  Come on.

9          We also see an cumulative stress, if you recall.

10  We went first surgery, second surgery, third surgery,

11  fourth surgery.  Terminal.  Okay.  Roller coaster, remember

12  that, of emotion.  Oh boy.  Oh no.  Oh boy.  Oh no.  Oh

13  boy.  Oh, no.  And then, oh, my God.  Sitting on the bed,

14  looking at all these CT scans.  There's song out now about

15  that.  Somebody might have heard.

16         The stress of economic difficulties?  I'm on

17  Ahcccs when Nicholas is born.  I have to borrow $2500 from

18  my mother and father or so Joe can get the third surgery.

19  These people, you know, have two children.  They're

20  expected to live on their own.  I don't want my 30- or

21  40-year-old kids coming back and saying help me.  They're

22  adults.  They're not children any more.  They're supposed

23  to be maintaining their own life style, supposed to be able

24  to carry their own load.  Okay.  They couldn't.  Why?

25  Several factors.  Joe's surgery.  Joe's loss of his

1   business.  Problems with his partner.  You name it.

2   Boats.  Okay.  We went over all that.  They obviously were

3   stressed from financial circumstances.  There is nothing to

4   that except emotion again.

5           Convictions?  There are none.  So you come up

6   with, okay, these people didn't chose to prosecute her.  We

7   don't know that.  We don't know what really happened in

8   that case.  She may have made restitution.  I don't know.

9   But the point is, the factor that you consider in your

10  mitigation circumstances is no prior felonies.  No prior

11  misdemeanors.  The rest of that stuff is irrelevant.  Isn't

12  part of what you're charged with.

13          Remorse.  Oh, my gosh.  She never blamed anyone

14  except herself.  That's what you heard yesterday.  She

15  didn't blame Joe.  Doctors told you that.  Nurses told you

16  that.  So forth and so forth.  "I made a lot of mistakes.

17  I wish I hadn't done those.  I'm in counseling.  I have

18  been for four years.  I'm going to have to continue to be

19  in counseling.  What I remember is what I told you on the

20  stand," is what she told you.  Okay.  She didn't believe

21  that she went too far in defending herself.  Do you believe

22  that she went too far in defending herself?  She is not

23  making up anything.  She's not trying to get you to buy

24  into anything.  That's what she told you.

25          THE COURT:  Mr. Delozier.

1        Mr. DELOZIER:  Yes, sir, Your Honor.  Thank you.

2        It isn't sympathy.  It's mere sympathy, to

3   correct the prosecutor on what he told you a moment ago.

4   You're not supposed to use mere sympathy as a circumstance

5   to decide to do it.  But if you find these mitigating

6   factors, then sympathy can be included.  Leniency can be

7   included.

8        And just briefly, you're not limited to

9   considering the ones that we posted on the wall, either,

10  the rules will tell you.  If you found one somewhere in the

11  trial that we didn't name, you're entitled to consider that

12  one as well.  You're also supposed to be able to consider

13  any mitigation circumstance you heard through all three

14  phases.

15        To clarify once again, individually determine the

16  nature and extent of the mitigating circumstances.  Not as

17  a group, individually.  What is it to me, as one juror.

18  What is my moral position on that circumstance.  What do I

19  think about whether it should be life or should be death.

20        And then say if you have any doubt on whether a

21  death sentence should be imposed, you're supposed to

22  resolve it in favor of a life sentence.

23        That's, once, again, what I ask you to do.  Thank

24  you so for much for your patience and your courtesy, your

25  time.  We know it's been a hardship for you guys and it's

1   been much longer than any of us thought it would be.   Thank

2   you.

3            THE COURT:  I'm going to ask the bailiff at this

4   time to pass out to each of you a copy of the final

5   instructions of Phase 3.

6            I'll ask each of you to please follow along as I

7   read the final instructions for Phase 3.

8            Final instructions Phase 3.  Duty of jury.  I'm

9   now going to give you the final instructions of the law

10  that you must follow to decide issues in this penalty phase

11  of the trial.

12           As you are aware, in the guilt of the trial the

13  defendant was found guilty of first degree murder.

14           In the aggravation phase the following

15  aggravating factor was found to exist:  The defendant

16  committed the first degree murder in an especially cruel

17  manner.

18           It is now your duty to determine whether or not

19  the defendant should be sentenced to death or life

20  imprisonment on her conviction of first degree murder.

21           In answering this question, it is your duty to

22  follow these instructions on the law.  You must consider

23  all of these instructions.  Do not pick out one instruction

24  or part of one and ignore the others.  As you determine the

25  facts, however, you may find some of the instructions no

1   longer apply.  You must then consider the instructions that

2   do apply along together with the facts as you have

3   determined them.

4        It is also your duty to determine the

5   facts. "Fact" means what actually happened.  Determine the

6   facts only from the evidence produced in court.  When I say

7   "evidence," I mean the testimony of witnesses and exhibits

8   received in evidence and any facts to which the parties

9   stipulated or that I instructed you to accept.

10       You should not speculate or guess gets about any

11  fact.  You must not consult outside sources for

12  information, such as dictionaries, a newspaper of the

13  Internet.  You must not be concerned with any opinion that

14  you feel I have about the facts or issues in any phase of

15  the trial.  You must not take anything I may have said or

16  done during the trial as indicating any opinion I may have

17  about the facts.  You, as jurors, are the sole judges of

18  what happened and of the issues to be decided.

19       Lawyers' comments are not evidence.  In their

20  opening statements and closing arguments lawyers have

21  talked to you about the law and the evidence.  What the

22  lawyers said is not evidence but it may help you to

23  understand the law and the evidence.

24       Stipulations.  The lawyer are permitted to

25  stipulate that certain facts exist.  This means that both

1   sides agree those facts do exist and are part of the

2   evidence.

3           Objections and stricken testimony.   If the Court

4   sustained an objection to a lawyer's question, you must

5   disregard it and any answer given.   Any testimony stricken

6   from the court record must not be considered by you for my

7   purpose.

8           Direct and circumstantial evidence.   Evidence may

9   be direct or circumstantial.   Direct evidence is the

10   testimony of a witness who saw, heard or otherwise observed

11   an event.   Circumstantial evidence is proof of a fact or

12   facts from which you may find another fact.   The law makes

13   no distinction between direct and circumstantial evidence.

14   It is for you to determine the importance to be given to

15   the evidence, regardless whether it is direct or

16   circumstantial.

17           Credibility of witnesses.   In determining the

18   evidence, you must decide whether or not to believe the

19   witnesses and their testimony.   As you do this, you should

20   consider the testimony in light of all the other evidence

21   in the case.   This means you may consider such things that

22   witnesses' ability and opportunity to observe, their manner

23   and memory while testifying, any motive or prejudice they

24   might have and any inconsistent statements they may have

25   made.

1    Expert testimony.  A witness may give an opinion

2    on a subject upon which the witness has become an expert

3    because education, study or experience.  You should give

4    consider the opinion of an expert and the reasons, if any,

5    given for it.  However, you are not bound by any expert

6    opinion.  Give the expert opinion the importance that you

7    believe it deserves.

8    Prior verdict and findings.  In the guilt phase

9    of the trial, the jury unanimously found beyond a

10   reasonable doubt that the defendant committed first degree

11   murder.  In the aggravation phase, the jury unanimously

12   found beyond a reasonable doubt the aggravating factor that

13   the defendant committed the first degree murder in an

14   especially cruel manner.  These issues have been finally

15   decided and you are not to reconsider these verdicts.

16   Burden of proof in penalty phase proceedings.  In

17   the penalty phase, the defendant has had the opportunity to

18   prove the existence of mitigating circumstances by a

19   preponderance of the evidence.  A mitigating factor is

20   proved by a preponderance of the evidence if it is shown to

21   be more likely true than not.  This is a lesser burden than

22   proof by clear and convincing evidence and proof beyond a

23   reasonable doubt.

24   Mitigating circumstances.  Mitigating

25   circumstances are circumstances which do not justify or

1   excuse the offense, but which, in fairness or mercy, may

2   extenuate or reduce the degree of blame or moral

3   culpability.  Such mitigating circumstances may be any

4   evidence presented by either the defendant or the State

5   that would lead you to apply leniency in this case and find

6   that death is not an appropriate sentence.

7          Although a final decision on a penalty of death

8   or life imprisonment must be unanimous, the determination

9   of what circumstances are mitigation is for each one of you

10  to resolve individually, based on all the evidence that has

11  been presented to you during this phase and in any of the

12  prior phases of the trial.  The evidence to be considered

13  by you in determining mitigation includes any aspect of the

14  defendant's background, character, propensity or record and

15  any of the circumstances of the offense that might justify

16  a penalty less severe than death.

17         The mitigating circumstances offered by the

18  defendant are as follows:

19         No prior felony convictions.

20         No prior misdemeanor convictions.

21         Good candidate for rehabilitation.

22         Good mother to two children.

23         Married for six years.

24         Good student in school, awards.

25         Good student in school grades.

1       Missionary work for church in Mexico.

2       Strong religious convictions.

3       Good inmate in jail.

4       Helpful to -- I'm sorry -- to staff and other

5   inmates in jail.

6       Cooperative with authorities after arrest.

7       Domestic violence victim.

8       Emotional abuse victim.

9       Sexual abuse victim.

10      Stress of husband cancer.

11      Stress of misdiagnosis of husband's cancer.

12      Stress of terminal diagnosis of husband's

13   cancer.

14      Stress of economic difficulties.

15      No future threat to community.

16      Remorse.

17      Impact on her family members and friends.

18      Age.  Considering level of intelligence,

19   maturity, participation in the crime and past experiences.

20      You're not limited to considering these

21   circumstances.  You must also consider any other relevant

22   mitigation evidence presented during any phase of the

23   trial, even if it was not proposed by either of the

24   parties.  As a juror and sentencer in a death penalty case,

25   you must give consideration to all relevant mitigating

1   evidence presented.

2          You may not consider any information presented

3   during this phase of the trial as a new aggravating

4   factor.

5          Mitigation rebuttal evidence.  The State has

6   presented evidence to rebut the defendant's mitigation

7   evidence.  This evidence is not a new aggravating

8   circumstance.  It is presented solely to give you a more

9   complete picture of the defendant's character, propensities

10  or record and to aid you in determining whether or not the

11  mitigation is sufficiently substantial to call for leniency

12  and the imposition of a life sentence.

13         Weighing the aggravating and mitigating

14  circumstances and deliberating on the penalty.  You must

15  make your decision about whether mitigation is sufficiently

16  substantial to call for leniency based solely upon your

17  weighing of any mitigation proven to you and the

18  aggravating factor you have already found during the

19  aggravation face.  To do this, you must individually

20  determine the nature and extent of mitigating

21  circumstances.  Then, in light of the aggravating

22  circumstance that has been proven to exist, you

23  individually determine if the totality of the mitigating

24  circumstances is sufficiently substantial to call for

25  leniency and a life sentence.

1       The weighing of aggravating and mitigating

2  circumstances does not mean a mere mechanical counting of

3  factors on each side of an imaginary scale or the arbitrary

4  assignment of weights to any of them.  You are free to

5  assign whatever value you deem appropriate to each and all

6  of the various factors you are permitted to consider.  In

7  weighing the various circumstances, you determine, under

8  the relevant evidence, which penalty is justified and

9  appropriate by considering the totality of the aggravating

10  circumstance with the totality of the mitigating

11  circumstances.

12      In reaching a reasoned, moral judgment about

13  which penalty is justified and appropriate, you must decide

14  how compelling or persuasive the totality of the mitigating

15  factors are when compared against the totality of the

16  aggravating factors.  You cannot be governed or influenced

17  by mere sentiment, passion or prejudice.  However, you may

18  consider grounds for leniency and decline to impose the

19  death penalty after a thoughtful consideration of the

20  evidence.

21      Neither the State nor the defendant has the

22  burden of proving that the weigh of the mitigation is or is

23  not sufficiently substantial to call for leniency.  The law

24  does now define what is sufficiently substantial to call

25  for leniency.  Each juror must determine for himself or

1   herself what is sufficiently substantial to call for

2   leniency.

3           Any verdict of death or life imprisonment must be

4   unanimous.  If you unanimously find that no mitigation

5   exists, then you must return a verdict of death.  If you

6   unanimously find that mitigation exists, each one of you

7   must individually weigh that mitigation in light of the

8   aggravating circumstance already found to exist and if you

9   unanimously find that the mitigation is not sufficiently

10  substantial to call for leniency, you must return a verdict

11  of death.

12          If you unanimously find that mitigation exists

13  and it is sufficiently substantial to call for leniency,

14  you must return a verdict of life.

15          If, after considering all of the aggravating amd

16  mitigating evidence you have a doubt whether a death

17  sentence should be imposed, you should resolve that doubt

18  in favor of a life sentence.

19          Victim impact information.  The victim's mother

20  and father have each made a statement relating to personal

21  characteristics of the victim and the impact of this murder

22  on the victim's family.  This information is not a new

23  aggravating circumstance and you cannot consider it as

24  such.  Just as the law allows you to see the defendant as a

25  unique person and see the loss that will result from her

1  execution, the law also allows you to see the murder victim

2  as a unique person and to see the loss resulting from his

3  murder.  You are to consider this information only for this

4  limited purpose.

5       Question to decided.  The question for you to

6  decide is:  Should the defendant be sentenced to death or

7  life imprisonment for her conviction of first-degree

8  murder.  As previously stated, in deciding this question

9  you must decide whether there is mitigation sufficiently

10  substantial to call for leniency.

11       Your decision is not a recommendation.  Your

12  decision will be binding.  If your verdict is that the

13  defendant should be sentenced to death, the defendant will

14  be sentenced to death.  If your verdict is that the

15  defendant should be sentenced to life, the defendant will

16  not be sentenced to death and the Court will sentence the

17  defendant to either life without parole until 25 calendar

18  years in prison are served or natural life, which means

19  that defendant would never be released from prison.

20       Deliberation schedule and breaks.  After you have

21  selected a foreperson, you should next discuss and then set

22  your deliberation schedule.  You may agree to deliberate

23  Monday through Friday in the morning and afternoon or only

24  half days.  You are in charge of your schedule and may set

25  and vary it by agreement and the approval of the Court.

1    After you have decided on a schedule, please send

2    it to me by note through the bailiff for my review and

3    approval.

4    You are to discuss the case and deliberate only

5    when all jurors are together in the jury courtroom.  You

6    are not to discuss the case with each other or anybody else

7    during breaks or recesses.

8    The Admonition I've given you during the trial

9    remains in effect when all 12 of you are not in the jury

10   room deliberating.

11   Review of instructions.  After setting your

12   schedule, I suggest you next review the written jury

13   instructions and verdict form.  It may be helpful for you

14   to discuss the instructions and form to make sure that you

15   understand them.  Again, during your deliberations, you

16   follow the instructions and refer to them to answer any

17   questions about applicable law, procedure and definitions.

18   Questions and messages.  Should any of you or the

19   jury as a whole have a question for the court during your

20   deliberations, or wish to communicate with me on any other

21   matter, please utilize the jury instruction form that we

22   will provide you.  Your question or message must be

23   communicated to the Court in writing and must be signed by

24   you or the foreperson.  The Court will consider your

25   question or note and if necessary consult with counsel

52

1   before answering it in writing.  The Court will answer it

2   as quickly as possible.  No member of the jury should ever

3   attempt to communicate with me except by a signed writing

4   and I will communicate with you on anything concerning the

5   case only in writing or orally on the record.

6          Remember that you're not to tell anyone,

7   including me, how you stand numerically or otherwise, until

8   you have reached a verdict or have been discharged.

9          Verdict.  The penalty issue is now submitted to

10  you for decision.  When you go to the jury room you will

11  choose a foreperson.  He or she will preside over your

12  deliberations and sign any verdict.

13          To return a verdict of death or life

14  imprisonment, your verdict must be unanimous.  Please mark

15  your decision on the verdict form provided.

16          You will be given one form of verdict.  That will

17  read as follows -- you don't have a copy of the verdict

18  form.  I have the verdict form in front of me.

19          The verdict form reads as follows:  Penalty

20  verdict.  We, the jury, duly empaneled and sworn in this

21  matter, upon our oaths, do unanimously find the defendant,

22  Wendy Elizabeth Andriano, shall be sentenced to, blank,

23  death, blank, life.

24          And there is a signature line for the foreperson

25  to fill out.

1          Do either counsel wish to have any additions or

2    changes to the final instructions, Phase 3, as read?

3          MR. MARTINEZ:  No, Judge.

4          MR. PATTERSON:  No, Your Honor, thank you.

5          THE COURT:  Do either counsel have any additions

6    or corrections to the verdict as read?

7          MR. MARTINEZ:  No, Judge.

8          MR. PATTERSON:  No, Your Honor.  Thank you.

9          THE COURT:  Juror Number 3, Juror Number 9 and

10   Juror Number 14, you were previously chosen by lot as the

11   alternate jurors in this case.  So in just a few moments

12   I'm going to allow the three of you to leave, physically.

13   But the admonition that I gave you previously will continue

14   to apply and you should follow that admonition until you're

15   contacted by us.  And when there's a verdict reached and

16   announced here in open court, we'll contact you and we'll

17   notify you of that fact and only at that time will the

18   Admonition I've give you no longer apply.

19          Now, if I don't see you again, Juror Number 3,

20   Juror Number 9, Juror Number 14, if I don't see you again

21   on behalf of everyone that has been involved in this trial,

22   on behalf of this court and on behalf of the community, I

23   want to thank you for the service you've given in this

24   case, the patience and the full attention you've given in

25   this case these past almost 16 weeks.  We began the jury

54

1    selection process in this case on August 23rd.  We had

2    opening statements on September 6th.  And so, we've come

3    quite a ways together.  And on behalf of everyone connected

4    with the trial, on behalf of this court and the community

5    we thank you for your service on the jury:

6             Remember to follow the Admonition until you're

7    contacted and advised otherwise.

8             I'm going to ask the clerk to swear in the

9    bailiff at this time.

10            (Bailiff sworn.)

11            THE COURT:  What I'm going to have the jury do is

12   to retire to the jury room, select your foreperson and then

13   write out what your deliberation schedule will be and then

14   have the bailiff return that to us.  And what I'll do have

15   everyone come in court and verify that.  And at that time

16   you can take your break so we can get all the evidence in

17   the jury room during your break.  And you can have all the

18   evidence in the jury room when you begin your

19   deliberations.

20            So the first thing I want to you to do is select

21   your foreperson and decide upon your deliberation

22   schedule.  And buzz us on the button and the bailiff will

23   get the note and we'll reconvene and verify that jury

24   deliberation schedule and you can take your break.

25            I'm going to ask everyone to stand while the jury

1    retires to the jury room.

2              (Jurors exit the courtroom. )

3              THE COURT:  Please be seated Cause Number

4    CR2000-096032, State of Arizona versus Wendy Elizabeth

5    Andriano.  The record will reflect the presence of

6    defendant and country outside the presence of the jury.

7              We'll reconvene once we get the note with regard

8    to the deliberation schedule.  And then, during the break

9    the clerk will place in the jury room, with the assistance

10   of the bailiff, all the exhibits which have been admitted

11   into the trial.

12             Is there anything further we need to discuss at

13   this time?

14             MR. MARTINEZ:  No, thank you.

15             MR. PATTERSON:  Just one issue.  Did you want a

16   disk of the time line presentation?

17             THE COURT:  That's hasn't been provided to the

18   clerk yet?

19             MR. PATTERSON:  Let me explain.  We have produced

20   the photographs but the time line presentation is

21   proprietary software and it could not be read by anybody

22   unless they had the proprietary software.  So we could make

23   one for you and put it in the record but nobody can read it

24   unless they have the software.

25             THE COURT:  Okay.  We can discuss that further

1    later on.  But what it is, I just wanted that marked for

2    identification, not admitted into evidence.  But we can

3    discuss that further.

4         Does anyone have any objection to the printed

5    copy is made.

6         MR. MARTINEZ:  Not, at all.

7         THE COURT:  Then you can make a printed copy and

8    we'll have that marked for identification.

9         MR. PATTERSON:  Thank you, Judge.

10        (Recess taken.)

11        THE COURT:  CR2000-096032, State of Arizona

12   versus Wendy Elizabeth Andriano.  The record will reflect

13   the presence of the defendant and counsel, outside the

14   presence of the jury.  The note returned is the jury

15   deliberation schedule and is as follows:  Monday through

16   Thursday 1:00 p.m. to 5:00 p.m.  Thank you.  Signed by the

17   jury foreperson.

18        Okay.  And so we'll bring the jury in and verify

19   that.  What I'm going to do, they will take a break and

20   we'll put the exhibits in the jury room.  And also I'm

21   going to tell them that when we retire for the evening

22   we're not going to formally retire with everyone here in

23   court.  I'll just remind them they can leave at the time

24   they decided to leave and to follow the Admonition when

25   they're not all together in the jury room.  I anticipate

1   unless we hear otherwise, we can follow the schedule.

2           MR. PATTERSON:  Judge, can we approach?

3           THE COURT:  Yes.

4           (Bench conference was held outside the hearing of

5   the court reporter.)

6           THE COURT:  Are we ready for the jury?

7           MR. PATTERSON:  Yes.

8           MR. MARTINEZ:  Yes.

9           THE COURT:  Please be seated.  This is Cause

10  Number CR2000-096032, State of Arizona versus Wendy

11  Elizabeth Andriano.  The record will reflect the presence

12  of the jury, defendant, counsel and the jury.

13          Ladies and gentlemen, I have received a note from

14  the jury foreperson that indicates that the jury

15  deliberation schedule is as follows: Monday through

16  Thursday 1:00 p.m. to 5:00 p.m.  Is there anyone on the

17  jury that disagrees with that deliberation schedule?  If

18  so, please raise your hand.  No one raised their hand.

19          What we'll do, then, is have you follow that

20  deliberation schedule.  And what we're going to as I

21  indicated a few moments ago you'll go ahead break at this

22  time so the exhibits can be placed in the jury room.  Also,

23  if you don't have a verdict near the time that you have

24  specified each day, then you may recess at that time and

25  return at the time that you agreed upon, the 1:00 p.m.

1   Monday through Thursday schedule.

2           Now, remember, when you're not in the jury room

3   with all jurors present, you must follow the Admonition

4   I've given you including the fact you're not to discuss the

5   case with anyone, do not let anyone discuss the case with

6   you.  Do not do any research, investigation,

7   experimentation or testing on your own.  Avoid any media

8   coverage of this case.  Keep on open mind.

9           And, again, when you return from break or from

10  recess, do not begin your deliberations until all jurors

11  are present and when all juror are present in juror room,

12  notify the bailiff.  You'll be meeting outside.  Just make

13  sure that all 12 of you need to be present before you

14  deliberate.  Okay.

15          I'll ask everybody to stand as the jury retires

16  to the jury room.

17          (Jurors exited the courtroom.)

18          THE COURT:  Please be seated.  CR2000-096032,

19  State of Arizona versus Wendy Elizabeth Andriano.

20          The record will reflect the presence of defendant

21  and counsel.

22          Counsel, just make sure my staff knows where

23  you're going to be so if there is a question or verdict you

24  can be contacted immediately.

25          We'll be in recess.

59

1        (Proceedings adjourned.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT EEE

000009103





IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,               )
                                )
            Plaintiff,          )
                                )
    vs.                         )     No. CR2000-096032
                                )         CR05 0005-AP
WENDI ELIZABETH ANDRIANO,       )
                                )
            Defendant.          )
_____)

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA

Mesa, Arizona
November 16, 2004

REPORTER'S TRANSCRIPT OF PROCEEDINGS
(Trial)

COPY                                SHARON FLORES
                              CERTIFIED COURT REPORTER
                                     50374

2

1

2

3

4                          A P P E A R A N C E S

5

6

7

8      For the State:

9                        Mr. Juan M. Martinez

10                       Deputy County Attorney

11

12

13

14

15      For the Defense:

16                       Mr. Daniel B. Patterson

17                       Mr. G. David Delozier, Jr.

18                       Office of the Public Defender

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2

3          THE COURT:  Good afternoon.  This is the trial in

4  Cause Number CR2000-096032, State of Arizona versus Wendi

5  Elizabeth Andriano.

6          The record will reflect the presence of the

7  defendant, counsel and the jury.

8          Ladies and gentlemen of the jury, the attorneys

9  will now make their closing arguments to tell what you they

10  think the evidence shows and how they think you should

11  decide the case.  The prosecutor has the right to open and

12  close the argument.  Since the State has the burden of

13  proof.  Just as in opening statement.  What is said in

14  closing argument is not evidence but it may help you to

15  understand the law and the evidence.

16          Mr. Martinez, would you like to give your opening

17  closing argument at this time?

18          MR. MARTINEZ:  Yes, sir.

19          THE COURT:  You may proceed.

20          MR. MARTINEZ:  Good afternoon, my presentation to

21  you will be broken down into three areas.  The first part

22  of the summation will deal with fact.

23          How was it that this woman to paraphrase Dylan

24  Thomas, made sure that her husband did not go gently into

25  that good night.  She made sure of that by going out and

4

1  getting some sodium azide.  Then, while he is in extreme

2  distress from that sodium azide and was down on the ground

3  unable to get up, she delivers the coop-de-grais which is

4  hitting him over and over and over again on the head.  And

5  when she's done with that, she hasn't been satiated yet,

6  she goes over to the kitchen, gets a knife and sticks it

7  inside of his neck, making sure that this time he is dead.

