# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| PPPPPP | Order Granting Motion to Exceed Page Limit |
| QQQQQQ | Motion for Extension Page Limits and Time to File Reply |
| RRRRRR | M.E. Order Signed 7-26-12 |
| SSSSSS | Order Accepting Day-Late Filing 7-25-12 |
| TTTTTT | M.E. Order Signed 8-6-12 |
| UUUUUU | M.E. 8-8-12 |
| VVVVVV | Reply Memorandum in Support of Petition |
| WWWWWW | M.E. Assigned for Ruling 9-13-12 |
| XXXXXX | Motion to Associate Counsel Pro Hac Vice |
| YYYYYY | Motion to Associate Counsel Pro Hac Vice Staino |
| ZZZZZZ | Motion to Associate Counsel Pro Hac Vice Wheatfall |
| AAAAAAA | Motion to Associate Counsel Pro Hac Vice Kruze |
| BBBBBBB | Motion for Leave to File Amicus Curiae Brief |
| CCCCCCC | Response to Motion for Leave |
| DDDDDDD | M.E. Order Signed 10-8-12 |
| EEEEEEE | Reply to Motion for Leave |
| FFFFFFF | Motion to Continue Informal Conference |
| GGGGGGG | M.E. 1-25-13 |
| HHHHHHH | Stipulation for Entry of Protective Order |
| IIIIIII | Motion for Appointment of and Authorization of Payment for Expert |
| JJJJJJJ | Stipulated Motion for Order Releasing All Medical and Mental Health |
| KKKKKKK | Motion to Continue Evidentiary Hearing |
| LLLLLLL | Stipulated Motion for Order Releasing Medical and mental Health Records |
| MMMMMMM | Stipulation to Issuance of Subpoena RE:  Kyre Lorts |
| NNNNNNN | Notice of the State's Position on this Court Ruling |
| OOOOOOO | Order for Production of Petitioner's Trial Counsel Files |
| PPPPPPP | Order Granting Release of Medical Records |

| | |
|---|---|
| QQQQQQQ | Order Issuing Subpoena for Deposition |
| RRRRRRR | Notice RE:  Court's Disclosure relating to Gary Lowenthal |
| SSSSSSS | M.E. 3-19-13 Hearing Reset |
| TTTTTTT | M.E. 4-12-13 |
| UUUUUUU | Unopposed Motion to Vacate 5-19-13 Telephonic |
| VVVVVVV | Order vacating Telephonic Conference 5-7-13 |
| WWWWWWW | M.E. 7-10-13 |
| XXXXXXX | Motion to Expand Time for Evidentiary Hearing |
| YYYYYYY | Motion to Disqualify Prosecutor Juan Martinez from Participating |
| ZZZZZZZ | M.E. 9-4-13 |
| AAAAAAAA | Response to Motion to disqualify Juan Martinez |
| BBBBBBBB | Motion to Associate Counsel Pro Hac Vice |
| CCCCCCCC | M.E. 10-11-13 Ruling on Motion to Disqualify |
| DDDDDDDD | M.E. 10-11-13 Status Conference |
| EEEEEEEE | Order to Associate Counsel Pro Hac Vice |
| FFFFFFFF | Request for Certified Contact Visit Order |
| GGGGGGGG | State's Memorandum RE:  Defense Counsel's Letter |
| HHHHHHHH | Response to State's Request for Contact Visit Order |
| IIIIIIII | Reply to Response to Request for Certified Contact Visit Order |
| JJJJJJJJ | Motion for Leave to File Sur-Reply |
| KKKKKKKK | Response to Motion for Leave |
| LLLLLLLL | M.E. Ruling 11-18-13 |
| MMMMMMMM | Order Granting Contact Visit 11-22-13 |
| NNNNNNNN | Petitioner's Witness List |
| OOOOOOOO | Respondent's Evidentiary Hearing Witness List |
| PPPPPPPP | Request for Certified Contact Visit |
| QQQQQQQQ | Order Granting Contact Visit 12-5-13 |
| RRRRRRRR | Motion to Associate Counsel Pro Hac Vice |
| SSSSSSSS | Motion RE:  Transportation and Meals During Hearing |

| | |
|---|---|
| TTTTTTTT | Order to Associate Counsel Pro Hac Vice 1-6-14 |
| UUUUUUUU | M.E. 1-8-14 Order Signed |
| VVVVVVVV | Sheriff Arpaio's Response to Motion RE:  Transportation and Meals |
| WWWWWWWW | Motion for Removal of Prisoner to Attend as Witness |
| XXXXXXXX | Joint Witness Schedule and Exhibit List |
| YYYYYYYY | Notice of Appearance |
| ZZZZZZZZ | M.E. Order Securing Attendance of Prisoner 1-16-14 |
| AAAAAAAAA | M.E. Order Securing Attendance of Prisoner 1-16-14 |
| BBBBBBBBB | M.E. Status Conference 1-16-14 |
| CCCCCCCCC | Sheriff Arpaio's Supplemental Response to Motion RE:  Transportation |
| DDDDDDDDD | Motion to Admit Exhibits |
| EEEEEEEEEE | M.E. Status Conference 1-24-14 |
| FFFFFFFFF | Notice of Firm Name Change |
| GGGGGGGGG | Motion to Continue Evidentiary Hearing |
| HHHHHHHHH | Petitioner's Opposition to State's Motion to Continue |
| IIIIIIIII | Sheriff Arpaio's Notice RE:  Transportation |
| JJJJJJJJJ | M.E. 1-24-14 |
| KKKKKKKKK | Order to Seal Document 1-31-14 |
| LLLLLLLLL | M.E. 1-29-14 |
| MMMMMMMMM | M.E. Ruling 1-30-14 |
| NNNNNNNNN | M.E. 2-3-14 |
| OOOOOOOOO | M.E. 2-4-14 |
| PPPPPPPPP | M.E. 2-5-14 |
| QQQQQQQQQ | Criminal Subpoena Shawn King |
| RRRRRRRRR | M.E. 2-6-14 |
| SSSSSSSSS | M.E. 2-7-14 |
| TTTTTTTTT | M.E. 2-10-14 |
| UUUUUUUUU | M.E. 2-14-14 Order Transporting Prisoner |
| VVVVVVVVV | M.E. 2-11-14 |

| WWWWWWWWW | M.E. 2-19-14 |
|---|---|
| XXXXXXXXX | Hearing Worksheet |
| YYYYYYYYY | M.E. 2-18-14 |
| ZZZZZZZZZ | M.E. 2-25-14 |
| AAAAAAAAA | M.E. 2-14-14 |
| BBBBBBBBBB | Order to Seal Documents 3-31-14 |
| CCCCCCCCCC | Stipulation to Extend Deadlines |
| DDDDDDDDDD | Transcript 2-4-14 |
| EEEEEEEEEE | Transcript 2-10-14 |
| FFFFFFFFFF | Transcript 2-3-14 a.m. |
| GGGGGGGGGG | Transcript 2-14-14 |
| HHHHHHHHHH | Transcript 2-6-14 |
| IIIIIIIIII | Transcript 2-7-14 |
| JJJJJJJJJJ | Transcript 2-3-14 p.m. |
| KKKKKKKKKK | Transcript 2-5-14 |

# EXHIBIT PPPPP

FILED
July 26, 2012 10:30am
MICHAEL K. JEANES, Clerk

By _____
H. O'Shaughnessy Deputy

# MARICOPA COUNTY SUPERIOR COURT

| | |
|---|---|
| STATE OF ARIZONA, | |
|     Plaintiff/Respondent, | CR 2000-096032-A |
|     -vs- | |
| WENDI ANDRIANO, | ORDER |
|     Defendant/Petitioner. | |

    Upon motion duly made, and for good cause appearing,

    IT IS HEREBY ORDERED that the State's Motion to Exceed the Page Limit is GRANTED.

    DATED this _24_ day of July, 2012.

JUDGE DOUGLAS L. RAYES

1

# EXHIBIT QQQQQQ

MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED

**12 JUL 26  AM 11: 32**

COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Suite 1200
Phoenix, Arizona 85004
(602) 224-0999
Scott M. Bennett, State Bar No. 022350

FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703
Telephone:  (608) 257-5035
Fax:          (608) 258-4258

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*

*Attorneys for Petitioner*
Wendi Andriano

## SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, ) | |
| ) | |
| Respondent, ) | No. CR2000-096032-A |
| ) | |
| vs. ) | **UNOPPOSED MOTION FOR** |
| ) | **EXTENSION OF PAGE LIMITS** |
| ) | **AND TIME TO FILE REPLY IN** |
| Wendi Elizabeth Andriano, ) | **SUPPORT OF POST-CONVICTION** |
| ) | **RELIEF PETITION** |
| Petitioner. ) | |
| ) | (Assigned to the Hon. Douglas Rayes) |
| ) | |

Pursuant to Rule 32.5 of the Arizona Rules of Criminal Procedure, Rule 5.2(d) of the Arizona Rules of Civil Procedure, and the Court's supervisory powers, Petitioner Wendi Andriano moves for a 15-page extension of page limits and a four-week extension of time, from August 7, 2012 to September 4, 2012, to file her reply in support of the petition for post-conviction relief. The State has indicated that it does not oppose this Motion.

The grounds supporting this Motion are as follows:

4821-5800-1104.1

1        1.     In recognition of the numerous grounds for post-conviction relief,

2  the extent of the post-conviction investigation and supporting materials, and the

3  significance of the stakes for Petitioner, Petitioner moved in November 2011 for

4  leave to submit a Petition of 100 pages.  On December 1, 2011, this Court granted

5  that relief in part over the State's objection, allowing Petitioner to file a 70-page

6  Petition.  That Petition was filed on February 17, 2012.

7        2.     Due in part to the "complicated and fact-intensive" nature of the case

8  and the Petition, the State moved for and was granted four extensions of time to

9  file its response brief.  Petitioner understood and appreciated that basis for the

10  requests, and did not oppose them.

11        3.     The State filed its response brief two days ago, on July 23, 2012.

12  Because the State's response was 25 pages over the 40-page limit for responses,

13  that response was accompanied by the State's motion *instanter* to extend the page

14  limits for its response.  Though the State had not sought Petitioner's consent for

15  this relief, Petitioner nevertheless does not oppose it, again in recognition of the

16  number of claims at issue and their fact-intensive nature, as well as the expansive

17  trial record and evidence submitted in support of the Petition.

18        4.     By rule, Petitioner's reply is presently due on August 7, 2012, and is

19  limited to 15 pages.

20        5.     By this motion, and for the reasons stated above, Petitioner seeks a

21  15-page extension of page limits and a four-week extension of time, until

22  September 4, 2012, to file her reply the to the State's response brief.

23        6.     Since receiving the State's response brief, Petitioner's counsel has

24  been working diligently to identify the issues warranting a reply.  Based on

25  Petitioner's counsel's initial review of the State's response and the counter-

26  arguments that must be raised in reply to adequately correct certain factual

27  misconceptions and defend her claims, Petitioner's counsel has reasonably

2

1    determined that it cannot adequately address the State's 65-page response within

2    the 15 pages and two weeks permitted by Rule 32.5 of the Arizona Rules of

3    Criminal Procedure.  As with any 65-page brief, there is simply too much material

4    to which to reply within those limitations.  Specifically, Petitioner's counsel has

5    identified several misconstructions of Petitioner's claims, numerous areas where

6    the State glosses over key factual information or argues unreasonable implications

7    from it, and statements of law that warrant discussion or distinction.  Such

8    discussion will assist the Court in addressing Ms. Andriano's claims and help to

9    ensure a full and fair opportunity for each side to respond to the other's position

10   on the merits.

11          7.     Given that this is a death-penalty case, and that it is a post-

12   conviction relief proceeding in which waiver and preclusion carry especially harsh

13   consequences, the requested extensions are necessary in the interests of justice to

14   ensure that Petitioner has an adequate opportunity to respond to counter-arguments

15   raised by the State.

16          8.     Absent extraordinary circumstances unrelated to the State's brief or

17   the nature of the claims in this case, Petitioner does not anticipate the need for

18   further extensions of the time or page limits for the reply.

19          9.     As noted above, Petitioner's counsel has contacted counsel for the

20   State regarding this Motion, who indicated that the State does not oppose it.

21

22

23

24

25

26

27

3

1    RESPECTFULLY SUBMITTED July 25, 2012.

2

3                                          FOLEY & LARDNER LLP

4

        By _____
5
                Allen A. Arntsen, *Pro Hac Vice*
6                Stephan J. Nickels, *Pro Hac Vice*
                Matthew R. Lynch, *Pro Hac Vice*
7

8                                          COPPERSMITH SCHERMER &
                                          BROCKELMAN PLC
9                                              Scott M. Bennett

10                                             *Attorneys for Petitioner*

11

12

13   ORIGINAL filed July 26, 2012,
     with the Clerk of the Maricopa County Superior Court.
14
     COURTESY COPY hand-delivered July 26, 2012, to:
15

16   Judge Douglas Rayes
     Maricopa County Superior Court
17   East Court Building-511
     101 W. Jefferson
18   Phoenix, AZ 85003-2243

19
     COPY mailed July 26, 2012, to:
20

21   Ms. Lacey Stover Gard
     Office of the Attorney General
22   400 W. Congress, Suite S-315
     Tuscon, AZ 85701-1367
23   *Attorney for the State of Arizona*

24

25   *[signature]*

26

27

                              4

# EXHIBIT RRRRRR

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
07/30/2012 8:00 AM

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CR 2000-096032                                     07/26/2012


                                        CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                      H. O'Shaughnessy
                                                Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)            JAMES J BELANGER
                                        SCOTT M BENNETT
                                        ALLEN A ARNTSEN
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        VICTIM WITNESS DIV-AG-CCC



                          MINUTE ENTRY


       The Court has received and considered the State's Motion to Exceed the Page Limit.
Good cause appearing,

       IT IS ORDERED that the State's Motion to Exceed the Page Limit is granted all in
accordance with formal written order signed by the Court on July 24, 2012 and filed by the Clerk
on July 26, 2012.

       FILED:  Order.

       This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine
their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT SSSSSS

FILED

8/6/12 9:02am

MICHAEL K. JEANES, Clerk

By _X/ O'Shaughnessy_

H. O'Shaughnessy Deputy

# MARICOPA COUNTY SUPERIOR COURT

STATE OF ARIZONA,

     Plaintiff/Respondent,

     -vs-

WENDI ANDRIANO,

     Defendant/Petitioner.

CR 2000-096032-A

ORDER

Upon motion duly made, and for good cause appearing,

IT IS HEREBY ORDERED that the State's Motion to Accept Day-Late Filing of Exhibits MM-EEE to Response to Petition for Post-Conviction Relief is GRANTED.

DATED this _25_ day of July, 2012.

_____

JUDGE DOUGLAS L. RAYES

1

# EXHIBIT TTTTTT

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
08/07/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          08/06/2012

                                              CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                          H. O'Shaughnessy
                                                    Deputy

STATE OF ARIZONA                         LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)             JAMES J BELANGER
                                         ALLEN A ARNTSEN
                                         STEPHAN J NICKELS
                                         MATTHEW R LYNCH

                                         CAPITAL CASE MANAGER
                                         COURT ADMIN-CRIMINAL-PCR
                                         VICTIM WITNESS DIV-AG-CCC

MINUTE ENTRY

        The Court has received and considered Petitioner's Motion to Accept Day-Late Filing of
Exhibits MM-EEE to Response to Petition for Post-Conviction Relief and Unopposed Motion for
Extension of Page Limits and Time to File Reply in Support of Post-Conviction Relief Petition.

        Good cause appearing,

        IT IS ORDERED granting said Motions all in accordance with formal written orders
signed on July 25, 2012 (Petitioner's Motion to Accept Day-Late Filing of Exhibits MM-EEE to
Response to Petition for Post-Conviction Relief) and July 27, 2012 (Unopposed Motion for
Extension of Page Limits and Time to File Reply in Support of Post-Conviction Relief Petition).

        Certified Copies sent.

        FILED:  Orders.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    08/06/2012

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine
their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT UUUUUU

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
08/15/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    08/08/2012


JUDGE DOUGLAS L. RAYES

CLERK OF THE COURT
H. O'Shaughnessy
Deputy


STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)         JAMES J BELANGER
                                     SCOTT M BENNETT
                                     ALLEN A ARNTSEN
                                     MATTHEW R LYNCH

                                     CAPITAL CASE MANAGER
                                     COURT ADMIN-CRIMINAL-PCR
                                     JUDGE ISHIKAWA
                                     VICTIM WITNESS DIV-AG-CCC


MINUTE ENTRY


9:46 a.m.

Courtroom SCT 5A

State's Attorney:        Lacey Gard appears telephonically
Defendant's Attorney:    Allan Artnsen and Matt Lynch appear telephonically
Defendant:               Presence Waived

Court Reporter, Elva Cruz-Lauer, is present.

A record of the proceeding is also made by audio and/or videotape.

LET THE RECORD REFLECT that victim, Jeanette Andriano appears telephonically.

Docket Code 085                Form R000D                      Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              08/08/2012


No issues pending, petition to be filed timely,

IT IS ORDERED that upon filing of Reply this matter will be assigned to the Honorable Brian Ishikawa for ruling.

9:48 a.m.  Matter concludes.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT VVVVV

FILED
MICHAEL K. JEANES. CLERK
RECEIVED CCC #8
DOCUMENT DEPOSITORY

12 SEP -4 PM 5: 00

1  Scott M. Bennett (Bar No. 022350)
2  COPPERSMITH SCHERMER & BROCKELMAN PLC
   2800 North Central Avenue
3  Phoenix, Arizona  85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
5  sbennett@csblaw.com

6  Allen A. Arntsen, admitted *pro hac vice*
7  Matthew R. Lynch, admitted *pro hac vice*
   FOLEY & LARDNER LLP
8  150 E. Gilman Street
   Madison, WI 53703-1481
9  (608) 257-5035 (office)
10 (608) 258-4258 (fax)

11 *Attorneys For Petitioner Wendi Andriano*

12

13                SUPERIOR COURT OF ARIZONA
                     COUNTY OF MARICOPA
14

15 STATE OF ARIZONA                  )  CASE NO: CR2000-096032-A
                                     )
16         RESPONDENT,               )
                                     )  **REPLY MEMORANDUM IN SUPPORT OF**
17    V.                             )  **PETITION FOR POST-CONVICTION**
                                     )  **RELIEF**
18 WENDI ELIZABETH ANDRIANO          )
                                     )
19         PETITIONER.               )
                                     )
20 ——————————————————————

21

22

23

24

25

26

27

28 |  REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
            CASE NO. CR2000-096032-A

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

ARGUMENT ................................................................................... 1

I.   WENDI'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS
     VIOLATED BY DEFENSE COUNSEL'S DEFICIENT PERFORMANCE
     AND RESULTING PREJUDICE DURING ALL PHASES OF THE
     TRIAL .......................................................................................... 1

     A.   Uninformed Choices Cannot Be Strategic ................................. 1

     B.   Defense Counsel's Performance Was Deficient In Numerous
          Respects ................................................................................ 3

          1.   Failure To Investigate Wendi's Social History ................... 3

          2.   Failure To Investigate Wendi's Psychiatric Disorders ........ 5

          3.   Failure To Object To Evidence And Argument Related To
               The Alleged Sodium Azide Poisoning ................................ 7

          4.   Failure To Elicit Key Corroborative Testimony .................. 8

     C.   Defense Counsel's Deficient Performance Was Prejudicial ........ 10

          1.   Prejudice Due To Failure To Investigate Wendi's Social
               History ......................................................................... 10

          2.   Prejudice Due To Failure To Investigate Wendi's Psychiatric
               Disorders ...................................................................... 13

          3.   Prejudice Due To Failure To Object To Evidence and
               Argument Related To The Alleged Sodium Azide Poisoning ......... 16

          4.   Prejudice Due To Failure To Elicit Corroborative Testimony ........ 16

     D.   A Reweighing Of The Mitigating And Aggravating Evidence Shows
          That Wendi Has Demonstrated A Reasonable Probability Of A
          Different Outcome ................................................................. 18

i

4851-6029-7232

1

**TABLE OF CONTENTS (cont'd)**

2
Page

3    II.   COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE
4          PERVASIVE PROSECUTORIAL MISCONDUCT, WHICH DEPRIVED
           WENDI OF DUE PROCESS ................................................................................. 19
5
           A.   "Verbal Guerrilla Warfare" Regarding Wendi's Promiscuity .................... 19
6
           B.   Implying Extrajudicial Evidence .................................................................. 20
7
8          C.   The Prosecutor's Baseless Attack On A Defense Expert's Ethics .............. 22

9    III.  ATTORNEY DELOZIER HAD AN ACTUAL CONFLICT OF
           INTEREST THAT AFFECTED THE ADEQUACY OF WENDI'S
10         REPRESENTATION ......................................................................................... 22

11              1.   The Conflict Claims Are Not Precluded ......................................... 23

12              2.   DeLozier Was Conflicted During The Entire Time He Was
13                   Supposed To Be Preparing The Mitigation Case .............................. 24

14              3.   DeLozier's Conflict Rendered Him Incapable Of Pursuing A
                     Plausible Alternative Defense Strategy ............................................ 26
15

16   IV.   THE JUROR MISCONDUCT CLAIM IS NOT PRECLUDED, AND THE
           STATE'S ATTEMPT TO MINIMIZE JUROR MISCONDUCT FAILS ............. 26
17
     V.    THE INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
18         CLAIM IS NOT WAIVED .................................................................................. 28

19   VI.   THE COURT SHOULD CONSIDER LARRY HAMMOND'S EXPERT
20         OPINION ............................................................................................................ 29

21   CONCLUSION ............................................................................................................ 30

22

23

24

25

26

27

ii

28

4851-6029-7232

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Ainsworth v. Calderon,*
   138 F.3d 787 (9th Cir. 1998) ............................................................................. 29

*Bean v. Calderon,*
   163 F.3d 1073 (9th Cir. 1998) .................................................................6-7, 14-15

*Beardslee v. Woodford,*
   358 F.3d 560 (9th Cir. 2004) ............................................................................. 29

*Boyde v. Brown,*
   404 F.3d 1159 (9th Cir. 2005) ........................................................................... 18

*Caro v. Calderon,*
   165 F.3d 1223 (9th Cir. 1999) ........................................................................... 14

*Chambers v. Armontrout,*
   907 F.2d 825 (8th Cir. 1990) .............................................................................. 3

*Correll v. Ryan,*
   539 F.3d 938 (9th Cir. 2008) ....................................................................2, 10-11

*Cunningham v. Zant,*
   928 F.2d 1006 (11th Cir. 1991) ........................................................................... 2

*Cuyler v. Sullivan,*
   446 U.S. 335 (1980).................................................................................... 23, 26

*Daniels v. Woodford,*
   428 F.3d 1181 (9th Cir. 2005) ........................................................................... 14

*Deutscher v. Whitley,*
   884 F.2d 1152 (9th Cir. 1989) ............................................................................. 2

*Douglas v. Woodford,*
   316 F.3d 1079 (9th Cir. 2003) ........................................................................... 14

*Frierson v. Woodford,*
   463 F.3d 982 (9th Cir. 2006) .............................................................................. 2

iii

4851-6029-7232

*Hale v. Gibson,*
   227 F.3d 1298 (10th Cir. 2000) .................................................................................. 29

*Hamilton v. Ayers,*
   583 F.3d 1100 (9th Cir. 2009) ............................................................................... 3, 7

*Harris ex rel. Ramseyer v. Wood,*
   64 F.3d 1432 (9th Cir. 1995) ..................................................................................... 17

*Harris v. Dugger,*
   874 F.2d 756 (11th Cir. 1989) ............................................................................... 2-3

*Hendricks v. Calderon,*
   70 F.3d 1032 (9th Cir. 1995) ..................................................................................... 15

*Hovey v. Ayers,*
   458 F.3d 892 (9th Cir. 2006) ..................................................................................... 10

*Jeffries v. Wood,*
   114 F.3d 1484 (9th Cir. 1997) .................................................................................. 27

*Jones v. United States,*
   327 F.2d 867 (D.C. Cir. 1963) ..................................................................................... 5

*Marzullo v. Maryland,*
   561 F.2d 540 (4th Cir. 1977) ..................................................................................... 29

*Pavel v. Hollins,*
   261 F.3d 210 (2d Cir. 2001) ......................................................................................... 8

*Pickens v. Lockhart,*
   714 F.2d 1455 (8th Cir. 1983) .................................................................................. 29

*Porter v. McCollum,*
   130 S. Ct 447 (2009) ......................................................................................... *passim*

*Provenzano v. Singletary,*
   148 F.3d 1327 (11th Cir. 1998) ................................................................................ 30

*Ramonez v. Berghuis,*
   490 F.3d 482 (6th Cir. 2007) ....................................................................................... 2

iv

4851-6029-7232

*Rompilla v. Beard,*
    545 U.S. 374 (2005)...............................................................................3, 10, 13

*Sears v. Upton,*
    130 S. Ct. 3259 (2010)..................................................................................13

*Silva v. Woodford,*
    279 F.3d 825 (9th Cir. 2002) ........................................................................28

*Simmons v. South Carolina,*
    512 U.S. 154 (1994).......................................................................................27

*Summerlin v. Schriro,*
    427 F.3d 623 (9th Cir. 2005) (en banc) ...............................................*passim*

*United States v. Withers,*
    638 F.3d 1055 (9th Cir. 2010) ......................................................................29

*United States v. Younger,*
    398 F.3d 1179 (9th Cir. 2005) ......................................................................21

*Wheat v. United States,*
    486 U.S. 153 (1988)........................................................................................26

*Wiggins v. Smith,*
    539 U.S. 510 (2003)................................................................................1-3, 30

*Williams v. Taylor,*
    529 U.S. 362 (2000).................................................................................11, 25

*Wood v. Georgia,*
    450 U.S. 261 (1981)........................................................................................26

**STATE CASES**

*Dwyer v. Comm'r,*
    No. CV 980357949S, 2000 Conn. Super. LEXIS 1934
    (Conn. Super. Ct. July 26, 2000) ................................................................29

*Foulke v. Knuck,*
    162 Ariz. 517, 784 P.2d 723 (Ct. App. 1989).............................................25

v

4851-6029-7232

1
2

3   *Harris v. Commonwealth,*
4       408 S.E.2d 599 (Va. App. 1991)...............................................................27

5   *In re Cordero,*
6       756 P.2d 1370 (Cal. 1988).....................................................................29

7   *Lashonda M. v. Dep't of Economic Security.,*
        210 Ariz. 77, 107 P.3d 923 (Ct. App. 2005)............................................28

8   *Musgrove v. State,*
9       986 S.W.2d 738 (Tex. App. 1999).............................................................27

10  *People v. Thomas,*
11      867 P.2d 880 (Colo. 1994)......................................................................29

12  *People v. Walker,*
        440 N.E.2d 83 (Ill. 1982).......................................................................28
13

14  *Pool v. Superior Ct.,*
        139 Ariz. 98, 677 P.2d 261 (1984) ....................................................19, 20

15  *Quick v. State,*
16      353 S.E.2d 497 (Ga. 1987)..................................................................27-28

17  *State v. Allen,*
18      223 Ariz. 125, 220 P.3d 245 (2009) ........................................................24

19  *State v. Bocharski,*
20      218 Ariz. 476, 189 P.3d 403 (2008) ...................................................14, 19

21  *State v. Carlson,*
        202 Ariz. 570, 48 P.3d 1180 (2002) .........................................................16
22

23  *State v. Christensen,*
        129 Ariz. 32, 628 P.2d 580 (1981) ......................................................14-15

24  *State v. DiFrisco,*
25      804 A.2d 507 (N.J. 2002)........................................................................29

26  *State v. Hall,*
        204 Ariz. 442, 65 P.3d 90 (2003) .............................................................28
27

28

PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4851-6029-7232

*State v. Hughes,*
   193 Ariz. 72, 969 P.2d 1184 (1998) ..................................................................... 19, 22

*State v. Jenkins,*
   148 Ariz. 463, 715 P.2d 716 (1986) .......................................................................... 23

*State v. Mincey,*
   115 Ariz. 472, 566 P.2d 273 (1977) .......................................................................... 20

*State v. Moody,*
   208 Ariz. 424, 94 P.3d 1119 (2004) .......................................................................... 14

*State v. Moore,*
   222 Ariz. 1, 213 P.3d 150 (2009) ............................................................................... 23

*State v. Morris,*
   215 Ariz. 324, 160 P.3d 203 (2007) .......................................................................... 20

*State v. Roque,*
   213 Ariz. 193, 141 P.3d 368 (2006) .................................................................. 11-12, 20

*State v. Soto-Fong,*
   187 Ariz. 186, 928 P.2d 610 (1996) .......................................................................... 16

*State v. Wallace,*
   --- Ariz. ---, 272 P.3d 1046 (2012) .......................................................................... 14

**RULES**

ARIZ. R. CRIM. P. 15.1(b) ..................................................................................... 21

ARIZ. R. CRIM. P. 24.1 ................................................................................... 27, 28

ARIZ. R. CRIM. P. 32.2(b) ..................................................................................... 23

ARIZ. R. EVID. 803(3) ............................................................................................. 9

ARIZ. R. PROF. COND. 1.9 ..................................................................................... 25

ARIZ. R. PROF. COND. 3.1, 3.3 ............................................................................ 23

FED. R. EVID. 412 .................................................................................................. 20

vii

4851-6029-7232

**INTRODUCTION**

The State tries to dismiss the evidence presented in the Petition in broad strokes, by asserting that the evidence is cumulative or was omitted by defense counsel for strategic reasons. None of these arguments withstands scrutiny. Defense counsel completely missed: (a) Wendi's actual life story, shaped by her social history; (b) her psychiatric disorders, and the manifestations of those disorders leading up to, and on the night of, Joe's death, as discussed in detail in the expert reports of Dr. Woods and Dr. Hopper (*see* Pet. Tabs 2 & 4); (c) the impossibility of the State's poisoning theory, which was the principal basis for the findings of premeditation and the especially cruel aggravating factor; and (d) key corroborative third party testimony.

Aside from these and other defense counsel errors, Wendi's trial was tainted by the prosecutor's attempts to inflame the jury by making over 100 references to her sexual history and promiscuity, even after having acknowledged that such facts were not relevant to motive (and thus not relevant to the case), and by her defense counsel's conflict of interest (*i.e.*, his representation of Wendi's parents in a custody proceeding involving Wendi and Joe's children at the same time he was supposed to be investigating childhood abuse as mitigating evidence to save Wendi's life). The State's other arguments regarding preclusion, juror misconduct, the performance of appellate counsel, and Wendi's *Strickland* expert, all lack merit.

For the reasons stated in the Petition and supporting materials, and this Reply, Wendi is entitled to post-conviction relief.

**ARGUMENT**

**I.     WENDI'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED BY DEFENSE COUNSEL'S DEFICIENT PERFORMANCE AND RESULTING PREJUDICE DURING ALL PHASES OF THE TRIAL**

**A.     *Uninformed Choices Cannot Be Strategic***

Much of the State's response can be answered by "the central teaching of *Strickland*, as reaffirmed by *Wiggins*," which was set forth in the Petition but ignored in

1

4851-6029-7232

1    the Response: "An uninformed strategy is not a reasoned strategy. It is, in fact, no

2    strategy at all." *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008); *Ramonez v.*

3    *Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007) ("[T]he state court ignored the central

4    teaching of *Strickland*, as reaffirmed by *Wiggins*, that the investigation leading to the

5    choice of a so-called trial strategy must itself have been reasonably conducted lest the

6    'strategic' choice erected upon it rest on a rotten foundation.") (citation omitted);

7    *Frierson v. Woodford*, 463 F.3d 982, 992 (9th Cir. 2006) ("Because strategy presupposes

8    investigation, [defense counsel's] actions cannot be attributed to strategy."). *See also*

9    *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) ("[O]ur principal concern in deciding

10   whether [defense counsel] exercised reasonable professional judgment is . . . whether the

11   investigation supporting defense counsel's decision not to introduce mitigating evidence

12   of Wiggins' background *was itself reasonable*.") (internal quotation & brackets omitted).

13          Virtually all aspects of defense counsel's ineffectiveness at trial stem from their

14   pre-trial failures to reasonably investigate the case, ranging from failures to interview key

15   witnesses regarding key issues, to failures to investigate Wendi's social history for

16   mitigating and potentially exculpatory evidence, to failures to follow-up on psychiatric

17   red flags, to failures to even determine who among them was actually responsible for

18   different aspects of the case. For example, defense counsel's decision not to seek an

19   instruction on lesser-included offenses was made without a reasonable pre-trial

20   investigation, which would have showed the availability of psychiatric and other defenses

21   to premeditation. Such failures render subsequent decision-making at trial uninformed,

22   and thereby non-strategic.[1] By repeatedly characterizing defense counsel's decisions as

23

[1] *See, e.g., Cunningham v. Zant*, 928 F.2d 1006, 1017-19 (11th Cir. 1991) (decision
24   "cannot be deemed tactical" when counsel failed to "present and argue readily available
     additional evidence" to bolster the mitigation presented at trial, and had reason to believe
25   more mental-health evidence existed); *Deutscher v. Whitley*, 884 F.2d 1152, 1160 (9th
     Cir. 1989) ("Counsel could not have chosen to avoid psychiatric evidence because of
26   potentially damaging rebuttal testimony. Counsel did not even know what evidence was
     available."), *vacated on other grounds*, 111 S.Ct. 1678 (1991), *and subsequently*
27   *reaffirmed*, 16 F.3d 981 (9th Cir. 1994); *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir.
     1989) (not a strategic decision when "counsel's failure to present or investigate

28                                                  2

4851-6029-7232

1   "strategic" without addressing their lack of investigation, the State's response *assumes*

2   the very issue (the adequacy of the investigation) in dispute—and thus offers no response

3   at all.

**B.     Defense Counsel's Performance Was Deficient In Numerous Respects**

**1.     Failure To Investigate Wendi's Social History**

6   As explained in the Petition, Wendi's defense counsel failed to conduct any

7   meaningful investigation of her social history.[2]  It is undisputed that defense counsel

8   never interviewed Wendi's biological father, Shelby "Skip" Robertson, who was serving

9   a 17-year sentence for child molestation in an Arizona prison, or any other members of

10   the Robertson family, never interviewed the majority of the witnesses who submitted

11   declarations in support of the Petition, and only had brief discussions with other

12   witnesses, which did not even touch on abuse or mental health issues.[3]  (Pet. at 29-30).

13   *Cf. Chambers v. Armontrout*, 907 F.2d 825, 828 (8th Cir. 1990) ("The decision to

14   interview a potential witness is not a decision related to trial strategy.  Rather, it is a

15   decision related to adequate preparation for trial.").

16   These failures constitute deficient representation under *Strickland.  See Wiggins*,

17   539 U.S. at 524-25 (deficient performance where counsel "abandoned their investigation

18

19   mitigation evidence resulted not from an informed judgment, but from neglect" in failing
    to communicate among themselves regarding mitigation case).

20   [2]  It is "unquestioned" that capital defense counsel has an "obligation to conduct a
    thorough investigation of the defendant's background."  *Porter v. McCollum*, 130 S. Ct

21   447, 452 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *see also

22   Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins*, 539 U.S. at 522-23.  This
    obligation was clear at the time of Wendi's trial.  *See Hamilton v. Ayers*, 583 F.3d 1100,

23   1130 (9th Cir. 2009) ("undisputed that counsel was required to obtain the type of
    available information that a social history report would contain, such as family and social

24   background and mental health"); *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005)
    (en banc) ("[T]he investigation should include inquiries into social background and

25   evidence of family abuse.").

    [3]  The State contends that, during the penalty phase, defense counsel "called several of

26   Andriano's friends and recalled her parents to offer additional information about her
    character and upbringing."  (Resp. at 10.)  In fact, for those points defense counsel called

27   only Wendi's parents and *their* friends.  None of them presented any evidence remotely
    close to what defense counsel could have and should have found.  (Pet. at 40.)

28                                                         3

4851-6029-7232

of [defendant's] background after having acquired only a rudimentary knowledge of his

history from a narrow set of sources" that nonetheless revealed that "[defendant's]

mother was a chronic alcoholic; [and defendant] was shuttled from foster home to foster

home and displayed some emotional difficulties while there"). *See also Porter,* 130 S.

Ct. at 453; *Summerlin,* 427 F.3d at 631.

These gross deficiencies in defense counsel's mitigation investigation are proven

by comparing the mitigation story that was told at Wendi's trial (*i.e.*, that she was the

product of a good family and a good upbringing, *see* Pet. at 29, 40) with Wendi's actual

life story (*see* Pet. at 2-17). For example, the jury that sentenced Wendi to death:

(a)   did not hear that Wendi's father (Skip), his father, and Skip's five brothers were all child molesters, who all had access to Wendi when she was an infant and young child (Pet. at 2-3);

(b)   did not hear about the perverted sexual relationship that Alejo, Wendi's stepfather, had with Wendi (Pet. at 3-5);

(c)   did not hear that Wendi was physically and psychologically abused her entire childhood, starting with Skip, who trained Wendi "like she was a dog, not a baby" by spanking her if she cried or didn't obey; continuing with Donna, who thought it was important to pull Wendi's diaper down when she was hitting her with a wooden spoon, and understood from church rules that the point of swatting Wendi was to "break her"; then Alejo, who also swatted Wendi and learned the sadistic trick (from church leader Tom King) of drilling holes in the paddle to make the paddling hurt more; and continuing with leaders at the Fishers of Men cult and the Harvest church/school, where swatting was "necessary to drive the sin from [her]" (Pet. at 5-7);[4]

(d)   did not hear the extent of the abject poverty Wendi was subjected to, including the fact that she was panhandling by herself at the age of 4, and was eating food out of the trash and searching for money on the street after Donna and Alejo sold all of their possessions and joined the Fishers of Men (Pet. at 7); and

(e)   did not hear that Wendi's religious upbringing was not a traditional Christian education, but rather a cult-like atmosphere of social experimentation, psychological control, physical abuse and sexual abuse (Tab 4 at 146-69, 226-30).

---

[4] Wendi's actual life story highlights how superficial and deficient aspects of the mitigation story told at trial were. For example, at trial, defense counsel called two witnesses who knew the Ochoas for limited periods in the 1980s to testify that Wendi was an obedient teenager. But the jury never heard that her "obedience" was the result of having been trained like a dog from the day she was born, and having been subject to a lifetime of abuse and ritualistic beatings at home and in school.

4

4851-6029-7232

## 2.    Failure To Investigate Wendi's Psychiatric Disorders

The duty to investigate a capital defendant's background for mitigating evidence includes the duty to assess her mental health. (Pet. at 44-45.) Here, defense counsel possessed evidence of Wendi's mental illness that should have prompted further investigation. Kandy Rohde, Dr. Potts and Dr. Rosengard all raised concerns about her mental health, noting indications of childhood sexual and/or physical abuse and evidence of mental illness. (Pet. at 23-24.) Defense counsel also knew that Wendi had attempted suicide in prison in 2003, and was housed in the Durango psychiatric unit. (*Id.* at 25.) Yet, defense counsel did not pursue the mental health investigation or signs of childhood abuse, and did not even seek to obtain certain medical and other records until *after* the guilt-phase of Wendi's trial was over. (Pet. at 26; Tab 6 ¶ 30; Tab 7 ¶¶ 23-24.)

In response, the State tries to minimize Wendi's mental illnesses by relying on Dr. Rosengard's August 2002 report.[5] (Resp. at 33-34.) Aside from omitting the fact that Dr. Rosengard diagnosed Wendi as having "major affective disorder," in addition to depression and probable post-traumatic stress disorder (*id.* at 34; *cf.* Tab 6C at 5), the State asserts that Dr. Rosengard recognized that:

> Questions could arise as to how somebody who *had a sound mind prior to and after the event* could now have blocked what had occurred, specifically at that juncture, *and the issue of amnesia for the subject appears all too convenient.*

(Resp. at 34 (quoting Tab 6C at 5) (emphasis added by State).)  The State relies on this

---

[5] The State argues that Dr. Rosengard's report is a "comprehensive mental health assessment" and "contains no compelling mitigation" (Resp. at 33 & 33 n.30), but it is wrong on both counts. *First*, Dr. Rosengard made a single visit to Wendi, and defense counsel could not provide Dr. Rosengard with the "critical" social history needed for a complete diagnosis, because they had not done that social history investigation. *See Jones v. United States*, 327 F.2d 867, 880 (D.C. Cir. 1963) ("[A] responsible psychiatric evaluation is not limited to interviewing the patient . . . . A social history of the patient should be obtained, the family background studied and members thereof interviewed."). *Second*, Dr. Rosengard concluded that Wendi's inability to remember the events leading to Joe's death was genuine, and that it was "more probable" that "her actions were a matter of self-defense" and "less probable" that "they were purposeful attacks in the heat of a momentary aggressive outburst." (Tab 6C at 6.) There is no conceivable "strategic" reason for defense counsel's inexcusable failure to follow up on these opinions.

5

4851-6029-7232

1   statement by Dr. Rosengard as the basis for its argument that Wendi "was a manipulative

2   and chronically untruthful person" and that she "apparently attempted to lay the

3   groundwork for an amnesia theory that she abandoned when Dr. Rosengard *did not*

4   *accept it*." (Resp. at 35 (emphasis added).)

5        But it is the State that is being untruthful here.  Three sentences later in the same

6   paragraph of his report, Dr. Rosengard explained:

7        An individual who goes through a traumatic event will often forget that
         extreme situation, because an individual is unable to deal with the thoughts
8        on an emotional basis.  This occurs in both children and adults who have
         been physically or sexually attacked and *more than explains the*
9        *Defendant's response*, particularly in light of the fact that she has had a past
         history, apparently, of being abused and symptoms consistent with
10       posttraumatic stress disorder.

11  (Tab 6C at 5-6 (emphasis added).)  In other words, Dr. Rosengard *did* accept that

12  Wendi's amnesia was real, which is the exact opposite of what the State asserts based on

13  its misleading excerpt of the Rosengard report.

14       The State also argues that Patterson had a strategic reason for not focusing on

15  Wendi's mental health as a mitigation theme.  (Resp. at 36.)  However, setting aside the

16  fact that DeLozier, not Patterson, was delegated responsibility for the mitigation portion

17  of Wendi's case (Tab 6 ¶ 22, Tab 7 ¶ 12), the quoted sentence from Patterson's

18  declaration does not support that conclusion.[6]  Specifically, Patterson stated:  "*Based on*

19  *the information then known to me*, I did not believe that there was a viable mitigation

20  theme based on [Wendi's] mental health."  (Resp. at 36 (quoting Tab 6, ¶ 30 (emphasis

21  added)).)  The relevant part of this statement is the first clause, which begs the question:

22  did the information then known to Patterson constitute a reasonable mitigation

23  investigation?  As explained in the Petition and this Reply, the answer is "no."  *See Bean*

---

[6] The State argues that defense counsel has "fallen on the sword" in this proceeding, and
that their declarations should be viewed with skepticism. (Resp. at 22 n.24, 29.)
However, this ignores what the declarations actually say.  Specifically, defense counsel
describe what they did (and did not do) in preparing for Wendi's trial, but they do not
admit error or draw legal conclusions about their performance as counsel. (*See* Tabs 6,
7.)  Thus, the State uses the "fallen on the sword" characterization without factual basis.

6

4851-6029-7232

1  *v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998) (failure to adequately investigate social

2  history for use in psychiatric diagnosis was "a deficiency in trial preparation, not a

3  strategic decision").

4        Thus, there was no strategic reason for defense counsel to fail to further

5  investigate Wendi's mental health.  Even without access to the social history needed for a

6  complete diagnosis, every qualified professional who examined Wendi raised concerns

7  about her mental health, and defense counsel knew that she had attempted suicide in jail.

8  *See Summerlin*, 427 F.3d at 632 ("[W]here counsel is on notice that his client may be

9  mentally impaired, counsel's failure to investigate his client's mental condition as a

10  mitigating factor in a penalty phase hearing, without a supporting strategic reason,

11  constitutes deficient performance.") (quotation omitted).  *See also Porter*, 130 S. Ct. at

12  453; *Hamilton*, 583 F.3d at 1117 (where "counsel was aware that [the defendant] tried to

13  commit suicide in prison . . . and that he was taking antidepressant medication at the time

14  of trial," counsel "should have retained a mental health expert and provided the expert

15  with the information needed to form an accurate profile of [the defendant's] mental

16  health").

17          **3.    Failure To Object To Evidence And Argument Related To The**
                 **Alleged Sodium Azide Poisoning**

18        At trial, on appeal, and now, the State stands behind the prosecutor's assertion that

19  Wendi poisoned Joe with 21 grams of sodium azide, the equivalent of 21 Sweet and Low

20  packets. (11/30/04 Tr. at 23, 32; Resp. at 54-55.)  The Petition pointed out that the

21  State's theory of poisoning was factually impossible.  Based on the "trace" concentration

22  of sodium azide found in the pot of stew on the stove of the Andrianos' apartment, Joe

23  would have had to eat roughly 88 pounds of stew to consume the equivalent of just *one*

24  gram of sodium azide.  (Pet. at 57.)  Moreover, it was undisputed at trial that it took four

25  to five pill capsules to account for a single gram of sodium azide (10/20/04 Tr. at 34-

26  35)—thus requiring Joes to consume 84 to 105 capsules to account for the 21 grams of

27

28                                   7

4851-6029-7232

1  missing sodium azide.[7]

2      The State does not dispute these facts, or the impossibility of its theory.  Instead,

3  the State distracts from the issue by pointing to what it calls "significant circumstantial

4  evidence":  (1) Wendi's fingerprints were on the packaging material for the sodium azide,

5  and (2) Joe did not tell Wendi's neighbor, Chris Hashisaki, about the sodium azide when

6  Hashisaki came to their apartment the night of Joe's death.  (Resp. at 53.)  This evidence

7  is hardly "significant," because Wendi never denied that she assisted Joe in handling the

8  sodium azide, and Hashisaki never testified that she sought or received any information

9  from Joe as to why Joe believed he was feeling ill.

10      From these facts, it is a reasonable probability that at least one juror would *not*

11  find that Wendi secretly poisoned Joe—particularly when combined with additional

12  evidence that Joe was contemplating suicide (*see* Pet. at 37-39, 60-61, and *infra*), which

13  defense counsel neglected to put before the jury.  Defense counsel was inadequate at both

14  the guilt and aggravation phases in failing to make this impossibility argument to the

15  jury, and failing to object to the prosecutor's assertions based on this fiction.

16      **4.**    **Failure To Elicit Key Corroborative Testimony**

17      The State's evidence of premeditation—Wendi's *efforts* to obtain an insurance

18  policy on Joe's life and the sodium azide he ingested—was circumstantial, and the State's

19  theory of premeditation depended entirely upon attacking Wendi's testimony that she

20  made those efforts at the behest of her terminally ill husband.  Though "it should be

21  perfectly obvious" that "readily-available fact witnesses whose non-cumulative testimony

22  would directly corroborate the defense's theory of important disputes" would be crucial

23  to Wendi's defense, *Pavel v. Hollins*, 261 F.3d 210, 221 (2d Cir. 2001), defense counsel

24  ———————————————

25  [7] The State's ignores this portion of the testimony and instead focuses on the same
witness's testimony asserting that Joe would have had to ingest 13 to 17 capsules filled
26  with sodium azide to account for the amount missing. (Resp. at 9 (citing, presumably,
10/20/04 Tr. at 35).)  While this is a discrepancy in the testimony indicating some witness
27  confusion about the question, it is immaterial:  whether it is 13-17 capsules or 84-105,
Wendi could not surreptitiously trick Joe into consuming so many capsules of anything.

28                8

4851-6029-7232

1 inexplicably failed to elicit key corroborative testimony of at least three witnesses.

2   *First*, defense counsel failed to interview Gia Palicki—the day-care provider for
3 Joe and Wendi's children, who had "developed a close friendship with both Wendi and
4 Joe"—regarding her direct knowledge of several facts in dispute at trial. (Tab 31 ¶¶ 1,
5 26.) Had they done so, they would have learned that Joe informed Palicki that he wanted
6 to obtain life insurance despite his terminal cancer, because he was anxious regarding the
7 financial condition of his family after he died, which would have undermined the State's
8 theory of motive. (*Id.* ¶ 8.) The State does not appear to dispute that defense counsel's
9 failure to obtain this information from Palicki was deficient.

10   *Second*, attorney Jeffrey Miller spoke with Joe prior to his death regarding Joe's
11 suicidal mindset. (Pet. at 37-38, Tab 19.) Defense counsel called Miller as a witness and
12 drew a hearsay objection to that testimony; rather than noting that Joe's responses to
13 questions regarding his state of mind necessarily fall within the hearsay exception for
14 statements of the declarant's "[t]hen existing mental, emotional, or physical condition,"
15 ARIZ. R. EVID. 803(3), counsel ineffectively moved on without eliciting Miller's crucial
16 testimony. (Pet. at 37-38.) The State's response ignores this argument, asserting without
17 explanation that Miller's statements were "rank hearsay" and that defense "[c]ounsel was
18 not deficient merely because this Court ruled against him." (Resp. at 58 & n.47.) The
19 State does not address defense counsel's failure to argue the obvious applicability of the
20 state-of-mind exception to the hearsay rule, as raised in the Petition.

21   *Third*, defense counsel failed to conduct any follow-up after an initial interview
22 with Chris Weaver, a longtime friend of Joe's, who Joe contacted shortly before his death
23 to ask Weaver to help take care of Joe's family after he died. (Pet. at 38.) Had they done
24 so, they would have learned that Joe had rejected long-term plans with Weaver leading
25 up to his death, telling Weaver that he had only "a few weeks to live." (Tab 37 ¶ 4.) The
26 State does not address the deficiency of defense counsel to follow-up with Weaver.

27

28

REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4851-6029-7232

C.   **Defense Counsel's Deficient Performance Was Prejudicial**

Under *Strickland,* counsel's deficient performance prejudices a defendant if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 694 (1984). "To assess that probability, we consider 'the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding' -- and 'reweig[h] it against the evidence in aggravation.'" *Porter,* 130 S. Ct. at 453-54 (quoting *Williams,* 529 U.S. at 397-398). The measure of prejudice is "the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented." *Hovey v. Ayers,* 458 F.3d 892, 929 (9th Cir. 2006) (quoting *Stankewitz v. Woodford,* 365 F.3d 706, 716 (9th Cir. 2004)). A "reasonable probability" is "less than the preponderance more-likely-than-not standard." *Summerlin,* 427 F.3d at 643. Rather, it is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. "[I]t is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." *Correll v. Ryan,* 539 F.3d 938, 951-52 (9th Cir. 2008); *see also Rompilla,* 545 U.S. at 393.

As explained in detail in the Petition, the cumulative effect of defense counsel's errors prejudiced Wendi during all three phases of her trial.

1.   **Prejudice Due To Failure To Investigate Wendi's Social History**

The State's response on prejudice makes stock arguments that it recycles in all capital cases, which have no application here.

*First,* the State asserts that much of the evidence cited in the Petition is "cumulative" of evidence introduced at trial. (Resp. at 45.) For example, the State notes that, at trial, it came out that Wendi "may have been molested" by one or more relatives. (*Id.*) The transcript itself reveals the weakness of this argument. Although Sharon Murphy testified that Wendi may have been sexually abused by one or more of the Robertsons

10

4851-6029-7232

1   when she was young (10/12/04 Tr. at 39-40), she admitted on cross-examination that she

2   was not aware of any investigation or factual basis for that speculation. The prosecutor

3   noted that the failure to investigate further rendered the abuse allegation no more reliable

4   than a statement that Wendi had been "attacked by Bigfoot." (10/14/04 Tr. at 81-83.) Of

5   course, defense counsel could have easily investigated further: Skip was sitting in an

6   Arizona prison, and other members of both Skip's and Donna's families were easy to

7   locate.

8       Likewise, the passing references at trial to Skip being "strict" (Resp. at 44), Wendi

9   being "exposed to Alejo's angry outbursts" (*id.* at 45), and the Harvest school being

10  "very strict" with "no extracurricular activities" (*id.*), do not begin to capture the extent of

11  the physical and sexual abuse, ritualistic beatings and psychological manipulation Wendi

12  endured her entire childhood, from the day she was born. *See Williams*, 529 U.S. at 398

13  (a "graphic description" of defendant's childhood, "filled with abuse and privation, . . .

14  might well have influenced the jury's appraisal of his moral culpability") (citation

15  omitted); *Correll*, 539 F.3d at 953 n.8 (without further investigation and presentation of

16  contextual evidence and argument, bare facts "served only to demonize [defendant] rather

17  than to mitigate the appropriateness of imposing the death penalty for his actions").

18      *Second*, the State argues that the abuse and privation of Wendi's childhood carry

19  less weight, given the passage of time. (Resp. at 46, 48.) The problem with this

20  argument is that it completely ignores the expert reports of Dr. Woods (Tab 2) and Dr.

21  Hopper (Tab 4), which explain the nexus between: (a) Wendi's social history, childhood

22  trauma and mental illnesses—none of which were adequately investigated, developed or

23  presented by defense counsel; and (b) Wendi's actions on the night of Joe's death. As

24  Dr. Woods explained, by age 18, Wendi suffered from cognitive disorder, bipolar

25  disorder, complex PTSD and dependent personality disorder, and "[a]ll were in play *at*

26  *the time of the offense*, a synergy of trauma, cognitive deficits, and mood defects,

27  *impairing her ability to conform her behavior to the requirements of the law*." (Tab 2 at

28                                          11

4851-6029-7232

1  7 (emphasis added); *see State v. Roque*, 213 Ariz. 193, 231, ¶ 169, 141 P.3d 368, 406

2  (2006) ("[T]he relationship between mitigating evidence and the murder may affect the

3  weight given to the mitigating evidence.") (citation omitted).)

4      *Third*, with respect to Alejo's abusive sexual relationship with Wendi, the State

5  expresses skepticism that it ever happened. (*See* Resp. at 45 ("Andriano testified that

6  Alejo never touched her inappropriately."); 46 ("it does not appear that Andriano ever

7  disclosed this alleged molestation before trial"); 47 ("Andriano does not attest in her

8  declaration that Alejo molested her, although this would certainly be a fact within her

9  personal knowledge.").) However, this reflects a profound misunderstanding of the

10 effects of childhood sexual abuse on its victims. In his report (completely ignored by the

11 State), Dr. Hopper explained that psychological dissociation is a disconnection from

12 painful memories, sometimes including "whole realms of experience and identity, such

13 that personality and identity are highly fragmented." (Tab 4 at 130.) In Wendi's case,

14 Dr. Hopper concluded that: "*I have never before encountered a patient or defendant with*

15 *such a severe disturbance of the capacity to recall autobiographical memories . . . .*"

16 (Tab 4 at 131 (emphasis added)); *see also* Tab 7A (Kandy Rohde noted that Wendi

17 dissociated in a manner that suggested childhood sexual abuse, and should be

18 comprehensively examined by a psychiatrist); Tab 6C at 5-6 (Dr. Rosengard stated that

19 victims of sexual attack frequently repress those memories).)

20     Moreover, the State does not dispute the evidence that Alejo required a scantily-

21 clad Wendi to rub his head, back and legs for hours almost every night starting from age

22 10 or 11, took Wendi to lingerie stores and dressed her in garter belts, nylons and heels

23 by age 12, took Wendi to pornography stores by age 14, took highly suggestive photos of

24 Wendi wearing lingerie or bikinis,[8] kissed Wendi in public on the mouth in what a

25 _____

26 [8] The State argues that Alejo's photographs of Wendi as a teenager "are not exploitative
   or obscene." (Resp. at 47 n. 40.) But, a number of the photos show Wendi on her hands
   and knees with an arched back; others show her on her knees, with her hands in her hair,
27 looking upward. (Tab 73.) Moreover, the State ignores Wendi's adopted brother's
   declaration that he found six sheets of pictures in Alejo's photo cabinet showing Wendi

28                                                    12

1  declarant described as "not a father-daughter kiss," and admitted to a member of the

2  church, who was concerned that Alejo had been sexually molesting Wendi, that he had a

3  problem sexually.  (Pet. at 3-5.)

4       *Finally*, in the face of the compelling mitigation evidence regarding Wendi's

5  harrowing childhood and upbringing that was missed by defense counsel, the State's

6  Pollyannaish response—that Wendi's "parents may not have been perfect," but they

7  "were well-intentioned and raised her in the best way they knew how" (Resp. at 46)—is

8  absurd.  *See Sears v. Upton*, 130 S. Ct. 3259, 3261 (2010) (prejudice where defendant's

9  childhood was inaccurately portrayed as "stable, loving, and essentially without

10 incident"); *Rompilla*, 545 U.S. at 391 (evidence of childhood in "slum environment,"

11 discontinuation of education at age 16, and teenage alcohol consumption "would have

12 destroyed the benign conception of [the defendant's] upbringing . . . counsel had formed

13 from talking with [the defendant] himself and some of his family members").

### 2.  Prejudice Due To Failure To Investigate Wendi's Psychiatric Disorders

15      The expert reports of Dr. Woods and Dr. Hopper present a detailed picture of

16 Wendi's troubled childhood, her psychiatric disorders and the downward spiral she

17 experienced in the period leading to Joe's death.  As Dr. Woods explained,

> The manifestations of her psychiatric disorders, including dissociation,
> likely played a substantial role in the events that caused Joe's death.  A
> person in Wendi's state would have been unable to control and manage her
> emotions and responses to the events as they unfolded.  Moreover, those
> disorders in conjunction—and particularly dependent personality disorder
> when the sufferer's dependency needs are thwarted—*likely would have
> substantially impaired Wendi's ability to accurately judge how to "help"
> her terminally ill husband,* who was the focus of Wendi's pathological
> dependence needs.  *Her ability to judge whether her behavior was right
> was marred by her multiple mental and cognitive symptoms.*

24 (Tab 2 at 56-57 (emphasis added).)

25      This mitigation evidence is significant, in all three phases.[9]  In the penalty phase,

26

27 in lingerie, and he was savagely beaten for it.  (Tab 26 ¶ 18.)

28 [9] Defense counsel's failure to present evidence of Wendi's mental illness as a mitigating

13

4851-6029-7232

1  instead of a mish-mash of inconsistent and inconsequential statements about Wendi's

2  childhood, disconnected in time from Joe's death, Dr. Woods and Dr. Hopper explain the

3  nexus between Wendi's childhood, her disorders, and Joe's death, and also provide a

4  powerful rebuttal to the prosecutor's themes that:  (a) Wendi was promiscuous and hyper-

5  sexual; and (b) she was a manipulative liar who feigned lack of memory of certain events.

6      Defense counsel's failure to investigate and introduce evidence of Wendi's

7  psychiatric disorders also had an impact at the aggravation phase, where their

8  introduction would have further eroded the cruelty finding by undermining the intent

9  requirement of that factor.  (Pet. at 55.)[10]

10      In the guilt phase, the evidence is relevant to a defense under *State v. Christensen*,

11  129 Ariz. 32, 35-36, 628 P.2d 580, 583-84 (1981), based on Wendi's "character trait for

12  impulsivity" (*i.e.*, acting reflexively in response to stress), particularly given evidence of

13  organic brain damage.[11]  As set forth at length in the psychiatric reports, the evidence

14

15  circumstance is a deficiency that has repeatedly been found prejudicial.  *See, e.g., Porter*, 130 S. Ct. at 454 (brain abnormality and cognitive defects); *Rompilla*, 545 U.S. at 392 ("organic brain damage" and "extreme mental disturbance significantly impairing several of [the defendant's] cognitive functions"); *Daniels v. Woodford*, 428 F.3d 1181, 1209 (9th Cir. 2005) (family history of mental illness); *Summerlin*, 427 F.3d at 641 ("lack of impulse and emotional control and organic brain dysfunction").  Courts have also found ineffectiveness in the failure to employ a mental health expert to explain the effect of traumatic experiences on a defendant's conduct.  *See, e.g., Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003); *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999).

19  [10]  The State tries to dispense with the "intent requirement," arguing that "[c]ruelty is determined by reference to an *objective* standard" and "judged from the perspective of a *reasonable person* in the defendant's position," rather than a person suffering under the psychiatric disorders or conditions of the defendant.  (Resp. at 50.)  This is not the law in Arizona.  In *State v. Moody*, 208 Ariz. 424, 472, ¶ 226, 94 P.3d 1119 at 1167 (2004), the Supreme Court reversed an "especially cruel" finding "because evidence was presented that Moody was in a 'dissociated state'" at the time of the murders—just as Wendi was here.  The State infers that *Moody* has been overruled, but neither of the cases cited by the State support that inference.  *See State v. Bocharski*, 218 Ariz. 476, 494, ¶ 85 n.15, 189 P.3d 403, 421 n.15 (2008) (holding that "[t]he third F.6 factor, especially cruel, also imposes an intent requirement.  The State must show that the perpetrator knew or should have known that the victim would suffer.") (quotation omitted); *State v. Wallace*, --- Ariz. ---, ¶¶ 22-27, 272 P.3d 1046, 1052 (2012) (noting defendant's characteristics in reversing aggravator finding, concluding that the blows occurred in a "clumsy" attempt to kill the victim rather than inflict gratuitous violence).

27  [11]  The fact that Wendi was found competent to stand trial does not change the fact that she was suffering from serious mental illnesses at the time of Joe's death.  A defendant

14

1  here would have established the same trait of "acting without reflection" relevant to

2  premeditation as the psychiatric evidence in *Christensen*. (Pet. at 8-13; Tab 5.)

3      The State's response to these arguments is unpersuasive. *First*, the State does not

4  even attempt to distinguish *Bocharski*, where the Arizona Supreme Court reduced

5  defendant's death sentence to life imprisonment on strikingly similar facts. (Pet. at 54.)

6      *Second*, the State's criticisms of Dr. Woods and Dr. Hopper rest not on expert

7  analysis, but rather on lawyer argument based on snippets of evidence taken out of

8  context. (Resp. at 38-43.) For example, the State asserts that Dr. Woods' opinion that

9  Wendi's "mental disorders had worsened in the weeks prior to Joe's death" is entitled to

10 little weight because she "has engaged in this type of behavior her entire life; it did not

11 arise suddenly in the fall of 2000[.]" (Resp. at 39; *id*. at 40.) However, this

12 misunderstands what it means to be bipolar. By its nature, manic bipolar states can

13 periodically spike (or be dormant), and Dr. Woods does not take the position that Wendi

14 has never experienced such episodes before. Rather, Dr. Woods' opinion is that Wendi's

15 erratic behavior in the period leading up to Joe's death were textbook symptoms of a

16 severe manic bipolar state. (Tab 2 at 15-16, 48-57.)

17      *Third*, the State argues that the testimony of Dr. Hopper and Dr. Woods would

18 have opened the door to "damaging rebuttal" by Dr. Bayless. (Resp. at 42.) The State

19 fails to recognize that Dr. Bayless's findings actually corroborate Dr. Woods' opinion:

20 "The *cyclic pattern* of violent outbursts with intermittent periods of appropriate behavior

21 represents a chronic and stable personality disorder that is extremely difficult to change."

22 (Resp. at 42 (emphasis added).) Furthermore, Dr. Bayless, who (like all other mental

23 health professionals who examined Wendi) did not have knowledge of her social history,

24 disclosed to defense counsel before trial that he had diagnosed Wendi with a depressive

25

26 who is mentally competent for trial may nonetheless suffer a mental illness that is severe
   enough to mitigate her culpability. *See Summerlin*, 427 F.3d at 631; *Bean*, 163 F.3d at
27 1078; *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995).

28                                      15

1  disorder and a personality disorder, and noted the possibility of childhood sexual abuse.

2  (Tab 6E at 2, 9.)  Thus, there is nothing in Dr. Bayless' report that would have led

3  defense counsel not to present the mental health opinions in the Woods and Hopper

4  reports, if defense counsel had performed an adequate mitigation investigation.

### 3.  Prejudice Due To Failure To Object To Evidence and Argument Related To The Alleged Sodium Azide Poisoning

6  The alleged poisoning of Joe was the cornerstone of the State's argument that

7  Joe's murder was *premeditated.*  Had defense counsel cast doubt on the State's poisoning

8  theory in the guilt and aggravation phases, the State would have been left to argue

9  premeditation (and cruelty) on the basis of Wendi hitting Joe with a stool (any one of

10  eight to ten blows from which would have rendered him unconscious) and stabbing him,

11  leading to his death "within a matter of minutes."  (11/30/04 Tr. at 58-59, 63-66, 69.)

12  Though violent, this manner of death—particularly when combined with the injuries

13  inflicted against Wendi (Tab 66), is not only *not* "above the norm of first-degree

14  murders," as required for the imposition of the death penalty, *State v. Carlson*, 202 Ariz.

15  570, 582, ¶ 45, 48 P.3d 1180, 1192 (2002); *State v. Soto-Fong*, 187 Ariz. 186, 204, 928

16  P.2d 610, 628 (1996), but also highlights defense counsel's error in not seeking an

17  instruction related to lesser included offenses.

18  Anticipating that outcome, the State grasps at one final straw, contending that it

19  recalled an expert during the aggravation phase "to establish, in support of the cruelty

20  allegation, that Joe had died with his eyes open, increasing the likelihood that he

21  perceived Andriano striking him before he lost consciousness."  (Resp. at 9-10.)  Again,

22  the State misrepresents the record:  the expert testified that "[t]he fact that the eyes are

23  open or closed gives us no insight as to whether or not this gentleman was conscious or

24  unconscious at the time[.]"  (11/30/04 Tr. at 45-46.)

### 4.  Prejudice Due To Failure To Elicit Corroborative Testimony

26  At trial, the jury was left without any testimony from a neutral third-party that

27  supported Wendi's explanation of the State's circumstantial evidence.  Thus, the above-

28  16

1  referenced corroborating testimony from Palicki, Miller, and Weaver—the credibility of
2  which cannot not be reasonably attacked—was crucial.

3      Rather than addressing "the cumulative impact of [these] multiple deficiencies," as
4  *Strickland* requires, *see Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir.
5  1995), the State divides them up and argues that none, in and of itself, proves that Wendi
6  *did not* commit premeditated murder. However, this is not the *Strickland* standard. *See*
7  *Strickland*, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and
8  hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a
9  preponderance of the evidence to have determined the outcome.").

10     *First*, the State attempts to downplay the value of Palicki's testimony, noting that
11  Palicki remembers those conversations occurring shortly after she met Joe and Wendi in
12  the summer or fall of 1999, while the State introduced evidence of Wendi's efforts to
13  obtain life insurance for Joe in the summer of 2000. (Resp. at 56-57.) The State's timing
14  argument glosses over the true import of this evidence. *Without* Palicki's testimony, the
15  State was free to plausibly argue (as it did) that Wendi sought a life insurance policy so
16  she could economically benefit from Joe's death, and that Joe never knew or approved of
17  her clandestine efforts. But if defense counsel had properly investigated and elicited
18  Palicki's testimony, then the State's theory becomes far less plausible: without any
19  evidence, the State would have to contend that Joe changed his mind in the intervening
20  months and told Wendi *not* to try to obtain life insurance, but Wendi did so anyway.

21     *Second*, the State contends that Miller's and Weaver's recollections of different
22  discussions with Joe regarding depression and suicide were immaterial because they
23  would not necessarily establish Joe's involvement in acquiring and ingesting the sodium
24  azide. (Resp. at 59-60.) Again, that is not the *Strickland* standard, which asks only
25  whether the cumulative impact of defense counsel's failures undermine confidence in the
26  outcome. Given that the State's theory of the case relied entirely upon circumstantial
27  evidence that Wendi surreptitiously poisoned Joe, evidence that Joe was openly

28                                              17

1    discussing suicide and informing a close friend that he expected to die within a few

2    weeks (coupled with the practical impossibility of him being "tricked" into ingesting such

3    a quantity of sodium azide, as noted above), certainly undermines confidence in the

4    State's theory of a premeditated, especially cruel, poisoning and murder by Wendi.

5
6

      **D.**     **A Reweighing Of The Mitigating And Aggravating Evidence Shows That Wendi Has Demonstrated A Reasonable Probability Of A Different Outcome**

7       To ascertain whether Wendi has shown a reasonable probability of a different

8    outcome, courts "consider 'the totality of the available mitigation evidence—both that

9    adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it

10    against the evidence in aggravation.'" *Porter*, 130 S. Ct. at 453-54 (quoting *Williams*, 529

11    U.S. at 397-98).  In doing so, this Court should weigh the mitigating evidence an

12    effective defense counsel would have found (as set forth in the Petition and *infra*) against

13    the cruelty aggravating circumstance based on the alleged sodium azide poisoning, and

14    assess what reasonably could have happened after "appropriately reduc[ing] the ballast

15    on the aggravating side of the scale." *Porter*, 130 S. Ct. at 454; *see also Boyde v. Brown*,

16    404 F.3d 1159, 1179-80 (9th Cir. 2005).

17       As explained above, the evidence related to Wendi's social history, her psychiatric

18    disorders, the impossibility of the State's poisoning theory, and the testimony of third-

19    party witnesses that was available but not presented during all three phases of the trial

20    was significant.  Had defense counsel provided effective representation, the State would

21    have been left to argue that the beating and stabbing of a husband (Joe) who was suicidal,

22    by a wife (Wendi) who was in a dissociative mental state, which caused Joe's

23    unconsciousness within eight to ten blows and his death in a matter of minutes, was

24    premeditated and "especially cruel" (*i.e.*, beyond the norm of other first-degree murders).

25    Had they done so, there is a reasonable probability that at least one juror would have

26    found that premeditation was not established, that the aggravator was not met, or that the

27    mitigating evidence showing Wendi's lifetime of abuse and privation outweighed the sole

28                     18

4851-6029-7232

1    aggravating factor.

2        In sum, Wendi is entitled to relief under *Strickland*.

3    **II.   COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE
         PERVASIVE PROSECUTORIAL MISCONDUCT, WHICH DEPRIVED
4        WENDI OF DUE PROCESS**

5        Based on the pervasive prosecutorial misconduct in this case, Wendi is entitled to

6    reversal of her conviction or, at a minimum, a new trial. *Bocharski*, 218 Ariz. at 491-92,

7    ¶ 74, 189 P.3d at 418-19.

8        **A.   "Verbal Guerrilla Warfare" Regarding Wendi's Promiscuity**

9        The prosecutor acknowledged at trial that Wendi's sexual history was *not relevant*

10   to motive, and therefore *not relevant* to the case.[12]   Nevertheless, the prosecutor made

11   over 100 references to her sexual history during all three phases of the trial (see Pet.

12   **Exhibit 2**), characterizing Wendi as a promiscuous and sex-crazed adulteress in order to

13   inflame the passions and prejudices of the jury.  That misconduct "so infected the trial

14   with unfairness as to make the resulting conviction a denial of due process." *State v.*

15   *Hughes*, 193 Ariz. 72, 78, ¶ 26, 969 P.2d 1184, 1191 (1998) (quotation omitted).[13]

16       The State half-heartedly defends the prosecutor's conduct, stating only that his

17   repeated references to Wendi's sexual history were "based on evidence properly admitted

18   at trial" and that his statements to the jury were argument rather than evidence.  (Resp. at

19   63.)  Neither are sufficient justifications for the prosecutor's tactical decision to engage in

20   "verbal guerrilla warfare," *Pool v. Superior Ct.*, 139 Ariz. 98, 103, 677 P.2d 261, 266

21   ─────────────────────────────────

22   [12]  Prior to trial, evidence that Wendi had sexual relationships with two men when
     married was deemed admissible for the purpose of showing, in the prosecutor's words at
     the time, the "motivation, if you will, or the reason why she wanted her husband dead."
23   (2/27/04 Tr. at 17.)  At trial, however, the prosecutor flatly disclaimed their relevance for
     that purpose, stating in open court that Wendi's affairs "couldn't really be the motive."
24   (11/30/04 Tr. at 20; 12/1/04 Tr. at 10-11.)

25   [13]  If defense counsel had investigated Wendi's social history and psychiatric disorders,
     they could have explained that Wendi's attitudes toward men and promiscuity were the
26   product of a lifetime of sexual and physical abuse.  Even having failed to do that, defense
     counsel also inexplicably failed to object to the vast majority of the prosecutor's
27   improper, cumulative and highly prejudicial questions and argument about Wendi's
     sexual history.

28                                          19

     ─────────────────────────────────
     REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                       *CASE NO. CR2000-096032-A*

4851-6029-7232

1  (1984), by referencing Wendi's sexuality at every conceivable opportunity. (*See* Pet.

2  **Exhibit 2**.)

3      Prosecutorial misconduct occurs when the prosecutor "appeal[s] to the fears or

4  passions of the jury," regardless of whether such appeals occur in argument to the jury

5  and regardless of whether they are based on admissible evidence. *State v. Morris*, 215

6  Ariz. 324, 337, 160 P.3d 203, 216 (2007). *See also State v. Mincey*, 115 Ariz. 472, 484,

7  566 P.2d 273, 285 (1977) (finding prosecutorial misconduct based on one statement that

8  improperly appealed to jurors' fears, even though "[t]he statement in question [was]

9  based on the evidence"), *rev'd on other grounds*, 437 U.S. 385 (1978). As the Arizona

10 Supreme Court has explained:

11      even if there was no error or an error was harmless and so by itself does not
        warrant reversal, an incident may nonetheless contribute to a finding of
12      persistent and pervasive misconduct, if the cumulative effect of the
        incidents shows that the prosecutor intentionally engaged in improper
13      conduct and did so with indifference, if not a specific intent, to prejudice
        the defendant.
14

15 *Roque*, 213 Ariz. at 228 ¶ 155, 141 P.3d at 403 (internal quotation and citation omitted).[14]

16      Considering that "[t]he prosecutor's interest in a criminal prosecution 'is not that it

17 shall win a case, but that justice shall be done,'" *Pool*, 139 Ariz. at 103, 677 P.2d at 266

18 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)), the prosecutor's tactic of

19 carpet-bombing the jury with references to Wendi's promiscuity had the effect of turning

20 Wendi's sexual history into a non-statutory (and unconstitutional) factor in the State's

21 quest to obtain a death sentence.

22      **B.      Implying Extrajudicial Evidence**

23      A prosecutor at trial "cannot make insinuations that are not supported by the

24

25 ----
   [14] Arizona recognizes the threat of unfair prejudice posed by references to a witness's
26 promiscuity, as evidenced by its passage of a rape-shield statute modeled after Federal
   Rule of Evidence 412, which was intended to prevent the "infusion of sexual innuendo
27 into the factfinding process" and appeals to "sexual stereotyping." FED. R. EVID. 412,
   1994 Advisory Committee Note.

28                                              20

4851-6029-7232

1    evidence." *Hughes*, 193 Ariz. at 85, ¶ 59, 969 P.2d at 1197.  Going beyond mere
2    insinuations, the prosecutor repeatedly implied that the State possessed extrajudicial
3    *knowledge* of factual matters that were for the jury to decide, frequently by prefacing
4    mere assertions, theories, or disputed facts with the improper endorsement, "we know."

5         Citing no law, the State makes the blanket assertion that the prosecutor's
6    statements  were based on the evidence presented.  (Resp. at 64.)  To the contrary, even if
7    the prosecutor was making statements that had evidentiary support—and in many
8    instances, he was not—prefacing such references with the phrase "we know" is still
9    improper, because it implies that the State *knows* the truth of facts within the province of
10   the jury to decide.  *See United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005).

11        The State's only specific response concerns the prosecutor's statements regarding
12   Shawn King, but that response raises more questions of prosecutorial misconduct than it
13   answers.  King was never called as a witness and supposedly never interviewed by the
14   State (Tab 15 at 32), yet the State contends that the prosecutor planned to call King as a
15   witness and had a "good faith basis" for asserting at trial that King caught Wendi "in a
16   state of undress with another male."  (10/13/04 at 51.)  If the State withheld statements or
17   reports regarding King, then it committed prosecutorial misconduct of a different variety.
18   *See* ARIZ. R. CRIM. P. 15.1(b)(1, 3).

19        In addition, the State contends that the prosecutor was justified in proclaiming to
20   the jury that King "would be judged as an accomplice" in Joe's murder, despite the fact
21   he was never charged with such a crime, because Wendi noted that King assisted her in
22   locating the sodium azide.  (Resp. at 63-64.)  But there is a vast difference between:  (1)
23   noting that Wendi received King's help in locating the sodium azide for the purpose of
24   helping Joe commit suicide, which *was* supported by the evidence; and (2) asserting that
25   King would be convicted as an accomplice to murder, which implied that the State
26   possessed evidence that King conspired with Wendi for the purpose of murdering her
27   husband.  The effect of the latter assertion cannot be overstated; no witness ever told the

28                                          21

4851-6029-7232

jury that Wendi ever expressed any intent to murder her husband, an evidentiary gap the
prosecutor conveniently and improperly filled by telling the jury that the State had
evidence of King's guilt, and thus his purported knowledge of Wendi's intent.

### C. The Prosecutor's Baseless Attack On A Defense Expert's Ethics

It is prosecutorial misconduct to even "*imply* unethical conduct on the part of an
expert witness without having evidence to support the accusation." *Hughes,* 193 Ariz. at
86 ¶ 59, 969 P.2d at 1194 (emphasis added). Here, the Petition noted that the prosecutor
described defense expert Sharon Murphy as a "liar" who "can't keep her story straight,"
without pointing to any instance of perjury by Dr. Murphy.

Rather than defend this clear-cut prosecutorial misconduct, the State denies that it
occurred, claiming—without citation to the record—that the prosecutor's "statements
referenced *Andriano,* whose self-report had formed virtually the entire basis of Dr.
Murphy's opinion." (Resp. at 64.) But the prosecutor's statement speaks for itself:

> If there's anybody that's conjuring anything up, if there is anybody here
> that can be labeled a conjurer or liar, it isn't the prosecutor. It certainly
> isn't. He's not the one that's the liar here. It may be someone else here in
> this courtroom, *the one who can't keep her story straight, Sharon Murphy*.

(12/1/04 Tr. at 61 (emphasis added).)

### III.   ATTORNEY DELOZIER HAD AN ACTUAL CONFLICT OF INTEREST THAT AFFECTED THE ADEQUACY OF WENDI'S REPRESENTATION

From mid-2001 through the time of the verdict, DeLozier had sole responsibility
for the mitigation investigation (Tab 6 ¶¶ 17, 21-22; Tab 7 ¶ 12), including the
responsibility to investigate childhood abuse and neglect—issues fundamental to any
mitigation investigation, but especially important here given the red flags and suspicions
of all of Wendi's mental-health evaluators. But in also concurrently representing
Wendi's parents in child custody and adoption proceedings, DeLozier had undertaken
two diametrically opposed roles:  (1) in representing Wendi's parents, he was charged
with advocating their quality as caregivers; and (2) in representing Wendi, he had a duty
to investigate and uncover evidence of childhood abuse and privation by those same

22

4851-6029-7232

1  parents (and their relatives).  In doing so, DeLozier was incapable of providing adequate

2  representation to both sets of clients.[15]

3       The State asserts that:  (1) DeLozier's ethical conflict should have been raised on

4  direct appeal and is therefore precluded; (2) any conflict was "cured" by the fact that

5  DeLozier no longer represented Wendi's parents by the time Wendi's trial began; and

6  (3) the conflict claim lacks merit, because "no plausible alternative mitigation strategy

7  existed" for DeLozier to pursue.  All of these arguments are baseless.[16]

8            **1.   The Conflict Claims Are Not Precluded**

9       The State contends that appellate counsel should have raised DeLozier's conflict

10  as a basis for reversal on direct appeal.  Though the State has the burden of proving

11  preclusion, ARIZ. R. CRIM. P. 32.2(b), the State cites no case ever holding conflict claims

12  precluded for failure to raise them on direct appeal, and it fails to explain how appellate

13  counsel could have raised such claims on direct appeal here.

14       It is axiomatic that appellate counsel is bound by the record on direct appeal, and

15  the Arizona Supreme Court advises defense attorneys that Rule 32 proceedings are the

16  proper forum for issues dependent upon evidence outside the record.  *See, e.g., State v.*

17

18  _____

[15] For example, if DeLozier represented that Wendi's parents were quality caregivers in
19  the custody proceeding (as he did), he could not argue that they were abusive in Wendi's
   trial without correcting the record in the custody proceeding.  ARIZ. R. PROF. COND. 3.1,
20  3.3.  Moreover, even if DeLozier *had* performed a reasonable investigation into abuse
   and neglect by Wendi's parents, his attorney-client relationship with them meant that any
21  information he learned from them would have been subject to confidentiality restrictions,
   *id.* 1.6, 1.9(C), and disclosure thereof would violate his continuing duty of loyalty to
22  Wendi's parents, *id.* 1.7(a)(2), 1.9(a, c).

[16] The State also contends that a defendant's Sixth Amendment right to conflict-free
23  counsel under *Cuyler v. Sullivan*, 446 U.S. 335 (1980) is "limited to the joint
   representation of co-defendants, which is not at issue here." (Resp. at 21.)  The basis for
24  this assertion is unclear; neither the Arizona Supreme Court nor the United States
   Supreme Court have ever so held, and the very cases the State cites in the conflict section
25  of its response do not limit *Cuyler* to that context.  *See State v. Moore*, 222 Ariz. 1, 15-16,
   ¶¶ 76-83, 213 P.3d 150, 164-65 (2009) (analyzing alleged conflict of defense counsel
26  who represented a defense witness in another matter on its merits); *State v. Jenkins*, 148
   Ariz. 463, 467, 715 P.2d 716, 720 (1986) (analyzing alleged conflict of defense counsel
27  who represented a prosecution witness in his unrelated divorce proceeding).

28                                    23

4851-6029-7232

1   *Allen*, 223 Ariz. 125, 129 ¶ 21, 220 P.3d 245, 249 (2009).  There was no development of

2   the record below on the conflict issue, which is a corollary to the ineffective assistance

3   claim generally, and thus it could not have been raised on direct appeal.  DeLozier did not

4   disclose his conflict in the record below, and appellate counsel had no basis for arguing

5   the nature of any harm relating to the conflict, because *no one* had yet investigated the

6   pervasive childhood abuse that Wendi suffered.  Therefore, the State has failed to show

7   preclusion under Rule 32.2.

8                              **2.    DeLozier Was Conflicted During The Entire Time He Was**
                                     **Supposed To Be Preparing The Mitigation Case**
9

10      Next, the State contends that DeLozier's conflict does not matter, because

11   DeLozier "was not actively representing both parties during Andriano's trial and the 2

12   years preceding it; he was only representing Andriano."  The State is incorrect.  DeLozier

13   ceased being Wendi's parents' *counsel of record* in the custody proceeding in 2002, but

14   he continued *representing* them in that matter at least until the time of Wendi's trial.

15      Between 2002 and the time of Wendi's trial in 2004, DeLozier filed two appellate

16   briefs in the Court of Appeals, followed by a petition for review, which emphasized the

17   Ochoas' fitness as caregivers and asked the appellate courts to "reverse the trial court's

18   award of sanctions against him *and the Ochoas.*"  (*See, e.g.*, State Ex. E at 39-69

19   (emphasis added).)  The mandate from the Arizona Supreme Court was filed on August

20   19, 2004—less than a week before jury selection began in Wendi's trial.  (Tab 77.)  Thus,

21   during the *entire time* DeLozier was supposed to be engaging in a thorough pre-trial

22   investigation of mitigating evidence on Wendi's behalf—including her harrowing

23   childhood with the Ochoas—he was hobbled by his competing responsibility to represent

24   those same individuals as quality parents in another proceeding.

25      The State's brief assumes that DeLozier's conflict was cured because he no longer

26   actively represented the Ochoas during Wendi's trial, but that argument misunderstands

27   the nature of DeLozier's conflict.  It is well settled that the "unparalleled investigation

28                                          24

into personal and family history" of the defendant that is required in a capital case "should begin as quickly as possible," and certainly take place *before* the capital trial commences. (Tab 76 at PCR480-84.) *See also Williams*, 529 U.S. at 395-96 (finding ineffective assistance when "[t]he record establishes that counsel did not begin to prepare for that [penalty] phase of the proceeding until a week before the trial."). Thus, by the time the trial began here, the damage from DeLozier's concurrent representation of Wendi and the Ochoas already had been done.

Moreover, the Ochoas were at least former clients *during* Wendi's trial, and therefore DeLozier owed them continuing duties of loyalty and confidentiality. ARIZ. R. PROF. COND. 1.9 & cmt. Therefore, DeLozier was prohibited from representing another client in a "substantially related matter in which that person's interests are materially adverse to the interests of the former client" without written consent, which apparently was not obtained here. *Id.* 1.9(a). Wendi's mitigation case was "substantially related" to the Ochoas' custody proceeding under this standard, because the Ochoas' parenting was a primary issue in the custody proceeding and, for the reasons set forth in the Petition, should have been a primary issue in Wendi's mitigation case. *See Foulke v. Knuck*, 162 Ariz. 517, 521, 784 P.2d 723, 727 (Ct. App. 1989) (matters are "substantially related" when "the general subject matter [of the prior representation] is substantially related to the issues which must necessarily be resolved" in the present action).[17]

Tacitly conceding DeLozier's violation of the Rules, the State argues in a footnote that "a violation of the Arizona Rules of Professional Conduct does not automatically

---

[17] In addition, matters are "substantially related" when there is "a substantial risk that that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." ARIZ. R. PROF. COND. 1.9 cmt. Here, there is little question that information regarding the Ochoas' rearing of Wendi "would in ordinary practice be learned by a lawyer" representing them in a child custody dispute. Whether DeLozier actually learned such confidential information is immaterial; the risk alone, "based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services," is disqualifying. *Id.*

25

4851-6029-7232

1  render counsel constitutionally ineffective." (Resp. at 22 n.25.) But actual conflicts are

2  different than other Rules violations: "Where a constitutional right to counsel exists, our

3  Sixth Amendment cases hold that there is a correlative right to representation that is free

4  from conflicts of interest," *Wood v. Georgia*, 450 U.S. 261, 271 (1981), which is so

5  fundamental that defendants are limited in their ability to waive it, *Wheat v. United*

6  *States*, 486 U.S. 153, 162 (1988).

### 3.    DeLozier's Conflict Rendered Him Incapable Of Pursuing A Plausible Alternative Defense Strategy

As noted in the Petition, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler*, 446 U.S. at 349-50. The State argues that Wendi fails to meet this standard because her Petition fails to show that "some other plausible defense strategy might have been pursued" by non-conflicted counsel. (Resp. at 21.) To the contrary, the Petition provides a detailed discussion comparing the path that DeLozier actually pursued with the one that non-conflicted counsel should have pursued. (*See* Pet. at 2-17, 29-30, 40, 63). Non-conflicted counsel should have investigated and presented evidence that Wendi's upbringing was in fact horrific, marked by abuse, sexual manipulation and molestation, and extreme deprivation. As the State concedes, the mere existence of this alternative path proves adverse effect. (Resp. at 21 ("The defendant need not show that the strategy would have been successful, but merely that it was a viable alternative.").)

## IV.    THE JUROR MISCONDUCT CLAIM IS NOT PRECLUDED, AND THE STATE'S ATTEMPT TO MINIMIZE JUROR MISCONDUCT FAILS

The Petition included the declarations of multiple jurors, which provide two areas of relevant testimony: (1) corroboration of prejudice, such as neutral, firsthand observations of the effects of Wendi's medications and sleep deprivation during the trial (Tab 39 ¶ 4; Tab 40 ¶ 10), which were neither monitored nor addressed by defense counsel (Pet. at 30-31); and (2) proof of juror misconduct, namely the jurors' creation of a chart showing sentencing outcomes during the *aggravation phase* deliberations and

26

4851-6029-7232

1  their focus upon an external, non-evidentiary consideration (the assumption that Wendi

2  would "get out of prison" if they did not find an aggravator) as a "key reason" for its

3  finding of especial cruelty.  (Tab 41 ¶ 6; *see also* Tab 39 ¶ 8.)

4      The State offers no response to the first purpose of the juror declarations, and

5  thereby concedes their admissibility to show prejudice.  As to the second—evidence of

6  juror misconduct—the State contends that:  (1) juror misconduct claims are precluded

7  now because they were not presented in a post-verdict motion under Rule 24.1; (2) the

8  jurors' statements showing misconduct are an inadmissible attempt to impeach the

9  verdict; and (3) the jurors' statements do not sufficiently show prejudice from the

10 misconduct.  None of these arguments hold up to closer examination.

11     *First*, the State's preclusion argument rests on the incorrect assumption that the

12 grounds for relief based on juror misconduct in this Rule 32 proceeding are limited to the

13 grounds for relief in a Rule 24.1 motion.  In fact, Rule 24.1 exists for the narrow purpose

14 of raising certain specified trial errors "for reconsideration," ARIZ. R. CRIM. P. 24.1 cmt.,

15 while Rule 32 requires a petitioner to raise "*every* ground known to him or her for

16 vacating, reducing, correcting or otherwise changing all judgments or sentences imposed

17 upon him or her," *id.* 32.5, including any challenge based on the U.S. Constitution, *id.*

18 32.1(a).

19     Here, the misconduct consisted of deciding an aggravating factor based on

20 extraneous information—the chart relating to parole availability—that the trial court had

21 precluded it from considering.  (7/30/04 Tr. at 6.)  That claim does not squarely fall

22 within the enumerated types of misconduct listed in Rule 24.1(c), but it is in fact a

23 violation of due process, as numerous courts have held.[18]  Parole speculation pervaded

---

[18] *See Simmons v. South Carolina*, 512 U.S. 154, 161 (1994) (due process violated when
parole issue injected into jury deliberations without providing defendant an opportunity
to address it).  *See also Jeffries v. Wood*, 114 F.3d 1484, 1490 (9th Cir. 1997) ("[T]he
introduction of prejudicial information to a juror violated a defendant's right to a fair trial
regardless of whether the source of that information was internal (*e.g.*, another juror) or
external (*e.g.*, a bailiff)."); *Musgrove v. State*, 986 S.W.2d 738 (Tex. App. 1999) (juror
discussion and consideration of parole possibilities in sentencing constitutes misconduct),

27

4851-6029-7232

1  the jury deliberations to an even greater extent here than the cases cited in the preceding

2  footnote, in that it affected the jury's decision-making not only at the *sentencing* phase

3  (which can be permissible under certain circumstances), but also at the *aggravation*

4  phase.  Moreover, the jurors here went beyond merely mentioning parole in their

5  deliberations; they actually made and displayed a chart to consider what sentence Wendi

6  may receive if they did or did not find an aggravating factor.  (Tab 39 ¶ 8.)

7      *Second*, as numerous decisions have acknowledged,[19] juror declarations are a

8  legitimate means of showing that misconduct occurred.  As these cases implicitly

9  recognize, there is a difference between impeaching the verdict and unearthing evidence

10  of juror misconduct; the State's expansive reading of Rule 24.1(d) would effectively

11  allow the exception (barring affidavits that impeach the verdict) to swallow the rule that

12  juror misconduct is a basis for relief.

13      *Third*, the State's fallback argument of a lack of prejudice lacks any factual or

14  legal basis.  The parole issue and the accompanying chart were considered by the entire

15  jury and were a "key reason" the jury found the cruelty aggravator; without that, there is

16  a reasonable probability at least one juror would not have found the aggravator.

17  **V.    THE INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL CLAIM**
**IS NOT WAIVED**

18

19  *Harris v. Commonwealth*, 408 S.E.2d 599, 601-02 (Va. App. 1991) (requiring evidentiary
inquiry into alleged misconduct in juror deliberations regarding parole eligibility); *Quick*

20  *v. State*, 353 S.E.2d 497, 503 (Ga. 1987) (reversing sentence when jury improperly
considered implications of parole, because "a defendant's parole eligibility is not, and

21  ought not be, an issue considered by the jury in the sentencing phase of a death penalty
case"); *People v. Walker*, 440 N.E.2d 83, 89-90 (Ill. 1982) (vacating death sentence

22  where, "[b]y injecting the parole consideration into the penalty determination, the jury
[wa]s diverting its attention from the offense and the offender, and [wa]s focusing upon a

23  speculative possibility that may or may not occur. . . . Whether or not the defendant may,
at some future time, be paroled is not a proper aggravating factor to consider in

24  determining whether the death penalty should be imposed.").

25  [19] *See* note 18 *supra*; *see also Silva v. Woodford*, 279 F.3d 825, 850 (9th Cir. 2002)
(relying upon juror declaration describing closeness of deliberations in reaching verdict

26  to bolster finding of prejudice); *State v. Hall*, 204 Ariz. 442, 446-49, ¶¶ 10-25, 65 P.3d
90, 94-97 (2003) (relying on juror affidavits to find juror misconduct); *Lashonda M. v.*

27  *Dep't of Economic Security.*, 210 Ariz. 77, 84, ¶ 25, 107 P.3d 923, 930 (Ct. App. 2005)
(rejecting claim of juror misconduct because it was *not* supported by a juror affidavit).

28                                          28

1   The State argues that the ineffective assistance of appellate counsel claim is

2   waived for insufficient argument (Resp. at 65), but never identifies what else the Petition

3   could or would need to say on the topic. The legal issues raised in the Petition are

4   meritorious; to the extent this Court finds that any of those issues were preserved by

5   defense counsel, then appellate counsel's failure to raise those meritorious issues on

6   direct appeal was prejudicial and falls below the prevailing standard for capital cases.

7   *See United States v. Withers*, 638 F.3d 1055, 1064-65 (9th Cir. 2010) (*Strickland* standard

8   applies to claims of ineffective assistance of appellate counsel); Tab 76 at PCR440, 526-

9   27 (the prevailing standard for appellate counsel requires it "to raise every potential

10  ground of error that might result in a reversal of the defendant's conviction or

11  punishment," and to present all "arguably meritorious" issues).

## VI.   THE COURT SHOULD CONSIDER LARRY HAMMOND'S EXPERT OPINION

The State argues that Attorney Hammond's opinions are "irrelevant" because *Strickland* involves only a question of law, for which no expert testimony is needed. (Resp. at 27.) To the contrary, as *Strickland* itself makes clear, "both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact." 466 U.S. at 698.

Just as courts permit attorney experts to testify in legal malpractice cases, federal[20] and state[21] courts routinely rely on the opinions of attorney *Strickland* experts in assessing the performance of trial counsel in capital cases. Of note, in the *Murdaugh*

---

[20] *See Wiggins*, 539 U.S. at 524 (noting testimony of attorney expert on "professional standards that prevailed" at time); *Beardslee v. Woodford*, 358 F.3d 560, 570 n.1, 583 (9th Cir. 2004) ( "*Strickland* expert" testified at hearing); *Ainsworth v. Calderon*, 138 F.3d 787, 791 (9th Cir. 1998) (district court did not err in permitting expert testimony in the form of two attorney declarations on ineffective counsel issue); *see also Hale v. Gibson*, 227 F.3d 1298, 1319 (10th Cir. 2000); *Pickens v. Lockhart*, 714 F.2d 1455, 1466-68 (8th Cir. 1983); *Marzullo v. Maryland*, 561 F.2d 540, 544-45 (4th Cir. 1977).

[21] *See* Ex. B. *See also State v. DiFrisco*, 804 A.2d 507, 533-34 (N.J. 2002); *Dwyer v. Comm'r*, No. CV 980357949S, 2000 Conn. Super. LEXIS 1934, *11-12 (Conn. Super. Ct. July 26, 2000); *People v. Thomas*, 867 P.2d 880, 886 (Colo. 1994); *In re Cordero*, 756 P.2d 1370, 1376 (Cal. 1988).

28

29

4851-6029-7232

1   capital case, the State tried to exclude Attorney Hammond from testifying as a *Strickland*

2   expert based on the same exact argument that it advances here, and the court (Granville,

3   J.) summarily denied the State's request.  (*See* Exs. A & B to this Reply (State's motion

4   to exclude Attorney Hammond in *Murdaugh* and order denying same).)

5        Finally, the cases the State relies upon are distinguishable because they address the

6   narrow question of "whether an attorney's actions were actually the product of a *tactical*

7   *or strategic decision*," *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998)

8   (emphasis added), which is different than the performance inquiry under *Strickland*.

9                                **CONCLUSION**

10       For the reasons stated above, this Petition should be granted.

11

12   DATE: SEPTEMBER 4, 2012          By: _____

13                                         Scott M. Bennett (022350)
                                           COPPERSMITH SCHERMER & BROCKELMAN PLC
14                                         2800 North Central Avenue
                                           Phoenix, Arizona  85004
15                                         (602) 224-0999 (office)
                                           (602) 224-6020 (fax)
16                                         sbennett@csblaw.com
17
                                           Allen A. Arntsen, admitted *pro hac vice*
18                                         Matthew R. Lynch, admitted *pro hac vice*
19                                         FOLEY & LARDNER LLP
                                           150 E. Gilman Street
20                                         Madison, WI 53703-1481
                                           (608) 257-5035 (Office)
21                                         (608) 258-4258 (Fax)
22
                                           *Attorneys For Petitioner Wendi Andriano*
23

24

25

26

27

28                                  30

4851-6029-7232

1  ORIGINAL filed September 4, 2012, with:

2  Clerk of the Maricopa County Superior Court
   South Court Tower
3  175 West Madison
   Phoenix, AZ 85007

4
   COURTESY COPY hand-delivered September 4, 2012, to:
5
   Judge Douglas Rayes
6  Maricopa County Superior Court
   101 W. Jefferson St., Room 511
7  Phoenix, AZ  85003-2243

8  COPY mailed September 4, 2012 to:

9  Lacey Stover Gard
   Office of the Attorney General
10 400 W. Congress, Suite S-315
   Tucson, AZ  85701-1367
11
   *Attorney for the State of Arizona*

12

13 *Carol Keesee*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    31

4851-6029-7232

# Exhibit A

MICHAEL K. JEANES, CLERK
BY *S. Keinon*
DEP

FILED

2007 OCT 18  PM 1: 47

TERRY GODDARD
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

SHERRI TOLAR ROLLISON
ASSISTANT ATTORNEYS GENERAL
CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, ARIZONA 85007–2997
TELEPHONE: (602) 542–4686
(STATE BAR NUMBER 013657)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
## COUNTY OF MARICOPA

|  |  |
|---|---|
| STATE OF ARIZONA,<br><br>RESPONDENT/PLAINTIFF,<br><br>-VS-<br><br>MICHAEL J. MURDAUGH,<br><br>PETITIONER/DEFENDANT. | CR-95-006472<br><br>MOTION TO PRECLUDE EXPERT TESTIMONY CONCERNING INEFFECTIVE ASSISTANCE OF COUNSEL.<br><br>THE HON. WARREN J. GRANVILLE |

Pursuant to Rule 32.8 of the Arizona Rules of Criminal Procedure and Rule 702 of the Arizona Rules of Evidence, Respondent respectfully requests that this Court preclude expert testimony concerning ineffective assistance of counsel. This motion is supported by the accompanying memorandum of points and authorities.

. . . .

. . . .

1

Respectfully submitted this 18th day of October, 2007.

TERRY GODDARD
ATTORNEY GENERAL

SHERRI TOLAR ROLLISON
ASSISTANT ATTORNEY GENERAL

## MEMORANDUM OF POINTS AND AUTHORITIES

On October 2, 2007, Petitioner noticed Larry Hammond as an expert witness on ineffective assistance of counsel for Petitioner's upcoming post-conviction relief evidentiary hearing. Respondent requests that this Court preclude expert testimony concerning ineffective assistance of counsel. Such testimony is not necessary to assist the trier of fact, and is therefore, irrelevant.

Rule 702 of the Arizona Rules of Evidence permits expert testimony under limited circumstances:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to *understand the evidence or to determine a fact in issue*, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(Emphasis added.)

In order to prevail on an ineffective assistance of counsel claim, Petitioner must satisfy the two-prong test enunciated in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984), by proving that (1) counsel rendered deficient performance

2

under prevailing professional standards, and (2) Petitioner suffered prejudice. And, to prove deficient performance, Petitioner must convince this Court that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. As numerous courts have recognized, whether counsel's trial tactics are reasonable is a question of law, not a question of fact. *See United States v. Swanson*, 943 F.2d 1070, 1072 (9th Cir. 1991); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991); *Smith v. Ylst*, 826 F.2d 872, 875 (9th Cir. 1987); *Lytle v. Jordan*, 22 P.3d 666, 679 (N.M. 2001); *Jefferson v. Zant*, 431 S.E.2d 110, 112 (Ga. 1993). As the United States Court of Appeals for the Eleventh Circuit stated:

> Inquiries into strategic or tactical decisions challenged as ineffective assistance of counsel involve both a factual and a legal component. The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact . . . . By contrast, the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact . . . .

*Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998).

In this case, expert testimony to establish *Strickland*'s deficient-performance prong would be irrelevant and would not "assist the trier of fact." Ariz. R. Evid. 702. As noted above, the question whether an attorney's performance fell below objective standards of reasonableness is one of *law* for this Court to determine. *See Swanson*, 943 F.2d at 1072; *Horton*, 941 F.2d at 1462; *Smith*, 826 F.2d at 875; *Lytle*, 22 P.3d at 679; *Jefferson*, 431 S.E.2d at 112. Expert testimony is admissible only to assist the trier of fact in resolving *factual* issues; legal questions are

inappropriate for such testimony. *See generally* Ariz. R. Evid. 702. In *Provenzano*, for example, the Eleventh Circuit rejected a defendant's attempt to secure an evidentiary hearing on the reasonableness of counsel's decision not to seek a change of venue. 148 F.3d at 1330–31. The defendant supported his argument with an affidavit from a defense attorney questioning trial counsel's decisions. *Id.* at 1331. The Eleventh Circuit concluded that the affidavit did not entitle the defendant to an evidentiary hearing:

> [T]he reasonableness of a strategic choice is a question of law to be decided by the court, not a matter subject to factual inquiry and evidentiary proof. Accordingly, it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable. The question is not one to be decided by plebiscite, by affidavits, by deposition or by live testimony. It is a question of law to be decided by the . . . courts . . . .

*Provenzano*, 148 F.3d at 1331–32; *see also Lytle*, 22 P.3d at 680 ("We believe it is superfluous for expert witnesses to advise a court . . . about the proper application of existing law to the established historical facts and about the ultimate issue of trial counsel's effectiveness."); *Jefferson*, 431 S.E.2d at 112 ("[T]he court correctly determined that opinion testimony from other attorneys concerning the performance of [the defendant's] trial attorneys was irrelevant.").

Additionally, expert testimony on *Strickland*'s deficient performance prong would not "assist the trier of fact to understand the evidence or to determine a fact in issue." Ariz. R. Evid. 702. As a retired Yavapai County Superior Court judge, this Court is undoubtedly familiar with the standard of care for a defense attorney,

and does not require expert testimony to resolve Petitioner's ineffective assistance of counsel claims. *See Clemmons v. State*, 785 S.W.2d 524, 531 (Mo. 1990) ("A motion court is at least as capable as another attorney in reaching a decision [on counsel's alleged ineffectiveness] based on the evidence presented, and therefore the opinion of an attorney on the same subject is irrelevant and incompetent."); *Parkus v. State*, 781 S.W.2d 545, 548 (Mo. 1989) (same); *State v. Ohler*, 366 N.W.2d 771, 775 (Neb. 1985) (rejecting defendant's argument that lower court erred in refusing to permit expert testimony "regarding what a 'reasonably prudent criminal trial attorney would have done'" and concluding that "[g]enerally, expert testimony is not admissible as proof that the assistance of counsel in a criminal case was ineffective"). To resolve the deficient performance aspect of Petitioner's ineffective assistance of counsel claim, this Court must apply the governing law to the facts elicited at the evidentiary hearing. Expert testimony would not facilitate this exercise.

Thus, expert testimony regarding the reasonableness of counsel's decisions is irrelevant and would not assist this Court in determining whether counsel was ineffective. For the foregoing reasons, Respondent respectfully requests that this Court preclude such testimony.

RESPECTFULLY SUBMITTED this 18th day of October, 2007.

TERRY GODDARD
ATTORNEY GENERAL

SHERRI TOLAR ROLLISON
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION

ATTORNEYS FOR RESPONDENT

COPIES of the foregoing were deposited for mailing this 18th day of October, 2007.

Thomas J. Phalen
45 W. Jefferson, Suite 506
Phoenix, Arizona 85003

Gilbert H. Levy
2001 Western, Suite 200
Seattle, Washington 98121-2114

Attorneys for PETITIONER/DEFENDANT

Barbara Lindsay

CRM01-1027
78134

6

# Exhibit B

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
11/02/2007 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 1995-006472                                    11/01/2007

HONORABLE WARREN J. GRANVILLE

CLERK OF THE COURT
J. Kosaka
Deputy

STATE OF ARIZONA                          SHERRI T ROLLISON

v.

MICHAEL JOE MURDAUGH (A)           THOMAS J PHALEN

VICTIM WITNESS DIV-AG-CCC
GILBERT LEVEY
2001 WESTERN, SUITE 200
SEATTLE WASHINGTON 98121-2114

ORDER ENTERED BY COURT

The Court having received and considered State's Motion to Preclude Expert Testimony
Concerning Ineffective Assistance of Counsel,

IT IS ORDERED denying State's motion.

# EXHIBIT WWWWW

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
09/17/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    09/13/2012


                                        CLERK OF THE COURT
JUDGE DOUGLAS L. RAYES                        T. Henninger
                                                Deputy



STATE OF ARIZONA                    LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)          JAMES J BELANGER
                                      SCOTT M BENNETT
                                      ALLEN A ARNTSEN
                                      MATTHEW R LYNCH

                                      APPEALS-PCR
                                      CAPITAL CASE MANAGER
                                      COURT ADMIN-CRIMINAL-PCR
                                      JUDGE ISHIKAWA



        RULE 32 PCR ASSIGNMENT TO JUDGE FOR RULING/CAPITAL CASE


        IT IS ORDERED assigning this Rule 32 proceeding to the Honorable Brian Ishikawa for
all further proceedings.

        This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp.
Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine
their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT XXXXXX

1

Melissa S. Ho (023269)
mho@polsinelli.com

2

**POLSINELLI SHUGHART PC**

3

CityScape
One E. Washington Street, Suite 1200

4

Phoenix, AZ 85004
Phone: (602) 650-2000

5

Fax: (602) 264-7033

6

Attorneys for *Amicus Curiae*,
Legal Momentum

7

MICHAEL K. JEANES, CLERK
BY S. Keinan DEP
FILED

**12 SEP 26  PM 4: 03**

8

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA**

9

10

STATE OF ARIZONA,

Case No. CR2000-096032-A

11

                              Plaintiff,

**MOTION TO ASSOCIATE
COUNSEL *PRO HAC VICE***

vs.

12

13

WENDI ELIZABETH ANDRIANO,

(Assigned to the
Honorable Brian Ishikawa)

14

                              Defendant.

15

16

         Melissa S. Ho of the law firm of Polsinelli Shughart PC, pursuant to Ariz. R. Sup.

17

Ct. 38(a), moves this Court to associate Mark W. Danis as counsel *pro hac vice* in this

18

19

action.  In support of this motion and pursuant to Rule 38(a)(3)(C), the following original

20

documents are attached:

21

         1.      Verified Application to Appear Pro Hac Vice;

22

23

         2.      Certificate(s) of Good Standing; and

24

         3.      State Bar of Arizona Notice of Receipt of Complete Application.

25

26

27

28

2832983.1

1    Polsinelli Shughart hereby agrees to serve as local counsel in this matter and accepts

2  the responsibilities detailed in Ariz. R. Sup. Ct. 39(a)(2).

3    Dated this 26th day of September, 2012.

4

5                              POLSINELLI SHUGHART PC

6                              By: _____

7                                 Melissa S. Ho
                                  CityScape
8                                 One E. Washington Street, Suite 1200
                                  Phoenix, AZ 85004
9

10  ORIGINAL filed this 26th day of
    September, 2012, with the Clerk of
11  the Superior Court.

12

13  COPY mailed/hand-delivered this
    same date to:
14

15  Honorable Brian Ishikawa
    Maricopa County Superior Court
16  Southeast Facility, Suite 1114
    222 E. Javelina Avenue
17  Mesa, AZ 85210

18

19  COPY mailed this same date to:

20

21  Lacy Stover Gard
    Office of Arizona Attorney General
22  400 W. Congress, Suite S-315
    Tucson, AZ 85701-1367
23

24  _____

25

26

27

28

2832979.1



**STATE BAR** OF **ARIZONA**

For Official Use Only
App# 1107108
Bar Number# P186516

Attn: Pro Hac Vice Dept
4201 N. 24th St., Ste 200
Phoenix, AZ 85016-6288
Phone: 602-340-7239

## Application for Appearance Pro Hac Vice

**PART I: Applicant Information**

Name of Applicant: Mark W. Danis

Firm/Company Name: Morrison & Foerster

Office Address: 425 Market Street, 32nd Floor, San Francisco, CA  94105-2482

Telephone: 415-268-7675          Fax: 415-276-7464          Email Address: mdanis@mofo.com

Residence Address: 325 Cherry Street, San Francisco, CA  94118-1619

Title of cause or case where applicant seeks to appear: State of Arizona v. Wendi Elizabeth Andriano

Docket Number: CR2000-096032-A

Court, Board, or Administrative Agency: Superior Court, County of Mariposa

Party on whose behalf applicant seeks to appear: Amicus Curiae, Legal Momentum

**Pursuant to Arizona Supreme Court Rule 38(a)(4), the applicant shall complete the information below:**

| Courts to Which Applicant Has Been Admitted: (Attach additional pages if necessary) | Date of Admission: | Bar Number: |
|---|---|---|
| State of California | October 4, 1990 | 147948 |
| USDC, Northern District of California | February 4, 1991 | |
| USDC, Southern District of California | July 5, 1994 | |
| USDC Central District of California | May 10, 2001 | |

☑ Applicant is a member in good standing in such courts.

☑ Applicant is not currently disbarred or suspended in any court.

Applicant ☐ is / ☑ is not (**select one**) currently subject to any pending disciplinary proceeding or investigation by any court, agency or organization authorized to discipline attorneys at law.

In the preceding three (3) years, applicant has filed applications to appear as counsel under Ariz. R. Sup. Ct., Rule 38(a) in the following:

| Title of Matter: | Docket #: | Court or Agency: | App Granted? (Y/N) |
|---|---|---|---|
| | | | |
| | | | |

This case or cause ☐ is / ☐ is not (**select one**) a related or consolidated matter for which applicant has previously applied to appear pro hac vice in Arizona. If this matter is a related or consolidated with any previous application, Applicant certifies that he/she will review and comply with appropriate rules of procedure as required in the underlying cause.
If applicable, please provide related or consolidated matter application or docket# _____

**DEPOSITED**
SEP 21 2012

Revised 08/22/11

CK# 99030053
$ 1600.00

Page 2

## PART II: Local Counsel Information

Name of Arizona Local Counsel: Melissa S. Ho

State Bar of Arizona Number: 023269

Address: One East Washington, Suite 1200, Phoenix, AZ 85004

Telephone: 602-640-2028    Fax: 602-264-7033    Email Address: mho@polsinelli.com

☑ Local Counsel is a member in good standing.

☑ Local Counsel associating with a nonresident attorney in a particular cause shall accept joint responsibility with the nonresident attorney to the client, to opposing parties and counsel, and to court, board, or administrative agency in that particular cause.

## PART III: Parties and Certification

Name(s) of each party in this cause and name and address of all counsel of record:

| Party: | Counsel of Record: | Address: |
|---|---|---|
| State of Arizona | Thomas C. Horne, Lacey Stover Gard | Office of the Atty Gen, 400 W. Congress, Ste S-315, Tucson, AZ 85701-1367 |
| Wendi Elizabeth Andriano | A. Arntsen, S. Nickels, M. Lynch, Foley & Lardner LLP | 150 E. Gilman Street, Madison, WI 53703 |
|  | Scott M. Bennett, Coppersmith Schermer & Brockelman P.C. | 2800 North Central Avenue, Phoenix, AZ 85004 |

☑ Applicant is including with this application a nonrefundable application fee, payable to the State Bar of Arizona, in the amount of $460.00. Fifteen percent of the non-refundable application fee paid pursuant to this section shall be deposited into a civil legal services fund to be distributed by the Arizona Foundation for Legal Services and Education entirely to approved legal services organizations, as that term is defined in subparagraph (f) of this rule.

☑ Applicant is furnishing a certificate from the state bar or from the clerk of the highest admitting court of each state, territory, or insular possession of the United States in which the nonresident attorney has been admitted to practice law certifying the nonresident attorney's date of admission to such jurisdiction and the current status of the nonresident attorney's membership or eligibility to practice therein. The certificate furnished shall be no more than forty-five (45) days old.

Applicant certifies the following:
1. Applicant shall be subject to the jurisdiction of the courts and agencies of the State of Arizona and to the State Bar of Arizona with respect to the law of this state governing the conduct of attorneys to the same extent as an active member of the State Bar of Arizona, as provided in Ariz. R. Sup. Ct. Rule 46(b).
2. Applicant will review and comply with appropriate rules of procedure as required in the underlying cause.
3. Applicant understands and shall comply with the standards of conduct required of members of the State Bar of Arizona.

## Verification

STATE OF    California    )

County of    San Francisco    ) ss.

I, Mark W. Danis    , swear that all statements in the application are true, correct and complete to the best of my knowledge and belief.

Dated: September 19, 2012    Applicant's Signature: _Mark W. D___

SUBSCRIBED AND SWORN TO before me this __19th__ day of September, 20 12, by

Mark W. Danis

Name of Applicant

GINA L. GERRISH
Commission # 1911854
Notary Public - California
San Francisco County
My Comm. Expires Nov 13, 2014

Notary Public

Revised 08/22/11

## Attachment – Pro Hac Vice Application (Mark W. Danis)

### Additional Courts Applicant Has Been Admitted:

| Court | Date of Admission | Bar Number |
|---|---|---|
| U.S. Court of Appeals, Federal Circuit | November 6, 2001 | |
| U.S. Court of Appeals, Ninth Circuit | September 29, 1993 | |

# THE STATE BAR
## OF CALIFORNIA

180 HOWARD STREET, SAN FRANCISCO, CALIFORNIA  94105-1617                    TELEPHONE: 888-800-3400

# CERTIFICATE OF STANDING

September 6, 2012

TO WHOM IT MAY CONCERN:

This is to certify that according to the records of the State Bar, MARK WILMOT DANIS, #147948 was admitted to the practice of law in this state by the Supreme Court of California on October 4, 1990; and has been since that date, and is at date hereof, an ACTIVE member of the State Bar of California; and that no recommendation for discipline for professional or other misconduct has ever been made by the Board of Trustees or a Disciplinary Board to the Supreme Court of the State of California.

THE STATE BAR OF CALIFORNIA

*Louise Turner*

Louise Turner
Custodian of Membership Records

# Certificate of Good Standing

United States of District Court )
) ss.
Northern District of California )

I, Richard W. Wieking, Clerk of the United States District Court for the Northern District of California, do hereby certify that **Mark Wilmont Danis, Bar No. 147948** was duly admitted to practice in said Court on **February 4, 1991**, and is in good standing as a member of the bar of said Court.

Dated at San Francisco on September 10, 2012

Richard W. Wieking
Clerk.



# United States District Court

## Central District of California

### CERTIFICATE OF GOOD STANDING

I, TERRY NAFISI, Clerk of this Court, certify that

Mark W. Danis, Bar 147948

duly admitted to practice in this Court on _____ May 10, 2001 _____

and is in good standing as a member of the Bar of this Court.

Dated at Los Angeles, California

on _____ September 10, 2012 _____
       *DATE*

TERRY NAFISI
District Court Executive, Clerk of Court

By _____
Lupe _____ Deputy Clerk

G-52 (09/08)(Rev. AO 136)      **CERTIFICATE OF GOOD STANDING - MEMBER OF BAR**

# CERTIFICATE OF GOOD STANDING

UNITED STATES OF AMERICA

SOUTHERN DISTRICT OF CALIFORNIA }  ss.

      I, W. Samuel Hamrick, Jr., Clerk of the United States District Court for the

Southern District of California,

      DO HEREBY CERTIFY That Mark Wilmont Davis was duly admitted to practice in said

Court on September 13, 2012, and is in good standing as a member of the bar of said Court

Dated at  San Diego, CA

                         W. SAMUEL HAMRICK, JR.
                                         Clerk

on September 13, 2012               By S.K. Hoestenbach
                                        Deputy Clerk



Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

# **Certificate of Good Standing**

I, Molly Dwyer, Clerk of this Court, certify that Mark Danis was duly

admitted to practice in this Court on September 29, 1993 and is in good standing in

this Court.

Dated at San Francisco, California on September 12, 2012.

_____
Clerk of the United States Circuit Court of Appeals for the Ninth Circuit

**Maricopa Superior Court**

| | |
|---|---|
| State of Arizona,<br>  Plaintiff | ) ) ) |
| v. | ) ) |
| Wendi Elizabeth Andriano,<br>  Defendant. | ) ) ) ) |

CASE # **CR200-096032-A**

SBA App #1007108

**NOTICE OF RECEIPT OF<br>COMPLETE APPLICATION**

NOTICE IS HEREBY given by THE STATE BAR OF ARIZONA that it has received the verified application and fee from Mark Danis.

In addition to this application, applicant has made the following applications to appear pro hac vice, pursuant to Rule38 (a), within the previous three (3) years:

| Title of Matter | Court/Agency | Date | Granted? |
|---|---|---|---|

Exhibit A, the original verified application and Exhibit B, the original Certificate(s) of Good Standing are attached hereto.

DATED this 24nd day of September 2012

*Fab Perez*

Fabiola Perez
Resource Center
State Bar of Arizona

Original Mailed on this 24nd day of September 2012 to:

Melissa Ho
Polsinelli Shughart PC
1 E Washington St Ste 1200
Phoenix, AZ 85004-2568

# EXHIBIT YYYYYY

MICHAEL R. JEANES, CLERK
BY S. Keinor DEP.

FILED

12 SEP 26 PM 4: 02

1  Melissa S. Ho (023269)
   mho@polsinelli.com
2  **POLSINELLI SHUGHART PC**
3  CityScape
   One E. Washington Street, Suite 1200
4  Phoenix, AZ 85004
5  Phone: (602) 650-2000
   Fax: (602) 264-7033
6  Attorneys for *Amicus Curiae*,
   Legal Momentum
7

8  ### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
   ### IN AND FOR THE COUNTY OF MARICOPA
9

10 STATE OF ARIZONA,                          Case No. CR2000-096032-A

11                      Plaintiff,            **MOTION TO ASSOCIATE**
                                              **COUNSEL *PRO HAC VICE***
   vs.
12
                                              (Assigned to the
13 WENDI ELIZABETH ANDRIANO,                  Honorable Brian Ishikawa)

14                      Defendant.

15

16      Melissa S. Ho of the law firm of Polsinelli Shughart PC, pursuant to Ariz. R. Sup.

17 Ct. 38(a), moves this Court to associate Efrain Staino as counsel *pro hac vice* in this action.

18 In support of this motion and pursuant to Rule 38(a)(3)(C), the following original

19 documents are attached:

20

21      1.      Verified Application to Appear Pro Hac Vice;

22      2.      Certificate(s) of Good Standing; and

23
        3.      State Bar of Arizona Notice of Receipt of Complete Application.
24

25

26

27

28

2832984.1

1  Polsinelli Shughart hereby agrees to serve as local counsel in this matter and accepts

2  the responsibilities detailed in Ariz. R. Sup. Ct. 39(a)(2).

3  Dated this 26th day of September, 2012.

4

5  POLSINELLI SHUGHART PC

6  By: _____

7  Melissa S. Ho
   CityScape
8  One E. Washington Street, Suite 1200
   Phoenix, AZ 85004
9

10  ORIGINAL filed this 26th day of
    September, 2012, with the Clerk of
11  the Superior Court.

12

13  COPY mailed/hand-delivered this
    same date to:
14

15  Honorable Brian Ishikawa
    Maricopa County Superior Court
16  Southeast Facility, Suite 1114
    222 E. Javelina Avenue
17  Mesa, AZ 85210

18

19  COPY mailed this same date to:

20

21  Lacy Stover Gard
    Office of Arizona Attorney General
22  400 W. Congress, Suite S-315
    Tucson, AZ 85701-1367

23

24

25

26

27

28

2832984.1


**STATE BAR** OF **ARIZONA**

For Official Use Only
App#: _100710 9_
Bar Number#: _P1-86523_

Attn: Pro Hac Vice Dept
4201 N. 24th St., Ste 200
Phoenix, AZ 85016-6288
Phone: 602-340-7239

## Application for Appearance Pro Hac Vice

**PART I: Applicant Information**

Name of Applicant: **Efrain Staino**

Firm/Company Name: **Morrison & Foerster**

Office Address: **425 Market Street, 32nd Floor, San Francisco, CA 94105-2482**

Telephone: **(415) 268-6272**          Fax: **(415) 268-7522**          Email Address: **estaino@mofo.com**

Residence Address: **317 29th Street #302, San Francisco, CA 94131**

Title of cause or case where applicant seeks to appear: **State of Arizona v. Wendi Elizabeth Andriano**

Docket Number: **CR2000-096032-A**

Court, Board, or Administrative Agency: **Superior Court, County of Maricopa**

Party on whose behalf applicant seeks to appear: **Amicus Curiae, Legal Momentum**

**Pursuant to Arizona Supreme Court Rule 38(a)(4), the applicant shall complete the information below:**

| Courts to Which Applicant Has Been Admitted: (Attach additional pages if necessary) | Date of Admission: | Bar Number: |
|---|---|---|
| State of California | Dec. 1, 2010 | 271715 |
| USDC Northern District of California | Jan. 5, 2011 | |
| US Court of Appeals, Ninth Circuit | Jan. 28, 2011 | |
| | | |

☑ Applicant is a member in good standing in such courts.

☑ Applicant is not currently disbarred or suspended in any court.

Applicant ☐ is / ☑ is not **(select one)** currently subject to any pending disciplinary proceeding or investigation by any court, agency or organization authorized to discipline attorneys at law.

In the preceding three (3) years, applicant has filed applications to appear as counsel under Ariz. R. Sup. Ct., Rule 38(a) in the following:

| Title of Matter: | Docket #: | Court or Agency: | App Granted? (Y/N) |
|---|---|---|---|
| | | | |
| | | | |

This case or cause ☐ is / ☐ is not **(select one)** a related or consolidated matter for which applicant has previously applied to appear pro hac vice in Arizona. If this matter is a related or consolidated with any previous application, Applicant certifies that he/she will review and comply with appropriate rules of procedure as required in the underlying cause. If applicable, please provide related or consolidated matter application or docket#_____

**DEPOSITED**

Revised 08/22/11

SEP. 2 1 2012

CK#99020588
$ 400 00

Page 2

## PART II: Local Counsel Information

Name of Arizona Local Counsel: Melissa S. Ho

State Bar of Arizona Number: 023269

Address: One East Washington Street, Suite 1200, Phoenix, AZ 85004

Telephone: 602-650-2028          Fax: 602-264-7033          Email Address: mho@polsinelli.com

☑ Local Counsel is a member in good standing.

☑ Local Counsel associating with a nonresident attorney in a particular cause shall accept joint responsibility with the nonresident attorney to the client, to opposing parties and counsel, and to court, board, or administrative agency in that particular cause.

## PART III: Parties and Certification

Name(s) of each party in this cause and name and address of all counsel of record:

| Party: | Counsel of Record: | Address: |
|---|---|---|
| State of Arizona | Thomas C. Horne, Lacey Stover Gard | Office of the AG, 400 W. Congress, Ste. S-315, Tucson, AZ 85701-1367 |
| Wendi Elizabeth Andriano | A. Arnsten, S. Nickels, M. Lynch, Foley & Lardner LLP | 150 E. Gilman St., Madison, WI 53703 |
| | Scott M. Bennett, Coppersmith Schermer & Brockelman PLC | 2800 North Central Ave., Phoenix, AZ 85004 |
| | | |

☑ Applicant is including with this application a nonrefundable application fee, payable to the State Bar of Arizona, in the amount of $460.00. Fifteen percent of the non-refundable application fee paid pursuant to this section shall be deposited into a civil legal services fund to be distributed by the Arizona Foundation for Legal Services and Education entirely to approved legal services organizations, as that term is defined in subparagraph (f) of this rule.

☑ Applicant is furnishing a certificate from the state bar or from the clerk of the highest admitting court of each state, territory, or insular possession of the United States in which the nonresident attorney has been admitted to practice law certifying the nonresident attorney's date of admission to such jurisdiction and the current status of the nonresident attorney's membership or eligibility to practice therein. The certificate furnished shall be no more than forty-five (45) days old.

Applicant certifies the following:
1. Applicant shall be subject to the jurisdiction of the courts and agencies of the State of Arizona and to the State Bar of Arizona with respect to the law of this state governing the conduct of attorneys to the same extent as an active member of the State Bar of Arizona, as provided in Ariz. R. Sup. Ct. Rule 46(b).
2. Applicant will review and comply with appropriate rules of procedure as required in the underlying cause.
3. Applicant understands and shall comply with the standards of conduct required of members of the State Bar of Arizona.

### Verification

STATE OF California                    )

County of San Francisco               ) ss.

I, Efrain Staino                    , swear that all statements in the application are true, correct and complete to the best of my knowledge and belief.

Dated: Sept. 18, 2012          Applicant's Signature: _____

SUBSCRIBED AND SWORN TO before me this 18th day of Sept. , 20 12 , by

Efrain Staino

Name of Applicant

GINA L. GERRISH
Commission # 1911854
Notary Public - California
San Francisco County
My Comm. Expires Nov 13, 2014

Notary Public

Revised 08/22/11

# THE STATE BAR
# OF CALIFORNIA

180 HOWARD STREET, SAN FRANCISCO, CALIFORNIA  94105-1617                    TELEPHONE: 888-800-3400

## CERTIFICATE OF STANDING

September 18, 2012

TO WHOM IT MAY CONCERN:

This is to certify that according to the records of the State Bar, EFRAIN STAINO FLORES, #271715 was admitted to the practice of law in this state by the Supreme Court of California on December 1, 2010; and has been since that date, and is at date hereof, an ACTIVE member of the State Bar of California; and that no recommendation for discipline for professional or other misconduct has ever been made by the Board of Trustees or a Disciplinary Board to the Supreme Court of the State of California.

THE STATE BAR OF CALIFORNIA

Louise Turner
Custodian of Membership Records

# Certificate of Good Standing

United States of District Court

Northern District of California

)
) ss.
)

I, Richard W. Wieking, Clerk of the United States District Court for the Northern District of California, do hereby certify that Efrain Staino Flores, Bar No. 271715 was duly admitted to practice in said Court on January 5, 2011, and is in good standing as a member of the bar of said Court.

Dated at San Francisco on September 14, 2012

Richard W. Wieking
Clerk





Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

# Certificate of Good Standing

I, Molly Dwyer, Clerk of this Court, certify that Efrain Staino Flores was duly admitted to practice in this Court on January 28, 2011 and is in good standing in this Court.

Dated at San Francisco, California on September 12, 2012.

Clerk of the United States Circuit Court of Appeals for the Ninth Circuit

1

**Maricopa Superior Court**

2   State of Arizona,                          )
      Plaintiff                               )
3                                             )        CASE # **CR2000-096032-A**
                                              )
                   v.                         )
4                                             )        SBA App #1007109
      Wendi Elizabeth Andriano,               )
5        Defendant.                           )        **NOTICE OF RECEIPT OF**
    _____    )        **COMPLETE APPLICATION**
6

7   NOTICE IS HEREBY given by THE STATE BAR OF ARIZONA that it has received the
    verified application and fee from Efrain Staino.

8   In addition to this application, applicant has made the following applications to appear pro hac
    vice, pursuant to Rule38 (a), within the previous three (3) years:
9

      Title of Matter          Court/Agency              Date        Granted?
10

11

    Exhibit A, the original verified application and Exhibit B, the original Certificate(s) of Good
12  Standing are attached hereto.

13  DATED this 25nd day of September 2012

14

15                                            _Fab Perez_____
                                              Fabiola Perez
16                                            Resource Center
                                              State Bar of Arizona
17

18  Original Mailed on this 25nd day of September 2012 to:

19  Melissa Ho
20  Polsinelli Shughart PC
    1 E Washington St Ste 1200
21  Phoenix, AZ 85004-2568

22

23

# EXHIBIT ZZZZZZ

MICHAEL K. JEANES, CLERK
BY *S. Keinow* DEP.

FILED

**12 SEP 26  PM 4: 03**

1   Melissa S. Ho (023269)
    mho@polsinelli.com
2   **POLSINELLI SHUGHART PC**
3   CityScape
    One E. Washington Street, Suite 1200
4   Phoenix, AZ 85004
5   Phone: (602) 650-2000
    Fax: (602) 264-7033
6   Attorneys for *Amicus Curiae*,
    Legal Momentum
7

8            **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
                **IN AND FOR THE COUNTY OF MARICOPA**
9

10  STATE OF ARIZONA,                          Case No. CR2000-096032-A

11                          Plaintiff,        **MOTION TO ASSOCIATE**
                                               **COUNSEL *PRO HAC VICE***
    vs.
12
    WENDI ELIZABETH ANDRIANO,                       (Assigned to the
13                                                Honorable Brian Ishikawa)
                            Defendant.
14

15

16          Melissa S. Ho of the law firm of Polsinelli Shughart PC, pursuant to Ariz. R. Sup.

17  Ct. 38(a), moves this Court to associate Natalie Elizabeth Wheatfall as counsel *pro hac vice*

18  in this action.  In support of this motion and pursuant to Rule 38(a)(3)(C), the following

19
    original documents are attached:
20

21          1.      Verified Application to Appear Pro Hac Vice;

22
            2.      Certificate(s) of Good Standing; and
23
            3.      State Bar of Arizona Notice of Receipt of Complete Application.
24

25

26

27

28

2832948.1

1    Polsinelli Shughart hereby agrees to serve as local counsel in this matter and accepts

2    the responsibilities detailed in Ariz. R. Sup. Ct. 39(a)(2).

3    Dated this 26th day of September, 2012.

4

5                                        POLSINELLI SHUGHART PC

6    By:_____

7                                        Melissa S. Ho
                                         CityScape
8                                        One E. Washington Street, Suite 1200
                                         Phoenix, AZ 85004
9

10   ORIGINAL filed this 26th day of
     September, 2012, with the Clerk of
11   the Superior Court.

12

13   COPY mailed/hand-delivered this
     same date to:
14

15   Honorable Brian Ishikawa
     Maricopa County Superior Court
16   Southeast Facility, Suite 1114
     222 E. Javelina Avenue
17   Mesa, AZ 85210

18

19   COPY mailed this same date to:

20
     Lacy Stover Gard
21   Office of Arizona Attorney General
     400 W. Congress, Suite S-315
22   Tucson, AZ 85701-1367

23

24

25

26

27

28



**STATE BAR**
**OF ARIZONA**

For Official Use Only
App# *1007107*
Bar Number# *P186515*

Attn: Pro Hac Vice Dept
4201 N. 24th St., Ste 200
Phoenix, AZ 85016-6288
Phone: 602-340-7239

## Application for Appearance Pro Hac Vice

**PART I: Applicant Information**

Name of Applicant: Natalie Elizabeth Wheatfall

Firm/Company Name: Morrison & Foerster

Office Address: 425 Market Street, 32nd Floor, San Francisco, CA  94105

Telephone: 415-268-6959          Fax: 415-268-7522          Email Address: nwheatfall@mofo.com

Residence Address: 757 Green Street, #3B, San Francisco, CA  94133

Title of cause or case where applicant seeks to appear: State of Arizona v. Wendi Elizabeth Andriano

Docket Number: CR2000-096032-A

Court, Board, or Administrative Agency: Superior Court, County of Maricopa

Party on whose behalf applicant seeks to appear: Amicus Curiae, Legal Momentum

**Pursuant to Arizona Supreme Court Rule 38(a)(4), the applicant shall complete the information below:**

| Courts to Which Applicant Has Been Admitted: (Attach additional pages if necessary) | Date of Admission: | Bar Number: |
|---|---|---|
| State of California | June 2, 2011 | 276248 |
| USDC, Northern District of California | June 16, 2011 | |
| US Court of Appeals, Ninth Circuit | June 16, 2011 | |

☑ Applicant is a member in good standing in such courts.

☑ Applicant is not currently disbarred or suspended in any court.

Applicant ☐ is / ☑ is not **(select one)** currently subject to any pending disciplinary proceeding or investigation by any court, agency or organization authorized to discipline attorneys at law.

In the preceding three (3) years, applicant has filed applications to appear as counsel under Ariz. R. Sup. Ct., Rule 38(a) in the following:

| Title of Matter: | Docket #: | Court or Agency: | App Granted? (Y/N) |
|---|---|---|---|
| | | | |
| | | | |

This case or cause ☐ is / ☐ is not **(select one)** a related or consolidated matter for which applicant has previously applied to appear pro hac vice in Arizona. If this matter is a related or consolidated with any previous application, Applicant certifies that he/she will review and comply with appropriate rules of procedure as required in the underlying cause.
If applicable, please provide related or consolidated matter application or docket# _____

**DEPOSITED**

Revised 08/22/11

SEP 2 1 2012

CK # 990030574
# 460.00

Page 2

**PART II: Local Counsel Information**

Name of Arizona Local Counsel: Melissa S. Ho

State Bar of Arizona Number: 023269

Address: One East Washington, Suite 1200, Phoenix, AZ 85004

Telephone: 602-650-2028          Fax: 602-264-7033          Email Address: mho@polsinelli.com

☑ Local Counsel is a member in good standing.

☑ Local Counsel associating with a nonresident attorney in a particular cause shall accept joint responsibility with the nonresident attorney to the client, to opposing parties and counsel, and to court, board, or administrative agency in that particular cause.

**PART III: Parties and Certification**
Name(s) of each party in this cause and name and address of all counsel of record:

| Party: | Counsel of Record: | Address: |
|---|---|---|
| State of Arizona | Lacey Stover Gard | Office of the Atty. Gen. 400 W. Congress, Ste S-315, Tucson, AZ 85701-1367 |
| Wendi Elizabeth Andriano | A. Arnsten, S. Nickels, M. Lynch, Foley & Lardner LLP | 150 E. Gilman Street, Madison, WI 53703 |

☑ Applicant is including with this application a nonrefundable application fee, payable to the State Bar of Arizona, in the amount of $460.00. Fifteen percent of the non-refundable application fee paid pursuant to this section shall be deposited into a civil legal services fund to be distributed by the Arizona Foundation for Legal Services and Education entirely to approved legal services organizations, as that term is defined in subparagraph (f) of this rule.

☑ Applicant is furnishing a certificate from the state bar or from the clerk of the highest admitting court of each state, territory, or insular possession of the United States in which the nonresident attorney has been admitted to practice law certifying the nonresident attorney's date of admission to such jurisdiction and the current status of the nonresident attorney's membership or eligibility to practice therein. The certificate furnished shall be no more than forty-five (45) days old.

Applicant certifies the following:
1. Applicant shall be subject to the jurisdiction of the courts and agencies of the State of Arizona and to the State Bar of Arizona with respect to the law of this state governing the conduct of attorneys to the same extent as an active member of the State Bar of Arizona, as provided in Ariz. R. Sup. Ct. Rule 46(b).
2. Applicant will review and comply with appropriate rules of procedure as required in the underlying cause.
3. Applicant understands and shall comply with the standards of conduct required of members of the State Bar of Arizona.

## Verification

STATE OF     California                                                 )

County of     San Francisco                                  ) ss.

I, Natalie Elizabeth Wheatfall                                  , swear that all statements in the application are true, correct and complete to the best of my knowledge and belief.

Dated: September 18, 2012                    Applicant's Signature: _____

SUBSCRIBED AND SWORN TO before me this   18th   day of September, 20 12 , by

Natalie Elizabeth Wheatfall                 **GINA L. GERRISH**
Name of Applicant                           **Commission # 1911854**
                                            **Notary Public - California**
                                            **San Francisco County**
                                            **My Comm. Expires Nov 13, 2014**

                                            _____
                                            Notary Public

Revised 08/22/11

**THE STATE BAR
OF CALIFORNIA**

180 HOWARD STREET, SAN FRANCISCO, CALIFORNIA  94105-1617          TELEPHONE: 888-800-3400

# CERTIFICATE OF STANDING

September 10, 2012

TO WHOM IT MAY CONCERN:

This is to certify that according to the records of the State Bar, NATALIE E.
WHEATFALL, #276248 was admitted to the practice of law in this state by
the Supreme Court of California on June 2, 2011; and has been since that
date, and is at date hereof, an ACTIVE member of the State Bar of
California; and that no recommendation for discipline for professional or
other misconduct has ever been made by the Board of Trustees or a
Disciplinary Board to the Supreme Court of the State of California.

THE STATE BAR OF CALIFORNIA

*Louise Turner*

Louise Turner
Custodian of Membership Records

# Certificate of Good Standing

United States of District Court )
) ss.
Northern District of California )

I, Richard W. Wieking, Clerk of the United States District Court for the Northern District of California, do hereby certify that **Natalie E. Wheatfall, Bar No. 276248** was duly admitted to practice in said Court on **September 10, 2012**, and is in good standing as a member of the bar of said Court.

Dated at San Francisco on September 10, 2012

Richard W. Wieking
Clerk





Office of the Clerk
**United States Court of Appeals for the Ninth Circuit**
Post Office Box 193939
San Francisco, California 94119-3939
415-355-8000

Molly C. Dwyer
Clerk of Court

# Certificate of Good Standing

I, Molly Dwyer, Clerk of this Court, certify that Natalie Elizabeth Wheatfall
was duly admitted to practice in this Court on June 16, 2011 and is in good
standing in this Court.

Dated at San Francisco, California on September 10, 2012.

Clerk of the United States Circuit Court of Appeals for the Ninth Circuit

**Maricopa Superior Court**

| | | |
|---|---|---|
| State of Arizona,<br>   Plaintiff | )<br>)<br>) | |
|          v. | )<br>) | CASE # **CR2000-096032-A** |
| Wendi Elizabeth Andriano,<br>   Defendant. | )<br>)<br>)<br>) | SBA App #1007107<br><br>**NOTICE OF RECEIPT OF**<br>**COMPLETE APPLICATION** |

NOTICE IS HEREBY given by THE STATE BAR OF ARIZONA that it has <u>received the</u> <u>verified application and fee from Natalie Wheatfall</u>.

In addition to this application, applicant has made the following applications to appear pro hac vice, pursuant to Rule38 (a), within the previous three (3) years:

| Title of Matter | Court/Agency | Date | Granted? |
|---|---|---|---|

Exhibit A, the original verified application and Exhibit B, the original Certificate(s) of Good Standing are attached hereto.

DATED this 24ⁿᵈ day of September 2012

Fabiola Perez
Resource Center
State Bar of Arizona

Original Mailed on this 24ⁿᵈ day of September 2012 to:

Melissa Ho
Polsinelli Shughart PC
1 E Washington St Ste 1200
Phoenix, AZ 85004-2568

# EXHIBIT AAAAAAA

MICHAEL K. JEANES, CLERK
BY S. Keenon DEP

FILED

**12 SEP 26  PM 4: 03**

1  Melissa S. Ho (023269)
   mho@polsinelli.com
2  **POLSINELLI SHUGHART PC**
   CityScape
3  One E. Washington Street, Suite 1200
4  Phoenix, AZ 85004
   Phone: (602) 650-2000
5  Fax: (602) 264-7033
6  Attorneys for *Amicus Curiae*,
   Legal Momentum
7

8          **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
              **IN AND FOR THE COUNTY OF MARICOPA**
9

10  STATE OF ARIZONA,                      Case No. CR2000-096032-A

11                          Plaintiff,      **MOTION TO ASSOCIATE**
    vs.                                     **COUNSEL *PRO HAC VICE***
12
13  WENDI ELIZABETH ANDRIANO,               (Assigned to the
                                            Honorable Brian Ishikawa)
14                          Defendant.

15

16
17          Melissa S. Ho of the law firm of Polsinelli Shughart PC, pursuant to Ariz. R. Sup.

18  Ct. 38(a), moves this Court to associate Diana B. Kruze as counsel *pro hac vice* in this

19  action.  In support of this motion and pursuant to Rule 38(a)(3)(C), the following original

20  documents are attached:

21
            1.      Verified Application to Appear Pro Hac Vice;
22
23          2.      Certificate(s) of Good Standing; and

24          3.      State Bar of Arizona Notice of Receipt of Complete Application.

25

26

27

28

2832979.1

1    Polsinelli Shughart hereby agrees to serve as local counsel in this matter and accepts

2    the responsibilities detailed in Ariz. R. Sup. Ct. 39(a)(2).

3        Dated this 26th day of September, 2012.

4

5                                POLSINELLI SHUGHART PC

6                                By: _____

7                                    Melissa S. Ho
                                     CityScape
8                                    One E. Washington Street, Suite 1200
                                     Phoenix, AZ 85004
9

10   ORIGINAL filed this 26th day of
     September, 2012, with the Clerk of
11   the Superior Court.

12

13   COPY mailed/hand-delivered this
     same date to:
14

15   Honorable Brian Ishikawa
     Maricopa County Superior Court
16   Southeast Facility, Suite 1114
     222 E. Javelina Avenue
17   Mesa, AZ 85210

18

19   COPY mailed this same date to:

20
     Lacy Stover Gard
21   Office of Arizona Attorney General
     400 W. Congress, Suite S-315
22   Tucson, AZ 85701-1367

23

24

25

26

27

28



**STATE BAR** OF **ARIZONA**

Attn: Pro Hac Vice Dept
4201 N. 24th St., Ste 200
Phoenix, AZ 85016-6288
Phone: 602-340-7239

For Official Use Only
App# _100-7106_
Bar Number# _PI-86514_

## Application for Appearance Pro Hac Vice

**PART I: Applicant Information**

Name of Applicant: Diana B. Kruze

Firm/Company Name: Morrison & Foerster

Office Address: 425 Market Street, 32nd Floor, San Francisco, CA 94105-2482

Telephone: 415-268-6507        Fax: 415-276-7424        Email Address: dkruze@mofo.com

Residence Address: 2275 41st Avenue, San Francisco, CA 94116

Title of cause or case where applicant seeks to appear: State of Arizona v. Wendi Elizabeth Andriano

Docket Number: CR2000-096032-A

Court, Board, or Administrative Agency: Superior Court, County of Maricopa

Party on whose behalf applicant seeks to appear: Amicus Curiae, Legal Momentum

### Pursuant to Arizona Supreme Court Rule 38(a)(4), the applicant shall complete the information below:

| Courts to Which Applicant Has Been Admitted:<br>(Attach additional pages if necessary) | Date of Admission: | Bar Number: |
|---|---|---|
| State of California | December 11, 2006 | 247605 |
| USDC, Northern District of California | March 14, 2007 | |
| US Court of Appeals, Federal Circuit | September 21, 2011 | |
| | | |

☑ Applicant is a member in good standing in such courts.

☑ Applicant is not currently disbarred or suspended in any court.

Applicant ☐ is / ☑ is not **(select one)** currently subject to any pending disciplinary proceeding or investigation by any court, agency or organization authorized to discipline attorneys at law.

In the preceding three (3) years, applicant has filed applications to appear as counsel under Ariz. R. Sup. Ct., Rule 38(a) in the following:

| Title of Matter: | Docket #: | Court or Agency: | App Granted? (Y/N) |
|---|---|---|---|
| | | | |
| | | | |

This case or cause ☐ is / ☐ is not **(select one)** a related or consolidated matter for which applicant has previously applied to appear pro hac vice in Arizona. If this matter is a related or consolidated with any previous application, Applicant certifies that he/she will review and comply with appropriate rules of procedure as required in the underlying cause. **DEPOSITED**
If applicable, please provide related or consolidated matter application or docket#_____

Revised 08/22/11

SEP 2 1 2012

CK# 99020530
$400.00

Page 2

**PART II: Local Counsel Information**

Name of Arizona Local Counsel: Melissa S. Ho

State Bar of Arizona Number: 023269

Address: One East Washington Street, Suite 1200, Phoenix, AZ 85004

Telephone: 602-650-2028          Fax: 602-264-7033          Email Address: mho@polsinelli.com

☑ Local Counsel is a member in good standing.

☑ Local Counsel associating with a nonresident attorney in a particular cause shall accept joint responsibility with the nonresident attorney to the client, to opposing parties and counsel, and to court, board, or administrative agency in that particular cause.

**PART III: Parties and Certification**
Name(s) of each party in this cause and name and address of all counsel of record:

| Party: | Counsel of Record: | Address: |
|---|---|---|
| State of Arizona | Thomas C. Horne, Lacey Stover Gard | Office of the Atty Gen, 400 W. Congress, Ste S-315, Tucson, AZ 85701-1367 |
| Wendi Elizabeth Andriano | A. Arnston, S. Nickels, M. Lynch, Foley & Lardner LLP | 150 E. Gilman Street, Madison, WI 53703 |
| | Scott M. Bennett, Coppersmith Schermer & Brockelman PLC | 2800 North Central Avenue, Phoenix, AZ 85004 |

☑ Applicant is including with this application a nonrefundable application fee, payable to the State Bar of Arizona, in the amount of $460.00. Fifteen percent of the non-refundable application fee paid pursuant to this section shall be deposited into a civil legal services fund to be distributed by the Arizona Foundation for Legal Services and Education entirely to approved legal services organizations, as that term is defined in subparagraph (f) of this rule.

☑ Applicant is furnishing a certificate from the state bar or from the clerk of the highest admitting court of each state, territory, or insular possession of the United States in which the nonresident attorney has been admitted to practice law certifying the nonresident attorney's date of admission to such jurisdiction and the current status of the nonresident attorney's membership or eligibility to practice therein. The certificate furnished shall be no more than forty-five (45) days old.

Applicant certifies the following:
1. Applicant shall be subject to the jurisdiction of the courts and agencies of the State of Arizona and to the State Bar of Arizona with respect to the law of this state governing the conduct of attorneys to the same extent as an active member of the State Bar of Arizona, as provided in Ariz. R. Sup. Ct. Rule 46(b).
2. Applicant will review and comply with appropriate rules of procedure as required in the underlying cause.
3. Applicant understands and shall comply with the standards of conduct required of members of the State Bar of Arizona.

## Verification

STATE OF        California                                    )

County of       San Francisco                           ) ss.

I, Diana B. Kruze                                    , swear that all statements in the application are true, correct and complete to the best of my knowledge and belief.

Dated: September 17, 2012          Applicant's Signature: _____

SUBSCRIBED AND SWORN TO before me this 17th day of September, 20 12, by

Diana B. Kruze
Name of Applicant

GINA L. GERRISH
Commission # 1911854
Notary Public - California
San Francisco County
My Comm. Expires Nov 13, 2014

Notary Public

Revised 08/22/11

# THE STATE BAR
# OF CALIFORNIA

180 HOWARD STREET, SAN FRANCISCO, CALIFORNIA  94105-1617                    TELEPHONE: 888-800-3400

# CERTIFICATE OF STANDING

September 6, 2012

TO WHOM IT MAY CONCERN:

This is to certify that according to the records of the State Bar, DIANA BARRETT KRUZE, #247605 was admitted to the practice of law in this state by the Supreme Court of California on December 11, 2006; and has been since that date, and is at date hereof, an ACTIVE member of the State Bar of California; and that no recommendation for discipline for professional or other misconduct has ever been made by the Board of Trustees or a Disciplinary Board to the Supreme Court of the State of California.

THE STATE BAR OF CALIFORNIA

Louise Turner
Custodian of Membership Records

# Certificate of Good Standing

United States of District Court )
                                ) ss.
Northern District of California )

I, Richard W. Wieking, Clerk of the United States District Court for the Northern District of California, do hereby certify that Diana Barnet Kruze, Bar No. 247605 was duly admitted to practice in said Court on March 15, 2007, and is in good standing as a member of the bar of said Court.

Dated at San Francisco on September 10, 2012

Richard W. Wieking
Clerk



**Maricopa Superior Court**

| | |
|---|---|
| State of Arizona,<br>　Plaintiff<br><br>　　　　v.<br><br>Wendi Elizabeth Andriano,<br>　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CASE # **CR2000-096032-A**

SBA App #1007106

**NOTICE OF RECEIPT OF
COMPLETE APPLICATION**

NOTICE IS HEREBY given by THE STATE BAR OF ARIZONA that it has <u>received the verified application and fee from Diane Kruze.</u>

In addition to this application, applicant has made the following applications to appear pro hac vice, pursuant to Rule38 (a), within the previous three (3) years:

| Title of Matter | Court/Agency | Date | Granted? |
|---|---|---|---|
| | | | |

Exhibit A, the original verified application and Exhibit B, the original Certificate(s) of Good Standing are attached hereto.

DATED this 24nd day of September 2012

_Fab Perez_

Fabiola Perez
Resource Center
State Bar of Arizona

Original Mailed on this 24nd day of September 2012 to:

Melissa Ho
Polsinelli Shughart PC
1 E Washington St Ste 1200
Phoenix, AZ 85004-2568

# EXHIBIT BBBBBBB

BY T. FARR, DEP
MICHAEL K. JEANES, CLERK
RECEIVED CCC #3
DOCUMENT DEPOSITORY

12 SEP 28   PM 3: 59

1   Melissa S. Ho, Esq., Az. Bar No. 023269
**POLSINELLI SHUGHART PC**
2   CityScape One East Washington Street, Suite 1200
Phoenix, Arizona 85004-2568
3   (602) 650-2028
mho@polsinelli.com
4
Mark W. Danis, Esq. (*pro hac vice* pending)
5   Efrain Staino, Esq. (*pro hac vice* pending)
Natalie E. Wheatfall, Esq. (*pro hac vice* pending)
6   Diana B. Kruze, Esq. (*pro hac vice* pending)
**MORRISON FOERSTER, LLP**
7   425 Market Street
San Francisco, CA 94105
8   (415) 268-7000
mdanis@mofo.com
9   estaino@mofo.com
nwheatfall@mofo.com
10   dkruze@mofo.com

11   Attorneys for Amicus Curiae
LEGAL MOMENTUM
12

FILED
BY E. ZUNIGA, DEP

13            **ARIZONA SUPERIOR COURT**

14             **MARICOPA COUNTY**

15
WENDI ELIZABETH ANDRIANO,          CASE NO. CR2000-096032-A
16
Plaintiff/Petitioner,
17                                   **LEGAL MOMENTUM'S**
v.                                   **MOTION FOR LEAVE TO FILE**
18                                   **AN AMICUS CURIAE BRIEF IN**
STATE OF ARIZONA,                    **SUPPORT OF PETITIONER**
19
Defendant/Respondent.
20

21

22        Amicus Curiae Legal Momentum respectfully moves for leave to file an amicus

23   brief in support of Wendi Andriano's Petition for Post-Conviction Relief.  While there is

24   no guidance in the Arizona Rules of Criminal Procedure regarding amicus briefing at the

25   trial court level, Rule 31.25(a) of the Arizona Rules of Criminal Procedure governs

26   amicus briefing at the appellate level.  Rule 31.25(a) provides in pertinent part as follows:

27            A brief of an amicus curiae may be filed only if accompanied
by written consent of all parties or by leave of court granted
28            upon motion. The brief shall be lodged with the motion, if

1

2833453.1

> any. The motion for leave shall identify the interest of the applicant, state that the applicant has read the relevant brief, petition or motion and shall state the reasons accepting applicant's amicus curiae brief would be desirable.

A.R.C.P. 31.25(a). Following the guidance of Rule 31.25(a), Legal Momentum hereby moves for leave of this Court to file the accompanying amicus curiae brief in support of Petitioner Wendi Andriano. A copy of the proposed amicus brief is attached hereto as Exhibit 1.

## I.    INTEREST OF PROPOSED AMICUS CURIAE

Legal Momentum, (formerly NOW Legal Defense and Education Fund) is one of the nation's foremost nonprofit advocacy organizations dedicated to fighting gender discrimination through litigation, advocacy and public education. Legal Momentum was founded in 1970 by leaders of the National Organization for Women to promote gender equity, challenge gender bias, and ensure that critical policies and services would be responsive to the realities of women's lives. This organization works to further equity in educational institutions, immigration policy, health care and reproductive choice, and in the courts. Legal Momentum has frequently appeared before courts around the country both as amicus curiae and direct counsel.

Through its project, the National Judicial Education Program (NJEP), established in 1980, Legal Momentum has been the national leader in the effort to identify and eliminate gender bias in the courts. The work of this project was the catalyst for the establishment of state and federal task forces on gender bias in the courts throughout the country, to which NJEP was a consultant. NJEP's Director has written frequently on this issue. *See, e.g.*, Lynn Hecht Schafran, *Gender Bias in the Courts: An Emerging Focus for Judicial Reform,* 21 ARIZONA STATE LAW JOURNAL 237 (1987); *Documenting Gender Bias in the Courts: The Task Force Approach,* JUDICATURE, Feb.-Mar. 1987 at 280; *Gender Equality in the Courts; Still on the Judicial Agenda*, JUDICATURE, Sept.-Oct. 1993, at 110.

NJEP was instrumental in the American Bar Association's decision to amend the

2

2833453.1

1    section of its Model Code of Judicial Conduct dealing with the courtroom to require

2    judges not to manifest bias or prejudice based on sex themselves or permit lawyers under

3    their direction and control to do so. This is the model for Arizona Code of Judicial

4    Conduct Rule 2.3, at issue in this case. Lynn Hecht Schafran, *The Obligation to*

5    *Intervene: New Direction from the American Bar Association Code of Judicial Conduct,* 4

6    GEO. J. LEGAL ETHICS 53 (1990). Legal Momentum has submitted briefs on many aspects

7    of gender bias in the courts to state and federal courts, including the U.S. Supreme Court.

8         Prior to filing this motion, counsel for amicus contacted Ms. Lacey Stover Gard of

9    the Office of the Attorney General and notified her of Legal Momentum's intention to file

10   an amicus brief on behalf of Wendi Andriano. Counsel for amicus requested the Attorney

11   General's consent to file the attached amicus brief, but counsel for the Attorney General

12   declined.

13        As proscribed by Rule 31.25(a), counsel for amicus have reviewed defendant

14   Wendi Andriano's Memorandum in Support of Petition for Post-Conviction Relief, as

15   well as the State's response brief and Petitioner's reply. Counsel for amicus are familiar

16   with the scope of the arguments that will be presented by Ms. Andriano and will endeavor

17   to not repeat those arguments in the proposed amicus brief. Counsel for amicus have also

18   reviewed the trial record for this case, as well as *State v. Andriano,* 215 Ariz. 497, 161

19   P.3d 540 (2007), affirming Petitioner's conviction and sentence.

20   **II.    BASIS SUPPORING THE REQUEST FOR LEAVE**

21        Legal Momentum respectfully submits that the matters asserted in its

22   accompanying brief, attached as Exhibit 1, are relevant to the disposition of the case at

23   bar. While the parties have briefed the legal bases for their positions, Legal Momentum

24   will supplement their arguments by providing the Court with a deeply informed

25   perspective on the issue of gender bias in the legal system – a matter at the heart of

26   Petitioner's prosecutorial misconduct claim. Legal Momentum has submitted legal and

27   legislative authorities, academic research, and sociological evidence that will enable the

28   Court to render its decision with the benefit of a fuller understanding of the effects of

1   gender bias in Ms. Andriano's case.  Accordingly, Legal Momentum submits that its

2   accompanying amicus curiae brief is both relevant to the case at bar and helpful.

3   **III.**     **CONCLUSION**

4        For the foregoing reasons, Legal Momentum respectfully requests that the Court

5   grant leave to file an amicus curiae brief in support of Petitioner, Wendi Andriano.

6        DATED this 28th day of September, 2012.

7

8                                 POLSINELLI SHUGHART PC

9                                 By: _____

10                                    Melissa S. Ho

11                                 Attorneys for Amicus Curiae
                                LEGAL MOMENTUM

12                                      and

13                                 MORRISON FOERSTER, LLP

14                                     Mark W. Danis
                                    Efrain Staino

15                                     Natalie E. Wheatfall

16                                     Diana B. Kruze
                                (*Pro Hac Vice* Admissions Pending)

17                                 Attorneys for Amicus Curiae
                                LEGAL MOMENTUM

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR LEAVE TO FILE AMICUS BRIEF IN SUPPORT OF PETITIONER
CASE NO. CR2000-096032-A

2833453.1

1   ORIGINAL filed this 28th day of
2   September 28, 2012, with the
    Clerk of the Maricopa County Superior Court.
3

4   COPY of the foregoing hand-delivered
5   this 28th day of September, 2012 to:

6   Honorable Brian K. Ishikawa
7   Maricopa County Superior Court
    Southeast Facility, Suite 1114
8   222 E. Javelina Avenue
    Mesa, AZ 85210
9

10  COPY of the foregoing mailed
11  and emailed this 28th day of
12  September, 2012, to:

13  Ms. Lacey Stover Gard
    Office of the Attorney General
14  400 W. Congress, Suite S-315
15  Tucson, AZ 85701-1367
    *Attorney for the State of Arizona*
16

17  *Helen Hoffman*

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR LEAVE TO FILE AMICUS BRIEF IN SUPPORT OF PETITIONER
CASE NO. CR2000-096032-A

2833453.1

# EXHIBIT CCCCCCC

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Martin
Filing ID 1480457
10/3/2012 3:08:54 PM

1  THOMAS C. HORNE
   ATTORNEY GENERAL
2  (FIRM STATE BAR NO. 14000)

3  LACEY STOVER GARD
   ASSISTANT ATTORNEY GENERAL
   CAPITAL LITIGATION SECTION
4  400 WEST CONGRESS, BLDG. S–315
   TUCSON, ARIZONA 85701–1367
5  TELEPHONE: (520) 628–6520
   LACEY.GARD@AZAG.GOV
6  CADOCKET@AZAG.GOV
   (STATE BAR NUMBER 22714)

7  ATTORNEYS FOR PLAINTIFF/RESPONDENT

8            SUPERIOR COURT OF ARIZONA

9               COUNTY OF MARICOPA

10

11  State of Arizona,                    CR2000-096032-A

12         Plaintiff/Respondent,

13         -vs-                          RESPONSE IN OPPOSITION TO
                                         LEGAL MOMENTUM'S MOTION
14  Wendi Andriano,                      FOR LEAVE TO FILE AMICUS
                                         CURIAE BRIEF ON BEHALF OF
15         Defendant/Petitioner.         PETITIONER.

16
                                         Assigned to the Honorable Brian
17                                       Ishikawa

18

19         Legal Momentum, an organization purportedly "dedicated to fighting gender

20  discrimination through litigation, advocacy and public education" (Motion, at 2)

21  and interested in the present case, seeks leave to file an amicus brief on behalf of

22  Defendant/Petitioner Wendi Andriano.   Although the State generally welcomes

23  amicus input and does not typically oppose motions for leave to file amicus briefs,

24  it objects to Legal Momentum's motion here for the following reasons.

25         First, in support of its motion for leave to file the amicus brief, Legal

26  Momentum relies on Arizona Rule of Criminal Procedure 31.25.  (Motion, at 1–2.)

27  But by its express terms, Rule 31 applies to appeals *from* superior court, not to

28  proceedings occurring *in* superior court.  *See* Ariz. R. Crim. P. 31.1 ("Rule 31

                                         1

governs the procedure for appeals from the Superior Court of Arizona to the Arizona Supreme Court or Court of Appeals which are jointly referred to herein as 'the Appellate Court.'").  Amicus input is not generally beneficial during trial-level post-conviction relief (PCR) proceedings.  Here, the parties have fully briefed Andriano's claims.  This Court must now examine those claims to determine 1) whether they are precluded under Arizona Rule of Criminal Procedure 32.2(a), and 2) if not, whether they satisfy the threshold for conducting an evidentiary hearing under Arizona Rules of Criminal Procedure 32.6 and 32.8.  Unlike an appellate court governed by Rule 31, this Court likely will not rule on the foregoing fact-specific claims in a published opinion that creates legal precedent and raises policy concerns.  To the contrary, this Court's decision will affect only the instant case.

Second, assuming that Rule 31.25 permits a party to file an amicus brief during the pre-hearing stage of a PCR proceeding, Legal Momentum's brief is not an amicus brief; it is an advocate's brief.[1]  The 1998 Comment to Rule 31.25 provides:

> [A]micus curiae should keep in mind the purpose of an amicus brief.  As the name implies, an amicus curiae brief should assist the Court, *not advocate a particular litigant's case*.  Ideally, it *should not duplicate the briefs of the parties*, nor merely extend the length of a litigant's brief.  Rather, it should provide a broader, more abstract presentation of law that is *not narrowly tied to the facts of the case*.  It should provide background and context for the court's decision.

(Emphasis added).  *Accord* Ariz. R. Civ. App. P. 16 cmt. (1998).

Although Legal Momentum's proposed amicus brief advances certain policy arguments relating to gender bias in the legal system (Brief, at 6–12), it strays far

---

[1] Curiously, Andriano's counsel does not appear to have consented to the amicus brief's filing, as Legal Momentum would undoubtedly have noted any such consent in its motion for leave to file the brief.

beyond the acceptable bounds of an amicus brief.  The brief reurges arguments presented in Andriano's PCR petition and directly responds to assertions in the State's response.  (*Id.* at 12–22.)  In fact, the brief expressly incorporates by reference portions of Andriano's petition.  (*Id.* at 5.)  It also asks this Court to *grant relief* and *reverse Andriano's conviction* based on the prosecutor's alleged misconduct and counsel's purported ineffectiveness in failing to object thereto.  (*Id.*)  Additionally, the brief raises at least two issues not advanced by Andriano:  1) a freestanding prosecutorial misconduct claim (which, in any event, would be precluded under Arizona Rule of Criminal Procedure 32.2(a)(3) because Andriano could have raised it on direct appeal), and 2) a claim that counsel was ineffective for allegedly opening the door to testimony about Andriano's sexual history.  (*Id.* at 21.)  *See Qwest Corp. v. City of Chandler*, 222 Ariz. 474, 483, ¶ 28 n.6, 217 P.3d 424, 433 (App. 2009) ("Amici are not allowed to raise new issues and their briefs may not 'create, extend, or enlarge issues beyond those ... argued by the parties.'") (quoting *Ruiz v. Hull*, 191 Ariz. 441, 446, 957 P.2d 984, 989 (1998)).

In light of the foregoing, Legal Momentum does not attempt to appear in this proceeding as a true amicus curiae, but as an advocate on Andriano's behalf.  *See State v. Brown (McMullen)*, 210 Ariz. 534, 536, ¶ 1 n.1 115 P.3d 128, 130 (App. 2005) ("[I]n the content and tone of the brief, the attorney general has not acted as an amicus but, rather, as a second advocate on behalf of the state."); *State v. Resendis-Felix*, 209 Ariz. 299, ¶ 3 n.10, 100 P.3d 457, 464 (App. 2004) ("By seeking only to restate or expand on arguments already made by the state instead of to offer 'background and context for the Court's decision' … the attorney general's brief does not constitute a true amicus curiae brief.") (quoting Ariz. R. Crim. P. 31.25 cmt (1998)).  This Court should reject Legal Momentum's inappropriate attempt to supplement Andriano's PCR petition.

Finally, should this Court grant Legal Momentum's motion and accept filing of the proposed amicus brief, the State respectfully requests that this Court afford it 20 days from the date of its order granting the motion within which to respond to the brief.  *See* Ariz. R. Crim. P. 31.25(a).

DATED this 2nd day of October, 2012.

RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR PLAINTIFF

1  Copy of the foregoing mailed
2  this 2nd day of October, 2012, to:

3  Melissa S. Ho
4  Polsinelli Shughart PC
   CityScape One East Washington Street, Suite 1200
5  Phoenix, Arizona 85004–2568

6
7  Mark V. Danis
   Efrain Staino
8  Natalie Wheatfall
   Diana B. Kruze
9  Morrison Foerster, LLP
10 425 Market Street
   San Francisco, CA 94105
11
12 Counsel for Amicus Curiae Legal Momentum

13
14 Scott M. Bennett
   Coppersmith Schermer & Brockelman PLC
15 2800 N. Central Ave., Suite 1200
   Phoenix, Arizona 85004

16
17 Allen A. Arntsen
   Stephen J. Nickels
18 Matthew R. Lynch
   Foley & Lardner LLP
19 150 East Gilman Street
20 P.O. Box 1497
   Madison, WI   53701-1497
21
22 Attorneys for Defendant/Petitioner Wendi Andriano

23
24 /s/Barbara Lindsay

25 #2883578
26

27

28

5

# EXHIBIT DDDDDDD

Michael K. Jeanes, Clerk of Court
*** Filed ***

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

10/9/2012-8:00AM

CR 2000-096032                                    10/08/2012

CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                       L. Mooney
                                                  Deputy

STATE OF ARIZONA                                  LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)                      JAMES J BELANGER
                                                  SCOTT M BENNETT
                                                  ALLEN A ARNTSEN
                                                  MATTHEW R LYNCH

                                                  APPEALS-PCR
                                                  CAPITAL CASE MANAGER
                                                  COURT ADMIN-CRIMINAL-PCR
                                                  MELISSA S HO
                                                  POLSINELLI SHUGHART PC
                                                  CITYSCAPE ONE EAST WASHINGTON
                                                  STREET, SUITE 1200
                                                  PHOENIX AZ 85004-2568
                                                  MARK V DANIS
                                                  MORRISON FOERSTER, LLP
                                                  425 MARKET STREET
                                                  SAN FRANCISCO CA 94105
                                                  EFRAIN STAINO
                                                  MORRISON FOERSTER, LLP
                                                  425 MARKET STREET
                                                  SAN FRANCISCO CA 94105
                                                  NATALIE WHEATFALL
                                                  MORRISON FOESTER, LLP
                                                  425 MARKET STREET
                                                  SAN FRANCISCO CA 94105
                                                  DIANA B KRUZE
                                                  MORRISON FOERSTER, LLP
                                                  425 MARKET STREET
                                                  SAN FRANCISCO CA 94105

Docket Code 023              Form R000A                            Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/08/2012

## MINUTE ENTRY

The Court has been given the assignment of this Rule 32 proceeding.

The Court has received the following:

- The defendant's Petition for Post-Conviction Relief
- The State's Response to Petition for Post-Conviction Relief
- The defendant's Reply

The Court has also received:

- Motions to Associate Counsel *Pro Hac Vice*
- Legal Momentum's Motion for Leave to File Amicus Curiae Brief in Support    of Petitioner
- The State's Response in Opposition to Legal Momentum's Motion for Leave to file Amicus Curiae Brief on Behalf of Petitioner.

Once Legal Momentum has filed a reply to its motion to file amicus curiae brief or the time for filing a reply has run, the Court will issue a ruling on the motions to associate counsel *pro hac vice*, and the motion to file amicus curiae brief.

A ruling on the Rule 32 proceeding will be held in abeyance pending a ruling on the motions to associate counsel *pro hac vice*, and the motion to file amicus curiae brief.

DATED this 8th day of October, 2012.

Honorable Brian K. Ishikawa
Judge of the Superior Court

# EXHIBIT EEEEEEE

1   Melissa S. Ho, Esq., Az. Bar No. 023269
    **POLSINELLI SHUGHART PC**
2   CityScape One East Washington Street, Suite 1200
    Phoenix, Arizona 85004-2568
3   (602) 650-2028
    mho@polsinelli.com
4
    Mark W. Danis, Esq. (*pro hac vice* pending)
5   Efrain Staino, Esq. (*pro hac vice* pending)
    Natalie E. Wheatfall, Esq. (*pro hac vice* pending)
6   Diana B. Kruze, Esq. (*pro hac vice* pending)
    **MORRISON FOERSTER, LLP**
7   425 Market Street
    San Francisco, CA 94105
8   (415) 268-7000
    mdanis@mofo.com
9   dkruze@mofo.com

10  Attorneys for Amicus Curiae
    LEGAL MOMENTUM
11

MICHAEL K. JEANES, CLERK
RECEIVED CCC #4
NIGHT DEPOSITORY

12 OCT 12  PM 5: 48

FILED
BY P. DOUGHERTY, DEP

12                    **ARIZONA SUPERIOR COURT**

13                     **MARICOPA COUNTY**

14

15  WENDI ELIZABETH ANDRIANO,              CASE NO. CR2000-096032-A

16              Plaintiff/Petitioner,

17       v.                                **LEGAL MOMENTUM'S REPLY
                                           BRIEF IN SUPPORT OF
                                           MOTION FOR LEAVE TO FILE
18   STATE OF ARIZONA,                     AN AMICUS CURIAE BRIEF**

19              Defendant/Respondent.

20

21      Legal Momentum's motion for leave to file an amicus brief should be granted.

22  None of the State's arguments in opposition dictate otherwise.

23      The State first argues that Arizona Rule of Criminal Procedure 31.25 applies to

24  appeals from superior courts, a point already noted in Legal Momentum's opening

25  memorandum. That a superior court has discretion to accept an amicus brief, and that

26
    Rule 31.25 provides the appropriate guidance, is conceded by the coordinating body for
27

28  Arizona state prosecutors. The Arizona Prosecuting Attorneys' Advisory Counsel advises

                                      1
2834277.1

1  that:

2      Although the Arizona Rules of Criminal Procedure do not specifically
3      provide for filing amicus briefs in superior court, in appropriate
    circumstances the courts may allow amicus briefs to be filed. See *Ackel v.*
4      *Ackel,* 83 Ariz. 207, 212, 318 P.2d 676, 679 (1957). . . . Assuming that a
5      superior court judge will allow an amicus brief to be filed in a superior
    court case, an attorney seeking to file such a brief should follow normal
6      procedure and the available rules and seek permission to participate from
7      the parties and/or the court.

8      Arizona Prosecuting Attorneys' Advisory Counsel, Amicus Curiae Briefs, Filing in

9  Superior Court, *available at* http://apaac.az.gov/research/category/28-rule%2031%20-

10  %20appeal%20from%20superior%20court.   In short, the Court has the authority to

11
12  consider Legal Momentum's amicus brief.

13      The State next argues that an amicus brief is of no benefit because "this Court's

14  decision will affect only the instant case." Response in Opposition at 2. That is not the

15  standard for consideration of an amicus brief. In fact, in one of the few reported Arizona

16
17  cases to address the propriety of an amicus brief at the trial court level, the trial court had

18  granted amicus status to a father in a trust and estates/real property matter. Despite the

19  fact that the dispute had no precedential implications beyond the parties at issue, the

20  Arizona Supreme Court held that the trial "court did not err in permitting appellant to

21
22  appear as an amicus curiae." *Ackel*, 83 Ariz. at 212. Here, the information and arguments

23  provided by Legal Momentum will add significant value to the discourse presented for the

24  Court's consideration. Moreover, it is hard to imagine a case where an amicus brief could

25  be of more vital importance given that Petitioner's life hangs in the balance.

26
27      The State further contends that Legal Momentum's amicus brief raises two issues

28  not advanced by Petitioner Wendi Andriano – "freestanding" prosecutorial misconduct,

1  and ineffective assistance of counsel.  Not so.  First, the Memorandum In Support of

2  Petition for Post-Conviction Relief clearly identifies prosecutorial misconduct as a basis

3
4  for relief.  For example, the Memorandum states in unequivocal terms that "Wendi is

5  entitled to the reversal of her conviction based on prosecutorial misconduct or, at a

6  minimum, a new trial."  Memorandum in Support of Petition for Post-Conviction Relief at

7  69; *see also id.* at 64:21-65:1.  Likewise, a majority of the Memorandum is devoted to

8
9  detailing trial counsels' ineffective assistance of counsel, including citing testimony

10  elicited by defense counsel that was mocked by the prosecutor.  *Id.* at 53 n.20.

11      Finally, the State incorrectly maintains that Legal Momentum's amicus brief is an

12  "inappropriate attempt to supplement Andriano's PCR petition."  Response in Opposition

13
14  at 3.  To the contrary, Legal Momentum's amicus brief brings to the Court's attention

15  over thirty articles, books, studies, task force reports, legislative authorities and

16  professional rules of conduct that help elucidate and place into context the gender bias that

17  infected this trial.  Legal Momentum's brief addresses these issues from its unique

18
19  perspective as an authority on the issue of gender bias in court systems.  The importance

20  of these issues in this case is such that this is the first capital case in which Legal

21  Momentum has sought leave to file an amicus brief.  These materials will help inform the

22  Court's decision on this Petition and are authorities that neither party cited or discussed in

23
24  relation to the facts of this case.

25
26
27
28

2834277.1

1    For the foregoing reasons, Legal Momentum respectfully requests that the Court

2    grant the motion for leave to file an amicus curiae brief.

3
4    DATED this 12th day of October, 2012.

5                                        POLSINELLI SHUGHART PC

6

7                                        By: _____
                                            Melissa S. Ho
8                                        Attorneys for Amicus Curiae
                                        LEGAL MOMENTUM
9

10                                            and

11                                       MORRISON FOERSTER, LLP
                                            Mark W. Danis
12                                          Efrain Staino
13                                          Natalie E. Wheatfall
                                            Diane B. Kruze
14                                          (*Pro Hac Vice* Admissions Pending)
                                        Attorneys for Amicus Curiae
15                                       LEGAL MOMENTUM

16

17

18

19

20

21

22

23

24

25

26

27

28
                                            4
                        REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE AMICUS BRIEF
                                    CASE NO. CR2000-096032-A
2834277.1

1   ORIGINAL of the foregoing
2   filed October 12, 2012, with the
    Clerk of the Maricopa County Superior Court.
3
    COPIES of the foregoing
4   mailed / hand-delivered
5   this 12ᵗʰ day of October, 2012 to:

6   Honorable Brian K. Ishikawa
7   Maricopa County Superior Court
    Southeast Facility, Suite 1114
8   222 E. Javelina Avenue
    Mesa, AZ 85210
9

10  Ms. Lacey Stover Gard
    Office of the Attorney General
11  400 W. Congress, Suite S-315
12  Tucson, AZ 85701-1367
    *Attorney for the State of Arizona*

13
14  By: _____
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT FFFFFFF

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Isabel Osuna
Filing ID 1539302
11/15/2012 10:36:14 AM

Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Elizabeth Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,  ) | No. CR2000-096032-A |
| ) | |
| Respondent,  ) | **PETITIONER'S <u>UNOPPOSED</u>** |
| ) | **MOTION TO CONTINUE** |
| vs.  ) | **INFORMAL CONFERENCE** |
| ) | |
| WENDI ELIZABETH ANDRIANO,  ) | (Assigned to the Hon. Brian K. Ishikawa) |
| ) | |
| Petitioner.  ) | |
| ) | |
| ) | |
| ) | |
| _____  ) | |

Petitioner Wendi Andriano moves to continue the informal conference that is currently set for 3 p.m. on November 29, 2012.  The lead attorney for Ms. Andriano, Allen Arntsen, has a scheduling conflict with that date.

Ms. Andriano's attorneys have confirmed with the State's attorney that the State does not oppose this request.

{00075189.1 }

1

2      A proposed order accompanies this motion.

3      RESPECTFULLY SUBMITTED November 15, 2012.

4                              COPPERSMITH SCHERMER &
                               BROCKELMAN PLC
5

6                              By    /s/Scott M. Bennett
                                     Scott M. Bennett
7

8                              FOLEY & LARDNER LLP
                                     Allen A. Arntsen
9                                    Stephan J. Nickels
                                     Matthew R. Lynch
10

11                             *Attorneys for Petitioner Wendi Andriano*

12    ORIGINAL e-filed with the Clerk of the Court
      on November 15, 2012.
13

14    COPY hand-delivered on November 15, 2012 to:

15    The Honorable Brian Ishikawa
16    Maricopa County Superior Court
      Southeast – Juvenile
17    1810 S. Lewis, #1114
      Mesa, AZ  85210
18

19    COPY mailed on November 15, 2012 to:

20    Ms. Lacey Stover Gard
21    Office of the Attorney General
      400 West Congress, Suite S-315
22    Tucson, Arizona  85701-1367
      *Attorneys for the State of Arizona*
23

24    */s/Michelle T. Gallegos*

25

26

# EXHIBIT GGGGGGG

Michael K. Jeanes, Clerk of Court
\*\*\* Filed \*\*\*

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

1.31.2013  8:00am

CR 2000-096032                                         01/25/2013

CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                I. Ostrander
                                                         Deputy

STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              JAMES J BELANGER
                                          SCOTT M BENNETT
                                          ALLEN A ARNTSEN
                                          MATTHEW R LYNCH

                                          APPEALS-PCR
                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          COURT REPORTER ADMINISTRATOR

STATUS CONFERNCE
EVIDENTIARY HEARING SET

State's Attorney:        Lacey Alexandra Stover Gard
Defendant's Attorney:    Scott M. Bennett and Allen A. Arntsen
Defendant:               Not Present
Court Reporter:          Marmie Guimont

3:35 p.m.  This is the time set for status conference regarding the scheduling of an evidentiary hearing.

**LET THE RECORD REFLECT** that prior to commencement of this proceeding, counsel met with the Court in chambers.

Docket Code 056                 Form R000D                      Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                             01/25/2013

**LET THE RECORD FURTHER REFLECT** that Joe and Jeanette Andriano are present telephonically.

**IT IS ORDERED** setting a **Status Conference** on **July 19, 2013, at 1:30 p.m.** before the Honorable Brian K. Ishikawa. The parties may appear telephonically at the status conference by contacting the division at (602) 506-5225 five (5) minutes prior to the scheduled hearing. Pursuant to Rule 32.7, Defendant need not be present at the status conference as she is represented by counsel.

**IT IS FURTHER ORDERED** setting **Evidentiary Hearing** regarding claims I(A) and II of Defendant's Petition for Post-Conviction Relief on **October 7 through 11, 2013, from 8:30 a.m. to 12:00 p.m. and from 1:30 p.m. to 5:00 p.m.** before the Honorable Brian K. Ishikawa.

**IT IS FURTHER ORDERED** that Defendant shall be present in person at the Evidentiary Hearing.

Defense counsel addresses the Court regarding transporting Defendant from DOC for the evidentiary hearing. Counsel is advised to inquire as to the options available for transporting Defendant to this courtroom for the evidentiary hearing. Based upon the information provided by counsel, an order securing the attendance of Defendant will be prepared.

**IT IS FURTHER ORDERED** that a court reporter be present at the Evidentiary Hearing on October 7 through 11, 2013.

DATED this 25th day of January 2013.

_____
HONORABLE BRIAN K. ISHIKAWA
JUDICIAL OFFICER OF THE SUPERIOR COURT

3:38 p.m. Hearing concludes.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT HHHHHHH

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
Kathleen Curtner
2/12/2013 1:57:05 PM
Filing ID 5112792

1
2
3
4
5
6
7
8
9
10
11

Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Elizabeth Andriano*

12
13

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

14
15
16
17
18
19
20
21

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | No. CR2000-096032-A |
| | ) | |
| Respondent, | ) | **STIPULATION FOR ENTRY OF** |
| | ) | **PROTECTIVE ORDER** |
| vs. | ) | |
| | ) | (Assigned to the Hon. Brian K. Ishikawa) |
| WENDI ELIZABETH ANDRIANO, | ) | |
| | ) | |
| Petitioner. | ) | |
| | ) | |
| | ) | |
| | ) | |

22
23
24
25
26

In preparation for the evidentiary hearing on Petitioner Wendi Andriano's petition for postconviction relief, the State has asked Ms. Andriano's current attorneys to produce relevant portions of the files of Ms. Andriano's trial attorneys.  The parties stipulate to the entry of the attached protective order, which addresses the production of those files by Ms. Andriano's current attorneys, as well as the use of the produced information at the evidentiary hearing and other proceedings.

{00084828.1 }

1

2       RESPECTFULLY SUBMITTED February 12, 2013.

3                             COPPERSMITH SCHERMER &

4                             BROCKELMAN PLC

5                             By    */s/Scott M. Bennett*
                                      Scott M. Bennett

6

7                             FOLEY & LARDNER LLP
                               Allen A. Arntsen

8                                Stephan J. Nickels
                               Matthew R. Lynch

9

10                             *Attorneys for Petitioner*

11                             OFFICE OF THE ATTORNEY GENERAL

12                             By    */s/Lacey Stover Gard*

13                                       Lacey Stover Gard

14                             *Attorney for the State of Arizona*

15

16 ORIGINAL e-filed with the Clerk of the Court
on February 12, 2013.

17

18 COPY hand-delivered on February 12, 2013 to:

19 The Honorable Brian Ishikawa

20 Maricopa County Superior Court
Southeast – Juvenile

21 1810 S. Lewis, #1114

22 Mesa, AZ  85210

23

24

25

26

COPY mailed on February 12, 2013 to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona  85701-1367
*Attorneys for the State of Arizona*

*/s/Michelle Gallegos*

# EXHIBIT IIIIIII

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Ann Martin
2/14/2013 1:29:40 PM
Filing ID 5116654

Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Elizabeth Andriano*

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

| STATE OF ARIZONA, | ) | No. CR2000-096032-A |
|---|---|---|
| Respondent, | ) | **MOTION FOR APPOINTMENT OF, AND AUTHORIZATION OF PAYMENT FOR, EXPERT WITNESS GARY LOWENTHAL** |
| vs. | ) | |
| WENDI ELIZABETH ANDRIANO, | ) | (Assigned to the Hon. Brian K. Ishikawa) |
| Petitioner. | ) | |

Petitioner Wendi Andriano, through her undersigned *pro bono* counsel, moves this Court, pursuant to Arizona Revised Statutes §§ 13-4013(B), 13-4041(I), *Ake v. Oklahoma*, 470 U.S. 68 (1985) and its progeny, *Strickland v. Washington*, 466 U.S. 688 (1984), the Due Process and Equal Protection Clauses of the 14th Amendment to the United States

Constitution, the 5th, 6th and 8th Amendments to the United States Constitution, and the 4th, 13th, 15th, and 24th Amendments to the State of Arizona Constitution for the appointment and authorization of payment of reasonable fees for expert Professor Gary Lowenthal ("Professor Lowenthal"), 1490 Camino Corrales Santa Fe, NM 87505.

Counsel is representing Petitioner on a *pro bono* basis based on a referral from the American Bar Association's Death Penalty Representation Project.  This Court has previously found Petitioner to be indigent.  Accordingly, Petitioner is entitled to court-appointed "investigators and expert witnesses as are reasonably necessary to present a defense at trial and at any subsequent proceeding."  Ariz. Rev. Stat. § 13-4013(B); *see also* Ariz. Rev. Stat. § 13-4041(I) ("The trial court may authorize additional monies to pay for investigative and expert services that are reasonably necessary to adequately litigate those claims that are not precluded by section 13-4232.").

Professor Lowenthal has been retained to assess whether the defense counsel in charge of Petitioner's penalty phase defense had an actual conflict of interest that affected the adequacy of Petitioner's representation, which is one of the issues that this Court has set for an evidentiary hearing.  The services of Professor Lowenthal are necessary for counsel to properly present Petitioner's evidence in support of her PCR petition.

Professor Lowenthal has served as a law professor for the past thirty-six years, primarily at Arizona State University, and also at Stanford, the University of Virginia, and the University of Miami. During this time, he has focused on criminal law and procedure, sentencing, and criminal lawyers' ethical responsibilities. His articles on criminal defense lawyers' conflicts of interest have appeared in the *Yale Law Journal* and the *University of Virginia Law Review*, and have been cited by the U.S. Supreme Court. Professor Lowenthal has served as a criminal defense lawyer, prosecutor, and *pro tem* felony trial court judge. During the past five years, he has consulted extensively on criminal defense lawyers' conflicts of interest and related ethical issues, testifying as an expert witness in

1   the Maricopa County Superior Court, and participating as an amicus curiae on a criminal

2   defense lawyer's conflicts of interest in the U.S. Court of Appeals for the Ninth Circuit.

3   From 1993 to the present, Professor Lowenthal has represented a death row client in all

4   stages of post-conviction proceedings, principally focusing on ineffective assistance of

5   counsel in the penalty phase of a capital case.

6       Professor Lowenthal's *curriculum vitae*, which further describes his education and

7   professional experience, is attached to this Motion as **Exhibit A**.

8       Although Professor Lowenthal's usual and customary charge for his services is

9   $350.00 per hour, he has agreed to assist in this matter at a discounted rate of $250.00 per

10  hour.  Petitioner requests that this Court authorize the payment of Professor Lowenthal's

11  reasonable fees and expenses by Mr. James Logan, Esq., the Director of the Maricopa

12  County Office of Public Defense Services.

13      Should this Court require any additional factual foundation for the necessity of the

14  appointment of Professor Lowenthal, Petitioner requests a hearing with the Court.

15      RESPECTFULLY SUBMITTED February 14, 2013.

16          COPPERSMITH SCHERMER &
17          BROCKELMAN PLC

18          By   */s/Scott M. Bennett*
19             Scott M. Bennett

20          FOLEY & LARDNER LLP
21             Allen A. Arntsen
           Stephan J. Nickels
22             Matthew R. Lynch

23          *Attorneys for Petitioner Wendi Andriano*

24  ORIGINAL e-filed with the Clerk of the Court
25  on February 14, 2013.

26  COPY hand-delivered on February 14, 2013 to:

{00084824.2 }
4831-1578-3954.3

1   The Honorable Brian Ishikawa
2   Maricopa County Superior Court
    Southeast – Juvenile
3   1810 S. Lewis, #1114
    Mesa, AZ  85210
4
5   COPY mailed on February 14, 2013 to:

6   Ms. Lacey Stover Gard
    Office of the Attorney General
7   400 West Congress, Suite S-315
8   Tucson, Arizona  85701-1367
    *Attorneys for the State of Arizona*
9
10  */s/Michelle T. Gallegos*_____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

{00084824.2 }

4831-1578-3954.3

4

# Exhibit A

# GARY LOWENTHAL

1490 Camino Corrales
Santa Fe, NM 87505
(505) 982-6708
gary.lowenthal@asu.edu

## Academic Appointments

2007-Present:   Emeritus Professor, Sandra Day O'Connor College of Law, Arizona State University.

2010-2011:   Visiting Professor, University of Miami Law School, teaching constitutional criminal procedure.

1976-2007:   Professor of Law, Arizona State University, teaching criminal law, criminal procedure, sentencing (including semester-long workshops for felony trial judges), law and psychiatry, ethics, white collar crime, clinical legal education, negotiation, mediation, and civil procedure.

1993-98:   Director of Clinical Programs, Arizona State University College of Law.

1984-85:   Visiting Professor, Stanford Law School, teaching criminal law, criminal procedure, and lawyering process.

1979-80:   Visiting Professor, University of Virginia School of Law, teaching criminal procedure and negotiation.

1969-70:   Instructor, Boalt Hall, University of California Berkeley School of Law, teaching legal research and writing.

## Non-academic Professional Experience

2007-Present:   Consultant in criminal litigation and lawyers' disciplinary proceedings, specializing in defense counsel's conflicts of interest and ineffective assistance of counsel in capital cases. In this role, have testified as an expert witness on defense counsel's ethical responsibilities, and currently serve as co-counsel with the Ethics Bureau at Yale as amicus curiae on a defense lawyer's conflicts of interest in a capital case pending before Ninth Circuit Court of Appeals.

Page two - Gary Lowenthal

<u>Non-academic Professional Experience</u>  (continued)

2002-Present:     Author, focusing on narrative nonfiction related to criminal cases.

1993-Present:     Representation of death row client in all stages of post-conviction proceedings, in United States Supreme Court, Ninth Circuit Court of Appeals, United States District Court for the District of Arizona, Arizona Supreme Court, and Maricopa County Superior Court.

1998-2004:        *Pro tem* Superior Court Judge, Maricopa County, AZ, presiding exclusively over criminal cases, including five or six jury trials and hundreds of sentencing proceedings.

1997-98:          Deputy County Attorney, Maricopa County Attorney's Office, Maricopa County, AZ, prosecuting gang related felonies (during one year sabbatical leave from A.S.U.).

1974-76:          Partner, Lowenthal & Zimmerman, Oakland and San Francisco, California, focusing on criminal defense, appellate practice, and commercial litigation.

1970-74:          Assistant Public Defender, Alameda County, California.

1969:             Associate, Morrison & Foerster, San Francisco, California.

1968:             Assistant to Legal Counsel, United States Bureau of Prisons, Washington, D.C.

### Selected Publications

DOWN AND DIRTY JUSTICE: A CHILLING JOURNEY INTO THE DARK WORLD OF CRIME AND THE CRIMINAL COURTS (New Horizon Press, 2003).

*Mandatory Sentencing Laws: Undermining the Effectiveness of Determinate Sentencing Reform*, 81 CALIFORNIA LAW REVIEW 61 (1993).

*The Bar's Failure to Require Truthful Bargaining by Lawyers*, 2 GEORGETOWN J. L. ETHICS 411 (1988).

Page three - Gary Lowenthal

<u>Selected Publications</u> (continued)

*Why Representing Multiple Defendants is a Bad Idea*, 3 CRIMINAL JUSTICE 7
(1988).

*The Disclosure of Arrest Records to the Public Under the Uniform Criminal
History Records Act*, 28 JURIMETRICS JOURNAL 9 (1987).

*Successive Representation by Criminal Lawyers*, 93 YALE LAW JOURNAL 1 (1983).

*A General Theory of Negotiation Process, Strategy and Behavior*, 31 KANSAS
LAW REVIEW 96 (1982).

*Theoretical Notes on Lawyer Competency and an Overview of the Phoenix
Criminal Lawyer Study*, 1981 ARIZONA STATE LAW JOURNAL 451.

*Joint Representation in Criminal Cases: A Critical Appraisal*, 64 VIRGINIA LAW
REVIEW 939 (1978).


<u>Books in Progress</u>

SHATTERED: A STORY OF TWO FAMILIES AND THE AMERICAN JUSTICE
SYSTEM (expected publication, 2014).

MADNESS ON TRIAL: LESSONS FROM THE COLIN FERGUSON CASE  (expected
publication, 2015).


<u>Education</u>

J.D.:   University of Chicago Law School, 1969.

Comments and Topics Editor, UNIVERSITY OF CHICAGO LAW
REVIEW.

Research Associate, University of Chicago Center for Studies in Criminal Justice.

A.B.:  Harvard University, 1966.

# EXHIBIT JJJJJJJ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Ann Martin
2/28/2013 1:27:26 PM
Filing ID 5135288

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA  85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR PLAINTIFF

## SUPERIOR COURT OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>           Plaintiff,<br><br>vs.<br><br>WENDI ANDRIANO,<br><br>           Defendant. | No. CR2000-096032-A<br><br>STIPULATED MOTION FOR ORDER RELEASING ALL MEDICAL, MENTAL HEALTH, AND TREATMENT JAIL RECORDS<br><br>(Honorable Brian Ishikawa)<br><br>**[DEATH PENALTY CASE]** |

The parties hereby request that this Court issue an order directing the Maricopa County Correctional Health Services to release the medical, mental health, and treatment records of former jail inmate Wendi Elizabeth Andriano, Booking Number A631830, for the entire period of her incarceration (October 8, 2000, to December 23, 2004), to counsel for the State, Lacey Stover Gard, and to counsel for Andriano, Allen Arntsen and Scott Bennett.  These records are necessary for the experts' review in the current post-conviction relief proceeding.

The parties have further stipulated that the State's use of these records will be limited to the purposes stated in the proposed order filed with this motion.

DATED this 28th day of February, 2013.

Respectfully Submitted,

Thomas C. Horne
Attorney General
(Firm State Bar No. 14000)


/s/
Lacey Stover Gard
Assistant Attorney General
Capital Litigation Section
400 West Congress, Bldg. S-315
Tucson, Arizona 85701
Telephone:  (520) 628–6520
Lacey.gard@azag.gov
cadocket@azag.gov
State Bar Number 22714
(Counsel for Plaintiff)

/s/
Allen A. Arntsen
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI  53701-1497
(Counsel for Defendant)
(Signed electronically with permission)

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2013, I filed the foregoing with the Clerk of the Court for the Maricopa County Superior Court. A courtesy copy of the foregoing is being delivered through electronic means or deposited for mailing to:

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

/s/_____
N. Kopf

3086608

3

# EXHIBIT KKKKKKK

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Ann Martin
2/28/2013 3:01:02 PM
Filing ID 5135614

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA  85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
CADOCKET.@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR PLAINTIFF

## SUPERIOR COURT OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | No. CR2000-096032-A |
| Plaintiff, | MOTION TO CONTINUE EVIDENTIARY HEARING. |
| vs. | (Honorable Brian Ishikawa) |
| WENDI ELIZABETH ANDRIANO, | |
| Defendant. | **[DEATH PENALTY CASE]** |

The State respectfully requests that this Court continue the evidentiary hearing currently set for October 7 through October 11, 2013, due to scheduling conflicts involving the statutory victims and the State's rebuttal mental-health expert.  Opposing counsel, Allen Artsen, does not oppose this request.

The parties have each consulted with their witnesses regarding scheduling, and the State has consulted with the victims, and it appears that all relevant individuals are free during the first two weeks of February 2014.  Accordingly, if time is available on this Court's calendar, the State respectfully requests that this

Court continue the evidentiary hearing to a period of 5 consecutive days, sometime

between February 3 and February 14, 2014.

DATED this 28th day of February, 2013.

Respectfully Submitted,

Thomas C. Horne
Attorney General
(Firm State Bar No. 14000)

/s/
Lacey Stover Gard
Assistant Attorney General
Capital Litigation Section
400 West Congress, Bldg. S-315
Tucson, Arizona 85701
Telephone:  (520) 628–6520
Lacey.gard@azag.gov
cadocket@azag.gov
State Bar Number 22714
(Counsel for Plaintiff)

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2013, I filed the foregoing with the Clerk of the Court for the Maricopa County Superior Court. A courtesy copy of the foregoing is being delivered through electronic means or deposited for mailing to:

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

/s/_____
N. Kopf


3115829

# EXHIBIT LLLLLLL

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Ann Martin
2/28/2013 1:49:17 PM
Filing ID 5135360

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA  85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
CADOCKET.@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR PLAINTIFF

## SUPERIOR COURT OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>    Plaintiff,<br><br>vs.<br><br>WENDI ELIZABETH ANDRIANO,<br><br>    Defendant. | No. CR2000-096032-A<br><br>STIPULATED MOTION FOR ORDER RELEASING ALL MEDICAL, MENTAL HEALTH, AND TREATMENT PRISON RECORDS<br><br> (Honorable Brian Ishikawa)<br><br>**[DEATH PENALTY CASE]** |

The parties hereby request this Court issue an order directing the Arizona Department of Corrections to release the medical, mental health, and treatment records of inmate Wendi Andriano, ADC # 191593, for the entire period of her incarceration in the Arizona Department of Corrections to counsel for Respondent, Lacey Stover Gard, and a copy to counsel for Andriano, Allen Arntsen and Scott Bennett.  These records are necessary for the experts' review in the current post-conviction relief proceeding.  The parties have further stipulated that the State's

use of these records will be limited to the purposes stated in the proposed order filed with this motion.

DATED this 28th day of February, 2013.

Respectfully Submitted,

Thomas C. Horne
Attorney General
(Firm State Bar No. 14000)


/s/
Lacey Stover Gard
Assistant Attorney General
Capital Litigation Section
400 West Congress, Bldg. S-315
Tucson, Arizona 85701
Telephone:  (520) 628–6520
Lacey.gard@azag.gov
cadocket@azag.gov
State Bar Number 22714
(Counsel for Plaintiff)

/s/
Allen A. Arntsen
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497
(Counsel for Defendant)
(Signed electronically with permission)

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2013, I filed the foregoing with the Clerk of the Court for the Maricopa County Superior Court. A courtesy copy of the foregoing is being delivered through electronic means or deposited for mailing to:

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

/s/_____
N. Kopf


3086586

# EXHIBIT MMMMMMM

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
ISABEL OSUNA
3/7/2013 4:11:03 PM
Filing ID 5147193

1   Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona  85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
5   sbennett@csblaw.com

6   Allen A. Arntsen, Admitted *Pro Hac Vice*
7   Stephan J. Nickels Admitted *Pro Hac Vice*
    Matthew R. Lynch Admitted *Pro Hac Vice*
8   Foley & Lardner LLP
    150 E. Gilman Street
9   Madison, WI 53703
    (608) 257-5035 (office)
10  (608) 258-4258 (fax)
11  aarntsen@foley.com

12  *Attorneys for Petitioner Wendi Andriano*

13                  SUPERIOR COURT OF ARIZONA
14                    COUNTY OF MARICOPA

15  State of Arizona,                    )    No. CR2000-096032-A
                                         )
16                                       )
                      Respondent,        )    **STIPULATION TO ISSUANCE OF**
17  v.                                   )    **A SUBPOENA ORDERING THE**
                                         )    **DEPOSITION OF KYRE LORTS**
18                                       )    **A/K/A KYRE NEUMAYER**
    Wendi Elizabeth Andriano,            )
19                                       )
                      Petitioner.        )    (Hon. Brian Ishikawa)
20                                       )
                                         )
21                                       )
                                         )
22  _____     )

23          The parties stipulate and request, pursuant to Rule 15.3 of the Arizona Rules of

24  Criminal Procedure, that this Court issue a subpoena ordering the deposition of  Kyre Lorts

25  a/k/a Kyre Neumayer, which is relevant and necessary to Ms. Andriano's petition for post-

26  conviction relief in this matter.  The deposition is sought by petitioner Wendi Andriano.

{00087228.1 }

A proposed order accompanies this stipulation.

Respectfully submitted March 7, 2013.

COPPERSMITH SCHERMER & BROCKELMAN PLC

By /s/ Scott M. Bennett
    James J. Belanger
    Scott M. Bennett

FOLEY & LARDNER LLP
    Allen A. Arntsen, *Pro Hac Vice*
    Stephan J. Nickels, *Pro Hac Vice*
    Matthew R. Lynch, *Pro Hac Vice*

*Attorneys for Petitioner*

OFFICE OF THE ATTORNEY GENERAL

By /s/ Lacey Stover Gard (by permission)
    Lacey Stover Gard

*Attorney for State of Arizona*

COURTESY COPY hand-delivered March 7, 2013, to:

Hon. Brian Ishikawa
Maricopa County Superior Court
1810 Lewis Street
Mesa AZ 85210-6235

COPY mailed March 7, 2013, to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tuscon, AZ 85701-1367
*Attorney for the State of Arizona*

/s/ Carol Keesee

# SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | | |
|---|---|---|
| State of Arizona, | ) | NO. CR2000-096032-A |
| | ) | |
|       Respondent, | ) | ORDER ISSUING SUBPOENA FOR |
| v. | ) | DEPOSITION OF KYRE LORTS |
| | ) | A/K/A KYRE NEUMAYER |
| Wendi Elizabeth Andriano, | ) | |
| | ) | |
|       Petitioner. | ) | |

Pending before the Court is the parties' Stipulation for an Order Issuing a Subpoena for the Deposition of Kyre Lorts a/k/a Kyre Neumayer.  After due consideration of said stipulation, and the relevant pleadings on file,

IT IS ORDERED that the Stipulation for an Order Issuing a Subpoena for the Deposition of Kyre Lorts a/k/a Kyre Neumayer is **GRANTED**.  The clerk is authorized to issue a subpoena for the deposition of Kyre Lorts a/k/a Kyre Neumayer.

IT IS SO ORDERED this _____ day of _____, 2013.


_____
THE HONORABLE BRIAN ISHIKAWA
Maricopa County Superior Court Judge


Copies of the foregoing provided
this ___ day of _____to:

Lacey Stover Gard
Assistant Attorney General
1275 West Washington
Phoenix, AZ  85007

{00087229.1 }

1

Scott Bennett
Attorney for Petitioner
2

Coppersmith Schermer & Brockelman PLC
3

2800 N. Central Ave, Suite 1200
Phoenix, AZ  85004
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT NNNNNNN

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
ISABEL OSUNA
3/11/2013 1:55:23 PM
Filing ID 5152667

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR No. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
CADOCKET.@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR PLAINTIFF

## SUPERIOR COURT OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>    Respondent,<br><br>vs.<br><br>WENDI ELIZABETH ANDRIANO,<br><br>    Petitioner. | No. CR2000-096032-A<br><br>NOTICE OF THE STATE'S POSITION ON THIS COURT RULING ON ANDRIANO'S MOTION TO APPOINT GARY LOWENTHAL AS A DEFENSE EXPERT.<br><br> (Honorable Brian Ishikawa)<br><br>**[DEATH PENALTY CASE]** |

The State has received this Court's disclosure that it is a former law student of Professor Gary Lowenthal, and that it has participated in one of Professor Lowenthal's criminal-law classes within the past several years. Pursuant to this Court's request, the State does not object to this Court ruling on Andriano's motion

to appoint Professor Lowenthal as a legal conflict-of-interest expert, and does not object to this Court continuing to preside over this case.[1]

DATED this 11th day of March, 2013.

Respectfully Submitted,

Thomas C. Horne
Attorney General
(Firm State Bar No. 14000)

/s/
Lacey Stover Gard
Assistant Attorney General
Capital Litigation Section
400 West Congress, Bldg. S-315
Tucson, Arizona 85701
Telephone:  (520) 628–6520
Lacey.gard@azag.gov
cadocket@azag.gov
State Bar Number 22714
(Counsel for Plaintiff)

---

[1] The State's lack of objection above is limited to the potential conflict identified by this Court; the State takes no position on the funding request itself. Moreover, the State does not concede that Professor Lowenthal would offer relevant, admissible information at the PCR hearing, and does not waive any potential future argument that Professor Lowenthal should be precluded, on relevance grounds, from testifying at that hearing.

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2013, I filed the foregoing with the Clerk of the Court for the Maricopa County Superior Court. A courtesy copy of the foregoing is being delivered through electronic means or deposited for mailing to:

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

/s/_____
N. Kopf


3147661

# EXHIBIT OOOOOOO

# ORIGINAL

HICHAEL K. JEANLS. CLERK
BY _____ DEP
FILED

13 MAR 12 PH 1: 49

1  Scott M. Bennett (022350)
   Coppersmith Schermer & Brockelman PLC
2  2800 North Central Avenue, Suite 1200
   Phoenix, Arizona 85004
3  (602) 224-0999 (office)
   (602) 224-6020 (fax)
4  sbennett@csblaw.com

5
   Allen A. Arntsen, Admitted *Pro Hac Vice*
6  Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
7  Foley & Lardner LLP
   150 East Gilman Street
8  Madison, WI 53703
   (608) 257-5035 (office)
9  (608) 258-4258 (fax)
   aarntsen@foley.com
10

11  *Attorneys for Petitioner Wendi Elizabeth Andriano*

12              SUPERIOR COURT OF ARIZONA
                   COUNTY OF MARICOPA
13

14  STATE OF ARIZONA,              ) No. CR2000-096032-A
                                   )
15              Respondent,        ) **ORDER FOR PRODUCTION OF**
                                   ) **PETITIONER'S TRIAL COUNSEL**
16      vs.                        ) **FILES RELATING TO INSTANCES OF**
                                   ) **INEFFECTIVE ASSISTANCE OF**
17  WENDI ELIZABETH ANDRIANO,      ) **COUNSEL AS SET FOR PETITIONER'S**
                                   ) **HEARING IN PETITION FOR POST**
18              Petitioner.        ) **CONVICTION RELIEF**
                                   )
19                                 )
                                   )
20                                 )
                                   )
21                                 )
                                   )
22                                 )
                                   )
23                                 )
                                   )
24  _____)

25      Based upon stipulation, and for good cause, IT IS ORDERED that Petitioner's

26  counsel shall make available for copying by the State the following files and other

{00084474.1 }

1    materials that relate to the matters set for an October 2013 evidentiary hearing in this

2    matter: all trial files or other trial materials delivered by Petitioner's trial counsel to

3    Petitioner's current PCR counsel related to Petitioner's claim that trial counsel "fail[ed] to

4    investigate and present expert testimony regarding her mental illness" and "fail[ed] to

5    investigate and present evidence regarding her harrowing childhood" in the penalty phase,

6    as well as Petitioner's claim that trial counsel "had an actual conflict of interest that

7    affected his representation of [Petitioner]" in the penalty phase, as identified by this Court

8    in its October 30, 2012 Minute Entry (Docket Code 595) granting an evidentiary hearing

9    on the claims for ineffective assistance of counsel in the penalty phase.

10       IT IS FURTHER ORDERED that production of any document or other materials

11   pursuant to this Order does not waive Petitioner's right to object to the admissibility of

12   such document or other materials at the evidentiary hearing in this proceeding, nor effects

13   a waiver of any applicable attorney-client, attorney work product, or other privilege that

14   may be applicable in this or any other future proceeding.

15       IT IS FURTHER ORDERED that the State's counsel may only use the material

16   produced under this protective order for the purposes of this matter and shall not disclose

17   the contents or substance of any of the attorney-client privileged communications or any

18   attorney's work product that may be included in the files or materials produced pursuant to

19   this Order, to any person who is not directly involved in the representation of the State in

20   these PCR proceedings. The State's counsel shall be permitted to disclose the material to

21   any experts retained in this matter. All persons to whom such communications or work

22   product is disclosed shall not disclose any information in or relating thereto to any other

23   person.

24       IT IS FURTHER ORDERED that there be no public disclosure of any document or

25   other material containing any attorney-client privileged communication or attorney's work

26   product, or the substance or contents thereof, produced pursuant to this Order.

1    IT IS FURTHER ORDERED that any documents or other materials produced

2  pursuant to this Order that are entered into the record in these PCR proceedings shall be

3  entered under seal.

4    IT IS FURTHER ORDERED that no attorney-client privileged communication or

5  attorney's work product produced to the State pursuant to this Order shall be rendered

6  admissible for any purpose at any trial or other proceeding aside from the evidentiary

7  hearing ordered by this Court in its October 30, 2012 Minute Entry (Docket Code 595) and

8  any future federal habeas corpus proceedings relating to the claims at issue in the

9  evidentiary hearing.

10    IT IS FURTHER ORDERED that nothing in this Order prevents any party from

11  moving to modify or lift the protective order established herein

12    DATED this 8th of March, 2013.

13

14    Judge Brian Ishikawa

15

16

17

18

19

20

21

22

23

24

25

26

COPIES mailed on _3-12-2013_ to:

Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona 85701-1367
*Attorneys for the State of Arizona*

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Stephan J. Nickels
Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703

*Attorneys for Petitioner Wendi Andriano*

L Hart

{00084474.1 }

4

# EXHIBIT PPPPPPP

**ORIGINAL**



MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED

13 MAR 12  PM 1:48

# SUPERIOR COURT OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>            PLAINTIFF,<br><br>-VS-<br><br>WENDI ANDRIANO,<br><br>            DEFENDANT. | NO. CR2000-096032-A<br><br>PROPOSED ORDER<br><br><br><br>[DEATH PENALTY CASE] |

Upon motion duly made, and for good cause appearing,

IT IS HEREBY ORDERED that within 5 working days of the date of this order, the Arizona Department of Corrections shall provide one complete copy of the medical, mental health, and treatment records of inmate Wendi Elizabeth Andriano, ADC # 191593, for the entire period of her incarceration in the Arizona Department of Corrections to counsel for Respondent, Lacey Stover Gard, and an additional copy to counsel for Petitioner, Allen Arntsen and Scott Bennett.

IT IS FURTHER ORDERED that the Clerk of the Court certify this Order and forward a copy of it to Madeline Carney, Wexford Health Services, 1850 N. Central Ave., #1050, Phoenix, Arizona 85004; Lacey Stover Gard, Arizona

Attorney General's Office, 400 West Congress, Bldg. S-315, Tucson, Arizona 85701; Scott M. Bennett, Coppersmith Schermer & Brockelman PLC, 2800 N. Central Ave., Suite 1200, Phoenix, Arizona 85004; and Allen A. Arntsen, Foley & Lardner LLP, 150 East Gilman Street, P.O. Box 1497, Madison, Wisconsin 53701.

IT IS FURTHER ORDERED that production of any document or other materials pursuant to this Order does not waive Petitioner's right to object to the admissibility of such document or other materials at the evidentiary hearing in this proceeding, nor effects a waiver of any privilege that may be applicable in this or any other future proceeding;

IT IS FURTHER ORDERED that the State's counsel may only use the material produced under this protective order for the purposes of this matter and shall not disclose the contents or substance of any privileged material that may be included in the files or materials produced pursuant to this Order, to any person who is not directly involved in the representation of the State in these PCR proceedings. The State's counsel shall be permitted to disclose the material to any experts retained in this matter. All persons to whom such material is disclosed shall not disclose any information in or relating thereto to any other person.

IT IS FURTHER ORDERED that there be no public disclosure of any document or other material containing any privileged material, or the substance or contents thereof, produced pursuant to this Order.

2

IT IS FURTHER ORDERED that any documents or other material produced pursuant to this Order that are entered into the record in these PCR proceedings shall be entered under seal.

IT IS FURTHER ORDERED that no privileged communication produced pursuant to this Order shall be rendered admissible for any purpose at any trial or other proceeding aside from the evidentiary hearing ordered by this Court in its October 30, 2012 Minute Entry (Docket Code 595) and any future federal habeas corpus proceedings relating to the claims at issue in the evidentiary hearing.

IT IS FURTHER ORDERED that nothing in this Order prevents any party from moving to modify or lift the protective order established herein.

DATED this _8th_ day of ___March___, 2013.

HONORABLE BRIAN ISHIKAWA
MARICOPA COUNTY SUPERIOR COURT

# EXHIBIT QQQQQQQ





13 MAR 12 PM 1:49

**SUPERIOR COURT OF ARIZONA**
**COUNTY OF MARICOPA**

| | |
|---|---|
| State of Arizona, | ) NO. CR2000-096032-A |
| | ) |
| Respondent, | ) ORDER ISSUING SUBPOENA FOR |
| v. | ) DEPOSITION OF KYRE LORTS |
| | ) A/K/A KYRE NEUMAYER |
| Wendi Elizabeth Andriano, | ) |
| | ) |
| Petitioner. | ) |

Pending before the Court is the parties' Stipulation for an Order Issuing a Subpoena for the Deposition of Kyre Lorts a/k/a Kyre Neumayer. After due consideration of said stipulation, and the relevant pleadings on file,

IT IS ORDERED that the Stipulation for an Order Issuing a Subpoena for the Deposition of Kyre Lorts a/k/a Kyre Neumayer is **GRANTED**. The clerk is authorized to issue a subpoena for the deposition of Kyre Lorts a/k/a Kyre Neumayer.

IT IS SO ORDERED this _8th_ day of _March_, 2013.

THE HONORABLE BRIAN ISHIKAWA
Maricopa County Superior Court Judge

Copies of the foregoing provided
this _12th_ day of _March 2013_ to:

Lacey Stover Gard
Assistant Attorney General
1275 West Washington
Phoenix, AZ  85007

{00087229.1 }

Scott Bennett
Attorney for Petitioner
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave, Suite 1200
Phoenix, AZ 85004

# EXHIBIT RRRRRRR

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Mary Ann Martin
3/13/2013 9:30:01 AM
Filing ID 5158100

1  Scott M. Bennett (022350)
2  Coppersmith Schermer & Brockelman PLC
   2800 North Central Avenue, Suite 1200
3  Phoenix, Arizona  85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
5  sbennett@csblaw.com

6  Allen A. Arntsen, Admitted *Pro Hac Vice*
7  Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
8  Foley & Lardner LLP
   150 E. Gilman Street
9  Madison, WI 53703
   (608) 257-5035 (office)
10 (608) 258-4258 (fax)
11 aarntsen@foley.com

12 *Attorneys for Petitioner Wendi Andriano*

13              SUPERIOR COURT OF ARIZONA
14                 COUNTY OF MARICOPA

15  State of Arizona,                )    No. CR2000-096032-A
                                     )
16                      Respondent,  )
                                     )    MS. ANDRIANO'S NOTICE
17  v.                               )    REGARDING COURT'S DISCLOSURE
                                     )    RELATING TO PROPOSED EXPERT
18  Wendi Elizabeth Andriano,        )    WITNESS GARY LOWENTHAL
                                     )
19                                   )
                        Petitioner.  )    (Hon. Brian Ishikawa)
20                                   )
                                     )
21  _____ )

22
23        On February 14, 2013, petitioner Wendi Andriano filed a motion seeking the

24  appointment of Professor Gary Lowenthal as an expert witness in support of Ms.

    Andriano's petition for postconviction relief.  Then on March 8, 2013, the Court informed
25
    the attorneys for both sides, through email, that Judge Ishikawa was a student in a law-
26
    school class taught by Professor Lowenthal 33 years ago, and has also participated in

hypothetical sentencing exercises with other judges and students in one of Professor Lowenthal's criminal law-related classes within the past several years.  Based on this disclosure, Ms. Andriano has no objection to Judge Ishikawa ruling on the motion to appoint Professor Lowenthal as an expert witness.

RESPECTFULLY SUBMITTED March 13, 2013.

COPPERSMITH SCHERMER & BROCKELMAN PLC

By    */s/Scott M. Bennett*

Scott M. Bennett

FOLEY & LARDNER LLP
Allen A. Arntsen
Stephan J. Nickels
Matthew R. Lynch

*Attorneys for Petitioner Wendi Andriano*

ORIGINAL e-filed with the Clerk of the Court
on March 13, 2013.

COPY hand-delivered on March 13, 2013 to:

Hon. Brian Ishikawa
Maricopa County Superior Court
1810 Lewis Street
Mesa AZ 85210-6235

COPY mailed March 13, 2013, to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tuscon, AZ 85701-1367
*Attorney for the State of Arizona*

*/s/ Carol Keesee*

# EXHIBIT SSSSSSS

Michael K. Jeanes, Clerk of Court
*** Filed ***
3|26|13      8:00am

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          03/19/2013

                                           CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA              M. Postert
                                           Deputy

STATE OF ARIZONA                         LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)             JAMES J BELANGER
                                         SCOTT M BENNETT
                                         ALLEN A ARNTSEN
                                         MATTHEW R LYNCH

                                         APPEALS-PCR
                                         CAPITAL CASE MANAGER
                                         COURT ADMIN-CRIMINAL-PCR
                                         COURT REPORTER ADMINISTRATOR


                         MINUTE ENTRY


        The Court has received and considered the State's Motion to Continue Evidentiary Hearing.
Counsel for the defendant do not oppose the motion.

        The Court's judicial assistant has conferred with counsel about new dates.

        IT IS ORDERED:

        •   Granting the State's Motion to Continue Evidentiary Hearing.

        •   Vacating the Evidentiary Hearing currently scheduled for 10-07-13, 10-08-
            13, 10-09-13, 10-10-13 and 10-11-13.

        •   Re-setting the Evidentiary Hearing for 02-03-14, 02-04-14, 02-05-14, 02-06-
            14 and 02-07-14 from 8:30 a.m. to 12:00 p.m. and from 1:30 p.m. to 5:00
            p.m.

Docket Code 003                    Form R000A                        Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      03/19/2013

- The defendant shall be present in person at the Evidentiary Hearing. Securing the attendance of the defendant for the Evidentiary Hearing will be discussed at the Status Conference.

- Vacating the Status Conference on 07-19-13 at 1:30 p.m.

- Re-setting the Status Conference on 10-11-13 at 1:30 p.m.  The parties may appear telephonically at the status conference by contacting the division at (602) 506-5225 five (5) minutes prior to the scheduled hearing. Pursuant to Rule 32.7, the defendant need not be present at the status conference as she is represented by counsel.

- A court reporter be present at the Status Conference on 10-11-13 and the Evidentiary Hearing on 02-03-14 through 02-07-14.

DATED this 19th day of March, 2013.

Honorable Brian K. Ishikawa
Judge of the Superior Court

# EXHIBIT TTTTTTT

Michael K. Jeanes, Clerk of Court
*** Filed ***

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

04/15/2013   8:00 am

CR 2000-096032                                    04/12/2013

                                      CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                  S. Quinones
                                                Deputy


STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)              JAMES J BELANGER
                                          SCOTT M BENNETT
                                          ALLEN A ARNTSEN
                                          MATTHEW R LYNCH
                                          JAMES LEO LOGAN

                                          APPEALS-PCR
                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          COURT REPORTER ADMINISTRATOR
                                          OFFICE OF PUBLIC DEFENSE
                                          SERVICES-CCC


MINUTE ENTRY


The Court has reviewed the defendant's Motion for Appointment of, and Authorization of Payment for, Expert Witness Gary Lowenthal ("Motion") (filed 2/14/2013), as well as Notice of the State's Position on this Court Ruling on Andriano's Motion to Appoint Gary Lowenthal as a Defense Expert (filed 3/11/2013) and Ms. Andriano's Notice regarding Court's Disclosure relating to Proposed Expert Witness Gary Lowenthal (filed 3/13/2013). These were filed in connection with the defendant's first Rule 32 proceeding following the Arizona Supreme Court's affirmance of her conviction and death sentence in *State v. Andriano*, 215 Ariz. 497, 161 P.3d 540 (2007).

The Court has granted an evidentiary hearing (2/3-2/7/2014) as to two of the claims identified by the defendant in her Petition for Post-Conviction Relief:

Docket Code 028                     Form R000A                          Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                           04/12/2013

Claim I(A): The allegation that trial counsel was ineffective in the penalty phase for failing to investigate and present expert testimony regarding her mental illness and for failing to investigate and present evidence regarding her harrowing childhood; and

Claim II: The allegation that counsel DeLozier, who was in charge of investigation of the penalty phase mitigation, had an actual conflict that affected his representation of defendant.

**Preliminary Matter**

As a preliminary matter, on March 8, 2013 the Court (Judge Ishikawa) advised counsel for both the defendant and the State that he, as a law student, had taken a class from the proposed expert, and that he, as a judge and within the past few years, had participated with other judges in a sentencing exercise for a criminal law class taught by the proposed expert. Notwithstanding these interactions, neither the defendant nor the State objected to the Court's determination of the Motion; further, the State had no objection to Judge Ishikawa continuing to preside over the case.

**The Motion**

The defendant seeks the appointment of, and authorization for payment of reasonable legal fees for, an expert to assist with the presentation of evidence related to the claim that penalty phase defense counsel had an actual conflict of interest that affected the adequacy of counsel's representation. The defendant outlined the proposed expert's qualifications. (Motion at 2-3, Exhibit A). Further, the defendant noted the proposed expert's willingness to discount his customary rate, seeking $250 per hour rather than $350 per hour. (Motion at 3). The defendant asked that "...this court authorize the payment of...reasonable fees and expenses by Mr. James Logan, Esq., the director of the Maricopa County Office of Public Defense Services [OPDS]." (Motion at 3).

The State took no position regarding the funding request, but cautioned that it did so without conceding that the expert "..would offer relevant, admissible information at the PCR hearing, and does not waive any potential future argument that [the expert] should be precluded, on relevance grounds, from testifying at that hearing." (Notice of State's Position at 2).

**Appointment**

When determining whether to appoint an expert, the Court must consider, *inter alia*, (1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education and (2) whether the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. Arizona Rules of Evidence, Rule 702.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      04/12/2013

The defendant bears the burden of proving her IAC claim.  As set forth in *State v. Watson*, 120 Ariz. 441, 450, 586 P.2d 1253, 1262 (1978):

> In order to succeed at the hearing, the defendant had the burden of proof in regard to facts supporting his allegations. Rule 32.8(c), Rules of Criminal Procedure, 17 A.R.S.; *State v. Stice*, 23 Ariz.App. 97, 530 P.2d 1130 (1975). To show ineffective assistance of counsel, the defendant had to show that the original trial had been reduced to a sham or a farce. That is, the defendant had to do more than show that his counsel had been unsuccessful or had made tactical errors. *State v. Watson, supra. See also State v. Tellez*, 111 Ariz. 34, 523 P.2d 62 (1974); *State v. Daniel*, 25 Ariz.App. 592, 545 P.2d 440 (1976). Here the trial on its face was not a sham or farce; it was aggressively tried by the trial counsel who presented legitimate defenses and made reasonable challenges to the evidence presented by the State. Therefore, in order to show that the preparation for an otherwise adequate trial was insufficient, defendant had to show that counsel's failure to investigate resulted in not presenting evidence or interposing a defense which would have made a crucial difference to the case at the trial. *Compare State v. Lopez*, 3 Ariz.App. 200, 412 P.2d 882 (1966).

THE COURT FINDS that that the proposed expert, Gary Lowenthal, appears to be qualified as an expert by knowledge, skill, experience, training, or education.

THE COURT FINDS that his specialized knowledge might be of assistance to the Court in determining a fact in issue, namely whether penalty phase defense counsel had an actual conflict of interest that affected the adequacy of counsel's representation.

However, the Court declines to appoint Gary Lowenthal as an expert pending the resolution of matters relating to compensation.

### Compensation

An expert is entitled to reasonable compensation, as set by the court. Arizona Rules of Evidence, Rule 706(c). Except as otherwise provided by law, appointment of an expert by the court is subject to the availability of funds or the agreement of the parties concerning compensation. Arizona Rules of Evidence, Rule 706(c). As acknowledged by defendant, Mr. Logan and OPDS are charged with administrative oversight relating to the budget to be charged, as well as any caps applicable to fee payment, and may have an interest in this proceeding as related to the availability of funds. There is no indication that the Office of Public Defense Services, which office is ultimately responsible for budgetary matters, has been served with notice of the motion.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                         04/12/2013

Based on the foregoing,

IT IS ORDERED that defense counsel shall serve the Office of Public Defense Services, James Logan, with a copy of the Motion, and otherwise comply with Rule 35.5.

IT IS FURTHER ORDERED setting an informal/telephonic conference on May 9, 2013 at 3:30 p.m. with this Court to address appointment of the requested expert and related compensation matters in an expedited manner, with defense counsel to provide Mr. Logan with notice of same to ensure his attendance.

Pursuant to Rule 32.7, the defendant need not be present at this conference as she is represented by counsel/shall appear telephonically.

DATED this 12TH day of April, 2013.

                                            Honorable Brian K. Ishikawa
                                            Judge of the Superior Court

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

Docket Code 028              Form R000A                          Page 4

# EXHIBIT UUUUUUU

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
ISABEL OSUNA
5/6/2013 3:45:34 PM
Filing ID 5238677

Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 E. Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

|  |  |
|---|---|
| State of Arizona, | No. CR2000-096032-A |
| Respondent, | UNOPPOSED MOTON TO VACATE MAY 9, 2013 TELEPHONIC CONFERENCE |
| v. | |
| Wendi Elizabeth Andriano, | |
| Petitioner. | (Hon. Brian Ishikawa) |

Petitioner Wendi Andriano moves to vacate the telephonic conference scheduled for May 9, 2013.  The Court scheduled that conference in order to determine the position of Jim Logan, of the Office of Public Defender Services, regarding the appointment of Gary Lowenthal as an expert witness for Ms. Andriano.

{00092544.1 }

1   After the Court issued its minute entry of April 12, 2013, Ms. Andriano's counsel

2   served Mr. Logan with a copy of the motion for the appointment of Mr. Lowenthal as an

3   expert witness, as the Court had instructed.  That led to communications between Ms.

4   Andriano's counsel and Mr. Logan, and ultimately Mr. Logan's office approved funding

5   for 50 hours of work by Mr. Lowenthal, with the possibility of additional hours later.

6   In light of these events, Ms. Andriano's counsel believes there is no need for the

7   May 9 telephonic conference, and asks the Court to vacate it.

8   The State does not oppose this motion.

9

10   RESPECTFULLY SUBMITTED May 6, 2013.

11
                                        COPPERSMITH SCHERMER &
12                                      BROCKELMAN PLC

13                                      By    /s/Scott M. Bennett
14                                           Scott M. Bennett

15                                      FOLEY & LARDNER LLP
16                                           Allen A. Arntsen
                                             Stephan J. Nickels
17                                           Matthew R. Lynch

18                                      *Attorneys for Petitioner Wendi Andriano*

19
ORIGINAL e-filed with the Clerk of the Court
20   on May 6, 2013.

21
COPY hand-delivered on May 6, 2013 to:
22

23   Hon. Brian Ishikawa
     Maricopa County Superior Court
24   1810 Lewis Street
     Mesa AZ 85210-6235
25

26

1

COPY mailed May 6, 2013, to:

2

3

Ms. Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tuscon, AZ 85701-1367
*Attorney for the State of Arizona*

4

5

6

*/s/ Tina Johannesen*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT VVVVVVV

FILED
MICHAEL K. JEANES, Clerk
By
Deputy

1   **SUPERIOR COURT OF ARIZONA**
2   **COUNTY OF MARICOPA**

3   State of Arizona,                          )      NO. CR2000-096032-A
4                                               )
5                  Respondent,                  )      ORDER VACATING MAY 9, 2013
     v.                                         )      TELEPHONIC CONFERENCE
6                                               )
     Wendi Elizabeth Andriano,                  )
7                                               )
8                  Petitioner.                  )

9          Based on the unopposed motion by petitioner Wendi Andriano, and for good cause,

10   IT IS ORDERED vacating the telephonic conference scheduled for 3:30 p.m. on May 9,

11   2013.

12

13          IT IS SO ORDERED this ___7th___ day of ___May___, 2013.

14

15

16          _____
             THE HONORABLE BRIAN ISHIKAWA
17           Maricopa County Superior Court Judge

18

19

20

21

22   Copies of the foregoing provided
23   this ___ day of _____ to:

24
     Lacey Stover Gard
25   Assistant Attorney General
     1275 West Washington
26   Phoenix, AZ  85007

{00092546.1 }

# EXHIBIT WWWWWWW

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
07/12/2013 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      07/10/2013

                                         CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                    M. Postert
                                                 Deputy

STATE OF ARIZONA                         LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)             JAMES J BELANGER

                                         AZ DOC MAIL CODE 481

ORDER SECURING ATTENDANCE OF PRISONER

        IT IS ORDERED that the Arizona Department of Corrections, release to the custody of the Maricopa County Sheriff's Office, or any county sheriff's office within the state of Arizona, Wendi Andriano, DOC #191593, date of birth: 8/06/1970, for purposes of transportation for hearing on **10/11/2013 at 1:30 p.m.**  before Judge Brian Ishikawa.

        IT IS FURTHER ORDERED upon conclusion of said hearing the Maricopa County Sheriff's Office, or any county sheriff's office within the state of Arizona, shall return the prisoner to the custody of the Arizona Department of Corrections.

3 certified copies delivered to MCSO-SIMS/MCSO-IN STATE

Docket Code 086                    Form R086A                         Page 1

# EXHIBIT XXXXXXX

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
8/20/2013 2:55:55 PM
Filing ID 5403715

1  Scott M. Bennett (022350)
2  Coppersmith Schermer & Brockelman PLC
   2800 North Central Avenue, Suite 1200
3  Phoenix, Arizona  85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
5  sbennett@csblaw.com

6  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels Admitted *Pro Hac Vice*
7  Matthew R. Lynch Admitted *Pro Hac Vice*
8  Foley & Lardner LLP
   150 East Gilman Street
9  Madison, WI 53703
   (608) 257-5035 (office)
10 (608) 258-4258 (fax)
11 aarntsen@foley.com

12 *Attorneys for Petitioner Wendi Elizabeth Andriano*

13         IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
14            IN AND FOR THE COUNTY OF MARICOPA

15 State of Arizona,                    )
16                                      )
                        Respondent,     )   No. CR2000-096032-A
17                                      )
18    vs.                               )   **UNCONTESTED MOTION TO**
                                        )   **EXPAND TIME FOR**
19 Wendi Elizabeth Andriano,            )   **EVIDENTIARY HEARING**
                                        )
20                      Petitioner.     )
21 _____  )

22        Petitioner Wendi Andriano moves this Court to expand the time for the evidentiary

23 hearing in the above-captioned matter, currently scheduled for the week of February 3,

24 2014, from one week to two weeks.  The State does not oppose the request to expand the

25 evidentiary hearing's length.  The grounds for this motion are as follows:

26        1.       The Petition for Post-Conviction Relief in this matter encompassed almost

27 200 pages of briefing by the parties, in addition to dozens of fact-witness declarations and

28 {00101504.2 }

the reports of four experts.  The vast majority of the declarations, and all of the expert reports, relate to claims for which this Court granted an evidentiary hearing.

2.      Since this Court's order setting a one week evidentiary hearing in this matter, counsel for both parties have communicated in discovery and pre-hearing preparations.  During the course of these preparations, counsel have recognized that it will not be feasible to complete the evidentiary hearing within one week.

3.      Specifically, Ms. Andriano anticipates at a minimum calling experts Larry Hammond, Professor Gary Lowenthal, Dr. George Woods, Dr. Jim Hopper, and Dr. Myla Young, as well as Ms. Andriano's two trial counsel and five to eight of the most pertinent fact witnesses, each with material testimony to offer relating to the claims at issue.  In addition, the State has indicated that it intends to call its own expert witness.  Counsel for Ms. Andriano will be as direct and efficient as reasonable in its examination of these witnesses, without prejudicing Petitioner's presentation of the evidentiary basis for post-conviction relief in this capital case.  Though the length of the hearing will be driven in part by how the State plans to argue its position, in preparing for the hearing it has become clear to counsel for Ms. Andriano that it will not be feasible to complete direct, cross, and redirect examination of these witnesses within five days, regardless of how much of their testimony the State intends to challenge.

4.      Counsel for Ms. Andriano has attempted to find ways to further streamline the presentation of evidence in this matter, including asking the State to stipulate that sworn witness declarations would be admissible in lieu of live testimony for a number of witnesses.  The State has refused that request.  As a result, live testimony from additional witnesses who signed declarations submitted to this Court may be necessary should the State challenge the factual underpinnings of their declarations.[1]

_____

[1] Most of those witnesses provide information regarding Ms. Andriano's family background and family mental health history, as well as the practices of the church school

1        5.     The State does not oppose extending the time for the hearing to two weeks.

2        WHEREFORE, Petitioner respectfully requests that this Court enter the proposed

3   order granting this motion to expand the time for the evidentiary hearing from one week to

4   two consecutive weeks, to commence upon this Court's first available two-week block of

5   time on or after February 3, 2014.

6        Respectfully submitted August 20, 2013

7

8                                   COPPERSMITH SCHERMER &

9                                   BROCKELMAN PLC

10                                  By: */s/ Scott M. Bennett*_____

11                                        Scott M. Bennett

12                                        2800 North Central Avenue, Suite 1200

13                                        Phoenix, Arizona 85004

14                                  FOLEY & LARDNER LLP

15                                        Allen A. Arntsen

16                                        Stephan J. Nickels

17                                        Matthew R. Lynch

18                                        Jodi K. Fox

19                                        150 East Gilman Street

                                    Madison, Wisconsin 53703

                                *Attorneys for Petitioner*

20

21

22

23

24

25

26

27

28

---

she attended through her childhood.  Many are corroborative of witnesses that counsel for Ms. Andriano intends to call live at the hearing.

{00101504.2 }               3

ORIGINAL e-filed with the Clerk of the Court
on August 20, 2013.

COPY hand-delivered on August 20, 2013 to:

The Honorable Brian Ishikawa
Maricopa County Superior Court
Southeast – Juvenile
1810 S. Lewis, #1114
Mesa, AZ  85210

COPY mailed on August 20, 2013 to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona  85701-1367
*Attorneys for the State of Arizona*

*/s/ Carol Keesee*

# EXHIBIT YYYYYYY

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
I. OSUNA, Deputy
9/3/2013 3:11:13 PM
Filing ID 5426286

Scott M. Bennett (Bar No. 022350)
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (office)
(608) 258-4258 (fax)

*Attorneys For Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA | CASE NO:  CR2000-096032-A |
| RESPONDENT, | |
| V. | **MOTION TO DISQUALIFY PROSECUTOR JUAN MARTINEZ FROM PARTICIPATING AS PCR COUNSEL AT THE EVIDENTIARY HEARING, OR IN THE ALTERNATIVE, MOTION IN LIMINE TO PRECLUDE HIM FROM ASSERTING PERSONAL KNOWLEDGE** |
| WENDI ELIZABETH ANDRIANO | |
| PETITIONER. | |

Petitioner Wendi Andriano moves this Court to disqualify Deputy County Attorney Juan Martinez—who served as prosecutor for the State in the underlying criminal proceedings that are the focus of this post-conviction relief proceeding—from participating as trial counsel at the evidentiary hearing in this matter.  Though the evidentiary hearing is five months away, Ms. Andriano brings this motion now to avoid

{00102631.1 }

1

1   any prejudice to the State arising from Mr. Martinez's disqualification.  The grounds for

2   this motion are twofold.

3        First, though a post-conviction relief proceeding "is part of the original criminal

4   action and not a separate action," Ariz. R. Crim. P. 32.3, after the verdict and sentence

5   Mr. Martinez treated his involvement in the case as over.  Specifically, in 2011 Mr.

6   Martinez appeared on multiple cable television programs that dramatized and opined

7   regarding Ms. Andriano's murder conviction, in which he gave multiple public

8   statements commenting upon Ms. Andriano's character, motives, and alleged behavior.

9   Having treated his participation as concluded by making statements reflecting a

10  "substantial likelihood of materially prejudicing an adjudicative proceeding in the

11  matter," Ariz. R. Prof. Conduct ER 3.6, Mr. Martinez cannot now resume his

12  representation of the State in this proceeding without necessarily violating Arizona's

13  ethical rules regarding publicity and the mandatory impartiality of prosecutors.

14       Second, the hearing will address the ineffectiveness of Mr. Martinez's opposing

15  counsel in pre-trial investigation and at trial, which prejudiced Petitioner by (among other

16  things) enabling Mr. Martinez to assert theories regarding Petitioner, her motives, and the

17  propriety of a death sentence that defense counsel would have been able to undermine

18  had they conducted an effective pre-trial investigation.  Ms. Andriano's trial counsel are

19  likely witnesses, as are experts who will comment upon their performance against Mr.

20  Martinez at trial.  Though Mr. Martinez would not appear to be a necessary witness at the

21  moment, there is an avoidable risk of unfairness should his testimony become necessary

22  in light of the testimony of these other witnesses, as well as an unnecessary temptation

23  for Mr. Martinez to inject testimonial statements and personal knowledge into his

24  questions of those witnesses.

25       Therefore, this Court should disqualify Mr. Martinez from acting as trial counsel

26  for the evidentiary hearing scheduled in this matter pursuant to the Arizona Rules of

27  Professional Conduct, the Due Process Clause, and this Court's inherent authority.

28  {00102631.1 }                                    2

4826-0078-9267.

In the alternative, Petitioner moves this Court for an order *in limine* precluding Mr. Martinez from asserting personal knowledge regarding the performance of Ms. Andriano's trial counsel, presenting personal opinions regarding their effectiveness and the resulting prejudice or lack thereof, making assertions regarding what he would have done had Ms. Andriano's trial counsel been effective, or making any other statements that assert or imply his personal knowledge of their performance at trial.

The grounds supporting this Motion are set forth more fully in the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    BACKGROUND

From the time she was charged through her December 23, 2004 death sentence, Juan Martinez served as the prosecutor in the State's case against Wendi Andriano.  The State was represented by different counsel on appeal, and Mr. Martinez has made no further appearances in the case after the death sentence and post-verdict motions.  Thus, it appeared from the record that Mr. Martinez's involvement as counsel for the State was complete upon the conclusion of trial proceedings in this Court.

Mr. Martinez treated his involvement in the matter as complete, as well.  In 2011—after Ms. Andriano's direct appeals, and almost two years after this Court began hearing procedural motions regarding her claims for post-conviction relief—Mr. Martinez appeared on two cable television programs to comment upon the case. (Affidavit of Matthew R. Lynch ("Lynch Aff.") ¶ 4.)  The first, an Oxygen Network program called *Snapped:  Women Who Kill*, first aired on June 2, 2011; it has since been re-run by the network and is available for online download and viewing.  (Lynch Aff. ¶ 2.)  The Oxygen Network describes the program as a "hit true crime series" that "profiles the fascinating cases of women accused of murder," answering the questions of

4826-0078-9267.

"[d]id they really do it" and "why."  *See* http://oxygen.com/tvshows/snapped/about.aspx.

According to Oxygen, "From socialites to secretaries, female killers share one thing in

common:  at some point, they all snapped."  *Id.*  Ms. Andriano's counsel declined

invitations to be interviewed for the program, on the basis that it was inappropriate to

comment on criminal proceedings that were still ongoing.  (Lynch Aff. ¶ 3.)

Mr. Martinez, however, appeared on the program and made several blanket,

authoritative, and prejudicial statements regarding Ms. Andriano's character and her case

to a national audience.  (Lynch Aff. ¶ 4.)  Among other comments, Mr. Martinez mocked

Ms. Andriano's credibility[1] and her changed appearance in the nearly four years between

her arrest and her trial,[2] and purported to speak regarding her motives and disputed events

leading up to her husband's death as if he possessed first-hand knowledge of them.[3]

After *Snapped* aired, Mr. Martinez appeared on a similar program, *Deadly*

*Women*, which aired on the Investigation Discovery channel on September 9, 2011.

(Lynch Aff. ¶ 2.)  Investigation Discovery describes the program as follows:  "Hell hath

no fury like a woman scorned, especially when she's on a mission to murder.  DEADLY

WOMEN investigates the motives and modus operandi of female murderers."  *See*

http://investigation.discovery.com/tv-shows/deadly-women/about-this-show/about-

---

[1] For example, he stated that "Ms. Andriano testified that in this very tender moment, that she decided to tell him the truth" and that his "cross-examination of her took a number of days.  She at times was very combative with [Mr. Martinez[, other times, she would refuse to answer the question directly, and other times, she had problems, if you will, keeping her facts straight."  (Lynch Aff. ¶ 4.)

[2] On the show, Martinez commented:  "At the time of the killing she was blonde, she had short hair, and just generally appeared to be much younger than the individual who presented in court, who had long dark hair, was wearing glasses, as if she were a librarian."  (Lynch Aff. ¶ 4.)  This is consistent with Mr. Martinez's commentary during the trial, in which he contrasted her physical appearance in court with prior photographs as a basis to attack her credibility.  (*See, e.g.*, 11/16/2004 Tr. at 63:17-19, 87:13-88:3, 152:7-152:12.)

[3] For example, Mr. Martinez asserted that Ms. Andriano "decided to poison him, and she administered the poison," despite no direct evidence refuting Ms. Andriano's testimony that her husband took sodium azide voluntarily as a means to attempt suicide.  (Lynch Aff. ¶ 4.)  Mr. Martinez also stated that Ms. Andriano "bludgeoned him, struck him over the head many many times, and then she delivered the coup de grace by sticking a knife in his neck."  (*Id.*)

{00102631.1 }                                                4

4826-0078-9267.

deadly-women.htm.  *Deadly Women* contains a mix of interviews and dramatizations of the supposed events.  (Lynch Aff. ¶ 2.)

Mr. Martinez went further in his *Deadly Women* interview, sarcastically damning Ms. Andriano's affairs with other men, asserting that she was motivated by greed (which the jury did not find as an aggravating factor), and purporting to state authoritatively what her "goals" were and how the homicide occurred.  (Lynch Aff. ¶ 4.)  For example, Martinez stated that Ms. Andriano "had a goal that Joe Andriano was not going to clutter her life any longer"; that she frequented bars and "would engage herself, if you will, with some of the men that she met"; that Mr. Martinez found it "difficult to understand why she would prefer to carouse with other men while her husband was at home, terminally ill"; and that "[t]he fact that she attempted to get this other life insurance was just an indication of how greedy she really was."  (Lynch Aff. ¶ 4.)  Like *Snapped*, the *Deadly Women* episode has aired multiple times on cable television and is available for download and viewing online.  (*Id.* ¶ 2.)

Last year, Wendi Andriano filed her petition for post-conviction relief in this matter, supported by multiple expert reports and several dozen sworn declarations of witnesses.  Among her claims, Ms. Andriano asserted that her trial counsel was ineffective in all three phases of her capital trial (guilt, aggravator, and sentencing), that the defense lawyer in charge of the sentencing phase of her case suffered under a conflict of interest, and that Mr. Martinez committed prosecutorial misconduct in several respects—including repeated attempts to "inject[] himself as a witness by either prefacing questions with assertions of fact never introduced into evidence . . . or by asserting that the State was in possession of additional facts or evidence not presented to the jury."  (Mem. in Support of Petition, at 66-68 ; Reply in Support of Petition, at 20-22.)

On October 30, 2012, this Court granted an evidentiary hearing on two of Ms. Andriano's claims:  (1) that she received ineffective assistance of counsel relating to the sentencing phase of her trial; and (2) that the defense attorney with responsibility for

4826-0078-9267.

investigating and presenting her case at the sentencing phase labored under a conflict of interest.  This Court initially scheduled the hearing for this fall, but subsequently rescheduled to February 2014 to accommodate the schedule of the State's proposed expert and the victims, without objection by Ms. Andriano.

The State has since indicated that Mr. Martinez would represent the State at the evidentiary hearing.  To date, Mr. Martinez has not appeared on any pleadings relating to the Petition for Post-Conviction Relief, and all of Ms. Andriano's counsel's interactions with the State have been through Attorney Gard of the Attorney General's office; to the best of Ms. Andriano's counsel's knowledge, Mr. Martinez has not performed any work thus far in preparation for the evidentiary hearing in this matter.

## II.   DISCUSSION

"A trial court's authority to apply an ethical rule to govern a disqualification motion in a litigation setting derives from the inherent power of the court to control judicial officers in any proceeding before it."  *Smart Indus. v. Superior Ct.*, 179 Ariz. 141, 145, 876 P.2d 1176 (Ct. App. 1994).  "[E]xtensive authority supports the inherent authority of the courts to regulate the practice of law."  *Scheehle v. Justices of the Supreme Court of Ariz.*, 211 Ariz. 282, 289 n.9, 120 P.3d 1092 (2005).  *See also In re Shannon*, 179 Ariz. 52, 75, 876 P.2d 548, 571 (1994) ("The judiciary's authority to regulate and control the practice of law is universally accepted and dates back to the year 1292.").  The trial court has inherent authority to authorize procedures and exercise its discretion when necessary to accomplish the purpose of the rules and protect the rights of the parties.  *See Lewin v. Jackson*, 108 Ariz. 27, 30-31, 492 P.2d 406, 409-10 (1972); *Aragon v. Wilkinson*, 209 Ariz. 61, 66, P 15, 97 P.3d 886, 891 (App. 2004).

With regard to ethical rules, "[t]he prosecutor must be held to a higher standard of conduct than an ordinary attorney."  *State v. Freader*, 144 Ariz. 224, 227, 696 P.2d 1373 (App. 1985).  *See also State v. Rodriguez*, 192 Ariz. 58, 64, ¶ 33, 192 P.2d 1006, 1012

{00102631.1 }

6

4826-0078-9267.

1   (1998) ("Pursuant to its role of 'minister of justice,' the prosecution has a duty to see that

2   defendants receive a fair trial."); *Pool v. Superior Ct.*, 139 Ariz. 98, 103, 677 P.2d 261

3   (1984) ("The prosecutor's interest in a criminal prosecution is not that it shall win a case,

4   but that justice shall be done.") (internal quotation omitted); Ariz. R. Prof. Conduct ER

5   3.8 cmt to 2003 amend. ("A prosecutor has the responsibility of a minister of justice and

6   not simply that of an advocate.  This responsibility carries with it specific obligations to

7   see that the defendant is accorded procedural justice and that guilt is decided upon the

8   basis of sufficient evidence.").

9          When the prosecutor "is personally interested in gaining a conviction, his interest

10   is adverse to that of the State" because it is "just as much the duty of the prosecution to

11   see that no innocent man suffers as it is to see that no guilty one escapes."  *State v. Cox*,

12   167 So. 2d 352, 358 (La. 1964).  "Criminal defendants are afforded constitutional

13   protection against prosecutors who are partial to interests beyond their official duties,"

14   and have a due process right to "the fair minded exercise of the prosecutor's discretion."

15   *Lux v. Commonwealth*, 484 S.E. 2d 145, 149 (Va. App. 1997) (internal quotation

16   omitted).  *See also People v. Eubanks*, 927 P.2d 310, 315 (Cal. 1996) ("The importance,

17   to the public as well as to individuals suspected or accused of crimes, that [the

18   prosecutor's] discretionary functions be exercised with the highest degree of integrity and

19   impartiality, and with the appearance thereof[,] cannot be easily overstated.") (internal

20   quotation omitted).

21          The paramount concern of fairness embodied in due process requirements prevents

22   not only actual prejudice on account of a particular prosecutor's involvement, but also the

23   mere "probability of unfairness."  *In re Murchison*, 349 U.S. 133, 136 (1955).  "[E]ven

24   the appearance of unfairness cannot be permitted[.]"  *State v. Latigue*, 108 Ariz. 521, 523,

25   502 P.2d 1340 (1972).  *See also Turbin v. Super. Ct.*, 165 Ariz. 195, 199, 797 P.2d 734

26   (App. 1990) (reaffirming the need to consider the "appearance of impropriety").

27

28   {00102631.1 }                                7

4826-0078-9267.

### A.   Mr. Martinez Should Be Disqualified Because His Resumed Involvement In The Case Would Violate Ethical Rules Regarding Publicity

A defendant's post-conviction relief proceeding is "is part of the original criminal action and not a separate action."  Ariz. R. Crim. P. 32.3.  Under Arizona Rule of Professional Conduct ER 3.6(a):

> A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

The rule goes on to specify certain generic categories of information that a lawyer may disclose without violating the rule, such as the claim, the fact that an investigation is ongoing, the time and place of arrest, the identity of the officers involved, and other basic background disclosures.  Ariz. R. Prof. Cond. ER 3.6(b)  The commentary to the rule identifies certain categories of statements "which are more likely than not to have a material prejudicial effect on a proceeding, particularly when they refer to . . . a criminal matter."  *Id.* cmt.  Those categories include comments regarding "the character, credibility, reputation or criminal record of a party."  *Id.*

Prosecutors are held to even higher standards regarding publicity.  Under Rule of Professional Conduct ER 3.8(f) and its commentary, a prosecutor must "refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused" and "avoid comments which have no legitimate law enforcement purpose and have a substantial likelihood of increasing public opprobrium of the accused."

Rules 3.6 and 3.8(f) are clearly applicable here.  *First*, Mr. Martinez's interviews for *Snapped* and *Deadly Women* were extrajudicial statements that Mr. Martinez knew would be disseminated by quite wide-ranging, public means:  national cable television and the Internet.

*Second*, Mr. Martinez's statements on those programs regarding Ms. Andriano's

{00102631.1 }

8

4826-0078-9267.

1  character and motives are exactly the types of comments that are "more likely than not to

2  have a material effect" on a criminal proceeding.  *Id.*  Chastising remarks regarding her

3  alleged promiscuity, characterizations of her as "greedy," and attributing her actions to

4  various evil motives and thoughts are highly prejudicial, not only toward the upcoming

5  evidentiary hearing but also for any future re-sentencing of Ms. Andriano.  They have no

6  conceivable law enforcement purpose—Ms. Andriano is already incarcerated—and no

7  other apparent purpose other than to increase Mr. Martinez's public stature and/or

8  prejudice Ms. Andriano's ongoing post-conviction relief investigation and proceedings.

9    *Third*, Mr. Martinez "is participating or has participated in the investigation or

10  litigation of" this matter:  he tried the case for the State.  This Court cannot undo the

11  prejudice that Mr. Martinez has already caused by making prejudicial statements

12  regarding a case in which he participated, but it should reduce the effect of that prejudice

13  by preventing Mr. Martinez from resuming his participation in this matter.  Having made

14  highly public and prejudicial comments regarding Ms. Andriano while this post-

15  conviction relief stage of her criminal proceeding was underway, Mr. Martinez should

16  not be permitted to compound an apparent rules violation by returning to try the case at

17  the evidentiary hearing.

19    **B.**  **Mr. Martinez Should Be Disqualified Because His Voluntary Public Statements Create a Conflict with His Duties as Prosecutor**

20    In addition, by making those public statements Mr. Martinez has voluntarily put

21  himself in a position adverse to the State, and thus suffers from a conflict of interest.  In

22  serving as counsel for the State in this matter, Mr. Martinez "is the representative not of

23  an ordinary party to a controversy, but of a sovereignty whose obligation to govern

24  impartially is as compelling as its obligation to govern at all; and whose interest,

25  therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be

26  done."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  His one-sided and derogatory

27  comments regarding Ms. Andriano to tabloid "true crime" television programs during the

28  {00102631.1 }

MOTION TO PRECLUDE JUAN MARTINEZ TO PARTICIPATE AS PCR COUNSEL
CASE NO. CR2000-096032-A

4826-0078-9267.

pendency of this post-conviction relief proceeding create an appearance of partiality and bias.  Moreover, by making those comments, Mr. Martinez has demonstrated a personal interest in upholding Ms. Andriano's conviction even if the evidence solicited at the hearing overwhelmingly shows that her claims for post-conviction relief are valid.  *See, e.g.*, *People v. Choi*, 80 Cal. App. 4th 476, 479-83 (Cal. Ct. App. 2000) (prosecutor's statements of personal beliefs regarding pending case to the press indicated a personal interest in the case warranting disqualification because they "creat[ed] a reasonable possibility the prosecutor may not act in an evenhanded manner") (internal quotation omitted); *State v. Hohman*, 420 A.2d 852, 854-55 (Vt. 1980) (noting that it was error for the trial court not to disqualify prosecutor on the basis of his advertisement stating that he would obtain a second conviction against a defendant on his retrial, and holding that "[t]he awesome power to prosecute ought never to be manipulated for personal or political profit").

Even before making appearances on the television circuit, Mr. Martinez was in a dubious position regarding a conflict of interest in participating in the post-conviction relief proceeding relating to a conviction he obtained as prosecutor:

> The prosecutor's personal "conviction" in obtaining a "conviction" ordinarily is an asset to the prosecutor and the community—when the prosecutor gets it right.  When the prosecutor gets it wrong and, consequently, an innocent (or at least a less-guilty) person is in prison, however, the prosecutor will likely be asked to reconsider the conviction.  When other lawyers are asked to turn against their own work, they typically must tell the client to obtain another lawyer.  Their obligation to their former client—and to themselves—prohibits them from pursuing the matter.  After a transactional attorney drafts a contract, for example, she cannot later challenge the contract on behalf of another client or herself. . . . In a similar vein, criminal defense (and other) attorneys generally cannot represent clients when (1) the attorneys' conduct or work product is in issue or (2) a significant incentive exists for the attorneys to soft-pedal the clients' claims to avoid liability.  Prosecutors, however, are special in this regard. . . .
>
> . . . "Justice" is always the prosecutor's (means and) ends, and if justice now calls for the opposite result (e.g., an exoneration), the prosecutor must pursue it. . . .
>
> The serious conflict is between justice and the prosecutor's personal interest.  The prosecutor has an interest, however subconscious or short-sighted, in not attacking her previous work product.  She (and her office)

{00102631.1 }

10

spent months or years advocating positions and filing documents seeking to secure the person's conviction.  It creates a significant conflict of interest to ask that prosecutor, and arguably even that office, to undo it.

Keith Swisher, *Prosecutorial Conflicts of Interest in Post-Conviction Practice*, 41 Hofstra L. Rev. 181, 184-88 (2013) (internal footnotes omitted).

Here, Mr. Martinez has volunteered his own personal interest in the case.  By appearing on television programs while the post-conviction relief investigation was ongoing and asserting his personal beliefs regarding Ms. Andriano's motives, character, and guilt, he has demonstrated an inability (if not unwillingness) to serve as an impartial and fair-minded advocate for justice in this matter—particularly if justice requires him to seek to overturn the very death sentence he pursued and obtained.  Even if Mr. Martinez could plausibly assert that he is capable of evenhanded consideration of the claims and evidence in this proceeding, his public statements give rise to an impermissible "appearance of unfairness" that renders disqualification appropriate.  *Latigue*, 108 Ariz. at 523.

### C.    Mr. Martinez Should Be Disqualified Because There Is A Risk That He Will Become A Necessary Witness And/Or Provide Unsworn Testimony In His Questioning And Argument

Ultimately, the Petition for Post-Conviction Relief focuses upon what was presented (and not presented) during the sentencing phase of Ms. Andriano's trial, and contentions that her defense counsel failed to rebut.  As the sole prosecutor for the State, Mr. Martinez played a key role in those events:  he hammered theories of Ms. Andriano's culpability that defense counsel could have answered had they conducted an appropriate investigation of mitigating circumstances.

Now, if permitted to serve as trial counsel in the evidentiary hearing, Mr. Martinez would be in the unconventional position of cross-examining his prior trial adversaries regarding their performance in the very case that he prosecuted.  That unusual posture is fraught with the risk that he will inject his own testimony into his questioning of those

{00102631.1 }

11

witnesses.  Say, for example, Mr. Martinez disagrees with the recollection of one of his

former adversaries regarding the content of a pre-trial witness interview in his office, or

the opinion of an expert regarding the effect that certain evidence would have had upon

the jury.  Though he is expressly prohibited from asserting personal knowledge of the

facts or stating his personal opinions regarding the case, Ariz. R. Prof. Conduct ER

3.4(e), his known direct involvement in the underlying proceedings at issue mean that

any disagreements he expresses regarding the facts or opinions of witnesses will

presumably be derived from his personal knowledge of the case.  In other words, rather

than asserting disagreements based on the evidence of record, there is a risk that Mr.

Martinez will assert disagreements with the testimony based on his personal recollections

and opinions regarding this case, its history, and the performance of defense counsel.

Courts are required to guard against that risk.  *See United States v. Prantil*, 764

F.2d 548, 552 (9th Cir. 1985) (prejudicial error for court not to disqualify prosecutor who

was a witness to the fugitive-harboring count at issue, and whose remarks during trial

reaffirmed his "role as a witness in the case without cross-examination, because they

appeared to be, in the way they were framed, assertions of personal knowledge based on

his dealings" with the fugitive who was harbored).  If Mr. Martinez is permitted to assert

his personal disagreement based on his recollection of the case and the opinions he

formed regarding the jury, then he will have made testimonial statements that Ms.

Andriano's counsel must have the opportunity to cross-examine.  *See State v. Salcido*,

140 Ariz. 342, 344, 681 P.2d 925 (Ct. App. 1984) ("A lawyer is prohibited, both by

judicial precedent and by the canons of ethics, from asserting his personal knowledge of

the facts in issue before a tribunal, unless he is testifying as a witness."); Ariz. R. Evid.

611(b) ("A witness may be cross-examined on any relevant matter.").  In that event, Mr.

Martinez will have made himself a necessary witness at the hearing.

Under Arizona Rule of Professional Conduct ER 3.7(a),

A lawyer shall not act as advocate at a trial in which the lawyer is likely to
be a necessary witness unless:  (1) the testimony relates to an uncontested

{00102631.1 }

12

issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client.

This rule prevents confusion regarding the nature of a lawyer's statements: "A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof." Ariz. R. Prof. Conduct ER 3.7 cmt. 2.

Mr. Martinez has previously blurred the distinction between advocacy and testimony before in this matter (Mem. in Support of Petition, at 66-68 ; Reply in Support of Petition, at 20-22), and this evidentiary hearing will present several new opportunities to do so again. But even if Mr. Martinez intends to merely comment on the evidence, the fact that he previously served as trial counsel and was an eyewitness to some aspects of defense counsel's ineffective assistance will create the natural assumption that his commentary is informed and supported by his personal knowledge. Cross-examination of Mr. Martinez may be necessary to combat that assumption.

In sum, Mr. Martinez is not now a necessary witness, but his participation in the evidentiary hearing risks making him one. There is no need to undertake that risk, which would further complicate the hearing and potentially require the State to find new counsel mid-hearing.

**D.   In The Alternative, Mr. Martinez Should Be Precluded From Making Testimonial Statements, Giving Opinion Testimony, Or Otherwise Implying Personal Knowledge.**

In the alternative, and at a minimum, this Court should bar Mr. Martinez from asserting or implying personal knowledge or personal opinions at the evidentiary hearing in this matter. "In criminal cases, a prosecutor has a special obligation to avoid 'improper suggestions, insinuations, and especially assertions of personal knowledge.'" *State v. Salcido*, 140 Ariz. at 344 (quoting *Berger v. United States*, 295 U.S. 78, 88

{00102631.1 }                               13

4826-0078-9267.

(1935).  Mr. Martinez may well possess personal knowledge regarding the facts and his own opinions about trial counsel's performance.  But having opted to sit at counsel table rather than a witness's chair, Mr. Martinez is not permitted to share that personal knowledge at the hearing.  *Id.*; Ariz. R. Prof. Conduct ER 3.4(e) ("A lawyer shall not . . . assert personal knowledge of facts in issue expect when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, . . . or the guilt or innocence of an accused.").

## III.     CONCLUSION

The State is inviting error in these proceedings by choosing to proceed with Mr. Martinez as its counsel at the evidentiary hearings.  This Court need not suffer the risk of unfairness that his participation would entail.  Disqualifying him now would not cause any hardship for the State, as it does not appear that Mr. Martinez has yet commenced material work in preparation for the evidentiary hearing.

For the foregoing reasons, this Court should disqualify Deputy County Attorney Juan Martinez from serving as counsel for the State in this post-conviction relief proceeding.  If his participation is permitted, he should be precluded from asserting or implying personal knowledge of facts and circumstances that will be the subject of testimony at the evidentiary hearing.

{00102631.1 }

14

4826-0078-9267.

DATE:  September 3, 2013

By: /s/ Scott M. Bennett_____
Scott M. Bennett (022350)
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (Office)
(608) 258-4258 (Fax)

*Attorneys For Petitioner Wendi Andriano*

ORIGINAL filed September 3, 2013, with:

Judge Brian Ishikawa
Maricopa County Superior Court
1810 S. Lewis St.
Mesa, AZ  85210-6235


COPY mailed and emailed September 3, 2013 to:

Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tucson, AZ  85701-1367

*Attorney for the State of Arizona*


/s/ Tina Johannesen_____

{00102631.1 }

15

4826-0078-9267.

1   Scott M. Bennett (Bar No. 022350)
2   COPPERSMITH SCHERMER & BROCKELMAN PLC
    2800 North Central Avenue
3   Phoenix, Arizona  85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
5   sbennett@csblaw.com

6   Allen A. Arntsen, admitted *pro hac vice*
7   Matthew R. Lynch, admitted *pro hac vice*
    FOLEY & LARDNER LLP
8   150 E. Gilman Street
    Madison, WI 53703-1481
9   (608) 257-5035 (office)
10  (608) 258-4258 (fax)

11  *Attorneys For Petitioner Wendi Andriano*

12

13                    SUPERIOR COURT OF ARIZONA
                        COUNTY OF MARICOPA
14

15  STATE OF ARIZONA                    )   CASE NO: CR2000-096032-A
                                        )
16           RESPONDENT,                )
                                        )   **AFFIDAVIT OF MATTHEW R. LYNCH IN**
17      V.                              )   **SUPPORT OF MOTION TO DISQUALIFY**
                                        )   **PROSECUTOR JUAN MARTINEZ FROM**
18  WENDI ELIZABETH ANDRIANO            )   **PARTICIPATING AS PCR COUNSEL AT THE**
                                        )   **EVIDENTIARY HEARING, OR IN THE**
19           PETITIONER.                )   **ALTERNATIVE, MOTION IN LIMINE TO**
                                        )   **PRECLUDE HIM FROM ASSERTING**
20                                          **PERSONAL KNOWLEDGE**

21  _____

22  STATE OF WISCONSIN    )
                          )    SS.
23  COUNTY OF DANE        )

24          MATTHEW R. LYNCH, being first duly sworn upon oath deposes and

25  states:

26          1.      I am an attorney with Foley & Lardner LLP, and one of the attorneys

27  of record for Petitioner.  I have personal knowledge of the matters stated below.

                                        1
28

1       2.     During the pendency of this post-conviction relief proceeding, two

2  "true crime" programs aired on cable television that featured Petitioner's case: (1) a June

3

4  2, 2011 episode of the Oxygen Network's *Snapped: Women Who Kill*; and (2) a

5  September 9, 2011 episode of the Investigation Discovery network's *Deadly Women*,

6  which contains a mix of interviews and dramatizations of the supposed events. Each of

7  the above-referenced episodes has aired multiple times since the original airing dates

8

9  noted above, and both are available for viewing online and download from iTunes and

10  Amazon.

11       3.     I knew of these programs because Petitioner's counsel and/or

12  witnesses associated with Petitioner's claim were contacted with requests to appear on

13

14  those programs. Because this post-conviction relief matter is ongoing, Petitioner's

15  counsel declined all such requests and asked witnesses associated with Petitioner's claim

16  to do the same.

17       4.     Deputy County Attorney Juan Martinez appeared on both programs

18  and spoke regarding Petitioner's case. In *Deadly Women*, he made the following

19

20  comments, among others:

21        -   Speaking regarding Wendi's relationship with her husband: "She had a

22            goal that he was not going to clutter her life. And he loved her."

23

24        -   "Ms. Andriano was noted for going out to bars and clubs. She would

25            engage herself, if you will, with some of the men that she met."

26

27

28                        2

4844-3881-1925.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- "It was difficult to understand why should would prefer to carouse with other men while her husband was at home, terminally ill."

- "The fact that she attempted to get this other life insurance was just an indication of how greedy she really was."

- "She heated some soup on the stove and replaced the medication with sodium azide, and had given him that."

- "She grabbed one of the kitchen knives that were there.  And in the area where the cancer actually started, she stuck that in the side of his neck."

In *Snapped*, he made the following comments, among others:

- "At the time of the killing she was blonde, she had short hair, and just generally appeared to be much younger than the individual who presented in court, who had long dark hair, was wearing glass, as if she were a librarian."

- "What she decided to do was to buy some poison."

- "After she purchased the sodium azide, she decided to poison him, and she administered the poison."

- "Ms. Andriano testified that in this very tender moment, that she decided to tell him the truth."

- "The fact that perhaps she had assisted his suicide absolutely required her to take the stand."

3

4844-3881-1925.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- "My cross-examination of her took a number of days.  She at times was very combative with me, other times, she would refuse to answer the question directly, and other times, she had problems, if you will, keeping her facts straight."

- "She bludgeoned him, struck him over the head many many times, and then she delivered the coup de grace by sticking a knife in his neck."

DATED this 3rd day of September, 2013.

_____

Matthew R. Lynch

Subscribed and sworn to before me
this 3rd day of September, 2013.

_____
Notary Public, State of Wisconsin.
My Commission: (expires 7·27·2014

4

AFFIDAVIT OF MATTHEW R. LYNCH IN SUPPORT OF MOTION TO PRECLUDE JUAN MARTINEZ TO
PARTICIPATE AS PCR COUNSEL
CASE NO. CR2000-096032-A

4844-3881-1925.

# EXHIBIT ZZZZZZZ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
09/06/2013 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      09/04/2013


                                          CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                     M. Postert
                                                 Deputy



STATE OF ARIZONA                    LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)        JAMES J BELANGER
                                    SCOTT M BENNETT
                                    ALLEN A ARNTSEN
                                    MATTHEW R LYNCH
                                    JAMES LEO LOGAN

                                    APPEALS-PCR
                                    CAPITAL CASE MANAGER
                                    COURT ADMIN-CRIMINAL-PCR
                                    COURT REPORTER ADMINISTRATOR
                                    OFFICE OF PUBLIC DEFENSE
                                    SERVICES-CCC




                            MINUTE ENTRY


        The Court has received and considered the Uncontested Motion to Expand Time for
Evidentiary Hearing electronically filed on 08-20-13.

        The Court's judicial assistant has conferred with counsel about additional dates.

        IT IS ORDERED:

            •   Granting the Uncontested Motion to Expand Time for Evidentiary Hearing
                electronically filed on 08-20-13.


Docket Code 023                     Form R000A                              Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      09/04/2013

- Affirming the previously scheduled Evidentiary Hearing dates set for 02-03-14, 02-04-14, 02-05-14, 02-06-14 and 02-07-14 from 8:30 a.m. to 12:00 p.m. and from 1:30 p.m. to 5:00 p.m.

- Expanding the time for the Evidentiary Hearing with the additional dates of 02-10-14, 02-11-14, 02-12-14, 02-13-14, and 02-14-14 from 8:30 a.m. to 12:00 p.m. and from 1:30 p.m. to 5:00 p.m.

- The defendant shall be present in person at the Evidentiary Hearing. Securing the attendance of the defendant for the Evidentiary Hearing will be discussed at the Status Conference.

- Affirming the Status Conference on 10-11-13 at 1:30 p.m.  The parties may appear telephonically at the status conference by contacting the division at (602) 506-5225.  Pursuant to Rule 32.7, the defendant need not be present at the status conference as she is represented by counsel.

- A court reporter be present at the Status Conference on 10-11-13 and the Evidentiary Hearing on 02-03-14 through 02-14-14.

DATED this 4th day of September, 2013.


_____
Honorable Brian K. Ishikawa
Judge of the Superior Court

# EXHIBIT AAAAAAA

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
L. Landeros, Deputy
9/18/2013 1:50:12 PM
Filing ID 5454449

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA  85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
CADOCKET.@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR PLAINTIFF

# SUPERIOR COURT OF ARIZONA

# IN AND FOR THE COUNTY OF MARICOPA

|  |  |
|---|---|
| STATE OF ARIZONA,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>WENDI ELIZABETH ANDRIANO,<br><br>　　　　　Defendant. | No. CR2000-096032-A<br><br>RESPONSE TO MOTION TO DISQUALIFY JUAN MARTINEZ AS COUNSEL FOR THE STATE.<br><br>　(Honorable Brian Ishikawa)<br><br>**[DEATH PENALTY CASE]** |

Defendant Wendi Andriano has moved to disqualify Deputy Maricopa County Attorney Juan Martinez as counsel for the State for the upcoming post-conviction relief hearing.  For the reasons stated in the following memorandum of points and authorities, this Court should deny Andriano's motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

Several months ago, the Attorney General's Office disclosed to Andriano's counsel that Deputy Maricopa County Attorney Juan Martinez, who represented the State during Andriano's guilt and sentencing trials, would, along with undersigned counsel, represent the State at the upcoming post-conviction relief ("PCR") evidentiary hearing. Andriano subsequently filed the present motion to disqualify Mr. Martinez ("Motion"), citing his appearances approximately 2 years ago on two true-crime television programs (*Snapped: Women who Kill* ("*Snapped*") and *Deadly Women*), in which he discussed this case. Andriano contends that, given these appearances, Mr. Martinez cannot ethically represent the State in the present proceeding. Andriano's motion is a thinly-veiled and inappropriate effort to dictate the State's representation in this manner. This Court should reject that effort and deny her motion.

"The Arizona Supreme Court has cautioned that a party should not be allowed to interfere with her opponent's attorney-client relationship except 'in extreme circumstances,' thereby putting the burden on [the party seeking disqualification] to show sufficient reason why the [attorney] should be disqualified." *Villalpando v. Reagan*, 211 Ariz. 305, 308, ¶ 10, 121 P.3d 172, 176 (App. 2005) (quoting *Alexander v. Superior Court*, 141 Ariz. 157, 161, 685 P.2d 1309, 1313 (1984)). The court "also has advised to 'view with suspicion' motions by opposing counsel to disqualify a party's attorney based upon his conflict of interest or appearance of impropriety." *Villalpando*, 211 Ariz. at 309–10, ¶ 10,

121 P.3d at 175–76 (quoting *Gomez v. Superior Court*, 149 Ariz. 223, 226, 717 P.2d 902, 905 (1986)).   "[I]t has … been long recognized that because every litigant has the *right* to the counsel of its choice a party should not be allowed to disqualify opposing counsel for mere strategic or tactical reasons." *Sec. Gen. Life Ins. Co. v. Superior Court*, 149 Ariz. 332, 335, 718 P.2d 985, 988 (1986).   And "[i]n matters of disqualification, '[w]henever possible the courts should endeavor to reach a solution that is least burdensome upon the client.'" *Sellers v. Superior Court*, 154 Ariz. 281, 285, 742 P.2d 292, 296 (App. 1987) (quoting *Alexander*, 141 Ariz. at 161, 685 P.2d at 1313).

Arizona courts have viewed with disapproval a party's use of the Arizona Rules of Professional Conduct as a basis to disqualify opposing counsel.   Although they can provide important guidance, "the rules of professional responsibility are for ethical enforcement and are not designed to be used as a means to disqualify counsel." *Amparano v. ASARCO, Inc.*, 208 Ariz. 370, 376, ¶ 22, 93 P.3d 1086, 1092 (App. 2004).   In fact, the preamble to the Arizona Rules of Professional Conduct "states that a violation of an ethical rule 'does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation,' and warns that 'the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons.'" *Id.* (quoting Ariz. R. Sup. Ct. 42, Pmbl. ¶ 20); *accord Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement and Power Dist.*, 801 F.Supp.2d 929, 944 (D. Ariz. 2011); *see also In re County of Los Angeles*, 223 F.3d 990, 996 (9th Cir. 2000) ("A motion to

disqualify a law firm can be a powerful litigation tactic to deny an opposing party's counsel of choice.").

### A. *Mr. Martinez has violated no ethical rule and there is no reason to disqualify him.*

Andriano seeks to disqualify Mr. Martinez under several Arizona Rules of Professional Conduct, principles of due process, and this Court's "inherent authority." (Motion, at 1–13.) As set forth above, Andriano has the burden of showing that disqualification is appropriate, and this Court should view her motion with strong suspicion. Andriano has not met her burden.

Andriano first contends that Mr. Martinez violated Ethical Rule 3.6 by appearing on *Snapped* and *Deadly Women*. (*Id.* at 8–9.) Rule 3.6, however, expressly governs *trial* publicity. Ariz. R. Sup. Ct. 42, ER 3.6(a). It prohibits a lawyer from making "an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." *Id.* The Rule's comments make clear that it is intended primarily to protect a defendant's right to a fair trial. *See* Ariz. R. Sup. Ct. 42, ER 3.6, 2003 Cmt. ¶¶ 1 (referring repeatedly to need to balance the *right to a fair trial* with freedom of expression), 6 (noting that, while speech may still be limited, "[n]on-jury hearings and arbitration may be even less affected" in a prejudicial manner by extrajudicial speech). And the rule enumerates several exceptions, one of which permits a lawyer to discuss "information contained in a public record." Ariz. R. Sup. Ct. 42, ER 3.6(b)(2).

4

Mr. Martinez's comments on *Snapped* and *Deadly Women* did not violate Rule 3.6.  Andriano had already been convicted and sentenced when Mr. Martinez appeared on these programs, and his comments thus could not have prejudiced her right to a fair trial.  And, at the time the programs aired, Andriano had not yet filed her PCR petition.  Although the parties were appearing for regular status conferences to address scheduling matters, the Attorney General's Office represented the State in these matters.  Further, on each of the programs in question, Mr. Martinez simply described the trial evidence in a manner consistent with the arguments he presented and the reasonable inferences he drew at trial.  (*See* Motion, at Lynch Affidavit (describing comments on *Snapped* and *Deadly Women*)).  The evidence presented at Andriano's trial was public record, and Mr. Martinez was free to discuss it.  *See* Ariz. R. Sup. Ct. 42, ER 3.6(b)(2).

Andriano next argues that Mr. Martinez violated Ethical Rule 3.8(f), which generally precludes a prosecutor from "making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused." (Motion, at 8–9.)  Ariz. R. Sup. Ct. 42, ER 3.8(f).  However, Rule 3.8(f) does not restrict statements otherwise permitted under Rule 3.6(b).  *See* Ariz. R. Sup. Ct. 3.8, 2003 Cmt. ¶ 5.  As previously argued, Mr. Martinez's comments were permissible under that rule.  And, Mr. Martinez's comments were not likely to heighten public condemnation of Andriano:  he simply stated his theory of the case, which he had already presented—successfully—in open court.  Further, the

forthcoming evidentiary hearing will take place before this Court, not before a jury. This Court is unlikely to be influenced by Mr. Martinez's statements.

Andriano also contends that Mr. Martinez's statements conflicted with his prosecutorial duties and placed him "in a position adverse to the State." (Motion, at 9.) She further argues that Mr. Martinez "demonstrated a personal interest in upholding" her conviction. (*Id.* at 10.) Andriano is incorrect. Mr. Martinez's comments on *Snapped* and *Deadly Women* were reasonable inferences from the trial evidence, and consistent with the arguments he made to the jury. He displayed no personal investment in ensuring Andriano remain incarcerated under a death sentence.

Finally, Andriano suggests that Mr. Martinez may prove to be a necessary witness at the PCR hearing given his knowledge of events outside the record, and argues that his continued representation *could* violate Ethical Rule 3.7, which precludes a lawyer from acting as both an advocate and a witness.[1] (Motion, at 11–13.) Andriano also fears that Mr. Martinez could inject into the PCR hearing his "personal knowledge of the facts" or state "his personal opinions regarding the case," and thus violate Ethical Rule 3.4(e). (*Id.*) Andriano's concerns are premature and unlikely to arise. In fact, the various county attorneys' offices

---

[1] Ironically, Andriano supports her motion to disqualify Mr. Martinez for his purported ethical violations with an affidavit from one of her present attorneys. *See* Ariz. R. Sup. Ct. 42, ER 3.7.

typically represent the State in non-capital PCR proceedings, as the Attorney General's Office is not statutorily required to do so.

Here, neither party has disclosed Mr. Martinez as a witness.  This Court has denied all claims relating to his alleged misconduct, and his testimony is not likely to be relevant to the ineffective-assistance-of-counsel claims currently at issue. *See State v. Tuzon*, 118 Ariz. 205, 208, 575 P.2d 1231, 1234 (1978) ("Calling a prosecutor as a witness for the defendant inevitably confuses the distinctions between advocate and witness, argument and testimony, and should be permitted only if required by a compelling need."); *State v. Howard*, 27 Ariz. App. 339, 341–43, 554 P.2d 1282, 1284–86 (1976) (finding motion to strike prosecutor because he might be called as a witness premature and recognizing, "Although a prosecutor, when he finds it necessary to testify on behalf of the prosecution, should withdraw, he has no such duty when called on behalf of the defendant").  If Mr. Martinez's testimony becomes necessary, he can withdraw as counsel and the Attorney General's Office can represent the State exclusively.  If Mr. Martinez attempts to inject his personal knowledge into the proceeding in a manner Andriano deems improper, her counsel may object.  But these circumstances have not arisen, and speculation that they may present themselves is insufficient to justify disqualifying the State's counsel.

….

….

….

7

**B. *The* Alexander *factors weigh against disqualifying Mr. Martinez.***

In the context of requests to disqualify an attorney based on an appearance of impropriety, the Arizona Supreme Court has set forth four factors for courts to consider:

> (1) whether the motion is being made for the purposes of harassing the [opposing party], (2) whether the party bringing the motion will be damaged in some way if the motion is not granted; (3) whether there are any alternative solutions, or is the proposed solution the least damaging possible under the circumstances, and (4) whether the possibility of public suspicion will outweigh any benefits that might accrue due to continued representation.

*Alexander*, 141 Ariz. at 165, 685 P.2d at 1317.   Although Andriano seeks disqualification based on perceived ethical violations and not based on an appearance of impropriety, these factors are nonetheless instructive here.   *See Gomez*, 149 Ariz. at 226, 717 P.2d at 905(applying *Alexander* factors to motion to disqualify counsel based on conflict of interest).

Although Andriano has not brought her motion for purposes of harassing the State, it is nonetheless legally and factually unsupported, as set forth above.  And she has failed to show how she would "be damaged … if the motion is not granted." *Alexander*, 141 Ariz. at 165, 685 P.2d at 1317.  As stated above, this Court—not a jury—will be the factfinder in the upcoming hearing, and will presumably be unaffected by Mr. Martinez's public statements.  *See* Ariz. R. Sup. Ct. 42, ER 3.6, 2003 Cmt. ¶ 6.  And disqualification is not the least damaging possibility available:  Andriano's alternative solution of an *in limine* order directed

toward Mr. Martinez—while still inappropriate, *see infra*—would have less of a negative impact.

The fourth *Alexander* factor—whether the possibility of public suspicion will outweigh any benefits from continued representation—weighs heavily against disqualifying Mr. Martinez.  Andriano "appears to be using disqualification as a tactical tool," which "can only promote general public suspicion of the legal profession." *Alexander*, 141 Ariz. at 165–66, 685 P.2d at 1317–18.  Mr. Martinez has successfully obtained a conviction and death sentence against Andriano.  He has demonstrated his effectiveness in cross-examining her and her witnesses, some of whom are expected to testify again at the forthcoming evidentiary hearing.  Viewing it with the appropriate suspicion, *see Gomez*, 149 Ariz. at 226, 717 P.2d at 905, Andriano's motion appears geared toward gaining a strategic advantage in the upcoming hearing, which will certainly heighten public suspicion of the profession.

Conversely, Mr. Martinez's participation in this matter will benefit the proceeding in several respects.  While undersigned counsel, who has represented the State in this matter since 2009, is familiar with the case, Mr. Martinez is perhaps even more so.  Mr. Martinez prosecuted Andriano and is consequently familiar with the investigation undertaken and any extra-record evidence developed.  Additionally, the trial file is in his possession, not undersigned counsel's.  Mr. Martinez's involvement will thus promote judicial economy.  *See Alexander*, 141 Ariz. at 166, 685 P.2d at 1318 (noting that continued representation

by "an attorney familiar with the case" would "save money and avoid delay," and stating, "By allowing the attorneys who are most knowledgeable about the case to continue to represent the [party], delay can be avoided and the interest of the State expedited.").   This Court should deny Andriano's motion to disqualify Mr. Martinez.

## C. *There is no need for an order restricting Mr. Martinez from relying on his personal knowledge.*

In the alternative, Andriano asks this Court to enter an order precluding Mr. Martinez from "asserting or implying personal knowledge or personal opinions" at the PCR hearing.   (Motion, at 13–14.)   Andriano cites no authority for such an order, and it is unnecessary here.   Mr. Martinez is an experienced attorney and well aware of the ethical rules and the contours of proper questioning.   If, in Andriano's view, Mr. Martinez crosses these boundaries, her counsel may object and this Court will undoubtedly take appropriate corrective action.   Unless and until such events occur, this Court need not enter the order Andriano requests.

## D. *Conclusion.*

For the reasons set forth above, Mr. Martinez has violated no ethical rule. Further, Andriano's speculation that Mr. Martinez may become a necessary witness or may inject his personal knowledge or opinions into the hearing in an improper fashion, is not a sufficient basis for disqualification.   This Court should deny Andriano's motion to disqualify Mr. Martinez, and her alternative request for an *in limine* order precluding him from expressing his opinions or revealing matters within his knowledge at the upcoming evidentiary hearing.

RESPECTFULLY SUBMITTED this 18th day of September, 2013.

Thomas C. Horne
Attorney General
(Firm State Bar No. 14000)

Jeffrey A. Zick
Chief Counsel


/s/
Lacey Stover Gard
Assistant Attorney General
Capital Litigation Section
400 West Congress, Bldg. S-315
Tucson, Arizona 85701
Telephone:  (520) 628–6520
Lacey.gard@azag.gov
cadocket@azag.gov
State Bar Number 22714
(Counsel for Plaintiff)

11

## CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2013, I filed the foregoing with the Clerk of the Court for the Maricopa County Superior Court. A courtesy copy of the foregoing is being delivered through electronic means or deposited for mailing to:

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

/s/_____
N. Kopf


3115829

# EXHIBIT BBBBBBB

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
10/1/2013 11:49:24 AM
Filing ID 5476223

Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com
*Attorneys for Petitioner Wendi Elizabeth Andriano*

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | ) |
| | ) |
| Respondent, | )   No. CR2000-096032-A |
| | ) |
| vs. | )   **MOTION TO ASSOCIATE** |
| | )   **COUNSEL *PRO HAC VICE*** |
| Wendi Elizabeth Andriano, | ) |
| | )   (The Honorable Brian Ishikawa) |
| Petitioner. | ) |
| | ) |

Scott Bennett of Coppersmith Schermer & Brockleman PLC, pursuant to Rule

38(e), Ariz. R. Sup. Ct., moves the Court to associate Jodi K. Fox of Foley & Lardner LLP

as counsel *pro hac vice* in this action.  In support of this motion and pursuant to Rule

38(a)(3)(C), the following original documents are attached:

      1.      Verified application to Appear Pro Hac Vice;

      2.      Certificate(s) of Good Standing; and

      3.      State Bar of Arizona Notice of Receipt of Complete Application.

Scott Bennett hereby agrees to serve as local counsel in this matter and accepts the

responsibilities detailed in Rule 39(a)(2), Ariz. R. Sup. Ct.

{00103988.1 }

RESPECTFULLY SUBMITTED on October 1, 2013.

COPPERSMITH SCHERMER &
BROCKELMAN PLC

By: */s/ Scott M. Bennett* _____
         Scott M. Bennett
         2800 North Central Avenue, Suite 1200
         Phoenix, Arizona 85004
         *Attorneys for Petitioner*

ORIGINAL e-filed with the Clerk of the Court
on October 1, 2013.

COPY hand-delivered on October 1, 2013 to:

The Honorable Brian Ishikawa
Maricopa County Superior Court
Southeast – Juvenile
1810 S. Lewis, #1114
Mesa, AZ  85210

COPY mailed on October 1, 2013 to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona  85701-1367
*Attorneys for the State of Arizona*

*/s/ Carol Keesee* _____

# EXHIBIT 1



STATE BAR OF ARIZONA

| For Official Use Only |
| App# |
| Bar Number# |

Attn: Pro Hac Vice Dept
PO Box 53099
Phoenix, AZ 85072-3099
Phone: 602-340-7239

## Application for Appearance Pro Hac Vice

**PART I: Applicant Information**

Name of Applicant:_____Jodi K. Fox

Firm/Company Name:____Foley & Lardner LLP

Office Address:_____150 E. Gilman Street, P.O. Box 1497, Madison, WI 53701-1497

Telephone:_____(608) 258-4275_____Fax:____(608) 258-4258_____Email Address:__jkfox@foley.com

Residence Address:_____1829 Van Hise Ave., Apt. 3, Madison, WI  53726

Title of cause or case where applicant seeks to appear:_____State of Arizona v. Wendi Elizabeth Andriano

Docket Number: _____2000-096032

Court, Board, or Administrative Agency: Maricopa County Supreme Court of Arizona

Party on whose behalf applicant seeks to appear:_____Wendi Elizabeth Andriano

**Pursuant to Arizona Supreme Court Rule 38(i)(3), the applicant shall complete the information below:**

| Courts to Which Applicant Has Been Admitted: *(Attach additional pages if needed)* | Date of Admission: | Bar Number: |
|---|---|---|
| Wisconsin State Courts | 4/8/2011 | 1083773 |
| Western District of Wisconsin | 5/17/2011 | |
| Eastern District of Wisconsin | 5/17/2011 | |
| Seventh Circuit Court of Appeals | 2/24/12 | |
| Illinois State Courts | 11/8/2007 | 6293467 |
| N.D. Illinois | 12/12/07 | |

☑ Applicant is a member in good standing in such courts.

☑ Applicant is not currently disbarred or suspended in any court.

Applicant ☐ is / ☒ is not **(select one)** currently subject to any pending disciplinary proceeding or investigation by any court, agency or organization authorized to discipline attorneys at law.

In the preceding three (3) years, applicant has filed applications to appear as counsel under AZ ST S.Ct., Rule 38(a) in the following:

| Title of Matter: | Docket #: | Court or Agency: | App Granted? (Y/N) |
|---|---|---|---|
| | | | |
| | | | |

This case or cause ☐ is / ☒ is not **(select one)** a related or consolidated matter for which applicant has previously applied to appear pro hac vice in Arizona. If this matter is a related or consolidated with any previous application, Applicant certifies that he/she will review and comply with appropriate rules of procedure as required in the underlying cause.

If applicable, please provide related or consolidated matter application or docket#_____

## PART II: Local Counsel Information

Name of Arizona Local Counsel: _____ Scott M. Bennett

State Bar of Arizona Number: __022350__

Address: ~~40 N. Central Avenue, Suite 1900, Phoenix, AZ 85004-4429~~ 2800 N. Central Ave., Suite 1200
Phoenix, AZ   85004

Telephone: __(602) ~~262-5338~~ 381-5476__ Fax: __(602) ~~734-3816~~ 224-6020__ Email Address: __~~sbennett@lrlaw.com~~__
sbennett@csblaw.com

☑ Local Counsel is a member in good standing.

☑ Local Counsel associating with a nonresident attorney in a particular cause shall accept joint responsibility with the nonresident attorney to the client, to opposing parties and counsel, and to court, board, or administrative agency in that particular cause.

## PART III: Parties and Certification

Name(s) of each party in this cause and name and address of all counsel of record:

| Party: | Counsel of Record: | Address: |
|---|---|---|
| Wendi Andriano | Scott M. Bennett | 40 N. Central Ave., Phoenix, AZ 85004 |
| Wendi Andriano | Todd E. Hale | 40 N. Central Ave., Phoenix, AZ 85004 |
| State of Arizona | Juan M. Martinez | 301 W. Jefferson, Phoenix, AZ 85003 |
| State of Arizona | Lacey Stover Gard | 400 W. Congress, Tucson, AZ 85701 |

☒ Applicant is including with this application a nonrefundable application fee, payable to the State Bar of Arizona, in the amount of $460.00. Fifteen percent of the non-refundable application fee paid pursuant to this section shall be deposited into a civil legal services fund to be distributed by the Arizona Foundation for Legal Services and Education entirely to approved legal services organizations, as that term is defined in subparagraph (f) of this rule.

☐ Applicant is furnishing a certificate from the state bar or from the clerk of the highest admitting court of each state, territory, or insular possession of the United States in which the nonresident attorney has been admitted to practice law certifying the nonresident attorney's date of admission to such jurisdiction and the current status of the nonresident attorney's membership or eligibility to practice therein. The certificate furnished shall be no more than forty-five (45) days old.

Applicant certifies the following:

1. Applicant shall be subject to the jurisdiction of the courts and agencies of the State of Arizona and to the State Bar of Arizona with respect to the law of this state governing the conduct of attorneys to the same extent as an active member of the State Bar of Arizona, as provided in Rule 46(b) Rules of the Supreme Court.
2. Applicant will review and comply with appropriate rules of procedure as required in the underlying cause.
3. Applicant understands and shall comply with the standards of conduct required of members of the State Bar of Arizona.

## Verification

STATE OF _____ Wisconsin _____ )

County of _____ Dane _____ ) ss.

I, ____ Jodi K. Fox ____, swear that all statements in the application are true, correct and complete to the best of my knowledge and belief.

Dated: __6-14-13__          Applicant's Signature: _____

SUBSCRIBED AND SWORN TO before me this 14th day of June, 20 13, by

____ Jodi K. Fox ____.
Name of Applicant

Patricia M Wright
Notary Public

Commission expires: 7/14/13

# EXHIBIT 2



Diane M. Fremgen
Clerk

**WISCONSIN SUPREME COURT**

OFFICE OF THE CLERK

110 E. Main Street, Suite 215
P.O. Box 1688
Madison, WI 53701-1688

Telephone: 608-266-1880
TTY: 800-947-3529
Fax: 608-267-0640
http://www.wicourts.gov

# *CERTIFICATE OF GOOD STANDING*

*I, Christopher J. Paulsen, Chief Deputy Clerk of the Supreme Court of Wisconsin certify that the records of this office show that:*

*JODI KRISTIN FOX*

*was admitted to practice as an attorney within this state on April 8, 2011 and is presently in good standing in this court.*

*Dated: August 12, 2013*

*CHRISTOPHER J. PAULSEN*
*Chief Deputy Clerk of Supreme Court*

AP-7000, 03/2005 Certificate of Good Standing

# Certificate of Admission
# To the Bar of Illinois

I, Carolyn Taft Grosboll, Clerk of the Supreme Court of Illinois, do hereby certify that

Jodi K. Fox

has been duly licensed and admitted to practice as an Attorney and Counselor of Law within this State; has duly taken the required oath to support the CONSTITUTION OF THE UNITED STATES and of the STATE OF ILLINOIS, and also the oath of office prescribed by law, that said name was entered upon the Roll of Attorneys and Counselors in my office on November 8, 2007 and is in good standing, so far as the records of this office disclose.

In Witness Whereof, I have hereunto
placed my hand and affixed the seal
of said Supreme Court, at Springfield,
in said State, this Monday, August 12, 2013.

*Carolyn Taft Grosboll*

Clerk

# EXHIBIT 3

1

**Supreme Court Of Arizona**

2 | State of Arizona, )
    Plaintiff )
3 | )                    CASE # **2000-096032**
                       )
        v.             )
4 | )                    SBA App #1007727
                       )
    Wendi Elizabeth Andriano, )
5 | Defendant.          )    **NOTICE OF RECEIPT OF**
                       )    **COMPLETE APPLICATION**
6

7 | NOTICE IS HEREBY given by THE STATE BAR OF ARIZONA that it has received the verified application and fee from Jodi Fox.

8 | In addition to this application, applicant has made the following applications to appear pro hac vice, pursuant to Rule38 (a), within the previous three (3) years:

9

10 | Title of Matter        Court/Agency        Date        Granted?

11

12 | Exhibit A, the original verified application and Exhibit B, the original Certificate(s) of Good Standing are attached hereto.

13 | DATED this 21ˢᵗ day of August 2013

14

15 |                                         Mirna Lerma

16 |                                         Resource Center
                                          State Bar of Arizona

17

18 | Original Mailed on this 21ˢᵗ day of August 2013 to:

19 | Scott M Bennett
20 | Coppersmith Schermer & Brockelman PLC
    2800 N Central Ave Ste 1200
21 | Phoenix, AZ 85004-1009

22

23

# EXHIBIT CCCCCCCC

Michael K. Jeanes, Clerk of Court
*** Filed ***

10/21/13-8:00AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/11/2013

                                        CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                    L. Mooney
                                                Deputy


STATE OF ARIZONA                   LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)       SCOTT M BENNETT
                                   ALLEN A ARNTSEN
                                   MATTHEW R LYNCH
                                   JAMES J BELANGER
                                   JODI FOX

                                   APPEALS-PCR
                                   CAPITAL CASE MANAGER
                                   COURT ADMIN-CRIMINAL-PCR


## RULING


        The Court has reviewed the defendant's *Motion to Disqualify Prosecutor Juan Martinez from Participating as PCR counsel at the Evidentiary Hearing, or in the Alternative, Motion in Limine to Preclude Him from Asserting Personal Knowledge*, including the supporting Affidavit of Matthew R. Lynch filed September 3, 2013 ("Motion"), and the State's *Response to Motion to Disqualify Juan Martinez as Counsel for the State* filed September 18, 2013. No reply has been received. These pleadings were filed in connection with the defendant's first Rule 32 proceeding following the Arizona Supreme Court's affirmance of her conviction and death sentence in *State v. Andriano*, 215 Ariz. 497, 161 P.3d 540 (2007).

### BACKGROUND

        The defendant seeks to disqualify the deputy county attorney, who prosecuted the defendant at trial, from participating in the post-conviction proceedings. The defendant claims that because the prosecutor appeared on two cable television programs in 2011 (1) his resumed involvement in the case would violate ethical rules regarding publicity; (2) his voluntary public statements create a

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              10/11/2013

conflict with his duties as a prosecutor; and (3) there is a risk that he will become a necessary witness and/or provide unsworn testimony in his questioning and argument.

Alternatively, the defendant seeks an order directing that the prosecutor be precluded from making testimonial statements, giving opinion testimony, or otherwise implying personal knowledge.

## ETHICAL RULES

Initially, the defendant claims that because the prosecutor appeared on two cable television programs in 2011, and shared his views of the evidence, the defendant's actions, and his continued belief in the guilt of the defendant, that his renewed involvement in the case would violate ethical rules regarding publicity. The defendant cites ER 3.6(a), which is captioned *Trial Publicity* and ER 3.8(f), *Special Responsibilities of a Prosecutor*. Rule 3.8 identifies the interrelationship between the two rules: "Paragraph (f) supplements ER 3.6, which prohibits extrajudicial statements that have a substantial likelihood of prejudicing an adjudicatory proceeding." ER 3.8, Comment 5.

Comment (1) to ER 3.6 makes it clear that the rule is an attempt to strike a balance between the right to free expression and the right to a fair trial, in an attempt to avoid statements that would have a material prejudicial effect on a proceeding. See ER 3.6, Comments 3-6. Comment 6 provides:

> "[A] relevant factor in determining prejudice is the nature of the proceeding involved. Criminal jury trials will be most sensitive to extrajudicial speech. Civil trials may be less sensitive. Non-jury hearings and arbitration proceedings may be even less affected. The Rule will still place limitations on prejudicial comments in these cases, but the likelihood of prejudice may be different depending on the type of proceeding."

AZ ST S CT RULE 42 RPC ER 3.6.

The Court notes that the trial, over which it presided, concluded nearly nine years ago. The Court has scheduled an evidentiary hearing for February 3rd -14th, 2014 to address two of the post-conviction claims made by the defendant. This is a post-trial proceeding, and there is no jury to sway through public opinion.

In the two claims, the defendant has alleged ineffective assistance of trial counsel during the penalty phase of her trial; other claims, including that of prosecutorial misconduct, were summarily dismissed. The Court alone will consider the merits of the ineffective assistance of counsel claims based on the evidence presented and admitted at the lengthy hearing in February.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/11/2013

The evidentiary hearing will be a non-jury proceeding, at which the Court will make findings of fact and conclusions of law in accordance with the evidence. Given the Court's familiarity with the case, with the law and with the Rules of Evidence, it is unlikely that the prosecutor's extra-judicial statements will prejudice the Court.

## DUTIES AS A PROSECUTOR

Next, the defendant claims that because the prosecutor appeared on the two cable television programs in 2011, his voluntary public statements create a conflict of interest with his duties as a prosecutor. The defendant alleges that this prosecutor "...has voluntarily put himself in a position adverse to the State." Motion at 9.

The defendant reminds the Court of the State's obligation "...in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

The Court notes the context of the quotation, which reads:

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

*Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L. Ed. 1314 (1935)

The Court sees neither an actual nor a potential conflict of interest in the prosecutor's renewed representation of the State related to his post-trial comments. The Court notes that the prosecutor's opinions may be strong, may be earnest, may be vigorous, and may be public – but the trial has been completed and the prosecutor is entitled to his opinion.

The Court finds neither conflict of interest nor does it find prejudice. Were there prejudice related to a conflict of interest, it appears to the Court that any prejudice would inure to the detriment of the State rather than the defendant, and could be raised or waived by the State more appropriately than by the defendant. *See* ER 1.7(b).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                   10/11/2013

The Court also notes that the State has made no objection to Mr. Martinez appearing on its behalf and, in fact, supports his assistance and appearance. Response at 2, 9. As the client, the State has the right to choose its counsel. *See Wheat v. United States*, 486 U.S. 153 (in the context of co-defendants, *Wheat* discusses the right to choose counsel, actual and potential conflicts, waiver, and the court's obligation).

## TESTIMONIAL STATEMENTS, OPINIONS AND PERSONAL KNOWLEDGE

Third, the defendant claims that because the prosecutor appeared on the two cable television programs in 2011, there is a risk that he will become a necessary witness and/or provide unsworn testimony in his questioning and argument. Related to this claim is the alternate relief sought by the defendant. Alternatively, the defendant seeks an order directing that the prosecutor be precluded from making testimonial statements, giving opinion testimony, or otherwise implying personal knowledge.

At the scheduled evidentiary hearing, the Court will address claims relating to the defendant's claim of ineffective assistance of counsel. At this time, the Court fails to see how testimony from the trial prosecutor would be relevant or of assistance to its review. The Court relies on the State's representation that neither the State nor the defendant has identified Mr. Martinez as a witness. Response at 7. The claim that the prosecutor may become a witness or attempt to provide unsworn testimony appears to be mere speculation. Consequently, the Court declines to address this claim.

Finally, the defendant seeks a *Motion in Limine* to preclude consideration of testimonial statements, opinion testimony, or personal knowledge by the prosecutor. The purpose of a motion *in limine* is to obtain a pretrial ruling on evidentiary disputes and to avoid the admission of unduly prejudicial evidence to a jury. *State v. Superior Court*, 108 Ariz. 396, 499, P.2d 152 (1972).

The evidentiary hearing will be heard, not by a jury, but by the Court. The Court will address and resolve evidentiary matters and objections raised in accordance with the Rules of Evidence as they arise during the course of the evidentiary hearing.

Based on the foregoing,

IT IS ORDERED DENYING the defendant's *Motion to Disqualify Prosecutor Juan Martinez from Participating as PCR counsel at the Evidentiary Hearing, or in the Alternative, Motion in Limine to Preclude Him from Asserting Personal Knowledge.*

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/11/2013


        The Court makes no finding as to the wisdom of the prosecutor's appearance on cable
television nor does it sanction such appearances.

        DATED this 11th day of October, 2013.


                                        Honorable Brian K. Ishikawa
                                        Judge of the Superior Court

# EXHIBIT DDDDDDD

Michael K. Jeanes, Clerk of Court
*** Filed ***

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

*10/21/13—8:00 AM*

CR 2000-096032                                    10/11/2013

CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                L. Mooney
                                                        Deputy

STATE OF ARIZONA                         LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)             SCOTT M BENNETT
                                                        MATTHEW R LYNCH
                                                        ALLEN A ARNTSEN
                                                        JAMES J BELANGER
                                                        JODI FOX
                                                        APPEALS-PCR
                                                        CAPITAL CASE MANAGER
                                                        COURT ADMIN-CRIMINAL-PCR


### STATUS CONFERENCE


OFF RECORD

Court and counsel discuss matters regarding scheduling.

1:39 p.m.

Courtroom JUJ12 – Courtroom 9

| | |
|---|---|
| State's Attorney: | Lacey Alexandra Stover Gard - Appearing Telephonically |
| Defendant's Attorney: | Scott Bennett - Appearing Telephonically |
| | Matthew Lynch – Appearing Telephonically |
| | Allen Arntsen – Appearing Telephonically |
| Defendant: | Not Present |
| Court Reporter: | Renee Mobley |

A record of the proceedings is made by audio and/or videotape also.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        10/11/2013


Court and counsel discuss matters regarding scheduling.

IT IS ORDERED affirming the Evidentiary Hearing dates scheduled on the week of
**February 3, 2014 through February 7, 2014 and the week of February 10, 2014 through
February 14, 2014.** The hearing each day will begin at 8:30 a.m. until 12:00 p.m. and 1:30 p.m.
until 5:00 p.m.

IT IS ORDERED setting a Final Status Conference in this matter for **January 16, 2014
at 11:00 a.m.** Counsel may appear telephonically for this Final Status Conference.

Discussion is held regarding the deadline date for the final witness list and exhibit list to
be submitted by counsel to the Court.

IT IS ORDERED that the parties file a Final Witness List by **December 2, 2013.**

IT IS ORDERED that the parties file a Joint Proposed Witness Schedule and Exhibit List
by **January 10, 2014.** The Court requests that counsel communicate with each other regarding
what exhibits can be stipulated into evidence if any and which exhibits will have objections
thereto and note this in the Joint Proposed Witness and Exhibit Schedule.

Discussion is held regarding the transport of the Defendant for the Evidentiary Hearing.

Counsel, Scott Bennett is working with the Maricopa County Sheriff's Office regarding
the transportation of the Defendant to ensure that the Defendant has the proper amount of rest for
the hearing each day.

Counsel, Lacey Alexandra Stover Gard addresses the Court regarding the scheduling of a
deadline for Expert Witness Disclosure.

IT IS ORDERED by agreement of counsel, that the State shall disclose their Expert
Witness, Dr. Stephen Pitts' Report to Defense Counsel by the **End of December 2013.**

Counsel, Lacey Alexandra Stover Gard addresses the Court and states that the statutory
victims were notified of today's hearing. They have not participated in this hearing.

LET THE RECORD REFLECT that the parties acknowledge the possibility of
supplementing their final witness list/reports.


Docket Code 028                         Form R000D                              Page 2

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              10/11/2013

1:49 p.m.  Matter concludes.

_____

HONORABLE BRIAN ISHIKAWA
JUDGE OF THE SUPERIOR COURT

# EXHIBIT EEEEEEEE

1   Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona 85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
5   sbennett@csblaw.com
    *Attorneys for Petitioner Wendi Elizabeth Andriano*
6

**FILED**
**MICHAEL K. JEANES, Clerk**
By _____
**Deputy**

7       IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
            IN AND FOR THE COUNTY OF MARICOPA

8   State of Arizona,                    )
9                                        )
                        Respondent,      )   No. CR2000-096032-A
10                                       )
11      vs.                              )   **ORDER TO ASSOCIATE COUNSEL**
                                         )   ***PRO HAC VICE***
12  Wendi Elizabeth Andriano,            )
                                         )
13                      Petitioner.      )
                                         )
14                                       )

15      Based on the Motion to Associate Counsel *Pro Hac Vice* by Scott Bennett of

16  Coppersmith Schermer & Brockelman PLC and the consent of Scott Bennett to appear as

17

18  local counsel, it is hereby ordered that Jodi K. Fox of Foley & Lardner LLP be admitted

19  *pro hac vice* as counsel for Wendi E. Andriano in this matter.

20      DATED this 8th day of October, 2013.

21

22

23                                  The Honorable Brian Ishikawa

24

25

26

27

28  {00103989.1 }

COPY mailed on _____, 2013 to:

Scott Bennett
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
*Attorneys for Petitioner*

Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona  85701-1367
*Attorneys for the State of Arizona*

_____

{00103989.1 }

2

# EXHIBIT FFFFFFFF

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Krane, Deputy
10/29/2013 4:54:36 PM
Filing ID 5527477

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701
TELEPHONE: (520) 628-6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
# COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>               Respondent,<br><br>-vs-<br><br>WENDI ELIZABETH ANDRIANO,<br><br>               Petitioner. | CR–2000–096032<br><br>**REQUEST FOR CERTIFIED CONTACT VISIT ORDER**<br><br>**[CAPTIAL CASE]**<br><br>The Hon. Brian Ishikawa |

The State of Arizona hereby requests this Court to issue a certified order directing the Arizona Department of Corrections (hereinafter "ADOC") to allow a confidential contact visit between Petitioner Wendi Andriano and Drs. Steven E. Pitt and Kiran Amin on November 26, 2013. Charles Ryan, Director of the ADOC,

by and through undersigned counsel Michael E. Gottfried,[1] does not object to this confidential visit.

Counsel for the State and ADOC have agreed to terms and conditions for the visit, and those terms and conditions are listed and contained in the attached proposed order.   Therefore, the State requests that the proposed certified order should issue.

RESPECTFULLY SUBMITTED this 29th day of October, 2013.

THOMAS C. HORNE                          THOMAS C. HORNE
ATTORNEY GENERAL                         ATTORNEY GENERAL


/S/                                      /S/
Lacey Stover Gard                        Michael E. Gottfried
ASSISTANT ATTORNEY GENERAL               ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION               LIABILITY MANAGEMENT SECTION
                                         CIVIL DIVISION
ATTORNEYS FOR RESPONDENT
                                         ATTORNEYS FOR ADOC

---

[1] Mr. Gottfried is appearing specially and for the limited purpose of representing the interests of the ADOC regarding the contact visit.

2

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2013, I electronically filed the foregoing with the Clerk of the Maricopa County Superior Court by using the Court's eFiling Online system.

Copies of the foregoing were deposited for mailing this date to:

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Attorneys for Petitioner

/s/ N. Kopf
Legal Secretary
Criminal Appeals/
Capital Litigation Division
1275 West Washington
Phoenix, Arizona  85007–2997
Telephone: (602) 542–4686

3590993

# EXHIBIT GGGGGGGG

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
M. Martin, Deputy
10/31/2013 4:09:05 PM
Filing ID 5532393

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701
TELEPHONE: (520) 628-6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
# COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | CR–2000–096032 |
| Respondent, | |
| -vs- | **STATE'S MEMORANDUM REGARDING ANDRIANO'S COUNSEL'S LETTER OF OCTOBER 31, 2013.** |
| WENDI ELIZABETH ANDRIANO, | |
| Petitioner. | **[CAPTIAL CASE]** |
| | The Hon. Brian Ishikawa |

The State of Arizona has received a copy of a letter Andriano's counsel sent

to this Court on October 31, 2013. (Exhibit A.) The letter asks this Court to hold

in abeyance ruling on the State's proposed contact visit Order pending further

negotiations between counsel. (*Id.*) It also suggests that undersigned counsel

failed to contact opposing counsel prior to filing the proposed Order. (*Id.*) The

State objects to Andriano's request that this Court hold its ruling in abeyance, as Andriano has not filed a proper motion seeking that relief.  Moreover, Andriano has shown no good reason to hold this matter in abeyance:  the proposed contact visit date is approximately 1 month away, which allows sufficient time for Andriano to respond to the State's motion and raise any appropriate objections, for the State to reply, and for this Court to resolve those objections.

Further, the State's proposed Order contains standard terms and conditions for contact visits between mental-health professionals and death-row inmates.  The State typically does not negotiate contact-visit orders or seek opposing counsel's position prior to filing them.  Nonetheless, as a courtesy, undersigned counsel notified Andriano's counsel by email on October 28, 2013, that she intended to file a motion for a contact visit in the coming week, and that the visit, if granted, would occur on November 26, 2013.  Andriano's attorneys did not reply to undersigned counsel's email, or request that any specific terms be included in the Order.

The State views its proposed terms as non-negotiable.[1]  If Andriano's attorneys object to the proposed Order, they should follow the ordinary procedure of stating those objections in a formal response.  The State will reply as appropriate.

---

[1] In particular, in a voicemail to undersigned counsel left shortly before he sent the present letter, Andriano's counsel suggested that a member of the defense team should be present during the evaluation.  The State will not agree to this condition, as the presence of third-parties would taint the mental-health evaluation.

2

RESPECTFULLY SUBMITTED this 31st day of October, 2013.

THOMAS C. HORNE
ATTORNEY GENERAL

JEFFREY A. ZICK
CHIEF COUNSEL

/S/
LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2013, I electronically filed the foregoing with the Clerk of the Maricopa County Superior Court by using the Court's eFiling Online system.

Copies of the foregoing were deposited for mailing this date to:

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Attorneys for Petitioner

/s/ N. Kopf
Legal Secretary
Criminal Appeals/
Capital Litigation Division
1275 West Washington
Phoenix, Arizona  85007–2997
Telephone: (602) 542–4686

3595685

# EXHIBIT A


**FOLEY & LARDNER LLP**

ATTORNEYS AT LAW

VEREX PLAZA
150 EAST GILMAN STREET
MADISON, WI 53703-1481
POST OFFICE BOX 1497
MADISON, WI 53701-1497
608.257.5035 TEL
608.258.4258 FAX
foley.com

WRITER'S DIRECT LINE
608.258.4293
aarntsen@foley.com EMAIL

CLIENT/MATTER NUMBER
999400-2746

October 31, 2013

**VIA EMAIL**

Honorable Brian K. Ishikawa
Maricopa County Superior Court
222 E. Javelina Avenue
Mesa, AZ 85210-6234

Re:   *State of Arizona v. Wendi E. Andriano* - CR2000-096032

Dear Judge Ishikawa:

This concerns the State of Arizona's Request for Certified Contact Visit Order, which was served on October 29. As framed, the proposed contact visit order does not adequately protect my client's constitutional rights and privileged communications and so petitioner objects to entry of the order as drafted.

Assistant Attorney General Gard did not contact me before filing the Request and Order, to discuss the terms and conditions of the requested contact visit. I have left a voicemail with her in an effort to reach agreement on appropriate terms and conditions. I request that the Court hold the proposed order in abeyance pending further communication from counsel as to the terms and conditions of the requested contact visit, which I anticipate either will be incorporated into a joint proposed order or will be the subject of alternative orders proposed by each side.

Thank you for your consideration of our position.

Very truly yours,

FOLEY & LARDNER LLP

Allen A. Arntsen

cc:   Lacey Gard (via electronic mail)
      Scott M. Bennett (via electronic mail)
      Matthew Lynch (via electronic mail)

BOSTON          JACKSONVILLE    MILWAUKEE      SAN DIEGO          SILICON VALLEY
BRUSSELS        LOS ANGELES     NEW YORK       SAN DIEGO/DEL MAR  TALLAHASSEE
CHICAGO         MADISON         ORLANDO        SAN FRANCISCO      TAMPA
DETROIT         MIAMI           SACRAMENTO     SHANGHAI           TOKYO
                                                                  WASHINGTON, D.C.

# EXHIBIT HHHHHHHH

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
E. Masis, Deputy
11/5/2013 4:20:39 PM
Filing ID 5540193

1  Scott M. Bennett, State Bar No. 022350
   COPPERSMITH SCHERMER & BROCKELMAN PLC
2  2800 North Central Avenue
   Suite 1200
3  Phoenix, Arizona  85004
   (602) 224-0999
4

5  FOLEY & LARDNER LLP
   150 E. Gilman Street
6  Madison, WI 53703
   Telephone:     (608) 257-5035
7  Fax:    (608) 258-4258

8  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels Admitted *Pro Hac Vice*
9  Matthew R. Lynch Admitted *Pro Hac Vice*

10 *Attorneys for Petitioner*
   Wendi Andriano
11
                    SUPERIOR COURT OF ARIZONA
12
                       COUNTY OF MARICOPA
13

14 STATE OF ARIZONA,                    ) No. CR2000-096032-A
                                        )
15                    Respondent,       ) **PETITIONER WENDI ANDRIANO'S**
                                        ) **RESPONSE TO STATE OF**
16       vs.                            ) **ARIZONA'S REQUEST FOR**
                                        ) **CONTACT VISIT ORDER**
17                                      )
18 WENDI ELIZABETH ANDRIANO,            ) **(CAPITAL CASE)**
                                        )
19                    Petitioner.       ) (Assigned to the Hon. Brian Ishikawa)
                                        )
20 ─────────────────────────────

21        On October 29, 2013, the State filed a Request For Certified Contact Visit Order.

22 That request asked the Court to enter an order allowing a contact visit between Drs.

23 Steven E. Pitt and Kiran Amin, and Petitioner Wendi Andriano.  The purpose of the visit

24 is for Drs. Pitt and Amin to conduct a mental health examination of Ms. Andriano on

25 behalf of the State.

26        Although Ms. Andriano does not object to this mental health evaluation, she

27 respectfully requests that the Court allow her attorney, Allen Arntsen, to attend.  Mr.

28 Arnsten would attend for the limited purpose of protecting communications with Ms.

{00108608.1 }

1  Andriano that fall within the attorney-client and/or work product privileges, and/or Ms.

2  Andriano's right against self-incrimination under the Fifth Amendment of the United

3  States Constitution and Article 2, section 10 of the Arizona Constitution—to the extent

4  that any questioning from Drs. Pitt and Amin implicates these protections.

5       The protections provided by the attorney-client and work product privileges and

6  the constitutional right against self-incrimination are central to an equitable judicial

7  system.  *See, e.g., Lund v. Myers*, 286 P.3d 789, 796 (Ariz. Ct. App. 2012) ("Our case law

8  . . . recognizes the importance of confidentiality and the central role the attorney-client

9  privilege plays in client relationships and effective provision of legal services . . . Our

10  courts have also recognized the policy of protecting against invading the privacy of an

11  attorney's course of preparation that is so essential to an orderly working of our system of

12  legal procedure.") (internal quotations and citations omitted), *vacated and remanded on*

13  *other grounds in Lund v. Myers*, 305 P.3d 374 (Ariz. 2013); *Kastigar v. United States*, 406

14  U.S. 441, 444 (the Fifth Amendment "reflects a complex of fundamental values and

15  aspirations, and marks an important advance in the development of United States

16  liberty").

17       Multiple courts have recognized the necessity of representation during a mental

18  health evaluation to protect such interests, and have accordingly permitted the defendant's

19  attorney to observe and object to improper questioning.  *See, e.g., State v. Hutchinson*,

20  766 P.2d 447, 454 (Wash. 1989) (holding that the defendant's attorney was entitled to

21  attend the mental health evaluation and that the defendant was entitled to refuse to answer

22  any question that might incriminate him); *State v. Mains*, 669 P.2d 1112, 1114 (Ore.

23  1983) (noting that a court order allowed the defendant's attorney to be present during the

24  mental health evaluation); *Houston v. State*, 602 P.2d 784, 795-96 (Alas. 1979) (holding

25  that a defendant is entitled to have his attorney present during a mental health evaluation);

26  *Shepard v. Bowe*, 442 P.2d 238, 293 (Ore. 1968) (holding that the defendant's attorney

27  was entitled to attend the mental health evaluation and to instruct defendant not to answer

28  questions that might incriminate him).

1
2
3
4
5
6
7
8

Arizona has specifically codified "the right to have a representative present during [a mental health] examination" conducted for a civil action, further evidencing the importance of representation in this context.  *See* Ariz. R. Civ. P. 35(a).[1]  Because Drs. Pitt and Amin will be conducting the mental health evaluation at the State's behest and may ask Ms. Andriano questions that could elicit information protected by the attorney-client or attorney work product privileges or invade the constitutional privilege against self-incrimination, Ms. Andriano requires the presence of counsel for the limited purpose of warning her of these risks.

9
10
11
12
13
14
15
16
17
18
19
20
21

The State has objected to Mr. Arntsen's attendance at the mental health evaluation based on the unsupported statement that "the presence of third-parties would taint the mental health evaluation."  State's Memorandum Regarding Andriano's Counsel's Letter of October 31, 2013, filed October 31, 2013, at n.1.  The State has provided no legal or factual support for this statement, which is solely attorney argument.  However, in an effort to address this concern, Ms. Andriano has submitted with this response a proposed order regarding the contact visit, which provides that Mr. Arntsen will remain seated outside of Ms. Andriano's line of sight throughout the evaluation and may not make any comments during the evaluation other than to advise Ms. Andriano regarding the attorney-client and attorney work product privileges and her right against self-incrimination.  These limitations would prevent Mr. Arntsen's presence from impacting the evaluation, while appropriately balancing Ms. Andriano's need for representation.  In addition, Mr. Arntsen—who had numerous contact visits with Ms. Andriano before the State changed

22
23
24
25
26
27
28

---

[1] Although the Arizona Supreme Court has held that "the presence of counsel at a mental examination is not constitutionally required," it left open the issue of whether allowing a criminal defendant's counsel to be present during a mental health examination may be appropriate under some circumstances.  *See State v. Schackart*, 175 Ariz. 494, 502 n.1, 858 P.2d 639, 647 (Ariz. 1993).

its policy to disallow such visits in 2012[2]—will be subject whatever other provisions the State or ADOC impose on the contact visit, as set forth in the Proposed Contact Visit Order.

Attached is a proposed form of order, which has been modified from the proposed order that the State submitted, to allow Mr. Arnsten to attend the examination. The redlined version shows the changes from the State's proposed order, and the final version is ready for the Court's signature.

For these reasons, Ms. Andriano respectfully requests that the Court grant the Proposed Modified Contact Visit Order filed concurrently with this motion, which incorporates Ms. Andriano's right to have counsel present during the evaluation, and imposes the limitations on counsel discussed above.

RESPECTFULLY SUBMITTED November 5, 2013.

FOLEY & LARDNER LLP
Allen A. Arntsen, *Pro Hac Vice*
Stephan J. Nickels, *Pro Hac Vice*
Matthew R. Lynch, *Pro Hac Vice*

COPPERSMITH SCHERMER & BROCKELMAN PLC

By */s/ Scott M. Bennett*
Scott M. Bennett

*Attorneys for Petitioner Wendi Andriano*

---

[2] *See* Petitioner's Motion To Allow Contact Visit, filed 11/23/2011, and the supporting exhibits, which detail the history of contact visits between Ms. Andriano and her legal team before the State changed its policy on the issue.

ORIGINAL efiled November 5, 2013,
with the Clerk of the Maricopa County Superior Court.

COURTESY COPY sent via FedEx November 5, 2013, to:

Judge Brian Ishikawa
Maricopa County Superior Court
Southeast Court
222 E. Javelina Avenue
Mesa, AZ 85210

COPY emailed and mailed
November 5, 2013, to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tuscon, AZ 85701-1367
*Attorney for the State of Arizona*


*/s/ Sheri McAlister*_____

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION 400
WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701
TELEPHONE: (520) 628-6520
LACEY.GARD@AZAG.GO
V CADOCKET@AZAG.GOV
(STATE BAR NUMBER 022714)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
# COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | CR–2000–096032 |
| Respondent, | |
| -VS- | **[PROPOSED] MODIFIED** **CONTACT VISIT ORDER** |
| WENDI ELIZABETH ANDRIANO, | **[CAPTIAL CASE]** |
| Petitioner. | THE HON. BRIAN ISHIKAWA |

Pending before the Court is the State of Arizona's request for a Certified Contact Visit Order which would allow a confidential visit in a contact setting between inmate Wendi Andriano and Drs. Steven E. Pitt and Kiran Amin on November 26, 2013. After due consideration of said request and the relevant pleadings on file,

**IT IS ORDERED** that the State's request for a Contact Visit Order is **GRANTED.**

**IT IS FURTHER ORDERED** that Drs. Pitt and Amin be permitted to have a confidential visit with inmate Andriano under the following terms:

A. The State's willingness to stipulate to these terms should not be considered a waiver of any aspect of ADOC's contact visitation policy.

B. Drs. Pitt and Amin shall be allowed a contact visit on November 26, 2013 beginning at 8:00 a.m. and continuing until 5:00 p.m. The contact visit will be recorded by video and audio.  Petitioner's Attorney Allen Arntsen shall be allowed to observe the contact visit.  Attorney Arntsen shall be seated in the same room as Drs. Pitt and Amin and inmate Andriano, but shall remain outside inmate Andriano's line of sight for the duration of the evaluation.  Attorney Arntsen shall not make any comments during the evaluation except as necessary to instruct inmate Andriano regarding the attorney-client privilege and/or her rights under the Fifth Amendment of the United States Constitution and Article 2, Section 10 of the Arizona Constitution, to the extent that any questioning from Drs. Pitt and Amin implicates these protections.

B.C.   The State shall make arrangements with Warden Judy Frigo, Arizona State Prison—Perryville, Lumley Unit, or her designee, to schedule such visit.

C.D.   The Warden, through her staff, may require Drs. Pitt and Amin and Attorney Arntsen to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with inmate Andriano.

D.E.   If requested by Drs. Pitt or Amin, the Warden, through her staff, shall remove handcuffs from inmate Andriano so that she may complete certain tests. However, inmate Andriano shall at all times during the contact visit remain in leg irons. ADOC may require inmate Andriano to wear a stun belt during the contact visit.

E.F.   Drs. Pitt and Amin and Attorney Arntsen will be required to wear all protective gear, including any protective vest and/or safety goggles provided by ADOC. Drs. Pitt and Amin and Attorney Arntsen will be allowed to wear clothing over the protective vest. If requested, Drs. Pitt or Amin shall be allowed to remove the protective gear such as vest and safety goggles if, in their opinion, the vest and/or the goggles interfere with the testing and evaluation of inmate Andriano.

F.G.   The door to the room in which the meeting takes place shall be open or closed during the meeting, at the discretion of Drs. Pitt and Amin. Drs. Pitt and Amin shall sit in the chairs closest to the door, and inmate Andriano shall not go between them and the door without permission. Attorney Arntsen shall remain seated in a chair outside inmate Andriano's line of sight for the duration of the evaluation.  The room in which the meeting takes place shall have three four chairs and a table no larger than three feet in width.

G. Before being allowed the contact visit authorized herein, Drs. Pitt and Amin and Attorney Arntsen shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

H. Drs. Pitt and Amin and Attorney Arntsen shall submit their full name and date of birth to ADOC at least ten days before the scheduled examination of

inmate Andriano. In the event that ~~either doctor~~any doctor/attorney has a prior arrest or conviction for any felony offense, that doctor/attorney will not be permitted into the institution.

**IT IS FURTHER ORDERED** that the Clerk of the Court certify this Order.

**IT IS FURTHER ORDERED** that the Clerk of the Court forward a certified copy of this Order to:

Deputy Warden Lacy Scott
ASPC-Perryville
2105 North Citrus Road
Goodyear, AZ 85395

Scott M. Bennett
Coppersmith Schermer & Brockelman
PLC 2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI 53701-1497

Lacey Stover Gard
Office of the Arizona Attorney General
400 West Congress, Bldg. S–315
Tucson, Arizona 85701

Michael E. Gottfried
Office of the Arizona Attorney General
1275 W. Washington
Phoenix, AZ 85007.

DATED this _____ day of October, 2013

Honorable Brian Ishikawa
Maricopa County Superior Court

# EXHIBIT IIIIIII

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
E. Masis, Deputy
11/7/2013 11:16:19 AM
Filing ID 5543861

TOM HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 W. CONGRESS ST., BLDG. S–315
TUCSON, ARIZONA  85701–1367
TELEPHONE:  (520) 628-6520
(STATE BAR NUMBER 22714)
CADOCKET@AZAG.GOV

ATTORNEYS FOR RESPONDENT

## SUPERIOR COURT OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>     RESPONDENT,<br><br>-VS-<br><br>WENDI ELIZABETH ANDRIANO,<br><br>     PETITIONER. | CR–2000–096032–A<br><br>**REPLY TO RESPONSE TO REQUEST FOR CERTIFIED CONTACT VISIT ORDER**<br><br>The Hon. Brian Ishikawa<br><br>**[CAPTIAL CASE]** |

Respondent, the State of Arizona, hereby replies to Petitioner Wendi Andriano's response to Respondent's request for a certified order permitting a contact visit between Andriano and Drs. Steven E. Pitt and Karin Amin.  Although Andriano does not object to the contact visit with Drs. Pitt and Amin, she requests that the order permit her attorney, Allen Arntsen,[1] to be present during the

---

[1] Counsel for the Arizona Department of Corrections (ADC) has previously appeared in this matter and explained that ADC does not permit contact visits between death-row inmates and their attorneys.  (Appendix 1.)

evaluation "for the limited purpose of protecting communications" that may fall within the attorney/client, work-product, or Fifth Amendment privileges. (Response, at 1–2.) This Court should deny Andriano's request; grant the State's motion; and adopt the State's proposed contact-visit order, without Andriano's suggested alterations.

Andriano has placed her mental health at issue during the present proceeding and has thus opened the door to a rebuttal evaluation by an expert of the State's choosing. *See State v. Newell*, 212 Ariz. 389, 404–05, ¶¶ 78–80, 132 P.3d 833, 848–49 (2006) ("[W]e have previously held that once a defendant puts his mental health in issue, during the penalty phase of a capital trial, a trial court may order the defendant to submit to a mental examination by the State's expert.") (quotations omitted); *accord Phillips v. Araneta*, 208 Ariz. 280, 283, ¶ 9, 93 P.3d 480, 483 (2004); *State v. Schackart*, 175 Ariz. 494, 500, 858 P.2d 639, 645 (1993). If Andriano refuses to submit to the State's evaluation, or circumscribes it in any way, her mental-health evidence should be precluded as a sanction. *See Newell*, 208 Ariz. at 404–05, ¶¶ 78–80, 132 P.3d at 848–49; *Phillips*, 283 Ariz. at 284–86, ¶¶ 15–19, 93 P.3d at 484–86.

The State's right to a rebuttal evaluation necessarily includes the right to a *complete and unfettered* examination, conducted in a manner consistent with the examiner's regular practices and any applicable professional and ethical standards. Dr. Pitt's standard practice is to exclude third parties from his evaluations. (*See* Appendix 2, at ¶ 11.) In Dr. Pitt's professional opinion, informed by decades of experience (*see id.* at ¶¶ 1–9; Appendix 2, Exh. A), a "third person witness is

disruptive and adversely affects [an] interview." (Appendix 2, at ¶¶ 1–9, 14.) *See, e.g., Estelle v. Smith*, 451 U.S. 454, 471 n.14 (1981) (observing that an "an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination") (quotations omitted); *Bennett v. State*, 766 S.W. 2d 227, 231 (Tex. Ct. Crim. App. 1989) ("Because of the intimate, personal and highly subjective nature of a psychiatric examination, the presence of a third party in a legal and non-medical capacity would severely limit the efficacy of the examination.") (quotations omitted).

This is true even if the third party does not actively participate in the evaluation, as his presence alone could fundamentally change the interview's nature and affect the examination's validity. (Appendix 2, at ¶ 11.) For example, Andriano could, "without realizing it, respond to questions in ways that she ordinarily would not but for the presence of the third person." (*Id.*) *See United States v. Byers*, 740 F.2d 1104, 1120 (D.C. Cir. 1984) ("[O]ne can scarcely imagine a successful psychiatric examination in which the subject's eyes move back and forth between the doctor and his attorney. Nor would it help if the attorney were listening from outside the room, for the subject's attention would still wander where his eyes could not.").

Moreover, Dr. Pitt intends, consistent with his standard practice, to record the evaluation he and Dr. Amin conduct by both video and audio. (Appendix 2, at ¶ 13.) Andriano has not objected to this portion of the State's proposed order, and with good reason: videorecording is beneficial to all parties. (*See* Appendix 2, Exh. B.) The presence of a recording device does not affect an evaluation's

integrity, and the existence of a recording will permit Andriano's experts to thoroughly scrutinize Dr. Pitt's methods and conclusions.  (Appendix 2, at ¶¶ 12, 14.)   Significant to the present issue, videorecording creates a complete, contemporaneous record of Andriano's statements for her attorneys to review, thereby eliminating any perceived need for their presence during the evaluation.  (*Id.* at ¶ 14.)

Andriano nonetheless contends that counsel's presence is necessary to protect her constitutional rights and preserve certain evidentiary privileges.  But the Arizona Supreme Court has long held that a defendant *has no right* to be represented during a mental-health evaluation conducted by a State representative.  *See Schackart*, 175 Ariz. at 501–02, 858 P.2d at 646–47 (finding no constitutional right to counsel during mental-health examination by State's retained expert and noting that "counsel's presence at a psychiatric examination might actually hinder the psychiatrist from effectively examining the defendant and therefore defeat the purpose of the exam") (citation and quotations omitted).  And there is even less reason to require counsel's presence during a post-conviction evaluation, where an inmate is not presumed innocent and her convictions and sentences are presumed valid.   *See Ex parte Martin*, 628 So.2d 421, 421–23 (Ala. 1993) (rejecting argument that defendant is entitled to counsel during post-conviction mental-health evaluation where defendant "is not presently charged with an offense.  He has already been tried and convicted and is pursuing a collateral attack on that conviction."); *see generally State v. Carriger*, 143 Ariz. 142, 145–46, 692 P.2d 991, 994–95 (1984) (post-conviction proceeding is not a second appeal, but is "designed

to accommodate the *unusual situation* where justice ran its course and yet went awry") (emphasis added).[2]

Nor is counsel's presence necessary to protect Andriano's privilege against self-incrimination, as an examination by the State does not violate that privilege. *See Schackart*, 175 Ariz. at 500–01, 858 P.2d at 656–46 (analogizing "to the rule that a defendant who elects to testify at trial may not invoke the self-incrimination privilege to avoid cross-examination," and holding "that ordering defendant to submit to a mental examination did not violate his privilege against self-incrimination"). This is particularly true where, as discussed above, Andriano is no longer presumed innocent.[3] For the foregoing reasons, this Court should grant the State's motion, adopt its proposed contact visit order, and deny Andriano's request to have counsel present during the contact visit.

---

[2] The extrajurisdictional authority Andriano cites in support of her request for counsel's presence is not binding and is incompatible with *Schackart*. *See State v. Hutchinson*, 766 P.2d 447, 454 (Wash. 1989); *State v. Mains*, 669 P.2d 1112, 1114 (Ore. 1983); *Houston v. State*, 602 P.2d 784, 792–96 (Alaska 1979); *Shepard v. Bowe*, 442 P.2d 238, 289–93 (Ore. 1968). Arizona Rule of *Civil* Procedure 35(a) is likewise inapplicable to this *criminal* case. Moreover, that rule permits a party's representative to be excluded if, as here, "the presence of that representative may adversely affect the outcome of the examination." Ariz. R. Civ. P. 35(a).

[3] Andriano's concerns on this point can easily be addressed through a separate, appropriately-worded protective order designed to "ensure that no statements made by [Andriano] will be used improperly during either the guilt or the penalty phase of [any potential re-]trial." *Phillips*, 208 Ariz. at 284, ¶ 14, 93 P.3d at 484.

Respectfully submitted this 7th day of November 2013.

Thomas C. Horne
Attorney General
(Firm State Bar No. 14000)

Jeffrey A. Zick
Section Chief Counsel


/s/Lacey Stover Gard
Assistant Attorney General
Attorneys for Respondent


## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2013, I filed the foregoing with the Clerk of the Court for the Maricopa County Superior Court by using the Court's eFiling Online system.

I have also on this date provided a copy of the foregoing by mail.

Scott M. Bennett
Coppersmith Schermer & Brockelman, PLC
2800 North Central Avenue
Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Stephen J. Nickels
Matthew R. Lynch
Foley & Lardner LLP
150 E. Gilman Street
Madison, WI 53703


/s Nicole Kopf

#3602858

# LIST OF APPENDICES

Appendix 1:  Arizona Department of Corrections' Response to Petitioner's Motion to
Allow Contact Visit, dated 12/7/11).

Appendix 2:  Affidavit of Dr. Steven E. Pitt.

# APPENDIX 1

1  Thomas C. Horne
   Attorney General
2  Firm State Bar No. 14000

3  Michael E. Gottfried, Bar No. 010623
   Assistant Attorney General
4  1275 W. Washington
   Phoenix, Arizona 85007-2926
5  Phone:  (602) 542-4951
   Fax:     (602) 542-7670
6  michael.gottfried@azag.gov

7  *Attorneys for*

## SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | No. CR2000-096032 DT |
|     Respondent, | **RESPONSE TO PETITIONER'S MOTION TO ALLOW CONTACT VISIT** |
| v. | |
| WENDI ELIZABETH ANDRIANO, | (Assigned to the Honorable Douglas Rayes) |
|     Petitioner. | |

15      Charles Ryan, Director of the Arizona Department of Corrections ("ADC"), through

16  undersigned counsel, responds to and opposes Petitioner (hereinafter "Andriano's")

17  Motion to Allow Contact Visit.   This Response is supported by the following

18  Memorandum of Points and Authorities.

19          **MEMORANDUM OF POINTS AND AUTHORITIES**

20  **I.     INTRODUCTION.**

21      Wendi Andriano, a Death Row inmate housed at the Arizona State Prison Complex

22  ("ASPC"), Perryville, Lumley Unit, seeks an Order from this Court permitting her a

23  contact visit on December 12, 2011, with Allen Arntsen, one of the attorneys representing

24  her in her current petition for post-conviction relief, along with local attorney Larry

25  Hammonds, whom Petitioner asserts is "a court-appointed expert providing an opinion

26  regarding the constitutional effectiveness of Andriano's trial counsel." (Motion p. 1, ll.

25-26.)  In support of her request, Andriano identifies three reasons the Court should grant her request.

First, she represents that Director Charles Ryan, since July 2010, "has agreed to and this Court has granted 65 such contact visits between Ms. Wendi Andriano and various attorneys, mitigation specialists, and mental health experts . . . " (Motion p. 2, ll. 1-3).  As described herein, by regulation, ADC does not allow contact visits with Death Row inmates.  Limited exceptions to this policy have been made for experts, typically medical or psychological, *requiring* contact with the inmate to do their job.  The contact visits previously allowed here were meant to fit within this limited exception:  mental health experts and the mitigation specialist.  In hindsight, allowing contact visitation for the mitigation expert, while arguably needing contact to do their job, was probably in error.

However, no contact visits have been approved with just attorneys.  If attorneys had contact visits without a mental health or mitigation expert it was in violation of the language, and certainly the intent, of the stipulated visitation order.  There is no argument made, or logical reason why, Mr. Hammond needs physical contact with Petitioner to develop an opinion about the effectiveness of trial counsel.

Second, they argue that "Deputy Warden Lacy Scott [Lumley Unit] approved the requested December 12 contact visit with . . . Arntsen and Hammond . . . on November 9, 2011"    and that it was Assistant Attorney General Terry Harrison[1] that subsequently denied the approval. *Id.* p. 2, ll. 7-10. *All* exceptions to the contact visitation ban must be, and have been, approved by the Attorney General's Office on behalf of the ADC.  A deputy warden's primary concern in these matters is scheduling; the intent of the department as a whole and security at the unit is determined in conjunction with the ADC

---

[1] At the time of the denial of Petitioner's request, Assistant Attorney General Terry Harrison, was the Attorney for Charles Ryan, Director, Arizona Department of Corrections.

2

in the form of the Attorney General's approval.  Thus, the warden's approval is only one part of the process and is not any type of waiver of the Department's final approval.

Third, they argue that the purpose of the requested contact visit is to "review multiple sensitive, voluminous mental health expert reports" and that the review "would be substantially impeded by a non-contact visit" because of the "glass barrier" and inability to "communicate freely".  *Id.*  p. 2, ll. 13-17.  Convenience is not a valid reason to allow contact visitation.  Andriano's third reason in effect argues that denial of contact visitation is synonymous with denial of access to the courts.   ADC provides appropriate and effective means for Andriano to review her legal material and communicate with her attorneys and experts.  If counsel and Mr. Hammond need additional time they can get it.[2]  Any claim here that the failure to grant relief denies Andriano her constitutional right to access the court or to effective assistance of counsel is speculative and unsupported by the record.

## II.    BACKGROUND.

All visitations with Death Row inmates at both the ASPC – Eyman – Browning Unit (male prisoners) and at the ASPC – Perryville – Lumley (Special Management Area) (female prisoners) are mandated non-contact pursuant to ADC Department Order ("DO") 911.[3]  As shown below, ADC's non-contact visitation policy at its high security prisons is rationally related to its legitimate penological concerns of prevention of escape, assault, hostage-taking, and the introduction of contraband.

---

[2] Counsel argued that additional time is difficult because they are from out-of-state; it is unclear why they need to be physically present while an independent expert prepares his report.

[3] *See* Department Order 911 – at 911.04 1.6.1 and 1.6.5 & 911.05 1.3.1 attached hereto as Exhibit A.

3

In the early 2000s the argument was put forward by various attorneys for Death Row inmates that for their clinical psychologists, clinical psychiatrist, neuropsychologist and psychiatrist and other experts in the medical sciences to properly perform mental health tests and adequately evaluate the inmate, limited contact with the inmate was clinically required. ADC considered the arguments and through a series of informal agreements, including considerations related to the criminal appellant process, compromises and various court rulings, a format and process was developed whereby the clinical experts retained for a Death Row inmate would be permitted limited contact visitation with the inmate for the purpose of administering tests and conducting evaluations that "required" contact with the inmate.  The process to secure limited contact visitation for clinical experts also incorporated a strict set of rules and guidelines designed to provide for the safety and security of the visitor, staff and penal institution.

Along with the limited contact visitation with the Death Row inmate by the clinical expert, ADC agreed that upon request and subject to the same rules and guidelines, the inmate's attorney would also be permitted to accompany the clinical expert into the contact visitation area to do introductions and answer any preliminary concerns of his/her client. The attorney would then leave the visitation room and the clinical expert would administer the tests and conduct the evaluation as required.

## III.    FACTS.

### A.    ASPC Perryville Lumley Unit Death Row is Non-Contact Visitation.

Arizona's Death Row for women is located at the ASPC – Perryville, Lumley ("Special Management Area").  The Special Management Area is the most secure and structured prison facility within ADC for female inmates and is reserved for Death Row inmates like Andriano, and the most violent and incorrigible inmates within the prison system, including validated prison gang members and associates.

4

The Special Management Area is designated as non-contact.[4]  Legal visits with inmates are governed by Department Order 902.13.[5]  Non-contact attorney visitation at the Special Management Area is conducted through a glass barrier using a telephone type arrangement for communication.  Non-contact attorney visitation is confidential and not recorded in any way.  (Declaration of Claudia Ponce, attached as Exhibit C, at paragraph 10) (Hereinafter "Ponce at __.")  ADC Department Order 902 provides inmates with access to the courts and, specifically, access to legal boxes (902.10), legal telephone calls (902.12) and legal visits (902.13).[6]

## III.   ANALYSIS.

### A.   ADC Policy.

Restricting physical access to Death Row inmates implicates operational security, officer and inmate safety, as well as the safety of the people that come into contact with the Death Dow inmates.  Nonetheless, restricting contact visitation with Andriano does not unconstitutionally restrict her access to his attorneys, experts, legal materials or access to the courts generally.  ADC Policy DO 902.10 sets out an orderly process to insure inmate access to their legal supplies, property, mail, telephone and legal counsel.

### B.   The Problems of Prison Security Are Extraordinarily Difficult and Are Left to Prison Administrators.

The U.S. Supreme Court has acknowledged the paramount importance of prison security and the extreme difficulty prison authorities face in maintaining it.  *Hudson v. Palmer*, 468 U.S. 517, 526 (1984).  Prison officials therefore have an unenviable task in maintaining prison security.

---

[4]   *See* Exhibit A.

[5]   Department Order 902, attached hereto as Exhibit B.

[6]   See Exhibit A.

1

2          Within this volatile "community," prison administrators are to
           take all necessary steps to ensure the safety of not only the
3          prison staffs and administrative personnel, but also visitors.
           They are under an obligation to take reasonable measures to
4          guarantee the safety of the inmates themselves. They must be
           ever alert to attempts to introduce drugs and other contraband
5          into the premises which, we can judicially notice, is one of the
           most perplexing problems of prisons today; they must prevent,
6          so far as possible, the flow of illicit weapons into the prison;
           they must be vigilant to detect escape plots, in which drugs or
7          weapons may be involved, before the schemes materialize.

8

9    *Id.* at 526–27; *accord Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Large v. Superior Court*,

10   148 Ariz. 229, 236, 714 P.2d 399, 406 (1986).

11        The   Supreme   Court   recognizes   that   security   considerations   may   trump

12   constitutional rights that inmates would otherwise enjoy:

13         "[C]entral to all other corrections goals is the institutional
           consideration of internal security within the corrections
14         facilities themselves."  Prison officials must be free to take
           appropriate action to ensure the safety of inmates and
15         corrections personnel and to prevent escape or unauthorized
           entry.    Accordingly, we have held that even when an
16         institutional restriction infringes a specific constitutional
           guarantee, such as the First Amendment, the practice must be
17         evaluated in the light of the central objective of prison
           administration, safeguarding institutional security.
18

19   *Wolfish*, 441 U.S. at 546 –47 (1979) (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974))

20   (citations omitted).  In short, security is the paramount concern of prison officials.

21        **C.     Prison Administration Is Generally Left to Prison Administrators,
                   Not the Courts.**
22

23        The heavy nature of these problems has led the Supreme Court to grant prison

24   administrators wide latitude when reviewing the solutions they have adopted:

25

26         [T]he problems that arise in the day-to-day operation of a
           corrections facility are not susceptible of easy solutions.

                                             6

1
2
3
>Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

4   *Wolfish*, 441 U.S. at 547. This deference flows not only from the recognition that prison

5   officials are better suited to run prisons than are judges, but also from the fact that, under

6   our constitutional system of separation of powers, running the prison is the prison

7   administrator's job, not the judge's. *Id.* at 547–48; *accord id.* at 547 n.29; *Turner v.*

8   *Safley*, 482 U.S. 78, 84–85 (1987).

9   In harmony with the deference to be shown to prison administrators, the Supreme

10  Court has also admonished the judiciary to adopt a hands-off attitude when it comes to

11  reviewing prison policies and interfering in prison operations. *Procunier v. Martinez*, 416

12  U.S. 396, 404–05 (1974) (footnotes omitted), *overruled on other grounds, Thornburgh v.*

13  *Abbot*, 490 U.S. 401. ("The court might disagree with the choice of means to effectuate

14  those interests [in prison security], but it should not "second-guess the expert

15  administrators on matters on which they are better informed.") Thus, courts must be

16  extremely hesitant to interfere with the decisions of prison officials and must accord them

17  great deference.

18
19
>**D.    In Concert with the Judiciary's Limited Role in Prison Administration, Courts May Not Interfere Without First Determining that a Prison Policy Impinges Constitutional Rights.**

20  The ADC has an administrative regulation prohibiting attorney-client contact visits

21  on Death Row. This regulation has the force of law, unless unconstitutional. *Kamen v. Az.*

22  *Bd. of Regents*, 217 Ariz. 147, 155, 171 P.3d 599, 607 (App. 2007). The Supreme Court

23  has adopted a standard for the courts to apply in reviewing the constitutionality of prison

24  policies which accommodates its admonitions to the courts to generally keep out of prison

25  management:

26

1
2
3
4
5
6
7
8
9
10
11
12

> [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetrating the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez*, 416 U.S., at 407, 94 S.Ct., at 1808.

13
14
15

*Turner*, 482 U.S. at 89 (alteration in original) (citation omitted); *accord Martinez*, 416 U.S. at 405–06 ("When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.")

16
17
18
19
20
21
22
23

Thus, the Supreme Court has set forth a specific procedural order to the determination of constitutional issues such as are presented here. The courts may not interfere in prison administration, such as the non-contact visitation policy related to Death Row inmates, by inquiring into the wisdom of prison regulations unless and until constitutional rights are implicated.[7] Otherwise, the courts become super-administrators in prison operations, a task for which they are not suited and a task that is not theirs in our constitutional system.

24
25
26

---

[7] Andriano's challenge to ADC's authority to deny contact visitation with a Death Row inmate is tantamount to a challenge to the constitutionality of Department Order 911 and to a lesser extent the constitutionality of Department Order 902.

8

In order to withstand a constitutional challenge, including a First Amendment challenge, a prison regulation must be "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.  The Court developed a four-pronged test (the *Turner* test) to determine whether a prison regulation or policy is reasonably related to legitimate penological interests: "(1) whether there is a valid, rational connection between the policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) whether the impact of accommodating the asserted constitutional right will have a significant negative impact on prison guards, other inmates and the allocation of prison resources generally; and (4) whether the policy is an 'exaggerated response' to the [prison's] concerns." *Turner*, 482 U.S. at 89-90.

First Prong:  In order to determine whether there is a rational connection between a prison regulation and a governmental interest justifying the regulation, a court must find the following: (1) the governmental interest is legitimate; (2) the governmental interest is neutral; and (3) the logical connection between the regulation and the interest is close enough to be rational and not arbitrary.  *Turner*, 482 U.S. at 89-90.

Without going into an extended discussion of the factors relevant to the first prong, the Ninth Circuit has held that ADC's non-contact visit policy at its high security prisons is rationally related to its legitimate penological concerns and constitutionally valid.  *Casey v. Lewis*, 4 F.3d 1516, 1523 (9th Cir. 1993) ("The ADOC policy is a reasonable response to the legitimate institutional concerns posed by full contact visitation: prevention of escape, assault, hostage-taking, and the introduction of contraband.")[8]

Second Prong: The second prong of the *Turner* test is whether there are alternative means of exercising the right.  Where other avenues remain available for the exercise of

---

[8] *See e.g.*, history of weapons manufactured by former Death Row inmate Robert Comer, detailed in 1/31/01 Motion to Stay/Vacate filed in CV94-1469-PHX-ROS, U.S.D.C (Ariz.).

the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation. *Turner*, 482 U.S. at 90. In applying this factor, the right in question must be viewed sensibly and expansively. *Thornburgh*, 490 U.S. at p. 417.

ADC recognizes that the constitutional right allegedly infringed by denying contact visitation to attorneys and others retained by the attorneys that do not have an identifiable clinical or other specific need for a contact visit with a Death Row inmates is related to an inmate right to access the courts under the First Amendment. Although the regulation mandates Death Row visits as non-contact, it does not ban confidential legal visits, telephone calls, written communication or the confidential exchange of documents. Therefore, there is clearly alternative means available to an inmate to communicate with his/her legal counsel and exercise their right to access the courts. *See* Exhibit B, DO 902.

Third Prong: The third *Turner* prong is whether the accommodation of the asserted constitutional right will have a significant negative impact on prison guards, other inmates and the allocation of prison resources generally. Under this prong considerable deference should be given to the determination of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world. *Thornburgh v. Abbott* 490 U.S. 401, 408 (1989).

Permitting Death Row inmates gratuitous contact visitation with attorneys and others for the sake of convenience and without an identifiable clinical need would have a significant negative impact on staff, other inmates and the allocation of prison resources generally. When a Death Row inmate is out of his/her cell everyone associated with prison security is significant impacted, including on prison guards, other inmates and the allocation of prison resources generally.

Fourth Prong: *Turner's* fourth prong asks whether the regulation is an exaggerated response to Department's concerns. For all of the reasons identified *supra*, mandating non-contact legal and non-legal visits because of contact with Death Row inmates constitutes a direct and immediate threat to the security, safety or order of the institution is not an exaggerated response to the security concern these inmates pose within the prison institutions.

For these reasons set forth above DO 911 is reasonably related to the legitimate penological interests of ADC and is therefore constitutional. *Casey*, 4 F.3d at 1523.

### E.   Andriano Bears the Burden of Establishing the Denial of a Contact Visit Denies Her Access to the Courts.

Andriano has the burden of establishing that the regulation barring non-contact visitation is unreasonable under *Turner*. *Casey*, 4 F.3d at 1520. Andriano concludes in her motion that being separated from her attorney by a glass barrier when reviewing documents hinders their ability to communicate freely and therefore denies her access to the courts. As set forth in the Declaration of Officer Ponce, attached as Exhibit C, the non-contact visitation area at Lumley provides for confidential communications between Andriano and her attorneys, a process for the exchange of documents before and during the non-contact visit and the ability to receive legal mail and telephone calls all pursuant to DO 902.[9] Because Andriano bears the burden of establishing a non-contact visit under these circumstances violates her right to access the courts and she provides no facts or legal argument, other than the conclusion that a non-contact visit is, essentially, inconvenient, her motion should be summarily dismissed.

### IV.   CONCLUSION.

Except for visits *requiring* contact, all visitation with Death Row inmates, including with attorneys, is non-contact. Non-contact visitation does not prevent an attorney, nor an

---

[9]   Declaration of CO II Claudia Ponce attached hereto as Exhibit C.

11

expert retained to opine on the potential ineffectiveness of trial counsel, from doing his job, Petitioner does not support any hardships other than inconvenience and possible additional time required to do that job because of this policy. This is not enough to overcome the validity of this regulation. Petitioner's motion should be denied.

RESPECTFULLY SUBMITTED this 7th day of December, 2011.

Thomas C. Horne
Attorney General

Michael E. Gottfried
Assistant Attorney General
*Attorneys for the Arizona Department of Corrections*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of December, 2011, the attached document was hand-delivered to the Clerk's Office for filing and a copy mailed and e-mailed to:

Honorable Douglas Rayes
Maricopa County Superior Court
101 West Jefferson, #411
Phoenix, AZ 85003-2243
drayes@superiorcourt.maricopa.gov

Scott M. Bennett
Coppersmith, Schermer & Brockelman PLC
2800 North Central Avenue, Ste. 1200
Phoenix, AZ 85004
sbennett@csblaw.com

12

Allen A. Arntsen
Stephen J. Nickels
Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703
aarntsen@foley.com

Lacey Stover Gard
Office of Attorney General
400 W. Congress, Ste. 315
Tucson, AZ 85701
*Attorneys for State of Arizona*
lacey.gard@azag.gov

Legal Secretary to:  Michael E. Gottfried
Amr:2502944

13

# EXHIBIT A

| ARIZONA DEPARTMENT OF CORRECTIONS | CHAPTER: 900<br><br>INMATE PROGRAMS AND SERVICES | OPR:<br><br>OPS |
|---|---|---|
| DEPARTMENT ORDER MANUAL | DEPARTMENT ORDER: 911<br><br>*INMATE VISITATION* | SUPERSEDES:<br><br>DO 911 (02/24/11) |
| | | EFFECTIVE DATE:<br><br>JULY 20, 2011 |
| | | REPLACEMENT PAGE REVISION DATE:<br><br>SEPTEMBER 23, 2011 |

# TABLE OF CONTENTS

**PURPOSE**

**RESPONSIBILITY**

**APPLICABILITY**

**PROCEDURES**                                                                                                    **PAGE**

911.01     VISITATION APPLICATION PROCESS.................................................................. 1

911.02     VISITATION PROCESS.................................................................................. 10

911.03     SEARCHES................................................................................................ 17

911.04     NON-CONTACT VISITATION ....................................................................... 19

911.05     SPECIAL CIRCUMSTANCE VISITATION........................................................ 21

911.06     SUSPENSION OF VISITATION ..................................................................... 21

911.07     SECURITY REQUIREMENTS ........................................................................ 21

911.08     VISITATION PRIVILEGES – REGULAR, HOLIDAY AND FOOD VISITS ............... 21

911.09     SIGNAGE ................................................................................................. 21

IMPLEMENTATION ............................................................................................... 21

DEFINITIONS ...................................................................................................... 21

AUTHORITY ........................................................................................................ 33

ATTACHMENTS

CHAPTER 900 – INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER – 911 – INMATE VISITATION

# PURPOSE

This Department Order establishes procedures authorizing family members and others to visit inmates for the purpose of maintaining family and community ties.

# RESPONSIBILITY

Except where noted, the Warden, unit Deputy Wardens, unit Associate Deputy Wardens, or the Deputy Warden for Contract Beds, possess discretionary authority and shall be responsible for the management of Visitation in their area. Specific responsibilities include:

- Screening and approval of visitors.

- Placement of inmates into Non-Contact Visitation.

- Suspension of visits.

- Approval of special circumstance visitation.

The Department retains the authority to deny any individual visitation privileges. The decision of the parent or legal guardian shall always be the determining factor when rendering a determination to permit a minor's visitation.

# APPLICABILITY

This Department Order applies to all Department Prisons. Visitation for inmates assigned to Contract Beds shall be in compliance with this Department Order and any applicable Department contract.

# PROCEDURES

911.01    **VISITATION APPLICATION PROCESS** - Persons with a disability may request reasonable accommodation, e.g., a sign language interpreter, in accordance with Department Order #108, Americans with Disabilities Act (ADA) Compliance, by contacting the Department. Requests should be made as early as possible to allow time to arrange the accommodation.

    1.1    Initial Processing

        1.1.1    During intake processing, inmates who choose to have visits shall complete and submit a Visitation List, Form 911-1, to the designated staff. Inmates are permitted to have a maximum of 20 approved visitors on their Visitation List form.

        1.1.2    Inmates who submit a Visitation List shall list the full name and relationship of each potential visitor.

        1.1.3    Persons wishing to visit an inmate may complete and submit the Application to Visit an Inmate form on line at www.azcorrections.gov, or print, complete and mail the form as outlined in 1.1.3.3 of this section. In Contract Bed facilities or institutions not listed on the website as able to receive the electronic form the inmate shall be responsible for mailing an Application to Visit an Inmate, Form 911-4, to each person listed on the Visitation List.

1.1.3.1   Inmates shall be responsible for postage expenses associated with mailing the applications.

1.1.3.2   The Department shall pay the postage for mailing applications for all inmates verified as indigent by the appropriate Business Office.

1.1.3.3   All applications shall be legible, fully completed, signed by the potential visitor (unless submitted electronically), and returned by mail with the envelope reading "Attention Visitation Officer" or via the internet directly to the unit Visitation Officer where the inmate is assigned. The one-time $25.00 background check fee shall be mailed in accordance with 1.2.2.1 of this section.

1.1.3.3.1   Applications to visit on behalf of a minor child may only be submitted by a non-incarcerated parent, legal guardian or temporary custodian of that minor child, and when someone other than a parent submits the visitation application, the application shall include documentation from a court establishing legal guardianship and/or temporary custody of the minor child.

1.1.3.3.2   A non-incarcerated parent, legal guardian or temporary custodian of record of a minor child may authorize a third party to accompany and be responsible for the minor child at visitation, as long as that third party has a notarized statement from the non-incarcerated parent, legal guardian or temporary custodian of record and is also an approved visitor.

1.1.4   Former Department employees:

1.1.4.1   Shall be prohibited visitation with an inmate for a period of two years from the date of separation of employment, except when the inmate is an immediate family member or relative.

1.1.4.2   Employees terminated or who resigned while under investigation for inappropriate behavior with an inmate or possession and/or introduction of contraband are permanently ineligible to visit any inmate.

1.1.5   Former inmates shall be prohibited visitation with an inmate for a period of two years from the date of release, except when the inmate is an immediate family member or relative.

1.2   Background Check Fee - A one-time, non-refundable, $25.00 background check fee must be paid at the time the application is submitted for all adult visitors applying for visitation on or after July 20, 2011. The fee is applicable regardless of the outcome, unless the visitor is exempt from the fee as set forth below in 1.2.1. The Director shall deposit all background check fees into the Department's Building Renewal Fund, established by A.R.S. 41-797.

1.2.1   The following persons are exempt from the one-time $25.00 background check fee:

1.2.1.1    Children under the age of 18.

1.2.1.2    Inmates' attorneys of record and their agents.

1.2.1.3    Foster parents or court appointed legal guardians of the inmates' minor child(ren), as outlined in 1.3.5.2 of this section.

1.2.1.4    Persons applying for telephone-only contact.

1.2.2    Applications received by mail and on-line for adult visitors shall not be processed until the background check fee is received.

1.2.2.1    Money Orders – The Money order must be payable to "Arizona Department of Corrections – Visitation". The visitor's name, the inmate's name and ADC Number must be written in the memo section of the money order. Separate money orders must be completed for each applicant. Money orders shall be sent by mail with the envelope reading "Attention Visitation Officer – Background Check Fee" directly to the unit Visitation Officer where the inmate is assigned. Money orders shall not be accepted in person.

1.2.2.2    Electronic Payment – An electronic payment method is available through the on-line Visitation Application process. Separate electronic payments must be completed for each applicant.

1.2.2.2.1    Should the applicant be denied and the decision appealed, an additional $25.00 background check fee shall not be imposed, whether the Administrator's decision is overturned or upheld.

1.2.2.2.2    In the event an inmate recommits and the visitor has previously paid the $25.00 background check fee, an additional $25.00 background check fee shall not be imposed.

1.2.3    The Visitation Officer shall annotate receipt of payment in AIMS and forward all money orders to the Complex Business Office for processing the same date they are received accompanied by a Visitation Money Order Tracking Log listing all money orders received.

1.3    **Approval of Visitors** - The Warden, unit Deputy Warden or Associate Deputy Warden, Deputy Warden for Contract Beds, or designee shall approve visitation for inmates assigned to the unit.

1.3.1    An improper and/or incomplete visiting application shall be returned to the person submitting the application. The potential visitor shall have an opportunity to properly complete the returned visitor application(s) and return it through the mail to the unit where the inmate is assigned.

1.3.2    All visitor applications shall be forwarded to the receiving unit when an inmate is transferred.

1.3.3    All visitor applications not received directly from the applicant through the mail or via internet shall be denied.

1.3.4    Staff shall verify the accuracy of all information provided on each visitor application submitted. A complete criminal history background check of all potential visitors, including infants and minors, using the Arizona Criminal Information Center/National Crime Information Center (ACIC/NCIC) system, shall be completed prior to submitting the application to the approving authority for final approval/disapproval of the visitation.

1.3.5    All minors and infants shall be run through the ACIC/NCIC Wants and Warrants and Missing Persons data bases. Minors, ages 7 – 17, shall also be run through the Juvenile Online Tracking System (JOLTS).

1.3.5.1    The one-time background check fee will not be applicable to minors. Upon reaching their 18th birthday, an ACIC/NCIC Wants and Warrants check will be run. Minors turning 18 will be required to apply for visitation privileges, and pay the one-time, $25.00 background check fee.

1.3.5.2    The parent, legal guardian, or temporary custodian of all minor children applying to visit an inmate, shall submit a copy of the minor's birth certificate for review. The copy shall be retained on file for future reference. Additionally, documentation of legal guardianship and/or temporary custody from adults who are not a non-incarcerated parent of the minor child, shall be submitted in the form of a court order or other legal record from a court of law that establishes the adult's legal responsibility to the minor, as outlined in 1.1.3.3.1 of this section.

1.3.6    All Process Servers shall undergo a complete criminal history background check, using the ACIC/NCIC system, prior to approval being granted by the institution's Chief of Security, or, if applicable, the Deputy Warden for Contract Beds, to permit the process server access to the facility and/or inmate.

1.3.7    A properly completed visitation application shall be processed and approved or denied within 60 days of receipt of background check fee or verification of previous payment. If the visitation application cannot be finalized within this time frame, written notification explaining the delay, shall be provided to the applicant within three work days after the expiration period.

1.3.8    Approved minors, including the inmate's natural, step or adopted children, shall be permitted to visit when accompanied by an approved adult listed on the inmate's Visitation List, unless the inmate has lost or forfeited parental rights, or the minor is the victim of a crime perpetrated by the inmate. (See section 911.01, 1.5.1.2).

1.3.8.1    A notarized letter from the parent or legal guardian, authorizing the visit, is required if the minor is escorted by someone other than a parent or legal guardian. A notarized letter from the inmate shall not be accepted.

1.3.8.2    Both the minor and the accompanying adult shall be listed on the inmate's approved visitation list prior to the visit.

1.3.8.3    A copy of the minor's birth certificate is required to be on file prior to the visit.

1.3.8.4     In instances where documented proof of the minor's legal marriage to the inmate is presented, the minor shall not require supervision by a parent or legal guardian.

1.3.9     Visitors shall be approved for only one inmate's Visitation List. A person shall be permitted visitation with only one inmate, unless the person is an immediate family member to other inmates incarcerated in the Department's institutions. The person may be approved and placed on the approved Visitation List of each inmate verified as an immediate family member.

1.3.9.1     A visitor applying to visit multiple immediate family members shall only be required to pay one background check fee. If a visitor is already approved to visit one immediate family member, the Administrator may run an ACIC/NCIC background to determine continuation as an approved visitor.

1.3.9.1.1     If the Administrator discovers a current felony or recent criminal activity which may constitute a denial or a threat to the safe and orderly operation of the institution, the Administrator or designee shall notify the other institution where the visitor is currently approved to determine if the visitor shall continue to be approved as a current visitor. The outcome shall be at the discretion of the Administrators to approve/deny visitation privileges.

1.3.10     A copy of all decisions related to visitation authorizations shall be retained in the inmate's visitation file.

1.3.11     A current Visitation List for each inmate choosing to have visits shall be maintained in the Visitation file at the assigned unit and updated as necessary.

1.3.12     Each inmate shall initially be provided a copy of the approved Visitation List.

1.4     **Processing Visitation Applications** - Visitation Staff shall:

1.4.1     Stamp the reverse side of the application "RECEIVED," including the date of receipt.

1.4.2     Verify receipt of application payment in AIMS.

1.4.3     Compare the applicant's name against the submitted visitation list to ensure the potential visitor is identified on the inmate's Visitation List.

1.4.3.1     If an applicant is not identified on the inmate's Visitation List, staff shall provide written notification to the inmate that an Application to Visit an Inmate has been received, but cannot be processed until a change is made to his/her visitation list. The inmate has 30 days to provide the change to the Visitation List.

1.4.3.2     A copy of the notification shall be retained in the inmate's visitation file.

**1.4.4**    Initiate a criminal history background investigation for all potential visitors (including minors) by submitting a Criminal History Information Request, Form 121-1, or the ACJIS Information Request List, Form 121-6, to the Arizona Criminal Justice Information System (ACJIS) Terminal Operator.

    **1.4.4.1**    If the criminal history background investigation reveals no criminal history, the ACJIS operator shall record the results on the written request and return it to Visitation staff. The unit Deputy Warden or unit Associate Deputy Warden shall check the ACJIS Information Request List for the clearances, verify the information and sign and date the bottom of the form.

    **1.4.4.2**    If the criminal history background investigation reveals a warrant for arrest, the ACJIS operator shall provide the results to the local Criminal Investigations Unit (CIU) for further investigation. The results of this investigation shall be provided to the Warden or Deputy Warden that requested the background investigation.

    **1.4.4.3**    If the criminal history background investigation reveals a criminal history, the ACJIS operator shall forward all documentation to the Warden, unit Deputy Warden, or for Contract Beds, the Deputy Warden for Contracts Beds, for review and final decision to approve or deny the application. The Warden, Deputy Warden or Associate Deputy Warden shall:

        **1.4.4.3.1**    Return approved visitation applications to the Visitation Officer for processing.

        **1.4.4.3.2**    Return all denied visitation applications and copies of denial letters to the Visitation Officer for processing.

        **1.4.4.3.3**    Destroy all ACJIS related documentation after determining action to be taken.

**1.4.5**    Ensure that criminal history information remains confidential.

**1.4.6**    Ensure that all inmates are provided written notification of <u>all</u> visitation actions. An updated copy of all approved changes to the inmate's Visitation List shall be provided. The inmate shall be advised of his or her responsibility to inform the potential visitor of their visitation status.

**1.4.7**    Ensure that potential visitors are provided written notification when visitation is denied.

    **1.4.7.1**    Criminal history background information shall not be included in the written notification.

    **1.4.7.2**    A copy of the written notification shall be retained in the inmate's visitation file.

**1.5**    <u>Denial or Removal of Visitors from Visitation List</u> - The Warden, unit Deputy Warden, unit Associate Deputy Warden, or for Contract Beds, the Deputy Warden for Contract Beds, shall be responsible for:

1.5.1    Denial of visitation or removal of a person(s) from an inmate's approved Visitation List, when the person:

    1.5.1.1    Poses a direct threat to the safety, security and/or orderly operation of the institution.

    1.5.1.2    Is the victim of the inmate. A person identified as the victim and who seeks visitation status with the inmate that victimized him/her, shall submit a written request listing the reason(s) for visitation. The entire circumstances shall be reviewed, prior to visitation being authorized. If the victim is a minor, the minor's parent(s) and/or legal guardian shall submit a notarized request listing the reason(s) for visitation. A minor identified as a victim of a sex offense shall not be permitted to visit that sex offender.

    1.5.1.3    Is discovered to have a previously undisclosed felony conviction or is convicted of a new felony.

    1.5.1.4    Has previously introduced illegal contraband into a correctional/confinement facility.

    1.5.1.5    Is listed as an approved visitor on another inmate's Visitation List, except as outlined in 1.3.9 of this section.

    1.5.1.6    Has felony charges or other active warrants pending. The person shall be reconsidered for visitation after the criminal charges/warrants have been resolved, the appropriate documentation submitted, and a review conducted.

    1.5.1.7    Provided false information on the visitation application.

    1.5.1.8    Is currently suspended at any of the Department's institutions.

    1.5.1.9    Has been prohibited from visiting pursuant to section 911.06 of this Department Order.

    1.5.1.10    Has not been properly cleared due to Department employee(s) failure to follow policy.

1.5.2    Providing written notification of the action taken to any person denied or involuntarily removed from an inmate's approved Visitation List.

    1.5.2.1    Persons denied visitation may appeal the decision. Those persons that do not appeal may not apply again for visitation for a period of six months from the date of denial.

1.6    <u>Visitation Denial/Removal Appeals</u>

1.6.1    A person appealing the denial or removal of visitation privileges shall submit a written appeal, within 10 work days of the action taken, to the Warden of the institution where the inmate is assigned.

    1.6.1.1    For inmates assigned to Contract Beds, the Deputy Warden for Contract Beds shall be responsible for reviewing the appeal and initiating appropriate action.

CHAPTER 900 – INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER – 911 – INMATE VISITATION

1.6.2    The Warden or the Deputy Warden for Contract Beds, if applicable, shall be responsible for providing written notification of the outcome of the appeal to the visitor within 10 work days of receipt of the written appeal. Appeal decisions shall be final.

1.6.2.1    When an appeal is denied, the person may not apply for Visitation reinstatement for a period of six months after the date of initial denial or removal action, or until the threat posed by the person ceases to exist.

1.6.2.2    Upheld appeals shall result in visitation being granted or reinstated immediately.

1.7    Visitation List Changes

1.7.1    An inmate may request the addition or deletion of approved persons to the Visitation List by submitting a Request to Change Visitation/Telephone Listing, Form 911-3 and the Visitation List, Form 911-1, to Visitation staff.

1.7.1.1    After authorized changes have been entered in AIMS by staff, a copy of the Visitation List shall be provided to the inmate in a timely manner. Changes may be made once every 90 days to the current Visitation List.

1.7.2    After an approved person has been entered on an inmate's visitation list, the person shall not be removed by the inmate for a minimum period of 90 days.

1.7.3    A person seeking voluntary removal from an inmate's Visitation List shall submit a notarized request for removal. All voluntary removals shall remain in effect for a minimum of 90 days. The person who was removed shall not be placed on any inmate's visitation list during this period.

1.7.4    All persons under visitation suspension shall require written approval for reinstatement as described in the initial application process.

1.8    Visitation Files

1.8.1    Visitation staff shall establish and maintain an inmate visitation file for each inmate assigned to the unit and shall enter all required visitor/visit information in the Adult Information Management System (AIMS.) Each inmate's Visitation File shall contain the following information:

1.8.1.1    Section One

1.8.1.1.1    All Background Information Forms.

1.8.1.1.2    A Visitation List.

1.8.1.1.3    Visitation Waiver, Form 911-2 - All waivers.

1.8.1.1.4    Request To Change Visitation/Telephone Listing.

1.8.1.1.5    All visitation notifications relating to the approval, denial, or removal of visitation privileges.

1.8.1.2    <u>Section Two</u> - All completed Applications to Visit an Inmate.

1.8.1.3    <u>Section Three</u>

1.8.1.3.1    All copies of inmate marriage certificates.

1.8.1.3.2    All legal guardianship documentation, including notarized correspondence from a parent(s)/legal guardian(s) authorizing a minor to be escorted by another adult to visit an inmate.

1.8.1.4    <u>Section Four</u>

1.8.1.4.1    Preliminary Notice of Visitation Suspension, Form 911-5. All copies.

1.8.1.4.2    Documentation for all special circumstance visits.

1.8.1.4.3    Special Visit Request, Form 911-6 - All requests.

1.8.1.4.4    Inmate correspondence regarding visitation.

1.8.1.4.5    Responses to inmate correspondence regarding visitation.

1.8.1.4.6    Information Reports regarding an inmate's visitation.

1.8.1.4.7    All visitor suspension correspondence.

1.8.1.4.8    All inmate non-contact assignment correspondence.

1.8.1.4.9    Visitor medical/special needs information.

1.8.2    A daily Visitor Sign-In, Form 911-8, shall be completed for each day visits are conducted. The daily record shall be retained a minimum of 30 days in a separate filing system by the unit.

1.8.3    A visitation file shall be established for all inmates, including inmates electing not to participate in visitation activity. The file shall contain all completed inmate Visitation Waivers.

1.8.4    Visitation staff shall maintain a permanent record log reflecting receipt and/or transfer of all inmate visitation files for a period of one year.

1.8.5    An inmate's visitation file shall be forwarded when the inmate is transferred to another unit. Upon notification, visitation staff shall deliver the visitation file to the institution Offender Information staff, who shall ensure the visitation file is transferred with the inmate.

1.8.6     When unforeseen emergency movement of inmates occurs, visitation staff shall forward the visitation files to the inmate's receiving unit. This activity shall occur on the first work day following the emergency movement.

    1.8.6.1     If an inmate's visitation file was not forwarded with the transferring inmate, the receiving unit shall notify the sending unit, by email or fax, that the file was not transferred. A copy of the notification shall be retained for file.

    1.8.6.2     A temporary visitation file for each inmate shall be established when the inmate's permanent file is not available.

    1.8.6.3     All persons currently listed on AIMS as approved for visitation may visit the inmate at <u>any</u> Department unit without being subjected to re-qualifying through the Visitation Application process.

1.9     <u>Annual Background Review</u>

    1.9.1     Visitation staff shall annually:

       1.9.1.1     Run all approved adult visitors through the ACIC/NCIC system to determine continued visitation privileges and admittance to ADC institutions. Any criminal or felonious activity, to include warrants deemed to pose a threat to safe, orderly operations of an institution may constitute suspension or denial of visit privileges, as outlined in 1.4.4 of this section.

       1.9.1.2     Run all minors and infants through the ACIC/NCIC Wants and Warrants and Missing Persons data bases. Minors, ages 7 - 17, shall also be run through the Juvenile Online Tracking System (JOLTS), as outlined in 1.4.4 of this section.

    1.9.2     The ACJIS operator, shall run an annual background report. If a new felony, criminal activity, etc. is discovered, the ACJIS operator shall forward the information to the Unit requesting the annual background. The unit Deputy Warden shall determine if visitation privileges shall continue for the visitor. If there is no new activity from the last annual approval date, visitation privileges shall continue.  The same process shall apply for denials/removals of visitation privileges as outlined in 1.4, through 1.6 of this section.

## 911.02     VISITATION PROCESS

1.1     Upon each visit, visitors shall be required to register by fully-completing the daily Visitor Sign-In at the Visitation Office.

1.2     Visitation staff shall establish and maintain an AIMS visitation record for each inmate. The record shall contain each visitor's complete name and the date(s) of each visit.

1.3     Persons shall be denied visitation at <u>all</u> Department institutions if conditions outlined in section 911.01, 1.5.1.1 through 1.5.1.10 of this Department Order, apply.

1.4    An inmate may refuse visitation from anyone, except a Department employee conducting official business or a person(s) acting under a court order. An inmate refusing visitation with any other persons shall be required to complete a Visitation Waiver for each instance of refusal. Inmates may visit, space permitting, with a maximum of six persons at one time, regardless of age, during each visitation. Inmates requesting visitation with more than six persons at one time shall complete a Special Visit Request at least 15 days in advance of the visit.

1.5    Visitors are prohibited from visiting more than one inmate during visitation, unless the other inmate is an immediate family member and the visitor is approved to visit the inmate as outlined in section 911.01, 1.3.9 of this Department Order. Nor may inmates visit with another inmate's visitors, unless the inmates are immediate family members of the visitor, and the visitors have been approved to visit both inmates.

1.6    Only one group shall sit at a table, except when the Visitation Area is experiencing space shortages. Visitation staff may allow more than one group to occupy a table if it is unlikely to create a problem.

    1.6.1    In the event the Visitation Area is at maximum capacity, Visitation staff shall ask visitors, on a voluntary basis, to end their visit. If a sufficient number of visitors fail to volunteer, staff shall terminate visits, beginning with the first visitors processed, until the required seating/space is available for incoming visitors.

        1.6.1.1    Visitors shall be permitted a two-hour visitation period prior to termination due to capacity issues.

        1.6.1.2    The Warden or unit Deputy Warden at remote facilities may alter minimum visitation time standards prior to terminating visits due to capacity issues. All changes to visitation periods shall be written and posted.

1.7    Breast-feeding during visitation is an acceptable practice when requested by the mother.

    1.7.1    Reasonable accommodation shall be made to provide privacy to the mother and infant in an area near, but separate from, the general visitation area.

    1.7.2    If a physically-separate area is unavailable or is not conducive to sound correctional practice, a privacy screen may be utilized within the general visitation area.

    1.7.3    For additional information, refer to the Visitation Post Order.

1.8    Visitation staff shall terminate visitation when an inmate or visitor becomes unruly and/or disruptive, with authorization from the shift commander, chief of security, or duty officer.

1.9    <u>Denial of Entry</u> - Approved visitors shall be denied entry to the unit and/or visitation area, if the person:

    1.9.1    Is currently suspended from visiting <u>any</u> Department institution.

    1.9.2    Fails to provide proper identification.

    1.9.3    Does not meet the Department's dress and/or grooming standards.

1.9.4　　Is reasonably suspected of being under the influence of alcohol and/or drugs.

1.9.5　　Possesses contraband or illegal contraband.

1.9.6　　Uses abusive language and/or engages in actions which disrupt the safety, security, and/or orderly operation of the unit.

1.9.7　　Is a minor/young child <u>not</u> accompanied by an adult and listed on the inmate's approved visitation list.

1.9.8　　Is the subject of a Service Dog <u>alert</u>, a <u>positive</u> Ion Scan reading, or fails to clear the metal detector.

1.10　　<u>Visitor Identification</u> - Adult visitors shall present acceptable evidence of identification upon entering and exiting the unit's visitation processing area.

1.10.1　　Identification shall include the visitor's name, a photograph, and date of birth. Visitation staff shall ensure this information is the same as that listed on the visitor's application and in AIMS.

1.10.2　　Acceptable photographic identification for adult visitors shall include, but is not limited to:

1.10.2.1　　Military Identification Card.

1.10.2.2　　Passport.

1.10.2.3　　Valid state driver's license.

1.10.2.4　　Official photographic identification cards originating from any U.S. state or federal agency, including government employee identification cards and Immigration and Custom Enforcement Agency (ICE) documentation cards. The Department shall not accept consular identification cards issued by a foreign government as a valid form of identification, pursuant to A.R.S 41-5001.

1.11　　<u>Conduct in the Visitation Area</u>

1.11.1　　Inmates and visitors shall conduct themselves in accordance the rules of conduct outlined in section 911.09 of this Department Order.

1.11.2　　Reporting Misconduct - An Information Report and/or Disciplinary Report, documenting unusual and/or misconduct incidents occurring in the Visitation Area, shall be submitted by the observing staff member(s).

1.11.2.1　　Suspensions and appeals due to misconduct shall be handled as described in section 911.06 of this Department Order.

1.11.2.2　　All violations and warnings shall be noted and entered on the AIMS Offender Comments/Visitation screen on a daily basis.

1.12　　<u>Allowable Property</u>

1.12.1　　Visitors shall be permitted only the items listed below. All other items <u>shall</u> remain secured in the visitor's vehicle or in pay lockers, if applicable.

CHAPTER 900 – INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER – 911 – INMATE VISITATION

1.12.1.1    Personal identification. For security reasons, personal identification shall be held by the Visitation office.

1.12.1.2    Prescription medication, in the original container, and only in a limited amount needed during the visitation period. For safety reasons, prescription medications shall be held by the Visitation office, with exception to inhalers and nitroglycerin medication in case of emergency.

1.12.1.2.1    Visitation staff shall attach the prescription medication to the visitors Personal Identification and place in an envelope. Prescription medications shall be kept in a secured location, within the Visitation office as determined by the Unit administration.

1.12.1.3    One unopened package of cigarettes. A flameless electric cigarette lighter shall be located in the designated smoking sections of the visitation area. The lighter shall be protected from the weather and shall be out of children's easy reach. The lighter shall be identified by a sign that includes a warning to keep children away.

1.12.1.3.1    Smoking may be prohibited in some Visitation areas in accordance with Department Order #109, Smoking and Tobacco Regulations.

1.12.1.4    Possession of coins totaling a maximum of $30.00 per visitor.

1.12.1.5    One wedding/engagement ring, one religious medallion, one wristwatch and one pair of earrings or two observable body piercing adornments. The visitor shall wear all items brought into visitation throughout the visit.

1.12.1.6    Two vehicle keys or one key and a vehicle remote control entry device.

1.12.1.7    One handheld baby carrier per infant. The carrier shall be subjected to a thorough search prior to entry. Strollers or carriers with wheels shall not be permitted. Toys shall be prohibited, except as outlined in 1.15.2.1.1 through 1.15.2.1.3 of this section.

1.12.1.8    One clear plastic diaper bag, per infant, that shall be subjected to a thorough search prior to entry. A diaper bag may contain only the following items:

1.12.1.8.1    Three clear-plastic baby bottles of milk/formula or equivalent size unopened, commercially sealed containers of juice.

1.12.1.8.2    Four small clear plastic containers of soft food or baby food such as Tupperware containers.

1.12.1.8.3    One diaper for each hour of visitation.

1.12.1.8.4    One clear container or Ziploc bag of baby sani-wipes.

1.12.1.8.5    One blanket, measuring no larger than 4' by 4'. The blanket cannot be tan in color.

1.12.1.8.6    One small plastic spoon used to feed an infant.

1.12.1.8.7    One baby pacifier.

1.12.1.8.8    One change of baby clothing.

1.12.1.8.9    One baby bib.

1.12.1.8.10   One small tube of diaper rash medication.

1.12.1.9    With the exception of cigarettes and disposable baby items (diapers, wipes), each visitor shall leave the visitation area with the exact property items possessed at the time the visitor was processed to visit.

1.12.2    Inmate permitted items in the visitation area:

1.12.2.1    An inmate is required to wear and provide the Department-issued identification (ID) card at all times, including during the visitation period.

1.12.2.2    An inmate may take in/out of the visitation area the following items only:

1.12.2.2.1    One-wedding/engagement ring, one religious medallion, and required medication in an amount sufficient for the length of the visit.

1.12.2.2.2    A locker key or room key, if applicable.

1.12.2.2.3    A reasonable quantity of tobacco products sufficient for the length of the visit. Absolutely no tobacco products shall be permitted to return to the unit from the visitation area.

1.12.2.2.4    One pair of regular prescription eyeglasses or reading eyeglasses. Sunglasses are prohibited unless prescription sunglasses are authorized.

1.12.2.3    An inmate is prohibited from possessing any coins or currency. An inmate shall be permitted to take absolutely no money in or out of the visitation area.

1.12.2.4    Only vending machine items and the permitted tobacco products may be exchanged between an inmate and visitor during visitation. All other exchange of personal property and items is prohibited.

CHAPTER 900 – INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER – 911 – INMATE VISITATION

1.13    Food and Beverage

1.13.1    Visitors are prohibited from taking any food or beverages into the visitation area, except as outlined in this section and section 911.08 of this Department Order.

1.13.2    Vending machines may be provided for hot/cold beverages and snacks for inmate and visitor convenience in the visitation area.

1.14    Visitor Dress Code

1.14.1    All clothing shall be clean, worn in good repair, be non-offensive, and within the bounds of common decency.

1.14.2    Visitors shall not wear any article of clothing fabricated with spandex-like material or clothing that is orange in color. Sheer, see through and/or open-netted clothing is prohibited.

1.14.3    Visitors are prohibited from wearing any brown-colored clothing that resembles the clothing worn by Department security staff, including khaki-colored clothing, solid light tan or light brown-colored shirts or dark brown-colored pants or slacks.

1.14.4    A visitor who has been determined, during initial registration, not to be in compliance with the Visitor Dress Code shall be given an opportunity to leave the prison grounds and return dressed appropriately, in compliance with the dress code requirements. No additional opportunities to gain compliance shall be extended for that specific visitation day.

1.14.5    The dress code for female visitors (age eight and over) is:

1.14.5.1    Shorts shall be knee length, when standing. Jogging shorts, cut-offs, or hip huggers are prohibited.

1.14.5.2    Skirts and dresses shall be knee length, when standing. Slits in skirts and dresses shall not extend above mid-thigh when seated.

1.14.5.3    Sleeveless tops or dresses; tank, tube, and halter tops; tops that are strapless; tops that allow display of bare midriff; mesh clothing; body suits; and swimsuits are prohibited.

1.14.5.4    Tops of clothing shall be no lower than the person's collarbone in the front and back. No cleavage shall be exposed.

1.14.5.5    Undergarments shall be worn at all times.

1.14.5.6    Shoes shall be worn at all times.

1.14.5.7    A wig or clip-on hair piece may be worn if medical documentation is provided and justifies the need.

1.14.6    The dress code for male visitors (age eight and over) is:

1.14.6.1    Shorts shall be knee length, when standing. Jogging shorts, cut-offs, or hip huggers are prohibited.

|  |  |
|---|---|
| 1.14.6.2 | Shirts shall be worn at all times. Muscle shirts; sleeveless shirts; tank-style shirts; mesh shirts; or shirts that display bare midriff are prohibited. |
| 1.14.6.3 | Undershorts shall be worn at all times. |
| 1.14.6.4 | Shoes shall be worn at all times. |
| 1.14.6.5 | A wig or clip-on hair piece may be worn if medical documentation is provided and justifies the need. |

1.15   **Visitation Area Recreational Activities**

1.15.1   Recreational opportunities for visitors shall be provided in contact visitation areas.

1.15.2   In accordance with Department Order #303, <u>Bank Accounts/Petty Cash System</u>, table/board games shall be purchased with available Activities and Recreation Funds.

|  |  |
|---|---|
| 1.15.2.1 | Authorized recreational items are: |

|  |  |
|---|---|
| 1.15.2.1.1 | Appropriate board games such as "Candyland," "Chutes and Ladders," "Connect 4," Memory games, Dominos, Scrabble and "Pictionary." |
| 1.15.2.1.2 | Simple playing card games such as "Uno," "Racko," "Old Maid," "Skip Bo' and regular playing cards. |
| 1.15.2.1.3 | Small simple illustrated children books, coloring books and crayons. |

|  |  |
|---|---|
| 1.15.2.2 | Prohibited recreational items include: |

|  |  |
|---|---|
| 1.15.2.2.1 | Any toy or game containing or having any metal or glass pieces as its parts. |
| 1.15.2.2.2 | Games that include play/fake currency or dice. |
| 1.15.2.2.3 | All stuffed animals, "Nerf-type" sports equipment, and animated books. |
| 1.15.2.2.4 | All items designated by the Warden or unit Deputy Warden or where specific written justification for exclusion has been provided. |

1.16   <u>Visitor Guidelines</u> -To enhance visitation, Attachment C, Visitor Guidelines, provides basic information concerning proper identification and dress code requirements, searches, allowable property and visitor conduct. A duplex-sided copy of the attachment shall be made available to all inmates and visitors. Inmates are responsible for providing a copy of the attachment to prospective visitors when mailing the Application to Visit an Inmate.

1.17   Animals are prohibited on prison property except for service animals accompanying an individual with a disability.

**911.03**      **SEARCHES**

1.1      <u>Visitor Searches</u> - All visitors, their personal possessions, and vehicles are subject to search by one or more of the methods listed below.

1.1.1      All visitors and their possessions are subject to physical search by staff, electronic metal detection devices, barrier sniff screening (Narcotics Detection) by a Department Service Dog, and/or Ion Scanning.

1.1.1.1      All visitors and their possessions shall successfully pass scanning by electronic detection devices/equipment.

1.1.1.1.1      All visitors shall remove their shoes. All shoes shall be passed through and clear the metal detector and shall be physically inspected/searched before returning to the visitor. Special attention shall be paid to athletic shoes worn by visitors, inspecting the inner sole and heel of the shoe to ensure no contraband is concealed. If shoes are unable to clear the metal detector, a secondary physical inspection/search shall occur to determine the reason the shoes are unable to clear. If no contraband is discovered during the physical inspection/search, the On-Site Duty Officer shall make the determination to allow the visitor in to visit.

1.1.1.1.2      If a visitor does not pass the scan, they will be notified they can return to their vehicle and remove any objects which may alert the scanner and return to pass through the electronic metal detector a second time.

1.1.1.1.3      If they do not clear the electronic metal detector on the second attempt, staff may elect to hand wand the area activating the electronic metal detector.

1.1.1.1.4      If they do not clear the electronic metal detector after hand wand, they will be asked to leave the facility and will not be permitted access to visitation for the day.

1.1.1.1.5      Under NO circumstances will a minor child (anyone under the age of 18) be searched with a hand wand. If the minor child does not pass the electronic metal detector, the child and accompanying legal guardian may be allowed to leave and return for a second attempt. If the minor child cannot pass the electronic metal detector after the second attempt, they will not be allowed to visit.

1.1.1.2      A visitor, with a special medical condition possibly affecting the reading of electronic detection equipment, shall advise Visitation staff prior to undergoing scanning by electronic detection devices/equipment. Examples may include a prosthesis, an embedded metal surgical pin or plate. The visitor shall be required to provide documentation of the existing medical condition prior to the second visit.

CHAPTER 900 – INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER – 911 – INMATE VISITATION

1.1.2  Visitors refusing to submit to a search shall be denied visitation. The Duty Officer, or in the absence of the Duty Officer, the Shift Commander shall be notified of all Service Dog alerts, positive Ion Scan readings and contraband recoveries.

1.1.3  All persons denied visitation shall be required to depart Department property immediately.

1.2  **Inmate Searches**

1.2.1  Prior to entering the visitation area, all inmates shall be thoroughly pat-searched by staff.

1.2.2  When reasonable suspicion exists that an inmate may be the recipient of contraband during visitation, a strip search shall be conducted prior to the inmate entering the visitation area to preclude entry of items facilitating the introduction of contraband, including the use of lubricants and balloons.

1.2.3  Upon completion of visitation, <u>all</u> inmates shall be strip searched by staff prior to exiting the visitation area and returning to their unit.

1.3  <u>Vehicle Searches</u> - All vehicles on Department property are subject to search. The owner/user shall be present during the search.

1.3.1  A Service Dog or Ion Scanning shall be deployed to screen the vehicle, when available.

1.3.1.1  All vehicle occupants shall be required to exit the vehicle.

1.3.1.2  If contraband or illegal contraband is detected during the search of a vehicle, staff shall confiscate the item(s). When illegal contraband is detected, the appropriate CIU shall be notified immediately. CIU shall be responsible for determining if local law enforcement is to be notified.

1.3.1.2.1  The person(s) responsible for the illegal contraband shall be denied visitation by the on-site Duty Officer. If no one in the vehicle claims responsibility for the contraband the driver of the vehicle will assume responsibility.

1.3.1.2.2  A Preliminary Notice of Visitation Suspension shall be issued to the person(s), pending review by the unit Deputy Warden. The owner/user and the vehicle shall be required to depart Department property immediately.

1.3.1.2.3  All other occupants in the vehicle will be suspended for the day.

1.3.1.3  A Department Service Dog alert <u>or</u> positive Ion Scan reading involving a vehicle in which no contraband is found shall result in all occupants of the vehicle being suspended for the day.

1.3.1.4    In accordance with Department Order #708, <u>Searches</u>, if a visitor is the subject of a Service Dog alert or a <u>positive</u> Ion Scan reading, <u>and extraordinary circumstances exist</u>, the Warden may authorize non-contact visitation for the visitor, who is the subject of the alert or the positive reading, as outlined in section 911.04 of this Department Order. Examples of extraordinary conditions include an alert or positive scan on an out-of-state visitor or an individual who is seriously ill or impaired, etc.

1.4    Reporting and Documenting Incidents - An Information Report and all related documents pertaining to the incident shall be completed and forwarded to the unit Deputy Warden. The unit Deputy Warden shall review all information related to the Service Dog alert or <u>positive</u> Ion Scan reading, including Ion Scan printouts, and within five work days, provide the affected person(s) with written notification of the outcome of the review.

1.4.1    All incidents shall be fully-documented on an Information Report.

1.4.2    Circumstances of the incident shall be entered on the appropriate AIMS screen.

**911.04    NON-CONTACT VISITATION**

1.1    The unit Deputy Warden shall determine visitation status relative to non-contact visitation. Deciding factors shall include consideration of:

1.1.1    Past behavior of the inmate and/or visitor during visitation.

1.1.2    An inmate's disciplinary record.

1.1.3    Other available information relating to sound correctional practice.

1.2    Non-contact visitation may be imposed:

1.2.1    To maintain the safety, security, and orderly operation of the unit.

1.2.2    For the well-being of visitors, staff, and inmates.

1.2.3    When an inmate is suspected of trafficking in contraband.

1.2.4    For repeated violation of visitation rules.

1.2.5    For purposes of investigation, when a visitor is found to possess a substance believed illicit or unauthorized.

1.2.5.1    Placement on non-contact visitation status, for investigative purposes, shall not exceed 30 calendar days.

1.2.5.2    Final determination that a substance(s) is illicit or unauthorized shall result in an additional suspension of the person(s) visitation, in accordance with section 911.06, 1.7 and 1.8 of this Department Order.

1.3    An inmate may be placed on non-contact visitation status for suspected drug activity until an investigation has been completed and appropriate disciplinary action taken.

1.3.1    Non-contact visitation for <u>suspected</u> drug activity shall not exceed 30 calendar days.

1.3.2    Should the substance(s) be determined to be illicit or unauthorized, further suspension of visitation shall be enacted in accordance with section 911.06, 1.7 and 1.8 of this Department Order.

1.4    An inmate who refuses to provide a urine specimen <u>or</u> whose urine specimen tests positive for drugs shall be placed on Non-Contact Visitation status, regardless of any disciplinary action.

1.4.1    First Incident – Suspension for 90 days and 180 days of non-contact visitation status.

1.4.2    Second Incident – Suspension for 180 days and one year of non-contact visitation status.

1.4.3    Third Incident – Suspended indefinitely and indefinite non-contact visitation. The Warden or unit Deputy Warden may impose permanent suspension of visitation.

1.5    The unit Deputy Warden shall establish a review date for each inmate assigned non-contact visitation status identified in 1.4.1 and 1.4.2 of this section. The review date shall be entered into the AIMS.

1.6    Inmate populations designated for non-contact visitation are:

1.6.1    Special Management Units.

1.6.2    Inmates in or on Detention status.

1.6.3    Reception Centers.

1.6.4    Central Unit - Florence.

1.6.5    Special Management Area - Perryville.

1.6.6    Those in any other status designated by the Warden or unit Deputy Warden.

1.7    An inmate shall be provided written notification of placement on non-contact visitation status in a timely manner (See Attachment A.)

1.7.1    The written notification shall contain a statement advising that the inmate has 14 calendar days to provide information, which may impact the decision, to the unit Deputy Warden.

1.7.2    Inmates assigned to a unit identified in 1.6.1 though 1.6.6 of this section shall not receive written notification of placement on non-contact visitation status.

1.8    An inmate placed on non-contact visitation status shall remain on that status until removed by the unit Deputy Warden where the inmate is assigned.

1.9    A decision by the unit Deputy Warden for placement into non-contact visitation may be appealed to the Warden within ten work days of the date of the notice. A decision by the Warden is final and cannot be appealed.

1.10    Visitation staff shall maintain a record of all inmates designated as non-contact visitation status. The record shall reflect the date of placement on non-contact visitation status for each inmate. Visitation staff shall submit, by the 28th day of each month, to the Warden through the chain of command, an informational memorandum listing all inmates currently on non-contact visitation status for the month. Information required includes:

    1.10.1    Inmate's full name.

    1.10.2    Inmate's Arizona Department of Corrections (ADC) number.

    1.10.3    Initial placement date.

    1.10.4    Review date.

    1.10.5    Status termination date.

    1.10.6    Reason or purpose for status.

1.11    Visitation staff shall document the non-contact visitation status for each inmate, including appropriate information being entered in AIMS on Offender Comments and Visitation screens.

1.12    All non-contact visitation is subject to space limitations, and prior reservations are required. The location and duration of the visitation shall be determined by the unit Deputy Warden.

## 911.05    SPECIAL CIRCUMSTANCE VISITATION

1.1    Hospitalized Inmates - Visits for hospitalized inmates shall be permitted for immediate family members when specifically authorized, in writing, by the Warden or unit Deputy Warden, with the concurrence of the attending physician and the Facility Health Administrator and one of the following criteria has been met:

    1.1.1    The inmate has been hospitalized for a period of 30 days or more.

    1.1.2    The inmate's death has been determined by medical staff to be imminent.

1.2    Law Enforcement Visitation - A law enforcement official(s) seeking to interview an inmate on official business shall be required to present proper identification (e.g., badge and identification card) for review by the Criminal Investigations Unit (CIU) staff prior to being granted visitation.

    1.2.1    CIU staff shall:

        1.2.1.1    Determine and document the purpose of the visit.

        1.2.1.2    Provide the law enforcement official(s) with appropriate Departmental policies and procedures for review prior to granting visitation to ensure the law enforcement official(s) is knowledgeable and in compliance with Department Orders during the interview process, specifically as it relates to providing/supplying an inmate an item(s) not issued or authorized by the Department.

1.2.2    Law enforcement officers serving as routine transportation officers are exempt from requirements of 1.2.1 through 1.2.1.2 of this section.

1.2.3    Should the Department be a party to a criminal or civil investigation, where a law enforcement official(s) is requesting admittance to conduct interviews with staff and/or inmates, or is requesting access to investigative reports, the official(s) shall be referred to the Department's Inspector General. Interviews shall not be conducted, nor reports released, until the request(s) has been authorized by the Inspector General.

1.2.4    Federal Bureau of Investigation agents, or other federal agency employees requesting visitation for conducting an interview(s) with Department staff or inmates for the purpose of investigating an alleged civil rights violation(s) are required to advise and consult with the Director, pursuant to the United States Code 42, Civil Rights Institutional Persons Act, Sub-chapter 1997b. The agent(s) shall be referred to the Inspector General. Admittance and/or interviews shall not be granted until the request(s) has been authorized by the Inspector General.

1.3    Special Needs Inmate Visitation - A special visitation area shall be designated for an inmate with special management needs, such as those inmates assigned to the Department's Reception Centers, the Special Management Units, Death Row, Administrative Detention, Protective Segregation, and Special Programs Unit.

1.3.1    Special Management Units are mandated as non-contact visitation for all visitations.

1.3.2    All inmates pending Protective Segregation classification action shall be closely supervised and physically separated from all other inmate visitation while participating in visitation activities and during escorts to and from visitation.

1.4    Religious Visitation - Religious visits shall be conducted in accordance with Department Order #904, Inmate Religious Activities/Marriage Requests.

1.5    Department Employee Visitation - Department employees, conducting official business, shall contact appropriate unit staff to schedule a visit with an inmate.

1.6    Court Order Visitation - Persons acting under a court order shall contact the appropriate unit staff to arrange/schedule a visit with an inmate. A copy of the court order shall be provided to appropriate unit staff for inclusion in the inmate's Visitation, Institution and Master files.

1.6.1    Court ordered visitation will be facilitated on the 1st and 3rd Friday of each month.

1.6.2    Department of Economic Security (DES) caseworkers must call the unit where the inmate is assigned to request a visitation time slot at least seven days prior to the Friday visit. DES caseworkers must bring their state identification card (with photo) to gain access to the facility.

1.7    Special Visitation - Inmates shall submit a Special Visit Request to their assigned Correctional Officer III at least 30 days prior to the date of the requested visit.

1.7.1    Only the unit Deputy Warden or designee may authorize special visits for:

    1.7.1.1    Exceptionally large families to facilitate all members visiting as a group with the inmate.

    1.7.1.2    Out-of-state visitors.

    1.7.1.3    Visitors unable to visit on a regular basis.

    1.7.1.4    Extraordinary circumstances.

1.7.2    Inmates shall complete a Special Visit Request prior to the visit and the Special visitors shall be required to clear the ACIC/NCIC criminal history background check.

    1.7.2.1    A one-time background check fee of $25.00 will be assessed for all adult visitors, not already approved, wishing to visit for special circumstances.

    1.7.2.2    The unit Deputy Warden may waive the 30 day time frame and/or the $25.00 background check fee for a one-time special visit due to extraordinary circumstances.

1.8    <u>Legal Visits</u> - Legal visits shall be conducted in accordance with Department Order #902, <u>Inmate Legal Access to the Courts</u>. As noted in Department Order #915, <u>Inmate Phone Calls</u>, inmates may include foreign consulates on their Visitation List.

1.9    <u>Holiday Visits</u> - Visitation may be scheduled during the normal work week when the following holidays occur during a week day. Those holidays that fall on a weekend day shall be considered the actual holiday and not the day before or after the weekend. For information regarding holiday visits, custody and phase eligibility, and dates held see Department Order #809, <u>Earned Incentive Program</u>.

1.9.1    New Years Day

1.9.2    Valentine's Day

1.9.3    Mother's Day

1.9.4    Father's Day

1.9.5    Independence Day (4th of July)

1.9.6    Labor Day

1.9.7    Veteran's Day

1.10    <u>Inmate Photographs</u> – Inmates are authorized to have photographs taken of themselves and/or their family members on identified holidays during specified time periods.

1.10.1    Visitation Photograph Schedule:

    1.10.1.1    New Years Day

    1.10.1.2    Mother's Day

CHAPTER 900 – INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER – 911 – INMATE VISITATION

1.10.1.3    Independence Day (4th of July)

1.10.1.4    Veteran's Day

1.10.2    Visitation Process - Photographs:

1.10.2.1    Only inmates who are authorized contact visits will be eligible to participate in the photograph process.

1.10.2.2    The unit Deputy Warden shall designate one location in each visitation area where all photographs shall be taken.

1.10.2.3    Maximum Custody and Special Management Areas are excluded from the photograph process.

1.10.2.4    Inmates wishing to participate in the process will be required to complete an Inmate Request for Withdrawal, Form 905-1, for the cost of the photos (currently $2.00 each with a limit of 4 photos). The Inmate Requests for Withdrawal form will be accepted two (2) weeks prior to the holiday.

1.10.2.5    No refunds will be issued for photographs that are seized or destroyed in accordance with this Department Order or for photographs not taken.

1.10.2.6    Prior to photographs being taken, inmates and visitors must be in full grooming and clothing compliance in accordance with Department policy and procedures.

1.10.2.7    Inmates and their visitors are prohibited from displaying excessive touching, kissing, or any hand gestures, gang signs, sexual acts or innuendos, simulated sexual acts or innuendos, or blatant display of tattoos.

1.10.2.8    Photographs will only be taken with approved digital equipment purchased by the institution or through the A & R Fund.

1.10.2.9    Staff designated by the unit Deputy Warden shall print and review all photographs for appropriateness and forward photos to the appropriate inmate who may retain or send the photo(s) out through mail and property.

1.10.2.10    Any photograph deemed inappropriate or in violation of this Department Order will be considered nuisance contraband and will be processed in accordance with Department policy and procedures.  Inmate is also subject to disciplinary proceedings.

1.10.2.11    Photographs will only be taken during regular visitation hours.

1.10.2.12    Inmates who are eligible for contact visitation who did not receive a visit shall be permitted to participate in the program during the time periods specified by the unit Deputy Warden. Photographs shall only be taken in the designated area of visitation.

1.10.2.13    Inmates receiving special visits may take photos only if the visit is on the authorized weekend or if the unit Deputy Warden approves an exception.

1.10.2.14    Inmates are prohibited from making copies of the visitation photographs. At no time should copies be made by staff for the inmates.

1.10.2.15    Inmate visitation photographs cannot be altered and sent back into the institution through the mail. Visitation photographs cannot be mailed from one inmate to another inmate.

1.10.2.16    Photographs will only be permitted on the day of the designated holiday and the weekend attached to that holiday.

**911.06        SUSPENSION OF VISITATION**

1.1    Cause for suspension includes:

1.1.1    Introduction and/or attempted introduction of contraband or illegal contraband, or discussion of contraband introduction.

1.1.2    Escape, attempted escape, or discussion of escape.

1.1.3    Any action, attempted action, or discussion of action(s) that may jeopardize the unit safety and/or security. This includes infractions of the inmate disciplinary system.

1.1.4    Any criminal activity, attempted criminal activity or discussion of criminal activity.

1.1.5    Any discussion of graphic, detailed descriptions of sexual acts.

1.1.6    Any misconduct, attempted misconduct or discussions of misconduct, as outlined in section 911.02 of this Department Order.

1.1.7    A Service Dog alert or positive Ion Scan reading.

1.2    Visitation Suspension Periods (See Attachment B):

1.2.1    Suspension periods for a Service Dog Alert or positive Ion Scan reading are:

1.2.1.1    First Incident - Visitor shall be suspended for the day.

1.2.1.2    Second Incident - Suspension for 30 days and 90 days of non-contact visitation status for the visitor following reinstatement.

1.2.1.2.1    If the visitor visits more than one inmate, the non-contact visitation shall also apply to visits with other inmates.

1.2.1.2.2    When a non-contact status visitor visits an inmate, the visit shall be non-contact, even if an inmate's other approved visitors are present.

CHAPTER 900 – INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER – 911 – INMATE VISITATION

1.2.1.3    Third Incident - Suspension for 90 days and 180 days of non-contact visitation status for the <u>visitor</u> if visitation privileges are reinstated.

1.2.1.4    Fourth Incident - Suspension for one year and indefinite non-contact visitation status for the <u>visitor</u> if visitation privileges are reinstated.

1.2.2    Suspension periods for possession of contraband and/or violation of standards of behavior are:

1.2.2.1    First Incident - Suspension for 90 days and 180 days of non-contact visitation status for the visitor following reinstatement.

1.2.2.2    Second Incident - Suspension for 180 days and one year of non-contact visitation status for the visitor following reinstatement.

1.2.2.3    Third incident - Suspended indefinitely and indefinite non-contact visitation for the visitor if visitation privileges are subsequently reinstated. The Warden or unit Deputy Warden may impose permanent suspension of visitation.

1.2.3    Suspension period for possession of illegal contraband. Suspension for 180 days, minimally, and one year of non-contact visitation status for visitor if visitation privileges are subsequently reinstated. Indefinite suspension and/or non-contact visitation status for the visitor may be considered based on the circumstances and type of illegal contraband detected.

1.3    Visitor appeals relating to visitation suspensions shall be addressed to, reviewed by, and decided by the Warden and not a designee. The Warden shall forward the appeal to the appropriate Regional Operations Director for review. The Regional Operations Director's decision is final.

1.4    Inmate visitation suspensions may be addressed through the inmate disciplinary system. Inmate appeals involving visitation suspensions may be addressed through the inmate disciplinary system appeals process.

1.5    Suspension of a person(s) visitation privileges shall also result in that person's telephone privileges being suspended. Suspension of visitation and telephone privileges shall be handled in the same manner.

1.5.1    When the telephone number of a suspended telephone call recipient is the same as another approved person, the unit Deputy Warden or designee may permit an inmate to call the person not under suspension at that number, provided that person is an immediate family member.

1.6    The visitor may submit a written statement to the Warden or unit Deputy Warden for review within five work days of the incident.

1.7    After reviewing all available information, the Warden or Deputy Warden shall determine appropriate action based on the specific circumstances and/or types of contraband detected.

1.8    A suspension may be extended, based on the issues and circumstances related to the incident. For standards of behavior, refer to Department Order #915, <u>Inmate Phone Calls</u>.

    1.9    Visitation and/or telephone privileges may be reinstated at the completion of the person's suspension period. A new visitation application shall be completed and shall be approved by the Warden or unit Deputy Warden prior to reinstatement.

**911.07**    **SECURITY REQUIREMENTS**

    1.1    The Warden or unit Deputy Warden at any Department facility may suspend all visitation activities upon determining the safety, security, and/or orderly operation of the unit is jeopardized.

    1.2    <u>Physical Security Requirement</u> - The Warden and unit Deputy Warden shall ensure:

        1.2.1    Visitation areas and buildings conform to physical security, access controls and security supervision consistent with the control needs of the inmate population of the unit being served.

        1.2.2    Sufficient security staff is assigned to ensure the safe, secure and orderly operation of each visitation area.

        1.2.3    40 hours of formalized, on-the-job training, including 16 hours of AIMS computer training, is provided to staff newly-assigned as a Visitation officer.

    1.3    In visitation areas where contact visitation occurs, the inmate and visitor restrooms shall be equipped with exterior locking mechanisms at the discretion of the Warden or unit Deputy Warden. Visitation staff shall control access to the restrooms.

    1.4    Shift Commanders shall tour the visitation area, minimally once per shift during scheduled visiting hours.

    1.5    On-site duty officers shall conduct a tour of the visitation area, at least once during scheduled visiting hours.

    1.6    Computer terminals shall be secured from both public and inmate access. Visual display monitors at the visitation registration offices shall be located and positioned to preclude viewing by inmates and/or visitors.

**911.08**    **VISITATION PRIVILEGES – REGULAR, HOLIDAY AND FOOD VISITS** - This section establishes procedures for the provisions of an inmate's earned incentive plan based on the inmate's Earned Incentive Program Phase and custody level as outlined in Department Order #809, <u>Earned Incentive Program</u>.

    1.1    Visitation periods will be in four-hour blocks each weekend, starting at 8:00 A.M. to 12:00 P.M. and 12:00 P.M. to 4:00 P.M. Frequencies for regular visitation, and food visitation will be based on the inmate's Phase level as outlined in this section.

    1.2    Food for the food visitation will be provided by the inmate's visitors (home cooked or family purchased), for all inmate custody levels except Maximum Custody, and on the approved holiday food visits according to the inmate's Phase. See Department Order #809, <u>Earned Incentive Program</u>, for holiday visitation hours and restrictions.

1.3     Maximum Custody Inmates - Maximum custody inmates shall be allowed to visit a maximum of one, 2-hour block per week with exception to Death Row inmates. Visitation shall be by appointment only. All maximum custody inmate visitations shall be for one block, and is always non-contact regardless of what phase the inmate is in, unless a court order authorizes a contact visit and is approved by the Department's Legal Services Division. The following phase requirements shall be for male Death Row inmates (female Death Row inmates are exempt from phase visitation):

    1.3.1     Phase I – Death Row inmates shall be allowed to visit one, non-contact 2-hour block per week.

    1.3.2     Phase II – Death Row inmates shall be allowed to visit two, non-contact 2-hour block per week.

    1.3.3     Phase III – Death Row inmates shall be allowed to visit three, non-contact 2-hour block per week.

1.4     Close Custody Inmates - See Department Order #809, Earned Incentive Program, Attachment B, for information regarding food visits for inmate in Close Custody.

    1.4.1     Phase I - Close custody inmates shall be allowed to visit one block per week.

    1.4.2     Phase II - Close custody inmates shall:

        1.4.2.1     Be allowed to visit two blocks per week.

        1.4.2.2     Not be eligible for food visitation.

    1.4.3     Phase III - Close custody inmates shall:

        1.4.3.1     Be allowed to visit three blocks per week.

        1.4.3.2     Be allowed food visitation on the following two holidays:

            1.4.3.2.1     Mother's Day.

            1.4.3.2.2     Labor Day.

1.5     Medium Custody Inmates

    1.5.1     Phase I - Medium custody inmates shall be allowed to visit one block per week.

    1.5.2     Phase II - Medium custody inmates shall:

        1.5.2.1     Be allowed to visit three blocks per week.

        1.5.2.2     Be allowed food visitation on the following two holidays:

            1.5.2.2.1     Mother's Day.

            1.5.2.2.2     Father's Day.

    1.5.3     Phase III - Medium custody inmates shall:

        1.5.3.1     Be allowed to visit four blocks per week.

      1.5.3.2     Be allowed food visitation on the following recognized holidays:

          1.5.3.2.1     Valentine's Day.

          1.5.3.2.2     Mother's Day.

          1.5.3.2.3     Father's Day.

          1.5.3.2.4     Veteran's Day.

**1.6**     <u>Minimum Custody Inmates</u>

    1.6.1     Phase I - Minimum custody inmates shall be allowed to visit one block per week.

    1.6.2     Phase II - Minimum custody inmates shall:

      1.6.2.1     Be allowed to visit three blocks per week.

      1.6.2.2     Be allowed food visitation on the following two holidays:

          1.6.2.2.1     Mother's Day.

          1.6.2.2.2     Father's Day.

    1.6.3     Phase III - Minimum custody inmates shall:

      1.6.3.1     Be allowed to visit four blocks per week.

      1.6.3.2     Be allowed food visitation on the following four holidays:

          1.6.3.2.1     Valentine's Day.

          1.6.3.2.2     Mother's Day.

          1.6.3.2.3     Father's Day.

          1.6.3.2.4     Veteran's Day.

**1.7**     <u>Food Visit Regulations</u> -- Families shall provide all food for the food visits, either home cooked or purchased by the family.

    1.7.1     No beverages shall be allowed into visitation on food visit days. Beverages may be purchased as normal inside of visitation.

    1.7.2     All food containers and utensils, per group, must fit into one ice chest/container, which shall be no larger than 36-quart size and must be able to clear the metal detector.

    1.7.3     No more than two different groups of visitors may visit the same inmate at the same time and no more than two different ice chests/containers may be with an entire group of visitors during the visit.

1.7.4      Permissible food items shall be pre-cooked and/or properly prepared prior to arrival, wrapped in plastic or wax paper, or stored in a plastic see-through container. Visitors shall provide their own plastic bags/containers. These items will not be provided by the units.

1.7.5      No food shall be cut on site. All food must be cut and pre-packaged into serving portions prior to arrival.

1.7.6      Allowable items are as follows:

     1.7.6.1      Meat - must be prepared and properly packed prior to entering the unit. Meat shall be deboned, sliced, shredded, diced, or minced.

     1.7.6.2      Salad – Dressing may be brought in a separate, see-through plastic container.

     1.7.6.3      Vegetables - shall be shredded, sliced, or diced. No corn-on-the-cob, but corn may be brought in a see through plastic container.

     1.7.6.4      Baked potatoes - shall be cut in half prior to entering the unit.

     1.7.6.5      Fruits - shall be peeled and quartered/sliced. No whole fruit will be permitted with exception to small fruit such as grapes, cherries, or berries.

     1.7.6.6      Pre-cooked casseroles - in serving portions.

     1.7.6.7      Tamales - must be husked and cut in half.

     1.7.6.8      Bread - must be pre-sliced.

     1.7.6.9      Cheese - must be sliced or grated.

     1.7.6.10      Tortillas.

     1.7.6.11      Pre-packaged chips. Must be transferred into a clear plastic container or bag.

     1.7.6.12      Pie(s) and cake(s) - must be pre-cut into serving portions.

     1.7.6.13      Ice cream - must be in original sealed/unopened container not to exceed one pint per person.

     1.7.6.14      Ice - limited to one bag. Ice may be kept in the bag or loose in the cooler.

     1.7.6.15      Condiments - (salt, pepper, etc.) in pre-packaged, single serving packets.

     1.7.6.16      Utensils - forks and spoons only; shall be light-weight and disposable (plastic).

     1.7.6.17      Paper plates and cups only. No Styrofoam.

1.7.7 Prohibited items are as follows:

1.7.7.1 Glass, metal, or non see-through containers.

1.7.7.2 Appliances of any type.

1.7.7.3 Cardboard food boxes of any type, such as Pizza, etc.

1.7.8 All food not consumed during the visit shall be removed by the visitor.

**911.09 SIGNAGE**

1.1 Each visitation room shall prominently post the following rules for visitors and inmates:

1.1.1 Conduct by inmates and visitors shall be quiet and orderly at all times.

1.1.2 Visitors and inmates are responsible for the conduct of young children and minors and shall be required to monitor and exercise proper control of them during the visit.

1.1.3 A brief kiss and/or embrace shall only be permitted at the beginning and end of the visitation period.

1.1.4 Inmates and visitors shall maintain a distance of at least two feet from any fence.

1.1.5 All clothing shall remain properly fastened at all times.

1.1.6 Inmates and visitors shall remain in an upright position.

1.1.7 Visitors or inmates shall not place their hands inside the other's clothing.

1.1.8 The following conduct is prohibited during visitation:

1.1.8.1 Exposing the genitals or breasts.

1.1.8.2 Lying on the floor or ground, upon seats or tables or under tables, or attempting to conceal the visitor and/or inmate from staff.

1.1.8.3 Sitting on a visitor's lap or holding the visitor on the inmate's lap, with the exception of the inmate's young child, 6 years or younger.

1.1.8.4 Gyrating or thrusting with the pelvic regions, in a standing or sitting position.

1.1.8.5 Sitting with legs entwined or overlapping with another person's legs.

1.1.8.6 Fondling and/or touching the breasts, buttocks, and/or genital area of another person in any manner.

| | |
|---|---|
| 1.1.8.7 | Using hostile, vulgar, or profane language, unruly behavior, engaging in activities that disrupt or disturb others, creating loud noises, creating unsanitary conditions, etc. Information detected during the monitoring of an inmate telephone call, relating to misconduct occurring during visitation, shall be documented as outlined in section 911.02, 1.11.2 of this Department Order. |
| 1.1.8.8 | Straddling bench seats. |
| 1.1.8.9 | Parent or legal guardian failing to properly control or accompany minors/young children while on prison property, including parking lot areas, approach walks, lobby areas, restrooms, and visitation areas. |
| 1.1.8.10 | Walking side-by-side with arms around the visitor, e.g., arms around waist or shoulders. Inmates may hold one hand of a visitor while walking side-by-side. Inmates may hold one hand of a visitor while sitting at a table but hands must remain above the table and visible to staff. |
| 1.1.8.11 | Inmates and visitors failing to keep their hands visible at all times. |
| 1.1.8.12 | Engaging in cuddling activities, laying heads on the shoulders of each other, massaging one another, etc. |

## IMPLEMENTATION

The Visitation Schedule shall be posted in the registration, visitation and designated inmate bulletin boards.

## DEFINITIONS

**BACKGROUND CHECK FEE** – The background check fee is a one-time, non-refundable fee for conducting background checks on adult visitation applications, as authorized by Senate Bill 1621 (Laws 2011, Chapter 33), signed into law and effective July 20, 2011.

**CONTACT VISITATION** - A visit between an inmate and his/her visitor that is conducted under staff supervision in an open area, allowing for limited physical contact and movement within the area.

**CONTRABAND** - Any item considered a detriment to the safety, security, and orderly operation of the unit. Contraband includes, but is not limited to:

- Any item which could be used as an aid to escape.

- Any item which could be used to disguise or alter an inmate's appearance.

- Any item of clothing or other item(s) for personal use or consumption that is not preauthorized through security or the unit's property room.

- Cameras, video, audio or other related equipment.

- The introduction and/or possession of any separate components that may aid in the use of wireless devices and/or multimedia storage devices. This includes, but may not be limited to:

  - Cell phone chargers.

- Mobile chargers.

- Cell phone batteries.

- Any other item that staff reasonably determines may aid in the use of wireless devices and/or multimedia storage devices.

**ILLEGAL CONTRABAND** - Any item, the possession of which in the community or on prison grounds is a felony or misdemeanor, i.e., weapons, explosive devices, drugs, wireless communication devices, multimedia storage devices or other statutorily prohibited item(s).

**INFANT** - A newborn child to 24 months of age.

**MINOR** - A person between 7 and 17 years of age.

**NON-CONTACT VISITATION** - A visit between an inmate and visitor conducted with a barrier between them, thereby preventing any physical contact.

**RELATIVE OR IMMEDIATE FAMILY** - An inmate's spouse; parent or stepparent; grandparent; grandchildren; mother-in-law or father-in-law; sibling; natural, adopted or step child; aunt or uncle; or any other person who had the primary responsibility of raising the inmate in the absence of parents.

**VISITATION LIST** - Each inmate's list of approved visitors, consisting of no more than 20 persons, including immediate family members, other relatives and friends.

**YOUNG CHILD** - A person from birth through six years of age.

{Original Signature on File}

Charles L. Ryan
Director

**ATTACHMENTS**
Attachment A - Sample Letter, Non-Contact Visits
Attachment B - Visitor Suspension Sanction Chart
Attachment C - Visitor Guidelines

**FORMS LIST**
911-1, Visitation List
911-2, Visitation Waiver
911-3, Request to Change Visitation/Telephone Listing
911-4, Application to Visit an Inmate
911-5, Preliminary Notice of Visitation Suspension
911-6, Special Visit Request
911-8, Visitor Sign-In

# AUTHORITY

Laws 2011, Chapter 33 - A.R.S 41-1604, Duties and Powers of Director

**DEPARTMENT ORDER 911**
**ATTACHMENT A**

**ARIZONA DEPARTMENT OF CORRECTIONS**

**UNIT**

**DATE:**

**TO:**

**FROM:**        (Unit Deputy Warden)

**SUBJECT:**     NOTIFICATION OF TEMPORARY NON-PUNITIVE ASSIGNMENT TO
NON-CONTACT VISITATION STATUS PENDING ADMINISTRATIVE REVIEW

In accordance with Department and Institution Orders concerning an incident occurring on (Insert Date), you have been placed on temporary non-punitive, Non-Contact Visitation status. This placement is the result of the following:

**(INSERT SUFFICIENT INFORMATION TO ALLOW FOR A RESPONSE,**
**e.g., having marijuana in your possession, using cocaine,....)**

Due to the seriousness the incident posed to the safety, security, and/or good order of the Unit, this temporary status has been imposed pending administrative review.

The administrative review shall include a determination to reinstate, modify, or revoke authorization permitting you to participate in Contact Visitation. You hereby have an opportunity to provide any relevant information which could assist in this decision. This information must be submitted in written form, mailed to this office, in compliance with Department Order #916, Staff/Inmate Communications, and received no later than fourteen (14) calendar days from the date of this memorandum. **Following receipt of your written response to this notice, you will be provided written notice of the decision within 30 days.**

For your information, all Non-Contact Visitation is subject to space limitations and staff availability. It is your responsibility to notify your visitors of your temporary visitation status. Should visitors wish to visit you on this status, please advise them to call your Unit's Visitation Officer, 24-hours-in-advance, for proper scheduling purposes.

A decision regarding Non-Contact Visitation may be appealed to the Complex Warden within ten (10) work days. The decision of the Warden is final.

**DISTRIBUTION:**

Inmate - Original
Visitation File

**DEPARTMENT ORDER 911**
**ATTACHMENT B**

## VISITOR SUSPENSION SANCTION CHART

|  | Suspension | Non-Contact |
|---|---|---|
| Alert/Ion Scan - First Incident | Visit  suspended for that day | N/A |
| Alert/Ion Scan - Second Incident | 30 days | 90 days |
| Alert/Ion Scan - Third Incident | 90 days | 180 days |
| Alert/Ion Scan - Fourth Incident | One year | Indefinite |

| | | |
|---|---|---|
| Contraband - First Incident | 90 days | 180 days |
| Contraband - Second Incident | 180 days | One year |
| Contraband - Third Incident | Indefinite | Indefinite |

| | | |
|---|---|---|
| Illegal Contraband - First Incident | 180 days | One year |
| Illegal Contraband - Second Incident | Indefinite | Indefinite |
| Illegal Contraband - Third Incident | Indefinite | Indefinite |

**ARIZONA DEPARTMENT OF CORRECTIONS**
**VISITOR GUIDELINES**

Effective:  July 20, 2011

The following information is intended to serve as a guideline to assist you when visiting an inmate and is not all-inclusive.  Complete rules and regulations are listed in Arizona Department of Corrections Department Order #911, <u>Inmate Visitation</u>, which may be accessed through the Department's Web Site at <u>www.azcorrections.gov</u> or in the Public Access Manual available in the Prison Administration area, Monday through Friday (holidays excluded), from 7:30 a.m. to 5:00 p.m.  Additionally, excerpts of the Department Order are posted at the prison entrance and in the Unit Visitation Areas.

## GENERAL INFORMATION

All persons, their personal belongings, and vehicles are subject to search while on Department property. All visitors and their possessions are subject to physical search by staff, electronic metal detection devices, barrier sniff screening (Narcotics Detection) by a Department Service Dog, and/or Ion Scanning. All visitors and their possessions must successfully pass scanning by electronic detection devices/equipment. A visitor, with a special medical condition possibly affecting the reading of electronic detection equipment, will be required to provide documentation of the existing medical condition. Persons refusing to submit to any search will be denied visitation and required to leave Department property immediately and are subject to subsequent suspension.

Contraband is not allowed on State property, including but not limited to: weapons or ammunition of any type, illegal drugs or drug paraphernalia, alcoholic beverages (empty or full), ladders, rope, cable, power tools, wire cutters, rakes, cameras, etc. Cell phones must remain secured in the visitor's vehicle. Visitors must present photo identification (ID) upon entering the visitation checkpoint. Acceptable forms of ID are: a valid driver's license, a military identification card, a passport, an official photo identification card of any U.S. state or federal agency, or Immigration and Naturalization documentation. Minors turning 18 will be required to apply for visitation privileges, and pay the one-time, $25.00 background check fee. The Department shall not accept a consular identification card that is issued by a foreign government as a valid form of identification, pursuant to A.R.S. 41-5001.

## DRESS CODE

- All clothing shall be clean, worn in good repair, be non-offensive, and within the bounds of common decency.
- Visitors are prohibited from wearing any brown-colored clothing that resembles the clothing worn by Department security staff, including khaki-colored clothing, solid light tan or light brown-colored shirts or dark brown-colored pants or slacks.
- Skirts and dresses shall be knee-length, when standing.  Slits in skirts and dresses shall not extend above mid-thigh when seated.
- Shorts shall be knee-length, when standing.  Jogging shorts, cut-offs or hip huggers are prohibited.
- Visitors shall not wear any article of clothing fabricated with spandex-like material, or clothing that is orange in-color.
- Sheer, see-through and/or open-netted clothing is prohibited.
- Sleeveless tops/shirts or dresses; tank, tube, and halter tops; tops that are strapless; tops that allow display of bare midriff; mesh clothing; body suits; "muscle" shirts; and swimsuits are prohibited.

- Tops of clothing shall be no lower than the person's collarbone in the front and back.
- Undergarments and shoes shall be worn at all times.

## ALLOWABLE PROPERTY

- Personal identification.
- Prescription eyeglasses.
- Prescription medication, in the original container, and only in a limited amount needed during the visitation period.
- One unopened package of cigarettes.  A flameless electric lighter shall be located in the designated smoking section of the Visitation Area.
- A maximum of $30.00 in coins, in a clear plastic bag/container, per visitor.
- One engagement/wedding ring, one religious medallion, one wristwatch and one pair of earrings or two observable body piercing adornments.
- Two vehicle keys or one key and a vehicle remote control entry device.
- Infant items:
  - One handheld baby carrier per infant.  Strollers or carriers on wheels will not be permitted.
  - One clear-plastic diaper bag per infant, which may only contain: one diaper for each hour of visitation; one change of baby clothing; one blanket no larger that 4 ft x4 ft.; one clear container or Ziploc bag of baby sani-wipes; one small tube of diaper rash medication; one baby bib; one small plastic spoon used to feed an infant; three clear-plastic baby bottles of milk/formula or equivalent-size unopened, commercially-sealed containers of juice; and four small plastic containers of soft or baby food; and one baby pacifier.

## VISITATION CONDUCT

- Conduct by visitors and inmates shall be quiet, orderly and respectful of others; unruly behavior and the use of profanity is prohibited.
- A brief kiss and/or embrace shall only be permitted at the beginning and end of the visitation period.
- Visitors are prohibited from visiting more than one inmate at a time, unless the other inmate is an immediate family member and the visitor is on the inmate's approved visitation list.
- The accompanying adult must properly control minor children while on prison property.
- Visitors and inmates shall remain in an upright position at all times.
- Inmates may visit with a maximum of six persons at one time.

The Department recognizes the importance of and encourages maintaining relationships while a person is incarcerated.  We ask for and expect your full cooperation in following the above-established visitation rules in order that visitation is a positive and pleasant experience for all concerned.

If you need assistance or clarification pertaining to the Visitation program during your visit, please contact a staff member for assistance.

**ENJOY YOUR VISIT.**

# EXHIBIT B

| ARIZONA DEPARTMENT OF CORRECTIONS | CHAPTER:  900<br><br>INMATE PROGRAMS AND SERVICES | OPR:<br><br>DIR |
|---|---|---|
| **DEPARTMENT ORDER MANUAL** | DEPARTMENT ORDER:  902<br><br>*INMATE LEGAL ACCESS TO THE COURTS* | SUPERSEDES:<br><br>DO 902 (08/15/07)<br>DI 84 (9/18/98) |
| | | EFFECTIVE DATE:<br><br>FEBRUARY 4, 2011 |
| | | REPLACEMENT PAGE REVISION DATE:<br><br>MAY 28, 2011 |

# TABLE OF CONTENTS

**PURPOSE**

**RESPONSIBILITY**

**PROCEDURES**

| | | PAGE |
|---|---|---|
| 902.01 | SYSTEM OVERVIEW | 1 |
| 902.02 | LEGAL RESOURCES AND ACCOMMODATIONS | 2 |
| 902.03 | GENERAL RESPONSIBILITY | 3 |
| 902.04 | PARALEGAL ASSISTANCE | 6 |
| 902.05 | QUALIFIED LEGAL CLAIMS COPYING | 9 |
| 902.06 | CHARGES - QUALIFIED LEGAL CLAIMS | 11 |
| 902.07 | NON-QUALIFIED LEGAL CLAIMS SERVICES | 12 |
| 902.08 | SPECIAL NEEDS INMATES | 13 |
| 902.09 | LEGAL SUPPLIES | 14 |
| 902.10 | LEGAL PROPERTY | 14 |
| 902.11 | LEGAL MAIL | 15 |
| 902.12 | LEGAL PHONE CALLS | 17 |
| 902.13 | LEGAL VISITS | 18 |
| | IMPLEMENTATION | 19 |
| | DEFINITIONS | 19 |
| | AUTHORITY | 21 |
| | ATTACHMENTS | |

# PURPOSE

The Department of Corrections ensures that all inmates have direct access to the courts in all legal claims involving direct appeals from the conviction for which they are incarcerated, habeas petitions, civil rights actions, or conditions of confinement. The Department facilitates this access by making forms and specific legal assistance available to the inmate population. The system is designed to maximize inmates' opportunity to present legal claims pertaining to the aforementioned legal claims to the State or Federal court, in a quick, efficient manner, with no barriers. This Department Order establishes the process to be used by inmates for gaining access to the courts and also describes the role of all parties involved. This Department Order sets forth all affirmative steps that the Department shall take to assist inmates in obtaining access to the courts. This process does not affect the inmates' ability to independently pursue actions on their own or to obtain outside counsel to represent them.

# RESPONSIBILITY

The Legal Access Monitor shall monitor this inmate legal access to the courts system in all facilities to ensure that the assistance provided to inmates by contract Paralegals conforms to all Department written instructions and contract provisions, and ensure staff are complying with the provisions of this Department Order.

# PROCEDURES

902.01       **SYSTEM OVERVIEW** - Inmates shall have direct access to the courts through the mail.

1.1       <u>Qualified Legal Claims</u> (See DEFINITIONS) - Inmates who do not feel able to draft pleadings or to complete District Court/state forms without assistance may:

1.1.1       Contact an attorney directly, at the inmate's expense.

1.1.2       Request the court to appoint an attorney to represent them.

1.1.3       Obtain active assistance through the Department from contract Paralegals. (See section 902.04 of this Department Order)

1.2       <u>Non-Qualified Legal Claims</u> - The Department may <u>not</u> actively assist inmates in the filing of documents not involving civil rights, conditions of confinement, appeals from conviction or habeas petitions. Inmates who desire assistance filing pleadings or petitions in matters <u>not</u> related to civil rights or conditions of confinement, appeals from conviction or habeas petitions may seek assistance of counsel, the courts or other assistance outside the Department. The Department may provide passive assistance as noted below:

1.2.1       Inmates may use legal texts and resource materials, as provided in section 902.02 of this Department Order and identified in Attachment A.

1.2.2       Inmates may request from the Paralegal or designated staff the address of any Arizona Court above the level of Justice of the Peace courts and selected Federal Courts. (See Attachment C for Federal Courts. State Court material is in the Forms packet as identified in Attachment B.)

1.3       <u>Legal Research</u> - No provision is made in this system for extensive, generalized legal research.

---

1.4 <u>Inmate Legal Assistants and Law Clerks</u> - There is no provision in this Department Order for an inmate legal assistance program. The Department shall take no affirmative steps to assist inmates helping other inmates with qualified legal claims. Inmates are prohibited from assisting other inmates with non-qualified legal claims.

1.5 <u>Right to Retain Counsel</u> - This system does not interfere with an inmate's right to retain counsel, to the extent that the inmate can afford counsel and is willing to pay for the services of an attorney.

    1.5.1 Inmates may, of course, avail themselves of pro bono services of a court-appointed attorney.

    1.5.2 Nothing in this system suggests that inmates may retain someone other than a licensed attorney for legal purposes.

1.6 <u>Access to Legal Resources</u> - All institutions shall provide access to the required legal resources. Smaller stand-alone units such as SACRC and Picacho may transport inmates to an institution that has the required legal resources, or shall provide storage areas for legal resources and materials in addition to the required work space, in accordance with the local Institution Order.

1.7 <u>Approved Department Forms and Other Documentation</u> - Staff and inmates shall only use the Department forms authorized by this Department Order to request services or report information about this legal access system. Any other forms are null and void. If additional forms are required, they shall be developed and approved only in accordance with Department Order #114, <u>Forms Management System</u>.

**902.02** **LEGAL RESOURCES AND ACCOMMODATIONS**

1.1 The Legal Resources identified in Attachment A are presently available for inmate use. Any additions or deletions to the legal texts and resource material identified in Attachment A shall be subject to the Director's approval.

1.2 All legal reference texts and manuals available for use by inmates shall be kept in the Reserve/Reference section of the Unit Library, under the control of designated staff, and shall be used only in the Unit Library, with the exception noted in 1.3.2 of this section.

    1.2.1 Legal Resource Centers shall provide no legal resource material except for such material set forth in this Department Order.

    1.2.2 The units are not required to possess and shall not possess older versions of the law. The centers do not provide archive services. Therefore, inmates requesting older versions of the law, for whatever reason, should be encouraged to contact the courts.

1.3 Inmates who visit the library may check out legal texts, manuals, and other legal reference material for a specified period of time within a given day, <u>for use only in the library</u>, in accordance with the Institution Order.

    1.3.1 Each book shall have a check out card, on which inmates shall write their name and ADC number.

        1.3.1.1 Inmates shall leave their identification card with designated staff, to be returned to them when they return the book.

1.3.2   Under special circumstances and in accordance with the local Institution Order, an inmate who is unable to visit the library may obtain legal texts and resources for use outside the library. Complex Detention Units (CDUs) and Protective Segregation Units shall maintain a legal resource library as prescribed in section 902.08, 1.3 and 1.3.1 of this Department Order.

1.4   The Legal Access Monitor shall provide designated staff with a supply of current court forms as identified in Attachment B. The inmate shall pay for copies of these court documents in accordance with section 902.06 of this Department Order.

1.4.1   Inmates may draft their own pleadings, motions and other legal documents.

1.4.2   Handwritten forms that are left incomplete shall not be considered qualified for copying.

1.5   The Department shall not supply inmates with forms, documents or any legal materials from other states. It shall be the duty of the inmate to contact the out-of-state court to request any forms, documents or legal materials from that state.

1.6   The Department shall ensure that inmates have access to the name and address of the Arizona State Courts and Federal District/Appellate Courts. These addresses shall be made readily available to inmates, and shall be posted on library bulletin boards in each unit. One or more copies shall be kept in the Reserve/Reference section of the Unit Library for referral by inmates. These copies are not to be taken from the Reserve/Reference desk; however, if an inmate requires a copy, it may be purchased in accordance with section 902.07 of this Department Order.

1.7   The Unit Deputy Warden may set aside a private room for the use of the Paralegal.

1.7.1   If requested by the Paralegal, a telephone with a speaker may be provided for use in tele-conferencing.

1.7.2   In all instances, designated staff, together with security staff, shall ensure that inmates who are meeting with Paralegals have space to prepare their legal actions.

1.8   The Department shall not make computers or typewriters available to inmates in the Unit Library for the purpose of enabling inmates to do legal work. Only inmates who have a qualifying disability may be provided a personal typewriter pursuant to a court order.

**902.03**   **GENERAL RESPONSIBILITY** - This inmate legal access to the courts system relies on five specific groups of individuals, with general responsibility as follows:

1.1   <u>Designated Staff</u> - These staff members shall be responsible for:

1.1.1   Cataloging and maintaining legal resources in the Reserve/Reference section of the Unit Library; signing out legal texts to inmates for use only in the library; keeping track of legal texts to prevent/minimize loss; making texts available for inmates who have limited access to the library; and maintaining records in accordance with Department Order #103, <u>Correspondence/Records Control.</u>

1.1.1.1   A monthly inventory of legal resources shall be completed and a copy sent via interoffice mail to the Legal Access Monitor during the first week of the following month.

1.1.2     Coordinating, with institution staff and the Paralegal, the scheduling of appointments for inmates to meet with Paralegals (See Section 902.04, of this Department Order) and ensuring that inmates are made aware of the date and time of their appointment.

      1.1.2.1     Designated staff shall work closely with security/other staff to arrange for meetings between Paralegals and inmates. Paralegals shall be allowed to remain and work in the facilities in order to complete appointments.

1.1.3     Photocopying or supervising the photocopying of all qualified and non-qualified legal claims.

1.1.4     Processing inmate requests for services including: notary services, copies of the court forms identified in Attachment B and other chargeable services in accordance with section 902.06 and 902.07 of this Department Order.

1.1.5     Facilitating the delivery of notary services, copies or other chargeable services in accordance with section 902.06 and 902.07 of this Department Order.

1.1.6     Providing assistance to the inmate in properly completing Department forms, requesting assistance or having photocopies made.

1.1.7     Maintaining the Contract Paralegals – Unit Sign-In Log, Form 902-4 at each unit for the ingress and egress of the Contract Paralegals. Designated staff shall collect data regarding paralegal visits and provide the information to the Legal Access Monitor on a monthly basis to use in verifying on-site hours worked by the paralegal contractors. The Contract Paralegals – Unit Sign-In Log shall be maintained for a period of three years.

1.2     <u>Paralegals</u> - Although not required to do so by law, the Department provides inmates with an opportunity to obtain assistance from qualified Paralegals (see definition), to facilitate their access to the courts.

1.2.1     Contract Paralegals shall be responsible for:

      1.2.1.1     Assisting inmates who request assistance in the actual preparation of their initial pleadings or petitions for filing with the courts.

      1.2.1.2     Providing bilingual services as required.

         1.2.1.2.1     A tele-conference with a bilingual interpreter is permissible.

         1.2.1.2.2     Certified interpretation is not required.

      1.2.1.3     Providing notary services, paid for by the inmate, in accordance with section 902.06, to the extent required by court rules.

         1.2.1.3.1     Non-qualified legal materials shall be notarized by authorized staff in accordance with the local Institution Order.

CHAPTER 900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER:  902 - INMATE LEGAL ACCESS TO THE COURTS

1.2.1.4     Making the determination as to what legal documents require photocopying and the number of copies to be made in matters involving qualified legal claims where the inmate is indigent. The Paralegal shall consult with the Legal Access Monitor if a question or problem arises. (See section 902.05, of this Department Order)

1.2.1.5     Contacting the Legal Access Monitor if they have any questions themselves pertaining to the inmate access to the courts system.

1.2.1.6     Contacting the Warden or designee with questions concerning institutional activity, coordination, etc.

1.2.1.7     Providing inmates with copies of Court names and addresses at a cost of $.10 per printed side.

1.2.1.8     Complying with Department Orders and other Department written instructions, as identified in their contract, as well as the terms and conditions of their contract.

1.2.1.9     Recording their time in hours to the nearest tenth using the Paralegal Activity Log, Form 902-3, on a weekly basis, and forwarding a copy to the Legal Access Monitor on a bi-weekly basis.

1.2.1.10     Reviewing questionable outgoing legal mail to determine if it is actually legal mail. (Mail not addressed to an attorney, judge or court, but may be required by court order or statute.)

1.2.2     Contract Paralegals shall not:

1.2.2.1     Practice law, give legal advice, conduct legal research, represent an inmate or make referrals.

1.2.2.2     Aid inmates in any matter, legal or non-legal that does not involve qualified legal claims. The contract paralegal may direct inmates to where they may find information in the resource center.

1.2.2.3     Assist inmates in qualified legal claims beyond the initial filing of their pleadings with the courts.

1.3     Legal Access Monitor - The Legal Access Monitor shall be responsible for:

1.3.1     Providing system-wide monitoring and operational oversight of the inmate legal access to the courts system.

1.3.2     Ensuring that the contract Paralegals are assisting inmates on matters involving qualified legal claims only and only at the initial pleading stage.

1.3.3     Resolving questions Paralegals and designated staff may have concerning the inmate legal access to the courts system.

1.3.4     Ensuring that the Paralegals are adhering to all contract provisions and Department written instructions in assisting inmates.

1.3.5   Visiting selected prison facilities to monitor the activities of the Paralegals, overseeing the operations of the inmate access to courts system, and reviewing legal resource material to ensure that it is up to date and complete.

1.3.6   Ensuring that accommodations and arrangements are being made for special needs inmates. (See section 902.08, of this Department Order)

1.3.7   Making recommendations to the Director to either purchase additional sets of legal resource materials or eliminate resource materials, as appropriate.

1.3.8   Reviewing Paralegal Activity Logs and billings for accuracy and determining the proper amount to be paid for work completed.

1.3.9   Reordering legal texts, as necessary, to replace missing texts and ordering updates as they become available from the publisher.

1.3.10   Performing other duties, as assigned.

1.4   <u>ADC Attorneys</u> shall be responsible for overseeing the tasks of the Legal Access Monitor and providing the Legal Access Monitor with direction.

1.5   <u>Inmates</u> - Inmates may use the resources available through this inmate legal access to the courts system.

1.5.1   The Department shall not establish an inmate legal assistant/inmate law clerk program, nor shall the Department take any affirmative steps in assisting inmates in helping other inmates with qualified legal claims.

1.5.1.1   Inmates who have been found charging or bartering in exchange for services, or who have been found to be creating a security problem or assisting inmates with non-qualified legal claims shall be disciplined and shall be precluded from helping other inmates in the future. No inmate shall be allowed to assist another inmate if the Warden or Deputy Warden determines that a potential or existing security problem has developed or may develop, or that allowing such assistance may detrimentally impact institutional resources.

1.5.1.2   Inmates shall not possess or store other inmates' legal paperwork in their cell or housing area.

1.5.2   Inmates shall mail legal materials in accordance with section 902.11 of this Department Order.

1.5.3   Inmates shall attempt to resolve issues related to this inmate legal access to the courts system through designated staff before contacting the Legal Access Monitor.

902.04   **PARALEGAL ASSISTANCE** - Inmates may receive active assistance in the <u>initial filing</u> of pleadings involving qualified legal claims from contract Paralegals provided by the Department. (See Attachment D, Paralegal Assistance Request Process.)

1.1     Inmates desiring legal assistance from a contract Paralegal shall complete an Inmate Request for Paralegal Assistance, Form 902-1, available only from designated staff. The request shall include a plain, concise description of the qualified legal claim and the type of assistance requested. The Inmate Request for Paralegal Assistance form is not to be used to ask legal questions, only to request to meet with the Paralegal regarding their qualified issues. The Inmate Request for Paralegal Assistance form shall also be available in Spanish. Illiterate inmates shall contact designated staff, who shall help them complete the form. Inmates serving sentences pursuant to Interstate Corrections Compact and concurrent custody agreements shall make the request in accordance with 1.11 of this section.

   1.1.1    If the issue involves Section 1983 civil rights or conditions of confinement, the inmate shall have first attempted to resolve the issue through the inmate grievance process, in accordance with Department Order #802, Inmate Grievance System. The inmate shall attach a copy of the final disposition of the grievance to the initial request for assistance. If the inmate has not attempted to resolve the issue through the inmate grievance process, the Paralegal shall advise the inmate that the court will likely dismiss the inmate's suit if the inmate fails to exhaust the administrative remedies available through the inmate grievance system.

   1.1.2    If the issue involves Notice of Appeal from the Superior Court, a Rule 32 or habeas petition, the inmate shall include the appropriate legal documents/orders of the court out of the trial court record.

1.2     Once the inmate has completed his/her portion of the form, the form shall be given directly to designated staff or placed in a designated drop box or tray at the direction of designated staff in accordance with the local Institution Order.

1.3     Designated staff shall accept, sign and date the Inmate Request for Paralegal Assistance form, provide a copy to the inmate, and forward the request along with any attached documents to the Paralegal. Designated staff:

   1.3.1    May fax the request and attachments (if any) to the Paralegal, using the designated fax machine. Material to be faxed shall not exceed 20 pages. Staff may also scan the request and send an electronic copy to the Paralegal via e-mail.

   1.3.2    Shall charge the inmate the actual cost of faxing as determined by the Institution Order. The charge shall be the actual cost of the telephone connection.

      1.3.2.1    The inmate shall prepare and submit an Inmate Request for Withdrawal, Form 905-1, to the designated staff prior to faxing. Inmates without the necessary funds shall be handled as specified in section 902.06, 1.1 of this Department Order.

   1.3.3    Shall not intercept or delay Inmate Requests for Assistance.

1.4     The Paralegal shall review each request and determine whether the matter described involves a qualified legal claim.

   1.4.1    If it is unclear whether the issue involves a qualified legal claim and/or the Paralegal determines a meeting is appropriate, the Paralegal shall request that designated staff, in consultation with the Paralegal, schedule a meeting with the requesting inmate to resolve the issue(s).

1.4.2   If the request does not involve a qualified legal claim, the Paralegal shall not provide assistance and shall return the request for assistance to the inmate through designated staff. If possible, the Paralegal shall direct the inmate to where assistance for a non-qualified claim exists.

1.5   The Paralegal shall keep a copy of the request.

1.6   Designated staff shall work with security staff and the Paralegal in scheduling days and hours when the Paralegal is scheduled to meet with inmates, based upon inmate population, the volume of requests, quick access, court deadlines and appropriate attention to security issues.

1.7   Designated staff shall schedule an appointment, in consultation with the Paralegal, and notify both the Paralegal and the inmate by completing the appointment section of the Inmate Request for Paralegal Assistance form and forwarding a notification copy to the inmate and to the Paralegal. Designated staff shall keep the file copy of the request and forward a copy to the Legal Access Monitor.

1.7.1   Turn-outs for scheduled Paralegal meetings shall not be suspended except when a legitimate security concern exists to do so.

1.8   Paralegals shall meet with inmates to provide necessary assistance with preparation of the initial pleading for filing. However, for Arizona inmates in other states who are serving sentences pursuant to Interstate Corrections Compact or concurrent custody agreements and who, in accordance with 1.11 of this section, request assistance with the preparation of an initial pleading, the contract Paralegal shall ensure that one copy of the appropriate sections of legal references, forms and instructions are mailed to the inmate. The mailings shall be made by Interstate Corrections Compact staff at the Offender Operations expense.

1.8.1   Paralegals shall not provide assistance beyond the initial filing stage. (See section 902.03, 1.2 of this Department Order for details concerning assistance provided by Paralegals.)

1.8.2   The Paralegal may authorize designated staff to copy documents in accordance with section 902.05 of this Department Order by completing the appropriate authorization requests.

1.8.3   The Paralegal may request additional meetings, as necessary. If additional meetings are required, designated staff shall schedule the meeting using a Paralegal Meeting Notification, Form 902-8.

1.8.4   The Paralegal shall be available on an as needed basis, based on number of requests, type of request and possible deadlines. The schedule shall be determined by the Paralegal and designated staff.

1.9   Staff shall not retaliate against an inmate for requesting assistance from a Paralegal or for exercising any other legal privilege pursuant to this Department Order nor shall they retaliate against an attorney, agent of an attorney or any other person for exercising any privilege pursuant to this Department Order.

1.10   Designated staff and/or Paralegals shall:

1.10.1   Direct questions concerning this inmate access to the courts system to the Legal Access Monitor.

1.10.2   Immediately report suspected abuses of this inmate access to the courts system to the Warden or Deputy Warden for review and resolution, ensuring that the Legal Access Monitor is also advised.

1.11   Arizona inmates in other states who are serving sentences pursuant to Interstate Corrections Compact and concurrent custody agreements may, upon written request addressed to the Offender Services Bureau Administrator, receive Paralegal assistance for a qualified claim. Upon receipt of the inmate's written request, the Administrator shall notify the Legal Access Monitor. The Legal Access Monitor shall forward the inmate's request to a contract Paralegal, who shall provide assistance, via the mail, for post-conviction relief claims and condition of confinement/civil rights claims that arose in Arizona. Any claim pertaining to conditions of confinement outside of Arizona shall be filed in the state where the inmate is confined. The mailings shall be made by Interstate Corrections Compact staff at the expense of Offender Services Operations.

902.05   **QUALIFIED LEGAL CLAIMS COPYING** - (See Attachment E, Qualified Legal Claims Copying Process.) All requests for copying involving qualified legal claims, except as provided in section 902.05, 1.10, shall be reviewed by the Paralegal prior to copying by using the following process:

1.1   To request photocopies, the inmate shall complete the appropriate section of a Request/Authorization for Qualified Legal Claim Copying, Form 902-2, and shall submit the request with the documents to be copied attached (including a copy of the pleading if the documents to be copied are intended as an attachment), in person, to designated staff. Failure to attach sufficient documentation to enable the Paralegal to determine if documents are qualified may result in a delay or return of the request to the inmate. The Paralegal shall deny a request that is vague or does not substantiate a qualified legal claim. It shall then be necessary for the inmate to submit another request with sufficient documentation.

1.1.1   In the event that the inmate is obtaining active assistance from the Paralegal and has completed the pleading in the presence of the Paralegal, the Paralegal shall complete the Request/Authorization for Qualified Legal Claim Copying form and submit it with the pleading directly to designated staff for photocopying.

1.2   Designated staff shall sign and date the form and provide the inmate a copy of the request as a receipt.

1.3   Designated staff shall forward the packet to the Paralegal, pursuant to the local Institution Order.

1.4   The Paralegal shall review the packet to determine which documents shall be copied and how many copies are to be made. Documents that violate prison rules (i.e., gang symbols, instructions regarding illegal activities, etc.) shall not be copied.

1.5   If Department Order compliance interpretation is needed then the Paralegal shall consult with the Legal Access Monitor.

1.6   The Paralegal shall complete the request and, within three work days of receipt, shall return the packet to designated staff.

1.7        Designated staff shall:

    1.7.1      Make photocopies in accordance with the Paralegal's notation on the request form, ensuring that the inmate has paid for the copies or that the account has been placed on hold in accordance with section 902.06 of this Department Order. Photocopies shall be made, if possible, within three work days of designated staff receiving the request form back from the Paralegal. Extra time may be necessary for extensive copying requests.

        1.7.1.1     All legal documents, such as, but not limited to, pleadings, briefs, motions, affidavits, copies of case law, and licenses submitted for photocopying shall not be censored, but may be read to the extent required to establish that the contents of the document do not contain contraband.

        1.7.1.2     All legal matters, other than legal documents, namely and especially letters to or from an inmate's attorney, to or from a judge, or to or from a court of law, that are submitted for photocopying, shall not be read or censored, but may be scanned to the extent necessary to establish that the letters do not contain contraband.

    1.7.2      Refrain from photocopying any documents, if so instructed by the Paralegal.

    1.7.3      Arrange for a meeting between the Paralegal and the inmate, if so instructed by the Paralegal.

1.8        Designated staff shall keep a copy of the request and:

    1.8.1      Forward a copy of the Request/Authorization for Qualified Legal Claim Copying form, together with the photocopied material, to the inmate.

    1.8.2      Return the material, above, to the inmate if the request was denied.

    1.8.3      Forward the Inmate Request for Withdrawal, Form 905-1, to the Business Office in accordance with section 902.06 of this Department Order, if the material is to be photocopied.

    1.8.4      Forward a copy of all requests for qualified legal claim copying to the Legal Access Monitor on a monthly basis.

1.9        The Paralegal's decision is final. Inmates may present concerns regarding qualified legal claim copying to the Legal Access Monitor through designated staff using the Inmate Letter, Form 916-1.

1.10      The inmate shall be responsible for payment for copies in accordance with section 902.06 of this Department Order, except that the inmate may choose to pay for copies relating to qualified legal claims in accordance with section 902.07 of this Department Order. In this event, the documents do not require the Paralegal's review.

1.11      If the copies do not relate to a qualified legal claim, the inmate may request that copies be made in accordance with section 902.07 of this Department Order as non-qualified legal documents or non-legal documents.

1.12    Telephonic review of qualified legal copying requests may be done when designated staff and the Paralegal determine it necessary based upon time frames (e.g., verified impending court deadlines, date of Paralegal's next visit to the unit, etc.)

1.13    There is no requirement that the paralegal meet in person with the inmate to review a qualified legal copy request.

1.14    Requests for copies of Exhibits/Attachments shall have a legitimate pleading to support the copying of those documents. Exhibits/Attachments shall also relate to the pleading. The contract Paralegal may deny copying of documents if they do not relate to a pleading in an active court case.

902.06    **CHARGES - QUALIFIED LEGAL CLAIMS** - All inmates shall be responsible for payment for services related to qualified legal claims.

1.1    For issues relating to qualified legal claims, the service requested shall be provided in accordance with the Paralegal's notation on the request regardless of the inmate's ability to pay. However, if the inmate has funds available, the cost of the service shall be deducted from the inmate's account. If funds are not available, the inmate's account shall be placed on hold in accordance with Department Order #905, Inmate Banking/Money System, until such time as the debt is paid.

1.2    Chargeable services include, but are not limited to:

   1.2.1    Qualified legal claim photocopying, including required court forms, other attachments or other documentation.

   1.2.2    Notary services related to qualified legal claims, or as required by statute or court rules.

   1.2.3    Court forms listed on Attachment B. (There is no charge for the initial form requested, or for one subsequent request on the same pleading.)

1.3    An inmate who is requesting any service relating to qualified legal claims shall complete and deliver to designated staff an Inmate Request for Withdrawal form in the amount necessary to completely pay for the requested service at the time designated staff perform the service or arrange for delivery of the service. For photocopies, the Request/Authorization for Qualified Legal Claim Copying form shall be required.

1.4    Designated staff shall submit the Inmate Request for Withdrawal form to the Business Office when the service has been provided to the inmate. Designated staff shall indicate on the Inmate Request for Withdrawal that the service is for qualified legal claims.

1.5    The Business Office shall:

   1.5.1    Upon receipt of the Inmate Request for Withdrawal form, ensure that if funds are available the inmate's account is debited or that the inmate's account is placed on hold.

   1.5.2    Ensure that the Inmate Request for Withdrawal form serves as documentation for the hold or request for payment.

   1.5.3    Ensure that funds collected are deposited in the appropriate account in accordance with Department Order #905, Inmate Banking/Money System.

1.6     The charge for any document is $.10 per printed side (excluding those provided at no charge as outlined in 1.2.3 of this section), including copies of court forms listed on Attachment B, a photocopy of a document or form, or any other form published by another agency or court (normally available and provided by the Department).

1.7     The charge for notary public services shall be $1.00 per notarized document, pursuant to A.R.S. 41-316. Notaries related to statute or court required purposes shall be treated the same as qualified legal claims. The contract paralegal or Legal Access Monitor can assist in determining these types of notaries.

1.8     The price charged for individual services, forms or copies shall be subject to periodic review and adjustment by the Director.

**902.07     NON-QUALIFIED LEGAL CLAIMS SERVICES** - (See Attachment F, Non-Qualified Legal Claims Copying Process.) Inmates shall be charged for all non-qualified legal claim photocopies as well as other services provided for in this section. Non-legal copying shall be done in accordance with Department Order # 910, Inmate Education and Resource Center Services.

1.1     Inmates who do not have sufficient funds to pay for the copies/service at the time requested shall be denied the service or copies.

1.2     All documents submitted for copying shall be in compliance with Department Order #909, Inmate Property, and are not to violate any other written instructions.

1.3     Chargeable items include:

   1.3.1     Non-qualified legal claim photocopies.

   1.3.2     Qualified legal claims photocopies that were not copied, in accordance with the Paralegal's notation on the request.

   1.3.3     Names and address lists for federal or state courts. (See Attachment C for federal courts. State courts are available in the Legal Resource Center.)

   1.3.4     Notary Services related to non-qualified claims.

1.4     An inmate who wishes to purchase non-qualified claim photocopies or other immediately chargeable services shall complete an Inmate Request for Withdrawal form and request that the assigned Correctional Officer III verify that funds are available.

1.5     The Correctional Officer III shall verify the availability of funds and sign and date the Inmate Request for Withdrawal form in accordance with Department Order #905, Inmate Banking/Money System.

1.6     The inmate shall deliver the Inmate Request for Withdrawal form to designated staff within two work days of verification by the Correctional Officer III, together with the material to be photocopied. An inmate who wishes to copy non-qualified legal material shall complete a Request for Non-Qualified/Non-Legal Copying, Form 902-7, as well as the Inmate Request for Withdrawal form, and deliver the Request for Non-Qualified/Non-Legal Copying form, the Inmate Request for Withdrawal form and the documents to be photocopied to designated staff.

1.7     Designated staff shall determine if the copies are authorized in accordance with Department Order #909, Inmate Property, or other written instructions. If there is any question about the suitability of the copies, designated staff may consult with:

   1.7.1     His/her supervisor, the Unit Deputy Warden or the Unit Chief of Security.

1.7.2    The Legal Access Monitor or Paralegal if it appears that the copying may be legal in nature.

1.8    Any attempt by the inmate to have contraband documents copied shall result in denial of the request for copies and shall subject the inmate to disciplinary action.

1.9    Designated staff shall arrange for delivery of the service, copies or forms and submit the Inmate Request for Withdrawal form to the Institution Business Office where the appropriate deduction from the inmate's account shall be made. Designated staff shall ensure that the Inmate Request for Withdrawal form indicates that it is for payment of non-qualified services or photocopies.

1.10    If at any time an inmate requests and receives copies or other service for which payment is due and the inmate's account has insufficient funds to pay, the account shall be placed on hold in accordance with Department Order #905, Inmate Banking/Money System. The hold shall remain in place until such time as the inmate has satisfied the obligation.

1.11    At no time shall non-qualified legal claims copying or non-legal copying take precedence over copying of documents relating to qualified legal claims.

1.12    All non-qualified legal matter copies shall be sold at $.10 per printed side.

1.13    Any other form published by another agency relating to a non-qualified legal claim, or to be utilized by the inmate for non-qualified legal claim purposes, that the inmate may require and that the Department normally provides, may be sold at a charge of $.10 per printed side.

1.14    Court name and address documents shall be copied at a charge of $.10 per printed side.

1.15    The Notice of Claim required for property claims in accordance with Department Order #909, Inmate Property, shall be sold to inmates at a cost of $.10 per copy. This form is not to be used for any other purpose than that outlined in Department Order #909, Inmate Property.

1.16    Inmates who request Notary Public Services for non-qualified/non-legal matters shall be charged $1.00 per notarized document.

**902.08    SPECIAL NEEDS INMATES**

1.1    Accommodations shall be made, as needed, to ensure access to the courts for inmates with special needs, to include inmates who are illiterate, non-English speaking, and disabled.

1.1.1    Accommodation may include providing a tele-conference with a bilingual interpreter and the Paralegal.

1.2    Arrangements shall be made for inmates who have limited access to the Unit Library to meet with Paralegals, to review legal resource materials, or to obtain forms or photocopies.

1.3    CDUs and Protective Segregation Units shall establish and maintain, within the unit, a collection of the required legal resource materials as identified in Attachment A.

1.3.1    The Warden shall designate a staff member to be responsible for those functions identified in section 902.03, 1.1 through 1.1.6 of this Department Order.

CHAPTER 900 - INMATE PROGRAMS AND SERVICES
DEPARTMENT ORDER: 902 - INMATE LEGAL ACCESS TO THE COURTS

**902.09**      **LEGAL SUPPLIES**

1.1     Inmate stores shall stock only those items authorized by Department Order #909, Inmate Property. There shall be no special order items.

1.2     Inmates shall be provided legal supplies regardless of their ability to pay. If the inmate does not have funds available, a hold shall be placed on the inmate's account.

1.3     Inmates shall be charged the current inmate store price for any item received.

1.4     The amount of other supplies provided per month to inmates who request them and do not have the funds to pay shall be:

     1.4.1    Pens - 1

     1.4.2    Pencils – 2

     1.4.3    Legal pad (size 8 1/2" x 11") - 2

     1.4.4    Regular envelopes - 10

     1.4.5    Manila envelopes - 6

1.5     Additional legal supplies may be provided after a showing is made by the inmate that additional supplies are necessary in order to present or support a qualified claim. These additional items shall be issued on an individual basis.

     1.5.1    The contract paralegal shall verify that the inmate is actually working on a qualified legal issue before additional legal supplies are provided.

1.6     Legal supplies are those supplies actually used for qualified and non-qualified legal claims. The Department is not required to provide supplies for personal/private use.

1.7     In order for indigent inmates to receive or continue to receive monthly legal supplies they must demonstrate that the supplies they have received are actually being used for qualified legal purposes. The Paralegal can assist in verifying actual qualified use of legal supplies.

**902.10**      **LEGAL PROPERTY** - Inmates shall be permitted to maintain personal legal books and materials in their housing location. Inmates shall be provided with legal boxes regardless of their ability to pay. If the inmate does not have funds available, a hold shall be placed on the inmate's account. Inmates shall only be provided with sufficient boxes to properly store specific legal documents.

1.1     Inmates are authorized to keep no more than three boxes of legal materials in their living area.

     1.1.1    The dimensions of each box shall not exceed 17-1/2" in length x 10-1/4" in height x 11-1/2" in width.

     1.1.2    The weight of each box shall not exceed 20 pounds.

     1.1.3    Each box of legal material shall be numbered in sequential order.

1.2     Legal materials in excess of the three boxes shall be stored by the Department. In order to store excess legal materials, inmates shall, in the presence of staff:

    1.2.1     Seal legal materials in a box, after staff inspection for contraband.

    1.2.2     Place their name and ADC number on the top and side of the box.

1.3     Inmates shall store and possess only their own personal legal materials. If staff discovers that an inmate is storing or possessing other inmate's legal materials, staff shall return the legal materials to the owner regardless of whether or not disciplinary action is taken.

    1.3.1     If it is determined that an inmate has drafted legal documents on behalf of another inmate, and those documents are being stored or possessed by the inmate who drafted them, those documents shall be confiscated and not given to the inmate whose name may be listed on the documents.

1.4     When an inmate wishes to exchange one box of legal material for another, the inmate shall:

    1.4.1     Notify the Property Officer by Inmate Letter.

    1.4.2     Clearly indicate by number the box(es) to exchange.

1.5     The Property Officer shall exchange the box(es) of legal materials within three work days from the date of receipt of the request, which shall be date stamped as received.

1.6     The legal materials to be exchanged shall be inspected for contraband by staff and sealed in the presence of staff prior to exchange.

    1.6.1     Only sealed boxes shall be exchanged.

    1.6.2     A Checklist for Storage of Inmate Legal Materials, Form 902-9, shall be used any time legal materials are stored or exchanged.

    1.6.3     Completed forms shall be placed in the Inmate Property File within five work days.

1.7     Possession of legal material and/or legal texts or books shall be subject to the quantity limitations in accordance with Department Order #909, Inmate Property.

1.8     Compact discs sent in from attorneys shall be considered as legal materials and barring any security concerns shall be stored in the inmate's legal boxes.

**902.11     LEGAL MAIL**

1.1     Inmates shall identify outgoing legal mail by writing "Legal Mail" on the lower left-hand corner of the envelope.  (See Definitions for guidance on what constitutes "Legal Mail".)

1.2     Outgoing mail not labeled as legal mail shall be processed as regular mail.

1.3     All legal mail, outgoing or incoming, shall be logged.

1.4     Staff who process incoming or outgoing inmate mail shall:

    1.4.1     Generally identify all legal mail and record it on a log by indicating the inmate's name and the sender's name.

1.4.2     Inspect such mail for contraband, stamp the envelope "**LEGAL MAIL, ARIZONA DEPARTMENT OF CORRECTIONS**" using a commercial stamp, and log it before it is placed in the envelope and sealed by the inmate.

     1.4.2.1     All incoming mail, letters, memoranda, and documents, from an inmate's attorney or from a judge or court, shall be opened for inspection purposes in the presence of the inmate. Such incoming mail may be scanned in the conducting of an inspection for contraband, but shall not be read or censored by staff.

     1.4.2.2     All outgoing letters to an inmate's attorney or to a judge or court shall be brought to the mail room by the inmate, where the letter shall not be read or censored but shall be inspected for contraband and sealed in the presence of the inmate. All outgoing legal documents to an inmate's attorney or to a judge or court (other than letters to an inmate's attorney or to a judge or court, such as pleadings, briefs and motions) shall not be censored, but staff are not prohibited from reading such documents to the extent necessary to establish the absence of contraband.

1.4.3     Send legal mail as first class mail regardless of the inmate's ability to pay the required postage.

1.4.4     Submit names of inmates claiming to have inadequate funds for postage to the Business Office, indicating postage due from the inmate. The Business Office shall either debit the inmate account or, if there are insufficient funds to pay the postage, place a hold on the inmate account.

1.4.5     Return the mail to the inmate if he/she requests mail to be sent as legal mail and it is not to an attorney, judge or court. The inmate may request to have the contract Paralegal review the mail to determine whether it may be approved as legal mail. The contract Paralegal may contact the Legal Access Monitor for direction.

1.5     Designated staff who process incoming mail shall attempt to make a determination, based on an inspection of the envelope, whether the contents constitute legal mail. The return address may be indicative of whether the contents of the envelope constitute legal mail. Designated staff shall not rely solely on the words "legal mail" having been stamped on the envelope. If there is any serious doubt as to whether the contents of the envelope contain legal mail, designated staff shall contact the Legal Access Monitor for direction.

1.6     Staff suspecting abuse of the legal mail designation shall advise the Warden or Deputy Warden who shall take appropriate action following consultation with the Department's General Counsel. An inmate who intentionally sends personal mail to a private address and falsely claims that it is legal mail shall be subject to disciplinary action in accordance with Department Order #803, Inmate Disciplinary System.

1.7     When applicable, staff shall take the following steps to locate inmates to whom legal mail is addressed and to forward such mail to the inmate.

     1.7.1     Use the Adult Information Management System (AIMS) and inmate records to locate any addressee of legal correspondence who is not located at the institution that received the correspondence, and to locate any inmate who has received legal mail that does not have an ADC number as part of the address.

        1.7.1.1    Staff shall have inmates verify that they are the person to whom the legal mail is addressed utilizing the inmate's identification card.

    1.7.2    Forward any legal correspondence to any inmate addressee who is under commitment to or supervised by the Department.

        1.7.2.1    Inmates, releasees and parolees receiving forwarded legal correspondence shall notify the sender of their new address.

    1.7.3    When legal mail is forwarded, in addition to the requirements outlined in section 902.11, 1.4.1 of this section, the inmate's forwarding address and the date forwarded shall be logged.

    1.7.4    Return legal correspondence to the sender only if the addressee is no longer an inmate, releasee or parolee, in which case the sender shall be advised of this fact.

**902.12**    **LEGAL PHONE CALLS** - Inmates who have retained counsel may make legal phone calls in accordance with the following:

    1.1    Inmates shall communicate legal matters through the mail whenever possible.

    1.2    Legal phone calls may be approved, according to the established Institution Order, when it is reasonable and necessary to do so. Staff shall approve court-ordered telephonic conferences and ensure that the inmate is provided the opportunity to participate in the conference.

        1.2.1    Legal phone calls should not exceed 30 minutes in length. Additional time is permitted at the discretion of the Deputy Warden. Time limits do not apply to court-ordered telephonic conferences.

    1.3    The Department shall not pay, reimburse or be responsible for the placement of inmate legal calls. All outgoing legal calls shall be collect.

        1.3.1    Court-ordered telephonic conferences shall be placed at the Department's expense, using the in-state long-distance telephone service when necessary.

    1.4    Inmates shall request legal calls 24 hours in advance, by submitting a Legal/Emergency Telephone Call Request, Form 915-2, through staff designated by the Warden or Deputy Warden.

        1.4.1    Upon approval, the call shall be scheduled according to the applicable Institution Order.

    1.5    Legal phone calls shall only be denied or suspended due to security concerns, provided that an effective method of legal communication remains available to the inmate.

        1.5.1    Legal phone calls shall not be denied as a form of discipline.

    1.6    Legal phone calls shall not be monitored or recorded.

    1.7    Staff shall not listen to the conversation, but shall maintain visual contact of the inmate when the inmate is in an area where security or information may be compromised.

1.8    Inmates who are acting Pro Se are not entitled to make legal calls unless instructed by the courts.

1.9    If an attorney requests a legal phone call with an inmate, staff shall contact the inmate first to determine if the inmate wishes the call.  Staff shall have the inmate complete the Legal/Emergency Telephone Call Request form to accept or refuse a legal call from the requesting attorney.

## 902.13    LEGAL VISITS

1.1    Attorney/Agent of an Attorney Visits

1.1.1    Attorney or agent visits shall be held in a location within the institution designated by the Warden, Deputy Warden or Administrator of the institution.

1.1.2    Attorneys or their agents shall contact the Warden, Deputy Warden or Administrator at least 48 hours in advance of the requested visit and provide their name and date of birth. Attorneys shall also provide their Bar number.

1.1.3    Contact or non-contact visits by attorneys or their agents shall be allowed (consistent with the safe, secure and orderly operation of the institution) only when they are approved in advance by the Warden, Deputy Warden or Administrator.

1.1.4    In an emergency, the Warden, Deputy Warden or Administrator may waive the advance notice requirement.

1.1.4.1    In such cases, the attorney or agent shall provide, at the time of the visit, written justification for the emergency.

1.1.4.2    When a justified emergency exists, space for the visit shall be provided, consistent with the safe, secure and orderly operation of the institution.

1.1.5    Attorneys and agents shall be advised that the inmate shall be questioned to determine if the inmate wishes to meet with the requesting attorney or agent.

1.1.6    If the inmate agrees to meet with the attorney or agent, the visit shall be approved and scheduled.

1.1.7    If the inmate does not wish to meet with the attorney or agent, the attorney or agent shall be contacted within the same 48 hour period of the initial request and informed that the visit has been denied. The appropriate staff member shall ensure that a Visitation Waiver, Form 911-2, is completed in accordance with Department Order #911, Inmate Visitation.

1.2    Agents of an Attorney Restrictions - The attorney shall understand that he or she is ultimately responsible for the actions of his or her agent.

1.2.1    The Warden, Deputy Warden or Administrator may exercise his or her discretion in permitting an agent to meet with an inmate. Any denial shall be for good cause and the Warden, Deputy Warden or Administrator shall be prepared to provide a reason for the denial.

1.3     Visits Under Court Order - Persons acting under a court order shall contact the appropriate unit staff to arrange a visit with an inmate. An original certified copy of the court order shall be provided by such person to the appropriate unit staff for inclusion in the inmate's Visitation, Institutional and Master File.

# IMPLEMENTATION

Wardens shall maintain an Institution Order that addresses the following, at a minimum:

- Identification of designated staff for carrying out responsibilities and processes required by this Department Order.

- Specific process for copying qualified, non-qualified, and non-legal materials.

- Specific process for submission of the Inmate Request for Paralegal Assistance and related documents to include charging for fax service.

- Process for legal resource and text check-out and monitoring, to include a specified period of time for check out.

- Allocation of space for Paralegal activities and/or storage of materials.

The Deputy Director for Offender Operations shall provide a copy of all such Institution Orders to the Legal Access Monitor for final approval prior to implementation.

# DEFINITIONS

**ACCESS TO THE COURTS** - Inmates shall not be barred from the courts and the Department shall, when written requests are made, actively assist inmates in the preparation and initial filing of (1) direct appeals from the convictions for which they were incarcerated, (2) Habeas petitions, (3) ' 1983 civil rights actions, and (4) conditions of confinement actions.

- Active Assistance - Assistance provided to inmates by contract Paralegals.

- Passive Assistance - Assistance available to inmates through resource materials to which they are directed.

**AGENTS OF AN ATTORNEY** - Individuals who are authorized by a licensed attorney to act on behalf of, for or in place of the attorney, and who are directed to visit an inmate on behalf of, or in place of an attorney.

- To demonstrate a bonafide agency relationship with an attorney, pursuant to this Order, an individual shall have documented (written) authorization by the attorney to act on behalf of, for or in place of the attorney. The written authorization, signed and dated by the attorney shall:

  - Expressly set forth the specific nature of the duty or duties in accordance with which the agent purports to act on behalf of, for or in place of the attorney.

  - Outline the general nature of the visit.

  - Be notarized.

- Agents may include private investigators, licensed in accordance with A.R.S. section 32-2401 et. seq.; Paralegals; law students; secretarial staff and duly appointed process servers.

- Agents shall not include anyone who is on an inmate's visiting list.

**ATTORNEY** - An attorney-at-law licensed to practice in any state or federal jurisdiction.

- Who has entered into or may in the future enter into an attorney-client relationship with the inmate or has been appointed to represent the inmate, as evidenced by court record, court order or by the inmate's written authorization.

- Shall not include anyone who is on an inmate's visiting list.

**CIVIL RIGHTS** - Rights guaranteed by the United States Constitution.

**DEBIT** - An immediate withdrawal of funds from an inmate's account.

**DESIGNATED STAFF** - Any Department Employee(s) appointed by the Warden to be responsible for such duties as outlined in this Department Order.

**HABEAS CORPUS** - A writ by which a party attempts to obtain release from confinement.

**HOLD** - An obligation owed by an inmate that restricts inmate funds until the obligation is collected.

**INITIAL FILING** - The filing of a pleading or petition with a court of law to begin a legal action in that court. An initial filing also includes the filing of all notices or other documents that may be required prior to the filing of the pleading or petition, including the initial filing of amended complaints or petitions.

**LEGAL ACCESS MONITOR** - A Department employee with paralegal training, located in the Legal Services Unit at Central Office.

**LEGAL CALL** - Unmonitored telephone calls made by an inmate to the inmate's attorney or an agent of the attorney, for legal purposes, which have been scheduled according to Institution Orders as legal calls. Court-ordered telephonic conferences with the court are also unmonitored calls and are made at the Department's expense on the state's long-distance service, when necessary.

**LEGAL MAIL** - Any letters to or from an inmate's attorney as defined above, or to or from a judge or to or from a court of law.

**NON-QUALIFIED LEGAL CLAIMS** - Any legal claims that do not fall under the definition of QUALIFIED LEGAL CLAIMS. These include divorce, child custody, paternity, name change, etc.

**PARALEGAL** - An independent contractor who has obtained a diploma/degree/certificate from an accredited Paralegal school that has met American Bar Association (ABA) approval, or possesses three or more years verifiable full-time paralegal experience. The Department shall contract in accordance with Department Order #302, Contracts and Procurement, to obtain the services of qualified Paralegals. Individuals who have graduated from law school but have never been licensed to practice law in any jurisdiction may serve as Paralegals.

**PETITION** - A written request that the court exercise its authority to redress a wrong.

**PLEADING** - For the purpose of this Department Order, a pleading refers to a Notice of Appeal pursuant to Ariz.R.Crim.P, 31.2; the initial filing of a Petition for Post-Conviction and related forms, pursuant to Ariz.R.Crim.P. 32; a Petition for Review pursuant to Ariz.R.Crim.P. 31.19; a Petition for Review pursuant to Ariz.R.Crim.P. 32.9(c); a Petition for Review pursuant to Ariz.R.Crim.P.31.19 and 32.9(g); a Petition for Writ of Habeas Corpus in state or federal court; and a civil rights complaint or condition of confinement complaint in state or federal court.

**POST-CONVICTION RELIEF (RULE 32, ARIZONA RULES OF CRIMINAL PROCEDURE)** - The process through which a party seeks relief from a sentence imposed on the party by a court of law.

**QUALIFIED LEGAL CLAIMS** - In the direct appeal, any claim of error; in the Post Conviction Relief proceeding, any non-precluded claim set forth in Ariz.R.Crim.P.32; and in federal court, any claim of error based on a violation of the federal constitution or law. Forms include the Notice of Appeal from the Superior Court (Ariz.R.Crim.P.31.2(a); Notice of Post-Conviction Relief, Request for Preparation of Post-Conviction Relief Record, and Petition for Post-conviction Relief (Ariz.R.Crim.P. 32);Petition for Review (Ariz.R.Crim.P. 32.9(c)); Petition for Review (Ariz.R.Crim.P. 31.19 and 32.9(g)); Petition for a Writ of Habeas Corpus in state or federal court; and a civil rights action or condition of confinement claim (42 U.S.C. ' 1983).

**WRIT** - A written judicial order to perform a specified act or giving authority to have a specified act done.

_____
Charles L. Ryan
Director

**FORMS LIST**
902-1, Inmate Request for Paralegal Assistance
902-1S, Solicitud De Preso Para Ayuda De Paralegal
902-2, Request/Authorization for Qualified Legal Claim Copying
902-3, Paralegal Activity Log
902-4, Contract Paralegals -- Unit Sign-In Log
902-7, Request/Authorization for Non-Qualified/Non-Legal Copying
902-8, Paralegal Meeting Notification
902-9, Checklist for Storage of Inmate Legal Materials

**ATTACHMENTS**
Attachment A, Legal Texts and Resource Material
Attachment B, Court Forms Packets
Attachment C, Federal Appellate/District Courts and State Appellate Courts
Attachment D, Paralegal Assistance Request Process
Attachment E, Qualified Legal Claims Copying Process
Attachment F, Non-Qualified Legal Claims/Non-Legal Copying Process

# AUTHORITY
_Lewis v. Casey,_ 116 S. Ct. 2174 (1996)

**Attachment A**
**Department Order 902**

### LEGAL TEXTS AND RESOURCE MATERIAL

The following legal texts and legal resource material may remain for use by inmates and shall be placed in the Reserve/Reference section of the General Library of each unit:

1. A complete set of Arizona Revised Statutes (non-annotated)
2. Arizona Revised Statutes (annotated), Volumes 5, 5A, 5B and 5C
3. Arizona Rules of Court - State
4. Arizona Rules of the Court - Federal
5. Federal Civil Judicial Procedure and Rules
6. Federal Criminal Code and Rules
7. A complete set of Department Orders or access to authorized computer-generated copies (General Access Department Orders only)
8. The Classification Manual
9. U.S. Code: 28 U.S.C. Section 2254
10. U.S. Code: 42 U.S.C. Section 1981 through 42 U.S.C. Section 2000d-7
11. Black's Law Dictionary
12. Rights of Prisoners 4th
13. The Law and Policy of Sentencing and Corrections 7th
14. Post-Conviction Remedies (Yackle)
15. U.S. Constitution (articles and amendments)
16. Arizona Legal Forms Book - Criminal Procedure.
17. Lewis v. Casey
18. Prisoner's Handbook (Rule 32) (Petitions for Post-Conviction Relief)
19. The Civil Rights of Institutionalized Persons Act (CRIPA) settlement agreement (Female units only)

Note: <u>Any deletions or additions to the above list will be subject to the approval of the Director of the Department of Corrections.</u>

**ATTACHMENT B**
**Department Order 902**

## COURT FORMS PACKETS

The following court documents and forms shall be available in Legal Resource Centers. The Legal Access Monitor will provide current copies to Designated Staff as needed.

1.  Arizona State Courts - Self-Help Resources
2.  Federal Section 1983 Forms Packet
3.  Federal Petition for Wit of Habeas Corpus by a Person in State Custody Forms Packet
4.  State Notice of Post-Conviction relief (Pursuant to Rule 32 of the Rules of Criminal Procedure)
5.  State Notice of Appeal from Superior Court
6.  State Petition for Post-Conviction Relief (Pursuant to Rule 32 of the Rules of Criminal Procedure)
7.  State Request for Preparation of Post-Conviction Relief Record
8.  State Court Complaint
9.  Petition for Review, Arizona Rules of Criminal Procedure, Rule 31.19(a)
10. Petition for Review, Arizona Rules of Criminal Procedure, Rule 32.9(c)
11. Petition for Review, Arizona Rules of Criminal Procedure, Rule 31.19 & 32.9(g)
12. State and Federal Notice of Change of Address Forms
13. State Certificate of Compulsory Arbitration
14. State Deferral or Waiver of Court Fees and Costs (State) Forms
15. State Deferral or Waiver of Appellate Court Fees and Costs Forms
16. Mandatory Civil Cover Sheet (Maricopa County)

**ATTACHMENT C**
**DEPARTMENT ORDER 902**

**ARIZONA DEPARTMENT OF CORRECTIONS**
Federal Appellate/District Courts and State Appellate Courts

**UNITED STATES COURTS**

Supreme Court of the United States
1 First Street, N.E.
Washington, D.C. 20543

**Phoenix:**

United States Ninth Circuit Court of Appeals
401 W. Washington Street
Phoenix, AZ 85003-2118
                    OR

P.O. Box 193939
San Francisco, CA 94119-3939

United States Bankruptcy Court
401 W. Washington Street
Phoenix, AZ 85003-2118

District Court of Arizona
United States Courthouse
401 W. Washington Street
Phoenix, AZ 85003-2118

**Tucson:**

District Court of Arizona
United States Courthouse
405 W. Congress Blvd
Tucson, AZ 85701-1711

**STATE APPELLATE COURTS**

Supreme Court of Arizona
State Courts Building
1501 W. Washington
Phoenix, AZ 85007

**Phoenix:**

Court of Appeals Division 1
State Courts Building
1501 W. Washington, Second Floor
Phoenix, AZ 85007

**Tucson:**

Court of Appeals Division 2
State Office Building
400 W. Congress
Tucson, AZ 85701-1374

# APPENDIX 2

## AFFIDAVIT OF STEVEN E. PITT, D.O.

State of Arizona          )
                          )
County of Maricopa        )

I, Steven E. Pitt, D.O., declare:

My name is Steven E. Pitt, D.O.  I am of legal age and competent to testify in Court. The facts stated herein are based on my personal knowledge, and I could and would testify to these facts in a court of law if asked to do so.

1. I graduated from Michigan State University's College of Osteopathic Medicine, in 1986.

2. I completed a one-year rotating internship at Oakland General Hospital in Madison Heights, Michigan, in 1987.

3. In 1990, I completed my Residency training in Psychiatry at the University of Michigan Medical Center.

4. In 1991, I completed my Fellowship in Forensic Psychiatry at the University of Maryland School of Medicine.

5. I am a Diplomate of the American Board of Psychiatry and Neurology and received my Board Certification in Psychiatry in April 1993 and my subspecialty Board Certification in Forensic Psychiatry in April, 1998.

6. For ten years, I served as a Board Examiner for the American Board of Psychiatry and Neurology.

7. I am licensed to practice medicine in Arizona, Michigan, Maryland, Colorado, and California.

8. I am a Clinical Associate Professor in the Department of Psychiatry, The University of Arizona College of Medicine – Phoenix. See Exhibit A, Curriculum Vitae.

9. As a forensic psychiatrist, I have video recorded several hundred independent medical examinations in a variety of contexts that include, but are not limited to, mental state at the time of the offense evaluations, impaired professional evaluations, psychic harm, wrongful termination, employment discrimination, and sexual harassment.

10. I have extensively researched the use of video recording forensic mental health evaluations and co-authored an article that was published in the Journal of Forensic Sciences about this subject entitled *Preserving the Integrity of the Interview: The Value of Videotape*. See Exhibit B.

11. It has been my position for several years that the presence of a third party adverse to the process can interfere with an independent medical examination. The presence of a third party during a one-on-one examination unavoidably changes the interaction between interviewer and subject. The validity of the examination will be adversely affected and the third person's presence to monitor me transforms the evaluation into an adversarial process. Ms. Andriano may respond differently than she would out of the presence of the third person. Ms. Andriano might, without realizing it, respond to questions in ways that she ordinarily would not but for the presence of the third person in the interview, which fundamentally changes the nature of the interview.

12. While the presence of a third party adverse to the process can be a disruptive influence, there is no objective data to suggest that the presence of audio or video recording equipment is a distraction, will diminish the accuracy of the process, or distort psychological openness or effect the spontaneity of the process.

13. It is my practice to record, through the use of both audio and video recording, all forensic interviews. The video record is taken by two cameras operating simultaneously – one focused on the examiner and one focused on the subject. The end result is a picture in picture image that allows the fact finder or an evaluator to see both the interviewer and the person being examined at all times. A continuous date and time code run while the interview is video recorded; thus any claimed gaps could easily be detected. The two cameras are mounted on the walls of the interview room or in the alternative, on two tripods. A third person is not present during the interview. I have regularly used this method of examination on cases for which I have testified as an expert. In cases in which the examination is not done in my office, I use one camera and whenever possible, try to capture the subject and me in the same image.

14. In my opinion, the use of video recording enables the interviewer to capture the subject's unique image, as well as all verbalizations and non-verbal behavior. It allows all interested parties to see the demeanor, body language and subtle aspects of the interview that cannot be captured with note taking or audio recording by itself. Audio and video recording eliminate the need for the examiner to take notes during the interview and eliminate the possibility of any unintentional bias in the selection of what is documented by the note-taker. The dual recordings preserve the data in order for all subsequent evaluators

(including defense counsel and defendant's own experts) to have access to equivalent material. This method also creates an unbiased record; it holds the examiner up to scrutiny, but protects him against unfounded claims of impropriety from the fallible memory of a live witness. Further, video and audio recording the examination eliminates the need for a third person in the room. In a forensic psychiatric examination, this third person witness is disruptive and adversely affects the interview. In short, it is my opinion that the combination of audio and video recording is an unparalleled instrument for preserving the integrity of a forensic psychiatric interview.

15. It has been my experience that the use of video and audio recording equipment has no substantive effect on the overall emotional well-being of the examinee.

16. Video recording forensic psychiatric examinations is the best way to insure the integrity of the process. Video recording forensic psychiatric examinations also serves as a safeguard and protection for both the evaluator and evaluee. This procedure will record the honesty, thoroughness and objectivity of the evaluator's work and will not interfere unnecessarily with the evaluation.

I declare under penalty of perjury of the laws of the United States and the State of Arizona that the foregoing is true and correct.

_____
Steven E. Pitt, D.O.

State of Arizona          )
                          )
County of Maricopa        )

     I hereby certify that the foregoing Affidavit was subscribed and sworn to before me on this 6th day of November, 2013, by Steven E. Pitt, D.O.

     WITNESS my official hand and seal.

     My commission expires: _May 29, 2017_

OFFICIAL SEAL
TREVA RILEY
Notary Public - State of Arizona
MARICOPA COUNTY
My Comm. Expires May 29, 2017
[SEAL]

_____
Notary Public

3

# EXHIBIT A

**CURRICULUM VITAE**
**(Updated February 1, 2013)**

**Steven E. Pitt, D.O.**

| | |
|---|---|
| **Address:** | 15849 North 71st Street |
| | Suite 100 |
| | Scottsdale, Arizona  85254-2179 |
| | Telephone: (480) 281-1638 |
| | Facsimile:  (480) 281-1639 |
| | E-Mail:      SEPitt@aol.com |
| | |
| | 1901 Avenue of the Stars |
| | Suite 200 |
| | Los Angeles, California  90067 |
| | Telephone: (310) 777-7806 |
| | E-Mail:      SEPitt@aol.com |
| **Education:** | Doctor of Osteopathic Medicine, Michigan State University, College of Osteopathic Medicine, East Lansing, Michigan, 1986 |
| | Bachelor of Science (Psychology), Michigan State University, East Lansing, Michigan, 1982 |
| **Training:** | Fellowship in Forensic Psychiatry, University of Maryland School of Medicine, Baltimore, Maryland, July 1, 1990 through June 30, 1991 |
| | Psychiatry Residency, The University of Michigan Hospitals, Ann Arbor, Michigan, July 1, 1987 through June 30, 1990 |
| | Internship, Oakland General Hospital, Madison Heights, Michigan, July 1, 1986 through June 30, 1987 |
| **Specialized Education:** | Criminal Procedure (Audit), University of Maryland Law School, Fall Term, 1990 |
| | Center for Forensic Psychiatry, Ann Arbor, Michigan, Elective Rotation, July, 1989 through December, 1989 |

**Academic and Teaching Appointment:** Clinical Associate Professor, Department of Psychiatry, The University of Arizona College of Medicine – Phoenix

**Licensure:**
State of Arizona (2703)
State of California (20A 12040)
State of Colorado (30823)
State of Maryland (H40097)
State of Michigan (51-01-009617)

**Certification:** Diplomate, American Board of Psychiatry and Neurology with Subspecialty Certification in forensic Psychiatry, 1998 and 2008

Diplomate, American Board of Psychiatry and Neurology, 1993

**Honors:** Cooperative Law Enforcement Award– Arizona Response Crisis Team; "In recognition of meritorious service and acts that have materially contributed to the attainment of the highest standards of cooperative Law Enforcement and Justice in the State of Arizona." Presented by the Law Enforcement Coordinating Committee, U.S. Department of Justice, District of Arizona, 2003

"Physician of the Year," Arizona Osteopathic Medical Association, 2003

Michigan State University College of Osteopathic Medicine "Dean's Award for Meritorious Contribution," 2002

American Osteopathic Association "Hero Medal," 2002

"Co-Peer of The Year," Arizona State Hospital Medical Staff, 1997

"Peer of The Year," Arizona State Hospital Medical Staff, 1996

Completed Senior Year of Residency Training in Psychiatry at The University of Michigan Hospitals "With Distinction"

2

The University of Michigan's Department of Psychiatry Representative at CIBA-GEIGY'S MED Start IV, Aspen, Colorado, 1989

**Memberships:**   American Academy of Psychiatry and the Law, 1995-Present
American Psychiatric Association, 1989-Present
American Osteopathic Association, 1988-Present
American Medical Association, 1991-Present
Arizona Psychiatric Society, 1992-Present
Arizona Osteopathic Medical Association, 1992-Present
Michigan Association of Osteopathic Physicians and Surgeons, 1989-Present

American College of Neuropsychiatrists, 1987-92
Colorado Psychiatric Society, 1991-92
Colorado Society of Osteopathic Medicine, 1991-92
Colorado Springs Osteopathic Foundation and Family Medical Center, 1991-92
Michigan Psychiatric Society, 1987-91
Michigan State Medical Society, 1987-90

**Associate:**   Park Dietz & Associates, Inc., Newport Beach, California, June, 1998 – Present

**Consulting Positions:**   Phoenix Police Department – Missing Persons Unit, Phoenix, Arizona, November, 2008 – Present

Threat Assessment Group, Inc., Newport Beach, California, April, 2000 – Present

Boulder Police Department, Boulder, Colorado, June, 1999 – Present

**Past Consulting Positions:**   Phoenix Police Department – Family Investigations Bureau – Re: Domestic Violence Suspect Grouping Protocols, 2011 - 2012

Phoenix Police Department – Homicide Unit, Phoenix, Arizona, August, 2001 – November, 2008

Arizona Humane Society, Phoenix, Arizona, April 2007-April 2008

3

Baseline Killer Task Force, Phoenix Police Department, Homicide Unit, July 17, 2006-December 7, 2006

Physician Advisor, Magellan Behavioral Health, MBC TriCare Central Region, Phoenix, Arizona, July, 2000 – October, 2005

Board Examiner: American Board of Psychiatry and Neurology, April, 1994 – January, 2004

Director, Columbine Psychiatric Autopsy Project, Threat Assessment Group, Inc., Newport Beach, California, August, 1999 – April, 2002

Advisory Panel, Legalvote.com, New York, N.Y., October, 2000 – March, 2002

Maricopa County Attorney's Office
Re:  Installation of Videotape Equipment for Psychiatric Interview Room at New County Jail, April, 1999.

DWL Architects Re:  Design of Arizona State Hospital's Proposed 174 Bed Forensic Psychiatric Facility, August, 1996 – March, 1997

**Past Legislative Work:** Working Member of Committee to Modify and Improve Criminal Rule 11 Procedure (Competency to Stand Trial) in the State of Arizona. Senate Bill 1273, Passed, 42nd Legislative Session, 1995

**Past Hospital Affiliations:** Maricopa Integrated Health System, Phoenix, Arizona; June, 1998 – February, 2000

Courtesy Staff Member, Paradise Valley Hospital, Phoenix, Arizona; December, 1992 – February, 1999

Arizona State Hospital, Phoenix, Arizona; March, 1994 – May, 1998

Moonlighting Privileges, Maricopa Medical Center; January, 1994 – January 1997

Provisional Medical Staff Member, Desert Vista Hospital, Mesa; Arizona, September, 1992 – November, 1994

Colorado Mental Health Institute at Pueblo, Institute for Forensic Psychiatry; July, 1991 – July, 1992

**Committee Appointments**   Law Enforcement Liaison Committee, American Academy of Psychiatry and the Law, October, 2007 – Present

**Past Committee Appointments:**   Private Practice Committee, American Academy of Psychiatry and the Law, October, 1995 – October, 2007

Law Enforcement Liaison Committee, American Academy of Psychiatry and the Law, February 2001 – October, 2006

Paradise Valley Hospital Institutional Review Board, September, 2000 –September, 2004

Public Affairs Representative, Arizona Psychiatric Society, June, 1997 – June, 2004

Program Committee, American Academy of Psychiatry and the Law, October, 1995 – 2001

Public Information Committee, American Academy of Psychiatry and the Law, October, 1991 – October, 1998

Chairperson, Forensic Psychiatry Committee, Arizona Psychiatric Society, June, 1997 – June, 1998

Family Medicine Program Advisory Committee, Arizona Graduate Medical Education Consortium, May 1995 – May, 1998

Peer Review of Psychiatric Testimony Committee, American Academy of Psychiatry and the Law, October, 1994 – October, 1997

Acting Chairperson, Special Class Committee, Arizona State Hospital, January, 1997 – December, 1997

Early Career Development Committee, American Academy of Psychiatry and the Law, October, 1994 – October, 1996

Court Appointed Advisory Group Member: Development of Mental Health Expert Qualifications and Training Program for Conducting Competency to Stand Trial Evaluations. Maricopa County Superior Court, June, 1995 – August, 1995

Adjunct Member, Program Committee, American Academy of Psychiatry and the Law 1995 Annual Meeting, Seattle, Washington, October, 1994 – October, 1995

Learning Resources Center Committee, American Academy of Psychiatry and the Law, October, 1991 – October, 1993

Clinical Risk Management Committee, Colorado Mental Health Institute at Pueblo, December, 1991 – July, 1992

Public Information Committee, Michigan Psychiatric Society, 1989-90

Faculty and Staff Assistance Program, University of Michigan Hospitals, 1989-90

**Past Academic and Teaching Appointments:**

Clinical Associate Professor, Department of Psychiatry, The University of Arizona Health Sciences Center, Tucson, Arizona, 1995 – 2009

Faculty Member – <u>2003 Training Mental Health Experts in Legal Competency and Restoration Conference</u>. Arizona Supreme Court; Phoenix, Arizona, September 24-25, 2003

6

Clinical Teaching Faculty, Department of Psychiatry, Maricopa Integrated Health System, Phoenix, Arizona, June, 1998 – June, 1999

Clinical Teaching Faculty, Department of Psychiatry, Good Samaritan Regional Medical Center, Phoenix, Arizona, January, 1995 – May, 1998

Faculty Member – <u>Training Mental Health Experts in Legal Competency and Restoration in the Criminal and Juvenile Courts</u>. Superior Court of Arizona; Tucson, Arizona, April 17, 1998

Faculty Member – <u>Mental Health Expert Training</u>: <u>Examinations with Regard to Competency</u>. Superior Court of Arizona, Maricopa County, Criminal Department; Phoenix, Arizona, November 10, 1995 and November 11, 1995

Assistant Clinical Lecturer, Department of Psychiatry, The University of Arizona Health Sciences Center, Tucson, Arizona, 1993 – 1995

Senior Instructor in Psychiatry, The University of Colorado Health Sciences Center, Department of Psychiatry, Denver, Colorado, July, 1991 – July, 1992

Consulting Psychiatrist (Instructor), The University of Michigan Law School, Clinical Law Program, Clinical Law 1, Winter Term, 1990

**Past Administrative And Clinical Positions:**

Chief, Outpatient Evaluations and Forensic Services, Department of Psychiatry, Maricopa Integrated Health System, June, 1998 – June, 1999

Director, Forensic Psychiatric Services, Arizona State Hospital, March, 1994 – May, 1998

Chairperson, Medical Education Committee, Arizona State Hospital, July, 1995 – May, 1998

Consulting Psychiatrist, ComCare, Tempe, Arizona, September, 1992 – March, 1994

Chairperson, Judicial Review Committee, Colorado Mental Health Institute at Pueblo, October, 1991 – July, 1992

Chairperson, Medical Education Committee, Colorado Mental Health Institute at Pueblo, July, 1991 – July, 1992

Director, Forensic Education Series, Colorado Mental Health Institute at Pueblo, Institute for Forensic Psychiatry, July, 1991 – July, 1992

Staff Psychiatrist, Colorado Mental Health Institute at Pueblo, Institute for Forensic Psychiatry, July, 1991 – July, 1992

Consulting Psychiatrist, Washtenaw County Community Mental Health Center, Ann Arbor, Michigan, July, 1989 – January, 1990

**Presentations:**   Pitt, S.E., Zick, J.A.: Using Mental Health Experts to Rebut Mitigation, 2012 Association of Government Attorneys in Capital Litigation – Summer Conference, San Francisco, California, July 26, 2012

Pitt, S.E., Zick, J.A.: Understanding and Meeting Mental Defenses, 2012 Arizona Prosecuting Attorneys' Advisory Council Summer Conference, Tucson, Arizona, August 3, 2012

Pitt, S.E., Nelson, E.M.: Child Abduction and Murder: What Happens After The Arrest?  Arizona Missing Persons Association; Glendale, Arizona, November 17, 2011

Pitt, S.E., Collins, N., Humphrey, M., Metzner, J., Dvoskin, J. Kolsrud, R.: Foreseeability, Lethal Violence and Risk Assessment: You Be The Judge, American Academy of Psychiatry and the Law 41st Annual Meeting; Tucson, Arizona, October 21, 2010

8

Pitt, S.E., Nelson, E.M.: Information Gathering: The Forensic Psychiatric Evaluation and Beyond ... Strategies to Maximize Success, <u>Forensic Trends: Psychiatric and Behavioral Issues</u>; Las Vegas, Nevada, May 6, 2010

Pitt, S.E., Nelson, E.M.: Media and Forensic Psychiatry: Practical Considerations, <u>Forensic Trends: Psychiatric and Behavioral Issues</u>: Las Vegas, Nevada, May 7, 2010

Pitt, S.E., Nelson, E.M.: The Forensic Psychiatric Evaluation: Civil and Criminal Case Applications, <u>Arizona Paralegal Association</u>; Phoenix, Arizona, May 21, 2010

Nelson, E.M., Pitt, S.E.: Forensic Psychiatric and Psychological Expert Consultation in Criminal Cases, <u>Maricopa County Bar Association</u>; Phoenix, Arizona, March 19, 2010

Pitt, S.E., Nelson, E.M.: Behind Closed Doors: Understanding the Human Side of Hoarding. <u>Petsmart® Charities Feline Forum</u>, Chicago, Illinois, September 2009

Stefan, S., Joyce, M., Dvoskin, J.A., Nelson, E.M., and Pitt, S.E." Right to Refuse Medication Hearings. <u>National Association for Rights Protection and Advocacy Conference</u>, Phoenix, Arizona, September, 2009

Pitt, S.E., Spiers, E.M., Difficult Physician Behavior: The Role of the Forensic Psychiatric Evaluation. <u>Arizona Health Care Lawyers Association</u>, Phoenix, Arizona, May 2009

Pitt, S.E., Spiers, E.M., Hayes, J., Back to Basics: The Independent Forensic Evaluation. <u>Office of the Arizona Attorney General</u>, Phoenix, Arizona, March 2009

9

Perrin, G., Pitt, S.E. Arizona Supreme Court 2007 Legal Competency and Restoration Training for Mental Health Experts; Arizona Supreme Court; Tucson, Arizona, May 4, 2007

Pitt, S.E.; Spiers, E.M.; Hayes, J.; Back to Basics: The Art of Interviewing. Arizona Psychiatric Society 2007 Spring Scientific Conference, Scottsdale, Arizona, April 21, 2007

Pitt, S.E., Hayes, J., Spiers, E.M., Links between animal cruelty and violence toward people. Arizona Humane Society, Law Enforcement Animal Protection program, Phoenix, Arizona, March 12, 2007

Pitt, S.E.. Hayes, J., Forensic Psychiatric Evaluations in Personal Injury Litigation. American Association of Legal Nurse Consultants -- Phoenix Chapter, Phoenix, Arizona, July 11, 2006

Pitt, S.E., DOphilia: Treatment strategies toward maximizing your practice of Osteopathic Medicine – A Forensic Psychiatrist speaks out. Arizona Osteopathic Medical Association Eighty-Fourth Annual Convention, Scottsdale, Arizona, April 4, 2006

Lewis, D., Rubin, P., Pitt, S.E., Murder City – The Art of the Interview. Judicial Education Day. Maricopa County Superior Court, Mesa, Arizona, October 27, 2006

Pitt, S.E., Interview and Interrogation Techniques. Boulder Police Department Looking Beyond the Obvious Training Program, Boulder, Colorado, October 30, 2006

Pitt, S.E., Ballentine, J., Murder for Hire. American College of Osteopathic Neurologists and Psychiatrists Mid-Year Meeting & Scientific Seminar, Scottsdale, Arizona, April 15, 2005

Pitt, S.E., Domestic Homicide: Clinical Considerations. <u>American Osteopathic Association 109th Annual Convention and Scientific Seminar</u>, San Francisco, California, November 8, 2004

Pitt, S.E., Dietz, P.E., Dvoskin, J.A., Spiers, E.M., The Importance of Video Recording Forensic Examinations. <u>American Academy of Psychiatry and the Law 35th Annual Meeting</u>; Scottsdale, Arizona, Ocober 22, 2004

Spiers, E.M., Dvoskin, J.A., Pitt, S.E., Dietz, P.E., and Walker, R.P.: Columbine: Understanding Why – Implications for Psychologists. <u>American Psychology-Law Society Annual Conference</u>, Scottsdale, Arizona, March, 2004

Pitt, S.E.  Assessing the Risk for Interpersonal Violence in Your Patient Population. <u>Maricopa Integrated Health System Department of Psychiatry Fall Resident Retreat</u>; Phoenix, Arizona, November 21, 2003 *and* <u>Michigan State University College of Osteopathic Medicine Fall Kaleidoscope: CME For Osteopathic Physicians</u>; East Lansing, Michigan, September 18, 2004

Pitt, S.E., Dietz, P.E., Dvoskin, J.A., Spiers, E.M., Walker, R.P., Kurtis, B. Columbine: Understanding Why. <u>American Academy of Psychiatry and the Law 34th Annual Meeting;</u> San Antonio, Texas, October, 2003

Pitt, S.E.  The Value of Videotape.  <u>Arizona Supreme Court 2003 Training Mental Health Experts in Legal Competency and Restoration Conference</u>; Arizona Supreme Court; Phoenix, Arizona, September 25, 2003

Dvoskin, J.A., Grisso, T., Pitt, S.E.  Ethical Issues in conducting Competency to Stand Trial Evaluations and Restoration to Competency.  <u>Arizona Supreme Court 2003 Training Mental Health Experts in Legal Competency and Restoration Conference</u>; Arizona Supreme Court; Phoenix, Arizona, September 24, 2003

Pitt, S.E.  Fasten your seat belt and enjoy the ride.  <u>Keynote speaker – Michigan State University College of Osteopathic Medicine Hooding and Commencement Ceremony</u>; MSU Wharton Center for Performing Arts, East Lansing, Michigan, May 1, 2003

Pitt, S.E., Columbine Massacre: Cause and Effect.  <u>American College of Osteopathic Neurologists and Psychiatrists Mid-year Meeting & Scientific Seminar</u>; Scottsdale, Arizona, April 11, 2003

Pitt, S.E.  Emotional Distress Claims In Employment Litigation. <u>State Bar of Arizona Employment and Labor Law Section, Continuing Legal Education</u>; Phoenix, Arizona, January 27, 2003 and Tucson, Arizona, March 26, 2003

Pitt, S.E., Spiers, E.M., Dvoskin, J.A. What has been learned from Columbine: The signs that were missed and how this can be avoided in our own backyards. <u>Mental Health Association of Arizona, Arizona Department of Health Services – Division of Behavioral Health, 15th Annual Seeds of Success Symposium</u>; Phoenix, Arizona, October 7, 2002

Ballentine, J., Bickart, A.B., Pitt, S.E. The Art and Science of Murder Conspiracy. <u>State Bar of Arizona Continuing Legal Education</u>; Scottsdale, Arizona, September 19, 2002

Pitt, S.E.  Investigative Forensic Psychiatry and the Insanity Defense. <u>State Bar of Arizona Continuing Legal Education</u>; Scottsdale, Arizona, September 19, 2002

Ballantine, J., Pitt, S.E., Schoon, S., Rubin, P.  Can Offenders be Rehabilitated?  Sociology 446 – Sociology of Crime – Arizona State University; November, 2001

Pitt, S.E., Sasak, K., Jenkins, W.J.J.  Mental Defenses – The Importance of the Forensic Examination.  Colorado District Attorneys' Council 30th Annual Training Conference; Steamboat Springs, Colorado, October 2, 2001

Pitt, S.E.  The JonBenet Ramsey Homicide Investigation: Lessons Learned.  Arizona Osteopathic Medical Association 79th Annual Conference Luncheon Speaker; Scottsdale, Arizona, April, 2001

Pitt, S.E.  Interview/Interrogation Techniques; Phoenix Police Department Homicide Unit; Phoenix, Arizona, January, 2001

Pitt, S.E., Spiers, E.M.. Assessing the Risk for Domestic Violence: Arizona School of Professional Psychology – Survey of Forensic Psychology; Phoenix, Arizona, November, 2000

Pitt, S.E., Spiers, E.M.  Dangerousness and Firearms: Assessing the Risk for Violence in Teens and Adults.  Midwestern University (Glendale Campus); Glendale, Arizona, November, 2000

Pitt, S.E., Spiers, E.M.  Necrophilia and Necrosadism: Identifying and Assessing the Offender. The Mortician as an Integral Part of the Community – Mortuary Science for the Present and the Future; Mesa Community College, Mesa, Arizona, October, 2000

Dvoskin, J.S., Hollebeek, J., Morenz, B., Pitt, S.E. Practical Perspectives. Training Mental Health Experts in Legal Competency and Restoration Conference; Supreme Court of Arizona, State of Arizona; Tucson, Arizona, August, 2000

Counts, W., Dvoskin, J.A., Fell, H., Jones, M., Pitt, S.E., Potts, J.L., Ethical Issues and other Hot Topics. <u>Training Mental Health Experts in Legal Competency and Restoration Conference</u>; Supreme Court of Arizona, State of Arizona; Tucson, Arizona, August, 2000

Pitt, S.E.  Anticipating and Investigating the Insanity Defense.  <u>Maricopa County Attorney's Office Advanced Trial Advocacy Course</u>; Phoenix, Arizona, June 2000 and Mesa, Arizona, October, 2000

Potts, J.L., Pitt, S.E.  Recognizing Lethality in Investigations from a Psychiatric Viewpoint; <u>Threat Management Seminar</u>. Maricopa County Attorney's Office; Phoenix, Arizona, November, 1999

Pitt, S.E.  Possible Solutions – Assessing the Dangerousness of Offenders and Fashioning Appropriate Dispositions. <u>The Mentally Ill and the Criminal Justice System (Panel) – State Bar of Arizona 66th Annual Convention</u>; Phoenix, Arizona, June, 1999

Pitt, S.E.  Addressing Mental Defenses. <u>Maricopa County Attorney's Office Advanced Trial Advocacy Course</u>; Maricopa County Attorney's Office; Phoenix, Arizona, June, 1999.

Pitt, S.E.  Conducting a Mental State at the Time of the Offense Evaluation: From Beginning to End. <u>Maricopa County Adult Probation Department</u>; Phoenix, Arizona, December, 2000 and <u>Continuing Education Programs for Mental Health Professionals – Arizona School of Professional Psychology</u>; Phoenix, Arizona, May, 1999

Ballantine, J., Pitt, S.E.  Murder for Hire.  <u>Maricopa County Legal Assistant Division Training Retreat</u>; Phoenix, Arizona, April, 1999

Pitt, S.E., Spiers, E.M.  Searching for Mental Illness in Firesetters. <u>Maricopa County Attorney's Office Arson Investigations Seminar</u>; Mesa, Arizona, February, 1999

Pitt, S.E.  Advanced Interviewing Workshop for Law Enforcement Officers. <u>Boulder Police Department</u>; Boulder, Colorado, January, 1999; with Wickman, T.J. <u>Reno Police Department</u>, Reno, Nevada, January, 1999; and <u>Florida Polygraph Association</u>, Key West, Florida, June, 1999

Pitt, S.E., Spiers, E.M.  Toward an Understanding of Infant Murder. <u>Northern New Jersey Maternal Child Health Consortium Hot Topics in Obstetrics and Pediatrics V</u>; West Orange, New Jersey, November, 1998

Deprato, D.K., Phillips, R.T.M., Dietz, P.E., Capo, L.L., Capo, B., Pitt, S.E.  Interaction with the Media: Advanced Workshop.  <u>American Academy of Psychiatry and the Law 29th Annual Meeting</u>; New Orleans, Louisiana, October, 1998

Pitt, S.E.  Introduction to Interviewing Mentally Ill Suspects.  <u>Phoenix Police Department Investigators Training/Criminal Investigation Course – Rio Salado Community College</u>; Phoenix, Arizona, October, 1999; March, 1999; October, 1999; March, 2000; October, 2000; March, 2001; October, 2001; March, 2002; March, 2003; November, 2003; March, 2004; October, 2004; March, 2005; October, 2005; March,2006; February 2007, August, 2007; October, 2008; March, 2009; November, 2009; March, 2010; July 2012; and December 2012.

Pitt, S.E., Whitback, T., O'Dell, A.  Aggressive Investigative Techniques for Law Enforcement. <u>Arizona Communities United Against Abuse – First Annual Statewide Conference on Domestic Violence</u>; Tucson, Arizona, October, 1998

Pitt, S.E., Potts, J.L. Risk Assessment in Stalking and Erotomania. <u>Arizona Association for Marriage and Family Therapy Fall 1998 Conference</u>; Phoenix, Arizona, September 1998

Pitt, S.E.  Sane or Insane: You be the Judge; <u>Good Samaritan Regional Medical Center. Department of Psychiatry, Grand Rounds Presentation</u>; Phoenix, Arizona, May, 1998 and <u>Maricopa County Adult Probation Department</u>; Phoenix, Arizona, August, 1998

Pitt, S.E.  Arizona State Hospital's Restoration to Competency to Stand Trial Program: <u>Training Mental Health Experts in Legal Competency and Restoration in the Criminal and Juvenile Courts. Supreme Court of Arizona</u>; Tucson, Arizona, April, 1998

Pitt, S.E.  Assessing Sociopathy and Mental Illness in Gang Members. <u>B.F.F. Consultants Arizona Gang Seminar</u>; Phoenix, Arizona, October, 1997

Pitt, S.E., Deprato, D.K., Dietz, P.E., Phillips, R.T.M., Anfang, S.E.  Forensic Psychiatry and the Media. <u>American Academy of Psychiatry and the Law 28th Annual Meeting</u>; Denver, Colorado, October, 1997

Pitt, S.E., Weir, P.A., Randall, M.M.  Insanity. <u>Colorado District Attorneys Council 26th Annual Training Conference</u>; Steamboat Springs, Colorado, October, 1997

Blair, J., Pitt, S.E.  Cross Examination of Mitigation Expert Demonstration.  <u>New York Prosecutors Training Institute, Inc., Statewide Conference on Capital Prosecution</u>; Albany, New York, September, 1997

Pitt, S.E.  Arizona State Hospital's Restoration to Competency to Stand Trial Program: What we do and how we do it.  Arizona Psychiatric Society 1997 Fall Scientific Conference; Apache Junction, Arizona, September, 1997 and Maricopa County Adult Probation Department; Phoenix, Arizona, March, 1999

Pitt, S.E. Assessing the Presence or absence of Mental Illness in a Suspect. Florida Polygraph Association; Fort Lauderdale, Florida, June, 1997

Pitt, S.E. Serial Rape, Dissociative Identity Disorder and the Insanity Defense. Arizona Osteopathic Medical Association 75th Annual Meeting; Scottsdale, Arizona, April 1997

Pitt, S.E. Introduction to Forensic Psychiatry. Midwestern University's (Glendale Campus) Lecture Series in Psychiatry; Glendale, Arizona, April, 1997; February, 1998; February, 1999; January, 2000; January, 2001; January, 2002; January, 2003; January, 2004; January, 2005; January, 2006; January, 2007; January, 2009; November, 2009; and December, 2010.

Bacal, E.B., Bowers, B.W., Jones, M.D., Pitt, S.E., Potts, J.L., Spencer, B.  Competency to Stand Trial: Evaluation, Restoration, and the New Amendments to Rule 11. Maricopa County Bar Association; Phoenix, Arizona, April, 1997

Arnold, C.L., Davidson, V., Franks, P.J., Pitt, S.E. Reaction Panelist – The MacArthur Treatment Competence Study. ComCare's Pivotal Issues in Mental Health Law Program; Phoenix, Arizona, January, 1997

Wettstein, H.C., Resnick, P.J., Rappeport, J.R., Griffith, E.E.H., Zonana, H.V., Pitt, S.E.  Peer Review of Expert Psychiatric Testimony. American Academy of Psychiatry and the Law 27th Annual Meeting; San Juan, Puerto Rico, October, 1996

17

Pitt, S.E.  The Forensic Psychiatric Assessment of a Criminal Defendant.  <u>Office of the District Attorney, First Judicial District</u>; Golden, Colorado, August, 1996

Pitt, S.E.  Investigator's Update: Mental Issues in Criminal Cases.  <u>Office of the District Attorney, 18th Judicial District</u>; Englewood, Colorado, July, 1996

Harrison, J.A., Karp, C., Morenz, B., Pitt, S.E.  Does Your Memory Serve You Well?  Debating False Memory Syndrome.  <u>The University of Arizona Extended University Behavioral Health Continuing Education Program</u>; Tucson, Arizona, May, 1996

Hirsh, B., Pitt, S.E.  The Insanity Defense in Arizona; A Legislative Response to High Profile Cases. <u>Sandra Day O'Connor Inn of Court</u>; Phoenix, Arizona, December, 1995

Pitt, S.E., Potts, J.L., Youngjohn, J., Boyer, C.  The Evaluation Process, Part One: How to do the Evaluation. <u>Mental Examinations with Regard to Competency</u>; Superior Court of Arizona, Maricopa County, Criminal Department; Phoenix, Arizona, November, 1995

Boyer, C., Pitt, S.E.  Writing the Report. <u>Mental Health Expert Training: Examinations with Regard to Competency</u>; Superior Court of Arizona, Maricopa County, Criminal Department; Phoenix, Arizona, November, 1995

Kenney, L., Pitt, S.E., Arnold, C.L.  Competing Agencies in Law and Mental Health.  <u>Mental Health Expert Training: Examinations with Regard to Competency</u>; Superior Court of Arizona, Maricopa County, Criminal Department; Phoenix, Arizona, November, 1995

18

Pitt, S.E., Bale, E.M.  Neonaticide, Infanticide, and Filicide: Two Case Reports and a Review of the Literature. Good Samaritan Regional Medical Center, Department of Psychiatry, Grand Rounds Presentation; Phoenix, Arizona, May, 1995

Pitt, S.E.  Components of a Forensic Psychiatric Examination: Competency to Stand Trial and Sanity Evaluations. The Maricopa County Office of the Public Defender Continuing Legal Education Seminar Re: Forensic Sciences and the Criminal Defense Team; Phoenix, Arizona, May, 1995

Pitt, S.E., Bale, E.M.  Women Who Murder Their Children. American College of Neuropsychiatrists' Mid-Year Meeting and Scientific Seminar; Phoenix, Arizona, April, 1995

Morenz, B., Harrison, J.A., Pitt, S.E.  Say "No" to Crimes of Passion: Arizona's New NGRI Law. American Academy of Psychiatry and the Law 25th Annual Meeting; Maui, Hawaii, October, 1994

Pitt, S.E.  DSM-IV and the Legal System: An Update on the Changes in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, and conducting Forensic Psychiatric Evaluations and Preparing Reports for the Court. Colorado District Attorneys Council 23rd Annual Training Conference; Snowmass, Colorado, September, 1994

Beck, J.T., Pitt, S.E., Wilkinson, W.E.  Differential Diagnosis and Therapeutic Jurisprudence. Worker's Compensation Seminar, 61st Annual Arizona State Bar Convention; Tucson, Arizona, June, 1994

Pitt, S.E., Bale, E.M.  Post-Traumatic Stress Disorder and DSM-IV: For Better or For Worse? Arizona Trial Lawyers Association; Medical Experts Speak: A Mélange of Riveting Medical Topics; Phoenix, Arizona, December, 1993

Pitt, S.E., Bale, E.M.  The Diagnosis and Treatment of Depression for the Family Practitioner. <u>Phoenix General Hospital and Medical Center</u>; Phoenix, Arizona, September, 1993

Pitt. S.E., Bale, E.M.  Confidentiality and Privilege: Are You Protecting Your Patient's Rights? <u>71st Annual Arizona State Osteopathic Medical Association Convention</u>; Phoenix, Arizona, April, 1993

Pitt, S.E., Bale, E.M.  Preparing for Courtroom Testimony. <u>71st Annual Arizona State Osteopathic Medical Association Convention</u>; Phoenix, Arizona, April, 1993

Olin, J.A., Ball, E.M., Pitt, S.E.  The Validity of Colorado NGRI Findings. <u>American Academy of Psychiatry and the Law 23rd Annual Meeting</u>; Boston, Massachusetts, October, 1992

Aspinwall, W., Fisher, H., Pitt, S.E.  Mental Incapacity: A Round Table Discussion of Diagnoses and Symptoms which Support a Finding of Not Guilty by Reason of Insanity. <u>Colorado District Attorneys Council 21st Annual Training Conference</u>; Estes Park, Colorado, September, 1992

Pitt, S.E.  Neonaticide: A Case Presentation and Review of the Literature.  <u>Colorado Springs Osteopathic Foundation and Family Medicine Center</u>; Colorado Springs, Colorado, May, 1992

Pitt, S.E.  Introduction to Forensic Psychiatry and The Malingering Patient. <u>Colorado Society of Osteopathic Medicine, Continuing Medical Education Program</u>; Keystone, Colorado, February, 1992

Pitt, S.E.  The Mental Status Examination. <u>Colorado Springs Osteopathic Foundation and Family Medicine Center</u>; Colorado Springs, Colorado, November, 1991

Pitt, S.E., Brandt, J.D., Cohen, M.E., Janofsky, J.S., Tellefsen, C.  Group Dynamics in Forensic Pre-Trial Decision Making. American Academy of Psychiatry and the Law 22nd Annual Meeting; Lake Buena Vista, Florida, October, 1991

Pitt, S.E.  Diagnosis and Management of Panic Disorder and Management of Insomnia.  Colorado Society of Osteopathic Medicine, Continuing Medical Education Program; Larkspur, Colorado, September, 1991

Pitt, S.E.  Malingering and Forensic Psychiatry. The University of Maryland Medical Center. Series on Forensic Psychiatry; Baltimore, Maryland, February, 1991

Pitt, S.E.  Malingering and Malingered Psychosis. The University of Michigan Hospitals, Department of Psychiatry, Consultation Liaison Service; Ann Arbor, Michigan, April, 1990

Pitt, S.E.  An Evolutionary Explanation of Self-Esteem. The University of Michigan Hospitals, Department of Psychiatry, Core Seminar Series on Evolution and Psychiatry; Ann Arbor, Michigan, March, 1990

Pitt, S.E.  Risk Taking Behavior. Ann Arbor Veterans Administration Hospital. Department of Psychiatry, Grand Rounds Presentation; Ann Arbor, Michigan, January, 1988

**TAG® School Violence Presentation Course(s):**

School Violence Presentation; East Penn School District, Emmaus, Pennsylvania, June 26, 2003

| | |
|---|---|
| **Research Assistant:** | Tellefsen, C., Cohen, M.E., Silver, S.B., Dougherty, C., "Predicting Success on Conditional Release for Insanity Acquittees: Regionalized Versus Nonregionalized Hospital Patients." <u>Bull Am Acad Psychiatry Law</u>; 20:87-100, 1992 |
| **Reviewer:** | <u>The Journal of the American Academy of Psychiatry and The Law</u>, 2000-2006 |

**Publications:**

<u>Articles</u>:

Dvoskin, J.A.; Pitt. S.E., Dietz, P.E.; Spiers, E.M.; Walker, R.P.: Making America's Schools Safer. <u>www.TeachSafeSchools.Org</u>, 2008

Miller, R.D.; Olin, J.; Ball, E.M.; Bennett, C.; Beven, G. F.; Pitt, S.E.: The Validity of Colorado Not Criminally Responsible Findings. <u>J Psychiatry and Law</u>. 34(1) Spr. 2006, 37-49

Glancy, G.D., Spiers, E.M., Pitt, S.E., Dvoskin, J.A., Commentary on Chen, Y-H, Arria, A.M., Anthony, J.C., Firesetting in adolescents and being aggressive, shy, and rejected by peers: New epidemiologic evidence from a national sample survey. Models and correlates of firesetting behavior. <u>J Am Acad Psychiatry Law</u>; 31(1):53-57, 2003

Pitt, S.E., Spiers, E.M., Dietz, P.E., Dvoskin, J.A., Preserving the integrity of the interview: The value of videotape. <u>J Forensic Sciences</u>; 44(6):1287-1291, 1999

Pitt, S.E., Brandt, J.D., Tellefsen, C., Janofsky, J.S., Cohen, M.E., Bettis, E.D., Rappeport, J.R., Group dynamics in forensic pre-trial decision making. <u>J Am Acad Psychiatry Law</u>; 25(1):95-104, 1997

Pitt, S.E., Bale, E.M., Neonaticide, Infanticide, and Filicide: A Review of the Literature. <u>Bull Am Acad Psychiatry Law</u>; 23(3):375-386, 1995

Pitt, S.E., Bale, E.M., Neonaticide: Mothers who Kill Their Newborn – A Case Report and Preliminary Review of the Literature. <u>AOMA Digest</u>; 8:6-7, 16; 1993

<u>Book Chapters</u>:

Kane, A.W., Nelson, E.M., Dvoskin, J.A., & Pitt, S.E. Evaluation for Personal Injury Claims.  In R. Roesch & P.A. Zapf (Eds.). <u>Forensic assessments in criminal and civil law:  A handbook for lawyers</u>. New York: Oxford University Press, 2013.

Spiers, E.M., Pitt, S.E., Dvoskin, J.A.  Psychiatric Intake Screening. *In* Puisis, Michael (Ed.), <u>Clinical Practice in Correctional Medicine, Second Edition</u>. Philadelphia: Elsevier Health Sciences, 2006

Dvoskin, J.A., Spiers, E.M., Metzner, J.L., Pitt, S.E. The Structure of Correctional Mental Health Services. *In* Rosner, Richard (Ed.), <u>Principles and Practice of Forensic Psychiatry</u>, Second Edition, London: Arnold Publishing, 2003

Spiers, E.M., Dvoskin, J.A., Pitt, S.E.  Mental Health Professionals as Institutional Consultants and Problem-Solvers. *In* Fagan, T., Ax, B. (Eds.), <u>The Correctional Mental Health Handbook</u>, Lanham, MD: American Correctional Association, 2002

<u>Letters To the Editor</u>:

"Pinal deputy story a work in progress," <u>The Arizona Republic</u>, September 29, 2010

"Campus security is no cure-all," <u>The Arizona Republic</u>, April 30, 2004

"False view of insanity defense," <u>The Arizona Republic</u>, August 28, 1995

Insanity plea is not rich man's defense," <u>The Arizona Republic</u>, July 2, 1994

# EXHIBIT B



JOURNAL OF

# Forensic Sciences



The Official Publication of the
AMERICAN ACADEMY OF FORENSIC SCIENCES

VOLUME 44
NUMBER 6
NOVEMBER 1999

*JFSCAS 44(6)/1109-1384 (1999)*

JOURNAL OF FORENSIC SCIENCES

VOL. 44—NO. 6

NOVEMBER 1999

*Journal of Forensic Sciences*

Vol. 44, No. 6
November 1999
CODEN JFSCA

# Contents

**Papers**

Activated Protein C Resistance Is Uncommon in Sudden Death Due to Pulmonary Embolism—JENNIFER J. RULON, CHONG G. CHO, LINDA L. GUERRA, ROBERT C. BUX, AND MARGARET L. GULLEY ........ 1111

Hypernatremia and Subdural Hematoma in the Pediatric Age Group: Is There a Causal Relationship?—TRACEY COREY HANDY, RANDY HANZLICK, LISA B. E. SHIELDS, ROSS REICHARD, AND STEVEN GOUDY ........ 1114

Drowning Without Aspiration: Is This an Appropriate Diagnosis?—JEROME H. MODELL, MONIQUE BELLEFLEUR, AND JOSEPH H. DAVIS ........ 1119

Estimating Time of Death of Deer in Missouri; A Comparison of Three Indicators—BRADLEY M. HADLEY, LYNN W. ROBBINS, AND DAVID A. BEFFA ........ 1124

Comparative Studies on Tissue Distributions of Organophosphorus, Carbamate and Organochlorine Pesticides in Decedents Intoxicated with These Chemicals—FUMIO MORIYA AND YOSHIAKI HASHIMOTO ........ 1131

An Evaluation of the Significance of Transfers of Debris: Criteria for Association and Exclusion—CHESTERENE CWIKLIK ........ 1136

Infrared Spectra of U.S. Automobile Original Topcoats (1974-1989): VI. Identification and Analysis of Yellow Organic Automotive Paint Pigments—Isoindolinone Yellow 3R, Isoindoline Yellow, Anthrapyrimidine Yellow, and Miscellaneous Yellows—EDWARD M. SUZUKI ........ 1151

Long PCR for VNTR Analysis—KRISTY L. RICHIE, MINDY D. GOLDSBOROUGH, MARLENE M. DARFLER, ELIZABETH A. BENZINGER, MELISSA L. LOVEKAMP, DENNIS J. REEDER, AND CATHERINE D. O'CONNELL ........ 1176

Comparative Identity and Homogeneity Testing of the mtDNA HV1 Region Using Denaturing Gradient Gel Electrophoresis—ROBERT J. STEIGHNER, LOIS A. TULLY, JUSTIN D. KARJALA, MIKE D. COBLE, AND MITCHELL M. HOLLAND ........ 1186

The Fitness of Juvenile Court—BRUCE H. GROSS ........ 1199

Analysis of Ballpoint Pen Inks by Field Desorption Mass Spectrometry—MASATAKA SAKAYANAGI, JUN KOMURO, YAEKO KONDA, KUNIO WATANABE, AND YOSHIHIRO HARIGAYA ........ 1204

**Technical Notes**

A Reevaluation of the Sex Prediction Accuracy of the Minimum Supero-Inferior Femoral Neck Diameter for Modern Individuals—CHRISTOPHER M. STOJANOWSKI AND RYAN M. SEIDEMANN ........ 1215

Presenting Three-Dimensional Forensic Facial Simulations on the Internet Using VRML—MARTIN P. EVISON AND MICHAEL A. GREEN ........ 1219

Interpolating Between Computerized Three-Dimensional Forensic Facial Simulations—MICHAEL A. GREEN AND MARTIN P. EVISON ........ 1224

Validation of the Use of a Commercially Available Kit for the Identification of Prostate Specific Antigen (PSA) in Semen Stains—JOHN P. SIMICH, SHANNON L. MORRIS, ROBERT L. KLICK, AND KATE RITTENHOUSE-DIAKUN ........ 1229

Detection of Epithelial Cells in Dried Blood Stains by Reverse Transcriptase-Polymerase Chain Reaction—MARTIN BAUER, ALEXANDRA KRAUS, AND DIETER PATZELT ........ 1232

Application of Solid-Phase Microextraction to the Profiling of an Illicit Drug: Manufacturing Impurities in Illicit 4-Methoxyamphetamine—JOHN C. COUMBAROS, K. PAUL KIRKBRIDE, AND GUNTER KLASS ........ 1237

TWGDAM Validation of a Nine-Locus and a Four-Locus Fluorescent STR Multiplex System—KATHERINE A. MICKA, ELIZABETH A. AMIOTT, TARA L. HOCKENBERRY, CYNTHIA J. SPRECHER, ANN M. LINS, DAWN R. RABBACH, JENNIFER A. TAYLOR, JEFFERY W. BACHER, DEBRA E. GLIDEWELL, SANDRA D. GIBSON, CECELIA A. CROUSE, AND JAMES W. SCHUMM ........ 1243

Data on the PCR Turkish Population Based Loci: LDLR, GYPA, HBGG, D7S8, and Gc—MELAHAT KURTULUŞ ÜLKÜER, ÖNER ÜLKÜER, TAHSİN KESİCİ, AND ADNAN MENEVŞE ........ 1258

Population Study of HUMTH01, HUMVWA31/A, HUMF13A1, and HUMFES/FPS Systems in Azores—FRANCISCO CORTE-REAL, LUÍS SOUTO, M. J. ANJOS, MÓNICA CARVALHO, DUARTE N. VIEIRA, ANGEL CARRACEDO, AND M. C. VIDE ........ 1261

Allele Frequencies of Six STR Loci in Argentine Populations—NOELIA TOURRET, JORGE LÓPEZ CAMELO, AND LIDIA VIDAL-RIOJA ........ 1265

A Systematic Analysis of Secondary DNA Transfer—CARLL LADD, MICHAEL S. ADAMOWICZ, MICHAEL T. BOURKE, CAROL A. SCHERCZINGER, AND HENRY C. LEE ........ 1270

Frequencies of D8S384 Alleles and Genotypes in European, African-American, Chinese, and Japanese Populations—H. Y. MENG, Y. P. HOU, G. D. CHEN, Y. B. LI, J. WU, H. WALTER, AND M. PRINZ ........ 1273

Population Data on the Thirteen CODIS Core Short Tandem Repeat Loci in African-Americans, U.S. Caucasians, Hispanics, Bahamians, Jamaicans, and Trinidadians—BRUCE BUDOWLE, TAMYRA R. MORETTI, ANNE L. BAUMSTARK, DEBRA A. DEFENBAUGH, AND KATHLEEN M. KEYS ........ 1277

1110   JOURNAL OF FORENSIC SCIENCES

Preserving the Integrity of the Interview: The Value of Videotape—STEVEN E. PITT, ERIN M. SPIERS, PARK E. DIETZ, AND
   JOEL A. DVOSKIN ............................................................................................................ 1287
Alcohol Content of Beer and Malt Beverages: Forensic Considerations—BARRY K. LOGAN, GLENN A. CASE, AND
   SANDRA DISTEFANO ......................................................................................................... 1292

**Case Reports**

Positive Identification of Cremains Recovered from an Automobile Based on Presence of an Internal Fixation Device—
   JOANNE L. BENNETT AND DEREK C. BENEDIX ....................................................................... 1296
Fulminant Liver Failure in a Young Child Following Repeated Acetaminophen Overdosing—MARTIN BAUER,
   BERNWARD BABEL, HEINRICH GIESEN, AND DIETER PATZELT ................................................... 1299
Traumatic Rupture of an Abdominal Aortic Aneurysm Associated with the Use of a Seatbelt—YASUO BUNAI, ATSUSHI NAGAI,
   ISAO NAKAMURA, AND ISAO OHYA ...................................................................................... 1304
A Case of Suicidal Hanging Staged as Homicide—THOMAS W. ADAIR AND MICHAEL J. DOBERSEN ............ 1307
Detection of Azide in Forensic Samples by Capillary Electrophoresis—GLEN L. HORTIN, SUSANTA K. DEY, MARILYN HALL, AND
   C. ANDREW ROBINSON JR. ................................................................................................. 1310

**Brief Communication**

Distribution of D1S80 Alleles in the Bahrainian Population—MOHAMMAD A. TAHIR, CAROL ROGERS, MOHAMMED ALKHAYYAT,
   MONA EL-GOHARY, BRUCE BUDOWLE, AND KUPPAREDDI BALAMURUGAN ................................... 1314

**For the Record**

Allele Frequencies for Nine STR Loci in African-American, Chinese, Vietnamese, and Bangladesh Populations—S. BORYS,
   A. EISENBERG, G. CARMODY, AND R. FOURNEY .................................................................... 1316
Allele Frequency Distributions for Nine STR Loci in the Japanese Population—S. BORYS, R. IWAMOTO, J. MIYAKOSHI,
   G. CARMODY, AND R. FOURNEY ......................................................................................... 1319
Allele Frequency in the Population of Buenos Aires (Argentina) Using AmpliType® PM + DQA1—R. A. PADULA,
   D. A. GANGITANO, G. J. JUVENAL, AND B. BUDOWLE ............................................................ 1320

**Correspondence**

Commentary on Tomczak PD, Buikstra JE. Analysis of Blunt Trauma Injuries: Vertical Deceleration Versus Horizontal
   Deceleration Injuries. J Forensic Sci 1999;44(2):253–262—ALISON GALLOWAY AND RICHARD T. MASON ... 1321
Authors' Response—PAULA D. TOMCZAK AND JANE E. BUIKSTRA .............................................. 1321
Commentary on Introna F, Di Vella G, Campobasso CP. Determination of Postmortem Interval from Old Skeletal Remains
   by Image Analysis of Luminol Test Results. J Forensic Sci 1999;44(3):535–538—GEORGE J. SCHIRO, JR. ... 1322
Authors' Response—FRANCESCO INTRONA, JR., ET AL. ............................................................ 1322
Commentary on Hochmeister MN, Budowle B, Sparkes R, Rudin O, Gehrig C, Thali M, Schmidt L, Cordier A. Validation
   Studies of an Immunochromatographic 1-Step Test for the Forensic Identification of Human Blood. J Forensic Sci
   1999;44:597–602—BARBARA O. ROWLEY ............................................................................. 1323
Authors' Response—MANFRED HOCHMEISTER ...................................................................... 1324
Commentary on Koons RD, Buscaglia J. The Forensic Significance of Glass Composition and Refractive Index
   Measurements. J Forensic Sci 1999;44(3):496–503—JAMES M. CURRAN, JOHN S. BUCKLETON, AND CHRISTOPHER M. TRIGGS ... 1324
Authors' Response—ROBERT D. KOONS AND JOANN BUSCAGLIA ................................................ 1326
Commentary on Linch CA, Smith SL, Prahlow JA. Evaluation of the Human Hair Root for DNA Typing Subsequent to
   Microscopic Comparison. J Forensic Sci 1998;43(2):305–314—MARK J. PETTENATI AND P. NAGESH RAO ... 1329
Authors' Response—CHARLES A. LINCH AND JOSEPH A. PRAHLOW ........................................... 1329
Commentary on Willey P and Scott DD, Who's Buried in Custer's Grave? J Forensic Sci 1999;44(3):656–665—
   NORMAN D. SPERBER ....................................................................................................... 1330
Authors' Response—P. WILLEY AND DOUGLAS D. SCOTT ...................................................... 1330
Partisan Expert Witness Testimony—EMANUEL TANEY .......................................................... 1331

**Book Reviews**

Review of The Litigator's Guide to Expert Witnesses—EMANUEL TANAY ................................... 1333
Review of Marihuana and Medicine—LEO UZYCH ................................................................ 1334
Review of Principles of Forensic Toxicology—CHARLES L. WINEK ........................................... 1335

**Editorial Communication**—ROBERT E. GAENSSLEN ........................................................... 1336

**Index to Volume 44** ................................................................................................. 1341

**Updated Information for Authors** ............................................................................... 1377

# TECHNICAL NOTE

*Steven E. Pitt,[1] D.O.; Erin M. Spiers,[2] M.A.; Park E. Dietz,[3] M.D., M.P.H., Ph.D.; and Joel A. Dvoskin,[4] Ph.D., A.B.P.P.*

## Preserving the Integrity of the Interview: The Value of Videotape

---

**REFERENCE:** Pitt SE, Spiers EM, Dietz PE, Dvoskin JA. Preserving the integrity of the interview: The value of videotape. J Forensic Sci 1999;44(6):1287–1291.

**ABSTRACT:** This article addresses the value of videotape in forensic mental health evaluations. Literature reviews were conducted using Medline and PsychInfo Databases. The authors briefly describe the general use of videotape, explore the use of videotape within the legal process, respond to opposition to videotape use, discuss confidentiality and consent issues, address possible exceptions to the use of videotape during forensic evaluations, and express their unwavering support for the use of videotape during forensic evaluations. The authors also provide a detailed set of instructions designed to assist professionals with establishing their own videotaping system. The authors conclude that videotape performs an essential function in the preservation of the integrity of forensic mental health evaluations.

**KEYWORDS:** forensic science, forensic psychiatry, forensic psychology, videotape, videotaping evaluations

The American Academy of Psychiatry and the Law (AAPL) recently completed a task force report regarding the use of videotape during forensic psychiatric evaluations (1). The task force evaluated the costs and benefits of videotape, discussed clinical and ethical issues germane to using videotape, and initiated the development of a uniform standard of practice for the use of videotape.

The AAPL task force concluded that, given the current state of research, a blanket endorsement of the use of videotape during forensic psychiatric evaluations is premature. The panel did, however, recognize that videotaping forensic psychiatric evaluations is a medically ethical practice. Moreover, several of the benefits of videotape are cited within their report.

[1] Clinical Associate Professor, Department of Psychiatry, The University of Arizona Health Sciences Center, Phoenix, Arizona.
[2] Doctoral student of clinical psychology, Arizona School of Professional Psychology, Phoenix, Arizona.
[3] Clinical Professor of Psychiatry and Biobehavioral Sciences, UCLA School of Medicine; President, Park Dietz & Associates, Inc., Newport Beach, CA
[4] Clinical Assistant Professor, Department of Psychiatry, The University of Arizona Health Sciences Center. Adjunct Assistant Professor, The University of Arizona College of Law, Tucson, Arizona.

Received 22 Jan. 1999; and in revised form 1 March 1999; accepted 11 March 1999.

In this article, we briefly describe the general use of videotape, explore the use of videotape within the legal process, respond to opposition to videotape use, discuss confidentiality and consent issues, address possible exceptions to the use of videotape, and express our unwavering support for the use of videotape during forensic evaluations. We also provide a detailed set of instructions designed to assist professionals with establishing their own videotaping system.

### Universal Applications

The use of audio and videotape to optimize education is a well established practice. Recorded materials have utility in disseminating information and have long been used in the behavioral sciences for research, documentation, professional training and public education (2). Behavioral scientists have made use of this medium for evaluating their own performance and highlighting areas in need of improvement in their interview styles and techniques. Furthermore, some therapists have used videotape as a means of enhancing patients' self-awareness and introspection (2). The use of videotape has proved invaluable in such diverse areas as scientific research, enhancing reports and presentations, and providing feedback during performance training. Despite the breadth of its availability, utility, and acceptance, the authors contend that videotape is underutilized by forensic mental health evaluators.

### Videotape and the Legal Process

The courts have become increasingly amenable to the use of videotaped testimony during legal proceedings. Such testimony is widely used in the context of custody and child abuse cases. The use of videotape with children served initially to protect children from unnecessary, repeated interviews. According to the American Academy of Child and Adolescent Psychiatry, the benefits of videotape include the verbatim preservation of children's initial statements, the reduction of instances in which children are forced to testify repeatedly, the presentation of videotape testimony to a grand jury, and the educational use of videotape to improve interviewer skills (3).

While the use of videotape began in the legal profession with the investigation and prosecution of child sexual abuse, its application has been far reaching. Videotape has been successfully employed in a myriad of settings in which accurate preservation of evidence

is valued by the legal system. The ability to capture and retain an accurate audio-visual record is an invaluable tool in law enforcement interviews, depositions, grand jury testimony, crime scene analysis, autopsies, and forensic mental health interviews.

Legal issues surrounding the use of videotape in forensic psychiatric settings have been examined by both state and federal court systems (1). Thus far, it has been concluded that an interviewer is neither required to use nor prohibited from using videotape during his or her interview (1). Furthermore, the interviewer is not required to provide a formal Miranda warning to the interviewee (1). The interviewer should, however, at the onset of the interview, provide a comprehensive description of the limits of confidentiality and attempt to obtain the subject's consent or assent, depending upon the context of the particular interview.

As courts become more accustomed to the use of videotaped interviews, it will be necessary for mental health professionals to enhance their standard of practice to keep pace with the expectations of lawyers, judges, and jurors.

## Confidentiality and Consent

The use of videotape for forensic mental health interviews is accompanied by specific professional issues and concerns. In preparing this paper, the authors requested information from the American Psychiatric Association, American Academy of Psychiatry and the Law, American Psychological Association, American College of Forensic Psychiatry, American Board of Forensic Psychology, the Psychiatry and Behavioral Science Section of the American Academy of Forensic Sciences, and the American College of Forensic Examiners.

With the exception of the AAPL task force report, none of the aforementioned associations has issued a policy statement or guideline about the use of videotape. However, the American Psychological Association referred the authors to the Division 41 specialty guidelines of the American Psychology-Law Society. The American Psychiatric Association, American College of Forensic Psychiatry, and American College of Forensic Psychology, each referred the authors to ethical guidelines regarding confidentiality and informed consent.

According to the AAPL ethical guidelines, "the psychiatrist maintains confidentiality to the extent possible given the legal context . . . An evaluation for forensic purposes begins with notice to the evaluee of any limitations on confidentiality." (4) Prior to the onset of any videotaped interview, it is incumbent upon the examiner to provide the interviewee with a detailed description of both the limits of confidentiality and the purpose of the evaluation. It is also wise to have the interviewee sign an informed consent document that eliminates his or her uncertainty about the limits of confidentiality, and to repeat the limits of confidentiality and purpose of the interview after taping has begun. Furthermore, the subject must be informed (preferably on tape) of all recording devices and the nature and potential use of the work product following the interview. It is also necessary to obtain consent (or assent) for the interview from either the individual or the agency acting on the subject's behalf. With respect to consent, AAPL ethical guidelines state, "Where consent is not required, notice is given to the evaluee of the nature of the evaluation. If the evaluee is not competent to give consent, substituted consent is obtained in accordance with the laws of the jurisdiction (4)."

Furthermore, prior to the onset of any forensic psychiatric evaluation, it is important to remind the subject that while the evaluator is a mental health professional, his or her current function is not in the role treating clinician. One should be mindful of a subject's limited understanding of this distinction (4).

### Response to Opposition

Five principal objections have been raised to the use of videotape in forensic mental health evaluations. We address each of these in turn.

*Third Party Presence*—Attorneys will frequently argue that their presence, or that of a representative acting on their behalf, is necessary during a forensic evaluation. This contention is often held to be based on the desire to ensure their client's constitutional rights and to verify the accuracy of future accounts of the interview (5). Additionally, attorneys may express concern about the accuracy of a psychiatrist's recollection and interpretation of nonverbal behaviors observable during a psychiatric evaluation. An attorney may also wish to observe the process in order to guarantee that the level of professionalism on behalf of the psychiatrist is not compromised at any time during the interview. The courts have not uniformly upheld a right of a defendant to have counsel present during a forensic psychiatric evaluation. In fact, in *Estelle v. Smith*, the U.S. Supreme Court found that "an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination (6)." In some cases, however, it has been held that the defendant may request videotape (1).

Videotape allows for the preservation of a precise account of an evaluation. The use of a videotape system with cameras positioned to face both the examiner and subject negates possible allegations of impropriety. Using a dual camera design, all behavior, interviewer and interviewee alike, may be accounted for without compromising the interview. Videotape addresses the need for verified accuracy without the disruptive effect of the presence of an attorney.

An additional advantage of videotape speaks directly to complications which may arise from an attorney's presence during an examination. The attorney who attends a forensic evaluation may potentially be compelled to testify regarding the interview he or she observed. Videotaping provides counsel with an explicit account of the interview while negating the perceived need for his or her attendance. To this end, the use of videotape precludes the possibility that an attorney may be forced to withdraw as counsel under the attorney-witness rule.

In addition, it prevents the attorney from influencing the interview in an undiscoverable manner. For example, one of the authors participated in a case that involved a defendant charged with kidnapping and sexual assault. The defendant alleged that the offenses were committed by an "alter" personality. A videotaped interview, conducted by a defense-retained psychologist and psychiatrist, was attended by defense counsel. As the interview progressed, the "alter" personality was interviewed by the aforementioned experts and defense counsel. During a review of the same videotape, prosecution-retained experts determined that the defendant was malingering.

*Interviewer-Interviewee Relationship*—A common argument used to dispute the use of videotape in a clinical psychiatric setting is that such devices may interfere with the establishment of therapeutic rapport (5). This concern surrounds the patient's lack of trust, which is thought to result in a lack of openness during the interview.

In the case of the forensic interview, however, the professional is striving to evaluate and assess rather than to treat. The subjects,

therefore, remain litigants rather than patients (7). Indeed, as Dietz points out, "The most fundamental distinction between clinical and forensic psychiatry is the absence of a doctor-patient relationship in the latter (8)." The purpose of the interview is primarily investigative, i.e., examining and presenting evidence regarding the litigant's behavior. It is therefore incumbent upon the professional to develop an interview style most conducive to accurate reporting by the subject without exploiting therapeutic rapport.

*Videotape Tampering*—Opposition to the use of videotape on the basis of susceptibility to tampering is simply without merit. Videotape tampering, such as pauses or breaks, can be readily identified by laypersons lacking any special technical training. However, should a concern be raised with regard to the integrity of a particular tape, experts are available to assess the material for flaws (7). It is possible, though unnecessary, to further protect against tampering by simultaneously producing duplicate copies with a time code, which creates a daunting obstacle to any party who may attempt to alter a videotaped interview.

*Professional Liability*—Resistence to the uniform use of videotape also arises from the concern of some evaluators regarding their own professional liability. Although there may be evaluators who have something to hide, we regard this as another argument in favor of videotape. The likelihood that one's work will be examined within a legal context is inherent in forensic psychiatry. The forensic professional must never be fearful of having his or her own work product preserved and scrutinized. Those who seek to avoid having their work product openly reviewed raise questions regarding the manner in which their work is conducted.

For example, one of the authors was retained as a prosecution witness in a case involving a serial rapist who alleged that, during the commission of the offenses, he suffered from a Dissociative Identity Disorder. A defense-retained psychologist met with the defendant on multiple occasions; however, only a select number of interviews were videotaped. The defense expert's videotaped interviews were noteworthy for leading questions, the repeated use of profane language and the absence of a time code, all of which called into question the professionalism of the interviewer.

Professionals who are mindful and conscientious will be able to embrace the advantages of videotape without reservations about liability. In fact, videotape may serve a protective function in the face of inquiry regarding an interviewer's conduct during an evaluation. An example of the protective nature of videotape is demonstrated by a toxic tort case in which one of the authors was retained as a defense expert. In addition to claiming emotional damages, the plaintiff alleged that her injuries led to a restriction in the range of motion of her upper extremities. On direct examination, the plaintiff alleged that during the independent psychiatric evaluation (which was attended by an associate of plaintiff's counsel), the examiner berated her and engaged in hostile dialogue. During the author's direct testimony, the veracity of the plaintiff's allegations was refuted through videotaped documentation of the interview which was viewed in its entirety by the jury. The production of a videotaped record allowed the jurors to see that the plaintiff had unlimited use of her upper extremities and prevaricated about what had taken place during the examination.

*Heightened Workload*—The potential for extensive and time-consuming review has been cited as an additional concern surrounding the use of videotape in forensic psychiatry (1). The opposing expert, through discovery, may have the opportunity to

examine the videotaped psychiatric interview. Subsequently, he or she may elect to videotape his or her own interview, necessitating the labor-intensive review of tapes from each side. Such comprehensive review in turn creates a scenario in which the expert may be subject to a more rigorous cross-examination (1).

The use of videotape may indeed facilitate the need for additional time allotted to review taped interviews. It additionally may heighten the intensity of potential cross-examination one may encounter. These arguments, however, are lacking in both weight and integrity. The nature of the field is such that meticulous preparation for report writing, testimony, and cross-examination are the cornerstones of our profession. The use of a tool that allows for superior preparation of an expert witness must never be discarded out of concern for a heightened workload.

In his text, *The Psychiatrist as Expert Witness*, Gutheil strongly recommends opposing both the presence of counsel and/or videotape during the interview, citing (with respect to videotape) the potential for distraction of the interviewer and opportunistic responses by the interviewee (9). Guthiel holds that "under rare circumstances, an audiotape or videotape of an interview may be constructive; it is certainly beneficial for teaching and self-review for quality assurance. Verbatim material also can be obtained this way. However, unobtrusive note taking probably represents the optimum compromise among choices."

It is our position that videotape is the optimum choice for the forensic interview. The ability to capture a subject's unique image and verbalizations on videotape unequivocally enhances the caliber of the evaluation and report. In our experience, the use of videotape does not serve as a distraction, nor does it result in response bias. We do not dispute the benefits of note-taking, however, videotape allows for intricacies unavailable to audiotape or note taking alone, such as subsequent examinations of nonverbal behavior, appropriateness of affect, and changes in affect during successive interviews. It also eliminates the possibility of intentional or unintentional bias in the selection of what is documented by the note-taker. To this end, videotape is an unparalleled instrument for preserving the integrity of a forensic psychiatric interview.

The importance of preserving subtle aspects of an interview is demonstrated in a case in which one of the authors was retained to examine a defendant charged with the double murder of an elderly couple. Both victims' throats had been cut with a bowie knife. At the onset of the independent psychiatric examination, the defendant was vague and evasive, providing monosyllabic responses to the interviewer's questions. However, the defendant, a knife enthusiast, demonstrated a marked change in his demeanor after being provided with an illustrated catalog of knives. He spoke at length with the examiner about his knowledge of the various knives depicted in the text. He described his familiarity with the different knives and knife-related products. In addition to significantly increasing his verbal dialogue, the defendant's affect became more animated and his rapport with the examiner improved. Videotape provided a comprehensive documentation of the totality of the defendant's demeanor.

### The Establishment and Use of a Videotape System

When incorporating videotape into a forensic psychiatric practice, the professional should be mindful of the audience(s) who may ultimately view their work product. In addition to preserving the integrity of the interview, he or she is creating a legal document that may be introduced into a court of law. Consequently, the interviewer should make a concerted effort to use equipment that ensures an accurate record of the proceedings.

The AAPL task force cites standards that attorneys are obligated to demonstrate prior to submitting a videotape into legal proceedings (1). These standards address several factors that focus on the production and utility of videotape. It is essential that forensic professionals be aware of and comply with such standards. This includes making certain that the videotape functions properly, the tape is authentic, the tape has not been altered, the film has been properly maintained, the tape is clear and is in no way unintelligible or misleading, and that any confessions contained within the tape were not coerced.

The integration of videotape into professional practice need not be an intimidating or arduous process. When developing a videotaping system, Dowrick contends that equipment should be selected to simply meet one's individual needs rather than succumbing to the temptation of an elaborate, overly complicated system (2). The authors agree that complexity should not be mistaken for usefulness when purchasing video products. The use of industrial videotape equipment is recommended as this equipment is durable and reasonably priced. Certain features must be included in order to create an appropriate record of any interview.

The ideal office-based videotaping system uses two cameras in the interview area. One camera should be either mounted or on a tripod behind the interviewee, and thus focused on the interviewer, while a second camera should be either mounted or on a tripod behind the interviewer and focused on the subject. The pictures are then fed into the same monitor in order to produce a picture-in-picture format or a split-screen format. This dual-camera design thwarts challenges about the non-verbal interactions between the interviewer and the interviewee.

The video monitor ensures accurate positioning of camera equipment and makes certain that both parties are appropriately captured on the videotape. In addition, the monitor allows the professional to review the end product. Notwithstanding the utility of a monitor, having the monitor operating during an evaluation serves as a distraction to the interview process. It is, therefore, recommended that if the monitor is located in the interview room, it remains off during the course of the interview. With the agreement of the interviewee's attorney, the monitor may be attended by a technician responsible for the videotaping.

Appropriate lighting is another factor that must be considered during the videotaping process. It is important that shadows and other obstacles be avoided. Positioning subjects according to light sources and windows is important for the reproduction of clear, precise images on tape. Lights must be set in a manner most conducive to the creation of an accurate picture. It is helpful if the camera is equipped with a manual iris to allow the user to determine the overall exposure (2).

Another important consideration is inclusion of a date and time code. We have found it extremely beneficial to have a running time code that captures the date the interview is conducted as well as a real time clock. The date and time code provides an added measure of accuracy and professionalism and can be exceedingly useful after a transcript of the interview is produced. Furthermore, this precaution protects against tampering with the videotape.

Gardner advises the use of equipment that allows for the simultaneous production of three master tapes as opposed to making one master followed by subsequent dubbings (7). The authors agree with this procedure. Often, one will be required to provide copies of the interview to multiple parties associated with a particular case. With analog equipment, subsequent dubs deteriorate with each generation and may result in one or more of the participants receiving an uneven work product. Moreover, the concurrent production and distribution of three tapes helps to deter any party from tampering with the individual copy that he or she has received.

Appropriate sound amplification is critical and must allow for an accurate audiotaped recording. Frequently, built-in audio recording equipment used with hand held recreational video machines is vulnerable to audio feedback and a disproportionate volume of ambient sounds in close proximity to the camera. To this end, it is worthwhile to invest in a high quality omnidirectional microphone, or to equip each participant with their own microphone, so as to ensure that the sound is of excellent quality.

In addition to a comprehensive videotaping system, a backup audiotape recording should be made to preserve a separate and distinct audio account of the interview. The audiotape not only maintains the audio record, but is essential if one plans to have a transcript made of the interview. It is highly ineffective and time-consuming for a transcriptionist to use the videotape as his or her primary source for preparing a transcript. Rather, it is far more productive to use an audiotape as the mechanism by which all transcripts are made.

Thoughtful selection of the type of audiotapes and videotapes used will add to the quality of the recording. We have found that videotapes should run no longer than 120 min, and the audiotapes should allow for 60 min of recording per side, for a total of 120 min per tape. The use of 120 min audiotapes and videotapes allows the interviewer to routinely change both audiotape and videotape at 2 h intervals. This is most effectively achieved when your audiotape player has an auto-reverse function that allows for audiotape recording on both sides of the tape without having to manually turn over the tape. We discourage the use of extended play videotapes, as the quality of these tapes is frequently inferior to standard VHS products, and the lack of coordination between audio and video recording may result in unnecessary confusion or distraction.

Storage of video and audiotapes is no more cumbersome than storing written records. Videotapes are roughly one inch in width and seven inches in length, therefore, two tapes placed adjacent to one another require no more space than an inch thick stack of standard paper. Audiotapes, which are substantially smaller, take up even less space.

In addition to establishing a comprehensive office-based video system, the professional may need portable equipment. When interviewing individuals housed in correctional settings or psychiatric facilities, the evaluator may be required to perform the evaluation on-site. Portable equipment will usually be less elaborate than a stationary system. However, one must make every effort to ensure that the work product remains of superior quality. The portable system must include a video camera and a tripod. Again, it is essential that the video camera be equipped with a date and time code. As previously discussed, all videotape should be supplemented with an audio backup to facilitate transcription. When conducting an on-site evaluation, the interviewer should position the camera so as to capture the images of both parties on screen. This is usually best achieved by placing the camera to the side, thus providing a profile view of both interviewer and interviewee. It is of particular importance that one use only the highest quality videotape in conducting evaluations of this nature. As simultaneous production of duplicates is likely not possible, quality videotape will minimize distortion on subsequent dubbings.

## Exceptions to the Use of Videotape

Institutional policies and financial constraints may make videotaping each and every forensic evaluation impractical. In these

cases, every effort should be made to audiotape the evaluation, thereby preserving the integrity of the spoken word. Furthermore, there are rare occasions whereby a stationary videotaping system may be unable to capture an evaluee who cannot sit still.

The authors also recognize that the development and implementation of a comprehensive videotaping system may present a financial hardship for part-time practitioners or for professionals in the early stages of their practice. One way to overcome this obstacle is for forensic mental health professionals to share the cost of equipment. As videotaping equipment becomes increasingly affordable, we believe that more and more forensic evaluations will be, and should be, videotaped.

Even professionals who videotape their forensic evaluations will come across certain situations when the cost of videotaping may not be justified by the nature of the evaluation (e.g., pre-sentence reports, social security disability evaluations). In such cases, forensic mental health professionals must assess the effect that forgoing a videotaped evaluation will have on their work product.

## Conclusion

The use of videotape during forensic mental health evaluations is advantageous for all parties who have an interest in seeking the truth. Videotape permits the preservation of data in order for all subsequent evaluators to have access to equivalent material. Furthermore, it allows for the identification of any instances in which interviewers asked leading questions, implanted ideas or symptoms, or otherwise shaped the evidence. Videotape further provides a verbatim record so evaluators needn't rely on memory or note-taking ability to faithfully capture the exact language that is so often the most important finding in a forensic psychiatric interview. The use of videotape encourages evaluators to conduct interviews of a quality that can withstand scrutiny, while concurrently protecting evaluators against unfounded claims of impropriety, all without introducing a third person into the interview room. Videotaped evaluations additionally protect the attorney, who may have otherwise wished to attend an evaluation, from being called as a witness.

The AAPL Task Force concluded that, given the current state of research available, it was unable to provide a blanket recommendation regarding the use of videotape in forensic psychiatry (1).

The Task Force did, however, determine that videotaping of interviews is an ethically acceptable medical practice. Furthermore, it is recognized that other legal and professional sources (e.g., statutes, case law, and practice guidelines) may require or recommend videotaping in certain circumstances. It was recommended that all forensic training programs consider the educational use of videotaping forensic interviews.

According to Dietz, "Some of the consumers of forensic psychiatric services are poorly equipped or unmotivated to distinguish among mediocrity, proficiency, and excellence" (10). The authors believe that through the use of videotape in forensic interviews, one is able to bridge the gap between proficiency and excellence in his or her own practice. Videotape performs an essential function in preserving the integrity of forensic interviews. No other medium allows for the complete and accurate recording of data that a videotape provides.

## References

1. American Academy of Psychiatry and the Law. AAPL task force. Videotaping of forensic psychiatric evaluations. J Am Acad Psychiatry Law. 1999;27(2):345–358.
2. Dowrick PW. Practical guide to using videotape in the behavioral sciences. New York: John Wiley & Sons, Inc.; 1991.
3. American Academy of Child and Adolescent Psychiatry. Guidelines for the clinical evaluation of child and adolescent sexual abuse. 1988.
4. American Academy of Psychiatry and the Law. Ethical guidelines for the practice of forensic psychiatry. Adopted May, 1987; last revised 1995.
5. Goldstein RL. Consequences of surveillance of the forensic psychiatric examination: an overview. Am J Psychiatry 1988;145(10):1243–7.
6. Estelle v Smith, 451 US 454, 470.
7. Gardner RA. Testifying in court: a guide for mental health professionals. Cresskill, NJ: Creative Therapeutics, Inc.; 1995.
8. Dietz PE. The quest for excellence in forensic psychiatry. Bull Am Acad Psychiat Law 1996;24(2):153–63.
9. Gutheil TG. The psychiatrist as expert witness. Washington D.C., American Psychiatric Press; 1998.
10. Dietz PE. The forensic psychiatrist of the future. Bull Am Acad Psychiat Law 1987;15(3):217–27.

Additional information and reprint requests:
Steven E. Pitt, D.O.
11801 N. Tatum Blvd.
Suite 103
Phoenix, AZ 85028



STEVEN PITT & ASSOCIATES
FORENSIC AND GENERAL PSYCHIATRY
15849 N. 71st Street Ste 100 Scottsdale, AZ 85254-2179
p480-281-1638  f480-281-1639  eSEPitt@aol.com
Steven E. Pitt, D.O.
Diplomate, American Board of Psychiatry and Neurology with Subspecialty Certification in Forensic Psychiatry

# EXHIBIT JJJJJJJJ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
I. OSUNA, Deputy
11/8/2013 2:33:16 PM
Filing ID 5547025

COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Suite 1200
Phoenix, Arizona  85004
(602) 224-0999
Scott M. Bennett, State Bar No. 022350

FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703
Telephone:  (608) 257-5035
Fax:          (608) 258-4258

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*

*Attorneys for Petitioner*
Wendi Andriano

## SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona,<br><br>　　　　　　　　Respondent,<br><br>　　vs.<br><br>Wendi Elizabeth Andriano,<br><br>　　　　　　　　Petitioner. | No. CR2000-096032-A<br><br>**PETITIONER WENDI ANDRIANO'S MOTION FOR LEAVE TO FILE SUR-REPLY TO STATE OF ARIZONA'S REQUEST FOR CONTACT VISIT ORDER**<br><br>**(CAPITAL CASE)**<br><br>(Assigned to the Hon. Brian Ishikawa) |

Ms. Andriano respectfully requests leave to file the attached sur-reply in response to the State's Reply To Response To Request For Certified Contact Visit Order.  The proposed sur-reply is only the third brief filed on the issue of the State's Request for Contact Visit Order, as the State did not submit any supporting authorities or argument when it filed its Proposed Contact Visit Order on October 29, 2013.  Ms. Andriano seeks to file a sur-reply to respond to a number of arguments raised by the State for the first time in its November 7, 2013 Reply.

1

2   RESPECTFULLY SUBMITTED November 8, 2013.

3

4                              FOLEY & LARDNER LLP
                                 Allen A. Arntsen, *Pro Hac Vice*
5                                Stephan J. Nickels, *Pro Hac Vice*
                                 Matthew R. Lynch, *Pro Hac Vice*
6

7                              COPPERSMITH SCHERMER &
                               BROCKELMAN PLC
8

9                              By */s/ Scott M. Bennett*
                                  Scott M. Bennett
10

11                             *Attorneys for Petitioner Wendi*
                               *Andriano*
12

13

14   ORIGINAL filed November 8, 2013,
     with the Clerk of the Maricopa County Superior Court.
15

16   COURTESY COPY hand-delivered November 8, 2013, to:

17   Judge Brian Ishikawa
     Maricopa County Superior Court
18   Southeast Court
     222 E. Javelina Avenue
19   Mesa, AZ 85210

20
     COPY emailed and mailed November 8, 2013, to:
21

22   Ms. Lacey Stover Gard
     Office of the Attorney General
23   400 W. Congress, Suite S-315
     Tuscon, AZ 85701-1367
24   *Attorney for the State of Arizona*

25
     /s/ Tina Johannesen
26

27

COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Suite 1200
Phoenix, Arizona  85004
(602) 224-0999
Scott M. Bennett, State Bar No. 022350

FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703
Telephone:  (608) 257-5035
Fax:          (608) 258-4258

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*

*Attorneys for Petitioner*
Wendi Andriano

## SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

|  |  |  |
|---|---|---|
| State of Arizona, | ) | |
| | ) | |
| Respondent, | ) | No. CR2000-096032-A |
| | ) | |
| vs. | ) | **PETITIONER WENDI** |
| | ) | **ANDRIANO'S SUR-REPLY TO** |
| | ) | **STATE OF ARIZONA'S REQUEST** |
| Wendi Elizabeth Andriano, | ) | **FOR CONTACT VISIT ORDER** |
| | ) | |
| Petitioner. | ) | **(CAPITAL CASE)** |
| | ) | |
| | ) | (Assigned to the Hon. Brian Ishikawa) |

        The State opposes Ms. Andriano's request to have her attorney, Allen

Arntsen, attend the mental health evaluation to be conducted by Drs. Steven E. Pitt

and Kiran Amin based on Dr. Pitt's "position" that "[t]he presence of a third party

during a one-on-one examination unavoidably changes the interaction between

interviewer and subject."  (Appendix 2 to State's Reply to Response to Request for

Certified Contact Visit Order ("State's Reply") at ¶ 11; *see also* State's Reply at 2-

3 (stating that "[i]n Dr. Pitt's professional opinion . . . a 'third person witness is

disruptive and adversely affects [an] interview.'").)  Notably, Dr. Pitt's Affidavit

4841-8605-2118.1

1   cites no specific medical, mental health or other authority supporting his

2   "position".  The State's unfounded speculation regarding the possibility of

3   disruption should not be permitted to outweigh Ms. Andriano's need for

4   representation during the evaluation, particularly given Mr. Arntsen's agreement

5   to remain out of Ms. Andriano's sight and to only interject if necessary to protect

6   communications that fall within the attorney-client and/or work product privileges

7   and/or Ms. Andriano's right against self-incrimination under the Fifth Amendment

8   of the United States Constitution and Article 2, section 10 of the Arizona

9   Constitution.

10          In seeking to bar Mr. Arntsen's attendance at the evaluation, the State relies

11   on *State v. Schackart*, 175 Ariz. 494, 502 n.1, 858 P.2d 639, 647 (Ariz. 1993).

12   (State's Reply at 4.  However, as explained in Petitioner's Response to State of

13   Arizona's Request for Contact Visit Order, the court in *Schackart* expressly left

14   open the issue of whether allowing a criminal defendant's counsel to be present

15   during a mental health examination may be appropriate under some circumstances

16   and referenced the companion Civil Rule 35(a) which permits an examinee's

17   representative to attend medical examinations in civil cases.  *Schackart*, 858 P.2d

18   at 647 n.1.  For the reasons detailed in Ms. Andriano's Response to State of

19   Arizona's Request for Contact Visit Order, the presence of counsel is appropriate

20   and necessary in this case.

21          The State also criticizes Ms. Andriano's citation to a number of decisions

22   granting a defendant representation during a mental health evaluation conducted

23   by the state.  (State's Reply at 5, n.2.)  First, the State argues that these decisions

24   are incompatible with *Schackart*.  (*Id.*)  This is not the case – as explained above,

25   *Schackart* merely held that such representation is not constitutionally mandated,

26   not that it is never appropriate.  *Schackart*, 858 P.2d at 647.  The State also notes

27   that these decisions are from courts outside of Arizona.  (*Id.*)  However, the State

1   also cites to multiple out-of-state decisions in opposing Mr. Arntsen's attendance.

2   (*See id.* at 3, 4 (citing decisions from the United States District Court for the

3   District of Columbia and the Alabama Supreme Court).)

4        Finally, the State notes that the Arizona Department of Corrections

5   ("ADC") does not permit contact visits between death-row inmates and their

6   attorneys.  (State's Reply at 1, n.1.)  Ms. Andriano does not dispute that the ADC

7   does not currently allow Ms. Andriano to have contact visits with her attorneys.

8   However, the ADC previously granted 65 contact visits between Ms. Andriano

9   and various attorneys (including Mr. Arntsen), mitigation specialists and mental

10   health experts who are assisting with her post-conviction representation, all

11   without incident.  (*See* Petitioner's Motion to Allow Contact Visit, filed on

12   November 23, 2011, at 1.)  As provided in Ms. Andriano's Proposed Modified

13   Contact Visit Order, Mr. Arntsen would comply with all of the conditions imposed

14   by the ADC on Drs. Pitt and Amin for the upcoming contact visit and the State

15   neither can nor does identify any particular ADC issues implicated in his

16   attendance.

17        Because the State has failed to provide any evidence to support its concern

18   about possible disruption and because of the importance of Ms. Andriano's

19   interests in having representation during the evaluation, Ms. Andriano respectfully

20   requests that the Court deny the State's Proposed Contact Visit Order and enter

21   her Proposed Modified Contact Visit Order.

22

23

24

25

26

27

{00108992.1 }

3

4841-8605-2118.1

RESPECTFULLY SUBMITTED November 8, 2013.

FOLEY & LARDNER LLP
Allen A. Arntsen, *Pro Hac Vice*
Stephan J. Nickels, *Pro Hac Vice*
Matthew R. Lynch, *Pro Hac Vice*

COPPERSMITH SCHERMER & BROCKELMAN PLC

By   */s/ Scott M. Bennett*
Scott M. Bennett

*Attorneys for Petitioner Wendi Andriano*

ORIGINAL lodged November 8, 2013,
with the Clerk of the Maricopa County Superior Court.

COURTESY COPY hand-delivered November 8, 2013, to:

Judge Brian Ishikawa
Maricopa County Superior Court
Southeast Court
222 E. Javelina Avenue
Mesa, AZ 85210

COPY emailed and mailed November 8, 2013, to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tuscon, AZ 85701-1367
*Attorney for the State of Arizona*

/s/ Tina Johannesen

{00108992.1 }

4

4841-8805-2118.1

# EXHIBIT KKKKKKKK

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
M. Martin, Deputy
11/13/2013 3:16:59 PM
Filing ID 5552546

TOM HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CRIMINAL APPEALS/CAPITAL LITIGATION SECTION
400 W. CONGRESS ST., BLDG. S–315
TUCSON, ARIZONA 85701–1367
TELEPHONE: (520) 628-6520
LACEY.GARD@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT

## COUNTY OF MARICOPA

STATE OF ARIZONA,

    PLAINTIFF/RESPONDENT,

-VS-

WENDI ELIZABETH ANDRIANO,

    DEFENDANT/PETITIONER.

CR–2000–096032–A

**RESPONSE IN OPPOSITION TO PETITIONER'S MOTION FOR LEAVE TO FILE SURREPLY TO STATE OF ARIZONA'S REQUEST FOR CONTACT VISIT ORDER.**

THE HON. BRIAN ISHIKAWA

**[CAPTIAL CASE]**

Petitioner Wendi Andriano seeks leave to file a surreply to the State's reply in support of its request for an order permitting a contact visit between Andriano and Drs. Steven Pitt and Kiran Amin. Andriano contends that the "proposed surreply is only the third brief filed on the issue … as the State did not submit any supporting authorities or argument" in its contact-visit motion. (Motion for Leave to File Surreply, filed 11/8/13, at 1.) Andriano distorts the procedural history on

this issue. The State filed a standard motion for a contact visit. (Request for Certified Contact Visit Order, filed 10/29/13.) Rather than file a response, Andriano sent a letter to this Court asking it to hold its ruling in abeyance pending further negotiations. (*See* State's Memorandum Regarding Andriano's Counsel's Letter of October 31, 2013, filed 10/31/13, at Exh. A.) The State filed a memorandum addressing the letter, in which it noted that Andriano had not filed a proper motion asking this Court to hold its ruling in abeyance and stated its unwillingness to negotiate its requested contact-visit terms. (State's Memorandum Regarding Andriano's Counsel's Letter of October 31, 2013, filed 10/31/13.) Andriano thereafter filed a response to the State's contact-visit motion, objecting to the State's proposed order because it did not permit her counsel to attend the evaluation and proposing an alternative order that provided for counsel's presence. (Response to Contact-Visit Motion, filed 11/5/13.)

The State filed a reply to Andriano's response, addressing her objections and supplying an affidavit from Dr. Steven Pitt attesting that, in his professional opinion, counsel's presence at the evaluation would be disruptive and compromise the examination's validity. (Reply to Response to Contact-Visit Motion, filed 11/7/13.) The State did not, as Andriano contends, raise new arguments in the reply; it merely addressed the specific contentions Andriano presented in her response. (*Id.*) This is the very function of a reply. *See* Ariz. R. Crim. P. 35.1(a) (a reply shall "be directed only to matters raised in a response").

Andriano cites no authority permitting her to file a surreply. *See id.* (permitting filing of motion, response and reply); *cf. Atreus Cmtys. Group of Ariz.*

*v. Stardust Dev., Inc.*, 229 Ariz. 503, 510–11, ¶ 34, 277 P.3d 208, 215–16 (App. 2012) (rejecting claim that superior court erred by not allowing party to file surreply because the "applicable civil procedure rule provides for a motion, a response, and a reply" and "makes no provision for a surreply").  Andriano is not entitled to have the "last word" on the State's motion.

Briefing on this matter is complete, and this Court should deny Andriano's request to file a surreply and rule on the record before it.  However, in the event that this Court permits Andriano to file a surreply, the State requests permission to respond to any arguments raised in the surreply.

Respectfully submitted this 13th day of November, 2013.

TOM HORNE
ATTORNEY GENERAL

JEFFREY A. ZICK
CHIEF COUNSEL

/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL

ATTORNEYS FOR RESPONDENT

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2013, I filed the foregoing with the Clerk of the Court for the Maricopa County Superior Court by using the Court's eFiling Online system.

I have also on this date provided a copy of the foregoing by e-mail.

Scott M. Bennett
Coppersmith Schermer & Brockelman, PLC
2800 North Central Avenue
Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Stephen J. Nickels
Matthew R. Lynch
Foley & Lardner LLP
150 E. Gilman Street
Madison, WI 53703


/s/Nicole Kopf

#3607725

# EXHIBIT LLLLLLL

Michael K. Jeanes, Clerk of Court
*** Filed ***

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

11/19/2013- 8:00 AM

CR 2000-096032                                    11/18/2013

HONORABLE BRIAN K. ISHIKAWA

CLERK OF THE COURT
L. Mooney
Deputy

STATE OF ARIZONA                    LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)        SCOTT M BENNETT
                                    ALLEN A ARNTSEN
                                    MATTHEW R LYNCH
                                    JAMES J BELANGER
                                    JODI FOX

                                    APPEALS-PCR
                                    CAPITAL CASE MANAGER
                                    COURT ADMIN-CRIMINAL-PCR

**RULING**

The Court has received and considered:

- *[State's] Request for Certified Contact Visit Order,* filed October 29, 2013
- *State's Memorandum regarding Andriano's Counsel's Letter of October 31, 2013,* filed October 31, 2013
- *Petitioner Wendi Andriano's Response to State of Arizona's Request for Contact Visit Order,* filed November 5, 2013
- *Reply to Response to Request for Certified Contact Visit Order,* filed November 7, 2013

The Court has further received *Petitioner Wendi Andriano's Motion for Leave to File Sur-Reply to State of Arizona's Request for Contact Visit Order* (filed on November 8, 2013), and *[State's] Response in Opposition to Petitioner's Motion for Leave to File Surreply to State of Arizona's Request for Contact Visit Order.*

Docket Code 019              Form R000A                    Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          11/18/2013

IT IS ORDERED granting the defendant's leave to file her Sur-Reply.

Thus, the Court has also considered:
- *Petitioner Wendi Andriano's Sur-Reply to State of Arizona's Request for Contact Visit Order,* attached to November 8, 2013 Motion for Leave to File Sur-Reply
- *[State's] Response in Opposition to Petitioner's Motion for Leave to File Surreply to State of Arizona's Request for Contact Visit Order.*

By Minute Entry dated October 30, 2012 the Court addressed the defendant's Petition for Post-Conviction Relief. The Court granted an evidentiary hearing regarding two claims, I(A) and II. In claim I(A), the defendant alleged that trial counsel was ineffective in the penalty phase for failing to investigate and present expert testimony regarding her mental illness, as well as by failing to investigate her childhood. The defendant placed her mental health at issue and, in doing so, has become subject to evaluation by the State.

The State has requested an order directing that the Arizona Department of Corrections (ADC) permit a confidential contact visit between the defendant and Doctors Steven E. Pitt and Kirin Amin on November 26, 2013. ADC does not object to the confidential contact visit.[1] *Request* at 2. The defendant does not object to the mental health evaluation. *Response* at 1.

The defendant does, however, request that one of her attorneys, Allen A. Arntsen, be permitted to be present during the evaluation "for the limited purpose of protecting communications that fall within the attorney-client and/or work-product privileges, and or…right against self-incrimination." *Response* at 1-2. The defendant proposes that counsel be "seated outside [the defendant's] line of sight…and [will make only such comments as necessary to] advise…" her regarding privileged communications and her Fifth Amendment right against self-incrimination. *Response* at 3. The State objects to the presence of counsel during the evaluation. *State's Memorandum* at 2, FN1.

Both the defendant and the State cite *State v. Schackart,* 175 Ariz. 494, 501-502, 858 P.2d 639, 646-647 (1993). Both parties agree that in *Schackart,* Arizona's Supreme Court held that "the

---

[1] ADC has a non-contact visitation policy at its high security prisons related to penological concerns. In the early 2000s clinical experts were permitted limited contact visitation to "properly perform mental health tests and adequately evaluate the inmate." "Upon request and subject to the same rules and guidelines, the inmate's attorney [may be] permitted to accompany the clinical expert into the contact visitation area to do introductions and to answer any preliminary concerns of his/her client. The attorney would then leave the visitation room and the clinical expert would administer the tests and conduct the evaluation…" *Reply,* Appendix I at 3-4.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              11/18/2013

presence of counsel at a mental examination is not constitutionally required." *Request* at 3, FN1; *Response* at 4.

The defendant claims that *Schackart* "left open the issue of whether allowing a criminal defendant's counsel to be present during a mental health examination may be appropriate under some circumstances." *Request* at 3, FN1 (citing *Schackart*, 175 Ariz at 502 n.1, 858 P.2d at 647). The defendant is correct; in a footnote, the Supreme Court stated:

We hold only that the presence of counsel at a mental examination is not constitutionally required. We express no opinion regarding whether this court should, as we recently have done in civil cases, afford defendants that right pursuant to our rulemaking authority. *See* Supreme Court of Arizona, Order Amending Rule 35, Arizona Rules of Civil Procedure, 172 Ariz. XLI (Oct. 1, 1992) (amending Rule 35(a) to grant a person subjected to a medical examination the right to have a "representative" present unless such presence "may adversely affect" the examination).

*State v. Schackart*, 175 Ariz. 494, 502, 858 P.2d 639, 647 (1993).

The Supreme Court has not adopted a criminal rule permitting a "representative" to attend a medical examination, as has been done in connection with civil matters. Were it to do so, this Court speculates that a similar limitation ("unless such presence 'may adversely affect' the examination") would be imposed.

The State notes that *Schackart* cautioned that "counsel's presence at a psychiatric evaluation might actually hinder the psychiatrist from effectively examining the defendant and therefore defeat the purpose of the exam." *Schackart*, 175 Ariz. at 501, 858 P.2d at 646. Dr. Pitt, the State's mental health expert, raises similar concerns regarding the presence of a third party.

The State has provided the *Affidavit of Steven E. Pitt, D.O.* and has included Dr. Pitt's *Curriculum Vitae. Reply*, Appendix 2; *Reply,* Appendix 2, Exhibit A.   Based on his expertise, the Court defers to Dr. Pitt's opinion that the presence of a third party necessarily changes the dynamics of the interview.

As is his standard practice, Dr. Pitt will record the evaluation by both video and audio recording. Reply, Appendix 2 at par. 11-13; *see also Reply,* Appendix 2, Exhibit B (Pitt, Steven E., D.O., *Preserving the Integrity of the Interview: The Value of Videotape*. Journal of Forensic Sciences; 44(6); 1287-1291, 1999).  The audio and video recording will permit the defendant to review the interview and to evaluate the expert's conclusions, as well as to challenge the use of any statements made, preserving the defendant's ability to ensure that such statements are not used improperly.

Docket Code 019                    Form R000A                         Page 3

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                           11/18/2013

The Supreme Court has cautioned:
The trial judge, however, must assure that an order subjecting a defendant to a mental health examination protects the defendant's privilege against self-incrimination. The judge must fashion an order that ensures that no statement made by the defendant during the course of the examination, no testimony by the mental health expert based upon the defendant's statement, and no other fruits of the defendant's statements may be used by the prosecution or admitted into evidence against the defendant except on those issues on which the defendant introduces expert testimony during the penalty phase of the trial. We leave to the trial judge the decision, in the first instance, as to which conditions must be imposed to ensure that no statements made by a defendant will be used improperly during either the guilt or the penalty phase of the trial.

*Phillips v. Araneta*, 208 Ariz. 280, 284, 93 P.3d 480, 484 (2004).


Based on the foregoing, the Court concludes that the presence of the defendant's attorney, even if not within the sight of the defendant during the mental health examination, would adversely affect the examination.

IT IS THEREFORE ORDERED granting the State's *Request for Certified Contact Visit Order* scheduled for November 26, 2013.

IT IS FURTHER ORDERED that the defendant's attorney shall be permitted to accompany the clinical expert into the contact visitation area to make introductions and to answer any preliminary concerns of his client. The attorney shall then leave the visitation room and the clinical expert shall administer the tests and conduct the evaluation.

IT IS FURTHER ORDERED denying the defendant's request that her counsel be permitted to attend the mental health evaluation.

IT IS FURTHER ORDERED that no statement made by the defendant during the examination, no testimony of an expert based on any such statement, and no other fruits of any statements made during the course of the examination may be used by the State or admitted into evidence except on those issues on which the defendant introduces expert testimony during the evidentiary hearing in this matter.

DATED this 18th day of November, 2013.

Honorable Brian K. Ishikawa
Judge of the Superior Court

# EXHIBIT MMMMMMMM

11/22/13 **FILED** 10:51Am
MICHAEL K. JEANES, Clerk
By _____
Deputy

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701
TELEPHONE: (520) 628-6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 022714)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
# COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | CR–2000–096032 |
| Respondent, | **CONTACT VISIT ORDER** |
| -VS- | **[CAPTIAL CASE]** |
| WENDI ELIZABETH AN DRIANO, | **THE HON. BRIAN ISHIKAWA** |
| Petitioner. | |

Pending before the Court is the State of Arizona's request for a Certified Contact Visit Order which would allow a confidential visit in a contact setting between inmate Wendi Andriano and Drs. Steven E. Pitt and Kiran Amin on November 26, 2013. The order would further allow inmate Andriano's attorney, Allen A. Arntsen, to be present at the beginning of the contact visit for the limited purpose of introducing the doctors to the inmate and answering her preliminary concerns. After due consideration of said request and the relevant pleadings on file,

**IT IS ORDERED** that the State's request for a Contact Visit Order is **GRANTED.**

**IT IS FURTHER ORDERED** that Drs. Pitt and Amin be permitted to have a confidential visit with inmate Andriano under the following terms:

A. The State's willingness to stipulate to these terms should not be considered a waiver of any aspect of ADOC's contact visitation policy.

B. Drs. Pitt and Amin shall be allowed a contact visit on November 26, 2013 beginning at 8:00 a.m. and continuing until 5:00 p.m. As set forth in paragraph J below, Attorney Arntsen may be present at the start of that visit. The contact visit will be recorded by video and audio.

C. The State shall make arrangements with Warden Judy Frigo, Arizona State Prison—Perryville, Lumley Unit, or her designee, to schedule such visit.

D. The Warden, through her staff, may require Attorney Arntsen and Drs. Pitt and Amin to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with inmate Andriano.

E. If requested by Drs. Pitt or Amin, the Warden, through her staff, shall remove handcuffs from inmate Andriano so that she may complete certain tests. However, inmate Andriano shall at all times during the contact visit remain in leg irons. ADOC may require inmate Andriano to wear a stun belt during the contact visit.

2

F. Attorney Arntsen and Drs. Pitt and Amin will be required to wear all protective gear, including any protective vest and/or safety goggles provided by ADOC. Attorney Arntsen and Drs. Pitt and Amin will be allowed to wear clothing over the protective vest. If requested, Drs. Pitt or Amin shall be allowed to remove the protective gear such as vest and safety goggles if, in their opinion, the vest and/or the goggles interfere with the testing and evaluation of inmate Andriano.

G. The door to the room in which the meeting takes place shall be open or closed during the meeting, at the discretion of Drs. Pitt and Amin. Drs. Pitt and Amin shall sit in the chairs closest to the door, and inmate Andriano shall not go between them and the door without permission. The room in which the meeting takes place shall have four chairs and a table no larger than three feet in width.

H. Before being allowed the contact visit authorized herein, Attorney Arntsen and Drs. Pitt and Amin shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed. However, such release shall not operate as a release of gross negligence on the part of ADOC.

I. Attorney Arntsen and Drs. Pitt and Amin shall submit their full name and date of birth to ADOC at least ten days before the scheduled examination of inmate Andriano. In the event that either doctor has a prior arrest or conviction for any felony offense, that doctor will not be permitted into the institution.

J. Inmate Andriano's attorney, Allen Arntsen, shall be permitted to accompany Drs. Pitt and Amin into the contact visitation area to make introductions and to answer any preliminary concerns of inmate Andriano. Mr. Arntsen shall then leave the visitation room and Drs. Pitt and Amin shall conduct the evaluation and administer any tests deemed necessary.

**IT IS FURTHER ORDERED** that the Clerk of the Court certify this Order.

**IT IS FURTHER ORDERED** that the Clerk of the Court make available a certified copy of this Order to:

Deputy Warden Lacy Scott
ASPC-Perryville
2105 North Citrus Road
Goodyear, AZ 85395

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

4

Allen A. Arntsen
Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Lacey Stover Gard
Office of the Arizona Attorney General
400 West Congress, Bldg. S-315
Tucson, Arizona 85701

Michael E. Gottfried
Office of the Arizona Attorney General
1275 W. Washington
Phoenix, AZ  85007.

DATED this **22nd** day of November, 2013

Honorable Brian Ishikawa
Maricopa County Superior Court

# EXHIBIT NNNNNNNN

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
I. OSUNA, Deputy
12/2/2013 1:44:32 PM
Filing ID 5580738

Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Elizabeth Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | No. CR2000-096032-A |
| Respondent, | **PETITIONER'S WITNESS LIST** |
| vs. | (Assigned to the Hon. Brian K. Ishikawa) |
| WENDI ELIZABETH ANDRIANO, | |
| Petitioner. | |

Petitioner Wendi Andriano may call one or more of the following as witnesses at the hearing in this matter:

1. Wendi Andriano
2. Daphne Budge

{00110870.1 }

3.  George Carlin

4.  Jeri Lyn Cunningham

5.  David DeLozier

6.  Larry Hammond

7.  James Hopper

8.  Joette James

9.  Brad Lambeth

10. Jeanea Lambeth

11. Kyre Lorts

12. Gary Lowenthal

13. Scott MacLeod

14. Alejo Ochoa

15. Brandon Ochoa

16. Donna Ochoa

17. Kathy O'Quinn

18. Dan Patterson

19. Keith Rohman

20. Cindy Schaider

21. George Woods

22. Any witness designated by respondent

Petitioner reserves the right to supplement this list with the identity of additional persons whom petitioner learns have relevant information.

RESPECTFULLY SUBMITTED December 2, 2013.

COPPERSMITH SCHERMER &
BROCKELMAN PLC

By ___/s/Allen A. Arntsen_____
      Allen A. Arntsen

FOLEY & LARDNER LLP
      Allen A. Arntsen
      Stephan J. Nickels
      Matthew R. Lynch

*Attorneys for Petitioner Wendi Andriano*

ORIGINAL e-filed with the Clerk of the Court
on December 2, 2013.

COPY hand-delivered on December 2, 2013 to:

The Honorable Brian Ishikawa
Maricopa County Superior Court
Southeast – Juvenile
1810 S. Lewis, #1114
Mesa, AZ  85210

COPY mailed on December 2, 2013 to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona  85701-1367
*Attorneys for the State of Arizona*

*/s/Carol Keesee* _____

# EXHIBIT OOOOOOO

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
I. OSUNA, Deputy
12/2/2013 3:38:23 PM
Filing ID 5581275

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

GREGORY HAZARD (State Bar Number 23258)
LACEY STOVER GARD (State Bar Number 22714)
ASSISTANT ATTORNEYS GENERAL
CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, ARIZONA 85007-2997
TELEPHONE: (602) 542-4686
Gregory.Hazard@azag.gov
Lacey.Gard@azag.gov
CADOCKET@AZAG.GOV

WILLIAM G. MONTGOMERY
MARICOPA COUNTY ATTORNEY
(FIRM STATE BAR NO. 32000)

JUAN M. MARTINEZ
DEPUTY COUNTY ATTORNEY
301 W. JEFFERSON, 4TH FLOOR
PHOENIX, ARIZONA 85003-2191
(STATE BAR NUMBER 9510)

ATTORNEYS FOR RESPONDENTS

# ARIZONA SUPERIOR COURT
# COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>       RESPONDENT,<br><br>-VS-<br><br>WENDI ANDRIANO,<br><br>       PETITIONER. | CR–2000–096032<br><br>**RESPONDENT'S EVIDENTIARY HEARING WITNESS LIST**<br><br>(The Hon. Brian Ishikawa) |

Pursuant to this Court's October 11, 2013, order, Respondent, the State of Arizona, hereby submits its list of witnesses for the upcoming evidentiary hearing:

1. Dr. Steven E. Pitt.

2. Dr. Karin Amin.

3. Daniel Patterson.

4. G. David DeLozier.

5. Patrick Linderman.

6. Scott MacLeod.

7. Chris Hashisaki.

8. Rick Freeland.

9. Shawn King.

10. Dawna Harris.

11. Custodian of records, State Bar of Arizona.

12. Custodian of records, Arizona Department of Corrections.

13. Any witness listed by Andriano.

RESPECTFULLY SUBMITTED this 2nd day of December, 2013.

> Thomas C. Horne
> Attorney General
>
> Jeffrey A. Zick
> Chief Counsel
>
> /s/Lacey Stover Gard
> Assistant Attorney General
> Capital Litigation Section
> Attorneys for Respondent

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2013, I filed the foregoing with the Clerk of the Court for the Maricopa County Superior Court by using the Court's eFiling Online system.

I have also on this date provided a copy of the foregoing by mail.

Scott M. Bennett
Coppersmith Schermer & Brockelman, PLC
2800 North Central Avenue
Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Stephen J. Nickels
Matthew R. Lynch
Foley & Lardner LLP
150 E. Gilman Street
Madison, WI 53703


/s Nicole Kopf

#3627948

# EXHIBIT PPPPPPPP

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Krane, Deputy
12/5/2013 11:39:30 AM
Filing ID 5587542

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA 85701
TELEPHONE:  (520) 628-6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
# COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>          Respondent,<br><br>-VS-<br><br>WENDI ELIZABETH ANDRIANO,<br><br>          Petitioner. | CR–2000–096032<br><br>**REQUEST FOR CERTIFIED CONTACT VISIT ORDER**<br><br>**[EXPEDITED RULING REQUESTED]**<br><br>**[CAPTIAL CASE]**<br><br>The Hon. Brian Ishikawa |

The State of Arizona hereby requests this Court to issue a certified order directing the Arizona Department of Corrections (hereinafter "ADOC") to allow a confidential contact visit between Petitioner Wendi Andriano and Dr. Kiran Amin on December 13, 2013, to allow Dr. Amin to administer certain psychological tests that he determined, following review of the defense expert's raw data, are

necessary to complete his evaluation of Andriano.[1]  Charles Ryan, Director of the ADOC, by and through undersigned counsel Michael E. Gottfried,[2] does not object to this confidential visit.

Counsel for the State and ADOC have agreed to terms and conditions for the visit, and those terms and conditions are listed and contained in the attached proposed order.  Therefore, the State requests that the proposed certified order should issue.

RESPECTFULLY SUBMITTED this 5th day of December, 2013.


THOMAS C. HORNE
ATTORNEY GENERAL

/s/
Lacey Stover Gard
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION

ATTORNEYS FOR RESPONDENT

THOMAS C. HORNE
ATTORNEY GENERAL

/s/
Michael E. Gottfried
ASSISTANT ATTORNEY GENERAL
LIABILITY MANAGEMENT SECTION
CIVIL DIVISION

ATTORNEYS FOR ADOC

---

[1] Dr. Amin does not intend to videorecord his visit, as it will consist exclusively of the administration of psychological tests and will not include a clinical interview.

[2] Mr. Gottfried is appearing specially and for the limited purpose of representing the interests of the ADOC regarding the contact visit.

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2013, I electronically filed the foregoing with the Clerk of the Maricopa County Superior Court by using the Court's eFiling Online system.

Copies of the foregoing were deposited for mailing this date to:

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

Attorneys for Petitioner

/s/Y. Garcia
Legal Secretary
Criminal Appeals/
Capital Litigation Division
400 W Congress, S-315
Tucson, Arizona  85701
Telephone: (520) 628-6520

3631735

# EXHIBIT QQQQQQQQ

MICHAEL K. JEANES, CLERK
BY _____ DEP

FILED

13 DEC -9 PM 12: 11

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S-315
TUCSON, ARIZONA 85701
TELEPHONE: (520) 628-6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 022714)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
# COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | CR-2000-096032 A |
| Respondent, | **CONTACT VISIT ORDER** |
| -vs- | **[CAPTIAL CASE]** |
| WENDI ELIZABETH AN DRIANO, | **THE HON. BRIAN ISHIKAWA** |
| Petitioner. | |

Pending before the Court is the State of Arizona's request for a Certified Contact Visit Order which would allow a confidential visit in a contact setting between inmate Wendi Andriano and Dr. Kiran Amin on December 13, 2013. The order would further allow inmate Andriano's attorney, Allen A. Arntsen, to be present at the beginning of the contact visit for the limited purpose of introducing the doctor to the inmate and answering her preliminary concerns. After due consideration of said request and the relevant pleadings on file,

**IT IS ORDERED** that the State's request for a Contact Visit Order is **GRANTED.**

**IT IS FURTHER ORDERED** that Dr. Amin be permitted to have a confidential visit with inmate Andriano under the following terms:

A. The State's willingness to stipulate to these terms should not be considered a waiver of any aspect of ADOC's contact visitation policy.

B. Dr. Amin shall be allowed a contact visit on December 13, 2013, beginning at 8:00 a.m. and continuing until 1:00 p.m. As set forth in paragraph J below, Attorney Arntsen may be present at the start of that visit.

C. The State shall make arrangements with Warden Judy Frigo, Arizona State Prison—Perryville, Lumley Unit, or her designee, to schedule such visit.

D. The Warden, through her staff, may require Attorney Arntsen and Dr. Amin to subject all instruments, equipment, manuals and the like to an inspection and inventory prior to and subsequent to any meeting with inmate Andriano.

E. If requested by Dr. Amin, the Warden, through her staff, shall remove handcuffs from inmate Andriano so that she may complete certain tests. However, inmate Andriano shall at all times during the contact visit remain in leg irons. ADOC may require inmate Andriano to wear a stun belt during the contact visit.

F. Attorney Arntsen and Dr. Amin will be required to wear all protective gear, including any protective vest and/or safety goggles provided by

2

ADOC.  Attorney Arntsen and Dr. Amin will be allowed to wear clothing over the protective vest.  If requested, Dr. Amin shall be allowed to remove the protective gear such as vest and safety goggles if, in his opinion, the vest and/or the goggles interfere with the testing and evaluation of inmate Andriano.

G. The door to the room in which the meeting takes place shall be open or closed during the meeting, at the discretion of Dr. Amin.  Dr. Amin shall sit in the chair closest to the door, and inmate Andriano shall not go between him and the door without permission.  The room in which the meeting takes place shall have three chairs and a table no larger than three feet in width.

H. Before being allowed the contact visit authorized herein, Attorney Arntsen and Dr. Amin shall certify in a written release to ADOC that they have investigated and ascertained the risks to their personal safety associated with the visit as authorized by and under the circumstances described in this order; that they agree to assume those risks; and that they release and hold harmless ADOC, the State of Arizona, and their officers and employees from any claim arising from death or injury associated with the risks assumed.  However, such release shall not operate as a release of gross negligence on the part of ADOC.

I. Attorney Arntsen and Dr. Amin shall submit their full name and date of birth to ADOC at least ten days before the scheduled examination of inmate Andriano.  In the event that either person has a prior arrest or

3

conviction for any felony offense, that person will not be permitted into the institution.

J. Inmate Andriano's attorney, Allen Arntsen, shall be permitted to accompany Dr. Amin into the contact visitation area to make an introduction and to answer any preliminary concerns of inmate Andriano. Mr. Arntsen shall then leave the visitation room and Dr. Amin shall administer the relevant psychological tests.

**IT IS FURTHER ORDERED** that the Clerk of the Court certify this Order.

**IT IS FURTHER ORDERED** that the Clerk of the Court forward a certified copy of this Order to:

Deputy Warden Lacy Scott
ASPC-Perryville
2105 North Citrus Road
Goodyear, AZ 85395

Scott M. Bennett
Coppersmith Schermer & Brockelman PLC
2800 N. Central Ave., Suite 1200
Phoenix, Arizona 85004

Allen A. Arntsen
Matthew R. Lynch
Foley & Lardner LLP
150 East Gilman Street
P.O. Box 1497
Madison, WI   53701-1497

4

Lacey Stover Gard
Office of the Arizona Attorney General
400 West Congress, Bldg. S–315
Tucson, Arizona 85701

Michael E. Gottfried
Office of the Arizona Attorney General
1275 W. Washington
Phoenix, AZ 85007.

DATED this ___ 5th ___ day of December, 2013

Honorable Brian Ishikawa
Maricopa County Superior Court

# EXHIBIT RRRRRRRR

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
12/23/2013 2:19:11 PM
Filing ID 5618869

1   Scott M. Bennett (022350)
2   Coppersmith Schermer & Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona  85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
    sbennett@csblaw.com
5   *Attorneys for Petitioner Wendi Elizabeth Andriano*

6

7

8               IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
                   IN AND FOR THE COUNTY OF MARICOPA
9
    State of Arizona,                  )   No. CR2000-096032-A
10                                     )
                       Respondent,     )   **MOTION TO ASSOCIATE**
11                                     )   **COUNSEL *PRO HAC VICE***
                                       )
12        vs.                          )
                                       )   (The Honorable Brian Ishikawa)
13                                     )
    Wendi Elizabeth Andriano,          )
14                                     )
                       Petitioner.     )
15                                     )
    _____)
16

17          Scott Bennett of Coppersmith Schermer & Brockelman PLC, pursuant to Rule

18   38(e), Ariz. R. Sup. Ct., moves the Court to associate Krista J. Sterken of Foley & Lardner

19   LLP as counsel *pro hac vice* in this action.  In support of this motion and pursuant to Rule

20   38(a)(3)(C), the following original documents are attached:

21          1.      Verified application to Appear Pro Hac Vice;

22          2.      Certificate(s) of Good Standing; and

23          3.      State Bar of Arizona Notice of Receipt of Complete Application.

24          Scott Bennett hereby agrees to serve as local counsel in this matter and accepts the

25   responsibilities detailed in Rule 39(a)(2), Ariz. R. Sup. Ct.

26

27

28
    {00112017.1 }

1    RESPECTFULLY SUBMITTED on December 23, 2013.

2                                          COPPERSMITH SCHERMER &
                                           BROCKELMAN PLC
3

4
                                    By:  /s/ Scott M. Bennett _____
5                                        Scott M. Bennett
6                                        2800 North Central Avenue, Suite 1200
                                         Phoenix, Arizona 85004
7                                        *Attorneys for Petitioner*

8

9

10   ORIGINAL e-filed with the Clerk of the Court
     on December 23, 2013.
11

12   COPY hand-delivered on December 23, 2013 to:

13
     The Honorable Brian Ishikawa
14   Maricopa County Superior Court
     Southeast – Juvenile
15   1810 S. Lewis, #1114
     Mesa, AZ  85210
16

17   COPY mailed on December 23, 2013 to:

18
     Ms. Lacey Stover Gard
19   Office of the Attorney General
     400 West Congress, Suite S-315
20   Tucson, Arizona  85701-1367
     *Attorneys for the State of Arizona*
21

22   /s/ Tina Johannesen _____

23

24

25

26

27

28

# Exhibits



## STATE BAR OF ARIZONA

For Official Use Only
App# *1007981*
Bar Number# *P192470*

Attn: Pro Hac Vice Dept
4201 N. 24th St., Ste 100
Phoenix, AZ 85016-6266
Phone: 602-340-7239

## Application for Appearance Pro Hac Vice

**PART I: Applicant Information**

Name of Applicant: Krista J. Sterken

Firm/Company Name: Foley & Lardner LLP

Office Address: 150 E. Gilman Street, P.O. Box 1497, Madison, WI  53701-1497

Telephone: (608) 258-4227 ___ Fax: (608) 258-4258 ___ Email Address: ksterken@foley.com

Residence Address: ___

Title of cause or case where applicant seeks to appear: State of Arizona v. Wendi Elizabeth Andriano

Docket Number: 2000-096032

Court, Board, or Administrative Agency: Superior Court of Arizona, Maricopa County

Party on whose behalf applicant seeks to appear: Wendi Elizabeth Andriano

**Pursuant to Arizona Supreme Court Rule 38(a)(4), the applicant shall complete the information below:**

| Courts to Which Applicant Has Been Admitted: (Attach additional pages if necessary) | Date of Admission: | Bar Number: |
|---|---|---|
| Western District of Wisconsin | | 1081419 |
| | | |
| | | |
| | | |

☑ Applicant is a member in good standing in such courts.

☑ Applicant is not currently disbarred or suspended in any court.

Applicant ☐ is / ☑ is not **(select one)** currently subject to any pending disciplinary proceeding or investigation by any court, agency or organization authorized to discipline attorneys at law.

In the preceding three (3) years, applicant has filed applications to appear as counsel under Ariz. R. Sup. Ct., Rule 38(a) in the following:

| Title of Matter: | Docket #: | Court or Agency: | App Granted? (Y/N) |
|---|---|---|---|
| | | | |
| | | | |

This case or cause ☐ is / ■ is not **(select one)** a related or consolidated matter for which applicant has previously applied to appear pro hac vice in Arizona. If this matter is a related or consolidated with any previous application, Applicant certifies that he/she will review and comply with appropriate rules of procedure as required in the underlying cause.
If applicable, please provide related or consolidated matter application or docket# ___

DEPOSITED

DEC 0 6 2013

Revised 10/29/12

CU4355076
IB 4600.00

Page 2

**PART II: Local Counsel Information**

Name of Arizona Local Counsel: Scott M. Bennett

State Bar of Arizona Number: 022350

Address: 40 N. Central Avenue, Suite 1900, Phoenix, AZ 85004-4429  *2800 N. Central Ave. Ste. 1200, Phoenix, AZ*

Telephone: (602) ~~262-5338~~ *381-5476*    Fax: (602) ~~734-3816~~ *772-3176*    Email Address: ~~sbennett@lrlaw.com~~  *85004*
*Sbennett@csblaw.com*

☑ Local Counsel is a member in good standing.

☑ Local Counsel associating with a nonresident attorney in a particular cause shall accept joint responsibility with the nonresident attorney to the client, to opposing parties and counsel, and to court, board, or administrative agency in that particular cause.

**PART III: Parties and Certification**
Name(s) of each party in this cause and name and address of all counsel of record:

| Party: | Counsel of Record: | Address: *2800 N. Central Ave., Ste. 1200, Phoenix, AZ 8500* |
|---|---|---|
| Wendi Andriano | Scott M. Bennett | ~~40 N. Central Ave., Phoenix, AZ 85004~~ |
| Wendi Andriano | Todd E. Hale | 40 N. Central Ave., Phoenix, AZ 85004 |
| State of Arizona | Juan M. Martinez | 301 W. Jefferson, Phoenix, AZ 85003 |
| State of Arizona | Kent E. Cattani | 1275 W. Washington, Phoenix, AZ 85007 |

☑ Applicant is including with this application a nonrefundable application fee, payable to the State Bar of Arizona, in the amount of $460.00. Fifteen percent of the non-refundable application fee paid pursuant to this section shall be deposited into a civil legal services fund to be distributed by the Arizona Foundation for Legal Services and Education entirely to approved legal services organizations, as that term is defined in subparagraph (f) of this rule.

☑ Applicant is furnishing a certificate from the state bar or from the clerk of the highest admitting court of each state, territory, or insular possession of the United States in which the nonresident attorney has been admitted to practice law certifying the nonresident attorney's date of admission to such jurisdiction and the current status of the nonresident attorney's membership or eligibility to practice therein. The certificate furnished shall be no more than forty-five (45) days old.

Applicant certifies the following:
1. Applicant shall be subject to the jurisdiction of the courts and agencies of the State of Arizona and to the State Bar of Arizona with respect to the law of this state governing the conduct of attorneys to the same extent as an active member of the State Bar of Arizona, as provided in Ariz. R. Sup. Ct. Rule 46(b).
2. Applicant will review and comply with appropriate rules of procedure as required in the underlying cause.
3. Applicant understands and shall comply with the standards of conduct required of members of the State Bar of Arizona.

## Verification

STATE OF    Wisconsin                                    )

County of   Dane                                         ) ss.

I, Krista J. Sterken                                     , swear that all statements in the application are true, correct and complete to the best of my knowledge and belief.

Dated: 11/15/13                    Applicant's Signature: _____

SUBSCRIBED AND SWORN TO before me this  15  day of  NW , 20 13 , by

Krista J. Sterken                          .
Name of Applicant

Notary Public _____

Revised 10/29/12



Diane M. Fremgen
Clerk

# WISCONSIN SUPREME COURT
## OFFICE OF THE CLERK
110 E. Main Street, Suite 215
P.O. Box 1688
Madison, WI 53701-1688

Telephone: 608-266-1880
TTY: 800-947-3529
Fax: 608-267-0640
http://www.wicourts.gov

## *CERTIFICATE OF GOOD STANDING*

*I, Diane M. Fremgen, Clerk of the Supreme Court of Wisconsin certify that the records of this office show that:*

*KRISTA J. STERKEN*

*was admitted to practice as an attorney within this state on September 23, 2010 and is presently in good standing in this court.*

*Dated: November 21, 2013*

*DIANE M. FREMGEN*
*Clerk of Supreme Court*

AP-7000, 03/2005 Certificate of Good Standing

# Certificate of Good Standing

United States of America

Western District of Wisconsin } §

I, Peter Oppeneer, Clerk of Court of the United States District Court for the Western District of Wisconsin,

DO HEREBY CERTIFY that Krista J. Sterken, was duly admitted to practice in said court on October 20, 2010, and is in good standing in said court.

Dated at MADISON, WI

November 19, 2013

Peter Oppeneer, Clerk of Court

By _____
Deputy Clerk

| | |
|---|---|
| 1 | **Maricopa County Superior Court** |

| | | |
|---|---|---|
| 2 | State of Arizona, | ) |
| |   Plaintiff | ) |
| 3 | | )     CASE # **2000-096032** |
| | v. | ) |
| 4 | | )     SBA App #1007981 |
| | Wendi Elizabeth Andriano, | ) |
| 5 |   Defendant. | )    **NOTICE OF RECEIPT OF** |
| | | )    **COMPLETE APPLICATION** |

6

7   NOTICE IS HEREBY given by THE STATE BAR OF ARIZONA that it has <u>received the verified application and fee from Krista Sterken</u>.

8   In addition to this application, applicant has made the following applications to appear pro hac vice, pursuant to Rule38 (a), within the previous three (3) years:

9

| Title of Matter | Court/Agency | Date | Granted? |
|---|---|---|---|
10

11

12   Exhibit A, the original verified application and Exhibit B, the original Certificate(s) of Good Standing are attached hereto.

13   DATED this 16rd day of December 2013

14

15   _Jennifer Ford_

    Jennifer Ford, CAP

16   Member Services Administrator

    State Bar of Arizona

17

18   Original Mailed on this 16rd day of December 2013 to:

19

    Scott M Bennett

20   Coppersmith Schermer & Brockelman PLC

    2800 N Central Ave Ste 1200

21   Phoenix, AZ 85004-1009

22

23

24

25

# EXHIBIT SSSSSSS

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Krane, Deputy
1/6/2014 11:45:17 AM
Filing ID 5636113

1   COPPERSMITH SCHERMER & BROCKELMAN PLC
2   2800 North Central Avenue
    Suite 1200
3   Phoenix, Arizona  85004
    (602) 224-0999
    Scott M. Bennett, State Bar No. 022350
4
5   FOLEY & LARDNER LLP
    150 E. Gilman Street
6   Madison, WI 53703
    Telephone:   (608) 257-5035
    Fax:   (608) 258-4258
7
8   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
9   Matthew R. Lynch Admitted *Pro Hac Vice*

10  *Attorneys for Petitioner Wendi Elizabeth Andriano*

11              SUPERIOR COURT OF ARIZONA

12              COUNTY OF MARICOPA

13

14  State of Arizona,                )
                                     )   No. CR2000-096032-A
15                  Respondent,      )
                                     )
16          vs.                      )   **PETITIONER WENDI**
                                     )   **ANDRIANO'S MOTION**
17  Wendi Elizabeth Andriano,        )   **REGARDING TRANSPORTATION**
                                     )   **AND MEALS DURING HEARING**
18                  Petitioner.      )
                                     )   **(CAPITAL CASE)**
19                                   )
                                     )
20                                   )   (Assigned to the Hon. Brian Ishikawa)
                                     )
21  _____)

22          Petitioner Wendi Andriano seeks an order setting forth minimum standards

23  to govern her housing and transportation during the two-week evidentiary hearing

24  that is scheduled to commence February 3, 2014.

25

26          During the multi-month trial that lead to Ms. Andriano's conviction and

27  death sentence, she did not have adequate sleep or food.  On a typical trial day,

28

Ms. Andriano was woken in the middle of the night, taken to a separate jail where she was held for five hours, and then transported to the courthouse, where she was again kept in a holding cell until the trial day began.  Ms. Andriano was provided with a sack lunch early in the morning that was to serve as both her breakfast and lunch for the day, and was not allowed any other food until trial had ended and she had been transported back to the psychiatric unit on which she was housed.  During her trial, Ms. Andriano's healthcare providers noted Ms. Andriano's resulting struggles to maintain the concentration and mental health necessary to be able to meaningfully participate in her trial.  Although this schedule and lack of food would tax anyone, Ms. Andriano's bipolar and sleep disorders magnify the impact of insufficient sleep and food.  These potential problems are particularly important in this case, because of both the length of the hearing (two weeks), and the fact that this is a death-penalty case.

Ms. Andriano's counsel have learned that she may be subjected to similar conditions during the hearing on her petition for post-conviction relief that is scheduled to commence February 3, 2014.  Accordingly, Ms. Andriano respectfully requests that the Court enter an order directing that she be transferred to the jail at which she will be housed during the hearing a week early (to allow her to adjust to her new environment) and providing her with the opportunity for adequate sleep and food for the duration of the hearing.

1.     **BACKGROUND**

    a.     **Ms. Andriano's Inadequate Sleep And Meals During Trial**

During her 2004 trial, Ms. Andriano was typically awakened at 1 a.m. at the Durango psychiatric unit to prepare for transportation to the Madison jail.  She then waited in a holding cell in Madison for five hours before being transported to court, where she was placed in a holding cell at the courthouse until trial the trial day began.  At the end of the day, she was then transported back to Durango.  (*See* Memorandum in Support of Petition for Post-Conviction Relief at 31.)  The only food provided to Ms. Andriano was a sack lunch at Madison and a meal upon her return to Durango at the end of the day.  (*Id.*)

As a result of her limited opportunities for sleep and food, Ms. Andriano struggled to participate in her trial.  Ms. Andriano has explained:

> As a result of my transportation schedule during my trial, I felt extremely tired throughout my trial and had difficulty remaining awake and focused while in court or when meeting with my attorneys . . . I consistently felt too tired to participate in my representation and trial.
>
> The sack lunch I was provided at 3:00 a.m. each morning was not enough food for both breakfast and lunch.  I was not allowed to eat any food other than that provided by the prison and was not given any additional food during the day beyond what was in the sack lunch I received at 3:00 a.m.  As a result, I frequently had difficulty focusing on and participating in my trial and meetings with my attorneys because I was hungry.

(Declaration of Wendi Andriano, filed as Tab 9 to Memorandum in Support of Petition for Post-Conviction Relief.)

During Ms. Andriano's trial, her psychiatrist and psychologist at Durango wrote a letter to her attorney, expressing their concern about Ms. Andriano's "ability to maintain her physical and mental health" as a result of this rigorous schedule and the lack of adequate food.  (September 1, 2004 Letter, filed as Tab 7G to Memorandum in Support of Petition for Post-Conviction Relief.)

> **b.   Ms. Andriano's Need For Adequate Sleep And Meals To Be Able To Meaningfully Participate In Upcoming Hearing**

Ms. Andriano has been diagnosed with bipolar disorder and a sleep disorder, which make adequate opportunities for sleep and meals at regular intervals essential to her ability to meaningfully participate in her upcoming hearing.  George Woods, M.D., who has examined Ms. Andriano in the context of her post-conviction relief efforts, explains:

> I strongly recommend a stabilizing regimen of medication, sleep, and diet during the evidentiary hearing currently set for February 14-19, 2014. Ms. Andriano has a well-documented history of bipolar disorder, with mood swings and impaired sleep status during extremely stressful periods.
>
> These symptoms, particularly her mood swings and sleep disorder, have been identified in the years before, during, and after her trial. There is reason to believe these symptoms would recur, given the current medication regimen which is aimed solely at anxiety, with none of the mood stabilizers Ms. Andriano has been successfully treated with in the past.

4

1
2

> . . . providing Ms. Andriano the ability for consistent sleep would go far to stabilize her bipolar symptoms as well, since sleep disruption is a common symptom in this disorder . . .

3
4
5
6

> Stabilization of diet would also help Ms. Andriano maintain cognitive and emotional stability. Ms. Andriano has a history of neurovegetative signs, specifically changes in eating and sleeping habits when under stress, consistent with her mood disorder. Ensuring a regular regimen of eating and rest would increase her potential for full participation in her hearing.

7
8
9

(December 20, 2013 Letter from Dr. George Woods to Attorney Arntsen, attached as Exhibit B.)

10
11

## 2.   MS. ANDRIANO'S REQUEST FOR ADEQUATE SLEEP AND FOOD DURING HEARING

12
13
14
15
16
17

Ms. Andriano respectfully requests that the Court issue an order requiring the Maricopa Sheriff's Department to refrain from waking her up prior to 5 a.m. and to return her to her cell by 8 p.m. each day of the hearing to provide an adequate opportunity for sleep; and to provide her a blanket, pillow, and place to lay down if she is kept in a holding cell for more than one hour.

18
19
20
21
22

Ms. Andriano also requests that she be transferred from the Perryville prison to the jail at which she will be housed at least one week prior to the hearing, to provide an opportunity for her to acclimate to this environment and obtain necessary supplies from the jail commissary.

23
24
25
26
27

Finally, Ms. Andriano requests that the Court issue an order requiring that she be provided with at least three meals each day, and permitting her attorneys to provide her with food and drinks during the day.  These requests would allow Ms.

Andriano to have the sleep and food required for her to maintain her mental health and participate meaningfully in her post-conviction relief hearing.

**3.     CONCLUSION**

For these reasons, Ms. Andriano respectfully requests that the Court enter the Proposed Order filed concurrently with this Motion.

Ms. Andriano's attorneys provided a copy of this motion to one of the attorneys for the State, Gregory Hazard.  Mr. Hazard informed Ms. Andriano's team that because his office does not represent the Maricopa County Jails, it will not be taking a position on this motion.  Mr. Hazard also provided the name and contact information for the attorney who represents the County Jails, Joseph Vigil. Copies of this motion will be sent to Mr. Vigil by both U.S. mail and email.

RESPECTFULLY SUBMITTED January 6, 2014.

FOLEY & LARDNER LLP


By */s/ Allen A. Arntsen*
    Allen A. Arntsen, *Pro Hac Vice*
    Stephan J. Nickels, *Pro Hac Vice*
    Matthew R. Lynch, *Pro Hac Vice*

COPPERSMITH SCHERMER &
BROCKELMAN PLC
    Scott M. Bennett

*Attorneys for Petitioner Wendi
Andriano*

6

ORIGINAL filed January 6, 2014,
with the Clerk of the Maricopa County Superior Court.

COURTESY COPY hand-delivered January 6, 2014, to:

Judge Brian Ishikawa
Maricopa County Superior Court
Southeast Court
222 E. Javelina Avenue
Mesa, AZ 85210

COPY emailed and mailed January 6, 2014, to:

Lacey Stover Gard
Gregory Hazard
Office of the Attorney General
400 W. Congress, Suite S-315
Tuscon, AZ 85701-1367
*Attorney for the State of Arizona*

Joseph Vigil
Maricopa County Attorney's Office
Civil Services Division
222 North Central Avenue, Suite 1100
Phoenix, AZ, 85004-2206
*Attorney for Maricopa County Jails*


*/s/ Carol Keesee*

# EXHIBIT TTTTTTTT

1   Scott M. Bennett (022350)
    Coppersmith Schermer & Brockelman PLC
2   2800 North Central Avenue, Suite 1200
    Phoenix, Arizona  85004
3   (602) 224-0999 (office)
4   (602) 224-6020 (fax)
    sbennett@csblaw.com
5   *Attorneys for Petitioner Wendi Elizabeth Andriano*

6
              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
7                 IN AND FOR THE COUNTY OF MARICOPA

8   State of Arizona,                      )
9                                          )
                            Respondent,    )   No. CR2000-096032-A
10                                         )
11          vs.                            )   **ORDER TO ASSOCIATE COUNSEL**
                                           )   ***PRO HAC VICE***
12  Wendi Elizabeth Andriano, -            )
13                                         )
                            Petitioner.    )
14                                         )
    _____
15

16          Based on the Motion to Associate Counsel *Pro Hac Vice* by Scott Bennett of

17  Coppersmith Schermer & Brockelman PLC and the consent of Scott Bennett to appear as

18  local counsel, it is hereby ordered that Krista Sterken of Foley & Lardner LLP be admitted

19  *pro hac vice* as counsel for Wendi E. Andriano in this matter.

20          DATED:  _01 - 06 - 14_

21

22

23

24                              The Honorable Brian Ishikawa

25

26

27

28
    {00112044.1 }

1  COPY mailed on _____, 201__ to:

2
   Scott Bennett
3  Coppersmith Schermer & Brockelman PLC
   2800 North Central Avenue, Suite 1200
4  Phoenix, Arizona  85004
   *Attorneys for Petitioner*
5

6  Lacey Stover Gard
   Office of the Attorney General
7  400 West Congress, Suite S-315
   Tucson, Arizona  85701-1367
8  *Attorneys for the State of Arizona*

9

10  _____

11

12-  

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
   {00112044.1 }

2

# EXHIBIT UUUUUUUU

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
01/09/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        01/08/2014


                                          CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                    L. Mooney
                                                Deputy



STATE OF ARIZONA                     LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)         JAMES J BELANGER
                                     SCOTT M BENNETT



**MINUTE ENTRY**



        The Court has received and reviewed the Motion to Associate Counsel *Pro Hac Vice* by Scott Bennett of Coppersmith Schermer & Brockelman PLC and the consent of Scott Bennett to appear as local counsel,

        IT IS ORDERED that Krista Sterken of Foley & Lardner LLP be admitted *pro hac vice* as counsel for Wendi E. Andriano in this matter.

        FILED:  Order to Associate Counsel *Pro Hac Vice*

# EXHIBIT VVVVVVVV

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
1/9/2014 3:23:16 PM
Filing ID 5645134

1  WILLIAM G. MONTGOMERY
   MARICOPA COUNTY ATTORNEY
2  By:    J. RANDALL JUE (014816)
          Deputy County Attorney
3  CIVIL SERVICES DIVISION
   222 North Central Avenue, Suite 1100
4  Phoenix, Arizona  85004
   Firm No. 00032000
5  Telephone No. (602) 506-8541
   Facsimile No. (602) 506-8567
6  juej@mcao.maricopa.gov
   ca-civilmailbox@mcao.maricopa.gov
7
   Attorneys for Sheriff Arpaio
8

9         **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

10            **IN AND FOR THE COUNTY OF MARICOPA**

11 STATE OF ARIZONA,                    No: CR2000-096032-A

12                    Respondent,       **SHERIFF ARPAIO'S RESPONSE TO
                                        WENDI ANDRIANO'S MOTION**
13 v.                                   **REGARDING TRANSPORTATION
                                        AND MEALS DURING HEARING**
14 WENDI ELIZABETH ANDRIANO,
                                        (Assigned to the Honorable
15                    Petitioner.        Brian K. Ishikawa)

16

17        Sheriff Arpaio, through undersigned counsel, hereby responds to Petitioner's

18 Motion Regarding Transportation And Meals During Hearing ("Motion for T&M").

19 Given that Petitioner is not claiming that she will suffer any violations of her

20 constitutional rights, she is not legally entitled to any relief.   Nevertheless, Sheriff

21 Arpaio is willing to accommodate Petitioner to a certain extent as discussed below.

22        Sheriff Arpaio agrees to (1) transport Petitioner from Perryville to the assigned

23 jail facility on January 29, 2014 (five days prior to the start of her scheduled two-week

24 evidentiary hearing); (2) transport Petitioner to the South Court Tower one hour prior to

25 her scheduled hearing start time; (3) provide her with three meals at the South Court

26 Tower on those days Petitioner is transported to the tower in the morning for a day-long

27 court session; and (4) provide her with a bench to lay down for any time spent in the

28 South Court Tower holding cell.

As to the other requests, because they pose unacceptable safety and security risks, Sheriff Arpaio objects to (1) providing a blanket and pillow to Petitioner when she is in the holding cell of the South Court Tower and objects to (2) permitting her attorneys to provide her with food and drink during breaks in the hearing.

## I. __APPLICABLE LAW__:

The sheriff alone has a statutory duty to "[t]ake charge of and keep the county jail, including a county jail under the jurisdiction of a county jail district, and the prisoners in the county jail." A.R.S. § 11-441.5; *accord* A.R.S. § 31-101 ("The common jails in the several counties and county jails under the jurisdiction of county jail districts shall be kept by the sheriffs of the counties in which they are respectively located."). Absent any constitutional violations, the judiciary has no authority to usurp the functions of the executive branch. *Judd v. Bollman*, 166 Ariz. 417, 419, 803 P.2d 138, 140 (Ariz. App. 1990). Even in the exceptional case where constitutional violations exist, the courts have limited authority to interfere with a sheriff's duties to maintain and operate the county jails. *Id.* Any such remedies for constitutional violations shall be narrowly fashioned. *Wilson v. Superior Court*, 194 Cal.App.3d 1259, 1269, 240 Cal.Rptr. 131, 137 (App.1987). While the Court has the authority to order Sheriff Arpaio to transport a defendant in matters that relate to a defendant's case, it cannot dictate specifics of the transport, including the timing, unless a constitutional violation is present. *Judd,* 166 Ariz. at 410, 803 P.2d at 140; *see also State ex rel. Ariz. Dept. of Corrections v. Kiger*, 224 Ariz. 252, 229 P.3d 264 (Ariz. App. 2010).

As an example of when judicial intervention may be appropriate, the courts have the inherent authority and obligation to provide relief to defendants from jail regulations that significantly interfere with or unreasonably burden the exercise of their Sixth Amendment right to access to counsel. *See, e.g.*, *Cobb v. Aytch*, 643 F.2d 946, 957 (3rd Cir.1981) (granting injunctive relief in class action enjoining prison transfers that "significantly interfered" with pretrial detainees' access to counsel); *see also Wolfish v. Levi*, 573 F.2d 118, 133 (2nd Cir.1978) (granting injunctive relief in class action in

1   which prison regulations restricting pretrial detainees' contact with their attorneys were

2   found unconstitutional because they "unreasonably burdened the inmate's opportunity to

3   consult with his attorney and to prepare his defense"), vacated in part on other grounds

4   by 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

5   **II.   REQUEST TO TRANSPORT PETITIONER TO THE ASSIGNED JAIL FACILITY EIGHT DAYS PRIOR TO THE START OF THE TWO-WEEK EVIDENTIARY HEARING IS WITOUT MERIT:**

6

7   Petitioner requests that she be transported to the assigned jail facility on January

8   26, 2014—which is eight days before the start of the scheduled evidentiary hearing— so

9   that she can "adjust to her new environment" and "obtain necessary supplies from the

10   jail commissary."  (Motion for T&M at pp. 2, 5.)  Petitioner's request is meritless and

11   should be denied for the following reasons.

12   First, Petitioner's request is not based on a constitutional violation.  She does not

13   have a right to be transported to her hearing housing early so that she can acclimate to

14   her new surroundings.  For that reason alone, the Court is without authority to dictate to

15   Sheriff Arpaio when Petitioner should be transported to the assigned jail facility.

16   Petition fails to present any authority suggesting otherwise.  Second, her request is not

17   supported by any legitimate medical basis.  Her Motion for T&M does not include any

18   opinions by any of her prior, or current, medical providers advocating the need to have

19   her transported to the assigned jail facility eight days prior to her evidentiary hearing.

20   Third, it would be unduly burdensome for Sheriff Arpaio to be required to expend

21   unnecessary resources to provide food and housing for a Petitioner merely so that she

22   can acclimate to a different housing situation.

23   As noted above, Sheriff Arpaio agrees to transport Petitioner from Perryville to

24   the assigned jail facility on January 29, 2014, which is five days prior to the scheduled

25   evidentiary hearing.[1]  This will provide Petitioner more than enough to time to acclimate

26   _____

27   [1] The standard operating procedure for the transportation of inmates for court appearances is that the Court order be received 14 days prior to the scheduled date. Sheriff Arpaio requests that the Court's transportation order be delivered as soon as possible to facilitate meeting the proposed transportation date of January 29, 2014.

28

3

to her Maricopa County Jail housing prior to her evidentiary hearing scheduled to begin on February 3, 2014.   Therefore, the Court should deny Petitioner's request to be transported to her assigned jail facility eight days before her scheduled evidentiary hearing.

### III.   PER POLICY, NONE OF THE HOLDING CELLS OF THE SOUTH COURT TOWER ARE EQUIPPED WITH A PILLOW AND A BLANKET:

Petitioner requests that a blanket and pillow be provided to her "if she is kept in a holding cell for more than one hour." (Motion for T&M at p. 5.)  Petitioner's request is meritless and should be denied for the following reasons.

First, Petitioner does not have a constitutional right to have a pillow and blanket if she is detained in the holding cell for more than one hour.  None of the persons who are detained in the holding cells are provided with a pillow and a blanket.  Second, similar to her request to be transported eight days prior to the evidentiary hearing, Petitioner provides no medical basis to support her request for a pillow and blanket in the holding cell if she is detained for more than one hour.

Third, upon information and belief, the cell is maintained at a temperature above 80 degrees.  This temperature setting obviates the need, and the request, for a blanket. Each cell is equipped with a bench which Petitioner may use to lie down on for any period in which she occupies a cell in the South Court Tower.

Fourth, it would be unsanitary for the holding cells to be equipped with a pillow and blanket because the cells are used by different people.  It would create an undue burden on the Maricopa County Sheriff's Office to equip the cells with pillows and blankets and implement a protocol to ensure the holding cells were sanitary.  Therefore, the Court should deny Petitioner's request to be provided with a blanket and a pillow if she is detained in a holding cell for more than one hour.

/ / /

4

**IV.** **IT WOULD BE AN UNACCEPTABLE SECURITY RISK IF PETITIONER'S ATTORNEYS WERE ALLOWED TO PROVIDE FOOD AND DRINK TO HER DURING THE EVIDENTIARY HEARING:**

Petitioner claims that during her trial in 2004 she received two meals per day and this amount of food did not adequately fortify her nutritionally for her trial. (Motion for T&M at p. 3.)  In her Motion for T&F, Petitioner references a letter from Dr. George Woods in which he opines that "[e]nsuring a regular regimen of eating and rest would increase her potential for full participation in her hearing."  (Motion for T&M at p. 5.)  Dr. Woods does not explicitly opine on the amount of food Petitioner needs or the frequency of her intake of food.  Therefore, Petitioner lacks a medical basis for her request that she be provided three meals a day along with snacks during the day.

Per policy, the Maricopa County typically provides two meals per day.  Nevertheless, as previously discussed, Sheriff Arpaio agrees to provide Petitioner with three meals for those court sessions in which she is brought to the South Court Tower in the morning.  However, as to the request to allow her attorneys to provide Petitioner with food and drink during breaks, Sheriff Arpaio strenuously objects to this because it poses a clear security risk for contraband to infiltrate the jail system.

Before anything becomes accessible to those in custody of the Maricopa County jails—including food and beverages—it must be checked, scrutinized and approved.  Petitioner's proposal that her attorneys should be allowed to provide her with unchecked food and drink, which they ostensibly would bring with them from the outside from unknown sources, would violate the security protocol in place.  It is undisputed that Petitioner's proposal would clearly create a significant risk of contraband intentionally or unintentionally being passed to Petitioner.

Moreover, Petitioner has not provided any evidence that she needs snacks in addition to the three meals, which she will be provided for any court sessions that last an entire day.  Petitioner's basis for her request is her assumption that she would only be provided two meals for day-long court sessions.  Her assumption is incorrect.  Therefore,

1  this Court must deny Petitioner's request that her attorneys be allowed to provide her

2  with snacks during breaks in her evidentiary hearing.

3  **V.      <u>CONCLUSION</u>**:

4         Based on the foregoing reasons, Sheriff Arpaio respectfully requests that the

5  Court deny Petitioner's requests (1) to be provided a blanket and pillow whenever she is

6  in a holding cell of the South Court Tower and (2) to be permitted to receive food and

7  drink from her attorneys during any breaks in her evidentiary hearing.

8         Sheriff Arpaio does not object to a Court order mandating the following: (1)

9  Petitioner shall be transported from Perryville to the assigned jail facility on January 29,

10  2014; (2)  Petitioner shall be transported to the South Court Tower one hour prior to her

11  start time for each scheduled evidentiary hearing date; (3) Petitioner shall be provided

12  three meals at the South Court Tower on those days Petitioner is transported to court in

13  the morning for a day-long session; and (4) provide her with a bench to lay down for any

14  time spent in the South Court Tower holding cell.

15         RESPECTFULLY SUBMITTED this 9th day of January 2014.

16                              WILLIAM G. MONTGOMERY
                               MARICOPA COUNTY ATTORNEY

17

18                              BY:  /s/ J. Randall Jue
                                    J. RANDALL JUE
19                                  *Attorneys for Sheriff Arpaio*

20

21

22

23

24

25

26

27

28

ORIGINAL electronically filed
and electronically sent
this 9th day of January 2014 to:

Honorable Brian Ishikawa
MARICOPA COUNTY SUPERIOR COURT
1810 South Lewis, #1114
Mesa, Arizona 85210-6234

with a copies mailed
this 9th day of January 2014 to:

Allen A. Arntsen
Stephan J. Nickels
Matthew R. Lynch
FOLEY & LARDNER LLP
150 East Gilman Street
Madison, Wisconsin 53703
*Attorneys for Petitioner*

Scott M. Bennett
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
sbennett@csblaw.com
*Attorneys for Petitioner*

Lacey Stover Gard
Gregory Hazard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona 85701-1367
Lacey.gard@AZAG.gov
CADocket@AZAG.gov
Attorneys for the State of Arizona

*/s/* L. Wink

S:\COUNSEL\Civil\Matters\GN\GN Closed 2010\GN10-0319 State v. Andriano\Arpaio'sResponse2Mtn-Transportation&Meals 1-9-14.docx

7

# EXHIBIT WWWWWWWW

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
1/10/2014 1:56:05 PM
Filing ID 5647460

1  Scott M. Bennett (022350)
   Coppersmith Schermer & Brockelman PLC
2  2800 North Central Avenue, Suite 1200
   Phoenix, Arizona  85004
3  (602) 224-0999 (office)
   (602) 224-6020 (fax)
4  sbennett@csblaw.com
5
6  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels Admitted *Pro Hac Vice*
7  Matthew R. Lynch Admitted *Pro Hac Vice*
   Foley & Lardner LLP
8  150 East Gilman Street
   Madison, WI 53703
9  (608) 257-5035 (office)
   (608) 258-4258 (fax)
10 aarntsen@foley.com
11
12 *Attorneys for Petitioner Wendi Elizabeth Andriano*

13                SUPERIOR COURT OF ARIZONA

14                  COUNTY OF MARICOPA

15
   State of Arizona,                    )   No. CR2000-096032-A
16                                       )
                          Respondent,    )   **PETITIONER'S MOTION FOR**
17                                       )   **REMOVAL OF PRISONER TO**
                                         )   **ATTEND AS WITNESS**
18      vs.                              )
                                         )
19 Wendi Elizabeth Andriano,            )   (Assigned to the Hon. Brian K.
                                         )   Ishikawa)
20                          Petitioner.  )
21 _____)
22

23        Petitioner Wendi Andriano moves for an order requiring the attendance of an

24 Arizona State prisoner, Jasper Neace (ADC #169831), at the upcoming evidentiary

25 hearing.  Mr. Neace is currently incarcerated in the Arizona State Prison in Safford.  Ms.

26 Andriano intends to call Mr. Neace as a witness on February 4 and/or February 5.  Ms.

27 Andriano makes this motion under A.R.S. § 13-4075.

28 {00114042.1 }

Because Jasper Neace is located in a prison outside of Maricopa County, pursuant to A.R.S.§ 13-4075 the Affidavit of Jodi K. Fox ("Fox Aff.") is attached.  That affidavit explains that testimony of Mr. Neace is material and necessary for the following reasons:

- Jasper Neace is a former childhood friend of Ms. Andriano.  (Fox. Aff. ¶ 2.)
- As childhood friends, Mr. Neace personally witnessed the upbringing of Ms. Andriano, including but not limited to interactions between Ms. Andriano and her parents, Donna and Alejo Ochoa.  (Fox Aff. ¶ 3.)
- Mr. Neace had numerous conversations with Ms. Andriano throughout her childhood, including conversations about her relationships and interactions with family and friends.  (Fox Aff. ¶ 4.)
- Mr. Neace is the only known potential witness for the hearing not related to the Ochoas who had a close personal relationship with both Alejo Ochoa and Ms. Andriano during Ms. Andriano's childhood.  (Fox Aff. ¶ 5.)
- Mr. Neace is one of the only known individuals who spoke with Ms. Andriano during her childhood about sexual abuse of Ms. Andriano by Alejo Ochoa.  (Fox Aff. ¶ 6.)
- Mr. Neace is the only known individual who has knowledge of the potential sexual abuse of Ms. Andriano by a former Principal of Ms. Andriano's.  Ms. Andriano recently discussed this abuse with Steven A. Pitt, D.O., the State's expert, during his forensic psychiatric evaluation of Ms. Andriano.  (Fox Aff. ¶ 7.)
- Because of Mr. Neace's personal knowledge of Ms. Andriano during her childhood, and his personal knowledge of her relationships and interactions with family and friends at that time, he has material and necessary knowledge of events related to the allegations of childhood sexual abuse contained in Ms. Andriano's Petition for Post-Conviction Relief.  (Fox Aff. ¶ 8.)

- Mr. Neace's testimony as a witness to various conversations and events related to the allegations of childhood sexual abuse are material and necessary for Ms. Andriano to fully present her arguments at the Evidentiary Hearing in support of her Petition for Post-Conviction Relief.  (Fox Aff. ¶ 9.)
- Ms. Andriano anticipates that Mr. Neace will testify to those facts identified in his Declaration dated June 7, 2010, a copy of which is attached as **Exhibit A**, and which is already in the possession of the State of Arizona.

For the foregoing reasons, Ms. Andriano requests this Court exercise its discretion pursuant to A.R.S. § 13-4075 and issue an order for the temporary removal of Jasper Neace, ADC #169831, from ASPC – Safford, Tonto Unit, located at 896 S. Cook Road, Safford, AZ 85546, so that he can be available to testify at the evidentiary hearing on February 4 and February 5, 2014.

RESPECTFULLY SUBMITTED January 10, 2014.

COPPERSMITH SCHERMER & BROCKELMAN PLC

By */s/ Scott M. Bennett*
Scott M. Bennett

FOLEY & LARDNER LLP
Allen A. Arntsen, *Pro Hac Vice*
Stephan J. Nickels, *Pro Hac Vice*
Matthew R. Lynch, *Pro Hac Vice*

*Attorneys for Petitioner*

{00114042.1 }                    3

ORIGINAL e-filed January 10, 2014,
with the Clerk of the Maricopa
County Superior Court

COURTESY COPY hand delivered
on January 10, 2014, to:

Judge Brian Ishikawa
Maricopa County Superior Court
Southeast Court
1810 S. Lewis Street
Mesa, AZ 85210

COPY mailed January 10, 2014, to:

Ms. Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tucson, AZ 85701-1367
*Attorney for the State of Arizona*

*/s/ Carol Keesee*

# AFFIDAVIT

# OF

# JODI FOX

{00114073.1 }

Scott M. Bennett (022350)
Coppersmith Schermer & Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 East Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA

## COUNTY OF MARICOPA

| | | |
|---|---|---|
| State of Arizona, | ) | |
| | ) | |
| Respondent, | ) | No. CR2000-096032-A |
| | ) | |
| vs. | ) | **AFFIDAVIT OF JODI K. FOX IN** |
| | ) | **SUPPORT OF MOTION FOR** |
| Wendi Elizabeth Andriano, | ) | **REMOVAL OF PRISONER TO** |
| | ) | **ATTEND AS WITNESS** |
| Petitioner. | ) | |
| | ) | (Assigned to the Hon. Brian K. Ishikawa) |

| | | |
|---|---|---|
| STATE OF WISCONSIN | ) | |
| | ) | SS. |
| COUNTY OF DANE | ) | |

Jodi K. Fox, being first duly sworn upon oath deposes and states:

1.    I am an attorney with Foley & Lardner LLP, and one of the attorneys of record for Petitioner Wendi Andriano. I am personally involved in the strategy and planning for Ms. Andriano's Evidentiary Hearing scheduled to commence on February 3, 2014, including the strategy and planning of the several witnesses Ms. Andriano intends to call at the Evidentiary Hearing.

2.    Jasper Neace is a former childhood friend of Ms. Andriano.

MADI_2674684.1

1       3.     As childhood friends, Mr. Neace personally witnessed the upbringing

2  of Ms. Andriano, including but not limited to interactions between Ms. Andriano and her

3  parents Donna and Alejo Ochoa.

4       4.     Mr. Neace had numerous conversations with Ms. Andriano

5  throughout her childhood, including conversations about her relationships and interactions

6  with family and friends.

7       5.     Mr. Neace is the only known potential witness for the hearing that is

8  not related to the Ochoas that had a close personal relationship with both Alejo Ochoa and

9  Ms. Andriano during Ms. Andriano's childhood.

10       6.     Mr. Neace is one of the only known individuals to speak with Ms.

11  Andriano during her childhood about sexual abuse of Ms. Andriano by Alejo Ochoa.

12       7.     Mr. Neace is the only known individual to have knowledge of the

13  potential sexual abuse of Ms. Andriano by a former Principal of Ms. Andriano's. Ms.

14  Andriano recently discussed this abuse with Steven A. Pitt, D.O., the State's expert, during

15  his forensic psychiatric evaluation of Ms. Andriano.

16       8.     Because of Mr. Neace's personal knowledge of Ms. Andriano during

17  her childhood, and his personal knowledge of her relationships and interactions with

18  family and friends at that time, he has material and necessary knowledge of events related

19  to the allegations of childhood sexual abuse contained in Ms. Andriano's Petition for Post-

20  Conviction Relief.

21       9.     Mr. Neace's testimony as a witness to various conversations and

22  events related to the allegations of childhood sexual abuse are material and necessary for

23  Ms. Andriano to fully present her arguments at the February 3, 2014 Evidentiary Hearing

24  in support of her Petition for Post-Conviction Relief.

25       10.     Upon information and belief, and upon performing an "ADC Inmate

26  Datasearch" (available at: www.azcorrections.gov/inmate_datasearch/Index_Minh.aspx),

27

28

2

MADI_2674684.1

1    Jasper Neace is a prisoner at ASPC Safford, Tonto Unit, located at 896 S. Cook Road,

2    Safford, AZ 85546.  Mr. Neace's ADC Number is "169831."

3

4        DATED this $\underline{10}$ day of January, 2014.

5

6                                                Jodi K. Fox

7    Subscribed and sworn to before me

8    this $\underline{10th}$ day of January, 2014.

9

10

11   Connor A. Sabatino

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    3

# Exhibit A

## DECLARATION OF JASPER NEACE

I, Jasper Neace, declare as follows:

1.      My name is Jasper Neace.  I was born on February 10, 1967, in Portsmouth, Ohio.  I am the son of Ronnie Gordon Neace and Glenda Sue Neace.  I have eight siblings.  In birth order they are: Ronnie, me, Sherry, Michael, Holly, Rene, Amanda, Candy and Manuel.  My family moved to Casa Grande, Arizona, from Georgia in about 1979.  Prior to our arrival in Casa Grande, my family had moved back and forth from Georgia to Florida.  I have known Wendi Andriano since shortly after my family arrived in Casa Grande when I was about twelve years old. When I first met Wendi, she was a child and called by her maiden name, "Wendi Ochoa."

2.      I am a former student of the 91st Psalm Christian School and former member of the 91st Psalm Christian Church located in Casa Grande, Arizona.  During the time I was there, the name 91st Psalm Christian Church was changed to Harvest Family Church and the school became Harvest Christian Academy.  This change in name occurred when the church changed hands.  When I first began attending church there, Calvin "Cal" Lorts was the pastor.  When he left, a man named Tom King took over and renamed the church and school.  I became a member of the church and began attending school there at the time my family arrived in Casa Grande in about

Initials

1979.  I remained at the school for about six years until the end of 1985 or the beginning of 1986, at which time I was eighteen years old.

3.     I remember Wendi well as I saw her every day for years and years.  I remember Wendi as the all-American girl.  She was funny and cute.  She was talkative, outgoing and smart.  She was everything a guy would want.  I never took an interest in her because she was too young for me.  She was only twelve years old when I was fifteen.  Wendi was in and out of all the groups and was accepted by everybody.

4.     Within a couple months of us moving there, my dad was gone.  My mother kicked him out because the church convinced her that he was a sinner.  The associated scripture was "A house divided against itself shall not stand."

5.     When my dad left, my family could not afford to remain in the house we were living in.  At that time, we moved to the projects.  At that time, my mother also started collecting welfare.  I recall that every month, when she got her welfare check, we went to the grocery store.  We had two shopping carts.  We filled one cart with cheap food.  The other cart was filled with high quality, healthier food.  We bought the food from both carts with our welfare money.  We kept the cheap food for ourselves, and gave the good food to Tom and Patricia King, the pastor at Harvest and his wife.  I remember stopping by their house on the way home from the market and bringing the food up to their house.  My mother did this every month.  I asked her why she was doing that and she responded, "God will bless us."  I still recall how bad that made me


Initials

feel. I guess, in another sense, I felt good about it. They had me okey-doked too, and I believed my mother when she said that God would bless us. But at the same time, I couldn't understand why Tom King accepted my mother's food. Never once did he refuse the food even though he knew we were poor and barely had enough for ourselves.

6.      I remember specifically that my mother would purchase three or four gallons of milk for Tom and Pat, and one for us. She poured half of our gallon of milk into an empty gallon container, and filled the remainder of both gallons with water and powdered milk. I also recall that the meat that she bought for Tom and Pat was of a higher quality than the meat she bought for us. They got rib eye steaks, and we got hamburger meat. Ours probably cost about a dollar a pound, while the meat we bought for them was ten dollars a pound. Still, we managed to get by. My mother was an amazing cook and she could make anything taste good.

7.      The idea behind my mother giving food to Tom King was the Bible instruction on tithing ten percent of what you have. Supposedly, if you do so, the Lord will return it to you one hundred fold. Church members signed a piece of paper stating how much they were committing to give. Regular collections were placed in a basket in the church during services. The contribution was in an envelope filled out with the person's name on it. The church kept a log and record of what each person gave. The church favored those that gave more. One of the biggest contributors was Martha England who donated ten to fifteen thousand dollars at a time. Another

Initials

church member, whose name I cannot recall, purchased a couple of buses for the school to use.

8.      Sometime in late 1982 or early 1983, I returned to Georgia with my family. My father had persuaded my mother to take him back. He promised to quit drinking. We remained in Georgia for about four or five months. We left because my father continued to drink, and we returned to Casa Grande. We snuck away while he was at work one day. At that time, my siblings and I returned to school at Harvest.

9.      As members of the congregation at Harvest, we were not permitted to associate with anyone who did not attend the church. Harvest was our whole world; we spent our days there, and then went home. The only recreational activities we were permitted were those put on by the church. For example, if I went to hang out with my neighbor buddy, and someone from the church found out, they reported to my mother that I was hanging out with "bad people." A "bad person" was anyone who did not subscribe to Tom King's way of thinking. Kids who did not attend our church and school were branded this way. They were called bad influences, and to spend time hanging out with them was to "tempt the Devil." We were told that they were ungodly and that we would become that way too if we spent our time with them. In this way, the church tried to control every aspect of our lives. It was not just limited to our behavior at the church and school, but any outside activities as well.

10.     I feel that I missed out on a lot as a child. I never watched "Mork and Mindy" or "Gilligan's Island." All television was forbidden. They called it the Devil's


Initials

box. We were only allowed to watch Christian movies, such as Ben Hur, and all other movies were also forbidden. I recall that I wanted to see Indiana Jones so bad, but I was not allowed. I was told that it was evil. We didn't watch or hear any news from the world outside, and I knew nothing of politics or world events. We were told that it was too much death and destruction. We were not permitted to eat sugar, and used honey for sweetener. We also were not permitted to eat white bread. I felt isolated and was cut off from how other children played and things they did. I lived in the projects and, though my mother tried, she couldn't always keep us away from all the neighbor kids. On the rare occasion that I was around kids not from the church, I remember hearing them talking about things, movies and television, and I couldn't participate in the conversation. I recall that my brother and I occasionally snuck off to the drive-in theatre. We cut a hole in the fence so we could watch movies that way. On those occasions, we told my mother that we were going to the park.

11.    I attended public schools until the sixth grade. After my family moved to Casa Grande I started attending 91st Psalm School. The church school was very different than the public schools. We were required to memorize and be able to recite fifteen verses from the King James Bible each month. The scripture assignment was given out at the beginning of the month and anytime during the month that a child was ready to recite, they could. If the end of the month came around and students still had not volunteered to recite the scripture assignment, they were called upon to do so. This was very difficult for my brother Michael. He is hearing impaired and as a result,


Initials

had poor pronunciation. Nevertheless, he was punished for not properly reciting the scripture assignment. Sometimes he lost recreation as punishment, and sometimes he was whooped.

12.     91st Psalm charged tuition for students to attend. In order to pay for the tuition for me and my brothers and sisters, I worked at the church and school until seven or eight in the evenings every night and on weekends to pay for our tuition. I did this for the entire six years I was there. Alejo Ochoa oversaw the work I did; for all intents and purposes, he was my boss. I was very dedicated to the church and school. The only sibling of mine who did not attend the school was my youngest brother, Manuel. We were all ousted from the church and school in 1985 or 1986, before Manuel entered school.

13.     As a result of working there and being around the school and church so much, I saw many things that went on both inside the classrooms, at the church, and after regular school and church hours. I never received actual payment in money for my work at the school and church. There was a written accounting that tracked how much I worked against the costs of my siblings to attend church and school. I know that we were charged for each Accelerated Christian Education ("ACE") booklet we used plus an amount for each semester that may have cost about $150 for each student.

14.     I think that the church and school were not so bad at the beginning when Calvin Lorts and his wife, Barb were there. Cal Lorts left 91st Psalm to take over


Initials

at a sister church, the 91st Psalm in Phoenix. His brother, Barry, was running the school up there before Cal left. After Cal went up to Phoenix to take over for Barry, Tom King rose to the position of head pastor and things went downhill. Initially, Cal traveled back and forth from Phoenix to Casa Grande and tried to remain at both schools. Tom King went behind his back and took over. Eventually, Cal didn't want to deal with it anymore, and he signed everything over to Tom. At that time, Tom changed the name to Harvest Family Church and the school became Harvest Christian Academy. The congregation dropped in number and the number of students at the school declined.

15.     Tom King's wife, Pat King, was a sweet lady who was devoted to Tom and right or wrong, she always had good things to say. She was jolly, played the piano and sang a lot. I felt sorry for her. Tom was hard on his two sons. One son, Shawn, who wound up dating Wendi, was run over in an automobile accident. The other, Brad, died in a plane crash. Their daughter, Amy, became a police officer. When Brad died, Tom King tried to raise him from the dead.

16.     Pat King was the head lady of the singing in the church and she played the piano during the church services. During the Sunday sermons by Tom, he liked to have attendees speak in tongues and then he interpreted what the person was saying. During these times, Pastor Tom would be preaching that the Lord is asking someone to speak and the piano would be going low in a real dramatic way. When a person


Initials

stood to speak, the piano stopped. When the person stopped speaking in tongues, the piano started up again. Pastor Tom then interpreted what they said as a message from God that he was able to decipher for the rest of us. I ran the recording booth during the services. I operated the lights so that they were dim during dramatic moments like when people came up for healings and I operated the microphones and tape decks to record the sermons.

17.     Pastor Tom also did healing by laying his hands on people. After preaching for a while, Tom would say that Jesus had healing power. I dimmed the lights and Tom asked that if anyone was sick, they should come up. When they did, Tom laid his hands on them and prayed. I never saw him make the blind see or the deaf hear. It was always something inside, not something visible that was healed. Both Tom and Calvin laid their hands on people to heal them. I saw people pass out. I thought they were faking it but Calvin really could make you believe anything. He was charismatic.

18.     There were special sermons given at the church about marriage and for couples. The sermons drew from the Old Testament and talked about how women were to be faithful to their husband and if they were not, they should be stoned because that was the greatest sin a woman could commit. The man is the boss and the woman is his backbone. If a woman is your wife then what the man says goes. It


Initials

seems to me that all of the worst punishment in the adult realm was reserved for the women. The women were also the butt of any jokes that were made.

19.     The Sunday service usually lasted about two or two-and-a-half hours. There were some years when there were more people in the church and for a while there were two Sunday services, one at 7:30 am and another at 10:00 am. After the sermons every day I went in and cleaned. I swept the floor and wiped down the benches and got the place ready for the next service.

20.     During the years that Cal was the pastor, the sermons were shorter and more exciting. Tom's sermons tended to be long and drawn out and boring. Tom was a negative person, he preached damnation, but Cal was more positive and optimistic. Cal could make you feel good.

21.     School was held in one large rectangular room. There were tables around the perimeter of the room with dividers or partitions between each student to the right and to the left so that we faced the wall and could not see the students to our right or to our left. With the partition on either side, it created individual cubicles for each student. There were adults, "monitors" who we called teachers and from whom we could request assistance. If we needed help, we placed a small American flag in a hole in the wall above our table so that it hung down for the "teacher" to see. The teacher would then come over and help us with whatever we needed. The monitors or teachers were members of the church who volunteered at the school. A few of the


Initials

school monitors were my neighbor, Connie Carlin; Sherry West; Joyce Casey; and Barbara Lorts, Cal Lorts' wife. The monitors had set schedules. Some of the monitors didn't work a normal job because their husbands supported them. Those individuals came in to volunteer "teach" five days a week. Others both worked and volunteered at the school, so they only came in two or three days a week. I recall that Connie Carlin and Sherry West came in two or three days a week, while Joyce Casey and Barbara Lorts came in five days a week.

22.    Because the monitors were not teachers, they were often not able to help with the questions I had. Barbara Lorts was pretty smart and she was able to help sometimes. The only man who I recall being a monitor was Johnny Casey for a period of time. He was a college graduate and so he was also able to help.

23.    The school was very strict. There were no professionally trained teachers with credentials and no formal group instruction except when we were instructed in the Bible, sewing, cooking, welding, physical education ("PE"), or photography. The remainder of our education was self-taught using ACE booklets. A typical school day started at seven thirty or eight in the morning. It varied over the years. We said the pledge of allegiance and then said our prayers for the day. After prayers, we worked at our cubicles for a couple of hours and then had a break for recess. After recess, we returned to our desks until lunch. There was no cafeteria and we brought lunch from home and ate outside. Unlike in the classroom, during recess and lunch we were able to hang out and talk with our schoolmates. After lunch, we


Initials

returned to our desks again. We had another break in the afternoon and then school concluded at three thirty.

24.     Alejo was the children's church pastor and youth pastor. He was the number one man behind the scenes. He was Tom King's right hand man, and also the janitor. Before Alejo, a man named Mikey Long was the children's church pastor for a time. He was a man who lived with Cal and Barbara when they were still in Casa Grande, before they moved to Phoenix.

25.     Formal Bible instruction took place about three times a week, but Bible teachings infiltrated nearly every subject we were taught in school. The Bible instruction took place in the children's church, which was separate from the adult church. Alejo or Johnny taught Bible instruction but usually it was Alejo. It was a lot like turning on a Christian channel on TV. He would start with scripture, read through it, and then give an explanation. There were different themes each week. One week, the class would be about anger, the next week, love, the next week, tithing, etc. It lasted approximately forty-five minutes to an hour. I recall that Alejo put most of his attention on the girls in the class. I remember feeling that he was more interested in them. I remember him licking his finger and touching their ears and acting real flirty. None of the guys liked Alejo; we all talked about it.

26.     During the time I attended school at Harvest, Mark and Nancy Keating came to work at the school. I believe they were actually real teachers. They were both college graduates and real athletic. Mark was into swimming and Nancy was also the

Page 11 of 25

Initials

track coach. They were real nice, but it seemed like they had problems with Tom King. That was the impression I got from being around the office all the time. They were real good with the students and they always acted real professional. I never had one bad experience with either one of them. I recall that at parent conferences they always spoke highly of me to my mother. When they arrived, we began having more activities at school. They started a track team, and some of us ran up to ten miles per day. I think they were still there when I left at the end of 1985.

27.     In the church system how I was raised, just about anything I did or wanted to do in the outside world was a sin so it was very difficult to cope. There were the standard kinds of sins, such as lying, stealing, and cheating. But there were other things that were normal that were also referred to as sins. Thinking negative thoughts was a sin. Gossip was a sin. Engaging in romantic relationships was a sin. Talking badly about people was a sin. I can still hear the words, "Sin is pleasure for a season but the end thereof is death." Upon reflection, it seemed that as long as Pastor Tom was happy, we were all going to heaven. But, if Tom was not happy for some reason or if he did not like you, anything you did was a sin.

28.     There are several main principles and guiding scriptures that were taught at the school and to which the school and church adhered. One that sticks out for me referred to us children, "Beat them when they are young and when they are old, they won't depart from it." Another was "Honor thy mother and thy father and


Initials

with long life will I satisfy thee." Corporal punishment was standard at Harvest. If there was one thing the adults enjoyed, it was beating the hell out of kids. That was the number one thing adults did at the school. Kids at school got whoopings for nearly everything; disobeying, not following orders, being unable or unwilling to memorize the scripture assignment, lying, cheating, and incomplete homework.

29.     Tom King encouraged our parents to spank us. He preached about it in sermons. I recall him saying, "Beat them while they're young and when they're old, they won't depart from it." When students were punished at the school, the monitor took them to an office and the beating was done in private. The students were beaten with paddles that had scriptures inscribed on them. When the kids were swatted, they bent over and touched the desk while they received the swats with the paddle. I think that it was pretty standard for a child to receive between three and five swats on their rear ends. I remember those paddles well and remember dusting them every day. After the kids were swatted, they returned to the main classroom. Everyone knew what happened. There were no opportunities to hide what had happened and we were not permitted to have any secrets. The kid came back in the classroom and you could see it on their face. Sometimes they were just red and embarrassed, sometimes they were crying.

30.     The church recommended that parents keep paddles in the home to hit their children with, and my mother ascribed to the church teachings that children


Initials

should be beaten. She used a paddle that I made out of a two-by-four. It was two feet long and was sanded down with scriptures written on it. When we were hit with it, we had to read both sides of the paddle that had scriptures about discipline and obeying. I never had a whooping until I was twelve years old after my mom began attending the 91st Psalm Church, and then I had one from her nearly every day until I was seventeen. I usually got about ten licks. I believe that my mother thought she was doing the right thing. She was brainwashed by the church's teachings, and she acknowledges that now. Every time I talk to her, she apologizes for what she put us through. I have to be careful not to bring up, because she cries and cries and feels so badly about it.

31.    I remember being in a welding class taught by Tom King. It was a class that we could take to earn extra credits. Tom owned some welding equipment and he taught us how to use it and how to operate heavy equipment. One day during class, I was sitting in the back of a pick up truck. Tom King and I exchanged words. I don't recall what we were arguing about, but I made him mad. He grabbed me out from the back of the pick-up truck, lifted me high above it and let me drop to the ground. He said, "There you go, how does that feel?" I hit the ground hard and it was gravel, so it scraped up my knees and the palms of my hands pretty bad. It caught me off guard and it hurt like hell. When I asked him why he did it, he responded, "You needed it."

32.    I recall another occasion when an adult at the school physically assaulted me. His name was Steve Justus. His wife, Cyndee Justus, was the sister of Patricia



Initials

King. Steve and Cyndee helped run the teen church, and we were on a teen camping trip. There was a kid who attended school at Harvest who was also on the trip. His name was Jordan and I didn't really like him. He wanted to trade watches with me, and I knew that his was watch was more expensive, so I agreed. Before we traded, however, Jordan asked me if my watch was waterproof. It said "water resistant" on it, so I told him it was. We held our watches under water to make sure, and after a couple minutes, they were both still working, so we traded. Later on in the day, the watch I gave to him quit working. He wanted his old watch back, and I told him, "Too bad, a deal's a deal." Steve heard us and he was angry. He called me a "Georgia-used-car salesman." He grabbed me and dragged me across the ground real hateful. I pushed him and he punched me and beat me up a little.

33.     It seemed like Tom King and the monitors at Harvest singled out certain kids for more frequent and harder beatings. Some kids really got it bad. Alejo was particularly abusive to the children and to my brother Michael. In addition to whooping the children during the school week, Alejo whooped the kids during Sunday school. I didn't get swatted at school too much. I think that I was such an asset to the church because I did so much work, that they kind of left me alone. Maybe they suspected that I wouldn't put up with it. My sister, Sherry, and my brother, Michael, were some of the hardest hit, both physically and mentally. They were whooped about three times a week.


Initials

34.     I'm not sure why my sister and brother were abused so frequently.  I
know they never really did their homework, and I think that was the catalyst for a lot
of the beatings.  They were also easy targets.  Michael was mostly deaf.  He had a very
difficult time memorizing and reciting the Bible versus and was punished heavily and
beaten hard because of his disability.  Sherry, bless her heart, was kind of an ugly little
girl.  I hate to say it, but she had big buckteeth and thin hair and she never really fit in
with the other students.

35.     The church destroyed Sherry.  They picked on her, drove her real hard.
When Sherry was about sixteen, she got a ride home from a churchgoer, and he raped
her.  My family never would tell me who the man was, because they were afraid what I
might do to him.  Later, Sherry turned to hard drugs to cope.  In addition to Sherry,
my brother Michael was also raped by a Christian man, and also later did drugs.

36.     Although Wendi Ochoa was younger than me, we were in the same
classroom together for years.  All of the students were together in one room for many
years and we all saw each other every day.  Sometime before I left the school, the
classroom was divided so that junior high and senior high-level students were in one
room and the other children in another room.  Wendi and I were always in the same
room together, and were around each other a lot.

37.     I was on the school and church grounds until late everyday working.
Wendi was also there late because she had to wait until her father left to get a ride
home.  We spent so much time there we practically lived there.  Wendi sometimes



Initials

helped clean up the church, but sometimes she just stayed there doing schoolwork or studying. She spent about 90% of her waking time at the church and school. While I don't recall Wendi getting beaten at the school, I remember her remarking about getting whoopings at home. I think that due to the fact that she lived with Alejo, most of her punishments were delivered after school, in her home.

38.      I always had good feelings about Wendi's mother, Donna. She was a really sweet, kind person; a pretty woman; and generally well-liked. Wendi's father, Alejo was a different story. I frequently saw him flirting with women. I saw him flirt with another church member, Connie Carlin, in the little kitchen area of the school. I remember seeing him lick his finger and touch her ear with it.

39.      Alejo acted very differently around his wife, Donna. I never saw him flirt with her the way he did with the other women or the young girls. Alejo and Donna's relationship appeared to be more professional than romantic.

40.      On numerous occasions I heard many different young girls complain about being alone with Alejo, and another man who was a teacher at the school, Johnny Casey. Girls did not like being alone with either one of them. As I understand it, Alejo and Johnny touched the girls in PE class. It was all under the guise of aiding them in stretching and things like that, but the children were under the impression that it was just an excuse to touch them. I remember specifically that Samantha Nichols talked about not liking being alone with Alejo or with Johnny. Alejo and Johnny spent a lot of time together. It creeped out the girls that Alejo licked his finger and then



Initials

touched their ears with it. I think that it was his way of being able to touch them somehow.

41.     I recall hearing that two members of the church, Connie and George Carlin, confronted Tom King about Alejo's behavior with one of their daughters, either Sara or Rachel. Connie and George confronted Alejo about it but Tom King took Alejo's side and stood up for him. Connie and George left the church and never came back.

42.     I also remember that Wendi told me that Alejo touched her in a sexual way. I was about fourteen or fifteen years old when Wendi told me this, so she was eleven or twelve. She was really upset and she was crying about it. I recall being under the impression that Alejo wanted to have sex with her. She told me things on several occasions that led me to believe that. Often, they were just little remarks. She said that her dad was disgusting. She said that her dad licked her neck. She said that her dad put his tongue on her and rubbed her upper leg. Other times, my impressions were from facial expressions that she made. She often screwed up her face in disgust when Alejo was nearby. I got the impression that she was afraid to be alone with him, that she was scared of what he might do. She was always real quiet when he was around, she didn't joke around like she normally did. She immediately changed when he walked in the room. I recall that she always crossed her legs and kept her dress pulled down as far as it would go. She sat there real quiet, and you could just feel the



Initials

tension. She never wanted to sit too close to him, and when she got in the car with him, I recall that she'd get in the back seat. She never sat next to him in the front. It seemed that no one had the guts to flat out tell on Alejo and what he was up to with her. It was hard being a kid in that situation because the adults had all the power.

43.     I recall hearing, long after I was gone from the school and church, that Alejo was no longer a part of the church because of his sexual behavior with girls. I heard that he abused a girl sexually. This does not surprise me.

44.     In addition to being a teacher at the school for a time, Johnny Casey worked as the back-up pastor. He did the sermons once in a while if Tom King wasn't around for some reason. He was always okay with me, but the girls didn't like him. He always tried to get the girls alone. I recall that a student, Samantha Nichols, told me that Johnny looked up her dress. He wasn't as obvious about touching or flirting with young girls as Alejo was, but the girls complained about him.

45.     I also witnessed what I consider a lot of hypocrisy. For example, when I worked at Kingdom Construction, the owners were two men who were members of the church. However, one of them drank alcohol, which was strictly prohibited by the church. When I cleaned out his truck, I found beer cans under his seat. When I approached the other owner about it, I was told to "keep it to yourself and pray for him."

46.     As I got older, I obtained a second job at Basha's grocery, in addition to the job working to pay tuition for myself and my siblings at the school and church. I

Page 19 of 25


Initials

worked an entire summer and part of the school year and saved up enough money to buy a motorcycle. I also worked odd jobs for church families and for Kingdom Construction. However, when Tom King saw the motorcycle, he told me that I had to sell it and give the money to my mother for food. I refused. I felt that it was none of his business what I did with my money, and I think that it was hypocritical for him to say something like that to me. He probably knew that if I sold my motorcycle and gave my mother the money, he'd end up with his ten percent.

47.     During the time I was at the church and school, we did outreach to people in impoverished communities in Arizona. I recall going out on buses and being dropped off in public housing projects. Areas were mapped out and we each went with two or three people in a group going door to door. We knocked on doors, telling people where we were from and about any specific event that was going on. We were given candy to take to the kids in order to try and convince them to go to church. We had books and fliers to pass out. At first I was a little uncomfortable doing it, but I got real good at it. I probably convinced hundreds of people to come to the church.

48.     We also did charity works. We went to Mexico to towns about an hour or so past the border with busloads of clothing and canned food. When we went, we spent the day with children handing out clothes.

49.     Another community event was building a Christmas Nativity Scene in town every year. The scene would be in place for twelve days and church members



Initials

played the parts of Jesus, Mary, Joseph and others. I helped build the nativity each year I was with the church.

50. My family was ousted from the church in about 1985, all of them except for me. My mother met someone and wanted to get married. The man she wanted to marry was not a member of the church. She asked Tom King's permission to marry him. He said no. Tom King did not like the man my mom wanted to marry because he was not a member of the church. My mom married him anyway. As a result, she was kicked out. At the time, I was living at the house of Barbara Lorts' mother. I was taking care of it for her. I wasn't kicked out of school when the rest of my family was because I wasn't living at home with them. I recall showing up at church and my family wasn't there. I went by my mother's house and asked her why she wasn't in church and she explained to me that she had been kicked out. I had every intention of leaving too, but my mom asked me to stay. She wanted me to finish school there because I was so close to graduating.

51. I was expelled from school at the age of seventeen or eighteen after Wendi brought the cover of a pornographic magazine to school and told me that it belonged to her father, Alejo Ochoa. She gave it to me and I put it in my locker, and then I told the pastor, Tom King, that I needed to talk to him about something important. My intention was to tell Tom King about the magazine. All the other kids were too afraid to say anything. I wanted Alejo to face the consequences for all the damage he was doing. I was angry about what I saw to be extreme hypocrisy. I was in


Initials

trouble for buying a motorcycle, and my mother got kicked out for getting married, but Alejo faced no consequences for his sexual behavior with children, for whooping on kids, and for looking at dirty magazines. Tom King called me into his office and asked me what I had to say. I told Tom King about the magazine, but Alejo was sitting right there in the office and he flatly denied it. Tom King said, "Are you sure you have the magazine? I'd like to see it." I said "Go to my locker, you'll find it." But when we went back to my locker to retrieve the magazine, it was gone. I still to this day have no idea what happened to it. I thought at the time that it was possible that Wendi took it out of my locker. She may have been afraid of what would happen if I showed it to Tom King. After it was discovered that the magazine was not in my locker, Tom and Alejo brought me back to the office. They looked so smug. I pointed my finger at Tom King, and I said to him, "I've always wanted to tell you this: Fuck you, Tom." I had intended on telling Tom King about Alejo's inappropriate behavior with Wendi, but I never got the opportunity. After I cussed at Tom, he told me he was going to call the cops. He started rattling off scriptures and he said that he was rebuking me in the name of Jesus and that he was turning me over to the devil. He said that I was an outcast and a liar and that I was evil just like my father. I tried to leave, but Tom King blocked one door and told Alejo to block the other. Tom King pinned me against the wall. I pulled my fist back to punch him and he said, "In the name of Jesus, you will not hit a man of God." I punched him in the chest as hard as I


Initials

could, and then I turned around and knocked Alejo down. I ran out the door and hopped on my motorcycle.

52.     After that incident, Tom King announced in a sermon that I was a demon and that no one was to talk to me. He told the congregation that they would perish in hell if they had anything to do with me.

53.     Shortly after we were ousted, my mother and siblings moved back to Georgia. I remained in Arizona and completed high school at another 91st Psalm School, the school in Phoenix that was run by Calvin Lorts, the former Pastor of 91st Psalm in Casa Grande. I stayed in Arizona because I was in love with a Christian girl from the school. Her name was Denise Miller. We dated for about two years. I stayed in the home of Calvin and Barbara Lorts and I attended Cal's church in Phoenix.

54.     Thinking back on my experience at 91st Psalm and Harvest, I realize that during the years I was growing up there, I was going through hell. The church made me think a certain way and it went so far it got to the point where it brainwashed me. In order to cope with all of the horrible things I went through at that church and school, I turned to drugs and alcohol, as I was becoming an adult. The teachings of the church had me convinced that I was a sinner and was going to hell; they crammed it down your throat day in and day out. I truly believed that I was going to hell. I turned to drugs to numb the pain and to forget about my impending fate in hell. I turned to drugs to break free. When I was eighteen, I went hog wild because I never

Page 23 of 25



Initials

had a chance to experience anything.  My whole life had been about what I could not

do, I never heard anything about what I *could* do.

55.     I remember that on my eighteenth birthday, I got stoned and drank

beer.  A year later, I was doing cocaine and a year and a half after that, I was using

methamphetamine.  Drugs were my way out.  Drugs were my way out of thinking that

if I did not put Jesus first that I was going to hell.

56.     The problems and issues that stemmed from my drug abuse probably

weren't any better than those I had from being part of the Harvest church and school,

but at least I wasn't depressed.  They were my release.

57.     My sister Sherry went down the same path I did after we left the school.

She started doing drugs, and spent time in prison.  She smoked crack and marijuana

and did cocaine.  I believe that she, like me, turned to drugs in an attempt to cope with

her problems.  She has been clean now for a year and a half.  My brother Michael also

got caught up in drugs.  He recently signed a ten-year plea deal for possession charges.

58.     In 2001, I shot my first wife in the ~~foot~~. *shoe* 1ˢᵗ  I came home and discovered a

man crawling out of the window.  Knowing my wife cheated on me caused me to

become enraged.  I became so enraged that I temporarily lost my mind.  At some

point, I blacked out, and though I don't remember what happened, I was told later

that I was quoting bible scriptures and that I was shooting a gun at my wife.  I told her

that she had committed the gravest of all sins.  I believe that the church environment



Initials

in which I was raised led to my losing my mind that way. At school, we had been taught that the punishment for adultery was death. We were taught about accounts of women being stoned to death for committing adultery.

59.     The life I lived there was so strange. Coming out of it was very hard. I remember watching television for five years trying to catch up on all that I missed. I think that overall it all started with good intentions and went bad somehow. It seems to me that Tom King destroyed so many lives with the way he did things and the way he got people to follow him and obey him. In the end he wound up with nothing, just a burnt down building. I have never even told my wife about the life I had there. I have four children and I never considered sending them to a Christian School of any kind. I do not want them in a church environment because I saw what could happen.

60.     Until now, no one has ever contacted me about Wendi or our experiences growing up together. If I had been asked to testify on Wendi's behalf to what I have said in the declaration, I would have done so.

I have read the forgoing declaration consisting of twenty-five (25) pages and sixty (60) paragraphs and it has been read to me. I declare under penalty of perjury under the laws of the State of Arizona and the United States of America that the foregoing is true and correct. Signed this 7 day of June 2010 in Pima County, Arizona.

Jasper Neace

Page 25 of 25

Initials

# EXHIBIT XXXXXXXX

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
E. Masis, Deputy
1/10/2014 5:12:35 PM
Filing ID 5648553

1  COPPERSMITH SCHERMER & BROCKELMAN PLC
2  2800 North Central Avenue
   Suite 1200
3  Phoenix, Arizona  85004
   (602) 224-0999
4  Scott M. Bennett, State Bar No. 022350

5  FOLEY & LARDNER LLP
   150 E. Gilman Street
6  Madison, WI 53703
   Telephone:   (608) 257-5035
7  Fax:   (608) 258-4258

8  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels Admitted *Pro Hac Vice*
9  Matthew R. Lynch Admitted *Pro Hac Vice*

10  *Attorneys for Petitioner Wendi Elizabeth Andriano*

11         IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

12              IN AND FOR THE COUNTY OF MARICOPA

13

14  State of Arizona,                          )
15                                             )
                        Respondent,            )   No. CR2000-096032-A
16                                             )
17      vs.                                    )   **JOINT WITNESS SCHEDULE AND**
                                               )   **EXHIBIT LIST**
18  Wendi Elizabeth Andriano,                  )
19                                             )
                        Petitioner.            )
20                                             )
   _____

21

22        Pursuant to the Court's order dated October 11, 2013, the parties submit the

23  following joint witness schedule and exhibit list.

24

25

26

27

28
   {00114096.1 }

**WITNESS SCHEDULE**

| PETITIONER'S WITNESSES | ANTICIPATED DATE(S) OF TESTIMONY |
|---|---|
| Dr. James Hopper | February 3 |
| Donna Ochoa | February 3-4 |
| Kyre Lorts | February 4 |
| Jeri Lyn Cunningham | February 4 |
| Jasper Neace | February 4 |
| Samantha Nichols | February 5 |
| Wendi Andriano | February 5 |
| Brandon Ochoa | February 5 |
| Alejo Ochoa | February 6 |
| Dr. Joette James | February 6 |
| Dr. George Woods | February 7 |
| Daniel Patterson | February 7, 10 |
| Scott MacLeod | February 10 |
| Cindy Schaider | February 10 |
| Keith Rohman | February 11 |
| David DeLozier | February 11 |
| Gary Lowenthal | February 12 |
| Larry Hammond | February 12 |

| STATE'S WITNESSES | ANTICIPATED DATE(S) OF TESTIMONY |
| --- | --- |
| Patrick Linderman | February 13 |
| Scott MacLeod | February 13 |
| Chris Hashisaki | February 13 |
| Rick Freeland | February 13 |
| Shawn King | February 13 |
| Dawna Harris | February 13 |
| Custodian of Records, State Bar of Arizona | February 13 |
| Dr. Kiran Amin | February 14 |
| Dr. Steven Pitt | February 14 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT LIST**

| PETITIONER'S EXHIBITS | DESCRIPTION | ADMISSIBILITY STIPULATED? |
|---|---|---|
| 1. | Petition Tab 1 – Expert Report of Larry Hammond | No. |
| 2. | Petition Tab 2 – Expert Report of Dr. George W. Woods | Yes. |
| 2.A. | Petition Tab 2.A. – Appendix A to Woods Report:  List of Documents Reviewed | Yes. |
| 2.B. | Petition Tab 2.B. – Appendix B to Woods Report:  Overview of the Biopsychosocial and Psychiatric History of Wendi Elizabeth Andriano and Her Family | Yes. |
| 2.C. | Petition Tab 2.C. – Appendix C to Woods Report:  Curriculum Vitae | Yes. |
| 2.D. | Petition Tab 2.D. – Appendix D to Woods Report:  Qualifications, Background and Experience | Yes. |
| 3. | Petition Tab 3 – Expert Report of James Hopper, Ph.D. (Executive Summary) | Yes. |
| 4. | Petition Tab 4 – Appendix to Expert Report of James Hopper, Ph.D. (Full Report) | Yes. |
| 4.A. | Petition Tab 4.A. – Exhibit A to Hopper Report:  Curriculum Vitae | Yes. |
| 4.B. | Petition Tab 4.B. – Exhibit B to Hopper Report:  List of Documents Reviewed | Yes. |
| 5. | Petition Tab 5 – Expert Report of Myla Young, Ph.D. | Yes. |
| 5.A. | Petition Tab 5.A. – Addendum to Expert Report of Myla Young | Yes. |
| 6. | Petition Tab 6 – Affidavit of Daniel Patterson | No. |
| 6. A. | Petition Tab 6.A. – Exhibit A to Patterson Affidavit:  Assessment by Dr. Jack Potts | Yes. |

| 6. B. | Petition Tab 6.B. – Exhibit B to Patterson Affidavit:  12/20/01 Email to Patrick Linderman | No. |
|---|---|---|
| 6. C. | Petition Tab 6.C. – Exhibit C to Patterson Affidavit:  Assessment by Dr. Richard Rosengard | Yes. |
| 6.D. | Petition Tab 6.D. – Exhibit D to Patterson Affidavit:  2/14/02 Email from Michelle Arvanitas | No. |
| 6.E. | Petition Tab 6.E. – Exhibit E to Patterson Affidavit:  Report of Dr. Michael Bayless | Yes. |
| 7. | Petition Tab 7 – Declaration of G. David DeLozier | No. |
| 7.A. | Petition Tab 7.A. – Exhibit A to DeLozier Declaration:  2/19/01 Letter from Certified Professional Counselor Kandy Rohde | No. |
| 7.B. | Petition Tab 7.B. – Exhibit B to DeLozier Declaration:  3/12/01 Letter from Certified Professional Counselor Kandy Rohde | No. |
| 7.C. | Petition Tab 7.C. – Exhibit C to DeLozier Declaration:  Notes from Certified Professional Counselor Kandy Rohde | No. |
| 7.F. | Petition Tab 7.F. – Exhibit F to DeLozier Declaration:  Trial Note from Client | No. |
| 7.G. | Petition Tab 7.G. – Exhibit G to DeLozier Declaration:  9/1/04 Letter from Dr. Gerald Perry and Dr. Pamela Drapeau | No. |
| 8. | Petition Tab 8 – Affidavit of Scott A. Mac Leod | No. |
| 9. | Petition Tab 9 - Declaration of Wendi Andriano | No. |
| 10. | Petition Tab 10 – Declaration of Constance Boys | No. |
| 11. | Petition Tab 11 – Declaration of George Carlin | No. |
| 12. | Petition Tab 12 – Declaration of Jeri Lynn Cunningham | No. |

| 13. | Petition Tab 13 – Declaration of Mark Keating | No. |
|---|---|---|
| 14. | Petition Tab 14 – Declaration of Nancy Keating | No. |
| 15. | Petition Tab 15 – Deposition Testimony of Shawn King | Yes. |
| 16. | Petition Tab 16 – Declaration of Barry Lorts | No. |
| 17. | Petition Tab 17 – Declaration of Kelsey Leon McGuffee, Jr. | No. |
| 18. | Petition Tab 18 – Declaration of Marjorie Micek | No. |
| 19. | Petition Tab 19 – Declaration of Jeffrey B. Miller | No. |
| 19.A. | Petition Tab 19. A. – Exhibit 1 to Miller Declaration:  10/10/00 Letter to Client | No. |
| 20. | Petition Tab 20 – Declaration of Sharon Murphy | No. |
| 21. | Petition Tab 21 – Declaration of Brenda Nagore | No. |
| 22. | Petition Tab 22 – Declaration of Frank Nagore | No. |
| 23. | Petition Tab 23 – Declaration of Jasper Neace | No. |
| 24. | Petition Tab 24 – Declaration of Alejo Ochoa | No. |
| 25. | Petition Tab 25 – Supplemental Declaration of Alejo Ochoa | No. |
| 26. | Petition Tab 26 – Declaration of Brandon Ochoa | No. |

| 27. | Petition Tab 27 – *filed under seal* | No. |
|---|---|---|
| 28. | Petition Tab 28 – *filed under seal* | No. |
| 29. | Petition Tab 29 – *filed under seal* | No. |
| 30. | Petition Tab 30 – Declaration of Deblen Oke | No. |
| 31. | Petition Tab 31 – Declaration of Gia Palicki | No. |
| 32. | Petition Tab 32 – Declaration of Shelby "Skip" Robertson | No. |
| 33. | Petition Tab 33 – Declaration of Stuart Wade Robertson | No. |
| 34. | Petition Tab 34 – Declaration of Cynthia Schaider | No. |
| 35. | Petition Tab 35 – Declaration of Stephen Schaider | No. |
| 36. | Petition Tab 36 – Declaration of John Shaddle | No. |
| 37. | Petition Tab 37 – Declaration of Christopher Weaver | No. |
| 38. | Petition Tab 38 – Declaration of Kimberly Wilson | No. |
| 39. | Petition Tab 39 – Declaration of Barbara Bauer | No. |
| 40. | Petition Tab 40 – Declaration of Martha Colvin | No. |
| 41. | Petition Tab 41 – Declaration of Linda Percy | No. |
| 42. | Petition Tab 42 – Declaration of Jacqueline Sacamano | No. |

| 43. | Petition Tab 43 – Authenticating Declaration of Matthew R. Lynch | No. |
|---|---|---|
| 44. | Petition Tab 44 – Notice of Defenses, Indicating (1) Intent to Raise Temporary Insanity Defense, and (2) Need for Expert Psychologist (filed 1/16/01) | Yes. |
| 45. | Petition Tab 45 – Counseling Session Notes from Certified Professional Counsel Kandy Rohde (January 2001 to April 2004) | Yes. |
| 46. | Petition Tab 46 – Counseling Session Notes from Casa Grande Valley Counseling Service (2/27/96 to 3/6/96) | Yes. |
| 47. | Petition Tab 44 – Notes from Estrella Jail and Durango Psychiatric Unit Medical Providers (Excerpts) (11/3/00 to 9/30/04) | Yes. |
| 48. | Petition Tab 48 – Special Needs Treatment Plan from Durango Psychiatric Unit Medical Providers | Yes. |
| 49. | Petition Tab 49 – Medication Records During Pre-Sentencing Incarceration (November 2000 to November 2004) | Yes. |
| 50. | Petition Tab 50 – Email from Donna Ochoa to Trial Counsel (12/4/01) | No. |
| 51. | Petition Tab 51 – Email from Donna Ochoa to Trial Counsel (9/30/02) | No. |
| 52. | Petition Tab 52 – Emails from Sharon Murphy to Trial Counsel (3/25/03 and 3/30/03) | No. |
| 53. | Petition Tab 53 – General Medical and Public Record Release Forms (obtained by Public Defender's Office in January 2002, March 2002, August | No. |

| | | | |
|---|---|---|---|
| | | 2002, April 2003, May 2003, November 2003, and April 2004) | |
| | 54. | Petition Tab 54 – Motion for Court Order to Assist Mitigation Investigation and Proposed Order, seeking "order directing state and local agencies to provide records regarding Ms. Andriano to the defense" (filed 11/19/04) | Yes. |
| | 55. | Petition Tab 55 – Article, "Sexual Abuse as Mitigation" (printed 1/17/03) | No. |
| | 56. | Petition Tab 56 – Email from Donna Ochoa to Trial Counsel (2/12/01) | No. |
| | 57. | Petition Tab 57 – Email from Donna Ochoa to Trial Counsel (2/26/03) | No. |
| | 58. | Petition Tab 58 – Transcribed Interview and Voice Message of Chris Weaver by Michelle Arvanitas (1/30/04) | No. |
| | 59. | Petition Tab 59 – Emails Regarding Interview of Chris Weaver (1/30/04 and 2/02/04) | No. |
| | 60. | Petition Tab 60 – Invoice from Goldman & Kaplan, Ltd. to Joseph Andriano "In Reference To: Estate Planning" (10/3/00) | No. |
| | 61. | Petition Tab 61 – Letter from G. David DeLozier to Alejo and Donna Ochoa (12/14/00) | No. |
| | 62. | Petition Tab 62 – Letter from Leon Thikoll to Bethanne Klopp-Bryant (11/29/00) | No. |
| | 63. | Petition Tab 63 – Emails Between G. David DeLozier and the Public | No. |

| | | |
|---|---|---|
| | Defender's Office (8/2/02 to 8/5/02) | |
| 64. | Petition Tab 64 – Email Regarding G. David DeLozier Not Receiving Files (10/23/03) | No. |
| 65. | Petition Tab 65 – Report of Autopsy (11/28/00) and Amendment (1/5/01) | Yes. |
| 65.A. | Petition Tab 65.A. Phoenix Fire Department Incident History Printout for 10/8/00 | Yes. |
| 66. | Petition Tab 66 – Police Photographs of Defendant's Pre-Arrest Injuries (10/8/00) | No. |
| 67. | Petition Tab 67 – Authenticating Declaration of Kristen Powers | No. |
| 68. | Petition Tab 68 – Summary Chart and Earnings of Alejo and Donna Ochoa, 1975 to 1995 | No. |
| 68.A. | Petition Tab 68.A.- Social Security Earnings Statements of Alejo Ochoa | No. |
| 68.B. | Petition Tab 68.B. – Social Security Earnings Statements of Donna Ochoa | No. |
| 69. | Petition Tab 69 – Summary Chart and Earnings Statements of Joe and Wendi Andriano, 1983 to 2000 | No. |
| 69.A. | Petition Tab 69.A. – Social Security Earnings Statements of Joe Andriano | No. |
| 69.B. | Petition Tab 69.B. – Social Security Earnings Statements of Wendi Andriano | No. |
| 70. | Petition Tab 70 – Inmate Record Summary for Shelby Robertson | No. |
| 71. | Petition Tab 71 – Inmate Record Summary for Tommy Robertson | No. |
| 72. | Petition Tab 72 – Photograph of Wendi Andriano by Alejo Ochoa | No. |

| 73. | Petition Tab 73 – Proof Sheet of Photographs of Wendi Andriano by Alejo Ochoa | No. |
|---|---|---|
| 74. | Petition Tab 74 – Proof Sheet of Photographs of Wendi Andriano and Others by Alejo Ochoa | No. |
| 75. | Petition Tab 75 – Card Sent to Wendi Andriano from Alejo Ochoa | No. |
| 76. | Petition Tab 76 – American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (February 2003) | No. |
| 77. | Petition Tab 77 – Mandate from Court of Appeals to Attorney DeLozier in *In Re the Adoption of Nicholas A. and Ashlee A.* (08/19/04) | No. |
| 78. | Expert Report of Gary Lowenthal | No. |
| 79. | Lowenthal Report Appx. 1 – Curriculum Vitae, Gary T. Lowenthal. | No. |
| 80. | Lowenthal Report Appx. 2 – Guardianship agreement, 11/00 | No. |
| 81. | Lowenthal Report Appx. 3 – Minute entry, 11/15/00 | No. |
| 82. | Lowenthal Report Appx. 4 – DeLozier invoice to Ochoas, p. 1, 2/7/01 | No. |
| 83. | Lowenthal Report Appx. 5 – Cover letter and fee agreement, 12/14/01 | No. |
| 84. | Lowenthal Report Appx. 7 – Stipulation for Substitution of Counsel, 6/12/01 | No. |
| 85. | Lowenthal Report Appx. 8 – Letters recommending Donna and Alejo | No. |

| | | |
|---|---|---|
| | Ochoa, 7/01 - 8/01 | |
| 86. | Lowenthal Report Appx. 9 – Correspondence between Donna Ochoa and David DeLozier, 7/01 | No. |
| 87. | Lowenthal Report Appx. 10 – Pinal County Superior Court Minute Entry, 12/18/01 | No. |
| 88. | Lowenthal Report Appx. 11 – Notice of Change of Judge, 1/2/02 | No. |
| 89. | Lowenthal Report Appx. 12 – Correspondence, DeLozier to Jakubczyk, 1/21/02, 2/7/02, 3/6/02 | No. |
| 90. | Lowenthal Report Appx. 13 – Correspondence, Jakubczyk to DeLozier, 4/1/02 | No. |
| 91. | Lowenthal Report Appx. 14 – Correspondence, DeLozier's office to Jakubczyk, 3/20/02 | No. |
| 92. | Lowenthal Report Appx. 15 – Motion to Compel Production of Medical Records, 3/12/02 | No. |
| 93. | Lowenthal Report Appx. 16 – Subpoena, 4/16/02 | No. |
| 94. | Lowenthal Report Appx. 17 – Investigator's cover letter and excerpts from investigative report, 5/8/02 | No. |
| 95. | Lowenthal Report Appx. 18 – Jeanea Lambeth letter to Jakubczyk, 3/15/02 | No. |
| 96. | Lowenthal Report Appx. 19 – Donna Ochoa letter to Dr. Yee, 3/28/02 | No. |
| 97. | Lowenthal Report Appx. 20 – Brian Yee letter to Superior Court, 3/13/02 | No. |

| 98. | Lowenthal Report Appx. 21 – Linda Gray letter to Superior Court, 4/17/02 | No. |
| 99. | Lowenthal Report Appx. 22 – Maricopa County Superior Court Minute Entry, 8/1/02 | No. |
| 100 | Lowenthal Report Appx. 23 – Motion for Sanctions, 7/15/02 | No. |
| 101. | Lowenthal Report Appx. 24 – Pinal County Superior Court Minute Entry, 7/23/02 | No. |
| 102 | Lowenthal Report Appx. 25 – Maricopa County Superior Court Order, 7/31/02 | No. |
| 103 | Lowenthal Report Appx. 26 – Arizona Supreme Court, Summary of Judgment, 3/25/04 | No. |
| 104 | Lowenthal Report Appx. 27 – Pinal County Superior Court Minute Entry, 10/15/02 | No. |
| 105 | Lowenthal Report Appx. 28 – Maricopa County Superior Court Minute Entry, 12/20/02 | No. |
| 106. | Lowenthal Report Appx. 29 – Maricopa County Superior Court Minute Entry, 9/8/03 | No. |
| 107. | Lowenthal Report Appx. 30 – Exchange of emails, DeLozier and Donna Ochoa, 3/3/03 | No. |
| 108. | Lowenthal Report Appx. 31 – Exchange of emails, DeLozier and Donna Ochoa, 4/14/03 | No. |
| 109. | Lowenthal Report Appx. 32 – DeLozier's blind copy of email from Donna Ochoa to Budge, 5/17/03 | No. |

| 110. | Lowenthal Report Appx. 33 – Rich Robertson investigation billing to DeLozier, 5/03 and 10/03 | No. |
|------|------|------|
| 111. | Lowenthal Report Appx. 34 – Excerpts, DeLozier's Court of Appeals Opening Brief, 5/27/03 | No. |
| 112. | Lowenthal Report Appx. 36 – Budge Motion to Reinstate Appeal, 2/25/04 | No. |
| 113. | Lowenthal Report Appx. 38 – Ochoa letter to Superior Court, 3/21/05 | No. |
| 114. | Lowenthal Report Appx. 40 – Notice of pro se representation, 11/15/04 | No. |
| 115. | Lowenthal Report Appx. 42 – Handwritten notes faxed to DeLozier, 3/7/05 | No. |
| 116. | Lowenthal Report Appx. 46 – DeLozier billing record for custody representation, July, 2002 | No. |
| 117. | Lowenthal Report Appx. 44 – DeLozier billing record, October 2003 | No. |
| 118. | DeLozier billing record, November 3, 2003 | No. |
| 119. | DeLozier billing record for custody representation, December 1, 2003 | No. |
| 120. | DeLozier billing record for criminal representation, December 1, 2003 | No. |
| 121. | DeLozier billing record for custody representation, December 31, 2003 | No. |
| 122. | Lowenthal Report Appx. 45 – DeLozier billing record for criminal representation, December 31, 2003 | No. |
| 123. | DeLozier billing record, January 2004 | No. |

| 124. | Lowenthal Report Appx. 37 – DeLozier billing record, February 2004 | No. |
|---|---|---|
| 125. | DeLozier billing record, March 2004 | No. |
| 126. | Lowenthal Report Appx. 39 – DeLozier billing record, April 2004 | No. |
| 127. | DeLozier billing record, May 2004 | No. |
| 128. | DeLozier billing record, June 2004 | No. |
| 129. | DeLozier billing record, September 2004 | No. |
| 130. | Lowenthal Report Appx. 41 – DeLozier billing record, December 2004 | No. |
| 131. | State Petition Response Ex. E, Pages E39-E67, E110-E136 – 2003 Appellate Briefing from Custody Proceeding | Yes. |
| 132. | March 18, 2003 Letter from Ochoas to Arizona Family Adoption Services | No. |
| 133. | Stipulation filed 12/21/04 in *John Doe XXIII v. The Roman Catholic Church of Diocese of Tucson* | No. |
| 134. | Motion for Reconsideration filed 11/28/06 in *John Doe XXIII v. The Roman Catholic Church of Diocese of Tucson* | No. |
| 135. | Keith Rohman, Curriculum Vitae | No. |
| 136. | 11/29/04 email from S. MacLeod to D. Patterson | No. |
| 137. | 12/06/04 emails from S. MacLeod to D. Patterson and D. DeLozier | No. |

| 138. | Demonstrative Exhibit from Penalty Phase – Powerpoint presentation slides | No. |
|---|---|---|
| 139. | March 4, 2003 *East Valley Tribune* article, "Justice System Can't Cope With Backlog of Death Penalty Cases" | No. |
| 140. | Photograph of W. Andriano and S. Robertson, circa 1970 | No. |
| 141. | Photograph of W. Andriano, circa 1970 | No. |
| 142. | Photograph of W. Andriano and S. Robertson, circa 1972 | No. |
| 143. | Photograph of W. Andriano, circa 1972 or 1973 | No. |
| 144. | Photograph of W. Andriano, D. Ochoa, and S. Robertson, circa 1973 | No. |
| 145. | Photograph of W. Andriano and S. Robertson, circa 1973 or 1974 | No. |
| 146. | Photograph of W. Andriano and A. Worsham, circa 1975 | No. |
| 147. | Photograph of W. Andriano with Ochoas and Fishers of Men, 1979 | No. |
| 148. | Photograph of W. Andriano and A. Ochoa, circa fall 1979 | No. |
| 149. | Photograph of W. Andriano and A. Ochoa, circa winter 1979 | No. |
| 150. | Photograph of W. Andriano and A. Ochoa, circa 1981 | No. |
| 151. | Photograph of Robertson siblings, circa 1987 | No. |
| 152. | 12/08/92 arrest report for S. Robertson and T. Robertson | No. |

| 153. | Photograph of W. Andriano and Ochoas, circa 1978 | No. |
|---|---|---|
| 154. | Photograph of W. Andriano and A. Ochoa, circa 1978 or 1979 | No. |
| 155. | Photograph of W. Andriano, circa 1980 | No. |
| 156. | Photograph of W. Andriano, circa 1980 or 1981 | No. |
| 157. | Photograph of W. Andriano and Ochoas, circa 1981 | No. |
| 158. | Photograph of W. Andriano and A. Ochoa, circa 1986 | No. |
| 159. | Photograph of W. Andriano, L. Bell, and A. Ochoa, circa late 1980s | No. |
| 160. | Photograph of K. Lorts, circa 1979 or 1980 | No. |
| 161. | Photograph of J. Casey, circa 1980 | No. |
| 162. | Photograph of J. Neace, circa 1980 or 1981 | No. |
| 163. | Photograph of B. Ochoa, circa 1991 | No. |
| 164. | Photograph of B. Ochoa, circa 1993 | No. |
| 165. | Audio Recording, sermon of Pastor T. King, Harvest Family Church (11/16/1988) | No. |
| 166. | Dr. Joette James, Curriculum Vitae | Yes. |
| 167. | Report of Dr. Joette James (tentative) | Unknown (report not yet disclosed) |

| STATE'S EXHIBITS | DESCRIPTION | ADMISSIBILITY STIPULATED? |
|---|---|---|
| 168 | Report of Dr. Steven Pitt (including exhibits) | No. |
| 169 | Report of Dr. Kiran Amin | No. |
| 170 | Phoenix Police Departmental Report (Bates #9256-9715) | No. |
| 171 | Records from H. Kandy Rohde | Yes. |
| 172 | Records from Maricopa County Jail (#1173–11799) | No. |
| 173 | Interview transcript of Daniel Patterson | No. |
| 174 | Interview transcript of G. David DeLozier | No. |
| 175 | Records from Mesa Police Department and court documents regarding Cynthia Edwards investigation (Bates # 4366-4390) | No. |
| 176 | Wendi Andriano's employment records from Casa Grande Regional Medical Center (Bates # 4221-4339) | No. |
| 177 | Wendi Andriano's Employment Application for First West Properties Corporation (Released Trial Exhibit 487/Bates #4401–02) | No. |
| 178 | Records relating to Wendi Andriano's theft from Courtyard Apartments (Bates # 4341-4364) | No. |
| 179 | DVDs of Wendi Andriano's interview with Detectives David Lucero and Sally Dillian | Yes. |
| 180 | Transcript of Wendi Andriano's interview with Detectives David Lucero and Sally Dillian (Bates #11500-11702) | Yes. |
| 181 | Medical Records from Arizona Department of Corrections (#11952–12250) | No. |
| 182 | Cassette tape of Wendi Andriano's Telephone Call with CIGI insurance company | No. |

| 183 | Report of Dr. Sharon Murphy, dated September 22, 2003 | Yes. |
|---|---|---|
| 184 | Medical records relating to Wendi Andriano's suicide attempt (Bates 9722-9745) | Yes. |
| 185 | Arizona Department of Corrections Medical Record Excerpt (Bates # 12152) | No. |
| 186 | DVD of forensic interview of Wendi Andriano by Drs. Steven Pitt and Kiran Amin | No. |
| 187 | Maricopa County Jail Disciplinary Report (Defense Bates # PCRDIS-PCR001722) | No. |
| 188 | Maricopa County Jail Disciplinary Report (Defense Bates # P001723–P001724) | No. |
| 189 | Arizona Department of Corrections inmate letter (Bates #11386) | No. |
| 190 | Arizona Department of Corrections inmate letter (Bates # 11377) | No. |
| 191 | Arizona Department of Corrections Disciplinary Report (Bates # 11365) | No. |
| 192 | Arizona Department of Corrections Disciplinary Report (Bates #11360) | No. |
| 193 | Arizona Department of Corrections mental health progress note dated November 23, 2011 (Bates # 12221) | No. |
| 194 | Arizona Department of Corrections mental health progress note dated December 12, 2011 (Bates # 12219) | No. |
| 195 | Wendi Andriano's records from Casa Grande Valley Counseling Service, Inc. (Trial Exhibit 544/Bates # 4212-4214) | Yes. |
| 196 | Notes from Maricopa County Jail (Bates # 4216-4219) | No. |
| 197 | Maricopa County Jail disciplinary report (Trial Exhibit 548/Bates # 4392–4393) | No. |
| 198 | Statement of financial status (Trial Exhibit 472/Bates #4396–98) | No. |

| 199 | Trial testimony of Chris Hashisaki September 8 and 9, 2004) | Yes. |
|---|---|---|
| 200 | Trial testimony of Rick Freeland | Yes. |
| 201 | Trial testimony of Dawna Harris (December 14, 2004) | Yes. |
| 202 | Arizona Department of Corrections Inmate Master File (Bates # 11329-11484) | No. |

The parties reserve the right to amend this list following witness interviews, or if additional relevant information arises.

RESPECTFULLY SUBMITTED January 10, 2014.

OFFICE OF THE ATTORNEY GENERAL

By: */s/ Lacey Stover Gard* (with permission)
    Lacey Stover Gard
    400 West Congress, Suite S-315
    Tucson, Arizona 85701-1367

    Gregory M. Hazard
    1275 West Washington Street
    Phoenix, AZ 85007-2926

    *Attorneys for the State of Arizona*

COPPERSMITH SCHERMER & BROCKELMAN PLC

By: */s/ Scott M. Bennett*
    Scott M. Bennett
    2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004

FOLEY & LARDNER LLP
    Allen A. Arntsen
    Stephan J. Nickels
    Matthew R. Lynch
    150 East Gilman Street
    Madison, Wisconsin 53703

    *Attorneys for Petitioner*

ORIGINAL e-filed January 10, 2014,
with the Clerk of the Maricopa County Superior Court

COPY mailed January 10, 2014, to:

Judge Brian Ishikawa
Maricopa County Superior Court
Southeast Court
1810 S. Lewis Street
Mesa, Arizona  85210

Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tucson, AZ 85701-1367
*Attorney for the State of Arizona*

Gregory Hazard
Office of the Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
*Attorney for the State of Arizona*


*/s/ Carol Keesee*

# EXHIBIT YYYYYYYY

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
1/13/2014 3:22:46 PM
Filing ID 5650746

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

GREGORY HAZARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, ARIZONA 85007–2997
TELEPHONE: (602) 542–4686
gregory.hazard@azag.gov
cadocket@azag.gov
(STATE BAR NUMBER 023258)
ATTORNEYS FOR PLAINTIFF

# ARIZONA SUPERIOR COURT
# COUNTY OF MARICOPA

STATE OF ARIZONA,

                    Plaintiff,

          -VS-

WENDI ANDRIANO,

                    Defendant.

CR–2000–096032

**NOTICE OF APPEARANCE**

The Hon. Brian Ishikawa

        Plaintiffs hereby notice the appearance of GREGORY HAZARD, Assistant Attorney General, as Plaintiff's counsel of record for these proceedings. Please send all orders and other correspondence to undersigned counsel at the address indicated above.

        RESPECTFULLY SUBMITTED this 13th day of January, 2014.

                              Thomas C. Horne
                              Attorney General

                              Jeffrey A. Zick
                              Chief Counsel

                              /s/ Gregory Hazard
                              Assistant Attorney General
                              Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2014, I electronically filed the foregoing with the Clerk of the Maricopa County Superior Court by using the Court's eFiling Online system.

Copies of the foregoing were deposited for mailing this date to:

SCOTT M. BENNETT
Coppersmith Schermer & Brockelman, PLC
2800 N. Central Ave., Ste. 1200
Phoenix, Arizona  85004

ALLEN ARNTESEN
Foley & Lardner, LLP
150 E. Gilman Street
Madison, Wisconsin 53703

Attorneys for Defendant

/s/ Liz Gallagher
Legal Secretary
Criminal Appeals/
Capital Litigation Sections
1275 West Washington
Phoenix, Arizona  85007–2997
Telephone: (602) 542–4686

3612047

2

# EXHIBIT ZZZZZZZZ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
01/21/2014 8:00 AM

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CR 2000-096032                                      01/16/2014


                                            CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                       L. Mooney
                                                   Deputy



STATE OF ARIZONA                         GREGORY MICHAEL HAZARD
                                         JUAN M MARTINEZ
                                         JAMES RANDALL JUE
                                         LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)             SCOTT M BENNETT
                                         ALLEN A ARNTSEN
                                         JODI FOX
                                         MATTHEW R LYNCH
                                         STEPHAN J NICKELS

                                         AZ DOC MAIL CODE 481


### ORDER SECURING ATTENDANCE OF PRISONER



       IT IS ORDERED that the Arizona Department of Corrections, release to the custody of
the Maricopa County Sheriff's Office, or any county sheriff's office within the state of Arizona,
Wendi Elizabeth Andriano, DOC# 191593, date of birth: 08/06/1970, for purposes of
transportation for hearings on or before 01/29/2014 through 02/14/2014 before Judge Brian
Ishikawa.

       IT IS FURTHER ORDERED upon conclusion of said hearings the Maricopa County
Sheriff's Office, or any county sheriff's office within the state of Arizona, shall return the
prisoner to the custody of the Arizona Department of Corrections.

3 certified copies delivered to MCSO-SIMS/MCSO-IN STATE

# EXHIBIT AAAAAAAA

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
01/21/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                         01/16/2014


                                              CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                        L. Mooney
                                                     Deputy



STATE OF ARIZONA                              GREGORY MICHAEL HAZARD
                                              JUAN M MARTINEZ
                                              JAMES RANDALL JUE
                                              LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)                  SCOTT M BENNETT
                                              ALLEN A ARNTSEN
                                              JODI FOX
                                              MATTHEW R LYNCH
                                              STEPHAN J NICKELS

                                              AZ DOC MAIL CODE 481


**ORDER SECURING ATTENDANCE OF PRISONER**



        IT IS ORDERED that the Arizona Department of Corrections, release to the custody of the Maricopa County Sheriff's Office, or any county sheriff's office within the state of Arizona, Jasper Neace, DOC# 169831, date of birth: 02/10/1967, for purposes of transportation for hearing on 02/04/2014 through 02/05/2014 before Judge Brian Ishikawa.

        IT IS FURTHER ORDERED upon conclusion of said hearing the Maricopa County Sheriff's Office, or any county sheriff's office within the state of Arizona, shall return the prisoner to the custody of the Arizona Department of Corrections.

3 certified copies delivered to MCSO-SIMS/MCSO-IN STATE

# EXHIBIT BBBBBBBB

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
01/21/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    01/16/2014


CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                L. Mooney
Deputy


STATE OF ARIZONA                    GREGORY MICHAEL HAZARD
JUAN M MARTINEZ
JAMES RANDALL JUE
LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)        SCOTT M BENNETT
ALLEN A ARNTSEN
JODI FOX
MATTHEW R LYNCH
STEPHAN J NICKELS


**STATUS CONFERENCE**


LET THE RECORD REFLECT that court and counsel hold a conference in chambers

11:31 a.m.

Courtroom:  SEJ 09

| | |
|---|---|
| State's Attorney: | Gregory Hazard, Juan Martinez |
| Defendant's Attorney: | Scott Bennett, Allen Arntsen, Krista Sterken |
| MCSO Attorney: | James Randall Jue |
| Defendant: | Not Present |
| Representative from Victim's Family: | Jana Adriano Clayton – Appearing Telephonically |
| Court Reporter: | Kim Hannan |

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          01/16/2014

A record of the proceedings is made by audio and/or videotape in lieu of a court reporter.

Upon stipulation made between Court and counsel,

IT IS ORDERED that all the dates of the Evidentiary Hearing are to begin at 9:30 a.m. each day instead of 8:30 a.m. beginning February 3, 2014 through February 14, 2014.

Discussion was held in chambers and an agreement was made regarding the Defendant's transportation to the Maricopa County Jail from the Department of Corrections before or on January 29, 2014.

IT IS ORDERED that the Defendant, Wendi Andriano, DOC #191593, be transported to the Maricopa County Jail from the Department of Corrections before or on January 29, 2014 as stated in another minute entry entitled, Order Securing Attendance of Prisoner.

LET THE RECORD REFLECT that Defense counsel and the Maricopa County Sheriff's Office are in an agreement that the jail shall provide certain toiletries for the Defendant upon her arrival to the Maricopa County Jail.  A schedule is still being discussed regarding the meals for the Defendant.  If an agreement can not be made, counsels are directed to contact the Court and a Status Conference shall be scheduled to discuss the issues.

Discussion was held regarding the transportation of a witness, Jasper Neace in chambers. With no objections from counsel,

IT IS ORDERED that inmate, Jasper Neace, DOC #169831, be transported to the Maricopa County Jail from the Department of Corrections on February 4, 2014 through February 5, 2014 as stated in another minute entry entitled, Order Securing Attendance of Prisoner.

Upon agreement of counsel, the Defense shall provide a report from Dr. James no later than January 23, 2014.

11:37 a.m.  Matter concludes.

# EXHIBIT CCCCCCCCC

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
1/21/2014 4:28:44 PM
Filing ID 5665217

1
2
3
4
5
6

WILLIAM G. MONTGOMERY
MARICOPA COUNTY ATTORNEY
By:     J. RANDALL JUE (014816)
          Deputy County Attorney
CIVIL SERVICES DIVISION
222 North Central Avenue, Suite 1100
Phoenix, Arizona  85004
Firm No. 00032000
Telephone No. (602) 506-8541
Facsimile No. (602) 506-8567
juej@mcao.maricopa.gov
ca-civilmailbox@mcao.maricopa.gov

7

Attorneys for Sheriff Arpaio

8

9

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

10

11

12

13

14

15

16

| STATE OF ARIZONA, | No: CR2000-096032-A |
| | |
| Respondent, | **SHERIFF ARPAIO'S SUPPLEMENTAL RESPONSE TO WENDI ANDRIANO'S MOTION REGARDING TRANSPORTATION AND MEALS DURING HEARING** |
| v. | |
| WENDI ELIZABETH ANDRIANO, | |
| Petitioner. | (Assigned to the Honorable Brian Ishikawa) |

17

18

19

20

21

22

23

    Sheriff Arpaio, through undersigned counsel, hereby submits this supplemental response to Petitioner's Motion Regarding Transportation And Meals During Hearing ("Motion for T&M") based on Petitioner's counsel renewal of this motion pursuant to a letter dated January 21, 2014, to Judge Brian Ishikawa.  Given that Petitioner is not claiming that she will suffer any violations of her constitutional rights, she is not legally entitled to any relief.  Nevertheless, Sheriff Arpaio is willing to accommodate Petitioner to a certain extent as discussed below.

24

25

26

27

28

    Sheriff Arpaio agrees to the following **ACCOMODATIONS**: (1) transport Petitioner from Perryville to the assigned jail facility on or before January 29, 2014 (five days prior to the start of her scheduled two-week evidentiary hearing); (2) transport Petitioner to the South Court Tower around 6 a.m.; (3) provide her with a meal at the South Court Tower prior to being transported to the Southeast Court facility; (4) provide

1  her with an additional sack meal at the Southeast Court facility; and (5) provide her with

2  enough space to lie down in the holding cell at the Southeast Court facility.

3      As to the other requests, because they pose unacceptable safety and security risks,

4  Sheriff Arpaio objects to (1) providing a blanket and pillow to Petitioner when she is in

5  the holding cell of the Southeast Court Facility and objects to (2) permitting her

6  attorneys to provide her with food and drink during breaks in the hearing.

7  **I.    APPLICABLE LAW**:

8      The sheriff alone has a statutory duty to "[t]ake charge of and keep the county jail,

9  including a county jail under the jurisdiction of a county jail district, and the prisoners in

10  the county jail."  A.R.S. § 11-441.5; *accord* A.R.S. § 31-101 ("The common jails in the

11  several counties and county jails under the jurisdiction of county jail districts shall be

12  kept by the sheriffs of the counties in which they are respectively located.").  Absent any

13  constitutional violations, the judiciary has no authority to usurp the functions of the

14  executive branch. *Judd v. Bollman*, 166 Ariz. 417, 419, 803 P.2d 138, 140 (Ariz. App.

15  1990).  Even in the exceptional case where constitutional violations exist, the courts have

16  limited authority to interfere with a sheriff's duties to maintain and operate the county

17  jails.  *Id*.  Any such remedies for constitutional violations shall be narrowly fashioned.

18  *Wilson v. Superior Court*, 194 Cal.App.3d 1259, 1269, 240 Cal.Rptr. 131, 137

19  (App.1987)  While the Court has the authority to order Sheriff Arpaio to transport a

20  defendant in matters that relate to a defendant's case, it cannot dictate specifics of the

21  transport, including the timing, unless a constitutional violation is present.  *Judd,* 166

22  Ariz. at 410, 803 P.2d at 140; *see also State ex rel. Ariz. Dept. of Corrections v. Kiger*,

23  224 Ariz. 252, 229 P.3d 264 (Ariz. App. 2010).

24      As an example of when judicial intervention may be appropriate, the courts have

25  the inherent authority and obligation to provide relief to defendants from jail regulations

26  that significantly interfere with or unreasonably burden the exercise of their Sixth

27  Amendment right to access to counsel. *See*, *e.g.*, *Cobb v. Aytch*, 643 F.2d 946, 957 (3rd

28  Cir.1981) (granting injunctive relief in class action enjoining prison transfers that

2

"significantly interfered" with pretrial detainees' access to counsel"); *see also Wolfish v. Levi*, 573 F.2d 118, 133 (2nd Cir.1978) (granting injunctive relief in class action in which prison regulations restricting pretrial detainees' contact with their attorneys were found unconstitutional because they "unreasonably burdened the inmate's opportunity to consult with his attorney and to prepare his defense"), vacated in part on other grounds by 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

With regard to food, the courts have concluded, "the Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir.1993) (citation omitted).   Only those conditions of confinement that deny a prisoner "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id*. (quoting *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).   Although the Ninth Circuit has provided no guidance on the quantity of prisoner food necessary to pass constitutional muster, other courts have established guidelines. *See, e.g., Green v. Ferrell*, 801 F.2d 765, 770–71 (5th Cir.1986) (finding two meals a day sufficient if nutritionally and calorically adequate); *see also Sostre v. McGinnis*, 442 F.2d 178, 186, 193–94 (2d Cir.1971) (finding diets of 2,800 to 3,300 calories per day constitutionally adequate), overruled on other grounds in Davidson v. Scully, 114 F.3d 12 (2d Cir.1997); *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir.1982) (finding one meal a day for 15 days, where the meal contained 2,000 to 2,500 calories and was sufficient to maintain health, constitutionally adequate).

## II.   ASIDE FROM THE ACCOMODATIONS SET FORTH ABOVE, PETITIONER'S OTHER REQUESTS SHOULD BE DENIED:

As the Court can see, the Sheriff's Office has bent over backwards to accommodate Petitioner, despite the fact that her requests have no constitutional basis. The Sheriff's Office has agreed to provide Petitioner with additional food, even though the two meals the inmates are normally provided is designed to meet their daily caloric needs.   Petitioner will be transported at 6 a.m. from the Estrella Jail which is reasonable.

3

1  All of Petitioner's other requests are not reasonable and are outweighed by the legitimate

2  security risks identified by the Sheriff's Office.

3  **V.**     **CONCLUSION**:

4         Based on the foregoing reasons and the reasons set forth in its initial response,

5  Sheriff Arpaio respectfully requests that the Court deny Petitioner's requests (1) to be

6  provided a blanket and pillow whenever she is in a holding cell of the South Court

7  Tower and (2) to be permitting to receive food and drink from her attorneys during any

8  breaks in her evidentiary hearing.  Sheriff Arpaio further agrees to any order consistent

9  with the **ACCOMODATIONS** outline above.

10        RESPECTFULLY SUBMITTED this 21st day of January 2014.

11                              WILLIAM G. MONTGOMERY
                               MARICOPA COUNTY ATTORNEY

12

13                              BY:  /s/ J. Randall Jue
                                   J. RANDALL JUE
14                                 *Attorneys for Sheriff Arpaio*

15

16

17  ORIGINAL electronically filed
    and electronically sent
18  this 21st day of January 2014 to:

19  Honorable Brian Ishikawa
    MARICOPA COUNTY SUPERIOR COURT
20  222 East Javelina Avenue
    Mesa, Arizona 85210
21  gwillcox@superiorcourt.maricopa.gov

22  with a copies mailed this
    21st day of January 2014 to:
23
    Allen A. Arntsen
24  Stephan J. Nickels
    Matthew R. Lynch
25  FOLEY & LARDNER LLP
    150 E. Gilman Street
26  Madison, WI 53703
    Attorneys for Petitioner

27

28  . . .

4

and copies e-mailed and mailed
This 21st day of January 2014 to:

Scott M. Bennett
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
sbennett@csblaw.com
Attorneys for Petitioner

Lacey Stover Gard
Gregory Hazard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona 85701-1367
Lacey.gard@AZAG.gov
CADocket@AZAG.gov
Attorneys for the State of Arizona

/s/ L. Wink

S:\COUNSEL\Civil\Matters\GN\GN Closed 2010\GN10-0319 State v. Andriano\Andriano-SuppResponse2MtnReTransportation-Meals 1-21-14.docx

5

# EXHIBIT DDDDDDDD

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
1/24/2014 11:27:51 AM
Filing ID 5672219

Scott M. Bennett (Bar No. 022350)
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (office)
(608) 258-4258 (fax)

*Attorneys For Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA ) | CASE NO:  CR2000-096032-A |
| RESPONDENT, ) | |
| ) | **MOTION TO ADMIT EXHIBITS** |
| v. ) | **PERTAINING TO MITIGATION** |
| ) | **EVIDENCE** |
| WENDI ELIZABETH ANDRIANO ) | |
| PETITIONER. ) | |

Pursuant to this Court's order granting the upcoming evidentiary hearing in this post-conviction relief proceeding, Petitioner Wendi Andriano will submit three general categories of evidence at the hearing:  (1) evidence of ineffective assistance of her trial counsel with regard to the investigation and presentation of mitigating evidence at the penalty phase of her trial; (2) evidence that her trial counsel suffered from a conflict of interest; and (3) the mitigating evidence that trial counsel could and would have

discovered and presented to the jury absent their ineffectiveness and/or conflict.

Because a defendant at the penalty phase would be entitled to "present any information that is relevant to any of the mitigating circumstances [listed in the statute, which includes "any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death"], regardless of its admissibility under the rules governing admission of evidence at criminal trials," Ariz. Rev. Stat. § 13-751.C, G, Ms. Andriano hereby moves for admission of all exhibits that relate to the third category of evidence set forth above.  Specifically, Ms. Andriano moves this Court to admit Exhibit Nos. 7A, 7B, 10-14, 16-18, 21-38, 51-52, 56-57, 68-75, 95, and 140-164, all of which constitute mitigating evidence that trial counsel could have presented in Ms. Andriano's trial.

The grounds for this Motion are set forth more fully in the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   DISCUSSION

On October 30, 2012, this Court ordered an evidentiary hearing in this post-conviction relief matter on the following issues:  (1) whether trial counsel David DeLozier had suffered from a conflict of interest pertaining to his representation of Ms. Andriano (the "Conflict Claim"); and (2) whether Ms. Andriano's trial counsel was ineffective with regard to the penalty phase of the trial in "failing to investigate and present expert testimony regarding her mental illness and by failing to investigate and present evidence regarding her harrowing childhood" (the "Ineffective Assistance Claim").  (Order at 4-6.)

To prove the Ineffective Assistance Claim under *Strickland v. Washington*, 466 U.S. 668 (1984), Ms. Andriano must show both deficient performance of trial counsel

4849-9891-4840.

and resulting prejudice.[1]  To prove prejudice, she must show a "reasonable probability" that the sentencer would have reached a different result absent the ineffectiveness of trial counsel in investigating and presenting mitigating circumstances at the penalty phase.  *Id.* at 694.  To assess prejudice, courts "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'"  *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000)).

Thus, Ms. Andriano's presentation at the evidentiary hearing will consist of three parts:  (1) evidence pertaining to the Conflict Claim; (2) evidence pertaining to the deficiency prong of the Ineffective Assistance Claim; and (3) evidence pertaining to the prejudice prong of the Ineffective Assistance Claim—that is, mitigating evidence that her trial counsel could and should have investigated, discovered, and presented to the jury had they performed a proper mitigation investigation in accordance with the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and prevailing norms for capital defense counsel.

To show the mitigation evidence that should have been investigated and presented by Ms. Andriano's trial counsel for purposes of the prejudice prong of the Ineffective Assistance Claim, Ms. Andriano will present the testimony of mental-health experts and certain key fact witnesses with direct knowledge of childhood abuse, neglect, and other trauma suffered by Ms. Andriano.  In addition, Ms. Andriano will ask this Court to consider many exhibits relating to Ms. Andriano's childhood, social history, and mental health history.

Because the prejudice requirement calls for this Court to assess whether there is a "reasonable probability" that the jury may not have sentenced Ms. Andriano to death had

---

[1] Prejudice is not an element of the Conflict Claim.  *See Cuyler v. Sullivan*, 446 U.S. 345, 349-50 (1980) ("[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.").

{00115096.1 }                                    3

MOTION TO ADMIT EXHIBITS PERTAINING TO MITIGATION EVIDENCE
CASE NO. CR2000-096032-A

4849-9891-4840.

1   it heard such evidence, the admission of such evidence in the evidentiary hearing should

2   be governed by the same evidentiary standards that would govern its admission if it were

3   presented to the jury at the penalty phase.  If this Court were to exclude evidence from

4   consideration in this evidentiary hearing that would have been admissible in the penalty

5   phase, then it would be incapable of considering the "totality of the available mitigation

6   evidence" that could have been presented to the jury.

7         The evidentiary standards for the penalty phase of capital cases differ significantly

8   from the evidentiary standards for admission of evidence in other phases or other

9   criminal cases.  Under Arizona law, "[t]he trier of fact shall consider as mitigating

10  circumstances *any* factors proffered by the defendant or the state that are relevant in

11  determining whether to impose a sentence less than death[.]"  Ariz. Rev. Stat. § 13-751.G

12  (emphasis added).  The parties may present such evidence "regardless of its admissibility

13  under the rules governing admission of evidence at criminal trials."  Ariz. Rev. Stat. § 13-

14  751.C.  *See also, e.g.*, *State v. Walton*, 159 Ariz. 571, 583, 769 P.2d 1017, 1029 (1989)

15  ("The defendant complains that admitting the report violated the foundation and hearsay

16  rules of evidence. However, information relevant to mitigation can be presented at a

17  sentencing hearing without regard to its admissibility under the rules of evidence for

18  criminal trials."), *overruled in part on other grounds*, *Ring v. Arizona*, 536 U.S. 584

19  (2002).  In short, Arizona law seeks to ensure that the jury in a capital case has the

20  opportunity to weigh all information pertinent to the sentencing decision, regardless of its

21  admissibility in other contexts.

22        While the State has stipulated to the admissibility of some of Ms. Andriano's

23  proposed exhibits for the hearing, the State has not conceded admissibility as to many

24  exhibits on Ms. Andriano's exhibit list that pertain to mitigating evidence.  Therefore,

25  Ms. Andriano moves for the admission of the following exhibits from the parties' joint

26  witness and exhibit list, all of which pertain (in full or in part) to the prejudice prong of

27  the Ineffective Assistance Claim.

28  {00115096.1 }                                    4

4849-9891-4840.

***Letters from Counseling Professionals:  Exhibits 7A, 7B, and 52.***  These exhibits consist of correspondence from the late H. Kandy Rohde, Certified Professional Counselor, and Sharon Murphy, Ph.D, to trial counsel regarding potential issues concerning Ms. Andriano's mental health and childhood trauma.  All were exhibits to the Petition filed with this Court on February 17, 2012.

***Sworn Declarations of Mitigation Witnesses:  Exhibits 10-14, 16-18, and 21-38.***  These exhibits consist of declarations from fact witnesses disclosing information pertaining to Ms. Andriano's personal and family history, her family mental health history, the environment of her upbringing, childhood abuse and neglect, and other matters pertinent to a proper social history and mental health evaluation.  All were exhibits to the Petition filed with this Court on February 17, 2012.

***Unsworn Correspondence from Potential Mitigation Witnesses:  Exhibits 51, 56-57, 95.***  These exhibits consist of four items of correspondence sent to trial counsel before Ms. Andriano's trial—three from Ms. Andriano's mother, and another from the victim's sister—disclosing mitigating evidence pertinent to potential childhood abuse of Ms. Andriano and mental health issues.  The three emails from Ms. Andriano's mother were exhibits to the Petition filed with this Court.

***Social History Records:  Exhibits 68-71, 152.***  These exhibits consist of three types of documents:  (1) Social Security Administration earnings records for Ms. Andriano, her husband, and her parents, relevant to Ms. Andriano's social history and a proper mental health diagnosis; (2) summary records establishing the arrest, conviction, and incarceration of Ms. Andriano's biological father and uncle for child molestation.  These are records kept by public agencies, and all but one of which was exhibit to the Petition filed with this Court.

***Social History Photographs and Cards:  Exhibits 72-75, 140-151, 153-164.***  These exhibits consist of photographs of Ms. Andriano and key individuals in her life at certain time periods (to provide context); inappropriately sexual photographs of Ms.

4849-9891-4840.

Andriano and her friends taken by her stepfather, Alejo Ochoa; and inappropriately sexual cards sent by Alejo Ochoa to Ms. Andriano during her incarceration.

## II.   CONCLUSION

Because this Court is tasked with assessing whether Ms. Andriano has shown a reasonable probability that a jury may not have imposed a death sentence in the penalty phase had her trial counsel performed an effective investigation and presentation of mitigating evidence, this Court should consider "any information that is relevant to any of the mitigating circumstances" at issue in this evidentiary hearing—namely, Ms. Andriano's mental health and harrowing childhood—"regardless of its admissibility under the rules governing admission of evidence at criminal trials."  Ariz. Rev. Stat. § 13-751.C.  Therefore, Ms. Andriano respectfully requests that this Court admit Exhibits 7A, 7B, 10-14, 16-18, 21-38, 51-52, 56-57, 68-75, 95, and 140-164 into evidence in this proceeding.

RESPECTFULLY SUBMITTED this 24th day of January, 2014.

By: */s/ Scott M. Bennett* _____

Scott M. Bennett (022350)
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (Office)
(608) 258-4258 (Fax)

*Attorneys For Petitioner Wendi Andriano*

{00115096.1 }

6

4849-9891-4840.

ORIGINAL e-filed January 24, 2014,
with the Clerk of the Maricopa County Superior Court

COURTESY COPY mailed January 24, 2014, to:

Judge Brian Ishikawa
Maricopa County Superior Court
1810 S. Lewis St.
Mesa, AZ  85210-6235

COPY mailed and emailed January 24, 2014, to:

Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tucson, AZ  85701-1367

*Attorney for the State of Arizona*


*/s/ Carol Keesee*

{00115096.1 }

7

4849-9891-4840.

# EXHIBIT EEEEEEEEE

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
01/28/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                           01/24/2014


                                            CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                      L. Mooney
                                                  Deputy


STATE OF ARIZONA                            LACEY ALEXANDRA STOVER GARD
                                            JUAN M MARTINEZ
                                            JAMES RANDALL JUE

v.

WENDI ELIZABETH ANDRIANO (A)                SCOTT M BENNETT
                                            ALLEN A ARNTSEN
                                            MATTHEW R LYNCH
                                            JAMES J BELANGER
                                            JODI FOX

                                            APPEALS-PCR
                                            CAPITAL CASE MANAGER
                                            COURT ADMIN-CRIMINAL-PCR


                         **MINUTE ENTRY**


        Courtroom 9

        State's Attorney:          Juan Martinez – Appearing Telephonically
        Defendant's Attorney:      Scott Bennett and Allen Arntsen –
                                   Appearing Telephonically
        M C S O Attorney:          James Randall Jue – Appearing Telephonically
        Defendant:                 Not Present

        Court Reporter, Patti Kotarba, is present.

        A record of the proceeding is also made by audio and/or videotape.

         Matter concludes.

Docket Code 029                      Form R000D                          Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          01/24/2014

# EXHIBIT FFFFFFFFF

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
1/28/2014 1:36:46 PM
Filing ID 5678068

1  Scott M. Bennett (Arizona Bar No. 022350)
2  COPPERSMITH BROCKELMAN PLC
   2800 North Central Avenue
3  Suite 1200
   Phoenix, Arizona  85004
4  (602) 224-0999
5  sbennett@cblawyers.com

6  *Attorneys for Petitioner Wendi Elizabeth Andriano*

7

8               SUPERIOR COURT OF ARIZONA

9                 COUNTY OF MARICOPA

10

11 State of Arizona,                    )
                                        )   No. CR2000-096032-A
12                      Respondent,     )
                                        )   **NOTICE OF FIRM NAME CHANGE**
13                                      )
        vs.                             )
14                                      )
   Wendi Elizabeth Andriano,           )
15                                      )
                                        )   (Assigned to the Hon. Brian Ishikawa)
16                      Petitioner.     )
                                        )
17                                      )
                                        )
18 _____ )

19

20     Attorney Scott Bennett gives notice that his firm name and email address

21 have changed.  His new contact information is as follows:

22                    Scott M. Bennett
                   sbennett@cblawyers.com
23              Coppersmith Brockelman PLC
             2800 N. Central Avenue, Suite 1200
24               Phoenix, Arizona  85004
                  Phone: (602) 224-0999
25

26

27

28

RESPECTFULLY SUBMITTED January 28, 2014.

COPPERSMITH BROCKELMAN PLC


*/s/ Scott M. Bennett*
        Scott M. Bennett
        *Attorneys for Petitioner Wendi Andriano*


ORIGINAL e-filed January 28, 2014,
with the Clerk of the Maricopa County Superior Court

COPY mailed on January 28, 2014, to:

Judge Brian Ishikawa
Maricopa County Superior Court
Southeast Court
1810 South Lewis Street
Mesa, AZ 85210

Lacey Stover Gard
Gregory Hazard
Office of the Attorney General
400 W. Congress, Suite S-315
Tucson, AZ 85701-1367
*Attorney for the State of Arizona*

Allen A. Arntsen
Stephan J. Nickels
Matthew R. Lynch
Foley & Lardner LLP
150 E. Gilman Street
Madison, WI 53703


*/s/ Carol Keesee*

# EXHIBIT GGGGGGGGG

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
1/28/2014 4:25:43 PM
Filing ID 5678959

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

GREGORY HAZARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, ARIZONA  85007–2997
TELEPHONE:  (602) 542–4686
gregory.hazard@azag.gov
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 023258)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
# COUNTY OF MARICOPA

|  |  |
|---|---|
| STATE OF ARIZONA,<br><br>               Respondent,<br><br>-VS-<br><br>WENDI ELIZABETH ANDRIANO,<br><br>               Petitioner. | CR2000–096032–A<br><br>**STATE'S MOTION TO CONTINUE EVIDENTIARY HEARING**<br><br>The Hon. Brian K. Ishikawa<br><br>(Expedited Hearing Requested)<br><br>**[DEATH PENALTY CASE]** |

The State respectfully requests that this Court continue the evidentiary hearing currently set for February 3 through February 14, 2014.  Juan Martinez, co-counsel for the State, has a medical emergency that makes him unavailable from February 4 through February 7, 2014.  Mr. Martinez's presence and participation in the hearing is indispensable to the State. Mr. Martinez notified State's counsel today of his condition.

The State would be able to start the hearing on Monday, February 10, 2014, and continue the hearing through Friday, February 14. If additional time is needed to complete the evidentiary hearing, the parties could schedule the remainder of the hearing at a date and time convenient for the Court and parties.  In the alternative, this Court could grant a continuance of the entire hearing to a block of time convenient for the Court and the parties.

Counsel for the State spoke with Mr. Lynch, counsel for Ms. Andriano, this afternoon.  Mr. Lynch conveyed that he needs additional time before taking a position on the State's motion to continue.

Given the timing of this request, the State requests an expedited hearing on this motion, and counsel for the State does not object to the parties appearing telephonically.

Counsel for the State avows that Victims' Rights have been complied with. The victim representatives are in agreement with the State's request for a continuance of the evidentiary hearing.

RESPECTFULLY SUBMITTED this 28th day of January, 2014.

Thomas C. Horne
Attorney General

Jeffrey A. Zick
Chief Counsel

/s/ Gregory Hazard
Assistant Attorney General
Attorneys for Respondent

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2014, I electronically filed the foregoing with the Clerk of the Maricopa County Superior Court by using the Court's eFiling Online system.

Copies of the foregoing were deposited for mailing this date to:

Allen A. Arntsen
Stephan J. Nickels
Matthew R. Lynch
FOLEY & LARDNER, LLP
150 E. Gilman Street
Madison, Wisconsin 53703

Scott M. Bennett
COPPERSMITH SCHERMER & BROCKELMAN, PLC
2800 N. Central Ave., Ste. 1200
Phoenix, Arizona  85005

Attorneys for Petitioner

Juan Martinez
Deputy County Attorney
Maricopa County Attorney's Office
301 West Jefferson 4th Floor
Phoenix, Arizona 85003

Attorney for the State

/s/ Tesha McCoy
Legal Secretary
Criminal Appeals/
Capital Litigation Sections
1275 West Washington
Phoenix, Arizona  85007–2997
Telephone: (602) 542–4686

3689682

3

# EXHIBIT HHHHHHHHH

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
E. Masis, Deputy
1/29/2014 11:32:19 AM
Filing ID 5680374

Scott M. Bennett (Bar No. 022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@cblawyers.com

Allen A. Arntsen, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (office)
(608) 258-4258 (fax)

*Attorneys For Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA )<br><br>     RESPONDENT, )<br><br>    V. )<br><br>WENDI ELIZABETH ANDRIANO )<br><br>    PETITIONER. )<br>_____ )<br> | CASE NO:  CR2000-096032-A<br><br>**PETITIONER'S OPPOSITION TO STATE'S MOTION TO CONTINUE EVIDENTIARY HEARING** |

Petitioner Wendi Andriano opposes the State's motion to continue the February 3, 2014 evidentiary hearing.  If this Court is inclined to grant the continuance, Petitioner strongly urges this Court to reschedule the two-week hearing in its entirety, rather than starting the hearing on February 10, 2014 and completing the remainder at a later date. The latter approach would multiply the hardships caused by a continuance and unfairly prejudice Petitioner in the presentation of her case in this death-penalty proceeding.

## DISCUSSION

### I.   A CONTINUANCE WOULD CREATE SIGNIFICANT HARDSHIPS FOR PETITIONER IN THE PRESENTATION OF HER CASE

Yesterday afternoon, the State informed Petitioner's counsel that it intended to seek a continuance of the evidentiary hearing scheduled in this matter to accommodate a medical procedure for Mr. Martinez that is scheduled for next Tuesday, February 4—the second day of the evidentiary hearing—with an expected recovery time that would make him unavailable for the hearing through Friday, February 7.  Though Petitioner and her counsel appreciates the apparent urgency and necessity of the procedure,[1] we submit that the hardships a continuance would create outweigh the hardship to the State of handling four of the ten hearing days without one of the several attorneys it has assigned to work on this case.

*First*, this hearing will involve several out-of-state witnesses and counsel, all of whom have already purchased non-refundable airfare and arranged their schedules to ensure availability for the hearing.  This includes five Foley & Lardner LLP personnel scheduled to fly to Phoenix this Friday, as well as two expert witnesses flying in from California, one from Boston, one from Virginia, and another from New Mexico.  In addition to the sunk cost of at least ten airline tickets and (at least for counsel) hotel cancellation fees, both counsel and the experts have invested significant time coordinating their schedules and foregoing other engagements to appear at the hearing.

*Second*, this Court and the Department of Corrections have invested resources in securing the attendance of two witnesses—Ms. Andriano and Jasper Neace.  Indeed, pursuant to court order, Ms. Andriano is scheduled to be transported today to the nearby jail for the hearing, a complicated process that required numerous discussions and coordination with the Arizona Department of Corrections and the Maricopa County Sheriff's Office.  Similarly, this court has ordered that Mr. Neace be transported from the Safford Correctional Facility to this court to testify on February 4 and 5, 2014.

---

[1] The State has not disclosed the nature of the medical issue.

4849-9891-4840.

1       *Third*, Petitioner's counsel have obtained and served  trial subpoenas for numerous

2   fact witnesses at trial, which were necessary for many of those witnesses to obtain

3   permission from their employers to be absent from work and to secure their attendance at

4   the hearing on or about the dates set forth on the Joint Witness Schedule and Exhibit List

5   that was filed with this Court.  These are not easy witnesses to reschedule:  several of the

6   fact witnesses scheduled for the first week of trial were and remain difficult to contact,

7   while Ms. Andriano's former trial counsel and mitigation specialist are attorneys with

8   demanding schedules.  Moreover, Petitioner has no control over any of these non-expert

9   witnesses; they are third parties giving testimony under subpoena, and Petitioner may be

10  unable to secure their testimony if the hearing is rescheduled.

11      Thus, starting from scratch with a new hearing date will waste significant time and

12  money incurred in reliance upon the scheduled hearing dates, all of which will have to be

13  incurred again at a later date.  Petitioner's counsel is appearing in this matter *pro bono*,

14  upon referral by the American Bar Association's Death Penalty Representation Project.

15  The airfare, hotel cancellation fees, process server costs, and attorney time devoted to

16  preparing for the hearing and coordinating witnesses are all underwritten by Petitioner's

17  counsel.  Forcing them to incur these significant costs twice is unfair.

18      The hardship for the State if the hearing proceeded as scheduled is less significant.

19  The State would be without one of the attorneys it assigned to the case for four days of

20  testimony from Petitioner's witnesses, but the State does not assert that its other attorneys

21  who have appeared in this post-conviction relief proceeding would be unavailable.

22  Indeed, the State has appeared in this proceeding recently through Mr. Hazard and Ms.

23  Gard of the Arizona Attorney General's Office; Mr. Martinez has not been counsel of

24  record on any of the motions or other pleadings filed to date.  He has participated in the

25  interviews of Ms. Andriano's trial counsel (with Ms. Gard and Mr. Hazard), but has not

26  participated in any other witness interviews at which Petitioner's counsel was present.  In

27  short, the State has not shown that Mr. Martinez's presence for the four hearing days at

28  issue is necessary to the presentation of the State's case, or that the witnesses cannot be

CASE NO. CR2000-096032-A

1  fully examined by the other attorneys for the State in his absence.

2  **II.   IF THIS COURT DECIDES TO CHANGE THE HEARING SCHEDULE, IT
3       SHOULD CONTINUE THE HEARING AS A WHOLE RATHER THAN
        TAKING A PIECEMEAL APPROACH THAT WOULD UNFAIRLY
4       PREJUDICE PETITIONER**

5         The State's motion proposes two alternatives for a continuance:  (1) to reschedule

6  for the same amount of time on different dates; or (2) to hold one week of hearings

7  commencing February 10, and complete the remainder of the hearing at some later date.

8  If this Court elects to cancel and reschedule the hearing notwithstanding the hardships to

9  Petitioner identified above, Petitioner asks that this Court reschedule the hearing in its

10 entirety.  The State's other alternative—keeping the second week of the hearing on the

11 calendar, then adding another week of testimony at some later date—would only multiply

12 the hardships associated with the continuance and significantly prejudice Petitioner's

13 ability to fairly present her case for post-conviction relief.  In a conversation today with

14 counsel for the State regarding options for addressing this motion, the State agreed that

15 keeping the hearing as a two-week block and rescheduling it in its entirety would be

16 preferable to a piecemeal approach.

17        As the parties and this Court agreed in setting this matter for an evidentiary

18 hearing, a two-week hearing is necessary for Petitioner and the State to fairly present

19 their evidence.  The parties' joint witness schedule and exhibit list (attached for reference

20 as **EXHIBIT 1**) illustrates why:  it includes eight experts and more than a dozen fact

21 witnesses discussing more than 200 potential exhibits.  Petitioner is not calling her

22 witnesses just to call them; they were identified as having particular importance among

23 more than 30 witnesses who submitted declarations and many more who were

24 interviewed during the course of several years of investigation that has consumed

25 countless hours.

26        The order of Petitioner's witnesses set forth in the parties' joint witness schedule

27 is the product of significant coordination, and Petitioner has relied upon that witness

28 order in preparing to present the issues in a logical manner in which each witness's

CASE NO. CR2000-096032-A

testimony in part builds off the testimony of prior witnesses.  Due to the scheduling concerns noted above (particularly at this late date), putting the "second week" first will result in witnesses appearing far out of order, making for a disjointed hearing.  Those problems are further exacerbated by a delay between hearing the "second half" of Petitioner's case and the first.  Thus, this approach would deprive Petitioner of a fair opportunity to present the evidence and witnesses in a compelling and logical manner.  Given the stakes of this proceeding, Petitioner's presentation of the evidence should not be permitted to suffer on account of Mr. Martinez's medical procedure.

Dividing the hearing by doing part now and part at some later date is also likely to add to the overall length and expense of the hearing, because it would produce some delay between the testimony of those witnesses Petitioner would call during the week of February 10 and the opposing evidence the State would present at some later date.  Given the risk of prejudice arising from hearing the State's experts and other witnesses fresh while several of Petitioner's witnesses and experts would have testified at earlier dates, rebuttal testimony is more likely to be necessary—increasing the length of the hearing and requiring several out-of-state experts to pay for travel for both parts of the hearing.

In addition, coordinating two separate hearings on different weeks would only increase the hardships of the continuance.  Petitioner's counsel would then need to purchase airfare and accommodations for two separate hearings, coordinate witness and expert witness schedules for two hearings, and secure prisoner transport for Petitioner for two separate hearings.

## **CONCLUSION**

For the foregoing reasons, this Court should deny the State's motion to continue the evidentiary hearing scheduled to commence on Monday, February 3, 2014.  Should this Court disagree and grant the State's motion, Petitioner requests that this Court reschedule the hearing in its entirety to avoid the unfair prejudice to Petitioner that would result from a disjointed and piecemeal hearing.

4849-9891-4840.

DATE: January 29, 2014                    By: _/s/ Scott M. Bennett_____

Allen A. Arntsen, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (Office)
(608) 258-4258 (Fax)

Scott M. Bennett (022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@cblawyers.com

*Attorneys For Petitioner Wendi Andriano*

ORIGINAL e-filed January 29, 2014,
with the Clerk of the Maricopa County Superior Court

COPY e-mailed on January 29, 2014 to:

Judge Brian Ishikawa
Maricopa County Superior Court
1810 S. Lewis St.
Mesa, AZ  85210-6235

COPY mailed and emailed January 29, 2014 to:

Gregory Hazard
Office of the Attorney General
1275 W. Washington
Phoenix, AZ 85007-2997

Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tucson, AZ  85701-1367
*Attorney for the State of Arizona*

_/s/ Carol Keesee_____

CASE NO. CR2000-096032-A

4849-9891-4840.

# EXHIBIT 1

COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Suite 1200
Phoenix, Arizona  85004
(602) 224-0999
Scott M. Bennett, State Bar No. 022350

FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703
Telephone:    (608) 257-5035
Fax:    (608) 258-4258

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*

*Attorneys for Petitioner Wendi Elizabeth Andriano*

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, )<br><br>                                    Respondent, )<br><br>      vs. )<br><br>Wendi Elizabeth Andriano, )<br><br>                                    Petitioner. )<br>_____ ) | No. CR2000-096032-A<br><br>**JOINT WITNESS SCHEDULE AND EXHIBIT LIST** |

Pursuant to the Court's order dated October 11, 2013, the parties submit the

following joint witness schedule and exhibit list.

{00114096.1 }

**WITNESS SCHEDULE**

| PETITIONER'S WITNESSES | ANTICIPATED DATE(S) OF TESTIMONY |
|---|---|
| Dr. James Hopper | February 3 |
| Donna Ochoa | February 3-4 |
| Kyre Lorts | February 4 |
| Jeri Lyn Cunningham | February 4 |
| Jasper Neace | February 4 |
| Samantha Nichols | February 5 |
| Wendi Andriano | February 5 |
| Brandon Ochoa | February 5 |
| Alejo Ochoa | February 6 |
| Dr. Joette James | February 6 |
| Dr. George Woods | February 7 |
| Daniel Patterson | February 7, 10 |
| Scott MacLeod | February 10 |
| Cindy Schaider | February 10 |
| Keith Rohman | February 11 |
| David DeLozier | February 11 |
| Gary Lowenthal | February 12 |
| Larry Hammond | February 12 |

{00114096.1 }

| STATE'S WITNESSES | ANTICIPATED DATE(S) OF TESTIMONY |
|---|---|
| Patrick Linderman | February 13 |
| Scott MacLeod | February 13 |
| Chris Hashisaki | February 13 |
| Rick Freeland | February 13 |
| Shawn King | February 13 |
| Dawna Harris | February 13 |
| Custodian of Records, State Bar of Arizona | February 13 |
| Dr. Kiran Amin | February 14 |
| Dr. Steven Pitt | February 14 |

**EXHIBIT LIST**

| PETITIONER'S EXHIBITS | DESCRIPTION | ADMISSIBILITY STIPULATED? |
|---|---|---|
| 1. | Petition Tab 1 – Expert Report of Larry Hammond | No. |
| 2. | Petition Tab 2 – Expert Report of Dr. George W. Woods | Yes. |
| 2.A. | Petition Tab 2.A. – Appendix A to Woods Report:  List of Documents Reviewed | Yes. |
| 2.B. | Petition Tab 2.B. – Appendix B to Woods Report:  Overview of the Biopsychosocial and Psychiatric History of Wendi Elizabeth Andriano and Her Family | Yes. |
| 2.C. | Petition Tab 2.C. – Appendix C to Woods Report:  Curriculum Vitae | Yes. |
| 2.D. | Petition Tab 2.D. – Appendix D to Woods Report:  Qualifications, Background and Experience | Yes. |
| 3. | Petition Tab 3 – Expert Report of James Hopper, Ph.D. (Executive Summary) | Yes. |
| 4. | Petition Tab 4 – Appendix to Expert Report of James Hopper, Ph.D. (Full Report) | Yes. |
| 4.A. | Petition Tab 4.A. – Exhibit A to Hopper Report:  Curriculum Vitae | Yes. |
| 4.B. | Petition Tab 4.B. – Exhibit B to Hopper Report:  List of Documents Reviewed | Yes. |
| 5. | Petition Tab 5 – Expert Report of Myla Young, Ph.D. | Yes. |
| 5.A. | Petition Tab 5.A. – Addendum to Expert Report of Myla Young | Yes. |
| 6. | Petition Tab 6 – Affidavit of Daniel Patterson | No. |
| 6. A. | Petition Tab 6.A. – Exhibit A to Patterson Affidavit:  Assessment by Dr. Jack Potts | Yes. |

| 6. B. | Petition Tab 6.B. – Exhibit B to Patterson Affidavit:  12/20/01 Email to Patrick Linderman | No. |
|---|---|---|
| 6. C. | Petition Tab 6.C. – Exhibit C to Patterson Affidavit:  Assessment by Dr. Richard Rosengard | Yes. |
| 6.D. | Petition Tab 6.D. – Exhibit D to Patterson Affidavit:  2/14/02 Email from Michelle Arvanitas | No. |
| 6.E. | Petition Tab 6.E. – Exhibit E to Patterson Affidavit:  Report of Dr. Michael Bayless | Yes. |
| 7. | Petition Tab 7 – Declaration of G. David DeLozier | No. |
| 7.A. | Petition Tab 7.A. – Exhibit A to DeLozier Declaration:  2/19/01 Letter from Certified Professional Counselor Kandy Rohde | No. |
| 7.B. | Petition Tab 7.B. – Exhibit B to DeLozier Declaration:  3/12/01 Letter from Certified Professional Counselor Kandy Rohde | No. |
| 7.C. | Petition Tab 7.C. – Exhibit C to DeLozier Declaration:  Notes from Certified Professional Counselor Kandy Rohde | No. |
| 7.F. | Petition Tab 7.F. – Exhibit F to DeLozier Declaration:  Trial Note from Client | No. |
| 7.G. | Petition Tab 7.G. – Exhibit G to DeLozier Declaration:  9/1/04 Letter from Dr. Gerald Perry and Dr. Pamela Drapeau | No. |
| 8. | Petition Tab 8 – Affidavit of Scott A. Mac Leod | No. |
| 9. | Petition Tab 9 - Declaration of Wendi Andriano | No. |
| 10. | Petition Tab 10 – Declaration of Constance Boys | No. |
| 11. | Petition Tab 11 – Declaration of George Carlin | No. |
| 12. | Petition Tab 12 – Declaration of Jeri Lynn Cunningham | No. |

| | | |
|---|---|---|
| 13. | Petition Tab 13 – Declaration of Mark Keating | No. |
| 14. | Petition Tab 14 – Declaration of Nancy Keating | No. |
| 15. | Petition Tab 15 – Deposition Testimony of Shawn King | Yes. |
| 16. | Petition Tab 16 – Declaration of Barry Lorts | No. |
| 17. | Petition Tab 17 – Declaration of Kelsey Leon McGuffee, Jr. | No. |
| 18. | Petition Tab 18 – Declaration of Marjorie Micek | No. |
| 19. | Petition Tab 19 – Declaration of Jeffrey B. Miller | No. |
| 19.A. | Petition Tab 19. A. – Exhibit 1 to Miller Declaration:  10/10/00 Letter to Client | No. |
| 20. | Petition Tab 20 – Declaration of Sharon Murphy | No. |
| 21. | Petition Tab 21 – Declaration of Brenda Nagore | No. |
| 22. | Petition Tab 22 – Declaration of Frank Nagore | No. |
| 23. | Petition Tab 23 – Declaration of Jasper Neace | No. |
| 24. | Petition Tab 24 – Declaration of Alejo Ochoa | No. |
| 25. | Petition Tab 25 – Supplemental Declaration of Alejo Ochoa | No. |
| 26. | Petition Tab 26 – Declaration of Brandon Ochoa | No. |

| 27. | Petition Tab 27 – *filed under seal* | No. |
|---|---|---|
| 28. | Petition Tab 28 – *filed under seal* | No. |
| 29. | Petition Tab 29 – *filed under seal* | No. |
| 30. | Petition Tab 30 – Declaration of Deblen Oke | No. |
| 31. | Petition Tab 31 – Declaration of Gia Palicki | No. |
| 32. | Petition Tab 32 – Declaration of Shelby "Skip" Robertson | No. |
| 33. | Petition Tab 33 – Declaration of Stuart Wade Robertson | No. |
| 34. | Petition Tab 34 – Declaration of Cynthia Schaider | No. |
| 35. | Petition Tab 35 – Declaration of Stephen Schaider | No. |
| 36. | Petition Tab 36 – Declaration of John Shaddle | No. |
| 37. | Petition Tab 37 – Declaration of Christopher Weaver | No. |
| 38. | Petition Tab 38 – Declaration of Kimberly Wilson | No. |
| 39. | Petition Tab 39 – Declaration of Barbara Bauer | No. |
| 40. | Petition Tab 40 – Declaration of Martha Colvin | No. |
| 41. | Petition Tab 41 – Declaration of Linda Percy | No. |
| 42. | Petition Tab 42 – Declaration of Jacqueline Sacamano | No. |

| 43. | Petition Tab 43 – Authenticating Declaration of Matthew R. Lynch | No. |
|---|---|---|
| 44. | Petition Tab 44 – Notice of Defenses, Indicating (1) Intent to Raise Temporary Insanity Defense, and (2) Need for Expert Psychologist (filed 1/16/01) | Yes. |
| 45. | Petition Tab 45 – Counseling Session Notes from Certified Professional Counsel Kandy Rohde (January 2001 to April 2004) | Yes. |
| 46. | Petition Tab 46 – Counseling Session Notes from Casa Grande Valley Counseling Service (2/27/96 to 3/6/96) | Yes. |
| 47. | Petition Tab 44 – Notes from Estrella Jail and Durango Psychiatric Unit Medical Providers (Excerpts) (11/3/00 to 9/30/04) | Yes. |
| 48. | Petition Tab 48 – Special Needs Treatment Plan from Durango Psychiatric Unit Medical Providers | Yes. |
| 49. | Petition Tab 49 – Medication Records During Pre-Sentencing Incarceration (November 2000 to November 2004) | Yes. |
| 50. | Petition Tab 50 – Email from Donna Ochoa to Trial Counsel (12/4/01) | No. |
| 51. | Petition Tab 51 – Email from Donna Ochoa to Trial Counsel (9/30/02) | No. |
| 52. | Petition Tab 52 – Emails from Sharon Murphy to Trial Counsel (3/25/03 and 3/30/03) | No. |
| 53. | Petition Tab 53 – General Medical and Public Record Release Forms (obtained by Public Defender's Office in January 2002, March 2002, August | No. |

| | | 2002, April 2003, May 2003, November 2003, and April 2004) | |
|---|---|---|---|
| 54. | | Petition Tab 54 – Motion for Court Order to Assist Mitigation Investigation and Proposed Order, seeking "order directing state and local agencies to provide records regarding Ms. Andriano to the defense" (filed 11/19/04) | Yes. |
| 55. | | Petition Tab 55 – Article, "Sexual Abuse as Mitigation" (printed 1/17/03) | No. |
| 56. | | Petition Tab 56 – Email from Donna Ochoa to Trial Counsel (2/12/01) | No. |
| 57. | | Petition Tab 57 – Email from Donna Ochoa to Trial Counsel (2/26/03) | No. |
| 58. | | Petition Tab 58 – Transcribed Interview and Voice Message of Chris Weaver by Michelle Arvanitas (1/30/04) | No. |
| 59. | | Petition Tab 59 – Emails Regarding Interview of Chris Weaver (1/30/04 and 2/02/04) | No. |
| 60. | | Petition Tab 60 – Invoice from Goldman & Kaplan, Ltd. to Joseph Andriano "In Reference To: Estate Planning" (10/3/00) | No. |
| 61. | | Petition Tab 61 – Letter from G. David DeLozier to Alejo and Donna Ochoa (12/14/00) | No. |
| 62. | | Petition Tab 62 – Letter from Leon Thikoll to Bethanne Klopp-Bryant (11/29/00) | No. |
| 63. | | Petition Tab 63 – Emails Between G. David DeLozier and the Public | No. |

| | | |
|---|---|---|
| | Defender's Office (8/2/02 to 8/5/02) | |
| 64. | Petition Tab 64 – Email Regarding G. David DeLozier Not Receiving Files (10/23/03) | No. |
| 65. | Petition Tab 65 – Report of Autopsy (11/28/00) and Amendment (1/5/01) | Yes. |
| 65.A. | Petition Tab 65.A. Phoenix Fire Department Incident History Printout for 10/8/00 | Yes. |
| 66. | Petition Tab 66 – Police Photographs of Defendant's Pre-Arrest Injuries (10/8/00) | No. |
| 67. | Petition Tab 67 – Authenticating Declaration of Kristen Powers | No. |
| 68. | Petition Tab 68 – Summary Chart and Earnings of Alejo and Donna Ochoa, 1975 to 1995 | No. |
| 68.A. | Petition Tab 68.A.- Social Security Earnings Statements of Alejo Ochoa | No. |
| 68.B. | Petition Tab 68.B. – Social Security Earnings Statements of Donna Ochoa | No. |
| 69. | Petition Tab 69 – Summary Chart and Earnings Statements of Joe and Wendi Andriano, 1983 to 2000 | No. |
| 69.A. | Petition Tab 69.A. – Social Security Earnings Statements of Joe Andriano | No. |
| 69.B. | Petition Tab 69.B. – Social Security Earnings Statements of Wendi Andriano | No. |
| 70. | Petition Tab 70 – Inmate Record Summary for Shelby Robertson | No. |
| 71. | Petition Tab 71 – Inmate Record Summary for Tommy Robertson | No. |
| 72. | Petition Tab 72 – Photograph of Wendi Andriano by Alejo Ochoa | No. |

| | | |
|---|---|---|
| 73. | Petition Tab 73 – Proof Sheet of Photographs of Wendi Andriano by Alejo Ochoa | No. |
| 74. | Petition Tab 74 – Proof Sheet of Photographs of Wendi Andriano and Others by Alejo Ochoa | No. |
| 75. | Petition Tab 75 – Card Sent to Wendi Andriano from Alejo Ochoa | No. |
| 76. | Petition Tab 76 – American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (February 2003) | No. |
| 77. | Petition Tab 77 – Mandate from Court of Appeals to Attorney DeLozier in *In Re the Adoption of Nicholas A. and Ashlee A.* (08/19/04) | No. |
| 78. | Expert Report of Gary Lowenthal | No. |
| 79. | Lowenthal Report Appx. 1 – Curriculum Vitae, Gary T. Lowenthal. | No. |
| 80. | Lowenthal Report Appx. 2 – Guardianship agreement, 11/00 | No. |
| 81. | Lowenthal Report Appx. 3 – Minute entry, 11/15/00 | No. |
| 82. | Lowenthal Report Appx. 4 – DeLozier invoice to Ochoas, p. 1, 2/7/01 | No. |
| 83. | Lowenthal Report Appx. 5 – Cover letter and fee agreement, 12/14/01 | No. |
| 84. | Lowenthal Report Appx. 7 – Stipulation for Substitution of Counsel, 6/12/01 | No. |
| 85. | Lowenthal Report Appx. 8 – Letters recommending Donna and Alejo | No. |

| | | |
|---|---|---|
| | Ochoa, 7/01 - 8/01 | |
| 86. | Lowenthal Report Appx. 9 – Correspondence between Donna Ochoa and David DeLozier, 7/01 | No. |
| 87. | Lowenthal Report Appx. 10 – Pinal County Superior Court Minute Entry, 12/18/01 | No. |
| 88. | Lowenthal Report Appx. 11 – Notice of Change of Judge, 1/2/02 | No. |
| 89. | Lowenthal Report Appx. 12 – Correspondence, DeLozier to Jakubczyk, 1/21/02, 2/7/02, 3/6/02 | No. |
| 90. | Lowenthal Report Appx. 13 – Correspondence, Jakubczyk to DeLozier, 4/1/02 | No. |
| 91. | Lowenthal Report Appx. 14 – Correspondence, DeLozier's office to Jakubczyk, 3/20/02 | No. |
| 92. | Lowenthal Report Appx. 15 – Motion to Compel Production of Medical Records, 3/12/02 | No. |
| 93. | Lowenthal Report Appx. 16 – Subpoena, 4/16/02 | No. |
| 94. | Lowenthal Report Appx. 17 – Investigator's cover letter and excerpts from investigative report, 5/8/02 | No. |
| 95. | Lowenthal Report Appx. 18 – Jeanea Lambeth letter to Jakubczyk, 3/15/02 | No. |
| 96. | Lowenthal Report Appx. 19 – Donna Ochoa letter to Dr. Yee, 3/28/02 | No. |
| 97. | Lowenthal Report Appx. 20 – Brian Yee letter to Superior Court, 3/13/02 | No. |

| 98. | Lowenthal Report Appx. 21 – Linda Gray letter to Superior Court, 4/17/02 | No. |
|---|---|---|
| 99. | Lowenthal Report Appx. 22 – Maricopa County Superior Court Minute Entry, 8/1/02 | No. |
| 100 | Lowenthal Report Appx. 23 – Motion for Sanctions, 7/15/02 | No. |
| 101. | Lowenthal Report Appx. 24 – Pinal County Superior Court Minute Entry, 7/23/02 | No. |
| 102 | Lowenthal Report Appx. 25 – Maricopa County Superior Court Order, 7/31/02 | No. |
| 103 | Lowenthal Report Appx. 26 – Arizona Supreme Court, Summary of Judgment, 3/25/04 | No. |
| 104 | Lowenthal Report Appx. 27 – Pinal County Superior Court Minute Entry, 10/15/02 | No. |
| 105 | Lowenthal Report Appx. 28 – Maricopa County Superior Court Minute Entry, 12/20/02 | No. |
| 106. | Lowenthal Report Appx. 29 – Maricopa County Superior Court Minute Entry, 9/8/03 | No. |
| 107. | Lowenthal Report Appx. 30 – Exchange of emails, DeLozier and Donna Ochoa, 3/3/03 | No. |
| 108. | Lowenthal Report Appx. 31 – Exchange of emails, DeLozier and Donna Ochoa, 4/14/03 | No. |
| 109. | Lowenthal Report Appx. 32 – DeLozier's blind copy of email from Donna Ochoa to Budge, 5/17/03 | No. |

| 110. | Lowenthal Report Appx. 33 – Rich Robertson investigation billing to DeLozier, 5/03 and 10/03 | No. |
| 111. | Lowenthal Report Appx. 34 – Excerpts, DeLozier's Court of Appeals Opening Brief, 5/27/03 | No. |
| 112. | Lowenthal Report Appx. 36 – Budge Motion to Reinstate Appeal, 2/25/04 | No. |
| 113. | Lowenthal Report Appx. 38 – Ochoa letter to Superior Court, 3/21/05 | No. |
| 114. | Lowenthal Report Appx. 40 – Notice of pro se representation, 11/15/04 | No. |
| 115. | Lowenthal Report Appx. 42 – Handwritten notes faxed to DeLozier, 3/7/05 | No. |
| 116. | Lowenthal Report Appx. 46 – DeLozier billing record for custody representation, July, 2002 | No. |
| 117. | Lowenthal Report Appx. 44 – DeLozier billing record, October 2003 | No. |
| 118. | DeLozier billing record, November 3, 2003 | No. |
| 119. | DeLozier billing record for custody representation, December 1, 2003 | No. |
| 120. | DeLozier billing record for criminal representation, December 1, 2003 | No. |
| 121. | DeLozier billing record for custody representation, December 31, 2003 | No. |
| 122. | Lowenthal Report Appx. 45 – DeLozier billing record for criminal representation, December 31, 2003 | No. |
| 123. | DeLozier billing record, January 2004 | No. |

| 124. | Lowenthal Report Appx. 37 – DeLozier billing record, February 2004 | No. |
| 125. | DeLozier billing record, March 2004 | No. |
| 126. | Lowenthal Report Appx. 39 – DeLozier billing record, April 2004 | No. |
| 127. | DeLozier billing record, May 2004 | No. |
| 128. | DeLozier billing record, June 2004 | No. |
| 129. | DeLozier billing record, September 2004 | No. |
| 130. | Lowenthal Report Appx. 41 – DeLozier billing record, December 2004 | No. |
| 131. | State Petition Response Ex. E, Pages E39-E67, E110-E136 – 2003 Appellate Briefing from Custody Proceeding | Yes. |
| 132. | March 18, 2003 Letter from Ochoas to Arizona Family Adoption Services | No. |
| 133. | Stipulation filed 12/21/04 in *John Doe XXIII v. The Roman Catholic Church of Diocese of Tucson* | No. |
| 134. | Motion for Reconsideration filed 11/28/06 in *John Doe XXIII v. The Roman Catholic Church of Diocese of Tucson* | No. |
| 135. | Keith Rohman, Curriculum Vitae | No. |
| 136. | 11/29/04 email from S. MacLeod to D. Patterson | No. |
| 137. | 12/06/04 emails from S. MacLeod to D. Patterson and D. DeLozier | No. |

| 138. | Demonstrative Exhibit from Penalty Phase – Powerpoint presentation slides | No. |
|---|---|---|
| 139. | March 4, 2003 *East Valley Tribune* article, "Justice System Can't Cope With Backlog of Death Penalty Cases" | No. |
| 140. | Photograph of W. Andriano and S. Robertson, circa 1970 | No. |
| 141. | Photograph of W. Andriano, circa 1970 | No. |
| 142. | Photograph of W. Andriano and S. Robertson, circa 1972 | No. |
| 143. | Photograph of W. Andriano, circa 1972 or 1973 | No. |
| 144. | Photograph of W. Andriano, D. Ochoa, and S. Robertson, circa 1973 | No. |
| 145. | Photograph of W. Andriano and S. Robertson, circa 1973 or 1974 | No. |
| 146. | Photograph of W. Andriano and A. Worsham, circa 1975 | No. |
| 147. | Photograph of W. Andriano with Ochoas and Fishers of Men, 1979 | No. |
| 148. | Photograph of W. Andriano and A. Ochoa, circa fall 1979 | No. |
| 149. | Photograph of W. Andriano and A. Ochoa, circa winter 1979 | No. |
| 150. | Photograph of W. Andriano and A. Ochoa, circa 1981 | No. |
| 151. | Photograph of Robertson siblings, circa 1987 | No. |
| 152. | 12/08/92 arrest report for S. Robertson and T. Robertson | No. |

| 153. | Photograph of W. Andriano and Ochoas, circa 1978 | No. |
|------|---------------------------------------------------|-----|
| 154. | Photograph of W. Andriano and A. Ochoa, circa 1978 or 1979 | No. |
| 155. | Photograph of W. Andriano, circa 1980 | No. |
| 156. | Photograph of W. Andriano, circa 1980 or 1981 | No. |
| 157. | Photograph of W. Andriano and Ochoas, circa 1981 | No. |
| 158. | Photograph of W. Andriano and A. Ochoa, circa 1986 | No. |
| 159. | Photograph of W. Andriano, L. Bell, and A. Ochoa, circa late 1980s | No. |
| 160. | Photograph of K. Lorts, circa 1979 or 1980 | No. |
| 161. | Photograph of J. Casey, circa 1980 | No. |
| 162. | Photograph of J. Neace, circa 1980 or 1981 | No. |
| 163. | Photograph of B. Ochoa, circa 1991 | No. |
| 164. | Photograph of B. Ochoa, circa 1993 | No. |
| 165. | Audio Recording, sermon of Pastor T. King, Harvest Family Church (11/16/1988) | No. |
| 166. | Dr. Joette James, Curriculum Vitae | Yes. |
| 167. | Report of Dr. Joette James (tentative) | Unknown (report not yet disclosed) |

| STATE'S EXHIBITS | DESCRIPTION | ADMISSIBILITY STIPULATED? |
|---|---|---|
| 168 | Report of Dr. Steven Pitt (including exhibits) | No. |
| 169 | Report of Dr. Kiran Amin | No. |
| 170 | Phoenix Police Departmental Report (Bates #9256-9715) | No. |
| 171 | Records from H. Kandy Rohde | Yes. |
| 172 | Records from Maricopa County Jail (#1173–11799) | No. |
| 173 | Interview transcript of Daniel Patterson | No. |
| 174 | Interview transcript of G. David DeLozier | No. |
| 175 | Records from Mesa Police Department and court documents regarding Cynthia Edwards investigation (Bates # 4366-4390) | No. |
| 176 | Wendi Andriano's employment records from Casa Grande Regional Medical Center (Bates # 4221-4339) | No. |
| 177 | Wendi Andriano's Employment Application for First West Properties Corporation (Released Trial Exhibit 487/Bates #4401–02) | No. |
| 178 | Records relating to Wendi Andriano's theft from Courtyard Apartments (Bates # 4341-4364) | No. |
| 179 | DVDs of Wendi Andriano's interview with Detectives David Lucero and Sally Dillian | Yes. |
| 180 | Transcript of Wendi Andriano's interview with Detectives David Lucero and Sally Dillian (Bates #11500-11702) | Yes. |
| 181 | Medical Records from Arizona Department of Corrections (#11952–12250) | No. |
| 182 | Cassette tape of Wendi Andriano's Telephone Call with CIGI insurance company | No. |

| 183 | Report of Dr. Sharon Murphy, dated September 22, 2003 | Yes. |
|---|---|---|
| 184 | Medical records relating to Wendi Andriano's suicide attempt (Bates 9722-9745) | Yes. |
| 185 | Arizona Department of Corrections Medical Record Excerpt (Bates # 12152) | No. |
| 186 | DVD of forensic interview of Wendi Andriano by Drs. Steven Pitt and Kiran Amin | No. |
| 187 | Maricopa County Jail Disciplinary Report (Defense Bates # PCRDIS-PCR001722) | No. |
| 188 | Maricopa County Jail Disciplinary Report (Defense Bates # P001723–P001724) | No. |
| 189 | Arizona Department of Corrections inmate letter (Bates #11386) | No. |
| 190 | Arizona Department of Corrections inmate letter (Bates # 11377) | No. |
| 191 | Arizona Department of Corrections Disciplinary Report (Bates # 11365) | No. |
| 192 | Arizona Department of Corrections Disciplinary Report (Bates #11360) | No. |
| 193 | Arizona Department of Corrections mental health progress note dated November 23, 2011 (Bates # 12221) | No. |
| 194 | Arizona Department of Corrections mental health progress note dated December 12, 2011 (Bates # 12219) | No. |
| 195 | Wendi Andriano's records from Casa Grande Valley Counseling Service, Inc. (Trial Exhibit 544/Bates # 4212-4214) | Yes. |
| 196 | Notes from Maricopa County Jail (Bates # 4216-4219) | No. |
| 197 | Maricopa County Jail disciplinary report (Trial Exhibit 548/Bates # 4392–4393) | No. |
| 198 | Statement of financial status (Trial Exhibit 472/Bates #4396–98) | No. |

| 199 | Trial testimony of Chris Hashisaki September 8 and 9, 2004) | Yes. |
|-----|-----------------------------------------------------------|------|
| 200 | Trial testimony of Rick Freeland | Yes. |
| 201 | Trial testimony of Dawna Harris (December 14, 2004) | Yes. |
| 202 | Arizona Department of Corrections Inmate Master File (Bates # 11329-11484) | No. |

The parties reserve the right to amend this list following witness interviews, or if additional relevant information arises.

RESPECTFULLY SUBMITTED January 10, 2014.

OFFICE OF THE ATTORNEY GENERAL

By: */s/ Lacey Stover Gard* (with permission)
    Lacey Stover Gard
    400 West Congress, Suite S-315
    Tucson, Arizona 85701-1367

    Gregory M. Hazard
    1275 West Washington Street
    Phoenix, AZ 85007-2926

    *Attorneys for the State of Arizona*

COPPERSMITH SCHERMER & BROCKELMAN PLC

By: */s/ Scott M. Bennett*
    Scott M. Bennett
    2800 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004

FOLEY & LARDNER LLP
    Allen A. Arntsen
    Stephan J. Nickels
    Matthew R. Lynch
    150 East Gilman Street
    Madison, Wisconsin 53703

    *Attorneys for Petitioner*

ORIGINAL e-filed January 10, 2014,
with the Clerk of the Maricopa County Superior Court

COPY mailed January 10, 2014, to:

Judge Brian Ishikawa
Maricopa County Superior Court
Southeast Court
1810 S. Lewis Street
Mesa, Arizona  85210

Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tucson, AZ 85701-1367
*Attorney for the State of Arizona*

Gregory Hazard
Office of the Attorney General
1275 West Washington Street
Phoenix, AZ 85007-2926
*Attorney for the State of Arizona*


*/s/ Carol Keesee*

# EXHIBIT IIIIIIII

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
1/29/2014 2:02:00 PM
Filing ID 5680886

WILLIAM G. MONTGOMERY
MARICOPA COUNTY ATTORNEY
By:     J. RANDALL JUE (014816)
        Deputy County Attorney
CIVIL SERVICES DIVISION
222 North Central Avenue, Suite 1100
Phoenix, Arizona  85004
Firm No. 00032000
Telephone No. (602) 506-8541
Facsimile No. (602) 506-8567
juej@mcao.maricopa.gov
ca-civilmailbox@mcao.maricopa.gov
Attorneys for Sheriff Arpaio

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | No: CR2000-096032-A |
| Respondent, | **SHERIFF ARPAIO'S NOTICE REGARDING TRANSPORTATION SCHEDULE DURING EVIDENTIARY HEARING** |
| v. | |
| WENDI ELIZABETH ANDRIANO, | (Assigned to the Honorable Brian Ishikawa) |
| Petitioner. | |

Sheriff Arpaio, through undersigned counsel, hereby gives notice of the transportation schedule for Petitioner on the scheduled dates of her upcoming evidentiary hearing.

Petitioner will be housed at the Estrella Jail ('Estrella').   On any given day, approximately 100 inmates must be transported from Estrella to various courtrooms in Maricopa County.   The hub for processing these inmates is the South Court Tower.   In order to accomplish the task of moving numerous inmates, the Estrella personnel generally allow for approximately two to three hours to wake up the inmates to provide the inmates with adequate time to shower and get dressed so that they are ready to board the shuttle by 6 a.m. According to Estrella personnel, the typical wakeup time will be closer to 4 a.m., but could be earlier depending on how many inmates need to be transported for court appearances on any particular day.

The inmates are then transported to South Court Tower where they will arrive about 6:30 a.m.  At the South Court Tower, the inmates are provided with their first meal of the day, which

1   is a sack lunch.  At about 8 a.m., Petitioner will be transported to the Southeast Court Complex

2   where she will arrive about 9 a.m.  No visitation by anyone, including attorneys, is permitted at

3   the holding cell area at the Southeast Court Complex.  Thus, if Petitioner needs to consult with

4   her attorneys prior to the start of the evidentiary hearing, this can only occur in Judge Ishikawa's

5   courtroom.

6          After each day's proceedings have concluded, the Sheriff's Office shall transport

7   Petitioner directly from the courtroom to Estrella where she will be served her one hot meal of

8   the day.

9          RESPECTFULLY SUBMITTED this 29th day of January 2014.

10                          WILLIAM G. MONTGOMERY
                            MARICOPA COUNTY ATTORNEY

11

12                          BY:  /s/ J. Randall Jue_____
                                 J. RANDALL JUE
13                               Attorneys for Sheriff Arpaio

     ORIGINAL electronically filed
14   and electronically sent
     this 29th day of January 2014 to:

15
     Honorable Brian Ishikawa
16   MARICOPA COUNTY SUPERIOR COURT
     222 East Javelina Avenue
17   Mesa, Arizona 85210
     gwillcox@superiorcourt.maricopa.gov
18
     with a copies emailed
19   this 29th day of January 2014 to:

20   Allen A. Arntsen
     Stephan J. Nickels
21   Matthew R. Lynch
     FOLEY & LARDNER LLP
22   150 East Gilman Street
     Madison, Wisconsin 53703
23   AArnsten@foley.com
     KSterken@foley.com
24   MLynch@foley.com
     Attorneys for Petitioner
25
     Scott M. Bennett
26   COPPERSMITH SCHERMER & BROCKELMAN PLC
     2800 North Central Avenue, Suite 1200
27   Phoenix, Arizona 85004
     sbennett@csblaw.com
28   Attorneys for Petitioner

                                    2

1

Lacey Stover Gard
Gregory Hazard
2   Office of the Attorney General
400 West Congress, Suite S-315
3   Tucson, Arizona 85701-1367
Lacey.gard@azag.gov
4   Gregory.Hazard@azag.gov
Attorneys for the State of Arizona
5

6   /s/ Lea Wink

7

8   S:\COUNSEL\Civil\Matters\GN\2014\State v. Andriano GN14-0025\Pleadings\NoticeReTransportationSchedule 1-29-14.docx

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT JJJJJJJJJ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
01/30/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    01/24/2014


                                          CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                      L. Mooney
                                                  Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD
                                          JUAN M MARTINEZ
                                          JAMES RANDALL JUE

v.

WENDI ELIZABETH ANDRIANO (A)              SCOTT M BENNETT
                                          ALLEN A ARNTSEN
                                          MATTHEW R LYNCH
                                          JAMES J BELANGER
                                          JODI FOX

                                          APPEALS-PCR
                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR


                          **MINUTE ENTRY**



        Due to a clerical error,

        IT IS ORDERED vacating the Minute Entry dated 01/24/2014, with docket code 029 and
replacing it with the following:



                          **MINUTE ENTRY**



        Courtroom SEF/JUV – Courtroom 9


Docket Code 023                    Form R000A                           Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    01/24/2014

| | |
|---|---|
| State's Attorney: | Juan Martinez – Appearing Telephonically |
| Defendant's Attorney: | Scott Bennett and Allen Arntsen – |
| | Appearing Telephonically |
| M C S O Attorney: | James Randall Jue – Appearing Telephonically |
| Defendant: | Not Present |

Court Reporter, Patti Kotarba, is present.

A record of the proceeding is also made by audio and/or videotape.

LET THE RECORD REFLECT that Jeanette and Joe Andriano are unable to participate in this telephonic conference due to the maximum allowed callers for the conference call. Counsel, Juan Martinez stated that he will relay to them what transpires at this Status Conference.

Discussion is held regarding Defendant's Motion Regarding Transportation and Meals.

Argument is held.

Counsel are all in agreement with the Transportation and Meal concerns regarding the Defendant.

Counsel, James Randall Jue will confirm that the Defendant will be awakening around the 5:00 a.m. hour each day for the hearing.  If this will not be the plan, then Mr. Jue shall be in contact with Mr. Arntsen and also notify the Court.  Mr. Jue will also confirm the return time of the Defendant to the Jail each day.

Discussion is held regarding the Exhibits for the Evidentiary Hearing.

IT IS ORDERED that counsel must submit all Exhibits to the Court no later than **Wednesday, January 29, 2014.**

LET THE RECORD REFLECT that counsel will not need any exhibits from the Trial.

Discussion is held regarding the scheduling of the evidentiary hearing.

IT IS ORDERED that the Evidentiary Hearing shall begin each day at 9:30 a.m.

Discussion is held regarding Opening statements.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      01/24/2014


LET THE RECORD REFLECT that counsel are in agreement to waiving Opening Statements in the Evidentiary Hearing.

LET THE RECORD REFLECT that the Court requests that counsel communicate with each other regarding time frames and scheduling each day to ensure the hearing shall be held in an efficient manner.  If there are any issues, counsel is directed to contact the Judicial Assistant to set up an Informal Status Conference to discuss the issues.

11:46 a.m.  Matter concludes.

# EXHIBIT KKKKKKKKK

*IN THE SUPERIOR COURT OF THE STATE OF ARIZONA*

*IN AND FOR THE COUNTY OF MARICOPA*

**FILED** 1/31/14 4:00 AM
MICHAEL K. JEANES, Clerk
By _____
Deputy

CAUSE NO. *CR 2000-096032 A*

CAPTION: *STATE OF Arizona*
*VS.*
*Wendi Elizabeth*
*Andriano*

**SEALED** ~~EXHIBIT~~ Document

IT IS ORDERED sealing the following ~~exhibit~~Document(s); same not to be opened without prior order of the court:

*Sealed envelope from the court.*

_____

_____

_____

_____

_____

_____

Dated: *01/31/2014*

_____
**Judge/Commissioner of the Superior Court**
*Judge Brian K. Ishikawa*

DISCOVERY AND CONFIDENTIAL MATERIAL

# EXHIBIT LLLLLLLL

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
02/03/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                           01/29/2014


                                           CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                  L. Mooney
                                              Deputy



STATE OF ARIZONA                    LACEY ALEXANDRA STOVER GARD
                                    JUAN M MARTINEZ
                                    JAMES RANDALL JUE

v.

WENDI ELIZABETH ANDRIANO (A)        SCOTT M BENNETT
                                    ALLEN A ARNTSEN
                                    MATTHEW R LYNCH
                                    JAMES J BELANGER
                                    JODI FOX
                                    STEPHAN J NICKELS

                                    APPEALS-PCR
                                    CAPITAL CASE MANAGER
                                    COURT ADMIN-CRIMINAL-PCR


                        **MINUTE ENTRY**



        Courtroom SEF/JUV - Courtroom 9

        State's Attorney:        Gregory Hazard, Juan Martinez - Appearing Telephonically
        Defendant's Attorney:    Scott Bennett, Allen Arntsen, Stephan Nickels,
                                 Matthew Lynch all appearing telephonically
        Defendant:               Not Present

        Discussion is held OFF the record.

        3:50 p.m.  ON the record.

        Court Reporter, Renee Mobley, is present.

Docket Code 020                 Form R000D                      Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      01/29/2014


A record of the proceeding is also made by audio and/or videotape.

State's Motion to Continue Evidentiary Hearing is argued to the Court.

IT IS ORDERED that counsel, Juan Martinez fax or email a letter to the Court by 11:00 a.m. on 01/30/2014 from his physician specifying the medical condition and procedure that is needed to done.   The Court shall keep this letter confidential, under seal and will not disclose the contents.  Once the Court reviews this letter, the Court shall make a ruling on the motion.

IT IS ORDERED taking this motion under advisement.

3:58 p.m.  Matter concludes.

# EXHIBIT MMMMMMMMM

Michael K. Jeanes, Clerk of Court
*** Filed ***

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

2/3/2014 8:00AM

CR 2000-096032                                    01/30/2014

CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA              L. Mooney
                                                                         Deputy

STATE OF ARIZONA                            LACEY ALEXANDRA STOVER GARD
                                                          JUAN M MARTINEZ
                                                          JAMES RANDALL JUE

v.

WENDI ELIZABETH ANDRIANO (A)             SCOTT ( LARSON) BENNETT
                                                          ALLEN A ARNTSEN
                                                          MATTHEW R LYNCH
                                                          JAMES J BELANGER
                                                          JODI FOX
                                                          STEPHAN J NICKELS

                                                          APPEALS-PCR
                                                          CAPITAL CASE MANAGER
                                                          COURT ADMIN-CRIMINAL-PCR

### RULING

The Court having considered the State's Motion to Continue Evidentiary Hearing,

IT IS ORDERED denying the State's Motion to Continue Evidentiary Hearing.

IT IS FURTHER ORDERED filing under seal a letter dated 01-29-14 from Mr. Martinez' treating doctor.

DATED this 30th day of January, 2014.

Honorable Brian K. Ishikawa
Judge of the Superior Court

Docket Code 019                    Form R000A                              Page 1

# EXHIBIT NNNNNNNNN

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
02/06/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        02/03/2014

                                              CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                        L. Mooney
                                                    Deputy

STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD
                                        GREGORY MICHAEL HAZARD

v.

WENDI ELIZABETH ANDRIANO (A)            ALLEN A ARNTSEN
                                        SCOTT M BENNETT
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH
                                        JODI FOX

                                        APPEALS-PCR
                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        SERGEANT SCOTT KELLER
                                        MARICOPA COUNTY SHERIFF'S
                                        OFFICE
                                        175 W. MADISON STREET
                                        PHOENIX ARIZONA  85003

**EVIDENTIARY HEARING
DAY 1**

Prior to commencement of hearing, State's 207 through 212 are marked for identification.

9:32 a.m.

Courtroom JUV Courtroom 9

State's Attorney:          Gregory Hazard and Lacey Stover Gard
Defendant's Attorney:      Allen Arntsen, Scott Bennett, Stephan Nickels,
                           Matthew Lynch, Krista Sterken, and Jodi Fox

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    02/03/2014

Defendant:                    Present
M.C.S.O.:                     Sergeant Scott Keller

Court Reporter, Renee Mobley, is present.

A record of the proceeding is also made by audio and/or videotape.

Discussion is held regarding the transportation and meals for the Defendant.

M.C.S.O Sergeant Scott Keller addressed the Court and stated that there was a miscommunication this morning, but the issue is now resolved.

Counsel stipulate to admitting the following exhibits:

Defense Exhibits: 2, 2.001, 2.002, 2.003, 2.004, 3, 4, 4.001, 4.002, 5, 5.001, 6.001, 6.003, 6.005, 15, 44, 45, 46, 47, 48, 49, 54, 65, 65.001, 131, 166, 167

State's Exhibits:  171, 179, 180, 183, 184, 195, 199, 200, 201

Defense Motion to Admit Exhibits Pertaining to Mitigation Evidence is discussed.

IT IS ORDERED taking this motion under advisement.

Discussion is held regarding Defense Oral Motion regarding witness sequestration.

IT IS ORDERED taking this under advisement.

State's oral Motion to Preclude Mr. Larry Hammond and Mr. Gary Lowenthal as Expert Witnesses in this case.

IT IS ORDERED denying the State's Motion to Preclude Mr. Larry Hammond and Mr. Gary Lowenthal as expert witnesses.

State's Motion regarding the Defendant signing a Waiver with the Arizona Supreme Court acknowledging that Defense counsel were not Rule 6.8 qualified to represent the Defendant in this case is presented to the Court.

LET THE RECORD REFLECT that the Court verifies with the Defendant that she is in agreement of counsel representing her in this post-conviction matter.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          02/03/2014

THE COURT FINDS that the Defendant has knowingly, voluntarily and intelligently made the Rule 6.8 waiver.

**<u>Defense Case:</u>**

Dr. James Hopper is sworn and testifies.

10:43 a.m.  Court stands at recess.

10:59 a.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceeding is also made by audio and/or videotape.

LET THE RECORD REFLECT that Victim Rights are in compliance.

Counsel for State invokes the rule of exclusion of witnesses.

Witness, Dr. James Hopper retakes the stand and continues to testify.

LET THE RECORD REFLECT that the exhibits are to remain in the courtroom which is locked during the lunch hour.

11:51 a.m.  Court stands at recess.

Prior to recommencement of the hearing, Defense Exhibit 206 is marked for identification.

1:32 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape in lieu of a court reporter.

Witness, Dr. James Hopper retakes the stand and continues to testify.

Defense offers to submit their power point presentation as evidence.

IT IS ORDERED denying this request.

Docket Code 005                        Form R000D                        Page 3

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        02/03/2014


LET THE RECORD REFLECT that the power point was used for demonstrative purposes.

State's Exhibit 213 is marked and admitted into evidence by stipulation.

2:45 p.m.  Court stands at recess.

State's Exhibits 214 through 225 are marked for identification.

3:10 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape in lieu of a court reporter.

Witness, Dr. James Hopper retakes the stand and continues to testify.

4:51 p.m.  The witness is excused until February 4, 2014 at 9:30 a.m. before Judge Ishikawa.  Court stands at recess.

# EXHIBIT OOOOOOOOO

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
02/07/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    02/04/2014


                                        CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                    L. Mooney
                                               Deputy


STATE OF ARIZONA                    LACEY ALEXANDRA STOVER GARD
                                    GREGORY MICHAEL HAZARD
                                    JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)        ALLEN A ARNTSEN
                                    SCOTT M BENNETT
                                    STEPHAN J NICKELS
                                    MATTHEW R LYNCH
                                    JODI FOX

                                    APPEALS-PCR
                                    CAPITAL CASE MANAGER
                                    COURT ADMIN-CRIMINAL-PCR
                                    JUDGE ISHIKAWA
                                    SERGEANT SCOTT KELLER
                                    MARICOPA COUNTY SHERIFF'S
                                    OFFICE
                                    175 W. MADISON STREET
                                    PHOENIX ARIZONA  85003


**EVIDENTIARY HEARING
DAY 2**


        Courtroom JUV Courtroom 9

        State's Attorney:        Gregory Hazard and Lacey Stover Gard
        Defendant's Attorney:    Allen Arntsen, Scott Bennett, Stephan Nickels,
                                 Matthew Lynch, Krista Sterken and Jodi Fox
        Defendant:               Present

Docket Code 005              Form R000D                        Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          02/04/2014


M.C.S.O.:                     Sergeant Scott Keller

Court Reporter, Renee Mobley, is present.

A record of the proceeding is also made by audio and/or videotape.

Defense Motion to Admit Exhibits Pertaining to Mitigation Evidence

IT IS ORDERED denying the Defense Motion to Admit Exhibits Pertaining to Mitigation
Evidence as a block without prejudice.

The Court will consider each exhibit asked to be admitted as each is introduced as
requested to be admitted.

IT IS ORDERED allowing Larry Hammond and Gary Lowenthal to be present in the
Courtroom during the testimony of Daniel Patterson and David Delozier but not Scott MacLeod.

IT IS FURTHER ORDERED that Keith Rohman may be present in the courtroom during
the testimony of Scott MacLeod.

IT IS FURTHER ORDERED allowing Dr. George Woods and Dr. Steven Pitt to be
present in the courtroom during the Petitioner, Wendi Andriano's Testimony.

Counsel for the Defense, Scott Bennett addresses the Court regarding concerns regarding
a State's Detective visiting with Defense Witnesses, Kyre Lorts and Alejo Ochoa.

Discussion is held.

The Court advises counsel that the Evidentiary Hearing shall proceed forward with the
Evidentiary Hearing.  The Court will allow counsel time to speak with witness Kyre Lorts prior
to her testimony today.  Any issues in regards to Alejo Ochoa shall be addressed on February 5,
2014 when he is scheduled to testify.

**Defense Case continues:**

Dr. James Hopper retakes the stand and continues to testify.

The witness is excused.

Kyre Lee Jean Lorts is sworn and testifies.

Docket Code 005                         Form R000D                              Page 2

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        02/04/2014

Defense Exhibit 160 is admitted into evidence.

State's Exhibit 226 is marked for identification.

The witness is excused.

10:59 a.m.  Court stands at recess.

11:13 a.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape in lieu of a court reporter.

**<u>Defense Case Continues:</u>**

Donna Ochoa is sworn and testifies.

Defense counsel moves to enter Defense Exhibits 27, 28, and 29 into evidence.

Counsel for the State objects.

LET THE RECORD REFLECT that the Court sustains the objection and Defense Exhibits 27, 28, and 29 are not entered into evidence.

Defense Exhibit 140 is admitted into evidence.

Defense Exhibit 141 is admitted into evidence.

Defense Exhibit 142 is admitted into evidence.

LET THE RECORD REFLECT that the exhibits are to remain in the courtroom which is locked during the lunch hour.

11:51 a.m.  Court stands at recess.

1:30 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              02/04/2014

A record of the proceedings is made by audio and/or videotape in lieu of a court reporter.

Witness, Donna Ochoa retakes the stand and continues to testify.

Defense counsel moves to enter Defense Exhibit 152 into evidence.

Counsel for the State objects.

LET THE RECORD REFLECT that the Court sustains the objection and Defense Exhibit 152 is not entered into evidence.

Defense Exhibit 143 is admitted into evidence.

Defense Exhibit 147 is admitted into evidence.

Defense Exhibits 68, 68.001, and 68.002 are admitted into evidence.

Defense Exhibit 161 is admitted into evidence.

Defense Exhibit 205 is admitted into evidence.

Defense Exhibit 159 is admitted into evidence.

Defense Exhibit 148 is admitted into evidence.

Defense Exhibit 149 is admitted into evidence.

Defense Exhibit 154 is admitted into evidence.

Defense Exhibit 158 is admitted into evidence.

Defense Exhibit 73 is admitted into evidence.

3:00 p.m.  Court stands at recess.

3:14 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    02/04/2014

A record of the proceedings is made by audio and/or videotape in lieu of a court reporter.

Witness, Donna Ochoa retakes the stand and continues to testify.

Defense Exhibit 80 is admitted into evidence.

Defense Exhibit 81 is admitted into evidence.

Defense Exhibit 84 is admitted into evidence.

Defense Exhibit 86 is admitted into evidence.

Defense Exhibit 85 is admitted into evidence.

Defense Exhibit 87 is admitted into evidence.

Defense Exhibit 104 is admitted into evidence.

Defense Exhibit 95 is admitted into evidence.

Defense Exhibit 96 is admitted into evidence.

Defense Exhibit 102 is admitted into evidence.

Defense Exhibit 107 is admitted into evidence.

Defense Exhibit 132 is admitted into evidence.

Defense Exhibit 108 is admitted into evidence.

Defense Exhibit 109 is admitted into evidence.

Defense Exhibit 114 is admitted into evidence.

Defense Exhibit 115 is admitted into evidence.

Defense Exhibit 113 is admitted into evidence.

Defense Exhibit 61 is admitted into evidence.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    02/04/2014

Defense Exhibit 56 is admitted into evidence.

Defense Exhibit 51 is admitted into evidence.

Defense Exhibit 57 is admitted into evidence.

The witness is excused.

Jeri Cunningham is sworn and testifies.

The witness is excused.

LET THE RECORD REFLECT that the Court is appointing counsel for Defense Witness, Alejo Ochoa due to 5th Amendment concerns.

Discussion is held regarding witnesses.

4:46 p.m.  Court stands at recess until **February 5, 2014 at 9:30 a.m.** before Judge Brian Ishikawa.

# EXHIBIT PPPPPPPP

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
02/07/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                                02/05/2014


                                                    CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                            L. Mooney
                                                        Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD
                                          GREGORY MICHAEL HAZARD
                                          JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)              ALLEN A ARNTSEN
                                          SCOTT M BENNETT
                                          STEPHAN J NICKELS
                                          MATTHEW R LYNCH
                                          JODI FOX

                                          APPEALS-PCR
                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          JUDGE ISHIKAWA
                                          SERGEANT SCOTT KELLER
                                          MARICOPA COUNTY SHERIFF'S
                                          OFFICE
                                          175 W. MADISON STREET
                                          PHOENIX ARIZONA  85003



**EVIDENTIARY HEARING
DAY 3**



        9:31 a.m.

        Courtroom JUV Courtroom 9

        State's Attorney:           Gregory Hazard and Lacey Stover Gard
        Defendant's Attorney:       Allen Arntsen, Scott Bennett, Stephan Nickels,

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                                    02/05/2014

|                   |                                              |
|-------------------|----------------------------------------------|
|                   | Matthew Lynch, Krista Sterken and Jodi Fox   |
| Defendant:        | Present                                      |
| M.C.S.O.:         | Sergeant Scott Keller                        |

Court Reporter, Renee Mobley, is present.

A record of the proceeding is also made by audio and/or videotape.

LET THE RECORD REFLECT that Witness, Jasper Neace is provided a headphone hearing device to assist him in hearing for his testimony.

LET THE RECORD REFLECT that the Defense shall not be calling Alejo Ochoa as a witness in their case.  The State may call this witness after contact with his court appointed counsel.

Discussion is held regarding witnesses.

**Defense Case Continues:**

Jasper Neace is sworn and testifies.

The witness is excused.

IT IS ORDERED that the Defendant be transported back to the Arizona Department of Corrections by the Maricopa County Sheriff's Office as ordered in the Order Securing Attendance of Prisoner minute entry dated 01/16/2014.

10:09 a.m.  Court stands at recess.

10:24 a.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape in lieu of a court reporter.

Counsels are in agreement that the Defendant shall not be called to testify from either the Defense or the State.

Discussion is held regarding witness, Alejo Ochoa.

Docket Code 005                    Form R000A                          Page 2

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          02/05/2014

Counsel for the State will be contacting counsel for witness, Alejo Ochoa during the lunch break regarding possibly calling Mr. Ochoa as a witness.

Discussion is held regarding testimony of the expert witnesses.

Dr. George Woods is sworn and testifies.

LET THE RECORD REFLECT that the exhibits are to remain in the courtroom which is locked during the lunch hour.

12:04 p.m.  Court stands at recess.

1:29 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape in lieu of a court reporter.

Discussion is held regarding witnesses.

Witness, Dr. George Woods retakes the stand and continues to testify.

The witness is excused.

3:04 p.m.  Court stands at recess until **February 6, 2014 at 1:30 p.m.** before Judge Brian Ishikawa.

# EXHIBIT QQQQQQQQQ

Juan M. Martinez
Deputy County Attorney
Bar Id #: 009510
301 West Jefferson, 4th Floor
Phoenix, AZ 85003
Telephone: (602) 506-5780
Mcaomjc1@mcao.Maricopa.Gov
MCAO Firm #: 00032000
Attorney for Plaintiff

MICHAEL K JEANES, CLERK
BY _____ DEP

FILED

14 FEB -7 AM 11: 14

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | CRIMINAL SUBPOENA |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CR 2000-096032 |
| WENDI ADRIANO, | ) | |
| | ) | |
| Defendant. | ) | **COUNT 1: FIRST DEGREE MURDER,** |
| | ) | **POST CONVICTION RELIEF** |
| | ) | **EVIDENTARY HEARING** |
| | ) | |

THE STATE OF ARIZONA, to:

**SHAWN KING**

**YOU ARE HEREBY ORDERED TO APPEAR AT 9:30 a.m., on February 13, 2014**, at the Superior Court of Arizona for Maricopa County (report to the Honorable Brian Ishikawa, 1810 S. Lewis, Courtroom 9, Mesa, Arizona 85210) and remain there until excused by the judge conducting the proceedings or otherwise discharged, to give testimony on behalf of the State of Arizona.  Requests for reasonable accommodation for persons with disabilities must be made to the division assigned to the case by parties at least 3 judicial days in advance of a scheduled court proceeding.

**IF YOU FAIL TO APPEAR AS ORDERED, A WARRANT WILL BE ISSUED FOR YOUR ARREST.**

DATED at Phoenix, Arizona, January 16, 2014.

WILLIAM G. MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY: /s/ _____

**PERSONAL SERVICE**

/s/ Juan M. Martinez
Deputy County Attorney

CERTIFICATE OF SERVICE

The undersigned swears (or affirms) that he\she is qualified to serve this subpoena and did so by showing the original to and informing the witness of its contents and by delivering a copy thereof to him\her at _10:35_ a.m.\p.m. on __JANUARY 22ND__, 20_14_, at _____CASA GRANDE_____, Arizona.

DET _____ #256-MCAO
Person serving subpoena ( 010105 )

# EXHIBIT RRRRRRRRR

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
02/11/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          02/06/2014


                                          CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                     L. Mooney
                                                 Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD
                                          GREGORY MICHAEL HAZARD
                                          JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)              ALLEN A ARNTSEN
                                          SCOTT M BENNETT
                                          STEPHAN J NICKELS
                                          MATTHEW R LYNCH
                                          JODI FOX

                                          APPEALS-PCR
                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          JUDGE ISHIKAWA
                                          SERGEANT SCOTT KELLER
                                          MARICOPA COUNTY SHERIFF'S
                                          OFFICE
                                          175 W. MADISON STREET
                                          PHOENIX ARIZONA  85003


**EVIDENTIARY HEARING
DAY 4**


        Prior to commencement of the hearing, Defense Exhibit 227 and 228 are marked for
identification.

        1:30 p.m.

        Courtroom JUV Courtroom 9

Docket Code 005                    Form R000A                              Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          02/06/2014


State's Attorney:              Gregory Hazard and Lacey Stover Gard
Defendant's Attorney:          Allen Arntsen, Scott Bennett, Stephan Nickels,
                               Matthew Lynch, Krista Sterken and Jodi Fox
Defendant:                     Present
M.C.S.O.:                      Sergeant Scott Keller

Court Reporter, Renee Mobley, is present.

A record of the proceeding is also made by audio and/or videotape.

Defense Counsel, Allen Arntsen addresses the Court and states that earlier today he interviewed Dennis Olson who was the interviewer of Alejo Ochoa and Kyre Lorts.

According to counsel, witness, Alejo Ochoa has stated to his counsel that he will take the 5th Amendment if asked to testify.

Defense moves into evidence Exhibits 24 and 25 which are the declaration of witness, Alejo Ochoa.

State asks to reserve their decision on Defense Exhibits 24 and 25 until later this afternoon.

**Defense Case Continues:**

Scott A. MacLeod is sworn and testifies.

Defense Exhibit 136 is admitted into evidence.

Defense Exhibit 137 is admitted into evidence.

The witness is excused.

Keith Rohman is sworn and testifies.

Defense Exhibit 135 is admitted into evidence.

Defense Exhibit 76 is admitted into evidence.

Defense Exhibit 206 is admitted into evidence.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                02/06/2014


3:02 p.m.  Court stands at recess.

3:15 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape in lieu of a court reporter.

Discussion is held regarding Alejo Ochoa and Defense Exhibits 24, 25, 227, and 228.

Counsel stipulate that the witness, Alejo Ochoa will be taking the 5th amendment and therefore will not be called as a witness from either side.

Defense Exhibits 24, 25, 227 and 228 are admitted into the evidence.

Witness, Keith Rohman retakes the stand and continues to testify.

Defense Exhibit 204 is admitted into evidence.

The witness is excused.

3:42 p.m.  Court stands at recess until **February 7, 2014 at 9:30 a.m.** before Judge Brian Ishikawa.

# EXHIBIT SSSSSSSSS

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
02/13/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                   02/07/2014


                                        CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                   L. Mooney
                                               Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD
                                        GREGORY MICHAEL HAZARD
                                        JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)            ALLEN A ARNTSEN
                                        SCOTT M BENNETT
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH
                                        JODI FOX

                                        APPEALS-PCR
                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        JUDGE ISHIKAWA
                                        SERGEANT SCOTT KELLER
                                        MARICOPA COUNTY SHERIFF'S
                                        OFFICE
                                        175 W. MADISON STREET
                                        PHOENIX ARIZONA  85003



**EVIDENTIARY HEARING**
**DAY 5**



    9:27 a.m.

    Courtroom JUV Courtroom 9

    State's Attorney:        Gregory Hazard and Lacey Stover Gard
    Defendant's Attorney:    Allen Arntsen, Scott Bennett, Stephan Nickels,
                             Matthew Lynch, Krista Sterken and Jodi Fox

Docket Code 005              Form R000A                          Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              02/07/2014

Defendant:              Present
M.C.S.O.:               Sergeant Scott Keller

Court Reporter, Renee Mobley, is present.

A record of the proceeding is also made by audio and/or videotape.

**<u>Defense Case Continues:</u>**

Daniel Bryant Patterson is sworn and testifies.

Defense Exhibit 6.002 is admitted into evidence.

10:45 a.m.  Court stands at recess.

11:04 a.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape.

Daniel Bryant Patterson retakes the stand and continues to testify.

Defense Exhibit 138 is admitted into evidence.

Defense Exhibit 229 is marked for identification.

Defense Exhibit 6.003 is admitted into evidence by stipulation.

Defense Exhibit 230 is marked and admitted into evidence.

Defense Exhibit 50 is admitted into evidence.

Defense Exhibit 6.004 is admitted into evidence.

Defense Exhibit 52 is admitted into evidence.

LET THE RECORD REFLECT that the exhibits are to remain in the courtroom which is locked during the lunch hour.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              02/07/2014

11:59 a.m.  Court stands at recess.

1:31 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape.

LET THE RECORD REFLECT that counsel for the State addresses the Court and states that they recognize him as someone who was an intern in the State's Office in 2006 and 2007. He had not worked in this case at that time or any capital cases that they are aware of during his employment in the State's Office.

**Defense Case Continues:**

Daniel Bryant Patterson retakes the stand and continues to testify.

3:06 p.m.  Court stands at recess.

3:19 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape.

Daniel Bryant Patterson retakes the stand and continues to testify.

The witness is excused.

3:43 p.m.  Court stands at recess until **February 10, 2014 at 9:30 a.m.** before Judge Brian Ishikawa.

# EXHIBIT TTTTTTTTT

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
02/13/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          02/10/2014

                                            CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                       L. Mooney
                                                   Deputy

STATE OF ARIZONA                      LACEY ALEXANDRA STOVER GARD
                                      GREGORY MICHAEL HAZARD
                                      JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)          ALLEN A ARNTSEN
                                      SCOTT M BENNETT
                                      STEPHAN J NICKELS
                                      MATTHEW R LYNCH
                                      JODI FOX

                                      APPEALS-CCC
                                      CAPITAL CASE MANAGER
                                      COURT ADMIN-CRIMINAL-PCR
                                      JUDGE ISHIKAWA
                                      SERGEANT SCOTT KELLER
                                      MARICOPA COUNTY SHERIFF'S
                                      OFFICE
                                      175 W. MADISON STREET
                                      PHOENIX ARIZONA  85003

**EVIDENTIARY HEARING
DAY 6**

9:31 a.m.

Courtroom JUV Courtroom 9

State's Attorney:          Gregory Hazard and Lacey Stover Gard
Defendant's Attorney:      Allen Arntsen, Scott Bennett, Stephan Nickels,
                           Matthew Lynch, Krista Sterken and Jodi Fox

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                             02/10/2014

Defendant:                    Present
M.C.S.O.:                     Sergeant Scott Keller

Court Reporter, Renee Mobley, is present.

A record of the proceeding is also made by audio and/or videotape.

**Defense Case Continues:**

Dr. Joette Deanna James is sworn and testifies.

The witness is excused.

10:38 a.m.  Court stands at recess.

10:57 a.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape.

Counsel stipulate to the admission of Defense Exhibits 82, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, and 130.

**Defense Case Continues:**

George David DeLozier Jr. is sworn and testifies.

Defense Exhibit 231 is marked and admitted into evidence.

Defense Exhibit 89 is admitted into evidence.

Defense Exhibit 88 is admitted into evidence.

Defense Exhibit 100 is admitted into evidence.

Defense Exhibit 101 is admitted into evidence.

Defense Exhibit 110 is admitted into evidence.

Docket Code 005                    Form R000A                    Page 2

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                                02/10/2014

Defense Exhibit 99 is admitted into evidence.

LET THE RECORD REFLECT that the exhibits are to remain in the courtroom which is locked during the lunch hour.

11:56 a.m.  Court stands at recess.

1:30 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape.

**Defense Case Continues:**

George David DeLozier Jr. retakes the stand and continues to testify.

Defense counsel moves to enter Defense Exhibit 134 into evidence.

Counsel for the State objects.

LET THE RECORD REFLECT that the Court sustains the objection and Defense Exhibit 134 is not entered into evidence.

Defense Exhibit 63 is admitted into evidence.

Defense Exhibit 7.002 is admitted into evidence.

The witness is excused.

2:50 p.m.  Court stands at recess.

3:05 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape.

**Defense Case Continues:**

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    02/10/2014

Cindy Schaider is sworn and testifies.

Defense counsel moves to enter Defense Exhibit 165 into evidence.

Counsel for the State objects.

LET THE RECORD REFLECT that the Court sustains the objection and Defense Exhibit 165 is not entered into evidence.

The witness is excused.

3:47 p.m.  Court stands at recess until **February 11, 2014 at 9:30 a.m.** before Judge Brian Ishikawa.

# EXHIBIT UUUUUUUU

Michael K. Jeanes, Clerk of Court
*** Filed ***

2/18/14 800AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    02/14/2014

CLERK OF THE COURT
L. Mooney
Deputy

HONORABLE BRIAN K. ISHIKAWA

STATE OF ARIZONA                    LACEY ALEXANDRA STOVER GARD
                                    GREGORY MICHAEL HAZARD
                                    JUAN M MARTINEZ
                                    JAMES RANDALL JUE

v.

WENDI ELIZABETH ANDRIANO (A)        ALLEN A ARNTSEN
                                    SCOTT M BENNETT
                                    STEPHAN J NICKELS
                                    MATTHEW R LYNCH
                                    JODI FOX

                                    AZ DOC MAIL CODE 481
                                    SERGEANT SCOTT KELLER
                                    MARICOPA COUNTY SHERIFF'S
                                    OFFICE
                                    175 W. MADISON STREET
                                    PHOENIX ARIZONA  85003

## ORDER TRANSPORTING PRISONER

IT IS ORDERED that the Maricopa County Sheriff's Office, or any county sheriff's office within the State of Arizona, return the prisoner, Wendi Elizabeth Andriano, DOC# 191593, date of birth: 08/06/1970 to the custody of the Arizona Department of Corrections on this date.

HONORABLE BRIAN ISHIKAWA
JUDGE OF THE SUPERIOR COURT

Docket Code 023                    Form R000A                    Page 1

# EXHIBIT VVVVVVVVV

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
02/19/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      02/11/2014


                                        CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                   L. Mooney
                                              Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD
                                        GREGORY MICHAEL HAZARD
                                        JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)            ALLEN A ARNTSEN
                                        SCOTT M BENNETT
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH
                                        JODI FOX

                                        APPEALS-CCC
                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        JUDGE ISHIKAWA
                                        SERGEANT SCOTT KELLER
                                        MARICOPA COUNTY SHERIFF'S
                                        OFFICE
                                        175 W. MADISON STREET
                                        PHOENIX ARIZONA  85003


**EVIDENTIARY HEARING**
**DAY 7**


Prior to commencement of the hearing,

Defense Exhibits 232 and 233 are marked for identification.

9:31 a.m.

Courtroom JUV Courtroom 9

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      02/11/2014


State's Attorney:            Gregory Hazard and Lacey Stover Gard
Defendant's Attorney:        Allen Arntsen, Scott Bennett, Stephan Nickels,
                             Matthew Lynch, Krista Sterken and Jodi Fox
Defendant:                   Present
M.C.S.O.:                    Sergeant Scott Keller

Court Reporter, Renee Mobley, is present.

A record of the proceeding is also made by audio and/or videotape.

Defense Exhibits 232 and 233 are admitted into evidence.

**Defense Case Continues:**

Larry A. Hammond is sworn and testifies.

Defense Exhibit 64 is admitted into evidence.

11:01 a.m.  Court stands at recess.

11:15 a.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape.

**Defense Case Continues:**

Larry A. Hammond retakes the stand and continues to testify.

Defense Exhibit 7.002 is admitted into evidence.

LET THE RECORD REFLECT that the exhibits are to remain in the courtroom which is locked during the lunch hour.

11:52 a.m.  Court stands at recess.

1:30 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      02/11/2014

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape.

**Defense Case Continues:**

Larry A. Hammond retakes the stand and continues to testify.

Defense counsel moves to enter Defense Exhibit 1 into evidence.

Counsel for the State objects.

LET THE RECORD REFLECT that the Court sustains the objection and Defense Exhibit 1 is not entered into evidence.

The witness is excused.

Gary Lowenthal is sworn and testifies.

Defense Exhibit 234 is marked for identification.

3:05 p.m.  Court stands at recess.

3:24 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape.

Discussion is held regarding scheduling.  Court shall continue past 5:00 p.m. on this date to complete the testimony of the witness if needed.

LET THE RECORD REFLECT that this hearing will not be held on Wednesday, February 12, 2014 or Thursday, February 13, 2014 due to witness availability.

IT IS ORDERED that the Defendant, Wendi Elizabeth Andriano shall remain at the Maricopa County Jail and not transported on Wednesday, February 12, 2014 or Thursday, February 13, 2014 and will be transported on Friday, February 14, 2014 for the conclusion of the Evidentiary Hearing.

Docket Code 005                     Form R000A                              Page 3

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    02/11/2014

**<u>Defense Case Continues:</u>**

Gary Lowenthal retakes the stand and continues to testify.

Defense Exhibit 105 is admitted into evidence.

Defense counsel moves to enter Defense Exhibits 78, 79, and 234 into evidence.

Counsel for the State objects to Defense Exhibits 78 and 234.

LET THE RECORD REFLECT that the Court sustains the objection and Defense Exhibits 78 and 234 are not entered into evidence.

Defense Exhibit 79 is admitted into evidence.

Defense Exhibit 97 is admitted into evidence.

State's Exhibit 174 is admitted into evidence.

The witness is excused.

Discussion is held regarding counsel submitting written closing arguments.  Counsel request with the Court that they have a copy of this Evidentiary Hearing Court Reporter Transcript before preparing their written closing arguments.

LET THE RECORD REFLECT that the Court shall provide counsel with a timeline for the written closing arguments on Friday, February 14, 2014.

4:38 p.m.  Court stands at recess until **February 14, 2014 at 9:30 a.m.** before Judge Brian Ishikawa.

# EXHIBIT WWWWWWWWW

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
02/20/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        02/19/2014


                                            CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                       L. Mooney
                                                   Deputy



STATE OF ARIZONA                            LACEY ALEXANDRA STOVER GARD
                                            GREGORY MICHAEL HAZARD
                                            JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)                ALLEN A ARNTSEN
                                            SCOTT M BENNETT
                                            STEPHAN J NICKELS
                                            MATTHEW R LYNCH
                                            JODI FOX

                                            APPEALS-PCR
                                            CAPITAL CASE MANAGER
                                            COURT ADMIN-CRIMINAL-PCR
                                            EDM-QC-CCC
                                            JUDGE ISHIKAWA
                                            MEEDS ADMINISTRATOR
                                            SERGEANT SCOTT KELLER
                                            MARICOPA COUNTY SHERIFF'S
                                            OFFICE
                                            175 W. MADISON STREET
                                            PHOENIX ARIZONA  85003


**MINUTE ENTRY**


        A clerical error having been made in that the minute entry was approved prior to
completion.


Docket Code 023                    Form R000A                              Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    02/19/2014


IT IS ORDERED deleting the minute entry with case number CR2000-096032A, dated February 14, 2014 and filed on February 19, 2014, with docket code 005, in its entirety and said minute entry is considered null and void.

IT IS FURTHER ORDERED that EDM-QC shall remove the minute entry from the Clerk's Office Docket and OnBase system.

IT IS FURTHER ORDERED that the MEEDS Administrator shall remove the minute entry from the Clerk's Office minute entry web site.

LET THE RECORD REFLECT that a new minute entry shall be issued to replace this minute entry for the Court Hearing on Friday, February 14, 2014.

# EXHIBIT XXXXXXXXX

FILED
*2/25/2014-1000AM*
MICHAEL K. JEANES, Clerk
By
**Deputy**

*SUPERIOR COURT OF ARIZONA*
*MARICOPA COUNTY*
*HEARING WORKSHEET*

| | | |
|---|---|---|
| Judge/Commissioner/Pro Tem: | JUDGE BRIAN K. ISHIKAWA | Case No.: CR 2000-096032-A |
| | | Co-Defendant: NO |

| | | |
|---|---|---|
| STATE OF ARIZONA | GREGORY MICHAEL HAZARD AND LACEY STOVER GARD | EVIDENTIARY HEARING |
| v. | | |
| WENDI ELIZABETH ANDRIANO | SCOTT BENNETT, ALLEN ARNTSEN, STEPHAN NICKELS, MATTHEW LYNCH, KRISTA STERKEN, AND JODI FOX | |

| HEARING DATE | NO OF JURORS | Amount $ | A.M. | | P.M. | |
|---|---|---|---|---|---|---|
| | | | CT. CLERK | CT. REPORTER | CT. CLERK | CT. REPORTER |
| 02/03/2014 | N/A | N/A | L. MOONEY | RENEE MOBLEY | L. MOONEY | RENEE MOBLEY |
| 02/04/2014 | N/A | N/A | L. MOONEY | RENEE MOBLEY | L. MOONEY | RENEE MOBLEY |
| 02/05/2014 | N/A | N/A | L. MOONEY | RENEE MOBLEY | L. MOONEY | RENEE MOBLEY |
| 02/06/2014 | N/A | N/A | N/A | N/A | L. MOONEY | RENEE MOBLEY |
| 02/07/2014 | N/A | N/A | L. MOONEY | RENEE MOBLEY | L. MOONEY | RENEE MOBLEY |
| 02/10/2014 | N/A | N/A | L. MOONEY | RENEE MOBLEY | L. MOONEY | RENEE MOBLEY |
| 02/11/2014 | N/A | N/A | L. MOONEY | RENEE MOBLEY | L. MOONEY | RENEE MOBLEY |
| 02/14/2014 | N/A | N/A | L. MOONEY | RENEE MOBLEY | L. MOONEY | RENEE MOBLEY |

## Rule of Exclusion of Witnesses invoked by __State__ on __02/03/2014__.

| Witnesses' Name(s) | Date Sworn | Date Testified |
|---|---|---|
| DR. JAMES HOPPER | 02/03/2014 | 02/03/2014, 02/04/2014 |
| KYRE LEE JEAN LORTS | 02/04/2014 | 02/04/2014 |
| DONNA OCHOA | 02/04/2014 | 02/04/2014 |
| JERI CUNNINGHAM | 02/04/2014 | 02/04/2014 |
| JASPER NEACE | 02/05/2014 | 02/05/2014 |
| DR. GEORGE WOODS | 02/05/2014 | 02/05/2014 |
| SCOTT A. MACLEOD | 02/06/2014 | 02/06/2014 |

| Witnesses' Name(s) | Date Sworn | Date Testified |
|---|---|---|
| KEITH ROHMAN | 02/06/2014 | 02/06/2014 |
| DANIEL BRYANT PATTERSON | 02/07/2014 | 02/07/2014 |
| DR. JOETTE JAMES | 02/10/2014 | 02/10/2014 |
| GEORGE DAVID DELOZIER JR. | 02/10/2014 | 02/10/2014 |
| CINDY SCHAIDER | 02/10/2014 | 02/10/2014 |
| LARRY A. HAMMOND | 02/11/2014 | 02/11/2014 |
| KIRAN AMIN | 02/14/2014 | 02/14/2014 |
| DR. STEVEN ERROL PITT | 02/14/2014 | 02/14/2014 |

# EXHIBIT YYYYYYYYY

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
02/26/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      02/18/2014


                                        CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                   L. Mooney
                                               Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD
                                        GREGORY MICHAEL HAZARD
                                        JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)            ALLEN A ARNTSEN
                                        SCOTT M BENNETT
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH
                                        JODI FOX

                                        APPEALS-PCR
                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        JUDGE ISHIKAWA
                                        SERGEANT SCOTT KELLER
                                        MARICOPA COUNTY SHERIFF'S
                                        OFFICE
                                        175 W. MADISON STREET
                                        PHOENIX ARIZONA  85003


**MINUTE ENTRY**


        IT IS ORDERED amending the Evidentiary Hearing Day 2 minute entry dated
02/04/2014 with docket code 005 to reflect on Page 4 the addition of Defense Exhibit 74.  The
placement of the entry is as follows:

        Defense Exhibit 73 is admitted into evidence.

        Defense Exhibit 74 is admitted into evidence.

        3:00 p.m.  Court stands at recess.

Docket Code 023                         Form R000A                         Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      02/18/2014

IT IS FURTHER ORDERED amending Page 1 to reflect the start time of the Evidentiary Hearing to be as follows:

9:32 a.m.

Courtroom JUV Courtroom 9

The remainder of the minute entry remains unchanged.

IT IS ORDERED amending the Evidentiary Hearing Day 5 minute entry dated 02/07/2014, with docket code 005 to reflect on Page 2 the addition of the following in **BOLD**:

Defense Exhibit 229 is marked for identification.

**Defense Counsel moves to enter Defense Exhibit 229 into evidence.**

**Counsel for the State objects.**

**LET THE RECORD REFLECT that the Court sustains the objection and Defense Exhibit 229 is not entered into evidence.**

# EXHIBIT ZZZZZZZZZ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
02/26/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                              02/25/2014


                                              CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                        L. Mooney
                                                   Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD
                                        GREGORY MICHAEL HAZARD
                                        JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)            ALLEN A ARNTSEN
                                        SCOTT M BENNETT
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH
                                        JODI FOX

                                        APPEALS-PCR
                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        JUDGE ISHIKAWA
                                        OFFICE OF PUBLIC DEFENSE
                                        SERVICES-CCC


**MINUTE ENTRY**


        The Court finds that the transcript of the PCR Evidentiary Hearing proceedings is a reasonable and necessary expense for the operation of the Court.

        IT IS ORDERED the cost of the transcripts for the PCR Evidentiary Hearing held of February 3, 2014; February 4, 2014; February 5, 2014; February 6, 2014; February 7, 2014; February 10, 2014; February 11, 2014; and February 14, 2014 will be paid for by the Office of Public Defense Services.

# EXHIBIT AAAAAAAAA

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
03/03/2014 8:00 AM

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

CR 2000-096032                                          02/14/2014


                                          CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                     L. Mooney
                                                Deputy



STATE OF ARIZONA                          LACEY ALEXANDRA STOVER GARD
                                          GREGORY MICHAEL HAZARD
                                          JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)              ALLEN A ARNTSEN
                                          SCOTT M BENNETT
                                          STEPHAN J NICKELS
                                          MATTHEW R LYNCH
                                          JODI FOX

                                          APPEALS-PCR
                                          CAPITAL CASE MANAGER
                                          COURT ADMIN-CRIMINAL-PCR
                                          JUDGE ISHIKAWA
                                          SERGEANT SCOTT KELLER
                                          MARICOPA COUNTY SHERIFF'S
                                          OFFICE
                                          175 W. MADISON STREET
                                          PHOENIX ARIZONA  85003


### EVIDENTIARY HEARING
### DAY 8


9:31 a.m.

Courtroom JUV Courtroom 9

State's Attorney:          Gregory Hazard and Lacey Stover Gard
Defendant's Attorney:      Allen Arntsen, Scott Bennett, Stephan Nickels,
                           Matthew Lynch, Krista Sterken and Jodi Fox

Docket Code 005            Form R000A                    Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                           02/14/2014


Defendant:                    Present
M.C.S.O.:                     Sergeant Scott Keller

Court Reporter, Renee Mobley, is present.

A record of the proceeding is also made by audio and/or videotape.

**Defense rests.**

**State's Case:**

Kiran Amin is sworn and testifies.

State's counsel moves to enter State's Exhibit 169 into evidence.

Counsel for the Defense objects to the admission of State's Exhibit 169.

LET THE RECORD REFLECT that the Court sustains the objection and State's Exhibit 169 is not entered into evidence.

The State asks the Court to reconsider the admission of State's Exhibit 169.

Counsel for the Defense objects to the admission of State's Exhibit 169.

LET THE RECORD REFLECT that the Court sustains the objection and State's Exhibit 169 is not entered into evidence.

Defense Exhibit 235 is marked for identification.

Defense Exhibit 236 is marked and admitted into evidence by stipulation.

The witness is excused.

10:13 a.m.  Court stands at recess.

11:23 a.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape.

Docket Code 005                    Form R000A                    Page 2

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        02/14/2014

State makes an oral motion for the admission of State's Exhibit 169.

Argument is held.

IT IS ORDERED taking this under advisement.

**State's Case continues:**

Dr. Steven Errol Pitt retakes the stand and continues to testify.

LET THE RECORD REFLECT that the exhibits are to remain in the courtroom which is locked during the lunch hour.

11:49 a.m.  Court stands at recess.

1:30 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape.

IT IS ORDERED allowing State's Exhibit 169 to be admitted into evidence.  The Court's understanding is that State's Exhibit 169 is to be used for the limited purpose of showing the basis of Dr. Pitts Opinions.

State's Exhibit 169 is admitted into evidence.

Counsel for the Defense makes an oral motion to admit Defense Exhibits 1 and 78.

Argument is held.

IT IS ORDERED denying the Defense motion.

Dr. Steven Errol Pitt retakes the stand and continues to testify.

State's Exhibit 186 is admitted into evidence.

State's Exhibit 203 is admitted into evidence.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    02/14/2014

State's counsel moves to enter State's Exhibit 168 into evidence.

Counsel for the Defense objects to the admission of State's Exhibit 168.

LET THE RECORD REFLECT that the Court sustains the objection and State's Exhibit 168 is not entered into evidence.

3:04 p.m.  Court stands at recess.

Prior to recommencement of the hearing, State's Exhibit 237 is marked for identification.

3:18 p.m.  Court reconvenes with respective counsel.  The Defendant is present.

Court Reporter, Renee Mobley, is present.

A record of the proceedings is made by audio and/or videotape.

State's Exhibit 237 is admitted into evidence.

The witness is excused.

Defense Exhibit 6.005 is admitted into evidence by stipulation.

The State asks the Court to reconsider the admission of State's Exhibit 168.

Counsel for the Defense objects to the admission of State's Exhibit 168.

LET THE RECORD REFLECT that the Court sustains the objection and State's Exhibit 168 is not entered into evidence.

State's oral Motion for Stay is presented to the Court.

IT IS ORDERED denying the State's oral Motion for Stay.

LET THE RECORD REFLECT that State's Exhibit 168 shall be an offer of proof.

**State rests.**

LET THE RECORD REFLECT that the Exhibits will remain in the custody of the Clerk of Court until such exhibits are processed for the court and for return to counsel.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          02/14/2014

After discussing informally with counsel a briefing schedule and with the anticipation that the transcripts of these proceedings will be available to counsel by 04/14/2014,

IT IS ORDERED

Giving the Petitioner up to and including 05/26/2014 in which to file her initial written closing arguments.

Giving the State up to and including 07/07/2014 in which to file its written closing arguments.

Giving the Petitioner up to and including 07/28/2014 in which to file her concluding written closing arguments.

THE COURT FINDS extraordinary circumstances exist due to among other things, the volume of evidence, the complexity of the issues, and the briefing schedule and therefore additional time will be required for the Court's consideration and ruling beyond the time set forth in Rule 32.8 (d) of the Arizona Rules of Criminal Procedure.  Upon receipt of the Petitioner's concluding written closing arguments, the Court will take the matter under advisement.

The Court commends and thanks counsel for the professionalism all of you have exhibited these past two weeks and the professional courtesies you've shown my staff.

IT IS ORDERED that the Maricopa County Sheriff's Office or any County Sheriff's Office within the State of Arizona return Petitioner Wendi Elizabeth Andriano (DOC #191593, dob:  08/06/1970) to the custody of the Arizona Department of Corrections on this date.

3:42 p.m.  Matter concludes.

# EXHIBIT BBBBBBBBB

FILED

3/31/14   10:17 AM
MICHAEL K. JEANES, Clerk
By_____K Dek_____
Deputy

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

CAUSE NO. CR 2000-096032-A

CAPTION: STATE OF ARIZONA

vs.

WENDi ELIZABETH ANDRIANO

**SEALED DOCUMENT**

**IT IS ORDERED** sealing the following document(s); same not to be opened without further prior order of the court:

UNREDACTED PAGES 12+13 AND EXHIBIT 1-TO:
MEMORANDUM IN SUPPORT OF PETITION
FOR POST-CONVICTION RELIEF - filed 2/17/12

Dated: 2/13/12

DISCOVERY AND CONFIDENTIAL MATERIAL

Judge/~~Commissioner~~ of the Superior Court
DOUGLAS RAYES

# EXHIBIT CCCCCCCCC

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
4/29/2014 5:01:27 PM
Filing ID 5847578

Scott M. Bennett (022350)
Coppersmith Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@cblawyers.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 E. Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | No. CR2000-096032-A |
| Respondent, | **STIPULATION TO EXTEND DEADLINES** |
| v. | |
| Wendi Elizabeth Andriano, | (Hon. Brian Ishikawa) |
| Petitioner. | |

The parties stipulate to extend the deadlines for the post-hearing briefing by 7 days, because the court reporter finished the transcripts slightly later than expected.

At the end of the hearing, the Court ordered the parties to submit post-hearing briefing instead of oral arguments.  Based on the assumption that the transcripts would be

complete by April 15, the Court set deadlines of May 26 for Ms. Andriano's initial written closing arguments, July 7 for the State's written closing arguments, and July 28 for Ms. Andriano's concluding written closing arguments.

The court reporter completed the transcripts slightly later than expected, and sent the final transcript to the parties on April 21.  The parties therefore ask the Court to extend all of the briefing deadlines by 7 days.

A proposed order extending the deadlines accompanies this stipulation.

Respectfully submitted April 29, 2014.

COPPERSMITH BROCKELMAN PLC

By /s/ Scott M. Bennett
    James J. Belanger
    Scott M. Bennett

FOLEY & LARDNER LLP
    Allen A. Arntsen, *Pro Hac Vice*
    Stephan J. Nickels, *Pro Hac Vice*
    Matthew R. Lynch, *Pro Hac Vice*

*Attorneys for Petitioner*


OFFICE OF THE ATTORNEY GENERAL

By /s/  Gregory Hazard *(by permission)*
    Gregory Hazard
    Lacey Stover Gard

*Attorneys for State of Arizona*

1   ORIGINAL e-filed April 29, 2014,
2   with the Clerk of the Maricopa County Superior Court

3   COPIES mailed on April 30, 2014, to:

4   Hon. Brian Ishikawa
5   Maricopa County Superior Court
    1810 Lewis Street
6   Mesa AZ 85210-6235

7
    Gregory Hazard
8   Office of the Attorney General
    1275 W. Washington
9   Phoenix, AZ 85007-2997
10  *Attorneys for the State of Arizona*

11  Ms. Lacey Stover Gard
12  Office of the Attorney General
    400 W. Congress, Suite S-315
13  Tuscon, AZ 85701-1367
    *Attorneys for the State of Arizona*
14

15  */s/ Carol Keesee*

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT DDDDDDDDD

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
5/2/2014 5:50:18 PM
Filing ID 5855454

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
          Respondent,                )
                                     )
vs.                                  )   No.
                                     )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,            )
                                     )
          Petitioner.                )
_____)


Phoenix, Arizona
February 4, 2014
9:32 a.m.


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


EVIDENTIARY HEARING

DAY 2


Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                        (ORIGINAL)

1                    A P P E A R A N C E S

2

3    On Behalf of the State:

4            Mr. Gregory Hazard
             Assistant Attorney General
5
             Ms. Lacey Gard
6            Assistant Attorney General

7
     On Behalf of the Defendant:
8
             ATTORNEYS AT LAW:
9
             Mr. Scott Bennett
10           Mr. Allen Arntsen
             Mr. Stephan Nickels
11           Mr. Matthew Lynch
             Ms. Krista Sterken
12           Ms. Jodi Fox

13                    I N D E X

14                T E S T I M O N Y

15
     WITNESS:                                        PAGE
16
     JAMES W. HOPPER, PH.D.
17
             Cross-Examination (Continued) by Mr. Hazard    20
18
     KYRE LEE JEAN LORTS
19
             Direct Examination by Ms. Fox              38
20           Cross-Examination by Mr. Hazard            64
             Redirect Examination by Ms. Fox           71
21
     DONNA ELIZABETH OCHOA
22
             Direct Examination by Mr. Arntsen         73
23           Cross-Examination by Ms. Gard            193

24   JERI CUNNINGHAM

25           Direct Examination by Ms. Fox            212
             Cross-Examination by Ms. Gard            240

1               P R O C E E D I N G S

2

3       THE COURT:  Good morning.  This is

4  CR 2000-096032, State of Arizona vs. Wendi Elizabeth

5  Andriano.

6           The record should reflect the presence of the

7  parties and counsel.

8           Just a couple of housekeeping matters before we

9  get started here this morning with the testimony.

10  Yesterday after we recessed, I did inform counsel

11  informally with regard to the Petitioner's Motion to Admit

12  Exhibits Pertaining to Mitigation Evidence.  I indicated

13  to them informally what my ruling would be.  I will go

14  ahead and put that on the record at this time.

15           It is ordered denying Petitioner's Motion to

16  Admit Exhibits Pertaining to Mitigation Evidence.  It is

17  without prejudice as a block.  I'm denying it as a block.

18           The Court will consider, however, each exhibit

19  has to be admitted as each is being introduced and

20  requested to be admitted.

21           Also, yesterday there was some discussion with

22  regard to the Rule of Exclusion of Witnesses and

23  Sequestration.

24           I'm going to make the following order:  It is

25  ordered allowing Larry Hammond and Gary Lowenthal to be

1   present in the courtroom during the testimony of Daniel

2   Patterson and David DeLozier, but not Scott MacLeod.

3            I'm also going to order that Keith Rohman can be

4   present in the courtroom during the testimony of Scott

5   MacLeod.

6            I am also going to order allowing Dr. George

7   Woods and Dr. Steven Pitt to be present in the courtroom

8   during the Petitioner Wendi Elizabeth Andriano's

9   testimony.

10           Okay.  Yes, sir.

11           MR. ARNTSEN:  Gary Lowenthal, with regard to

12  Patterson and DeLozier, I believe that was stipulated.

13           THE COURT:  Okay.  Was that stipulated?

14           MS. GARD:  Yes, Your Honor.

15           THE COURT:  Okay.  Yesterday when we recessed, we

16  had Dr. James Hopper on the witness stand.

17           Are we going to continue at this time?

18           MR. NICKELS:  We are.  But, Your Honor, before we

19  do, I have an issue to raise with you and a motion to

20  make.

21           THE COURT:  Okay.

22           MR. NICKELS:  Yesterday at about 4:00 in the

23  afternoon, we received a distressing call.  You may have

24  noticed a number of our lawyers actually left the

25  courtroom.

1          It was a call from Krye Lorts, who as you heard

2 yesterday, is a very important witness in this case.  What

3 she told us is that yesterday afternoon, a detective --

4 not an investigator, a detective -- showed up at her house

5 wanting to question her.  She said that she didn't want to

6 talk to this person.  Instead of leaving, he sat outside

7 of her house in a car, making her feel trapped in her own

8 home.

9          She was extremely upset by this, to the point

10 that we actually had to go get her last night and take her

11 out of her home and bring her to our hotel, where she just

12 felt more safe and comfortable, so she would be ready to

13 testify today.

14          Then about two hours later, we received a call

15 from Alejo Ochoa, another critical witness in this case.

16 He tells us for the first time, out of the blue:  I'm

17 taking the Fifth and I'm not going to testify.

18          It doesn't make any sense to us, Your Honor.  We

19 have been in touch with Alejo during the course of this

20 investigation for the last few years and never before has

21 he told us this.  And now on the eve of trial, he tells us

22 that he is not going to testify.

23          About a half hour later, Donna, his wife, called

24 us and explained what happened.  She said that a detective

25 showed up at their house and talked to Alejo.  And after

1  that conversation, Alejo says:  I'm no longer going to

2  testify.

3         Your Honor, the State has every right to

4  interview our witnesses, but the timing of this and the

5  manner in which it occurs is highly inappropriate.  These

6  are two witnesses that they have known about for, in the

7  Alejo case, years, and in Krye's case, several months.

8  And never during those years or months have they made any

9  attempts to contact them.  They have never done an

10 interview, as far as we know.

11        Yet, on the eve of their testimony, while all of

12 us are in the courtroom and can't do anything about it,

13 and while Dr. Hopper is explaining the significance of

14 these folks, they're being contacted.

15        Now, Your Honor, we actually just -- we actually

16 heard part of the interview with Alejo.  Apparently, there

17 was a recording of that playing on the computer where I

18 listened to it.  When this detective showed up, he does

19 not identify himself as an investigator who's looking at

20 the facts of this case.  He says:  I'm a detective with

21 the prosecutor's office.  And then he goes on to describe

22 allegations of criminal conduct by Alejo.  And then he

23 says:  I'm not here to arrest you.  You're not a suspect,

24 and as an added token, I'm not here to intimidate you.

25        But, at that point, Your Honor, the damage is

1  done.  You show up saying I'm a detective.  You talk about

2  criminal conduct and you use the words arrest and suspect,

3  of course, the witness is intimidated at that point.

4  That's why Alejo is now saying I'm taking the Fifth.

5         So, Your Honor, we believe this is prosecutorial

6  misconduct.  This was not a coincidence that these

7  witnesses were contacted yesterday in the manner that they

8  were.  We believe the intended effect was to intimidate

9  these witnesses, and, frankly, it worked.

10         Now with Krye, she is here.  She is going to

11  testify today.  It didn't completely work.  We're going to

12  have her testify earlier than she otherwise would because

13  we want to make sure she gets done today, and we're

14  concerned, given the length of the cross-examination

15  yesterday, that the examination of Donna Ochoa could go

16  longer.  So we're going to have Kyre go right after

17  Dr. Hopper is done.

18         But this now brings me to the motion part of my

19  position here.  If Alejo Ochoa indeed takes the Fifth and

20  does so likely as a result of this intimidating visit

21  yesterday, we would ask that you admit his declaration

22  into evidence.

23         Two, we want to make sure we have all the audio

24  recordings.  We have what we believe to be the audio

25  recording of Alejo.  If there is one of Krye, we want that

1    as well.

2         In addition, Your Honor, we want the opportunity

3    to interview this investigator.  We want to find out what

4    was he wearing.  Did he show a badge?  Was he in a police

5    outfit?  You know, doing the kinds of things that would

6    make the witnesses as scared as they got.

7         And, finally, Your Honor, if they plan to have

8    their folks pay any more visits to our witnesses this week

9    or during the course of this trial, we want 48 hour's

10   notice, so we can have one of our lawyers or our

11   investigators to be there to make sure everything is on

12   the up-and-up.  Thank you, Your Honor.

13        THE COURT:  Ms. Gard or Mr. Hazard, did you want

14   to respond?

15        MR. HAZARD:  Your Honor, I'll respond.  With

16   respect to some of the things and the background with

17   Ms. Lorts, all of this -- a large chunk of it occurred

18   before I was even an employee of the attorney general's

19   office.

20        I know Ms. Gard, if there's anything that she

21   needs to supplement, because she was privy to some things

22   before I came on the case, I ask just for Your Honor to

23   feel free to ask her any questions or follow-up.

24        But I want to make a record as to this very

25   important witness that Petitioner's counsel has brought

1  up, Ms. Lorts.

2          The only thing that was disclosed to the State as

3  part of the materials related to the Petitioner's Petition

4  for Post-Conviction Relief and the appendices was the

5  declaration by Kyre Lorts' uncle, Barry, and that was

6  included in the appendices.

7          In essence, Barry Lorts, as it pertains to

8  Kyre Lorts in his declaration states that sometime -- and

9  I'll just quote this from his declaration -- quote,

10  Sometime after Wendi's arrest, probably about six or seven

11  years ago -- and this declaration is dated August 19th of

12  2010 -- my niece, Krye, confided in me that Alejo was

13  sexually abusive to both Wendi and herself.  Krye

14  frequently spent the night at Wendi's home, and according

15  to Kyre, Alejo molested her and Wendi on a regular basis.

16  Kyre did not go into detail with me about the abuse, and I

17  didn't ask too many questions about it.  She kept it quiet

18  for a long time.  As far as I know, I was the first person

19  she told.  She still had a lot of anger built up about it

20  when she told me and I think she needed to get it off her

21  chest.

22          At that time, she was trying to work things out

23  in her life and come to terms with it.  I know that Kyre

24  and Wendi spent a lot of time with two other girls,

25  Samantha Nichols and Shilo Justice.  So it is possible

1    that Alejo was molesting them as well.  I was very

2    surprised to hear that this had happened.  Alejo never

3    seemed like that kind of person to me.

4         I'm under the impression that it took place after

5    I moved to Phoenix.  I don't know if Donna was aware of

6    what was going on in her home, but I believe that this may

7    be the reason that Alejo has not returned my calls.  Maybe

8    he is afraid of what I would do.  Who knows what he

9    thinks?

10        As far as it relates to Kyre Lorts, that's it.

11        All right.  Now in Mr. Hammond's declaration,

12   Larry Hammond's declaration -- and this was something that

13   Ms. Gard pointed out to me because I didn't see the

14   connection.  Mr. Hammond refers to, in the materials that

15   he relied upon in his declaration, declarations by Krye

16   Martinez, and then in parentheses, through Alexis Bootby.

17        There's no -- nothing was disclosed.  That

18   declaration wasn't disclosed.  There is no quote in

19   Mr. Hammond's, or even specific reference to Krye Lorts in

20   his materials that were disclosed in his declaration.  And

21   so, she has a different name, but we have determined that

22   that is the same as Kyre Lorts.  She also has a third name

23   that we've determined I guess through marriages, Krye Muer

24   or Mayer.

25        MS. GARD:  Mayer.

1          MR. HAZARD:  All we have, though -- we didn't

2     have a date of birth.  We had Kyre Lorts and that's it,

3     just this declaration by her uncle, not very specific.

4     And Mr. Hammond's declaration was dated February 16th of

5     2012.

6          All right.  In March of 2013 -- and this is

7     something that Ms. Gard can supplement if I have my

8     information wrong -- but my understanding is that

9     Petitioner's counsel contacted Ms. Gard and let her know

10    that they were -- they wanted to depose Ms. Lorts, seek a

11    deposition, a court ordered deposition, presumably because

12    she was not being cooperative or they were having a hard

13    time just tracking her down.  I'm not sure about that.

14    But, in any event, they were seeking the court

15    intervention to actually depose her.

16         And Ms. Gard responded and said that she wanted

17    to be a part of that.  When they actually filed the motion

18    with Your Honor, it was a joint motion for both parties to

19    depose Ms. Lorts.  And that was filed I believe in March

20    of 2013.  Your Honor granted the request and this court

21    issued a subpoena for Ms. Lorts.

22         Then we have looked at our e-mails, and starting

23    with e-mails dated June 25th of 2013 -- and I'll just read

24    these into the record, given the allegations by defense

25    counsel.  It looks like the first e-mail on June 25th is

1  from Jodi Fox from Foley and Lardner, Counsel for

2  Petitioner, and she states:  Lacey, I work with Allen

3  Arntsen and Matthew Lynch on the Andriano matter.  We are

4  in the process of attempting to serve Kyre Lorts a

5  subpoena for a deposition to take place July 9, 2013, a

6  day Ms. Lorts has indicated she is available.  Please

7  confirm your availability for that day.  We will confirm

8  with you when we have served Ms. Lorts.  Thank you.

9       Ms. Gard responded the same day:  I have to leave

10 for the Ninth Circuit on July 10th and will likely be

11 unavailable July 9th due to argument and preparation.

12 However, I can have another attorney cover the deposition

13 for me.

14      The next response again is from Ms. Fox:  Thank

15 you, Lacey.  I will keep you updated on service.

16      The following day, on June 26, 2013, Ms. Gard

17 then sends correspondence to counsel and it's Ms. Fox,

18 CC to Mr. Arntsen and Mr. Lynch, and Ms. Gard's question

19 was:  What time do you plan on starting the deposition?

20      And then that same day, June 26th, Scott Bennett,

21 also counsel for Ms. Andriano, local counsel, stated:

22 10:00 a.m.  It will be at my office, and he gives the

23 location of his office.

24      Ms. Gard responds:  Thanks, Scott.  Matt Difford

25 from our office will cover the deposition for me.

1        Then the next correspondence that we have is from

2   Ms. Fox on July 2nd:  Good morning.  Lacey and Matt, we

3   successfully served Krye Lorts yesterday for the

4   deposition on July 9, 2013.  Thanks.

5        All right.  Then on July 8th, Ms. Fox wrote the

6   day before the scheduled deposition in Mr. Bennett's

7   office, Ms. Fox wrote:  Lacey, Ms. Lorts is suffering from

8   some serious medical issues, and, as a result, we need to

9   cancel the deposition scheduled for tomorrow.  I will be

10  in touch to reschedule a new time.  Thank you.  And I

11  apologize for the late cancellation.

12       And that was the last we had heard about Krye

13  Lorts until she was on the witness list that was submitted

14  shortly before, you know, this hearing I believe in either

15  late December or --

16       MS. GARD:  January.

17       MR. HAZARD:  -- January of this year.

18       Now when I interviewed Dr. Hopper telephonically,

19  and all I wanted really on that interview was just to make

20  sure that I had everything that he had and there would be

21  no surprises.  And during that interview on January 30th,

22  it was revealed to me for the first time that they had not

23  only a written declaration that they had not disclosed

24  from Kyre Lorts herself, but that Dr. Hopper had also

25  interviewed Ms. Lorts in November, as he testified

1   yesterday, November 10th and November 11th of 2013.

2          And I obtained some notes on January 30th and the

3   remainder of the notes, including all of those that I kind

4   of fumbled around with yesterday, Your Honor -- I received

5   those on February 2nd for the first time.

6          Now what we know from the declaration of

7   Kyre Lorts is that it is signed June 30th of 2013, which

8   means that on that July 2nd correspondence, the defense

9   had this declaration and didn't mention anything, didn't

10  disclose it, didn't mention it.  And they had it certainly

11  on July 8th when they cancelled the deposition because, as

12  they stated, Ms. Lorts had medical issues.

13         And as Ms. Fox wrote:  I will be in touch to

14  reschedule a new time.  Thank you.  And I apologize for

15  the late cancellation.  And that was never done.  They

16  never contacted us.

17         THE COURT:  Well, when you got the witness

18  schedule and you saw that she was on there, didn't anyone

19  communicate and say:  Hey, I want to talk to -- I want to

20  interview Ms. Lorts?

21         MR. HAZARD:  Well, that leads me to the other

22  thing, Your Honor.  Ms. Lorts was one of the witnesses

23  that when Mr. Martinez, Ms. Gard and I conferred after

24  seeing the witness list and to divide up the workload in

25  preparation for the hearing, because at that point,

1    Ms. Gard was not going to participate and Mr. Martinez was

2    going to help, Ms. Lorts was a witness that he was going

3    to take care of because it had to deal with facts close --

4    even though she had never been a part -- it never came up

5    in the trial proceedings -- it was part of that

6    Ms. Andriano's circle of fact witnesses.  And I was

7    focusing on more of the experts and those sorts of things

8    in preparation for the hearing.  And I don't -- I don't --

9    it doesn't appear that Mr. Martinez made those efforts.

10              THE COURT:  Was Alejo Ochoa ever interviewed?

11              MR. HAZARD:  No.  And, again, that was

12   Mr. Martinez who was going to handle his cross-examination

13   or his --

14              THE COURT:  Okay.  Let's do this.  So what

15   happened yesterday, are the facts correct that someone

16   went out there to try to speak with these individuals?

17              MR. HAZARD:  Yes.  And let me make myself clear

18   about that.  On February 2nd, when I received those notes

19   from Dr. Hopper about his interviews with Ms. Andriano,

20   that's when I discovered this note about Alejo Ochoa

21   saying that he would, through Ms. Andriano, through Donna

22   Ochoa, through Ms. Andriano, he was willing to lie and say

23   that he abused Wendi to help her out.  And then following

24   up Ms. Andriano's comment, Mr. Ochoa would say he would do

25   anything to help Wendi and Wendi Andriano's comment that's

1    revolting.  I told him:  I don't want your help.

2         And so, given that and given the fact that the

3    materials that we had, Mr. Ochoa had never been asked the

4    question directly, given that Ms. Gard and I had concerns

5    about even before that, whether Mr. Ochoa should have to

6    have the Court appoint counsel for him if we're going to

7    ask him, because we intended to ask him those questions

8    directly that he had never been asked before.  I know that

9    was something that was discussed sometime ago.

10         (WHEREUPON, an off-the-record discussion ensued

11    between Mr. Hazard and Ms. Gard.)

12         MR. HAZARD:  Yeah, and we did make that request

13    before we got the notes.  But, especially, when I saw

14    those notes, that it made it clear that we needed help to

15    find out whether he was going to lie and take the stand

16    and commit perjury.

17         THE COURT:  Weren't all of these things, Counsel,

18    things that should have been discussed at the status

19    conferences that we had, instead of wasting our time here

20    at the evidentiary hearing, bringing up these matters to

21    the Court for the very first time?

22         MR. HAZARD:  Well, Your Honor, we tried to make

23    efforts that we wouldn't waste the Court's time.

24         THE COURT:  Well, just from what I hear, these

25    are issues that you knew about and counsel knew about that

 1   might be a problem.  When we had the status conference, I

 2   asked at the status conference:  Is there anything else

 3   that we need to discuss?  No one brought up anything.

 4           And here we are Day 2 of this evidentiary

 5   hearing.  We're already running behind and we got started

 6   at 9:30 promptly, and now we're 22 minutes into the

 7   hearing without having heard any additional testimony.

 8           So what we're going to do right now is we're

 9   going to continue with Dr. Hopper.

10           Is Krye Lorts here?

11           MR. NICKELS:  Is she in the court building?

12           MS. FOX:  I can go check right now, Your Honor.

13           THE COURT:  Well, you don't have to check.  But I

14   assume we're going to finish with Dr. Hopper by the lunch

15   hour; is that correct?

16           MR. NICKELS:  Well, I hope so.

17           THE COURT:  If we don't -- even if we don't,

18   during the lunch hour, I'll allow counsel to sit down and

19   you all can talk with Kyre Lorts.  We're going to continue

20   in the afternoon.

21           Now with regard to Mr. Ochoa, Alejo Ochoa, I'm

22   not sure what he's going to do.  Who knows what he's going

23   to do?  Okay.  I guess we're going to reach that bridge or

24   cross that bridge when we reach that bridge; right?  Okay.

25   It depends upon, you know, what the situation is, and I'll

1   make the ruling.

2           But it is anticipated, you think, that he is

3   going to plead the Fifth?  Is that what you anticipate?

4           MR. NICKELS:  That's what he told us.

5           THE COURT:  And you had him scheduled to testify

6   on Thursday or --

7           MR. NICKELS:  Tomorrow, probably.

8           MR. ARNTSEN:  Probably tomorrow, hopefully.  That

9   was our hope for tomorrow.

10          THE COURT:  Did this investigator or this

11  detective or whoever went to speak with Kyre Lorts and

12  Mr. Ochoa, did he or she record the interview?

13          MR. HAZARD:  We do.  And we have provided a copy.

14  I obtained that this morning.  I drove downtown to pick it

15  up at the Maricopa County Attorney's Office.  They have a

16  copy.  We have a copy.  And I have not had a chance to

17  listen to all of it.

18          THE COURT:  I'm just curious.  Why didn't you say

19  to them:  Hey, I want to speak with this Kyre Lorts and I

20  want to speak with this Alejo Ochoa?  Let's all sit down

21  and do an interview.  I'm just curious.

22          MR. HAZARD:  Well, first of all, Your Honor, we

23  only knew about -- Ms. Gard and I only knew about the

24  issue with Mr. Ochoa, that that was going to take place --

25          THE COURT:  But you probably knew sometime back

1    that these two people were going to be witnesses; correct?

2          MR. HAZARD:  Well, we knew.  Yes, we knew in

3    January.

4          THE COURT:  And in preparation for the

5    evidentiary hearing, I would imagine you would want to

6    interview potential witnesses.  And as soon as I -- if I

7    were in your shoes, and as soon as I made a determination,

8    hey, these people may be called as witnesses, I would

9    contact counsel and say:  Hey, you know, I want to talk to

10   these people before the evidentiary hearing.  Let's set up

11   some interviews.  Was that ever done?

12         MR. HAZARD:  I don't believe Mr. Martinez did

13   that, Your Honor, and --

14         THE COURT:  Okay.  We're going to continue with

15   Dr. Hopper at this time.  And then at the lunch hour, you

16   can interview Kyre Lorts.  We're going to keep this

17   evidentiary hearing moving along right now.

18         With regard to Alejo Ochoa, you know, let's see

19   what he says.  Okay?  If he pleads the Fifth, then we will

20   have to deal with it.  Okay?

21         MR. HAZARD:  Okay.

22         THE COURT:  Then let's proceed.

23         MR. HAZARD:  Thank you, Your Honor.

24         MR. NICKELS:  Thank you, Your Honor.

25         THE COURT:  Okay.  The record will reflect that

1   Dr. James Hopper is back on the witness stand.

2         THE WITNESS:  Do I have to be sworn in again?

3         THE COURT:  No.  You're still under oath.

4         So yesterday when we recessed, Dr. Hopper was on

5   the stand, and Mr. Hazard was in his cross-examination.

6         Go ahead and state your name for the record

7   again.

8         THE WITNESS:  James W. Hopper.

9         THE COURT:  And we will continue with the

10  cross-examination by Mr. Hazard.

11

12              JAMES W. HOPPER, PH.D.,

13  having been previously sworn to tell the truth, the whole

14  truth, and nothing but the truth, testified as follows:

15

16         CROSS-EXAMINATION  (Continued)

17  BY MR. HAZARD:

18  Q.   Dr. Hopper, where we left off yesterday, I had

19  started asking you questions about Ms. Andriano's conduct

20  in the weeks leading up to October 8, 2000.  And do you

21  remember that that's where we ended?

22  A.   Yes.

23  Q.   All right.  And although I think I covered this

24  with you, you mentioned that Ms. Andriano, the evidence

25  shows that she tried to fraudulently obtain life insurance

1  policies and she also enlisted or reached out to people to

2  try to help her in that fraud; is that correct?

3        MR. NICKELS:  Your Honor, I object to asked and

4  answered, since we're already behind.  That was covered.

5        THE COURT:  Sustained.  Sustained.

6        Let's we'll move on.

7  *Q.*   BY MR. HAZARD:  And with respect to trying to

8  obtain poison, Ms. Andriano, the evidence shows that she

9  did use a false name, Ann Newton; correct?

10  *A.*   I remember seeing that evidence, yes.

11  *Q.*   Right.  And she also made up a company in the

12  effort, the goal to achieve this poison -- to obtain this

13  poison from the company that was selling it; correct?

14  *A.*   Yes.

15  *Q.*   And she even went to the lengths of actually

16  doctoring a business license and faxing that to the

17  company in order to obtain that poison; correct?

18        MR. NICKELS:  Your Honor, I have a foundational

19  objection I just want to make.  I believe he is asking him

20  about what happened at trial and it's not clear that this

21  witness knows that.

22        THE COURT:  Sustained.  Sustained.

23        Let's we'll move on.

24  *Q.*   BY MR. HAZARD:  Did that come out in trial?

25        THE COURT:  If you know from reviewing

1   transcripts or --

2        THE WITNESS:  A variety of horrendous decisions

3   that she made in the time leading up did come out at

4   trial.

5        *Q.*   BY MR. HAZARD:  All right.  One of those maybe

6   horrendous decisions or certainly a decision that she made

7   that I think you talked to her a little bit about was the

8   affair she had with Travis Black a couple of weeks or so

9   before the murder.  You remember that; correct?

10       *A.*   Yes.

11       *Q.*   And whether it was through Wendi's account in

12  your interviews or evidence presented at trial,

13  Ms. Andriano had told Travis Black that her husband in

14  fact actually had died of cancer when that was not true.

15  Do you remember hearing about that?

16       *A.*   I remember hearing about that was one of those

17  bad decisions, yeah.

18       *Q.*   Okay.  And then when we get to the night of

19  October 7th and the early morning hours of October 8,

20  2000, the evidence came out, and I think based on your

21  testimony, it doesn't appear that Ms. Andriano is

22  disputing that she did hit her husband a number of times

23  over the back of the head with a barstool; is that

24  correct?

25       *A.*   That's correct.

1    *Q.*    All right.  And although Ms. Andriano's accounts

2    and memory with respect of how the knife was used, there

3    was evidence presented at trial that Ms. Andriano stabbed

4    her husband in the neck with the knife; correct?

5    *A.*    Correct.

6    *Q.*    And the evidence at the trial was that

7    Ms. Andriano didn't call 911 right away after her husband

8    had been killed.  There was some things that she did and

9    phone calls that she made before calling 911 for that last

10   time.  Do you remember that?  Do you remember hearing

11   about that?

12   *A.*    Yes, I do.

13   *Q.*    Including, the first phone calls she made were to

14   try to get in touch with Alejo Ochoa; correct?

15   *A.*    Correct.

16   *Q.*    And the evidence was they did have a telephone

17   conversation where she sought Mr. Ochoa's advice and

18   assistance; correct?

19   *A.*    I don't know what they said in that conversation.

20   That's quite plausible, but I don't know.  I didn't hear

21   the conversation.  It wasn't record, as far as I'm aware.

22   *Q.*    All right.  But you do remember hearing that

23   evidence of that came out in the trial?

24   *A.*    Yes.

25   *Q.*    And you also remember that evidence came out that

1   even before she called 911, she actually spoke to Chris

2   Hashisaki as well over the phone?

3       *A.*   Yes.

4       *Q.*   And this is, again, after her husband had been

5   murdered; correct?  Do you remember that?

6       *A.*   The time sequence of everything that happened,

7   I'm not solid on that.  I mean, I read these transcripts.

8   That was not the focus, as we know, of what I was supposed

9   to do, but I read these and I tried to absorb as much as I

10   could.  Time sequence and things like that, I can't say

11   I'm confident on those.

12       *Q.*   Fair enough.  The evidence came out, too, at

13   least from the State's perspective that was presented to

14   the jury through the crime scene experts, was that

15   Ms. Andriano had at least staged a portion of that crime

16   scene with respect to the belt and maybe the knife as well

17   at the location?  Do you remember hearing about that?

18       *A.*   That evidence suggesting that it happened?

19       *Q.*   Yes.

20       *A.*   Yes.

21       *Q.*   Do you remember also that when she did call 911

22   that last time after the murder to report it, that she

23   told the operator at that point that her husband had

24   gotten into a fight with her and that she thinks that she

25   may have stabbed him?  Do you remember hearing about that

1  coming out in trial?

2      *A.*   I listened to the call.  I listened to the

3  recording of that call.

4      *Q.*   Is that consistent with your memory of that call?

5      *A.*   Yeah.  It's been a long time since I heard it,

6  though.

7      *Q.*   There was evidence presented that during her

8  interactions with Chris Hashisaki that night, when

9  Ms. Hashisaki was called by Ms. Andriano and came over,

10  that at least from Chris Hashisaki's testimony and the

11  evidence presented at her trial, that Wendi deceived

12  Ms. Hashisaki about some things about her and her husband

13  related to the October -- what was going on on October 8,

14  2000?

15          MR. NICKELS:  Your Honor, I object to this on one

16  of two grounds.  I feel this is irrelevant because we have

17  no tie right now on how this plays into Dr. Hopper's

18  analysis.  Or I'm going to object on 403 grounds.  We

19  don't need to retry the, entire you know, underlying case

20  here in order to get to the questions that may be

21  relevant.  On 403 grounds, this is becoming a waste of

22  time.

23          THE COURT:  I'm going to sustain the objection.

24          If you're going to ask the question about

25  something that had occurred at trial, ask how it applies

1  to what he has testified or how it applies to his

2  opinions.  I mean, you're basically just saying this is

3  what happened at trial.  This is what happened at trial.

4  Are you aware of this?  Are you aware of this?  I mean,

5  ask a question and ask how it applies to his opinions.

6          MR. HAZARD:  And, Your Honor, I was planning to

7  do that after getting through this.  I just have a few

8  more facts and then asking him about the opinions.

9          THE COURT:  Okay.  Is that where you're going?

10         MR. HAZARD:  Yes, Your Honor.

11         THE COURT:  Okay.  Let's we'll move on, then.

12         MR. HAZARD:  All right.

13     Q.   BY MR. HAZARD:  There was evidence that she

14  deceived Chris Hashisaki; correct?

15     A.   Evidence was presented of that.  It did not --

16  you know, I'm not a detective.  I looked over that, and as

17  a human, I wanted to try to understand it, but I don't

18  know.  You know, I wasn't there.

19     Q.   BY MR. HAZARD:  And there was evidence, at least,

20  that she deceived the paramedics to get them to go away or

21  tell them half-truths.  Would you agree with that?

22     A.   Testimony to that effect by certain people at

23  trial.  That's my understanding.

24     Q.   And there was also evidence to show that she did

25  lie to the police about some things during her

1   interrogation?

2       *A.*    Yes.  There's a lot that can be said about how

3   interrogations go and how people respond in those kinds of

4   situations and what constitutes a lie and what constitutes

5   what we call confabulation.  You ask the wrong questions

6   and you try to answer them and you end up saying things

7   that can then be used against you.  So I don't think it's

8   so simple as just that.  But there is evidence that she

9   lied about some things, yes.

10      *Q.*    Then my final point as far as things that came

11  out in trial, do you remember also there was evidence that

12  during the break with her police interview, that she

13  called a -- contacted a co-worker at the apartment to go

14  into her office and remove some of the personal papers of

15  Ms. Andriano?  Do you remember hearing about that?

16      *A.*    Yes.

17      *Q.*    In fact, there was testimony that a detective

18  found the co-worker in that office doing that very thing.

19  Do you remember hearing about that?

20      *A.*    Yes.

21      *Q.*    And so, given all of these things that she did to

22  obtain life insurance, to obtain the poison --

23      *A.*    Yeah.

24      *Q.*    -- and this is a weeks before the murder, the

25  lies that she -- and the fraud that she used to attain

1   those goals, and the continuing as the things that

2   happened on the night of October 7th and October 8th,

3   starting with the poisoning of Joe Andriano, the assault

4   and murder of him, and the things she did afterwards,

5   which included some lies and deception, how does this

6   relate to her childhood trauma --

7        A.    I'm so glad you asked that.

8        Q.    -- given that -- given that this happened 12

9   years after she turned 18?

10       A.    Yeah.  That's a great question.  And I would love

11  to answer it and I want to make sure I have the time to do

12  that without interruption.  So I've talked a lot about

13  executive functions of the prefrontal cortex.

14            I've talked about how we know from, not only

15  decades of research on childhood trauma and neglect, but

16  also now 15 years of neuroscience research on executive

17  functioning of the brain, the bases we use in looking at

18  them, people with child abuse, a history of trauma and

19  depression and all kinds of other disorders.

20            One of the things we know that I don't think came

21  through as clear on my direct as I wish it had, which is

22  that decision making is one of the first executive

23  functions to go because of a variety of reasons.  One is

24  dependent on the kind of information you can access.  So

25  it's dependent on being able to retrieve certain kinds of

1  information, which requires other executive functions.

2  But, more important, decision making is the first to go

3  because our decision making is dependent so much of the

4  time on how we feel and our emotions.

5        And so, the decisions we make, even what used to

6  appear to be the most, quote, rational decisions, Antonio

7  Damasio and other neuroscientists have shown, we can't

8  make rational decisions about your daily life unless we

9  consider emotional information.

10        In fact, the decision making areas of the brain

11  are on the bottom and the middle of the prefrontal cortex

12  and they're the most tightly wired into emotional areas.

13  We all know from our own experience, we can make decisions

14  based on habit or we can make decisions based on

15  reasoning.  And bad decision making is the first thing you

16  see as someone is becoming overwhelmed.  And you

17  particularly see it in someone who is as traumatized and

18  damaged as Wendi Andriano, and not only that, but didn't

19  have models of making good decisions throughout her entire

20  childhood.

21        But even apart from that, as we saw from the

22  neuropsych, the very Gambling tasks that you pointed out

23  to me was stark evidence of how when she gets stressed,

24  like many of us do with our children -- hey, I'm stressed

25  out and my child is annoying me, I'm going to yell or use

1    a negative tone of voice.  I might snap at my wife.

2    That's a bad decision.  My decision making goes first.

3           So leading up to the crime, horrendous decisions.

4    Horrendous decisions as her husband is dying, as she is

5    fearing that all kinds of terrible things are going to

6    happen.  As their relationship is deteriorating, she is

7    just trying to escape into alcohol because her other

8    addiction of taking care of people wasn't working for her

9    anymore.

10          So there are so many different things.  Her

11   decision making is going downhill dramatically.  There's

12   no surprise that someone who's this traumatized is going

13   to be making horrific decisions of this sort.

14          Then when we get into like whatever was going on,

15   I don't claim to know, but when someone is killing

16   someone, I can say from past experience, someone is being

17   attacked or attacking someone, blood is everywhere, that's

18   when you get the total shutdown of the prefrontal cortex.

19   Forget about it.  It's not just decision making.  It's

20   impulse control.  It's everything you depended on.

21          And so then the horror partly passes.  You know,

22   if you listen to her voice on those calls, you know, she

23   is incredibly distressed.  But, you know, she is not in a

24   complete shutdown state in terms of the prefrontal cortex.

25   And, yeah, perhaps with the influence of her father and

1    his, quote, advice -- like I said, with fathers like that,

2    who needs enemies?  Then she is going to making some

3    really bad decisions.  In the interrogation room, going to

4    call people to tamper with evidence, things like that.

5              So it is absolutely consistent with what

6    overwhelming lifetime, a childhood of trauma, which takes

7    years of treatment to even get over some of this pretty

8    well.  So it's absolutely a perfect example of how

9    decision making goes first in all of us, but especially in

10   someone who has been through the overwhelming trauma that

11   she has been through.  That's exactly what you would

12   expect.  So it is completely consistent with everything I

13   know as a therapist, as a scientist and everything I've

14   studied for the last 20 years.

15       Q.    Doctor, premeditated murder is always an

16   irrational decision, though; correct?

17       A.    Depending on what you mean by irrational.

18       Q.    It's an exercise of bad judgment; correct,

19   always?

20       A.    Yes, it is.

21       Q.    And everything that I -- all of the facts,

22   looking objectively just at Ms. Andriano, the facts

23   presented at her trial, one could also reasonably conclude

24   that this is the acts of a person who is conniving and

25   deceitful and calculating?

1    *A.*   That's why -- were you done?  Is it going to be a

2  compound question or --

3    *Q.*   Just a yes or no question.

4    *A.*   I can't answer that yes or no because now I don't

5  -- now, what was presented at trial lacked the very things

6  that we have been talking about for the last all day

7  yesterday.

8          So, of course, if all that I've just presented

9  and all the expertise that I'm trying to share with the

10 Court was not presented at trial, then, of course, it's

11 easy to paint her as a conniving bitch, who's off sleeping

12 around and drinking and having fun as her husband is

13 dying.  You know, prosecutors can do that sort of thing

14 when this kind of evidence is not presented.

15         The whole point -- the reason why I'm here is

16 because there is such evidence.  We have now done a

17 thorough investigation.  As I said, this is the most

18 thorough one I've ever been involved in.  I have mountains

19 of data.  Many people's evidence.  No one piece am I

20 grounding it on.

21         Even Alejo never even touched her, even if

22 Alejo -- Kyre doesn't exist, that kind of your own father

23 doing that stuff to you every day.  There is so much -- so

24 much evidence of trauma and the effect this would have on

25 someone's brain.  It was never presented at trial and

1    that's why she would be presented as a conniving person.

2          What I'm saying is 52 hours with her, looking at

3    all the evidence, my own professional integrity as a

4    therapist, a scientist, and somebody who testifies in

5    court, it just doesn't -- it just doesn't compute.  I'm

6    sorry.

7          Q.    There was mitigation presented at her trial,

8    though.  Do you agree with that?

9          A.    If you can call it that.  I mean, from what I

10   saw -- what you are you referring and the issues?

11         Q.    Domestic violence and the effects of domestic

12   violence that went directly to the statements Ms. Andriano

13   made to police and that she testified to.

14         Do you agree with that?

15         A.    I agree with that.  Also, as you know from my

16   notes with her, she said she tried to fight the domestic

17   violence offense because she didn't think it was fair to

18   Joe and she didn't think it was right.

19         Q.    But you agree that from the onset, from her first

20   interview with police, and consistent with her testimony

21   at trial, that her testimony was -- her position was she

22   was reacting to violence inflicted upon her by the victim

23   Joe Andriano.  You agree with that; correct?

24         A.    Yes.  But that is -- domestic violence, as a

25   whole construct versus violence at the time, I want to be

1   clear that I'm answering to her statement that there was

2   something violent coming at her at the time when she lost

3   her ability to deal with things at that time.

4          MR. HAZARD:  All right.  No further questions.

5          THE COURT:  Redirect?

6          MR. NICKELS:  We have nothing, Your Honor.

7          THE COURT:  May this witness be excused?

8          MR. NICKELS:  Yes.

9          THE COURT:  Thank you very much.  You're excused.

10         THE WITNESS:  Thank you.

11         (WHEREUPON, the witness exited the courtroom.)

12         THE COURT:  Was Krye Lorts going to be the next

13  witness?

14         MR. ARNTSEN:  Yes, Your Honor.

15         THE COURT:  We can take a recess.  Then you can

16  do the interview and then we will proceed.

17         Did you provide some type of transcript or some

18  type of recording of the interview done by the detective

19  or the investigator with Ms. Lorts yesterday?

20         MS. GARD:  My understanding, Your Honor, from

21  Mr. Martinez is that she refused to be interviewed and I

22  don't believe there is any recording.

23         And to make the record clear, I have no knowledge

24  of any detective waiting outside her home or anything like

25  that.

1    THE COURT:  Was an investigator sent out there?

2    MS. GARD:  It was an investigator, yes, from the

3 Maricopa County Attorney's Office, a former detective on

4 this case, Dennis Holgrum.

5    THE COURT:  I'm just curious as to why counsel

6 didn't communicate and say:  Let's interview Ms. Lorts

7 rather than sending an investigator out there on the day

8 of the evidentiary hearing.

9    MS. GARD:  Well, we did not know until after the

10 fact that Ms. Lorts was going to be interviewed.  That was

11 a decision made by Mr. Martinez.  So I don't know if

12 that --

13    THE COURT:  You didn't know what?

14    MS. GARD:  We didn't know that the interview --

15 we knew that the investigator would talk to Mr. Ochoa, but

16 we did not know he was going to talk to Ms. Lorts.

17    THE COURT:  Well, I'm just curious as to both

18 Ms. Lorts and Mr. Ochoa, why wouldn't it be a situation

19 where you called up the Petitioner's counsel and say:

20 Look, you have these people listed as witnesses.  I want

21 to interview these people and let's sit down and interview

22 them together.

23    MS. GARD:  Your Honor, I can't speak to why that

24 wasn't done before the start of the hearing.  Like we

25 said, we divided the labor and this was put on

1  Mr. Martinez.  So I don't really know.

2        THE COURT:  Well, let's go ahead and proceed

3  today.  If you've decided that you weren't going to

4  interview Ms. Lorts, let's go ahead and proceed at this

5  time.

6        MR. ARNTSEN:  Okay.

7        THE COURT:  You knew that she was going to be a

8  witness.  So let's go ahead and proceed.

9        MR. ARNTSEN:  Thank you, Your Honor.

10        MS. GARD:  And, Your Honor, just for the record,

11  we were supposed to be involved in a deposition of her and

12  that was never done.

13        THE COURT:  Right, but that was in July or June.

14        MS. GARD:  I understand.

15        THE COURT:  And that's been months.  So I'm going

16  to allow the Petitioner to proceed with the witness.

17        (WHEREUPON, the witness entered the courtroom.)

18        (WHEREUPON, an off-the-record discussion ensued.)

19        MR. ARNTSEN:  Your Honor, we were just

20  coordinating with witnesses.  What I told Attorney Hazard

21  is that Donna Ochoa will be our next witness.  She is

22  about five minutes from here.  Again, I'm going to call

23  her to come over here when Attorney Hazard starts his

24  cross of Ms. Lorts, just like I did yesterday with

25  Dr. Hopper.

 1            THE COURT:  Are you Kyre Lorts?

 2            THE WITNESS:  Yes.

 3            THE COURT:  Why don't you go ahead and step

 4    forward to the witness stand.  Before you sit down there,

 5    please face the clerk here.  Raise your right hand and she

 6    will swear you in.

 7            THE CLERK:  Could you please state your name and

 8    spell your name for the record?

 9            THE WITNESS:  Kyre Lee Jean Lorts.  K-Y-R-E;

10    L-E-E; J-E-A-N; L-O-R-T-S.

11            THE COURT:  What is the middle name again?

12            THE WITNESS:  Lee Jean.

13            THE COURT:  Can you spell that for me again?

14            THE WITNESS:  L-E-E, next word, J-E-A-N.

15            THE COURT:  Oh, it's separate?

16            THE WITNESS:  Yes.

17            THE COURT:  Okay.

18            (WHEREUPON, the witness was duly sworn by the

19    clerk.)

20            THE COURT:  Go ahead and have a seat there on the

21    witness stand.  Ms. Lorts, there's just a couple of things

22    to remember as you testify.  Remember to speak up so that

23    everyone can hear you.  Also, it's important that you wait

24    until the question is completed before you answer the

25    question.  It is also important that you give us a verbal

1  response.  In other words, don't just shake your head and

2  say uh-huh or uh-huh.  Say yes, no, whatever it might be.

3         Can you do that for us?

4         THE WITNESS:  Yes.

5         THE COURT:  Okay.  Go ahead and state your name

6  for the record.

7         THE WITNESS:  Krye Lee Jean Lorts.

8         THE COURT:  Let's see.  Is it going to be

9  Ms. --

10        MS. FOX:  Fox.

11        THE COURT:  Ms. Fox?

12        MS. FOX:  Yes.

13        THE COURT:  Okay.  Ms. Fox, you may proceed.

14        MS. FOX:  Thank you very much.

15

16                  KYRE LEE JEAN LORTS,

17  having been first duly sworn to tell the truth, the whole

18  truth, and nothing but the truth, testified as follows:

19

20                  DIRECT EXAMINATION

21  BY MS. FOX:

22    Q.  Hi, Kyre.

23    A.  Hi.

24    Q.  Thank you for being here today.  Just to start

25  off, can you please state your date of birth for the

1  record?

2      *A.*   9/16/72.

3      *Q.*   And how old does that make you?

4      *A.*   42.

5      *Q.*   Where do you currently reside?

6      *A.*   In San Tan Valley.

7      *Q.*   What is your profession?

8      *A.*   I'm a teacher.

9      *Q.*   What kind of teacher do you do?

10     *A.*   I teach special needs children.

11     *Q.*   What type of special needs children do you teach?

12     *A.*   Emotionally disabled.

13     *Q.*   How long have you been teaching emotionally

14  disabled children?

15     *A.*   Since about 2010.

16         THE COURT:  You may want to slow down a little,

17  Ms. Fox.

18         MS. FOX:  I'm sorry.  I talk fast.

19         THE COURT:  Just for the court reporter's sake.

20         MS. FOX:  Okay.

21         THE COURT:  Thank you.

22     *Q.*   BY MS. FOX:  Do you have any children?

23     *A.*   I have four.

24     *Q.*   How old are they?

25     *A.*   23, 19, 18, 16.

1    *Q.*   You do you know the Petitioner, Wendi Andriano?

2    *A.*   I do.

3    *Q.*   How do you know Wendi?

4          THE COURT:  I didn't hear a response to the last

5    question.

6          THE WITNESS:  I do.

7          MS. FOX:  May I approach the witness?

8          THE COURT:  Yes.  There's some Kleenex there,

9    Ms. Lorts.

10         MR. ARNTSEN:  Would you like a glass of water, by

11   the way?

12         THE COURT:  If you would like some water, there's

13   water right there and some cups.

14         THE WITNESS:  I grew up with Wendi.

15   *Q.*   BY MS. FOX:  Are you okay?

16   *A.*   No.

17   *Q.*   Do you need a second?

18   *A.*   Yes.

19   *Q.*   Okay.  So you said you grew up with Wendi?

20   *A.*   Yes.

21   *Q.*   How old were you when you first met Wendi?

22   *A.*   Oh, I was probably seven.

23   *Q.*   How old was Wendi?

24   *A.*   About nine or ten.

25   *Q.*   And where did you first meet Wendi?

1    *A.*   We went to the same school together.

2    *Q.*   And had you heard of Wendi before you started

3    going to school together?

4    *A.*   Had I heard of her?

5    *Q.*   Yes.

6    *A.*   No.

7    *Q.*   Does your family have any relationship with

8    Wendi's family?

9    *A.*   We did.  We did.

10    *Q.*   What was the relationship between your family and

11    Wendi's family?

12    *A.*   My dad owned the church and school that her

13    family went to and my dad employed her dad at first for

14    to be a groundskeeper and maintenance, and then he moved

15    into being a devotions teacher and pastor eventually.

16    *Q.*   Did your dad know Alejo before he started working

17    at the church?

18    *A.*   He did.

19    *Q.*   How did your father know Alejo before he started

20    working at the church?

21    *A.*   My father went to school with him or they were

22    teenage friends.

23    *Q.*   And you said you met Wendi when you were around

24    seven or eight years old.  How often did you see Wendi

25    during the period of time that you knew her?

1      *A.*    Every day during the school days and then Sundays
2   at church.

3      *Q.*    And how long did you attend school with Wendi
4   for?

5      *A.*    Umm, probably three years.

6      *Q.*    So from the time you were seven or eight until
7   you were around 11?

8      *A.*    Yeah.

9      *Q.*    How old was Wendi during that time period?

10     *A.*    She would have been ten to 13 or 14.

11     *Q.*    And what was the name of the school that you
12   attended with Wendi?

13     *A.*    91st Psalm.

14     *Q.*    And what was the name of the church you attended
15   with Wendi?

16     *A.*    91st Psalm.

17     *Q.*    Was the school affiliated with the church?

18     *A.*    Yes.

19     *Q.*    Who was the pastor at 91st Psalm?

20     *A.*    My dad, Pastor Cal Lorts.

21     *Q.*    And who was the principle of the school at
22   91st Psalm?

23     *A.*    My dad as well.

24     *Q.*    And can you describe a typical school day for you
25   at 91st Psalm?

1    *A.*    It was a Christian school.  So we were all in a
2    big room with learning centers.  And the curriculum wasn't
3    teacher-taught like you would if you were in a public
4    school.  It was a self-taught curriculum.  We had paces
5    that we did.  If we needed help, the supervisor or
6    monitors would walk around the room and we were able to
7    ask questions.  We went out to recess, lunch.  We had
8    music, devotions, PE.

9    *Q.*    You said you would sit at learning centers.  Can
10   you please describe what a learning center is?

11   *A.*    It's like a study corral.  You have your own room
12   to work and there was dividers and it was just to minimize
13   distraction.

14   *Q.*    And you stated that monitors or supervisors would
15   be the ones tending to the classroom?

16   *A.*    Yes.

17   *Q.*    Who would act as the monitors or supervisors?

18   *A.*    It would have been the adults that were hired.
19   So my mom, Wendi's mom, just certain people that were
20   hired for those positions.

21   *Q.*    But you just said they didn't act as actual
22   teachers?

23   *A.*    No.

24   *Q.*    You were teaching yourself?

25   *A.*    Yes.

1    Q.    What would happen if a student acted out or got
2  in trouble?
3    A.    The discipline system was demerits if it wasn't a
4  major offense.  Maybe losing recess or lunch and also
5  getting the rod.
6    Q.    What do you mean by getting the rod?
7    A.    We would get spanked.
8    Q.    What would you be spanked with?
9    A.    With a paddle.
10   Q.    And who would deliver the spankings?
11   A.    The pastors.
12   Q.    When you were at school, did you ever encounter
13  Wendi's dad, Alejo?
14   A.    Yes.
15   Q.    What was Alejo doing around the school?
16   A.    Keeping the grounds.  Like I said, he taught
17  devotions.
18   Q.    What's devotions?
19   A.    It's where we would learn about the Bible and we
20  had devotion books that we used and kind of like a little
21  mini church.
22   Q.    And what was Alejo like while teaching devotions?
23   A.    Very stern and gruff, harsh.
24   Q.    What do you mean by harsh?
25   A.    He didn't talk, or when he taught like my dad

1   would preach or teach, he would -- we had a devotion book

2   and he would -- like one time, it was the Song of Solomon

3   and the Song of Solomon has scriptures or verses and it

4   talks about breasts and touching, and he would just say

5   weird things to us kids, and, again, it wasn't like what

6   my dad did.  So it was just -- it wasn't right.

7        Q.   Why was it weird?

8        A.   Telling the boys how to touch breasts.

9             MR. HAZARD:  Objection.  Hearsay.

10            THE COURT:  Overruled.

11            MS. FOX:  Continue.

12            THE WITNESS:  Telling the boys how to touch

13   breasts or talking about kissing with your tongue.  Things

14   I had never heard as a kid.

15       Q.   BY MS. FOX:  And did he often talk about things

16   like touching breasts or kissing in devotions class?

17       A.   Yes.

18       Q.   Was your dad the pastor the entire time that you

19   attended 91st Psalm?

20       A.   Yes.

21       Q.   And at what point did you stop attending 91st

22   Psalm?

23       A.   When we moved up to Tempe.

24       Q.   Who was the pastor that took over?  And when did

25   you we'll move to Tempe?

1      *A.*    Umm, '83, '84.

2      *Q.*    Who was the pastor that took over after your

3  father?

4      *A.*    Pastor Tom King.

5      *Q.*    Did you ever attend the church under Pastor Tom

6  King?

7      *A.*    I visited a few times.

8      *Q.*    And was the church different under Tom King in

9  comparison to how it was under your father?

10     *A.*    Yeah.  It was a lot smaller.  His preachings were

11 very stern and.  Again, I compare it to my dad.  Not like

12 my dad's.  Very damning from the pulpit.  I felt not a lot

13 of love coming through his messages.

14     *Q.*    Did you ever attend 91st Psalm School in

15 Casa Grande when Tom King was pastor?

16     *A.*    No.

17     *Q.*    At school did you spend at any time with Wendi at

18 your recesses or breaks?

19     *A.*    Yes.

20     *Q.*    How often would you spend time with Wendi during

21 lunch or recess?

22     *A.*    Every day.  We were good friends.

23     *Q.*    Who else would spend time with you and Wendi at

24 lunch or recess?

25     *A.*    Shawn, Brad, Lonnie, Laura.  There was a lot of

1   us kids that were pretty close knit.  Jeri Lynn.  I've

2   already said Laura, though.

3        *Q.*   Did you ever see Wendi outside of school?

4        *A.*   Yes.

5        *Q.*   How often would you see Wendi outside of school?

6        *A.*   On Sundays at church.  And then I wasn't really

7   allowed to spend the night with a lot of people, but I

8   would get to stay the night at her house.

9        *Q.*   How old were you when you were able to spend the

10  night at Wendi's house?

11       *A.*   Probably about eight or nine.

12       *Q.*   And how often would you spend the night at

13  Wendi's house?

14       *A.*   Every -- twice a month.  Maybe every other

15  Friday.

16       *Q.*   What would you do at your sleepovers with Wendi?

17       *A.*   We got to dress up, play dress-up, and we would

18  go in her mom's closet and get her mom's nightgowns and

19  put them on and, you know, parade around the house and --

20       *Q.*   I would like to show you Exhibit 160.  It's also

21  in the book right in front of you.  There should be

22  exhibit binders?

23       *A.*   Oh, okay.

24            MR. ARNTSEN:  Your Honor, may I approach the

25  witness --

1          THE COURT:  Yes.

2          MR. ARNTSEN:  -- just to get the witness binder

3  out?

4          THE COURT:  Yes.

5          MR. ARNTSEN:  Thank you.

6          THE WITNESS:  Thank you.

7      Q.  BY MS. FOX:  Have you ever seen this picture

8  before?

9      A.  Yeah.

10     Q.  And can you tell us what this is a picture of?

11     A.  That is a picture of me and in my school uniform.

12     Q.  And how old were you at the time this picture was

13  taken?

14     A.  Umm, five, six.  I was born in '72.  So, seven.

15  I'm not doing the math right.  Yes, seven.

16     Q.  Seven?  Is this approximately the age you were

17  when you started sleeping over at Wendi Andriano's house?

18     A.  Yes.

19         MS. FOX:  I would like to we'll move Exhibit 160

20  into evidence.

21         THE COURT:  Any objection?

22         MR. HAZARD:  No, Your Honor.

23         THE COURT:  Exhibit No. 160 for identification is

24  admitted into evidence.

25     Q.  BY MS. FOX:  So you stated that you would play

1    dress-up when you slept over at Wendi's house.  I would

2    like you to walk me through the first time that every

3    happened.

4              MR. HAZARD:  Objection.  Relevance.

5              THE COURT:  Overruled.

6              THE WITNESS:  I went to her house and ate dinner.

7    I got to go pick out -- or go in her mom's closet and pick

8    out Donna's nightgowns.

9         Q.   BY MS. FOX:  Who suggested that you go play

10   dress-up?

11        A.   Wendi.

12        Q.   And when she said play dress-up, what did you

13   think she meant -- what did you interpret that to mean?

14        A.   Trying on her mom's shoes, her mom's dresses.

15   That's how I would have -- how I did it at my house with

16   my mom's clothes.

17        Q.   So she said let's play dress-up.  And what

18   happened next?

19        A.   So we picked out some stuff of Donna's and it was

20   nightgowns and we tried them on.

21        Q.   Can you please describe the nightgowns that you

22   were trying on?

23        A.   They were lacy or see-through, short, long,

24   different sizes.

25        Q.   And after you tried them on, did you end up

1   putting one on?

2       *A.*   Yes.

3       *Q.*   And were Wendi's parent at home when you were

4   trying on Donna's nightgowns?

5       *A.*   Yes.

6       *Q.*   What happened after you put on the nightgown?

7   Did Wendi put one on as well?

8       *A.*   Yeah, Wendi had one on and we would just go in

9   the bathrooms and look at ourselves.

10      *Q.*   Did you have any underwear on under the

11  nightgown?

12      *A.*   The first time.

13      *Q.*   This time, you did?

14      *A.*   Yes.

15      *Q.*   So you were looking at yourself in the bathroom

16  with Wendi and what happened?  And both of you were

17  wearing Donna's nightgowns.  Were these nightgowns

18  see-through in any way?

19      *A.*   Yeah, they were see-through.  I mean, as an

20  adult, I would call them lingerie.  As a kid, I -- I just

21  called them nighties.

22      *Q.*   So you're in the bathroom with Wendi looking at

23  yourselves in the lingerie.  And what happened next?

24      *A.*   Well, we might -- we just played with each other.

25  We might go play with dolls.  Or the first few times, it

1  was just playing dress-up.

2     *Q.*   You said the first few times.  Did that change at

3  some point in time?

4     *A.*   It did.

5     *Q.*   And how did that change?

6     *A.*   It changed when we had to go into the room with

7  Alejo.

8     *Q.*   What do you mean you had to go into the room with

9  Alejo?

10          MR. HAZARD:  Objection as to when this is.

11          THE COURT:  Sustained.  Lay some foundation.

12     *Q.*   BY MS. FOX:  When did this change?  Your normal

13  playing until the time you said you needed to go into the

14  room with Alejo, do you remember how old you were?

15     *A.*   Oh, I was still seven, eight.  I was still eight.

16  So when we started playing dress-up, the first few times I

17  spent the night with Wendi, it was just that, dress-up

18  with her mom's nighties, but they didn't look like my

19  mom's nightgowns.  And then probably the third or fourth

20  time, that's when it changed.

21     *Q.*   And what grade were you in at this point in time?

22     *A.*   That would have been third.

23     *Q.*   And do you know how far into the school year it

24  was in your third grade year?

25     *A.*   I don't remember.

1    *Q.*    You don't remember?

2    *A.*    No.

3    *Q.*    But you know it was your third grade year?

4    *A.*    Yes.

5    *Q.*    And so you it changed one time.  What happened on

6    that time that it changed?

7    *A.*    We were invited to come into Alejo's room.

8    *Q.*    What was Alejo's room?

9    *A.*    It was the room he sat in a lot.  He had a big

10   chair in there and a tiny TV and watched videos all the

11   time -- videos with naked people.

12   *Q.*    And you said he invited you in.  How did he

13   invite you in?

14   *A.*    I don't remember him saying anything.  We just

15   went in there.

16   *Q.*    We, being you and Wendi?

17   *A.*    Yes.

18   *Q.*    And when you went in, what happened next?

19   *A.*    Wendi sat on his lap and I sat on his lap.  We

20   were both on a knee -- on his knee.

21   *Q.*    Did you immediately go to his lap?

22   *A.*    Wendi went first and then I followed.  The first

23   time, I ran out.

24   *Q.*    Why did you run out?

25   *A.*    I just didn't -- the first time I saw those

1  movies and him sitting there, I just ran into the

2  bathroom.

3       *Q.*   What type of movies were on that you ran away

4  from?

5       *A.*   Naked people.

6       *Q.*   And what was Alejo wearing?

7       *A.*   He red wore shorts.

8       *Q.*   Did he have any shirt on?

9       *A.*   No.

10      *Q.*   Was he sitting in the chair when you walked in?

11      *A.*   Yes.

12      *Q.*   And you said he ran away.  Where did you run to?

13      *A.*   The bathroom.

14      *Q.*   The bathroom?

15      *A.*   Yes.

16      *Q.*   When you got to the bathroom, what did you do?

17      *A.*   I was just shaking and confused and I didn't know

18  how to feel.

19      *Q.*   And what were you wearing?

20      *A.*   Donna's nightie.

21      *Q.*   Did you have any underwear on?

22      *A.*   No.

23      *Q.*   And so you're in the bathroom shaking, and what

24  happened next?

25      *A.*   Wendi came in and said it was okay, and I felt

1  calmer when she said it was okay.  And then I followed her

2  back into the room.

3      Q.   And when you followed her back in the room, was

4  Alejo still in the chair?

5      A.   Yes.

6      Q.   And was the movie still on?

7      A.   Yes.

8      Q.   The pornography?

9      A.   Uh-huh.

10          MR. HAZARD:  Objection.

11          THE COURT:  Sustained.  Rephrase that question.

12      Q.   BY MS. FOX:  The movie with the naked people on

13  the screen that you had previously mentioned?

14      A.   Yes.

15      Q.   And what happened when you went back in the room

16  with Wendi?

17      A.   Oh, we sat on his lap.

18      Q.   And he was in a chair you stated?

19      A.   Uh-huh, yes.

20      Q.   What type of chair?

21      A.   It was a big brown chair.

22      Q.   Like the type of chair I'm sitting in or

23  like a --

24      A.   Like a recliner.

25      Q.   A recliner.  And so he was sitting on the chair

1    and you both sat on his lap?

2        *A.*    Yes.

3        *Q.*    And you stated he was wearing his red shorts?

4        *A.*    Yes.

5        *Q.*    And you were wearing one of Donna's nighties with

6    no underwear on?

7        *A.*    Yes.

8        *Q.*    What was Wendi wearing?

9        *A.*    She was wearing a nightie, too.

10       *Q.*    And after you sat on his lap, what happened?

11       *A.*    He grew or got big down there and --

12       *Q.*    How could you tell?

13       *A.*    I could see it.

14       *Q.*    Did he have underwear on?

15       *A.*    I don't think he had underwear on.

16       *Q.*    And so you said he grew down there.  And then

17   what was the next thing that happened?

18       *A.*    Oh, he would touch -- touch my legs, touch Wendi,

19   touch my chest.  He just kept touching us.

20           MR. HAZARD:  Your Honor, she has an open notebook

21   in front of her.  What --

22           MS. FOX:  It's the picture.

23           THE COURT:  It's just open.

24           MR. HAZARD:  All right.

25       *Q.*    BY MS. FOX:  And so you said he was touching your

1  legs and your chest.  Was he touching Wendi's legs and

2  chest?

3      *A.*    Yes.

4      *Q.*    Was he touching you anywhere else?

5      *A.*    No.

6      *Q.*    Was he touching Wendi anywhere else?

7      *A.*    Yes.

8      *Q.*    Where else was he touching Wendi?

9      *A.*    In her private part.

10     *Q.*    And how long did this go on for?

11     *A.*    It seemed forever.  It was probably ten minutes.

12     *Q.*    Did you touch him at all?

13     *A.*    Not the first time, but eventually.

14     *Q.*    So this happened more than once?

15     *A.*    Yes.

16     *Q.*    During this first time, you didn't touch him,

17  though?

18     *A.*    I remember accidentally touching it, but it

19  wasn't like what it ended up to be.

20     *Q.*    We will go to that next.  And the first time, did

21  Wendi touch him in his genital area?

22     *A.*    Yes.

23     *Q.*    And so after, you said this lasted probably ten

24  to 15 minutes?

25     *A.*    Yes.

1    Q.    What happened?  How did it end?

2    A.    We got up and went in the bathroom again and

3  started playing.  I mean, it just --

4    Q.    How were you feeling?

5    A.    Shaking.  Scared.  I had never seen a man before.

6    Q.    And did you say anything to Wendi about what had

7  just happened?

8    A.    No.

9    Q.    Did you sleep through that night?

10    A.    Yes.

11    Q.    When you woke up in the morning, was Alejo there?

12    A.    Yes.

13    Q.    Did you say anything to him?

14    A.    No.

15    Q.    How did you feel seeing him that morning?

16    A.    Nervous.

17    Q.    Did he say anything to you?

18    A.    No.

19    Q.    Did you say anything to Donna?

20    A.    No.

21    Q.    When you went home from the sleepover that day,

22  did you say anything to either of your parents about what

23  had happened?

24    A.    No.

25    Q.    Why not?

1    *A.*    I didn't know what to tell them.  Alejo was a
2    pastor.  I wasn't even allowed to say the word butt in my
3    household.  So to describe what went on, I wouldn't have
4    known -- I didn't know what to say.
5    *Q.*    When was the next time you saw Alejo?
6    *A.*    After that morning?
7    *Q.*    After that morning.
8    *A.*    It would have been Sunday at church.
9    *Q.*    And how did you feel when you saw him?
10   *A.*    I wanted to avoid him.  I wanted to hide.
11   *Q.*    Did he say anything to you?
12   *A.*    No.
13   *Q.*    And did you see him in school that week?
14   *A.*    Yes.
15   *Q.*    When you saw him, was that difficult for you?
16   *A.*    Yeah.  I wanted to be invisible.
17   *Q.*    Did you think about telling anyone about what had
18   happened to you?
19   *A.*    No.
20   *Q.*    Why not?
21   *A.*    Because I -- I didn't know how.
22   *Q.*    And did you sleep at Wendi's again after that
23   first incident?
24   *A.*    Yes, I did.
25   *Q.*    Why did you go back to Wendi's after what had

1   happened?

2      *A.*   Wendi was my friend and I didn't get to stay the

3   night with anybody.  And I -- I liked being with her.

4      *Q.*   And when you went -- when was the next time you

5   slept at Wendi's after that initial incident?

6      *A.*   I believe it was two weeks later.

7      *Q.*   And what happened when you slept over the next

8   time?

9      *A.*   It was the same.  We got to eat dinner and hang

10  out, play.  And then we would -- we got the nightgowns on

11  again and we went in the room again.

12     *Q.*   And you stated that the first time, you didn't

13  touch him, but you indicated that that changed at some

14  point.  How did that change and at what point did that

15  change?

16     *A.*   Oh, with me, it probably was the third time, and

17  I -- I touched him.

18     *Q.*   How did you touch him?

19     *A.*   I put my hand on his thing.

20     *Q.*   And you stated the first time that he didn't

21  touch you anywhere except your legs and your breasts.  Did

22  that change at any point in time?

23     *A.*   He would touch me just over the nightgown in that

24  area.

25     *Q.*   In that area, do you mean your genital area?

1    *A.*    Yes.

2    *Q.*    And how long did this go on for?

3    *A.*    For that school year.

4    *Q.*    Your third grade school year?

5    *A.*    Yes.

6    *Q.*    And did it stop after the third grade school

7    year?

8    *A.*    Yes.

9    *Q.*    How did you feel when it stopped?

10    *A.*    Well, I was confused.  And I was gaining weight.

11    I didn't know how to feel.  I didn't know if I was still

12    going to be Wendi's friend or still -- I didn't feel good.

13    *Q.*    And during this time period that this was going

14    on for the entire third grade, did you ever talk to Wendi

15    about what was happening?

16    *A.*    No.

17    *Q.*    Did you ever tell your parents?

18    *A.*    No.

19    *Q.*    Did you ever tell any other authority figure?

20    *A.*    No.

21    *Q.*    So after it stopped in the fourth grade, how much

22    longer did you attend 91st Psalm School with Wendi?

23    *A.*    Umm, about two, three more years.

24    *Q.*    And when you stopped attending, you stated you

25    had moved to Tempe?

1      *A.*    Yes.

2      *Q.*    After you moved to Tempe, you said you were about

3  11 years old?

4      *A.*    Yes.

5      *Q.*    Making Wendi 13?

6      *A.*    Yes.

7      *Q.*    How often did you see Wendi after you moved away?

8      *A.*    Not that often.

9      *Q.*    Can you approximate how many times you saw Wendi

10  after you moved away when you were 11 years old?

11     *A.*    Umm, maybe five times.

12     *Q.*    So since you were 11.  And you're 43 now?

13     *A.*    42.

14     *Q.*    42.  You have seen Wendi approximately five

15  times?

16     *A.*    Yes.

17     *Q.*    When was the last time you saw Wendi, before

18  today, that is?

19     *A.*    It would have been at Brad King's funeral.

20             THE COURT:  I'm sorry.  I didn't hear you.

21             THE WITNESS:  Brad King's funeral.

22     *Q.*    BY MS. FOX:  Was that Tom King's son?

23     *A.*    Yes.

24     *Q.*    And when was Brad King's funeral?

25     *A.*    Oh --

1    *Q.*    Approximately?

2    *A.*    15 years ago.

3    *Q.*    So you haven't seen Wendi in over 15 years?

4    *A.*    No.

5    *Q.*    And how has Alejo's abuse affected you?

6          MR. HAZARD:  Objection.  Relevance.

7          THE COURT:  Sustained.

8          THE WITNESS:  Umm --

9          MS. FOX:  You can't answer.

10         THE COURT:  Ask your next question.

11         MS. FOX:  Yes.

12   *Q.*    BY MS. FOX:  When did you first find out about

13   Wendi being in jail for killing Joe Andriano?

14   *A.*    My parents told me.

15   *Q.*    And when they told you, what was your reaction?

16   *A.*    I was not surprised.

17   *Q.*    Why weren't you surprised?

18   *A.*    Because of what we went through when we were

19   young.

20   *Q.*    And why didn't you bring up what Alejo did to you

21   earlier such as during Wendi's initial trial?

22   *A.*    Nobody asked me.  I didn't know I needed to.

23         MS. FOX:  Thank you, Ms. Lorts.  I know this has

24   been very difficult for you to do today.  I really

25   appreciate you coming and sharing your experience.

1          I have no further questions.

2          THE COURT:  Ms. Gard or Mr. Hazard.

3          MR. HAZARD:  It will be me, Your Honor.

4          THE COURT:  Mr. Hazard.

5          MR. ARNTSEN:  Your Honor, I'm just going to step

6  out a second and call the next witness.

7          THE COURT:  Okay.

8          MR. HAZARD:  Your Honor, we're just marking an

9  exhibit.

10         THE COURT:  Okay.

11         (WHEREUPON, an off-the-record discussion ensued.)

12         MS. FOX:  Your Honor, this is something on the

13  exhibit list that I don't have a copy to review, if he's

14  asking the witness.

15         THE COURT:  I'm sorry?

16         MS. FOX:  The exhibit that he is about to mark

17  was not on the exhibit list and I don't have a copy.

18         THE COURT:  Where did that come from?

19         MR. HAZARD:  From them.

20         MS. FOX:  It was a declaration, but since it

21  wasn't on the witness list, I don't have a copy here.

22         THE COURT:  Does someone have a copy?

23         MR. HAZARD:  We might have an extra copy.

24         MS. FOX:  Thank you.

25         MR. HAZARD:  Your Honor, may I approach the

1  witness with Exhibit No. 226 --

2          THE COURT:  Yes.

3          MR. HAZARD:  -- for identification purposes?

4

5                    CROSS-EXAMINATION

6  BY MR. HAZARD:

7      Q.   Ms. Lorts, I'm handing you Exhibit 226.  Do you

8  recognize that?

9      A.   Yes.

10     Q.   That's the declaration that you made and signed

11 on June 30th of 2013; correct?

12     A.   Yes.

13     Q.   And you avow that everything in that declaration

14 is true and correct?

15     A.   I do.

16     Q.   Okay.  How did you come to make this declaration?

17 Who contacted you?

18     A.   Alexis.

19     Q.   Who is Alexis?

20     A.   One of the people on the case.

21     Q.   Can you be more specific?  What does she do?

22     A.   She takes information.

23     Q.   What's her last name?

24     A.   I don't know.

25     Q.   Did you know her before?

1    *A.*    No.

2    *Q.*    How did she approach you?  What did she say?

3    *A.*    She knocked on my door and said she had some

4    questions about Wendi she would like to ask me.

5    *Q.*    When did this happen?

6    *A.*    Oh, I -- I couldn't tell you the actual date.

7    *Q.*    Is it 2012?  2013?

8    *A.*    2010.

9    *Q.*    Okay.  Did she tell you who she was representing

10   or why she was there?

11   *A.*    Yeah.  She said to get information about Wendi's

12   childhood.

13   *Q.*    Okay.  Did you know that she was part of -- she

14   was there to help Wendi?

15   *A.*    Yes.

16   *Q.*    Now tell me about the next time Alexis or anybody

17   from Ms. Andriano's team contacted you after this initial

18   visit.

19   *A.*    She knocked on the door or would call and asked

20   to talk.

21   *Q.*    How many times have you spoken to someone from

22   Ms. Andriano's team, whether it's Alexis or somebody else

23   since 2010?

24   *A.*    I have no idea.

25   *Q.*    More than five?

1    *A.*    Yes.

2    *Q.*    More than ten?

3    *A.*    Yes.

4    *Q.*    Between more than 20?

5    *A.*    I don't know.

6    *Q.*    But more than ten?

7    *A.*    More than ten.

8    *Q.*    And your testimony is that you knew that

9    Ms. Andriano had been arrested for the murder of her

10   husband when it -- shortly after it happened; is that

11   accurate?

12   *A.*    Umm, I don't know if it was shortly after.

13   *Q.*    When do you remember hearing about it?

14   *A.*    I just remember my parents telling me.

15   *Q.*    But when?  How old were you?

16   *A.*    Umm, in my 30s.

17   *Q.*    Can you be more specific?

18   *A.*    I can't.  I honestly don't remember.

19   *Q.*    And did you ever attempt to notify anybody, Wendi

20   or anybody else associated with her when you heard about

21   that she was in jail having murdered her husband?

22   *A.*    No.

23   *Q.*    You never told anyone about what you experienced

24   that you testified here today; is that correct?

25   *A.*    No, that is not correct.

1    *Q.*    All right.  You told family members when you were

2    19?

3    *A.*    Yes.

4    *Q.*    But not until you were 19?

5    *A.*    Correct.

6    *Q.*    And in your declaration, didn't you state that:

7    Until that time, I had convinced myself that I made it up,

8    that I had dreamt it?  Do you remember stating that?

9    *A.*    I do.

10   *Q.*    Okay.  Other than -- did you tell your father?

11   *A.*    No.

12   *Q.*    You never told your father?

13   *A.*    I told him eventually when I was 19.

14   *Q.*    But not while this was going on?

15   *A.*    When I was a child?

16   *Q.*    Yes.

17   *A.*    No.

18   *Q.*    You didn't tell anyone?

19   *A.*    No.

20   *Q.*    And it sounds like after you were about 11 years

21   old, that's when you moved and went to a different school

22   and a different church; correct?

23   *A.*    No.  It was the same name of --

24   *Q.*    But was it the same school in Casa Grande?

25   *A.*    No.

1   *Q.*   All right.  And where was that school?

2   *A.*   In Tempe.

3   *Q.*   And was Alejo Ochoa employed at that school?

4   *A.*   No.

5   *Q.*   Was he ever around you after the fourth grade.

6   Like you testified to?

7   *A.*   He was around me until I left when I was 11.

8   *Q.*   All right.  But after that point?

9   *A.*   No.

10   *Q.*   And you never came forward until you were 19?

11   *A.*   With?

12   *Q.*   With these allegations?  You never told anybody?

13   *A.*   No.

14   *Q.*   And you never notified anybody from

15   Ms. Andriano's team until they came knocking on your door

16   in 2010?

17   *A.*   Correct.

18   *Q.*   You've never reported it to police to this day;

19   correct?

20   *A.*   Correct.

21   *Q.*   You're a teacher, you said?

22   *A.*   Uh-huh.

23   *Q.*   Is that a yes?

24   THE COURT:  Is that a yes.

25   THE WITNESS:  Yes.

1    Q.    BY MR. HAZARD:   Which school do you teach at?

2    A.    I would say a private school.

3    Q.    What private school?

4    A.    Desert Choice.

5    Q.    And where is that?

6    A.    On Higley.

7    Q.    Gilbert?

8    A.    Gilbert, yes.

9    Q.    You have been doing that since 2010?

10   A.    Not with Desert Choice in 2010.

11   Q.    What other schools have you worked at?

12   A.    Umm, Desert Choice.   Poston Butte High School.

13   Q.    So that's a public school; is it not?

14   A.    Yes.

15   Q.    I take it, then, you're a certified teacher in

16   Arizona?

17   A.    Yes.

18   Q.    And for elementary education?

19   A.    K through 8.

20   Q.    And you mentioned you teach special needs

21   children?

22   A.    Yes.

23   Q.    And that makes you a mandatory reporter --

24   A.    Yes.

25   Q.    -- under the law; correct?   And you're familiar

1   with that law?

2       *A.*   Yes.

3       *Q.*   But your testimony is you still have never

4   informed anyone other than what you testified today in

5   2010 and that's the only time?  Aside from your parents at

6   19, and the defense team for Ms. Andriano in 2010, those

7   are the only times you have reported it?

8       *A.*   No.

9           MS. FOX:  Objection.  Misstates the witness's

10  prior testimony.

11          THE COURT:  Overruled.

12          Go ahead and answer it.

13          THE WITNESS:  No.  I'm not saying that's the only

14  time.  I've been in counseling several years for this

15  abuse and I have talked about it in counseling several

16  times.

17      *Q.*   BY MR. HAZARD:  Okay.  But, again, while

18  Ms. Andriano was awaiting trial, you never let her know or

19  anybody on her defense team about these allegations;

20  correct?

21      *A.*   I did not think I needed to.

22      *Q.*   That wasn't my question.

23      *A.*   No, I did not.

24          MR. HAZARD:  No further questions.

25          THE COURT:  Ms. Fox, redirect?

1          MS. FOX:  I just have a couple of questions very

2     quickly.

3

4                    REDIRECT EXAMINATION

5     BY MS. FOX:

6          Q.    Around the time of Wendi's trial, did an attorney

7     named Dan Patterson contact you at any point in time about

8     participating in Wendi's trial?

9          A.    No.

10         Q.    Did an attorney named DeLozier contact you at any

11    point in time in order to see if you wanted to participate

12    in Wendi's trial?

13         A.    No.

14         Q.    Did a man named Scott MacLeod contact you at any

15    time to see if you wanted to participate in Wendi's trial?

16         A.    No.

17         Q.    Did anyone, around the time of Wendi's original

18    trial, contact you to see if you had any information

19    regarding Wendi Andriano?

20         A.    No.

21         MS. FOX:  Thank you.  That's all I have.

22         THE COURT:  May this witness be excused?

23         MS. FOX:  Yes, Your Honor.

24         MR. HAZARD:  Yes, Your Honor.

25         THE COURT:  Thank you very much.  You're excused.

1          (WHEREUPON, the witness exited the courtroom.)

2          THE COURT:  Let's go ahead and take a ten-minute

3   recess at this point.  We will be in recess for ten

4   minutes.

5          (WHEREUPON, a recess ensued from 10:59 a.m. to

6   11:13 a.m.)

7          THE COURT:  This is CR 2000-096032, State of

8   Arizona vs. Wendi Elizabeth Andriano.

9          The record will reflect the presence of the

10  parties and counsel.

11         The Petitioner may call its next witness.

12         MR. ARNTSEN:  The Petitioner calls Donna Ochoa.

13         THE COURT:  Ms. Ochoa, if you would please step

14  forward.  Please step forward to the witness stand here.

15  And before you sit down, please face the clerk.  Please

16  give her your full name and raise your right hand and she

17  will swear you in.

18         THE CLERK:  Ma'am, can you please state your name

19  for the record and spell your last name?

20         THE WITNESS:  My name is Donna Elizabeth Ochoa,

21  O-C-H-O-A.

22         THE CLERK:  Raise your right hand, please.

23         (WHEREUPON, the witness was duly sworn by the

24  clerk.)

25         THE COURT:  Please be seated.  Just a few things,

1   Ms. Ochoa, before you start to testify.

2            THE WITNESS:  Yes.

3            THE COURT:  Remember to speak so that everyone

4   can hear you.  Also, please wait until the question is

5   completed before you answer the question.  And please make

6   sure that you give us a verbal response.  In other words,

7   don't just shake your head and uh-huh or un-huh.  Say yes,

8   no or whatever it might be.

9            Can you do that for us?

10           THE WITNESS:  Yes, I can.

11           THE COURT:  Go ahead and state your name for the

12   record.

13           THE WITNESS:  Donna Elizabeth Ochoa.

14           THE COURT:  Ms. Fox, you may proceed.

15           MR. ARNTSEN:  No, Judge.  I'm going to do it.

16           THE COURT:  I'm sorry.  Mr. Arntsen, you may

17   proceed.

18

19                    DONNA ELIZABETH OCHOA,

20   having been first duly sworn to tell the truth, the whole

21   truth, and nothing but the truth, testified as follows:

22

23                    DIRECT EXAMINATION

24   BY MR. ARNTSEN:

25       Q.   Donna, what is your relation to Wendi Andriano?

1       *A.*    I'm Wendi's mother.

2       *Q.*    Did you execute some declarations in connection

3    with this proceeding?

4       *A.*    Yes, I did.

5       *Q.*    Can you take a look at the folders that are there

6    in front of you?  You'll see one is marked Exhibit 27.

7    One is marked Exhibit 28 and one is marked Exhibit 29.

8       *A.*    These are my declarations.

9       *Q.*    Have you reviewed your declarations in connection

10   with your testimony?

11      *A.*    Yes, I have.

12      *Q.*    In reviewing those declarations, did you see any

13   portion that you wanted to correct?

14      *A.*    Yes, I did.

15      *Q.*    And what portion is that?  And I'll turn your

16   attention to it.  You and I talked about this; correct?

17      *A.*    Yes.  Yes, we did.

18      *Q.*    I'll turn your attention to Exhibit 27, on

19   Paragraphs 280 through 282.

20      *A.*    Yes.

21      *Q.*    And do you want to take a minute to review the

22   contest of those paragraphs or are you familiar with them?

23   And take whatever time you need.

24      *A.*    Okay.  Thank you.  Okay.

25      *Q.*    Okay.  What correction would you like to make to

1  that portion of your declaration?

2      *A.*   I would like to make a correction with some --

3  with the verbiage in there where it spoke of hardcore,

4  triple X adult porno and sex stores and explain that.

5      *Q.*   Okay.  Please do so.

6      *A.*   Okay.  To me, anything that was sexually -- had

7  anything to do, you know, with sex and stuff like that, I

8  just always considered it was porno or anything.  Uh, an

9  example?

10      *Q.*   Sure.

11      *A.*   Like, say, in Spencer's, you know, they would

12  have items there that were on the shelves or in the back

13  of the store such as like, an example, soaps in the shape

14  of male genitalia.  And, especially, you know, being where

15  I was with the church, you know, to me all of that was

16  very offensive.

17         And so that's -- that like Victoria Secrets,

18  Frederick's, parts in the Spencer's.  There was a lingerie

19  store in Chandler that had, you know, fancy women's

20  lingerie and they had, you know, cards and stuff that were

21  to me inappropriate and offensive, as well as the back

22  room where they sold other things.

23      *Q.*   So is that what you were referring to?

24      *A.*   Yes.

25      *Q.*   With those corrections, are the statements in

1  Exhibits 27, 28 and 29 true and correct?

2      *A.*   Yes, they are.

3          MR. ARNTSEN:  We would we'll move Exhibits 27

4  through 29 into evidence.

5          THE COURT:  Any objection?

6          MS. GARD:  Yes, Your Honor.  Hearsay.

7          THE COURT:  I'll sustain the objection.

8          MR. ARNTSEN:  Your Honor, just I guess in the

9  nature of an offer of proof, which there will probably be

10  a number of those today, I would just offer the

11  declarations as part of the offer of proof.

12          THE COURT:  Okay.  I'll sustain the objection.

13          MR. ARNTSEN:  Understood.  Thank you.

14      *Q.*   BY MR. ARNTSEN:  What I want to focus on right

15  now is family history of your family, of your birth

16  family, and particularly issues of mental health issues

17  relating to your family.  Okay?

18      *A.*   Yes.

19      *Q.*   Is there any history of bipolar disorder in your

20  family?

21      *A.*   Yes, there is.

22      *Q.*   Who?

23      *A.*   My sister, Nadine.  Her daughter, Marjorie

24  Edmonds, and her -- my sister's granddaughter, Kayla, and

25  possibly my mom.

1    Q.    Is there any history of depression in your

2  family?

3    A.    Yes, there is.

4    Q.    Who?

5    A.    Myself, Brandon, my sister, Nadine.

6    Q.    And, Brandon, who are you referring to?

7    A.    Brandon Ochoa, my adopted son.

8    Q.    Thank you.  How does the depression that you

9  suffer evidence itself, generally?

10   A.    Generally, it at times -- well, the worst times

11 are times when I would have like meltdowns, what I always

12 thought of as meltdowns or thoughts of suicide and things

13 like that.

14   Q.    And tell me about the first -- describe what one

15 of these meltdowns consists of.  What happens?

16   A.    Okay.  For an example, the first one that I

17 really recall was when I was somewhere as a preteen, 11,

18 12, 13, somewhere around there.  My parents would fight

19 all the time.  My father was an alcoholic.  And one time,

20 I think I just had enough and I just shut down.  I

21 wouldn't talk to anybody.  I wouldn't eat anything.  My

22 parents finally took me to a doctor friend of my father's.

23   Q.    How long did this shutdown last before you pulled

24 out of it?

25   A.    A couple of weeks.

1    *Q.*   And you indicate that was -- you were about how
2  old then?
3    *A.*   I was preteen, maybe around 11, 12, 13, something
4  like that.
5    *Q.*   When was the next time you had one of these
6  meltdowns, that you can recall?
7    *A.*   The next big one that I remember was when Wendi
8  was born.
9    *Q.*   And tell us about that.
10    *A.*   I had Wendi in a little hospital in Texas.  And
11  prior to that, I had a little dog, a little Cockapoo that
12  was my baby.  My dad had given him to me.  And I slept
13  with him and everything like that.  And when -- back then,
14  you stayed in the hospital, you know, three days or
15  whatever.
16         When I came -- when they brought me home, they
17  told me that the dog was gone and I got all hysterical.  I
18  wouldn't have anything to do with the baby, with Wendi.  I
19  just shut down again.  I wasn't eating I couldn't -- I
20  wouldn't talk to anybody.  I was just broken up about the
21  dog.
22    *Q.*   About how long were you in that condition?
23    *A.*   A week or two.
24    *Q.*   And then describe the process of pulling out of
25  it.

1    *A.*   My mom was staying with us in Texas.  She had
2    come out earlier.  Skip was there and they kept trying to
3    talk to me to get me to, you know, snap out of it and take
4    care of the baby, Wendi.

5    *Q.*   Have you had meltdowns since --

6    *A.*   Yes.

7    *Q.*   -- Wendi was born?

8    *A.*   Yes.

9    *Q.*   Why don't you describe the next one that you can
10   recall.

11   *A.*   One time when Skip and I were still married --
12   and excuse me -- I may be referring to him as Skip or
13   Shelby.

14   *Q.*   Oh, by the way, if you want a glass of water, the
15   pitcher and the glasses are right behind you there.  I can
16   help you pour it if your hand gets in the way.

17   *A.*   Okay.

18   *Q.*   Go ahead.  Continue.

19   *A.*   We had had a fight.  Mainly, it was him yelling
20   and pushing around.  And I usually would, you know, fight
21   for a little bit and then I -- or yell back and then I
22   would go into the bathroom and hide.

23         And when he left that evening, I went to the
24   refrigerator.  And I remembered my mom doing this.  And I
25   went to the refrigerator and get took out ketchup and

1   other bottles of things in the refrigerator and I went

2   outside and started throwing them on the concrete driveway

3   and then just sort of fell to the ground and I don't know

4   how long I stayed there.  I know that I was a mess for a

5   while afterwards.

6       Q.   About how long before you pulled out of that one?

7       A.   I -- I don't really know how long it was.

8       Q.   The next time you can recall having one of these

9   meltdowns.

10      A.   After -- I'm sorry.

11      Q.   That's okay.

12      A.   After Wendi was arrested.

13      Q.   What happened then?

14      A.   For the first few days, it was like, you know,

15   like -- you know, like just cruising through.  And then

16   all of a sudden, it hit me that Joe was gone, Wendi was in

17   jail, and I probably wasn't going to get my grandchildren.

18   And I just -- I just remember hitting the floor in the

19   living room and Alejo came in the house and found me and

20   he called one of the girls from work.  And I know that

21   they got me to bed.  I know that they called the counselor

22   that I had been talking to and I remember taking

23   medications.  I just don't remember a whole lot.

24      Q.   Understood.  Have you had any meltdowns since

25   then?

1    *A.*    A couple of times, yeah.

2    *Q.*    And just briefly tell us about those.

3    *A.*    They were times after I would have a conversation

4    with Jeanea about, you know, the kids and things.  And I

5    just melted down.

6    *Q.*    Similar kind of process?

7    *A.*    A similar kind of thing, right.  Then I just

8    would take the pills to help float my way through it.

9    *Q.*    And what pills are you referring to?  Do you know

10   what they were?

11   *A.*    I had several different ones that they had given

12   me back then.  I think I had Klonopin.  I'm don't know

13   exactly how to say all the right names.  But similar to

14   like Lorazepam, Ambien, Ativan, things like that.

15   *Q.*    Thank you.  Have you ever contemplated suicide?

16   *A.*    Yes, I have.

17   *Q.*    Tell us about that.

18   *A.*    Well, I've thought about it lots in my life.

19   I've just always, you know, thought, oh, it would be

20   really easy, you know, to just go head-on into a car or

21   drive off the side of the road.  I just thought that was

22   normal.  I guess it was normal for me.

23   *Q.*    And ultimately --

24   *A.*    But the time that I made a plan was -- I started

25   making a plan during Wendi's trial and had stacked up on

1   all the medications that I had been getting.  And when

2   they came back, you know, with the verdict and everything,

3   I just knew I was going to do it.

4         And I had a conversation with my executive at

5   work and she got me to a counselor right away, like within

6   the next few hours.  I spent time with the counselor and

7   she said, you know, that not to be thinking like that

8   because you've got Wendi that needs you.  And that's what

9   kept me going.

10   *Q.*   Thank you.  Now I'm going to change topics here

11   and start with sort of some things that have happened in

12   your life.  I'm going to start with your first marriage.

13   Okay?

14   *A.*   Okay.  Yes.

15         MR. ARNTSEN:  Your Honor, what I did is I --

16   because Ms. Ochoa had some hand surgery, what I did is I

17   pulled out the exhibits that I intend to talk with her

18   about and they're in that small, white binder.  I spoke

19   with counsel for the State about it.  And so she will be

20   using that instead of the big binders.  Okay?

21         THE COURT:  Okay.

22   *Q.*   BY MR. ARNTSEN:  So, Donna, can you -- actually,

23   I'm just going to pull the declarations off her table

24   because she doesn't need them anymore.  Can you turn to

25   Exhibit 140, please?

1          MR. ARNTSEN:  And, Matt, can you put 140 up on
2    the screen?
3      *Q.*   BY MR. ARNTSEN:  Looking at Exhibit 140, what's
4    that a picture of?
5      *A.*   That's a picture of Skip and Wendi when Wendi was
6    a baby.
7      *Q.*   Who is Skip?
8      *A.*   Skip is Shelby.  Skip Robertson, my husband -- my
9    first husband.
10     *Q.*   Is that Wendi's natural father?
11     *A.*   Yes, it is.
12         MR. ARNTSEN:  I we'll move Exhibit 140 into
13   evidence.
14         THE COURT:  Any objection?
15         MS. GARD:  No, Your Honor.
16         THE COURT:  Exhibit No. 140 for identification is
17   admitted into evidence.
18     *Q.*   BY MR. ARNTSEN:  Why don't you tell us about
19   Skip?
20     *A.*   Skip was the youngest of a family of eight.
21     *Q.*   How did you meet him?
22     *A.*   My best friend's mom married his older brother.
23   My best friend, Alice.  And her mom -- her mom had lost
24   her husband to a mining accident down in San Manuel.  And
25   a few years later, she met Buck and married Buck.  And

1  that's how I came to know the Robertson family.

2       Q.    How old were you when you first met Skip?

3       A.    I was probably maybe 12, 13, 14, somewhere around

4  in there.

5       Q.    And, obviously, you didn't marry him at around

6  that time; correct?

7       A.    No.  I didn't like him then.

8       Q.    Describe the circumstances essentially that led

9  to your marriage to Skip.  How old you were, how old he

10  was, what he had been doing, how you met, that sort of

11  thing.

12      A.    Okay.  I was 18 years old.  I was going to

13  college down at Eastern Arizona in Thatcher, Arizona.  And

14  I had come home for from -- or for Christmas break and I

15  had just broken up with my boyfriend at college.  And I

16  think it was Christmas Eve.  My family didn't do anything

17  special.  They were probably working.  And I had gone over

18  to Alice's house and a couple of the brothers and Alice's

19  mom and them said:  Well, you know, Skip is getting home

20  today from the Marine Corps.  He's flying in.  You're

21  going to go up there with us and we're going to have a

22  family thing up there.  They kind of adopted me in their

23  family.  And so I said:  Sure.  Why not?

24            So I went up there with them and I saw Skip.

25  And, of course, you know, he was this nice marine that had

1  come home from fighting in Vietnam.  And we just kind of

2  hit it off and, of course, both us were drinking.  And so

3  that's how we met.

4      Q.   How long after that did you marry him?

5      A.   How long after that?  Two months.

6      Q.   Okay.  Tell me a little bit about life with Skip.

7  Did he sort of manifest any sort of symptoms you had to

8  watch out for?

9      A.   Yes, right away.  Like I said, he had just gotten

10  back from Vietnam in December.  And when we got married,

11  we went over -- we lived in San Clemente and not on the

12  base.  He would sleep at night and I remember the first

13  morning that I went to wake him up, you know, I did it

14  just like you would anyone else.  You go up to their

15  shoulder:  Wake up, Honey, whatever.  And he came up

16  swinging.  And, you know, I was like:  What?  And so, you

17  know, we talked about it.  He said, you know:  If you're

18  going to wake me up, you need to stand at the end of the

19  bed, just wiggle my foot a little bit, and he goes and

20  then step back.  And, plus, at nighttime, he would be

21  thrashing around.  Sometimes, you know, he would take

22  swings and stuff and you could hear him having nightmares

23  and stuff.

24      Q.   What do you mean hear him having nightmares?

25      A.   Well, because he would be talking out and crying

1  out in his sleep and yelling like for his buddies and

2  stuff.

3      Q.   Did Skip have a drinking problem?

4      A.   Yes.

5      Q.   Why don't you tell us about that?

6      A.   Okay.  His family, the Robertson family were from

7  Texas.  They drove trucks and they were a pretty rough and

8  rowdy group and they drank a lot.  All of them did.  And

9  so, you know, and Skip had drank a lot in high school and

10  things like that.  He always ran around with the bad boys.

11          So, of course, you know, that behavior continued

12  because we would have some of the other guys from the base

13  come over, you know, week nights, weekends, whatever, and

14  they all would get drunk.

15     Q.   Did they all -- did that include you?

16     A.   Not at that time, no.  You know, it was one thing

17  to go out and get drunk when you went to the bar or

18  something like that, but, not -- these guys were, you

19  know, drinking their memories away.

20          And he would start out happy, you know, kind of a

21  happy drunk and then he would start getting really mean

22  and antagonistic.  I just had to learn how to stay away

23  from him.

24     Q.   How would he act when he was in the mean and

25  antagonistic stage of being drunk?

1    *A.*   He would start yelling, saying:  Well, you don't

2   know how to do this.  You don't know how to do that.  And

3   then just, you know, talking -- just talking ugly,

4   degrading.

5    *Q.*   Did you guys fight much?

6    *A.*   As the time went on, yes.

7    *Q.*   Tell me about the fights.

8    *A.*   Okay.  He had promised that when we got married,

9   that he wasn't going to be like his brothers and he wasn't

10  going to drive trucks.  So when we came back -- after he

11  was discharged from the marines, we came back to Arizona

12  and he went to refrigeration school.  He did pretty well

13  at it.  But he wanted the money and his brothers were

14  always, you know, harping on him to come, you know, drive

15  trucks with us.  We make lots of money, et cetera,

16  et cetera.

17          And, finally, he just broke down because they had

18  put so much pressure on him.  Then once -- so when they

19  were starting to do that is when things got rougher around

20  the house because I just had not envisioned having all of

21  these brothers and everything up in our -- in our lives

22  and basically, you know, telling us how to live our lives.

23          So he would drink and I would push and he would

24  physically push back at me and he'd go, well, you know,

25  just -- and then he was drinking and smoking and

1  everything and wanted sex all the time.  And I would --

2  until I would tell push him away.  I would tell him, no, I

3  just don't want you until he finally just kept harping

4  on me.

5      *Q.*   And I want to talk in relation to your marriage

6  with Skip.  About how long after that, did you find out

7  that you were pregnant with Wendi?

8      *A.*   Right around November or December of 1969.

9      *Q.*   And were you in any motor vehicle accidents while

10 you were pregnant?

11     *A.*   Yes, I was.

12     *Q.*   Why don't you tell us about that?

13     *A.*   Skip had just gotten back from California.  They

14 had -- him and his brother had had a great big truck

15 accident on the Grapevine and they had come back home.

16 Then him and I were driving over to another brother's,

17 Buck, the one that was my girlfriend's stepfather.  On our

18 way over there, an ACME wrecking truck ran a stop sign and

19 T-boned us, spun us around.  Bob went flying out the

20 window.  The car was destroyed and I was bounced around,

21 you know, in the car.

22     *Q.*   About how pregnant were you then?

23     *A.*   I was about three months pregnant.

24     *Q.*   Did you go to the hospital?

25     *A.*   No.

1    *Q.*    Why not?

2    *A.*    I just didn't do that.

3    *Q.*    Why don't you tell us about Wendi's birth?

4    *A.*    Okay.  When I was about six months pregnant or so

5    in June of 1970, Skip decided that we were going to -- we

6    were living in Tucson at the time.  He decided that he

7    wanted us to live in Broom, Texas, that he was going to

8    stop driving his truck and he was going to work at a truck

9    stop there.  Because we had, you know, kind of separated a

10   couple of times and he always came back with, you know,

11   I'm going to try harder.

12         So we went to Texas and he would go out at night.

13   Sometimes he wouldn't come back, you know, until the next

14   day afterward.  He was drinking pretty hard.  And it was

15   getting really stressful on me.  I mean, I'm out in the

16   middle of nowhere.  I know no one except the people that

17   owned the truck stop.  And I started having labor pains in

18   July and the little country doctor there thought that I

19   would probably deliver early because I was, you know,

20   getting down to five minutes on the pains.

21         So I asked my mom to come out.  Actually, I think

22   Skip did, too, to help, you know, until the baby was born,

23   thinking she was going to be born early.

24   *Q.*    Okay.  And then what happened?  So your mom came

25   out to live with you?

1    *A.*    So my mom came out and moved in with us and

2    basically took care of us financially.  Skip was still out

3    running around.  Finally my mom said, you know:  He's

4    cheating on you.  And I must have just walk around with

5    blinders.  I don't know.  And it turned out, he was.  He

6    was having an affair with a waitress there.

7         And so I've got all that stress going on.  It was

8    a couple of weeks into August and the doctor said:  Well,

9    you know what?  He was he was a DO, a small town, and he

10   had 12 kids of his own.  And he said:  Let's try the

11   old-fashioned way and we will give you some --

12   *Q.*    Caster oil?

13   *A.*    Thank you.  Caster oil and orange juice, the most

14   horrible thing in the world.  And he goes:  If

15   you're ready to -- if she's ready to come out, if she's

16   ready to deliver, then it will happen.  Well, I end up in

17   the hospital with all the cramps and everything, but she

18   didn't and it was another couple of weeks before she did.

19        So I'm thinking, oh, my gosh, if this is just the

20   start of it.  You know, I didn't know anything about

21   babies.  Nobody that I had grown up with, you know -- a

22   lot of girls were pregnant, but they were all back in

23   Tucson.  So I didn't have anyone to talk to or know

24   anything.  My mother would never tell me anything.  And

25   so, one day, Skip and I had gone fishing out on a little

1   pond for some catfish.  And when we were coming back out

2   of the field, a bull started to run after me.  Well, I

3   never did gain very much weight with Wendi.  I was a stick

4   with a ball.  And so, you know, I ran as fast as I could

5   and I was able to get out through the fence because I

6   hadn't been that far from the fence.

7           And then a few hours later, contractions started

8   going and everything.  I went to the doctor.  He goes:

9   You know what?  You need to check into the hospital.  And

10  he goes:  And I'll see you in eight, ten, 12 hours,

11  however long it takes.  So I checked in I think at -- I

12  don't know.  It was early evening, 5:00 or 6:00.  And my

13  mom was there with me.

14          They were trying to find Skip.  They didn't know

15  where he was.  And, finally, I guess he came, you know,

16  when I went in to deliver her.  And they said:  Well, how

17  far apart are the contractions?  And I go:  I don't know.

18  I can't tell the difference.  And she was born, from the

19  time I got to the hospital, in about two and-a-half hours.

20      Q.   Okay.  And then describe your first few days with

21  Wendi in the hospital.

22      A.   Okay.  Well, first of all, I was upset because

23  she was a girl because I knew that Skip wanted a boy.  And

24  in those first few days, like I said, a small town, a

25  small hospital.  She was the only baby there at the time.

1   And, at that time, you didn't keep your babies with you.

2   And so, most of the time that I was in the hospital, she

3   was in the nursery with the nurses.

4           And then, you know, we into the situation where I

5   came home and found out that the puppy was gone.  And, at

6   that moment in my life, I was more concerned about the

7   puppy than I was the baby.

8       Q.   And so how did that affect your interactions with

9   Wendi when you first came home from the hospital?

10      A.   I wouldn't have anything to do with her.  I was

11  hysterical about the dog.  And I had people all over town

12  looking for the dog, you know, because this woman that

13  just had a baby won't do anything.  So, yeah, I was --

14      Q.   Who took care of Wendi?

15      A.   My mom and Skip.

16      Q.   Can you take a look Exhibit 141, please?  Do you

17  have it there in front of you?

18      A.   Yes, I do.

19      Q.   And is it up on the screen?

20      A.   Yes, it is.

21      Q.   Who is that picture of?

22      A.   It's a picture of Wendi and my mom.

23      Q.   What role did your mom play in taking care of

24  Wendi in Texas?

25      A.   Mom and -- my mom basically took care of her.

1   Wendi had croup or, you know, I don't know if it was

2   croup.  It was colicky, you know, where she cried all the

3   time.  So my mom would sit and rock her and she would give

4   her to me and Wendi would never stop crying.  She would

5   only stop crying when mom held her.

6          MR. ARNTSEN:  I would we'll move Exhibit 141 into

7   evidence.

8          THE COURT:  Any objection?

9          MS. GARD:  No, Your Honor.

10         THE COURT:  Exhibit No. 141 for identification is

11  admitted into evidence.

12      Q.   BY MR. ARNTSEN:  And so, then, how long did your

13  mom stay with you after Wendi was born in Texas?

14      A.   She stayed with us the whole time I was still in

15  Texas, which wasn't that long.  We moved back to Phoenix

16  probably when Wendi was about five or six weeks old.

17      Q.   How come?

18      A.   Well, there were two stories.

19      Q.   Go ahead.

20      A.   The first one is because it snowed on Labor Day

21  and I just freaked out because I'm not used to snow.  The

22  real story was because the girl that he had been having an

23  affair with said that she was pregnant and was trying to

24  pin it on Skip.

25      Q.   So Skip was motivated to we'll move back to

1   Arizona?

2       *A.*   (No oral response.)

3       *Q.*   You have to use words.

4       *A.*   Oh, I'm sorry.  Yes, he was very motivated to

5   leave Texas and we'll move back to Arizona.

6       *Q.*   Let's talk a little bit about Skip's child

7   rearing.  First off, can you take a look at Exhibit 140,

8   which we had looked at a little earlier.  As evidenced

9   from Exhibit 140, was Skip involved in feeding Wendi?

10      *A.*   Yes.  The first, you know, week or so, I would

11  nurse Wendi just a little bit because I was still so

12  upset.  And so they were giving her additional in a

13  bottle.  And then, you know, after that, I had wanted to

14  nurse her for a long time, but I probably was just too

15  stressed.  And so he fed her a lot and he bathed her.  Him

16  and my mom gave Wendi her first bath.  I probably didn't

17  bathe her until she was a couple of months old.  I was

18  scared of her.

19      *Q.*   Why was it that Skip played this larger role in

20  Wendi's infancy?

21      *A.*   Well, as I said, Skip was the youngest in the

22  family of eight.  So all of his siblings, you know, had

23  had children, or most all.  But he was around them a lot

24  when he was growing up and he took care of the kids and he

25  knew how to be around children.

1    *Q.*   What was Skip's approach to child raising with
2  young children?

3    *A.*   Pretty rough.

4    *Q.*   What do you mean by that?

5    *A.*   Well, his whole family was, you know, just kind
6  of really rough around the edges.  And he would tell her
7  to do something only like in a loud commanding voice.
8  Skip potty trained her.  I was --

9    *Q.*   Well, yeah, go ahead and tell us about that.

10   *A.*   I was -- I was working and he --

11   *Q.*   How old was Wendi?

12   *A.*   She was around 11 months.  He started when she
13  was around ten months.  And I would come home and he says
14  goes:  Oh, she is going to the bathroom on the toilet.  I
15  said:  Well, what are you doing?  How are you doing that:
16  Because, like I said, I didn't know anything.  He goes:
17  Watch.  And he would put her on the toilet and he would
18  go:  Go to the bathroom.  And she would sit there a little
19  bit and she would go to the bathroom.  Only he would say
20  it in a real strong, strict voice and kind of like if you
21  were -- the way I've always thought about it was like
22  training a dog.  I've always thought that.

23   *Q.*   How about if like comforting Wendi when she was
24  crying?  What was your and -- how did you and Skip handle
25  that?

1      *A.*    Well, going back to Broom, Texas, the doctor had

2  always told us that you need to put your baby down by

3  8:00 o'clock no matter what.  So we would put Wendi down

4  to bed.  And, you know, she would be crying for a while.

5  And then I would start getting nervous going, you know, we

6  need to go check on her or something.  He goes:  You can

7  go check and see if she's dry, see if she's hungry.  And

8  if she's not, then you just leave her be and you let her

9  cry.  He goes:  Don't be picking her up.

10      And so that's what would happen.  Sometimes, you

11  know, she might quit crying after 15 minutes.  Sometimes

12  an hour.  Sometimes an hour and-a-half.  By then, I'm

13  frantic and he's just going:  Leave her alone.  You know,

14  just -- and I didn't do anything else but do what he told

15  me.  You know, I just left her alone.

16      *Q.*    Why was that?  You're her mom.

17      *A.*    But he knew about kids and I was scared.  You

18  know, I didn't want to make him upset.

19      *Q.*    How did you guys discipline Wendi?

20      *A.*    Spanked her.

21      *Q.*    From what age about?

22      *A.*    Oh, when she was in diapers.

23      *Q.*    And do you have any sense as to how often?

24      *A.*    Skip would spank her if she wouldn't do what he

25  told her to do.  So you can imagine a little kid.  You

1  know, they're not going to do everything you tell them to.

2  So it was probably often.

3     Q.   Take a look at Exhibit 142, please.  What is

4  Exhibit 142?

5     A.   Again, that's Wendi and Skip.

6     Q.   And where are you living then?

7     A.   I'm not really sure.  I know it was up in

8  Phoenix.  I'm not sure.  We moved several times, though.

9          MR. ARNTSEN:  I we'll move Exhibit 142 into

10 evidence.

11         THE COURT:  Any objection?

12         MS. GARD:  No, Your Honor.

13         THE COURT:  Exhibit No. 142 for identification is

14 admitted into evidence.

15         MR. ARNTSEN:  Your Honor, I'm just going to start

16 in another outline section here.  It's probably ten or

17 15 minutes, either way.

18         THE COURT:  Why don't we go ahead and take our

19 lunch break then at this time and we will resume promptly

20 at 1:30.

21         MR. ARNTSEN:  Thank you, Your Honor.

22         THE COURT:  We will be in recess.

23         (WHEREUPON, the lunch recess ensued from

24 11:51 a.m. to 1:30 p.m.)

25         THE COURT:  Good afternoon.  This is

1   CR 2000-096032, State of Arizona vs. Wendi Elizabeth

2   Andriano.

3            The record will reflect the presence of the

4   parties and counsel.

5            The record will reflect that when we took our

6   recess, Donna Ochoa was on the witness stand.  She is now

7   on the witness stand.

8            You are still under oath.  We will continue the

9   direct examination by Mr. Arntsen.

10           Mr. Arntsen.

11           MR. ARNTSEN:  Thank you, Your Honor.

12      Q.   BY MR. ARNTSEN:  Donna, what I want to turn to

13   now is Skip's family.  Okay?  First of all, tell us

14   generally about Skip's family.

15      A.   Six boys, two girls.

16      Q.   Where was Skip in the birth order?

17      A.   He was the baby.

18      Q.   What can you tell us about child abuse issues in

19   Skip's family?

20           MS. GARD:  Objection.  Vague.  I mean we need

21   more.

22           THE COURT:  Sustained.

23           Rephrase the question.

24      Q.   BY MR. ARNTSEN:  Did you ever hear stories about

25   child sexual molestation in Skip's family?

1    *A.*    Yes, I did.

2    *Q.*    Tell us what you heard.

3    *A.*    Okay.  The one story was that after Skip and I

4    were married and had Wendi, and my sister-in-laws, of

5    course, all older than I were, told me to keep Wendi away

6    from grandpa because grandpa was a dirty old man and they

7    knew that he had been messing around with some of the

8    granddaughters.

9    *Q.*    Did Wendi ever spend time alone with her

10   grandfather?

11   *A.*    Yes, she did.

12   *Q.*    Can you tell us -- first of all, did you try to

13   keep that from happening?

14   *A.*    Yes, I did.  I tried to, you know, keep her away

15   from him.  And one time we went to -- I went with Skip on

16   the truck to LA.  We were only supposed to be gone two

17   days.  That was the weekend that I believe it was in '71

18   when the big LA earthquake hit.  And so we couldn't get

19   the load in and couldn't get the load back out for a

20   couple of days while they were checking all th freeways.

21   And when I got back, I expected to see Wendi over at my

22   sister-in-law's house and she wasn't.  She was at

23   grandpa's house.

24   *Q.*    How did that come to be?

25   *A.*    Pardon?

1    *Q.*    How did that come to be?

2    *A.*    Evidently, Ida maybe decided she needed to go do

3  some things and she was busy, so she just dropped her off

4  over at grandpa's.

5    *Q.*    How about Skip's brothers?

6    *A.*    Skip's brothers, several of them had been in jail

7  once or twice for different things.  His older brother,

8  one year or so older than him, Tommy, was accused of child

9  molestation or abusing the child, and it was Skip's

10 stepdaughter.  And Skip was, too.  Both were sent to

11 prison for that.

12   *Q.*    Take a look at Exhibit 152.  Is Exhibit 152

13 what's up on the screen?

14   *A.*    Yes.

15   *Q.*    And you see that that's a two-page document?

16   *A.*    Yes.

17   *Q.*    What does the first page set forth?

18   *A.*    The first page is for Shelby Wayne Robertson,

19 Skip.  It's for molesting a child and sexual conduct with

20 a minor.

21   *Q.*    Was Skip convicted of that?

22   *A.*    Yes, he was.

23   *Q.*    Did he go to prison?

24   *A.*    Yes, he did.

25   *Q.*    Do you know for about how long?

1    *A.*    Umm, ten or 15 years.  I'm not sure.

2    *Q.*    What was Skip's relationship with the child he

3 was convicted of molesting?

4    *A.*    His stepdaughter.

5    *Q.*    And what was he convicted of doing to his

6 stepdaughter?

7    *A.*    Intercourse.

8    *Q.*    Can you look at the second page of Exhibit 152?

9 Do you see that?

10    *A.*    Yes.

11    *Q.*    Does that relate to Skip's brother, Tommy?

12    *A.*    Yes, that's Tommy.

13    *Q.*    And is that also a sexual abuse conviction

14 relating to Tommy?

15    *A.*    Yes, it is.

16    *Q.*    Is the victim the same as Skip's?  As was the

17 victim of Skip's?

18    *A.*    Yes, the same victim.

19         MR. ARNTSEN:  We'll move Exhibit 152 into

20 evidence.

21         MS. GARD:  Objection.  It's hearsay.

22         THE COURT:  I'm going to sustain the objection on

23 Exhibit 152.

24         MR. ARNTSEN:  Just to make the record, Your

25 Honor, I believe first of all that it is properly

1  admissible under the public records exception 8038 and we

2  also believe that it is properly admissible as mitigation

3  evidence that would have gone in during Wendi's sentencing

4  under the *Strickland* rule and the Arizona rule.

5         THE COURT:  Anything further from the State you

6  want to put on the record?

7         MS. GARD:  No, Your Honor.

8         THE COURT:  I'm still going to sustain the

9  objection.

10        MR. ARNTSEN:  Understood.  Again, we will just --

11        THE COURT:  Right.

12        MR. ARNTSEN:  The actual documents are an offer

13 of proof right now.

14        THE COURT:  Right.  Go ahead.

15        MR. ARNTSEN:  Thank you.

16    *Q.*  BY MR. ARNTSEN:  Was Skip ever accused of

17 molesting any of his nieces?

18    *A.*    Yes, he was.

19    *Q.*    Tell us about that.

20    *A.*    My sister-in-law told me several years later that

21 Skip had molested her two daughters.

22    *Q.*    Under what circumstances?

23    *A.*    They were in the -- they were in the car.  I was

24 in the car.  We were coming back from California.  They

25 had gone over and picked us up and brought us back to

1   Arizona.

2        Q.   Did Skip ever indicate to you that he believed

3   that one of his brothers molested Wendi?

4            MS. GARD:  Objection.  Hearsay.

5            MR. ARNTSEN:  Your Honor --

6            THE COURT:  Overruled.

7            Go ahead and answer the question.

8            MR. ARNTSEN:  Go ahead.

9            THE WITNESS:  Would you ask that again?

10       Q.   BY MR. ARNTSEN:  Did Skip ever indicate to you

11  that he believed one of his brothers may have molested

12  Wendi?  I'm referring to his brother Tommy.

13           THE COURT:  That's a yes or no question.

14           THE WITNESS:  That's a yes.

15       Q.   BY MR. ARNTSEN:  What did he tell you?

16       A.   He told me that he thought that Tommy was

17  probably messing around with Wendi.

18       Q.   Under what circumstances?  Do you recall?

19           MS. GARD:  Judge, I object.  This is speculative.

20           THE COURT:  I'll sustain the objection.

21           Let's move on.

22       Q.   BY MR. ARNTSEN:  In terms of an offer of proof,

23  have you exhausted your recollection in connection with

24  that?  Do you recall anything else?

25       A.   No.

1    Q.    You don't recall anything else?

2    A.    No.

3    Q.    Okay.  Do you recall anything else?  That was a

4    bad question.

5    A.    Okay.  In reference --

6          THE COURT:  That's a yes or no question.

7          THE WITNESS:  Yes.  Yes, I do recall.

8    Q.    BY MR. ARNTSEN:  Can you please tell us, again,

9    in the context of an offer of proof, what you recall about

10   the circumstances under which Skip said he suspected Tommy

11   molested Wendi?

12   A.    When we were talking about it after he was out of

13   jail.

14   Q.    What did he tell you?

15   A.    He told me that he thought that the times that

16   Wendi was with grandpa and Tommy, that Tommy did, too.

17   Q.    Thank you.  Now, at or around the time when Wendi

18   was little, did she have a concern about sleeping in beds

19   other than her own?

20   A.    From the time that -- yes.

21   Q.    What can you tell us about that?

22   A.    When she was little, and I'm talking real little,

23   less than a year, we would take her other places, like

24   maybe over to the in-laws or something, and she would not

25   sleep anywhere but in her own crib.  You could put her

1 down with some of the other kids or in a bed by herself,

2 but she would not go to sleep.

3     *Q.*    Thank you.  Now do you recall an incident

4 involving Skip and his brothers and Wendi in a swimming

5 pool?

6     *A.*    Yes, I do.

7     *Q.*    Why don't you tell us about that?

8     *A.*    Wendi was around a year -- between a year and two

9 years old and we had gone for like a family get-together

10 and they were all playing -- the brothers and some of the

11 kids were playing in the pool.  It was a big pool like at

12 a -- it was a big pool.  And the brothers got a hold of

13 Wendi and decided that she needed to learn how to swim.

14 And, of course, they had been drinking.  So they started

15 to -- they put her in the pool and then they just started

16 to toss her around and they would just throw her in the

17 water and she couldn't swim.  You know, she would go down

18 and then somebody would finally pick her up.  She was just

19 crying her little heart out.

20         And, you know, I just asked them to stop.  I

21 didn't yell or scream and I looked to the sister-in-laws

22 to help me and everyone just sort of let them do what they

23 wanted to do.

24     *Q.*    Thank you.  Now I want to talk a little more --

25 well, first of all, when did you and Skip split up?

1       *A.*   We were divorced in 1974.

2       *Q.*   Okay.  Thank you.  So Wendi would have been three

3  or four?

4       *A.*   Yeah, three or four.

5       *Q.*   Can you take a look at Exhibit 143?  What is

6  Exhibit 143 show?  And is that what's up on the screen?

7       *A.*   Yes.

8       *Q.*   What's this a picture of?

9       *A.*   That's a picture of Wendi sitting on top of my

10  car.

11       *Q.*   Do you know where she is?

12       *A.*   That was in Tempe, Arizona.

13       *Q.*   I want to talk some about --

14            MR. ARNTSEN:  Oh, we'll move Exhibit 143 in.

15            MS. GARD:  No objection.

16            THE COURT:  Exhibit No. 143 for identification is

17  admitted into evidence.

18       *Q.*   BY MR. ARNTSEN:  Did you move around a lot while

19  Wendi was a toddler?

20       *A.*   Yes, I did.  Yes, I did.

21       *Q.*   Could you just generally describe the reasons for

22  and the circumstances of the moves, say, taking her up to

23  age four or so?

24       *A.*   Okay.  Well, we moved from Texas back to Phoenix.

25  In Phoenix, I know that we lived in one, two, three houses

1  within a year and-a-half.  Then we moved over to Tempe.

2  And then after I got my divorce, then I moved back to

3  Phoenix with my mom.  Then we moved to Casa Grande.

4      *Q.*  Okay.  That pretty well covers it.  Were you

5  working during this time?

6      *A.*  I started working again when Wendi was a few

7  months old.

8      *Q.*  Doing what?

9      *A.*  I worked for a title company.

10      *Q.*  And what -- how was Wendi taken care of?  Strike

11  that?  I apologize.  What were your work hours with the

12  title company?

13      *A.*  Normally 8:00 to 5:00.

14      *Q.*  And how was Wendi taken care of when you were at

15  work?

16      *A.*  Okay.  If Skip was home from driving trucks, he

17  would take care of her.  Otherwise, my mother worked

18  nights at a Mexican food restaurant.  And so she would

19  take care of Wendi during the daytime.  And then there was

20  a span of a few hours where before I would get home and

21  mom would have to be at work.  So she would drop her off

22  at a day care and I would pick her up.

23      *Q.*  Did you have any social life during this period

24  of time?

25      *A.*  Not when we were in Phoenix.  But when we were in

1   Tempe, yes.

2   *Q.*   How old was Wendi when you moved to Tempe?

3   *A.*   She was about two, two and-a-half.

4   *Q.*   Was Skip still around?

5   *A.*   Yes.  He was driving a truck.  So he was gone a

6   lot of the time.

7   *Q.*   How much of the time?  Was he gone most of the

8   time?

9   *A.*   Yes, most of the time because the type of hauling

10  that he did, back in the day, it was called garbage

11  hauling because they had refrigerator trucks and they

12  would take a load to someplace across the country and then

13  they would have to wait until the broker could find them a

14  load to come back.  Sometimes they could head to one

15  straight and travel all around the country for weeks

16  before they ever got back to home base.

17  *Q.*   And you indicated you and Skip got divorced in

18  1974.  How long before you got divorced, did he move out?

19  *A.*   He was sort of in and out.  And I knew at one

20  point that he was living with his girlfriend.

21  *Q.*   While you were still married?

22  *A.*   Yes.

23  *Q.*   And so, I mean, really what I'm asking is in the

24  context of how Wendi is being looked after.  You indicated

25  while Skip was still living with you and while he was not

1   on the road, he would look after her.  When did that end?

2       A.   Okay.  Probably a month or two before we got

3   divorced.

4       Q.   Okay.  Not long?

5       A.   Not long, no.

6       Q.   So then you had indicated you moved to Tempe.

7   Did your mom still take care of Wendi on a regular basis

8   when you were in Tempe?

9       A.   No.  My mom stayed in Phoenix.

10      Q.   And so, then, were you still working at the title

11  company?

12      A.   I was still working at the title company.  I had

13  transferred to Tempe.  And, at that time, I would have her

14  in day care.  But also right down the street from where I

15  lived was a Montessori school that I put her into day care

16  there.

17      Q.   Were your work hours still pretty much 9:00 to

18  5:00?

19      A.   Yes.

20      Q.   Did you go out at night much?

21      A.   Yes, I did towards -- yes, I did.

22      Q.   How frequently?  And are we talking about you

23  going out to the bars and that sort of thing?

24      A.   Yes.

25      Q.   How frequently?

1    *A.*   Several nights a week.  Always on the weekend.

2    *Q.*   Always on the weekend, plus some week nights; is

3    that what you're saying?

4    *A.*   Uh-huh, yes.

5    *Q.*   And how would Wendi be taken care of when you

6    went out for the evening?

7    *A.*   I'm sorry.  It's just real hard to look back and

8    see what I did.  The neighbor next door, I would -- well,

9    especially if it was a work night, I would put Wendi down

10   to bed at 8:00 o'clock and wait for a little bit.  And

11   then I would go over and ask her -- you know, I would tell

12   her:  Hey, I'm going downtown.  Would you keep an eye on

13   Wendi?  And she said:  Yeah, sure.  I'll keep an eye on

14   her.

15   *Q.*   Was this a period of your life where you were

16   somewhat promiscuous?

17   *A.*   Yes, it is.

18   *Q.*   And would you bring men back to your apartment?

19   *A.*   On occasion.

20   *Q.*   And would you sometimes find yourself ending up

21   in other peoples' apartments?

22   *A.*   On occasion.

23   *Q.*   And, again, how was Wendi taken care of while you

24   were doing this?

25   *A.*   A neighbor.

1    *Q.*    Thank you.  And I believe we're getting around in
2    the 1973, 1974 period of time here.  You were still
3    working at the title company?
4    *A.*    Yes.
5    *Q.*    And then did you start volunteering or taking on
6    a significant volunteer commitment?
7    *A.*    Yes, I did.  One of the girls that I worked with
8    at the title company was dating the program manager for
9    Terros.
10   *Q.*    What's Terros?
11   *A.*    Terros was or is a drug abuse prevention
12   organization under the umbrella company.  It used to be of
13   CODAC, which is Community Organization for Drug Abuse
14   Corporation or something like that.  And --
15   *Q.*    So what was --
16   *A.*    And --
17   *Q.*    Go ahead.  I'm sorry.
18   *A.*    Okay.  And so I started going to Terros in the
19   evening times or on the weekends to see what it was all
20   about and I ended up going to some counseling there.  I
21   thought, wow, this is really cool.  I want to be a
22   counselor, too.  So I enrolled in Phoenix College and was
23   taking classes for counseling.  And I also received my
24   EMT and worked the ambulances at Terros.
25   *Q.*    First of all, your classes at Phoenix College,

1  was that -- are those classes that you took at home or did

2  you go out for those classes?

3      *A.*   No.  I went to Phoenix college because it wasn't

4  very far from where Terros was located on Roosevelt.

5      *Q.*   And over what period of time were going to school

6  at Phoenix College while you were working at the title

7  company?

8      *A.*   Umm, '73, '74, through there.

9      *Q.*   About what sort of time commitment was your

10 school work?

11     *A.*   A lot of the stuff I would do when I was at

12 Terros, the homework.

13     *Q.*   What was your time commitment at Terros?

14     *A.*   I would spend anywhere from ten to 30 hours or

15 more a week at Terros, depending on what kind of time I

16 had and what kind of babysitter I could get.

17     *Q.*   And that leads to my next question.  How was

18 Wendi taken care of when you're spending all of this time

19 at Terros?

20     *A.*   There were overnights -- there were 24-hour

21 day care facilities in Phoenix.  If I could impose on my

22 mother, you know, like if I wanted to be there for like a

23 whole weekend or something, then I would do that.  But

24 mainly day care.

25     *Q.*   So during this time in your life, where did Wendi

1  rank on your priority list?  I'm sorry these are hard

2  questions.

3      *A.*   Not very high.

4      *Q.*   Thank you.  Now at some point in time, did your

5  volunteer work at Terros lead to a regular job in the drug

6  and alcohol counseling field?

7      *A.*   Yes, it did.  I was offered a position to work in

8  CODAC at the main office on McDowell.  I started working

9  there in the accounting and they groomed me to write

10  grants because I had always done pretty well with stuff

11  like that.

12      *Q.*   What were your hours at CODAC?

13      *A.*   8:00 to 5:00.

14      *Q.*   Did you work at CODAC at all in addition to those

15  8:00 to 5:00 hours?

16      *A.*   Yes.  If we were working on trying to get a grant

17  done for monies and stuff, then I would work late at night

18  or even on Saturdays and Sundays.

19      *Q.*   When did you start at CODAC?  What year about, if

20  you know?

21      *A.*   Probably '73, '74, I think maybe.

22      *Q.*   So Wendi is about four?  Three or four?

23      *A.*   Uh-huh.

24          THE COURT:  Is that a yes?  Is that a yes?

25          THE WITNESS:  Yes, it is.  I'm sorry.

1    MR. ARNTSEN:  I apologize.

2    *Q.*   BY MR. ARNTSEN:  How was Wendi being taken care

3   of other than by you while you were at CODAC?

4    *A.*   If I was working overtime, I had to pick her up

5   by a certain time at the one day care.  And so I would

6   just bring her back to CODAC with me, or on the weekends,

7   I would just bring her with me.

8         Downstairs was another part of Terros, which was

9   a detox center and a methadone clinic.  And, also, the one

10  part was detox for those first few days and then the other

11  part was for women where they had, you know, finished the

12  hard detox and they were getting cleaned up until they

13  were allowed to leave.

14   *Q.*   And so where would Wendi be?

15   *A.*   Down in the women's section.

16   *Q.*   And where were you?

17   *A.*   I was upstairs in the offices.

18   *Q.*   And for how long might Wendi be downstairs while

19  you were upstairs?

20   *A.*   Well, if I stayed all day on Saturday, that's

21  where she would be.

22   *Q.*   Thank you.  And Wendi was also going to day care

23  during that time?

24   *A.*   Yes.

25   *Q.*   Do you recall an incident coming up which caused

1   Wendi to get kicked out of day care?

2       *A.*   Yes, I do.

3       *Q.*   Can you tell us about that?

4       *A.*   I got a -- I went to pick up Wendi one day from

5   day care.  And it wasn't too far from where I worked.  And

6   they asked me to come inside and they wanted to have a

7   talk with me.  And they said, you know:  Wendi and a

8   couple of other kids were in the bathroom today and they

9   were showing off each others' private parts to each other.

10  And we can't tolerate behavior like that.  Basically, if

11  it happened again -- you know, because they felt like

12  Wendi was the instigator.  And they said, you know, if

13  something like that happens again, that they were going to

14  take stronger steps.

15      *Q.*   Did they take stronger steps?

16      *A.*   Yes.

17      *Q.*   What happened?

18      *A.*   It wasn't too long after that, they called me at

19  work and said that I needed to come down and pick Wendi

20  up, that the same scenario had happened again and that

21  they felt that it was Wendi that had instigated it.  So I

22  needed to come and pick her up and she wasn't welcome

23  anymore.

24      *Q.*   Did you do anything further to investigate what

25  happened there?

1      *A.*    No, I did not.

2      *Q.*    Did you ever get Wendi any treatment relating to

3    that?

4      *A.*    No, I did not.

5      *Q.*    Now at some point in time -- and I believe we're

6    getting there chronologically -- did you shift to a job

7    down in Casa Grande?

8      *A.*    Yes, I did.  I went to a conference in Scottsdale

9    and met a -- a behavioral health type conference.  And I

10   met Rick Barnes and he offered me a position in

11   Casa Grande.  I said, well, you know, I would think about

12   it.  I would go down there and check it out and see what I

13   thought about it and, you know, let him know later on

14   because I didn't know much about Casa Grande and I like

15   the city.

16     *Q.*    So then did you do that?  Did you explore it?

17     *A.*    Yes, I did.  I went down there and I spent a few

18   nights down there, a few weekends down there at Rick's

19   house with Wendi.  And I decided, yeah, that after the end

20   of the year, that I would -- I think it was the end of the

21   year, somewhere around December, January, that I would

22   start working for them as a grant writer and also in the

23   position of -- there were a lot of drug addicts, that at

24   the time if they were in Pinal County, had to come down

25   and there and drop urine specimens according to their

1   parole provisions.

2       *Q.*   So you indicated you stayed with Rick Barnes?

3       *A.*   Yes, I did.

4       *Q.*   Was Wendi ever alone with Rick Barnes?

5       *A.*   Yes.

6       *Q.*   Did you find out that Rick Barnes had a history

7   of sexual abuse with children?

8            MS. GARD:  Objection.  Hearsay.

9            MR. ARNTSEN:  Mitigation.

10           THE COURT:  Overruled.

11           Just this question is a yes or no answer.

12           THE WITNESS:  Yes.

13      *Q.*   BY MR. ARNTSEN:  Tell us what you found out.

14      *A.*   Rick was gone one day and he had told me to find

15  some papers and medication or stuff that we needed

16  downtown for the office.  And so I went looking for it and

17  I came across a box that had letters and things in there

18  and found that he had been working in Thailand previous to

19  coming to Casa Grande and that he was fired from his

20  teaching position in Thailand for sexual misconduct with

21  young girls.

22      *Q.*   You moved down to Casa Grande; correct?

23      *A.*   Yes, that is correct.

24      *Q.*   And who did you live with?

25      *A.*   Rick suggested that I live with Nicky Barnes, his

1  ex-wife because Nicky didn't have anyone to take care of
2  her.  And so Nicky had a young child and, of course, I had
3  Wendi.  So Nicky and I rented an apartment together.
4      Q.   What was Nicky's daughter's name?
5      A.   Tasha.
6      Q.   And about how old was she in relation to Wendi?
7      A.   She was a year and-a-half, two years younger than
8  Wendi, somewhere around there.
9      Q.   Did you ever come to hear that Rick Barnes was
10  accused of molesting Tasha?
11     A.   Yes, I did.
12          MS. GARD:  Objection.  Hearsay.
13          THE COURT:  Sustained.
14     Q.   BY MR. ARNTSEN:  In connection with an offer of
15  proof, what you did hear in that regard?
16     A.   I heard from several people that I knew later on
17  after Rick and his second -- his next wife moved to
18  California that he had molested both Linda's daughter as
19  well as his own daughter, Tasha.
20     Q.   Thank you.
21     A.   And he left the country.
22     Q.   What was Rick's position at PADAC?
23     A.   He was the boss.
24     Q.   What was your job at PADAC?
25     A.   Several things.  I did counseling.  You know, I

1  was there for when they needed to drop a urine sample.  I

2  wrote grants.  I worked pretty much on everything.  If

3  they brought a drunk in at nighttime, the police, then we

4  had a van that would take them to Eloy and sometimes I

5  would have to go in the van with them.

6     *Q.*   What were your work hours at PADAC?

7     *A.*   When I first started down there, I worked from

8  Friday night around 6:00 o'clock until Monday morning.

9     *Q.*   About how long was that?

10    *A.*   Definitely more than 48 hours.

11    *Q.*   What would you do with Wendi during this time?

12    *A.*   I would bring her to work with me on Friday

13  evening.  And then when Nicky got out of school, then she

14  would come and she would pick up Wendi and then for the

15  nighttime.  And then maybe in the daytime, she would bring

16  her back on Saturdays and Sundays because she needed to

17  study.

18    *Q.*   Bring her back where?

19    *A.*   Bring her back down where I was at at PADAC.

20    *Q.*   And then what would Wendi to do while she was

21  with you at PADAC?

22    *A.*   She would play with, you know, some of the adults

23  that would be around there.

24    *Q.*   Did she spend all of her time in the building?

25    *A.*   No, she didn't.  She would go outside of the

1   building on the big sidewalk and then go around the

2   corner.  There was a jewelry store there at the time and

3   around the corner was a place was called Stoney's

4   Furniture.  So she would wander around through there.

5       Q.   What would she be doing while she was out there?

6       A.   Panhandling.

7       Q.   Now, I want to talk -- was it about this time

8   that you met Alejo Ochoa?

9       A.   Yes.  Alejo was on the board of directors for

10  PADAC and that's how I met him.

11      Q.   Tell me about Alejo's reaction -- did Alejo come

12  to know Wendi because of your working at PADAC?

13      A.   Yes, he was one of the guys -- Alejo would come

14  down and check on me and then he would hang around and

15  play with Wendi.  Sometimes, you know, his cousin would

16  come and they would entertain her.  That's how I found out

17  she was panhandling.

18      Q.   Did Alejo and Wendi seem to hit it off pretty

19  quickly?

20      A.   Yes, they did, she really liked him because he

21  played with her.  He paid attention to her.  And they

22  just -- she just became attached to his hip, I guess you

23  could say.  She just really liked him.

24      Q.   How did you and Alejo get together?

25      A.   Oh, probably the biggest reason that I decided to

1   go ahead and take the job in Casa Grande was that one

2   night, I was driving home from Terros.  It was about

3   2:00 o'clock in the morning and I was driving along and

4   then, all of a sudden, I thought I saw somebody standing

5   and just pop up in front of me.  And I slammed on the

6   brakes.  I thought I hit something.  I looked back and

7   that was back when there would be no cars at 2:00 o'clock

8   in the morning.  And I didn't see anything.  And I knew

9   that my life was just getting totally out of control.  And

10  I went back to my apartment and I thought, you know, I've

11  got to change.  I've got to change.  I've got to get back

12  to God.  I've got to go to church.  I've got to do

13  something.  This is not -- this isn't right.

14          And so one of the young men that would come up

15  from Casa Grande from Terros had told me about, you know,

16  that he was going to church down there and stuff.  So I

17  just kind of connected all the pieces and I thought:

18  Okay, I'm going down there.  You know, I've got a job down

19  there.  You know, maybe there's a church down there.

20  Randy thinks there's a good place to go.  So I started

21  going to -- at the Christian bookstore in Casa Grande,

22  they were having church meetings in the back, full gospel

23  meetings.  So I started going there with Randy and I

24  started dragging Tasha and Nicky and, you know, I just

25  really liked it.  And so, slowly, Alejo started to come

1  with us, too.

2      *Q.*    At about this time, did you and Alejo start

3  sleeping together?

4      *A.*    Yes, we did.

5      *Q.*    And where were you sleeping at this time?

6      *A.*    I had -- well, in the apartment.  We were

7  sleeping in my bedroom in the apartment.

8      *Q.*    Where would Wendi sleep?

9      *A.*    She slept there, too, because Wendi and I had

10 always slept -- we were sleeping together.

11     *Q.*    In the same bed?

12     *A.*    In the same bed.

13     *Q.*    So did you and Alejo sleep together at the

14 apartment?

15     *A.*    Yes.

16     *Q.*    With Wendi in the bed?

17     *A.*    Yes.

18     *Q.*    And do you recall a bedwetting issue arising with

19 Wendi at this time?

20     *A.*    Yes.  Like I said, you know, Skip had potty

21 trained her and she never had accidents.  And then, all of

22 a sudden -- she never had accidents that I recall.  And

23 then, all of a sudden, she started wetting the bed.  I

24 woke up one night and she was in the middle between Alejo

25 and I.  I woke up and like the bed was just soaking wet.

1   It took me a little bit because it just, you know, hadn't

2   happened before.  And then probably two, three or four

3   nights a week, she kept doing that for a matter of a

4   couple of months.

5       Q.   From her starting her bedwetting, what's the

6   relation in time between this and when Alejo started

7   sleeping with the two of you?

8       A.   She didn't start bedwetting until after Alejo

9   started sleeping with us.

10      Q.   I believe you were testifying a little bit about

11  your essentially finding religion about this time?

12      A.   Yes.

13      Q.   Can you take a look at Exhibit 147?  Do you see

14  that?

15      A.   Yes.

16      Q.   Are some of the people in this picture -- and

17  we're going to get into another chapter.  But are some of

18  these people in this picture people who you were involved

19  with in this sort of religious awakening while you were in

20  Casa Grande?

21      A.   Yes, they are some of them.

22      Q.   Can you tell us who is pictured in Exhibit 147?

23      A.   In the front row is Rosalie and then Wendi.  I'm

24  right behind Wendi.  Then Rebecca.  And then the two

25  people, the young man and the lady at the end, were some

1  homeless people that we had ministered to.  And in the
2  back row is Rick and then Alejo and then Al.
3       MR. ARNTSEN:  We'll move Exhibit 147 in.
4       THE COURT:  Any objection?
5       MS. GARD:  I'm just looking at the text
6  underneath.  No objection.
7       THE COURT:  Exhibit No. 147 for identification is
8  admitted into evidence.
9       MR. ARNTSEN:  Thank you.
10      Q.   BY MR. ARNTSEN:  Is this about the time you met
11  Rick and Al?
12      A.   Umm --
13      Q.   Again, not the time of the photo.
14      A.   Oh, okay.
15      Q.   But, really, the time we're talking about in
16  Casa Grande and around the time when you and Alejo became
17  a couple.
18      A.   Yes.  Rick and Al would stop at the -- they were
19  traveling between Willcox and Northern California.  And
20  when they would stop through there, they would have
21  services at the Christian bookstore.
22      Q.   Tell us about your religious faith development
23  during this period of time.
24      A.   Nicky and I got really involved with listening to
25  Rick and Al.  And I remember -- I remember one time, they

1   had taught on idolatry and things like that and you know

2   how -- how do I put this?  That certain items that you

3   might have may carry bad spirits with them, stuff like

4   that.  So Nicky and I went back to our apartment and we

5   went through the apartment and we took out all kinds of

6   stuff.  We had bagfuls of all of our pictures.  We had --

7   back then I was really into I'm Okay, You're Okay and all

8   of that with the counseling.  And I got all of those books

9   so that the only kind of books that we had in the house

10  were Bibles or, you know, things that went with the Bible.

11  We got rid of all of her stuff that she had brought back

12  with her from Thailand because she was married to Rick at

13  that time.  And we took it out to CG Mountain and burned

14  barrels of stuff because we thought, you know, we're just

15  being really faithful by getting rid of all of this stuff

16  that was of the devil.

17      Q.   And was religion becoming a more and more

18  important part of your life during this period?

19      A.   Yes, it was.

20      Q.   Where are we talking about in terms of years or

21  Wendi's ages?

22      A.   That would have been probably when Wendi was

23  about four and-a-half all through Wendi's high school and

24  everything.

25      Q.   Did you and Alejo get married around this time?

1    *A.*    Yes, we did.  We were sleeping together and Rick

2    and Al came and they -- one time they came over and really

3    to see Nicky and I and they realized that Alejo was there.

4    They go:  Are you guys sleeping together?  And, you know,

5    yeah.  And so they had taken Alejo off and told him:  You

6    guys have to get married.  You can't be sleeping together,

7    you know, without you being married.

8    *Q.*    Did you move out of Nicky's apartment then or did

9    you and Alejo move somewhere?

10   *A.*    No.  Alejo and I got married and we stayed in the

11   apartment until the lease went out and then we had a house

12   built.

13   *Q.*    Had a house built?

14   *A.*    Right.  There was a program back when.  It was

15   kind of like a HUD.  It's a program for low income people

16   that live out in THE rural areas where they'll build a

17   house, you know, and the interest rate is very low and

18   it's usually outside of the town.  That's where we were

19   living.  So we paid rent according to what our income was.

20   *Q.*    When was this about when you had this house built

21   for you?

22   *A.*    It was the summer of 1975.

23   *Q.*    So Wendi was five?

24   *A.*    Yeah, that's right.  Yeah, she probably turned

25   five right about the time that we were moving in.

1    *Q.*   In terms of your religious beliefs, how did that

2   relate to your health care philosophy?

3    *A.*   Well, we believed that everything in the Bible

4   was true.  And so, if it was, then that meant that you

5   could pray and you would be healed.

6    *Q.*   Did that ever affect any illnesses that Wendi

7   came down with?

8    *A.*   Yes, it did.

9    *Q.*   Can you please explain that?

10    *A.*   Yes.  One time when we were living out there in

11   the house, Wendi became really ill.  She had a fever that

12   was really high.  I don't know how high because we didn't

13   keep thermometers or anything.  I kept asking her -- you

14   know, we kept praying that she would be healed.  I kept

15   asking -- finally, I was so scared because she had been

16   hot -- you know, so hot for so long.  And I said:  Do you

17   want to go the -- do you want to go to the doctor?  Do you

18   want to go to the doctor?  And she's five years old.  And

19   she's going:  No, I don't want to go to the doctor.  Jesus

20   is going to heal me.  And, you know, I'm turning to Alejo.

21   He goes:  Well, she can -- she can decide.  And so I let a

22   five-year-old make a decision.

23    *Q.*   Now at around this time -- or strike that.

24        Did your religious beliefs cause you to quit your

25   job at PADAC?

1    *A.*   Yes.  Because with government grants, you can't

2    talk about religion.  And, you know, I was determined that

3    if I was going to be a counselor, I was going to have to

4    tell them about God.  If they wouldn't let me, then I

5    wasn't going to work for them anymore.  So I quit working

6    for them.

7    *Q.*   And about what time was this?

8    *A.*   That was about the time that Alejo and I got

9    married.

10   *Q.*   And then what did you guys do to get by with you

11   having quit your job?

12   *A.*   Well, at that time, it turned out that the week

13   that we got married, his mother had sold the tortilla

14   factory to his aunt.  So that left him without a job.  And

15   he didn't know that that was going to happen.  So he

16   started working for I believe Foxworth.  And that's what

17   we lived on, what he made.

18   *Q.*   Now, as I understand it, you lived for a period

19   of time in Casa Grande and then you sort of went on the

20   road again; correct?

21   *A.*   That is correct.

22   *Q.*   How long did you -- how old is Wendi at the

23   time -- at the end of this time in Casa Grande?

24   *A.*   Okay.  Wendi went to kindergarten and first grade

25   in Casa Grande.  And then when she was out of

1    kindergarten -- and during this time, we were having house
2    meetings.  We didn't go to churches because we didn't
3    believe in denominations.  And so we had been talking with
4    everyone and having the meetings at home and somebody said
5    that they felt that we were -- that God was saying that we
6    should go on the road with Rick and Al, that we needed to.
7    And so Rick and Al came by and we said:  Well, you know,
8    we feel like God is leading us to do that.  What do you
9    think?  And so, basically, we gave our house away.  You
10   can't sell those kind of houses.  And we packed up
11   everything that would fit in a Volkswagen van.  I think I
12   left my china at his mother's, but that was it and the
13   dog.  And Rick and Al took us down to Willcox.

14       *Q.*    And what did you do in Willcox?

15       *A.*    In Willcox we lived in a large house that had
16   several families in it.  Some of the women had husbands.
17   Some did not, but they had children.  So we were staying
18   there and we stayed there for a couple of months I think
19   until about the end of the summer.  And then, all of a
20   sudden one night, everyone said, you know, that we had to
21   pack up and leave.  And Alejo and I and Wendi and we also
22   ended up taking Rick and Rosalie, the two other young
23   ladies that are in that picture.  We took them with us as
24   well as Mike and Mary.  And they had just gotten married
25   because it was prophesied they were supposed to get

1  married.  Mary had a house in Tucson and that's where we

2  went.

3      Q.   How long were you in Tucson?

4      A.   We were in Tucson around a year.

5      Q.   So now at the end of your time in Tucson, Wendi

6  is how old?

7      A.   Probably around six.  Going on six or going on

8  seven.

9      Q.   Probably six or seven.  When you left Casa

10  Grande, she had finished first grade; correct?

11      A.   Right.

12      Q.   Now you're a little over a year past that;

13  correct?

14      A.   Right.

15      Q.   What did you to in Tucson?

16      A.   In Tucson, Alejo and Mike went out on jobs

17  through like ADECO, you day jobs like that to make money.

18  Myself and Mary and Rick and Rosalie stayed at the home.

19  I was teaching Wendi, home schooling Wendi at the time.

20  And, at that time, Rosalie had two children.  But when we

21  left Willcox, she had left her children in Willcox.

22      Q.   So in Tucson, there any other kids in the house

23  besides Wendi?

24      A.   No, there was not.  Just Wendi.

25      Q.   And what role did religion play in your

1    household?

2       A.    We were doing it like we thought was correct in

3    the Bible, that the man was the head of the house.   So

4    Mike and Alejo were the bosses, I guess you would say, and

5    that basically we followed whatever they said.

6       Q.    When you left Tucson, what do you do next?

7       A.    Okay.   We were really struggling in Tucson as far

8    as financially and everything.   And Rick and Al were

9    coming back and forth and back and forth.   And so, you

10   know, finally, Mike and Alejo said:   You know, can we just

11   go to California with you guys?   Is that okay?   Because we

12   had talked about that they were going to be building a

13   church up outside of Walnut Creek or actually in Walnut

14   Creek.   You know, eventually we would go up there.   We

15   said, you know, that we really need to leave because there

16   were times that Rick and Rosalie and Wendi and I would

17   walk up to the store to go, you know, to try and buy some

18   food or whatever and we would be looking for pennies on

19   the ground to buy beans.   And I had -- at one point, I was

20   teaching Wendi her math, you know, with beans and

21   macaroni, and we actually ended up taking them off the

22   paper and using them for dinner.

23      Q.    So money was tight?

24      A.    Money was very tight.   You would open a cabinet

25   and usually we had some flour and beans and that's what we

1   would eat.

2   *Q.*   So then what was your life like over the next

3   year or so?

4   *A.*   The next year or so, we headed up to California.

5   We broke down in Flagstaff and ended up having to leave a

6   bunch of things there.  Then we went to California and we

7   stayed at one lady's house, Val's house for a few weeks.

8   Then we had to move out of there and we stayed -- we were

9   living in like a panel truck, in the Volkswagen van, and

10  Rick and Al had a bus -- an old bus.  Alejo and I owned a

11  truck.  Eventually, they traded -- Rick and Al took the

12  truck and we took the Volkswagen van.  And so we were

13  sleeping in those kinds of arrangements, you know, taking

14  turns sleeping in the different vehicles.

15          At one time, we lived in a house in Martinez.

16  Another time we landed in a trailer court where Rick and

17  Al or Ashley and Rick decided to buy one of the old

18  trailers.  And so we lived in a trailer while they were

19  fixing it.  And then after they fixed it up, they decided

20  they wanted to make a fifth wheel out of it so that that

21  could be used to travel with, also.

22          The goal was that eventually Rick was going to

23  marry Rosalie and Al would marry Rebecca and so that they

24  would each have two homes, too.

25  *Q.*   Were you traveling around during this time?

1    *A.*    After we got the fifth wheel ready, we went down

2   to Santa Anna, down into Orange County.  We worked with a

3   mission down there, Orange County Rescue Mission with

4   Dr. Whitehead.  And with any other churches, you know,

5   that wanted speakers, we would go there.  We worked with

6   Melody Bland.

7            And then we went to San Diego and we couldn't

8   find any churches that would have anything to do with us.

9   So, at that point, we turned around and came back up to

10  Santa Anna.  We did a lot of street ministry working, you

11  know, in the barrios and things like that.

12   *Q.*    What was Wendi doing during this period?

13   *A.*    Wendi would be hanging out with all of us.  I

14  would be, you know, home schooling her.  And, at that

15  point, once we got to California, Rosalie and Rebecca each

16  took a subject and they worked with her.  We had gotten

17  schoolbooks down in Tucson from the Tucson Public School

18  District.  They gave us access to old textbooks and

19  encyclopedias and everything like that.  So we had

20  material.  We would send our information -- our curriculum

21  to an alternative site in New Mexico that had been

22  basically set up for hippies that wanted to home school

23  their kids.

24   *Q.*    Were there any other kids besides Wendi with you

25  at that time?

1    *A.*    No.  For a little while, Lisa's daughter -- I'm

2   sorry.  Val's daughter Lisa and Wendi played together.

3   But that was just for a short period of time, maybe a

4   month or so, maybe two, at the very most.

5    *Q.*    If Wendi acted up or misbehaved, how was that

6   handled?

7    *A.*    She was disciplined by spanking.

8    *Q.*    How?

9    *A.*    By spanking.

10    *Q.*    And who would discipline her?

11    *A.*    If Alejo and I were around, it would be one of

12   us.  If we weren't around, then it would be whoever the

13   elder male was.

14    *Q.*    How would you guys make a living during this

15   period?

16    *A.*    As I found out later, Rick basically took money

17   from Val to buy -- you know, to the make the fifth wheel

18   an do all of these things.  And Mike and Alejo would go

19   out and do day labor.

20    *Q.*    Can you take a look at Exhibit 68?

21    *A.*    Yes.

22    *Q.*    Do you recognize Exhibit 68 as being what's

23   sideways up on the screen?

24    *A.*    Yes.

25    *Q.*    What is that?  You can take a look at your

1   exhibit.

2       *A.*   Yes.

3       *Q.*   Do you recognize what that is?

4       *A.*   It's a chart showing what our earnings were

5   compared to the poverty level.

6       *Q.*   Can you take a look just at Exhibit 68 A and 68 B

7   behind us.  Actually, what I'll represent to you is this.

8   We prepared this summary.  Those are the Social Security

9   records from which Exhibit 68 was prepared.

10          Does Exhibit 68 appear to accurately reflect your

11  income during the periods of time that it is set forth

12  there?

13      *A.*   Yes, it does.

14          MR. ARNTSEN:  We'll move Exhibit 68 and 68 A and

15  B into evidence.

16          THE COURT:  Any objection?

17          MS. GARD:  No, Your Honor.

18          THE COURT:  It would usually run A and B, but it

19  looks like from the actual exhibit worksheet, we're doing

20  1 and .001 and .002.

21          MR. ARNTSEN:  Right.  I understand.

22          THE COURT:  So, just to be clear, then, it will

23  be Exhibit No. 68, Exhibit No. 68.001 and then

24  Exhibit No. 68.002 are admitted into evidence.

25          MR. ARNTSEN:  Thank you, Your Honor.

1     *Q.*   BY MR. ARNTSEN:  So how did this Fishers of Men

2  period end?

3     *A.*   I think about the time that we were in San Diego

4  and, you know, trying to hook up with churches down there,

5  and no one would have anything to do with us, there was

6  very little money.  I actually found out when Rick and Al

7  would bring food home, it turned out that it had been food

8  that they had gone Dumpster diving for.  You know, I need

9  to get out.  I need to leave.  This isn't right.  Wendi

10  went barefoot for almost a year when we first got there

11  because there was no money to buy her shoes.  And, yet,

12  there was money to make a fifth wheel.  You know, it was

13  like -- it was just I guess some of the shine wore off

14  and I just wanted to leave.  I just wanted to leave.

15     *Q.*   And did you and Alejo leave?

16     *A.*   Not at first.  Alejo said:  Nope, we can't leave

17  until I know that God tells us we can leave.

18     *Q.*   And did God tell you that you could leave?

19     *A.*   Not for a while, not until after we got back up

20  to Santa Anna.  And Rick and Al, the brothers -- we always

21  called each other brother and sister.  The brothers

22  decided it was time for them to marry Rosalie and Rebecca.

23  And as soon as they got married, then Alejo told Rick and

24  Al -- he said:  We're leaving now.  We're going back to

25  Arizona.  And then he told me, he just wanted to wait

1  until he knew that they were married so that it wasn't

2  just for single people.

3      Q.   I understand that there were a couple of stops

4  along the way, but then did you end up back in

5  Casa Grande?

6      A.   Yes, we did.

7      Q.   When did you get -- when did you resettle in

8  Casa Grande?

9      A.   We eventually -- after we left, we got down to

10  Tucson to my dad's, and somehow Alejo's father had gotten

11  in contact with him I think through his mother and offered

12  to pay for Alejo to go to school to be in the union for

13  training.  I don't know how that works.

14          And so I stayed at my dad for a week or so.  And

15  then I thought:  Well, you know what?  Because Alejo was

16  up in training outside of Prescott.  And so I said:  Why

17  don't I just go back up to Casa Grande and that way it

18  would be closer for you to come home on the weekends.  And

19  that's how we ended up back in Casa Grande at his mom's.

20      Q.   Did Wendi seem changed at all as a result of your

21  experience with the Fishers of Men?

22      A.   Yes.  When she was younger and even in Tucson,

23  she was this bubbly little kid.  I remember she had the

24  nickname of Happy Jack and she was just always happy.  She

25  would, you know, come up and cuddle with anybody and

1  everybody.  Just, you know, this cute little chunky-faced

2  kid.

3        And, on the road, I could tell that she was

4  starting to act like a little adult.  You know, I just

5  figured, well, she's around grown-ups.  She didn't get to

6  play with kids or anything.

7        And we got back to Casa Grande and she was -- she

8  was different.  She didn't even want to cuddle with me.

9  She was more withdrawn.  She wasn't like open with people

10  like she had been.  Yeah, you could see a difference.

11    Q.   Now when you got back to Casa Grande, did you

12  become involved in a church known as the 91st Psalm

13  Church?

14    A.   Yes, I did.

15    Q.   How did that happen?

16    A.   The 91st Psalm Church, Calvin Lorts was the

17  pastor and Calvin had been a friend with Alejo.  He was

18  the one that had, you know, spent time with Alejo talking

19  about God and everything.  And Calvin's brother Barry was

20  also there and Barry and Alejo had been close when they

21  were growing up in high school.  So, you know, I missed

22  being around church.  Not so much church.  I missed being

23  around the Word and the Bible.

24        And so in talking with Alejo's mom, she goes:

25  Well, you know what?  You ought to go to Calvin's church.

1   I went to it when it was down the street at the junior

2   high cafeteria, and she goes, I really liked it.  And so I

3   thought okay.

4          So I went on a Saturday with mom, with Alejo's

5   mother and Wendi and we went to the church and I went:

6   Okay.  I like the music.  It's the kind of music that we

7   used to, you know, sing and do when we would be in

8   churches and the message.  You know, it felt pretty good.

9   They seemed kind of a lot looser and freer, you know, than

10  we had.  I had an attitude like, well, you guys aren't

11  really very strict Christians.

12         But that was because of the atmosphere I had come

13  out of where Rick and Al went around every morning singing

14  and waking us all up and the first thing we would do is we

15  would have church.  Then we would eat breakfast.  Then we

16  would have some more Bible studies, ate lunch, and then

17  school with Wendi, supper, as long as we had food and into

18  the Bible again, and then we would go to bed.

19  Q.   What was the theology of the 91st Psalm Church?

20  A.   Real similar to what my first or the Fishers of

21  Men was, in that, you know, they believed that the Word of

22  God was right, you know, and believed in the Trinity and

23  salvation and baptism and fire and water -- and water and

24  fire, meaning baptizing in the spirit, in the Holy Ghost,

25  with speaking -- evidence of speaking in tongues and such,

1 which is everything that we had believed with the Fishers

2 of Men.

3      Q.   How about gender roles?

4      A.   It was basically the same.  The man is the head

5 of the house.  The woman is his partner.  But when you

6 think of his helpmate is how the old King James says.

7 That the woman is the helpmate.  So it was kind of taken

8 more like, you know, you're the -- you're the doormat that

9 the husband steps on, but it's a sweet saver, you know, up

10 to Heaven.  That's what we believed.

11      Q.   Was there a school associated with the 91st Psalm

12 Church?

13      A.   Yes.  91st Psalm Academy.

14      Q.   And did Wendi start school at 91st Psalm?

15      A.   Yes, she did.  Not at first.  I think we were

16 living in Casa Grande for a couple of months.  And I

17 didn't have the money to send her to the school because

18 you pay for it.  And so Calvin came around one day and

19 said that he would like give her a scholarship or

20 whatever.

21           I was kind of scared because here I had been home

22 schooling for a couple of years.  And they tested her and

23 it's an accelerated SEC program.  So it's Christian

24 education from a Baptist church in Texas.  And so they

25 tested her and she was way above, you know, what her grade

1    level was.  So I was happy with that.

2        Q.    Can you take a look at Exhibit 161 in your

3    binder?

4        A.    Oh, sorry.

5        Q.    That's okay.  So what year did Wendi start at

6    91st Psalm School?

7        A.    161?

8        Q.    161, yes.

9        A.    1980.

10       Q.    Look at Exhibit 161.  Who is that a picture of?

11       A.    That's a picture of John Casey.

12       Q.    What was John Casey's role at the school when

13   Wendi started there?

14       A.    He was the school principal.

15       Q.    What's that he's got in his hand?

16       A.    He has a paddle.

17       Q.    What was that paddle used for?

18       A.    Spanking the children.

19           MR. ARNTSEN:  We'll move Exhibit 161 into

20   evidence.

21           THE COURT:  Any objection?

22           MS. GARD:  No, Your Honor.

23           THE COURT:  Exhibit No. 161 for identification is

24   admitted into evidence.

25       Q.    BY MR. ARNTSEN:  Did you and Alejo come to work

1  at the 91st Psalm Church and School as well as being

2  church members and Wendi going to school there?

3      *A.*   Yes, we did.

4      *Q.*   In what positions?

5      *A.*   Alejo, Calvin asked him to be the youth pastor.

6  And I was working in the school.

7      *Q.*   And then you --

8      *A.*   In the office.

9      *Q.*   And then Wendi started school?

10     *A.*   Yes.  Wendi started school before Alejo and I

11  started working there.

12     *Q.*   Did Wendi acquire some friends through her going

13  to school there?

14     *A.*   Yes, she did.  It was hard for her at first, but

15  then she made friends, yes.

16     *Q.*   Take a look at Exhibit 160.  Who is that?

17     *A.*   That's Kyre Lorts.

18     *Q.*   Were Kyre and Wendi friends?

19     *A.*   Yes, they were.

20     *Q.*   Did Kyre and Wendi run away together a couple of

21  times?

22     *A.*   Yes, they did.  Yes, they did.  It seems like I

23  was always the last to know, but I found out that they had

24  taken off from school.  Nobody knew where they were.  And

25  so they started looking for them and they were a couple of

1   miles away down at Foxworth.  I think they had stopped

2   there for some water.  And I heard later that they were

3   headed to Flagstaff.

4        MR. ARNTSEN:  We'll move Exhibit 160 into

5   evidence.

6        THE COURT:  I think that's already been admitted

7   into evidence.

8        MR. ARNTSEN:  Has it?  Okay.  Thank you.

9   Q.   BY MR. ARNTSEN:  Can you take a look at

10  Exhibit 205.  Do you know who that is?

11  A.   That's Jeri Lynn Wilkerson.

12  Q.   Do you know what Jeri Lynn's last name is now?

13  A.   I believe it's Cunningham.

14  Q.   Were Jeri Lynn and Wendi friends?

15  A.   Yes, they were.

16  Q.   Oh, by the way, would Krye sleep over at your

17  house on occasion?

18  A.   Yes.

19  Q.   On a regular basis?

20  A.   Pretty much.  She was there a whole lot.

21  Q.   How about Jeri Lynn?

22  A.   The same thing.  They were a little bit different

23  time periods, but --

24  Q.   Was Jeri Lynn after Krye?

25  A.   Yes.

1          MR. ARNTSEN:  We'll move Exhibit 205 into

2    evidence.

3          THE COURT:  Any objection?

4          MS. GARD:  Relevance.

5          THE COURT:  I'm sorry?

6          MS. GARD:  It's irrelevant.

7          THE COURT:  This Jeri Lynn Cunningham is going to

8    be testifying?

9          MR. ARNTSEN:  Yes.

10          THE COURT:  Over the objection, Exhibit No. 205

11    is admitted into evidence.

12      Q.   BY MR. ARNTSEN:  Take a look at Exhibit 159.

13          THE COURT:  What number?

14          MR. ARNTSEN:  159.

15      Q.   BY MR. ARNTSEN:  Who is that a picture of?

16      A.   That's Wendi and Alejo and Laura Bell.

17      Q.   Who is Laura Bell?

18      A.   Laura Bell was another close friend of Wendi's.

19          MR. ARNTSEN:  We'll move Exhibit 159 into

20    evidence.

21          THE COURT:  Any objection?

22          MS. GARD:  No, Your Honor.

23          THE COURT:  Exhibit No. 159 for identification is

24    admitted into evidence.

25          MR. ARNTSEN:  Thank you.

1      *Q.*    BY MR. ARNTSEN:  Now, when you're in Casa Grande,
2  tell me about Wendi and Alejo's relationship.  You're back
3  in Casa Grande.  Actually, let me ask one sort of
4  background line of questioning.  When you started church
5  and school, it was called 91st Psalm Church and School; is
6  that correct?

7      *A.*    Yes.  That is correct.

8      *Q.*    Then did the name change at some point in time?

9      *A.*    Yes, it did, to Harvest Family Church and Harvest
10  Academy, I believe.

11      *Q.*    About when did that happen?

12      *A.*    Sometime in the -- oh, gosh, in the 80's.

13      *Q.*    And did that change -- was that in connection
14  with the change in who the pastor of the church was?

15      *A.*    Yes, it was.  Calvin started a church.  Calvin
16  Lorts started a church up in Tempe and he would go up
17  there on Sunday afternoons after having church on Sunday
18  mornings, and him and the Alejo would.  And, finally,
19  Calvin got a building and after he got enough, you know,
20  people involved in the church up there.  He expected Tom
21  to help finance the new Tempe church even know, you know,
22  it was already started.  And, finally, Tom and him parted
23  ways and Tom took over 91st Psalm in Casa Grande and
24  changed it to Harvest Family.

25      *Q.*    Did you continue working?  Were you continuing

1   working at the church and school at this time?

2       *A.*   At Harvest?

3       *Q.*   Right.  Did you change jobs?

4       *A.*   No, I didn't change jobs.

5       *Q.*   About when did you change jobs so you weren't

6   working at Harvest anymore?

7       *A.*   Maybe around '84, '85, somewhere in there.

8       *Q.*   What was your job?  What did you change to doing?

9       *A.*   I went to work for a company.

10      *Q.*   Doing what?

11      *A.*   I was doing office work, office manager.

12      *Q.*   And from that time on, have you worked at other

13  at various companies over the years?

14      *A.*   Yes, I have.  I did at one point come back and

15  work at Harvest in the 90's for a couple of years.

16      *Q.*   Doing what?

17      *A.*   Teaching or helping in the school room.

18      *Q.*   I was starting to ask a line of questions in

19  connection with Alejo's and Wendi's relationship during

20  your time at Harvest School.

21          First of all, can you take a look at Exhibit 148?

22  Can you identify what that is?

23      *A.*   That's a picture of Wendi and Alejo.

24      *Q.*   And it says on it November 1979.  Does that seem

25  about right?

1    *A.*    Yes.  That was at his mother's house.

2    MR. ARNTSEN:  We'll move Exhibit 148 into

3    evidence.

4    THE COURT:  Any objection?

5    MS. GARD:  No, Your Honor.

6    THE COURT:  Exhibit No. 148 for identification is

7    admitted into evidence.

8    *Q.*    BY MR. ARNTSEN:  Can you take a look at

9    Exhibit 149, please?

10    *A.*    Okay.

11    *Q.*    Who is that a picture of?

12    *A.*    Again, that's Wendi and Alejo.

13    *Q.*    Again, around the end of the year of 1979?

14    *A.*    Yes.

15    MR. ARNTSEN:  We'll move Exhibit 149 into

16    evidence.

17    THE COURT:  Any objection?

18    MS. GARD:  No, Your Honor.

19    THE COURT:  Exhibit No. 149 for identification is

20    admitted into evidence.

21    *Q.*    BY MR. ARNTSEN:  Tell me about your sort of

22    family dynamics during this time when you're back in

23    Casa Grande in terms of who was doing what with whom and

24    kind of what your day looks like?

25    MS. GARD:  Objection.  Foundation.  What exact

1    time period?

2            THE COURT:   Sustained.

3            Lay some foundation.

4        Q.   BY MR. ARNTSEN:   In 1980, again, this time when

5    you're getting back into Casa Grande and staring up Wendi

6    going to the 91st Psalm School.

7        A.   Okay.   I was doing some day care for the state

8    at this time before I started -- before Alejo started with

9    them, 91st Psalm.   And so Wendi would -- Alejo normally

10   took her to school before he went to work and picked her

11   up after school because we only had one car.   And so I was

12   basically at home and they spent a lot of time together.

13       Q.   During this period of time, would you say that

14   Wendi was closer to Alejo or to you?

15       A.   She was closer to Alejo.

16       Q.   And can you just provide some details on that?

17       A.   Because like they spent a lot of time playing.

18   If she had her friends over, he always played with them.

19   Usually, you know, if dinner was already over or anything,

20   I usually went off to the bedroom to read.   We didn't have

21   a television at the time.   And so they just spent -- they

22   spent a lot of time together.

23       Q.   Would Wendi's friends sleep over on occasion?

24       A.   Yes.   Yes, Wendi's did sleep over from the time

25   she was that age when we had our own house through being a

1  teenager.

2     *Q.*   And during these sleepovers, were they

3  interacting more with Alejo or with you?

4     *A.*   Oh, definitely with Alejo.  Alejo was the one

5  that always, you know, played with them, tickled them,

6  teased them, watched TV when we got a TV, and took them

7  out to drive, you know, go driving.  He was the one that

8  would be scaring them in the middle of the night and, you

9  know, things like that.  So he definitely spent more time.

10    *Q.*   What would you be doing during these sleepovers?

11    *A.*   Usually, I didn't really want to be hanging out

12  with them, you know, in the living room or whatever.  So I

13  just went off and read my books and went to bed.

14    *Q.*   In your room?

15    *A.*   In my room.

16    *Q.*   Thank you.  Now were there any negative -- what

17  you viewed as negative aspects of how Alejo treated Wendi

18  during again this same period of time?  And I'm looking at

19  the 1980, early 1980's period.

20         MS. GARD:  Objection.  Vague.

21         THE COURT:  Overruled.

22         Go ahead and answer the question.

23         THE WITNESS:  Okay.  Would you state it again?

24    *Q.*   BY MR. ARNTSEN:  Were there any negative aspects

25  of Alejo and how Alejo treated Wendi during this period of

1   time, the early 1980's?

2      *A.*   Okay.  Alejo was always -- I don't if it's a good

3   word or not -- but volatile.  You never knew when he was

4   going to come in and be yelling about something that

5   happened at church or school or down the street or, you

6   know, or something that we didn't do right -- you know,

7   that Wendi and I didn't do right, because he always looked

8   mean anyway.

9          And he was also very derogatory.  He teased her a

10  lot, especially about being blond.  And, you know, maybe

11  they watched a show and she would be like:  Oh, did that

12  really happen?  And he would be like:  Wendi, do you

13  really think that happened?  Come on.  Don't be dumb.

14  Don't be blond.

15         And the thing that I witnessed a lot was the fact

16  that like when commercials would come on TV and it might

17  be for like sanitary pads or Tampax or things like that,

18  he would always -- he would start making comments about:

19  Well, do you use those?  What are those for?  Come on.

20  Wendi tell me.  And it was not like he would just leave it

21  alone.  He just kept pushing the buttons.  You know, it's

22  like he didn't know when to stop, somebody who that

23  just -- and he was like that with a lot of things where,

24  you know, if you would tease a kid and you would stop, you

25  know, after a little bit, instead of just keep pushing on

1  them.  And he just wouldn't.  And, to me, it always seemed

2  really mean.  But I would say something to him and he

3  would go:  Oh, no, they like it.  They like it.  And, you

4  know, there just gets to a point where you just don't

5  fight anymore, you know, or try to stop him.  There really

6  wasn't anything -- he didn't listen to me and he didn't

7  listen to the kids.  He would do the same thing --

8          MS. GARD:  Judge, I object.  This is a narrative.

9          THE COURT:  Sustained.

10         Ask your next question.

11         MR. ARNTSEN:  That's fine.

12    *Q.*  BY MR. ARNTSEN:  Turning to first looking at

13  where you referenced Alejo's explosiveness or volatility,

14  about how often or what was the frequency of these

15  explosions?

16    *A.*  You would never know when it would happen.  And

17  it could be like every night that week or we might be able

18  to go a whole week, but never more than a week.

19    *Q.*  Were any of those explosions related to sex at

20  all?

21    *A.*  Yes.

22    *Q.*  And can you explain your answer?

23    *A.*  Alejo and I fought a lot about sex.

24    *Q.*  And what was the nature of the fights?

25    *A.*  That I didn't want to have sex as much as he did.

1    *Q.*   How would that connect to these explosions that

2    you mentioned?

3    *A.*   Then he would start getting angry and he would

4    say:  Well, you're supposed to do what your husband says.

5    And, you know, just a lot of guilt trips on me.  You know,

6    I would --

7    *Q.*   Talking about what you indicated about Alejo

8    teasing her or demeaning Wendi, did any of that have a

9    sexual content to it?

10   *A.*   Yes.  The things like the Tampax and things like

11   that.  We might be driving by a store or in a store, like

12   a lingerie store and, you know, he would go:  Oh, look,

13   you can see everything.  And, you know, he was just making

14   inappropriate comments.  I mean, even as -- I know it's

15   hard to believe that I was straitlaced in this time period

16   of my life, but I was.  And, you know, I just thought, you

17   just don't talk to your daughter about things like that.

18   But, yet, I don't know.  I'm sorry.

19   *Q.*   Between you and Alejo, who was it that instructed

20   Wendi -- who provided sex education to Wendi?

21   *A.*   Alejo did.

22   *Q.*   Do you know about how old Wendi was when this

23   happened?

24   *A.*   Oh, she was probably 11, 10, 12, around there.

25   *Q.*   Thank you.  Now I want to turn your attention to

1  what I believe has been referred to as rubbing on or

2  touching on Alejo.  Do you know what I'm referring to?

3      *A.*    Yes, I do.

4      *Q.*    And tell me what that meant in your household.

5      *A.*    That meant that Alejo wanted us to sit down and

6  spend time, what at that time was called ministering to

7  him, to rub his head or rub his shoulders, rub his legs.

8  And I did that for a long time.  Excuse me.  And it got to

9  where, especially when, you know, I was working and

10  everything, I said:  You know, I just don't want to do

11  that.  And so it became Wendi's duty, and literally duty,

12  to be the one to rub his head, scratch his head, rub his

13  legs, rub his back.

14      *Q.*    About how old was Wendi when she started assuming

15  this duty?

16      *A.*    Well, she was doing it, you know, from like the

17  time that we got back to Casa Grande.  And then gradually,

18  as the years passed, she was the one that was doing it a

19  lot more than I was.

20      *Q.*    Can you take a look at Exhibit 154, please?

21      *A.*    Yes.

22      *Q.*    What's that a picture of?

23      *A.*    That's a picture of Alejo and Wendi.

24      *Q.*    Is this about the time when she's starting this

25  rubbing-on?

1      *A.*    Yes.

2           MR. ARNTSEN:  We'll move Exhibit 154 into

3    evidence.

4           THE COURT:  Any objection?

5           MS. GARD:  No, Your Honor.

6           THE COURT:  Exhibit No. 154 for identification is

7    admitted into evidence.

8      *Q.*    BY MR. ARNTSEN:  Can you take a look at

9    Exhibit 158, please?

10     *A.*    Yes.

11     *Q.*    Can you identify what that is?

12     *A.*    That's a picture of Alejo and Wendi.

13     *Q.*    And it says circa 1986.  Does that look about

14    right?

15     *A.*    Yes, it does.

16          MR. ARNTSEN:  We'll move Exhibit 158 into

17    evidence.

18          THE COURT:  Any objection?

19          MS. GARD:  No, Your Honor.

20          THE COURT:  Exhibit No. 158 for identification is

21    admitted into evidence.

22     *Q.*    BY MR. ARNTSEN:  And, again, is Wendi's rubbing

23    on Alejo continuing throughout the period of time of the

24    pictures we just looked at?

25     *A.*    Oh, yes.

1    *Q.*   About how long would that be in a particular

2    evening?  Are we talking about ten minutes?  What are we

3    talking about?

4    *A.*   No.  We're talking a longer length of time.

5    Anywhere from 45 minutes to a couple of hours because, you

6    would get tired.  She would get tired or I would have and

7    it was like:  No, please, just touch me.  Touch me.  You

8    know, and that's what -- you know, and don't you love me.

9    Touch me.

10    *Q.*   When Wendi would rub Alejo's head, where would

11    his head be?

12    *A.*   Usually, one of two different places.  He may be

13    sitting on the floor like he was in the previous pictures,

14    and she would rub his head that way.  But, normally, and

15    especially as she got older, he would lay on the couch and

16    you would have to sit on the end of the couch and he would

17    put his head on her lap and, you know, say:  Touch me.

18    Touch me.  And rub his head and rub his back.

19    *Q.*   What would Alejo be wearing during these touching

20    experiences?

21    *A.*   Normally like a pair of like, you know, workout

22    shorts, you know, the baggie -- you know, sweatpants, you

23    know, like that are cut off or whatever.

24    *Q.*   Do you know if he would have underwear on under

25    it?

1    *A.*    No.  He didn't like wearing underwear.

2    *Q.*    Did Alejo ever buy lingerie for Wendi?

3    *A.*    Yes, he did.

4    *Q.*    And starting when she was about how old?

5    *A.*    I would say around 12.

6    *Q.*    And what types of lingerie?

7    *A.*    Little bikini things because I remember her being

8    around 13, and he had bought her like little lacy

9    underwear and a bra to match and a garter belt, things

10   like that.

11   *Q.*    Did you accompany them on these shopping trips?

12   *A.*    No.

13   *Q.*    Why not?

14   *A.*    Because Alejo usually would take her on Mondays,

15   which is a day that I worked and that he was off at the

16   church.  And he would just say, you know:  Wendi is going

17   to take the day off and we're going to go up and just, you

18   know, go window shopping.  Or if it was on a weekend, he

19   would go:  You know what, you don't need to go.  We know

20   you're tired.  They always made it sound -- or he always

21   made it sound like it was about me.  Oh, you're tired.

22   Stay here.  You don't have to go.

23   *Q.*    And Frederick's of Hollywood catalogs, were they

24   in your house?

25   *A.*    Yes, they were.

1    *Q.*    Who ordered them?

2    *A.*    Alejo did.

3    *Q.*    Did Alejo and Wendi ever go to a Frederick's

4    store, if you know?

5    *A.*    Yes, they did.

6    *Q.*    And describe that circumstance.

7    *A.*    Okay.  One time when we were going over to

8    California to go see a ministry over there, one of the

9    prime stops that Alejo wanted to make was to go to

10   Frederick's of Hollywood, the main store down in

11   downtown -- I don't know.  Wherever it is, in Hollywood.

12   And so that was one of the first things that we did when

13   we got there is went to Frederick's.  He's trying to drag

14   her around or saying:  Come here.  Come here.  Look at

15   this.  Look at that.  He's not asking me.  No, he's not

16   asking me.  He's showing Wendi.  To me, the type of stuff

17   in there -- and I don't -- it was really risqué.

18   *Q.*    Were there any other stores that Alejo took Wendi

19   to that you thought were inappropriate?

20   *A.*    Yes.  There was -- well, for her age, there was a

21   lingerie store -- kind of an adult lingerie store that had

22   been on the corner of Arizona Avenue down where Downtown

23   Chandler is or was and he would take her there.  I went

24   there once with them.  And Wendi said:  Yeah, he takes me

25   here always.  We always stop here.  You know, we stop here

1   a lot or whatever.  And that's the one where they have

2   like lots of off-color cards and things like that and --

3       Q.   How about Spencer's?

4       A.   What?

5       Q.   How about Spencer's?

6       A.   Definitely Spencer's.  You know, Spencer's was

7   always kind of a knickknacky store.  But they did have

8   a -- they always had a section, you know, at least one

9   little aisle there where, you know, things were -- you

10  know, it could be something as simple as like having a

11  little toilet that had a little penis that shot water out

12  of it or, you know, other things that were a lot more

13  inappropriate.  It wasn't age-appropriate for Wendi.

14          And they also had a back part that was kind of

15  shielded off a little bit where there were other things

16  that were a little bit stronger.  That's been a while.

17  I've been in a Spencer's since and it's a lot different

18  now than it used to be.

19      Q.   And were you concerned about the parts of the

20  Spencer's store that Alejo was directing Wendi?

21      A.   Yes.  You know, there was like a lot of cute

22  gadgets and stuff there.  But he always -- the first place

23  he went was back to that one section.  I'll always

24  remember you come in on the right-hand side and he went

25  straight back and that's where he would go:  Come here.

1 Let's look at this.  Oh, look at all the cards.  He would

2 start reading, you know, all these cards that, again, you

3 know, they were adult themes and inappropriate for a

4 child --

5     *Q.*    Sure.

6     *A.*    -- your daughter.

7     *Q.*    At some point in time, did Alejo take up

8 photography?

9     *A.*    Yes, he did.

10    *Q.*    And about when was this?

11    *A.*    It was sometime in the 80's.

12    *Q.*    About how old was Wendi?

13    *A.*    She was like maybe 13, 14, somewhere around

14 there.

15    *Q.*    And would you take a look at Exhibit 73?  Can you

16 identify what that is?

17    *A.*    Those are some of Alejo's photos.

18    *Q.*    And is Wendi depicted in Exhibit 73?

19    *A.*    Yes, she is.

20    *Q.*    In what part of it?  If you want to take a look

21 at that.  It looks like there are lines of films.

22    *A.*    Yeah, there's different lines.  Well, she's in

23 this line, this line, this line.

24    *Q.*    So the top three lines, for sure?  Which lines,

25 just for the record?

1    *A.*    Just for the record, she's in the second, third

2    and fourth lines.

3         MR. ARNTSEN:  We'll move Exhibit 73 into

4    evidence.

5         THE COURT:  Any objection?

6         MS. GARD:  No, Your Honor.

7         THE COURT:  Exhibit No. 73 for identification is

8    admitted into evidence.

9    *Q.*    BY MR. ARNTSEN:  Can you take a look at

10   Exhibit 74?  Can you identify what that is?

11   *A.*    Those are pictures of Wendi.

12   *Q.*    And in Exhibit 74, sort of which rows again show

13   pictures of Wendi?

14   *A.*    All of them.

15        MR. ARNTSEN:  We'll move Exhibit 74 into

16   evidence.

17        THE COURT:  Any objection?

18        MS. GARD:  No, Your Honor.

19        THE COURT:  Exhibit No. 74 for identification is

20   admitted into evidence.

21   *Q.*    BY MR. ARNTSEN:  Now, as Wendi was growing up,

22   did she evidence any symptoms or activities that you

23   associate with mental health issues?

24        MS. GARD:  Objection.  Foundation.

25        THE COURT:  Sustained.

1    *Q.*    BY MR. ARNTSEN:  Did Wendi have -- did Wendi's

2  sleep patterns vary as she was growing up?

3    *A.*    Yes, they did.  When she was little, she was

4  always the kind that, you know, was up and bouncing in the

5  mornings and waking me up and things like that.

6          And when we came back from California -- and, of

7  course, in California, we were getting woken up every day

8  early.  And we came back from California and it totally

9  changed.  It was like she wanted to sleep.  There would be

10 time periods when, you know, she would go to bed early and

11 sleep for a long time and I would have to go and wake her

12 up.  It was really hard to wake her up.  She would come

13 home from school.  She would want to lay down and take a

14 nap.

15   *Q.*    And over what period of time of her excessive

16 sleepiness would she evidence this?

17   *A.*    Umm, you mean as far as --

18   *Q.*    Years?

19   *A.*    The years?  For as long as I can recall --

20   *Q.*    Would it come and go?

21   *A.*    -- even up into her adulthood.

22   *Q.*    Did she ever evidence any memory lapses?

23   *A.*    Yes.

24   *Q.*    Can you describe that?

25   *A.*    Yes.  That was the thing that I always thought

1  was really strange.  Something could happen to her and it
2  could be bad or it could be good -- normally, it was bad.
3  And I would ask her about it a few weeks later.  Like
4  maybe she got a whoopin', a spanking, you know, at school
5  or from her dad or something, and I would make a comment
6  about it, and she goes:  Well, I don't remember that.  I'm
7  going what?

8         I remember a time that I saw her when she -- this
9  was when she was an adult and she was grown and her knee
10  was just all mangled up, you know, just -- and I said:
11  What happened to you?  And she told me what happened.  Her
12  and Joe had a fight and she had gotten out of the truck
13  and whatever and didn't tell me a whole lot.

14         And so six months later, I'm saying:  Man, that
15  turned into a nasty scar.  Now you didn't tell me exactly
16  what happened.  What happened?  And she goes:  I don't
17  know.  I don't know.  What do you mean?  I must have got
18  this when I was a kid.  Just bizarre.

19     Q.   I mean, you've given a couple of examples.  Were
20  there a lot more examples like that?

21     A.   There were.  There were a lot more, a lot more.
22  I know that I have a tendency to do that, also, but Wendi
23  was just weird.  I mean, it's like:  What do you mean you
24  don't remember?  This was such a big deal.  Why don't you
25  remember this?

1    *Q.*   And over what period of her life did Wendi

2    evidence these memory lapses?

3    *A.*   Again, I would say after we came back from

4    California is when I noticed it.  You know, she was

5    younger.  You know, before that.  And California was just

6    an intense thing.  And she didn't -- and we didn't always

7    even sleep in the same place, Alejo and I and Wendi.  She

8    always slept with Rick and Rosalie -- or not Rick and

9    Rosalie.  I'm sorry.  With Rebecca and Rosalie.

10   *Q.*   And so, starting when you got back from

11   California, was Wendi evidencing this per what?  Per day?

12   *A.*   She was.

13        MR. ARNTSEN:  Your Honor, this is a good time for

14   a break because what I'm going to switch into is the

15   interaction with the lawyers.  We don't have to take a

16   break now, but if you want.

17        HE COURT:  We will go ahead and take our

18   afternoon break right now.

19        MR. ARNTSEN:  Thank you, Your Honor.

20        THE COURT:  We'll be at recess.

21        (WHEREUPON, a recess ensued from 3:00 p.m. to

22   3:14 p.m.)

23        THE COURT:  This is CR 2000-096032, State of

24   Arizona vs. Wendi Elizabeth Andriano.

25        The record will reflect the presence of counsel

1  and the parties.

2          The record will reflect that Donna Ochoa is on

3  the witness stand.  We will continue with the direct

4  examination of Mr. Arntsen.

5          Mr. Arntsen.

6      Q.  BY MR. ARNTSEN:  Donna, now I want to sort of

7  fast-forward to October of 2000 after Joe's death and

8  Wendi's arrest.  And then did you get involved in some

9  custody issues relating to Wendi's children?

10     A.  Yes, we did.  Yes, I did.

11     Q.  And just in terms of setting a context, what

12  happened with Wendi's children immediately following

13  Wendi's arrest?

14     A.  I had gone up to Wendi's apartment while, you

15  know, when the police were there.  And the police put

16  Nicholas and Ashlee into my custody and I took them back

17  to Casa Grande with me.  Jeanea had asked that.

18     Q.  Jeanea who?

19     A.  Jeanea Lambeth had asked --

20     Q.  What is her -- is she --

21     A.  Jeanea is Joe's sister.  Joe Andriano's sister.

22  And she had asked if I could meet -- bring my pastor and

23  the kids and meet at her mother's house in Casa Grande and

24  she was going to bring her priest and we were going to,

25  you know, talk.

1        And so I did.  And my pastor, Pastor Tom came.

2   When I got there, we didn't really, you know, talk because

3   the priest didn't come.  So we didn't talk like that.  But

4   they did ask me -- the Andrianos and the Lambeths asked me

5   if they could keep Nicholas and Ashlee until the funeral

6   because they were having family come into town and they

7   wanted the family to be able to see the kids.  And I said:

8   Yes.  You know, and then they will come back with me, you

9   know, after the funeral.

10        Then we had the funeral on Friday, Joe's funeral.

11   And, afterwards, we were over at the Rebecca Hall and I

12   was getting ready to leave.  So I was going to take the

13   kids.  They said:  No, you can't take the kids.  We're

14   going to keep them longer.  And Brad had told me:  I'm

15   going to go down to the jail and I'll talk to Wendi and,

16   you know, whatever.  And so that's where everything kind

17   of started.

18   Q.    Were the Lambeths appointed the guardians of

19   Nicholas and Ashlee?

20   A.    Yes, they were.

21   Q.    Can you take a look at Exhibit 80, please?  Do

22   you have it in front of you?

23   A.    Yes, I do.

24   Q.    And that document is entitled Agreement Regarding

25   the Guardianship of Nicholas Andriano and Ashlee Andriano;

1    is that correct?

2       *A.*   That is correct.

3       *Q.*   And is your signature on the second page of

4    Exhibit 80?

5       *A.*   Yes, it is.

6             MR. ARNTSEN:  We'll move Exhibit 80 into

7    evidence.

8             MS. GARD:  No objection.

9             THE COURT:  Exhibit 80 for identification is

10   admitted into evidence.

11      *Q.*   BY MR. ARNTSEN:  And then was that guardianship

12   affirmed by a court order?

13      *A.*   Yes, it was.

14      *Q.*   Can you take a look at Exhibit 81?  And is

15   Exhibit 81 the order appointing the Lambeths guardians of

16   Nicholas and Ashlee Andriano?

17      *A.*   Yes, it is.

18            MR. ARNTSEN:  We'll move Exhibit 81 into

19   evidence.

20            THE COURT:  Any objection?

21            MS. GARD:  No, Your Honor.

22            THE COURT:  Exhibit No. 81 for identification is

23   admitted into evidence.

24      *Q.*   BY MR. ARNTSEN:  Now did you hire a lawyer to

25   take some efforts to get the kids back?

1    *A.*    Yes, we did.

2    *Q.*    Who did you hire?

3    *A.*    At the beginning, we had hired Leon Thikoll to

4    help us, you know, with the children.

5    *Q.*    And at some point in time, did David DeLozier

6    replace Attorney Thikoll as your counsel?

7    *A.*    Yes, he did.

8    *Q.*    Can you take a look at Exhibit 84, please?  And

9    look at the second page of Exhibit 84.  You see that

10   that's a July 12, 2001 letter to a Mrs. Gray?  Do you see

11   that?  It's the second page of Exhibit 84.

12   *A.*    Yes.

13   *Q.*    And is that your signature on the bottom of the

14   letter?

15   *A.*    Yes, it is.

16   *Q.*    And I'm just going to read into the record the

17   first two sentences:  Dear, Mrs. Gray, we have changed

18   attorneys due to Mr. Thikoll's illness.  Our new counsel

19   is G. David DeLozier.  Did I read that correctly?

20   *A.*    Yes, you did.

21   *Q.*    How did you --

22          MR. ARNTSEN:  We'll move Exhibit 84 into

23   evidence.

24          THE COURT:  Any objection?

25          MS. GARD:  No, Your Honor.

1          THE COURT:   Exhibit No. 84 for identification is

2    admitted into evidence.

3          *Q.*   BY MR. ARNTSEN:   And who is Mrs. Gray?

4          *A.*   She was the counselor that was working with

5    Nicholas and Ashlee.

6          *Q.*   And what were the circumstances by which you

7    retained -- well, why did you retain Attorney DeLozier to

8    represent you regarding in connection with the children?

9          *A.*   To be the attorney of record?   Or do you mean

10   what else I had --

11         *Q.*   Was he your lawyer in connection with these

12   proceedings?

13         *A.*   Yes, he was.

14         *Q.*   And can you take a look at Exhibit 86?   Do you

15   recognize that that is an e-mail from you to David

16   DeLozier?

17         *A.*   Yes, it is.

18         *Q.*   And it's dated July 15, 2001?

19         *A.*   Yes, it is.

20         *Q.*   And what's this e-mail concern or relate to?

21         *A.*   I had sent some letters over to David DeLozier

22   that people had written for me.   He had asked that I have

23   people that we knew -- that knew us to write some letters.

24         *Q.*   What kind of letters?

25         *A.*   Letters saying that we were good parents and we

1   were good grandparents, like that.

2       Q.   What was your understanding of the purpose for

3   obtaining these letters?

4       A.   The purpose was just to prove that we, you know,

5   we're suitable to take care of Nicholas and Ashlee.  And

6   they were given to -- they're supposed to be given to the

7   counselors so that they could read them and see that we

8   were upstanding people, I guess.  I don't know.

9           MR. ARNTSEN:  I we'll move Exhibit 86 into

10  evidence.

11          THE COURT:  Any objection?

12          MS. GARD:  I have a hearsay objection.

13          THE COURT:  Are they letters?

14          MR. ARNTSEN:  That's actually 85, which I'll get

15  to in a minute.  86 is the e-mail.

16          THE COURT:  It's just the e-mail itself?

17          MR. ARNTSEN:  Yes.

18          THE COURT:  Exhibit No. 86 for identification is

19  admitted into evidence.

20      Q.   BY MR. ARNTSEN:  Okay.  Can you take a look at

21  Exhibit No. 85?  What are these?  It's a group exhibit

22  with a number of documents.  Are what are these?

23      A.   These are letters from people that we knew

24  stating -- telling about Alejo and I that were --

25      Q.   And these people who you asked to write these

1  letters on this topic?

2     *A.*   Yes, they are.

3     *Q.*   And had Attorney DeLozier asked you to obtain

4  these letters?

5     *A.*   Yes, he did.

6     *Q.*   And then after you obtained the letters, did you

7  forward them onto Attorney DeLozier?

8     *A.*   Yes, I did.

9         MR. ARNTSEN:  We'll move Exhibit 85 into

10  evidence.

11        THE COURT:  Any objection?

12        MS. GARD:  No, Your Honor.

13        THE COURT:  Exhibit No. 85 for identification is

14  admitted into evidence.

15    *Q.*   BY MR. ARNTSEN:  The guardianship matter relating

16  to Nicholas and Ashlee, that was proceeding in Maricopa

17  County; is that correct?

18    *A.*   That is correct.

19    *Q.*   Did Attorney DeLozier start a related proceeding

20  in Pinal County?

21    *A.*   Yes, he did.

22    *Q.*   What was the nature of that proceeding?

23    *A.*   That we could adopt Nicholas and Ashlee.

24    *Q.*   Take a look at Exhibit 87, please.  Does

25  Exhibit 87 relate to that adoption proceeding?

1     *A.*    Yes, it does.

2     *Q.*    And was Judge O'Neill the judge presiding over

3  that adoption?

4     *A.*    Yes, he was.

5          MR. ARNTSEN:  We'll move Exhibit 87 into

6  evidence.

7          THE COURT:  Any objection?

8          MS. GARD:  No, Your Honor.

9          THE COURT:  Exhibit No. 87 for identification is

10  admitted into evidence.

11    *Q.*    BY MR. ARNTSEN:  And how was that adoption

12  proceeding resolved?

13    *A.*    It was denied with I think the word sanctions.

14  They put sanctions on us.  I'm not sure of what the

15  terminology is.

16    *Q.*    But, in a nutshell, it did not end successfully

17  for you; is that correct?

18    *A.*    That is correct.

19    *Q.*    Can you take a look at Exhibit 104, please?  Can

20  you identify what this is?  Is this another order in the

21  adoption proceedings?  If you would take a look at the top

22  of the first page.

23    *A.*    Yes.

24          MR. ARNTSEN:  We'll move Exhibit 104 into

25  evidence.

1          THE COURT:  Any objection?

2          MS. GARD:  No, Your Honor.

3          THE COURT:  Exhibit No. 104 for identification is

4     admitted into evidence.

5     *Q.*     BY MR. ARNTSEN:  Now, in connection with the

6     Maricopa County proceedings, the custody issues, what were

7     the issues that you were dealing with and using

8     Attorney DeLozier for in that proceeding?

9     *A.*     To be able to see my grandchildren.

10    *Q.*     Was the nature of the -- was this something you

11    were in a dispute with the Lambeths?

12    *A.*     Yes.  At different times, it was set up that we

13    were supposed to see them so many times and that wasn't

14    happening.  So I wasn't able to see my grandchildren as it

15    was supposed to have -- as it was laid out in the

16    different times.

17    *Q.*     How were you interfacing with the court or social

18    service agencies in connection with this dispute?

19    *A.*     There was a time where the court went ahead and

20    said that we needed to have supervised visits.  And even

21    after, you know, the professional would say that we didn't

22    need to have supervised visits anymore, then something was

23    always thrown up and said, and then we -- I haven't seen

24    my kids since the spring of 2004.  That's how it ended.

25    *Q.*     Can you take a look at Exhibit 95, please?  In

1   the course of these proceedings, were there some

2   allegations back and forth as to potential abuse of

3   Nicholas or Ashlee?

4       A.   Yes, there was.

5       Q.   And you see that Exhibit 95, it states at the

6   top, it's apparently from Brad and Jeanea Lambeth and to

7   John Jakubczyk.  Do you who John Jakubczyk was?

8       A.   Yes.  He was Brad and Jeanea's attorney.

9       Q.   And I also notice up at the top -- do you see at

10  the top the header, it looks like a fax --

11      A.   Yes.

12      Q.   -- marker for G. David DeLozier?

13      A.   That's correct.  That's the attorney.

14      Q.   Did you receive Exhibit 95 at some point in time?

15      A.   Yes, I did.

16      Q.   Who did you receive it from?

17      A.   From David.

18      Q.   David DeLozier?

19      A.   David DeLozier.

20      Q.   And looking at Exhibit 95, can you take a look at

21  the first full paragraph or the second paragraph on the

22  first page of Exhibit 95?  And I'm just -- can you read

23  along with me?  I'm just going to read a small portion of

24  this into the record.

25           I first noticed that Ashlee had a red bottom

1  after a visit on Thursday, November 29, 2001.  The Ochoas

2  took the kids at 5:00 p.m. and returned them at 7:00 p.m.

3  When I was getting them ready for a bath, I noticed that

4  Ashlee's bottom was red.  She said:  Grandpa Alejo touched

5  her butt, in quotes.  I asked her if he helped her go to

6  the bathroom and she said she didn't know.

7           And then going down into that paragraph a little

8  further down, she says:  During the following week, Ashlee

9  was really emotional and said on several occasions:

10 Grandma Donna says keep secrets.  Did I read that

11 correctly?

12      *A.*  Yes, you did.

13      MR. ARNTSEN:  And we'll move Exhibit 95 into

14 evidence.

15      THE COURT:  Any objection?

16      MS. GARD:  Judge, I don't object, but the

17 victim's address is on it and it needs to be redacted.

18      MR. ARNTSEN:  That's fine, of course.  I

19 apologize.

20      THE COURT:  Okay.  With the understanding that

21 the address will be redacted, Exhibit No. 95 --

22      THE CLERK:  Did counsel want to do this?

23      THE COURT:  Why don't you take a look at -- look

24 at it together and I'll allow you to do that.

25      MR. ARNTSEN:  We can do it now or at the close of

1   proceedings.  It is really very straightforward redacting
2   it I believe.  It's essentially the second and third lines
3   at the top left-hand page.
4           MS. GARD:  Correct.
5           THE COURT:  I'll hand it to you.  Why don't you
6   do it right now.
7           MR. ARNTSEN:  I don't know if I have a marker.
8           THE CLERK:  We do.
9           MR. ARNTSEN:  Thank you.
10          (WHEREUPON, an off-the-record discussion ensued.)
11          THE COURT:  Okay.  Thank you.  With the address
12  redacted, then, Exhibit No. 95 for identification is
13  admitted into evidence.
14      Q.   BY MR. ARNTSEN:  And then can you take a look at
15  Exhibit 96?  Do you see that?
16      A.   Yes, I do.
17      Q.   And is that a letter -- it indicates it's a
18  letter to Dr. Brian Yee.  Who is Dr. Brian Yee?
19      A.   He was the therapist that both Brad and Jeanea
20  and Alejo and I had to go and be interviewed with and --
21      Q.   And Exhibit 96 isn't signed, but you see at the
22  end, it says:  Sincerely, Alejo and Donna Ochoa?
23      A.   Yes.
24      Q.   Did you write this letter?
25      A.   I did with the help of David DeLozier.

1       MR. ARNTSEN:  We'll move Exhibit 96 into
2  evidence.
3       THE COURT:  Any objection?
4       MS. GARD:  One moment, Your Honor.
5       THE COURT:  Yes.
6       MS. GARD:  No.
7       THE COURT:  Exhibit No. 96 for identification is
8  admitted into evidence.
9    *Q.*  BY MR. ARNTSEN:  And at some point in time, was
10  Attorney DeLozier substituted out as your attorney of
11  record in the guardianship proceeding?
12    *A.*  Yes, he was.
13    *Q.*  And then who replaced him as your attorney?
14    *A.*  Daphne Budge.
15    *Q.*  And can you particular take a look at
16  Exhibit 102, please?  Do you have that in front of you?
17    *A.*  Yes, I do.
18    *Q.*  And I'll just read into the record the start of
19  the second full paragraph:  It is hereby ordered
20  substituting Daphne Budge for G. David DeLozier as Counsel
21  of Record for the maternal grandparents, et cetera, and
22  it's dated July 31, 2002.  Do you so that?
23    *A.*  Yes, I do.
24    *Q.*  Is this the order substituting Daphne Budge for
25  David DeLozier in that proceeding?

1    *A.*   Yes, it is.

2          MR. ARNTSEN:  We'll move Exhibit 102 into

3    evidence.

4          THE COURT:  Any objection?

5          MS. GARD:  No, Your Honor.

6          THE COURT:  Exhibit No. 102 for identification is

7    admitted into evidence.

8    *Q.*   BY MR. ARNTSEN:  And why did you substitute --

9    why was Attorney Budge -- why did you substitute

10   Attorney Budge as your counsel of record for

11   Attorney DeLozier?

12   *A.*   Because there were issues with the Pinal County

13   proceedings with the grandchildren.

14   *Q.*   Even after Attorney Budge substituted in as your

15   attorney of record in the guardianship proceedings, did

16   you continue to consult with Attorney DeLozier relating to

17   those proceedings?

18   *A.*   Yes, I did.

19   *Q.*   Can you take a look at Exhibit 107, please?  Can

20   you identify what that is?

21   *A.*   That is an e-mail from me to David DeLozier.

22   *Q.*   And what was the subject -- what was the subject

23   that was being discussed in that e-mail?

24   *A.*   It was regarding the severance hearing.

25   *Q.*   By the severance hearing, what are you referring

1   to?

2       *A.*   Wendi's rights being severed from the children.

3       *Q.*   And how would that affect you?

4       *A.*   If she -- if her rights were severed, then mine

5   were, too.

6       *Q.*   And why were you sending this to

7   Attorney DeLozier in March of 2003?

8       *A.*   Because he was always my attorney and I

9   considered him -- I still considered him to be.

10          MR. ARNTSEN:  We'll move Exhibit 107 into

11   evidence.

12          THE COURT:  Any objection?

13          MS. GARD:  Hearsay.

14          THE COURT:  Can I see the exhibit?

15          THE CLERK:  107?

16          THE COURT:  107.

17          MR. ARNTSEN:  If you want some argument, I'll

18   provide it.

19          MS. GARD:  I'm sorry, Your Honor.  I'll withdraw

20   it and just not object.

21          THE COURT:  The objection is withdrawn?

22          MS. GARD:  Yes.

23          THE COURT:  Exhibit No. 107 for identification is

24   admitted.

25       *Q.*   BY MR. ARNTSEN:  Can take a look at Exhibit 132,

1  please?  Do you have that in front of you?

2      *A.*    Yes, I do.

3          THE COURT:  What number?  What number?

4          MR. ARNTSEN:  132.

5          THE COURT:  Okay.  Thank you.

6      *Q.*    BY MR. ARNTSEN:  And you see at the top left

7  corner, it indicates this is a letter from you and Alejo;

8  is that correct?

9      *A.*    That is correct.

10     *Q.*    And do you see at the end, it says:  Respectfully

11  submitted, Alejo and Donna Ochoa?

12     *A.*    Yes.

13     *Q.*    And it's to Jill Zubers.  Who is Jill Zubers at

14  the Arizona Family Adoption Services?

15     *A.*    Correct.

16     *Q.*    And why were you -- who wrote this letter?

17     *A.*    I did with the help of David DeLozier.

18     *Q.*    And what was the purpose of the letter?

19     *A.*    The purpose was to -- it was after the severance

20  or during the time of all that, and I was just trying to

21  explain to them that I felt like the children needed all

22  of us.

23     *Q.*    And how did Attorney DeLozier assist you with

24  this letter?

25     *A.*    He helped me with the language and he reviewed it

1    before I sent it.

2          MR. ARNTSEN:  We'll move Exhibit 132 into

3    evidence.

4          THE COURT:  Any objection?

5          MS. GARD:  Well, Judge, if I could just clarify.

6    This isn't being offered for the truth but for the fact

7    that it's being disclosure?

8          MR. ARNTSEN:  For the fact that, yes, it was

9    co-written by Donna and Attorney DeLozier.

10         MS. GARD:  No objection, Your Honor.

11         THE COURT:  Exhibit No. 132 for identification is

12   admitted into evidence.

13   Q.    BY MR. ARNTSEN:  Can you take a look at

14   Exhibit 108, please?  Is that an e-mail exchange between

15   you and Attorney DeLozier?

16   A.    Yes, it is.

17   Q.    I see it is from inhispresence@hotmail.com.  Is

18   that --

19   A.    That's one of my hotmail accounts.

20   Q.    What caused this e-mail exchange?  Strike that.

21   Do you see at the bottom typically indicating the first

22   e-mail, it says, Donna, what happened today at court, by

23   Attorney DeLozier to you?

24   A.    Yes.

25   Q.    And is the top your response to this?

1    *A.*    Yes, and the top is my response letting him know

2    what had happened in court.

3    *Q.*    And why were you having this exchange with

4    Attorney DeLozier?

5    *A.*    Because, you know, I just kept David in the loop.

6    He had been our attorney through all of this.

7            MR. ARNTSEN:  We'll move Exhibit 108 into

8    evidence.

9            THE COURT:  Any objection?

10           MS. GARD:  No, subject to the same record I made

11   before.

12           THE COURT:  Right.  It is to show that she was

13   keeping in contact with Attorney DeLozier?

14           MR. ARNTSEN:  Yes, exactly.  I mean, ultimately,

15   the point of it is it's not going attorney-client

16   privilege.

17           THE COURT:  Right.  Exhibit No. 108 for

18   identification is admitted into evidence.

19   *Q.*    BY MR. ARNTSEN:  Can you take a look at

20   Exhibit 109, please?  And I'll represent to you that this

21   came from Attorney DeLozier's file.  Okay?

22   *A.*    Okay.

23   *Q.*    As indicated by the base number at the bottom and

24   also the footer.  Do you see at the bottom, it says:

25   Saturday, May 17, 2003, americanonline gddelozier.  Do you

1  see that?

2      *A.*    Yes.

3      *Q.*    This looks to be a May 16, 2003 e-mail from you

4  to Daphne Budge; is that correct?

5      *A.*    That is correct.

6      *Q.*    And do you know how this would have gotten in

7  Attorney DeLozier's file?

8      *A.*    I would have given it to him.  I probably blind

9  copied him.

10          MR. ARNTSEN:  We'll move Exhibit 109 into

11  evidence.

12          THE COURT:  Any objection?

13          MS. GARD:  No, Your Honor, subject to the prior

14  record.

15          THE COURT:  Is that correct?

16          MR. ARNTSEN:  The same thing, yes, Your Honor.

17          THE COURT:  Exhibit No. 109 for identification is

18  admitted into evidence.

19      *Q.*    BY MR. ARNTSEN:  Can you take a look at

20  Exhibit 114, please?  Can you identify what that is?

21      *A.*    That's where we're letting the court know that

22  we're not being represented by Daphne Budge anymore but by

23  ourselves.

24      *Q.*    And how did that come about that Attorney Budge

25  was no longer your counsel of record?

1    *A.*    She went to work for the state, I believe.

2    *Q.*    Who prepared Exhibit 114?

3    *A.*    David Delozier did.

4         MR. ARNTSEN:  We'll move Exhibit 114 into

5    evidence.

6         THE COURT:  Any objection?

7         MS. GARD:  No, Your Honor.

8         THE COURT:  Exhibit No. 114 for identification is

9    admitted into evidence.

10   *Q.*    BY MR. ARNTSEN:  Can you take a look at

11   Exhibit 115, please.  First of all, you see this appears

12   to be a fax from Attorney DeLozier at the top?  Do you see

13   that?

14   *A.*    Yes.

15   *Q.*    3/7/2005, the date.  Do you see that?

16   *A.*    Yes, I do.

17   *Q.*    Do you recognize the handwriting on this?

18   *A.*    The top half of the page is Wendi's handwriting.

19   *Q.*    And then the bottom half?

20   *A.*    And the bottom half is my handwriting.

21   *Q.*    Is this something that you sent to

22   Attorney DeLozier?

23   *A.*    Yes, it is.

24   *Q.*    For what purpose?  What did it relate to?

25   *A.*    It related to Wendi and her representation.

1    *Q.*    Did it relate to the guardianship proceeding?

2    *A.*    Yes, it did.  Yes, it did.  The grandchildren.

3          MR. ARNTSEN:  We'll move Exhibit 115 into

4    evidence.

5          THE COURT:  Any objection?

6          MS. GARD:  No objection subject to the prior

7    limitations.

8          THE COURT:  Is that correct, Mr. Arntsen?

9          MR. ARNTSEN:  That's fine.

10          THE COURT:  Okay.  Exhibit No. 115 for

11    identification is admitted into evidence.

12    *Q.*    BY MR. ARNTSEN:  Can you take look at

13    Exhibit 113, please.  You see that that's a March 21,

14    2005, letter to the Maricopa County Superior Court case

15    number -- to the Maricopa County Superior Court signed by

16    you and Alejo?

17    *A.*    Yes, it is.

18    *Q.*    Who wrote this letter?

19    *A.*    I wrote it with David DeLozier's help.  Actually,

20    he wrote most of it.

21    *Q.*    And so we have just gone through a series of

22    documents with starting from Exhibit 84, which is July 12,

23    2001, a letter indicating that Attorney DeLozier was

24    substituting for Attorney Thikoll as your counsel in the

25    guardianship, and through Exhibit 113, which is this

1  March 21, 2005 letter that you indicated that you and

2  Attorney DeLozier wrote in connection with the

3  guardianship proceedings.

4        In your view, was Attorney DeLozier your lawyer

5  in those guardianship proceedings during this entire

6  period?

7      *A.*   Yes, he was.

8        MR. ARNTSEN:  We'll move Exhibit 113 into

9  evidence.

10       THE COURT:  Any objection?

11       MS. GARD:  No, Your Honor, subject to the prior

12  record made.

13       MR. ARNTSEN:  That's fine.

14       THE COURT:  Exhibit No. 113 for identification is

15  admitted into evidence.

16     *Q.*   BY MR. ARNTSEN:  Okay.  Now I want to turn to

17  Attorney DeLozier's representation of Wendi in the

18  criminal proceedings.  Okay?

19     *A.*   Yes.

20     *Q.*   Were you involved in essentially

21  Attorney DeLozier coming to represent Wendi in the

22  criminal proceedings?

23     *A.*   Yes.

24     *Q.*   And describe how that came about.

25     *A.*   A friend of Wendi's had seen Wendi's picture on

1   the TV after her arrest.  She asked her husband --

2       *Q.*   And what was this friend's name?

3       *A.*   Jeri Lynn Wilkerson-Cunningham.

4       *Q.*   Is Cunningham her married name?

5       *A.*   Yes, Cunningham is her married name.

6       *Q.*   Is that one of the girls whose pictures was up

7   earlier?

8       *A.*   Yes, it is.

9       *Q.*   Okay.  And continue.

10      *A.*   She asked her -- husband is a --  at the time, he

11  was a minister and he sat on a board of directors along

12  with David DeLozier.  And she asked her husband if he knew

13  of anyone, you know, that could help Wendi.  And so he

14  talked to David.

15          And, in turn, David went down and talked to Wendi

16  and said that he would be willing to help on her case to

17  be her attorney.  And then we -- then we connected with

18  David and Alejo met David and gave him a retainer.

19      *Q.*   Can you take a look at Exhibit 61, please?  Is

20  this a December 14, 2000 letter from Attorney DeLozier to

21  you and Alejo relating to his engagement as Wendi's lawyer

22  in these criminal proceedings?

23      *A.*   Yes, it is.

24          MR. ARNTSEN:  We'll move Exhibit 61 into

25  evidence.

1           THE COURT:  Any objection?

2           MS. GARD:  No, Your Honor.

3           THE COURT:  Exhibit No. 61 for identification is

4    admitted into evidence.

5       *Q.*  BY MR. ARNTSEN:  And during the course of the

6    proceedings between Wendi's arrest and her trial -- her

7    arrest in 2000 and her trial in 2004 -- did you have

8    occasion to interact with Attorney DeLozier in connection

9    with Wendi's defense?

10      *A.*  Yes, I did.

11      *Q.*  Who was your principal contact on Wendi's defense

12   team?

13      *A.*  David was.

14      *Q.*  Can you take a look at Exhibit 56, please.  It

15   indicates from the header line, it looks like a

16   February 12, 2001 e-mail from you to David DeLozier; is

17   that correct?

18      *A.*  That is correct.

19      *Q.*  And looking at the second sentence, you see it

20   says:  If more is needed, please ask Kandy what sort of

21   details she would like.  Do you see that?

22      *A.*  Yes, I do.

23      *Q.*  Who is Kandy?

24      *A.*  Kandy was Wendi's therapist.

25      *Q.*  And how did Kandy come to become Wendi's

1 therapist?

2    *A.*    David suggested that Kandy would become -- that
3 Kandy would see Wendi as a therapist.

4    *Q.*    Who paid for Kandy's services?

5    *A.*    I did.

6         MR. ARNTSEN:  We'll move Exhibit 56 into
7 evidence.

8         THE COURT:  Any objection?

9         MS. GARD:  No, Your Honor.

10         THE COURT:  Exhibit No. 56 for identification is
11 admitted into evidence.

12    *Q.*    BY MR. ARNTSEN:  Can you take a look at
13 Exhibit No. 51, please.  That appears to be an e-mail from
14 you to -- who is the e-mail to?

15    *A.*    Okay.  I sent it to Dan Patterson, to David
16 DeLozier and Michelle Arvanitas.

17    *Q.*    And who is Michelle Arvanitas?

18    *A.*    Michelle Arvanitas was part of the legal team I
19 think for Wendi.  She worked for Dan.

20    *Q.*    Okay.  And it states at the start:  Just to keep
21 you updated.  Do you see that?

22    *A.*    Yes.

23    *Q.*    And did you have regular communications with
24 Wendi's legal team?

25    *A.*    I would send them e-mails a lot.

1      MR. ARNTSEN:  We'll move Exhibit No. 51 into

2   evidence.

3      THE COURT:  Any objection?

4      MS. GARD:  No, Your Honor.

5      THE COURT:  Exhibit No. 51 for identification is

6   admitted into evidence.

7      *Q.*   BY MR. ARNTSEN:  Can you take a look at

8   Exhibit 57, please?  Can you identify what that is?

9      *A.*   This is an e-mail that I sent to Michelle and to

10  Dan Patterson and to David and this was information on

11  Skip and where he was located.  I had found out that he

12  had gone to prison.

13      MR. ARNTSEN:  We'll move Exhibit 57 into

14  evidence.

15      THE COURT:  Any objection?

16      MS. GARD:  No, Your Honor.

17      THE COURT:  Exhibit No. 57 for identification is

18  admitted into evidence.

19      *Q.*   BY MR. ARNTSEN:  You testified earlier today some

20  about Skip's family and the child abuse issues and the

21  criminal problems it caused for them.  Did you tell that

22  to Wendi's legal team?

23      *A.*   I had mentioned about the grandpa -- you know,

24  granddad and what Skip was in jail for.

25      *Q.*   Thank you.

1     *A.*     You're welcome.

2     *Q.*     Did you ever talk with a man by the name of

3     Patrick Linderman?

4     *A.*     Yes, I did.

5     *Q.*     What was your understanding of his role in

6     Wendi's defense team?

7     *A.*     My understanding was that he was supposed to go

8     out and talk to people about Wendi.

9     *Q.*     Did he ever ask you any questions about anything

10    about mental health issues?

11    *A.*     No, he did not.

12    *Q.*     Did he ever ask you any questions relating to

13    childhood abuse that Wendi may have suffered?

14    *A.*     No, he did not.

15    *Q.*     Did you ever talk with a man by the name of Scott

16    MacLeod?

17    *A.*     Yes, I did.

18    *Q.*     What did you understand his role was on Wendi's

19    defense team?

20    *A.*     I understand that he's supposed to be to

21    mitigation specialist, which I don't really understand.

22    *Q.*     Did he ever ask you any questions about Wendi's

23    mental health?

24    *A.*     No, he did not.

25    *Q.*     Did he ever ask you any questions about childhood

1  abuse Wendi may have suffered?

2      *A.*   No, he did not.

3      *Q.*   Generally, what were your interactions with

4  Attorney Dan Patterson?

5      *A.*   I met with him a couple of times before the trial

6  and, you know, they would just ask if I had any more

7  questions, and, you know, I asked him if -- obviously, I

8  had sent them e-mails with attachments, you know, with

9  information about history and stuff like that and, you

10  know, I told them, you know, if you need anything else.

11  And not ever having done anything like this before, you

12  know, I didn't know what to expect, you know,

13  if they were --

14     *Q.*   Do you ever recall Dan Patterson asking you any

15  questions of Wendi's mental health?

16     *A.*   No, he did not.

17     *Q.*   Did he ever ask any questions about any abuse

18  Wendi may have suffered as a child?

19     *A.*   No.

20     *Q.*   Did David DeLozier ever ask you any questions

21  about Wendi's mental health?

22     *A.*   No.

23     *Q.*   Did he ever ask you any questions about abuse she

24  may have suffered as a child?

25     *A.*   No, he did not.

1    *Q.*   In the penalty phase of Wendi's trial, did

2   Attorney DeLozier ask you for some assistance?

3    *A.*   Yes, he did.

4    *Q.*   What did he ask you for assistance with?

5    *A.*   He said that was trying to put together -- and I

6   don't remember if it was the opening, the closing,

7   whatever it was, but, you know, to present Wendi and her

8   life.  And he asked if I could help him write it, you

9   know.  And he said:  Well, this is what you do.  And I'd

10   sit there at home and I'm going:  I have no experience in

11   this.  I don't know what to do.

12          So I called a friend of mine, Cindy Schaider, who

13   writes grants and works and asked, you know:  This is what

14   the attorney is asking me, but I don't know what to do

15   with this.  Can maybe you contact him and maybe you can

16   help him?  You know, because I knew that she was real good

17   with words.

18          THE COURT:  What was her name again?

19          THE WITNESS:  Cindy Schaider.

20          THE COURT:  And who is she?

21          THE WITNESS:  A friend of mine.

22          THE COURT:  Go ahead.  I'm sorry.

23          MR. ARNTSEN:  She will also be a witness, Your

24   Honor.

25          THE COURT:  Okay.

1    *Q.*   BY MR. ARNTSEN:  Donna, we have talked about a

2    lot of topics here today relating to Wendi's childhood and

3    growing up.  And is this information that you would have

4    provided in the initial trial if you would have been

5    asked?

6    *A.*   Yes, I would have, certainly.

7          MR. ARNTSEN:  No further questions.

8          THE COURT:  Is it going to be Ms. Gard?

9          MS. GARD:  Yes, Your Honor.

10         THE COURT:  Ms. Gard.

11

12                      CROSS-EXAMINATION

13   BY MS. GARD:

14   *Q.*   Mrs. Ochoa, if I could get you to turn back to

15   Exhibit 56, which has been admitted and is your history of

16   Wendi's early years that you gave to Mr. DeLozier.

17   *A.*   Uh-huh.

18   *Q.*   And you mentioned in there -- you mentioned on

19   page -- let me get you a Bates number so you can follow

20   along.  Just a moment.  I have a copy that's not quite

21   lined up with this one.  So that's why it's not

22   matching up.

23         Okay.  The page with the Bates number on the

24   bottom right-hand corner of -- the first Bates number on

25   the very top, 8351.

1    *A.*    Yes.

2    *Q.*    You talk in there about the --

3         THE COURT:  Which exhibit is this?  I'm sorry.

4         MS. GARD:  I'm sorry, Your Honor?

5         THE COURT:  Which exhibit number is this?

6         MS. GARD:  It's Exhibit 56.

7         THE COURT:  Thank you.

8    *Q.*    BY MS. GARD:  About midway through the page,

9    there's a paragraph that starts:  This part is hard?

10   *A.*    Yes.

11   *Q.*    Then you go on to tell counsel in that paragraph

12   about the allegations about Skip's grandfather; is that

13   correct?

14   *A.*    Yes.

15   *Q.*    And you said today that you told counsel what

16   Skip was in prison for; that's correct?

17   *A.*    That is correct.

18   *Q.*    So you understood that there was some potential

19   importance to those facts; right?  Or else you wouldn't

20   have told counsel about them?

21   *A.*    I'm sorry?

22   *Q.*    You understood that those were potentially

23   important to your daughter's defense and that's why you

24   told counsel about them?

25   *A.*    Well, I just told him everything, you know, that

1    I -- yes.

2        Q.   Okay.  But you didn't tell them about the

3    lingerie shopping with Alejo that you found unusual?  You

4    never told counsel about that; right?

5        A.   No.

6        Q.   And you never told counsel about this touching-on

7    ritual; right?

8        A.   That, I believe I did.

9        Q.   You did?  Who did you tell?

10       A.   Probably David.

11       Q.   Do you remember when?

12       A.   No.

13       Q.   Do you remember where this conversation happened?

14       A.   No.

15       Q.   Okay.  So this touching-on ritual, it didn't

16   involve -- and apologize for getting so graphic here.  But

17   it didn't involve your daughter touching Alejo's penis;

18   right?

19       A.   No, that I'm aware of.

20       Q.   That you ever saw happened?

21       A.   That I ever saw.

22       Q.   It didn't involve Alejo touching your daughter's

23   genitals; right?

24       A.   Not that I ever saw.

25       Q.   That you ever saw.  All I want to know is what

1   you actually saw.  Okay.  From what you saw, you never saw

2   your husband touch your daughter's breasts; right?

3       *A.*    I had seen him many cuddle up to her and hold

4   her, you know, maybe just a little bit too much.

5       *Q.*    But in a sexual manner?

6       *A.*    I would say sometimes, it appeared uncomfortable

7   to me.

8       *Q.*    It appeared uncomfortable to you how so?

9       *A.*    Like maybe, you know, just too much hugging.

10      *Q.*    But it was in a hugging-type situation?

11      *A.*    I don't understand what you mean by a hugging

12  type situation.

13      *Q.*    Well, not to get too graphic here, but did you

14  ever see your husband -- I'll use the word fondle -- reach

15  out and fondle your daughter's breasts?

16      *A.*    No.

17      *Q.*    Nothing like that?

18      *A.*    No.

19      *Q.*    What about any of her friends?  Did you see that

20  happen?

21      *A.*    No.

22      *Q.*    Did you ever she anything -- when your daughter

23  would have sleepovers with Krye Lorts, did you ever

24  witness any sexual contact between your husband and Kyre

25  Lorts?

1    *A.*    No.  But, again, I'm in the room most of the
2    time.
3    *Q.*    Outside from the touching-on ritual just in
4    general, did you ever see any sexual contact between your
5    husband and your daughter?  And by sexual contact, I
6    define that as sexual intercourse.
7    *A.*    No.
8    *Q.*    Oral sex or sexual contact?
9    *A.*    No.
10   *Q.*    Nothing like that?  Okay.  Did your daughter ever
11   ask you to purchase lingerie for her?
12   *A.*    No.
13   *Q.*    Would you have purchased it if she had asked you
14   that?
15   *A.*    I would have purchased nice cotton underwear.
16   *Q.*    Conservative cotton underwear?
17   *A.*    Yes.
18   *Q.*    Did you object to her wearing the more risqué
19   lingerie?
20   *A.*    Well, let me put it this way:  I ignored a lot of
21   things -- a lot of things that I should not have ignored.
22   *Q.*    You had objections, then, that you didn't
23   communicate to her wearing the lingerie?
24   *A.*    Exactly.
25   *Q.*    And, again, not to get too personal, but do you

1  or did you in the time period -- and I'm talking about the

2  time period when your daughter was growing up in

3  Casa Grande.  Did you own any type of risqué nightgowns?

4      *A.*    A couple of times Alejo, you know, bought me some

5  and I took them back.

6      *Q.*    So you didn't keep them in the house?

7      *A.*    No.

8      *Q.*    To your knowledge, was there pornography kept in

9  your home?  And by pornography, I define as images or

10  videotapes depicting sexual contact between individuals.

11      *A.*    Not like -- not the Victoria Secrets catalogs;

12  right?

13      *Q.*    No, I'm not considering Victoria Secrets or

14  anything like that.

15      *A.*    Not to my knowledge.

16      *Q.*    And, again, you clarified on direct that some of

17  your prior statements relating to your daughter being

18  taken into pornography stores, you're referring to things

19  like Spencer's Gifts?

20      *A.*    Spencer's Gifts, the lingerie stores that would

21  maybe have like, you know, the back part, you know, where

22  things might be for sale that aren't out in the public

23  parts, yes.

24      *Q.*    The kind of novelty stores with kind of trinkets

25  that may have sexual themes to them?

1    *A.*    Yes.

2    *Q.*    Is that fair?  Okay.  When Wendi was first born,

3    you discussed how you feel that you were unavailable to

4    her because of your emotional problems.  But it's true,

5    isn't it, that you always made sure that she was cared

6    for; right?  Your mother was there, for example, when she

7    was first born to take care of her?

8    *A.*    Yes.

9    *Q.*    And Skip took care of her as well?

10   *A.*    Yes.

11   *Q.*    And when you were going out late at night as she

12   was older, you did arrange for people to watch her; right?

13   *A.*    I don't know if the lady ever went inside my

14   house to watch her or not.  She was inside my house alone.

15   *Q.*    Okay.  But in that time period, you left her in

16   the house alone.  But, for example, then you started

17   taking her to the 24-hour day cares; right?

18   *A.*    For a short period of time.

19   *Q.*    For a short period of time where people would

20   watch her 24 hours a day; right?

21   *A.*    Right.

22   *Q.*    Okay.  The incident with the day care, did the

23   day care give you any kind of specifics why this was so

24   disturbing to them?

25   *A.*    Because they were in the bathroom showing -- the

1   kids were in the bathroom showing each other their private

2   parts.

3        *Q.*   Do you consider it unusual for four-year-old

4   children to maybe be curious about why a girl might have a

5   different part than a boy, for example?

6        *A.*   That is kind of a hard question.

7        *Q.*   Well, I mean, you've been around children; right?

8   You've raised children.  Children are curious.  What about

9   this made it abnormal?  Did the day care communicate that

10  to you?

11       *A.*   They were touching each other.

12       *Q.*   They were touching each other?

13       *A.*   Yeah.

14       *Q.*   Did you put that fact in your declaration?

15       *A.*   No.

16       *Q.*   Did you mention it on direct?

17       *A.*   I don't know if I did or not.

18       *Q.*   Okay.  Did you tell Dr. Hopper about that part of

19  the story when he interviewed you?

20       *A.*   I don't recall.

21       *Q.*   You have no personal knowledge or you never

22  witnessed Rick Barnes molest your daughter; right?

23       *A.*   Correct.

24       *Q.*   And you have no personal knowledge whether that

25  happened or not; right?

1      *A.*     That is true.

2      *Q.*     And the same is true, is it not, of her

3   grandfather, Skip's father; right?  That you have no

4   personal knowledge that may have happened?

5      *A.*     No, I did not see anything happen.

6      *Q.*     You did not see any of that happen over there.

7   Okay.  And the same is true really of any of Skip's family

8   members; right?  That you have no personal knowledge that

9   your daughter was molested by any of Skip's family

10  members; right?

11     *A.*     Not where I saw anything, no.

12     *Q.*     You told the jury at trial -- do you recall

13  telling the jury at trial that Alejo was a good man?

14     *A.*     I probably did.

15     *Q.*     Do you still believe Alejo is a good man?

16     *A.*     No, I don't.

17     *Q.*     Are you still married to him?

18     *A.*     Yes, I am.

19     *Q.*     Have you reported any of your suspicions about

20  anyone involving your daughter to CPS?  Did you ever make

21  a report?

22     *A.*     No, I did not.

23     *Q.*     Did you ever say:  My husband is taking my

24  daughter into lingerie shops and I don't feel comfortable

25  about that?

1    *A.*   No, I did not.

2    *Q.*   You never reported that to any law enforcement

3    agencies, nothing like that?

4    *A.*   No.

5    *Q.*   And, again, you never reported it to counsel at

6    the time of trial?  Wendi's counsel?

7    *A.*   No.

8         THE COURT:  What's the answer?

9         THE WITNESS:  No.

10   *Q.*   BY MS. GARD:  You would agree, wouldn't you, that

11   Ms. Andriano was closer to Alejo growing up than she was

12   to you; right?

13   *A.*   Yes.

14   *Q.*   And, in fact, on the night of the offense, she

15   called Alejo for help; right, after she murdered Joe?

16   *A.*   She called to our house.

17   *Q.*   And she spoke to him and he went to help her;

18   right?

19   *A.*   He went up there.

20   *Q.*   Before you did; right?

21   *A.*   Yes.

22   *Q.*   Do you recall at trial -- were you present when

23   evidence was presented suggesting that he falsified some

24   evidence?

25   *A.*   I was not in the court at any time except for

1   when I testified.

2       Q.    Would you agree that the defendant could

3   manipulate your husband?

4       A.    I'm sorry?

5       Q.    Would you agree that the defendant could get your

6   husband to do things she wanted him to do?  If she wanted

7   something, she could ask your husband for it and he would

8   give it to her?

9       A.    Can you give me an example?  I don't --

10      Q.    Let me just pull up one of your exhibits.

11            MS. GARD:  Can I have a moment, Your Honor?

12            THE COURT:  Yes.

13      Q.    BY MS. GARD:  It's back in Exhibit 56.  If you go

14  to the page that's marked 8532, the second paragraph from

15  the bottom.

16      A.    Yes.

17      Q.    Okay.  Wendi and Alejo loved each other from the

18  start.  I'm reading this from the document.  Okay?  When

19  we were dating, he would tell her something to do and she

20  would look at him with her hands on her hips and say:  You

21  can't tell me what to do.  You're not my boss.  He would

22  just laugh and say:  Okay.  Wouldn't you like to do this?

23  She would do it, you know, like she had won the contest.

24            So did the defendant engage in that type of

25  flirty kind of behavior with your husband to get what she

1  wanted?

2     *A.*   No.  I don't see where a four-year-old would be

3  flirting.  I'm sorry.  That's --

4     *Q.*   After the murder, you say you paid for Wendi's

5  mental health treatment; right?  You paid for her

6  counselor, for Kandy Rohde?

7     *A.*   Yes, I did.

8     *Q.*   What was the purpose of hiring Kandy Rohde?

9     *A.*   To help Wendi through what all was going on.

10  That was my purpose.

11     *Q.*   Just to provide therapy for her?

12     *A.*   Yes.  Because it was suggested to me.

13     *Q.*   By Mr. DeLozier?

14     *A.*   Yes.

15     *Q.*   With respect to the adoption issue between you

16  and the Lambeths, you in fact filed a report with CPS

17  accusing them of injuring the children; did you not?

18     *A.*   Yes, I did.

19     *Q.*   Why did you file the report?

20     *A.*   Because at the time, I -- in the State of

21  Arizona, if you're a health care worker and you suspect

22  something, then you are supposed to report that, and that

23  is what I did.

24     *Q.*   So in that instance, you reported the Lambeths

25  because you believed that they had injured the child;

1  right?

2      *A.*    Yes.

3      *Q.*    And, in addition, if you could turn back to

4  Exhibit 104, which is the petition that Mr. DeLozier filed

5  or an order relating to the petition that Mr. DeLozier

6  filed in Pinal County, which has been admitted into

7  evidence, on the second page of that document, the Court

8  made a finding, did it not, that you had engaged in

9  conduct done to thwart the orders of the Maricopa Superior

10  Court; right?  You and Alejo personally?

11     *A.*    That's what it says, yes.

12     *Q.*    And that's why the petition was dismissed with

13  prejudice and the sanctions; right?

14     *A.*    Yes.

15     *Q.*    Your daughter grew up in a loving household;

16  right?  You loved your daughter?

17     *A.*    I loved her.

18     *Q.*    You still love your daughter; right?

19     *A.*    I still love my daughter, of course.

20     *Q.*    And you're still pretty close to her; right?

21     *A.*    Well, as close as you can be under the

22  circumstances.

23     *Q.*    You talk to her on the phone?  You have a

24  relationship with her?  You visit her?

25     *A.*    Yes.

1    *Q.*    And as she was growing up, she had opportunities;

2    right?  She took music lessons; right, for example?  Is

3    that correct?

4    *A.*    From one of the associative pastors -- from the

5    music ministry gentleman, yes.

6    *Q.*    In fact, she excelled in school as well?  Didn't

7    she win an academic award and things like that?

8    *A.*    Yes.

9    *Q.*    She's very intelligent and a good student; right?

10    *A.*    Yes.

11    *Q.*    And aside from the time that you were in the

12    traveling ministry, when she was growing up in Casa Grande

13    during her teenage years she, you typically had food to

14    eat; right?

15    *A.*    Typically, yes.  In Casa Grande, yes.

16    *Q.*    And a roof over her head; right?

17    *A.*    Yes.

18    *Q.*    And, obviously, she had clothes to wear; right?

19    She was getting -- your husband was purchasing extras, you

20    know, lingerie, things she didn't need; right?

21    *A.*    Yes.

22    *Q.*    So she got things that she wanted?  She got

23    things --

24    *A.*    Well, we shopped -- we did a lot of shopping down

25    in Tucson at the secondhand stores, yes.

1    *Q.*    Okay.  But she had clothes to wear?

2    *A.*    Yes.

3    *Q.*    She was always fully clothed.  And you tried to

4    teach her?  In fact, you raised her in a religious

5    environment; right?

6    *A.*    Yes.

7    *Q.*    And you tried to teach her values as part of that

8    environment; correct?

9    *A.*    Yes.

10   *Q.*    And Harvest Family Church in fact, whatever

11   other, you know, disagreements you may have with it, they

12   still taught Christian values; correct?

13   *A.*    Yes.

14   *Q.*    Okay.  Do you still attend that church, by the

15   way?

16   *A.*    No.

17   *Q.*    Can you explain to me a little bit more about how

18   it came to divide from 91st Psalm to Harvest, how the two

19   split apart?

20   *A.*    The only thing that I know is that there was some

21   disagreements about the money situation.  That's all I

22   know.  I don't know any details.

23   *Q.*    Did it lead to -- was it a contentious split

24   between Tom King and Cal Lorts?

25   *A.*    No.

1    *Q.*   Was there bad blood occurring afterwards?

2    *A.*   I don't know.

3    *Q.*   Well, you alluded to a financial dispute that

4    Cal Lorts thought --

5    *A.*   Right, because Tom didn't want to keep sending

6    money, you know, like tithes up to the Tempe church.

7    *Q.*   Okay.  And that --

8    *A.*   And then when they, you know, divided it up, then

9    that money flow stopped.

10   *Q.*   And, to your knowledge, did that cause any bad

11   feelings between the two of them?

12   *A.*   No.

13           MS. GARD:  Your Honor, may I have just one

14   moment?

15           THE COURT:  Yes.

16           (WHEREUPON, an off-the-record discussion ensued.)

17   *Q.*   BY MS. GARD:  Can you turn back to Exhibit 56,

18   please, Bates No. 1668 at the very bottom corner, the very

19   lowest page from there.

20           MR. ARNTSEN:  What's the number?

21           THE WITNESS:  What's --

22           MS. GARD:  Okay.  It's Bates No. 1668 on

23   Exhibit 56.

24           MR. ARNTSEN:  I don't think those Bates numbers

25   are on that exhibit.

1          MS. GARD:  Okay.  I'll pull up the --

2          MR. ARNTSEN:  There's a couple -- there's one

3    that starts PCR and one that starts O083.

4          (WHEREUPON, an off-the-record discussion ensued.)

5          MS. GARD:  It's 8350, the top Bates number.

6          MR. ARNTSEN:  There we go.

7          THE WITNESS:  Oh, okay.

8     *Q.*   BY MS. GARD:  Okay.  At the bottom, there's a

9    paragraph that starts:  Wendi was a really good baby.

10    *A.*   Yes, I see that.

11    *Q.*   She had colic and, in fact, my mom and I would

12    take turns rocking her.  So your mom -- you did rock her

13    some; right?

14    *A.*   Yes, I did.

15    *Q.*   You did spend time, then, with her?  And your mom

16    did as well?

17    *A.*   My mom did a whole lot more.

18    *Q.*   But someone was rocking her; right?

19    *A.*   Yes.

20    *Q.*   When she's crying, someone is picking her up?

21    *A.*   Yes.

22    *Q.*   Then it says you nursed her for four months and

23    then she went on a bottle; right?

24    *A.*   Yes.  Actually, she was taking food through a

25    bottle before that at a couple of months old because I

1  was -- the milk that I was giving out wasn't good.  It

2  wasn't good enough.

3      *Q.*   So you were supplementing it?

4      *A.*   Yes.

5      *Q.*   But you were still nursing her in addition to the

6  supplements?

7      *A.*   I was trying to as much as I could.

8      *Q.*   As much as you could.  Okay.

9          MS. GARD:  I don't have anything else.  Thank

10  you.

11         MR. ARNTSEN:  No redirect, Your Honor.

12         THE COURT:  May this witness be excuse?

13         MR. ARNTSEN:  Yes, Your Honor.

14         THE COURT:  Thank you very much.  You're excused.

15         You may call your next witness.

16         (WHEREUPON, the witness entered the courtroom.)

17         MS. FOX:  The Petitioner calls Jeri Lynn

18  Cunningham to the stand.

19         THE COURT:  Ms. Cunningham, if you can please

20  step forward to the witness stand.  Before you sit down

21  there, please face the clerk.  Please give her your name

22  and spell your name and raise your right hand and she will

23  swear you in.

24         THE CLERK:  Would you please state your name for

25  the record and spell your name?

1          THE WITNESS:  Jeri Cunningham.  J-E-R-I;

2     C-U-N-N-I-N-G-H-A-M.

3          THE CLERK:  Raise your right hand, please.

4          (WHEREUPON, the witness was duly sworn by the

5     clerk.)

6          THE COURT:  Please be seated.  Ms. Cunningham,

7     just a few things to remember.  Remember to speak up so

8     that everyone can hear you.  Also, it's important that you

9     wait until the question is completed before you answer the

10    question.  And make sure that you give us a verbal

11    response.  Okay?  Don't just shake your head and say

12    uh-huh or un-huh.  Say, yes, no, whatever it might be.

13         Can you do that for us?

14         THE WITNESS:  Yes.

15         THE COURT:  Go ahead and state your name for the

16    record.

17         THE WITNESS:  Jeri Cunningham.

18         THE COURT:  And Ms. Fox.

19         MS. FOX:  There you go.

20         THE COURT:  You may proceed.

21         MS. FOX:  Thank you.

22

23                   JERI CUNNINGHAM,

24    having been first duly sworn to tell the truth, the whole

25    truth, and nothing but the truth, testified as follows:

1                    DIRECT EXAMINATION

2   BY MS. FOX:

3       Q.   Jeri, thank you so much for being here today.

4   Sorry for keeping you waiting.  To start off, if you could

5   just state your date of birth.

6       A.   May 20, 1970.

7       Q.   How old are you?

8       A.   43.

9       Q.   Where do you currently reside?

10      A.   I live in Laveen, Arizona.

11      Q.   And are you married?

12      A.   Yes, I am.

13      Q.   How long have you been married?

14      A.   Almost 25 years.

15      Q.   What's your maiden name?

16      A.   Wilkerson.

17      Q.   What does your husband do for a living?

18      A.   She is a pastor at Southgate Church.

19      Q.   How many parishioners attend his church?

20      A.   Around 150 to 200.

21      Q.   How long has he been the pastor at that church?

22      A.   Over 25 years.

23      Q.   Do you work?

24      A.   Yes, I do.

25      Q.   What's your profession?

1    *A.*    I'm a teacher at 91st Psalm Christian School.

2    *Q.*    When you say 91st Psalm Christian School, is that

3    the one located in Casa Grande?

4    *A.*    No, it's not.  It's in Phoenix at my husband's

5    church.

6    *Q.*    What grade did you say you taught?

7    *A.*    Second grade.

8    *Q.*    And how many children attend this school that you

9    teach at?

10    *A.*    There's around 150 students.

11    *Q.*    How long have you been teaching?

12    *A.*    For eight years.

13    *Q.*    Do you and your husband have any children?

14    *A.*    Yes, we do.

15    *Q.*    How many children do you have?

16    *A.*    We have five children.

17    *Q.*    And how old are those children?

18    *A.*    Our oldest is 19.  And we have a 16-year-old, a

19    13-year-old, a 11-year-old and a nine-year-old.

20    *Q.*    And do those children attend the school that you

21    teach at?

22    *A.*    Four of them do.  My oldest is in the

23    United States Air Force right now.

24    *Q.*    Do you know the Petitioner Wendi Andriano?

25    *A.*    Yes, I do.

1    Q.    When did you first meet Wendi?

2    A.    I met her when I was around ten years old in

3    1980.

4    Q.    And are you the same age as Wendi?

5    A.    Yes, I am.

6    Q.    So you were both ten at the time?

7    A.    Yes.

8    Q.    And where did you meet Wendi?

9    A.    I met her at 91st Psalm Church in Casa Grande.

10   Q.    Can you describe the circumstances surrounding

11   your first meeting?

12   A.    I attended children's church with her and her

13   mother, Donna Ochoa, introduced us.

14   Q.    And what was children's church.

15   A.    Children's church is when all the kids would be

16   in a room and hear Bible stories and puppet shows while

17   the adults were in the main service.

18   Q.    Who taught children's church at this time in 1980

19   when you first met Wendi?

20   A.    Alejo Ochoa and Mike Long.

21   Q.    What interactions did you have with Wendi at

22   church during this time period when you first met Wendi in

23   1980?

24   A.    Well, Wendi, when we first introduced, we

25   started -- usually I would go to her house after church

1 and then I would go back -- I would spend the afternoon --

2 Sunday afternoons with her until the Sunday evening

3 service.  And, yeah, at first, it was just an occasionally

4 going to her house or maybe her going to my house.

5    Q.   And you said that was between a morning and an

6 and evening church service?

7    A.   Yes.

8    Q.   So you would go to church twice on Sundays?

9    A.   Yes.

10   Q.   And in the time period in between, occasionally,

11 you and Wendi would play together?

12   A.   Yes.

13   Q.   At any point in time, did you start seeing Wendi

14 more often than at church on Sundays and the occasional

15 times when you would go to her house in between the two

16 services?

17   A.   Yes.  My sixth grade year, I began going to

18 school at 91st Psalm Christian School in Casa Grande.

19   Q.   And do you know exactly what year that would have

20 been or month when you would have started sixth grade?

21   A.   It would have been September of 1981, I believe.

22   Q.   How long did you attend school with Wendi at

23 91st Psalm in Casa Grande?

24   A.   Until the end of my eighth grade year.

25   Q.   Who was the pastor at 91st Psalm during that time

1  period?

2      *A.*   Pastor Cal Lorts.

3      *Q.*   Can you please describe a typical school day at

4  91st Psalm during this period of time?

5      *A.*   Yes.  We would get to school in the morning and

6  play outside until all the students came in.  Most of the

7  students were in one room.  We had multiple grades.  I

8  believe it was first through sixth grade in one room.  And

9  we had cubicles that faced the walls with dividers

10  in between.

11          We didn't have a typical classroom setting.

12  There wasn't a teacher to teach the lessons.  We completed

13  PACES, which were little workbooks for each subject.  We

14  would complete 12 workbooks I believe per subject

15  per school year.

16      *Q.*   And what would happen if the student acted out or

17  got in trouble?

18      *A.*   Either there was a supervisor that could take

19  care of it and handle it.  If it was something more

20  serious, then we would be sent to the office.

21      *Q.*   And what type of discipline was used at the

22  school?

23      *A.*   There was corporal punishment.

24      *Q.*   What type of corporal punishment?

25      *A.*   It was known as the Rod of Correction.  We would

1  get a swat or two.

2      *Q.*   And what was the Rod of Correction?

3      *A.*   It was a paddle.

4      *Q.*   Were you ever disciplined?

5      *A.*   I never received the rod at school.  Wendi and I

6  got called into the office one time for having bad

7  attitudes.

8      *Q.*   What was your bad attitude?

9      *A.*   We weren't really sure.  We were just told that

10  we had bad attitudes and that we needed to have better

11  attitudes or we would get the rod.

12      *Q.*   And did you have a better attitude after that.

13      *A.*   I was really solemn after that and Wendi was

14  trying to cheer me up and tell me:  You better put a smile

15  on your face or you're going to get the rod.  But, yeah,

16  we never got called back into the office.  So I guess our

17  attitudes improved.

18      *Q.*   Was Cal Lorts the pastor the entire time that you

19  attended 91st Psalm?

20      *A.*   Yes, he was.

21      *Q.*   Did that change at any point in time, Cal Lorts

22  being the pastor at 91st Psalm?

23      *A.*   Yes.  In 1984, Pastor Cal began a church in

24  Tempe, Arizona, and my family also moved to Tempe when

25  Pastor Cal moved.

1   *Q.*   Do you know who was the pastor after Cal Lorts?

2   *A.*   Yes.  Pastor Cal turned the church over to Tom

3   King.

4   *Q.*   Did you ever attend the church when Tom King was

5   the pastor?

6   *A.*   No.  My last service there was the service that

7   he turned it over to Tom King.

8   *Q.*   So did you spend any time with Wendi while you

9   were at school during the school day?

10   *A.*   Yes, I did.

11   *Q.*   When would you see Wendi during the school day?

12   *A.*   All day.  We would play together during our break

13   time and have lunch together.

14   *Q.*   And did you play with anyone else except Wendi

15   during these breaks?

16   *A.*   We had a group of people that played together or

17   we would sit and eat lunch together.  We usually played

18   tag and basketball and just ran around and were active.

19   *Q.*   Who else would you sit you or play with you

20   during lunch breaks?

21   *A.*   Kyre Lorts was there.  Brad and Shawn King.

22   Laura Bell, that I remember.

23   *Q.*   Once you started school at 91st Psalm, which you

24   said was around September '81, I believe?

25   *A.*   Yes.

1    *Q.*    Did you ever see Wendi outside of school?

2    *A.*    Yes.  I started -- we started having play dates

3    more often and I eventually began to have sleepovers at

4    her house.

5    *Q.*    How often would you and Wendi have play dates

6    let's say during this first year of sixth grade?

7    *A.*    Probably around once a month maybe.

8    *Q.*    How often would you and Wendi have sleepovers

9    during this first year?

10   *A.*    It was the same.  I would go to her house and

11   spend the night maybe once a month.

12   *Q.*    And where was Wendi living at this time?

13   *A.*    In the Downtown Casa Grande area.

14   *Q.*    And were Wendi's parents at home when you would

15   sleep over at her house?

16   *A.*    Yes, they were usually at home or one person at

17   least would be home.

18   *Q.*    And where would Alejo, Wendi's stepfather, be

19   when you were playing at Wendi's?

20   *A.*    He would be coming in and out.  Sometimes he

21   would join us whenever we were playing or talking.  He

22   would come in and joke around with us.

23   *Q.*    And would Donna be around when you were playing

24   at Wendi's?

25   *A.*    Yeah, she would be around.  A lot of times, she

1  would be in her room reading or being busy doing

2  something.

3      Q.   Did she ever play with you and Wendi?

4      A.   Not that I recall.

5      Q.   And during that first year at Wendi's house, what

6  would you and Wendi do when you were playing?

7      A.   We just like to go in her room and we would just

8  giggle and talk.  We would talk about boys and doing

9  makeup and hair and talk about hairstyles and music, just

10  typical 11- and 12-year-old girl things.

11      Q.   And what did Wendi's bedroom look like at this

12  house?

13      A.   It was a small room.  It had about a full-size

14  bed.  There wasn't very much room or space in the room.

15  Enough room for the bed and dresser.

16      Q.   And during this first time period, were you

17  sleeping at her house the whole time or was some of this

18  time just daytime play?

19      A.   Sometimes it would be daytime play.  We would go

20  to the mall or something like that.

21      Q.   Who would you go to the mall with?

22      A.   Alejo would take us.

23      Q.   Would Alejo spend time with you when you were at

24  the mall with Wendi?

25      A.   Yes, he did.

1    *Q.*   And what was he like when he was spending time
2    with you and Wendi at the mall?

3    *A.*   He would just walk around with us and he would
4    always like to joke around and play.  He was very playful.

5    *Q.*   Besides the sleepovers that you discussed and
6    playing at Wendi's occasionally during the day and going
7    to the mall, did you spend any other time with Wendi and
8    her family outside of church or school?

9    *A.*   I did go on vacation with them to California one
10   time.

11   *Q.*   And where in California did you go?

12   *A.*   We went to San Diego.

13   *Q.*   How did you get there?

14   *A.*   We drove.  I drove with Donna and Alejo and
15   Wendi.

16   *Q.*   And when you were in San Diego, where did you
17   stay?

18   *A.*   We camped out on the beach in tents.

19   *Q.*   How many tents did you have?

20   *A.*   Wendi and I had our own tent and Donna and Alejo
21   had their own tent.

22   *Q.*   And is there anything that stands out in your
23   memory about this trip?

24   *A.*   We just spent a lot of time playing at the beach.
25   We had a lot of fun at the beach.  I remember going

1  everywhere in our swimsuits.  We lived in our swimsuits.

2  I remember going to stores thinking it was odd that we

3  were -- that everyone went to stores in swimsuits.

4         Another thing that stands out is the time when we

5  had to take showers outside at the camp grounds.  So we

6  had our swimsuits on and we were talking showers, washing

7  our hair and Alejo was taking pictures of us.

8  *Q.*   How did you feel when Alejo was taking pictures

9  of you while you showered?

10  *A.*   We were both yelling at him to stop taking our

11  pictures, that we were embarrassed.

12  *Q.*   Did he continue?

13  *A.*   He took a few more pictures and then stopped.

14  *Q.*   Between church, playing at Wendi's, vacation with

15  the Ochoas, did you get to observe Wendi's relationship

16  with her parents?

17  *A.*   Yes, I did.

18  *Q.*   What did you think of Donna?

19  *A.*   She was -- Donna was more of the serious parent.

20  She made sure that we didn't say words -- like, she didn't

21  like us to say sick or, you know, or gross.  She was more

22  strict, but she was like a typical mom.  You know, a

23  typical mom with her daughter.

24  *Q.*   And what did you think of Alejo?

25  *A.*   He was more of the playful parent, I thought,

1   and, you know, he always liked to joke around with us and

2   play around.  He would sometimes bang on a window to try

3   to scare us.  He was just very playful and teased a lot.

4        Q.   Let's go and move to your sleepovers at Wendi's

5   house.  You stated that you slept over at Wendi's house

6   about once a month?

7        A.   Yes, I did.

8        Q.   And for what time period did you sleep over at

9   Wendi's about once a month?

10       A.   It probably started when I was between 11 and

11  12 years old up until -- until I moved to Phoenix.

12       Q.   What would you and Wendi do at the sleepovers?

13       A.   We would sit in her room and talk and play and

14  just laugh and be silly.  We would just like -- we would

15  just like to talk about things and have fun.

16       Q.   Where would Wendi's parents be when you slept at

17  Wendi's?

18       A.   Donna usually went to bed early.  Alejo sometimes

19  would come in the room at the same time.

20       Q.   What would Alejo do when he came in the room?

21       A.   He would pop in his head.  We would just pop his

22  head in to see what we were doing.  Sometimes he would

23  just come into the room while we were talking and he

24  would -- he would just -- he just -- he always had a

25  presence there.  He would always be around.

1    Q.    So when you slept at Wendi's, where would you

2  sleep?

3    A.    I slept in Wendi's bed.

4    Q.    And what type of bed was this?

5    A.    It was a full-size bed.

6    Q.    And was it against a wall or in the middle of the

7  room?

8    A.    It was in the middle of the room.

9    Q.    And did you usually sleep on a certain side?

10    A.    I remember sleeping on -- it would have been the

11  east side of the room.

12    Q.    And what would you wear when you slept at Wendi's

13  house to sleep in?

14    A.    I wore like a nylon-type nightgown.

15    Q.    And what would Wendi wear to sleep in?

16    A.    It was the same type style of nightgown.

17    Q.    And besides Alejo popping his head at night, did

18  you see him at all at any other time during your

19  sleepovers?

20    A.    Yes.  I remember the first time being asleep and

21  waking up and finding Alejo in bed between Wendi and I.

22    Q.    And you said you woke up and Alejo was in bed

23  between you and Wendi?

24    A.    Yes.

25    Q.    How old were you?

1     *A.*    I was probably about 12 years old.

2     *Q.*    And was he above the covers or under the covers?

3     *A.*    He was under the covers.

4     *Q.*    When you woke up, did you say anything?

5     *A.*    No.  I noticed -- I woke up.  I had my back to

6     him.  I was facing the wall.  And I noticed that his hand

7     was down my shirt.

8     *Q.*    And what did you do when you realized his hand

9     was down your shirt?

10    *A.*    I moved his hand.  He was snoring.  So I thought

11    he was asleep.

12    *Q.*    And what happened after you moved his hand?

13    *A.*    He put his hand back.

14    *Q.*    And did you move it again?

15    *A.*    Yes, I did.

16    *Q.*    And how many times did this happen?

17    *A.*    It happened probably four -- three or four times,

18    that I remember.  Oh, you mean --

19    *Q.*    You mean like him moving his hand back?

20    *A.*    Yeah, I probably moved his hand away probably

21    three or four times before he stopped.

22    *Q.*    And when he was -- do you know what Alejo was

23    wearing when he was in bed between the two of you?

24    *A.*    I think he was wearing a T-shirt and shorts.

25    *Q.*    And what was your reaction when you realized he

1  was in bed and his hand was under your nightgown?

2      *A.*   I was trying to figure out if he was really

3  sleeping.  Ad first, I thought he was asleep.  But when he

4  kept putting his hand back, I thought he was faking being

5  asleep, so that he could put his hand there.

6      *Q.*   Did it upset you when he was putting his hand

7  under your nightgown?

8      *A.*   Yes, it did.

9      *Q.*   And did Wendi move or stir or react at all to him

10 being in bed with the two of you?

11     *A.*   I don't recall.  I couldn't tell because he was

12 between us.

13     *Q.*   But she didn't say anything?

14     *A.*   No.

15     *Q.*   And you didn't hear her react?

16     *A.*   No, I didn't.

17     *Q.*   After three or four times, you said he stopped

18 putting his hand under your nightgown?

19     *A.*   Yes, he did.

20     *Q.*   And what happened next?

21     *A.*   Eventually, I fell asleep.

22     *Q.*   How long did it take you to fall asleep?

23     *A.*   It took me a while to fall back asleep.  But

24 eventually -- I don't know.  It took a while, but I

25 eventually fell back asleep.

1    *Q.*    And then was he in the bed with the two of you

2    when you woke up the next morning?

3    *A.*    No.  He was gone when I woke up the next morning.

4    *Q.*    And did you see him when you woke up and got out

5    of the bed that morning like in the house?

6    *A.*    I don't recall seeing him in the house.  I don't

7    recall.

8    *Q.*    When you went home, did you say anything to your

9    mother or father about what had happened?

10   *A.*    No, I didn't.

11   *Q.*    Why not?

12   *A.*    I was -- I was afraid they wouldn't let me go to

13   Wendi's house anymore and she was my best friend.  And,

14   also, I was afraid my dad -- I was afraid of what my dad

15   would do to Alejo.  I thought my dad would kill Alejo.

16   *Q.*    And when was the next time you saw Alejo after

17   that happened?

18   *A.*    I would see Alejo -- he worked -- he worked for

19   the church and the school.  So I would see him either at

20   church or every day at school because he taught our

21   devotions class.

22   *Q.*    And did he ever say anything to you?

23   *A.*    No, he didn't.

24   *Q.*    And how did it feel when you saw him around

25   school and church?

1          MS. GARD:  Objection.  Relevance.

2          THE COURT:  Overruled.

3          Go ahead and answer the question.

4          THE WITNESS:  I just -- I felt, umm -- I felt

5    awkward that he acted like nothing happened.  So I just

6    would tell myself that he was sleeping and he didn't know

7    what he was doing.

8     *Q.*   BY MS. FOX:  And did you sleep over at Wendi's

9    again?

10    *A.*   Yes, I did.

11    *Q.*   How long after this incident did you sleep at

12   Wendi's again?

13    *A.*   It was probably another month or two.

14    *Q.*   And then when you slept over again, did the same

15   thing happen?

16    *A.*   I don't know if it happened the very next time,

17   but it did happen again on other occasions.

18    *Q.*   How many times total did it happen?

19    *A.*   I can remember -- I can remember it happening at

20   least three or four times.

21    *Q.*   And each time, he would get into bed between you

22   guys and put his hand under your nightgown on your

23   breasts?

24    *A.*   Yes.  One time he came into bed, though, while we

25   were still awake.

1    *Q.*    What happened that time?

2    *A.*    We were sitting on her bed and we were talking

3    and then he comes inside and he said:  I'm sleeping in

4    here tonight.

5    *Q.*    And did you or Wendi react at all?

6    *A.*    Yeah.  Wendi said:  No, dad, don't sleep in here.

7    Go on, dad.  And he said:  No, you girls are never going

8    to sleep.  So I'm sleeping in here tonight.  So we didn't

9    argue.  We just laid down and tried to go to sleep.

10   *Q.*    And did he get into bed with you under the

11   covers?

12   *A.*    Yes, he did.

13   *Q.*    And did he go through the same ritual of trying

14   to put his hand on your breasts?

15   *A.*    Yes, he did.

16   *Q.*    And did you remove it?

17   *A.*    Yes, I did.

18   *Q.*    How many times did you need to do it that time?

19   *A.*    It was probably the same amount of times that I

20   recall.

21   *Q.*    And, total, this happened three or four times?

22   *A.*    Yes.

23   *Q.*    Was this all during that first year, sixth grade?

24   *A.*    It probably happened from the time I was 12 and

25   also when I was 13.

1    *Q.*   And you never talked -- did you ever talk to
2    Wendi about this?

3    *A.*   No, I didn't.

4    *Q.*   Why not?

5    *A.*   I -- I didn't know what she would think about it.
6    And I was just really uncomfortable talking about it.  So
7    I never brought that up.

8    *Q.*   Why were you uncomfortable talking about it?

9    *A.*   I was embarrassed that it happened.  And Alejo
10   was her dad.  I didn't want to say anything and I didn't
11   want to talk to my parents about it either.

12   *Q.*   Why didn't you want to talk to your parents about
13   it?

14   *A.*   Just, well, because I wanted to be able to remain
15   friends with her and I didn't believe that would be
16   possible if my parents knew.  And, also, my dad.  I know
17   my dad would have tried to kill Alejo.

18   *Q.*   Was Wendi at the same house during the time
19   period that this was occurring or did she move at any
20   point?

21   *A.*   When I was around 13, she moved to a different
22   house.

23   *Q.*   And besides Alejo getting into bed with you and
24   you and Wendi talking, were there any other activities you
25   and Wendi liked to do at your sleepovers at either house?

1    *A.*   We liked to -- we liked to have Alejo take us out

2    to the desert at night because we liked to tell each other

3    scary stories.  So we liked to go out in the desert when

4    it was dark.

5    *Q.*   And would Alejo take you to the desert?

6    *A.*   He would, but he would make us put our nightgowns

7    on first.

8    *Q.*   So before he would take you to the desert, he

9    made you put your nightgowns on?

10   *A.*   Yes.

11   *Q.*   What was your reaction to that request?

12   *A.*   We wanted to go to the desert, so we put on our

13   nightgowns.

14   *Q.*   Did you think it was an odd request?

15   *A.*   I thought maybe he just wanted us ready for bed

16   so that we would be ready for bed when we got back.  But

17   when the incidents in the bed started happening when he

18   was touching me, it made me think otherwise, that he just

19   wanted to see us in our nightgowns.

20   *Q.*   And how many times would he take you into the

21   desert, but make you put on your nightgowns first?

22   *A.*   Every time we went.  Every time he took us to the

23   desert, he would always have us put our nightgowns on

24   first.

25   *Q.*   And how often would you ask to go to the desert?

1      *A.*   I can remember going probably five times.  I

2   don't know.  Multiple times, we went to the desert.

3      *Q.*   And besides making you guys get on your

4   nightgowns, at any time when he took you into the desert,

5   did he impose any other conditions before he would take

6   you?

7      *A.*   One time when he was living -- when they were

8   living at their other house, he wanted me to rub his head.

9   He wanted -- he wanted Wendi and I to rub his head and his

10   feet before he took us to the desert.

11      *Q.*   And did you rub his head and feet?

12      *A.*   Yeah.  We sat on the couch and Wendi rubbed his

13   feet while I rubbed his head.

14      *Q.*   How big was the couch?

15      *A.*   It wasn't very bug.  Maybe -- maybe three

16   cushions.

17      *Q.*   Do you remember what color it was?

18      *A.*   I don't recall.  Some kind of -- I don't recall.

19      *Q.*   So how logistically did this occur with you

20   rubbing his head and her rubbing his feet?  Can you

21   describe how everyone was sitting?

22      *A.*   I would be sitting where Wendi is sitting now and

23   Wendi was sitting where you would be.  Alejo had his head

24   on my lap and his feet on Wendi's lap.

25      *Q.*   And what was Alejo wearing?

1    *A.*    I think he was wearing a T-shirt and shorts

2    maybe.  I believe a T-shirt and shorts.

3    *Q.*    And you said he had his head in your lap?

4    *A.*    Yes.

5    *Q.*    Was his head face up or face down?

6    *A.*    After a while, I could hear him snoring and his

7    face was gradually turning towards my crotch area.

8    *Q.*    And when his face turned to your crotch area, how

9    did that make you feel?

10    *A.*    I pushed his head the other way.

11    *Q.*    Why?

12    *A.*    It made me very uncomfortable.

13    *Q.*    Why did it make you feel uncomfortable?

14    *A.*    I could -- I could feel his breath on me and I

15    could feel -- and I didn't believe he was sleeping

16    because it was -- his face was so much in my crotch, I

17    didn't believe he was sleeping.  So I kept shoving his

18    head away in the other direction.

19    *Q.*    And did he eventually -- how long did this go on

20    for?

21    *A.*    It seemed like forever.  I don't remember.  It

22    just seemed like it lasted a long time.

23    *Q.*    And did you say anything about you being

24    uncomfortable?

25    *A.*    No.  I just would move his head.

1    *Q.*   Why didn't you say anything?

2    *A.*   I don't know.  I wish I would have.  I -- I

3 didn't.

4    *Q.*   And after this incident stopped which you said

5 felt like forever with his head in your crotch, breathing

6 in your crotch, did he eventually take you to the desert?

7    *A.*   Yeah.  Eventually, he acted like -- he got up

8 saying, oh, I fell asleep, but I didn't believe that he

9 was asleep.  And he told us to get our nightgowns on and

10 he would take us to the desert.

11    *Q.*   So when you were massaging his head, you weren't

12 in your nightgown?

13    *A.*   No.  I was wearing -- I believe I was wearing

14 shorts.

15    *Q.*   And did you say anything to anyone about Alejo

16 putting his head in your crotch and you feeling

17 uncomfortable?

18    *A.*   No, I didn't.

19    *Q.*   Did you ever talk about it with Wendi?

20    *A.*   No, I didn't.

21    *Q.*   Did you ever talk about it with your parents?

22    *A.*   No, I didn't.

23    *Q.*   Why didn't you tell anyone about what happened

24 with him putting his head in your crotch?

25    *A.*   The same reasons I stated before, just --

1    *Q.*    You felt uncomfortable?

2    *A.*    Yeah.  I was very uncomfortable and embarrassed

3   by it.  And, you know, I just never said anything.  I kept

4   it a secret.

5    *Q.*    You stated you stopped going to school with Wendi

6   and was it -- how old were you?

7    *A.*    I was 14.

8    *Q.*    14?

9    *A.*    Yes.

10   *Q.*    And you moved to Tempe, you said?

11   *A.*    Yes.

12   *Q.*    And after you moved to Tempe, how often did you

13  see Wendi?

14   *A.*    I would still go and see her if I -- every -- if

15  we had an extended break at school, I would have my

16  parents drive me to go spend the weekends with her.

17   *Q.*    Did it scare you to spend the night there

18  considering what would happen sometimes when you spent the

19  night there?

20   *A.*    It -- it used to scare me.  Before we had moved,

21  like my mom was sick at one time and my dad wanted me to

22  spend a week there while she was in the hospital.  And I

23  didn't want to spend a whole week there because I was

24  worried that it would happen again.  And I made up a story

25  to my dad that it was because I wouldn't have time to do

1  my makeup.  So I know I had to be around 13 because that

2  was when I was allowed to wear makeup.

3        But after -- some time after I was 14 and we had

4  moved, it hadn't happened in a while, so I figured it

5  was -- I became more comfortable going over there.

6    *Q.*    And how many times would you say you saw Wendi

7  during the period of when you were, say, 14 to 16?

8    *A.*    It just -- at first, I saw her more frequently.

9  But then by the time I was -- by the time I was 16, I was

10 only seeing her maybe once a year by the time I was 16.

11   *Q.*    So from time you were 16 to the present, how --

12 or from the time you were 16 until the time that you heard

13 that Wendi killed Joe, which we'll get into in a second,

14 how many times did you see Wendi?

15   *A.*    I had seen her at a wedding when I was 18 or 19.

16 And then I saw her again when I was pregnant with my first

17 child, when I was 24, at Brad's funeral.

18   *Q.*    So from the time you were 16 until the time Wendi

19 got arrested, you only saw her twice?

20   *A.*    Yes.

21   *Q.*    How did you find out about Wendi's arrest?

22   *A.*    A friend of mine called me.  And they had heard

23 about it on the news and they called and told me about it.

24   *Q.*    And after you found out about Wendi's arrest, did

25 you get in contact with her?

1    *A.*    Yes.  I called Donna and just let her know that I

2    was very sorry and I asked her if Wendi would want any --

3    would want to see any guests or have a visitor, and she

4    thought Wendi would like that.

5    *Q.*    How many times did you see Wendi around the time

6    of her trial?

7    *A.*    I probably came and visited her four or five

8    times maybe.

9    *Q.*    And then you just stopped visiting her?

10   *A.*    Yeah.  I didn't see her after -- I'm trying to

11   remember if it was my third child or fourth child.  I was

12   pregnant.

13   *Q.*    Oh, you were pregnant at the time?

14   *A.*    Yes.

15   *Q.*    So you were visiting her and then you had your

16   baby?

17   *A.*    Yes.

18   *Q.*    And the visits stopped?

19   *A.*    Yes.

20   *Q.*    And then so the last time -- how old is that

21   child now?

22   *A.*    I'm trying to remember which child I was pregnant

23   with.  So it was either -- I have a 13-year-old and I have

24   a nearly 12-year-old.  So it was 12 or 13 years ago.

25   *Q.*    So you haven't, until today, seen Wendi in 12 to

1   13 years?

2       *A.*   No, I haven't.

3       *Q.*   And did you in any way assist in Wendi's trial?

4       *A.*   Someone from our church had given my husband

5   information on an attorney that did pro bono cases.  So we

6   gave the information to the Ochoas.

7       *Q.*   And do you know if they ended up using that

8   attorney?

9       *A.*   Yes, they did.

10      *Q.*   Why didn't you bring up this abuse earlier around

11  the time of Wendi's trial?

12      *A.*   I thought about it.  It was in my mind.  I had

13  never told anybody about it, not even my husband.  So it

14  was in my mind, but I -- I didn't want to bring any

15  more pain into the family by bringing these accusations

16  against Alejo.

17           And but, at the same time, I was wondering if it

18  would help bring more light into her state of mind.  So I

19  was torn about what to do.  I wasn't sure if it would be

20  relevant or not.  And so I decided not to say anything.

21      *Q.*   And did Wendi's attorney contact you at any point

22  about helping with the proceedings?

23      *A.*   No, they did not.

24      *Q.*   So did Mr. DeLozier -- Attorney DeLozier ever

25  contact you to ask you anything about Wendi?

1      *A.*    No.  I've never spoken to him.

2      *Q.*    Or did Attorney Patterson ever contact you about

3   speaking with Wendi?

4      *A.*    No, he didn't.

5      *Q.*    And did Scott MacLeod, a mitigation specialist,

6   ever contact you about your life with Wendi?

7      *A.*    No.

8      *Q.*    What about a man named Patrick Linderman?

9      *A.*    No.

10     *Q.*    If they had asked you, would you have shared with

11  them the information that you shared with the Court today?

12           MS. GARD:  Objection.  Speculation.

13           THE COURT:  Overruled.

14           Go ahead and answer the question.

15           THE WITNESS:  If they -- if they would have asked

16  me about it, I would have.  The only reason I didn't say

17  anything is because I thought:  Well, it probably isn't

18  relevant.  So if they would have asked me about it, I

19  would have said something.

20           MS. FOX:  That's all I have for you.  I really

21  appreciate you coming.  I know this wasn't easy for you

22  today.

23           THE WITNESS:  Okay.

24           THE COURT:  Ms. Gard.

25           MS. GARD:  Just very briefly.

1          THE WITNESS:  Okay.

2

3                    CROSS-EXAMINATION

4  BY MS. GARD:

5      Q.   You never saw Alejo touch Wendi the same way that

6  he touched you; right?

7      A.   I couldn't tell.  He was between us.  He had one

8  hand on me.  I don't know where his other hand would have

9  been.

10     Q.   But so the answer is, no, you never saw him touch

11  her that way?

12     A.   I never did see that.

13     Q.   Okay.  The incident in California with the

14  photographs that you described --

15     A.   Yes.

16     Q.   -- that Alejo took, can you describe those

17  showers to me?  Were they public showers?

18     A.   Yes.  It was -- it was -- yeah, they were public

19  showers out in the open.

20     Q.   So was there any kind of partition around the

21  shower or was it just one of those at the beach that

22  just a --

23     A.   Yeah, I don't remember a partition being around

24  it.

25     Q.   And when he took the photographs, you were

1   wearing a bathing suit; is that right?

2       A.   Yes.

3       Q.   When Alejo placed his hand on your breasts, I

4   think it was the first time, you described hearing him

5   snoring?

6       A.   Uh-huh.

7       Q.   Are you sure he was not asleep?  How do you know

8   he wasn't asleep?

9       A.   At first, I thought he was asleep, but it kept

10  happening so frequently, that I just believed that -- I

11  thought -- I wondered -- I wondered if he was really

12  asleep.

13      Q.   But you don't know for sure?  You're just

14  speculating that he was -- that he was really awake;

15  right?

16      A.   It became very -- especially when it happened

17  multiple times, it became very hard to believe that he was

18  actually sleeping.

19      Q.   Okay.  Did you tell him to stop?  Did you say

20  anything to him?

21      A.   No.  I just kept pushing his hand away.

22      Q.   Okay.  And you didn't say anything to Donna;

23  right?

24      A.   No, I did not.

25      Q.   And in terms of one of the reasons -- you

1   testified at the end of your direct that you would have

2   probably told Wendi's attorneys if they had asked you?

3       *A.*   Yes.

4       *Q.*   Because your reason for not coming forward was

5   that you didn't consider it relevant.  But you had also

6   said earlier that you didn't want to bring more pain into

7   the family; right?  Was that another consideration?

8       *A.*   I didn't want to bring more pain into the family

9   if it wasn't necessary.  But if I would have known that

10  was necessary, I would have had to do it.

11      *Q.*   But you thought about coming forward with the

12  information, but you decided not to; is that fair?

13      *A.*   I weighed it in my -- in my mind.  I never talked

14  about it to anybody, but I did weigh it in my thinking.

15          MS. GARD:  I don't have anything else, Judge.

16          THE COURT:  Redirect?

17          MS. FOX:  I don't have anything else.

18          THE COURT:  May this witness be excused?

19          MS. FOX:  Yes.

20          THE COURT:  Thank you very much.  You're excused.

21          THE WITNESS:  Okay.  Thank you.

22          (WHEREUPON, the witness exited the courtroom.)

23          THE COURT:  Before we take our evening recess,

24  based upon what Mr. Arntsen indicated to the Court this

25  morning about Alejo Ochoa, what I'm going to do is I'm

1  going to appoint counsel for him with regard to any Fifth

2  Amendment issues that might come up tomorrow.  So I've had

3  my judicial assistant to get him appointed counsel

4  tomorrow.

5       It's my understanding he is scheduled to testify

6  tomorrow afternoon?

7       MR. ARNTSEN:  He's scheduled to be our third

8  witness tomorrow.  Jasper Neace will be first, first thing

9  in the morning coming from the prison, and then Wendi and

10  then Alejo.

11       THE COURT:  So he is probably not going to be

12  until the afternoon?

13       MR. ARNTSEN:  It could be late morning, but

14  probably not until the afternoon.

15       THE COURT:  Okay.  I think you spoke with my

16  judicial assistant with regard to Jasper Neace to make

17  sure he is available tomorrow morning?

18       MR. ARNTSEN:  Right.  And when I spoke with her,

19  I wasn't sure if Ms. Cunningham would be done today or

20  not, and she is.  So Jasper Neace will be first thing

21  tomorrow.

22       THE COURT:  I think my judicial assistant made

23  arrangements.

24       MR. ARNTSEN:  I know she made arrangements for

25  the morning.

1          THE COURT:  Right.  Okay.

2          MS. FOX:  Really quickly about Mr. Neace, I know

3     he was very concerned about his hearing problem.

4          THE COURT:  Right.  You know what?  I think

5     earlier today, I saw someone deliver a headset --

6          MS. FOX:  Okay.

7          THE COURT:  -- from court administration or

8     somewhere.  And so I think we have a headset for him.

9          MS. FOX:  Okay.  Wonderful.  I just know he was

10    very concerned about it.

11         THE COURT:  Okay.  So we have something for him.

12         MS. FOX:  Okay.  Great.  Thank you.

13         THE COURT:  Okay.  Everyone have a nice evening.

14    We will be in recess, then.

15         (WHEREUPON, the proceedings were concluded at

16    4:46 p.m.)

17                    *  *  *  *  *  *  *

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7           C E R T I F I C A T E

8

9

10          I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11   the State of Arizona, do hereby certify that the foregoing

12   244 pages constitute a full, true, and accurate transcript

13   of the proceedings had in the foregoing matter, all done

14   to the best of my skill and ability.

15          SIGNED and dated this 12th day of April, 2014

16

17

18                  /s/  Renée A. Mobley, RPR

19                  RENÉE A. MOBLEY, RPR

20                  Certified Reporter

21                  Certificate No. 50500

22

23

24

25

# EXHIBIT EEEEEEEEEE

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
5/2/2014 5:55:36 PM
Filing ID 5855461

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
          Respondent,                )
                                     )
vs.                                  )   No.
                                     )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,            )
                                     )
          Petitioner.                )
_____)


Phoenix, Arizona
February 10, 2014
9:31 a.m.


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


EVIDENTIARY HEARING

DAY 6


Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                        (ORIGINAL)

1                  A P P E A R A N C E S

2

3   On Behalf of the State:

4           Mr. Gregory Hazard
            Assistant Attorney General
5
            Ms. Lacey Gard
6           Assistant Attorney General

7
    On Behalf of the Defendant:
8
            ATTORNEYS AT LAW:
9
            Mr. Scott Bennett
10          Mr. Allen Arntsen
            Mr. Stephan Nickels
11          Mr. Matthew Lynch
            Ms. Krista Sterken
12          Ms. Jodi Fox

13                      I N D E X

14

15                 T E S T I M O N Y

16

WITNESS:                                    PAGE
17
    JOETTE JAMES, PH.D.
18
            Direct Examination by Mr. Nickels        5
19          Cross-Examination by Mr. Hazard         46

20  GEORGE DAVID DELOZIER, JR.

21          Direct Examination by Mr. Lynch         56
            Cross-Examination by Mr. Hazard        144
22
    CINDY SCHAIDER
23
            Direct Examination by Ms. Fox          154
24          Cross-Examination by Mr. Hazard        179

25

1                    P R O C E E D I N G S

2

3          THE COURT:  Good morning.  This is

4    CR 2000-096032, State of Arizona vs. Wendi Elizabeth

5    Andriano.

6          The record will reflect the presence of the

7    parties and counsel.

8          Are there any matters we need to discuss before

9    we get started with the witnesses?

10          MR. ARNTSEN:  Not from the Petitioner,

11    Your Honor.

12          MS. GARD:  No, Your Honor.

13          THE COURT:  The Petitioner may call her next

14    witness, then.

15          MR. NICKELS:  Thank you, Your Honor.  Pardon my

16    voice.

17          THE COURT:  Okay.

18          MR. NICKELS:  The Petitioner calls Dr. Joette

19    James.

20          THE COURT:  Okay.  Doctor, if you would please

21    step forward up to the witness stand here.  Before you sit

22    down, if you can please face the clerk.  Please give the

23    clerk your full name and she will swear you in.

24          THE WITNESS:  Sure.  It's Joette Deanna James.

25          THE CLERK:  Would you please spell your name for

1   the record?

2           THE WITNESS:  Sure.  It's J-O-E-T-T-E.  And my

3   last name is James, J-A-M-E-S.

4           THE CLERK:  Thank you.  Raise your right hand,

5   please.

6           (WHEREUPON, the witness was duly sworn by the

7   clerk.)

8           THE COURT:  Dr. James, if you could make yourself

9   comfortable there on the witness stand.  Please remember

10  to speak up so that everyone can hear you.  Also, please

11  wait until the question is completed before you answer the

12  question and make sure that you give us a verbal response.

13          Is that all agreeable to you?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Go ahead and state your name for the

16  record.

17          THE WITNESS:  My name is Joette Deanna

18  James.

19          THE COURT:  And you may proceed.

20

21                  JOETTE JAMES, PH.D.,

22  having been first duly sworn to tell the truth, the whole

23  truth, and nothing but the truth, testified as follows:

24

25

1                     DIRECT EXAMINATION

2   BY MR. NICKELS:

3       Q.   Good morning, Dr. James.

4       A.   Good morning.

5       Q.   Where do you live?

6       A.   I live in Washington, D.C.

7       Q.   What do you do for a living?

8       A.   I am a Board certified clinical

9   neuropsychologist.

10      Q.   And have you done work for Ms. Andriano's matter?

11      A.   Yes, I have.

12      Q.   And what were you asked to do?

13      A.   I was asked to review the raw data of Dr. Myla

14  Young, who conducted a neuropsychological evaluation of

15  Wendi in 2010 and 2011.  And I was asked to do an

16  independent scoring analysis of that evaluation and come

17  to opinions about whether or not Wendi as any

18  neuropsychological deficits.

19      Q.   And we will get into your analysis and

20  conclusions in detail later.  But if you could please

21  provide a summary for us of what you found.

22      A.   Sure.  So I found that Wendi did fine in certain

23  parts of the evaluation.  However, she showed cognitive

24  deficits in three particular areas:  In attention,

25  executive functioning and in information processing speed.

1    *Q.*   And in attention, executive functioning,

2  information processing, how does that translate into kind

3  of the real world?  Somebody who is affected with that,

4  how will it affect them in their day-to-day life?

5    *A.*   So Wendi performs better on tasks that are simple

6  in nature and has more difficulty when she is faced with

7  complexity.

8    *Q.*   Okay.  So does this affect Wendi's ability to

9  respond to or otherwise handle life situations?

10    *A.*   Yes.  In situations that are high stress where

11  emotions are running high, she is more likely to become

12  overloaded and overwhelmed.  And when that happens, she

13  shuts down.  Her neurological system shuts down and she

14  has difficulty engaging in a thoughtful goal-directed

15  decision making process.  And as a result, she tends to

16  then act on impulse.

17    *Q.*   Okay.  Like I said, we're going to get into that

18  in more detail in a little bit.  But for now I'm going to

19  turn back to your qualifications and have you tell the

20  Court a little bit more about what you do.

21        So why don't you just start with your educational

22  experience and we will walk through it from there.

23    *A.*   Sure.  I completed an undergraduate degree in

24  psychology, in honor psychology at the University of

25  Western Ontario, London, Ontario, Canada.

1          I then completed a doctoral degree, a Ph.D., in
2    clinical psychology from Northwestern University Medical
3    School.
4          I then did a year long internship at Boston
5    Children's Hospital, Harvard Medical School.
6          And then I completed a two-year post-doctoral
7    fellowship in pediatric neuropsychology from Children's
8    National Medical Center in Washington, D.C.
9    Q.    What have you done following that education and
10   your internship and fellowship?
11   A.    Sure.  I became Boarded by the American Board of
12   Professional Psychology in Clinical Neuropsychology.  In
13   April of 2013 is when I finished the process.
14         That involves a review of my credentials and
15   education.  Then submission of -- and then a written exam.
16   Then submission of two independent practice samples which
17   are then reviewed by peers and then an oral exam involving
18   ethics, a defense of those practice samples, and a
19   fact-finding novel case.
20   Q.    This Board certification that you just described,
21   is that something that all psychologists in your field
22   have?
23   A.    No.  All psychologists who are in practice are
24   required to be licensed.  And I'm licensed in Virginia,
25   Maryland and the District of Columbia.  Board

1 certification is an additional credential that

2 approximately four percent of psychologists have.

3     *Q.*   And that is something that you have?

4     *A.*   Yes.

5     *Q.*   What have you done professionally since becoming

6 Board certified?

7     *A.*   As a neuropsychologist, what I do is I

8 evaluate -- I conduct evaluations -- comprehensive

9 evaluations of individuals of a range of ages from

10 toddlers through adults who have or are suspected to have

11 developmental or acquired injury to the brain.  That would

12 be -- a developmental injury would be an injury that has

13 been there since birth or since before birth, such as an

14 attention disorder, an intellectual disability or autism.

15         For example, an acquired injury to the brain

16 would be something like a traumatic brain injury, seizure

17 disorder, et cetera.  And to understand how biological

18 factors, psychosocial factors impact learning emotions and

19 behavior.

20     *Q.*   What about work like this?  And this is a case

21 where you're serving as an expert witness.  How long have

22 you been doing that kind of work?

23     *A.*   I've been doing explicitly forensic work either

24 consulting or conducting evaluations with adolescents and

25 adults since 2008, 2009.

1    *Q.*    How many capital cases have you worked on?

2    *A.*    I've worked on approximately I would say between

3    15 and 20 capital cases in Florida, Georgia, Oklahoma,

4    both state and federal.  Maryland, Virginia.  And, yeah,

5    about 15 to 20, I've actually done.

6    *Q.*    And then do you do forensic work and expert

7    consulting work beyond capital cases?

8    *A.*    Yes.  I do forensic work related to competency,

9    competency to waive Miranda, competency to stand trial.

10   I've done some guardianship work on civil cases.  And I've

11   done a lot of work with adolescents who are facing

12   juvenile waiver and transfer hearing.

13   *Q.*    What about your clinical work?  Do you have a

14   practice?  Do you work for a large hospital?  Have you

15   down both?

16   *A.*    So for nine years, I -- or seven years, actually.

17   I was two years as a post-op, but then seven years as a

18   faculty member at Children's National Medical Center where

19   I saw children from, again, from toddlers through young

20   adults with injuries to the brain.  I worked both

21   inpatient and as an outpatient neuropsychologist.

22           I also had a joint assistant professorship at

23   George Washington University.  And then during that time,

24   I was seeing adolescents and adults as well as privately

25   for clinical cases, again, individuals with acquired and

1   developmental brain injuries.

2          And then as of January of 2014, I started an

3   official private practice doing both clinical and forensic

4   work.

5      Q.   Can you give us a percentage currently in your

6   private practice -- and I know it just got started.

7      A.   Yeah.

8      Q.   What percentage of your work is the clinical work

9   versus the forensic work like this?

10     A.   I would say probably half and half.  I see about

11  50 percent clinical and then 50 percent forensic.

12     Q.   Now, Dr. James, there is an exhibit binder in

13  front of you.  If you could please turn to Exhibit 166.

14     A.   Yes.

15     Q.   And it should be a copy of your CV; is that

16  right?

17     A.   Yes.  That is correct.

18     Q.   Okay.  And does the CV that is shown in

19  Exhibit 166, you know, reflect more or less what you just

20  described to the Court?

21     A.   Yes, it does.

22          MR. NICKELS:  Well, and this has already been

23  admitted into evidence, but I wanted to just bring it to

24  the Court's attention.

25     Q.   BY MR. NICKELS:  Now, Dr. James, we're going to

1   shift gears and we're not yet going to turn to your

2   substantive analysis.  Instead, I just want to walk

3   through the process you undertook here, what you all did.

4   Okay?

5       *A.*   Okay.  Yes.

6       *Q.*   So you told us before, you were asked to review

7   the raw data of Dr. Young.  Just kind of take it from

8   there and tell us what you did.

9       *A.*   Sure.  So I reviewed about -- well, it took me

10  six, seven hours or so to review her raw data.  And so,

11  basically, what I did was I took a look at her data and

12  then I just took a look at her scores and interpretations

13  and made interpretations of the scores that saw.  And then

14  I also took a look at her report as well.

15      *Q.*   And then did you come to your own analysis and

16  come to your own conclusions?

17      *A.*   Yes, I did.  I basically did just a reanalysis of

18  the data there.

19      *Q.*   Do you know why Dr. Young is not here?

20      *A.*   Yes.  I believe that I know she's had some

21  longstanding health issues.  I believe, unfortunately, she

22  passed away a couple of months ago.

23      *Q.*   Let's even step back further.  You said you were

24  reviewing the raw data?

25      *A.*   Yes.

1    *Q.*    What do you mean by that?

2    *A.*    Well, raw data is essentially all of the

3    responses that an individual makes.  So they're both

4    written responses that are verbal that are then recorded

5    by the psychologist.  And then responses on other tasks

6    that are more numerical in nature, visual in nature that

7    require not a verbal response, but a written response or a

8    choosing of a particular stimulus over others.

9         Also, there were a number of tasks that were

10   computer-based.  So she would be doing tasks and it would

11   be computer-scored or the computer would be recording her

12   responses.  So, basically, raw data is all of the recorded

13   responses of the individual.

14   *Q.*    And this is neuropsyche testing that's being

15   done.  Give us a sense of what kinds of tests that are

16   being run and what you're looking for, what you're trying

17   to measure.

18   *A.*    Sure.  So what a neuropsychologist does is look

19   at performance in a number of different domains of

20   functioning.  So they will look at memory, for example.

21   They will look at academic achievement.  They will look at

22   overall general intellectual functioning and reasoning.

23   They will look at areas like attention, executive

24   functioning, emotional functioning.

25        So a neuropsychological evaluation spans these

1   areas or domains of cognitive functioning, of brain

2   functioning.  And then there are particular tests that one

3   would do to examine these particular areas.

4       *Q.*   In your field, is there a standard battery of

5   tests that one would administer to measure these various

6   domains or areas?

7       *A.*   There are a number of accepted validated norms,

8   meaning that they have been given to a number of people

9   and then the results are -- so there's a stable pattern of

10  results in terms of people doing well, people doing

11  poorly.  That's what it means when a test is normal.  When

12  a test is standardized, it means it has been given in a

13  particular way.  So there a number of tests that sample

14  each of those domains.

15          So a neuropsychologist may -- often will do --

16  have a certain core battery that is the same for every

17  person.

18          For example, you would almost always give a

19  intelligence test, for example, because that's a

20  fundamental area of knowledge that you want to assess.

21          And then there are tests in each of those other

22  domains that I have mentioned.  That one would sample from

23  and then we have specific well norm tests in each area to

24  choose from.

25      *Q.*   The tests that Dr. Young ran here, and you in

1   turn analyzed --

2       *A.*   Yes.

3       *Q.*   -- were these tests that fall into that category

4   of standard tests that have been run many times, so you've

5   got reliable data and you've got norms, so to speak?

6       *A.*   Yes.   That's correct.   Dr. Young performed more

7   than 35 tests.

8       *Q.*   Now, running 35 tests, in your professional

9   opinion, is that considered sort of a light amount of

10  tests or a more thorough, exhaustive battery of tests?

11      *A.*   A very exhaustive battery.   And she documented

12  25 hours spent with Wendi.   And she saw her over five

13  occasions.   So that would be an extraordinarily thorough

14  battery.

15      *Q.*   Now you mentioned that you rescored the tests.

16  Why did you do that?

17      *A.*   I did that to just check for accuracy.

18      *Q.*   Okay.

19      *A.*   And, yes, that's the primary reason.

20      *Q.*   And what did you find?

21      *A.*   I found that about -- I found some typographical

22  and arithmetic errors, about three or so.   And I found

23  that they didn't change the overall analysis.

24          And there were a couple of more subjective

25  measures, I would say, that I rescored again, not based on

1  errors, just simply my own as another neuropsychologist

2  coming to the table interested in looking at it and I

3  rescored a couple of those.

4      *Q.*   So there were some scoring changes that you

5  needed to make?

6      *A.*   Yes.

7      *Q.*   What about the raw data itself?  Is there any

8  sort of realistic concern that the data itself is

9  unreliable?

10     *A.*   Well, again, it was quite a large amount of data.

11  And a number of the tests were, like I said, administered

12  by computer, so that there wouldn't be that danger of it

13  being recorded incorrectly.  And many of the tests are

14  also computer-scored.

15         As well, Dr. Young, she did some audio recording

16  of the more subjective verbal responses and then those

17  were later transcribed as well.

18         You know, in terms of the integrity of the data,

19  I felt comfortable given that there was significant

20  consistency in Wendi's performance in terms of strengths

21  and weaknesses and they hung together, which made the data

22  very solid.

23     *Q.*   That last point, is that your way of saying, that

24  if there were errors in the recording of the data, they

25  were consistently wrong in a certain way?

1    *A.*    Yeah, which would be difficult to do.  Yeah,

2    there would have to be, yeah, consistent errors and

3    consistent patterns of errors, which I just did not see.

4    I mean, her strengths hung together and her weaknesses --

5    areas of weakness also hung together.

6    *Q.*    Do you believe that -- well, let me ask you it

7    this way:  When you do this kind of work, do you typically

8    administer the tests yourself?

9    *A.*    Yes, typically.

10   *Q.*    But, in other instances, have you been asked to

11   review other peoples' raw data, as you have done here?

12   *A.*    Yes, yes.  Yes, I have, as I mentioned before,

13   served in more of a consulting role where the goal was

14   really to review someone else's raw data or someone else's

15   previous evaluations.

16           And, typically, as part of a neuropsychological

17   evaluation that I would conduct myself, especially with

18   adults, there would be previous evaluations that I would

19   be critiquing as well.

20   *Q.*    Do you believe the fact that you were not -- that

21   you just reviewed the raw data here versus administering

22   the test itself has any impact on the validity of your

23   conclusions?

24   *A.*    No, it doesn't.  Again, she conducted an

25   extraordinarily thorough evaluation with many, many hours

1   of available raw data to look at.

2      *Q.*   Before we turn to exactly what you found, I want

3   to address this issue of effort or malingering.

4         As you saw it from the State's expert report,

5   they have taken a position that generalized here, it says

6   that Wendi may not have been giving her best effort, and,

7   therefore, the results are not reliable.

8         We will talk more later about Dr. Amin's report.

9   But what I want you to tell us now is is there anything in

10  Dr. Young's testing that measures effort and measures

11  whether there is any malingering going on?

12     *A.*   Yes.  Well, I mean, the field of neuropsychology

13  has changed.  You know, the past 15 or so years, we've

14  really been focused, especially due to research indicating

15  that in particular situations, you know, notably forensic

16  ones, individuals may be more prone to not performing and

17  giving as much effort as they should.

18        And so the field has really moved towards

19  specific tests of efforts.  What we call them are

20  performance validity tests to account for this.

21        And so in Dr. Young's evaluation, again, I think

22  consistent with the thoroughness of the number of tests

23  that she gave, she gave quite a number of performance

24  validity tests.

25        In the field, we distinguish between stand-alone

1   validity tests and ones that are embedded.  Stand-alone

2   tests are tests that are designed just to measure effort.

3   That is their main focus.

4           An embedded test is a test basically that's doing

5   double duty.  It's a test that we would normally give as

6   part of the battery, say, an intelligence test, but that

7   test can also be used as a measure of validity.

8           In the testing of Wendi that Dr. Young conducted,

9   she did seven -- I mean, really, at least seven.  There

10  were actually more, but seven that she identified as

11  measures of effort, several stand-alone measures and also

12  several embedded measures, and Wendi passed all of them.

13      Q.   And is seven consistent?  You said 35 is a lot of

14  tests overall?

15      A.   Yes.

16      Q.   Is seven validity tests also in a high range?

17      A.   It's on the high end, yes.

18      Q.   Was there anything in the results that you saw?

19  And I don't mean just the validity tests.  Just the

20  results overall that gives you confidence on whether Wendi

21  was exhibiting her best effort.

22      A.   So in addition to having the actual effort tests,

23  both the stand-alone ones and embedded ones, the

24  neuropsychologist also looks at the consistency of the

25  testing.  So both in terms of -- we talked about it in

1  terms of the raw data, but also just in terms of the

2  consistency of her results.

3          So what you see are her strengths all in similar

4  domains and then we see weaknesses in similar domains.

5  And that helps us to understand a little bit more in

6  addition to the effort tests about her performance

7  validity simply because it would be nearly impossible,

8  extraordinarily difficult to know what each test was

9  measuring, especially over the course of five sessions and

10 25 hours, and then deliberately perform well or poorly in

11 these different domains and come up with the profile of

12 strengths and weaknesses that she did.

13     *Q.*    Okay.  Now we are going to turn to your analysis.

14 You told us at the outset that there were three area of

15 deficits:  Attention, executive functioning and processing

16 speed; is that right?

17     *A.*    That's correct.

18     *Q.*    Well, then let's start first with attention.

19 While the word may be self-evident, tell us what you mean

20 from a psychological or neuropsyche standpoint.  What do

21 you mean when you refer to attention?

22     *A.*    Certainly.  So attention is a very basic function

23 in that you need to have -- you need on some level to be

24 alerted, oriented, attentive even at a -- you know, in a

25 short duration in order to really have any other mental

1   activity make sense or even to conduct any other kinds of

2   mental activity.

3           So attention is a very basic function served by

4   very primitive parts of the brain initially.  But then,

5   you know, attention is also served by some of the more

6   sophisticated and more fragile networks of the brain like

7   the prefrontal cortex.

8           So there are different models of attention, but

9   one of the most common models of attention is one that

10  looks at attention from its very basic levels to more

11  sophisticated and more challenging levels.

12          So at the very basic, we have just what I had

13  mentioned, orientation, being able to respond to very

14  discreet stimuli, focused attention.

15          Then we have one's ability to sustain attention

16  over time, sustained vigilance over a period of minutes or

17  hours.

18          Then we have one's ability to alternate

19  attention.  Direct cognitive activity from one task and

20  then shift it to another.

21          Then we have the ability to selectively attend.

22  To attend to one thing in the face of competing stimuli

23  and ignore that stimuli.

24          You could think at the very top level, we have

25  really essentially what is multi-tasking, which is being

1  able to direct equal amounts of attention to something at

2  the same time or divided attention.

3      Q.   Did the tests that Dr. Young administer measure

4  each of those levels of attention from the most simplistic

5  up to the divider, multi-tasking?

6      A.   Yes.  She conducted a number of attention tests

7  that span those various difficulty levels with Wendi.

8      Q.   And how did Wendi do?

9      A.   So, again, hearkening back to the simple versus

10 complex, Wendi did well in the average range.  She had a

11 couple of scores in the low average range, a couple in the

12 above average range on simpler attention tasks.  Simple

13 orientation, quickly canceling numbers that she saw on a

14 page, or being able to repeat a string of numbers

15 backwards and forward.  Very simple oriented attention.

16      She had more difficulty with the more complex

17 aspects of attention, shifting attention back and forth

18 between two different types of cognitive tasks or being

19 able to selectively attend to one or divide her attention

20 between two.

21      Q.   Okay.  Now was there any particular tests that

22 you can describe to us where she had struggles?

23      A.   Yes.  I think the best example would be the

24 Connor's Continuous Performance Test, the second edition

25 of that.  That is a computerized task which it takes

1  usually about 15, 20 minutes, somewhere in that range.  It
2  assesses sustained attention to that vigilance of being
3  able to sustain attention over a period of time,
4  selectively attend, and to alternate attention between two
5  different types of cognitive tasks.  It is computer-based.
6          Essentially what you need to do is every time a
7  certain letter comes up -- every time X comes up, you
8  ignore it.  And every time another letter of the alphabet
9  comes up, you respond to it by pressing a space bar or
10 mouse.
11         Wendi's performance on that was on four of the
12 seven indicators of attention, it indicated problems.  So
13 problems with attention in four of seven subtests of that
14 measure.
15     Q.   When you say she had problems, I believe -- these
16 are all scored; right?
17     A.   Yes.
18     Q.   What was her score on these areas?
19     A.   So the average range for all of these tests
20 essentially is the 25th to 75th percentile.  On this
21 particular attention test, and like I said, there were a
22 number of subtests of this test, Wendi's scores range in
23 the problematic attention areas from less than the first
24 percentile to the 18th percentile, meaning that, you know,
25 at the worst, she was -- more than 99 percent of the

1  population of individuals of her age actually were

2  performing better than she did.

3     *Q.*   Dr. James, how does this translate to the real

4  world when somebody has problems with these more complex

5  attention functions?  Tell us what that means in everyday

6  life.

7     *A.*   So I think it's easier to understand that in

8  terms of understanding some of how she performed.  And,

9  really, she had the most difficulty on tasks where, in

10  this particular computer task, in that her responses were

11  slow.  Her reaction time was slow.  And the areas -- and

12  it was also highly variable.  So variable both within her

13  own self, her own performance on the tasks earlier and

14  later and also in comparison to others.

15          What also happened was that as tasks changed, the

16  stimuli is presented at even intervals, one second,

17  sometimes at two-second intervals, sometimes at

18  four-second intervals.

19          When the interstimulus interval changed, so when

20  it went from two seconds to four seconds to one second, it

21  changes randomly, she was unable to keep up with those

22  changes.  And so her scores deteriorated significantly.

23  That's when she actually performed at less than the first

24  percentile.

25          So what that means in real life is that what

1  we're talking about is responding to the changing demands

2  of the situation or the task.  That as the task changes,

3  as the demand changes, as what's required changes, she is

4  unable to keep up with -- keep pace with the task.

5      Q.   Okay.  Does she have an ability to adjust her

6  behavior to changing demands?

7      A.   It's very difficult.  Her performance on these

8  tests indicate that it is very difficult for her to do so.

9           Again, we're looking at her performance in these

10  tests under relatively a stress-free environment.  I mean,

11  there is some stress being associated with being tested.

12  But you in a more complex or high stress situation, you

13  would expect her to deteriorate further in terms of her

14  ability to change with the changing demands or situation.

15      Q.   We will now turn to the second area of deficit

16  that you noted was executive functioning.  Give us kind of

17  an overview of what you mean by executive functioning.

18      A.   Sure.  So executive functioning a little bit of a

19  complex concept.  I mean, it's not unitary and it really

20  involves a number of different types of abilities that

21  fall under this umbrella.

22           We're really talking about mental -- the mental

23  organizational processes involved in initiating,

24  implementing, being able to revise and monitor a plan of

25  action.  So we're talking about goal-directed behavior and

1  all of the factors involved in being able to function

2  efficiently and effectively.

3          It's really the bridge to real world functioning

4  and it includes abilities such as working memory, the

5  short-term memory, the ability to hold information in your

6  mind, and then use it to guide behavior.

7          It refers to initiation, being able to get

8  started on the task without being prompted or reminded.

9          It refers to flexibility, being able to shift

10  from one way of thinking or one sort of behavioral plan to

11  another.

12          It involves being able to control impulses and

13  also recruits attention in terms of being able to sustain

14  attention to a task long enough to be able to complete it.

15      Q.   And Dr. Young, did she administer tests that

16  measured executive functioning?

17      A.   Yes.   She administered a number of measures that

18  looked at working memory, particularly organization,

19  decision making, flexibility, et cetera.

20      Q.   How did Wendi do on those tests?

21      A.   So Wendi had again a similar pattern of when the

22  task was relatively simple, again, you could think of like

23  a digit span backwards task where she doesn't have --

24  where she is being read digits backwards, and then she's

25  read digits in a forward sequence and then she has to

1   remember them in a backwards sequence, and she did fine.

2   But when you add more demands, when you increase the load,

3   increase the complexity, then she really struggles.

4       *Q.*   Let's walk through a couple of these tests.  What

5   particular tests did she take and how did they turn out?

6       *A.*   So there is one particular test that is the very

7   high load on working memory.  It's called the Paced

8   Auditory Serial Addition Test.

9           THE COURT:  Can you repeat that?

10          THE WITNESS:  Yes.  It's the Paced Auditory

11  Serial Addition Test, the PASAT.  And Wendi scored in the

12  7th percentile on that test on the first trial; in the

13  4th percentile on the second trial; and in the

14  2nd percentile on the third and fourth trials.  And, in

15  fact, she performed so poorly on the first trial, it could

16  have been discontinued.

17          The test essentially, it's quite challenging, and

18  it basically involves a series of numbers being read

19  aloud.  So like one, two, five at an interval initially at

20  about two seconds -- no, it's 2.6 seconds in between each

21  number.  What the person is required to do is add the

22  numbers together, the first two numbers together.  Then

23  hold in mind the next number that they are hearing and

24  add those last two numbers together.

25          So you're constantly spitting out a response or

1    an answer, but holding in mind the last one so you can add

2    them together.

3        *Q.*   BY MR. NICKELS:  And you had said to me based on

4    the numbers that's now 2, 7, 4 percent.  Again, I think

5    did you say the average for all of these is always 25 to

6    75?

7        *A.*   Yes.  That's correct.

8        *Q.*   What other tests were administered in the

9    executive functioning area?

10       *A.*   Sure.  So what we also saw -- you know, when I

11   looked at this data, what I also saw was that difficulties

12   in this area of decision making.  And that again involves

13   this idea of cognitive flexibility and how one responds in

14   the face of certain -- certain behavioral contingencies,

15   let's say.

16           So the example for that is the Iowa Gambling

17   Test.  That's a measure that looks at the ability to

18   flexibly change your responses depending on the

19   contingency, depending on what's being presented.

20           So the paradigm is really a gambling paradigm.

21   The individual is given a certain amount of money and the

22   task at the end of 100 trials of this test is to end up

23   with more money than you had originally, or at least not

24   to lose money.

25           And there are four different decks of cards from

1  which to choose and each deck has a different win/loss

2  ratio.  It's a different cost benefit ratio.  And so as it

3  goes along, the individual is picking from these decks and

4  making decisions about how to pick from further decks

5  based on their performance.

6      Q.   Okay.  So you're getting feedback as you pick

7  from the cards?

8      A.   Yes.

9      Q.   And so the test is how are you processing the

10 feedback?

11     A.   Yes.  How are you responding to it?  How are you

12 making decisions?

13     Q.   Okay.  And how did Wendi respond to the feedback

14 processing?

15     A.   So her overall score was in the below average

16 range.  But I think that what was more striking was really

17 her tendency to pick from Deck A.  Now Deck A of the four

18 decks has a high -- has a very high -- it's basically a

19 very high risk deck.  It has a high rate of reward or

20 return but also a high rate of punishment.  And,

21 typically, people figure out very quickly that that's not

22 the deck that they want to choose from.

23          In fact, the authors of the Iowa Gambling Test,

24 their research indicates that neurologically intact people

25 rarely continue to pick from Deck A and that a higher

1   number of picks from that deck indicates some real

2   decision making impairment, and that's what we saw with

3   Wendi.

4       *Q.*   She stuck with Deck A?

5       *A.*   Yes.  She had a higher number.  She did pick from

6   other decks, and but she had a somewhat higher pick from

7   Deck A.  It was somewhat unusual in terms of the scoring.

8       *Q.*   What about this Rey-Osterrieth Test?  I

9   understand that was another one that measured executive

10  functioning?

11      *A.*   Yes.  So the Rey-Osterrieth is an old

12  neuropsychological measure that has been used for many,

13  many years that really looks at one's ability to organize

14  their approach to a task.

15          It's a figure that is very complex.  It's

16  visually presented in front of a person and they're

17  required to copy it.  what you're interested in looking at

18  is how they copy it, the approach that they take to

19  copying it.  Do they see the big picture or do they focus

20  on the details?  And the integrity of the copy.

21          There is also a measure of the visual spatial

22  understanding there.  Do they have the proper relationship

23  between the visual spatial elements of the test?  But it's

24  an executive functioning measure in terms of the approach

25  to the task.

1    *Q.*   How did Wendi do when she was asked to copy the
2    picture?
3    *A.*   She actually did quite well when she was asked to
4    copy it and she showed good memory of the figure
5    30 minutes later.
6    *Q.*   Were there any other aspects of this test,
7    though, where she did not do as well?
8    *A.*   Yes.  She had pretty significant difficulty on
9    the recognition aspect of the test.  And what that is
10   basically is after the 30 minutes are over and you've
11   copied it again -- I mean, sorry.  You've produced the
12   figure again from memory without seeing it again.
13   Straight after that, there is a recognition test.
14          Basically what that is is that the original
15   figure is taken and broken up into different pieces and
16   put on four different pieces of paper.  And the trick to
17   it is is that some of the pieces of the figure were really
18   there and then there are drawings that are on the four
19   pieces of paper that actually weren't part of the original
20   figure.
21          And the task is for the person to recognize --
22   that's why it's called a recognition test -- recognize
23   which aspects were part of the original and which were
24   not.
25          On this aspect of the test, she performed very

1  poorly, in the 2nd to 5th percentile for both recognizing

2  in her mind recognizing pieces of the figure that weren't

3  actually there and then identifying pieces being there.

4  I'm sorry.  False for -- not recognizing -- missing,

5  basically, parts of the figure that were there.

6         So she was missing and then she was also saying

7  that pieces were there that actually weren't there.  And

8  she scored at the 2nd to 5th percentiles for both of

9  those.

10  Q.   What does it tell you that Wendi did fine on the

11  part of this test where she had to draw it from memory,

12  but then struggled when, you know, additional parts were

13  added in?

14  A.   Again, it's this idea of being faced with more

15  information, overwhelmed with a larger amount of

16  information.  On four pages, you have quite a number of

17  drawings and you have to distinguish between what was

18  there and what was not there, as opposed to, you know,

19  drawing the figure that you remember after 30 minutes.

20         So it's again back to this idea of complexity and

21  being overloaded by a large amount of information.  When

22  faced with that large amount of information, her ability

23  to distinguish between what was present and what wasn't

24  and accurately remember became -- became lost.

25  Q.   Were there any other executive functioning

1  testing that you found notable?

2      *A.*    Yeah.  Again, this is a measure -- what we also

3  do as neuropsychologists is we look at the executive

4  components of tests that aren't necessarily designed to

5  measure executive functioning directly.

6          So the Rey-Osterrieth is one example of something

7  that is designed to measure executive functioning as well

8  as other things.

9          The California Verbal Learning Test is a verbal

10  memory test, but it has specific executive functioning

11  components.  It's a long list of words, 16 words, that a

12  person is read aloud and then subsequently asked to tell

13  the examiner as many of those words as they can remember.

14          And while Wendi did well on aspects of that test

15  in terms of her delayed recall of the list, for example,

16  she struggled in the beginning when she was given the

17  list, and then asked to tell as many words as she could

18  remember, she was only able to remember about five of

19  16 words on the first trial.  You know, less than a third.

20  And certainly for her age, falling significantly below

21  average in the 7th percentile for her age.

22          And basically what that was is again overload,

23  overwhelmed.  I'm reading a long list of words and then

24  she is only able to give me a few.

25          And what was interesting is that pattern repeated

1   itself.  And so after several trials of the list, she was

2   learning, but then presented with a completely different

3   list, again, only four of 16 remembered.

4      Q.   So you have been stressing this point of overload

5   and overwhelmed.  Somebody who suffers from that,

6   overwhelms easily from the complexity of heavy loads,

7   again, how does that translate to everyday life?

8      A.   Well, again, in situations, particularly when

9   there is high stress, when there are multiple demands

10  being placed on the person, when there is more complexity,

11  any element that can -- another example would be, you

12  know, again, are emotions running high.  When there are

13  any elements that can increase the complexity of the

14  situation, increase the stress of the situation, her

15  threshold for being overwhelmed, and that having her brain

16  function in a way that is not adaptive, not helpful, her

17  threshold is lower.  It's much -- it's much lower.

18     Q.   What happens to somebody when they overwhelm,

19  when things start shutting down?

20     A.   When their neurological system is overwhelmed, a

21  number of things could happen.  One is just a shutdown and

22  a withdrawal from the situation.  You know, it's really

23  just sort of going into yourself.

24          Another is becoming more inflexible and therefore

25  stuck in routines or patterns of behavior that are not

1  adaptive, that are maladaptive, but that you can't get out

2  of.

3          Another is to have, you know, emotional outbursts

4  for it to be displayed, you know, in an acting-out type of

5  manner.  Another is to become increasingly impulsive.

6      Q.  Let's wrap up this part of your testimony with

7  the processing speed.  You said that was the third area

8  where Wendi didn't do as well.

9          As we did with the other two, could you start off

10  by explaining to the Court what you mean by processing

11  speed?

12     A.  So information processing speed is really, you

13  know, the -- it's really the degree or how quickly in

14  which you're able to input information, take in

15  information, and then to output information.  Essentially,

16  it's efficiency, efficiency learning, how efficient you

17  are in taking information in and then outputting that

18  information.

19          And it's an important component of thinking and

20  learning and behavior because we see in some particular

21  kinds of diagnoses, while someone is able to learn, when

22  you learn more slowly and less efficiently, that can

23  really cause a lot of problems in everyday life, not to

24  mention when the situation is made more complex or

25  stressful.

1      So that's essentially what it is.  It's being

2  able to input information quickly and output information

3  quickly.

4      Q.   And there were tests run here that measured

5  processing speed?

6      A.   Yes.  There were a number of tests that did that.

7  And what I found in terms of looking at the raw data was

8  that in just about every test where there was a time

9  component -- and often in these tests that are timed, the

10  individual being timed is not aware that they're being

11  timed.  So they're not explicitly told you are being timed

12  now or you have 60 seconds to do this.  Sometimes, but

13  often not.

14      She performed poorly.  And when I say poorly, I

15  mean less than the 1st percentile, the 2nd percentile, the

16  9th percentile, the 5th percentile.  There were a number

17  of tests.  I think the combination of that is taking a

18  look at her Intelligence Index Scores.  The intelligence

19  sources is made up of four components:  Her verbal

20  ability; her nonverbal visual ability; her very basic

21  working memory skills; and then processing speed.

22      Processing speed was an overall standard score of

23  76, which is at the 5th percentile range.

24      Q.   I understand there was a particular vocabulary

25  test with a time component that you found notable?

A.   Yeah.  It was interesting how just simply adding the stress of a timed component to the task would overload Wendi in terms of looking at the scores.

So and it is often something that we do again is to look at this distinction between how someone functions on a simpler task versus a more complex one.

So the simpler task would be vocabulary as part of the WAIS 4, which is the standard intelligence test.

There is a subject called vocabulary where the individual is asked to define vocabulary words.  And Wendi did very well on that test.  She scored at the 50th percentile, solidly within the average range for her age.  She was able to define a number of vocabulary words.

But then when a test that was given that essentially got at the same kind of component, her vocabulary.  Vocabulary is a big part of this.  And she timed.  It was the timing component that really seemed to derail her.

So this latter test is called Verbal Fluency. It's part of a battery of executive functioning measures. She performed I believe at the 9th percentile for that test.

Essentially what that is is you're told I'm going to give you a letter and I want you to think of as many words that begin with that letter as you can.  Again, it

1   draws very much on your vocabulary.  Someone with a poor

2   vocabulary wouldn't be able to generate very many words.

3        But Wendi's performance dropped off significantly

4   from the 50th to the 9th percentile despite having a

5   strong vocabulary.  And it was really the addition of the

6   element of the time component that derailed her.

7   Q.   So on the basic vocabulary of just knowing words,

8   she was at the 50th percentile?

9   A.   That's correct.

10  Q.   When you add in the little complexity of timing,

11  she went down to the 9th percentile?

12  A.   That's correct.

13  Q.   And, again, is that showing this lower threshold

14  of being overwhelmed?

15  A.   Yes.  I mean, the time component puts stress on

16  the prefrontal cortex systems, which are not only -- so

17  when you're doing the latter task, you're not only tapping

18  into areas of the brain that control language, which is

19  typically the left hemisphere of the brain is very

20  language centered, but you're also tapping into this

21  prefrontal cortex, which is involved in being able to

22  quickly in an organized way retrieve those words.  So

23  you're tapping into two areas of the brain.

24        And, similarly on other measures in other

25  domains, where there was a combination of brain areas

1   involved, motor and tactile, for example, that's where we

2   see deficits in Wendi's performance.

3       *Q.*   So for all three of these areas, attention,

4   executive functioning, processing speed, you have talked

5   low thresholds being overwhelmed, and how that can lead to

6   a shutdown and impulsive behavior.

7           Is there a cumulative effect?  When you've got

8   deficits in a number of areas, do they work together to

9   make these symptoms even worse?

10      *A.*   Yes.  I mean, in some ways, it's almost artifical

11  to separate these three areas because they just

12  work usually -- they're supposed to work so seamably

13  together.  And the brain -- the brain is extraordinarily

14  complex and the prefrontal cortex is really the boss.

15  It's the CEO of the brain and it brings everything

16  together.  It's tracking all the inputs and then giving

17  instructions to all of the rest of the parts of the brain.

18          So when that area is not functioning properly,

19  then there is really a breakdown in communication between

20  the brain -- that part of the brain and other parts,

21  recruiting language, being able to recruit memories, being

22  able to put a stop on impulses, being able to consider

23  plans of actions, think ahead.

24          You know, all of those abilities are sort of run

25  and managed by this CEO, and when that CEO is not working,

1   then you have a breakdown in the system.

2      Q.   Finally, Dr. James, we're going to talk about,

3   you know, the State's report, which is prepared by

4   a Dr. Amin.  Have you had a chance to review that?

5      A.   Yes, I have.

6      Q.   There's a couple of areas that I want to focus

7   on.  You told us earlier that Dr. Young did a

8   comprehensive battery of tests.

9           What about Dr. Amin?  How does his battery of

10  tests compare to what Dr. Young performed?

11     A.   Well, I mean, his battery of tests was not as

12  comprehensive as Dr. Young's?  It really -- he, for

13  example, did seven measures and documented in his report

14  that he saw Wendi over two occasions, but spent about two

15  hours and 44 minutes in direct testing with her.

16          Again, as I've said, you know, in contrast,

17  Dr. Young spent 25 hours with Wendi over five occasions

18  and conducted over 35 tests with her.

19     Q.   And what about this area in which you just talked

20  about the CEO of the brain, the executive functioning?

21  Did Dr. Amin run tests in that area?

22     A.   Of the seven tests that he gave Wendi, he did

23  repeat the Rey-Osterrieth Complex Figure.  He didn't talk

24  about it as a measure of executive functioning.  Although.

25  I would say most neuropsychologists would consider it

1  primarily a measure of executive functioning.  He talked

2  it about it as a visual memory measure.  So one out of his

3  seven.

4      Q.   And that was the only one in your view that

5  tested executive functioning?

6      A.   Yes.  It would be the only one that a

7  neuropsychologist would see as a measure of executive

8  functioning, as a primary measure.

9      Q.   How did Wendi do on the Rey-Osterrieth Test?  And

10 just to remind the Court, is that the one where you're

11 drawing the figure --

12     A.   Yes.

13     Q.   -- and you're putting the pieces back together,

14 that test?

15     A.   Yes.  And she did well on it and I do believe

16 that she did -- as I mentioned, she previously did well on

17 it and I think she showed the same pattern I believe of

18 more difficulty with the recognition.  But she generally

19 did well or even a little bit better than she did with him

20 -- did for Dr. Young.

21     Q.   Overall, her scores on that test with Dr. Amin

22 were higher --

23     A.   Yes.

24     Q.   -- than they had been with Dr. Young?

25     A.   I believe so.

1    *Q.*   What do you attribute that to?

2    *A.*   So generally what you see is this what we call

3    the practice effect.  It's a phenomena in the

4    neuropsychological literature and in assessment literature

5    that's well accepted.

6          It's this idea that when you've been exposed

7    previously to a test, even if you're just exposed not to

8    the materials itself, but even to the method or procedure

9    in taking the tests, there is a likelihood that you will

10   do better the second time around.  And that's known as the

11   practice effect.

12         And, you know, it doesn't mean that you -- we

13   don't -- we don't know how long a practice effect can be

14   in existence.  Sometimes it's over weeks.  Sometimes it's

15   over months or sometimes it's even over years.  So it's

16   important to even note, though, that the practice effect

17   exists to give the test, but then to interpret the results

18   in light of that practice effect.

19   *Q.*   Do all of these tests have a practice effect or

20   are some more susceptible to that phenomena?

21   *A.*   Some are more susceptible.  Memory tests are more

22   susceptible to practice effect.  Tests with more unique

23   solutions, so kind of like a one-shot test where you would

24   see or figure it out, figure the solution out.  And then

25   it's unlikely that, you know, the second time around, if

1  you figured it out the first time -- even if you don't

2  consciously remember it, the fact that it was like a

3  single solution and very unique would make it more likely

4  that you would perform well on it again, even

5  unconsciously.

6      Q.  This Rey-Osterrieth Test, which is the sole

7  executive functioning test run by Dr. Amin, how does that

8  one rate in terms of susceptibility to the practice

9  effect?

10     A.  Well, it is sort of a single solution test, in

11  that it's very unique looking.  I often have patients tell

12  me that when they see it again:  Oh, that's -- I've seen

13  that, you know, that spaceship looking figure before.

14  It's fairly recognizable.

15     Q.  Dr. Amin also offers an opinion on malingering

16  and, again, to be generalized and say he said he believes

17  Wendi may not have been giving her best effort.  Have you

18  reviewed that part of his report?

19     A.  Yes.  Again, you know, I had some concerns about

20  the comprehensiveness of Dr. Amin's evaluation in terms of

21  the number of the tests given, and then consistent with

22  that, the number of specific tests of performance validity

23  or effort that were given.  He gave two stand-alone

24  measures of effort in his evaluation, which was

25  considerably less than Dr. Young.

1    *Q.*    Dr. Young did how many?

2    *A.*    Seven.  You could say eight, even.

3    *Q.*    Okay.  And tell us about those two tests of

4    performance validity that were run by Dr. Amin.

5    *A.*    So one is the Validity Indicator Profile, or the

6    VIP.  And Wendi's performance on that test did not

7    indicate any concerns with effort or performance validity.

8    *Q.*    So, essentially, she passed that test?

9    *A.*    She passed that test.

10   *Q.*    And then there was one other test that could

11   measure effort?

12   *A.*    Yes.  That was the Structured Inventory of

13   Malingered Symptoms, which is basically a self-report

14   inventory where one I believe indicates true or false for

15   different kinds of symptoms, mood symptoms, feeling

16   fatigued, memory problems, some problems even associated

17   with psychosis and thought disorder, thinking unusual

18   things.

19   *Q.*    How did Wendi do on that test?

20   *A.*    So her score on that test was a raw score of 15.

21   And the cutoff in terms of thinking about the cutoff that

22   has been typically used as a total score is 14.  So she

23   was just one above the cutoff in terms of thinking about

24   effort.

25   *Q.*    So to the extent she failed, it was sort of --

1    *A.*    Yeah.  It was one point, yeah.

2    *Q.*    Now, stepping back, this self-reporting test you

3    just described, is that considered in your field to be a

4    good measure of effort?

5    *A.*    Well, it's used, but the research around it

6    indicates that it's quite problematic.  But self-report in

7    general for effort is not very good.  It's not very

8    reliable.  And this test, in particular, studies that have

9    been done with it, again, with this total score have found

10   that it has a relatively high error rate in the sense that

11   the error rate is about 40 percent.

12         One study that was done in 2007 found that people

13   who were performing credibly had an average score on the

14   test of 14.9.  So if the cutoff of 14 is used, then those

15   people performing credibly would be seen as not performing

16   credibly and actually malingering.  And that's

17   problematic.

18         It's really an issue of what we call specificity.

19   The test's ability to not only identify and recognize

20   people who are not putting the effort who are performing

21   in a noncredible manner, but tests ability to only to

22   restrict its identification to those people who are

23   performing in a noncredible manner.  To restrict its

24   identification to those people, and not to accidentally

25   identify people who are performing credibly as not.

1    And this test has a high -- what is called a high

2  false positive rate, which is that 40 percent of the

3  people who are performing credibly on the test are

4  misdiagnosed as performing -- as malingering, and that's a

5  problem.

6    *Q.*   So of all of the effort tests that Wendi took

7  between the two from Dr. Amin and the seven or eight from

8  Dr. Young, the only one she failed was the one that has a

9  high rate of false positives?

10    *A.*   That's correct.

11    *Q.*   I have no more substantive questions, but before

12  I let you go, could you just -- you wrote a report; is

13  that right?

14    *A.*   Yes, I did.

15    *Q.*   Could you look at Exhibit 167?

16    *A.*   Yes.  I'm looking at it now.

17    *Q.*   Is that a copy of your report?

18    *A.*   Yes, it is.

19    MR. NICKELS:  Okay.  Again, this has already been

20  admitted into evidence, but I just wanted to highlight it

21  in case anybody wants to take a look at it.

22    I have no further questions, Your Honor.

23    THE COURT:  Mr. Hazard.

24    MR. HAZARD:  Thank you, Judge.

25

1                     CROSS-EXAMINATION

2  BY MR. HAZARD:

3      *Q.*    You never did an evaluation of Ms. Andriano;

4  correct?

5      *A.*    That's correct.

6      *Q.*    You never met with her?

7      *A.*    That's correct.

8      *Q.*    You never spoke with her?

9      *A.*    That's correct.

10     *Q.*    All right.  And you're familiar I assume with the

11 APA Ethics Code; correct?

12     *A.*    That's correct.

13     *Q.*    And what is the APA?  What does that stand for?

14     *A.*    American Psychological Association.

15     *Q.*    I'm going to talk to you about the section that

16 deals with the Principle No. 9, assessments.

17     *A.*    Okay.

18     *Q.*    In particular, 9.01.  Are you familiar with that,

19 Doctor?

20     *A.*    Yes, I am.

21     *Q.*    First, I'll just read 901 (C):  When

22 psychologists conduct a record review or provide

23 consultation or supervision, and an individual examination

24 is not warranted or necessary for the opinion,

25 psychologists explain this and the sources of information

1   on which they base their conclusions and recommendations.

2         You're familiar with that principle; correct?

3   *A.*   Yes.

4   *Q.*   Did you follow that principle with your work

5   here?

6   *A.*   Yes.

7   *Q.*   And then I'll read you now 901 (B):  Except as

8   noted in 901 (C), what we just talked about, psychologists

9   provide opinions of the psychological characteristics of

10  individuals only after they have conducted an examination

11  of the individual adequate to support their statements or

12  conclusions, period.

13        Do you think you followed the principles in your

14  work in this case?

15  *A.*   Yes, I do.

16  *Q.*   Okay.  It goes on:  When, despite reasonable

17  efforts, such an examination is not practical,

18  psychologists document the efforts they made and the

19  result of those efforts, clarify the probable impact of

20  their limited information on the reliability and validity

21  of their opinion and appropriately limit the nature and

22  extent of their conclusions or recommendations.

23        You're familiar with that as well; correct?

24  *A.*   Yes, I am.

25  *Q.*   And you think you followed that principle in your

1  work in this case?

2      *A.*   Yes, I do.

3      *Q.*   Can you show me in your report where you mention

4  anything about being limited by not being able to do an

5  evaluation of Ms. Andriano and an actual assessment or an

6  interview?

7      *A.*   Well, I think -- it's not mentioned in my report,

8  but I think I would qualify that by saying that what I did

9  here was a different -- wasn't an assessment as indicated

10  in the ethical principles that you're quoting.  It's

11  really a consultation is what I did.  And I did that based

12  on the information that I had available to me, which was

13  quite extensive.

14      *Q.*   But you're testifying today in court.  So that's

15  more than a consultation; would you agree?

16      *A.*   Well, I'm testifying to the results of my

17  consultation.

18      *Q.*   Okay.  But you also made a diagnosis in your

19  report; did you not?

20      *A.*   Yes, I did.

21      *Q.*   And could you state your diagnosis of

22  Ms. Andriano, what you believe she was suffering from?

23      *A.*   Yes.  Cognitive disorder, not otherwise

24  specified.

25      *Q.*   And is that a consultation or is that more than a

1   consultation?

2      *A.*   It can be included in a consultation.  In this

3   case, I believe that it sufficiently represents that

4   consultation.

5      *Q.*   You testified that you found some errors that

6   Dr.  Myla Young made her in her calculations; is that

7   correct?

8      *A.*   That's correct.

9      *Q.*   But your testimony is, that notwithstanding those

10   errors that you found and corrected, you still agree with

11   Dr. Young's opinions?

12      *A.*   Yes.  That's correct.

13      *Q.*   So those errors that she apparently made do not

14   change your opinion on this case whatsoever; correct?

15      *A.*   No, they do not.

16      *Q.*   And to be fair, you obviously were not there when

17   Dr. Young was administering these various tests to

18   Ms. Andriano?

19      *A.*   That's correct.

20      *Q.*   So do you know for sure that Dr. Young didn't

21   make any sort of errors in administering those tests,

22   since you weren't there?

23      *A.*   I wouldn't know for sure, but, like I had

24   mentioned, the pattern of strengths and weaknesses and it

25   is very consistent and the extensive nature of the

1  evaluation and the raw data really supports the

2  conclusions that I've come to.

3      Q.    You mentioned on Page 6 of your report and

4  summary and implications, to go along with the statements

5  you just made.  And I know on direct, counsel talked to

6  you about the deficits that you've found and Dr. Young

7  found, but on Page 6, you also state the strengths of

8  Ms. Andriano; correct?

9      A.    That's correct.

10     Q.    And you state, quote:  She demonstrates relative

11 strengths in core knowledge and reasoning, particularly in

12 the verbal domain where she shows strong language base,

13 conceptual and problem solving abilities and well

14 developed abstract thinking skills.

15         And you still agree with that opinion; correct?

16     A.    Yes.

17     Q.    You further state:  She also demonstrates

18 strengths in core academic skills, including reading

19 decoding, reading comprehension and mathematical reasoning

20 and calculation.

21         And you still stand behind that opinion; correct?

22     A.    Yes, I do.

23     Q.    With respect to these deficits in attention

24 executive functioning and information processing, are your

25 opinions based solely on your analysis of the raw data and

1  drawing your own conclusions from that raw data of the

2  tests that Dr. Young administered?

3      *A.*   Yes.

4      *Q.*   Did you ever base any of your opinions or

5  testimony on the conduct that Ms. Andriano, as the State's

6  evidence that was presented at her trial, her conduct in

7  the weeks leading up to October 8th of 2000 and the

8  homicide that occurred in this case?

9      *A.*   No, I did not.

10     *Q.*   Well, would you agree that from the -- if the

11  State's evidence was accurate that Ms. Andriano -- I mean,

12  are you aware of the facts of the evidence that was

13  presented at her trial?

14     *A.*   No.  I really -- my opinions are based on the

15  analysis that I did.

16     *Q.*   Then you were not aware that when Ms. Andriano

17  was interviewed by police just hours after the homicide,

18  that during a break in that interview, she contacted a

19  co-worker?  Were you aware of that?

20     *A.*   No, I was not.

21     *Q.*   That she called this co-worker and told her --

22  asked her to remove some paperwork that Ms. Andriano left

23  behind in the office of the apartment complex she worked

24  for.  You weren't familiar with that?

25     *A.*   No.

1    *Q.*   And you obviously weren't familiar, then, that

2  there was testimony that a police sergeant went to that

3  office and found that co-worker actually going through

4  that paperwork and stopped her?  You weren't familiar with

5  that fact?

6    *A.*   No, sir.

7    *Q.*   And located within some of that paperwork was

8  evidence that incriminated Ms. Andriano and was used

9  against her in her trial.  You weren't aware of that?

10    *A.*   No.

11    *Q.*   Do you think that during a police interview just

12  hours after the death of her husband, when police are

13  interviewing Ms. Andriano, when she's giving her account

14  of how the death of her husband occurred -- do you think

15  that that would be a situation where Ms. Andriano might be

16  overloaded?

17    *A.*   Potentially.

18    *Q.*   Does the fact that she was able to on a break

19  think about the possibility of incriminating evidence and

20  taking steps to try to get rid of that incriminating

21  evidence, isn't that goal-oriented?

22    *A.*   Again, I think that's a difficult -- that's a

23  difficult question for me to answer not having been

24  there --

25    *Q.*   Okay.

1      *A.*      -- and not knowing the specific circumstances or

2  her responses.

3              MR. HAZARD:  Thank you, Doctor.

4              No further questions.  Thank you.

5              THE COURT:  Mr. Nickels, any redirect?

6              MR. NICKELS:  No, Your Honor.

7              THE COURT:  May this witness be excused?

8              MR. NICKELS:  She may.

9              THE COURT:  Doctor, you are excused.

10             THE WITNESS:  Thank you, sir.

11             THE COURT:  Don't walk off with any exhibits.  I

12 don't think you have any exhibits there.

13             THE WITNESS:  No, I don't.

14             THE COURT:  You're excused.  Thank you very much.

15             THE WITNESS:  Thank you.

16             (WHEREUPON, the witness exited the courtroom.)

17             THE COURT:  Mr. Nickels.

18             MR. NICKELS:  Our next witness is David DeLozier.

19 He's going to be probably a lengthy witness.

20             THE COURT:  Do you want to take our morning break

21 right now?

22             MR. ARNTSEN:  Yes, Your Honor.  They're on their

23 way over here right now.

24             THE COURT:  All right.  Let's go ahead and take

25 our morning break at this time, then.  We will be in

 1   recess.

 2           (WHEREUPON, a recess ensued from 10:38 a.m. to

 3   10:57 a.m.)

 4           THE COURT:  This is CR 2000-096032, State of

 5   Arizona vs. Wendi Elizabeth Andriano.

 6           The record will reflect the presence of the

 7   parties and counsel.

 8           The Petitioner may call her next witness.

 9           MR. LYNCH:  Your Honor, one housekeeping matter

10   before calling the next witness.  There are a number of

11   exhibits that are invoices from David DeLozier to either

12   Wendi Andriano or her parents, the Ochoas.

13           I've spoken with the State, and rather than go

14   through the time of authenticating and admitting each one

15   individually, the State has agreed to stipulate to their

16   admission.

17           THE COURT:  Okay.

18           MR. LYNCH:  Those exhibit numbers are Nos. 82 and

19   Exhibits 116 through 130.

20           THE COURT:  Does that sound correct?

21           MS. GARD:  Yes.

22           THE COURT:  Then Exhibit No. 82 and

23   Exhibit Nos. 116 through 130 for identification are

24   admitted into evidence.

25           Mr. Lynch.

1          MR. LYNCH:  The Petitioner calls David DeLozier.

2          THE COURT:  Mr. DeLozier, if you could please

3     step forward to the witness stand here.  Before you sit

4     down, Mr. DeLozier, if you would please face the clerk and

5     give the clerk your full name.  Raise your right hand and

6     she will swear you in.

7          THE CLERK:  Can you please state your name and

8     spell your name for the record?

9          THE WITNESS:  Sure.  George David DeLozier, Jr.

10    D-E-L-O-Z-I-E-R.

11          (WHEREUPON, the witness was duly sworn by the

12    clerk.)

13          THE COURT:  Make yourself comfortable there on

14    the witness stand.  Please remember to speak up so that

15    everyone can hear you.  Also, please wait until the

16    question is completed before you answer the question and

17    make sure that you give us a verbal response.  Help

18    yourself to the water there.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  Mr. Lynch, you may proceed.

21

22          GEORGE DAVID DELOZIER, JR.,

23    having been first duly sworn to tell the truth, the whole

24    truth, and nothing but the truth, testified as follows:

25

<pre>
 1                    DIRECT EXAMINATION
 2  BY MR. LYNCH:
 3       Q.    Good morning, Mr. DeLozier.
 4       A.    Good morning.
 5       Q.    What do you do for a living?
 6       A.    I'm a lawyer.
 7       Q.    Where?
 8       A.    In Phoenix, Arizona.
 9       Q.    At what firm?
10       A.    In my own firm.
11       Q.    How many attorneys do you have?
12       A.    Presently, just me.
13       Q.    How many attorneys have you had at any time in
14  the past?
15       A.    Five, six.
16       Q.    How long have you had your own firm?
17       A.    Since about 1980.
18       Q.    During the time you've had your own firm, from
19  1980 through the present, has your firm done criminal
20  work?
21       A.    Yes.
22       Q.    When did you begin taking criminal cases?
23       A.    Sometime in the 90's.
24       Q.    What kind of criminal cases did you take in the
25  1990's?
</pre>

1    *A.*    Misdemeanor and some felonies.

2    *Q.*    By the year 2000, approximately what percentage

3    of your practice was devoted to criminal matters?

4    *A.*    Probably 25 percent.

5    *Q.*    Mr. DeLozier, have you ever represented any

6    capital defendants at trial?

7    *A.*    Yes.

8    *Q.*    What was your first capital case?

9    *A.*    This one.

10    *Q.*    By this one, you mean State vs. Andriano?

11    *A.*    Yes.

12    *Q.*    Mr. DeLozier, how did you come to represent Wendi

13    Andriano?

14    *A.*    My recollection is there was a pastor by the name

15    of Andrew Cunningham that called me or had Wendi's parents

16    call me.  I'm not sure which one happened first, how it

17    flowed.  But Andrew Cunningham's name comes to mind.  At

18    the time, I think he was a pastor at some church in the

19    Valley and I can't tell you which one.

20    *Q.*    Mr. DeLozier, would you grab a binder and turn to

21    Exhibit 83?

22    *A.*    Yes, I will.  Sorry.

23    *Q.*    Okay.  When you get to Exhibit 83, you'll see the

24    first two pages appear to be a cover letter; is that

25    right?

1    *A.*    Yes, sir.

2    *Q.*    And after that, it appears to be a Representation

3    Agreement?

4    *A.*    Yes, sir.

5    *Q.*    Is the Representation Agreement in Exhibit 83 the

6    agreement for your representation of Wendi Andriano in

7    this case?

8    *A.*    Yes, sir.

9    *Q.*    Now, Mr. DeLozier, I want you just to take a look

10   at this agreement for one moment here.  I would like you

11   to look at the second page of the Representation

12   Agreement.

13   *A.*    Okay.

14   *Q.*    Paragraph 3 of that agreement.

15   *A.*    Okay.

16   *Q.*    Are you with me?

17   *A.*    Yes, sir.

18   *Q.*    I want you to look at the middle of the page.

19   Well, what are you discussing in Paragraph 3?

20   *A.*    The scope of the representation is part of what

21   we were trying to detail in Paragraph 3.

22   *Q.*    In the middle of the paragraph --

23   *A.*    I should mention this at the time on the first

24   page is a first degree case, not a capital case.  I'm

25   sorry.

1    *Q.*   Understood.  When did you learn that the

2    representation of Ms. Andriano would be a capital case?

3    *A.*   I don't recall the when.  It was sometime later

4    after this agreement.

5    *Q.*   Turning back to Paragraph 3 of that agreement,

6    I'm going to take your attention to the middle of the

7    paragraph with the sentence beginning:  This is especially

8    important.

9    *A.*   Right.

10   *Q.*   It is especially important in the area of fees

11   retaining the services of psychologists and other

12   technical personnel who may be required to assert various

13   potentially appropriate defenses?

14   *A.*   Yes, sir.

15   *Q.*   Why did you include that in the Representation

16   Agreement?

17   *A.*   In this particular case, I don't know that I can

18   give you a specific answer, but when you are faced cases

19   that are complicated, it is often necessary to have

20   technical personnel to participate in the defense or in

21   presenting the case or in fact helping me prepare whatever

22   the case may be.

23        One of those people of course is often a

24   psychologist or psychiatrist or whatever to talk to the

25   person.

1          I think at this time we also had -- I think she

2    had already been seen by a counselor.  What is her name?

3    Kandy Rohde, yes.  But it's just a standard to include

4    something like that when you have some suspicion that that

5    kind of technical personnel might be needed.

6          And you do that in part to make sure that the

7    client is aware that there's going to be expenses beyond

8    whatever my costs are.  Okay?  So because we've got filing

9    fees, service of process.  You know, that's standard

10   language in the first part of that Paragraph 3.

11   Q.   Sure.  And, Mr. DeLozier, would you turn back to

12   the cover letter that accompanied the Representation

13   Agreement?

14   A.   Yes, sir.

15         THE COURT:  What exhibit number is this again?

16         MR. LYNCH:  This is still Exhibit 83.  It's the

17   cover letter and a retainer agreement kind of combined in

18   the same exhibit number.

19         (WHEREUPON, an off-the-record discussion ensued

20   between Mr. Lynch and Mr. Arntsen.)

21         THE COURT:  You know, I think 83 is something

22   else.

23         MR. LYNCH:  Your Honor, this was -- and

24   Mr. Arntsen just brought this to my attention.  This was a

25   was a mistake in the exhibits that we submitted to the

1   Court prior to the hearing.  The Exhibit 83 that we have

2   and that we meant to submit is the cover letter that is

3   also reflected in --

4            MR. ARNTSEN:  The cover letter is Exhibit 61.

5            MR. LYNCH:  Yes.  But also the retainer agreement

6   is in the remainder of Exhibit 83.

7            THE COURT:  I think 83 has been admitted as

8   the --

9            THE CLERK:  Declaration.

10            THE COURT:  -- declaration of Jeri Lynn

11   Cunningham.  Let's just double-check and make sure we're

12   all on the same page here.  It looks like exhibit

13   number --

14            THE CLERK:  May I step around, sir, to check?

15            THE COURT:  Yes.

16            (WHEREUPON, an off-the-record discussion ensued.)

17            THE COURT:  Exhibit 83 that has been admitted

18   into evidence is the declaration of Jeri Lynn Cunningham.

19            MR. ARNTSEN:  Was it admitted into evidence?

20            THE COURT:  That was -- well, let me double-check

21   here.  That was not admitted into evidence.  It's marked

22   for identification.

23            MR. ARNTSEN:  Right.

24            MS. GARD:  Can we just mark a copy?

25            MR. ARNTSEN:  Yes.  Can we mark it?  This was a

1    copying mistake, Your Honor, and I apologize.  We intended

2    to fix this last week.  Exhibit 61, which is the cover, is

3    fine because Exhibit 61 is in evidence.  But then we

4    notice -- I guess Exhibit 61 doesn't include the actual

5    retainer agreement.  So what we would like to do is

6    substitute this and this is the new Exhibit 83 or we can

7    call it a different number.

8              THE COURT:  Why don't we call it a different

9    number.

10             MR. ARNTSEN:  Why don't we just call it the next

11   number in order.

12             THE CLERK:  I believe that will be 231, but I

13   will I have to verify it.

14             THE COURT:  We'll double-check it, but I believe

15   it will be Exhibit 231 for identification.

16             MR. ARNTSEN:  Okay.

17             THE COURT:  So this will be the cover letter and

18   the agreement?

19             MR. ARNTSEN:  Right.  And the cover letter was

20   already admitted as Exhibit 61.  But this also has the

21   retainer with it.

22             THE COURT:  Right.  So this would be marked for

23   identification as Exhibit No. 231.

24             THE CLERK:  231, yes.

25             THE COURT:  Are you asking that that be admitted

1   into evidence?

2          MR. LYNCH:  Yes, we are, Your Honor.

3          THE COURT:  Is there going to be any objection?

4          MS. GARD:  No objection.

5          THE COURT:  Exhibit No. 231 for identification is

6   admitted into evidence.  That is the letter, which

7   actually has been admitted as Exhibit 61, also, but it's

8   the letter and the agreement.

9          MR. LYNCH:  Yes.

10          THE COURT:  Okay.

11          MR. LYNCH:  Just for clarity for the record,

12   every time Mr. DeLozier or I have mentioned Exhibit 83 in

13   the course of this examination, what we were referring to

14   is now Exhibit 231.

15          THE COURT:  Okay.

16     Q.   BY MR. LYNCH:  Mr. DeLozier, sorry for that

17   interruption.

18     A.   It's all right.

19     Q.   If you would take a look at the third paragraph

20   of the cover letter.

21     A.   Okay.

22     Q.   And tell me once again why you included that

23   third paragraph in the cover letter.

24     A.   It attempts in letting people know in advance

25   what we're looking at and what we're going to have to look

1   at to provide an adequate defense, or know if we have one.

2        But that paragraph basically says there is

3   another lawyer involved, Mr. Thikoll, and if you guys and

4   he feel like you have people that might be helpful, you

5   know, let me know.  It talked about the attorney's fees,

6   but it also talked about the costs again of these other

7   kind of witnesses, experts, you might call them.

8   Q.   Are the psychologists, again, one of the other

9   types of witnesses you mean?

10  A.   Yes.  Most notably psychologists is what I said.

11  Q.   How long did Mr. Thikoll remain involved in the

12  representation?

13  A.   I don't know when he started.  Okay?  I know that

14  he had some role when I agreed to be of assistance.  And

15  my recollection is he became quite ill and had to

16  withdraw.  How many months?  That's all it was.  It would

17  be a matter of months.  Three, four, five, six months at

18  the most.

19  Q.   Sure.  And, finally, Mr. DeLozier, on

20  Exhibit 231, would you turn to the second to the last page

21  of Exhibit 231 with your signature?

22  A.   I'm sorry.  With what?

23  Q.   The page with your signature.

24  A.   Yes, sir.

25  Q.   It would be Page 4 of the Representation

1   Agreement.

2       *A.*    Okay.

3       *Q.*    I note that the Representation Agreement is

4   signed by Alejo Ochoa and Donna Ochoa.  Why did you obtain

5   their signatures?

6       *A.*    Well, anytime you have a client that is unable to

7   pay themselves, you, of course -- or we do, anyway, ask if

8   there is anybody that would be responsible for their

9   payments.  And that would be a personal guarantee by the

10  parents in this case.

11      *Q.*    Did you ever receive any payments from Wendi

12  Andriano directly in this case?

13      *A.*    No.

14      *Q.*    Did you receive payments from Alejo or Donna

15  Ochoa for the criminal representation?

16      *A.*    I don't know about Donna.  I know Alejo met me

17  one time and brought some cash.

18      *Q.*    To this date, have the Ochoas paid the full bill

19  incurred in Wendi's representation?

20      *A.*    I really don't know.

21      *Q.*    Mr. DeLozier, we talked about some mentions in

22  the retainer agreement about psychologists.  Did you take

23  any initial steps to follow through on obtaining a

24  psychologist?

25      *A.*    I'm sure we did.  I can't tell you when that

1  would have happened, though, but I know we did.

2     Q.   Mr. DeLozier, would you turn to Exhibit 230 if

3  it's up at the witness table there?

4     A.   The book I have just goes to 206.

5          MR. ARNTSEN:  She's got it up there.

6          THE COURT:  I think we have 230 has been admitted

7  into evidence.  It was admitted on February 7th, I

8  believe.

9          MR. LYNCH:  Do you have a copy available?

10         (WHEREUPON, an off-the-record discussion ensued.)

11    Q.   BY MR. LYNCH:  Mr. DeLozier, I'm handing you what

12  has been admitted as Exhibit 230.

13    A.   Okay.

14    Q.   What IS that document?

15    A.   You mean the title of it?

16    Q.   Sure.

17    A.   IT'S State of Arizona vs. Wendi Andriano -- Wendi

18  Elizabeth Andriano.  And it's titled Motion For

19  Determination of Competency Pursuant to Rule 11, Arizona

20  Rules of Criminal Procedure.  It looks like it's filed --

21  it was filed on February 22, 2001, according to the court

22  stamp.

23    Q.   It was filed by you?

24    A.   Yes.

25    Q.   Mr. DeLozier, I just want you to turn to the

1  Memorandum of Points and Authorities on Exhibit 230.  Do

2  you see that?

3      *A.*   Yes, sir.

4      *Q.*   Page 2?

5      *A.*   Yes, sir.

6      *Q.*   If you would look just at the paragraph -- the

7  first paragraph beginning -- well, the last sentence of

8  the first paragraph.  I apologize.  Defendant's counsel

9  believes that there is sufficient evidence to warrant a

10 determination of whether the defendant, one, is competent

11 to stand trial.

12     *A.*   Pardon me.  I'm not sure where you are.

13     *Q.*   I was looking at the Memorandum of Points and

14 Authorities on Exhibit 230.  Do you see that?

15     *A.*   Yes.

16     *Q.*   And the last sentence of the first paragraph

17 under the Memorandum of Points and Authorities.

18     *A.*   Okay.

19     *Q.*   Do you see where I'm at now?

20     *A.*   The word specifically Ms. Rohde?  Is that what

21 you're --

22     *Q.*   No, no.  I'm just looking at that last sentence.

23         MR. ARNTSEN:  First paragraph.

24         THE WITNESS:  Oh, first paragraph.  Sorry.  Yes,

25 I see it now.

1    *Q.*    BY MR. LYNCH:  Defendant's counsel believes that

2    there is sufficient evidence to warrant a determination of

3    whether the defendant, one, is competent to stand trial.

4    *A.*    Yes.

5    *Q.*    Did you follow through in obtaining an expert to

6    determine whether the defendant was competent to stand

7    trial?

8    *A.*    We did.

9    *Q.*    Was that Dr. Jack Potts?

10   *A.*    It was.

11   *Q.*    Continuing on in that sentence, you asked,

12   No. 2, whether the defendant is able to assist him in the

13   preparation of the defense of the case.

14   *A.*    Yes.

15   *Q.*    Is that something Dr. Jack Potts also evaluated?

16   *A.*    No, not in my opinion.  He recommended further

17   analysis.

18   *Q.*    Then No. 3, the mental condition at the time of

19   the offense.

20   *A.*    Right.  That's what it says.

21   *Q.*    To your knowledge, was an expert ever retained

22   for that purpose?

23   *A.*    Not that I recall.

24   *Q.*    Mr. DeLozier, let's turn to what's been admitted

25   as Exhibit 6.001.  It would be 6 A in the binders that you

1   have at the witness table.

2       A.   I'm sorry.  Did you say 60 A?

3       Q.   6 A in the binders in front of you.

4       A.   Okay.  I'm sorry.  All right.

5       Q.   Is this Dr. Potts' report?

6       A.   Yes, apparently so.

7       Q.   Did you receive it at the time you were

8   representing Ms. Andriano?

9       A.   I'm sure I did.  I don't recall actually the

10  receipt of it, but I'm certain it came to me.

11      Q.   Now if you remember back to the motion we were

12  just looking at, Exhibit 230, you had asked three things.

13  I would like you to look at the bottom of Page 2 in

14  Dr. Potts' report.

15      A.   In summary?

16      Q.   Yes.  The paragraph beginning:  In summary.  Let

17  me know when you've had a chance to review that.

18      A.   That paragraph continues onto the next page.  Do

19  you want me to continue?

20      Q.   Please, yes.

21      A.   Okay.  Yes, sir.

22      Q.   As we saw in Exhibit 230, you first asked the

23  Court to evaluate -- for an expert to evaluate the

24  competency of Ms. Andriano.  What was Dr. Potts'

25  conclusion regarding her competency?

1          MR. HAZARD:  Objection.  Hearsay.

2          THE COURT:  Well, I'll allow you to go into it.

3     This exhibit has already been admitted into evidence.

4          Although it speaks for itself, I'll let you go

5     ahead and answer that question.

6          THE WITNESS:  Thank you, Your Honor.

7          It says she is competent to do the things that

8     Rule 11 says.

9     Q.   BY MR. LYNCH:  The last item you request in your

10    motion is that the mental states around the time of the

11    offense be evaluated.  Did Dr. Potts look into that?

12    A.   No.

13    Q.   At any time after receiving Dr. Potts' report,

14    did you personally engage any experts to confirm whether,

15    as Dr. Potts stated, whether Ms. Rohde's diagnostic

16    assessment was correct?

17    A.   No.

18    Q.   Between the date of Dr. Potts' report of

19    March 28, 2001, and the date of the jury sentencing in

20    Wendi's trial, were you ever made aware of any experts

21    performing such an evaluation?

22    A.   No.

23    Q.   Did you eventually learn of an expert performing

24    such an evaluation?

25    A.   Yes, that's my understanding that there was an

1  examination done.

2      *Q.*   And did you learn that information before or

3  after Wendi's trial?

4      *A.*   After.

5      *Q.*   Mr. DeLozier, I would like to turn to

6  Exhibit 84 and talk about a different matter.

7      *A.*   Very well.  Okay.  I'm at 84 according to this

8  book.

9      *Q.*   Okay.  Mr. DeLozier, this has been admitted.  I

10  can represent to you that this is a printout from the

11  document in the guardianship proceedings for Wendi's

12  children.

13      *A.*   Yes, sir.

14      *Q.*   I would like to note the bracketed portion of

15  Exhibit 84.  Do you see that right in the middle, with the

16  date June 8, 2001?

17      *A.*   Yes.

18      *Q.*   What is that referring to in the document?

19      *A.*   I had some representation -- I had representation

20  of Alejo and Donna Ochoa regarding the children of Wendi

21  Andriano and there was a person -- I believe this is when

22  the another person substituted in.  I'm not certain,

23  though.  It could be when I came in.  I don't know.

24      *Q.*   Well, do you recall when you began representing

25  the Ochoas --

1     *A.*   I do not.

2     *Q.*   -- in the guardianship proceedings?

3     *A.*   Sorry.  I do not.

4     *Q.*   Mr. DeLozier, if you would look at the next page

5   of Exhibit 84.

6     *A.*   All right.

7     *Q.*   And tell me if that exhibit -- if that next page

8   refreshes your recollect as to when you began representing

9   the Ochoas in the guardianship proceedings.

10    *A.*   Oh, okay.  It would, yes.

11    *Q.*   When did you begin representing the Ochoas in

12  the guardianship proceedings?

13    *A.*   According to this letter, it was July 12, 2001,

14  is the date of this letter from Alejo.  And that

15  presumably would coincide with the bracketed first page of

16  84.  And I suppose Mrs. Gray, whoever she is, or Ms. Gray

17  was being informed of that.  I don't know who Ms. Gray is.

18    *Q.*   The guardianship proceedings with the Ochoas and

19  your representation of the Ochoas, what did that

20  representation entail?

21    *A.*   What did it entail?  It was a guardianship at the

22  time that apparently Thikoll was involved in, although I

23  don't remember that.  And it was regarding sharing, I

24  guess is the best word, the children's time between the

25  grandparents of both of them.

1    *Q.*    Aside from the guardianship, did you represent
2    the Ochoas in any other proceedings relating to their
3    grandchildren?

4    *A.*    Yes.

5    *Q.*    What was that proceeding?

6    *A.*    There was a filing for an adoption in Pinal
7    County.

8    *Q.*    Adoption of the grandchildren?

9    *A.*    Right.

10   *Q.*    As to those two proceedings in which you
11   represented the Ochoas, the guardianship and the adoption,
12   were they contested?

13   *A.*    Yes.

14   *Q.*    By whom?

15   *A.*    The paternal grandparents.  Is that what you
16   mean?

17   *Q.*    Yes.

18   *A.*    Or were you seeking who their lawyer was?

19   *Q.*    Either/or?

20   *A.*    Okay.  Well, their lawyer was John Jakubczyk.
21   But it was my understanding that at the time, it was the
22   paternal grandparents.

23   *Q.*    What were the contested issues in those
24   proceedings?

25   *A.*    Well --

1     *Q.*   And I apologize.  I should have asked more
2   broadly.  What was the nature of the contested issues in
3   those proceedings?

4     *A.*   Typically, it's grandparents' visitation time or
5   who has the children most of the time or to the exclusion
6   of the other one, if necessary.  You know, it's the
7   typical guardianship-type proceeding where everybody gets
8   a chance to say what they want to say and sometimes the
9   Court, and did in this case, appoint a psychologist to
10  help.

11    *Q.*   Were there any allegations back and forth between
12  the parties?

13    *A.*   Well, there's always allegations in these kind of
14  cases.

15    *Q.*   Was there any dispute in these proceedings
16  regarding the Ochoas caregiving skills?

17    *A.*   Yes.  But that's true in any kind of contested
18  family case.

19    *Q.*   During the course of the guardianship or adoption
20  proceedings, what, if any, positions did you advocate on
21  behalf of the Ochoas?

22    *A.*   That they were appropriate parties to have some
23  time with their grandchildren.

24    *Q.*   Can you be more specific about the arguments
25  raised?

1    *A.*    The stuff that goes on in family law cases was

2    typical of what we had here.  Both people felt like they

3    were better grandparents than the other grandparents and

4    they should have more time.  It's just normal stuff in my

5    mind.  I don't know if that answers your question.  But it

6    was not anything unusual, as far as I was concerned.

7    *Q.*    Did you make any arguments or advocate any

8    positions regarding the Ochoas' parenting skills?

9    *A.*    I'm sure we did.

10    *Q.*    What were those positions or arguments?

11    *A.*    That they were honorable people and that they

12    were would raise or help assist in raising these children

13    appropriately.

14    *Q.*    Did the Lambeths dispute the Ochoas' suitability

15    as caregivers?

16    *A.*    Sure.

17    *Q.*    Did you ever share any of the Lambeths'

18    allegations against the Ochoas in the guardianship

19    proceeding or the adoption proceeding with anyone at the

20    public defender's office at any time?

21    *A.*    I don't recall doing that, no.

22    *Q.*    Mr. DeLozier, let's take a look at Exhibit 89.

23    This appears to be a series of letters, as you page

24    through it, written by you to John Jakubczyk?

25    *A.*    Yes.

1    *Q.*    And just remind me.  Who is John Jakubczyk?

2    *A.*    The attorney for the paternal grandparents is

3    what my recollection is of his role at that time.

4    *Q.*    Would those letters pertain to issues in the

5    guardianship proceedings?

6    *A.*    Yes.

7            MR. LYNCH:  Your Honor, I move to admit

8    Exhibit 89.

9            THE COURT:  Any objection?

10           MR. HAZARD:  No, Your Honor.

11           THE COURT:  Exhibit No. 89 for identification is

12   admitted into evidence.

13   *Q.*    BY MR. LYNCH:  Mr. DeLozier, would you turn to

14   Exhibit 95?  95 has been admitted.  Mr. DeLozier, is

15   Exhibit 95 a document you received during the guardianship

16   proceedings?

17           THE WITNESS:  Yes.

18           MR. HAZARD:  Your Honor, I object again.  Once

19   again, they are putting on the viewfinder the victim's

20   address.

21           THE COURT:  It has already been admitted.  We're

22   referring to Exhibit 95?

23           MR. LYNCH:  I will take it off the viewfinder.

24   We'll deal --

25           MR. HAZARD:  It needs redaction.

1         MR. ARNTSEN:  The problem was the address on the

2    one on the computer.  We redacted everything else but the

3    one on the computer.  I apologize.

4         MR. LYNCH:  Yes.  That's correct.  My apologies

5    as well.

6    *Q.*  BY MR. LYNCH:  Mr. DeLozier, is Exhibit 95

7    something you reviewed in the guardianship proceedings?

8    *A.*  It appears to be, yes.

9    *Q.*  Did you ever communicate any of the allegations

10   in Exhibit 95 to anyone at the public defender's office?

11   *A.*  No, I don't recall having done so.  It's

12   possible, but I don't recall having done so.

13   *Q.*  Now, Mr. Mr. DeLozier, you mentioned two

14   proceedings, the guardianship and the adoption.  I want to

15   ask now about the adoption proceedings specifically.

16   Would you turn to Exhibit 88?

17   *A.*  Okay.

18   *Q.*  This appears to be a document you filed on behalf

19   of the Petitioners in the adoption proceedings; is that

20   right?

21   *A.*  Yes, sir.

22   *Q.*  Who were the Petitioners referred to in this

23   document?

24   *A.*  Alejo Ochoa and Donna Ochoa.

25        MR. LYNCH:  We'll move to admit Exhibit 88.

1     THE COURT:  Any objection?

2     MR. HAZARD:  No objection.

3     THE COURT:  Exhibit No. 88 for identification is

4  admitted into evidence.

5     *Q.*  BY MR. LYNCH:  I apologize, Mr. DeLozier.  This

6  is a heavy document morning here.  If you would turn to

7  Exhibit 100.  You may have to dig to find it there.

8     *A.*  Okay.

9     THE COURT:  What number are we looking at?

10     MR. LYNCH:  Exhibit 100.

11     THE COURT:  Okay.  Thank you.

12     *Q.*  BY MR. LYNCH:  This Exhibit 100 appears to be a

13  motion for sanctions?

14     *A.*  Right.

15     *Q.*  Do you recall this motion?

16     *A.*  Yes.

17     *Q.*  Very briefly, can you tell us what this sanctions

18  issue was about?

19     *A.*  Mr. Jakubczyk essentially was asking the Court to

20  sanction me for filing the adoption petition in Pinal

21  County.

22     *Q.*  As opposed to what?

23     *A.*  As opposed to what?  I don't understand.

24     *Q.*  Was it a jurisdictional issue?

25     *A.*  I mean, I don't -- I don't recall.  The

1   jurisdiction issue was why I felt like Pinal County was
2   appropriate.  Okay?  And not Maricopa County.  Okay?  So
3   John's position was that, you know, I shouldn't have done
4   this without notification of him.  The statute doesn't
5   require doesn't require notification to him.  Okay?  So
6   that was my argument.
7         MR. LYNCH:  Your Honor, I move to admit
8   Exhibit 100.
9         THE COURT:  Any objection?
10        MR. HAZARD:  No, Your Honor.
11        THE COURT:  Exhibit No. 100 for identification is
12  admitted into evidence.
13    Q.   BY MR. LYNCH:  And the next exhibit,
14  Mr. DeLozier, is Exhibit 101.
15    A.   One moment.  One moment while I -- okay.
16    Q.   Mr. DeLozier, is this the court order on the
17  sanctions motion we were just discussing?
18    A.   It looks like it.
19    Q.   What was the outcome of the sanctions motion, if
20  you recall?
21    A.   The judge ordered me to pay Mr. Jakubczyk $6,000.
22        MR. LYNCH:  Your Honor, I move to admit
23  Exhibit 101.
24        THE COURT:  Any objection?
25        MR. HAZARD:  No objection.

1      THE COURT:  Exhibit No. 101 for identification is

2   admitted into evidence.

3      Q.   BY MR. LYNCH:  And let's turn to Exhibit 131.

4      A.   Okay.

5      Q.   And Exhibit 131 has been admitted.  Do you recall

6   filing this document?

7      A.   I do.

8      Q.   What is it?

9      A.   It is an opening brief at the Court of Appeals.

10      Q.   Will you turn to the Page 24 of that brief?

11      A.   Yes, I will.  Okay.

12      Q.   I want to draw your attention to the conclusion

13   of that brief to the Court of Appeals:  For the foregoing

14   reasons, undersigned respectfully requests that this court

15   reverse the trial court's order of sanctions against me

16   and the Ochoas.

17      A.   Yes, sir.

18      Q.   In this brief, why did you ask the court to

19   reverse the sanctions against the Ochoas?

20      A.   I'm sorry.  I don't remember.  I would have to

21   look back at the order to see what the order said and I

22   don't remember what it said other than I had to pay

23   John Jakubczyk $6,000.

24      Q.   Well, let me back up.  After the sanctions

25   motions was filed, did you withdraw as counsel for the

1   Ochoas in the adoption proceedings?

2       *A.*   I don't recall.

3       *Q.*   After the sanctions order was entered, did you

4   withdraw as counsel of record in the adoption proceedings?

5       *A.*   I don't recall.

6       *Q.*   At the time you filed this brief to the Court of

7   Appeals, were you still representing the Ochoas?

8       *A.*   In what?

9       *Q.*   In the adoption proceedings.

10      *A.*   Oh, I don't know.  I know I was substituted out

11  in the guardianship in Maricopa County, but I don't know

12  that I was any kind of further representation by anyone in

13  Pinal County on the adoption.  I don't know if that's what

14  your -- I just don't know other than that.  We would have

15  to look at documents to see or the court docket sheet or

16  whatever.  I don't know.  I don't remember.

17      *Q.*   Well, let me ask it this way:  Regardless of the

18  timing of your status a counsel of record, as of the time

19  of this appellate brief, May 27, 2003, were you still

20  representing the interests of the Ochoas?

21      *A.*   Well, I think what you're -- what's a little

22  confusing for me is there's one -- there's one answer to

23  it if you're talking about does the court recognize a

24  person as a lawyer for of record in the case.  And there's

25  another kind of something beyond what goes in the

1  courtroom, the court files officially.  Is that what

2  you're asking?

3      *Q.*   Yes.

4      *A.*   Yes, to answer your question, I felt that I still

5  should represent their interests regardless of whether I

6  was officially of the court record or not.  Is that what

7  you want?  I mean, I don't know if I'm answering your

8  question correctly.

9      *Q.*   I think you are, Mr. DeLozier.  What types of

10  steps did you take, if any, to represent the Ochoas'

11  interests in the guardianship or adoption proceedings

12  after the sanctions?

13      *A.*   Okay.  I think I understand what you're saying.

14  Just because I'm not officially of record in the courts,

15  if a person calls me that I have previously represented

16  and has a question or wants to talk to me about their

17  case, I will not hang up on them.  Okay?  I continue to be

18  their contact if they feel like I can provide any

19  information for them.

20          I'll give you an illustration.  I had a fellow

21  that had been in prison for ten or 12 years.  He called me

22  one day and said:  Can you pick me up at the bus station?

23  I've got 50 bucks in my pocket.  I hadn't talked to him in

24  12 years, but he called and wanted me to come and pick him

25  up and take him around so he could get his state ID and

1    food stamps and so forth.  It's just kind of what you do.

2        Q.    Did the Ochoas continue to ask questions

3    regarding the guardianship or adoption proceedings?

4        A.    Sure.

5        Q.    Through what time?

6        A.    Oh, I can't tell you the last time I talked to

7    Donna.  I don't -- it probably was sometime -- it would be

8    a guess.  2005 maybe.

9        Q.    Did the Ochoas ask you to provide any advice

10    during that time period?

11        A.    I don't know.  They may have.  If they asked a

12    question, I would probably tell them what I thought.  But

13    I don't remember anything specific.

14        Q.    Let's turn to a few other documents.

15    Exhibit 132.  What has been admitted as Exhibit 132.

16        A.    All right.

17        Q.    Mr. DeLozier, I apologize.  I directed you to the

18    wrong document.  Let's go to Exhibit 110.

19        A.    110?

20        Q.    Yes.

21        A.    All right.  I'm almost there.  Okay.

22        Q.    Do you recognize this document?

23        A.    Excuse me.  Yes.

24        Q.    What is it?

25        A.    Well, this would be billings from a private

1  investigative consulting firm called Rich Robertson

2  Consulting investigation for fees, costs and a copy of our

3  check back to pay for that it looks like.

4      *Q.*   Do you know what these invoices are referring to,

5  the work performed by Rich Robertson Consulting?

6      *A.*   It would be the something for the benefit of

7  Alejo and Donna Ochoa, it looks like.

8      *Q.*   And why was Rich Robertson sending you invoices

9  relating to the guardianship proceedings?

10     *A.*   Well, there's a variety of people that do

11 process serving and investigative work around the Valley

12 and that just happens to be who we were using at the time.

13 So they were sending their invoice to get paid.

14         MR. LYNCH:  Your Honor, I move to admit

15 Exhibit 110.

16         THE COURT:  Any objection?

17         MR. HAZARD:  No objection.

18         THE COURT:  Exhibit No. 110 for identification is

19 admitted into evidence.

20     *Q.*  BY MR. LYNCH:  Mr. DeLozier, I want you to turn

21 to what has been admitted as Exhibit 130.

22     *A.*   Yes, sir.

23         THE COURT:  I don't think 130 has been admitted.

24 Oh, it was admitted today.  Okay.  Go ahead.

25     *Q.*   BY MR. LYNCH:  Mr. DeLozier, what is this

1  document?

2     *A.*   It's a 12/31/2004 dated invoice from our firm for

3  services in the -- the print is real bad.  I'm sorry.

4  I've got to take a look at it.  It looks like a mixed bag.

5     *Q.*   Well, let me direct you just to a couple of

6  entries specifically.

7     *A.*   It says 12/1, for example.  Pardon me for

8  interrupting you.  It's a 1:00 o'clock, five hours with

9  Judge Ishikawa.  But beyond that, you know, there's other

10  stuff there.  Go ahead.

11     *Q.*   BY MR. LYNCH:  First off, I just want to look at

12  the December 8, 2004 billing entry.

13     *A.*   Okay.

14     *Q.*   Nine hours, and it looks like it's

15  blocked-billed.  So we can't quite tell how much time is

16  spent on each.  But just the first task in that

17  blocked-billed entry --

18     *A.*   Yes, sir.

19     *Q.*   -- do you recall what that related to?

20     *A.*   I have no idea except it talks about guardianship

21  and adoption files.  It may have been that I was taking

22  them or taking whatever I had to them.  I don't know what

23  it is.

24     *Q.*   Do you see the date was December 8, 2004.  Do you

25  remember what was going on in Wendi's case at the time?

1   *A.*   Some sort of a hearing in this case.  I don't

2   know what kind of hearing.  It doesn't say.  It's not

3   specific.  Oral argument on various motions, it says, but

4   I don't know what those motions were.

5   *Q.*   Mr. DeLozier, could you turn to -- finally, just

6   one last document to get admitted.  Could you turn to

7   Exhibit 99?

8   *A.*   All right.

9   *Q.*   Mr. DeLozier, this document does note that you

10   had withdrawn as counsel of record in the guardianship

11   proceedings?

12   *A.*   Yes.

13   *Q.*   When is this document dated?

14   *A.*   August 1, 2002 is the upper left-hand.  It shows

15   field August 13, 2002.

16   *Q.*   Who is Daphne Budge?

17   *A.*   She's a lawyer that apparently substituted in the

18   guardianship case in Maricopa County.

19   *Q.*   Did you communicate with her?

20   *A.*   I'm sure there was some communication, but I

21   don't recall any of the details.  I imagine getting files

22   from standard replacement counsel-type stuff.

23   *Q.*   Did you receive this minute entry relating to the

24   guardianship proceedings?

25   *A.*   There is no indication on any of the documents

1    that it came to me, but I got it somehow.  It's fairly

2    common in those days that courts would mail or e-mail to

3    anybody that had been involved.

4        Q.    Do you recall reviewing this minute entry?

5        A.    I know it happened.  I don't recall reviewing it,

6    no.

7        Q.    Did you communicate any information -- or what

8    did you learn about that hearing at any time?

9        A.    I don't understand the question.

10       Q.    Let me restate it.  Did you know about this

11   hearing as it was occurring in the guardianship

12   proceedings?

13       A.    I don't know.  I really don't.  But the standard

14   procedure is you would sign a piece of paper that says

15   substitute, I'm out, she's in, that type of thing.  So I

16   would assume at that some point, the court would have a

17   hearing on it.  It doesn't reflect that I'm involved in

18   that hearing, though.  It doesn't say I'm there.  It just

19   says that she's there.  So would I have known that it was

20   happening that day?  I doubt it?

21            MR. LYNCH:  I move to admit Exhibit 99 at least

22   as a public record.

23            THE COURT:  Any objection?

24            MR. HAZARD:  No, Your Honor.

25            THE COURT:  Exhibit No. 99 for identification is

1   admitted into evidence.

2       Q.   BY MR. LYNCH:  Mr. DeLozier, we have talked about

3   custody and guardianship proceedings that you were

4   handling between 2000 and 2001 through 2005.  I want to

5   talk about one other matter that you were handling during

6   that time period.

7           Do you have any experience representing victims

8   of childhood sexual abuse in the context of civil

9   litigation?

10      A.   Yes.

11      Q.   How many types of those cases have you handled?

12      A.   In the 20's.

13      Q.   When did you first represent a victim of

14  childhood sexual abuse?

15      A.   Allegations of it?

16      Q.   Yes.

17      A.   Oh, way back in the early part of '90 in a family

18  law case.

19      Q.   And how about in a case in which you sought

20  damages?

21      A.   My first one would have begun in 2003.

22      Q.   Do you recall the date you first met the

23  plaintiff in that representation?

24      A.   I don't recall the date.  I know the

25  circumstances.  Do you want me to give you that?

1     *Q.*   Yes.

2     *A.*   Okay.  I believe in April, early April, is the

3  day that the United State started bombing Baghdad, Iraq.

4  Why that sticks in mind is I had been in court in Bagdad,

5  Arizona, the same day.

6     *Q.*   Did you ultimately file a lawsuit on behalf of

7  that claim?

8     *A.*   Yes.

9     *Q.*   Who was the lawsuit against?

10    *A.*   A laundry list of folks.  The Tucson Dioceses and

11  Catholic Church and the Phoenix Dioceses and Catholic

12  Church, the various people who were bishops at the time

13  and at least one or more priests.

14    *Q.*   What were the allegations in that lawsuit?

15    *A.*   Oh, God, it's a long --

16         MR. HAZARD:  Objection.  Relevance.

17         THE COURT:  Overruled.

18         Go ahead and answer the question.

19         THE WITNESS:  Yes, sir.  It was a long complaint.

20  Racketeering, for one, because of the church cover-up that

21  we believed existed, specific violations, sexual abuse

22  violations.  That statute of limitations was not

23  applicable in this case.  The young man was ten, 11,

24  12 years old when this allegedly occurred.  He then was in

25  his 40's.  Arizona had a case back in the mid-90's that

1  said it's from the time you are aware or remember.

2  Repressed memory, in other words, is another word for it.

3  Suppressed memory some people call it.

4        That the bishops knew about it and basically hid

5  it.  The activities moved people around from various

6  locations so that the information -- you know, this went

7  on and on.  But a variety of allegations.  I don't know

8  that I recall all of them.

9     Q.   BY MR. LYNCH:  Do you recall when that lawsuit

10  was filed?

11    A.   It was in 2004.  Probably close to a year from

12  the time that I met this young man.

13    Q.   Do you recall the exact date?

14    A.   No.

15    Q.   If you would turn to Exhibit 133, just for -- the

16  stipulation filed in that case, might that refresh your

17  recollection as the exact date?  I would point you

18  specifically to Paragraph 2 of Exhibit 133 on the second

19  page.

20    A.   Oh, okay.  April 21, 2004, according to this

21  document.

22    Q.   Is that consistent with your memory of when you

23  filed it?

24    A.   Approximately a year from the time we met, yes.

25    Q.   Now you mentioned earlier that you first met this

1   client in the spring of 2003.  Yet, the lawsuit was filed

2   in April 21, 2004.

3        Why was there a one-year delay between the time

4   you began the representation and the time the lawsuit was

5   filed?

6   A.   I told this particular person that I had never

7   had this kind of case before and it was going to take me a

8   while to research what I thought was necessary to be able

9   to present a valid claim in the form of a complaint.

10  Q.   What did you do to -- or what kind of research

11  did you do?

12  A.   Well, obviously, the Internet was still -- it was

13  up and running in those days, perhaps not as much as it is

14  today.  But I went online to see what else -- what was

15  going on in the rest of the country and, frankly, the

16  world on this kind of subject.  We had heard about stuff

17  like this, frankly, but I had never the opportunity to

18  work with anybody that had this kind of complaint.

19       The first thing we would have to do, of course,

20  is determine if there's a jurisdictional problem.  Okay?

21  Because, obviously, this happened, you know, some 30 years

22  earlier than when the complaint would have been filed.

23       So the first thing is research Arizona law to see

24  what's happening in the typically two-year statute of

25  limitations problem.  For a minor, of course, it's two

1   years after you turn 18.  But, you know, is there any case

2   law that says:  Wait a minute, the door is still open.

3           And we did find a case.  I can't recite it.  I

4   can't give you the name of it.  But it was Jane Doe

5   something or other.  But basically they said two years

6   from the -- the Supreme Court of Arizona said two years

7   from the time that they recovered the memory.

8           So the next problem you've got is how do you

9   determine whether this person is telling the truth.  Okay?

10  And, obviously, I'm not psychologist.  So I take

11  somebody's word for something, but I have to have some

12  expert that knows more about it than is qualified to opine

13  because you have to have that.

14          So then it was finding a person that was somewhat

15  familiar with these kind of issues.  That would be a

16  psychiatrist, psychologist, neuropsychologist or whatever

17  that would put that person's name on the line.  Okay?  So

18  you went through the process of having this person see

19  that individual.

20          I went online and found a law firm in Minnesota

21  had had several of these cases in various parts of the

22  country, and they were very cooperative and shared their

23  pleading and so forth with me.  I read an enormous amount

24  of literature on the subject, both pro and con.

25          There's one or two experts in the country that

1   believe that there is such thing as a memory that has been

2   implanted into it, so you knew what the defense might be

3   is that it's not a recent recovery.  It's something they

4   remembered all their life.  Or the people that are dealing

5   with him, like me or the psychologists in cases, have

6   actually implanted the memory into these people and it's a

7   false memory.  Okay?  It never really happened, in other

8   words.

9           So you do those things.  You read the literature.

10  You read the books.  I've got books on my shelves and I

11  learned more than I wanted to know, to be perfectly

12  candid, about this whole field.

13      Q.   Mr. DeLozier, let me see if I understand.  To

14  gain this knowledge, it sounds like you did two sorts of

15  things.  One was research on your own?

16      A.   Right.

17      Q.   In researching on your own, did you consult any

18  sources that weren't equally available to any lawyer

19  representing a sex abuse victim?

20      A.   I would say that's probably accurate.  Whether

21  that anybody else -- I don't know how to answer that other

22  than it's not anything that is hidden.  Is that what you

23  mean?

24      Q.   Right.

25      A.   It's available.

1    *Q.*   And then the second thing you talked about was

2    mental health professionals?

3    *A.*   I guess that's the right word.

4    *Q.*   Well, what's a better word?

5    *A.*   I don't know that I -- I don't know how to

6    classify people in various pigeon holes.  Okay?  So I'm

7    talking about psychiatrists, psychologists,

8    neuropsychologists, those kind of people.  That's probably

9    the mental health field.  I did something like that.

10   *Q.*   In the time between the spring of 2003 and the

11   complaint filing date, April 21, 2004, did you consult

12   with any psychiatrists regarding childhood sexual abuse?

13   *A.*   Sure.  Over the years, I've used several of them

14   from the east coast to the west coast.

15   *Q.*   Who specifically did you consult with during that

16   period for the John Doe case?

17   *A.*   You know, I don't remember if there was more than

18   one, but there probably was.  But Dr. David Leighton is

19   one that comes readily to mind.

20   *Q.*   Why did you talk to Dr. Leighton?

21   *A.*   I know how I got introduced to him.  I'm sorry.

22   I don't know.

23   *Q.*   Why did you go talk to an expert in that field,

24   to begin with?

25   *A.*   Well, No. 1, if you're going to present this kind

1  of a case, some expert is going to have to have an opinion

2  that it is a recently recalled, or some people use the

3  word flashbacks that are just now happening to a person.

4  I can't do that and neither can my client successfully

5  overcome it.  So, obviously, you've got to have somebody

6  that has the credentials that is able to tell the court

7  because it's a motion to dismiss normally that gets filed

8  and the motion to dismiss will be successful without that

9  person.

10  *Q.*  Did you and Dr. Leighton have any discussions

11  prior to your filing the John Doe case?

12  *A.*  I don't know, but I'm sure we did.  One of the

13  things I had one -- of the things that we did in that case

14  was to have him have this individual start seeing

15  Dr. Leighton fairly frequently because, you know, the

16  trauma, if you will, that comes with that kind of thing,

17  especially if it's recently remembered, is enormous.

18  *Q.*  Let's talk about, Mr. DeLozier, what you have

19  learned, whether through your own research or through

20  Dr. Leighton, between the spring of 2003 and April 21,

21  2004.

22         First, what did you learn -- what, if anything,

23  did you learn about victims of childhood sexual abuse?

24         MR. HAZARD:  Objection.  Relevance.

25         MR. LYNCH:  It goes to the --

1          THE COURT:  Overruled.

2          You can answer the question.

3          THE WITNESS:  No. 1, they don't want to remember

4    it.  Okay?  It comes to them and in painful sequences.

5    Okay?  It is an almost like you wake up in the middle of

6    the night nightmares, if you will.  Okay?  They start

7    visualizing the kinds of things that happened to them.

8    They do not want to relive it.  Okay?  But they are forced

9    to.  And, frankly, a lot of them are angry.  Some of them

10   have spent years not being able to be with people, not

11   being able to be with their parents, their siblings, and

12   often turn to drugs, often turn to crime, often are

13   unemployable or can't keep a job.

14         They're angry and they don't know all who to be

15   angry at.  They're just angry, generally.  They don't

16   understand why their life has been such turmoil.  They

17   don't want to remember it.  Some people call it

18   dissociation.  Some people call it amnesia.  It's

19   difficult to get them to tell the story, if you will,

20   because it is painful.  The phycological terms, you know,

21   are several.

22   Q.   BY MR. LYNCH:  What are those psychological

23   terms?

24   A.   Obviously, dissociation is one of them.  Amnesia

25   is another.  Angry is another.  Depression is a huge part

1   of the problem.

2     Q.   Prior to filing the John Doe complaint on

3   April 21, 2004, did you learn anything regarding when the

4   abuse typically occurred for the victims?

5     A.   Well, it's usually in the preteen and teen years.

6   It usually is for a variety of reasons.  I don't find --

7   my experience, anyway, is for the Catholic-type cases,

8   they're in the eight- to 12-type range.  I had one that

9   the young lady was older than that.

10          THE COURT:  Why don't we go ahead and take our

11  lunch break at this time.  Is this good timing?

12          MR. LYNCH:  That's fine.

13          THE COURT:  Let's go ahead and take our lunch

14  break.  We will be in recess.  We will begin promptly at

15  1:30.  We will be in recess.

16          (WHEREUPON, the lunch recess ensued from

17  11:56 a.m. to 1:30 p.m.)

18          THE COURT:  Good afternoon.  This is

19  CR 2000-096032, State of Arizona vs. Wendi Elizabeth

20  Andriano.

21          The record will reflect the presence of the

22  parties and counsel.

23          The record will reflect that Mr. David DeLozier

24  is on the witness stand.

25          We will continue wit the direct examination by

1  Mr. Lynch.

2          Mr. Lynch.

3      Q.   BY MR. LYNCH:  Mr. DeLozier, do you remember

4  before the break, we were talking about the John Doe case

5  that you filed on April 21, 2004?

6      A.   Yes.

7      Q.   I want you to turn to Exhibit 134.

8      A.   Okay.

9      Q.   Do you recognize this document?

10     A.   (No response.)

11     Q.   Mr. DeLozier, is that a document that you filed

12  in connection with the John Doe case?

13     A.   That appears to be the case.  I don't have an

14  independent recollection of it.  This actually was signed

15  by another lawyer in the firm at the time, Lawrence

16  Dunlavey.

17     Q.   When you say another lawyer in the firm, which

18  firm?

19     A.   I'm sorry.  The one that I own.

20     Q.   Were you still working on the case at the time

21  that document was filed?

22     A.   Oh, I'm sure.

23     Q.   Mr. DeLozier, there is an attachment to that

24  motion.  Do you see that attachment?  I believe it says

25  Page 16 of 22 at the bottom.  The page numbers are at the

1   bottom.

2       A.   Okay.  Yes.

3       Q.   What is this attachment?

4       A.   Well, it's entitled Affidavit of Dr. David

5   Layton.

6       Q.   I direct you to Paragraph 5 of that affidavit.

7       A.   Yes.

8       Q.   I have personally treated John Doe 23 since

9   November 19, 2003?

10      A.   Yes.

11      Q.   Mr. DeLozier, is that consistent with your

12  recollection of when you engaged Dr. Leighton to treat

13  your client, John Doe?

14      A.   I can't -- I can't be for certain about that

15  date, but that probably is correct.

16      Q.   It was in and around that time that you were

17  having discussions with Dr. Leighton about effects of

18  childhood sexual abuse that you mentioned earlier?

19      A.   More than likely, before that date, but yes.

20      Q.   Mr. DeLozier, I would direct you down to the page

21  beginning -- it says Page 17 of 22 at the bottom.  It's

22  actually the next page would be the affidavit?

23      A.   Yes.

24      Q.   Beginning with the Clinical Description of

25  Injury, if you wouldn't mind just taking a chance to

1   quickly review the information provided there.

2       *A.*   All of this -- the heading is Clinical

3   Description of Injury?

4       *Q.*   Correct.

5       *A.*   Okay.  I've finished the first paragraph.

6       *Q.*   Mr. DeLozier, is that consistent with your

7   understanding of childhood sexual abuse and discussions

8   with Dr. Leighton prior to filing the John Doe case?

9       *A.*   Well, I don't think it's -- I don't think it's as

10   thorough as it might be because if you'll notice the list

11   of shocking self-destructive behaviors is the heading that

12   that begins with.  So that is a -- those are some of the

13   self-destructive behaviors that Mary Frawley-O'Dea had

14   indicated in that testimony.

15       *Q.*   Okay.

16       *A.*   I'm familiar with that lady.  I've consulted with

17   her.  In fact, I used her on one case as well.

18       *Q.*   When you say, I don't know if this is that

19   thorough, you mean you had greater knowledge prior to

20   filing the John Doe case?

21       *A.*   No.  I'm sorry.  I didn't mean to mislead you.

22   What I'm saying is this is a list of what O'Dea made of,

23   quote, shocking self-destructive behaviors.  But that is

24   not all inclusive of all the kinds of things that one

25   sees.  They're just self-destructive behaviors.

1    *Q.*    Sure.  If you would turn to just the next page of

2  that affidavit.

3    *A.*    Yes.

4    *Q.*    The block-intended quotation, is that consistent

5  with your understanding of the grooming process of

6  childhood sexual abuse prior to filing the John Doe case?

7    *A.*    Absolutely.  Yes.

8    *Q.*    And, finally, Mr. DeLozier, if you would turn to

9  the next page of Dr. Leighton's affidavit, Page 19 of 22

10  at the bottom of Exhibit 134, statements regarding

11  dissociation?

12    *A.*    Yes.

13    *Q.*    Are those statements consistent with what you

14  knew regarding childhood sexual abuse prior to filing the

15  John Doe case in April of 2004?

16    *A.*    Yeah.  Yes.  It goes into more than just

17  dissociation, though.  But, yes.

18    *Q.*    What else does it go into?

19    *A.*    Well, relationships with other people is one of

20  the things right about the middle I'm going to pick out.

21  Further down, too often, sex, even with trusted other,

22  triggers terrifying disorganizing flashbacks.  It says

23  several additional areas is my point.

24    *Q.*    I noted also it discusses post-traumatic stress

25  disorder.  Do you see that in the middle of that

1   paragraph?

2       A.   Yes.

3       Q.   Did you have any knowledge regarding

4   post-traumatic stress disorder as it relates to childhood

5   sexual abuse by April of 2004?

6       A.   Yes.

7            MR. LYNCH:  Your Honor, at this time, I would

8   like to move to admit Exhibit 134, not for the truth of

9   the matter, but rather as evidence of Mr. DeLozier's

10  knowledge as of the time of filing the John Doe case.

11           THE COURT:  Mr. Hazard?

12           MR. HAZARD:  I think it is for the truth of the

13  matter asserted.  So I object.

14           THE COURT:  I'm going to sustain the objection.

15      Q.   BY MR. LYNCH:  Mr. DeLozier, let's move on to

16  talking about Wendi's case specifically.

17      A.   Okay.

18      Q.   We talked about these two other cases, the John

19  Doe case and the child guardianship and adoption

20  proceedings case.

21           With regard to Wendi's case, at some point, did

22  you obtain co-counsel in your representation of Wendi?

23      A.   I don't know for sure I follow the word

24  co-counsel.  Who are you -- are you referring to someone

25  specifically that came in after Mr. Thikoll was --

1    Q.    I'm referring specifically to Mr. Patterson.

2    A.    Oh, yes.  I'm sorry.  I don't know that I would

3    use the term co-counsel, but that's fine.

4    Q.    Why wouldn't you use that term?

5    A.    He became first chair and the public defender's

6    office took over at a point in time.  I think it was in

7    2001.

8    Q.    Did you meet with Mr. Patterson after he became

9    first chair on Wendi's case?

10   A.    I don't recall a specific meeting early on.

11   There was a, here, I gave my files that I had to that

12   point to someone in that office.  But I know we had

13   meetings later on.  I can't recall if there's one early on

14   or not.

15   Q.    Early on, and I'm talking about the period after

16   Mr. Patterson became the first chair, but still, you know,

17   within the years 2001, 2002, did you have an understanding

18   of what your role on Wendi's defense team would be?

19   A.    No.

20   Q.    Did you have an understanding of certain

21   individuals for which you would be responsible as

22   co-counsel?

23   A.    I don't know that there was any kind of role

24   defined early on about it other than he was -- he or the

25   public defender's office was the first chair.  I was

1  second.  And I had, by that time, knowledge of and a

2  relationship with Wendi and her parents, if that's what

3  you mean.

4      Q.  If that is so, what did you understand your role

5  to be with regard to Wendi and her parents as to Wendi's

6  criminal case?

7      A.  Oh just to continue to meet with them and answer

8  any questions that I could and hold their hands,

9  basically.

10     Q.  After Mr. Patterson became lead counsel, did you

11  tell Mr. Patterson that you had no capital experience?

12     A.  Oh, I'm almost certain I did, but I couldn't -- I

13  couldn't possibly tell you that we had that conversation

14  that direct, but I know he was aware of that.  In fact,

15  that's one of the reasons the public defender's office was

16  asked to take over.

17     Q.  Did Mr. Patterson give you any guidance on

18  capital defense work?

19     A.  No.

20     Q.  Did he give any instructions on how to conduct a

21  mitigation investigation?

22     A.  No.

23     Q.  How often did you and Mr. Patterson communicate

24  regarding Wendi's case?

25     A.  I communicated mostly by e-mail because I didn't

1  get return phone calls.  And the people that did respond,

2  I found that was a lady named Michelle and I would often

3  tell Michelle:  I don't know what's going on.  I'm not

4  getting copied on documents.  I don't know what's being

5  filed.  I don't know where we are on the case, those kinds

6  of things.

7      Q.   Well, let's start with in-person meetings.  How

8  often did you meet in person with Mr. Patterson?

9      A.   I can remember prior to the trial two times.

10     Q.   Any times before that?

11     A.   No.  Well, I mean I don't know when those were.

12  But I can remember one meeting at an office somewhere here

13  in this area.  I don't know if the PD's office still has

14  an office here or not and I couldn't tell you where it is,

15  but it was somewhere in this area.  It was not in the main

16  court building.  I can recall that.

17          And I remember another meeting downtown at the

18  PD's office on Jefferson, I think it is.  Those are the

19  only two that I remember for sure.

20          During the second one was when there was the lady

21  named Michelle.  There was another lady named Patricia, I

22  think it was, and there was this Scott something.

23     Q.   MacLeod?

24     A.   Yeah.  And Dan.  And it was sometime I believe

25  after April of 2004 and before the trial started.  How

1    close to the trial starting, I can't tell you.

2        Q.    So how often did you and Mr. Patterson

3    communicate by e-mail?

4        A.    I don't know that I ever had an e-mail from him.

5    I do know that I was told at one point to direct my

6    communications directly to him by Michelle because she

7    wanted out of the loop, I think.  But I'm not certain how

8    that -- so I don't know that there was -- there was

9    communication.

10            Now we may have gotten documents.  I think there

11   was one e-mail where:  I've already copied these once, but

12   I'll do it again for him if he can't find them, something

13   to that effect, where they claim they had given me stuff

14   that I couldn't find.

15       Q.    And you mentioned Michelle?

16       A.    You got to remember my office is a long ways from

17   theirs.  Okay?  At that time, I was in a suburb of

18   Cave Creek.  Okay?  To get downtown, it's an hour.  To get

19   to Mesa, it's an hour.  So, you know, it's not next door.

20       Q.    How about communications by telephone?

21       A.    Like I said, I don't recall having a telephone

22   conversation with Mr. Patterson.

23       Q.    You mentioned a couple of other individuals at

24   the PD's office.  One of whom was Scott MacLeod?

25       A.    Right.

1    *Q.*   How often did you meet with Scott MacLeod prior

2    to the penalty phase of Wendi's trial?

3    *A.*   Oh, we would have met for the first time I think

4    April or May, somewhere along in there of 2004, when we

5    had that group meeting.  I don't recall having much

6    conversation with him until right before the trial and

7    then he was I believe at the trial most every day that I

8    was there.  So we would have seen each other during that

9    time.  I don't know if that's responsive to your question,

10   though.

11   *Q.*   It is.

12   *A.*   Okay.

13   *Q.*   During that April of 2004 meeting, do you recall

14   what was discussed?

15   *A.*   Well, he was new on the case.  Mr. MacLeod was.

16   And before that, there was a person, if I remember his

17   name was Linderman.  I don't remember ever meeting him or

18   not, but I know, that he was, quote, their mitigation

19   expert in the PD's office.  And MacLeod took over for

20   Linderman.  Okay?

21        And I don't know.  My recollection was that

22   MacLeod did not have any capital experience in mitigation.

23   Frankly, none of us did with the new *Ring* decision, or at

24   least I didn't.  It seems like Mr. Patterson might have

25   had one case before this one on the -- subsequent to the

1  *Ring* decision.

2      *Q.*   When you did meet with Scott MacLeod, you

3  mentioned you saw him in court.  What did you discuss?

4      *A.*   I don't know that we had a discussion.  He was

5  there.  I was there.

6      *Q.*   And how about, you don't remember meeting Patrick

7  Linderman, you said?

8      *A.*   I do not remember meeting him.  It's possible

9  that I did, but I don't remember.  I wouldn't know him if

10  he walked in today.

11      *Q.*   Mr. DeLozier, did you, during the course of your

12  representation of Wendi, provide the public defender's

13  office with any information or materials?

14      *A.*   Everything that I had, including Kandy Rohde's

15  entire file, for example.  What else did I give them

16  besides my file and that, I don't have an independent

17  recollection about what I gave them at the front end.  But

18  I know I gave them my file and all of her records.

19      *Q.*   Mr. DeLozier, would you turn to Exhibit 63?  I

20  want you to start at the second page.

21      *A.*   Just one moment, please.

22      *Q.*   Yes.

23      *A.*   Okay.

24      *Q.*   Is this an e-mail you sent to Michelle Arvanitas

25  on August 2nd, 2002?

1     *A.*   Yes.  It was copied to -- I believe that's Dan
2   Patterson's e-mail address, or was it was at the time.
3     *Q.*   Why did you send this e-mail?
4     *A.*   I don't know.  I'll have to look at it.  Is that
5   okay?
6     *Q.*   Sure.
7     *A.*   What's the question now?  I'm sorry.
8     *Q.*   Why did you send this e-mail?
9     *A.*   Well, No. 1, we independently found out that the
10  hearing was going to be postponed through Donna Ochoa
11  telling me.  And, like I said a moment ago, it's not next
12  door.  So it's a good portion of your day if you drive
13  over and you find out when you get there that the court is
14  not going forward.
15       So, first off, was to tell Michelle, and
16  hopefully through Dan, that they needed to keep me
17  in the loop, so to speak.
18       Secondly was to tell her that I still don't have
19  the documents that have been filed, assuming there are any
20  being filed and that I would like to be kept informed, and
21  I'm working on keeping this from being frustrating, it
22  says.
23       But Dan made it very clear that I'm second chair
24  and the PD's office is not going to put anyone else on the
25  case, but I am completely without knowledge of the case

1  developments.  So I sent it as a way of saying:  Hey, I'm

2  here.

3      *Q.*   Mr. DeLozier, would you look back at the response

4  on the first page?

5      *A.*   Sure.

6      *Q.*   It looks like you have some correspondence back

7  and forth with Michelle Arvanitas shortly after that.

8  Were the issues you raised in your initial e-mail

9  resolved?

10     *A.*   No.

11     *Q.*   Were they ever resolved?

12     *A.*   No.

13     *Q.*   Tell me about any further concerns about

14  communications during the case.

15     *A.*   This is illustrative of I just didn't bother to

16  document after that.  I knew that was not going to have

17  the kind of communication that I would expect and I just

18  went along with whatever I got.

19          At some point, you just -- you know, if you're

20  not going to solve a problem, you just look -- you know,

21  you figure that the other people know what they're doing.

22  They've had experience.  They have a budget, so forth, so

23  forth.  They don't really need me, in other words.

24          MR. LYNCH:  Your Honor, I move to admit

25  Exhibit 63.

1          THE COURT:  Any objection?

2          MR. HAZARD:  No objection.

3          THE COURT:  Exhibit No. 63 for identification is

4   admitted into evidence.

5     *Q.*   BY MR. LYNCH:  Now Mr. DeLozier, we were talking

6   earlier about the knowledge that you acquired regarding

7   childhood sexual abuse prior to filing the John Doe case

8   in April of 2004?

9     *A.*   Yes.

10    *Q.*   In the course of your representation of Wendi,

11  did you ever engage experts such as Dr. Leighton to

12  evaluate her as a potential victim of childhood sexual

13  abuse?

14    *A.*   I did not, other than Dr. Potts.  I think we were

15  involved in that him being or having a role in the case.

16  But beyond that, I did not.

17    *Q.*   To your knowledge, did anyone else do so?

18    *A.*   I don't know if anyone else did at the time.

19    *Q.*   Do you know now?

20    *A.*   Yes.

21    *Q.*   Did they?

22    *A.*   I have seen a Dr. -- what is it?  Rosengard.  I

23  understand he had seen her.

24    *Q.*   Okay.  Well, Mr. DeLozier, let's go back to

25  Exhibit 230, if you would.

1    *A.*    Now was my 83; right?

2    *Q.*    That should be the separate document there, not

3    in the binders.

4    *A.*    Oh, yes.  Okay.  Sorry.  I have it.

5    *Q.*    Now I want to look at the first attachment to

6    Exhibit 230.

7    *A.*    All right.

8    *Q.*    This would have been an attachment to your motion

9    seeking the appointment of Dr. Potts; right?

10   *A.*    Yes.

11   *Q.*    I want to look specifically at the first

12   paragraph:  I also suspect that her defense system

13   includes dissociation?

14   *A.*    Yes.

15   *Q.*    Her mother's reference to possible abuse by

16   Wendi's paternal grandfather could be the origin of that

17   dissociation?

18   *A.*    Yes.

19   *Q.*    Mr. DeLozier, other than filing the motion to

20   which this letter is attached, did you follow up on this

21   letter?

22   *A.*    Other than a motion?  Is that the question?

23   *Q.*    Yes.

24   *A.*    I gave all of Rohde's stuff to Mr. Patterson's

25   office.  But did I hire anybody to follow up on it?  No.

1    *Q.*   To your knowledge, did the public defender's

2   office ever follow up on this statement about

3   dissociation?

4    *A.*   Not that I'm aware of or not that I was aware of

5   at the time.

6    *Q.*   Mr. DeLozier, I want you to turn back to what's

7   Exhibit 6 A in the binder.  It's 6.001 for the record.

8    *A.*   Okay.  I'm at 6.

9    *Q.*   6 A.

10   *A.*   6 A.  Okay.  Thank you.

11   *Q.*   I just want to read --

12   *A.*   What portion?

13       MR. ARNTSEN:  Bottom of Page 2.

14       MR. LYNCH:  Bottom of Page 2, Mr. DeLozier.

15       THE WITNESS:  Bottom of Page 2.  Okay.  Thank

16   you.

17   *Q.*   BY MR. LYNCH:  Dr. Potts:  Whether or not she has

18   amnesia around the time of the alleged offense is

19   something I cannot determine.  Defense counsel may wish to

20   independently retain an expert to evaluate his client's

21   state of mind around the time of the offense.

22   *A.*   Right.

23   *Q.*   Certainly, there is something quite bizarre about

24   what allegedly occurred.  If Ms. Rohde is accurate in her

25   diagnostic assessment, then the criminal culpability of

1  the defendant and her state of mind at the time of the

2  alleged offense should be evaluated independently.

3       Mr. DeLozier, did you ever arrange for an

4  independent evaluation to confirm Kandy Rohde's diagnosis?

5  *A.*  No.

6  *Q.*  Based on your understanding as of April of 2004,

7  at the time you filed the John Doe lawsuit, are the issues

8  set forth in the prior Kandy Rohde letter consistent with

9  victims of childhood sexual abuse?

10       MR. HAZARD:  Objection.  Calls for speculation.

11       THE COURT:  Sustained.

12       MR. LYNCH:  Your Honor, I'm just making an offer

13  of proof.  I have established his knowledge as of April of

14  2004, and that was really the preface of the question.

15  *Q.*  BY MR. LYNCH:  And the offer of proof, your

16  answer, Mr. DeLozier?

17       THE COURT:  Go ahead, as an offer of proof.

18       THE WITNESS:  Oh, absolutely.

19       MR. HAZARD:  I would also object on relevance.

20  It's profiling and it's inadmissible.

21       THE COURT:  Okay.  Let's move on.

22  *Q.*  BY MR. LYNCH:  Mr. DeLozier, I would like you to

23  turn to Exhibit 6 C in your binder.  It's 6.003 in the

24  record.

25  *A.*  Okay.

1    *Q.*   Mr. DeLozier, is this the report from

2    Dr. Rosengard that you mentioned previously?

3    *A.*   It appears to be.  I was aware of one, but I had

4    never seen it.

5    *Q.*   What do you mean by you have never seen it?

6    *A.*   I don't recall ever having a copy of this

7    document in my files or even having been provided a copy

8    by Patterson or whatever.  So I don't know how else to say

9    it or answer.

10   *Q.*   Mr. DeLozier, turn to the diagnoses on Page 5.

11   *A.*   Okay.

12   *Q.*   Major effective disorder, depression?

13   *A.*   Right.

14   *Q.*   Probable post-traumatic stress disorder?

15   *A.*   Right.

16   *Q.*   And panic disorder?

17   *A.*   Right.

18   *Q.*   At any time, before or after April of 2004, did

19   you engage any expert to examine these diagnostic

20   impressions of Dr. Rosengard?

21   *A.*   No.

22   *Q.*   Based on your knowledge as of April of 2004, what

23   is your impression of these diagnoses of Dr. Rosengard?

24          MR. HAZARD:  Objection.

25          THE COURT:  Sustained.

1          MR. LYNCH:  And the same offer of proof, Your

2    Honor.

3          THE COURT:  Go ahead, as an offer of proof.

4          THE WITNESS:  They're consistent with things that

5    I saw in those people that I represented during the

6    20-plus sex abuse cases.

7      *Q.*  BY MR. LYNCH:  If you could also turn to the

8    conclusions of Dr. Rosengard's report.  Starting at the

9    bottom of Page 5, the very last carryover sentence there,

10   I'll read it:  An individual who goes through a traumatic

11   event will often forget that extreme situation because an

12   individual is unable to deal with the thoughts on an

13   emotional basis.  This occurs in both children and adults

14   who have been physically or sexually attacked and more

15   than explains the defendant's response, particularly in

16   light of the fact that she has a past history apparently

17   of being abused and symptoms consistent with

18   post-traumatic stress disorder.

19         Next sentence:  That situation and emotional

20   responses that she has had from that situation make it

21   more likely that she would have had such an amnestic

22   response to her apparent actions.

23         Mr. DeLozier, were you familiar with all of these

24   symptoms and diagnoses discussed here as of April of 2004?

25     *A.*  Yes.

1    *Q.*    Mr. DeLozier, let's turn now to Exhibit 6 D in

2    the binder.   It would be 6.004 for the record.

3    Mr. DeLozier, this has been admitted as 6.004.   It's an

4    e-mail exchange between Michelle Arvanitas and Dan

5    Patterson.   Did they ever send this exchange to you?

6    *A.*    Not that I'm aware of.

7    *Q.*    Mr. DeLozier, looking at the diagnoses in the

8    middle of the page, depersonalization disorder,

9    dissociative amnesia, and physical, sexual or neglect of a

10   child -- presumably, that's is supposed to be physical or

11   sexual abuse or neglect of a child.   Would those

12   diagnoses have had meaning for you in April of 2004?

13   *A.*    Certainly.

14   *Q.*    What would that meaning have been?

15   *A.*    What would it have been?   That this is a person

16   who had suffered some sort of physical or mental trauma or

17   emotional trauma.

18   *Q.*    To your knowledge, was this information disclosed

19   to any psychiatrist before Wendi's trial?

20   *A.*    The only -- the only psychiatrist that I was

21   aware of during that period of time was Potts.   So did he

22   have this information?   He had Rohde's letter, as I recall

23   from looking at -- what was it?   Exhibit 32 or 230.   I

24   don't know what else he had, nor do I know what else

25   anybody else had because I wasn't -- I wasn't part of that

1  loop.

2      *Q.*  Mr. DeLozier, I want you to turn to what's been

3  admitted as Exhibit 49.  They are jail medical records

4  for Wendi.

5      *A.*  Excuse me.  I've got to get another book.  You

6  said 49?

7          MR. ARNTSEN:  Yes.

8          MR. LYNCH:  Yes.

9          THE WITNESS:  Okay.

10     *Q.*  BY MR. LYNCH:  I would like you to turn towards

11  the back of Exhibit 49 around PCR 253 to 254, and just if

12  you would, Mr. DeLozier, just review the medications that

13  are listed there.

14     *A.*  Okay.

15     *Q.*  Once you've had an opportunity to do so, please

16  let us know if you're familiar with any of the medications

17  that are listed in Ms. Andriano's jail medical records.

18     *A.*  I am familiar with almost all of them.

19     *Q.*  Did you have that familiarity between 2001 and

20  2004?

21     *A.*  I certainly would have had by 2004, but I believe

22  I knew that she was on several of these things.  And some

23  of the clients I've had over the years who were bipolar

24  had some of these things.

25     *Q.*  Did you receive these jail medical records at any

1    time during the course of Wendi's representation?

2        A.    No.  No, I didn't have access to them.

3        Q.    Mr. DeLozier, do you have any knowledge of a

4    suicide attempt --

5        A.    I was aware --

6        Q.    -- while she was incarcerated?

7        A.    I'm sorry.  I thought you were finished.  Go

8    ahead.

9        Q.    Mr. DeLozier, did you have any knowledge of a

10   suicide attempt while Wendi was incarcerated prior to her

11   trial?

12       A.    Yes.

13       Q.    What was that knowledge?

14       A.    Well, she was put on suicide watch because of it.

15   I can't tell you when it was.  It wasn't -- it wasn't

16   early, but it wasn't late either, as I recall.  But other

17   than having familiarity with the occurrence, I don't know

18   that I knew much more about it other than I know she was

19   put on a watch and she might have been moved to a

20   different area of the facility that she was being held in

21   at the time.

22       Q.    Mr. DeLozier, were you ever provided with any of

23   Wendi's medical records from the jail relating to the

24   suicide attempt?

25       A.    I don't remember having them, but I don't know.

1    Q.   Did the public defender's office ever provide you

2    with those records?

3    A.   I don't recall having them, no.

4    Q.   I would like to turn to Page 3 of Exhibit 47.

5    A.   47?

6    Q.   Oh, 49, before we were talking about the jail

7    medication records.  I'm sorry.  I would like you to turn

8    to Page 3 of Exhibit 47 now.

9    A.   Okay.  All right.

10   Q.   Exhibit 47 has been admitted.  It's her general

11   medical records during prison.  Now the first few pages

12   are typewritten transcripts of a few of those records.

13   A.   Okay.

14   Q.   I would like you to take a look at the

15   September 29, 2003 medical records.

16   A.   Uh-huh, yes.

17   Q.   Wendi says quote:  I guess I just panicked.  That

18   officer lied to me and I felt trapped.  I knew I would be

19   in lockdown during my trial and just couldn't do it.  I

20   just freaked out.

21        And it then gives data about Wendi and it says:

22   She came to the Durango Psychiatric Unit after a panicked

23   and impulsive suicidal gesture which was all too

24   successful.

25        Mr. DeLozier, after Wendi's suicide attempt, did

1   you engage any psychiatrist to examine whether her

2   response to panic and stress?

3       *A.*   No.

4       *Q.*   To your knowledge, did anyone from the public

5   defender's office do so?

6       *A.*   No.

7       *Q.*   Mr. DeLozier, we have been talking about several

8   documents that you said you did not receive during the

9   course of Wendi's representation.  I want to turn now to

10  some of the documents that you did.  And that's starting

11  with Exhibit 7 B.  It's a letter -- it would be 7.002 for

12  the record.

13      *A.*   Just one moment, please.

14      *Q.*   Sure.

15      *A.*   This area accommodates one notebook but not two.

16  You said 7; right?

17      *Q.*   Yes, 7 B in your binder.

18      *A.*   Okay.

19      *Q.*   Mr. DeLozier, is this a letter that you received

20  during the course of your representation of Wendi?

21      *A.*   Yes.

22      *Q.*   Who is that letter from?

23      *A.*   It says H. Kandy Rohde at the top.

24      *Q.*   Who is Kandy Rohde?

25      *A.*   Her letterhead says Certified Professional

1 Counselor.  Is that what you mean?

2    *Q.*   Well, I just meant your knowledge of Kandy.

3    *A.*   Oh, I'm sorry.  It's my understanding that the

4 family, Alejo and Donna Ochoa, hired Kandy to counsel

5 Wendi.  That was what I understood how that occurred.  I

6 did not know Ms. Rohde prior to being involved in this

7 case.

8    *Q.*   What was your knowledge, if any, of her

9 qualifications?

10    *A.*   A master level counselor is what I understood she

11 was.

12    *Q.*   Mr. DeLozier, I want to turn to the content of

13 this March 12, 2001, letter.

14       MR. LYNCH:  And, at this time, I would move to

15 admit that letter, again, not for the truth but for

16 counsel's knowledge at the time.

17       MR. HAZARD:  And my objection is for hearsay.

18       THE COURT:  Overruled.  I'll allow

19 Exhibit No. 7.002 to be admitted.

20       THE CLERK:  I'm sorry.  7. --

21       THE COURT:  002.

22       THE CLERK:  Thank you.

23    *Q.*   BY MR. LYNCH:  Mr. DeLozier, I'll read from that

24 first paragraph if you would follow along after the

25 initial couple of sentences.

1   *A.*   Okay.

2   *Q.*   I suspect that she was molested by her natural

3   father and/or grandfather when she was less than four

4   years old.

5          Mr. DeLozier, did you personally investigate

6   whether Wendi was a victim of childhood molestation by her

7   natural grandfather or father?

8   *A.*   No.

9   *Q.*   Do you know whether anyone else ever did?

10  *A.*   I don't know that anyone else ever did.

11  *Q.*   Did you personally investigate whether Wendi was

12  a victim of childhood molestation by her stepfather?

13  *A.*   No.

14  *Q.*   Do you know whether anyone else did?

15  *A.*   Not to my knowledge.

16  *Q.*   The next sentence, Ms. Rohde writes:  She seems

17  to have begun dissociating as a defense beginning at a

18  very young child and continuing until today.  She told me

19  that she has no trouble remembering events in her life,

20  even stressful events.  Yet, when I asked her about her

21  childhood, her marriage, her imprisonment, she was unable

22  to recall large sections of her history.  After I brought

23  that to her attention, she spoke to her mother, who said

24  that Wendi habitually forgot anything that was unpleasant.

25  She said that as a child, Wendi would sit in a large

1   closet to disappear from anything she found stressful.

2        Mr. DeLozier, at any time after receiving this

3   letter from Ms. Rohde, through the time of Wendi's trial,

4   did you engage any experts to work with -- to evaluate

5   Wendi on these memory issues?

6   A.   No.  The only one that I had any role in was

7   Dr. Potts and he, of course, additionally mentioned those

8   things in his report.

9   Q.   To your knowledge, did anyone at the public

10  defender's office or anyone else examine these issues of

11  memory loss or dissociation in Wendi?

12  A.   Not that -- not that I was aware of.  All of

13  this -- all of this stuff I had from Ms. Rohde was

14  provided to the public defender's office.  What they did

15  with it, I don't know.

16  Q.   Mr. DeLozier, can you turn to the second page of

17  that exhibit?

18  A.   Okay.

19  Q.   I just want to look at the last paragraph.  I

20  think Wendi suffers from serious psychological disorders,

21  and I'm anxious to have her examined by another

22  professional for a second opinion.  If I can be of

23  assistance to that person, please let me know.

24       Mr. DeLozier, to your knowledge, was Wendi ever

25  examined by another professional for a second opinion on

1   Ms. Rohde's diagnoses?

2       *A.*   Other than Potts, I have no knowledge of anybody

3   else talking to her.

4       *Q.*   And, to your knowledge, on other than Dr. Potts,

5   did any -- let me start again.

6           Other than Dr. Potts, are you aware of any

7   professionals who were provided with any information from

8   Kandy Rohde with regard to Wendi Andriano?

9       *A.*   No.  It doesn't look like Dr. Rosengard, in his

10  report that I glanced at only today, was provided the

11  information that Rohde had developed.

12          The reason I say that is Potts outlined what he

13  had received.  And Rosengard, the glance I had at his

14  report, he did not outline what he had received, if

15  anything.

16      *Q.*   Mr. DeLozier prior to trial, did Ms. Rohde send

17  you any other notes or materials regarding Ms. Andriano?

18      *A.*   I'm sure she probably did.  I don't have an

19  independent recollection of that, though.  And whatever I

20  got, I provided to the PD's office.

21      *Q.*   Can you open from the binder to Exhibit 45, which

22  what has been admitted as Exhibit 45.

23      *A.*   Sorry.  45; right?

24      *Q.*   Yes.

25      *A.*   All right.

1    *Q.*   Are these notes that Kandy Rohde sent along to

2    you?

3    *A.*   All right.  I would say yes.  I haven't looked at

4    this kind of material in a long time.  So, to be perfectly

5    accurate, I would have to go through the entire exhibit

6    to -- to.

7    *Q.*   Understood, Mr. DeLozier.

8    *A.*   But I mean --

9    *Q.*   And I won't ask you to do that.  I just want to

10   look at a few specific passages.

11   *A.*   Yeah, it looks like it.

12   *Q.*   If you would turn to the page number of

13   Exhibit 45 marked PCR 27.

14   *A.*   Okay.

15   *Q.*   I just want to read from the middle of the page:

16   She said that she cannot talk to her mother frankly

17   because she is monitored.

18   *A.*   Hold on a second.

19   *Q.*   Yeah, right after that sentence.

20   *A.*   Okay.

21   *Q.*   She said that she has never had a sexual feeling

22   and wondered if I thought it had to do with her possibly

23   having been molested.  She said she has never had an

24   orgasm and she only enjoys hugs and kiss.  I told her that

25   the dissociation and the lack of sexual responsiveness fit

1  a profile for early molestation, but that is not proof.

2          Mr. DeLozier, at any time during Wendi's trial,

3  did you take any steps to develop any proof as to whether

4  she was a victim of childhood molestation?

5      *A.*   No.

6      *Q.*   To your knowledge, did anyone from the public

7  defender's office do so?

8      *A.*   Not that I'm aware of.

9      *Q.*   Mr. DeLozier, if you would turn to the page of

10 Exhibit 45 marked --

11     *A.*   I'm sorry.

12     *Q.*   If you could turn to the page of Exhibit 45 that

13 is marked PCR 62.

14     *A.*   Okay.

15     *Q.*   I'm going to look at approximately a quarter of

16 the way down the page beginning with:  She said that she

17 is disappointed.  She said that she is disappointed that

18 Michelle and the PD's psychologist have not been in

19 contact with her despite their promises.

20     *A.*   Hold on.  What page?

21     *Q.*   Sorry.  It's PCR 62.  I need to be a little more

22 patient.

23     *A.*   I think I have the right page, but I don't see

24 where you're reading.

25     *Q.*   Do you see on the screen it's about a quarter of

1  the way down the page?

2      *A.*   Oh, yes.  Okay.

3      *Q.*   I'll start again:  She said that she is

4  disappointed that Michelle and the PD's psychologist have

5  not been in contact with her despite their promises.  We

6  talked about the possibility that her father might testify

7  to his abuse of her or his family's abuse of her.

8          Mr. DeLozier, did you ever speak with Wendi's

9  biological father regarding potential abuse of Wendi?

10     *A.*   No.

11     *Q.*   Did you ever speak with Wendi's stepfather

12  regarding potential abuse of Wendi?

13     *A.*   The stepfather being Alejo?

14     *Q.*   Yes.

15     *A.*   No.

16     *Q.*   To your knowledge, did anyone from the public

17  defender's office do so?

18     *A.*   No.

19     *Q.*   One more of these, Mr. DeLozier.  Go to the

20  page PCR 73 in Exhibit 45.

21     *A.*   Okay.

22     *Q.*   I would like you to look right in the middle of

23  the page:  Since the beginning, Wendi said it was

24  normal -- said that it was normal.  Do you see where I'm

25  at?

1   *A.*   Yes.

2   *Q.*   Wendi said that it was normal for her to fall
3   asleep in the midst of chaos and that she could sleep
4   literally for days without food or water to avoid
5   emotions.  She said that she could remember doing it in
6   her teens and that she did it then because her parents did
7   not allow her to be herself.

8        Mr. DeLozier, did you undergo any investigation
9   into potential causes for Wendi's sleep issues, let's call
10  them?

11  *A.*   No.

12  *Q.*   Do you know whether anyone else did so?

13  *A.*   Not to my knowledge.

14  *Q.*   And, finally, the next page.  Sorry.  I lied and
15  said there is one more.  I want you to look kind of about
16  a quarter of the way down the page or a third of the way
17  down the page:  I continue to believe that Wendi
18  dissociates and left her body when her fear turned into
19  anger.  I think she could tolerate being afraid, but she
20  could not tolerate being angry.  I'm not sure if the anger
21  was at herself or at Joe, but I suspect it was at herself
22  because she was always the responsible one.  Her history
23  of sleeping while angry is a willful dissociation from
24  anger.

25        Mr. DeLozier, do you know whether anyone

1    investigated Wendi's dissociation?

2    *A.*   No.

3    *Q.*   Do you know whether anyone ever investigated

4    potential sources of dissociation?

5    *A.*   No.

6    *Q.*   Did you personally?

7    *A.*   No.

8    *Q.*   Mr. DeLozier, sorry, I keep telling you it's the

9    last one, and this one really is.  If you would go to

10   PCR 112.

11   *A.*   I'm sorry?

12   *Q.*   PCR 112 of Exhibit 45.

13   *A.*   Okay.

14   *Q.*   This appears to be a document from Kandy Rohde to

15   Scott MacLeod.  Do you see that at the top of the page?

16   *A.*   Yes.

17   *Q.*   And this was Scott MacLeod, the mitigation

18   specialist?

19   *A.*   That's -- yes.

20   *Q.*   To your knowledge, were he and Kandy Rohde

21   communicating?

22   *A.*   I don't know.  I frankly believed they were, but

23   that would be today's thought process.  It's not

24   necessarily then's thought process.

25   *Q.*   Do you see the entry of April 26, 2004 --

1    *A.*   Yes.

2    *Q.*   -- in the middle of the page?

3    *A.*   Yes.

4    *Q.*   I want you to follow that entry down the next --
5    the next couple of pages all the way to PCR 114.

6    *A.*   What is it you want me to do?

7    *Q.*   Follow that April 26th entry down to PCR 114.

8    *A.*   Okay.

9    *Q.*   Are you on PCR 114?

10   *A.*   No.  I'm on 112.

11   *Q.*   I would like you to turn to PCR 114.

12   *A.*   Oh, I'm sorry.  I thought I was not following
13   your instructions.  Go ahead.

14   *Q.*   And I would just like to read the -- would you
15   read the first line of the second to the last paragraph of
16   that.  It says Wendi said that --

17   *A.*   Yes.

18   *Q.*   Go ahead.

19   *A.*   Wendi said that she got into the sexy stories
20   through her a roommate in jail named Kelly.

21   *Q.*   Now, if you would -- and I'll read the final
22   paragraph there into the record:  Wendy said that she put
23   Kelly up to reading her story to Alejo.  She said that she
24   told him about the Tina letter.  Wendi said that Alejo
25   said that she should send stories to him for the Internet.

1  Wendi said that someone Alejo knows from his photography

2  was his connection into the Internet.  Wendi said that

3  these photographers have lingerie parties, some of which

4  are innocent and some are more provocative.  Wendi seems

5  to have open knowledge of these enterprises and does not

6  think they are inappropriate.

7        Mr. DeLozier, did you ever investigate any sexual

8  aspects of Wendi's relationship with her stepfather?

9  *A.*   No.

10  *Q.*   To your knowledge, did Scott MacLeod do so?

11  *A.*   I have no idea.  It was never brought to my

12  attention if he did.

13  *Q.*   To your knowledge, did anyone else at the public

14  defender's office do so?

15  *A.*   I'm not aware of any.

16  *Q.*   David, would you -- or Mr. DeLozier, would you

17  turn on Exhibit 52?

18  *A.*   Okay.

19  *Q.*   This is an e-mail from Sharon Murphy to you and

20  Dan Patterson.  Did you have communications with Sharon

21  Murphy?

22  *A.*   Yes.

23  *Q.*   And who was she?

24  *A.*   She was at ASU at the time and her specialty was

25  domestic violence.  And she was someone I had spoken to

1  prior to the public defender being involved, yes.

2      Q.    And why was she involved with Wendi's case?

3      A.    Well, she is regarded as an expert in that field

4  of domestic violence.  And one of the prongs that I felt

5  like needed to be looked at long before the public

6  defender's office was involved was domestic violence,

7  based on the things that I knew or at least had been told

8  that went on.

9      Q.    Mr. DeLozier, on Exhibit 52, I just want to look

10 at the second paragraph of Ms. Murphy's e-mail to you:

11 She learned to dissociate from painful memories a long

12 time ago.  That is very clear to me.  Are you going to

13 subpoena her counselor?  I know that there's something

14 that happened during childhood that she hasn't told me

15 yet.  I'll get at it before we're finished.

16          Mr. DeLozier, did you ever take any steps to

17 investigate anything painful from Wendi's childhood?

18     A.    No.  This e-mail is dated March 30th of 2003.  I,

19 at that point, was second chair and being not really

20 involved.

21     Q.    Do you know whether --

22     A.    No, I did not.  I don't know if anybody else did.

23     Q.    Thank you.  Do you know if -- thank you.

24          Finally, Mr. DeLozier, Exhibit 56.

25     A.    Okay.

1    *Q.*   I would like you to turn to the third page of

2    Exhibit 56.

3    *A.*   Okay.

4    *Q.*   Is this an e-mail from Donna Ochoa to you?

5    *A.*   That's what it looks like.  It's February 12,

6    2001.  So I would have been her sole lawyer at the time.

7    *Q.*   Mr. DeLozier, I would like to go down to the

8    paragraph in the middle of the page beginning with:  This

9    part is hard.

10   *A.*   Okay.

11   *Q.*   This part is hard.  Sometime in 1972, rumors were

12   flying through the family that the grandpa, Skip's dad,

13   was touching the granddaughters inappropriately.

14   *A.*   Yes.

15   *Q.*   Mr. DeLozier, did you ever take any steps to

16   investigate whether Wendi's grandfather had molested her?

17   *A.*   No.  It seemed like he might have been in prison

18   at that time.  But, no, I didn't take any independent

19   steps to see if he had done anything to her.

20   *Q.*   Are you referring to Wendi's biological father

21   who was in prison?

22   *A.*   It could be.  It could be.

23   *Q.*   Do to your knowledge, did anyone else investigate

24   any members of Wendi's biological family?

25   *A.*   No, not to my knowledge.

1    *Q.*    Mr. DeLozier, in your representation of Wendi,
2  did you attempt to discover any negative material
3  regarding Wendi's upbringing?

4    *A.*    Well, obviously, when we were communicating with
5  Ms. Rohde, we were being -- she was sharing with me the
6  things and it's one of the things that led to Dr. Potts'
7  initial, okay, review and the kind of things that he did.
8  But, yes, we were on that -- on that page, if you will.

9    *Q.*    And after receiving Dr. Potts' evaluation, did
10 you take any additional steps to further investigate any
11 potentially negative material regarding Wendi's
12 upbringing?

13   *A.*    I did not.

14   *Q.*    And to your knowledge, did anyone else from the
15 public defender's office?

16   *A.*    Not that I'm aware of.

17   *Q.*    Mr. DeLozier, all of the materials we have just
18 discussed, Dr. Potts, Dr. Rosengard, Kandy Rohde, Sharon
19 Murphy, Donna, jail records, suicide attempt, do you
20 believe they warranted further investigation --

21   *A.*    Well, absolutely.

22   *Q.*    -- as part of Wendi's defense?

23   *A.*    Absolutely.

24   *Q.*    Why?

25          MR. HAZARD:  Objection as to what he is

1    referring to.

2         THE COURT:  Restate the question again.

3         MR. LYNCH:  Sure.

4    *Q.*   BY MR. LYNCH:  All of these materials we have

5    just discussed, Dr. Potts, Dr. Rosengard, to Sharon

6    Murphy, Kandy Rohde, to Donna, to the jail records to the

7    suicide attempt -- I'm referring to the entire line of

8    questioning we've been going through for the last half

9    hour or so.  Do you believe the concerns raised in those

10   materials warranted further investigation?

11   *A.*   Absolutely.

12        I didn't know if you were going to object.  I was

13   waiting.

14        MR. HAZARD:  Well, is the question now or back

15   then?

16        THE COURT:  Specify when you're talking about it.

17        MR. LYNCH:  Well, let's ask this.

18   *Q.*   BY MR. LYNCH:  Did you believe that they

19   warranted further investigation then?

20   *A.*   Yes.

21   *Q.*   And do you believe they warranted further

22   investigation now?

23   *A.*   Yes.

24   *Q.*   Mr. DeLozier, why wasn't that investigation done?

25   *A.*   Well, we were on that path.  Okay?

1    *Q.*    When you say we, who are you referring to?

2    *A.*    My staff, my office, Wendi and I, if you will,

3    the people like Potts and Rohde and Sharon Murphy who were

4    all on the path to develop that part of her case.  Okay?

5         To my way of thinking and way of possibly wording

6    it and so forth, there were a number of things that had

7    not been done to determine whether once you believe

8    inculpable.  Okay?  But, certainly, for mitigation

9    purposes, that would have been an integral part of what we

10   would have presented had anybody taken the lead to do so.

11   I was not in a position, in my opinion, to force the

12   public defender to do anything.  Okay?

13   *Q.*    Did you make any efforts to alert the public

14   defender regarding these potential issues?

15   *A.*    They got copies of everything.  Did I -- did I go

16   and grab anybody by the shirt collar and say:  You better

17   do this?  No.

18   *Q.*    After you obtained knowledge in connection with

19   your John Doe lawsuit, why didn't you grab somebody by the

20   shirt collar at the public defender's office and tell them

21   to investigate further?

22   *A.*    I don't know.  I really don't know why I didn't

23   do that.  I can't -- I don't have an explanation for it at

24   all.  I wish I did, but I don't.

25   *Q.*    In retrospect, do you have an understanding of

1  what may have happened?

2          MR. HAZARD:  Objection.  Relevance.

3          THE COURT:  Sustained.

4      *Q.*  BY MR. LYNCH:  Mr. DeLozier, do you believe your

5  representation of Donna and Alejo Ochoa may have affected

6  your noninvestigation of these issues?

7      *A.*  It's possible.

8      *Q.*  Why do you say it's possible?

9      *A.*  Two things.  One is when you're in a family law

10  case, whether it's called guardianship or whatever it's

11  called, and you have two people, people on each side, and

12  you've got unfortunately lawyers that are throwing rocks

13  at each other, and everybody is focused on what they

14  believe is in the best interest of the children,

15  regardless of the position they're taking or the rocks

16  they're throwing.  Okay?  The negativity and so forth.

17  They're still thinking they're doing the right thing for

18  the children.

19          So I never get too concerned about what people

20  are saying because I expect both of them to be

21  exaggerating on both sides.  That's the history of what

22  I've seen in family law, anyway.

23          So you start off with that, so you're focusing on

24  anything you know negative about the other side,

25  unfortunately.  It's the nature of the beast.  And

1   anything you know positive about what's going on with the

2   people that you're currently representing because although

3   they want the grandkids as well.

4        So it's possible that focusing on that aspect of

5   the grandparent case kept me from focusing on anything

6   that might have been historical in Wendi's case.  Okay?

7   As far as the things that Rohde and so forth and so forth

8   were telling.

9        But as the footnote to that, frankly, I really

10  wasn't -- that wasn't my job, you know.  I was the third

11  wheel, basically, in the criminal case and I only did what

12  I was told to do.  I specifically was told that the PD's

13  office is not going to have -- appoint anybody else to

14  help Dan.  I'm it.  Okay?  I'll tell you what I want you

15  to do when I want you to do anything.  So I said okay.

16      Q.   How often did Dan Patterson tell you to do

17  something?

18      A.   Right before the trial started, he started

19  telling me that he wanted me to do certain things and who

20  I was going to probably be having as -- what do you call

21  it?  Direct testimony.  Okay?  Those kinds of things.

22      Q.   Mr. DeLozier, let's turn now to what happened at

23  Wendi's trial.  At some point in the trial, did you begin

24  fasting?

25      A.   Oh, sure.

1    Q.    Why did you start that fast?

2    A.    Well, I probably ought to digress a little tiny

3    bit on this because there are lots of different

4    definitions of the word fast.  Okay?  For example, some

5    people don't eat don't animal products.  That's a kind of

6    fast.  So you can have a point in time when you don't have

7    breakfast.  To some people, that's a fast.

8    Q.    What did this fast involve for you?

9    A.    Well, I did not -- I did not care for some of the

10   things that were going on during the trial and I thought

11   it might be helpful if I could focus on it a little more

12   clearly because that's what happens to me when I fast is

13   my antennas get higher.  Let's put it that way.  I'm more

14   observant and so forth.

15        So I was not real thrilled with some of the

16   things that were being done and weren't being done and I

17   thought it might help me to focus.

18   Q.    What were some of the things that you weren't

19   thrilled about?

20   A.    Well, this would involve -- you're talking about

21   the trial now as the problem?

22   Q.    Yes, the trial specifically.

23   A.    I understood the limitations, and I don't try --

24   I'm not trying to be argumentative, but I don't -- we had

25   a crime scene investigator that I put --

1        MR. HAZARD:  Objection.  Relevance.  This goes to

2   the guilt phase.

3        THE COURT:  Sustained.

4        THE WITNESS:  See what I mean?  I did it.

5    Q.   BY MR. LYNCH:  Mr. DeLozier, did you have an

6   associate at your firm helping you on Wendi's case?

7    A.   Yes.

8    Q.   What was his name?

9    A.   He was a lawyer, a young -- he had been out of

10   law school only three or four years.  He had been in the

11   PD's office for two or three.  His name is Justin Blair.

12   Q.   Tell me what happened with Justin Blair.

13   A.   On October 17th, Mr. Blair was murdered.

14   Q.   How did that affect you?

15   A.   He was like a son to me and my wife.  We had

16   police from Glendale.  We had the newspapers.  We had the

17   TV.  You know, how did it affect me?  I know that we took

18   two or three days off from the trial to allow me some time

19   to get my bearings.  Let's put it that way.  I don't know

20   that I ever did during the trial, personally.

21   Q.   When you say, I don't know if I ever did, do you

22   mean get your bearings?

23   A.   Yes.

24   Q.   Did that include the penalty phase of the trial?

25   A.   From October 17th forward, whenever that was,

1   whatever phase we were in at the time.

2      Q.   Let's talk about the penalty phase evidence that

3   was presented at the trial.  Did you coordinate with

4   anyone else from the public defender's office on the

5   presentation of the mitigation phase evidence?

6      A.   MacLeod.  I think he was probably the only one.

7      Q.   What was the extent of your coordination?

8      A.   He told me that he had developed a -- what do you

9   call it?  A PowerPoint presentation that he wanted me --

10  that he thought I ought to do.  And, you know, I think I

11  saw that one time before it was presented.  I think I did.

12     Q.   Did you present the PowerPoint to the jury?

13     A.   Yes.

14     Q.   What did you do to develop the script for the

15  PowerPoint?

16     A.   Well, I think I asked Donna to help and she had

17  somebody else that volunteered to assist me with drafting

18  it.  Because up to that point in time, Justin would have

19  been my ghost writer, if you will, for getting ready for

20  the next day.

21          And that's generally what happened is I would be

22  told the night before what I was supposed to do the next

23  day.

24     Q.   Were you responsible for examining any

25  witnesses --

1    *A.*   Yes.

2    *Q.*   -- at the penalty phase?

3    *A.*   Sorry.  I think so.

4    *Q.*   If I can represent for the record, I just want to

5    make sure these names sound familiar to you.  You

6    conducted the direct examination of Chris Vargas, Jimmy

7    Galleon, Linda Galleon, Lonnie Inskeep, Barbara Mitchell

8    and Donna Ochoa and Alejo Ochoa?  Does that sound correct?

9    *A.*   I don't remember most of the first several, but

10   it sounds right.

11   *Q.*   Other the Ochoas, had you met with any of those

12   witnesses prior to conducting their examinations?

13   *A.*   No.

14   *Q.*   How did those witnesses come to your attention?

15   *A.*   I don't know.

16   *Q.*   Let me just -- one last thing.  Exhibit 136.

17   *A.*   Okay.

18   *Q.*   Mr. DeLozier, this e-mail dated November 29, 2004

19   between Scott MacLeod and Dan Patterson, were you ever

20   provided with a list of witnesses reflected in Scott

21   MacLeod's November 29, 2004 e-mail?

22   *A.*   I don't recall ever seeing this before.

23   *Q.*   Are you aware of anyone who is not included on

24   that list who was interviewed as part of a mitigation

25   investigation in Wendi's case?

1      *A.*    I wasn't asked to interview anybody.

2      *Q.*    And you're not aware of anyone else being

3  interviewed by the public defender's office?

4      *A.*    I wouldn't have any idea who they interviewed.

5      *Q.*    One last question, Mr. DeLozier.  What was your

6  understanding of themes of the mitigation case?

7      *A.*    A good person.  Didn't mean to do it.

8      *Q.*    Let's take a look at the next exhibit,

9  Exhibit 137.

10     *A.*    Okay.

11     *Q.*    It looks like it's a December 6, 2004 e-mail that

12  Scott MacLeod forwarded to you.  In your understanding,

13  this e-mail is providing mitigation themes?

14     *A.*    Yes.

15     *Q.*    Prior to this December 6, 2004 e-mail, do you

16  remember any discussions with Mr. MacLeod regarding the

17  themes for Wendi's penalties phase presentation?

18     *A.*    No.  And I don't remember getting this, but I

19  must have.

20          MR. LYNCH:  I have no further questions.

21          THE COURT:  Cross-examination.

22

23                    CROSS-EXAMINATION

24  BY MR. HAZARD:

25     *Q.*    Mr. DeLozier, do you remember giving an interview

1  with us back on November 25, 2013?

2      *A.*   I don't remember the date, but, yes, I do

3  remember you.

4      *Q.*   And do you remember Ms. Gard and Mr. Martinez

5  asked you some questions about what you knew at the time

6  when you were representing Ms. Andriano as it related to

7  the Ochoas and whether they were good parents or not?  Do

8  you remember those questions?

9      *A.*   I don't.  I'm sorry.  I don't have that

10  independent recollection of what the questions were.

11      *Q.*   Well, do you remember being asked about whether

12  you perceived at the time a possible conflict of interest

13  between your representation of Ms. Andriano and her trial

14  and the Ochoas?

15          MR. LYNCH:  I'm sorry.  Do you have a page number

16  that you're referring to?

17          MR. HAZARD:  It's coming.

18      *Q.*   BY MR. HAZARD:  And the Ochoas and the

19  guardianship or adoption proceedings?

20      *A.*   Do I remember?

21      *Q.*   Being asked whether you perceived at the time a

22  conflict?

23      *A.*   No, I don't remember, but I'm sure -- I'm sure he

24  did or somebody did.

25      *Q.*   Okay.  Do you remember being asked this question:

1  Did you perceive yourself as having a conflict of interest

2  there?

3           MR. LYNCH:  Your Honor, I object.  I would like a

4  page number.

5           THE COURT:  Go ahead and refer to the page and

6  line that you're reading from.

7           MR. HAZARD:  Sure.  It's a reporter's transcript

8  of November 25, 2013, interview with David DeLozier.  It's

9  Exhibit No. 174 for these proceedings, Page 67, Line 14.

10          MR. LYNCH:  And I would also ask that the witness

11  be provided a copy to review.

12          THE WITNESS:  Yeah, it's not in the notebooks

13  here.

14          MR. HAZARD:  This is the way I would like

15  to proceed, Your Honor.

16          THE COURT:  Go ahead.

17          MR. LYNCH:  It would be Exhibit 174.

18          THE COURT:  Go ahead and ask the question, and if

19  he needs to refer to it, then we'll address it.

20     Q.  BY MR. HAZARD:  The question was:  Did you

21  perceive yourself as having a conflict of interest there?

22          And your answer was:  No.  I thought I was

23  presenting the same information both places.

24          Do you remember saying that?

25     A.  No, I don't remember saying it.  I believe it's

1   in there if you're reading it.

2       *Q.*   Were you telling the truth at that time?

3       *A.*   I beg your pardon?

4       *Q.*   Were you telling the truth?

5       *A.*   I -- I swore to tell the truth both times.

6       *Q.*   Okay.

7       *A.*   Okay?

8       *Q.*   That's a little different than what you said here

9   today?

10      *A.*   How's that?

11      *Q.*   Well, you testified on direct, that you didn't

12  perceive a conflict?

13          MR. LYNCH:  Object.  Mischaracterizes his prior

14  testimony.  He said in retrospect.  Not at the time.

15          THE COURT:  Overruled.

16          Go ahead and ask your next question.

17      *Q.*   BY MR. HAZARD:  If you could clarify that,

18  because perhaps I'm not -- I didn't understand it --

19      *A.*   Of course.

20      *Q.*   -- Because I thought you said at the time, that

21  you perceived a conflict?

22      *A.*   At that time, I believed that I was -- that I was

23  telling the truth about both parties, both the Ochoas and

24  Ms. Andriano, that she had a good upbringing and so forth

25  and so on.  I presented the same kind of information, or

1    at least would have, had I been involved at that time.

2           Now that doesn't mean that we didn't have issues

3    in the guardianship case.  We obviously did.  We had

4    issues in her criminal case as well.  Okay?  But based on

5    what I knew about her upbringing with the church she went

6    to, the kinds of things that mommy and daddy were trying

7    to provide, meaning Alejo and Donna, I didn't see a real

8    conflict at that time between the two.  The kinds of

9    things that I felt and believed about her childhood were

10   similar to what was being told about the grandparents and

11   their behavior.

12       Q.   And did I --

13       A.   Do I feel that way today?  I don't know if that's

14   what you're asking or not.

15       Q.   No.  I'm asking about then.

16       A.   Okay.  Then I -- then I felt comfortable with

17   that representation in both cases.

18       Q.   You thought at the time, because of all the

19   information that you had that you believed to be true,

20   that Ms. Andriano's interests were aligned with the

21   Ochoas' interests; is that correct?  That they had the

22   same desires and they weren't using one against the other?

23       A.   Exactly.

24       Q.   And, in fact, did Ms. Andriano want you to

25   represent the Ochoas in the guardianship and whatever

1  other proceedings that you helped the Ochoas in?

2      A.   Yes.

3      Q.   You met with Ms. Andriano numerous times during

4  the four years she was in custody awaiting trial; correct?

5      A.   Yes.

6      Q.   Do you even have an estimate about how regular

7  your visits were with Ms. Andriano in the jail during that

8  time?

9      A.   I do not.

10     Q.   Do you feel like you met enough with her to

11  develop a kinship or a bond appropriate for a lawyer and

12  client?

13     A.   I -- I do that with every -- all my clients.  So

14  there was a bond, yes.

15     Q.   And do you feel like you met with her long enough

16  to develop trust and an open line of communication?

17     A.   I -- I don't know how to answer that.  She shared

18  with me what she had on her mind the day we were there.  I

19  don't know whether you call that a trust relationship or

20  not.

21     Q.   During all of your meetings with her, did she

22  ever tell you anything about inappropriate conduct that

23  Alejo Ochoa may have done with her?

24     A.   We didn't talk about the case.  The majority of

25  the time, we never talked about the case, either one of

1   them.

2       *Q.*   Did she ever mention anything at all about that?

3       *A.*   No.

4       *Q.*   And during your time in representing or knowing

5   Donna Ochoa, did Ms. Ochoa ever tell you anything about

6   sexual improprieties with Alejo Ochoa on Wendi?

7       *A.*   No.

8       *Q.*   What about Alejo himself?

9       *A.*   No.

10      *Q.*   And you also had some communications with Brandon

11  Ochoa; correct?

12      *A.*   It seemed like I might have, yes.  It sounds

13  familiar.

14      *Q.*   Did he ever mention anything like that?

15      *A.*   No.

16      *Q.*   And even your discussions with Kandy Rohde, I

17  recall in your interview on November 25th that you stated

18  you -- that if you would have had your druthers, Ms. Rohde

19  would have played a much bigger role in defending

20  Ms. Andriano; is that correct?

21          MR. LYNCH:  Object, again.  I would like him to

22  refer to the actual testimony in the exhibit.

23          THE COURT:  Well, just overruled.

24          Go ahead and answer the question.

25          THE WITNESS:  She knew Wendi, in my opinion,

1  better than anybody.  Okay.  So should she have -- should

2  she have taken a more active role, in using my terminology

3  a moment ago, grabbing somebody's shirt collar and shaking

4  them, I don't know.  Probably.  But I should have

5  probably, also.  Because the kinds of things that she

6  developed, whether Potts knew about.  I don't know about

7  this Rosengard.  There's nothing in his report that seems

8  to indicate that he had her records.  Certainly, Sharon

9  Murphy had the records.  And nobody did anything with

10  them, including me.

11     Q.   BY MR. HAZARD:  Well, do you agree that Ms. Rohde

12  was doing -- in her counseling sessions with Ms. Andriano,

13  they were covering a lot of the area with the victim Joe

14  Andriano and incidents of domestic violence?

15     A.   Well, of course, yeah.

16     Q.   And that was one of the not only defenses in the

17  guilt phase, but also carried through into mitigation,

18  domestic violence?  That Ms. Andriano had been a victim of

19  domestic violence; correct?

20     A.   I'm sorry.  You've mentioned two parts there.

21     Q.   Okay.

22     A.   And I would -- I think based on the fact that

23  we're not dealing with the penalty, you might want to

24  reword that.  I'm not trying to tell you what to do.  I

25  will be glad to answer it if you want to leave it the way

1    it is.

2        *Q.*   Okay.  Was domestic violence a theme that was

3    carried into the mitigation?

4        *A.*   Yes.

5            MR. HAZARD:  One moment, Your Honor.

6            (WHEREUPON, an off-the-record discussion ensued.)

7            MR. HAZARD:  That's all, Your Honor.

8            THE COURT:  Redirect, Mr. Lynch?

9            MR. LYNCH:  No redirect, Your Honor.

10           THE COURT:  May this witness be excused?

11           MR. LYNCH:  Yes.

12           THE WITNESS:  Thank you very much, sir.  You are

13   excused.

14           THE WITNESS:  Good to see you again, Your Honor.

15           THE COURT:  Good to see you.

16           THE WITNESS:  Do you want me to do something with

17   this?

18           THE COURT:  Is that an actual exhibit?

19           THE WITNESS:  Yes.

20           THE COURT:  Don't walk off with it.

21           THE WITNESS:  No.

22           (WHEREUPON, the witness exited the courtroom.)

23           MR. ARNTSEN:  Your Honor, would this be -- it's a

24   little early for the afternoon break.  We've got one more

25   witness.

1       THE COURT:  Is this a good time to take the

2  afternoon break?

3       MR. ARNTSEN:  Yes.

4       THE COURT:  Let's go ahead and take our afternoon

5  break at this time.  We will be in recess.

6       (WHEREUPON, a recess ensued from 2:50 p.m. to

7  3:05 p.m.)

8       THE COURT:  This is CR 2000-096032, State of

9  Arizona vs. Wendi Elizabeth Andriano.

10      The record will reflect the presence of the

11  parties and counsel.

12      Ms. Fox.

13      MS. FOX:  Yes.

14      THE COURT:  You may call your next witness.

15      MS. FOX:  We would like to call Cindy Schaider.

16      THE COURT:  Ms. Schaider, if you could please

17  approach the witness stand there.  Before you sit down, if

18  you could please face the clerk.  Please give her your

19  name, spell your name, raise your right hand and she will

20  swear you in.

21      THE WITNESS:  My name is Cindy Schaider,

22  S-C-H-A-I-D-E-R.

23      THE CLERK:  That's Cindy, C-I-N-D-Y?

24      THE WITNESS:  Yes, ma'am.

25      (WHEREUPON, the witness was duly sworn by the

1  clerk.)

2        THE COURT:  Please have a seat there on the

3  witness stand.  Ms. Schaider, if you can remember to speak

4  up, so that everyone can hear you.  Also, please wait

5  until the question is completed before you answer the

6  question and make sure that you give us a verbal response.

7  Don't just shake your head and say uh-huh or un-huh.  Say

8  yes, no, or whatever it might be.

9        Can you do that for us?

10        THE WITNESS:  Yes, sir.

11        THE COURT:  Go ahead and state your name for the

12  record.

13        THE WITNESS:  Cindy Schaider.

14        THE COURT:  And, Ms. Fox, you may proceed.

15

16                    CINDY SCHAIDER,

17  having been first duly sworn to tell the truth, the whole

18  truth, and nothing but the truth, testified as follows:

19

20                  DIRECT EXAMINATION

21  BY MS. FOX:

22    Q.   Hi, Cindy.  Thanks for being here today.

23        I would like to start with your date of birth.

24    A.   July 6, 1957.

25    Q.   Where do you currently reside?

1    A.    1169 East Manor Drive, Casa Grande, Arizona.

2    Q.    Are you married?

3    A.    Yes, I am.

4    Q.    And who is your husband?

5    A.    My husband is Steve Schaider.

6    Q.    How long have you been married to Steve?

7    A.    Since 1980.

8    Q.    And is Schaider your married name?

9    A.    Yes.

10   Q.    What's your maiden name?

11   A.    McCann, M-C-C-A-N-N.

12   Q.    Do you have any children?

13   A.    I have one stepchild.

14   Q.    How old is your stepdaughter?

15   A.    She is 40.  Excuse me.  40.  Wait.  39.

16   Q.    39.  And how old was your stepdaughter when you

17   became her stepmother?

18   A.    Bree was five.

19   Q.    Do you work?

20   A.    Yes, I do.

21   Q.    And what is your profession?

22   A.    I'm the executive director of the Casa Grande

23   Alliance, which is a drug abuse prevention and education

24   agency.

25   Q.    Do you know the defendant, Wendi Andriano?

1    *A.*    Yes, I do.

2    *Q.*    When did you first meet Wendi?

3    *A.*    I met Wendi in 1980.

4    *Q.*    And where did you meet Wendi?

5    *A.*    I met Wendi at Harvest Family Church.  That was

6    called 91st Psalm at that time.

7    *Q.*    And did you attend the church prior to 1980?

8    *A.*    No.

9    *Q.*    So you met Wendi when you started attending the

10   church?

11   *A.*    Yes, ma'am.

12   *Q.*    And do you know approximately how old Wendi was

13   in 1980 when you met her?

14   *A.*    I think Wendi was around nine years old.

15   *Q.*    How often did you see Wendi when you first met

16   her around 1980?

17   *A.*    I saw Wendi two or three times a week, when we

18   went to church Sunday morning, Sunday night and Wednesday

19   evenings.

20   *Q.*    So you saw Wendi three times a week at church

21   services?

22   *A.*    Yes, ma'am.

23   *Q.*    And did this frequency of seeing Wendi three

24   times a week continue through the time Wendi was 18?

25   *A.*    Yes.

1    *Q.*    Do you know Wendi's parents?

2    *A.*    Yes, I do.

3    *Q.*    Donna and Alejo Ochoa?

4    *A.*    Donna and Alejo Ochoa.

5    *Q.*    How do you Wendi's parents?

6    *A.*    I met Donna and Alejo at the same time that I met

7    Wendi and we attended the church together?

8    *Q.*    How often would you see Donna and Alejo?

9    *A.*    At the same frequency that I saw Wendi.  Usually,

10   twice on Sundays and once on Wednesday nights.  And

11   occasionally on three-day -- we would have three-day

12   weekend revivals and we would all be attending together.

13   *Q.*    Did you have any contact with Wendi or Donna

14   outside of church?

15   *A.*    Yes, I did.

16   *Q.*    What was that?

17   *A.*    When my stepdaughter, Bree -- that's, B-R-E-E --

18   moved in with us, Donna and Wendi babysat for her during

19   the summer and after school the first year that Bree came,

20   which would have been about 1984.

21   *Q.*    When Donna and Wendi babysat, was it at your

22   house or at the Ochoa's?

23   *A.*    It was at the Ochoa's house on Date Street.

24   *Q.*    And did you ever see Wendi's stepfather Alejo

25   outside of church?

1    *A.*    Perhaps a chance meeting in town, but nothing

2    more than that.

3    *Q.*    What was your -- what was Wendi's stepfather

4    Alejo like?

5    *A.*    The first words that come to mind are drug

6    burnout, which may be because of what I do for a living

7    and I know that he had a drug history.

8    *Q.*    Yeah.

9    *A.*    But I also thought Alejo was kind of sneaky.

10   *Q.*    What do you mean by sneaky?

11   *A.*    I never felt like I was getting the whole story

12   from Alejo.  There was always something that he was

13   hiding.  For example, if we had a workday at the church

14   where we would all come and be painting or cleaning, he

15   would disappear and for virtually no reason that we knew

16   of and just would come back and would sometimes smell of

17   cigarette smoke.

18        And if we would say, Alejo, you smell like you've

19   been smoking, he would say, oh, no, I would never do that.

20   But it was quite clear that he had been.  So that's just

21   an example of kind of sneaky behavior.

22   *Q.*    What was Alejo's role at the church?

23   *A.*    He was the children's pastor.

24   *Q.*    What does it mean to the children's pastor?

25   *A.*    The children's pastor is responsible for the

1   Wednesday night children's service if it was going on.

2   And if there was a children's service on Sunday morning,

3   he would also be in charge of that and was kind of

4   responsible for advising or keeping an eye on the kids.

5        Q.   Did you ever observe Alejo in his role in the

6   children's church?

7        A.   Yes, I did.  I helped on the Wednesday night

8   children's service, the children's church for probably a

9   year.

10       Q.   What was Alejo like with the kids?

11       A.   He seemed to have inconsistent boundaries.  One

12  week, something was okay.  And the next week, it was not

13  okay for them to do.  And if they -- if they misbehaved,

14  he would be harsh with them.  And then the next time, he

15  might act like a big kid and laugh at exactly the same

16  behavior.  So it felt very inconsistent.

17       Q.   Did Alejo have any hobbies that you're aware of?

18       A.   Yes.  He enjoyed photography.

19       Q.   And how do you know that?

20       A.   I saw some of the photographs that he took.

21       Q.   What were the photos of that you saw that Alejo

22  took?

23       A.   Specifically, relevant to our situation today, I

24  saw photographs of Wendi.

25       Q.   What were the photographs of Wendi?

1      *A.*    Wendi was in a teddy, women's underwear and they

2    had been taken -- the pictures had been taken out in the

3    desert near Casa Grande Mountain.

4      *Q.*    And how did you see these pictures?

5      *A.*    Alejo showed them to me.

6      *Q.*    How old was Wendi in the pictures, if you know?

7      *A.*    She looked maybe 15, 16, 17, somewhere in that

8    age.

9      *Q.*    And at what point in time, did you see these

10   pictures?

11     *A.*    It would have been when she was about that same

12   age.  They would have been very recent photographs.

13     *Q.*    And when you saw these pictures, what was your

14   reaction?

15     *A.*    I thought it was creepy and inappropriate.

16     *Q.*    Did you say anything to Alejo about how you

17   thought they were creepy and inappropriate?

18     *A.*    No, ma'am.

19     *Q.*    Why not?

20     *A.*    Because he was one of pastors and you would never

21   say anything reproachful to a pastor.

22     *Q.*    What do you mean by that?

23     *A.*    They were our spiritual leaders and he was one of

24   the men in charge.  I have no right to question what he

25   does.

1    *Q.*    You stated that you knew Wendi from 91st Psalm

2  Church; correct?

3    *A.*    Yes, ma'am.

4    *Q.*    And that you started attending the church in

5  1980?

6    *A.*    Yes, ma'am.

7    *Q.*    Who was the pastor when you first started

8  attending 91st Psalm?

9    *A.*    It was Calvin Lorts.

10    *Q.*    And what was the church like when Cal was pastor?

11    *A.*    When Cal was pastor, it was a great feeling of

12  family and the church was growing and it was kind of the

13  happening place in Casa Grande.  The church grew so much

14  that we had to add a second service on Sunday mornings to

15  accommodate all the people who were coming.

16    *Q.*    And was Cal the pastor the entire time you

17  attended the church?

18    *A.*    No.

19    *Q.*    When did he stop being the pastor at 91st Psalm?

20    *A.*    Cal left in maybe 1983, '84.

21    *Q.*    And when he stopped being pastor, do you know who

22  took over?

23    *A.*    Yes.  It was Tom King.

24    *Q.*    And did you continue to attend this church after

25  Tom King took over?

1    *A.*    Yes.

2    *Q.*    At some point, did the church change its name?

3    *A.*    Yes.  It went from 91st Psalm to Harvest Family

4 Church.

5    *Q.*    When Tom take over the church, did he make any

6 changes at the church?

7    *A.*    They weren't -- yes, he did.  And the changes

8 were not abrupt.  They were kind of subtle over time.

9 They were incremental.

10    *Q.*    And can you describe what those changes were?

11    *A.*    The first thing I think of is the difference in

12 size.  The church went from about 150 people until maybe

13 20 or 25 people were attending when we left.  And Tom's

14 preaching style was much different than Calvin's.

15    *Q.*    How was Tom's preaching style different than

16 Cal's?

17    *A.*    His preaching and his leadership style was more

18 directive.  He told us how to live.  It was more of a

19 bully pulpit.

20    *Q.*    How did Tom tell you how to live?

21    *A.*    He told us what our relationships were supposed

22 to be like between men and women.  He told us how to raise

23 our children, how to conduct our lives, who our friends

24 were supposed to be or not be.

25    *Q.*    Let's parse through those changes and those

1  directives that Tom King was giving you.  You said that he

2  was directive as to the relationships between men and

3  women?

4      *A.*   Yes, ma'am.

5      *Q.*   In what way?

6      *A.*   Women are to be subjective to their husbands and

7  he told us that we -- the women should quit their jobs and

8  stay home and take care of the house and the family.  He

9  was very sexist.  He felt there were specific roles for

10  men and women.

11     *Q.*   And you also stated that he was directive in how

12  to raise your children?

13     *A.*   Yes.

14     *Q.*   What do you mean by that?

15     *A.*   We were not instructed to have close relationship

16  with our children and reason with them.  We were told that

17  they should be obedient and he used scripture, the Rod of

18  Correction.  That foolishness is born in the heart of a

19  child and the Rod of Correction will drive it far from

20  him.  And so we were taught to beat our children.

21     *Q.*   And we'll return to that topic.  You also stated

22  that he was directive as to who you could be friends with?

23     *A.*   Yes, ma'am.

24     *Q.*   Can you explain that statement?

25     *A.*   The scripture used was:  Be not unequally yoked

1    with unbelievers.  And were discouraged from having

2    friendships or relationships with people outside of the

3    church family.  We weren't forbidden, but it was made

4    quite clear we should not be close friends with anyone who

5    was not a Christian and that somehow those who attended

6    our church were better Christians than other Christians.

7    So it was pretty clear we should be friends with just the

8    people in the fellowship.

9         Q.   And you also stated I believe that Tom King gave

10   directives about how to conduct your lives; correct?

11        A.   Yes.

12        Q.   And what do you mean by that?

13        A.   Tom said that the horoscopes were of the devil.

14   And our local paper had the horoscope in it, so we

15   shouldn't be getting the local paper.  And that he didn't

16   like what was on TV.  So he turned his TV to the wall and

17   maybe we should consider doing the same thing.

18        Q.   Did Tom King try to influence any political

19   beliefs of the church?

20        A.   Yes, ma'am.

21        Q.   In what way?

22        A.   There were voting materials in the entryway and

23   he wanted us all to be registered voters, but we were all

24   to be Republicans because good Christians were

25   Republicans.

1    *Q.*   When you said that he was doing this through

2    directives, was this in conversations or through the

3    pulpit?

4    *A.*   Both.

5    *Q.*   Both?

6    *A.*   Through conversations and from the pulpit on

7    Sunday morning or Sunday night or Wednesday night.

8    *Q.*   You also mentioned that Tom King I believe you

9    described it as a bully pulpit?

10   *A.*   Yes, ma'am.

11   *Q.*   What do you mean by that?

12   *A.*   He bullied us and bullied others.  One time

13   Brandon --

14   *Q.*   Brandon is who?

15   *A.*   Wendi's stepbrother.  He was maybe about 11 or

16   12.  He was a preteen doing what preteens do, acting out a

17   little bit and he dyed his hair orange.  And Tom said that

18   he looked like a faggot.  His words.  Not mine.  And that

19   we should all make fun of Brandon so that he knows how

20   wrong it was to have orange hair.

21   *Q.*   So Tom King directed the entire congregation to

22   make fun of an 11-year-old?

23   *A.*   Yes, ma'am.

24   *Q.*   Was this typical of Tom King?

25   *A.*   Not atypical.

1    *Q.*    And what would happen if someone left the church?

2    *A.*    I wouldn't say we were ex-communicated, but it

3    was pretty clear that if you left the church, you were no

4    longer part of the -- part of the fold.  He said:  You're

5    either with me or against me.  If you leave the church,

6    it's like a divorce.  So don't expect to have a

7    relationship.

8    *Q.*    So if someone left the church, would you

9    typically maintain a friendship with them?

10    *A.*    No, ma'am.

11    *Q.*    You mentioned earlier that Tom King, one of his

12    directives that he gave was to beat your children;

13    correct?

14    *A.*    Yes, ma'am.

15    *Q.*    Was through you're his sermons?

16    *A.*    Yes.

17    *Q.*    And do you know whether his sermons at Harvest

18    were recorded?

19    *A.*    Absolutely, they were.

20    *Q.*    How do know that?

21    *A.*    My husband was the sound man for most of the

22    20-plus years we were there and he recorded those sermons.

23    *Q.*    And based on the 20-plus years you attended

24    Harvest, would you recognize Tom King's voice if you heard

25    it?

1     *A.*   Yes, ma'am.

2          MS. FOX:  I would like at this point to play a

3     portion of the recording from 165 to first just

4     authenticate that this is what this recording is of.

5          THE COURT:  Any objection?

6          MR. HAZARD:  At this point, no.

7          MS. FOX:  Okay.  I'm going to play you a portion.

8     If you can please tell me what you hear on the recording.

9     Let's hope the speakers work.

10          (WHEREUPON, Exhibit 165 was played.)

11          MR. HAZARD:  Your Honor, I object.  The witness

12     has been mouthing the statements.  She obviously

13     understands and recognizes the recording.

14          THE COURT:  Stop the recording.

15          Do you recognize the voice?

16          THE WITNESS:  Yes.

17          THE COURT:  Ask your next question.

18     *Q.*   BY MS. FOX:  Who is that?

19     *A.*   It's Tom King.

20     *Q.*   And did you attend this sermon?

21     *A.*   Yes, ma'am.

22     *Q.*   Do you know approximately when this sermon

23     happened?

24     *A.*   The message was so common, it could have been any

25     time.  But I'm guessing mid to late 80's.

1          MS. FOX:  At this point, I would like to offer

2    Exhibit 165 into evidence.

3          MR. HAZARD:  I object as to hearsay.

4          THE COURT:  I'll sustain the objection.

5          MS. FOX:  I would like to -- but it's going --

6    can I ask for an explanation of how this is hearsay when

7    it's just going in for what he was saying to the

8    congregation?

9          THE COURT:  Well, let's move on.

10         MS. FOX:  I would like to do an offer of proof.

11         THE COURT:  Go ahead.

12         MS. FOX:  Okay.  I would like to continue playing

13   this recording.

14         THE COURT:  Now hold on a second.

15         MR. HAZARD:  No.

16         THE COURT:  I'm not going to allow you to

17   continue playing the recording.  She has indicated that

18   she recognizes the voice.  Okay?

19         MS. FOX:  Okay.

20         THE COURT:  Then you basically have already got

21   in testimony from her that it's basically his method and

22   his ways of doing things.  So let's move on.

23   Q.   BY MS. FOX:  Okay.  Can you explain to me how you

24   believed you were supposed to beat your children?

25   A.   We were supposed to beat them until they cried

1    and beat them until they cried softly.  And we were

2    instructed that if we had a small child like a baby on a

3    changing table, we should use a wooden spoon to beat that

4    child.  And as they grew older, we should use a paddle

5    like a ping pong paddle or a 1 x 2 board to beat our

6    children.  And that we could beat them four or five times

7    and it was okay if they got bruised.

8            His own children got bruised and even beat them

9    as they -- clear into their teenage years.  And he told us

10   that if we would beat them, it would -- we should break

11   their spirit.  And that he had experienced that if he

12   broke their spirit, they would then come around and be

13   thankful to him.

14   *Q.*   And was this preached through his sermons to the

15   entire congregation?

16   *A.*   Yes, ma'am.

17   *Q.*   When did you stop attending Harvest?

18   *A.*   Not soon enough.

19   *Q.*   Can you give me an approximate date?

20   *A.*   2001, maybe 2002.

21   *Q.*   And why did you stop attending Harvest?

22   *A.*   Because I realized I was embarrassed to call

23   Tom King my spiritual leader.

24   *Q.*   Why were you embarrassed to call Tom your

25   spiritual leader?

1    A.    I think the watershed moment for me was at a

2    family dinner night.  We had carry-in dinners once a

3    month.  I heard Tom talking to another parishioner and he

4    was saying that the city council was insane.  I said:

5    Tom, they're not insane.  He said:  Oh, yes, they're

6    insane.

7          It's because they were making a decision that he

8    didn't agree with, so he painted them with this broad

9    brush that they were all out of their minds because they

10   somehow disagreed with what he thought should be done.

11         And I thought if I saw this man in town or was in

12   a meeting with him and he said those kinds of things, I

13   would feel embarrassed and ashamed to call him my pastor

14   and I couldn't go there anymore.

15   Q.    Did Harvest have a negative effect on the

16   families that attended?

17   A.    It did on mine.

18   Q.    Can you explain that?

19   A.    My stepdaughter Bree is 39 and -- can I get a

20   drink of water?

21   Q.    Yeah.  Go ahead.

22   A.    Our relationship is broken.  And I think it's

23   because of the teaching that we got and the things that we

24   said and did while she was with us as a child.

25   Q.    So you said that you would see Wendi about three

1  times a week during the time that you attended church with

2  her; correct?

3      *A.*   Yes.

4      *Q.*   Up to what point in time, were you seeing Wendi

5  three times a week?

6      *A.*   When Wendi married Joe, Joe liked to go to the

7  lake on Sundays.  And so they didn't come to church as

8  consistently as Wendi did when she was -- before she

9  married because she was spending time with Joe.

10         And then when Joe got sick, I think they started

11 coming back to church more often.  Then they went to

12 Colorado for a season and I didn't see her then.  When

13 they came back from Colorado, they were very consistent

14 until they moved to Ahwatukee for Wendi's job.

15     *Q.*   Do you know about what point in time they moved

16 to Ahwatukee?

17     *A.*   Oh, gosh, maybe late 1990's.

18     *Q.*   And did you lose touch with Wendi at that point

19 in time?

20     *A.*   Yes.

21     *Q.*   When did you first hear about Wendi's arrest?

22     *A.*   Soon after she was arrested, the church secretary

23 Lola called and told me.

24     *Q.*   Were you involved at all in the preparation of

25 Wendi's trial?

1    *A.*    Yes, ma'am.

2    *Q.*    In what way?

3    *A.*    Donna, Wendi's mother, called me and said that

4    she was reviewing the tapes from the police interrogations

5    and she was doing it so she could save money for

6    Wendi's -- on Wendi's defense.  She was doing some work

7    for Mr. DeLozier.  And so she was listening to the tapes

8    and comparing them to the transcripts.  And they were

9    really hard for her to listen to and she wasn't sure if

10   she was going to have time to listen to all of the tapes

11   before he needed the information.  So she asked if I would

12   help.

13          So I brought the tapes to my home and my husband

14   and I listened to the tapes and read the transcripts and

15   marked on the transcripts any places there were

16   discrepancies from what we heard and what we read.

17   *Q.*    Did you attend Wendi's trial?

18   *A.*    Yes, ma'am.

19   *Q.*    How often did you attend Wendi's trial?

20   *A.*    I came to many of the days.  Not all of them.  I

21   was self-employed at the time so I had some freedom in my

22   schedule.  So maybe I would say 80 -- 80 percent of it,

23   maybe better than that.

24   *Q.*    Was that for all of the different portions of

25   Wendi's trial?

1    *A.*    Yes.  Both the guilt phase and the sentencing

2  part.

3    *Q.*    Did you ever meet Wendi's attorneys?

4    *A.*    Yes.

5    *Q.*    How did you meet Wendi's attorneys?

6    *A.*    Well, I met them when we were -- when we attended

7  the trial, and we would -- at the end of each day, we

8  would help carry things out to the car for them and kind

9  of talk about how the day went.  And they would bounce

10  ideas off of us.  I think they were kind of using my

11  husband and I as the average guy, since then couldn't

12  interact with the jury.  And they would say:  You know,

13  how well did we make this point or that point?  And what

14  do you feel like came across strongly?  And that was

15  about it.

16    *Q.*    When you attended the trial, did you hear any

17  testimony about Wendi's good Christian upbringing at

18  Harvest?

19    *A.*    Yes.

20    *Q.*    Did you think that it was presented accurately?

21    *A.*    I actually had some concerns about it.  And one

22  day during one of the breaks, I stopped Scott.

23    *Q.*    Scott MacLeod?

24    *A.*    Yes, ma'am.  And said -- I was really kind of

25  upset because the culture was very complex and what you

1  saw on the surface was not always what was going on behind

2  the scenes.

3           And I said to Scott:  I don't think that the

4  total picture of Harvest has been presented.  And he

5  said -- he kind of got agitated with me and said:  What

6  more needs to be said?  I said:  They're not -- they don't

7  get it.  They don't get what it was really like.

8           He said:  What difference does that make?  What

9  point will it make?  I said:  I don't know, but they're

10 not getting it.

11  *Q.*   And besides that one time, did you try to tell

12 anyone else on the defense team about what it was really

13 like at Harvest?

14  *A.*   No.  I figured if Scott didn't think it was

15 important, nobody else would.

16  *Q.*   Did you ever have any other interactions with

17 Scott MacLeod?

18  *A.*   No.  Well, yes, I did.  The first day we showed

19 up for court to see the trial, he stopped my husband and I

20 before we went into the courtroom and said:  I've been

21 looking for you, which I found surprising since we're in

22 the phone book and we're home every night.

23           But, nevertheless, he said:  I've been looking

24 for you because I want to know if you would be a witness

25 for Wendi.  And I said:  We haven't seen Wendi in a few

1   years.  I don't know what we could add to -- we haven't

2   seen her since she moved to Ahwatukee.  I don't know what

3   we could tell you about her life when all of this

4   happened.  And he said:  Okay.

5       Q.   Did he indicate that Wendi's childhood would be

6   at all relevant?

7       A.   No.

8       Q.   No?  Would you have been willing to talk to him

9   about Wendi's childhood if asked?

10      A.   Yes.

11      Q.   Did you assist at all with the sentencing portion

12  of Wendi's trial?

13      A.   Yes, ma'am.

14      Q.   And can you please tell us what you did?

15      A.   I wrote the opening and closing arguments.

16      Q.   You wrote the opening and closing arguments?

17      A.   Yes.

18      Q.   Why did you do that?

19      A.   After the first part of the sentencing phase,

20  Mr. DeLozier was out in the hallway looking and he came

21  over and he was kind of looking befuddled.  And so I

22  don't -- he said to me:  I don't really know how to get

23  started on this.  I don't know how to put all the pieces

24  together, knowing what Wendi has done and how all this

25  fits together.  I just don't know how to get started.

1        And I said:  Would you -- you want me to write

2   some things up for you?  Some -- a draft for some opening

3   arguments?  Do you want me to write something up?  He

4   said:  Oh, that would be so grateful.  I would be so

5   grateful.  That would be wonderful.

6        So that evening, my husband and I wrote up what

7   we thought the jury needed to hear and gave it to him.

8        And then at the end of that phase, that second

9   part of the sentencing, the same thing kind of went on.  I

10  asked:  Would you like us to write something up?  And he

11  said:  Yes.

12       And we kind of had to hurry because that part

13  came to an end and he was going to have to present like

14  the next day.  So we went home and worked late into the

15  night and typed something up and e-mailed it to him.

16  *Q.*   Do you have any -- are you a lawyer?

17  *A.*   No.

18  *Q.*   Have you had any legal training?

19  *A.*   No legal training.

20  *Q.*   Do you have any training as a mitigation

21  specialist or investigator?

22  *A.*   No.

23  *Q.*   Did anyone explain to you what should go into a

24  mitigation case?

25  *A.*   No.

1    *Q.*   And did any of the attorneys inform you what

2    mitigation factors were?

3    *A.*   No.

4    *Q.*   And why didn't you put any of the bad stuff about

5    Harvest in your opening or closing statements?

6    *A.*   Well, it hadn't been talked about in trial at

7    all.  And all I wrote -- I wrote up that I thought

8    Wendi was a -- I wanted the jury to know that Wendi was a

9    good woman who had made a bad choice.  So that's what I

10   wrote in that closing statement.

11   *Q.*   And did you attend the trial at the portion where

12   the closing statement was done?

13   *A.*   Yes.

14   *Q.*   And was what you wrote part of the closing

15   statement?

16   *A.*   I can't swear it was word-for-word, but it felt

17   like it was pretty close.  Mr. DeLozier read it.

18   *Q.*   And what was your opinion of his reading of the

19   closing statement?

20   *A.*   I was really disappointed because we wrote it as

21   an impassionate plea.

22          MR. HAZARD:  Objection to relevancy.

23          THE COURT:  Sustained.

24   *Q.*   BY MS. FOX:  Did you observe Mr. DeLozier's

25   performance during the entirety of the trial?

1     *A.*   Yes.

2     *Q.*   And what was your opinion of it?

3           MR. HAZARD:  Objection.  Relevance.

4           THE COURT:  Sustained.

5     *Q.*   BY MS. FOX:  Do you have any knowledge of how the

6     attorneys on the case were dividing the labor on the case?

7     *A.*   I asked Dan about that during one part of the

8     trial and I think it was that sentencing part.  I was

9     concerned about Mr. DeLozier because he didn't look good.

10    He had gotten really thin.  I think he was fasting during

11    the trial and he had gotten really skinny and he seemed

12    kind of cowed and intimidated by the prosecutor.

13           And I said to Dan after court one day:  Can't you

14    do something?  Can't you step in and do that part because

15    I think David is in over his head?

16           And he said that there had to be a division of

17    labor.  There had to be two lawyers and there had to be a

18    division of labor.  So he had to let David do something is

19    what I remember him saying.

20           MS. FOX:  Okay.  I have no further questions.

21    Thank you very much.

22           THE COURT:  Cross-examination.

23           MR. HAZARD:  Thank you.

24           May I approach the witness, Your Honor?

25           THE COURT:  Yes.

1                    CROSS-EXAMINATION

2    BY MR. HAZARD:

3        Q.    Ms. Schaider, I'm handing you Exhibit 85 which

4    has been admitted.  Let me turn your attention to it ends

5    up being the second page after the title Appendix 8.  Do

6    you recognize that letter?

7        A.    Yes.

8        Q.    What is that letter?

9        A.    It's a letter that I wrote on behalf of Donna and

10   Alejo when they were hoping to get custody of the

11   grandchildren.

12       Q.    Do you remember who that letter was addressed to?

13   It is to whom it may concern, but do you remember who was

14   going to view that letter?

15       A.    The Court, I would presume.

16       Q.    Is it possible, too, that it was the court

17   appointed psychologist, Dr. Yee, that was going to help

18   assist the family judge -- the family court judge decide

19   who should have visitation or guardianship rights to

20   Ms. Andriano's children?

21       A.    I don't remember.  I just remember it was going

22   into a court process.

23       Q.    All right.  And you knew a judge was going to

24   review this?

25       A.    Yes.

1    Q.    Were you honest in that letter?

2    A.    Yes.

3    Q.    Where in that letter do you call Alejo a drug

4    burnout?

5    A.    Nowhere.

6    Q.    Where in that letter do you call him sneaky or

7    refer to him as being sneaky?

8    A.    Nowhere.

9    Q.    Where in that letter do say that he set

10   inconsistent boundaries in the way that he disciplined

11   children in the church?

12   A.    Nowhere.

13   Q.    Where in that letter do you mention these

14   photographs that you apparently were aware of that Alejo

15   took of Ms. Andriano?

16   A.    Nowhere.

17   Q.    Turn the page to Page 2 at the top.  You write:

18   Nicholas stole the heart of everyone in our church family?

19   You wrote that?

20   A.    Yes.

21   Q.    Nicholas is Ms. Andriano's son?

22   A.    Yes.

23   Q.    Then you write:  We all watched and waited as he

24   took his first steps.  As the youngest child in our

25   fellowship, our hearts were tender towards him and pastor

1   frequently allowed him to wander the sanctuary visiting

2   with each of us during the service.  You wrote that;

3   correct?

4       A.   Yes.

5       Q.   Now were you talking about the good pastor or the

6   bad pastor there?  This is 2001.

7       A.   I'm sorry.  I don't understand the question.

8       Q.   Were you talking about the good pastor or the bad

9   pastor?

10          MS. FOX:  Objection.  I don't understand.

11          THE COURT:  Sustained.

12          Be more succinct.

13      Q.   BY MR. HAZARD:  Were you talking about

14   Pastor King?

15      A.   Yes, Pastor Tom King.

16      Q.   You don't mention anything about Pastor King

17   being evil or inappropriate there; correct?

18      A.   No.  I didn't call him evil or inappropriate

19   today either.

20      Q.   All right.  In this letter, you give glowing

21   praise to Donna and Alejo Ochoa; do you not?

22      A.   Yes, I do in this letter.

23      Q.   You talked about -- you wrote Alejo and Donna

24   have always been very dedicated to helping and supporting

25   the children and adolescents in our church fellowship,

1  and, in fact, Alejo is even a pastor there; correct?  You

2  wrote that?

3      *A.*    I wrote that.

4      *Q.*    I worked alongside of him for several years

5  during the 1980's in the children's church.  You wrote

6  that; correct?

7      *A.*    I wrote that.

8      *Q.*    I found them to be very relaxed with the

9  children, able to set appropriate limits for behavior, yet

10  be playful with them.  Are you talking about Alejo and

11  Donna there in that context?

12      *A.*    In that letter, at that time, yes, I was.

13      *Q.*    The children were drawn to them and enjoyed their

14  company?  You wrote that?

15      *A.*    Let me go back.  Yes, that's what I wrote.

16      *Q.*    They use every opportunity to instruct them in

17  appropriate moral values.  You wrote that?

18      *A.*    Yes, I wrote that.

19      *Q.*    You also -- one, two, three, four, five, six

20  paragraphs down on that same page, you start discussing

21  Brandon Ochoa and how wonderful Alejo and Donna were in

22  helping to positively change Brandon Ochoa's life;

23  correct?

24      *A.*    No, that's not precisely what it says, sir.

25      *Q.*    All right.  I will read precisely what you said

1  for the sake of accuracy.  Brandon had been living in

2  deplorable conditions with his natural mother, Donna's

3  sister, and they again opened their hearts and home to a

4  child.  And you're referring to they as Alejo and Donna

5  Ochoa; correct?

6      A.   Yes.

7      Q.   Growing up in a drug abusing home with a constant

8  stream of men in and out of his mother's life, Brandon

9  came with a great deal of emotional baggage.  I watched

10  the Ochoas patiently and lovingly work with him to feel

11  accepted and loved by who Brandon now calls his mom and

12  dad.  That's what you wrote?

13      A.   That is what I wrote.

14      Q.   And, again, you wrote this knowing -- on July 18,

15  2001, knowing that a judge was going to consider this in

16  deciding whether the Ochoas were appropriate parental

17  figures for Nicholas and Ashlee, Ms. Andriano's children;

18  correct?

19      A.   Yes.

20      Q.   You mention that you wrote and assisted

21  Mr. DeLozier in his opening statement and closing argument

22  in what you deemed or what counsel called the sentencing

23  phase; correct?

24      A.   Yes.

25      Q.   And as I understand your testimony, you were

1   talking about -- can you tell me exactly where in the

2   penalty phase this took place, to your memory?

3       *A.*   If I understand the penalty phase right, there's

4   the aggravating part and the mitigating part.  And I

5   remember it being toward the end of the -- the beginning

6   of the mitigating part and the end of the mitigating part.

7       *Q.*   All right.  And you mentioned in your direct

8   testimony, that after the mitigation had been presented,

9   for closing argument, you assisted Mr. DeLozier in writing

10  that closing argument; correct?

11      *A.*   No.  I wrote up several pages of material and

12  gave it to him.  And he used it for much of his closing

13  argument.

14      *Q.*   On which day because you mentioned that the

15  closing argument was split into two different days, an

16  opening close and a rebuttal close; correct?

17      *A.*   I don't know.

18      *Q.*   You don't know what he used in which phase?

19      *A.*   No, I don't.

20      *Q.*   I assume that you're not -- you don't have

21  psychic powers or can't read minds; correct?  Is that

22  correct?

23      *A.*   That is correct.

24      *Q.*   All right.  And so if there is anything in

25  Mr. DeLozier's rebuttal closing argument that was in

1   response to Mr. Martinez's arguments made just minutes

2   before, you would not have been able to anticipate those;

3   correct, and write those?

4        A.   No.  I don't really understand your question or

5   what you're trying to get at.

6        Q.   When you wrote -- whatever you wrote to

7   Mr. DeLozier, did you write in anticipation of what

8   Mr. Martinez was going to argue?

9        A.   No.  I wrote -- what I wrote down was what I

10  thought I would want the jury to know and understand.

11            MR. HAZARD:  No further questions.

12            THE COURT:  Redirect?

13            MS. FOX:  No.  Thank you, Your Honor.

14            THE COURT:  May this witness be excused?

15            MS. FOX:  Yes.

16            THE COURT:  Thank you very much.  You're excused.

17  Don't walk off with any of the exhibits.  Okay?

18            THE WITNESS:  I won't.

19            THE COURT:  Okay.  Thank you.

20            Is that it for today?

21            MR. ARNTSEN:  That's it for today.

22            THE COURT:  Let me ask counsel, just with

23  regards, to my recollection, I think tomorrow you

24  indicated to me on Friday that Mr. Hammond and

25  Mr. Lowenthal will be testifying?

1        MR. ARNTSEN:  Right.  And that will be the end of
2   our case.
3        THE COURT:  That's Tuesday.  What are we looking
4   at on Wednesday?
5        MR. ARNTSEN:  I believe -- I mean, I suppose it's
6   possible they won't get quite done tomorrow.
7        THE COURT:  Right.
8        MR. ARNTSEN:  But that's it.  We're done.
9        The State can talk about what they've got going.
10       THE COURT:  Mr. Hazard.
11       MR. HAZARD:  Judge, Friday, the 14th, is when
12   Dr. Pitt and Dr. Amin are available.  I contacted them on
13   the weekend, but they did not get back to me to see if
14   they were available earlier.
15       Based on my previous conversations, they aren't.
16   The 14th, they're locked in.  But we have no other
17   witnesses we intend to call.
18       THE COURT:  But we're going to be able to finish
19   on the 14th?
20       MR. HAZARD:  Yes.
21       MR. ARNTSEN:  Yes.
22       THE COURT:  So tomorrow we're going to have
23   Mr. Hammond and Mr. Lowenthal and it may go into
24   Wednesday.  But we're probably going to recess early on
25   Wednesday and not have anything on Thursday.  Is that what

1    I hear?

2           MR. HAZARD:  That is correct.

3           MR. ARNTSEN:  That's correct.  Your Honor, just

4    as kind of a logistics matter, for whatever days, if we're

5    not going to be here for a whole day, one thing we would

6    ask the Court to communicate that to the jail, so that

7    Ms. Andriano isn't hauled over here.

8           THE COURT:  Right.  Then, so each day, we will

9    make sure that we're all on the same page.  Okay?

10          MR. ARNTSEN:  Right.

11          THE COURT:  Okay.  Anything further before we

12   take our evening recess?

13          MR. ARNTSEN:  No, Your Honor.

14          THE COURT:  Okay.  Thank you very much.  Everyone

15   have a nice evening.  We will be in recess until tomorrow

16   at 9:30 a.m.

17          (WHEREUPON, the proceedings were concluded at

18   3:47 p.m.)

19                        *  *  *  *  *  *  *

20

21

22

23

24

25

```
1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9

10        I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11   the State of Arizona, do hereby certify that the foregoing

12   187 pages constitute a full, true, and accurate transcript

13   of the proceedings had in the foregoing matter, all done

14   to the best of my skill and ability.

15        SIGNED and dated this 12th day of April, 2014.

16

17

18                    /s/  Renée A. Mobley, RPR

19                    RENÉE A. MOBLEY, RPR

20                    Certified Reporter

21                    Certificate No. 50500

22

23

24

25
```

# EXHIBIT FFFFFFFFF

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
M. Martin, Deputy
5/2/2014 5:47:05 PM
Filing ID 5855441

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                )
                                 )
          Respondent,            )
                                 )
vs.                              )   No.
                                 )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,        )
                                 )
          Petitioner.            )
_____)

Phoenix, Arizona
February 3, 2014
9:32 a.m.

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING

DAY 1

VOLUME I OF II

Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                    (ORIGINAL)

1                     <u>A P P E A R A N C E S</u>

2

3

4    On Behalf of the State:

5             Mr. Gregory Hazard
              Assistant Attorney General
6
              Ms. Lacey Gard
7             Assistant Attorney General

8
     On Behalf of the Defendant:
9
              <u>ATTORNEYS AT LAW</u>:
10
              Mr. Scott Bennett
11            Mr. Allen Arntsen
              Mr. Stephan Nickels
12            Mr. Matthew Lynch
              Ms. Krista Sterken
13            Ms. Jodi Fox

14                     <u>I N D E X</u>

15

16                  <u>T E S T I M O N Y</u>

17
     <u>WITNESS</u>:                                    <u>PAGE</u>
18

19   JAMES W. HOPPER, PH.D.

20        Direct Examination by Mr. Nickels        24

21

22

23

24

25

1                          P R O C E E D I N G S

2

3          THE COURT:  Good morning.  This is

4  CR 2000-096032, State of Arizona vs. Wendi Elizabeth

5  Andriano.

6              Is the State ready?

7          MR. HAZARD:  Yes, Your Honor.

8          THE COURT:  Are the Petitioners ready?

9          MR. ARNTSEN:  Yes, we are, Your Honor.

10         THE COURT:  Just so that we have a clear record,

11  why don't you go ahead and identify yourself, everyone for

12  the State.

13             MS. GARD:  Lacey Gard for the State, Your Honor.

14             MR. HAZARD:  Gregory Hazard for the State.

15         THE COURT:  And?

16             MR. BENNETT:  Scott Bennett for Ms. Andriano.

17             MS. FOX:  Jodi Fox for Ms. Andriano.

18             MR. ARNTSEN:  This is Ms. Andriano.  Allen

19  Arntsen for Ms. Andriano.

20             MR. NICKELS:  Good morning, Your Honor.  Steve

21  Nickels for Ms. Andriano.

22             THE COURT:  Good morning.

23             MS. GARD:  And, Your Honor, the other people at

24  counsel table are our paralegals.

25             THE COURT:  Okay.  Thank you.

1          MR. ARNTSEN:  Your Honor, also here is Matthew
2  Lynch and Krista Sterken.
3          THE COURT:  Mr. Lynch and Ms. Sterken.  Okay.
4  Thank you.
5          We are set today for Day 1 of a Post-Conviction
6  Relief Evidentiary Hearing.  In our status conferences, it
7  is my understanding that the Petitioner and the State have
8  agreed to waive opening statements; is that correct?
9          MR. ARNTSEN:  That's correct, Your Honor.
10          THE COURT:  Are we ready to proceed at this time?
11          MR. ARNTSEN:  We are.  There are a couple of
12  issues before we start with the evidence that I would like
13  to bring up.
14          THE COURT:  Go ahead.
15          MR. ARNTSEN:  First of all, you may recall we
16  have had some hearings on Ms. Andriano's transportation
17  and feeding, essentially.  And, unfortunately, there are
18  still some issues there.  I thought we would wait until
19  this morning to see what happened rather than speculating
20  as to what might happen.
21          This morning she was woken up at 3:30, taken out
22  of her cell at 4:15, and put in a holding cell in
23  Estrella.  Somewhere between 6:00 and 6:30, she was placed
24  on a bus and taken somewhere.  She assumes downtown, where
25  she was at a holding cell for about five minutes.  Then

1    she got back on a bus around 7:00 o'clock to come over

2    here.

3            And what time did you get here?  About 8:00.

4            THE PETITIONER:  8:00.

5            MR. ARNTSEN:  8:00.  And instead of -- she didn't

6    get breakfast before she left Estrella.  And then at

7    downtown, they gave her just one sack when we had

8    understood she would get one sack for breakfast and one

9    sack for lunch here today.

10           So what we would like -- we have kind of gone

11   back and forth on this a number of times.  And, really,

12   what we would ask is an order for the Court setting forth

13   some parameters on Ms. Andriano's transportation.

14           Hopefully, for instance, if the bus doesn't leave

15   Estrella until 6:00 or 6:30, it seems to me like

16   Ms. Andriano ought to be able to not be awoken before

17   5:00.

18           Also, it seems to me that she ought to get two

19   sack lunches, being gone all day like this, which, again,

20   we thought we had an agreement with the county on before,

21   but it just didn't happen.

22           THE COURT:  Well, it was my understanding from

23   the status conference that Mr. Jue attended, who

24   represented the sheriff's office -- it was my

25   understanding from you and from him, that all of these

1   matters had been resolved.  Mr. Jue is not here right now.
2   So I'm reluctant to go into these things without Mr. Jue
3   being present representing the sheriff's office.
4          So what we will do is I'll have my judicial
5   assistant contact Mr. Jue's office and indicate to him
6   that there is an issue, and either we will have him on the
7   telephone or have him come to court here today and we can
8   discuss this towards the end of the day.
9          MR. ARNTSEN:  Okay.  That would be fine.
10          THE COURT:  I'm reluctant to discuss or rule on
11   any matters without Mr. Jue being present.
12          MR. ARNTSEN:  Understood.  The next issue --
13          THE COURT:  Sure.
14          MR. ARNTSEN:  Oh, I'm sorry.
15          SERGEANT KELLER:  Your Honor, if I may, I'm
16   Sergeant Keller with the Maricopa County Sheriff's Office.
17   I'm in charge of the transport detail.  There was a
18   miscommunication this morning for her.  She was supposed
19   to be waiting for me and my crew to bring her here, which
20   would have given her more time.  The secondary sack lunch
21   that he's talking about is being delivered for lunchtime.
22          THE COURT:  Okay.
23          MR. ARNTSEN:  Okay.  So we're probably okay.
24   Maybe what we'll do is we'll just check in on it again
25   tomorrow.

1          THE COURT:  Okay.  Thank you, Deputy.

2          MR. ARNTSEN:  Thank you very much.

3          THE COURT:  So we don't have to contact Mr. Jue

4    it sounds like at this point.

5          MR. ARNTSEN:  Yes.  We will see what happens with

6    tomorrow.  That sounds just fine, Your Honor.

7          THE COURT:  Okay.

8          MR. ARNTSEN:  The second issue is the parties had

9    stipulated to the admission of a number of exhibits as set

10   forth in the Trial Exhibit List.  I was going to go

11   through and move them into evidence before we got started

12   just kind of in mass.  I can give the exhibit numbers and

13   I believe they would show on the Trial Exhibit List that

14   admissibility was stipulated.  Although if that isn't

15   necessary, then that's fine.

16         And that would be on the Joint Witness Schedule

17   and Exhibit List that the parties filed a couple of weeks

18   ago.  I'm ready to go down the list of exhibits whenever

19   everybody else is ready.

20         THE COURT:  Go ahead.

21         MR. ARNTSEN:  Are you ready?  It would be

22   Exhibit 2, 2 A, 2 B, 2 C, 2 D, 3, 4, 4 A, 4 B, 5, 5 A,

23   6 A, 6 C, 6 E.  Give me just a second.  44, 45.

24         THE COURT:  Did you miss 15?  Was 15 going to be

25   admitted?

1          MR. ARNTSEN:  Yes, Your Honor, 15.  44, 45, 46,

2    47, 48, 49, 54.  And then we move up to I believe 131.

3          MS. GARD:  No.  It's 65.

4          MR. ARNTSEN:  65?

5          MS. GARD:  Yes.  And 65 A.

6          MR. ARNTSEN:  65 and 65 A.  131.

7          THE COURT:  Say that one more time.

8          MR. ARNTSEN:  131.  And 166.  And then there are

9    certain of the State's exhibits and I'll let them do that.

10          MS. GARD:  Those exhibits, Your Honor, would be

11   171, 179, 180.

12          THE COURT:  180?

13          MS. GARD:  Yes.  183, 184, 195, 199, 200, 201.

14   And I would also note for the record that we have them on

15   our exhibit schedule.  We have exhibits marked as 7, you

16   know, 7 A, 7 B.  But on the exhibit list, they're actually

17   marked with decimal points after.  So it's like 2.001

18   instead of 2 A.

19          THE CLERK:  That's how the system does it.

20          MS. GARD:  Okay.  So I just wanted to make sure

21   the record is clear what we're talking about.

22          THE COURT:  So those State's exhibits marked for

23   identification, it's a stipulation that they can be

24   admitted; is that correct?

25          MR. ARNTSEN:  Right.  All of the exhibits, yes,

1   all of both sides.

2           THE COURT:  Along with what you said; right?

3           MR. ARNTSEN:  Yes.

4           THE COURT:  All right.  Let's just go over that

5   one more time, then.  Okay?  Pursuant to stipulation,

6   then, Exhibit No. 2, 2 A, 2 B, 2 C, 2 D, 3, 4, 4 A, 4 B,

7   5, 5 A, 6 A, 6 C, 6 E, 15, 44, 45, 46, 47, 48, 49, 54, 65,

8   65 A, 131, 166, and then 171, 179, 180, 183, 184, 195,

9   199, 200 and 201 are all admitted into evidence.

10          MR. ARNTSEN:  Yes, Your Honor.  And as we were

11  doing this, Attorney Hazard came over and told me also

12  that the State had no objection to the admission of

13  Exhibit 167.

14          THE COURT:  167?

15          MR. ARNTSEN:  Dr. James' report.

16          THE COURT:  Is that correct, Mr. Hazard?

17          MR. HAZARD:  Yes, Your Honor.

18          THE COURT:  Then also Exhibit No. 167 for

19  identification is admitted into evidence.  Okay.  Is that

20  it?

21          MR. ARNTSEN:  We had filed a motion before trial

22  with regard to certain evidence relating to the mitigation

23  case that we are saying should have been presented.  And

24  just as a very brief overview, we've got kind of three

25  categories of evidence.

1     We have the evidence related to the conflict of

2  interest issue.  We have the evidence relevant to the

3  *Strickland* claim, the ineffective assistance of counsel

4  claim, which is one looks at effectiveness and then the

5  other prong is prejudice.

6     And the prejudice part of that claim is the

7  mitigation case that we're saying should have been

8  presented, but wasn't.  And so, with regard to that

9  evidence -- and in our motion, we list the specific

10  exhibits -- and I can list them later on following the

11  argument here -- that they're admissible irrespective of

12  their admissibility under the Arizona Rule of Evidence

13  based on the rule in Arizona Revised Statute 13-751, that

14  any factors proffered by the defendant or the State that

15  are relevant in determining whether to impose a sentence

16  less than death are admissible regardless of its

17  admissibility under the rules governing admission of

18  evidence in criminal trials.

19     So, again, what this is evidence is the evidence

20  that we're saying should have been presented in the

21  mitigation case under that standard, and that,

22  accordingly, that evidence and, again, the specific

23  exhibits and related testimony as laid out in the motions

24  should be admitted at this stage irrespective of any

25  evidentiary issues under the rules of evidence, that

1   Ms. Andriano has a constitutional right to have her -- any
2   of this mitigation evidence, you know, allowed into
3   evidence here.
4           THE COURT:  It looks like that motion was filed
5   on or about January 24th.  Did the State file a response
6   that I should be aware of?
7           MS. GARD:  We have not filed a response yet,
8   Your Honor, or at all.  I would like to respond orally if
9   that's all right.
10          THE COURT:  Okay.
11          MS. GARD:  First of all, Ms. Andriano has no
12  constitutional right to this proceeding, period.  But
13  settling that side, the rules of evidence apply to a
14  PCR hearing, and I think it's Rule 32.8.  This is not a
15  resentencing.  13-751 would apply if it were.  It is not.
16  This Court is governed by or this hearing is governed by
17  the rules of procedure and they should be applied.
18          THE COURT:  Okay.  Let me think about the motion
19  and the argument that has been made here today and I'll
20  make a ruling.  Okay.
21          MR. ARNTSEN:  Okay.  I anticipate the issue will
22  arise with our second witness, Donna Ochoa.  Our first
23  witness will be Dr. James Hopper.
24          And I spoke with Attorney Hazard before the
25  hearing and, you know, in terms of experts are allowed to

1   rely on nonadmissible evidence if it's the kind of

2   evidence they normally rely on.  Attorney Hazard and I

3   discussed that of a protocol where Dr. Hopper could

4   testify without lots of objections under the understanding

5   that to the extent he was discussing underlying factual

6   evidence, that was being -- that was being used under the

7   expert use of evidence exception to the other evidentiary

8   rules.

9          Greg, I don't think I misrepresented it at all.

10         THE COURT:  Mr. Hazard?

11         MR. HAZARD:  No.  That's correct, Your Honor.  I

12   can make objections to hearsay.  And if it is offered for

13   a basis for Dr. Hopper's opinion --

14         THE COURT:  For opinion.

15         MR. HAZARD:  -- for his opinion, however you want

16   to, so the record is clear that we are objecting to being

17   offered for the truth of the matter asserted.  But we

18   could -- with that understanding, I don't know if I need

19   to make objections every time because it would interrupt

20   the proceedings.

21         THE COURT:  Can we proceed with that

22   understanding?

23         MR. ARNTSEN:  Yes, Your Honor.

24         THE COURT:  Okay.  Then you won't have to make an

25   objection each and every time then.

1          MR. HAZARD:  Thank you, Judge.

2          THE COURT:  Everyone agrees to that?

3          MR. ARNTSEN:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. ARNTSEN:  Then yes.  And the issue with

6   regard to the motion on mitigation evidence, that will

7   come up with Donna Ochoa, who will be our second witness,

8   who we anticipate will start sometime this afternoon.

9          THE COURT:  Okay.  It looks like Dr. Hopper is

10  going to be the first witness this morning; is that

11  correct?

12         MR. ARNTSEN:  Yes, Your Honor.

13         THE COURT:  Then who is going to be asking

14  questions on behalf of the State?

15         MR. HAZARD:  That would be me, Your Honor.

16         THE COURT:  Mr. Hazard.  Who is going to be

17  asking questions on behalf of the Petitioner?

18         MR. NICKELS:  I will, Your Honor.

19         THE COURT:  Okay.  And you're?

20         MR. NICKELS:  Mr. Nickels.

21         THE COURT:  Okay.  Thank you.  I'll get used to

22  everyones' faces and names.

23         MR. NICKELS:  Sure.

24         THE COURT:  Okay.  It would be Mr. Nickels.

25         Then you anticipate that Ms. Ochoa will be later

1   this afternoon?

2           MR. ARNTSEN:  That's what we anticipate.

3           THE COURT:  Do you anticipate that we're going to

4   go with Dr. Hopper some time in the afternoon, also?

5           MR. ARNTSEN:  That's what we anticipate, yes,

6   Your Honor.

7           THE COURT:  What I anticipate doing is going up

8   to the noon hour.  We will take about a 10-minute or

9   15-minute break about 10:45 for the court reporter and the

10  staff.  Okay?

11          MR. ARNTSEN:  Yes.  Then one other preliminary

12  matter and this is the last one.

13          THE COURT:  Okay.  That's okay.

14          MR. ARNTSEN:  It actually doesn't need to be

15  resolved today, but it concerns witness sequestration.

16  Specifically what it involves is whether experts may be

17  allowed to be in the courtroom while fact witnesses or

18  other experts testify.

19          We had reached an agreement with Attorney Hazard

20  that our legal experts, Larry Hammond and Gary Lowenthal,

21  could be present for Attorney Patterson and

22  Attorney DeLozier's testimony.

23          What we are asking is that they also be allowed

24  to be present for Mitigation Specialist Scott MacLeod's

25  testimony.

1        The State has objected to Attorney Hammond's and

2   Attorney Lowenthal's presence during Mr. MacLeod's

3   testimony.

4        We submit that their presence should be allowed

5   under Arizona Rule of Evidence 615 (C) as a person -- as

6   their presence is essential to the presentation of our

7   case.

8        And I would cite the *State vs. Williams* case,

9   183 Ariz. 368 at Page 380.  904 P.2d 437 at 449.  It was

10  reversed on other grounds, but this ruling holds up.

11       Also, in *State vs. Barocsi*, 2012, Arizona

12  unpublished Lexis 938 at Page 6.  It's an August 12th,

13  2012 opinion.  The Court applied that in the context of

14  Rule 9.3.

15       And the reasons why it's essential that

16  Attorneys Lowenthal and Hammond also be present during

17  Mr. MacLeod's testimony is that their opinions relate in

18  part to the adequacy of the defense team's work in the

19  underlying trial.  The defense team being made up of

20  Attorneys Patterson and DeLozier and Mitigation Specialist

21  MacLeod.  And we submit that there's nothing -- you're not

22  implicating the reasons for the sequestration rule by them

23  being present.  It's not like they're going to try to

24  align -- you know, they're basing their -- the opinions

25  they have done so far were based on the declarations of

1   these witnesses and interviews with them.

2          It's essential, if the witnesses testify, whether

3   on direct or cross, different from what they said in their

4   declarations or interviews, they ought to be able to

5   incorporate those opinions and say:  Oh, this makes a

6   difference in what my opinions are here.

7          And, again, it's not something like that they're

8   kind of -- you know, typically, you want witness

9   sequestration so that witnesses don't sort of coordinate

10  their testimony.  Fact witnesses don't keep -- you know,

11  so that they don't try to keep their stories straight.  We

12  submit that that just isn't implicated at all in the

13  context of a legal expert observing the testimony of a

14  fact witness.

15         And one other area with sequestration is the

16  parties have agreed that their respective mental health

17  experts, Attorney Woods on our side and -- not Attorney

18  Woods -- Dr. Woods on our side and -- or Drs. Woods and

19  James on our side and Drs. Pitt and Amin on their side can

20  be present during each other's testimony.

21         But we also ask that Dr. Woods be allowed to be

22  present with when Ms. Andriano testifies because his

23  opinions are relating to essentially her mental health

24  condition.  And we are amenable to Dr. Pitt also being

25  present when Ms. Andriano testifies.  We're not looking

1   for a one-sided arrangement here.

2          But, again, we think it's appropriate given that

3   Dr. Woods is going to be testifying as to mental health

4   issues with regard to Ms. Andriano, and that being present

5   during her testimony would help inform his opinion and,

6   again, doesn't run into the concerns you have for

7   sequestration of witnesses keeping their stories straight.

8   He is an expert.  He is basing his opinions on certain

9   assumed facts and it's really important that those facts

10  be right.

11         And if, for instance, he's assuming a certain

12  fact, and for whatever reason, she testifies something

13  different, under the sequestration rules, we can't tell

14  him that, and then he's up here giving opinions that

15  aren't based on the right facts.  And just, to me, it is

16  not helpful for the Court.  It is not helpful for the

17  process.  And, again, there is no issue on people keeping

18  stories straight because it is an expert offering an

19  opinion regarding lay witnesses.

20         THE COURT:  Okay.  Who wants to address this?

21  Mr. Hazard?

22         I should ask, Ms. Gard, should I address you as

23  Ms. Stover Gard or Ms. Gard?

24         MS. GARD:  Ms. Gard, Your Honor.

25         THE COURT:  Ms. Gard.  Okay.  Thank you.

1        Mr. Hazard.

2        MR. HAZARD:  Judge, I can respond to the e-mail

3   communication I had with Mr. Arntsen.  The State was not

4   going to take any position on Mr. Hammond and/or

5   Mr. Lowenthal being in the courtroom when Dan Patterson

6   and David DeLozier are testifying.  We did that as a

7   courtesy to facilitate things.

8        In addition, sort of the experts being present

9   when other experts are testifying, we have done that.  Our

10  office has done that in the past as a courtesy because it

11  certainly facilitates cross-examination when you're

12  dealing with scientific technical or otherwise knowledge

13  that's going to be beyond an attorney having a mental

14  health expert examine and be in the courtroom to assist

15  the attorneys with cross-examination of the opposing

16  expert.  I can understand why that would be beneficial.

17  And that's why we're not taking a position on that.

18        But any other witness on the stand, including the

19  defendant herself, Ms. Andriano, we would object to other

20  witnesses being present in the courtroom.

21        THE COURT:  So, basically, you have no objection

22  to Mr. Hammond and Mr. Lowenthal being present while

23  Mr. Dan Patterson and Mr. David DeLozier testify?

24        MR. HAZARD:  Correct.

25        THE COURT:  You do have a problem with them being

1    present while Mr. MacLeod testifies?

2           MR. HAZARD:  Correct.

3           THE COURT:  And then let me make sure I

4    understand.  And then, did you say that you -- what is the

5    State's position with regard to Dr. Woods being present

6    while Ms. Andriano testifies?

7           MR. HAZARD:  We object to that.

8           THE COURT:  You object?  Okay.

9           That's the only doctor that you're asking as far

10   as being present while the testimony?

11          MR. ARNTSEN:  Yes, Your Honor.  Although,

12   actually, in my initial run-up, I missed one.  We also

13   asked that our Mitigation Specialist Expert Keith Rohman

14   be present when Scott MacLeod testifies.  Again, he's

15   offering an opinion on the work of the mitigation

16   specialist here and, again, it's an expert who is -- it's

17   akin to Attorneys Hammond and Lowenthal being present

18   during Mr. MacLeod's testimony.

19          We ask that our other legal expert, although here

20   as a mitigation specialist expert, be allowed to be

21   present.

22          THE COURT:  And the State objects to that?

23          MR. HAZARD:  Yes, Your Honor.

24          THE COURT:  Let me think about these matters and

25   I'll make a ruling in a timely manner before these

1   actually come up.  Okay?

2          MR. ARNTSEN:  Thank you.  And that's all I have,

3   Your Honor.

4          MS. GARD:  Your Honor, I have two brief

5   housekeeping issues, if I may.

6          THE COURT:  Sure.

7          MS. GARD:  On the subject of Mr. Hammond and also

8   Mr. Lowenthal, in the PCR Petition, I had objected to

9   consideration of Mr. Hammond's opinions on two grounds

10  because he is -- this is a legal determination.  So he

11  shouldn't be offering an expert opinion on a legal

12  determination whether counsel was ineffective.

13         And, also, because it is not necessary to assist

14  the trier of fact because Your Honor is an attorney

15  familiar with the standard of care.

16         I would just like to renew that objection to

17  Larry Hammond's testimony and, also, to apply it to

18  Mr. Lowenthal's testimony as well.

19         THE COURT:  For now, I'm going to deny that

20  motion.

21         MS. GARD:  And the final thing I wanted to

22  address, Your Honor, Ms. Andriano, when these attorneys

23  were appointed to represent her, signed a waiver with the

24  Arizona Supreme Court acknowledging that they were not

25  Rule 6.8 qualified.

1          We think it would be beneficial to engage her

2   perhaps in a colloquy, if the Court is willing, to insure

3   and just to reaffirm that waiver and protect the record

4   for future proceedings.

5          THE COURT:  Mr. Arntsen.

6          MR. ARNTSEN:  And I apologize.  This may show my

7   ignorance for not being sure.  I'm not quite sure what she

8   just said.

9          THE COURT:  Do you want to go ahead and repeat

10   it?

11          MR. ARNTSEN:  I would assume to be sure if she

12   repeated it again.

13          MS. GARD:  Under the rules for appointment for

14   capital defense counsel, there's certain minimum

15   qualifications that have to be met.

16          My recollection is that Ms. Andriano signed a

17   written waiver when she accepted this appointment with the

18   Arizona Supreme Court.  We think it would be beneficial to

19   have the Court reaffirm that she consents to

20   representation by these attorneys.

21          THE COURT:  May I address, Ms. Andriano?

22          MR. ARNTSEN:  You may.

23          THE COURT:  Ms. Andriano, you heard what Ms. Gard

24   said?

25          THE PETITIONER:  Yes, sir.

1          THE COURT:  And it's my understanding you did

2  sign a waiver; is that correct?

3          THE PETITIONER:  Yes, sir.

4          THE COURT:  You would like these counsel -- the

5  counsel that are here with you, representing you here

6  today, to represent you in this Post-Conviction Relief

7  Proceeding?

8          THE PETITIONER:  Yes, Your Honor.

9          THE COURT:  And you do so freely, voluntarily and

10  intelligently?

11          THE PETITIONER:  Yes, Your Honor.

12          THE COURT:  You've had the opportunity to discuss

13  this with your counsel and you've had the opportunity to

14  think about this; is that correct?

15          THE PETITIONER:  Yes, Your Honor.

16          THE COURT:  And you did sign the consent freely,

17  voluntarily and intelligently?

18          THE PETITIONER:  Yes.

19          THE COURT:  Okay.  Any further questions?

20          MS. GARD:  No, Judge.

21          THE COURT:  Okay.  Then we will go ahead and

22  proceed then at this time.

23          MR. ARNTSEN:  Thank you, Judge.

24          THE COURT:  The Petitioners may call their first

25  witness.

1          MR. NICKELS:  Thank you, Your Honor.  The

2   Petitioner calls Dr. James Hopper.

3          THE COURT:  Sir, if you would step forward to the

4   witness stand here.  Before you sit down there, please

5   face the clerk.  Raise your right hand and she will swear

6   you in.

7          THE CLERK:  Please state your name and spell your

8   last name for the record.

9          THE WITNESS:  James W. Hopper, H-O-P-P-E-R.

10         (WHEREUPON, the witness was duly sworn by the

11  clerk.)

12         THE COURT:  Okay.  Sir, if you would please have

13  a seat there on the witness stand.  Just a few things to

14  remember while you testify.  Remember to speak up so that

15  everyone can hear you.

16         Also, it is important that you wait until the

17  question is completed before you answer the question.  And

18  also make sure that you give us a verbal response.  Don't

19  just shake your head and say uh-huh or un-huh.  Say yes,

20  no, whatever it might be.

21         Can you do that for us?

22         THE WITNESS:  Yes, I can.

23         THE COURT:  Go ahead and state your name for the

24  record.

25         THE WITNESS:  James Warren Hopper.

1          THE COURT:  You may proceed.

2

3                    JAMES W. HOPPER, PH.D.,

4   having been first duly sworn to tell the truth, the whole

5   truth, and nothing but the truth, testified as follows:

6

7                    DIRECT EXAMINATION

8   BY MR. NICKELS:

9       *Q.*   Good morning, Dr. Hopper.

10      *A.*   Hi.

11      *Q.*   Where do you live?

12      *A.*   I live in Arlington, Massachusetts.

13      *Q.*   When do you do for a living?

14      *A.*   I'm trained as a clinical psychologist and I work

15   as an independent consultant.  I provide training for

16   therapists, for police investigators, for prosecutors,

17   throughout the military.  I consult and provide teaching

18   through Harvard Medical School to an addiction clinic and

19   for psychiatry residents.  I do some clinical work.

20      *Q.*   Have you done work for this Andriano matter?

21      *A.*   Yes, I have.

22      *Q.*   We're going to get into your analysis and

23   conclusions in detail, but can you please provide a

24   summary of what you did for this case?

25      *A.*   So, for this case, I reviewed the events and

1  relationships of Wendi's life, particularly birth to

2  age 18, to determine whether she suffered traumatic

3  experiences that would affect her as an adult and what

4  effect those traumatic experiences have on her,

5  particularly her psychological functioning and her ability

6  to have close relationships.

7      *Q.*   And what did you find?

8      *A.*   Wendi suffered severe and pervasive trauma

9  throughout her childhood, including, but not limited to,

10  severe neglect by her mother, emotional and physical abuse

11  by her mother, her biological father and her stepfather

12  and sexual abuse by her stepfather.

13      *Q.*   What effect did this have on Wendi?

14      *A.*   Wendi entered adulthood as a severely damaged

15  person, who was not able to properly respond in situations

16  involving complex emotions or high stress, and she was

17  also unable to have normal, healthy, closer intimate

18  relationships.

19      *Q.*   In your professional opinion, Dr. Hopper, did the

20  trauma that Wendi suffer affect her in the time leading up

21  to Joe Andriano's death?

22      *A.*   Absolutely.  There is no way it couldn't happen.

23      *Q.*   Like I said, we're going to get back to your

24  analysis and discuss it in more detail.  But before we do

25  that, I'm going to have you just tell the Court a little

1   bit more about your background and qualifications.

2       A.   Okay.

3       Q.   So if you could just start with your educational

4   experience and take us up to the present.

5       A.   Sure.  So in college, I was a major in history,

6   but I took a lot of psychology courses.  When I graduated

7   from college, I worked at a mental hospital where I -- it

8   was a Harvard teaching hospital, where I learned a lot

9   about psychological trauma and saw it in the patients in

10  the hospital.  I worked on research, on the effects of

11  childhood trauma and especially this kind of chronic

12  pervasive trauma.

13          Then I went to graduate school at the University

14  of Massachusetts, Boston.  There I did my master's and

15  dissertation research on the effects of childhood trauma,

16  physical abuse, sexual abuse.  There I particularly

17  focused on men and outcomes of violence against others and

18  sexual abuse, child abuse, assault, those sorts of things.

19          Then as a post-doctoral follow, I worked at -- I

20  both got clinical training in working with people with

21  complex major trauma histories like this.

22          I also was the director of the research lab there

23  with a man named Bessel van der Kolk, who is one of the

24  leaders in the field of traumatic stress studies.

25          And then I conducted research in this realm on

1  traumatic memories, on treatment for child abuse or

2  related trauma, on what's going on in peoples' brains when

3  they're overwhelmed by being reminded of their traumas.

4        I also have done work through Harvard Medical

5  School on addictions and how trauma can lead to

6  addictions.  And that's pretty much my main training, you

7  know.

8    Q.   Have you done prior work on capital cases such as

9  this?

10   A.   Yes, I have.

11   Q.   Describe that for us, please.

12   A.   So I've worked on about eight.  I worked on eight

13  cases over the last ten years.  And I've -- you know, I do

14  about one a year, usually.

15   Q.   Was the work in those cases similar to what you

16  have done here, which is to analyze someone's life

17  experiences that determine whether there is trauma, and

18  then offer an opinion as to what effect that would have on

19  that person?

20   A.   Yes.  That's the kind of work I did.  One thing

21  different about this case is that there was such a

22  thorough investigation and so much evidence.  So that's

23  what makes this case stand out.  But all the methods and

24  procedures that I've used in the other cases are the same.

25   Q.   Okay.  Now you'll notice there is a set of

1  exhibit binders down by your feet.  If you could grab the

2  yellow one, please, and if you could look to what's

3  labeled as Exhibit 4 A.

4      A.   Okay.  I see it.

5      Q.   Could you please tell us what that is?

6      A.   This is my curriculum vitae, my CV, dated

7  February 3rd, 2012.  It's substantially the same.

8      Q.   Does that essentially describe what you have just

9  testified to to the Court about your educational and

10  professional experience?

11      A.   Yes.  I mean, there's definitely a lot more work

12  I've been doing to train in the military in the last

13  couple of years, but, otherwise, yes.

14      Q.   Okay.  Well, this is one of the exhibits that has

15  already been admitted into evidence, but I wanted to just

16  highlight it so that everybody knows that's what

17  Exhibit 4 A is.

18          We're now going to turn to the process that you

19  undertook here, what you reviewed, who you talked to,

20  et cetera.  So take us through that now.  Let's start with

21  any in-person interviews that you have done.

22      A.   Yes.  So I did in-person interviews with

23  Ms. Andriano and with six other people:  Her mother, her

24  biological father, her stepfather, a woman named Martha

25  England, who was an adult and a parent in a church in a

1   cult community that she was in as a teenager, and then two

2   women who were friends of hers at the time when she was a

3   child in that community, Kyre Lorts and Jeri Lynn

4   Cunningham.

5       Q.   How many interviews did you do with Ms. Andriano?

6       A.   There was six visits I made out here, and some of

7   those were one day with her and some were two or three.

8   So six times out here and 52 hours of interviews.

9       Q.   So that was 52 hours just with Ms. Andriano?

10      A.   Yes.

11      Q.   And then you had the other -- was it six other

12  people that you interviewed?

13      A.   Yes.

14      Q.   In addition to these in-person interviews, did

15  you review other materials?

16      A.   Yes.  I received ten binders of materials.  As I

17  said, this is one of the most thoroughly researched cases.

18  So I had documents on her mother, her biological father,

19  her stepfather, school records, medical records, family

20  records, military records for her father.  So lots of

21  records on her parents.

22          And then, also, many records on Wendi's life as

23  well.  Again, school records, everything from yearbooks

24  from the community she was in, to any records that were --

25  basically, any paper that was generated on her and by her

1  family.

2       *Q.*    In addition to all of those records and documents

3  that were in the binders, did you have an opportunity to

4  review any other witness statements, declarations,

5  affidavits, stuff like that?

6       *A.*    Yes, I did.  There were 25 declarations by people

7  who were family members or acquaintances of hers, many of

8  whom have had no contact with her since she was 18.  There

9  were four other declarations by people who were friends

10  with Joseph Andriano and also a woman who had taken care

11  of her children in the time leading up to the crime.

12      *Q.*    So a total of 29 declarations --

13      *A.*    That's correct.

14      *Q.*    -- in addition to those other documents and

15  witness interviews you've described?

16      *A.*    Yes.

17      *Q.*    Did you prepare a report?

18      *A.*    I did.

19      *Q.*    Let's turn to the same binder, Exhibits 3 --

20  really, 3, 4 and 4 B.  We'll go to 3 first, if you don't

21  mind.

22      *A.*    Sure.

23      *Q.*    What is Exhibit 3?

24      *A.*    This is my report.  It's a 26-page report.  It's

25  sort of like an executive summary because there was

1   another one, you're probably already guessing, was much

2   bigger.  But, yes.

3       Q.    Okay.  So you report, you have this 26-page

4   executive summary, and that's Exhibit 3?

5       A.    Yes.

6       Q.    And then why don't we go ahead and turn to 4 and

7   4 B right now and you can tell us what that is?

8       A.    Okay.

9       Q.    As you suggested, they go together?

10      A.    Sure.  So 4 is labeled:  Appendix to Expert

11  Report of James W. Hopper.  And this is a 250-page report

12  documenting, you know, what I learned about her parents'

13  lives and the traumas they went through and then Wendi's

14  life and the traumas she went through and the effects this

15  had on her.

16      Q.    So is it fair to say Exhibit 3 is sort of the

17  executive summary report and Exhibit 4 is the full long

18  version and the complete version; correct?

19      A.    The full report, yes, that's correct.

20      Q.    And then look at 4 B quickly.  Let's just

21  identify what that is for the Court.

22      A.    So this is a listing of all the -- let's see.

23  Excuse me.  Dr. Woods' CV is in here.  There is a listing

24  of the materials that I did in the beginning of that, all

25  of the materials that I reviewed, apparently.

1    *Q.*    The materials that you've been describing to us?

2    *A.*    Yes.  It's a very concise overview of those

3    materials.

4    *Q.*    Understood.  And, again, these are exhibits that

5    have already been admitted into evidence, but I wanted to

6    just highlight them for the Court.

7         Now I understand that you mentioned about the

8    interviews you did, some were of some of the childhood

9    friends of Wendi's.  Are all of these reflected in your

10   report or did any occur after --

11   *A.*    Sure.

12   *Q.*    -- you finished your report?

13   *A.*    There was one witness who I was only able to

14   interview just this past fall in November of 2013.

15   *Q.*    Do you know why you interviewed this witness?

16   *A.*    Yes.

17   *Q.*    Oh, who was it?

18   *A.*    It was Kyre Lorts.

19   *Q.*    Why did you interview Kyre Lorts after you had

20   finished your report?

21   *A.*    Because she was too mentally unstable to safely

22   interview her about the kind of trauma that she had went

23   through as a child until that point.

24   *Q.*    But she had gotten to that point after the report

25   was done?

1   *A.*   Yes.

2   *Q.*   Please give us your best estimate for the total

3   amount of time you've invested into your work in this

4   matter.

5   *A.*   So all the work up to writing the report and the

6   writing of the report was about 620 hours.  And then since

7   then, the interview with Kyre Lorts and preparation for

8   this testimony, it's been about another 160 or 170 hours.

9   *Q.*   The process that you just described for us, is

10  this consistent with the type of process you would

11  normally undertake when you're doing an analysis of a

12  trauma patient and offering opinions as to what effect

13  trauma may have on that person?

14  *A.*   Yes.  And, as I said, it's more thorough because

15  of all of the evidence that was brought to me by the

16  investigators, but it's the same process.

17  *Q.*   And the materials you relied on here, is it

18  consistent with the type of materials you would typically

19  rely upon to come to your opinions and conclusions as to

20  whether trauma affected Wendi Andriano?

21  *A.*   Yes.

22  *Q.*   We're now going to turn back to your analysis.

23  When you summarized it for us earlier, you said that you

24  had analyzed Wendi's life with a particular emphasis on

25  ages 1 through 18 and the trauma that occurred?

1    *A.*    Yes.

2    *Q.*    Did you find that trauma, whatever may have

3    happened, was consistent throughout or did you break it

4    out in any way?

5    *A.*    Yeah.  So, on the one hand, she was consistently

6    neglected and emotionally and physically, and there's

7    evidence for sexual abuse, throughout, but there were

8    different constellations of people who were doing these

9    things to her at different times.  So that was one reason

10   why I broke it down in that way and then other reasons.

11   We broke it down into birth to 4.5, 4.5 to nine, and then

12   nine to 18.

13        MR. NICKELS:  And for Your Honor and opposing

14   counsel, we just put a slide up on the screen.  We will

15   just use it as a demonstrative from time to time

16   throughout the testimony when we're giving these

17   organizational kind of cues as to what's to come.

18        So go ahead.

19        THE WITNESS:  So, as I said, I broke it down into

20   these age ranges because there were different kinds --

21   different people involved in neglecting her and abusing

22   her during this time, and, also, because these also are

23   known by developmental psychologists as particular stages

24   of development where kids have certain needs and certain

25   things are happening that are really basic to who they're

1  going to become in the next stage and as adults.

2      Q.   BY MR. NICKELS:  Let's start with the first time

3  period, birth to 4.5.  Tell us first what is significant

4  about that time period in a child's life from a

5  developmental standpoint.

6      A.   So one of the key things is that infants and

7  young children are literally unable to regulate their own

8  emotions and physiological states without the help of

9  caregivers during this phase.  So they're in a very

10  vulnerable state and they really need good caregiving from

11  their parents.

12         And the other, as it says there, is that this is

13  a time where they're having kind of etched into their

14  brains basic patterns and habits for the emotions they

15  experience and how they relate to those emotions and also

16  their close relationship -- relationships, in general, but

17  especially close relationships.

18      Q.   And then from a factual standpoint, what was

19  occurring during this time of Wendi's life that you found

20  to be significant?

21      A.   So there were three main things.  One was her

22  mother's severe neglect of her throughout this time.

23         Another was that she was exposed to emotional and

24  physical abuse by her mother as well as her biological

25  father.

1          And the third, as a consequence of the neglect,

2   she was exposed to several people who were known and even

3   convicted child molesters.

4       Q.   Let's walk through all three starting with the

5   first one that you mentioned --

6       A.   Sure.

7       Q.   -- which is Donna's neglect.  What happened

8   there?

9       A.   Well, it starts with her birth.  When Wendi's mom

10  gave birth to her in the hospital, she made no effort to

11  visit Wendi in the nursery area.  She was completely

12  freaking out about how her dog had run away and not really

13  able to think about Wendi.

14      Q.   Was that something that happened just in the

15  hospital or did it continue after Wendi came home?

16      A.   Well, then when she got home, she went from this

17  kind of anxious, overwhelmed state, her mother did, to a

18  severe depression where for a few days she wasn't eating

19  and she wasn't getting out of bed.  She wasn't even

20  nursing Wendi at that point.  She was completely

21  incapacitated.

22      Q.   Now, who, if anybody, was there to meet Wendi's

23  needs during this time?  If she is upset or she is crying,

24  were there folks there to comfort her?

25      A.   For the first month, her grandmother, Ann

1   Worshing, was -- so Donna's mother was there in Texas

2   where she was born.  And Skip was working full-time.

3   That's her father, Skip Robertson.  And he was working

4   full-time, but he was around some.  But these were the two

5   people who Donna sort of depended on to take care of Wendi

6   as she couldn't.  Still, we're focusing on those first few

7   days in that first month.  They are things we can talk

8   about in there as well.

9       Q.   Okay.  Well, what are those other things?

10      A.   So even after Donna came out of this depression

11  after the first couple of days, she was still really

12  unable to connect with Wendi, as she had described it.

13  You know, we kind of went through Donna's childhood that

14  her mother never bonded with her.

15           But she was unable to connect with Wendi.  She

16  basically started a pattern that would go through Wendi's

17  entire childhood, which is handing her off to other

18  people.  She wasn't able to think about Wendi.  Literally,

19  she said:  I wasn't thinking about her and her needs.  She

20  was handing her off to other people.  So the first people

21  she handed her off to were her own mother and her

22  biological father, Skip Robertson.

23      Q.   Now you mentioned that this is what was occurring

24  in the first month of Wendi's life.  Did that continue

25  after the first month?

1      *A.*   Yes.  So after the first month, they came back to

2    Arizona, and at this time Donna started working full-time.

3    She was volunteering.  She was doing all kinds of social

4    things.  And she was really -- again, as she said, not

5    really thinking about Wendi.  She spent at most maybe an

6    hour or two a day with her.  And this wasn't the kind of

7    time that an infant needs.  It wasn't an hour or two of

8    focusing on her and playing with her and cuddling her and

9    soothing her when she was upset.  It was an hour or two

10   of, you know, getting her dinner and getting her off to

11   bed kind of thing.

12     *Q.*   Sure.  And the time frame -- what you just

13   described, what time period was that?

14     *A.*   Well, so that was throughout, you know, let's go

15   up to age two before they moved down to Tempe.  So

16   throughout that time, that's what was going on.  And

17   Donna's mother was around.  She lived in the neighborhood

18   and she would -- Wendi would spend some time with her, but

19   just for a couple of hours at a time maybe a couple of

20   days a week.  And Skip was a truck driver at this time.

21   So, often, he wasn't around at all.

22     *Q.*   Now the grandmother being there, Donna's mother,

23   is that an adequate substitute for Donna not being there?

24     *A.*   No.  I mean, it's certainly better than not

25   having her grandmother there.  But there is no way a

1   couple of hours a week and a couple of days a week can

2   compensate for your own mother not being able to connect

3   with you, not even thinking about your needs.

4          And the other thing I did mention is her mom

5   would take her to these 24-hour day cares.  So, at any

6   time, day or night, she might just take her to a 24-hour

7   day care.  So, no, it can't compensate for that.

8      *Q.*   Now you mentioned that when they moved back to

9   Arizona, Donna was working a lot and that didn't give her

10  much time with Wendi.  What about what's going on in

11  Donna's life at the time socially?  Is she taking any free

12  time she has and spending that with Wendi?

13     *A.*   No.  As I've said, what the evidence suggests is

14  that she only spent time with Wendi when she absolutely

15  had to.  She was actually off drinking a lot.  She was out

16  drinking a lot, drinking to the point of throwing up

17  several times a week and, also, she was sleeping around

18  with other men.

19         As you know, Wendi's father, Skip, was doing out

20  driving his truck, Donna was doing the same kinds of

21  things, drinking and sleeping around.

22         She looks back on this time and is amazed that

23  she was so sexually active with the number of men at this

24  time as well as all the drinking.

25     *Q.*   You described or you said that this took Wendi up

1   to age two.  What about kind of two to four and-a-half?
2   Again, are we seeing the same kind of pattern?  What is
3   going on in Wendi's life at that time that you found to be
4   significant?

5   *A.*   Well, the neglect is continuing, but some other
6   factors come in.  You know, we can first focus on just the
7   physical and emotional abuse that I mentioned before.  I
8   mean, these actually started before age two.

9        So Wendi's father, Skip -- again, Donna sort of
10  didn't want to be involved, didn't help to potty train
11  Wendi or anything.  So Skip had those responsibilities.
12  The description of that is that Skip was very harsh with
13  Wendi and trained her like a dog, is the phrase that's
14  been used.  Basically, you know, if Wendi didn't
15  immediately do what he wanted, he would scream at her or
16  hit her.

17       Donna also describes hitting Wendi with her hand
18  from when she was a toddler.  And, you know, this isn't
19  just corporal punishment we're talking about here.  The
20  descriptions are that any time that Wendi didn't instantly
21  obey or didn't instantly come when she was called, she was
22  beaten.

23       And, you know, anybody who has had young children
24  or who knows young children, a little two-year-old is not
25  necessarily able to jump up immediately every time they're

1  called if they're absorbed in a game or something.

2  So she was being beaten for things that she

3  couldn't help doing and being beaten for not doing things

4  that she really couldn't do.

5  Q.  And before we focus -- we will focus a little bit

6  more on that emotional and physical abuse, but I had a

7  couple of more questions about Donna and her involvement.

8  You mentioned she was working a lot of the time?

9  A.  Yes.

10  Q.  Where was she working and what kind of schedule

11  was she keeping?

12  A.  Yeah, so she was working.  You know, first she

13  had clerical work, but then she changed to working at

14  these drug treatment centers.  So she worked at two

15  alcohol and drug treatment centers.  And these were places

16  where, you know, the people coming there were prostitutes,

17  drug addicts.  And she would actually bring Wendi along to

18  these places and kind of leave Wendi in the care of the

19  prostitutes and drug addicts or whoever else may or may

20  not be looking out for her.

21  Q.  So how old is Wendi during the time that Donna is

22  working at these drug treatment facilities?

23  A.  Like two to four and-a-half years old.

24  Q.  And you said during this time, Donna frequently

25  brought Wendi to the facility?

1    *A.*    Yeah.

2    *Q.*    And did they have some kind of a day care there

3    or a child care?

4    *A.*    No.

5    *Q.*    So what was Wendi doing while she was at the drug

6    treatment facility?

7    *A.*    In some ways, we really don't know because Donna

8    had no idea.  But we do know some things, that she was

9    actually wandering around out on the streets panhandling

10   as a three or four-year-old kid walking around

11   panhandling.

12   *Q.*    With the prostitutes and other drug addicts

13   coming to the clinic?

14   *A.*    Yeah.  Or maybe on her own.  It's unclear who was

15   watching out for her.

16   *Q.*    As far as you know, are these in kind of a

17   medical research part type of community or neighborhood?

18   Or is this a --

19   *A.*    No.  These are --

20   *Q.*    What kinds of streets is she walking around on?

21   *A.*    Yeah, these were not a safe part of town.

22   *Q.*    Did she ever spend any time -- Wendi, that is --

23   with any of the employees -- the other employees at the

24   drug treatment facility?

25   *A.*    Yes.  In fact, the director of the second

1   facility, a man named Rick Barnes, was someone who Donna

2   actually knew to be a child molester.  When she first got

3   the job from him, she would state she would travel down to

4   stay at his house while she was helping him write grants.

5   She at one point rummaged through some paperwork at his

6   house and discovered these documents saying that he had

7   been kicked out of a school in Thailand for sexually

8   abusing young girls in the seven- to eight-year-old range.

9        Q.   Was Wendi ever left alone with Rick Barnes?

10       A.   Yeah.  Both at his house and sometimes she was in

11  his office alone with him at the drug treatment center.

12  And, again, Donna didn't really know what was going on.

13  She knew this was happening, but she wasn't keeping track.

14  She wasn't thinking about her.

15       Q.   This neglect by Donna that you have just

16  described occurring, you know, in the first four

17  and-a-half years of Wendi's life, what kind of effect does

18  that have on a child at that age?

19       A.   Well, as I said at the beginning, young infants

20  and young children are not able to regulate their emotions

21  and deal with sadness and fear and anger on their own.

22  They need adults to soothe and help them with that.  So if

23  you're severely neglected like this, what happens is the

24  child ends up going through very extreme emotional and

25  biological brain states with no one to help them deal with

1  these.  And it's a very extremely traumatic thing that can

2  cause lifelong effects.  We've seen problems with

3  depression, anxiety with regulating your emotions and

4  impulses, with dealing with close relationships.

5       If the person who you're most supposed to have

6  loving and caring for you in those early years doesn't

7  really even think about your needs and has abandoned you

8  in the various ways that I've described, then that really

9  has a very negative effect on your ability to trust in any

10  way for the rest of your life.

11     Q.   You also mentioned executive functioning

12  deficits.  What does that mean?

13     A.   Yes.  So I've talked about regulating your

14  emotions and problems with regulating your emotions.

15       Executive functioning is a way of thinking about

16  it in a more technical and even neuroscientific way that

17  we know from decades of research, but especially in the

18  last 10 or 15 years, that this front area of our brain,

19  the prefrontal cortex is kind of like the CEO of our brain

20  and it has these capacities we call executive functioning.

21       These include the ability to inhibit impulses,

22  the ability to remember our rules that we're supposed to

23  following when we're trying to navigate a situation,

24  especially an emotional situation, very important

25  functions to be able to reflect on what you're doing and

1    stop if it's not working or to change your behavior if

2    things aren't working out.

3            So these are executive functions that are known

4    to only in these early years -- you know, certainly an

5    infant and a young child doesn't have that many executive

6    functions, but what they're dependent on is a parent to

7    help cultivate the emergence of these executive functions.

8            And if you're neglected and you're left to cry

9    for hours and things like Wendi went through, then those

10   executive functions are not developing the way they need

11   to be.  And, instead, what happens, is the kid's kind of

12   brain resorts to these extreme attempts to deal with the

13   overwhelming emotions by just shutting down in a

14   depressive state or going out of control with anxiety or

15   kids do different things to try to deal with that.  But it

16   really undermines those executive functions.

17   *Q.*   And the third one you mentioned, vulnerability to

18   sexual predation.  Tell us about that.  I mean, it's

19   somewhat self-evident.  Explain what that means.

20   *A.*   Yes.  So if your mom is leaving you around

21   prostitutes and drug addicts -- and we'll talk about some

22   other places she left her, too -- you know, unfortunately,

23   you know, someone who's studied this for many years, there

24   are people who prey on children sexually.  And so it left

25   her very, very vulnerable to being preyed upon.  And we'll

1    hear some more about how that may have played out.

2         Q.   Then let's turn back to where we just started to

3    get to before.  You were talking about the emotional and

4    physical abuse and how some of that which occurred during

5    this first time frame?

6         A.   Yeah.

7         Q.   And you just were starting to describe her

8    father, Skip, and his treatment of her?

9         A.   Yeah.

10        Q.   Why don't you tell us that again.

11        A.   Right.  Yeah, I got a little ahead of myself.  So

12   Skip, Skip Robertson was someone who himself grew up in a

13   very disorganized household.  He didn't really have some

14   contact with his mother and his father.  And, basically,

15   as I started to describe before, Skip was very harsh with

16   Wendi.  Donna didn't want to deal with Wendi and Skip was

17   willing to deal with Wendi, but the way he did it was very

18   harsh.  So he would use a scary tone of voice.  He would

19   be threatening.  He would beat her when she didn't

20   instantly obey him.

21             For example, in my own interview with Skip, he

22   reported to me a time where they had been in a

23   drive-through -- a drive-in movie and Wendi was crying.

24   He brought her home and he actually proudly told me how he

25   had beaten an infant, infant Wendi, in order to get her to

1   shut up and stop crying.  He thought that was a good

2   thing.  So that's one example of what he was doing.

3          As I said before, it's not just corporal

4   punishment.  Beating an infant is not corporal punishment.

5   They're not going to learn anything good from that.

6          Also, beating a child for not instantly obeying

7   or coming when they're absorbed in a game or something

8   like that is very severe physical abusive.

9   *Q.*   Was it just Skip engaging in this kind of

10  behavior or Donna as well?

11  *A.*   Donna as well.  Donna talks about how when Wendi

12  was a toddler, she would beat her with a wooden spoon,

13  again, for something as kind of as crazy as not instantly

14  jumping up and coming when she was called.

15         And then Wendi got older, she was beating her

16  with her hands, again, for any sort of infraction or

17  what -- you know, we'll hear about this more later.

18  Anything that could be construed as disobedience or

19  rebellion -- anything that wasn't instant compliance with

20  the wish of a patient could bring a beating and usually

21  did.

22  *Q.*   I understand that there was an incident at a pool

23  one day that you found particularly significant?

24  *A.*   Yes.  So this would be when Wendi was about two

25  or three years old.  At this point, they had moved down to

Tempe and they were in frankly quite a dangerous
environment, which was Skip's brothers.  He had five
brothers and a father.  The brothers were known -- well,
we'll get into that later -- known pedophiles, but also
they were hard drinking guys and they were -- at this
particular incident, what happened was they were at a
pool.  They were all drinking and Donna was there and Skip
and his brothers and the brothers were basically goading
and taunting Skip to throw Wendi into the middle of the
pool:  Oh, come on, she's got to learn to swim sometime,
like this kind of thing.

    *Q.*    How old was Wendi at the time?

    *A.*    About two or three.

    *Q.*    And did Skip -- did he give into the goading?
Did he throw her in?

    *A.*    He did.  He threw her right into the middle of
the pool.

    *Q.*    As far as you know, did Wendi know how to swim at
the time?

    *A.*    No, she didn't know how to swim.

    *Q.*    Now she's here.  So, presumably, somebody jumped
in and got her?

    *A.*    Right.

    *Q.*    Do you know if it was one of her parents?

    *A.*    I mean, Donna, when I talked to her about this

1  incident, she doesn't remember who fished Wendi out of the

2  pool.  But, also, just to highlight, I mean, this kind of,

3  yes, she survived, she didn't drown, but, you know,

4  through millions of years of evolution, it's programmed

5  into your brain, if we can't swim and we're flailing

6  underwater, it's terrifying.  Your brain just feels like

7  you're going to die.

8         So this would be one of the most terrifying

9  experiences that anybody, but especially a young child

10  could have, especially to have your own father throwing

11  you in.

12      *Q.*   Did Donna do anything to intervene or protect

13  Wendi during this incident?

14      *A.*   No.  She talked about how she was afraid to say

15  anything.  And she even used this phrase:  You know, in

16  that family, they're just going to take them.  So she did

17  nothing to intervene.

18         It sounds like she rebuked Skip after she was

19  fished out, something to the effect of like:  I can't

20  believe you did that or something.  And he said:

21  Whatever, she's not hurt.  Don't make a big deal out of

22  it.

23      *Q.*   Just a note for the court reporter, from time to

24  time, slow down.  I have a tendency to go a little fast

25  myself.  I've been scolded by court reporters in the past.

1       So these incidents that you just described, this

2   kind of consistent using physicality when there is not

3   total submission or total compliance and episodes like

4   this pool incident, how does that affect a child, you

5   know, in that age range of zero to four and-a-half?

6       A.   Yeah, so as they put up on here on the slide, you

7   know, like neglect, this kind of physical and emotional

8   abuse, especially, you know, the severity and the

9   constantnous to try to get someone to comply with every

10  wish of a parent, this is known to cause symptoms of

11  depression and anxiety.  Of course, again, it's going to

12  make it hard for a child to regulate their own emotions.

13      Not only do they have the emotions that they're

14  going through because they're neglected and no one is

15  helping soothe them, but now they've got horrible emotions

16  from being thrown into the pool, from being beaten, from

17  being yelled at.

18      And so there is no one -- her parents aren't even

19  able to help her.  So just lifelong problems.  If you've

20  got your whole first five years of this kind of treatment,

21  it's going to cause lifelong problems with your ability to

22  regulate your emotions and then also managing close

23  relationships during that first stage.

24      Q.   What do you mean when you say hinders

25  internalization of rules and values?

1    *A.*    So if you want a child -- disciplining a child,

2    the goal should be that the child wants to follow the

3    rules and they sort of take thing and make them their own.

4    They understand they want they are.  They want to be good.

5    They want to do what their parents want.  Even from

6    toddler to age four and-a-half or five, kids can start to

7    take on these rules and they want to do them and be able

8    to regulate their own behavior a little bit.

9            But if a child is being beaten and fear and pain

10   and beatings are used constantly to get the child to

11   instantly comply with what the parents want, then this

12   actually makes it harder for the child to take in the very

13   values and rules that the parents are trying to teach

14   them.  It's kind of like the tragic, the parents are so

15   confused, that they're actually defeating their own

16   purpose.

17   *Q.*    Now the third sort of set of facts that you said

18   was going on in Wendi's life during this time was you

19   called it sexual abuse or sexualization.  What did you

20   mean by that and what was happening there?

21   *A.*    So here, particularly, again, after they moved

22   down to Tempe, and so they're living in a community where

23   Skip's brothers are there, Skip's father, and these men

24   are known child molesters many years even before Wendi was

25   even born.  There's a lot of evidence, probably more than

1  I can even get to here, but, you know, just to get it in a
2  nutshell, some of it was that her mother Donna's best
3  friend Alice McGuffee -- when she was a teenager, her best
4  friend, she had younger daughters or younger sisters,
5  Charlotte, and a woman by the name of Devlin, and Debbie
6  who reported independently to the brother and even to
7  Donna that -- and we have a declaration from Devlin that
8  for years, Devlin was molested and raped repeatedly by all
9  of Skip's brothers and she named Skip as one of the people
10 who molested and raped her as well when he was a teenager
11 living in the house.

12     Q.   So she said that Skip, who was Wendi's father --
13 Wendi's biological father, and Skip's brother all molested
14 her?

15     A.   Yeah.  And then her sister, Charlotte, reported
16 this, too.  Both Devlin and Charlotte reported it to their
17 brother, Leon.  Charlotte reported it at some point to
18 Donna.  And so, you know, it was known that these guys
19 were, you know, serial child abusers and literally, you
20 know, for years.  And their brother Leon talks about how
21 they used to brag about their sexual exploits with women
22 and girls.

23     Q.   Did Wendi -- did she spend time with these family
24 members?  Was she left alone with them?

25     A.   Yeah.  So in the same pattern of, you know, with

1   the drug treatment center, leaving her around prostitutes

2   and drug addicts, in this situation there were many

3   parties, cookouts, camping trips, fishing trips, hunting

4   trips where Wendi was left vulnerable to these men.

5          And Donna describes, you know, being in the

6   kitchen cooking and talking to the other women, while for

7   hours on end, she had no idea what was going on with Wendi

8   while Skip and his brothers and his father were drinking

9   heavily and had access to her.

10   *Q.*   Did anybody ever observe any inappropriate

11   behavior, you know, by these brothers or Skip's father

12   with any of the -- Wendi or any of the other young

13   children?

14   *A.*   Yes.  So Donna talks about all of the time, you

15   would see the brothers, you know, grabbing at the kids or

16   kissing them in an inappropriate way and grabbing their

17   behinds and kind of doing that sort of thing right out in

18   the open in front of the kids' own mothers.  So that was

19   one thing.

20          She was also told by the other wives of the other

21   brothers that Skip's father was, you know, going to try to

22   sexually abuse their kids, even their infants.  So that

23   was another thing.

24   *Q.*   Did Wendi spend -- what about Skip's father you

25   just mentioned?  Did Wendi spend time with him?  Was she

1  left alone with him?

2  *A.*   Yeah.  Interestingly, this was one of the only

3  attempts that Donna ever made to protect Wendi from this

4  kind of sexual abuse in that family was because she had

5  been told that the father had definitely molested one of

6  the other infants in this network of kids.

7         And so, Donna and Skip went away on a

8  sometimes -- you know, Skip was a trucker.  So sometimes

9  Donna would go with him on these trips and leave Wendi

10  behind for a few days.

11        And so, on one of these trips, when she got

12  back -- and one of the brother's wife's, Ida May, you

13  know, she explicitly told her:  Do not let Skip's father,

14  B.G., he went by, have access to Wendi.  His father had

15  been asking to babysit her repeatedly and he was told no.

16        So when she got back and knocked on the door and

17  she said:  Where's Wendi?  They said:  Oh, she's with

18  Skip's father.  So that was it.  After that, the other

19  mothers said:  Oh, yeah, definitely, she was abused.  So

20  that's a story we have about Skip's father.

21  *Q.*   And what about you said Skip is a trucker.  Was

22  there anytime that Wendi spent time with any of the

23  brothers in any of those kinds of situations?

24  *A.*   Yeah.  So, actually, one time, Skip said that he

25  took a trip with his brother, Tommy.  They were in the

1    truck and they brought Wendi along.  And this is the same

2    brother -- both Skip and his brother Tommy were actually

3    convicted and in prison for many years for sexually

4    abusing Skip's stepdaughter.

5         And what led them to be convicted in that case

6    was that Tommy had taken pictures of the stepdaughter

7    partially clothed in the sleeper cab part of the truck.

8         And Skip said that on this very trip that he and

9    Tommy went with Wendi, that Tommy was sleeping in the

10   sleeper cab with Wendi, and Skip himself said, you know,

11   he probably sexually abused her during that time.

12   *Q.*   Now from your analysis of Wendi during that time,

13   does she show any behavioral evidence of somebody who had

14   been sexually abused?

15   *A.*   Yes.  There were two evidences that came to my

16   attention.  So one was that Donna reported that Wendi was

17   generally a very compliant child, which, you know, you

18   could imagine if she is being beaten for not immediately

19   complying.  But, you know, some kids, they'll try to

20   comply.

21        And but one of the things she said that Wendi did

22   not comply with and the only things that caused her

23   problems was Wendi would refuse to sleep in a bed that

24   wasn't her own bed.  She would refuse to sleep, take a nap

25   in other bedrooms.  And this would be consistent with if

1   during these cookouts and things that, you know, if maybe

2   she had taken a nap and she was sexually abused and she

3   was taken into these rooms to be abused.  So it's not a

4   direct, you know, smoking gun, but it's certainly

5   consistent.

6          And then the other evidence, which is more, you

7   know, a higher threshold is Donna actually got calls from

8   a day care that Wendi was staying in.  She got two calls

9   saying that Wendi had been engaged in very inappropriate

10  sexual behavior with other children and that they had

11  investigated this and they determined that Wendi was the

12  instigator.

13         This was not just the typical child, you know,

14  you show me yours, I'll show you mine sort of thing.  It

15  was very concerning, concerning enough that the day care

16  actually threatened to expel Wendi from the day care.

17  *Q.*   And this is the type of behavior that you would

18  see in somebody who had been sexually abused?

19  *A.*   Yeah, this is a common phrase.  You know, in our

20  field, we call it abuse reactive behavior where a kid who

21  has been sexually abused, then turns around in a

22  reactivate way.  It's not because Wendi wanted to abuse

23  other kids.  She's reacting to the abuse that happened to

24  her.  When it's this kind of extreme inappropriate sexual

25  play that goes beyond what's developmentally normal, that

1   this is seen as evidence of sexual abuse.

2       Q.   If there was sexual abuse during this time, how

3   does that affect a child of that age?

4       A.   Well, one other point I want to make here is that

5   even though Donna got this call, that Donna made no effort

6   to try to determine whether Wendi had been sexually

7   abused.  She made no effort to have her evaluated.  She

8   made no effort to get her kind of any treatment for this

9   kind of behavior, even though she was threatened with

10  being expelled from the day care.

11          This is just another example of how, you know,

12  Donna kind of, as we'll see, she just didn't think about

13  Wendi, didn't want to know, didn't want to deal with it.

14      Q.   Then I'll rephrase my question.  How does the

15  potential sexual abuse, coupled with this continued

16  neglect by her mother -- how does that affect somebody at

17  that age?

18      A.   Yeah, so, again, you know, this common refrain

19  I'm going to make during my testimony here is that sexual

20  abuse, too, is known to have the same kind of effects as

21  neglect and physical and emotional abuse.  So this is one

22  of the real findings of a lot of research that, you know,

23  sometimes we like -- you know, we can give a lot of press

24  to sexual abuse and, oh, that's so horrible, and it is,

25  but all of these kinds of neglect and emotional and

1   physical abuse, all these have serious effects on

2   someone's brain and can lead, you know, as I was saying,

3   to depression, anxiety, difficulty regulating your own

4   emotions, the things I'll keep bringing up.

5          And, also, just as you pile trauma on top of each

6   other, you're going to have more severe impacts.  Now

7   we've got the sexual abuse piled on top of the neglect,

8   the emotional and physical.

9          And the other thing, though, the specifics of the

10  sexual abuse, and Bullet 2 there, is that you get this

11  premature sexualization.  Young children, you know, they

12  may have some curiosity about their genitals.  They may

13  notice that it feels good to touch themselves there, but

14  normal healthy young children, that is not where their

15  attention is focused and they're not even thinking about

16  other people being interested in doing things sexual to

17  them.

18         But a child who has been sexually abused, they

19  get this what I'm referring to here as this premature

20  sexualization, even kind of a hypersexualization, so that

21  the child may do things like engage in inappropriate

22  sexual behavior with other kids.

23         But, also, as Wendi described to me herself, just

24  from as early as she could remember, she had sort of this

25  awareness of sexual energy or chemistry coming from men

1  and this was just something that was always there and she
2  always experienced.

3      *Q.*   And how does the third one there -- sexual object
4  for men's gratification -- how is that different than what
5  you just described?

6      *A.*   So one of the points I'll keep making is that
7  these interactions, especially early childhood, really
8  shape and etch into peoples' brains patterns of relating
9  and expectations for what to expect, what people are going
10 to do, what they're going to say to you and how they're
11 going to treat you.  If a child is having, you know,
12 repeated experiences of men using her in a sexual way,
13 then even if she doesn't put any words to it, there is
14 sort of this learning that takes place that this is part
15 of why I'm here for.  And I can't tell you how many
16 patients I've heard over the years tell me that:  Well,
17 like, that's part of what I'm here for.  It's very sad,
18 but it's what they learn.

19         MR. NICKELS:  Your Honor, we're about to turn to
20 the second time period that we had mentioned.  I see it is
21 coming up on what you said would be the morning break.

22         THE COURT:  Why don't we go ahead and take about
23 a ten-minute morning break at this time.  We will be in
24 recess.

25         (WHEREUPON, a recess ensued from 10:43 a.m. to

1   10:59 a.m.)

2          THE COURT:  This is CR 2000-096032, State of

3   Arizona vs. Wendi Elizabeth Andriano.

4          The record will reflect the presence of the

5   parties and counsel.  The record should also reflect that

6   we have on the witness stand James W. Hopper.  We will

7   continue with the examination in just a moment.

8          I should have asked at the beginning of this case

9   whether victims' rights had been complied with.

10          MR. HAZARD:  They have been, Your Honor, and

11   victim representatives are present in the courtroom and

12   are seated behind our counsel table.

13          THE COURT:  Okay.

14          MR. HAZARD:  And I'm not sure exactly who else is

15   in this courtroom, but based on our preliminary

16   discussion, we ask that the rule be in effect subject to

17   those.

18          MR. ARNTSEN:  Yes.  Just to explain, the two

19   women in the second row are investigators, Kristen Powers,

20   but they're not going to be witnesses.

21          THE COURT:  Okay.  Then the Rule of Exclusion of

22   Witnesses will be in effect.  If there is anyone that

23   you're aware of that might be a witness that is sitting in

24   the courtroom, then alert the Court.  Okay?

25          MR. ARNTSEN:  Okay.  We will do that.

1          MR. HAZARD:  Yes.  Thank you.

2          THE COURT:  The record will reflect that

3   James W. Hopper is on the witness stand.  We will continue

4   with the examination by Mr. Lynch; right?

5          MR. NICKELS:  Mr. Nickels.

6          THE COURT:  Mr. Nickels.  I'm sorry.

7          MR. NICKELS:  You'll get it on the third try;

8   right?

9          THE COURT:  I'll get it eventually.

10         MR. NICKELS:  Thank you, Your Honor.

11    *Q.*   BY MR. NICKELS:  Dr. Hopper, when we left off, we

12   were just turning to that second time period that you had

13   found particularly significant in Wendi's life.  And that

14   was four and-a-half to nine?

15    *A.*   Yes.

16    *Q.*   Please tell us what, from a developmental

17   standpoint, is significant in a child's life at that time.

18    *A.*   Yes.  So as I've put in this slide, the first

19   thing to note is that, depending on what kind of

20   experiences a child has in this period of their life, it

21   could really mitigate some of the effects of the kind of

22   trauma that we have already described Wendi as having gone

23   through in the first four and-a-half years.

24         On the other hand, if the trauma continues, if

25   the neglect and the emotional and the physical and the

sexual abuse continue, then it can also make them worse
and much worse.  As I said before, you have just kind of
this cumulative piling on effect of trauma upon trauma.

Q.   And what else is developmentally significant
during this time period?

A.   So developmental psychologists agree that some
key issues going on here are learning how to form stable
peer relationships and how to navigate those
relationships.  Also, coming into four, a more lasting
understanding of yourself and how you relate to others.

As I said, in those first four and-a-half years,
literally, it's habit learning that's being laid down, and
the part of the brain that allows you to remember that
hasn't even developed well enough yet.

So in those early years, it's habit learning and
there's not that much language and the kids can't think
very much about this stuff.

But now from four and-a-half to nine, the kids
are able to retrieve these memories of things that
happened to them, good and bad.  They have much more
language and ability to think through, well, who am I as a
person?  Am I a good boy?  Am I a bad girl?  Am I a good
girl?  How am I supposed to be?  What do my mommy and
daddy want from me?  They really start telling themselves
and elaborating more the story of who they are as a child.

1   So that's a big thing going on.

2       Q.   The fourth one, learning to be more

3   self-regulated and independent, what do you mean by that?

4       A.   So anybody, and as kids know, there's a time when

5   they go off to kindergarten and first grade and they start

6   to expand more out into the world of their peers.

7            Part of what, if development is going well, what

8   they should be learning is how to take the rules and

9   values that should be being imparted in their family and

10  how to enact those in their relationships with peers and

11  navigating conflict and making friends and all of that

12  sort of stuff.  So that's a fundamental thing that's going

13  on developmentally and really should be during

14  this phase.

15      Q.   Let's then turn to the facts.

16      A.   Yes.

17      Q.   What, from a factual standpoint, was happening in

18  Wendi's life during that time that you found to be

19  significant?

20      A.   Again, there's two major things to point to.  I

21  mean, the neglect was ongoing by her mother, of course,

22  but Alejo Ochoa, who was her stepfather, entered into her

23  life and became an extremely disruptive force in

24  emotional, physical and sexual abuse.

25           Then, also, there was this two-year period from

1   age seven to nine, where she was involved in this, what
2   really could just be called a traveling cult, where she
3   was subject to extreme poverty, severe control and
4   everything was regimented.  We will get into the details
5   later.  And, also, some severe physical abuse and there is
6   even some suggestion of sexual abuse going on in that
7   traveling cult.

8       Q.   Well, let's take the first one first, Alejo
9   entering her life and the beginning of a pattern of bad
10  behavior.  Let's kind of start at the beginning.  When and
11  how did Alejo come to be part of Wendi's life?

12      A.   When Wendi's mother was working at the second
13  drug treatment center, the one where, again, she was left
14  to wander around and panhandling on the streets and things
15  like that, and vulnerable to the director who's a known
16  pedophile, Alejo was volunteering there as well.  Alejo
17  actually knew Wendi.  He knew who Donna was, but he had
18  no -- he didn't talk to her anything.  But he knew who
19  Wendi was.

20           And there was a point at which he -- one night
21  when Donna was on one of her weekend late night shifts,
22  she didn't have a client to process and bring in or a
23  person, he went into the office she was in and they ended
24  up having sex.  And within, you know, a couple of months
25  of this, maybe in a few weeks, he had moved into their

1    house and was just spending a lot of time with Wendi.  We

2    will get into some more of those details later.

3              So Alejo, again, we don't have time to go into

4    his whole history.  But Alejo himself is someone who

5    suffered from serious neglect, physical abuse, emotional

6    abuse, tormenting and sort of sexual teasing from his

7    uncles and things like that, other major traumas, and

8    Alejo is a deeply disturbed guy, again, as we will hear

9    more about later.

10             So here at this point, he comes in and very

11   quickly, in Donna's pattern, she kind of hands Wendi off

12   to this very disturbed sexually predatory guy.

13   *Q.*   And just sort of on a day-to-day basis, how does

14   Alejo treat Wendi?

15   *A.*   So we can break it down into different things.

16   So one of the things is the emotional abuse of Wendi.

17   From the beginning -- and we have other descriptions of

18   other people in other communities we can get to later

19   observing this kind of behavior in Alejo.

20             Alejo was a very immature guy and he would -- on

21   the one hand, he could be playful and acting like a little

22   kid himself, but the next moment, he could be screaming

23   and yelling at either Donna or at Wendi, or in really

24   nasty ways, just teasing her and kind of picking at her in

25   even sadistic ways.  Again, others have observed this, him

1  doing this with other children.

2          So that was kind of -- at any point, he could

3  emotionally abuse in one of two ways.  He could be

4  screaming and yelling at Wendi or he could be kind of

5  picking at her and being cruel to her.

6          And there's another example that I can give that

7  he actually told me himself.

8      *Q.*   What's that example?

9      *A.*   So I did interview Alejo and he talked about how

10  when he first met Wendi how captivated he was with her and

11  how she could melt your heart and things like this and he

12  talked about how innocent she was.

13         Then an example he gave of her innocence was how

14  shortly after he had moved in with Donna and Wendi, he had

15  discovered that she had been drawing on the wall with

16  crayons behind a bedroom door that either Donna didn't

17  notice or didn't care.  When Alejo discovered this, he

18  brought it to Wendi's attention and he said:  You have to

19  clean this up.

20         Now Wendi is a four and-a-half-year-old kid.  So

21  she goes:  Okay.  I'll help clean it up.  So she helps

22  clean it up, but like any four and-a-half-year-old, after

23  five, ten, 15-minutes, you know, she would like a break.

24  She's, you know, this isn't so fun anymore, even though

25  she wants to be a good little girl and do what her parents

1  want.

2       And so what Alejo told me with pride, actually,

3  as if this was an example of good parenting, was that he

4  made Wendi spend the next hour and-a-half scrubbing

5  everything off that wall despite the fact that she was

6  crying and totally upset throughout the whole thing.

7       And, you know, to me this is an example that he's

8  reporting on his own, though he generally denies a lot of

9  things, of just how clueless and cruel he could be to

10  Wendi, and this is just one example.

11  Q.   This teasing and the picking at and the provoking

12  and the yelling and screaming, how frequent does this

13  happen?  Is this just a time-to-time thing or is it a

14  consistent pattern of behavior?

15  A.   Yes, it's a consistent pattern.  I mean, really,

16  the reports are to this day, Alejo is very volatile and he

17  can yell and scream at any time.

18       And, you know, again, we can get into it a little

19  more later, but Alejo himself in his declaration talks

20  about how he often would wake up in the morning wanting to

21  have sex with Donna back throughout their relationship

22  and, you know, maybe Donna wasn't interested and he would

23  get frustrated and angry.  Then it would build up to a

24  point that halfway through or by the end of the day, he

25  was just likely to explode out this sexual frustration

1    that Wendi and Donna -- and, you know, then we will talk

2    about the things that they had to do to placate him later.

3    So it was very continuous and pervasive.  You know,

4    anytime he could fly out of control and be really cruel.

5        *Q.*    You just described some emotional abuse.  What

6    about was there any physical abuse by Alejo during this

7    time?

8        *A.*    Yes.  You know, I've talked before about how Skip

9    and Donna treated Wendi as not merely corporal punishment,

10   but beating her anytime she didn't instantly and

11   mindlessly obey them.  And the same thing was true for

12   Alejo that both he and Donna during this time would beat

13   Wendi first with their hands, but by the time she was six

14   years old, they were beating her with a wooden paddle and

15   what they were starting to learn -- and they had gotten

16   involved in a cult that hadn't taken off on traveling

17   yet -- and they were being taught that like this book,

18   Train Up a Child, that some people may have heard of,

19   they're being taught that you have to beat children and

20   you have to beat any hint of rebelliousness out of them.

21   They must instantly obey you and you have to beat it out

22   of them.

23        This may mean actually beating them to the point

24   where if they're upset and showing any anger, you have to

25   keep beating them until they're crying softly or it may

1  mean other things that we can talk about.

2      Q.   We've got a picture up on the screen right now.

3  Can you just tell us what that is?

4      A.   So this is a picture, as you can see, dated 1979.

5  That's Alejo with Wendi when she was nine years old on the

6  couch.

7      Q.   What you've been describing to us, you know, this

8  emotional and physical abuse, that was occurring during

9  this four and-a-half up to nine period; is that right?

10     A.   Yes.  The one thing we'll talk about in the

11  traveling cult --

12     Q.   Yes, we'll get to that.

13     A.   -- is he may have had some -- well, he had a

14  little less access to her during that time.  But when he

15  was around her, yes, at any time, he could do this stuff.

16     Q.   Any indications that there was sexual abuse

17  during this time period?

18     A.   Yes, we do have indications that that was

19  happening right from the beginning.  We don't have, you

20  know, iron clad direct evidence, which we do have direct

21  evidence for abuses in the nine to 18 period that we'll

22  talk about later.  But, yes, there is some evidence.

23     Q.   What is that?

24     A.   You know, there was kind of a sequence of it.

25  You know, one thing was that Alejo had this prior

1  relationship with Wendi before he had sex with Donna and

2  got involved with her.  He was very fascinated with Wendi.

3  He was more interested in spending time with her than with

4  Donna.  And this was consistent all the way through, and

5  other people and many witnesses and other people reported

6  this.  So he had this fascination and this kind of

7  obsession with her.

8       And soon after he and Donna slept together that

9  first time, he started sleeping in the bed at Wendi and

10  Donna's house -- sleeping in the bed with Wendi and Donna.

11  And it was at this time, for the first time in her life,

12  that Wendi started wetting the bed.

13  *Q.*  What does that mean to you?

14  *A.*  It's not an uncommon response to sexual abuse.

15  It's not -- again, it's not like, oh, definitely that

16  means she was sexually abused.  Kids can wet the bed for

17  various reasons.  But if you look developmentally, that

18  doesn't usually suddenly start at age four and-a-half.  So

19  it's suggestive and it would be consistent with

20  experiencing sexual abuse.

21       Also, some children, they wet the bed as a way of

22  trying to stop the abuse that's actually happened to them

23  because it wakes up -- people have to wake up and change

24  the sheets and things like that.  So I've had patients

25  tell me that they've had to resort to that sort of thing

1   to try and stop themselves from being sexually abused.

2      Q.   So this emotional and physical abuse that you

3   described, coupled with potential sexual abuse, what

4   effect is that going to have on a child at this age of the

5   four and-a-half to nine years that Wendi was at the time

6   this was happening to her?

7      A.   Yeah, so, you know, that first bullet up there,

8   giving up hope of a relationship with her mother, her

9   mother neglected her all the way along.  But Skip was out

10  driving trucks and things like that and Wendi was at

11  day cares and who knows where.  But here was a different

12  dynamic that was starting.  We'll get back to this several

13  times, I'm sure.  This is what we call an incestuous

14  family dynamic where basically Donna is handing Wendi over

15  to Alejo.  She doesn't want to deal with her and Alejo is

16  taking over, and Donna is relieved.  She literally

17  describes to her being relieved that Wendi was taking care

18  of Alejo and Alejo was taking care of Wendi.

19         So for a child, you know, hope brings eternal for

20  kids usually, but it's not eternal.  I mean, if you've

21  been neglected for four and-a-half, five years, and now

22  this guy comes in and he's totally taking over, then kids

23  can give up hope of their mother really having any

24  interest in them.

25         Donna talks about how, by the time Wendi was nine

1    years old, she wouldn't cuddle with her.  She had no

2    interest in her.  She would reject the few attempts Donna

3    did make to connect in some way.  And so that sort of

4    suggested Wendi just kind of gave up on her mom at that

5    point.

6        *Q.*    And I see, and you told us that this would be a

7    pattern --

8        *A.*    Yeah.

9        *Q.*    -- of more depression and --

10       *A.*    Yeah, you know, this kind of emotional, physical

11   and possible sexual abuse, especially now from a father

12   figure.  So, before, it was from, you know, maybe brothers

13   and a father and things like that.  Now you're living with

14   someone who is sleeping in the bed with you.  And if

15   they're not sexually abusing you, certainly on a daily

16   basis, they're emotionally and physically abusing you.  So

17   that's going to just exacerbate these kinds of problems

18   with the depression and anxiety and dealing with the

19   emotions that are being triggered by all of that.

20            And then, finally, if sexual abuse is going on at

21   a time like this, and there's the premature sexualization,

22   and now, as I said, in the four and-a-half to nine, the

23   child, you know, may be able to, if they're not blocking

24   everything out -- though, there is evidence that she was

25   able to block a lot of things out -- but they have

1   memories of now these sexual things happening to them and

2   they have maybe some ideas about it.  Even if they're

3   blocking that stuff out, again, there is this sensitivity

4   and this confusion and even disgust that Wendi describes

5   in her interviews with me.

6          Like, even as a young kid in this seven, eight,

7   nine-year-old range, she would find herself being aware of

8   the sexual attention and energy kind of coming from guys

9   and sort of wanting that, which is, you know, a very

10  disturbing thing to think about.  But it, unfortunately,

11  is not an uncommon thing for a kid who has learned that

12  this is what men want from me and if I want people to

13  like me.

14         And when she would get that kind of attention,

15  then she feels disgusted and awful.  So it's just the

16  sexuality is like getting really messed up in this phase,

17  in some kind of layman's terms.

18  *Q.*   Let's turn to this traveling ministry.  You

19  mentioned that that was something going on in Wendi's life

20  from seven to nine.  Before I have you start telling us

21  what happened there, there is a picture here.  Can you

22  tell us what this?

23  *A.*   I don't have a pointer, but this is a -- there

24  was a small group of people and some people went in and

25  out.  There were two leaders of this cult, Rick Miller and

1  Al Farmer.  I'm not -- I'm guessing it was one of those

2  guys.  I don't know which one is which.  But Wendi is

3  there in the front in the middle in the white and Donna is

4  directly behind her and Alejo is behind and just to the

5  left of Donna, left in looking at the picture.

6          And so this a group of people that even before

7  they started traveling around, Donna became involved with

8  this group and very quickly, you can start to see some of

9  the disturbing things that were happening.  So they were

10  told that all pictures were idols and literally any

11  pictures she had of family members, including Wendi as a

12  baby, she burned them.  There are other things I can talk

13  about even before they went traveling.

14     *Q.*   Sure.  One thing you described a lot is that

15  Wendi lived under this whole and sort of this dictatorial

16  system where any lack of compliance was met with severe

17  results?

18     *A.*   Right.

19     *Q.*   Was there any relief from that in the traveling

20  ministry?

21     *A.*   No.  It was the same thing.  And, actually, you

22  know, Donna talks about how the leaders of the group, they

23  were even more severe about it.  They wanted Donna and

24  Wendi to -- I mean, Donna and Alejo to beat Wendi even

25  harder than they were wooden paddles and sort of things

1  like that.

2      *Q.*   Were there other children in this ministry?

3      *A.*   Well, only when they weren't traveling.  So there

4  was a couple of times where they stopped along the way and

5  then some children were involved.  And, actually, you know

6  some of those children were taken away from their parents

7  because this was a group of, you know, pretty confused and

8  disturbed people who were falling under the influence of

9  these cult leaders.  But for the most part, when they

10  traveling, no, Wendi had no children to play with.

11      *Q.*   And that's what I was getting at.  Did Wendi have

12  an opportunity to interact with other kids and do sort of

13  the normal things that kids of this age would do?

14      *A.*   No.  Not only did most of the time she didn't

15  even have any other kids around, but the control that the

16  leaders exerted over the members was so thorough, you

17  know, the classic kind of cult control things.  They would

18  wake them up very early.  They would always have to be

19  doing something, some sort of chore, some sort of

20  construction project.  Wendi did get some home schooling

21  during that time.  But, otherwise, there was no real time

22  to play.  There was chores and things to do constantly.

23  So she really didn't have much time to play, let alone any

24  kids to play with most of the time.

25      *Q.*   Is her only schooling during that time just

1   whatever is being taught to her by the members of the

2   ministry?

3       *A.*   Yeah, they found some old textbooks and things

4   like that.  When they got to California, some guy taught

5   her math for a little while.  But, yeah, there was a

6   couple of hours a day and they were kind of winging it and

7   trying to give her some schooling.

8       *Q.*   But she's not in a normal school and having

9   recess and lunch hour?

10      *A.*   No, no, not at all.  As I said, she was like a

11  little adult.  Alejo talks how about at the end of this --

12  you know, Donna talks about how the end of it, Wendi was

13  depressed.  And Alejo talks about she was like a little

14  adult who, you know, kind of would be his partner,

15  basically.  So, yeah, she was doing adult things, helping

16  with the construction projects and doing various things.

17          Actually, she was panhandling.  There was such

18  poverty, that sometimes all they had was rice and beans

19  and Wendi was out there panhandling.  So, no, she was

20  not -- she was not playing.  She was not playing with

21  other kids.

22      *Q.*   Any evidence of any sexual abuse occurring during

23  this time by any members of the ministry?

24      *A.*   Yeah.  So this is actually interesting and

25  something, you know, that we'll touch on later.  In my

1  52 hours of interviews with Wendi, this was one of the

2  things that I wanted to assess her for was sexual abuse.

3  We knew about Alejo and we suspected, hey, maybe one of

4  these cult leaders would do it, and address that myself,

5  and Dr. Woods I'm sure asked her about that.  And she

6  reported no memories of that.

7       But then just last fall with Dr. Pitt, the

8  prosecution expert, she reported remembering that Rick

9  Miller -- not Rick Barnes -- Rick Miller would touch her

10 in inappropriate sexual ways ostensively under the guise

11 of teaching her how to play the guitar and, also, she

12 remembers him exposing his private parts to her.

13      As we'll talk about, Wendi's memory is not good.

14 So there may have been more going on that we can't know.

15 *Q.*   This environment that she is in in this traveling

16 ministry or cult, where there is no play, it's very

17 dictatorial and there's physical beatings, and there's

18 even somebody who is touching her inappropriately, can you

19 tell us again how does that affect a child of Wendi's age?

20 *A.*   Yeah.  So, you know, again, we're just piling on

21 traumas here.  So depression, here, particularly, in terms

22 of this lack of ability to play, you know.  And that's

23 what kids are supposed to do; right?  Kids, a lot of their

24 learning and their joy of life comes though playing.  If

25 they're not able to play, that's dispiriting for a child.

1   That's depressing.  Also, if you're not able to do things
2   with peers, and one of the basic developmental things that
3   you should be doing at this time, you're not really
4   getting any experience of doing that.  So it undermines
5   the development of some of those capacities.
6          And, again, the coercive control of the cult
7   environment, the trained for obedience and beaten when you
8   don't immediately obey, it hinders the development of the
9   ability to regulate your own emotions, to regulate your
10  own impulses, and to take in the very values that these
11  people, again, in their confusion, think they're teaching
12  you.
13  *Q.*   Now the inability to regulate emotions and
14  reactions, you've mentioned that several times.  Is that
15  the same thing you were talking about with the executive
16  functioning, the CEO of the brain, just the ability to
17  kind of properly process and prioritize in moments of
18  complexity and stress?  Is that the same thing?
19  *A.*   Yes, definitely.  There's various executive
20  functions and some much them toward the middle parts of
21  the prefrontal cortex are very focused on modulating
22  impulses and emotions and keeping things in check and that
23  sort of thing.
24         But then there's these other executive functions
25  about thinking clearly, being able to make decisions and

1   things like that.  These only develop properly in the

2   context of good relationships in schools and communities.

3   And if you've got this going on, it's seriously

4   undermining these capacities.

5       Q.   So we started out this time period by you saying

6   that what is developmentally significant is that you said

7   good can mitigate bad.  If there's some good things that

8   happened during this second time period, it can help

9   repair some of the damage.

10          What you have just described is that we didn't

11  have good.  We had more piling on of the bad?

12      A.   Yeah.

13      Q.   Tell us, you know, where are we at at this point

14  in Wendi's life and what is sort of some of the cumulative

15  effect of what has been happening to her both in the first

16  time period and the second?

17      A.   Yeah, so a lot of it I've already said, but

18  there's two particular things that I like to draw

19  attention to here, what we call dissociation and the

20  serious memory deficits.

21          Now different children, depending on their

22  genetics and biology and their personality, will have

23  different kinds of responses to trauma, but one thing

24  we've learned is that very serious overwhelming trauma of

25  this sort for many years on end starting, you know, from

1  birth, it often results in these kinds of effects.  And
2  I'll talk about each of them.
3          So dissociation is a concept that I'll try to
4  define simply.  One way to think about it is a
5  disintegration of experience, that things that in normal
6  healthy development should be integrated like your
7  memories and your emotions or your ability to feel your
8  emotions, what that feels like in your body as you're
9  having it and things like that.  Those things people who
10  have been severely traumatized in this way, these things
11  get disconnected.
12          Also, what you can see is in the moment.  This is
13  something I saw repeatedly with Wendi, that as I'm talking
14  to her or asking her about some of these more distressing
15  things, she would literally just, as I say, either space
16  out and blank out.  She would just kind of check out.  She
17  wouldn't be able to think clearly anymore.  She wouldn't
18  be able to remember what she was just talking about.  She
19  would not be able to have any access to the emotions that
20  were being stirred up by the distressing things that we
21  were talking about and she literally wouldn't even be able
22  to feel her body at those times.
23          So that's an example of this dissociation.  And
24  it's something that kids who are subjected to this kind of
25  abuse, and especially if it's associated with sexual

1    abuse, it's kind of an intrusion that you just kind of try

2    to split off and blank these things out.  So that's part

3    of it.

4        *Q.*    And how is the memory deficits?  How is that

5    different?

6        *A.*    Yeah, so this is one of the more remarkable

7    things, you know, in my evaluation of Wendi.  And I've

8    done a lot of clinical work in this area, a lot of

9    research.  I've worked on other cases.  And Wendi really

10   had some of the most, or if not the most, severe memory

11   deficits that I had ever encountered.

12          These kinds of -- you know, we don't have any

13   evidence of like massive blows to her head or anything

14   causing this, you know, that kind of brain damage.  So

15   these are things that tend to go with major trauma.

16          So we're going to work through it here.  There is

17   kind of a bit of explaining to do.  The first thing I

18   noticed was that she has just kind of this general lack of

19   memories for her childhood.  She doesn't have zero

20   memories, but compared to other people, she's really got

21   some major gaps, in general.

22          Another thing that I kept observing over and over

23   again, and we can even see it in interviews with Dr. Pitt,

24   is she has what we call over general memories.  And this

25   is when you ask someone to remember something about their

1   past, including about their childhood, perhaps, and, you

2   know:  What was your mother like?  They will say:  Well,

3   you know, she was nice.  She did the best she could or

4   something like that.  But these are just kind of

5   abstractions.

6          And you say:  Well, can you give me an example of

7   your mother being caring toward you?  Or in these cases,

8   can you give an example of Alejo being abusive toward you?

9   All you get is these kind of general abstract schematic

10  things and they're literally unable to get at details.

11         And what the research has shown is that this is

12  something that you see in people suffering from

13  depression, people suffering from post-traumatic stress

14  disorder, which Wendi does.  And the latest research is

15  suggesting that basically what happens is when you're

16  asked to remember something, your prefrontal cortex has to

17  engage in some retrieval, especially if it's just kind of

18  a global question like:  Were you ever sexually abused or

19  something.

20         And when the prefrontal cortex tries to do that,

21  what happens is it just aborts the search because your

22  brain has learned like there's really bad stuff in there

23  and you don't want to get it.  So the recent experimental

24  evidence is showing that when people try to search for

25  these memories, the search gets aborted and they can't do

1   them.

2        So this was something I saw over and over again

3   with Wendi, literally an inability.  And she talked about

4   how, you know, I'm trying and I'm trying to remember and I

5   can't go there, and if I do, my mind just spins around on

6   some meaningless detail.  This is totally consistent with

7   what I've seen in other people who suffer from this.

8   *Q.*   And you alluded to the interview with Dr. Pitt,

9   the State's expert; right?

10  *A.*   Yeah.

11  *Q.*   And we have that.  And you said that that

12  interview demonstrated some of the things you're talking

13  about right now?

14  *A.*   Yeah.  There is one more point I want to get to

15  before that.

16  *Q.*   Sure.  Sure.

17  *A.*   This issue or the last point is fragmented

18  memories in certain types are inaccessible.  Again, in

19  healthy development, you know, a child should grow up with

20  some good experiences and some bad experiences, some good

21  memories and some bad memories.  And the healthy child is

22  able to recall both kinds and they're able to experience

23  themselves as one person who has good memories and bad

24  memories, good feelings and bad feelings.

25       But when a child is severely, severely

1   traumatized and there is no one in their environment who

2   is helping them with it, these memories tend to get split

3   off.  But not only that, but whole ways of thinking and

4   feeling and perceiving other people, they get fragmented.

5   The worst this can get is what people used to call

6   multiple personality disorder.

7            But so in Wendi's case, what we see is that there

8   is some aspects of her memory that she can retrieve, but

9   even then, it is difficult and you get these over general

10  memories.  But when it comes to the traumatic stuff, some

11  of it is just completely inaccessible a lot of the time or

12  even with like the best possible cue you could imagine --

13  we call them cues as memory servers -- to invoke a memory,

14  it's just not coming out because they're split off

15  basically from the rest of her memories in the sense of

16  who she is.

17  *Q.*   Well, now we'll turn to this video, which, as we

18  said, is a video of the State's expert --

19  *A.*   Yes.

20  *Q.*   -- interviewing Wendi.  Can you tell us, do you

21  know when that interview occurred?

22  *A.*   I think it was last November or October,

23  somewhere in that range.

24  *Q.*   And what we're going to show here is a clip from

25  that and then we're going to pause it and you can tell us

1   what we're seeing.

2           THE COURT:  The court reporter won't be taking

3   this down.  Okay?

4           MR. NICKELS:  Understood.  You mean what's being

5   said on the video?

6           THE COURT:  Right, what's being said on the

7   video.

8           There's no objection to this video being shown;

9   is there?

10          MR. HAZARD:  No, Your Honor, as long as there's

11  proper identification on the record of what it is.

12          THE COURT:  This is Dr. Pitt?

13          MR. NICKELS:  This is Dr. Pitt's interview of

14  Wendi.  And like Dr. Hopper said, it happened last fall.

15  It's the video that they sent to us and it's just a

16  handful of clips that's going to be -- I don't think it's

17  ten minutes.

18          THE WITNESS:  It is ten minutes.

19          MS. GARD:  I guess what we're preferring, Judge,

20  is that we know exactly when we're looking at the record

21  and what's being played, which portion of the video it is.

22          MR. NICKELS:  Yes, we can tell you exactly the

23  time mark.

24          THE COURT:  And we'll have you describe that

25  portion or I guess we will get it from the testimony.

1        Was this one of the exhibits that is submitted

2   into evidence?

3        MR. HAZARD:  It is, Your Honor.  There is an

4   entire transcript of the entire interview in that exhibit.

5        THE COURT:  Okay.  Then I'll allow you to

6   proceed, then.

7        MR. NICKELS:  Okay.  Thank you.

8        (WHEREUPON, the video was played.)

9   *Q.*   BY MR. NICKELS:  So, Dr. Hopper, what did we see

10  there?

11  *A.*   I guess first I just want to say that I'm sorry.

12  You know, it must be difficult for the family to hear this

13  and I want to acknowledge that.

14       So we see there this she's attempting to retrieve

15  memories and she's got, you know, some images of blood,

16  but there's this resistance, this kind of automatic

17  resistance in her brain to retrieving this kind of awful

18  memory.

19       And this was something that we saw not just when

20  talking about the crime, but when talking about

21  experiences, bad experiences, traumatic experiences she

22  had as a child, she would be really trying to answer my

23  questions and just unable to pull up these memories.

24  *Q.*   And I understand some of the clips we're going to

25  look at relate to questions she was being asked by

1   Dr. Pitt about the night of the crime?

2       *A.*   Yeah.

3       *Q.*   And then others relate to questions she was asked

4   by Dr. Pitt about her background, frankly some of the

5   stuff that you've been talking about; is that right?

6       *A.*   Yes.  And, to be clear, I put text in there to

7   introduce where that shift takes place.  So that will be

8   very clear.

9       *Q.*   So these first few are questions about the night

10  of the crime; is that right?

11      *A.*   The first one is about the night of the crime.

12  The second one is about general memory problems.  Then

13  back to the night of the crime and then the childhood

14  stuff.

15          (WHEREUPON, the video was played.)

16      *Q.*   BY MR. NICKELS:  What did we see there?

17      *A.*   Again, we saw something that I repeatedly

18  encountered in my 52 hours of interviewing her that not

19  only is she unable to retrieve a memory if you kind of

20  give her like a blanket concept like, did this happen to

21  you, did that happen to you, but even we call at recall,

22  and that's a prefrontal cortex thing where you're trying

23  to retrieve it.

24          But even if presented -- and there was an

25  interview that I did with her in April of 2011 where

1   gradually in a very careful way, so as not to distort or

2   influence her memory, only at the very end did I give her

3   clear descriptions of things that other witnesses had

4   reported.  Even there with that kind of information, which

5   is something when I teach these military investigators how

6   to interview sexual assault victims, you have to get that

7   kind of -- to really get the memories of the assault, you

8   have to ask specific questions.  Even there, she says

9   here, she couldn't recognize or remember even when you

10  gave her details verbatim from other peoples' witness

11  reports.

12          So that really speaks to not just the over

13  general memory of fear of searching for it, but the

14  dissociation and the fragmentation of even if you give

15  like really good cues to remember, even good descriptions

16  of actual events from other people, it doesn't come up.

17     Q.   Okay.  We'll go to the third one.

18          (WHEREUPON, the video was played.)

19     Q.   BY MR. NICKELS:  What did you see there?

20     A.   So I saw something that, you know, that you see

21  in people who have gone through terribly traumatic

22  experiences, not only as a victim, but as a perpetrator of

23  them.  Something that I again teach on a regular basis,

24  teaching investigators and prosecutors about how memory

25  can work in a very traumatized person.  And when someone

1   is asked these kind of global questions, what tends to

2   happen is they get these awful fragments of the memory,

3   blood, horrible sensations in their body, maybe if they

4   were raped, and they can't just narrate something in a

5   sequential order.

6          Here in Wendi's case, we see that she says:  I

7   don't know what's going on.  She is just like those

8   executive functions then are just breaking down before our

9   eyes.  This was again something we saw not just in talking

10  to her about the crime, but in talking about some of these

11  traumatic experiences that she went through, or even if

12  she couldn't remember them, sometimes she would be

13  breaking down and just have little pieces and be very

14  overwhelmed like this.

15      Q.   And is that what we see in these next videos?

16      A.   Well, I'm going to point out different things

17  that we see.  But it's along these lines, yes.  These next

18  videos are about her childhood experiences, yes.

19      Q.   Right.  In fact, I believe one of these starts

20  with a question about a he or a him?

21      A.   Yeah, that's flagged.

22      Q.   Is that Alejo?

23      A.   That's Alejo.

24      Q.   That's Alejo they're referring to?

25      A.   Yes.

1                    (WHEREUPON, the video was played.)

2          *Q.*   BY MR. NICKELS:  What did you see there,

3    Dr. Hopper?

4          *A.*   A few things.  I mean, one general comment just

5    to make is if you just ask someone, if you use the

6    language like sexual relationship and sexual intimacy,

7    it's not clear what that actually means to the person

8    you're asking.  But that's not something someone who works

9    with sex abuse who is obviously trained in these

10   investigations would do.

11                 But what we have here is she's asking these

12   questions.  She's saying no response.  She's saying:  I

13   don't know.  I don't remember.  At the beginning, you know

14   there is just kind of confusion.  You see the confusion

15   and not really sure what to think.  But she does refer to

16   what she does remember was the constant sexualized

17   comments.  The sexual environment that this created, we'll

18   get to later.  But you can just see right there, the

19   confusion, the struggles with memory, the not really sure

20   if it happened or not.

21                 MR. NICKELS:  Okay.  We'll turn to the next one.

22                 (WHEREUPON, the video was played.)

23         *Q.*   BY MR. NICKELS:  What did that clip show us,

24   Dr. Hopper?

25         *A.*   So, as we all saw, it took her like a minute to

1   come up with any kind of example.  Now part of that may be

2   attributable to it was so common, that she's just

3   describing it.  But even when she tries to come up with an

4   example, it takes her literally a minute or so to come up

5   with something.  And that's what I had talked about

6   before, that over general memory.  You ask someone for an

7   example of something that describes, for example, a

8   parent, and they're trying, trying and trying and they

9   can't -- like she kept saying:  I can't get any details.

10  I can't pull up any details.  Until finally after a

11  minute, finally she pulls up a detail.

12          The thing about the ball and pretending those are

13  or, you know, implying those are relating to those male

14  sexual parts, that was an example that she had told me a

15  couple of years ago.  But even that, an example that she

16  had shared before, it still took her over a minute to

17  retrieve that.  So that's just an example of this over

18  general memory and difficulty retrieving memories.

19          MR. NICKELS:  I believe we have one more.

20          THE WITNESS:  There's one more.

21          (WHEREUPON, the video was played.)

22     Q.   BY MR. NICKELS:  What did that show you?

23     A.   Again, it shows that when she's asked a question

24  about, do you remember going to stores with sexual apparel

25  like Frederick's or something like that, when she tries to

1  retrieve this memory, at first she can't.  It doesn't come

2  up.  Then after she starts saying she doesn't have a

3  memory of it, she starts putting some words to it, and

4  then suddenly the memory pops into her head.  And this is

5  something that her mother had reported witnessing, Alejo

6  taking her into a Frederick's of Hollywood.

7        But even when the memory pops into her head of

8  being in the store, then the next comes:  Well, why did

9  you go in there?  What was the purpose?  That might not be

10  the exact wording.  I'm not sure of the exact wording.

11  And she says:  I don't remember.

12        So even when she accesses the memory of going

13  into the store, she still is unable to remember why she

14  was there, which was, you know, as we'll hear a lot more

15  about after lunch, to get lingerie.

16        So it's just an example of the various breakdowns

17  that can occur in her memory along the way, unable to

18  retrieve the detail, even when it pops up, and she still

19  can't access the full thing, especially the most

20  disturbing part about it, which would be looking at the

21  lingerie with her father and actually buying the lingerie.

22    Q.  These memory problems that you just described and

23  the dissociation that you described before that -- and,

24  remember, even though we just saw a video of it still

25  occurring to this day, we started out by you saying this

1  was actually setting in already when she's nine years old.

2  Why is this important and what does it mean to you?

3      *A.*   Well, I would say even before nine years old, but

4  she says as long as she could remember during this time

5  period, that last time period we're talking about.

6          Well, again, we don't see -- barring like, you

7  know, a serious blow to the head or multiple concussions

8  or something like that, you just don't see these kinds of

9  major memory deficits unless someone has been through very

10  significant trauma, at least as far as, you know, the

11  research is showing.  It's either organic damage from a

12  blow or blows to the head or, you know, something like a

13  stroke or something like that or massive trauma is the

14  other thing that is known to cause these kinds of

15  problems.

16     *Q.*   And you've talked about memories being

17  fragmented, not being connected.  How does this -- I

18  understand it's evidence that she was traumatized.  How

19  does it translate, though, to what kind of person she is

20  and how it affects her ability to handle it?

21     *A.*   Right.  So for people -- you know, again, this is

22  something I've seen for many years as a therapist.  For

23  people who have been so traumatized and who have these

24  memories that are split off and they can't access them

25  even when they're trying, they've blocked out this really

1    bad stuff, awful images, awful feelings in their body of

2    being abused and assaulted.

3          But under certain circumstances, high stress,

4    frightening and confusing circumstances, this stuff can

5    come rushing back in.  And we talked about that executive

6    functioning and the CEO.  It can literally just knock the

7    CEO out and then the person is left to whatever bad stuff

8    is coming in and whatever impulses are arising and they're

9    just reacting to the situation without being able to think

10   it through.

11   Q.   Does a person whose CEO has been overwhelmed or

12   knocked out, do they have the ability to control impulse?

13   A.   Not really.  One of the things we know from

14   research by several groups, including one at Yale and

15   Arnsten is that in very stressful and terrifying

16   situations, there are chemicals that hit your prefrontal

17   cortex that impair the ability of the nerves to

18   communicate with each other and literally can shut it

19   down.

20         So when that happens, the very area of your brain

21   that you need to inhibit impulses and to remember rules

22   and laws and things like that, it's not functioning.

23         And with someone who has a major, major trauma

24   history like this, and who already has deficits in

25   executive functioning that have been documented by

1   Dr. James, you know, they don't really stand a chance when

2   awful stuff comes in.

3          MR. NICKELS:  Your Honor, just from a planning

4   standpoint, we're about to turn to the third time period.

5   I can tell you that that time period is broken up into two

6   sections.  One is relatively short and one is a little bit

7   longer.  The short one is probably going to be 15 to

8   20 minutes.  We could maybe get through it now or we could

9   break right now.

10          THE COURT:  Why don't we go ahead and break right

11  now since it's ten minutes until 12:00.  It's about nine

12  minutes until 12:00.  Why don't we go ahead and take a

13  clean break right now.

14          MR. NICKELS:  Okay.

15          THE COURT:  And we will begin again at 1:30.  So

16  we will be in recess until 1:30, then.

17          (WHEREUPON, the lunch recess was taken at

18  11:51 a.m.)

19                    *  *  *  *  *  *  *

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6
 7                    C E R T I F I C A T E
 8
 9
10        I, RENÉE A. MOBLEY, RPR, a Certified Reporter in
11   the State of Arizona, do hereby certify that the foregoing
12   95 pages constitute a full, true, and accurate transcript
13   of the proceedings had in the foregoing matter, all done
14   to the best of my skill and ability.
15        SIGNED and dated this 14th day of April, 2014.
16
17
18                    /s/  Renée A. Mobley, RPR
19                    RENÉE A. MOBLEY, RPR
20                    Certified Reporter
21                    Certificate No. 50500
22
23
24
25
```

# EXHIBIT GGGGGGGGGG

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
5/2/2014 5:57:29 PM
Filing ID 5855463

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,         )
                             )
      Respondent,     )
                             )
vs.                    ) No.
                           ) CR 2000-096032 A
WENDI ELIZABETH ANDRIANO, )
                           )
      Petitioner.     )
_____)

Phoenix, Arizona
February 14, 2014
9:31 a.m.

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING

DAY 8

Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500             (ORIGINAL)

1                   A P P E A R A N C E S

2

3

4   On Behalf of the State:

5           Mr. Gregory Hazard
            Assistant Attorney General
6
            Ms. Lacey Gard
7           Assistant Attorney General

8
    On Behalf of the Defendant:
9
            ATTORNEYS AT LAW:
10
            Mr. Scott Bennett
11          Mr. Allen Arntsen
            Mr. Stephan Nickels
12          Mr. Matthew Lynch
            Ms. Krista Sterken
13          Ms. Jodi Fox

14                   I N D E X

15

16                 T E S T I M O N Y

17
    WITNESS:                                         PAGE
18
    KIRAN AMIN, PH.D.
19
            Direct Examination by Mr. Hazard           4
20
            Cross-Examination by Ms. Sterken          27
21

22   STEVEN E. PITT, D.O.

23          Direct Examination by Mr. Hazard          33

24          Cross-Examination by Mr. Nickels          93

25          Redirect Examination by Mr. Hazard       107

1                    P R O C E E D I N G S

2         THE COURT:  Good morning.  This is

3    CR 2000-096032, State of Arizona vs. Wendi Elizabeth

4    Andriano.

5         The record will reflect the presence of the

6    parties and counsel.

7         Are there any preliminary matters we need to

8    discuss?

9         MR. ARNTSEN:  Not from the Petitioner.

10         MS. GARD:  No, Your Honor.

11         THE COURT:  The Petitioner rests?

12         MR. ARNTSEN:  The Petitioner rests.

13         THE COURT:  The State may call its first witness.

14         MR. HAZARD:  Thank you, Your Honor.  The State

15    calls Dr. Kiran Amin to the stand.

16         THE COURT:  Sir, if you could please step

17    forward.  Go ahead and step forward up to the witness

18    stand.  Before you sit down, if you could please face the

19    clerk.  Give her your full name and she will swear you in.

20         THE CLERK:  State your name and spell your name

21    for the record, please.

22         THE WITNESS:  Kiran Amin.  K-I-R-A-N; A-M-I-N.

23         THE CLERK:  Raise your right hand, please.

24         (WHEREUPON, the witness was duly sworn by the

25    clerk.)

 1          THE COURT:  Sir, go ahead and have a seat there

 2   on the witness stand.  If at anytime you need water,

 3   there's some water behind you there and help yourself.

 4   Just remember to speak up so that everyone can hear you.

 5   Also, please wait until the question is completed before

 6   you answer the question and please make sure that you give

 7   us a verbal response.

 8          Is that all agreeable to you, sir?

 9          THE WITNESS:  Yes.

10          THE COURT:  Go ahead and state your name for the

11   record.

12          THE WITNESS:  Kiran Amin.

13          THE COURT:  Is it going to be Mr. Hazard?

14          MR. HAZARD:  Yes, Your Honor.

15          THE COURT:  Mr. Hazard, you may proceed.

16          MR. HAZARD:  Thank you, Your Honor.

17

18               KIRAN AMIN, PH.D.

19   having been first duly sworn to tell the truth, the whole

20   truth, and nothing but the truth, testified as follows:

21

22               DIRECT EXAMINATION

23   BY MR. HAZARD:

24     Q.   What do you do for a living, sir?

25     A.   I'm currently a professor of clinical psychology

1   at Midwestern University on the Glendale campus.

2       Q.   And let's talk about your education, training and

3   experience.  First let's start with, can you share with

4   the Court your education?

5       A.   Yes.  I have a past degree in mathematics and

6   statistics and then a degree in psychology from Britain.

7   And then I have a Doctorate Degree in Clinical Psychology

8   from McGill University in Montreal, Canada.

9            Subsequent to that, I have completed a

10  post-doctoral fellowship at the Barrow Neurological

11  Institute at St. Joseph's Hospital here in Phoenix in

12  clinical neuropsychology.

13      Q.   Are you a member of any boards or organizations

14  that are related to your field of study?

15      A.   Yes.  I'm a member of the American Psychological

16  Association and a member of Division 40, which is a

17  division concerned with clinical neuropsychology.  I'm a

18  member of the National Academy of Neuropsychology and I'm

19  also a member of the International Neuropsychological

20  Society.

21      Q.   What other experience have you had?  You

22  mentioned your teaching experience.  What other experience

23  have you had related to neuropsychology?

24      A.   After completing my post-doctoral training in

25  clinical neuropsychology, I worked for six years at

1    Good Samaritan Regional Medical Center, which is now known

2    as Banner, and I was there as an outpatient

3    neuropsychologist for six years.

4          Thereafter, I worked at Jarvis University as an

5    associate professor and eventually becoming a professor

6    there until four years ago.  And then I've been at

7    Midwestern University as a professor of clinical

8    psychology since that time.

9    *Q.*    Have you ever worked or been retained as an

10   expert witness in neuropsychology?

11   *A.*    Yes.

12   *Q.*    Can you tell the Court a little bit about that

13   experience?

14   *A.*    Since 1992, I have been retained an as expert

15   initially on matters to do with personal injury

16   evaluations and neuropsychological evaluations in person

17   injury matters.  And, subsequently, I became involved in

18   doing neuropsychological evaluations in criminal matters.

19          And in the last five to ten years, I've become

20   more involved in doing evaluations like the present one

21   where a capital matter is involved.

22   *Q.*    Have you testified as an expert witness before in

23   court?

24   *A.*    Yes.

25   *Q.*    Tell us a little bit about that.

1      *A.*    I've testified both for the defense and the

2  prosecution on both personal injury matters, competency

3  evaluations and then criminal matters such as this.

4      *Q.*    Were you retained by the Arizona Attorney

5  General's Office to do a neuropsychological assessment of

6  Ms. Wendi Andriano?

7      *A.*    Yes.

8      *Q.*    And after completing that assessment, did you

9  write a report?

10     *A.*    I did, yes.

11          (WHEREUPON, an off-the-record discussion ensued.)

12          MR. HAZARD:  May I approach the witness?

13          THE COURT:  Yes.

14     *Q.*    BY MR. HAZARD:  Dr. Amin, I'm handing you what

15  has been marked for identification purposes as

16  Exhibit 169.  Do you recognize what's in that exhibit

17  folder?

18     *A.*    Yes.  It is the report I wrote.

19     *Q.*    Okay.  And did you complete that report dated

20  December 26, 2013?

21     *A.*    Correct.

22          MR. HAZARD:  We move to admit Exhibit 169 into

23  evidence.

24          THE COURT:  Any objection?

25          MS. SKERKEN:  Yes.  We would object on hearsay

1  grounds.

2          THE COURT:  I'll sustain the objection.

3      Q.   BY MR. HAZARD:  All right.  Let's talk about

4  first off the records that you reviewed and the materials

5  that you reviewed in preparation for your assessment of

6  Ms. Andriano in writing your report.  Can you tell us a

7  little bit about those types of materials?  Are they

8  listed in your report?

9      A.   Some of them are listed.  I haven't listed them

10  all because I was writing a memorandum effectively to

11  Dr. Pitt.  And as I mentioned in my memorandum, that I'm

12  listing the critical ones that I referred to -- the

13  critical records that I referred to.

14      Q.   What sorts of things do you generally want to

15  have to complete the type of neuropsychological assessment

16  that you did with Ms. Andriano?

17      A.   I would need all previous psychological

18  evaluations and neuropsychological evaluations that I need

19  to review.  I would need to conduct a clinical interview.

20  And I may need to also review any other relevant materials

21  such as school records, past records of any kind of

22  indication of the person's cognitive or neuropsychological

23  functioning.

24      Q.   And you did that in this case?

25      A.   I did, yes.

1    *Q.*    You mentioned Dr. Pitt.  Did you also attend and

2  participate in a forensic interview with Ms. Andriano

3  conducted by Dr. Pitt on November 26, 2013?

4    *A.*    I did, yes.

5    *Q.*    And why did you do that in this case?

6    *A.*    It's always customary, at least for me, to

7  interview the person in question.

8    *Q.*    Then after that forensic interview was completed,

9  did you request additional testing to be conducted on

10  Ms. Andriano?

11    *A.*    Yes.

12    *Q.*    And can you tell the Court how that went about

13  and why you did that?

14    *A.*    After reviewing Dr. Young's report and after the

15  interview, I wanted to test or retest some of the tests

16  that had been given to Ms. Andriano, and, also, to see if

17  currently what level she was currently functioning at,

18  bearing in mind that Dr. Young's report was over almost --

19  almost three years ago.

20           And so I felt it necessary to go back and at

21  least do some of the tests of interest to me to see how

22  Ms. Andriano performed on them and to check out any

23  hypotheses that I constructed based on the actual

24  interview that I was present with with Dr. Pitt of

25  Ms. Andriano.

1    *Q.*    Did you conduct those tests on December 13, 2013?

2    *A.*    Yes.

3    *Q.*    And why did you select the particular tests?

4    First of all, what specific tests did you administer on

5    Ms. Andriano?

6    *A.*    I administered the following tests:  The

7    California Verbal Learning Test, Second Edition; Halstead

8    Finger Tapping Test; Groove Pegboard Test; Minnesota

9    Multiphasic Personality Inventory, Second Edition;

10    Structured Inventory of Malingered Symptoms; the

11    Rey-Osterrieth Complex Figure Test; and the Validity

12    Indicator Profile.

13         And, specifically, I was interested in memory

14    functioning, given that Ms. Andriano had stated that she

15    had difficulties with her memory.

16         And so the first test I gave or that is listed

17    here, sorry, is the California Verbal Learning Test.  It

18    is, as described, as a test of verbal learning and

19    retention over repeated trials.

20         I also gave her a memory test to do with

21    nonverbal material and that is the Rey-Osterrieth Complex

22    Figure Test.

23         So I gave her two memory tests that I was

24    particularly interested in seeing how she functioned on.

25    And as it happened, both tests had been administered to

1   Ms. Andriano over almost three years prior.

2          Additionally, I gave her some motor tests, the

3   Halstead Finger Tapping Test and the Groove Pegboard Test.

4   These are tests of motor functioning that I wanted to see

5   how Ms. Andriano compared with Dr. Young's test results

6   from the previous administration.

7          And then, finally, I gave the personality test,

8   the Minnesota Multiphasic Personality Test, which had not

9   been given by Dr. Young to Ms. Andriano, but it had been

10  given by Dr. Bayless some years prior.

11         I also administered something called a Validity

12  Indicator Profile, which is a measure of how much effort

13  the testee is putting forth.

14         So those are the tests that I -- oh, and the

15  Structured Inventory of Malingered Symptoms is another

16  questionnaire-based measure that attempts to see if the

17  respondent is in any way exaggerating or feigning symptoms

18  that are actually not typically claimed by people with

19  genuine mental or neurological disorders.

20  Q.   During the forensic interview on November 26,

21  2013, did you ask Ms. Andriano some questions related to

22  any head trauma or injuries she may have suffered?

23  A.   I did, yes.

24  Q.   And why did you do that?

25  A.   That is part of my normal clinical interview

1  questions that I check with the client exactly what their

2  prior history is from a neurological and

3  neuropsychological point of view.  So I go repeatedly over

4  some questions to do with any prior head injuries, motor

5  vehicle accidents, falls, episodes of loss of

6  consciousness and so forth.

7      Q.    Did Ms. Andriano report any significant head

8  injuries or loss of consciousness to your questions?

9      A.    No.

10      Q.    When you administered these tests on

11  December 13th on Ms. Andriano, what was her -- did you

12  have the opportunity to observe her mood and affect?

13      A.    She was cooperative, fully present, and I believe

14  on most of the tests, she performed with good effort -- at

15  least on some of the measures I gave her.

16      Q.    Before you administer each test, is there a

17  certain protocol that you follow to inform, in this case,

18  Ms. Andriano about why you're taking the test or anything

19  like that?  And, if so, please tell the Court how that

20  goes.

21      A.    Initially when I start the test administration, I

22  explain to the client that I'm going to be giving them

23  some paper and pencil tests, that the purpose of which is

24  to evaluate their cognitive and neuropsychological

25  functioning.  I explain that that refers to how what their

1 problem solving styles are like, what their memory is

2 like, what their language skills are like and so forth,

3 and, also, to get a picture of their personality

4 functioning.

5      *Q.*   And did Ms. Andriano indicate that she understood

6 what she was supposed to do with these tests?

7      *A.*   Yes.  And she also indicated during the testing

8 that she remembered doing similar tests several years ago

9 with Dr. Young.

10      *Q.*   The tests that you administered, are these tests

11 that experts in your field of neuropsychology reasonably

12 rely upon?

13      *A.*   Yes, as you can see, I gave what?  Seven tests

14 altogether, seven measures.  I would normally do a full

15 assessment, but given that Dr. Young had already

16 administered a huge -- a very large number of tests three

17 years prior, I was more interested in seeing what changes,

18 if any, had occurred since that testing by Dr. Young.

19      *Q.*   And that's why you selected the specific tests

20 you did; correct?

21      *A.*   Yes.  Yes.

22      *Q.*   All right.  Can you take us through the findings

23 that you made after Ms. Andriano completed the tests and

24 you started reviewing the data from those tests?  Can you

25 take us step-by-step as far as findings that you made,

1  given Ms. Andriano's performance on the tests you

2  administered, and anything else related to her prior

3  history?

4      *A.*    Yes.   So first what I do is -- always do is score

5  the tests and generate some results, which indicate to me

6  how Ms. Andriano had been functioning on these tests.   And

7  then I would then go back to any prior testing, as in the

8  case of done by Dr. Young, Dr. Bayless and others, and

9  review those records and compare those findings with mine.

10         And after doing that, I form my own opinions and

11  then write a report.   In the report, I lay out the tests

12  I've given and the results I've obtained.   I also then

13  compare those results with results reported by previous

14  examiners and then comment on any differences or

15  similarities, and then offer my opinions.

16      *Q.*    What about the VIP test?   Can you tell us about

17  that and what findings you made?

18      *A.*    Yes.   The VIP stands for the Validity Indicator

19  Profile.   It is a test involving problems to do with both

20  verbal and nonverbal material, and the purpose of the test

21  is to establish if the examinee is responding with

22  adequate effort to the items administered.

23         On the Validity Indicator Profile, which had not

24  previously been administered to Ms. Andriano, she

25  performed within normal limits.   In other words, she put

1    forth normal effort.

2        Q.    What about the MMPI-2?

3        A.    The MMPI-2 is a personality measure with over --

4    with 567 items, and it generates ten initial scales and

5    then many other subscales.

6            And this measure had been given to her quite a

7    few years ago by Dr. Bayless.  And so I was interested in

8    knowing how Ms. Andriano's performance compared with the

9    performance that she demonstrated at that time with

10   Dr. Bayless.

11           And, as I report, I found that her MMPI-2

12   measures were showing some serious scale elevations,

13   meaning that these were scales in what we would call the

14   clinically significant range on eight of the ten standard

15   scales.

16           The profile also has measures to indicate whether

17   the person was responding adequately and whether the

18   profile was interpretable, and it was interpretable in my

19   opinion.  So I proceeded with the analysis.

20           And what I found was that something called a

21   Symptom Validity Scale, FVS, was elevated, indicating

22   possibly some exaggeration of some symptoms.

23           I then, of course, compared these findings with

24   the ones that Dr. Bayless had obtained.  I don't know the

25   exact date.  I have it written down here.  In 2004, nine

1   years ago.

2          What I found that was noteworthy was that the

3   profile pattern was the same except that the profile I

4   obtained was significantly elevated compared to what

5   Dr. Bayless found.  So that suggests that the profile

6   pattern has not changed, but that on the face of it,

7   Ms. Andriano is in a considerably -- considerably greater

8   level of distress, psychological distress currently when I

9   tested her.

10         Also, as I said, I found the FVS subscale

11   elevated, suggesting that there was a possibility of

12   exaggeration of symptoms.

13   Q.   You mentioned comparing the MMPI to the test that

14   Dr. Bayless administered in 2004?

15   A.   The same one, yeah.

16   Q.   The same one.

17   A.   And which Dr. Young had not administered.  Nobody

18   else had administered the MMPI since Mr. -- Dr. Bayless

19   had administered it in August of 2004.

20   Q.   What was significant -- did you find any

21   significance in comparing the test that Dr. Young

22   administered with the test that you also administered?

23   And, if so, what sort of findings or opinions have you

24   rendered with respect to Dr. Young's work?

25   A.   Right.  There were several areas in which the

1   performance was different and worth comment from me.  So

2   as I go through the list, there was the Structured

3   Inventory of Malingered Symptoms, SIMS, which I explained

4   earlier is a measure to determine whether the individual

5   is endorsing items that are not typically endorsed by

6   people with genuine psychiatric and neurological

7   conditions.

8           This measure was given by Dr. Young.  And, at

9   that time, Ms. Andriano performed within normal limits.

10          However, when I administered it to her, as I

11  report, she was showing symptoms of some kind of

12  exaggeration or claiming symptoms that would not typically

13  have been claimed by people with genuine neurological or

14  psychiatric disorders.

15          So there was evidence and suggestions that of

16  malingering or feigning of symptoms on the SIMS based on

17  my test results compared to those of Dr. Young's three

18  years prior, roughly.

19      Q.   After you completed your report, did you have the

20  opportunity to review a report submitted by Dr. Joette

21  James on these proceedings?

22      A.   I did, yes.

23      Q.   And in that report, Dr. James is critical of you;

24  is that correct?

25      A.   On several accounts, yes.

1   *Q.*   Let's first off talk about the first topic of

2   criticism in Dr. James' report, and that was the time you

3   spent with Ms. Andriano.  Could you comment on that?

4   *A.*   As I explained, I first did an interview with

5   Dr. Pitt, a clinical interview which lasted I think three

6   or four hours, if I can recall.

7        And then on a subsequent occasion, I went in and

8   administered the tests that we have just been talking

9   about, and as I list, they took a total of two hours and

10   44 minutes.

11        I wasn't giving what we would call a full

12   neuropsychological evaluation for the reasons stated, that

13   on the face of it, Dr. Young had administered a great

14   variety of tests, and this was over three years prior.

15   And so I was more interested in seeing how the selective

16   tests that I gave Ms. Andriano compared with the

17   performance three years prior.

18        Initially, at that time, I had no reason to doubt

19   any of the initial findings reported by Dr. Young.  As it

20   happened, when I started making the comparisons, I have to

21   go through the scoring done by Dr. Young, and as I listed

22   in the report, I did find some errors and inconsistencies

23   which I have listed in that report.

24   *Q.*   Did Dr. James even bring up the fact that you sat

25   in and participated in Ms. Andriano's forensic interview?

1      *A.*    No.  No, she did not.

2      *Q.*    And is that also important in your overall

3  assessment of Ms. Andriano?

4      *A.*    Absolutely, in that, in a forensic assessment,

5  it's important to meet with the client and not just go by

6  a paper review alone.

7      *Q.*    The second kind of topic that Dr. James was

8  critical of had to do with the idea that Ms. Andriano, in

9  your opinion, was showing some issues that call into

10  question whether she put forth her best effort --

11      *A.*    Correct.

12      *Q.*    -- and symptoms consistent with malingering?

13      *A.*    Right.

14      *Q.*    Could you address those criticisms?

15      *A.*    Right.  So there are -- so let me just count.

16  There are at least three tests which we're talking here

17  about.  The Validity Indicator Profile, as I reported just

18  now, showed no attempts of feigning or malingering.  So it

19  was within normal limits.  And so Dr. James had no quibble

20  with that.

21          The next one is the SIMS, which Dr. James herself

22  administered, on which Ms. Andriano performed within

23  normal limits for Dr. Young, but, for me, she was clearly

24  showing some symptoms of feigning.

25          And, at this point, Dr. Young cast doubt on the

1   SIMS as a worthwhile measure, which was the issue as to

2   why Dr. Young herself administered that same test to

3   Ms. Andriano.  Sorry.  I meant Dr. James cast doubt on the

4   SIMS as a worthwhile measure.

5          But I'm in agreement with Dr. Young that it is a

6   worthwhile measure in the context of proper testing.  And

7   so there is a difference of opinion with Dr. James, in

8   that Dr. James doesn't take the -- doesn't feel that the

9   SIMS is valid enough or reliable enough, in her opinion.

10          Then we move to the Rey-Osterrieth Complex Figure

11   Test.  This is a test of nonverbal memory.  And this was

12   administered by Dr. Young, and I administered it, too.

13          And in comparing the results from that

14   administration and mine, I found some interesting things.

15   I found, for instance, that there's something called a

16   Recognition Trial, which is where you ask to state whether

17   you recognize something that you saw before.  And I had

18   given a Recognition Trial, but what I noticed, which

19   Dr. Young had overlooked, was that the Recognition Trial

20   showed that Ms. Andriano was performing significantly less

21   well than other measures of the same test that Dr. Young

22   had administered.  When this occurs, there is an issue of

23   explaining why there is such a discrepancy, and Dr. Young

24   had overlooked that.

25          And I pointed out that there was a possibility

1   here of some degree of malingering because typically,

2   Recognition Trials are a lot easier to do than Recall

3   Trials.  And this was a discrepancy I picked up in

4   Dr. Young's administration.

5          In my opinion, also I noticed that Dr. Young

6   omitted to mention that 30 minutes after the initial

7   administration -- introduction to the stimulus,

8   Ms. Andriano still performed within the normal range,

9   indicating that as far as nonverbal memory goes, she was

10  not showing any significant deficits, but Dr. Young omits

11  to mention that.  So in all of these counts, there are

12  these disagreements between myself and Dr. Young.

13         Dr. James, who reviewed these records, feels that

14  she did not come across any research regarding Recall

15  versus Recognition on the ROCFT.

16     *Q.*   Do you agree with that?

17     *A.*   I do not.  In fact, I have about a half a dozen

18  such articles addressing this very issue.  So that was the

19  ROCFT.

20         Then as you note, I mentioned the Minnesota

21  Multiphasic Personality Inventory, Second Edition, and the

22  FVS -- elevated FVS index.

23         Dr. James did not address this at all in her

24  review of this testing as to what it meant and did not

25  address it all in her review, as I said, and the

1  comparison between my results and the results obtained by

2  Dr. Bayless 13 years prior.  So that's where we stand with

3  regard to this.

4      And the California Verbal Learning Test, which

5  was a straightforward test of this learning,

6  Ms. Andriano performed within normal limits on my

7  administration, and I believe she did so also on

8  Dr. Young's administration, but Dr. James didn't comment

9  on that finding.

10  *Q.*   What about Dr. James' criticism that you did not

11  account for the practice effect to explain some of these

12  suspicious findings that you found with Ms. Andriano's

13  test results?  First off, what is the practice effect?

14  *A.*   The practice effect is simply if you give the

15  same test to a person a second or third time, they may

16  typically show improvements on that test.  That's known as

17  a practice effect.  The issue is what kind of time period

18  should elapse before a practice effect is likely to occur.

19      Well, as you can see -- as you know, it's been a

20  good almost three years between when Dr. Young did her

21  administration and when I did it, which I think is more

22  than adequate time to in fact not consider the practice

23  effect as an issue in this matter.

24      And, in fact, I selected these tests bearing that

25  precisely in mind, that I wanted to make sure that there

1    was no issue of practice effects.  Three years had gone

2    by.  And, in fact, during the administration, Ms. Andriano

3    never recalled doing any of these tests.

4            The second issue regarding practice effects is

5    that on some of the tests, there were discrepancies which

6    were to do with possible malingering or feigning of

7    symptoms.  And the practice effect doesn't really apply

8    here because it's in reverse, in the sense that compared

9    to how, for instance, Ms. Andriano performed 13 years ago

10   on the MMPI-2 and when I administered the test to her, she

11   was showing a great increase in her symptoms and distress

12   level, for instance.

13           Likewise with the SIMS, the Structured Inventory

14   of Malingered Symptoms, there, too, she showed an

15   elevation of endorsing items that are not typically

16   endorsed by people with genuine neurological or

17   psychiatric disorders.

18           So given all of these considerations, that's what

19   I can say regarding the practice effect:  That in the

20   instances where it might be possibly relevant, it is not,

21   because, in my opinion, too great of a time period has

22   passed between the previous testing and the current one.

23           Just to give you an example, in rehabilitation

24   settings where individuals going for rehabilitation after

25   brain injury or neurological insult, a period of six

1   months is considered adequate to bypass the possibility of

2   practice effects between the first and second testing.

3       *Q.*   Now, Dr. Amin, October 8, 2000 is the date of

4   offense, the date of the murder; correct?

5       *A.*   Yes.

6       *Q.*   And the tests that you administered in 2013, the

7   tests that Dr. Young administered in 2010 through 2011, in

8   that time frame you talked about, the tests Dr. Bayless

9   administered in 2004, and anything else, how do you use

10  this data, interpreting this data, to make any sort of

11  opinion about Ms. Andriano's mental state at the time of

12  October 8, 2000?

13      *A.*   Well, for instance, the issue here is how

14  consistent are these findings over three different time

15  periods.  And as I pointed out, there are inconsistencies

16  here, and they cannot be explained by practice effect, and

17  in my testing, I found some evidence of feigning of

18  symptoms and possible malingered amnesia, as I point out.

19          So that's what the comparison over three

20  different time periods is telling me in this matter.  That

21  when I administered the tests that I did, I found

22  inconsistencies compared to prior testing that made me

23  concerned, even after allowing for the fact that I had

24  found some errors in Dr. Young's scoring.

25      *Q.*   Have you rendered any opinions as it relates to

1  whether Ms. Andriano was suffering a cognitive impairment

2  at the time of October 8, 2000?

3      *A.*    Yes.

4      *Q.*    And what is that opinion?

5      *A.*    Well, as I explained, that I do not believe that

6  at the time of the offense, she was suffering from any

7  serious cognitive disorder.

8      *Q.*    And why is that?

9      *A.*    Because all of her functioning at the time and my

10  test results and the test results of Dr. Young and

11  Dr. Bayless that indicate to me that she was effectively

12  performing within almost normal limits.

13      *Q.*    And since you have -- in your opinion,

14  Ms. Andriano was not suffering from a cognitive impairment

15  at the time of the murder, what is your opinion as to

16  whether she could appreciate the wrongfulness of her

17  conduct and conform her conduct to the requirements of the

18  law?

19      *A.*    Well, I believe that she knew the difference

20  between right and wrong and she knew what was not in

21  conformance with the law at the time.

22      *Q.*    And with respect to any sort of causal connection

23  between whether Ms. Andriano suffered a cognitive

24  impairment at the time of October 8, 2000 and her conduct

25  on that date and the weeks leading up to October 8, 2000,

1    what is your opinion?

2        *A.*   That I do not believe there is such a causal

3    connection there.  Negative as to such a causal

4    connection.

5             MR. HAZARD:  And, Your Honor, I'm going to ask

6    the Court to reconsider admission of Dr. Amin's report

7    under Rule 703 to form the basis of his opinions.  Their

8    experts relied on Dr. Amin's report also to form the basis

9    of their opinions.

10            I want to note for the record that the State

11   stipulated to the admissibility of all mental health

12   experts by the defense in this case for the same reasons.

13   So we're not offering it for the truth of the matter

14   asserted.

15            (WHEREUPON, an off-the-record discussion ensued.)

16            MR. ARNTSEN:  It's hearsay.

17            MS. SKERKEN:  Yeah, I mean, we would still object

18   on hearsay grounds.

19            THE COURT:  I'll sustain the objection.

20            MR. HAZARD:  No further questions.

21            THE COURT:  We'll turn to Ms. Sterken.  Are you

22   going to do the cross?

23            MS. SKERKEN:  Yes.  One moment.

24            (WHEREUPON, an off-the-record discussion ensued.)

25

                        CROSS-EXAMINATION

1   BY MS. STERKEN:

2       *Q.*   Dr. Amin, one of your conclusions was that Wendi

3   may not have put forth her best effort on some of your

4   testing; correct?

5       *A.*   Correct.

6       *Q.*   And you administered two stand-alone tests, the

7   Validity Indicator Profile, the VIP, and the Structured

8   Inventory of Malingered Symptoms, the SIMS; correct?

9       *A.*   Yes.  One measures efforts in the sense that you

10  just described.  The other one is seeing if the person is

11  endorsing items that are not typically endorsed by people

12  with genuine psychiatric or neurological disorders.

13      *Q.*   And both tests, the sole purpose is to determine

14  whether the examinee is putting forth an honest, good

15  faith effort; correct?

16      *A.*   Correct.

17      *Q.*   Wendi's performance on the VIP was consistent

18  with her putting forth her best effort?

19      *A.*   Yes.

20      *Q.*   But you concluded that Wendi's performance on the

21  SIMS suggested a possibility that she might not have put

22  forth her best effort?

23      *A.*   Yes.  That she had not responded candidly to the

24  items.  Let's put it that way.  And may I say something?

1    *Q.*    Okay.

2    *A.*    In addition, remember, you have to take into

3    consideration the MMPI-2.  That is -- that has a

4    stand-alone scale of malingering in the FVS and what we

5    call the embedded measures of effort.  And, specifically,

6    this refers to the ROCFT, the Rey-Osterrieth Complex

7    Figure test, which I've talked about.

8    *Q.*    Dr. Amin, Wendi scored a 15 on the SIMS.  Do you

9    recall?  Is that correct?

10   *A.*    I'll have to look at my records whatever the

11   number was.

12           MS. SKERKEN:  Permission to approach.

13           THE COURT:  Yes.

14           MS. SKERKEN:  I would just mark that.

15           THE WITNESS:  Thank you.

16           THE CLERK:  235.  I just marked it 235.

17           MS. SKERKEN:  I'm sorry.  What number was

18   the exhibit?

19           THE CLERK:  235.

20   *Q.*    BY MS. SKERKEN:  Have you had a chance to review

21   her test results?

22   *A.*    Yes.

23   *Q.*    And she scored a 15 on the SIMS?

24   *A.*    Correct.

25   *Q.*    And the cutoff is a 14; correct?

1    *A.*    Yes.  That's for the overall score.  The combined

2    score.

3    *Q.*    Okay.  And her combined score was a 15?

4    *A.*    Correct.

5    *Q.*    The SIMS itself warns that it cannot be used as a

6    stand-alone effort indicator; correct?

7    *A.*    It's not so much an effort indicator, but how

8    candid the respondent is in responding to these items.

9    *Q.*    And the SIMS specifically warns that it can't be

10    used alone to determine whether someone is candidly

11    responding; correct?

12    *A.*    Correct.

13    *Q.*    And that was the only stand-alone effort test

14    that Wendi, according to you, did not pass; correct?

15    *A.*    Yes, unless you talk about the embedded measures

16    that I just mentioned.

17            MS. SKERKEN:  I have no further questions.

18            THE COURT:  Redirect?

19            MR. HAZARD:  Nothing further, Your Honor.

20            THE COURT:  May this witness be excused?

21            MR. HAZARD:  Yes.

22            THE COURT:  Thank you very much, sir.  You're

23    excused.  Don't walk off with any exhibits if there are

24    any exhibits up there.

25            THE WITNESS:  Okay.  Thank you.

1          THE COURT:  Thank you.

2          The State may call its next witness.

3          MR. HAZARD:  Judge, our next witness will be here

4     at 11:30.

5          THE COURT:  Okay.  I guess we'll take a recess,

6     then.  Then we can discuss informally some matters about

7     scheduling and whatnot while we're here.

8          MR. HAZARD:  Okay.  Thank you.

9          THE COURT:  Okay.  We'll be in recess, then.

10          (WHEREUPON, a recess ensued from 10:13 a.m. to

11     11:23 a.m.)

12          THE COURT:  This is CR 2000-096032, State of

13     Arizona vs. Wendi Elizabeth Andriano.

14          The record will reflect the presence of the

15     parties and counsel.

16          The State may call its next witness.

17          MR. HAZARD:  Your Honor, may we make a brief oral

18     argument before we call the next witness, by Ms. Gard?

19          THE COURT:  Go ahead.

20          MS. GARD:  Your Honor, I wanted to refer the

21     Court to *State vs. Tucker* as to the matter of admitting

22     the expert reports in this particular case.  The objection

23     was hearsay, but the reports aren't being offered for

24     their truth.  They're being offered for the basis of the

25     expert opinion.  They contain the basis of the opinions.

1  In addition, their experts relied on Dr. Amin's report to

2  form their opinions.

3         So, for that reason, we believe that the reports

4  are admissible.  I just wanted to make that record.  The

5  citation to *Tucker* is 215 Ariz. 298.  And that case

6  analyzed the issue under Rule 703, which is the rule that

7  Greg cited -- or Mr. Hazard cited this morning.  And it

8  would be the end of Paragraph 58 of that case.

9         MR. ARNTSEN:  Just briefly, we haven't seen the

10 case they're citing.  But presuming for the same reason

11 the Court kept out Attorney Hammond's and Attorney

12 Lowenthal's reports, it's not the underlying evidence.  I

13 mean, that's what Rule 703 says, not for the truth.  The

14 reports are there for the truth.  This is what the experts

15 says or what they think.

16        MS. GARD:  Your Honor, if I may respond, our

17 objection to Mr. Hammond's and Mr. Lowenthal's report was

18 on relevance grounds and consistent with our position that

19 they shouldn't have been testifying at all.

20        THE COURT:  Let me think about it and I'll -- I

21 assume we're going to take a lunch break and then we're

22 going to have the continuation of the witness's testimony.

23 Then I'll look at it during the lunch hour.

24        MR. ARNTSEN:  Okay.  Thank you, Your Honor.

25        MS. GARD:  Thank you, Judge.

1          THE COURT:  The State may call its next witness.

2          MR. HAZARD:  Thank you, Your Honor.

3          The State calls Dr. Steven Pitt.

4          THE COURT:  Go ahead and approach the witness

5    stand there.  Before you sit down, if you could please

6    face the clerk and give her your full name, and she will

7    swear you in.

8          THE CLERK:  Can you please state your name and

9    spell your name for the record, sir?

10         THE WITNESS:  Dr. Steven, S-T-E-V-E-N; Errol,

11   E-R-R-O-L; and Pitt, P-I-T-T.

12         (WHEREUPON, the witness was duly sworn by the

13   clerk.)

14         THE COURT:  Go ahead and make yourself

15   comfortable there on the witness stand.

16         THE WITNESS:  Okay.  Thank you, Judge.

17         THE COURT:  If you need any water at anytime,

18   it's right behind you there.

19         THE WITNESS:  Okay.

20         THE COURT:  Go ahead and make yourself

21   comfortable there.  Remember to speak up so that everyone

22   can hear you.  Also, please wait until the question is

23   completed before you answer the question and make sure

24   that you gave us a verbal response.

25         Is that all agreeable to you?

1         THE WITNESS:  Yes, sir, Your Honor.

2         THE COURT:  Go ahead and state your name for the

3   record.

4         THE WITNESS:  Dr. Steven Pitt, P-I-T-T.

5         THE COURT:  And, Mr. Hazard, you may proceed.

6         MR. HAZARD:  Thank you.

7

8                     STEVEN E. PITT, D.O.,

9   having been first duly sworn to tell the truth, the whole

10  truth, and nothing but the truth, testified as follows:

11

12                    DIRECT EXAMINATION

13  BY MR. HAZARD:

14      Q.   What do you do for a living, Dr. Pitt?

15      A.   I'm a physician.  I'm a Board certified

16  psychiatrist with subspecialty training and Board

17  certification in the discipline of forensic psychiatry.

18      Q.   What is forensic psychiatry?

19      A.   Forensic psychiatry is the interface between

20  psychiatry and law.  It's applying psychiatric principles

21  to legal concepts in a variety of contexts, be it civil,

22  criminal, legislative or correctional.

23      Q.   Were you retained by the Arizona Attorney

24  General's Office to do a forensic psychiatric evaluation

25  of Ms. Andriano?

1    *A.*   I was.

2    *Q.*   And let's talk about your education, training and

3    experience.  Let's start with your education.

4    *A.*   I went to Michigan State University where I

5    received my undergraduate degree.  That then was followed

6    by my attendance at the Michigan State University College

7    of Osteopathic Medicine where I received my Doctor of

8    Osteopathic Medicine Degree.

9         THE COURT:  You want might to slow down just a

10   little bit for the court reporter.

11        THE WITNESS:  Sure.  I apologize.  I then did my

12   residency in psychiatry at the University of Michigan

13   Medical Center in Ann Arbor, Michigan.

14        Then that was followed by a fellowship in

15   forensic psychiatry at the University of Maryland School

16   of Medicine.

17        I left out one spot.  After completing my

18   osteopathic education, I did a rotating internship for a

19   year at Oakland General Hospital in Madison Heights,

20   Michigan.

21   *Q.*   BY MR. HAZARD:  And what about your professional

22   experience since you've completed your education and

23   residency?

24   *A.*   Well, my whole career path, if you will, was

25   pretty much geared towards forensics, the discipline of

1  forensic psychiatry once I was exposed to it during my

2  residency in psychiatry.

3         So following my completion of my fellowship in

4  forensic psychiatry, I went to -- I moved to Colorado

5  where I worked as a forensic psychiatrist for a year on a

6  forensic unit.

7         I then moved here to Arizona where I opened up my

8  own practice in forensic and general psychiatry and then

9  simultaneously worked for about the first four and-a-half

10 years as the director of -- well, first for a year

11 and-a-half at the Maricopa County Medical -- it's

12 called -- then it was called ComCare.  It was an

13 outpatient mental health center.  I did that for about a

14 year and-a-half.

15         Then I worked for about four or four and-a-half

16 years as the director of Forensic Psychiatric Services at

17 the Arizona State Hospital.

18         And then I spent a year doing some outpatient

19 forensic work with the county.  And then ever since then,

20 it's been pretty much exclusively private practice, both

21 in forensic and general psychiatry, with along the

22 majority being forensic psychiatry.

23    *Q.*   Have you ever testified in court as an expert in

24 forensic psychiatry?

25    *A.*   Yes.

1    *Q.*    What courts have you actually testified in front

2  of?

3    *A.*    Multiple jurisdictions in this state as well as

4  other jurisdictions around the country.

5    *Q.*    Have you also been retained by parties to both

6  civil and criminal actions to do forensic psychiatry work

7  such as consulting or in preparation for testimony?

8    *A.*    Yes.

9    *Q.*    Could you tell us a little bit about your career

10  in that regard?

11    *A.*    Well, in the criminal context, it's been in

12  situations like this where there's an issue about

13  aggravation and mitigation and an appeal issue going on

14  related to someone's mental state at the time of the

15  offense, specifically, in cases that go right to the heart

16  of the mental state at the time of the offense, such as

17  where someone is making a plea for insanity, issues

18  related to someone's competency to stand trial.

19         Pretty much in the criminal context, anything

20  really related to issues having to do with mental health

21  issues or someone's mental state at or around the time of

22  the offense.

23         In the civil arena, it's pretty much been issues

24  related to where someone is making a claim for some type

25  of emotional harm, whether it's from wrongful termination,

1  sexual harassment, medical malpractice or psychiatric

2  malpractice, things of that sort.

3    *Q.* In the criminal context, have you previously

4  testified as an expert on matters involving the death

5  penalty?

6    *A.* Yes.

7    *Q.* And have you previously been retained by other

8  state's attorney's offices or prosecuting attorney's

9  office before this case?

10    *A.* Yes.

11    *Q.* And have you also been retained by criminal

12  defense attorneys as well in the past?

13    *A.* Yes.

14    *Q.* Let's talk about your retention on this matter,

15  State v. Wendi Andriano for these proceedings.  Could you

16  give us some background as to when you were retained, and

17  did you complete a forensic interview of Ms. Andriano?

18    *A.* Two things.  I was initially contacted by Lacey

19  Gard from your office back on January 23 of 2013.  I was

20  then sent what I think pretty much now amounts to roughly

21  five Bankers Boxes of material.

22    And then I evaluated and met with Ms. Andriano on

23  November 26, 2013, and interviewed her for about

24  4.9 hours, including breaks.  And with me was my

25  associate, who I think testified prior to me,

1   Dr. Kiran Amin.  And then I authored a report that's dated

2   December 27, 2013.

3       Q.   Prior to your forensic evaluation and your

4   interview with Ms. Andriano on November 26, 2013, had you

5   had communications with Ms. Gard regarding the questions

6   that she had that she wanted explored as part of that

7   forensic interview, and then afterwards was a formal

8   referral letter sent to you?

9       A.   Yes.  During one of the initial -- in forensic

10  psychiatry, one of the first things that you're taught

11  pretty much is what are you being asked to answer.  What's

12  the referral question?  Oftentimes, when you initially

13  talk with a lawyer, whether it's in a civil or criminal

14  context, they're pretty clear on what the referral

15  question is.  Sometimes it takes a little bit of a

16  dialogue to better understand the four corners of

17  the case.

18          In this particular case with Ms. Gard, what I

19  recall is that the referral questions were pretty clear

20  from the outset.  And then what I asked of Ms. Gard was

21  that she send me in advance of the report -- preparing the

22  report, a referral letter that specifically outlined the

23  referral questions.

24      Q.   When you do a forensic psychiatric evaluation,

25  you mentioned a little bit about how the referral

1  questions influence, but is that all you're relying upon

2  or is there more to the forensic evaluation?

3      *A.*  No, no, first of all, I didn't say they influence

4  anything.

5      *Q.*  Okay.

6      *A.*  And they don't influence anything.  All the

7  referral questions do is they help frame the questions

8  that I'm being asked to answer.  More specifically, they

9  frame -- they help frame the report.  They have nothing to

10  do with the evaluation, per se.

11          If you take a civil forensic psychiatric

12  evaluation and a criminal forensic psychiatric evaluation,

13  about 90 percent of it is identical in terms of the kind

14  of core issues that you're going to cover or the core

15  concepts that are going to be covered.  Where it turns on

16  is the referral question or referral questions.

17          So, in this particular case, I know that there

18  was issues having to do with Ms. Andriano's mental state

19  at the time of the offense, whether she could appreciate

20  the wrongfulness of her conduct, issues regarding duress,

21  issues regarding mitigation and aggravation, issues

22  regarding alleged claims of having a major mental illness,

23  and just figure out how that all ties together.

24      *Q.*  Can you take us through and summarize -- did you

25  complete in your report a list of the materials you

1   considered in preparing and writing your report and

2   reaching any opinions?

3       *A.*   I did.  First of all, the report, is -- it's

4   154 pages long, and included with the report are several

5   exhibits, the most significant being the transcript of the

6   evaluation, which is Exhibit B.

7           But with the specific -- with respect to your

8   question of the specific sources that I considered and

9   reviewed, these included, but were not limited to, what's

10  listed on Pages 4 to 21 of my report, or basically

11  Nos. 1 through 112.

12          And then subsequent to completing the report, I

13  received some additional documents.  There's another

14  neuropsychologist's report that I looked at.  I'm blacking

15  on her name.

16      *Q.*   Is it Dr. James?  Joette James?

17      *A.*   Thank you.  And I looked at a mitigation report

18  that was done or a critique of a mitigation report.  Or it

19  was done by a mitigation expert who was critiquing some of

20  the issues that were raised I guess in the previous -- by

21  the previous mitigation folks.

22      *Q.*   Would that be Mr. Rohman's report?

23      *A.*   Thank you.  Yes.  I'm trying to think if there's

24  anything else.

25      *Q.*   Did you also review, after the completion of your

1  report, some interview -- the interview notes taken by

2  Dr. James Hopper?

3     *A.*   I looked at the interview notes and I was also

4  provided the -- and back there, in Dr. Hopper's report,

5  there was -- there's an appendix that was fairly lengthy

6  and there was some pages apparently that were either

7  redacted or missing, and I've since been able to review

8  those and look at those pages as well.

9     *Q.*   Did you also receive a written declaration signed

10 by a Kyre Lorts?

11    *A.*   I did.   Thank you.   Yes.

12    *Q.*   And then in those materials, Pages 4 to 21 where

13 you list -- and, as you testified, that's not an

14 exhaustive list of the materials you reviewed.   But with

15 respect to declarations, written witness statements made

16 by Donna Ochoa, did you review those?

17    *A.*   Yeah.   There's -- I don't know that this is

18 actually -- this may have been an oversight on my part

19 whether or not it's listed in here.   But not only did I

20 review it back when I was preparing the report, but I

21 reviewed it in preparation for our visit here today.

22       There's essentially -- there's three

23 declarations.   There's a declaration from June 19, 2011.

24 There's a declaration from September 11, 2011.   And then

25 there's a declaration from October 29, 2011.

1    *Q.*   Both in general in your practice, as well as
2    specifically to this case with Ms. Andriano, do some of
3    the materials you rely upon deal with a personal history
4    of Ms. Andriano or social history?

5    *A.*   Yeah, of course.  Yes, of course.

6    *Q.*   And why is that important to rely upon that
7    information?

8    *A.*   Well, to understand who Wendi Andriano is.  You
9    get a sense of who she is, what her -- what her construct
10   is, how she came to be the person that she is.

11   *Q.*   And during your forensic interview with
12   Ms. Andriano, did you also address questions related to
13   her personal history and social history?

14   *A.*   Of course.

15   *Q.*   The legal history of Ms. Andriano, were those
16   materials that you considered?  And, if you would, define
17   in this context what you mean by legal history.

18   *A.*   Well, whether it's this context or any other
19   context, legal history is just what it sounds like.  It's
20   if the person has been involved in any previous contacts
21   with the law and criminal contacts.  Sometimes we'll ask
22   people about their litigation history as well.

23         In this particular case, we reviewed some of -- I
24   don't believe Ms. Andriano has ever been -- well, other
25   than for the instant offense ever formally charged or

1  arrested with anything -- for anything.  But to be sure

2  she did engage in some unlawful conduct prior to the

3  instant offense.

4      Q.   And what about psychiatric history with

5  Ms. Andriano?

6      A.   Of course, you have to review that.  I spoke with

7  Ms. Andriano about her psychiatric history prior to the

8  date of the offense as well as subsequent to the date of

9  the offense.  We discussed her treatment history prior to

10  the extent it existed prior to the instant offense.

11      We discussed her treatment history while she was

12  incarcerated both at the Maricopa County Jail as well as

13  in the Arizona Department of Corrections.  And we

14  discussed her symptom complex to the extent it exists both

15  prior to the offense as well as subsequent to the offense.

16      Q.   Did you also rely upon documents of the

17  psychiatric history from Ms. Andriano?

18      A.   Of course.  We looked at the Maricopa County

19  records from the correctional -- Maricopa County

20  Correctional records as well as the Arizona Department of

21  Corrections medical and mental health records.

22      Q.   Did you rely upon testimony that was documented

23  in the actual -- in Ms. Andriano's trial transcripts?

24      A.   Yes.

25      Q.   Including Ms. Andriano's testimony; correct?

1    *A.*    Including Ms. Andriano's testimony.

2    *Q.*    Did you also rely upon various law enforcement

3    reports, not only related to this offense, but other

4    investigations that may have involved Ms. Andriano?

5    *A.*    Yes.

6    *Q.*    And did you also rely upon facts as stated in the

7    Arizona Supreme Court Opinion regarding this case?

8    *A.*    I did.  And I also relied upon crime scene

9    photographs and I relied upon the interview that

10   Ms. Andriano gave to the detectives following her arrest.

11   I relied upon the audio-taped calls that Ms. Andriano had

12   with an insurance company, the name of which is escaping

13   me.  But those are all things that I considered and relied

14   upon.

15   *Q.*    Did you also review -- aside from psychiatric or

16   medical records that were made available to you from the

17   time Ms. Andriano was incarcerated either at the Maricopa

18   County Jail or in the Arizona Department of Corrections,

19   did you also rely upon other records from those

20   corrections agencies, for example, letters or requests

21   that Ms. Andriano had made?

22   *A.*    I did.

23   *Q.*    And all of these things that we're talking about,

24   these are things that forensic psychiatrists reasonably

25   rely upon; correct?

1      *A.*   Yes.

2      *Q.*   All right.  Let's talk about leading up to your

3  forensic interview with Ms. Andriano.  You testified

4  previously the definition of a forensic interview.  Did

5  you video- and audio-record this particular interview with

6  Ms. Andriano?

7      *A.*   I did.

8      *Q.*   And why -- do you always do that?

9      *A.*   I do.

10     *Q.*   And why?

11     *A.*   I shouldn't say -- for the last 15 years, I don't

12  believe I've done an evaluation that hasn't either been

13  video- or audio-recorded.  And the reason I do that is

14  because by video- and audio-recording an evaluation, it

15  leaves no doubt as to who said what.  It holds the

16  defendant up to scrutiny, but, more importantly, it holds

17  me up to scrutiny as well.

18          So, as you know and as I think everyone in this

19  room knows, sometimes how things look on a transcript can

20  be very different than how they look on a video or how

21  they sound.  Affectations are different, facial

22  expressions, behavioral nuances.  And so it's been my

23  experience that by video- and audio-recording an

24  evaluation, we have no doubt as to who said what and to

25  what happened during the course of the evaluation.

1          The other utility and value of video-recording an
2   evaluation is that because I know it's being
3   video-recorded and audio-recorded, and because I know I'm
4   going to have a transcript made of the evaluation, I don't
5   really have to take very many notes.  So it really allows
6   me to focus one-on-one with the individual that I'm
7   evaluating as opposed to when you're constantly taking
8   notes and you're moving up and down and you're not having
9   the same kind of connection.  You're not picking up on
10  certain nuances, certain behavioral pieces that are going
11  on that are important in terms of the interview, in terms
12  of figuring out where to go and how to move along in the
13  process.
14         So the value of that, in addition to having the
15  notes, I have this transcript made, which I then go
16  through like I did in this case, and I put in the various
17  headings of the different topic areas that we were
18  discussing.  So rather than regurgitating all of the
19  information in my report, I summarize the psychosocial
20  history pieces, if you will, and remind readers and
21  encourage readers that, look there's a video.  There's a
22  transcript and you should really take a look at the video
23  and the transcript if you really fully want to understand
24  or come to any -- or have any doubts about what went on
25  during this evaluation.

1    *Q.*    Where was the interview conducted?

2    *A.*    I'm blocking on the name of the place.

3    *Q.*    The Perryville Prison?

4    *A.*    Yeah, the Arizona State Prison Complex at

5    Perryville in Goodyear.  It was in a multi-purpose room.

6    *Q.*    When you arrived, was Ms. Andriano's counsel

7    present to sort of do introductions?

8    *A.*    Yeah.  The gentleman that is sitting right in the

9    middle between Ms. Andriano and the other gentleman.

10            MR. HAZARD:  May the record reflect he's

11    referring to Mr. Arntsen?

12            THE COURT:  Yes, the record may so reflect.

13    *Q.*    BY MR. HAZARD:  And you said that you and

14    Dr. Amin were there.  Was anybody else present besides

15    Mr. Arntsen, Ms. Andriano, Dr. Amin and yourself during

16    the interview?

17    *A.*    No.  As the video reflects and as the transcript

18    reflects, in the beginning, there was -- well, let me back

19    up.  In the beginning, they wanted us to actually do the

20    evaluation in kind of this hallway, and there was too many

21    ambient noise from a -- there were some soda or candy

22    machines and I just knew it wouldn't work there.

23            And the folks there were kind of enough to put us

24    in this multi-purpose room, which worked out fine but for

25    the fact that during the initial part of the evaluation,

1    there was some traffic of some people moving in and out,

2    some correctional officers a couple of times, and it's

3    reflected in the record.  But other than that, it was a

4    perfectly fine place to conduct this evaluation.

5        Q.   Before you began your interview, did you explain

6    to Ms. Andriano the purpose of your visit and what you

7    were going to do in your evaluation?

8        A.   Well, sort of.

9        Q.   Okay.  And explain, please.

10       A.   I explained to Ms. Andriano that I'm a forensic

11   psychiatrist, that I'm retained by the State, and that I'm

12   here to do an evaluation.  I explained to her that it's

13   not confidential.  There's no doctor/patient relationship,

14   that it's being video- and audio-recorded.  What I pretty

15   much regularly or assiduously try to strive to do is not

16   specifically tell people why I'm here.

17       Q.   And why is that?

18       A.   Because I want to hear what they have to say

19   about why I'm here.  I want to hear what their

20   understanding is about the evaluation.  And so after her

21   counsel made introductions, we pretty much started off

22   right there.

23       Q.   And did Ms. Andriano indicate to you that she

24   understood and agreed to proceed?

25       A.   She agreed to proceed, yes.

1          (WHEREUPON, an off-the-record discussion ensued.)

2          MR. HAZARD:  Your Honor, right now, we're going

3   to go into a -- transition into another area that's going

4   to take longer.  So I don't know if you want to --

5          THE COURT:  Why don't we just go ahead and take

6   our lunch break at this point in time, then.

7          Okay.  We'll go ahead and take our lunch break at

8   this time.  We'll resume promptly at 1:30.  Have a nice

9   lunch.  We'll be in recess.

10          (WHEREUPON, a recess ensued from 11:50 a.m. to

11   1:31 o'clock p.m.)

12          THE COURT:  This is CR 2000-096032, State of

13   Arizona vs. Wendi Elizabeth Andriano.

14          The record will reflect the presence of the

15   parties and counsel.

16          I did during the lunch hour review the

17   *Tucker* case.  I also reviewed Rule 703.  I also looked at

18   Exhibit No. 169 for identification, which was requested to

19   be admitted into evidence.  And I think I am going to

20   order allowing Exhibit No. 169 to be admitted into

21   evidence.

22          The basis for that ruling is the fact that it's

23   my understanding that the purpose of the State, in

24   order -- the purpose of the State in requesting that that

25   exhibit be admitted into evidence is for the limited

1    purpose of showing the basis of Dr. Pitt's opinions; is
2    that correct?
3            MS. GARD:  That's one of the reasons, yes, Judge.
4            THE COURT:  Okay.  Go ahead.
5            MR. ARNTSEN:  Your Honor, in light of that
6    ruling, I guess I would renew our request that Exhibit 1,
7    Attorney Hammond's declaration, and Exhibit 78,
8    Attorney Lowenthal's declaration also be admitted to the
9    same extent.
10           THE COURT:  But with regard to Mr. Hammond's
11   declaration, there was no testimony that he was relying
12   upon anything that is in his declaration for the basis of
13   his opinion; correct?  Or the same would be with regard to
14   Mr. --
15           MR. ARNTSEN:  I believe he testified, for
16   instance, that the list of the materials reviewed in his
17   declaration, that was among the bases for his opinion.
18   You know, I don't have the testimony going back as to the
19   details, but each of the experts had occasion to refer
20   back to their declaration for kind of the detailed
21   underlying parts of their opinions.
22           THE COURT:  I'm going to deny that request, but
23   I'm going to allow Exhibit No. 169 to be admitted into
24   evidence.  And that's for the limited purpose of showing
25   the basis of the doctor's opinions because there's a

1  number of tests that were done by Dr. Amin that he

2  testified to.  So I'm going to allow Exhibit 169 to be

3  admitted into evidence.

4          MS. GARD:  Thank you, Judge.

5          THE COURT:  The record will reflect that, as I

6  indicated, the presence of the parties and counsel.

7          The record will reflect that Dr. Pitt is still on

8  the witness stand, Dr. Steven Pitt.  We will continue with

9  the direct examination by Mr. Nickels.  I'm sorry.

10 By Mr. Hazard.

11         MR. HAZARD:  Thank you, Your Honor.

12    *Q.*  BY MR. HAZARD:  Dr. Pitt, when we had our recess,

13 we were getting ready to talk about Ms. Andriano's

14 forensic interview you conducted of Ms. Andriano.  Do you

15 remember that?

16    *A.*  Yes, sir.

17         (WHEREUPON, an off-the-record discussion ensued.)

18         MR. HAZARD:  May I approach the witness?

19         THE COURT:  Yes.

20    *Q.*  BY MR. HAZARD:  Dr. Pitt, I'm handing you what

21 has been marked for identification purposes as

22 Exhibit 186.  If you could just take a look at the

23 contents in that folder.  What is that?

24    *A.*  These would be the DVD's of the video-recorded

25 evaluation.

1    *Q.*   And are those copies that you actually -- you and

2    your assistants made in conjunction with these

3    proceedings, and are they fair and accurate

4    representations of your interview with Ms. Andriano?

5    *A.*   It would be me.  I run the video room as well.

6         MR. HAZARD:  Okay.  I move to admit Exhibit 186

7    into evidence, Your Honor.

8         MR. NICKELS:  No objection.

9         THE COURT:  Exhibit No. 186 for identification is

10   admitted into evidence.

11   *Q.*   BY MR. HAZARD:  How did you start with the

12   interview with Ms. Andriano?  What were you trying to get

13   her to talk about at the beginning of the interview?

14   *A.*   No two interviews are the same in terms of their

15   format, but they're similar to a certain extent, like I

16   talked about earlier in terms of the content that's

17   covered.

18        So, in this particular case, I'm going to talk to

19   Ms. Andriano about her personal history, her relationship

20   history, her employment history, her legal history, her

21   psychiatric history, her course since her arrest, her

22   educational history.  These are all general areas that are

23   going to be covered.

24        In this particular case, what I'm also going to

25   discuss with her, especially given the first referral

1   question, is Ms. Andriano's version, the defendant's

2   version of the offense.

3       *Q.*   And you said that was because of the referral

4   questions?  Is that why you thought it was important to

5   ask her about that?

6       *A.*   That's why it is important.  The threshold

7   question is essentially:  Does Ms. Andriano have -- that

8   first question.  I'm paraphrasing, but the first question

9   is essentially:  Does she have a mental disease or defect

10  that in some way affected her ability to appreciate the

11  wrongfulness of her conduct.

12          So it seems to me that a logical place to jump

13  off from is to have her talk about the offense.

14      *Q.*   Did you try to get her to -- ask her questions,

15  for example, tell me what you remember, those sorts of

16  questions about that incident?

17      *A.*   Yes.

18      *Q.*   Did you encounter any difficulties getting

19  responses from Ms. Andriano?

20      *A.*   Thematically, one of the things that happened

21  during the course of the interview -- and let me just

22  digress for a second.  Ms. Andriano is a fairly -- I've

23  interviewed a lot of people over time.  She's a fairly

24  savvy person when it comes to being interviewed.  She's

25  been interviewed before and I think she knows her way

1    around the process, if you will.

2              Understand, that I was not the first person to

3    evaluate her.  Pretrial she was evaluated by several

4    mental health professionals.  Since she's been convicted,

5    she's been evaluated by several mental health

6    professionals.

7              So the issue that she was having with me was she

8    was claiming that she couldn't really remember certain

9    aspects.  And I think one of her concerns that she

10   expressed to me was that she feared that I was going to

11   hold her to some type of chronological order, that if she

12   left something out, that somehow that was going to be a

13   ding against her.

14             And I told her that that wasn't the case at all.

15   I just wanted to hear her story.  I wanted to hear what

16   she remembered and how she remembered it because I want --

17   I need that information.  I don't have to explain to her

18   why I'm doing it, but I can explain to you why I'm doing

19   it, because I want to see how her information comports

20   with the information that she's previously shared.

21             Understand, contextually, this is a woman who

22   told the police one version at the beginning of the

23   interrogation and changes the version halfway through the

24   interrogation and gives different versions to different

25   people.  She tells the counselor a whole series of stories

1  during the course of therapy.  She has told different

2  people different pieces about the offense.

3        And so it's important for me to hear her version

4  of the offense, so I can put it in a context.  And that's

5  the purpose of why I asked her all of those questions.

6     Q.   Was she reporting to you that she had

7  difficulties remembering?

8     A.   She did.

9     Q.   And could you tell us a little bit about that, in

10 summary?

11    A.   Just, essentially, she was having -- she goes:  I

12 can't remember it like a movie.  I'm having difficulty

13 remembering certain pieces.  These are my words.  Not

14 hers.  But the essence of it was that she was having a

15 difficult time recalling certain pieces.

16        I mean, frankly, she couldn't even recall

17 initially what date the offense occurred.  And so we broke

18 the month of October down into thirds.  She couldn't

19 recall what the poison was that she ordered under the

20 pseudonym of Ann Newton and coming up with a fake

21 business.  She couldn't recall that it was sodium azide.

22 I mean, so she couldn't even recall about whether the --

23 how the stabbing happened or even if she did the stabbing.

24        I mean, of course, that's a story in and of

25 itself if you follow the history of the knife and the

 1   stabbing and the different versions that she's given.

 2       Q.    When you were -- as your interview was

 3   progressing, you began asking her questions about whether

 4   or not she could appreciate the wrongfulness of her

 5   conduct?

 6       A.    Right.

 7       Q.    And I would like to turn your attention to

 8   Pages 106 -- the bottom of 106 on into 107 of the body of

 9   your report.

10       A.    Yes.

11       Q.    And was there a point when you were having this

12   dialogue where she expressed a sense of frustration?

13       A.    Tell me where you are.

14       Q.    At the bottom of Page 107.

15       A.    Yes.

16       Q.    What was happening then?

17       A.    Well, we were talking about wrongfulness, issues

18   related to wrongfulness.  For example, I asked her:  Is it

19   wrong to lie to the police?  And she said:  Yes.  Is it

20   wrong to poison somebody?  She said:  Of course.  Is it

21   wrong to steal?  Of course.

22            And she starts to then -- and then she said to

23   me -- she goes:  Look, it's wrong to lie to anybody.  And

24   what happens is she said that I'm learning -- I'm

25   learning -- going through this process, I'm learning who I

1  am and, essentially, I've found that I fill in information

2  at times to just please people.

3         And then she said -- she says:  I don't -- this a

4  quote.  She goes:  I don't -- when I tell you -- when you

5  ask me a question, and I tell you, quote, I don't know,

6  end quote, there's a sense of frustration and then I feel

7  you get upset.  Not you personally, but people in general.

8  And, at that time, that was just my nature.  I would just

9  fill in whatever because I -- I don't want -- I don't want

10  somebody upset at me and I don't want them to be

11  frustrated and think I'm not cooperating.

12     *Q.*  How does that tie into the query -- the first

13  query of whether Ms. Andriano could appreciate the

14  wrongfulness of her conduct when she gives a statement

15  like that?

16     *A.*  Well, this statement in isolation doesn't really

17  -- doesn't really tie in so much to the wrongfulness

18  piece.  What it ties into thematically is one of the

19  themes that emerges in Ms. Andriano's iteration of events

20  that have happened throughout her life is that she is the

21  victim.  And one of the themes that emerges when she talks

22  is that, well, I'm not sure quite what I told the police,

23  but if I did tell them stuff, I told them that because,

24  like, I wanted to please them.  Okay?

25         So you get this thematic -- there's this theme

1 that kind of runs through her life, which is even if I

2 don't know, I'll just stay stuff just to please people.

3 That's a separate issue from her appreciation of

4 wrongfulness.

5        When you look at the behavioral evidence in this

6 case, when you frankly -- and I'm sure you're going to get

7 to this in a little bit.  But when you look at her

8 pre-offense behavior, her offense behavior, her

9 post-offense behavior, her behavior in the interrogation,

10 there is no doubt, none, zero that this woman could

11 appreciate the wrongfulness of her conduct.

12   Q.   And, Dr. Pitt, did you also have a transcript

13 prepared of your entire forensic interview of

14 Ms. Andriano?

15   A.   I did.

16   Q.   And is that located in the contents of your

17 report?

18   A.   Yes.  That would be exhibit -- excuse me.  That

19 would be Exhibit B to my report.

20   Q.   Right.  If you would turn your attention to --

21 and it's going to be Page 210, starting with I believe

22 Line 17 on that transcript.

23        THE COURT:  Has the transcript been marked for

24 identification as an exhibit at all?

25        MR. HAZARD:  It's in the report, Your Honor.

1          THE COURT:  What exhibit number is the report?

2          MR. HAZARD:  168.  And if may approach.

3          THE COURT:  Yes.

4     Q.   BY MR. HAZARD:  And, Dr. Pitt, I'm showing you

5 Exhibit 168.  What does that contain?

6     A.   My report and the various exhibits.

7     Q.   Have you found Page 210, Line 17?  Or Line 15?

8     A.   Yes, sir.

9     Q.   In the context of your interview, what precedes

10 that?  What are we getting to?

11    A.   Well, I was asking her earlier -- one of

12 Ms. Andriano's stories is that her husband who was

13 suffering from cancer, that he no longer wanted to live

14 and that she was going to assist him in a suicide attempt.

15 That's the essence of the story.  And that they ordered --

16 that she ordered sodium azide and that he somehow approved

17 the order of this, knew about the order of this, and

18 actually helped her load these capsules with the

19 sodium azide.

20          And so, right before this, I said to her -- I

21 said -- I just kind of asked her:  So if your husband

22 wanted to die, why didn't he just take a gun and kill

23 himself?  And she said:  I don't know that.

24          And then I said:  Well, why this whole elaborate

25 thing of having to put -- and I said, by the way, I

1   believe it was sodium azide.  I said:  Why go through that

2   whole story?

3            This story doesn't make sense.  At the end of the

4   day, when you look at this case from the 10,000 foot view

5   or the 40,000 foot view, Wendi Andriano's version of what

6   happened here just doesn't make sense.  The physical

7   evidence does not comport with the behavioral evidence.

8       Q.   What about there has been testimony about

9   Ms. Andriano having, at least in the early stages, a

10  medical malpractice claim --

11      A.   Right.

12      Q.   -- as related to Joe Andriano's cancer?

13      A.   Right.

14      Q.   Is there something about the status of that

15  belies the notion that Joe Andriano was involved in a

16  suicide -- alleged suicide pact?

17      A.   This is --

18           MR. NICKELS:  Objection.  Leading.

19           THE COURT:  Overruled.

20           Go ahead and answer the question.

21           THE WITNESS:  This is what I understand.  And I

22  may get some of the legalese here wrong.  So forgive me.

23  But I think Mr. Miller, who was representing the Andrianos

24  in a civil litigation that was in its infancy, had either

25  testified to or given a declaration or given a declaration

1    and testified to the fact that essentially if Mr. Andriano

2    died as a result of events tied to his cancer, then the

3    wrongful death case would proceed.  However, if

4    Mr. Andriano died from some other cause, then all bets

5    were essentially off.

6              And so you sit here and you think this through

7    and you're like, so let me make sure I get this straight.

8    Your husband, being cognizant of the civil lawsuit, is

9    going to somehow get together with you and have ordered

10   the sodium azide to help him take his own life?  That just

11   doesn't make sense.

12             MR. HAZARD:  We're going to play -- with the

13   permission of the Court, if we can play a clip about the

14   interview -- the portion of the interview that Dr. Pitt

15   was testifying about.  And, for the record, it starts with

16   Line 17 on Page 210 and goes until Page 212, Line 10.

17             THE COURT:  Of the transcript?

18             MR. HAZARD:  Of the transcript.

19             THE COURT:  What's being played is part of

20   Exhibit No, 186, which has been admitted into evidence.

21             MR. HAZARD:  You're right, Your Honor.  That's

22   186, the DVD's.

23             THE COURT:  Right.  This is part of one of the

24   DVD's; right?

25             MR. HAZARD:  That's correct.

1      THE COURT:  It has already been admitted into
2  evidence.  Okay.  I'll allow the State to play the
3  portions with the understanding that the court reporter is
4  not going to take down what's being said on the video or
5  the DVD portion that you're going to be playing.
6      (WHEREUPON, a portion of Exhibit 186 was played.)
7      MR. HAZARD:  We're going to stop it right here
8  for a moment, Dr. Pitt, because that goes into -- now for
9  reference for the court reporter, on Exhibit 168, marked
10  for identification purposes, the transcript of forensic
11  psychiatric evaluation, this would be Page 211, starting
12  with Line 3 and going into Page 212, Line 10.
13      (WHEREUPON, a portion of Exhibit 186 was played.)
14      *Q.*   BY MR. HAZARD:  Okay.  Doctor, the first part,
15  when she was expressing to you that -- and this is
16  Page 211, Line 10, about being caught by surprise in her
17  trial about the way the evidence was being played out, do
18  you recall that portion?
19      *A.*   Yes.  Yes.
20      *Q.*   Are there statements that she made before the
21  trial that go against that notion that she was caught
22  off guard by the evidence in her case?  For example,
23  statements that she made to police in her interrogation or
24  statements that she made to Ms. Rohde, her counselor?
25      *A.*   Yes.

1    Q.    Could you tell us a little bit about that?

2    A.    Well, in the counseling sessions, there's

3    dialogue about her version of the offense and in the

4    police reports, or in the interrogation, there's specific

5    dialogue about the offense.  So I --

6    Q.    Do you --

7    A.    Go ahead.

8    Q.    Do you recall in the police interrogation, did

9    Ms. Andriano ever bring up anything about poison?

10   A.    No.  No.  What happens, if I remember this right

11   and I think do -- what happens is during the

12   interrogation, there's a break.  And it's during that

13   break in the interrogation that Ms. Andriano calls a

14   co-worker/friend.  I want to say her name is Sharon or

15   Shannon Sweeney, I think is her last name, if I'm right.

16   But, regardless, and during the break in the

17   interrogation, she calls and says:  Hey, can you remove

18   some stuff out of the office?  And it's those materials

19   that were moved from the office, if my memory is right

20   about this, were incriminating evidence that I also

21   believe went to the sodium azide purchase.

22   Q.    We'll come back to Ms. Andriano's conduct that

23   you just described during the break in the interrogation.

24   A.    All right.

25   Q.    Back to this clip, it was clear that she was well

1 aware of the status of her case in these proceedings,

2 though; correct?

3   *A.*   Oh, yes.  Like I said, this is a -- I've

4 interviewed a lot of folks over time, and Wendi Andriano,

5 in terms of just having some savvy and having a little

6 game, she is definitely in the top 10 percent.

7   *Q.*   You then moved on in your interview, still on

8 Page 212, now starting with Line 11, and you take her into

9 a summary of the events leading up to October 8, 2000; is

10 that correct?

11   *A.*   Yes.

12      MR. HAZARD:  And we're going to, with the

13 permission of the Court, play that clip.

14      For the record, that would also be located

15 starting on Page 212, Line 13 of the transcript, ending

16 point, Page 221, Line 22.

17      May we play the clip?

18      THE COURT:  Yes.

19      (WHEREUPON, a portion of Exhibit 186 was played.)

20   *Q.*   BY MR. HAZARD:  Why did you ask her about that

21 particular line of questioning in leading up to:  Why if

22 this is true, why kill your husband at that point?

23   *A.*   Because her version of the offense didn't make

24 sense and I wanted to -- I wanted to hear -- just as I was

25 reviewing this information, as I'm sitting there talking

1  to her, what she's telling me, the pieces don't add up.

2  The data just doesn't add up.

3         And this particular clip is -- I'm actually glad

4  you picked it because it's relevant and it's important on

5  several accounts.  Working backwards is this notion of I

6  don't know if I was telling the truth or not.  If I really

7  remembered at that time, I'm not remembering now.

8         I think I may have said this before, but if I

9  didn't, I'll say it.  And if I did, I apologize.  If not,

10  I'll say it now.

11         Thematically, another part of the narrative in

12  this case is that Wendi Andriano is the victim in this

13  story.  It is that Wendi, by way of various things from

14  her upbringing to alleged mental illness, that she is the

15  victim.  And that's the narrative that runs through not

16  only her trial, but it's the narrative that continues

17  post-trial.  And you see that in this -- in that capture

18  -- those series of exchanges there.

19         The other thing that's interesting about this is

20  that Wendi Andriano says that -- she says:  It's not

21  funny, as if I'm laughing.  Now everyone in this courtroom

22  saw that.  I wasn't laughing, but I was -- to use Wendi's

23  words, which I'll come to in a minute, I was incredulous

24  because the story doesn't add up.  And she was stuck

25  there.  She was really, really stuck on that one.  And you

1  can't see it in the video, but you could feel it in the

2  room in terms of how everything changed with that.  She

3  did not see that question coming.

4      And I recall after doing this interview, that we

5  spoke and I recall that we discussed this part, and I

6  said:  As sure as I am talking to you, Wendi Andriano is

7  going to spin this interview and she is going to make some

8  accusations about me and my conduct in this interview.

9  She is going to say that I was laughing at her or that I

10  was doing something.

11      Q.   Did you make a request that we should try to

12  obtain some type of material?

13      A.   I did.  I suggested that you secure the phone --

14  telephone records for the first week following this

15  evaluation, which indeed you did.  And, true to form,

16  Wendi Andriano did not disappoint.  She made me out to be

17  the devil and herself out to be the victim.

18      MR. HAZARD:  May I approach the witness,

19  Your Honor?

20      THE COURT:  Yes.

21      Q.   BY MR. HAZARD:  I'm approaching you with

22  Exhibit 203 marked for identification purposes.  Did you

23  listen to that recorded call from the prison?

24      A.   I did.

25      Q.   And is that a copy of that recording that you

1  also listened to?

2     *A.*   Well, I haven't listened to this particular tape.

3  I'm assuming it is a copy.  It's marked as such, so I will

4  assume that it is.

5     *Q.*   What is the date of that recording?

6     *A.*   November 30, 2013.

7          MR. HAZARD:  I move to admit Exhibit 203 into

8  evidence, Your Honor.

9          THE COURT:  Any objection?

10          MR. NICKELS:  I object.  I'm not sure how this

11  witness can authenticate the call.  He definitely was not

12  a participant to that conversation.

13          THE COURT:  Mr. Hazard.

14          MR. HAZARD:  Well, Your Honor, there will be

15  authentication from the call itself that makes it clear

16  who it is.

17          THE COURT:  Regardless of whether it's

18  authenticated, you relied -- you heard this audio;

19  correct?

20          THE WITNESS:  Yes.

21          THE COURT:  And you're basing some of your

22  opinions on this audio?

23          THE WITNESS:  Yes.

24          THE COURT:  Okay.  I'll allow Exhibit No. 203 for

25  identification be admitted into evidence.

1        MR. HAZARD:  And, Your Honor, permission to play.

2  We're only playing the timestamp on this call,

3  Exhibit 203, starting at 038.  So 38 seconds into 154, one

4  minute and 54 seconds.

5        THE COURT:  Okay.  The court reporter will not be

6  taking this down.

7        (WHEREUPON, a portion of Exhibit 203 was played.)

8    Q.   BY MR. HAZARD:  So, Doctor, did you make some

9  diagnoses during your -- as part of your evaluation

10  assessment of Ms. Andriano and in your report, did you

11  have a diagnostic section?

12    A.   I did.  I do.

13    Q.   And could you summarize first -- well, let me

14  break it down.  Did you in that report -- in your report,

15  did you include the diagnoses from a number of other

16  mental health professionals, including the ones that were

17  retained by the defense in the PCR proceedings?

18    A.   Yes, sir.

19    Q.   And then why was that important to consider those

20  diagnoses -- various diagnoses in helping you render your

21  own opinion and conclusions in this report?  How did you

22  use those to formulate your own opinions?

23    A.   Well, the first part of the process is leave out

24  for a second what the other diagnostic opinions are.  To

25  be sure, I look at that information, but the defendant

1  gets the benefit of the doubt in terms of getting a clean

2  slate and I have to do my own analysis and I have to ask

3  my own questions as it relates to diagnostic issues.

4        So when I'm interviewing Wendi Andriano, I'm

5  moving through what we call a series of questions related

6  to a differential diagnosis.  So I'm talking to her about

7  whether she had depressive symptoms before or whether

8  she's had anxiety symptoms before or whether she's heard

9  voices.  I'm talking to her about her sleep.  I'm talking

10  to her about her energy and her appetite because it's

11  important to kind of critically look at it independent of

12  what other people have said.

13        The second part of that is when I'm synthesizing

14  the information, I have to consider what the other experts

15  are saying and what other diagnoses she has been given,

16  whether it's been by other experts or whether it's been

17  given by people who treated her at the Maricopa County

18  Jail or within the Arizona Department of Corrections.

19        So when you look at -- and anyone who may have

20  treated her prior to the offense, which she was seen I

21  think for two sessions -- counseling sessions in an

22  Employee Assistance Program after she was caught involved

23  in a significant fraud with the Casa Grande Regional

24  Medical Center that involved in excess of $18,000.

25        So I look at these different diagnoses, and in

1   the spirit of being as complete and thorough as I can be,

2   I say at the outset of my report:  These are the diagnoses

3   that he has been given by and large by other people

4   involved in this case, whether they have been treaters or

5   experts.

6           And then what I went ahead and did is I

7   systematically went through and looked at the merits of

8   each of these diagnoses and whether or not I agreed or

9   disagreed with them.

10  *Q.*   What sort of things are you including in your

11  synthesis to determine whether these diagnoses are -- you

12  agree with them or not?  You mentioned --

13  *A.*   Right.  That's a terrific -- that's a terrific

14  question because to be sure, one of the things is

15  self-report.  I have to listen to Ms. Andriano and ask her

16  what she's experienced.

17          But we don't look at mental illness and mental

18  illness symptoms simply in a vacuum, especially in a

19  context like this, a legal context where you have to worry

20  about the person gaining the system, if you will.

21          So I factor in what Wendi Andriano says to me.  I

22  look at other records and because what you're really

23  looking for is a longitudinal history.  It's not like --

24  mental illness is not like a broken bone where if I slip

25  walking out of here today, if I slip and trip on the curb

1   and break my ankle and we put up an X-ray, well, it's

2   pretty clear on this date, I broke my ankle.

3          Mental illness, to be sure, there's an onset

4   point, but generally speaking, especially the kind of

5   mental illnesses that were being proffered by some of the

6   defense experts, you would expect to see a chronic course

7   of those conditions, a chronicity of the symptom complex.

8          So that's why it's not just listening to Wendi

9   Andriano, it's not just looking at what the other experts

10  are saying, it's looking at, well, what are some other

11  data points that I can look at?

12         Certainly, the EAP records are an important

13  source of information because that's prior to the offense.

14  There is no other treatment history that I know of prior

15  to the offense.

16  *Q.*   What are the EAP records?  What did they reveal?

17  *A.*   I have to go back.  I have it in the psychiatric

18  history of the report.  The EAP records note that she

19  appeared to be depressed and that she would be a good

20  candidate for a mild antidepressant to help her sleep

21  better and cope with the stresses she is facing at work

22  and at home.  She was given -- oh, it also says that for a

23  brief period of time, Ms. Andriano took an antidepressant

24  medication, but had a bad reaction.

25         Anyhow, she was given a diagnosis of what's

1   called an adjustment disorder with mixed disturbance of

2   emotions and conduct and a rule-out diagnosis of major

3   depression.

4       So adjustment disorder is more of a garden

5   variety kind of depression, if you will, related to

6   different stressors.  A major depressive disorder, a major

7   depressive episode is a much more serious condition where

8   your sleep and appetite and energy and concentration, sex

9   drive are all effected.

10  *Q.*   And this counseling referral, as you mentioned,

11  that was in response to her employer having discovered

12  that Ms. Andriano was stealing money through a fraudulent

13  means; correct?

14      MR. NICKELS:  Object.  Leading.

15      THE COURT:  Sustained.

16      Rephrase the question.

17  *Q.*   BY MR. HAZARD:  Why was this referral given?

18  *A.*   Well, between March 1995 and January 1996, while

19  employed at Casa Grande Regional Medical Center,

20  Ms. Andriano was involved in a fraud scheme by forgery in

21  which she profited $18,336.05.  She was never criminally

22  charged, but she was terminated.

23      So the EAP records are important.  Following her

24  arrest, the jail records are important, the correctional

25  records.  And then following her conviction, the DOC

1  records are important.

2         And so you see different mental health providers

3  treat her over time, and you see different diagnoses

4  bandied about, including post-traumatic stress disorder,

5  including bipolar disorder, including major depressive

6  disorder, but nobody definitively, nor conclusively,

7  diagnoses her with a major mental illness.  Not at the

8  jail.  Not at the DOC.

9         And I believe at the time of trial, three

10  witnesses were called from the jail.  It was her counselor

11  that was called.  I believe her last name is King.  There

12  was a doctor.  I think his name is Dr. Gerald Perry.  And

13  the third person I'm going to forget.  It's a nurse.

14  Joyce, I think.  She's a nurse.

15     Q.   Was that Joyce Van Every?

16     A.   Thank you.  And all three of these people in

17  their testimony said that while she was incarcerated at

18  the jail, she did not have a major mental illness.

19         If you look at the DOC records, she is not being

20  treated for major mental illness.  In fact, Wendi Andriano

21  in -- let's see.  It's July 20, 2012, Ms. Andriano

22  completed a health needs request form and wrote in part,

23  quote:  I do not wish to take psyche meds, exclamation

24  point, and end quote.

25         So the point of this process is you have to look

1    at whether she's evidencing symptoms across contexts, and

2    as it relates to major depressive disorder, bipolar

3    disorder, and the depressive disorder otherwise specified.

4    I was not impressed with that data.

5         Now what I do say in that part of my report is

6    that she did in the run-up to the offense, was complaining

7    of some -- she was experiencing some depressive symptoms

8    and was experiencing some anxiety symptoms.  And I believe

9    that.  I think that she was.

10        The next diagnosis is post-traumatic stress

11   disorder.  And this one is a little bit more nuanced

12   insofar as if you believe -- one of the claims that

13   Ms. Andriano has made is that she was the victim of

14   emotional, physical and sexual abuse.  If you believe that

15   these things happened in the way that she claims that they

16   happened, then it's reasonable to consider a diagnosis of

17   post-traumatic stress disorder.  But it's a little bit

18   scattered in terms of how this information comes in in

19   terms of the nature of the physical abuse, the emotional

20   abuse and even the sexual abuse.

21        But what I said as it relates to post-traumatic

22   stress disorder and complex post-traumatic stress

23   disorder, which is a -- it's not a diagnosis within a

24   mental health manual, but it's a diagnosis that's

25   mentioned in the literature.  It's a more serious form, a

1   chronic form.

2         Post-traumatic stress disorder, I said if it is

3   conclusively proven that these things happened, then it's

4   reasonable to consider that diagnosis.  But, again, the

5   symptom complex really isn't there.  You don't really see

6   it.

7         Now, you do see it in one of the jail records

8   shortly after Kandy -- or shortly after her therapist at

9   the time is treating her and calls the doctor because she

10  interjects this concept of PTSD, but you don't really see

11  it throughout the records.

12        The next one is cognitive disorder.  I'm going

13  to -- I'm going to pass on it insofar as I suspect that

14  that's what Dr. Amin ably addressed.  But I will say that

15  when you look at her behavior around the time of the

16  offense, whether when she was talking on phone calls with

17  life insurance personnel, 911 operators, the police, her

18  speech was logical.  It was coherent.  It was not at all

19  consistent with someone who's having a cognitive disorder.

20  She had executive functioning, planning, decision making.

21        I mean, how slick is that to remember at a time

22  that's arguably one of the most stressful times for a

23  suspect on an arrest, and in the break of an interrogation

24  has the presence of mind to call someone to help them

25  remove incriminating evidence?  If that's not the epitome

1    of executive functioning that's working at full throttle,

2    I don't know what is.

3         So then we get to anxiety and panic disorder.

4    And Ms. Andriano tells a story of experiencing

5    anxious-like symptoms, anxiety-like symptoms.  And, again,

6    this comes across in the EAP records and you see some of

7    it in the correctional records, both jail and DOC.

8         And what I said in my report is that while

9    there's a dearth of evidence to support like a full-blown

10   anxiety disorder, what I do believe that as a result of

11   economic issues, interpersonal issues, relationships that

12   she was having outside the marriage, that she was having

13   some symptoms of anxiety in the run-up to the offense.

14        What I also talk about is a personality disorder,

15   not otherwise specified, with antisocial borderline and

16   dependent features.

17        Wendi Andriano does not have an antisocial

18   personality disorder.  She doesn't have the history to

19   meet the criteria that we go by.  But make no mistake

20   about it, as an adult, she engaged in some antisocial

21   behavior at Casa Grande Regional Medical Center and there

22   were two different apartment complexes where there was

23   theft by conversion.  And then there's the one while she's

24   incarcerated and she's in cahoots with someone to get

25   checks fraudulently cashed.

1        So there is an anti -- and then let's not forget
2    the offense itself and some of the -- as I understand it,
3    some of the physical evidence was staged.  And just the
4    whole concocted story between the paramedics coming,
5    sending the paramedics on their way, the lies that she
6    told the police.  I mean, she definitely has an antisocial
7    flavor to her personality.

8        Dependent personality disorder, I know that some
9    people have said that she has the full criteria for that.
10   I definitely think she has features of someone who's a
11   dependent personality.  And I also think she has features
12   insofar as she needs to be around other people.  I don't
13   think she does real well when people leave her, per se.

14       But I also think she has features of a borderline
15   personality insofar as she's impulsive.  She can be
16   demissive.  And I'm blacking on it.  Oh, impulsive.  Oh,
17   promiscuity.  There's a period of promiscuity when she was
18   younger.

19       So one of the conclusions I have is that she has
20   these features of a personality disorder, not otherwise
21   specified, with antisocial borderline and dependent
22   features.

23       There's an issue of malingering.  Dr. Amin talked
24   about that, that he thought she may have been malingering
25   amnesia during the actual interview.

1        And then my concluding diagnosis is an adjustment

2   disorder with mixed anxiety and depressed mood in addition

3   to the personality disorder, not otherwise specified.

4        In other words, what I'm saying is that in the

5   run-up to the offense, around the time of the offense,

6   that she was unhappy in her relationship with her husband.

7   She purportedly felt guilty about being involved in

8   an extramarital affair -- two extramarital affairs.  And I

9   believe that the financial stressors, caring for her ill

10  husband, I believe that these things are consistent with

11  what's called an adjustment disorder, and in this

12  particular case, an adjustment disorder with mixed anxiety

13  and depressed mood.

14       And I will tell you that that's a diagnosis that

15  pops up in different places, both at the Arizona

16  Department of Corrections as well as in the Maricopa

17  County Jail records.

18  Q.   Is there a reference -- a material, a reference

19  material that you used to help you synthesize these

20  various symptoms documented over a long period of time

21  with Ms. Andriano in helping you render your diagnoses?

22  A.   Yes.  I had a -- we had a chronology put

23  together.  And then from that chronology, I did -- we did

24  like a subchronology that went through the different

25  symptoms that I'm talking about to you now, both at the

1   jail and at the Department of Corrections.  It's kind of

2   like a hot doc that just kind of points out what the

3   positives were and what the negatives were over the period

4   of time that we're talking about.

5           So at the end of the day, it's my opinion, to a

6   reasonable degree of medical probability, that at the time

7   of the offense, Wendi Andriano had an adjustment disorder

8   in addition to a personality disorder, not otherwise

9   specified, with antisocial borderline and dependent

10  features.  That's the first part of the first question.

11      Q.   Now let's talk about the referral questions that

12  you mentioned previously.

13      A.   Right.

14      Q.   What was the first referral question that our

15  office asked you to consider?

16      A.   Well, the first referral question is:  It says

17  under A.R.S., et cetera, first degree murder can be

18  mitigated if the defendant's capacity to appreciate the

19  wrongfulness of his conduct or to conform his conduct to

20  the requirements of the law was significantly impaired,

21  but not so impaired as to constitute a defense to

22  prosecution.

23          And the question goes on and it says:  In your

24  professional judgment, does Ms. Andriano suffer from a

25  mental illness or cognitive impairment that significantly

1   impairs her capacity to appreciate the wrongfulness of her

2   conduct or conform her conduct to the requirements of the

3   law.

4         So that's why this first question, I break it

5   into two parts because the first threshold question is you

6   have to figure out is there a mental disease or defect?

7   Is there a problem?  That's why I take the time to go

8   through the mental illness piece.

9         The second part of the question, I broke it in

10  and I said:  Did that affect her ability to appreciate the

11  wrongfulness of her conduct?  And the essence of my

12  opinion here is that I believe my diagnostic opinions are

13  correct.

14        But let's assume for a minute that I'm not right.

15  Let's assume that the other doctors are correct.  Whether

16  it's major depressive disorder or bipolar disorder, that

17  is not a get-out-of-jail ticket.  That's simply a

18  descriptor to describe a series of symptoms.  It does not

19  account for the behavior.  And so you have to overlay in

20  this particular case the behavior with the diagnostic

21  opinions.  And so --

22      Q.   In forensic -- I'm sorry to interrupt you,

23  Doctor.  In forensic psychiatry, why are behavioral

24  choices and the actions that ensued from those behavioral

25  choices so important in rendering opinions like the one

1  you're about to do?

2      *A.*    Well, one, because the law sets it up that way.

3  I mean, the statutory language is such that -- I mean, if

4  it wasn't this way, then -- well, sadly, prisons are

5  filled with people that have mental illness.  It's a

6  reality.  But only a very, very, very small portion of

7  people are sent to a state hospital, for example, if

8  they're found insane, you know, not responsible because of

9  mental disease or defect, whereby, they couldn't

10 appreciate the wrongfulness of their conduct.

11          So, in this particular case, I have to look at

12 the behavior and tie it together with whatever mental

13 illness Ms. Andriano may or may not have had.

14          So while I say, I believe that I'm correct

15 diagnostically, for the sake of discussion, I'm willing to

16 concede.  For the sake of discussion, let's assume I'm

17 wrong.  Let's assume that it's bipolar disorder.  Let's

18 assume it is some other condition.  Well, here's the

19 problem:  When you walk through -- I believe there's

20 23 bullet points in my report.  When you walk through

21 these different behaviors that Ms. Andriano engaged in,

22 those are not explained by a mental illness.  Those are

23 explained by choices that Wendi Andriano made.

24          So, for example, mental illness and a major

25 mental illness did not in August and September of 2000

1   cause Wendi Andriano to actively research different life

2   insurance companies to see if she could fraudulently

3   secure a life insurance policy for her husband, who it

4   appears was unaware.

5          Now, I know that the defense says that he

6   actually was a player in this, but just to be extra

7   special sure I was right about this, this morning I went

8   back and I listened to the phone call that Wendi Andriano

9   had with the insurance company.  Because what happens is

10  the insurance adjuster first calls and it's her husband

11  that picks up the phone and he says:  I know nothing about

12  this.  Okay?  So that's one example.

13         Approximately four months prior to the instant

14  offense, she offers co-worker James Yost $10,000 to pose

15  as her husband for a life insurance physical exam.  Yost

16  declined.

17         In September of 2000, she asked Eric Valiant if

18  he would be willing to pose as her husband during the life

19  insurance physical exam.  He passes.

20         Wendi Andriano used her computer at work to

21  research poisons.  And when confronted about her research,

22  she told her co-worker she was doing research for a friend

23  who was writing a book.

24         On September 22, 2000, Wendi Andriano, as Ann

25  Newton, discusses her desire with Wade Boyt, the owner of

1  Boyt Global Distribution in Topeka, Kansas, her desire to

2  purchase sodium cyanide or potassium cyanide mixed with

3  greens in order to kill rodents.

4         On or around September 27, 2000, Wendi Andriano

5  meets Travis Black at the Rock & Rodeo Bar.  The next

6  morning, they have a relation -- they have sexual

7  relations.  And they talk the next few days and

8  Ms. Andriano told Mr. Black that her husband had died of

9  cancer and that she was involved in a medical malpractice

10  suit.  Well, that was 50 percent true.  She was involved

11  in a medical malpractice suit, but Mr. Andriano was still

12  alive.

13         On October 5, 2000, Wendi Andriano picked up and

14  signed the Airborne Express package containing sodium

15  azide that she ordered while using an alias, Ann Newton,

16  and then altered a business license from McCollough's

17  business.

18         This was pretty sophisticated.  I was actually

19  impressed when I went back and really appreciated how

20  sophisticated she was with this.

21         She hid the sodium azide in a storage unit in the

22  apartment complex.

23         During the early morning hours of October 8,

24  Wendi Andriano calls her neighbor, Chris -- I'm going to

25  butcher the last name here.  I'll just spell it.

1  H-A-S-H-I-S-A-K-I.  For help.  And when Chris met with
2  Andriano in the parking lot, she told Chris that she had a
3  problem and not to ask questions.

4       None of these things that I'm talking about are
5  caused by adjustment disorder, bipolar disorder, major
6  depressive disorder.  These are things that are caused by
7  a personality disorder, by a defect in her personality
8  construct.  That's what's causing these things.

9       After she called paramedics to attend to her
10 husband, Ms. Andriano then instructed Chris to tell the
11 paramedics to go away.  She also told Chris to leave and
12 threw her purse outside and then shut the door.

13      As I already talked about, she didn't respond to
14 firefighters when they first responded and then until
15 dispatch calls her apartment, and then she comes out the
16 front door -- instead of coming out the front door, she
17 comes out the back patio door.  And she spoke with
18 firefighters.  She told the firefighters that this was a
19 mistake.  She doesn't need their assistance and that for
20 the last six years, she's been dealing with this problem.
21 She says thank you for coming and please go.

22      I think it's at this time, too, that her hair is
23 wet and maybe her shirt had been changed, but I may be
24 mistaken.

25      *Q.*  Based on your review of the trial testimony and

1    the reports documenting that particular incident, was

2    Ms. Andriano calm when she was --

3        *A.*   Apparently so.

4        *Q.*   -- when she was speaking to the paramedics?

5        *A.*   Yes.  I'm sorry.  Apparently so.

6            Now Chris, who witnessed Ms. Andriano's

7    interaction with the firefighters, said that the defendant

8    was, quote, extremely confused and not there.  Chris also

9    said that Andriano's hair was wet and that she had changed

10   her clothes before she exited the apartment.

11           So the paramedics leave.  She calls her father on

12   two separate occasions.  I'm sorry.  See called her father

13   and she called Chris on two separate occasions.  And then

14   during the second call, which is about 30 minutes after

15   the first call, she tells Chris that she needed to tell

16   her what really happened.

17       *Q.*   So this is a period of time where, based on the

18   evidence, the victim Joe Andriano is dead?

19       *A.*   Apparently so.

20       *Q.*   And she calls Alejo Ochoa and then speaks to her

21   friend Chris Hashisaki --

22       *A.*   Yes.

23       *Q.*   -- on two different occasions?

24       *A.*   She told Hashisaki that her husband discovered

25   that she was having an affair and that he, quote, lost it

and became very, very angry.  She explained that her
husband tried to strangle her.  So she hit him on the back
of the head with a bar stool, which is why he was in the
position he was in when Hashisaki got to the apartment.
The problem there is that Hashisaki didn't notice a broken
bar stool or blood when she was in the apartment.

Following her arrest and during a break in her
interrogation, Wendi Andriano calls Sharon -- Shannon.  I
said Sharon earlier.  It's Shannon Sweeney.  And asked her
to remove her personal belongings from the management
office.

During her interrogation, Wendi Andriano
initially told Detective Lucero that she did not stab her
husband, but did admit to having a knife in her hand when
her husband collapsed.

During her interrogation, Wendi Andriano
initially told Detective Lucero that she was not having an
extramarital affair.

During her interrogation, Wendi Andriano
initially told Detective Lucero that she did not change
her clothes.

Crime scene specialist concluded that Wendi
Andriano's alleged physical injuries did not comport with
her version of the events.

Crime scene specialist concluded the blood

1   spatter evidence did not comport with Wendi Andriano's
2   version of the offense.
3           Crime scene specialist concluded that Wendi
4   Andriano staged a portion of the crime scene.
5           And Wendi Andriano's father told Detective Lucero
6   that after he arrived at his daughter's apartment, the
7   police were already on the scene and his daughter told him
8   that she, quote, screwed up, end quote, and stabbed her
9   husband.
10          Now, in preparation for today's get-together, I
11  went back and I looked at these crime scene photos.  I
12  hadn't done that in a while.  And it's real easy, when the
13  narrative gets going, that Wendi Andriano the victim --
14  it's real easy to forget the real victim in this story.
15  And when you look at these crime scene photos and when you
16  look at the blood spatter evidence and when you look at
17  how this man died and when you look at how many times the
18  injuries to his head, make no mistake about it, a major
19  mental illness did not cause this.  This behavior was not
20  the byproduct of a major mental illness, whether it's a
21  major depressive disorder, a bipolar disorder, or any
22  other major mental illness.  It just did not happen that
23  way.
24          This was driven by Ms. Andriano's character
25  pathology, which was really out of just pure selfishness.

1        But the scene -- I had forgotten just how -- how

2   brutal the crime scene is and the level of overkill

3   almost, if you will, that was at that scene.

4        *Q.*   That takes us to the second query that our office

5   asked you to consider dealing with unusual and/or

6   substantial duress.  Could you tell us about that

7   question and what your conclusions are or opinions are

8   related to that second query?

9        *A.*   Well, to be sure, during the days and the weeks

10   leading up to the offense, as I said earlier, Ms. Andriano

11   was trying to cope with a number of stressors:  Caring for

12   her two young children, her ill husband, financial

13   difficulties, dissatisfaction in her marriage, and in

14   addition to her involvement in these two affairs.

15        But these are stressful events.  Make no mistake

16   about it.  But I don't believe these are stressful events

17   where it reached the point where she was under unusual and

18   substantial duress.

19        And, again, what I say in my report is that when

20   you look at the pre-offense, the offense, and post-offense

21   behavior, you realize that not only did she plan the

22   offense, but she -- as I said earlier, she kept her wits

23   about her.  This is a woman, who following the offense,

24   stages a portion of the crime scene ostensibly to help her

25   version of the offense.

1          I went back and I looked at those photos of the

2    belt.  She laid the belt I think it's over him.  The belt

3    has no blood spatter, none, zero.  So how does -- the

4    place is a bloody mess, but somehow the belt is devoid

5    that supposedly was used to like to go after her.  The

6    belt is devoid of blood spatter.  It makes no sense.

7          MR. NICKELS:  Your Honor, whether the belt had

8    blood on it or not and the descriptions where the blood

9    was --

10         THE COURT:  Sustained.

11         Let's move on.  Ask your next question.

12    Q.   BY MR. HAZARD:  Doctor, evidence of staging the

13    crime scene, how does that belie the notion that that was

14    created by some sort of duress or substantial duress?

15    A.   The point is that this is someone who kept her

16    wits about her independent of whatever mental issues she

17    may or may not have had at the time of the offense.  And

18    it's my opinion that, to a reasonable degree of medical

19    probability, that Wendi Andriano was not at the time of

20    the instant offense under unusual or substantial duress.

21    And that to the extent she did have stressors, they were

22    not causally connected to her actions that occurred on or

23    about October 8, 2000.

24    Q.   And that leads us to the third query that our

25    office asked you to consider, and that was what, if any,

1   causal connection exists between any mental illness or

2   cognitive impairment that Ms. Andriano suffered from or

3   suffers and the murder?

4       A.   Well, as I already stated, none of these

5   conditions to the extent they existed, are responsible for

6   the choices, no matter how misguided, that Ms. Andriano

7   made.

8           As I said earlier, these were behaviors that

9   that were driven by anti -- they were antisocial and

10  selfish acts designed to benefit Wendi Andriano.

11          I'm not going to recite all the different

12  behaviors that she engaged in again, but, suffice it to

13  say, what I did in my report is I gave an abridged version

14  of all the same elements, behavioral choices that she

15  made.  I just -- I just believe that these choices were

16  really driven just by her character pathology and not a

17  major mental illness.  She made the choices.

18      Q.   Did she also say that, in essence, during your

19  forensic interview?

20      A.   Not only did she say it to me, she said it when

21  she testified I think at sentencing.  She tells the jury

22  that she made horrible choices.

23          MR. HAZARD:  Your Honor, at this moment, we would

24  like to play a portion of Ms. Andriano's forensic

25  interview with Dr. Pitts.

1          THE COURT:  Which is part of Exhibit No. 186;

2    correct?

3          MR. HAZARD:  It is.  And, for the record, the

4    transcript starting point would be Page 117, Line 8 and

5    continuing until Page 117, Line 29.

6          THE COURT:  I'll allow the State to present that

7    portion with the understanding that the court reporter

8    will not be taking it down.

9          (WHEREUPON, a portion of Exhibit 186 was played.)

10         (WHEREUPON, an off-the-record discussion ensued.)

11         MR. HAZARD:  Your Honor, I'm also going to at

12   this time move to admit Exhibit 179, which are the DVD's

13   of Ms. Andriano's interview with police at the time of the

14   offense.

15         THE COURT:  Those have already been admitted by

16   stipulation.  You're talking about Exhibit 179?  There's

17   five CD's.  It looks like from my notes and from the

18   clerk's exhibit list, that by stipulation, those five CD's

19   under Exhibit 179 were admitted by stipulation on

20   February 3rd.

21         MR. HAZARD:  Thank you, Judge.  And I also move

22   to admit Exhibit 168, which is Dr. Pitt's report into

23   evidence.

24         MR. NICKELS:  We object, Your Honor, on hearsay

25   grounds.

1         THE COURT:  I'll sustain the objection with

2    regards to 168.

3         MR. HAZARD:  And, Your Honor, again, we ask the

4    Court to admit it not for the truth of the matter

5    asserted.  It was relied upon by other experts in this

6    case, including the experts from the defense.

7         We ask that Your Honor not take into

8    consideration any assertions and opinions as written in

9    the report, only to consider the testimony and separate

10   that.  But there are abundance of materials that not only

11   go to Dr. Pitt, what he relied upon, but also what the

12   other experts here relied upon.  That's what our motion is

13   based on.

14        THE COURT:  Mr. Nickels.

15        MR. NICKELS:  Yeah, Your Honor, I mean, I don't

16   think it can get in as a basis of what he relied on

17   because if that were the case, every report would go in

18   because it's kind of a circular logic.

19        But as far as our experts, they didn't rely on

20   it.  I mean, they spent some time rebutting some of the

21   things, but it's not to be relied on.  It's not that kind

22   of assertion.

23        THE COURT:  I'll sustain the objection.

24        MR. HAZARD:  No further questions, Your Honor.

25        THE COURT:  Mr. Nickels, cross-examination?

1        MR. NICKELS:  Yes, Your Honor.

2

3                    CROSS-EXAMINATION

4  BY MR. NICKELS:

5      Q.    Dr. Pitt, at one point in your examination by

6  Attorney Hazard, you were talking about the materials you

7  reviewed, and you used the phrase:  In the spirit of being

8  as complete and thorough as I can be.  Do you remember

9  saying that?

10     A.    Yes, sir.

11     Q.    And I think you were just referring to the fact

12 that the process you go through reviewing documents,

13 interviewing witnesses and the lead-up to the rendering of

14 an opinion or writing a report, you want that to be as

15 thorough as possible; right?

16     A.    Yes, sir.

17     Q.    You want it to be as complete and comprehensive

18 as possible as well; right?

19     A.    Yes, sir.

20     Q.    And this may include the interviews with

21 collateral sources of information?

22     A.    If indicated, yes, sir.

23     Q.    And by collateral sources, I'm just referring to

24 someone other than the person about who you're offering an

25 opinion?

1    *A.*   Yes, sir.

2    *Q.*   So, in this case, that would be Wendi.  So a

3 collateral source would be somebody other than Wendi

4 Andriano; right?

5    *A.*   I concur.

6    *Q.*   And, overall, I mean, I think you would agree

7 that this review that you performed, you want to do

8 everything you can to make the evaluation complete?

9    *A.*   Yes, sir.

10    *Q.*   Here, you did interview Wendi Andriano, as we

11 saw; right?

12    *A.*   Yes, sir.

13    *Q.*   One time?

14    *A.*   Yes, sir.

15    *Q.*   For less than five hours?

16    *A.*   4.9 hours.

17    *Q.*   By contrast, Dr. Woods and Dr. Hopper, who

18 provided contrary opinions to what you have offered today,

19 interviewed Wendi on nine separate occasions; is that

20 right?

21    *A.*   I'm not going to quibble with you, but, sure, it

22 sounds about right.

23    *Q.*   And for it was a total of 64 and-a-half hours

24 that they interviewed her; is that right?

25    *A.*   I didn't know that, but if you say so, I'll--

1    *Q.*    You have no reason to dispute that?

2    *A.*    No, sir.

3    *Q.*    And Wendi was your only interview that you

4    performed in this evaluation; correct?

5    *A.*    Yes, sir.

6    *Q.*    You didn't interview anybody else?

7    *A.*    No, sir.

8    *Q.*    You didn't interview Wendi's mother Donna, who

9    provided evidence about the neglect and abuse that Wendi

10   suffered as a child?

11   *A.*    No, sir.

12   *Q.*    You didn't interview Alejo Ochoa, Wendi's

13   stepfather, about whom there was evidence that he may have

14   sexually molested Wendi as a child?

15   *A.*    I did not interview him.

16   *Q.*    You didn't interview anybody from these various

17   ministries that Wendi was involved in where there was

18   evidence to show that Wendi suffered further abuse there;

19   is that right?

20   *A.*    Yes, sir.

21   *Q.*    You didn't interview Jeri Lynn Cunningham, who

22   testified that Wendi -- or excuse me -- that Alejo, you

23   know, touched her breasts when she was sleeping over at

24   Wendi's house?

25   *A.*    Yes, I did not interview her.

1    *Q.*   And you didn't interview Kyre Lorts, who

2  testified that Alejo touched her vagina and forced her to

3  rub his penis and who also testified that Wendi was doing

4  the same thing, rubbing Alejo's penis and being touched in

5  the vagina?  You didn't interview Kyre Lorts; did you?

6    *A.*   I did not interview her.

7    *Q.*   Dr. Woods and Dr. Hopper, they did interview

8  additional witnesses; is that right?

9    *A.*   I believe so, yes, sir.

10    *Q.*   And would you have any reason to dispute that it

11  was six additional witnesses?

12    *A.*   I have no reason to dispute that.

13    *Q.*   And that included Jeri Lynn Cunningham and Krye

14  Lorts?

15    *A.*   Yes, sir.

16    *Q.*   Now, you have been doing this kind of work for a

17  long time; right?

18    *A.*   It's relative.  I would like to think that it's a

19  reasonable amount of time.  Go ahead.

20    *Q.*   And in over that time, you've encountered a

21  number of folks who could be victims of sexual abuse or

22  other trauma?

23    *A.*   Absolutely.

24    *Q.*   And would you agree that interviewing a victim of

25  sexual abuse or other trauma can be a delicate matter?

1    *A.*    In certain situations, yes, sir.

2    *Q.*    And because many victims of abuse or other

3    trauma, are just not -- they're not comfortable talking

4    about it; right?

5    *A.*    I concur.

6    *Q.*    These are painful memories?

7    *A.*    They can be.

8    *Q.*    And, in some instances, they could be not

9    memories at all, in the sense that these folks may block

10   them out?

11   *A.*    They may.

12   *Q.*    And so in order -- when you interview these

13   folks, you often have to do some work to bring the

14   information out?

15   *A.*    I don't know what you mean by that.

16   *Q.*    Well, in other words, if you interview a victim

17   of potential sexual abuse, I mean, you don't just walk up

18   and say:  Hi, I'm Steve, have you been sexually abused?

19   You're going to try to work them and maybe build some

20   rapport beforehand?

21   *A.*    Generally speaking, yes.

22   *Q.*    I mean, you would like it if they have some

23   comfort level before talking about the trauma, or sexual

24   abuse or other trauma; right?

25   *A.*    Yes.

1    Q.    It's helpful that they have some trust in you

2    before approaching that subject?

3    A.    Well, yes and no.

4    Q.    Let's now we're going to watch some of the video

5    that was shown over here before.  We're going to watch it

6    over here.  And what I'll represent to you, Dr. Pitt, is

7    what I'm about to show you is three separate clips.  We're

8    going to run them -- there will be a little break in

9    between.  We will run them all and I'll ask you some

10   questions about it.

11          What I'll tell you now is that this is a segment

12   of the interview that occurred in the first couple of

13   hours of your time with Wendi and it occurred before you

14   had asked her any questions about any sexual abuse or

15   anything like that.  Okay?

16   A.    Can you tell me where the citations are in the

17   transcript?

18   Q.    I don't have that right now, but, certainly, we

19   can provide that to your counsel.  And I don't know if

20   you'll need to follow along in the transcript because it

21   will be on the screen.

22   A.    No, because there's context.  Everything is

23   context-related.  And so it's helpful for me if I can

24   appreciate at least minimally let me see in the transcript

25   where I'm talking to her.  I mean, we did that for you in

1   the stuff that we just showed.

2       *Q.*   Well, I don't have that information.  Here's what

3   we'll do.  We'll show the video, and if you and

4   Attorney Hazard would like to show other parts of the

5   video following this, you'll have an opportunity to do

6   that.

7           MR. HAZARD:  Your Honor, I object.  The witness

8   has asked a simple request to assist him.

9           THE COURT:  Do you have a copy of the transcript?

10  Do we all have a copy of the transcript?

11          MR. NICKELS:  Yes, everybody has a copy of it.

12          THE COURT:  Okay.  You have a copy of it?  Then

13  on your redirect, you can refer to that portion on your

14  redirect.  Okay?

15          THE WITNESS:  Sure.

16          MR. NICKELS:  Thank you.

17          THE COURT:  I'll allow this to be played as part

18  of Exhibit No. 186, which has been admitted into evidence

19  with the understanding the court reporter will not take

20  this down.

21          (WHEREUPON, an off-the-record discussion ensued.)

22          (WHEREUPON, a portion of Exhibit 186 was played.)

23          THE COURT:  Do we know whether that's

24  Disc No. 1?

25          MS. FOX:  It's Disc 1.

1          THE COURT:  Disc 1?

2          MR. NICKELS:  Yes.

3          THE COURT:  Towards the beginning?

4          MS. FOX:  I think it's somewhere -- I have the

5    exact times, which I can get as soon we get done.

6          THE COURT:  But we know it's Disc 1?

7          MS. FOX:  It's Disc 1.  All of these are before

8    the lunch hour.  So it's Disc 1.  And one is from

9    Disc 2.

10          THE COURT:  Okay.  Go ahead.

11          MR. NICKELS:  Like I said, there's going to be

12   three of these.

13          THE COURT:  You're going to play three?

14          MR. NICKELS:  Each about a minute or two.  Then

15   I'll ask the questions following the three.

16          (WHEREUPON, a portion of Exhibit 186 was played.)

17     Q.   BY MR. NICKELS:  So, Dr. Pitt, as we saw in those

18   video clips, you know, Wendi was getting upset; right?

19     A.   Yes, sir.

20     Q.   And she said she was feeling defensive?

21     A.   I -- okay.  Yes, sir.

22     Q.   And she also described herself as agitated to the

23   point where she could not think?  Did you hear her say

24   that?

25     A.   Yes, sir.

1   Q.   And then she even said she felt like she was on

2   trial again?

3   A.   Yes, sir.

4   Q.   And so, you know, whatever you may have been

5   doing to build any rapport or make her feel comfortable,

6   it certainly wasn't working if she was feeling the

7   opposite; correct?

8   A.   The question presupposes that I'm there to build

9   rapport and I'm there to win friends and influence people,

10  and that's not the purpose of a forensic evaluation.

11       Wendi Andriano was not my friend.  Okay?  I'm not

12  there to build rapport.  I'm there to get to the truth, to

13  get the information, to hear her version of the events.

14       I'm sorry that Wendi Andriano killed her husband.

15  I'm sorry that it's painful for her to talk about it.  But

16  I've got to ask her these questions.  Otherwise, I'm not

17  doing my job.

18  Q.   I'm now going to show you a clip that occurred

19  about two hours into the interview with Wendi.  And what

20  I'll represent to you here is at least based on our -- and

21  we've watched the whole thing.  Based on our review, this

22  is the first time that you mention any potential sexual

23  abuse by Alejo?

24  A.   Do you have the citation?

25  Q.   Well, again, what we'll do is we'll watch it and

1    we can give you the exact time of the clips, and if you

2    would like to show other parts of the video, you can do

3    that.

4          What we'll do again is I'll just let it play for

5    a few minutes and then I'll ask you some questions after

6    that.

7    *A.*   Okay.

8          (WHEREUPON, a portion of Exhibit 186 was played.)

9    *Q.*   BY MR. NICKELS:  Okay.  Doctor, let's kind of

10   unpack that a little bit.  As you heard there, the first

11   question you asked was were you and he -- and the "he" is

12   Alejo.  Were you and he sexually involved?  Do you

13   remember that?

14   *A.*   Yes, sir.

15   *Q.*   And that was the first question you asked of her

16   on this topic; right?

17   *A.*   Yes, sir.

18   *Q.*   And you didn't -- did you define for Wendi what

19   you meant by sexually involved?

20   *A.*   I did not.

21   *Q.*   Okay.  So for all you knew -- for all you know,

22   she may have thought that meant intercourse?

23   *A.*   Sure.

24   *Q.*   And she responded with:  I don't believe so.  I

25   don't know, and then went on to describe Alejo as a very

1    sexual person where, quote, everything has something to do

2    with something sexual.  Do you remember that answer?

3         *A.*   Yes, sir.

4         *Q.*   Now you didn't follow up with her by asking what

5    she meant by:  I don't know or I don't believe so?

6         *A.*   No, I didn't.

7         *Q.*   And you didn't follow up by asking how it made

8    Wendi feel that her stepfather was a, quote, very sexual

9    person for whom, quote, everything has something to do

10   with something sexual; did you?

11        *A.*   No, I did not ask her how it made her feel.

12        *Q.*   Instead, your next question, and I think you even

13   just -- you actually said it while she was still talking

14   was this, quote:  But did you have a sexual relationship

15   with Alejo, end quote; is that right?

16        *A.*   That sounds about right.

17        *Q.*   Then you went on to ask:  Were you ever in a

18   sexually intimate relationship with Alejo?  Do you

19   remember that?

20        *A.*   Yes, sir.

21        *Q.*   And, again, you didn't define what you meant by

22   sexually intimate; did you?

23        *A.*   No, I didn't.

24        *Q.*   So, for all you know, Wendi thought the word

25   intimacy meant some sort of a consensual or a romantic

1   type of relationship; right?

2       *A.*   It's certainly possible.

3       *Q.*   And then actually she answered with:  I would say

4   emotionally, yes, but, physically, I don't remember.  Do

5   you remember that answer?

6       *A.*   Yes, sir.

7       *Q.*   And, again, you did not follow up on that; did

8   you?

9       *A.*   I did not.

10      *Q.*   You did not ask her what she meant by having an

11  emotional, sexually intimate relationship with Alejo?

12      *A.*   I did not.

13      *Q.*   You didn't ask her how that made her feel?

14      *A.*   I did not.

15      *Q.*   And you didn't follow up with any questions on

16  what effect having an emotional, sexually intimate

17  relationship with her stepfather would have had on Wendi;

18  did you?

19      *A.*   No, I didn't.

20      *Q.*   And then, finally, Dr. Pitt, you asked the

21  question:  Did you ever sleep naked in bed with him?  Do

22  you remember that?

23      *A.*   Yes, sir.

24      *Q.*   And you understand -- you mentioned it

25  before that there's evidence in this case that Alejo

1    touched Jeri Lynn Cunningham's breasts during sleepovers

2    at Wendi's house; right?

3        *A.*    There's testimony -- Jeri Lynn Cunningham says

4    that, yes, sir.

5        *Q.*    Right.  So there's testimony about that; right?

6        *A.*    Yes, sir.

7        *Q.*    And then that occurred while Jeri Lynn was trying

8    to sleep in Wendi's bed, that Alejo would crawl into bed

9    and that's when he would touch her breasts; right?

10       *A.*    Yes, sir, uh-huh.

11       *Q.*    You didn't ask Wendi about that -- about those

12   allegations; did you?

13       *A.*    No, I didn't.

14       *Q.*    You didn't mention Jeri Lynn's name in the entire

15   interview; did you?

16       *A.*    I certainly did not.

17       *Q.*    Nor did you ask Wendi whether anything ever

18   happened in bed, regardless of whether someone was naked

19   or not?

20       *A.*    No.  You're right, I didn't ask that question

21   either.

22       *Q.*    Instead, the one question you asked was -- it

23   included this factual assumption of nakedness that

24   actually no one is alleging has occurred in this case;

25   right?

1      *A.*    Umm, I'll take your word for that.

2      *Q.*    Okay.

3             (WHEREUPON, an off-the-record discussion ensued.)

4             MR. NICKELS:  Your Honor, given the time, I know

5      we're a few minutes past the normal 3:00 o'clock break,

6      and I am transitioning to a new topic.

7             THE COURT:  How are we doing on time today?  Are

8      we doing okay?

9             MR. NICKELS:  I don't have a whole lot left, but

10     I'm assuming they have some redirect.

11            THE COURT:  Okay.  Let's go ahead and take our

12     15-minute break for the afternoon recess.  We'll be in

13     recess.

14            (WHEREUPON, a recess ensued from 3:04 p.m. to

15     3:18 p.m.)

16            THE COURT:  This is CR 2000-096032, State of

17     Arizona vs. Wendi Elizabeth Andriano.

18            The record will reflect the presence of the

19     parties and counsel.

20            The record will reflect that Dr. Steven Pitt is

21     on the witness stand and we will continue with the

22     cross-examination by Mr. Nickels.

23            Mr. Nickels.

24            MR. NICKELS:  Actually, Your Honor, I have

25     nothing further of this witness.

1          THE COURT:  Okay.  Redirect?

2

3                    REDIRECT EXAMINATION

4    BY MR. HAZARD:

5      Q.   Dr. Pitt, counsel for Ms. Andriano took different

6    excerpts from your interview with Ms. Andriano; is that

7    correct?

8      A.   Yes, sir.

9          MR. NICKELS:  If you don't mind, I just want to

10   tell the Court, during the break, we did give them the

11   exact times of the video that we showed him.  Sorry about

12   that.  I meant to mention that before we got back on.

13         THE COURT:  Okay.  Go ahead.

14         MR. HAZARD:  Okay.  May I approach the witness --

15         THE COURT:  Yes.

16         MR. HAZARD:  -- with Exhibit 237?

17     Q.   BY MR. HAZARD:  Dr. Pitt, what is that exhibit?

18   Do you recognize that?

19     A.   Yes.  This is the transcript of my forensic

20   psychiatric evaluation.  It's dated November 26, 2013, and

21   it is 233 pages long.

22     Q.   Is that an accurate transcription of the forensic

23   interview with Ms. Andriano that has already been admitted

24   into evidence?

25     A.   As I -- it's to the best of the ability of my

1   transcriptionist who completed it, yes, sir.

2         MR. HAZARD:  We move to admit Exhibit 237 into

3   evidence, Your Honor.

4         THE COURT:  Any objection?

5         MR. NICKELS:  No, Your Honor.

6         THE COURT:  Exhibit No. 237 for identification is

7   admitted into evidence.

8     Q.   BY MR. HAZARD:  Dr. Pitt, counsel talked about

9   materials that you reviewed and I think his words were in

10  the spirit of being complete and thorough?

11    A.   Yes.

12    Q.   Do you remember that?

13    A.   Yes.

14    Q.   And why didn't you interview other people than

15  Ms. Andriano?

16    A.   Because it wasn't indicated.  It wasn't

17  necessary.

18    Q.   And why is that?

19    A.   Well, in this particular case, you have to

20  remember that, one, it's voluminous.  And by voluminous,

21  what I mean is that there was a trial.  There are trial

22  transcripts.  It's voluminous because there was a police

23  investigation.

24         It's voluminous because there has been an appeal.

25  It's voluminous because, along with that appeal, there has

1  been I don't know how many declarations, but, many, many,
2  many declarations.

3      It's voluminous because mitigation specialists
4  have gone ad nauseam to interview everyone across the
5  country to get input and background on Wendi Andriano.
6  It's voluminous, because as counsel pointed out, his
7  experts spent so much time interviewing not only
8  Ms. Andriano, but collateral sources.

9      So I just didn't think it was indicated.  Trust
10 me, I think I have a good enough reputation, that if I
11 thought it was indicated, I would have done it.  It wasn't
12 necessary.

13 *Q.*  As part of your role as a forensic psychiatrist,
14 can you talk about why you're here and what's important,
15 based on your profession, for the judge to hear?

16 *A.*  Well, with all due respect to the Court, I know
17 that the judge has been on the bench a while.  And, but
18 the discipline of forensic psychiatry, a couple of key
19 points about it is that as a forensic expert, to be sure,
20 I'm retained by you, but I'm not an advocate for you or
21 for the State or for the party that retains me.  I'm an
22 advocate for one thing and one thing only, which is my
23 opinion.

24      And after I authored this report and after I
25 signed this report, I was not only very happy with the

1    work product, but absent some new piece of information

2    that was somehow going to change my opinion, I was and am

3    wedded to my opinion.  I believe I am correct.

4             That's very different than the role of a

5    therapist, who is treating someone who's an advocate for

6    the patient whom they're treating.

7             What happens sometimes in forensic cases,

8    especially -- well, I won't say especially.  But it

9    happens at times in forensic cases, boundaries get blurred

10   and roles get blurred.  People tend to sometimes forget

11   that while they may be retained by the defense or retained

12   by the prosecution, that that's not in service of the

13   party that retained them.

14            They may forget that while sitting and talking to

15   someone like Wendi Andriano, who's every verbally

16   competent and very verbally facile, that she's not --

17   you're not there to win friends and influence people.

18   You're not there to make her a buddy.

19            I take a lot of pride in the fact that regardless

20   of who retains me, the person at the end of the day

21   shouldn't really know.  In other words, the evaluation

22   should be the same.  Whether they like me or don't like me

23   is immaterial.  What's important to me is that was the

24   evaluation thorough?  Did I hit the points?  Did I hit the

25   central elements of the referral questions that I was

1   being asked to answer.

2          I didn't do the evaluation the way that you told

3   me.  I'm going to do it the way I want to do it.  But I

4   have to be thinking about the referral questions.

5          Counsel talks about Dr. Woods and Dr. Hopper.  I

6   don't see in either one of their reports anywhere where

7   statutory language akin to the language that Ms. Gard

8   asked me about and akin to what's before the Court here is

9   even addressed.

10          And so I applaud their efforts to sit with her

11   and interview her for however long they did, but I just

12   didn't feel it was necessary for me to go ahead and

13   interview any other collateral sources.

14      Q.   In forensic psychiatry, is it about keeping score

15   as to how many hours?

16      A.   No.  It's like in your work and in my work, it's

17   no different whether you're the landscaper who cuts the

18   lawn or whether you're a lawyer or whether you're a

19   forensic psychiatrist.  I think it's a -- you know, just

20   because a lawyer does a direct exam or a cross-examination

21   for hours on end, that doesn't necessarily mean that it

22   was good.  There's an art to interviewing and there's a

23   way in which questions need to be asked.

24          So I think it's highly misleading to simply

25   assume that just because someone spends 30 hours with

1    someone, that, therefore, they really understand it better

2    than the person who may spend less, especially in my case

3    when if I thought I needed more time, I would have

4    spent it.

5        *Q.*   You asked Ms. Andriano the question in her

6    interview if she had a sexual relationship with Alejo

7    Ochoa?

8        *A.*   Right.

9        *Q.*   Do you remember that particular question?

10       *A.*   I do.

11       *Q.*   And what was her answer?

12       *A.*   She didn't think so.

13       *Q.*   In rendering your opinions, did you also take

14   into consideration that and account for Ms. Andriano

15   actually being the victim of sexual abuse?  And, if so,

16   how?

17       *A.*   Yes.  I talked about that in my direct

18   examination.  I say -- I talk about it in my report.  I

19   say that I'm aware that there has been testimony which

20   speaks to allegations that she was the victim of

21   emotional, physical and/or sexual abuse.  And if it can be

22   conclusively proven, then maybe some of the symptoms that

23   she has could potentially be tied to post-traumatic stress

24   disorder.  Could potentially.

25           But the problem here is that what defense counsel

1   is doing is it's exceedingly misleading because the idea

2   is --

3           MR. NICKELS:  Object, Your Honor, for him to

4   comment on defense counsel.

5           THE COURT:  That last comment will be stricken.

6           But go ahead and give your opinion.

7           THE WITNESS:  I'm sorry, Judge.

8           And, Counsel, I apologize to you as well.

9           THE COURT:  Give your opinion without the

10  editorial comment.

11          THE WITNESS:  Okay.

12      Q.   BY MR. HAZARD:  What does sexual abuse, whether

13  Ms. Andriano suffered it as a child or not, have to do

14  with the ultimate determination?

15      A.   Right.  The questions presuppose that -- well,

16  let me answer it differently because I think I'm going

17  down the same path.

18          If you assume in this particular case that Wendi

19  Andriano is a victim in this story, in the narrative,

20  there's this idea -- there's this nexus that somehow

21  because of sexual abuse, therefore, it goes she had

22  somehow some psychiatric issues, some psychiatric

23  diagnoses.  And we know that sometimes that does in fact

24  happen for people.  I'm not minimizing people that have

25  been sexually abused.  And, therefore, it goes that she

1   somehow wasn't responsible for the choices that she made.

2            At the end of the day and what my report is

3   saying is that it doesn't matter.  If she was a victim of

4   sexual abuse, that's a terrible thing and I feel sorry for

5   her.  But the reality is this isn't about:  Was she a

6   victim of sexual abuse?  This is about:  Does she have a

7   mental disease or defect whereby she couldn't appreciate

8   the wrongfulness of her conduct?  Question No. 1.

9   Answer:  No.  No.  It's just not there.  You don't see the

10  diagnoses across contexts the way we talked about it.

11           And ditto for Questions No. 2 and

12  Questions No. 3.  So this idea that A leads to B, which

13  leads to C, which kind of gets us to D is a nonstarter for

14  me.

15      Q.   Is it appropriate in forensic psychiatry to do

16  reverse engineering?  And do you know what I mean by that?

17      A.   I know exactly what you mean by reverse

18  engineering.  No, it's not appropriate.  We don't --

19  what's appropriate in forensic psychiatry is to look at --

20  is to look at the data.  We don't take -- we don't make

21  the data fit our theory.  We look at where the data takes

22  us.  And it's an analogy that I view --

23           MR. NICKELS:  Your Honor, I'm letting some of

24  this go, but I object to this as being well beyond the

25  scope of cross-examination.

1          THE COURT:  Overruled.

2          Go ahead and answer the question.

3          THE WITNESS:  Thank you, Your Honor.

4          Where this goes is that -- is you look at where

5     the data takes you.  And when you look at the data in this

6     particular case -- you all are from Wisconsin, Green Bay

7     Packers.  We'll use the football analogy here, which I've

8     used before.

9          If you look at the data on this particular case,

10    where's all the data points about mental illness, that she

11    doesn't have a mental illness?  Most of the data points

12    are around the 50-yard line.  Sure, you have some that are

13    at the 40 and some that are at the 20 and you've got a

14    couple in the stands, but the totality of the data points

15    away from this woman having a major mental illness.  The

16    records support that opinion.  The people that treated her

17    at the Maricopa County Jail support that opinion.  And the

18    Arizona Department of Corrections records support that

19    opinion.

20        Q.  BY MR. HAZARD:  Defense counsel also brought in

21    and played a number of clips from your interview and asked

22    questions -- asked you questions about building rapport

23    and commenting that Ms. Andriano was visibly upset.

24          Could you tell us a little bit about your

25    interview techniques and why you interview the way you do?

1      *A.*   Sure.

2      *Q.*   First off, have you been published on the topic

3   of video forensic interviews?

4      *A.*   Yes, I'm published.  There's only a couple of

5   articles on the value and utility of video-recording

6   forensic evaluations and some others.  I did an article on

7   that.

8      *Q.*   Do you teach others interview techniques --

9      *A.*   I do.

10      *Q.*   -- in forensic psychiatry?  Can tell us a little

11   bit about that?

12      *A.*   I think we were talking over each other.  It was

13   my fault.  I'm sorry.

14          The answer is I do.  And I teach law enforcement

15   officers about interviewing, not interrogation.  I also

16   teach medical students about interviewing.  I also teach

17   other psychiatrists about interviewing.

18          You have to remember that in this particular

19   interview, this is an adversarial context.  I'm dealing

20   with a very, very savvy defendant.  The evaluation

21   starts -- and I'm paraphrasing.  But I essentially ask

22   Ms. Andriano to tell me what happened.  And we get to the

23   spot of:  Why, I don't know what you mean, tell me.  And

24   see comes back to me and essentially says:  Why don't you

25   tell me what you know and you ask me specific questions,

1   and then I'll answer them?  Well, that's not how this

2   works.  It's my interview and I get to ask the questions.

3          And the point is it's adversarial.  To be sure,

4   you want to have some give-and-take and some dialogue and

5   some rapport, but she was very quick on her feet, and I

6   sensed that right out of the box.  And there were only a

7   couple of times that I really, really felt that I caught

8   her completely off guard.  But everything else, make no

9   mistake about it, she was ready for it.  She had been

10  asked about it by other people.  She was ready for it.

11  This was someone who has been practiced in terms of being

12  interviewed.

13         And so, again, I'm not there to win friends and

14  influence people.  I'm there to be respectful, which I

15  believe I was.  I'm there to get information, which I

16  believe I did, that satisfies me, so that I can author a

17  report and render opinions that I can share with the

18  Court.

19     Q.   Do you also take into consideration the

20  reliability of the evidence or proof before you make an

21  opinion?

22     A.   Absolutely.  On a scale of one to ten, if ten is

23  the most important and one is the least important, I think

24  I've said in the past, that I count the interview anywhere

25  between seven, eight, nine depending on the context.  That

1   would be true here.

2           But the beauty of this particular case, in part

3   because it is so voluminous, is you have so much

4   information to pull from, so many different data points

5   that support what I believe -- what are my opinions.  Not

6   what I believe are my opinions, but what are my opinions.

7   And the data -- the records speak for themselves.

8           MR. HAZARD:  One moment, Your Honor.

9           THE COURT:  Yes.

10          (WHEREUPON, an off-the-record discussion ensued.)

11          MR. HAZARD:  That's all, Your Honor.

12          THE COURT:  May this witness be excused?

13          MR. HAZARD:  Yes, Your Honor.

14          THE COURT:  Thank you very much.  You're excused.

15          THE WITNESS:  Thank you, Judge.

16          THE COURT:  Don't walk off with any exhibits.

17          THE WITNESS:  I won't do that, Judge.

18          THE COURT:  Thank you.

19          Anything further from the State?

20          MR. HAZARD:  Your Honor, yes.  Ms. Gard would

21   like to.

22          MS. GARD:  I have two housekeeping matters.

23   Actually, one housekeeping matter.  Then I would like to

24   make a record on his report.

25          THE COURT:  Okay.

1          MS. GARD:  The housekeeping matter deals with
2     Exhibit 6.005, which was the report of Dr. Bayless.  We
3     had in our joint witness schedule and exhibit list filed
4     on January 10th -- we had stipulated to admit that, and I
5     think we overlooked it when we were admitting evidence the
6     first day.  So I would move that exhibit into evidence.
7          THE COURT:  Any objection to Exhibit No. 6.005
8     being admitted into evidence?
9          MR. ARNTSEN:  No objection, Your Honor.
10          THE COURT:  Exhibit No. 6.005 is admitted into
11     evidence.
12          MS. GARD:  And the other issue regards the report
13     and I would like to renew the argument that I made earlier
14     in support or in connection with Dr. Amin's report.  We're
15     not offering Dr. Pitt's report for a hearsay purpose.
16     We're offering it to show, well, it contains facts showing
17     the basis of his opinion.  And I would also like to point
18     that, once again, I know this was pointed out earlier,
19     that we stipulated to all the mental health reports of the
20     defense, and all the rest are in evidence.  I think it's
21     important for this Court to consider the totality of the
22     evidence prior to making a ruling and consider the weight
23     of each opinion in context.
24          THE COURT:  So was that the Exhibit 169 you're
25     referring to?

1          MS. GARD:  No. 168, I believe it is.  168.  So I

2    would just ask for you to reconsider that ruling.

3          MR. ARNTSEN:  Your Honor, we object for the same

4    reasons raised earlier.  It is hearsay.  And just because

5    there are things in it, it's not admissible.  It sets

6    forth his opinions.  And, again, presumably for the same

7    reason this Court granted the State's objections to keep

8    Mr. Lowenthal's and Mr. Hammond's reports out, we would

9    ask that you keep Dr. Pitt's report out.

10          THE COURT:  I'm going to reaffirm the Court's

11    ruling with regard to Exhibit No. 168 not being admitted

12    into evidence.

13          MS. GARD:  And, Your Honor, we do believe this is

14    significant or sufficient purpose for us to bring a

15    special action.  So I would ask for a stay.  Although we

16    don't really need a stay, I would ask that we don't do

17    anything for 60 days, but --

18          THE COURT:  Okay.  I'm going to deny the oral

19    motion for a stay.  We have time.  I'm going to be setting

20    forth a briefing schedule.

21          MS. GARD:  Correct.  And the last matter, I would

22    like to offer Exhibit 168 to lodge it as an offer of

23    proof.

24          THE COURT:  Okay.  Well, 168 will be considered

25    as an offer of proof then by the State.  Okay?

1          MS. GARD:  Okay.

2          THE COURT:  It's not formally admitted into

3  evidence for the purpose of this hearing, but it will be

4  part of -- I guess if they file a special action, then

5  we'll have it.  I guess technically, we would have it as a

6  -- well, I'll have it admitted as an offer of proof only.

7          MR. ARNTSEN:  Okay.  Yes, because there were a

8  number of them.

9          THE COURT:  Right, because I believe there were a

10  number of things that we allowed for an offer of proof.

11  So 168 is not admitted for the purposes of this

12  evidentiary hearing, but only for the purpose of an offer

13  of proof.

14          MS. GARD:  Thank you, Judge.

15          MR. HAZARD:  In that case, the State rests,

16  Your Honor.

17          THE COURT:  Okay.  Anything further from the

18  Petitioner?

19          MR. NICKELS:  No, Your Honor.

20          THE COURT:  Counsel, with regard to exhibits that

21  were marked for identification but have not been admitted,

22  I think the clerk is going to be going over all the

23  exhibits and whatnot on Tuesday.  And so she will be

24  looking at all of that and I guess you can make contact

25  with her about any release of any exhibits not admitted

1  into evidence.  Okay?

2         But she won't be doing all of that until Tuesday;

3  is that correct?

4         THE CLERK:  I'm going to begin on Tuesday.  I

5  have my own court on Monday or Tuesday morning.  So it

6  will be Tuesday afternoon, I'll start.

7         MR. ARNTSEN:  There's no particular rush.  I'm

8  assuming Attorney Bennett will handle that; right?

9         MR. BENNETT:  Yes, Your Honor.  Just a point of

10  clarification, Your Honor.  I believe we discussed this

11  earlier, but I just want to make sure we're all on the

12  same page.

13         So our understanding is exhibits that were

14  admitted are part of the record.  Exhibits that were

15  offered, but not admitted, will also become part of the

16  record.  Exhibits that were never offered will simply be

17  returned.  Is that correct?

18         THE COURT:  Right.

19         THE CLERK:  Correct.

20         MR. BENNETT:  Okay.  Thank you.

21         THE COURT:  Any disagreement about that?

22         MS. GARD:  No, Judge.

23         MR. ARNTSEN:  No.

24         THE COURT:  Then, for the record, I did discuss

25  informally with counsel a briefing schedule with the

1    understanding and the anticipation that the transcripts of

2    these proceedings will be available to counsel by

3    April 14, 2014.  And counsel were able to speak informally

4    with the court reporter here that is taking down these

5    proceedings the past two weeks.

6         It was my understanding that counsel have

7    basically agreed to a briefing schedule where in about

8    60 days, when the transcripts are made available to

9    counsel, that the Petitioner will have about 40 days to

10   file an opening closing argument.

11        The State will have another 40 days to file their

12   written closing argument.

13        And then the Petitioner will have an additional

14   20 days to file a concluding written closing argument.

15        Is that correct?  Is that my understanding?

16        MR. ARNTSEN:  Yes, Your Honor.

17        THE COURT:  And if that's the case, I did some

18   calculations.  So what I'm going to do, then, with the

19   anticipation that the transcripts will be available to

20   counsel by April 14, 2014, for right now, I'm going to

21   order giving the Petitioner up to and including May 26,

22   2014, in which to file her initial written closing

23   arguments.

24        I'm going to order giving the State up to and

25   including July 7, 2014, in which to file written closing

1   arguments.

2        Then I'm going to order giving the Petitioner up

3   to and including July 28, 2014, in which to file her

4   concluding written closing arguments.

5        So May 26, 2014.  July 28, 2014.  And I'm sorry.

6   May 26, 2014.  July 7, 2014.  And July 28, 2014.

7        And based upon everything that has been presented

8   to the Court, the Court does find extraordinary

9   circumstances exist due to, among other things, the volume

10  of the evidence, the complexity of the issues and the

11  briefing schedule, and, therefore, additional time will be

12  required for the Court's consideration and ruling beyond

13  the time set forth by Rule 32.8 (d) of the Arizona Rules

14  of Criminal Procedure.

15       So upon receipt of the Petitioner's concluding

16  written closing arguments, the Court will take the matter

17  under advisement at that time.  But the rule talks about

18  within X-amount of days.  I'm going to be very careful.

19  I'm going to keep an open mind and I'm going to do my very

20  best to get the ruling out as soon as possible.  Okay?

21       MR. ARNTSEN:  Understood.

22       THE COURT:  Okay.  Then I do want to put on the

23  record, I do -- and I've informed counsel of this.  I

24  commend counsel, all of you, for your professionalism

25  during these proceedings these past two weeks and the

1   professional courtesy that you've shown my staff.

2            I also want to thank the sheriff's office for the

3   transportation and all the issues that we had with regard

4   to making sure that we got started on time with

5   Ms. Andriano here.

6            So I do thank everyone for their professionalism.

7            And then I'm going to order that the Maricopa

8   County Sheriff's Office or any county sheriff's office

9   within the State of Arizona return Petitioner Wendi

10  Elizabeth Andriano to the custody of the Arizona

11  Department of Corrections.  If it can be done on this

12  date, it should be done on this date, but as soon as

13  possible.  Okay?

14           MR. ARNTSEN:  Thank you, Your Honor.

15           THE COURT:  Let me just pause here to make sure

16  we've covered everything.

17           Okay.  Anything further from counsel?

18           MR. ARNTSEN:  Nothing further, Your Honor.

19           MS. GARD:  No, Your Honor.

20           THE COURT:  Okay.  Counsel from out-of-state,

21  have a safe trip back.

22           And, again, I do thank you all.  Thank you.

23  We'll be in recess.

24           (WHEREUPON, the proceedings were concluded at

25  3:42 p.m. )

1                        * * * * * * *

2

3

4

5                    C E R T I F I C A T E

6

7

8        I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

9   the State of Arizona, do hereby certify that the foregoing

10  125 pages constitute a full, true, and accurate transcript

11  of the proceedings had in the foregoing matter, all done

12  to the best of my skill and ability.

13       SIGNED and dated this 28th day of February, 2014.

14

15

16               /s/  Renée A. Mobley, RPR

17               RENÉE A. MOBLEY, RPR

18               Certified Reporter

19               Certificate No. 50500

20

21

22

23

24

25

# EXHIBIT HHHHHHHHHH

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
R. Krane, Deputy
5/2/2014 5:53:28 PM
Filing ID 5855456

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                )
                                 )
        Respondent,              )
                                 )
vs.                              )   No.
                                 )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,        )
                                 )
        Petitioner.              )
_____)


Phoenix, Arizona
February 6, 2014
1:30 p.m.


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


EVIDENTIARY HEARING

DAY 4


Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                    (ORIGINAL)

1                    A P P E A R A N C E S

2

3

4  On Behalf of the State:

5          Mr. Gregory Hazard
           Assistant Attorney General
6
           Ms. Lacey Gard
7          Assistant Attorney General

8
   On Behalf of the Defendant:
9
           ATTORNEYS AT LAW:
10
           Mr. Scott Bennett
11         Mr. Allen Arntsen
           Mr. Stephan Nickels
12         Mr. Matthew Lynch
           Ms. Krista Sterken
13         Ms. Jodi Fox

14                     I N D E X

15

16                 T E S T I M O N Y

17
   WITNESS:                                        PAGE
18

19  SCOTT A. MACLEOD

20         Direct Examination by Mr. Bennett        7

21
   KEITH ROHMAN
22
           Direct Examination by Mr. Bennett       37
23
           Cross-Examination by Ms. Gard           80
24
           Redirect Examination by Mr. Bennett     90
25

1            P R O C E E D I N G S

2

3        THE COURT:  Good afternoon.  This is

4    CR 2000-096032, State of Arizona vs. Wendi Elizabeth

5    Andriano.

6            The record will reflect the presence of the

7    parties and counsel.

8            Are there any things that we need to discuss

9    before we get started?

10           MR. ARNTSEN:  Just one thing from the

11   Petitioner's side, Your Honor.

12           THE COURT:  Yes, sir.

13           MR. ARNTSEN:  Over the lunch hour, we interviewed

14   Detective Dennis Olson, who was the detective who

15   interviewed Mr. Ochoa and Ms. Lorts on Monday.  And we

16   have here that we have marked as exhibits both

17   Detective Olson's report, which is marked as Exhibit 227,

18   and the CD of his interview with Mr. Ochoa, which is

19   Exhibit 228.  So we have that in the record here.

20           And we received -- Attorney Bennett received a

21   text message from Attorney Miller, which stated that --

22   this morning, which stated that Mr. Ochoa would take the

23   Fifth as to any questions asked of him in this proceeding.

24           He also confirmed that he had sent a similar text

25   to Attorney Gard, and Attorney Gard confirmed that to me.

1          So I wanted to, one, make this a record, and,

2    two, see if the Court wanted anything else to sort of nail

3    down and kind of, you know, wrap up this issue for this

4    record.

5          I suppose we could have Mr. Ochoa come up here

6    and say that, if the Court thinks that is necessary.  The

7    Court is the audience for this and the record, but I'll

8    make that representation.

9          And then, second, what we would also ask is that

10   in light of this, we would ask that Mr. Ochoa's

11   declarations submitted in connection with the petition,

12   which are Exhibits 24 and 25, be received into evidence.

13          THE COURT:  Ms. Gard or Mr. Hazard.

14          MS. GARD:  One moment, Judge.

15          THE COURT:  Okay.

16          (WHEREUPON, an off-the-record discussion ensued.)

17          MS. GARD:  Your Honor, if we could have until

18   after the break to give our position on that.  It is

19   hearsay, but we're considering, you know, agreeing to

20   that.

21          THE COURT:  With regards to Exhibit Nos. 24 and

22   25?

23          MS. GARD:  That being the declarations; right?

24          THE COURT:  Right.

25          MS. GARD:  Yes.

1        THE COURT:  Then let me make sure I understand.

2   Exhibit 227 marked for identification, was it a transcript

3   of the interview with Kyre Lorts?

4        MR. ARNTSEN:  Exhibit 227 is Detective Olson's

5   report on his interview with Mr. Ochoa.

6        THE COURT:  Okay.

7        MR. ARNTSEN:  And then Exhibit 228 is a CD with

8   the recording of that interview.  There was no recording

9   of the interview with Ms. Lorts.

10        THE COURT:  Okay.  It was my understanding

11   yesterday that the Petitioner decided not to call

12   Mr. Ochoa and then the State was going to think about it

13   and maybe speak to Mr. Miller about the situation before

14   they made a final decision.  We will wait until the break

15   and we will let you discuss the matter.  Okay?

16        MS. GARD:  Okay.  Thank you, Judge.

17        MR. ARNTSEN:  Thank you.

18        THE COURT:  Okay.  Go ahead.

19        MR. BENNETT:  Good morning, Your Honor.  Our next

20   witness is Scott MacLeod.  I'll go retrieve him.

21        THE COURT:  Okay.  Thank you.

22        (WHEREUPON, the witness entered the courtroom.)

23        THE COURT:  Mr. MacLeod, if you could please step

24   forward right up here to the witness stand.  Before you

25   sit down there, if you could please face the clerk and

1   give the clerk your full name and raise your right hand

2   and she will swear you in.

3          THE WITNESS:  I shall, Your Honor.

4   thank you.

5          THE CLERK:  Sir, please state your name and spell

6   your name for the record.

7          THE WITNESS:  Scott A. MacLeod.  S-C-O-T-T.  The

8   middle initial is A.  The last name is MacLeod,

9   M-A-C-L-E-O-D.

10          (WHEREUPON, the witness was duly sworn by the

11   clerk.)

12          THE COURT:  Go ahead and have a seat there.  Just

13   a few things I remind each witness, Mr. MacLeod, is that

14   remember to speak up so that everyone can hear you.  Also,

15   please wait until the question is completed before you

16   answer the question and please make sure that you give us

17   a verbal response.

18          Is that all agreeable to you?

19          THE WITNESS:  It is, Your Honor.

20          THE COURT:  If you need some water, there's some

21   water over here to the side.  Okay?

22          THE WITNESS:  Sure.  Thank you.

23          THE COURT:  Mr. Bennett.

24          MR. BENNETT:  Thank you, Your Honor.

25

1                    SCOTT A. MACLEOD,

2    having been first duly sworn to tell the truth, the whole

3    truth, and nothing but the truth, testified as follows:

4

5                    DIRECT EXAMINATION

6    BY MR. BENNETT:

7        Q.    Mr. MacLeod, were you the mitigation specialist

8    in Wendi Andriano's murder trial?

9        A.    I was one of the mitigation specialists who

10   worked on her case, yes, Mr. Bennett.

11       Q.    Let's talk a little bit about your background.

12   Now I know you've received a law degree since then.  Let's

13   talk about the education you had at the time you worked on

14   Ms. Andriano's case.

15       A.    Yes, sir.

16       Q.    What was that?

17       A.    How far back do you want to go?

18       Q.    College, please.

19       A.    College, yes, sir.  I got my undergraduate degree

20   from ASU.  I went to community college for a couple of

21   semesters before that.  I got an undergrad degree from

22   ASU in 1997 in political science with a minor in English.

23       Q.    Do you have any formal education in social work?

24       A.    By formal education, if you mean college, I took

25   a sociology class at a community college.  And, you know,

1    I was thinking about this in the last couple of days.  I

2    think I took a psychology course as well, but that would

3    be about the extent of my, if you will, social work

4    studies during my undergrad years, but they were very

5    limited.

6         Q.    Do you have any degrees in social work?

7         A.    I do not.

8         Q.    Any degrees in sociology?

9         A.    I do not.

10        Q.    Psychology?

11        A.    I do not.

12        Q.    Any other behavioral science?

13        A.    I do not.

14        Q.    Before you went to work for the public defender's

15   office, what did you do?

16        A.    How far back do you want me to go, Mr. Bennett?

17        Q.    What was your job immediately before you started

18   with the public defender's office?

19        A.    I would say probation officer as an Adult II

20   Probation Officer with the Maricopa County Adult Probation

21   Department.

22        Q.    How long did you hold that job?

23        A.    I believe about two and-a-half years.

24        Q.    And what were your duties as a Probation II

25   Officer?

1      A.   Well, I started out as a typical probation

2   officer.  And if you need me to define typical, I'll be

3   happy to do that.  But I oversaw a caseload of about 60 to

4   70 felony offenders.  I did that for about a year, a year

5   and-a-half.

6           Then they put me on a team of adult probation

7   officers where we worked to -- I think we supervised,

8   goodness, a couple hundred adult offenders.  And I was the

9   field probation officer.  I would go to clients' homes,

10  their places of work, things like that, and supervise

11  their work activities and their activities at home,

12  et cetera.

13          Also, as a probation officer, I authored

14  presentence reports and investigations to the Court.  I

15  enjoyed doing that.  I couldn't tell you how many of those

16  I did.  It was dozens, if not even more.  But the sort of

17  typical duties of a probation officer.

18      Q.   When did you start as a probation officer?

19      A.   I want to say -- I will say 1998.  August of

20  1998, I think.

21      Q.   And when did you leave that job?

22      A.   December of 2000, I think, Mr. Bennett.

23      Q.   And what did you do in December of 2000?

24      A.   I was working on a master's degree.

25      Q.   What was your next job?

1    *A.*    Mitigation specialist with the public defender's

2  office.

3    *Q.*    When did you start that?

4    *A.*    August of 2001, I believe.

5    *Q.*    When you first started as a mitigation specialist

6  with the public defender's office, what sort of cases were

7  you handling?

8    *A.*    I was given the gamut of felony cases, you know,

9  everything short of first degree murders.  Well, you know

10 that first month or two, I want to say I wasn't given

11 particularly serious felonies.  But I was entrusted to be

12 the mitigation specialist on Class 6, 5, 4, 3 and 2

13 felonies, and loved it.  I absolutely loved it.

14   *Q.*    So is it fair to say that when you first joined

15 the office, you did mitigation work on noncapital felony

16 cases?

17   *A.*    Yes, sir.  That is correct.

18   *Q.*    Did that change at some point?

19   *A.*    Yes, it did.  After about two and-a-half years,

20 three years of employment with the public defender's

21 office, I was approached by a supervisor director there

22 with the department, with the public defender's office,

23 who asked me:  Scott, will you be interested in doing

24 death penalty mitigation work?  And, at first, I was

25 hesitant to do so, but then I said yes.

1    *Q.*   Take a step back.  When you became a mitigation

2   specialist for the noncapital cases, what sort of training

3   did you receive from the public defender's office about

4   doing the job of a mitigation specialist?

5    *A.*   Yeah, most of it was hands-on training, shadowing

6   other veteran, if you will, mitigation specialists.  There

7   was not a formal training program as in, you know, I

8   attended classes or workshops or anything like that.

9        Although the public defender's office, during my

10  five and-a-half years there, did send me to seminars and

11  workshops.  But as a starting mitigation specialist, there

12  wasn't -- I wouldn't call it a particular type of formal

13  training.  But I did shadow, follow around and probably

14  pester veteran mitigation specialists my first few months

15  on the job.

16   *Q.*   And then when did you become a capital mitigation

17  specialist with that office?

18   *A.*   I think it was after about two and-a-half to

19  three years, I believe.

20   *Q.*   When were you assigned to Wendi Andriano's case?

21   *A.*   Going back and asking me months and years

22  attached to those months, I'm not exactly sure.  I want to

23  say, oh, goodness, when did we -- when did we go to trial?

24  I think I was asked to be -- to work on her case about six

25  months before we went to trial, something like that.

1       She had a previous probation -- or excuse me --
2   mitigation specialist working on her case named Patrick.
3   And I'm afraid I can't recall Patrick's last name.   I
4   believe Patrick was leaving the public defender's office.
5   And so they asked me:  Could you please, you know, now
6   take over Patrick's duties?  Which I was more than happy
7   to do.
8       Q.   Before that, had you ever dealt with mitigation
9   work for cases where the defendant would be sentenced by
10  a jury as opposed to a judge?
11      A.   I don't think so.  I don't think so.
12      Q.   If you could take a look, there are some exhibit
13  binders, and I think they're on the floor right in front
14  of you.  Not the black one but the colored ones.
15      A.   Yeah, those are exhibits binders.  Sure.
16      Q.   Could you grab the first volume, the one that
17  would contain Exhibit 8, please?
18      A.   And I'm sorry.  Which exhibit, Counsel?
19      Q.   Exhibit 8.
20      A.   Okay.  I think I'm on Exhibit 8.
21      Q.   Okay.  Great.  Do you recognize this document?
22      A.   Yes.  It seems to mirror an affidavit you sent to
23  me yesterday and also one that I've had in my possession
24  for the last couple of years.
25      Q.   And this is an affidavit that you signed?

1    *A.*    Yes, sir.

2    *Q.*    Would you take a look at Paragraph 1 of the

3    affidavit and tell me if it refreshes your recollection

4    about when you were assigned Ms. Andriano's case?

5    *A.*    Yes, sir.  Yes, sir, it does.

6    *Q.*    And when was that that you were assigned to her

7    case?

8    *A.*    I've noted in the affidavit that it was April of

9    2004.

10   *Q.*    Do you have an independent recollection of that

11   or are you having to rely on the affidavit?

12   *A.*    Well, I noted to you I thought it was about six

13   months -- I was assigned to Wendi's case about six months

14   before it went to trial.

15   *Q.*    When did her case go to trial?

16   *A.*    If my memory serves, it was sometime in the fall

17   of 2004.

18   *Q.*    Does August of 2004 sound correct?

19   *A.*    It seemed like it was a little bit later than

20   that, but, sure, yes, sir.  It might have been a month or

21   two later, to my memory.

22   *Q.*    Okay.  When you were assigned to Ms. Andriano's

23   case, was it the first capital case that you were assigned

24   to as a mitigation specialist?

25   *A.*    You know, I've thought about -- I've thought

1   about that as well in the intervening years since you took

2   this affidavit.  I can't say that is true any longer.  I

3   might have been assigned to another case or two.  I do

4   know that Wendi's case was the first one that I went to

5   trial -- that the legal team I was working with went to

6   trial.  I know that.

7       Q.   At the time you were assigned to be the

8   mitigation person on Ms. Andriano's case, how many other

9   capital cases were you assigned to?

10      A.   Probably a couple, one or two more.  It

11  couldn't -- it couldn't have been more than a handful.

12      Q.   And at the time you were assigned Ms. Andriano's

13  case, were you still finishing up your caseload of the

14  noncapital felony cases?

15      A.   I did.  I think -- I had some noncapital cases I

16  was still working on, yes, sir.

17      Q.   Was Ms. Andriano's case the first case you

18  handled as a mitigation specialist that involved potential

19  jury sentencing as opposed to judge sentencing?

20      A.   I don't know.  I don't recall.

21      Q.   If you could take a look at Paragraph 8 of

22  Exhibit 8, please.  Please read that to yourself.

23      A.   Okay.  I've reviewed that.

24      Q.   Does that refresh your recollection about whether

25  Ms. Andriano's case was the first case you worked on with

1  potential jury sentencing?

2      A.    Again, I have reviewed this affidavit within the

3  last couple of days and a few weeks ago, and, of course,

4  after I signed it, after you sent it to me.  And I'm not

5  sure that statement is accurate as of this time.

6      Q.    Because you believed that you had taken on

7  another capital case before Ms. Andriano's?

8      A.    I may have.  I may have been working on one or

9  two other capital cases, yes, sir.

10      Q.    Now once you went into the role of capital

11  mitigation specialist, what training did you receive

12  regarding mitigation work in a death penalty case?

13      A.    Again, that training was somewhat similar to the

14  training that I participated in when first becoming a

15  mitigation specialist, mainly shadowing.  I think I was

16  shadowing Patrick and our supervisor at the time, who did

17  capital cases as well, Pam Davis.  I was shadowing them,

18  learning from them.

19            I did attend a couple of seminars.  I think I

20  might have attended a seminar in Chicago that summer while

21  I was working on Wendi's case.  But as far as, you know,

22  formal -- any sort of formal training classes, those were

23  absent.

24      Q.    A moment ago, you had mentioned a prior

25  mitigation specialist on Ms. Andriano's case?  A Patrick,

1    you mentioned?

2        *A.*    Yes.

3        *Q.*    Is that Patrick Linderman?

4        *A.*    Yes, that's it.  Thank you.  That's his name.

5    Sorry, I couldn't recall.

6        *Q.*    When you took over as the mitigation specialist

7    on this case, what work had Patrick Linderman done on the

8    mitigation investigation?

9        *A.*    I think he had done quite a bit.  I remember him

10   delving pretty deeply into Wendi's social history.

11   Patrick was a very thorough well thought of employee.  I

12   certainly thought well of him.  He cared for his clients.

13   I remember that being reflected in the work that he did on

14   behalf of Wendi.  As memory serves strong from almost nine

15   years ago, he seemed to know Wendi's history pretty well,

16   pretty well.

17       *Q.*    And what information did he provide you?  How did

18   he provide you the workup that he had done?  How did he

19   pass that along to you?

20       *A.*    He had -- he had notes.  I want to say there were

21   some folders with notes, documents that he had collected,

22   et cetera, which I reviewed.  To get more specific than

23   that, I can't.  I can't recall exactly what documents or

24   evidence he may have handed me, but there were -- there

25   were documents and there was evidence.

1   *Q.*   Okay.  So --

2   *A.*   I remember -- I remember, also, if I may -- I'm

3   sorry to cut off your question, Counsel.  I do remember

4   him creating a large genealogy, like a map.  I don't

5   remember us ever using it at trial, but I remember him

6   creating a large poster board genealogy of Wendi.  I

7   remember reviewing that with him out in the Mesa office.

8   *Q.*   What witnesses had Mr. Linderman interviewed

9   before you took over?

10  *A.*   I couldn't tell you that.  I'm not sure.  I don't

11  remember.

12  *Q.*   What life history documents, such as medical

13  records, school records, work records had Mr. Linderman

14  collected before you took over?

15  *A.*   I don't recall.

16  *Q.*   Do you recall anything else about the work

17  Mr. Linderman had done before you took over?

18  *A.*   I'm pretty certain he had interviewed family

19  members.  I can remember him, you know, referring to

20  family members by their first names.  I think I recall him

21  visiting the family members at their homes, friends at

22  their homes, things like that, because he knew Casa

23  Grande -- Grande, excuse me, I think which is where Wendi

24  lived at one point or something.  I think one time Patrick

25  and I visited the family members in Casa Grande.  I think

1  we did that once.  I can't recall all of the things as of
2  right now, Mr. Bennett.
3      *Q.*   Who in Casa Grande did you visit with
4  Mr. Linderman?
5      *A.*   It was Wendi's family members.  I want to say her
6  mom, but, I'm sorry -- I just -- my memory is not serving
7  me well enough to be positive with that.
8      *Q.*   All right.  Let's talk now about the difference
9  between the noncapital case work that you had been doing
10  and then the capital cases, including Ms. Andriano's case.
11     *A.*   Yes, sir.
12     *Q.*   Overall, do you view your role as a mitigation
13  specialist differently in death penalty cases than in
14  regular penalty cases?
15     *A.*   I did.  I did.  Do you want me to expound on
16  that?
17     *Q.*   Please.
18     *A.*   Okay.  Thank you.  With the standard mitigation
19  specialist position that I had, of course you tried to do
20  as thorough background investigation of your client and
21  social history, et cetera, that you could.  We had a much
22  larger caseload.  And, also, you would -- as a standard
23  mitigation specialist, you would -- 90 percent of the
24  time, you would create a report, author a report and
25  submit the report to the Superior Court.  And sometimes

1   you would then also orally advocate during sentencing.

2          And those two latter responsibilities, of course,

3   were not a part of being a death penalty mitigation

4   specialist.  A death penalty mitigation specialist was

5   much more tasked and chore-factored.  You have to much

6   more thoroughly examine, review and research your

7   client's, the defendant's, social history and their

8   background.

9          Essentially, what kind of person they were, how

10  they came to be the type of person they were, their family

11  involvement, their social history, their education,

12  et cetera.  It was just much more thorough, much more

13  in-depth.

14      Q.   Overall, though, aside from the presentence

15  report which you would create for noncapital cases, which

16  you obviously don't do for capital cases; right?

17      A.   I did not.  That's correct.

18      Q.   Was there anything that you would not do in a

19  noncapital case that you would do in the investigation of

20  a capital case?

21      A.   Well, in the investigation of a capital case,

22  again, it would be much more thorough.  You just didn't

23  have the time as a noncapital mitigation specialist to put

24  into the background investigation research that you could

25  or had to as a death penalty mitigation specialist.

1         As a death penalty mitigation specialist, in the

2    couple of years I did it, I think four or five cases were

3    the most I ever had.  Whereas, a noncapital case

4    mitigation specialist, I often had a caseload of 15, 16,

5    17 -- 17 cases and those were cases that were going to go

6    to sentencing usually within a month or two after they

7    were assigned to you.  Whereas, of course, with a death

8    penalty mitigation case, it could be years before we got

9    to -- got to trial or were in a sentencing setting.

10        Q.   So, if I understand your testimony correctly, the

11   difference between the noncapital cases and the capital

12   cases was not that you would do different tasks, but then

13   you would do them on a more involved level with the

14   capital cases?

15        A.   At the very least, yes.

16        Q.   Would you mind taking a look at Exhibit 8.

17   Paragraph 17, please?

18        A.   Okay.  I've reviewed that.

19        Q.   All right.  Did that refresh your recollection

20   about the time the trial started in Ms. Andriano's case?

21        A.   It does not.

22        Q.   It does not?

23        A.   It does not.

24        Q.   Okay.  So you don't recall when the trial started

25   in Ms. Andriano's case?

1    *A.*    No, I'm not saying that.  I'm saying I don't

2  recall it starting in August of 2004.  I thought it

3  started a little bit later, but okay.

4    *Q.*    Assuming that it started in August of 2004, that

5  would have meant that you would have had four to five

6  months to complete the mitigation investigation from the

7  time you were assigned it in April of 2004?

8    *A.*    Yes.

9    *Q.*    When did you start your investigation in

10  Ms. Andriano's matter?

11    *A.*    The second I was assigned the case.

12    *Q.*    Do you recall the date of the guilty verdict in

13  Ms. Andriano's case?

14    *A.*    I thought we were in trial for three or for

15  months.  It seems like we mainly did afternoons.  So was

16  it December?  I want to say December of 2004.  Excuse me.

17    *Q.*    If I were to say it was November 18th of 2004,

18  does that sound correct?

19    *A.*    Sure.  Yes, sir.

20    *Q.*    Do you recall when the defense attorneys filed a

21  motion asking the Court to order state and local

22  government entities to produce records relating to

23  Ms. Andriano?

24    *A.*    No, I don't recall that.

25    *Q.*    You're going to have to switch binders.  It would

1  be the blue one.

2      *A.*    Is there a chance I'll be coming back to No. 1?

3      *Q.*    Probably.

4      *A.*    Okay.  So we'll just set No. 1 aside.

5      *Q.*    All right.  It is Exhibit 54, please.  What is

6  this document?

7      *A.*    It appears to be a motion.

8      *Q.*    Okay.  And when was this motion filed?

9      *A.*    It looks like Danny submitted it on

10  November 19th.

11      *Q.*    Okay.

12      *A.*    2004.  Excuse me.

13      *Q.*    Does this refresh your recollection of when the

14  attorneys filed a motion asking for a court order for

15  production of state and local government records of

16  Ms. Andriano?

17      *A.*    It does not.

18      *Q.*    Do you remember this motion?

19      *A.*    I do not.

20      *Q.*    All right.  You can put that binder away for the

21  moment.  Maybe put it to the side.

22          Let's talk now about the substance of the

23  mitigation investigation.  In your mind, who was in charge

24  of the mitigation?  Who was the director?

25      *A.*    Dan -- Dan Peterson.  Patterson.  Excuse me.

1    *Q.*    And then who was Dan Patterson?

2    *A.*    He was the lead attorney in Wendi's initial

3    trial.

4    *Q.*    Did you look to Mr. Patterson for direction as to

5    where to take the mitigation investigation?

6    *A.*    I did.  And those were my instructions as a death

7    penalty mitigation specialist is that, if you will, the

8    lead attorney was in charge and, of course, I should do my

9    utmost and best to investigate and research Wendi's

10   background history.  But, ultimately, yes, Daniel

11   Patterson made those decisions.

12   *Q.*    How often -- and there was another attorney on

13   Wendi's case, yes?

14   *A.*    Yes, there was.

15   *Q.*    Okay.  And that was?

16   *A.*    I'm sorry.  I don't recall that person's name.

17   *Q.*    Okay.  So how often did you and Dan Patterson and

18   the other attorney communicate about Ms. Andriano's case?

19   *A.*    My office during -- while I was assigned to

20   Danny's team, my office was right next door to Danny's and

21   on purpose.  Of course, Danny, being Daniel Patterson.

22   Thank you.  And I probably conferred with Danny at least a

23   couple of times a week.  He and I were also just plain

24   friends.  So I would stop in his office or he would stop

25   in mine.  I couldn't tell you how many times a week we

1  would talk about Wendi's case from April until -- because

2  now, as I understand it, being November of 2004, it was --

3  it was our last.  It was all encompassing.

4      Q.   How often did you communicate with the attorney

5  whose name you can't remember about Ms. Andriano's case?

6      A.   Very rarely.  Very rare.

7      Q.   How often did you and Mr. Patterson and the other

8  attorney have meetings to discuss Ms. Andriano's name?

9      A.   If you could tell me that gentleman's name, it

10 would make it a little bit easier for me to recall things.

11 I think that would just serve me in a pneumatic device.

12 What is that guy's first name?  That counsel's first name?

13     Q.   David DeLozier.

14     A.   Okay.  David.  Thank you.  Your question again,

15 please?

16     Q.   How often did you and Mr. Patterson and

17 Mr. DeLozier meet to discuss Ms. Andriano's case?

18     A.   What time frame are you asking me, Counsel?

19     Q.   From the time you were assigned the case until

20 the conclusion of the case.

21     A.   It was probably a handful of times all three of

22 us met.

23     Q.   Let's talk about witness interviews.  Who did you

24 interview as part of the mitigation investigation in this

25 case?

1      *A.*    I really don't recall.

2      *Q.*    Do you recall interviewing any family members?

3      *A.*    Well, there's at least that episode where I

4   recall myself and Patrick going out and interviewing some

5   family members.  And I want to say I interviewed mom --

6   Wendi's mom.  Excuse me.  And, yeah, I think I interviewed

7   others, but I can't -- I can't tell you names.

8      *Q.*    How many people did you interview in the course

9   of the mitigation investigation?

10     *A.*    I don't recall.

11     *Q.*    Does the name Kyre Lorts ring a bell with you?

12     *A.*    Kyre Lawrence?

13     *Q.*    Kyre Lorts.

14     *A.*    It does not.

15     *Q.*    So is it fair to assume that you did not

16   interview Ms. Lorts as part of this investigation?

17     *A.*    No, I don't think that's fair to assume.

18     *Q.*    Do you remember interviewing Ms. Lorts?

19     *A.*    I do not remember interviewing Ms. Lorts.

20     *Q.*    Do you remember interviewing a woman named

21   Jeri Lynn Cunningham?

22     *A.*    I do not remember doing that.

23     *Q.*    Do you remember interviewing a man named Jasper

24   Neace?

25     *A.*    Jasper Neace?

1    *Q.*    Yes.

2    *A.*    I do not recall that name.

3    *Q.*    When did you finish interviewing witnesses in

4    Ms. Andriano's case?

5    *A.*    I don't recall.

6    *Q.*    Was it before the guilty/not guilty phase

7    verdict?

8    *A.*    I don't recall.

9    *Q.*    Was it before the penalty phase started?

10   *A.*    I don't recall.

11   *Q.*    I apologize for making you do this again, but

12   could you grab the pink binder, please?

13   *A.*    That's okay.

14   *Q.*    Exhibit 136, please.  What is this document,

15   Exhibit 136?

16   *A.*    Give me some time to review it, please.

17   *Q.*    Sure.

18   *A.*    It appears to be the e-mail correspondence.

19   *Q.*    Okay.  Does this e-mail refresh your recollection

20   about when you finished interviewing the witnesses in

21   Ms. Andriano's case?

22   *A.*    It does not.

23   *Q.*    It does not?  Do you have any independent

24   recollection of what you laid out here in this e-mail, as

25   we sit here today?

1      *A.*   Let me review it again, please.  I do not.  I do

2   not recall this e-mail.

3      *Q.*   Okay.  At the time that you wrote this e-mail, do

4   you believe you had knowledge of what you were writing

5   about in the e-mail?

6      *A.*   Assuming this is my e-mail, Counsel, I would hope

7   so.  I can't tell you this is my e-mail.

8      *Q.*   Okay.  You don't remember writing this e-mail?

9      *A.*   I don't remember writing this.

10      MR. BENNETT:  Your Honor, I move for the

11   admission of this e-mail under Rule 8035 as a recorded

12   recollection.

13      MR. HAZARD:  Your Honor, I don't think he has

14   laid the foundation, but I don't have an objection to

15   admitting it.

16      THE COURT:  No objection?

17      MR. HAZARD:  No objection.

18      THE COURT:  If there is no objection, then

19   Exhibit No. 136 for identification is admitted into

20   evidence.

21      MR. BENNETT:  We're done with that binder for the

22   moment.  You can put that to the side.

23      *Q.*   BY MR. BENNETT:  All right.  Mr. MacLeod, during

24   the course of your mitigation work for Ms. Andriano, did

25   you prepare a comprehensive life history of her?

1     *A.*   I don't recall.

2     *Q.*   Did anyone on the defense team do that?

3     *A.*   I don't recall.

4     *Q.*   Did you assist the attorneys, Mr. Patterson and

5   Mr. DeLozier, in identifying appropriate experts to help

6   the defense?

7     *A.*   Help with the mitigation or defense?

8     *Q.*   To help either.

9     *A.*   I believe we had discussions about expert

10   witnesses that could help with mitigation, yes, sir.

11     *Q.*   Please take a look at Exhibit 8 once again.  Now,

12   on the list -- and this is your affidavit, yes?

13     *A.*   Yes, sir.

14     *Q.*   Okay.  On Page 6, is that your signature?

15     *A.*   Yes, sir.

16     *Q.*   And you are an attorney?

17     *A.*   Yes, sir, I am.

18     *Q.*   So you're aware of the importance of an affidavit

19   like this?

20     *A.*   Yes, sir.

21     *Q.*   Okay.  And were you aware at the time you signed

22   this, that there was a possibility that this affidavit

23   would be submitted to a court?

24     *A.*   Oh, certainly, yes.

25     *Q.*   Would you please take a look at Paragraph 21?

1 Have you read that?

2    *A.*   I have, sir.

3    *Q.*   Does that refresh your recollection about whether

4 you recommended the retention of any experts in this case

5 or assisted in identifying appropriate experts?

6    *A.*   It does not.

7    *Q.*   In Paragraph 21, it states:  I do not recall

8 recommending the retention of any experts in this case or

9 identifying assisting appropriate experts.  Did I read

10 that correctly?

11    *A.*   Yes, sir.

12    *Q.*   And you signed this affidavit?

13    *A.*   Yes, sir, I did.

14          MR. HAZARD:  Your Honor, I object.  That's

15 exactly what he said in court today.  It's not a prior

16 inconsistent statement.  He doesn't recall.  He didn't

17 recall then.

18          THE COURT:  Sustained.

19          MR. HAZARD:  Thank you.

20          MR. BENNETT:  Your Honor, if I may, what he said

21 was he recalled having discussions with the attorneys

22 about appropriate experts.  And in a prior statement, he

23 specifically said:  I did not assist in identifying any

24 appropriate experts.  I believe that is inconsistent.

25          THE COURT:  Is the word assist or identify in the

1   affidavit?

2          MR. BENNETT:  Yes.

3          MR. HAZARD:  Your Honor, the --

4          THE WITNESS:  If I may, Your Honor, on

5   Section No. 21, which counsel pointed to, it says:  I do

6   not recall recommending the retention.  Mr. Bennett's

7   question to me did not ask recommending.

8          THE COURT:  I'll sustain the objection.

9      Q.   BY MR. BENNETT:  Mr. MacLeod, did you ever

10  suggest mitigation themes to the attorneys based upon your

11  investigation?

12     A.   Yes, I did.

13     Q.   Please take a look at Paragraph 23 of your

14  declaration or affidavit.  Please read that to yourself,

15  sir.

16     A.   Okay.  I've reviewed that.

17     Q.   All right.  Does that refresh your recollection

18  about whether you suggested mitigation themes to the

19  attorneys?

20     A.   Yes, it does.

21     Q.   Did you suggest mitigation themes to the

22  attorneys?

23     A.   Yes, I believe I did.

24     Q.   In Paragraph 23, the first sentence says:  The

25  themes for mitigation were provided to me by Dan

1    Patterson.   Mitigation strategy was always his call as far

2    as I was concerned.

3            And the third sentence -- the second sentence:

4    Discussed the theme of domestic violence provided by

5    Mr. Patterson.   The third sentence says:   I do not recall

6    working with counsel to include additional themes or facts

7    based on my investigation.

8            Did I read that correctly?

9    *A.*   Yes, sir, you did.

10   *Q.*   Mr. MacLeod, what themes did you suggest to the

11   defense attorneys?

12   *A.*   I don't recall.

13   *Q.*   Now we know that the defense at trial included an

14   allegation of domestic violence; is that correct?

15   *A.*   I recall that, yes, sir.

16   *Q.*   And did you do investigation into that allegation

17   of domestic violence?

18   *A.*   I don't recall.

19   *Q.*   Did you ever do any investigation into any

20   potential trauma experienced by Ms. Andriano?

21   *A.*   Can you be more specific what you mean by trauma,

22   Mr. Bennett?

23   *Q.*   Sure.   Why don't you take a look at Paragraph 19

24   of your affidavit?   I'm simply using your words.

25   *A.*   I've reviewed that.

1    *Q.*   All right.  Mr. MacLeod, did you ever investigate

2    any potential trauma experienced by Ms. Andriano other

3    than potential domestic violence?

4    *A.*   Not that I can recall.

5    *Q.*   Aside from the domestic violence, did you ever

6    investigate any other potential explanations for

7    Ms. Andriano's extramarital affairs in the months leading

8    up to her husband's death?

9    *A.*   I don't recall doing that.

10    *Q.*   Aside from the domestic violence, did you ever

11    investigate any possible explanations for any other

12    potentially out-of-character actions by Ms. Andriano in

13    the months leading up to her husband's death?

14    *A.*   I don't recall.

15    *Q.*   Did you ever investigate the possibility that

16    Ms. Andriano suffered physical abuse as a child?

17    *A.*   I don't recall.

18    *Q.*   How about sexual abuse?

19    *A.*   It seems like we did some investigation and

20    research into that.  I can't recall more specifically.

21    *Q.*   Do you remember which witnesses you spoke to

22    to investigate potential sexual abuse?

23    *A.*   I do not recall.

24    *Q.*   Do you remember what documents you collected to

25    investigate potential sexual abuse?

1    *A.*   I do not recall.

2    *Q.*   Do you recall what other work you did to

3    investigate potential sexual abuse?

4    *A.*   I do not recall.

5    *Q.*   Did you investigate any issues related to

6    Ms. Andriano's mental health?

7    *A.*   Yeah, I'm rather certain we did.  That would have

8    been an important part -- was an important part to her

9    mitigation defense.

10   *Q.*   Mr. MacLeod please take a look at Paragraph 20 of

11   your affidavit, the one you signed.

12   *A.*   I've reviewed it.

13   *Q.*   I'm sorry.  I gave you the wrong paragraph

14   number.  Paragraph 26, please.  Have you read that?

15   *A.*   I have, sir.

16   *Q.*   Does this refresh your recollection as to whether

17   you investigated any issues relating to Ms. Andriano's

18   mental health?

19   *A.*   Yes, it does.

20   *Q.*   And did you?

21   *A.*   My answer is the same.  I don't recall.

22   *Q.*   So you don't recall whether you investigated -- I

23   just want to make the record clear.  You don't recall

24   whether you did any investigation into Ms. Andriano's

25   mental health?

1    *A.*    No.  I don't recall identifying or investigating

2  potential issues.

3    *Q.*    Back to the pink binder, please.  Exhibit 138.

4    *A.*    Okay.  I think I'm on 138, Counsel.

5    *Q.*    What is this document?

6    *A.*    Can you give me a moment, please?  It appears to

7  be a printed version of a PowerPoint presentation.

8    *Q.*    Do you recall using this PowerPoint presentation

9  during the trial?

10    *A.*    I haven't reviewed its entirety.  Would you like

11  me to take the time to do that?  Because as of right now,

12  I do not.

13    *Q.*    Do you have any independent memory of this

14  PowerPoint presentation?

15    *A.*    After going through the first ten pages, I do

16  not, Counsel.

17    *Q.*    Do you know who prepared the slides for this

18  PowerPoint presentation?

19    *A.*    I do not.

20    *Q.*    Is it fair to say you have no memory at all of

21  this PowerPoint presentation?

22    *A.*    As of this time, yes, I do not recall this.

23    *Q.*    If you could tab back one to Exhibit 137, please.

24  Are you with me?

25    *A.*    I believe, yes, I'm on 137.

1    *Q.*    Okay.  What is this document?

2    *A.*    Give me some time to review it, please.  It

3    appears to be an e-mail from -- we call it a thread,

4    because there seems to be multiple parties involved in the

5    two-page exhibit.

6    *Q.*    Is this an e-mail that you sent to Daniel

7    Patterson on December 6th of 2004?

8    *A.*    I don't know.

9    *Q.*    Do you have any memory of this e-mail?

10   *A.*    I do not.

11   *Q.*    At the top of the page, you'll see there is an

12   e-mail account, macleod@mail.maricopa.gov, or mcleods, I

13   suppose.

14   *A.*    I see that, sir.

15   *Q.*    Okay.  Was that your e-mail account when you

16   worked at the public defender's office?

17   *A.*    I couldn't tell you.

18   *Q.*    You don't recall your e-mail address?

19   *A.*    I don't recall my e-mail address.

20   *Q.*    You don't recall the format for the e-mail

21   addresses at the public defender's office?

22   *A.*    I do not.

23          MR. BENNETT:  Your Honor, I move for the

24   admission of 137.

25          MR. HAZARD:  We have no objection.

1        THE COURT:  Exhibit No. 137 for identification is

2   admitted into evidence.

3        MR. BENNETT:  Nothing further, Your Honor.

4        MR. HAZARD:  I have no questions, Your Honor.

5        THE COURT:  May this witness be excused?

6        MR. BENNETT:  Yes, Your Honor.

7        THE COURT:  Thank you very much, sir.  You are

8   excused.  Don't walk off with any of the exhibits.

9        THE WITNESS:  No.  If I may take the time to

10  clean up my mess.

11       THE COURT:  Okay.  Thank you.

12       THE WITNESS:  Thank you, Judge.

13       (WHEREUPON, the witness exited the courtroom.)

14       THE COURT:  The Petitioner may call her next

15  witness.

16       MR. BENNETT:  Thank you, Your Honor.  Our next

17  witness is Keith Rohman.

18       THE COURT:  Sir, before you sit down there,

19  please face the clerk.  Give the clerk your full name and

20  she will swear you in.

21       THE CLERK:  Please state your name and spell your

22  name for the record.

23       THE WITNESS:  Keith Rohman, R-O-H-M-A-N.

24       THE CLERK:  Raise your right hand, please.

25       (WHEREUPON, the witness was duly sworn by the

1  clerk.)

2          THE COURT:  Sir, you can make yourself

3  comfortable there on the witness stand.

4          THE WITNESS:  Thank you.

5          THE COURT:  Remember to speak up so that everyone

6  can hear you.  Wait until the question is completed before

7  you answer the question and make sure that you give us a

8  verbal response.

9          THE WITNESS:  Thank you, Your Honor.

10          THE COURT:  Mr. Bennett.

11

12                  KEITH ROHMAN,

13  having been first duly sworn to tell the truth, the whole

14  truth, and nothing but the truth, testified as follows:

15

16                  DIRECT EXAMINATION

17  BY MR. BENNETT:

18      Q.    Mr. Rohman, what do you do for a living?

19      A.    I'm the President of Public Interest

20  Investigations and I'm employed as a mitigation

21  specialist.

22      Q.    How long have you been doing that?

23      A.    I've been President of Public Interest

24  Investigations for 30 years and I've been involved in

25  mitigation investigation for approximately the last

1   25 to 27 years.

2      Q.   During those 25 to 27 years, how many capital

3   cases have you worked on as a mitigation specialist?

4      A.   I have been involved in one way or another in

5   probably 40 or 50 capital cases in Arizona, California,

6   Alaska, Utah and a number of other states.

7      Q.   Have you ever -- yeah, please help yourself to

8   the water.

9      A.   I've got a little cold.  Pardon me.

10      THE COURT:  For the record, we did work on the

11   temperature in the courtroom here and I think it's

12   considerably cooler.  So we will note that for the record,

13   at the request of counsel, or at least some counsel.  I

14   think Mr. Arntsen wanted it to be closer to his weather.

15      MR. ARNTSEN:  No.  It was Attorney Gard.

16      THE COURT:  Oh, okay.  It was Attorney Gard.

17      I thought Mr. Arntsen wanted it closer to his

18   northern-type temperature.

19      MR. ARNTSEN:  I think it was five below zero this

20   morning.  So I'm really not aiming for that.

21      THE COURT:  Thank you.  Mr. Bennett.

22      Q.   BY MR. BENNETT:  All right.  So, Mr. Rohman, have

23   you ever received any sort of training as to doing

24   mitigation investigations in a death penalty case?

25      A.   Yes, I have.

1    *Q.*    Please explain that to the Court.

2    *A.*    Sure.  As a mitigation specialist, I regularly

3    attend trainings in capital litigation on at least an

4    annual basis and have for the last probably 20 years.

5    These are usually -- one of the ones that I've attended

6    most consistently is the annual Capital Case Defense

7    Seminar in Monterey, California.  It's a four-day long

8    marathon of training put on by psychiatrists,

9    psychologists, experienced capital litigators, mitigation

10   specialists and investigators, covering all ranges of

11   issues related to capital litigation, including mitigation

12   investigation.

13        In addition, I have had the opportunity to work

14   with an experienced mitigation specialist and to work with

15   capital lawyers who are experienced as well.

16   *Q.*    Have you ever taught on the topic of mitigation

17   investigation?

18   *A.*    I am an adjunct professor at the Loyola College

19   of Law in Los Angeles and I teach a class on -- generally

20   on the subject of fact investigation.  As part of that

21   work, mitigation investigation and the techniques that are

22   used in mitigation are part of that presentation.

23        In addition, I have lectured at law schools and

24   to attorney groups CLEs, Continuing Legal Education.  I

25   lectured here in Phoenix I think in 2008 to a gathering of

1   the Mexican Capital Legal -- MCLAP.  It's the -- I

2   can't -- I'm not going to remember the initials right now,

3   but it was a gathering here of capital litigators involved

4   in the defense of Mexican nationals on capital cases.  So

5   I've done those trainings and others as well.

6        *Q.*   Thank you.  Would you please grab the pink

7   binder?  It's the one with Exhibits 101 to 167.

8        *A.*   Got it.

9        *Q.*   Can you please take a look at Exhibit 135?

10        *A.*   Yes.

11        *Q.*   What is this?

12        *A.*   This a copy of my curriculum vitae.

13        MR. BENNETT:  Your Honor, I move for the

14   admission of Exhibit 135.

15        THE COURT:  Any objection?

16        MS. GARD:  No, Your Honor.

17        THE COURT:  Exhibit No. 135 for identification is

18   admitted into evidence.

19        *Q.*   BY MR. BENNETT:  All right.  Mr. Rohman, could

20   you please explain to me in the context of a death penalty

21   case what is mitigation?

22        *A.*   Well, mitigation assumes that the client has been

23   convicted of a crime, which is outside the experience of

24   most people and outside the experience of most jurors.

25   They have heard a lengthy presentation both in the guilt

1   phase and then in the case in aggravation about a terrible

2   crime which the client has now been convicted of.

3          Your mitigation process is the process of trying

4   to not excuse that conduct, but put some context around it

5   to explain what happened by talking about a broader

6   concept of the client's life.

7          The trial up to that point has covered obviously

8   the date of the crime and the events that preceded it, but

9   it's a relatively narrow window into the client's life.

10          I think the defendant was approximately 30 years

11   old at the time of this crime.

12          What mitigation does is seeks to broaden the view

13   of that person's life to look at all of the influences and

14   factors that have come into that person's life that might

15   have affected them and perhaps give some explanation and

16   some understanding to why the crime happened in the way

17   that it did.

18   Q.   What are the skills that are necessary for a

19   mitigation specialist in a capital case?

20   A.   Mitigation specialists have a different job than

21   anybody else on the defense team.  While they interact

22   with them, they have a separate set of skills that they

23   need to have to be effective.  The first is some

24   particular skills in the area of witness interviews.  Much

25   of mitigation brings you into context with contact with

1   families and family systems where there have been abuse,

2   trauma, neglect, and you are really called upon to elicit

3   really essentially often embarrassing, even humiliating

4   family stories.

5          So the first skill that a mitigation specialist

6   really needs to have is some training and some experience

7   and some skills in eliciting that kind of testimony.

8          The second piece that's probably critical is the

9   collection of life history documents.  The standard of

10  care in mitigation involves a collection of life history

11  documents both from the client and from the people in the

12  client's family.  And many times, those records are not

13  ones that are easily or readily available.

14         You want -- you have a 30-year-old defendant and

15  you want her ten-year-old school records because they may

16  contain information that is relevant to that person's

17  life.  You don't just send over a letter and get those

18  records mailed back.  You have to have a set of skills and

19  certain persistence at collecting records of the scope

20  needed in a mitigation investigation.

21         You also then generally are called upon to be the

22  person on the defense team who plays a role in identifying

23  mental health potential symptoms or indications that the

24  client may suffer from some sort of mental disease or

25  defect.  While the professional standard calls for at

1  least one person on the team to be that, that role often

2  falls to the mitigation specialist, first and foremost.

3       The mitigation specialist also recommends experts

4  to the team based on his or her observations of the issues

5  related to the case.  And, finally, mitigation specialists

6  -- well, they also identify themes for mitigation because

7  the mitigation specialist is sort of the first one on the

8  ground.  The first responder is the wrong phrase.  But the

9  first person to have contact with perhaps these stories

10  from the family and will have some of the earliest

11  insights as to what may be themes the defense wants to

12  put on.

13       And then, finally, there is a set of documents

14  and materials which mitigation specialists are called upon

15  to develop.  The most significant of those is the social

16  history life chronology, which lists in considerable

17  detail all of the information collected in the mitigation

18  investigation both from interviews, from documents, and

19  any other -- and court records and any ancillary

20  documents.

21       And, also, to utilize -- to give the defense team

22  other sorts of life history documents, family trees and

23  the like that might be used in the case in these

24  presentations.

25       Q.   Now you heard Mr. MacLeod's testimony about his

1  understanding of the difference between mitigation work in

2  a noncapital case and a capital case?

3      *A.*   I did.

4      *Q.*   Do you agree with that?

5      *A.*   Well, you know, if you can refresh my

6  recollection, I remember that he testified -- that his

7  declaration said that he saw no difference.  And I was

8  confused because I thought he testified here today that he

9  saw a difference.

10         MS. GARD:  Objection, Judge.  That was hearsay.

11  Move to strike that comment.

12         THE COURT:  Sustained.

13     *Q.*   BY MR. BENNETT:  Well, all right.  So

14  Mr. MacLeod testified that his understanding -- he

15  testified that his understanding was that mitigation in a

16  capital case was more in-depth than in a noncapital case,

17  but otherwise essentially the same?

18         MS. GARD:  Object to counsel testifying.

19         THE COURT:  Overruled.

20     *Q.*   BY MR. BENNETT:  Do you agree with that?

21     *A.*   No, I do not.

22     *Q.*   Why not?

23     *A.*   Mitigation investigation in a noncapital case --

24  in a capital case is different from that in a noncapital

25  case in such a matter of degree that it's difficult to put

1  them in the same category.

2      If a noncapital mitigation investigation is

3  setting a splint on an arm, capital mitigation is doing

4  heart surgery or brain surgery.  I'm not a heart surgeon

5  or brain surgeon, but I'm trying to emphasize the

6  difference in degree and the difference in the amount of

7  information that you're going to gather.

8      Under Arizona law, I'm not a lawyer here today,

9  but the statute -- the capital statute allows for a

10 different set of rules of evidence to be considered -- to

11 be utilized in the penalty phase of a trial.  The scope

12 and spectrum of work and information that you would bring

13 into a non -- excuse me -- into a capital -- into a

14 capital presentation is so much broader than that of a

15 noncapital, that it's hard to put them on the same list.

16     *Q.*   And is there a difference on mitigation work that

17 must be done when a jury is going to be doing the

18 sentencing as opposed to a judge?

19     *A.*   Well, I've worked in Arizona before the *Ring*

20 decision and I've worked in Arizona after the *Ring*

21 decision.  And the standard for how capital work should

22 have been done was the same before and the same after.

23     However, as a practical matter, the kinds of

24 evidence that would be significant to a jury, that would

25 appeal to a jury, that would move a jury would be

1  different and was different.  And an understanding of

2  those differences would be critical to being effective as

3  a mitigation specialist.

4      Q.   Let's shift topic.  Are there any kind of written

5  guidelines that set forth what is expected of a mitigation

6  investigation?

7      A.   Yes, there are.

8      Q.   What are those?

9      A.   They are the ABA Guidelines.  There's two

10  iterations that I'm most familiar with.  There's the

11  2003 Guidelines and then the 2008 Guidelines,

12  Supplementary Guidelines for Mitigation Work.

13      Q.   Would you please take a look -- and I apologize.

14  It's probably in about two binders.  It's Exhibit 76 and

15  206.

16      A.   Got it.  The last one in the box.  Yes.

17      Q.   All right.  Exhibit 76, are these the 2003

18  ABA Guidelines that you referred to?

19      A.   Yes, they are.

20      Q.   And Exhibit 206, are those the 2008 Guidelines

21  that you referred to?

22      A.   The Supplementary Guidelines for Mitigation

23  Function, yes.

24      Q.   Now these guidelines, either the 2003 or the 2008

25  versions, did they create a new standard for how

1  mitigation investigations should be done?

2      *A.*   No, they did not.  What the '03 Guidelines and

3  the '08 Guidelines did was summarize standards and

4  practices that had been in effect in the area of

5  mitigation for at least a decade before the 2003.

6          You know, the capital punishment came back in

7  this country sometime in the late 70's, early 80's.

8  Through the probably beginning part of the 80's, there's

9  an evolving standard of practice.  But, certainly, by the

10  1990's, there was a clear understanding by both capital

11  litigators and certainly mitigation specialists for the

12  type of work that needed to be done in these cases.

13          What the guidelines did was summarize those,

14  perhaps codify some of those.  But when I remember

15  reviewing the guidelines in '03 and thinking to myself,

16  well, there must be something new in here, and, in fact,

17  there really was not nothing new.  This was sort of a

18  short checklist of what -- some portion of what I had

19  already been doing and what was the standard for care at

20  the time.

21      *Q.*   And what about the 2008 Guidelines?  How could

22  they apply to a case that went to trial in 2004?

23      *A.*   Well, the '08 Guidelines are actually -- I'm

24  pointing to them the wrong way.  The '08 Guidelines are in

25  fact just more specific references to items that are

1   covered in the '03 Guidelines.

2           For instance, the '03 Guidelines say that a

3   mitigation specialist is supposed to be somebody with

4   appropriate training.  The '08 Guidelines talk about how

5   exactly how often that training at a minimum should be

6   conducted.

7           The '03 Guidelines talk about an exhaustive

8   multi-generational investigation of the client's family

9   and social history.

10          The '08 Guidelines, Supplemental Guidelines, say

11  exactly the same thing, but they list as examples what

12  types of witnesses you might want to consider.

13          So they really are just -- they really are just

14  what they say, a supplement.  They don't define anything

15  new.  And there was no change in the patent -- there was

16  no change in the practice or the standards for how this

17  work should have been done between 2003 and 2008.

18          MR. BENNETT:  Your Honor, I move for the

19  admission of Exhibits 76 and 206.

20          THE COURT:  Any objection?

21          MS. GARD:  No, Your Honor.

22          THE COURT:  Exhibit No. 76 and Exhibit No. 206

23  are admitted into evidence.

24      *Q.*  BY MR. BENNETT:  All right.  Mr. Rohman, what

25  information did you review about this case?  What

1   information did you collect, I guess would be a better

2   question?

3       *A.*   You know, if I could refresh my recollection with

4   my report.

5       *Q.*   Please.

6       *A.*   But I don't know where that is in all of this.

7       *Q.*   Exhibit 204.

8       *A.*   Thank you.  I reviewed the guilt and innocence

9   phase and opening and closing statements or arguments by

10  counsel.  I reviewed the penalty phase transcript.  I

11  reviewed e-mails from Patrick Linderman and Scott

12  DeLozier. (Sic)  I reviewed the declaration of David

13  DeLozier, Scott MacLeod, Dan Patterson.

14          And then I reviewed a variety of other materials

15  as well:  A report by Dr. Bayless; correspondence from

16  H. Kandy Rohde; notes of H. Kandy Rohde; a report by

17  Dr. Potts; a report by Dr. Rosengard and a report by

18  Dr. Murphy.

19          In addition, I reviewed visitor logs for Wendi

20  Andriano at the jail facility where she was incarcerated.

21  Then I met with Wendi Andriano, Donna Ochoa and Alejo

22  Ochoa and I interviewed them with a specific agenda.  I

23  did not -- my agenda was not to ask them questions about

24  their social history or life history, but to ask them

25  about their interactions with the defense team regarding

1  mitigation and the role of the mitigation specialist.

2      *Q.*    Did you look at any of the mitigation evidence

3  that has been developed in the Post-Conviction Proceeding?

4      *A.*    No, I did not.

5      *Q.*    Why not?

6      *A.*    I view my role in evaluating what the defense did

7  at trial as what would I have done as a qualified

8  mitigation specialist with the information that I had at

9  hand at that time.  So that, I didn't want to confuse or

10  conflate whatever information the defense had collected --

11  the PCR defense team has collected since the conviction.

12      *Q.*    So let's turn now to the issue of Scott MacLeod's

13  qualifications.

14      *A.*    Sure.

15      *Q.*    What qualifications does someone need to be a

16  mitigation specialist?  Is it the ability you described

17  earlier or something else?

18      *A.*    Yeah.  No, I believe -- you know, we've talked --

19  I talked earlier about the skills and abilities earlier:

20  Interview skills, document collection, familiarity

21  questions, capital law, the ability to develop the

22  relevant kinds of presentation materials.  And those are

23  abilities which you obtain in the process of both

24  professional education and experience working with

25  qualified professionals.

1    *Q.*   Do the ABA Guidelines address the qualifications

2    needed for a mitigation specialist?

3    *A.*   They do.  They do.  They indicate it has to be

4    somebody who by -- well, they have appeared.  They talk

5    about the -- and they're gone now.  They do.  They talk

6    about the need for training.  They talk about the need for

7    experience in these areas, including, for instance, they

8    talk in detail about specific abilities in terms of

9    interview techniques, document collection and the like.

10   *Q.*   Okay.  Thank you.

11        MR. BENNETT:  If you wouldn't mind putting that

12   up again.  Thank you.

13   *Q.*   BY MR. BENNETT:  Is one provision from the

14   guidelines regarding the training necessary for mitigation

15   specialists?

16   *A.*   Yes.  That's accurate.

17   *Q.*   Would you mind reading that for us?

18   *A.*   Sure.  It is the ABA Guidelines under Training.

19   All capital team members should attend and successfully

20   complete at least once a year a specialized training

21   program that focuses on the defense of death penalty

22   cases.

23   *Q.*   Would that be like the seminar you attend in

24   Monterey?

25   *A.*   That's correct.  And in other parts of the

1  country.

2      *Q.*    Based on the information that you have reviewed

3  and the interviews you have conducted, was Scott MacLeod

4  qualified to work as a mitigation specialist on a capital

5  case?

6      *A.*    Not that I could see.

7      *Q.*    Why is that?

8      *A.*    Well, first, he had no prior experience working

9  on a capital case before this case.  And if I review his

10  declaration, he received no special training in how to

11  work on a capital case.

12          He told Wendi Andriano -- when I interviewed

13  Wendi Andriano, she told me that Scott MacLeod had in fact

14  told her that he wasn't qualified.

15          In addition, MacLeod's declaration says that he

16  sees no difference between a noncapital mitigation and

17  capital mitigation.  That statement by itself shows his

18  lack of qualifications.

19          But he had no training.  He had no experience and

20  he had no guidance.

21          The last area where you might -- you know,

22  everybody has to do a first case.  I grant that.  But when

23  you do, you want to do that in the context of somebody who

24  both lawyers and other people on the case or perhaps

25  supervisors or mentors who can give you that information.

1  There is no indication that Mr. MacLeod received any of

2  that kind of training or oversight.

3      *Q.*   Let's turn to another topic, which is the time

4  that was allotted for the investigation.  When does the

5  mitigation investigation in a death penalty case need to

6  start?

7      *A.*   The standard of care in this field is that that

8  work needs to be begin as soon as possible after the

9  client's arrest.  Typically, that should be within weeks,

10 certainly within a month or two following the client's

11 arrest.  And it should be prepared at every stage of the

12 case through the pretrial, through potential plea

13 negotiations, motions work, jury selection, the guilt and

14 innocence phase, the aggravation phase and the penalty

15 phase.

16          That work needs to start as soon as possible.

17 And that's both been the standard of care for years as

18 well is spelled out in the guidelines.

19          My first capital case in Arizona was in 1994.  It

20 was a case in Maricopa County.  I was brought in by

21 counsel at that time to work on a matter called -- a

22 defendant named Damian Curl, who was capitally charged in

23 Maricopa County.  And the work that -- I began mitigation

24 work immediately.

25          MS. GARD:  Objection.  Relevance.

1          THE COURT:  Overruled.

2          Go ahead.

3          THE WITNESS:  I began work immediately on that

4   case.  And the information that we developed led to

5   questions of the defendant's competency, which led to a

6   process, which eventually led to a plea for Mr. Curl to

7   have a life sentence.

8          I tell that story as an example the way in which

9   mitigation work needs to start early to be effective at

10  all stages of the case.

11     Q.   BY MR. BENNETT:  All right.  Are these two

12  portions of the ABA Guidelines that refer to when the

13  investigation needs to commence?

14     A.   Yes.  That's correct.

15     Q.   Would you mind reading those?

16     A.   Sure.  The first is:  The mitigation

17  investigation should begin as quickly as possible.  This

18  is from the 2003 Guidelines.

19         The second says:  The responsibility for the

20  development and presentation of mitigation evidence must

21  be incorporated into the defense at all stages of the

22  proceedings from the moment the client is taken into

23  custody.  And that's from the '08 Supplement.

24     Q.   Putting aside the potential uses of mitigation

25  evidence in other parts of the case, but other than

1   sentencing, why would it take the years that it normally

2   takes for a capital case to go to trial to complete a

3   mitigation investigation?  Does it takes that long?  Do

4   you need that much time, in other words, to collect the

5   information?

6       A.   The answer is yes.  The reason is because, first

7   of all, you're delving back years into somebody's life and

8   history.  So, for instance, the collection of those

9   documents is not something you send out -- as I said

10  earlier, you send out a letter and the documents come

11  back.  That process is time-consuming.

12           But, more importantly, the kind of information

13  that we're seeking in these cases is private, personnel,

14  humiliating even and certainly embarrassing to the family.

15  It is the family secrets that have been kept under wraps

16  for a long time.  You don't just walk into someone's

17  living room and ask them about it.  You don't even walk

18  into the defendant's cell or the visiting room and ask him

19  or her about it.  It takes time to build up a rapport, to

20  build confidence, to elicit that kind of information.

21           So it is not untypical to have several years to

22  prepare a capital case for trial.

23      Q.   On that note, in your experience, how many

24  conversations are necessary to get people to reveal

25  information about things such as childhood sexual abuse?

1    *A.*    You know, there is no one number, of course, but

2    it is multiple times to get people, because what happens

3    is someone will make a passing reference at one point to

4    an incident that happened with a relative, and then you

5    come back a week or so later and then they tell you a

6    little bit more and then they backtrack.

7           That process can take literally sometimes -- and

8    with our clients, I meet with them dozens and dozens of

9    times, and with important life history witnesses, it's not

10   unusual for me to meet with them eight, nine, ten or 11

11   times.

12   *Q.*    What is a social history and how does that play

13   into a mitigation investigation?

14   *A.*    The social history, or sometimes called the

15   social history chronology, is a document which draws

16   together the broad range of evidence which has been

17   collected in the mitigation investigation.  It brings

18   together the documents provided that you've been able to

19   collect, the interviews with the client, the defendant,

20   interviews with family members, school teachers, social

21   workers, doctors, treating psychiatrists or psychologists

22   and puts that and arranges that in date order.  That

23   process, which is very time-consuming, then creates this

24   document which is a -- first of all, it's a reference tool

25   for the defense team.  It orients everybody to an

1   understanding of the client's life in its full

2   perspective.

3            But it also can be used to then give to whatever

4   mental health specialists may be brought into the case,

5   psychiatrists, psychologists, trauma specialists, because

6   they aren't going to have the time to read all the 50 or

7   100 interviews or whatever the number of interviews you've

8   done.  They're not going to have time to review the

9   thousands hopefully pages of documents or the hundreds of

10  pages of documents you've collected.  This document

11  becomes a summary document that they can then rely upon if

12  it's properly prepared.

13       Q.   Based upon the information you received and the

14  people you talked to, did the mitigation investigation in

15  Ms. Andriano's case start soon enough?

16       A.   No.

17       Q.   Why not?

18       A.   Well, the mitigation -- there was enough time to

19  do a mitigation investigation.  They had almost four years

20  from the time of the crime, I think if I have the numbers

21  right, approximately to the trial.  But as far as I can

22  tell, the mitigation investigation did not really

23  begin until -- at least, the mitigation investigation that

24  got used at trial did not begin until Scott MacLeod began

25  his work in, if memory serves me, is it April of 2004?

1   And the trial starts in August of 2004.  So that's just

2   not nearly enough time.

3      *Q.*   By the way, Mr. Rohman, in the materials that you

4   reviewed or the people you talked to, did you get any

5   indication that Patrick Linderman had done any substantive

6   work on this case?

7      *A.*   I saw no evidence in any part of the file that I

8   reviewed, in any e-mails with the defense lawyers, in

9   either of the declarations by either of the attorneys in

10  this case, and in anything -- any of the materials

11  generated by any of the psychologists, that Patrick

12  Linderman played any significant role.

13          I talked with family members and asked them if

14  they had any recollection of -- and Ms. Andriano if they

15  had any recollection of Linderman playing a significant

16  role, and they had no memory either.

17          MS. GARD:  Objection, Your Honor.  I should have

18  made this record probably earlier, but if he's being

19  offered as an expert and if he's testifying to that

20  hearsay for that purpose and for his opinions, that's one

21  thing, but I would object to these statements coming in

22  because it's hearsay.

23          THE COURT:  Is that a basis of your opinions?

24          THE WITNESS:  Oh, yes, sir.

25          THE COURT:  Then the objection is overruled.

1       Go ahead.

2       MR. BENNETT:  Thank you.

3       Q.   BY MR. BENNETT:  All right.  Please take a look

4   at the pink binder.

5       A.   What number?

6       Q.   Exhibit 137, please.

7       A.   Yes.

8       Q.   All right.  Is this an e-mail that you reviewed

9   in forming your opinions about this matter?

10       A.   Yes, it is.

11       Q.   In your opinion, does this e-mail give any

12   indication about whether the mitigation investigation

13   started soon enough?

14       A.   Yes, it does.

15       Q.   And what is that indication?

16       A.   Well, I think it's important to note the date of

17   the e-mail is December 6, 2004.  If memory serves me, the

18   aggravation phase has been completed and the penalty phase

19   either has begun or is about to begin.

20       So this is an e-mail from Scott MacLeod to Dan

21   Patterson.  Its subject is -- and it's written on Monday,

22   December 6, 2004.  The subject line is:  Some ideas from

23   Thursday and Friday's seminar.  So I'm assuming these are

24   ideas that he developed the Thursday and Friday before

25   this.

1          MS. GARD:  Objection.  Speculation.

2          THE COURT:  Sustained.

3          Ask your next question.

4     Q.   BY MR. BENNETT:  All right.  So, at this point in

5     time, and it's now December 6th of 2008, with the

6     penalty --

7          THE COURT:  2008, I think you said?

8          MR. BENNETT:  I'm sorry.  I misspoke, yeah.

9     Q.   BY MR. BENNETT:  On December 6th of 2004, with

10    the penalty phase about to begin, based on your

11    experience, would this kind of e-mail have been useful to

12    the defense?

13    A.   No.  This kind of e-mail would have been useful

14    to the defense three or four years earlier.  This is the

15    kind of e-mail that you would expect from mitigation

16    specialists at the beginning of your work on a case.  This

17    is sort of the equivalent of trying to put together a car

18    as it, you know -- putting wheels on a car as it's rolling

19    down the highway at 60 miles an hour.  The horse has left

20    the barn.  The case is underway.  This is -- whether or

21    not these are useful themes and ideas, I don't know, but

22    the timing of them makes them almost useless to the

23    defense.

24    Q.   Yes, please feel free to take a drink.  Please

25    turn one tab back to Exhibit 136, please.  Did you review

1   this e-mail in formulating your opinions about this case?

2       A.   Yes, I did.

3       Q.   And did this e-mail have any bearing upon your

4   conclusion that the investigation started too late?

5       A.   Yes.  This is a memo -- an e-mail dated

6   November 29th, updated list 11/30 of mitigation witnesses

7   and is a list of simply -- what he calls simply:  My list

8   of witnesses of potential people to call in the trial.  He

9   has not interviewed everybody on the list and he provides

10  no data in here about what these witnesses will say or

11  won't say.

12          So the very fact that he's just dropping this

13  information onto the defense team at this late -- to call

14  this the 11th hour, this is really 11:55 p.m. is -- again,

15  this tells me that this is, again, the kind of thing you

16  would have wanted two years before trial, not two days.

17          And if I might add, I also reviewed e-mails which

18  showed Mr. MacLeod sending interview note summaries to the

19  attorneys of some of these witnesses in the days following

20  this.  Again, delivering that information to the attorneys

21  in the form of memos that late in the case is well below

22  any reasonable standard for how you would want these cases

23  to be handled.

24      Q.   You have reviewed some of the transcripts from

25  the trial proceedings; correct?

1    *A.*   Yes.

2    *Q.*   Were there any statements by Attorney Daniel

3    Patterson in there that led you to conclude that the

4    mitigation investigation started too late?

5    *A.*   Yes.  I believe at the end of the aggravation

6    stage, Mr. Patterson -- and I know it's referenced in my

7    memo, but I do remember the sum and substance of it.  He

8    said that he had to change mitigation specialists and that

9    Mr. MacLeod was rushed and hurried trying to get ready for

10   this trial.

11   *Q.*   And the final question on this topic, Mr. Rohman,

12   were there any indications in the materials you reviewed

13   about whether the attorneys were involved in the

14   mitigation investigation prior to the spring of 2004?

15   *A.*   Well, the thing that's most striking about this

16   is that there are declarations from three -- both

17   attorneys and from Mr. MacLeod.  Mr. Patterson says that

18   he left the development -- in his declaration, as I

19   recall, he left the development of the mitigation

20   completely to Mr. DeLozier and Mr. MacLeod.

21          Mr. DeLozier says he played no role in making any

22   decisions on the case and waited for assignments from

23   Mr. Patterson until the 11th hour when he's sent to handle

24   mitigation, and they didn't consult with Mr. Patterson

25   about it.

1        Mr. MacLeod says he took all of his direction

2   from Mr. Patterson because Mr. Patterson was the lawyer.

3        So nobody here is running the mitigation.  Not

4   the lawyers.  Not the investigator.  It's just not

5   happening.

6   *Q.*   Let's turn to the next topic, the need for the

7   mitigation -- the defense to work as a team in

8   investigating mitigation.

9   *A.*   Sure.

10  *Q.*   What is the standard there?

11  *A.*   Well, the concept of the capital litigation is

12  that this is more than one person can do, more than two

13  people can do.  So the ABA Guidelines and the standard and

14  practice make repeated references to the defense team, and

15  that phrase team occurs over and over again.

16        And what that means in practice and in my 20-plus

17  years doing mitigation is that there is regular ongoing

18  consultations between the lawyers, the investigators, the

19  guilt and innocence investigators, the paralegal and the

20  mitigation specialists.

21        It is standard practice on cases that I'm

22  involved in, including as recently as last week, to have

23  team meetings either by phone or in person every two weeks

24  in the run-up to a trial or to preparing a Post-Conviction

25  Appeal.

1          So that kind of team approach is both part of the

2     standard and practice of the field, it's what's regularly

3     taught and talked about at these seminars, and it's also

4     laid out in the ABA Guidelines.

5          Q.   I was going to ask:  Do the guidelines address

6     these issues?

7          A.   They do, indeed.

8          Q.   All right.  Based on the materials that you

9     reviewed and the interviews you have conducted, and the

10    testimony here today, did Mr. MacLeod and the defense

11    attorneys work as a team in putting together the

12    mitigation in this case?

13         A.   No, they did not.

14         Q.   What made you come to that conclusion?

15         A.   Well, Mr. Patterson's declaration talks about --

16    and if I might refer back to my report just because I

17    don't want to misquote in his declaration.

18         Q.   Sure.

19         A.   And that is at 1 --

20         Q.   204?

21         A.   204.  Thank you.  I'm refreshing my recollection

22    from that.  In Mr. MacLeod's declaration -- I'm sorry.

23    Mr. Patterson's declaration said -- I'm sorry.  Could you

24    repeat the question?  In any event, I'm -- could you

25    repeat the question?

1    *Q.*   No worries.  Was there anything in the materials

2    that you reviewed and the testimony you heard here today

3    that led you to conclude that the defense did not work

4    together as a team?

5    *A.*   Mr. Patterson's declaration in which he said:  I

6    gave limited direction to Mr. Linderman and Mr. MacLeod as

7    to developing themes and theories of mitigation.  I do not

8    recall giving Mr. MacLeod any specific direction and

9    largely left the development of the mitigation case to the

10   discretion of Mr. MacLeod and Attorney DeLozier.

11        If lead counsel is not in touch with his

12   mitigation specialists, they are not working as a team.

13   They are not -- there is no coordination going on.

14        And this became even more striking at the point

15   during the end of the penalty phase when the defense put

16   on this PowerPoint demonstration, and I believe

17   Mr. MacLeod -- I'm sorry -- Mr. Patterson said that he

18   hadn't had an opportunity to see or review this prior to

19   it being presented in court.

20   *Q.*   And I think you're referring to Exhibit 138, if

21   you could turn there, please.

22   *A.*   Yes, I am.

23   *Q.*   Is this the PowerPoint presentation?

24   *A.*   Yes.  That's correct.

25   *Q.*   What is your understanding of how this was used

1    in the trial?

2       A.   Mr. DeLozier's affidavit says that this

3    PowerPoint presentation was prepared -- the photos were

4    put together by Scott MacLeod and that the text of the --

5    the presentation and the text of his argument, to prepare

6    that, he turned to the defendant's mother, Wendi, and

7    asked that she write the text for this.  But as per the

8    declaration, Wendi's mother then asked a family friend,

9    who she felt would be a better writer.  So this was

10   somebody who had I guess experience in drafting grant

11   proposals.  You know, in my --

12      Q.   Just to correct the transcript, too, I think a

13   moment ago, you mentioned the defendant's mother as Wendi.

14   I assume you meant Donna?

15      A.   Correct.

16      Q.   Okay.

17      A.   And I'll just say that I've been exposed to

18   obviously the cases I've been involved in and I have as

19   well, just though my professional context, reviewed the

20   work in other capital cases.  I have never seen a capital

21   trial where defense counsel advocated their role to lay

22   people, family members to draft a closing argument.  I've

23   never seen it before.

24      Q.   Let's turn to the next issue, the investigation

25   of potential mental health experts.

1          MR. BENNETT:  Your Honor, before we turn to this,

2    would this be a good time for a break?

3          THE COURT:  Okay.  We will go ahead and take our

4    afternoon recess.  We will be in recess.

5          (WHEREUPON, a recess ensued from 3:02 p.m. to

6    3:15 p.m.)

7          THE COURT:  This is CR 2000-096032, State of

8    Arizona vs. Wendi Elizabeth Andriano.

9          The record will reflect the presence of the

10   parties and counsel.  The record will reflect that Keith

11   Rohman is on the witness stand and we will continue with

12   the direct examination by Mr. Bennett.

13         Mr. Bennett.

14         MR. ARNTSEN:  Your Honor, just one thing.  We've

15   got an agreement on the Alejo Ochoa stuff.  We can deal

16   with it later.  We don't need to deal with it now.  I

17   don't know when you would rather deal with it.

18         THE COURT:  Go ahead.  I'll hear it from you.

19         MR. ARNTSEN:  What it is is that counsel are in

20   agreement that both sides essentially accept Alejo Ochoa's

21   lawyer's representation that he will testify as to the

22   Fifth as to everything.  And so, we don't see any point in

23   having him come up here and say this, but we want to

24   essentially have the record be the same as if he had come

25   up here and said that.  We just don't see -- and if the

1  Court is comfortable with that, counsel is in agreement on

2  that.

3          And then, similarly, with regards to Exhibits 24

4  and 25, which are his declarations, and Exhibits 227 and

5  228, which are the Detective Olson's recording of the

6  interview and Detective Olson's report of that, that we

7  agree that those may be admitted into evidence, but we are

8  preserving our hearsay, in terms of hearsay as to the

9  truth of the matters asserted therewith.

10          So did I state that right?

11          MS. GARD:  That's correct, Judge.

12          THE COURT:  So, basically, both sides agree that

13  based upon their conversations with Mr. Alejo Ochoa's

14  counsel that I appointed, that he would be asserting the

15  Fifth.  And, based upon that, then both sides agree that

16  you will not be calling him as a witness; correct?

17          MR. ARNTSEN:  Correct.

18          THE COURT:  And then Exhibit Nos. 24, 25, 227 and

19  228 will be admitted into evidence with the understanding

20  that --

21          MR. ARNTSEN:  That the hearsay objections are

22  being preserved.

23          THE COURT:  Is that correct?

24          MS. GARD:  Correct.

25          MR. ARNTSEN:  And, again, Your Honor, this

1  agreement -- we just want to make sure that you are

2  comfortable with the state of the record, so that,

3  essentially, with Mr. Ochoa, it's the same as if he came

4  in here and took the Fifth, essentially.

5          THE COURT:  Right.  I'm comfortable with that.

6          MR. ARNTSEN:  Okay.  Thank you, Your Honor.

7          THE COURT:  So Exhibit Nos. 24, 25, 227 and 228

8  are admitted into evidence with that understanding.

9          MR. ARNTSEN:  Thank you, Your Honor.

10          MS. GARD:  Thank you, Judge.

11          THE COURT:  Okay.  So the record will reflect

12  that Keith Rohman is on the witness stand.  We will

13  continue with the direct examination by Mr. Bennett.

14          Mr. Bennett.

15          MR. BENNETT:  Thank you, Your Honor.

16  Q.   BY MR. BENNETT:  All right.  Let's turn to the

17  next topic, this investigation of potential mental health

18  issues.

19  A.   Okay.

20  Q.   The investigation of the mental health issues, is

21  that the responsibility of a mitigation specialist in

22  every capital case?

23  A.   An examination of whether there is the presence

24  of possible mental health issues in the client's life is

25  in fact part of every capital representation in every

1   mitigation specialist's work.

2       *Q.*    Is this, what we have up on the screen, a

3   relevant provision from the ABA Guidelines on this issue?

4       *A.*    Yes.  This is from the 2003 Guidelines.

5       *Q.*    And what does that say?

6       *A.*    Neurological and psychiatric impairment, combined

7   with a history of physical and sexual abuse, are common

8   among persons convicted of violent offenses on death row.

9   The defendant's psychological and social history and his

10  emotional and mental health are often of vital importance

11  to the jury's decision at the punishment phase.  And

12  that's from the '03 Guidelines.

13      *Q.*    Thank you.  And that statement at the top about

14  neurological and psychiatric impairment with physical and

15  sexual abuse being common among people on death row, is

16  that consistent with your own experience?

17      *A.*    Yes.  You know, I can't say that every single one

18  of my clients, but virtually all of my clients who I've

19  been involved in representing on a capital murder charge

20  have had one or any combination of neurological,

21  psychiatric and the types of abuse talked about up there.

22      *Q.*    Thank you.  Why?  Why does mental health matter?

23  Why is it the important for the mitigation to look into

24  potential mental health issues?

25      *A.*    Well, mental health goes to giving the jury that

1  overall context of the client's life and background that

2  leads them to an ability to perhaps find for a sentence

3  less than death.  The mitigation specialist's task is to

4  evaluate evidence, gather evidence, and help advise

5  counsel as to whether or not there are some of these

6  issues present and how to go about investigating them,

7  what experts to use and then potentially how to go about

8  presenting this evidence.

9      Q.   Based on everything that you have reviewed, was

10  there an adequate investigation into potential mental

11  health issues in this case?

12     A.   No, I don't believe there was.

13     Q.   Why do you say that?

14     A.   Well, first of all, the defense had many

15  indications that the client was suffering from severe

16  mental illness, and it received that from people working

17  in contact with them.  Kandy Rohde wrote to the defense

18  team on more than one occasion at an early point imploring

19  them to bring in somebody with special skills to evaluate

20  and diagnose the client.  That work was not done in an

21  adequate way or in a complete way.

22     Q.   In the materials you reviewed, were there any

23  other indications or any other sort of red flags that

24  would have indicated to a mitigation specialist that

25  mental health needed to be looked into?

1      *A.*   Sure.  The big red flag was that the client

2   attempted suicide while in the Maricopa County Jail System

3   and spent the bulk of the last couple of years of her

4   confinement there on a psyche ward, so that the client --

5   and under psychiatric care.  That would be the strongest

6   indication that there are some issues here at least worth

7   evaluating.

8          But, in addition, there was a Rule 11 evaluation

9   by Dr. Jack Potts, in which Dr. Potts, while ruling that

10  she was competent to stand trial -- and I would have to

11  refresh my recollection of the exact words -- but

12  indicated that there were in fact potentially more serious

13  psychological issues which should be examined by the

14  defense.

15     *Q.*   And you're aware that Ms. Andriano was evaluated

16  by a Dr. Rosengard?

17     *A.*   Yes.  That's correct.

18     *Q.*   So why was that not satisfactory?

19     *A.*   Well, Dr. Rosengard evaluated the client in I

20  believe the summer of 2002, if memory serves me, which was

21  a very early stage in the defense's preparation of the

22  case and before any mitigation investigation had been done

23  at all.  And the phrase is garbage in/garbage out, vacuum

24  in/less out.  Dr. Rosengard did not have the advantage of

25  knowing the real story of the client's life and

1    background.

2            For instance, a very basic fact about the

3    client's life, her natural father was in state prison at

4    the time while she was growing up for the crime of

5    molesting children.  Dr. Rosengard didn't have that very

6    basic piece of information.  All the other information

7    about the client's background and history, he was relying

8    on the client's self-report.

9            The nature of a mental health examination

10   suggests that the self-reporting of the client should be

11   examined with a certain skepticism.  A properly prepared

12   mental health examination involves providing that

13   examining psychiatrist or psychologist with the kind of

14   detailed social history background that should be prepared

15   in these cases.  That's both what the standard and

16   practice has been in mitigation investigation for as long

17   as I can remember and certainly what is outlined in the

18   ABA Guidelines.

19       Q.   Let's turn now to our final area, the

20   investigation into Ms. Andriano's family history.

21       A.   Sure.

22       Q.   Is it the standard of care in mitigation

23   investigation to investigate a defendant's -- a capital

24   defendant's family history?

25       A.   Yes, it is.

1    *Q.*    Is that reflected in the ABA Guidelines?

2    *A.*    Yes, it is.

3    *Q.*    All right.  Are these a couple of the relevant

4    guideline provisions?

5    *A.*    Right.  That's correct.  They're both from the

6    '03 Guidelines.

7    *Q.*    Would you mind reading what we have on the

8    screen?

9    *A.*    Because the sentencer in a capital case must

10   consider mitigation, anything in the life of the defendant

11   which might militate against the appropriateness of the

12   death penalty for the defendant, penalty phase preparation

13   requires extensive and generally unparalleled

14   investigation into personal and family history.  That's

15   from Page 81 of the '03 Guidelines.

16          And on Page 83, it states:  Must investigate at

17   least three generations.

18   *Q.*    All right.  Thank you.  On a related note, in

19   addition to investigating family history, is it a

20   necessary part of a mitigation investigation to interview

21   nonfamily members who knew the defendant?

22   *A.*    Indeed.  In fact, it's really a vital part of

23   that process.  Jurors have a tendency to look askance at

24   family members.  They assume that perhaps they have a bias

25   in favor of the defendant.  Sometimes the most --

1      MS. GARD:  Objection.  Foundation.

2      THE COURT:  Overruled.

3      Go ahead.

4      THE WITNESS:  Many times in my experience and

5  observation, the most effective witnesses in a penalty

6  phase are nonfamily members, school teachers who witnessed

7  something or a medical doctor who examined them as a young

8  person or some neighbor or family member who or less

9  immediate family member who observed acts of misconduct in

10  the home or around the home, social workers, the whole

11  realm of people who came in contact with the family.

12      In addition, I just want to clarify, that when we

13  talk about three generations, the guidelines talk about

14  doing the family history and the family background both

15  horizontally and vertically -- sorry -- both vertically

16  and horizontally.  And so that, you're not just looking at

17  the client's parents and grandparents you're looking at

18  the client's cousins and then aunts and uncles and then

19  great uncles and great aunts as well over the three

20  generations.

21  *Q.*  BY MR. BENNETT:  Should a mitigation

22  investigation include interviewing childhood friends of

23  the defendant?

24  *A.*  Absolutely.  Childhood friends would be a perfect

25  example of people who might be close to the client inside

1   the family structure but would be perhaps more able to

2   talk honestly about it because they are not actually in

3   the family.

4        Q.   When it becomes to investigating potential sexual

5   abuse of someone, is it important then to interview people

6   who are not part of the family or not living in the same

7   household?

8        A.   Yes, it is.  You're talking again about the most

9   private of things that happen in a home and sometimes the

10  most shameful.  Getting people in that immediate circle to

11  talk about these things is difficult.  And but there are

12  often people who witness aspects of it or who heard

13  contemporaneous reports back in the day or there is a

14  school record that makes reference to the child missing

15  many days of school.

16       There are a lot of different ways you can seek

17  corroboration and it often involves the most important

18  corroboration coming from people outside the immediate

19  family circle.

20       Q.   Based on all of the information you've reviewed,

21  did Scott MacLeod and the defense conduct an adequate

22  investigation into Ms. Andriano's family history?

23       A.   No, they did not.

24       Q.   Why not?

25       A.   Well, I don't think they collected the kinds of

1  documents that you would need.  There is no indication

2  that they did.  I noted, for instance, that they did

3  not -- this was touched upon in Mr. MacLeod's testimony.

4  That they did not request jail records of the client until

5  I believe the aggravation phase of the case was already

6  underway and I don't believe they received those until the

7  eve of the penalty trial.  That's emblematic of an effort

8  that is starting too little, too late.

9        In addition, they didn't seek a broad enough

10 group of records, nor did they interview nearly enough

11 witnesses, which is not surprising since they had about

12 four to 16 weeks to do their job, if you give them about

13 four months' worth of work.

14        I reviewed the records based on what was

15 available at the time of the trial and saw many additional

16 witnesses could have been obtained and interviewed by the

17 defense.

18   Q.   If you could take a look at Exhibit 136, please.

19   A.   Yes.

20   Q.   You see here that Mr. MacLeod has listed a number

21 of potential witnesses for the penalty phase?

22   A.   Yes.  Yes.

23   Q.   Is this an adequate list of the number of

24 witnesses to interview for the penalty phase of a capital

25 murder case?

1      *A.*   Not at all.  Not at all.  And I note that at

2    least two of them are employees of Durango Jail.  So they

3    would have been -- I mean, that's just -- that's just

4    picking off the low hanging fruit.  It's not actually

5    getting out and talking to family members and people in

6    the community who would know her, doing the kind of

7    extensive, and what the guidelines refer to as an

8    exhaustive social history investigation.

9      *Q.*   And, on that note, when this investigation is

10   done and the investigation that you referred to involved

11   talking to dozens or more than a hundred people and

12   collecting thousands of pages of documents, is all that of

13   information presented in the penalty phase at trial?

14     *A.*   No, not necessarily.  It's presented to the

15   attorneys so they have the ability to review it and then

16   make a judgment about what evidence would be most

17   appropriate and most effective as part of the trial.  So

18   it becomes a resource for the attorneys and they are

19   indeed the final decision maker about who gets called.

20     *Q.*   Based on your review of the materials that were

21   available to Mr. MacLeod and to his attorneys, did you

22   identify potential sources of documents about

23   Ms. Andriano's life?

24     *A.*   I did.

25     *Q.*   How many potential sources of documents did you

1 identify?

2 *A.* You know, anywhere upwards of 40 or 50 potential

3 sources of documents, such as schools, employers, medical

4 facilities and the like.

5 *Q.* Similarly, did you identify potential witnesses

6 who might have useful information for mitigation?

7 *A.* Again, based on my review, there's upwards of a

8 hundred potential witnesses who could have been

9 interviewed:  Family members, people in the traveling

10 religious group, neighbors, school friends, childhood

11 friends and the like.

12 *Q.* So to wrap this up, Mr. Rohman, what is your

13 general conclusion about the mitigation investigation that

14 was done in Ms. Andriano's case?

15 *A.* My considered opinion is that the mitigation

16 investigation was well below the standard of care for what

17 anyone would want in a capital case, below the standard as

18 laid out in the ABA Guidelines and below the standard of

19 the practice in the field.

20 It was work done by unqualified individuals who

21 did not have enough time, even if they were qualified, and

22 who then put on a completely deficient presentation about

23 the client's life and background.

24 MR. BENNETT:  Thank you.

25 Your Honor, I move for the admission of

1   Exhibit 204, Mr. Rohman's report.

2          MS. GARD:  No objection.

3          THE COURT:  Exhibit No. 204 for identification is

4   admitted into evidence.

5          MR. BENNETT:  No further questions.

6          THE COURT:  Ms. Gard.

7          MS. GARD:  Thank you, Judge.

8

9                    CROSS-EXAMINATION

10  BY MS. GARD:

11     Q.   Mr. Rohman, you are licensed as a private

12  investigator in California; is that right?

13     A.   That's correct.

14     Q.   And there's no separate licensing scheme for

15  mitigation specialists; right?

16     A.   That's correct.

17     Q.   So there is no one who would monitor a mitigation

18  specialist's training or to make sure that he complies

19  with minimum educational requirements or anything like

20  that?  There is no board?

21     A.   No, there is no board.

22     Q.   There is no one that they report to other than

23  their employer, whoever that may be?

24     A.   Generally, the attorney who has retained them on

25  the case or had gotten them appointed, yes.

1    *Q.*    Now you have handled a number of cases in

2    Arizona; is that right?

3    *A.*    That's correct.

4    *Q.*    We talked at the break about the Sharp case in

5    Cochise County?

6    *A.*    That's right.

7    *Q.*    And the Michael White case in Yavapai County?

8    *A.*    That's correct.

9    *Q.*    What other cases have you helped investigate?

10    *A.*    Okay.  Ruben Garza.

11    *Q.*    I'm sorry.  Let me stop you and just clarify on

12    Post-Conviction -- Post-Conviction Relief cases.

13    *A.*    Do you want their names or would a number do?

14    *Q.*    A number would be fine.

15    *A.*    Yeah, I think approximately ten.

16    *Q.*    And in any of those cases, have you found the

17    trial mitigation investigation to be adequate?

18    *A.*    Well, in those cases, I have not been asked to

19    testify as an expert to evaluate necessarily the

20    mitigation.  This is one of the first opportunities where

21    I've really testified directly to reviewing the

22    mitigation.

23    *Q.*    Okay.  I should have been more precise, then.

24    You said one of the first that you've offered -- or one of

25    the cases that you've done.  How many others have there

1   been?

2        A.   Probably three or four.

3        Q.   Are they in this state or other states?

4        A.   This state.

5        Q.   And have you found the mitigation to be adequate

6   in those cases?

7        A.   No, I have not.

8        Q.   In none of those cases where you have been

9   retained for that purpose?

10        A.   Correct.

11        Q.   Okay.  You have a Bachelor of Arts; is that

12   right?

13        A.   That's right.

14        Q.   And is that in Liberal Arts?

15        A.   Yes.

16        Q.   Did you have a particular concentration?

17        A.   History was my area of concentration.

18        Q.   So you don't have a degree also in psychology?

19        A.   No, I do.

20        Q.   Or in social work?

21        A.   No.

22        Q.   Or in any other type of behavioral science?

23        A.   Correct.

24        Q.   In your report, you spoke about formal training

25   and Mr. MacLeod lacking formal training?

1    *A.*    Correct.

2    *Q.*    And that he received his training on-the-job or

3    training on-the-job.  You would agree, though, that

4    on-the-job training is valuable in this context?

5    *A.*    If on-the-job training means that you're being

6    supervised and having your work directed by somebody who

7    is trained and experienced in this field, yes, I would.

8    *Q.*    You were present when Mr. MacLeod testified

9    today; right?

10    *A.*    Yes.

11    *Q.*    And you were present when he testified that he

12    had undergone training with Patrick Linderman; correct?

13    *A.*    Yes, that he shadowed Patrick Linderman.

14    *Q.*    That he showed Patrick Linderman.  I believe he

15    also mentioned Pamela Davis as well; is that right?

16    *A.*    He mentioned Pamela Davis.

17    *Q.*    Do you know who she is?

18    *A.*    No, I do not.

19    *Q.*    You were also present when Mr. MacLeod this

20    morning or earlier today testified that he met regularly

21    with Dan Patterson; correct?

22    *A.*    Yes.

23    *Q.*    Okay.  You spoke at length about the

24    ABA Guidelines.  Is it your position that those are

25    imposed mandatory duties on a defense team?

1    *A.*   It's my position that they describe the standard

2    of care for capital work.  I'm not sure I would adopt your

3    mandatory duties.  They describe what is considered the

4    minimum level of work that should be done on a capital

5    case.

6    *Q.*   And you're familiar with *Strickland vs.*

7    *Washington*?

8    *A.*   Yes, I am.

9    *Q.*   And you've read that?

10   *A.*   Yes, I have.

11   *Q.*   And you're aware that *Strickland* states that the

12   ABA Guidelines are only guides to what is reasonable?

13   *A.*   I do.

14   *Q.*   And that there are no particular duties that

15   govern counsel's performance?

16   *A.*   Umm --

17        MR. BENNETT:  Objection to any testimony about

18   the duties of an attorney.

19        THE COURT:  Overruled.

20        Go ahead and answer it if you can.

21        THE WITNESS:  You know, I would have to look at

22   *Strickland* again and review it more closely to answer your

23   question accurately.

24   *Q.*   BY MS. GARD:  You stated in your report as well

25   that a mitigation specialist, and today testifying, that

1  one of your roles is to screen for potential mental

2  impairments or mental health problems?

3      A.   Yes.  That's correct.

4      Q.   But there is no requirement, is there, that a

5  mitigation specialist be a trained psychologist?

6      A.   Oh, no, not at all.  Indeed, no.

7      Q.   Or psychiatrist?

8      A.   Correct.

9      Q.   So a mitigation specialist would not necessarily

10 have the training to spot more subtle mental health

11 issues; right?

12     A.   We don't have the training to diagnose.  We

13 should have the training to be able to identify mental

14 health symptoms that are -- and we receive training.  When

15 you go to these seminars, that's part of what the training

16 is.  It's given by psychiatrists and psychologists about

17 how to identify, because we can't afford to have

18 psychiatrists and psychologists all running around doing

19 mitigation.  That work is done by others.

20     Q.   And attorneys -- to your knowledge, if you know,

21 attorneys attend some of the same seminars as you;

22 correct?

23     A.   Yes.

24     Q.   And many criminal defendants, would you agree

25 with this, have mental health issues?

1    *A.*    I think that's probably true.

2    *Q.*    An experienced attorney, then, would come into

3    contact with many people -- an experienced defense

4    attorney may come into contact with many clients who have

5    mental health issues?

6    *A.*    I would think so.

7    *Q.*    And they may also learn how to detect red flags;

8    correct?

9    *A.*    Yes, I think there are certainly attorneys who

10   could do that.

11   *Q.*    And, in this particular case, you did not

12   investigate any mitigation, any of her history; right?

13   The defendant's history?

14   *A.*    That's correct.

15   *Q.*    Okay.  And you offered the opinion that the

16   mitigation specialist or the mitigation investigation

17   essentially started with Scott MacLeod; right?

18   *A.*    That's correct.

19   *Q.*    And that, in your opinion, Mr. Linderman didn't

20   do anything?

21   *A.*    I've seen no evidence in the record to reflect

22   that.

23   *Q.*    Did you speak to Mr. Linderman?

24   *A.*    No, I did not.

25   *Q.*    Did you ask to speak to Mr. Linderman?

1    *A.*   I -- I was told that Mr. Linderman was

2    unavailable.

3    *Q.*   Is there ever a circumstance -- you testified on

4    direct, that mitigation specialists would be skilled at

5    extracting embarrassing information from people; correct?

6    *A.*   Correct.

7    *Q.*   Is there ever a circumstance where someone just

8    might not come -- no know matter what you try, someone

9    just might not tell you something?

10   *A.*   That's correct.

11   *Q.*   That does happen; doesn't it?

12   *A.*   Sure.

13   *Q.*   Especially, with maybe a deeply buried family

14   secret, something like that?

15   *A.*   You know, it's my experience, that given enough

16   time and an effective investigation, many, if not most,

17   family secrets will come out.  In all cases, no,

18   obviously, I can't say that.

19   *Q.*   In this particular case, you would agree that

20   counsel at least consulted with a number of experts;

21   right, including -- let me go down the list -- including

22   Sharon Murphy?

23   *A.*   Yes.

24   *Q.*   Do you recall her?  And you spoke about

25   Dr. Rosengard; correct?

1    *A.*    Yes.

2    *Q.*    A doctor named Mindy Mechanic?

3    *A.*    Yes, I'm aware of her.

4    *Q.*    You mentioned also H. Kandy Rohde?

5    *A.*    Yes.

6    *Q.*    Do you know who she is?

7    *A.*    She's a counselor who was involved in providing

8    some kind of therapy to the defendant during this period.

9    *Q.*    Do you have any information about what kind of

10   qualifications she may have had to diagnose mental

11   illness?

12   *A.*    I'm not familiar with her background and

13   training.

14   *Q.*    Okay.  Were you aware that she ultimately was I

15   believe banned from the jail for bringing in contraband?

16   *A.*    No, I'm not aware of that.

17   *Q.*    And you didn't review Ms. Andriano's correctional

18   records; right, as part of your --

19   *A.*    Her correctional records or her jail records?

20   *Q.*    Her correctional health or her health records and

21   her disciplinary records?

22   *A.*    From her jail incarceration?

23   *Q.*    From jail.

24   *A.*    You know, I'm not sure at this time.  I don't

25   recall reviewing those.

1    *Q.*    And you also did not review the interview

2  transcript of Dan Patterson; right?

3    *A.*    No, I don't recall reviewing that.

4    *Q.*    So you wouldn't be aware, then, if he -- that he

5  may have had strategic reasons for not presenting certain

6  things at sentencing?

7    *A.*    I'm not aware of what's in his transcript.

8    *Q.*    You did review the sentencing transcripts; right?

9    *A.*    Yes.

10   *Q.*    So you're aware that there were several treating

11  mental health professionals that were called; right, from

12  the jail?

13   *A.*    Yes.

14   *Q.*    Dr. Perry being one of them?

15   *A.*    Yes.

16   *Q.*    And a counselor named Laura King?

17   *A.*    Yes.

18   *Q.*    And another, I believe she's a nurse named Joyce

19  VanEvery?

20   *A.*    Yes.

21   *Q.*    Do you have Exhibit 136 in front of you still?

22   *A.*    Yes, I do.

23   *Q.*    And you offered the opinion that that list was

24  inadequate; right?

25   *A.*    Yes.

1    *Q.*    Okay.  But you would acknowledge, would you not,

2    that the e-mail also says right before -- right above the

3    list of names:  This is not a complete, nor exhaustive

4    list; it is simply my list of witnesses; right?

5    *A.*    That's what it says.

6          MS. GARD:  I have nothing further, Judge.

7          THE COURT:  Redirect?

8          MR. BENNETT:  Briefly, Your Honor.

9

10                     REDIRECT EXAMINATION

11   BY MR. BENNETT:

12   *Q.*    Mr. Rohman, in your work as a mitigation

13   specialist, do you suggest mitigation themes to the

14   defense attorneys who you work with?

15   *A.*    Yes, I do.

16          MS. GARD:  Objection.  Beyond the scope.

17          THE COURT:  Overruled.

18          THE WITNESS:  Yes, I do.

19   *Q.*    BY MR. BENNETT:  Based on your experience, is it

20   possible to make competent recommendations about

21   mitigation themes before you have all the relevant

22   information?

23   *A.*    No.  You need to be collecting -- you need to

24   understand what the evidence is before you can make

25   informed recommendations.

1          MR. BENNETT:  All right.  Thank you.  I have

2    nothing further.

3          THE COURT:  May this witness be excused?

4          MR. BENNETT:  Yes, Your Honor.

5          THE COURT:  Thank you very much, sir.  You are

6    excused.  Don't walk off with any of the exhibits.

7          THE WITNESS:  No.  I will reorganize them the

8    best I can.

9          MR. ARNTSEN:  We're done for the day, Your Honor.

10         THE COURT:  We're done for the day?

11         MR. ARNTSEN:  We have Attorney Patterson

12   tomorrow.  And, again, while I apologize for the gaps,

13   we're well ahead of schedule.

14         THE COURT:  We're going to have Mr. Patterson

15   tomorrow.  Is that the only witness we're going to have

16   tomorrow?

17         MR. ARNTSEN:  Yes.

18         THE COURT:  Okay.  Then we will see everyone at

19   9:30 sharp.  I want everyone to have a nice evening.  We

20   will be in recess.

21         (WHEREUPON, the proceedings were concluded at

22   3:42 p.m.)

23                    *  *  *  *  *  *  *

24

25

1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9

10          I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11    the State of Arizona, do hereby certify that the foregoing

12    91 pages constitute a full, true, and accurate transcript

13    of the proceedings had in the foregoing matter, all done

14    to the best of my skill and ability.

15          SIGNED and dated this 14th day of April, 2014.

16

17

18                    /s/   Renée A. Mobley, RPR

19                    RENÉE A. MOBLEY, RPR

20                    Certified Reporter

21                    Certificate No. 50500

22

23

24

25

# EXHIBIT IIIIIIIII

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
R. Krane, Deputy
5/2/2014 5:54:34 PM
Filing ID 5855457

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,           )
                            )
        Respondent,         )
                            )
vs.                         )   No.
                            )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,   )
                            )
        Petitioner.         )
_____)


Phoenix, Arizona
February 7, 2014
9:27 a.m.


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


EVIDENTIARY HEARING

DAY 5


Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                    (ORIGINAL)

1                  A P P E A R A N C E S

2

3

4   On Behalf of the State:

5           Mr. Gregory Hazard
            Assistant Attorney General
6
            Ms. Lacey Gard
7           Assistant Attorney General

8
    On Behalf of the Defendant:
9
            ATTORNEYS AT LAW:
10
            Mr. Scott Bennett
11          Mr. Allen Arntsen
            Mr. Stephan Nickels
12          Mr. Matthew Lynch
            Ms. Krista Sterken
13          Ms. Jodi Fox

14

15                    I N D E X

16
                  T E S T I M O N Y
17

18  WITNESS:                                    PAGE

19
    DANIEL BRYANT PATTERSON
20
        Direct Examination by Mr. Lynch          5
21
        Cross-Examination by Mr. Hazard         97
22
        Redirect Examination by Mr. Lynch      162
23

24

25

1                P R O C E E D I N G S

2

3          THE COURT:  Good morning.  This is

4   CR 2000-096032, State of Arizona vs. Wendi Elizabeth

5   Andriano.

6          The record will reflect the presence of the

7   parties and counsel.

8          Are there any matters we need to discuss before

9   we proceed with the witnesses?

10          MR. ARNTSEN:  You'll be pleased to hear, no, from

11   the Petitioner.

12          THE COURT:  I'll move on before anyone changes

13   their minds.

14          The Petitioner may call her next witness.

15          MR. LYNCH:  The Petitioner calls Dan Patterson.

16          THE COURT:  Mr. Patterson, if you can step

17   forward right up here by the witness stand.  Before you

18   sit down, please face the clerk.  Give the clerk your full

19   name and she will swear you in.

20          THE CLERK:  Would you please state your name and

21   spell your name for the record?

22          THE WITNESS:  My name is Daniel Bryant Patterson.

23   All three, you want spelled?

24          THE CLERK:  Yes, please.

25          THE WITNESS:  D-A-N-I-E-L; B-R-Y-A-N-T;

1   P-A-T-T-E-R-S-O-N.

2          THE CLERK:  Would you please raise your right

3   hand?

4          (WHEREUPON, the witness was duly sworn by the

5   clerk.)

6          THE COURT:  Mr. Patterson, make yourself

7   comfortable there on the witness stand.  Remember to speak

8   up so that everyone can hear you.  Please wait until the

9   question is completed before you answer the question.

10  Please make sure you give us a verbal response.

11         Is that all agreeable to you?

12         THE WITNESS:  It is.

13         THE COURT:  Anytime you need water, there's some

14  water there on the side.

15         THE WITNESS:  Thank you.

16         THE COURT:  Go ahead and state your name for the

17  record.

18         THE WITNESS:  Daniel Bryant Patterson.

19         THE COURT:  And is it going to be Mr. Lynch?

20         MR. LYNCH:  Yes, it's my turn, Your Honor.

21         THE COURT:  Mr. Lynch, you may proceed.

22

23                 DANIEL BRYANT PATTERSON,

24  having been first duly sworn to tell the truth, the whole

25  truth, and nothing but the truth, testified as follows:

1                    DIRECT EXAMINATION

2    BY MR. LYNCH:

3        Q.    Mr. Patterson, good morning.

4        A.    Good morning.

5        Q.    What do you do for a living?

6        A.    I'm an attorney.

7        Q.    Where do you work?

8        A.    I'm currently employed by the Office of the

9    Maricopa County Public Defender.  My current assignment is

10   supervisor of the Capital Unit in that office.

11       Q.    How long have you been the supervisor of the

12   Capital Unit?

13       A.    A little over three years.

14       Q.    How long have you been with the public defender's

15   office total?

16       A.    Two separate tours of duties, if you will from

17   '01 through today, and previously, '90 through '93, in

18   that area.

19       Q.    Let's start with the first tour of duty.  What

20   were your responsibilities during the time you were with

21   the public defender's office between '90 and '93?

22       A.    General trial attorney assignments.  A caseload

23   of about 20, 25, 30 felonies.  I don't recall any specific

24   capital work at the time.  Although, I may have had some

25   capital cases.

1    Q.   What did you do after leaving the public

2  defender's office in 1993?

3    A.   I resigned and went back in private practice as a

4  sole practitioner.  My office was in Downtown Phoenix.  I

5  continued for approximately eight years, '93 through 2001.

6    Q.   What kinds of cases did you and handle as a sole

7  practitioner?

8    A.   I had a contract for felony and complex cases

9  with Maricopa County.  I was also on the federal panel.

10  So I got court-appointed cases through the federal system

11  and also through the local Maricopa County system.

12       I also participated in a capital case in Yuma.

13  Bernard Smith was the client's name.  I believe at that

14  time, I participated in a capital case in Pinal County.  I

15  believe that was when Bob Vickers had one of his many

16  trials in Pinal County.

17    Q.   You mentioned a couple of capital cases when you

18  were a sole practitioner.  How many capital cases did you

19  handle during that time period?

20    A.   I have not gone back and cataloged those cases.

21  I started taking and was assigned death penalty cases in

22  the mid-80's.  The structure of the complex case contract

23  with the county included and required you to take capital

24  cases.  So I'm comfortable saying in excess of ten.

25    Q.   When did you rejoin for your second tour of duty

1   with the public defender's office?

2       *A.*   July of 2001.

3       *Q.*   At that time, were you assigned any cases?

4       *A.*   Yes.  I had joined the office for the second tour

5   with the expectation again of being just a line trial

6   attorney.

7           At that time, capital cases were assigned

8   geographically within the office.  We had a Mesa office

9   right over there just down the street.  And if the

10  homicide occurred in the East Valley, Mesa, Tempe

11  Scottsdale, those cases were assigned to attorneys who

12  worked out of this location of the Maricopa County Public

13  Defender.

14          If the homicide occurred in Glendale, Phoenix, by

15  and large, they were assigned to downtown lawyers.

16          The lawyer out here when I joined the office was

17  a gentleman by the name of Jerry Gavin, who was assigned

18  the capital caseload.  He resigned shortly after I got

19  here.  I got a phone call from my boss and he asked if I

20  would assume the capital caseload.

21      *Q.*   How many cases were included in that case capital

22  caseload?

23      *A.*   At the time, we were obviously in a *pre-Ring*

24  environment.  So we were doing judge sentencings.  I had

25  an excess of eight cases, I believe.  Let me rephrase

1  that.  Jerry Gavin had at that time about eight cases.  I
2  assumed all eight of his caseloads.

3      *Q.*  Was State vs. Andriano one of those cases?

4      *A.*  I believe it was.

5      *Q.*  In July of 2001?

6      *A.*  I believe it was.

7      *Q.*  Now you mentioned judge sentencing and jury
8  sentencing there.  At the time you were signed
9  Ms. Andriano's case, did you have any experience with jury
10 sentencing in a capital case?

11     *A.*  None whatsoever.

12     *Q.*  From the perspective of defense counsel, are
13 there any differences between trying a capital case under
14 jury sentencings and trying a capital case under judge
15 sentencings?

16     *A.*  Absolutely.

17     *Q.*  What are they?

18     *A.*  I guess primarily the personalities involved.  As
19 a defense attorney, you work in the divisions with the
20 judges who are ultimately going to decide the sentence in
21 a capital case and for all kinds of cases.  And they
22 develop reputations, the reputations that you're aware of.
23 There are certain judges who are death penalty advocates.
24 There are certain judges who are not inclined to give the
25 death sentence.  And that factors into the manner in which

1  you prep the case.

2         When a judge is the finder of fact, he can draw

3  upon or she can draw upon a reservoir of experience and

4  can differentiate amongst capital or potential capital

5  cases, those which are truly capital cases and those which

6  the reality or likelihood of receiving a death sentence is

7  remote.

8         When you have 12 new people to the system,

9  12 jurors who have never done this before, they don't

10  bring with them the life experience that the judge does.

11  And so that's the significant difference, in my

12  estimation.

13         The preparation is different, too.  Under a judge

14  sentencing structure, you can go ahead and do what we now

15  call the Phase 1 and Phase 2 proceedings.

16         If the jury in that proceeding finds your client

17  guilty, then the custom at the time was to allow you of

18  upwards to one, two, two and-a-half years to develop the

19  mitigation.  You would have a separate sentencing hearing

20  in front of the judge.

21         In the jury sentencing system, you have to

22  front-load all that mitigation and sentencing information

23  because the jurors that preside over the guilt/innocence

24  phase also are the arbiters of the sentence.  So those are

25  the significant differences, in my estimation.

1    *Q.*   When did the law change between judge sentencing

2   to jury sentencing?

3    *A.*   It was a combination of two factors.  The U.S.

4   Supreme Court decided in *Ring V. Arizona* that judge

5   sentencing was unconstitutional.  They only -- the holding

6   is limited to the notion that the jurors need to find the

7   aggravators.  You could still have a constitutional judge

8   sentencing system, but our legislature just went ahead and

9   converted it from a judge sentencing system to a jury

10  sentencing system, when they made changes in our statute,

11  to comport with the holding in *Ring V. Arizona*.

12   *Q.*   Do you recall when the *Ring V. Arizona* came down?

13   *A.*   '01, '02.  That's when things structurally

14  changed, by my recollection.  And the rule was even though

15  the homicide occurred -- may have occurred before changes

16  in the statute, that under the decisions and in the new

17  statute cases that were tried after these changes would be

18  tried in the new manner with jury sentencing.

19   *Q.*   This change, do you recall whether that came

20  after were you assigned State vs. Andriano?

21   *A.*   Yes, yes, afterwards.

22   *Q.*   After the switch to jury sentencing, after the

23  *Ring* decision, did you personally feel confident to try

24  capital cases?

25   *A.*   No.  In my estimation, it changed dramatically

1   the manner in which defense attorneys defended capitally

2   accused clients.

3           In that regard, to that end, I went to a number

4   of seminars.  I can't give you an accurate recitation of

5   how many or where.  But after the seminars, yes, they

6   instructed us to change our approach in capital cases and

7   adopt new manners and techniques in trying to persuade

8   jurors as opposed to persuading judges.

9   Q.   How long did you feel not competent to try a jury

10  sentencing case after *Ring*?

11  A.   There was some push on the part of the judiciary

12  at the time to get these cases tried.  But I was

13  successful in my estimation of delaying the prosecution of

14  those cases involving my clients until I got to the point

15  where I felt -- are we ever truly competent?  I don't

16  know.  But I felt better equipped to deal with the changes

17  structurally in the system here in Arizona.  In my first

18  trial in the *post-Ring* environment was *State V. Roque*.

19  Q.   We will talk about *State V. Roque* in a minute,

20  but just, in general, how many capital cases have you

21  taken to trial with jury sentencings since *Ring*?

22  A.   Roque, Andriano, Manuel, Medina twice, Silva.  I

23  think where I was the lead or co-counsel, I think those

24  are the six that I've been involved in since the *Ring*

25  decision.

1    *Q.*   And how many have you overseen in your current

2    position as supervisor of the Capital Unit?

3    *A.*   I can't give you an accurate number, but I can

4    say in the three years, our unit has nine trial teams, two

5    attorneys per team.  Each team is expected to carry three

6    cases.  Obviously, that fluctuates when cases are disposed

7    of.  But I probably personally been involved in over 35,

8    40 capital cases in the last three years -- involved from

9    the supervisorial perspective.

10   *Q.*   Sure.  Over the time from the first jury

11   sentencing cases that you handled through, through all the

12   cases you're supervising now, has your approach to

13   preparing for a jury sentencing case changed?

14   *A.*   Absolutely.

15   *Q.*   How so?

16   *A.*   Wow.  There is far more emphasis on the mental

17   health of the client.  We routinely -- we have kind of a

18   stable, if you will, of mental health experts that we

19   involve in cases.  We give the -- we try to give the

20   client a mental status evaluation at or near the time of

21   the homicide.  We then go through a more thorough

22   psychological evaluation.  If there's indicators of

23   organic problems, we bring in neuropsyche evaluators.  If

24   they confirm the existence of an organic problem, we may

25   resort to a CAT scan, PET scan or MRI evaluation, and

1  that's a significant focus of the unit.

2         There's more lawyer mitigation specialist

3  integration.  We expect that each trial team will have a

4  team meeting at least bi-weekly.  We expect mitigation

5  people, when they do anything, to commit what they have

6  down to a memorandum that becomes part of the file.  Those

7  memorandums are expected to be reviewed by both attorneys.

8         We don't -- we have not adopted the fiction, at

9  least in my office, that there are lead counsel and

10  co-counsel.  We expect both lawyers to be responsible for

11  all aspects of the defense.  We expect both lawyers to go

12  to all witness interviews.  We expect both lawyers to be

13  involved in the development of theme and theory both for

14  defense and for mitigation.

15     Q.   You talk about both lawyers.  Is it policy at

16  your office that both lawyers have capital experience?

17     A.   Well, in a perfect world, we would do that, but

18  it's impossible, particularly if you're familiar with our

19  Rules of Criminal Procedure, we have a Rule 6.8, which is

20  not recently adopted, but adopted after the Andriano case.

21         That specifically requires, in order to serve as

22  lead counsel, that you have a capital trial.  That's the

23  most difficult complement of that accreditation rule, if

24  you will, for people that we promote to the unit.  Being a

25  distinct Capital Unit, the folks that are eligible for

1  promotion to the unit come from the trial group who don't

2  do capital trials.

3           That being said, we bring them into the unit.  We

4  pair them hopefully with somebody who does have full

5  6.8 qualifications.

6           There's a provision within the rule that persons

7  who have experience, competencies that aren't prescribed

8  expressly by Rule 6.8, they can petition the Supreme Court

9  for certification to serve as capital counsel.  And

10  whoever comes into the unit seeks Supreme Court approval.

11           So to answer your question directly, not like a

12  lawyer, it seems to me that, in my estimation, everybody

13  we promote to our unit, after a brief apprenticeship,

14  becomes qualified within the spirit of Rule 6.8.

15      Q.   At the time -- well, let me just ask this:  Do

16  you recall when Wendi Andriano's case went to trial?

17      A.   I think '04.  That's what I'm thinking.

18      Q.   Does jury selection in August of '04 sound about

19  right?

20      A.   That sounds about right, yes.

21      Q.   In August of 2004, at that time, had you taken

22  any other jury sentencing cases to trial?

23      A.   Roque.

24      Q.   Is that the only one?

25      A.   Yes.

1   *Q.*   Let's talk about that Roque case.  What was Roque

2   about?

3   *A.*   Roque, the allegations involved in the immediate

4   aftermath of the fore of 911 in New York City and then

5   D.C. and Pennsylvania, a local citizen, Frank Roque, was

6   watching TV and seeing the horrors.  He was a New York

7   born and raised guy.  He was in the aviation industry.  It

8   got to him, to put it simply, and he went on a shooting

9   spree and he shot and killed a Sikh, who was wearing the

10  traditional garb of the Sikh religion.  Frank misperceived

11  him and thought he was an Arab and made some horrible

12  comments about the gentleman's ancestry and shot and

13  killed him out in front of his gas station/convenience

14  mart.

15          He proceeded back to the house that he had sold

16  to persons of Middle Eastern extraction and shot through

17  the window and shot into a Mobil gas station where the

18  person -- the proprietors were persons of Middle Eastern

19  ancestry.  That, in a nutshell, was Frank's case.

20  *Q.*   Did the Roque case get any media attention?

21  *A.*   Tremendous.  There was an actual independent

22  movie made of the victims' lives.  Mr. Singh I believe his

23  name was, Singh.  Rodey Singh.  I apologize for not

24  remembering the man's name.  But an independent film was

25  done of his life.  He was a wonderful man.  And the

1   Court TV camera was in the back of the courtroom every day

2   of the proceeding.

3       *Q.*   Was Roque the highest profile case that you've

4   handled?

5       *A.*   Probably.

6       *Q.*   When was the Roque case assigned to you?

7       *A.*   Well, I assumed my role as capital lawyer out in

8   Mesa at or around July of 2001.  911 is obviously

9   September 11th of that year.  And he was arrested shortly

10  after the shooting and assigned our office for defense.

11  So in September or so of 2001, I received Frank Roque in

12  addition to the cases I had.

13         And I think -- I need to also tell you that once

14  the system changed so dramatically, I called my

15  supervisor, the director, Jim Haas, and said that there is

16  no way anybody can carry eight capital cases in a

17  juror-based sentencing scheme.

18         So I received permission from my director to pare

19  my caseload down and I believe I knocked it in half at a

20  minimum.  So I think I probably had four cases at the time

21  that Frank came to my caseload.  So I probably had been

22  carrying five cases at the time.

23      *Q.*   So just for chronology, you were assigned Wendi

24  Andriano's case in July of 2001?

25      *A.*   Correct.

1    *Q.*   And roughly two months later, you were assigned
2    the Roque case?
3    *A.*   Correct.
4    *Q.*   How much time did it require of you to prepare
5    for the Roque case?
6    *A.*   It was significant.  We determined at some point
7    in the preparation of the case, that it would be a GEI
8    defense.  We retained the osteopathic physician,
9    psychiatrist Dr. Rosengard, that participated in Wendi's
10   case, for that case.  He opined that Frank was insane at
11   the time of the event.  A John Shaley, Dr. John Shaley was
12   retained by the government to refute that position.
13   Records collection, yeah, yeah, it required a great deal
14   of preparation.
15   *Q.*   During that time period between the time you were
16   assigned Roque in September 2001 and the time of the Roque
17   trial -- I should back up.  When was the Roque trial?
18   *A.*   It preceded Ms. Andriano's trial.  I'm certain it
19   would be better perhaps if you have done the research, you
20   could probably tell me exactly what days it was.
21   *Q.*   Does September of 2003 sound close?
22   *A.*   Yes.
23   *Q.*   During the period between the time you were
24   assigned the Roque case in September of 2001 and the trial
25   two years a later, how much time were you able to devote

1   to Wendi's case?

2      *A.*   You know, I can't give you a precise minutes,

3   hours.  It was the custom back then to, you know,

4   prioritize your caseloads, which case -- which judge was

5   pushing you more vehemently to get that case prepared and

6   get to trial.

7         Judge Ishikawa did not preside over the case in

8   its early moments.  It was Judge Akers I believe was the

9   first judge assigned.  And I don't recall what other

10  judges were involved before we have got to Judge Ishikawa.

11  But none of those judges for Wendi, in Wendi's case were

12  pushing me to get Wendi's case to the forefront.  So, in

13  that regard, I let it languish, if that's a fair word

14  while I focused on Mr. Roque's case.  Because of its

15  notoriety, if you will, in the newspaper, it was more of a

16  push in Judge Acedo's court to get that case to trial more

17  quickly than Ms. Andriano's case.  So, in that regard,

18  Roque went first and Ms. Andriano went second.

19     *Q.*   Did your involvement in the Roque case conclude

20  right at the end of trial?

21     *A.*   Yes.  I didn't do any direct appeal.  I may have

22  filed a Motion for a New Trial, which would have been a

23  good practice.  But beyond that, I don't -- I didn't do

24  anything hands-on with Mr. Roque's case.  It was passed

25  off to the appellate section of our office for further

1  proceedings.

2      Q.   You mentioned Roque was your first jury

3  sentencing case?

4      A.   Correct.

5      Q.   Were you able -- did you take away any lessons

6  from the Roque case with regard to handling a capital case

7  for jury sentencing?

8      A.   Let me hesitate just for a moment.  Obviously,

9  ten years, 12 years later, yes, I can look back and say

10  these are specific things I learned from Frank's

11  representation.

12          But, at the time, not really because the Roque

13  case was unique.  It blended -- obviously, the things they

14  were telling us back at the seminars were to front-load

15  your mitigation because jurors make determinations early

16  on in the process.

17          That being said, Roque was easy to front-load

18  because the whole defense was mental illness.  The whole

19  defense was mitigation, if you will.  It wasn't too

20  concrete or disparate kind of categories that you had to

21  develop.

22          So I didn't learn a lesson in that first trial,

23  if you will, of separately developing mitigation for a

24  person who doesn't present any mental health defense on

25  the front side.  And, in retrospect, obviously, I think

1    mitigation should be more seriously developed in the early

2    moments of the case.

3           Secondly, assuming her representation in the

4    homicide, Mr. Andriano died -- and can you give me the

5    date of the --

6      Q.   I believe it was October 8th of 2000.

7      A.   Okay.  And I got to the scene, if you will, in

8    2001.  So nothing had been done up to that point in that

9    case.  I think in Ms. Andriano's case, I think that that's

10   a mistake.  Obviously, you can't wait over a year before

11   you begin developing mitigation for the client.  It's a

12   serious and egregious error.  And my error was not -- not

13   riding more closely Mr. MacLeod and Mr. DeLozier in the

14   development of mitigation.  So those are lessons I've

15   learned.

16     Q.   Well, you just mentioned Mr. DeLozier.  And was

17   he your co-counsel in State vs. Andriano?

18     A.   He was, I guess more specifically, Knapp counsel.

19     Q.   What is Knapp?  For the court reporter, it's

20   K-N-A-P-P.

21     A.   It's an anomaly.  I don't think any other state

22   in the union has Knapp counsel.  It is a -- the Supreme

23   Court decision, our state Supreme Court, which holds that

24   defendants can have -- indigent defendants, who have

25   access to resources, may use those resources to retain

1   counsel to assist court-appointed counsel.

2       Q.   In your career, how many capital cases have you

3   defended with this private co-counsel under Knapp?

4       A.   One.

5       Q.   Which one?

6       A.   Ms. Andriano.

7       Q.   Why only one?

8       A.   It's not a good, competent defense tactic, in my

9   estimation.  Obviously, Knapp counsel come in a wide range

10  of experience.  And there are cases now in the system

11  where you have competent Knapp counsel like the man, Dan

12  Raynak.  He does some Knapp work.  And because he knows

13  what he's doing, he does serve a valuable function in the

14  defense team.

15          But my understanding of Knapp at the time, and in

16  looking back at Knapp and again rereading Knapp, I think

17  the judiciary and the defense Bar mistakenly believed that

18  Knapp counsel was a right of the defendant.  And rereading

19  Knapp, I don't read it that way now.  My understanding of

20  the holding of Knapp is that it was a way to save the

21  taxpayers some money.

22          And so if an indigent person, who would otherwise

23  require taxpayer funding in an indigent defense, can get

24  mommy or daddy to bring some money in to hire private

25  counsel, that's permissible, but it's not an absolute

1   right, in my estimation.

2           So unless I'm convinced that Knapp counsel is

3   competent under 6.8, I would file a motion with the Court

4   to resist any Knapp association currently.  That wasn't my

5   take at the time.

6           My belief at the time was that if Wendi and

7   Wendi's parents wanted an attorney to help her defend her

8   life, that she was entitled to have that person

9   participate in the defense.  And, to that end,

10  Mr. DeLozier, as Knapp counsel, was my co-counsel.

11      *Q.*   You mentioned some, you know experience issues

12  and that those differ among different Knapp counsel.  Just

13  setting aside the experience for a moment, was your

14  experience working with Knapp counsel different in any

15  ways from other cases where you had co-counsel from the

16  same office?

17      *A.*   Well, just to be precise here, I've only served

18  with Knapp counsel one time and that was this case.  So

19  that's my only experience with Knapp counsel.

20          That being said, a Knapp attorney is a very poor

21  substitute for a full-time agency-trained, unit-trained,

22  unit-supervised co-counsel.

23          And so, and if we were so inclined to accept

24  Knapp's representation as well in a capital case

25  currently, I would insist that the two lawyers -- agency

1   lawyers remain on the case as well.  So, in effect, in

2   this environment, we would have three lawyers on the case.

3           Back then, I believed that the Knapp lawyer

4   served to satisfy the two counsel obligation required by

5   the ABA Guidelines, but I have since reaccessed that

6   position.

7   *Q.*   Now you mentioned that David DeLozier as Knapp

8   counsel.  When did you first meet David DeLozier?

9   *A.*   It would have been the first session in

10  Judge Akers' Court when I came on board replacing Jerry

11  Gavin.  It was probably at a pretrial status conference,

12  not a significant court appearance.  You know, it wasn't a

13  substantive motion day.  It think I met -- I don't know if

14  I went over to see Ms. Andriano in advance of that hearing

15  or just met her that day.  It was almost, boom, I got the

16  case and now there's something on the docket.  And so it

17  was one of those propositions.  But that's when I first

18  met Mr. DeLozier.

19  *Q.*   What was your understanding of how long he had

20  been representing Ms. Andriano at that time?

21  *A.*   I think he came in at or near the time of the

22  filing of the charges against Ms. Andriano.  There was a

23  gentleman by the name of Leon Thikoll.  I never met him,

24  but looking at the file in my mind's eye, he had filed a

25  notice of appearance.  Then, for some reason, he had some

1  personal issues and he had to resign from the case.

2  Mr. DeLozier was on the case at the time I came into it.

3      Q.   And at that initial meeting you mentioned in

4  Judge Akers' courtroom, did you form any impressions of

5  Mr. DeLozier following that meeting?

6      A.   He spoke competently, but he did expressly say

7  that he had no capital case experience and that he was

8  there at the request of the parents and that he had a very

9  close relationship with the parents and he had been

10 retained as Knapp counsel to serve in Wendi's interests.

11     Q.   At the time of that initial meeting, did

12 Mr. DeLozier disclose to you that he was representing the

13 Ochoas in any other capacity?

14     A.   Not specifically, but I kind of came to the

15 conclusion he was the family lawyer for the Ochoas down in

16 Casa Grande.  But he didn't articulate for me any specific

17 other cases that he was involved in representing Alejo or

18 Donna Ochoa.

19          And, also, I also believed at the time, there was

20 a spiritual kinship between the Ochoas and Mr. DeLozier

21 and Wendi.  That they were all of the same faith and that

22 they -- that was a connection and that was one of the

23 reasons he was involved in this case.

24     Q.   At some point in time in your involvement in the

25 representation of Wendi, did you learn that Mr. DeLozier

1   was representing the Ochoas in another legal matter?

2      *A.*   Yes.

3      *Q.*   When was that?

4      *A.*   It's kind of two-tiered.  In discussions with

5   Wendi, obviously, one of her concerns was the welfare of

6   her children.  And her being incarcerated and, obviously,

7   Mr. Andriano dead, there was a need for a guardianship.

8   And there was a time when the kids were placed with Joseph

9   Andriano's sister.  I believe her name was Jeanea and Brad

10  Lambeth.

11         So I derived from Wendi that David was involved

12  in that in some manner.  But I don't recall that I got the

13  particulars that who he was representing and where the

14  proceeding was.  He came --

15     *Q.*   Let me --

16     *A.*   I'm sorry.

17     *Q.*   Let me just stop you right there.  At the time

18  you came to the understanding that he was involved in some

19  capacity, did Mr. DeLozier ever disclose to you that he

20  was representing the Ochoas specifically?

21     *A.*   I don't recall an expressed discussion with David

22  that he and I discussed the particulars of the -- I think

23  it was a severance or a dependency or whatever the nature

24  of the proceedings involving the children was.

25         No, I never had a particularized discussion with

1    him about the process, the progress, or the results of

2    those cases.

3        *Q.*   Now you mentioned it was some kind of a

4    two-tiered disclosure.  Is that the first tier?

5        *A.*   Yes, that's the first tier.  The second tier,

6    we're right in the middle of trial, and Mr. Martinez comes

7    to court that morning with a bit of a cheshired grin on

8    his face and tells us that he has some information that he

9    wishes to use to impeach Donna Ochoa.

10           And that's when it first came to my attention

11   that Mr. DeLozier apparently had been involved in two

12   separate proceedings, two separate venues involving

13   essentially the same subject matter and had failed to

14   abide by a Pinal County court order, that he was in a bit

15   of a bind.  And that Mr. Martinez sought to use that

16   development for impeachment purposes when Ms. Ochoa was

17   about to testify.

18           We had a hearing, as I recall, in front of

19   Judge Ishikawa and I believe he declined to allow

20   Mr. Martinez to go into that.  That's my recollection.

21       *Q.*   So was this disclosure during trial when Juan

22   Martinez brought this in as impeachment material the first

23   time that you learned that Mr. DeLozier -- the first time

24   that you learned the nature of the proceedings that

25   Mr. DeLozier was handling for the Ochoas?

1      *A.*   Yes.  It came as a complete surprise to me that
2   there was a problem.

3      *Q.*   I just want to go back to a little bit here and
4   talk about Wendi's case at the time it was assigned to
5   you.  How long had it been pending at the time it was
6   assigned to you?

7      *A.*   Well, if the date of the homicide is 2000, I get
8   there in July -- August, September.  So, I mean, do the
9   math.  That's the time frame.

10     *Q.*   Sure.

11     *A.*   And I had a regular relationship with Wendi from
12   the moment I got the case.  But I did not go to see her in
13   the county jail on a regular basis until much later in the
14   course of the representation.  That function was satisfied
15   by Mr. DeLozier.  I was advised by Wendi and David that
16   they were meeting on a weekly basis.  And I believed they
17   were discussing the case, discussing the development of
18   mitigation of the case, discussing family issues in the
19   case.  But I did not get an actual report from
20   Mr. DeLozier, nor from Wendi, as to the facts and
21   circumstances of those weekly discussions.

22     *Q.*   Aside from your initial meeting with Mr. DeLozier
23   after the case was assigned to you, did you do anything
24   else to bring yourself up-to-speed on Wendi's case?

25     *A.*   Well, again, it was --

1    *Q.*   And, just for clarity, I'm talking about sort of

2    the initial few months after the case was assigned to you.

3    *A.*   We had -- in the beginning, we had a mitigation

4    specialist by the name of Patrick Linderman, who was

5    assigned the task of working up the mitigation for Wendi

6    because we recognized obviously with the *Ring* decision and

7    the changes in the statute, that you needed to begin to

8    develop this mitigation.  And I relied upon Patrick to do

9    that.

10         We commissioned Dr. Rosengard at some point to

11   conduct a mental health evaluation of Wendi.  I was led to

12   believe that Patrick was in contact with the family and

13   was accessing the witnesses and sources of information in

14   an effort to develop the mitigation presentation for

15   Ms. Andriano.

16         I was also -- I also believed that Mr. DeLozier

17   was in constant contact with the Ochoas and that he, too,

18   was actively involved in developing that end of the case,

19   that aspect of the case.

20   *Q.*   You mentioned several things there.  Did you also

21   review the pleadings and orders that had been, you know,

22   submitted in the case at the time before you were

23   assigned?

24   *A.*   Yeah.  There wasn't a whole lot in the file, as I

25   recall.  Very little had been done in terms of developing

1   anything in Wendi's case.  I don't recall any substantive

2   motions.  I don't recall accessing the grand jury

3   transcript, filing a motion to remand.  It was a sparse

4   file when I received it.

5         While Mr. DeLozier and Patrick Linderman were

6   doing their tasks, I don't think we really got down,

7   Mr. Martinez and I, and began to interview the government

8   witnesses.  But in advance of trial, that was my primary

9   function in prepping for Phase 1.  And I interviewed --

10  there must have been over 100 government witnesses that we

11  interviewed.  I engaged in our own witness development

12  regarding Phase 1 issues.  I spoke with people.  Wendi

13  gave me some leads, lawyers she had spoken with, that kind

14  of thing.  So that was my end of the proposition.

15  Q.   You mentioned you know the roles of Mr. Linderman

16  and Mr. DeLozier and you mentioned your involvement in

17  interviews of witnesses with Mr. Martinez.  I just want to

18  step back a little bit.

19        In the course of this representation, can you

20  kind of summarize what the division of labor was?  Let's

21  start right at the outset, you know, of 2001.

22  A.   Well, it was -- in all candor, it was a truly

23  evolutionary process.  Nobody involved in the defense of

24  capital cases had ever done it this way before.  My office

25  promoted kind of a garden variety, for lack of a better

1  term, mitigation people who were serving as mitigation

2  developers for garden variety felony cases.

3     *Q.*   Let me stop you.  When you say garden variety

4  mitigation people, what do you mean?

5     *A.*   Well, I mean, in today's environment, we hire

6  people that we believe can develop mitigation in the

7  capital context.  That wasn't how the folks were hired

8  back then.  These persons were mitigation people,

9  employees of the office, who developed mitigation for

10 burglary clients, for methamphetamine clients, for dope

11 dealers, that kind of thing, and weren't specifically

12 trained to be capital mitigation people.

13        And as a line defense attorney in the unit, I

14 didn't have the luxury of selecting that person which

15 would serve that capacity on my team.  I was told that

16 Patrick, he's your mit specialist.  He's the Mesa mit guy.

17 He's your man.  I was not involved in the hiring of

18 Mr. Linderman.  Quite frankly, I don't think I ever viewed

19 his resumé or his credentials.  I was told that this is

20 your mit specialist and he served that function.

21        As a defense attorney, I didn't have instruction

22 then that to constantly monitor the work product of your

23 mitigation person.  I delegated that responsibility to

24 him, believing him to be qualified and believing him to

25 have far more acumen in that regard than I had.

1          My strength obviously as a trial attorney was

2     developing the Phase 1 aspects.  So I did the Phase 1

3     work.

4          David, by virtue of his special relationship with

5     the family, was more actively involved in the mitigation

6     case.

7          But Patrick Linderman, being my kind of direct

8     line employee, he answered to me rather than to David.

9     David had no authority.  But I assumed they had a working

10    relationship, and so that if David had suggestions,

11    Patrick would follow up on them.  But then if he needed

12    money, he would come to me and I would fill out the forms,

13    that kind of thing.

14    *Q.*   I would like to know more about Mr. DeLozier's

15    role and how he fell into the mitigation assignment in

16    that case?

17          MR. HAZARD:  Objection as to how he fell in.

18          MR. LYNCH:  How he --

19          THE COURT:  Rephrase the question.

20          MR. LYNCH:  Let me rephrase the question.  That

21    was a bad question.

22    *Q.*   BY MR. LYNCH:  Can you elaborate on

23    Mr. DeLozier's role in the mitigation development?

24    *A.*   As I understood the relationship with Patrick and

25    Patrick's successor, Scott MacLeod, he had a special

1  relationship with the family.  He had a special

2  relationship with the client.

3  And the theme that was presented to me was that

4  this was a wonderful mom, wonderful human being, hard

5  worker, did well in class, a good Christian woman.  Those

6  were the prevailing themes.  And to that end, securing

7  information to substantiate that position fell upon David

8  because he had a special relationship with Donna and

9  Alejo.

10  Q.  During this time period of 2001 through let's say

11  April of 2004, did you meet regularly with Mr. DeLozier?

12  A.  What was the time frame again?

13  Q.  2001 through April of 2004.

14  A.  Yeah, we -- he was also always available if I

15  needed to see him.  He had a very active law practice.  So

16  he was often in court out in Mesa here, so he would stop

17  by.  He was actively involved in one aspect of the

18  Phase 1, the retention and preparation and development of

19  Joe Collier with regard to the sodium azide issue.

20  Did we have a weekly meeting?  No.  Did we have a

21  monthly meeting?  No.  There was nothing formally

22  scheduled, but he was always accessible, and I believe I

23  was always accessible to him.

24  Q.  During that time period, were you aware of the

25  work that Mr. DeLozier was doing in the mitigation case?

1    *A.*    Not specifically.  Not -- I got no memoranda from

2    either him, nor from Patrick.  There would be contact with

3    Patrick in the hallway:  How's it coming?  Any problems?

4    No specialized reports from either Mr. DeLozier or

5    Mr. Linderman, nor from Mr. Linderman's successor,

6    Scott MacLeod.

7    *Q.*    And when you're talking about reports, what do

8    you mean?

9    *A.*    Well, again, contraposing that era with the

10   current era, mitigation people, when they do something,

11   are expected to document it and expected in your bi-weekly

12   meeting -- the defense team meeting to bring it up,

13   discuss it, go over it, see what it leads to, what is the

14   logical development here, how many additional witnesses

15   now need to be discovered and interviewed bearing upon

16   this particular issue.  So we didn't have that in 2001 in

17   the period of time preceding Wendi's trial.

18   *Q.*    During that time period, 2001 through, again,

19   April of 2004 for a cutoff time, did Mr. DeLozier bring

20   any mitigation evidence to your attention?

21   *A.*    It was all -- it was given to the mitigation

22   person.  That was the conduit by which I became aware

23   of it.

24   *Q.*    Would you expect or did you expect Mr. DeLozier

25   to bring any a potential mitigating evidence to either

1   your attention or the mitigation specialist's attention?

2       *A.*   Yes.  But, quite frankly, I -- I didn't perceive

3   at the time anything that was contrary to the theme that

4   she's a wonderful mom, she's a wonderful lady, she's a

5   wonderful hard worker, good to her kids, beloved by her

6   co-workers.  I mean, that was the theme.  So I wouldn't

7   expect anything other than that.

8       *Q.*   Were you getting that same theme from

9   Mr. DeLozier as well?

10      *A.*   Yes, absolutely.

11      *Q.*   And also from Linderman?

12      *A.*   Yes, uh-huh.

13      *Q.*   Mr. Patterson, would you turn to Exhibit 95?

14  There should be a few binders up there with labels for

15  you.

16      *A.*   Trial exhibits?

17      *Q.*   Yes.

18      *A.*   51 through 100?  95.  Appendix 18.

19      *Q.*   A lot of paper to go through.

20      *A.*   A letter from Brad and Jeanea Lambeth, it

21  appears.

22      *Q.*   Mr. Patterson, would you please take a moment to

23  just review the second paragraph of Exhibit 95, beginning

24  with:  I first noticed that Ashlee?

25      *A.*   Okay.

1          MR. HAZARD:  Your Honor, I object to that being

2    used on the viewfinder.  The victim's address is on it.

3          THE WITNESS:  Oh, okay.  I will avoid --

4          THE COURT:  Okay.  Why don't we use the actual --

5          THE WITNESS:  Is it up there?

6          THE COURT:  Why don't we use the actual exhibit

7    or --

8          MR. HAZARD:  Does Mr. Patterson have a copy of

9    the actual exhibit in front of him?

10          THE CLERK:  The exhibits are all in here.

11          THE COURT:  Why don't we go ahead and get the

12    actual Exhibit No. 95.

13          THE CLERK:  95, sir?

14          THE COURT:  Is it 95?

15          MR. ARNTSEN:  Yes.  He's got it in the binder

16    here.

17          THE WITNESS:  But they're concerned about this

18    address.

19          THE COURT:  I think Mr. Hazard was concerned

20    about what?  An address on the binder copy?

21          THE WITNESS:  If we have a sticky, I could put it

22    over it.

23          THE COURT:  Here, do you need a bigger sticky?

24          MR. ARNTSEN:  I think this sticky will work.

25          THE CLERK:  Or do you want a black marker?

1    MR. ARNTSEN:  As well, a black marker will work.
2    And, actually, a black marker will take care of this for
3    good.
4    THE COURT:  Okay.  So the record will reflect
5    that in the binder copy of Exhibit No. 95, Mr. Arntsen has
6    blacked out the address information.
7    THE WITNESS:  If Your Honor please, there is a
8    lawyer address as well.  Is that problematic?
9    MR. ARNTSEN:  I don't believe so.
10   MR. HAZARD:  It's a business address.  No.
11   THE WITNESS:  Yes, I'm familiar with this exhibit
12   having been given it during the course of our prep for the
13   Rule 32 proceedings.  I had never seen this prior to that
14   point in time.  And I certainly never saw this during the
15   pendency of Ms. Andriano's trial.
16   *Q.*  BY MR. LYNCH:  Do you consider the allegations in
17   that second paragraph to be relevant to the mitigation
18   investigation in Wendi's case?
19   MR. HAZARD:  Objection as to his opinion on that
20   area.
21   THE COURT:  Overruled.
22   Go ahead and answer the question.
23   THE WITNESS:  I think it bears upon potential
24   areas of mitigation that should have been developed at a
25   bear minimum under *Wiggins*.

1   *Q.*   Did Mr. DeLozier -- you know, setting aside this

2   exhibit, did Mr. DeLozier ever bring any allegations of

3   potential abuse by the Ochoas to your attention?

4   *A.*   No.

5   *Q.*   Did Mr. DeLozier ever bring to your attention

6   anything negative about the Ochoas at any time?

7   *A.*   No.

8   *Q.*   We're also talking about this time period where

9   Patrick Linderman was involved; correct?

10   *A.*   Yes.

11   *Q.*   During that same time period, did Mr. Linderman

12   ever bring any negative information about the Ochoas to

13   your attention?

14   *A.*   No.

15   *Q.*   Did Mr. Linderman ever bring any negative

16   information about any other family members to your

17   attention?

18   *A.*   There was -- I don't know where I derived this

19   information.  There was some suggestion that a paternal or

20   maternal grandfather was in prison for improper touching

21   of children.  There was an allegation that Wendi may have

22   been improperly touched by a biological father.  In terms

23   of adverse family information, that was about it.

24   *Q.*   When you heard those allegations regarding

25   Wendi's biological father or grandfather, did you direct

1   Mr. Linderman to investigate further?

2       *A.*   I did not.

3       *Q.*   Why not?

4       *A.*   Well, I think I relied upon the Rosengard report

5   where it was first referenced, at least, and I think

6   probably was the only reference to it.  It certainly --

7   may I ask Judge Ishikawa a question?

8           To what extent can I talk about what Wendi talked

9   to me about?  Is there a victim's waiver here?  Is it

10  limited?

11          THE COURT:  It's my understanding, based upon the

12  issues presented, that he can discuss these matters that

13  were discussed between Ms. Andriano and Mr. Patterson;

14  correct?

15          MR. LYNCH:  That's correct as to this issue.

16          THE COURT:  There is no objection from

17  Ms. Andriano; correct?

18          MS. ANDRIANO:  No.

19          THE COURT:  Thank you.

20          THE WITNESS:  With regard to the improper

21  touching by her biological father, I never derived that

22  information from Wendi.  It was referenced in

23  Dr. Rosengard's report.  And he says:  My recollection is

24  that it had -- she had no specific recall, nor any

25  flashbacks relating to that incident.

1    So, in my estimation, based upon the limited

2    information I had at the time, it was a nonissue.  And so

3    I did not direct anybody to follow up on it.

4    *Q.*   BY MR. LYNCH:  Prior to the issuance of the

5    Rosengard report, did you direct Patrick Linderman to

6    follow up on the issue of potential abuse by a biological

7    father?

8    *A.*   I did not.

9    *Q.*   With regard to your own role in the pretrial

10   investigation of Wendi's case, is there a particular part

11   of Wendi's case that was primarily your responsibility?

12   *A.*   Phase 1 and Phase 2.  Motion practice, jury

13   selection, those functions were my primary assignment.

14   *Q.*   Did you conduct an investigation into the guilt

15   phase and aggravator phase of Wendi's trial?

16   *A.*   Yes, I did.

17   *Q.*   When did the bulk of your own guilt phase and

18   aggravator phase investigation occur?

19   *A.*   Probably upon the conclusion of the Roque trial.

20   That trial I recall lasted probably two and-a-half, three

21   months.  So during that time frame, I wasn't involved in

22   any other client case.  In advance of the Roque trial, I

23   may have done some of the investigation that I recall with

24   regard to Phase 1 and Phase 2 for Ms. Andriano.

25       And then I don't know what the time frame between

1    the conclusion of the Roque case and the commencement of

2    the Andriano case was, but I did a lot of things in that

3    interim because it came to my attention in advance of

4    trial, that Mr. DeLozier's meetings with Ms. Andriano were

5    not necessarily related to the trial of the case.

6        Q.   Well, let's talk about Mr. DeLozier's meetings

7    with Ms. Andriano.  Were you aware that Mr. DeLozier was

8    meeting with Ms. Andriano prior to trial?

9        A.   Yes.  I was led to believe it was -- it was

10   almost on a weekly basis.

11       Q.   What was your reaction to knowing that he was

12   meeting with Ms. Andriano on a weekly basis?

13       A.   I mean, it's good practice in a capital case to

14   have the frequent meetings with your client.  In our

15   current practice, we have at least one member of the team

16   go over and see the client on a weekly basis.  You need to

17   develop a kinship with the client, a bond with the client

18   in order to develop those things that might be relevant to

19   mitigation.

20            So I was encouraged that he believed he had to

21   meet with her that frequently.  That was a good thing.

22       Q.   Prior to April of 2004, did you have any

23   assumptions about the contents of those meetings between

24   Mr. DeLozier and Wendi?

25       A.   Yes.  I assumed they were talking about the facts

1    and circumstances of the case and they were talking about

2    mitigation issues, that they were talking about sources of

3    information from the potential witnesses.  Doing the

4    things that you would expect a competent capital defense

5    attorney to do during the course of meeting with a client.

6         Now, certainly in an effort to develop a

7    relationship with the client, you don't always talk about

8    the case.  There have been times that I go over and see a

9    client and we talk about the Diamondbacks.  That being

10   said, you need to touch upon the important things in the

11   case on a regular basis.  My understanding -- do you want

12   me to --

13        *Q.*   Continue.

14        *A.*   We were in the process of assigning tasks for

15   trial because it was reasonably certain we were going to

16   go to trial.  And based upon the fact that Mr. DeLozier

17   had this weekly contact with Wendi and had a very good

18   relationship with her and with the parents, he was the

19   logical candidate to do her direct because we had come to

20   the conclusion that in a self-defense case, the defendant

21   has to probably take the stand and that's good practice.

22        When I suggested that to David in front of

23   Ms. Andriano, I recall her eyes getting wide open and she

24   kind of grabbed me by the elbow and she said she needed to

25   talk to me.  Outside the presence of Mr. DeLozier, she

1  said that she doesn't talk about the case with

2  Mr. DeLozier.  That they have a spiritual relationship.

3  And I don't know if it was at this time, but at some time

4  she said and she believed it to be God's will, that God

5  provided her a spiritual counselor to assist her and

6  provided a defense attorney to defend the criminal case.

7        And it made perfect sense to Wendi and apparently

8  made perfect sense to David.  It didn't make perfect sense

9  to me.

10     *Q.*  Let me backtrack.  I'm sorry if I missed it in

11  your answer.  When did you learn that information?

12     *A.*   It was three months before trial.  It came to my

13  attention that I had to -- knowing that he couldn't do the

14  direct exam of Wendi, it gave me sufficient time to meet

15  with her.  I met with her, wow, just regularly weeks and

16  weeks and we went over and over and over the facts and

17  circumstances of that night and the facts and

18  circumstances of that day.  They had going down to

19  Casa Grande for a family dinner with the Andrianos.  I

20  recall I had ample time to prep with her.  So it had to

21  have occurred of a period in advance of trial.

22     *Q.*  During that prep time, was there any particular

23  phase of Ms. Andriano's case that was the focus?

24     *A.*  I'm sorry.  Repeat.

25     *Q.*  That was a bad question.  I'll rephrase.  Were

1   you preparing Ms. Andriano for her direct examination

2   during the guilt phase?

3       *A.*   Yes.  That's when she testified was during the

4   guilt phase, yes.  Yes, our preparation was in

5   anticipation of her taking the stand in Phase 1 and

6   explaining the facts and circumstances of the

7   confrontation that night and the background that led to

8   that confrontation, the fact that he was dying of terminal

9   cancer, that there was an effort to locate the poisons to

10  assist him in the process.  That it was anticipated to be

11  a horrible death, that he would suffocate, that she was

12  agreeable to assisting him in committing suicide to avoid

13  that pain.

14          And, yes, so we prepped the events pertaining to

15  Joseph's illness, the plan and scheme to ease his

16  suffering, and her testimony with regard to the actual

17  confrontation that evening.

18      *Q.*   During those prep sessions, was there any focus

19  on childhood?

20      *A.*   No, not to my recollection.

21      *Q.*   And why not at that time?

22      *A.*   Oh, I didn't see the relevance of childhood.  In

23  my estimation, at the time, she told a cogent, believable

24  story about how that evening came about.  And so, I mean,

25  we were on the stand seven to eight days, anyway.  If we

1  would have started the story when she was in elementary

2  school, I think we would still be there.  It just wasn't

3  relevant, Mr. Lynch.

4      *Q.*   I guess, in other words, were those meetings at

5  all focused on developing mitigating --

6      *A.*   No.

7      *Q.*   -- evidence?

8      *A.*   I'm sorry to interrupt.  No, they were not.  They

9  were dedicated and devoted to prepping her for Phase 1 and

10 Phase 2 issues.

11     *Q.*   Now you mentioned this learning about meetings

12 with between Mr. Wendi and Mr. DeLozier not being what you

13 thought they were.  During the course of the trial, did

14 you notice any other performance-related issues with

15 Mr. DeLozier?

16     *A.*   Yes, several.

17     *Q.*   What were they?

18     *A.*   In no particular order, I recall one day during

19 the course of trial, I was with Wendi at counsel table.

20 We turned around, and entering the rear of the courtroom

21 was Mr. DeLozier.  And he was a sharp dressed man,

22 three-piece suit, shine on the shoes, a real dapper

23 looking guy.

24          Well, and this was probably a month into the

25 trial, five weeks into the trial, and he comes in and his

1    suit is just hanging on him.

2         I think I turned to Wendi and I said:  Is David

3    sick?  She said:  No, he's not sick.  I said:  Well, he

4    looks terrible.  And she said:  Well, that's the result of

5    his fasting.  I said:  What's he doing?  And she said that

6    that was David's manner to get closer spiritually to God.

7         And so he was only drinking, I believe it was,

8    apple juice and he had only been drinking apple juice

9    since the commencement of the trial.

10         I talked to him about it I believe at that time.

11   I think he said:  I'm doing fine.  Don't worry about me.

12   I don't recall whether I asked him not to do that or

13   change his conduct.  That, I can't tell you.  But he had

14   lost a considerable amount of weight.

15   *Q.*   Do you recall that fast stopping at any point

16   prior to the sentencing phase in Wendi's case?

17   *A.*   I can't tell you.  I don't recall specifically

18   saying to him, you know:  Cut this out.  This is not

19   helping.  And it was okay with Wendi.  So I just didn't

20   see it was my place to tell a man not to get in touch with

21   his deity.  So I don't recall specifically saying:  Don't

22   do that.  And I don't recall remarking to myself or to

23   Wendi thereafter about his physical appearances.

24         Another incident involved his associate, Justin.

25   I forget Justin's last name.

1    *Q.*   Blair.

2    *A.*   Blair.  Justin Blair.  I came to know that

3  Mr. DeLozier had a one-man operation and he had quite a

4  few clients in quite a few different justice courts,

5  municipal courts, superior courts, and he had a wide

6  ranging kind of civil practice and he did some DUI work

7  and that kind of thing.

8          And Justin was his only associate.  And Justin,

9  by my way of thinking, was more than just his associate.

10  He was also like a son to David.  David was very fond of

11  Justin.

12          One morning I got a call from David and he was

13  crying inconsolably and he said that Justin is dead.  And

14  I don't know if I put two and two together that that was

15  his associate.  I said:  Who died?  Justin, my associate.

16  And he was -- he was emotional visibly -- not visibly

17  because I couldn't see him.  But emotionally on the phone,

18  he was shaken.

19          So we came to court the next day and I don't

20  think David was here.  I think may have phoned into

21  Judge Ishikawa's JA that we had a horrible catastrophic

22  occurrence here and we needed a continuance.

23  Judge Ishikawa was kind enough to afford us that.  I think

24  it was a three-day continuance.

25          When we came back in Mr. DeLozier, one of his

1  tasks was to do a direct exam of -- was it Collier?  Or

2  somebody.  And in the middle of his performance, he's just

3  staring at the table with his head down and he just

4  stopped in the middle of it.  I talked to him.  I pushed

5  him and he just -- he wasn't there.  We went to sidebar

6  and we continued for that day.

7          He came back the next day and continued and

8  completed his task.  But he said it was about, you know,

9  the Justin, the death of his associate, that it was still

10  an emotionally difficult circumstance for him to

11  accommodate.

12     Q.   Did you observe any improvement in Mr. DeLozier's

13  handling of that situation through the end of Wendi's

14  trial?

15     A.   I've got to say I think he gave a pretty powerful

16  summation in Phase 3.  I was -- I didn't notice any defect

17  in performance during his participation in the mitigation

18  presentation.

19          I did some of the witnesses.  He did some of the

20  witnesses and he did the summation and opening.  And I was

21  pleased at the time with his performance.

22          So beyond those two circumstances, I don't recall

23  any specific incidents that I could recount relating to

24  his performance.

25     Q.   Mr. Patterson, I want to talk to you generally

1  about the development of the mitigation case.  And you

2  mentioned this a couple of times, but I want to get all

3  the names and chronology straight.  Who was responsible

4  for developing the mitigation case for Wendi's case?

5      *A.*  Under the circumstances that existed in 2001,

6  2004?

7      *Q.*  The circumstances that you were imploring at that

8  time.

9      *A.*  Well, I think ultimately, I'm responsible as the

10  senior attorney.  And, now, currently, the senior attorney

11  is absolutely responsible for the development of all

12  aspects of the case.

13       Back then, I wasn't as experienced in developing

14  those things as I am now.  So I relied on the mitigation

15  person more than I would today.  I relied on Patrick

16  Linderman.  I relied on Scott MacLeod and I relied on

17  co-counsel.

18      *Q.*  In your case team -- specifically, we're talking

19  about this division of labor -- who was responsible for

20  performing the tasks related to mitigation development?

21      *A.*  I believed at the time, the primary

22  responsibility for developing mitigation was the

23  mitigation specialist and David DeLozier who was in a

24  better position to develop the theme that she was a

25  wonderful daughter, a wonderful mom, a good student, a

1    good citizen.  So, yeah, it was their responsibility.

2        Q.   Mr. Patterson, in your experience as a capital

3    attorney, are you familiar with the term social history?

4        A.   Yes.

5        Q.   What is that?

6        A.   Well, I mean, it's the source of all mitigation

7    information, in my estimation.  You start with the

8    earliest possible moments in a client's life and bring it

9    current and you're constantly updating this social

10   history, developments in the county jail, additional

11   psychological evaluations, new witnesses.

12           It's a kind of a chronological recapitulation of

13   the client's life and all significant events that occurred

14   in the client's life, all significant influences in the

15   client's life, corroborated as much as possible with

16   documents and witnesses and those types of things.

17       Q.   Under your current practice, do you submit social

18   history information to mental health professionals?

19       A.   Yes.

20       Q.   Why?

21       A.   Well, because it -- an expert opinion is only as

22   good as the information upon which he or she derives that

23   opinion.  And so a social history of the client, in my

24   estimation, is essential.

25           In a perfect world, you have an absolutely

1   100 percent developed social history.  I don't think in

2   practice, you're able to do that.  But we try to get as

3   well developed a social history as we can before we bring

4   the experts to begin their evaluations of the client,

5   except for the present status evaluator at or near the

6   time of the homicide.  Obviously, you don't have the

7   luxury of a social history at that time.

8           But they're evaluating the client for other

9   reasons, you know, just to determine whether there are

10  Phase 1 issues.  Or the current mental status may give

11  right rise to a belief that there was something in the

12  past that needs to be developed as well.

13          That social history -- a significantly developed

14  social history should be there before your experts go in

15  to begin their evaluations.

16      Q.   Mr. Patterson, let's take a look at Exhibit 6 B.

17      A.   6 B, as in boy?

18      Q.   B, as in boy.

19      A.   6 B.

20      Q.   Are you with me?

21      A.   Yeah.  It appears to be an e-mail from me to

22  Patrick Linderman.

23      Q.   And is that responding to another e-mail?

24      A.   You know, I don't have what anticipated or

25  precipitated this.

1    *Q.*    Just look right below under original message, if

2    you would.

3    *A.*    Oh, is this like a string?

4    *Q.*    Yes.

5    *A.*    All right.  Yeah, it looks like Patrick contacted

6    me.  And even the terminology.  He was the Client Services

7    Coordinator.  I mean --

8    *Q.*    And I was going to ask, what is the Client

9    Services Coordinator?

10    *A.*    It goes back to this person served several

11    functions.  He wasn't just a dedicated capital mitigation

12    specialist like we have now.  He worked all the range of

13    cases, all manner of cases.  So we gave them the generic

14    kind of title, Client Services Coordinator.

15            And, in fact, I had to reflect to Patrick that,

16    at least according to the e-mail, that these were death

17    penalty cases.  I mean, in this day and age, when I give

18    something to my mit person, they know it's a death penalty

19    case.  It's not unique that it's a death penalty case.

20    *Q.*    Well, Mr. Patterson, I just want to take a look

21    at your response to Mr. Linderman.  And, specifically,

22    this sentence:  Both clients should be examined by mental

23    health professionals, not because I believe they suffer

24    from mental illness, but as death penalty cases, a mental

25    health exam can provide a source for mitigation.

1    *A.*    I apparently said that.

2    *Q.*    When was Patrick Linderman assigned to

3    Ms. Andriano's case?

4    *A.*    Well, I can't give you a precise date, Mr. Lynch.

5    *Q.*    Would reference to the first e-mail give you a

6    hint?

7    *A.*    It appears on Wednesday, December 19, I became --

8    2001, I became aware that he in fact would serve that

9    function for Ms. Andriano.  I directed him, pursuant to my

10   return e-mail, to commence a mental illness review to

11   determine if that could be a potential source of

12   mitigation in the case.

13   *Q.*    Okay.  Did he --

14   *A.*    And that was December 20th of 2001.

15   *Q.*    Sure.  And I'm just establishing the time frame

16   here.  So he was assigned December 19th of 2001?

17   *A.*    At or near that time, yes.

18   *Q.*    Sure.  And did he follow your direction to obtain

19   a mental health exam?

20   *A.*    Yes.  I believe I received a report from a

21   Dr. Richard Rosengard.

22   *Q.*    Do you recall the date of that report?

23   *A.*    Could you refresh my recollection here?  Oh, 6 C?

24   *Q.*    6 C would be it.

25   *A.*    The evaluation apparently was conducted June 23,

1  2002, and the report was dictated August 25, 2002.  I have

2  no reason to believe those are incorrect dates.

3  *Q.*   Okay.  During the time period between

4  December 19th of 2001, when Patrick Linderman was

5  assigned, and the date of the evaluation in June of 2002,

6  did Patrick Linderman provide you with a development of

7  any social history done for Ms. Andriano?

8  *A.*   No.

9  *Q.*   Are you aware of Patrick Linderman providing any

10  social history information to Dr. Rosengard?

11  *A.*   I am not aware of any information.  I don't -- I

12  am not aware of anything that Mr. Linderman gave to

13  Dr. Rosengard, except to the extent it might have been

14  recited in his report.

15  *Q.*   Are you aware of any social history information

16  that Mr. DeLozier may have provided to Dr. Rosengard?

17  *A.*   I am not aware of any.

18  *Q.*   Are you aware of any information or social

19  history information for Ms. Andriano that anyone may have

20  provided to Dr. Rosengard before he issued his report?

21  *A.*   Specifically, no.

22  MR. LYNCH:  Your Honor, I would move to admit

23  Exhibit 6 B.

24  THE COURT:  6 what?

25  MR. LYNCH:  6 B, as in boy.

1        THE COURT:  Any objection?

2        MR. HAZARD:  No objection.

3        THE COURT:  It's actually 6.002.

4        MR. LYNCH:  Oh, I apologize.

5        THE COURT:  There being no objection,

6    Exhibit 6.002 is admitted into evidence.

7        Q.   BY MR. LYNCH:  Aside from the e-mail we just

8    looked at in Exhibit 6.002, do you recall giving

9    Mr. Linderman any specific direction on the mitigation

10   investigation?  For example, did you direct him to

11   investigate specific people or to interview specific

12   witnesses?

13       A.   I did not.

14       Q.   At some point, did Mr. Linderman leave the

15   public defender's office?

16       A.   He did.

17       Q.   When was that?

18       A.   Oh, I cannot --

19       Q.   I can help you with your recollection, if you

20   would like.

21       A.   Yeah, please, if you've got something to rekindle

22   my recollection.

23       Q.   Exhibit 6, Paragraph 21.

24       A.   Exhibit 6, Paragraph 21?

25       MR. ARNTSEN:  And 6 comes before 6 B.

1        THE WITNESS:  6 A.  So it's in advance of 6 A?

2        MR. ARNTSEN:  Yes.

3        THE WITNESS:  Is it -- I have my affidavit.

4        MR. ARNTSEN:  Yes.

5        THE WITNESS:  Is that it?  Okay.  Can you direct

6   me to the paragraph?

7        MR. LYNCH:  21.

8        THE WITNESS:  Okay.  It reflects in my

9   affidavit -- and I must have sourced this in some

10  manner -- early 2004.

11      Q.  BY MR. LYNCH:  Early 2004 is when Patrick

12  Linderman left the office?

13      A.  Correct.

14      Q.  Can you recall any significant mitigation work

15  that Mr. Linderman performed on Wendi's case prior to

16  leaving the public defender's office in early 2004?

17      A.  Not specifically, except the general notion, she

18  was a nice woman, a good parent, a good Christian girl,

19  did well in class, that kind of generalized theme.

20      Q.  Other than that generalized theme of a good

21  person, can you think of any other mitigating evidence

22  that he brought to your attention?

23      A.  I recall nothing specifically.

24      Q.  Now after Mr. Linderman left the office in early

25  2004, did anyone take over the mitigation specialist role

1  in Wendi's case?

2      *A.*   Yes.  Scott MacLeod.

3      *Q.*   At the time he became the mitigation specialist,

4  what was your familiarity with Scott MacLeod?

5      *A.*   Just a name and a new personality.  I was not

6  involved in his hire.  I was not involved in his

7  education.  I was not involved in his on-the-job training.

8  He appeared one day and said:  I'm your -- I'm replacing

9  Patrick.  And I understand that you have a caseload and

10 I'm to help you with certain cases on your caseload.

11     *Q.*   Did you meet with Mr. MacLeod once he was

12 assigned -- beyond that initial meeting, did you have

13 further meetings with Mr. MacLeod once he was assigned to

14 your case?

15     *A.*   Irregularly.

16     *Q.*   What does irregularly mean?

17     *A.*   Well, again, we had no -- no protocol that

18 required him to submit any reports.  We had no protocol

19 that required to meet with him in a team meeting context

20 on a weekly or a bi-weekly basis.

21        His office in Mesa was down the hall and I would

22 see him in the hall.  He would update me informally and

23 advise me if there was any specific monetary needs that he

24 may have with regard to my cases.  But, no, we had no

25 specific:  This is what we're going to do next.  This is a

1   punch list that needs to be accomplished.  I did not do it

2   that way with him.

3       *Q.*   Did you give him any specific direction in the

4   mitigation investigation?

5       *A.*   I relied upon his expertise and allowed him free

6   reign to develop what he thought was the appropriate

7   mitigation package for Ms. Andriano.

8       *Q.*   What expertise did Mr. MacLeod have?

9       *A.*   Mr. MacLeod, again, I didn't go over his

10  particulars or his resumé.  He was hired by my superiors

11  and assigned to assist me in the defense of Ms. Andriano's

12  case.  I don't know what his bona fides were.  Sorry.

13          MR. LYNCH:  Your Honor, this may be a good time

14  for the morning break here.

15          THE COURT:  Okay.  We will go ahead and take our

16  morning recess at this time.  We will be in recess for

17  about 15 minutes.

18          (WHEREUPON, a recess ensued from 10:45 a.m. to

19  11:04 a.m.)

20          THE COURT:  This is CR 2000-096032, State of

21  Arizona vs. Wendi Elizabeth Andriano.

22          The record will reflect the presence of the

23  parties and counsel.

24          The record will reflect that Mr. Daniel Patterson

25  is on the witness stand.  We will continue with the direct

1   examination by Mr. Lynch.

2         Mr. Lynch.

3   *Q.*   BY MR. LYNCH:  Yes.  One more question.  We were

4   talking about Scott MacLeod before the break.  Did

5   Mr. MacLeod ever recommend that you retain any experts?

6   *A.*   No.

7   *Q.*   Did Mr. MacLeod ever provide you with any

8   information regarding the potential childhood abuse of

9   Ms. Andriano?

10   *A.*   He -- directly, no.  The information I received

11   is as I previously discussed with you through

12   Dr. Rosengard's report.

13   *Q.*   Sure.  At some point in the preparation of

14   Ms. Andriano's case, did the defense team settle upon

15   themes for the mitigation portion of the case?

16   *A.*   By default.  I mean, we didn't sit down and say:

17   This is the way it's going to go.  The most plausible

18   mitigating information that I had at the time was, as I

19   said, that she was a good woman, she took care of her

20   kids, and she was a devoted wife, that she was -- I mean,

21   to the extent it integrated with the Phase 1 stuff, that

22   she was in love with her husband and desirous of making

23   his final months as painless as possible.

24   *Q.*   I guess that's what I'm asking is how were those

25   themes that you just mentioned determined?  Were the

1  themes driven by what you found during the mitigation

2  investigation or vice versa?

3      *A.*   I don't quite understand your question.

4      *Q.*   Well, let me --

5      *A.*   Let me answer it in the converse or in the

6  whatever.  Nothing was ever presented to me during the

7  course of my representation of Ms. Andriano that she

8  suffered from a significant mental illness.  No

9  information was presented to me that she had a significant

10  drug problem, that she had a significant sexual abuse

11  dysfunctional development, except to the extent that we

12  did develop it through Sharon Murphy.  She was

13  uncomfortable with certain of the preferences of her

14  husband and that she did it anyway because she thought

15  that was what a good wife should do.

16      I had no independent information that she had

17  a -- had been abused as a child or as a young adult or

18  that any of that kind of stuff was visited upon her by

19  relatives, parents, stepparents, anything of that nature.

20      So, by default, the theory of the theme became

21  she's a good woman, she's a good mom, she's a hard worker,

22  she provides for the family, those kinds of things.

23      *Q.*   And was that theme based on the information that

24  the mitigation specialist provided to you?

25      *A.*   Yes.

1    *Q.*   Why don't you take a look at Exhibit 138?  Sorry
2    to make you keep changing binders here.
3    *A.*   It appears to be the PowerPoint or Excel or
4    spreadsheet, whatever the heck you call it, that was
5    presented during the mitigation phase in Ms. Andriano's
6    trial.
7    *Q.*   Were you personally involved in the preparation
8    of this?
9    *A.*   No.  Well, I did not obtain any of the items that
10   were incorporated in it.  I reviewed it prior to its
11   presentation.  I made no corrections or additions to it.
12   *Q.*   All right.  Who did initially prepare the
13   PowerPoint?
14   *A.*   I think this was produced by Scott MacLeod in
15   conjunction with information supplied to him by David
16   DeLozier or directly from her parents, Alejo and Donna
17   Ochoa.
18   *Q.*   Have you had a chance to just take a look through
19   Exhibit 138?
20   *A.*   Yeah.  It appears to be in some part a social
21   history, if you will, a life story, a chronology of
22   significant events in Ms. Andriano's life up to that point
23   in time.
24   *Q.*   In drawing on your knowledge today and
25   recollection of the PowerPoint at trial, do you recall

1  Mr. MacLeod presenting you with any potentially mitigating
2  evidence that's not included in that PowerPoint?

3     *A.*   No.  Was I -- to paraphrase your question, I did
4  not ask that other things be included in this
5  presentation, nor did I reject any of the things contained
6  therein.  And I know of no other information that should
7  have been included in this presentation, such as it is.

8     *Q.*   Do you recall Mr. MacLeod presenting you with any
9  social history information that's not included in that
10  PowerPoint?

11    *A.*   No.

12    *Q.*   Do you recall Mr. DeLozier presenting you with
13  any information at all about the Ochoas that is
14  inconsistent with what's included in that PowerPoint?

15    *A.*   No.  I derived no information from Mr. DeLozier
16  inconsistent with the presentation of in this PowerPoint,
17  which essentially says she's a good mom, good student,
18  good person, that kind of thing.

19        MR. LYNCH:  Your Honor, I move to admit
20  Exhibit 138.

21        THE COURT:  Any objection?

22        MR. HAZARD:  No objection.

23        THE COURT:  Exhibit No. 138 for identification is
24  admitted into evidence.

25    *Q.*   BY MR. LYNCH:  Mr. Patterson, I'll give you a

1   minute to get the binders out of your way.

2       *A.*   I'm sorry.  There's too many up here.  There we

3   go.  Okay.

4       *Q.*   Mr. Patterson, you mentioned earlier that the

5   mitigation investigation was really delegated to the

6   mitigation specialist?

7       *A.*   Yes.

8       *Q.*   And to Mr. DeLozier?

9       *A.*   Yes.

10      *Q.*   Do you personally have any expertise in

11   interviewing victims of childhood sexual abuse?

12      *A.*   I've never been trained in that regard, but just

13   as a function of doing this for over 30 years, I have some

14   intuitive senses about it.  But, no, I have no specialized

15   training.

16      *Q.*   Did you personally investigate whether Wendi was

17   a victim of childhood sexual abuse?

18      *A.*   I did not.

19      *Q.*   Did you personally investigate whether Wendi had

20   suffered any other childhood trauma?

21      *A.*   To the extent that I went to see a gentleman by

22   the name of Shawn King, the primary purpose of meeting

23   with Mr. King, who was a former boyfriend, had to do with

24   efforts to acquire the sodium azide or similar substance.

25           It wasn't -- the function of the meeting was not

1 to develop mitigation information, but as a former

2 boyfriend, he did allow some information in that regard,

3 but nothing that I recall that would be significant.

4        Beyond that, in terms of interviewing, I did the

5 brother's direct at trial.   I met with Donna and Alejo on

6 a number of occasions, which presented the possibility for

7 mitigation development, but nothing concrete was derived

8 in those meetings with Donna or Alejo, and nothing that I

9 developed did I then give to Scott MacLeod, Patrick

10 Linderman or David DeLozier.

11    Q.   In those meetings with you mentioned Wendi and

12 Brandon and Donna and Alejo and Shawn King?

13    A.   Shawn King.

14    Q.   Is that everyone, I'm thinking?

15    A.   Those are the ones that I just referenced in our

16 immediate discussion, yes.

17    Q.   Right.   In those interviews, was the focus of

18 those interviews to investigate whether Wendi had suffered

19 any childhood trauma?

20    A.   Was that my purpose for meeting with those

21 people?  No.  Obviously, my purpose was to gather

22 information that might be beneficial in assisting in

23 Phase 1 or Phase 2 issues.  To the extent that something

24 may have come up because I was there, it may have had some

25 mitigation function as well.

1        But nothing specific came up.  Nothing adverse

2   about her background development, rearing, if you will,

3   was ever disclosed to me during the course of those

4   meetings with any of those people.

5        Q.   And by use of the term came up, do you mean

6   disclosed by them to you?

7        A.   Right.  Because I didn't go into the meeting

8   knowing, oh, this bad thing has happened to Wendi.  We

9   need to talk about it.  Oh, this happened to her when she

10  was this age.  We need to talk about it.

11       Had I been presented with that kind of

12  information, the substance of our meeting would have been

13  different.  My information was she's a wonder kid, a

14  wonderful student, graduated first in her class, a strong

15  Christian background.  How can you -- you know, that's

16  not -- I'm not concerned about the mitigation now.

17       What was her relationship with Mr. Andriano?

18  What would have precipitated the confrontation that night?

19  Was Mr. Andriano dying of cancer?  Those kinds of things.

20  But that was the focus of my discussions with those folks.

21       Q.   And you talked earlier about discretion given to

22  the mitigation specialist.  But just to confirm, did you

23  give any specific direction to any mitigation specialist

24  to investigate whether Wendi was the victim of childhood

25  molestation or trauma?

1    *A.*   That topic, specifically no.  And other than that

2    initial kind of contact in e-mail with Patrick Linderman

3    to have her evaluated for mental illness, no, I did not

4    have specific daily direction, no input for either

5    Mr. Linderman or Mr. MacLeod.  I was relying upon

6    Mr. DeLozier to assist in that regard and the expertise of

7    the mitigation people.

8    *Q.*   Did you direct Mr. DeLozier to investigate

9    whether Wendi was the victim of childhood molestation or

10   abuse?

11   *A.*   I did not.  I had no reason to believe that -- I

12   guess, as is customary today, yes, these are one or some

13   of the areas we just as a matter of course investigate.

14         In '04, '01, '02, '03, absent some kind of

15   suggestion that there is an issue there, I did not

16   routinely investigate those kinds of situations.

17   *Q.*   Mr. Patterson, my question was just about

18   Mr. DeLozier.  Did you give him any direction?

19   *A.*   Well, because it's connected, Mr. Lynch, if I had

20   reason to believe that that existed, I certainly would

21   have said to Mr. Linderman, Mr. MacLeod or Mr. DeLozier:

22   Hey, we've got a credible witness that says she was abused

23   physically and sexually at the tender age of ten, we need

24   to flush that out.  I had no indication that that was

25   true.  So I did not give him a generalized directive

1   rule out sexual abuse.  Does that answer your question?

2      Q.   No, that -- that does.

3      A.   Okay.

4      Q.   Did you direct any experts to specifically assess

5   whether Wendi manifested any symptoms of childhood sexual

6   abuse?

7      A.   Well, again I was -- there were other mental

8   health people involved in the process.  Dr. Potts

9   completed a Rule 11 evaluation by the time I got there.

10  Dr. Rosengard weighed in with his opinions.  Susan --

11  Sharon Murphy, albeit she is not a Ph.D. in the

12  business -- I believe she had master's in social work and

13  certainly dealt with mental health issues.  She developed

14  a number of mental health issues as it related to the

15  relationship that Wendi had with Joseph.

16         Mindy Mechanic, who is a professor at Cal

17  Fullerton or Cal Irvine, one of the two, was brought on

18  board specifically to deal with the issues raised by

19  Dr. Potts, who is a Ph.D., a psychologist.

20         So there were other mental health people involved

21  in the process.  So did I give directive to Mr. MacLeod to

22  bring in experts beyond those people?  No, I did not.

23     Q.   My question was a little more specific.  Did you

24  ever give direction to either Dr. Rosengard or any of the

25  other experts you mentioned to specifically assess whether

1  Wendi exhibited any symptoms consistent with childhood

2  sexual abuse?

3      *A.*   I did not.

4      *Q.*   Why didn't -- and I think you've already answered

5  this in question, but I'll ask again.  Why didn't you

6  investigate further into Wendi's -- whether Wendi was the

7  victim of childhood sexual abuse?

8      *A.*   Again, it wasn't something that I believed the

9  standard of care required, as a matter of course, to

10  investigate sexual abuse absent some kind of indication

11  that there was a problem.

12          Dr. Rosengard, in his report, said there may have

13  been, but it didn't appear to him to be psychologically

14  significant or psychiatrically significantly.  So that's

15  why I didn't pursue that any further.  I had no credible

16  witness who supplied information either that she was

17  sexually abused, nor did the client advise me that there

18  was something there.

19      *Q.*   So I understand, you weren't provided with

20  information suggesting that there was childhood sexual

21  abuse for Wendi?  That's the reason you didn't further

22  investigate that?

23      *A.*   Yes.

24      *Q.*   Are there any other reasons why you didn't either

25  personally or direct others to investigate childhood

1  sexual abuse?

2     *A.*   I didn't think it was a significant issue in the

3  development of mitigation or development of the defense

4  for Ms. Andriano.

5     *Q.*   Is that the same as not being presented any

6  information suggesting there was childhood sexual abuse?

7     *A.*   Right.  I think -- I mean, there are certain

8  things now that we do as a matter of course.  I didn't do

9  them as a matter of course back then absent some indicator

10  that it was a fertile area to explore.

11        Sexual abuse history can be a significant

12  mitigator.  But I had no -- no reporters advising me that

13  it was an issue, nor did the client claim that there was

14  an issue.

15     *Q.*   Did Mr. MacLeod advice that it was an issue?

16     *A.*   No, no.  No, he did not tell me.  If he thought

17  it was an issue, he certainly did not report that to me.

18     *Q.*   Were there any other reasons, besides this

19  concept that there was lack of fertile ground, for not

20  further investigating any childhood sexual abuse?

21     *A.*   No.  It certainly wasn't a strategic decision, if

22  that's what you're saying.  No, you can't exercise or make

23  a strategic decision absent some information.  And I

24  didn't have any information that sexual abuse was an issue

25  in Ms. Andriano's case.

1    *Q.*   Just one final question about the childhood

2    sexual abuse.   Did Mr. DeLozier give you any information

3    to suggest there was a childhood sexual abuse theme for

4    mitigation then?

5    *A.*   No, he did not.

6    *Q.*   With regard to mental health, just to confirm

7    with you personally, do you have any expertise in mental

8    health diagnoses?

9    *A.*   Except that derived over 35 years in this

10   business.

11   *Q.*   Sure.   But no education?

12   *A.*   No education, no.   I can talk political science

13   with you, but I don't know.   My training area is not in

14   the area of psychological development or psychological

15   issues.

16   *Q.*   Aside from the report of Dr. Rosengard that you

17   have mention a few times, did you investigate Wendi's

18   mental health as a potential mitigating factor?

19   *A.*   Only to the extent that her relationship with

20   Joseph.   As the defense -- Phase 1 defense/mitigation had

21   to do with her characterizing her relationship with Joseph

22   as that of a domestic violence victim.   That she -- her

23   mental abilities, decision making abilities were

24   overborne, if you will, if that's a word, by this abusive

25   history with her husband, primarily sexually.   He

1   wasn't -- he didn't beat her.  He didn't yell at her, but

2   he forced her to do things that she found distasteful, and

3   in that manner, we believed controlled her conduct.

4         That being said, we brought in Sharon Murphy to

5   attest to that and Mindy Mechanic to corroborate her

6   findings.

7         Independent of that, no, we didn't have any

8   reason to believe that she suffered from a mental illness

9   or disease or defect that either accounted for the

10  incident, nor was compelling mitigation.  So we didn't

11  explore it.

12      Q.   After he issued his report, did you ask

13  Dr. Rosengard to perform any additional work --

14      A.   I did not.

15      Q.   -- related to Wendi's case?

16      A.   I did not.

17      Q.   And other than the investigation of domestic

18  violence issues and potential psychiatric consequences

19  coming from those, did you direct Sharon Murphy or Mindy

20  Mechanic to investigate any other mental health issues?

21      A.   Only to the extent that Mindy Mechanic was

22  primarily rebuttal to the government expert Brad Bayless,

23  who apparently had administered -- as I recall,

24  administered an MMPI, saw an absence of indicators in the

25  MMPI that related to ST, the battle fatigue,

1  post-traumatic stress disorder.  And she had the

2  credentials.  She was a psychology professor.  So she did,

3  in the context of her rebuttal development, assay, if you

4  will, her mental health.

5      Q.   Let's talk about Mindy Mechanic.  Did Mindy

6  Mechanic evaluate Wendi?

7      A.   I don't know that she gave a clinical evaluation,

8  no.  I think her review was limited to the review of

9  materials that Dr. Bayless administered to Ms. Andriano.

10  I don't think she gave an independent psychiatric or

11  psychological evaluation.  That's my recollection.

12      Q.   Other than --

13      A.   And I'm not suggesting that Dr. Mechanic gave her

14  a thorough, you know, cover-to-cover mental health

15  evaluation.  I'm not suggesting that.  Plus, she was a

16  mental health professional who could have given me

17  information if she had reservations about her mental

18  health.

19      Q.   Mr. Patterson, would it be helpful just to

20  revisit the transcript from Mindy Mechanic just to clear

21  up this whole evaluation thing?

22      A.   Please, if I'm missing something, let me know.

23      Q.   All right.

24          MR. LYNCH:  I think this is just an excerpt from

25  a transcript.  I mean, it's already technically in the

1  record for this case, but I would just bring it along to

2  confirm what Mindy Mechanic did.

3         THE COURT:  Why don't you share it with counsel

4  before?  Has it been marked?  Has this portion been marked

5  for identification as an exhibit?

6         MR. LYNCH:  Not yet.

7         THE CLERK:  It's going to be marked as 229.

8         THE COURT:  229 C?

9         THE CLERK:  No.  Just 229.  I'm sorry.

10        MR. LYNCH:  May I approach?

11        THE COURT:  Yes.

12   *Q.*  BY MR. LYNCH:  Mr. Patterson, I can represent to

13  you this is an excerpt from Mindy Mechanic's testimony

14  from November 15, 2004, specifically Page 8 of that

15  testimony.  It has now been marked as Exhibit 229.

16   *A.*  Yeah, I've reviewed it, Mr. Lynch.  I think it's

17  consistent with my testimony.  I'm not asserting that she

18  was given a full battery of tests, instruments that

19  psychologists use to determine mental health disease or

20  defect.  Her function was to review Dr. Bayless's work and

21  weigh in with regard to the validity of his findings.

22   *Q.*  And just to confirm, did she ever evaluate Wendi

23  at all?

24   *A.*  No.  According to the transcript and according to

25  my recollection as refreshed, no, she did not give her a

1   battery of psychological instruments that would allow her

2   to come to any conclusions with regard to her mental

3   health except to the extent she reviewed Dr. Bayless's

4   work product.

5          MR. LYNCH:  Your Honor, as I mentioned, this I

6   guess technically is in the record, but, nevertheless,

7   I'll move Exhibit 229, the excerpt of November 15, 2004.

8          MR. HAZARD:  I object, Your Honor.  It's

9   intrinsic evidence of the witness at this point.

10          THE COURT:  I'll sustain the objection.  He's

11   testified to his recollection.

12     *Q.*   BY MR. LYNCH:  Mr. Patterson, other than you

13   mentioned Sharon Murphy, Mindy Mechanic, Dr. Rosengard,

14   did you engage any other experts to further evaluate

15   Wendi's mental health?

16     *A.*   I did not.

17     *Q.*   Did you direct Patrick Linderman to engage any

18   other experts, other than Dr. Rosengard, to further

19   evaluate Wendi's mental health?

20     *A.*   I did not.

21     *Q.*   Did you direct Scott McLeod to engage any other

22   experts to further evaluate Wendi's mental health?

23     *A.*   I did not.

24     *Q.*   And the same question with David DeLozier.  Did

25   you direct him to engage any other experts?

1       *A.*    The same answer, I did not.

2       *Q.*    Mr. Patterson, why didn't you investigate further

3   into potential mental health issues as a mitigating

4   factor?

5       *A.*    Based upon Dr. Rosengard's report, I didn't see

6   that to be an issue in her case.  The facts and

7   circumstances of her conduct and the defense that we had

8   chosen were not wholly consistent with mental disease,

9   defect or illness.  None of the persons involved in the

10  case brought to my attention any need for further mental

11  health inquiry.

12          My experiences person-to-person with Ms. Andriano

13  didn't lead me to believe that there was an issue --

14  mental health issue.  None of her close relatives or

15  family suggested there was a mental health issue.  Her

16  history, her performance in high school suggested that if

17  she had metal health issues, she had certainly adapted

18  with them.  And to suggest that she had mental health

19  problems, see, I can't say what I would have done with

20  that information had it been developed at the time.  We

21  didn't develop it.  So I don't know, beyond what I just

22  told you, whether it would have had application in the

23  trial.

24      *Q.*    On other than those reasons, did you have any

25  strategic reason not to further investigate?

1    *A.*   No.   Again, you can't develop a strategy to not

2   introduce something that you don't know exists.   So it

3   wasn't a strategic or tactical issue.

4    *Q.*   Okay.   Mr. Patterson, you mentioned Dr. Rosengard

5   a few times.   Can you take a look at his report,

6   Exhibit 6 C?

7    *A.*   6 C.   Okay.   Got it.

8         MR. LYNCH:   And I believe 6 C is admitted as 6 C.

9         THE COURT:   For the record, we're referring to

10   6.002 --

11         MR. LYNCH:   Thank you, Your Honor.

12         THE COURT:   -- for identification.

13    *Q.*   BY MR. LYNCH:   First, Mr. Patterson, can you just

14   confirm the date of Dr. Rosengard's report?

15    *A.*   Dictation date is August 25, 2002.

16    *Q.*   As far as Rosengard's report goes, I would like

17   to draw your attention to the date of the evaluation right

18   underneath the addressee.

19    *A.*   June 23, 2002.

20    *Q.*   Mr. Patterson, is your understanding that

21   Dr. Rosengard only had one meeting with Ms. Andriano?

22    *A.*   It appears, yes, one in-person discussion with

23   her.

24         (WHEREUPON, an off-the-record discussion ensued.)

25         MR. LYNCH:   Your Honor, it's my understanding

1    that this is not reflected.  It's 6.00 --

2            MR. ARNTSEN:  3.

3            MR. LYNCH:  3.  I think in the parties' pretrial

4    list, it was stipulated into evidence.  However, it's not

5    reflected that way now.

6            Is that the right way to understand it, Ms. Gard?

7            THE COURT:  I don't think it was stipulated as

8    far as I know.

9            MR. HAZARD:  Regardless, I have no objection to

10   admitting it.

11           THE COURT:  I don't think it was stipulated in

12   before, but if there is no objection, then

13   Exhibit No. 6.003 for identification is admitted into

14   evidence.

15       Q.   BY MR. LYNCH:  And, Mr. Patterson, I want to draw

16   your attention to the last paragraph on that page, just

17   looking at the first two sentences there.

18       A.   I reviewed the cover letter?  That paragraph?

19       Q.   That paragraph, yes.

20       A.   Okay.  All right.

21       Q.   Let me know when you've had a chance to review

22   those.

23       A.   Yes, I'm familiar with its contents.

24       Q.   Do you have any reason to believe that

25   Dr. Rosengard was provided any additional materials that

1  are not mentioned there?

2      *A.*    I have no reason to believe that other than the

3  materials reflected in the report, those were the

4  materials that he reviewed in advance or in anticipation

5  of his face-to-face meeting with Ms. Andriano in the

6  Estrella Jail.

7      *Q.*    Please turn to Page 3 of the report, if you

8  would.

9      *A.*    Two, 3.  Yes I have that.

10     *Q.*    I've got to catch up with you.  Page 3, under

11  other psychiatric conditions, the second paragraph there.

12     *A.*    I see it.

13     *Q.*    I'm just going to read this into the record:  The

14  defendant indicated that her mother and therapist say that

15  her biological grandfather sexually abused her when she

16  was under the age of three.  Although, she could not

17  recall that and had no dreams or flashbacks.  She had had

18  difficulty in trusting others sexually but was able to

19  enjoy herself with the exception of intercourse --

20          THE COURT:  Slow down.

21          MR. LYNCH:  My apologies.  Was able to enjoy

22  herself with the exception of intercourse and she did not

23  like that.  She got easily upset in dealing with others

24  who were in abusive relationships, and with the aid of

25  therapy, she felt that she was in an abusive relationship

1  with her husband.  She was particularly upset in finding

2  out about and dealing with children who were sexually

3  abused.

4      *Q.*  BY MR. LYNCH:  Mr. Patterson, did you personally

5  investigate whether Wendi had been sexually abused by her

6  biological grandfather?

7      *A.*  We were made -- I was made aware, during the

8  course of the representation, that a grandfather was

9  incarcerated in Arizona.  And the allegation had to do

10  with some sexual abuse allegation.  Whether it was

11  specific to Wendi, that I can't answer.  And I did no

12  further investigation to ascertain whether it was specific

13  to Wendi.

14      *Q.*  Did you interview the grandfather or father who

15  was in prison?

16      *A.*  Well, I think we're talking about two separate

17  people here.  And the answer is, no, I did not interview

18  either of those two individuals, be it the biological

19  grandfather, nor a biological father.

20      *Q.*  Did you investigate whether Wendi had been

21  sexually abused by anyone else who had regular access to

22  her as a child?

23      *A.*  I did not.  Well, I was not -- I was not informed

24  that there were other potential abusers out there that

25  required investigation.  So the answer is, no, I did not

1  talk with anybody else.

2      *Q.*   And, finally, did you direct anyone else to do

3  so?

4      *A.*   I did not, for the same reason.

5      *Q.*   Flip to Page 5, if you would.

6      *A.*   Got it.

7      *Q.*   I'm just looking at the diagnostic impression

8  there.

9      *A.*   Uh-huh.

10     *Q.*   So the first major affective disorder depression,

11  what did you understand that diagnosis to be?

12     *A.*   I believed that it was situational as a result of

13  dealing with husband's cancer, the plan to deal with the

14  last days of his life, and the actual confrontation that

15  night resulted in Joseph's death.  That she was depressed

16  as a result of those events.  Well, in the summary

17  opinions and recommendations, the doctor suggested that

18  can be treated with a pill.  So I didn't find that to be a

19  significant mental health issue.

20     *Q.*   Did you investigate any alternative causes of

21  what Dr. Rosengard believed to be major affective disorder

22  or depression?

23     *A.*   I did not.  I relied upon the body of his report.

24     *Q.*   Did you direct anyone else to do so?

25     *A.*   I did not.

1    *Q.*    The next diagnosis:  Probable post-traumatic

2   stress disorder.

3    *A.*    Again, based upon the report and the totality of

4   the report, I concluded that that was a result of those

5   events:  The cancer of the husband, the discord in the

6   family because of it, the cancer and the events of that

7   evening that resulted in Mr. Andriano's death.  That was

8   the PTSD precipitator, for want of a better term.

9    *Q.*    Did you investigate any further regarding any

10  other potential sources of her PTSD?

11   *A.*    I did not.

12   *Q.*    Did you direct anyone else to do so?

13   *A.*    I did not.

14   *Q.*    Let's turn to, well, I guess the final diagnosis.

15  Sorry.  I almost skipped one.  Panic disorder.

16   *A.*    I would give you the same answer.  That she had

17  no demonstrable mental health issue prior to the

18  chronological events that we have discussed, her husband

19  getting cancer, her dealing with the cancer.  Her

20  developing in context with and in concert with Joseph,

21  they planned to deal with his last days and the

22  confrontation that occurred that evening.

23   *Q.*    Mr. Patterson, if you would just turn back to

24  Page 3.

25   *A.*    Okay.

1    *Q.*   I'm looking at the beginning of the first full

2   paragraph:  The defendant denied simply --

3          THE COURT:  Slow down.  Slow down.  Start over

4   and slow down.

5          MR. ARNTSEN:  You're admonished.

6          THE COURT:  It's a preemptive for the court

7   reporter.

8    *Q.*   BY MR. LYNCH:  The defendant denied symptoms that

9   would be consistent with manic episodes, but did admit to

10  panic attacks since childhood.

11         Did you do any further investigation into what

12  the source of those panic attacks since childhood may have

13  been?

14   *A.*   I personally did not.

15   *Q.*   Did you direct anyone else to do so?

16   *A.*   I did not.

17   *Q.*   Mr. Patterson, during the course of your

18  representation, did you become familiar with an individual

19  named Kandy Rohde?

20   *A.*   Yes.  That individual is familiar to me.

21   *Q.*   Who is she?

22   *A.*   She was a participant in the case when I arrived.

23  She apparently -- her services are were paid for by the

24  parents.  Her contact person primarily was David DeLozier.

25  And her function was to assist Wendi in dealing with the

1  aftermath issues of the homicide, the fact that she was

2  incarcerated, the fact that she didn't have her children,

3  couldn't see her children, to deal with those issues.

4  That was her function.

5      MR. LYNCH:  I'm just going to have one more

6  exhibit for marking.  It's going to be marked as --

7      MR. ARNTSEN:  230.

8      MR. LYNCH:  230.

9      MR. ARNTSEN:  Did he give you one?

10     MS. GARD:  Yes, we got one.  Thank you.

11  Q.   BY MR. LYNCH:  Mr. Patterson, what is this

12  document?

13  A.   Well, I mean, it kind of speaks for itself.  It

14  appears to be a pleading filed in this case at a time

15  before I became involved with it.  It's dated February 22,

16  2001.  It seeks what appears to be a standard Rule 11

17  evaluation of the client for competency.

18  Q.   Would this have been one of the pleadings you

19  reviewed when you took over the case?

20  A.   I assume if it was in the file, yes.  It's

21  something that, although -- yes, I must have reviewed it.

22  Do I have a specific independent recollection sitting down

23  with this document?  No.  But if it would have been part

24  of the file, I would have reviewed it.

25      MR. ARNTSEN:  I move for the admission of

1   Exhibit 230.

2           THE COURT:  Any objection?

3           MR. HAZARD:  No objection.

4           THE COURT:  Exhibit No. 230 for identification is

5   admitted into evidence.

6       *Q.*  BY MR. LYNCH:  Mr. Patterson, would you turn to I

7   guess it's marked as what appears as Exhibit 1 to

8   Exhibit 230.  This appears to be a letter from Kandy Rohde

9   to David DeLozier attached to that motion; is that right?

10      *A.*  Yes.  And I have no independent recollection of

11  this document.  It was appended to the Rule 11 Petition.

12  Again, I don't independently remember this.

13      *Q.*  Well, just to confirm, I want you to take a look

14  at just a few diagnoses.  And I'll read this line:  I

15  believe that her willingness to give up her will to others

16  is a symptom of some kind of personality disorder.  I also

17  suspect that her defense system includes dissociation.

18  Her mother's reference to possible abuse by Wendi's

19  paternal grandfather could be the origin of that

20  dissociation.

21          The intense sense of peace she describes since

22  the arrest is sufficiently inappropriate, causing me to

23  ask for collaboration for another specialist.

24          Just to confirm, Mr. Patterson, do you ever ask

25  any mental health professionals to evaluate Wend's

1    symptoms of dissociation?

2        *A.*    I don't remember.  Well, the answer to your

3    question is no.  I did no independent evaluation -- or

4    strike that.  Let me back up.  I did not request any

5    mental health expert to evaluate Wendi Andriano for the

6    expressed purpose of determining whether she had any

7    dissociative traits.

8        *Q.*    At the time, what was your understanding of

9    dissociation?

10       *A.*    Again, it's a layman's perspective here.  But

11   being able to remove oneself from circumstances,

12   dissociating yourself from the realties of a current set

13   of stressors.  You know, going off to never, never land

14   to avoid the realities -- harsh realities of life, those

15   kinds of things.

16       *Q.*    Did you have any familiarity at the time

17   regarding any links between childhood sexual abuse and the

18   subsequent dissociation?

19       *A.*    Did I specifically have knowledge of those

20   connections?  No, not that I'm aware of.

21       *Q.*    Did you direct anyone to specifically investigate

22   whether Wendi suffered dissociation caused by childhood

23   sexual abuse?

24       *A.*    I did not.

25       *Q.*    Let's turn to what's has been marked as

1  Exhibit 50.  We're keeping your arms busy, Mr. Patterson.

2     *A.*   I need the exercise.  Exhibit 50?

3     *Q.*   Yes.

4     *A.*   It appears to be the last in this binder.  It

5  appears to be another e-mail from Donna Ochoa.  Is that

6  what we're talking about?

7     *Q.*   Yes.

8     *A.*   Bates 009456?

9     *Q.*   Well, I want to direct your attention to the last

10 line or last few sentences here starting with:  Wendi's

11 therapist Kandy Rohde would really like to hear from your

12 office.  She's trying to keep a definite distinction

13 between her relationship with Wendi and the defense, so

14 that she doesn't appear to be part of the defense.  Does

15 that make sense?  Anyway, please give her a call.  She has

16 good information.

17       Do you recall giving Kandy Rohde a call after

18 receiving this e-mail?

19    *A.*   I really can't answer that, no.  I have no

20 specific recollection of initiating a telephone call to

21 Ms. Rohde as a result of receiving, if I did receive this

22 particular e-mail.

23       MR. LYNCH:  Your Honor, I move to admit

24 Exhibit 50.

25       MR. HAZARD:  I have no objection.

1        THE COURT:  Exhibit No. 50 for identification is

2  admitted into evidence.

3        *Q.*   BY MR. LYNCH:  Mr. Patterson, can we make your

4  arms work again and go to Exhibit 6004?  It would be 6 D I

5  believe in the binders.

6        *A.*   Yes, I have it.

7        *Q.*   Mr. Patterson, this appears to be an e-mail

8  exchange between you and Michelle Arvanitas on

9  February 13th of 2002 and February 14th of 2002; is that

10  right?

11        *A.*   It is dated Thursday, February 14, 2002.  It

12  appears to be a response that I received from Michelle

13  after I -- let's see.  Let me get the sequence here.  She

14  sent me an e-mail reciting her discussions with David

15  DeLozier and Kandy Rohde.  And I responded with:  Thank

16  you, Michelle.  So I assume I received it and I assume I

17  responded appropriately.

18        *Q.*   Just looking at the middle of the page where

19  beginning with:  I also spoke with Kandy Rohde, Wendi's

20  counselor.  Wendi was diagnosed with three things,

21  according to Kandy.  And I'll just list them:

22  Depersonalization disorder, dissociative amnesia, and

23  physical, sexual or neglect of a child.  I assume that's

24  supposed to be physical sexual abuse or neglect.

25        Did you specifically follow up on the

1  depersonalization disorder?

2      *A.*   I can't tell you.

3      *Q.*   That, you don't recall?

4      *A.*   I don't recall.  I did not obviously retain any

5  expert with the expressed purpose of evaluating any of the

6  three items mentioned in that e-mail from Michelle

7  Arvanitas.

8          MR. LYNCH:  I move to admit Exhibit 6.004.

9          THE COURT:  Any objection?

10         MR. HAZARD:  Well, I object if it's being offered

11 for the truth of the matter asserted as to Ms. Rohde's

12 conclusions.  But if it's being offered for other reasons,

13 then no.

14         MR. LYNCH:  Your Honor, it's being offered not

15 for the truth of the diagnoses by Kandy Rohde.

16         THE COURT:  Exhibit No. 6.004 then is admitted

17 into evidence.

18     *Q.*   BY MR. LYNCH:  Mr. Patterson, you mentioned

19 Sharon Murphy previously as a domestic violence expert.

20 Can you remind me again what her educational credentials

21 were?

22     *A.*   My belief is that she was an adjunct professor in

23 sociology, women's issues with the Arizona State

24 University in Tempe.  She has since moved to

25 New Hampshire.  In fact, I think she had moved to

1   New Hampshire to be a professor at the University of

2   New Hampshire in advance of the trial.  I think we had to

3   bring her in from New Hampshire, as I recall.  So, you

4   know, that's her credentials.

5           She was recommended to me I believe by a clearing

6   house for abused women issues out of Philadelphia.  I

7   think that's where I derived her name, or from other

8   colleagues in the office who had used her in the domestic

9   violence context previously.

10      Q.   Did you work closely with Ms. Murphy during the

11  development of the case?

12      A.   Yes.

13      Q.   Would you turn to Exhibit 52?  I think it's a new

14  binder again.

15      A.   Okay.  It appears to be two e-mails dated 3/30/03

16  and 3/25/03.

17      Q.   I just want to focus on the first e-mail, the

18  3/30/2003.

19      A.   The first one, 3/30/03?

20      Q.   Yes.

21      A.   Okay.

22      Q.   I want to just start with the middle paragraph:

23  She learned to dissociate from painful memories a long

24  time ago.  That is very clear to me.  Are you going to

25  subpoena her counselor?  I know there is something that

1    happened during childhood, but she hasn't told me yet.

2    I'll get at it before we're finished.

3           Mr. Patterson, did you follow up on dissociation

4    from painful memories a long time ago in this e-mail?

5    A.    As specifically, I don't recall whether I did or

6    not, Mr. Lynch.  I know I worked with Ms. Murphy and she

7    did not present that issue as a significant area to be

8    explored.  So I did not follow up on it.  And I also note

9    that it was apparently sent to David as well, who I relied

10   upon to develop the mitigation aspect of this case.

11          MR. LYNCH:  Your Honor, I move admission of

12   Exhibit 52 subject to the same, not for the truth of the

13   matter.

14          THE COURT:  Any objection?

15          MR. HAZARD:  No objection.

16          THE COURT:  Exhibit No. 52 for identification is

17   admitted into evidence.

18   Q.    BY MR. LYNCH:  Mr. Patterson, I'll keep you in

19   the same binder here.  Exhibit 57.

20   A.    Okay.  It appears to be an e-mail from Donna

21   Ochoa.

22   Q.    Dated February 26, 2003?

23   A.    Yes.

24   Q.    What is this e-mail?

25   A.    It apparently claims that there is a biological

1   father.  His name is Shelby Robertson and he's located at

2   the Eyman Complex and his term is scheduled to expire --

3   well, let's see.  17.  I don't know how to read that

4   whether it's in 2017.  That would make no sense.  So I

5   don't know quite what that series of numbers reflects or

6   was intended to mean.

7       Q.   Mr. Patterson, did you know who Shelby Wayne

8   Robertson was at the time of this e-mail?

9       A.   Well, having read the e-mail, it's easy to

10  conclude who he is, but I don't recall him independently

11  today, nor do I -- I mean, I never had contact with him

12  as well.

13      Q.   Did you direct anyone else to interview him?

14      A.   I did not.

15          MR. LYNCH:  I move to admit Exhibit 57.

16          THE COURT:  It has already been admitted into

17  evidence by stipulation on February 4th.

18          MR. LYNCH:  Okay.  That's fine.  Thank you,

19  Your Honor.

20      Q.   BY MR. LYNCH:  Exhibit 54, Mr. Patterson, which

21  has also already been admitted.  Mr. Patterson, this

22  appears to be a motion to assist mitigation.  And if you

23  look at the last page, you can get the date.

24      A.   Yeah.  It's over my signature.  November 19,

25  2004.

1    Q.    Do you recall why this motion was filed?

2    A.    Specifically?  No, I cannot tell you why it was

3    filed.  It obviously was in effort to acquire records.  I

4    don't know what precipitated it.  Any number of

5    explanations could be possible.

6    Q.    Was the social history for Ms. Andriano

7    incomplete at this stage?

8    A.    Let's see.  When did we start trial?  Is this in

9    the middle of trial or -- I can't answer that.  I don't

10   know.  I can't integrate this motion because I can't

11   recall specifically its reason for being.  So I don't know

12   where it lies in the acquisition of social history

13   information.

14         I don't know if this was generated to supplement

15   existing information or needed to fill in gaps in the

16   social history.

17   Q.    Mr. Patterson, do you recall a time during your

18   representation of Wendi that there was a suicide attempt

19   in prison?

20   A.    Yes, I remember the topic coming up, uh-huh.

21   Q.    Suicide attempt by Wendi?

22   A.    Yes.  Not by me.

23   Q.    Do you recall roughly when that was?

24   A.    Specifically, in context, no, I don't, Mr. Lynch.

25   Q.    Did you investigate further with regard to her

1    mental health after this suicide attempt?

2        A.    I can't recall specifics.

3        Q.    But you can take a look at an exhibit,

4    Exhibit 47, which has been admitted into evidence.

5        A.    47?

6        Q.    Yes.

7        A.    Okay.  Yes, I've got a note from November of 2000

8    through September of '03.

9        Q.    And I can represent to you that the first part of

10   this exhibit is typewritten excerpts from notes that the

11   illegible handwritten versions appear thereafter.

12       A.    So it appears the episode that you're describing

13   occurred in September of '03.

14       Q.    The episode, meaning Wendi's suicide attempt?

15       A.    Yes.

16       Q.    I want to turn your attention -- well, first off,

17   Mr. Patterson, did your office obtain jail medical records

18   for Ms. Andriano?

19       A.    I -- I would assume as a matter of course, yes,

20   we would have acquired that information.

21       Q.    Did you personally review them?

22       A.    I don't recall.  I recall hearing about the

23   suicide effort.  It may have been -- and I spoke with

24   Wendi I think afterwards about it.  But the first reporter

25   may have been Kandy Rohde.  I don't recall the exact

1  circumstances of her suicide effort.

2      *Q.*   Let me draw your attention to the medical records

3  on Page 4 of the notes at the bottom, an entry dated

4  September 30th.  Do you see that?

5      *A.*   Dated November 24th?

6      *Q.*   September 30 of 2003 is the one I'm looking at.

7      *A.*   I'm sorry.  It would be a Dr. Kay Hoffert?

8      *Q.*   Yes.

9      *A.*   Okay.

10     *Q.*   Are you with me?

11     *A.*   I am.

12     *Q.*   The third paragraph:  Wendi apparently could not

13  handle --

14         MR. HAZARD:  Judge, I object.  This is hearsay.

15  It hasn't been admitted into evidence.

16         MR. LYNCH:  I believe it has been admitted by

17  stipulation.

18         THE COURT:  Let me just double-check.  It looks

19  like Exhibit No. 47 was admitted on February 3rd.

20         MR. ARNTSEN:  Yes, it was stipulated.

21         MR. HAZARD:  Okay.

22         THE COURT:  It was admitted on February 3rd.

23         Go ahead, but slow down.

24         MR. LYNCH:  Wendi apparently could not handle the

25  prospect of involuntarily administrative

1   segregation.  Impulsively stabs self, quotes, without

2   thinking.

3          Following Ms. Andriano's suicide attempts, did

4   you engage any mental health experts to examine Wendi's

5   ability to control impulse under stress?

6          THE WITNESS:  I did not.  My belief at the time,

7   I think, was that this was impulsive, episodic.  Not the

8   kind of thing that merited any further investigation.  And

9   I think when I discussed it with Wendi, she said, you

10  know, it was just something stupid.  I didn't -- I don't

11  recall it being a significant mental health issue.

12         And I do recall believing at the time of the

13  situation that she wasn't dealing with incarceration in a

14  good manner, and I think that's reflected that she didn't

15  want to go into ad seg.

16         Again, my belief was that all of her mental

17  health issues derived from the immediate series of events

18  before the confrontation and the actual confrontation.

19  That it didn't -- it didn't compel the conclusion that

20  there was something that happened early in her childhood

21  that was fundamentally wrong with her and occasioned this

22  kind of misbehavior.  That was my evaluation at the time.

23  So did not obtain additional experts in this regard.

24      Q.  And, finally, Mr. Patterson, who would have been

25  given the task of discovering that material early from her

1  childhood?

2    *A.*    Again, I relied upon those persons that I thought

3  were better equipped to deal with these issues,

4  Mr. MacLeod and, certainly, David DeLozier, who had

5  regular access to Alejo and Donna Ochoa to confirm or

6  refute the existence of factors that may have contributed

7  to this episode in September of '03.

8         MR. LYNCH:  Thank you, Mr. Patterson.  I have

9  nothing further.

10         THE COURT:  Okay.  This is a good time to take

11  our lunch break, then.  So we will go ahead and take our

12  lunch break now.  We will begin again promptly at 1:30.

13  Have a nice lunch.

14         (WHEREUPON, the lunch recess ensued from

15  11:59 a.m. to 1:31 p.m.)

16         THE COURT:  Good afternoon.  This is

17  CR 2000-096032, State of Arizona vs. Wendi Elizabeth

18  Andriano.

19         The record will reflect the presence of the

20  parties and counsel.

21         The record will reflect that Mr. Daniel Patterson

22  is on the witness stand.  We will begin the examination by

23  the State.

24         Is it going to be Ms. Gard?

25         MS. GARD:  It's going to be Mr. Hazard.  But I

1  told counsel beforehand, I need to make a record before we

2  start.

3          THE COURT:  Okay.  Go ahead.

4          MS. GARD:  And it has to do with Mr. MacLeod.

5  Over the lunch break, Mr. Vidal, the paralegal, and myself

6  were discussing him and how we recognize him.  We realized

7  that he had been an intern in our office.  That would have

8  been sometime in the 2006, 2007 range.  We don't remember.

9  He would not have worked on this case, and to my

10 recollection and Mr. Vidal's recollection, he didn't work

11 on any capital cases.  And this case, in particular, would

12 have been in the Tucson office.  But I wanted to just make

13 a record of that.

14         THE COURT:  So he was an intern in the attorney

15 general's office?

16         MS. GARD:  Yes.

17         THE COURT:  Sometime probably in 2006?

18         MS. GARD:  Or 2007, yes, in that range.

19         THE COURT:  Okay.  Anything further?

20         MR. LYNCH:  No, Your Honor.

21         THE COURT:  Then the record will reflect that

22 Mr. Daniel Patterson is on the witness stand.  We will

23 begin the examination by Mr. Hazard.

24         Mr. Hazard.

25         MR. HAZARD:  Thank you, Your Honor.

1                    CROSS-EXAMINATION

2  BY MR. HAZARD:

3      *Q.*   Good afternoon, Mr. Patterson.

4      *A.*   Good afternoon, sir.

5      *Q.*   You testified about some of your experience on

6  direct.  I'm going to talk to you about your entire

7  experience as a defense attorney.  After passing the Bar,

8  you began criminal defense work in 1979; is that correct?

9      *A.*   That's correct.

10     *Q.*   And up until about 1990 or 1991, you were in

11 private practice and doing exclusively criminal defense

12 work?

13     *A.*   Not exclusively, but it was certainly 85, 80

14 percent of my practice.  An occasional divorce, an

15 occasional collection, a tort case here and there.  But

16 the bulk of my caseload was criminal.

17     *Q.*   And it was during that time in the mid-80's when

18 you started also handling capital cases; is that correct?

19     *A.*   Yes, to the best of my recollection.

20     *Q.*   And then around 1990 or so through 1993, you

21 worked as a deputy public defender in Maricopa County?

22     *A.*   Correct.

23     *Q.*   And then you went back into private practice in

24 1993 till right around September 11th of 2001, in that

25 time frame; is that correct?

1    *A.*    Actually, I started with the Maricopa County
2   Public Defender's in July of 2001, my second tour.

3    *Q.*    Okay.  And, again, during that time you were in
4   private practice in those eight years, did you also focus
5   the brunt of your work on criminal defense?

6    *A.*    Absolutely.  I received cases from the federal
7   panel.  I contracted at all times with the county for
8   felony work, and in the last year or two, I had a city
9   court, municipal court contract.

10   *Q.*    And if you remember in your deposition, you
11  estimated that you had -- before Ms. Andriano's case went
12  to trial, you had completed approximately eight to ten or
13  so death penalty cases that went all the way to the
14  sentencing phase; is that correct?

15   *A.*    I think that's a fair surmise.  Some may have
16  resolved by plea agreement before, but, yes, they weren't
17  -- there was some resolution either by trial or by plea
18  agreement.

19   *Q.*    You had mentioned that the cases that you
20  resolved, you weren't including in that number.  You
21  thought it was probably twice as much?

22   *A.*    You're probably accurate.  I had at least
23  probably eight trials.  Given time, I could probably give
24  you the clients' names.  But, yeah, I think that's a fair
25  estimate.

1    *Q.*    So you were an experienced capital defense

2    attorney before you were assigned to represent

3    Ms. Andriano?

4    *A.*    Yes.

5    *Q.*    And you mentioned on direct -- and I wrote it

6    down.  You made a comment that you're not sure even to

7    this day, even though you actually -- I will ask you this.

8    You supervise the deputy public defenders in your office

9    who are handling capital cases?

10    *A.*    We have a dedicated unit, a Capital Unit.  It has

11    18 lawyers divided into two-person teams.  We have nine

12    teams.  Each has a dedicated mit specialist, a dedicated

13    paralegal, and we share the services of about five

14    investigators amongst the cases in the unit.

15    *Q.*    And in spite of that wealth of experience that

16    you had in representing capital defendants, defendants

17    facing capital crimes and now you work as a supervisor,

18    you made the comment that you're not sure even to this day

19    if you are truly competent.  Do you remember saying that?

20    *A.*    This is an evolutionary process.

21    *Q.*    All right.  And I imagine when you make that

22    comment, you're not -- those are standards that you have

23    imposed upon yourself; is that correct?

24    *A.*    Absolutely.

25    *Q.*    And you consider yourself an ethical attorney;

1  correct?

2      *A.*   Absolutely.

3      *Q.*   A thoughtful attorney?

4      *A.*   Absolutely.

5      *Q.*   And you take your job very seriously?

6      *A.*   Absolutely.

7      *Q.*   And so your definition of competent is a much

8  higher standard than what the U.S. Constitution would

9  require; is that fair?

10     *A.*   I would like to think I'm well above the

11  *Strickland* standard, yes.

12     *Q.*   And you've always strived to be above that

13  standard?

14     *A.*   Yes.

15     *Q.*   As an ethical attorney, if you ever felt that you

16  were not adequately prepared or adequately fit to

17  represent a client who's facing the death penalty, then

18  you would move either for a continuance for more time for

19  preparation or move to withdraw altogether; is that

20  correct?

21     *A.*   Yes.

22     *Q.*   And you did not feel that way when you

23  represented Ms. Andriano?

24     *A.*   No.  Judge Ishikawa afforded us what I thought

25  was sufficient time to properly prepare for trial.  My

1  main focus was preparing for Phase 1 and Phase 2.  And

2  nothing that I was aware of at the time led me to believe

3  there was any deficiency in the Phase 3 presentation at

4  the time we commenced the trial.

5      *Q.*   Thank you, Mr. Patterson.  Given the statements

6  you've made about where you are now in overseeing the

7  capital defense team in your office, I would imagine that

8  you're proud that your office appears to hold its

9  attorneys to higher standards than what *Strickland*

10 requires?

11     *A.*   Absolutely.

12     *Q.*   And you do everything you can as a supervisor to

13 maintain those high standards; correct?

14     *A.*   Absolutely.

15     *Q.*   And you mentioned a lot on direct about the

16 difference between today and the time when you were

17 representing Ms. Andriano in 2001 through the end of 2004

18 when she had her trial; correct?

19     *A.*   Yes.  It was significantly different.  We were

20 learning as we were earning, so to speak, back then.  The

21 *Ring* decision changed dramatically the manner in which we

22 defended capital cases.  The team concept alone was an

23 innovation.  The ABA Guidelines suggested it, but

24 colleagues of Judge Ishikawa would suggest that those

25 standards are aspirational rather than operational.

1       And so, that being said, we developed a team

2 concept over time and better trained mitigation people.

3 Yes, it's changed dramatically.

4       Q.    In the almost ten years since Ms. Andriano was

5 tried, you would agree that these practices have evolved?

6       A.    Absolutely.

7       Q.    And I would imagine, although none of us has a

8 crystal ball, that ten years from now, we might be looking

9 back and thinking, well, we could have done more; is that

10 fair?

11       A.    Hindsight is always 20/20, I agree.  And with

12 regard to specifics, the mental health standard of care

13 has evolved.  It's not unusual now to have MRI's routinely

14 done in all cases.  It's not unusual for EEG's to be done

15 routinely in all cases.  That was not the standard of

16 care, at least as I understood it, back in the immediate

17 aftermath of the *Ring* decision.

18       Q.    Which is the time that's really relevant for

19 these proceedings; would you agree, Mr. Patterson?

20       A.    That's the question.  I don't know what standard

21 needs to apply with this case.

22       Q.    It's a relatively small community, and it was the

23 same back in 2004, of criminal defense attorneys who

24 handle capital cases; would agree with that?

25       A.    Yes.  It was a small specialty kind of boutique

1   practice, yes.  In fact, I was the only -- when I first

2   came out to the Mesa office, I never intended to be the

3   capital lawyer.  When the capital lawyer out here

4   resigned, I became the capital lawyer.  And I was the only

5   person out here at that time who could have been the

6   capital lawyer.

7       *Q.*   Based on your wealth of experience in defending

8   capital defendants?

9       *A.*   Well, wealth is a --

10      *Q.*   Well, what we talked about?

11      *A.*   Significant experience, yes.  It wasn't my first

12  rodeo.

13      *Q.*   In other words, back in 2004 when Ms. Andriano

14  was tried following -- shortly following *Ring* and

15  everything as it was being settled, you were all kind of

16  in the same boat?

17      *A.*   Absolutely.  And the entire system was in the

18  same boat.  The judges weren't educated on juror

19  sentencing.  The prosecutors weren't educated on juror

20  sentencing.  We scrambled to go to seminars to try and

21  become as competent as we could.  There were always

22  compelling reasons to get this case to trial.  We had the

23  Victims' Bills of Rights.  And the victims in this

24  particular case attended every court appearance.  And they

25  were very flexible.  I concede in that, but they wanted

1  their day in court as well.  And so that it was a constant

2  tension with the Court to get this thing done.

3      *Q.*   And you also always have a client in a death

4  penalty case sitting in custody awaiting trial; correct?

5      *A.*   Yes.  They're very -- I have never had a client

6  on OR release or bonded release in a capital case.  That

7  would be an extremely unusual circumstance.

8      *Q.*   And Ms. Andriano had been in the custody of the

9  county jail for about four years before her case went to

10  trial; correct?

11      *A.*   That was not unusual.  The practice back when we

12  had eight cases was when you got your eighth case was to

13  go to the eighth client and say, you know, sit tight.

14  Your case is going to trial in about five years.  We did a

15  disservice to the clients.  I'm glad that has changed.

16  But that was the practical situation back then you carried

17  eight clients.

18          It was similar when you had four clients, in

19  that, we were all learning how to do this stuff and it

20  took time.

21      *Q.*   And before you tried the case State V. Andriano,

22  you mentioned that you were able to seek out training

23  seminars related to this new *post-Ring* taking sentencing

24  to the same jury that you did in the guilt phase; correct?

25      *A.*   Yes.

1    *Q.*   And you did that training because you felt it was

2    an obligation to your clients?

3    *A.*   Absolutely.  And I used that need for training as

4    the predicate for a number of continuances in cases.  I

5    told the Court:  I'm not ready -- competently ready to try

6    this kind of capital case because I'm not schooled in

7    juror sentencing.  And that's a significant departure from

8    what we had before.

9    *Q.*   You acted that way in representing Ms. Andriano;

10   correct?

11   *A.*   I did.

12   *Q.*   You, also, I think in the past, you mentioned

13   about going to your boss and making sure that your capital

14   caseload was pared down to something that you could

15   manage; is that fair to say?

16   *A.*   It was the first order of business after I read

17   the *Ring* decision.  And after I -- I don't know.  The *Ring*

18   decision came down and then shortly thereafter there were

19   changes in Title 13.  Putting those two together, it was

20   apparent no capital attorney could handle eight capital

21   cases in a juror sentencing scheme.

22   *Q.*   You mentioned that one of the things you've

23   learned in these early seminars following *Ring* was the

24   idea of front-loading mitigation in the guilt phase if you

25   could?

1    *A.*   If you could.

2    *Q.*   Right?

3    *A.*   Yes.

4    *Q.*   And you were able to adopt that strategy in

5    State V. Andriano; correct?

6    *A.*   Yes.

7    *Q.*   The idea of front-loading?

8    *A.*   Yes.  I think the fact that we portrayed her as a

9    domestic violence victim was in and of itself mitigating.

10   The totality of her circumstances, her compassion for her

11   husband, all of those things I think were compelling

12   mitigation that I introduced -- we introduced in Phase 1.

13   *Q.*   And even ten years after the fact, is that still

14   considered a good idea if you have the evidence to support

15   it and the theories to support it, to front-load if you

16   can?

17   *A.*   Yes.  It's a sound theory based upon the

18   suggestion that the jurors make up their mind about which

19   way they're going shortly after the State's opening

20   statement.

21   *Q.*   In case, you ran in the guilt phase, as you

22   mentioned, a justification-type of defense related to the

23   prior incidents of spousal abuse; correct?

24   *A.*   Obviously, our range of available defenses was

25   limited.  Obviously, alibi was not appropriate.  It was

1  apparent that there was a struggle.  The physical evidence

2  was very compelling.  The back story for Joseph Andriano

3  was very compelling.

4       Our only available defense was that she was

5  justified in doing it.  And that in Arizona, we have a

6  domestic violence statute that gives further dimension to

7  the self-defense affirmative defense because the conduct

8  is then viewed within the eyes of a domestic violence

9  victim.  So, yeah, that was -- that defense almost

10  invented itself, so, I mean.

11       Q.   Well, and I imagine in every case, you choose a

12  defense based on the evidence that you know the State has

13  against you; fair enough?

14       A.   Correct.

15       Q.   And that was no different in this case?  You had

16  the crime scene evidence to contend with; correct?

17       A.   Correct.

18       Q.   Ms. Andriano actually spoke not only to 911

19  operators commensurate with the homicide, but also she

20  interviewed with police; correct?

21       A.   It was apparent that there was no question as to

22  who was involved with the fight with Joseph Andriano.

23  That being said, then that being obvious to us that

24  Phase 1 had to involve an explanation and justification.

25       Q.   And there was also a reason then to carry that

1   Phase 1 defense into a big part of your mitigation

2   strategy; correct?  That, again, reminding the jury, if

3   you got to that penalty phase, that they should grant

4   leniency because of her domestic violence history?

5      *A.*   Absolutely.  I think we renewed a portion of it

6   by having Sharon Murphy come back and repeat her earlier

7   testimony.  There was some risk involved in upsetting the

8   jurors.  But, yeah, that was a continuing theme throughout

9   all three phases of the presentation and what I felt -- in

10  concert with that she was a good person.  She had no -- no

11  history of misconduct.  She had no -- she was a hard

12  worker.  She was the manager of her department.  The

13  family liked her.  The Andrianos liked her prior to the

14  event.

15         So, I mean, the fact that she was good person

16  coupled with her victim status as a domestically abused

17  person, that's a compelling mitigation theme and that was

18  the thrust of our theme.

19     *Q.*   And the reasons you did the combination of

20  domestic violence victim and good character evidence, that

21  was based on the evidence that you had and the

22  investigation that you did; correct?

23     *A.*   Yes, exactly.  Right.  I had no -- on other than

24  what we have talked about, the references in Rosengard's

25  report, and apparently Donna sent me an e-mail that she

1   had also sent perhaps to David or conversed with David

2   about, the things that Mr. Lynch has brought out, yeah,

3   obviously, they were there.

4          But I didn't give them a great deal of

5   consideration and I passed them onto Mr. DeLozier and to

6   Mr. MacLeod or Mr. Linderman for further review.  At the

7   time of the commencement of the trial, I was confident

8   that we had a sufficient mitigation package to persuade

9   the jurors to concede to us for life for her.

10   *Q.*   You mentioned Sharon Murphy and Dr. Mindy

11   Mechanic in earlier testimony.  Who selected them to be

12   witnesses?

13   *A.*   I did.

14   *Q.*   And why did you select them?  What was your

15   rationale in why you selected them, in particular?

16   *A.*   Dr. Murphy -- and maybe I'm giving her more -- I

17   don't know if actually she is a doctor.

18   *Q.*   According to her resumé, she has a Ph.D.  That's

19   correct.

20   *A.*   Okay.  She was recommended to me I think by a

21   clearing house for abused women out of Philadelphia.  I

22   spoke with a person affiliated with that agency and I

23   think she was the first to mention Sharon's name.

24          I also got confirmation from others in the office

25   that she was a domestic violence person.  And I met her in

1   an Einstein's Bagel in the first meet, and we talked about

2   in general what would she need to help me develop a

3   domestic violence defense.  She agreed to talk with Wendi,

4   and ultimately I retained her and --

5       *Q.*   And I don't mean to interrupt you, but, in

6   reviewing when you spoke with your client in reviewing the

7   evidence that you had before the thought of even reaching

8   out to a domestic violence expert, there were things that

9   you saw that -- some types of red flags or triggers that

10  suggested there might be domestic violence?

11      *A.*   Dr. Rosengard's report.  In all candor, it was

12  difficult to get Wendi to talk about concrete examples of

13  domestic violence.  But after she discussed it at length

14  with Dr. Murphy, she became more open with me as well.

15  She was never have comfortable speaking about the sexual

16  issues that were at the heart of the domestic violence

17  issues with her husband.

18          So when Dr. Murphy came in, she became more open

19  with Dr. Murphy and she's the one that reported most of

20  the things to Dr. Murphy, who incorporated those things in

21  discussions with me thereafter.

22      *Q.*   Do you still have Exhibit 183, Dr. Murphy's

23  report in front of you?

24      *A.*   I don't recall reflecting on it.  But it's --

25  183?

1          MR. HAZARD:  May I approach the witness, Your

2   Honor?

3          THE COURT:  Yes.  And for the record, that

4   exhibit has been admitted into evidence.

5      Q.   BY MR. HAZARD:  Mr. Patterson, I'm handing you

6   Exhibit No. 183.

7      A.   Okay.

8      Q.   And that is Dr. Murphy's report that she prepared

9   for you on this case; correct?

10     A.   Okay.  It looks like it, yes.  I have no reason

11  to doubt its authenticity.

12     Q.   And then, first off, if you would look at the

13  very top, the information, client's name, case number, and

14  then assessment dates?

15     A.   Yes.

16     Q.   And you see that.  Could you just read into the

17  record the number -- the dates that Dr. Murphy actually

18  met with Ms. Andriano to do her assessment.

19     A.   March 25, 2003; March 26, 2003; March 29, 2003;

20  March 30, 2003; April 8, 2003; April 11, 2003; April 22,

21  2003; June 4, 2003.  Total interview time:  20 hours.

22     Q.   Thank you Mr. Patterson.

23         MR. HAZARD:  One moment, Your Honor.

24         THE COURT:  Yes.

25         MR. HAZARD:  May I approach the witness?

1          THE COURT:  Yes.

2          MR. HAZARD:  Mr. Patterson, I'm handing you

3  Exhibit No. 52 for identification purposes.

4          THE CLERK:  It was admitted.

5          MR. HAZARD:  It has been admitted?

6          THE COURT:  Yes.  That was admitted earlier

7  today.

8          THE CLERK:  Yes.

9          THE WITNESS:  This was referenced in the direct

10  examination of Mr. Lynch?

11     Q.  BY MR. HAZARD:  Yeah.  That is the e-mail that

12  Dr. Murphy sent to you and Mr. DeLozier about sort of

13  giving you a brief status update on her work in assessing

14  Ms. Andriano; correct?

15     A.  I agree.

16     Q.  And that e-mail was dated March 30th of 2003?

17     A.  It is.

18     Q.  All right.  So Ms. Murphy continued to meet four

19  additional times with Ms. Andriano after that e-mail was

20  sent; correct, based on her report?

21     A.  It looks like June 8th; June 11th.  I'm sorry.

22  Strike that.  April 8th; April 11th; April 22nd and

23  June 4th.  Yes, I would agree with you.

24     Q.  If you could turn your attention, then, to

25  Exhibit 183, Dr. Murphy's report.

1    *A.*    Yes.

2    *Q.*    And if you go to the second page, which would be

3    Bates stamp I think 7160.

4    *A.*    Yes.

5    *Q.*    And that Paragraph No. 2, the Subsection A, about

6    halfway down the page, what is the title of that?

7    *A.*    Childhood History, Unstructured Interview with

8    Wendi Andriano.

9    *Q.*    Could you take the time and just read to yourself

10   that Paragraph A.  I'm just going to ask a couple of

11   questions.  Let me know when you've read all the way to

12   the next page where Paragraph B begins.

13   *A.*    I've completed Subsection 2 A.

14   *Q.*    And so, during that section, Dr. Murphy talks

15   about -- discusses the alleged abuse that her biological

16   father may have committed on Ms. Andriano; correct?

17   *A.*    Discussion I think gives it too much credit.

18   Touches upon it.

19   *Q.*    Okay.  And, at the very end, Dr. Murphy states:

20   Mom does not have any proof this happened to Wendi, but

21   has thought it might have been a possibility?

22   *A.*    And that comported with my understanding, my

23   knowledge of that act if it occurred at that time.

24   *Q.*    Do you recall if that evidence was presented at

25   Ms. Andriano's trial?

1    *A.*   Well, I don't recall specifically what was

2    presented.  But I recall using Sharon Murphy and her

3    report to touch upon a host of things that may not have

4    been otherwise capable of being admitted because the

5    witnesses weren't available.  The notion may not have been

6    corroborated.

7           But because Dr. Murphy used it in her assessment

8    and evaluation, I think it was admissible pursuant to the

9    rules.  So we did touch upon pretty much, as I recall,

10   everything that's reflected in this report.

11   *Q.*   And so there was a good sound reason to call

12   Dr. Murphy in this case?

13   *A.*   Absolutely.

14   *Q.*   And in spite of all those meetings that

15   Dr. Murphy had, she never discovered a hint of abuse by

16   the Ochoas on Ms. Andriano?

17   *A.*   If she discovered it, she never reported it to

18   me, nor did she report it to anybody that was working with

19   me, nor was it further touched upon by Ms. Andriano and in

20   later meetings that I had with her.

21   *Q.*   Let's talk a little bit just briefly about

22   Dr. Mindy Mechanic.  What was your reason to sort of have

23   the two domestic violence experts in this case?  Was there

24   a reason that you wanted both of them to testify?  And, if

25   so, what is that reason?

1      *A.*   Well, obviously, two witnesses who come to the

2   same conclusion, it seems to me, being that they're

3   experts, it's better for the proposition being proven.

4           That being said, when I noticed Dr. Murphy as my

5   domestic violence expert, Mr. Martinez brought in

6   Dr. Brad Bayless and noticed him as the rebuttal, if you

7   will, expert.

8           After discussions with him, interviews with -- I

9   think after interviews with him and the focus of his -- he

10   rendered a report.  After having reading the report, I

11   realized that I needed somebody to equate in terms of

12   experience with Dr. Bayless.

13          Dr. Mechanic is a professor.  She was a clinical

14   psychologist, I think.  She was familiar with the

15   substance of the MMPI.  I think, as I recall, the MMPI was

16   the bulk of Brad Bayless's -- the basis for his opinions

17   in this case.  He didn't have an independent domestic

18   violence caseload or clientele.  He came in as kind of a

19   clinical psychologist who gave an MMPI to the client and

20   didn't see the things in the scales that he would expect

21   to see of a person who claims to be the victim of domestic

22   violence.

23          I brought in Dr. Mechanic to rebut that

24   contention.  I also filed a motion in front of

25   Judge Ishikawa to preclude Brad Bayless from testifying.

1   Judge Ishikawa denied that motion.  He may have limited
2   Dr. Bayless in some manner.  That, I don't recall.
3       Q.   Do you recall that the testimony of Dr. Bayless
4   was limited to domestic violence and the MMPI scale, but
5   you were able to keep out any mention of anti-social
6   traits of Ms. Andriano?
7       A.   Yes.  It's my recollection that Judge Ishikawa
8   conceded some points to me.  One of which may have been
9   removing the highly inflammatory language, like
10  anti-social personality, that kind of thing.
11           And my recollection, sir, is that his testimony
12  primarily was dedicated and devoted to his evaluation of
13  Wendi's MMPI.
14      Q.   And that was as a result -- obviously, the judge
15  made the ruling, but that was a result of advocacy on your
16  part; correct?
17      A.   Yes, uh-huh.
18      Q.   Why did you seek to preclude Dr. Bayless from
19  testifying altogether and then also seeking to preclude or
20  limit his testimony?
21      A.   If I can be candid.
22      Q.   Well, that's why we're here.
23      A.   Okay.  And I know Brad Bayless.  He used to work
24  on our side of the proposition.  But he had developed, in
25  my estimation, a reputation of providing information to

1  the government that comported with their -- their desired

2  understanding of the case.  And I don't think he was

3  intellectually honest, medically honest or psychologically

4  honest in his evaluations.

5       *Q.*   Was he an effective witness, though?

6       *A.*   You anticipated the next.  He was an

7  extraordinarily effective witness in person.  A very

8  engaging personality.  He had the credential, if you will,

9  of having served both sides of the equation.  And he

10  always let the jurors know that he is not a hired gun.  He

11  has worked for the defense.  He is a very personable man.

12  I think I may have played golf with him at one point.

13  He's just a likable guy.

14            But because he's your adversary, he is the kind

15  of adversary that you have to minimize.  And he didn't

16  have the credentials intellectually, in my estimation, to

17  serve as a domestic violence expert.  And that's why I

18  filed the motion.

19            If you look at his resumé, he had no clinical

20  practice involving domestic violence.  He had no teaching,

21  no courses involving domestic violence.  His primary focus

22  is juvenile conduct.  And I didn't think he was qualified

23  to -- and his opinion did not assist the finders of fact

24  in this case.  I filed a motion.  Judge Ishikawa disagreed

25  with me, but did limit the scope of his testimony.

1    *Q.*   And so, if I can summarize and ask you if this is

2    accurate.  So Dr. Mechanic, then, really served as a

3    number of functions.  No. 1, you could have her to rebut

4    the anticipated testimony of Dr. Bayless?

5    *A.*   Correct.

6    *Q.*   She was also a domestic violence expert that came

7    to similar opinions to corroborate and validate

8    Dr. Murphy; correct?

9    *A.*   Yes.

10   *Q.*   And then it also gave the jury an opportunity, if

11   for whatever reason they weren't persuaded by Dr. Murphy,

12   they had someone with different credentials that they

13   might find more credible; is that fair?

14   *A.*   That's an accurate summation of why I did what I

15   did.

16   *Q.*   And, again, this was -- these were decisions that

17   you made based on the evidence that you had and what you

18   knew?

19   *A.*   Yes.

20   *Q.*   I'm going to just ask you some general questions,

21   well, and specific to this case about the mitigation

22   investigation.  I'm not going to spend too much time on

23   this.

24          But, first off, Mr. Patterson, I think you

25   answered sort of this question on direct.  But do you ever

1   start with a theme for mitigation and then try to collect

2   evidence to support it or is it the other way around?

3       *A.*   It's the other way around.

4       *Q.*   And that was the practice in 2004 when you

5   represented Ms. Andriano and --

6       *A.*   Yes.

7       *Q.*   -- and that's what you followed; correct?

8       *A.*   Yes.  What has changed is I take a more active

9   role in the development of that information in concert

10  with my mitigation specialists.

11          Back then, I delegated -- I guess that's the

12  question.  How much responsibility should I have delegated

13  to Mr. MacLeod?  I delegated a great deal of

14  responsibility to him because I was working diligently in

15  developing Phase 1 defenses, domestic violence defenses,

16  interviewing Mr. Martinez's government witnesses.

17          This was a very onerous case to defend.  There

18  were a lot of witnesses.  There were a lot of issues,

19  domestic violence.  There was blood spatter.  There was --

20  we had to become knowledgeable about sodium azide.  I know

21  more about sodium azide than I really need to know, quite

22  frankly.  It was a very complex case and it took a great

23  deal of my time developing Phase 1 defenses.

24      *Q.*   Obviously, you disagreed with the State's theory

25  of the case.  But, at the time, did you believe that it

1   was a very compelling case that you had to fight?

2       A.   Absolutely.  Absolutely.  And I filed some

3   motions to limit the so-called 404 (b) stuff.  The affair

4   that she had with Travis.  The misconduct in the

5   limousine.  And that appeared to be the thrust of

6   Mr. Martinez's case that this was a bad woman who deserves

7   to die and that's the way he structured it.  And

8   Judge Ishikawa denied my motions and that's the way we

9   defended it.

10      Q.   And you relied on Patrick Linderman and later

11  Scott MacLeod because they were employed by your office to

12  do the very work that you had them do?

13      A.   Yes.

14      Q.   And, again, that was the practice when you were

15  adapting to *post-Ring* and when you were defending

16  Ms. Andriano; correct?

17      A.   Yes.  At least, my practice, because I was the

18  only guy out there.  As the cases -- the caseloads

19  developed, we had additional cases -- capital cases

20  noticed by the State, Larry Matthew from my office, who is

21  still in our unit, came out.  Lynn Burns became a capital

22  defense attorney.  Joel Brown, Bob Stein.  I was the first

23  and I was joined thereafter, but it was over the course of

24  time.

25           I still -- I think we only had MacLeod as the

1   mitigation person for the entire -- for all of the capital

2   cases out in Mesa, and that didn't change.

3            When we went a more defined unit in the office,

4   we only had one capital mitigation person, a Cupervert.  I

5   forget her first name.

6            But it's only of recent vintage, we have a

7   dedicated mitigation person per team.  That's probably

8   2006 -- '05, '06.  I'm speculating.  But that was a

9   development.  Scott MacLeod did all the capital cases out

10  there.  Patrick Linderman did all the capital cases out

11  there.  He was brought up from trial group as your

12  Client's Services Coordinator.  He wasn't even a defined

13  capital mitigation person.

14           So that was -- that was the standard of care that

15  existed in my office back at the time when it's relevant

16  in Wendi's case.

17       Q.   And although you delegated a lot of that

18  mitigation investigation to Mr. MacLeod, so you could

19  focus on Phase 1 --

20       A.   And Mr. DeLozier.

21       Q.   -- and to Mr. DeLozier, the three of you did

22  discuss the themes and strategies for mitigation; correct?

23       A.   Yes.  We didn't have a formalized every two weeks

24  we were going to meet and go over what happened in the

25  preceding two weeks, which is the standard of care

1   currently.  We didn't do that.  But, yes, I was always

2   available to Scott.  He was always available to me, as was

3   Mr. DeLozier, to bring to my attention things concerning

4   development of mitigation, and we discussed it.

5         And I was led to believe that everything was

6   wonderful.  We've got proof that she was a good woman,

7   proof that she was a good person down in Casa Grande, that

8   Donna and Alejo were great people, and that was my belief

9   when we commenced trial.

10  *Q.*   And as the mitigation case was presented the way

11  it was presented in trial, do you agree that it was

12  consistent with you were all on the same page, and those

13  themes and theories were presented effectively in your

14  mind?

15  *A.*   Yes.  Again, I think David was tasked with doing

16  the mitigation function, which was consistent with the

17  education I received at seminars.  That they told us that

18  the tasks attendant to all three phases in a capital case

19  are too much for one attorney.  You have to allocate those

20  responsibilities, particularly when you get to Phase 3

21  because you may have lost the jurors when you get to

22  Phase 3.

23        I stood up in front of them in two phases and

24  said things and they looked me in the eye and said:

25  You're wrong.  That's not true, Mr. Patterson.

1          And so the conventional wisdom is then you pass

2     it off to a new face to present a compelling argument as

3     to why you should save the client's life.

4          In looking back, David made an eloquent opening,

5     compassionate closing, and we presented all of the

6     witnesses that we had available to establish the

7     proposition that she was a good woman, had a good

8     Christian upbringing, and she had the support and love of

9     her family.

10    Q.   When did you find out about allegations of abuse

11    by Alejo Ochoa and/or Donna Ochoa on Wendi Andriano?

12    A.   In preparation for this proceeding.  And I think

13    it was first brought to my attention by Mr. Arntsen, if

14    I'm pronouncing his last name correctly.  He's the one

15    that brought to my attention the letter that was authored

16    I think by Mr. Lambeth that suggested that during the

17    period of time that the Ochoas had the child in their

18    custody, bad things happened to his bottom and that the

19    bad things were attributed to Alejo.  That was the first I

20    had ever heard that Alejo was other than a wonderful

21    stepfather.

22    Q.   You met with Alejo and Donna Ochoa before Wendi

23    Andriano's trial?

24    A.   On at least two occasions at their home in

25    Casa Grande.  They were very gracious hosts.  Nothing

1  about the domestic environment there led me to believe

2  that she had been brought up in a challenging environment.

3      *Q.*   What was the house like, just in general?

4      *A.*   Well-maintained, clean, ordered.  Donna was a

5  very gracious host.  Alejo I think on one occasion had

6  just come back from work.  He was very, very engaging.

7  Nothing about that environment led me to believe that

8  there was domestic violence within that setting or that

9  they had ever visited that kind of stuff on Wendi as

10 bringing up as a child.

11     *Q.*   And you actually sat in on the pretrial

12 interviews that Juan Martinez, the prosecutor, had with

13 the Ochoas; correct?

14     *A.*   Yes.

15     *Q.*   And David DeLozier didn't insist on being there

16 for those interviews?  You were happy to stand in and do

17 them because --

18     *A.*   My recollection it was an accommodation to

19 Mr. DeLozier.  His office in is -- if you're familiar,

20 obviously, with the Phoenix area.  It's in Cave Creek

21 just off of Cave Creek Road north of Dynamite,

22 approximately Dixileta in that area.

23          The Ochoas live lived in Casa Grande.  At the

24 time, we were officing here in Mesa.  It was a convenience

25 thing.  Juan came out from downtown.  We used the

1   conference room here.  They came up from Casa Grande.  It

2   was just convenient.  And, like I said, Mr. DeLozier had

3   an active practice and he may have had a court appearance

4   that precluded him from participating.

5       But, no, he was not excluded.  It was an

6   accommodation that I would do it and then assist Juan set

7   up a meeting room for him and audit his interviews with

8   the Ochoas.

9       Q.   During your interaction with Donna Ochoa, did she

10  ever mention anything to you about these allegations that

11  had come forward, anything like that, improper conduct by

12  Alejo --

13      A.   No.

14      Q.   -- on Wendi?

15      A.   Never.

16      Q.   And what about Alejo himself?  Alejo Ochoa?

17      A.   Never.  Nor Wendi.

18      Q.   And you also met Brandon Ochoa?

19      A.   Yes.  In fact, I think I did his direct at the

20  mitigation phase.

21      Q.   And he didn't disclose anything?

22      A.   No.  And I prepped with him before his testimony

23  and there were no allegations consistent with what you

24  folks believed may have existed now.  None of that.  No

25  sexual abuse.  No physical abuse.  None of it, un-huh.

1    *Q.*   Were Donna, Alejo and Brandon Ochoa helpful,
2    though, to you every time you met with them?
3    *A.*   Yes.  They were always available.  I would like
4    to think that I had a very good relationship with the
5    Ochoa family, as with Ms. Andriano.
6    *Q.*   They appeared to be forthcoming to you?
7    *A.*   Yes.  Very, very -- very gracious woman, very
8    willing to help her daughter at all times.  And her glass
9    is always 85 percent full.  She is a very positive woman.
10   *Q.*   I'm going to now take some time to talk to you
11   about your meetings, interactions and communications with
12   Ms. Andriano.
13   *A.*   Okay.
14   *Q.*   Did you find her to be helpful in identifying or
15   locating or even finding people that might be beneficial
16   to her defense?
17   *A.*   Yes.
18   *Q.*   And in what way?  If you can give us specific
19   examples or generalized examples.
20   *A.*   Well, one specific example, one of her co-workers
21   was a lady named Chris Hashisaki, who Wendi characterized
22   had to me as a very good friend of hers.  I interviewed
23   her without the participation of the government lawyer at
24   a Denny's or something of that nature and derived
25   information from her.  I recorded the interview.

1          She gave me a list of co-workers at the -- I

2   forget the name of the complex, the apartment complex that

3   she worked at.  She turned me on to -- or she was helpful

4   in assisting us in locating a Shawn King, a former

5   boyfriend.

6       *Q.*   And you chose, after interviewing Mr. King, not

7   to call him as a witness; correct?

8       *A.*   He was difficult to locate initially.  We did

9   find him.  And at the time of the interview, he was

10   represented by counsel.  So the ability to go into certain

11   areas was restricted.  And I think that the stated reason

12   was that one of the things he was a potentially helpful

13   witness for was that he may have assisted Wendi in using

14   the computer in locating sources of sodium azide.

15          He felt that because of the way -- the manner in

16   which that stuff was used ultimately, it may have

17   implicated him in some kind of criminal conspiracy.  He

18   felt he needed to have counsel.  His counsel instructed

19   him not to be forthcoming in our interview.

20          So we talked in general about things,

21   boyfriend/girlfriend things.  He apparently had a horrible

22   accident where his legs were severed by a locomotive, a

23   train.  His father was a pastor, as was Wendi's father.

24   So there was a kinship, a kindred spirit there.

25          Nothing in the content of that interview did I

1   obtain that gave rise to any kind of mitigation or source

2   of other witnesses for potential development of

3   mitigation.  So it was a pretty straightforward interview.

4       *Q.*    So there was a reason not to call him based on

5   everything you told us there?

6       *A.*    Oh, absolutely.  Absolutely.

7       *Q.*    But he was an individual that Ms. Andriano was

8   very helpful in and you able to track him down and talk

9   with him; correct?

10      *A.*    Right.  I think during the course of our

11  deposition, you presented a letter in her handwriting.  I

12  think that was her effort to try and locate this guy for

13  us.

14          Yes, she was very helpful in all regards.  There

15  were certain areas that she didn't discuss.  But, no, she

16  was one of the one -- one of the best clients I've ever

17  had, quite frankly, in terms of communication.  No

18  unreasonable expectations.  No time demands.  Didn't

19  constantly pepper my office with phone calls.  Didn't

20  complain to my supervisor.  She was a very nice client.

21  I'm proud to have represented her.

22      *Q.*    Along those same lines, could you describe just

23  her personality in your meetings with her, just your

24  general observations of Ms. Andriano as a person?

25      *A.*    She had the rosy optimism of her mother.  There

1 was never anything -- she never complained.  She didn't --
2 she never gave me any concrete examples of sexual abuse
3 from persons other than Joseph Andriano.  No information
4 concerning mental health issues or addiction issues, no.
5       And we spent a great deal of time going over the
6 facts and circumstances of the events and the events
7 leading to the event.  She was very forthcoming with
8 information.  She had accurate recall, and I think we
9 spent eight days on the stand going over that stuff.  So I
10 have no complaints about Wendi Andriano.  She was a
11 wonderful client.
12     Q.   So she had a good memory of the events of the
13 homicide and the events leading up to the homicide;
14 correct?
15     A.   Absolutely.
16     Q.   A good memory of things that you might even deem
17 as more collateral to the homicide and things leading up
18 to what she was on trial for?
19     A.   I had no question about her recall with regard to
20 anything.  She could tell us things about the high school.
21 She could tell us things about growing up in Casa Grande.
22 Oh, no, she was an excellent reporter of all things that
23 were relevant in her case.
24     Q.   And you thought she was candid with you?
25     A.   Yes.

1    *Q.*   Other than the domestic violence and her sexual

2   history with Joe Andriano, you thought she was very candid

3   and forthcoming; correct?

4    *A.*   Without exception.  She didn't -- and I didn't

5   press it because, you know, clearly she wasn't comfortable

6   talking about certain things that she was compelled to do

7   with Joseph.

8        But I had Sharon Murphy to go into that stuff.

9   So I didn't compel her to discuss things that she found

10  distasteful.

11   *Q.*   And imagine the way you assessed her credibility

12  would be to take the evidence that you knew existed, that

13  you knew the State was going to put on and compare that

14  with her statements, and based on that, you felt she gave

15  at least reasonable, you know, reasons to explain the

16  evidence, even the incriminating evidence; correct?

17   *A.*   There was low level spatter on the sofa.  She

18  explained that she struck him with the barstool while he

19  was down.  His neck was cut from ear to ear.  She

20  explained a reasonable, plausible explanation for how that

21  happened.  There was sodium azide in soup bowls.  She had

22  a plausible explanation for how that may have occurred.

23        It was an unusual set of circumstances when the

24  first responders first arrived.  She took a shower.  She

25  had an explanation -- a valid explanation for that.  She

1   had a valid explanation for why she called Alejo to come

2   up rather than calling law enforcement or the fire

3   department.

4        She had a plausible explanation for why it came

5   to a head that night.  She talked about the last supper

6   and going down to the Andrianos and then knowing that it

7   was going to be their last family supper.  And it was by

8   Joe's desire that he wanted to go down there and have one

9   last session with his parents.  That was the night that

10  they decided to take the sodium azide.  It didn't work.

11  In fact, just the opposite occurred.  It's the stuff they

12  use to fill air bags in a crash.  And it caused a horrible

13  nitrogen gas development in Mr. Andriano's stomach.  She

14  had a plausible explanation for that and how it angered

15  him, how it -- why she admitted at that time that she had

16  had affairs, just as kind of -- he was dying and she

17  wanted him to go with the full knowledge of who she was as

18  a human being.

19       So, no, her ability to recall details was

20  extraordinary.  And she withstood significant cross-exam

21  from Mr. Martinez in that regard, in my estimation.

22  *Q.*   And it sounds to me that that's not only because

23  of her abilities, but also because of the preparation, the

24  time that you had with her?

25  *A.*   We spent a great deal of time going over every

1   aspect of her version of events leading up to the
2   homicide, during the homicide and her conduct thereafter.
3   I have not prepared -- I'm just trying to put that in the
4   scheme of things.  I probably spent more time developing
5   her testimony than any client I've ever had.
6       Q.   So in spite of that unpleasant surprise that you
7   talked about when you found out that Ms. Andriano and
8   Mr. DeLozier were not talking about the case, you still
9   had adequate time?
10      A.   Yes.  Yes.
11      Q.   And in spite of all this time you spent with her,
12  there were just no red flags that she gave to you about
13  past sexual abuse or physical abuse with Alejo Ochoa on
14  her or anyone else; correct?
15      A.   No.  Apparently, I was presented with these
16  things that Mr. Lynch brought up on direct.  But I either
17  discounted them or passed them onto DeLozier, or DeLozier
18  was notified contemporaneous with me, and I assumed that
19  he would have been -- you know, was going to be
20  forthcoming and responsible to follow up, if need be.
21           You know, I didn't -- unfortunately, I didn't
22  assist greatly in the development of mitigation in this
23  case other than she's a good woman and her story is a
24  credible story.
25      Q.   And, likewise, she never gave any indication of

1  prior abuse --

2      *A.*    No.

3      *Q.*    -- other than what was gleaned from Dr. Murphy

4  and following up with Ms. Andriano as it related to

5  domestic violence with the victim, Joe Andriano; correct?

6      *A.*    Absolutely.  She never suggested to me that her

7  biological grandfather touched her improperly, that her

8  biological father touched her improperly, or that any

9  other human being, other than Joseph Andriano, touched her

10  in a manner that she didn't wish to be touched sexually.

11      *Q.*    I'm now going to ask you about the mental health

12  aspect to these proceedings and Ms. Andriano.  First off,

13  can we talk a little bit more about *State V. Roque*.   And

14  that was the first capital trial you took all the way to

15  jury sentencing; correct?

16      *A.*    Correct.

17      *Q.*    And that was -- that trial went approximately a

18  year before Ms. Andriano's trial?

19      *A.*    That's fair, uh-huh.

20      *Q.*    Who was the prosecutor on *State V. Roque*?

21      *A.*    Vince Imbordino.

22      *Q.*    And what defense did you raise in *State V.*

23  *Roque*?

24      *A.*    Guilty except insane.

25      *Q.*    And you talked about that and what psychiatrist

1 did you hire to be your expert on the mental state at the

2 time of the offense and so forth related to the

3 GEI defense?

4     *A.*   Dr. Richard Rosengard, the same doctor who

5 participated in Wendi's workup.  The government hired a

6 Dr. John Shaley.  And the statute allows the Court in a

7 GEI circumstance to appoint its own expert.  Dr. Potts was

8 appointed as an expert by Judge Mark Acedo.

9     *Q.*   So that was a mental health intensive case?

10     *A.*   Absolutely.  And I did -- and I didn't rely on a

11 mitigation person to develop that stuff because that stuff

12 was Phase 1 relevant material.  So I hired Dr. Rosengard.

13 I developed all of the information that I gave to

14 Dr. Rosengard to assist him in developing the GEI.  I did

15 the leg work in that case.

16     *Q.*   And did that impart why you consulted with and

17 hired Dr. Rosengard to evaluate Ms. Andriano, because you

18 had had this prior working relationship with him?

19     *A.*   Partially.  He was an expert that the office

20 respected.  He was an expert who had -- his heart was on

21 our side of the equation, so to speak.  And he was a guy

22 and an expert who was capable of defending his opinions.

23        So, yeah, I mean a number of considerations went

24 into retaining Dr. Rosengard for Wendi's case, based upon

25 my experience with him in the *Roque* case.

1    *Q.*   And based upon your review entirely of his

2    report, you concluded that there were no significant

3    mental health issues that warranted further investigation

4    with Ms. Andriano; correct?

5    *A.*   Nothing jumped out of that report that demanded

6    that we follow up, in my estimation.  Again, Scott MacLeod

7    or Patrick Linderman had access to this report, as did

8    Mr. DeLozier, and if they felt that follow-up was

9    necessary, I assumed they would have done it.  Maybe I

10   advocated my responsibilities there.

11         But there was nothing in Rosengard's report that

12   screamed this woman has a mental health issue.  Nothing in

13   my experience with the woman led me to conclude that she

14   had a mental health issue.  So, no, I did not personally

15   follow up and retain other experts to assess and evaluate.

16   Today, I would have.

17   *Q.*   And there was no hint in Dr. Rosengard's report

18   about any form of child abuse in Ms. Andriano's history;

19   correct?

20   *A.*   My reading of Dr. Rosengard's report is that her

21   dysfunction -- current dysfunction was a situational

22   result of her being incarcerated, having lost her husband

23   in a horrible manner, and being alienated from her family,

24   who lived in Casa Grande, and her children who were warded

25   out to guardians that were aligned with the Andriano

1  family.  That's what I thought caused her this distress,

2  this depression that's reflected in the report, this

3  post-traumatic stress disorder.

4         There was nothing in the report that suggested we

5  should do anything further to rule out post-traumatic

6  stress disorder or rule out any mental illness.  There was

7  no NOS suggestion that this is a series of -- let's see.

8  What word do I want?  A collection of symptoms that we

9  can't define with any particular mental illness, but

10  there's need to go further and try to perhaps do things

11  that might enable you to define what the actual defect is.

12  I don't read anything in Dr. Rosengard's report that leads

13  me in that direction.

14     *Q.*  And So you relied on Dr. Rosengard's report

15  because he was someone whose opinion you trusted in your

16  office and your office trusted; correct --

17     *A.*  Yes.

18     *Q.*  -- as a mental health professional?  You didn't

19  just rely on Dr. Rosengard's report; correct, as far as

20  this mental health issue?

21     *A.*  Well, at this time, you know, we've got -- I

22  don't know if Dr. Murphy is on this.  No, Dr. Murphy is

23  not involved yet.  But there were other people who had far

24  better handles on mental health issues than I ever will

25  who were brought into the team.  Scott MacLeod and Patrick

1  Linderman were working constantly on the case.  And nobody
2  brought to my attention that there was a fertile area of
3  mitigation in the mental health field.  And these were
4  persons -- you know, I respected Dr. Murphy's opinion.  I
5  respected Mindy Mechanic's opinion.
6        I don't respect Brad Bayless's opinion, but even
7  he suggested there's no issue here.  So, no, I didn't get
8  anybody.  I didn't derive any information that in my
9  estimation compelled me to go further.  Today, I would
10 have.
11    Q.   And, Mr. Patterson, there was some discussions
12 about Ms. Andriano's suicide attempt.  Or another way --
13 another one's perspective might be, you know, hurting
14 herself while she was in the custody of the jail; correct?
15    A.   Well, again, I mean, I'm familiar -- having a
16 host of clients in custody, I'm familiar with the
17 stressors inherent in being in custody and dealing with
18 Joe Arpaio's folks.  The folks here, you're not the
19 problem.  But there are jailers who make life difficult
20 for my clientele.  Okay?  So I recognize that being in
21 custody does have its own set of the stressors and that my
22 clients react.
23        I did not feel that this was a serious effort on
24 her part to kill herself.  It was a situational response
25 to a provocation at that time.  Once the provocation was

1   removed, she went back to being good, old Wendi Andriano.

2   Maybe I shouldn't have minimized this.  Maybe it should

3   have been a -- maybe it should have been something that

4   generated further interest in mental health issues.  It

5   didn't.  I didn't take it as a serious attempted suicide.

6   I spoke with her about it.  She brushed it off.  But, in

7   retrospect, that's her nature.  It's never about Wendi.

8   She doesn't focus undue attention on herself.  She's not

9   needy.  She doesn't -- that's not who she is.  In

10  retrospect, the fact that she minimized its importance to

11  me doesn't surprise me in the least.

12      Q.   After she cut up her arm, she was transferred to

13  the psyche unit in the Durango Jail; right?

14      A.   The standard operating procedure for inmates in

15  these circumstances.

16      Q.   While she was there, she was treated by mental

17  health professionals and seen on a regular basis; correct?

18      A.   I assume so.

19      Q.   And there was no mention of this on direct

20  testimony, but do you recall that on the first day of your

21  mitigation case, you called all three of her primary

22  treating mental health professionals at that psyche unit?

23  You called Laura King, who was her counselor?

24      A.   Oh, okay, now that you mention it, yes.

25      Q.   Dr. Gerald Perry, who was the clinical

1   psychologist that managed her case; is that correct?

2        A.    Okay.   Now that you mention it, I have some

3   recollection of that.   But if obviously it was in the

4   transcript, it happened.   I must have had a reason for

5   doing it.

6        Q.    And Joyce VanEvery, the nurse -- the psychiatric

7   nurse that cared for her during that time as well?

8        A.    Okay.

9        Q.    And, Mr. Patterson, would it surprise you that

10  you asked all three of these qualified mental health

11  professionals who actually treated Ms. Andriano during

12  this time, did she have any sort of serious mental disease

13  or defect, and all three of them said no.   Does that

14  surprise you?

15       A.    That would not surprise me and it would comport

16  with my understanding from a number of sources.

17       Q.    Do you recall, also, that they were -- you

18  elicited testimony in mitigation about Ms. Andriano's

19  behavior while she was in the psyche ward and how she

20  dealt with other inmates and how helpful she was.   Does

21  that refresh your memory?

22       A.    She was a model inmate from all sources.   She was

23  a helpful person.   She was helpful to other inmates.

24       Q.    Why would Ms. Andriano's conduct while she was in

25  custody be a good thing to let the jury know about when

1   they're deciding whether she lives or dies?

2       *A.*   Well, that is a predictor for future performance

3   for life in prison that she is not going to be a problem

4   for the guards, that she is not going to be a problem for

5   other inmates, that you can warehouse her, to use a

6   cliché, for the balance of her natural life, and that

7   would be a sufficient punishment.  It's an alternative to

8   the death penalty that you raise for consideration by the

9   jurors.

10      *Q.*   And it was also advantageous here because these

11  were people that actually cared for her?

12      *A.*   Yes, absolutely.

13      *Q.*   They weren't hired to render opinions?

14      *A.*   Correct.  One of the -- if we don't have that

15  kind of information, we do retain Aiken -- Ed Aiken out of

16  Avidican.  I forget the gentleman's first name.  It's a

17  former prison -- former prison warden who evaluates the

18  conduct record of the client while in the county jail and

19  renders an opinion as a corrections expert with regard to

20  the manageability of the client in the life in prison

21  environment.

22          I didn't have to do that in this case because of

23  apparently what I already had, that she was a model

24  inmate.

25      *Q.*   You chose not to call Kandy Rohde to the stand?

1      *A.*   Yes.

2      *Q.*   And why is that?

3      *A.*   I never had a really good understanding of her

4    function here.  She certainly wasn't a treating mental

5    health person.  She didn't have the credentials.  I don't

6    even know if she had a master's in social work.

7      *Q.*   Did you consider her part of your defense team?

8      *A.*   No.  She was -- here was her function, as I was

9    led to believe.  She was already on site when I arrived.

10   Her services were paid for by the Ochoas and her contact

11   person primarily was David DeLozier.  My understanding of

12   her function was to visit with Wendi periodically and help

13   her deal with the stressors inherent in her current

14   environment, a county jail inmate, lack of contact with

15   her family, lack of contact with her children.  A big

16   sister, a hand holder, that was what I was led to believe

17   was her function here.  That she had no therapeutic

18   function.  That she had no diagnostic function.

19           And my concern was that having been kind of a big

20   sister with Wendi, that Wendi may have divulged things to

21   her concerning the facts and circumstance of the homicide

22   that she did not divulge to me, and that putting Kandy

23   Rohde on the witness stand and subject to cross-exam by a

24   very adept cross-examiner, Juan Martinez, would have

25   been -- could have been sheer folly.  It could have been a

1  significant mistake because she could have blurted out

2  things that she had obtained from Wendi that I wasn't

3  aware of that could have been devastating to the case.  So

4  I made the election not to call Kandy Rohde.

5      *Q.*  Do you recall, also, that Ms. Rohde admitted that

6  she smuggled a compact, mirror and makeup to Ms. Andriano?

7      *A.*  Yes.  There was some impeachment material

8  available for Mr. Martinez, as I recall; you're right.

9  That's correct.

10     *Q.*  This is a general question.  You've testified and

11 made it very clear that the reason you didn't pursue a

12 mental health investigation -- you've given those reasons

13 and why you wouldn't present mental health as a mitigation

14 theme or theory to Ms. Andriano's case.

15         In general, when you put your client's mental

16 health or mental state at the time of the offense in a

17 capital case, what does that -- what potential problems

18 does that create?

19     *A.*  Well, this is going to be as a result of having

20 done this for ten years.  Do you want my assessment

21 now or --

22     *Q.*  Yes.

23     *A.*  Now, in my experience discussing with my

24 attorneys in the unit, my own personal experience, mental

25 health, unless it's schizophrenia, unless it's the kind of

1  mental health that's palpable, that the average juror can

2  relate to, it is somewhat -- and the prosecution dismisses

3  it as the abuse excuse.  And, unfortunately, it also, in

4  my estimation, portrays your client as a defective human

5  being, which may give a potential juror license to vote to

6  kill your client.  So I'm very, very reserved about the

7  use of mental health information as mitigation.

8        The downside, once you notice it, then you

9  subject your client to evaluation from the government's

10  expert.  And there are a number of local experts who are

11  very adept at portraying your client as an anti-social

12  human being.

13      Q.   Was Dr. Brad Bayless one of those?

14      A.   Absolutely.  Absolutely.  And, in fact, from my

15  own personal experience afterwards in the *Medina* case,

16  that very thing happened.  We put mental health at issue.

17  He came in, based upon his review of the MMPI, that the

18  client was an anti-social personality.  It may have been a

19  fair diagnosis in that particular case.

20        That being said, when jurors hear those words,

21  they are inflammatory and, again, they portray your client

22  as a social defective who is deserving of being executed.

23        So you have to be very, very circumspect with the

24  use of mental health evidence in the juror sentencing

25  system.

1       By contrast, I would have no reservation if

2   Judge Ishikawa were the arbitrator of the sentencing in

3   the case in giving him all the mental health evaluations

4   available because he can put the information in context

5   and judges find mental health information very compelling.

6       I don't know that it is as compelling in the

7   juror sentencing system.  I only have, you know, ten years

8   of experience in that regard.  I don't have a great deal

9   of statistical information to support it.  But it's just

10  my belief that you have to be careful with mental health

11  information, in general.  But that doesn't -- I'm not

12  saying that you shouldn't develop it.  Once developed,

13  then you need to look at it very closely and determine

14  whether the benefits of presenting it outweigh the

15  possible detriments.

16  Q.   In this case, Mr. Martinez tried to get you to

17  disclose Dr. Rosengard's report.  Do you recall that?

18  A.   It would not surprise me if he did.

19  Q.   And you resisted those efforts?

20  A.   Yes.

21  Q.   Why?

22  A.   Well, because mental health was not noticed as a

23  mitigator.  I did not put it at issue.  If I put that

24  topic at issue, then the case law in Arizona requires me

25  to submit the client to a full evaluation by a government

1  hired expert, and that is very risky behavior.

2      Q.   Why did you think that selecting the theme of

3  portraying Ms. Andriano as, in simple terms, a good person

4  who did some very bad things on October 8, 2000 -- why did

5  you think that was a compelling theme or topic to portray

6  to the jury?

7      A.   Well, I think you need to include in your

8  question, they were bad things, but they were justified

9  things.  All of the ostensibly bad things that she did

10  had a lawful explanation.  Sure, there was poison on site,

11  but it was to delay the suffering of Joseph Andriano.

12  Yes, she hit him with a barstool, but after he had

13  attacked her with the knife.  His throat was cut after

14  they struggled with the knife.

15          So the notion that she is an otherwise good

16  person who got involved in a set of circumstances in the

17  last few months of Mr. Andriano's life was consistent.  I

18  mean, she was an otherwise -- I mean, and it was rare that

19  we have clients of her lack of bad background.  I mean I

20  usually have to deal with priors.  I usually have to deal

21  with, you know, circumstances.  She had a wonderful

22  background.

23          So I thought that that was something that would

24  save her life and that's why I concluded that it was a

25  viable mitigation theme.  And it was consistent with her

1  efforts to help her husband.

2          We talked to the doctor and the doctor talked

3  about this horrible death that Joe was going to endure by

4  virtue of his -- it was a multi-salivac kind of carcinoma.

5  That, basically, he would suffocate to death and it was a

6  horrible ending to a good man's life.  And for her to help

7  him, you know, go to the next life with the least amount

8  of suffering, I thought was a noble thing.

9          So we had explanations for all of her conduct

10 that were consistent with the facts that she was a good

11 woman.

12     *Q.*   And given that two-pronged strategy, the domestic

13 violence abuse to try to explain her conduct that the jury

14 had already found her guilty --

15     *A.*   Right.

16     *Q.*   -- correct?

17     *A.*   Right.

18     *Q.*   With the prior evidence of good character, was

19 there also a sense that that's the type of mitigation that

20 might get a jury to emphasize with?

21     *A.*   Yes, absolutely.  I had no reservations about the

22 theme we adopted.  I didn't see any downsides to it.  I

23 was shocked when they came back with the verdict.  I mean,

24 I guess that's a new moment, but that's -- it surprised

25 me.

1   *Q.*   And do you recall, you were able to keep some
2   things from Ms. Andriano's past that would reflect maybe
3   not a perfect character with respect to the theft from her
4   employer, Casa Grande Regional Hospital?
5   *A.*   Yeah, I recall that.  And was that -- did that
6   come in?
7   *Q.*   You were able to preclude that --
8   *A.*   Oh, okay.
9   *Q.*   -- from the jury hearing it.  Do you remember
10  that?
11  *A.*   Okay.  If you say so.  I don't specifically
12  recall.  But I do recall now that she had some theft
13  issues.  She was entrusted with some funds and -- yeah, I
14  don't -- I would have made an effort to keep that out.
15  *Q.*   And you would not want the jury to hear that,
16  obviously?
17  *A.*   No, obviously.
18  *Q.*   If there were things -- knowing that that was out
19  there, would that influence the way you would present
20  certain type of good character to make sure you didn't
21  open the door?
22  *A.*   You have to structure your presentation so that
23  you operate consistent with any court pretrial verdict or
24  ruling.  And, yes, you insidiously avoid things that might
25  open that door.  So, yes, I agree with you.

1    *Q.*   Do you recall, also, that during the mitigation

2  phase, the number of people from Ms. Andriano's church,

3  especially during her child and adolescent years,

4  testified?

5    *A.*   Yes.  I thought we had -- we had Brandon was

6  there.  There were other folks that knew her over time in

7  Casa Grande.  Mom and dad testified.

8    *Q.*   Do you recall a Chris Vargas, who was at that

9  point in time the chief deputy of the Pinal County

10 Sheriff's Office, testified?

11   *A.*   Yes, now that you mention it.

12   *Q.*   He was a retired police lieutenant from

13 Casa Grande PD as well?

14   *A.*   Yes.

15   *Q.*   And he went to the same church as Ms. Andriano

16 and knew her for ages eight to up until her early 20's.

17 Do you recall that?

18   *A.*   I don't recall specifics of his testimony, but I

19 do recall in general him being part of the presentation.

20   *Q.*   And, again, none of these witnesses that you

21 spoke to, that you called -- none of them brought up any

22 sort of allegations or hints that Alejo or Donna Ochoa

23 were not the parents that you thought they were?

24   *A.*   I agree.  I received no information that would

25 lead me to believe that she lived in an otherwise -- you

1  know, obviously, it's not a Ward and June Cleaver

2  environment, but, you know, every family has their

3  problems.

4         But the problems that I was advised of went back

5  to the point in time when Alejo was kind of a street

6  preacher and they lived in a Volkswagen minibus and went

7  from town to town preaching the gospel.  Those were lean

8  years according to Donna and Wendi.  But even Wendi said

9  that there was something nice about being with the family.

10 So even, that's Wendi.  She's very optimistic about

11 everything.

12        No, none of those folks ever suggested that there

13 were things going on in that household involving Wendi

14 that shouldn't have been going on.

15 Q.    That sort of traveling ministry that you just

16 mentioned, at the time, there was nothing that made you

17 think it was sinister in any way; correct?

18 A.    No, not whatsoever.  It was a good thing.  It was

19 a valuable thing.  It was Alejo doing spiritual things for

20 the good of mankind.  That was the way it was portrayed to

21 me.

22 Q.    I'm going to ask some questions now about David

23 DeLozier.  You mentioned about the importance of meeting

24 regularly with a client who is facing the death penalty,

25 the death notice, and developing a kinship with that

1  client; correct?

2     *A.*    Absolutely.

3     *Q.*    And, although, you were alarmed that Mr. DeLozier

4  and she were not talking about the case when you

5  discovered that, would you agree that he was developing

6  that kinship at least with her?

7     *A.*    Absolutely.  I was only alarmed to the extent

8  that had I known earlier, then I would have made different

9  decisions about things that I had to do.  It would have

10  given me more lead time to do them.

11        But, no, developing a bond with the client is

12  essential.  It's what they teach at all mitigation

13  development seminars.  You're not going to get the client

14  to talk about horrible things in his or her life from

15  their childhood unless you have a well-established

16  relationship with that client.

17        And we're instructed now, you don't even talk

18  about those things the first year or so with the client.

19  You know, you develop -- you talk about the Diamondbacks.

20  You develop a rapport with the client with the hope and

21  expectation that the things that are truly valuable will

22  be forthcoming because they trust your judgment.  You're

23  not a public defender.  You're not a government lawyer,

24  you know, that's going to sell them out.

25        Sometimes you go with mitigation witnesses and

1   you just sit down and have a cup of tea with the aunt and

2   you don't talk about the case.  You're developing and

3   establishing a relationship with the next-of-kin or with

4   relatives of the client.

5           Now this is a well-defined process and we know

6   far more about it currently than we did back in 2002, '03,

7   '04.

8   *Q.*   Your work in relationship with Mr. DeLozier was

9   good; correct, on this case?

10  *A.*   Yes.  Yes.

11  *Q.*   And you mentioned and when we interviewed you,

12  that your impression was that he was grateful when you

13  were appointed to represent Ms. Andriano?

14  *A.*   Yes.

15  *Q.*   Could you tell the Court a little bit about that?

16  *A.*   Well, he was candid that he had never done this

17  stuff before.  He never had done a capital case.  He felt

18  in over his head and he was glad that there was somebody

19  to help him with the defense of the case.

20  *Q.*   Not only because of your experience and

21  qualifications, but because of the resources that you had;

22  correct?

23  *A.*   And that's very true.  I brought with me the

24  power of the public purse.  We could retain anybody that

25  was reasonably needed to properly defend Wendi.

1    *Q.*   And when you got on the case, you limited his

2    work?

3    *A.*   Not by design.  His function -- I mean, again, it

4    was kind of a literal reading of a Knapp lawyer.  You deal

5    with mom and dad.  But as it developed, that was the

6    source of the mitigation information.  And because he had

7    a far better relationship with Donna and Alejo than I ever

8    would, he was the natural conduit to treat or retrieve

9    that information.

10            I didn't limit his participation.  You know, he

11   had his practice.  He had other clients.  Her case was

12   assigned to my office.  I had Scott and Patrick there.  I

13   had Michelle Arvanitas.  I had Patty Moncava.  I had the

14   resources to do the Phase 1 stuff.  So I shouldered that

15   responsibility.

16            You know, I had a good rapport with Juan.  You

17   know, I had been to the county attorney's office before to

18   do witness interviews.  So it was just a natural upshot of

19   my experience versus his experience that I would laden,

20   you know, shoulder the bulk of the Phase 1

21   responsibilities, and he would assist in developing the

22   Phase 3 responsibilities because of his relationship with

23   the family.

24   *Q.*   He never told you at any time that he felt like

25   he was being shut out or pushed aside; correct?

1   *A.*   Apparently, there is some e-mail that he sent to

2   somebody.  No.  That shocks me.  Maybe, you know, because

3   I had a caseload and my focus was with Mr. Roque or my

4   focus was with Mr. Carrion or with some other client.  I

5   may have shut him out in the sense that, no, I'm not going

6   to work on Wendi's case this week.  I've got enough going

7   on.

8        But once we started scheduling interviews of key

9   witnesses, he never expressed a desire to participate, nor

10  did he express a feeling that she was being shut out of

11  the process.  I thought I had a good working relationship

12  with Mr. DeLozier.

13  *Q.*   You thought he was a good advocate for

14  Ms. Andriano?

15  *A.*   Having watched him in Phase 3, I think his

16  performance, in my opinion, was at least *Strickland*

17  performance.

18       MR. LYNCH:  Object to the legal characterization

19  there, the legalese.

20       THE COURT:  Overruled.  Overruled.

21  *Q.*   BY MR. HAZARD:  And you thought he took his job

22  seriously?

23  *A.*   Yes.  He certainly absolutely took responsibility

24  for his performance in this case.  He was a dedicated

25  counselor with Wendi.  I mean, they had an extraordinary

1 relationship.  A very, very good relationship.  So, yeah,

2 I have no -- obviously, he didn't -- I didn't get a report

3 from him as to those things he was accomplishing, but I

4 never ever believed that he was shirking his

5 responsibilities in this case.

6     *Q.*   You mentioned on direct or you made some comments

7 about the Knapp counsel and how today your views on how

8 Knapp counsel should be handled and how it's not a right

9 of the defendant.

10         Putting that aside for a moment, this was

11 Ms. Andriano's choice to have Mr. DeLozier represent her;

12 correct?

13     *A.*   Yes, absolutely.

14     *Q.*   And at least at the time in 2004, your

15 interpretation of Knapp as having this sort of necessary

16 he's there and you've got the defendant's rights, you have

17 to work with him, that was a reasonable interpretation in

18 2004; correct?

19     *A.*   Both from the defense perspective and from the

20 judicial perspective.  I don't recall any judge telling

21 folks in court that your ability, Mr. Client, to have a

22 Knapp counsel is dependent upon the willingness of the

23 public defender to work with that person, and if the

24 public defender objects, you cannot be Knapp counsel.

25 That was not the wisdom in the early 2000's.

1    If a client said, I want a Knapp lawyer and my

2 parents are willing to pay for it, you got Knapp counsel,

3 period.

4    Now, if after Knapp counsel was there for a

5 period of time and you had irreconcilable differences that

6 the Knapp counsel wouldn't abide by or concede to the

7 public defender deputy the right to be the control, if you

8 will, or the lead counsel, or if there was some disputes

9 with regard to strategy and theory in the case, then you

10 could have a Knapp counsel dismissed.

11    But that didn't -- it didn't eliminate the

12 possibility of a new Knapp counsel because everybody

13 believed it was the client's right to have Knapp counsel,

14 which I think is absolutely wrong.  But that's what we

15 thought back then.

16    *Q.*   And you didn't have any of those types of

17 differences with Mr. DeLozier on this case?

18    *A.*   No, absolutely not.  He was a good man to work

19 with.

20    *Q.*   You mentioned on direct your discovery of

21 Mr. DeLozier and his fasting; correct?

22    *A.*   Yes.

23    *Q.*   Notwithstanding, there was nothing that you

24 gleaned from that fasting that you thought affected

25 Mr. DeLozier's performance; correct?

1    *A.*    I can't give you a concrete example, no.  Did he

2    fail to do something because he was too weak to do it?

3    No.  But he -- the man had lost a considerable amount of

4    weight.  It was apparent in his face and apparent in the

5    way his suit coat fell from his shoulders.  It was

6    obvious.  And it was a fast that had a duration of

7    five weeks at the time because we were well into the

8    trial.

9    *Q.*    And you also mentioned on direct about the death

10   of his associate and it was someone that he felt was like

11   a son to him?

12   *A.*    Absolutely.

13   *Q.*    And that happened in the middle of the trial?

14   *A.*    Yes.

15   *Q.*    You mentioned about when you saw evidence that he

16   was just not there momentarily; correct?

17   *A.*    Yes.

18   *Q.*    And it was your conclusion, it was just as a

19   result of what he was going through with the grief and

20   everything surrounding that?

21   *A.*    It had to be.  It had to be.  I think we made a

22   record of it.  I remember approaching Judge Ishikawa's

23   bench and we dismissed the jurors and I think we made a

24   record of it.  So it should be there someplace.  But,

25   yeah, he was not equipped that day to deal with the

1   stresses of a capital trial.

2      *Q.*   Judge Ishikawa gave you a break?

3      *A.*   Yes.

4      *Q.*   And when you did return and resume the trial, I

5   think you mentioned that you thought that Mr. DeLozier,

6   quote, soldiered on after the recess and you didn't see

7   deficiency in his performance?

8      *A.*   No.

9      *Q.*   Did Mr. Arntsen also or Mr. Lynch, when they met

10  with you that first time in these proceedings -- did they

11  mention this purported conflict of interest between the

12  Ochoas and Mr. DeLozier at all?

13     *A.*   No.  The substance of that allegation and being

14  one of the issues at this hearing only became apparent to

15  me after Judge Ishikawa granted the part -- the portions

16  of the relief requested and then set the parameters for

17  this hearing.  That's when I discussed with Mr. Lynch and

18  Mr. Arntsen more fully how a potential conflict of

19  interest arose.

20     *Q.*   At the time you were representing Ms. Andriano,

21  you had no idea there was any possible conflict?

22     *A.*   No.  No.  No belief and no information that there

23  was in fact an actual conflict of interest.

24     *Q.*   It has been reported that Mr. DeLozier may have

25  had some help or have actually some other people write his

1    statements or arguments that he presented to the jury in

2    the mitigation phase.  Now does that gel with your memory

3    of the way he presented it?  What was your impression at

4    the time?

5        A.    There was some reference to the fact that Donna

6    may have helped script him with the presentation.  I can't

7    confirm that.  I don't know.  And I don't really recall

8    where I heard that, whether it was an acknowledgement or

9    admission by Mr. DeLozier or something that Ms. Ochoa

10   told me.  I can't -- I would be speculating completely in

11   that regard.

12       Q.    Given that this was at a stage where Mr. DeLozier

13   was essentially arguing for leniency to spare

14   Ms. Andriano's life, would there be anything wrong with

15   taking advice from the people who knew Ms. Andriano well

16   to prepare and draft those types of remarks?

17       A.    You know, absent more information, Counselor, I

18   really can't weigh in on that.  I mean, certainly, you

19   want to include in your opening and in your summation

20   quotes from relatives, family.  You want to humanize the

21   client to the best extent possible and you may enlist the

22   woman who knows the client better than anybody else on the

23   planet in preparing those statements, that presentation.

24          Whether I would delegate that responsibility

25   completely to the mom and then read verbatim what the mom

1  wrote, I don't think that's the standard of care that

2  should be adopted.  But incorporating a mother's influence

3  or input into the closing summation in Phase 3, I don't

4  think that that's too far out of line.

5     *Q.*   Even if that did happen in this case, which is

6  not consistent with your memory, and Mr. DeLozier had

7  somebody else write out the statements and arguments that

8  he made in the jury mitigation phase, based on what you

9  heard and saw in the courtroom when he was presenting it,

10  was there anything that you thought was deficient?

11    *A.*   No, not from my perspective.  I, to this day,

12  believe he made a compelling argument for life.

13    *Q.*   In summary, Mr. Patterson, you and your team

14  relied on Alejo Ochoa to help you with mitigation;

15  correct?

16    *A.*   Yes.

17    *Q.*   And Donna Ochoa to give you evidence, advice,

18  suggestions; correct?

19    *A.*   Yes.

20    *Q.*   Brandon Ochoa as well?

21    *A.*   Yes.

22    *Q.*   Ms. Andriano herself?

23    *A.*   Yes.

24    *Q.*   And there were no red flags, aside from an

25  incident regarding Alejo and photographs of furniture,

1  that made you think that there was something to suspect

2  Alejo Ochoa as being a good father?

3      A.   Well, and I need to dissect your predicate here.

4  The incident involving the photographs where he may, at

5  least if you believe Mr. Martinez, took a photograph after

6  the fact and claimed that it was a photograph that showed

7  the domestic violence before the homicide --

8      Q.   It was a furniture in Ms. Andriano's apartment;

9  correct?

10     A.   Right.  And I think it particularly related to a

11  box that had a lamp.  That, at one time, it held a lamp.

12  And that one position was that that lamp had been

13  purchased that morning the day of the homicide at the

14  COSTCO or Wal-Mart.  And so that that damage was not

15  damaged furniture that was occasioned by another domestic

16  violence act, but it was damage that was occasioned or

17  created or staged the day of the homicide to make it

18  appear that there was a fight.

19          That being said, that only led me to believe that

20  he was willing to do things with evidence that may not be

21  appropriate.  It didn't lead me to believe that he was a

22  bad father.  It didn't lead me to believe that he was an

23  abusive father.  It just caused me some concern about the

24  legitimacy of all of the things that he had told me up to

25  that point because he apparently -- I mean, if you believe

1   Mr. Martinez's take on it, he created a bit of evidence to

2   support his daughter's position that was wholly concocted

3   by him and not the way that the apartment looked.

4        *Q.*   If Mr. Martinez's version is accurate, then that

5   reflects that Mr. Ochoa was willing to help out his

6   daughter, although in a very inappropriate way; correct?

7        *A.*   Yes, it does.  Yes.  If Mr. Martinez's take --

8   yes.  But, unfortunately, that occurred late in the

9   process.

10        MR. HAZARD:  Thank you, Mr. Patterson.

11        THE COURT:  Okay.  This is a good time to take

12   our afternoon break.  We will go ahead and take our

13   afternoon break.  We will take 15 minutes.  We will be in

14   recess.

15        (WHEREUPON, a recess ensued from 3:06 p.m. to

16   3:19 p.m.)

17        THE COURT:  This is CR 2000-096032, State of

18   Arizona vs. Wendi Elizabeth Andriano.

19        The record will reflect the presence of the

20   parties and counsel.

21        The record will reflect that Mr. Daniel Patterson

22   is on the witness stand.  We will begin the redirect by

23   Mr. Lynch.

24        Mr. Lynch.

25

REDIRECT EXAMINATION

1

2 BY MR. LYNCH:

3     *Q.*    Mr. Patterson, in your testimony on

4 cross-examination, you mentioned the *Strickland* case

5 several times; right?

6     *A.*    Uh-huh.

7     *Q.*    And that was in the context of the case that was

8 presented at trial?

9     *A.*    Yes.  I think that was the way it was structured,

10 the question, yes.

11     *Q.*    You reviewed the order granting this PCR hearing

12 in this case; correct?

13     *A.*    Correct.

14     *Q.*    And you're aware that that PCR hearing -- that

15 this case is about *Strickland* in the context of failure to

16 develop mitigating evidence, not failure to present what

17 had been developed previously?

18     *A.*    I understand the distinction.

19     *Q.*    Okay.  Mr. Patterson, you talked about that Wendi

20 did not disclose sexual abuse to you; is that right?

21     *A.*    Correct.

22     *Q.*    And that Brandon did not disclose sexual abuse to

23 you?

24     *A.*    To the best of my recollection; correct.

25     *Q.*    Alejo didn't disclose sexual abuse to you?

1    *A.*   No, definitely not.

2    *Q.*   And Donna didn't disclose sexual abuse to you?

3    *A.*   Correct.

4    *Q.*   As for each of those individuals, did you ask

5    them?

6    *A.*   No, I didn't.  I did not sit them down and say:

7    I need to know about a history of sexual abuse.  No, I did

8    not ask them that question directly.  I, for whatever

9    reason, assumed that it was made known to them that things

10    of significance in their daughter's background and history

11    are important and that it was incumbent upon them to bring

12    those things to our attention.

13    *Q.*   What was the basis of that assumption?

14    *A.*   Because we had good relationships with both Donna

15    and Alejo and they were aware that part of their function

16    to assist us was to bring to us -- to our attention those

17    kinds of issues.  We made it known to them that those are

18    the kinds of things that are admissible.

19    *Q.*   And Donna and Alejo were the primary caregivers

20    for Ms. Andriano growing up?

21    *A.*   To my knowledge, yes, absolutely.

22    *Q.*   So if there had been sexual abuse or neglect or

23    trauma suffered by Ms. Andriano, it's entirely possible

24    they may have been perpetrators of that?

25    MR. HAZARD:  Objection.  Calls for speculation.

1          THE COURT:   Sustained.

2     *Q.*   BY MR. LYNCH:   Mr. Patterson, you talked about

3  Kandy Rohde and your reliance on her or nonreliance on

4  her.  I'm sorry.

5     *A.*   That's a better way to state it.

6     *Q.*   And you stated that one of the reasons was you

7  weren't sure if she had any credentials; right?

8     *A.*   Correct.

9     *Q.*   I want you to turn back to what we looked at

10  earlier, Exhibit 230.

11     *A.*   I believe that's the Rule 11 request?

12     *Q.*   Yes.

13     *A.*   Okay.

14     *Q.*   If you would turn to the last page of that

15  exhibit.

16     *A.*   Exhibit 2?

17     *Q.*   Or second to the last page to that exhibit.  I'm

18  sorry.

19     *A.*   Okay.  I see it.

20     *Q.*   Did you review this portion of Exhibit 230 when

21  you reviewed the initial pleadings in this case?

22     *A.*   I have no specific recollection of being aware of

23  these credentials that are described in this particular

24  resumé.

25     *Q.*   About her education, do you see that Ms. Rohde

1   had an MA in counseling psychology?

2   *A.*   She apparently was a counselor, I agree.

3   *Q.*   And, specifically, counseling psychology?

4   *A.*   As it -- I have no independent knowledge of what

5   I'm reading absent what's said and presented before me.  I

6   did not investigate her credentials.

7   *Q.*   Well, in terms of relying upon Wendi, I think you

8   used that word in the very last sequence of the questions.

9   Relying upon Wendi to report allegations of sexual abuse

10   or something worth investigating?

11   *A.*   Yes.

12   *Q.*   We went through earlier -- and I can through them

13   again -- some notes from Kandy Rohde talking about

14   dissociation associated with childhood sexual abuse.  Do

15   you remember that?

16   *A.*   Well, I don't accept your premise that they were

17   causally related.  There was some suggestion that a

18   grandfather may have improperly touched her and that a

19   stepfather may have improperly touched her, but it was

20   never confirmable.

21   *Q.*   Let's go --

22   *A.*   And she had no specific recollection of any

23   misconduct in that regard as well.

24   *Q.*   Let's just turn back to --

25        MR. HAZARD:  Your Honor, can we have

1  clarification as to who he means by the stepfather?

2         THE WITNESS:  Did I say stepfather?  I meant

3  biological father.

4         THE COURT:  When you said father, you meant

5  biological father?

6         THE WITNESS:  Yes.

7         THE COURT:  Okay.

8  *Q.*    BY MR. LYNCH:  Let's turn back two pages in that

9  same exhibit, Exhibit 230.

10 *A.*    Okay.  Is that again the Petition for Rule 11

11 Competency Determination?

12 *Q.*    Yes.

13 *A.*    Okay.

14 *Q.*    It's the letter from Ms. Rohde in that exhibit.

15 *A.*    Okay.

16 *Q.*    Once again, I also suspect that her defense

17 system includes dissociation.  Her mother's reference to

18 possible abuse by Wendi's paternal grandfather could be

19 the origin of that dissociation.

20        Did you consider that dissociation may have been

21 a reason why Wendi was unable to report childhood sexual

22 abuse?

23 *A.*    I did not go through that analysis.  Quite

24 frankly, I didn't have a great deal of competence in

25 Kandy Rohde.

1    *Q.*    Why not?

2    *A.*    Because of her limited participation in the case,

3    her function in the case.  She was not an evaluating or

4    treating physician.  And, again, I don't recall this

5    letter specifically.  So I can't opine with regard to what

6    I did or didn't do having read it, if I did read it.  So I

7    really can't weigh in, Mr. Lynch, on that notion very

8    well.

9    *Q.*    Did you have any knowledge of how often Ms. Rohde

10   was meeting with Ms. Andriano?

11   *A.*    Frequently, from what I understood.

12   *Q.*    Would you turn to exhibit -- what has been

13   admitted as Exhibit 45?

14   *A.*    Okay.  That appears to be some notes, I guess.

15   Wendi Andriano, January 9, 2001.  That one?

16   *Q.*    That would be it.

17   *A.*    Okay.

18   *Q.*    And I would ask you to turn to the page marked

19   PCR 27.

20   *A.*    PCR 8, 9, 14, 24, 27.  27, I have it.  It's

21   Bates 007333?

22   *Q.*    Yes.  Mr. Patterson, you see underneath that the

23   Bates number beginning PAT?

24   *A.*    Correct.

25         MR. LYNCH:  If I can represent to the Court, that

1   receiving files from Mr. Patterson's office, we placed the

2   Bates number PAT on files from Mr. Patterson and

3   Bates number DEL from Mr. DeLozier.  That's in my

4   Exhibit 43, my authenticating declaration.

5       Q.   BY MR. LYNCH:  Mr. Patterson, do you have any

6   reason to doubt that's true?

7       A.   Yeah, could you rephrase or repeat the question?

8       Q.   Do you have any reason to doubt that we got this

9   note from your file?

10      A.   I have no reason to suspect that you created this

11  particular document.

12      Q.   Well, that we received this document from your

13  file?

14      A.   I have no reason to dispute that.

15      Q.   Did you review this document in the pretrial

16  preparation of Ms. Andriano's case?

17      A.   I don't have any specific recall with regard to

18  this particular page.

19      Q.   Mr. Patterson, I would like you to take a look at

20  the middle of the page.  You see the sentence beginning?

21  She said?

22      A.   This, again, are the notes of whom?

23      Q.   Kandy Rohde.

24      A.   Okay.  All right.  Yes, I'm there.

25      Q.   She said that she has never.  Do you see that?

1      *A.*   She said that she has never had an orgasm and

2   that she only enjoys hugs and kisses.  Yes, I was familiar

3   with --

4      *Q.*   I'm sorry to interrupt.  I would like you to read

5   the next line as well.

6      *A.*   Okay.  I told her that the dissociation and the

7   lack of sexual responsiveness fit a profile of early

8   molestation, but that it is not proof.  Shall I read more?

9      *Q.*   No.  That's fine right there, Mr. Patterson.

10     *A.*   Okay.  Thank you.

11     *Q.*   Again, did you ever consult with any experts to

12  determine whether Wendi fit the profile for early

13  molestation?

14     *A.*   I did not.

15          MR. HAZARD:  Objection as to profile.

16          THE WITNESS:  Well --

17          THE COURT:  Overruled.

18          Go ahead and answer the question, if you can.

19          THE WITNESS:  I did not direct that any expert

20  investigate a relationship between dissociative

21  personality and an early molestation that had -- that may

22  have occurred to Ms. Andriano.  No, I did not investigate

23  that aspect of her case more fully.

24     *Q.*   BY MR. LYNCH:  I did note a couple of times in

25  your cross-examination that -- and I believe this is

1  right -- that, you know, you didn't believe there was

2  childhood sexual abuse because of the reports of Dr.

3  Rosengard and Sharon Murphy.  Is that accurate?

4      A.    No, I don't know that I said I didn't believe it.

5  I just said there was no confirmation that those facts in

6  fact occurred.  They were not confirmed by the client.

7  They were not confirmed by persons of interest in the

8  case.  So I categorized it as speculation at the time.

9      Q.    Did Dr. Rosengard interview anyone other than

10 Ms. Andriano regarding childhood sexual abuse?

11     A.    Not to my knowledge.

12     Q.    Did Sharon Murphy interview anyone other than

13 Wendi Andriano regarding childhood sexual abuse?

14     A.    Not that I'm aware of.

15     Q.    Did anyone from your office interview anyone

16 other than Wendi Andriano, Alejo Ochoa, Donna Ochoa,

17 Brandon Ochoa, immediate family regarding potential

18 childhood sexual abuse?

19     A.    They may have.  They didn't report it to me if

20 they did.

21     Q.    Did anyone from your office interview Skip

22 Robertson, who was incarcerated for childhood sexual

23 abuse?

24     A.    No, nobody -- to my knowledge, if they did, that

25 fact was not reported to me.  I did not interview

1   Mr. Robertson.

2       *Q.*   And was Mr. Robinson Ms. Andriano's biological

3   father?

4       *A.*   I've come to realize that when you showed me the

5   e-mail from Ms. Ochoa.  I may have had independent

6   knowledge of that fact back at the time.

7       *Q.*   You also mentioned that you went to the Ochoa's

8   house and didn't get any sense that there was anything

9   wrong?

10      *A.*   Yes.

11      *Q.*   Was that a reason for not investigating potential

12  childhood sexual abuse?

13      *A.*   Again, I did not investigate sexual abuse --

14  childhood sexual abuse because I didn't think there was

15  any validity to the allegation.  If it were to be

16  investigated, it was the function of either Mr. MacLeod or

17  Mr. Linderman under my direction, or Mr. DeLozier.  I did

18  not do that.

19      *Q.*   I guess what I'm sort of -- why didn't you think

20  there was any validity to the allegation?

21      *A.*   Well, and I guess my question to you is:  Why do

22  you think there is?  I have Kandy Rohde reporting to me

23  this theory that because she can't have an orgasm, somehow

24  that has to stem from being wrongfully touched by a

25  grandfather.

1          You know, the standard of care today, maybe we

2    would do that out of an abundance of caution to rule out

3    sexual abuse, to rule out mental health issues.  Nothing

4    that was presented to me set off the notion in my mind

5    that there was something fertile here that could lend

6    itself to a mitigation theme.  It was never reported to me

7    that it was something that we should further investigate.

8          Today, yes, as a matter of course, we probably

9    would.  Back then, I didn't.

10   *Q.*   Let's go back to Exhibit 52.

11   *A.*   Motion for Court Order to Assist Mitigation?  No

12   it's 54.  My mistake.  52.  Yes, it's a report from Sharon

13   Murphy of a contact with Wendi.

14   *Q.*   I understand you --

15   *A.*   It was sent to both me and David, apparently.

16   *Q.*   I understand that you at the time did not think

17   that Kandy Rohde had proper credentials.  Did you think

18   Sharon Murphy had better credentials?

19   *A.*   I didn't make a comparative evaluation.  I had

20   confidence in Sharon Murphy's ability to evaluate.  I

21   didn't share that confidence with regard to Karen's or

22   Ms. Rohde's ability to diagnose and evaluate.

23   *Q.*   Well, Sharon Murphy wrote that she believed Wendi

24   had learned to dissociate some painful memories a long

25   time ago.  Why didn't you follow up with investigating

1   potential childhood trauma?

2      A.   Well, I mean, that's a quantum leap, it seems to

3   me, Mr. Lynch, that she dissociates from painful childhood

4   memories to the notion that she was sexually abused.  I

5   mean, most of our clients have painful memories and they

6   cope with it by dissociation.

7          Again, with the benefit of the 20/20 vision,

8   Mr. Lynch, you are suggesting that that was a red flag.

9   It wasn't to me at the time.

10     Q.   I guess here's what I'm struggling with,

11  Mr. Patterson.  It seems that we've mentioned a couple of

12  reports where they touch on sexual abuse, but you note

13  that sexual abuse has not been confirmed and it's

14  speculative; correct?

15     A.   Well, I don't even know if it's touched upon.

16  But a report that a grandfather many, many years ago may

17  have done something for which she has no concrete memory,

18  I don't know that that's the kind of information that

19  compels an active investigation.

20     Q.   And you and I miss disagree on that.  But, at the

21  same time, you would confirm that your office was not

22  actively trying to find whether there was evidence that

23  any sort of sexual abuse had occurred in Ms. Andriano's

24  past?

25          MR. HAZARD:  Objection.  Leading.

1         MR. LYNCH:  Your Honor, at this point --

2         THE COURT:  Overruled.

3         Go ahead and answer the question.

4         THE WITNESS:  I don't know to what extent --

5    you'll have to talk with Mr. MacLeod, Mr. Linderman and

6    Mr. DeLozier as to what they may have done with regard to

7    investigating this possibility.  I, myself, was not led to

8    believe that it was a significant basis for a mitigation

9    theme.  So I didn't develop it.  I didn't preclude

10   Mr. DeLozier from developing it, nor did I preclude

11   Mr. Linderman, nor Mr. MacLeod from developing it based

12   upon their expertise and ability to assist in the

13   development of mitigation.

14   *Q.*   BY MR. LYNCH:  Mr. Patterson, you talked about

15   the idea of front-loading mitigation is a good practice;

16   right?

17   *A.*   Yes, sir.

18   *Q.*   And trying to have your mitigation themes

19   consistent with your Phase 3 themes; right?

20   *A.*   It's good practice.

21   *Q.*   And your mitigation theme in this case, I think

22   you used the term, wonderful background?

23   *A.*   Yes.  Wonderful, maybe.  A solid, familial

24   support system, a mother and father who loved her, who

25   cared about her, who guided her, who instructed her, that

1   kind of thing.

2       Q.   Do you recall during the trial significant

3   information coming out regarding Ms. Andriano's

4   promiscuity?

5       A.   Well, I don't --

6            MR. HAZARD:  Objection as to beyond the scope of

7   cross.

8            THE COURT:  Overruled.

9            Go ahead and answer the question.

10           THE WITNESS:  I didn't conceive it as

11  promiscuity.  I conceived it as a woman seeking

12  companionship with a male to replace that which she no

13  longer had with an abusive husband who was dying of

14  cancer.

15           Her relationship with Travis Black was not a

16  promiscuous act, in my estimation, and I fought hard to

17  keep it out.  It was just her way of dealing with these

18  stressors of her husband's cancer, and that's how I

19  conceptualized it.  I never thought of her as a

20  promiscuous woman.

21      Q.   BY MR. LYNCH:  How did you conceptualize the

22  evidence that she also had an affair with Rick Freeland?

23      A.   Well, again, I mean, two affairs in her history,

24  I concluded that that was not in this day and age a

25  conduct that manifested some kind of mental disease,

1    defect, lack of character, failure of parental upbringing.

2    It was a woman who had a chance to do some things that may

3    have been not appropriate when your husband is dying of

4    cancer, but that she is a human being and she allowed

5    herself to do those things.

6        Q.   And the evidence that she was frequenting bars

7    while Joe was going through cancer treatment, did that fit

8    with your wonderful person theme?

9            MR. HAZARD:  Objection.  Argumentative.

10           THE COURT:  Sustained.

11           Rephrase the question.

12       Q.   BY MR. LYNCH:  How did the evidence that came out

13   at trial that Wendi was frequenting bars fit with your

14   larger theory of mitigation in the case?

15       A.   Again, it was situational.  It did not occur in

16   the early part of their relationship.  It only happened

17   after his diagnosis of cancer and recurrence of cancer.

18   It apparently was a coping mechanism to deal with the

19   situational stressors at the time, not some indicator of

20   an aberrant sexual development as a child, having been

21   touched improperly by relatives.

22       Q.   And the evidence that Mr. Martinez brought out in

23   Sharon Murphy's cross-examination about prior men that she

24   had been with?

25       A.   Could you more specific?

1    *Q.*   For example, I believe there was a Mr. Gomez.

2    *A.*   I'm not familiar with that name.  I don't

3    recollect that name.

4    *Q.*   And, finally, how did this theory of Wendi is a

5    wonderful person explain the 23 blows with the barstool on

6    the night of Joe's death?

7    *A.*   It may not have.  I can't tell you what persuaded

8    the jurors to vote the three times they were called upon

9    to vote in the manner that they did.  We -- I adopted a

10   theory and theme that I thought would best explain the

11   totality of the evidence in the case.  It's impossible to

12   explain every component -- the evidentiary component of

13   the case.  There were some things that aren't explainable.

14   Or that the government's explanation is more credible.

15       I can't -- but, by the same token, hitting him 18

16   times, under the circumstances as she then perceived them,

17   this gentleman who was enraged as a result of her

18   admission to him that she had been unfaithful to him.  In

19   the middle of that rage, in the midst of that rage,

20   striking him with the barstool more than once is not -- it

21   may be understandable.  It may be understandable.

22   *Q.*   Mr. Patterson, if you had have been presented

23   with evidence of childhood sexual abuse that you deemed

24   sufficient, and had been presented with an alternative

25   mental health theme that explained the affairs, the going

1   out to bars, the barstool hitting, would that have been

2   something that could have been consistent with the case as

3   a whole?

4       *A.*   Absolutely.

5           MR. HAZARD:  Objection.  Relevance.  Assumes

6   facts not in evidence.

7           THE COURT:  Overruled.

8           Go ahead and answer, if you can.

9           THE WITNESS:  I absolutely agree with you,

10  Mr. Lynch, that if -- if that evidence existed, it should

11  have been developed.  Whether it would have been presented

12  at trial, that would have been my call and that truly

13  would have been a strategic call.

14          That being said, there was an obligation if this

15  information exists, to develop it in advance of trial.

16          MR. LYNCH:  I have nothing further.

17          THE COURT:  May this witness be excused?

18          MR. LYNCH:  Yes.

19          THE COURT:  Thank you, Mr. Patterson.  You're

20  excused.

21          THE WITNESS:  Thank you, Judge.

22          THE COURT:  Don't walk off with any of the

23  exhibits, though.

24          THE WITNESS:  I won't.  Thank you.

25          THE COURT:  And is that it for today?

1          MR. ARNTSEN:  It is, Your Honor.

2          THE COURT:  How are we doing time wise, Counsel,

3     with regard to the schedule that we have?

4          MR. ARNTSEN:  On Monday, we are going to have two

5     witnesses who we believe will be relatively short, Joette

6     James, our neuropsychologist, and Cindy Schaider, and then

7     one witness that will be more extensive, David DeLozier.

8          We anticipate we will be done with those three

9     witnesses on Monday.  I suppose it's possible we won't

10    quite be.

11         And then on Tuesday, we have Larry Hammond and

12    Gary Lowenthal.  I anticipate that they will be done on

13    Tuesday.  However, that is kind of neither here nor there

14    because the State has informed me that they don't intend

15    to call any fact witnesses.

16         Is that correct?

17         MR. HAZARD:  That's correct.

18         MR. ARNTSEN:  And so that frees up the day.  The

19    State has also indicated that Drs. Pitt and Amin, while

20    they're going to check, they don't know if they're

21    available before Friday.  And so what it means is we've

22    got extra time next week.  We're in good shape,

23    Your Honor.

24         THE COURT:  I commend counsel for moving things

25    along and alerting the Court to these schedules.  So I

1    appreciate that.

2           Anything further we need to discuss?

3           MR. HAZARD:  Nothing further from the State.

4           MR. ARNTSEN:  No, Your Honor.

5           THE COURT:  Everyone have a nice weekend.  We

6    will be in recess.  Don't walk off with any of the

7    exhibits.

8           We're going to start promptly at 9:30 on Monday.

9    Thank you.

10          (WHEREUPON, the proceedings were concluded at

11   3:43 p.m.)

12                         * * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                              C E R T I F I C A T E

8

9

10          I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11   the State of Arizona, do hereby certify that the foregoing

12   180 pages constitute a full, true, and accurate transcript

13   of the proceedings had in the foregoing matter, all done

14   to the best of my skill and ability.

15          SIGNED and dated this 12th day of April, 2014.

16

17

18                    /s/  Renée A. Mobley, RPR

19                    RENÉE A. MOBLEY, RPR

20                    Certified Reporter

21                    Certificate No. 50500

22

23

24

25

# EXHIBIT JJJJJJJJJJ

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
M. Martin, Deputy
5/2/2014 5:48:17 PM
Filing ID 5855442

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,               )
                                )
          Respondent,           )
                                )
vs.                             )   No.
                                )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,       )
                                )
          Petitioner.           )
_____)


                    Phoenix, Arizona
                    February 3, 2014
                       1:33 p.m.

                   VOLUME II OF II


   BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


        REPORTER'S TRANSCRIPT OF PROCEEDINGS

                 EVIDENTIARY HEARING

                       DAY 1




        Renée A. Mobley, RPR
        Certified Reporter
        Certificate No. 50500                    (ORIGINAL)

1                    A P P E A R A N C E S

2

3

4    On Behalf of the State:

5            Mr. Gregory Hazard
             Assistant Attorney General
6
             Ms. Lacey Gard
7            Assistant Attorney General

8
     On Behalf of the Defendant:
9
             ATTORNEYS AT LAW:
10
             Mr. Scott Bennett
11           Mr. Allen Arntsen
             Mr. Stephan Nickels
12           Mr. Matthew Lynch
             Ms. Krista Sterken
13           Ms. Jodi Fox

14                    I N D E X

15

16                T E S T I M O N Y

17
     WITNESS:                                        PAGE
18

19   JAMES W. HOPPER, PH.D.

20
             Direct Examination (Continued) by Mr. Nickels    4
21
             Cross-Examination by Mr. Hazard                  50
22

23

24

25

1                    P R O C E E D I N G S

2

3          THE COURT:  This is CR 2000-096032, State of

4    Arizona vs. Wendi Elizabeth Andriano.

5          The record will reflect the presence of the

6    parties and counsel.

7          The record will also reflect that

8    Dr. James W. Hopper is on the witness stand.  And we will

9    continue with the direct examination by Mr. Nickels.

10         Mr. Nickels.

11         The third time I got it right; right?

12         MR. NICKELS:  That's exactly right.

13         Your Honor, before we go back on one quick point,

14   when we mentioned the video clips, we had a short

15   discussion about the clips before they went on.  The State

16   had asked for knowing exactly where they are.

17         During the lunch break, we actually went through

18   and I note -- well, first off, the video is Exhibit 186

19   and then there is a transcript of that.  That is

20   Exhibit 168.  We identified the page and line number from

21   that transcript, Exhibit 168, and we can provide it to

22   them.  And we can do it right now or we can do it later.

23         MS. GARD:  Later is fine.

24         MR. NICKELS:  Later is fine?

25         MS. GARD:  Yes.

1          MR. NICKELS:  So we have that information

2     whenever they want it.

3          MS. GARD:  Thank you.

4          THE COURT:  Thank you.

5          So the record will reflect that James W. Hopper

6     is on the witness stand.

7          Anything further?

8          MR. NICKELS:  Not from us.

9          THE COURT:  We will continue with the direct

10    examination by Mr. Nickels.

11         Mr. Nickels.

12         MR. NICKELS:  Thank you, Your Honor.

13

14              JAMES W. HOPPER, PH.D.,

15    having been previously sworn to tell the truth, the whole

16    truth, and nothing but the truth, testified as follows:

17

18              DIRECT EXAMINATION  (Continued)

19    BY MR. NICKELS:

20    *Q.*   Dr. Hopper, when we broke for lunch, we had just

21    wrapped up our discussion of the second of those three

22    significant time periods in Wendi's life.  So now we're

23    going to turn to the third time, which was ages nine to

24    18; is that right?

25    *A.*   Yes.

1      Q.   As we have done with the other two, let's start
2    off with your telling us what is significant from a
3    developmental standpoint for a child of that age.
4      A.   Sure.  Here again, we can refer to the slide.  As
5    we all know, especially as you get 12, 13, 14, physical
6    and psychological changes and challenges of puberty and
7    sexuality in that way are coming in.
8           Also, it is well known through research that new
9    cognitive capacities are emerging, especially for certain
10   reasoning processes associated with the prefrontal cortex.
11   So those are coming out at this time.
12          And, finally, this is kind of a long one, but
13   it's worth absorbing.  During this time period, this is
14   when you want to launch someone into being an adult.  So
15   if things go well, there is potential for emotional and
16   social development that lays the ground work to becoming a
17   healthy adult.
18          That means also being capable of managing
19   difficult emotions and relationships and making good
20   decisions in very stressful situations.
21     Q.   Then, again, like we've done before, we'll turn
22   to the facts.  What was occurring in Wendi's life during
23   this time period that had an impact on her development?
24     A.   So shortly after returning from traveling with
25   that traveling cult back to Casa Grande, her family joined

1   a church community that over the next couple of years,

2   especially when she was 13, became a very -- as I say, a

3   very abusive cult, especially in a man we're going to hear

4   more about named Tom King, who took over as the leader and

5   the preacher in this community.  So that was one very

6   toxic influence.

7        Q.    And what's the second?

8        A.    The second is that Alejo, her stepfather's abuse,

9   emotional, physical and sexual was really at its most

10  extreme and unrelenting during this whole time period.

11       Q.    Okay.  Well, let's start, then, with this new

12  church community that Wendi was put into.  You said that

13  it started off as one and became worse when Tom King got

14  involved around the age of 13?

15       A.    Uh-huh.

16       Q.    Explain that, please.

17       A.    Yeah, but before I get to Tom King, let me just

18  kind of paint a picture of what kind of community it was.

19  So it was a Fundamentalist Christian Community with the

20  school connected to the church, and most of the children

21  whose families were in the church were going to the

22  school.  Though when we call it a school, we should

23  clarify how it's not your typical school.

24       Q.    And what kind of school was it?

25       A.    This was a school where there really were no

1   teachers.  Kids sat alone in cubicles, not allowed to talk

2   to each other except during recess.  They worked out of

3   workbooks and they had -- instead of teachers, they had

4   what were called monitors.  The monitors were just kind of

5   there to keep order and make sure the kids were handing in

6   their work on time and things like that.  There was also a

7   principal and some new principals came later who we can

8   talk about.

9          So these monitors and the principals weren't

10  really teaching so much as the kids were learning on their

11  own.  But one of the things the monitors and the

12  principals were doing a lot of was unfortunately beating

13  the children.

14  *Q.*   And was this -- was this similar to what we saw

15  before where it's any lack of compliance, any show of

16  defiance --

17  *A.*   Yeah.

18  *Q.*   -- led to a physical rebuke?

19  *A.*   Yes.  There were -- we have reports from multiple

20  people who were part of that community.  Both they were

21  children at the time as well as adults, and they describe

22  how then kids were beaten for any kind of infraction.  For

23  even a bad attitude could result in a child being beaten.

24  We're talking about being beaten with a big wooden paddle

25  with scripture written on it.  And they would get maybe

1   three, four, five, six, they called them swats, as an

2   euphemism for beating a child with a paddle.  They beat

3   them all the way up to 18, so teenagers, and this was a

4   very common part of that experience.

5       *Q.*   Okay.  And --

6       *A.*   And that's just the school so far.  There's other

7   things, too, about the community.

8       *Q.*   Right.  Just to reorient us, the time frame here

9   we're talking about, was this the first couple of years or

10  was this after Tom King gets involved or is this kind of

11  throughout that you've just described?

12      *A.*   So there was definitely corporal punishment and

13  beatings of kids, but it got way worse when Tom King took

14  over and it was like a cruelty and a sadism that he was

15  kind of the driver of, and humiliating kids through

16  beatings and rounding up a whole bunch of teenagers.

17          There's even a really disturbing audiotape that I

18  was able to listen to -- and anyone else could as well

19  here in the room -- of Tom King preaching about beating

20  toddlers and beating some little toddler until the kid's

21  will was broken and also beating a two-month-old infant

22  and talking about rebellion in an infant.  If you've

23  changed his diaper and you've given him the food, and, you

24  know, he just wants some attention, and that that's sin,

25  that's the devil and that needs to be beaten out of a

1  two-month-old infant.  So that's the kind of severity

2  we're talking about from 13 to 18.

3      *Q.*   I just want to confirm.  Now, was that --

4  Tom King arrived when Wendi was 13?

5      *A.*   Yes.

6      *Q.*   And then was she in this community with Tom King

7  and the kind of actions that you just described up until

8  18?

9      *A.*   Yes.

10     *Q.*   Okay.  Tell us more about this community.  What

11 about any other -- what was the attitude towards women?

12     *A.*   Yeah, women were supposed to be just purely

13 subservient to their husbands.  Tom King's wife was sort

14 of an example of a beaten-down, subservient woman.  They

15 were supposed to just follow the orders of their husband.

16 Again, this kind of instant obedience that was expected of

17 children was also expected of women in the church.

18         There were other things going on in terms of

19 disrespectful treatment of women that we can talk about

20 more later and Alejo being involved in that.

21     *Q.*   I understand there was one particular instant

22 involving Brandon, one of Wendi's relatives?

23     *A.*   Yeah.

24     *Q.*   What happened there?

25     *A.*   Well, we can put that in the context of, you

1   know, Tom King used ridicule and humiliation on a regular

2   basis.  He might take a whole family that he felt like

3   wasn't being godly enough or maybe they weren't

4   contributing enough to the church.  Who knows?  And he

5   would humiliate this family in front of the whole

6   congregation and turn people against them.  Or he would

7   not let a family go to the funeral of a family member

8   because the funeral was scheduled at a time when he was

9   preaching.  So there was just these threats, this

10  ostracism, this ridicule, this humiliation.

11        The thing you were talking about is Wendi's

12  cousin who then became her adoptive brother.  When he was

13  a teenager, he was rebellious after years of horrible

14  beatings by Alejo, among other things, and he dyed his

15  hair orange one time.  And so Tom King, in front of the

16  entire congregation, from the pulpit, encourages the whole

17  congregation to ridicule and humiliate Brandon.  He calls

18  him a faggot in front of everybody and encourages other

19  people to call him names and ridicule him.

20        So this is kind of an example of the sadistic

21  treatment of children and teenagers going on literally

22  from the pulpit and from the whole community.  Everyone

23  lived in fear, like is it going to be me next?  So it was

24  a very fearful place to be.

25        *Q.*   Now we just put a photograph up on the screen.

1  Can you tell us what that is?

2      *A.*    Yes.  This is a picture.  This is out of a page

3  in the 1980 yearbook.  So this would have been when Wendi

4  was ten years old and this was a principal named John

5  Casey, or he's known, as you can see down there, Johnny

6  Casey.  Here we have underneath it, you know, as if it's

7  funny, you know, Johnny's favorite past time and it says

8  Board of Education.  This is kind of representing how

9  common the beating of children was with a big paddle like

10 this.  We're talking young, young kids all the way up to

11 the teenage years.

12     *Q.*    And this environment that Wendi was in, you're

13 saying it was both sort of her church, religious

14 environment, but also the school as well?

15     *A.*    Yeah.  So it was like there wasn't much escape.

16 Also, especially, when Tom King took over, there was this

17 what you see in cults, like don't talk to anybody from

18 outside of the community.  They're not godly.  Don't watch

19 TV.  So this really controlling environment where people

20 are isolated.  And that was -- and her father was a -- you

21 know, Wendi's father, Alejo, was a youth pastor there.  So

22 it was kind of an all encompassing pretty disturbed

23 abusive environment.

24     *Q.*    So Alejo was involved with this community in an

25 instructor or authoritative role?  Is that what you're

1    saying?

2        *A.*    Yeah, at the beginning, he came on really as a

3    volunteer and janitor and they would just give -- and

4    Donna was also helping out maybe with the books or

5    something early on.  And they would just give them enough

6    money to help them survive, basically, but maybe not even

7    enough.  And then -- gosh, I forgot the question.

8        *Q.*    Alejo was involved?

9        *A.*    Yes, yes.  So, anyway, from being the janitor

10   kind of role to being the youth pastor.  And this meant

11   that Alejo, who as we'll hear more about, is an incredibly

12   disturbed, especially sexually guy, who basically these

13   kids were given over to Alejo to, quote, teach them.  And

14   Alejo was very, very sexually abusive in different ways to

15   these kids and harassing them.  I guess we'll get to that

16   later.

17       *Q.*    Yes, we'll get back to that.  I just wanted to --

18   you had mentioned -- I just want you to define or tell us

19   what Alejo's role was with this church/school community.

20       *A.*    Yes.  So he was the youth pastor and sometimes

21   referred to as Tom King's right-hand man.

22       *Q.*    You told us at the outset of this time period

23   that this was a time where folks can be sort of launched

24   into adulthood.

25              And so, then, given what this environment that

1  Wendi is in, this domination of women, this more

2  punishment, lack of any free time, how is that going to

3  affect somebody, you know, in their adolescent and teen

4  years?

5      *A.*   Well, I just wanted to clarify one thing.  The

6  lack of free time, that kind of thing, that was in the

7  traveling cult.  Here, Wendi did have some free time.

8      *Q.*   All right.

9      *A.*   But wherever she was, she was surrounded by this

10 kind of sick, disturbed, abusive community of people

11 beating children and the ridiculing them and humiliating

12 them and things like that.

13         But, yes, so the effects of this, again,

14 depression, you know, it's depressing to be in an

15 environment where children and other people are treated

16 like this where you can't escape from these kind of

17 threats that you're going to hell and things like that.

18         And so depression and anxiety just piling on with

19 what she's had up to this point, and, again, the

20 difficulty in managing emotions and relationships.  There

21 is no one in this community who was helping her any more

22 than anyone did in the first period or the second period

23 through all this time, who is really helping her deal with

24 all the terrible stuff that now she has inside, given all

25 the trauma she's been through.

1    So really a great difficulty managing her

2  emotions involving some really twisted relationships, what

3  we'll talk about.  So definitely problems there.

4    And then as I was saying before, before the

5  break, this kind of unrelenting trauma, this kind of

6  pervasive trauma all around you and abuse and things and

7  beating people, rather than helping them, learned values

8  that they kind of want to take into themselves, beating

9  people into fear, beating into submission, that makes it

10  really hard to control your own behavior in various ways.

11    But, particularly, as I talked about, in times of

12  stress, in times of great stress, the damage that she's

13  had makes it hard to think straight to make good

14  decisions.

15  Q.  Let's now turn to Alejo.  You had said that the

16  other significant factual event in this time period was

17  that you said Alejo's emotional, physical and sexual abuse

18  rose to new levels.  Let's, first of all, focus on the

19  emotional and physical abuse.

20  A.  Yeah.

21  Q.  What happened there?

22  A.  So, as I said before, you know, Wendi's mother

23  reports that Alejo and others in the church community

24  witnessed this, too, that Alejo at any time could switch

25  from being playful to being really mean, just mean, cruel

1    teasing.  And so he was often, you know, picking at Wendi,
2    criticizing her, trying to kind of beat her down mentally.
3    So that continued.  And as we'll talk about later, it took
4    on this whole another sexual level, that teasing.

5          The physical beatings for rebellion and things
6    like that, that continued.  Alejo at this point was the
7    one administering them.  Not Donna.  She was pretty much
8    out of the picture.  In general, Donna was pretty much out
9    of the picture at this point.

10         But in terms of the physical abuse, Alejo, also,
11   as I mentioned before, he at any time could fly off the
12   handle.  He is screaming and yelling at Donna or screaming
13   and yelling at Wendi.

14         During this time, Donna had two gynecological
15   surgeries.  She had already pulled back from Alejo a lot
16   in terms of closeness.  You know, Donna is not a person
17   who is really capable of having good intimate
18   relationships in the first place, but she was not
19   interested in sex with Alejo.  Alejo would, as I described
20   before, he would wake up in the morning, be upset that
21   Donna didn't want to have sex with him, get more and more
22   angry as the day went on and then explode in rages on
23   Wendi and Donna and throw things and things like that.  So
24   that was another kind of almost daily occurrence of him
25   just lashing out and him screaming and yelling at Donna.

Q.   Okay.  You've told us that there was sexual
abuse --

A.   Yeah.

Q.   -- by Alejo during this time.  What happened?

A.   Well, there was a whole lot that happened.  And
so it ranged from this kind of the emotional abuse really
being very sexualized to buying and having Wendi dress up
in lingerie and wear it a lot.  There was actual fondling
and molestation and sexual abuse of her and her friends.

Q.   Okay.  And before I have you kind of just walk
through some of this subcategory, please explain for the
Court sort of like the offset.  What is the effect of this
sort of unrelenting sexual abuse that takes many forms as
compared to, say, you know, a one time maybe violent or
somebody gets violently raped, but it happens just one
time versus this?  Give us some context of the impact that
can have.

A.   Sure.  Yeah, this is something that research has
been done on that.  You know, even a really horrific
single trauma, even a horrible brutal -- violent brutal
rape is -- and we don't wish -- we would never wish that
on anyone, of course.  But it pales in comparison to
ongoing sexual abuse day-in, day-out.

     As a child, when things happen to you, the
younger you are, the more this kind of abuse is more

1   devastating.

2          And then, finally, to be sexually abused by your

3   father is incredibly horrible.  It's a horrible betrayal.

4   There is nowhere safe.  It has been documented many awful

5   effects to have -- the more closer you are to the person,

6   the more power they have over you, like a parent, the more

7   destructive this kind of abuse is.

8      *Q.*   Let's start, then, with that first subcategory,

9   sort of this sexual environment.  What did you mean by

10  that?

11     *A.*   All right.  The first part of that is, as I

12  started to refer to, you know, Alejo all along had been

13  prone to teasing her and picking on her in really cruel

14  and mean ways, as it had been done to him -- again, we

15  don't have time to go into it all -- but relentlessly to

16  him when he was a kid.  And he took this to another level

17  at this age.  Now he's constantly teasing and picking at

18  Wendi and trying to embarrass her about sexual things.

19          So if they're watching television and an ad for a

20  tampon comes on, he's like:  Oh, what are those for?  Oh,

21  what do you want to do with that?  You know, that sort of

22  thing and just this kind of unrelenting -- you know, the

23  teasing now takes on this whole another level of sexual.

24  And this is a form of sexual abuse.  It does not involve

25  penetration of a body, but it is still sexual abuse, and

1  it's a climate of sexual abuse that was there all the way

2  through this time.

3     *Q.*   What about -- and we heard some of this during

4  the video clips.  What about going to some of these shops

5  that have adult clothing or items?

6     *A.*   Yeah.  So we -- you know, just to back up on that

7  for a second, we have reports from a couple of different

8  people who actually report witnessing Wendi dressing up in

9  lingerie when she was nine, ten, 11, 12 years old.

10       So one guy who was a kid at the time, you'll hear

11  describes her prancing around in a thong and lacy

12  stockings.

13       So there is a woman named Martha England who I

14  interviewed myself, whose daughter Suzy was around Wendi's

15  age at the time and she remembers her daughter coming to

16  her and not only telling her how sexually perverted Alejo

17  was and how he's constantly making sexual comments to his

18  daughter, but that Wendi had told her daughter that her

19  daddy liked her to dress up in her nightie doll or baby

20  doll nightie and lie in bed with her.  And Martha

21  remembers being very disturbed by this and visiting the

22  house and thinking what was happening to Wendi.

23       But then Martha had her own history of abuse and

24  she tried to block it out, and because Alejo was a pastor,

25  she didn't feel like she could say anything about it.

1    So that's just some of the witness reports of her

2  wearing the stuff.  Now, in terms of going to the places

3  they went?

4    *Q.*  Yeah, yeah, that's what -- what about just sort

5  of taking her into adult stores or stores that had these

6  adult things that, well --

7    *A.*  Yeah.  So, you know, Donna reports that by the

8  time she was 12 or 13, she had like a whole drawerful of

9  this lingerie.  So she had to get it somewhere.  Where she

10  would get it evidently is going to these lingerie stores

11  like Frederick's of Hollywood.

12    We saw that memory, you know, at first not being

13  able to be accessible to Wendi, and then it would pop in

14  her head, oh, yeah, we went to Frederick's of Hollywood,

15  though she couldn't remember what she got there.

16    But this was an example of, you know, Wendi being

17  taken into these stores to purchase lingerie and something

18  that Donna witnessed sometimes, knew was going on, but

19  just didn't want to know about it.

20    *Q.*  Now we'll talk a little bit more about the

21  lingerie and Wendi being dressed up in that stuff.  But I

22  understand sort of this sexual environment and the

23  frequent talk about it.  Has it continued almost to this

24  day?

25    *A.*  Yeah.

1    *Q.*    We have an exhibit from that?

2    *A.*    Yes, we do, before we put it up.  So even when --

3    even when she was in prison after the crime, she would get

4    cards from her father, from Alejo, that were sexualized.

5            And, here, we actually have an example of one

6    that survived.  We have it right here for us.  Just to

7    warn people, this is pretty disturbing.

8    *Q.*    So this is a card, and where did you get this?

9    *A.*    The investigators.  Capital case private

10   investigators found it and then it was given to me.

11   *Q.*    This is a card that was sent from Alejo to Wendi

12   when Wendi was incarcerated?

13   *A.*    Yes.

14   *Q.*    Obviously, you can see there's some writing on

15   there -- some handwriting that we can't see?

16   *A.*    Yeah.  But we can see what's up there.  You know,

17   you get the pretty filthy stuff.  It's a bright town and

18   cute, witty, and these are just a few of the things that

19   we have in common.

20           And then the other part, we verbatim put it on

21   the next slide.  You can see what he actually said in this

22   card.  So this is what her father says to his daughter in

23   a card he sends her when she's in prison:  This is the

24   first riddle.  I'll send you the answer with the next

25   riddle.  Have fun, double exclamation point.  Dad.  I

1  sometimes get balls caught in my throat.  My box smells.

2  I can have a little pussy.

3      *Q.*  And that was from Alejo to his daughter?

4      *A.*  Yeah.

5      *Q.*  And I can have you look at it, but that's

6  Exhibit 75 in the exhibit binders.  Now, you mentioned

7  that --

8      *A.*  Well, I can say a little bit more about this,

9  that, you know, he's sending these cards now, but they

10  used the make many trips to a place called Spencer's

11  Gifts, which has sections of the store which have these

12  cards and sexualized games and things like that.

13      So from when she was -- oh, I'm forgetting the

14  exact age, but definitely prepubescent and teen years,

15  Alejo would repeatedly -- when they would go to the mall,

16  they would go to this store, and Alejo being the sexually

17  perverted guy that he is, would kind of make a beeline to

18  the sex stuff and he would insist that Donna and Wendi

19  come over with him.  And Donna would pretty quickly walk

20  away and this would leave Wendi with Alejo in the section

21  of the store where he's showing her these kind of cards

22  making who knows what kind of comments about them and

23  forcing her -- though, by all reports, by then Wendi was

24  fairly compliant and just kind of did what Alejo wanted.

25  So hanging out in this section of the store with her

1  father on a regular basis.

2      Q.   You just told us that Alejo also had a teacher

3  type role at the church community and school?

4      A.   Yeah.

5      Q.   Was what you just described as his behavior

6  towards Wendi and sexualization, was that consistent with

7  how he acted at the church with those other kids?

8      A.   Yeah.  Again, people who were children at the

9  time, as well as parents of those children, multiple -- we

10  have declarations.  And I talked myself to both Martha

11  England and to Kyre Lorts about this kind of behavior,

12  that Alejo was constantly making sexualized comments, you

13  know, not just about popsicles and balls, but, you know,

14  about microphones, pretending they're a penis.  He would

15  make gestures simulating sex in front of the whole

16  congregation, in front of four, five, six-year-old kids.

17          He would comment on women's breasts.  He would

18  make all kinds of sexual innuendo comments to women.  It

19  was a general topic in the community.  There were people

20  who were just horrified by this.  And, actually, one

21  person said that years later, after she had gotten, you

22  know, extricated herself from this horrible community,

23  that she met up with someone else who left the community

24  years before and they counted 13 families that had been

25  driven out of the community by Alejo's constant sexual

1    harassment of the mothers and the daughters.

2       *Q.*    Did Alejo ever discuss Wendi with any of the

3    other children?

4       *A.*    Yeah.  There is one particularly disturbing

5    example where -- as I said, Alejo would teach these

6    devotions, they called it.  It's a class where you go over

7    Bible scripture and what does it mean and things like

8    that.

9            And, you know, even when I talked to Alejo

10   himself -- so I interviewed Alejo.  When I asked him what

11   he was teaching, he made this kind of comment -- well, he

12   said:  Well, I'll tell you what I was supposed to be

13   teaching, and then he laughed.  And I kind of thought:

14   Wow, what's that about, you know?

15           So then I followed up and asked him:  What was

16   that laugh about?  What were you teaching that you weren't

17   supposed to be teaching them?  He said:  Track meets.

18           But, you know, this kind of -- what we have,

19   though, is we have direct reports from people that he was

20   teaching about sexual things.

21           So Kyre Lorts reports a time where the kids were

22   like:  What's going on?  Why are you teaching us about

23   this sexual stuff?  And he was talking to the kids about

24   masturbation.  He was talking to them about how they can

25   touch girls down there and it feels good.  If a girl

1   touches you down there and you're a boy, it feels better.

2   And he actually said to the -- to the boys that if they

3   wanted to touch Wendi, they could.

4       Q.   So he told the other students -- male students

5   that they could touch Wendi if they wanted to?

6       A.   Yeah.

7       Q.   Now, let's move onto the next subcategory, this

8   constant -- this touching-on ritual that you had

9   discussed.

10      A.   Right.

11      Q.   Tell us what that meant.

12      A.   Well, again, just to kind of provide some

13  background on that, so when Wendi was in the traveling

14  cult, there were many hours a day where the men were off

15  doing work on projects or whatever when the girls and the

16  leaders of the cult were back around the vehicles.  And so

17  in a way, Wendi had, you know, some respite time from

18  Alejo.

19          But once they got back from the traveling group,

20  you know, they're living in the same house.  They're

21  spending a lot of time together.  From the beginning,

22  Alejo had only wanted to be with Wendi most of the time,

23  not Donna, in the first place.

24          But, here, it took on a whole another level of

25  literally for hours each night, Alejo would lie on the

1    couch or lie on the floor and it would be Wendi's and
2    Donna's job to caress his legs, to caress his hair, play
3    with his hair, to rub his back.  And what Donna reports is
4    that she didn't really want to do this.  And so within,
5    you know, a couple of months of Wendi turning nine and
6    them coming back, she basically pulled herself out of the
7    picture and would retreat to her room to read or whatever
8    as was her habit and leave Wendi spending literally hours
9    a night doing this touching-on again.  And Alejo would
10   whine and say, oh, just touch on me, and things like this.
11   And this is an example of what we can call an incestuous
12   relationship.  I could talk about that now if that's
13   appropriate.
14       *Q.*   We'll get to that in a moment.  Just a few more
15   details about what's actually happening here.  Is Alejo --
16   is he wearing clothes when they're rubbing him?
17       *A.*   Yes, he was wearing clothes, but often not much.
18   And Donna's account over the times of the years of doing
19   this ritual, he became more and more scantily clad.  So
20   sometimes he's just lying there with nothing more than a
21   pair of shorts or pair of underwear with his genitals
22   exposed as Wendi is playing, you know, rubbing his legs.
23            And Wendi reported how she used to try not to rub
24   his legs so she wouldn't have to see his penis.  And so
25   she would try and rub his head.  But, unfortunately,

1   rubbing his head had its own costs.

2       Q.   What was that?

3       A.   Well, then he would put his face like right in

4   front of her genitals.  And one of her friends reported

5   this as well.  So literally hours a night, this is what

6   she was dealing with.

7       Q.   So you said once in a while, Wendi had to rub his

8   legs and then she's literally having to see up because

9   he's wearing these shorts?

10      A.   Yeah.

11      Q.   And then the other option was to rub his head,

12  but then he would put his head --

13      A.   -- in her lap.  They called it ministering to

14  him, but it was Alejo's own perverted way of putting his

15  head in his daughter's crotch.

16      Q.   Now you said Donna withdraw from this.  Did Wendi

17  or did Donna ever try to intervene and help Wendi?

18      A.   No.  I mean, it's worse than that.  I mean, Donna

19  actually said she was relieved to hand this duty off to

20  Wendi, that it was a relief for her.

21           And this is an example of what we call, you know,

22  -- what we call a classic incestuous family.  You've got

23  two really damaged adults.  In this case, the mother is

24  depressed and withdrawn and isn't interested in being

25  involved with the father anymore sexually or intimately

1   and retreating to the room.  And the father is this really

2   damaged sexually perverted pedophile, basically.

3          And so we have Donna basically handing Wendi over

4   to Alejo and glad that she's taking care of Alejo's stuff

5   and glad that, you know, she doesn't have to deal with it.

6          So it was worse than just not looking away.  She

7   was actually relieved.  But, again, this horrible as it

8   is, unfortunately, this is not an uncommon dynamic in some

9   of these really disturbed incestuous families.

10  Q.   Okay.  Now the third subcategory that you

11  mentioned was that Alejo had Wendi dress in lingerie?

12  A.   Right.

13  Q.   Tell us what happened there.

14  A.   Yeah.  So, yeah, I got a little ahead of myself

15  there.  But so he would -- after buying the lingerie, he

16  would -- he would have her dress up in it and sometimes

17  she would be dressed in the lingerie as she was doing this

18  ritual with him.  And he also actually took pictures of

19  her in the lingerie at one point, or several points, it

20  sounds like, actually.  Not one point.

21  Q.   When she is dressed in this, is she home alone or

22  are her friends ever seeing any of this?

23  A.   Yeah.  As I mentioned before, someone who was a

24  boy at the time talked about how Wendi would put this

25  lingerie on when her friends visited the house and say:

1    My daddy likes me to look my best and dress up in these as

2    she's prancing around the house.  Martha England's

3    daughter told her about that as well.

4        Q.   Give us a sense of what it is that she's wearing.

5        A.   Yeah.  So, you know, as Donna described it, like

6    frilly, lacy, silky underwear, these kind of panties with

7    nylons that attach by a strap, so you see like this sexy

8    strip of thigh at the top.  Just, you know, really as

9    extreme as you can get in terms of sexually provocative

10   lingerie.  She has a whole drawerful of that stuff that

11   she's wearing for Alejo's pleasure.

12       Q.   And, again, is Donna doing anything to kind of

13   step in and, you know --

14       A.   No.

15       Q.   -- stop from having her daughter be pranced

16   around and fondled?

17       A.   No.  She said she -- you know, she didn't care to

18   know about it.

19       Q.   You mentioned photographs?

20       A.   Yes.

21       Q.   What happened with that?

22       A.   Yeah.  So, you know, Alejo would have Wendi dress

23   up in lingerie.  Sometimes he would take her out into the

24   desert and take pictures of her in lingerie.  And we

25   actually have a picture that he took of her when she was a

1    teenager.

2      *Q.*   Okay.  Before we -- well, there it is.  It's also

3    Exhibit 72 in the book if anyone wants to look at it.

4           But what are we seeing here, Dr. Hopper?

5           THE COURT:  You know, some of these exhibits

6    haven't been admitted into evidence.

7           Any objection at all for the Court looking at

8    these slides?

9           MR. HAZARD:  Not to look at them, Your Honor.

10          THE COURT:  I'm sorry?

11          MR. HAZARD:  Not to look at them, no, Your Honor.

12          THE COURT:  Okay.  Go ahead.

13          THE WITNESS:  Well, also, it's Alejo was behind

14   the camera.  He had Wendi -- you know, you can see that

15   there's hardly any clothing on her.  And he wanted to get

16   this picture of her out in a lightning storm.  And,

17   actually, Alejo was proud of this picture.

18          The woman named Cynthia Schaider, who was an

19   adult at the time in the community was shown these

20   pictures even though Alejo had promised Wendi he would

21   never show them to anyone, and she remembers being very

22   disturbed seeing these pictures, you know, as anybody is,

23   but this is his daughter.

24      *Q.*   BY MR. NICKELS:  Do we have any reports about

25   what she's wearing in this picture?

1    *A.*    Yeah.  I think it was like some sort of

2    see-through teddy kind of thing.

3    *Q.*    Any other stories of photographs being taken of

4    Wendi --

5    *A.*    Yeah.  There was --

6    *Q.*    -- when she's wearing lingerie or nothing at all?

7    *A.*    Yeah.  There was another incident later when she

8    was maybe 17 or 18 where Alejo basically kind of cajoled

9    and manipulated her.  She really didn't want to do it, but

10   over like a week or so, you know, to go alone with him to

11   a hotel room where he shows up with a bag of lingerie and

12   wants her to --

13   *Q.*    So he actually got her to go to a hotel room for

14   pictures?

15   *A.*    Yeah, to go to a hotel room and --

16   *Q.*    And then what happened when they got there?

17   *A.*    So this is an incident that Wendi partially

18   remembers, like many other things.  You know, she doesn't

19   remember, but she remembers pieces of it.

20          But this one she remembers not wanting to do it.

21   She remembers getting to the hotel room and him pulling

22   out this bag and starting to pull lingerie out of the bag

23   and just being freaked out and thinking, oh, my God, I

24   don't want to put that on, but she doesn't remember

25   anything after that.  She's pretty sure she complied with

1   his wishes, as she did usually, to do this sexual thing,

2   but she doesn't remember anything after that pulling the

3   lingerie out of the bag.

4       *Q.*   So her last memory of that is she agrees to go to

5   this hotel room.  It's just her and Alejo and he's got a

6   bagful of lingerie.  He pulls something out and that's --

7       *A.*   That's her last memory.

8       *Q.*   -- her last memory is I don't like this, but --

9       *A.*   Yeah.  Just like the video we saw where she

10  remembers, oh, wow, yeah, I remember going into

11  Frederick's of Hollywood.  Why were you there?  I don't

12  remember.  It's the same kind of thing.

13      *Q.*   Well, finally, Dr. Hopper, you said that there

14  was -- that Wendi was molested.

15      *A.*   Yeah.  Sexual abuse involving actual physical

16  contact --

17      *Q.*   Correct.

18      *A.*   -- with the pictures and words and cards.

19      *Q.*   What happened?

20      *A.*   So we have reports from two women who were girls

21  at the time.  One of them is Jeri Lynn Cunningham.  And

22  this is a sexual abuse that she experienced lying in bed

23  next to Wendi.  So we don't know if Alejo was

24  simultaneously doing it to Wendi.  But it's still

25  important I think for the Court to hear about what

1   Jeri Lynn's experiences were.  And that wasn't the only

2   one.  And then Kyre Lorts.

3       *Q.*   Well, first, tell me who's Jeri Lynn?

4       *A.*   There's a picture of Jeri Lynn.  Jeri Lynn was a

5   friend of Wendi's who was at the church, in the church

6   community.  Well, she arrived when I think Wendi was about

7   ten and Wendi quickly befriended and took care of her in

8   some ways.  And then she left not long after -- you know,

9   she left with Calvin Lorts before, so she didn't

10  experience all the horror of Tom King.

11          So Jeri Lynn was friends for a couple of years

12  with Wendi and she would play at Wendi's house and she did

13  sleepovers at Wendi's house.  So that's who Jeri Lynn was.

14  She's was in the school as well.

15      *Q.*   Okay.  So she's a friend of Wendi's and she was

16  doing sleepovers at Wendi's house?

17      *A.*   Yeah.

18      *Q.*   And what happened during those sleepovers?

19      *A.*   Yeah.  So we'll go from there like from the least

20  worst to the worst.  So Alejo would -- Wendi and Jeri Lynn

21  liked to go out in the desert and tell ghost stories, you

22  know, the night before they were -- on these sleepover

23  nights.  And Alejo would tell them they weren't allowed to

24  go out into the desert unless they first dressed up in

25  their nighties.  So purely for his own satisfaction, he's

1   forcing these 11 -- ten, 11-year-old girls to dress up in

2   their nighties before he will agree to take them out in

3   the desert.  And that happened numerous occasions.  And

4   Jeri Lynn remembers feeling, you know, this just felt

5   wrong.  Why should I have to put this on?  I'm not ready

6   for bed yet.  Why he's doing this to us?  Yeah, so that

7   was the first kind of thing.  He did it numerous

8   occasions.

9       Q.   In addition to forcing them to get dressed up in

10  these nightgowns, what else happened relating to

11  Jeri Lynn?

12      A.   So then there was another time where he insisted

13  that Jeri Lynn participate in this touching-on ritual that

14  I've talked about.  And so, you know, Jeri Lynn was put in

15  the position of rubbing his head and playing with his hair

16  while Alejo lied there and kind of pretended to fall

17  asleep or whatever.  But his face was right up against her

18  genitals, and this was for her a very, very disturbing

19  experience and, you know --

20      Q.   Okay.  Did anything happen during the sleepover

21  portion of the night?

22      A.   Yes.  And then, finally, it sounds like maybe

23  three or four times over this time during these

24  sleepovers, after Wendi and Jeri Lynn had gotten in bed

25  and gone to sleep, they were sleeping in the same bed, and

1  Alejo would come into the bedroom and get into the bed in

2  between them.

3       Q.   Okay.  What happened when he got into bed?

4       A.   Yeah.  So then literally for hours over the

5  course of the night, Alejo would repeatedly reach over and

6  grasp and fondle Jeri Lynn's breasts.  And she would wake

7  up to this experience of Alejo fondling her breasts and

8  then she would freak out and push him away.  And then he

9  would pretend to be asleep or whatever and she would

10 eventually fall back asleep again, and then again over and

11 over again, like literally throughout the night until the

12 early or late hours of the morning, you know, whatever,

13 6:00 a.m. or something like that, but for many hours over

14 and over again.  And this happened, as I said, three or

15 four times and this was also obviously a horrible

16 experience.

17      Q.   Does Jeri Lynn know whether Alejo was doing this

18 to Wendi at the same time?

19      A.   She doesn't know.  She just knew what was

20 happening to her.

21      Q.   Does she know whether Wendi reacted at all when

22 Alejo got in the bed and was groping her?

23      A.   She didn't see anything like that.  And they

24 never talked about it either.  And nor did Jeri Lynn ever

25 tell anybody else about it until just recently.

1    *Q.*    Do you know -- did you talk about that with her?

2    *A.*    Yeah, I did.  You know, she said at the time that

3  she was afraid to tell her father.  She was afraid of what

4  her father would do if she told.  She was afraid to lose

5  her friend.  And we'll hear this from Krye, too.  She sort

6  of felt this was the cost of being with her friend, to put

7  up with the stuff from Alejo.

8      And then, finally, she cared and said she still

9  cares about Alejo and doesn't want to hurt him, and it was

10  really hard for her to talk to guys about this and talk to

11  me about it.

12    *Q.*    You said there were two friends of Wendi's who

13  reported sexual abuse and the other was Kyre Lorts?

14    *A.*    Yeah.

15    *Q.*    Tell us first who is Kyre Lorts?

16    *A.*    So there's a picture of Wendi and Krye.  Kyre is

17  the little girl on the right.  She was about two years

18  younger than Wendi.  So here she's eight years old.  And

19  that's how old she was when the things I'm going to

20  describe to you were happening.

21    *Q.*    Okay.  And what happened?

22    *A.*    Yeah.  So, again, we'll kind of build from bad to

23  the worst.  Krye remembers how when she first became

24  friends with Wendi and started spending time at her house,

25  as they were maybe brushing their hair or combing, or

1   brushing their teeth or combing their hair in front of the

2   bathroom mirror, and Wendi started saying things to her

3   like:  I'm not allowed to close the door when I use the

4   bathroom.  My daddy helps me wipe.  My daddy likes to

5   watch me take showers.  My daddy likes to take showers

6   with me.  My daddy touches me down there.  And my daddy

7   likes to watch bad movies.

8        So these were all things Wendi started telling

9   her as they became friends and Krye is coming into her

10   house.  As an adult looking back, Kyre is thinking Wendi

11   is kind of alerting me to like things aren't -- you know,

12   this is what my house is like.  This is what my daddy is

13   like.

14   Q.   In addition to Wendi telling Krye some of these

15   things about Alejo, did Krye ever experience any of this

16   herself or see it happen to Wendi?

17   A.   Yes, she did.

18   Q.   And what happened?

19   A.   So, you know, we can start with the first

20   experience she had of this.  Krye describes Wendi saying

21   to her:  Hey, let's play dress-up.  And Krye thought to

22   herself:  Oh, hey, dress-up.  I've played dress-up at home

23   with my sisters.  That sounds like fun.  But when they go

24   into Wendi's bedroom to get the dress-up stuff, she's

25   thinking:  Whoa, this isn't how we play dress-up.  What

1   Wendi is doing is pulling out some of that lingerie from

2   that drawerful of more lingerie she has.

3       Q.   So did Krye and Wendi --

4       A.   Yeah, they put --

5       Q.   Did Kyre and Wendi put the lingerie on?

6            THE COURT:  Wait until the question is completed.

7            THE WITNESS:  Yeah.  Sorry.

8            So, yeah, so Kyre remembers trying on one of the

9   lingerie and it was too big.  So she tried on another one

10  that was smaller.  It was still big on her because she was

11  only an eight-year-old little girl.  But, you know, it fit

12  her well enough.  It would hold onto her body.  And then

13  Wendi had put on hers.  And then they walked out of

14  Wendi's room and encountered Donna.

15      Q.   BY MR. NICKELS:  What happened when they saw

16  Donna?

17      A.   She remembers Donna saying:  Oh, those are cute.

18      Q.   And this is with an eight- and a ten-year-old

19  wearing lingerie?

20      A.   Dressed up in lingerie.

21      Q.   What happened after they walked out of the room

22  and saw Donna and she commented on it?

23      A.   So then they walked -- Wendi leads her down the

24  hall and into this room, which Krye noticed before.  A

25  room with a chair in it and there was some pornography

1   magazines in there.  And so Wendi leads her into this room

2   and Alejo is already there and he's sitting on the chair

3   and in these red shorts that she said he always wore when

4   he did this.  To think of them even to this day, she gets

5   nauseous thinking of these red shorts.

6       Q.   And the "she" you're referring to, that's Krye?

7       A.   That's Krye, yeah.

8       Q.   Okay.  Go on.

9       A.   And so then they come into the room and she just

10   knows.  She just has this feeling that this is awful, this

11   is terrible.  She's really freaking out.  She's starting

12   to shake.  And then Alejo makes this signal.  He taps on

13   his knee.  And Wendi knows what this signal means and she

14   walks over and sits on his lap and Wendi reaches over and

15   starts stroking Alejo's penis.

16       Q.   How does Kyre react to this?

17       A.   She was completely freaked out.  She left the

18   room, walked down the hall to the bathroom and got on the

19   toilet and pretended to pee.  She realizes as she sat on

20   the toilet, oh, I'm not allowed to lock or close the door.

21   So here we've got this eight-year-old girl just seeing

22   that horrible thing.  She goes to the bathroom and sits

23   down on the toilet and is shaking, you know, and then

24   Wendi comes to her.

25       Q.   So is Krye able to stay in the bathroom and --

1    *A.*   No.  So then Wendi comes to her and says, you

2    know -- her memory is that Wendi says:  It's okay.  This

3    is just something I like to do with my dad.  And then

4    Wendi --

5    *Q.*   That's what Wendi --

6    *A.*   Said to her.

7    *Q.*   -- said to Krye?

8    *A.*   Yeah.  And then Wendi took her by the hand and

9    led her back to that room.

10    *Q.*   What happened when they got back to there?  And

11    in the room, you mean you're talking about the room where

12    Alejo was?

13    *A.*   Yes.

14    *Q.*   What happened when they got back to the room?

15    *A.*   So then Wendi went back and sat where she had

16    been sitting on Alejo.  And Krye thought to herself:  This

17    is my friend.  You know, she was overwhelmed.  She was

18    confused.  Her friend was leading her back into this

19    situation.  She sat on the other -- the other side of his

20    lap and Alejo proceeded to put his hand in her lingerie

21    and rub her vagina, as he was doing to Wendi.  He would

22    take turns doing that.  He reached up and grabbed at her

23    chest.  She was only eight years old.  She had no breasts,

24    but Alejo was still grabbing at her in that way and doing

25    that to Wendi.

1    *Q.*    So he touched both of them on their vaginas?

2    *A.*    Yeah.

3    *Q.*    You said earlier that before Krye left the room,

4    Wendi was stroking his penis.  When they came back

5    together, did that resume?

6    *A.*    I know that it was part of the ritual to be

7    stroking his penis, and that was something that they

8    repeated, yeah.

9    *Q.*    Is there anything else that Krye remembers

10   from --

11   *A.*    Yeah.

12   *Q.*    -- the room and her reactions to it?

13   *A.*    So this happened several times over the course --

14   she remembers it happening over the course of one school

15   year.  And during these sleepovers over at Wendi's house,

16   they would get dressed in lingerie, go into the room, be

17   abused by Alejo in this way.  And she doesn't remember

18   from the first time, but the other times, she remembers it

19   being a common element that Alejo would turn on the

20   television and there would be pornography playing on the

21   television just several feet away from them while he was

22   molesting them for, you know, maybe ten, 15 minutes in

23   this way.

24   *Q.*    What about Wendi?  Does she remember anything

25   else about what Wendi was doing at this time?

1    *A.*    Yeah, she remembers closing and scrunching her
2    eyes to not look at the pornography, but the sounds -- I
3    mean, she could still hear the sounds.  And she remembers
4    one time looking up to see if Wendi's eyes were open and
5    Wendi's eyes were open looking toward the TV.
6    *Q.*    You said this went on for ten or 15 minutes at a
7    time?
8    *A.*    Yeah.  It's hard to know.  For her, it felt like
9    forever, but it was clearly some drawn-out ritual that
10   involved stroking the penis, rubbing the vagina, grabbing
11   the chest and pornography on.  Sometimes Alejo would be
12   kissing Wendi.  Kyre said he did not kiss or kind of
13   make-out with her, but he did that with Wendi.  So who
14   knows?  But a long time for any child to be going through
15   something like that.
16   *Q.*    Did Alejo ejaculate as part of this ritual?
17   *A.*    No, she does not report that.  And, you know, I
18   asked her about that and she said --
19          THE COURT:  When you said "she", you're talking
20   about Kyre?
21          THE WITNESS:  Oh, Kyre.  I'm sorry.  Yes.  Krye,
22   yes.  That, you know, looking back, it sort of seemed
23   strange to her.  It was more like, you know, as she
24   described it, like a long time make-out, foreplay sort of
25   thing.  And she does not remember that happening, no.

1     Q.   BY MR. NICKELS:   Now does Wendi have any -- in

2  your interviews with Wendi, does she remember this

3  happening?

4     A.   No.   I mean, she actually, you know, had a

5  visceral response, but one of like, that's impossible.

6  That's absurd.   You know, she just couldn't -- she

7  couldn't fathom it.   Just she had no memory of it and it

8  freaked her out to even hear about it and it was very

9  upsetting for her to hear about this.

10     Q.   As a trauma expert, Dr. Hopper, who treats people

11  who have gone through childhood sexual abuse, do you

12  believe Kyre?

13          MR. HAZARD:   Objection, Your Honor.

14          THE COURT:   Sustained.

15     Q.   BY MR. NICKELS:   Your Honor -- or not Your Honor.

16  Dr. Hopper --

17          THE COURT:   He's honorable, too.

18          MR. NICKELS:   He's honorable, too.   I'm trying.

19  But it's some kind of a Freudian slip there.

20     Q.   BY MR. NICKELS:   So this sexual abuse that you

21  just described from the sexualized environment, the

22  touching-on, the lingerie and the molestation, how is that

23  going to impact, you know, like an adolescent and a

24  teenager that was the age that Wendi was at this time?

25     A.   Well, you know, again, we have a slide for this.

1  As I've been saying, you know, throughout, it's just, you

2  know, one more, but now one more massive kind of

3  continuous sexual trauma over nine to 18 years, piled on

4  top of everything else.  So it's going to have the same

5  kind of effects of depression, anxiety, emotion regulation

6  problems, intimacy problems.

7          But, also, you know, this kind of

8  hypersexualization, you know, for a child to be

9  continually exposed to this kind of treatment over and

10 over again, it, you know, conditions their brain to be

11 very -- you know, different kids can have different

12 responses, for sure.  Some kids just completely refuse to

13 have anything to do with any kind of sexual stuff and

14 others are kind of hypersexualized, or at least vulnerable

15 to being responsive to sexual attention they're getting

16 from men, to go ahead and have sex with men because, hey,

17 that's what men want from me.  That's what makes them

18 happy.  I don't have an orgasm.  I don't enjoy it, but,

19 you know, that's my role is to have sex.  So this kind of

20 hypersexualization, this confusion over --

21          THE COURT REPORTER:  This confusion about --

22          THE WITNESS:  I'm sorry.  I'm talking too fast.

23     Q.   BY MR. NICKELS:  You got a little fast there.

24     A.   Yeah.

25     Q.   I would like you to start over on that third one

1  because it did come out too fast.

2      *A.*   Yeah.  Confusion about sexual desires and

3  impulses.  So, as I talked about before, on the one hand

4  she describes this experience of, you know, noticing and

5  being attentive to that sexual energy coming from men and

6  wanting to please men in that way and wanting them to like

7  her in that way because that's kind of the role that men

8  had related to her.

9          But, on the other hand, then when she got that

10  attention and when it did become sexual, then feeling kind

11  of disgusted and dirty with herself.

12          This is a really awful dilemma that a lot of

13  sexually abused boys and girls get into.  On the one hand,

14  being vulnerable and like acting on that stuff and then

15  feeling really dirty and horrible about it afterwards.

16      *Q.*   So, Dr. Hopper, let's now kind of pull it all

17  together.  You talked about -- you've described for us

18  various forms of trauma that happened throughout Wendi's

19  first 18 years and you've talked about the cumulative

20  effect.  Now that we're kind of at right at 18 --

21      *A.*   Yeah.

22      *Q.*   -- what do we have?  What is the cumulative

23  effect upon Wendi of the trauma that you've described?

24      *A.*   In a way, you could never sort of do it justice.

25  But, you know, the quickest summary is she entered

1  adulthood as a severely damaged person.

2  *Q.*   In what ways?

3  *A.*   Well, we can look at in different ways again and

4  we can never kind of capture it all.  But one way to think

5  about it is in terms of what we call psychopathology or

6  psychiatric disorders and symptoms.  So depression,

7  anxiety, someone like Wendi who has a genetic

8  predisposition to bipolar disorder, those kinds of

9  symptoms coming in.

10        Post-traumatic stress disorder, she has those

11  symptoms.  Something we call complex post-traumatic stress

12  disorder, which has to do with these memory deficits and

13  problems regulating emotions and twisted relationships

14  with the perpetrator, so she has that.  So she has a whole

15  bunch of psychopathology.  That's one way to think

16  about it.

17  *Q.*   And what about you've talked repeatedly about her

18  ability to regulate her emotions or respond to stresses or

19  complexity.  What's the effect of all this trauma on that

20  as she's entering adulthood?

21  *A.*   So one way to think about this is, you know, any

22  child who is born has the potential to have different,

23  various kinds of upbringing.  And what we want for

24  children is to have parents who are nurturing and caring,

25  to have schools that are supportive and nurturing of kids

1    in what they're trying to learn and who they're to become

2    and communities that are safe, healthy places where kids

3    can learn how to relate to peers and follow rules and be

4    good people, basically, and be able to regulate their

5    emotions whether there's sadness or fear or shame or

6    anger.

7            And when things go well, you know, we can think

8    of this as, you know, as a ten or the optimal.  You know,

9    anybody who is getting like a 79 or a ten, they're having

10   a pretty good childhood and not everything is perfect, but

11   they have been on a developmental course where, you know,

12   they're going to have these capacities to regulate their

13   emotions, including if they're in a really stressful

14   situation.  They may not be perfect at regulating them,

15   but they won't just completely lose access to their

16   executive functions.

17   *Q.*   So are you saying that it's simply a matter of

18   she didn't develop sort of the positive attributes that

19   would allow you to deal with stress in a complexity?

20   *A.*   Unfortunately, it's worse than that.  It's when

21   you've been subjected to this kind of unrelenting trauma

22   of all kinds throughout your entire childhood, and at the

23   hands of parents, then it actually, you know, kind of

24   warps your capacities and it stunts them in various ways,

25   so you can't remember all of who you are.  You can't

1 regulate your emotions and impulses when you're stressed

2 and you can't do all kinds of things and your system is

3 not functioning well.  You're just trying to block things

4 out.

5 You're just trying to get by, in Wendi's case, by

6 just taking care of other people, doing what they want.

7 And then when, you know, a very complex situation hits

8 with a lot of stress, it's kind of like the system crashes

9 and that CEO, that prefrontal cortex is just offline and

10 all that lifetime of trauma and any impulses that go with

11 it can just kind of come out and take over.

12 *Q.*   And when that lifetime of trauma comes kind of

13 flooding back, what does happen from the standpoint of the

14 ability to react appropriately?

15 *A.*   As I said before the lunch break, we know from a

16 lot of research that any of us in very stressful

17 situations, there are chemicals released in the prefrontal

18 cortex that impair it.  And if you've got a history of

19 major abuse and major deficits in these prefrontal

20 executive capacities, and you add that together, like I

21 said, you're not going to be able to think clearly.

22 You're not going to remember rules, laws, and you're just

23 reacting on impulse.

24 *Q.*   This place that Wendi was, then, as you've just

25 described, sort of entering adulthood, can that be -- can

1   that be fixed?  Can you get treatment and get better?

2       *A.*   You can definitely get treatment.  And that's

3   what a lot of my training is directed toward.  It takes

4   years.  What we've found is for people who have this

5   massive chronic abuse starting in infancy and going all

6   the way through their childhood, it takes years, and, you

7   know, literally, it can take years just to help the person

8   feel safe in their body and be able to navigate in certain

9   relationships in a safe way, let alone respond to like

10  really stressful situations.

11          So even -- even with the best, even if, say,

12  Wendi had gotten five to ten years of really good trauma

13  therapy, she still would have been vulnerable, as anybody

14  would.  She still would have been vulnerable to if the

15  right stress or if kind of the right buttons get pushed,

16  to really having this kind of breakdown and losing these

17  capacities.

18      *Q.*   Do you know whether Wendi received any such

19  treatment prior to Joe Andriano's death?

20      *A.*   No.  I mean, the records I saw and everything

21  I've heard, she maybe had a couple of visits to a

22  counselor through her employment or something like that,

23  but nothing approaching the kind of comprehensive

24  long-term treatment that would be necessary to help

25  someone recover from this kind of horrible trauma.

1    *Q.*   So, as far as you know, the person that you've

2    described who had all these sort of deficiencies and

3    inabilities to react appropriately, that same person would

4    have existed?  That was the same Wendi in the time leading

5    up to Joe's death?

6    *A.*   Yes.  And sadly, to this day, I mean, she hasn't

7    gotten really good treatment to this day.  And even some

8    of the clips we saw just a couple months ago with

9    Dr. Pitt, you can see her breaking down and I can't think

10   straight.  I mean, I can't remember things.  I can't -- so

11   to this day, she's sadly still quite harmed.

12           MR. NICKELS:  Thank you, Dr. Hopper.  I have no

13   more questions.

14           Your Honor, at this time, we would move for the

15   admission of the PowerPoint that we used in connection

16   with Dr. Hopper's testimony.

17           THE COURT:  Any objection?

18           MR. HAZARD:  I'm going to object to that.

19           THE COURT:  Let's see.  And is that marked as

20   a -- which exhibit?

21           MR. NICKELS:  It actually I think was not

22   premarked.  We are in the process of making copies.  We

23   can certainly add it to --

24           THE COURT:  I'm going to deny it, but I allowed

25   you to use it for demonstrative purposes.  Okay?

1          MR. NICKELS:  Okay.

2          THE COURT:  So I'll deny it, but I allowed it for

3    demonstrative purposes today during his testimony.  Okay?

4          MR. NICKELS:  Right.  Very good.

5          MR. ARNTSEN:  Your Honor, I'm just going to step

6    out a second just to call our next witness and arrange for

7    the next witness to come.

8          THE COURT:  Okay.  Can we continue with --

9          MR. ARNTSEN:  Oh, absolutely.

10          THE COURT:  Mr. Hazard, you're going to be doing

11    the questioning?

12          MR. HAZARD:  Yes, Your Honor.

13          THE COURT:  Okay.  I'll turn to Mr. Hazard.

14          Mr. Hazard.

15          MR. HAZARD:  Thank you, Your Honor.

16          THE WITNESS:  Can I get some water real quick?

17          THE COURT:  Okay.  Sure.

18

19                    CROSS-EXAMINATION

20    BY MR. HAZARD:

21     Q.   How much have you been compensated thus far for

22    your work and then also include whatever fee you're

23    charging for today's testimony, please?

24     A.   I don't have an exact number, but I would say

25    around total probably about $200,000.

1    *Q.*    And I see that you finalized your report and
2    signed it on February 14, 2012; is that correct?
3    *A.*    That's correct.
4    *Q.*    And you mentioned a number of things that you
5    have relied upon in that written report?
6    *A.*    Yes.
7    *Q.*    Including Dr. Woods' report; is that correct?
8    *A.*    Yes, I read it, and it was consistent with my
9    conclusions.
10   *Q.*    Sure.  In fact, you referred to his report
11   repeatedly in your written report?
12   *A.*    At the very end, yes, I do refer to that.
13   *Q.*    And Dr. Woods' report was also February 14, 2012?
14   *A.*    I don't -- don't know the date of his report, but
15   I'll believe that, sure.
16   *Q.*    And Dr. Woods states that he relied on your
17   report as well?
18   *A.*    Okay.
19   *Q.*    Well, who had the time machine?  I mean, if you
20   both relied on each other's reports, someone had to finish
21   before the other.  Do you know?
22   *A.*    Well, I saw a draft of his report before it was
23   done.
24   *Q.*    Was it a draft of his report?
25   *A.*    Oh, I don't know if there were any -- you know,

1  maybe it wasn't a draft.  I don't know.  But I know that

2  the attorneys didn't want me to see it until it was either

3  done or very close to done.

4      *Q.*   But whenever you saw it, you stated in your

5  report that it was Dr. Woods' report.  You didn't use the

6  word draft; correct?

7      *A.*   Okay.

8      *Q.*   Is that a yes?

9      *A.*   Yes.

10     *Q.*   Okay.  And that you relied upon it?  I know you

11 can't --

12     *A.*   Can I say word the rely?  I don't know.  Can you

13 show me where I say that?  Can you show me the document

14 where I say that?

15         THE COURT:  Is it marked as an exhibit?

16         MR. HAZARD:  It is an exhibit, Your Honor.  It's

17 admitted.

18         MR. NICKELS:  I think it's Exhibit 3 or 4.  3 is

19 the short version.  4 is the long.

20         THE COURT:  It looks like it's Exhibit No. 3

21 that has been admitted into evidence.  So why don't you

22 refer to Exhibit No. 3 admitted into evidence.

23     *Q.*   BY MR. HAZARD:  And, Dr. Hopper, the date of your

24 report is on the last page, Page 252, and it's the same

25 date that you put on your executive portion as well.

1      *A.*   All right.

2           MR. NICKELS:  Greg, will you be looking at the

3     longer version or the short version?

4           MR. HAZARD:  The longer version, yes.

5           THE WITNESS:  The longer version?  Okay.  I think

6     that was the conclusions.  I'm seeing the shorter one here

7     in 3.  The longer one is 4.

8           MR. HAZARD:  All right, then.

9           THE WITNESS:  So where are you referring to this

10    that I wrote the relying?

11          MR. HAZARD:  On the last page, Page 252 in your

12    long report.  The last page of No. 4.

13          THE WITNESS:  The exhibit I have here is unsigned

14    and dated.  But I remember -- I remember being done

15    substantially before that, but I remember signing it in

16    February.  But the date isn't on it.  My exhibit doesn't

17    have a signature or date on it.

18          THE COURT:  The courtesy copy that I guess

19    counsel provided to the Court in the notebook, under

20    Exhibit No. 3, it has a Page 27, which is a last date and

21    it's dated February 14, 2012, and purportedly signed by

22    Dr. Hopper.

23          Then there is a courtesy copy of Exhibit No. 4,

24    which appears to be a longer report, but it is not dated

25    and it is not signed on the last page.

1          THE CLERK:  Did you want me to check the

2    originals?

3          THE COURT:  Okay.

4          MR. HAZARD:  Our copy is signed.

5          MR. NICKELS:  Your Honor, I believe the reason

6    why No. 4 may not be signed is we actually attached that

7    as an appendix to his report.

8          THE COURT:  Right.

9          MR. NICKELS:  So we may have just had him sign

10   the 27-page version and this was an appendix.  There were

11   a couple of other things that were an appendix as well.

12   That may be why it's not signed.

13         THE CLERK:  Here is Exhibit 4.

14         THE COURT:  On the actual Exhibit No. 4 that has

15   been admitted into evidence, on the last page, it's not

16   signed and it's not dated.

17         Do you have Exhibit No. 3?

18         MR. HAZARD:  Judge, if we could mark this as

19   well.  This is signed.  It's a duplicate.

20         THE COURT:  Under Exhibit No. 3, which has been

21   admitted into evidence, on the last page, Page 27, it is

22   dated February 14, 2012, and purportedly signed by

23   Dr. Hopper.

24         Okay.  So, Counsel, you would like to have this

25   marked as an exhibit?

1          MR. HAZARD:  Yes, Your Honor.

2          MR. NICKELS:  And we have no objection to that.

3          THE COURT:  Okay.  Could we have that marked?

4          THE CLERK:  Yes.

5          THE COURT:  What number will that be?

6          THE CLERK:  I believe it will be 213.  213, sir.

7          THE COURT:  So then we'll have Exhibit No. 213

8    marked and by stipulation admitted into evidence.  And

9    what is 213?  Is that an exact copy of Exhibit No. 4

10   except for it's signed and dated on the last page?

11         MR. HAZARD:  Yes, Your Honor.

12         THE COURT:  Is that correct?

13         MR. NICKELS:  I have every reason to believe it

14   is.

15         THE COURT:  Okay.  But there is no objection;

16   right?

17         MR. NICKELS:  There is no objection.

18         THE COURT:  So Exhibit No. 213 for identification

19   is admitted into evidence.

20         And, Mr. Hazard, you may proceed.

21         MR. HAZARD:  Thank you.

22    Q.   BY MR. HAZARD:  And, Dr. Hopper, as you answered

23   earlier, that you do refer towards the end of your long

24   report a number of times to Dr. Woods' report.

25         So turning your attention to Page 242 on your

1    long report, which I think is Exhibit 4 --

2        A.    I have it.  I'm there.

3        Q.    -- Bates stamp 626?

4        A.    Coincidently, I happen to be on 242 already.

5        Q.    Okay.  And you can see, for example, No. 530, in

6    addition is addressed by Dr. Woods and then you?

7        A.    Uh-huh.

8              THE COURT:  Is that a yes?

9              THE WITNESS:  Yes.  I'm sorry.  Yes.

10       Q.    BY MR. HAZARD:  And, also, on Page 246,

11   Bates stamp 630, No. 540, again, you start that paragraph

12   with:  As discussed by Dr. Woods?

13       A.    Yes.

14       Q.    Correct?

15             THE COURT:  Go ahead and answer the question.

16             THE WITNESS:  I think I did say yes; didn't I?

17       Q.    BY MR. HAZARD:  All right.  I'm sorry.  I didn't

18   hear you.

19       A.    I'm sorry.

20       Q.    And then on Page 248, Bates stamp 632, the same

21   Exhibit No. 544, (sic) you start that paragraph:  As

22   discussed in detail by Dr. Woods, comma?

23       A.    Yes.  So, in each, I'm talking about he discussed

24   these things.  I'm aware of what he is saying is

25   consistent with what I discovered.

1    Q.    Sure.  But that's coming from his report?

2    A.    Sure.  Yes.

3    Q.    That was also dated February 14, 2012?

4    A.    Yes.

5    Q.    Now you mentioned that both in your report here

6    today the scope of your assignment.  And that was that you

7    were asked by counsel for Ms. Andriano to examine

8    psychologically traumatic aspects of Wendi's development

9    from birth to age 18; correct?

10   A.    Correct.

11   Q.    And you also state a particular focus were, one,

12   experiences of neglect, abuse and other potentially

13   traumatic mistreatment by her parents or other adults;

14   correct?

15   A.    Correct.

16   Q.    And, two, harmful effects of such traumatic

17   experiences and relationships on her mental health and

18   ways of relating to others; correct?

19   A.    Correct.

20   Q.    And that was your understanding of the scope, and

21   that's what you did; correct?

22   A.    Correct.

23   Q.    And so your focus was on traumas in Wendi's life?

24   A.    Correct.

25   Q.    You weren't focusing on the good things and

1  positive things in her life; correct?

2      A.   I asked about those.  I did not -- that was not

3  the focus of the main thing I was supposed to focus on.

4      Q.   Sure.  Thank you.  And your scope was also to

5  stop at age 18 when Wendi reached adulthood; correct?

6      A.   I was to look at -- as I said earlier today, I

7  was to look at her whole life and focus on birth to 18 in

8  terms of the traumatic events and also to look at the

9  effects that those traumatic events could have on her as

10  an adult.  So to understand the effects that they could

11  have on her as an adult, I needed to look past 18.

12      Q.   All right.  How many of those events did you

13  include in your actual written report in Wendi's life

14  after the age of 18?

15      A.   Which events?  You said those events.  Which

16  events are you referring to?

17      Q.   Yeah.  You mentioned that -- you just testified

18  that you had to consider things that happened after 18 in

19  her life in reaching your opinions; correct?

20      A.   Correct.

21      Q.   But in your report, there really isn't -- in your

22  actual written report, there isn't really mention of too

23  many things that happened in her adult life; is that fair?

24          MR. NICKELS:  I'm going to object to the extent

25  that I think he's mischaracterizing what the witness has

1   said.

2          THE COURT:  Overruled.

3          You can answer the question.

4          THE WITNESS:  Sure.  Can you repeat the question,

5   please?  I'm sorry.

6      *Q.*   BY MR. HAZARD:  What I'm getting at is in both

7   forms of your written report, Exhibit 3 and Exhibit 4, the

8   executive summary and the long form, you essentially stop

9   in that report at Wendi's age of 18 and then you start

10  making some conclusions and some opinions.  Is that an

11  accurate way of how your report was set up?

12     *A.*   In terms of the events that she experienced, yes,

13  I focus up to 18.  In terms of the consequences of those

14  events, my conclusions actually focus more on the

15  consequences of her -- as I said today, to this day, the

16  consequences on her functioning and relationships in

17  various ways.

18     *Q.*   Okay.  In your report, do you mention anything

19  about Wendi's version of the events on the night of

20  October 7th and going into the early morning hours of

21  October 8, 2000 in your actual written report?

22     *A.*   No.

23     *Q.*   Did you ask Ms. Andriano about the murder and the

24  events leading up to the murder?

25     *A.*   I did.

1      Q.   But you did not include that in your written
2   report; correct?
3      A.   Correct.
4      Q.   And you met -- you said you met with Ms. Andriano
5   a number of times.  I'll just ask you if these dates are
6   accurate.  And if you need to review a copy of your notes,
7   we can provide that for you.
8      A.   That would be helpful.
9      Q.   Okay.
10          (WHEREUPON, an off-the-record discussion ensued.)
11          MR. HAZARD:  Your Honor, I apologize.  I thought
12   these had been marked, but they haven't been.
13          THE COURT:  Show them to counsel before they're
14   marked.
15          (WHEREUPON, an off-the-record discussion ensued
16   between Mr. Hazard and Mr. Nickels.
17          MR. HAZARD:  Your Honor, I apologize.  Counsel,
18   although they might have an electronic copy, they want a
19   hard copy.  And if it's appropriate to take a brief
20   recess, we can make sure they can follow along.
21          MR. NICKELS:  Or at least give me some time to
22   pull it up.  That's going to take a few minutes for me to
23   get it up on the computer.
24          THE COURT:  Let's take a short break, then.
25   We'll take about a five-minute break.  Okay?

1          MR. NICKELS:  Okay.  Thank you.

2          THE COURT:  We'll be in recess.

3          (WHEREUPON, a recess ensued from 2:45 p.m. to

4     3:10 p.m.)

5          THE COURT:  This is CR 2000-096032, State of

6     Arizona vs. Wendi Elizabeth Andriano.

7          The record will reflect the presence of the

8     parties and counsel.

9          Just a couple of housekeeping measures.  I've

10    been told by my staff that some counsel feel that it's

11    warm in here today.  We'll note for the record that the

12    juvenile attorneys that practice before me, most of them

13    say it's too cold in here.  So I guess over the objection

14    of the juvenile attorneys, we'll indicate for the record

15    that the PCR attorneys are more warm-blooded than the

16    juvenile attorneys.

17         We'll do what we can.  We have to call downtown,

18    believe it or not, to get them to change the controls in

19    here.  So my judicial assistant is going to be working on

20    that.  So I don't want you to think that we're ignoring

21    your wishes.

22         And then, two, I think my staff -- my judicial

23    assistant contacted counsel with regard to the transport

24    of Mr. Neace.

25         MR. ARNTSEN:  Yes.

1            THE COURT:  It's my understanding that we'll need

2    Mr. Neace on Wednesday; correct?

3            MR. ARNTSEN:  Wednesday morning; correct.

4            THE COURT:  Then we're working on getting -- I

5    guess Mr. Neace has hearing impaired requirements.  So

6    we're working on getting some headphones for him.

7            MR. ARNTSEN:  Thank you.

8            THE COURT:  Okay.  Did we get everything taken

9    care of with regard to that exhibit?

10           THE CLERK:  I have them all marked now.

11           THE COURT:  So the record will reflect that

12   Dr. Hopper is still on the witness stand and we'll

13   continue with the cross-examination by Mr. Hazard.

14           Mr. Hazard.

15           MR. HAZARD:  Thank you, Judge.

16   *Q.*  BY MR. HAZARD:  And, Dr. Hopper, I'm just going

17   to ask you a question about and then put on the record the

18   actual dates that you met with Ms. Andriano.  And would

19   reviewing your notes refresh your memory and help you to

20   get that information on the record?

21   *A.*  Yes.

22           MR. HAZARD:  And if I may approach the witness,

23   Your Honor.

24           THE COURT:  Yes.

25   *Q.*  BY MR. HAZARD:  So, Dr. Hopper, I have for

1   identification purposes what have been marked as

2   Exhibits 214 through 225.  And, Dr. Hopper, each exhibit

3   deals with a separate day that you interviewed her.  You

4   testified earlier that you made six or seven actual trips,

5   but some of those visits took more than one day; correct?

6       A.   Correct.

7       Q.   And is that an accurate copy of your notes?

8       A.   Yes.  The bottoms are cut off of some, but

9   otherwise it appears to be so.  I would obviously need to

10  look at them all to know.

11      Q.   All I'm asking right now are some dates.

12      A.   Sure.

13      Q.   So I have that you met with Ms. Andriano on

14  June 8th and June 9th of 2010; is that correct?

15      A.   Yes, I see those.

16      Q.   July 6th of 2010?

17      A.   Correct.

18      Q.   And August 31st and September 1st of 2010?

19      A.   Correct.

20      Q.   November 2nd, 2010?

21      A.   Yes.

22      Q.   January 4th and January 5th of 2011?

23      A.   Yes.

24      Q.   April 11th, 12th and 13th also in 2011?

25      A.   Yes.

1    *Q.*   And then finally August 16, 2011?

2    *A.*   Yes.

3    *Q.*   And we'll come back later to these notes.  I'll

4    have some questions later.

5    *A.*   Okay.

6    *Q.*   And you mentioned that approximately 52 hours in

7    total over those various visits is how much you spent

8    interviewing Ms. Andriano; is that correct?

9    *A.*   Yes.

10   *Q.*   You mentioned that you've had about eight or so

11   of these types of cases.  Does that mean capital cases?

12   *A.*   Capital mitigation kind of cases, yes.

13   *Q.*   In the last ten or so years; correct?

14   *A.*   Yes.

15   *Q.*   And I take it you've also worked on the

16   mitigation side; is that correct?

17   *A.*   In capital cases; correct.

18   *Q.*   Okay.  Now you've concluded that Ms. Andriano has

19   suffered various types of trauma, including sexual abuse?

20   *A.*   Yes.

21   *Q.*   And you defined sexual abuse kind of broadly to

22   include things like emotional or verbal offensive

23   statements or an environment that might be uncomfortable;

24   is that correct, that's sexualized?

25   *A.*   When it's an inappropriate act toward a child and

1  it involves something sexual, consistent with how it's

2  defined in DSM, for example, yes, that's correct.

3      *Q.*    And you also concluded that there's actual --

4  you've concluded that Ms. Andriano suffered actual

5  physical sexual abuse when she was a child; correct?

6      *A.*    The evidence I have to me is consistent with

7  that.

8      *Q.*    All right.  Let's talk about that evidence.  Were

9  there any police reports that documented Ms. Andriano's

10 alleged misconduct -- sexual misconduct against

11 Ms. Andriano?

12     *A.*    No.

13     *Q.*    And any other law enforcement records like Child

14 Protective Services reports?

15     *A.*    As is typical with most of these cases, no.

16     *Q.*    No medical findings of course to support?

17     *A.*    No.

18     *Q.*    No court records?  For example, the juvenile

19 history of Ms. Andriano?

20     *A.*    No.

21     *Q.*    Or family court history?

22     *A.*    No.

23     *Q.*    And, in fact, the evidence that you have comes

24 from statements made by people; is that accurate?

25     *A.*    Correct.

1    *Q.*   And these statements were all made by people who

2    have at least come to your attention after Ms. Andriano

3    was sentenced to death?

4    *A.*   Came to my attention?  Yeah, because I didn't --

5    *Q.*   I'll clarify that.

6    *A.*   Yes.

7    *Q.*   And there's no documentation to support that --

8    aside from some things that may have happened with Wendi's

9    biological father, but as it relates to Alejo Ochoa, no

10   documents that you found to support that anyone came

11   forward until after Ms. Andriano was sentenced to death?

12   *A.*   Correct.

13   *Q.*   Now with respect to Wendi's biological father,

14   that evidence was presented at her trial; correct?

15   *A.*   That's my understanding.

16   *Q.*   Well, you did review some transcripts?

17   *A.*   Yes, I did.  A massive amount of data.  I can't

18   remember everything I saw.

19   *Q.*   Sure.  And do you disagree that, for example,

20   Donna Ochoa testified during Wendi's trial that she was

21   convinced that her biological father abused Wendi because

22   he was a convicted child molester and he had access to

23   her; is that correct?

24   *A.*   Correct.

25   *Q.*   But even as it relates to Skip, Wendi's

1  biological father, there is nothing to document that any

2  abuse actually happened to Wendi?

3      *A.*   There's the evidence I cited.  In terms of

4  official documents contemporaneously, there is none, as is

5  common in these cases.  It's remarkable when there is

6  documentation.

7      *Q.*   It's mostly an argument and an inference that

8  because he had demonstrated pedophilic tendencies that

9  caused him a prison sentence against another girl and

10 because he had access to Wendi, that the inference is he

11 could have abused her?

12     *A.*   Yes.  But as you may have heard, I wasn't -- I

13 actually think more like with the brothers than him.  I

14 didn't focus on Skip as a sexual abuser.

15     *Q.*   All right.  But it's the same argument with the

16 brothers?  Because of their histories, based on your

17 interviews; correct?

18     *A.*   My interviews and multiple reports -- convergent

19 reports from several other people.

20     *Q.*   It still boils down to because they had

21 pedophilic tendencies, they must have abused Wendi because

22 they had access to her?

23     *A.*   I didn't say they must have.

24     *Q.*   They could have?

25     *A.*   I would say they were likely to have.

1    *Q.*   Right.

2    *A.*   Highly likely.  But I can't say they absolutely

3    did, of course.

4    *Q.*   Nevertheless, you still called and you mentioned

5    that that's very similar to what you have as relates to

6    Alejo?  We have statements made by people alleging that

7    Alejo did certain things; correct?

8    *A.*   Correct.

9    *Q.*   And you call Alejo a pedophile in your report?

10   *A.*   What I do is I rely on a large mass of data.  If

11   you want to take any particular person and challenge their

12   credibility, but it would have to be a huge conspiracy of

13   many people telling me that --

14   *Q.*   Doctor, that wasn't my question.

15   *A.*   Okay.  Sorry.  Yes.

16   *Q.*   You called Alejo Ochoa a pedophile in your

17   report; correct?

18   *A.*   Uh-huh.

19         THE COURT:  Is that a yes?  Make sure you give a

20   verbal response.

21         THE WITNESS:  Yes.  Yes.

22   *Q.*   BY MR. HAZARD:  And today you called him a sexual

23   predator; is that correct?

24   *A.*   Yes.

25   *Q.*   Are you making a pedophilia diagnosis?

1    *A.*    Am I making a pedophilia diagnosis?  I guess you

2    could say that I have, yeah.

3    *Q.*    Pedophilia is a clinical term; correct?

4    *A.*    It is.

5    *Q.*    Based on the evidence that you have, is it your

6    opinion that Alejo Ochoa meets the clinical definition of

7    a pedophile?

8    *A.*    Based on all the evidence I've seen, yes.

9    *Q.*    Even though you have no law enforcement reports

10   documenting that people reported Alejo Ochoa of doing

11   improper things with kids; correct?

12   *A.*    Law enforcement reports do not constitute reality

13   in sexual abuse.  I'm sorry.  It's just they're incredibly

14   rare in sexual abuse cases.  So if I was to only rely on

15   law enforcement reports to make this determination when I

16   have a wealth of other evidence, I would consider that

17   malpractice, to tell you the truth.

18   *Q.*    Today no one has reported to the police still

19   that anyone reported to the police that Alejo Ochoa, to

20   your knowledge, molested any child; correct?

21   *A.*    Correct.  I wish -- I wish someone had.

22   *Q.*    And Wendi Andriano in your interviews -- many

23   interviews with her, you spent a lot of time talking to

24   her about Alejo Ochoa; correct?

25   *A.*    Correct.

1    *Q.*   And talking about the topic of sexual abuse in
2    the many ways that you defined it today; correct?
3    *A.*   Correct.
4    *Q.*   And as it relates to actual sexual misconduct,
5    child molestation, Wendi has denied that Alejo Ochoa has
6    ever touched her inappropriately; correct?
7    *A.*   No, that's not correct.
8    *Q.*   It's not correct that she denied?
9    *A.*   She said:  I don't remember.
10   *Q.*   Okay.  Do you remember interviewing her on
11   April 12, 2011?
12   *A.*   I'm sure I could retrieve those memories if I had
13   some documentation to help me do that.
14   *Q.*   Sure.  When you asked her if Alejo Ochoa had ever
15   done anything over-the-line to her, in your words --
16   *A.*   Uh-huh, yes.
17          MR. HAZARD:  And, Your Honor --
18          THE COURT:  Yes.
19          MR. NICKELS:  Is it the 12th or the 11th?
20          MR. HAZARD:  It's the 11th.  April 11th.
21          THE COURT:  April 11th?
22          MR. HAZARD:  April 11th.  And it's Exhibit 222.
23   If I may approach the witness.
24          THE COURT:  Yes.
25          MR. NICKELS:  Greg, if you could tell me where

1   you're going to go and if it's on the first or second page

2   of the notes.  I guess there's nine pages.  So whatever

3   page you'll be on.

4            MR. HAZARD:  It's dated April the 12th.

5   April the 12th.

6            MR. NICKELS:  Oh, now it's April 12th?

7            MR. HAZARD:  It's April the 12th.  I apologize.

8            MR. NICKELS:  Okay.

9            MR. HAZARD:  So it will be 223.

10           THE COURT:  So it will be Exhibit No. 223 marked

11   for identification.

12           MR. NICKELS:  Do you know the page number you'll

13   be on, or if it's multiple, just so I can follow along?

14           MR. HAZARD:  And it's right on that very first

15   page, which is labeled No. 6 on your notes at the top.

16           THE WITNESS:  Yes.

17       Q.   BY MR. HAZARD:  You mentioned things that seem to

18   be over-the-line and she talked about sexual overtones

19   that you've testified to; correct?

20       A.   Can you point out to me where on the page?

21       Q.   It's about two-thirds of the way down.

22       A.   Okay.  I see that.  Is there a question about

23   that?

24       Q.   Is that what she told you in reference -- on that

25   page?

1    *A.*    Yes.  I asked her that question I think the day

2    before, also.  In this case, I asked it again and she --

3    what I wrote in my notes is everything was sexual

4    overtones on it always, yes; correct.

5    *Q.*    And she also later said, quote:  I can't think of

6    any times my father touched me; correct?  You do remember

7    that?

8    *A.*    Well, of course.  Of course.  I mean, I showed

9    you the videotape of her saying similar things with your

10   expert.

11   *Q.*    And she also stated, I didn't really have

12   specific things, and later said more of emotions and

13   feelings; correct?

14   *A.*    Where are you referring to now?

15   *Q.*    The same context in the same section on that

16   first page.

17   *A.*    Well, I would like to be able to see it.

18          THE COURT:  One at a time.  One at a time.

19          You can approach the witness if you would like.

20          THE WITNESS:  Yeah, you can approach me.

21          MR. NICKELS:  Your Honor, may I approach just to

22   see where he's pointing as well?

23          THE COURT:  Yes.

24          (WHEREUPON, an off-the-record discussion ensued.)

25          MR. NICKELS:  Starting with right here?

1          MR. HAZARD:  Yes.

2          MR. NICKELS:  Okay.

3     *Q.*   BY MR. HAZARD:  And that's when she states:  I

4    can't think of any time my father touched me; correct?

5     *A.*   Correct.

6          THE COURT:  When she made reference to that, is

7    she talking about the biological father or the stepfather?

8          THE WITNESS:  Alejo at that point.

9          THE COURT:  Okay.  I just wanted to make sure I

10   understood.

11         THE WITNESS:  Stepfather.

12         THE COURT:  Okay.

13    *Q.*   BY MR. HAZARD:  And she never said at any time to

14   you that I can remember a specific instance where Alejo

15   sexually, physically abused me; correct?

16    *A.*   Correct.

17    *Q.*   And you talked a number of days about those

18   topics?

19    *A.*   Yes.  I very systematically went through in a way

20   that research suggests is the least suggestive way to try

21   to elicit memories of these things, particularly in people

22   who have difficulty retrieving them like Wendi Andriano.

23    *Q.*   Okay.  But she didn't have difficulty retrieving

24   other things when you talked to her; is that correct?

25    *A.*   Correct.

1    *Q.*   And, in fact, when you talked to her about the

2    incident, the murder, when you met with her on

3    September 1st, 2010, her memory of that event was much

4    better than it was when she was interviewed by Dr. Pitt;

5    correct?

6    *A.*   Her ability to access those memories was better.

7    And it's always easier to access painful traumatic

8    memories when you feel safe because of the effects of the

9    prefrontal cortex that I've been talking about throughout.

10   *Q.*   Well, let's talk about that.  Did she know that

11   you were there hired by her own attorneys?

12   *A.*   Yes.

13   *Q.*   Did you tell her that you were there to help her?

14   *A.*   I told her the scope of the work I was to do to

15   try to understand what she had been through and how it

16   affected her.

17   *Q.*   Right.  And she told you with many details about

18   her account of what happened when she murdered her

19   husband; correct?

20   *A.*   It wasn't quite like that.  That's not an

21   accurate characterization.

22         MR. HAZARD:  All right.  May I approach with

23   Exhibit No. 218?

24         THE COURT:  Yes.

25   *Q.*   BY MR. HAZARD:  Now those are your notes on your

1  interview with Ms. Andriano on September 1st, 2010;

2  correct?

3      *A.*   Correct.

4      *Q.*   And on the second page, about a quarter of the

5  way down, a starting place, do you see that part?

6      *A.*   Yes.

7      *Q.*   Now Ms. Andriano was able to talk at length about

8  Joe's diagnosis and with many details.  For example, that

9  he had a 20 percent chance -- definitely less than a

10 50 percent chance of survival; correct?

11     *A.*   Correct.

12     *Q.*   She talked about the CAT scan that they went to

13 and found out the horrible news?

14     *A.*   Correct.

15     *Q.*   All right.  They found out about the tumor, how

16 it had doubled in size?

17     *A.*   Right.

18     *Q.*   Lots of details about his health -- specific

19 details; correct?

20     *A.*   Yeah, though --

21     *Q.*   Would that be distressing, do you think?

22     *A.*   Not as distressing as killing someone with a

23 barstool, not even close.

24     *Q.*   Okay.  We'll get to that.  But, Doctor, she loved

25 her husband.  So hearing that kind of news would be very

1  distressing; would it not?

2      *A.*   I don't think that memory works quite the way

3  you're implying here.  There is some misunderstanding.

4      *Q.*   Okay.  You mentioned that things that are

5  distressing to a person who had the trauma that Wendi

6  experienced in childhood, that that causes memory loss.

7  That was your testimony today?

8      *A.*   It was more precise than that.

9      *Q.*   All right.  Well, clarify for me.

10     *A.*   I would love to.  So research has shown -- and

11  you can see this clinically and you can see it in the tape

12  of Wendi, especially if you have the whole tape -- that

13  there's different degrees of stress, and different degrees

14  of stress, there's different degrees of impairment of the

15  ability to retrieve memories using your prefrontal cortex.

16         Also, with different degrees of stress, there are

17  potentials for these phenomena called dissociation, or for

18  literally blocking memories out from being able to be

19  retrieved.  And there's, you know, a lot of neuroscience

20  and research on that in the top journals.

21         So to equate, quite distressing news about the

22  cancer.  But it was something that they had talked about

23  over and over again and were living with for months.  One

24  of the things we know is that stressful, awful things,

25  when they repeat them over and over again, is what we call

1    habituation.  It's less stressful.  So ten years later,
2    that's not even as close to as stressful as is an incident
3    of horrible violence and blood everywhere.  For the
4    reasons I've described, the way that affects the brain,
5    it's just -- it's a whole another level.  It's a
6    completely different matter.  So to equate them is not
7    correct.
8        Q.   She then talks about trying to get life insurance
9    for Joe in your interview; correct?
10       A.   I remember that she talked about that.
11       Q.   And her story, when she talked to you on
12   September 1st, 2010, was the same story that she told on
13   the witness stand at her trial?  And that was Joe wanted
14   the life insurance; that was his idea; correct?
15       A.   Correct.
16       Q.   And that she just made a couple of phone calls to
17   try to get it, but had no intent to defraud anybody;
18   correct?
19       A.   Now you're referring to --
20       Q.   Just that's what she said, yes?
21       A.   When?  Because you're saying -- it seems like
22   you're saying she said the exact same words on the witness
23   stand and with me.  And I don't remember those exact words
24   and I don't -- I'm not sure that's an accurate
25   characterization of what I heard from her and what's in my

1  notes.

2  *Q.*   At her trial, and on September 1st, 2010 in your

3  interview with her, she denied trying to defraud an

4  insurance company, that it was her own idea, that this was

5  something that Joe wanted and she was doing it just to

6  please him; correct?

7  *A.*   To please or help him, yes, that's definitely --

8  that's the essence of what she said; correct.

9  *Q.*   And, again, she gave you specific details about

10  that account?

11  *A.*   She gave me some specific details, yes.

12  *Q.*   She also talked later about just that Joe

13  spending time on the boat and growing distant with her;

14  correct?

15  *A.*   Yes.

16  *Q.*   And then turning the page --

17  *A.*   What page are you on now?

18  *Q.*   This would be the --

19  *A.*   Does it say 5 up in the corner maybe or --

20  *Q.*   This would be the fourth page.

21  *A.*   Okay.

22     MR. NICKELS:  What page?  Does it say 4 at the

23  top, Greg?

24     THE WITNESS:  No.  You just have to flip through

25  to get to the fourth; right?  Is that what you mean?

1  2, 3 --

2        MR. NICKELS:  What page?  What is the first word?

3        THE COURT:  You can approach and show him.

4        THE WITNESS:  I don't mean to help.

5        THE COURT:  Hold on a second.  You can approach

6  and show him and also show counsel.

7        MR. HAZARD:  Sure.  It starts with:  I agreed.

8        THE WITNESS:  Oh, okay.

9   Q.   BY MR. HAZARD:  I agreed to help him?

10  A.   Yes.

11  Q.   Are you there?

12  A.   Yes, I am.

13  Q.   I agreed to him because I didn't feel like there

14  was any other choice.  That was her statement to you;

15  correct?

16  A.   Yes.  And I know because when I put things in

17  quotes, that means I'm certain that that's what she said.

18  You know, I'm pretty certain.  I try to be very careful

19  about putting quotes around things.

20  Q.   And she then goes on to talk about Joe losing his

21  hair and the effects of cancer and their decision that she

22  claims that Joe and she decided to have this suicide pact

23  where they would obtain poison; correct?

24  A.   Correct.

25  Q.   And, again, she gave you details of that, of

1  everything that she did for Joe to obtain that poison?

2      *A.*   I doubt she told me everything, but she certainly

3  gave me some details.

4      *Q.*   Okay.  She mentioned about October 7th about the

5  dinner she attended; correct?  The party she went to

6  earlier and the dinner later in the evening?

7      *A.*   Just for -- did you flip a page or should we go

8  to the next page?  Because I would like to be able to

9  follow along to what you're pointing to as well as answer

10  your questions.

11      *Q.*   And on Page 7 --

12      *A.*   The one with the No. 7 on it?

13      *Q.*   Yes, the one with the No. 7, she states that on

14  the car ride home, he, meaning Joe, said, quote:  I want

15  to do it tonight, meaning, commit suicide; correct?

16      *A.*   Correct.  I can't find it on here, but I remember

17  her saying that to me.  I remember seeing my notes

18  previously.

19      *Q.*   And, again, maybe not the exact words, but this

20  is also consistent with her trial testimony, to your

21  memory as well; correct?

22      *A.*   Correct.

23      *Q.*   So she's again able to give you details about

24  what started to become the reason she's on death row, the

25  events that led up to her murdering her husband?

1    *A.*   Exactly.  As I explained before, these wouldn't

2   be things we wouldn't expect to have details of, or at

3   least certainly more than in the midst of the worst horror

4   of it.

5    *Q.*   You would agree she had a much harder time

6   talking about that when she was being interviewed by

7   Dr. Pitt?

8    *A.*   About the crime?

9    *Q.*   Yes.

10    *A.*   Oh, yes.

11    *Q.*   Okay.  She also on that same page started talking

12   about how she and Joe got the capsules -- the gel capsules

13   and together on the back patio they put poison in the

14   capsules; correct?

15    *A.*   Correct.

16    *Q.*   She also then, turning the page, started talking

17   about the sexual activity that she had with Joe before the

18   murder; correct?

19    *A.*   Correct.

20    *Q.*   And she gave a number of details about the use of

21   prophylactics and so forth; correct?

22    *A.*   Correct.

23    *Q.*   She talks about, as that page continues going

24   onto Page 8, the next page, about Joe actually taking the

25   poison and waiting for his fate; correct?

1      *A.*    Correct.

2      *Q.*    And, again, that was very consistent with her

3    testimony at trial; is that correct?

4      *A.*    Correct.

5      *Q.*    All right.  She talks about him, continuing on

6    Page 8, remembering Joe throwing up in the living room;

7    correct?

8      *A.*    Again, I don't see it, but I remember her telling

9    me that.  I remember seeing it when I reviewed my notes;

10   correct.

11     *Q.*    All right.  And she also talks about -- she

12   refers to that that's about when she told Joe that she was

13   having an affair or that she had an affair, going onto the

14   next page; correct?

15     *A.*    Can you just -- I want to make sure I understand.

16   Can you repeat that question?

17     *Q.*    Yes.  Going down to the bottom of Page 8 onto the

18   top of Page 9, the next page, that's when she states after

19   he got sick, I told him about Travis, never about Ray;

20   correct?

21     *A.*    Correct.

22     *Q.*    And she's referring to a man she had an affair

23   with; correct?

24     *A.*    Yes, a brief one.  Travis Black I think was his

25   name.  Something like Travis, yeah.

1    *Q.*    So she remembered all of that?

2    *A.*    As would not be unexpected, as I explained

3    before, and as I often explain to military and police

4    investigators about how memory works, yeah, that's not

5    surprising.

6    *Q.*    All right.  Then she starts talking about how

7    angry Joe became.  And this, again, is very much in line

8    with the way she testified in her trial; correct?

9    *A.*    Correct.

10   *Q.*    And that Joe attacked her; correct?  It's still

11   the same page, kind of down in the middle.

12   *A.*    Uh-huh.

13          THE COURT:  Is that a yes?

14          THE WITNESS:  Well, what I want to do is I want

15   to look at the text because I don't know if the word

16   attacked is in there or exactly how she described it to

17   me.

18          MR. HAZARD:  All right.

19          THE WITNESS:  But she was certainly -- she

20   described him as extremely angry in a way that she hadn't

21   encountered before.  I don't -- do you want to point me to

22   where you're --

23   *Q.*    BY MR. HAZARD:  Your notes state the next thing:

24   I don't even want to say this.  He backed me against the

25   wall, busted pots into the wall next to my head, thinking

1   he had hit my head -- or thinking he had hit me.  He had

2   held me down, but nothing like that.  It was crazy.

3   Correct?

4       *A.*   Give me a second to -- I was trying to follow you

5   and I'm just finding it now.  Okay.  Correct.

6       *Q.*   All right.  Then further down, oh, about ten rows

7   up from the bottom, she starts:  Then he was out.  I tried

8   to play it out in my head.  I've had people show me

9   photos, read reports.  Do you see that part?  And that's

10  what she said to you?

11      *A.*   Correct.

12      *Q.*   Then she states two things she knows are not

13  true:  Smothering him with a pillow.  And you write:  And

14  belt; correct?

15      *A.*   Correct.

16      *Q.*   And does that mean or was she referring to her

17  planting the State's evidence that she planted the belt

18  after murdering Joe Andriano?  Is that your understanding

19  of what she was referring to when she mentioned the belt?

20      *A.*   I'm trying to remember back then.  But that

21  sounds plausible, but I can't remember what I thought at

22  the time and my notes don't fully reveal what I -- what

23  that meant.  It's plausible.

24      *Q.*   So she pointed out details of the event and also

25  memories of what she disagreed with that was presented at

1 trial, that was different from her memory?  Is that

2 accurate or her version?

3     *A.*    That was a compound question.  I think there were

4 two parts.  Can you break it down?

5     *Q.*    No, it was a lousy question.  You called me on it

6 and that's fine.  I'll ask it again, Doctor.

7     *A.*    Okay.

8     *Q.*    She pointed out to you that there were things she

9 disagreed with of the State's evidence, arguments made by

10 the State, and this was different from her account of what

11 happened on that night; correct?  Smothering him with a

12 pillow?

13     *A.*    And the belt.

14     *Q.*    And the belt.  Correct?

15     *A.*    Correct.

16     *Q.*    And those are both very distressing things; are

17 they not?

18     *A.*    Well, yeah.  If they happened, I would think that

19 would be -- well, what do you mean those are distressing

20 things?  You described the belt as something that was

21 planted.  So I don't know what you're referring to.  What

22 would be distressing?  The smothering, certainly.

23     *Q.*    Well, she's remembering her husband being a

24 bloody mess and dead; correct?  To conjure up those

25 memories?

1    *A.*    Yeah.  Well, I don't know if that was what she

2    was remembering right there when she was saying two things

3    she knows are not true.  If when she remembers that, as we

4    saw in the videotape, when her brain is full of images of

5    the blood, she breaks down and she can't hardly

6    communicate anything.  So I don't think she was

7    remembering that.  But that would not be consistent with

8    how -- again, how the brain works.

9    *Q.*    She then on the next page, she starts talking

10   about calling 911 and then calling her friend later --

11   calling her friend Chris to come over; correct?

12   *A.*    Correct.  I would also say that one thing she

13   said repeatedly and you can see it in the notes is after

14   that point where she confessed to the affair, she says she

15   has a lot of concerns about her memory and how accurate it

16   is.  She feels like there were so many questions asked of

17   her, she doesn't express confidence in barely anything.

18   But I guess she said she was sure about the pillow and the

19   belt.  But, in general, all of this had the caveat from

20   her of:  I am not sure.  I don't know.  I fear that I

21   could get it wrong.  And something she said about her

22   stepfather, too:  I don't want to say things that aren't

23   true because she's had the experience of an investigation

24   of --

25   *Q.*    Where does she say that, Doctor, in this context

1  of the notes that we just went through?

2      *A.*   I was providing context for the -- for what's

3  going on here because it didn't -- the way you were

4  characterizing it, it wasn't --

5      *Q.*   Dr. Hopper, did she say --

6          THE COURT:  One at a time.  One at a time.

7          MR. NICKELS:  Yeah, I would ask you to let the

8  witness finish his answer.

9          MR. HAZARD:  Nonresponsive, Your Honor.

10          THE COURT:  Ask your next question.

11          THE WITNESS:  I'm sorry.

12          THE COURT:  One at a time.

13      *Q.*   BY MR. HAZARD:  Did she state -- in panic state

14  before throwing up or throw up, he said call 911; correct?

15      *A.*   Correct.

16      *Q.*   She then goes on to state:  Actually, he wanted

17  me to take him.  She's talking about the hospital;

18  correct?

19      *A.*   Correct.

20      *Q.*   That's how he got in the living room and that's

21  why I called Chris because I wanted her to stay with the

22  kids; correct?  That's what she said to you?

23      *A.*   Correct.

24      *Q.*   Then she goes on and says:  After Chris got

25  there, called 911 because he couldn't get up and walk;

1  correct?

2  *A.*  Yes.

3  *Q.*  And then, finally, she says she can't remember

4  what she said in the first of the two 911 calls, but she

5  does remember that the next was much longer; correct?

6  *A.*  Correct.

7  *Q.*  Now these are very minute details of what had to

8  be a very distressing time for her, and, yet, she

9  remembers the length of a second phone call to 911?

10  *A.*  She remembers it was longer.  Time estimation can

11  be --

12  *Q.*  Then she states --

13  *A.*  -- very sensitive.

14  *Q.*  All right.  Then she states that when the EMTs

15  arrive, Joe said, quote:  I don't want that.  She said

16  that; correct?

17  *A.*  That's what she said to me; correct.

18  *Q.*  And he, meaning Joe, didn't want her to open the

19  front door because he thought they would want to, it says

20  check him, meaning take him to the hospital; correct?

21  *A.*  I think check him would be to determine whether

22  he needs to go to the hospital.

23  *Q.*  Sure.

24  *A.*  But, you know, look at him.  They're EMTs.  Sure,

25  check him out.

1    *Q.*    Sure.  And that was her statement to you?

2    *A.*    Correct.

3    *Q.*    Again, this was all -- she was just doing what

4    Joe was telling her to do and giving specific details

5    consistent with her testimony at her trial; correct?

6    *A.*    She was attempting to give me the best memory she

7    could of the events, while giving me the caveat at the

8    beginning was she was shaky about her confidence in these

9    things.

10    *Q.*    And you would agree that the testimony of her

11    friend Chris was much different; correct?

12    *A.*    Correct.

13    *Q.*    And, in fact, Wendi, in another context later

14    mentioned to you that Chris let down.  Do you remember her

15    saying that to you in a different interview?

16    *A.*    Something like that.  I don't -- you know, I

17    would want to see the exact thing to really confirm it.

18    *Q.*    Sure.

19    *A.*    But I remember that, something along those lines.

20    *Q.*    Do you remember her saying that Chris was

21    probably going to get fired from her job and Wendi saved

22    her job, and, yet, she turned on me at trial?  Do you

23    remember that conversation?

24    *A.*    I remember something to that effect, yeah.

25    *Q.*    She then -- still on Page 9; right?

1    *A.*    Hang on.  The one that has the 9 in the corner of
2    it?

3    *Q.*    Yes.  About two-thirds of the way down, she
4    states:  They were saying there were so many blows to the
5    back of his head, but it wasn't that way.  Correct?  She
6    said that to you?

7    *A.*    Well, you're leaving out the second half of that
8    statement.

9    *Q.*    No, I will finish it.  But she said that to you?

10    *A.*    Oh, okay.  She did.

11    *Q.*    It was my attempt to help him; correct?

12    *A.*    Correct.  If I could --

13    *Q.*    So she remembers from her trial the evidence that
14    was presented that Joe had at least 23 blows to the back
15    of his head from that barstool; correct?  That's what
16    she's referencing?

17    *A.*    The evidence from her trial, yes.

18    *Q.*    And that's what she's referencing, and she's
19    telling you that it wasn't that way?

20    *A.*    Well, but if you put it together with that second
21    one, I can explain.  And I was there and I heard her say
22    this to me what she actually meant.  So it's not -- it's
23    not the way you're interpreting it.  And I could clarify
24    what my understanding is of what it means.

25    *Q.*    Sure.  I suppose one way she could be stating it

1  is that it was 23 blows to the head and that's what it
2  took to kill him.  Is that one way to interpret it?  In
3  order to help him?

4      A.   She remembers -- yeah, she remembers -- my memory
5  of this what she said to me was that she remembers him
6  suffering from the other blows that she had given him and
7  just trying to get it over with.

8      Q.   And, Doctor, I agree with your interpretation
9  because the very next line, she states:  Not like in the
10 books and TV; correct?

11     A.   That's pretty much what everybody I've ever
12 interviewed who's murdered someone says:  It's not like
13 TV.

14     Q.   Oh, my God, that didn't work.  That's her next
15 statement to you; correct?

16     A.   Yes.

17     Q.   I have to do that again.  So she was referring to
18 hitting Joe -- defenseless Joe over the head with the
19 barstool again?

20     A.   Yeah.

21     Q.   That's your understanding?

22     A.   Yes.

23     Q.   And you don't think that's a distressing fact
24 that she remembered?

25     A.   Yeah.  There's this paradox in the way traumatic

1    memories work.  On the one hand, they can be etched in

2    very, very strongly.  We know the neurochemistry of that.

3    And, on the other hand, they can sometimes be

4    inaccessible.

5            And even when they're etched in very strongly --

6    again, this is something I have to teach investigators all

7    the time -- traumatic memories are encoded as fragmentary

8    sensations.  They lack context.  They lack time

9    information and they're missing lots of pieces.  So this

10   is perfectly consistent with that.  Certain pieces can be

11   well-encoded, where others can't, and then there can be

12   distortion.

13           As I said, all of this, she said there were

14   things she wasn't sure of.  So it's consistent with how

15   memory works in these situations, definitely, and how

16   traumatic memory gets encoded and retrieved from the

17   brain.

18       Q.   All right.  The point is, though, she said all of

19   these things to you on September 1st, 2010, or you would

20   not have documented them; correct?

21       A.   Correct.

22       Q.   And you documented them accurately to the best

23   of your ability?

24       A.   Exactly, the best I could.  You know, I'm a

25   note-taker.  I'm not a stenographer.  But, you know --

1     *Q.*    Sure.  You didn't video- and audio-record these

2     interviews; is that correct?

3     *A.*    No, I did not.

4     *Q.*    But as you've testified today, these are as

5     accurate as you could by taking notes of her statements?

6     *A.*    Yes.

7     *Q.*    And that is markedly different than the

8     information she gave to Dr. Pitt just three years later

9     in November of 2013; correct, with that same incident?

10    *A.*    Yeah, not surprisingly if you look at how he

11    conducted the interview.  I mean, it's not one that would

12    lead to someone being able to retrieve information.  It's

13    kind of actually a textbook case of how to not interview

14    for traumatic memory that I could use to teach the

15    investigators that I teach.

16    *Q.*    Well, we'll hear from Dr. Pitt at the end and the

17    judge can decide.

18    *A.*    Yeah.  Yeah.

19    *Q.*    Now you would agree that Alejo Ochoa is immature?

20    In fact, I think you testified to that earlier today?

21    *A.*    Yeah, I mean, there's no one who doesn't say that

22    about Alejo who's met him.

23    *Q.*    In fact, Wendi repeatedly has said to you and

24    others that she felt she had babied him.  If fact, she

25    used the term babied him a lot in how she related to

1 Alejo Ochoa; correct?

2     *A.*    Yeah, it was the term in the family, babying him,

3 babying him.

4     *Q.*    Well, and it's a term that Wendi used herself?

5     *A.*    Oh, yeah.

6     *Q.*    Did she also tell you that she doesn't remember

7 Alejo ever being in bed with her and another friend at the

8 same time; correct?

9     *A.*    She did, yeah.  She told me she didn't remember.

10 Even when we gave her -- at the very last stage, we tried

11 to give her the details that Jeri Lynn reported, and she

12 still couldn't remember it.

13     *Q.*    Did she also say in one of her interviews that,

14 quote:  She didn't live her life in fear of spankings by

15 either Donna or Alejo?

16     *A.*    She did say that.

17     *Q.*    Do you remember her saying that?  Is that yes?

18     *A.*    Yes.

19     *Q.*    And Wendi said that spanking wasn't an everyday

20 occurrence, maybe twice a week that she can recall on

21 average; is that accurate?

22     *A.*    But not just her, but Alejo and Donna described

23 her as overall very compliant and not needing to be beaten

24 very often, is the way they put it.

25     *Q.*    And you use the term beating, but Alejo and Donna

1   and Wendi all used the term spanking; is that accurate?

2       *A.*    No.  They used the term swatting.

3       *Q.*    All right.  You don't think Wendi has used the

4   word spanking as well?

5       *A.*    Not that I remember.  It was a swat, swats.  I

6   might have -- it might be somewhere in there.  But

7   swatting was the term that was used in the cult to

8   describe these beatings.  Even if it was 15 beatings, you

9   know, 15 hits with a huge paddle, they called it swats.

10      *Q.*    Did Wendi spank her own children?

11      *A.*    Not that I'm aware of.

12      *Q.*    She denied that; right, in your interviews with

13  her?

14      *A.*    I don't remember that specific exchange.  If you

15  want to point me to it.

16      *Q.*    Do you have a difference of memory?  Did she

17  ever -- do you remember her ever admitting to spanking or

18  using any form of corporal punishment on her own children?

19      *A.*    I don't remember that, no.

20      *Q.*    Didn't she tell you that she was against that and

21  that's not something she did?

22      *A.*    That sounds right, but, you know, 52 hours, it's

23  hard to remember everything.

24      *Q.*    Okay.  And that's also consistent with what

25  others told you, including Donna, that Wendi didn't spank

1  her kids?

2      *A.*   I don't remember if Donna told me that.  If you

3  want to show me the notes.

4      *Q.*   And you uncovered absolutely no evidence that

5  Wendi sexually abused her own children in any way?

6      *A.*   Right.  There is no evidence of that.

7      *Q.*   There is no suggestion of that?

8      *A.*   No.

9      *Q.*   Based on your investigation, Wendi in practice

10  rejected the teachings of her church and even her own

11  experiences because she did not include corporal

12  punishment of her own children; correct?

13      *A.*   Well, that was again one of those compound

14  statements.  And I don't think everything in it was

15  accurate, so you might need to break it down.

16      *Q.*   All right.  She didn't spank her kids?

17      *A.*   Correct.

18      *Q.*   She didn't use a paddle?

19      *A.*   Correct.

20      *Q.*   Or a wooden spoon?

21      *A.*   Correct.

22      *Q.*   Or a belt?

23      *A.*   Correct.

24      *Q.*   She made it very clear she was against that, and

25  you uncovered no evidence to the contrary to say that she

1  was lying about that; correct?

2      *A.*   Correct.

3      *Q.*   All right.  And, yet, she grew up -- your

4  testimony is she grew up in this environment where she was

5  spanked and swatted with a belt, a paddle, a wooden spoon;

6  correct?

7      *A.*   Correct.

8      *Q.*   By her own parents?

9      *A.*   Yeah.  And the monitors and the principal and the

10  cult leader.

11      *Q.*   Right.

12      *A.*   Sure.

13      *Q.*   But she did not do that with her own children?

14      *A.*   Asked and answered.  I mean, I don't know.  Is

15  there some other -- something else you're trying to ask

16  me?  I really don't know.

17          THE COURT:  No.  Go ahead and answer the

18  question.

19          THE WITNESS:  I already said no.

20      *Q.*   BY MR. HAZARD:  So she did not have any sort of

21  automatic response because she was abused and then

22  inflicted that -- carried on that abuse to her own

23  children; correct?

24      *A.*   No.  Because what she did, which many children

25  do, is instead, they respond to this kind of abuse by

1    being a compliant caretaker.  And so that would play out

2    in doing what Alejo wanted sexually and it would play out

3    in trying to be caring toward her own kids and taking care

4    of -- you know, trying to care for other people, in

5    general.

6          That was her MO was to try and care for other

7    people so they wouldn't get angry at her and abandon her

8    and attack her.  So I wouldn't expect to see anything

9    different.  But that was a response that was shaped by the

10   beatings.

11   Q.    You mentioned a couple of instances that you

12   thought were strongly suggestive of that Wendi had been

13   sexually abused as a child.  And I'm referring to the

14   incident that Donna Ochoa reported at day care in the

15   bathroom with the other kids; correct?

16   A.    It was more than one incident.  She got called on

17   two separate occasions.

18   Q.    In two incidents; right?

19   A.    Correct.

20   Q.    And, also, wetting the bed when she shared the

21   bed with her parents?

22   A.    I said that is consistent with, but not per --

23   you know, not certainly.

24   Q.    All right.  Now, again, both of these incidents

25   that were reported by Donna Ochoa, you have no other

1   evidence?  No one else talked about these particular

2   incidents but Donna; correct?

3       *A.*   That's correct.

4       *Q.*   And even -- and Donna wasn't completely specific

5   about what happened in the bathroom when Wendi was four

6   years old in the preschool?  Just that she was with other

7   similarly aged children in there and they were apparently

8   comparing each other private parts; correct?

9       *A.*   No, no, that wasn't it at all.

10      *Q.*   Well, did she tell you that they were acting out

11  a sexual act?

12      *A.*   Yes.

13      *Q.*   What's that sexual act that she told you?

14      *A.*   She didn't tell me one.  If you remember my

15  testimony, she didn't say there was a specific.  What I

16  said was it wasn't -- that the day care people had told

17  her that it wasn't your typical show me yours, I'll show

18  you mine.  It was something that they found very

19  concerning and alarming.  It was not age appropriate or

20  usual sexual touching, so that they were so concerned that

21  they threatened to boot her out of there.  I wish they

22  had referred her to --

23      *Q.*   Were the police called?

24      *A.*   No.  I wish they would have.  And it's a tragedy.

25  If --

1      Q.    Doctor, are you telling me that four-year-olds

2    playing doctor is proof of that they've been sexually

3    abused?

4      A.    Of course not.  I just explained why that's not

5    what I'm saying.

6      Q.    Isn't that perfectly natural behavior for

7    four-year-olds to be engaged in who have never been

8    subject to any form of abuse?

9      A.    I just explained how what you're saying is not --

10   no, no, of course not.  No, I'm not because I just

11   explained that they told her it was not age appropriate

12   behavior.

13     Q.    This is coming from Donna; correct?

14     A.    Yes.

15     Q.    Not from anyone at the day care; correct?

16     A.    This is how she described what they said to her.

17     Q.    All right.  And Donna never said specifically

18   what the act was; correct?

19     A.    Donna didn't want to know such things.

20     Q.    Did she tell you the act, Doctor?

21     A.    No.  I've already explained to you what she told

22   me.

23     Q.    Right.  Isn't it perfectly natural for

24   four-year-olds to be curious about their own sexuality,

25   their body parts?

1    *A.*    In my own testimony, I said that.  And I said

2    this was not -- as described by Donna, this was not in

3    that category.  So I don't --

4    *Q.*    You also said that --

5    *A.*    I don't know how many times I can say this.

6         THE COURT:  One at a time.  One at a time.

7         THE WITNESS:  I said it repeatedly.

8    *Q.*    BY MR. HAZARD:  You said after the two incidents,

9    Wendi never repeated it again, whatever it was?

10   *A.*    Not that anyone reported it.  That's a big

11   difference between she never did it and no one ever

12   reported it.  She was quite neglected and who knows.  But

13   it sounds like she didn't do it at that day care and get

14   caught, anyway.

15   *Q.*    Dr. Hopper, didn't you write in your report,

16   quote:  In addition, that Wendi appears to have stopped

17   engaging in those behaviors after being admonished by day

18   care staff and her mother, parentheses, and perhaps beaten

19   by her mother, would be consistent with sexual abuse of

20   Wendi having ended at least for a time, and then you go

21   on; correct?

22   *A.*    Oh, yeah.

23   *Q.*    That's your opinion; correct?

24   *A.*    It was an opinion where I was clear that I was

25   saying perhaps, and that knowing what I knew about Donna

1   and how they raised her and Donna's own admissions for how

2   she beat her, that was a plausible way to understand how

3   she stopped.  But, you know, I wasn't for sure.

4      Q.   And based on -- based on that, if what Donna said

5   was true, Wendi never did it again after being told it was

6   wrong?  That's your understanding; correct, whatever it

7   was?

8      A.   That was -- you know, that was the most plausible

9   explanation that I have of the evidence that I have, yeah.

10     Q.   All right.  Which proves that even at age four,

11  Wendi was able to conform her conduct to what people were

12  telling her was wrong; correct?

13     A.   Oh, sure.  I never said she wasn't.  She was

14  quite compliant with people and what people told her to

15  do, actually, as I've repeated.

16     Q.   And that wetting the bed incident is the only the

17  incident of bedwetting that you have any knowledge of;

18  correct?

19     A.   Correct.  And, well, I wouldn't call it an

20  incident.  It sounded like it was more than one time.  It

21  was a -- it went on for a while.  She didn't say she wet

22  the bed once.  She said she started wetting the bed, I'm

23  pretty sure was the language.

24          I can remember that was the meaning that I had,

25  that it wasn't just that she wet the bed one time.  You

1   know, how many parents would remember if your kid just wet

2   the bed one time at age four and-a-half?  It's when your

3   kid starts wetting the bed repeatedly, that's what's

4   memorable.

5        Q.   All right.  And, again, that is also very common

6   behavior by kids of that age to wet the bed, even those

7   who have not been abused; correct?

8        A.   As I said in my direct testimony, yes, it's a

9   common.  It's also a common response to sexual abuse.  And

10  it's uncommon for it to suddenly start at age

11  four and-a-half.

12       Q.   Is that your medical opinion?

13       A.   That's what I've -- that's what I've learned.  I

14  mean, I'm not a pediatrician.  I have two kids who are six

15  and eight.  I kind of went through some of that stuff and

16  learned some things along the way.  But that's my

17  understanding from years of experience, but I haven't

18  specialized in bedwetting, no.

19       Q.   Let's talk about Myla Young's report and

20  assessment of Wendi Andriano because you refer to that in

21  your report; correct?

22       A.   Correct.

23            MR. HAZARD:  And if I may approach, Your Honor.

24            THE COURT:  Yes.

25            MR. HAZARD:  January 4, 2011.

1    *Q.*   BY MR. HAZARD:   January 4, 2011, you interviewed

2    Ms. Andriano; is that correct?

3    *A.*   It sounds correct.   I'll see the date when you

4    give it to me.   Yeah, I remember that date.

5          MR. HAZARD:   And this is, for identification

6    purposes, Exhibit No. 220.

7          May I approach the witness, Your Honor?

8          THE COURT:   Yes.

9    *Q.*   BY MR. HAZARD:   And that is your notes of the

10   January 4, 2011 interview with Wendi Andriano?

11   *A.*   Yes.

12   *Q.*   All right.   And about halfway down, you have this

13   section of the interview, testing with Myla, and that's

14   obviously Dr. Myla Young; correct?

15   *A.*   Correct.

16   *Q.*   And Wendi said that she hated the testing?

17   *A.*   Yeah.

18   *Q.*   Yes?

19   *A.*   Yes.   I'm sorry.

20   *Q.*   She told you that the first test that Wendi

21   recalled was the, quote, ugly ink blob thing; correct?

22   *A.*   Correct.

23   *Q.*   And that's the Rorschach?

24   *A.*   Rorschach, yes.

25   *Q.*   And she told you that she felt like she was being

1    judged?

2        *A.*   Correct.

3        *Q.*   And with each test that Dr. Young administered,

4    she had that same feeling of being judged; correct?

5        *A.*   I don't know if every single one, but certainly

6    the overall experience in most of them from my memory.  I

7    could review the notes, but I don't know about every

8    single one.  There's probably some innocuous ones.

9        *Q.*   Well, you wrote the fourth bullet point down from

10   testing on Myla, at first excited?

11       *A.*   Uh-huh.

12       *Q.*   Do you see that?

13       *A.*   Yes.

14       *Q.*   And then she talks about the Rorschach exam.  And

15   then after the ellipses, she states:  Felt like being

16   judged, and each test had that feeling.

17       *A.*   Oh, okay.

18       *Q.*   Is that correct?

19       *A.*   Correct.

20       *Q.*   All right.  She later says that the Delayed

21   Memory Test felt like she was being tricked or trapped?

22       *A.*   I don't see it, but I remember that.

23       *Q.*   It's on the very next page at the top.

24       *A.*   Yes.

25           MR. NICKELS:  Greg, when you're going to go to

1    the next page, if you just wouldn't mind letting us know,

2    it would be a little easier to follow along.

3              MR. HAZARD:  All right.

4              MR. NICKELS:  Thank you.

5        Q.   BY MR. HAZARD:  During that section of talking

6    about the Delayed Memory Test, Ms. Andriano talked about a

7    number of distractions including the noise from a

8    corrections officer's radio; correct?

9        A.   And the dropping of the coins; correct.

10       Q.   And dropping coins; correct?

11       A.   Correct.

12       Q.   And Wendi Andriano's statement was after all of

13   these years in this environment, which meaning prison;

14   correct?

15       A.   Correct.

16       Q.   To have someone doing something behind me was

17   wigging me out.  That's what she told you; correct?

18       A.   Correct.

19       Q.   All right.  And then about halfway down that same

20   page, the Gambling Task Test, she talked to you about

21   that; correct?

22       A.   Correct.

23       Q.   She stated she wanted to give up?  Yes?

24       A.   Correct.

25       Q.   She thought to push the money losing option just

1  to get it over with; correct?

2      *A.*   Yeah.  And this is actually how that task works.

3  If you -- if you -- it shows a breakdown of decision

4  making under stress and she's just making a bad decision

5  just to try to get it over with --

6      *Q.*   Sure.

7      *A.*   -- because she's stressed and doesn't have those

8  prefrontal cortex functions working too well.

9      *Q.*   It could also mean that she's telling you she

10  deliberately did not put forth her best effort because she

11  was being frustrated?

12      *A.*   That's how the test works.  That's part of how

13  the test works.  It's designed to look at decision making

14  processes.  And, yes, so she's telling me that she did

15  very badly on the test and by impulsively trying to get it

16  over with, yes.

17      *Q.*   But she tells you she intended to do that?  She

18  thought to just do it deliberately to get it over with;

19  correct?

20      *A.*   Correct.  And --

21      *Q.*   Meaning, that she would not be using her best

22  effort on that test; correct, Doctor?

23      *A.*   As I tried to explain, this test in particular is

24  designed to elicit these kinds of impulsive decisions as a

25  test of someone's ability to not make bad decisions and

1    just try and get things over with.

2        *Q.*    Right.

3        *A.*    So it's not a manipulation.  It's actually valid

4    data that this very test is designed to collect on

5    breakdown of decision making when and people's inability

6    to measure punishments versus rewards or bad things versus

7    trying to quickly escape from them in an impulsive way.

8            So it's not accurate to say that there was some

9    sort of -- in this task, that there was some sort of -- I

10   forget your phrase.  But whatever it was, it doesn't

11   accurately describe what she was doing here or how this

12   test works.

13       *Q.*    All right.  And then going onto the very next

14   page at the top, she had been talking about the third day

15   of testing and she continues talking about the third day

16   of testing; correct?

17       *A.*    Uh-huh.

18           THE COURT:  Is that a yes?

19           THE WITNESS:  Yes.  I'm sorry, sir.

20       *Q.*    BY MR. HAZARD:  And she says:  I had a meltdown

21   and refused to do it.  She, meaning Dr. Young, tried to

22   make me do it and I refused; I was angry; correct?

23       *A.*    Meltdown.  I don't see the word angry on there.

24       *Q.*    Refused to do it.  And then a couple of sentences

25   down, I was angry.  The angry line --

1      *A.*   Oh, yeah.  Okay.  Yeah, yeah.  I felt my ears get
2   hot and I was angry.  Yeah.  Okay.
3      *Q.*   And, again, that could be evidence that she
4   wasn't putting forth her best effort because she was
5   angry; correct?
6      *A.*   No.  No.  I don't see it that way.
7      *Q.*   All right.
8      *A.*   I think that's reading an awful lot and it
9   doesn't -- it's not consistent with how these tests work,
10  just as I tried to explain on the last one.  It's evidence
11  actually of strong emotions getting activated and her
12  executive functioning breaking down.  That's what it's
13  evidence of.
14     *Q.*   Sure.
15     *A.*   And that's one of the things these tests are
16  supposed to formally assess for.  And we see it here in
17  the testing and what I've been talking about all day.
18     *Q.*   And the overreaching theme on this that she keeps
19  telling you is that she felt that she was being judged and
20  she related that to other instances in her life; correct?
21     *A.*   Yes.
22     *Q.*   Now you mentioned that in your opinion that
23  Ms. Andriano has a cognitive deficit related to executive
24  functioning; correct?
25     *A.*   Correct.

1    *Q.*   And in layman's terms, that's like thinking on

2   your feet.   Is that at least responding to stressful

3   situations and having to make quick decisions?

4    *A.*   Yes.

5    *Q.*   Showing -- exercising good judgment; correct?

6    *A.*   That doesn't fully capture it.   So I would like

7   to clarify.

8    *Q.*   Well, you can do it on redirect.   Am I --

9    *A.*   The results of the neuropsyche testing were more

10  complex than what you -- what you were describing in terms

11  of executive functioning.   So I don't think what you're

12  saying accurately captures the results of the neuropsyche

13  testing.

14   *Q.*   All right.   When you were discussing her first

15  job -- Ms. Andriano's first job as a leasing agent -- and

16  this is in the same interview.

17   *A.*   The next page.

18   *Q.*   Ms. Andriano stated that:   I am the worst

19  procrastinator.   If I don't have pressure, I won't do it.

20  I wait for the last minute.   Do you remember her telling

21  you that?

22   *A.*   Yes, I do.

23   *Q.*   Okay.   And then she also told you, quote:   If I

24  don't have pressure on me, I won't be motivated or

25  interested enough to do anything; is that correct?

1    *A.*   That's correct.

2    *Q.*   And that was in the context of her first job as a

3    leasing agent?

4    *A.*   Correct.

5    *Q.*   And this is also the interview where she said

6    that Chris had turned on her at trial; correct?

7    *A.*   I don't know.  Do you want to refer me to the

8    page for that?  I'm not disbelieving you, but just off the

9    top of my head, I don't know.  Yeah, I see it.  It's on

10   Page 4, like 4 and-a-half, the back side of Page 4.

11   *Q.*   You came back and interviewed Ms. Andriano the

12   very next day on January 5th of 2011; is that correct?

13   *A.*   That sounds right, yes.

14   *Q.*   And I'll show you January 5th, 2011, which should

15   be No. 221.

16          MR. HAZARD:  May I approach the witness,

17   Your Honor?

18          THE COURT:  Yes.

19   *Q.*   BY MR. HAZARD:  And Exhibit No. 221, that is a

20   copy of your notes on that January 5, 2011 interview of

21   Ms. Andriano; is that correct?

22   *A.*   Correct.

23   *Q.*   Now turning to the second page of that document,

24   you began talking -- you have about halfway down a section

25   buying bras.  Do you see that?

1      *A.*   Yes.

2      *Q.*   All right.  And you mentioned the first thing in

3   that is:  Laura's mother took her.  What do you remember

4   Ms. Andriano referring to with that note, Laura's mother

5   took her?

6      *A.*   I think that Laura's mother took her to buy bras,

7   her and Laura.

8      *Q.*   Who is Laura?

9      *A.*   Her friend at the time, Laura Bell.  I think she

10  has another last name now.

11     *Q.*   Okay.  And the very next sentence is:  Donna

12  bought her, meaning Ms. Andriano, very covering-up, in

13  quote, bras, very conservative; is that correct?

14     *A.*   Yeah.  The ones Donna bought, yeah.

15     *Q.*   Right.  But then Wendi tells you that:  I wanted

16  to wear bras like Laura; correct?

17     *A.*   Yeah.  Yes.

18     *Q.*   She got used to wearing the bras that her mom

19  liked, but Wendi made it clear that's not the type of bras

20  she wanted to wear?

21     *A.*   That's what she said, yeah.

22     *Q.*   And she states:  I remember my dad saying you can

23  just go without a bra and he encouraged her; correct?

24     *A.*   Yes.

25     *Q.*   And then she states:  There was always this big

1   tug-of-war between my mom and my dad; right?

2       A.   Correct.  Over what kind of clothing she would

3   wear --

4       Q.   Sure.

5       A.   -- revealing or sexy or whatever it was.

6       Q.   And you made your testimony very clear that you

7   think that is evidence suggesting that Alejo Ochoa had

8   sexually desired Wendi and, therefore, was likely to

9   engage in sexual abuse of her; correct?

10      A.   I mean, I saw that an example of, you know,

11  sexualization, sexual exploitation, sexual abuse, in your

12  words, depending on how you want to define them for --

13  but, yes, I saw that as an example, having your young

14  eight, nine, ten-year-old daughter dress up in lingerie

15  and taking photographs of her, yeah, sure.

16      Q.   Well, Laura was wearing bras?  Her friend, Laura?

17      A.   Yes.

18      Q.   And so was Wendi?

19      A.   Yes.  But, you know, sometimes maybe she

20  didn't wear a bra.

21      Q.   Was she wearing a bra at eight and nine years old

22  there in the context, do you think, or was she talking

23  about later in life?

24      A.   Well, you know, this is an interesting question

25  because kids who are -- girls who experience a lot of

1  abuse, especially sexual abuse, tend to go through puberty

2  earlier.  I don't remember when she did.  So she could

3  have developed breasts earlier due to the trauma.  It

4  wouldn't be unusual.

5      *Q.*  Is there anything in your notes to indicate that

6  she was eight or nine?

7      *A.*  Umm, no.  I don't remember when she was --

8  exactly when she was friends with Laura.  It's in -- we

9  could look at the declaration of Laura and see.  I think

10  it's always in the first paragraph when they were friends.

11  So we could get that information.  I wouldn't want to

12  speculate.  I rather be dealing with, you know, what

13  evidence we have.  I don't know exactly how old she was.

14      *Q.*  Okay.

15      *A.*  Can I request that document or am I just going by

16  memory?

17      *Q.*  The point is Wendi wanted to wear bras more like

18  her friend was wearing, however old she was; correct?

19      *A.*  Yes.

20      *Q.*  All right.  And you mentioned about this story of

21  Alejo Ochoa taking Wendi to Frederick's of Hollywood to

22  shop for bras; correct?

23      *A.*  I mentioned it and I showed Wendi retrieving that

24  memory and going, uh, ah-ha in a startled way.  Yes, I

25  talked about it and demonstrated that.

1    *Q.*   Okay.  So based on this interview, isn't it
2  possible that Alejo Ochoa just took Wendi to get the bra
3  because that's what Wendi wanted to be like her friend?
4  Not because he had some sort of sexual perversion.  It was
5  just he wanted to make his daughter happy?

6    *A.*   I mean, to look at all of the evidence before us
7  and everything I've just presented today and draw that
8  conclusion, I don't see how anybody could support that
9  conclusion.  It's utterly implausible.

10    *Q.*   Are there any instances -- other instances where
11  Alejo Ochoa made it very clear that he wanted to keep
12  Wendi happy and do things for her that her mother wouldn't
13  do, like buying the bra she wants, for example?

14    *A.*   Yeah.  It's -- it's not quite like that.  The way
15  you're presenting it isn't really -- it's leaving out so
16  much that Wendi wanted -- I quoted to you how Wendi said
17  she wanted to please her dad.  She did it for her dad.
18  She was in this incestuous relationship taking care of her
19  dad, rubbing his legs for hours, and, you know, doing that
20  with her friends.  She wanted to please her father.  And,
21  sadly, her father wanted her to do these sexual things to
22  please him.

23    *Q.*   That's your opinion?

24    *A.*   Well, that's based on the evidence that I have,
25  yes.

1    *Q.*   Wendi was closer to her father than she was to
2  her mother; correct?
3    *A.*   You could say that, yes.
4    *Q.*   In fact, after she murdered her husband, whom did
5  she call?
6    *A.*   Yeah, her father.
7    *Q.*   Because she was in trouble and needed help;
8  correct?
9    *A.*   Correct.
10   *Q.*   Do you think she did that to please her father --
11   *A.*   No, of course not.
12   *Q.*   -- or to seek his help, his assistance?
13   *A.*   Well, of course it would be to seek his help,
14  yes.  That's obvious.
15   *Q.*   Because she trusted him?
16   *A.*   What do you mean by that?
17   *Q.*   Well, she called him?  In the biggest time of her
18  need, she just murdered her husband, and she called her
19  father; correct?
20   *A.*   It's pretty sad that's who she had to turn to in
21  her time of need, yeah.
22   *Q.*   Well, and he tried to help her; didn't he?
23   *A.*   He tried.  He's not a very competent guy.
24   *Q.*   Sure.
25   *A.*   I don't know what he did, but I doubt it was all

1   that helpful.

2       *Q.*   He tried to fabricate evidence to help her;

3   correct?

4       *A.*   I don't know, but that wouldn't surprise me.

5       *Q.*   That was what came out at trial; correct?

6       *A.*   Yeah.

7       *Q.*   And isn't it a fact that in one of your

8   interviews with Wendi, she brought up the fact that Donna

9   told her Alejo was going to lie and say he abused Wendi so

10  she could get off death row?  Do you remember Wendi

11  telling you that?

12      *A.*   Oh, absolutely.  I remember her saying she was

13  disgusted by that --

14      *Q.*   Right.

15      *A.*   -- and horrified that he would say that.  She

16  didn't want that kind of help from him.

17      *Q.*   In fact, Wendi stated that she heard from her

18  father, from Alejo, that he told her he would be willing

19  to do anything to help her; correct?  That was her quote

20  to you?

21      *A.*   Yeah, but, you know, she --

22      *Q.*   That was what she said?

23      *A.*   Yeah.  He would want to lie and do whatever else

24  someone disturbed like that would do in a court of law.  I

25  mean, yeah.

1    *Q.*   And she said that she found it revolting and told

2   him:  I don't want you to lie for me; correct?

3    *A.*   Yeah.  With fathers like that, who needs enemies?

4   You know what I mean?  Yeah.

5    *Q.*   You made references to photographs.  In your

6   interview on June 8, 2010, Wendi denied ever seeing any

7   pornography in her home at any point; correct?  That was a

8   topic that you wanted to cover.

9    *A.*   Are we going to be going through those notes?

10  Because I would like to have them if you're going to refer

11  to them.

12   *Q.*   That's the only question that I have on June 8,

13  2010.  Do you remember covering that topic to see if there

14  was any pornography -- memories of pornography in the

15  home, and Wendi said:  No, there was never pornography in

16  the home?

17   *A.*   Yeah.  She just remembered the Frederick's of

18  Hollywood catalog behind the couch.

19   *Q.*   Do you remember consider that pornography?

20   *A.*   No.

21   *Q.*   You mentioned an incident involving the shower

22  that Jeri Lynn Cunningham talked to you about; correct?

23   *A.*   Umm, a shower and Jeri Lynn?  I don't think so.

24   *Q.*   All right.

25   *A.*   It might have been Krye.

1    *Q.*    What about --

2    *A.*    Oh, oh, oh, in the notes where they poured the

3    water over?

4    *Q.*    Yes.  And Wendi mentioned an incident as well;

5    correct?  The same incident involving Jeri Lynn?

6    *A.*    I remember Wendi telling me about how they had --

7    in return for Alejo doing a prank to them, they were

8    throwing cold water.  They did it to him, and then it was

9    okay for him to do it, but not them.  I don't remember if

10   I talked to Jeri Lynn about that.  If you want to show me

11   my notes, I would be happy to look at that.

12   *Q.*    But you do remember talking to Wendi about that?

13   *A.*    I do.

14   *Q.*    And she told you that there was a time when Alejo

15   played a prank on them by pouring cold water while

16   Jeri Lynn and she were taking a shower in their bathing

17   suits; correct?

18   *A.*    Oh, oh, okay.  They're very different things.

19   Actually, you're confusing two events.  One was something

20   that happened in Wendi's house where Alejo poured water

21   into it.  The one when they were in their bathing suits.

22   So they would have been naked in the shower when he did

23   that at their house.  So Alejo went in while they were

24   taking a shower naked and poured water.

25   *Q.*    Do your notes say naked anywhere?

1    *A.*   Well, I mean, they were.  But the bathing

2    suits -- when she specifically told me about the bathing

3    suits, that was when Jeri Lynn went with them to

4    California and they were on the beach and --

5    *Q.*   Well, Doctor, let me --

6         THE COURT:  One at a time.  One at a time.

7         THE WITNESS:  I'm just saying there's two

8    separate events.

9         THE COURT:  One at a time.  Ask your question,

10   and then wait until he finishes.

11        Go ahead.

12   *Q.*   BY MR. HAZARD:  Jeri Lynn's account was that this

13   occurred in California, this incident; correct?  Cold

14   water with two girls --

15   *A.*   Two incidents.  Two incidents.

16        THE COURT:  Wait, wait.

17        THE WITNESS:  Oh, I'm sorry.  I've got to wait to

18   answer.

19        THE COURT:  One at a time.

20        THE WITNESS:  I'm sorry.  Okay.

21   *Q.*   BY MR. HAZARD:  That Jeri Lynn told you an

22   incident in the shower involving cold water that happened

23   in California; correct?

24   *A.*   I don't want to answer any more questions until

25   you show me my notes because I know there were two

1  incidents involving a shower, and I want to be clear that

2  I'm not agreeing to things that aren't true and things

3  aren't being mischaracterized.  So I don't feel

4  comfortable answering questions about this without my

5  notes that he's referring to.  It's asymmetrical.

6      Q.   Well, you mentioned Jeri Lynn Cunningham in your

7  report; did you not?

8      A.   Yes.

9      Q.   And that's the incident I'm talking about.

10     A.   Again, what do you mean by the incident, because

11 at the beginning you put two things together?

12     Q.   In California.

13     A.   The incident in California?

14     Q.   Correct.

15     A.   Okay.

16     Q.   And then Wendi talked to you about the shower

17 incident that she remembers occurring at their home on

18 Cedar Street; correct?

19     A.   Correct.  I think Wendi might have talked about

20 the thing in California, too.  It's a separate incident.

21 Again, without my notes, you know, it's kind of gray.

22     Q.   I would be happy to show you your notes, Doctor.

23     A.   Yeah, that would be great.

24     Q.   So you don't remember without looking at them?

25     A.   52 hours worth of notes?  I mean, I'm not savant

1   in that way, no.

2          MR. HAZARD:  This is Exhibit No. 222, Your Honor.

3   May I approach the witness?

4          THE COURT:  Yes.

5     *Q.*  BY MR. HAZARD:  The February 11, 2011 interview.

6     *A.*  Okay.

7          MR. NICKELS:  Hold on one second, Greg.  We may

8   not have this one.  February 11th?

9          THE WITNESS:  It would be the second day I think

10  of 4/11, 12 and 13.  So they may be clustered into one.

11         MR. NICKELS:  What is this?

12         THE WITNESS:  4/11/11.

13         MR. ARNTSEN:  Oh, April 11th?

14         MR. NICKELS:  Oh, it's April 11th?  You said

15  February 11th.

16         THE COURT:  When you said February 11th, did you

17  mean April 11th, Mr. Hazard?

18         MR. HAZARD:  I'm sorry.  April 11th.

19         THE COURT:  Okay.  So we're referring to

20  Exhibit No. 222 for identification and we're talking about

21  an April 11, 2011 interview by Dr. Hopper with the

22  Petitioner; is that correct?

23         MR. HAZARD:  Yes.

24         MR. NICKELS:  And that one I do have.  And do you

25  have a page number?

1    Q.   BY MR. HAZARD:  Yes.  It's Page 2 on your notes.
2    It would be the third page in on that exhibit and it's
3    going towards the bottom.
4         And you state:  The earliest memory you have with
5    an experience with your father -- and you're referring to
6    Alejo Ochoa at that point; correct?  Not her biological
7    father?
8    A.   Correct.  That was uncomfortable.
9    Q.   That was uncomfortable; correct?
10   A.   Correct.
11   Q.   And Wendi states:  My mind is going blank.  And
12   you follow up with:  Any memory; correct?
13   A.   Correct.
14   Q.   She states nothing at my Nana's house or on
15   12th Street.  And then she talks about the next place she
16   lived was on Cedar; is that correct?
17   A.   Correct.
18   Q.   And then she states it wasn't uncomfortable, but
19   it's something that she does remember?
20   A.   Right.  She was -- as often happens in these kind
21   of interviews, the language can -- the word you use can
22   have a huge effect on what people are able to retrieve.
23   So she was saying to me uncomfortable wouldn't be the
24   right word that she would put on that, which, you know,
25   it's something that I need to pay attention to in these

1   investigations.

2       Q.   And, Doctor, she talks about this incident that

3   you referred to in the shower with the practical joke;

4   right?  It goes on for the next couple of pages.

5       A.   Right.  And this was not in California.

6       Q.   Correct.  But Jeri Lynn is with her?

7       A.   Yeah.  That's -- I don't see it on here, but I

8   remember this is -- you know, this is one of the ones

9   that -- I don't know.  Is it?  Let's confirm that.  Where

10  does it say Jeri Lynn?  Yeah, there you go.  Yeah.  Okay.

11      Q.   All right.

12           THE COURT:  When you're talking about Jeri Lynn,

13  we're talking about, Jeri, J-E-R-I; Lynn, L-Y-N-N;

14  Cunningham; is that correct?

15           THE WITNESS:  Correct.

16           THE COURT:  Is that who we're referring to?

17           MR. HAZARD:  Yes, Your Honor.

18           THE WITNESS:  Correct.

19           THE COURT:  Okay.  Thank you.

20      Q.   BY MR. HAZARD:  And, in summary, as you mentioned

21  earlier, Alejo poured cold water from a bucket onto them

22  over the shower curtain; correct?

23      A.   Yes.

24      Q.   And Wendi and Jeri Lynn decided to get him back,

25  in her words; correct?

1    *A.*    We just tried to get him back.

2    *Q.*    Okay.  And she talked about how they grabbed a

3    stool and got the key off the doorjamb above Alejo Ochoa's

4    bathroom door; is that correct?

5    *A.*    Yes, they did.

6    *Q.*    You had covered, if not in this interview, but at

7    another time, Wendi had mentioned that Donna and she

8    shared a bathroom and Alejo had his own bathroom; correct?

9    *A.*    So she says, yeah, at Cedar, he had his own

10   bathroom and my mother and I had our own.  So him coming

11   into our bathroom was not normal.  It was in another place

12   where he would routinely be coming in while she was taking

13   a shower.

14   *Q.*    Sure.  And they mentioned that he would take

15   showers in the morning and he would keep the door locked?

16   *A.*    Yeah.  He would take like hour long showers when

17   Jeri Lynn was there.

18   *Q.*    But he locked his own bathroom door?

19   *A.*    Yeah.

20   *Q.*    And on this incident, then actually sneaked up

21   with a stool, Jeri Lynn Cunningham and Wendi Andriano, got

22   the key, opened the door and returned the favor by pouring

23   cold water on him; correct?

24   *A.*    Correct.

25   *Q.*    And that is, like you called it, a prank?

1    *A.*    Yeah.  He did the prank, which in the context of

2    everything else, we know going into his daughter and her

3    friend in the shower.  But then they -- yeah, they tried

4    to get him back.

5    *Q.*    All right.  And Wendi Andriano made it very clear

6    that was not something that made her uncomfortable;

7    correct?

8    *A.*    What was not something that made her

9    uncomfortable?

10    *Q.*    This incident when she started telling you about

11    the memory.

12    *A.*    Uh-huh.

13    *Q.*    Yes?

14    *A.*    Well, it was certainly uncomfortable when he was

15    very mean to her after she did it.  But there were many

16    aspects of this experience.  You're saying the whole

17    thing?

18    *Q.*    Yes.

19    *A.*    She said the word uncomfortable was not a good --

20    let's see.  Let's see what happened.  Yeah, I don't think

21    that refers to this event.  If you look closely at the

22    notes, the uncomfortable comment is followed by me

23    reminding her of something she had said before about how

24    he would repeatedly come into the bathroom when she was

25    taking showers.  And then she said he wasn't able to do

1    that at Cedar.

2         I asked her for a specific memory of that.  She

3    remembers screeching and saying:  What are you doing in

4    here?  And him being like:  Oh, what's wrong with you?

5    The shower curtain is closed.  I remember my father always

6    told my mother that we were so uptight.

7         So to connect the uncomfortable on the previous

8    page to the Jeri Lynn thing, I don't know if there is any

9    connection there because the next memory she told of the

10   shower is how her father would repeatedly come into the

11   shower and act like there was something wrong with her for

12   protesting her father coming into the shower with her.

13        Q.   Alejo Ochoa's response was:  I'm your father;

14   it's no big deal; correct?

15        A.   Yeah.  That's a common response and to minimize

16   the reality of his sexual stuff.

17        Q.   And, yet, he would keep the door locked to his

18   own shower, at least in that time when Jeri Lynn

19   Cunningham and Wendi were over at the house?

20        A.   What do you mean by and yet?  I don't know what

21   you're --

22        Q.   No.

23        A.   It totally makes sense to me.  I mean, someone

24   who is routinely invading other peoples' spaces, his own

25   daughter when they're taking a shower, you know, maybe he

1   doesn't feel so safe in the shower because he knows that

2   showers aren't safe places in this home.  And so he locks

3   himself in, but he feels entitled to go into her shower at

4   anytime.

5         So that's the understanding I have of him locking

6   the shower door is he feels entitled to go into his

7   daughter's shower at anytime, whereas he gets to lock his

8   door.

9   Q.   And the next day is when you continue the

10  interview and Wendi said:  I can't think of any times my

11  father touched me, as we talked about earlier?

12  A.   Where?  On what page?

13  Q.   That would be April 12, 2011.  I think you have

14  that exhibit in front of you.

15  A.   Oh, yeah, there it is.

16  Q.   It's No. 223.

17        MR. NICKELS:  Did you just say the page number?

18  Did you say Page 3?

19        THE COURT:  No.  I think he said Exhibit No. 223

20  for identification.  And we're referring to the April 12,

21  2011 interview.

22  Q.   BY MR. HAZARD:  And do you remember earlier

23  testifying to that?

24  A.   To what?

25  Q.   She stated that I can't think of any times my

1 father touched me when you were talking about examples of

2 over-the-line?

3    *A.* Well, again, I prefer to see -- I see, get back

4 to over-the-line -- I see other examples of over-the-line.

5 Are you referring to down at the -- about two-thirds of

6 the way down the page where I say: Other examples

7 over-the-line with a question mark?

8    *Q.* Yes.

9    *A.* Where she says I was really searching for, yeah,

10 something more than --

11    *Q.* Right. And then on that same page down at the

12 bottom: I can't think of any times my father touched me?

13    *A.* Yeah, despite searching for memories like that,

14 she couldn't find any, as we saw on the videotape.

15    *Q.* And this is after you had told her about

16 Jeri Lynn's report to you, which included the shower

17 incident in California that you talked about, as well as a

18 molestation of Jeri Lynn Cunningham; correct?

19    *A.* You know, I would want to make sure. Was that --

20 now you're referring back to the day before? That we had

21 talked about those things the day before?

22    *Q.* Yes. During the sequence of interviews on

23 April 11th, April 12th and April 13th of 2011, you did

24 cover that with her; correct? What Jeri Lynn Cunningham

25 had told you?

1      *A.*   I'm not sure without looking at it.  I see her

2   referring to the shower experiences where her father kept

3   coming in, and I asked her about how did she feel in

4   between that.  But I don't -- if you could point me to

5   where the Jeri Cunningham in California story is, I would

6   appreciate it because I don't know where that is.

7      *Q.*   Well, Doctor, let's go to page -- I believe it

8   would be right before Page 11.  On your notes, it would

9   be --

10      *A.*   What about --

11      *Q.*   -- in between Page 10 and Page 11, that page.

12      *A.*   Yeah.

13      *Q.*   And it starts at the top:  What about your father

14   asking you or your friends to do anything with each other?

15         THE COURT:  Are we still referring to

16   Exhibit No. 223 for identification?

17         MR. HAZARD:  That's correct.  April 12, 2011,

18   Your Honor.

19         THE COURT:  Thank you.

20      *Q.*   BY MR. HAZARD:  Do you see that?

21      *A.*   Yes.

22      *Q.*   And she stated:  No, nothing.  I hadn't heard

23   about that; correct?

24      *A.*   Correct.

25      *Q.*   All right.  And that's when you brought up Kyre

1   Lorts?

2     *A.*   Correct.

3     *Q.*   The person that you described as being -- what

4   were your words?  Psychologically unstable?

5     *A.*   What I said was that she was too unstable in the

6   -- well, here what I said.  She was too unstable

7   psychologically for me to interview her as part of this

8   process until November of -- you know, just last year was

9   what was conveyed to me.

10       But when we say that, it doesn't mean that there

11   is some inequality of her too unstable.  We have to

12   consider that in the context of an investigation.

13       So what I heard from the attorneys was that it

14   had taken a long time for her to feel safe talking to

15   someone like me who's going to ask her in detail about

16   sexual abuse memories, without wanting to kill herself or

17   something like that.

18     *Q.*   Sure.  In your opinion, Krye Lorts was too

19   mentally unstable -- those were the words you used

20   earlier -- to interview before the November 10, 2013

21   interview you had with her?

22     *A.*   You could say mentally unstable or you could say

23   traumatized.

24     *Q.*   These were your words, Doctor.

25     *A.*   Oh, I know.  And I'm saying both of those phrases

1  and others could apply.

2     Q.   Okay.  You mentioned earlier that when you shared

3  this, what Kyre Lorts had told you, that Wendi's reaction

4  was that's ridiculous, basically; correct?

5     A.   No, not to this.  This is actually an interesting

6  story here that's not quite --

7     Q.   Yes or no?

8     A.   No is the answer, then.

9     Q.   All right.  Kyre Lorts in her -- she gave an

10  earlier declaration that you're familiar with; correct, on

11  June 30th of 2012?

12     A.   Yes.

13     Q.   Do you know if that was a period of time when she

14  was mentally unstable?  Do you know?

15     A.   Yeah, I heard she was pretty vulnerable and it

16  was really hard to get that from her, you know.

17     Q.   In that declaration, she mentioned that she and

18  Wendi engaged in all sorts of sexual acts together;

19  correct?

20     A.   Yeah.  And she reported that to me, also, when I

21  met with her in person.

22     Q.   And Wendi --

23     A.   I don't know all sorts, but I could name them.

24  Maybe we should be more specific, but --

25     Q.   And the Petitioner Wendi Andriano has never

1    admitted to anything like that happening in her life?  She

2    denied ever having touching, sexual experiences with other

3    girls while growing up like that; correct?

4        A.   That's a good question.

5        Q.   You asked her about that?

6        A.   Well, no, I asked her specifically -- are you

7    referring to the question -- the text here on this page

8    that we're referring to?  That was asking her a very

9    specific question about whether her father Alejo asked:

10   What about your father asking you or your friends to do

11   anything sexually with each other?  That's what that was

12   about.  Not whether they had ever done anything sexually

13   with each other.

14       Q.   And Krye Lorts talked about how she was having a

15   sexual act with Wendi during the posing of a yearbook

16   picture; correct?

17       A.   Yeah.  That they were, quote, fingering each

18   other, which was she described as something common that

19   these girls did with each other, yeah.

20       Q.   Right.  And she also mentioned in her interview

21   that she has a fear of dogs because every time dogs lick

22   themselves, she freaks out; correct?  And, in fact, she

23   admitted that she attacked or hit her sister's dog because

24   it wouldn't stop licking itself; correct?

25       A.   Yes, because it reminded her of some other sexual

1  things that she had been through that involved licking,

2  unfortunately.

3      *Q.*   And Wendi Andriano has never admitted that

4  anything that Kyre Lorts told you about happened; correct?

5      *A.*   Admitted?  I don't think I would use that word.

6      *Q.*   Well, she has never said that it happened;

7  correct?

8      *A.*   She doesn't recall it.  She's not able to

9  retrieve memories of that sort.

10     *Q.*   But you thought this uncorroborated statement by

11 a person that you say is mentally unstable and has a

12 history of this was important to include in your report

13 and reliable enough to include in your report; correct?

14     *A.*   Yeah, because it's so sad when people think of it

15 that way that because someone is traumatized, that,

16 therefore, they have no credibility.  This is what allows

17 people to get away with raping children and adults and

18 this is something that all the time I see with these

19 investigations.

20     *Q.*   Doctor, did you actually include Kyre Lorts in

21 your written report?

22     *A.*   No, because for me, I was concerned.  And that's

23 one of the reasons I wanted to meet her myself because I

24 wanted to check this out.  And, in fact, as I said before,

25 about this quote here, there was a misunderstanding that I

1   was able to clear up when I met with Kyre.  Because, yes,

2   I was trying to be conservative.  I did not want to

3   overreach.  It was only after I met with Kyre and assessed

4   her myself that I had confidence in the information she

5   gave me is consistent with what we would expect to see in

6   someone who had these experiences.

7           MR. HAZARD:  Your Honor, I have a section of

8   additional questions.  I don't think I'll be able to

9   finish in 15 minutes.  This is a good time to wrap up.

10          THE COURT:  Let me ask, Counsel, how are we doing

11  time wise?  I mean, we had a schedule here that counsel

12  provided to the Court, and the schedule was that we were

13  going to get to Dr. Hopper today and conclude with his

14  testimony and then begin with Donna Ochoa today.

15  Obviously, we still have Dr. Hopper on the stand.

16          How are we doing time wise because I want to keep

17  everyone in line with regard to the two-week schedule that

18  we set because I'm in trial in other matters for a very

19  long time after that and I don't have any free time after

20  the two weeks.

21          MR. NICKELS:  Your Honor, I can tell you with

22  regard to Dr. Hopper, I don't quite know how much longer

23  they have.  But I can tell you we have -- right now I

24  think I have literally one very discreet topic for

25  redirect.  So my redirect is going to be a few minutes.

1        Now I realize that may prompt more from them.

2   Although, it's truly one topic.  I think it may be two or

3   three questions.  So if he's only got 20 or 25 minutes --

4        THE COURT:  Well, we're not going to go past

5   5:00.  What I'm inclined to do is stop each evening before

6   5:00, five of or ten of for the deputy's sake so that we

7   can get the transportation going and what not.  And they

8   actually close this courthouse right at 5:00.  They don't

9   want us going past 5:00.  Okay?

10       So why don't we go for another ten minutes and

11  then we'll conclude at 5:50.  Okay?  Not 5:50.  4:50.

12       MR. HAZARD:  One moment.

13       (WHEREUPON, an off-the-record discussion ensued.)

14  *Q.*  BY MR. HAZARD:  All right.  Your testimony is

15  that because of -- in a nutshell, because Ms. Andriano

16  suffered from various traumas, abuse inflicted by family

17  members that before she was 18, that she was essentially

18  so damaged, that it made her ill-equipped to deal with

19  circumstances that came to fruition in her life as an

20  adult; correct?

21  *A.*  That's very general circumstances that came to

22  fruition.  I'm not sure what you're referring to there.

23  *Q.*  In a nutshell, you're saying that this abuse --

24  this alleged abuse that you have talked about affected

25  Wendi Andriano's state of mind the night she murdered her

1  husband?

2      *A.*   What I said was that under situations of high

3  stress complexity, changing situations, that she would,

4  given what she's been through and what the neuropsyche

5  testing and how human brains work, she would lose access

6  to those prefrontal cortex functions that allow someone to

7  remember rules, laws, to inhibit impulses, those sorts of

8  things.

9      *Q.*   Well, let's talk about the various things that

10 Ms. Andriano -- that we know that she did during her adult

11 life between ages 18 and 30.  All right?  Now let's just

12 talk about some general things.  She moved out of the

13 home; correct?

14     *A.*   Yes.

15     *Q.*   So she was no longer living with people that you

16 alleged abused her; correct?  Alejo Ochoa and Donna Ochoa?

17     *A.*   Correct.

18     *Q.*   And she did what adults do?  She went to college

19 for a bit?  She got her first grown-up job; correct?

20     *A.*   Correct.

21     *Q.*   She started socializing with new friends, going

22 out, sometimes partying; correct?

23     *A.*   Correct.

24     *Q.*   She had some sexual relationships with men?

25     *A.*   Correct.

1    *Q.*   Not that much different than a lot of men and

2    women have when they turn 18; correct?

3    *A.*   No, that's not entirely true.  The sexual

4    relationships were not that --

5    *Q.*   Well, I'm not talking about -- I'm not talking

6    about what went on.  I'm talking about just the things

7    that she did, the milestones she reached as she was a

8    young adult.

9    *A.*   Well, what I'm saying is --

10   *Q.*   Doctor --

11   *A.*   -- until you describe the sexual abuse --

12   THE COURT:  One at a time.

13   THE WITNESS:  Well, he had finished asking.  Do I

14   get to keep going?

15   THE COURT:  Go ahead.

16   THE WITNESS:  Everything you said up until the

17   sexual relationships with others, I could agree with that,

18   but the sexual relationships were not normal or healthy by

19   the evidence.  I have even Dr. Pitt at some point

20   corroborating that.

21   So those were evidence of trauma and consistent

22   with sexual abuse, actually, that she unable to orgasm and

23   she didn't enjoy it.  She did it just to please the guy.

24   So the last part of your question is not at all consistent

25   with healthy entry into adulthood.

1    *Q.*    BY MR. HAZARD:  And, again, that's assuming that
2    Ms. Andriano is being truthful; correct?
3    *A.*    Yeah.  About those things, yeah.
4    *Q.*    All right.  She met Joe Andriano and married him?
5    That also happened during her adult -- young adult life;
6    correct?
7    *A.*    Correct.
8    *Q.*    And she had two children with him?
9    *A.*    Correct.
10    *Q.*    And Joe Andriano developed cancer; correct?
11    *A.*    Yes.  It was detected too late, but --
12    *Q.*    Right.  Now leading up to Joe's murder, Wendi
13    Andriano did a number of things in August and September
14    well in advance of October 8th; correct, as far as, for
15    example, contacting life insurance companies?
16    *A.*    Uh-huh.  Yes.
17    *Q.*    Yes?  And although I understand Ms. Andriano
18    disagrees, but the State's evidence presented at trial was
19    that she was engaging in fraud trying to get other people
20    to pose as her husband to get a life insurance policy,
21    knowing that he had cancer; correct?
22    *A.*    That's what was evidence that was presented at
23    trial; correct.
24    *Q.*    Right.  In fact, she offered one of her
25    co-workers $10,000 to pose as her husband to get the life

1  insurance exam; correct?

2      *A.*   Well, I just --

3      *Q.*   That was the evidence presented at trial?

4      *A.*   That was what someone told her, just like the

5  things that people told me that you said we can't trust.

6  Someone said that as though documentation.

7      *Q.*   Well, a jury -- a jury must have believed it;

8  right?

9      *A.*   Well, I already said that.

10     *Q.*   Then she asked in September another friend to

11 pose as her husband, again, for the purpose of obtaining

12 life insurance fraudulently; correct?

13     *A.*   Evidence was presented.  The jury believed it.  I

14 don't know.  I have no way of knowing.  So I can't say

15 correct.  I don't know.

16     *Q.*   She used her computer at work then to research

17 poisons.  I know Ms. Andriano says Joe Andriano was

18 involved in that.  Mr. King was involved in that.  But the

19 evidence was presented at trial that Ms. Andriano was

20 doing this to research poisons; correct?

21     *A.*   Yes.  Yes.

22     *Q.*   And when one of her co-workers asked her what she

23 was doing, she said she was doing research to write a

24 book; correct?  Do you remember that?

25     *A.*   It sounds right, yes.

1    *Q.*   All right.  So how do those so far link to her

2    abuse?

3    *A.*   I can explain, yeah.  I mean, she grew up in an

4    environment where there was so much hypocrisy and lying

5    going on all around, especially in her own family, that --

6    *Q.*   How does that equate with her deficits in

7    executive functioning?

8         MR. NICKELS:  Your Honor, he needs to let him

9    finish the answer.

10        THE COURT:  Go ahead and answer the question.

11        THE WITNESS:  Not the kind of executive functions

12   I was talking about.  That would -- that's a different

13   issue.

14   *Q.*   BY MR. HAZARD:  So that doesn't?  That doesn't at

15   all have anything to do with her alleged what you think

16   are deficits in executive functioning?  Planning

17   fraudulent activity?

18   *A.*   Decision making is called an executive function

19   and is one of them.  And, you know, those were

20   decisions -- you know, seriously bad and impaired

21   decisions under some stressful circumstances, but not like

22   the things I was mostly referring to which would apply to

23   once, you know, in fear and things.  Then you have a

24   massive impairment of the prefrontal cortex.

25        THE COURT:  Okay.  We're going to go ahead and

1    take our evening recess at this time.

2              So I guess, Dr. Hopper, you have to return

3    tomorrow.

4              THE WITNESS:  Okay.

5              THE COURT:  We'll begin promptly at 9:30.  Okay?

6              MR. ARNTSEN:  Thank you, Your Honor.

7              THE COURT:  Thank you.  We will be in recess.

8              (WHEREUPON, the proceedings were concluded at

9    4:51 p.m.)

10                        * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                     C E R T I F I C A T E

8

9

10        I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11   the State of Arizona, do hereby certify that the foregoing

12   142 pages constitute a full, true, and accurate transcript

13   of the proceedings had in the foregoing matter, all done

14   to the best of my skill and ability.

15        SIGNED and dated this 18th day of April, 2014.

16

17

18                    /s/  Renée A. Mobley, RPR

19                    RENÉE A. MOBLEY, RPR

20                    Certified Reporter

21                    Certificate No. 50500

22

23

24

25

# EXHIBIT KKKKKKKKKK

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
M. Martin, Deputy
5/2/2014 5:51:27 PM
Filing ID 5855455

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                  )
                                   )
        Respondent,                )
                                   )
vs.                                )   No.
                                   )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,          )
                                   )
        Petitioner.                )
_____)


Phoenix, Arizona
February 5, 2014
9:31 a.m.


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


EVIDENTIARY HEARING

DAY 3


Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                        (ORIGINAL)

1                    A P P E A R A N C E S

2

3

4    On Behalf of the State:

5            Mr. Gregory Hazard
             Assistant Attorney General
6
             Ms. Lacey Gard
7            Assistant Attorney General

8
     On Behalf of the Defendant:
9
             ATTORNEYS AT LAW:
10
             Mr. Scott Bennett
11           Mr. Allen Arntsen
             Mr. Stephan Nickels
12           Mr. Matthew Lynch
             Ms. Krista Sterken
13           Ms. Jodi Fox

14                      I N D E X

15

16                  T E S T I M O N Y

17
     WITNESS:                                      PAGE
18
     JASPER C. NEACE
19
             Direct Examination by Ms. Fox           8
20
             Cross-Examination by Mr. Hazard        29
21

22   GEORGE W. WOODS, JR., M.D.

23           Direct Examination by Mr. Nickels      41

24           Cross-Examination by Mr. Hazard       112

25

1                     P R O C E E D I N G S

2

3          THE COURT:  Good morning.  This is

4    CR 2000-096032, State of Arizona vs. Wendi Elizabeth

5    Andriano.

6          The record will reflect the presence of the

7    parties and counsel.

8          Before we get started here this morning, we do

9    have Mr. Jasper Neace here, who's seated in the witness

10   stand.  He has some audio equipment that's going to assist

11   him in hearing and we have a microphone that -- we don't

12   have 2014 up-to-date equipment, but I think we have

13   sufficient equipment here that will assist Mr. Neace.

14         But, anyway, we have him with headphones.  Then

15   there's a speaker microphone there that what I'll do is

16   when the Petitioner is asking questions, then we'll have

17   that on your desk.  When the State is asking questions,

18   we'll have that on the State's desk.

19         Mr. Neace, are you able to hear me?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Okay.  If at anytime you feel that

22   you cannot hear what's being said, will you please let us

23   know?

24         THE WITNESS:  Yes, sir.

25         THE COURT:  Okay.  Why don't we go ahead and have

1   Mr. Neace stand and be sworn.

2          Or is there anything we need to discuss before we

3   begin?

4          MR. ARNTSEN:  Very briefly, Your Honor.

5          THE COURT:  Go ahead.

6          MR. ARNTSEN:  We won't be calling Alejo Ochoa to

7   testify.  We did speak briefly with his appointed lawyer

8   last night, who hadn't met with him and didn't know

9   anything about him.

10         THE COURT:  It's Mr. Miller.

11         MR. ARNTSEN:  Mr. Miller; correct.

12         THE COURT:  Mr. Rick Miller.

13         MR. ARNTSEN:  Yes.  And so he won't be here to

14   testify.

15         In fact, we have a proposal to the State

16   concerning Ms. Andriano that I'm waiting to hear back from

17   them on.  But we have then George Woods would be the next

18   witness and he'll be over here shortly.

19         THE COURT:  Dr. George Woods?

20         MR. ARNTSEN:  Yes.

21         MS. GARD:  Judge, if we could have until the

22   break to -- the lunch break to make our decision on

23   Ms. Andriano.

24         THE COURT:  Okay.

25         MR. ARNTSEN:  She'll be the witness right after

1  Mr. Neace.

2          MS. GARD:  So, Your Honor, if we could just break

3  briefly after Mr. Neace.

4          THE COURT:  Sure.

5          MS. GARD:  Okay.

6          THE COURT:  So just as a housekeeping measure,

7  then, Samantha Nichols will not be testifying.  Brandon

8  Ochoa will not be testifying and Alejo Ochoa will not be

9  testifying.

10          MR. ARNTSEN:  Correct.  Then after Dr. Woods,

11  it's Scott MacLeod and then Keith Rohman and then

12  Dan Patterson.  We're in pretty good shape on the schedule

13  this week.

14          THE COURT:  Okay.  So we expect Dr. Woods this

15  afternoon?

16          MR. ARNTSEN:  Yes.  Or perhaps even this morning,

17  depending.  He will be here this morning either to testify

18  or to listen to Ms. Andriano's testimony, and we'll go on.

19          THE COURT:  What about Dr. James?

20          MR. ARNTSEN:  She can't come until Monday.  So

21  she's had a schedule.

22          THE COURT:  And then when do we anticipate

23  Mr. Patterson and Mr. MacLeod?

24          MR. ARNTSEN:  Mr. MacLeod will be Thursday

25  afternoon, depending.  And we'll know better at the end of

1   the day today.  We might have a gap tomorrow morning if
2   Dr. Woods is done.  But, again, it's good.  It's just
3   Mr. MacLeod can't come until the afternoon.  He and
4   Mr. Rohman will be tomorrow afternoon.  Attorney Patterson
5   will be starting Friday morning.
6           THE COURT:  Let's do this.  We will proceed with
7   the testimony of Mr. Neace.  Then we'll take a break so
8   that counsel can speak.
9           MR. ARNTSEN:  Thank you.
10          THE COURT:  Does that sound right?
11          MS. GARD:  Yes.  And, Your Honor, just to give
12  notice, we may call Alejo Ochoa in our case once we have
13  an opportunity to talk to his appointed counsel and find
14  out what he's going to say.
15          MR. ARNTSEN:  Okay.  That's understood.
16          THE COURT:  Okay.  Let's go ahead and proceed,
17  then.
18          We will have, Mr. Neace, if you can please stand
19  and face the clerk.  Give her your name and she'll swear
20  you in.
21          THE WITNESS:  My name is Jasper Charles Neace.
22          THE CLERK:  Could you please spell your name for
23  the record?
24          THE WITNESS:  What?
25          THE COURT:  Can you spell your name, please?

1          THE WITNESS:  Yes.  J-A-S-P-E-R.  Charles,

2   C-H-A-R-L-E-S.  Neace, N-E-A-C-E.

3          THE CLERK:  Raise your right hand, please.

4          (WHEREUPON, the witness was duly sworn by the

5   clerk.)

6          THE COURT:  You can be seated there, Mr. Neace.

7   Again, Mr. Neace, if you have any difficulty hearing

8   what's being said, will you please let us know?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  Sir, another thing I want you to

11   remember is to speak up so that everyone can hear you.

12          THE WITNESS:  Okay.

13          THE COURT:  Also, please wait until the question

14   is completed before you answer the question.

15          THE WITNESS:  Yes.

16          THE COURT:  Then also make sure that you give us

17   a verbal response.  Don't just shake your head and say

18   uh-huh or un-huh.  Say, yes, no, or whatever it might be.

19          Can you do that for us?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Thank you.  Go ahead and state your

22   name for the record.

23          THE WITNESS:  Jasper Charles Neace.

24          THE COURT:  And, Ms. Fox, you may -- is it going

25   to be Ms. Fox?

1       MS. FOX:  Yes, it will be.

2       THE COURT:  Ms. Fox, you may proceed.

3       MS. FOX:  Thank you.

4

5                   JASPER CHARLES NEACE.

6  having been first duly sworn to tell the truth, the whole

7  truth, and nothing but the truth, testified as follows:

8

9                   DIRECT EXAMINATION

10  BY MS. FOX:

11      Q.   Mr. Neace, thank you for being here today.  I

12  understand county is not quite as nice as where you

13  usually are.  I appreciate your taking the time for a

14  couple of days to be up here.

15       First of all, do you know the defendant, Wendi

16  Andriano?

17      A.   Yes, I do.

18      Q.   And how do you know Wendi?

19      A.   From school and church.

20      Q.   How old were you when you first met Wendi?

21      A.   I was probably about 12 or 13.

22      Q.   And how old was Wendi when you met her?

23      A.   I would say probably about maybe ten, 11.

24      Q.   And what year would that have been?

25      A.   Around 1980.

1    *Q.*    And you said you knew Wendi from church and
2    school?
3    *A.*    Yes.
4    *Q.*    What was the name of the church?
5    *A.*    91st Psalm at the time.
6    *Q.*    And what was the name of the school?
7    *A.*    91st Psalm School.
8    *Q.*    And the church and school were affiliated?
9    *A.*    Yes.
10    *Q.*    How often would you see Wendi?
11    *A.*    Pretty much every day at school and then on
12    church days, too, like Sunday.
13    *Q.*    And would you see Wendi besides during the school
14    day at school and at church?
15    *A.*    Well, I would see her also at work because I
16    worked for the school.  After school would be out, I would
17    work for four hours a day, usually.  And I would see her
18    because she would be waiting for to get a ride home from
19    her stepdad at the time, which was Alejo.
20    *Q.*    And you said you were working at the school?
21    *A.*    Yes.
22    *Q.*    And you were 12, 13 years old?
23    *A.*    Yes.
24    *Q.*    Why were you working at the school at age 12, 13
25    for four hours a day after school?

1    *A.*    To help pay the tuition for me and my brothers
2  and sisters that were going to school at the time.
3    *Q.*    How many brothers and sisters do you have?
4    *A.*    I have five sisters and three brothers.
5    *Q.*    And you said you worked four hours a day.  Was
6  that every day after school?
7    *A.*    Yes, ma'am.
8    *Q.*    And did you work on weekends at all?
9    *A.*    Yes, I did on Sundays.  Sometimes Saturdays.  It
10 depends on what's going on.
11   *Q.*    And what type of work did you do at the school?
12   *A.*    I did groundskeeping, watering trees, things like
13 that.  Just general basic keeping the carpet clean,
14 dusting, keeping it ready for the church services,
15 bathrooms, things like that.
16   *Q.*    So is it fair to say that you spent a lot of time
17 with Ms. Andriano?
18   *A.*    Yes.  Yes.
19   *Q.*    And from what ages were you spending time with
20 Ms. Andriano?
21   *A.*    For -- what was the question again?
22   *Q.*    How old were you during this time period where
23 you saw Wendi every day at school, churches on Sundays and
24 after school while you were working and she was waiting
25 for Alejo?

1    *A.*    Probably -- I mean, I saw her a lot, but when we
2    started talking was more when she was probably a couple of
3    years into it.
4    *Q.*    A couple years into it?  So how old were you at
5    that point?
6    *A.*    I would probably have been about 14.
7    *Q.*    And how old was Wendi then?  12?
8    *A.*    Yeah, probably 12.  She was getting older,
9    anyway.
10   *Q.*    And you said around that time, you started to
11   talking to Wendi more?
12   *A.*    Yeah, because she would work sometimes, too,
13   after school.
14   *Q.*    How long did you attend 91st Psalm?
15   *A.*    Right at five years.
16   *Q.*    Five years.  So you were around from 1980 to
17   about 1985?
18   *A.*    Yes.
19   *Q.*    And you were maybe 15 or 16 at the time you
20   stopped attending?
21   *A.*    No.  I was older.  I was probably about 17.
22   *Q.*    17?  Sorry, my math.  That's why I went into law.
23   Okay.  So who was the pastor at 91st Psalm in 1980 when
24   you and Wendi first met?
25   *A.*    Calvin Lorts.

1    *Q.*   Was he the pastor the entire time you attended
2  the church?

3    *A.*   No, ma'am.

4    *Q.*   When did that change?

5    *A.*   About two to three years into being there.

6    *Q.*   So '82, '83?

7    *A.*   I can't be for sure, but pretty close.

8    *Q.*   Can you describe what the church was like under
9  the pastor?  Did you say that was Calvin Lorts?

10   *A.*   Yes, ma'am.  It was good.  It was, you know, a
11 lot of fun, a lot of activities.  We were always busy
12 doing different things.  It was a real good atmosphere.
13 It was great.

14   *Q.*   And you said you left around approximately 1983?

15   *A.*   Yeah.

16   *Q.*   And you said a new pastor took over?  Tom King?

17   *A.*   Yes.

18   *Q.*   What was the church like under Tom?

19   *A.*   That's -- it all changed real fast.  It was
20 different.  Immediately, he took over everything and just
21 like started controlling my family more and my mom and my
22 brothers and sisters and me.

23   *Q.*   Did he control just you and your family or the
24 congregation as a whole?

25   *A.*   He seemed to be controlling everything.

1    *Q.*   What types of things did Tom try to control?

2    *A.*   Our music, our TV.  He went all the way down to

3    eating sugar.  He wanted us -- we were supposed to have

4    honey with our cereal, just all kinds of things like that.

5    *Q.*   What did he control with your TV and music?

6    *A.*   Well, first of all, the TV was a big deal.  He

7    said it was the devil's box and that it had nothing but

8    garbage coming out of it.  Music was the same thing.  No

9    music, no country, no rock.  Just Christian music.

10         He controlled even -- for instance, I bought a

11   motorcycle once and he found out I didn't have insurance

12   on it.  So he told me -- he called me into the office and

13   told me that I needed to sell it because I was committing

14   a sin riding without insurance and that I needed to sell

15   it and give the money to the church for a good cause and

16   all that.  So, very controlling.

17   *Q.*   How was Tom's preaching style?

18   *A.*   Brimstone and condemning, I guess you could say.

19   Real hard, real -- just it was different than what we were

20   used to, or I was used to, anyway.

21   *Q.*   And did Tom insert himself in any way into how

22   the parishioners raised their children?

23   *A.*   Oh, very much so.

24   *Q.*   In what way?

25   *A.*   The Rod of Correction.  That was one of the big

1  topics there.  It was a paddle or a 2 x 4 turned into a

2  paddle, I guess you could say, and it had these scriptures

3  written on it.  I still remember them today, a lot of

4  them.  It was beat a child when he's young, and when he's

5  old, he won't depart from it.  Honor they father and

6  mother.  With long life, don't stray aside.  Them kind of

7  things would be written on it.  And he encouraged our

8  parents to use them and not to be scared to use them.

9      Q.   Did the parishioners obey Tom and paddle their

10  children or beat their children with the Rod of

11  Correction?

12      A.   I can speak for my household.  I know that my

13  mother did.  And I heard, you know, rumors throughout the

14  church from other kids because they would complain about

15  it.  But I did witness it firsthand.

16      Q.   And did Tom take any position on whether or not

17  the congregation should have any friends that didn't

18  attend the church?

19      A.   Oh, the friendship out-of-the-church thing?

20      Q.   Yes.

21      A.   Oh, that was one of the no-no's.  We were not to

22  hang out with heathens or ungodly people because they

23  would be a bad influence on our lives and we didn't need

24  that, he would tell her.  So my mom, he would tell and the

25  whole church, too.  And so we were pretty much isolated

1    from everybody but the church people.

2        Q.    So did he consider anyone who wasn't a church

3    member a heathen?

4        A.    Yeah, pretty much.  They were going to hell,

5    basically.

6        Q.    How long did you attend school at 91st Psalm,

7    which eventually I believe changed to the name of Harvest

8    when Tom King took over?

9        A.    Yeah, up to my last year.  He kicked me out.

10       Q.    We will get to that in a little bit.

11       A.    Okay.

12       Q.    So let's just start talking generally about what

13   it was like to attend Harvest or 91st Psalm.  Well, let's

14   concentrate, actually, on the Harvest time period.  What

15   would happen if a student acted out or got in trouble?

16       A.    The Rod of Correction and they would be beaten.

17       Q.    And who would administer the punishments?

18       A.    Tom, Alejo and Johnny Casey.

19       Q.    And so Tom, Tom King; Alejo, Alejo Ochoa; and

20   Johnny Casey?

21       A.    Yes, ma'am.

22       Q.    And did they all beat children in the same way or

23   were there different levels of severity between the three?

24       A.    Umm, I'm not sure how to answer that exactly, but

25   I know that --

1       MR. HAZARD:  Objection as to how he knows.  Is

2   this his personal knowledge?

3       THE COURT:  Sustained.  Sustained.

4       Q.   BY MS. FOX:  Do you know if there was a

5   difference between how the three men beat the children?

6       A.   Umm, I believe they all used the Rod of

7   Correction on them.  Umm, what else?

8       Q.   Okay.  And do you know if the beatings ever

9   caused children to have bruises or welts?

10      A.   Yes, ma'am.

11      Q.   And how do you know this?

12      A.   Because of my brothers and sisters.

13      Q.   And did Alejo ever beat your brothers and

14  sisters?

15      A.   Yes, ma'am.

16      Q.   And when Alejo beat your brothers and sisters, do

17  you know if it ever caused bruising or welts?

18      A.   Yes, ma'am, it did.

19      Q.   What type of behavior would cause a kid to get

20  beaten with the Rod of Correction?

21      A.   Well, there's a lot of rules.  But, I could think

22  of a few, I guess.  For instance, my brother, he is also

23  deaf.  He's much worse than I am.  But we had to memorize

24  15 verses of the Bible every month and recite them in

25  front of the whole class.  And when he wouldn't be able to

1    do that, he would get a whoopin' for that.  Him and my

2    sister both got whoopin's for not doing their work, you

3    know, diligently and doing it right when we were working.

4    They went to work when they got older, too, with me.  Just

5    a variety of things, you know.

6        Q.    Do you know if Wendi was ever disciplined?

7        A.    Do I?  I never saw it with my own eyes, but I was

8    told by her that she was.

9            MR. HAZARD:  Objection.  Hearsay.

10           THE COURT:  Sustained.

11           THE WITNESS:  Pardon me?

12           THE COURT:  Go ahead and restate the question.

13       Q.    BY MS. FOX:  Were you ever told that Wendi was

14   beaten?

15           MR. HAZARD:  Objection.  Calls for hearsay.

16           THE COURT:  Sustained.

17           MS. FOX:  I would like to do an offer of proof --

18           THE COURT:  Go ahead.

19           MS. FOX:  -- for mitigation evidence.

20           THE COURT:  Go ahead.

21       Q.    BY MS. FOX:  You can answer the question.

22       A.    Umm, yes, we would -- I was told that, yes.

23       Q.    And what were you told about Wendi being beaten?

24       A.    That she had gotten beaten, whooped, beaten from

25   a paddle.

1    *Q.*    Who told you that?

2    *A.*    She did.

3    *Q.*    When you were at school, you stated that Alejo

4    was one of the people that disciplined the children.   Did

5    you often see Alejo at the school and church?

6    *A.*    Every day.

7    *Q.*    Where would you see Alejo?

8    *A.*    He would sometimes play teacher and then he was

9    always the maintenance man and the worker around there.

10   And that's what I was doing.  So I was with him every day

11   pretty much.

12   *Q.*    What was Alejo like with the students?

13   *A.*    He -- you know, it -- he was real, umm -- real

14   touchy, real flirty, real outgoing.  Just, you know, just

15   real active with them, touching them, different things.

16   *Q.*    What do you mean by he was real touchy with the

17   students?

18   *A.*    Well, we had a lot of kids that complained about

19   him.  And I saw a lot of it with my own eyes.  But he

20   would lick his fingers and touch them on the neck, behind

21   their ears, flirt with them.  Just real -- I mean, he even

22   did that with the older -- with the staff members, too,

23   some of the prettier ladies.  I remember seeing him do

24   stuff like that.

25   *Q.*    The students that he was touching and flirting

1  with, was this girls or boys or both?

2      A.   No, I never seen it with boys.  Just girls.

3      Q.   And besides licking the finger and putting it to

4  the girls' necks, did you ever see him touch the female

5  students in any other way?

6      A.   Yeah, I'd seen -- he would rub up on some of the

7  older ones when he would come into class and bend over at

8  their desks and help them out on their math or social

9  studies or whatever they was doing.  And then a lot of

10  times, they would complain about it, you know, and how he

11  was rubbing on them and how his breath smelled and just

12  stuff like that.  Just typical teenage stuff, you know,

13  about him being a little too close to them and stuff.

14      Q.   And did he ever say inappropriate things to any

15  of the students?

16          MR. HAZARD:  Objection.  Calls for hearsay.

17          THE COURT:  Sustained.

18          MS. FOX:  I'm going to do an offer of proof for

19  the mitigation evidence on this portion.

20          THE COURT:  Go ahead.

21          MS. FOX:  You can answer.

22          THE WITNESS:  What was the question again?

23      Q.   BY MS. FOX:  Did you ever hear him say anything

24  inappropriate?

25          MR. FOX:  And, also, I would also like to say for

1    the record that it's not coming in for the truth of the

2    matter asserted.  It's just that he heard these things

3    stated.

4              THE COURT:  Go ahead and answer the question.

5              MS. FOX:  Yes.

6              THE WITNESS:  Okay.  Yeah, he -- I can't -- I can

7    just say that just he would flirt with the girls and the

8    women.  Just he would always stop short of -- you know,

9    just -- it was just the way he would just congest them.

10   You know, the way he would act, it was -- it was -- I

11   wouldn't want my mom or my sisters or my children, my

12   daughters to be around that.  But I don't really know how

13   to explain it.  It was just weird how he -- you know, he

14   just -- he said things, you know, but I can't really

15   remember exactly, you know.

16      Q.  BY MS. FOX:  And how did the students feel about

17   Alejo?

18      A.  Well --

19             MR. HAZARD:  Objection.  Calls for speculation.

20             THE COURT:  Sustained.

21             MS. FOX:  He was part of the community and he

22   knows his general reputation and all of that.

23             THE COURT:  You can ask him how he felt about

24   him.

25      Q.  BY MS. FOX:  How did you feel about Alejo?

1    *A.*   At first when I went there, I didn't really know

2    about him, I guess.  But as time went by and I saw how he

3    was acting with the kids and the girls and stuff and

4    beating on my brothers and sisters and other kids, he

5    seemed like a pervert.

6         Basically, I wouldn't doubt if he was a child

7    molester or something.  You know, I mean, I just -- I

8    mean, he just -- he was sick, I think.  I'm not for sure.

9    But, in my opinion, I think there's something wrong with

10   the man.

11   *Q.*   And you stated previously that you spent a fair

12   amount of time with Wendi at the school, during school, at

13   church and after school.  And at a certain point in time

14   around I believe you said two years after you met her,

15   around when she was 12, you started spending even more

16   time with her and talking to her more; correct?

17   *A.*   Yes, ma'am.

18   *Q.*   Did you witness Wendi and Alejo together?

19   *A.*   Yes, I did.

20   *Q.*   How often would you see Wendi and Alejo together?

21   *A.*   Umm, you know, it just depended.  At least once a

22   day, I mean, when they would give me a ride home from

23   work.  But just here and there, you know, through the

24   church, school or whatever it was, I would see them

25   together a few times a day.

1    *Q.*    So a few times a day?

2    *A.*    Yeah.

3    *Q.*    For five, six years?

4    *A.*    For a good five, yeah.

5    *Q.*    What was Wendi's and Alejo's relationship like?

6          MR. HAZARD:  Objection.

7          MS. FOX:  He witnessed it firsthand.

8          THE COURT:  Be more specific on the question.

9    *Q.*    BY MS. FOX:  What was -- what did you view

10   Wendi's and Alejo's relationship as?

11   *A.*    Well, I knew he was the stepfather.  But it --

12   you know, she was more like how she acted than him.  But

13   like when we would be talking about just everyday things

14   you know, that kids talk about, and then sometimes things

15   that everyday kids don't talk about.  But he would come

16   into the room and she would get nervous and give me the

17   signal to, you know, time to shut up and be quiet, don't

18   talk no more.  She was scared and nervous around him.

19   That's what I saw.

20   *Q.*    Did you and Wendi ever talk about her

21   relationship with Alejo?

22   *A.*    Yes, we did, on several occasions.

23   *Q.*    And what did you discuss about Alejo?

24   *A.*    Umm, she told me that --

25          MR. HAZARD:  Objection.  Calls for hearsay.

1          THE COURT:  Sustained.

2          MS. FOX:  I would like to do this as an offer of

3    proof for the mitigation evidence.

4          THE COURT:  You may proceed.  Go ahead.

5          MS. FOX:  Please continue.

6          THE WITNESS:  She told me about some incidents

7    that was disgusting her and making her feel nervous around

8    him.  She said that he used to make her give him massages

9    and she felt like that he was, you know, getting off of on

10   it, being perverted.  She didn't like doing it.  He made

11   her -- he would lay his head in her lap and have her comb

12   his hair, just different things like that.

13          I even heard him when he hurt his back at work

14   one day, he told her that when she got home, her work

15   wasn't done until she got home and gave him a back rub.

16   So I heard him say things like that.  Umm, so things like

17   that.

18      Q.   BY MS. FOX:  You stated earlier that you were

19   kicked out of Harvest at a certain point?

20      A.   Yes.

21      Q.   How old were you when you were kicked out of

22   Harvest?

23      A.   I was -- man, it's been a long time.  I was

24   pretty close to being 18.  I was 17, somewhere around

25   there.

1      *Q.*   And can you please describe the circumstances

2  surrounding your getting kicked out of Harvest?

3      *A.*   Well, it's kind of a long story, but I'll try to

4  make it short here.  Basically, I got kicked out.  We had

5  been talking about Alejo again and Wendi had told me

6  that --

7             MR. HAZARD:  Objection.  Calls for hearsay.

8             THE COURT:  Sustained.

9             MS. FOX:  I would like to argue that we would

10  like to do this not only as for mitigation, but this also

11  just conforms his actions moving forward.  And so it's not

12  coming in for the truth of the matter asserted, but it's

13  coming in to show why he did the things he did.

14             THE COURT:  Well --

15             MR. HAZARD:  And, Your Honor -- oh, I'm sorry.

16             THE COURT:  Go ahead.

17             MR. HAZARD:  I also object to relevance as to

18  why -- how he got kicked out of the church is even

19  relevant.

20             THE COURT:  Well, why don't you get into how he

21  got kicked out first.  Then let me hear what he has to say

22  and then I may or may not let you go into this other area.

23             MS. FOX:  Well, this directly is part of the

24  story of how he got kicked out.  I'll show that --

25  the relevance will be apparent and --

1          THE COURT:  Why don't you get into who kicked him

2     out and those circumstances first.

3          *Q.*   BY MS. FOX:  Okay.  Who kicked you out of the

4     school?

5          *A.*   Tom King and Alejo Ochoa.

6          *Q.*   What was the infraction that you allegedly got

7     kicked out for?

8          *A.*   Well, after all the -- after a period of time of

9     me and the kids talking and somebody wanting to stand

10    up -- and stand up for us.  So I decided to do that.  And

11    when I did, they just booted me out -- kicked me out of

12    the church.

13         *Q.*   What were you doing to stand up for the kids?

14         *A.*   Well, that's where Wendi comes in.

15         THE COURT:  Okay.  I'll allow him to proceed.  Go

16    ahead.

17         MS. FOX:  Okay.  Continue.

18         THE WITNESS:  It's all right?

19         MS. FOX:  Yes.

20         THE WITNESS:  She had brought a Playboy book to

21    school and said that it had came from Alejo's property,

22    his belongings.  We were raised that that was a sin and we

23    weren't allowed to do it.  He was beating on my brothers

24    and sisters and whoever else and doing what he was doing.

25              And I decided that I was going to take it and

1 confront Tom with it and let him know what we had going on

2 because it needed to be dealt with, I felt.

3          I had told Tom's son Brad about it, too, at PE.

4 I told him I had it in my locker.  Anyway, they called me

5 into the office for a meeting that I had set up with Tom.

6 I didn't know Alejo was going to be there.  And I go by my

7 locker and the book is gone.  Wendi didn't know what

8 happened to it because I asked her.  So I had assumed -- I

9 still don't really know what happened to it, but I assume

10 Brad must have told him or something.

11          But I go into the office and sat down for a

12 second with Tom and Alejo.  We was talking and Tom asked

13 me what I had to say, and so I told him.  And he called me

14 a liar and asked me where my proof was.  He condemned me

15 to burn in hell and told me to leave and to never come to

16 the school or the church.

17     *Q.*    BY MS. FOX:  And did you ever go back to the

18 school or the church?

19     *A.*    No, ma'am.

20     *Q.*    At the point in time when you got kicked out, was

21 your family still attending the church?

22     *A.*    No.  My mom and brothers and sisters had got

23 kicked out a few months before, maybe like two months.

24     *Q.*    What for?

25     *A.*    Because my mother got married without his

1  permission.

2      *Q.*   So your mother got kicked out of the church for

3  getting married to someone?

4      *A.*   Yes.  Because they weren't attending the church

5  or were a part of the church.

6      *Q.*   After you got kicked out of Harvest, where did

7  you go?

8      *A.*   I went to -- actually, I got a phone call from

9  Calvin Lorts and he asked me to come and stay with him and

10  his family and finish up high school, and I did.

11      *Q.*   After you got kicked out of Harvest, when you

12  were, you said -- what year was that in?

13      *A.*   It would have been in '84 or kind of in between

14  '84 and '85 because the school went into '85.  So it was

15  in between '84 and '85.

16      *Q.*   So since, let's use the later date, 1985, how

17  many times have you seen Wendi?

18      *A.*   I've never seen Wendi but just once and that was

19  at a restaurant.

20      *Q.*   And when was that?

21      *A.*   I believe that would have been -- umm, that was

22  in the late 90's.  I saw her at the Casa Grande Cafe

23  Restaurant.  But that was the last time.

24      *Q.*   And so you've seen Wendi once since 1985?

25      *A.*   One time just for about ten minutes maybe.

1   *Q.*   When were you first told about Wendi killing her

2   husband?

3   *A.*   I think it was probably a couple of weeks later,

4   maybe a month later.  I had heard it from my mother and my

5   ex-wife.

6   *Q.*   What was your reaction?

7   *A.*   I was shocked.  I didn't believe it at first, but

8   they said it was true, and pretty much that was the end

9   of it.

10   *Q.*   And why haven't you come forward previously with

11   this information?

12   *A.*   I've never been asked, for one.  And, you know, I

13   didn't know that anybody needed to hear it.  I mean, it

14   was -- it's not something that I'm proud of, you know,

15   because my brothers and sisters were done dirty, and I was

16   older than them and I should have been there for them

17   more, I guess.  But it still bothers me, you know.

18   *Q.*   What bothers you about it?

19        MR. HAZARD:  Objection.

20        THE WITNESS:  Well, I should have stood up more

21   for them and --

22        MR. HAZARD:  Objection.

23        THE COURT:  Hold on a second.

24        MR. HAZARD:  Objection as to the relevance of why

25   it bothers him.

1          THE COURT:  Sustained.  Let's move on.

2     *Q.*   BY MS. FOX:  So around the time of Wendi's trial

3 and in the years prior, did anyone from Wendi's defense

4 team ever contact you?

5     *A.*   No.

6     *Q.*   So did an attorney named Dan Patterson ever

7 contact you?

8     *A.*   Nobody ever did.

9     *Q.*   So a David DeLozier never contacted you?

10    *A.*   No, ma'am.

11    *Q.*   A Scott MacLeod never contacted you?

12    *A.*   No, ma'am.

13    *Q.*   A Patrick Linderman never contacted you?

14    *A.*   No, ma'am.

15    *Q.*   If any of these people had contacted you, would

16 have told them what you've told the Court today?

17    *A.*   I would have.

18         MS. FOX:  Thank you.  I have no further questions

19 for this witness.

20         THE COURT:  Mr. Hazard?

21         MR. HAZARD:  Yes.

22

23                    CROSS-EXAMINATION

24 BY MR. HAZARD:

25    *Q.*   Mr. Neace, you're currently in the Department of

1  Corrections?

2      *A.*   Yes, sir.

3      *Q.*   And you're serving a prison sentence for a felony

4  conviction; is that correct?

5      *A.*   Yes, sir.

6      *Q.*   And that's not your first felony conviction;

7  correct?

8      *A.*   No, sir.

9      *Q.*   Do you have three other felony convictions?

10     *A.*   Yes, sir.

11     *Q.*   Okay.  And one was in 2002 out of Pinal County,

12  CR 2002-00120, and you served two and-a-quarter years.  Do

13  you remember that?

14     *A.*   Yes, sir.

15     *Q.*   And the next one was also in Pinal County

16  Superior Court, CR 2006-00335, and you served one

17  and-a-half years in prison for that felony conviction?

18     *A.*   Yes, sir.

19     *Q.*   And then, finally, in 2009, also out of Pinal

20  County Superior Court, CR 2009-00618, you served

21  1.75 years in prison for that one; correct?

22     *A.*   Yes, sir.

23     *Q.*   All right.  And when you knew Ms. Andriano, when

24  you met her when you were going to school together, I read

25  in your written statement that you called her the

1   All American Girl; is that accurate?

2       *A.*   Yes.

3       *Q.*   She was funny?

4       *A.*   Yes.

5       *Q.*   Outgoing?

6       *A.*   Yes.

7       *Q.*   Smart?

8       *A.*   Yes.

9       *Q.*   She was popular with other kids at the school and

10  church, from what you could see?

11      *A.*   I don't remember saying that.

12      *Q.*   All right.  She got along with everyone, though?

13      *A.*   I don't remember saying that.

14      *Q.*   Okay.  Was there a time when you moved away from

15  Casa Grande and moved to Georgia right around 12 or

16  13 years old?

17      *A.*   Umm, for about three months, we had moved there.

18      *Q.*   And then you came back?

19      *A.*   Yes.

20      *Q.*   And during that time you were away in Georgia, I

21  assume you didn't interact with Ms. Andriano; correct?

22  You didn't see her?

23      *A.*   No.  I couldn't see her from Georgia, no.

24      *Q.*   All right.  With respect to when you got kicked

25  out of the church by the Pastor Tom King, you testified

1   about how you confronted him about the Playboy magazine

2   and told him about it; correct?

3       *A.*   Yes, sir.

4       *Q.*   Isn't it a fact that you also punched Mr. King in

5   the chest as hard as you could?

6       *A.*   Umm, not as hard as I could, no, but I -- he

7   grabbed me, yes, and for trying to hold me down, telling

8   me just didn't different things.  I didn't have my hearing

9   aids on at the time, but he was telling me that I was

10  condemned to hell and I was going to burn.  And he had

11  already kicked my parents out -- my mother out.  And I had

12  a lot of anger in me for him, yes, I did.  But I did hit

13  him.  I pushed him and hit him towards the doors so I

14  could get out and leave.

15          (WHEREUPON, an off-the-record discussion ensued.)

16          MR. HAZARD:  Your Honor, if I may approach the

17  witness with Exhibit No. 23 for identification purposes.

18          THE COURT:  Yes.

19          MR. HAZARD:  And if I may approach the witness.

20          THE COURT:  Yes.

21      *Q.*   BY MR. HAZARD:  Mr. Neace, do you recognize

22  Exhibit No. 23?  Do you recognize that, sir?

23      *A.*   Yes.

24      *Q.*   Turn to the last page.  Is that your signature at

25  the bottom where it says Jasper Neace?

1    *A.*    Yes, it is.

2    *Q.*    And you signed that declaring under penalty of

3    perjury under the laws of the State of Arizona, United

4    States of America, that everything that was in that

5    document was true and correct?

6    *A.*    To the best of my knowledge and to the best of my

7    remembering, yes, I did.

8    *Q.*    All right.  And you signed that on the 7th day of

9    June of 2010; correct?

10   *A.*    Yes, sir.

11   *Q.*    And was this declaration prepared for you by

12   someone from Ms. Andriano's team?

13   *A.*    Umm, it was just I guess what they wrote out when

14   they was taking my statement and what I could remember

15   that day.

16   *Q.*    All right.  And if you would turn to what's

17   marked as Page 22 in that exhibit at the very bottom.  And

18   that's where you were -- in your written statement, that's

19   discussing your confrontation with Pastor King; correct?

20   *A.*    Yes, sir.

21   *Q.*    And at the bottom you state:  I punched him in

22   the chest as hard as I could and then I turned around and

23   knocked Alejo down, going onto the next page?

24   *A.*    Yeah.

25   *Q.*    Is that correct?

1    *A.*    Yes, I did say that.

2    *Q.*    I ran out the door and hopped on my motorcycle;

3    correct?

4    *A.*    Yes, sir.

5    *Q.*    Now after reviewing that, is that what happened?

6    *A.*    Umm, yeah.  I mean, I did hit him, but I didn't

7    know that I said as hard as I could.  But I meant I was a

8    kid, you know.  But I hit him and then, yeah, I did, and

9    then I had to turn around and run out the other door and

10   get on my motorcycle.  That's what I did.  I don't

11   remember -- I think that Alejo either fell down or I

12   pushed him down going out the door.  I don't remember

13   exactly how it went because he tried to grab the door, but

14   I made it out the door.  But, yeah, that's pretty close

15   to it.

16   *Q.*    And then you got kicked out of the church?

17   *A.*    Well, yeah.  That day, that was it.

18   *Q.*    And you said a number of your family members were

19   kicked out of this church; correct?

20   *A.*    Yeah.

21   *Q.*    Do you blame that church in part for the problems

22   you've had with your criminal history?

23   *A.*    I believe that -- you know, I would have to

24   explain myself to say yes or no to that question.  But, I

25   mean, if you want to hear it, I can tell you.

1    *Q.*   Your words in that declaration were:  I feel like

2    they put me through hell; is that accurate?

3    *A.*   I did.  Yes, I did some of it -- some parts of

4    it.  Not all of it was bad.

5    *Q.*   And you don't like Pastor Tom King; correct?

6    *A.*   I don't -- it's not that I don't like him.  It's

7    that I disapprove of the way he -- you know, my mother has

8    passed away now.  But the way he brainwashed her to raise

9    us and to take us -- you know, we were a poor family and

10   she had to pay tithes with her food stamps, and every time

11   we'd go shopping, we had to get two carts and give him the

12   best of it.  And, yeah, there's a lot of things that I

13   disagree with in that man.

14           MR. HAZARD:  No further questions.

15           THE COURT:  Redirect?

16           MS. FOX:  Nothing, Your Honor.

17           THE COURT:  May this witness be excused?

18           MS. FOX:  Yes.  Thank you very much.

19           THE COURT:  Mr. Neace, thank you very much.

20   You're excused.

21           THE WITNESS:  Thank you.

22           THE COURT:  Then I'm going to order that

23   Mr. Neace be transported back to the Department of

24   Corrections.

25           And then, Deputies, thank you for assisting here

1   with Mr. Neace.

2           (WHEREUPON, the witness was excused and exited

3   the courtroom.)

4           THE COURT:  We will go ahead and take a break

5   now.  We'll be in recess.

6           (WHEREUPON, a recess ensued from 10:09 a.m. to

7   10:24 a.m.)

8           THE COURT:  This is CR 2000-096032, State of

9   Arizona vs. Wendi Elizabeth Andriano.

10          The record will reflect the presence of the

11  parties and counsel.

12          Counsel.

13          MR. ARNTSEN:  Yes, Your Honor.  We conferred with

14  the State's counsel during the break and we reached an

15  agreement with them.  Essentially, we agreed we would not

16  call Ms. Andriano in our case if they agreed they would

17  not call her in their case, and we have that agreement and

18  Ms. Andriano will not be called as a witness.

19          THE COURT:  By either --

20          MR. ARNTSEN:  By either side.

21          THE COURT:  -- the Petitioner or by the State; is

22  that correct?

23          MR. ARNTSEN:  That's correct, Your Honor.

24          MR. HAZARD:  That's correct, Your Honor.

25          THE COURT:  Then another housekeeping measure is

1    the State indicated that they might be calling Alejo

2    Ochoa, even though the Petitioners are not.

3            We have Mr. Miller, who is representing Mr. Ochoa

4    on the Fifth Amendment issue, on standby for this

5    afternoon.  If you do call Alejo Ochoa, would it be this

6    afternoon or out-of-order or would it be some time next

7    week?

8            MS. GARD:  Your Honor, I haven't consulted with

9    counsel on that, but my thinking would be it would be

10   during our case next week unless they have a preference.

11           MR. NICKELS:  No.  I mean, well, for what it's

12   worth, Your Honor, we don't want to overly pressure them

13   on time.  The schedule is a little back-loaded next week.

14   Our next witness is going to be Dr. Woods.  His direct is

15   going to be in the 90-minute range.  So I don't know how

16   long the cross is, but I suspect we will get done with him

17   today and would have time to slot in Alejo this afternoon

18   or even tomorrow.

19           And so, from the time standpoint, this afternoon

20   or tomorrow work very well for him.  Now, again, I can't

21   force them to call in somebody.  I'm just letting you know

22   that and letting them know that.

23           MR. ARNTSEN:  He's under subpoena for today and

24   tomorrow, but, again, it's fundamentally your call.

25           MS. GARD:  Have you released him from the

1   subpoena?  Is he still under subpoena?

2          MR. BENNETT:  We told his lawyer he was released

3   for the moment, but subject to being called.

4          MS. GARD:  Your Honor, if we could try to get a

5   hold of Mr. Miller over the lunch break and maybe then we

6   can have a little bit better idea.

7          THE COURT:  Okay.  What I'll do is I'll notify my

8   judicial assistant to contact Mr. Miller and indicate that

9   you may be contacting him during the lunch hour.

10         MS. GARD:  Yes, Your Honor.  Does your judicial

11  assistant have his cell phone number or something so we

12  can get a hold of him quickly?

13         MR. BENNETT:  I have that.  I can provide it.

14         THE COURT:  For Mr. Miller?

15         MS. GARD:  Mr. Bennett has it.  So he can provide

16  the number.

17         THE COURT:  Okay.  Gina, if you can hear me, go

18  ahead and call Mr. Miller and indicate to him that the

19  State may be calling him during the lunch hour.

20         Okay.  The Petitioner may call their next

21  witness.

22         MR. NICKELS:  Thank you, Your Honor.  We call

23  Dr. George Woods.

24         And as he's setting up, I just wanted to let the

25  Court know that we have conferred with counsel as to

1   evidentiary objections to this witness, and like was the

2   case with Dr. Hopper, I believe they are preserving their

3   objections as to admissibility of certain evidence.

4        We believe it goes under the mitigation rule and

5   703, but that they're not going to assert the objection or

6   make the objection again, again and again throughout the

7   testimony, so as to not slow it down too much.

8        THE COURT:  Ms. Gard or Mr. Hazard?

9        MR. HAZARD:  Yes.  My objection would be as to

10  hearsay, it goes to the truth of the matter asserted.  If

11  it's being offered to form the basis of any opinions, then

12  it would come in under that rule.  So that's kind of a

13  standing objection that we would have.

14       THE COURT:  Okay.  Sir, if you could please state

15  your name and face the clerk and raise your right hand,

16  the clerk will swear you in.

17       THE WITNESS:  Thank you, Your Honor.

18       THE CLERK:  Sir, could you please state your name

19  and spell your name for the record?

20       THE WITNESS:  Yes.  George Woods.  G-E-O-R-G-E;

21  W-O-O-D-S.

22       THE CLERK:  Thank you.

23       (WHEREUPON, the witness was duly sworn by the

24  clerk.)

25       THE COURT:  Sir, if you would please be seated on

1    the witness stand there.

2              THE WITNESS:  Thank you, Your Honor.

3              THE COURT:  And, sir, just a few things to

4    remember.  Go ahead and be seated.  If you need water,

5    there's water right there.

6              Just a few things to remember.  Speak up so that

7    everyone can hear you.  Also, please wait until the

8    question is completed before you answer the question and

9    please make sure that you give us a verbal response.

10             Is that all agreeable to you?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Go ahead and state your name for the

13   record.

14             THE WITNESS:  George Woods.

15             THE COURT:  And Mr. Nickels?

16             MR. NICKELS:  Yes.

17             THE COURT:  Okay.  You may proceed.

18             MR. NICKELS:  Thank you.

19             THE WITNESS:  May I just take a moment,

20   Mr. Nickels, to get organized?  I apologize.

21             MR. NICKELS:  Of course.

22             THE WITNESS:  Thank you.

23             MR. NICKELS:  All set?

24             THE WITNESS:  Yes.

25

1                GEORGE W. WOODS, JR., M.D.,

2    having been first duly sworn to tell the truth, the whole

3    truth, and nothing but the truth, testified as follows:

4

5                        DIRECT EXAMINATION

6    BY MR. NICKELS:

7        Q.   Okay.  Well, where do you live, Dr. Woods?

8        A.   My practice is in San Francisco.  I live in

9    Oakland, California.

10       Q.   What do you do for a living?

11       A.   I'm a neuropsychiatrist.

12       Q.   Have you done work for this matter?

13       A.   Yes, I have.

14       Q.   What did you do?

15       A.   I interviewed Wendi on three different occasions.

16   I interviewed her mother, Donna Ochoa.  I reviewed a

17   number of documents, including employment records and

18   medical records both of Mr. Andriano and of Wendi.  I

19   reviewed school records.  There were nine volumes of

20   mitigation records that I reviewed that included

21   everything from records of her father to biological

22   father's family, school records, a number of records.

23       Q.   We'll get into a little more detailed discussion

24   of the process you undertook in a few minutes.  But,

25   first, if you could just start off by giving a summary of

1    what you were asked to do for this case.

2    A.    Excuse me.  Yes, I was asked to do a

3    neuropsychiatric evaluation of Wendi in order to determine

4    whether she suffered from any psychiatric disorders or

5    cognitive deficits.

6    Q.    And please give us a summary of what you found.

7    A.    Well, I also was asked to determine if she had

8    any -- well, I said cognitive deficits; right?

9    Q.    Yes.

10   A.    I found that Wendi suffered from a number of

11   psychiatric disorders, including post-traumatic stress

12   disorder, complex type; bipolar disorder; dependent

13   personality disorder.

14         I also found that Wendi suffered from

15   dependent -- from what's called caregiver burden.  And,

16   also, that she did have cognitive deficits.

17   Q.    And we'll get into those in more detail later,

18   but, briefly now, if you could tell us what effect did

19   these disorders have on Wendi?

20   A.    Well, it's my professional opinion that they,

21   in league, undermined her ability to function effectively,

22   to weigh and deliberate effectively, and to handle

23   emotionally complex and stressful circumstances.

24   Q.    In your professional opinion, Dr. Woods, did

25   these neuropsychiatric disorders and cognitive deficits

1  that Wendi suffered affect her in the time leading up to

2  Joe Andriano's death?

3      *A.*   Yes.

4      *Q.*   Okay.  Like I said, we'll go through that in more

5  detail.  But now let's just turn back to your

6  qualifications.

7      *A.*   Sure.

8      *Q.*   Why don't you just start with your educational

9  experiences and take it from there to explaining your

10  qualifications in this area?

11     *A.*   Sure.  I went to Westminster College in Salt Lake

12  City, Utah.  And I majored in psychology, English history

13  and biology.  I'm sorry.  Psychology, English history and

14  biology.

15         I then left the academic arena and worked for IBM

16  for four years in San Francisco.  I returned to medical

17  school at the University of Utah and completed my medical

18  degree in 1976.  I then did a medical internship at

19  Alameda County Hospital in Oakland, California.

20         And I then did a psychiatric residency at

21  Pacific Presbyterian Hospital in San Francisco,

22  California.  I was chief resident my last year.

23     *Q.*   Once you finished your residency, did you go into

24  private practice?

25     *A.*   No.  I started a fellowship with the National

1    Institute of Mental Health and the American Psychiatric

2    Association.  And the fellowship was in geriatric

3    psychopharmacology.

4        Q.    How long was that?

5        A.    That was approximately two years.  I then --

6    during at that time and actually in my last year, I was

7    working as a family physician.  I had a medical practice

8    and actually practiced in right under the Arizona and

9    California borders in Blythe, California, and Parker,

10   Arizona.

11       Q.    What has been the focus of your medical practice

12   since that time?

13       A.    Since that time, it's been neuropsychiatry.

14       Q.    In this matter, you're serving as an expert

15   witness and a consultant.  Have you done that before?

16       A.    Yes, I have.

17       Q.    About how many times?

18       A.    I've testified probably about 85 times.  And I

19   testify in approximately 11 percent of the cases that I'm

20   consulted on.  So I've consulted on a number of cases over

21   time.

22       Q.    Now the cases in which you serve as an expert

23   witness or as a consultant, is it always capital cases

24   like this matter?

25       A.    No.

1  *Q.*   What other kind of work is it?

2  *A.*   Most of my forensic work -- besides my clinical

3  practice, most of my forensic work is actually civil.  I

4  do civil, both plaintiff and defense work, primarily

5  around issues of employment law and family law.  I'm a

6  certified mediator by the State of California.  I do

7  mediation.  So that's the bulk of my practice -- of my

8  forensic practice.

9  *Q.*   Of the times -- you've just told us how many

10  times overall you've served an expert witness or

11  consultant.  Can you give us your best guess as to how

12  many times it has been a capital case like this?

13  *A.*   That really referred to my capital case

14  experience.

15  *Q.*   Oh, the 85 times?

16  *A.*   Yes.

17  *Q.*   Okay.  In those cases, do you work on the capital

18  cases more work for the plaintiff or for the defense?

19  *A.*   I've never been retained by the government.  In

20  those 85 cases, they have been for the defense.

21  *Q.*   Okay.  Now in addition to your practice and your

22  forensic work, do you do anything else like teaching or

23  any of that type of work?

24  *A.*   Yes.  I'm a fellow of the American Psychiatric

25  Association.  I'm also a member of the American

1    Psychological Association.  Excuse me.  I'm the

2    president-elect of the International Academy of Law and

3    Mental Health based at the University of Montreal.

4         I'm also on the advisory board of the

5    International Association of Trauma Professionals, which

6    is an organization that's based in Nashville, Tennessee,

7    but is international in scope where we do teaching around

8    trauma.  We do research around various types of trauma,

9    both disaster trauma as well as interpersonal trauma.

10        I'm on the executive committee of the

11   International Association for Specialized Study of

12   Developmental Disorders.  And there we look at people that

13   have what we call challenging behaviors, but primarily in

14   areas of fetal alcohol spectrum disorder or Fragile X high

15   intellectual disability.

16   Q.   Now there should be a set of four binders down by

17   your feet.  Do you see that?

18   A.   Yes.

19   Q.   Does one of them say Binder 1, or the first set,

20   Exhibits 1 through 25?

21   A.   Yes.

22   Q.   If you could grab that, please.

23   A.   Okay.

24   Q.   And if you could take a look at the exhibits in

25   there that are marked 2 C and 2 D.  For the official

1 exhibit list, these would be 2.003 and 2.004.  But,

2 Dr. Woods, for you, they're 2 C and 2 D.

3    *A.*    Yes.

4    *Q.*    Can you please just tell us what those are?

5    *A.*    These are -- and I apologize for this.  These are

6 CV's.  These are a bit dated.  I've been updated.  And if

7 I may just add the things that should be on these CV's.

8    *Q.*    Oh, sure.

9    *A.*    I teach currently at FOTOL, the University of

10 California Berkeley School of Law.  I teach second year

11 law students a course called Law and Mental Health.  I've

12 been teaching that since 2012.  I actually started right

13 after this.

14        I also teach at Morehouse School of Medicine in

15 Atlanta, Georgia, and I've been teaching there for

16 approximately 12 years.  So I think that would be captured

17 here.  And I teach two courses:  Introduction to Forensic

18 Psychiatry and Introduction to Geriatric Psychiatry.

19    *Q.*    Okay.  So 2 C, or 2.003, is your CV.  And then in

20 2 D, what is that?

21    *A.*    This is a declaration that outlines, again, some

22 of my background and training.

23    *Q.*    And is it the two -- generally speaking, the two

24 documents you've just looked at, they're consistent with

25 the experience that you've just described for us in your

1  testimony?

2      *A.*   Yes.

3      *Q.*   Okay.  Now, Dr. Woods, these are both already

4  admitted into evidence.  So we don't need to move them in

5  now.  I just wanted to have you tell the Court what they

6  are.

7         Now, Dr. Woods, let's turn back to what you had

8  previewed for us, which is the process you undertook --

9      *A.*   Yes.

10     *Q.*   -- in this matter.  We're not now talking about

11  your analysis or conclusions.  I just want you to tell us

12  what you did when you interviewed, materials you reviewed,

13  et cetera.  So I know you started this before, but, if you

14  could, tell us again what you all did in this case.

15     *A.*   Sure.  First I -- and I'm not sure this is first

16  in terms of time, but in terms of priority, I had the

17  opportunity to examine Wendi.  And I did that on three

18  different occasions over the course of about a year.

19         I think it's important, if possible, to be able

20  to see someone on a number of occasions because

21  psychiatric disorders and brain disorders can often

22  change, and it's important to be able to see if things --

23  people change over time.  So I saw her on three different

24  occasions.

25         I then -- based upon that, I recommended that

1  neuropsychological testing be completed because there

2  appeared to be some subtle but significant cognitive

3  impairments that I felt needed to be evaluated more

4  thoroughly.

5      *Q.*   And was that done?

6      *A.*   Yes, it was.

7      *Q.*   Are you referring to the neuropsyche testing that

8  was performed by Dr. Myla Young and analyzed by Dr. Joette

9  James?

10     *A.*   That's correct.

11     *Q.*   In addition to interviewing or examining Wendi,

12  did you interview anybody else?

13     *A.*   I interviewed her mother, Ms. Ochoa, Donna Ochoa,

14  on April 27th, I believe it was, 2011.

15     *Q.*   What else did you look at?

16     *A.*   I looked at a comprehensive social history of

17  Wendi that really went back to before her birth that had

18  significant information about her father, his family,

19  about the structure of his family, about the medical

20  history of his family, about the social history of his

21  family, that there had been several members of the family

22  that had been incarcerated.  There was a history of sexual

23  molestation in that family.  It actually ended up with her

24  father being incarcerated for about 17 years secondary to

25  child sexual molestation.

1      I also was able to look at Ms. Ochoa's family and

2  see what I thought was relevant medical history about her

3  family as well, about the makeup of her family, the

4  relationship between her mother and father, their tense

5  relationship, the history of alcohol with her father, for

6  example.

7      Q.   And this information, you're describing looking

8  at Wendi's life history and then both of her parents.  Are

9  you getting this information through, you know, records,

10  medical records, declarations?  What kinds of documents

11  are you looking at?

12      A.   Yes.  In this particular case, although the

13  methodology is the same in every case, you would like to

14  have medical records, employment records, school records

15  and family medical records.

16      In this case, it was particularly rich.  There

17  were, frankly, many, many more records than I'm normally

18  used to having in this type of case.

19      Q.   But the types of documents you reviewed are

20  consistent with what you would normally review in a case

21  like this?

22      A.   That's correct.

23      Q.   And the process overall that you went through, is

24  that consistent with the process that you would typically

25  undertake in a case like this?

1      *A.*    Yes, if possible.

2      *Q.*    And in this case was it possible?

3      *A.*    Yes.

4      *Q.*    Did you prepare a report?

5      *A.*    Yes, I did.

6      *Q.*    And if you could look at the same exhibit binder.

7   I'm going to direct you to Exhibits 2, 2 A and 2 B.  And

8   then on the official exhibit list, it's 2, 2.001 and

9   2.002.

10     *A.*    2 B?  2.001?

11     *Q.*    Oh, no.  You're looking at 2, 2 A and 2 B.  And I

12  don't want to be confusing.

13     *A.*    Right.  Okay.

14     *Q.*    Unfortunately, that binder does not match up

15  exactly.

16     *A.*    I see.

17     *Q.*    Essentially, the 001 takes the place of the A.

18  The 002 takes the place of the B.  So you're looking for

19  2, 2 A and 2 B.  Could you tell us what those are?

20     *A.*    Yes.  2 A is Appendix A to my report.  This goes

21  through the materials reviewed.  And I see there are

22  actually many things that I didn't capture:  The writings

23  of Wendi; crime scene photographs; the trial testimony of

24  a number of people; Donna's testing and school records;

25  photographs that were taken by Mr. Ochoa; and other

1  declarations as well as expert reports of Mr. Hopper --

2  Dr. Hopper.

3      Q.   So 2 A of the list of materials that you reviewed

4  is Exhibit 2.  Is that your actual report?

5      A.   Yes.

6      Q.   Okay.  And what's 2 B?

7      A.   2 B is an overview of the biopsychosocial history

8  of Wendi and her family.  So this really is a -- it

9  captures the family history of Wendi and her biological

10  dad and her mother.

11      Q.   Okay.  And, again, these are already into

12  evidence, but I wanted to just highlight for the Court

13  where they are and what they are.

14          Dr. Woods, let's now turn to your analysis.  In

15  your opening remarks, you said that Wendi suffers from

16  multiple disorders and deficits and you named several.

17  Could you please tell us again what those are?

18      A.   Sure.  Post-traumatic stress disorder.  The type

19  that Wendi suffers from is what is entitled complex

20  post-traumatic stress disorder.  There are several types

21  of traumatic stress.  Bipolar disorder.  Dependent

22  personality disorder.  It's my belief that Wendi suffers

23  from specific cognitive impairments.  And I use the term

24  in the literature of caregiver burden.

25      Q.   Yes, caregiver burden, is that a diagnosis like

1   the other four that you mentioned?

2      A.   Caregiver burden is not a diagnosis.  Caregiver

3   burden has been used for the last 25 years as a term --

4   it's an umbrella term to talk about the specific stressors

5   that occur when people take up the role of caring for

6   chronically ill persons, most commonly terminally ill

7   persons.

8         This term was initially utilized by Hazelton in

9   1978 looking actually at schizophrene and family members

10  that took care of schizophrene.

11     Q.   So is caregiver burden its own diagnosis or is it

12  more something that can exacerbate other disorders?

13     A.   That is a good question.  Caregiver burden is a

14  disrupter.  Caregiver burden undermines a person's ability

15  to care for themselves, to solve problems.

16        It's one of the reasons why today you see with

17  the explosion of Alzheimer's, for example, that you have

18  multiple caregiver groups because it's become understood

19  that caregiver burden undermines that person's ability to

20  function effectively, but it also exacerbates and disrupts

21  symptoms that that person may -- that caregiver may have.

22  It may in fact enhance the difficulties that that

23  caregiver brings to the situation.

24     Q.   But it's your opinion, just to summarize it,

25  Wendi suffered from sort of four disorders or deficits and

1   then has this caregiver burden that can exacerbate those

2   deficits?

3       *A.*   Yes.

4       *Q.*   Let's walk through each of them starting with

5   complex PTSD.  If you could just start off by telling us

6   what is complex PTSD?

7       *A.*   Bessel van der Kolk and Judith Herman first

8   coined the term complex PTSD in around 1985.  And it was

9   really designed to separate out what we now recognize as

10  Type 1 PTSD and Type 2 PTSD.

11      *Q.*   What's the different between Type 1 and Type 2

12  PTSD?

13      *A.*   Type 1 PTSD is the type of PTSD that is reflected

14  by a single incident, an assault, a rape, either with

15  great bodily injury or seeing someone and particularly

16  someone that is close to you, have that type of

17  experience.  But, more commonly, it's a singular

18  experience that leaves a person reliving that experience,

19  that leaves them not wanting to perhaps be in areas where

20  that experience occurred, although, they may have to.  It

21  may have been something that happened at work.  They have

22  no choice of going back.  It dysregulates the emotions so

23  that people tend to underrespond or overrespond.

24      *Q.*   How is Type 2 or complex PTSD different from what

25  you just described?

1    A.    Complex PTSD Type 2 is an ongoing trauma as
2    opposed to the singular event.

3         Complex PTSD is the ongoing sexual abuse or
4    ongoing physical abuse or ongoing domestic violence, and
5    it presents differently.  People often with the complex
6    PTSD, they don't really have to relive the act, the
7    experience in their minds because they're reliving it from
8    day-to-day.  They don't have to move away from the
9    experience quite so much because it's ongoing.  And so you
10   find that complex PTSD really creates symptoms that are
11   more long lasting symptoms of what we call rumination,
12   having these things go on over and over.  And complex
13   PTSD, more than Type 1 PTSD, disrupts day-to-day
14   functioning.

15   Q.    And you believe Wendi suffers from complex PTSD?

16   A.    Yes, I do.

17   Q.    Why do you believe that?

18   A.    Because when I had the opportunity to examine
19   Wendi, she manifested some of the symptoms of complex
20   PTSD.  She had problems with remembering affectively
21   laden events.  And what I mean by that are events that
22   have some emotional content to them.  It's not like
23   remembering a football score or an address.  It's
24   something that is -- that pulls for the emotions.

25   Q.    Did she have trouble with those memories?

1    *A.*   Yes.

2    *Q.*   Is that something you typically see in folks who

3    suffer from complex PTSD?

4    *A.*   Yes.

5    *Q.*   What else did you see in your interview

6    examination of Wendi that caused you to believe she

7    suffers from complex PTSD?

8    *A.*   Wendi described -- and this in some ways derives

9    from the memory problems.  Wendi describes dissociative

10   experiences.  And dissociation is a perceptual disorder.

11   It's a disorder of perceiving things accurately.  The most

12   common dissociative experience that we probably all have

13   had are déjà vu experiences.  I think I've been here

14   before.  I think I've experienced this before.  That is a

15   type of dissociation.  But the most pathological

16   dissociative experiences are those that come from trauma.

17          And the one that really I think that captured it

18   for me were photographs that had been taken by Wendi's

19   biological -- by her adopted father.  And these were

20   photographs that were very suggestive.  They were

21   photographs of her in a nightgown with a light shining

22   behind her, so that you could actually see the silhouette

23   of her body -- her naked body through the nightgown.  On

24   several occasions -- on at least two occasions, I talked

25   to Wendi about these photographs, and on one occasion,

1  showed them to her.

2      Q.   Did she remember these pictures being taken?

3      A.   She remembered going up the mountain.  She said

4  she did recall going up the mountain.  She did not recall

5  having the pictures taken.

6           And there are other pictures of Wendi in

7  lingerie, again, in her early teens being taken in a hotel

8  room.  And, again, she recalled being in the hotel room

9  with her adopted father, but she didn't recall having the

10 pictures taken.

11     Q.   In addition to these memory problems and the

12 dissociation you've just described and that you observed

13 in Wendi, you said you also reviewed her social history?

14     A.   Yes.

15     Q.   Anything from that that causes you to conclude

16 she suffers from complex PTSD?

17     A.   The social history, yes.

18     Q.   What is that?

19     A.   The social history, as described by Ms. Ochoa and

20 as described by Wendi was a social history of sexual

21 pressures.  A social history -- and there were

22 declarations of others, people within the church that saw

23 the sexual pressures that Wendi was subject to from her

24 biological father.  And these included dressing in

25 clothing that perhaps is not only inappropriate for their

1   church, a very fundamentalist Christian church, but

2   certainly may have been inappropriate for anyone at that

3   age, of a very -- someone ten years old to 12 years old,

4   13.   Inappropriate types of touching, soothing.

5          And even before Mr. Ochoa was in her life, there

6   were instances of neglect that were every bit as important

7   as the abuse.   The trauma literature is very clear that

8   neglect can have the same type of impact as trauma.

9          And so we have these stories of Wendi wandering

10   the streets when her mother is working in very, very tough

11   neighborhoods with -- and her mother is working with

12   people that are drug abusers and a very difficult crowd.

13   Wendi is on the streets.   She's three years old.   She's

14   wandering on the streets.

15   Q.   These kinds of traumatic experiences, then, that

16   were a pervasive part of Wendi's life, are these the types

17   of things that could cause a complex PTSD, in your

18   experience?

19   A.   They can cause -- they are the basis for the

20   types of behaviors that derive from complex PTSD.

21   Q.   What do you mean by that?

22   A.   What one sees with PTSD are behaviors like

23   numbing.   Numbing is -- it's just what it sounds.   When we

24   think of being numb, we think of not being able to -- you

25   know, if we get something -- if we get a shot or

1    something, we can't feel it.

2         And that's what happens with complex PTSD.  It

3    happens to some degree with Type 1, but where you really

4    get numbing is when these behaviors occur over and over

5    and over again.  And one of the things that happens with

6    numbing is these behaviors that are so inappropriate, that

7    are so beyond the pale, become normalized.

8    Q.   In addition to -- well, you just talked about the

9    traumas that Wendi suffered in her childhood.  By that, I

10   mean, you know, zero up to age 18.

11   A.   Right.

12   Q.   Is there anything in Wendi's life beyond that?

13   Any traumas or other experiences that could have impacted

14   or exacerbated her complex PTSD?

15   A.   Yes.

16   Q.   What is that?

17   A.   Certainly, the illness of Mr. Andriano.

18   Q.   And how would that affect her?

19   A.   When someone is -- when someone has a history of

20   trauma, it makes them vulnerable to new types of trauma.

21   And when we see the course of Mr. Andriano's medical

22   history, it is a terrifying and extraordinarily sad

23   history, even more so than the idea of someone getting a

24   diagnosis -- a terminal diagnosis and then having to live

25   with that diagnosis.

1    *Q.*   What makes this history -- this medical history

2    for Mr. Andriano more difficult, particularly from the

3    standpoint of having to handle that of somebody who is

4    already dealing with PTSD?

5    *A.*   Wendi and Mr. Andriano were married I believe on

6    January 22nd of 1994.  And within a very short period of

7    time, within months, perhaps -- I think it was four or

8    five months; it may have been a bit longer than that --

9    Mr. Andriano went in for his first surgery.  That surgery

10   only took a small part of the area away.  The pathology

11   reports said that they were in fact benign.  And so we

12   have a young couple that gets a scare, but are able to

13   kind of get through it.  They're trying to get their life

14   together.  They're both trying to work.

15            And then the pain comes back and he's feeling

16   this pain and he's recognizing that something is again

17   going awry, at which point they have the second surgery.

18   And in the second surgery, there's a wider swath that is

19   taken.  This is common in these types of surgery where

20   they try to get as many lymph nodes, as much of that area,

21   that there's a wider swath that's taken.  And, again, the

22   pathology report says that the pathology was benign.

23            And by the time you get to the third surgery,

24   which is what's really called a radical surgery, they take

25   significant parts of his neck.  He has a tracheostomy.

1    For a period of time, he has to have a tube through his

2    tracheostomy.  They have had children, Nicholas and then

3    Ashlee.  They have moved a number of times from the

4    Andriano family home to a condominium to apartments that

5    Wendi had been working at, to The Biltmore, where she

6    can't work -- she can't have an apartment there.  So they

7    get a separate apartment, but the distance in going back

8    and forth becomes problematic.

9         So you see multiple disruptions of their life,

10   and it's this sawtooth pattern that is in my opinion even

11   more difficult to adjust to, even more pressurized than

12   just a trajectory of terminal illness.

13   *Q.*   Dr. Woods, let's now turn to the effects of

14   complex PTSD.  Somebody who suffers from this, as Wendi

15   did, what is going to be the effect on that person, on

16   Wendi, and how she kind of handles day-to-day life?

17        MR. NICKELS:  And, opposing counsel and Your

18   Honor, as with Dr. Woods -- or with Dr. Hopper, we have a

19   slide after this.

20        THE COURT:  Okay.

21        THE WITNESS:  These are the -- there are multiple

22   effects of complex PTSD, but I felt these were the ones

23   that were most relevant to our description here.

24        First of all, numbing of emotions.  And I've

25   talked about that.  And numbing of emotions, it's

1  surprising to many people because they feel like if a

2  person is involved in this traumatic situation, then, you

3  know, you will always be reactive.  You should always be

4  -- you should always feel it.

5       Yet, when something is chronic, when something is

6  ongoing, the pattern of PTSD, there is this numbing of

7  emotion.  It doesn't mean that the person doesn't feel.

8  It means that in order to fight off the multiple stresses,

9  they cocoon themselves.

10      *Q.*   BY MR. NICKELS:  What do you mean by your second

11  point there, dysregulation?

12      *A.*   And I apologize.  I spelled this wrong.  It's

13  D-Y-S instead of D-I-S.  I apologize for that.

14  Dysregulation is one post-traumatic stress loader.  It's

15  really the primary impact of post-traumatic stress

16  disorder.  Dysregulation -- post-traumatic stress disorder

17  throws off one's ability to respond accurately and

18  effectively.  People that have severe traumatic stress,

19  they either overrespond or they underrespond.  And I'm not

20  saying in each and every situation, but certainly in

21  emotional laden situations.  They often just miss the bar.

22      And it's because of the third one:  Their ability

23  to really effectively weigh and deliberate what's going on

24  is impaired, their ability to kind of add up all the

25  figures to determine what's the best course of action.  A

1  part of that is because of what's happened in the brain.

2      Q.   What does happen in the brain?

3      A.   When someone experiences a traumatic event, it's

4  really a shift.  It's really a shift from left brain to

5  right brain.  And this is kind of a gross generalization.

6  But most of us, most times we sit in our left brain.  We

7  sit in kind of that part of the brain that's rational and

8  organized.  The left side of the brain is where we learn

9  how to weigh and deliberate.  That's where we -- where our

10 reading skills are, our math skills, those things that

11 kind of keep us together.

12         The right side of the brain is really more

13 emotion.  It's really the side of the brain that really

14 handles emotions, where people may become impulsive, where

15 it -- because the right side of the brain, it's actually a

16 part of the brain as you look at the big picture.

17         And so the best studies show that when people

18 have been traumatized, and particularly traumatized over

19 time, you see impairments in that right brain, in that

20 right parietal lobe, in that right frontal lobe.  You see

21 impairments in being able to really understand and

22 recognize social situations.  So that's where it would

23 occur.

24     Q.   And the final point, what do you mean by a high

25 co-morbidity with substance abuse?

1     *A.*    So often when we're talking about a

2   neuropsychiatric disorder, it's interesting, we think of

3   one disorder.  A person has schizophrenia or a person has

4   PTSD.  But when you think of going to the doctor, that's

5   not really how it happens.  You may have some allergies.

6   You may have a cough, a flu.  You may have hypertension.

7           And that's really how it is with psychiatric

8   disorders as well.  Psychiatric disorders occur together.

9   And substance abuse, drinking, drug use occur more

10  commonly in people that have post-traumatic stress

11  disorder than in any other psychiatric disorder except for

12  bipolar disorder.

13          So if you have a diagnosis of post-traumatic

14  stress disorder, 65 percent of people that carry a

15  diagnosis of post-traumatic distress disorder, at some

16  time in their life will also meet the criteria for a

17  diagnosis of chemical dependency.  They go hand-in-hand.

18    *Q.*   Let's turn now to the one you just mentioned,

19  bipolar disorder.  What does it mean for someone to have

20  bipolar disorder?

21    *A.*   Bipolar disorder is a genetic or familial

22  disorder as opposed to PTSD, which is really an

23  environmentally-derived disorder, when you stop and think

24  about it.  PTSD occurs because something happens in the

25  environment to you.

1          Bipolar disorder and all mood disorders,

2   including depression, have really been found to be

3   disorders that run in families.  If a mother or a father

4   or a sibling or an aunt or uncle have a mood disorder like

5   depression or like bipolar disorder, it increases one's

6   ability, one's potential of inheriting that disorder four

7   to six times.

8      Q.   What are the symptoms of bipolar disorder?

9      A.   Well, the bipolar obviously refers to two poles.

10  And the first pole is really depression.  People that have

11  bipolar disorder at some time in their life have to have

12  met the criteria of being depressed, of having feelings of

13  hopelessness, of isolation.  If it's a retarded

14  depression, of sleeping excessive amounts, of feeling

15  almost physically unable to function.

16         But the other pole is a little different.

17  Historically, it was thought that mania, which is the

18  other pole, was grandiosity.  You're up and you're active

19  and you're running around and you think you're the king of

20  England or what have you.  But we now know that that's not

21  correct.

22         That bipolar disorder really reflects more

23  irritability, impaired judgment, impulsivity.  There are

24  what we call neurovegetative signs.  There's problems

25  sleeping.  There may be problems eating as well.

1        So bipolar disorder -- and there may be some

2   grandiosity, but we now recognize that in bipolar

3   disorder, it's much more identified by irritability, by

4   problems sleeping, by impulsivity, by impaired judgment.

5        Q.   What did you see in Wendi either in your direct

6   observations of her or your analysis of the family history

7   that caused you to conclude she suffers from bipolar

8   disorder?

9        A.   Well, the first thing that one looks at is family

10  history.  And we have a biological father that has a

11  history of a mood disorder of depression.  We have a

12  maternal aunt who was diagnosed with bipolar disorder and

13  lived with that psychiatric disorder her entire life, was

14  treated for it, was hospitalized a number of times for

15  bipolar disorder, was treated with a number of medications

16  into her 70's.

17        And we have Ms. Ochoa who gives a history of

18  depression, as well as a history of periods of increased

19  activity, periods of increased spending when you don't

20  have it, that are consistent with periods of -- periods of

21  what we call anxiety, panic attacks that also are

22  consistent with by bipolar disorder.

23        Q.   And what --

24        A.   Excuse me.  And one other that I had mentioned,

25  there are particular types of depression that are also

1   associated with the potential of bipolar disorder.  One of

2   them is a postpartum depression.  People that have --

3   women that have postpartum depression, there's about a

4   20 to 25 percent greater incidence of postpartum

5   depression in women that have bipolar disorder.

6   *Q.*   What does the research and what do the numbers

7   show as to the odds that somebody will suffer from bipolar

8   disorder when there are others in their family who also

9   suffer from that?

10   *A.*   The incidence of bipolar disorder in the United

11   States is about 4 percent.  It's a little bit higher

12   internationally.  If you look at the Diagnostic and

13   Statistical Manual, it's about 4 percent.  If you look at

14   the International Classification of Disease, it's about

15   6.7 percent in the general population.

16          If you look, however, at one family member, that

17   pretty much doubles the incidence.  It comes to about to

18   8 percent.  If you have two family members, it goes to

19   about 12 to 14 percent.

20   *Q.*   So you're saying that if there's no history of

21   bipolar in your family, you've got about a 4 percent

22   chance?

23   *A.*   That's correct.

24   *Q.*   It goes up to 8 percent if you have one other

25   family member who suffers from it, and then up to 12 if

1   you have two family members who suffer from it?

2       A.   And that includes depression as well as bipolar.

3   It doesn't have to be specific to bipolar.

4       Q.   What did you see in Wendi herself in your

5   observations and examination of her that caused you to

6   believe she suffers from bipolar disorder?

7       A.   Well, the first thing -- and I didn't -- this

8   wasn't directly in examining Wendi.  But in her history,

9   there was a history of depression.  Wendi, even as a young

10  child, would hide in the closet.  And as she got older

11  while doing missionary work in Mexico, she was in bed for

12  days at a time, and I believe in one period, for a couple

13  of weeks.

14           This early period, usually in adolescence, is

15  what's called a prodromal period, and the prodromal period

16  is a period that is kind of like the -- I think it was

17  kind of like the bubble, bubble, 12 and trouble.  It's a

18  period that comes before the crystallization of the

19  disorder.  It's typically adolescence.  For mood

20  disorders, the first symptom that you see, particularly in

21  women, is depression.  And this is what's been described

22  with Wendi.

23      Q.   What about the other pole, the mania side of

24  things, did you see anything -- did you see signs of that?

25      A.   The mania was really captured more after her

1  incarceration.  During the time of her incarceration from

2  about 2002 to about 2005, Wendi was actually on a

3  psychiatric unit within the jail setting.  And while on

4  that unit, she was treated with medications that were

5  consistent with a mood disorder, both antidepressants as

6  well as other medications.

7      *Q.*   Was she ever treated with any medications that

8  were specific to bipolar?

9      *A.*   She was.

10     *Q.*   What's that?

11     *A.*   Seroquel.  There are really only two indications

12 to Seroquel.  Seroquel is what is described as an atypical

13 antipsychotic.  It is a medication that is within a class

14 of antipsychotic medications where the mechanism is

15 poorly -- the physiological mechanism is poorly

16 understood.  And so it's called an atypical antipsychotic,

17 Abilify, Clozaril, there are a number of others.

18          Seroquel initially started out in use with

19 someone who's psychotic, someone that has impaired

20 contact with reality.  Over the last ten years, however,

21 it has been specifically indicated for bipolar depression.

22     *Q.*   And that's what she was being treated with by the

23 medical professionals through the prison/jail system; is

24 that right?

25     *A.*   That's correct.  She was initially started on

1  about 50 milligrams, which is a relatively small dose of

2  Seroquel, which increased over time to about

3  200 milligrams.

4  Now if we look at Wendi's -- excuse me.  But if

5  we look at Wendi's history, you know, in the jail setting,

6  we see that she is initially treated with Trazodone.

7  Trazodone is an antidepressant.  However, it is such an

8  extraordinarily sedating antidepressant, that it is not

9  used for depression.  It's actually used for sleep.

10  And so she was initially treated with an

11  antidepressant, but you can't really say that a mood

12  disorder was being treated because they were trying to

13  help her sleep.

14  Secondly, she was treated with Prozac, an

15  antidepressant.  Next, she was treated with Remeron.

16  Remeron is again an antidepressant.  And these were

17  treatments for significant depression.  It was around this

18  time that she had a suicide attempt and they switched her

19  to the Seroquel.

20  Q.  Now, Dr. Woods, you're describing symptoms and

21  treatment once Wendi was incarcerated.  Could someone just

22  say, well, of course, she was depressed?  She was in jail

23  facing life in prison and the death penalty.  Anybody

24  would be depressed from that.  Could that be the cause?

25  A.  Well, Mr. Nickels, first, of course, someone

1  could say that.  But, first, what we have is a history of

2  depression, symptoms of depression before she was

3  incarcerated.

4        Secondly, the forensic literature, and

5  particularly the literature of Adrian Raine, for example,

6  or even Reed Malloy really looks at the fact of what

7  occurs in those early stages of incarceration is anxiety

8  because in fact they have not been sentenced.  They have

9  not been tried yet.

10        And what we see with Wendi was that they were

11  treating her during this period of time before -- before

12  she came to trial, during the time that she came to trial.

13  And within the medical records, themselves, there are

14  indications that they saw her as fragile, that they were

15  concerned about her ability to handle multiple stresses.

16        I've taken a moment to pull some of the notes --

17  medical records out that I think illustrate these periods,

18  and if I could -- I couldn't commit them to memory.  I'm

19  sorry.  But if I could -- if I could look at those

20  quickly.

21    Q.   Certainly.  Go ahead.

22    A.   On September 30th of 2003, the Maricopa County

23  medical records note that Wendi was, quote, overwhelmed by

24  multiple circumstances.  On 9/30 of 2003 -- and I think

25  this really kind of goes to her cognitive state.  We'll

1  talk more about that.  The increasing stress of
2  incarceration, legal status and toxic environment have
3  combined to erode Wendi's ability to cope.
4        On October 10, 2003, she is good at covering and
5  appears less distressed than she really is.
6        Again, I think that speaks to cognition, and
7  we'll talk about that.
8        On October 17, 2003, Wendi has multiple serious
9  stressors.  Although, she is high functioning, she is too
10 fragile for general population.
11 Q.   What does that one mean?  I know we're jumping
12 ahead a little bit to the cognitive issues, but what is
13 that high functioning coupled with fragility?  What does
14 that mean to you?
15 A.   Well, I think if you look at Wendi before the --
16 before she married Mr. Andriano and before the terrible
17 events happened to him and his illness, she was well
18 functioning.  She was going to college.  She got good
19 grades.  She worked.  So I think that you could look at
20 that period as a period where she was not under the
21 stressors.  She wasn't even under the stressors that she
22 had had at home.  She had moved out of her home.  And so
23 she was functioning much more effectively.
24       What this describes and what we've seen in the
25 neuropsychological testing is an erosion of skills as one

1   starts to see Wendi in more complex and more emotional

2   situations.  That as she walks down into complexity or

3   what we call affectively laden, emotionally laden

4   circumstances, she starts to fall apart.

5       *Q.*   I understand we have some video clips from

6   when -- as you understand, the State has an expert,

7   Dr. Pitt, and the counterpart to you, who interviewed

8   Wendi this past fall.  Is that consistent with your

9   understanding?

10      *A.*   Yes.

11      *Q.*   And we have some clips from that interview that I

12  understand demonstrate some of the behaviors or issues

13  that we're talking about now; is that right?

14      *A.*   That's my opinion, yes.

15          THE COURT:  No objection?

16          MR. HAZARD:  No, as long as the record is

17  supplemented at some point before the close of these

18  proceedings exactly which clips and where they are.

19          MR. NICKELS:  Yes.  We can do the same thing with

20  Dr. Woods like we did with Dr. Hopper, which is tell them

21  exactly where it is in the transcript.

22          THE COURT:  Can we do that?

23          MR. HAZARD:  Yes.

24          THE COURT:  This is with the understanding that

25  the court reporter will not be taking down what's being

1   said on the video; is that correct?

2            MR. NICKELS:  That's correct.

3            THE COURT:  Okay.

4            MR. NICKELS:  Before we hit play, we're just

5   going to make sure the speakers are properly hooked up.

6            (WHEREUPON, the video was played.)

7       Q.   BY MR. NICKELS:  So what did we see there,

8   Dr. Woods?

9       A.   We saw Wendi describing symptoms of mania,

10  difficulty sleeping, bursts of energy that really were not

11  tied to any particular activity.

12           The last question about sexuality is an important

13  question because what you see in at least the National

14  Institute of Mental Health describes impulsivity and

15  sexual impulsivity as being one of the key symptoms that

16  one sees in bipolar disorder.

17           MR. NICKELS:  Okay.  Let's go to the next video.

18           (WHEREUPON, the video was played.)

19      Q.   BY MR. NICKELS:  What did we see there,

20  Dr. Woods?

21      A.   What we saw there was a description of the sleep

22  disruption that occurs with post-traumatic distress

23  disorder.  One of the symptoms that is common in

24  post-traumatic distress disorder, and really in all

25  psychiatric disorders, are disruptions of sleep.

1      And in the late 90's, I ran a sleep disorder

2  program in Northern California.  And what you really are

3  seeing here are a -- dreams occur -- and I'll do this very

4  quickly.

5      Q.  Take your time.

6      A.  Dreams occur early in the morning right before

7  you wake up.  It's called rapid eye movement, or REM

8  sleep, and it's the period of time that you -- that most

9  people dream.  You have small pieces of that earlier in

10 the evening and it gets fine, it gives up.

11     Disorders of stress or disorders of anxiety

12 disrupt your sleep architecture.  And so it makes it more

13 difficult both to fall asleep, and by making it more

14 difficult to fall asleep, the normal stages of sleep are

15 disrupted.

16     But what you're hearing here are really pretty

17 classic symptoms of post-traumatic distress disorder,

18 which for years was defined as anxiety disorder.  Now it's

19 become a separate category of a stress disorder in

20 DSM-5, but for years, it was defined as an anxiety

21 disorder because it has symptoms that are very consistent

22 with anxiety.

23     The important part of this is that when you're

24 trying to make a diagnosis, particularly in a forensic

25 setting, you want to hear both classic symptoms, but you

1   also want to hear the small cues.  You want to hear these

2   little things that people say that they couldn't have read

3   in a book about post-traumatic stress disorder.  And,

4   certainly, the type of disruption in sleep is not

5   something that you're going to get in a Today or, you

6   know, the Wall Street Journal.  So there are these little

7   clues that really tell you she's accurately describing a

8   sleep disorder.

9        MR. NICKELS:  Okay.  I understand we have one

10  more video in this segment.

11       (WHEREUPON, the video was played.)

12   *Q.*  BY MR. NICKELS:  What do we have in that video,

13  Dr. Woods?

14   *A.*  We have -- and I'm sorry.  I should have said

15  something while the video was going.  But, at one point,

16  Mr. Nickels, perhaps you heard her talk about her mind is

17  racing.  Racing thoughts is a term of art in looking at

18  mood disorders.  Racing thoughts are a type of thinking

19  that occurs in bipolar disorder that is not really

20  consistent with any other type of psychiatric disorder.

21  It's the shift that your thoughts are going so fast that

22  you just aren't able to hold onto them.

23       And it's ironic, because within the Maricopa

24  County medical records -- and this is what really made me

25  understand that the treatment with Seroquel was for

1    symptoms of a mood disorder.  I'm not sure that they ever

2    used the diagnosis of bipolar disorder.  But they talk on

3    November 25th, 2003:  Thoughts are mildly racing.

4        Q.   That's from the Maricopa County medical records?

5        A.   That's correct.

6        Q.   Okay.  So they're using the same terminology of

7    what we saw from Wendi on the video?

8        A.   That's exactly right.  These are the progress

9    notes from Maricopa County:  Thoughts are mildly racing.

10   That really describes a specific constellation of symptoms

11   that is just not found.  You don't have racing thoughts in

12   schizophrenia.  You don't have racing thoughts in

13   depression.  You don't have racing thoughts even in PTSD.

14       Q.   Now let's turn to -- you've described the reasons

15   you believe Wendi suffers from bipolar disorder.  Let's

16   turn to the effects.

17       A.   Sure.

18       Q.   What happens to somebody?  What is the effect on

19   someone of this disorder?

20       A.   The first one up there is really the -- it's the

21   big one, and that is impaired judgment.  People that have

22   bipolar disorder have significantly impaired judgment.

23   These are people -- and it can occur on either pole.  It

24   can occur with people that are depressed.  It can occur

25   with people that are manic.  Their ability to effectively

1    weigh and deliberate, think their way through a problem,

2    is significantly impaired.

3        Q.   What do you mean by unusual and flagrant

4    behavior?  Is that sort of the result of this impaired

5    judgment?

6        A.   Umm, that's a good question.  Is a result of an

7    impaired judgment?  It is, yes.  It's a factor, though,

8    not only of the impaired judgment, but of -- and I don't

9    have this here -- their loss of understanding of social

10   boundaries, their ability to under context.  They may be

11   very intrusive.  They may have been involved in sexual

12   activity or other types of behavior.

13            I once had a patient that sold her two million

14   dollar house for 50 bucks because she had enough money,

15   she thought.  So you get this just amazingly impulsive,

16   flagrant and behavior that's unusual outside of the

17   confines of their disorder.

18            If this person is what we call euthymic, which

19   means they are kind of at their baseline, they're not

20   really that elevated, they're not depressed, you know,

21   they do very, very well.  We know that some of our

22   greatest writers and other people have had bipolar

23   disorder.

24            But if they move into that mania, we see

25   impulsivity, impaired judgment, real inability to

1   effectively weigh and deliberate.

2   Q.   Then I see again we've got that high co-morbidity

3   that you talked about with PTSD?

4   A.   Yes.  Bipolar disorder and PTSD have the greatest

5   relationship to chemical dependency.  People that have

6   bipolar disorder self-medicate.  People that have PTSD

7   self-medicate and they do it to a greater level than any

8   other psychiatric diagnosis.

9   Q.   Let's turn now, Dr. Woods, to the third disorder

10  you talked about, which is the cognitive deficits.

11  A.   Sure.

12  Q.   You mentioned a little bit of that as we've gone

13  through your analysis.  What causes you to conclude that

14  Wendi suffers from cognitive deficits?

15  A.   Well, you know, I'm going to say, Mr. Nickels,

16  that, you know, the neuropsychological testing as well as

17  the examination that I performed showed Wendi's ability to

18  read, write, function in those ways to be pretty intact.

19  There were specific areas -- not global impairment, but

20  there were specific areas that she showed erosion of

21  performance.

22  Q.   What were those areas?

23  A.   The first was memory.  Her memory was impaired.

24  But I need to take a moment to kind of talk about memory,

25  if that's okay.

1    *Q.*   Sure.

2    *A.*   There are multiple types of memory.  There are

3  claritive memory:  What did you eat last night?  There's

4  explicit memory:  What is your telephone number?  There's

5  implicit memory:  Your date of birth.  These are all in

6  different parts of the brain.  And there's memory for

7  verbal things as opposed to memory for written things.

8  These are all in different parts of the brain.

9         So when we talk about memory, I want to be

10  specific.  Her ability to remember baseball scores and

11  that type of thing is probably relatively intact.  Where

12  her memory breaks down are in emotionally laden

13  situations.  And this is primarily verbal memory, being

14  able to hear things accurately, being able to understand

15  them appropriately.  So it's her verbal memory.

16    *Q.*   What about the concept of working memory, the

17  ability to kind of remember in the moment as you're

18  processing information?  How did she do in that area?

19    *A.*   Working memory was one of her weaknesses.  And

20  working memory is the ability to hold several things in

21  mind while doing something else.  You know, we call it

22  multitasking.  But it's the ability to hold things in your

23  mind, to know I've got my pen here and I've got to write

24  and I've got to answer your question and I need to think

25  about the paperwork here.  Am I thirsty?  I need to pick

1 up the water.  Don't drink too much water or I'll have to

2 go to the bathroom.  You know, all of these things you

3 keep in your mind.

4         What happens in working memory -- in Wendi's

5 working memory is that in tasks that are not complex or

6 that -- and that don't have significantly emotional

7 valence, she can do pretty well.

8         As the task decreases -- or increases in

9 complexity or stress, her ability to remember and to

10 function falls apart.  And so what you see with Wendi,

11 it's a pattern that you really see in her other cognitive

12 impairments.  If you look at them superficially, they're

13 intact.  If you start to walk through them and see her

14 presented with more complex tasks, you know, multiple

15 things to do, multiple emotions, her ability to remember,

16 to hold that in her working memory, it becomes less and

17 less effective.

18     Q.    What in addition to working memory was the

19 problem for Wendi on these neuropsyche tests?

20     A.    Processing speed.  Processing speed is the speed

21 by which you pick things up, the speed by which you are

22 able to line your ducks up.  How long does it take you.

23 So if someone is giving you instructions and you're

24 processing speed is too slow, you may not be able to

25 capture all of the instructions.  Hold that thought.  Can

1  you say that again?  I didn't quite -- I didn't quite

2  catch that.

3          So it's your processing speed that, again, is

4  captured or captive to -- at least with Wendi, it's

5  captive to the complexity of the event and the emotional

6  valence of the event.

7          If it's something simple like what we call trails

8  making where there's only one or two things that you have

9  to do, she is able to do that pretty well, but on tests

10  that required more complexity of thought where you had to

11  have whole things in mind, she did less successfully on

12  those.

13      *Q.*   And any other areas of weakness in the

14  neuropsyche testing?

15      *A.*   Well, those were the important areas in the

16  testing.  The quality of testing is only as good as what

17  we've called ethological validity.  And that means:  How

18  does this work on the streets?  You know, how does this

19  translate to her ability to function on the streets?

20      *Q.*   Before you do that, was there any testing of

21  executive functioning in the neuropsyche testing?

22      *A.*   Yes.

23      *Q.*   How did Wendi do in that area?

24      *A.*   She -- may I just quickly just kind of describe

25  what executive functioning is?  Dr. Hopper may have talked

1    about that.

2         Q.   Of course.

3         A.   Executive functioning is the ability to

4    effectively weight and deliberate; to effectively sequence

5    your behavior and your motor behavior as well as thinking;

6    to effectively understand the big picture; to get the

7    gestalt of the situation; to effectively inhibit unwanted

8    behavior and to recognize and respond appropriately to

9    social cues.

10            And there are three periods within life that you

11   see executive functioning:  From zero to two; from

12   approximately seven to nine; and usually after about 16 up

13   to 25 is when you see the development of executive

14   functioning.

15        Q.   And how did Wendi do in that portion of the

16   testing?

17        A.   Mr. Nickels, she did the same as she did in terms

18   of working memory and processing speed.  When the tasks

19   were rather straightforward and simplistic, she did okay.

20   When the tasks involved decision making and decision

21   making in complex circumstances, she did less

22   successfully.

23        Q.   Now, in addition to the neuropsyche testing, you

24   mentioned -- you were reading actually some of the medical

25   records before that had observations from previous medical

1 professionals that you believe show deficits in the

2 cognitive areas?  Do you remember that?

3     *A.*    Yes.

4     *Q.*    Why don't you go back to that and tell us what's

5 in there that also supports this conclusion of yours?

6     *A.*    Sure.  I think the ones that were particularly

7 meaningful to me was -- I'll start with one that actually

8 I didn't read, if you don't mind.

9         November 6, 2003, this is a progress note.  It

10 states:  Her fragility and affective mood warrant

11 continued housing in Durango.

12         Her fragility -- and this is a term that, as I

13 look at the ones that I've pulled out, is used at least

14 two or three times.

15     *Q.*    Fragility?

16     *A.*    Fragility.  Fragile.  Fragility.  So they're

17 saying that her appearance is not as though she's falling

18 apart, but she's fragile.  It's not as though she's

19 presenting at that moment as someone that just that can't

20 handle it, but that she's fragile, and that that and her

21 mood warrant continued stay in the psychiatric unit.

22         Her stay within the psychiatric unit for this

23 period of time -- and I may be wrong about this, but I

24 believe it was about three years -- was relatively

25 unprecedented in Maricopa County.

1      Q.   Anything else in those prior medical records that

2    you found to be significant from the standpoint of

3    illustrating a cognitive deficit in Wendi?

4      A.   Yes.  The September 30 of 2003 medical record

5    progress note says -- and I've read this one -- increasing

6    stress of incarceration, legal status and toxic

7    environment have combined to erode Wendi's ability to

8    cope.

9           And that really captures what we saw in her

10   neuropsychological testing is that if you've only got one

11   stress, Wendi can handle it pretty well.  If you have

12   multiple stressors at the same time, her ability to

13   function effectively is eroded.

14          10/10/2003, they note -- and I mentioned this

15   before -- she is good at covering and appears less

16   distressed than she really is.

17          Again, this is what we see in the cognitive

18   testing.

19          MR. NICKELS:  Now we have a video for this as

20   well.  And before we turn to that, Your Honor --

21          THE COURT:  Is this a good time to take a lunch

22   break before we go to the video?  Or do you want to play

23   the video first?

24          MR. NICKELS:  Well, it's a three and-a-half

25   minute video.  And then we have the wrap-up with effects.

1    I think we can hit it right at the 12:00 o'clock mark.

2            THE COURT:  Okay.  That's fine.  Let's go ahead.

3            MR. NICKELS:  Okay.

4            (WHEREUPON, the video was played.)

5    Q.   BY MR. NICKELS:  So, Dr. Woods, what did we see

6    in that video?

7    A.   I think what the video illustrates to me was

8    exactly what we're talking about here.  And, that is, the

9    erosion of decision making, the making of bad decisions.

10   Not a lack of awareness, but rather multiple factors that

11   led to terrible decisions and terrible decision making.

12   Q.   Well, let's then wrap up this section by talking

13   about what the effects are.  You've already alluded to

14   this throughout, but to summarize for the Court, when

15   somebody suffers from these cognitive deficits, what

16   effect is that going to have on them?

17   A.   Cognitive deficits are at their worst in moments

18   of new, novel and stressful circumstances.  If what we're

19   doing is relatively straightforward and relatively

20   simplistic, people can function very, very well.

21           Cognitive deficits also are not as obvious on a

22   day-to-day basis unless someone is significantly -- this

23   is why we have such difficulty with people that are mildly

24   mentally retarded because there's nothing that identifies

25   them.  They can work from day-to-day and do extremely

1  well.  But when strain is put on with someone that has the

2  type of cognitive impairments that Wendi has, the first

3  thing you see is that inability to martial up the forces.

4       *Q.*   What do you mean by that?

5       *A.*   Most of us have a level of resiliency.  That

6  resiliency is created from our past experiences.  Our

7  parents taught us how to cope with things.  They gave us

8  directions.  When we overresponded, they let us know.

9  When we underresponded, they made us get up there and do

10  it.

11          When you don't have that resiliency, either

12  because of the psychiatric disorders that you have or the

13  cognitive impairments that you have, you're unable to

14  martial up the forces when they're needed.  You're unable

15  to kind of pull out the things that are needed to make you

16  win the day.  And that leads to a real failure to

17  recognizance social circumstances.

18       *Q.*   What do you mean by that?  You actually alluded

19  to that in some of your earlier testimony.

20       *A.*   Bipolar disorder, particularly cognitive

21  deficits -- and this is where the co-morbidity becomes

22  really intertwined.  It's synergistic.

23          Bipolar disorder is by definition a disorder of

24  impaired judgment.  It's by definition a disorder where

25  you do things that you just wouldn't do if you weren't

1   experiencing and suffering from these symptoms at that

2   time.

3           Cognitive defects are very similar, in that, you,

4   when under stress, can't martial up the forces.  You can't

5   understand, well, wait a minute, this is not the -- this

6   is not the place to do this.  This is not the time to do

7   this particular thing.  And so it's truly a

8   misunderstanding of social circumstances, doing things in

9   a situation in a place and environment where you would

10  never do that or have that kind of behavior core.

11      Q.   And, finally, I see once again we're seeing

12  inability to effectively weigh and deliberate?

13      A.   Yes.

14      Q.   And after the lunch break, we'll talk a little

15  bit more about sort of the overlap of some of these

16  symptoms and how that -- what kind of cumulative effect

17  that has.

18      A.   Sure.

19           MR. NICKELS:  So, Your Honor, we're actually done

20  with that section.  I'm sorry.  We ran four minutes over

21  the 12:00 o'clock hour.

22           THE COURT:  We'll go ahead and take our lunch

23  recess now.  We'll be in recess.  Have a nice lunch,

24  everyone.

25           (WHEREUPON, a recess ensued from 12:03 p.m. to

1   1:29 p.m.)

2        THE COURT:  Good afternoon.  This is

3   CR 2000-096032, State of Arizona vs. Wendi Elizabeth

4   Andriano.

5        The record will reflect the presence of the

6   parties and counsel.

7        Is there anything we need to discuss with regard

8   to scheduling and Mr. Miller?

9        MS. GARD:  Your Honor, I spoke to Mr. Miller over

10  the lunch break.  He had met with Mr. Ochoa.  I think

11  telephonically, he had spoken to him, but he was meeting

12  with him again tomorrow.  So he was going to contact me

13  tomorrow after that.  And I suppose we can try to fit him

14  in next week sometime.

15       I notified counsel today we were no longer

16  calling Shawn King.  So we can remove him from the witness

17  list.  He was scheduled on the 13th.

18       THE COURT:  Okay.

19       MR. ARNTSEN:  Then, Your Honor, we mentioned it

20  this morning, but, I mean, really we're in the good

21  position of being basically ahead of schedule.

22       THE COURT:  Right.

23       MR. ARNTSEN:  And, tomorrow, again, Mr. MacLeod,

24  the mitigation specialist, we had him coming up early, but

25  he can come tomorrow but not until the afternoon.

1           THE COURT:  Okay.

2           MR. ARNTSEN:  So, tomorrow, depending on when

3    Dr. Woods is done, we may have an open morning.

4           THE COURT:  Okay.

5           MR. ARNTSEN:  And then tomorrow afternoon would

6    be Mr. MacLeod and then Keith Rohman, the mitigation

7    expert.  And then Friday is Dan Patterson.  He's the only

8    witness here, but then we're a day ahead, basically.

9           THE COURT:  Okay.  That sounds good.  Thank you.

10   I appreciate counsels' efforts.

11          MR. ARNTSEN:  And I apologize for the gaps, but

12   they're kind of good gaps.

13          THE COURT:  Okay.  Thank you.

14          The record will reflect that Dr. George Woods is

15   on the witness stand.

16          You're still under oath, Dr. Woods.  We'll

17   continue with the direct examination by Mr. Nickels.

18          Mr. Nickels.

19          MR. NICKELS:  Thank you, Your Honor.

20      Q.   BY MR. NICKELS:  Dr. Woods, when we broke for

21   lunch, we were just turning to the fourth diagnosis that

22   is contained in your opinions, and that's dependent

23   personality disorder; is that right?

24      A.   Yes.

25      Q.   What is dependent personality disorder?

1     *A.*   Personality disorders are, oh, a pervasive way of

2   being in the world that causes you conflict with others

3   and often interpersonal conflict as well.

4     *Q.*   And what does it -- what you just described as

5   personality disorders, in general, what does it mean to

6   have a dependent personality disorder?

7     *A.*   Someone that has a dependent personality disorder

8   has dependency needs that are pathological.  Their need to

9   care for others, to some degree their need to be cared

10  for, but certainly their need to care for others is

11  difficult to satisfy.

12    *Q.*   And tell us what you mean by that.  So with a

13  dependency, they depend on caring for others, but that

14  becomes difficult to satisfy.  What does that mean?

15    *A.*   What happens in dependent personalities is that

16  they are just not able to provide the care that someone

17  else might need.  They are unable to provide the quality

18  of care.  It's really a dichotomy because, on the one

19  hand, they are acquiescent really to the other person.  On

20  the other hand, there's a certain loss of self of who they

21  are and how they react and how they live in the world in

22  that acquiescence.  That really leads to inner turmoil of

23  their own.

24    *Q.*   Does somebody with dependent personality disorder

25  -- what do they do to meet their own needs?

1      *A.*    Unfortunately, they often ignore their own needs

2    until a critical moment, a moment in which they can't

3    continue to fulfill this other person's needs, and the

4    person may draw away from them, or the needs may become

5    overwhelming, and no one could in fact perform that

6    Herculean task.  So it's at that point that you often see

7    dependent personalities really fall apart.

8      *Q.*   What did you see in Wendi that caused you to

9    conclude that she suffers from a dependent personality

10   disorder?

11     *A.*   Mr. Nickels, it's really Wendi's history.  Wendi

12   was groomed, so to speak, to be dependent.  She was

13   groomed by her adopted father to take care of his soothing

14   and his -- at least some sexualized needs.  She was

15   groomed by the cult that she actually grew up in to adhere

16   to the religious tenets and the corporal tenets.  You

17   could be corporally punished, spanked for looking the

18   wrong way, for acting the wrong way.  And so this grooming

19   started very, very early and continued with the neglect

20   that you saw within the family.

21          Wendi has been seen as and describes herself as

22   the peacemaker in the family, the one that would intervene

23   between Mr. and Mrs. Ochoa to keep the yelling and

24   screaming and anger under control.  And certainly in

25   Ms. Ochoa's declaration, she describes handing off many of

1    the responsibilities of her relationship with her husband

2    to Wendi.

3        Q.    So is it fair to say that the dependency you're

4    describing is that it becomes -- you become dependent on

5    your need to always be serving others, fulfilling others'

6    needs as opposed to your own?

7        A.    Yes.

8        Q.    Now I understand there is a term normalization

9    that relates to this phenomena you're describing.  What

10   does that mean?

11       A.    Normalization is when the abnormal experiences

12   that you are having suddenly -- not suddenly because

13   that's not true -- over time occurs so frequently and you

14   make these adjustments to them, and so you begin to see

15   these as normal.  So you normalize by, you normalize this

16   sexualizing behavior of your adopted father.  You

17   normalize, and when placed in other situations where that

18   type of violence or anger or aggression occurs, you don't

19   overrespond to it.  You see it as just normal.

20       Q.    And this dependency that you describe that you

21   said she was groomed for as a child, did you see it play

22   out in her relationship with Joe Andriano?

23       A.    Yes.

24       Q.    How?

25       A.    Early in her relationship with Mr. Andriano, she

1   describes him moving in.  She says he needed a place to
2   stay.  When she talks with Dr. Pitt and myself, she also
3   says there was no sex for several months during that.  So
4   it wasn't as though he moved in and immediately
5   established this sexual relationship both because she saw
6   this relationship as potentially being something special
7   because she was struggling with her own religious beliefs.
8   But even during that time, she started to move away from
9   her friends, move away from her family.

10          One of the stories that I think really is telling
11  in terms of dependency is a story of I believe it was a
12  cousin who was to be best man at the wedding, but there
13  was some tension between this person.  It may have been
14  her best friend.  There was some tension between her and
15  Mr. Andriano.  And over time, she decided not to ask this
16  person to be her maid of honor at the wedding.

17          So you see some things that many people do in
18  relationships, maybe change their hair or change their
19  style of dress over time.  But with Wendi it was even --
20  it was even more than that.  It was kind of a loss of
21  self.

22      Q.   So when we look at it, what you describe is Wendi
23  has sort of this need to please?

24      A.   Yes.

25      Q.   How, if at all, could that impact -- you know,

1   she's met with and was interviewed by a number of experts,

2   you, Dr. Hopper, the State's experts.

3        But could this need to please cause her to just

4   say whatever she thinks that the expert wants to hear at

5   the time, and, therefore, leads to unreliable data,

6   answers, observations?

7   *A.*   Certainly her need to please -- and even in the

8   tape here that you see with Dr. Pitt, she says:  Tell me

9   what you want -- what you're trying to get from me.  I'll

10  try to answer that.

11       That reflects a couple of things.  It really

12  reflects this kind of inability to broaden your own

13  perspective and kind of think of multiple areas.  We

14  already know that that's a problem in terms of working

15  memory.

16       But what we've seen over time is we've got

17  numbers of instruments in the neuropsychological testing.

18  For example, there are instruments of effort.  There are

19  embedded instruments.  There are what we call embedded

20  instruments within the testing itself that speaks to her

21  effort.

22       We have history that Wendi cannot create.  She

23  can't create the history of her aunt who was diagnosed

24  with bipolar disorder and treated with Lithium and

25  Tegretol and these medications over the course of her

1  life.

2          She cannot create the Seroquel that was given to

3  her over a period of time.  These are issues that really

4  speak both against her being able to manipulate that

5  particular system as well as issues of malingering.

6      Q.   We will get back to that malingering issue in a

7  bit, but first we have a couple of videos.

8      A.   Sure.

9      Q.   Again, this is from Dr. Pitt's interview just

10  this last November.

11      A.   Sure.

12          (WHEREUPON, an off-the-record discussion ensued.)

13          (WHEREUPON, the video was played.)

14      Q.   BY MR. NICKELS:  Dr. Woods, what did we see in

15  that video?

16      A.   We see acquiescence.  And I think when we talk

17  about sexuality, we see acquiescence in her affairs as

18  well.  So we see this, yes.

19      Q.   Tell us what you -- you're talking about what she

20  was describing there was sex with her husband?

21      A.   Right.

22      Q.   Right?

23      A.   Yes.

24      Q.   You're saying there was acquiescence there?

25      A.   Yes.

1    *Q.*   You mentioned in the affairs.  What did you mean
2    by that?
3    *A.*   Well, when you -- when I talked with her, when
4    Dr. Pitt talked with her, and the question came up:  Why
5    did you have sex?  Well, it's something I thought you
6    should do.  It's something I thought that he wanted.  And
7    that was pretty consistently her response, even at times
8    when that was within a very impulsive response.  So you
9    see this acquiescence that is really the danger of
10   dependent personality disorder.
11           MR. NICKELS:  We have one more video.
12           (WHEREUPON, the video was played.)
13   *Q.*   BY MR. NICKELS:  What did that show us?
14   *A.*   It showed us Wendi thinking back on those things
15   that she felt she didn't have a backbone, the ability to
16   make good decisions for herself and for her family.
17           It's important to note that having a dependent
18   personality is not the same as being a milquetoast.  It's
19   not the same as just kind of going away and, oh, okay,
20   you've done this to me again or I put myself in this
21   position again.  So I'm just going away, when that may be
22   -- that may be what someone that is involved in a
23   relationship that maybe -- they're maybe getting dominated
24   or they're not comfortable in the relationship.  They see
25   it's not working.  They may just say, you know, I'm

1  cutting my loss.  I'm getting out of here.

2       But you have to keep in mind that personality

3  disorders are by definition pathological, and when

4  dependent personalities are not able to make that, the

5  response is often one of anger, one of explosive

6  responses.  It's not one of just, okay, I'm just going to

7  go away.  It doesn't -- it doesn't work that way.

8    Q.   Well, Dr. Woods, that leads into the effects of

9  the dependent personality disorder and what that can do to

10  somebody?

11   A.   Right.

12   Q.   You just alluded to it, that you could see anger

13  and frustration when it's not working, and, you know,

14  aside to that, the ability to be dependent dissolves.

15  Tell us what you mean by the first part of that sentence,

16  that the ability to be dependent dissolves.

17   A.   With dependent personality disorder, the need,

18  the ability to be dependent is ongoing, and people that

19  are involved in relationships with others that have

20  dependent personality disorders, that can be very, very

21  difficult.  It's also very, very difficult for the person

22  that is dependent.  They see their needs not being met,

23  and, yet, that's a way they have learned how to function.

24  They don't know other ways how to function.  Personality

25  disorders are very pervasive.

1          So when we talk about Wendi having a personality

2    disorder, we're not saying that at 21, this just kind of

3    just happened.  We're talking about seeing the abuse and

4    neglect at three and seeing the sexualizing at four or

5    five, six and seven.  All of that daily grooming is the

6    only word that I can really use that leads to that.

7      Q.   And just to be clear, is what you're describing

8    here, the person who has the personality disorder and a

9    dependent personality disorder like Wendi, you're saying

10   that they have a need to fulfill the needs of others?

11   They're going to depend on fulfilling the needs other?

12     A.   Yes.

13     Q.   On this issue of it dissolving or you're no

14   longer going to do it, let's talk about how that played

15   out in Wendi and in her relationship with Joe Andriano.

16   How did that ability to be dependent and to meet his needs

17   dissolve?

18     A.   Well, I think that it was an unsolvable

19   situation.  The needs that Mr. Andriano had tragically

20   could not have been resolved.  Perhaps earlier if the

21   adrenal tumor had been found at an earlier time, perhaps.

22   But certainly what you saw in this relationship was real

23   needs, not just someone that was demanding, but someone

24   that had real needs who was medically ill, who was in fact

25   grieving themselves and fearful for their own life, and,

1  yet, Wendi could not meet those needs.  It just wasn't

2  possible.

3      Q.   And then that as he's -- obviously, she can't

4  cure his cancer, but also can't meet his emotional needs.

5  You're saying that then -- will that have an effect on her

6  because her own need is to fulfill his, and she can't?

7      A.   Everything is being thwarted and it's the

8  situation rather than the individual.

9      Q.   Let's turn finally to caregiver burden.

10      A.   Sure.

11      Q.   You said earlier this is not a separate disorder

12  or diagnosis of its own?

13      A.   Correct.

14      Q.   But it's something -- and I think you refer to it

15  as destabilizer?

16      A.   Exactly.

17      Q.   Why do you believe Wendi had a caregiver burden

18  and what effect did that have on her?

19      A.   She had no choice but to have a caregiver burden.

20  She was attempting to care for someone that was dying.  We

21  have to -- I think it may be helpful to understand the

22  context as I -- as I see the caregiver.  There are

23  multiple places in which care needed to be given.

24          From 1994 through 1998, not only was Mr. Andriano

25  increasingly ill with brief moments of respite when he

1   would have surgery, but they had two children.  So by

2   1998, he is increasingly debilitated, increasingly ill,

3   not being able to work, not being able to provide for his

4   family or for himself.

5        They have two very young children.  I believe

6   Nicholas was born in '95 and Ashlee I believe was maybe

7   '94 and '97.  I'm sorry.  I don't know the dates, but,

8   certainly, in that period of time.  They were moving from

9   place to place.  Their home life was unstable.  Their

10  financial life was unstable.  There were times when they

11  had no health insurance.  Mr. and Mrs. Ochoa provided for

12  prenatal care for one of the children because they didn't

13  have health insurance.

14       So that's the context, and within that context,

15  we see Wendi trying to provide for just everyday finances,

16  trying to provide for her children, trying to provide for

17  Mr. Andriano.  And in the end, we see her -- and I mean in

18  the months before, we see her pathologically.  We really

19  start to see these symptoms of mood disorder and PTSD crop

20  up and we see decisions that are significantly different

21  than decisions she's ever made in her life.

22  Q.   And is it your opinion that, you know, this

23  massive burden, financial, child caring, caring for her

24  husband and then just coping with his degrading health,

25  all of which is falling on her, that then exacerbates.

1   You just mentioned the symptoms of the other disorders?

2       A.   Right.

3       Q.   Does that caregiver burden exacerbate those

4   symptoms?

5       A.   That's what -- that's what caregiver burden does.

6   It unravels the strength that one has.

7       Q.   Well, Dr. Woods, then let's summarize, and we'll

8   be doing a slide for this.  I want you to talk about --

9   you told us now about these four disorders that Wendi

10  suffered from and the caregiver burden, which is

11  amplified.  You called it a destabilizer.  What is the

12  cumulative effect of all of this?

13      A.   Well, the cumulative effect is, first of all,

14  atypical behavior.  Behavior that is beyond the pale.

15  Behavior that is unusual in this person's life.  And when

16  we look at Wendi Andriano's life with Mr. Andriano, Joe

17  Andriano, we see behavior that we've never seen before.

18  That's because you've got multiple disorders that create

19  this synergistic relationship.  You've got bipolar

20  disorder.  You've got impaired judgment.  You've got

21  cognitive deficits that lend themselves to impaired

22  judgment.  You've got dependent personality that can

23  create anger and hostility.  You've got numbing of

24  post-traumatic stress disorder.  All of these interact.

25      Q.   Well, and on that point, I was going to ask you,

1   you know, as we went through each disorder, everybody

2   could see there was overlap?

3        *A.*   Yes.

4        *Q.*   For example, inability to weigh and deliberate,

5   impaired decision making.  We've heard these again and

6   again?

7        *A.*   Yes.

8        *Q.*   When you have multiple disorders that cause these

9   same effects, you know, does it sort of even out or do

10   those amplify?  Do they kind of build on each other and

11   amplify and become even worse?

12       *A.*   They amplify on each other.  And that's where you

13   get really more severe behavior.  You know, they really --

14   you can't look at them separately.  You can't look at,

15   okay, well, there's bipolar disorder symptoms, so there's

16   this.  So there's post-traumatic stress disorder, so

17   there's this.  They interact and they interact in ways

18   that create more severe behavior and behavior that frankly

19   you often do not see until you see that kind of co-morbid

20   interaction.

21       *Q.*   Dr. Woods, now for the final segment of your

22   testimony, we're going to spend some time talking about

23   Dr. Pitt's report --

24       *A.*   Yes.

25       *Q.*   -- and the opinions he provided.  Did you have a

1   chance to read Dr. Pitt's report?

2       *A.*   I did.

3       *Q.*   So you're familiar with it?

4       *A.*   Yes.

5       *Q.*   What I want to start out with is -- well, first

6   off, were there any areas in that report where he agreed

7   with you?

8       *A.*   Well, I think Dr. Pitt noted that, for example,

9   under post-traumatic stress disorder, that if in fact this

10  history that Wendi described to him was accurate, then

11  post-traumatic stress disorder is a diagnosis that should

12  be considered.

13          Dr. Pitt also noted that Wendi had a history -- a

14  family history of mood disorders, and that her

15  descriptions of mood problems were consistent with having

16  a mood disorder.

17      *Q.*   So he acknowledged the family history of mood

18  disorders, that Wendi's own behavior would be consistent

19  with mood disorders, but did he diagnose one?

20      *A.*   No, he did not.

21      *Q.*   Do you know why or what was his explanation?

22      *A.*   Well, it was just his belief that her symptom

23  complex did not meet the criteria for a bipolar disorder

24  or a major depressive disorder.  I did not see Dr. Pitt's

25  analysis, for example, of the medication treatment.

1    *Q.*   That's just -- as far as you know, that wasn't in
2    there or you didn't see it?

3    *A.*   I don't -- I don't recall that.

4    *Q.*   Okay.  And then you also say that he acknowledged
5    that PTSD would be an appropriate diagnosis if the social
6    history that has been described is accurate?

7    *A.*   Yes.

8    *Q.*   Now I understand that he did offer a couple of
9    opinions that certainly are different than yours.  One of
10   them is this issue of malingering?

11   *A.*   Yes.

12   *Q.*   What is your understanding of what he meant by
13   that?

14   *A.*   Malingering is not a diagnosis.  Malingering is
15   the absence of a diagnosis.  Malingering is the expression
16   of symptoms or exaggeration of symptoms for secondary
17   gain.

18   *Q.*   Is that a scientific way of saying she's faking
19   it?

20   *A.*   Yeah.  The area of inaccurate reporting is
21   actually called dissimulation.  You can fake it two ways.
22   You can fake it either you can minimize symptoms or you
23   can maximize symptoms.  Malingering is when you maximize
24   symptoms.

25   *Q.*   Do you believe Wendi is malingering?

1    *A.*   No, I don't.

2    *Q.*   Why not?

3    *A.*   Well, I think there are a number of factors.
4    No. 1, there is a family history that Wendi could not have
5    malingered.  There is a family history of mood disorders
6    with her dad, her biological father.  There's a family
7    history of bipolar disorder in her maternal aunt and one
8    other cousin.  Her mother gives a very solid history of
9    postpartum depression.  So that is impossible to
10   malinger -- for Wendi to malinger.

11          We also see the ongoing history of sexualization
12   and inappropriate behavior that has been -- there have
13   been a number of people that have talked about Mr. Ochoa's
14   behavior, including not only family members, but also
15   members of the church, other friends of Wendi's who had
16   the opportunity to visit her at her home at one time or
17   another.

18          The third part is that there are times when it
19   would have been to her advantage to say that something had
20   happened.  It was certainly to her advantage to say
21   potentially that my father had sexualized behavior with me
22   or that he had taken me to take these really inappropriate
23   photographs.

24   *Q.*   And here, or let's face it, for all of this sort
25   of the worst stuff, she's saying she doesn't remember any

1    of it; right?

2         A.    Certainly in those instances, that's correct.

3         Q.    What about this issue of an adjustment disorder.

4    That is another -- that's something else that Dr. Pitt

5    talks about.  What is your understanding of that?

6         A.    An adjustment disorder is most commonly -- it's

7    an interesting diagnosis.  It's most commonly an

8    adjustment to a known stressor, but that it's -- and your

9    adjustment is greater than would be expected from that

10   stressor, and that adjustment can be either in mood or in

11   behavior.

12             And so, typically, adjustment disorders are

13   time-limited, six months.  You can't have chronic

14   adjustment disorder.  But, typically, they're

15   time-limited.

16        Q.    What does Dr. Pitt say with regards to Wendi and

17   adjustment disorders?

18        A.    It's his belief that she experienced an

19   adjustment disorder during the period of the end and

20   during the offense and during the period of with

21   Mr. Andriano when she was under such tremendous pressures.

22        Q.    Is he saying that she was just kind of

23   overreacting while it was happening?

24        A.    Well, an adjustment disorder is a diagnosis.  So

25   it's not necessarily just, you know, I'm having a bad hair

1 day.  It's a serious diagnostic.  Does it capture

2 everything that was going on at that time?  No.  Why?  I'm

3 sorry.  Now I'm asking myself questions.

4     *Q.*   Well, let me ask you this:  Do you agree with

5 this opinion that she had an adjustment disorder?

6     *A.*   No, I would have to disagree with that.

7     *Q.*   Why would you disagree?

8     *A.*   Umm, well, first of all, adjustment disorders are

9 by definition time-limited.  They can become chronic, but

10 that's very rare.

11     If we look at the first months of Wendi being

12 treated under the Durango facility, the psychiatrists note

13 that it was their belief that her depression has been

14 going on for at least a year.  So this is really longer

15 than what we would normally look at when we talk about

16 adjustment disorders.

17     The other piece, of course, is that we see

18 adjustment disorders typically coming under control over

19 time and coming back to a homeostatic basis.

20     And that's not really true.  That's not what

21 happened with Wendi.  What really you saw were a number of

22 different medications being used to treat her depression

23 and eventually them moving to on drugs that are

24 specifically for bipolar depression and her being on those

25 off and on for about three years.  So we don't have the

1  resolution that one gets when you just have an adjustment

2  disorder.

3      *Q.*   Dr. Pitt also, then, he has a section of his

4  report where he cites several of Wendi's actions leading

5  up to and on the night of the offense that he claims shows

6  she was thinking clearly, knew what she was doing, and was

7  not in fact being affected by a mood disorder or other

8  deficits.

9          Are you familiar with that part of his analysis?

10      *A.*   Yes, a series of bullet points.

11      *Q.*   Yes.  And to kind of summarize them, he's talking

12  about, you know, sort of these allegations of insurance

13  fraud, the steps that were taken to procure the

14  sodium azide, things like that, and then the things that

15  happened the night of the offense, that staging of this

16  crime scene, telling lies.  He said those facts show, no,

17  she knew what she was doing.  This wasn't some disorder.

18  You're familiar with that?

19      *A.*   Yes.

20      *Q.*   How do you explain those actions?  That kind of

21  series of facts, how do you explain that?

22      *A.*   The symptoms that we described of bipolar

23  disorder, post-traumatic stress disorder, her cognitive

24  impairments were at their greatest and she was at her most

25  vulnerable, as anyone would be facing this situation.

1          We have to look at the situation.  This is a
2    terrible situation that she's facing.  This is a terrible
3    situation that Mr. Andriano is facing.  He is dying.  And
4    during this period of time, it wasn't just this smooth
5    situation where he's diagnosed, you go through the various
6    steps, he gets a chance to grieve, she gets a chance to
7    grieve.  The children are really too young to know what's
8    going on.
9          It was this sawtooth pattern of him being
10   diagnosed and a little bit gets taken away and he's okay,
11   and as a family, they're better.  And then it happens
12   again and they say this one is also benign, and a little
13   bit more gets taken out.  And they try to be a family
14   again.  And then it comes back again and it comes back and
15   it's in his lungs and he's facing a terrible death.
16   That's the context.
17         Within that, we see the symptoms of Wendi's
18   bipolar disorder, the impulsivity.  We see the numbing.
19   We see the incredibly bad decisions both personal and
20   professional.  There's no question about that.  But
21   they're within that time period.  They're not -- this is
22   not the Wendi that was before the marriage of Joe and
23   Wendi Andriano.  They are within that context, and you
24   can't separate them from that context.
25         Q.   When you said earlier, Dr. Woods, that -- you

1  discussed this context of the caregiver burden triggering

2  or exacerbating the symptoms?

3      *A.*   Right.

4      *Q.*   Were they at their greatest as this ordeal went

5  on?

6      *A.*   They were clearly at their most severe.  We see

7  the impulsivity of bipolar disorder.  We see the numbing

8  of post-traumatic stress disorder.  We see the inability

9  to effectively weigh and deliberate in the decision

10  making, her cognitive impairments.  It's really all there.

11      *Q.*   In your professional opinion, Dr. Woods, were

12  Wendi's multiple disorders and deficits present and, in

13  fact, heightened at the time leading up to Joe Andriano's

14  death?

15      *A.*   Yes.

16      *Q.*   And, in fact, do they actually explain Wendi's

17  behavior leading up to and including the night of the

18  offense?

19      *A.*   In my professional opinion, yes.

20          MR. NICKELS:  We have no further questions,

21  Your Honor.

22          THE COURT:  Is it going to be Mr. Hazard?

23          MR. HAZARD:  Yes, Your Honor.

24          (WHEREUPON, an off-the-record discussion ensued.)

25          MR. HAZARD:  May I approach the witness,

1    Your Honor?

2         THE COURT:  Yes.

3

4                   CROSS-EXAMINATION

5    BY MR. HAZARD:

6    *Q.*    Dr. Woods, I'm handing you Exhibits 185, 181, 49,

7    48, 47, 46, 6 A and 6 C.  And for the sake of time, those

8    are counseling and medical records, psychiatric records

9    for Ms. Andriano that are germane to this case?

10   *A.*    Yes, sir.

11   *Q.*    Okay?

12   *A.*    Yes, sir.

13   *Q.*    Could you -- and you don't need to review those

14   actual records and it's going off of your report or

15   memory.  Can you show me where there's documented in those

16   records a diagnosis of bipolar disorder?

17   *A.*    There is not a documented record that I was able

18   to find of bipolar disorder.

19   *Q.*    And you mentioned that -- is there a number of

20   records, a rich history of records that you frequently

21   don't have in the cases that you have to work up?  And

22   that wasn't the case here?  There's a lot of records to

23   review?

24   *A.*    Sure.

25   *Q.*    Is that correct?

1      *A.*    Yes, sir.

2      *Q.*    And one of the primary sources is the fact that

3  Ms. Andriano has been in custody for 13 years now and has

4  had various mental health professionals and treatment and

5  evaluations during that time; is that correct?

6      *A.*    Yes.

7      *Q.*    And records that have been kept?

8      *A.*    That's correct.

9      *Q.*    Now bipolar disorder is a serious disorder,

10 right, and it's generally something that is lifelong;

11 correct?

12     *A.*    It certainly is lifelong, yes.

13     *Q.*    And so, isn't the absence of bipolar disorder

14 being documented telling in this case, because wouldn't

15 you expect to see over the context of Ms. Andriano's life,

16 bipolar disorder diagnoses popping up?

17     *A.*    Not necessarily, no, because 78 percent -- the

18 best epidemiological studies note that 78 percent of

19 people that have suffered psychiatric disorders have never

20 been seen, let alone diagnosed, so --

21     *Q.*    But, Dr. Woods, she has been diagnosed over the

22 years, and things that have come up are things like

23 depression?

24     *A.*    Right.

25     *Q.*    Anxiety-related --

1    *A.*   Right.

2    *Q.*   -- disorders.  And so your testimony is the

3    absence of bipolar disorder as a diagnosis documented does

4    not affect your opinion on this case; correct?

5    *A.*   That's correct.

6    *Q.*   All right.  Diagnoses, whatever -- and Dr. Pitt

7    made his diagnoses?  You made yours?

8    *A.*   Yes.

9    *Q.*   We can disagree on that.  But, in essence,

10   Doctor, isn't a diagnosis just a label to put on that

11   describes symptoms that have manifested themselves?

12   *A.*   Yes.

13   *Q.*   Okay.  And would you agree that symptoms of

14   disorders are different than behavioral choices?

15   *A.*   No.

16   *Q.*   You think they're the same thing?

17   *A.*   It depends upon the symptom.  Symptoms lead to

18   behavioral choices.

19   *Q.*   Okay.  But there's a gap; is there not?

20   *A.*   No.

21   *Q.*   Doesn't a person have to make a decision, a

22   choice, and then act upon it?

23   *A.*   That's exactly what is damaged in psychiatric

24   disorders, particularly in bipolar disorders, that

25   relationship you're discussing.

1    *Q.*   All right.  You're familiar -- you reviewed a

2    number of materials related to, including transcripts of

3    Ms. Andriano's trial; correct?

4    *A.*   Yes.

5    *Q.*   And at trial, she raised a justification defense

6    based on history of domestic violence; is that correct?

7    *A.*   I didn't know there was a specific name for it,

8    but that seemed to be what the -- yes.

9    *Q.*   Do you remember that her defense both at the

10   guilt phase and mitigation phase relied heavily on a

11   history of domestic violence with her husband, the victim,

12   Joe Andriano; correct?

13   *A.*   Yes.

14   *Q.*   And in that trial case, didn't that evidence come

15   largely from statements made by Donna Ochoa, Ms. Andriano

16   herself, the Petitioner?

17   *A.*   I don't recall as many from Donna Ochoa, but

18   obviously, they did come from Ms. Andriano.

19   *Q.*   Okay.  And, in fact, Ms. Andriano -- wasn't the

20   first time that domestic violence was raised in the actual

21   murder itself came through a phone call that she made to

22   her friend, Chris Hashisaki, right before she called

23   911 after the murder?  Do you recall seeing that?

24   *A.*   I remember the call.  I don't remember the

25   reference to domestic violence.

1    *Q.*   Do you remember in that call that Ms. Andriano

2   told Chris Hashisaki:  I'm going to tell you the whole

3   story; Joe attacked me and I had to defend myself?

4    *A.*   Yes.

5    *Q.*   Okay.  And then shortly after that phone call is

6   when Ms. Andriano called 911 and reported the same thing,

7   that her husband attacked her and she thought she stabbed

8   him acting in self-defense; is that correct?

9    *A.*   It's close.  It's not quite, but that is close.

10   *Q.*   Okay.  What would you say to change that to be

11   more accurate?

12   *A.*   I just am not sure that that was -- I'm not sure

13   that you can synopsize the conversation.  But it did -- it

14   did appear that that's what she said.

15   *Q.*   Okay.  And then in her police interview, it was,

16   although she did give varying accounts of some details --

17   *A.*   Uh-huh.

18   *Q.*   -- she did say that her husband attacked her and

19   she had to fight him off and that ultimately led to his

20   death; correct?

21   *A.*   Yes.  Concisely, yes.

22   *Q.*   And now in these proceedings, Ms. -- the

23   Petitioner has raised the history of childhood trauma

24   largely related to sexual abuse.  Do you agree with that?

25   As well as physical abuse?

1    *A.*    Yes.

2    *Q.*    And at least with the sexual abuse allegations as

3    to her stepfather, Alejo Ochoa, that's new?  That was not

4    part of her trial case; correct?

5    *A.*    Yes.

6    *Q.*    And, again, you relied in your investigation --

7    Dr. Hopper's investigation -- developing the social

8    history of Ms. Andriano that you did, you relied heavily

9    on statements by her mom, Donna Ochoa; correct?

10   *A.*    She was one of the persons that -- certainly, one

11   of the informants that I relied upon.

12   *Q.*    And the allegations of abuse also came from

13   friends of Ms. Andriano's --

14   *A.*    Yes.

15   *Q.*    -- from her childhood; correct?

16   *A.*    Yes.

17   *Q.*    These are people that on their surface probably

18   have a bias towards Ms. Andriano?  You would agree with

19   that; correct, based on family relationship or friendship?

20   *A.*    I'm not clear why that would lend one to a bias.

21   *Q.*    Well, would you agree that her friends and her

22   family members maybe may have a bias in hope that she gets

23   off death row?

24   *A.*    Well, I could see that.  I'm not sure that would

25   -- I just don't -- I'm not clear that that would lend to

1    them, umm -- yes, I'll just say I can see where this is

2    going.  I'm sorry.  Yes, I could see that perhaps.

3        *Q.*   Okay.  Fair enough.  In Arizona we have victims'

4    rights, and you're familiar that; correct?

5        *A.*   Yes.

6        *Q.*   And we're always -- attorneys who represent the

7    State are always appreciative when opposing counsel

8    respect victims' rights.

9            But, in this case, did you personally ever think

10   of requesting permission to speak to the victim Joe

11   Andriano's family about their observations of Ms. Andriano

12   during the time they knew her, including right at the time

13   of the murder?

14       *A.*   I didn't think that was possible in Arizona.

15       *Q.*   Okay.  Is that something that, thinking back now,

16   that might have been helpful to you?  Let me put it this

17   way:  Ms. Andriano and Joe Andriano were a couple for

18   about eight years; correct?

19       *A.*   Yes.

20       *Q.*   And, therefore, Joe Andriano's family certainly

21   interacted with Ms. Andriano during that time, especially

22   after they were married?

23       *A.*   Yes.

24       *Q.*   Okay.  And, in fact, hours before the murder,

25   members of Joe Andriano's family saw and interacted with

1  Wendi Andriano; correct?

2      *A.*   That's correct.

3      *Q.*   And so maybe their observations could have been

4  helpful in determining whether Ms. Andriano really was in

5  this depressed, bipolar state, or what have you?

6      *A.*   All information may be helpful.  So I think

7  that's what I would say.

8      *Q.*   All right.  Let's look at the actual choices and

9  actions that Ms. Andriano made in the weeks and months

10 leading up to October 8th, 2000.

11     *A.*   Sure.

12     *Q.*   Okay.  But even before I do that, let's just

13 spend a little bit of time about some other things that we

14 know Ms. Andriano did after she turned 18.  And, first, do

15 you remember in your materials learning about

16 Ms. Andriano's employment history with the Casa Grande

17 Regional Hospital?

18     *A.*   Yes.

19     *Q.*   And she was about 24, 25 years old during that

20 time; is that correct?

21     *A.*   That's correct.  Can you give me a year on that?

22     *Q.*   Sure.

23     *A.*   Was that 1995?

24     *Q.*   1995 to 1996.

25     *A.*   All right.

1    *Q.*    She was a bookkeeper or secretary for the

2   hospital; correct?

3    *A.*    That's correct.

4    *Q.*    And an investigation revealed that she stole from

5   her employer; correct?

6    *A.*    Yes.

7    *Q.*    It wasn't like a waitress reaching into the till

8   and pocketing some cash?  It was something that was more

9   gradual and more clever; correct?

10   *A.*    I believe so.

11   *Q.*    It involved forgery, checks that she was

12  essentially cashing from the hospital to herself over a

13  period of time?

14   *A.*    That's correct.

15   *Q.*    Now, and there was also a history of her other --

16  of stealing in some form with her other places of

17  employment; is that correct?

18   *A.*    At least one other, as I recall.

19   *Q.*    All right.  At the Courtyard Apartments when she

20  was a leasing agent -- and this is when she was about

21  28 years old in 1999 -- it was kind of the same thing.

22  There was some theft by conversion; was there not?

23   *A.*    That's correct.

24   *Q.*    And even at San Rivas Apartments, her last

25  employer when she was manager, after her arrest, they

1    discovered that she was giving some tenants, friends of

2    hers, free rent or reduced rent; correct?  Do you remember

3    seeing that?

4        A.   I -- I don't recall that.  But what I recalled

5    was perhaps some furniture, but I don't recall reduced

6    rent or free rent.

7        Q.   And then while she was in jail awaiting trial,

8    there was this investigation involving a church friend of

9    hers, Cynthia Edwards.  Do you remember about that?

10       A.   Yes.

11       Q.   And cashing forged checks and Ms. Andriano

12   receiving some money on her books; correct?

13       A.   Yes.

14       Q.   Okay.  Now just taking those in the whole over a

15   period of time, these dishonest acts of stealing from her

16   employers, does bipolar disorder cause that?

17       A.   Does bipolar disorder cause that?  Umm, persons

18   that have bipolar disorder, and if you actually look at

19   the DSM V, these are just the kinds of behaviors that one

20   sees with bipolar disorder.  These are the very types of

21   irrational behaviors that one sees in a bipolar disorder,

22   particularly in the hypomanic and manic phase.

23           So to say that it causes it is not quite it.  To

24   say that it disrupts the person's mood so that they would

25   then commit these acts that are so dissimilar to who they

1   have been in the past is probably more accurate.

2       *Q.*   Doctor, let's assume for the sake of argument

3   that Ms. Andriano was suffering from all of the disorders

4   that you diagnosed.

5       *A.*   Sure.

6       *Q.*   And let's go ahead and assume for the sake of

7   argument that she was victimized by the abuse that she

8   alleges in these proceedings.

9       *A.*   All right.

10      *Q.*   Okay?

11      *A.*   Sure.

12      *Q.*   With respect to that series of thefts over a

13  period of years, including right up and even after her

14  arrest for murder, those were choices that she made

15  regardless of disorders or abuse in her past; correct?

16  They're choices that she made and actions that she took?

17      *A.*   Damaged choices.

18      *Q.*   Okay.

19          THE COURT:  What did you just say?

20          THE WITNESS:  Damaged choices.

21      *Q.*   BY MR. HAZARD:  Is there any evidence that

22  suggests that Ms. Andriano didn't know that was wrong to

23  do, to steal from her employer, as damaged as her choices

24  may have been?

25      *A.*   I don't see any evidence that suggests that she

1  didn't know that it was wrong.  She certainly --

2  certainly, after she stole from the regional center, she

3  was in therapy and acknowledged this in therapy, along

4  with the other pressures and difficulties that she had.

5  The question is:  What impact did her symptoms have on her

6  decision making?

7       *Q.*    Okay.  Doctor, that's fair enough.  But would you

8  agree with me that just the sheer nature, the fraudulent

9  activity, the sneakiness of it, is an indication that she

10 knew it was wrong, but did it any way?

11      *A.*    I would agree with that.

12      *Q.*    All right.  And then now leading up to October 8,

13 2000, do you remember seeing the evidence that was

14 presented in her trial and any other materials that you

15 reviewed --

16      *A.*    Yes.

17      *Q.*    -- police reports and what have you, that about

18 four months before, Ms. Andriano made efforts to either

19 increase her life -- Joe Andriano's life insurance policy

20 or get new life insurance policies; correct?

21      *A.*    Yes.

22      *Q.*    In fact, she contacted three different types of

23 agencies to try to obtain life insurance policies on Joe

24 Andriano's life.  Do you remember that?

25      *A.*    Yes.

1    *Q.*    And she made efforts reaching out to others, two

2    people?  In fact, she offered one friend, a co-worker,

3    $10,000?

4    *A.*    I think that was Mr. Yost.

5    *Q.*    James Yost; correct.

6    *A.*    Yes.

7    *Q.*    And you remember that?

8    *A.*    Yes.

9    *Q.*    To pose as her husband in order to pass a

10   physical exam to obtain the life insurance policy;

11   correct?

12   *A.*    Yes.

13   *Q.*    And then she also asked another friend?

14   *A.*    Eric Valiant.

15   *Q.*    Correct.

16   *A.*    Yes.

17   *Q.*    To do the same?

18   *A.*    Yes.

19   *Q.*    To pose; correct?

20   *A.*    Uh, yeah.

21   *Q.*    All right.  Do any of these disorders cause that

22   type of -- those types of choices and actions?

23   *A.*    These are the very types of choices and actions

24   that derive from this type of disorder.

25   *Q.*    Well, how does bipolar disorder cause that?

1    *A.*   When we looked at the context of each of these,

2  Mr. Yost -- you can correct me if I'm wrong.  Mr. Yost was

3  in fact her assistant manager at San Rivas or had some

4  relationship at San Rivas.  Eric Valiant was a friend of

5  Mr. Andriano's as well as in this situation.

6          So what we see Wendi doing over and over is

7  within this confined area really of San Rivas in many

8  ways, she is asking people these pretty bizarre kinds of

9  things.

10          I mean, first of all, if we go back through the

11  trial transcripts, I think it was pretty clear that it was

12  going to be impossible.  The reason why she was doing this

13  was because it was going to impossible to get life

14  insurance given his health.  And so there was a question

15  of trying to find someone else that might pose as him.

16          As I recall, they contacted someone whose either

17  wife or friend was an insurance broker or knew about

18  insurance, and they said:  That's never going to fly.  You

19  know, you're not going to be able to do that.

20          So Wendi is trying to doing these things.  I

21  guess it's completely on her own.  I'm not clear about

22  that whether it's actually, truly completely on her own,

23  but, certainly, she was the one calling the person,

24  calling Mr. Valiant, a friend of Joe's that they knew.

25  They had his telephone number in Mr. Andriano's book.

1  Calling Mr. Yost, who was her assistant manager in the

2  very business that she works in, trying to get them

3  involved.  And that's fairly bizarre behavior.

4      *Q.*  Well, Doctor, it would be bizarre if she asked

5  strangers to do this sort of thing; correct?  That would

6  be bizarre?

7      *A.*  It --

8      *Q.*  Would it be bizarre to ask strangers on the

9  street to pose as her husband, letting them know that she

10  was trying to get more life insurance on her dying

11  husband?

12     *A.*  I don't know exactly how people do this.  So I

13  can't really say.  What I -- I mean, from what I do more

14  commonly see is that they try to -- people try to find

15  someone that isn't somehow related to this situation.  The

16  things that Ms. Andriano did -- that Wendi did were all

17  within this complex and --

18     *Q.*  Well, Doctor, if you're going to engage in

19  this --

20     *A.*  I'm sorry.  May I --

21     *Q.*  I'm sorry to cut you off.

22     *A.*  May I just finish?  I apologize.  And what we see

23  is that prior to her marriage to Mr. Andriano, we did not

24  see this kind of behavior.  We did not see this stealing.

25  We did not see -- after the pressures of Mr. Andriano

1    dying and these things, we see this behavior.

2         Within that context, to me, these behaviors are

3    clearly -- could clearly be related to this.

4         MR. HAZARD:  One moment, Your Honor.

5         THE COURT:  Yes.

6         (WHEREUPON, an off-the-record discussion ensued.)

7    Q.   BY MR. HAZARD:  Now, Dr. Woods, if a person is

8    going to engage in fraud, wouldn't they want to -- and

9    they needed someone's help, they would go to someone that

10   they trusted; correct?

11   A.   I -- I can't really answer that.

12   Q.   Okay.  Rather than a stranger?

13   A.   I -- I just can't answer that.  I -- I don't

14   know.

15   Q.   Do you remember reviewing a transcript of a

16   deposition of Shawn King?

17   A.   Yes.

18   Q.   Okay.  And do you recall --

19        (WHEREUPON, an off-the-record discussion ensued.)

20        MR. HAZARD:  May I approach, Your Honor?

21        THE COURT:  Yes.

22        MR. ARNTSEN:  What page and line are we talking

23   about?

24        MR. HAZARD:  Page 11, starting with the question

25   on Line 17 going down.

1          MR. ARNTSEN:  Okay.

2     *Q.*   BY MR. HAZARD:  Dr. Woods, I'm going to hand you

3   Exhibit No. 15.  And turn your attention to Page 11 on

4   that deposition.

5     *A.*   Okay.

6     *Q.*   Line 17, the question.  Do you see that comment

7   by Mr. King?

8     *A.*   Yes, I do.  Yes.

9     *Q.*   About the deviousness of Ms. Andriano?

10    *A.*   Yes.

11    *Q.*   And that was before she was married; correct?

12    *A.*   Well, if you go onto the next page, you'll notice

13   they'll ask him what kind of devious things that -- can

14   you give me an example?

15          And you go to Page 12, and he says:  I'm trying

16   to think.  Well, she got away with anything, like

17   pinching.  That was a big thing I remember from one time

18   whenever people would be pinching each other and girls

19   were pinching guys, and she never got caught.

20          So I guess that's what he was talking about.

21    *Q.*   And then on Page 16, if you would.

22    *A.*   Yes.

23    *Q.*   And, again, the same sorts of comments.

24   Mr. King is referring to Ms. Andriano when she was very

25   young, getting people to do what she wants?

1            MR. NICKELS:  Can you be more specific?  Are you

2   referring to a specific line on Page 16?  You just

3   mischaracterized it.

4            MR. HAZARD:  It's Page 15, Line 19.

5            THE WITNESS:  Line 19.

6            MR. HAZARD:  I apologize.  Our technology is --

7            THE WITNESS:  I see what he's saying there, yes.

8            MR. NICKELS:  Just to be clear, I mean, Page 15,

9   Line 19?  Is that what you're reading from?  Because if

10  that's what it is, I would like the witness to read it out

11  loud because it's not at all consistent with the

12  characterization you just gave it.

13      Q.   BY MR. HAZARD:  Yeah, the page numbers are

14  covered on this.  I believe it's Page 16 starting even as

15  far as Line 5 up, all the way down.

16           THE COURT:  We're talking about Page 16?

17           MR. HAZARD:  16.  To Line 23.

18           THE WITNESS:  Shall I read that?

19           MR. HAZARD:  Yes.

20           THE WITNESS:  I caught her --

21           THE COURT:  Why don't you read it to yourself

22  first and then ask the question.

23           THE WITNESS:  Okay.

24           MR. HAZARD:  Okay.

25           THE WITNESS:  Okay.

1    *Q.*    BY MR. HAZARD:  And he's talking about how -- in

2   that section of testimony, how he believed Ms. Andriano

3   that they were monogamous and he found out that that was

4   not the case; correct?

5    *A.*    That -- in his opinion, that was not the case.

6    *Q.*    Correct?

7    *A.*    Yes.

8    *Q.*    And that he was going back to his devious comment

9   that her ability to fool people and gain trust from

10  people; correct?  That's what he was talking about with

11  devious?

12   *A.*    I don't know that they're related.

13   *Q.*    Okay.

14   *A.*    Umm, this seems more related to their

15  relationship rather than some overall idea.

16   *Q.*    All right.  You remember reading that

17  Ms. Andriano researched poisons using a computer at work;

18  correct?

19   *A.*    Yes.

20   *Q.*    And she used a false name to contact the sellers

21  of that poison; correct?

22   *A.*    Ann Newton, as I recall.

23   *Q.*    Correct.  And she also used a business that was

24  defunct, actually her father-in-law's old business;

25  correct?

1    *A.*    Yes.

2    *Q.*    And doctored a business license in order to

3    obtain that poison; correct?

4    *A.*    Yes.

5    *Q.*    Then she obtained that poison and hid it in a

6    storage facility at her apartment complex; correct?   There

7    was evidence presented at trial?

8    *A.*    I thought she initially brought it back to her

9    office.

10   *Q.*    Correct.   And then she eventually put it in a

11   storage facility?

12   *A.*    Eventually, yes.

13   *Q.*    All right.   And at least from the State's

14   perspective of that evidence, she administered that poison

15   on Joe Andriano without him knowing it; correct?

16   *A.*    From the State's perspective; that's correct.

17   *Q.*    Does bipolar disorder cause that type of

18   behavior?

19   *A.*    Absolutely.   There's nothing -- I think the

20   confusion here is that somehow people that have

21   psychiatric disorders, their behavior is completely

22   fragmented and that there may not be any particular focus.

23   There may be a focus of someone that has bipolar disorder

24   or that's making these types of impaired decisions.   It's

25   just a bad focus.   It's a damaged focus.

1    *Q.*   Well, Doctor --

2    *A.*   It's not --

3          MR. NICKELS:  Your Honor --

4          THE COURT:  Ask your next question.  Ask your

5    next question.

6          MR. NICKELS:  Well, Your Honor, I would like --

7          MR. HAZARD:  It's nonresponsive.  Objection.

8          THE COURT:  All right.  Sustained.  Ask your next

9    question.

10         MR. NICKELS:  Your Honor, if I may, it was

11   responsive.  It was refuting his question.  It was

12   certainly responsive.

13         THE COURT:  Ask your next question.  You can

14   follow up on cross.

15         Go ahead.  Ask your next question.

16   *Q.*   BY MR. HAZARD:  This isn't a choice that

17   Ms. Andriano made and actions that she took?

18   *A.*   A damaged choice.

19   *Q.*   But isn't every crime a damaged choice?

20   *A.*   If someone --

21   *Q.*   Doctor, yes or no?  Isn't every crime a damaged

22   choice?

23   *A.*   It's not an answer that I can answer yes or no.

24   *Q.*   All right.

25   *A.*   I can't -- if I can say -- if I can complete my

1    answer.

2              THE COURT:  Go ahead.

3              THE WITNESS:  Thank you, Your Honor.

4         If someone does not have a psychiatric disorder

5    and they commit a crime, obviously crimes are bad choices.

6    They're things that we don't want to do.  But if someone

7    has the types of psychiatric disorders that Ms. Andriano

8    has, that has to be taken into the context of the crime.

9              MR. HAZARD:  So --

10             THE WITNESS:  So, yes, it's a damaged choice.

11   And, yes, there are criminals that may make -- but this is

12   different because she has a psychiatric disorder that

13   lends itself to the very types of behavior that we're

14   discussing.

15        Q.   BY MR. HAZARD:  Doctor, that wasn't my question.

16   My question was causation.  Do any of these disorders

17   cause Ms. Andriano to poison her husband?

18        A.   I don't understand cause in this sense.  What do

19   you mean?

20        Q.   Did the disorder, whatever she had, cause her to

21   choose and act out in poisoning her husband?

22        A.   I'm just not sure how to answer it any other way

23   than the way I already have.

24        Q.   Okay.  And using fraudulent means to obtain that

25   poison, is it your testimony that that is also caused by

1  bipolar disorder?

2      *A.*   Well, it wasn't my testimony at first that it was

3  caused.   It was that it was consistent with someone having

4  bipolar disorder.

5      *Q.*   Then the answer is, no, it's not caused by it;

6  correct?

7      *A.*   No, that's not my answer.

8      *Q.*   Okay.   Did bipolar disorder cause Ms. Andriano to

9  pick up a bar stool and hit her husband over the back of

10 the head once?

11     *A.*   I'm sorry.   I'm struggling with this idea of

12 causation.

13     *Q.*   Okay.

14     *A.*   Okay.   Because if you're asking, did her bipolar

15 disorder undermine her decision making, so that that

16 was -- that act was done?   Yes.

17     *Q.*   Doctor, given your testimony here, can anyone who

18 has -- whether it's the history of abuse or bipolar

19 disorder, doesn't that give them a get-out-of-jail-free

20 card, given your testimony?

21     *A.*   Of course not.

22     *Q.*   Okay.   Isn't the act of murder always an action

23 of impaired judgment, regardless of what's going on in the

24 person's history, whether it be mental health diagnoses or

25 instances of trauma that they've had?

1    *A.*   Well, that's a -- that's a hypothetical that's

2  very difficult.  Yeah, of course, it's an impaired -- an

3  impaired judgment.  But the cause -- but the question is:

4  What caused the impaired judgment?  That's what the law is

5  all about is if there are other reasons for that impaired

6  judgment, they should be taken into consideration.

7    *Q.*   Well, Doctor, let me put it another way.  Let's

8  assume that consistent with the State's theory, and

9  obviously a jury's verdict, that Ms. Andriano had the goal

10  to kill her husband that night.  All right?  Let's assume

11  that.  And her goal was to get away with it.

12         What does bipolar disorder have to do with that

13  or any other mental health diagnosis or trauma experienced

14  in a childhood, if her goal is to kill her husband and act

15  on that and take measures to cover it up?

16    *A.*   If we accept that position, the development of

17  that goal -- and I'm certainly not suggesting it.  But the

18  development of that goal, if it were developed under the

19  types of severe psychiatric distress that Ms. Andriano was

20  under, then it has to relate to her psychiatric disorder.

21    *Q.*   Do you think she failed to appreciate that it was

22  wrong to hit her husband 23 times in the head with a

23  bar stool?

24    *A.*   I think she said that she knew that it was wrong.

25    *Q.*   Okay.  Do you think she failed to appreciate the

1  wrongfulness and could not appreciate the wrongfulness of

2  stabbing her husband in the neck?

3  *A.*   I think she said that she knew that it was wrong.

4  *Q.*   And there was evidence that she staged the crime

5  scene by adding a belt after she murdered her husband;

6  correct?  Evidence was presented in her trial?

7  *A.*   Evidence was presented.

8  *Q.*   Right.  And given that that was done close in

9  time to the murder, that is a goal to get away with

10  murder; correct?  She's covering her tracks?  That's

11  evidence of that; correct?

12  *A.*   I -- I would hardly say that she was covering her

13  tracks, but she certainly introduced something into the

14  crime scene, assuming that position.

15  *Q.*   She told police that he came after her with a

16  belt?

17  *A.*   Yes.

18  *Q.*   So having a belt near him would help with that

19  defense; correct?

20  *A.*   Yes.

21  *Q.*   And according to the State's theory, that was

22  staged by Ms. Andriano after the murder; correct?

23  *A.*   That's correct.

24  *Q.*   All right.  And then she called Alejo Ochoa after

25  the murder; correct?

1   *A.*   Yes.

2   *Q.*   And she sought his advice?   There was evidence

3   presented that she sought his advice during that phone

4   call?

5   *A.*   Yes.

6   *Q.*   She also called her friend Chris Hashisaki;

7   correct?

8   *A.*   Yes.

9   *Q.*   And told her about the story about Joe Andriano

10  attacking her and acting in self-defense?

11  *A.*   Yes.

12  *Q.*   Okay.   And, again, those were choices that she

13  made to try to get away with murder; correct, according to

14  the State's theory?

15  *A.*   Those are certainly choices that she made.

16  *Q.*   If the jury were to believe that Ms. Andriano --

17  -- Mr. Andriano had attacked the defendant with the belt

18  beforehand, and that she acted in self-defense, that would

19  have been a good result for Ms. Andriano; correct?

20  *A.*   Yes.

21  *Q.*   So her actions show a -- reflect a goal she had

22  during a time of serious distress; correct, if you believe

23  the State's theory?

24  *A.*   Yes.

25  *Q.*   And, again, does bipolar disorder cause that type

1  of behavior?

2      *A.*    It caused the formation of those kinds of damaged

3  goals.

4      *Q.*    Does PTSD cause that type of behavior?

5      *A.*    It caused the formation of those kinds of damaged

6  goals.

7      *Q.*    What about caregiver burden?

8      *A.*    Well, you know, we have cases in the courts all

9  the time about caregivers who take the lives of the person

10  that they are in fact caring for.  Often that is a -- it's

11  a reflection of both the illness of the person and the

12  stress that that person is under.

13      *Q.*    Ms. Andriano --

14      *A.*    So -- so, again, those kinds of obviously poor

15  decisions -- damaged decisions can reflect that kind of

16  burden and that kind of disorder.

17      *Q.*    Ms. Andriano's testimony at trial was that her

18  husband took the poison himself knowingly to commit

19  suicide; correct?

20      *A.*    Yes.

21      *Q.*    All right.  And while they were waiting for his

22  last moments on Earth, according to Ms. Andriano's

23  testimony, that's when she told him about the affair with

24  Travis Black?  Do you remember that?

25      *A.*    Yes.

1     *Q.*   Now, does caregiver burden explain that type of

2     behavior or is that just evidence of being mean, if it's

3     to be believed?

4     *A.*   It's really much more consistent with bipolar

5     disorder, as was the affair with Travis Black.

6     *Q.*   Okay.  These were his last moments on Earth,

7     which according to her testimony, that's what she wanted.

8     She wanted to give Joe peace and for him to die on his

9     terms.  Do you remember that?

10    *A.*   I don't recall that.  I'm sorry.  I just don't

11    recall that.

12    *Q.*   Okay.  Let's assume that was consistent with her

13    testimony.

14    *A.*   Sure.

15    *Q.*   All right.  What would that serve to help her

16    husband to let him know in his last moments that she

17    cheated on him?

18    *A.*   I recall it a bit differently.  But I don't

19    recall -- I don't see any particular benefit that it would

20    serve.

21    *Q.*   There was a benefit that she used in her defense,

22    though; correct?  Well, didn't she say that that's what

23    set her husband off and caused him to attack her?

24    *A.*   Yes.

25    *Q.*   Right.  So that was a way -- under the State's

1  theory, that was a way of formulating a defense to murder

2  by giving her husband a reason to attack her, if you

3  accept the State's theory of evidence; correct?

4      *A.*    Under the State's theory, yes.

5      *Q.*    And is that evidence of a cognitive deficit?

6  Isn't that clever?

7      *A.*    I'm sorry, Mr. Hazard.  I don't -- I don't see it

8  as clever.  I may have to --

9      *Q.*    Well, Doctor --

10     *A.*    I'm sorry.  Let me finish.

11             THE COURT:  One at a time.

12             THE WITNESS:  Okay.  Thank you.

13             I -- I don't see it as clever.  It's, again,

14  pretty impaired thinking.

15     *Q.*    BY MR. HAZARD:  Murder is pretty impaired

16  thinking?

17     *A.*    That's not what I said.  I was responding to your

18  question.

19     *Q.*    Okay.  Her husband had 23 blows to his head;

20  correct?

21     *A.*    Yes.

22     *Q.*    That's what the autopsy revealed?

23     *A.*    Yes.

24     *Q.*    And a gaping stab wound in his neck; correct?

25     *A.*    Right.

1    *Q.*   And given the circumstances involving the

2  paramedics, Chris Hashisaki before, there was no way for

3  Ms. Andriano to say a stranger committed that offense;

4  correct, given the evidence?

5    *A.*   Well, given her prior behavior.

6    *Q.*   Correct.  Therefore, given that she knew that

7  police were going to discover her husband in that state,

8  would it having -- staging evidence of a struggle help her

9  to achieve her goal of getting away with murder?

10   *A.*   I'm just not sure how to answer that.  I don't

11 know -- I don't know the answer to that.

12   *Q.*   Dr. Woods, did you write the entire contents of

13 your report?

14   *A.*   Yes.

15   *Q.*   Including the citations in the footnotes?

16   *A.*   I think probably some of the footnotes were -- I

17 received help from the attorney's office.  But the rest of

18 the report, I wrote.

19   *Q.*   All right.

20   *A.*   Formatted.

21   *Q.*   If you would look at your report, I see on

22 Page 65 that you have a date of February 14, 2012?

23       THE COURT:  Let's refer to the exhibit.  What

24 exhibit is that?

25       MR. HAZARD:  It is Exhibit No. 2, I believe,

1    Your Honor.

2         THE WITNESS:  Yes.

3    *Q.*    BY MR. HAZARD:  And, Doctor, did you rely on

4    Dr. Hopper's report?  You mentioned that you did in your

5    report; correct?

6    *A.*    Yes.

7    *Q.*    And Dr. Hopper, also -- his report is also dated

8    February 14, 2012?

9    *A.*    Okay.

10   *Q.*    How does that work?  How can you both rely on

11   each other's report when they were both dated the same

12   day?

13   *A.*    I think that prior to that, Dr. Hopper and I had

14   discussed his findings.  And so if -- I think that's

15   really what I meant.  I may have misspoken when I said

16   report exactly.  But we had discussed the findings.

17   *Q.*    Is it your testimony that a person with bipolar

18   disorder cannot be held responsible for her actions?

19   *A.*    Oh, no.

20   *Q.*    Is it your testimony that a person with a history

21   of sexual abuse and physical abuse cannot be held

22   responsible for her actions?

23   *A.*    No.  And I don't think I was asked the question

24   of responsibility.

25   *Q.*    Okay.  And that's why I'm asking you now.

1      *A.*   Fine.  So, no.

2      *Q.*   The jails are filled with people with histories

3 of -- prisons are filled with people with histories of

4 sexual abuse and physical abuse in their past; is that

5 correct, based on your experience?

6      *A.*   The largest psychiatric hospitals in the

7 United States are prisons -- are a prison.

8      *Q.*   Well, I'm talking about actual prisons, Doctor.

9      *A.*   I'm talking about actual prisons.

10      *Q.*   And prisons are also filled with people who have

11 serious mental disorders; correct?

12      *A.*   That's what I meant, yes.

13           (WHEREUPON, an off-the-record discussion ensued.)

14           MR. HAZARD:  Thank you, Your Honor.  No further

15 questions.

16           THE COURT:  Is this a good time to take our

17 afternoon break?

18           MR. NICKELS:  It is.  I can tell you we don't

19 have any redirect.

20           THE COURT:  No redirect?

21           MR. NICKELS:  So the afternoon break may turn

22 into the end-of-day break.

23           THE COURT:  May this witness be excused?

24           MR. NICKELS:  Yes.

25           THE COURT:  Thank you very much, sir.  You're

1  excused.  Don't walk off with any of the exhibits, though.

2          THE WITNESS:  Okay.

3          THE COURT:  Thank you.

4          THE WITNESS:  Thank you.

5          THE COURT:  So what is the situation of -- I

6  guess no more witnesses for today?

7          MR. ARNTSEN:  Right, Your Honor.

8          THE COURT:  And then no witnesses for tomorrow

9  morning?

10          MR. ARNTSEN:  Right.

11          THE COURT:  So we're going to reconvene tomorrow

12  afternoon at 1:30 sharp?

13          MR. ARNTSEN:  Yes.  We wanted to reconvene a

14  little earlier but, again, our problem is that the next

15  witness, Mr. Bennett, isn't available in the morning.

16          Do you know when he's available, Scott?

17          MR. BENNETT:  Mr. MacLeod.

18          MR. ARNTSEN:  Or Mr. MacLeod.

19          MR. BENNETT:  1:30.

20          MR. ARNTSEN:  It's 1:30 tomorrow.  I'm sorry.

21          THE COURT:  Okay.  Then we'll go ahead and take

22  our recess until 1:30 tomorrow afternoon.  Everyone have

23  a nice evening.  Thank you.

24          (WHEREUPON, the proceedings were concluded at

25  3:04 p.m.)

1                      *  *  *  *  *  *  *

2

3

4                       C E R T I F I C A T E

5

6

7          I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

8    the State of Arizona, do hereby certify that the foregoing

9    144 pages constitute a full, true, and accurate transcript

10   of the proceedings had in the foregoing matter, all done

11   to the best of my skill and ability.

12          SIGNED and dated this 28th day of February, 2014.

13

14

15                  /s/  Renée A. Mobley, RPR

16                  RENÉE A. MOBLEY, RPR

17                  Certified Reporter

18                  Certificate No. 50500

19

20

21

22

23

24

25