8          The second portion of my presentation will deal

9  with the jury instructions.  What is the law that you have

10  indicated and have sworn you will follow.  That is the law

11  that the Judge will give you at the close of these

12  summation.  I will not dwell on every single one of the

13  jury instructions.  I will only talk to you about some of

14  the salient portions that I wish or hope you would consider

15  what you go back into the jury room to deliberate in this

16  case.

17          Specifically, of course, one of the jury

18  instructions that I will talk to you about will be the

19  self-defense justification instruction.  And how is it that

20  after you read it, after you take a look at it, the

21  defendant, Wendi Elizabeth Andriano will not be able to

22  avail herself of the protections contained therein.  And

23  the reason that she will not meet the standard that is set

24  forth in the jury instruction is that Joseph Andriano was

25  weak.  He had just had chemotherapy treatment ten days

1   before.  Additionally, he was suffering from the effects of

2   the sodium azide.  Additionally, we know from the hit on

3   the back of the head that he was face down on the ground,

4   his face rubbing up against the carpet with each hit.

5   That's how he got the burns on his face.  And when he was

6   in that condition, he posed absolutely no threat to anybody

7   but yet she had to go get a knife and stick it in his

8   neck.

9           And because of that, she cannot avail herself or

10  in other words, use that as a way for you to excuse what

11  she did on that particular night.  It was not

12  self-defense.  It is not justification.  It was a

13  massacre.  It was a slaughter.  It was blood everywhere.

14  And it was all her doing when her husband was down on the

15  ground, incapacitated.

16          We'll also talk to you about the issue of

17  first-degree murder and the elements that the State has

18  charged or has indicated it will meet in this particular

19  case.

20          Now, first-degree murder is pretty simple,

21  basically.  But first-degree murder requires the State

22  prove that the defendant, with premeditation, killed

23  another human being.  That's what we have to prove to you

24  in this case.  And, in fact, we have already proven it.  We

25  have already proven it to you.  In fact, by the defendant's

6

1  own testimony she indicated that she purchased the sodium

2  azide to kill Joseph Andriano.  That's premeditation.  That

3  is the will to kill.  Although, she has an excuse for why

4  she's doing it.  But, she indicated and, in fact, confessed

5  to you in court that's what she was doing.

6       We'll also talk about the standard that you are

7  to apply.  Specifically, everybody's heard about it:  The

8  beyond a reasonable doubt standard.  That is the standard

9  that you apply to the facts and the evidence in this case

10  to reach your verdict, to reach your conclusion.

11      And with regard to that, the standard, if you

12  will, the definition that is given to you is that you have

13  to be firmly convinced we have proven to you not only shown

14  you that you should be firmly convinced that she was the

15  one that did it but, in addition to that, we have also

16  shown you that way beyond any doubt that she was the person

17  who actually did commit this crime against Joseph

18  Andriano.

19      The third facet of my presentation will deal with

20  the self-defense that was placed before you for your

21  consideration.  What they did, was they coded it,

22  basically, like a gift to you brought in by Sharon Murphy.

23  However, that gift brought in by Sharon Murphy did not

24  quite live up to its billing.  How it was that she

25  indicated to you, well, the defendant was the victim of

1   domestic violence.  But when we started talking about it,

2   she didn't take into account everything that she brought to

3   you came from the Defendant's mouth.  There is no empirical

4   test.  There's nothing.  And quite frankly, she went in

5   with the idea that this was a case of domestic violence.

6   That's what she did.

7            And all of the tests were geared towards that.

8   But in any event, they were wrapped up, gave it to you,

9   presented it to you like it was some sort of gift.  Of

10  course, not letting you know that it was filled with lies,

11  with omissions, with misrepresentations, with a story that

12  the defendant wanted you to hear before she also took the

13  stand and told you her story.

14           Additionally, one of the factors what we will

15  discuss with regard to this particular defense is what

16  happened at the crime scene.  One of the things I will

17  discuss with you, for example, is how it is that a lamp

18  that was purchased on October 6 or October 7 of the year

19  2000, how it is that her father came out and took a picture

20  of it in the early part of September 2000.  It just can't

21  happen that way.  But she fabricated the defense.  She

22  fabricated and altered the scene.  And that's what they

23  presented for you.  To sit back and say, well, maybe it did

24  happen that way.  Well, I submit to you that there was no

25  defense that was presented to you.  What I submit to you

8

1  that was presented was nothing but the fabrication, the

2  ruminations of this defendant, who, if it's in her best

3  interest, if it's to her benefit, she will make things up.

4  She will lie.  She will cheat.  She will omit things.  And

5  then she'll misrepresent them.  And that was presented to

6  you.  And that's her defense.  It's based, if you will, in

7  quick sand and just sinks to the bottom.

8           So let's talk a little bit about the facts that

9  were presented in this case.  I know that the trial had

10  been somewhat long and you've heard a lot but let's talk a

11  little bit about the facts that were presented to you.  We

12  can't really take a look at October 8th, 2000 and get a

13  full understanding of it without actually taking a look at

14  and seeing what the defendant was like.  Because that's

15  something that they presented to you.

16           I want to take you back to the time when she

17  first met Joseph Andriano to see what person she was, the

18  type of individual that she was.  That she indicated to you

19  over and over that she is a God-fearing, Harvest family

20  church person.  That she was able to memorize Proverbs.

21  That this is a person who, if you will, came in cloaked --

22  it was like a flag that she bought in, waived it around:

23  I'm one with Jesus or something like that.  She wanted you

24  to believe she's this incredibly religious individual who

25  grew up that way.

9

1          But let's take a look at what this incredibly

2   quote, unquote, religious individual did.  You know that

3   according to her on Saint Patrick's day in 1992 is the day

4   she met Joseph Andriano at a place called Dell's Pizza.

5   And, of course, when she presented it to you, she said, you

6   know, I was out with my friend.  And it was kind of dark

7   but not dark.  It was kind of late when we went to Dell's

8   Pizza.  You know what, it really wasn't my idea to go over

9   there.

10          Again, she's minimizing.  She's shirking her

11   responsibility for being in a place where they drink.

12   Perhaps she thinks that somehow you're going to think less

13   of her that there's a church person that she's out at a

14   bar, drinking.  But she minimizes, she says, "You know

15   what, it wasn't me.  I only went because my friend wanted

16   to go when I met him."  And that's the type of individual

17   that we're dealing with.  Someone who minimizes to present

18   the best light.  Even though we know now that that's not

19   true.

20          Additionally, she tells us, well, you know, I saw

21   Joseph Andriano.  I saw him there and he was one of the

22   farm kids  and I immediately liked him.  He gave me his

23   number and I give him mine.  And one of the things that we

24   know about this individual based on that little encounter

25   is that when he didn't call her, this woman who is

1   subservient, this woman who backed off, this woman who is

2   not assertive, this woman who is not aggressive, according

3   to her, what did she do?  She called him and said, "You

4   know, I want to talk to you.  You know, you gave me your

5   number and I want to talk to you."  But did that stop

6   there?  No.  When he didn't return her call, she was very

7   much focused.  She had a goal.  Because she had learned,

8   according to her, the lessons of the Rocky movie, which was

9   if you have a goal, you'll do just about anything to attain

10  it.

11          The problem is, she really didn't get the theme.

12  She didn't get the lesson that was in the Rocky movie.

13  That lesson in that Rocky movie that she flounced in front

14  of you was that you don't cheat.  You work hard.  You tell

15  the truth.  And, yes, you may achieve your goal.  But for

16  her, she misread it.  She will cheat.  She will

17  misrepresent things.  And she will slight things to make

18  herself look better.

19          So what did she do?  She called Joseph Andriano.

20  She called him one time.  He doesn't return her call.

21  She's not going to be deterred.  She has a goal in mind.

22  What is that goal?  To have him go out with her.  The next

23  thing that happens is that, well, she then calls him

24  again.  He doesn't return her call.  But said it's not that

25  he doesn't want to talk to me, it's that he's in Oklahoma.

1  Really.  Do you really think that's what it is?  Are we

2  sure that's what it is?  Are we going to take her word that

3  that's what was happening?  Or is it that he really doesn't

4  want to talk for her and all of a sudden he keeps getting

5  these calls from this girl that he met in that bar.  And

6  finally decides to call her back.  Because, you see,

7  according to her, Joe was a step up from where she was

8  coming from.  According to her, based on all the

9  descriptions, Joseph Andriano offered a step up.  And being

10  the greedy individual that we now know she was later on in

11  life, because according to Erik Vaillant, that's how he

12  described her, that she is somebody that is full of greed,

13  she decided this is my way up.  This is my one step up.

14  And, again, we can now start seeing the full picture of

15  this individual that testified before you and started

16  crying in front of you.  And started crying a river of

17  crocodile tears that in Arizona could have certainly

18  alleviated the drought.  But now, what happens back then is

19  she calls him and then he, of course, then returns her call

20  and then they begin to date.

21         One of the things that happens as a result of the

22  dating relationship is that he decides to move in with

23  her.  And, again, she is at a crossroads because she is,

24  according to her, very religious and you are supposed to

25  obey your father.  But what does she do?  She says, "The

1   heck with it, I'm not going to obey my father.  I'm going

2   to do what I want.  I'm going to carry out my goal.  And my

3   goal is to be with Joseph Andriano for whatever reason."

4   And so she lets him move in contravention of her father's

5   wishes.

6          And the other thing that we know about this woman

7   is that when she wants something, she'll get it.  We know

8   that she was living at the Quail Garden apartments.  We

9   know she rented or was given, if you will, a one-bedroom

10  apartment.  We also know that she told us, "Well, you know,

11  it would be very difficult if not impossible for me to get

12  a two-bedroom apartment.  But I continued to pressure the

13  manager.  I continued to talk to her.  I continued to get

14  after her to give me a two-bedroom apartment."  Does that

15  sound like someone's that's not goal-oriented?  Does that

16  sound like someone who is subservient?  It absolutely does

17  not.  That shows the sign of a woman who is dominate, who

18  is secure and who will get out there and get what it is

19  that she is seeking.  And she was successful.

20         So then she has Joseph Andriano move in.  And one

21  of the things she's quick to tell us, well, it wasn't a

22  sexual relationship to start with.  Again, she's

23  minimizing.  They're living together.  And no, it wasn't a

24  sexual relationship.  I don't want you to think anything

25  bad.  I don't want you to think I'm going against the

13

1   wishes of my God.  Of course, when they're married, it's

2   all right to go out and have affairs.  But right now, it's

3   against the wishes of my God to do that.  I'm not going to

4   do that.  Plus, my father would be really upset with me

5   even though I am living with this boy Joseph Andriano.

6          Well, it didn't take long, we don't know exactly

7   how long, for the defendant and Joseph Andriano to become

8   intimate.  That's a very telling sort of sordid little

9   story that she told you because according to her and

10   according to Sharon Murphy, what happened after this

11   wondrous experience as she put it, she cried.  That's what

12   it is.  And according to Sharon Murphy, the reason that she

13   cried   and remember this is their expert, this is the

14   person who is coming in here and saying, "Ah, this woman is

15   the victim of domestic violence.  And the reason that I

16   know that is because of some of the things that I'm telling

17   you.  One of the things I'm telling you is that Joseph

18   Andriano was the first individual that she ever slept

19   with."  Because, of course, that increases the power and

20   control.  She was some sort of ingenue.  Some sort of

21   naivete that he took advantage of.  That's why that's

22   important to her.  And you could almost see Joseph Andriano

23   almost glowing as she cried from the glow, if you will, of

24   that first experience.

25          Except, there is a problem.  There is a problem

1   not only for the defendant and there's a problem for Sharon

2   Murphy.  Because, she was asked on the stand, that wasn't

3   the first experience.  Sharon Murphy got it wrong.  It was

4   absolute fabrication.  And it was an absolute omission that

5   the defendant had led Sharon Murphy to believe.  And the

6   reason, of course, that she led her to believe that because

7   it would make her look better in Sharon Murphy's eyes, of

8   course.

9           I mean, you can see what kind of person this is.

10   She lies about things that happened in her past so that you

11   would think better of her.  And the other thing that -- the

12   reason that's important to us is because that shows you

13   Joseph Andriano is in way over his head.  She may be

14   younger than him but she is much more sophisticated then

15   this guy could ever think he could be.  She's got him

16   believing she is Mother Teresa's daughter or something.

17   Somebody that is holier than anything because she cries.

18   It's a first experience for her.  We know that it isn't.

19           We know that Joseph Andriano is in for a rough

20   ride.  We know that because of all of these things that

21   we've been talking about.  And then she says well, you know

22   what, we decided to get married.  Actually, she said it

23   wasn't my decision.  Joseph Andriano just announced it and

24   I decided to go forward with it.  Again, she's minimizing

25   what she's doing.  She is saying I was so not in control

1   that, you know, he forced me to do it.  That's basically

2   what she's saying.  But do you believe that from this woman

3   who we see is very goal-oriented, who really knows what

4   she's about, who will move forward no matter what to obtain

5   the goal?  Absolutely not.  She knew what she wanted.  She

6   wanted to be with Joseph Andriano and enjoy what she

7   considered to be a better life, a life that afforded her a

8   much more comfortable standard of living.  She comes to you

9   and says, "Well, we didn't even get married in my church.

10  But, of course, I don't even remember what church we were

11  married in."  And we went to Las Vegas and, you know, all

12  these things that she tells you about it.  But then she

13  says, "But, you know, right before the wedding I wasn't

14  even sure that I wanted to get married.  But I went a head

15  and did it."  She wants to show you that she's

16  subservient.  Do you really think that's that happened at

17  the wedding?  Do you really think she sat back and said,

18  "No, I don't want to do this?"  The reason that she told

19  you that, given the background that I've shown you, is

20  because she wants you to think that Joseph Andriano took

21  advantage of her.  She wants Sharon Murphy to think that

22  somehow Joseph Andriano took advantage of her.  But it's as

23  we have been seeing and we will see later, everything that

24  she told to a great extent to Sharon Murphy was based on a

25  lie.

1           So what ends up happening is they get together.

2    And this halcyon sort of standard of living she is

3    envisioning is not going to come true.  And part of the

4    reason that it's not going to come true, even though Joseph

5    Andriano is a very good worker and she said that to the

6    police when she was being interviewed, she said, "Yes, he

7    was a hard worker when we first got married."

8           Additionally, she indicated not only was he a

9    hard worker but he was making good money.  But if you

10   remember, Sharon Murphy said well, no, he was a sporadic

11   person who didn't work very often.  But of course, in her

12   statement to the police, she negates that.  She forgets

13   about that.  And, you know, one of the old adages, if you

14   will, from Mark Twain in Huckleberry Finn involves two

15   individuals who were talking, going back and forth about

16   telling the true, about fabrication and about

17   misrepresenting things.  And at one point one character

18   says to the other, "With the truth ya ain't got to remember

19   nothing."  She's got a lot to remember.  That's why it's

20   very difficult for her with so many stories because she's

21   always omitting something, she's always adding something.

22   She's always minimizing.  And  that's what you have in this

23   particular situation.  She wants Mr. Andriano to be this

24   lackey who didn't pull his weight.  And that's the

25   impression that was presented to you by Sharon Murphy.

1   That's the impression that she gave you.

2          But, when she speaks to the police, when she

3   hasn't had time to formulate this defense yet she said he

4   was a very good worker.  He brought in a lot of money.

5   And, in fact, he even paid my car.  Remember that?  He also

6   help me with the rent.  And it was only after 1998 when he

7   was having problems with his cancer and part of his

8   shoulder was taken out that she told the police he couldn't

9   work any more because he didn't have the strength.  And

10  that's what she told the police.  She did not admit it on

11  direct or cross-examination.  But she said he didn't have

12  the strength to do it any more.  I mean, it was before he

13  worked.  And according to her, she tells you after that he

14  could have worked if he wanted to but he just chose not

15  to.

16          It's amazing that the Federal government, who

17  does this for a living, in other words, who provides for

18  people who are unable to work did determine that Joseph

19  Andriano was going to be entitled to a stipend because he

20  could no longer work.  But she turns around and tells

21  Sharon Murphy, oh, sure he could work.  He was this guy,

22  just a bad guy who didn't like to work, liked to go on his

23  boat and likes to do that sort of thing.  And so she turns

24  that around.  She forgets that the Federal government

25  actually sits down, conducts an investigation, sends people

1  to doctors to see whether or not they are malingering,

2  whether or not they're making it up.  And in this case,

3  they determined that as a result of the operation, as a

4  result of the cancer, Joseph Andriano could not work.

5  Which is diametrically opposed to what they've been telling

6  you.

7       The other issues that we have in this particular

8  case are involving that particular period, also.  One of

9  things that I asked the defendant on cross-examination was,

10  "Do you remember this Jerry Robles with whom you had the

11  business arrangement."  " Yeah, I remember him."  Do you

12  remember that it was late 1996 which would make it about a

13  year and half or two years after her marriage, that you

14  wrote to him, "I don't want to be in the same office" or

15  words to that effect, "because I'm sick of being in the

16  same office with my husband."  And, again, that's back at

17  the end of 1996 when she said that.  She turns around and

18  she says that again.  She's very good at just turning

19  around and saying that's when I was going to leave him.

20  But that creates a problem because if you remember, Sharon

21  Murphy told us that was in the summer and Mr. Andriano was

22  at the lake with his friend and he came back early from the

23  lake.  So it couldn't have been the winter of 1996 when it

24  happened as she told us.

25       Additionally, she told us that again when she was

1   going to leave Mr. Andriano she already had Nicholas.

2   Nicholas wasn't born until 1997.   But she was very quick to

3   spout back and say, well, you know it was this time to try

4   and to cover up her tracts.   Because she just can't

5   remember everything that she said.   It's very difficult for

6   her to keep the lies straight.   It's so difficult because

7   it's from the time she was 21 or even earlier up to the

8   time -- she's what, 33 now.   That's a long time.   Maybe if

9   we were talking about getting an award for trying to keep

10  things straight and for a number of misrepresentations,

11  maybe she'd get an award for that.

12          But that's not what we're here to judge.   We are

13  not here to judge whether or not she's a good fabricator or

14  somebody who is good at making things up.   We're here to

15  determine whether or not on October 8th of the year 2000,

16  she premeditated the murder of Joseph Andriano.

17          What happened is in 1998 is that Joseph Andriano

18  is diagnosed with adenoid cystic carcinoma.   Obviously,

19  everybody is devastated for the past four years and then

20  three surgeries he has been misdiagnosis.   Not only has he

21  been misdiagnosed but it's worse than that, it's absolutely

22  worse than that because Joseph Andriano is going to die

23  now.   He is going to die in part because of what doctors

24  may or may not have done.   It's a terrible thing for this

25  33-year-old man with two kids.   It's just a horrible

1  thing.

2        But, you know, there was somebody in that

3  relationship that's not quite too upset about it.  And this

4  is the person who has been described as being greedy, a

5  person who has been described as being cold.  And that's

6  the defendant.  Because, you know, she sees a silver lining

7  in this very dark cloud.  And that silver lining is that

8  Joseph Andriano is now worth millions of dollars in the

9  form of a medical malpractice case.  And that if he dies

10  before it goes to trial it will become a wrongful death

11  lawsuit.  And she is quoted as saying, "could be worth up

12  to twenty million dollars."  She said it.  We don't know if

13  Jeffrey Miller told her but she said it and that was her

14  impression.  And it's her state of mind that's important

15  here.  And according to her it will be worth more if it's a

16  wrongful death lawsuit.  It doesn't matter if Jeffrey

17  Miller told her.  It doesn't matter what he told her

18  because she already admitted that's what she believed.

19        So we have the silver lining, if you will, in

20  this very dark cloud.  Actually, for her it's not even a

21  dark cloud because now she can go on doing what she wants.

22  It doesn't really matter.  She's not going to take care of

23  Joseph Andriano during these surgeries.  She's not going to

24  do that at all.  She's got her father and mother to do that

25  for her.  Also, he's just icky.  Also according to Eric

1   Vaillant she said Mr. Andriano is just gross.   Just

2   skinny.   Doesn't want anything to do with him from this

3   point forward.

4           So what we have is a situation where she is going

5   to benefit from something horrible happening to her

6   husband.   And so what does she do immediately in September

7   of 1998, almost as quick as he is diagnosed, because

8   remember according to them, he had that surgery in late

9   August of 1998.   By early September of 1998 she's ringing

10  that phone up at Jeffery Miller's office and she says, "I

11  want to refer this case to you.   I want you to talk to us

12  about this so we can go ahead and get this thing started."

13  And, sure enough, he sees the dollar signs and he goes out

14  there.

15          And one of the things that he does is that he

16  goes out to their house in Casa Grande, Arizona.   What's

17  telling and important about that is that Joseph Andriano is

18  nothing more than an after thought for them.   Because, if

19  you remember, according to Mr. Miller, he wasn't even

20  there.   I mean, we can understand the business reason why

21  he's there.   But we can't understand the cold heartedness

22  of the defendant to not even include him in that

23  conversation.   He comes walking in later.   But isn't this

24  about Joseph Andriano?   Isn't about the misdiagnosis

25  involving Mr. Andriano?   This is not about Wendi Andriano

1   and her loss of consortium because that's not worth

2   anything.  That's not worth anything.

3            The problem here is with the misdiagnosis and the

4   problems that Mr. Andriano is going to have.  And so, she

5   has this conversation and we know that as a result of that,

6   Jeffery Miller writes a confirming letter and sent it to

7   both of them.  And it says, you know -- and the defendant

8   confirmed this on cross-examination -- you know I didn't

9   think that I spoke to Mr. Andriano about the retainer

10  agreement.  You know what the retainer agreement is.  It's

11  what tells the parties how much money is going to be kept

12  by the lawyer and how much money the litigant or the

13  plaintiffs are going to be able to keep.  It's a very

14  important juncture, if you will, in a personal injury

15  case.  That's why it's done at the very beginning.  But,

16  of course, Mr. Andriano is not included in that.  You know,

17  the defendant doesn't care.  It's not about him.  It's

18  about her, right?  All he's got to do is sacrifice that

19  body -- die.  So she can then be made richer -- 20 million

20  dollars richer.

21            THE COURT:  Hold on.  You have a cell phone in

22  here you have to turn it off or I keep the cell phone.

23            You turned it off.

24            OBSERVER:  Yes.

25            THE COURT:  If anyone has a cell phone, turn it

1   off.

2          You may continue on.

3          MR. MARTINEZ:  So, we're at the point now where

4   she has now had these negotiations involving fees with a

5   lawyer outside the presence of Mr. Andriano.  It is such an

6   important deal, that the lawyer feels compelled to write

7   her a letter and say, you know what, I didn't discuss it

8   with Mr. Andriano.  Perhaps you know, if you ever want I'll

9   come out and we'll discuss this fee agreement again.  But

10  you can see, again, who's the dominant person.  You can see

11  the person that's in charge.  She is.  She's the one that's

12  conducting these negotiations.  Joseph Andriano is just

13  somebody there who is going to make her rich.  He's the

14  goose that's going to lay the huge golden egg.  That's all

15  he is.

16          And what happens after is there are negotiations

17  -- not negotiations but there's another conversation

18  between the defendant and Jeffrey Miller.  And that

19  conversation is whether or not they're going to settle this

20  lawsuit.  Because, if they want to settle it earlier, it's

21  going to be less money than if they take their time and go

22  to trial.  And one of the conversations the defendant had

23  with the detective, she tells him Joseph was very

24  frustrated that this thing wasn't settling.  He wanted to

25  settle it early.  She did not want to settle it early.

1   Because, according to her in that tape, this takes time.

2   This is how they have to do their job.  Well, they have to

3   do their job to maximize the return.  But, if they don't

4   want to maximize the return, what they can do is they can

5   settle it for less.  In the conversation about how this

6   lawsuit is going to be guided is between the lawyer and the

7   defendant, Wendi Andriano.  It's not between him and Joseph

8   Andriano.  And, in fact, the letter tells her you need to

9   discuss it with him to see whether or not you want me to

10  settle this early or not.  And, again, she's the one that

11  imposes her will.  She's the one that is the driving

12  force.  What does she care if it's settled early.  She

13  didn't care at all.  And the reason she didn't care at all

14  is because, you know, the longer it goes, the more money

15  she gets to keep.  And if he dies before that, wow, that's

16  going to be a big pay off, twenty million dollars.

17        This is all about greed.  This is all about her

18  having this goal.  And that goal is to make sure that she

19  has a lot money.  And so that's -- we have sort of a feel

20  for what's going on.

21        One of the other things that we know as this is

22  happening is that the defendant is changing jobs.  We also

23  know that she ultimately ends up at the San Riva

24  Apartments.  We also know that one of the things that she

25  is doing is that according to her assisting Mr. Andriano

1  with his treatments, she maintains she went to all of his

2  chemotherapy treatments.  We have Mr. Andriano, Sr. who

3  indicated no, that's not true.  I was the one that was

4  actually there.  He told you exactly what happened with

5  that.

6           But we also know that this issue of money, this

7  issue of greed, isn't only manifested with regard to the

8  lawsuit.  It's also manifested with regard to the contact

9  that the defendant has with the insurance company.  And we

10  know that because one of the things that she does on August

11  10th of the year 2000 she gets on the phone and calls Ed

12  Sandidge.  It seems that Ed Sandidge had a very modest

13  $5000 policy that he had underwritten on the life of Joseph

14  Andriano.  And she calls up -- the wife of Joe Andriano of

15  Ahwatukee -- calls up and speaks to Terry Crispin and says,

16  "You know what, we want to or I want to increase the

17  coverage for Mr. Andriano."  And as a result of that

18  conversation it's increased up to or 500 -- or he creates a

19  proposal, if you will, for life insurance for $500,000.

20           One of the things that she indicates on that is

21  another lie: Mr. Andriano is willing to take an exam.  You

22  see, the thing with that is she figures what the heck,

23  there's already an existing policy, why not just ask him if

24  we can increase it.  Since they're already covering him,

25  there shouldn't have to be an exam that is required.  But

1    if you remember, Terry Crispin said, "well, I was the one

2    that brought up this thing about the exam and she said that

3    Mr. Andriano would take it."

4            The problem is that when Ed Sandidge called her

5    up and said, "I need to talk to Mr. Andriano.  I need to

6    know what he wants to do, you know, take this exam."  What

7    did she do?  That isn't allowed to go forward because

8    Mr. Andriano doesn't know anything about this.  It's not

9    Mr. Andriano'S doing.  It's just the greed inside the

10   defendant that is motivating all this.  She wants more

11   money.

12           According to Jimmy Yost he indicates he talked to

13   her.  She talked to him about and in fact at some point

14   indicated she was trying to get a million dollars in life

15   insurance to sort of tie her over until this lawsuit comes

16   and the twenty million dollars would be available to her,

17   whatever amount of money they got.

18           But she didn't stop there.  In September, she

19   figured, well, I can't sort of put this one over on

20   Ed Sandidge.  So what I'll do is I'll open an account in

21   June of 2000 and I'll open it with USA.NET and open it in

22   my name and send out these feeler.

23           And the first one that she contacted was Amica.

24   She spoke with somebody by the name of Caroline Catalano.

25   And one of the things she asked was for a policy worth

1   hundred thousand dollars.  Again, you can see that it's

2   just the money that she's following involving

3   Mr. Andriano.  And when she did that, I mean, she tells

4   them the same blithe lie.  It doesn't matter to her.  She

5   said, "Oh, yeah, he doesn't have cancer."  Maybe she was of

6   the opinion they wouldn't require a medical exam.  I don't

7   know.  We don't know what she thought.  But she definitely

8   lied to them.  She definitely told them he didn't have

9   cancer.

10          This continued on until we get to the next day.

11  There is an e-mail that was sent to ETERM.COM and an

12  individual by the name of Gary Foster who gets assigned the

13  case.

14          One of the things he does is he gets right on it

15  and he decides, well, you know, they want a hundred

16  thousand dollar policy.  The husband doesn't have any

17  cancer, doesn't have any problems.  He decided to make a

18  contact call.  He calls the house and low and behold this

19  is the one and only time that we hear from Joseph

20  Andriano.  And it's significant because if anybody would

21  stand up behind his wife, it would be Joseph Andriano.

22  He's the individual that wrote that birthday card, "I love

23  you.  I love you.  I love you.  Turn it on the inside,

24  happy birthday.  Oh, by the way, have I told you that I

25  love you."  He's the same individual that never cheated on

1   her.  He's the same individual that took care of his kids;

2   took them over to his friend's house, Jake Roberts' house.

3   And took them over and they're eating a milkshake or

4   whatever, cleaning their faces up and was on their way.

5   That's the same individual that we're talking about.  That

6   through their recording device this was captured.

7          And one of the things that happened is that Gary

8   Foster says, "Hello, Mr. Andriano, I'm calling you about

9   this application for life insurance."  You heard the tape.

10  It says, "What?  I don't know about anything about it."

11  That diametrically is opposed to what she told us.  I'm

12  doing all this because Joseph is telling me to do this.

13  No, you're not.  Joseph, himself, is calling you a liar in

14  that tape recording.  No, you're not.  He's saying that's

15  not true.  And then Gary Foster pushes him a bit and says,

16  well, do you have a wife named Wendi Andriano?  I do.  So

17  we know that's he cogent.  We know that he's oriented.  We

18  also know he can barely speak.  We don't know exactly how

19  he is feeling on that particular day but we know that he is

20  oriented.  He knows he has a wife.  He also knows he didn't

21  request any life insurance.

22          And Gary Foster pushes him a little bit.  You

23  were able to listen to that recording when he says, "You

24  know, well, maybe if I call you later you guys can talk

25  about it."  All he says, huh, okay.

1        But even his voice, even her own husband, points

2   her out to be what she really is.  That is a woman who does

3   not know the truth.  That is a woman who fabricated that.

4   That is exactly what Joseph Andriano said in that

5   recording.

6        So we now know that she was involved in this sort

7   of stuff.  We also know that it's the money that she's

8   after.  She's already talked to Jimmy Yost and said, "I

9   have his wallet right here.  Here's his driver's license.

10  You look like him.  Why don't you pose for the medical exam

11  for purposes of the insurance."  He says, "No, I'm not

12  going to do it."  She says "I'll give you ten thousand

13  dollars."  "No, I'm not going to do it.  That's fraud,

14  they'll catch you."  She said, "No, they want because the

15  coroner will rule it a heart attack."

16        That's what she tells him because she's studied

17  up.  She knows what the symptoms are.  And he says, "No,

18  I'm still not going to do it."  "Well, how about if I give

19  you $20,000, $30,000, $40,000 if you stand in."  "No, I'm

20  not going to do it."  She's negotiating with him.  She

21  needs him.  She's desperate.  She needs somebody to help

22  her out.  But he's not forthcoming.  He's honest.  He's not

23  going to do it.  And so she tops out at $50,000.  And

24  finally he says, "I'm not going to do it.  I'm just not

25  going to do it.  If you want me to do it you've got the

1   wrong guy.  I'm not going to do it."

2          He's also the individual who saw them together

3   and will tell you she wore the pants in the family.  He saw

4   them continously -- not continously but saw them together

5   on a social basis.  So he knows that.

6          The other individual with regard to this

7   insurance issue was Erik Vaillant.  He was also

8   approached.  And one of the things that Erik Vaillant will

9   tell you is that, well, you know, she came to me and said,

10  "You know, I want you to pose as Joe for the purpose of

11  this examination."  And he said, "I'm not going to do it.

12  You're just money hungry.  Twenty million dollars not

13  enough for you?  That's just being money hungry.  I'm just

14  not going to do it."  And he didn't do it.

15         But they remained friends, though, because we

16  know that what ended up happening is on July 26 of the year

17  2000, which is approximately two or three months before she

18  gave him the poison and before she poisoned him on October

19  8th of the year 2000, she opened an account.  And she

20  didn't open the account in her name.  She opened that

21  account in the name of Anne Newton.  Even though she

22  quibbled with it, that's just another lie.  This woman is,

23  as I told you, is so goal-oriented that she's not going to

24  have a problem with just changing her name.  Ug-huh just

25  make it Anne Newton.  They're not going to know the

1  difference.  She's also used the name of Mrs. Montegomery.

2  Whatever Mrs. Montegomery's first name is.  That was with

3  regards to her student loan.

4        With regards to the student loan, when it is to

5  her benefit to reduce the payment of the garnishment, I'll

6  be Mrs. Montegomery.  I'll submit fictitious documents.

7  I'll wipe things out so they will think I'm actually paying

8  over $500 in rent when I'm not.  But, again, I mean, that's

9  the kind of thing that she does.  She'll change her name.

10  She'll do whatever.

11        But we now know that as early as July 26 of the

12  year 2000 there was an idea in her head she was going to

13  poison her husband and going to make him go away.  She gets

14  up there and says, "Yes, it's me but he made me do it."

15  Really.  Is that right.  Everything else that we have seen,

16  you indicate that it was somebody else's fault.  I mean,

17  it's so basic that with regards to the virginity issue,

18  something so private as that.  She said, "Well, you know

19  what, yes, I was chaste but, you know what, I didn't want

20  to be.  So what I did basically is make sort of an

21  agreement with Dido Gomez to get rid of it because it

22  wasn't my fault.  Barbara Mitchell was kidding me about

23  it."

24        You see how nothing is her fault.  Nothing that

25  this woman does is her fault.  Even the most private of

1  things, the most things that happen between a man and

2  woman, even that's not her fault because Barbara Mitchell

3  was teasing her about it.  And she needed to get rid of it

4  like it was some sort of bad thing that was hanging around

5  her neck.  Nothing's her fault, including ordering this

6  poison even though it's in her name.

7        One of the things we know when she's ordering

8  this poison is she makes up a lot of things.  She said that

9  she wants them for rodents.  She indicates that she's been

10  to Ireland.  She indicates that she has a business by the

11  name of Wyndstar doing business as Aztec Creations.  All of

12  it, nothing but a lie.  Nothing but a lie because she wants

13  to make sure that she gets that poison.  She starts out

14  asking for cyanide and it turns into a request for sodium

15  azide.  And so she is able, if you will, to bring that

16  about because she contacts somebody from Copper State Glass

17  and Mirror, gets them to send over their business license.

18  And what did she do?  Like she did previously before when

19  she wanted out.  She did the same thing here.  She pasted

20  something over and created a business license for her under

21  Aztec Creations -- I'm sorry, Wyndstar Enterprises doing

22  business as Aztec Creations.  That's what she did.  You saw

23  what she did.

24        She also filed this indemnity agreement with

25  Voigt Global.  Along the way she asks Erik Vaillant to help

1  her.  He helps her, whether at the computer at the

2  bookkeeper's office.  But, when she's asked about it by

3  Janis Lynn, does it surprise you that she lies and says,

4  "No, I wasn't looking at the poison site.  That wasn't me

5  at all."

6          Again, every time, any time it becomes

7  uncomfortable for her she turns to a lie.  And so she asks

8  Eric Vaillant and, yes, they do determine that there is a

9  Voigt Global.  And she goes about her business and she is

10 able to have the sale consummated.  As part of that sale

11 she goes over to ABCO and she gets a money order and she

12 signs for it, name Anne Newton.  Again, a lie.  Sends for

13 it and then it's ultimately dropped shipped, as they say,

14 from Alfa Aesar.

15          When it gets out here, they can't deliver it

16 because the address that she listed doesn't exist.  It's

17 2442 rather than 2424.  She purposely put the numbers

18 wrong.  And the only number they have is her cell number.

19 That's how they get in contact with her.  So she trots on

20 down there on October 5th, which is a Thursday at 2:30 in

21 the afternoon to get it.  And she's the one that signs for

22 it.  She says, "Oh, yeah Joe was with me."

23          I mean, every time that something cannot be

24 corroborated, Joe was with me.  And even when things can be

25 corroborated it's not my fault.  And even then when things

1   get a little worse or a little more dicey she says you know

2   what, it's somebody else's fault not, my fault. Just like

3   that.

4           If Joe was with her that afternoon, why is it

5   that she goes to the office, the leasing office?  Why did

6   she do that?  Why didn't she go directly home?  If Joe was

7   with her, why doesn't she leave the box behind?  Why did

8   she take the label off it if Joe is with her?  What's the

9   big deal?  Why don't we go to the storage shed, number 315

10  which they own, where it ultimately ends up.  Why don't we

11  just go put it there?  No one can have access to it there.

12  The door comes down.  You can put a lock on it.  Where as

13  at the office, there's all the people that have access to

14  it.  Why you do it that way?

15          The reason that she does it that way is because

16  Joseph Andriano has absolutely no idea that this Saturday

17  when he spends his time down at his family's house in Casa

18  Grande, Arizona, is the last night that he'll be alive.

19  That's what going on in this case.  That's why she leaves

20  it down there because she didn't want him to know about

21  it.

22          If she did want him to know about it, she would

23  have taken it right up.  They would have sat down, held

24  hands, cried, sang Kumbaya, whatever it was they were going

25  to do if this really was a suicide attempt.  But, of

1   course, she's always surreptitious about it.   She can never

2   walk down Main Street.   She's always got to go down an

3   alley.   And then she'll turn around and say to you but the

4   alley was dark.   And I'm not responsible for how unlit it

5   was.   That's how she turns things around.   Why not just

6   take it up there.   If Joseph Andriano was part of this, why

7   not do that?   Why for God's sake buy some elderberry.   Why

8   go ahead and buy that.   Why take the laborious time to sit

9   there, get the capsules out, take whatever is inside them,

10  and then put sodium azide in them.   If Joseph Andriano was

11  going to commit suicide, why didn't he just put it in some

12  water and chug it?   Why didn't he just put in it in some

13  food and eat it if that's what he was going to do.   Or put

14  it in some Gatorade, as she alleges that he took it with.

15          It makes absolutely no sense that on Friday, the

16  next day, he would sit down say okay put on gloves so we

17  don't get anything on us -- of course, it's only her

18  fingerprints on everything -- filled up the capsules and go

19  ahead and put them back in the elderberry bottle.   Why

20  would he do that?   That makes absolutely no sense under any

21  sort of fact pattern that you've been given that it would

22  make any sense.   It just doesn't.   And then say, well, I

23  then went ahead and put it back in or he put it back in

24  storage shed Number 315.   That doesn't make any sense

25  whatsoever.   She's trying to sell you a bill of goods.

1   She's trying to come at you from the side through the alley

2   without the lights on.  Or perhaps in the dim light of a

3   lie, you will be taken in.  That's what she wants you to

4   do.

5          But we know that on that Thursday she leaves that

6   package behind.  When she leaves, once that she leaves that

7   package behind you can only imagine how happy she was

8   because now it's going to be all over.  Now, Joseph

9   Andriano is going to be out of her life.  She's got this

10  lawsuit that's worth twenty million dollars.  That's what's

11  going on here.

12         And so what happens the next day even though

13  she's not working, she goes into the office.  There's only

14  one reason she has to go down to the office.  And that is,

15  of course, to go pick up this box.  As she's walking out,

16  she's being pestered or asked by the other worker, Shannon

17  Sweeney, "Hey, what you got there?  What is that Wendi?

18  What is it that you have in there?"  She's got this huge

19  smile on her face because she knows that she's going to be

20  through with Joseph Andriano soon enough.  And she says,

21  you know what, it's a gift, a present for a friend.

22         I never have heard, and I'm sure you never have

23  either, that death is referred to as a present for a

24  friend.  How euphemistic of her to say that death is a

25  present for Joseph Andriano.

1          But, then she takes it way.  And according to her

2    in between going to the movies, they fill out these

3    capsules.  The problem with that is you take a look at the

4    receipt for the purchase of the lamp, you'll see what time

5    that Joseph Andriano was actually at Sam's Club, it would

6    not be possible for him to be at Sam's Club and then also

7    for her to tell us that shortly thereafter he was filling

8    capsules with the sodium azide.  Actually, she was doing

9    that while he was at Sam's Club buying the lamp.

10          So, what happens after that is now we get to

11   Saturday and they have now purchased one of the lamps

12   that's made of pewter on October 6 of 2000.  October 7th of

13   2000 everything was okay, according to her.  Nothing's

14   going on.  His parents have been on vacation and so, on

15   this particular day his mother comes over sometime around

16   ten o'clock in the morning they do just normal sort of

17   things.  They go over to the swap meet to buy Nicholas a

18   tricycle where he could ride himself and Ashley on that

19   tricycle.  They come back, they go over to Sam's Club, and

20   low and behold, they buy a second lamp.  That's when they

21   buy the second lamp.  So they take it home.  By that time

22   it's getting late.  Her mother is already inside the house,

23   even though on cross-examination she said, no they were

24   just in the parking lot.  According to her and that

25   statement to the police, her mother was inside the house

1   while her father was outside getting cranky because her

2   mother was taking too long inside the house.   Everything

3   was okay.   Of course, everything is okay.   She knows she

4   was going to kill him.   All her problems are going to be

5   done and over with.   And so, what ends up happening, she

6   says at three o'clock that's when Joseph Andriano, Nicholas

7   Andriano and Ashley Andriano, the two kids that are two and

8   three, go down to sleep.   She stays up reading.   And the

9   three of them that have slept, get up at five or 5:30 in

10  the afternoon.   And she also tells the police that by 6:30

11  they're in Casa Grande.

12          So, pray tell, please explain it to me.   Please

13  explain it so that it would make sense to us in that time,

14  if Joseph Andriano gets up at 5:30 and it takes about 40

15  minutes to get to Casa Grande and are there by 6:30, when

16  did he have time to be putting together this lamp that she

17  alleged that he's putting together before they go to Casa

18  Grande?   That lamp that when questioned about it because

19  she let it slip that she went out to the living room where

20  he supposedly was, she didn't see it.   When does he have to

21  time to be putting it together.   When does he have time to

22  be breaking it?   He doesn't.   She's just making it up.   And

23  we know he was actually putting it together sometime after

24  they came back from Casa Grande.   The reason we know that

25  is because the shade is still on the bed.   There was none

1   of this going to sleep because that was still on the bed.

2          And that's how it was left.  But, according to

3   her, they then go to Casa Grand and they're there until

4   about approximately eleven o'clock.  Some football game is

5   over and they get back around midnight.  And now here's

6   where the story becomes problematic for her.  There's times

7   she indicates, well, we did take a shower and made love.

8   Or, no, we didn't take a shower or we took a bath and we

9   argued.  Needless to say, according to her, that's the time

10  that Joseph Andriano is poisoned.

11         So now we know that it's between twelve and one

12  o'clock in the morning that Joseph Andriano is poisoned.

13  It gets into his system.  Whether it's her telling you, I'm

14  not really sure, I'm not really sure if he wanted to die or

15  not.  But, you know, that's when I give him the Gatorade or

16  she put it in the food.  She can't explain that.  Or she

17  gave him the capsules.  We know it was between 12 and 1

18  a.m. that the poison goes into him.

19         We also know that there is a substantial period

20  of time when they're alone, where there's nothing, all we

21  have is her word.  Her word is not quite valid to us

22  because of her prior conduct, if you will, of her prior

23  statements.  So we know that that's the time that the

24  poison is in him.

25         And then what happens is that at some point, they

1  find themselves in the living room.  And according to her

2  in her statement to the police the reason that they're in

3  the living room is because he wants to argue.

4          And so she orders him to go to the living room if

5  they're going to argue.   You can see who wears the pants

6  in that family.  Even when he's upset, he's getting ordered

7  around to go to the living room and according to her at

8  that point things are going bad.  We know that he's

9  vomiting.  We heard from the expert.  That's one of the

10  symptoms.  Additionally, there's cramping, also gets

11  tachycardic.  In other words, the heart starts beating very

12  quickly.  The blood pressure goes down and there's a myriad

13  of symptoms that occur.  But we know that it's between

14  twelve and one o'clock, around there.  And we know that the

15  next contact with an independent source that can

16  corroborate what's going on is about 2:30 in the morning,

17  between 2:20 and 2:30 in the morning when the defendant

18  calls Chris Hashisaki to come over.

19          What her motive is in calling her over is

20  unclear.  But we know according to Chris Hashisaki that the

21  apartment was cleaner than she'd ever seen it.  What that

22  means is that she was getting ready for company.   She was

23  getting ready for people to come over and pick up Joseph

24  Andriano's body.  That's why she was calling her over, so

25  she could come view the body.  So she could watch him die.

1   That's why she was calling her over.

2          She says that then she has x-ray vision and can

3   see through buildings and could see all the way through all

4   these buildings and watch Chris Hashisaki come out of her

5   apartment and down to meet her by the breezeway.  And the

6   first thing that she discusses with Chris Hashisaki is the

7   issue about calling the paramedics.  And that's important

8   and it's important that it's the first thing she discusses

9   with Chris Hashisaki because she didn't want Chris

10  Hashisaki to tell Joe that even though she already told

11  Joseph Andriano that she's called the paramedic, she lied

12  to him.

13          Now, why would she lie to Joseph Andriano about

14  calling the paramedics?  Would it be because Joseph

15  Andriano isn't in on the suicide attempt?  Could it be that

16  she made that up?  That's the only logical explanation.

17  And she turns around and said, well, you know, Chris

18  Hashisaki is an absolute liar.  Why would Chris Hashisaki

19  lie?  That's her friend.  That's the person that she

20  called.  That's the individual that she chose to be present

21  there.  It's her friend.  They went out.  They did whatever

22  it is they did.  So why is it that all of a sudden now

23  Chris Hashisaki is a liar.  Chris Hashisaki is a liar

24  because she doesn't like what she's saying, which is the

25  truth.  Chris Hashisaki comes over.  She says, "I lied to

1    my husband.  The paramedics were supposed to be called.  I

2    told him that I did but I didn't."  And Chris says, "You

3    better get over there.  You better call the paramedics

4    because if you don't, you're going to be sorry."

5              Of course, at this point Chris is not operating

6    with full knowledge.  All she's operating with is what the

7    defendant has told her.  What the defendant has told her is

8    that, you know, Joe is not feeling well.  Told her about

9    the sodium azide, has she?  Isn't that something that

10   should be important to talk about?

11             Well, now we have things not going quite the way

12   that they should.  And so Chris Hashisaki makes her way

13   into Apartment 132.  What does she see.  She sees a wasted

14   shell of a man, who is terminally ill with cancer, lying on

15   his left side who has thrown up once.  She does not see a

16   pillow.  She does not see any blood.  She doesn't see any

17   of that.  Because if she would have, she would have

18   immediately called.  She would have told you that she did.

19   She didn't see any of that.  What she sees is this feeble

20   man who cannot get up from the floor.  That's what she

21   sees.

22             And there is no reason to believe that Chris

23   Hashisaki has any bias in this case because she's just

24   somebody who saw something there.  And she goes up to him.

25   And in the meantime, the defendant leaves them alone and

1  goes to make a call, calls nine-one-one.  And when she's

2  there, she talks to him and says, "You know what Joe, even

3  though the defendant says that you may not be focusing

4  right, I'm wearing my glasses.  Do you know who I am?"  "Of

5  course I do, you're Chris.  I recognize you.  I don't have

6  a problem, I'm just sick.  Doesn't mean that I have

7  dementia.  Doesn't mean I'm confused.  I'm just sick."  And

8  he starts complaining at that point.  "I've been like this

9  for such a long time.  Where are the paramedics," he asks

10  her.

11         I mean he's almost whining.  He's almost like a

12  child at that point.  He obviously is incapacitated at that

13  point.  He can't do anything.  He's down on the ground.  He

14  is at -- this person right here -- he's at her mercy.

15         So what happens is he starts talking to Chris and

16  says, "You know, what" -- he may not have a watch in hand

17  -- but he says, "I've been like this for at least 45

18  minutes.  What's taking the paramedics so long?"

19         If he's been like that for 45 minutes, if he's

20  asking about the paramedics and the defendant confirmed

21  that she's lied to him about calling the paramedics, what

22  does that tell you?  That she's a liar.  When she tells you

23  this is a suicide attempt.  What's it tells you?  You must

24  consider it in light of all the other lies that she's

25  told.  Because this woman would not know the truth if it

1   was staring her in the face.

2          What happens then is that the defendant comes

3   back and she is now on with the dispatcher.  And according

4   to her she tells the dispatch, "Er, well, he's having a

5   heart attack."  Why, if she wants to save him, if this is

6   an aborted suicide attempt and she wants to take the

7   pills -- that's why she has them near the door according to

8   her -- why not tell the person that's going to provide the

9   medical care that it is not a heart attack.  That it is a

10  poisoning with sodium azide.  Why not do that?

11          The reason you don't do that is because you want

12  the person to die.  This is not a suicide attempt as she

13  maintains.  There's nothing about what happened that night

14  that says that.  So she lies again.  She says "heart

15  attack," because she's now been schooled with regard to

16  the symptoms of sodium azide.  And she knows, or what she

17  told Erik Vaillant, it's going to be like a heart attack.

18  So he starts are getting blue.  Are you having trouble

19  breathing and all that stuff.  And Chris says why are you

20  asking me these questions?  Just tell them to get here.

21  He's not feeling well.

22          And so the call is made.  But now there's a huge

23  problem with the defendant because now the plan is starting

24  to go a little bit astray.  Yes, he is going to die.  Yes,

25  he is dying.  He's exhibiting these symptoms.  But now

1   she's got Chris involved.  Chris has made her call the

2   paramedics even though she lied to her about it.  And now

3   Joe is saying, God, why are they taking so long.  And no

4   they're on the way.  So what did she do?  What can she do?

5   Do the thing that comes back to her.  Fall back on another

6   lie and say, "You know what, we better take him to the

7   hospital.  The reason we need to take him to the hospital

8   is that they said, the paramedics, the emergency response

9   team, said they were too busy to come out here.  It's going

10   to take them a long time to get out here so we need to take

11   him to the hospital."  Do you think she really wanted to

12   take him to the hospital or do you think that she wanted to

13   avoid providing treatment to him.  That's exactly what's

14   going on.  She wants the poison to take affect.  That's

15   what she wants to do.  She wants to make sure that he's in

16   that situation where no one can find him, where no one can

17   provide any care for him.  That's what's going on.  So she

18   begins to get a little frustrated.  And this shows, again,

19   this is important because it shows who wears the pants in

20   the family, who is dominant, who is the person who is

21   calling the shots.  The reason that is important is because

22   Sharon Murphy has a problem with that issue.

23          What happens is at that point, the defendant

24   begins to get proactive and she goes up to Mr. Andriano,

25   who is lying down on his left side, tries to lift him up

1   and she's asking him to help her get up.  And he can't.

2   He's too weak.  Whether it because of the chemotherapy

3   treatment, you heard from Dr. Kellogg who indicated between

4   eight and 12 days is when they are weakest.  This was the

5   tenth day.  We also know that he had sodium azide in him.

6   We also know from Dr. Keen that the cancer had spread, not

7   only in his lungs but the kidneys to his head.  And we also

8   know that according to her he was about 220 and we know

9   when he died he was about 165 pounds.  This is an

10  individual who is down for the count.  Can't physically get

11  up.  So what does she do?  She tries to lift him and says

12   -- the words you would hear in church since she is such a

13  churchgoing woman -- "Get your ass up."  That does not

14  sound like somebody who loves him, who sat there and cried

15  for you and said, "Oh, he's so cute.  He's such a cute

16  boy.  I just loved his eyes."

17          Well, you know what, it's not what it sounds

18  like.  It sounds like a murderer who's trying to take the

19  victim out so no one could provide treatment.

20          And, then, as if that isn't enough, when he can't

21  get up and to motivate him, she goes a little further and

22  says, you know what she said, "Get your fucking ass up."

23  She didn't get it the first time, now, you're really going

24  to get it.  That, again, shows you who is dominant in the

25  relationship.  Mr. Andriano says, "What is going on here?"

000009149

1  And then the two of them start to talk.  And that's what

2  Chris Hashisaki says, "Hey, hold here.  The two of you need

3  to hold on.  We already hear the sirens."  And when she

4  says that, Joseph Andriano hears that.  There is never an

5  indication that he is not coherent.  There's never an

6  indication that he cannot carry on a conversation.  His

7  brain is okay.  So he knows the paramedics were on their

8  way.

9        So Chris Hashisaki decides to go out to show them

10  so they get there a little bit quicker.  But that's a

11  problem for the defendant.  And it's not so much a problem

12  that they're arriving there.  The reason that it's a

13  problem is because now Joseph Andriano knows that there's

14  somebody out there that can help him.  She can no longer

15  tell him that the paramedics are not there.  She can no

16  longer lie to him to keep him inside the apartment.

17  Because, when they come knocking on that door, Joseph

18  Andriano is going to say, "Hey, I'm in here.  Help me,"

19  because he had already told Chris Hashisaki that that's

20  what he wanted.

21        He's not going to just sit back when the door is

22  being knocked on and keep quiet.  And he starts talking

23  about, you know, did you really use that condom?  Are you

24  having an affair?  Do you think that this person who is

25  vomiting and dying is going to be worried about an affair?

1   Is going to having sex with her?  Do you really think

2   that's what's going on?  He's going to be saying as loud as

3   he can, "Come on in, help me."  You know. "I don't feel

4   well."  That's what's going to happen.  She and he are

5   inside.  That's what we know.

6           As Chris Hashisaki leaves, she turns around.

7   He's now on his left elbow again and throws up again.  That

8   is not the cancer.  That is the sodium azide.  That's the

9   poison.  We did test that and it did not have any sodium

10  azide in it.  What's important to note at this point that

11  is that way sodium azide works.  When it gets into your

12  system, it just doesn't stay there in your stomach, it gets

13  into the highway that delivers it where it's going to do

14  the most harm and that is the tissues in your body.

15          If there's a small amount of sodium azide in your

16  veins that indicates in this case there was a large amount

17  that was consumed a long time ago.  Because the veins are

18  nothing more than conduits.  If there had been a lot in the

19  blood system, that would mean that there had been recent

20  ingestion.  All that the veins do, all that the arteries do

21  is just deliver it to the tissues.  So that's how an

22  individual dies.

23          So the fact that there is only two parts per

24  million indicates there was a large consumption a long time

25  ago.  It means that Joseph Andriano was on his way out.  It

1   means she just didn't wait long enough.  That's what that

2   means.

3            All this argument about whether it's only a small

4   amount, well, that's good.  If you want to kill the guy

5   that's exactly what that means.  And so we know that at

6   that point he's dying.  He didn't have much in his system.

7            We also know that the poison is also on the stove

8   in some food stuff, looks like soup or something.  And we

9   know that she fed it to him.  That's exactly how he

10  ingested it.  And she also gave him the pills.  That's what

11  happened.  You can see in the photograph, right there on

12  burner.  She can't, of course, explain that to you.  Just

13  no way for her to explain that.  Just no way to explain

14  that to you.

15           So what happens is Chris Hashisaki leaves without

16  her purse.  And then she goes to talk to the fire

17  department.  What's important about that is that she is not

18  at the door, near the door when she goes and talks to the

19  fire department when they're staging.  According to her,

20  the staging takes approximately five, six, seven maybe 10

21  minutes.  According to her, they're not moving quick enough

22  for her.

23           So they're taking their time by the fire engine.

24  That's the time that Joseph Andriano is unguarded.  That's

25  the time he's by himself with the defendant.  And that's

1  the time that she uses to kill him.  Plans to kill him.

2         The reason that we know that's what happened is

3  afterwards what she is wearing when she came out.  What we

4  know is that he can't get up.  So what that means is she

5  had to move away from him to get an implement to kill him.

6  We know that she went to the bedroom.  That's a reasonable

7  assumption because that's where the shade for the lamp

8  was.  There's no reason to believe that the lamp was in the

9  leaving room.  We also know that the lamp was not in the

10 living room because Chris Hashisaki said that it wasn't

11 there.  She didn't see it.  So we know it wasn't there.

12 She actually went to the master bedroom, got the lamp, hit

13 him over the head with it.  But it broke.  We have pieces

14 to show you.

15         Then what happened is she got the stool and

16 started hitting him over and over and over again.  What's

17 important about that is that he does have injuries to the

18 right side of his face, nose, mouth, right here in the

19 temple area.  Doctor Keen, the coroner indicated those were

20 actually rug burns.  One way that can be caused is his head

21 is down on the ground, somebody is hitting you in the back

22 of the head, that's how those were caused.  He's down on

23 the ground.  He's unable to resist.  She just keeps hitting

24 him over and over and over.  Twenty-three times.  Eight to

25 ten of those individually would have rendered him

1   unconscious.  So he's now down on the ground, unconscious.

2   He's out.  And besides, he couldn't get up any way.

3          One of the things that we need to take a look at

4   with regard to this injury -- and we have photographs for

5   you -- is that they are in a situation where they are all

6   directed to one place.  What's important about that is that

7   if he was moving around like she said he was, then they

8   wouldn't be quite so centered.  The hits would be to the

9   face.  The hits would be to the side.  They would be all

10  over.  But, they're not.  They're actually only in the back

11  of his head.  That's because he was lying face down.  You

12  understand when she hit him over and over and over and over

13  again, that's what caused in injuries to his face.  See

14  that?  He's lying on his right side when she kept hitting

15  him over and over again.  He wasn't moving.  He wasn't a

16  threat to her.  He wasn't a threat to anyone.  At that

17  point, especially in light of what Chris Hashisaki told

18  you, she said he was just down.

19         And so, she breaks the stool.  He's down.  But

20  she wants to make sure.  What she did is she gets the

21  knife, goes to the kitchen.  That's how the blood got

22  there.  He's already bleeding.  Goes to the kitchen, gets

23  the knife.  Sticks it right here in the left side of his

24  neck.  We also know the knife is punched in all the way

25  back to the spinal column.  Even though the blade is very

1   small, it's a 1                        ade, the

2   coroner indicat                        as this big

3   was because who                        stuck it in

4   there and just moved it around.  That somebody wanted

5   somebody to die.  And for her to say that this individual,

6   who's already been beaten up, who's already suffered from

7   cancer, has chemotherapy, cannot get up, is throwing up,

8   has the strength to grab that and stick that in there and

9   twist it around, defies the laws of nature.  It just did

10  not happen that way.

11          It's during this attack that she kills him.  She

12  thought about it.  There's no way the paramedics are going

13  to come in.  For whatever reason, she'll get in trouble.

14  He won't die.  I'll just say it's self-defense.

15          So what she does then is she needs to clean up.

16  She doesn't go to the kitchen to clean up.  The reason we

17  know she didn't go to the kitchen to clean up is because

18  the barrette that's in her hair is full of blood.  We know

19  that she had to wash her hair.  We also know that when

20  Chris Hashisaki was there, she saw the defendant wearing a

21  white T-shirt.  We also know that when Chris Hashisaki

22  left, she says, "Hey, Wendi, where's my purse?"  And the

23  purse comes flying out.  The defendant may call her, may

24  call Chris Hashisaki an absolute liar but that would have

25  to include Rich Perrott of the fire defendant.  That would

1   also have to include Benjamin McKinnon because they both

2   corroborated what Chris said.   According to Rich Perrott,

3   he saw a purse that was thrown down there.   That's what he

4   saw.   Exactly like Chris said.   It wasn't after, like the

5   defendant maintains that she threw it out there.   Not at

6   all.

7            And we also know what happens is that she does

8   some very unusual things.   The first thing that is unusual

9   is she has to be called out.   She won't answer the door.

10  If there really is nothing going on in there, why not come

11  to the front door.   The reason she doesn't come to the

12  front door is because she has already done her deed.

13  Mr. Andriano is now dead.

14           So what she does, according to her statement to

15  the police, is she then goes and she steps into the

16  shower.   She also goes over to the sink, sticks her head

17  down in, cleans her glasses out, cleans her hair out, gets

18  it all wet.   Then gets into the tub, cleans her legs.

19  And, then, what she ends up doing is, she goes over to the

20  patio rather than going to the front door.   She jumps over

21  the patio, going over the north side and comes all the way

22  around.

23           And low and behold, she's not got a striped shirt

24  and it's now about 2:30, 2:40 in the morning.   She's

25  changed clothes.   Why does she need to change clothes?   If

1  she didn't get any blood on it, why do you change clothes?

2  Why do you have to have your hair wet?  She says Chris

3  Hashisaki is an absolute liar when she says that's what

4  happened.

5         Well, then, okay.  How about Rich Perrott?  He

6  said that she had wet hair.  And Trip McKinnon said the

7  clothes she was wearing looked like they had just been put

8  on or like she is going to work is how he described it.

9         So they're all liars.  Everybody who doesn't

10  agree with Wendi Andriano, that is what she's saying,

11  basically.  But, you know, these individuals, the

12  paramedics, they don't have any reason to fabricate.  Chris

13  Hashisaki, what does she care?  She's just here to tell the

14  truth.

15         But she does show up.  She has washed her hair.

16  And the only reason she would need to wash her hair is

17  because it was bloody.  She has changed clothing.  The only

18  reason she would need to do that is because that was

19  bloody.  So what ends up happening is, again, always in

20  control.  Always the master of deception.  Always this

21  misdirection.  She tells them go away, he doesn't want you

22  here.  He doesn't want to you here?  He's the same

23  individual that was complaining that it was taking them too

24  long to get there.  He's the one that was saying, "God, I

25  hope they get here soon.  I'm just so sick.  What's taking

1   them so long." That's the individual that you're telling

2   us doesn't want you there? That somehow all of a sudden

3   made a just incredible gigantic recovery against all the

4   laws of medicine? That's the individual that you're

5   telling us does not want the paramedics there?

6          That individual that you're talking about is no

7   longer on this earth. That individual that you are

8   attributing those statements to is dead. That individual

9   is in that apartment, 132, alone with his two kids, his two

10  and three year old. It's amazing -- it's amazing to think

11  that that happened with those kids in there. But it's also

12  more amazing she didn't come in here and complain to you,

13  know what, he died when those two kids were in there and I

14  was outside with the paramedics. I mean, it's surprising

15  she isn't blaming him for dying and leaving those kids

16  alone on this earth.

17          It's just amazing, given the fact that she has

18  blamed him for everything that has ever gone wrong in her

19  life. Blamed him for the affairs. Blamed him for having

20  to go out. Blamed him for wanting to go out dancing.

21  Blamed him for wanting to go out and kiss guys. Blamed him

22  for sitting between guys' legs. Blamed him for kissing

23  this guy. Blames him for everything. It's amazing she

24  doesn't blame him for dying and leaving the two kids

25  alone.

1        But she goes back inside.  And she doesn't go to

2   the front door.  She's goes in through the back door,

3   again.  What is the need of that?  But before she leaves,

4   one of the things that she says to Chris Hashisaki is,

5   "That's okay.  You know, you don't need to stay.  I've

6   already called my father.  I've already talked to my

7   father."  And remember that's about 2:40 in the morning.

8   Why would she need to talk to her father if Chris Hashisaki

9   is there?  Why would she need to do that?

10       According to her father, this first call was

11  placed about two o'clock in the morning.  And he didn't get

12  it, because he was asleep.  According to the defendant, she

13  then called a relative and that relative got in contact

14  with him.  And she was able to talk to him.  But one of the

15  things that her father told us was that when he got on the

16  phone with her -- remember this was immediately before she

17  came to the apartment -- she was telling Chris, "I've just

18  talked to my father."  Her father says that she told him

19  that she stabbed him.  That's what she says.  She stood up

20  there on the witness stand and said, "No, that's not what I

21  said."  And then when the tape is played and you saw the

22  tape.  It says, "Yeah, I don't know if it was on the cell

23  phone or the phone from the house, or whatever but she told

24  me that she stabbed him." That's what he testified to.  And

25  that's what he told the police.  So that tells us she's

1  already spoken to him when the paramedics are there, when

2  she talking to the paramedics.  And she changed clothes.

3  And she's showered.  And she tells somebody that she's

4  already stabbed him.  That tells us that Joseph Andriano is

5  now dead.

6          So now that leaves us with an hour and 14 minutes

7  between calls.  Let's be generous, give them an hour.  We

8  already know that Alejo Ochoa, this person who can

9  teletransport himself through time, gives him time to get

10  there, doesn't it?  And what are they doing for that hour?

11  What is it that Wendi Andriano is doing for that hour?

12  What is it about dialing nine-one-one that she has a

13  problem with?  She didn't dial none-one-one when her

14  husband is alive.  She didn't dial nine-one-one when her

15  husband is dead.  What is it about those three digits that

16  are causing her problems?  The problem that she is

17  having -- and the reason she's not dialing those three

18  digits -- is that she's got to come up with a story.  She's

19  got to come up with another lie.  That's what she's got to

20  do.  And so she goes in there and concocts this

21  self-defense thing.  Oh, yeah, you know, I'm going to tell

22  them that I'm really thin, I'm really skinny and show up in

23  court looking marmish with my black hair and glasses, even

24  though I'm wearing contacts all the time.  I'm going to

25  tell them that, you know, I was only about hundred pounds

1  back then so they can think that he took advantage of me.

2  You've seen what she looked like back then, all sassed up

3  in her pink little outfit.  You've seen what she looked

4  like.  She didn't look like somebody who was unhealthy.

5  Didn't look like somebody who couldn't hold her own.  This

6  individual was somebody who was and did kill her husband.

7  Was strong enough to do that.

8         But we also know she's always thinking.  She's

9  just doesn't lose her cool.  She's talking to the

10  paramedics.  She just killed her husband.  You know, go

11  away.  He doesn't want you here.  She's already talked to

12  her father.  The father has had classes in police work.

13  And between the two of them, they decide to come up with

14  this plan.  One of the first things that they have to do

15  with regard to this plan is they have to get rid of the

16  lamp.  You see that didn't fit because the lamp wasn't

17  out.  The lamp was inside of the bedroom.

18         So they have to get rid of that.  But, you know,

19  even though they tried to be as thorough as they can, they

20  only have an hour to fix this thing up.  So what they do is

21  they get most of the pieces.  But there is that recliner

22  there.  There's one piece on the recliner, two of them

23  underneath and one by the door.  They miss those three

24  pieces that goes to that lamp.  As much as they want to be

25  thorough, and they were, they missed that.  And, you know,

1   it's just one of those things, you know, the laws of nature

2   just are not subject to change.  They are not subject to

3   lying.  There's no way they can tell those three items are

4   not part of the lamp because they are.  They can't change

5   that.

6           So where is the lamp?  That is the answer, where

7   is the lamp?  We asked her about it.  Did she tell you

8   where the lamp was?  No, she didn't because it wasn't to

9   her benefit to tell you where the lamp was.  She knows

10  where the lamp was.  They got rid of it.  That's what they

11  did with it.

12          And so, now they're beginning the process of

13  making this seem like self-defense.  But one of the other

14  things that they forgot is they forgot about the box.  That

15  the box was there.  They forgot about the receipt.  You

16  know Joseph Andriano has helped us so far as with regards

17  to the recording where he says you know, no, I don't want

18  life insurance.  Now, his wallet is helping us a little bit

19  more.  He's got two receipts, one for October 7 of the year

20  2000 and one for October 6.  Both for the same lamp.  Same

21  stock number.  It's the same lamp.

22          So, according to her, I don't know, there could

23  have been a third lamp, that a burglar, who came in through

24  the side gate of the patio left behind.  Remember, she told

25  you that that's something that could happen.  Yeah, a

1    burglar could have came in, dropped this lamp off for her.

2    That's exactly what he did and forgot about the box.

3          Again, they were in a hurry.  Because, see, they

4    had other things to take care of.  They had that dresser to

5    contend with.  They had to do something with that dresser

6    where the condoms were supposedly contained.  According to

7    her, she reached over and found one.  But you can see

8    they're not readily accessible.  That's another lie.

9          But they had to do something with that dresser.

10   And what they did is, they, unfortunately, left that box

11   right there.  This box that was only purchased on October

12   7th.  It could never have been photographed by Alejo Achoa

13   in the early part for September because they hadn't

14   purchased it yet.  They hadn't bought it.  Unless he can

15   teleport himself.  However, it didn't happen.  It just

16   didn't happen.

17         So, now we're getting a flavor of this

18   individual.  We're getting a flavor of what she is capable

19   of doing.  Well, we also know that that's the situation

20   about the knife.  And also the situation about a belt.  She

21   came in here and told you, well, I don't know about the

22   belt.  But she was a Chatty-Kathy with the detective and

23   said, no, no, no.  The way it worked is that he attacked

24   me.  He came after me with the belt.  Remember that?  And

25   she was able to get away from him with that belt.  That's

1  not what she told you here.  But, you know, maybe because

2  she took an oath she's going to tell you, well, now I will

3  tell you the truth.  But he's got the belt.  According to

4  her, she was able to get out of that.  And in all the while

5  this defendant is chasing her.  I'm sorry.  All the while

6  Mr. Joseph Andriano was chasing her.

7       And then what ends up happening is that he's

8  chasing her with the belt, she able to get away.  But,

9  then, according to her, he picks up this cell phone

10  plug-in.  And when he picks up that plug-in, he goes after

11  her with that.  She tells you that, oh, God, I was

12  kneeling.  I was kneeling in the kitchen looking at the

13  photograph of the family when he came up behind me.  That's

14  what she told you.  That's what she told you here in

15  court.

16       Of course, with the police when she doesn't have

17  her story straight, she says, well, the cord, he puts it

18  over me and I went to make a phone call.  I thought it was

19  he put the cord over me and then we went through the living

20  room into the kitchen.  And I had to get near a place where

21  there was a knife.  I asked her was the cord very tight?

22  Yes, it was very tight.  It was making me fear for my

23  life.  I couldn't breathe.  I couldn't breathe.  And then

24  what happened.  When I couldn't breathe I ended up getting

25  near the knife.  So you were able to go over there.  We

1   went over there.  She got the knife.  And than she said

2   with one hand she grabbed the knife, with the other she cut

3   the cord.  The problem is she's going to cut the cord, why

4   doesn't she have a stab wound up in her chin?  Why doesn't

5   she have that?  If it's so tight that it's making her

6   afraid for her life, why is it then that she doesn't have,

7   if you will, any cuts, any marks, anything like that right

8   here in this part.  Because that's where she said it

9   happened.  She doesn't have anything like that.  The reason

10  she doesn't have any of that is because she's making it

11  up.

12          And then she says, oh, you have it wrong,

13  Mr. Martinez.  What I actually did is I pulled it out this

14  far.  What that means, then, is that it wasn't very tight.

15  You can't have it tight and then be able to pull it.  You

16  can't do that.  She says I was able to do that.  I was able

17  to pull it this far and start doing that.   If you can do

18  that, why didn't you just put it over your head and be done

19  with it.  She says, well, I didn't think of that.  The

20  reason she didn't think of it is because it's a lie.  And

21  then what happens is she cuts the cord, puts it down,

22  according to her, and the fight continues.

23          The problem for her is that she then says that

24  she gets the knife.  She has the knife.  He's now in the

25  living room.  He never struggles with her for the knife at

1   all.  Doesn't say a single solitary thing about him having

2   the knife, about him screaming at her saying "I want to

3   commit suicide."  Doesn't say anything like that.  Doesn't

4   say anything at all.  What she does say is that I have the

5   knife in my hand.  And, then, after I have the knife my

6   hand, he's bleeding.  He's down on the ground and he's

7   bleeding.

8          Well, coupled that with the fact you told Alejo

9   Achoa that you stabbed him.  Certainly, it's clear she's

10  the one that did the stabbing of the man who is down on the

11  ground unable to defend himself.  So what does she do after

12  that?  Well, the blood that's in the kitchen, that's on the

13  counter, that's on the refrigerator, the one down on the

14  ground in the picture, that's fabricated evidence.  She

15  just put it there.  She put it there to give credence to

16  this story that she concocted that night.  They only had an

17  hour and they come up with quite a story.  Because

18  according to her when she talked with the police, she

19  immediately, after the attack was done, cleaned up.

20          Well, it doesn't make sense if she's cleaned up

21  and all the blood is here and she tells us that other

22  story.  It just doesn't make sense.  The only thing that

23  makes sense is if you're going to be removing things, like

24  the lamp, if you're going to be saying that you're kneeling

25  or you're somewhere else, you're going to be making up the

1   stories up, the only thing that makes sense is that you

2   made this up with regard to the cord.  And you made it up

3   because you want to have self-defense available to you.

4            The other thing that's impossible for her is that

5   she tells the detective, well, I hit him a couple times and

6   he started bleeding.  What happens is he then comes after

7   me.  He is bleeding.  That's how the blood got in the

8   kitchen.

9            Well, see, that's something that can't be true.

10  Because he never got up.  And we know he never got up

11  because the blood never goes down this way.  The laws of

12  gravity -- Isaac Newton would be surprised to note that

13  Wendi Andriano trumped him -- the laws of gravity does not

14  apply in that apartment.  And it doesn't apply with regard

15  to feet.  Hers have blood on.  His do not.  She claims,

16  well, you know, he got up and came after me.  If he is

17  bleeding, if he has all that blood, then how come he didn't

18  have any on his body?  The only explanation is he never got

19  up.  And all this blood all around the apartment is

20  something that she put.  And then she also says, you know,

21  I didn't let anybody into this apartment.  I cleaned up.

22  And then, I opened the door to let the paramedics in.

23           Then she counters and says, well, when I moved

24  him, that's when I got blood on me and that's why I opened

25  the door.  But in the statement to the police what she

1   actually told them was that I grabbed him by the shorts,

2   the buttocks and the leg.  And then I just turned him

3   over.

4            How about the blood outside?  She claims never to

5   have gone out there.  How did that get there?  Again, maybe

6   providence swooped down and put that down there.  Or maybe

7   it's that she's lying about the way things happened.  And

8   perhaps that's exactly what is going on in this case.

9            We do know then that the police were finally

10  called.  The paramedics are finally called about 3:45 in

11  the morning.  There is something to be said about that

12  golden hour.  She did take full advantage of it.  She did

13  stage the scene.  She wants you to believe there was a

14  fight there when, in fact, there was no fight.  Because a

15  fight takes two people.  There was only one combatant.

16  That's because the defendant, Mr. Andriano, couldn't get

17  up.

18           We've been talking about these facts and I've

19  been telling you about it.  But what about some of the

20  things or some people that she talked to?  What about some

21  of the people that this defendant's spoken to?  And what is

22  it that she's told them?  Perhaps I will elucidate and show

23  you what kind of person she is.

24           One of the people that she talked to was Sharon

25  Murphy.  Let's talk a little bit about Sharon Murphy and

1   what the defendant told her.  And let's do this in the

2   context of one of the jury instructions.  And one of the

3   instructions that you'll get is going to read as follows:

4   In determining the evidence you must decide whether or not

5   to believe the witnesses and their testimony.  As you do

6   this, you should consider the testimony in light of all the

7   other evidence in the case.  This means you may consider

8   such things as the witness' ability and opportunity to

9   observe, their manner and memory while testifying, any

10  motive or prejudice they may have and any inconsistent

11  statements that may have made.

12          It also gives you further guidance and says you

13  must evaluate the defendant's testimony the same as any

14  other witnesses' testimony.

15          So that's the standard you are to apply and the

16  law that you indicated that you would follow with regard to

17  the defendant's testimony.

18          Let's see what it is that she told Sharon

19  Murphy.  We know one of the things that she and Sharon

20  Murphy talked about was this broken window in her car back

21  on November of 1991 when she was living at Quail Garden

22  Apartments.  And that was the time when she had this

23  relationship with Shawn King, if you remember.  It was at

24  that time, according to her, that Mr. King came over and

25  bit her finger or bit the ring -- one of the two things

1   depending on what you to believe -- and then he went out

2   and broke her window.

3          Sharon Murphy laid great weight to the fact she

4   never reported it.  She said there was no police report

5   with regard to that.  You saw the look on Sharon Murphy's

6   face when the State produced a police report from the Casa

7   Grande Police Department saying wait a minute, it involved

8   Wendi and Joe, it involved Shawn King, it involved the

9   incident that she was talking about.

10          All of a sudden, the woman who is the

11   prototypical domestic violence victim is not so

12   prototypical because she has no compulsion about talking to

13   the police.  The defendant can get up on that stand as many

14   times as she wants and yammer and mutter away as long as

15   she wants but she cannot change the fact that there is a

16   report.  And she cannot change the fact that that report

17   does not include any reference to anybody coming to her

18   door, does not include any reference to any security guard,

19   doesn't include any reference to any of that.  I guess that

20   Casa Grande Police Department was out to get her because

21   they too are absolute liars.

22          That's what she's going to tell you.  But that's

23   not what is in the report.  They indicated she had to

24   confirm, there was never any mention of that.  It does

25   indicate, per her admission, that she is the person that

1    they talked to.  She's the person that gave them all of the

2    information.  She's the reason that a citation was issued

3    for Shawn King for the broken window.   All of a sudden,

4    Sharon Murphy's great big opening salvo, if you will, that

5    she has all these relationships and in all these

6    relationships she has been abused and she has learned not

7    to call the police.  All of a sudden -- no pun intended --

8    that's out the window.  That's not part of the inquiry.  So

9    we have a lie.  A huge lie, if we're going to talk in the

10   social worker vernacular of the assessment world.  That's a

11   big lie.  That's a very important issue.  Their expert and

12   also Sharon Murphy said that.  All of a sudden, this woman

13   knows her way to a telephone.  She knows her way to

14   nine-one-one.  She did, in fact, call the police.  There's

15   a report to prove that.

16        The other thing that we have is that Sharon

17   Murphy based her opinion in large part on the fact that the

18   defendant was an ingenue, someone chaste at the time that

19   she came across Joseph Andriano, a big 220 pounds lox of a

20   man that she came across.  Well, she indicated and placed

21   great place weight on the fact that she, the defendant,

22   cried when she had this first sexual experience with Joseph

23   Andriano.  The problem, again, this is the problem with the

24   assessment because there is the issue of secondary gain.

25   If it is to you're benefit to lie, you may do it.  And all

1   we have here is the Defendant's word.

2          And according to their expert, Mindi Mechanic,

3   who has supposedly done all this research, there's nothing

4   out there in the research world done on this issue of

5   secondary gain in a person charged with a crime who is

6   asserting the defense of domestic violence.

7          And what all that tells you is it's up to the

8   evaluator to see what opinion they reach.  The bottom line

9   what's going on here is Mindi Mechanic chose to believe her

10  even though we have the issue here.  Even though she didn't

11  do her job.  She didn't do her job.  Why does she come in

12  here and say I think that was that her first sexual

13  experience.  And she was asked by defense counsel, not even

14  by the State, was that her first sexual experience.  Yes,

15  it is.  She took an oath to tell you the truth, the whole

16  truth and nothing but the truth.

17          What does she tell you?  Half truths.  She tells

18  you about a broken window.  She tells you about a first

19  sexual experience.  Because that's how she feels.  That's

20  how Sharon Murphy feels because she has a bias toward the

21  defendant.  And so she's going to believe everything she

22  tells her and she's going to feel in her heart, nothing

23  with her mind, that that was the first sexual experience.

24  And how does she feel that?  Because the defendant cried.

25  That's something to be expected.

1          Well, what about Dido Gamez.  I mean, he might be

2     a little upset he's not considered the first because the

3     defendant says he was.  I'm sure and Sharon Murphy was

4     quick to point out every time that the defendant has sex

5     with Mr. Andriano, she had to use a lubricant.  I wander if

6     she had to use a lubricant with Dido Gamez.  I wonder if

7     she had to use a lubricant with Vernon Barnes.  These are

8     issues they brought up because they wanted to paint her

9     holier than Thou.  They wanted to paint her white as an

10    angel.  But there is a problem when you lie, it catches up

11    with you.  Just like it did right there.

12         When she talks about this issue of the lubricant,

13    the only thing that I can tell you is that even though she

14    sits up there and cries, she cries her eyes out and says

15    it's a beautiful face and I love him so much.  You may tell

16    us that right now.  But you weren't in love with him

17    because you could not even bring yourself to the point of

18    enjoying the most intimate thing that two people in love

19    do, that's enjoy sexual intercourse.  Couldn't do it.

20         According to her, towards the end he was nothing

21    but gross.  He was skinny.  Certainly wasn't like Rick

22    Freeland, right?  That good looking guy that she really

23    loved from her little statement.  That guy that was her

24    best friend and that would listen to her.  Yeah, he wasn't

25    like that at all.  He was real healthy.  Certainly wasn't

1   like Travis Black who has arms the size of legs that she

2   met one night and had a one-night stand.  But, you know,

3   that's not an affair.

4          And they also talked to you about having sporadic

5   employment.  That's on the part of Mr. Andriano.  That's

6   nothing more than an attempt to smear Mr. Andriano.  Of

7   course, he's not here to talk about it.  So it's real easy

8   to make that particular charge.

9          But the problem with making that charge is that

10  she forgot that she had a conversation with the Phoenix

11  Police Department.  They were the ones that pointed out you

12  didn't know you were being videotaped.  You didn't know you

13  were being recorded.  So what?  What difference did it

14  make.  Does the truth care whether it's being tape

15  recorded?  Does the truth care whether it's being

16  videotaped?  Absolutely not.  What difference does it

17  make?  The law allows it.  Nothing improper about it.

18  She's videotaped.  So what?

19         But, at 8:33 and 31 seconds when she spoke to the

20  police about that issue, David Lucero, the detective there,

21  asked her about his work history.  Did he, meaning Joseph

22  Andriano, make pretty decent money before?  And talking

23  about before the surgery in 1998.  And she said, "Yeah, he

24  did.  He made great money."  How is that sporadic

25  employment?  How is that sporadic employment?  How is he a

1   bad provider that way?  You know what, she just couldn't

2   get her story straight.  And so remember I asked her on

3   cross-examination, well, isn't it the truth that the reason

4   that he had sporadic employment was because he couldn't

5   work any more?

6           What happened is that for whatever reason the

7   fates that drive our lives had decided that Joseph Andriano

8   had a bullseye on his back and we're going to take his life

9   away from him.  And not only that, with the help of the

10  Mayo Clinic and surgery, he no longer, basically, has

11  muscles in his shoulder.  He had a problem with his neck.

12  And the Federal government saw fit, because of that

13  disability to pay him because he couldn't work.  And I

14  asked her, "Isn't it true that he couldn't work?"  Sharon

15  Murphy said, "Oh, no, no, no."  According to Sharon Murphy

16  he could work.  According to the defendant, yeah, he could

17  work.  Let's see what she told the police at 8:28:40 in the

18  morning back on October 8 of the year 2000 he could no

19  longer work because of the Mayo Clinic, when they did that

20  surgery, they removed some muscles -- some muscles here.

21          And he always used to install auto glass.  See,

22  he was a big guy; big strong guy.  And he picked up these

23  windshields and set them in cars.  And, now, after the

24  surgery, he couldn't do it any more.

25          You know, it's that saying, you know.  I said it

1  once before and I won't bore with you it more than one more

2  time: With the truth, you ain't got to remember nothing.

3  You don't.  These kind of things would not be an issue if

4  she was telling the truth.  If she was, in fact, the victim

5  of domestic violence.  She's not.  And these are the things

6  that Sharon Murphy laid great -- or placed great weight

7  on.  Because, now, you know all of a sudden the person is

8  sort of a lacky or a slacker who goes to the lake all the

9  time and doesn't carry his own weight.  Those are the kind

10  of people that we don't like.  That's the kind of guy that

11  takes advantage of women.

12       The problem is that Sharon Murphy didn't do her

13  homework.  She's passing off fable as truth.  She's passing

14  anecdotal information as truth.  How does she know about

15  this sporadic employment?  Why didn't she review the

16  defendant's statement?  Maybe she could have gotten a

17  better look at what the defendant's really about.

18       The reason that she didn't do it because she's

19  got a bias.  She's got a bias for the defendant.  She likes

20  the defendant.

21       And then we have up there this issue of the stone

22  pot.  This stone pot involved the circumstance that

23  happened in the farm house.  That's how they classify it.

24  That's the first mention that Sharon Murphy made of the

25  first incident where the defendant indicates to her that

1   there had been any form of physical violence, if you will,

2   between her and Mr. Andriano.  And she went to great

3   lengths about saying that he threw himself through the

4   door, grabbed her up against the wall, had a pot and hit

5   the wall with that pot.  She then ran hiding somewhere.  He

6   went to sleep.  And that was the end of it.  They never

7   talked about it.

8          There's a problem with that.  That's not what

9   happened.  And at 8:42:36 the defendant talked to the

10  police about it.  One of the things that she and the police

11  talked about was involving this incident.  So, of course,

12  the defendant is saying this, was having a little fit or

13  whatever.  I was mad at him because he was doing whatever

14  he is doing.  These are things that are available for you

15  to look at.  I called my dad and had him pick me up and

16  take me home.  Same thing that she's does all the time.

17  She's got to talk to her dad.  Not her mom.  So when he

18  gets home involving the stone pot, she says, he's drunk as

19  can be and starts to pass out on the bed.  Well, I'm mad.

20  Uh-huh, look out.  The woman with the pants in the family

21  is mad.  So I start arguing with him, you know.  I'm, like,

22  I know, I want to know why you did what you just did.

23  We're just married, remember?  We just got married.  What's

24  going on or whatever.  She never said to Sharon Murphy that

25  she was a participant, as least, initially.  Not that what

1   Mr. Andriano did was right, but she didn't give her the

2   full story.  The reason that's important is because now we

3   have this thing where Mr. Andriano is seen as the bad guy.

4           Well, let's talk about this whole thing.  Let's

5   talk about why this even came about.  The reason this came

6   about is because he was going to sleep, she started bugging

7   him.  And she started going after him.  She's mad.  And

8   because she wears the pants in the family if she can't

9   sleep, nobody else in the house is going to sleep is what

10  she's saying.

11          Then she says, at 8:59:24 that day, in this

12  particular fight that we're having, I know I hit him.  Wait

13  a minute, doesn't that go contra to the person who is a

14  victim of domestic violence?  It sure does indicate, of

15  course, that the person in charge, the defendant, she

16  initiated the fight.  There is a fight.  Again, not

17  excusing what Mr. Andriano may or may not have done.  We

18  also know that she's the one that hit him.  How about for

19  wearing the pants in the family?  All of a sudden this

20  isn't quite the glorious work of art that had been

21  presented to.

22          She also talked about how she used to work with

23  Sharon Murphy at the Courtyard Apartments.  That's one of

24  the things that she said that she did.  And on

25  cross-examination she did admit that she lied to Sharon

1   Murphy and why she left the Courtyard Apartments.  Well,

2   whether she admits it or not it's still a lie.  And not

3   only is it a lie, additionally she indicated, well, it

4   really wasn't a wholehearted lie because it was Sharon

5   Murphy -- now it's her fault -- but Sharon Murphy put down

6   management company.  That the management company had

7   changed.  That's why I was fired.  I just meant that

8   management changed.  It's really Sharon Murphy's fault

9   because I never said that it was the management company.

10           But, of course, when she speaks to the

11  police -- and you have this back there for you -- during

12  the course of all that, we lived in Casa Grande.  The

13  apartment place I was managing switched management

14  companies.  And so they didn't retain me as manager.  I

15  think it was because of a lot of the medical problems.  So

16  that's why I found employment with San Riva.  When she

17  makes these statements, it's not her fault, for God's

18  sake.  How could it be her fault?  It's Joe's fault.  Not

19  only was she untruthful but untruthful as to the reason she

20  was terminated.  That's what she told you.  She finally

21  admitted that she was terminated there.  And so, again,

22  that's another lie.  All of a sudden, this house of bricks

23  that Sharon Murphy has built around the wall of domestic

24  violence is coming down because there is no domestic

25  violence here.  If you show this all to the light of day

1    what you actually have is a woman who is lying to her.

2              But let's talk little bit more about the topic

3    that they covered just to make sure because that is the

4    crux of their case.  Well, they talked about bruising and

5    then abusive observation checklist.  Remember that?  One of

6    the things that she put on the abusive observation

7    checklist is that three to ten times she had been bruised

8    by Mr. Andriano.  The problem with that is that she was

9    asked by the detective did he ever leave any marks.  And

10   she said no.  And then that's when we got into the

11   tete-a-tete, well, marks don't mean bruises.  That's the

12   reason why I said no.  Bruises are different than marks.

13   Well, the whole quote is "Did he ever leave any marks?"

14   The answer, "No, I don't -- I don't mark.  I don't bruise."

15             Either way, all of a sudden, this information

16   that she's providing to the observation checklist shows you

17   the fallacy and the weakness of the approach they took.  It

18   is only as good as the truthful nature of the person who

19   provided it.

20             Let's talk about the affair.  Well, she indicated

21   that she only had one affair.  That's all she had.  That's

22   all she said she had.  Because the intimate moment that she

23   shared with Travis Black, outside of marriage, even though

24   she's a good Christian woman, is not an affair.  You can

25   now all go home, those of you who are married, and say to

1   your significant other, that's okay, I'm going to go a head

2   and do that because that's not an affair.  I was in court

3   and I heard that.

4           Well, you know, that's nothing but hogwash.  She

5   strayed from the marriage with Travis Black.  One of the

6   reasons that's important is when she filled out the abusive

7   observation checklist, she's only listed one.  She listed

8   one because she wanted to make herself seem better.  Either

9   way, she's lying.  It is an affair.  And she said, "No, it

10  isn't.  It is not an affair and I never said that it's an

11  affair."

12          Yet, when she was testifying on October 28 of

13  this year to you, this is what she told you in response to

14  a question, "It's not his fault that I had an affair; that

15  I cheated on him."  That was on October 8th of the year

16  2000.

17          So what is it.  She can come in here and lie to

18  you and say that it isn't an affair.  And say but you know

19  what, I filled that out I was angry.  Again, that

20  illustrates the problem with the test.  That illustrates

21  that in that particular case Sharon Murphy was in over her

22  head.  She's a master liar.  She took her in.  And Sharon

23  Murphy, you know, to even to the end of the testimony still

24  believes her, even though these things were brought to her

25  attention.

1          Let's talk a little bit about Rick Freeland.

2 Well, the issue with Rick Freeland. One of the things that

3 Sharon Murphy believed was that it wasn't the defendant's

4 fault that she got involved with Rick Freeland. I mean,

5 she has a husband who is dying of cancer. The other thing,

6 she was really stressed out. And not only was she stressed

7 out but, you know, this guy was nice and was really just

8 more like a friend. Why is it that she gets involved with

9 him? Why is it that they engaged in the most intimate acts

10 that two people can engaged in? Well, because, according

11 to her, she didn't want to be a tease. Wow. Just because

12 you have a drink with somebody, just because a man is nice

13 to you, you better be careful you're not a tease. But if

14 you are, then you can have intercourse with him and you

15 know what, it's not your fault. It really isn't your fault

16 because that's not, according to the defendant, the way

17 women should act. According to her, it's worse to be a

18 tease than it is to be a cheat. I guess that's what she's

19 telling us.

20          The other thing that she didn't tell Sharon

21 Murphy was that, well, I stood outside of this door for an

22 hour, telling him to come on out. I want to talk to you.

23 Because that would make her look pretty bad. She didn't do

24 that. Why would she do that? That's a lie by omission.

25 If we really want the full truth in the assessment to come

1   out, that's one of the things that you should say.

2          The other thing that she didn't tell Sharon

3   Murphy is that she gave him some furniture -- bought him

4   some furniture.  According to Mr. Freeland, he was going to

5   pay her back.  The defendant spends the money for that.  I

6   thought that they had this home.  I thought they had these

7   two kids.  Don't you think that the money would have been

8   better served by using it on these kids, the two and three

9   year old that she cried about when she took the stand?  But

10  that's all right.  Let's take some of the food out of their

11  mouths to give to Rick Freeland.  Yeah, he's a much better

12  candidate for that, right?  Let's go a head and give it to

13  him.

14          But, of course, Sharon Murphy knew nothing of

15  that.  Because that would mean that the issue of financial

16  responsibility in this power and control wheel would be

17  problematic.  The power and control which we know is not

18  the norm, which is not a scientific psychiatric approach.

19  All of the tests are nothing but self-reporting.  The

20  reason that I put Travis Black underneath Rick Freeland is

21  because Mr. Black was not mentioned in her report.  Can you

22  imagine?  Okay.

23          I understand that -- I understand that perhaps

24  that was not considered an affair.  Why didn't she tell

25  them about it anyway so that Sharon Murphy could make up

1  her mind?

2           One of the things most telling about Travis Black

3  and the way that came about is that Mr. Andriano was going

4  through the chemotherapy, which indicates he wants to live,

5  he wants to spend more time with his kids.

6           You don't go through this horrible thing that

7  makes you go bald, that kills your kidneys, that makes you

8  feel tired, that makes you feel terrible -- you don't do

9  that unless there's a greater good.

10          The secondary gain is that he's going to have,

11 hopefully, more time because of the tumors are not going to

12 be spreading.  What's galling about that is on September

13 26th of the year 2000, he goes to get the chemotherapy

14 treatment.  His dad is there with him, not the defendant.

15 And there's none of the movie stuff that she said.  Well,

16 when he goes there, he comes out and he's feeling bad.  We

17 knows he's not home.  Where is he.  We're really not sure

18 where he is but he's definitely to not at Apartment 132 the

19 next day, September 27th.

20          And what's galling about that is he is fighting

21 for his life to be with his family, the woman that he's

22 indicated that he loved, the person that he never cheated

23 on.  And what did she do?  She goes to dancing at Rockin'

24 Rodeo.  She's stressed out.  Okay.  Which is worse, one is

25 dying or you're stressed out.

1       What ends up happening is she's so stressed out

2   she's got to get the energy out, get the stress out.  What

3   happens is there's a last dance that they have.  And at

4   this last dance, there's a good-looking guy.  Let me go on

5   over.  And before the song is over, probably before he even

6   knows her name, they're kissing.  And according to him --

7   he has no reason to lie.  Why would he lie?  He doesn't

8   care about this.  The bottom line is she starts kissing him

9   and he returns the favor.  That's what he said.  And when

10  she started to grab him in the various places, he, again,

11  responded accordingly.  She's the one that initiated --

12  this demure little lotus blossom we have here -- she's the

13  one that is all that.  Not everybody can be telling a

14  lie.  All these people don't know each other to get

15  together and collude against her.  They're just telling the

16  truth how it happened.

17      So they leave that night club.  Sure he doesn't

18  know anything about this, doesn't talk about it.  They go

19  over with his friend, over to the Denny's off of I10 and

20  Baseline, I believe that's what they said.  When they're

21  there things are happening.  What's happening is that she

22  starts to grope him under the table.  I guess the woman has

23  needs and she's going to do something about it because

24  she's so goal oriented and what ends up happening is he

25  takes her home.  According to him, he didn't think anything

1   was going to happen.  She invited him in.  He does not

2   invite himself in.  Again, she is the aggressor.  They go

3   upstairs, started to hang out, sits on the couch, has a

4   beer and then nature takes its course.  But what is

5   important about that is that he says I was going through a

6   divorce.  And, in fact, when I was at the Rockin' Rodeo my

7   wife, my estranged wife was there and that's one of the

8   reasons we left.  I was drunk.  The defendant was drunk.

9   But I know one thing, I have boxes of condoms at my house.

10   I have bunches of condoms in the truck.  I had a whole

11   bunch of condoms with me.  That was part of the reason that

12   I was there.  And he said, "I have no doubt in my mind that

13   I was the one that supplied the condom."  None of this

14   story about her going to the bedroom in the middle of it

15   and running there and getting it and that's what created

16   the problem.  He categorically told you that he was the one

17   that supplied the condom.

18           But, of course, none of this went to Sharon

19   Murphy.  How complete is her report if all of this was

20   omitted?  How complete is it?  It isn't.  It's incomplete

21   and short shrifted and based on misrepresentation and

22   lies.

23           Let's get to the issue of --

24           THE COURT:  Let's take our afternoon break at

25   this point in time.

1          Ladies and gentlemen, during the break remember

2   the entire admonition I have given you.  During the break

3   do not discuss the case with each other.  Do not let anyone

4   discuss the case with you.  Keep an open mind.  Have a nice

5   break.  We'll see you 20 minutes.

6          (Recess taken.)

7          THE COURT:  This is Cause Number CR2000-096032,

8   State of Arizona versus Wendi Elizabeth Andriano.

9          The record will reflect the presence of

10  defendant, counsel and the jury.

11         We will continue with opening closing argument by

12  Mr. Martinez on behalf of the State.

13         Mr. Martinez.

14         MR. MARTINEZ:  Thank you.

15         We left off immediately before talking about the

16  30th birthday soiree that the defendant took with people at

17  the San Riva apartment complex that included Chris

18  Hashisaki, Shannon Sweeney and Stephanie Koeppen.  The

19  reason that this is significant is because the assessment

20  that was done by Sharon Murphy only mentions three specific

21  incidents of physical violence.  This is the second one.

22  If somebody is so physically abused that results in

23  bruising and everything, it's significant that this 30th

24  birthday is the second one which according to her he grabs

25  her and drags her home.  At least, that's the version that

1   is given to Sharon Murphy.

2           Specifically, if you will remember, this is one

3   where they went out to various bars, they came back

4   according to the defendant in her tail to Ms. Murphy.   When

5   she came home, Mr. Andriano was there when she got out of

6   the car.   He had left the two kids alone in the apartment

7   to spy on her and began screaming at her and grabs her.

8   "Dragging her home" was the term that she used.

9           But, upon further examination and talking to the

10  people who were actually there, not just talking to the

11  defendant but also talking to the people that were there,

12  we now know it was quite a different sort of picture that

13  was presented.   We also know that other things went on.

14          For example, we know that on the way home the

15  defendant had the audacity to say, well, you know it's my

16  30th birthday let's stop and pick up Shawn -- I'm sorry

17  Ryan and Chris.   Let's go a head and pick them up.   Ryan

18  being Shannon's boyfriend; Chris being Ryan's roommate.   It

19  was her request.   It wasn't a situation where either of the

20  other women said let's go and stop and get them.

21  Specifically, it wasn't Shannon Sweeney.

22          So, on they're way back they stop in Tempe and

23  they picked them up.   And one of the things we know is that

24  the defendant, never missing an opportunity, starts to make

25  out, kiss, whatever term you want to use.   Starts doing

1  this with this individual by the name of Chris.  Her

2  justification was, "There was no other place to sit so I

3  had to sit between his legs.  And so we were just

4  flirting.  It wasn't a big deal.  I didn't mean any

5  disrespect."

6          Really.  That's exactly what you think of the

7  situation?  That shows you that no matter what happens,

8  it's not her fault.  She tries to justify it and minimize

9  it and say, well, it really isn't my fault.  It's really

10  not something that I can be held responsible for.  Don't

11  think any worse of that.  Don't think I'm less religious

12  because I am this religious woman.  And, you know, don't

13  think any less of me.

14          Additionally, with regards to the issue of

15  Mr. Andriano being there and the kids being left alone in

16  the apartment, we now know that is a lie.  There is no two

17  ways for her to get around that.  It's an absolute lie.

18  It's just a lie.  She made it up.  And she made it up to

19  Sharon Murphy because she wants to make herself seem

20  better.  Just wants to change the whole panorama of life to

21  make it seem that she is this victim of domestic violence

22  even though it isn't true.

23          One way to do it is get someone like Sharon

24  Murphy, lie to her, and try to paint the other person as

25  badly as possible, to make Joseph Andriano as an uncaring

1   rube who leaves his kids like some sort of sort trailer
2   trash locked up in the apartment.  That's just not what
3   happened.  They had a baby-sitter and she admitted she
4   lied.
5          Of course, it's always about Joseph Andriano,
6   isn't it?  Then what ends up happening, according to the
7   people that were there, is that Mr. Andriano sees what's
8   happening.  And what's happening is that perhaps the
9   defendant is heading to Shannon Sweeney's, to her
10  apartment, that direction to her apartment rather than
11  going home.  Perhaps she's going to experience another one
12  of these dalliances that is not an affair.  We don't know.
13  But she was certainly headed with another man to another
14  apartment at 1:30 or 2:00 in the morning, when, by her own
15  account she was blasted, she was drunk.  This is the woman
16  who kisses men on the way home.
17         If we talk to Chris, perhaps his view of things
18  may be a little bit different than the defendant's.  That
19  he's not such a big brother, which is what she told us.
20         We know, according to her, according to the other
21  people that were there, yes, Mr. Andriano threw a phone.
22  But he didn't throw it at her.  He just threw it down on
23  the ground and said, "Wendi, what are you doing?"
24         Now, those words certainly are provocative,
25  aren't they?  Boy, that is a case of domestic violence if

1   you've ever seen it because you are experts now.  We spent

2   three or four days talking with Sharon Murphy about what it

3   was and what the history was.  You know that, boy, what a

4   horrific event of domestic violence.  Right?  You know

5   that's not true.  You know that what happened after that is

6   the defendant started walking after Mr. Andriano, "Joe, let

7   me explain.  Let me explain what's going on."  What is it

8   that she was trying to explain?  That those kisses were not

9   meant to be disrespectful?  That sitting between this young

10  man's legs was not meant to be disrespectful?  Exactly what

11  is she trying to explain?  Or was she trying to explain to

12  him that she is a victim of domestic violence.  Exactly

13  what was it that she was trying to explain?  But, again,

14  her version to Sharon Murphy was that, no, no, he grabs me,

15  physically grabs me.  Which nobody there saw.

16          The other thing is that he screamed at me.  Well,

17  nobody else heard it, either.  Basically, the only thing he

18  said is, "Wendi, what are you doing?" And then he walked

19  back.

20          But when she's been in court one of the things

21  that had happened is that she has received a bolt of

22  lightening that has delivered her the truth.  And the

23  reason that I say that is that she now remembers that on

24  the way home Joseph was very upset and he fortuitously

25  brought the keys and took her to the Yukon and held on to

1   the steering wheel and just screamed at her.   Remember

2   that?   That is just his way, because he was so angry at

3   what was happening.   And the reason he was so angry is

4   because she violated her curfew.   That's what she told

5   you.

6          And he did that.   And he was just so mad and

7   walks out and went in.   But she didn't tell that to Sharon

8   Murphy.   If that's the truth and that was such a traumatic

9   event when that happened at the end of August of the year

10  2000, don't you think she would have remembered?   And the

11  way that she talks, don't you think she would have told it

12  if that actually happened?   No, but she got to tell it.

13  She got to tell it with you.

14         And she just realizes that this is only the

15  second event.   Oh, my God, there really isn't anything that

16  Mr. Andriano is doing to me.   There's nothing I can point

17  to.   Yet, she brings in her brother to come and say, oh,

18  yes, there was the other slap.   Do you remember this other

19  slap that she didn't tell Sharon Murphy about?   And that

20  happened down at the town house, remember?   All these

21  things, you know, are coming back to her.   Somehow this is

22  a process whereby she's remembering all these things.

23  Well, you know that's not how it happened.

24         Then what happens, according to her, remember,

25  her dress is red.   It was down, all past her knees.   And

1   one of the things she tells us is that they don't use the

2   front door, they go in through the patio.  The reason that

3   she wants to tell you that is because she wants to make

4   what happened on the morning of October 8th of the year

5   2000 seem plausible.  We use the back entrance all the

6   time.  We climb over the fence.  It will seem plausible to

7   you that she used it for a very innocent reason on October

8   8th of the year 2000.  But that's not it.

9           Picture this, if you will, according to her, that

10  wall is about up to here (demonstrating).  We have

11  something similar to that.  Can you imagine hiking this

12  dress up all the way up to here, like this trying to get

13  over that wall?  You think that's how she did it?  You

14  think that's how she got into that apartment?  It's not as

15  hard as you think.  Why go in through the back door when

16  you go in through the alley when the main street will do

17  just fine?  The reason that she does that, the reason she

18  uses side entrances, the reason she's looking for back

19  doors is because she not telling the truth.  She's somebody

20  who is not used to the light of day.  She is someone that

21  is not used to being forthright.

22          That's an absolute a lie.  They didn't go through

23  the back.  She walks in through the front door.  But she's

24  got to make the story seem a little bit more believable, if

25  you will, with regards to what happened on the night that

1  she killed her husband.  And she did kill her husband.

2  Make no mistake about that.

3        The other thing that Sharon Murphy laid great

4  store in is the fact she is demure and subservient.  That

5  under the power and control wheel she was subservient to

6  her father.  Remember, she learned to be a good Christian

7  girl.  The Bible tells you to do everything that your

8  husband tells.  You do everything your father tells you.

9  Of course, we see many examples where she basically told

10 her father that, no, I'm going to do whatever I want.

11 Additionally, we see many incidences where she told her

12 husband that.

13        And so, one of the first incidents that she told

14 her father no that she was going to go to the family

15 reunion when she was 17 years old.  If you remember, she

16 testified that there was a family reunion.  And she said

17 she wanted to go.  Her father told her no but she went

18 anyway.  Her father didn't talk to her for about two or

19 three weeks or two or three months.  That was at the age of

20 17.  That was when she was living under his roof.  She

21 can't use the excuse, well, I was over the age of 18.  She

22 was still living with him and what did she do, she stood

23 up.  She's goal-oriented and by God, she's going to do

24 whatever she wants.  It doesn't matter if it's her father

25 that's telling her not to do something or if it's her

1   husband that's counseling her not to do this or asking her

2   not to do it or if it's her God that's telling you you

3   shall not go out and cheat with other men.  She doesn't

4   care.  She's going to do whatever she wants.  What does she

5   care about the Ten Commandants.  Those are just words to

6   her.  They're just words that are written down that tell

7   her how to act and she didn't care.  She's going to violate

8   them at every turn.  The reason we know that is because she

9   did it.

10           We'll also talked about Saint Patrick's Day.

11   Remember how demure Ms. Murphy made her seem?  How when

12   they went to Dell just this individual who was just sort of

13   hanging out there.  She found he was attractive and how she

14   really didn't call him, that he called her and that's how

15   they got together.  When she took the stand, that's not

16   what she said.  When she took the stand she said that she

17   actually had to make the calls herself.

18           Again, Sharon Murphy just doesn't get the

19   picture.  It may be she's not getting the picture or maybe

20   she's slanting it just to be favorable to the defendant

21   because in her mind, no matter what happens, she went in

22   with the preconceived notion that this was nothing more

23   than a situation of domestic violence.

24           We also have the situation involving the Quail

25   Garden Apartments.  We've already discussed that situation

1   where, again, Sharon Murphy didn't lay great store in the

2   fact that when she was at the Quail Garden Apartments they

3   had a one-bedroom apartment.  She wanted two bedrooms.  She

4   didn't have any compunction about brooking authority and

5   saying give me a two bedroom so I can live here with

6   Mr. Andriano.  They're living together.

7           We already discussed the fact that Sharon Murphy

8   didn't lay any great store in the fact that she's standing

9   up to authority, her boss.  She's standing up to her father

10  and she's standing up, in a sense, to her religion.  So

11  none of those things that are very important play any great

12  weight.  It shows you that she's not demure.  That she's

13  not subservient to anybody.

14          That other thing we have is the Las Vegas trip.

15  Initially, she told us there isn't any way I could come

16  back from Las Vegas in May of 2000.  I had to come back at

17  a certain time.  She tried to tell us, well, it was for

18  this reason, it was for that reason.  Finally, when I

19  pointed out to her that when she went to Memphis in

20  September, she had no problem changing those tickets.  And

21  she finally admitted, well, you know, Sharon Murphy was

22  wrong.  The reason I didn't come back from the Las Vegas

23  trip early is because I didn't want to.  She stood up to

24  him.  And, again, it shows she's not the subservient person

25  that they pointed her out to be.  But, of course, she's got

1   to embellish it.  She's got to say, well, you know, when we

2   came back, Joseph was cursing all the time.  That's Donna

3   Ochoa that was said that.  He was cursing at the store, he

4   was driving really fast.  He pulled up in the lane,

5   squealed the tires, threw the items into the Yukon and then

6   we drove away real fast.  What they don't tell you is

7   perhaps he was in the wrong lane just trying to get in the

8   Yukon.  I don't for a minute excuse the fact he was cursing

9   and asking, "Where have you been?"  He did curse at them.

10  But that in and of itself is not domestic violence.

11  Speeding is not domestic violence.  When you're angry and

12  speeding is not domestic violence.  They tried to prove

13  that point with Barbara Mitchell when they asked her have

14  you ever sped and have you ever been angry?  Well, yeah, I

15  have.

16          Well, what does that prove?  That she is someone

17  who is prone to domestic violence?  That just proves she

18  sped.  Mr. Andriano didn't said say a word driving home.

19  Didn't say a word.  Just walked into the apartment when

20  they left.

21          Another point to be made is that Donna Ochoa says

22  the reason that we took two cars that night that the

23  defendant killed Joseph Andriano was that the Mazda had a

24  problem with the trunk.  Remember she told you that?  Well,

25  Barbara Mitchell said, no, there was no problem with it.  I

1    also asked Alejo Achoa, there was no problem with it.   Turn

2    the key, you get right on in there.

3           They're having a problem there with the stories

4    that are presented.   The only reason that I talked about

5    them is because Sharon Murphy used them as the paradyme of

6    truth who corroborated the defendant.   So if they can come

7    into court and they can raise their hand and swear to tell

8    the truth and then come up with inconsistencies like that,

9    can you imagine what they're capable of doing when they're

10   talking to Sharon Murphy?   Of course, they're going to

11   slant the truth.

12          One of the most noticeable items that Sharon

13   Murphy placed value on was this cursing that Mr. Andriano

14   was always cursing and that he used, according to her, the

15   eff word.   And that made the defendant very uncomfortable.

16          Well, you know, in the most crucial time of

17   Joseph Andriano's life, when he was dying, which makes it a

18   very crucial time for the defendant, in that crucial time

19   what is it that the defendant does?   She resorts to

20   cursing.   She resorts to cursing at him.   I thought she

21   didn't like it.   That's something that Sharon Murphy didn't

22   know about.   That's something that, you know, all of these

23   things are just adding up.

24          The two times a week they're referring to the

25   time she was married to Mr. Andriano, the last couple two

96

1   or three months of his life that for two or three months,

2   two times a week, minimum, the defendant was going out;

3   Tuesdays and Saturday or Fridays.  Remember that?  Rockin'

4   Rodeo on the weekends and Tijuana Country Club in the

5   middle of the week.  What kind of marriage is that?  Who is

6   wearing the pants in that family?  Husband is dying.

7   Terminally ill with cancer.  Rather than spending time with

8   him, what do you do?  Let's go out and look for the young

9   bucks we have out here on the dance floor.  Maybe we can

10  take one home.  That's exactly what's going on.

11          According to Shannon Sweeney and Chris Hashisaki,

12  the defendant always wanted to be the center of attention

13  and was always kissing men.  In and of itself there's

14  nothing wrong with that.  But please don't turn around and

15  bring her up as some sort of vestal virgin.  Don't do

16  that.  Just be honest with us and tell us we didn't know

17  about that.  And you know what, that might have changed my

18  opinion.  But Sharon Murphy is not like that.  She didn't

19  change her opinion even in the face of all of these

20  inconsistencies which are outright lies.

21          Well, the other one that's probably the more

22  telling of all of them is that they're having a fight,

23  according to the defendant, when they come back from Casa

24  Grande.  When they come back from Casa Grande, one of the

25  things that happens is that she doesn't want to have a

1   fight in the bedroom.

2          Now, if there is a fight and you have an

3   individual such as Joseph Andriano who has been described

4   as completely mad and out of control, throwing things

5   against the door, comes at you, and does that sort of

6   thing, you would expect that if there is an argument in the

7   bedroom you want it to be there and keep it there.

8          But according to the defendant's statement, on

9   this particular night she tells the detective at 9:12 in

10  the morning, "So then we go out to the living room because

11  I'm like, you know what, if you're going to start arguing,

12  I don't want the kids to hear it.  Go to the living room."

13  You saw that tape.  She's pointing with her finger.  "Go

14  to the living room.  I don't want the upstairs neighbors to

15  hear it."  You're in the bedroom, they'll hear everything.

16  It's, you know, it's part of apartments.  It's something we

17  know.  That shows you who's wearing the pants in the

18  family.  That shows you that even when they're angry, even

19  when they're not in a controlled state, if you will, of

20  their emotions, the person who rules the roost is the

21  defendant.  That's what it tells you.  There's no doubt

22  about it.  So, of course, that's a contraindication to the

23  domestic violence indication that Sharon Murphy pointed us

24  to.

25          But the bottom line is it's something she didn't

1   consider.  It's something that you should consider when you

2   go back when you debate whether or not Sharon Murphy's

3   report is really worth the paper that it's printed on.

4           Additionally, along the same lines, Shannon

5   Sweeney, Erik Vaillant and Chris Hashisaki indicated that

6   the person who wore the pants in the family was the

7   defendant.

8           Additionally, they indicated that she was the

9   dominant one.  That she was the one that made things go.

10  The question was asked, well, you saw them in a social

11  setting.  You didn't see them behind closed doors.  By the

12  defendant's own admission, behind closed doors she was the

13  one that ruled the roost.  So for them to say, no, she

14  wasn't the person who was in charge is just not true.

15          So we now know that with regards to Sharon

16  Murphy, she lied to Sharon Murphy, she withheld things and

17  she misstated things that we know were very crucial in

18  Sharon Murphy's report.  Perhaps the prosecutor is being

19  unduly harsh with the defendant when he pointed that out.

20  After all, it was 20 hours that Sharon Murphy spent with

21  her.  And there might be a situation where perhaps there

22  might be some inconsistencies there and perhaps that would

23  satisfy the jury instruction that I just read to you.

24          So let's take a look at all of the other people

25  that she's dealt with during that period of time to see

1   whether or not, in fact, she was more honest with them.

2           The other people she dealt with, and there are

3   three of them, that's the insurance companies.  One of them

4   was Ed Sandidge of Massachusetts Mutual.  The other one was

5   Amica, Carolyn Catalano.  And ETERM.COM and that was Gary

6   Foster.

7           Was she truthful with Ed Sandidge?  No, she

8   called on behalf of her husband who says he's willing to

9   take an exam.  That is a lie.  Because Ed Sandidge, when he

10  took the stand said, "No, I spoke to her.  She left that

11  number.  I spoke to her within a day or so.  I prepared a

12  proposal for insurance coverage of $500,000.  And when I

13  talked to her, she refused to let me talk to him."  So,

14  that's a lie.  That's a lie that Mr. Andriano was willing

15  to take that examination, that physical examination.  So we

16  have that problem.  So she wasn't honest with him.

17          How about with Carolyn Catalano?  Well, she fills

18  out this application and she says that her husband doesn't

19  have any cancer.  And it isn't Joseph Andriano that's

20  filling this out.  According to her, he's not computer

21  literate.  He's not the one that's poking on the keys and

22  sending out that message over the Internet.  That's not

23  him.  It's her.  And she sends it out and guess what?  It's

24  a lie.  An absolute lie.

25          Well, how about when she does have a conversation

1  with her over the telephone.  She calls and says this is
2  really strange, she says that she doesn't live with her
3  husband.  It's just a strange conversation.  Did she not
4  live with her husband?  Well, she did live with her
5  husband.  And she, again, was trying to make sure there
6  wasn't the contact between the insurance companies and her
7  husband because she was the moving party.  She was the one
8  that was moving things ahead.
9       Now, with regard to Mr. Foster, one of the things
10  that we know about ETERM.COM is that they're very
11  persnickety, if you will, or very fastidious about making
12  sure every telephone call they have is recorded.  This is
13  the one where we see or hear Mr. Andriano.  And
14  Mr. Andriano disputes what she says without even knowing it
15  and pointing a finger at her even from where he may be, if
16  anywhere, and says you're a liar because I never asked you
17  to do that.  He, himself, said that.  And Gary Foster
18  contacted her and spoke with Mr. Andriano and he said, "I
19  don't want any insurance."  That was on September 6th of
20  the year 2000.  And then on September 11th there's an
21  e-mail, that anonymous e-mail, contact my wife, Wendi go a
22  head and deal with her.
23       Of course, she's lies to him and you know what
24  there's no cancer here.  Well, okay.  So she lied to them,
25  too.  She talked to Sharon Murphy and we know what she said

1   to her and how we characterized it.  So she lied to the

2   insurance company.

3           How about her employers.  We talked about that.

4   Well, her employer, one of the things that we do know is

5   she submitted a resume, filled out an application.  This is

6   the important part of the process.  That's how they're

7   going to determine whether or not they want you to work for

8   them.  What does she do?  She lies.

9           One of the things that she indicates because she

10  wants more money is that she has a BA or BS from the

11  University of Phoenix.  That's an absolute untruth.  It's

12  not true.  She doesn't have a degree.  But she puts it down

13  in the resume that she presents to Janis Lind of San Riva

14  Apartments.  She lists it in the application for the

15  Courtyard Apartments.  She doesn't tell the truth.  She

16  also didn't tell San Riva the reason that she left the

17  Courtyard Apartments.  She lied.  She indicates that she

18  wanted to work with her husband.  That's not true.  The

19  reason she left the Courtyard Apartments was that she was

20  disinvited.  They said we don't want you to work here

21  anymore.  You're fired.  That's what they told her.  But

22  she didn't disclose that.  Then she goes on and talks about

23  how much she was making.  She indicates that she was making

24  up to $54,000, I think, I'm sorry, $50,400 as a maximum.

25  And when confronted with that, she says no, no that's

1   actually no accurate.  That's not true.  That includes the

2   value of the apartment.  I see.  Even when it's to her

3   benefit, even though the apartment complex is providing it,

4   it's to her benefit, she lists the amount.  But when it's

5   not to her benefit, such as the IRS, she lists that amount

6   of money.  Of course, she didn't.

7           So, we're trying to be fair to her to see whether

8   or not she's telling the truth.  And we now know that she

9   began lying to Sharon Murphy.  She lies to the insurance

10  company.  We know she lied to the employer.  We also know

11  in that application for the student loan, she lied.  Not

12  only did she lie, she fabricated documents.  She did the

13  exact same thing in this case that she did with the

14  business license in this case.  So you can see that she

15  already has a track record, if you will, of doing this sort

16  of thing.  Nothing is going to stop her from this goal that

17  she has, whatever, the goal may be.  She's learned the

18  lesson from that Rocky movie.  If you have a goal, you do

19  almost anything to achieve it.  But, again, she missed the

20  theme of it.  The theme of it is that you don't cheat and

21  you don't lie.

22          Well, was she honest with USA.NET?  She was in

23  June of the year 2000 when she originally opened the

24  account in her name.  So she knows to tell the truth.  But

25  was she honest on July 26 of the year 2000 when she opened

1   it in the name of Anne Newton?  Nope.

2           All these people, everybody that she's come in

3   contact with throughout her life through the period is

4   nothing but lies.  Absolutely nothing but lies.  Are we

5   going to believe her now?  Because she's entered into a

6   courtroom and raised her right hand somehow she's been

7   imbued with the power to only tell the truth.  Is that how

8   you think it works?   It absolutely does not work that

9   way.  She has lied to everyone and it is something for you

10  to consider in debating whether or not she told you the

11  truth.

12          Voigt Global, perhaps she told them the truth.

13  We know her initial e-mail was August 21st of the year

14  2000.  But she lied to them about her identity.  And that's

15  crucial because she didn't want them to know what they

16  are.  Doesn't want to leave a trail.  Doesn't want to be

17  associated with this poison.  The reason she doesn't want

18  to be associated with the poison is she is premeditating

19  the murder of her husband.  That's the reason why she

20  doesn't want people to know who she is.  That's the reason

21  why she lies to the police about it.  And in the e-mail she

22  knows a number of subjects: Rodents.  There are no rodents

23  at San Riva.  We brought Bud Ellis to tell you he's treated

24  that.  There are no rodents there.  So they can't come

25  forward and say that's what that's about.  She doesn't own

1   any property in Arkansas.  She doesn't own any property in

2   Casa Grande.  She's never treated rodents.  It's just a

3   lie.

4           The social security number.  It's interesting how

5   it's only a couple of numbers off but it's a lie,

6   nonetheless.

7           The business name, Wyndstar Enterprises doing

8   business as Aztec Creations.  It's something that came from

9   her mind.  It's just a lie.  Because she has a goal:  Get

10  poison to kill her husband.

11          Did she go to Ireland?  No.  She didn't go to

12  Ireland but she did go to Memphis.  I mean, it's part of a

13  visit -- I don't know if that's what she was referring to.

14  Never any indication she ever went to Ireland.  That's a

15  lie and that's just a way of her trying to ingratiate

16  herself, make her seem more human, if you will, and to let

17  Voigt Global know I haven't forgotten about you.  But she

18  doesn't want him to turn her down.

19          The indemnity agreement.  You saw how she worked

20  on it, one, two and finally she got the third one right and

21  faxed it over.  But she listed someone else's address on

22  it.  A guy by the name of Walker.  That's a lie.

23          The business license she was so assiduous about

24  going about it, making sure everything was just right.

25  First making sure that she got the name right.  Than she

1   forgot and then had to go back and white out the number.

2         All of these things, it wasn't Joseph Andriano

3   that did it.  It was her.  And she's lying.  She's making

4   up falsifying documents.  That qualifies as a lie.

5         She says Joseph Andriano bought the money order.

6   Really.  Then how come you signed it?  If he bought it, why

7   didn't he sign it?  What difference does it make?  Does it

8   make any difference who signed it?  It doesn't at all.  She

9   signed it, presented herself as Joseph Andriano.  And

10  that's a lie.

11        How about the people that she was most intimate

12  with, her paramours.  I'm talking about Rick Freeland and

13  Travis Black.  Was she honest with them?  Well, we know

14  with regard to Rick Freeland she didn't tell him the

15  truth.  She told him that she was not married.   Did not

16  have a husband.  And, in fact, that's what created the big

17  rift between them because once he found out she was

18  married, he didn't want anything to do with her.  And on

19  July 21st she sent him that e-mail saying you know what, I

20  don't know why I keep pushing it.  We know why you keep

21  pushing it because that's your nature.  You have a goal,

22  you want to be with him.  That's why you stand outside of

23  the door for an hour on the cell phone saying I'm not

24  leaving, I'll get the pass key unless you let me in.  But

25  she says, no, it's because he was my friend.  But the

106

1  bottom line is she lied to him, too.  Someone that she

2  supposedly loved and, you know, wanted to be his friend.

3          How about Travis Black.  What did she tell him?

4  Well, she lied to him too.  Didn't tell him she was

5  married.  In fact, she went a step further and says you

6  know what, my husband died of cancer.  Maybe that was a

7  precursor to what she was thinking.  Maybe she knew that

8  soon he would be dead, not from cancer but from poison.

9  But she lied to him, too.  So she's not telling the truth

10 to anybody.

11         And it's not one isolated instance.  It's over

12 and over and over again.

13         Airborne Express.  Well, she has a driver's

14 license, but or maybe she doesn't to go pick this up.  But

15 it's in the name of Anne Newton.  So what did she do?  She

16 gets the air bill number.  She contacts Voigt Global, gets

17 the air bill number from them.  Has a conversation that he

18 ask to Airborne Express, gives them the number.  And you

19 know what, without identification she can feel free to be

20 an imposter using the aka, Anne Newton.  Perhaps she's more

21 comfortable with that.  At least she was in that situation

22 and that's what she signed for.  It isn't Joseph Andriano's

23 signing it, it was her.  So she lied to them.

24         You know, things have progressed to the point

25 where things are not -- things are just bad.  And it gets

1   to the point where she's down at the police station.  The

2   police tell her you're not under arrest now but you're not

3   free to leave because we are investigating this.  We want

4   to know what happened.

5        You would think if there was ever a time to tell

6   the truth, that would be it.  But what does she do?  Well,

7   instead of telling the truth, she decides to fall back to

8   what she's most comfortable with, lies.  Does she tell the

9   police about the sodium azide?  No, she doesn't.  That is

10  a lie.

11       They can stand up here or sit up here or

12  pontificate about it up here and say, you know what, she

13  admitted it in court that she didn't tell them about the

14  sodium azide.  Okay, so what.  Does that make it any less

15  of a lie when it most mattered that she didn't tell them

16  that it was sodium azide?  Of course not.  They want to

17  take away the stain or stench, whatever is associated with

18  the lie, by saying but we told you about it here.  Does

19  that make it any less of a lie?  Absolutely not.  So we

20  have her lying to the police about the sodium azide.

21       Does she tell the police that she's been

22  attempting to get the insurance fraudulently?  She doesn't

23  do that either.  I mean, the police have to dig this up

24  themselves.  I mean, the fact that she admits that she did

25  it now, does that make it any less of a lie then?  No.

1        This thing about the suicide.  You know, do you

2   think that that's something very salient, or important that

3   that's something for them to consider?  Did she do that?

4   She didn't do that, either.  She's just absolutely is not

5   forthcoming with regard to anything.

6        Her injuries.  One of the things that's

7   interesting about it -- and you have the stills on it --

8   she did not know that she was being taped.  So when she was

9   left alone in the room, she has a totally different

10  demeanor with regard to the injuries than she does when the

11  officer is there.  Take a look at it when they begin

12  photographing the injuries.  At certain times when she

13  doesn't know that she's being observed, she has no problem

14  putting her left hand like this.  If you look at it, that's

15  what the still shows.  Has no problem doing that.  Has no

16  problem going to her hair constantly.  Has no problem

17  playing with her nails; playing with her glasses.  Has no

18  problem at all.  She doesn't know that she's being

19  videotaped.  But, again, the truth shouldn't know

20  videotape.  The truth shouldn't depend on videotape.

21        But as soon as -- what happens as soon as they go

22  to take a picture of her so that they can, if you will,

23  capture it in that form, what happens?  She goes up like

24  this (demonstrating).  And people with injuries notice that

25  sort of thing.  Right away that's what she does.  Why did

1   she do that?  Because she wants to lie to them about the

2   severity of the injury.  So she talks about her finger, how

3   bad it is.  She talks about all these injuries that she

4   received.

5          Let's be clear about it.  You have photographs

6   that show the only injuries that she has are the scratches

7   to the side that were done by her nails.  It certainly

8   wasn't done by any cord.  It certainly wasn't done by

9   Joseph Andriano because she never said that that's what he

10  did.  So those injuries right there are nothing but nail

11  scratches that she put on her neck.  The cord that we're

12  talking about doesn't not leave that kind of imprint

13  because it just stretches out to a single line, if you

14  will.

15          With regard to her hand, yes, one nail is gone on

16  each hand.  She did that to herself.  I mean, you know, if

17  this woman can stab somebody with a knife in the neck, what

18  are a couple little injuries?  Maybe she did those to

19  herself when she was using the bar stool.  Maybe she did

20  those to herself whenever she was doing whatever she was

21  doing.  We know that those injuries are not substantial.

22          She complains about the lump in the back of her

23  head because she wants to substantiate the fact he pushed

24  her against the wall.  Detective Dillian checked and, "Said

25  you know what, I don't feel anything back there.  I don't

1   see any redness at all.  I didn't feel a bump at all."
2   Whenever anything is subject to corroboration, it turns out
3   it's not true.
4            If you take a look at her leg, there's nothing
5   there.  She claims that she has bruising here and that it
6   hurts right here on her midsection.  You have photographs
7   of that.  There is nothing there because it didn't happen.
8   She's just making herself this poor victim, this individual
9   who's a victim of domestic violence.  That's what she wants
10  the police to believe.
11           And what's probably the most telling thing about
12  that conversation with the police is that after she is
13  transferred to the room where she has the conference with
14  Detective Lucero, she picks up the telephone.  You know,
15  this is a woman who is really, really very cool under
16  pressure.  Not only does she have the wherewithal to stage
17  the scene after all these horrific things happen but she's
18  been questioned by police, what does she do?  Does she
19  call, for example, Mr. and Mrs. Andriano and say, "Oh, I'm
20  so sorry that this happened.  I'm so sorry that I did
21  this?"  No.  What does she do?  She picks up the phone
22  sometime around 11:30 in the morning, noon.  You can see
23  her thinking, I've got to cover up.  Got to cover up.  She
24  calls Shannon Sweeney, her friend, and says, you know what,
25  I want you to look in the credenza.  And she begins to tell

1  her to take things out and get them out of there and hide

2  them from the police.  That's what kind of individual we

3  have.  Cold.  Calculating.

4         All of a sudden, Donna DeAngelis, her hair

5  dresser, is not so far off base when she called her a cold

6  individual.  She's just not.  And this was based on

7  interaction between them and the defendant saying, you

8  know, I'm over it.  I just wish Joe would die so I can get

9  on with my life.  So she calls Shannon.  What does she call

10  Shannon to do?  To do away with the evidence.  She didn't

11  want to get caught.

12         And, again, that shows you how cold and collating

13  she may be.  So all of the people you've seen that she's

14  dealt with, she's lied to everybody.  She lied to every one

15  of the individuals.  The most important one, Sharon Murphy,

16  the insurance people.  She lied to Airborne Express, Voigt

17  Global.  Anybody that had anything to do with this case she

18  lied to them.

19         So that brings us to here.  And that brings us to

20  you, the jury.  And that brings us to what she told you.

21  Let's talk a little bit about what it is that she told

22  you.

23         Well, one of the things she told you that, well,

24  when -- we did go over to Casa Grande.  She indicates that

25  they come back to the house at about three o'clock.  Joe

1   Andriano and the kids go to sleep.  She stays up reading

2   until about 5:30.  They leave to go to Casa Grande and they

3   arrived there at 6:30.  So far that pretty much is

4   corroborated by what she tells the police.  Then she says

5   they come back around midnight.  They come back and what

6   happens, according to her, is that's when Mr. Andriano

7   decides to take the poison around midnight.

8          But before that happens one of the things they

9   decide to do is take a bath.  And according to her, this is

10  a precious moment to be coveted in his life.  Because they

11  do it about once a month and they do this bit with the

12  shower, I mean bath.  They take a shower and sit there,

13  according to her.  She uses some of her squeegees or

14  whatever, sponges, and she sort of bathes him.  And then

15  they made love.  She told you that it was of a long

16  duration.  The problem with that story is that it's not

17  what she told the police.

18          One of the things that she told the police when

19  she was asked about that, is, well, when we got back we

20  went to our room and put my jammies on and he crawled into

21  bed.  And I turned the light on and he turned the TV on

22  which is normal.  In your bedroom?  Yeah.  He starts

23  flipping the channels.  I start reading my book.  He starts

24  questioning me again about my birthday day night, just

25  can't stop.  All of a sudden, this wonderful, halcyon sort

1   of thing that she's presented to you, this bucolic thing

2   that she has for you, is starting to shatter and fray.

3   Because all of a sudden, according to her, when they get

4   home they're arguing and they're arguing about the birthday

5   thing.

6          So which is true?  Which is it?  One of them is

7   not true.  Which one is it?  I submit to you that she would

8   say anything to anybody if it's to her benefit.  So that's

9   something that you have to consider.

10          Additionally, she then is asked about this

11   situation again.  And the detective says, "He was upset

12   because?"  She answered, "Well --"  And the detective

13   interrupted and says, "You guys weren't sexually as active

14   as you had been?"  She answered, "Active, exactly, you

15   know.  Once every two days is still pretty active to me.

16   You know what I mean?  And that's what started the argument

17   tonight."

18          So, which is it?  Even internally she's being

19   inconsistent.  She's saying they're having an argument

20   about the 30th when she went out or they're having an

21   argument about sex.  She just wants to make this guy seem

22   to be the worse guy in the world.  And, specifically, she

23   even addresses the issue of sex, once every two days.

24   This is the individual who is going through chemotherapy.

25   Who's hair is falling out.  Who is being told you got to

1   get up because if you don't get up, you're not going to be

2   able to urinate.  He's going through this all the while he

3   was dying.  It's not a situation where it's an individual

4   who is healthy.  It's just an absolute fabrication on her

5   part.  Either way.  So which is it?  Did have a fight about

6   the 30th or did they have a fight about sex?  What is it

7   with her that she can't tell the truth?  What is it with

8   her is that she's caught.  What is it with her is that she

9   killed him and she's looking for excuses.  Okay.

10            And so, we know that according to her they did

11   get into the bath tub.  She tells the detective that was

12   about one o'clock in the morning.  Well, that's roughly

13   about the same time she indicated that they got into the

14   bath tub before.

15            But the reason that she's saying that they got

16   into the bath tub is because she's got to account for the

17   fact that she's got wet hair when paramedics arrive.

18   That's what's important.  She knows she has wet hair.  But,

19   according to her own statement, that was either between at

20   midnight or that was one o'clock in the morning.  She must

21   have very special hair that in an hour and a half does not

22   dry.  Two hours that it takes for very short hair to dry.

23   You saw that.  And so that's why she's making this thing up

24   about the time that she went into the bath tub.

25            Well, she told you that she, yes, they did have

115

1    sex.  But in speaking with the detective she said, well, so

2    I lit the candles, filled up the bath tub, put the bubble

3    bath in the tub and we sit there and start to talk again.

4    And that's when it just -- and the detective interrupted

5    and said, "You're sitting in the bath tub, talking?"

6    "Uh-huh, that's kind of what we do.  And we just got into

7    this huge argument and it was just like, you know what,

8    this is so ridiculous.  So I get out of the bath tub and

9    he's sitting there and I dry off and put my clothes on."

10            There was no love-making, according to her that

11   night when she spoke to the detective.  Is it perhaps that

12   we're missing something?  That the truth depends on the

13   time that you say it?  In other words, does it depend on

14   the fact that it was morning and she testified in the

15   afternoon?  Is that what determines what the truth is?  Do

16   you really -- or is it perhaps what you're wearing that

17   determines the truth?  Because this woman does not tell the

18   same story every time.  It's in direct contradiction.

19            When she was asked here in court, how long was

20   the time that you spent in the bath tub?  It was of long

21   duration.  That's what she said.  So the detective asked

22   her how long were you in the bath tub before you got out.

23   Not too long.  Maybe ten minutes.  So now she's out of the

24   bath tub after ten minutes.  According to her, now she's

25   dressed.  She's upset now.  They've been arguing and she's

1   upset.  But according to her, when she came in and told you

2   this story, this is when it gets absolutely much more

3   romantic.  This is when we get closer.  She's helping him

4   out.

5           According to her, by her own admission, she's

6   killing him.  She went and got the sodium azide.  That's

7   what she's doing.  But she, of course, doesn't talk to the

8   defendant about that.  But, you know, again, with her it's

9   a different story.  She goes and gets the Gatorade.  That's

10  about one o'clock in the morning and then gives him the

11  sodium azide.

12          So they're trying to put a time on it.  We know

13  that he ingested -- he being Mr. Andriano -- ingested the

14  sodium azide about one o'clock.  When the paramedics

15  arrived about an hour and a half later, the poison had that

16  chance to it work on his body.

17          But, let's get back to the narrative.  According

18  to her, what ended up happening after that is she just

19  didn't get dressed -- she did get dressed.  What she did is

20  she put shorts on, put some T-shirt on and grabbed them off

21  the floor.  She remembers that.  She threw all my dirty

22  clothes on the floor in the closet and I grabbed the

23  clothes and I stuck them.  And she wasn't wearing any

24  shoes.  Those are the clothes that Chris Hashisaki saw her

25  in, white shirt, black pants or the shorts that she was

1   wearing.

2              According to her then one of the things that

3   happened is that Mr. Andriano starts to feel bad.  And he's

4   in their bedroom now.  Well, according to her, this story,

5   they were already in the bedroom now because they think

6   they're going to go to the hospital.  That's why they go in

7   the living room.  Whereas before the reason she told you

8   they went into the living room was because they were going

9   to argue.  I'll leave it to you to decide which one is the

10  truth.

11             But what ends up happening there is they start to

12  get scared.  That is one of the most unbelievable things

13  that somebody has ever said.  If you are poisoning

14  yourself, if you're going to commit suicide, why are you

15  afraid that you're dying?  Why are you afraid of the

16  symptoms.  It makes absolutely no sense on the one hand

17  with that breath saying, you know what, I'm going to die.

18  And then on the other side of your mouth talk and say, but

19  we were scared.  And then at this point she says, well, you

20  know, we called Shawn King.  That's one of the things that

21  she indicated, that they called Shawn King at that point

22  and, in fact, in the transcript she indicated that she

23  indicated that, "I need to walk you back because I

24  neglected to ask you one issue at one point on that date

25  when Joe is on the carpet after the EMT left, did you make

118

1   another phone call?"

2         She answered, "I did."

3         "To whom was that phone call made?"

4         She said, "I called Shawn."

5         "Shawn?"

6         She said, "Yeah, King."

7         "Whose direction was that?"

8         "Joe's."

9         "What did Joe say to you was the reason for

10  calling Shawn King?"

11        She said, "To find out what the hell happened."

12        But, one of the things she tells the detective

13  about Shawn King, you know, he's asking her about all these

14  men that she knows.  One of the people that she mentions is

15  Eric and she also mentions they sponsor a softball team.

16  And then the detective says, "Okay, anybody else?  You said

17  there were a couple of them."

18        They're talking about men.  She says, "Shawn."

19        The detective asks, "What's Shawn's last name?"

20        She answers, "Shawn King."

21        The detective says, "Okay."

22        And she says, "And he actually got in an accident

23  a year ago and had both of his legs chopped off.  And they

24  put them back on and he's going through rehabilitation

25  now.  And I know Joe gets really upset when I talk with

1   him.  I talk with him a lot because I was raised with him.

2   We're, like, best friends."

3          That's important for two reasons, she's lying

4   about who they called that night.  She says on the one hand

5   she called Shawn King at Joe's direction.  But Joe hates

6   him and doesn't want me to talk to him.  It's also

7   important because whatever Joe asks her to do, she's not

8   going to do it.  He asked her not to talk to Shawn King,

9   she'll do it anyway.  That goes against what Sharon Murphy

10  says.

11         Well, we now have a situation where, according to

12  her, he's now falling down in the bedroom.  None of this is

13  disclosed to the detective.  He's exhibiting these

14  symptoms.  And according to her, they then decide, well,

15  he's got to go to the living room and put the shorts on.

16  The reason they do that is because they're going to go to

17  the hospital.  Why do you go to the hospital if what's

18  happening is supposed to happen?  It just doesn't make any

19  sense.  So she's making that up.

20         And then what happens, according to her, is that

21  there's this situation with Chris Hashisaki.  That is

22  somewhat consistent.  Chris Hashisaki does come over.

23  That's where things deviate.  Because according to what she

24  told the police, she had already beat up Mr. Andriano when

25  the paramedics and Chris Hashisaki came over.

120

1    According to the statement that she gave the

2  police, he was already bleeding profusely when Chris came

3  over.  Chris Hashisaki said nothing about that.  But, of

4  course, according to her, Chris Hashisaki is an absolute

5  liar.  She tells the police -- and this is before Chris

6  Hashisaki came over -- and he bends over to pick up the

7  belt.  I conked him in the head.  See, now she's even

8  changed the item she's picking up.  Now, he's picking up

9  the belt.  Not a knife.  He's picks up a belt.  And then

10  the detectives asked with what?  The bar stool.  And he

11  bellows, oh, my God.  Remember they're living in an

12  apartment.  There's no witnesses that were brought forth

13  that heard any bellowing, any noises, anything whatever.

14  Because the reason they didn't is because she took that

15  pillow, stuck it in his mouth so he couldn't scream.  So he

16  wouldn't be making any noises.  She went crazy on him.

17  According to Chris Hashisaki, there's was no pillow there

18  when she went there.

19    Well, then what happens according to her he leans

20  over to pick up that thing.  Again, referring to the belt

21  and I pop him again.  So she admits to hitting him twice.

22  Just because he's picking up a belt, not a knife, a belt.

23  Which is it?  Is he picking up a knife as she's out in the

24  kitchen or what?  And then, she says as he's stands up and

25  has the belt, and there's blood and I'm freaking out but

1   I'm going -- I didn't mean to make him bleed.  I just

2   meant -- he's bleeding at this point.

3          So now he's bleeding before Chris Hashisaki come

4   over.  And then there's this interlude, if you will, with

5   the paramedics.  And then the detective asks her, "Do you

6   go back inside outside?"  And she says, "I go back inside

7   the house and he's up off the floor standing there just

8   mad.  Why did you hit me?  You made me bleed."

9          And there's a problem with that narration.

10  Number one is it doesn't correspond or corroborate with

11  what she told you.

12         Number two, if a person is bleeding and they're

13  standing there, it's going to follow the laws of gravity

14  and go down.  And according to witness's testimony, that's

15  not corroborated.  When Chris Hashisaki came over he

16  wasn't bleeding.  So for her to say that now is a true

17  inconsistency.  It's an absolute inconsistency.  And given

18  what we've seen with her, an absolute lie.

19         But, she's now saying he's picking up a belt.  A

20  belt she can't account for now.  So the detective follows

21  up on that and says, "You didn't tell me he choked you with

22  a belt.  When did that happen?"

23         "Oh, yeah, that happened before the kitchen

24  thing.  Before I even -- that was when I ran.  As soon as I

25  got away to get something to stop him."

122

1          "You're losing me there," he says.

2          "Oh, I'm sorry," she says.  "He's choking me with

3   the belt.  I get out of that.  Start running for the

4   kitchen and that's where he grabs me again.  And must have

5   grabbed the cell phone thing.  And then that's when I he

6   grabbed the knife."

7          And the detective says, "Where is the cell phone

8   at?"

9          "I have no idea.  I didn't see any."

10         "Where does he plug it in?"

11         "I don't know, just wherever."

12         And then she goes on and says, "Then he grabs the

13   cell phone thing like he's going to call somebody and it

14   has the charger hooked up for it.  And that's when he

15   wrapped that thing about my neck."

16         "What's that?"

17         "The cord to the cell phone.  He wrapped it

18   around my neck and, oh, my God, we had been standing by

19   where he keep this thing charged or whatever.  I don't even

20   know.  I haven't noticed it.  If I would have, I would have

21   thought something different."

22         And then they talk again. "He grabs, he's like,

23   he has that around my neck.  But that was kind of

24   stretching so I could pull it.  And he kept trying to

25   squeeze it tighter and tighter.  And I started moving my

1   way into the kitchen.  And that's when I thought I needed

2   to get a knife.  I got to cut this.  I got to cut it.  Oh,

3   my God.  I remember reaching into the drawer, trying,

4   getting, grabbing a knife.  I remember and he's trying to

5   pull me away from the knife.  And I think I try to grab on

6   to the refrigerator.  Anything I could do."

7           "How did you get from being in the kitchen,

8   getting the knife out of the drawer back into the living

9   room?"

10          "I have no idea."

11          Then she's asked, "How did he get cut?"

12          She says, "I don't know.  That's what-- I don't

13  know.  I don't know what happened.  All I know is all of a

14  sudden there is blood everywhere.  And I'm like, what just

15  happened?  I don't know."

16          "But you've got the knife in your hand at that

17  time?"

18          She answers, "I had the knife in my hand."

19          "Where were you, in the living room or the

20  kitchen?"

21          "The living room."

22          And she's asked, "What is he doing when you stab

23  him?  What's he doing?"

24          "Bleeding.  There's blood everywhere."

25          And then, this is also very telling given what

124

1   she told you.  She says, "Well, I get slpat -- oh, how do I

2   explain to you.  I felt like I just got drenched in blood.

3   It's in my hair.  I mean, it's on my face.  It's all over

4   my glasses.  I go to the bathroom.  And my hands.  I'm like

5   what in the world has happened.  It's like something, I

6   don't know, I felt like it just squirt -- Oh, Jesus, help

7   me.  I think -- I think blood squirted on me."

8           She wasn't upset that she stabbed him.  She's

9   upset because the blood squirted on her.

10          "I don't know.  All I know is I run for the

11   bathroom, the kitchen.  I got to get it off of my glasses.

12   That was my first -- I got to see.  I got to see what's

13   going on.  I turn on the bathroom sink.  I dump my glasses

14   in the sink.  I'm running water over them.  I'm looking at

15   my hands.  I'm like, oh, my God, this is just so

16   horrendous."

17          The fact she has blood on her is horrendous.  Not

18   the fact that she has stabbed him.

19          "Can't -- you know.  It's blood like -- a crazy

20   whatever.  I don't know.  I'm trying to remember.  So I'm

21   cleaning.  I'm like, oh, my God.  Oh, my God.  I was not

22   thinking about what was going on with him in the living

23   room."

24          She doesn't care about him.  All she cares is

25   about herself.

1        "I'm just freaking out.  I'm like, oh, my God

2   what am I doing?  I looked down.  I had blood all over my

3   legs.  I'm like, oh shit.  I stepped into the bathroom.

4   I'm rinsing of my legs.  That's when I'm like --"

5        The detective said, "You got into the bath?"

6        "I got into the bath tub."

7        He says, "okay."

8        "It's, oh, my God it was just so absolutely

9   gross."

10       She's not worried about the fact that she killed

11  him.  All she's worried about is her well-being.

12       "Did you turn on the shower head?"

13       "No, because I know I dunked my head into the

14  bathroom sink with my glasses because I smashed my

15  glasses.  I don't remember.  I don't think I turned on the

16  shower head."

17       "Do you remember if you washed your hair out?"

18       She answered, "Oh, I tried to rinse it out right

19  here.  I probably still have it in my hair.  I don't know.

20  Totally disgusting.  Oh, that would be sick if I had blood

21  in my hair."

22       That's what she said.  She doesn't care about

23  him.  That's totally different from the story she told you

24  about how she's kneeling down in front of the portrait, how

25  she grabs the knife, talks about cutting him and then

1   tosses the knife at him.  It just doesn't make any sense

2   that way.

3          According to her, she beats him up.  He fell on

4   the ground.  And somehow she goes into the master bedroom

5   and decides to come back out.  And then, this is what we

6   have, the cherry, if you will, on top of the sundae, this

7   is the real coop-de-grais of all the things she told you.

8   Because at this point -- and please keep in mind this

9   individual we know what his health is.  I hate to belabor

10  it but it's important.  This individual is terminally ill

11  with cancer.

12         According to her, from the time they met with

13  Dr. Kellogg he has about a year left.  According to the

14  coroner, it has spread to his head, cancer.  It's in his

15  lungs.  Keeps growing.  He had it in his mouth at one

16  point, cancerous tumor.  Also has it in his kidneys, also

17  lungs.  Then he's undergoing chemotherapy treatment.  And

18  he is, according to Dr. Kellogg, at his weakest.

19         Additionally, he has been poisoned.  On top of

20  all that, he has had a pillow shoved in his mouth to keep

21  him quiet so he doesn't call for help.  He's been hit in

22  his head with a lamp and broken.  He has been hit in the

23  head with a bar stool and that's broken.  A total of 23

24  hits.  Eight to ten of those independent of each other

25  would have rendered him unconscious.  That's the individual

1   that we have now.

2           And according to Dr. Keen, the stab wound was the

3   last thing that happened.

4           According to her, he comes back to life, if you

5   will.  She takes that knife and they began to fight for

6   it?  Where as she tells her husband -- she tells her father

7   that she stabbed him.  And, according to her, they fight

8   for it and he has superhuman strength and it's all because

9   she told him of an affair.  You think he's concerned about

10  an affair after being hit like that?  He had the knife,

11  according to her, in his hands.  And according to her, he

12  wants to commit suicide by stabbing himself.

13          How poetic that he wants to stab himself in the

14  area where the cancer grew.  It's so poetic that you would

15  think it was staged.  Wait a minute, it was staged, wasn't

16  it.  I don't think it was staged, we know it was.  The

17  scene was staged.  He didn't stab himself.  She stabbed him

18  because he was going to talk to the paramedics about what

19  happened in this case.  Then she washed her hair right

20  before they came around.

21          So having looked at that, having looked at the

22  jury instructions for credibility of witnesses, the State

23  submits to you that the defendant is not someone who is to

24  be believed.  Or if she is to be believed, it must be

25  corroborated by everything that you look at, must be looked

128

1   at as, if you will, with a single eye.  Because she's the

2   type of individual that if it's to her benefit she will

3   lie.

4          Let's talk about the count of first-degree

5   murder, the crime she committed back on October 8th.  It

6   indicates that first-degree murder, the crime of

7   first-degree murder requires the proof of the following

8   three things:  The defendant caused the death of another

9   person.  And number two, the defendant intended or knew

10   that she would cause the death of another person and the

11   defendant acted with premeditation.

12          In this case, did the defendant cause the death

13   of Joseph Andriano?  Absolutely.  She absolutely did know

14   that.

15          Did the defendant intend or know that this would

16   cause the death of any person?  Yeah, if you hit someone

17   that has his medical problems and you just poisoned and you

18   hit over the head, and you stick a knife in his neck all

19   the way back to the spine, yeah, you know that you're going

20   to kill him.

21          This knife is not designed for that.  The knife

22   was designed to be a kitchen utensil.  She used it in a

23   bastardized fashion, very effectively.  There was no way he

24   could have survived that.

25          The defendant acted with premeditation.

129

1   Premeditation is defined as meaning that the defendant

2   intended to kill another human being or knew that she would

3   kill another human.

4            Well, that part of the previous definition, yes,

5   she knew she would kill another human being.   There's two

6   ways that we know that.   Number one was poison.   She

7   admitted that on the stand.   She knew that was poison.

8   That's why she was getting it.   And she would kill another

9   human being.

10            We know that hitting him over the head with a

11   stool -- at the age of 30 you have to have certain

12   knowledge that reasonable persons in the community would

13   have -- if you start hitting people over the head with

14   stools, you start hitting them on the head with lamps that

15   gives you the knowledge you're going to kill another human

16   being.

17            Additionally, on top of that, you had the fact

18   that you go into the kitchen once this person is down and

19   you grab a knife and you grab that knife and place it in

20   somebody's neck, yeah, you will know that you're going to

21   kill that human being.

22            And it says that after forming this intent or

23   knowledge or knowing that you're going to kill somebody

24   that you reflected on the decision before killing them.

25            This is something that is going to be raised by

130

1    the defense, this reflection issue.

2              What is reflection?  It says right here.

3    Reflection, regardless of the length of time in which it

4    occurred.  That's such an important concept that I'll put

5    it on there on the easel so that you can see.  It is this

6    reflection, regardless of the length of time in which it

7    occurs, is what distinguishes first-degree murder from

8    second-degree murder.

9              Well, in this particular case, it tells you that

10   the length of time can be very short.  For example, in this

11   case we have premeditation since July 26 that we can point

12   to.  That's when she started her effort to buy the poison.

13   We have that length of time in the premeditation.  There's

14   no other reason why you're going to buy poison.  There are

15   no rats.  There is nothing like that.  So she is going to

16   buy poison to kill him.

17             Additionally, let's say the argument is, well,

18   the poison didn't kill him.  Right.  Absolutely right.  She

19   jumped the gun.  Absolutely.  Just like she couldn't wait

20   for the cancer to have him shuffle off this mortal soil.

21   Just like she couldn't wait for that, she couldn't wait for

22   the poison to act.  Maybe it was because of circumstances

23   were beyond her control but she couldn't wait for that to

24   happen.

25             Then why don't we talk about the situation that

000009233

1  happened while the paramedics are out there.  We know that

2  in that case, one of the things that happened is she hit

3  him over the head with the lamp.  Why would you hit someone

4  over the head with a lamp unless you want to cause him

5  injury.

6          You have to consider what his circumstances were,

7  what his mental health was, the fact that he's down on the

8  ground and he can't get up, will not get up because he

9  can't.  You have to consider that.

10          Additionally, she starts hitting him over the

11  head 22 other times, if you will, with the stool.  A total

12  of 23.

13          What do you think that person is thinking because

14  it can be as short as a second because this tells you that

15  premeditation can be a very short period of time.  It is

16  this reflection regardless of the length of time in which

17  it occurred.  It can be very short.  It can be a second,

18  two seconds.  It can be three seconds.  It can be five

19  seconds, whatever it can be.  How long does it take to

20  strike somebody on the back of the head 23 times?  Figure

21  it out for yourself.  It's during that time that she's

22  reflecting.  She's thinking.  And that's what this is

23  talking about.

24          So if we take it that, well, you know, it isn't

25  the poison that killed him, it's this incident that

1  happened, if you will.  You know he's not getting up.  He's

2  not going after her.  He's not doing anything.  So it's

3  one, two, three, four, five, six, seven -- I'm doing this

4  quick -- eight, nine, ten.

5         There's a period between each one of these hits.

6  That's premeditation.  There's a thought.  It isn't a

7  situation where she's mentally retarded.  And that's why we

8  did the Shipley.  That she doesn't know the count.  She

9  doesn't know what's going to happen.  She knows what's

10  going to happen.

11        The other thing that is important is that it's

12  very directed to the back of his head.  It's not a

13  situation where it's all over.  It's to the head.  She

14  wants a maximum effect from that bar stool in the head.  If

15  she didn't, why not hit him in the body.  Why not hit him

16  on the arm.  Why not hit him in the buttocks.  No, it's the

17  head.  Number one, because he can't move.  And number two

18  because you want to do the most damage.  And so she knew

19  that if you do that, you're going to kill somebody.

20        Then, and again, he is not getting up.  You would

21  have to believe Chris Hashisaki and everything else and

22  just the defendant in order to assume that he got up.  In

23  this case, given all the evidence, he never got up.

24  Couldn't get up.

25        So when he's down after being beat, she has to

1    get the knife.  Chris Hashisaki did not see any knife when

2    she came over this night.  Didn't see any pillow, either.

3    Didn't see any blood.

4         So, after beating him, she has to go get the

5    knife.  Or, think about it, why does she need to get the

6    knife?  He's not going to cut steaks.  She's more like a

7    butcher in what she's going to do.  She butchers Joseph

8    Andriano, a defenseless individual who is down on his luck

9    because of the health issues, who is down on his luck

10   because of the consequences of that.  No money.  He has two

11   kids, two and three years old.  And that he is going

12   through horrendous chemotherapy treatment and all the side

13   effects.  No luck at all.  And then to have this woman come

14   over in the same living room, in the same sofa where on

15   September 27th she enjoyed the spoils, if you will, with

16   Travis Black in the same place.

17        Maybe there is something poetic there.  I don't

18   know.  But what ends up happening is she gets up.  She has

19   to go get the knife.  She's thinking about it.  So there's

20   your time she's thinking about it.  So when they get up and

21   start talking to you, well, this isn't premeditation with

22   the poison.  It's doesn't mean anything.  It absolutely

23   does.  It shows her frame of mind that night she wanted him

24   dead.

25        The law says that you are going to be given,

134

1   doesn't say, well, she has to start with poison she has to

2   continue with poison.  So if she starts with a knife, you

3   finish with a knife.  You have to intend to kill.  That's

4   what she did.  She just used a variety of means because she

5   wanted him dead.  She's goal-oriented.  She'll do it under

6   any circumstance.

7           But for that you have this justification for

8   self-defense.  It tells you that a defendant is justified

9   in using or threatening physical force in self-defense if

10  the following two conditions exist.  There has to be two

11  conditions that exist.  A reasonable person.  We are not

12  talking about Wendi Andriano.  We are talking about a

13  reasonable person in the community.  A reasonable person in

14  the defendant's situation would have believed that physical

15  force was immediately necessary to protect against

16  another's use or attempted use of unlawful physical force.

17          In other words, what that is saying is that the

18  individual can use physical force.  It doesn't say lethal

19  force.  That's different.  It doesn't say gun.  It doesn't

20  say knife.  You can use force against someone else if the

21  other individual is using force against you.

22          What kind of force was Joseph Andriano using

23  against her?  Was it the force of his buttocks against the

24  carpet?  No, that couldn't be it.  Was it the force of the

25  elbows on the carpet?  Was it the force of the guilt that

1  she felt or was it the force of the fact that she wanted

2  money.  That she wanted him dead so she could get all the

3  money.  Be free to do whatever she wanted.  Is that what

4  was the force that she felt?  Well, he never used any

5  physical force on her.  We know that.  In fact, the only

6  thing that he did is he put his hands up trying to cover

7  himself.  Per Dr. Keen, these were defensive wounds.  He

8  never got up.

9          Forensically speaking, all the blood spatter

10 indicates that he was down when he was hit.  There was no

11 blood on the soles of his feet.  There was blood right here

12 on his ankles.  But that blood was put there by the

13 defendant.  There's no blood on the legs.  No blood on

14 upper part of his body.  He never got up.  He just never

15 got up.  He was resting on the ground.  And per Chris

16 Hashisaki, he never got up.  So, what kind of physical

17 force did he use again her?  Nothing.  So she doesn't meet

18 that.  So, she doesn't deserve protection of this law

19 because she doesn't meet its requirement.

20          But if you think that she does, there is a second

21 requirement.  The defendant used or threatened to use no

22 more physical force than would have appeared necessary to a

23 reasonable person in the defendant's situation.  The

24 defendant knows about the victim's mental health.

25 She knows about the chemotherapy treatment.  And more

136

1   importantly she knows about the sodium azide.  So she knew

2   that he was weak.

3          So she knows all that.  She knows that he's

4   throwing up.  She knows that he's on the ground.  And the

5   other thing that she knows is what she tells him, "Get your

6   fucking ass up," she knows that even that isn't getting him

7   up because he can't.  She physically tries to get him up

8   and can't do it.

9          So, would a reason person think that a knife was

10  necessary to go after somebody who can't get up?  No.

11  There is no justification here.  This is a massacre.  A

12  slaughter.  He's like a pig, he bled out right in the

13  neck.  That's how they slaughter pigs.  That's what she did

14  to him.

15          Then it also tells you that the threat or use of

16  physical force against another is not justified in response

17  to verbal provocation alone.  He could have been screaming

18  the filthiest of obscenities at her from that situation

19  that he was in.  According to her, he did use some

20  obscenities.  But you know what, that's not enough.  The

21  law says stay away from him.  Do whatever.  Call

22  nine-one-one.  Make sure that you know your way to a

23  telephone.  There's no -- again, words are not enough.

24          And there's a restriction.  A defendant may use

25  deadly force in self-defense only to protect against

1   another's use or apparent attempted or threatened use of

2   deadly physical force.

3          In other words, that's different from what you

4   have before.  This is deadly physical force.  That is

5   talking about the knife.  The previous section that I read

6   to you just involved force, hitting, that sort of thing.

7   Here's, it's deadly physical force.

8          You are only entitled to use deadly physical

9   force if the other person is using deadly physical force.

10         Again, same inquiry.  What deadly physical force

11  could Joseph Andriano available himself of when he's

12  throwing up on the carpet, he's down on -- and he's being

13  poisoned.  He's had it in his system for an hour and a

14  half.  It has already gone through the highway, the

15  transportation, the blood system into his tissues.  The

16  sodium azide is now working its magic.  That's what it's

17  doing.  It's killing him.  That's what it's doing.  It's

18  already in his tissues.  That's why we get a reading for

19  two parts per million in the blood system.  What can he

20  do.

21         Not only that, he's got the chemotherapy to deal

22  with.  He's got the cancer.  He's got the weight loss.

23  There isn't any use or apparent attempted or threatened

24  physical force.  He couldn't get up to get the knife.  He

25  couldn't get up to get the belt.  He couldn't get up to get

1   the phone.  Just couldn't.  I mean, what does she want you

2   to believe?  That somehow, he's levitating or something?

3   It just doesn't make sense.

4           Then it says a person is justified in using or

5   threatening to use deadly physical force against another if

6   such person would be justified in threatening or using

7   physical force against the other as described above.  In

8   other words, the same thing as described above.  I don't

9   need to go through that.  And when a reasonable person

10  would believe that deadly force is immediately necessary to

11  protect against another's use or attempted use of unlawful

12  deadly physical force.

13          It's the same thing as above only this applies to

14  deadly physical force.  In other words, you can't use

15  force, you can't use deadly physical force unless you feel,

16  as a reason person, not as Wendi Andriano, but as a reason

17  person, that in this particular case she felt her life was

18  in danger.  How could her life possibly have been in any

19  danger when he's down on the ground unable to get up, when

20  according to Chris Hashisaki, throwing up.

21          We know from her own account she fed him the

22  poison around midnight.  It's about 2:30 in the morning

23  now.  That's two and a half hours, that's between one and a

24  half and two and a half hours.  That's the period of time.

25  And, again, he's the subject of this chemotherapy.

1          And it tells you self-defense justifies the use

2    or threat of use of physical force or deadly physical force

3    only while the apparent danger continues and ends when the

4    apparent danger ends.  He never was a danger for her.  He

5    was always down on the ground.  And, again, this cautions

6    you, the force used cannot be greater than is reasonably

7    necessary to defend against the apparent danger.  It tells

8    you the use of physical force or deadly physical force is

9    justified if a reasonable person in this situation would

10   have reasonably believed that immediate physical danger is

11   present.  The same scenario.  He's on the ground.  He can't

12   get up.  Actual danger is not necessary to justify the use

13   of physical force or deadly physical force.

14          In other words, if it appears to the reasonable

15   person that he could somehow get up and get a knife, even

16   if he's not using it, then that's when it becomes an

17   issue.  In this case, no reasonable person, knowing what

18   she knows, would think that she was in any kind of danger.

19   Was Chris Hashisaki in any kind of danger?  Could he have

20   gotten up -- and she didn't even know about anything that

21   was going on -- could he have gotten up and stabbed her?

22   Could he have gotten up and done anything to her, put a

23   cord around her neck, could he have put the belt around her

24   neck?  No.  Because she went down to him and she tried to

25   lift him, tried to help him.  He couldn't even get up with

1   her.

2          Does that mean for whatever reason the defendant

3   has curative powers?  That she could revive him and make

4   him get up?  No.  In this case, the reasonable person is

5   Chris Hashisaki even though she didn't know some of the

6   things that the defendant knew.

7          And then it tells you you must decide whether a

8   reasonable person in a similar situation would believe that

9   physical force or deadly physical force was immediately

10  necessary to protect against another's use of unlawful

11  physical force.

12         And then it tells you that the defendant's

13  believe was honest is immaterial.  The reasonable person is

14  Chris Hashisaki.  You must measure the defendant's belief

15  against what a reasonable person in this situation would

16  have believed.  She didn't even have a full panoply of

17  ailments that Mr. Andriano was suffering.  But, she knew he

18  couldn't get up.  She knew he wasn't a danger to her.  He

19  wasn't angry.  He wasn't upset.  He couldn't get up.  He

20  was just sick.  He only wanted the paramedics to save him.

21         And then it tells tell you find that there have

22  been past acts of domestic violence as defined below

23  against the defendant by another person, the state of mind

24  of a reasonable person for the purposes of the above

25  instruction of self-defense shall be determined from the

1   perspective of a reasonable person who has been the victim

2   of past acts of domestic violence.

3           In other words, what that's telling you is you

4   look at the situation.  If they have been the victim of

5   domestic violence, if they are, do they have the

6   characteristics?  Then you look at what a person who has

7   been the victim of domestic violence would think.  I, for

8   not one minute, think this is a woman who suffered from

9   domestic violence.  You saw, she's in control.  She's the

10  dominant one.  She wears the pants.  There are no acts of

11  domestic violence here.

12          There are only three incidents that Sharon Murphy

13  testified to involved, the one on her 30th birthday, the

14  one involving the pot and the one involving when she went

15  out to the softball game where the defendant was watching

16  Rick Freeland play.  Those are the only times that Sharon

17  Murphy referenced anything like that.  So, she is not a

18  victim of domestic violence.

19          The defendant has the burden of proving any

20  self-defense justification by a preponderance of the

21  evidence which is a lesser burden than proof beyond a

22  reasonable doubt.

23          As stated earlier, the State's always has the

24  burden of proving the crime charged beyond a reasonable

25  doubt and this burden never shifts throughout the trial.

1        Proof by a preponderance of the evidence is

2   defined as follows:  It means that a fact is more probably

3   true than not.

4        If you find the defendant has proved self-defense

5   justification by a preponderance of the evidence then you

6   must find the defendant not guilty of the crime charged.

7        In other words, if you think that she was

8   defending herself from this man who was dying on the

9   ground, then that's more probably true than not.  It tells

10  you to acquit.  Based on the assessment that was presented,

11  she is not the victim of domestic violence.

12        And the last jury instruction I want to cover is

13  the standard that you are to make that you are to apply to

14  this particular case.  That is the burden of proof.  That

15  tells you that the charge against the defendant is not

16  evidence against her.  And also tells you that in civil

17  cases it is only necessary to prove that a fact is more

18  likely true than not or that its truth is highly probable.

19        That's the preponderance of the evidence

20  standard.  It states that in criminal cases such as this,

21  the State's proof must be more powerful than that.  It must

22  be beyond a reasonable doubt.  Proof beyond a reasonable

23  doubt is proof that leaves you firmly convinced of the

24  defendant's guilt.

25        Are you firmly convinced that Joseph Andriano

1   didn't get up?  Is there any doubt?  Is there any doubt

2   she's the one who got the poison?  Is there any doubt she's

3   the one that stabbed him?  Is there any doubt that she's

4   the one that hit him in the head?  Is there any doubt

5   Joseph Andriano is dead?  No.  Is there any doubt that

6   anybody would know that if you hit somebody over the head

7   that you're going to cause serious physical injury and

8   could cause death?

9           It goes on to say there are very few things in

10  this world that we know with absolute certainty.  And in

11  criminal cases, the law does not require proof that

12  overcomes every doubt.  If, based on your consideration of

13  the evidence, you are firmly convinced that the defendant

14  is guilty of the crime charged, you must find the defendant

15  guilty.

16          That's the end of your inquiry.  And you need to

17  do no more, no less.  And that's what you indicated that

18  you would do when you were questioned on this issue.  If,

19  on the other hand, you think there's a real possibility

20  that the defendant is not guilty you must give the

21  defendant the benefit of the doubt and find the defendant

22  not guilty.

23          It doesn't say that you start out and say, I'm

24  going to give the defendant the benefit of the doubt with

25  regard to Sharon Murphy.  I'm going to give the defendant

144

1    the benefit of the doubt with regard to the insurance

2    company even though she lied.  I'm going to give her the

3    benefit of the doubt about why she lied.  Doesn't say

4    that.  It says if, based on your consideration of the

5    evidence, you are firmly convinced that the defendant is

6    guilty of the crime charged you must find her guilty.

7    That's all you need to do.

8              So those are the jury instructions that you are

9    going to take back with you.  There are a number of others

10   that I have not covered and the Judge will read with you.

11             So that leads to the final portion of my

12   presentation which is the defense that was presented in

13   this case.  And, basically, the situation that we have here

14   is a situation where they wanted to you to sort of feel

15   sorry for the defendant.  That's sort of the gist of it.

16   They want you to feel sorry for the defendant because,

17   according to them, she's in a domestic violence situation

18   with an individual who is suffering from cancer.

19             Well, the way they do it, we know that it's a

20   situation where they staged it for you.  They brought it in

21   for you with half truths, omissions and lies.  They brought

22   it in through assessment and they brought it in through the

23   defendant, an individual who really has a difficult time of

24   being candid with you.

25             But, let me put it to you in this sort of

1    perspective, if you will.  It's with regard to a work of

2    literature.  It's an individual from Spain back in the 16th

3    century who was a reader of books.   Much like the

4    defendant professes to be.  And he reads many, many books.

5    He was an older gentleman and one of the things that

6    happened with regard to him reading these books is that he

7    came to believe in fantasy.  He began to, if you will, the

8    line between imagination and the line between reality

9    merged for him.  So he began to feel that what was not

10   true, was actually true.

11          And that's what we have in this case.  We have

12   the situation where the defendant thinks that what is not

13   true, i.e. that she's a victim of domestic violence, that

14   she believes that that's true.  Of course, by any standard,

15   she is not.  Because the assessment is flawed.  Because the

16   assessment does not take into account secondary gain; does

17   not take into account the defendant is a liar.

18          But she's in a fantasy world.  That's what they

19   presented to you.  This fantasy world is just like this

20   elderly gentleman.  But this elderly gentleman is undaunted

21   and he's read stories about being a knight and that's

22   something he wants to do.  Just like this defendant.  Wants

23   to be out on the dance floor.  Want's to be out kissing

24   guys.  Wants to be out in this fantasy world that seems so

25   real to her with the strobe lights going on.  That's where

1  she wants to be.

2          Well, one of the things that she does in order to

3  do this, well, I can't go out there with my own name.  I'm

4  going to change it.  I'm going go to have a different

5  name.  That's what the defendant does.  She's Anne Newton

6  now.  Or maybe she Ms. Montegomery.  I don't know.

7  Whatever name she wants to be.  That's the name.

8          He also takes a name.  His name is actually

9  Lorenzo Quiano and he changes it to Don Quixote.  That's

10  like she wants to do.

11          But before he does that, he's got to get the

12  suit, the armor.  If he's going to be a knight out there,

13  that's what he's got to do.  So he finds one up in the

14  attic and starts cleaning it, getting it all shiny and

15  everything.  Just like they did with the defendant.  They

16  dressed her up for you.  The hair is different.  They got

17  different clothing.  You've seen it, how she's all sassed

18  up over there by the pool.  And you know how she's out,

19  changing clothing from Rustler's Roost according to

20  Mrs. Green.  Going over to the dance floor.  Doesn't want

21  anyone to know that she's doing that.  I mean, she changes

22  clothes.  I mean, she's somebody who's out there.  That's

23  what they did.  They brought in somebody who is very

24  marmish, very different than the person that's out there in

25  October of the year 2000.

000009249

1          Well, the other thing that he does is that he

2   doesn't have a helmet or hood.  So what he did is that he

3   makes one out of paper mache.  Took him a long time.  Just

4   like it took the defendant a long time to get the domestic

5   violence assessment done, 20 hours.  Well, he does the same

6   thing, takes a lot of time.  Very, very laborious but he

7   doesn't mind.  It's a labor of love.  Look's just like the

8   outfit.  And says I've got test it.  Takes the swore and

9   sheathes it, goes over to the paper mache, cuts it right in

10  half.  Undaunted, he continues on.  And goes through the

11  same process again.  He puts it together and this time

12  thinks, you know what, I'm going to go get that sword

13  because I know what's going to happen.  I'm go to have

14  faith that it's going to stand up.

15          And that's what they want you to do.  They want

16  you to have faith in the defendant's word.  That's exactly

17  what they want you to have.  Don't worry that it's been

18  proven over and over untrustworthy.  It doesn't matter to

19  Don Quixote De La Mancha he's already hacked it in half.

20  He has faith.

21          So that's what they want you to have.  And these

22  misrepresentations from Sharon Murphy to everybody but

23  that's okay, you should believe her.  Each and every one of

24  you should have faith and believe her.  Right?  That's what

25  they want you to believe.

1          One of the other things that they do is that, if

2    he's going to be a knight-errant, he's got to have a

3    horse.  There's a nag out there in the stable and he gives

4    it very, very flowery name, Rosianta (phonetic).  And then

5    he sees a young lady walking down the street, someone he

6    doesn't even know.  Every knight has to have a lady for

7    whom these good works he's going to do.  So what does he

8    call her?  Dulcinea del Toboso.

9          Just like in that case we have this great love

10   affair by the defendant that's only one way.  It's not

11   reciprocated by Rick Freeland.  But, you know what, they,

12   between themselves, pick out names for each other.  But

13   they've got different names for each other.

14         So what happens is that he decides to go out

15   there and he decides to go out and try to do these good

16   deeds and be a knight-errant.  Well, the problem is, that

17   when he gets out there that he needs somebody to help him

18   out.  This is not a situation where he can go out there and

19   do whatever he wants by himself.  So he needs someone to

20   help him.  And the situation is that somewhere he finds an

21   individual riding a donkey, an individual name Sancho

22   Ponca.  And Sancho Ponca is the kind of individual that

23   really wants to avoid responsibility and he goes along with

24   him.

25         We also have a Sancho Ponca here.  His name is

1    Alejo Ochoa.  According to her, every time something goes

2    wrong she calls him.  Remember?  Initially, right after

3    being married, she called him and said, hey, why don't you

4    come over here.  Why don't you help me out.  And that's

5    when a fight takes place.

6            Additionally, in this case, when something

7    happens, she called him.  She called her father, calls

8    Mr. Achoa and says to her mother who picks up the phone and

9    says, "I don't want to talk to you.  I want to talk to my

10   dad because he's the one that can help me."

11           And the reason that that's important is because

12   Mr. Ochoa then rushes over to help her, just like Sancho

13   Ponca who is there to help Don Quixote.

14           What ends up happening is that when he goes out

15   there and this is the traditional one that most of us

16   associate with that novel is that he goes out there but

17   what he sees is not reality.  So when he speaks, he speaks

18   of things that are not real.

19           I do not need to belabor all of the things that

20   she has already said.  We spent many, many minutes talking

21   about the fact that she has lied to everybody.

22           Just for an example, we'll pick Travis Black.

23   One of the things she said is that, no, I got the condom.

24   He's absolutely wrong, I did.  According to him he's on the

25   dance floor by himself and she comes up to him and starts

1   kissing him.  Her reality is, no, I was introduced to him.

2   And I wasn't kissing him, he kissed me.  And I wasn't

3   grabbing him, he was grabbing me.

4            Again, it's a situation where she doesn't see

5   reality.  Because everybody else would have to be wrong,

6   everybody else in the world would have to be wrong for

7   Wendi Andriano to be right.

8            Just like in the mystical, magical made-up world

9   everybody would have to be wrong in order for Don Quixote

10  to be right.  And that's just not the way it is.

11           For example, the traditional one most people

12  think of is the one where he sees these windmills.  What is

13  actually happening is that he thinks these are dragons and

14  he wants to slay them for Dulcinea Del Toboso.  Of course,

15  that would be a way for him to achieve aggrandizement,

16  someone to be reckoned with.  So Sancho Ponca, the voice of

17  reason, is telling him no, no, that's just a windmill.

18  You're going to get hurt.  Don't do it.  So he kicks that

19  nag into gear and he charges.  He's very good with his aim

20  and hits on a blade, hits it and he gets hurt.  Can't get

21  up for a couple days.  But he has justification.  He has a

22  reason why he did not succeed.  He is minimizing why he

23  didn't succeed.  And he's pointing the blame at somebody

24  else for why he didn't succeed.  He is minimizing why he

25  did succeed.  He said it's necromancers, sorcerers,

1    magicians who want to take away my glory that I have and

2    have attempted to achieve for Dulcinea del Toboso.  They've

3    taken it away from me.  That's what they've done.  It's not

4    that I haven't vanquished the dragon.  It's that they

5    changed it to a windmill.  And that's why it looked like

6    that to you, Sancho Ponca.  You, Sancho are really not

7    seeing reality as it is.

8           And that's what we have with this defendant in

9    order for domestic violence defense to work.  Everything

10    that is out there would have to be changed.  The report of

11    Sharon Murphy would have to be accurate.  Her tale to

12    Sharon Murphy would have to be truths.  Her omissions to

13    Sharon Murphy would have to be included.  The misstatements

14    that she made would have to be made complete.  The whole

15    report of 20 hours would have to be changed.  And the tests

16    she administered would have to be changed.  Brad Bayless

17    would have to be wrong in his use of the MMPI.  Everybody

18    would have to be wrong in order for her to be a victim of

19    domestic violence and for it to work in this particular

20    case.

21           THE COURT:  Ladies and gentlemen, we'll go ahead

22    and take our evening recess at this point in time.  During

23    the recess, please remember the entire admonition I have

24    given you, including the fact you are not to discuss the

25    case with anyone or let anyone discuss the case with you.

152

1  Do not do any research about the case or research,

2  investigation or experimentation about the case.  Avoid any

3  and all media coverage of the case.

4           We'll see everyone tomorrow at 1:00 p.m.

5           Have a nice evening.

6           (Proceedings adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

000009255