# TABLE OF CONTENTS (INTERACTIVE)

| | |
|---|---|
| LLLLLLLLLL | Transcript 2-11-14 |
| MMMMMMMMMM | Order 4-30-14 Extending Deadlines |
| NNNNNNNNNN | M.E. 5-19-14 Order Signed |
| OOOOOOOOOO | Petitioner's Post-Hearing Memorandum |
| PPPPPPPPPP | Motion of the Ethics Bureau at Yale for Leave to File Amicus Curiae Brief |
| QQQQQQQQQQ | Response in Opposition to Motion for Leave |
| RRRRRRRRRR | Reply in Support of Motion for Leave |
| SSSSSSSSSS | Unopposed Motion for Extension of Time |
| TTTTTTTTTT | M.E. 7-15-14 Extending Time |
| UUUUUUUUUU | State's Closing Memorandum |
| VVVVVVVVVV | M.E. 8-4-14 Denying Motion to Stay |
| WWWWWWWWWW | Unopposed Motion for Extension of Time |
| XXXXXXXXXX | Order Granting Extension of Time |
| YYYYYYYYYY | Petitioner's Post-Hearing Reply Memorandum |
| ZZZZZZZZZZ | M.E. 11-1-14 Dismissing PCR |
| AAAAAAAAAA | Unopposed Motion for Extension of Time |
| BBBBBBBBBB | Order 11-21-14 |
| CCCCCCCCCC | Exhibit Worksheet |
| DDDDDDDDDD | M.E. 12-29-14 |
| EEEEEEEEEE | Unopposed Motion for Extension of Time |
| FFFFFFFFFF | Order Granting Extension of Time |
| GGGGGGGGGG | Motion to File Overlength Brief |
| HHHHHHHHHH | Petition for Review |
| IIIIIIIIII | Letter Returning CD Containing |
| JJJJJJJJJJ | Confirmation of Pro Hac Vice Renewal of Lynch |
| KKKKKKKKKK | Confirmation of Pro Hac Vice Renewal of Arnstsen |
| LLLLLLLLLLL PART 1 | Petitioner's Appendix to Petition for Review |

# EXHIBIT LLLLLLLLL

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
M. Martin, Deputy
5/2/2014 5:56:32 PM
Filing ID 5855462

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
            Respondent,              )
                                     )
vs.                                  )   No.
                                     )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,            )
                                     )
            Petitioner.              )
_____)


Phoenix, Arizona
February 11, 2014
9:32 a.m.


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


EVIDENTIARY HEARING

DAY 7


Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                        (ORIGINAL)

1                      A P P E A R A N C E S

2

3

4    On Behalf of the State:

5            Mr. Gregory Hazard
             Assistant Attorney General
6
             Ms. Lacey Gard
7            Assistant Attorney General

8
     On Behalf of the Defendant:
9
             ATTORNEYS AT LAW:
10
             Mr. Scott Bennett
11           Mr. Allen Arntsen
             Mr. Stephan Nickels
12           Mr. Matthew Lynch
             Ms. Krista Sterken
13           Ms. Jodi Fox

14

15                        I N D E X

16                    T E S T I M O N Y

17

18   WITNESS:                                          PAGE

19
     LARRY A. HAMMOND
20
             Direct Examination by Mr. Arntsen         5
21           Cross-Examination by Ms. Gard             91
             Redirect Examination by Mr. Arntsen      108
22

23   GARY LOWENTHAL

24           Direct Examination by Ms. Sterken        112
             Cross-Examination by Ms. Gard            176
25

1                    P R O C E E D I N G S

2

3          THE COURT:  Good morning.  This is

4   CR 2000-096032, State of Arizona vs. Wendi Elizabeth

5   Andriano.

6          The record will reflect the presence of the

7   parties and counsel.

8          Are there any matters we need to discuss before

9   we proceed?

10          MR. BENNETT:  Quickly, Your Honor, we have two

11   exhibits to move into evidence, 232 and 233, certified

12   copies of the minute entries reflecting the convictions

13   and sentences of Skip and Tommy Robertson, Wendi's

14   biological father and uncle, for sexual offenses related

15   to children.

16          THE COURT:  Any objection?

17          MS. GARD:  No, Your Honor.

18          THE COURT:  Exhibit Nos. 232 and 233 for

19   identification are admitted into evidence.

20          The Petitioner may call her next witness.

21          MR. ARNTSEN:  Larry Hammond.

22          THE COURT:  Mr. Hammond, if you would please step

23   forward here.  Please face the clerk.  Raise your right

24   hand and she will swear you in.

25          THE CLERK:  Could you please state your name and

1   spell your name for the record, please?

2          THE WITNESS:  Larry A. Hammond, H-A-M-M-O-N-D.

3          THE CLERK:  Thank you.

4          (WHEREUPON, the witness was duly sworn by the

5   clerk.)

6          THE COURT:  Please make yourself comfortable

7   there on the witness stand.  And you've been in court many

8   times, Mr. Hammond.  So I'll just remind you to speak up

9   so that everyone can hear you.  Okay?

10          THE WITNESS:  I'll try to.  May I get some water?

11          THE COURT:  Sure.

12          Is it going to be Mr. Arntsen?

13          MR. ARNTSEN:  Yes, Your Honor.

14          MS. GARD:  Your Honor, before we begin, can I

15   just note for the record my continuing objection on

16   relevance grounds to Mr. Hammond's testimony.

17          THE COURT:  Okay.  We will note that.

18          MS. GARD:  Thank you.

19          THE COURT:  And go ahead and state your full name

20   for the record, Mr. Hammond.

21          THE WITNESS:  Larry A. Hammond,

22   H-A-M-M-O-N-D.

23          THE COURT:  Mr. Arntsen, you may proceed.

24          MR. ARNTSEN:  Thank you.

25

1                         LARRY A. HAMMOND,

2    having been first duly sworn to tell the truth, the whole

3    truth, and nothing but the truth, testified as follows:

4

5                      DIRECT EXAMINATION

6    BY MR. ARNTSEN:

7        Q.    What's your profession, Mr. Hammond?

8        A.    I'm a criminal defense lawyer.

9        Q.    And how long have you been engaged in the defense

10   of capital litigation?

11       A.    I've been continuously engaged in one form or

12   another of capital work since 1981.

13       Q.    We will go back over your qualifications in just

14   a minute.  But can you summarize the opinions that you are

15   offering today?

16       A.    Yes.  My opinions that I've been asked to present

17   here today deal with the development and presentation of

18   the mitigation case or the Phase 3 case.

19       Q.    And what are those opinions?

20       A.    My primary opinions are that the group of defense

21   lawyers and others who worked with them were not properly

22   qualified and organized to serve the function of capital

23   defense counsel.

24             I also am concerned about the lack of appropriate

25   investigation from the outset of this case.  I think those

1    are the primary areas of my testimony.

2        Q.    And you frame it in terms of concern.  Is it your

3    opinion that this was constitutionally ineffective

4    representation of Ms. Andriano at the penalty phase?

5        A.    Yes, I do.

6        Q.    Thank you.  Let's go to your qualifications.  If

7    you would take a look in the white binder there.  Take a

8    look at Exhibit 1.  Is that the report that you prepared

9    in this matter?

10       A.    Yes, it is.

11       Q.    And is there a curriculum vitae attached to that

12   report?

13       A.    Yes, there is.

14       Q.    Let's just give the judge a minute to --

15             THE COURT:  Thank you.

16       Q.    BY MR. ARNTSEN:  And approximately what is the

17   date of that CV?

18       A.    I think the one that you have was last updated at

19   the very beginning of 2012.

20       Q.    And in terms of items that would be on your

21   current CV that aren't on the CV attached to Exhibit 1,

22   are there some other things that would be there?

23       A.    Well, I thought about this a little bit.  There

24   are three things I might mention that occurred after this

25   CV was written.

1          In the year 2012, I was inducted into the
2  American College of Trial Lawyers.  I take some special
3  pleasure in that because I'm one of the few criminal
4  defense lawyers in Arizona to have been inducted.  It is
5  primarily civil lawyers who are taken into that
6  organization.
7          In 2013, I received the award from the American
8  Bar Association Litigation Section for lifetime
9  achievement in my work in criminal defense and capital
10  defense known as the John Minor Wisdom Award.
11          In the summer of 2013, I was awarded the Arizona
12  State Bar's award for lifetime achievement as a criminal
13  defense lawyer.
14  *Q.*   And so, with those additions, would the CV
15  attached as Exhibit 1 be complete and accurate as to
16  substantial items in your career and resumé?
17  *A.*   Yes, I'm pretty sure it is.
18  *Q.*   Now what I want to do is just take you through
19  your history and involvement in capital case defense.
20  Let's just take it through and start it chronologically.
21  I believe we're talking at the start, that you were a law
22  clerk?
23  *A.*   I graduated from law school in 1970.  In 1971 and
24  '72, I served as a law clerk for Lewis Powell on the
25  Supreme Court.  That was really my first exposure to

1  capital work.  I was assigned to work with Justice Powell

2  on his opinion in *Furman v. Georgia*.

3      *Q.*   Just going back for just a minute, had you

4  clerked for a Supreme Court Justice before Justice Powell?

5      *A.*   Yes.  I was the last law clerk for Justice Hugo

6  Black.

7      *Q.*   But you didn't have any involvement in death

8  penalty matters as part of that clerkship?

9      *A.*   Not that I remember.

10      *Q.*   I apologize for interrupting.

11      *A.*   So I spent six months in late '71 and early '72

12  working almost full-time on the preparation of what became

13  Justice Powell's dissent in affirmance and that was my

14  real exposure to the death penalty.

15          I then did other things for a while.  And when

16  Jimmy Carter was elected, I went to become the deputy in

17  the Office of Legal Counsel.  And during the course of

18  that four years, I was asked to head up a team of people

19  do a White Paper on the state of the death penalty in the

20  United States, both at the federal level and the state

21  level, so that other the president and his advisors could

22  have as complete a picture as possible with the death

23  penalty world in the late 1970's.

24      *Q.*   Now let's turn to your actual practice involving

25  capital litigation.  And, again, if you would just start

1  at chronologically and we will move forward until either

2  someone objects or a chronological change in time.

3      *A.*   Well, I'll try to be a little quick about this.

4  I returned to my law firm here in Arizona in 1981.   I

5  began immediately doing a capital case in that year, a

6  case for a man named John Henry Knapp.

7          I then was involved in one way or another in

8  death penalty work for every time since then.  I've never

9  had a time in the last now 33 or 34 years in which I have

10  not been engaged in representation or consulting on

11  capital cases.

12     *Q.*   You had said your initial case was for John Henry

13  Knapp.  I know that earlier in this case, there have been

14  some references to Knapp counsel.  Is Mr. Knapp the name

15  sake of that concept?

16     *A.*   He is.  His case went to the Supreme Court

17  several years before I was appointed to represent him on

18  the question of whether a defendant could have the

19  assistance of counsel paid for by a third party without

20  disrupting his right to have a public defender.

21     *Q.*   Over what period of time did you represent

22  Mr. Knapp?

23     *A.*   From 1981 until 1992.  11 years.

24     *Q.*   Have you been lead counsel in capital cases?

25     *A.*   Yes.  I've been lead counsel in a number of

1   capital cases.  Three of them have gone to jury trials.

2   But I have been lead counsel in a good many that did not.

3      *Q.*   Any sense as to how many a good many is?

4      *A.*   Well, I was appointed in eight federal death

5   penalty cases in the southwest as what is known as learned

6   counsel as, which is the first chair role I've heard

7   talked about in this proceeding.  Those cases were in

8   Arizona and New Mexico, Nevada and California.

9         I also have been Knapp counsel for two death

10   penalty cases that I did in conjunction with the Office of

11   the Legal Defender here, the second public defender

12   office.

13      *Q.*   Can you tell us something about those cases?

14   When were they?

15      *A.*   Those cases were death penalty cases that were

16   brought in I think in 1999 and 2000.  One of them involved

17   a woman named Valerie Pape who was accused of killing her

18   husband.  The other one was a man named Paul Pilipow, a

19   Canadian who was charged with murdering a 74-year-old

20   woman and burning her.

21      *Q.*   How did you become to be Knapp counsel in those

22   cases?

23      *A.*   We agreed -- my colleagues and I in the law firm

24   agreed to become Knapp counsel with the legal defender's

25   office on a pro bono basis as a way to help deepen our

1   collective understanding of the importance of team work in

2   capital cases.  The Office of Legal Defender had some very

3   competent experienced lawyers, but we thought and they

4   thought that it might be useful to bring some of the

5   expertise that lawyers in a private firm might have with

6   witnesses and experts and things of that sort.  So we

7   partnered in that.

8       Q.   So when you say we, were other lawyers in your

9   firm also working in this Knapp counsel basis --

10      A.   Yes.

11      Q.   -- with you on this?

12      A.   Yes.  I was the lawyer primarily responsible in n

13  my firm.  But one of my partners, John Stookey, was my

14  primary colleagues, among others.

15      Q.   And because of your and Attorney Stookey's

16  involvement in that case, did you supplant anyone from the

17  Office of Legal Defender's staffing of the case.

18      A.   No, quite decidedly not.  In both cases, the

19  Office of Legal Defender had two lawyers assigned to the

20  case.  They had their own mitigation specialist and they

21  had access to such other mental health consultants as

22  proved to be necessary in cases.

23      Q.   Over what period of time was this Knapp counsel

24  service on the Pape and Pilipow cases?

25      A.   I would say a couple, three years overall from

1  probably 1999 until sometime in 2002.

2      *Q.*   And you mentioned a team concept.  Tell us how

3  the team functioned in those cases.

4      *A.*   Well, the team functioned the way we have seen

5  teams function in virtually all of the capital cases that

6  I've been involved in.  We have operated from some very

7  basic principles that are now set forth in guidelines that

8  I know you've talked about some in this case.  But we had

9  regular team meetings.

10      *Q.*   By regular, what intervals, just a ballpark?

11      *A.*   Almost always weekly.  There was sometimes when

12  we couldn't, but, generally, we tried to meet with all of

13  the team or at least so much of it as was available.

14      *Q.*   Who was the team comprised of?

15      *A.*   The teams in those cases and in all of my federal

16  death penalty cases consisted of at least two other

17  lawyers in addition to myself in those cases.  In both

18  cases, it turned out that both of those lawyers had in

19  fact tried other capital cases.  But we had a mitigation

20  specialist, someone with training in developing the

21  mitigation case.  And then we brought in as necessary

22  consultants on mental health issues.

23      *Q.*   And what were the resolutions of the Pape and

24  Pilipow cases?

25      *A.*   Both of those cases resulted in successful plea

1  arrangements.  Ms. Pape was sentenced to second degree

2  murder and a 16-year sentence.  And Mr. Pilipow was given

3  a life sentence.

4      Q.    But when you began your involvement, those were

5  capital cases?

6      A.    They most decidedly were.  They were both very

7  high profile and cases that on the surface, one would

8  think might very well remain capital cases.

9      Q.    In addition to your service as counsel in capital

10  cases, have you been appointed as experts in

11  ineffective -- in proceedings relating to capital cases?

12      A.    Yes, I've been appointed many times.  I'm not

13  sure of the precise number.  I've testified as an expert

14  on the effectiveness of counsel in six cases.

15          And I think, by the way, Mr. Arntsen, my resumé

16  may say four, but there have been two more in the last

17  year and-a-half.

18      Q.    And on each of the cases that you have testified,

19  was it your opinion that there was ineffective assistance

20  of counsel?

21      A.    Yes.

22      Q.    Let's talk about the cases that you haven't

23  testified.  What's the magnitude we're looking at there in

24  terms of either cases you were appointed or cases that you

25  reviewed?

1     *A.*   Well, that's really almost impossible for me to
2     give you an accurate number.  But I have been involved in
3     looking at questions of ineffective assistance of counsel
4     in capital cases for at least since 1989.  Often on a
5     consulting basis.  But in noncapital cases, I have been
6     primarily responsible for reviewing ineffective assistance
7     of counsel claims on behalf of the Arizona Justice Project
8     in many hundreds of cases.

9     *Q.*   In those cases, you review them and provide your
10    opinion as to whether there was a viable IAC claim?

11    *A.*   I either have provided an opinion or have
12    consulted with other lawyers about why I thought that the
13    conduct of counsel didn't fall below the constitutional
14    requirements.

15    *Q.*   You talked about that you looked at hundreds of
16    cases, and I understand it's impossible to come up with
17    any exact percentages.  But can you explain just sort of
18    where you came out in the bulk of those cases that you
19    reviewed?

20    *A.*   With the bulk of them were cases in which either
21    the performance of counsel did meet constitutional norms
22    or there was -- and this happened in a huge number of
23    cases -- reconsideration of the case was barred --
24    precluded by the laws and statutes.

25    *Q.*   You've also represented lawyers who had been

1 found to have been ineffective in providing counsel in

2 subsequent proceedings?

3     A.    Yes, several times.  And the two that I recall

4 where lawyers -- Bar complaints had been filed against

5 lawyers by the attorney general's office for conceding

6 that had been constitutionally effective.

7     Q.    Now I want to turn towards your work in this

8 case.  What materials did you review?  And you may want to

9 take a look at your report and I call your attention to

10 Paragraphs 21 and 22.  Although, that may help refresh

11 your recollection, but this isn't a memory test.

12     A.    Thank you.  I did review the materials listed in

13 Paragraph 21.  Since then, I have reviewed a good number

14 of reports and documents related to the case.

15     Q.    Have you reviewed the filings, the petition,

16 response and reply?

17     A.    Yes, absolutely.

18     Q.    Have you reviewed Mr. Rohman's report?

19     A.    Yes, I reviewed Keith Rohman's report.  And there

20 were reports of -- I don't know if they're mentioned

21 here -- but Dr. Woods and Dr. Hopper.

22     Q.    Did you review the report of Dr. James?

23     A.    Yes, I did.  Thank you.

24     Q.    Did you review transcripts of interviews of

25 Attorneys Patterson and DeLozier?

1      *A.*    Yes, I did.

2      *Q.*    Did you review various declarations that were

3   submitted in this matter?

4      *A.*    Yes, I did.

5      *Q.*    Did you review the reports of the State's

6   experts, Drs. Pitt and Amin?

7      *A.*    Yes, I did.  I read both of those reports and I

8   also reviewed or I viewed a portion of the recorded

9   interview of Ms. Andriano.

10     *Q.*    And then, finally, you were here during the

11  testimony of Attorneys Patterson and DeLozier; correct?

12     *A.*    Yes, I was.

13     *Q.*    Want I want to turn to now is the standard of

14  practice for capital defense counsel in the 2000 through

15  2004 period, which is the period of time between

16  Ms. Andriano's arrest and conviction.

17          First of all, can you explain to the Court the

18  difference between a custom and a standard of care?

19     *A.*    Well, I think it's important to address that

20  question.  The standard of care is what should be seen as

21  an objective guide to the performance of lawyers who do

22  capital cases and do them proficiently.

23          There are certainly habits and customs that have

24  developed among lawyers here in Arizona and elsewhere that

25  may have been in the realm of what lawyers do, but those

1  are not part of the standard of care.  Or stated

2  differently, just because some lawyers do the same thing

3  over and over again, it doesn't make it the standard of

4  care for doing capital work.

5       Q.   Are you knowledgeable about the standard of care

6  for capital defense counsel?  And, again, just so I don't

7  avoid repeating it all the time, but I'm talking about in

8  connection with the penalty phase of a capital case --

9       A.   Yes.

10      Q.   -- in the 2000 through 2004 period.  And, also,

11 just so I don't keep repeating it over and over again,

12 that's the time period we're talking about.  Okay?

13      A.   I believe so.  Yes, I understand.

14      Q.   So are you familiar with the standard of care?

15      A.   I believe I am.

16      Q.   What is the basis for that familiarity?

17      A.   Well, in addition to the specific things I

18 mentioned, I was one of the founding members of the

19 Arizona Capital Representation Project in 1989.  That

20 project, which I helped create and staff, was designed to

21 be a resource for lawyers undertaking capital cases --

22 lawyers and others -- to provide a kind of a ready

23 reference to the existing cases and what was happening in

24 those cases to keep up with changes in the literature,

25 court decisions.  And that project continues today and

1   I've remained on the board throughout the existence of
2   that project.
3           In addition, in 1995, I was appointed by the
4   State Bar to be the chair of what is known as the Indigent
5   Defense Task Force.  It is a task force created by the Bar
6   to essentially explore and help understand the world of
7   indigent representation generally, but our focus
8   primarily, particularly in the first decade, was on
9   indigent defense in capital cases.
10      Q.   Were you also involved in any academic work
11  related to capital defense?
12      A.   Yes, I have taught the death penalty course at
13  the Arizona State College of Law.  And I have taught in
14  the undergraduate school at Arizona State a death penalty
15  class that was actually very much like the one we did at
16  the law school.
17      Q.   Any other teaching in the death penalty area?
18      A.   Yes.  I have very recently in 2008 -- I spent a
19  semester at the Elon University Law School in North
20  Carolina and taught a course then that involved the
21  indigent defense of capital case.
22      Q.   Would you take a look at Exhibit No. 76, which
23  has already been received into evidence?
24      A.   Did you say 76?
25      Q.   76.

1    *A.*    Yes.

2    *Q.*    What is that?

3    *A.*    That is the 2003 ABA Death Penalty Guidelines.

4    *Q.*    Are you familiar with this document?

5    *A.*    Yes.

6    *Q.*    Are you familiar with the process that resulted

7    in the creation of this document?

8    *A.*    Yes.  I had been involved in both through the

9    State Bar and directly with the ABA in the process of

10    creating these guidelines to amend and update the

11    guidelines that had been issued by the American Bar

12    Association in 1989.

13    *Q.*    So, as I understand your answer, there were some

14    guidelines issued by the American Bar Association in this

15    area in 1989, and then those were updated that resulted in

16    the 2003 document; correct?

17    *A.*    Yes.  And I think more accurately, I should have

18    said it was a collaborative effort between the ABA and the

19    National Criminal Defense Lawyer and Indigent Defense

20    Lawyer organizations.

21    *Q.*    Looking at the guidelines -- you were here during

22    Attorney Patterson's testimony where he referred to some

23    kind of related to the guidelines being aspirational.  Do

24    you remember that?

25    *A.*    Well, I know there was a little colloquy about

1   that.

2      *Q.*   And are the guidelines aspirational?

3      *A.*   No, they are not.  And the guidelines themselves

4   very clearly state at the outset -- I looked at it

5   again -- it's Page 2 of the guidelines that they are not

6   aspirational.  They reflect norms that existed before 2003

7   and are compiled here.

8          There is one sense in which I would say you could

9   use the word aspirational.  Maybe this goes back to your

10  question about customs.  The very large number of people

11  who worked on this report did have the hope that all

12  lawyers would aspire to do better, and giving them a set

13  of guidelines to work with, would assist in that effort.

14  So, to that extent, I certainly accept the idea that all

15  guidelines are aspirational.

16     *Q.*   And just so the record is clear, could you turn

17  to Page No. 2 or PCR 402 of Exhibit 76 with regard to the

18  aspirational sentence that you were referring to.  And I

19  believe what it is is it's the second sentence under the

20  heading History of the Guidelines; is that correct?

21     *A.*   Yes.

22     *Q.*   And I'll just read it just kind of the last

23  clause of that sentence:  These guidelines are not

24  aspirational.  Is that what is set forth there?

25     *A.*   Yes.  And I think the next sentence is also

1   important.  Instead they embody the current consensus

2   about what is required to provide effective defense

3   representation in capital cases.

4       *Q.*   Thank you.  Now have the guidelines been codified

5   or referenced by rule in Arizona?

6       *A.*   Yes.  In 2005, the Arizona Criminal Rules were

7   amended.  The rule specifically known as Rule 6 E, that

8   governs the qualifications required of death penalty

9   lawyers.  That provision was amended to refer specifically

10  to the guidelines and to say that lawyers -- all lawyers

11  undertaking capital cases must be familiar with and guided

12  by the performance guidelines in the ABA document.

13      *Q.*   That Arizona amendment of rules, is that

14  something that was typically undertaken in the various

15  states resulting from the promulgation of the guidelines?

16      *A.*   No.  And I'm not sure about this, but I at one

17  time understood that Arizona was the only state that had

18  actually changed a criminal rule to refer specifically to

19  the guidelines, but I could be wrong.  Maybe it's happened

20  -- it's happened elsewhere.  But we thought it was very

21  important to put that provision in the Arizona rules.

22      *Q.*   And were you involved in that process to

23  reference the guidelines in the rules?

24      *A.*   Yes.  I was the principle petitioner on behalf of

25  the State Bar Indigent Defense Task Force.

1     *Q.*   And was the exact language of the rule the

2  subject of some debate?

3     *A.*   Yes.  That there was a fair amount of response

4  and some open opposition to the rule over about a

5  six-month period of comments and responses.  All of our

6  rules are adopted eventually by the Arizona Supreme Court.

7  But so there is a process whereby anyone who has an

8  interest can express their concern.

9     *Q.*   What was the nature of the opposition and

10  resolution of the language issues?

11     *A.*   Well, as I look back on that, the most

12  significant argument made and often made by prosecutors

13  was that the rule change was unnecessary because lawyers

14  doing capital cases were already and had for a long time

15  been complying with them.  So why have a provision in the

16  rule that would require it?

17         There were also several judges who also filed a

18  statement.  Their document is referred to as the report of

19  some judges.  And those judges I think expressed some

20  concern that the guidelines would in some way become a

21  straightjacket on the performance of lawyers doing

22  capital cases.

23     *Q.*   And were those various concerns ultimately

24  reflected in the ultimate language of the rule?

25     *A.*   Oh, I think that they are.  There was an

1   amendment process that ended with what you now see in the

2   rule that requires lawyers to be both familiar with and

3   guided by.

4          At one time, the proposed rule also referred

5   specifically to what are called the performance

6   guidelines, which are in Part 10 of these guidelines.

7   That specific reference was deleted and replaced by the

8   notion that lawyers would be guided by the entire

9   documents.

10     Q.    And we'll get to some specific guidelines

11  applicable to this matter in just a minute.  But, first, I

12  would like to talk for just a minute on the *Ring* case --

13  and which, again, Attorney Patterson discussed in some

14  detail -- and its impact on penalty phase capital defense.

15     A.    It's hard for me to talk about *Ring* in one

16  minute.  Timothy Ring was my client.  I was asked by the

17  Office of the Federal Public Defender to represent Tim

18  Ring and to seek review in the United States Supreme Court

19  of an Arizona Supreme Court decision, which had said that

20  juries need not be involved in fact-finding at sentencing.

21  The cert was granted by the Supreme Court.  My partner,

22  Andy Hurwitz, argued it.  And the case resulted in the

23  reversal of the Arizona Supreme Court and the reversal of

24  other United States Supreme Court cases.  It came down in

25  July -- June -- excuse me -- of 2002.

1      *Q.*   And as a result of the -- did the *Ring* decision
2   again prompt some changes in Arizona Criminal Rules?
3      *A.*   Yes.  And it also resulted in a statutory change
4   that we heard some mention of with Mr. Patterson.  The
5   legislature then developed its own statutory mechanism for
6   the penalty phases of capital cases.
7      *Q.*   Did the *Ring* decision and the resulting statutory
8   changes change the standard of care for capital defense in
9   penalty cases?
10      *A.*   No.  And I think this is very important.  *Ring*
11   did not change the standard of care in Arizona or in any
12   of the other -- there were eight states that had laws
13   similar to Arizona of the 38 states that had the death
14   penalty at the time.
15          It certainly changed the process.  It required
16   the development of presentation skills that might not
17   always come naturally to lawyers.  But it certainly didn't
18   change the basic standards.
19      *Q.*   And I believe you may recall Attorney Patterson
20   stated that it was -- I'm loosely paraphrasing -- but it
21   was generally his practice in capital cases before *Ring* to
22   focus on the Phase 1 guilt phase, and then if there was a
23   guilty verdict, then turn to mitigation because you had
24   time to do -- you know, you would be granted time to do
25   so.  And he typically -- and there were some differences

1   between focusing the penalty arguments on the judge rather
2   than the jury.  Do you recall that testimony?

3       *A.*   Yes.  And I think it was in that context, if I
4   recall correctly, that Mr. Patterson used the word custom.
5   That was, as he described it, his understanding of the
6   custom.

7           I quarrel with the idea that it was the custom.
8   But the basic idea of capital defense before *Ring* was that
9   you need to develop the whole case from the outset and you
10  need to have a functioning team from the outset.  The idea
11  that you could put aside all consideration of the life and
12  experience of the offender and focus just on the offense
13  was never the standard of care.

14      *Q.*   And even prior to *Ring*, was there a substantial
15  practice, and even in this general area, relating to
16  jury -- you know, defensive cases regarding jury
17  sentencing?

18      *A.*   Yes.  And that one of the jury involvement in
19  fact-finding and sentencing was the norm across the
20  United States.  All of our sister states had jury
21  involvement in sentencing.  California, which has over 700
22  people on death row, had it.  New Mexico, Nevada and, of
23  course, at the federal level all of those cases had direct
24  jury involvement in sentencing.

25      *Q.*   So, similarly, you talk about the various capital

1  defense groups.  Even during the *pre-Ring* period, were

2  there a lot of educational programs, seminars, that sort

3  of thing that addressed issues related to presenting

4  penalty issues to juries?

5       *A.*   Yes.  And many of the lawyers in all of our

6  public defender offices participated often as presenters

7  in those conferences.  But there are some very famous

8  ones.  There was a conference called Life in the Balance

9  that was administered every year certainly all the way

10 through the 1990's.

11          There were, as I mentioned earlier, the

12 establishment of the resource centers both here in Arizona

13 and in 20 other states to do exactly this:  To provide the

14 training, to provide the opportunity for people to gather

15 information and share use.  All of that was going on well

16 in the 80's.  I mean, or really from 1978 forward, we

17 began to see a great increase in this kind of educational

18 opportunity.

19      *Q.*   And so, just as a summary, is it your opinion

20 that the ABA Guidelines set forth the standard of care for

21 capital case defense in the 2000 through 2004 period?

22      *A.*   Yes.  They reflect a standard of care that

23 existed at that time and before.

24      *Q.*   And are you also familiar with a 2008

25 Supplemental Guideline?

1     *A.*    Yes.

2     *Q.*    And I'll reference to you they're Exhibit 206.
3    You don't need to look at them.  I'm not going to go into
4    detail.  But did they change anything or just can you
5    explain what they were about?

6     *A.*    Those guidelines are known as the Supplemental
7    Mitigation Guidelines.  The idea behind those guidelines
8    was to focus in more detail on how the mitigation function
9    works, to look at some of the difficulties inherent in
10   conducting an appropriate mitigation investigation and
11   presentation.  So that's what those guidelines do.  And I
12   think they have been very helpful.

13    *Q.*    Now, again, in his testimony last Friday,
14   Attorney Patterson at times appeared to be somewhat
15   equivocal in terms of whether the guidelines -- with the
16   guidelines as to what his practice should be measured by.

17          MS. GARD:  I object to counsel's characterization
18   of Mr. Patterson's testimony.

19          MR. ARNTSEN:  That's fine.

20    *Q.*   BY MR. ARNTSEN:  If you would take a look
21   at Exhibit --

22          THE COURT:  I think you said last Friday.  He
23   testified on Monday.

24          MR. ARNTSEN:  I said Patterson.  It was last
25   Friday.  Dan Patterson.

1      THE COURT:  You mentioned, yes, Mr. Patterson.

2  I'm sorry.

3      MR. ARNTSEN:  I didn't mean to be testifying.  I

4  was just transitioning.

5      THE COURT:  Okay.

6      Q.   BY MR. ARNTSEN:  Can you take a look at

7  Exhibit 54, please.  What is this?

8      A.   Well, this a motion filed by Dan Patterson on the

9  19th of November, 2004.

10     Q.   And what's the subject of the motion?

11     A.   Well, he is asking for assistance from the Court

12  in his investigation of the mitigation case.

13     Q.   And we will get to this in more detail a little

14  later on, but is the timing of this motion significant?

15     A.   Well, it's stunning.  And I'm sure we can talk

16  about it in more detail.  But it clearly acknowledges and

17  embraces the idea that the guidelines are important for a

18  variety of reasons that he correctly summarizes here.

19     Q.   You see that Exhibit 54 is comprised of a

20  two-page motion and then I believe it's a three-page

21  Memorandum of Points and Authorities.  Do you see that?

22     A.   Yes.

23     Q.   And both of which are dated November 19th and

24  signed by Attorney Patterson?

25     A.   Correct.

1    *Q.*   Can you take a look at the first page of the
2    memorandum?  And it's PCR 299.  Really looking at the
3    second paragraph on that page, how is Attorney Patterson
4    representing the guidelines?

5    *A.*   Well, I mean, he says it I think correctly here
6    when he says that the investigation into the existence of
7    any mitigating circumstances must be conducted in
8    accordance with the recently revised guidelines.  And then
9    he cites the guidelines.  He cites what turns out to be I
10   think the same provision I spoke about earlier that says
11   that the guidelines are not simply aspirational.

12         And he cites a couple of very important Supreme
13   Court cases that have defined the role of capital lawyers,
14   but they are cases from 1978, 1982, cases that have been
15   around for a long time.  And then I think importantly, he
16   cites Wiggins, which at that time, had really I think just
17   come down --

18   *Q.*   And then turning --

19   *A.*   -- which also cited the guidelines.  Excuse me.

20   *Q.*   And then turning to the next page, PCR 300 or
21   Page 4 of the document, does he make some specific
22   statements with regard to the standard applicable to
23   penalty phase preparation?

24   *A.*   Yes, he does.  He says that as the guidelines, as
25   what I was referring to as the performance guidelines,

1  require is a thorough and independent investigation of all

2  issues relating to guilt and to penalty.

3          He correctly cites the Supreme Court opinion in

4  Wiggins for the idea that counsel must undertake efforts

5  to discover all reasonably available mitigating evidence

6  and information.

7     Q.   So is there any doubt in your mind, that

8  regardless of what he may have said in terms of his

9  custom, that Attorney Patterson recognized that the

10  guidelines governed his defense of Ms. Andriano in the

11  penalty phase of her case?

12          MS. GARD:  Objection.  Speculation.

13          THE COURT:  Sustained.

14     Q.   BY MR. ARNTSEN:  Now looking at the guidelines,

15  can you -- and it's Exhibit 76 again.

16     A.   Thank you.

17     Q.   I want to talk about your initial opinion

18  relating to the composition and functioning of the defense

19  team.  If you could turn to Guideline 4.1 at Page 28.

20     A.   Yes.

21     Q.   What is the standard with regard to the defense

22  team for capital cases?

23     A.   Well, I think that this part of the guidelines

24  accurately summarizes that you need to have at least a

25  two-lawyer team of people who are qualified to be doing

1    this work.  You need to have a specialist in mitigation

2    related work.  And then you need to be sure that you have

3    someone who has qualification and training in mental and

4    psychological issues.

5         *Q.*   Now I want to turn our attention to

6    Ms. Andriano's defense team.  I think I'll kind of go in

7    reverse order here.  Was there someone -- and I want to

8    turn to the person with training on mental health and

9    psychological issues.  Okay?

10             First of all, why is that important?  And if you

11   want to turn to Page 30 of the Exhibit 76.  And the last

12   paragraph on that page, that may reference it in terms of

13   the applicable standard.

14        *A.*   Well, I think this does summarize some of the

15   reason.  I mean, you obviously have to have someone who

16   has training and experience in dealing with psychological

17   and psychiatric impairments.

18        *Q.*   Why?

19        *A.*   It's critically important.  The truth is that

20   lawyers, first of all, with really few exceptions, aren't

21   trained in how to explore and develop and understand

22   someone's mental state.

23        *Q.*   And so --

24        *A.*   Sometimes we think we have that training, but we,

25   as lawyers, we're just not trained or experienced in the

1   same way that mental health professionals are.

2       Q.    Could you turn to the next page of the

3   guidelines?  And you see the first full paragraph?

4       A.    Yes.

5       Q.    Can you read that sentence?

6       A.    Yes.  Counsel's own observations of the client's

7   mental status, while necessary, can hardly be expected to

8   be sufficient to detect the array of conditions, and then

9   it lists them, that could be of critical importance.

10      Q.    And is one of the conditions listed

11  post-traumatic stress syndrome?

12      A.    It is.

13      Q.    Okay.  And in terms of involving the mental

14  health expert, at what stage in the process should the

15  mental health expert be involved in the team's activities?

16      A.    From as close to the beginning as counsel can do

17  it.  The process of developing and exploring mental state

18  issues really has to begin from the beginning.

19      Q.    And as to what aspects of the defense does the

20  mental health expert contribute to?

21      A.    Well --

22      Q.    Starting from the earliest through the trial?

23      A.    Yeah.  Well, first of all, there are very few

24  cases that don't involve mental state issues relevant to

25  the guilt or innocence side of the case.  But, also, as to

1   the mitigation side --

2      Q.   Which is what I want you to focus on.

3      A.   Yeah.  And the mitigation side of the case has to

4   be integrated and coordinated from the outset.  And when

5   you talk about there being a custom or a habit of not

6   investigating mitigation until after the verdict, that

7   simply is not what is done in capital cases.  You need to

8   know what the story is of the life history and the mental

9   challenges and experiences of the defendant as you're

10  developing your approach to the trial.

11     Q.   Can the mental health professional assist in

12  issue or theme identification for the defense?

13     A.   Yes.  And that's a very important part of the

14  job.

15     Q.   How about in terms of guiding the investigation

16  or providing investigation avenues?

17     A.   Yes.  And one of the reasons why it's critically

18  important to have very frequent meetings and communication

19  is that that's exactly what has to happen in capital

20  cases.  People have to talk to each other so that when

21  someone, who does have knowledge or concerns about the

22  mental state of the client, can tell you:  This is

23  something we need to explore.  We may need a different

24  mental health professional to explore in more detail or we

25  may need to deepen our fact investigation.

1    *Q.*   And this is probably the most straightforward.
2  Mental health professionals get involved in issues of
3  diagnosing conditions or the findings?

4    *A.*   Yes.  Quite obviously, yes.

5    *Q.*   And then how about presentation of the mitigation
6  case?

7    *A.*   And that's also very important.  And not just the
8  calling of an expert to testify, but building the
9  presentation and deciding who your witnesses are going to
10  be is a process that does require I think a fair amount of
11  learning and understanding.  And, again, particularly when
12  you're talking about jurors.  The understanding of mental
13  health issues, it's challenging.  And without the aid of a
14  trained professional or professionals, deciding how to
15  present that would be very difficult.

16    *Q.*   Did Ms. Andriano's defense team contain at least
17  one member qualified by training and experience to screen
18  individuals for the presence of mental or psychological
19  disorders or impairments?

20    *A.*   No.

21    *Q.*   I want to talk about some specific individuals
22  who had some connection to her defense.  Are you familiar
23  with some work done by Dr. Potts?

24    *A.*   Yes.

25    *Q.*   And if it helps, his report is Exhibit 6 A or

1   6.001.

2      *A.*   Well, I can refer to it.  But Dr. Potts did the

3   first preliminary Rule 11, what's called a Rule 11

4   examination.

5      *Q.*   Did he perform any other services, to your

6   knowledge, assisting the defense team?

7      *A.*   I don't see any others.  He did recommend that

8   Dr. Garcia-Bunuel -- I'm not sure I'm pronouncing his last

9   name right -- be consulted.  But I don't believe that Jack

10  Potts -- Dr. Potts did any more than that.

11     *Q.*   Was Dr. Bunuel consulted or engaged by the

12  defense team, to your knowledge?

13     *A.*   I see no evidence that he was.

14     *Q.*   And what is the date of Dr. Potts' report?

15     *A.*   It was very early on.

16     *Q.*   It's 6 A.

17     *A.*   It was report to the Court and it was dated in

18  March of 2001.

19     *Q.*   And, to your knowledge, did Dr. Potts have any

20  ongoing involvement in the defense team after that?

21     *A.*   I don't believe so.

22     *Q.*   Next Dr. Rosengard.

23     *A.*   Yes.

24     *Q.*   So you want to refer to Exhibit 6 B.  Oh, backing

25  up just a second, is Dr. Potts a qualified mental health

1  professional?

2      *A.*   Well, he's been qualified probably hundreds of

3  times.  He's very well-known.  He has been employed by

4  Maricopa County for -- I don't want to do him a

5  disservice, but I'll bet it's more than a quarter of a

6  century.  He has consulted both with prosecutors and

7  defense lawyers.  So, yes, I think he's quite

8  well-qualified.

9      *Q.*   Now, Dr. Rosengard.  Are you familiar with

10  Dr. Rosengard?

11      *A.*   I am.

12      *Q.*   Is he a qualified mental health professional, in

13  your estimation?

14      *A.*   I certainly think so.  My experience with him has

15  been quite good.

16      *Q.*   Take a look at reference to Exhibit 6 B or 6.002.

17  I believe that's Dr. Rosengard's report; is that right?

18  Or did I get the exhibit number wrong?

19      *A.*   I think it's 6 C.

20      *Q.*   6 C.  It is 6 C.  I apologize.  6.003.  Do you

21  recognize that as Dr. Rosengard's report?

22      *A.*   Yes.

23      *Q.*   What is the date of that report?

24      *A.*   This is August 27, 2002.

25      *Q.*   And did --

1    *A.*    So we're now --

2    *Q.*    Go ahead.

3    *A.*    We're now almost two years into the case.

4    *Q.*    And, Dr. Rosengard, did he play a role in the

5    defense team?

6    *A.*    Well, he played the role you can see in this

7    document.  He did see Ms. Andriano and he did write a

8    report.  But I have no information that he was asked to do

9    anything beyond this.

10    *Q.*    Do you know if he had any involvement with

11    Ms. Andriano's defense time after issuing his report of

12    August 27, 2002?

13    *A.*    I believe that Mr. Patterson said that he did

14    not.  And I haven't seen any document to the contrary.

15    *Q.*    Turning now to the name Sharon Murphy.  Are you

16    familiar with Ms. Murphy?

17    *A.*    I'm not personally familiar with her, I don't

18    believe, but I have read her report.

19    *Q.*    What was your understanding of her role in

20    Ms. Andriano's defense?

21    *A.*    Can you show me the document number?

22    *Q.*    I believe that there is -- we actually don't have

23    a report.  There's an e-mail from Ms. Murphy that's marked

24    as Exhibit 52.

25    *A.*    I was just trying to refresh myself on the time

1   frame, which is now another year later.  It's March of

2   2003.  But I understand that she was brought in to do

3   essentially what's called a DMV, or a domestic violence

4   workup.

5       *Q.*   Do you know whether Dr. Murphy performed any role

6   relating to mental health services other than on the side

7   of the area of domestic violence?

8       *A.*   I don't see any evidence that she did.  She did

9   meet with Ms. Andriano a number of times, but I don't

10  think she had any continuing role.

11      *Q.*   And in terms of in connection with advising the

12  defense team in connection with mental health issues

13  generally outside the domestic violence context?

14      *A.*   No.  There is no evidence of that.  And I think,

15  again, Mr. Patterson said that he didn't consult her in

16  terms of a presentation other than she eventually

17  testified.

18      *Q.*   Another woman by the name of Kandy Rohde.  Do you

19  recall testimony relating to Kandy Rohde?

20      *A.*   I do.

21      *Q.*   And what did --

22      *A.*   I think her reports --

23      *Q.*   What?

24      *A.*   I'm sorry.  I was just going to say I think her

25  reports are Exhibit 45.

1    *Q.*    Her notes?

2    *A.*    Her notes.

3    *Q.*    Yes.  And if you would take a look at

4    Exhibit 7 A or 7.001, you'll see that's a letter from

5    Ms. Rohde?

6    *A.*    Yes.

7    *Q.*    And what was your understanding of her

8    involvement with Ms. Andriano's defense team?

9    *A.*    Well, I can't say that I have a clear

10   understanding of what her role was.  I understand that she

11   was at least one counselor who saw Ms. Andriano very

12   frequently from close to the very outset.  She developed

13   these notes, and as her relationship with

14   Ms. Andriano advanced, she expressed increasing concerns

15   about things that she was seeing and observing in

16   Ms. Andriano.

17   *Q.*    Based on your review of the materials and, also,

18   Attorneys DeLozier's and Patterson's testimony, was she in

19   fact a part of Ms. Andriano's defense team?

20   *A.*    Well, she didn't have much of an effect on the

21   team.  And I think Mr. Patterson had no interest in

22   communicating with her and no involvement with her, as far

23   as I can tell.

24   *Q.*    And then you were here yesterday for

25   Attorney DeLozier's testimony; correct?

1      *A.*    Yes, I was.

2      *Q.*    And do you remember some of his testimony was

3  that he had developed some expertise in the area of child

4  abuse from some cases that he was in the process of

5  bringing against the Catholic Church.  Do you recall that?

6      *A.*    I do.

7      *Q.*    Would Attorney DeLozier's expertise in that area

8  qualify him to fill the mental health professional role on

9  Ms. Andriano's team?

10     *A.*    Well, you know, I don't think he could fill the

11 role.  But I must say -- and I saw this at the time of his

12 interview as well -- I frankly found it very encouraging

13 that here was somebody who had a significant interest in

14 some of the problems that arise when you're dealing with

15 people who have been victims of child sexual abuse.

16          Was he an expert?  No.  Could he perform the

17 whole role of being the mental health person?  Of course

18 not.  But he at least was someone who had a background and

19 interest in at least one phase of the mental health case.

20     *Q.*    But based on the testimony of Attorneys Patterson

21 and DeLozier, was that background -- did that work to

22 inform Ms. Andriano's defense in any way?

23     *A.*    Well, I think that -- I mean, it clearly didn't

24 in any way.  And I think that was obviously one of the

25 consequences of not having a functioning team that

1  actually would meet and confer.

2     *Q.*   Staying on the topic of Attorney DeLozier, and

3  now I want to focus on the two qualified death penalty

4  counsel portion of the team.

5        Was Attorney DeLozier a qualified counsel for

6  death penalty cases during his period of participating in

7  Ms. Andriano's team?

8     *A.*   No.

9     *Q.*   What's your basis for saying that?

10    *A.*   Well, again, the important concept here for -- I

11  mean, if he was being asked to be second chair, I think

12  it's fair to say that the standard of care at that time

13  would have said, you could have someone as second counsel

14  who hadn't tried a capital case, but you would still want

15  to have someone who had done studying in the field, who

16  had been attending programs, getting education, conferring

17  with other lawyers.  You just can't have a second counsel

18  who comes as a blank slate to doing capital work.

19    *Q.*   Based on his testimony as to his approach, to his

20  view of his role in Ms. Andriano's defense team, did that

21  also impair Attorney DeLozier's ability to function as one

22  of the two lawyers required for this team?

23    *A.*   Well, he came to the case, as he said at the time

24  of his recorded interview, with an assumption that some

25  lawyers do have who say:  I'm doing criminal defense work.

1  I've developed mitigating evidence in my other cases.  I

2  can approach this capital case the same way I would

3  approach any other criminal case.

4          That is fundamentally wrong.  And I think now

5  virtually everyone understands that.  But to have someone

6  as your second chair who doesn't identify that there are

7  significant differences between doing capital work and

8  noncapital work is I think sort of emblematic of the

9  problem here.

10     *Q.*   And then once the public defender's office came

11  in and Attorney DeLozier was assisting -- was designated a

12  second chair as Knapp counsel, do you recall his testimony

13  as to kind of how he went about fulfilling his role in the

14  defense team during the time leading up to trial?

15     *A.*   Well, what he said is that he wound up having

16  virtually no role for a long period of time.  He expressed

17  some frustration.  When I say a long period of time, I

18  think he said something that may approach years of no

19  communication about what was going on in the case.  He

20  clearly was not a part.  Even if he had had some training

21  or experience, he was not a part of this team in any

22  meaningful way.

23     *Q.*   So is he fairly filling the role of the second

24  defense lawyer on the team?

25     *A.*   No.  And he should never have been.

1      Q.   And turning to Attorney DeLozier's performance
2  during trial, were there some issues there that raised
3  concerns in your mind as to his suitability as a capital
4  defense counsel?
5      A.   Well, yes.  I mean, it again was obvious that
6  neither he, nor Mr. Patterson approached the case as a
7  whole as a case in which the mitigation themes had to be
8  understood and developed prior to trial.  That just didn't
9  happen here at all.
10          I mean, other than portraying the client as a
11  good person who had had a good life, they did no other
12  development and certainly no presentation of any other
13  mitigating circumstances.
14     Q.   Do you recall Attorney DeLozier's testimony that
15  he would find out the day before that he was going to
16  examine a -- Attorney Patterson was going to ask him to
17  examine a witness that he really had no knowledge of?
18     A.   Yes, I did hear him say.
19     Q.   Is that appropriate?
20     A.   No, of course, it's not.  And, again, one of the
21  reasons you have a team is so that people can communicate,
22  and particularly -- I mean, I've always said at the
23  beginning of the case, the communication is maybe at its
24  most important.  But, certainly, when you get up close to
25  trial, those communications have to be intimate, and they

1  didn't even exist here.

2      *Q.*    Do you recall some testimony and there's some

3  materials in the record relating to Attorney DeLozier's

4  decision to fast during the trial?

5      *A.*    I did.

6      *Q.*    And I believe that the evidence is that he fasted

7  for 70 days in trial, drinking apple juice.  Do you recall

8  that?

9      *A.*    Yes.

10     *Q.*    Is that a problem?

11     *A.*    Well, it's a problem that affects the whole

12  trial, in my opinion.  I must tell you that I was

13  horrified when I heard that.  And I understand or at least

14  I appreciate what Mr. DeLozier had to say about how that

15  enhanced his listening and communicating skills.

16          But, you know, a trial in which someone's life is

17  at issue is not a time to experiment with changes in your

18  diet or changes in your approach to the practice of law.

19  Whatever you may think about how something might make you

20  a better lawyer, the courtroom in a death penalty case is

21  the last place you ought to be experimenting.

22     *Q.*    Do you recall Attorney DeLozier's testimony

23  relating to -- and Attorney Patterson's relating to the

24  death of his associate, Justin Blair, on October 17th of

25  2004 and its impact on him?

1    *A.*    I do.

2    *Q.*    And in your view, should that have been handled

3    differently than it was?

4    *A.*    Again, and this is another one of those things

5    that I think affects the whole trial.  But having a death

6    like that -- and I don't know a lot of the details, but I

7    know enough from what we've heard here and seen a little

8    bit on the record, that this man, Justin Blair, was not

9    only a friend, he was his colleague in the law firm.  He

10   was the ghost writer, I think is the phrase that

11   Mr. DeLozier used.  He was an intimate part of

12   Mr. DeLozier's practice.

13        And then when he died very suddenly, Mr. DeLozier

14   also had responsibilities with respect to caring for his

15   family and dealing with the ongoing criminal investigation

16   into Mr. Blair's death.

17        I don't see how any lawyer, no matter how

18   determined, could go through that kind of an experience

19   and not have it affect not only his stand-up in court

20   abilities, but his ability to prepare and plan and work

21   toward the eventual mitigation side of the case.

22   *Q.*    In your opinion, what should have been the

23   defense team's course of conduct following, given

24   Mr. Blair's murder and its impact on Mr. DeLozier?

25        MS. GARD:  Judge, I object on relevance grounds.

1  This is guilt phase.

2          THE COURT:  I'm going to sustain the objection.

3          Let's move on.

4          MR. ARNTSEN:  If I can make an offer of proof,

5  Your Honor.

6          THE COURT:  Go ahead.

7     *Q.*   BY MR. ARNTSEN:  What do you think should have

8  happened?

9     *A.*   I think they should have done internally a little

10  bit more of their own investigation of the circumstances

11  as they affected Mr. DeLozier and they should have then

12  made a record.  I think that they should have asked for a

13  longer postponement or a mistrial so that Mr. DeLozier

14  could either be brought back to where he was before or

15  that some other counsel be subject to perform.

16     *Q.*   And in light of counsel's objection, did this

17  affect the mitigation phase?

18     *A.*   I think it did.  Clearly, he was not spending any

19  time preparing for the mitigation side of the case, which

20  he had been told he was going to wind up having

21  responsibility for.

22          MR. ARNTSEN:  Thank you.  That's the conclusion

23  of the offer of proof.

24     *Q.*   BY MR. ARNTSEN:  Turning your attention now to

25  the mitigation specialist, Scott MacLeod, if you could

1   look at Page 33 of the guidelines, again, Exhibit 76.

2   *A.*   Yes.

3   *Q.*   Does that discuss the role of the mitigation

4   specialist?

5          MS. GARD:  Judge, I object to cumulative to

6   Mr. Rohman.  He has already testified about mitigation

7   specialists and what is required.

8          THE COURT:  I'll let Mr. Arntsen go into it a

9   little bit here.

10  *Q.*   BY MR. ARNTSEN:  Does that discuss the role of a

11  mitigation specialist?

12  *A.*   Yes, it does.

13  *Q.*   Based upon your review of the materials, was

14  Scott MacLeod a qualified mitigation specialist?

15  *A.*   No, he was not.

16         MS. GARD:  Objection.  Foundation.

17  *Q.*   BY MR. ARNTSEN:  Why not?

18         THE COURT:  Overruled.

19         Go ahead.

20  *Q.*   BY MR. ARNTSEN:  Why not?

21  *A.*   The information that we have about Mr. MacLeod

22  both from his declaration and from what other counsel have

23  said about him is he was a Maricopa County probation

24  officer.  He had no specialized training or experience in

25  developing mental health themes, developing information

1    about the life story of the defendant.  And to the extent

2    that counsel -- defense counsel might have thought that

3    the training as a probation officer would qualify someone

4    to do mitigation work in a capital case is simply wrong.

5    They aren't pretrial -- or excuse me -- presentencing fact

6    development for the county is a much different skill than

7    developing a mitigation case.

8        Q.   Do you recall Attorney Patterson's testimony

9    relating to his delegation of the mitigation case to

10   Mr. MacLeod and Mr. Linderman?

11       A.   I do.  I remember what he said.

12       Q.   Was that appropriate?

13       A.   No.

14       Q.   Why not?

15       A.   It wasn't at all because, again, first of all, he

16   didn't know what their skills were, either one of them.

17   He had not ever -- according to his testimony, he had not

18   interviewed them.  He had not developed an understanding

19   of the level of their knowledge and experience and he

20   didn't supervise them.  He didn't direct them.  He left

21   them out on their own.  As he said, he didn't ride -- he

22   didn't ride-herd on them.  There was words to that effect.

23       Q.   What's wrong with that?

24       A.   Well, again, foundational to the criminal defense

25   capital team is communication and coordination.  You can't

1  just send somebody out and say:  Okay.  You're in charge

2  of mitigation.  You go do your thing for the next couple

3  of years and come back and we will talk about it.  That

4  just can't happen in capital cases.

5      *Q.*  And during the testimony, the name Patrick

6  Linderman came up, who I believe was the mitigation

7  specialist who preceded Mr. MacLeod.  Based on your review

8  of the materials, did you see any significant contribution

9  by Mr. Linderman to Ms. Andriano's defense effort?

10     *A.*  No.  And I've asked if there were other

11 documents.  And, apparently, there are very few things

12 that indicate that Mr. Linderman did anything.

13     *Q.*  Okay.  Now let's turn to Attorney Patterson as

14 the lead counsel.  First of all, in your view, was

15 Attorney Patterson a qualified capital defense lawyer in

16 this period?

17     *A.*  By experience and training, I believe he was.

18     *Q.*  I want to focus on his role as the leader of the

19 Andriano defense team.  Are you critical of his

20 performance in that regard?

21     *A.*  Yes.

22     *Q.*  Can you turn to Page 65 of the guidelines?  And

23 can you read just the first sentence under commentary?

24     *A.*  It says:  The Commentary to Guideline 4.1 that we

25 spoke about earlier.  It says:  As reflected in

1  Guideline 4.1 and the accompanying commentary, the
2  provision of high quality legal representation in capital
3  cases requires a team approach that combines the
4  difference skills, experience, and perspectives of several
5  disciplines.
6      Q.   And if you would turn back a couple of pages to
7  Page 63, Guideline 10.4 B, do you see where it says lead
8  counsel bears overall responsibility for the performance
9  of the defense team?
10     A.   Yes.
11     Q.   And was Attorney Patterson the lead counsel?
12     A.   Well, he was the lead counsel.  He didn't perform
13  his role, but he was the lead counsel.
14     Q.   You were here during Attorney Patterson's
15  testimony regarding his view of interactions with Knapp
16  counsel.  Do you recall that?
17     A.   Yes.
18     Q.   What did it appear was his approach to how he
19  integrated Attorney DeLozier into his team?
20     A.   Well, he said that he, first of all, thought that
21  Knapp counsel replaced having a second lawyer in his
22  office.  He then, having assumed that Mr. DeLozier was
23  going to be his co-counsel, he gave him for a very long
24  period of time no direction.  They communicated virtually
25  not at all for a very extended period of time.  I think

1  like three years.

2      *Q.*   Can you take a look at Exhibit 63, please?

3      *A.*   63.  Yes.

4      *Q.*   What is that and how does that relate to this

5  topic?

6      *A.*   This is an e-mail exchange between Mr. DeLozier

7  and Michelle Arvanitas, I think is how her name is

8  pronounced.

9      *Q.*   That's correct.  She was an investigator with the

10  public defender's office.

11      *A.*   We're now in August of 2002.  So we're almost two

12  years into the case.  And Mr. DeLozier is complaining that

13  he's had no communication or direction and doesn't really

14  know what's happening with the case.

15      *Q.*   Can you take a look at Exhibit 64, please?

16      *A.*   Yes.

17      *Q.*   And what's the date of that?

18      *A.*   It says October of 2003.

19      *Q.*   And does this also discuss this same issue?

20      *A.*   It does.  And, again, it's another indication of

21  the lack of communication between Mr. DeLozier and the

22  Office of the Public Defender.

23      *Q.*   Do you see the first clause of the second

24  paragraph, that he was adamant about not having received

25  anything since Attorney Patterson took over the case?

1    *A.*    Yes.

2         MR. ARNTSEN:  I move Exhibit 64 into evidence not

3    for the truth but as support of his opinions.

4         MS. GARD:  For that purpose, I have no objection.

5    For that limited purpose.

6         THE COURT:  Exhibit No. 64 for identification is

7    admitted into evidence.

8         MR. ARNTSEN:  Thank you.

9    *Q.*    BY MR. ARNTSEN:  Do you recall Attorney

10   Patterson's testimony regarding when he spoke with

11   Ms. Andriano with regard to -- in April of 2004 with

12   regard to who was going to examine her at trial?

13   *A.*    Yes.

14   *Q.*    And does that inform your conclusions as to the

15   state of communication between the team or lack thereof?

16   *A.*    Well, I think it must have been a horrifying

17   moment for Mr. Patterson.  But, yes, I think it's very

18   informative.  Mr. Patterson had clearly been under the

19   impression for some lengthy period of time, again,

20   measured in years, that Mr. DeLozier was in frequent --

21   very frequent communication with the client about the

22   case.  And it didn't become clear that that was not the

23   situation until they began to talk about getting ready for

24   trial.

25         And, at that point, according to what you've

1    heard here in court and what Mr. Patterson said in his

2    declaration, I believe, or in his interview, I'm not sure

3    which, it was the client who brought to lead counsel's

4    attention that the lawyer she had been communicating with

5    for the last three years was not someone knowledgeable

6    about the case sufficiently to undertake her examination.

7        Q.   And how does the role played by Attorney DeLozier

8    as Knapp counsel contrast with your role as Knapp counsel

9    in your 2000 to 2002 period in the Pape and Pilipow cases?

10       A.   Well, it's --

11            MS. GARD:  Objection.  Relevance.

12            THE COURT:  Overruled.

13            Go ahead and answer the question.

14            THE WITNESS:  It's fundamentally different.  As I

15   said before, in the cases we did with the Office of the

16   Legal Defender, they did not replace one of their lawyers

17   with me.  They insisted correctly on continuing to do all

18   of the things that a defense team would do:  Frequent

19   meetings, consulting, providing notes to each other.  None

20   of which seemed to happen here from the time that

21   Mr. Patterson became involved.

22            THE COURT:  Is this a good time to take our

23   morning recess?

24            MR. ARNTSEN:  That's fine.

25            THE COURT:  Why don't we go ahead and take our

1   morning recess.  We will be in recess.

2          (WHEREUPON, a recess ensued from 11:01 a.m. to

3   11:15 a.m.)

4          THE COURT:  This is CR 2000-096032, State of

5   Arizona vs. Wendi Elizabeth Andriano.

6          The record will reflect the presence of the

7   parties and counsel.

8          The record will reflect that Mr. Larry Hammond is

9   on the witness stand.  We will continue with the direct

10  examination by Mr. Arntsen.

11         Mr. Arntsen.

12     Q.   BY MR. ARNTSEN:  Mr. Hammond, do you recall

13  Attorney Patterson's testimony as to that he focused on

14  Phase 1 and Phase 2 and delegated the mitigation phase to

15  others?

16     A.   Yes.

17     Q.   Is that a problem?

18     A.   Well, it is.  I mean, it's one of the fundamental

19  concerns here that lead counsel certainly needs to

20  delegate responsibilities, but lead counsel has to be

21  involved in and in charge of all phases of the case.

22     Q.   Why?

23     A.   Because of the importance, first of all, of

24  understanding the client.  And for I guess some lawyers

25  out there, they think that if you're just doing the

1   guilt/innocence phase, you don't need to understand the

2   client and the client's challenges and life history.  But

3   that simply can't really be the case in capital

4   litigation.

5       *Q.*   Now I want to turn to what I believe was your

6   second opinion, which is you were critical of the defense

7   team's investigation of the mitigation case?

8       *A.*   Yes.

9       *Q.*   Is that correct?

10      *A.*   Yes.

11      *Q.*   Can you take a look at Section 10.7 of the

12  guidelines?  And it's page 76.

13      *A.*   Yes.

14      *Q.*   Do you see the first guideline under A?  Counsel

15  at every stage have an obligation to conduct thorough and

16  independent investigations relating to the issues of both

17  guilt and penalty.

18      *A.*   Yes.

19      *Q.*   Again, for the purposes of this hearing, we're

20  just focusing on the penalty portion of the case.  Does

21  that set forth the standard governing applicable in 2000

22  to 2004?

23      *A.*   Yes.

24      *Q.*   Can you turn to Page 80 of the guidelines, which

25  then discusses specifically the investigation obligation

1  relating to the penalty phase?  Can you just read into the

2  record the first three sentences there under penalty?

3      *A.*   Yes.  I think these are important.  Let me read

4  them out loud.  Counsel's duty to investigate and present

5  mitigating evidence is now well-established.  The duty to

6  investigate exists regardless of the expressed desires of

7  a client.  Nor may counsel, quote, sit idly by thinking

8  that the investigation would be futile, close quote.

9      *Q.*   And, again, does that reflect the standard

10  applicable to the defense of Ms. Andriano's case?

11     *A.*   Yes.  And had been for quite a while before then.

12     *Q.*   Can you turn to the next page, Page 81?  Or,

13  actually, even the sentence running between 80 and 81.  Is

14  this investigation important in order for everybody to

15  make informed decisions as to how to point and frame the

16  defense?

17     *A.*   Yes.  Part of this is, as the comments suggest,

18  is being able to advise the client as well as advise the

19  other members of your team.

20     *Q.*   Then turning to the next paragraph, does that set

21  forth the standard as to the scope of the investigation?

22     *A.*   Yes.

23     *Q.*   And can you read that first sentence of that

24  paragraph into the record, please?

25     *A.*   And, again, quote, because the sentencer in a

1  capital case must consider in mitigation anything in the

2  life of the defendant which might militate against the

3  appropriateness of the death penalty for the defendant,

4  penalty phase preparation requires extensive and generally

5  unparalleled investigation into personal and family

6  history.

7      Q.   In the case of the client, this begins with the

8  moment of conception; correct?

9      A.   Yes.

10     Q.   And, also, in connection with family history,

11  does it even extend back before then?

12     A.   Yes.  And the guidelines make that clear.  They

13  should extend in what is typically referred to as a

14  multigenerational review of the life of the client and the

15  client's family and the acquaintances.

16     Q.   Why is that multigenerational review important

17  for an effective defense?

18     A.   Well, I think it's basic to humanity that we are

19  affected by our backgrounds, by our parents, our living

20  situation, both the places we've lived and the people that

21  we've lived with.

22     Q.   And now turning to the next page as to when this

23  mitigation investigation should begin.  Can you take a

24  look at the first full paragraph on Page 82?

25     A.   Yes.

1    *Q.*   When does it say the mitigation investigation

2    should begin?

3    *A.*   As quickly as possible.

4    *Q.*   And why is that?

5    *A.*   Well, there are several reasons for that.  But

6    one is that we've already talked about, that you need to

7    begin to understand how the client's life and history and

8    psychological and psychiatric problems relate to the rest

9    of the case.

10          But the emphasis on the phrase, at the beginning,

11   has I think a deeper meaning, which is described in these

12   comments.  Understanding the life of a client is not

13   something you can do by simply going out and asking a few

14   questions or reviewing documents.  That may be a place to

15   start, but most of the things that wind up being relevant

16   to the mental health of a client are things that people

17   don't freely want to talk about.

18   *Q.*   Could this also be true of things relevant to the

19   social history of the client?

20   *A.*   Yes.

21   *Q.*   Independent of mental health?

22   *A.*   Yes.  Yes, quite so.  And things like sexual

23   abuse are things that routinely people don't want to talk

24   about.  Their family members don't want to talk about

25   them, quite understandably.

1          So unless you start -- and there's a line in

2     here.  I can't tell you exactly where it is, but it

3     emphasizes the importance of developing a relationship of

4     trust with the client.

5          Well, trust doesn't come in five minutes.  It has

6     to be developed over time and it's developed at least in

7     significant part because you are communicating with the

8     client and the client's family and caring about them --

9     showing that you care about them.

10    *Q.*   And this topic you were just discussing, is that

11    referenced in the standards here at the bottom of Page 82

12    and then up in the top of Page 83?

13    *A.*   Yes.  Yes.  This is exactly what I was thinking

14    of, Mr. Arntsen.  I just didn't remember where it was.

15    *Q.*   Then we were talking for a moment about a social

16    history.  what is a social history?

17    *A.*   A social history is the full history of the

18    client, the client's family, those who went before, and

19    then a full understanding of the life of the client.  And,

20    again, exploring things like where the client resided,

21    with whom the client resided.  There are often other

22    people who may know more about the client than the family

23    does and sometimes more than the client is willing to

24    freely disclose.

25    *Q.*   Do you see the text on Pages 83 and 84 of

1  Exhibit 76?  Does that generally talk about the scope and
2  sources of information for a social history?
3      *A.*   Yes, it does.
4      *Q.*   Is a social history a substantial document?
5      *A.*   Yes, it can be.  And, in most cases, it is.
6      *Q.*   And is it something that takes a long time to
7  prepare?
8      *A.*   It often does.  These things can't be done in a
9  month.  And, in many cases, particularly where there are
10 delicate issues involved, as there is in most of the cases
11 that I've been around, it takes time to peel the onion, so
12 to speak, to get to where you have enough understanding to
13 be able to appreciate the things that might not be said.
14 But it begins with gathering the records.
15     *Q.*   And is the social history also something that is
16 a resource for the mental health experts to then look at
17 for their diagnoses?
18     *A.*   Yes.  And that's one of the themes that runs
19 through these guidelines and through the mitigation
20 guidelines that I mentioned earlier.  For your mental
21 health people to be able to do their jobs appropriately,
22 you need to have available for them the history of the
23 client.
24     *Q.*   And, again, when you say the history, this is
25 this multigenerational social history --

1    *A.*    Yes.

2    *Q.*    -- involving with the various sources of

3    information?

4    *A.*    Yes.

5    *Q.*    Okay.  That brings us back to Exhibit 54 again.

6    Can you turn to Exhibit 54?  Do you have that in front of

7    you?

8    *A.*    I do.

9    *Q.*    First of all, is this an appropriate motion to

10   make in connection with gathering information for a social

11   history?

12   *A.*    Yes.

13   *Q.*    Is the timing of concern?

14   *A.*    It's entirely inappropriate.  And that's why I

15   hesitated.  There isn't really a line in this pleading

16   that I would disagree with, but it's breathtaking that

17   it's being filed at this stage of the case.

18   *Q.*    But what is your understanding of the stage of

19   the case as of November 19, 2004?

20   *A.*    They were nearing or close to the end of the

21   trial, I believe, and within which turned out to be no

22   more than -- is it two weeks from the commencement of the

23   Phase 3?

24   *Q.*    Looking first at the motion and then we will turn

25   to the memorandum, the motion seeks an order that if any

1  state or local agency or entity possesses any records

2  relating to Ms. Andriano and/or her family, the defense

3  needs to obtain them to conduct an independent and

4  thorough mitigation investigation in this capital case.

5  Did I read that correctly?

6      *A.*   Yes.  And it's a totally fair statement.  But I

7  don't know how you could be getting these documents at the

8  end of trial and on the eve of sentencing and hope to use

9  them as a foundation for learning anything else about the

10  client.

11      *Q.*   Are these the kinds of documents, again, that are

12  foundational to a social history?

13      *A.*   Routinely.

14      *Q.*   I want to turn to the memorandum for just a

15  second.  Can you look at it's the first page of the

16  memorandum PCR 299.  Can you read into the record the

17  second sentence -- and starting at the start of the second

18  sentence of the first paragraph?

19      *A.*   Are you looking at the sentence that say, quote,

20  in order to conduct?

21      *Q.*   Yeah.  Ms. Andriano is entitled.

22      *A.*   Oh, I'm sorry.  Yeah.  Ms. Andriano is entitled

23  to have her defense attorneys conduct an independent and

24  thorough investigation of potential mitigating information

25  to be used at the sentencing proceeding.  In order to

1  conduct an independent and thorough investigation, the

2  defense must obtain all records documenting Ms. Andriano's

3  life.

4       *Q.*   When should they have gotten these records in

5  terms of an appropriate defense for a capital case?

6       *A.*   They should have begun getting them from the very

7  early days and weeks of the representation.

8       *Q.*   Then can you take a look at the next page,

9  Page 4, the last paragraph?  You see where that talks

10 about the creation of a social history?

11      *A.*   Yes.

12      *Q.*   And then take a look at the top of Page 5.

13      *A.*   Uh-huh.

14      *Q.*   Do you see where it states:  The reason the

15 defense wants to get these records is to build the social

16 history?

17      *A.*   Yes.  And that's the point I was making earlier.

18 Mr. Patterson fairly identifies and quotes from the same

19 guidelines that we have been talking about and identifies

20 some of the same principles, but they're not principles

21 that could be effectively employed on the eve of the

22 sentencing phase of the case.

23      *Q.*   Can you take a look at Exhibit 136, which is also

24 at about this same time?  Have you seen this document

25 before?

1    *A.*    I have.

2    *Q.*    And it's a November 29, 2004 e-mail exchange

3   between Attorney Patterson and Scott MacLeod; is that

4   correct?

5    *A.*    Yes, it is.

6    *Q.*    And does this e-mail raise any concerns about the

7   state of the mitigation investigation as of that date?

8    *A.*    Well, yes, it raises concerns.

9    *Q.*    What are the concerns?

10   *A.*    Well, the primary concern -- most obvious primary

11  concern is that the mitigation person is out there

12  developing a list of witnesses and scheduling follow-up

13  interviews of people who are going to testify or

14  candidates to testify at mitigation right at the end of

15  the trial.

16   *Q.*    You mentioned follow-up interviews.  Can you take

17  a look at the third sentence of Mr. MacLeod's e-mail that

18  starts:  Almost?  Do you see that?

19   *A.*    Yes.

20   *Q.*    Do you see where it says:  Almost every person on

21  this list I have interviewed?

22   *A.*    Yes.

23   *Q.*    What's the problem with that?

24   *A.*    Well, obviously, it's the same problem.  There

25  has been no -- apparently, no coordinated effort to

1   identify witnesses who might testify and to work with

2   them.  To be sending a memo to the head of the team at the

3   end of the trial saying, I've talked to some of these

4   people or maybe even most of them, but clearly not all of

5   them, and I now need to go do follow-up interviews.

6       Q.   And then can you look at the last sentence before

7   the list of the witnesses?  Do you see where, it says:

8   This is not a complete nor exhaustive list; it is simply

9   my list of witnesses?

10      A.   Yes.

11      Q.   What's the problem with that?

12      A.   Well, again, it's very good and helpful and,

13  indeed, I think essential for the members of the team to

14  communicate and to communicate in writing.  So that part

15  of it, if there had been 100 of these over the four years

16  before trial, that would have been encouraging.

17           But to be here at this point and to be saying, I

18  don't really have a complete list yet, they clearly

19  haven't been talking about how this phase of the case is

20  going to work.  So I find that troubling.

21      Q.   Can you take a look at the next exhibit,

22  Exhibit 137, which is also from this time frame?

23      A.   Yes.  Yes, I'm familiar with this.

24      Q.   You recognize this again?  This is a

25  December 6th, 2004 e-mail exchange from between Attorney

1  Patterson and Mr. MacLeod?

2      *A.*   Yes.

3      *Q.*   And you see that if you look at Mr. MacLeod's

4  e-mail, it says sent Monday, December 6th, 2004?

5      *A.*   Yes.

6      *Q.*   Then the title of it is:  Some ideas from

7  Thursday and Friday's seminar?  Do you see that?

8      *A.*   He apparently attended a death penalty seminar

9  just right on the commencement of the sentencing of this

10  case.

11      *Q.*   Is it fair to summarize the content of the e-mail

12  as identifying possible mitigation themes?

13      *A.*   Yes.

14      *Q.*   What's the problem with that?

15      *A.*   Well, again, you can't do it at this stage.  If

16  this had happened three years earlier, we would then begin

17  to have something we could work with.  He should be

18  thinking about themes -- you should be thinking about them

19  in the open-minded way you would if you were building

20  something from scratch as opposed to looking for themes

21  you can present on the eve of sentencing.

22      *Q.*   Do Exhibits 54, 136 and 137, the three documents

23  we were just looking at, indicate to you a substantial

24  deviation from the standard of care of governing capital

25  cases with regard to Ms. Andriano's mitigation?

1     *A.*    Yes.  I think these are examples of the

2  deficiency in the mitigation development and presentation,

3  yes.

4     *Q.*    And is it your opinion that this falls below the

5  standard of care applicable at that time?

6     *A.*    It does.  And that is my opinion.

7     *Q.*    Is it even close?

8     *A.*    I don't think so.

9     *Q.*    Backing up through the mitigation investigation,

10  I want to focus now on the investigation of Ms. Andriano's

11  social history.  Can you take a look at Exhibit 56,

12  please?

13     *A.*    Yes.

14     *Q.*    What is this document?

15     *A.*    Well, this is kind of an interesting memo that

16  Donna Alejo sent to Mr. DeLozier.

17     *Q.*    Is that Donna Ochoa?

18     *A.*    I'm sorry.  Donna Ochoa.  Excuse me.

19     *Q.*    And what's the date of the e-mail?

20     *A.*    I was just reconfirming that.  It's very early

21  on.  It's February of 2001.

22     *Q.*    Do you see the first sentence of the e-mail in

23  the first page?  It says:  I've done a short early history

24  on Wendi?

25     *A.*    Yes.

1    *Q.*   And then if you would take a look in a larger

2    text portion in Pages 2 through 5 of Exhibit 56.  Does

3    that seem like -- is that what that appears to be?

4    *A.*   Yes, it does appear to be kind of a start at

5    Wendi's mother trying to look at the help identified.

6    *Q.*   To help construct a social history?

7    *A.*   Yes.

8    *Q.*   Have you seen -- in terms of now your

9    understanding of Ms. Andriano's case, have you seen any

10   other document in the defense files to concert a better

11   social history than this one?

12   *A.*   Well, the only one that might -- I mean, no, I

13   don't think that there is one.  I've been very interested

14   in the work that Kandy Rohde did.  I think that could form

15   the foundation of a social history.  There's lots of stuff

16   in there that would support that, but I don't know if

17   there is another document other than this one.

18   *Q.*   And we will get to some of Ms. Rohde's work in a

19   moment.  But first looking at this document, looking at

20   Exhibit 56, do you see -- if you look on the first page of

21   the text, do you see where it starts:  Wendi's early

22   years?  This is PCR 306.  Do you see the second page of

23   the exhibit?  Do you see what I'm referring to?  If you

24   look up, the first words on it are:  Wendi's early years?

25   *A.*   Yes.

1    *Q.*    And then if you go to just really the third line

2    there, do you see where she says:  My father was an

3    alcoholic?

4    *A.*    Yes.

5    *Q.*    Then if you turn to the next page, do you see on

6    just about at the end of the first paragraph:  Skip was

7    the one that had Wendi potty trained by 11 months?

8    *A.*    Yes, I see that.

9    *Q.*    Then if you get to the second to the last

10   paragraph, starting:  This part is hard.  Do you see that?

11   *A.*    Yes, I do.

12   *Q.*    And there she's talking about potential sexual

13   abuse of Wendi as a young child?  Do you see that?

14   *A.*    Yes, I have seen that.

15   *Q.*    And then going into the next paragraph, do you

16   see towards the bottom of the paragraph, she is talking

17   about her work at CODAC and she would take Wendi there

18   with her and lots of the -- and the ones that are detoxed

19   would talk to her, et cetera.  Lots of the women had

20   children of their own, usually hookers, and they loved

21   seeing her.  It was almost therapy for them.  Do you see

22   that?

23   *A.*    I do.

24   *Q.*    And if you turn to the next page, if you look in

25   the second full paragraph right above in the middle of the

1   paragraph, it says:  My mother loved Wendi like she was

2   her own.  I remember getting jealous a few times when

3   Wendi would call her mom.  Do you see what I'm referring

4   to?

5       *A.*   I do.

6       *Q.*   And then going into the next paragraph where

7   she's talking about her subsequent work at PADAC in

8   Casa Grade, she says:  The facility I worked at was in

9   Downtown Casa Grande.  Wendi would be down there with me.

10  Sometimes she would sneak out the door and stand there

11  asking people for money.  A couple of times, she wandered

12  over to Stoney's.  If she looked like she was going to go

13  anywhere else, he would walk her back to the center.  Do

14  you see that?

15      *A.*   Yes, I do.

16      *Q.*   And then two paragraphs down, do you see where it

17  says that Wendi and Alejo loved each other from the start?

18      *A.*   I do see that.

19      *Q.*   And then looking at the next page, finally, the

20  middle of the second full paragraph:  She was and is a

21  caretaker.  Do you see what I'm referring to?  It's kind

22  of right above where she mentioned South Dakota.  Second

23  full paragraph on the last page.

24      *A.*   Yes, I see it.

25      *Q.*   And, again, in connection with your review of the

1    materials in this matter, you reviewed Dr. Woods' and

2    Dr. Hopper's reports; correct?

3        A.   I did.

4        Q.   And are some of the items raised in Exhibit 57

5    items that Dr. Woods and Dr. Hopper give significance to

6    in their reports?

7        A.   Yes, they do.

8        Q.   Did you see anything to indicate that the defense

9    team followed up on any of this?

10       A.   I don't at all.  But this would have been a

11   tantalizing place to start.

12       Q.   And this was to Attorney DeLozier.  But do you

13   recall Attorney DeLozier testifying that he made copies of

14   his files for the public defender's office?

15       A.   Yes.  He said he passed them on, but he never

16   heard anything from them.

17       Q.   Take a look at the next exhibit, Exhibit 57.  Are

18   you there?

19       A.   Yes.

20       Q.   What is this?

21       A.   Well, this is the e-mail passing on the DOC

22   address for Wendi's biological father.

23       Q.   Is it your understanding that he was in prison

24   for sexual abuse of his stepdaughter?

25       A.   Yes, that's what I've understood.

1    Q.   Can you think of any fathomable reason why the

2  defense team did not interview Shelby Robertson?

3    A.   No.

4    Q.   Again, is this close?

5    A.   Well, I mean, he's the biological father.  He

6  participated for some period of time in raising Wendi.

7  Whatever his offense was, you would interview him.  But

8  having any indication that there might have been sexual

9  abuse in his background would have required it.  It

10  wouldn't have been closed, to answer your question.

11    Q.   And he wasn't hard to find; was he?

12    A.   No.

13    Q.   Now I want to turn to information that Kandy

14  Rohde provided to the defense team.  Can you take a look

15  at Exhibit 7 B or 7.002?

16    A.   It's actually 7 B?

17    Q.   7 B.

18    A.   Yes.

19    Q.   Do you see that this is a March 12th, 2001 letter

20  from Kandy Rohde to Attorney DeLozier?

21    A.   Yes.

22    Q.   And is there information in this letter that

23  would have been helpful in connection with building a

24  social history?

25    A.   Yes.  I mean, this is another one of those very

1   early communications.  When I said I had focused on Kandy

2   Rohde, this was one of the things that caused me to be

3   concerned.

4       Q.   Based on your understanding of the mitigation

5   case, was the information or the themes mentioned in

6   Ms. Rohde's letter, Exhibit 7 B or 7.002, integrated into

7   Ms. Andriano's mitigation case?

8       A.   No.

9       Q.   Were they followed up on at all, to your

10  knowledge?

11      A.   Not that I can tell.  And although I did hear

12  Mr. Patterson say last week that he looked at some of the

13  information in the case and said, well, maybe Wendi was

14  dissociating, that comment appears, and this comment,

15  similarly, that appears in this letter.

16      Q.   And do you see also in the middle of the first

17  paragraph, Ms. Rohde talks about Wendi's memory issues?

18      A.   Yes.

19      Q.   And she says:  She told me she has no trouble

20  remembering events in her life, even stressful events.

21  Yet, when I asked her about her childhood, her marriage

22  and her imprisonment, she was unable to recall large

23  sections of her history.  After I brought that to her

24  attention, she spoke to her mother, who said that Wendi

25  habitually forgot anything that was unpleasant.  Do you

1  see that?

2      *A.*   Yes.

3      *Q.*   Do you recall Attorney Patterson testifying that

4  Wendi had a good memory?

5      *A.*   Yes, I do.

6      *Q.*   The issue of memory issues, based upon your

7  understanding of their interactions and professional

8  qualifications, who would you rely on?  The counselor or

9  the lawyer?

10     *A.*   Well, I would certainly always, as a lawyer, I

11 would want to listen with considerable attention to any

12 trained counselor, and, frankly, to anyone else, but

13 particularly to a trained counselor who expresses concerns

14 about amnesia behavior.

15         And, as I said earlier, when you are trying to

16 peel the onion and gain a better understanding of the

17 defendant and her circumstances, you are very often going

18 to encounter these kinds of issues, where people very

19 honestly and for reasons that mental health people

20 understand, do not remember.  They do not disclose

21 particularly very personal things like sexual abuse and

22 particularly sexual abuse within the family.

23     *Q.*   Turning to some more materials provided by

24 Ms. Rohde, can you take a look at Exhibit 45, please?

25     *A.*   I have it.

1      Q.   And I don't think I'm going to go -- you know,

2   these were covered extensively with Attorney DeLozier

3   yesterday and I don't know that we need to go through them

4   in detail.  But these notes -- Ms. Rohde's notes in

5   Exhibit 45, first of all, is it your understanding these

6   were shared with the defense team?

7      A.   Well, that's what -- I mean, Mr. DeLozier had

8   them and he said that he gave them to the defense team.

9      Q.   Can you actually take a look at quite almost to

10   the end of the document?  The page number is PCR 112.  Do

11   you see what I'm referring to?

12      A.   Yes, I have that.

13      Q.   Do you see at the top, it says:  To Scott MacLeod

14   from Kandy Rohde?

15      A.   Yes.

16      Q.   And did you get a chance to review Ms. Rohde's

17   notes?

18      A.   Yes, I did.  I spent a couple of hours reading

19   them.

20      Q.   Are these the kinds of things that, again, as a

21   defense lawyer, you would find useful in building a social

22   history and identifying mental health issues?

23      A.   Yes.  I would say these notes are a gold mine of

24   information and they would set off -- I think with any

25   trained professional and most lawyers, these would be just

1  a series of red flags, things that you would have to be

2  concerned about and would want to follow up on.

3      *Q.*   And based, again, hearkening back to your review

4  of Dr. Hopper's and Dr. Woods' reports, some of the items

5  raised or discussed in Ms. Rohde's notes, were they given

6  significance by Dr. Woods and Dr. Hopper?

7      *A.*   Yes.

8      *Q.*   And, to your knowledge, were they incorporated at

9  all into the mitigation themes that Wendi's defense team

10  used at trial?

11      *A.*   No.  And, indeed, Mr. Patterson I think said

12  that.

13          MR. ARNTSEN:  I would move Exhibit 7.002 into

14  evidence.  I don't know that it has been received yet.

15  Again, it's something he is relying on.

16          THE COURT:  Any objection?

17          MS. GARD:  Let me just pull it up, Judge.

18          MR. ARNTSEN:  That's the Kandy Rohde letter of

19  March 12th.

20          MS. GARD:  Oh, no, objection.

21          THE COURT:  Exhibit No. 7.002 is admitted into

22  evidence.

23          MR. ARNTSEN:  Thank you, Your Honor.

24          Now I want to turn from the social history

25  investigation to the mental health investigation.

1          Actually, Your Honor, it's a good time.

2          THE COURT:  It's a good time?

3          MR. ARNTSEN:  Yes.  It's your call.

4          THE COURT:  It looks like you're moving onto

5    another area.  So we will go ahead and take our lunch

6    break at this time.  We will be in recess until 1:30.

7    Everyone have a nice lunch.

8          (WHEREUPON, the lunch recess ensued from

9    11:52 a.m. to 1:30 p.m.)

10         THE COURT:  Good afternoon.  This is

11   CR 2000-096032-096032, State of Arizona vs. Wendi

12   Elizabeth Andriano.

13         The record will reflect the presence of the

14   parties and counsel.

15         The record will reflect that Mr. Larry Hammond is

16   on the witness stand.  And we will continue with the

17   direct examination by Mr. Arntsen.

18         Mr. Arntsen.

19         MR. ARNTSEN:  Thank you, Your Honor.

20     Q.   BY MR. ARNTSEN:  Mr. Hammond, what we're going to

21   talk about now is the mental health investigation

22   undertaken by Wendi's defense team.

23         Can you take a look at Exhibit 6 B?  It's 6.002

24   for the record, but 6 B in your binder.  Do you have that

25   in front of you, sir?

1        *A.*    Yes, I do.

2        *Q.*    Can you take a minute to read through that?

3        *A.*    Okay.

4        *Q.*    Do you see that this is a December 19 and 20,

5    2001 e-mail exchange between Dan Patterson and Patrick

6    Linderman?

7        *A.*    I do.

8        *Q.*    And then it relates in part to Ms. Andriano's

9    case; correct?

10       *A.*    Yes, it does in part.

11       *Q.*    And I really want to focus your attention on

12   Attorney Patterson's e-mail.  At the top of the page, do

13   you see where he says that:  Both clients should be

14   examined by mental health professionals, not because I

15   believe they suffer from mental illness, but as death

16   penalty cases, a mental health exam can provide a source

17   of mitigation?

18       *A.*    Yes, I do see that.

19       *Q.*    First of all, both under the standards, how much

20   weight should be given Attorney Patterson's belief -- lack

21   of belief that Ms. Andriano suffered from mental illness?

22            MS. GARD:  Objection.  Relevance.

23            THE COURT:  Sustained.

24            MR. ARNTSEN:  Offer proof.  Go ahead an answer

25   the question.

1          THE COURT:  Go ahead.

2          THE WITNESS:  Well, I think that, as I've said

3   before, the lawyers on the team ought to be reluctant to

4   rely on their own impressions about whether a case

5   involves a mental illness without the aid of trained

6   professionals.

7          *Q.*    BY MR. ARNTSEN:  Do you recall that the

8   guidelines expressly comment on this point?  And I'll turn

9   your attention to Page 31 of Exhibit 76, starting with the

10   first full paragraph.

11          *A.*    Yes.

12          *Q.*    What does that refer to?

13          *A.*    Well, it is the point I was making is that

14   lawyers need to be cautioned not to rely excessively on

15   their own impressions of the client's mental state.

16          *Q.*    Thank you.  Did you agree that Ms. Andriano

17   should be examined by mental health professionals?

18          *A.*    Yes.

19          *Q.*    And do you agree that in death penalty cases,

20   mental health can provide a source for mitigation?

21          *A.*    Of course, yes.

22          *Q.*    So in connection with that part of Attorney

23   Patterson -- as opposed to his own opinion of her mental

24   health, that part of Attorney Patterson's e-mail you agree

25   with; is that correct?

1      *A.*   Yes.  And I think it comes a little late, but I
2  do agree with it.

3      *Q.*   Yes, right now, we're a little after -- about
4  five months after Attorney Patterson has come on the case
5  and we're approximately 14 months after the offense; is
6  that right?

7      *A.*   Yes, that's what I was referring to.

8      *Q.*   And as I understand your answer, it's a little
9  late, but it's not irretrievably late in the context of
10  this proceeding; is that correct?

11     *A.*   Well, and I think you never know whether the
12  passage of time is going to do some uncorrectable damage,
13  but I don't have any evidence that -- given the large
14  amount of time that passed between charge and trial, it
15  certainly appears to have been correctable at that point.

16     *Q.*   And can you take a quick look at Exhibit 6 A or
17  6.001.  This is the March 28, 2001 Potts' report.  Do you
18  see that?

19     *A.*   Yes.

20     *Q.*   So this is after that; right?  Attorney
21  Patterson's e-mail to Mr. Linderman --

22     *A.*   Yes --

23     *Q.*   -- is after Dr. Potts' report?

24     *A.*   Yes, it's about eight months after; that's right.

25     *Q.*   And then if you take a look at Exhibit 6 C, which

1   is 6.003, do you see that that's Dr. Rosengard's

2   August 27, 2002 report?

3        *A.*   Yes.

4        *Q.*   Is this the type of examination that there would

5   be appropriate response to Attorney Patterson's e-mail?

6        *A.*   Well, it would have been one of the things that

7   would have been appropriate, yes.

8        *Q.*   And when we talked earlier -- I won't go over it

9   again -- about important reasons to involve health

10  professionals on the team early on.  Do you recall that?

11  Help make tactical decisions, guide investigations,

12  diagnoses, and that sort of thing?

13       *A.*   Yes.

14       *Q.*   Under the standard of care applicable during this

15  period, is it appropriate to make a strategic decision not

16  to have your client examined by a mental health

17  professional in a death penalty case?

18       *A.*   No.  I believe that there is not a good strategic

19  or tactical reason not to consult and work with mental

20  health people as part of the investigation.

21       *Q.*   Do you recall Attorney Patterson's testimony last

22  Friday that he was concerned about how, you know, getting

23  Dr. Bayless involved in the case or doing something that

24  would cause the State to involve Dr. Bayless?

25       *A.*   Yes, I do.

1    *Q.*    Would that support, because of that sort -- is

2    that a valid strategic concern?

3    *A.*    Well, I think it's not at the pretrial

4    investigative stage.

5    *Q.*    Can you explain your answer?

6    *A.*    Well, I think, if I recall correctly what

7    Mr. Patterson was saying, at some point if you have a

8    mental health examination of a various kinds done, the

9    other side, the prosecution will also be given that same

10   opportunity.  And to the extent that Mr. Patterson was

11   saying, well, let's not even start down that road, let's

12   not have a mental health examination because we think at

13   the end of the day, that the prosecution may bring on a

14   competing expert, I think we've long since decided as a

15   Bar and as a community, that that is not a valid reason.

16   *Q.*    Why not?

17   *A.*    Well, there's no valid reason that I know of not

18   to conduct an investigation for all of the reasons that

19   we've talked about.  It is very important that you know as

20   well as you can what may be down the road before you make

21   those more refined strategic and tactical reasons.  You

22   can't make them in the blind, so to speak.

23   *Q.*    And just to be clear, if you could turn back just

24   for a second to Dr. Potts' report, Exhibit 6 A or 6.001,

25   Dr. Potts was not part of the defense team; was he?

1    *A.*    No.  He's a court employee or county employee.

2    *Q.*    So now I want you to take a look at Exhibit 6 C,

3    6.003, Dr. Rosengard's report which was referenced by

4    Attorney Patterson.

5         What would you call this report or this

6    examination and report?  I just want to make sure we have

7    the nomenclature right.

8    *A.*    Well, it might be fairly called a -- I would call

9    it a preliminary investigation or inquiry that was

10   designed to provide some information, a personal history,

11   and then at least a preliminary set of diagnostic

12   impressions from which then the defense team could build.

13   *Q.*    And what makes you call this preliminary?

14   *A.*    Well, I think there are places in here where

15   Dr. Rosengard says that further work is necessary and that

16   these are his impressions but not formal findings.

17   *Q.*    And so for a formal mental health -- and, again,

18   correct me if I'm using the words wrong.  But, really,

19   sort of a final mental health examination to be used in

20   connection with the defense, would you want the mental

21   health professional to have the social history available

22   in connection with the report?

23   *A.*    Yes.  For the reasons I said this morning.  And

24   then you would want -- if you had a report like this, to

25   follow up on the specific things that Dr. Rosengard found.

1    *Q.*    Then if you would take a look at Page 4 of the

2    report.   And it's got a Bates number at the bottom, 7547.

3    Do you see that?

4    *A.*    Yes, I do.

5    *Q.*    Do you see that past personal history there?

6    *A.*    Yes.

7    *Q.*    That section of the middle of the page?

8    *A.*    Yes, I do.

9    *Q.*    Shortly before the break, remember we were

10   looking at the extended e-mail that Donna Ochoa had sent

11   to David DeLozier in early 2012 --

12   *A.*    Yes.

13   *Q.*    -- which we talked about is an early draft of a

14   start of the social history?

15   *A.*    Yes.

16   *Q.*    If you would just kind of briefly peruse the

17   personal history portion of Dr. Rosengard's report, would

18   you agree that there are a lot of items that Donna Ochoa

19   related concerning Wendi's early years that are not

20   reflected in Dr. Rosengard's summary of personal history?

21   *A.*    Yes, there are things.   And you identified some

22   of them this morning.   We identified some of the things

23   that are not -- that are not to have been known by

24   Dr. Rosengard.

25   *Q.*    And the items that we talked about this morning

1    in Donna Ochoa's report, the concerns of childhood abuse
2    and calling her grandma, instead of her mom, mom and the
3    various other things, leaving her running around in the
4    streets, that sort of thing, are those kinds of things
5    that you would expect to see in the personal history
6    portion of a mental health examination?
7        A.   At some point, yes.  And, again, as I've said
8    several times, this is an iterative process.  It's a
9    growing process.  I wouldn't condemn any single report
10   because it hadn't plumbed the full depths of what you need
11   to discover with respect to findings.
12       Q.   As I understand it from both familiarity with the
13   record and Attorney Patterson's testimony, other than the
14   domestic violence work done by Sharon Murphy and then the
15   retention of Dr. Mechanic to respond to some of
16   Dr. Bayless's testing issues, this was really the last
17   psychological evaluation done by the defense team?
18       A.   It's the last one of which I'm aware, yes.
19       Q.   Does that meet the standard applicable to capital
20   defense in this period?
21       A.   No.  And the fact that this is more than -- I
22   think it's still more than two years before the
23   commencement of the trial.
24       Q.   And I won't go over it in detail, but you recall
25   yesterday during Attorney DeLozier's examination,

1  Attorney Lynch put this up on the board and identified a

2  number of what they called red flags pointed out by

3  Dr. Rosengard?

4      *A.*   Yes.

5      *Q.*   And what I say was red flags, would you

6  understand red flags to be things that should be followed

7  up on?

8      *A.*   Yes.  And I alluded to that this morning.  One of

9  the important aspects of the investigative stage is to be

10  looking for things that need to be followed up on.  And

11  then, obviously, in my capacity now as a witness, I look

12  back at the things that were there, the indications that

13  would have led a lawyer to conduct a further

14  investigation, and I find them important and they're many

15  of the things you talked about before.

16      *Q.*   And are these the kinds of things that had the

17  defense team worked more extensively with Dr. Rosengard

18  moving forward in the two years between his report and the

19  trial, that based on your experience with Dr. Rosengard,

20  he could have contributed to as part of this defense?

21      *A.*   I have a high regard for Dr. Rosengard.  I think

22  he could have and would have been helpful.  He's also very

23  good about saying he knows his own limitations, and in

24  some of these areas, he may have suggested a different

25  mental health professional, but he certainly would have

1  been very helpful.

2      *Q.*    And that's the kind of thing, and based on your

3  experience and working with him, that he could contribute

4  to the defense; is that correct?

5      *A.*    I'm sure he could have, yes.

6      *Q.*    Even talking generally about the mental health

7  red flags that were gone over yesterday with

8  Attorney DeLozier, Kandy Rohde's notes, suicide attempt,

9  those sorts of things, are those the kinds of things that

10  if a psychiatrist like Dr. Rosengard had been an integral

11  member of the defense team, that they could have utilized

12  and incorporated into defense themes?

13      *A.*    Well, that's the idea of it.  And I would assume

14  that in a properly functioning team, that would happen in

15  the ordinary course.  You could gain information and

16  evaluate it and then you make decisions about the ultimate

17  incorporation of that information both at trial and at

18  sentencing.

19      *Q.*    And we talked this morning in some detail about

20  the fact that there really wasn't anybody on the team who

21  was in a position to do that; correct?

22      *A.*    That's my understanding.

23      *Q.*    And, again, does that comport with the standard

24  of care applicable at this time?

25      *A.*    No, it does not.

1     *Q.*  Can you summarize your opinion with regard to

2  whether Ms. Andriano's defense team adequately

3  investigated mental health issues in the preparation for

4  her mitigation case?

5     *A.*  Well, I don't want to repeat what I said before.

6     *Q.*  Right.

7     *A.*  But just by way of very quick summary, the

8  absence of a properly constructed approach to the

9  investigation of the case, including primarily the

10  failures to develop a close relationship with the client,

11  the failure to conduct an appropriate social history, the

12  failure to consult with appropriate mental health

13  professionals, all of those are factors that contributed

14  to the ineffectiveness, and I would say, constitutional

15  ineffectiveness, too.

16     *Q.*  And, again, based on your review, do you see any

17  plausible strategic reason for this, that justifies this

18  failure?

19     *A.*  No, no.  I don't think either of the lawyers who

20  were involved in the trial of this case would say that

21  there was either.

22     *Q.*  Were there mitigation themes available that were

23  not presented at Ms. Andriano's trial?

24     *A.*  Well, there were many of them.  We have the

25  benefit now of the work that has been done by

1   post-conviction counsel, which I think would give anyone a

2   kind of a nice comparison chart.  All one needs to do is

3   to read the opening statement of the mitigation case or

4   the closing argument of mitigation and compare that with

5   what has been assembled in the last couple of years during

6   the time that post-conviction counsel and your team have

7   been involved.  I think you can see that there are

8   multiple important themes that were completely left out.

9       Q.   Thank you.  And, again, is the fear at trial of

10  what the State might do in rebuttal to these themes any

11  valid reason not to investigate and pursue them to the

12  fullest extent with regard to the investigation stage?

13      A.   No, I don't believe there is.

14      Q.   Now just wrapping up, Mr. Hammond, what I would

15  like you to do is just again summarize the opinions that

16  you're here to -- that you've offered in connection with

17  this case.

18          First of all, what opinion do you have with

19  regard to whether the composition and operation of

20  Ms. Andriano's defense team comported with the standard of

21  practice applicable during the relevant time?

22      A.   My opinion is that the composition and operation

23  of the defense team fell woefully below even the most

24  minimal standards of preparation and coordination

25  necessary to defend a capital case.

1    *Q.*    And, specifically, do you have -- what is your

2    opinion with regard to whether the use of mental health

3    professionals as part of the defense team comported with

4    the applicable standard?

5    *A.*    No, it clearly didn't.  And we have gone through

6    the few mental health individuals who were involved at

7    some point and you can see that there was no coordinated

8    use of those individuals, no follow-up with respect to

9    mental health information, and that includes Dr. Potts,

10   Kandy Rohde, Dr. Rosengard and others who did provide in

11   one way or another, as we talked about, very important

12   information that should have been presented.

13   *Q.*    And what is your opinion with regard to whether

14   Ms. Andriano's defense team adequately investigated social

15   history and mental health issues relevant to the penalty

16   phase of her trial?

17   *A.*    Well, they clearly did not.  And as I said

18   earlier, maybe the strongest indication of that is the

19   memorandum that Mr. Patterson filed toward the end of the

20   merit's case asking for resources and help in the building

21   of the social history.

22   *Q.*    And is there any colorable strategic reason for

23   the shortcomings that you've just identified?

24   *A.*    No, I don't believe there is.

25         MR. ARNTSEN:  I would move Exhibit 1,

1    Mr. Hammond's report into evidence.

2              THE COURT:  Any objection?

3              MS. GARD:  Yes.  Relevance.

4              THE COURT:  I'll sustain the objection.

5              MR. ARNTSEN:  And the report is the offer of

6    proof, obviously.  No further questions.

7              THE COURT:  Ms. Gard?

8              MS. GARD:  Yes, Judge.

9

10                          CROSS-EXAMINATION

11   BY MS. GARD:

12        Q.   How much have you billed so far in this case,

13   Mr. Hammond?

14        A.   I don't know for sure.  I think the last summary

15   I had seen is somewhere around $40,000.

16        Q.   And you're charging a reduced rate, right,

17   because the attorneys are pro bono?

18        A.   Well, I charge in all of these cases a reduced

19   rate.  I'm charging 250 an hour, yes.

20        Q.   So can you approximate the number of hours you've

21   spent reviewing materials and preparing?

22        A.   I don't know how that arithmetic works, but I

23   would have to assume it's in excess of 100.  I know that.

24        Q.   I want to spend some time talking about your

25   experience.  Certainly, we don't dispute you have done a

1  tremendous amount work for indigents in this state, and

2  we're all very appreciative of that work, but it appears

3  to me at least that one thing you haven't done is

4  represented a defendant in a capital -- for a penalty

5  phase of a capital sentencing before a jury.  Am I correct

6  on that, in the State of Arizona?

7      *A.*   Yes.  That is correct.

8      *Q.*   What about outside of Arizona?  Have you done

9  that?

10     *A.*   Not at the penalty phase of a capital case.

11     *Q.*   Before a jury?

12     *A.*   Before a jury; right.

13     *Q.*   You mentioned there were three cases -- three

14  capital cases here that you served as lead counsel; right?

15     *A.*   Yes.

16     *Q.*   Okay.  And those are all in Arizona; right?

17     *A.*   They are.

18     *Q.*   One was the Knapp case?

19     *A.*   Correct.

20     *Q.*   And was another one a case, a defendant named

21  Dale Burch?

22     *A.*   Yes.

23     *Q.*   And that was out of Pima County; right?

24     *A.*   Yes, it was, Tucson.

25     *Q.*   And the third one that you're referring to, is

1  that the DeMocker case?

2      *A.*  Yes, it is.

3      *Q.*  And in that case, you withdrew during jury

4  selection; is that right?

5      *A.*  No.  No.

6      *Q.*  Is that incorrect?  Okay.  Then clear it up.

7      *A.*  No.  We withdraw with the approval of the Arizona

8  Supreme Court six months into the trial and five months

9  after jury selection.

10      *Q.*  Okay.

11      *A.*  At the end of jury selection, the county attorney

12  removed the death penalty, but we continued on for another

13  five months.

14      *Q.*  So when you tried it, it was no longer a death

15  penalty case?

16      *A.*  When opening statements started, it was a death

17  penalty case all the way up to the opening statements,

18  including the jury selection.

19      *Q.*  The prior cases where you have testified as an

20  expert, you mentioned that there are a number of cases

21  where you have not testified because you found counsel to

22  be effective; right?

23      *A.*  Well, that's not exactly what I intended to say.

24  There are cases in which I have concluded that there was

25  no ineffective assistance of counsel claim that I would

1   support.

2        Q.   Can you give us the name of some of those cases?

3        A.   I really -- I really don't know that I can.

4        Q.   How many do you think there were?

5        A.   Well, if you include both capital and noncapital

6   cases, as I think I said this morning, it would hundreds,

7   hundreds of cases.

8        Q.   What about just capital cases?

9        A.   I don't know.  It would have -- it would be

10  almost a guess, but I think it would have to be more than

11  30 or 40.

12       Q.   You testified, according I think to your CV, in

13  the Grant Henry case; right?

14       A.   Yes, I did.

15       Q.   And you expressed the opinion that his counsel

16  was ineffective?

17       A.   Yes.

18       Q.   And the trial court disagreed and denied relief;

19  right?

20       A.   Yes.  The PCR court disagreed.

21       Q.   The PCR court.  I'm sorry.

22       A.   Yes.

23       Q.   And the same is true of the Murdaugh case where

24  you testified; correct?  The PCR court denied it?

25       A.   That's right.

1    *Q.*    And the same is also true of the Kayer case;

2    correct?  You testified in that case?

3    *A.*    Yes.

4    *Q.*    And relief was denied there?

5    *A.*    Yes, at that level.

6    *Q.*    And you also testified in the Hanson case

7    recently; right?

8    *A.*    Yes.

9    *Q.*    And there has been no ruling on that case;

10   correct?

11   *A.*    I don't believe so.

12   *Q.*    In your CV, you talk about the Lacy case that you

13   testified in?

14   *A.*    Yes.

15   *Q.*    Your CV, being Exhibit 1.  And in that, you say

16   it was reversed based in part of ineffective assistance?

17   *A.*    Yes.

18   *Q.*    Can you clear that up?

19   *A.*    Yes.  It was not a capital case, but Byron Lacy

20   was a man who was convicted of first degree murder.  And

21   we eventually discovered -- this was an Arizona Justice

22   Project Case.  We eventually discovered that the bullet

23   hole in the victims skull was smaller than the gun alleged

24   to have killed him.  And so the ineffectiveness counsel in

25   failing to investigate the facts of the case became one of

1  the reasons for the Superior Court to set aside his

2  conviction.

3       *Q.*   Are you currently doing any state

4  post-convictions?  Are you representing any state court

5  defendants on post-conviction?

6       *A.*   You mean as counsel?

7       *Q.*   As counsel.

8       *A.*   No.

9       *Q.*   Are you representing them in some other capacity

10  in any way?

11       *A.*   Well, there are other state post-conviction cases

12  in which I have been appointed as the defense expert.  And

13  there are other cases that I have not accepted an

14  appointment in, but have essentially said I will continue

15  to consult.

16       *Q.*   When you're appointed as an expert in these

17  cases, do you consider yourself to be part of the defense

18  team?

19       *A.*   No.

20       *Q.*   Do you consider yourself to be representing the

21  client?

22       *A.*   No.

23       *Q.*   Do you give advice to PCR counsel about how to

24  draft a petition?

25       *A.*   Yes.

1    *Q.*    Yes.  Do you give advice about what claims to

2    raise in the petition?

3    *A.*    Well, I share my suggestions with them, but --

4    *Q.*    And did you give that advice in this case to

5    counsel about what things to include?

6    *A.*    I'm sure I had -- no doubt that I had

7    conversations with them about that.

8    *Q.*    Are you currently -- well, you're aware that the

9    Arizona Supreme Court maintains a list of qualified PCR

10   counsel; right?

11   *A.*    Yes.

12   *Q.*    Are you on that list currently?

13   *A.*    No.  But we helped to create that list.

14   *Q.*    And you helped to create that list?

15   *A.*    Yes.

16   *Q.*    That is with your work with what committee?

17   *A.*    That has been a combination of both the State Bar

18   Indigent Defense Task Force and the American Bar

19   Association.  It's also a work in progress.

20   *Q.*    You testified that you helped to draft Rule 6.8

21   of the Arizona Rules of Criminal Procedure?

22   *A.*    Yes.  I submitted the application to amend the

23   rule.

24   *Q.*    I'm sorry?

25   *A.*    To amend the rule.

1    *Q.*   To amend the rule.  Okay.  You would agree that
2   the rule does not require second chair counsel to have
3   capital experience?

4    *A.*   It does not.  That's correct.

5    *Q.*   And you would also agree that there is no
6   constitutional entitlement to second chair counsel in a
7   capital case?

8    *A.*   I don't agree with that.

9    *Q.*   You disagree with that?

10   *A.*   I do.

11   *Q.*   But you agree that Mr. Patterson was qualified to
12  be first chair counsel?

13   *A.*   I said he was.  Honestly, I think he was, yes.

14   *Q.*   Staying on the topic of Rule 6.8, there was a
15  comment published to that rule in 2006; correct?  Do you
16  recall that?

17   *A.*   A comment?  There were numerous comments.

18   *Q.*   There was one relating specifically to the
19  American Bar Association Guidelines, that ABA Guidelines
20  we were talking about?

21   *A.*   Well, there were lots of them related to the ABA
22  Guidelines, yes.

23   *Q.*   Okay.  And you would agree that one of those
24  comments states that the guidelines should be considered a
25  continuum of best practices, but that some may not be

1    applicable to Arizona practice or the circumstances of

2    this particular case?

3        *A.*    I'm not sure which comment you're talking about.

4    The attorney general submitted a comment and then there

5    was a comment by some judges.

6        *Q.*    There is comment to the rule, the State Bar,

7    whoever publishes the comments to the rule.

8        *A.*    Oh, I'm sorry.  I'm sorry.  I thought you were

9    talking about the comments that people make.

10       *Q.*    No, not the comments.

11       *A.*    Yes.

12       *Q.*    The actual comment that is published with the

13   rule.

14       *A.*    There's a two-paragraph.

15       *Q.*    Yes.  And you would agree that it essentially

16   says that the guidelines are -- the ABA Guidelines are to

17   be considered best practices, but some may not be

18   applicable in a given case?

19       *A.*    I don't know about the exact wording of that, but

20   that's reasonably accurate.

21       *Q.*    And you would agree that that is consistent with

22   the language in *Strickland vs. Washington*; right?

23       *A.*    Well --

24       *Q.*    Well, let be more precise.  You're familiar with

25   *Strickland vs. Washington*?

1    *A.*    I would say everything is consistent with

2    *Strickland V. Washington.*   But, yes.

3    *Q.*    You're familiar with *Strickland*?  Very familiar,

4    I'm sure; right?

5    *A.*    Well, yes.

6    *Q.*    You would agree with me that *Strickland* tells us

7    that the ABA Guidelines and other professional

8    publications should be concerned as a guide to what is

9    reasonable; right?

10   *A.*    Yes.  But *Strickland* itself, as you know, doesn't

11   talk about the ABA Death Penalty Guidelines.  It predated

12   the Death Penalty Guidelines by some number of years.

13   *Q.*    But it does cite the ABA standards for criminal

14   justice; right?

15   *A.*    It does, yes.

16   *Q.*    It also says that no particular set of detailed

17   rules for counsel's conduct can take into account all of

18   the circumstances that an attorney would make; right?

19   *A.*    It certainly says that, yes.

20   *Q.*    And that there are different ways to defend any

21   given case?

22   *A.*    Yes, it says that.

23   *Q.*    And it also says that the assistance of detailed

24   guidelines can actually be distracting sometimes for

25   counsel from their mission of the client's advocacy;

1  right?

2  *A.*   Yes.  I think there is a straightjacket approach

3  that has been cited coming out of that language.  It says

4  lawyers shouldn't put themselves into a straightjacket.

5  *Q.*   So a deviation from the ABA Guidelines does not

6  necessarily mean, per se, ineffectiveness; right?

7  *A.*   That's correct.  At least, it's correct in my

8  view.

9  *Q.*   You were asked about the *Ring* case and you

10  expressed the opinion that the standard of care did not

11  change between *pre-Ring* and *post-Ring*; correct?

12  *A.*   That's correct.

13  *Q.*   But would you agree that the method of presenting

14  mitigation changed?

15  *A.*   Yes.  And that's what I was trying to say.  I'm

16  not sure if I said it clearly, but I was saying that the

17  method of presentation and the approach to that method did

18  change.

19  *Q.*   And you were present when Mr. Patterson expressed

20  that same opinion yesterday; right?

21  *A.*   Well, he -- last Friday.

22  *Q.*   Or Friday.

23  *A.*   Mr. Patterson expressed a part of that idea, but

24  he also -- he also I think characterized it in a way that

25  I can't agree with.

1   *Q.*   Well, you also are aware that Mr. Patterson

2   testified that he was able to acquire additional training

3   in how to present a case to the jury prior to this

4   defendant's case?

5   *A.*   Yes.  I think he said he went out and attended a

6   number of conferences after *Ring* was decided.

7   *Q.*   Okay.  You were questioned about Dr. Rosengard's

8   report.  Do you still have that in front of you?  I think

9   it's Exhibit 6.003.

10        MR. ARNTSEN:  6 C.

11        MS. GARD:  6 C in your binder.

12        THE WITNESS:  Yes, I do have it.

13   *Q.*   BY MS. GARD:  And you characterized this -- and

14   correct me if I misunderstood your testimony.  But you

15   seemed to characterize this as a preliminary report?

16   *A.*   Yes.  That's my sense of the report, yes.

17   *Q.*   He doesn't say that it's a preliminary report,

18   though; does he?

19   *A.*   No.  But, as I said, he talked about it in terms

20   of his -- I think he called them impressions and

21   recommendations.  That's the kind of report you would

22   expect that is a kind of a preliminary review of what

23   Dr. Rosengard found.

24   *Q.*   Well, he made three diagnoses on Axis 1; right?

25   *A.*   He does.

1    *Q.*    And there are no rule-out diagnoses that he

2    makes; right?

3    *A.*    I do not see any here.

4    *Q.*    And he also expressed some skeptism about the

5    defendant's claim that she had amnesia for the event; is

6    that right?

7    *A.*    Can you show me what you're looking at?

8    *Q.*    I'm looking at the page of the report of

9    Exhibit 6.003 with the Bates stamp 7548 on the bottom

10   right-hand corner.

11   *A.*    Yes.

12   *Q.*    Okay.

13   *A.*    The issue of amnesia, the subject appears all too

14   convenient?

15   *Q.*    Appears all too convenient; correct.

16   *A.*    Yes, I see that he said that.

17   *Q.*    This report, as you understand it, was prepared

18   as a tool for developing mitigation; right?  We know that

19   from the e-mail?

20   *A.*    Well, no.  It was prepared at the request of the

21   Office of the Public Defender.  Whether I would say it was

22   prepared for the specific purpose of mitigation, I can't

23   tell you.  I don't know.

24   *Q.*    And in the guilt phase, you recall there was

25   substantial testimony about the defendant being a victim

1   of domestic violence?

2       *A.*    Yes.

3       *Q.*    And that was her defense to the first degree

4   murder charge; right?

5       *A.*    Yes.

6       *Q.*    And you will recall that that theme was carried

7   over into sentencing; correct?

8       *A.*    Yes.

9       *Q.*    And that there was an additional theme presented

10  in the context of her being a good -- essentially a good

11  person?

12      *A.*    Yes.

13      *Q.*    A good mother?

14      *A.*    A good woman, a good mother.

15      *Q.*    A good Christian.  And you also are aware that

16  Dr. Murphy testified in both phases?

17      *A.*    Sharon Murphy did testify.

18      *Q.*    Correct.  Sharon Murphy.  And that Mr. Patterson

19  also called Mindy Mechanic for both of those findings in

20  the guilt phase; right?

21      *A.*    Yes.

22      *Q.*    Would you agree that once a theme is selected,

23  consultation with mental health experts may not be

24  necessary depending on the theme or presentation of mental

25  health testimony may not be necessary?

1   *A.*   Presentation may not.  Investigation, I think
2   must continue.
3   *Q.*   So you should have your client evaluated
4   by mental health --
5   *A.*   You should do more than just -- as I spoke about
6   earlier today, it's more than simply a matter of having a
7   mental health evaluation.  That's why the rest of this is
8   so important.  The social history, the opportunity to look
9   at the jail records, life history records, all of those
10  things are an important part.  It wouldn't be adequate
11  just to say that I've hired a mental health person and
12  that person has conducted an examination.
13  *Q.*   You're aware from your review of the record that
14  Mr. Patterson was able to keep out some of the defendant's
15  other prior bad acts of theft and things like that by
16  limiting what he presented.  Are you aware of that?
17  *A.*   Well, I can't say I'm intimately aware of that.
18  *Q.*   You're aware that he was able to limit
19  Dr. Bayless's evaluation right?
20  *A.*   Yes.
21  *Q.*   And you, I'm sure, are familiar with Dr. Bayless?
22  *A.*   I am.
23  *Q.*   And he's a pretty devastating witness for the
24  defendant; isn't he?
25  *A.*   Devastating for the defendant?

1    *Q.*    In terms of he's a very compelling witness for

2    the State?

3    *A.*    Let me say that he can be.  It s certainly far

4    from true that he is universally a powerful witness.  Like

5    all experts and maybe like me, you can make mistakes.

6    *Q.*    And in many cases, you would agree that he is a

7    very powerful witness?

8    *A.*    He has a reputation for being a successful

9    witness.

10   *Q.*    You were questioned about Mr. DeLozier's fast and

11   his performance at trial.  I believe you testified this

12   morning that you reviewed Mr. DeLozier's interview?

13   *A.*    Yes, I did.

14   *Q.*    So you're aware that he fasts regularly?  It's

15   something that he does from time to time?

16   *A.*    He has said that he has done different kinds of

17   fasting at different times.  But, yes, he did talk about

18   that.

19   *Q.*    And you're aware that it's his position that

20   fasting actually improves his performance?

21   *A.*    Well, he said that I think here in his testimony

22   that he thought at least in the early stages of his fast,

23   that it sharpened his mind and clarified his thinking.  I

24   did hear him say that.

25   *Q.*    The death of Mr. Blair occurred on October 17th,

1    as I understand it.  Is that your understanding?  Of 2004?

2        *A.*    Yes, uh-huh.

3        *Q.*    The penalty phase, as I understand it, of this

4    trial began in December?

5        *A.*    December.

6        *Q.*    December of that same year?

7        *A.*    December 9th or something like that.

8        *Q.*    So, give or take, that happened two months before

9    the penalty phase; right?

10       *A.*    Yes.

11       *Q.*    And the one time it was brought to the judge's

12   attention that Mr. DeLozier was having problems, the judge

13   continued the trial for that day; right?

14       *A.*    Yes.

15       *Q.*    So he wasn't forced to continue in that state on

16   that day?

17       *A.*    No, he was not.

18       *Q.*    You would agree that *Strickland* directs that a

19   court not apply the benefit of hindsight to counsel's

20   decision making process?

21       *A.*    Yes.  And the court talks about the distorting

22   effects of hindsight.

23       *Q.*    And that you need to -- or the courts need to

24   evaluate counsel's decisions from his perspective at the

25   time?

1    *A.*   Well, both from his perspective and the
2    perspective of an objectively reasonable criminal defense
3    lawyer at the time.

4    *Q.*   At the time of the representation?

5    *A.*   Yes.

6    *Q.*   Okay.  Do you think you complied with that?

7    *A.*   Do I think --

8    *Q.*   Given your opinions here, do you think you're not
9    apply the benefit of hindsight?

10   *A.*   I'm doing what I think Justice O'Connor and the
11   Court had in mind.  I've tried to remove from my own
12   thinking the distorting effects of hindsight.

13          MS. GARD:  Nothing further, Judge.

14          THE COURT:  Redirect?

15          MR. ARNTSEN:  Just a couple for Attorney Hammond.

16

17                  REDIRECT EXAMINATION

18   BY MR. ARNTSEN:

19   *Q.*   Counsel for the State asked you some questions on
20   some Supreme Court cases?

21   *A.*   Yes.

22   *Q.*   Actually, it may help you if you take a look at
23   Exhibit 54.  I want to ask you a question about the
24   Wiggins case.

25   *A.*   Yes.

1        MS. GARD:  Objection.  Beyond the scope.

2        THE COURT:  Overruled.

3        Go ahead.

4        Q.   BY MR. ARNTSEN:  Are you familiar with the

5  Wiggins case?

6        A.   I am.

7        Q.   It was decided in 2003?

8        A.   I believe that's right.

9        Q.   If you take a look at PCR 299 in Exhibit 54.

10       A.   Yes.

11       Q.   The last sentence on the page.

12       A.   Yes.

13       Q.   Can you read that into the record?

14       A.   Yes.  Mr. Patterson says that the United States

15  Supreme Court has affirmed that the guidelines are the

16  established standards for capital defense counsel.

17       Q.   And citing Wiggins?

18       A.   Yes.

19       Q.   And do you agree with that statement?

20       A.   Yes.

21       Q.   Can you take a look at Exhibit 6 C or 6.003,

22  Dr. Rosengard's?

23       A.   Yes, I have it.

24       Q.   And if you can turn to -- and counsel asked you

25  questions on the fifth page of his report, the Bates

1   number is 7548 at the bottom in the summary, opinions and

2   recommendations section.

3        *A.*   Yes.

4        *Q.*   Are you there, sir?

5        *A.*   Yes.

6        *Q.*   Do you recall she asked you some questions

7   concerning possible amnesia?

8        *A.*   Yes.

9        *Q.*   And can you read into the record the sentence

10   that begins at the bottom of the page, an individual, and

11   then through into the top of the page and until it wraps

12   up that topic?

13        *A.*   Yes.  An individual who goes through a traumatic

14   event will often forget the extreme situation because an

15   individual is unable to deal with the thoughts on an

16   emotional basis.  This occurs in both children and adults

17   who have been physically or sexually attacked and more

18   than explains the defendant's response, et cetera.

19             MR. ARNTSEN:  Thank you.  No further questions.

20             THE COURT:  May this witness be excused?

21             MR. ARNTSEN:  Yes.

22             THE COURT:  Thank you very much, sir.  You are

23   excused.

24             THE WITNESS:  Thank you, Your Honor.

25             THE COURT:  The Petitioner may call her next

1  witness.

2           (WHEREUPON, the witness entered the courtroom.)

3           THE COURT:  Please step forward up to the witness

4  stand here.  Face the clerk.  Give her your full name.

5  Raise your right hand and she will swear you in.

6           THE CLERK:  Please state your name for the record

7  and spell your name.

8           THE WITNESS:  Gary Lowenthal, L-O-W-E-N-T-H-A-L.

9           THE CLERK:  Raise your right hand, please.

10          (WHEREUPON, the witness was duly sworn by the

11  clerk.)

12          THE COURT:  Thank you.  Make yourself comfortable

13  there.

14          THE WITNESS:  Thank you.  Good afternoon,

15  Your Honor.

16          THE COURT:  Good afternoon.  Go ahead and make

17  yourself comfortable there.  Remember to speak up so that

18  everyone can hear you.

19          THE WITNESS:  I'll try, Your Honor.

20          THE COURT:  Is it going to be Ms. Sterken?

21          MS. STERKEN:  Yes, Your Honor.

22          THE COURT:  Okay.  And go ahead and state your

23  name for the record.

24          THE WITNESS:  My name is Gary Lowenthal.

25          THE COURT:  Ms. Sterken, you may proceed.

1          MS. STERKEN:  Thank you.

2

3                    GARY LOWENTHAL,

4  having been first duly sworn to tell the truth, the whole

5  truth, and nothing but the truth, testified as follows:

6

7                    DIRECT EXAMINATION

8  BY MS. STERKEN:

9      Q.    Mr. Lowenthal, what's your profession?

10     A.    I'm an attorney and I'm a retired law professor.

11     Q.    I'm going to ask you some more questions about

12  your background in a bit.  But, first of all, what was the

13  scope of your review in this case?

14     A.    I was retained by your firm in these PCR

15  proceedings to investigate whether Attorney David DeLozier

16  had an actual conflict of interest in his representation

17  of Ms. Andriano in Phase 3 of her trial, whether he

18  actively represented conflicting interests, and whether if

19  a conflict of interest adversely affected his

20  representation of Ms. Andriano in Phase 3 of her trial.

21     Q.    And could you briefly state your conclusions?

22     A.    Briefly, I found that after reviewing everything

23  that I could, first, that Mr. DeLozier did in fact have an

24  actual conflict of interest in representing Ms. Andriano

25  in the preparation and presentation of her Phase 3

1    mitigation case.

2              Second, that he actively represented conflicting

3    interests.

4              And, third, that his conflict of interest

5    adversely affected his representation of Ms. Andriano.

6              Do you want me to go into any more detail than

7    that?

8         Q.   No.  We will do that later.

9         A.   Okay.  Thank you.

10        Q.   Did you create a report summarizing your analysis

11   and conclusions?

12        A.   I did.

13        Q.   Could you please refer to Exhibit 78?  There are

14   some binders underneath you there.

15        A.   Oh, thank you.  Well, oh, I see.  Yes.

16        Q.   Can you identify that document?

17        A.   Obviously, I haven't enough time to read it, but

18   this appears to be the report I submitted to you and all

19   the appendices to the report that I submitted.

20        Q.   How did you reach your conclusions in this case?

21   And I'll direct you perhaps to Page 5 of your report to

22   the extent that is helpful.

23        A.   All right.  Let me find it.  Yes.

24        Q.   How did you reach your conclusions in this case?

25        A.   Well, I reviewed a tremendous amount of material.

1  The first thing I did was to review the pleadings that

2  your office submitted and Ms. Gard submitted for the State

3  in this proceeding.

4          Then I read and reviewed the Arizona Supreme

5  Court decision in State V. Andriano.

6          I drew up a list of materials that I wanted to

7  see to help me form an opinion.  I requested those

8  materials from your office.  I received a great many, much

9  more than I would have wanted to, and I reviewed those

10  materials.

11          Then I suggested to Mr. Arntsen that it would be

12  useful for me to interview certain witnesses, which I then

13  did.  And then after I did that, I began to prepare my

14  report and I prepared my report on that basis.

15      Q.   Does Page 5 through 9 of your report provide a

16  complete list of the documents that you reviewed prior to

17  completing your report?

18      A.   Yes, it does.  I want to add that I noticed

19  within the last few days, there an omission on Page 9 --

20  either Page 9 or on 10.  Of the persons -- the interviews

21  I conducted before I prepared the report, I also

22  interviewed Ms. Andriano.  And I refer to that later in

23  the report things that I learned from that interview, but

24  I didn't include it on Pages 5 through 9.

25      Q.   Who are the individuals that you interviewed

1  prior to reaching your conclusions?

2      A.    Oh, I came here from New Mexico and interviewed

3  in late October of 2013 -- I interviewed Donna and Alejo

4  Ochoa in Casa Grande.  I went up to the Cave Creek area to

5  interview Mr. DeLozier.  I went out to Perryville to

6  interview Ms. Andriano.

7          Then I traveled to the office of the Maricopa

8  County Public Defender's and interviewed Mr. Patterson.

9  That was over I think a three-day period.

10     Q.    Did you conduct any other interviews?

11     A.    Yes, I did.  Before preparing my report, I

12  decided that there were two other persons I wanted to

13  interview.  I did not -- for both economic reasons,

14  financial limitations and time constraints, I did not come

15  back to Arizona to conduct those interviews.

16         I interviewed a person named Daphne Budge on the

17  telephone.  And I also interviewed a person named Kathy

18  O'Quinn.

19     Q.    And, briefly, what were Ms. Budge's and

20  Ms. O'Quinn's role in this case?

21     A.    Ms. Budge is an attorney who represented Donna

22  and Alejo Ochoa in proceedings with regard to either the

23  guardianship or adoption or severance of parental and

24  grandparent rights with regard to Ms. Andriano's children.

25  She was counsel of record for them in a proceedings after

1   Mr. DeLozier was.

2          And Ms. O'Quinn was a paralegal working for

3   Mr. DeLozier in 2001 at the time when there was a dispute

4   whether he would be representing Ms. Andriano or the

5   public defender or there would be some other arrangements

6   for her representation.

7   Q.   You've testified that your report provides a

8   complete list of all the documents that your reviewed

9   prior to coming to your conclusions?

10  A.   Yes.

11  Q.   Have you reviewed any additional documents since

12  completing your report?

13  A.   As a matter of fact. I have. I reviewed, I

14  would say, that I can recall, three separate either

15  affidavits or declarations:  One by Keith Rohman, one by a

16  Dr. Leighton and one by a fact witness.  I think her name

17  is Kyre Lorts.

18          I also had an opportunity to review the reports

19  of Dr. Amin and Dr. Pitt.  And I read the transcript of

20  the interview Dr. Pitt conducted with the defendant, the

21  Petitioner.  And, of course, I was present in court when

22  Mr. DeLozier testified yesterday and Mr. Patterson last

23  Friday.

24  Q.   Could I have you refer to Exhibit 79?  Can you

25  identify that document?

1    *A.*    Yeah.  It's my resumé.

2    *Q.*    Is that a current copy?

3    *A.*    Yeah.  I think it's current, yes.

4    *Q.*    Can you tell me a little bit about your

5    educational background?

6    *A.*    I graduated from Harvard College in 1966 and

7    university of Chicago Law School in 1969.

8    *Q.*    And where are you currently admitted to practice?

9    *A.*    I'm currently admitted to practice in the State

10   of California, the United States District Court for the

11   District of Arizona, the Ninth Circuit Court of Appeals

12   and the United States Supreme Court.  That's currently.

13          I was also a member of the State Bar of Arizona

14   for over 20 years while I was a law professor at Arizona

15   State University.

16   *Q.*    Can you tell me a bit about your professional

17   background after law school?

18   *A.*    Yeah.  My first significant employment was as an

19   assistant public defender in Alameda County, California,

20   which is the Oakland, Berkeley East Bay area of the bay

21   area.  And I worked there for about four and-a-half years.

22          And, actually, since my assignment here really

23   involves -- is involving a conflict of interest, it's at

24   that point in time early in my career that I became

25   intensely interested in the issue of conflicts of interest

1    and have remained so for 40 years.

2        *Q.*   Can you tell me what interested you in conflict

3    of interests at that time?

4        *A.*   I experienced, particularly among my colleagues,

5    and one case in particular, a very painful experience

6    involving a conflict of interest.

7            My best friend in the public defender's office

8    was representing a defendant.  And this is in the early

9    1970's.  I was in this office from '70 to '74.  He was

10   representing a defendant who was charged with sexual

11   assault, a rape and robbery of a woman.  It turns out -- I

12   didn't know this at the time, even though I talked to him

13   about the case -- he had represented the woman before.  He

14   had represented her probably three weeks into his career

15   as a public defender.  He represented her on a misdemeanor

16   prostitution charge.

17           And it turns out the defense was that it was a

18   consent defense, that they engaged in an act of

19   prostitution, that the defendant -- they got into a

20   dispute over how much he was to pay her and she claimed

21   that he robbed her and raped her.  He claimed that that

22   wasn't true.

23           The case went to trial.  I was in the courtroom

24   when the case went to trial.  And he did not bring up any

25   facts from her prior representation, but he did bring up

1    of the fact that she had been convicted of prostitution on

2    more than one occasion.  He was aware of her record.  He

3    did not think he was doing anything wrong.  He was a very

4    conscientious guy.  I'm sorry.

5            And, afterwards, his client was acquitted and he

6    was very happy.  The victim complained to the head of our

7    office and she was very upset.  She felt she had been

8    betrayed.  And, as a result of that, he got in trouble and

9    he was put under suspension.  And he honestly believed he

10   had done nothing wrong, but it was his job to zealously

11   represent his client.  From that day forward, I became

12   interested in conflict of interest.

13       Q.   And, just to clarify, the attorney had previously

14   represented the woman in prostitution charges; is that

15   correct?

16       A.   Yeah.  And, actually, the office continued --

17   although, the office still represented her on probation

18   revocation matters.

19       Q.   So you told me about your time in the public

20   defender's office.  What did you do after that?

21       A.   I'm sorry for that aside.  I then went into a

22   private practice for a couple of years as a partner in a

23   law firm in the San Francisco, Oakland area.

24           And then in 1976, I moved here to Arizona.  And

25   for the next 31 years, I was a law professor at Arizona

1    State University.

2        Q.    Did your teaching or your research focus on any

3    particular areas of law?

4        A.    Yes.  In a general sense, I -- well, I wrote

5    about a few other things, but in a general sense, my

6    primary interest was in the ethical problems encountered

7    by both criminal defense lawyers and prosecutors.

8              My teaching was primarily in the area of criminal

9    law and criminal procedure.  And within the area of

10   ethical problems, I specialize in conflicts of interests.

11             I conducted three empirical studies and formed my

12   later research in writing form.  I conducted a national

13   survey of public defender officers as to how they handle a

14   whole range of conflict of interest problems.

15             I also looked at -- I don't remember how many.  I

16   think it was about 500 cases from Superior Court files

17   here in Maricopa County and then followed up on facts from

18   those cases to determine how lawyers dealt with conflict

19   of interest-type problems or problems that could be

20   considered to be a conflict of interest.  Some cases were.

21   Some cases weren't.

22             In a third study, I interviewed a few hundred

23   lawyers or interviews were conducted under my supervision

24   by law students of private -- lawyers in private practice

25   and how they dealt with a range of issues, including

1   conflict of interest problems.

2       Q.    What your research on that published?

3       A.    Oh, yes, a series of articles.  The two most

4   significant were in the University of Virginia Law Review

5   and the Yale Law Journal.

6       Q.    Did the U.S. Supreme Court ever reply upon your

7   fellowship?

8       A.    Yes, they did in the -- probably the three cases

9   that are most germane to this proceeding:  *Kyla vs.*

10  *Sullivan; Wood vs. Georgia* and the third one was *Vicken*

11  *vs. Taylor*.  The majority opinion of the Court cited my

12  work in its analysis of the issues in the case.

13      Q.    Have you ever represented a capital defendant,

14  Mr. Lowenthal?

15      A.    Yes.

16      Q.    When?

17      A.    In post-conviction proceedings.  In 1993, I was

18  appointed by the Federal District Court for the District

19  of Arizona to represent an individual in a post-conviction

20  habeas corpus proceedings.  I continued to represent that

21  individual and it's 21 years later.

22      Q.    What's the principle issue in that case?

23      A.    Ineffective assistance of the counsel in the

24  preparation for and presentation of mitigating evidence.

25      Q.    Have you served as consultant on conflict of

1    interest issues prior to this case?

2        *A.*    Yes.

3        *Q.*    Can you tell me a bit about that?

4        *A.*    Yes.  Primarily -- and this mostly over the last

5    ten years.  Primarily, at the request of the Arizona

6    Capital Representation Project, I have consulted with

7    lawyers, both public defenders and lawyers in private

8    practice with regard to questions they have as to whether

9    or not a certain situation they were in constituted a

10   conflict of interest.  And, if so, what or if possibly or

11   if definitely what they should do.

12            I've also served as an independent consultant for

13   criminal defendants who were -- generally, I was contacted

14   by their families to provide independent advice as to

15   whether or not they had a conflict of interest with their

16   lawyer, so that they could make an informed judgment based

17   on a weighing of the consequences of different courses of

18   action, to determine whether they should proceed with

19   their lawyer.

20       *Q.*    Mr. Lowenthal, in reaching your conclusions, did

21   you rely on any statements or testimony by

22   Attorney DeLozier?

23       *A.*    Yes.

24       *Q.*    Does this include information about

25   Attorney DeLozier's professional background prior to

1    representing Wendi Andriano?

2        *A.*    Yeah.  I heard a little bit of that in the

3    courtroom here yesterday.  But when I interviewed him in

4    October -- sorry.  I've got a dry mouth.  When I

5    interviewed him in October, we went into a fair amount of

6    detail about his prior background.

7        *Q.*    What did he tell that was relevant to your

8    conclusions regarding his professional background?

9        *A.*    Well, although, he was initially admitted to

10   practice in 1970, he began to practice criminal law

11   probably I would say 1990 or shortly thereafter, early

12   1990's.  By the mid-1990's and the beginning, it was

13   mostly a DUI, misdemeanor-type practice.  Eventually, it

14   evolved into more a felony practice in the mid to late

15   1990's.  I would say it was certainly by no means all of

16   his practice.  Probably 25 percent or more of his

17   practice.

18       *Q.*    Did you determine whether Attorney DeLozier had

19   any familiarity with mitigation work prior to representing

20   Wendi Andriano?

21       *A.*    Oh, yeah, we talked about that at length.

22           MS. GARD:  Your Honor, and I just object at this

23   point to the hearsay unless it's being offered as the

24   basis of his opinion.

25           MS. STERKEN:  It is being offered on that basis.

1          THE COURT:  Lay some foundation as to the basis

2    of his opinion and I'll let you go into it.

3          MS. STERKEN:  Sure.

4     *Q.*   BY MS. STERKEN:  Mr. Lowenthal, did you rely upon

5    statements from Attorney DeLozier regarding his

6    professional background in reaching your opinions in this

7    case?

8     *A.*   Yes.  It was very important in my opinion to know

9    what his professional background was.

10    *Q.*   And did that include his experience with

11   mitigation work?

12    *A.*   Oh, yes.

13    *Q.*   What did he tell you regarding his experience

14   with mitigation work that was relevant to your

15   conclusions?

16    *A.*   I don't know whether obviously it's true, but

17   what he told me and what I'm relying on is that he had

18   attended State Bar seminars on mitigation.  That he had

19   presented mitigation evidence in several of his cases,

20   felony cases before his undertaking of representation of

21   Ms. Andriano.

22          That he was -- I specifically asked him if he had

23   any awareness of the impact or potential impact of

24   childhood abuse, trauma, neglect as factors that might

25   help a sentencer understand the defendant's behavior at

1    the time of an offense.

2            And he indicated to me that he certainly

3    currently was aware of that and he was aware of that from

4    his training before and his experience before

5    Ms. Andriano's case.

6        Q.    Can you elaborate on Attorney DeLozier's

7    experience with sexual abuse as far as it's relevant to

8    your conclusions?

9        A.    Well, he told me also that some time --

10   approximately around the time that he was beginning to

11   focus on the penalty phase in Ms. Andriano's case, he was

12   very actively involved in the representation of what he

13   told me was up to 20 cases involving individuals who

14   allegedly were sexually abused by Catholic priests.

15       Q.    In the context of these cases did

16   Attorney DeLozier explain to you his understanding of how

17   to develop facts relevant to sexual abuse cases?

18       A.    I don't know if we went into great depth about

19   that.  So I knew he was experienced in that area and had

20   experience in that area.  He did mention that he was

21   aware -- and this I took into consideration in forming my

22   opinion.  He said he was aware of the relationship between

23   childhood abuse, in general, and sexual abuse, in

24   particular, because of his civil case experience with

25   things such as dissociation, memory loss, post-traumatic

1   stress disorder, ability to recall incidents, painful

2   incidents from childhood.  I'm trying to think of what

3   else he might have mentioned.  I think he also mentioned

4   to me his awareness of the difficulty that some of his

5   clients had experienced in forming meaningful

6   relationships as adults.

7       Q.   So I'm going to ask you to kind of walk us

8   through a timeline of the events that are relevant to your

9   opinion.  Did you create any type of summary document of

10  these statements?

11      A.   I did.  I did, yes.

12           MS. STERKEN:  Permission to approach.

13           THE COURT:  Yes.

14           THE WITNESS:  Can I put this aside for a moment?

15           MS. STERKEN:  Yes.

16           THE WITNESS:  Thank you.

17      Q.   BY MS. STERKEN:  Have you had a chance to review

18  that document?

19      A.   Yeah, I just did.

20      Q.   Is this the summary document you created?

21      A.   Yes, I created it.  I can't say it looked as

22  pretty as it looks at this very moment.  When I turn it

23  over, but it's the same document, yes.

24      Q.   What are the two representations that

25  Attorney DeLozier had that are relevant to your conflict

1  of interest analysis?

2      *A.*    Well, above the line in blue is the criminal case

3  representation of Wendi Andriano.  Below the line in

4  green, it reflects the highlights of Mr. DeLozier's

5  representation of Ms. Andriano's mother and adopted

6  father, Donna and Alejo Ochoa.

7      *Q.*    Can you just give me some background on

8  Attorney DeLozier's representation of the Ochoas in the

9  guardianship case?  Perhaps, how did the case start?

10     *A.*    The case started -- actually, it says here

11 November 15, 2000 is a good point.  Two weeks before that,

12 Mr. and Mrs. Ochoa and Joe Andriano's family, and

13 specifically his sister, Jeanea Lambeth and her husband,

14 Brad, reached an agreement and they signed an agreement.

15 They both were represented by counsel at the time, not

16 Mr. DeLozier.  And the agreement provided that the

17 Lambeths would be given guardianship of the children,

18 the two -- Ms. Andriano's two children.  And that the

19 Ochoas would have very liberal overnight visitation.  I

20 think it was at a minimum, every other weekend.

21     *Q.*    Did that agreement deteriorate at any point?

22     *A.*    Very quickly.  As you might expect in a case in

23 which the parties were necessarily thrown together by the

24 tragic events that occurred in this case, and the death of

25 the dad and the accusations of the mom murdered the dad,

1  they became -- acrimony between the families very quickly

2  developed.

3       *Q.*   At the time that there was some acrimony, did the

4  Ochoas retain an attorney to assist them on the case?

5       *A.*   Yes.  His name is Leon Thikoll.

6       *Q.*   And did the Court take any steps around this time

7  to determine what should happen with the children pending

8  this litigation?

9       *A.*   Well, yeah.  what I have here on the timeline is

10  the first thing is the Court sanctioned and put into

11  effect the agreement on November 15th.  Around March of

12  2001, you'll see on the next page, on Page 2, that Thikoll

13  basically filed a motion to terminate the Lambeth's

14  guardianship and to substitute the Ochoas as guardians of

15  the children.

16           There was a quite a bit of hostility between the

17  Ochoas and the Lambeths as to who was rude to whom,

18  whether the Ochoas were getting the overnight visitation

19  that they wanted, whether they were -- should get --

20  whether they were appropriate for overnight visitations,

21  and the Lambeths didn't believe.  And so the case went

22  back to court in the spring of 2001.

23       *Q.*   And did the Court take any steps to determine

24  where the children should reside pending this dispute?

25       *A.*   Yeah.  The Court all along kept the Lambeths as

1   guardians.  But I think it was -- yeah, it was April 5th

2   is the date that I have here on my -- I'm sure that's from

3   the records in the case.  On April 5th, the Court -- and

4   by the Court, it's Commissioner Bayham-Lessel -- I think

5   it's Lesselyong.  I'm not sure if I have that right.

6           THE COURT:  That sounds fine.

7           THE WITNESS:  Yeah.  Okay.

8           The commissioner.  I'll just say the

9   commissioner.  The commissioner appointed a clinical

10  psychologist named Dr. Brian Yee to do an assessment.

11  Initially, that assessment was specifically are the Ochoas

12  appropriate for overnight visitation.

13      Q.   BY MS. STERKEN:  Did you reach any conclusions

14  regarding whether Attorney DeLozier functioned as an

15  attorney for the Ochoas during the time that

16  Attorney Thikoll was formally representing them?

17      A.   Oh, yes, I did.  And I had two to three sources

18  for that information.  I asked Donna Ochoa.  I asked

19  Mr. DeLozier himself.  And I also saw correspondence that

20  indicated that he was informally but regularly giving her

21  legal advice.  By her, I mean Donna Ochoa during the

22  spring of 2001.

23          As I recall, either in March or April 2001,

24  Mr. Thikoll became ill.  And she increasingly relied on

25  David DeLozier to provide her with insight as to how to

1    proceed with these now contentious court hearings.

2       Q.    Did Attorney DeLozier ever undertake the Ochoa's

3    representation in a formal capacity?

4       A.    Yes, he did.  I think it shows here June 12th.

5    Yes.  I knew it was in June of 2001.  On June 12th,

6    DeLozier is formally substituted in as counsel of record

7    in the representation of the Ochoas in the guardianship

8    proceeding in Maricopa County.

9       Q.    So you told us a bit about how Attorney DeLozier

10   became involved with representing the Ochoas.  Can you

11   tell me a bit about how he ended up being Wendi's attorney

12   in her criminal case?

13      A.    Yeah.  If we could flip back here to the first

14   page, the reason it was important to me to have this kind

15   of an exhibit is because you need to see how the events

16   were occurring simultaneously.

17             In late November of 2000, Ms. Andriano was

18   represented -- it's not clear from the records.  She was

19   either represented by the Maricopa County Public Defender

20   or by Leon Thikoll himself in her murder prosecution.

21             But in late November of 2000 -- and it shows here

22   November 24, 2000.  I'm sure this is from the records in

23   the case, Exhibit 82.  Oh, yes, that was an invoice of

24   Mr. -- from an invoice of Mr. DeLozier's, I saw that he

25   was initially contacted by Jeri Lynn Cunningham's husband,

1   Andrew Cunningham, who asked him to go to the jail, the

2   Estrella facility here in Maricopa County, to interview

3   Wendi.  And DeLozier didn't do it immediately.  He made a

4   couple of other phone calls and then had a conversation

5   with Jeri Lynn herself, who explained to him that she had

6   been a childhood friend of Wendi's and she asked him to go

7   interview Wendi in the jail.

8       *Q.*   And did Attorney DeLozier interview Wendi in the

9   jail?

10      *A.*   Yes, he did.

11      *Q.*   How do you know that?

12      *A.*   Well, I know it because of correspondence.  Well,

13  first, I know it because he told me.  Ms. Andriano told me

14  that.  And he also -- the correspondence in his file and

15  his invoice in his file.

16      *Q.*   And I'll just note for the record that the

17  timeline continued citations to various exhibits, these

18  have all been admitted into evidence already with the

19  exception of one or two documents that I'll deal with

20  separately.  But to be efficient, we won't identify each

21  individual exhibit during your testimony.

22          So you said that Attorney DeLozier visited Wendi

23  in jail.  At some point, was there a fee agreement for her

24  representation?

25      *A.*   Yes, there was.  Mid-December -- in fact

1    December 14, 2000, Mr. DeLozier, after visiting with Wendi

2    in the jail and meeting separately with Alejo Ochoa,

3    entered into a formal fee agreement with the Ochoas and

4    Wendi Andriano.

5        *Q.*   Were there any terms of the fee agreement that

6    were relevant to your expert conclusions?

7        *A.*   Yeah, I think some of the terms of the fee

8    agreement are very relevant to the conflict of interest

9    issue.

10       *Q.*   What are those on terms?

11       *A.*   First of all, just to give you an overview of the

12   agreement, the representation was for $30,000 to represent

13   Wendi in her murder case.  And that Alejo Ochoa gave to

14   Mr. Andriano $5,400 as a down payment.

15           THE COURT:  You mean Mr. DeLozier?

16           THE WITNESS:  I'm sorry.  I may have misspoken

17   the name.  Alejo Ochoa gave to Mr. DeLozier -- I don't

18   know.  I probably got it backwards.  $5,400 as a down

19   payment.

20           The agreement specified that the remaining

21   roughly just under $25,000 was fully due and payable upon

22   the execution of the agreement.  And regardless of whether

23   or not there would be a subsequent substitution of

24   counsel, the Ochoas, and specifically Alejo Ochoa, was

25   responsible for paying the full $30,000 to Mr. DeLozier.

1   Those are the terms that I think were most important for

2   the conflict of interest issue which I can get into later

3   on.

4       Q.   Okay.  When did Attorney Patterson become

5   involved in Wendi's representation and how?

6       A.   If you flip forward -- well, there's some events

7   involving Kandy Rohde I don't need to go into.  But what

8   happened in the spring of 2001 is that the State had

9   now -- well, actually within a week after the fee

10  agreement, the State filed a notice of intent to seek the

11  death penalty.

12          DeLozier, in his -- he actually had been aware of

13  this from the beginning.  In his cover letter to the

14  Ochoas, he stated:  Hey, we're going to need -- for a case

15  like this, we're going to need a lot of expert assistance.

16  We're going to need -- and he said especially a

17  psychologist.  But he said:  We're going to need forensic

18  experts, investigation.  We're going to need a whole range

19  of assistance in resources that go beyond my

20  representation of you.  And I think he mentioned this in

21  his testimony on Monday.

22          Well, he started to get involved in this now

23  capital case and realized that he didn't have those

24  resources in the spring of 2001.  Thikoll was no longer in

25  the picture.  He was representing solo Wendi Andriano at

1    this point.

2            And so there were two hearings in Judge Barker's

3    court here in Maricopa County and they were highly

4    contentious.  DeLozier wanted resources.  He wanted to

5    stay in charge of the case.

6            And then I want to take issue with something that

7    Dan Patterson said last Friday.  He was not happy about

8    someone with more experience coming on the case.  He

9    wanted to be in charge.

10           MS. GARD:  Objection.  Speculation.

11           THE COURT:  I'm sorry?

12           MS. GARD:  Speculation.

13           THE COURT:  Overruled.

14           THE WITNESS:  This is what was in the record.

15   This is in the transcripts -- the transcripts and the

16   records that were turned over to the State that he wanted

17   to be in charge.  He did not want to be a second chair.

18   And the Ochoas wanted him to be in charge of the case.

19           And this is why -- but he needed resources.

20   Office of Court-Appointed Counsel didn't want to give him

21   the resources.  And it there was a push toward getting the

22   public defender's office involved and the public

23   defender's representative who came these hearings said:

24   We will not get involved in this case unless we're first

25   chairing it.

1          And as a result of that, DeLozier went back to --

2    he said:  I need to talk to the Ochoas and I need to talk

3    to Wendi Andriano.  He went back and got their consent to

4    the public defender taking on first chair status and him

5    becoming Knapp counsel as second chair.

6        Q.    BY MS. STERKEN:  And when you say Attorney

7    DeLozier got their consent, who do you mean?  Whose

8    consent?

9        A.    Oh, I mean all three.  I mean his client,

10   Ms. Andriano in the criminal case, and her parents, who

11   were paying his bill.

12       Q.    So you told us a bit about how Attorney DeLozier

13   became involved in these two cases.  I'm going to ask you

14   now to shift back to the guardianship case.  What was one

15   of the first steps that Attorney DeLozier took when he

16   assumed representation of the Ochoas?

17       A.    We're back in the guardianship case?

18       Q.    Yes.  I know it's confusing.

19       A.    Yeah, in June, he substituted in as counsel of

20   record.  One of the first things he did was to tell Donna

21   and Alejo Ochoa that they needed to persuade Dr. Yee.  And

22   I believe also at that time, the children's -- the

23   children were getting counseling from Linda Gray, who's

24   a -- I don't if she still does.  But back then, she was

25   with the Children's Advocacy Center here in Maricopa

1   County working with children who are involved in the

2   criminal process.

3          And these people were going to be making

4   recommendations to the commissioner handling the

5   guardianship case.  So his suggestion to the Ochoas was go

6   out and get as many letters as you can.  I want letters

7   that tell me or tell the -- particularly, Dr. Yee and

8   Commissioner Bayham-Lesselyong -- that tell them what

9   wonderful parent figures you are.  If you can focus on

10  your relationship with your grandchildren, great.  If they

11  have any other experiences with you that reflect on your

12  experience as a parent and a parent figure, appropriate

13  custodial figure, that would be great, too.  So they did

14  just that in July and August of 2001.

15     Q.   And have you had an opportunity to review those

16  letters?

17     A.   Yes.

18     Q.   Can you summarize the general content of the

19  letters?

20     A.   Well, they're pretty much along the lines that I

21  just described.  I would say the number one focus of

22  almost all of the letters, not all, but almost all the

23  letters was their relationship with their grandchildren.

24         The second thing was their ability and their

25  qualities as parent figures in general.  And many of the

1    letter writers had known them for 20-plus years.  So they

2    wrote about their experiences or their observations of the

3    Ochoas as parents of Wendi and her adopted brother.

4        Q.    How were these letters used in the guardianship

5    case?

6        A.    I don't know.  I don't know how they were

7    actually used.  I do know the process in which they got to

8    the Court.

9        Q.    Can you tell us a bit about that process?

10       A.    Yes.  Donna and Alejo Ochoa would either hand

11   deliver or fax the letters to Mr. DeLozier, who would

12   review them for their appropriateness.  And at least in

13   one case, one of the letter writers wrote two separate

14   versions very close, but two separate versions of the same

15   letter, and Donna asked David to pick the one that he

16   thought was the more appropriate one.  He would then give

17   his approval and they would then deliver them to whomever.

18   I think it was to Dr. Yee.

19       Q.    Okay.  So Attorney DeLozier is representing the

20   Ochoas in this guardianship matter.  Did Attorney DeLozier

21   ever initiate a second proceeding on behalf of the Ochoas

22   relating to the children?

23       A.    He did.

24       Q.    What was that second proceeding?

25       A.    In August of 2001.  There it is.  August 31,

1  2001.  Mr. DeLozier filed a petition to adopt the children

2  on behalf of his clients, the Ochoas, in Pinal County

3  Superior Court.

4      *Q.*  Did Attorney DeLozier ever notify the Lambeths of

5  this petition?

6      *A.*  No.  He never notified them.  He never served

7  them with process.  They were the guardians of the

8  children.  The Court, Judge O'Neill -- William O'Neill was

9  the judge handling the case.  Judge O'Neill appointed an

10 agency to do a social study.  And DeLozier was directed to

11 provide information about relevant people for the social

12 study and he never provided the Lambeths information to

13 the agency in Pinal County.

14     *Q.*  Did the Pinal County Court have discover

15 Mr. DeLozier's failure to notify the Lambeths?

16     *A.*  According to the record, it did.  Judge O'Neill,

17 in December of 2001, December 18, 2001, issued an order

18 directing Mr. DeLozier to serve the Lambeths with process

19 and also to give their information to the social agency --

20 social services agency.

21     *Q.*  Was there ever any conflict between the Ochoas

22 and Lambeths regarding red marks on the children's bottoms

23 during these proceedings?

24     *A.*  Yes, there was.  There was.

25     *Q.*  Can you tell me what that conflict involved?

1    *A.*   Yeah.  Around December of 2001 -- before I do

2  that, I just wanted to say that Mr. DeLozier decided he

3  wasn't going to follow Judge O'Neill's order.  I mean,

4  instead of notifying the Lambeths, as ordered by

5  Judge O'Neill, he filed a notice of change of judge.  He

6  tried to get O'Neill off the case and that motion was

7  denied.  He just let it go.

8          And then at this time -- while these events were

9  going on in Pinal County, at the very same time, these

10  pretty severe red marks, whether they were bruises or burn

11  marks, it's not clear, appeared on both sides of the

12  buttocks of both children.  And the accusations were made

13  against the Ochoas in a letter.

14          I think it was in March of 2002, Jeanea Lambeth,

15  at the request of her lawyer, provided a summary of how

16  these occurred.  And she indicated in her letter that the

17  red marks appeared every time the children would go to the

18  Ochoas for overnight visitation starting in

19  December of '01.

20          And when she asked the children about it, the

21  younger one, the girl, Ashlee had told her that it

22  occurred when Grandpa Alejo touched my bottom or touched

23  my butt, she said on another occasion.  She used bottom

24  once, butt on another occasion.  And when Jeanea Lambeth

25  inquired further about it, I believe it was Ashlee again,

1  but it may have been both of them, Nicholas and Ashlee

2  said Grandma Donna told us to keep secrets.

3      *Q.*   In addition to what you have just told me about,

4  were there any other allegations made in the guardianship

5  case that Alejo Ochoa abused the children or acted

6  inappropriately with them?

7      *A.*   Yeah, there were.  When I interviewed Alejo Ochoa

8  in October of 2013, he was reticence to talk about this.

9  However, he volunteered to me that on another occasion,

10 Brad Lambeth, who was Joseph Andriano's brother-in-law,

11 accused him on the telephone of taking naked photographs

12 of the children.

13      And I said:  Well, you're talking about

14 photographs of the red bottom?  He said:  No, no.  This is

15 something different.  Yeah, there was another accusation.

16      *Q.*   So.  Turning back to the letter, did

17 Attorney DeLozier ever receive a copy of this letter with

18 these allegations?

19      *A.*   Oh, yes.  I know that for sure.

20      *Q.*   And how do you know that?

21      *A.*   Well, I think if the letter is in evidence, and

22 you'll on the top of the letters either the fax stamp or

23 whatever.  There's DeLozier's office and the day it was

24 received and so on.

25      Second, both DeLozier and -- David DeLozier and

1    Donna Ochoa told me that he received it.  And, third,

2    Donna -- and I think it's -- the letter itself, the Jeanea

3    Lambeth letter is Exhibit 18 attached to my report.

4          Exhibit 19 is a letter from Donna Ochoa and

5    that's a letter that she wrote at the request of David

6    DeLozier trying to rebut the allegations that Jeanea

7    Lambeth had made.  She indicated that she was given

8    Jeanea's letter by David DeLozier.

9    Q.    And what about the allegations of the naked

10   photos?  Did Alejo Ochoa inform Attorney DeLozier of those

11   photos?

12   A.    Yeah.  He told me the first he did was to call

13   Mr. DeLozier on the phone.

14   Q.    Did you identify any other information that

15   Attorney DeLozier learned in the guardianship case

16   suggesting concerns about the Ochoas ability to care for

17   the children?

18   A.    Well, yeah.  I think that consistent with the

19   fact that he went ahead and filed an adoption proceeding

20   in Pinal County, the guardianship proceeding, the minute

21   entries increasingly went just one after another poorly

22   for the Ochoas.  And I think it was right about the time

23   in the midsummer of 2002, the Court discontinued all

24   overnight visitation.  And, to my knowledge, it was never

25   recontinued.  They never got it back, the Ochoas.

1          And the Court suspended -- the commissioner

2    suspended all visitation until the Ochoas underwent

3    therapeutic counseling.  And this is at the

4    recommendation, according to the Court, to the Court

5    commissioner of not just Dr. Yee, but Linda Gray, and I

6    think the gentleman's name is Gary Weiser who was the

7    guardian ad litem for the children.

8          MS. STERKEN:  Judge, I think we're at a good

9    stopping point if you want to --

10         THE COURT:  Okay.  Let's go ahead and take our

11   afternoon break.  We will take a 15-minute break.  We will

12   be in recess.

13         (WHEREUPON, a recess ensued from 3:05 p.m. to

14   3:24 p.m.)

15         THE COURT:  This is CR 2000-096032, in the matter

16   of State of Arizona vs. Wendi Elizabeth Andriano.

17         The record will reflect the presence of the

18   parties and counsel.  We have Mr. Gary Lowenthal on the

19   witness stand.

20         Before we continue with his direct examination, I

21   have spoken with counsel informally.  It's my

22   understanding that counsel feel that if we go until about

23   5:15 or 5:20, at the most, we can complete Mr. Lowenthal's

24   testimony today and not have court tomorrow; is that

25   correct?

1          MR. ARNTSEN:  Correct.  Or Thursday.

2          THE COURT:  Or Thursday.  Then what we will do is

3    I have instructed -- based upon that information, I've

4    instructed my judicial assistant to notify the sheriff's

5    office, and I have spoken to Sergeant Keller about this,

6    that we won't have Ms. Andriano transported tomorrow or

7    Thursday.  And so I think everyone is in agreement with

8    that.

9          We have also contacted court security to notify

10   them that we're going to be going a little bit past

11   5:00 o'clock today.

12         MR. ARNTSEN:  Thank you, Your Honor.

13         THE COURT:  Okay.

14         THE WITNESS:  Please let me know if I'm running

15   on too much.

16         THE COURT:  Okay.  And this notice, this

17   representation time, we should probably have that marked

18   for identification as an exhibit.

19         THE CLERK:  It has been marked.

20         THE COURT:  Oh, it has already been marked?

21         THE CLERK:  It's already been marked as

22   No. 234.

23         THE COURT:  Okay.  234.

24         So the record will reflect that Mr. Lowenthal is

25   on the witness stand.  We will continue with the direct

1   examination by Ms. Sterken.

2      Q.   BY MS. STERKEN:  Mr. Lowenthal, before we took

3   our break, you were telling us about the adoption case.

4   You were telling us how Attorney DeLozier did not notify

5   the Lambeths of this case.  Did the Lambeths eventually

6   learn about the adoption case?

7      A.   Yes.  John Jakubczyk, their attorney, somehow or

8   another got wind of it.  I don't know how.  In the summer

9   of 2002, six months after the proceedings that I just

10   discussed a few minutes ago.  And he traveled -- he didn't

11   know anything about it.  So he traveled down to Pinal

12   County and he went through court records and discovered

13   the existence of an ongoing adoption proceeding.

14      Q.   What did he do when he discovered this adoption

15   proceeding?

16      A.   He immediately filed a motion.  I think I have it

17   here.  On July 15, 2002.  And this says move for

18   sanctions.  It was actually a motion -- he filed a motion

19   in Pinal County to dismiss the action and also a motion

20   for sanctions against both David DeLozier and the Ochoas.

21      Q.   After he filed this motion, did Attorney DeLozier

22   continue as formal counsel of record for the Ochoas in

23   that case?

24      A.   In that case, yes.  In Maricopa County, the

25   immediate aftermath of Mr. Jakubczyk's motion was that

1   Judge O'Neill sent a very angry minute entry to Maricopa
2   County alerting the commissioner here as to what was going
3   on in Pinal County.
4          So a paralegal working for Mr. DeLozier.
5   not Ms. O'Quinn.  It was another one.  Arranged for Daphne
6   Budge to step in as substitute of counsel of record here
7   in Maricopa County.  DeLozier, at least for a few months,
8   continued to participate in the proceedings in Pinal
9   County.
10     Q.   And you said there was a motion for sanctions and
11  to terminating the adoption case.  How was that motion
12  resolved?
13     A.   Well, after a lengthy hearing in September of
14  2002 in Judge O'Neill's court, in which kind of oddly
15  both -- it wasn't clear who was representing the Ochoas.
16  Both Mr. DeLozier and Daphne Budge appeared and they both
17  made arguments for the Ochoas.
18         In October, about a month later -- I have here it
19  as October 18th in Exhibit 104 -- Judge O'Neill issued an
20  order in which he granted the motion to dismiss the case
21  and as sanctions against -- and granted sanctions against
22  both Mr. DeLozier and the Ochoas.  The sanctions against
23  Mr. DeLozier were in essence a fine requiring of $6,000 --
24  requiring him to pay that $6,000 to Jakubczyk as
25  attorney's fee for the Lambeths.  And also, he reported

1    him to the State Bar of Arizona very pretty angrily.

2           He also had sanctions against Mr. and Mrs. Ochoa,

3    dismissed their action with a petition with prejudice, and

4    reported to -- and wrote that they were complicit -- in

5    his view, complicit in DeLozier's actions, and reported it

6    back to the Maricopa County commissioner.

7       Q.   So shortly after the dismissal of the adoption

8    case, what happened in the guardianship case?  You can

9    refer to your --

10      A.   Sure.  There were continuing minute entries over

11   the next year, year and-a-half.  The most important one

12   was in December of 2012, in which -- excuse me -- 2002, I

13   think it was, yeah.  Okay.  In December of 2002, the

14   commissioner -- court commissioner here denied the motion

15   of the Ochoas to substitute -- to break the guardianship

16   of the Lambeths and substitute themselves as guardians.

17   And there were a number of orders over time with regard to

18   supervised visitation.

19      Q.   Can I just stop you there?  Could you refer to

20   Exhibit 105, please?

21      A.   Okay.  You want me to look at it here?

22      Q.   Yeah, if you don't mind.

23      A.   Sure.  All right.  Yeah, this is the minute entry

24   I was just talking about.

25           MS. STERKEN:  I would move for admission of

1    Exhibit 105.

2           THE COURT:  Any objection to Exhibit No. 105 for

3    identification being admitted into evidence?

4           MS. GARD:  No, Judge.

5           THE COURT:  Exhibit No. 105 for identification is

6    admitted into evidence.

7       Q.   BY MS. STERKEN:  Mr. Lowenthal, did you conclude

8    whether Attorney DeLozier continued to represent the

9    Ochoas in the guardianship matter after Attorney Budge

10   formally substituted in on the case?

11      A.   He continued to represent them with regard to

12   their disputes with the Lambeths over issues of custody

13   visitation primarily and severance of parental and

14   secondly grandparental rights.  He was not formally

15   counsel of record in court.

16      Q.   If I could refer you to Page 6 of your timeline.

17      A.   Sure.

18      Q.   Could you give us some examples of the evidence

19   you identified that showed a continuing representation of

20   the Ochoas in the guardianship case?

21      A.   If you don't mind a narrative, I'll go through

22   this as expeditiously as possible, knowing this

23   afternoon's schedule.

24           The first item I have here is March 3rd, 2003.

25   At this point, the Ochoas were represented by Daphne Budge

1   in court.  There was an exchange of e-mails that are

2   Exhibit 107 I guess, in which the DeLozier was asking

3   Donna to tell him information about an upcoming hearing,

4   which was a hearing on a petition to sever the rights of

5   Ms. Andriano and the Ochoas in Judge Damron's court.

6   Apparently, she gave him the paperwork for the pleadings

7   for this hearing.

8           The next one is April 14, 2003.  That was

9   immediately after the hearing in Judge Damron's court

10  exchanging e-mails.  DeLozier wanted to know what happened

11  and Donna Ochoa gave him a description of her

12  interpretation of the events that occurred in court.

13          The next item I have here is May 16th, 2003.

14  Actually this should be May 16th and 17th, 2003.  On

15  May 16th, Donna Ochoa sent an e-mail to her attorney or

16  counsel of record, Daphne Budge, discussing upcoming --

17  strategy with regard to an upcoming mediation and also

18  with regard to other matters in their ongoing case.  That

19  was dated March 16th.

20          On March 17th, she sent DeLozier a blind copy of

21  this.  I found this is an interesting document because she

22  didn't CC David DeLozier on this.  She just on the bottom,

23  there's a file stamp that DeLozier received it on the 17th

24  of May.

25          I asked both -- actually, I asked all three of

1  them.  I asked Daphne Budge as well and Donna Ochoa and

2  David DeLozier if this was an aberration, and Donna Ochoa

3  told me very frankly that she frequently sent him copies

4  or blind copies of e-mails that she had sent to Daphne

5  Budge and DeLozier said the same thing.

6          Daphne Budge was not aware of it, but said that

7  it was consistent with her understanding of what was going

8  on at the time.

9          May 27th is the next item I have here.  As I

10 mentioned earlier, Judge O'Neill -- Judge O'Neill imposed

11 sanctions on Mr. DeLozier the previous October, and

12 DeLozier filed an appeal with the Arizona Court of Appeals

13 contesting those sanctions.  And although the brief was

14 representing himself, a substantial section of the brief

15 argued against sanctions for the Ochoas as well.

16    *Q.*   Can I --

17    *A.*   I'm sorry.

18    *Q.*   Sorry.  Can I just interject here that I think

19 the timeline notes Exhibit 111 for this document.  This is

20 a smaller version of the full brief, which was admitted as

21 Exhibit 131, just so the record is clear.

22    *A.*   Okay.  Thank you.  June 9th was the first of two

23 instances in which DeLozier hired a private investigator,

24 Rich Robertson, whose practice is -- I think it probably

25 still is here in the East Valley.  And he asked him to do

1   work.  It wasn't clear from the documentation in the file

2   as to what that work consisted of.

3          You see the next item is November 24th, Private

4   Investigator Robertson who DeLozier retained to work on

5   the guardianship case, Exhibit 110.  I had these documents

6   indicating that invoices from Robertson to DeLozier, and I

7   had copies of these and checks from DeLozier's office to

8   Robertson.

9          And I presented them to Mr. DeLozier.  I said:

10  What's this all about?  Was this in connection with your

11  representation of Wendi Andriano or was this something

12  else?  He said:  I don't know.  And I said:  Is there any

13  way you can find out?  And we were having this meeting in

14  his office up in the North Valley.  So he asked his

15  bookkeeper to check and she came back about ten minutes

16  later in my presence and said:  This is in regard to your

17  representation of the Ochoas with regard to the children.

18         So February 27, 2004, there's a prior event two

19  days earlier.  Daphne Budge filed a pleading in court in

20  which she notified the Court that she had left private

21  practice and was now entering the public defender's

22  office -- Maricopa County Public Defender's Office and

23  that she no longer represented the Ochoas in connection

24  with the guardianship proceedings.

25         February 27th, two days after that, the Ochoas

1   met twice with David DeLozier before and after court and

2   in a proceeding in Wendi Andriano's case.  None of them

3   had an independent recollection of meeting.  To me, the

4   timing made it -- to me, I concluded from the timing of

5   the meeting that they must have discussed, among other

6   things, how they were proceeding in the guardianship case.

7           The next item is April 17, 2004.  This is an

8   interesting day.  It's a Saturday, April 17, 2004.  On

9   April 17th, there was a -- at this point in time in 2004,

10  the Ochoas had long since not been allowed overnight

11  visitation.  And their visitation was limited to short

12  supervised visitation in public locations by supervisors

13  chosen by the Lambeths and paid for by the Ochoas.

14          The Ochoas had scheduled that Saturday -- the

15  parties had scheduled a visitation at a restaurant in

16  Casa Grande.  The Ochoas arrived at the restaurant at the

17  appointed time and no one came and they waited for a

18  while.  And then they waited, I don't know, an hour or two

19  and then went home very upset.

20          They contacted Mr. DeLozier.  They e-mailed him.

21  They sent him several e-mails and he e-mailed back.  His

22  invoice records show on that Saturday e-mails going back

23  and forth between him and the Ochoas.  And in a later

24  correspondence in which she described this particular day,

25  in a letter that Donna Ochoa wrote at a later point in

1    time, she described how her attorney tried to help her

2    work through this problem on that day.

3        *Q.*   Did you conclude that that attorney was

4    Attorney DeLozier?

5        *A.*   Oh, yeah, yeah.  August 19th, 2004, is simply --

6    it's significant because it's right on the eve of the

7    beginning of the Andriano murder trial.

8            That's when the Court of Appeals issued its

9    mandate finally dismissing the appeal or denying

10   DeLozier's appeal in which he argued for both himself and

11   the Ochoas.

12           The next item -- and now we're on the last page,

13   happily.  November 15, 2004.  This is a very interesting

14   document.  The Ochoas signed and filed on November 15,

15   2004 -- and this was during Ms. Andriano's trial.  I don't

16   know whether it was before Phase 3.  I don't know whether

17   it was in Phase 2.  I think it was probably during

18   Phase 2, maybe Phase 1.

19           On November 15, 2004, the Ochoas filed a notice

20   on pleading paper of pro se representation that henceforth

21   they would be representing themselves.  Interestingly, it

22   was typed using kind of typical lawyer language and it was

23   on pleading paper -- lined pleading paper.  And it was

24   originally drafted and typed in drafted July 2004.  That

25   was crossed out and someone handwrote in there

1   November 15, 2004, when it was actually filed in court.

2          I asked Donna Ochoa if she had drafted this

3   document.  She said, no, she didn't have the capability in

4   her view to do it.  And she had asked Mr. DeLozier to do

5   it.

6          I asked DeLozier and he said that he wasn't sure,

7   but probably he was the one that drafted it.  It was

8   something he would typically do for a client.

9          I asked Daphne Budge if she had drafted it, even

10  though she was in the public defender's office.  She told

11  me, no, she definitely wouldn't.  The font, the formatting

12  was totally different from her own pleadings.  And so that

13  was further ongoing representation.

14          December 7th -- and December 8, 2004, very

15  significant date.  You'll notice that on the blue side up

16  on the top of the page, December 8, 2004 is the day that

17  David DeLozier presented his opening statement in Phase 3

18  of Ms. Andriano's trial.  And his billing invoice for

19  December 2004 includes entries involving several hours on

20  December 7th and December 8th, the day he gave his opening

21  statement, in which he was going through his files and

22  looking for records with regard to the bruises on the

23  buttocks of the children in medical records and pleadings

24  from court proceedings with regard to the Ochoas, his

25  representation of the Ochoas.

1    *Q.*   Can I stop you for --

2    *A.*   And then on the 8th, he actually met with Alejo

3    and went over those documents.

4    *Q.*   And if I could just stop you there.  What is

5    happening at the same time in Wendi's criminal trial?

6    *A.*   Well, as I mentioned, this is the very beginning

7    of Phase 3 in which DeLozier gave his opening statement.

8    And the next day on December 9th, he started calling

9    witnesses.

10    *Q.*   And the witnesses that he was calling around the

11    same time, what type of testimony did he solicit from

12    these witnesses?

13    *A.*   Well, this is one of the most striking things

14    I've ever seen.  The way that the defense team divided up

15    the Phase 3, when I read through the transcript of this

16    proceeding, was DeLozier gave the opening statement and

17    closing argument and called all the social history

18    witnesses that preceded the marriage with Joe Andriano,

19    childhood, so on.  And there were five of them.

20          And one of them -- the first one was -- the one

21    that was referred to by Mr. Hazard last week when he was

22    examining -- when he was examining Mr. Patterson, it

23    wasn't Mr. Patterson's witness.  It was DeLozier's witness

24    and this -- all of these witnesses, Mr. Vargus.  There was

25    a Mr. and Mrs. Galleon.  There was a woman named Inskeep.

1         And all of these witnesses, DeLozier would call

2    over the next two or three days after his opening

3    statement, and the way one would expect -- I would expect

4    in a mitigation hearing:  Are you familiar with the

5    defendant?  Do you know Wendi Andriano?

6         And he started his examination as:  Do you know

7    the Ochoa family?  How do you know the Ochoa family?  And

8    then each witness went into how they knew Donna and Alejo

9    Ochoa from church in the 1980's.  None of the witnesses

10   had any contact with Wendi Andriano after 1990, ten years

11   before the homicide.  They all talked about what wonderful

12   parents the Ochoas were.  And this is where they were

13   developing the theme that she was raised in a very

14   supportive, wholesome, deeply religious family.

15        And this came right after the opening statement

16   in which he said:  Before she married Joe Andriano, she

17   had led a -- she was an innocent girl who had led a very

18   sheltered life.

19   Q.   So following imposition of the death sentence,

20   did you conclude whether Attorney DeLozier continued to

21   represent the Ochoas in the guardianship matter?

22   A.   I'm sorry.  Following what?

23   Q.   Following imposition of the death sentence in

24   Wendi's case.

25   A.   Oh, yeah, yeah.  I think the testimony I heard

1    him say in court the other day is accurate.  At least

2    2005.  Early 2005.  March of 2005.  The Lambeth's petition

3    to become guardian -- to sever parental rights and

4    grandparental -- as an advent to that, grandparent -- all

5    visitation, grandparental, parental visitation finally

6    proceeded after Ms. Andriano's conviction.  This would

7    allow for adoption of the children by the Lambeths.

8            Donna Ochoa in early March of 2005 sent a

9    handwritten pleading to David DeLozier saying:  Is there

10   anything you can do?  Can you help us?  We're desperate.

11   I think it also went to a gentleman named Bell, who was it

12   sounded like connected with post-conviction representation

13   of Ms. Andriano.

14           And two weeks later, according to Mr. DeLozier

15   and Donna Ochoa, he -- she submitted a letter to the

16   Superior Court.  He said basically -- both of them told me

17   that there was really nothing he could do in court to help

18   her, but that he helped her draft a letter that would put

19   on the record for the future, so when the children became

20   older, they would know about it, just how much and how

21   deeply their grandparents cared about them and how much

22   Donna, in particularly, but the grandparents had really

23   worked over the years to be a part of their lives.  And

24   both of them told me that David substantially wrote the

25   letter.

1      Q.   We have talked about a number of instances in

2   which Attorney DeLozier provided some assistance or

3   counseling to the Ochoas following the period in which he

4   was no longer formally representing them in this case.

5           Have you reached a conclusion regarding whether

6   Attorney DeLozier continued to have an attorney-client

7   relationship with the Ochoas through March of 2005?

8      A.   Oh, absolutely, absolutely.  I mean, you don't

9   define an attorney-client relationship merely by whether

10  someone is an advocate for them in court.  Attorney roles

11  run a pretty wide gamut certainly as an advisor, which is

12  present here, as a drafter of documents, as a negotiator,

13  as an evaluator.

14          And, in fact, the Preamble to the Arizona Rules

15  of Professional Conduct say just that.

16     Q.   I'm going to ask you to turn back very briefly to

17  Wendi's representation.  When did Attorney DeLozier start

18  focusing on developing mitigation evidence, based on your

19  review of the record?

20     A.   All right.  We're back above on the blue stuff

21  on the top in Wendi's case.  Yeah, I think Patterson said

22  that after the Roque case finished, he started to focus

23  on the Andriano case.  And if you would look at -- and I

24  think it's Exhibit 117 here and this is on Page 7 of my

25  timeline.

1          There is a really indication there that it's in
2    the record, in the invoices that DeLozier -- if you look
3    at the invoices that DeLozier prepared over time, it
4    starts up in October of 2003.  He met -- first he met with
5    Dan Patterson and Patrick Linderman together on a couple
6    of occasions.  I have it here October.  I'm sure it is.
7    October 22nd and October 31st of 2003.
8          And then the next item on December 2nd, 2003,
9    DeLozier's billing invoice indicates that he either made a
10   phone call or sent an e-mail -- I guess it's e-mail to
11   Linderman pestering him as to following up on the
12   mitigation work that he had discussed and that Patterson
13   wanted him to get.
14         Patterson clearly was in charge of the case, and
15   as Patterson indicated, he delegated this responsibility
16   to Mr. DeLozier.
17         It's not on this on my outline.  I wish I had
18   included it.  Linderman continued in the public defender's
19   office until March of 2004.  And in March of 2004,
20   DeLozier's invoice for that month indicates substantial
21   contact with Linderman, exchanging and giving him
22   documents for mitigation purposes.  Receiving documents
23   from Linderman, the mitigation specialist, and having
24   interactions with him.
25         And then in April, of course, Scott MacLeod came

1   on the case and there are several entries of his

2   involvement with MacLeod.

3         Now, sometime in the spring, and it was probably

4   in April of 2004, a decision was made to put together this

5   -- I don't know what it is -- a PowerPoint presentation

6   about Wendi's wonderful life.  So I think when MacLeod

7   came on board, that was a decision already made.

8     Q.   Over the course of Attorney DeLozier's

9   representation of Wendi in her criminal trial, did he

10  learn any information to suggest that her childhood might

11  have been troubled in some way?

12        And if I can ask you just to touch on it briefly

13  because I think these are documents that we've gone

14  through.

15    A.   During his representation of Ms. Andriano?

16    Q.   Yes.

17    A.   Oh, yeah, yeah, yeah.  I was in court and heard

18  the testimony about Kandy Rohde.  The communications in

19  February and March, those are probably the most important

20  to me because she made reference to such matters as

21  dissociation, memory loss and so on and referred to the

22  fact that Donna had told her that there was possible

23  childhood abuse by Skip Robertson or his father and that

24  this could have been the reason for these symptoms that

25  she was seeing.

1    *Q.*   Did Attorney DeLozier come across any other
2   evidence while representing Wendi to suggest a troubled
3   childhood?
4    *A.*   I don't think I need to go through item-by-item,
5   but I think you went through them or whoever was at it, I
6   think was doing the direct examination of DeLozier and
7   those are things that I saw in the file.  Sharon Murphy,
8   continuing things from Kandy Rohde and Sharon Murphy,
9   something from Sharon Murphy.  Dr. Potts' preliminary
10  Rule 11 evaluation.  There were several items, yes.
11   *Q.*   You mentioned that you interviewed Attorney
12  Patterson in the course of conducting your analysis; is
13  that correct?
14   *A.*   Yes.
15   *Q.*   Did Attorney Patterson tell you whether he was
16  aware at any time during Wendi's criminal case that
17  Attorney DeLozier was representing her parents in a
18  guardianship matter?
19   *A.*   I'm sorry.  I lost track of your question.
20  Again, please.
21   *Q.*   Yes.  You spoke to Attorney Patterson; correct?
22   *A.*   Yes.
23   *Q.*   Did he tell you whether he was informed by
24  Attorney DeLozier that Attorney DeLozier was representing
25  Wendi's parents in the guardianship case?  Was he aware of

1    that?

2         *A.*    That was one of the most interesting parts of our

3    interview.  I mean, he -- I was stunned by his revelation.

4    He said the first time he learned about it was when mom --

5    in the middle of the guilt phase of the trial, Donna Ochoa

6    was about to take the stand and Juan Martinez made a

7    request of Judge Ishikawa to be able to bring in

8    impeachment evidence against Donna Ochoa that related to

9    the sanctions that had occurred in Pinal County.

10         Patterson said he was shocked.  He didn't know

11   anything about it.  He didn't know that DeLozier had

12   represented the Ochoas.  He had never been told.

13        *Q.*    So we talked a bit about the kind of concurrent

14   cases that Attorney DeLozier was involved in.  I would

15   like to turn now to your expert opinions in this case.

16        *A.*    All right.

17        *Q.*    First of all, did you reach an opinion with

18   regard to whether there was an actual conflict of

19   interest?

20        *A.*    Yes, I did.

21        *Q.*    What were your reasons for making that

22   conclusion?

23        *A.*    Well, first, the conclusion is -- well, as I said

24   earlier, there was an actual conflict of interest.  And I

25   had three reasons for it.

1     *Q.*   Would you briefly state those three reasons?

2     *A.*   Yeah.   The first reason is that the interests of

3     the two sets of clients, Ms. Andriano on the one hand and

4     the Ochoas on the other, were directly adverse.   That was

5     the first reason why there was an actual conflict of

6     interest.

7              The second one is that Mr. DeLozier had a

8     responsibility, an ethical duty to the Ochoas not to use

9     information he had obtained and had in his possession

10    that related to their representation to their

11    disadvantage.   And this responsibility to the Ochoas

12    materially interfered with his representation of Wendi

13    Andriano in the mitigation phase, Phase 3 of her trial.

14    *Q.*   Did you say there was a third reason?

15    *A.*   Oh, yeah.   The third reason is actually an

16    additional factor that relates to and draws upon the first

17    two reasons.   And that is DeLozier's personal interests in

18    collecting as much of the $25,000 that Alejo Ochoa owed

19    him and the fees that were building up in his

20    representation of the Ochoas in the various proceedings

21    and in his advising the Ochoas and representing them.

22             And because of the information he had in his

23    possession, delicate information and also because their

24    interests were adverse to Wendi Andriano, I think there

25    was definitely an actual conflict of interest.

1     *Q.*   So if we could turn back to the first reason that
2  you gave for finding an actual conflict of interest.  And
3  what was that again?
4     *A.*   The first reason was that the interests of the
5  parties were directly adverse.
6     *Q.*   Okay.  Is it ever permissible for an attorney to
7  represent two clients with directly adverse interests?
8     *A.*   Yes, it can be.  It's possible, first of all,
9  well, at a minimum.  In order to represent two parties
10  with directly adverse interests, one would have to obtain
11  a lawyer -- would have to obtain informed consent reduced
12  to writing from the affected party.
13         This is kind of related to what I was talking
14  about earlier when I have advised capital defendants about
15  whether or not they have conflicts of interests to get an
16  independent assessment of and informed consent.
17         It's even difficult for the lawyer himself or
18  herself to do it.  Sometimes you need a third -- an
19  additional lawyer to come in to do that.  To help the
20  clients sort out whether they can do it.  So it is
21  possible.  It is possible.
22     *Q.*   Did you determine whether the Ochoas or Wendi
23  ever gave their informed consent to this direct adversity?
24     *A.*   I found out that neither party did.  They both
25  told me -- all three, both Ochoas and Wendi Andriano told

1   me that they were never asked for -- never informed of the

2   problem, never asked for informed consent, never gave it.

3   And I found nothing in the DeLozier's files or anything

4   else in the case to contradict that.  No paper to

5   contradict that.

6       *Q.*   Why do you believe the Ochoa's interests were

7   directly adverse to Wendi's interests?

8       *A.*   Oh, you have to look at what are the interests.

9   Wendi Andriano's interests was in seeking leniency.  Her

10  life was at stake.  He she was on trial for a capital

11  offense.  And because her interest is in seeking leniency,

12  she had an interest in the jury learning about anything

13  from her childhood that might help the jury understand how

14  she could have behaved the way she did at the time of the

15  offense and in this case in the months preceding the

16  offense.  That was her interest.

17       The Ochoa's interest that was directly adverse

18  was an interest over this entire period of 2001 to 2005 to

19  be portrayed as wonderful, loving, capable, caring,

20  nurturing parental figures.

21      *Q.*   So as I understand it, you have explained that

22  Attorney DeLozier, for Wendi's interest, should be

23  pursuing anything that could explain her behavior.

24  Whereas, with the Ochoas, he should be pursuing anything

25  that presents them as loving, capable parents; is that

1   correct?

2       *A.*   I think that's a fair assessment.

3       *Q.*   Is that an accurate summary?

4       *A.*   Yes.

5       *Q.*   Did you reach any conclusions regarding which

6   approach Attorney DeLozier decided to take?

7       *A.*   Well, I think the record speaks for itself.  I

8   mean, the theme that we have heard about from several

9   witnesses while I was in the courtroom was that she came

10  from a very nurturing, loving home.  The witnesses that

11  were called in Phase 3 testified to that.  And in both in

12  opening statement and closing argument, that's the

13  approach that DeLozier took.  That basically was choosing

14  the Ochoa's interests in explaining Wendi's behavior.

15      *Q.*   I would like to turn to the second reason you

16  gave for your conclusion that Attorney DeLozier had an

17  actual conflict of interest.  What was that second reason

18  again?

19      *A.*   The second reason was that he had a

20  responsibility to the Ochoas not to use information in his

21  possession or that he had learned that related -- even

22  broader, that related to his representation of the Ochoas

23  to their disadvantage without their informed consent.

24      *Q.*   Did you --

25      *A.*   And I think that materially interfered with

1    his representation of Ms. Andriano.

2        Q.    Did you reach any conclusion regarding whether

3    the Ochoas gave informed consent to this potential issue?

4        A.    Yes, I did reach a conclusion.  They didn't give

5    informed consent.  They were never asked for it and they

6    never gave it.

7        Q.    What information specifically did Attorney

8    DeLozier learn that he had an obligation not to use

9    against the Ochoas?

10       A.    Well, some of the things we went through earlier.

11   Certainly, the March 15th Lambeth letter.  March 15, 2002.

12   The increasingly negative reports from or decisions of the

13   Superior Court to in essence terminate their overnight

14   visitation.  The accusations that Brad Lambeth had made

15   against Alejo Ochoa.  Those are some of the things, yeah.

16       Q.    And how did Attorney DeLozier's obligation not to

17   use that information against the Ochoas materially limit

18   his representation of Wendi?

19       A.    How did it materially limit?

20       Q.    Limit his representation of Wendi.

21       A.    Well, by the time he was placed in or delegated

22   the responsibility by the attorney, the leader of the

23   team, Dan Patterson, to work with the mitigation

24   specialists Linderman and MacLeod, he was already very

25   aware of the information with regard to the relationship

1   between childhood abuse in general and trauma, childhood

2   trauma, and very specifically sexual abuse and some of the

3   very behaviors that he was seeing in Wendi Andriano's

4   file.  And his not using that information is a clear

5   indication that he was influenced by his representation

6   of the Ochoas.

7         Now I asked him specifically -- and I think he

8   was asked on cross-examination yesterday I think it was:

9   Did you think at the time you had a conflict of interest?

10  And he said:  No, I didn't.  Now I have a different view

11  of that, he said.  That's pretty classic.  That's very

12  classic.

13        What he said to me when I asked him these

14  questions was that he felt blinded by his zealous advocacy

15  of the Ochoas.

16        And I think he said the same thing in court in a

17  different way.  He said:  You know, when things are going

18  back and forth and I hear negative things about my client,

19  I want -- I want to see the good and I don't want to see

20  the bad.  I disregard the bad.

21        And he told me he felt he was blinded.  And this

22  is very classic behavior for a person with a conflict of

23  interest, just like my friend in the public defender's

24  office 30 years earlier, who actually didn't realize he

25  had a conflict of interest.

1    *Q.*    Is there any research looking at how conflicts of

2    interests could blind a person to their obligation to

3    different clients?

4    *A.*    On, yeah, there's a huge body of research.

5    *Q.*    Could you provide just a brief summary to us?

6    *A.*    Yeah.  It cuts across social science disciplines,

7    experimental psychology, philosophy, even, and

8    neurobiology.  The idea is that people when they're

9    engaged -- professionals, not just lawyers.  Financial

10   advisors, accountants, whatever --

11        MS. GARD:  Your Honor, I object to foundation.

12   It sounds like it's beyond.

13        THE COURT:  Sustained.

14        THE WITNESS:  Okay.

15   *Q.*    BY MS. STERKEN:  Can you just testify

16   specifically with respect to lawyers?

17   *A.*    With regard to lawyers?

18   *Q.*    Yes.  And how this --

19   *A.*    Yes.  Lawyers frequently in good faith do engage

20   in conduct that amounts to conflict of interest without

21   appreciating at the time that they're engaged in that

22   conduct, but it is a conflict of interest.

23   *Q.*    So turning back to the rule, you're not allowed

24   to represent clients -- two different clients if your

25   representation of one will be materially limited by the

1   obligation not to use information discovered in the other

2   client's representation against them; is that accurate?

3       *A.*   Yes.

4       *Q.*   Does this prohibition apply regardless of whether

5   the clients are current or past clients?

6       *A.*   Oh, yeah, this prohibition exists.  The

7   obligation in ER 1.8 in Arizona is for current clients and

8   the obligation almost identically worded in ER 1.9 has to

9   do with former clients.  And in both cases, the lawyer

10  cannot -- is told you cannot, without informed consent,

11  use information relating to the representation of your

12  current or former client.

13          Then if you go back to ER 1.7, it says regardless

14  of whether it is a current client or a former client, it

15  is a concurrent conflict of interest.

16      *Q.*   If we could turn to the third reason you gave for

17  your conclusion that Attorney DeLozier had an actual

18  conflict of interest, would you mind restating that

19  briefly?

20      *A.*   Yeah, the fee agreements.  I have never seen a

21  written fee agreement with the Ochoas.  I've seen

22  billings.  But, basically, they owed him money.  They owed

23  him money, at least $25,000 or almost $25,000 for his

24  criminal case representation and several thousand dollars

25  for his representation of the Ochoas in conjunction with

1   their ongoing dispute with the Lambeths.  And he had a

2   self-interest in collecting those fees.  He was a solo

3   practitioner.

4       *Q.*   And I think you had said that you believe that

5   that interfered with his independent professional judgment

6   on Wendi's behalf?  Did I state that correctly?

7       *A.*   Yeah, I think that's an accurate statement.

8   Independent professional judgment, yes.  I know we need to

9   move along, but it's not always inappropriate to accept a

10  fee from a third person.

11      *Q.*   You anticipated my next question.

12      *A.*   Okay.  I just didn't want to leave it hanging

13  there because it happens all the time.  Employers pay fees

14  for their employees.  Parents pay criminal lawyer's fees

15  for their children.  I'm in that situation myself.  I've

16  done it.  It happens.

17          The U.S. Supreme Court has said it is not -- it

18  has never prohibited it.  The Arizona Rules of

19  Professional Conduct don't prohibit it.  But the Supreme

20  Court has said very strongly that in *Wood V. Georgia* that

21  this is a situation that is fraught with danger and the

22  professional -- the Rules of Professional Conduct reflect

23  that.

24      *Q.*   Do the rules require informed consent prior to --

25      *A.*   Yeah, that's the issue.  I mean, that's the issue

1  here is when there is as in a case like this where it

2  jumps out -- when there are risks that I have to do a

3  mitigation investigation for one client, and on behalf of

4  another client, I'm doing work and they're the parents of

5  the person whose mitigation investigation I'm doing, it

6  screams for a requirement of informed consent.

7      Q.   And did you determine whether Wendi or the Ochoas

8  ever gave their informed consent to this situation?

9      A.   No.   Neither were asked.   They told -- again,

10 it's the same scenario.   They informed me that they were

11 never asked for informed consent, nor did they give

12 informed consent, specifically Ms. Andriano.

13     Q.   So you have given us the three reasons that you

14 believe Attorney DeLozier had an actual conflict of

15 interest?

16     A.   Yes.

17     Q.   Did you determine whether Attorney DeLozier

18 actively represented conflicting interests?

19     A.   Yes, I did make that determination.

20     Q.   And what was your conclusion?

21     A.   That for two separate reasons, he actively

22 represented conflicting interests.

23     Q.   What were those two reasons?

24          MS. GARD:   Judge, haven't we been over this?

25          THE COURT:   I think we're going over what we have

1   gone over before; aren't we?

2        THE WITNESS:  Okay.

3        MS. STERKEN:  I don't know that we have.

4        THE COURT:  Let me hear where you're going.

5        MS. STERKEN:  I think it's going to be three

6   minutes.

7        THE COURT:  Okay.  Go ahead.

8        THE WITNESS:  I'll try to be brief.  First of

9   all, his representation of the Ochoas lasted from 2001 to

10  2005, which was pretty much the time span, give or take a

11  few months, with Wendi Andriano's.  And he was actively

12  doing things on behalf of both during that period.  That's

13  the first reason.

14       And the second reason relates to the ER 1.8 and

15  1.9 and that is that the responsibility to protect

16  information relating to representation is an ongoing one.

17       Mr. DeLozier not only had the responsibility or a

18  responsibility to the Ochoas in 2004 to protect

19  information he learned in the representation of the

20  Ochoas, he still has that obligation today.

21   *Q.*   BY MS. STERKEN:  Do you have any opinion

22  regarding whether Attorney DeLozier's active

23  representation of conflicting interests had an adverse

24  impact on Wendi's representation?

25   *A.*   Yes, I do.

1    *Q.*   What's your opinion?

2    *A.*   My opinion is that it did have an adverse effect

3    on his representation of Ms. Andriano.

4    *Q.*   And why did you reach that conclusion?

5    *A.*   Well, based the governing standards in this

6    state, if he had a plausible alternative approach and

7    didn't follow that approach, then the conflict of interest

8    adversely affected his representation in Phase 3.

9          And a plausible approach doesn't have to make a

10   difference on the outcome or anything like that.  It's

11   just was there an alternative that wasn't followed because

12   of his conflict of interest.

13   *Q.*   And what alternative did Attorney DeLozier not

14   follow because of the conflict?

15   *A.*   Well, the alternative of, well, actually asking

16   the hard questions of the family.  And he was the person

17   on this team, on this defense team by everybody's

18   account -- he was the person who had the close

19   relationship with the family.  He developed a relationship

20   with the family.  Now maybe a mitigation specialist in

21   other cases.  In this case, it was David DeLozier who knew

22   the Ochoas and who was relied upon to provide information

23   from the Ochoas.  He never -- he never asked the hard

24   questions.

25         He never called Jeri Lynn Cunningham.  She was

1    the person who asked him to represent Wendi Andriano.

2    Part of the mitigation factors at the penalty phase of the

3    trial was that she had been a good student in school.  He

4    never contacted Mark Keating, the principal of the school.

5    I think his -- Mr. Keating's declaration is included in

6    the materials.  He never asked the mitigation specialist

7    to follow up on these thing.  He never asked the hard

8    questions of the family himself.

9        Q.    I think you've heard testimony that the

10   mitigation theme was essentially that Wendi is a good

11   person; correct?

12       A.    Yes.

13       Q.    What plausible defense -- alternative defense

14   strategy could Wendi's attorneys have employed if it

15   weren't for the conflict?

16             THE WITNESS:  Well --

17             MS. GARD:  Objection.  Beyond the scope.  This

18   man is being offered as a conflict of interest expert.

19             THE COURT:  Sustained.

20             MS. STERKEN:  Can I do it as an offer of proof?

21             THE COURT:  Go ahead.

22             MS. STERKEN:  You can go ahead.

23             THE WITNESS:  Yeah.  I think the standard for a

24   conflict of interest is:  Is there a viable alternative?

25   And the viable alternative in this case would have been to

1  present evidence to the jury that Ms. Andriano -- that

2  there were factors in her childhood in her relationship

3  with her adoptive father and her mother from when she was

4  a preadolescent and then adolescent that would be helpful

5  in explaining her behavior in the months before and during

6  the offense.

7      *Q.*   BY MS. STERKEN:  And you heard testimony that

8  Attorney DeLozier believed at the time that he did not

9  have a conflict that would impact his representation of

10  Wendi and the Ochoas.  Does that alter your analysis at

11  all?

12     *A.*   Not at all for the reasons I said earlier.

13         MS. STERKEN:  Your Honor, I would ask that

14  Exhibits 78, 79 and 234 be moved into evidence.

15         THE COURT:  Any objection to Exhibit Nos. 78, 79,

16  and 234 for identification being admitted into evidence?

17         MS. GARD:  78 and 79, Judge, I object to

18  relevance.  Actually, I don't object to 79.  78, I object

19  on relevance.  And 234, I object.  I don't have a problem

20  with it being used as a demonstrative exhibit, but,

21  otherwise, it's hearsay.  It's sort of argumentative.

22         THE COURT:  Okay.  I'm going to sustain the

23  objection with regard to Exhibit No. 78.

24         But Exhibit No. 79 for identification is admitted

25  into evidence.

1        And I will sustain the objection with regard to

2   Exhibit No. 234 for identification.  Although, I've

3   allowed it to be used during this direct examination for

4   demonstrative purposes.

5        MS. STERKEN:  I have no further questions.

6        THE COURT:  Ms. Gard?

7        MS. GARD:  Yes, Your Honor.  Thank you.

8

9                    CROSS-EXAMINATION

10  BY MS. GARD:

11  Q.   Mr. Lowenthal, the issue with the rash on the

12  children's bottoms that you referred to, from the

13  materials that you reviewed, you learned that the Ochoas

14  actually filed a CPS report against the Lambeths based on

15  those injuries; correct?

16  A.   Yeah.  You used the word injuries and rash.

17  They're two different things.

18  Q.   But the condition.

19  A.   I don't know what they were.  There was a

20  condition on their bottoms.  Yes.  That's correct.

21  Q.   And nowhere in the records that you reviewed was

22  that condition determined to be abuse caused by abuse from

23  the Ochoas?

24  A.   I don't know what caused it.  All I know is that

25  David DeLozier was aware of allegations that his clients

1   -- his client Alejo Ochoa caused it.

2      *Q.*    And that he was also aware that his clients were

3   the ones that reported it; right, to the authorities?

4      *A.*    They were the initial ones who reported it;

5   that's correct.

6      *Q.*    Okay.  The comment that you consider significant

7   is about one of the children saying that Grandpa Alejo

8   touched her butt; right?

9      *A.*    It was more than one.  That was two or three

10  different occasions, yeah.

11     *Q.*    And that comment was made during the course of

12  when the children had these rashes; right?

13     *A.*    It was during that period in time, yeah.  I

14  think, yes.  In fact, according to the letter I saw, that

15  comment was made in December of 2001.

16     *Q.*    Okay.  And the Ochoas had inspected the

17  children's bottoms to look at the injuries; right?  And

18  they had photographed the injuries as well or the

19  condition?

20     *A.*    I think that's right, they did.  And, of course,

21  at the time that they did that, they were not aware of the

22  allegations that Alejo had done it.

23     *Q.*    Okay.  And you also consider significant the fact

24  that one of the children reported that Donna Ochoa told

25  her to keep secrets; right?

1      *A.*    Yes.  I think it was at least one of the

2  children, maybe both.  But I think it was at least one of

3  them.

4      *Q.*    And you are aware that from the materials, again,

5  that you reviewed, that Mrs. Ochoa denied this pretty

6  vehemently; right?

7      *A.*    Yeah, she did.

8      *Q.*    She denied ever saying that she told the children

9  to keep secrets; right?

10     *A.*    Yes, she did.  She denied it.

11     *Q.*    And Mr. DeLozier would have been aware that she

12  denied that; right?

13     *A.*    That's right.

14     *Q.*    And she also accused -- she also attributed

15  Mrs. Lambeth's statements about her -- about the child

16  saying she had to keep secrets to retaliation for the

17  CPS report; right?

18     *A.*    I think that's the way she saw it at the time or

19  at least she articulated that at the time, yes.

20     *Q.*    And in the materials you reviewed, did Mrs. Ochoa

21  also recognize that she had a duty by law to report what

22  she believed to be abuse to the authorities?

23     *A.*    That's what she said, yes.

24     *Q.*    And, to this day, she maintains -- when you spoke

25  to her to prepare your report, she maintained that the

1   Lambeths caused injuries to the children's bottom; right?

2   And she, being Mrs. Ochoa.

3       *A.*   I don't think I directly asked her that question.

4   I don't recall that she -- I asked her do you still

5   maintain to this day that the Lambeths caused injury.  I'm

6   not aware of that, no.

7       *Q.*   You reviewed Dr. Yee's report; right?  Can you

8   turn to Exhibit 97 in your binders?

9       *A.*   Uh-huh.  What I have as 97 is actually -- oh,

10  Dr. Yee's?

11      *Q.*   Dr. Yee's.

12      *A.*   Oh, Dr. Yee's?  Oh, I'm sorry.  Yes, I'm familiar

13  with this.

14      *Q.*   And Dr. Yee was a court-appointed psychologist,

15  right, who was appointed to investigate the two homes, the

16  Lambeths and the Ochoas; right?

17      *A.*   Right.

18      *Q.*   Generally speaking?  Okay.  And Dr. Yee did note

19  adjustment difficulties on the children's part right after

20  visits with the Ochoas?

21      *A.*   Yeah, he said -- well, again, he is -- what he

22  was doing was just reporting what the Lambeths had said to

23  either him or Linda Gray.  I don't think they were his own

24  observations.  He said that the Lambeths had informed

25  either him or Linda Gray that when the children came back

1  from the Ochoas, that they were -- I don't know.  I don't

2  remember the exact wording in this letter, but I think it

3  is that they were having sleep problems, that they were

4  having anger problems, that they were having bladder

5  problems and they were having bowel problems.

6       Q.   And just before we go any further, you have

7  relied on those documents to form your opinions; right?

8       A.   In part, yes, yes.

9            MS. GARD:  Your Honor, I move to admit this as a

10  basis for his opinions.

11           THE COURT:  Any objection?

12           That's Exhibit No. 97 for identification?

13           MS. GARD:  97.

14           MS. STERKEN:  No.

15           THE COURT:  Exhibit No. 97 for identification is

16  admitted into evidence.

17       Q.   BY MS. GARD:  And Dr. Yee interviewed each of the

18  children individually; right?  It appears on Page 2 of

19  this document.

20       A.   I would have to look at this.  Yeah.

21       Q.   And the children told -- I'm directing you to the

22  third paragraph from the top on Page 2.

23       A.   All right.  The one after the one sentence

24  paragraph?

25       Q.   Yes.  Correct.

1    *A.*    Yes.

2    *Q.*    About the first -- the top third of that

3    paragraph, he reports that both children voiced an

4    enjoyment of their time with the paternal and maternal

5    grandparents; correct?

6    *A.*    Yeah.  I think he wrote a very even-handed report

7    and said that the children seemed comfortable in both

8    homes.

9    *Q.*    And he also reported that the children denied any

10   history of spanking; right, in that same paragraph?

11   *A.*    Yeah.  We're dealing with a four- and a

12   three-year-old self-reporting.  Yeah, I think that's

13   correct.

14   *Q.*    Okay.  And, in addition -- and I'll direct you to

15   the first paragraph.  I'm a little bit of out of order

16   here, but the first paragraph on Page 2.  Dr. Yee

17   interviewed the children's therapist, Linda Gray; right?

18   *A.*    That's right.

19   *Q.*    And Linda Gray reported that the children had

20   disclosed to her that the Ochoas were allowing the

21   children to speak with the defendant; right, on the

22   telephone?

23   *A.*    I think that's correct, yes.

24   *Q.*    And that they were receiving input from the

25   maternal grandparent's household that was contributing to

1  the adjustment difficulties; right?

2      *A.*   I think that's correct, yes.

3      *Q.*   And based on these factors, she recommended

4  discontinuing the overnight visitation with the

5  grandparents; right?  Maternal grandparents?

6      *A.*   I don't know all the reasons because I've never

7  seen -- and these are sealed records -- Linda Gray's

8  recommendations to the Court.

9      *Q.*   Okay.

10     *A.*   She apparently had continuing recommendations.  I

11 know that the Court the following year conditioned

12 overnight -- the resumption of overnight visitation on

13 Linda Gray's approval and it never occurred.  That's all I

14 know.

15     *Q.*   Dr. Yee in his report does not note any abuse

16 from the Ochoas toward the children; right?

17     *A.*   Other than that reported by the Lambeths.

18     *Q.*   Other than that reported by the Lambeths?

19     *A.*   First of all, the Dr. Yee's letter was on

20 November 13th.  I mean, excuse me.  March 13th of 2002.

21 It was two days later that Jeanea Lambeth's letter was

22 written.

23     *Q.*   Well, but the children's rashes emerged in

24 December of 2001; correct?

25     *A.*   The injuries or bruises or rashes or whatever

1    they were began appearing in December of 2001.

2        Q.    And, in fact, on Page 2 in that same first

3    paragraph near the end, Dr. Yee discusses the rashes in

4    the CPS report; right?

5        A.    You're going fast for me, Counsel.  Where are we

6    looking?

7        Q.    I'm sorry.  On that first paragraph on Page 2 of

8    Exhibit 97.  And he refers there to the children's rashes

9    on the buttocks?

10       A.    Yes.

11       Q.    And the CPS investigation; right?

12       A.    I -- I don't see that specific language, but I'm

13   sure it's -- I'm not -- I'm not quarreling or quibbling

14   with you.

15       Q.    And he also noted that during this process, the

16   custody proceeding to this point, the parties had made

17   representations of the multiple inadequacies of the other

18   parties?

19       A.    That's correct, yes.

20       Q.    And he noted that there was tension between the

21   households?  And I'm now looking at Page 3 of the report,

22   Bullet Point 4.  There was tension between the households

23   which at times had reached hysterical proportions; right?

24       A.    That's right.  Without reading it, that's the

25   essence of what he was saying.

1    *Q.*    And you were present in court when Mr. DeLozier

2    testified; right?

3    *A.*    Yes.

4    *Q.*    And he had some background in family law matters;

5    right?

6    *A.*    I don't -- yes.  Oh, yes, he does.  He told me he

7    did, yeah.

8    *Q.*    And he testified that people in child custody

9    disputes often levy accusations against each other?

10    *A.*    He said that.  I don't know if it's true.  I

11    assume that sometimes happens, yeah.

12    *Q.*    To him, it was not terribly unusual for these

13    types of things to be thrown around?

14    *A.*    Yeah.  But he also said that, if I may add

15    something there, that he chose to disbelieve the

16    allegations against his clients and to believe the good

17    things about his clients.

18    *Q.*    He was presented with no concrete evidence that

19    his clients had abused the grandchildren; right?

20    *A.*    Well, I think the concrete evidence is in the

21    letter that arrived two days later.

22    *Q.*    The one instructing the children to keep secrets?

23    *A.*    No.  The one that --

24    *Q.*    The one recounting --

25    *A.*    -- the Lambeths wrote to the Court.

1    *Q.*    Recounting the --

2    *A.*    Recounting incidents that Dr. Yee was not aware

3    of.  This letter is dated two days earlier.

4    *Q.*    He was aware of the allegations going back and

5    forth between the parties about those rashes, though;

6    right?

7    *A.*    He was aware that the parties had made

8    allegations, but he was certainly not aware of anything

9    about Grandpa Alejo touched my butt and Grandma Donna told

10   me to keep secrets.

11          And I don't know whether that's true.  I'm not

12   saying that Grandpa Alejo touched her butt or Grandma

13   Donna told her to keep secrets.  All I'm saying is this is

14   information that Mr. DeLozier had in his possession and at

15   the time that he was representing Wendi Andriano, and a

16   year or so later was made responsible to work with the

17   mitigation expert to develop mitigation evidence in the

18   case.

19   *Q.*    I understand that.  And turning to his

20   involvement in investigating mitigation, again, you were

21   present when he testified yesterday?

22   *A.*    Uh-huh.

23   *Q.*    And you have reviewed his interview transcript?

24   *A.*    That's right.  He interview with you and

25   Mr. Martinez?

1    *Q.*    Correct.

2    *A.*    Yes.

3    *Q.*    And Mr. DeLozier expressed the opinion that he

4    was being frozen out of the defense of Ms. Andriano;

5    right?

6    *A.*    On, yeah, I think he pretty much felt that way.

7    *Q.*    And he felt that Mr. Patterson was not delegating

8    him any tasks to do; right?

9    *A.*    Yeah.  I think he said something to that effect,

10   I wasn't getting delegation of facts.  He said that.

11   That's contrary to the record.  If you look at his

12   invoices, it indicates that he was delegated the

13   responsibility to work with the mitigation specialists.

14   *Q.*    He did not attribute his failure to develop

15   mitigation to any feeling of loyalty to the Ochoas; right?

16   *A.*    He told me he was blinded by his representation

17   of the Ochoas.  That he just couldn't see what was in

18   front of him.

19   *Q.*    He told you that in his interview with you?

20   *A.*    Yes.

21   *Q.*    But he did not mention that in --

22   *A.*    In fact, he used the same language in his

23   interview with you.

24   *Q.*    Blinded with the Ochoas?

25   *A.*    He said I was blinded.  I don't know whether I

1  was misled or not, but I was blinded.  He used the word

2  blinded in his interview.  I don't know whether it was a

3  question from you or from Mr. Martinez.

4       MS. GARD:  Your Honor, actually, may I --

5  *Q.*  BY MS. GARD:  You relied on that transcript to

6  form your opinions; correct?

7  *A.*  Yeah.  He went into much more detail with me, but

8  he used the same language with you.  I think it was your

9  question, Ms. Gard.

10  *Q.*  What number is that?

11  *A.*  I don't have a page.

12       MS. GARD:  Your Honor, since he has relied on

13  that transcript, I would move to admit it as the basis for

14  his opinions.  It is Exhibit 174, for that limited

15  purpose.

16       THE COURT:  Is there any objection to 174 for

17  identification being admitted into evidence?

18       MS. STERKEN:  No.

19       THE COURT:  Exhibit No. 174 for identification is

20  admitted into evidence.

21       THE WITNESS:  It was a basis.  You said the

22  basis.

23  *Q.*  BY MS. GARD:  A basis?

24  *A.*  It was a basis that he had told me he was -- that

25  he felt blinded by his representation of the Ochoas.  That

1    he didn't know whether he was being misled or not, but he
2    felt blind-sided or blinded.  And I saw the word blinded
3    in response to a question of yours somewhere around
4    Page 70 or 80 of your interview with him and then you went
5    onto another subject.
6         Q.   While we look for that, let's move onto another
7    subject.  I would like some clarification on -- you went
8    through the three parts of your opinion?
9         A.   Sure.
10        Q.   I would like some clarification on the third
11   part, the financial interests of the Ochoas, because I'm
12   not clear on how that all works.
13        A.   Yeah, I think I stated in my report -- and I
14   wasn't asked on direct exam.  It was not a conflict of
15   interest for the Ochoas to pay or to be responsible for
16   paying the fee because that happens sometimes of
17   necessity.
18             It was a conflict of interest when he had an
19   interest in asking tough questions in trying to find out
20   about her childhood what -- who was the real Wendi
21   Andriano.  And without asking for anyone's informed
22   consent.  He just didn't ask those questions.
23        Q.   Okay.  How does that relate to the payment from
24   the Ochoas or the fee agreement?
25        A.   Oh, the fee?

1      *Q.*   Yes.  That's what I was trying to get at.

2      *A.*   Well, I mean, criminal lawyers in private

3  practice very often ask for their fee up front and then

4  they get what they -- over time, what they can from their

5  clients, whether it's the defendant himself or herself or

6  the parents or some third party.  And there is a real

7  interest on the lawyer's part in maintaining a

8  relationship with the party who is paying the fee in order

9  to continue collecting the fee.

10     *Q.*   How did that affect in your -- I still don't

11 follow how that affected his ability to investigate

12 mitigation, the fee.

13     *A.*   Well, we have a situation where you have -- I

14 can't say in December of 2000 that there was a direct

15 adverse interest.  Oh, there probably was even in 2000

16 because taking on that case, he knew he was going to have

17 to investigate mitigation.  And investigating mitigation

18 is to find out about the client's childhood.  And that

19 means that you're going to -- very often, as you're going

20 to have to -- you or your mitigation specialists are going

21 to have to sit down with the family and say I don't know

22 how -- I know this is really painful.  I know this is

23 really difficult, but we really have to find out what

24 really happened here.

25            And forcing someone to talk about very painful

1   experiences is difficult on that person, and there has to

2   be a natural reluctance on someone who wants to continue

3   to get money from that person to push them into that

4   situation.

5       Q.   All right.  Can I direct you back to Exhibit 174,

6   the transcript of Mr. DeLozier's interview?

7       A.   Yeah.  I haven't looked at this in quite a while,

8   but I -- 174?

9       Q.   I'm not sure that it's in those binders.  It may

10  not be.

11      A.   Well, then can you give me a copy of it?

12           MS. GARD:  Yes, I can.  Your Honor, may I

13  approach the exhibits?

14           THE COURT:  Yes.

15           MS. GARD:  Here's the marked copy.

16           THE WITNESS:  Thank you.

17           MS. GARD:  You're welcome.

18      Q.   BY MS. GARD:  Okay.  If I could direct you to

19  Page 42 of that exhibit.  Are you at Page 42?

20      A.   Uh-huh, yes.

21      Q.   Is this the part you were thinking of that --

22      A.   I think --

23           THE COURT:  One at a time.  Okay.  Go ahead.

24      Q.   BY MS. GARD:  Of being blinded?

25      A.   No.  I think there's a later point in the

1  transcript in which he said:  I was blinded.  And you

2  asked him some questions about being misled.  He said:  I

3  don't know whether I was misled.

4      *Q.*    And the context of this particular discussion

5  is --

6      *A.*    He used the word blinded here, yeah.

7      *Q.*    Yes.  Mr. DeLozier feeling misled by the Ochoas

8  for not disclosing this; right?

9      *A.*    Yeah.  I think so, yes.

10      *Q.*    You would agree, wouldn't you, that a violation

11  of ethical rules does not necessarily mean a violation of

12  *Strickland*; right?

13      *A.*    I don't think we're dealing with *Strickland*.

14  We're dealing with *Kyra vs. Sullivan*.

15      *Q.*    Okay.  That's the only question that you were

16  asked to answer; right?

17      *A.*    That's right, yes.

18      *Q.*    Your position is that Mr. DeLozier violated

19  ethical rules; right?

20      *A.*    Absolutely.

21      *Q.*    Have you reported him to the State Bar for an

22  investigation?

23      *A.*    No.

24      *Q.*    Is it your intention to do so?

25      *A.*    I might.  I have definite views about the ethics

1    involved here, very strong views.

2            MS. GARD:  I have nothing further of this

3    witness.

4            THE COURT:  Redirect?

5            (WHEREUPON, an off-the-record discussion ensued.)

6            MS. STERKEN:  No.  No further questions.

7            THE COURT:  May this witness be excused?

8            MS. STERKEN:  Yes.

9            THE COURT:  Mr. Lowenthal, thank you very much.

10   You are excused.

11           THE WITNESS:  Thank you, Your Honor.  Nice seeing

12   you.

13           THE COURT:  Don't walk off with any exhibits.

14           THE WITNESS:  No, I promise.  I don't know who

15   gets this.

16           MR. ARNTSEN:  Just leave it there.

17           THE COURT:  Yes, just go ahead and leave it

18   there.

19           THE WITNESS:  Thank you very much.

20           THE COURT:  Thank you.

21           Then it's my understanding from our discussions,

22   that we will not have trial tomorrow.  We will not have

23   trial on Thursday and we will reconvene at 9:30 on Friday,

24   February 13th.

25           THE CLERK:  14th.

1          THE COURT:  14th.  I'm sorry.  Valentine's Day.

2          MS. GARD:  And, Judge, since we finished a little

3    bit early, can we made a record of our discussion at the

4    bench yesterday after the hearing concluded about doing

5    closing briefs and argument?

6          THE COURT:  Yes.  Can we do that right now?

7          MS. GARD:  Yes, if there's time.

8          THE COURT:  Okay.  So we will not have trial

9    tomorrow, which is February 12th.  We will not have trial

10   on February 13th, which is Thursday.  But we will

11   reconvene at 9:30 on February 14th.

12          Then Ms. Andriano will not be transported to

13   court either tomorrow or Thursday.  I think my judicial

14   assistant has already notified the sheriff's office with

15   regard to that.

16          Then you wanted to put on the record the fact

17   that yesterday, I had an informal discussion with counsel

18   about the fact that after the presentation of the

19   evidence, I would expect that we will have written closing

20   arguments for the Court's consideration.  And it's my

21   understanding that the attorneys would like to have the

22   transcripts of these proceedings before they work on their

23   closing arguments; is that correct?

24          MR. ARNTSEN:  Yes, Your Honor.

25          THE COURT:  Then I guess, in the meantime, when

1   we get closer to Friday, we will ask the court reporter
2   the time frame of when she might be able to complete those
3   transcripts.  Then I'll try to give you a schedule of the
4   closing arguments, then.
5           Is that agreeable to everybody?
6           MR. ARNTSEN:  That is, Your Honor.
7           MS. GARD:  Yes, Judge.
8           THE COURT:  Anything further before we take our
9   evening recess?
10          MR. ARNTSEN:  I don't think so.
11          THE COURT:  Okay.  Thank you very much.  Everyone
12  have a nice evening and the next couple of days.  We will
13  see you on Friday, February 14th, at 9:30.  Thank you.
14          (WHEREUPON, the proceedings were concluded at
15  4:38 p.m.)
16                    * * * * * * *
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7                          <u>C E R T I F I C A T E</u>

8

9

10          I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11    the State of Arizona, do hereby certify that the foregoing

12    194 pages constitute a full, true, and accurate transcript

13    of the proceedings had in the foregoing matter, all done

14    to the best of my skill and ability.

15          SIGNED and dated this 12th day of April, 2014.

16

17

18                    <u>/s/   Renée A. Mobley, RPR</u>

19                    RENÉE A. MOBLEY, RPR

20                    Certified Reporter

21                    Certificate No. 50500

22

23

24

25

# EXHIBIT MMMMMMMMMM

FILED
5-19-14   4:00 pm
MICHAEL K. JEANES, Clerk
By _____
S. Perez, Deputy

1  Scott M. Bennett (022350)
2  Coppersmith Brockelman PLC
   2800 North Central Avenue, Suite 1200
3  Phoenix, Arizona 85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
5  sbennett@cblawyers.com

6  Allen A. Arntsen, Admitted *Pro Hac Vice*
7  Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
8  Foley & Lardner LLP
   150 E. Gilman Street
9  Madison, WI 53703
10 (608) 257-5035 (office)
   (608) 258-4258 (fax)
11 aarntsen@foley.com

12
   *Attorneys for Petitioner Wendi Andriano*
13
                  SUPERIOR COURT OF ARIZONA
14                   COUNTY OF MARICOPA

15
   State of Arizona,                  )    No. CR2000-096032-A
16                                     )
                    Respondent,        )    **ORDER TO EXTEND**
17 v.                                  )    **DEADLINES**
                                       )
18 Wendi Elizabeth Andriano,          )    (Hon. Brian Ishikawa)
19                                     )
                    Petitioner.        )
20                                     )
                                       )
21                                     )
                                       )
22 _____)

23      Based on a stipulation by the parties, and for good cause, IT IS ORDERED
24 extending the deadlines for the parties' post-hearing briefing as follows:
25      Ms. Andriano shall file her initial written closing arguments no later than June 2,
26 2014.

{00124409.1 }

1    The State shall file its written closing arguments no later than July 14, 2014.

2    Ms. Andriano shall file her concluding written closing arguments no later than

3    August 4, 2014.

4    DATED: _04-30-14_

5

6    _____

7    The Honorable Brian Ishikawa

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1   COPY mailed on _____, 2014 to:

2

3   Scott Bennett
Coppersmith Brockelman PLC
2800 North Central Avenue, Suite 1200

4   Phoenix, Arizona  85004

5   *Attorneys for Petitioner*

6   Allen A. Arntsen, Admitted *Pro Hac Vice*

7   Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*

8   Foley & Lardner LLP
150 E. Gilman Street

9   Madison, WI 53703

10  *Attorneys for Petitioner*

11  Gregory Hazard
Office of the Attorney General

12  1275 W. Washington

13  Phoenix, AZ 85007-2997
*Attorneys for the State of Arizona*

14

15  Lacey Stover Gard
Office of the Attorney General

16  400 West Congress, Suite S-315
Tucson, Arizona  85701-1367

17  *Attorneys for the State of Arizona*

18

19

20

21

22

23

24

25

26

{00124409.1 }

3

# EXHIBIT NNNNNNNNN

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
05/20/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    05/19/2014


                                          CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                K. Sotello-Stevenson
                                                Deputy



STATE OF ARIZONA                     LACEY ALEXANDRA STOVER GARD
                                     GREGORY MICHAEL HAZARD
                                     JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)         ALLEN A ARNTSEN
                                     SCOTT M BENNETT
                                     STEPHAN J NICKELS
                                     MATTHEW R LYNCH
                                     JODI FOX

                                     APPEALS-PCR
                                     CAPITAL CASE MANAGER
                                     COURT ADMIN-CRIMINAL-PCR
                                     JUDGE ISHIKAWA
                                     OFFICE OF PUBLIC DEFENSE
                                     SERVICES-CCC



DEADLINES EXTENDED


Based on a stipulation by the parties, and for good cause,

IT IS ORDERED extending the deadlines for the parties' post-hearing briefing as
follows:

Ms. Andriano shall file her initial written closing arguments no later than June 2, 2014.
The State shall file its written closing arguments no later then July 14, 2014.

Docket Code 023                  Form R000A                          Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                                      05/19/2014

     Ms. Andriano shall file her concluding written closing arguments no later than August 4, 2014.

     This order is signed by the Court on 04/30/2014, and filed by the clerk on 05/19/2014.

     This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT OOOOOOOOO

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
E. Masis, Deputy
6/2/2014 1:34:00 PM
Filing ID 5907495

Scott M. Bennett (Bar No. 022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@cblawyers.com

Allen A. Arntsen, admitted *pro hac vice*
Stephan J. Nickels, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
Jodi K. Fox, admitted *pro hac vice*
Krista J. Sterken, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (office)
(608) 258-4258 (fax)

*Attorneys For Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, | CASE NO:  CR2000-096032-A |
| RESPONDENT, | |
| v. | **PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF** |
| WENDI ELIZABETH ANDRIANO, | |
| PETITIONER. | |

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... vi

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 3

I.     WENDI'S TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO
DEVELOP EVIDENCE OF WENDI'S HARROWING CHILDHOOD,
HER MENTAL DISORDERS, AND THE IMPACT UPON HER
BEHAVIOR AS AN ADULT ................................................................................ 3

    A.    Prejudice ................................................................................................... 3

        1.    Analytical Framework ................................................................... 3

            a.    Wendi's Harrowing Childhood and Psychiatric
Disorders and Defects Are Relevant Mitigation, With
or Without Any Nexus to the Offense ................................... 4

            b.    The State's Expert Applied an Incorrect, Narrow
Standard in Assessing Whether Wendi's Mental
Health Evidence was Mitigating ........................................... 6

            c.    We Cannot Assume the Jury Agreed With the State's
Position on Facts Not Necessary to the Verdict ..................... 8

        2.    Wendi's Traumatic Childhood and Its Effects ................................. 9

            a.    Dr. James Hopper ................................................................ 10

            b.    Birth to Age 4.5 .................................................................. 11

                (i)    Donna's Neglect ....................................................... 12

                (ii)    Emotional and Physical Abuse ................................. 14

                (iii)    Exposure to Pedophiles ............................................. 15

            c.    Ages 4.5 to Nine .................................................................. 17

                (i)    Alejo Ochoa, and the Psychological Effects of
Trauma Accumulation in Wendi ............................... 17

{00128370.1 }

i

4843-7819-0105.

**TABLE OF CONTENTS (cont'd)**

Page

        (ii)     Fishers of Men ......................................................... 19

        (iii)   Wendi's Dissociation and Memory Deficits.............. 20

   d.    Ages Nine to 18.................................................................. 21

        (i)      The Environment of Abuse at Wendi's School ........ 22

        (ii)     Alejo's Sexual Abuse................................................. 24

             (1)     "Dressing Up" and Photographing
                     Wendi in Lingerie. ........................................... 25

             (2)     "Ministering" to Alejo ................................... 26

             (3)     Overt Molestation by Alejo ........................... 27

   e.    The Connection Between Wendi's Traumatic
       Childhood and Joe's Death ................................................ 30

        (i)      The State Did Not Rebut the Facts Regarding
                Wendi's Harrowing Childhood or Their Effects ....... 30

        (ii)     Evidence of Wendi's Childhood Trauma Could
                Have Persuaded the Jury Not to Impose a Death
                Sentence ..................................................................... 31

 3.    Wendi's Psychological Disorders and Their Effects ...................... 34

   a.    PTSD ................................................................................ 36

   b.    Bipolar Disorder............................................................... 38

   c.    Cognitive Disorder........................................................... 40

        (i)      Diagnosis................................................................... 40

        (ii)     Effects ....................................................................... 43

        (iii)   Dr. Amin Failed to Materially Rebut the
                Findings of Dr. Young and Dr. James ...................... 44

   d.    Dependent Personality Disorder ......................................... 46

   e.    The Interaction of Multiple Disorders ................................. 47

   f.    Dr. Pitt Failed to Materially Rebut the Findings of Dr.

{00128370.1 }

ii

4843-7819-0105.

**TABLE OF CONTENTS (cont'd)**

<u>Page</u>

Woods and Dr. Hopper ......................................................... 48

B.    TRIAL COUNSEL'S PERFORMANCE WAS DEFICIENT ................... 52

    1.    Standards ......................................................................... 52

    2.    The Composition and Operation of the Defense Team Was
        Deficient in Several Respects .......................................... 55

        a.    The Composition of the Defense Team Was Deficient
            to Perform an Adequate Mitigation Investigation ............... 56

        b.    The Operation of the Defense Team Was
            Dysfunctional ........................................................... 61

            (i)    No One Took Responsibility to Investigate
                  Mitigating Evidence ..................................... 61

            (ii)    Wendi's Attorneys Failed to Work Together ........... 64

    3.    The Defense Team Failed to Adequately Investigate All
        Reasonably Available Mitigating Evidence..................................... 66

        a.    Standard of Care................................................... 66

        b.    The Mitigation Investigation Was Deficient........................ 68

            (i)    The Defense Team Was Ineffective in Failing to
                  Substantively Begin the Mitigation
                  Investigation Until Far Too Late in the
                  Proceeding.................................................. 68

            (ii)    The Social History Investigation Was Deficient ....... 70

                  (1)    Attorneys Patterson and DeLozier................. 71

                  (2)    Mitigation Specialists MacLeod and
                      Linderman....................................... 73

            (iii)    The Mental Health Investigation Was Deficient ....... 77

        c.    Trial Counsel Failed to Investigate and Develop
            Potential Mitigating Evidence That Came to Their
            Attention................................................................... 80

            (i)    Early History from Donna (Exhibit 56)..................... 81

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF LIEF

CASE NO. CR2000-096032-A

**TABLE OF CONTENTS (cont'd)**

Page

(ii)     February 2001 Letter from Kandy Rohde
(Exhibit 230) ............................................................ 81

(iii)    March 2001 Kandy Rohde Letter (Exhibit
7.002) ...................................................................... 83

(iv)    Potts Letter (Exhibit 6.001) ...................................... 84

(v)     Request to Contact Rohde (Exhibit 50) .................... 84

(vi)    February 2002 Rohde Communication (Exhibit
6.004) ...................................................................... 86

(vii)   Rohde Notes Throughout Wendi's Pre-Trial
Incarceration (Exhibit 45) ........................................ 87

(viii)  Rosengard Report (Exhibit 6.003) ............................ 90

(ix)    Sharon Murphy Email (Exhibit 52) .......................... 93

(x)     Wendi's Suicide Attempt (Exhibit 47) ..................... 94

(xi)    Wendi's Pre-Trial Medications (Exhibit 49) ............. 95

(xii)   Skip Robertson Information (Exhibit 57) ................. 95

(xiii)  Schaider Comments ................................................... 96

d.    There Were No Strategic Reasons for Failing to
Investigate and Develop Mitigating Evidence of
Wendi's Traumatic Childhood and Psychiatric
Disorders ................................................................... 96

II.    POST-CONVICTION RELIEF IS WARRANTED UNDER *CUYLER*
BECAUSE ATTORNEY DELOZIER SUFFERED FROM A
DEBILITATING CONFLICT OF INTEREST ................................................. 99

A.    DeLozier's Representation of the Ochoas ................................................. 100

B.    DeLozier's Representation of Wendi ........................................................ 104

C.    DeLozier's Actual, Active Conflict of Interest Adversely Affected
Wendi's Representation ............................................................................ 107

1.    DeLozier Had Actual Conflict of Interest ..................................... 108

4843-7819-0105.

1

**TABLE OF CONTENTS (cont'd)**

2

<u>Page</u>

3

        a.     DeLozier's Representation of the Ochoas' Interests in
4
                 Custody Proceedings Was Directly Adverse to
                 Wendi's Interests in Developing All Reasonably
5
                 Available Mitigating Evidence ........................................... 108

6

        b.     DeLozier's Representation of Wendi Was Materially
7
                 Limited by His Duty of Confidentiality to the Ochoas....... 110

8

        c.     The Payment Obligations of the Ochoas Interfered
                 with DeLozier's Independent Judgment ........................... 111
9

10
     2.     DeLozier's Conflict Affected the Representation of Wendi.......... 113

11
CONCLUSION ........................................................................................... 115

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF LIEF
CASE NO. CR2000-096032-A

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Bean v. Calderon,*
    163 F.3d 1073 (9th Cir. 1998) ...............................................................96

*Boyde v. California,*
    494 U.S. 370 (1990)...............................................................4, 9, 110

*Correll v. Ryan,*
    539 F.3d 938 (9th Cir. 2008) ...............................................................5, 96

*Cuyler v. Sullivan,*
    446 U.S. 335 (1980)...............................................................2, 99, 113, 115

*Deutscher v. Whitley,*
    884 F.2d 1152 (9th Cir. 1989), *vacated on other grounds,* 111 S.Ct. 1678
    (1991), *and subsequently reaffirmed,* 16 F.3d 981 (9th Cir. 1994) .......................96

*Douglas v. Woodford,*
    316 F.3d 1079 (9th Cir. 2003) ...............................................................4

*Eddings v. Oklahoma,*
    455 U.S. 104 (1982)...............................................................6, 53

*Fitzpatrick v. McCormick,*
    869 F.2d 1247 (9th Cir. 1989) ...............................................................99, 109

*Foxworth v. Wainwright,*
    516 F.2d 1072 (5th Cir. 1975) ...............................................................100, 110

*Frierson v. Woodford,*
    463 F.3d 982 (9th Cir. 2006) ...............................................................96

*Furman v. Georgia,*
    408 U.S. 238 (1972)...............................................................53

*Hamilton v. Ayers,*
    583 F.3d 1100 (9th Cir. 2009) ...............................................................5, 94

*Hitchcock v. Dugger,*
    481 U.S. 393 (1987)...............................................................53

*Hovey v. Ayers,*
    458 F.3d 892 ...............................................................4

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Lambright v. Schriro*,
    490 F.3d 1103 (9th Cir. 2007) ........................................................................5, 6

*Libberton v. Ryan*,
    583 F.3d 1147 (9th Cir. 2009) .........................................................................5

*Lockett v. Ohio*,
    438 U.S. 586 (1978).......................................................................................6, 53

*Lockhart v. Terhune*,
    250 F.3d 1223 (9th Cir. 2001) ...............................................99, 110, 113, 115

*Padilla v. Kentucky*,
    559 U.S. 356 (2010)........................................................................................52

*Porter v. McCollum*,
    558 U.S. 30 (2009) (per curiam)....................................................................5

*Ramonez v. Berghuis*,
    490 F.3d 482 (6th Cir. 2007) .........................................................................96

*Rompilla v. Beard*,
    545 U.S. 374 (2005)........................................................................................4, 5

*Sears v. Upton*,
    130 S. Ct. 3259 (2010)....................................................................................4

*Stankewitz v. Wong*,
    698 F.3d 1163 (9th Cir. 2012) .......................................................................5

*Strickland v. Washington*,
    466 U.S. 668 (1984).............................................................................. *passim*

*Summerlin v. Schriro*,
    427 F.3d 623 (9th Cir. 2005) (en banc) .......................................................4, 80

*United States v. Henke*,
    222 F.3d 633 (9th Cir. 2000) ...............................................................99, 111

*Wiggins v. Smith*,
    539 U.S. 510 (2003)............................................................................. *passim*

*Williams v. Taylor*,
    529 U.S. 362 (2000)........................................................................................53

*Wood v. Georgia*,
    450 U.S. 261 (1981)...............................................................................99, 111

{00128370.1 }

vii

4843-7819-0105.

**State Cases**

*State v. Bocharski*,
218 Ariz. 476, 189 P.3d 403 (2008)..................................................................6, 7

*State v. Jenkins*,
148 Ariz. 463, 715 P.2d 716 (1986)..................................................................113

*Knapp v. Hardy*,
111 Ariz. 107, 523 P.2d 1308 (1974)...............................................................54

*State v. Martinez-Serna*,
166 Ariz. 423 (1990)................................................................100, 110, 113

*State v. Nordstrom*,
206 Ariz. 242, 77 P.3d 40 (2003)...................................................................7, 8

*State v. Stewart*,
126 A.D.2d 943 (N.Y. 1987) ..........................................................................100

*State v. Thomas*,
545 N.E.2d 654 (Ill. 1989)........................................................100, 110, 112

**State Statutes**

Ariz. Rev. Stat. § 13-751(G)(1) .......................................................................7

Ariz. Rev. Stat. § 13-752(H) ............................................................................3

**Rules**

Ariz. R. Crim. Proc. 6.8 ...................................................................................52

Ariz. R. Crim. Proc. 6.8(b)(1)(iii) ..................................................................53

Ariz. R. Crim. Proc. 11.1 .................................................................................84

Ariz. R. of Prof'l Conduct 1.7(a)(1), (b).......................................................108

Ariz. R. of Prof'l Conduct 1.7(a)(2) .............................................................110

Ariz. R. of Prof'l Conduct 1.8.......................................................................110

Ariz. R. of Prof'l Conduct 1.8, Comment 11...............................................112

Ariz. R. of Prof'l Conduct 1.8(f)...................................................................111

{00128370.1 }

viii

**INTRODUCTION**

The eight-day evidentiary hearing held from February 3 to 14, 2014 confirmed the merit of the two post-conviction relief claims at issue:  (1) Petitioner Wendi Andriano's "trial counsel was ineffective in the penalty phase by failing to investigate and present expert testimony regarding her mental illness and by failing to investigate and present evidence regarding her harrowing childhood"; and (2) one of her trial counsel, David DeLozier, "had an actual conflict of interest that affected his representation of her."  (Oct. 30, 2012 Order Granting Evidentiary Hearing at 4, 5.)

Wendi's trial counsel, Daniel Patterson and David DeLozier, admitted that they did not investigate or develop mitigating evidence regarding her harrowing childhood and mental health issues, and ignored (or assumed that someone else would address) a number of "red flags" indicating that such an investigation would be fruitful.  As Attorney Patterson summarized during the State's examination of him:

> Apparently, I was presented with these things that [were] brought up on direct.  But I either discounted them or passed them onto DeLozier, or DeLozier was notified contemporaneous with me, and I assumed that he would have been—you know, was going to be forthcoming and responsible to follow up, if need be.  You know, I didn't—unfortunately, I didn't assist greatly in the development of the mitigation in this case other than she's a good woman and her story is a credible story.

(2/7/14 Tr. at 132:15-24 (D. Patterson) (Cross).)

Attorney DeLozier's ability to undertake an investigation into Wendi's abusive childhood and the resulting psychological effects was limited by his concurrent representation of Wendi's mother, Donna Ochoa, and stepfather, Alejo Ochoa, in custody proceedings concerning their grandchildren.  After confirming his knowledge of the severe impact of childhood sexual abuse upon adults—after all, DeLozier was also concurrently seeking damages on behalf of victims of childhood sexual abuse in civil cases—DeLozier acknowledged that "it's possible that focusing on [the Ochoas' good qualities in] the grandparent case kept me from focusing on . . . the things that Rohde and so forth and so forth were telling" DeLozier regarding Wendi's childhood.  (2/10/14 Tr.

{00128370.1 }

1

at 138:4-139:8 (D. DeLozier).)

Three legal experts—Attorney Larry Hammond, Professor Gary Lowenthal, and mitigation specialist Keith Rohman—concluded that these failures fell far below the standard of care for effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984) and *Wiggins v. Smith*, 539 U.S. 510 (2003), and, as to DeLozier, gave rise to an impermissible conflict of interest under *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

The evidence submitted at the hearing also confirmed that these failures mattered, because the mitigating evidence that Wendi's trial counsel failed to develop and present was compelling.  Three mental health experts—Dr. James Hopper, Dr. George Woods, and Dr. Joette James—detailed the severe impact of Wendi's childhood and related mental health disorders upon her life as an adult, including her impaired ability control impulse and to react and respond appropriately in times of great stress.  Multiple witnesses confirmed the social history supporting those experts' findings, including the gut-wrenching testimony of Kyre Lorts and Jeri Lynn Cunningham, two childhood friends of Wendi who were firsthand witnesses to (and victims of) sexual abuse by Wendi's stepfather.

None of the evidence submitted at the hearing undermined the colorable claims of the Petition in any respect.  The factual evidence was essentially undisputed.  The State could not and did not meaningfully attack the credibility of any witness called by the Petitioner, nor did it introduce any conflicting factual evidence.  Its primary witness, Dr. Stephen Pitt, did not opine that the evidence of childhood trauma and mental health was not mitigating; he opined only that Wendi was able to appreciate that her conduct was wrongful, a far narrower question than the prejudice inquiry under *Strickland*, *Wiggins*, and the cases applying them.

The record following the hearing is even more compelling than the evidentiary

4843-7819-0105.

1   record submitted with the Petition.  For the reasons set forth below, that record

2   demonstrates that post-conviction relief on these claims is warranted.

3                                          **ARGUMENT**

4   **I.    WENDI'S TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO
           DEVELOP EVIDENCE OF WENDI'S HARROWING CHILDHOOD, HER**

5   **MENTAL DISORDERS, AND THE IMPACT UPON HER BEHAVIOR AS
       AN ADULT**

6

7         The Sixth Amendment to the United States Constitution guarantees a criminal

8   defendant the right to effective assistance of counsel, *Strickland*, 466 U.S. at 685-86,

9   including effective assistance at the sentencing stage of a capital case, *Wiggins*, 539 U.S.

10  at 521.  To prove an ineffective assistance claim, the petitioner must show that (1)

11  "counsel's performance was deficient"; and (2) "the deficient performance prejudiced the

12  defense."  *Strickland*, 466 U.S. at 687.

13        To remain consistent with the general sequence of the evidentiary presentation at

14  the hearing, this brief will address the two prongs of the *Strickland* analysis in reverse

15  order.

16        **A.    PREJUDICE**

17              **1.    Analytical Framework**

18        The prejudice prong of *Strickland* is satisfied when "there is a reasonable

19  probability that, but for counsel's unprofessional errors, the result of the proceeding

20  would have been different."  *Id.* at 694.  In a case involving the failure to investigate and

21  present mitigating evidence, the ultimate question is whether "there is a reasonable

22  probability that at least one juror would have struck a different balance" in weighing the

23  aggravating and mitigating evidence.  *Wiggins*, 539 U.S. at 537.  *See also* Ariz. Rev. Stat.

24  § 13-752(H) (requiring unanimous jury verdict to impose death sentence).  A "reasonable

25  probability" is a "probability sufficient to undermine confidence in the outcome,"

26  *Strickland*, 466 U.S. at 694, which is "less than the preponderance more-likely-than-not

27

28

4843-7819-0105.

standard." *Summerlin v. Schriro*, 427 F.3d 623, 643 (9th Cir. 2005) (en banc).

In cases alleging prejudice from the failure to investigate, the measure of prejudice is "the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented." *Hovey v. Ayers*, 458 F.3d 892, 929 (9th Cir. 2006 (quotation omitted).  Here, there is no dispute that trial counsel's mitigation presentation centered upon portraying Wendi as the product of "[a] solid, familial support system, a mother and father who loved her, who cared about her, who guided her, who instructed her, that kind of thing."  (2/7/14 Tr. at 174:23-175:1 (D. Patterson) (Redirect).)    The United States Supreme Court has found prejudice in such inaccurately positive portrayals, such as where trial counsel presented a defendant's childhood as "stable, loving, and essentially without incident" when a reasonable investigation would have shown it to be "anything but tranquil" and marked by verbal and sexual abuse. *Sears v. Upton*, 130 S. Ct. 3259, 3261 (2010).  *See also Rompilla v. Beard*, 545 U.S. 374, 391 (2005) (evidence that defendant was raised in "slum environment," discontinued school at age 16, and consumed alcohol as a teen "would have destroyed the benign conception of [the defendant's] upbringing . . . [that] counsel had formed from talking with [the defendant] himself and some of his family members").

### a.  Wendi's Harrowing Childhood and Psychiatric Disorders and Defects Are Relevant Mitigation, With or Without Any Nexus to the Offense

"Evidence regarding social background and mental health is significant, as there is a 'belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003) (quoting *Boyde v. California*, 494 U.S. 370, 382 (1990)).

Since *Wiggins*, the United States Supreme Court and the United States Court of Appeal for the Ninth Circuit have repeatedly found that the failure to investigate and

present the type of mitigating evidence presented at the evidentiary hearing in this case (and summarized below) constitutes prejudice for the purpose of a Sixth Amendment claim.  *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 33 (2009) (per curiam) ("Unlike the evidence presented during [the defendant's] penalty hearing . . . the new evidence described his abusive childhood," his post-traumatic stress disorder arising out of military service, "and his impaired mental health and mental capacity"); *id.* at 43 (evidence of childhood abuse "may have particular salience" in a case involving the murder of a loved one); *Rompilla*, 545 U.S. at 392-93 (evidence of childhood neglect and impairment of "several of [the defendant's] cognitive functions" constituted mitigating evidence that "might well have influenced the jury's appraisal of . . . culpability" and therefore constituted prejudice); *Stankewitz v. Wong*, 698 F.3d 1163, 1174 (9th Cir. 2012) (prejudice found where the jury "heard next to nothing about [the defendant's] traumatic childhood" of abuse and neglect or his history of mental illness); *Libberton v. Ryan*, 583 F.3d 1147, 1172-73 (9th Cir. 2009) (prejudice found where defense counsel failed to investigate and present evidence that the defendant was "seriously abused during his childhood," and noting that "[t]he Supreme Court has repeatedly held that evidence of childhood abuse is a relevant mitigating factor"); *Hamilton v. Ayers*, 583 F.3d 1100, 1131-33 (9th Cir. 2009) (defense counsel's failure to pursue the "classic mitigating evidence" of childhood sexual abuse by family members and evidence that the defendant "had suffered from serious mental illnesses throughout most of his life" constituted prejudice); *Lambright v. Schriro*, 490 F.3d 1103, 1118 (9th Cir. 2007) (failure to investigate and present "classic mitigation evidence" of mental health problems, including post-traumatic stress disorder and a personality disorder, constituted prejudice); *Correll v. Ryan*, 539 F.3d 938, 950-51 (9th Cir. 2008) (failure to investigate and present evidence of childhood abuse and neglect, religious teaching enforced by corporal punishment, incest in the family, and impulse control problems and impaired judgment at

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

the time of the offense was "precisely th[e] type of evidence that the Supreme Court has termed as 'powerful'" mitigating evidence, constituting prejudice).  *See also State v. Bocharski*, 218 Ariz. 476, 497-99, 189 P.3d 403, 424-26 (2008) (reducing defendant's sentence to life imprisonment on independent review, on account of mitigating evidence that the defendant "suffered severe physical, mental and sexual abuse during his childhood" and "came from a severely dysfunctional family").

"[T]o develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual[,]" the Supreme Court has held "that the sentencer in capital cases *must* be permitted to consider any relevant mitigating factor" regardless of whether it is enumerated in a statute or has a causal nexus with the offense itself.  *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982) (emphasis added).  Indeed, "[t]o meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors."  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  *See also Lambright*, 490 F.3d at 1115 ("If evidence relating to life circumstances with no causal relationship to the crime were to be eliminated, significant aspects of a defendant's disadvantaged background, emotional and mental problems, and adverse history . . . would not be considered, even though some of these factors . . . might cause a sentencer to determine that a life sentence, rather than death at the hands of the state, is the appropriate punishment for the particular defendant.").

> **b.**     **The State's Expert Applied an Incorrect, Narrow Standard in Assessing Whether Wendi's Mental Health Evidence was Mitigating**

As illustrated in the numerous cases cited above, the "classic mitigation evidence" of childhood trauma and mental health disorders plainly qualifies as relevant mitigating evidence.  For that reason, it is odd that the State's primary witness, Dr. Stephen Pitt, looked only to the issue of whether Wendi was capable of appreciating the wrongfulness of her conduct.  As he claimed:  "If she was a victim of sexual abuse, that's a terrible

6

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

1   thing and I feel sorry for her.  But the reality is this isn't about:  Was she a victim of

2   sexual abuse?  This is about:  Does she have a mental disease or defect whereby she

3   couldn't appreciate the wrongfulness of her conduct?"  (2/14/14 Tr. at 114:2-8 (S. Pitt)

4   (Redirect).)

5          As noted above, that is not the standard for relevance of mitigation evidence.  It is

6   true that Arizona *courts* on independent review (though not necessarily jurors in the first

7   instance) weigh mitigating evidence of mental health more strongly when that evidence

8   fits within the terms of Ariz. Rev. Stat. § 13-751(G)(1), which lists as a mitigating factor

9   whether the "defendant's capacity to appreciate the wrongfulness of his conduct or to

10  conform his conduct to the requirements of law was significantly impaired, but not so

11  impaired as to constitute a defense to prosecution."  *See State v. Nordstrom*, 206 Ariz.

12  242, 248, 77 P.3d 40 (2003).  But Dr. Pitt's testimony was narrower than even that

13  standard.  By focusing his inquiry on whether Wendi could appreciate that her actions

14  were wrongful, he ignores the rest of the statute:  (1) whether her *capacity* to do so was

15  significantly *impaired*, and (2) whether her ability to conform her conduct to the

16  requirements of the law was significantly *impaired*.  *See Bocharski*, 218 Ariz. at 497-99

17  (finding mitigating evidence had causal connection where defendant's expert testified

18  that "a person in [defendant's] state would have been far less able than others to control

19  and manage his feelings and reactions" at the time of the offense).

20         Wendi called three expert witnesses with expertise in different fields of mental

21  health—Dr. James Hopper, Dr. George Woods, and Dr. Joette James—who testified

22  regarding her extensive childhood trauma, psychiatric disorders, and cognitive deficits.

23  Each of them tied their conclusions to the homicide itself, noting that Wendi's disorders

24  impaired her ability to exercise judgment, control impulse, and conform her conduct to

25  the requirements of the law under the circumstances existing at the time of the offense.

26  Even in cases where such expert testimony is "not particularly compelling"—and that is

27

28

{00128370.1 }                                      7

4843-7819-0105.

not the case here—the Arizona Supreme Court has found it sufficient to establish that a jury could have weighed the evidence differently.  *Nordstrom*, 206 Ariz. at 248.

### c.  We Cannot Assume the Jury Agreed With the State's Position on Facts Not Necessary to the Verdict

As a final introductory matter, in order to accurately evaluate the prejudice established by trial counsel's failure to develop this evidence, it is necessary to begin with what the jury actually found.  Though the State's counsel prefaced some questions regarding the State's contentions concerning the run-up to the offense by asserting that "the jury must have believed it" (*see, e.g.*, 2/3/14 Tr. II at 140:7-9), in fact the jury made no such findings adopting those contentions.  Wendi was convicted of first-degree murder; as noted in the State's autopsy report (Ex. 65), Joe's death was caused by "multiple blunt force and incised injuries" attributable to being struck with a barstool and cut with a kitchen knife.  Thus, the *only* conclusions we can draw from the jury verdict are that (1) Wendi beat and stabbed Joe, causing the injuries that killed him; (2) she formed the intent to kill him at some point before completing those actions; and (3) she was not justifiably acting in self-defense when doing so.

We do not know what else the jury may or may not have believed.  The jury may have believed that the evening began as an assisted suicide (consistent with Wendi's testimony), turned into a physical fight (consistent with Wendi's testimony and the physical injuries she suffered), and at some point her actions in that fight escalated beyond self-defense to the point of cruelty in excessively beating and then stabbing him.  The State's only evidence to the contrary was circumstantial—namely, the absence of verification of Joe's involvement in the preparations for the assisted suicide.  Thus, the State and Dr. Pitt were incorrect in assuming that the jury must have believed that Wendi had ordered sodium azide as part of a plan to murder her dying husband weeks before his actual death.

It is that final moment—the act of actually committing the homicide—that matters

---

for the purpose of assessing impairments to Wendi's ability to appreciate the wrongfulness of her conduct or conform her conduct to the law, not the moments or weeks before in ordering sodium azide.[1]  Dr. Pitt's analysis ignores that crucial moment of the homicide itself; Dr. Hopper, Dr. Woods, and Dr. James do not.

Having addressed the analytical framework through which the prejudice in this case must be assessed, this brief turns to the evidence of prejudice itself.

### 2.    Wendi's Traumatic Childhood and Its Effects

Though there is a well-recognized "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse," *Boyde*, 494 U.S. at 382, trial counsel failed to look for or present such evidence.  Instead, the presentation of Wendi's childhood at trial emphasized "establish[ing] the proposition that she was a good woman, had a good Christian upbringing, and she had the support and love of her family."  (2/7/14 Tr. at 123:4-9 (D. Patterson) (Cross).).  It failed to provide the jury with an answer to an obvious question: if Wendi's upbringing was so strong, how could she engage in such abnormal, irrational, and ultimately violent behavior as an adult?

The evidentiary hearing showed that the deeper truth—uncovered by conducting an adequate mitigation investigation and following up on red flags that trial counsel disregarded—is far different.  It sheds far more light upon Wendi's conduct as an adult,

---

[1] This is true even if the jury had accepted the State's theory that Wendi initially set out to poison him.  Wendi necessarily abandoned any such plan to poison Joe when she called a neighbor to watch the children, attempted to take Joe to the hospital, and ultimately called an ambulance for Joe.  The State's theory depends upon Wendi changing her mind at some point after the ambulance was called, turning away the paramedics, and forming a new plan to end his life that ultimately succeeded.  Thus, even under that theory it is the point *after* her alleged change of heart in which all elements of the first-degree murder occurred, and it is that point in which her ability to appreciate the wrongfulness of her conduct is relevant.

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

1  and reveals how her capacities became impaired through incessant emotional, physical,

2  and sexual trauma throughout her formative years.

### a.      Dr. James Hopper

4          Dr. James Hopper is a clinical psychologist specializing in the effects of trauma

5  upon its victims, particularly childhood trauma.  (2/3/14 Tr. I at 24:14-19, 26:5-27:3 (J.

6  Hopper).)  After obtaining his Ph.D., Hopper focused his "research in this realm on

7  traumatic memories, on treatment for child abuse or related trauma, on what's going on in

8  people's brains when they're overwhelmed by being reminded of their traumas."  (*Id.* at

9  26:25-27:3.)  He is a leading scholar in the field, having taught in the Department of

10  Psychiatry at Harvard Medical School, conducted research at Harvard Medical School

11  and the Boston University School of Medicine, and published more than a dozen papers

12  in peer-reviewed journals on various aspects of the effects of childhood trauma, trauma-

13  related memory, and post-traumatic stress disorder.  (Ex. 3 at 1-2.)  Dr. Hopper also

14  performs clinical work, conducting assessments and providing therapy to adults suffering

15  from the effects of childhood neglect and abuse.  (*Id.*)

16          Dr. Hopper evaluated Wendi using the same process he would follow when

17  analyzing a trauma patient (2/3/14 Tr. I at 33:9-16 (J. Hopper)), though he noted that

18  there was more information available to him regarding Wendi than in most cases (*id.*; *see*

19  *also id.* at 29:16-21).  That information—virtually none of which was retrieved or

20  developed until *after* Wendi's death sentence—included more than 20 declarations from

21  family members and others who knew Wendi as a child; a variety of records regarding

22  Wendi, her biological parents and her stepfather; six interviews of Wendi encompassing

23  more than 50 hours; and interviews of her biological parents, her stepfather, and two

24  close childhood friends:  Kyre Lorts and Jeri Lynn Cunningham.  (*Id.* at 28:22-30:16.)

25          Dr. Hopper concluded that "Wendi suffered severe and pervasive trauma

26  throughout her childhood, including, but not limited to, severe neglect by her mother,

27

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

emotional and physical abuse by her mother, her biological father and her stepfather and sexual abuse by her stepfather." (*Id.* at 25:8-12.) As a result, she "entered adulthood as a severely damaged person, who was not able to properly respond to situations involving complex emotions or high stress, and she was also unable to have normal, healthy, closer intimate relationships." (*Id.* at 25:14-18.) According to Dr. Hopper, "[t]here is no way [the effects of her childhood trauma] couldn't" have affected Wendi's behavior in connection with her husband's death. (*Id.* at 25:22.)

Dr. Hopper broke down Wendi's childhood into three developmentally significant periods (birth to age 4.5, ages 4.5 to nine, and ages nine to 18), each marked by its own sources of trauma impairing Wendi's development. (*Id.* at 34:5-35:1.) This brief summarizes the evidence pertaining to each.

### b.      Birth to Age 4.5

As Dr. Hopper noted, infants and young children are "in a very vulnerable state," unable to "regulate their own emotions and physiological states without the help of caregivers." (2/3/14 Tr. I at 35:6-17 (J. Hopper).) Because "this is a time where they're having kind of etched into their brains basic patterns and habits for the emotions they experience and how they relate to those emotions," attentive caregiving is essential to proper development of that self-regulation. (*Id.*)

Wendi Andriano was not born into promising circumstances for that development to occur. At the time of Wendi's birth, her mother, Donna, was in the throes of a psychological breakdown attributable to depression (2/4/14 Tr. at 78:10-23 (D. Ochoa)), one of two primary mental health disorders (the other being bipolar disorder) that ran in her family (*id.* at 76:19-77:7).[2] Donna acknowledged that she "wouldn't have anything

---

[2] Donna, her nephew (and adopted son) Brandon Ochoa, and her sister Nadine Bednorz suffer from depression. (*Id.* at 77:1-7.) Donna's niece, her great niece, and Bednorz suffer from bipolar disorder; Donna believes her mother may have had that condition, as well. (*Id.* at 76:19-25.)

1  to do with" Wendi, admitting that "at that moment in [her] life," she "was more

2  concerned about [a lost family dog] than I was the baby." (*Id.* at 91:22-92:7, 94:10-18.)

3  For the several weeks after Wendi was born, Donna left Wendi largely in the care of her

4  husband, Skip Robertson, and her mother (*id.* at 92:14-15, 93:12-16)—the first instance

5  of what Dr. Hopper noted became a pattern of Donna "handing off" Wendi to others.

6  (2/3/14 Tr. I at 37:10-22 (J. Hopper).)

7       Skip Robertson, like many of those to whom Donna "handed off" Wendi during

8  her childhood, was a poor choice. He suffered from post-traumatic stress disorder

9  marked by violent nightmares (2/4/14 Tr. at 85:9-23 (D. Ochoa)), drank heavily (*id.* at

10  86:20-87:4), and fought with Donna (*id.* at 87:8-88:4). He also came from a family of

11  multiple pedophiles, two of whom (including Skip) were later convicted of sexual

12  molestation of a child. (*Id.* at 99:3-8, 100:6-11, 102:20-21; Ex. 232, 233.)

13       Five or six weeks after Wendi's birth, Donna, Skip, and Wendi moved from Texas

14  to Phoenix, "because the girl that [Skip] had been having an affair with said that she was

15  pregnant and was trying to pin it on Skip." (2/4/14 Tr. at 93:14-24 (D. Ochoa).) For the

16  next four-and-a-half years, Wendi suffered three ongoing sources of trauma: (1) her

17  mother's neglect; (2) emotional and physical abuse by both parents; and (3) as a result of

18  the neglect, being "handed off" to several people with a history of childhood sexual

19  abuse. (2/3/14 Tr. I at 35:21-36:3.) As noted by Dr. Hopper, each had a substantial

20  impact on Wendi's ability to regulate her behavior as an adult.

21                    **(i)**    **Donna's Neglect**

22       Following their move to Phoenix, Donna began working full-time at a title

23  company, socializing, and leaving her daughter in the care of others for all but an hour or

24  two per day. (2/3/14 Tr. I at 38:1-11 (J. Hopper).) Neither Donna nor Skip was an

25  attentive parent, sometimes leaving Wendi to cry for an hour-and-a-half at Skip's urging

26  to "[l]eave her alone." (2/4/14 Tr. at 96:1-18 (D. Ochoa).)

27  

28  

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1   After they moved to Tempe, and with Skip absent much of the time as a trucker

2   (*id.* at 108:2-16), Donna's inattention to her toddler daughter became more severe.  After

3   working 9-to-5, she would take Wendi to a 24-hour day care facility or ask a neighbor to

4   keep an eye on Wendi while she went out drinking several nights a week (including every

5   weekend) and was promiscuous with other men, bringing them home or staying at their

6   houses overnight.  (*Id.* at 109:6-110:25, 112:20-24.)  In addition to her full-time job,

7   Donna also began taking counseling classes at Phoenix College and volunteering "from

8   ten to 30 hours or more a week at Terros," a drug abuse prevention organization,

9   depending upon "what kind of babysitter I could get."  (*Id.* at 111:1-14, 112:13-16.)  As

10  Donna tearfully admitted, Wendi was "[n]ot very high" on her list of priorities.  (*Id.* at

11  112:25-113:3.)

12  Over time, Donna began to leave Wendi with no babysitter at all.  She took a new

13  job writing grants and performing accounting work for CODAC, a local drug treatment

14  clinic.  (*Id.* at 113:12-23.)  While working overtime, Donna would leave Wendi in the

15  downstairs portion of the building—a detox center and methadone clinic—while she

16  worked in the offices upstairs.  (*Id.* at 114:2-21.)

17  This pattern continued after Donna divorced Skip, accepted a new job at PADAC

18  (a faith-based drug counseling center in Pinal County), and moved to Casa Grande when

19  Wendi was approximately four years old.  (*Id.* at 116:5-117:1, 118:25-119:5.)  When

20  Donna began at PADAC, she worked from Friday night until Monday morning

21  continuously while Wendi would play with "some of the adults that would be around the

22  drug treatment center," or "wander around" the neighborhood to panhandle.  (*Id.* at

23  119:6-120:6.)

24  In sum, Wendi spent the first four-and-a-half years of her life as an afterthought of

25  her mother, being passed off by Donna to anyone she could find (ranging from 24-hour

26  day care providers and neighbors to drug counseling patients to no one at all) while

27  {00128370.1 }

28

13

4843-7819-0105.

1  Donna handled her depression through work, alcohol, and men.  As Dr. Hopper

2  explained, this level of neglect has a significant impact on development of crucial aspects

3  of emotional regulation:

> Executive functioning is a way of thinking about it in a more technical and even neuroscientific way that we know from decades of research . . . that this front area of our brain, the prefrontal cortex is kind of like the CEO of our brain and it has these capacities we call executive functioning.
>
> These include the ability to inhibit impulses, the ability to remember our rules that we're supposed to follow when we're trying to navigate a situation, especially an emotional situation, very important functions to be able to reflect on what you're doing and stop if it's not working or to change your behavior if things aren't working out.
>
> . . . [C]ertainly an infant and a young child doesn't have that many executive functions, but what they're dependent on is a parent to help cultivate the emergence of these executive functions.
>
> And if you're neglected and you're left to cry for hours and things like Wendi went through, then those executive functions are not developing the way they need to be.  And, instead, what happens, is the . . . brain resorts to these extreme attempts to deal with the overwhelming emotions by just shutting down in a depressive state or going out of control with anxiety . . . .  But it really undermines those executive functions.

14  (2/3/14 Tr. I at 44:13-45:16 (J. Hopper).)

15                          **(ii)      Emotional and Physical Abuse**

16        When Skip and Donna did give attention to their young daughter, it often came in

17  the form of physical and emotional abuse.  Skip, in particular, approached child-rearing

18  "like training a dog," and began spanking her while she was still in diapers if she did not

19  obey his commands.  (2/4/14 Tr. at 95:18-22, 96:19-97:2 (D. Ochoa).)  She was not in

20  diapers for long, however:  at only eleven months old, Skip potty-trained Wendi by

21  putting her on the toilet and commanding her, "in a real strong, strict voice," to go.  (*Id.*

22  at 95:5-22.)  At a Robertson family gathering when Wendi was less than two years old,

23  Skip and his brothers "decided she needed to learn how to swim."  They threw her into a

24  swimming pool, "toss[ing] her around" despite her crying and letting her sink before one

25  would "finally pick her up."  (*Id.* at 105:8-23.)

26        As Dr. Hopper opined, training an infant like a dog can have self-defeating

27

28

{00128370.1 }                                   14

consequences for that child's ability to internalize rules and regulate her own behavior later in life:

> [I]t's going to make it hard for a child to regulate their own emotions.  Not only do they have the emotions that they're going through because they're neglected and no one is helping soothe them, but now they've got horrible emotions from being thrown into a pool, from being beaten, from being yelled at. . . .  If you've got your whole first five years of this kind of treatment, it's going to cause problems with your ability to regulate your emotions . . . .
>
> . . . Even from toddler to age four-and-a-half or five, kids can start to take on . . . rules and they want to do them and be able to regulate their own behavior a little bit.  But if a child is being beaten and fear and pain and beatings are used constantly to get the child to instantly comply with what the parents want, then this actually makes it harder for the child to take in the very values and rules that the parents are trying to teach them.

(2/3/14 Tr. I at 50:6-51:16 (J. Hopper).)

### (iii)     Exposure to Pedophiles

The stakes of Donna's neglect were particularly high for Wendi, because numerous individuals with access to Wendi during this time period were pedophiles. (2/3/14 Tr. I at 51:21-55:11 (J. Hopper).)  In the Robertson family, both Skip and his brother Tommy were ultimately convicted and sentenced to extensive prison terms for molesting a relative.  (2/4/14 Tr. at 99:3-8, 100:6-11, 102:20-21 (D. Ochoa); Ex. 232, 233.)  Skip was also accused of molesting two other nieces (*id.* at 102:20-21; 2/3/14 Tr. I at 51:21-52:11 (J. Hopper)), and Skip himself speculated that Tommy may have molested Wendi (2/4/14 Tr. at 103:10-17 (D. Ochoa)).  Their father and Wendi's grandfather, Boyd, was sufficiently notorious for pedophilia that Skip's sisters warned Donna to "keep Wendi away from grandpa" because "they knew he had been messing around with some of the granddaughters." (*Id.* at 99:3-8.)  Boyd also had access to Wendi as a young child. (*Id.* at 99:14-100:4.)

Even after Donna's divorce from Skip, she continued to leave Wendi in the care of alleged pedophiles.  Donna and Wendi spent multiple nights and weekends at the home of Donna's boss at PADAC, Rick Barnes, and Wendi spent time alone with him.  (*Id.* at

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

116:17-117:5.)  Later on in their work relationship, Donna came across a letter in a box in Barnes's office indicating that Barnes had been fired from a teaching position in Thailand for sexual misconduct with young girls.  (*Id.* at 117:14-21.)

While Donna did not personally observe molestation of Wendi by the Robertsons or Rick Barnes, Wendi did begin to exhibit symptoms of potential abuse.  Wendi refused to sleep in any bed but her own (consistent with a child who had suffered abuse elsewhere (2/3/14 Tr. I at 55:15-56:16 (J. Hopper))), and one of her day-care providers reported two incidents in which Wendi instigated inappropriate sexual behavior with other children, which were sufficiently abnormal to cause the day care to expel Wendi.  (2/4/14 Tr. at 114:22-115:23, 200:7-13 (Cross) (D. Ochoa).)  As Dr. Hopper observed, "[w]hen it's this kind of extreme inappropriate sexual play that goes beyond what's developmentally normal, that . . . is seen as evidence of sexual abuse."  (2/3/14 Tr. I at 56:19-57:1 (J. Hopper).)  Consistent with Donna's neglect, she did not inquire further or obtain treatment for Wendi.  (2/4/14 Tr. at 115:24-116:4 (D. Ochoa).)

In addition to causing many of the same adverse effects as neglect and physical abuse, molestation at the early stages of childhood development may lead to "premature sexualization, even kind of a hypersexualization, so that the child may do things like engage in inappropriate sexual behavior with other kids."  (2/3/14 Tr. I at 57:18-58:22 (J. Hopper).)  The effects of that early sexualization are "etch[ed]" into children's developing brains, creating an expectation that they exist, in part, for the sexual gratification of others.  (*Id.* at 59:6-18.)  Wendi appears to have suffered that early sexualization:  as she described in her interviews with Dr. Hopper, "just from as early as she could remember, she had this awareness of sexual energy or chemistry coming from men and this was just something that was always there and she always experienced."  (*Id.* at 58:23-59:2.)

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

### c.    Ages 4.5 to Nine

Unlike the "habit learning" that marks development from birth until roughly age 4.5, children between ages 4.5 and nine expand more into the world of their peers, develop a sense of self-identity and, "if development is going well, what they should be learning is how to take the rules and values that should be being imparted [by] their family and how to enact those in their relationships with peers . . . ." (*Id.* at 62:6-63:14.) But "if the neglect and the emotion and the physical and the sexual abuse continue," then it can worsen their cumulative impact on executive functioning through the "piling on effect of trauma upon trauma." (*Id.* at 61:24-62:3.)

For Wendi, that trauma continued unabated through the next stage of her development.  It presented much the same instability and neglect as the first stage— including a poverty-stricken two-year stretch on the road with a traveling cult— but introduced a new and much more pervasive source of abuse:  Alejo Ochoa.

### (i)    Alejo Ochoa, and the Psychological Effects of Trauma Accumulation in Wendi

Alejo Ochoa entered Wendi's life as a damaged person himself.  As a young child, he was tormented by persistent sexual teasing by a wide variety of family members (Ex. 24[3] at 3 (¶ 8)), and was teased and beaten by his father (*id.* at 4 (¶ 10)).  He was introduced to sex by older women when he was between the ages of 13 and 16 (*id.* at 7-8 (¶¶ 20-21)), began using marijuana, LSD and cocaine in high school (*id.* at 12-13 (¶¶ 32-34)), started trafficking drugs across the Mexican border at age 16 (*id.* at 9-10 (¶¶ 24-

---

[3] On the first day of the evidentiary hearing, Alejo received a visit from Dennis Olson, who identified himself as a detective with the prosecutor's office.  Following that visit, this Court appointed counsel for Alejo, and that counsel indicated that Alejo would exercise his Fifth Amendment right against self-incrimination if called to testify.  This Court addressed those events by treating Alejo's indication that he would take the Fifth "the same as if he came in and here took the Fifth," and admitted Alejo's sworn declaration (Ex. 24) into evidence.  (*See* 2/4/14 Tr. at 4:22-19:13; 2/6/14 Tr. at 67:19-69:10.)

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

1   25)), and was beaten and raped in a Mexican jail at age 18 (*id.* at 10 (¶ 26).).  Roughly

2   five years later—after curbing his drug use, meeting Calvin Lorts and having a religious

3   moment he likened to a "sexual experience" culminating in an orgasm—Alejo

4   participated in helping to found PADAC.  (*Id.* at 15-16 (¶¶ 40, 42-44).)

5       Alejo befriended Wendi after Donna joined PADAC in 1974 (2/4/14 Tr. at 120:7-

6   23 (D. Ochoa)), and he and Donna soon began a sexual relationship (Ex. 25 at 18 (¶ 48)).

7   Alejo and Donna slept together in Donna's apartment, with Wendi in the same bed.

8   (2/4/14 Tr. at 122:2-17 (D. Ochoa).)  For the first time since being potty-trained at less

9   than a year old, Wendi began wetting the bed on a regular basis, several nights per week

10  for months.  (*Id.* at 122:18-123:9.)  As Dr. Hopper acknowledged, while "[k]ids can wet

11  the bed for various reasons," from a developmental standpoint it "doesn't usually

12  suddenly start at age four-and-a-half" and sudden bedwetting is "not an uncommon

13  response to sexual abuse."  (2/3/14 Tr. I at 69:24-71:1 (J. Hopper).)

14      Alejo was a volatile presence in the home.  According to him, 90 percent of his

15  arguments with Donna were about sex; she would refuse him in the morning, and "it built

16  and built all day and [he] spent the day hoping she would change her mind until [he] was

17  ready to explode."  (Ex. 24 at 44-45 (¶¶ 123-24).)  Donna "never said anything and just

18  clammed up," he responded with anger, and Wendi "took [his outbursts] hard."  (*Id.*)

19  According to Donna, "You never knew when it would happen.  And it could be like every

20  night that week or we might be able to go a whole week" without one occurring, "but

21  never more than a week."  (2/4/14 Tr. at 151:16-18 (D. Ochoa).)  "Most of the screaming

22  [Alejo] did was [directed] at Donna"; as for Wendi, Alejo sought to instill discipline by

23  spanking her with a wooden paddle, during which "she always cried."  (Ex. 24 at 45 (¶

24  126).)

25      Donna's neglect of Wendi continued as she and Alejo soon fell under the

26  influence of Rick Farmer and Al Miller, two self-styled missionaries who hosted Bible

27

28

{00128370.1 }                                   18

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

studies at their home.  (2/4/14 Tr. at 124:24-125:19 (D. Ochoa).)  That influence was

profound, to the point that Donna "burned barrels" of photographs and other household

items following a sermon on idolatry and evil spirits.  (*Id.*)  Donna and Alejo did not seek

medical care when Wendi came down with a prolonged, "really high" fever, relying upon

prayer to heal her.  (*Id.* at 127:1-22.)  Indeed, in 1975, Donna and Alejo married because

Farmer and Miller told them they could not continue sleeping together otherwise.  (*Id.* at

126:1-7.)

### (ii)     Fishers of Men

After marriage, the Ochoas' religious zeal and attachment to Farmer and Miller

intensified.  Donna quit her job at PADAC because the government grants it obtained

restricted her from talking about religion (2/4/14 Tr. at 128:1-6 (D. Ochoa)), pulled

Wendi out of first grade in Casa Grande, and left with Alejo and Wendi to live under the

same roof as other families devoted to Farmer's and Miller's ministry in a home in

Willcox, Arizona.  (*Id.* at 128:24-130:4.)  It soon became a transient ministry, spending

time in another home in Tucson before living in a travel trailer in various locations in

California over the next two years.  (*Id.* at 132:4-133:11.)  Their daily routine on the road

consisted of church, Bible study, and attempting to find food.  (*Id.* at 139:12-18.)

Wendi lived in abject poverty throughout that time, "looking for pennies on the

ground to buy beans," going barefoot for almost a year, and eating food retrieved from

dumpsters.  (*Id.* at 131:6-132:1, 136:3-14.)  The group believed in corporal punishment,

and Wendi was spanked by Donna, Alejo, or "whoever the elde[st] male was" around at

the time of her disobedience.  (*Id.* at 134:5-13.)  Wendi was not in school and was the

only child in the group, leaving her with no peers whatsoever from ages seven to nine.

(*Id.* at 130:5-23, 133:12-134:4.)

By the time the Ochoas left the group and Wendi returned to Casa Grande at age

nine, she was "different" and "more withdrawn."  (*Id.* at 137:22-138:10.)  With Donna's

{00128370.1 }

19

4843-7819-0105.

1   neglect continuing, Wendi became closer to a parent more willing to give her attention:

2   Alejo.  (*Id.* at 148:4-22.)

3                    **(iii)    Wendi's Dissociation and Memory Deficits**

4          The accumulation of trauma through age nine continued to thwart Wendi's ability

5   to develop proper executive functioning (2/3/14 Tr. I at 77:20-79:4 (J. Hopper)), but also

6   had new psychological effects on Wendi.  After leaving the Fishers of Men and returning

7   to Casa Grande, Donna began to notice Wendi suffering from memory lapses on a daily

8   basis.  (2/4/14 Tr. at 163:1-12 (D. Ochoa).)  These were not mere instances of absent-

9   mindedness or forgetfulness but rather black holes in biographical memories.  As Donna

10  recalled:  "That was one thing that I always thought was really strange.  Something would

11  happen to her . . . normally, it was bad.  And I would ask her about it a few weeks later.

12  Like maybe she got a whoopin', a spanking, you know, at school or from [Alejo] or

13  something, and I would make a comment about it," but Wendi would have no memory of

14  it.  (*Id.* at 161:22-162:25.)

15         The 4.5 to nine year-old stage of development is when children retain memories,

16  but "very serious overwhelming trauma of this sort for many years on end . . . often

17  results" in "dissociation and . . . serious memory deficits."  (2/3/14 Tr. I at 79:18-80:2 (J.

18  Hopper).)  Dissociation is "a disintegration of experience"—that is, a "disconnect[ion]"

19  of normally integrated parts of identity, such as "your memories and your emotions or

20  your ability to feel your emotions, what that feels like in your body as you're having it

21  and things like that."  (*Id.* at 80:3-81:3.)  Dr. Hopper witnessed Wendi experiencing

22  symptoms of dissociation firsthand in his 50-plus hours of interviews with her, finding

23  that she would respond to distressing subjects by "check[ing] out," being unable to think

24  clearly, unable to access the emotions stirred up by those subjects, and even unable to

25  feel her body.  (*Id.*)

26         With regard to memory deficits, Dr. Hopper—who has "done a lot of clinical work

27                                          20

28   _____
     PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
     PETITION FOR POST-CONVICTION RELIEF
     CASE NO. CR2000-096032-A

{00128370.1 }

4843-7819-0105.

in this area, a lot of research"—found that "Wendi really had some of the most, if not the most, severe memory deficits that [he] had ever encountered," including "major gaps" in her memories from childhood.  (*Id.* at 81:7-83:7.)  Those memory deficits are not the kind we normally associate with memory loss due to age or mere forgetfulness, but rather "events that have some emotional content to them.  It's not like remembering a football score or an address."  (2/5/14 Tr. at 55:18-24 (G. Woods).)

During the evidentiary hearing, Dr. Hopper showed multiple examples of Wendi's memory deficits during distressing portions of her videotaped interview with Dr. Pitt. (2/3/14 Tr. I at 86:11-23, 87:17-89:14, 90:25-91:18, 91:23-92:21 (J. Hopper).)  Absent serious head injuries, research shows that "you just don't see these kinds of major memory deficits unless someone has been through very significant trauma."  (*Id.* at 93:3-15.)

> During times of stress, that defense mechanism can have severe effects:
>
> For people who have been so traumatized and who have these memories that are split off and they can't access them even when they're trying, they've blocked out the really bad stuff . . . .  But under certain circumstances, high stress, frightening and confusing circumstances, this stuff can come rushing back in.  And we talked about that executive functioning and the CEO.  It can . . . just knock the CEO out and then the person is left to whatever bad stuff is coming in and whatever impulses are arising and they're just reacting to the situation without being able to think it through.

(*Id.* at 93:21-94:10.)  Even for normal individuals, research indicates that in highly stressful situations "there are chemicals that hit your prefrontal cortex that impair the ability of the nerves to communicate with each other," impairing the ability to inhibit impulse; for an individual whose executive functioning development was stunted by years of childhood trauma, that impairment is far more severe.  (*Id.* at 94:13-95:2.)

### d.    Ages Nine to 18

The time period between ages nine to 18 is "when you want to launch someone into being an adult," a stage in which "it is well-known through research that new cognitive capacities are emerging, especially for certain reasoning processes associated

4843-7819-0105.

1  with the prefrontal cortex." (2/4/14 Tr. II at 5:4-20 (J. Hopper).)  Healthy social and

2  emotional development in this time period renders one "capable of managing difficult

3  emotions and relationships and making good decisions in very stressful situations." (*Id.*)

4         Unhealthy development, such as development affected by ongoing sexual abuse,

5  constitutes "one more massive kind of continuous sexual trauma over nine to 18 years,

6  piled on top of everything else.  So it's going to have the same kind of effects of

7  depression, anxiety, emotion regulation problems, intimacy problems" as prior ongoing

8  childhood trauma. (*Id.* at 43:1-44:15.)  But it also creates "confusion . . . about sexual

9  desires and impulses" for the victims during this time of sexual development, leading

10 some to become "hypersexualized" and acquiescent to sexual attention because it

11 conditions their brains that their "role is to have sex." (*Id.*)

12        As recounted by multiple eyewitnesses, including three of Wendi's childhood

13 friends and classmates during this stage, Wendi suffered persistent trauma on two fronts:

14 (1) the environment of physical and emotional abuse in the strict fundamentalist school

15 she attended; and (2) the sexual, emotional, and physical abuse inflicted upon her by

16 Alejo at home, enabled by Donna's continued neglect.

17                    **(i)     The Environment of Abuse at Wendi's School**

18        Upon their return to Casa Grande, the Ochoas joined the 91st Psalm Church of

19 Pastor Calvin Lorts, a friend Alejo had met shortly after ceasing his drug trafficking.

20 (Ex. 24 at 13 (¶¶ 35-36), 15 (¶ 41); 2/4/2014 Tr. at 138:16-139:11 (D. Ochoa).)  Like the

21 Fishers of Men, Lorts preached a fundamentalist version of the Bible with firm beliefs

22 regarding the proper roles of men and women. (2/4/14 Tr. at 139:20-140:10 (D. Ochoa).)

23 In 1980, Alejo and Donna enrolled Wendi in the church's school. (*Id.* at 141:5-9.)

24        After Lorts resigned his leadership position in 1983 or 1984 and moved away, the

25 church changed its name (from 91st Psalm to Harvest Family Church) and took on more

26 extreme views.  Tom King, the church's new leader, was a firebrand:  he gave "[v]ery

27

28

{00128370.1 }                                    22

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1   damning" sermons (2/4/14 Tr. at 46:8-13 (K. Lorts)), condemned non-members to hell

2   (2/5/14 Tr. at 15:2-5 (J. Neace)), and promoted isolation by warning members against

3   associating with non-members (2/10/14 Tr. at 163:25-164:8 (C. Schaider)).  As multiple

4   witnesses testified, King instructed them on all aspects of their daily lives, from

5   condemning television and sugar (2/5/14 Tr. at 13:1-9 (J. Neace)) to instructing women

6   to quit their jobs and assume their proper roles as homemakers (2/10/14 Tr. at 163:6-10

7   (C. Schaider)), to giving parents detailed instructions on how to beat their children "until

8   they cried and beat them until they cried softly" to "break their spirit" and produce

9   unquestioning obedience (*id.* at 163:15-20, 168:25-169:13).  He enforced these

10  instructions through shame, such as one incident in which he encouraged the

11  congregation to mock Wendi's 11 or 12 year-old cousin as a "faggot" for dying his hair

12  orange.  (*Id.* at 165:15-25.)

13          The church put its strict principles into practice in its school.  Other than a

14  "devotions" class taught by Alejo (2/4/14 Tr. at 44:22-45:14), their classes did not have

15  teachers but rather "monitors"—parents or older students who maintained order while the

16  children completed workbooks on their own.  (2/4/14 Tr. at 216:3-15 (J. Cunningham);

17  2/4/14 Tr. at 43:1-25 (K. Lorts).)  Infractions were punished by swats from the "rod of

18  correction," a large wooden "paddle or a two-by-four turned into a paddle" resembling

19  the blade of an oar.  (2/4/14 Tr. at 216:16-217:3 (J. Cunningham); 2/5/14 Tr. at 13:25-

20  14:8 (J. Neace); *see also* Ex. 161.)  Disobedience was loosely defined; one classmate

21  recalled that his deaf brother was beaten for failing to recite 15 verses of scripture from

22  memory.  (2/5/14 Tr. at 16:21-17:5 (J. Neace).)

23          Upon the Ochoas' return from the Fishers of Men, Alejo took a maintenance job

24  with 91st Psalm that he quickly expanded into a role as its children's pastor.  (2/10/14 Tr.

25  at 158:22-159:4 (C. Schaider); 2/4/14 Tr. at 141:25-142:8 (D. Ochoa).)  In that position,

26  he was responsible for conducting children's services twice a week, teaching the

27

28

4843-7819-0105.

1  "devotions" class at the school, and generally "advising or keeping an eye on the kids."

2  (2/10/14 Tr. at 158:22-159:4 (C. Schaider).)  He used the "rod of correction" with the

3  students, though with "inconsistent boundaries" reflective of his volatility.  (2/5/14 Tr. at

4  16:13-18 (J. Neace); 2/10/14 Tr. at 159:11-16 (C. Schaider).)

5      While "stern and gruff" with students generally (2/4/14 Tr. at 44:22-23 (K.

6  Lorts)), multiple witnesses reported sexually inappropriate advances by Alejo toward his

7  students.  Alejo was "touchy, real flirty" with female students and would "rub up on"

8  them while they were at their desks.  (2/5/14 Tr. at 18:12-19:13 (J. Neace).)  His lessons

9  "often" devolved into sexual topics:  "he would just say weird things to us kids," such as

10  transforming a lesson on the Song of Solomon into "[t]elling the boys how to touch

11  breasts or talking about kissing with your tongue."  (2/4/14 Tr. at 44:22-45:17 (K. Lorts).)

12  When Jasper Neace reported facts pertaining to Alejo's sexual nature to Tom King—

13  specifically, that Wendi had "brought a Playboy book to school" that belonged to Alejo—

14  King called Neace a liar, expelled him, told him never to return, and condemned him to

15  "burn in hell."  (2/5/14 Tr. at 25:20-26:16 (J. Neace).)

16      For a child who had already suffered extensive trauma and showed "great

17  difficulty managing her emotions," the church-school's environment of fear, isolation,

18  and sexualization without recourse served as yet another source of "unrelenting trauma"

19  for Wendi.  (2/3/14 Tr. II at 13:9-14:10 (J. Hopper).)  It left Wendi without anyone

20  "really helping her deal with all the terrible stuff she [had] inside" (*id.*)—an accumulation

21  of "terrible stuff" that did not cease when she came home from school.

22          **(ii)      Alejo's Sexual Abuse**

23      Alejo's sexual comments and teasing continued outside of school, with Wendi as

24  the target.  He was "very derogatory" toward Wendi and made sexual statements and

25  jokes to his pre-teen stepdaughter, speaking with her about sex as early as ten years old.

26  (2/4/14 Tr. at 150:9-152:24 (D. Ochoa).)  He frequently took Wendi to the adult section

27                                          24

{00128370.1 }

28

4843-7819-0105.

1  of novelty store Spencer's Gifts, directing her attention to sex-themed items that were not

2  "age appropriate." (*Id.* at 157:18-159:6.) The pattern has continued into adulthood, as

3  reflected in the sexual messages he sent her while incarcerated (Ex. 75) and his request

4  that she send him erotic stories from prison (Ex. 45 at PCR114).

5       Yet Alejo's sexual relationship with his stepdaughter went well beyond

6  uncomfortable comments or jokes. Several witnesses testified to various aspects of his

7  systematic manipulation and sexualization of Wendi from her pre-pubescent years

8  onward, up to and including sexual assault.

9                    **(1)    "Dressing Up" and Photographing Wendi in**
                            **Lingerie.**
10

11      Both Kyre Lorts and Jeri Lynn Cunningham, two friends of Wendi between the

12  time Wendi was nine and 13, reported that their sleepovers at Wendi's house included

13  dressing up in nightgowns for Alejo's pleasure. Lorts, who slept over at the Ochoas'

14  home roughly twice a month when Wendi was 10 or 11 years old (2/4/14 Tr. at 47:3-15,

15  48:12-15 (K. Lorts)), noted that their sleepovers regularly included "play[ing] dress-up"

16  in Donna's lingerie, after which they would be "invited" to Alejo's room. (*Id.* at 47:16-

17  19, 50:19-21, 51:15-52:11, 53:19-22.) Cunningham, who slept over at Wendi's house

18  roughly once a month when Wendi was 12 to 13 years old (2/4/14 Tr. at 218:23-219:11

19  (J. Cunningham)), recalled that they "liked to have Alejo take us out to the desert at night

20  because we liked to tell each other scary stories." (*Id.* at 231:1-24.) "Every time" they

21  did so, however, Alejo "would make [them] put our nightgowns on first." (*Id.*)

22      Around the time Wendi was 12, Alejo began taking her on father-daughter

23  shopping trips for lingerie, such as "little lacy underwear and a bra to match and a garter

24  belt, things like that." (2/4/14 Tr. at 156:2-22 (D. Ochoa).) Alejo took up photography

25  around the same time (*id.* at 159:7-14), and began photographing his teenage

26  stepdaughter in lingerie. Some photos, likely from her late teens, still survive (Ex. 72-

27  74); Alejo also showed Cindy Schaider photographs of Wendi between ages 15 to 17 "in

28

{00128370.1 }                                25

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

a teddy, in women's underwear . . . taken out in the desert." (2/10/14 Tr. at 159:17-160:12 (C. Schaider).)  Dr. Hopper recounted another incident from his interviews, in which a 17- or 18-year-old Wendi acquiesced in Alejo's requests to meet him in a hotel room, where he had brought with him a bag of lingerie:

> So this is an incident that Wendi partially remembers, like many other things.  You know, doesn't remember, but she remembers pieces of it.  But this one she remembers not wanting to do it.  She remembers getting to the hotel room and him pulling out the bag and starting to pull lingerie out of the bag and just being freaked out and thinking, "Oh, my God, I don't want to put that on," but she doesn't remember anything after that.  She's pretty sure she complied with his wishes, as she did usually, to do this sexual thing, but she doesn't remember anything after that pulling the lingerie out of the bag.

(2/3/14 Tr. II at 30:7-31:3 (J. Hopper).)

Alejo snapped photos surreptitiously, as well.  Jeri Lynn Cunningham recalled accompanying the Ochoas camping on the beach in San Diego, where she caught Alejo taking pictures of her and Wendi in their swimsuits as they showered.  (2/4/14 Tr. at 222:4-7 (J. Cunningham).)

Donna, as had become her custom, did not protest Alejo's sexual actions toward her daughter:  "I ignored a lot of things—a lot of things that I should not have ignored." (2/4/14 Tr. at 197:18-24 (D. Ochoa) (Cross).)

### (2)    "Ministering" to Alejo

Alejo's sexualization of Wendi went beyond the verbal and visual.  After their return to Casa Grande, Alejo demanded that Wendi assume a "duty" that Donna increasingly refused to perform:  the ritual of "ministering to him."  (2/4/14 Tr. at 153:5-19 (D. Ochoa).)  Alejo would wear workout shorts or sweats without underwear and lay on the couch; it was Wendi's "duty, and literally duty, to be the one to rub" his body and head from "[a]nywhere from 45 minutes to a couple of hours" a night.  (*Id.* at 153:5-13, 155:4-156:1.)  "[N]ormally, and especially as [Wendi] got older, he would lay on the couch and [she] would have to sit on the end of the couch and he would put his head on her lap and, you know, say:  Touch me.  Touch me."  (*Id.* at 155:14-18.)

4843-7819-0105.

Childhood friend Jeri Lynn Cunningham was subjected to one of these sessions during a sleepover, as a condition for Alejo taking her and Wendi to the desert.  (2/4/14 Tr. at 232:7-10 (J. Cunningham).)  She and Wendi sat at either end of the couch, with Alejo laying on the couch with his head in Cunningham's lap.  (*Id.* at 232:11-24.)  Alejo gradually turned his face toward Cunningham's crotch area and pretended to snore; Cunningham pushed his face away, but Alejo would repeatedly feign snoring and return his face to the 12- or 13-year-old Cunningham's genitals.  (*Id.* at 233:6-25.)

Dr. Hopper cited this ritual as a textbook indication of an incestuous family dynamic:

> Donna actually said she was relieved to hand this duty off to Wendi, that it was a relief for her.  And this is an example of what we call, . . . a classic incestuous family.  You've got two really damaged adults.  In this case, the mother is depressed and withdrawn and isn't interested in being involved with the father anymore sexually or intimately . . . .  And so we have Donna basically handing Wendi over to Alejo and glad that she's taking care of Alejo's stuff and glad that, you know, she doesn't have to deal with it.  So it was worse than just not looking away.  She was actually relieved. . . . [H]orrible as it is, unfortunately, this is not an uncommon dynamic in some of these really disturbed incestuous families.

(2/3/14 Tr. II at 26:18-27:9 (J. Hopper).)

### (3)    Overt Molestation by Alejo

Alejo's sexual abuse went further.  In light of Wendi's memory deficits relating to trauma and Donna's neglect, no two witnesses were better positioned to testify about Alejo's abuse than Lorts and Cunningham—two close childhood friends of Wendi, who saw Wendi on a daily basis and slept over at her house one to two times per month when Wendi was roughly 10 to 13 years old.  (2/4/14 Tr. at 40:14-24, 46:17-22, 52:5-11 60:2-5 (K. Lorts); 218:8-219:11 (J. Cunningham).)

Lorts began sleeping over at the Ochoas' house shortly after Wendi began school at 91st Psalm in 1980, when Lorts was eight years old and Wendi was 10 or 11.  (2/4/14 Tr. at 51:15-20 (K. Lorts).)  The "first few" sleepovers had a routine pattern:  after dinner, Wendi would take Lorts to Donna's bedroom to play dress-up in Donna's

4843-7819-0105.

1    lingerie, look at themselves in the mirror and "parade around the house."  (*Id.* at 47:16-

2    19, 49:6-24, 50:8-21.)

3        At the third or fourth sleepover, the pattern changed.  After dressing up, Wendi

4    and Lorts (who was dressed in Donna's nightie, with no underwear) "were invited to

5    come into Alejo's room."  (*Id.* at 52:5-11, 53:19-22.)  Lorts followed Wendi into the

6    room, where she saw Alejo wearing only a pair of red shorts, sitting in a large recliner

7    and watching "videos with naked people" on a small television.  (*Id.* at 52:5-11, 53:3-9,

8    53:19-22, 54:18-24.)

9        Lorts initially recoiled at the scene and retreated to the bathroom, "shaking and

10   confused and [unsure] how to feel."  (*Id.* at 53:12-18.)  Wendi followed and told her that

11   "it was okay," and the eight-year-old Lorts felt calmer after her 11-year-old friend's

12   reassurance.  (*Id.* at 53:25-54:2.)  Lorts and Wendi returned to Alejo's room, where he

13   remained sitting in his red shorts, watching an adult video.  (*Id.* at 53:25-54:14.)

14       The girls sat on Alejo's lap, and Lorts saw him "grow or g[e]t big down there" as

15   he fondled their legs, chests, and Wendi's genital area.  (*Id.* at 54:15-56:9.)  Lorts saw

16   Wendi touching Alejo "in the genital area," as well.  (*Id.* at 56:20-22.)  Though the

17   incident seemed to last "forever" to Lorts, who was in third grade at the time, she

18   estimated that the fondling continued for "probably ten minutes."  (*Id.* at 56:10-11.)

19       Lorts, not knowing how to describe what had occurred and wanting to remain

20   friends with one of her only female peers at the church-school, continued to sleep over at

21   Wendi's house for another year.  (*Id.* at 57:21-58:4, 58:22-59:3.)  Each time, she and

22   Wendi were subjected to the same routine of dressing up in lingerie, being summoned to

23   Alejo's room, and being fondled.  (*Id.* at 60:2-5.)  By the third time, Alejo had grown

24   bolder with Lorts, putting her "hand on his thing" and touching her in the genital area.

25   (*Id.* at 59:12-60:1.)

26       Cunningham was the same age as Wendi, and testified regarding a series of

27

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1  sleepovers that occurred in 1982 and 1983, when they were 12 to 13 years old.  (2/4/14

2  Tr. at 228:8-229:25 (J. Cunningham).)  During the sleepovers, Wendi and Cunningham

3  slept in the same bed in their nightgowns.  (*Id.* at 224:1-16.)  On three or four different

4  sleepovers, Cunningham awoke in the night to find Alejo under the covers between her

5  and Wendi, with his hand down Cunningham's nightgown.  (*Id.* at 224:20-225:21,

6  228:14-20.)  She moved his hand away multiple times; each time, his hand would return

7  to her chest.  (*Id.* at 225:5-21.)  She would eventually fall back asleep, and awake in the

8  morning to find Alejo gone from the bed.  (*Id.* at 226:21-227:3.)

9     Neither Lorts nor Cunningham told their parents about the abuse at the time—

10  Lorts because Alejo was (like her own father) a pastor and she lacked the vocabulary or

11  sexual knowledge to understand or describe what had occurred (2/4/14 Tr. at 57:21-58:4

12  (K. Lorts)), and the older Cunningham because she was afraid her father "would kill

13  Alejo" and that her parents would no longer let her see her best friend, Wendi (2/4/14 Tr.

14  at 227:12-15 (J. Cunningham)).  But while both were traumatized by the events, both

15  were also able to speak about them long before Wendi's trial.  Lorts, who is now a

16  special needs teacher in San Tan Valley, first disclosed Alejo's abuse to family members

17  in the early 1990s, when she was 19 years old.  (2/4/14 Tr. at 39:3-12, 66:23-67:5 (Cross)

18  (K. Lorts).)  Cunningham, who is now a second-grade teacher, had not previously

19  disclosed the abuse, but was willing to do so had anyone from Wendi's defense team

20  contacted her regarding Wendi's childhood.  (2/4/14 Tr. at 238:10-239:19 (J.

21  Cunningham).)

22     As reflected in their testimony, Alejo's molestation of Lorts and Cunningham still

23  carries an emotional impact for them.  But unlike Lorts and Cunningham, who were

24  subjected to abuse on a limited number of circumstances over discrete time periods,

25  Wendi had no respite.  Alejo was with her at school each day, and at home each night.

26  He was her stepfather and adoptive father; unlike Cunningham and Lorts, Wendi had no

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

other father figure in her life with whom she could feel safe.  As Dr. Hopper testified, ongoing sexual abuse by a parent is more psychologically destructive than any other form:

> [E]ven a really horrific single trauma, even a . . . violent brutal rape . . . pales in comparison to ongoing sexual abuse day-in, day-out.  As a child, when things happen to you, the younger you are, the more this kind of abuse is more devastating. . . .  It has been documented [that the] closer you are to the [abuser], the more power they have over you, like a parent, the more destructive this kind of abuse is.

(2/3/14 Tr. II at 16:10-17:7 (J. Hopper).)

e.    **The Connection Between Wendi's Traumatic Childhood and Joe's Death**

(i)    **The State Did Not Rebut the Facts Regarding Wendi's Harrowing Childhood or Their Effects**

The State offered no rebuttal to Dr. Hopper's conclusion that Wendi suffered severe and ongoing childhood trauma.  Nor could it.  Multiple witnesses testified regarding various aspects of the same types of trauma inflicted upon Wendi as a child, and—as evidenced by the dozens of declarations filed with the Petition—many more could have offered further corroboration if the State had opted to dispute the facts of her traumatic childhood.

Nor did the State dispute that the types of trauma Wendi suffered impairs the development of crucial executive functions necessary to self-regulate, control impulse, and make sound decisions under stress.  Dr. Hopper is a leading expert in the field who has devoted his career to the study and treatment of childhood trauma and its effects, and his opinions were buttressed by widely accepted literature.  Dr. Pitt did not (and could not have) challenged Dr. Hopper's testimony regarding the effects of pervasive childhood trauma on brain development and adult behavior, nor could he challenge Dr. Hopper's observation that such extensive trauma generally requires years of therapy just "to be able to navigate in certain relationships in a safe way" (2/3/14 Tr. II at 48:4-17 (J. Hopper))— therapy that Wendi never received.

{00128370.1 }

30

4843-7819-0105.

And the State did not meaningfully contend that many symptoms Wendi exhibited as an adult, such as memory deficits concerning emotionally laden events and acquiescence to the sexual attentions of men, were natural consequences of her harrowing childhood.  The State half-heartedly sought to raise an inference that her memory deficits could be mere fabrications to bolster her mental health defense, but there is no credible support for that argument.  *First*, Wendi's memory deficits with regard to emotionally laden effects were noted by her mother as early as age 9 or 10, and by professional counselor Kandy Rohde as early as February 2001 and throughout her pre-trial incarceration—long before any psychologist or psychiatrist had examined her in connection with Joe's death.  *Second*, the State never explains how it would have been in Wendi's self-interest to feign lack of memory regarding traumatic events.  *Third*, the State quibbles by noting that Wendi could remember certain biographical details but not others, but this line of argument ignores the undisputed testimony of Drs. Hopper and Woods that the presence or absence of a memory deficit is a function of the emotional impact it carries for the trauma victim—*not* whether it is an event that the average person would believe to be memorable or non-memorable, emotional or non-emotional.

> **(ii)** **Evidence of Wendi's Childhood Trauma Could Have Persuaded the Jury Not to Impose a Death Sentence**

The unrebutted evidence regarding Wendi's traumatic childhood and its effects likely would have had a significant impact upon the jury, in two main respects.

*First*, the impact of childhood trauma upon executive functions explains Wendi's behavior during the offense itself, which began with a physical confrontation with Joe, as a product of impaired impulse control.  It also explains her behavior before and after the offense not as a product of evil, premeditated scheming, but rather a series of actions by a damaged individual incapable of sound, deliberate decision making under stress.

Dr. Hopper explained how such evidence bears upon Wendi's culpability:

{00128370.1 }

31

1    [W]hen you've been subjected to this kind of unrelenting trauma of all
2    kinds throughout your entire childhood, and at the hands of parents, then it .
     . . warps your capacities and stunts them in various ways . . . .  You can't
3    regulate your emotions and impulses when you're stressed and you can't do
     all kinds of things and your system is not functioning well.  You're just
4    trying to block things out. . . .  And then when . . . a very complex situation
     hits with a lot of stress, it's kind of like the system crashes and that CEO,
5    that prefrontal cortex is just offline and all that lifetime of trauma and any
     impulses that go with it can just kind of come out and take over.

6    (2/3/14 Tr. II at 46:17-47:11 (J. Hopper).)

7         After a long series of questions on cross-examination regarding various facts of

8    the case—none of which concerned the homicide itself—the State again asked Dr.

9    Hopper how Wendi's behavior prior to and after the homicide related to her childhood

10   trauma.  Dr. Hopper referenced his prior testimony regarding the impact of ongoing

11   childhood trauma on the development of executive functions in the prefrontal cortex

12   (2/4/14 Tr. at 28:10-31:14 (J. Hopper) (Cross))—the part of the brain responsible for

13   "modulating impulses and emotions and keeping things in check" (2/3/14 Tr. I at 78:19-

14   79:4 (J. Hopper)).  Healthy executive functioning is also necessary for decision making.

15   (2/4/14 Tr. at 28:10-31:14 (J. Hopper) (Cross).)  "[B]ad decision making is the first thing

16   you see as someone is becoming overwhelmed" due to the close connection between

17   decision making and emotions, but individuals whose ability to regulate emotions is

18   impaired due to persistent childhood trauma find their decision making "going downhill

19   dramatically" as stressors (including their own bad decisions) accumulate.  (*Id.*)  When

20   those stressors culminated in a physical confrontation between Wendi and Joe, "that's

21   when you get the total shutdown of the prefrontal cortex," including the inability to

22   control impulse.  (*Id.*)

23        As Dr. Hopper summarized, Wendi's actions before, during, and after the

24   homicide are "absolutely consistent" with one whose executive functioning had been

25   impaired by "a childhood of trauma":  "So it's absolutely a perfect example of how

26   decision making goes first in all of us, but especially in someone who has been through

27   the overwhelming trauma that she has been through.  That's exactly what you would

28

{00128370.1 }                                    32

expect.  So it is completely consistent with everything I know as a therapist, as a scientist and everything I've studied for the last 20 years."  (*Id.* at 31:5-14.)

But beyond shedding light on Wendi's actions in causing Joe's death, the evidence regarding her childhood trauma and its effects also lends context to a number of the facts that the State emphasized in urging the jury to impose a death sentence.  For example, in the penalty phase of her trial, the State repeatedly referenced Wendi's sexual intercourse with two other men in the months prior to Joe's death as evidence that she wanted to "go out and goof around with other men."  (12/15/04 Tr. at 121:18-20.)  But the jury never heard about the childhood sexual abuse she suffered, which causes the very hypersexuality that the State emphasized in arguing that the death penalty was appropriate.

The State also referenced her purportedly wholesome and religious upbringing, arguing to the jury that her actions leading up to Joe's death were completely inconsistent with her Christian upbringing.  (*See, e.g.*, 12/15/04 Tr. at 129:23-130:21.)  A true, legitimate social history would have shown how her actions were completely consistent with someone who had suffered the pervasive trauma she experienced throughout her developmental years.  As Dr. Hopper noted during cross-examination:

> So, of course, if all that I've just presented and all the expertise that I'm trying to share with the Court was not presented at trial, then, of course, it's easy to paint her as a conniving bitch, who's off sleeping around and drinking and having fun as her husband is dying.  You know, prosecutors can do that sort of thing when this kind of evidence is not presented.
>
> The whole point—the reason why I'm here is because there is such evidence.  We have now done a thorough investigation. . . .  There is so much—so much evidence of trauma and the effect this would have on someone's brain.  It was never presented at trial and that's why she would be presented as a conniving person.  What I'm saying is 52 hours with her, looking at all the evidence, my own professional integrity as a therapist, a scientist, and somebody who testifies in court, it just doesn't—it just doesn't compute.

(2/4/14 Tr. at 32:8-33:6 (J. Hopper) (Cross).)

In sum, evidence of Wendi's harrowing childhood and the effects of such trauma

4843-7819-0105.

establishes a lens through which the jurors would have viewed all of her subsequent

actions—a lens through which Wendi's actions are not the result of purely vicious or

selfish desires, but rather the byproduct of suffering repeated molestation, physical abuse,

deprivation, and neglect through at least the first 18 of her 30 years prior to Joe's death.

Had this evidence been presented, her sexual acquiescence to other men becomes a sad

and predictable consequence of childhood sexual abuse by her stepfather, rather than

evidence that "[s]he's going to do what she wants.  What does she care about the Ten

Commandments?"  (11/16/04 Tr. at 97:19-20.)  Her increasingly deformed decision

making leading up to Joe's death becomes a product of her stunted executive functioning

under stress, rather than part of her "character . . . to try and achieve her goal in any way

possible."  (12/15/04 Tr. at 113:1-3.)  Her memory deficits regarding emotionally laden

events have a scientific explanation, rather than a target for the prosecutor to ask the jury,

"If that's the truth and that was such a traumatic event . . . don't you think she would

have remembered?"  (11/16/04 Tr. at 94:23-25.)  The beating with the barstool and

subsequent cut with the knife become the product of a lack of impulse control naturally

arising from 18 years of abuse and neglect, rather than part of a considered effort to "not .

. . leave the job undone."  (12/15/04 Tr. at 114:17-18.)

Evidence of Wendi's harrowing childhood speaks to all of the reasons underlying

the State's argument for death.  It certainly could have persuaded the jury—which

deliberated at the penalty phase for four days even *without* this evidence—to impose a

sentence of life in prison rather than death.

### 3.    Wendi's Psychological Disorders and Their Effects

In March 2001, Dr. Jack Potts was given the narrow task of assessing whether

Wendi was competent to assist trial counsel.  (Ex. 6.001.)  He concluded that she was, but

could not help but comment that something seemed amiss with regard to her mental

health in connection with the offense:

Certainly there is something quite bizarre about what allegedly occurred.  If

{00128370.1 }

34

4843-7819-0105.

> Ms. Rohde is accurate in her diagnostic assessment, then the criminal culpability of the defendant and her state of mind at the time of the alleged offense should be evaluated independently, outside the scope of a [competency] evaluation.

(*Id.* at 2-3.)

As noted in more detail in the portion of this brief concerning ineffective assistance of counsel, prior to this post-conviction relief proceeding no psychiatrist was given the task of assessing Wendi in light of the diagnostic impressions of Kandy Rohde, the certified professional counselor Wendi was seeing on a regular basis while incarcerated.[4]  In addition, every witness who testified on the subject at the evidentiary hearing—including Dr. Pitt and Patterson—emphasized the importance of an accurate and complete social history to a proper diagnosis.  (*See, e.g.*, 2/5/14 Tr. at 49:16-51:3 (G. Woods); 2/6/14 Tr. at 72:19-73:18 (K. Rohman); 2/7/14 Tr. at 49:6-50:15 (D. Patterson); 2/11/14 Tr. at 60:15-61:4 (L. Hammond); 2/14/14 Tr. at 43:4-21, 44:23-45:1, 72:23-25 (S. Pitt).)  Prior to this proceeding, no one had compiled an accurate social history of Wendi that included the extensive childhood trauma referenced above.  The only social history compiled by the defense team was the superficial and unequivocally positive portrayal of Wendi's upbringing captured in the PowerPoint presentation it made at trial. (2/7/14 Tr. at 60:24-61:18 (D. Patterson).)

Thus, Dr. George Woods,[5] who was retained in connection with this post-conviction relief proceeding, was the first psychiatrist given the task of assessing Wendi

---

[4] Dr. Richard Rosengard, who performed a one-visit diagnostic assessment in 2002, did not review (and apparently was not provided) any materials from Rohde.  (Ex. 6.003 at 1 (noting materials reviewed, which consisted of police reports and other evidence regarding the offense itself).)

[5] Dr. Woods has been a practicing psychiatrist for more than 35 years, is a fellow with the American Psychiatric Association, serves on the advisory boards for the International Association of Trauma Professionals and the International Association for Specialized Study of Developmental Disorders, and currently teaches psychiatry at the Morehouse School of Medicine in Atlanta.  (*Id.* at 43:8-47:18.)

4843-7819-0105.

1    in light of the diagnostic impressions of Rohde and others, and the first to have the

2    benefit of a full social history in making that diagnosis, including the social and mental

3    health history of her family.  Dr. Woods relied upon "a comprehensive social history of

4    Wendi that really went back to before her birth that had significant information about"

5    both the paternal and maternal sides of her family.  (2/5/14 Tr. at 49:16-50:6 (G.

6    Woods).)  Dr. Woods was also the first—and still the only—evaluating psychiatrist to

7    spend more than a single visit with Wendi, evaluating her on three different occasions

8    and conducting a separate interview of Donna.  (*Id.* at 48:15-24, 49:11-14.)

9        With all of this relevant information at hand, Dr. Woods diagnosed Wendi with

10   four disorders:  (1) complex post-traumatic stress disorder, a severe form of PTSD that

11   results from exposure to continuous, ongoing trauma; (2) bipolar disorder, a mood

12   disorder prevalent on the maternal side of her family; (3) cognitive disorder not otherwise

13   specified, an impairment of the executive functioning in her brain that was confirmed by

14   additional neuropsychological testing; and (4) dependent personality disorder, a

15   pathological need to attempt to satisfy the needs of others, deriving from a childhood

16   punctuated by neglect, abuse, and coercion by adults.[6]

17       The following sections address each of the four conditions identified by Dr.

18   Woods and their effect on Wendi's behavior, both individually and cumulatively.

19                          **a.    PTSD**

20       Post-traumatic stress disorder, or PTSD, has at least two variations.  Type 1 PTSD

21   "is the type of PTSD that is reflected by a single incident . . . that leaves a person reliving

22   that experience," such as a traumatic rape or great bodily injury.  (*Id.* at 54:13-23.)  Type

23

24   ─────────────────────────

     [6] In addition, Dr. Woods also noted that over years of helping to care for Joe's cancer,
25   Wendi suffered from "caregiver burden"—an umbrella term describing specific stressors
     and disruptions to mental health faced by those who assume the primary role of caring for
26   chronically or terminally ill family members, which exacerbates the symptoms of other
     disorders suffered by the caregiver.  (*Id.* at 52:25-54:3.)
27

28
     {00128370.1 }                              36

1  PTSD "dysregulates the emotions so that people tend to overrespond or underrespond"

2  to specific circumstances, such as being in the area where the traumatic events occurred.

3  (*Id.*)

4          Type 2, or "complex PTSD," is a form of PTSD often associated with ongoing

5  trauma over a longer duration, such as ongoing sexual or physical abuse.  (*Id.* at 55:3-14.)

6  Because its sufferers faced the same or related trauma on a day-to-day basis, the effects

7  of Type 2 PTSD are more disruptive than Type 1 PTSD:  "you find that complex PTSD

8  really creates . . . long-lasting symptoms of what we call rumination, having these things

9  go on over and over.  And complex PTSD, more than Type 1 PTSD, disrupts day-to-day

10 functioning."  (*Id.* at 55:3-14.)

11         Childhood sexual abuse and neglect are common sources of complex PTSD.  (*Id.*

12 at 57:15-59:7.)  Even the State's expert, Dr. Pitt, conceded that if the traumatic childhood

13 events outlined in the Petition were true—as the testimony at the hearing proved them to

14 be—then "maybe some of the symptoms that she has could potentially be tied to post-

15 traumatic stress disorder."  (2/14/14 Tr. at 112:17-24 (S. Pitt.) (Redirect).)

16         Memory deficits and dissociation are manifestations of complex PTSD, and Dr.

17 Woods observed both in his interviews of Wendi.  (2/5/14 Tr. at 55:18-24, 56:9-57:10 (G.

18 Woods).)  Complex PTSD is also marked by sleep disruption of the kind reported by

19 Wendi.  (*Id.* at 75:11-76:8.)  Further, complex PTSD causes "numbing" in its sufferers, in

20 which "behaviors that are so inappropriate, that are so beyond the pale"—such as

21 acquiescing to a stepfather's sexual advances—"become normalized."  (*Id.* at 58:22-

22 59:7.)  "It doesn't mean that the person doesn't feel.  It means that in order to fight off the

23 multiple stresses, they cocoon themselves."  (*Id.* at 61:24-62:9.)  Sufferers often self-

24 medicate by abusing alcohol or other drugs.  (*Id.* at 64:9-17.)

25         But the "primary impact of post-traumatic stress disorder" again relates to "what's

26 happened in the brain" as a result of the trauma.  (*Id.* at 62:14-63:1.)  As explained by Dr.

27

28

{00128370.1 }

<div align="center">37</div>

4843-7819-0105.

1   Woods:  "[PTSD] throws off one's ability to respond accurately and effectively.  People

2   that have severe [PTSD], they either overrespond or underrespond.  And I'm not saying

3   in each and every situation, but certainly in emotionally laden situations.  They often just

4   miss the bar."  (*Id.* at 62:14-21.)  In such situations, "[t]heir ability to really effectively

5   weigh and deliberate what's going on is impaired, their ability to kind of add up all the

6   figures to determine what's the best course of action."  (*Id.* at 62:22-63:1.)

7        Wendi's PTSD resulting from a lifetime of trauma explains many behaviors that

8   went largely unexplained at trial.  It explains her excessive drinking in the months prior

9   to Joe's death, not as "having the time of her life" but rather a form of self-medication for

10  a significant mental disorder.  (12/16/04 Tr. at 11:12-14.) It explains her "[c]onfused"

11  affect when she asked Chris Hashisaki to watch her children while she accompanied Joe

12  to the hospital on the night of the homicide (9/8/04 Tr. II at 11:22-23 (C. Hashisaki))—

13  followed by irrational actions in calling and then dismissing paramedics for Joe—as a

14  function of her inability to weigh and deliberate her actions at that moment of extreme

15  stress.  The numbing effect of PTSD explains why "[s]he didn't shed a tear" during the

16  police interrogation that followed.  (12/15/04 Tr. at 108:12-13.)  And, most of all, it

17  explains Wendi's overresponse in her physical altercation with Joe, resulting in his death.

18       Had the jury been provided the medical explanation of complex PTSD for these

19  otherwise inexplicable acts—a diagnosis that the State's own expert does not refute—it

20  could have reached a different result at the penalty phase.

21               **b.**     **Bipolar Disorder**

22       While "PTSD occurs because something happens in the environment to you[,]"

23  bipolar disorder (like other mood disorders such as depression) is a "disorder[] that run[s]

24  in families."  (*Id.* at 64:21-65:7.)  Both sides of Wendi's biological family suffer from

25  mood disorders:  Wendi's maternal aunt and possibly grandmother suffered from bipolar

26  disorder (2/4/14 Tr. at 76:19-25 (D. Ochoa)), Skip had the mood disorder of depression,

27

28

4843-7819-0105.

and Donna suffers from depression with some indications of bipolar disorder.  (2/5/14 Tr. at 66:9-22 (G. Woods).)

"Bipolar disorder is by definition a disorder of impaired judgment.  It's by definition a disorder where you do things that you just wouldn't do if you weren't experiencing and suffering from these symptoms at that time."  (*Id.* at 87:23-88:2.)  As its name suggests, bipolar disorder is marked by swings between two poles:  depression (marked by feelings of hopelessness, isolation, excessive sleep, and feeling unable to function) and periods of mania, which was historically thought to refer to grandiosity but "really reflects more irritability, impaired judgment, [and] impulsivity."  (*Id.* at 65:9-25.) While in the midst of either pole, individuals with bipolar disorder "have significantly impaired judgment. . . .  Their ability to effectively weigh and deliberate, think their way through a problem, is significantly impaired."  (*Id.* at 77:21-78:2.)  The mood disruption can lead to bizarre and irrational behavior, the "loss of understanding of social boundaries," and hypersexuality.  (*Id.* at 78:7-79:1, 121:14-122:1 (Cross), 125:6-9 (Cross), 126:22-127:3 (Cross).)  As with PTSD, people with bipolar disorder also tend to self-medicate.  (*Id.* at 79:4-8.)

Bipolar disorder usually begins to manifest itself in adolescence, and "the first symptom that you see, particularly in women, is depression."  (*Id.* at 68:7-22.)  Wendi exhibited those symptoms at least by her teenage missionary trip to Mexico, where she went through a period where she was in bed for weeks.  (*Id.*)  She also exhibited periods of the opposite pole of mania as an adult, marked by the key symptoms of sexual impulsivity and "bursts of energy not tied to any particular activity."  (*Id.* at 74:9-16.) While incarcerated, her medical providers noted that she experienced racing thoughts, a "type of thinking that occurs in bipolar disorder that is not really consistent with any other type of psychiatric disorder.  It's the shift that your thoughts are going so fast that you just aren't able to hold onto them. . . .  This describes a specific constellation of

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

1  symptoms that is just not found" in other disorders.  (*Id.* at 76:15-77:13.)  Moreover, after

2  going through a variety of medications while in pre-trial incarceration, prison medical

3  providers eventually began treating her mental health symptoms with Seroquel—a drug

4  that "has been specifically indicated for bipolar depression."  (*Id.* at 69:7-21.)

5        Dr. Woods noted that several of her behaviors after the onset of the disorder in her

6  late teens, including actions leading up to the time of the offense, were "the very types of

7  irrational behaviors that one sees in bipolar disorder."  (*Id.* at 121-14-122:1.)  Dr. Pitt

8  agreed that Wendi was experiencing mood disorder symptoms prior to the homicide:

9  "Now what I do say in that part of my report is that she did in the run-up to the offense . .

10  . experienc[e] some depressive symptoms and was experiencing some anxiety symptoms.

11  And I believe that.  I think she was."  (2/14/14 Tr. at 74:5-9 (S. Pitt).)

12        Wendi's trial counsel attempted to rationalize Wendi's irrational behaviors leading

13  up to Joe's death.  But some of those actions simply cannot be rationalized.  For example,

14  asking a neighbor to pose as Joe to try to obtain a life insurance policy for the family,

15  even with Joe's knowledge and consent, was a misguided and irrational decision doomed

16  to failure.  Had the jury been provided a sound medical explanation for her increasingly

17  abnormal conduct in the months leading up to and including Joe's death, ranging from

18  the socially inappropriate (such as openly flirting and kissing men in front of co-

19  workers), to the bizarre (such as hare-brained efforts to obtain insurance for someone in

20  the advanced stages of terminal cancer), to the utterly irrational (such as her excessive

21  violence in her altercation with Joe, resulting in his death), it is reasonable to believe that

22  it would not have imposed a death sentence.

23              c.    **Cognitive Disorder**

24                   **(i)    Diagnosis**

25        In light of Wendi's severe childhood trauma and mental disorders, Dr. Woods

26  enlisted the assistance of the late Dr. Myla Young, a neuropsychologist, to evaluate

27

{00128370.1 }                                    40

28

4843-7819-0105.

1   Wendi's neuropsychological functioning.  Neuropsychologists assess different areas of

2   brain functioning by administering various standardized tests aimed at assessing specific

3   functions (2/10/14 Tr. at 12:18-13:24 (J. James)), and Dr. Young administered what the

4   State's expert characterized as "a huge—a very large number of [neuropsychological]

5   tests three years prior" to the hearing.  (2/14/14 Tr. at 13:13-18 (K. Amin).)  Specifically,

6   Dr. Young administered an "extraordinarily thorough battery" of 35 tests, spending 25

7   hours over five visits with Wendi in the process. (2/10/14 Tr. at 14:3-14 (J. James).)

8   "[T]here was significant consistency in Wendi's performance in terms of strengths and

9   weaknesses" across the tests, many of which were computer-scored or, in the case of tests

10  requiring verbal responses, recorded and transcribed.  (2/10/14 Tr. at 12:2-13, 15:10-22

11  (J. James).)

12          After Dr. Young's passing a few months before the hearing (*id.* at 11:19-22), Dr.

13  Joette James reviewed the raw neuropsychological testing data and Dr. Young's analysis,

14  conducted her own independent scoring analysis of the data, and performed a fresh

15  reanalysis of Dr. Young's interpretations.  (*Id.* at 5:13-18, 11:9-18.)  Dr. James is a

16  clinical neuropsychologist who received her Ph.D. in clinical psychology from

17  Northwestern, served an internship at Boston Children's Hospital through Harvard

18  Medical School, and spent two years in fellowship and seven years on the faculty at the

19  Children's National Medical Center in Washington, D.C.  (*Id.* at 6:23-7:8, 9:16-10:1.)

20  She also maintained a clinical practice in neuropsychology and was certified by the

21  American Board of Professional Psychology in Clinical Neuropsychology, a credential

22  held by only four percent of her peers in the field.  (*Id.* at 7:11-8:4, 9:16-10:1.)

23          Consistent with the testimony of Dr. Hopper regarding the impact of pervasive

24  childhood trauma on brain development, the neuropsychological tests confirmed that

25  Wendi's cognitive functions were impaired in three specific respects:  executive

26  functioning, information processing speed, and attention.  (*Id.* at 5:22-25.)  As described

27

28

{00128370.1 }

41

4843-7819-0105.

1  below, all of these deficits relate to her brain's inability to function properly under stress.

2  **Executive Functioning.**  Dr. Young administered "a number of measures" that

3  tested various aspects of executive functioning, which is "the bridge to real world

4  functioning and it includes abilities such as working memory, the short-term memory, the

5  ability to hold information in your mind, and then use it to guide behavior" and to

6  "control impulses."  (*Id.* at 24:18-25:19.)  The results showed that Wendi performed

7  "fine" when the tasks involved in the testing were relatively simple; when complexity

8  was introduced, however, her performance plummeted dramatically.  (*Id.* at 25:21-26:3.)

9  She scored in the 7th percentile or less in all four trials of one test for executive

10  functioning (*id.* at 26:4-16); she performed in the 2nd to 5th percentile in another complex

11  test (*id.* at 30:1-31:9) and the 7th percentile in a third (*id.* at 32:9-33:3), all illustrating her

12  inability to function when "overloaded by a large amount of information" (*id.* at 31:14-

13  24).

14  **Information Processing Speed.**  A number of the neuropsychological tests

15  included a time component, which "puts stress on the prefrontal cortex systems."  (*Id.* at

16  37:15-38:2.)  In reviewing the testing data, Dr. James found "that in just about every test

17  where there was a time component . . . [s]he performed poorly.  And when I say poorly, I

18  mean less than the 1st percentile, the 2nd percentile, the 9th percentile, the 5th percentile.

19  There were a number of tests."  (2/10/14 Tr. at 35:6-23 (J. James).)  "[I]t was really the

20  addition of the timing element that derailed her," as illustrated by one vocabulary test in

21  which she scored in the 50th percentile when not timed, but her performance fell to the 9th

22  percentile when Dr. Young added a timing component to the test.  (*Id.* at 36:1-37:6.)

23  **Attention.**  Similarly, Wendi's performance on tests of different types of attention

24  was normal when the tests were simple, but "[s]he had more difficulty with the more

25  complex aspects of attention, shifting attention back and forth between two different

26  types of cognitive tasks or being able to selectively attend to one or divide her attention

27  {00128370.1 }

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

between the two"—with scores ranging from the 18th percentile to less than the 1st percentile.  (*Id.* at 21:9-23:2.)  In particular, Wendi was "unable to keep up" with changes in the tests, scoring at less than the 1st percentile upon a task that provided stimuli at random varying intervals.  (*Id.* at 23:7-24:4.)  As Dr. James explained, "what that means in real life is that . . . as the task changes, as the demand changes, as what's required changes, she is unable to keep up with—keep pace with the task."  (*Id.*)

### (ii)  Effects

Individuals with these types of cognitive deficits are subject to becoming easily overwhelmed (*id.* at 33:8-17); when that occurs, they may respond by shutting down, by "acting out" with "emotional outbursts," and by becoming "increasingly impulsive."  (*Id.* at 33:20-34:5.)  When that "shutdown" of executive functioning occurs, "then there is really a breakdown in communication between . . . that part of the brain and other parts, recruiting language, being able to recruit memories, being able to put a stop on impulses, being able to consider plans of actions, think ahead.  You know, all of those abilities are sort of run and managed by this CEO [of the brain], and when that CEO is not working, then you have a breakdown in the system."  (*Id.* at 38:10-39:1.)

The testing may not fully capture the extent of Wendi's crash in cognitive function under the stressful circumstances leading up to Joe's death, because while there is "some stress associated with being tested," that stress is mild compared to a truly "complex or high stress situation, [in which] you would expect her to deteriorate further in terms of her ability to change with the changing demands or situation."  (*Id.* at 24:7-14.)  Indeed, as Dr. Woods noted, medical records from Wendi's pre-trial incarceration (such as records pertaining to her suicide attempt) indicated her inability to function cognitively when faced with "multiple stressors at the same time."  (2/5/14 Tr. at 85:1-18 (G. Woods).)

Because Wendi is capable of functioning normally on straightforward tasks, her

4843-7819-0105.

cognitive deficits "are not as obvious on a day-to-day basis."  (*Id.* at 86:17-87:3.)  But "[i]n situations that are high stress where emotions are running high, she is more likely to become overloaded and overwhelmed.  And when that happens, she shuts down.  Her neurological system shuts down and she has difficult engaging in a thoughtful goal-directed decisions making process.  And as a result, she tend to then act on impulse." (2/10/14 Tr. at 6:10-16 (J. James); *see also* 2/5/14 Tr. at 87:23-88:10 (G. Woods) ("Cognitive defects are very similar [to bipolar disorder], in that, you, when under stress, can't martial up the forces" to make reasoned decisions).)

As with her complex PTSD and bipolar disorder, Wendi's cognitive deficits under stress provide further context for her increasingly impulsive and irrational behavior leading up to and including Joe's death.  But the results of her neuropsychological testing also provide concrete, measurable verification of her impairments in executive functioning arising from a childhood of repetitive trauma.  Even if a jury disagreed regarding the particular cause of her cognitive deficits, the fact that those cognitive deficits exist weighs upon how the jury considers all of her actions under the exceptionally stressful circumstances of caring for Joe as his cancer progressed, while raising two young children and serving as the family's sole breadwinner.

### (iii)   Dr. Amin Failed to Materially Rebut the Findings of Dr. Young and Dr. James

The State's neuropsychologist, Dr. Kiran Amin, did not endeavor to rebut the findings of Dr. Young and Dr. James that Wendi suffered cognitive deficits in executive functioning, information processing, and attention under stress.  Indeed, Amin did not specifically test for executive functioning (2/10/14 Tr. at 39:19-40:8 (J. James)), and did not dispute that the results of the comprehensive battery of tests administered by Dr. Young showed the cognitive deficits identified by both Dr. Young and Dr. James.

Instead, Dr. Amin "was more interested in seeing what changes, if any, had occurred since that testing by Dr. Young" (2/14/14 Tr. at 13:14-18 (K. Amin)) to assess

{00128370.1 }                                        44

1  the possibility that Wendi was malingering—or faking—her cognitive deficits.

2      Dr. Amin's evidence of malingering was flimsy at best, for several reasons.  Dr.

3  Young had previously given Wendi seven different "performance validity tests" to spot

4  malingering during the testing relied upon by her and Dr. James, as well as numerous

5  checks for malingering embedded in tests on other functions.  (2/10/14 Tr. at 17:21-18:12

6  (J. James).)  *None* of those tests indicated malingering by Wendi during the battery of

7  tests administered by Dr. Young.  (*Id.*)  Thus, the most Dr. Amin could show was that

8  Wendi was malingering during his administration of the tests he conducted—not the tests

9  that produced the raw data relied upon by Dr. Young and Dr. James.

10      Dr. Amin failed to show that Wendi was malingering during his test

11  administration, either.  Dr. Amin administered two stand-alone tests for malingering.  He

12  acknowledged that on the first, "which had not previously been administered to Ms.

13  Andriano, she performed within normal limits.  In other words, she put forth normal

14  effort."  (2/14/14 Tr. at 14:23-15:1 (K. Amin).)  On the second, the Structured Inventory

15  of Malingered Symptomology (SIMS)—a test that specifically warns that it cannot be

16  used alone to determine whether one is candidly responding (*id.* at 29:9-12 (Cross))—

17  Wendi had a combined score of 15, only one point away from being considered normal

18  under the test's own criteria.  (*Id.* at 28:20-29:4 (Cross).)  Moreover, those criteria are

19  inaccurate.  As Dr. James noted, a 2007 study showed that people performing credibly on

20  the test had an average score of 14.9—one-tenth of a point from Wendi's score—and that

21  the test had a false positive rate of 40 percent.  (2/10/14 Tr. at 44:5-45:5 (J. James).)[7]

22      Finally, had Wendi been malingering with Dr. Amin in an effort to exaggerate her

23

24  _____

[7] Dr. Amin also administered the MMPI, a personality test that had been previously
25  administered by Dr. Bayless prior to Wendi's trial, and noted that there were elevations in
    some areas as compared to prior administration a decade earlier.  (2/14/14 Tr. at 16:2-9
26  (K. Amin).)  But as Dr. Amin acknowledged, those elevations simply indicate that Wendi
    was in a "considerably greater level of distress" when Dr. Amin tested her.  (*Id.*)

27  {00128370.1 }                                45

28

4843-7819-0105.

1    cognitive deficits, one would expect her to perform worse on certain tests than she had

2    with Dr. Young three years earlier.  Yet in the sole test he administered that captures

3    executive functioning—the complex figure test—her performance improved.  (*Id.* at

4    39:19-40:8, 40:21-41:18.)  That improvement is expected, due to the "practice effect" of

5    having performed the same unusual task before.  (*Id.*)  The complex figure test is

6    particularly susceptible to the practice effect.  (*Id.* at 42:10-14.)

7                    d.       **Dependent Personality Disorder**

8            Dependent personality disorder is a psychiatric disorder marked by a pathological

9    dependence upon and acquiescence to others, including an insatiable need to satisfy the

10   perceived needs of others.  (2/5/14 Tr. at 91:7-11 (G. Woods); *see also* Ex. 2 at 21-23.)

11   When one suffering from dependent personality disorder proves unable to continue to

12   fulfill those needs or feels the focus of their dependence withdrawing, she "fall[s] apart"

13   (2/5/14 Tr. at 92:1-7 (G. Woods)) and responds not with meek acquiescence but "often

14   [with] anger, [with] explosive responses."  (*Id.* at 97:14-98:7.)

15          "Wendi was groomed, so to speak, to be dependent," from being educated in a

16   church that believed acquiescence to be a woman's duty to submitting to Alejo's

17   sexualized needs to facing corporal punishment throughout her childhood for

18   disobedience or rebelliousness.  (*Id.* at 92:11-20.)  She exhibited symptoms of dependent

19   personality disorder early on in her relationship with Joe (*id.* at 93:25-94:21), in her

20   sexual relationships with other men (*id.* at 96:16-18), and even in her interview with Dr.

21   Pitt (*id.* at 95:7-15).  Dr. Pitt agreed that she "definitely . . . has features of someone

22   who's a dependent personality.  And I also think she has features insofar as she needs to

23   be around other people.  I don't think she does really well when people leave her, per se."

24   (2/14/14 Tr. at 77:8-13 (S. Pitt).)

25          Wendi's dependent personality disorder would have helped the jury understand the

26   dysfunction underlying Wendi's drastic shift in behavior in the months prior to Joe's

27

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1   death—when the cancer progressed despite all of the surgeries, chemotherapy, holistic

2   healing, and even seeking spiritual healing through Pastor Tom King and the Harvest

3   Family Church.  It was, as Dr. Woods described, a situation in which "[t]he needs that

4   Mr. Andriano had tragically could not have been resolved. . . .  [W]hat you saw in this

5   relationship was . . . someone that had real needs who was medically ill, who was in fact

6   grieving themselves and fearful for their own life, and, yet, Wendi could not meet those

7   needs.  It just wasn't possible."  (2/5/14 Tr. at 99:18-100:2 (G. Woods).)  Her

8   pathological dependency needs thwarted, she responded by seeking the approval of other

9   men, succumbing to stresses that accelerated her other disorders, and, ultimately,

10  violence.  Had the jury been given this psychiatric context when judging those behaviors

11  in the penalty phase deliberations, it could have reached a different result.

### e.      The Interaction of Multiple Disorders

13          As noted above, each of Wendi's disorders individually has the impact of

14  impairing her ability to deliberate, exercise rational judgment, and control impulse under

15  certain stressors that were most abundant in the time leading up to Joe's death,

16  culminating in the physical fight and resulting overresponse of Wendi in causing his

17  death.  Evaluating the impact of each disorder in isolation, however, fails to capture the

18  full extent of her impairment.  As Dr. Woods explained, Wendi's disorders are co-

19  morbid, meaning that they "amplify on each other":

20          You've got bipolar disorder.  You've got impaired judgment.  You've got
            cognitive deficits that lend themselves to impaired judgment.  You've got
21          dependent personality that can create anger and hostility.  You've got
            numbing of post-traumatic stress disorder.  All of these interact. . . .  They
22          interact and they interact in ways that create more severe behavior and
            behavior that frankly you often do not see until you see that kind of co-
23          morbid interaction.

24  (2/5/14 Tr. at 102:13-103:20 (G. Woods).)

25          The stressors giving rise to this co-morbid interaction in Wendi were beyond those

26  faced previously in her adult life, in part due to the cumulative effect of caring for Joe's

27  terminal cancer for several years prior to his death.  The stressors of caring for the

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

chronically and terminally ill are captured by the umbrella term "caregiver burden," which is not a diagnosis but a "disrupter" that "exacerbates and disrupts symptoms that that . . . a caregiver may have." (*Id.* at 53:2-23.) Over time, Wendi's caregiving stressors were profound. Joe was "increasingly ill with brief moments of respite when he would have surgery" between 1994 and 1998; after that time, he was "increasingly debilitated, increasingly ill" and unable to work. (*Id.* at 100:19-101:21.) Thus, in addition to caring for Joe, Wendi was primarily responsible for caring for their two young children and providing the sole income for the family's mounting medical and other expenses. (*Id.*) It is in this context of these extreme stresses on a day-to-day basis, which serve as triggers for her various co-morbid disorders, that "[w]e really start to see these symptoms of mood disorder and PTSD crop up and we see decisions that are significantly different than decisions she's ever made in her life." (*Id.* at 101:14-21.)

f.    **Dr. Pitt Failed to Materially Rebut the Findings of Dr. Woods and Dr. Hopper**

Dr. Pitt reached different diagnoses following his single visit with Wendi, which totaled less than five hours (2/14/14 Tr. at 94:10-16 (S. Pitt) (Cross)), but (as noted above) he did not claim that the diagnoses of Dr. Woods were incorrect. He conceded that complex PTSD was possible if allegations regarding her traumatic childhood were shown to be accurate. (*Id.* at 75:2-4.) He did not dispute that Wendi has a family history of mood disorders such as bipolar, and noted that she was experiencing symptoms consistent with a mood disorder (namely, "some depressive symptoms" and "some anxiety symptoms") "in the run-up to the offense." (*Id.* at 74:5-9.)[8] He noted that she

---

[8] Dr. Pitt attributed those symptoms to an "adjustment disorder" in dealing with the stress of Joe's cancer (*id.* at 78:4-13), but that diagnosis is not sustainable. As Dr. Woods noted, "adjustment disorders are by definition time-limited," lasting a matter of months before "coming back to a homeostatic basis." (2/5/14 Tr. at 108:4-109:2 (G. Woods).) When Wendi was arrested, her medical providers noted that her depression had been ongoing for at least a year prior to the offense. (*Id.*) It continued after her incarceration, as set forth in the jail records: "What really you saw were a number of different

4843-7819-0105.

has "features of someone with a dependent personality," though he characterized it as a personality disorder with "borderline and dependent features" rather than dependent personality disorder.  (*Id.* at 77:8-22.)  He did not opine regarding Wendi's cognitive disorder, deferring to Dr. Amin.  (*Id.* at 75:12-14.)

Dr. Pitt's only substantive criticism of Dr. Woods' diagnoses was that, while her pre-trial jail records saw "different diagnoses bandied about, including [PTSD and] bipolar disorder," Wendi had not previously been "definitely, nor conclusively, diagnose[d] with a major mental illness" before her trial.  (*Id.* at 73:2-8.)  That is not surprising.  As noted above, an accurate social history and family mental-health history are key components to a conclusive psychiatric diagnosis.  Every mental health provider who ever treated or evaluated Wendi prior to trial—from her brief employer-mandated counseling in 1996 (*id.* at 71:16-72:9), to Kandy Rohde's pre-trial counseling, to Dr. Potts's competency evaluation, to Dr. Rosengard's initial assessment, to Dr. Bayless's assessment for the State, to her jail medical providers who prescribed psychotropic drugs for her and treated her following her suicide attempt—noted that Wendi suffered from psychiatric disorders.  But because of trial counsel's inadequate mitigation investigation, they made those assessments without the benefit of an accurate and complete social history, including a family mental health history, and often from single-visit evaluations. Dr. Woods and Dr. Hopper, by contrast, had access to a full family mental health and social history for Wendi and made a combined nine visits with Wendi covering several dozen hours.  (2/3/14 Tr. I at 29:5-10 (J. Hopper); 2/5/14 Tr. at 48:15-18 (G. Woods).) They had the information necessary to make conclusive diagnoses, information that was not investigated or provided to those assessing her before her trial.

_____

medications being used to treat her depression and eventually them moving on to drugs that are specifically for bipolar depression and her being on those off and on for about three years.  So we don't have the resolution that one gets when you just have an adjustment disorder."  (*Id.*)

4843-7819-0105.

In short, Dr. Pitt offered no substantive rebuttal to the analysis of Dr. Woods, Dr. Hopper, and Dr. James.  Instead, he devoted the bulk of his testimony to unscientific attacks on Wendi's credibility and his personal impressions of the State's evidence at trial.  Dr. Pitt dismissed responses from Wendi that were consistent with the diagnoses of Dr. Woods as false answers from a "savvy" defendant, without explanation.  The extent of Wendi's purported "savviness" appeared to grow through the course of Dr. Pitt's testimony, in which Wendi went from "a fairly savvy person when it comes to being interviewed" (*id.* at 53:23-24) to being "in the top 10 percent" in terms of "having some savvy and having a little game" (*id.* at 64:5-6) to being a "a very, very savvy defendant" (*id.* at 116:19-20) by the time of his redirect examination.  Yet, as described more fully in following sections regarding mental health red flags that trial counsel did not pursue, Wendi reported the same symptoms relied upon by Dr. Woods long before her trial. Labeling her consistent reports of those symptoms today as "savvy" is not a credible rebuttal, and is inconsistent with the emotion she showed in the various video clips of Dr. Pitt's interview that were aired during the evidentiary hearing.

Similarly, as Dr. Hopper noted, Dr. Pitt's interview of Wendi was not structured to obtain psychiatrically pertinent information, but was "a textbook case of how to not interview for traumatic memory."  (2/3/14 Tr. II at 93:10-15 (J. Hopper) (Cross).)[9]  Dr. Pitt himself acknowledged that he approached the interview as an interrogation regarding factual events rather than a psychiatric assessment of her disorders and their effects:  "I'm not there to build rapport.  I'm there to get to the truth, to get the information, to hear her

---

[9] For example, though Dr. Pitt agreed with Dr. Hopper that interviewing sexual abuse victims regarding the abuse is a delicate matter and that victims often block out memories of abuse (*id.* at 96:24-97:11 (Cross); 2/3/14 Tr. I at 90:4-20 (J. Hopper)), Dr. Pitt opened his discussion of sexual abuse with Wendi by bluntly asking whether she and Alejo were "sexually involved."  (2/14/14 Tr. at 102:9-106:2 (S. Pitt).)  Wendi stated that she did not remember when they had a physically sexual relationship, but knew they had an emotionally sexual one; Dr. Pitt did not follow up on the answer, and instead proceeded to ask whether she remembered other physical aspects of Alejo's sexual abuse.  (*Id.*)

4843-7819-0105.

1   version of the events."  (2/14/14 Tr. at 101:8-13 (S. Pitt) (Cross).)

2       Consistent with that interrogative objective, much of Dr. Pitt's testimony consisted

3   not of psychiatric opinions, but whether Wendi's recitation of the guilt-phase facts

4   comported with his own beliefs or the testimony of others at her trial.  (*See id.* at 59:20-

5   60:7 ("Wendi Andriano's version of what happened here just doesn't make sense."); *id.*

6   at 61:6-11 ("And so you sit here and you think this through and you're like, so let me

7   make sure I get this straight.  Your husband, being cognizant of the civil lawsuit, is going

8   to somehow get together with you and have ordered the sodium azide to help him take his

9   own life?  That just doesn't make sense.");[10] *id.* at 64:20-65:2 (asking Wendi additional

10  factual questions "[b]ecause her version of the offense didn't make sense . . . the pieces

11  don't add up.  The data just doesn't add up.").)  Dr. Pitt's armchair analysis of the facts of

12  the offense and whether they "make sense" are not psychiatric opinions.  From a

13  psychiatric standpoint, Wendi taking actions that do not make sense around the time of

14  the offense are consistent with all of the diagnoses identified by Dr. Woods, all of which

15  cause impaired judgment and irrational, impulsive, and sometimes bizarre behavior,

16  particularly when triggered at the same time.

17      For all of these reasons, evidence of Wendi's harrowing childhood and mental

18  disorders constituted highly probative mitigating evidence.  The jury should have had an

19  opportunity to hear this evidence before sentencing Wendi to death; had it been provided

20  that opportunity, "there is a reasonable probability"—that is, a "probability sufficient to

21  undermine confidence in the outcome"—"that at least one juror" would not have imposed

22  the death penalty.  *Wiggins*, 539 U.S. at 537; *Strickland*, 466 U.S. at 694.

23  _____

24  [10] Actually, it does make sense.  It is hardly irrational for one with an increasingly

25  debilitating terminal illness that would eventually lead to death by suffocation (10/27/04
    Tr. at 30:1-7 (W. Andriano)) to wish to die on his own terms, and it is not irrational for

26  him to seek a means of doing so that would preserve his family's right to take action
    against the doctors who negligently failed to diagnose his cancer when it was still

27  treatable.

28

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

## B.   TRIAL COUNSEL'S PERFORMANCE WAS DEFICIENT

### 1.   Standards

The deficiency prong of *Strickland* looks to whether the prejudice was a product of "deficient" performance by trial counsel—that is, whether "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 687-88.  "[P]revailing professional norms" are not the same as customs or habits that may have developed among lawyers performing criminal defense work, which may or may not conform to the standard of care; norms are "an objective guide to the performance of lawyers who do capital cases and do them proficiently."  (2/11/14 Tr. at 16:19-17:4 (L. Hammond).)

The "prevailing norms of practice as reflected in American Bar Association standards . . . are guides to determining what is reasonable." *Strickland*, 466 U.S. at 687-88.  The American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (the "Guidelines") (Ex. 76), which were "a collaborative effort between the ABA and the National Criminal Defense Lawyer and Indigent Defense Lawyer organizations" (2/11/14 Tr. at 19:17-20 (L. Hammond)), are "measures of the prevailing professional norms of effective representation" in capital cases. *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010).  The Guidelines are particularly important to establishing the standard of care in Arizona, which is one of only three states (along with Oregon and Ohio) to specifically refer to the Guidelines in its criminal rules governing the appointment and performance of defense counsel. *See* Ariz. R. Crim. P. 6.8.

The Guidelines reflected the standard of care for capital defense work from Wendi's 2000 arrest through her trial.  (2/11/14 Tr. at 26:19-23 (L. Hammond).)  Though Wendi's trial counsel failed to comply with the Guidelines in several respects, they accurately described the standard of care for the mitigation investigation of a capital case

{00128370.1 }

4843-7819-0105.

in a November 2004 motion they filed in Wendi's case:

> The investigation into the existence of any mitigating circumstances must be conducted in accordance with the recently revised guidelines for defense counsel in capital cases. *See* [Guidelines]. The Guidelines "are not aspirational . . . [but rather] embody the current consensus about what is required to provide effective defense representation in capital cases." [Guidelines 1.1 cmt.] The United States Supreme Court has affirmed that the Guidelines are the established standards for capital defense counsel. *Wiggins v. Smith*, [539] U.S. [510, 524] (2003) (The [Guidelines] are "well defined norms."). *See also* Ariz. R. Crim. P. 6.8(b)(1)(iii).

> . . . Penalty phase preparation requires an extensive and unparalleled investigation into the personal and family history of the accused. [Guidelines 10.7 cmt.] Mitigation investigation must include "efforts to discover *all reasonably available* mitigating evidence" and evidence to rebut aggravating evidence that may be introduced by the prosecutor. *Wiggins*, 123 S.Ct. at 2537 (emphasis in original). This is because the sentencer in a capital case may not refuse to consider or be precluded from considering any relevant mitigating evidence. *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987). *See also Eddings v Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).

> A significant step in the mitigation investigation is the creation of a social history, which is used to identify events and circumstances of a capital defendant's life. A social history is required "to construct a persuasive narrative, rather than to simply present a catalog of seemingly unrelated mitigating factors." [Guidelines 10.11 cmt.] Construction of the narrative "normally requires evidence that sets forth and explains the client's complete social history from before conception to the present." *Id.*

(Ex. 54 at 3-4.) Though a deviation from the Guidelines does not automatically constitute ineffective assistance of counsel, they are "well-defined norms," *Wiggins*, 539 U.S. at 524, and the United States Supreme Court has found ineffective assistance where attorneys' performance failed to meet the norms expressed in the Guidelines or predecessor provisions in the ABA Standards for Criminal Justice. *See, e.g.*, *Wiggins*, 539 U.S. at 524-27; *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

Larry Hammond is uniquely well-qualified to testify regarding the standards for capital defense counsel. Following law school, Hammond clerked for the United States Supreme Court and spent six months working on Justice Powell's dissent in *Furman v. Georgia*, 408 U.S. 238 (1972). (2/11/14 Tr. at 7:18-8:14 (L. Hammond).) After taking a position in the White House Office of Legal Counsel, he was tasked with leading a team to research and compile a summary of the death penalty in the United States for the

53

1    President and his advisors.  (*Id.* at 8:15-23.)  Hammond returned to Arizona in 1981 and

2    immediately began taking capital cases in Arizona.  (*Id.* at 9:3-23.)  He has served as lead

3    counsel in a number of capital cases (*id.* at 9:25-10:2), and served as private counsel

4    pursuant to *Knapp v. Hardy*, 111 Ariz. 107, 523 P.2d 1308 (1974), in two others.  (*Id.* at

5    10:23-12:1.)  Hammond was a founding member of the Arizona Capital Representation

6    Project, a group that provides legal resources and education to capital defense counsel

7    (*id.* at 17:17-18:9), was appointed Chair of the Indigent Defense Task Force in 1995 (*id.*),

8    and has taught courses on the death penalty at the Arizona State College of Law and Elon

9    University Law School (*id.* at 18:10-21).  He was actively involved in the creation and

10   amendment of the Guidelines.  (*Id.* at 19:8-12.)

11          Since 1989, Hammond has reviewed "hundreds" of cases (both capital and non-

12   capital) to assess whether there was ineffective assistance of counsel, and was "primarily

13   responsible for reviewing ineffective assistance of counsel claims on behalf of the

14   Arizona Justice Project" in numerous cases.  (*Id.* at 14:1-8.)  In "hundreds" of the cases

15   he has reviewed in his career, Hammond concluded that trial counsel met the standards

16   for effective assistance.  (*Id.* at 93:19-94:11 (Cross).)

17          Wendi's case was not one of them.  After reviewing the trial transcripts, witness

18   declarations, and expert reports, as well as observing the testimony of Wendi's trial

19   counsel (*id.* at 15:7-16:12), Hammond concluded:  (1) "the composition and operation of

20   the defense team fell woefully below even the most minimal standards of preparation and

21   coordination necessary to defend a capital case" (*id.* at 89:18-25); and (2) the defense

22   team performed a constitutionally defective mitigation investigation in several respects

23   (*id.* at 88:1-15).

24          This brief addresses both of these related categories of deficiencies in turn.

25

26

27                                                              54

28   {00128370.1 }

## 2.    The Composition and Operation of the Defense Team Was Deficient in Several Respects

Wendi's trial counsel consisted of Attorney David DeLozier, who her family retained to represent her in December 2000 (Ex. 231), and Attorney Daniel Patterson, who assumed the role of lead counsel when the Public Defender's Office was assigned Wendi's case in July 2001 (2/7/14 Tr. at 8:1-6 (D. Patterson)).  The Public Defender's Office assigned Patrick Linderman to serve as mitigation specialist for Wendi's case in December 2001 (Ex. 6.002); after Linderman resigned his position in early 2004 (2/7/14 Tr. at 55:11-13 (D. Patterson)), Scott MacLeod replaced him in that role (*id.* at 55:24-56:10).  Patterson, DeLozier, and MacLeod testified at the hearing.

As was evident from their testimony and the relevant exhibits, they did not function as a cohesive team.  Time and again, one testified that he assumed a certain task relating to mitigation was being performed by someone else, while that other person assumed it was the responsibility of another.  Each had pieces of information that could and should have formed the basis of follow-up investigation for mitigating evidence, but none took the responsibility—nor, in some instances, had the qualifications—to put them together and follow through with the level of investigation required by *Wiggins* and the Guidelines.

In short, the defense team failed to put itself in a position to conduct an adequate mitigation investigation, in two main respects:  (1) for different reasons, each of its members were ill-suited to perform an adequate mitigation investigation in Wendi's case; and (2) lack of communication and coordination by its members led to a dysfunctional investigation in which no one took responsibility for following mitigation leads, interviewing mitigation witnesses, and making "efforts to discover *all reasonably available* mitigating evidence" prior to her sentencing.  *Wiggins*, 539 U.S. at 524 (quotation omitted; emphasis in original).

4843-7819-0105.

### a.    The Composition of the Defense Team Was Deficient to Perform an Adequate Mitigation Investigation

For various reasons, each of the members of Wendi's defense team had obstacles or deficiencies that impeded the performance of the time-consuming and challenging task of a competent investigation sufficient to discover all reasonably available mitigating evidence in Wendi's case.

**Attorney Patterson.**  While Wendi's case was included among the first group of capital cases assigned to Patterson upon re-joining[11] the Public Defender's Office in July 2001 (2/7/14 Tr. at 7:3-8:6 (D. Patterson)), Patterson had previously gained experience in court-appointed capital cases while in private practice.  (*Id.* at 6:1-24.)  Thus, as a general matter, he was qualified to serve as counsel in a capital case.  (2/11/14 Tr. at 49:13-17 (L. Hammond).)

But while Patterson could put his capital experience to use in the guilt and aggravator phases of the case, he conceded that his experience was not sufficient to make him competent at the penalty phase once Arizona amended its law to provide for jury sentencing.  (2/7/14 Tr. at 8:7-11, 10:22-11:2 (D. Patterson).)  Patterson had participated in only one trial with jury sentencing prior to Wendi's—*State v. Roque*—but that case was sufficiently unique that he did not learn lessons from the experience that he was able to carry over into Wendi's representation.  (*Id.* at 19:5-20:2.)

In any event, Patterson simply did not have time to meaningfully participate in the mitigation investigation.  He testified that the *Roque* case was likely the most high-profile he ever tried, requiring a significant time commitment; as a result, he let Wendi's case "languish" while preparing for *Roque*, which went to trial in the fall of 2003.  (*Id.* at 15:20-16:5, 17:4-18:18.)  After the conclusion of *Roque*, and with less than a year until

---

[11] Patterson served as a general trial attorney with the Public Defender's Office from 1990 to 1993, but did not recall performing any capital work during that period.  (*Id.* at 5:14-25.)

4843-7819-0105.

1    Wendi's trial, Patterson focused his attention on guilt-phase issues and interviewing the

2    large number of guilt-phase witnesses identified by the State.  (*Id.* at 119:8-23 (Cross).)

3    He delegated responsibility over the mitigation development to the other members of the

4    team:  DeLozier, mitigation specialist Patrick Linderman, and Linderman's successor,

5    Scott MacLeod.  (*Id.*; *id.* at 39:9-16, 62:4-9.)

6        ***Attorney DeLozier.***  DeLozier had no experience whatsoever in capital defense

7    work, and thus no experience developing mitigating evidence in a capital case.  (2/10/14

8    Tr. at 57:5-11 (D. DeLozier).)  His firm first began taking criminal cases in the 1990s, but

9    prior to Wendi its practice was limited to misdemeanors and some non-capital felonies,

10   and its criminal work accounted for only a quarter of the firm's practice.  (*Id.* at 56:22-

11   57:4.)  Patterson provided DeLozier with no guidance on capital defense work or

12   instruction on how to conduct a mitigation investigation (*id.* at 104:17-22); indeed, as

13   noted in more detail below, the two barely communicated in the three years between the

14   time Patterson was assigned the case and the date of Wendi's trial.

15       After trial began, DeLozier faced two further impediments to his ability to

16   meaningfully and adequately participate in the case, one self-imposed and one tragic.

17   *First*, DeLozier made the unusual decision to fast during the course of Wendi's four-

18   month trial, consuming only fruit juices, because he was "not real thrilled with some of

19   the things that were being done and weren't being done and I thought it might help me

20   focus."  (*Id.* at 140:1-17.)  As Patterson observed, DeLozier "lost a considerable amount

21   of weight" over the course of the trial and his clothing was "just hanging on him."

22   (2/7/14 Tr. at 44:24-45:14 (D. Patterson); *see also* 2/11/14 Tr. at 44:2-21 (L. Hammond)

23   ("I must tell you I was horrified when I heard that. . . . [A] trial in which someone's life is

24   at issue is not a time to experiment" with such matters.).)

25       *Second*, midway through the trial Justin Blair, an associate in DeLozier's office

26   who was "like a son to [him] and [his] wife," was tragically murdered.  (2/10/14 Tr. at

27

28

4843-7819-0105.

141:12-20 (D. DeLozier).)  DeLozier admits he never recovered "his bearings" throughout the rest of the trial (*id.* at 141:14-25)—a significant impairment given that the mitigation investigation had barely commenced at the time of Blair's murder, as outlined in the following sections of this brief.

 ***Patrick Linderman.***  Linderman's qualifications were unknown even to the attorneys relying upon him as a mitigation specialist.  As Patterson explained, "in today's environment, we hire people that we believe can develop mitigation in the capital context.  That wasn't how the folks were hired back then.  These persons . . . weren't specifically trained to be capital mitigation people. . . .  Quite frankly, I don't think I ever viewed his resume or his credentials."  (2/7/14 Tr. at 30:3-20 (D. Patterson).)  Whatever Linderman's qualifications may have been, it is clear he did not put them to use in conducting a thorough mitigation investigation.  Upon reviewing the file and interviewing witnesses, experts Larry Hammond and Keith Rohman failed to find any evidence that Linderman made any material contribution to the development of mitigating evidence (2/6/14 Tr. at 58:3-16 (K. Rohman); *see also* 2/11/14 Tr. at 49:5-12 (L. Hammond)), and Patterson could not recall any (2/7/14 Tr. at 55:14-23 (D. Patterson)).

 ***Scott MacLeod.***  Scott MacLeod was assigned to replace Linderman as the mitigation specialist for Wendi's case in April 2004, with less than five months to complete a mitigation investigation prior to Wendi's trial.  (2/6/14 Tr. at 13:8-14, 21:4-8 (S. MacLeod).)  Other than one community college sociology class, MacLeod had no education in social work, psychology, or any other behavioral science.  (*Id.* at 7:19-8:13.) He worked as a probation officer prior to the joining the Public Defender's Office in August 2001, where he worked as a mitigation specialist on lesser felonies.  (*Id.* at 8:17-10:25.)  Wendi's was one of "[p]robably a couple" of the first capital cases to which he had been assigned, and it was the first capital trial in which he served as a mitigation

4843-7819-0105.

specialist.  (*Id.* at 13:22-14:16.)  MacLeod received no kind of "formal training classes" on capital mitigation work, and assumed that capital mitigation meant that he would do the same tasks as other mitigation work but just perform them "more thorough[ly]."  (*Id.* at 19:18-20:15.)

MacLeod's training and experience were insufficient to warrant the faith that trial counsel apparently placed in him to perform an adequate mitigation investigation. "Mitigation investigation . . . in a capital case is different from that in a noncapital case in such a matter of degree that it's difficult to put them in the same category."  (2/6/14 Tr. at 44:23-45:15 (K. Rohman).)  While "everybody has to do a first case," for mitigation specialists that first capital case must be handled under close oversight and training from both the attorneys and others experienced in capital mitigation work.  (*Id.* at 52:2-53:2.) Here, however, MacLeod was given no instructions by trial counsel (who did not know what his credentials were) and met only "[i]rregularly" with them prior to trial.  (*Id.*; 2/7/14 Tr. at 56:11-57:12 (D. Patterson).)  Moreover, for even an experienced mitigation specialist, four to five months prior to trial is "not nearly enough time" to conduct a thorough mitigation investigation.  (2/6/14 Tr. at 57:13-58:2 (K. Rohman).)

***No one qualified in mental health issues.***  Finally, the defense team did not "contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments," as the Guidelines demand.  (Ex. 76 at 28.)  The need for a team member with mental health training is well-established:  "In particular, mental health experts are *essential* to defending capital cases," because "[n]eurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses" and the client's mental status "is relevant to numerous issues that arise at various junctures during the proceedings . . . ."  (*Id.* at 30 (emphasis added).)

The defense team included no such professionals.  (2/11/14 Tr. at 34:16-20 (L.

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

Hammond).)  Its entire inquiry into mental health consisted of a single-visit evaluation of Wendi's competency to stand trial by Dr. Jack Potts in March 2001 (Ex. 6.001) and a single-visit preliminary report of her mental health by Dr. Richard Rosengard in August 2002, made without any consideration of her social history (Ex. 6.003, at 1; 2/7/14 Tr. at 53:3-21 (D. Patterson)).  Neither professional was consulted again regarding any issues in Wendi's case as they arose in the pre-trial preparations (2/7/14 Tr. at 70:12-16 (D. Patterson); 2/10/14 Tr. at 70:13-17 (D. DeLozier))—a glaring breach of the standard of care (2/11/14 Tr. at 105:3-12 (L. Hammond) (Cross) ("[I]t's more than simply a matter of having a mental health evaluation.  That's why the rest of this is so important.  The social history, the opportunity to look at the jail records, life history records, all of those things are an important part.  It wouldn't be adequate just to say that I've hired a mental health person and that person has conducted an examination.")).

Instead, the lawyers of the defense team responded to pertinent information regarding Wendi's mental health—such as notes and letters from her counselor (Exs. 6.004, 7.002, 45, 230), suggestions from others involved in the case (Ex. 52, 6.001, 6.003), and news of her suicide attempt—with uninformed and incorrect armchair analysis that failed to recognize their significance.  (*See infra* Part I.B.3.c-d.)  That is precisely the reason the Guidelines call for the inclusion of one qualified in mental health issues on the defense team  (*See* Ex. 76 at 31 ("Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (*e.g.*, post-traumatic stress disorder . . . ) that could be of critical importance.  Accordingly, Subsection A(2) mandates that at least one member of the defense team" have qualifications in mental health.).)

In short, the defense team was not set up to succeed in performing an adequate mitigation investigation.  Indeed, in light of these deficiencies, the lack of a thorough and competent mitigation investigation was almost a foregone conclusion.

{00128370.1 }

4843-7819-0105.

b.      **The Operation of the Defense Team Was Dysfunctional**

(i)     **No One Took Responsibility to Investigate Mitigating Evidence**

Several basic elements of a standard mitigation investigation slipped through the cracks in Wendi's case, and the dysfunction of the defense team sheds some light as to why.  As the testimony of Patterson, DeLozier, and MacLeod made clear, no one took ownership over the development of mitigating evidence.

According to Patterson, his "primary assignment" was preparation for the guilt and aggravator phases of the case (2/7/14 Tr. at 39:9-16 (D. Patterson); he delegated the responsibility for the mitigation investigation to DeLozier and to MacLeod:  "I believed at the time, the primary responsibility for developing mitigation was the mitigation specialist and David DeLozier who was in a better position to develop the theme that she was a wonderful daughter, a wonderful mom, a good student, a good citizen.  So, yeah, it was their responsibility."  (*Id.* at 48:18-49:1; *see also id.* at 62:4-9, 121:17-20 (Cross), 122:15-22 (Cross) ("[DeLozier] was tasked with doing the mitigation function . . . ."), 152:3-23 (Cross).)

DeLozier had "no authority" over the mitigation specialists, but Patterson believed that DeLozier would be "more actively involved in the mitigation" investigation "by virtue of his special relationship with the family."  (*Id.* at 30:21-31:13.)  Patterson was "[n]ot specifically" aware of what (if any) mitigation investigation others were undertaking (*id.* at 32:24-33:6), received no reports from DeLozier regarding the mitigation investigation (*id.*), and assumed that any mitigation development by DeLozier would have been "given to the mitigation [specialist]"—though he admitted he "wouldn't expect anything other than" mitigation evidence consistent with his perception that Wendi was "a wonderful lady."  (*Id.* at 33:18-34:7.)

DeLozier did not share Patterson's understanding of the division of labor. According to DeLozier, he had no understanding of his role on the defense team after the

{00128370.1 }                                          61

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1   Public Defender's Office assumed representation of Wendi in July 2001, other than "just

2   to continue to meet with [the Ochoas] and answer any questions I could and hold their

3   hands, basically."  (2/10/14 Tr. at 103:15-19, 104:4-9 (D. DeLozier).)  He "wasn't asked

4   to interview anybody" by Patterson, and did not interview any potential mitigation

5   witnesses other than his "hand-holding" with the Ochoas and meetings with Wendi,

6   during which they "didn't talk about the case."  (*Id.* at 143:16-144:4, 149:21-150:1

7   (Cross).)

8          MacLeod believed that Patterson was "in charge" of the mitigation investigation,

9   and looked to him "for direction as to where to take the mitigation investigation[.]"

10   (2/6/14 Tr. at 22:22-23:11 (S. MacLeod).)  But Patterson gave no such directions:

11   according to Patterson, he gave MacLeod "free reign to develop what he thought was the

12   appropriate mitigation package for Ms. Andriano."  (2/7/14 Tr. at 57:3-7 (D. Patterson).)

13   Though Patterson had no familiarity with MacLeod or his credentials—"Just a name and

14   a new personality" (2/7/14 Tr. at 56:3-10 (D. Patterson))—Patterson did not actively

15   supervise his work.  He gave MacLeod no specific directions (*id.* at 54:7-13, 57:3-7),

16   received no reports regarding any mitigation investigation he or Linderman had

17   performed (*id.* at 32:24-33:6), had no scheduled meetings or list of tasks or witnesses,

18   and met with MacLeod only "[i]rregularly" (*id.* at 56:11-57:2).  Patterson admits this was

19   a mistake:  "my error was not—not riding more closely Mr. MacLeod and Mr. DeLozier

20   in the development of mitigation.  So those are lessons I've learned."  (*Id*. at 20:12-15.)

21          In short, all members of the defense team assumed that someone else was in

22   charge of the mitigation investigation, and no one took responsibility to ensure that the

23   investigation was coordinated and issues were not neglected.  As expert mitigation

24   specialist Keith Rohman observed:  "So nobody here is running the mitigation.  Not the

25   lawyers.  Not the investigator.  It's just not happening."  (2/6/14 Tr. at 62:15-63:5 (K.

26   Rohman).)

27

28          {00128370.1 }                              62

4843-7819-0105.

That is not the team approach envisioned by the Guidelines, and Patterson's wholesale delegation of the mitigation case to DeLozier, who had no capital experience, and to Linderman and MacLeod was inappropriate:

> [F]irst of all, he didn't know what their skills were, either one of them. He had not ever—according to his testimony, he had not interviewed them. He had not developed an understanding of the level of their knowledge and experience and he didn't supervise them. He didn't direct them. He left them out on their own. As he said, he didn't ride—he didn't ride-herd on them. . . . [F]oundational to the criminal defense capital team is communication and coordination. You can't just send somebody out and say: Okay. You're in charge of mitigation. You go do your thing for the next couple of years and come back and we will talk about it. *That just can't happen in capital cases.*"

(2/11/14 Tr. at 48:8-49:4 (L. Hammond) (emphasis added).)

The effect of this dysfunction culminated in the penalty phase presentation. During the penalty phase, DeLozier conducted the direct examinations of five witnesses he had *never even met* before they took the stand; he did not know who made the decision to call them. (2/10/14 Tr. at 143:4-15 (D. DeLozier).) In addition, the focal point of the mitigation presentation was a PowerPoint prepared by MacLeod (Ex. 138), which (to Patterson's knowledge) constituted the only social history of Wendi that MacLeod had compiled. (2/7/14 Tr. at 61:3-18 (D. Patterson).) Patterson had no role in preparing it and reviewed it once prior to its presentation, making no changes (*id.* at 60:1-11), while DeLozier "saw that one time" before he presented it to the jury. (2/10/14 Tr. at 142:7-11 (D. DeLozier).) The day before he was to present argument at the penalty phase, DeLozier asked Donna to help draft the argument to accompany the PowerPoint presentation; Donna passed that duty along to friend Cindy Schaider, and DeLozier read Schaider's work as the bulk of his closing argument. (2/10/14 Tr. at 142:14-23 (D. DeLozier); 2/4/14 Tr. at 192:1-25 (D. Ochoa); 2/10/14 Tr. at 175:19-177:3 (C. Schaider).)

Such last-minute scrambling, which was the product of a failure to develop any kind of communication, coordination, and accountability for the mitigation case, is

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1  wholly inappropriate in a capital case.  (*See, e.g.*, 2/11/14 Tr. at 43:19-44:1 (L.

2  Hammond).)

3                    **(ii)     Wendi's Attorneys Failed to Work Together**

4          While communication and oversight over the mitigation investigation was

5  virtually nonexistent, the communication problems between Wendi's two attorneys were

6  especially problematic.  As a result, DeLozier—who was ostensibly charged with

7  providing mitigating information from Wendi and her family—did not meaningfully

8  contribute to the defense and performed virtually no substantive work on the case in the

9  almost three years between July 2001, when the Public Defender's Office was engaged,

10  and April 2004, mere months before trial.

11          At the outset, DeLozier informed Patterson that he had no capital experience.

12  (2/7/14 Tr. at 151:11-19 (D. Patterson); 2/10/14 Tr. at 104:10-16 (D. DeLozier).)  Rather

13  than forming a working relationship in which DeLozier sought (and Patterson provided)

14  guidance and specific direction (2/10/14 Tr. at 104:17-22 (D. DeLozier)), the two

15  essentially ceased communications about the case.  DeLozier could recall only two in-

16  person meetings with Patterson prior to the commencement of trial (*id.* at 105:7-106:1),

17  and testified that his phone calls to the Public Defender's Office were not returned and he

18  did not recall ever receiving an email from Patterson directly (*id.* at 104:23-105:6).

19          In August 2002, more than one year after Patterson assumed the role as lead

20  counsel, DeLozier sent an exasperated email to the Public Defender's Office, copying

21  Patterson:

22          Donna Ochoa called me today around noon to advise that the scheduled
          hearing for 1:30 pm was postponed.  I am glad I did not make a trip to
23          Mesa!!  Also, as we discussed when you were at my office, I am still not
          receiving any of the filings nor the previous ones filed.  What do you
24          suggest on how I might be able to keep informed on what is going on.  I am
          working on keeping this from being frustrating.  But [Patterson] made it
25          very clear that I was second chair and that the PD's office was not going to
          put anyone else on the case.  And, *I am completely without knowledge of*
26          *case developments*.  Please advise.  I am copying [Patterson], just in case he
          is unaware of these issues.

27
                                        64

28

4843-7819-0105.

1  (Ex. 63 (emphasis added).)  According to DeLozier, his email did not resolve the

2  communication issues; he simply "didn't bother to document" them after that point.

3  (2/10/14 Tr. at 110:13-23 (D. DeLozier).)  As he describes, he essentially abandoned any

4  effort to be a part of the defense team:  "I knew that I was not going to have the kind of

5  communication that I would expect and I just went along with whatever I got. . . .  [Y]ou

6  figure the other people know what they're doing.  They've had experience. . . .  They

7  don't really need me, in other words."  (*Id.* at 110:13-23.)

8      As it turned out, the team plainly did need DeLozier.  While out of the loop in

9  Wendi's case, DeLozier had undertaken the first of the more than 20 civil suits he has

10  handled on behalf of victims of childhood sexual abuse against the Catholic Church.  (*Id.*

11  at 88:7-90:24.)  By April 2004, when he filed the first of those lawsuits, he had educated

12  himself regarding the patterns, symptoms, and lifelong effects of childhood sexual abuse,

13  including dissociation, memory deficits, self-destructive behaviors, depression, and

14  PTSD.  (*Id.* at 92:20-102:6.)  He was also aware of the need to involve mental health

15  professionals with expertise in childhood sexual abuse to diagnose and treat the client,

16  and to explain the effects of that abuse (and the client's memory deficits) to the finder of

17  fact.  (*Id.* at 94:10-95:17.)

18      In short, DeLozier obtained knowledge the defense team desperately needed,

19  particularly given its failure to involve a mental-health professional on an ongoing basis.

20  It is shocking—and a sign of the significant impact of his conflict of interest in

21  representing the Ochoas—that DeLozier apparently did not make the connection on his

22  own between Wendi's dissociation, memory deficits, and other symptoms various

23  individuals reported that she suffered and childhood sexual abuse.  But it is also clear that

24  his isolation from the rest of the team enabled his blindness:  "I was not in a position, in

25  my opinion, to force the public defender to do anything."  (*Id.* at 136:24-137:12.)

26      The standard of care in a capital case "requires a team approach that combines the

27

28

{00128370.1 }

65

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

different skills, experience, and perspectives of several disciplines" (Ex. 76 at 65) and demands "[f]requent meetings, consulting, providing notes to each other" to ensure that information is shared and lines of investigation do not slip through the cracks (2/11/14 Tr. at 53:14-21 (L. Hammond)).  As Hammond observed, "None of [that] happened here[.]"  (*Id.*)

### 3.    The Defense Team Failed to Adequately Investigate All Reasonably Available Mitigating Evidence

#### a.    Standard of Care

The Guidelines emphasize the gravity of the "well-established" duty to conduct a thorough investigation of mitigating evidence in a capital case:  "Because the sentencer in a capital case must consider in mitigation, 'anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant,' 'penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history.'"  (Ex. 76, at 80-81 (citations omitted).)  Neither the client's desires nor the belief that such an investigation would be futile excuse the failure to complete this substantial duty, because "[c]ounsel cannot responsibly advise a client about the merits of different courses of action . . . unless counsel has first conducted a thorough investigation with respect to both [guilt and penalty] phases of the case."  (*Id.*)

An "unparalleled investigation" includes medical history and a "[f]amily and social history (including physical, sexual, or emotional abuse, family history of mental illness, cognitive impairments, substance abuse or domestic violence; poverty, familial instability, neighborhood environment and peer influence); [and] other traumatic events . . . ."  (*Id.* at 81.)  To obtain that information, "it is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client), and virtually everyone else who knew the client and h[er] family, including neighbors, teachers, clergy, . . . and others."  (*Id.* at 83.)  Given the magnitude of the task and its relationship with other phases of the case, the Guidelines counsel that the

1    mitigation investigation "should begin as quickly as possible" after the client's arrest.

2    (*Id.* at 82.)[12]

3          In addition, the Guidelines discuss at length the importance of a thorough

4    investigation into the defendant's mental health.  "[M]ental health experts are essential to

5    defending capital cases[,]" because "[n]eurological and psychiatric impairment,

6    combined with a history of physical and sexual abuse, are common among persons

7    convicted of violent offenses."  (*Id.* at 30.)   Though "[e]vidence concerning the

8    defendant's mental status is relevant to numerous issues that arise at various junctures

9    during the proceedings," "the defendant's psychological and social history and h[er]

10   emotional and mental health are often of vital importance to the jury's decision at the

11   punishment phase."  (*Id.* at 30-31.)  A cursory glance at mental health issues is

12   insufficient:

13            Creating a competent and reliable mental health evaluation consistent with
             prevailing standards of practice is a time-consuming and expensive process.
14            Counsel must compile extensive historical data, as well as obtaining a
             thorough physical and neurological examination.  Diagnostic studies,
15            neuropsychological testing, appropriate brain scans, blood tests or genetic
             studies, and consultation with additional mental health experts may be
16            necessary.

17    (*Id.* at 31.)

18          Trial counsel's investigation fell far below those norms.  They reiterated

19   throughout the evidentiary hearing that they did no investigation into potential childhood

20   physical, sexual and emotional abuse, failed to interview numerous individuals likely to

21   possess mitigating evidence, and failed to follow up on evidence suggesting significant

22   mental health issues.  In addition, it is evident that they did not begin to truly prepare for

23   the mitigation portion of the case until *after* the jury found Wendi guilty of first-degree

24   murder—far too late to perform a thorough investigation, and obviously too late to

25   incorporate any mitigating evidence into the guilt phase of the case.  As Hammond

---

26   [12] As with all Guidelines provisions, these represented the standard of care from the time
27   of Wendi's arrest through her trial.  (2/11/14 Tr. at 55:11-57:15 (L. Hammond).)

{00128370.1 }                                67

28

4843-7819-0105.

summarized:

> [I]t again was obvious that neither [Attorney DeLozier], nor Mr. Patterson approached the case as a whole as a case in which the mitigation themes had to be understood and developed prior to trial.  That just didn't happen here at all.  I mean, other than portraying the client as a good person who had had a good life, they did no other development and certainly no presentation of any other mitigating circumstances.

(2/11/14 Tr. at 43:5-13 (L. Hammond).)

### b.       The Mitigation Investigation Was Deficient

The defense team failed to meet the standard of care for investigating all reasonably available mitigating evidence in least three general respects:  (1) it did not focus upon the mitigation investigation until after the guilty verdict, much too late to adequately develop the mitigation case; (2) its social history investigation was cursory and far short of the "unparalleled investigation" the Guidelines demand; and (3) it failed to adequately investigate potential mitigating evidence relating to Wendi's mental health.

### (i)       The Defense Team Was Ineffective in Failing to Substantively Begin the Mitigation Investigation Until Far Too Late in the Proceeding

On November 19, 2004—more than four years after Wendi's arrest, and *after* the jury's guilty verdict—the defense team filed a Motion for Court Order to Assist Mitigation Investigation, which referenced the social history required by the Guidelines and sought "any records relating to Ms. Andriano or her family that may be in the possession of state or local agencies" because they "are necessary to *build* [t]his social history."  (Ex. 54 at 5 (emphasis added).)

Ten days later, and a little over a week before the penalty phase began, MacLeod emailed Patterson a list of mitigation witnesses, with the caveat that it was "not a complete, nor exhaustive list, [but] simply my list of witnesses."  (Ex. 136.)  MacLeod acknowledged that he had not yet interviewed all of the witnesses on the list, was hoping to "schedule[e] follow-up interviews sometime this week," and would submit summaries of their interviews later that week.  (*Id.*)  Then, on December 6, 2004—a mere two days

68

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

1    before the penalty phase began—MacLeod emailed Patterson and DeLozier to brainstorm

2    themes for their mitigation presentation.  (Ex. 137.)

3            These are documents one would expect to see at the outset of a mitigation

4    investigation years prior to trial, not on the eve of the penalty phase of a capital trial.

5    (2/11/14 Tr. at 61:24-62:13, 63:23-66:21 (L. Hammond).)  Both Hammond, as an expert

6    on the standard of care for the attorneys in capital cases, and Keith Rohman, as an expert

7    on the standard of care for mitigation specialists, found the timing of these documents

8    "breathtaking" and "almost useless" at that stage of the case.  (2/6/14 Tr. at 60:9-23 (K.

9    Rohman); 2/11/14 Tr. at 61:5-17 (L. Hammond).)

10           A proper social history can take "years" of investigation, and obtaining records

11   and interviewing witnesses is the *first* step.  Rohman explained why:

12           The reason is because, first of all, you're delving back years into
             somebody's life and history.  So, for instance, the collection of those
13           documents is not something [where] you send out . . . a letter and the
             documents come back.  That process is time-consuming.  But, more
14           importantly, the kind of information that we're seeking in these cases is
             private, personal, humiliating even and certainly embarrassing to the
15           family.  It is the family secrets that have been kept under wraps for a long
             time.  You don't just walk into someone's living room and ask them about
16           it.  It takes time to build up a rapport, to build confidence, to elicit that kind
             of information.  So it is not untypical to have several years to prepare a
17           capital case for trial.

18   (2/6/14 Tr. at 55:6-22 (K. Rohman).)

19           The Guidelines state that a "mitigation investigation should begin as quickly as

20   possible" (Ex. 76 at 82), and that early start is especially important for obtaining

21   mitigating evidence regarding childhood physical and sexual abuse, neglect, and family

22   mental health issues.  Like all of us, defendants and their family members may easily and

23   readily disclose positive biographical facts, but "where there are delicate issues involved,

24   as there is in most of the cases that I've been around, it takes time to peel the onion, so to

25   speak."  (2/11/14 Tr. at 60:6-14 (L. Hammond); *see also id.* at 58:1-59:9 (noting that

26   "most of the things that wind up being relevant to the mental health of a client are things

27   that people don't freely want to talk about," and it takes time to build trust and probe

28

{00128370.1 }                                          69

4843-7819-0105.

1   these lines of inquiry).)  "Many, if not most, family secrets will come out" eventually

2   "given enough time and an effective investigation" (2/6/14 Tr. at 87:15-17 (K. Rohman)

3   (Cross))—namely, an investigation that includes interviews of all family members and all

4   who were closely acquainted with the defendant at various points of her life, as the

5   Guidelines require.  (Ex. 76 at 83.)

6        But such an investigation, which "*begins* with gathering the records" sought in the

7   November 19, 2004 Motion to Assist Mitigation (2/11/14 Tr. at 60:6-14 (L. Hammond)

8   (emphasis added)), takes significant time.  At the evidentiary hearing, Patterson admitted

9   that, "in retrospect, obviously, I think mitigation should be more seriously developed in

10  the early moments of the case."  (2/7/14 Tr. at 19:25-20:2 (D. Patterson).)

11       Patterson is correct.  "The standard of care in this field is that [mitigation] work

12  needs to begin as soon as possible after the client's arrest."  (2/6/14 Tr. at 53:7-54:10 (K.

13  Rohman).)  The motion and MacLeod's emails, all from the eve of the penalty phase,

14  provide evidence of basic tasks the defense team had yet to perform and key decisions it

15  had not yet considered during the previous four years since Wendi's arrest, and are

16  perhaps the "strongest indication" that their mitigation investigation was superficial and

17  inadequate.  (2/11/14 Tr. at 90:13-24 (L. Hammond); *see also* 2/6/14 Tr. at 61:5-23 (K.

18  Rohman) (mitigation witness lists and interview summaries are information "you would

19  have wanted two years before trial," rather than mere days before the sentencing hearing,

20  and was "well below any reasonable standard for how you would want these cases to be

21  handled").)  The defense team's failure to undertake fundamental steps of a mitigation

22  investigation until after the jury had already returned its guilty verdict was not "even

23  close" to compliant with the standard of care.  (2/11/14 Tr. at 66:22-67:8 (L. Hammond).)

24              **(ii)    The Social History Investigation Was Deficient**

25       Given their apparent failure to focus attention on the mitigation investigation until

26  the eve of Wendi's sentencing, it is not surprising that neither the attorneys nor the

27                                      70

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

mitigation specialists who worked on Wendi's case between 2001 and 2004 conducted any meaningful social history investigation.  In particular, none took any steps whatsoever to embark upon the time-consuming task of "peel[ing] the onion" (2/11/14 Tr. at 60:6-14 (L. Hammond)) to investigate Wendi's childhood to determine whether she suffered "physical, sexual, or emotional abuse" or "other traumatic events," as the Guidelines require.  (Ex. 76 at 81.)

As noted by expert witness Keith Rohman, a mitigation specialist with over 25 years' experience in capital cases across the western United States and an instructor of mitigation investigation at CLE seminars and the Loyola College of Law (2/6/14 Tr. at 37:19-38:6, 39:18-40:5 (K. Rohman)), who reviewed the mitigation investigation undertaken by Wendi's trial team (*id.* at 49:8-50:1), "the mitigation investigation was well below the standard of care for what anyone would want in a capital case, below the standard as laid out in the ABA Guidelines and below the standard of practice in the field."  (*Id.* at 79:12-23.)

### (1)    Attorneys Patterson and DeLozier

Both Patterson and DeLozier believed others to be responsible for developing mitigating evidence, and therefore neither took it upon himself to ask difficult questions or interview witnesses to develop her social history.

Patterson believed that "his end of the proposition" and "primary function" was preparation for guilt-phase issues.  (2/7/14 Tr. at 29:5-14, 39:9-13 (D. Patterson).)  He stuck to that role.  He interviewed Wendi extensively in preparation for her testimony during the guilt phase, but those meetings focused entirely upon the guilt-phase issues of Joe's spousal abuse and the events leading up to and including the homicide.  (*Id.* at 43:3-20 (D. Patterson).)  He does not recall asking her any questions regarding her childhood because he "didn't see the relevance of childhood" to guilt-phase issues, and confirmed that his meetings with Wendi "were dedicated and devoted to prepping her for" the guilt

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1   and aggravator phase, *not* mitigation.  (*Id.* at 42:10-44:10.)  Patterson did not ask Wendi

2   any questions regarding potential sexual abuse (*id.* at 162:19-163:12 (Redirect)); in his

3   words, "I didn't compel her to discuss things that she found distasteful" (*id.* at 130:4-10

4   (Cross)).

5          Patterson also met with Donna, Alejo, Brandon Ochoa, and Shawn King, Wendi's

6   childhood boyfriend who assisted in obtaining the sodium azide, but the purpose of those

7   meetings "was to gather information that might be beneficial in assisting [guilt phase] or

8   [aggravator phase] issues."  (*Id.* at 63:11-64:20.)  He did not ask questions aimed at

9   developing mitigating evidence, and "nothing specific came up" regarding mitigation.

10  (*Id.*)  Though Patterson emphasized at several points in his testimony that no one ever

11  told him about potential childhood abuse—a recollection that was mistaken, as this brief

12  discusses in a subsequent section—he admitted on redirect examination that he never

13  broached the subject of childhood abuse with anyone he interviewed.[13]  (2/7/14 Tr. at

14  162:19-163:12 (D. Patterson) (Redirect).)  Accordingly, he also never investigated

15  whether Wendi was a victim of childhood sexual abuse.  (*Id.* at 62:16-18.)

16         After Patterson's office assumed representation of Wendi in July 2001, DeLozier

17  understood his role with the family as "just to continue to meet with them and answer any

18  questions that I could and hold their hands, basically."  (2/10/14 Tr. at 104:4-9 (D.

19  DeLozier).)  He met frequently with Wendi, but those meetings concerned whatever

20  Wendi "had on her mind the day we were there. . . .  We didn't talk about the case.  The

21  majority of the time, we never talked about the case."  (*Id.* at 149:17-25 (Cross).)

22  DeLozier took no steps to identify or investigate *any* potentially negative facts regarding

23  Wendi's upbringing (*id.* at 135:1-16), and he did not interview any potential mitigation

24  _____

25  [13] Donna agreed, testifying at the evidentiary hearing that Patterson never asked her any
    questions regarding trauma in Wendi's childhood or questions pertaining to the mental
26  health history of Wendi and her family.  (2/4/14 Tr. at 190:2-191:25, 193:1-6 (D.
    Ochoa).)
27
                                            72

28

witnesses other than his clients:  Wendi and the Ochoas (*id.* at 143:4-144:4).  As noted by DeLozier, who viewed his role as subordinate to Patterson, "I wasn't asked to interview anybody."  (*Id.* at 143:23-144:1.)

Though they were aware that Skip Robertson was Wendi's biological father, aware that he was serving time in an Arizona prison for child molestation, and even given his prison contact information (Ex. 57), neither Patterson nor DeLozier interviewed Wendi's biological father, Skip Robertson.  (2/7/14 Tr. at 170:21-171:1 (D. Patterson) (Redirect); 2/10/14 Tr. at 128:8-18 (D. DeLozier).)

### (2)   Mitigation Specialists MacLeod and Linderman

Though he did not actively monitor their work, Patterson testified that he "assumed" or was "led to believe" that DeLozier, MacLeod or MacLeod's predecessor in the mitigation specialist role, Patrick Linderman, was conducting a thorough mitigation investigation while Patterson focused on evidence of the crime itself.  (*See, e.g.*, 2/7/14 Tr. at 28:11-15 ("I was led to believe that Patrick was in contact with the family and was accessing the witnesses and sources of information in an effort develop the mitigation presentation for Ms. Andriano."); 31:9-11 ("But I assumed [DeLozier and Linderman] had a working relationship . . . ."); 40:9-41:3 ("I was led to believe" DeLozier was meeting with Wendi on a weekly basis, and "I assumed they were talking about the facts and circumstances of the case and they were talking about mitigation issues . . . ."); 132:15-24 ("I assumed that [DeLozier] would have been – you know, was going to be forthcoming and responsible to follow up, if need be."); 135:1-16 ("Scott MacLeod or Patrick Linderman had access to this report, as did Mr. DeLozier, and if they felt that follow-up was necessary, I assumed they would have done it.  Maybe I abdicated my responsibilities there.") (D. Patterson).)

As evidenced by the emails MacLeod issued on the eve of the sentencing hearing (Ex. 136 & 137), those assumptions were misguided.  Though the defense team had

4843-7819-0105.

1   almost four years between the date of Wendi's arrest and the commencement of her trial

2   in which to conduct the mitigation investigation, it squandered essentially all of that time

3   and never engaged in the difficult and time-consuming tasks of compiling a multi-

4   generational investigation of Wendi's family, interviewing those close to Wendi at

5   various points of her life, or asking difficult questions regarding potential childhood

6   abuse and other trauma, all of which are required by the Guidelines.  (Ex. 76 at 83.)

7          Linderman was not assigned as a mitigation specialist until late December 2001

8   (Ex. 6.002), more than a year after Wendi's arrest and five months after the Public

9   Defender's Office took control of the representation.  Rohman "saw no evidence in any

10  part of [defense counsel's] file . . . that Patrick Linderman played any significant role"

11  during the two-and-a-half years he served as mitigation specialist for Wendi's case.

12  (2/6/14 Tr. at 58:3-16 (K. Rohman).)  Members of the defense team agreed.  Attorney

13  DeLozier does not recall ever meeting Linderman (2/10/14 Tr. at 108:6-10 (D.

14  DeLozier), while Patterson could not recall any specific mitigation work that Linderman

15  performed, other than "the general notion" that Wendi "was a nice woman" (2/7/14 Tr. at

16  55:14-23 (D. Patterson)).  When MacLeod took over as mitigation specialist upon

17  Linderman's resignation from the Public Defender's Office, he believed Linderman had

18  left behind "some folders with notes," and had made a family tree of Wendi, but could

19  not recall what if any documents Linderman had compiled or witnesses he had

20  interviewed.  (2/6/14 Tr. 16:17-17:15 (S. MacLeod).)  Donna recalls meeting with

21  Linderman, but Linderman never asked any questions regarding childhood abuse or

22  mental health.  (2/4/14 Tr. at 190:2-14 (D. Ochoa).)  Neither Kyre Lorts nor Jeri Lynn

23  Cunningham were contacted by Linderman or any other members of the defense team.

24  (2/4/14 Tr. at 71:6-20 (K. Lorts), 238:19-239:9 (J. Cunningham).)

25         MacLeod assumed Linderman's responsibilities as mitigation specialist for

26  Wendi's case in April 2004.  (2/6/14 Tr. at 13:8-14 (S. MacLeod).)  Given the lack of

27

28
{00128370.1 }                                74

1    attention to the mitigation investigation prior to that time, four months was "not nearly

2    enough time" to conduct a thorough investigation even if MacLeod had made a concerted

3    effort to conduct a Guidelines-compliant investigation.  (2/6/14 Tr. at 57:13-58:2 (K.

4    Rohman).)

5          It is clear that MacLeod did not make that effort, though his own testimony sheds

6    little light on the subject.  MacLeod refused to confirm or deny almost anything regarding

7    his mitigation investigation after assuming the role of mitigation specialist on the case,

8    even to the point of refusing to acknowledge that an email regarding the case from

9    macleods@mail.maricopa.gov—MacLeod's email address at the Public Defender's

10   Office—came from him.  (2/6/14 Tr. at 34:23-35:22 (S. MacLeod); *see also id.* at 26:3-10

11   (no recollection of when he finished interviewing witnesses); *id.* at 26:14-27:9 ("I can't

12   tell you this is my email."); *id.* at 27:23-28:3 (no recollection of whether he or anyone

13   else prepared a comprehensive life history for Wendi); *id.* at 31:19-32:4 (does not recall

14   investigating any childhood trauma); *id.* at 32:5-14 (does not recall investigating Wendi's

15   mental health or any other explanations for abnormal behavior leading up to the offense);

16   *id.* at 32:15-17 (does not recall investigation as to whether Wendi suffered childhood

17   abuse); *id.* at 33:22-34:2 ("I don't recall identifying or investigating potential issues"

18   relating to sexual abuse).)  Though one would think Wendi's case would have been

19   memorable for MacLeod—it was his first capital trial (*id.* at 13:25-14:6) —MacLeod did

20   not even remember the PowerPoint presentation regarding Wendi's positive upbringing

21   that defense counsel presented at the penalty phase (Ex. 138), which both Patterson and

22   DeLozier agreed that he had prepared.  (*Compare* 2/6/14 Tr. at 343:3-22 (S. MacLeod)

23   *with* 2/7/14 Tr. at 60:12-17 (D. Patterson) *and* 2/10/14 Tr. at 142:7-11 (D. DeLozier).)

24         MacLeod's lack of memory notwithstanding, there is no evidence that he actually

25   conducted the depth of investigation required by the Guidelines.  *First*, he did not

26   interview nearly enough people to conduct an "unparalleled investigation" into Wendi's

27

28   {00128370.1 }

75

social history.  The list of potential mitigation witnesses he sent to counsel on November 29, 2004 consists of what Rohman characterized as "the low hanging fruit"—namely, immediate family (including Donna, Alejo, and Brandon), three jail employees (Laura King, Joyce Van Every, and Gerald Perry), Wendi's babysitter, and a handful of individuals who had little interaction with Wendi, some of whom MacLeod had not even interviewed.  (Ex. 136; 2/6/14 Tr. at 77:23-78:8 (K. Rohman).)  Rohman testified that this scope of investigation was "[n]ot at all" adequate, and MacLeod's list showed that he was "not actually getting out and talking to family members and people in the community who would know her, doing the kind of extensive, and what the Guidelines refer to as an exhaustive social history investigation."  (*Id.*)

A proper mitigation investigation includes interviews of extended family (because it "frequently discloses significant patterns of family dysfunction" and may help establish "the hereditary nature of a particular impairment," such as bipolar disorder (Ex. 76 at 83; *see also* 2/6/14 Tr. at 75:12-20 (K. Rohman); 2/11/14 Tr. at 57:10-21 (L. Hammond))), as well as "the whole realm of people who came in contact with the family," such as teachers, neighbors, and classmates.  (2/6/14 Tr. at 75:4-11 (K. Rohman).)  "Childhood friends would be a perfect example of people who might be close to the client inside the family structure but would be perhaps more able to talk honestly about it because they are not actually in the family."  (*Id.* at 75:24-76:3.)  In reviewing the materials available to MacLeod, Rohman identified 40 to 50 potential sources of documentation and "upwards of a hundred potential witnesses who could have been interviewed:  Family members, people in the traveling religious group, neighbors, school friends, childhood friends and the like."  (*Id.* at 78:20-79:11.)

MacLeod did undertake that scope of work.  All of the mitigation witnesses the defense team ultimately called to testify were included on MacLeod's November 29, 2004 list, and the minimal probative value of the testimony from some of those witnesses

{00128370.1 }

4843-7819-0105.

indicates that MacLeod did not interview anyone else.  For example, during the sentencing phase the defense team called witnesses Jimmy and Linda Galyon, who testified that Wendi served as their babysitter in the 1980s and early 1990s, without incident; they had no further information to report.  Family acquaintances Chris Vargas and Lonnie Inskeep testified that Wendi was an obedient and bright teenager, but knew nothing more.  If MacLeod's investigation led him to suggest calling these minimally knowledgeable witnesses to shed light on Wendi's upbringing, then clearly that investigation was insufficiently narrow.

*Second*, it is apparent that MacLeod conducted no investigation into potential childhood abuse, neglect, or other trauma.  Investigating childhood sexual abuse, in particular, often begins with hints or passing references and ultimately requires multiple interviews with the same witnesses, and ideally "corroboration coming from people outside the immediate family circle."  (*Id.* at 56:1-11, 76:8-19.)  MacLeod did not have sufficient time in the four months between his appointment as mitigation specialist and Wendi's trial to conduct that level of investigation, and it does not appear that he tried. He brought no information regarding potential physical or sexual abuse to the attention of trial counsel (2/7/14 Tr. at 58:7-12, 68:15-17 (D. Patterson)), and never even raised the subject with Wendi's mother.  (2/4/14 Tr. at 190:15-191:2 (D. Ochoa).)

(iii)    **The Mental Health Investigation Was Deficient**

Finally, the defense team made no meaningful investigation into Wendi's mental health.  It focused a great deal of attention on the issue of domestic violence with Joe, engaging two testifying experts on the subject (Sharon Murphy and Mindi Mechanic). But neither examined Wendi for mental health issues:  Murphy had a degree in social work with a focus on domestic violence, not psychology or psychiatry (2/7/14 Tr. at 87:18-88:9 (D. Patterson); 2/10/14 Tr. at 133:2-8 (D. DeLozier)), while Mechanic's testimony was focused on rebutting the opinion of the State's expert regarding domestic

{00128370.1 }

4843-7819-0105.

violence.  (2/7/14 Tr. at 72:22-73:4 (D. Patterson).)  Mechanic never examined Wendi or

evaluated her for mental health.  (*Id.*)

        In the four years between Wendi's arrest and her trial, only one mental health

expert—Dr. Richard Rosengard—examined Wendi for mental health issues.[14]  He did so

in a single visit with Wendi in 2002.  (Ex. 6.003 at 1.)

        No one at the evidentiary hearing testified that a psychiatric opinion in the absence

of a social history is reliable, least of all Patterson himself:

> [A]n expert opinion is only as good as the information upon which he or
> she derives that opinion.  And so a social history of the client, in my
> estimation, is essential.  In a perfect world, you have an absolutely 100
> percent developed social history.  I don't think in practice, you're able to do
> that.  But we try to get as well developed a social history as we can before
> we bring the experts to begin their evaluations of the client . . . .  That
> social history – a significantly developed social history should be there
> before your experts go in to begin their evaluations.

(2/7/14 Tr. at 49:17-50:15 (D. Patterson); *see also* 2/5/14 Tr. at 49:16-51:3 (G.

Woods); 2/6/14 Tr. at 72:19-73:18 (K. Rohman); 2/11/14 Tr. at 60:15-61:4 (L.

Hammond); 2/14/14 Tr. at 43:4-21, 44:23-45:1, 72:23-25 (S. Pitt).)

        Yet Dr. Rosengard was provided with no social history of Wendi whatsoever prior

to his visit with her.  (Ex. 6.003 at 1; 2/7/14 Tr. at 53:3-21, 76:15-77:6 (D. Patterson).)

Moreover, despite having letters (Ex. 230 & 7.002), notes (Ex. 45), and summaries (Ex.

6.004) of mental health observations regarding Wendi from certified professional

counselor Kandy Rohde following dozens of sessions with Wendi, Wendi's trial counsel

provided *none* of that material to Dr. Rosengard.  (Ex. 6.003 at 1; 2/7/14 Tr. at 76:15-

77:6 (D. Patterson).)  Instead, Dr. Rosengard went into his single visit with Wendi

essentially cold, provided with only a police report, a transcript of Wendi's 911 calls on

the night of the homicide, and medical records for Joe.  (Ex. 6.003 at 1.)

---

[14] Dr. Jack Potts examined Wendi to determine whether she was competent to understand
the proceedings against her and assist counsel; he did not perform a diagnostic
evaluation.  (Ex. 6.001.)

4843-7819-0105.

The Guidelines recognize that "provid[ing] social history information to experts" is necessary to "enable them to conduct competent and reliable evaluations." (Ex. 76 at 33.)  As noted by Rohman, a mitigation specialist with experience in compiling clients' social histories and collaborating with mental health professionals in criminal matters:

> [T]he phrase is garbage in/garbage out . . . .  Dr. Rosengard did not have the advantage of knowing the real story of the client's life and background. For instance, a very basic fact about the client's life, her natural father was in state prison at the time while she was growing up for the crime of molesting children.  Dr. Rosengard didn't have that very basic piece of information.  All the other information about the client's background and history, he was relying on the client's self-report.  The nature of a mental health examination suggests that the self-reporting of the client should be examined with a certain skepticism.  A properly prepared mental health examination involves providing that examining psychiatrist or psychologist with the kind of detailed social history background that should be prepared in these cases.  That's both what the standard and practice has been in mitigation investigation for as long as I can remember and certainly what is outlined in the ABA Guidelines.

(2/6/14 Tr. at 72:19-73:18 (K. Rohman).)

Notwithstanding the lack of a social history, Dr. Rosengard identified numerous avenues for further development in his single visit with Wendi, outlined in more detail in the following section regarding red flags that counsel dismissed or ignored.  Though Patterson noted that the Public Defender's Office had sufficient resources "to retain anybody that was reasonably needed to properly defend Wendi" (2/7/14 Tr. at 151:23-25 (D. Patterson) (Cross)), the defense team inexplicably declined to consult further with Dr. Rosengard, did not arrange a second visit between him and Wendi, and did not ask any other experts to examine Wendi's mental health.  (*Id.* at 70:12-16, 73:12-16.)

This does not meet the standard of care.  "[T]here are very few cases that don't involve mental state issues relevant to the guilt or innocence side of the case" (2/11/14 Tr. at 32:19-33:10 (L. Hammond)), and it is not sufficient to "just to say that I've hired a mental health person and that person has conducted an examination" (*id.* at 105:3-12 (Cross)).  Mental health professionals must be given the social history necessary to reliably diagnose the client (*id.* at 60:15-61:4) and consulted throughout the course of the

79

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

pre-trial investigation (*id.* at 32:10-18).  There is no reasonable justification for the defense team's failure to do so.  (*Id.* at 81:14-20.)

<div align="center">

**c.**  **Trial Counsel Failed to Investigate and Develop Potential Mitigating Evidence That Came to Their Attention**

</div>

At the evidentiary hearing, Patterson justified the failure to investigate mental health by asserting that "nobody brought to my attention that there was a fertile area of mitigation in the mental health field."  (2/7/14 Tr. at 137:1-10 (D. Patterson) (Cross).) While that is not the standard of care—the Guidelines mandate that a person with training in mental health be a part of the defense team from the outset, and they note that "mental health issues are so ubiquitous in capital defense representation that the provision of resources in that area should be routine" (Ex. 76 at 31)—the evidence from trial counsel's files plainly shows that information concerning mental health and childhood abuse *did* come to the attention of trial counsel, from a variety of sources, throughout the period between Wendi's arrest and her trial.  (*See, e.g.*, 2/6/14 Tr. at 71:9-21 (K. Rohman) ("[T]he defense had many indications that the client was suffering from severe mental illness, and it received that from people working in contact with them.")

Trial counsel's failure to develop potentially powerful mitigating evidence that stared them in the face is simply inexplicable, and fell far short of the standard of care. *Wiggins*, 539 U.S. at 525 (an attorney complying with the standard of care "would have realized that pursuing these leads [regarding the defendant's traumatic childhood] was necessary to making an informed choice among possible defenses," particularly where "*[h]ad counsel investigated further, they may well have discovered the sexual abuse later revealed during state postconviction proceedings*") (emphasis added); *Summerlin*, 427 F.3d at 632 ("[W]here counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance.")

<div align="center">

80

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

</div>

4843-7819-0105.

### (i)      Early History from Donna (Exhibit 56)

On February 12, 2001—two months after DeLozier began his representation of Wendi, and roughly five months before Patterson was assigned—Donna sent DeLozier a "short early history on Wendi." (Ex. 56 at PCR305.) Her history gives a large number of biographical facts regarding the first nine years of Wendi's life. They do not provide the level of detail elicited by numerous witnesses at the evidentiary hearing in this matter, of course; as Donna noted, it was a "short early history" and she was unsure "what sort of details" would be helpful. But as Hammond noted, "it would have been a tantalizing place to start" a social history investigation. (2/11/14 Tr. at 71:8-11 (L. Hammond).)

There is no indication that trial counsel pulled any of the threads Donna's initial history provided to them. (Id.) Among those threads was Donna's disclosure that "[s]ometime in 1972 rumors were flying through the family that the grandpa, Skip's dad, was touching the granddaughters inappropriately," but Donna did not want to believe it was true because "Wendi had been around the grandpa numerous times. And I have thought of it through the years, and have been scared about it." (Ex. 56 at PCR307.) Despite receiving that disclosure more than three-and-a-half years before Wendi's trial, DeLozier made no investigation into potential sexual abuse of Wendi by any members of her family at any time. (2/10/14 Tr. at 134:11-135:13 (D. DeLozier).)

### (ii)      February 2001 Letter from Kandy Rohde (Exhibit 230)

In the opening sentence of Exhibit 56, Donna mentions the late Kandy Rohde, a certified professional counselor with a master's in counseling psychology who was retained by Donna to treat Wendi after her incarceration. (2/4/14 Tr. at 187:14-188:5 (D. Ochoa); (2/10/14 Tr. at 122:3-7 (D. DeLozier); Ex. 230 at 9187.) One week after Donna's email—still more than three-and-a-half years before Wendi's trial—Rohde shared her observations with DeLozier.

I have been meeting with Wendi Andriano, and I recommend that a

{00128370.1 }                                                     81

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

psychiatrist be called in to examine her.  I believe that her willingness to give up her will to others is a symptom of some kind of personality disorder.  I also suspect that her defense system includes dissociation.  Her mother's reference to possible abuse by Wendi's paternal grandfather could be the origin of that dissociation.

(Ex. 230 at 9185.)

DeLozier attached Rohde's letter as an exhibit to a Motion for Determination of Competency Pursuant to Rule 11 (Ex. 230), which ultimately led to the competency evaluation by Dr. Potts, discussed below.  Ms. Rohde's observations do not relate to Wendi's competency to assist her counsel, however; they relate to the same psychiatric diagnoses and childhood trauma that formed the substance of the testimony of Dr. Hopper and Dr. Woods.  Beyond attaching Rohde's letter to that competency motion, and later forwarding that motion (together with all other materials concerning Rohde) to Patterson, DeLozier did not follow up in any way on Rohde's observations.  (2/10/14 Tr. at 112:5-113:5 (D. DeLozier).)

Patterson acknowledges that he "must have reviewed" the letter as part of the file when he assumed representation of Wendi.  (2/7/14 Tr. at 82:18-24 (D. Patterson).) Patterson had no independent understanding of connections between childhood abuse and dissociation as an adult, and he did not seek any expert to evaluate those symptoms in Wendi or direct anyone to investigate potential childhood causes of her dissociation.  (*Id.* at 84:4-7, 84:16-24.)  Patterson simply did not "accept [the] premise" that dissociation and childhood abuse "were causally related.  There was some suggestion that a grandfather may have improperly touched her and that a stepfather may have improperly touched her, but it was never confirmable."  (2/7/14 Tr. at 165:12-20 (D. Patterson) (Redirect).)

As shown at the evidentiary hearing, however, Wendi's childhood sexual abuse *was* confirmable; her defense team simply made no attempt to confirm it.  Indeed, Patterson acknowledged that he never interviewed any childhood friends or others in a position to provide evidence regarding such abuse, and he never even broached the

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

1  subject with Wendi, Donna, or Alejo.  (2/7/14 Tr. at 163:4-12 (D. Patterson) (Redirect).)

2  "Had counsel investigated further, they may well have discovered the sexual abuse later

3  revealed during state postconviction proceedings."  *Wiggins*, 539 U.S. at 525.

4  **(iii)     March 2001 Kandy Rohde Letter (Exhibit 7.002)**

5  On March 12, 2001—around the same time DeLozier began representing Donna

6  and Alejo in proceedings regarding the custody of their grandchildren—Rohde wrote a

7  more detailed letter to DeLozier.  (Ex. 7.002.)  Rohde told him that Wendi "seems to

8  have begun dissociating as a defense beginning as a very young child and continuing

9  until today," and that she suspected that the source of that dissociation was childhood

10  molestation.  (*Id.*)  Rohde also noted memory deficits in Wendi, stating that while Wendi

11  claimed to have a good memory, when "asked about her childhood, her marriage and her

12  imprisonment she was unable to recall large sections of her history."  (*Id.*)  Donna

13  confirmed that Wendi's memory deficits dated back to childhood.  (*Id.*)

14  "In addition to my belief that she is the victim of sexual molestation and that she

15  suffers from Depersonalization Disorder as well as Dissociative Amnesia," Rohde

16  continued, "I believe she exhibits the symptoms of the Cluster C Personality Disorders."

17  (*Id.*)  Rohde then gave a description of symptoms consistent with dependent personality

18  disorder (*id.*), which the Diagnostic and Statistical Manual of Mental Disorders ("DSM")

19  recognizes as a cluster C personality disorder.  Rohde concluded by noting that she

20  believed "Wendi suffers from serious psychological disorders and am anxious to have her

21  examined by another professional for a second opinion."

22  DeLozier did not follow Rohde's advice.  Despite receiving notice from a mental

23  health professional who had been treating Wendi for months that his client likely suffered

24  from "serious psychological disorders," DeLozier took no steps to follow up beyond

25  forwarding Rohde's observations to the Public Defender's Office and retaining Dr. Potts

26  for an evaluation of Wendi's *competency to stand trial*—not whether she suffered from

27  {00128370.1 }                                    83

28

4843-7819-0105.

serious disorders.  (2/10/14 Tr. at 123:16-124:15 (D. DeLozier).)  In addition, though Wendi's mental health symptoms caused Rohde to suspect childhood molestation, DeLozier never investigated whether she was a victim of childhood sexual abuse at the hands of any of the male members of her family.  (*Id.* at 123:2-15.)

### (iv)    Potts Letter (Exhibit 6.001)

DeLozier's sole step to investigate Wendi's mental health was to engage Dr. Potts to examine Wendi's competency to stand trial, a narrow inquiry that looks only to whether the defendant "is unable to understand the proceedings against him or her or to assist in his or her own defense."  Ariz. R. Crim. Proc. 11.1.  In March 2001, Dr. Potts issued a two-and-a-half page letter to the court that reached the obvious conclusion that she had an "understanding of the proceedings she is facing" and was able to assist her attorneys in her defense.  (Ex. 6.001 at 2.)  But Dr. Potts concluded his letter by noting the narrow focus of his task in assessing competency, and urging further investigation by the defense team:  "If Ms. R[oh]de is accurate in her diagnostic assessment, then the criminal culpability of the defendant and her state of mind at the time of the alleged offense should be evaluated independently, outside the scope of a Rule 11 evaluation."  (*Id.* at 3.)  Dr. Potts was presumably referring to the "diagnostic assessment" in the letter from Rohde submitted with the motion for a competency evaluation (Ex. 230), which is referenced in the first page of Dr. Potts's letter (Ex. 6.001 at 1).

Contrary to Dr. Potts's advice, DeLozier never retained anyone to determine whether "Ms. Rohde's diagnostic assessment [was] correct."  (2/10/14 Tr. at 70:13-17, 113:17-114:5 (D. DeLozier).)

### (v)    Request to Contact Rohde (Exhibit 50)

After Patterson became involved in Wendi's case in July 2001, DeLozier forwarded a copy of his case file to Patterson's office (2/10/14 Tr. at 103:8-14 (D. DeLozier)), which included "[e]verything that [he] had, including Kandy Rohde's entire

84

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1    file, for example." (*Id.* at 108:11-18.)  Patterson had no reason to believe that his office

2    did not receive the materials from Rohde throughout the case.  (2/7/14 Tr. at 168:12-14

3    (D. Patterson) (Redirect).)

4        On December 4, 2001, Donna wrote Patterson to state that Rohde "would really

5    like to hear from your office," and urged Patterson to "please give [Rohde] a call"

6    because "[s]he has good information."  (Ex. 50.)  Donna made clear that Rohde sought to

7    consult with him rather than to testify—she did not want to "appear to be part of the

8    defense"—but that she had information that would be helpful in establishing that "there is

9    a lot more to this than the prosecut[o]r has shown."  (*Id.*)

10       Patterson has no recollection of contacting Rohde (2/7/14 Tr. at 85:9-22 (D.

11   Patterson)), and given his comments regarding Rohde in his testimony, it is unlikely he

12   did so.  During his cross-examination, Patterson stated that he did not rely upon her

13   because he "never had a really good understanding of her function here.  She certainly

14   wasn't a treating mental health person.  She didn't have the credentials.  I don't even

15   know if she had a master's in social work."  (*Id.* at 141:3-6 (D. Patterson) (Cross).)

16   When reminded on redirect that Rohde's credentials were in fact attached to the

17   competency motion that he had reviewed upon his assuming his representation of Wendi

18   (Ex. 230), and that those credentials included a masters in counseling psychology,

19   Patterson conceded that he "did not investigate her credentials" (2/7/14 Tr. at 164:22-

20   165:6 (D. Patterson) (Redirect)) but simply "didn't have a great deal of co[nfid]ence in

21   Kandy Rohde" (*id.* at 166:16-25 (Redirect).  Though he acknowledged his understanding

22   that Rohde was meeting with Wendi "frequently," he stated that his lack of confidence

23   arose from "her limited participation in the case, her function in the case.  She was not an

24   evaluating or treating physician."  (*Id.* at 167:1-11 (Redirect).)

25       This exchange illustrates the lack of any reasonable justification for the defense

26   team's failure to follow up on information it received from Rohde.  Patterson asserts that

27

28

                                    85
_____
                   PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
                        PETITION FOR POST-CONVICTION RELIEF
                            CASE NO. CR2000-096032-A

4843-7819-0105.

he did not consult with Rohde because of her limited function, but her function was limited precisely because Patterson did not consult with her. Patterson says he did not consult with her because he did not know her credentials, but those credentials were provided to him and he apparently did not review them. And he claims that he did not trust her opinions because she was not an evaluating or treating psychiatrist—even though he received repeated entreaties from Rohde (Ex. 230 and Ex. 7.002) and Dr. Potts (Ex. 6.001 at 3) urging the defense team to obtain a psychiatrist to determine whether her diagnostic impressions, informed by her training with a master's degree in counseling psychology, were correct.

As Hammond testified, the defense team's dismissive attitude toward Rohde was a significant error. From February 2001 until Wendi's trial in 2004, Rohde consistently provided the defense team with "a gold mine of information [that] would set off – I think with any trained professional and most lawyers, these would be just a series of red flags, things that you would have to be concerned about and would want to follow up on." (2/11/14 Tr. at 75:16-76:12 (L. Hammond).) Yet this "gold mine" of information from Rohde "didn't have much of an effect on the team. And I think Mr. Patterson had no interest in communicating with her and no involvement with her, as far as I can tell." (2/11/14 Tr. at 38:18-39:23 (L. Hammond).)

### (vi)   February 2002 Rohde Communication (Exhibit 6.004)

The defense team's pattern of ignoring Rohde—who visited with Wendi at least 90 times prior to trial (Ex. 45), 89 more than any other defense-affiliated mental health professional—continued for years prior to Wendi's trial, even when the information did not come from Rohde herself. On February 13, 2002, Michelle Arvanitas, an employee at that the Public Defender's Office, relayed further information from Rohde to Patterson. (Ex. 6.004.)

According to Arvanitas, Rohde believed Wendi suffered from depersonalization

4843-7819-0105.

1   disorder ("persistent . . . feeling[s] of detachment or estrangement from one's self"),

2   dissociative amnesia (an "inability to recall important personal information, usually of a

3   traumatic or stressful nature, that is too extensive to be explained by normal

4   forgetfulness"), and childhood physical and sexual abuse and neglect.  (*Id.*)  In addition,

5   Arvanitas noted that "[s]upposedly, her biol[ogical] father is in prison for molestation."

6   (*Id.*)

7        Patterson did not retain any expert to evaluate the psychiatric symptoms noted by

8   Rohde and relayed by Arvanitas (2/7/14 Tr. at 87:4-7 (D. Patterson)), nor did he

9   personally investigate (or direct anyone else to investigate) whether Rohde was correct in

10  her conclusion that Wendi had suffered physical and sexual abuse and neglect as a child

11  (*Id.* at 62:16-18, 64:21-65:7).  He did not interview and did not direct anyone else to

12  interview Wendi's biological father, Skip Robertson, despite Arvanitas's disclosure that

13  he was in prison for child molestation.  (*Id.* at 170:21-171:1 (Redirect).)  No one at the

14  Public Defender's Office forwarded those diagnostic impressions to DeLozier, who

15  acknowledged that the email indicated that Wendi "had suffered some sort of mental

16  trauma or emotional trauma."  (2/10/14 Tr. at 117:1-17 (D. DeLozier).)

### (vii)   Rohde Notes Throughout Wendi's Pre-Trial Incarceration (Exhibit 45)

19       The "gold mine" of leads from Rohde on potentially mitigating evidence

20  continued throughout Wendi's pre-trial incarceration.  From January 19, 2001 to April

21  26, 2004, Rohde regularly saw Wendi and sent notes from 90 of her visits to Wendi's

22  trial counsel.  (Ex. 45.)  The notes included a wealth of information and diagnostic

23  impressions that should have led the defense team to investigate further into potentially

24  mitigating evidence.  As DeLozier candidly summarized on cross-examination, Kandy

25  Rohde "knew Wendi, in my opinion better than anybody," she had provided her records

26  to the defense team, "[a]nd nobody did anything with them."  (2/10/14 Tr. at 150:25-

27  151:10 (D. DeLozier) (Cross).)

28

{00128370.1 }

87

4843-7819-0105.

Examples of red flags that Rohde noted and relayed to the defense team include the following:

**March 28, 2001:**  In response to learning that Wendi had never "had a sexual feeling" or an orgasm, Rohde noted that Wendi's "dissociation and the lack of sexual responsiveness fit a profile for early molestation, but that is not proof."  (Ex. 45 at PCR27.)

Despite learning that Wendi's adult symptoms "fit a profile" for victims of childhood sexual abuse, Patterson and DeLozier took no steps to develop such proof of childhood molestation, such as interviewing childhood friends or others in a position to witness it.  (2/7/14 Tr. at 170:15-20, 171:11-18 (D. Patterson) (Redirect); 2/10/14 Tr. at 126:21-127:8 (D. DeLozier).)  Nor did they engage any experts to determine whether childhood sexual abuse may have been the source of Wendi's dissociation and lack of sexual responsiveness as an adult.  (2/7/14 Tr. at 169:11-23 (D. Patterson) (Redirect) ("I did not direct that any expert investigate a relationship between dissociative personality and an early molestation that had—that may have occurred to Ms. Andriano.  No.  I did not investigate that aspect of her case more fully.").)

**February 28, 2002:**  Rohde noted that "[Wendi] said that she is disappointed that Michelle and the PD's psychologist have not been in contact with her despite their promises.  We talked about the possibility that her father might testify to his abuse of her or his family's abuse of her."  (Ex. 45 at PCR62.)

Though Wendi and Rohde were openly discussing the possibility that her father might be willing to testify regarding his and/or his family's abuse of her as a child, neither DeLozier nor Patterson ever contacted Wendi's biological father.  (2/7/14 Tr. at 170:21-171:1 (D. Patterson) (Redirect); 2/10/14 Tr. at 128:3-18 (D. DeLozier).)

**August 7, 2002:**  Rohde noted that "it was normal for [Wendi] to fall asleep in the midst of chaos and that she could sleep *literally for days without food or water to avoid*

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

*emotions*."  (Ex. 45 at PCR73 (emphasis added).)  This was not a mere reaction to Joe's

cancer or the homicide; Wendi "could remember doing it in her teens."  (*Id.*)  Rohde

noted that Wendi's "history of sleeping while angry is a willful dissociation from anger,"

and that she "dissociate[d] and left her body when her fear turned into anger" during the

homicide.  (*Id.* at PCR74.)

Though Wendi's periods of excessive sleep since her teens was evidence that her

mental health symptoms dated back to her childhood, Patterson continued to assume that

all of Wendi's symptoms were a product of the homicide and/or Joe's cancer.  (2/7/14 Tr.

at 79:10-25, 80:1-22, 81:17-82:4, 94:6-23 (D. Patterson).)  DeLozier made no further

inquiry with Wendi or her family regarding these periods of excessive sleep or their

origin, and made no inquiry into Wendi's dissociation.  (2/10/14 Tr. at 128:19-130:7 (D.

DeLozier).)

***April 26, 2004:***  In April 2004—shortly after Scott MacLeod replaced Patrick

Linderman as mitigation specialist—Rohde faxed a particularly sensitive set of notes to

MacLeod's attention at the Public Defender's Office.  In them, Rohde provided the

defense team with a clear-cut example of the inappropriately sexual nature of Alejo's

relationship with his stepdaughter, Wendi, and Wendi's normalization of such sexualized

behavior:

> Wendi said that she got into the sexy stories through a roommate in jail
> named Kelly. . . .  Wendi said that she put Kelly up to reading her story to
> Alejo. . . .  Wendi said that Alejo said that she should send stories to him
> for the Internet.  Wendi said that someone Alejo knows from his
> photography was his connection into the Internet.  Wendi said that these
> photographers have lingerie parties, some of which are innocent and some
> are more provocative.  Wendi seems to have open knowledge of these
> enterprises and does not think they are inappropriate.

(Ex. 45 at PCR112-114.)

These were the last set of notes received from Rohde, and they should have been

an eye-opener: a client with mental health symptoms that "fit a profile" for victims of

childhood sexual abuse (*id.* at PCR27) had "open knowledge" of her stepfather's

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1   "lingerie parties" with other photographers, and her stepfather was urging Wendi to send

2   him erotic stories while she was incarcerated (*id.* at PCR112-114).  This entry should

3   have shattered any of trial counsel's misperceptions that Alejo and Wendi had a normal

4   stepfather-stepdaughter relationship, and it certainly warranted further investigation.

5       It received none.  No member of the defense team made any inquiry into any

6   sexual aspects of Wendi's relationship with Alejo.  (2/7/14 Tr. at 62:16-18, 68:15-17 (D.

7   Patterson); 2/10/14 Tr. at 131:19-132:15 (D. DeLozier).)

8                        **(viii)   Rosengard Report (Exhibit 6.003)**

9       On June 23, 2002, for the first and only time, Wendi was examined by a defense-

10  retained psychiatrist, Dr. Richard Rosengard.  Two months later, Dr. Rosengard issued a

11  five-and-a-half page letter to Patterson regarding his diagnostic impressions (Ex. 6.003

12  (the "Rosengard Report)), which Patterson cited several times in his testimony at the

13  evidentiary hearing as a justification for not further investigating Wendi's mental health

14  and/or childhood trauma.  (*See, e.g.*, 2/4/14 Tr. at 67:4-18, 74:2-23, 135:1-136:13 (Cross)

15  (D. Patterson).)

16      Patterson's reliance upon the Rosengard Report to justify failing to investigate

17  potentially mitigating evidence is unreasonable.  Patterson admitted that an "expert

18  opinion is only as good as the information upon which he or she derives that opinion.

19  And so a social history of the client, in my estimation, is essential."  (*Id.* at 49:17-50:15.)

20  As noted above, Dr. Rosengard had a single visit with Wendi, and was not provided any

21  social history or any of the observations of mental health providers (such as Rohde) who

22  had seen her previously.  Thus, it was unreasonable to Patterson to rely upon the

23  Rosengard Report as a reason for not further investigating mental health.

24      But despite being provided nothing more than a single interview with Wendi (Ex.

25  6.003 at 1; 2/7/14 Tr. at 75:16-23 (D. Patterson)), the Rosengard Report still identifies a

26  plethora of potential mitigating evidence relating to Wendi's childhood and mental health

27

28

{00128370.1 }

4843-7819-0105.

that were not pursued.  That report was plainly preliminary, because "there are places in [it] where Dr. Rosengard says that further work is necessary and that these are his impressions but not formal findings," which would lead defense counsel performing at or above the standard of care to "follow up on the specific things that Dr. Rosengard found." (2/11/14 Tr. at 83:13-25 (L. Hammond).)  As noted below, Wendi's trial counsel did not do so.

*First*, and foremost, Dr. Rosengard noted that while Wendi's memory deficits could "appear[] all too convenient," he believed those deficits were genuine and rooted in Wendi's PTSD:

> I do not believe that there is any evidence that would conclude that what had occurred was premeditated; and certainly, the actions were regretted from the very beginning, as witnessed by the Defendant's response when answering questions posed to her when she called the emergency numbers. Because of what she saw, she surmised that she actually had killed her husband and admitted to feeling badly about it.  An individual who goes through a traumatic event will often forget that extreme situation, because an individual is unable to deal with the thoughts on an emotional basis. ***This occurs in both children and adults who have been physically or sexually attacked and more than explains the Defendant's response, particularly in light of the fact that she had a past history, apparently, of being abused and symptoms consistent with post-traumatic stress disorder.***

(Ex. 6.003 at 5-6 (emphasis added).)  Elsewhere in his report, Dr. Rosengard concluded that Wendi had "[p]robable post-traumatic stress disorder."  (*Id.* at 5.)

Patterson, who neither made nor directed any inquiry into when and whether Wendi developed PTSD, assumed that it was a product of Joe's cancer and the events of the homicide.  (2/7/14 Tr. at 80:1-13 (D. Patterson).)  The Rosengard Report makes no such finding, and Patterson offered no basis for his personal conclusion regarding the origin of Wendi's PTSD.  If anything, the Rosengard Report suggests that Wendi's PTSD arose from childhood sexual abuse, noting that her mother and therapist indicated that Wendi may have been molested and that Wendi was "particularly upset in finding out about and dealing with children that were sexually abused."  (Ex. 6.003 at 3 ("Other Psychiatric Conditions").)

{00128370.1 }

91

4843-7819-0105.

*Second*, though Dr. Rosengard was at least the third person to suggest to the defense team that Wendi may have been molested as a child (following Donna and Rohde), and though Patterson knew that Wendi's biological father was in prison for child molestation (Ex. 6.004), Patterson did not interview Wendi's biological father, did not interview anyone else who had regular access to her as a child regarding potential sexual abuse, and made no investigation into the subject whatsoever.  (2/7/14 Tr. at 78:4-79:4 (D. Patterson).)

*Third*, Dr. Rosengard preliminarily diagnosed Wendi with a panic disorder.  (Ex. 6.003 at 5.)  Though the Rosengard Report specifically noted that Wendi had suffered symptoms consistent with "panic attacks since childhood" (*id.* at 3), Patterson testified that he did not investigate further because he assumed her panic attacks were a product of Joe's cancer.  (2/7/14 Tr. at 80:14-22 (D. Patterson).)  Patterson made no investigation into the origin of Wendi's "panic attacks since childhood."  (2/7/14 Tr. at 81:8-16 (D. Patterson).)

*Fourth*, Dr. Rosengard preliminarily diagnosed Wendi with a mood disorder: major affective disorder – depression.  (Ex. 6.003 at 5.)  Again, Patterson assumed that any such psychiatric disorder "was situational as a result of dealing with [Joe's] cancer" and the homicide, and he did not investigate further.  (2/7/14 Tr. at 79:10-25 (D. Patterson).)  In his (inaccurate) summary of Rosengard's conclusion, Patterson testified that Dr. Rosengard "suggested that [Wendi's major affective disorder] can be treated with a pill.  So, I didn't find that to be a significant mental health issue."[15]  (2/7/14 Tr. at 79:10-19 (D. Patterson).)  Patterson did not investigate further into the nature of Wendi's mood disorder symptoms, and did not direct anyone else to do so.  (*Id.* at 79:20-25.)

_____

[15] Dr. Rosengard did not suggest that her disorders could be "treated with a pill"; he stated that Wendi should receive individual therapy and that an antidepressant "could be beneficial both for her depression and traits of post-traumatic stress disorder."  (Ex. 6.003 at 6.)

4843-7819-0105.

After receiving the Rosengard Report, Patterson rested upon his assumptions regarding the findings and did not ask Dr. Rosengard to perform any additional work on Wendi's case. (*Id.* at 70:12-16.) From receipt of the Rosengard Report through Wendi's trial, Patterson directed no further investigation into Wendi's psychiatric disorders as mitigating evidence, and instead retained experts for the sole purpose of establishing Wendi as a victim of domestic violence. (2/7/14 Tr. at 69:16-70:11, 73:12-74:1 (D. Patterson).) Indeed, according to DeLozier, Patterson did not even share Dr. Rosengard's findings with him prior to Wendi's sentence. (2/10/14 Tr. at 114:22-115:9 (D. DeLozier).)

Obtaining and then ignoring a psychiatric report that raises issues for further investigation—particularly one that is necessarily preliminary (because no social history had been provided)—did not meet the applicable standard of care for capital defense counsel at the time of Wendi's case. (2/11/14 Tr. at 85:19-23 (L. Hammond).)

### (ix)    Sharon Murphy Email (Exhibit 52)

On March 30, 2003, domestic violence consultant Sharon Murphy informed Patterson and DeLozier by email that Wendi "learned to di[]ssociate from painful memories a long time ago—that is very clear to me. . . . I know there's something that happened during childhood that she hasn't told me yet—I'll get at it before we're finished." (Ex. 52.)

No one followed up on Murphy's observations, which apparently fell through the cracks of pre-trial investigation. Patterson took no steps to investigate her dissociation or whether there was "something that happened during her childhood" to cause it, but he "note[d] that it was apparently sent to [DeLozier] as well, who I relied upon to develop the mitigation aspect of this case." (2/7/14 Tr. at 89:5-10 (D. Patterson).) Patterson's reliance was unfounded: according to DeLozier, he took no steps to investigate source of painful memories from childhood because "at that point, I was second chair and not

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

1    really involved."  (2/10/14 Tr. at 133:9-22 (D. DeLozier).)

2                    **(x)    Wendi's Suicide Attempt (Exhibit 47)**

3         Another "big red flag," and perhaps "the strongest indication that there are some

4    [mental health] issues here" came six months after Murphy's email, when Wendi

5    attempted suicide while incarcerated.  (2/6/14 Tr. at 72:1-7 (K. Rohman).)  The jail

6    medical records regarding the event indicate that Wendi slashed the inside crook of her

7    arm, causing her to lose 200 cc of blood, go pale, and require emergency medical

8    attention.  (Ex. 47 at 1-2.)  She was hospitalized, then transferred to the Durango

9    Psychiatric Unit, where she remained until her sentencing.  Two days after the suicide

10   attempt, Wendi's medical provider wrote that Wendi had "acted out impulsively with [a]

11   significant suicide attempt in [a] moment of panic."  (*Id.* at 3.)

12        Rather than viewing Wendi's impulsive violence in a moment of panic as a red

13   flag warranting further investigation into potentially mitigating mental health evidence,

14   Wendi's trial counsel largely dismissed it.  DeLozier was aware of the suicide attempt,

15   but did not know "much more about it other than I know she was put on a watch and she

16   might have been moved to a different area of the facility that she was being held in at the

17   time."  (2/10/14 Tr. at 119:9-21 (D. DeLozier).)  Patterson also knew of the suicide

18   attempt, but he "did not feel that it was a serious effort on her part to kill herself" and

19   assumed that it was a product of Wendi not "dealing with incarceration in a good

20   manner" rather than a "mental health issue."  (2/7/14 Tr. at 94:5-23 (D. Patterson),

21   137:23-138:11 (Cross).)  Accordingly, Wendi's suicide attempt caused neither Patterson

22   nor DeLozier to engage in any further mental health investigation.  (*Id.*; 2/10/14 Tr. at

23   120:14-121:6 (D. DeLozier).)

24        Trial counsel's dismissiveness toward Wendi's suicide attempt fell well below the

25   standard of care.  *See, e.g.*, *Hamilton*, 583 F.3d at 1117 (where "counsel was aware that

26   [the defendant] tried to commit suicide in prison . . . and that he was taking

27                                              94

{00128370.1 }

28

4843-7819-0105.

antidepressant medication at the time of trial," counsel "should have retained a mental health expert and provided the expert with the information needed to form an accurate profile of [the defendant's] mental health").

### (xi)    Wendi's Pre-Trial Medications (Exhibit 49)

Medication records from Wendi's pre-trial incarceration reveal that her jail medical providers prescribed her psychotropic medications throughout the four years between her arrest and her sentencing, including Ativan, Zoloft, and Seroquel.  (*See, e.g.*, Ex. 49 at PCR253-54.)  At the evidentiary hearing, DeLozier noted that he was "familiar with almost all" of the medications prescribed, that he would have had that familiarity by 2004, and that he specifically recognized that some of them were used for the treatment of bipolar disorder.  (2/10/14 Tr. at 118:10-24 (D. DeLozier).)

But DeLozier did not retrieve, and was not provided with, Wendi's jail medication records at any time during his representation of Wendi.  (2/10/14 Tr. at 118:25-119:2 (D. DeLozier).)  The Public Defender's Office obtained them at some point, presumably as a result of its post-verdict Motion to Assist Mitigation (Ex. 54), which was far too late to provide assistance to a mental health expert or develop further mitigating evidence.

### (xii)    Skip Robertson Information (Exhibit 57)

More than two years after Wendi's arrest and still 18 months before her trial began, Donna emailed Patterson and DeLozier to provide the prison contact information for Wendi's biological father, Skip Robertson.  (Ex. 57.)  As noted above, no one from the defense team attempted to contact him prior to Wendi's trial.  (2/7/14 Tr. at 170:21-171:1 (D. Patterson) (Redirect); 2/10/14 Tr. at 128:3-18 (D. DeLozier).)

As Attorney Hammond testified, that failure falls far below the standard of care:

> I mean, he's the biological father.  He participated for some period of time in raising Wendi.  Whatever his offense was, you would interview him. But having any indication that there might have been sexual abuse in his background would have required it.  It wouldn't have been close, to answer your question.

95

1   (2/11/14 Tr. at 71:17-72:12 (L. Hammond).)

2                          **(xiii)   Schaider Comments**

3          Finally, Cindy Schaider testified that she raised a red flag for the defense team

4   during the trial itself.  After hearing a depiction of Harvest on one day of the trial,

5   Schaider pulled aside Scott MacLeod during a break.  As she recalled:

6          I was really kind of upset because the culture was very complex and what
           you saw on the surface was not always what was going on behind the
7          scenes. . . .  He said:  "What difference does that make?  What point will it
           make?"

8   (2/10/14 at 173:16-174:10 (C. Schaider).)

9                  **d.      There Were No Strategic Reasons for Failing to
10                           Investigate and Develop Mitigating Evidence of Wendi's
                             Traumatic Childhood and Psychiatric Disorders**
11

12         Neither Patterson nor DeLozier identified any strategic reasons for dismissing

13  these red flags and failing to develop evidence of Wendi's traumatic childhood and

14  psychiatric disorders, nor could they.  Simply put, there was no strategic decision for

15  them to make, because they failed to conduct an investigation sufficient to develop such

16  evidence in the first place.

17         "[S]trategy presupposes investigation," *Frierson v. Woodford*, 463 F.3d 982, 992

18  (9th Cir. 2006), and thus "[a]n uninformed strategy is not a reasoned strategy.  It is, in

19  fact, no strategy at all."  *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008).  *See also*

20  *Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007) ("[T]he central teaching of

21  *Strickland*, as reaffirmed by *Wiggins*, [is] that the investigation leading to the choice of a

22  so-called trial strategy must itself have been reasonably conducted lest the 'strategic'

23  choice erected upon it rest on a rotten foundation."); *Bean v. Calderon*, 163 F.3d 1073,

24  1079 (9th Cir. 1998) (failure to adequately investigate social history for use in psychiatric

25  diagnosis was "a deficiency in trial preparation, not a strategic decision"); *Deutscher v.*

26  *Whitley*, 884 F.2d 1152, 1160 (9th Cir. 1989) ("Counsel could not have chosen to avoid

27  psychiatric evidence because of potentially damaging rebuttal testimony.  Counsel did not

                                                96

28  {00128370.1 }

                    PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
                          PETITION FOR POST-CONVICTION RELIEF
                              CASE NO. CR2000-096032-A

even know what evidence was available."), *vacated on other grounds*, 111 S.Ct. 1678 (1991), *and subsequently reaffirmed*, 16 F.3d 981 (9th Cir. 1994).

Here, as in *Wiggins*, "counsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable." *Wiggins*, 539 U.S. at 536. In their testimony, trial counsel stated time and again that they had no idea that Wendi had actually been the victim of sexual abuse and neglect throughout her childhood and had no understanding that she was suffering from significant psychiatric disorders that affected her ability to control impulse, make rational decisions, and conform her conduct to the law at the time of the offense. Thus, they never faced the choice of whether to present the type of mitigating evidence submitted at the evidentiary hearing in this matter, because (in spite of the red flags noted above) they failed to investigate whether it existed. As Patterson acknowledged, "you can't develop a strategy to not introduce something you don't know exists. So it wasn't a strategic or tactical issue." (2/7/14 Tr. at 75:1-3 (D. Patterson); *see also id.* at 68:18-25 ("No, you can't exercise or make a strategic decision absent some information. And I didn't have any information that sexual abuse was an issue in Ms. Andriano's case.").)

As trial counsel testified, the mitigation presentation at trial was not the product of a strategic choice, but was dictated by the information that MacLeod and DeLozier brought to his attention. (2/7/14 Tr. at 31:24-32:9 (D. Patterson).) "So, by default, theory or the theme became she's a good woman, she's a good mom, she's a hard worker, she provides for the family, those kinds of things." (*Id.* at 59:6-25.) Because Attorney DeLozier "had a special relationship with Donna and Alejo," he was given responsibility for "securing information to substantiate that position." (*Id.* at 31:24-32:9.)

Neither Patterson nor DeLozier expressed any kind of tactical reasons for not investigating evidence of mental health or childhood trauma as a potential theme in mitigation. Patterson simply assumed there was nothing worth pursuing, and that

{00128370.1 }

4843-7819-0105.

1   MacLeod or DeLozier would bring it to his attention if there was.  (*See, e.g.*, *id.* at 68:11-

2   14 ("Sexual abuse history can be a significant mitigator.  But I had no – no reporters

3   advising me that it was an issue . . . .").)  DeLozier, meanwhile, believed both then and

4   now that the red flags warranted further investigation (2/10/14 Tr. at 136:18-23 (D.

5   DeLozier)), but stated that he did not investigate further because:  (1) the Public

6   Defender's Office had taken over the representation and he "was not in a position, in my

7   opinion, to force the public defender to do anything" (*id.* at 136:24-137:12); and (2) "it's

8   possible that focusing on [the positive aspects of the Ochoas in the custody] case kept me

9   from focusing on anything that might have been historical in Wendi's case" (*id.* at 138:4-

10   139:8).

11          None of those explanations offer a strategic reason for not investigating further.

12   As Patterson acknowledged:

13          I absolutely agree . . . that if – if that evidence existed, it should have been
            developed.  Whether it would have been presented at trial, that would have
14          been my call and that truly would have been a strategic call.  That being
            said, there was an obligation if this information exists, to develop it in
15          advance of trial.

16   (2/7/14 Tr. at 177:22-178:15 (D. Patterson) (Redirect).)

17          The State suggested no strategic reasons not to investigate childhood trauma and

18   mental health as potentially mitigating evidence, and no strategic reasons for failing to

19   follow up on the red flags identified above.  During Patterson's cross-examination, the

20   State seemed to suggest reasons why Patterson may not have wanted to present the

21   information he possessed regarding mental health or childhood trauma.  But that line of

22   questioning misses the point.  No one is arguing that trial counsel should have called

23   Kandy Rohde as an expert witness, or that the defense team should have presented

24   preliminary and incomplete evidence of mental health disorders and childhood trauma

25   without further investigation.  The argument on post-conviction relief is simply that trial

26   counsel should have investigated and developed that information, so that it could then

27   make an informed choice as to whether it would be presented—a choice that trial counsel

28

{00128370.1 }                                    98

did not put themselves in a position to make.  (*Id.*; *see also, e.g.*, 2/11/14 Tr. at 81:14-20

(L. Hammond) (under the standard of care, "there is not a good strategic or tactical

reason not to consult and work with mental health people as part of the investigation");

*id.* at 82:5-22 ("[T]here's no valid reason that I know of not to conduct an investigation

for all of the reasons that we've talked about.  It is very important that you know as well

as you can what may be down the road before you make those more refined strategic and

tactical reasons.  You can't make them in the blind, so to speak."); *id.* at 89:9-13

(possibility of rebuttal evidence is not a strategic reason for failing to investigate in the

first instance).)

## II.     POST-CONVICTION RELIEF IS WARRANTED UNDER *CUYLER* BECAUSE ATTORNEY DELOZIER SUFFERED FROM A DEBILITATING CONFLICT OF INTEREST

A criminal defendant has a Sixth Amendment right to an attorney with undivided

loyalty.  *See Wood v. Georgia*, 450 U.S. 261, 271 (1981).  If a defendant shows that her

attorney's conflict of interest actually affected the adequacy of her representation, she is

entitled to a new trial.  *Cuyler v. Sullivan*, 446 U.S. at 350; *see also Lockhart v. Terhune*,

250 F.3d 1223, 1229-30 (9th Cir. 2001) (if a defendant "shows on appeal that 'an actual

conflict of interest adversely affected his lawyer's performance,' reversal is required").

Courts have repeatedly ordered a new trial where a conflict of interest adversely affected

a defendant's representation under facts similar to those presented here.  *See, e.g.,*

*Lockhart*, 250 F.3d at 1229-30 (ordering new trial because defense counsel refrained

from presenting evidence that would have been favorable to defendant but harmful to

another client in a related matter); *United States v. Henke*, 222 F.3d 633, 636-38 (9th Cir.

2000) (ordering a new trial because defense counsel was ethically barred from using

information obtained during joint defense meetings against the witness in cross-

examination); *Fitzpatrick v. McCormick*, 869 F.2d 1247, 1251-54 (9th Cir. 1989)

(ordering new trial because counsel's prior representation of another person involved in

4843-7819-0105.

1    the charged offense caused him to disbelieve the defendant's version of events in favor of

2    the prior client's report); *State v. Martinez-Serna*, 166 Ariz. 423, 425 (1990) (ordering

3    new trial because counsel's concurrent representation of two defendants altered his

4    "select[ion] [of] defenses and strategies"); *Foxworth v. Wainwright*, 516 F.2d 1072, 1079

5    (5th Cir. 1975) (same); *State v. Thomas*, 545 N.E.2d 654, 657 (Ill. 1989) (ordering new

6    trial because defense counsel's concurrent representation of a prosecution witness may

7    have caused him to avoid questioning the witness "for fear of offending her in the course

8    of examination and losing her business" or because "an attack on her veracity might later

9    come to haunt [her] in her felony case"); *State v. Stewart*, 126 A.D.2d 943, 943 (N.Y.

10   1987) (ordering new trial because defense counsel's representation of a prosecution

11   witness may have contributed to her decision not to attempt to impeach the witness).

12          DeLozier represented the Ochoas in seeking to obtain custody of Wendi's children

13   (Nicholas and Ashlee) while also representing Wendi in her criminal case.  This

14   concurrent representation created an irreconcilable conflict of interest.  As the Ochoas'

15   attorney, DeLozier's duty was to persuade the court that the Ochoas were excellent

16   parents and grandparents and would be suitable caretakers for their grandchildren.  As

17   Wendi's attorney, DeLozier was responsible for developing mitigation evidence that

18   might sway the jury towards leniency—including evidence that Wendi was a victim of

19   childhood abuse and neglect by the Ochoas.  DeLozier had an ethical obligation not to act

20   against the Ochoas' interests and a personal interest in receiving payment from the

21   Ochoas for both representations, which impaired his ability to adequately investigate and

22   present Wendi's history of childhood abuse as part of the penalty phase of Wendi's trial.

23   Because DeLozier's active representation of conflicting interests adversely affected

24   Wendi's representation, she is entitled to a new trial.

25          A.     **DELOZIER'S REPRESENTATION OF THE OCHOAS**

26          Shortly after Wendi's arrest in the fall of 2000, Wendi, the Ochoas and the

27   {00128370.1 }                                    100

Lambeths (Joe's sister and brother-in-law) agreed that the Lambeths would have custody of Wendi's children through the pendency of the criminal case, and that the Ochoas would be permitted regular visitation.  (2/4/14 Tr. at 165:18-166:5 (D. Ochoa); Ex. 80.)  Based on this agreement, the Maricopa County Superior Court appointed the Lambeths as the children's guardians.  (2/4/14 Tr. at 166:11-13 (D. Ochoa); Ex. 81.)

The Ochoas soon regretted agreeing to the Lambeths' guardianship and retained an attorney, Leon Thikoll, to assist them in obtaining custody of Wendi's children. (2/4/14 Tr. at 166:24-167:4 (D. Ochoa); Ex. 84.)  Thikoll, who filed a motion to terminate the Lambeths' guardianship, fell ill and resigned as the Ochoas' attorney in June 2001. (*Id.*; 2/10/14 Tr. at 64:11-18 (D. DeLozier).)  The Ochoas then retained DeLozier (who was already informally advising them regarding the children) to represent them in the guardianship case.  (2/4/14 Tr. at 167:8-168:13 (D. Ochoa); Ex. 84; 2/11/14 at 129:13-130:1 (G. Lowenthal).)

One of DeLozier's first acts as the Ochoas' counsel of record was to instruct them to collect letters from friends and family stating that they were "upstanding people," "good parents and . . . good grandparents" to prove that they were "suitable to take care of Nicholas and Ashlee."  (2/4/14 Tr. at 168:21-169:8 (D. Ochoa).)  DeLozier's instruction was consistent with his approach throughout the guardianship case: he viewed his responsibility as persuading the court that the Ochoas "were appropriate parties to have some time with their grandchildren . . . [t]hat they were honorable people and that they would raise or help assist in raising these children appropriately."  (2/10/14 Tr. at 74:19-75:13 (D. DeLozier).)

The Lambeths vigorously disputed the Ochoas' suitability as guardians, going so far as to accuse the Ochoas of child abuse.  In March 2002, the children developed bright red marks on their bottoms.  (Ex. 95.)  When questioned about the redness, Ashlee reported to Jeanea Lambeth on a number of occasions that "Grandpa Alejo touched [her]

{00128370.1 }

4843-7819-0105.

butt" and that "Grandma Donna says to keep secrets."  (*Id*.)  Jeanea documented these accusations in a letter to her attorney.  (*Id.*)  DeLozier promptly learned of these allegations and assisted Donna in preparing a written response.  (2/4/14 Tr. at 175:14-25 (D. Ochoa); Ex. 96.)  On another occasion, Brad Lambeth accused Alejo of taking naked photographs of the children – an allegation that was reported to DeLozier.  (2/11/14 Tr. at 141:9-13 (G. Lowenthal).)

In August 2001 (while the guardianship case was still pending), DeLozier initiated an adoption case on behalf of the Ochoas in Pinal County.  (2/4/14 Tr. at 170:19-23 (D. Ochoa); 2/10/14 Tr. at 73:1-9 (D. DeLozier).)  He did not, however, notify the Lambeths about the adoption case, even after the court ordered him to do so.  (Ex. 87, 104.)  The Lambeths eventually learned about the attempted adoption and in July 2002 sought sanctions.  (Ex. 100.)  In October 2002, the court granted the Lambeths' request, sanctioned DeLozier, dismissed the adoption petition, and notified the Maricopa County Superior Court of the Ochoas' actions.  (Ex. 104.)  A month later, the Maricopa County Superior Court suspended the Ochoas' visitation rights upon the recommendations of two mental health providers "so supervised therapeutic sessions [could] occur with a counselor and the Ochoa grandparents."  (Ex. 99; *see also* 2/4/14 Tr. at 172:19-24 (D. Ochoa); 2/11/14 Tr. at 141:18-142:7 (G. Lowenthal).)  In December 2002, the court denied the Ochoas' request for guardianship of the children.  (*See* 2/11/14 Tr. at 141:18-142:7 (G. Lowenthal).)

While the Lambeths' sanctions motion prompted DeLozier to withdraw as formal counsel of record in the guardianship case, both he and Donna acknowledge that he remained the Ochoas' lawyer and consulted with them on numerous issues pertaining to the guardianship proceeding until its conclusion in 2005.  (2/4/14 Tr. at 177:14-18 (D. Ochoa); 2/10/14 Tr. at 83:2-13 (D. DeLozier); Ex. 102.)  Documents from DeLozier's file verify that relationship:

102

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

- On March 3, 2003, Donna emailed DeLozier the date, time, and location of a hearing on the Lambeths' motion to sever Wendi's parental rights "[b]ecause [DeLozier] was always my attorney and I considered him—I still considered him to be." (2/4/14 Tr. at 177:19-178:9 (D. Ochoa); Ex. 107.)

- On March 18, 2003, DeLozier assisted Donna in writing a letter to Arizona Family Adoption Services, urging that the Lambeths' adoption of the children and severance of Wendi's parental rights not occur. (2/4/14 Tr. at 179:6-180:1 (D. Ochoa); Ex. 132.)

- On April 14, 2003, DeLozier emailed Donna seeking an update regarding a hearing that had been held that day in the guardianship case. (2/4/14 Tr. at 180:13-181:6 (D. Ochoa); Ex. 108.) Donna responded with a summary of the hearing, which she did "[b]ecause, you know, I just kept [DeLozier] in the loop. He had been our attorney through all of this." (2/4/14 Tr. at 181:5-6 (D. Ochoa).)

- On May 16, 2003, Donna forwarded DeLozier questions about supervised visitation with the children. (2/4/14 Tr. at 182:3-9 (D. Ochoa); Ex. 109.)

- On May 27, 2003, DeLozier filed a brief with the Court of Appeals, requesting that it overturn the sanctions imposed by the Pinal County Superior Court against him and the Ochoas. (Ex. 131.) As explained by DeLozier, although he was no longer the Ochoas' attorney of record, "[he] felt that [he] still should represent [the Ochoas'] interests regardless of whether [he] was officially of the court record or not." (2/10/14 Tr. at 81:17-82:7 (D. DeLozier).)

- In June 2003, DeLozier paid a private investigator for work he had performed the month before in the guardianship case. (2/10/14 Tr. at 83:17-84:13 (D. DeLozier); Ex. 110.) He did the same in November 2003. (*Id.*)

- On April 17, 2004, the Ochoas had multiple communications with DeLozier regarding the Lambeths' failure to bring the children to a scheduled visit. (2/11/14 Tr. at 151:7-152:7 (G. Lowenthal).)

- On November 15, 2004, the Ochoas filed a notice that they would be representing themselves in the guardianship going forward. (2/4/14 Tr. at 182:19-183:3 (D. Ochoa); Ex. 114.) The notice was drafted by DeLozier. (2/4/14 Tr. at 183:2-3 (D. Ochoa).)

- On December 7, 2004, DeLozier reviewed medical records and photographs of the children's red bottoms. (2/10/14 Tr. at 85:11-23 (D. DeLozier); Ex. 130.)

- On December 8, 2004, DeLozier met with Alejo to discuss the guardianship and adoption files. (*Id.*)

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

- On March 7, 2005, Donna faxed a letter to DeLozier regarding an upcoming hearing in the guardianship case. (2/4/14 Tr. at 183:10-184:2 (D. Ochoa); Ex. 114.)
- On March 21, 2005, DeLozier assisted the Ochoas in drafting a letter to be placed in the guardianship case file, documenting their efforts to maintain contact with the children. (2/4/14 Tr. at 184:12-20 (D. Ochoa); Ex. 115.)

## B.   DELOZIER'S REPRESENTATION OF WENDI

While representing the Ochoas in seeking to obtain custody of their grandchildren, DeLozier simultaneously represented Wendi in her criminal case. DeLozier assumed Wendi's representation in December 2000, when the Ochoas agreed to pay DeLozier a non-refundable, $30,000 retainer ($5,400 of which was paid up-front, with the remainder personally guaranteed by Alejo). (Ex. 61; Ex. 231 ¶ 2; 2/10/14 Tr. at 65:3-10 (D. DeLozier).) DeLozier remained Wendi's attorney from December 2000 through her conviction and death sentence in December 2004, serving as the primary contact for both Wendi and her parents throughout this time. (2/10/14 Tr. at 103:20-104:9 (D. DeLozier); 2/7/14 Tr. at 28:16-19, 31:4-6, 48:21-49:1 (D. Patterson)); 2/4/14 Tr. at 187:5-13 (D. Ochoa).) In particular, DeLozier was responsible for working with Wendi and the Ochoas to develop possible mitigation evidence, since he had the closest relationship with the Ochoas. (2/7/14 Tr. at 27:11-21, 48:21-49:1 (D. Patterson).)

Over the course of Wendi's representation, DeLozier repeatedly received reports that she may have experienced childhood trauma or abuse. *See generally supra* Section I.B.3.c (discussing the numerous "red flags" suggestive of a history of childhood abuse that DeLozier never took any steps to investigate).

Despite multiple clues pointing towards the possibility of childhood abuse, DeLozier never investigated any negative aspects of Wendi's childhood or upbringing, the cause of Wendi's dissociation, or the reasons behind Wendi's maladaptive reactions to stress. (2/10/14 Tr. at 112:19-113:5, 122:23-124:15, 127:2-8, 129:25-130:7, 133:9-18 (D. DeLozier).) DeLozier never asked Donna whether Wendi may have suffered abuse

4843-7819-0105.

as a child.  (2/4/14 Tr. at 191:23-25 (D. Ochoa).)  DeLozier never investigated whether Alejo's relationship with Wendi was sexually inappropriate (notwithstanding Wendi's "open knowledge" of Alejo's "lingerie parties" and Alejo's request to his daughter for erotic stories) (2/10/14 Tr. at 132:7-9 (D. DeLozier)) or whether *any* members of Wendi's family may have sexually abused her (*id.* at 134:11-135:13).  DeLozier also never informed Patterson, MacLeod, or anyone else that the Lambeths vigorously disputed the Ochoas' ability to serve as appropriate caregivers for their grandchildren or that they had accused the Ochoas of child abuse.  (*Id.* at 75:17-21, 77:6-12; 2/7/14 Tr. at 36:11-15, 37:1-7 (D. Patterson).)  In fact, DeLozier never brought anything negative about the Ochoas to Patterson's attention at any time (2/7/14 Tr. at 37:5-7 (D. Patterson)) and never even disclosed that he was representing the Ochoas in the guardianship/adoption cases.  (*See id.* at 25:17-27:2 (explaining that he did not learn about DeLozier's representation of the Ochoas until the issue was raised by the prosecutor in the midst of Wendi's trial).)

Instead, he pursued a mitigation theme consistent with the interests of the Ochoas in the guardianship case:  that Wendi had a strong Christian upbringing, with no suggestion of any childhood abuse.  Consistent with this theme, DeLozier described Wendi as "an innocent young girl who lived a sheltered life" during his opening statement in the mitigation phase.  (12/8/04 Tr. at 28:30.)  DeLozier then elicited positive testimony about the Ochoas from multiple witnesses that knew them from church during the 1980s.  Tellingly, DeLozier's first substantive question to each of these witnesses was whether they knew the *Ochoa family* – not whether they knew *Wendi*.  (12/9/04 Tr. at 7:22-23 (to Chris Vargas: "Are you familiar with the Ochoa family, Donna, Alejo, and Wendi?"); 12/9/04 Tr. at 37:1 (to Jimmy Galyon: "And do you know the Ochoa family?"); 12/9/04 Tr. at 37:1 (to Linda Galyon: "Do you know the Ochoa family?"); 12/13/04 Tr. at 37:14 (to Lonnie Inskeep: "And do you know the Ochoa family?").)  The

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

witnesses – none of whom were in a position to know Wendi well or to witness the Ochoas' abuse of Wendi—testified regarding their positive experiences with Donna and Alejo instead.  For example, Chris Vargas testified that the Ochoas influenced his "Christian upbringing" (12/9/04 Tr. at 7:22-9:24) and Lonnie Inskeep described Alejo's role as youth pastor at the church and Donna's role as a monitor at the church school (12/13/04 Tr. at 40:9-41:4).  Similarly, DeLozier's direct examination of Donna focused on highlighting the Ochoas' various charitable acts.  (12/9/04 Tr. at 92:9-99:9 (D. Ochoa).)

The prosecutor capitalized on this approach, reinforcing testimony about the Ochoas as excellent parents and contrasting Wendi's apparently idyllic, wholesome childhood with her adult actions.  For example, Martinez asked Jimmy Galyon:

Q:     . . . [Y]ou do know about the church back then, right?

A:     Yes.

Q:     They didn't teach people to lie, did they?

A:     No.

Q:     In fact, that's something that's frowned upon, they were taught not to, right?

A:     They were taught basic Bible principles, yes.

Q:     And that's one of the basic Bible principles, right?

A:     Yes.

Q:     How about cheating.  Did they teach them to cheat?

A:     No.

                                    . . .

Q:     So if she did those things, she learned those things, it wasn't part of the church upbringing, was it?

A:     I don't know.

Q:     Or maybe she just didn't assimilate the church upbringing?

A:     I don't know.

4843-7819-0105.

(12/9/04 Tr. at 31:12-32:12.)

### C.   DELOZIER'S ACTUAL, ACTIVE CONFLICT OF INTEREST ADVERSELY AFFECTED WENDI'S REPRESENTATION

Gary Lowenthal was retained to determine whether DeLozier had an actual conflict while representing both Wendi and her parents and whether any such conflict adversely affected Wendi's representation.  (2/11/14 Tr. at 112:14-20 (G. Lowenthal).) Lowenthal is an attorney and retired law professor who taught at Arizona State University for over thirty years.  (*Id.* at 117:6-7, 119:24-120:1; Ex. 79.)  His teaching and research has focused on attorney conflicts of interest, and he has conducted several empirical studies on conflicts that were published in the University of Virginia Law Review and the Yale Law Journal and cited by the United States Supreme Court. (2/11/14 Tr. at 120:2-121:12 (G. Lowenthal); Ex. 79.)  Lowenthal has also served as a consultant on conflicts in multiple cases and has represented a criminal defendant in post-conviction proceedings.  (2/11/14 Tr. at 121:13-122:19 (G. Lowenthal).)

In evaluating the existence and effect of a conflict of interest, Lowenthal reviewed the parties' briefing on Wendi's petition for post-conviction relief (including the attached declarations and expert reports), the Arizona Supreme Court's decision in *State v. Andriano*, and multiple additional witness declarations (including one by Keith Rohman and one by Kyre Lorts).  (2/11/14 Tr. at 113:25-114:14 (G. Lowenthal).)  Lowenthal also conducted in-person interviews of Donna, Alejo, Wendi, DeLozier, and Patterson. (2/11/14 Tr. at 115:2-116:6 (G. Lowenthal).)  For the reasons explained in greater detail below, Lowenthal concluded that DeLozier had an actual, active conflict of interest while representing Wendi as a result of his concurrent representation of her parents and that this conflict had an adverse effect on Wendi's representation.  (2/11/14 Tr. at 112:22-113:5 (G. Lowenthal).)

{00128370.1 }

4843-7819-0105.

## 1.    DeLozier Had Actual Conflict of Interest

DeLozier suffered from an actual conflict of interest throughout Wendi's representation for three reasons:  (1)  his representation of the Ochoas, which required him to present the Ochoas as excellent parents and grandparents, was directly adverse to Wendi's interests in having counsel investigate and present any evidence "which might militate against the appropriateness of the death penalty," "including physical ,sexual, or emotional abuse . . . [and] other traumatic events" (Ex. 76 at 80-81); (2) DeLozier's representation of Wendi was materially limited by his responsibility not to disclose information learned while representing the Ochoas; and (3) the Ochoas' ongoing obligation to pay fees incurred by DeLozier in representing Wendi, as well as their obligation to compensate DeLozier for the work he was performing for them in the guardianship/adoption matters, impaired his ability to thoroughly investigate certain matters and exercise independent professional judgment on Wendi's behalf.

### a.    DeLozier's Representation of the Ochoas' Interests in Custody Proceedings Was Directly Adverse to Wendi's Interests in Developing All Reasonably Available Mitigating Evidence

Under Arizona law, a conflict of interest exists if a lawyer's representation of one client is directly adverse to the interests of another client.  Ariz. R. of Prof'l Conduct 1.7(a)(1), (b).[16]  Here, the Ochoas' interest in obtaining custody of their grandchildren was in direct conflict with Wendi's interest in providing the jury with all possible reasons to consider leniency, including a history of childhood abuse and neglect by the Ochoas. (2/11/14 Tr. at 164:6-20 (G. Lowenthal).)

---

[16] Although representation of two parties with directly adverse interests may be permissible if both parties provide informed consent, neither Wendi nor the Ochoas were informed of the conflict or provided any consent.  (2/11/04 Tr. at 163:22-164:5 (G. Lowenthal).)

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

The Ochoas retained DeLozier to assist them in obtaining guardianship of their grandchildren.  This required DeLozier to present the Ochoas as strong parents and grandparents who would provide a wholesome, nurturing, safe environment for their grandchildren.  (2/11/14 Tr. at 164:6-20 (G. Lowenthal).)  Indeed, DeLozier understood this to be his objective – he had to persuade the court that the Ochoas "were appropriate parties to have some time with their grandchildren . . . [t]hat they were honorable people and that they would raise or help assist in raising these children appropriately."  (2/10/14 Tr. at 74:19-75:13 (D. DeLozier).)  In contrast, Wendi's

> interest was in seeking leniency.  Her life was at stake.  She was on trial for a capital offense.  And because her interest is in seeking leniency, she had an interest in the jury learning about anything from childhood that might help the jury understand how she could have behaved the way she did at the time of the offense and in this case in the months preceding the offense. That was her interest.

(2/11/14 Tr. at 164:6-20 (G. Lowenthal).)

Any efforts DeLozier might have taken to investigate and present evidence that Wendi experienced childhood abuse or neglect would have unavoidably compromised the Ochoas' efforts to obtain custody of their grandchildren.  Confronted with this irreconcilable conflict, DeLozier put his head in the sand.  He "chose to disbelieve the allegations against [the Ochoas] and to believe the good things about [the Ochoas] instead," ignored the multiple clues suggestive of Wendi's troubled childhood, and never developed Wendi's history of childhood physical, psychological, and sexual abuse as a potential mitigation theme.  (2/11/14 Tr. at 165:5-14, 184:14-17 (G. Lowenthal).)  *See also Fitzpatrick*, 869 F.2d at 1251-54 (ordering new trial because counsel's prior representation of another person involved in the charged offense caused him to disbelieve the defendant's version of events in favor of the prior client's report).  Specifically, DeLozier told the jury that Wendi had a wholesome, sheltered childhood and elicited repeated testimony praising the Ochoas as good, Christian parents.  (*See, e.g*., 12/8/04 Tr. at 28:30; 12/9/04 Tr. at 7:22-9:24 (C. Vargas), 92:9-99:9 (D. Ochoa); 12/13/04 Tr. at

{00128370.1 }

4843-7819-0105.

40:9-41:4 (L. Inskeep).)  This approach was entirely consistent with the Ochoas'
objectives in the guardianship case, but wholly inconsistent with the requirements for
Wendi's capital representation.  *See Boyde*, 494 U.S. at 382 (noting the "belief, long held
by this society, that defendants who commit criminal acts that are attributable to a
disadvantaged background . . . may be less culpable than defendants who have no such
excuse").  *See also Lockhart*, 250 F.3d at 1229-30 (ordering new trial because defense
counsel refrained from presenting evidence that would have been favorable to defendant
but harmful to another client in a related matter);  *Martinez-Serna*, 166 Ariz. at 425
(ordering new trial because counsel's concurrent representation of two defendants altered
his "select[ion] [of] defenses and strategies"); *Foxworth*, 516 F.2d at 1079 (5th Cir. 1975)
(same); *Thomas*, 545 N.E.2d at 657 (ordering new trial because defense counsel's
concurrent representation of a prosecution witness may have caused him to avoid
questioning the witness because "an attack on her veracity might later come to haunt
[her] in her felony case").

> **b.**    **DeLozier's Representation of Wendi Was Materially
> Limited by His Duty of Confidentiality to the Ochoas**

A conflict of interest exists when a client's representation is materially limited by
her attorney's responsibilities to another client or former client.  Ariz. R. of Prof'l
Conduct 1.7(a)(2). Arizona law forbids attorneys from "us[ing] information relating to
representation of the client to the disadvantage of the client unless the client gives
informed consent . . ." Ariz. R. of Prof'l Conduct 1.8.  Because DeLozier had to refrain
from using any information relating to the Ochoas' representation to their detriment,
Wendi's representation was materially limited.

While representing the Ochoas, DeLozier learned of the Lambeths' vigorous
objections to the Ochoas' suitability as caregivers as well as their allegations of possible
child abuse.  (2/11/04 Tr. at 166:7-15 (G. Lowenthal).)  He was also aware that the court
suspended the Ochoas' visitation rights until the Ochoas received therapeutic counseling

{00128370.1 }                                     110

4843-7819-0105.

1   and ultimately denied their request to serve as the children's guardians or to obtain

2   continuing visitation rights.  (*Id.* at 141:14-142:7.)  All of this information should have

3   raised questions about the Ochoas' parenting practices and could have been used to

4   develop Wendi's history of childhood abuse as mitigation evidence.  (*Id.* at 166:19-

5   167:6.)  However, DeLozier was ethically constrained from using information learned

6   from his representation of the Ochoas to their disadvantage, even if it could have assisted

7   in developing a compelling mitigation case for Wendi.  As a result, DeLozier's ethical

8   obligations materially limited his representation of Wendi.  (*Id.* at 162:7-13.)  *See Henke*,

9   222 F.3d at 636-38 (ordering a new trial because defense counsel was ethically barred

10  from using information obtained during joint defense meetings against the witness in

11  cross-examination).

12                        **c.    The Payment Obligations of the Ochoas Interfered with
                                  DeLozier's Independent Judgment**

13

14          Finally, the Ochoas' ongoing obligation to pay fees incurred by DeLozier in

15  representing the Ochoas and Wendi interfered with his exercise of independent

16  professional judgment on Wendi's behalf.  Although a lawyer may, under some

17  circumstances, accept compensation for representing a client from someone other than

18  the client, this situation is fraught with "inherent dangers," especially when the person

19  paying the fees has interests in conflict with the client's interests.[17]  *Wood v. Georgia*,

20  450 U.S. 261, 271-72 (1981) ("Courts and commentators have recognized the inherent

21  dangers that arise when a criminal defendant is represented by a lawyer hired and paid by

22  a third party . . .").  An impermissible conflict exists if the lawyer enters into or continues

23  such a fee arrangement when "there is a significant risk that the lawyer's representation

24  _____

25  [17] Although Arizona permits payment by a non-client in some circumstances if the client
    provides informed consent,  Ariz. R. of Prof'l Conduct 1.8(f),  neither Wendi nor the
26  Ochoas ever consented to the conflict.  (2/11/04 Tr. at 166:2-6 (G. Lowenthal)).

27                                        111

{00128370.1 }

28  _____
    PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
    PETITION FOR POST-CONVICTION RELIEF
    CASE NO. CR2000-096032-A

of the client will be materially limited by the lawyer's own interest in the fee arrangement or by the lawyer's responsibilities to the third-party payer."  Ariz. R. of Prof'l Conduct 1.8, Comment 11.

At the outset of Wendi's representation, DeLozier entered into a fee agreement under which the Ochoas made an initial cash payment and Alejo remained solely responsible the remaining amount owed.  (Ex. 61; Exhibit 231 at ¶ 2; 2/10/14 Tr. at 65:3-10 (D. DeLozier).)  Wendi never made any payments towards the costs of her representation; the only payment DeLozier ever received was from her parents.   (2/10/14 Tr. at 65:11-20 (D. DeLozier).)

Because of this arrangement, DeLozier had a strong personal interest in maintaining an amicable relationship with the Ochoas.  Any critical investigation into their parenting practices or efforts to inform the jury about Wendi's history of childhood abuse would have inevitably compromised this relationship.  As explained by Lowenthal,

> . . . taking on that case, [DeLozier] knew he was going to have to investigate mitigation.  And investigating mitigation is to find out about the client's childhood.  And that means that you're going to – very often, as you're going to have to – you or your mitigation specialists are going to have to sit down with the family and say I don't know how – I know this is really painful.  I know this is really difficult, but we really have to find out what really happened here.  And forcing someone to talk about very painful experiences is difficult on that person, and there has to be a natural reluctance on someone who wants to continue to get money from that person to push them into that situation.

(2/11/14 Tr. at 189:13-190:4 (G. Lowenthal).)  Relatedly, the Ochoas had retained DeLozier to represent them as well.  As a result, DeLozier also had an interest in ensuring continued payment from them on the guardianship/adoption matter, which would similarly dissuade him from confronting the Ochoas or developing damaging information about them.  *Thomas*, 545 N.E.2d at 657 (ordering new trial because defense counsel's concurrent representation of a prosecution witness may have caused him to avoid questioning the witness "for fear of offending her in the course of examination and losing her business").

{00128370.1 }

112

4843-7819-0105.

## 2.    DeLozier's Conflict Affected the Representation of Wendi

The right to representation by an attorney with undivided loyalty is so important that, unlike other Sixth Amendment claims, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler*, 446 U.S. at 350.  Rather, reversal is required once a defendant proves that a "plausible defense strategy" was not pursued because of the conflict. *Lockhart*, 250 F.3d at 1229-30; *Martinez-Serna*, 166 Ariz. at 425; *State v. Jenkins*, 148 Ariz. 463, 466, 715 P.2d 716, 720 (1986).  A plausible defense strategy is one that would have been a "viable alternative" to the strategy actually taken, regardless of whether the alternative strategy might have been successful. *Martinez-Serna*, 166 Ariz. at 425, 803 P.2d at 418; *Jenkins*, 148 Ariz. at 466, 715 P.2d at 710.

DeLozier was presented with numerous indications that Wendi suffered from a traumatic childhood.  Mental health providers informed DeLozier about her dissociation dating back to childhood and several potential psychiatric disorders, and they specifically raised the possibility of childhood sexual abuse.  (Ex. 230, 7.002, 45, 52.)  Wendi also impulsively attempted suicide while incarcerated.  DeLozier knew that these behaviors and diagnoses were suggestive of childhood abuse; beginning in 2003, he represented numerous victims of childhood sexual abuse in lawsuits against the Catholic Church. (2/10/14 Tr. at 88:7-90:24 (D. DeLozier).)  As a result of these cases, DeLozier knew that impaired memories, dissociation, depression, and post-traumatic stress disorder were common effects of childhood sexual abuse.  (*Id.* at 90:25-97:9, 102:3-6.)

DeLozier was also presented with numerous indications that the Ochoas were flawed parents.  DeLozier knew that the Lambeths strongly contested the Ochoas' ability to appropriately care for their grandchildren, seeking not only to retain guardianship of the children themselves but also to severely limit (and ultimately end) any visitation rights.  (*See, e.g.*, Ex. 95, 96.)  DeLozier also knew that the Lambeths had accused the

{00128370.1 }

4843-7819-0105.

1    Ochoas of child abuse and that the court had imposed supervised visitation, mandated

2    "therapeutic counseling," and ultimately terminated the Ochoas' visitation rights entirely.

3    (Ex. 99, 105; 2/11/14 Tr. at 141:18-142:7 (G. Lowenthal).)

4         Although DeLozier was aware that Wendi may have endured childhood abuse and

5    that the Ochoas' parenting practices had been the subject of considerable concern, he did

6    nothing to investigate whether this information could be used in Wendi's defense.

7    (2/10/14 Tr. at 112:19-25, 122:23-124:15, 127:2-8, 129:25-130:7, 133:9-18 (D.

8    DeLozier).)  Following up on these matters—by asking the Ochoas and others whether

9    Wendi had been subjected to childhood abuse, investigating the Ochoas' parenting

10   practices, or seeking further mental health evaluation of Wendi targeted at the issue of

11   childhood abuse—would have been a viable alternative approach.  (2/11/14 Tr. at 173:13-

12   174:8 (G. Lowenthal).)  *See also Wiggins*, 539 U.S. at 525 ("Had counsel investigated

13   further, they may well have discovered the sexual abuse later revealed during state

14   postconviction proceedings.").  Indeed, Patterson readily admitted that the Lambeths'

15   child abuse allegations "bear upon potential areas of mitigation that should have been

16   developed at a bare minimum under *Wiggins*." (2/7/14 Tr. at 36:16-25 (D. Patterson).)

17        DeLozier elected not to develop this in mitigation and never informed Patterson

18   about the abuse allegations or *anything* negative about the Ochoas.  (2/7/14 Tr. at 37:1-7

19   (Patterson).)  Had DeLozier objectively investigated Wendi's childhood and the Ochoas'

20   parenting choices, the defense could have provided the jury with an explanation for the

21   behaviors the prosecution highlighted in arguing for the death penalty.  Rather than the

22   actions of a promiscuous, dishonest, self-centered woman, Wendi's conduct in the

23   months leading up to Joe's death demonstrate why leniency is appropriate – her decision-

24   making has been profoundly impaired by a history of childhood abuse and neglect.

25        When questioned why he did not pursue the possibility of childhood abuse,

26   DeLozier admitted that he was focused on the Ochoas' positive attributes while serving

27

28

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

as their attorney and

> it's possible that focusing on that aspect of the grandparent case kept me from focusing on anything that might have been historical in Wendi's case. Okay?  As far as the things that Rohde and so forth and so forth were telling.

(2/10/14 Tr. at 138:23-139:8 (D. DeLozier).)  As explained by Lowenthal, DeLozier's report of being "blinded by his zealous advocacy of the Ochoas" and therefore incapable of critically evaluating their conduct in the context of Wendi's case is "very classic behavior for a person with a conflict of interest."  (2/11/14 Tr. at 166:21-167:25 (G. Lowenthal).)

In short, DeLozier assumed the role of championing the Ochoas as good parents at the very outset of Wendi's case, and as a result lost his ability to view them objectively when developing mitigation evidence for Wendi.  The blinding effect of his loyalty to the Ochoas was further compounded by his ethical obligations not to use information he learned against them and by his own personal interest in obtaining payment from the Ochoas both for Wendi's representation as well as their own.  As a result, the attorney tasked with developing mitigation evidence from Wendi's family did nothing to follow up on repeated indications that Wendi had a history of childhood abuse.  Because DeLozier's conflicted representation deprived Wendi of the opportunity to provide an alternative explanation for her behavior in the months leading up to Joe's death, she is entitled to a new trial.  *See, e.g., Cuyler*, 446 U.S. at 350; *Lockhart*, 250 F.3d at 1229-30.

## CONCLUSION

Trial counsel's failure to adequately investigate and develop evidence of Wendi's childhood trauma and psychiatric disorders constituted deficient and conflicted performance, which deprived the jury of an opportunity to consider significant mitigating evidence prior to sentencing Wendi to death.  Had the jury been given the opportunity to consider the mitigating evidence elicited in the evidentiary hearing and summarized herein, there is a reasonable probability that it would not have imposed a death sentence.

{00128370.1 }

4843-7819-0105.

For the reasons stated above, this Petition should be granted.

DATE:  JUNE 2, 2014                 By: */s/ Scott M. Bennett* _____

                                         Scott M. Bennett (022350)
                                         COPPERSMITH BROCKELMAN PLC
                                         2800 North Central Avenue
                                         Phoenix, Arizona  85004
                                         (602) 224-0999 (office)
                                         (602) 224-6020 (fax)
                                         sbennett@cblawyers.com

                                         Allen A. Arntsen, admitted *pro hac vice*
                                         Stephan J. Nickels, admitted *pro hac vice*
                                         Matthew R. Lynch, admitted *pro hac vice*
                                         Jodi K. Fox, admitted *pro hac vice*
                                         Krista J. Sterken, admitted *pro hac vice*
                                         FOLEY & LARDNER LLP
                                         150 E. Gilman Street
                                         Madison, WI 53703-1481
                                         (608) 257-5035 (Office)
                                         (608) 258-4258 (Fax)

                                         *Attorneys For Petitioner Wendi Andriano*

{00128370.1 }                          116

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

ORIGINAL e-filed June 2, 2014,
with the Clerk of the Maricopa County Superior Court

COURTESY COPY hand-delivered
on June 2, 2014, to:

Judge Brian K. Ishikawa
Maricopa County Superior Court
Southeast Juvenile Division
1810 S. Lewis
Mesa, AZ. 85210-6234

COPY mailed on June 2, 2014, to:

Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tucson, AZ  85701-1367

Gregory Hazard
Office of the Attorney General
1275 W. Washington
Phoenix, AZ  85007-2997

*Attorney for the State of Arizona*

*/s/ Carol Keesee* _____

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

# EXHIBIT PPPPPPPPP

MICHAEL K. JEANES, CLERK
RECEIVED CCC #1
NIGHT DEPOSITORY

14  JUN -5  PM 5: 33

FILED
BY T. FARR, DEP

1

2  *Cohen Kennedy Dowd & Quigley, P.C.*
   *The Camelback Esplanade I*
3  *2425 East Camelback Road • Suite 1100*
   *Phoenix, Arizona  85016*
4  *Telephone 602•252•8400 • Facsimile 602•252•5339*

5  Daniel G. Dowd (012115) – ddowd@ckdqlaw.com
6  Maureen M. Manning (028877) – mmanning@ckdqlaw.com

7  *DRINKER BIDDLE & REATH LLP*
   *One Logan Square, Ste. 2000*
8  *Philadelphia, PA 19103-6996*
   *(215) 988-2714*
9  Lawrence J. Fox (PA Bar #15261) – lawrence.fox@yale.edu

10

11  *Attorneys for the Ethics Bureau at Yale*

12      **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

13          **IN AND FOR THE COUNTY OF MARICOPA**

14

15  STATE OF ARIZONA,                    Case No:  CR2000-096032-A

16                  Respondent,
                                         **MOTION OF THE ETHICS**
17  vs.                                  **BUREAU AT YALE FOR LEAVE TO**
                                         **FILE AMICUS CURIAE BRIEF IN**
18  WENDI ELIZABETH ANDRIANO,            **SUPPORT OF THE PETITIONER**

19                  Petitioner.          (Assigned to the Honorable Brian K.
20                                       Ishikawa)

21

22      Now comes the Ethics Bureau at Yale ("Ethics Bureau") by its supervising lawyer,
23  Lawrence J. Fox, and moves this Court to permit the filing of the amicus curiae brief in
24  support of the Petitioner, Wendi Andriano, attached as Exhibit A hereto. In support of
25  this motion, the amicus asserts as follows:
26      1.      The Ethics Bureau, a clinic composed of fourteen law school students
27  supervised by an experienced practicing lawyer and lecturer, drafts amicus briefs in cases
28  concerning professional responsibility; assists defense counsel with ineffective assistance

of counsel claims relating to professional responsibility; and offers ethics advice and counsel on a pro bono basis to not-for-profit legal service providers, courts, and law schools.

2.    The Ethics Bureau has read Petitioner's Post-Hearing Memorandum in Support of Petition for Post-Conviction Relief.

3.    Given the commitment by the Ethics Bureau to issues of professional responsibility, the Ethics Bureau is interested in the outcome of this case because it centers on a conflict of interest issue. The Ethics Bureau aims to ensure that the Court's consideration of this issue and interpretation of the standards of care that determine when lawyers' ethical violations render counsel ineffective take into account the professional responsibility perspective.

4.    The Ethics Bureau respectfully submits this brief as amicus curiae for two reasons. First, it has an abiding interest in ensuring that the Sixth Amendment and the Model Rules of Professional Conduct preserve the right of every criminal defendant to conflict-free representation. Second, it believes that when courts ignore conflicts of interest affecting the representation of criminal defendants, they not only damage the integrity of the proceedings at issue, but also undermine public confidence in the legal system.

5.    A letter of consent from Petitioner Wendi Andriano's counsel granting Mr. Fox permission to file such a brief is attached as Exhibit B hereto.

6.    The undersigned has been unable to obtain permission from the Respondent to file a brief.

A proposed form of Order is being lodged with this Motion.

. . .

. . .

2

WHEREFORE, the above moves for permission to file the brief of amicus curiae.

RESPECTFULLY SUBMITTED this 5th day of June, 2014.

COHEN KENNEDY DOWD & QUIGLEY, P.C.

By: _____
Daniel G. Dowd
Maureen M. Manning
The Camelback Esplanade I
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016

DRINKER BIDDLE & REATH LLP
Lawrence J. Fox
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996

*Attorneys for the Ethics Bureau at Yale*

ORIGINAL filed with the Clerk
of the Court this 5th day of June,
2014, and a COPY mailed to:

The Honorable Brian K. Ishikawa
Maricopa County Superior Court
Southeast Facility
222 East Javelina Avenue
Mesa, Arizona 85210-6234

COPIES of the foregoing sent
via U.S. Mail this 5th day
of June, 2014 to:

Scott M. Bennett (Bar No. 022350)
COPPERSMITH & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona 85004

3

1

Allen A. Arntsen, admitted *pro hac vice*

2 Stephan J. Nickels, admitted *pro hac vice*

3 Matthew R. Lynch, admitted *pro hac vice*

Jodi K. Fox, admitted *pro hac vice*

4 Krista J. Sterken, admitted *pro hac vice*

5 FOLEY & LARDNER LLP

6 150 East Gilman Street

Madison, WI  53703-1481

7   *Attorneys for Petitioner Wendi Andriano*

8

Lacey Stover Gard

9 Office of the Attorney General

10 400 West Congress, Suite S-315

Tucson, Arizona  85701-1367

11

12 Gregory Hazard

13 Office of the Attorney General

1275 West Washington

14 Phoenix, Arizona  85007-2997

15   *Attorneys for the State of Arizona*

16

17

18

19

20

21

22

23

24

25

26

27

28

4

A

1

2 *Cohen Kennedy Dowd & Quigley, P.C.*
*The Camelback Esplanade I*
3 *2425 East Camelback Road • Suite 1100*
*Phoenix, Arizona  85016*
4 *Telephone 602•252•8400 • Facsimile 602•252•5339*

5 Daniel G. Dowd (012115) – ddowd@ckdqlaw.com
6 Maureen M. Manning (028877) – mmanning@ckdqlaw.com

7
*DRINKER BIDDLE & REATH LLP*
8 *One Logan Square, Ste. 2000*
*Philadelphia, PA 19103-6996*
9 *(215) 988-2714*

10 Lawrence J. Fox (PA Bar #15261) – lawrence.fox@yale.edu

11
*Attorneys for the Ethics Bureau at Yale*
12

13

14 **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

15 **IN AND FOR THE COUNTY OF MARICOPA**

16

17 STATE OF ARIZONA,                          Case No:  CR2000-096032-A

18                    Respondent,         **AMICUS CURIAE BRIEF OF THE**
                                          **ETHICS BUREAU AT YALE IN**
19 vs.                                    **SUPPORT OF THE PETITIONER**

20 WENDI ELIZABETH ANDRIANO,

21                    Petitioner.         (Assigned to the Honorable Brian K.
                                          Ishikawa)
22

23

24

25

26

27

28

# Table of Contents

I.     Summary of Facts ........................................................................................ 6

II.    Introduction ................................................................................................. 6

III.   Argument..................................................................................................... 7

       A.     Lawyers owe their clients fiduciary obligations, the most important
              of which is the duty of loyalty ................................................................. 7

       B.     Conflicts of interest compromise the duty of loyalty, and thus pose a
              particularly insidious threat to the lawyer-client relationship ................. 8

       C.     Mr. DeLozier labored under serious conflicts of interest in his
              representation of Ms. Andriano ............................................................. 10

              1.     Mr. DeLozier's representation of Alejo and Donna Ochoa was
                     directly adverse to Ms. Andriano's interests............................... 10

              2.     Mr. DeLozier's representation of the Ochoas presented a
                     conflict of interest regardless of whether the Ochoas were
                     current or former clients ............................................................. 12

       D.     Mr. DeLozier's conflict of interest also denied Ms. Andriano her
              constitutional right to effective representation, for which she is
              entitled to relief..................................................................................... 14

              1.     Mr. DeLozier labored under an actual conflict of interest, in
                     violation of Ms. Andriano's Sixth Amendment right to
                     counsel ........................................................................................ 14

              2.     The conflict here is so egregious that Ms. Andriano should not
                     be required to prove adverse effect in order to receive relief ..... 15

              3.     Ms. Andriano suffered a clear adverse effect from Mr.
                     DeLozier's conflict ...................................................................... 16

IV.    Conclusion................................................................................................. 17

*Cohen Kennedy Dowd & Quigley*

# Table of Authorities

## Cases

*Brown v. Craven,*
  424 F.2d 1166 (9th Cir. 1970) ................................................................ 11

*Castillo v. Estelle,*
  504 F.2d 1243 (5th Cir. 1974) ................................................................ 11

*Cuyler v. Sullivan,*
  446 US 335 (1980) .................................................................................. 10

*Glasser v. United States,*
  315 U.S. 60 (1942) ............................................................................. 5, 10

*Mickens v. Taylor,*
  535 U.S. 162 (2002) ............................................................................... 11

*Romero v. Furlong,*
  215 F.3d 1107 (10th Cir. 2000) ............................................................. 11

*Smiley v. Dir., Office of Workers Compensation Programs,*
  984 F.2d 278 (9th Cir. 1993) ................................................................... 6

*State v. Jenkins,*
  715 P.2d. 716 (Ariz. 1986) ............................................................... 10, 12

*State v. Jones,*
  923 P.2d 560 (Mont. 1996) .................................................................... 11

*State v. Martinez Serna,*
  803 P.2d 416 (Ariz. 1991) ..................................................................... 12

*State v. Moore,*
  213 P.3d 150 (Ariz. 2009) ..................................................................... 10

*State v. Padilla,*
  859 P.2d 191(Ariz. Ct. App. 1993) .......................................................... 9

*Stockton v. Ford,*
  52 U.S. 232 (Dec. Term, 1850) ................................................................. 7

*Strickland v. Washington,*
  466 U.S. 668 (1984) ............................................................................... 11

*Young v. United States,*
  481 U.S. 787 (1987) ................................................................................. 6

## Rules

Ariz. Rules of Prof'l Conduct Preamble (2003) ........................................ 12
Ariz. Rules of Prof'l Conduct R 1.1 (2003) ............................................... 6
Ariz. Rules of Prof'l Conduct R 1.3 (2003) ............................................... 6
Ariz. Rules of Prof'l Conduct R 1.4 (2003) ............................................... 6
Ariz. Rules of Prof'l Conduct R 1.7 (2003) .................................. 5, 8, 9, 11

Ariz. Rules of Prof'l Conduct R 1.9 (2003) ............................................................. 10

**Other Authorities**

Henry Lord Brougham, Speeches of Henry Lord Brougham 63 (1841),
    *quoted in* Steven H. Goldberg, *The Former Client's Disqualification Gambit:*
    *A Bad Move in Pursuit of an Ethical Anomaly,* 72 Minn. L. Rev. 227, 228
    n.18 (1987) ............................................................................................................. 5

Teresa Stanton Collett, *The Ethics of Intergenerational Representation*, 62
    Fordham L. Rev. 1453 (1994) ................................................................................ 9

Tigran W. Eldred, *The Psychology of Conflicts of Interest in Criminal Cases*, 58
    Kan. L. Rev. 43 (2009) ........................................................................................... 7

*Luke* 16:13 (King James) ......................................................................................... 5

Don A. Moore, Lloyd Tanlu & Max H. Bazerman, *Conflict of Interest and the*
    *Intrusion of Bias*, 5 Judgment & Decision Making 37 (2010) .............................. 6

*National Reporter on Legal Ethics and Professional Responsibility, Vols. I–IV*
    (2001) ..................................................................................................................... 5

Restatement (Third) of the Law Governing Lawyers § 16(2) (2000) .......................... 6

### Interest of Amicus Curiae

The Ethics Bureau at Yale, a clinic composed of fourteen law school students supervised by an experienced practicing lawyer and lecturer, drafts amicus briefs in cases concerning professional responsibility; assists defense counsel with ineffective assistance of counsel claims relating to professional responsibility; and offers ethics advice and counsel on a pro bono basis to not-for-profit legal service providers, courts, and law schools.

The Ethics Bureau respectfully submits this brief as amicus curiae for two reasons. First, it has an abiding interest in ensuring that the Sixth Amendment and the Model Rules of Professional Conduct preserve the right of every criminal defendant to conflict-free representation. Second, it believes that when courts ignore conflicts of interest affecting the representation of criminal defendants, they not only damage the integrity of the proceedings at issue, but also undermine public confidence in the legal system.

I.   **Summary of Facts**

Amicus adopts the facts as recounted in the Petitioner's brief.

II.   **Introduction**

> No servant can serve two masters: for either he will hate the one, and love the other; or else he will hold to the one, and despise the other. *Luke* 16:13 (King James).

In our adversarial system, the lawyer-client relationship is built upon the expectation that lawyers will be loyal to their clients. Yet, as the ancient dictum above reminds us, such unyielding loyalty is impossible in the face of a conflict of interest. Lawyers torn between two causes can serve neither cause as zealously as their responsibilities require. This idea is so fundamental to our system of justice that all fifty states have adopted ethical rules barring lawyers from undertaking a representation involving a conflict of interest. *See generally National Reporter on Legal Ethics and Professional Responsibility, Vols. I–IV* (2001) (reprinting the codes of professional responsibility for all fifty states).

While conflicts of interest can pose a problem in any representation, they are particularly insidious where, as here, one of the clients is a criminal defendant in a capital case. Wendi Andriano relied upon David DeLozier to develop and present mitigating evidence on her behalf. Mr. DeLozier had access to precisely such evidence concerning Ms. Andriano's upbringing. But this same evidence would have harmed his other clients, Ms. Andriano's parents, whom he concurrently represented in a custody dispute. Mr. DeLozier never investigated or brought this evidence to the court's attention. Regardless of his intentions, Mr. DeLozier's actions denied Ms. Andriano her Sixth Amendment right to conflict-free counsel, *see Glasser v. United States*, 315 U.S. 60, 70 (1942), for which she is entitled to relief regardless of whether she shows adverse effect. By vindicating Ms. Andriano's rights here, the court can fulfill its role as the guardian of loyalty in the lawyer-client relationship and ensure that lawyers' professional responsibility obligations will be enforced.

6

## III.   Argument

### A.   Lawyers owe their clients fiduciary obligations, the most important of which is the duty of loyalty

A lawyer's paramount duty to his client is the duty of loyalty. As their clients' fiduciaries, lawyers owe their clients a variety of duties, long celebrated in the common law, enshrined in our rules of professional conduct, and codified in the Restatement of the Law Governing Lawyers.   Indeed, "[l]oyalty and independent judgment are essential elements in the lawyer's relationship to a client." Ariz. Rules of Prof'l Conduct R. 1.7 cmt. 1 (2003). The importance of lawyer loyalty has been consistently recognized and eloquently expressed for centuries. In 1820, in the most famous articulations of this duty, Lord Brougham described the obligation to serve the client: "[A]n advocate, by the sacred duty which he owes his client, knows . . . [t]o save that client, by all expedient means, to protect that client, at all hazards and cost to all others . . . ."   Henry Lord Brougham, Speeches of Henry Lord Brougham 63 (1841), *quoted in* Steven H. Goldberg, *The Former Client's Disqualification Gambit: A Bad Move in Pursuit of an Ethical Anomaly,* 72 Minn. L. Rev. 227, 228 n.18 (1987).

The duty of loyalty is so important precisely because it is central to a lawyer's ability to fulfill his or her other duties to the client. For example, when a lawyer undertakes a case, the lawyer must act with reasonable competence and diligence. Ariz. Rules of Prof'l Conduct R 1.1, 1.3 (2003); Restatement (Third) of the Law Governing Lawyers § 16(2) (2000) [hereinafter RLGL]. Lawyers are also expected to communicate directly with the client about all material information regarding the matter. Ariz. Rules of Prof'l Conduct R 1.4 (2003). Yet, a conflicted lawyer is unlikely to prepare adequately for the representation, to advocate the client's interests by all means necessary, or to discuss the representation with his or her client regularly. For these reasons, loyalty is at the root of all interactions that a lawyer has with his or her client, rendering the duty of loyalty    the    most    fundamental    aspect    of    the    lawyer-client    relationship.

7

**B.      Conflicts of interest compromise the duty of loyalty, and thus pose a particularly insidious threat to the lawyer-client relationship**

The duty of loyalty is the keystone of the lawyer-client relationship, and conflicts of interest threaten to damage this foundation. As the Ninth Circuit has explained, when a practitioner has to "choose between conflicting duties," he might "attempt to reconcile conflicting interests rather than enforce a client's rights to the fullest extent." *Smiley v. Dir., Office of Workers Compensation Programs*, 984 F.2d 278, 282 (9th Cir. 1993).

Conflicts of interest infect the lawyer-client relationship in subtle ways, leaving the entire representation suspect. The Supreme Court has recognized that a legal representation "contains a myriad of occasions for the exercise of discretion, each of which goes to *shape* the record in a case, but few of which are part of the record." *Young v. United States*, 481 U.S. 787, 812–13 (1987) (discussing the effect of a non-disinterested prosecutor). Unlike other ethical or representational failures, which are discrete and whose effects are manifest and readily measured, a conflict of interest casts a shadow over every aspect of the lawyer-client relationship. Depending on the conflict and the representation, this breach can blunt a lawyer's advocacy, compromise a lawyer's independent professional judgment, and inhibit a lawyer's creativity and zeal.

Social science research has substantiated the existence of these effects. *See* Don A. Moore, Lloyd Tanlu & Max H. Bazerman, *Conflict of Interest and the Intrusion of Bias*, 5 Judgment & Decision Making 37, 46 (2010) ("Participants were placed in partisan roles that gave them a reason to desire a certain outcome. When asked then to make neutral judgments, they failed to extricate themselves from the influence of their partisan roles. It was as if, once they had arrived at a partisan perspective, the justifications for that perspective were readily accessible in their minds and so held undue sway over subsequent judgments."). A suspect representation produces a verdict that has not been adequately tested by the adversarial process and, thus, cannot be trusted.

While unrevealed conflicts always cast shadows on the representation, the problem is particularly acute in capital cases. There is no way to recreate what might have, could have, or should have happened if the accused were represented by a lawyer with undivided loyalty. The defense of capital cases is an art, not a science. Each case is unique. The decision tree from retainer to final appeal includes hundreds of branches, dead ends, false starts, and choices, ranging from the minor—do I ask one more question on cross-examination?—to the major—what evidence should I introduce for mitigation?

Even lawyers acting without ill intention have difficulty recognizing the effects of conflicted interests. Studies have shown that people use heuristics to make ethical decisions, and one of those mental shortcuts is a bias in favor of a positive view of one's self. Tigran W. Eldred, *The Psychology of Conflicts of Interest in Criminal Cases*, 58 Kan. L. Rev. 43, 66 (2009). This bias impacts how lawyers react to conflicts of interest in their practice. For instance, people tend to be overconfident in their own objectivity, which in turn leads them to believe that conflicting interests do not influence their behavior. *Id*. at 67–68. Similarly, when lawyers engage in questionable ethical behavior, such as representing two clients with divergent interests, their immediate reaction is to become defensive and presume their own competence. These sentiments lead them to seek, and quickly find, some justification for their troubling behavior. *Id*. at 68. In contrast to these biases that occur unconsciously and automatically, remembering one's professional responsibilities requires a more deliberative mode of thought that is easier to block out. *Id*. Thus, even well-intentioned lawyers are susceptible to certain psychological processes that blind them to conflicts and their impact on decision-making while making it easier for them to ignore their ethical obligations in the process. *Id*. at 48, 68.

Importantly, the Supreme Court recognized early on that the courts were obliged to monitor the behavior of lawyers before them to ensure that the lawyers' duty of loyalty was fulfilled:

9

> There are few of the business relations of life involving a higher trust and confidence than that of attorney and client, or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it.

*Stockton v. Ford,* 52 U.S. 232, 247 (Dec. Term, 1850). As a result, when confronted with such an egregious conflict of interest, this court should take action to rectify it, being particularly sensitive to the harm the client suffered and to the potential damage to the justice system for failing to remediate the ethical lapse.

### C.   Mr. DeLozier labored under serious conflicts of interest in his representation of Ms. Andriano

#### 1.   Mr. DeLozier's representation of Alejo and Donna Ochoa was directly adverse to Ms. Andriano's interests

In Arizona, a conflict of interest exists if "the representation of one client will be directly adverse to another client," or if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person . . . ." Ariz. Rules of Prof'l Conduct R 1.7 (2003). Mr. DeLozier operated under just such a conflict of interest by representing Ms. Andriano in her criminal trial and concurrently representing her parents in pursuing custody of Ms. Andriano's children; he owed independent, unfettered duties of loyalty to Ms. Andriano and to her parents at the same time. This created an impossible conflict of interest, as Mr. DeLozier was required to both present mitigation evidence on behalf of Ms. Andriano and to effectively pursue guardianship rights for the Ochoas.

Representing the Ochoas required Mr. DeLozier to build an image of the couple as loving and capable caregivers. Not surprisingly, Mr. Delozier focused on the Ochoas' relationship with children, strongly emphasizing their wholesome style of parenting towards Ms. Andriano and her brother.

Conversely, Mr. DeLozier's principal responsibility as Ms. Andriano's counsel was to investigate and develop mitigating evidence regarding her life history and to

10

present this evidence to the jury. Because the prosecutor had emphasized throughout Ms. Andriano's trial that she had been sexually promiscuous in the period before Mr. Andriano's death, Mr. DeLozier had to provide the jury with a compelling explanation for this behavior in order to develop a successful mitigation case. Mr. DeLozier knew from prior experience that any evidence of his client being victimized by sexual abuse through her pre-adolescent and adolescent years would be invaluable as mitigation evidence.

It turns out that in the course of representing the Ochoas, and well before the conclusion of Ms. Andriano's trial, Mr. DeLozier learned that Alejo Ochoa may have physically and possibly sexually abused, inter alia, Ms. Andriano's child on several occasions, and that Donna Ochoa may have tried to cover up this abuse. Other neutral experts and childcare professionals repeatedly noted the possibility that Wendi herself may have been subject to childhood neglect and abuse, including sexual abuse.

Mr. DeLozier has admitted that if he had not been restricted by his duties to the Ochoas, this information regarding possible child abuse would have prompted him to undertake an in-depth investigation of Ms. Andriano's own upbringing. The evidence regarding abuse resulting from such an investigation would have enhanced, dramatically, Ms. Andriano's mitigation case. However, to present this evidence would have been in direct conflict with Mr. DeLozier's duty to portray the Ochoas as moral, loving parents in their custody case. These opposing goals demonstrate in stark terms the irreconcilable conflict of interest that Mr. DeLozier faced in representing both Ms. Andriano and her parents.

The conflict is in no way diminished by the fact that Ms. Andriano and her parents belong to the same family. There are no special exceptions under Rule 1.7 for the representation of multiple family members. *See* Ariz. Rules of Prof'l Conduct R 1.7 (2003). Indeed, representation of multiple family members requires heightened scrutiny by lawyers precisely because the family members' interests may align at one point only to completely diverge later. Once a lawyer perceives a conflict of interest between family

11

members, he can no longer simultaneously represent those members. This point is made clear in *State v. Padilla*, where the court held that the defendant's lawyer had rendered ineffective assistance of counsel in violation of Rule 1.7 for concurrently representing multiple family members with adverse interests. 859 P.2d 191, 194 (Ariz. Ct. App. 1993). The court found it irrelevant that the family members had together committed the offense as participants in a "family enterprise," and therefore could gain certain efficiencies from sharing counsel. *Id.* Rule 1.7 requires that family members retain separate counsel once their interests conflict.

The rules governing professional conduct have always treated clients as single individuals rather than as familial organizations. *See, e.g.*, Teresa Stanton Collett, *The Ethics of Intergenerational Representation*, 62 Fordham L. Rev. 1453 (1994) ("[T]he rules that govern lawyers' conduct are largely premised upon an understanding of clients as single, perhaps even isolated, individuals."). Unlike corporate entities, families do not qualify as organizations under Rule 1.13 for the compelling reason that "family members do not act as agents of 'the family.'" Collett, *supra* at 1486. Rather, all members are autonomous individuals who may possess or develop opposing interests. As with any two unrelated clients, lawyers risk facing conflicts of interest when they agree to concurrently represent multiple family members.

The present case exemplifies the potential for divergent interests within a family. Under Arizona Rule of Professional Conduct 1.7(a)(2), Mr. DeLozier operated under a clear conflict of interest because his representation of one client was limited by his responsibilities of another client, a conflict made all the more egregious because of the high stakes in Ms. Andriano's capital trial.

### 2. Mr. DeLozier's representation of the Ochoas presented a conflict of interest regardless of whether the Ochoas were current or former clients

Mr. DeLozier represented the Ochoas through the conclusion of Ms. Andriano's trial. Mr. DeLozier openly served as the Ochoas' official lawyer in guardianship

12

proceedings through July 2002 and continued to counsel them privately thereafter through telephone calls, e-mail correspondence, and meetings. He further assisted them in drafting legal documents and filings regarding their guardianship claim even after he ended his tenure as their counsel of record. In fact, this representation lasted at least until March of 2005, several months after the conclusion of Ms. Andriano's criminal trial. These facts demonstrate that a lawyer-client relationship between Mr. DeLozier and the Ochoas continued to exist throughout Ms. Andriano's trial, thus creating a concurrent conflict of interest.

But even if the lawyer-client relationship between Mr. DeLozier and the Ochoas terminated upon Mr. DeLozier's formal resignation as the Ochoas' counsel prior to Ms. Andriano's trial, Mr. DeLozier nevertheless labored under a disabling conflict of interest created by the duties lawyers owe former clients. Arizona Rule of Professional Conduct 1.9(c), the former client rule, states that:

> "(c) lawyer who has formerly represented a client in a matter shall not thereafter:
> (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or
> (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client."

Ariz. Rules of Prof'l Conduct R. 1.9(c) (2003). In short, regardless of whether the Ochoas were former or current clients, Mr. DeLozier was barred from using the information he obtained in confidence while serving as their lawyer, especially information that may be adverse to their interests. Mr. DeLozier's ongoing obligations to the Ochoas materially limited the kind of evidence he could develop and present on behalf of Ms. Andriano during the mitigation phase. Even if Mr. DeLozier was not actively representing the Ochoas during Ms. Andriano's trial, his prior representation of the Ochoas created a conflict of interest with his then-active representation of Ms. Andriano.

13

**D.   Mr. DeLozier's conflict of interest denied Ms. Andriano her constitutional right to effective representation, for which she is entitled to relief**

The lawyer's duty of loyalty is inextricably intertwined with the client's constitutional rights. The Sixth Amendment guarantees a defendant not merely the right to counsel but the right to effective counsel. Recognizing the dangers posed by conflicts of interest, the Supreme Court has interpreted this requirement as a right to conflict-free counsel. *See Glasser v. United States*, 315 U.S. 60, 70 (1942). Where representation falls short of that standard, the defendant is entitled to relief.

Generally, in order to receive relief, a defendant must show that she suffered an adverse effect as a result of an actual conflict. *Cuyler v. Sullivan*, 446 US 335, 345–49 (1980); *State v. Moore*, 213 P.3d 150, 165 (Ariz. 2009) ("To succeed on a conflict of interest claim, a defendant must prove the existence of an actual conflict that adversely affected counsel's representation."). Given the egregious nature of the conflict here, Ms. Andriano should not have to show an adverse effect in order to receive relief. Nonetheless, if such a showing were required, the adverse effect on Ms. Andriano is manifest.

**1.   Mr. DeLozier labored under an actual conflict of interest, in violation of Ms. Andriano's Sixth Amendment right to counsel**

As described above, it is clear that Mr. DeLozier labored under an actual and active conflict of interest. To prove an actual conflict, Ms. Andriano must show that "some plausible alternative defense strategy might have been pursued." *State v. Jenkins*, 715 P.2d. 716, 719 (Ariz. 1986). Here, it is clear that Mr. DeLozier failed to pursue an alternative mitigation strategy on Ms. Andriano's behalf because of his concurrent representation of her parents. The optimal strategy for each client was directly adverse to the interests of the other—on one hand, to succeed in the custody matter in which he represented Ms. Andriano's parents, Mr. DeLozier needed to show that the Ochoas were caring and loving parents; on the other hand, directly opposed to this first imperative, Mr.

DeLozier also needed to uncover and present mitigating evidence about Ms. Andriano's upbringing that could help explain her behavior.

Yet, Mr. DeLozier elected, either consciously or unconsciously, to protect the interests of Ms. Andriano's parents over those of Ms. Andriano, presenting positive evidence of their exemplary parenting in both her mitigation phase and in the custody case. Were he not bound by his loyalty to Ms. Andriano's parents, Mr. DeLozier would have been compelled to present evidence of the possible abuse Ms. Andriano suffered at the hands of her stepfather, providing information to the jury that could help them to understand her later behavior. Such an alternative defense strategy would have been both plausible, preferable, and, indeed, compelled, more than meeting the definition of an actual conflict.

### 2. The conflict here is so egregious that Ms. Andriano should not be required to prove adverse effect in order to receive relief

While there was a clear adverse effect here (as discussed below), in cases where the conflict is as egregious as this one, there should be no requirement to show adverse effect in order to receive relief. Though *Cuyler* enshrined the actual conflict/adverse effect framework in Sixth Amendment jurisprudence, more recent cases have muddied the waters on the question of whether that framework applies outside the context of concurrent representation of codefendants. *See Mickens v. Taylor*, 535 U.S. 162, 176 (2002) ("Whether *[Cuyler v.] Sullivan* should be extended to [successive representation] cases remains, as far as the jurisprudence of this Court is concerned, an open question."). Nonetheless, cases like Ms. Andriano's—where a conflict spans the entirety of the representation and infects every action the lawyer takes—should be treated as per se violations. Such cases demand relief without further proof of an adverse effect in order to remove that burden from defendants, emphasize the importance of unalloyed loyalty, and heighten the trust between counsel and client.

Client confidence is at the center of the requirement for conflict-free counsel. "Mutual trust" between lawyer and client is "necessary for effective representation."

*State v. Jones,* 923 P.2d 560, 566 (Mont. 1996); *see also Strickland v. Washington*, 466 U.S. 668, 690 (1984) (Lawyers must be granted latitude in order to prevent "undermin[ing] the trust between attorney and client."). A conflict has the potential to make a client "feel betrayed, and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively." Ariz. Rules of Prof'l Conduct R. 1.7 cmt. 6 (2003). This erosion of trust may rise to the level of a constitutional violation, as the client's distrust may become so severe as to render the lawyer incapable of providing constitutionally adequate representation. *See Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970); *Romero v. Furlong*, 215 F.3d 1107 (10th Cir. 2000).

In advancing her parents' interests over Ms. Andriano's, Mr. DeLozier clearly violated the duty of loyalty that he owed Ms. Andriano. He also violated her trust in him and in his ability to zealously represent her. A "cold record" cannot be expected to disclose "subtle, even unconscious" prejudice, nor the "erosion of zeal which may ensue from divided loyalty." *Castillo v. Estelle*, 504 F.2d 1243, 1245 (5th Cir. 1974). To ensure the mutual trust between lawyer and client—and to protect the integrity of the system—the court should embrace a per se reversal rule in cases such as this one, where the conflict is so egregious as to undermine trust in the criminal justice system.

### 3.   Ms. Andriano suffered a clear adverse effect from Mr. DeLozier's conflict

Regardless of which standard the court applies, the conflict's adverse effect on Ms. Andriano is manifest. Under the framework put forth in *State v. Jenkins*, "adverse effect is a less burdensome requirement than prejudice." 715 P.2d 716, 720 (Ariz. 1986). To meet the threshold for "adverse effect," the defendant need not establish that the conflict alone changed the outcome of the trial; the defendant need only show that the conflict had a substantially negative impact. *Id.*; *see also State v. Martinez-Serna*, 803 P.2d 416, 418 (Ariz. 1991).

*Cohen Kennedy Dowd & Quigley*

16

In this case, the conflict had a substantially negative impact on the entirety of the mitigation phase of trial because it induced Mr. DeLozier to pursue a mitigation strategy that presented Ms. Andriano's childhood and family life in a uniformly positive light. Had Mr. DeLozier been free of the conflict, there is no rational reason why he would not have used the information about Ms. Andriano's history of childhood abuse, presenting a mitigation case that contextualized her behavior around the time of the incident. That may have swayed at least one juror toward life instead of death, because this is exactly the sort of mitigation evidence that has long been used to present capital defendants in a more sympathetic light and to explain otherwise unexplainable acts. Had Mr. DeLozier not been conflicted, he would have pursued this "plausible defense strategy." *Jenkins*, 715 P.2d at 719. His failure to do so reduced his effectiveness as a capital defense lawyer, stripping him of his ability to use the very evidence that may have saved his client's life.[1]

## IV.   Conclusion

This case reflects how a conflict can come to thoroughly infect a criminal case. Unfortunately, it also reflects how the very person obliged to protect the defendants' rights—her own defense lawyer—can be blinded to the conflict even without malicious intentions, leaving the client to pay the ultimate price, while at the same time undermining the integrity of the criminal justice system.

---

[1]   While nothing suggests that Mr. DeLozier acted maliciously when he decided to continue both representations, there is also nothing in the Arizona Rules or caselaw to suggest that only those lawyers acting with a malevolent purpose may be responsible for violating the rules governing a conflict of interest. The rule prohibiting lawyers from laboring under a conflict of interest, like virtually all the Rules of Professional Conduct, has no intent requirement: regardless of a lawyer's motivations, if there is an actual conflict that has an adverse effect on the representation, the client has been deprived of the effective assistance of counsel. All lawyers are expected to know and follow the Rules of Professional Conduct: they are "partly obligatory and disciplinary and partly constitutive and descriptive in that they define a lawyer's professional role." Ariz. Rules of Prof'l Conduct Preamble 16. The Rules on conflicts "are imperatives, cast in the terms 'shall' or 'shall not.' These define proper conduct for the purpose of professional discipline." *Id.* Preamble 14. When it comes to conflicts, then, the Rules leave no room for discretion or absolution for good intentions because the harmful effect on the client is the same.

Our adversarial system is premised on the requirement that a lawyer will be loyal to his client and will zealously advocate on her behalf. Yet when his loyalty is split between two clients with conflicting interests, at least one client is denied the loyal advocate to which the client is entitled. Though a conflict of interest poses a serious problem in any kind of representation, the stakes are never higher than in the mitigation phase of a capital case. While Ms. Andriano relied upon Mr. DeLozier to recognize, investigate, and present mitigating evidence that could convince the jury to spare her life, Mr. DeLozier's split loyalty—split loyalty that the Rules required him to recognize and that is not excused by any lack of intent—resulted in his keeping such evidence out of court and, indeed, presenting evidence to the contrary.

In so doing, Mr. DeLozier not only abandoned his ethical duties to Ms. Andriano, but he also denied her Sixth Amendment right to conflict-free counsel. While Ms. Andriano clearly suffered adverse effects from Mr. Lozier's conflicted representation, this conflict was so egregious that she should not be required to show such effects in order to receive relief. By vindicating Ms. Andriano's rights in this case, this court would not only ensure that she receives the level of counsel on retrial that she is constitutionally guaranteed, but would also affirm the importance of loyalty in the lawyer-client relationship and preserve public trust in the integrity of the criminal justice system.

. . .
. . .

18

RESPECTFULLY SUBMITTED this ___ day of June, 2014.

**COHEN KENNEDY DOWD & QUIGLEY, P.C.**

By: _____

Daniel G. Dowd
Maureen M. Manning
The Camelback Esplanade I
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016

**DRINKER BIDDLE RINKER & REATH LLP**
Lawrence J. Fox
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996

*Attorneys for the Ethics Bureau at Yale*

ORIGINAL filed with the Clerk
of the Court this ____ day of June,
2014, and a COPY mailed to:

The Honorable Brian K. Ishikawa
Maricopa County Superior Court
Southeast Facility
222 East Javelina Avenue
Mesa, Arizona 85210-6234

COPIES of the foregoing sent
via U.S. Mail this ____ day
of June, 2014 to:

Scott M. Bennett (Bar No. 022350)
COPPERSMITH & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona 85004

Allen A. Arntsen, admitted *pro hac vice*
Stephan J. Nickels, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*

19

Jodi K. Fox, admitted *pro hac vice*
Krista J. Sterken, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 East Gilman Street
Madison, WI 53703-1481
  *Attorneys for Petitioner Wendi Andriano*

Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona 85701-1367

Gregory Hazard
Office of the Attorney General
1275 West Washington
Phoenix, Arizona 85007-2997
  *Attorneys for the State of Arizona*

B



**FOLEY & LARDNER LLP**

ATTORNEYS AT LAW

VEREX PLAZA
150 EAST GILMAN STREET
MADISON, WI 53703-1481
POST OFFICE BOX 1497
MADISON, WI  53701-1497
608.257.5035 TEL
608.258.4258 FAX
foley.com

WRITER'S DIRECT LINE
608.258.4293
aarntsen@foley.com EMAIL

CLIENT/MATTER NUMBER
999400-2746

June 2, 2014

<u>**VIA EMAIL**</u>

Professor Lawrence J. Fox
Ethics Bureau
Yale University
127 Wall Street
New Haven, CT  06511

   Re: State v. Andriano Amicus Brief

Dear Attorney Fox:

  As you know, I am one of the attorneys for petitioner Wendi Andriano in the above-referenced post-conviction relief proceeding before the honorable Brian J. Ishikawa in the Maricopa County, Arizona Superior Court.  The purpose of this letter is to confirm that Ms. Andriano consents to the Yale University Ethics Bureau filing an amicus brief with Judge Ishikawa in connection with those proceedings.

     Very truly yours,

     FOLEY & LARDNER LLP

     Allen A. Arntsen

BOSTON
BRUSSELS
CENTURY CITY
CHICAGO
DETROIT

JACKSONVILLE
LOS ANGELES
MADISON
MIAMI
MILWAUKEE

NEW YORK
ORLANDO
SACRAMENTO
SAN DIEGO
SAN DIEGO/DEL MAR

SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TALLAHASSEE
TAMPA

TOKYO
WASHINGTON, D.C.

4831-9192-1179.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

**IN AND FOR THE COUNTY OF MARICOPA**

| | |
|---|---|
| STATE OF ARIZONA,<br><br>                    Respondent,<br><br>vs.<br><br>WENDI ELIZABETH ANDRIANO,<br><br>                    Petitioner. | Case No:  CR2000-096032-A<br><br>**(PROPOSED) ORDER GRANTING MOTION OF THE ETHICS BUREAU AT YALE FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF THE PETITIONER**<br><br>(Assigned to the Honorable Brian K. Ishikawa) |

Having reviewed the Motion of the Ethics Bureau at Yale for Leave to File Amicus Curiae Brief ("Amicus Curiae Brief") in Support of the Petitioner, and for good cause appearing,

IT IS HEREBY ORDERED granting the Motion and deeming the Amicus Curiae Brief filed.

_____

HONORABLE BRIAN K. ISHIKAWA

# EXHIBIT QQQQQQQQQ

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
6/11/2014 4:52:39 PM
Filing ID 5927278

1

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

2

3

JEFFREY A. ZICK
CHIEF COUNSEL

4

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG. S–315
TUCSON, ARIZONA  85701–1367
TELEPHONE: (520) 628–6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 22714)

5

6

7

8

9

ATTORNEYS FOR PLAINTIFF/RESPONDENT

10

# SUPERIOR COURT OF ARIZONA

11

## COUNTY OF MARICOPA

12

13

State of Arizona,

Plaintiff/Respondent,

14

-vs-

15

16

Wendi Andriano,

Defendant/Petitioner.

17

18

19

20

CR2000-096032-A

RESPONSE IN OPPOSITION TO THE ETHICS BUREAU AT YALE'S MOTION FOR LEAVE TO FILE AMICUS BRIEF IN SUPPORT OF PETITIONER.

Assigned to the Honorable Brian Ishikawa

21

22

23

24

The Ethics Bureau at Yale (a student law clinic) ("Ethics Bureau"), seeks leave to file an amicus curiae brief on behalf of Defendant/Petitioner Wendi Andriano.  (Motion for leave to file amicus ("Motion"), at 1–3 & Exhibits A, B.) Although the State generally welcomes amicus input and does not typically oppose

25

26

27

28

1

motions for leave to file amicus briefs,[1] it objects to the Ethics Bureau's motion here for the following reasons.

First, the Ethics Bureau cites no authority permitting it to file an amicus brief in support of a closing memorandum following a post-conviction evidentiary hearing. Amicus input is not generally beneficial during state trial court post-conviction proceedings, which typically involve the application of facts developed at an evidentiary hearing to existing legal principles. This case is no exception. The facts underlying Andriano's claims were developed at the 8-day evidentiary hearing in February. The purpose of the closing briefing currently in progress is to apply those facts to Andriano's claims in order to assist this Court in determining whether she should receive a new sentencing proceeding. The law governing Andriano's claims is well-established, and there is no issue of first impression before this Court. This Court therefore will not likely rule on Andriano's claims in a published opinion that creates legal precedent. To the contrary, this Court's decision will affect only the instant case. Amicus input would not be helpful under these circumstances.

Second, the Ethics Bureau's brief not a true amicus brief; it is an advocate's brief. *Cf.* Ariz. R. Crim. P. 31.25 cmt. (1998) ("[A]micus curiae should keep in mind the purpose of an amicus brief. As the name implies, an amicus curiae brief should assist the Court, *not advocate a particular litigant's case*. Ideally, it *should*

---

[1] In its motion for leave to file the amicus brief, the Ethics Bureau notes that Andriano's counsel has consented to the filing, but claims that it "has been unable to obtain permission from the [State] to file a brief." (Motion, at 2.) However, the Ethics Bureau did not contact the State's counsel and request permission to file an amicus brief. Nor has the State been served with a motion from Pennsylvania attorney Lawrence Fox—who supervises the Ethics Bureau and whose name appears on both the motion for leave to file the amicus brief and the proposed brief—for admission in Arizona *pro hac vice*.

*not duplicate the briefs of the parties*, nor merely extend the length of a litigant's brief.  Rather, it should provide a broader, more abstract presentation of law that is *not narrowly tied to the facts of the case*.  It should provide background and context for the court's decision.") (emphasis added); *accord* Ariz. R. Civ. App. P. 16 cmt. (1998).  Although the Ethics Bureau's brief provides background information on a lawyer's duty to avoid conflicts of interest, it strays far beyond the acceptable bounds of an amicus brief.

The brief reurges arguments presented in Andriano's closing memorandum.  In fact, the brief expressly adopts portions of that memorandum.  (Motion, at Exhibit A, p.2 (adopting Andriano's statement of the facts).)  It also opines that second-chair counsel David DeLozier labored under an actual conflict of interest, suggests incorrectly that this Court should presume that DeLozier's purported conflict adversely affected Andriano's sentence, and asks this Court to "vindicate[e] … Andriano's rights" in this matter.  (*Id.* at pp. 5–18.)  Further, the Ethics Bureau's suggestion that this Court excuse Andriano from showing that any conflict adversely affected her representation appears to be a new argument not presented in Andriano's closing memorandum.  *See Qwest Corp. v. City of Chandler*, 222 Ariz. 474, 483, ¶ 28 n.6, 217 P.3d 424, 433 (App. 2009) ("Amici are not allowed to raise new issues and their briefs may not 'create, extend, or enlarge issues beyond those ... argued by the parties.'") (quoting *Ruiz v. Hull*, 191 Ariz. 441, 446, 957 P.2d 984, 989 (1998)).

In light of the foregoing, the Ethics Bureau does not seek to appear in this proceeding as a true amicus curiae, but as an advocate on Andriano's behalf.  *See State v. Brown (McMullen)*, 210 Ariz. 534, 536, ¶ 1 n.1 115 P.3d 128, 130 (App. 2005) ("[I]n the content and tone of the brief, the attorney general has not acted as an amicus but, rather, as a second advocate on behalf of the state."); *State v. Resendis-Felix*, 209 Ariz. 299, ¶ 3 n.10, 100 P.3d 457, 464 (App. 2004) ("By

3

seeking only to restate or expand on arguments already made by the state instead of to offer 'background and context for the Court's decision' … the attorney general's brief does not constitute a true amicus curiae brief.") (quoting Ariz. R. Crim. P. 31.25 cmt (1998)), *vacated on other grounds*, 2005 WL 2787475, * 1, ¶ 1 (Ariz. App. Oct. 25, 2005).  Instead, the Ethics Bureau seeks to supplement Andriano's closing memorandum with a second advocate's brief.  This Court should reject this effort and deny the Ethics Bureau's motion.

Finally, should this Court grant the Ethics Bureau's motion and accept filing of its proposed amicus brief, the State respectfully requests leave to consolidate its response to that brief with its response to Andriano's closing memorandum.

DATED this 11th day of June, 2014.


RESPECTFULLY SUBMITTED,

THOMAS C. HORNE
ATTORNEY GENERAL


/S/LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
ATTORNEYS FOR PLAINTIFF

4

1   Copy of the foregoing mailed
2   this 11th day of June, 2014, to:

3   Daniel G. Dowd
4   Maureen M. Manning
    Cohen Kennedy Dowd & Quigley, P.C.
5   The Camelback Esplanade I
6   2425 East Camelback Road, Suite 1100
    Phoenix, Arizona 85016
7
8   Lawrence J. Fox
    Drinker Biddle & Reath LLP
9   One Logan Square, Suite 2000
10  Philadelphia, PA 19103–6996

11  Counsel for Amicus Curiae The Ethics Bureau at Yale

12
13  Scott M. Bennett
    Coppersmith Brockelman PLC
14  2800 N. Central Ave., Suite 1200
    Phoenix, Arizona 85004
15
16  Allen A. Arntsen
    Stephen J. Nickels
17  Matthew R. Lynch
    Foley & Lardner LLP
18  150 East Gilman Street
19  P.O. Box 1497
    Madison, WI   53701-1497
20
21  Attorneys for Defendant/Petitioner Wendi Andriano

22
23  /s/ Arna Salazar
24
25  #3845308

26

27

28

5

# EXHIBIT RRRRRRRRR

MICHAEL K JEANES. CLERK
BY _Harbaua_ DEP

FILED

14 JUN 23 PM 3: 59

1

2 *Cohen Kennedy Dowd & Quigley, P.C.*
*The Camelback Esplanade I*
3 *2425 East Camelback Road • Suite 1100*
*Phoenix, Arizona 85016*
4 *Telephone 602•252•8400 • Facsimile 602•252•5339*

5 Daniel G. Dowd (012115) – ddowd@ckdqlaw.com
6 Maureen M. Manning (028877) – mmanning@ckdqlaw.com

7 *DRINKER BIDDLE & REATH LLP*
*One Logan Square, Ste. 2000*
8 *Philadelphia, PA 19103-6996*
*(215) 988-2714*
9
Lawrence J. Fox (PA Bar #15261) – lawrence.fox@yale.edu
10

11 *Attorneys for the Ethics Bureau at Yale*

12 **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

13 **IN AND FOR THE COUNTY OF MARICOPA**

14

15 STATE OF ARIZONA,                    | Case No:  CR2000-096032-A

16                    Respondent,

17 vs.

18 WENDI ELIZABETH ANDRIANO,

19

20                    Petitioner.

21

**THE ETHICS BUREAU AT YALE'S REPLY IN SUPPORT OF ITS MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF THE PETITIONER**

(Assigned to the Honorable Brian K. Ishikawa)

22         The Ethics Bureau at Yale is a student law clinic whose mission is to provide
23 analysis of important issues of professional responsibility and to urge the courts to give
24 full effect to the fiduciary obligations of lawyers as they are reflected in the court-adopted
25 rules of professional conduct.  The Ethics Bureau focuses particularly on those cases in
26 which these obligations rest upon either prosecutors or defense counsel.  Both examples
27 of prosecutorial misconduct and ineffective assistance of counsel often arise directly from
28 lawyer ethical transgression.

1    As a result, the Ethics Bureau certainly has a point of view which it regularly
2  expresses in the many amicus briefs it has filed in tribunals ranging from trial courts to
3  the United States Supreme Court. It is that mission the Ethics Bureau sought to fulfill in
4  filing its brief.

5    The Ethics Bureau knows of no requirement that an amicus not choose sides. One
6  need only look at the amicus briefs filed in the United States Supreme Court to see
7  examples of zealous advocacy by amici on behalf of one side or the other.

8    Nor does the Ethics Bureau know of any reason why an amicus brief cannot be as
9  effective in assistance to a trial court as it would be in an appellate context, particularly in
10  the area of habeas jurisprudence. It is the Ethics Bureau's view that the law is rarely
11  clear and, further, that even if the law were clear, there is no reason why an amicus
12  cannot fairly argue for a change in the law.

13    The Ethics Bureau is accused of adopting portions of Andriano's closing brief, on
14  the one hand, and then accused of making arguments Andriano's counsel has not
15  advanced, on the other. The only aspect of Andriano's brief the Ethics Bureau adopted
16  was Andriano's version of the facts. The legal argument gives important background and
17  public policy arguments that are nowhere to be found in Andriano's brief in the hopes
18  that, viewed in that context, the brief will help the Court appreciate the gravity of Mr.
19  DeLozier's violations of his fiduciary duties.

20    With all due respect, the Ethics Bureau at Yale prays that this Court accept and
21  consider its brief in the spirit in which it has been offered.

22  . . .
23  . . .
24  . . .
25  . . .
26  . . .
27  . . .
28  . . .

RESPECTFULLY SUBMITTED this 23rd day of June, 2014.

**COHEN KENNEDY DOWD & QUIGLEY, P.C.**

By: _____

Daniel G. Dowd
Maureen M. Manning
The Camelback Esplanade I
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016

**DRINKER BIDDLE & REATH LLP**
Lawrence J. Fox
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996

*Attorneys for the Ethics Bureau at Yale*

ORIGINAL filed with the Clerk
of the Court this 23rd day of June,
2014, and a COPY mailed to:

The Honorable Brian K. Ishikawa
Maricopa County Superior Court
Southeast Facility
222 East Javelina Avenue
Mesa, Arizona 85210-6234

COPIES of the foregoing sent
via U.S. Mail this 23rd day
of June, 2014 to:

Scott M. Bennett (Bar No. 022350)
COPPERSMITH & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona 85004

Allen A. Arntsen, admitted *pro hac vice*
Stephan J. Nickels, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
Jodi K. Fox, admitted *pro hac vice*

*Cohen Kennedy Dowd & Quigley*

3

Krista J. Sterken, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 East Gilman Street
Madison, WI 53703-1481
  *Attorneys for Petitioner Wendi Andriano*

Lacey Stover Gard
Office of the Attorney General
400 West Congress, Suite S-315
Tucson, Arizona 85701-1367

Gregory Hazard
Office of the Attorney General
1275 West Washington
Phoenix, Arizona 85007-2997
  *Attorneys for the State of Arizona*

Rachael McDaniel

4

# EXHIBIT SSSSSSSSS

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Krane, Deputy
7/10/2014 4:50:47 PM
Filing ID 5980383

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

GREGORY HAZARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, ARIZONA 85007–2997
TELEPHONE: (602) 542–4686
GREGORY.HAZARD@AZAG.GOV
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 023258)

LACEY STOVER GARD (SBN 022714)
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGRESS, BLDG S-315
TUCSON, ARIZONA 85701-1367
TELEPHONE: (520) 628-6520
LACEY.GARD@AZAG.GOV
CADOCKET@AZAG.GOV
ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
# COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>           Respondent,<br><br>-VS-<br><br>WENDI ELIZABETH ANDRIANO,<br><br>           Petitioner. | CR2000–096032–A<br><br>**STATE'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE STATE'S CLOSING BRIEF AND PETITIONER'S REBUTTAL CLOSING BRIEF**<br><br>The Hon. Brian K. Ishikawa<br><br>**[DEATH PENALTY CASE]** |

Pursuant to Rule 32.8 of the Arizona Rules of Criminal Procedure, the State

of Arizona, by and through undersigned counsel, respectfully requests an extension

of time to file the State's Closing Memorandum in Response to Petitioner's Post-

Hearing Memorandum in Support of Petition for Post-Conviction Relief.  The current due date is July 14, 2014.  The State requests a 7-day extension until July 21, 2014.  Counsel for the State submits there is good cause for an extension of time for the following reasons.

Counsel for the State have worked diligently on their closing memorandum and have completed a substantial portion of it.  However, additional time is necessary due to delays caused by both counsels' involvement in other capital matters before the state and federal courts.

In recent weeks, Counsel Gregory Hazard has had to devote substantial time to work on other cases, thus impeding his ability to complete his work on this memorandum. In particular, Mr. Hazard is lead counsel in the post-conviction evidentiary hearing involving *State v. Albert Martinez Carreon*, No. CR2001–090195–001. Although the courtroom testimony was completed on May 25, approximately 10 to 12 additional witnesses are testifying by deposition to complete the evidentiary hearing, and these depositions will continue until the middle of August.  Most of these depositions involve the testimony of expert witnesses. Mr. Hazard also recently completed a response brief to a petition for review before the Arizona Supreme Court.  In addition, an ongoing family medical emergency has further limited Mr. Hazard's ability to complete his work on this memorandum.

Co-counsel Lacey Gard has had to divide her time in recent weeks between the present memorandum and her supervisory duties at the Attorney General's Office, which have recently been more time-consuming than normal; in particular, in recent days, Ms. Gard has edited numerous briefs and pleadings from line attorneys, some of which have exceeded 100 pages in length. Ms. Gard is also lead counsel in a post-conviction evidentiary hearing involving complicated medical testimony and requiring significant preparation time, which is scheduled to begin before another Judge of this Court on July 14, 2014, and last for 2.5 days, *see State v. Joshua Villalobos*, No. CR2004–005523–001. Ms. Gard has further been occupied with a 42 U.S.C. § 1983 action challenging the scheduled execution of inmate Joseph Wood, *see Wood, et al. v. Ryan, et. al.*, CV 14–1447–PHX–NVW–JFM (United States District Court for the District of Arizona) and, on June 30, 2014, completed and filed a response to a capital post-conviction relief petition in Pima County Superior Court. *See State v. Cody James Martinez*, No. CR2003–1993.

Mr. Hazard has communicated with Mr. Arntsen and Mr. Bennett, counsel for Petitioner, and they have no objection to the State's request for additional time. In light of the State's request for an extension of time, the parties stipulate that the deadline for Petitioner to file her rebuttal/final closing memorandum should be extended until August 11, 2014.

For the reasons stated, the State requests that the deadline to file its closing memorandum be extended until July 21, 2014, and that the deadline for Petitioner to file her rebuttal/final closing memorandum be extended until August 11, 2014.

RESPECTFULLY SUBMITTED this 10th day of July, 2014.

Thomas C. Horne
Attorney General

Jeffrey A. Zick
Chief Counsel

/s/ Gregory Hazard
Assistant Attorney General
Attorneys for Respondent

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2014, I electronically filed the foregoing with the Clerk of the Maricopa County Superior Court by using the Court's eFiling Online System.

Copies of the foregoing were emailed and deposited for mailing this date to:

Hon. Brian K. Ishikawa
MARICOPA COUNTY SUPERIOR COURT
1810 South Lewis
Mesa, Arizona  85210–6234

Allen A. Arntsen
Stephan J. Nickels
Matthew R. Lynch
FOLEY & LARDNER, LLP
150 East Gilman Street
Madison, Wisconsin 53703
Email: AArntsen@foley.com

Scott M. Bennett
COPPERSMITH SCHERMER & BROCKELMAN, PLC
2800 North Central Avenue, Ste. 1200
Phoenix, Arizona 85005
Email: SBennett@cblawyers.com

Attorneys for Petitioner


                              /s/ Jennifer Mathis
                              Legal Secretary
                              Criminal Appeals/
                              Capital Litigation Sections
                              1275 West Washington
                              Phoenix, Arizona  85007–2997
                              Telephone: (602) 542–4686

3881596

# EXHIBIT TTTTTTTTTT

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
07/17/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                         07/15/2014


                                              CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA              K. Sotello-Stevenson
                                                     Deputy


STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD
                                        GREGORY MICHAEL HAZARD
                                        JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)            ALLEN A ARNTSEN
                                        SCOTT M BENNETT
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH
                                        JODI FOX

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        OFFICE OF PUBLIC DEFENSE
                                        SERVICES-CCC


**EXTENSION GRANTED**


        The Court having considered the State's Unopposed Motion for Extension of Time to File State's Closing Brief and Petitioner's Rebuttal Closing Brief,

        **IT IS ORDERED** extending the deadlines for the parties' post-hearing briefing as follows:

        The State shall file its written closing memorandum no later than July 31, 2014.

        The Petitioner shall file her rebuttal/final closing memorandum no later than August 22, 2014.

Docket Code 197                    Form R000A                         Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                           07/15/2014

     This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT UUUUUUUUU

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
7/31/2014 5:14:48 PM
Filing ID 6022061

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

GREGORY HAZARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, ARIZONA 85007–2997
TELEPHONE:  (602) 542–4686
gregory.hazard@azag.gov
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 23258)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGREDD, BLDG. S-315
TUCSON, ARIZONA 85701-1367
TELEPHONE: (520) 628-6520
lacey.gard@azag.gov
(STATE BAR NUMBER 22714)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
# COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>              Respondent,<br><br>-VS-<br><br>WENDI ELIZABETH ANDRIANO,<br><br>              Petitioner. | CR2000–096032–A<br><br>**STATE'S CLOSING MEMORANDUM**<br><br>The Hon. Brian K. Ishikawa<br><br>**[DEATH PENALTY CASE]** |

The State of Arizona, by and through undersigned counsel, submits the following post-hearing brief.  For the reasons stated in the following memorandum of points and authorities, Petitioner Wendi Andriano has not met her burden of showing ineffective assistance of counsel.  This Court should deny relief.

RESPECTFULLY SUBMITTED this 31st day of July, 2014.

Thomas C. Horne
Attorney General

Jeffrey A. Zick
Chief Counsel

/s/ Gregory Hazard
Assistant Attorney General
Attorneys for Respondent

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Arizona Supreme Court summarized the factual history as follows:

> Wendi Andriano, her terminally ill husband, Joe, and their two small children attended a barbeque on October 7, 2000. They returned to their apartment around midnight and put the children to bed.

> At about 2:15 a.m. on October 8, Andriano called Chris, a coworker who also lived at the apartment complex, and asked her to watch the children while Andriano took Joe to the doctor. When Chris arrived, Andriano met her outside the apartment. She told Chris, "I have a problem. Don't ask any questions. My husband's in on the floor dying and I haven't called 911 yet." When Andriano cautioned, "He doesn't know I haven't called 911," Chris urged her to make the call.

> Upon entering the apartment, Chris found Joe lying on the living room floor in the fetal position. He had vomited, appeared weak, and was having difficulty breathing. While Andriano was in another room calling 911, Joe told Chris that he needed help and had "for a long time." He asked why it was taking forty-five minutes for the paramedics to arrive.

> Andriano returned to the room and told Chris she needed to get Joe to the car so she could drive him to the hospital because the paramedics were responding to another call. Joe said he could not get up, so Andriano tried to lift him. When she could not, she became irritated and yelled at Joe, using profanities. Hearing sirens approaching, Chris went out to direct the paramedics to the apartment as Joe began to vomit again.

> As the paramedics were unloading their equipment, Andriano came out of the apartment screaming at them to go away. She then slammed the door. Chris and four paramedics knocked on the apartment door, but no one answered. After five to ten minutes of knocking, the Phoenix Fire Department alarm room called the Andrianos' home telephone in an attempt to get Andriano to open the door. The alarm room notified the

paramedics that contact had been made with someone in the apartment who would come out to speak with them. Rather than coming through the front door, which opened to the living room, Andriano went out through her back door, climbed over the back patio wall, and walked around the apartment building to the front door, where Chris and the paramedics were standing.

Andriano had changed her shirt and her hair was wet. She told the paramedics that Joe was dying of cancer and had a do-not-resuscitate order. She explained that "this was not the way that he wanted to go." The paramedics and Chris left without going into the apartment.

Andriano called 911 again at 3:39 a.m. The same paramedics responded and saw Andriano, wearing a bloody shirt, standing outside the apartment talking to a police officer.

When the paramedics entered the apartment, they found Joe lying on the floor in a pool of blood. He had a deep stab wound to the left side of his neck and lacerations on his head that exposed some brain matter. A police detective observed at 3:52 a.m. that the blood surrounding Joe's head was already starting to dry. A broken bar stool covered in blood was found near Joe's body, as were pieces of a lamp,[1] a kitchen knife with blood on the sharp edge, a bloody pillow, and a belt.

---

[1] The remainder of this lamp was never found, but its shade remained in the apartment. (R.T. 9/14/04, at 16–17, 28–32.) It is a reasonable inference that Andriano (or someone assisting her, suggested at trial to be Alejo Ochoa) removed it from the apartment after she murdered Joe but before she reported her crime. As the supreme court found, the evidence suggested that "Andriano staged the scene of the murder to make it appear as though she acted in self-defense." *Andriano*, 215 Ariz. at 512, ¶ 76 n.12, 161 P.3d at 555. The blood inside the apartment was already beginning to dry when police arrived, thus supporting the inference that Andriano killed Joe long before she called 9-1-1. Andriano also changed clothes and showered after Chris left the apartment, and exited the residence through the back patio door to speak to paramedics. These facts support the

(continued ...)

A search of the Andrianos' storage unit revealed an open cardboard shipping box containing a 500-gram bottle of sodium azide,[2] two Tupperware containers containing sodium azide, nine Q-tips, a plastic knife and fork, and two pairs of latex gloves. Andriano's fingerprints were on the plastic knife and the vacuum-packed bag in which the cardboard box was shipped. During a search of the Andrianos' apartment, the police found gelatin capsules filled with sodium azide in a bottle labeled for an herbal supplement. Trace amounts of sodium azide were also discovered in the contents of a pot and two soup bowls in the kitchen. In all, 20.8 grams of sodium azide could not be accounted for.

The medical examiner determined that Joe sustained brain hemorrhaging caused by no fewer than twenty-three blows to the back of his head, eight to ten of which independently could have rendered Joe unconscious. Defensive wounds on Joe's hands and wrists indicated, however, that he was conscious for at least part of the attack. Joe also sustained a 3 and 3/4-inch-long by 2-inch-wide stab wound to the left side of his neck that extended to his spine and severed his carotid artery. The medical examiner opined that the blows to the head were sustained before the stab wound to the neck and that Joe was still alive, although likely unconscious, when he was stabbed. Trace amounts of sodium azide were found in Joe's blood and gastric contents. The cause of death was attributed to blunt force trauma and the stab wound.[3]

---------------------

( ... continued)

inference that Andriano attacked and killed Joe as the paramedics waited outside. *Id.* at 500–02, ¶¶ 2–14, 161 P.3d at 543–45.

[2] Andriano purchased this poison over the internet from a business, using a fictitious name and shipping address and a forged business license. (R.T. 9/8/04, at 65–68; R.T. 9/21/04, at 29–115; R.T. 9/22/04, at 22–146; R.T. 9/29/04 at 3–49.)

[3] A pillow found near Joe's body bore a blood pattern consistent with blood being exhaled. (R.T. 9/14/04, at 21–24.) This pattern likely resulted from Andriano placing the pillow over Joe's face.

Based on the blood spatter and other evidence, a Phoenix police detective opined that Joe was lying down while he was being struck and did not get up during the attack. He further opined, based on the absence of arterial spurting on the belt and the knife, that both items were placed beside Joe's body after he died. Blood spatter on the bar stool, on the other hand, suggested that the stool was present when the arterial spurting began.

After being taken into custody, Andriano called one of her coworkers and asked her to hide certain items that were in Andriano's business office. Andriano's adoptive father told a police detective on the day of the murder, "I remember [Andriano] telling me that she stabbed [Joe]."

*State v. Andriano*, 215 Ariz. 497, 500–02, ¶¶ 2–14, 161 P.3d 540, 543 – 45 (2007).

Based on the foregoing facts, the jurors found Andriano guilty of first-degree premeditated murder. *Id.* at 502, ¶ 14, 161 P.3d at 545.

At the penalty phase, Andriano's trial counsel proffered evidence of several mitigating circumstances, including Andriano's missionary work and religious convictions; her purported status as a domestic violence and abuse victim; the stress of Joe's terminal cancer, initial misdiagnosis, and the family's financial problems; purportedly being a good mother; good behavior while she was in custody pending trial; and her potential for rehabilitation. (R.T. 12/8/04; R.T. 12/9/04; R.T. 12/13/04; R.T. 12/14/04.) To establish this mitigation, trial counsel relied partially on the guilt-phase evidence, but also called several of Andriano's friends and recalled Donna and Alejo Ochoa to offer additional information about her character and upbringing, and describe how her execution would affect them.

(R.T. 12/9/04; R.T. 12/13/04.) They also offered evidence characterizing Andriano as an excellent mother, who was devoted to her children. (*Id.*)

Andriano's trial counsel also presented testimony from several people who knew Andriano as a child and young adult, and described her as passive, demure, friendly, and nonviolent. (R.T. 12/9/04, at 7–45; R.T. 12/13/04.)  Trial counsel further recalled Dr. Sharon Murphy, who offered additional testimony on domestic violence, and testified that Andriano may have been sexually abused as a child and that a man exposed himself to her as a child.  Dr. Murphy opined that Andriano  may have been dissociating during her police interview. (R.T. 12/13/04, at 47–83.)

Andriano also presented testimony from three individuals who treated Andriano while she was in the jail's psychiatric unit:  a mental health counselor, Laura King; a psychologist, Dr. Gerald Perry; and a psychiatric nurse, Joyce Van Every. (R.T. 12/8/04.) All three witnesses characterized Andriano as being helpful and generous to others. (*Id.* at 73–74, 85.) They further characterized Andriano as naive and credulous, and claimed that she was valuable to the psychiatric unit  because  she  helped troubled inmates and brought problems to the attention of the psychiatric staff. (*Id.* at 81–83, 142–43.) Dr. Perry and King testified that Andriano was never diagnosed with a serious mental illness in jail, and that she was treated only for depression and anxiety. (*Id.* at 71–72, 92, 134, 111, 121–22.)

King opined that these circumstances stemmed from the trauma of killing Joe. (*Id.* at 111.)  Dr. Perry opined that they resulted from the stress inherent in the jail environment.  (*Id*. at 122.) Andriano was treated with Zoloft (an antidepressant), Ativan (an antianxiety medication) and Seroquel (an antipsychotic also used as a sleep aid).  (*Id.* at 139–40.)

In rebuttal, the State called Joe's sister, Jana Clayton, who described several instances in which Andriano had placed the burden of caring for her children on others; described her use of a paddle to discipline her son; and recalled Andriano's sadness when she became pregnant with her daughter, because she did not want to gain weight. (R.T. 12/13/04, at 119–32.)  Timothy Lee, Andriano's boss when she worked at the Courtyard Apartments, testified about Andriano's refusal to leave work to attend to her seriously injured son, which directly contradicted her trial testimony that she had immediately rushed to the hospital to see him. (R.T. 12/14/04, at 25-27.)

The State also called Dr. Michael Brad Bayless in rebuttal, who opined  that Andriano was manipulative, and that her suicide attempt while in the custody of the jail, helpful behavior in prison, frequent tears, and general portrayal of herself as a victim were all goal-directed actions. (R.T. 12/15/04, at 12–27.)  In addition, two detention officers testified about Andriano's reputation as a "control freak" in prison who upset other inmates; their belief that Andriano was in charge of the

other inmates; Andriano's discipline for possessing contraband; occasions on which Van Every, King, and Dr. Perry were caught giving Andriano preferential treatment or violating policy to accommodate her; and inappropriate contact between Andriano and her transsexual cellmate. (R.T. 12/14/04, at 48–111.)

After finding the existence of the  especially cruel aggravating factor, and following completion of the penalty phase, the jury found no mitigation sufficiently substantial to warrant leniency and sentenced Andriano to death.  *See Andriano*, 215 Ariz. at 500, ¶ 1, 161 P.3d at 543.

On direct appeal, the Arizona Supreme Court affirmed Andriano's conviction and independently reviewed her death sentence. The court affirmed Andriano's death sentence, finding the "quality and strength of Andriano's mitigation evidence … not sufficiently substantial to call for leniency in light of the especially cruel manner in which Andriano murdered her husband."  *Id.* at 510–13, ¶¶ 63–78, 161 P.3d at 553–56. Andriano petitioned the United States Supreme Court for a writ of certiorari; the Court denied certiorari on October 11, 2007.  *Andriano v. Arizona*, 552 U.S. 923 (2007) (mem.)

Andriano thereafter filed a petition for post-conviction relief ("PCR"), raising several claims.  This Court granted a limited evidentiary hearing on two claims: (1) whether trial counsel was ineffective in the penalty phase "by failing to investigate and present expert testimony regarding [Andriano's] mental illness and

by failing to investigate and present evidence regarding her harrowing childhood"; and (2) whether David DeLozier "had an actual conflict of interest that affected his representation of her." (M.E. 10/30/12 granting evidentiary hearing.) In February 2014, this Court heard eight days of testimony on these claims.

## II. APPLICABLE LAW

To obtain relief under *Strickland v. Washington*, 466 U.S. 668, 686 (1984), Andriano must show that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  Andriano must show that (1) counsel's performance was deficient under prevailing professional standards and (2) she suffered prejudice as a result. *Strickland*, 466 U.S. at 687–88. This Court "is not required to address both components of the *Strickland* test in deciding an ineffective assistance of counsel claim 'if the defendant makes an insufficient showing on one.'"  *LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir.1998) (quoting *Strickland*, 466 U.S. at 697). "'Surmounting *Strickland*'s high bar is never an easy task.'" *Harrington v. Richter*, 131 S.Ct. 770, 788 (2001) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S.Ct. 1473, 1485 (2010)).

To establish deficient performance, Andriano must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 699; *see also State v. Santanna*, 153 Ariz. 147, 149, 735 P.2d 757, 759

(1987). Her allegations and supporting evidence must withstand this Court's "highly deferential" scrutiny of counsel's performance, and overcome its "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 689–90; *see also State v. Gerlaugh*, 144 Ariz. 449, 454, 698 P.2d 694, 700 (1985). Under this deferential standard, Andriano bears the heavy burden of showing that counsel's assistance was "neither reasonable nor the result of sound trial strategy," *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001), and actions by counsel that "'might be considered sound trial strategy'" do not constitute ineffective assistance. *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Yarborough v. Gentry*, 540 U.S. 1, 5– 6 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").

Additionally, this Court should "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994)(en banc). Rather, as *Strickland* holds, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the  distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

perspective at the time." *Id.* at 689.   The test for deficient performance "has nothing to do with what the best lawyers would have done.   Nor is the test even what most good lawyers would have done."   *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998), *rev'd on other grounds*, 525 U.S. 141 (1998) (internal quotations omitted).   Instead, this Court examines "only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.*

Even if Andriano establishes that counsel performed deficiently, this Court should not grant relief unless she also proves prejudice.   *Strickland*, 466 U.S. at 691–92 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").   The prejudice requirement recognizes that a defendant is entitled to "*effective* (not mistake-free) representation." *United States v. Gonzales-Lopez*, 548 U.S. 140, 147 (2006) (emphasis in original).   This Court should not presume prejudice, *see Jackson v. Calderon*, 211 F.3d 1148, 1155 (9th Cir.   2000), but should require Andriano to affirmatively prove actual prejudice. *See Cooper v. Calderon*, 255 F.3d 1104, 1109 (9th Cir. 2001) ("[A petitioner] must 'affirmatively prove prejudice.' … This requires showing more than the possibility that he was prejudiced by counsel's errors; he must demonstrate that the errors *actually* prejudiced him.") (quoting *Strickland*, 466 U.S. at 693) (emphasis in

original).

To carry this burden, Andriano must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (prejudice prong concerned with whether "counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair … [u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right"). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

If a post-conviction claim proceeds to an evidentiary hearing, the defendant/petitioner bears the burden of proving the claim by a preponderance of the evidence. Ariz. R. Crim. Proc. 32.8(c). The United States Supreme Court has held that "*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." *Wong v. Belmontes*, 558 U.S. 15, 26-28 (2009). Andriano has not met her burden to prove that her trial counsel was ineffective.

…

…

…

13

## III. ARGUMENT

### A. Claim 1: Alleged failure to investigate and present mitigation evidence regarding Andriano's mental health and childhood.

Andriano contends that her trial counsel was ineffective at the penalty phase for failing to investigate and present expert testimony regarding her purported mental illnesses, and evidence of her "harrowing" childhood. At the evidentiary hearing, Andriano called trial counsel Patterson and DeLozier, mitigation specialists Scott MacLeod and Keith Rohman, legal experts Larry Hammond and Gary Lowenthal, psychologist Dr. James Hopper, psychiatrist Dr. George Woods, neuropsychologist Dr. Joette James, and several of Andriano's family members or friends: Kyre Lorts, Donna Ochoa, Jeri Cunningham, Jasper Neace, and Cindy Schaider. In rebuttal, the State presented neuropsychologist Dr. Kiran Amin and psychologist Dr. Steven Pitt. Andriano's claims fail because she has shown neither deficient performance nor prejudice.

### 1. Andriano has not proven deficient performance of trial counsel for allegedly failing to investigate and present expert testimony regarding her mental health.

Andriano asserts that counsel made no meaningful investigation into her mental health. She argues that information provided by Dr. Potts's competency evaluation, and correspondence written by Andriano's personal counselor Kandy Rohde, were "red flags" for trial counsel to conduct a mental health investigation. But contrary to Andriano's argument, her trial counsel thoroughly investigated

Andriano's mental health based on Dr. Potts' and Rohde's recommendations. More than two years before trial, Patterson retained Dr. Richard Rosengard, a psychiatrist, to evaluate Andriano and complete a report. (Exh. 6.003.) Contrary to Andriano's contention, this report offers no compelling mitigation, and, read in its entirety, did not trigger an obligation of trial counsel to further investigate Andriano's mental health. Rather, the report is damaging and would have undermined counsel's trial and mitigation strategy of portraying Andriano as a good mother and a timid, submissive woman who endured years of domestic violence from her husband. (*Id.*)

Andriano further argues that her counsel was ineffective because the "defense team inexplicably decline to consult further with Dr. Rosengard, did not arrange a second visit between him and Wendi, and did not ask any other experts to examine Wendi's mental health." However, in his report Dr. Rosengard did not recommend consulting with another expert. (*Id.*) Andriano has produced no evidence that Dr. Rosengard requested another visit with Andriano. But the law does not impose a duty on trial counsel to retain additional mental health experts in the hope they could offer a more favorable diagnosis for mitigation purposes. *See, e.g., Turner v. Calderon*, 281 F.3d 851, 875–76 (9th Cir. 1998) ("The choice of what type of expert to use is one of trial strategy and deserves a heavy measure of deference. [Counsel's] reliance on Dr.  Hamm, a properly selected   expert,

was within the wide range of professionally competent assistance.") (quotations omitted); *see also Worthington v. Roper*, 631 F.3d 487, 501–02 (8th Cir. 2011) ("Where counsel has obtained the assistance of a qualified expert on the issue of the defendant's sanity and nothing has happened that should have alerted counsel to any reason why the expert's advice was inadequate, counsel has no obligation to shop for a better opinion."). When their mental-health investigation failed to yield favorable results, there was no reason for counsel to inquire further into that topic and their focus on other areas of mitigation—including presenting extensive expert testimony that Andriano was a domestic violence victim—was objectively reasonable. *See Strickland*, 466 U.S. at 688.

Moreover, at the evidentiary hearing, Patterson explained why he did not pursue a mental health investigation following Dr. Rosengard's report:

> Based upon Dr. Rosengard's report, I didn't see [mental health mitigation] to be an issue in her case. The facts and circumstances of her conduct and the defense that we had chosen were not wholly consistent with mental disease, defect or illness. None of the persons involved in the case brought to my attention any need for further mental health inquiry.
>
> My experiences person-to-person with Ms. Andriano didn't lead me to believe that there was an issue – mental health issue. None of her close relatives or family suggested there was a mental health issue. Her history, her performance in high school suggested that if she had mental health issues, she had certainly adapted to them.

(R.T. 2/7/14, at 74.)

In light of the foregoing, Andriano has not shown that counsel's performance fell below an objective standard of reasonableness in choosing not to pursue any further investigation into Andriano's mental health. She has therefore failed to show deficient performance under *Strickland*.

## 2. Andriano has not proven her trial counsel performed deficiently in allegedly failing to investigate and present mitigating evidence regarding her childhood.

Andriano contends that counsel was also ineffective for failing to interview extended family members and acquaintances and discover evidence of her "harrowing" childhood. But no one, including Andriano, disclosed an allegation of sexual abuse by Alejo Ochoa to any member of Andriano's trial defense team. In addition, Andriano never revealed to her trial counsel that she suffered abuse from anyone other than her husband – and that information was thoroughly investigated and presented at her trial. "We have repeatedly held that "[a]n attorney does not render ineffective assistance by failing to discover and develop childhood abuse that his client does not mention to him (internal quotations omitted)." *Puiatti*, 732 F.3d at 1281 (citing *DeYoung v. Schofield*, 609 F.3d 1260, 1287-88 (11th Cir. 2010) (holding that counsel's investigation was reasonable in light of the fact that there was "no evidence that DeYoung mentioned to his trial or appellate counsel or to any mental health experts... that there was significant internal strife or dysfunction in his family"); *Newland v. Hall*, 527 F.3d 1162, 1202 (11th Cir. 2008)

(noting that "[b]ecause information about childhood abuse supplied by a defendant is extremely important in determining reasonable performance, '[w]hen a petitioner ... does not mention a history of physical abuse, a lawyer is not ineffective for failing to discover or to offer evidence of abuse as mitigation'" (alterations in original) (additional internal quotation marks omitted)).

In addition, every mental health expert that evaluated Andriano never discovered any evidence of sexual abuse committed upon Wendi Ochoa (aside from the allegation regarding her biological father, and the evidence related to the domestic violence investigation involving Andriano's husband – all of which was presented at her trial). Thus, even experts on mental health and abuse failed to discover the abuse Andriano alleges was available to be discovered by trial counsel, if they had only investigated it. "It strains credulity to think that not only was trial counsel ineffective as an attorney in investigating Puiatti's background in 1984, but so too were [mental health experts] Drs. Meadow[s] and DelBeato incompetent and unable to evoke pivotal information regarding Puiatti's allegedly abusive childhood." *Puiatti*, 732 F.3d at 1285 (quoting the district court and affirming its finding of no ineffective assistance of counsel).

Andriano further argues that her trial counsel failed to conduct "any meaningful social history investigation," and repeatedly asserts that her trial counsel did not meet the standards that the ABA Guidelines "require." Larry

18

Hammond and Keith Rohman repeatedly echoed this sentiment in their testimony at the evidentiary hearing. However, the Arizona Supreme Court and the United States Supreme Court have rejected the view that the Guidelines impose mandatory obligations on counsel.  *Bobby v. Van Hook*, 558 U.S. 4, 7–9 (2009); *id.* at 13–14 (Alito, J., concurring) ("The views of the [ABA]'s members, not to mention the views of the advisory committee that formulated the 2003 Guidelines, do not necessarily reflect the views of the American bar as a whole.   It is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution, and I see no reason why the ABA Guidelines should be given a privileged position in making that determination."); *Rompilla v. Beard*, 545 U.S. 374, 400 (2005) (Kennedy, J., dissenting) ("[W]hile we have referred to the ABA Standards for Criminal Justice as a useful point of reference, we have been careful to say these standards are only guides and do not establish the constitutional baseline for effective assistance of counsel.") (quotations omitted); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (noting that court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms") (quotations omitted); *Strickland*, 466 U.S. at 688–89 ("Prevailing norms of practice as reflected in American Bar Association

standards and the like are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."); *State v. Kiles*, 222 Ariz. 25, 35, ¶ 45 n.13, 213 P.3d 174, 184 (2009) ("Although this Court has subscribed to the ABA Capital Standards under Arizona Rule of Criminal Procedure 6.8(b)(1)(iii), the comment to the rule itself makes clear '[a] deviation from the guidelines . . . is not per se ineffective assistance of counsel. The standard for evaluating counsel's performance continues to be that set forth in *Strickland* . . . .' Ariz. R. Crim. P. 6.8, 2006 cmt."); *State v. Nash*, 143 Ariz. 392, 397–98, 694 P.2d 222, 227–28 (1985) ("Obviously, [the ABA Standards] are merely guides and do not represent rules counsel must follow.").

At the evidentiary hearing, Patterson testified about the standard of care at the time he represented Andriano. (R.T. 2/7/14, at 118-123.)  In summary, Patterson testified that the standard of care at the time of Andriano's trial did not require an attorney to investigate whether a client had suffered child abuse absent an indication that abuse occurred.  Both Patterson and DeLozier denied that anyone they spoke to mentioned anything that would suggest Andriano suffered abuse – aside from the conjecture regarding her biological father or grandfather which was presented to the jury at Andriano's trial.  (R.T. 2/10/14, at 149-150; R.T. 2/7/14, at

148-49.)  And the alleged "red flags" of child abuse Andriano contends that trial counsel ignored are either not actually suggestive of child abuse, or are not suggestive of child abuse absent the immaculate lens of hindsight.  Rather, as Patterson explained, the alleged "red flags" were reasonably explained by Andriano's circumstances of being in jail, charged with a capital crime, unable to be with her children, and the trauma associated with murdering her husband.  (R.T. 2/7/14, at 79-81.) *See Puiatti v. Secretary, Florida Dept. of Corrections*, 732 F.3d 1255, 1281 (11th Cir. 2013) (Affirming that trial counsel for Defendant was not ineffective and holding "Indeed, trial counsel reasonably chose her mitigation strategy based primarily on the information that she received from Puiatti, his family members, and two mental health experts. Puiatti told counsel he came from a good family and he never wanted for anything. Puiatti told the sentencing judge he came from a "good and crime-free" family. In all of the interviews defense counsel conducted of Puiatti and his family members, no one ever disclosed the pattern of systemic child abuse endured by Puiatti, which came to light only years after Puiatti was sentenced.").

In light of the foregoing evidence, Andriano has not met her burden that trial counsel's performance was deficient for failing to investigate or present mitigation evidence regarding her childhood.

### 3. Andriano did not suffer prejudice from any deficient performance.

Even if Andriano has proved deficient performance, she has not proved prejudice and is not entitled to relief under *Strickland*.  In fact, her claim fails for largely the same reasons the petitioner could not show prejudice in *Wong v. Belmontes*, 558 U.S. 15, 22 (2009):

> Some of the evidence was merely cumulative of the humanizing evidence [counsel] actually presented; adding it to what was already there would have made little difference. Other evidence proposed … would have put into play aspects of [Andriano's] character that would have triggered admission of … powerful … evidence in rebuttal. This evidence would have made a difference, but in the wrong direction for [Andriano]. In either event, [Andriano] cannot establish *Strickland* prejudice.

Specifically, the evidence Andriano presented at the PCR hearing regarding her upbringing was, in large part, cumulative to that she presented at trial.  Further, Andriano failed to prove by a preponderance of the evidence that she suffers from mental disorders but, even if she does, offering them as mitigation would have led to the admission of damaging rebuttal evidence that counsel had successfully asked this Court to exclude.  Further, none of the mitigation is significantly weighty given the absence of a persuasive explanatory relationship between it and Joe's murder.  After balancing the aggravating and mitigating factors, the horrific facts and circumstances of the crime, and the State's rebuttal evidence, there is no reasonable probability that the jurors would have imposed a life sentence.

### a. Preliminary matters.

In her closing memorandum, Andriano misstates the *Strickland* prejudice standard and reveals her fundamental misunderstanding of the role of mitigation in Arizona's capital sentencing scheme.  (Closing memorandum, at 7–8.)  She also inappropriately invites this Court to ignore certain material facts in resolving the prejudice inquiry based on no more than speculation about the jurors' deliberative process.  (*Id.* at 8–9.)  This Court should apply *Strickland*'s well-established prejudice test and, in so doing, should consider *all* trial and post-conviction evidence to determine whether Andriano has shown a reasonable probability that the omitted mitigation would have resulted in the jurors imposing a life sentence.

### i. Andriano misstates and misapplies *Strickland*'s prejudice standard.

According to Andriano, "[i]n cases alleging prejudice from [counsel's] failure to investigate, the measure of prejudice is 'the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented.'"  (Closing memorandum at 4 (quoting *Hovey v. Ayers*, 458 F.3d 892, 929 (9th Cir. 2006).)  Andriano presents her prejudice argument in a manner consistent with this perceived standard, highlighting the *quantity* of additional evidence that counsel could have presented, with little focus on the likely *effect* of that evidence on the sentencing equation.  (*Id.* at 9–51.)

But when assessing a claim that counsel failed to investigate and present mitigation in a death-penalty case, this Court should not consider the omitted mitigation in a vacuum, as Andriano encourages.  Rather, under *Strickland*, the "'question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that *the balance of aggravating and mitigating circumstances* did not warrant death.'"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1408 (2011) (quoting *Strickland*, 468 U.S. at 695).  This analysis requires this Court to "'reweigh the evidence in aggravation against the totality of available mitigating evidence.'"  *Pinholster*, 131 S. Ct. at 1408 (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).[4]

Further, where, as here, counsel's selection of a particular mitigation theme would have opened the door to rebuttal evidence, this Court should, in assessing prejudice, "consider *all* the relevant evidence that the jury would have had before it if [counsel] had pursued [a] different path—not just the mitigation evidence [counsel] could have presented, but also the [rebuttal] evidence that almost

---

[4] Even in *Hovey*, upon which Andriano relies, the United States Court of Appeals for the Ninth Circuit did not simply compare the quantity of new evidence to old evidence and stop there.  Rather, the court also found that counsel's failures led to the "devastating cross-examination" of a critical defense witness and that the aggravating factors were "strong, but ... not so overwhelming as to preclude the possibility of a life sentence."  458 F.3d at 930.  The court ultimately granted habeas relief because it found "a reasonable probability that [the] jury would have concluded that the *balance of aggravating and mitigating circumstances did not warrant death*."  *Id.* at 931 (emphasis added).

certainly would have come in with it."  *Belmontes*, 558 U.S. at 20.  "Thus, to establish prejudice, [a petitioner] must show a reasonable probability that the jury would have rejected a capital sentence after it weighed the entire body of mitigating evidence (including the additional testimony [counsel] could have presented) against the entire body of aggravating" and rebuttal evidence.  *Id.*; *see also Pinholster*, 131 S. Ct. at 1410.

In her closing memorandum, Andriano fails to address the omitted mitigation's *effect* on the sentencing equation in light of the aggravation, facts and circumstances of the crime, and potential rebuttal evidence—in fact, she all but ignores the latter three categories of evidence.  (Closing memorandum, at 9–51.) Instead, she pursues a "'more-evidence-is-better' approach," arguing simply that counsel should have presented an additional *quantity* of mitigating evidence, without acknowledging or accounting for the risks inherent in that strategy.  (*Id.*) *See Belmontes*, 558 U.S. at 25 (petitioner's argument that counsel should have taken a "'more-evidence-is-better' approach" ignored that there "was a lot to lose" from that tactic because it would have invited damaging rebuttal evidence about petitioner's prior murder).  Absent some showing that the omitted mitigation would have changed the sentencing calculus, Andriano cannot carry her burden under *Strickland*.

Andriano also contends that *Strickland*'s reasonable-probability standard is "'less than the preponderance more-likely-than-not standard.'" (Closing memorandum at 3–4 (quoting *Summerlin v. Schriro*, 427 F.3d 623, 643 (9th Cir. 2005)). However, "the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011) (quoting *Strickland*, 466 U.S. at 693). Further, Arizona Rule of Criminal Procedure 32.8(c) requires Andriano to prove her factual allegations by a preponderance of the evidence. And at a sentencing hearing, she would be required to prove her proffered mitigating circumstances by a preponderance of the evidence. A.R.S. § 13–751(C).

Overall, *Strickland* "places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different" absent counsel's purported errors." *Belmontes*, 558 U.S. at 27 (quoting *Strickland*, 466 U.S. at 694). And "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. 792. In general, "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Id.* at 787 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). This Court should hold Andriano to her heavy burden and should, for the reasons set forth below, conclude that she has not carried it.

### ii. Andriano misunderstands the effect on the sentencing equation between a defendant's mitigation and her offense.

Citing a number of cases in which petitioners have obtained federal habeas relief based on counsel's ineffectiveness, and one case in which the Arizona Supreme Court reduced a sentence to life imprisonment on independent review, Andriano contends that her purportedly "harrowing childhood and psychiatric disorders and defects are relevant mitigation, with or without any nexus to the offense."  (Closing memorandum at 4–6.)

The State does not dispute this principle:  a sentencer—as well as this Court in determining the effect of any hypothetical deficient performance on Andriano's sentence—must *consider* a capital defendant's relevant mitigating evidence, regardless whether it is causally connected to the offense of conviction.  *See, e.g., Tennard v. Dretke*, 542 U.S. 274, 284–86 (2004); *Eddings v. Oklahoma*, 455 U.S. 104, 113–14 (1982) *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  And evidence of a defendant's troubled childhood or mental disorders would (if proven) be relevant mitigation.  *See, e.g., Eddings*, 455 U.S. at 110 ("'[T]he 'Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'") (quoting *Lockett*, 438 U.S. at 604) (emphasis deleted); *State v.*

*Kayer*, 194 Ariz. 423, 440, ¶ 62, 984 P.2d 31, 48 (1999) ("[M]itigating factors must relate to the 'defendant's character, propensities or record and any of the circumstances of the offense.'") (quoting A.R.S. § 13–751(G)).

But Andriano fails to acknowledge that merely because a sentencer must *consider* relevant mitigation does not mean it must give that mitigation any particular *weight*. In fact, after *considering* a defendant's mitigation, a sentencer may—consistent with the constitution— conclude that it is unproven or entitled to little or no *weight* in mitigation. *See Harris v. Alabama*, 513 U.S. 504, 512 (1995) ("[T]he Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer."); *Eddings*, 455 U.S. at 114–15 ("The sentencer, and the [appellate court] on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight *by excluding such evidence from their consideration*.") (emphasis added); *see generally Kansas v. Marsh*, 548 U.S. 163, 175 (2006) ("In aggregate, [this Court's] precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here.").

Consistent with these principles, the Arizona Supreme Court has recognized that the lack of a causal relationship between a defendant's mitigation and her

28

offense lessens the mitigation's weight.  *See, e.g., State v. Styers*, 227 Ariz. 186, 189, ¶ 12, 254 P.3d 1132, 1135 (2011) ("Although we do not require establishment of a nexus between the mitigating factors and the crime before we consider the mitigation evidence, we may consider the failure to show such a connection as we assess the quality and strength of the mitigation evidence, and may attribute less weight to the mitigating effect of a disorder if the defendant fails to establish a relationship between the disorder and the criminal conduct.") (quotations and citation omitted).  Thus, while Andriano is correct that the absence of a causal or explanatory relationship between the mitigation and the offense does not preclude *consideration* of the mitigation, it diminishes the *weight* to which that mitigation is entitled.[5]

### iii. This Court should not disregard relevant trial evidence based on speculation that the jurors may not have found it persuasive.

Andriano asserts that this Court "cannot assume the jury agreed with the State's position on facts not necessary to the verdict," and speculates about various scenarios the jurors could have believed in which she murdered Joe with premeditation by bludgeoning and stabbing him but did not engage in certain

_____

[5] Along the same lines, Andriano contends that Dr. Stephen Pitt, who testified on the State's behalf, erroneously "looked only to the issue … whether [Andriano] was capable of appreciating the wrongfulness of her conduct.  (Closing memorandum, at 6–7.)

actions leading up to that crime, such as ordering sodium azide.  (Closing memorandum, at 8–9.)  Accordingly, she continues, "the State and Dr. Pitt were incorrect in assuming that the jury must have believed that [she] had ordered sodium azide as part of a plan to murder her dying husband weeks before his actual death."  (*Id.* at 8.)  She therefore suggests that this Court disregard that and other evidence not directly related to Joe's cause of death.  (*Id.* at 8–9.)  Perhaps not coincidentally, the evidence she attacks is that which? most convincingly rebuts her proffered mental-health evidence.

As a threshold matter, the Arizona Supreme Court considered arguments similar to those Andriano now advances in resolving whether she was entitled to jury instructions on the lesser-included offenses of second-degree murder and manslaughter.  *Compare* Closing memorandum at 8–9 & n. 1 *with Andriano*, 215 Ariz. at 504–05, ¶¶ 32–36, 161 P.3d at 547–48.  The court concluded that the evidence did not support the instructions.  *Andriano*, 215 Ariz. at 504–05, ¶¶ 32–36, 161 P.3d at 547–48.  The court also found, during its independent, *de novo* review of the death penalty, that Andriano had "poisoned her terminally ill husband, struck him in the back of the head twenty-three times, and slit his throat." *Id.* at 512, ¶ 70, 161 P.3d at 555.  This finding is not surprising, given that the evidence established—beyond a reasonable doubt—that Andriano ordered sodium azide under a false name, administered it to Joe surreptitiously, bludgeoned and

stabbed him to death when the poison failed to kill him, and staged the murder scene to make it appear as though she had acted in self-defense.  *See id.* at 500–02, 512, ¶¶ 2–15, 76 n. 12, 161 P.3d at 543–45, 556.  That the jurors found both premeditation (*see* Response to PCR, Exh. A, at 244, 254) and the cruelty aggravating factor, *see id.* at 502, ¶ 15, 161 P.3d at 545, proven beyond a reasonable doubt underscores this point, and the decision of Andriano's experts to largely ignore conduct occurring prior to the night of Joe's death bears upon the credibility of their opinions.

Regardless, this Court should not disregard relevant evidence based on Andriano's speculation that jurors *might* not have found it compelling.  In fact, doing so in the context of this ineffective-assistance-at-sentencing claim would be akin to considering residual-doubt evidence, which is inadmissible in the penalty phase.  *See, e.g., State v. Moore*, 222 Ariz. 1, 22, ¶ 133, 213 P.3d 150, 171 (2009); *State v. Harrod*, 218 Ariz. 268, 279, ¶ 40, 183 P.3d 519, 530 (2008); *Andriano*, 215 Ariz. at 506–07, ¶¶ 44–46, 161 P.3d at 549–50.

Disregarding evidence of Andriano's pre-offense behavior would also be inconsistent with the well-established principle of appellate law that a reviewing court views the facts in the light most favorable to sustaining the jury's verdict and resolves all reasonable inferences and evidentiary conflicts against the defendant. *See, e.g., State v. Forde*, 233 Ariz. 543, 552 n.2, 315 P.3d 1200, 1209 (2014); *State*

*v. Lopez*, 174 Ariz. 131, 134, 847 P.2d. 1078, 1081 (1992).  This principle is even more appropriate on collateral review than direct appeal because Andriano's convictions have been affirmed and are presumed valid.  *See Dist. Atty's Office v. Osborne*, 557 U.S. 52, 68–69 (2009); *Canion v. Cole*, 210 Ariz. 598, 600, ¶ 13, 115 P.3d 1261, 1263 (2005).  This Court should therefore presume that the jurors resolved all reasonable inferences against Andriano, and should conduct its *Strickland* analysis from that perspective.  It should not disregard relevant evidence merely because a juror *could* have found it unpersuasive.

### b. Counsel presented evidence of Andriano's childhood difficulties, and the additional details developed at the PCR hearing would not have affected the sentencing equation.

Andriano contends that counsel should have presented evidence that her early childhood was marked by poverty, abuse, and neglect; that she was raised in a draconian religious environment an adolescent; and that her stepfather, Alejo Ochoa, sexually abused her. (Closing memorandum, at 9–29.)  But with the exception of the allegations against Alejo, counsel presented this information to the jurors, albeit in less detail, and they found it insufficiently substantial to warrant leniency.  Here, as in *Belmontes*, 558 U.S. at 23 "[t]he sentencing jury was 'well acquainted' with [Andriano's] background and humanizing features" and "[a]dditional evidence on these points would have offered an insignificant benefit, if any at all," especially where Andriano failed to draw a persuasive explanatory

relationship between her childhood and her offense.  Similarly, Andriano has failed to prove her allegation that Alejo sexually abused her and, even if he did, that fact carries minimal mitigating weight.

### i. With the exception of the sexual-abuse allegations against Alejo Ochoa, the jurors were aware of Andriano's childhood difficulties.

As previously stated, a defendant is not prejudiced by counsel's omission of cumulative evidence at sentencing.  *See Belmontes*, 558 U.S. at 23; *see also Cox v. Ayers*, 613 F.3d 883, 900 (9th Cir. 2009) (no prejudice from counsel's failure to present additional mitigating evidence where evidence was cumulative of penalty phase evidence); *Matylinsky v. Budge*, 577 F.3d 1083, 1096–97 (9th Cir. 2009) (where counsel presented humanizing evidence, petitioner could not show prejudice from failure to present additional, cumulative evidence); *Babbitt v. Calderon*, 151 F.3d 1170, 1176 (9th Cir. 1998) (finding no reasonable probability of a life sentence where evidence not presented would have been cumulative) (collecting cases).  Although one of counsel's mitigation themes was that Andriano was a good person from a good household, they nonetheless presented evidence that her upbringing was less than ideal, in part to further their theory that she was a victim of domestic violence.

During the guilt phase of Andriano's trial, Donna Ochoa described Andriano's early childhood, including how, when Andriano was a young child, her

family joined a traveling ministry, slept in a fifth wheel, and had insufficient money even to purchase shoes.  (Response to PCR, Exh. KK (R.T. 10/4/04), at 15–17.)   Donna also described the isolationist atmosphere at 91st Psalm/Harvest Family Church in Casa Grande, where the family attended church and Andriano attended school as an older child and young adult.  (*Id.* at 21, 32–36.)  And she exposed Andriano's uncomfortable home life as an adolescent, which was marked by Alejo's volatile temper and arguably verbally abusive behavior.  (*Id.* at 36–38.)

Similarly, during her nine days of testimony, Andriano described her time living in the traveling ministry and under Harvest's strict rules, and Alejo's volatility.  (Response to PCR, Exh. V (R.T. 10/25/04), at 9–42.)   Andriano's adopted brother, Brandon, and her cousin, Barbara Mitchell, likewise testified about the restrictive environment at Harvest, describing how its leaders corporally punished schoolchildren and isolated the church's congregants from outside influences.  (Response to PCR, Exh. SS (R.T. 10/21/04), at 55–58, 149–53.)  And Dr. Sharon Murphy, Andriano's domestic-violence expert, testified that Andriano had been part of a traveling ministry, that another individual in the ministry had exposed himself to her when she was a very young child (a "traumatic experience," according to Dr. Murphy), that her biological father may have molested her, that Alejo was prone to violent verbal outbursts, and that Andriano endured a strict religious upbringing at Harvest.  (Response to PCR, Exh. OO (R.T. 10/12/04), at

39–47.)

Dr. Murphy reminded the jurors in the penalty phase that Andriano may have been sexually abused and that a man had exposed himself to her.  (Response to PCR, Exh. ZZ (R.T. 12/9/04), at 59–65.)  She described how this early abuse, combined with her isolation at Harvest and other factors, constituted "building blocks to trauma" that affected Andriano's actions when she killed Joe.  (*Id.*)  And Donna Ochoa stated expressly, "I do not believe that [Andriano] had an idyllic or perfect childhood," and explained that Andriano's biological father was verbally and physically abusive; that he and other family members were child molesters; that the family lived in poverty with the traveling ministry; that she had sent Andriano to a day care facility that ultimately was closed due to abuse allegations[6]; and that that Andriano had been raised in such a strict, sheltered environment that "[s]he had no clue how to survive" in the outside world.  (Response to PCR, Exh. AAA (R.T. 12/13/04), at 22–27.)

At the PCR hearing, Andriano presented additional details on the themes above through various witnesses, but their testimony did not strengthen, or otherwise materially alter, the picture of her upbringing presented to the jurors.

---

[6] At the PCR hearing, Donna mentioned nothing about a day-care facility being closed due to abuse allegations.  Instead, she claimed that Andriano had nearly been expelled from day care after engaging in inappropriate, sexual-type behavior with other students.  (R.T. 2/4/14, at 115–16.)

Donna Ochoa—who has been chastised by the Pinal County Superior Court for engaging in dishonest and deceitful behavior (*see* R.T. 2/4/14, at 205; PCR Hrg. Exh. 104)—regurgitated her trial testimony, albeit in greater detail.  She claimed that Andriano's biological father, Skip Robertson, his brother and their father were child molesters who had access to Andriano and may have molested her as a very young child; however, she had no personal knowledge whether this occurred. (R.T. 2/4/14, at 99–105, 200–01.)  She described having left Andriano alone with a man named Rick Barnes who had a history of child molestation but, again, had no personal knowledge whether he molested Andriano.  (*Id.* at 116–18, 200–01.)  She recounted, as she did at trial, the family's transient and impoverished lifestyle in the traveling ministry.  (*Id.* at 128–39.)  She described, as she did at trial, joining the 91st Psalm Church, which later became Harvest Family Church, and recalled its strict rules and use of corporal punishment.  (*Id.* at 139–45.)   And she recounted, as she did at trial, Alejo's explosive temper.  (*Id.* at 150–51.)

Donna also provided several minute details about Andriano's birth, infancy, and toddler years.  She claimed to have been a detached, depressed, neglectful parent, engulfed in a dysfunctional relationship with Robertson and more concerned with her dog's welfare than her child's.  (*Id.* at 78–109.)  She stated that she placed Andriano in day care, or left her in the care of whoever was available, while she worked or socialized.  (*Id.* at 109–10.)  But she also admitted that her

mother and Robertson (until the couple separated) cared for Andriano when Donna was unable to do so.  (*Id.* at 199.)  And Donna did not, as Andriano suggests in her closing memorandum, entirely neglect Andriano:  for example, she nursed her as a baby, rocked her when she developed colic and, when Andriano was an older child, home-schooled her for a period.  (*Id.* at 209.)

Several other church members testified at the PCR hearing.  Jasper Neace— a four-time convicted felon currently serving a prison sentence for a felony conviction, described (as did Brandon Ochoa, Barbara Mitchell, and Donna Ochoa at trial) Harvest's strict, controlling environment and use of a paddle to discipline children.  (*Id.* at 7–17.)  Notably, however, he never saw Andriano paddled.  (*Id.*)  Kyre Lorts and Jeri Lynn Cunningham supplied additional details about the church environment before it changed from 91st Psalm to Harvest Family Church.  They recalled the pastors using a paddle to discipline students.  (R.T. 2/4/14, at 43–44, 217.)  Neither Lorts nor Cunningham attended the church after Tom King took over and renamed it Harvest, but Andriano remained.  (*Id.* at 45–46, 218.)  Cindy Schaider, a family friend, described King's promotion of physical discipline, endorsement of traditional gender roles, suspicion of persons outside of the church, and efforts to control the congregants' through processes.  (R.T. 2/4/04, at 163– 70.)

The evidence above merely expands upon what the jurors already knew:

that Andriano experienced a transient and impoverished early childhood; that she was left in the care of various child abusers; that she, at a minimum, was victimized by a man exposing himself to her and may have been sexually molested; and that she was raised in a controlling religious environment.  And the evidence does not negate the positive aspects of Andriano's upbringing presented at trial and reaffirmed in the PCR proceeding, including her ability to spend time with friends, take music lessons, excel academically, and (in her adolescent years) live in a financially secure and socially stable family.  (R.T. 2/4/14, at 205–07.) None of the foregoing evidence persuaded the jurors to impose a life sentence. There is no reasonable probability that adding additional, cumulative details to the story already presented would have changed this result.  *See Belmontes*, 558 U.S. at 23; *Cox*, 613 F.3d at 900; *Matylinsky*, 577 F.3d at 1096–97; *Babbit*, 151 F.3d at 1176.

### ii. Andriano has not proved that Alejo Ochoa sexually abused her and, even if he did, that fact would have added little in to the sentencing calculus.

The allegation that Alejo sexually abused Andriano was the only new circumstance of her upbringing presented at the PCR hearing, and Andriano has failed to prove by a preponderance of the evidence that it is true.  *See* Ariz. R. Crimp. P. 32.8(c).  First, the allegation did not emerge until *after* Andriano was convicted and sentenced to death and the timing of it, standing alone, calls into

question its veracity.  Andriano's family, and her mother in particular, worked tirelessly before trial to ensure that she did not receive a death sentence.  To this end, Donna disclosed voluminous information to counsel about Andriano's upbringing—including potential sexual abuse by Robertson's family and Alejo's propensity to engage in verbal tirades—but never once reported any suspicion that Alejo sexually abused Andriano.  (PCR Hrg. Exh. 56; R.T. 2/7/14, at 128–26; R.T. 2/10/14, at 149–50; R.T. 2/14/14, at 193–95.)  Likewise, neither Alejo nor Brandon Ochoa reported any impropriety involving Alejo and Andriano.  (R.T. 2/10/14, at 149–50; R.T. 2/14/04, at 149–50.)

And despite her numerous visits with counselor H. Kandy Rohde and domestic-violence expert Dr. Sharon Murphy—during which she  disclosed other sensitive information, such as her potential early childhood molestation, the details of her sexual relationship with Joe, and Alejo's verbal outbursts—Andriano failed to disclose that Alejo sexually abused her.  (Response to PCR, Exh. OO (R.T. 10/12/04), at 40–41.)  She also never told counsel that Alejo had sexually abused her.  (R.T. 2/7/14, at 123–26; R.T. 2/10/14, at 149–50.)  Even more significant, Andriano testified under oath—unequivocally—that Alejo had *never touched her improperly*, save one occasion when he grabbed her shoulders and shook her. (Response to PCR, Exh. V (R.T. 10/25/04), at 39–42.)  These in-court statements are entitled to a strong presumption of verity.  *Cf. Blackledge v. Allison*, 431 U.S.

63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.").  Donna likewise testified that Andriano had never claimed to have been touched inappropriately.  (R.T. 12/9/04, at 124.)

The failure of Andriano, Donna, Alejo, and Brandon to disclose this information prior to trial is significant not only because it gives rise to the inference that the allegation is recently created, but also because, even if it is true, there is no reasonable probability counsel could have learned of it and presented it at trial.  Despite multiple opportunities to do so, and despite their willingness to disclose equally sensitive information of a similar nature to the present allegations, none of the four individuals living in the Ochoa household divulged what had purportedly happened between Andriano and Alejo.  Andriano cannot carry her burden under *Strickland* by speculating that they would have disclosed the information if asked different questions.  *See generally Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (speculation is insufficient to establish *Strickland* prejudice); *cf. Duckett v. Mullin*, 306 F.3d 982, 998 (10th Cir. 2002) ("It would be unreasonable to deem trial counsel ineffective for failing to discover potential mitigating evidence when counsel conducted a reasonable investigation but was stymied by potential witnesses who were not forthcoming."); *Babbitt*, 151 F.3d at

1174 (no ineffectiveness where counsel's investigator spoke with petitioner's "family members and friends and others who might have had such information, but none of them indicated there was any history of mental illness in [the petitioner's] family"); *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997) ("In general, counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel.").

Second, only one witness,[7] Kyre Lorts, claims to have personal knowledge that Alejo sexually abused Andriano, and several factors cast doubt upon her testimony.[8]  Lorts claimed that Alejo sexually abused both her and Andriano

────────────

[7] The two best witnesses to what may or may not have occurred between Andriano and Alejo are, of course, Andriano and Alejo.  Andriano declined, at the last minute, to testify at the PCR hearing.  (R.T. 2/5/14, at 36–40.)  However, she told both Dr. Hopper and Dr. Pitt that Alejo did not sexually abuse her.  (PCR Hrg. Exh. 237, at 109–112, 173; R.T. 2/3/14 (Vol. II), at 42.)  Alejo invoked the Fifth Amendment privilege and refused to testify (R.T. 2/6/14, at 3–5, 67–69), but his declaration and a statement he made to the State's investigator were admitted into evidence:  Alejo did not address the allegations in his declaration, and he denied them to the State's investigator.  (PCR Hrg. Exhs. 24, 25, 227, 228.)  However, regardless what Alejo has said or not said during this proceeding, historical events prove that he will do or say anything he believes will help Andriano.  For example, the trial evidence established that he falsified photographic evidence to support Andriano's self-defense claim.  (PCR Response Exh. MM (R.T. 10/6/04), at 80–93.)  And Andriano told Dr. Hopper that Alejo had offered to lie and admit that he sexually abused her to ensure that she received a new sentencing proceeding.  (R.T. 2/3/14, at 117.)

[8] Notably, Lorts refused to be interviewed by the State's investigator prior to her testimony.  (R.T. 2/4/14, a 4–5.)  Afterward, Andriano's defense team collected

(continued ...)

during sleepovers during their pre-adolescent years.   (R.T. 2/4/14, at 38–61.) According to Lorts, she and Andriano played "dress-up" with Donna's "lacy or see-through" lingerie and watched pornographic movies with Alejo.  (*Id.*)  During these encounters, Alejo purportedly touched Andriano's and Lorts' genitals and breasts, and they touched his genitals.  (*Id.*)

But Donna testified at the PCR hearing that she did not possess any nightgowns of the type Lorts described and that, to her knowledge, there were no pornographic movies in her home.  (R.T. 2/4/14, at 197–98.)  And Lorts admitted that, despite claiming to be a teacher and acknowledging that she is a mandatory reporter of child abuse under Arizona law, she has never reported Alejo's alleged conduct to any law enforcement or child-welfare agency.  (*Id.* at 68–70.)  She also admitted that she failed to disclose Alejo's conduct to anyone (law enforcement or otherwise) until she was 19 years old—despite moving away from Casa Grande, and escaping Alejo's influence, several years earlier—and then told only family members.  (*Id.* at 67–70.)

Lorts further conceded that, for a long time, she believed that she had "made … up" or "dreamt" the memories.  (*Id.* at 67.)  Even more critically, Dr. Hopper explained that he did not interview Lorts before writing his report because she was

_____

( ... continued)

her from her home and took her to the hotel at which the team was staying, "where she just felt more safe and comfortable."  (*Id.* at 5.)

"mentally unstable."  (R.T. 2/3/04 (Vol. I), at 32, R.T. 2/3/04 (Vol. II, at 131.)  And during her testimony, Lorts' demeanor changed visibly between direct and cross-examination:  while being questioned by Andriano's attorney, Lorts appeared tearful and insecure, but while being questioned by the State's attorney, she appeared defensive, defiant, and resilient.

No other witness claimed to have directly observed any type of sexual contact between Alejo and Andriano; accordingly, if this Court finds Lorts unreliable, as it should, Andriano's claim is based entirely on speculation and innuendo and does not warrant relief.  Donna Ochoa never saw any such activity.[9]  (R.T. 2/4/14, at 195–97.)  Likewise, Andriano's friend, Jeri Lynn Cunningham, who claimed that Alejo touched her breasts when he may or may not have been sleeping,[10] never saw any such activity.  (*Id.* at 240.)  Donna and Cunningham described a regular "touching-on" ritual that involved Andriano, and sometimes

---

[9] Nor did she ever report her suspicions to any law enforcement agency despite being a healthcare worker and legally obligated to do so.  Donna was well aware of her obligation, as she testified that it was one of the reasons she reported Joe's sister and her husband to Child Protective Services after Andriano's children developed rashes Donna considered suspicious.  (R.T. 2/4/14, at 204–05.)

[10] The breast-touching incidents occurred during sleepovers at the Ochoa residence.  (R.T. 2/4/14, at 223–30.)  Alejo was audibly snoring when he allegedly touched Cunningham's breasts.  (*Id.* at 225, 241.)

Case 2:16-cv-01159-SRB   Document 30   Filed 08/28/17   Page 425 of 1878


Cunningham, massaging Alejo.[11]  (*Id.* at 155, 231–34.)  However, this ritual did not involve Andriano or Cunningham touching Alejo's genitals, or vice-versa.  (*Id.* at 195–97.)  And all participants were clothed.  (*Id.* at 155–56, 231–35.)  This conduct in no way establishes that Alejo sexually abused Andriano.

Nor does Alejo's alleged purchase of what Donna considered risqué lingerie for Andriano, or his purported conduct in showing her sexually-themed material in mainstream novelty stores such as Spencer's Gifts, establish any sort of sexual misconduct.  (*Id.* at 156–60.)  In fact, it is a reasonable inference from the evidence that Andriano desired risqué lingerie but knew that her mother would not purchase them for her—in fact, Donna confirmed at the PCR hearing that, had Andriano asked her to purchase such items, she would have declined and instead bought her conservative cotton underwear.  (*Id.* at 197.)  Andriano also told Dr. Hopper that she disliked wearing the conservative bras Donna purchased for her, and wanted to wear the same type as her friend Laura; she recalled a "big tug-of-war" between her parents over what clothing she was permitted to wear.  (R.T. 2/3/14 (Vol. II), at 112–13.)

———————————

[11] The trial evidence established that Donna and Andriano would massage Alejo's head in an effort to placate him after his angry outbursts, an account that differs markedly from that presented at the PCR hearing.  (PCR Response, Exh. OO (R.T 10/12/04), at 41–42.)

Likewise, Cindy Schaider[12] claimed that Alejo took what she considered inappropriate photographs of Andriano wearing lingerie as a teenager.  (R.T. 2/10/14, at 159.)  And Cunningham testified that Alejo once photographed her and Andriano in bathing suits as they showered in an open, public beach shower on a California vacation.  (R.T. 2/4/14, at 221–22.)  Although the practice may be unusual or unseemly, there is nothing *illegal* about photographing a teenager in lingerie, when her genitals are covered, and the act of doing so does not necessarily reveal an inappropriate sexual relationship.  And taking photographs of one's child and her friend on vacation at the beach clad in swimsuits is not particularly unusual, and is certainly not illegal or indicative of sexual impropriety.

Third, even if Alejo sexually abused Andriano, that fact would be cumulative to evidence presented at trial that Andriano may have been molested as a child.  As set forth above, Donna Ochoa and Dr. Murphy testified at length about their suspicions that Andriano's biological father may have molested her, and Dr. Murphy discussed the potential effects of early sexual abuse molestation on one's behavior.  Even assuming, for the sake of argument, that Alejo also molested Andriano, that fact would have carried minimal additional mitigating weight, as

---

[12] At the PCR hearing, Schaider branded Alejo a "drug burnout"-type, and called him "sneaky."  (R.T. 2/10/14, at 158.)  Years earlier, however, she wrote a glowing recommendation letter on behalf of the Ochoas when they sought custody of Andriano's two children after Joe's death and Andriano's arrest.  (*Id.* at 179–85.)

adding another offender to the mix would not have made Andriano's status as a molestation victim any more compelling.   This is particularly true where, as discussed at length below, over a decade passed between the time Andriano reached adulthood and the night she murdered Joe.   Andriano has not shown prejudice from counsel's failure to present evidence that Alejo sexually abused her.

### iii. Andriano has failed to show how her childhood experiences explain her conduct in murdering Joe.

As the Arizona Supreme Court has already determined, Andriano's childhood circumstances carry little mitigating weight because "the events are remote in time to the offense and thus their relevance is minimal."  *Andriano*, 215 Ariz. at 512, ¶ 72, 161 P.3d at 555.  The new details Andriano has submitted do not remedy this deficiency, and she has not shown a reasonable probability of a different result had counsel presented them.

### 1. Dr. James Hopper's opinions were based on selective facts.

Andriano attempted to establish an explanatory relationship between her purported childhood difficulties and Joe's murder through developmental specialist Dr. James Hopper.[13]  (R.T. 2/3/14 (Vol. II), at 50.)  Dr. Hopper's testimony, in general, adds little to the sentencing calculus.  Andriano's negative childhood

_____

[13]  Drs. Woods and James relied on Dr. Hopper's opinions regarding Andriano's childhood development to make their psychiatric/psychological diagnoses.

experiences and their potential effect are concepts that are "neither complex nor technical" and the jury "did not need expert testimony to understand the … evidence; it could use its common sense …." *Belmontes*, 558 U.S. at 23–24. Common sense dictates—as the Arizona Supreme Court has already found—that Andriano's childhood experiences shed little light on the reasons for her actions at the age of 30 and are entitled to minimal mitigating weight. *See Andriano*, 215 Ariz. at 512, ¶ 72, 76, 161 P.3d at 555.

Common sense also defeats the connection Dr. Hopper attempted to draw between Andriano's background and her offense. Dr. Hopper presented a lengthy social-history recitation—most of which duplicated testimony from Donna and other lay witnesses which, in turn, largely duplicated the trial evidence —including instances of alleged neglect by Donna, physical and emotional abuse by various persons, exposure to known child molesters, sexual abuse by Alejo, and involvement with a strict religious sect.  (R.T. 2/3/14 (Vol. I); R.T. 2/3/14 (Vol. II).)  From this history, Dr. Hopper concluded that Andriano's childhood "trauma" affected her decision-making ability and executive functioning and led to memory problems and periods of dissociation.  (R.T. 2/3/14 (Vol. I), at 80–81, 86–89, 97; R.T. 2/4/14, at 19–32.)   In circumstances of high stress, Dr. Hopper opined, Andriano loses the ability to regulate her behavior and succumbs to "whatever impulses are arising."  (R.T. 2/3/04 (Vol. I), at 93–94.)   As a result of her

"trauma," he continued, Andriano "entered adulthood as a severely damaged person," predisposed to mental illness and unable to regulate her emotions.  (R.T. 2/3/04 (Vol. II), at 44–47.)  Dr. Hopper conceded, however, that Andriano is able to conform her conduct to social norms, and that she knows right from wrong.  (*Id.* at 102.)

The trial evidence belies Dr. Hopper's opinion that Joe's murder is causally connected to Andriano's upbringing.  Andriano was a high-functioning and very capable adult.  She married and raised a family for 6 years.  *Andriano*, 215 Ariz. at 512, ¶ 72, 161 P.3d at 555.  She established a successful career as a property manager, which she maintained despite the stress of having two children and a terminally-ill husband.  She executed several complicated criminal enterprises, both in the community and from jail, resulting in the theft of tens of thousands of dollars.  (R.T. 2/5/14, at 119–21; R.T. 2/14/14, at 72.)  She carefully planned Joe's murder over the course of several weeks, creating a false identity and business license to obtain the sodium azide she intended to use for the deed.  (PCR Response, Exh. EE (R.T. 9/8/04) at 65–68; GG (R.T. 9/21/04), at 29–115; HH (R.T. 9/22/04), at 22–146; O (R.T. 9/29/04), at 3–49; R.T. 2/14/14, at 81–87.)  And after she killed Joe, she manipulated evidence to fabricate a self-defense claim and—during a break in a police interview, unquestionably a highly stressful time— had the presence of mind to call a friend and direct her to remove incriminating

material from Andriano's office.  (R.T. 2/14/14, at 86.)  *Id.* at 512, ¶ 72 n.12, 161 P.3d at 556.

Further, Dr. Hopper based his opinion on selective information and facts of questionable veracity.  For example, Dr. Hopper relied heavily on Cunningham's account of Alejo groping her breasts, but discounted Andriano's statements that she could not remember the events Cunningham described.  (*Id.* at 94.)  He gave undue prominence to a card Alejo sent Andriano when she was an adult—introducing it with a dramatic warning to spectators that it was "pretty disturbing" and suggesting it was evidence of an untoward relationship between the two—when any reasonable observer would immediately recognize its contents as no more than an off-color riddle about a housecat.  (*Id.* at 20–21.)  He highlighted Andriano's exposure to corporal punishment, but discounted her statement that she did not "live her life in fear" of being spanked by her parents and that spanking was not an everyday occurrence.  (*Id.* at 94.)  He opined that Andriano was unable to perform adequately under pressure, but discounted her statement that, absent pressure, she is not "motivated or interested enough to do anything."  (*Id.* at 110.)

Dr. Hopper also relied heavily on Kyre Lorts' account, despite conceding her mental instability and being aware of other facts bearing on her credibility, such as her unsubstantiated and bizarre claim that she and Andriano engaged in a sexual act beneath the camera's view in a yearbook photograph, and her admission

that she had engaged in an act of animal cruelty, attacking a dog because it licked itself and unwittingly reminded her of an unrelated act of sexual abuse she had purportedly experienced.  (*Id.* at 133–34.) He discounted the fact that Alejo had offered to lie and admit to abusing Andriano to get her off death row, explaining that the comment merely reflected Alejo's "disturbed" nature.  (*Id.* at 117.)  He coordinated his report with Dr. George Woods' report:  each claimed to rely on the other's work, but their reports were signed and dated the same day.  (R.T. 2/3/14 (Vol. II), at 50–51.)  And incredibly, he diagnosed Alejo as a pedophile based on speculative and unverified information, without ever forensically evaluating him. (*Id.* at 68–69.)   Dr. Hopper's opinion is unpersuasive, and no reasonable probability exists that presenting his testimony would have led the jurors to impose a life sentence.

### 2. Andriano murdered Joe at age 30, dramatically reducing the weight to which a jury would have given her childhood-related mitigation.

As previously stated, the absence of an explanatory relationship between Andriano's upbringing and her offense does not *preclude* her upbringing's consideration as mitigation, it dramatically reduces the *weight* to which that factor is entitled.  *E.g. Styers*, 227 Ariz. at 189, ¶ 12, 254 P.3d at 1135.  In particular, the relevance and mitigating weight of childhood-related difficulties diminishes as a defendant's age increases. *See State v. Greene*, 192 Ariz. 431, 442, ¶ 51, 967 P.2d

er

106, 117 (1998) ("[B]ecause adults have personal responsibility for their actions, adult offenders have a difficult burden of proving a connection between family background and offense-related conduct….").

Here, Andriano killed Joe when she was 30 years of age, over a decade after she reached adulthood and escaped her parents' influence. *See Andriano*, 215 Ariz. at 512, ¶¶ 72, 76, 161 P.3d at 555. As previously noted, since reaching adulthood, she had married, borne two children, maintained her own household, and developed a successful career as a property manager. Although she had engaged in criminal behavior, she had incurred no criminal record. It is undisputed that she can tell right from wrong, and that she knew it was wrong to kill her husband. Thus, even taking as true Andriano's allegations about her childhood, they would be entitled to minimal mitigating weight given the passage of time and the intervening events between the end of her childhood and Joe's murder. *See State v. Pandeli*, 215 Ariz. 514, 531–32, ¶¶ 71–72, 161 P.3d 557, 574–75 (2007) ("Pandeli's difficult childhood and extensive sexual abuse [which included abuse by at least four men, including his uncle], while compelling, are not causally connected to the crime. Moreover, Pandeli murdered Iler when he was in his late twenties, reducing the relevance of his traumatic childhood. We do not give this mitigating evidence significant weight."); *State v. Anderson*, 210 Ariz. 327, 399, ¶ 136, 111 P.3d 369, 357 (2005) ("Anderson's childhood troubles do not in any way

explain his decision, decades later at age forty-eight, to kill three innocent people to steal a pickup.").  This Court should reject Andriano's claim.

### 3. Andriano does not suffer from serious psychological disorders and, even if she does, they carry little mitigating weight, would have invited damaging rebuttal, and would not have resulted in a life sentence.

The evidentiary hearing confirmed that Andriano has not proved that she suffers from a serious mental illness, either now or at the time she killed Joe. (Response, at 40–43.)  And even if she has a serious mental illness, she has not shown that her illness explains why she killed Joe, dramatically reducing the mitigating weight the jury would have given it.  Further, presenting mental-health mitigation would have opened the door to compelling rebuttal evidence.  It would not have benefitted Andriano's case, but would, instead, have detracted from it. Andriano has failed to prove that she suffers from a serious mental illness.

Despite having been evaluated by multiple professionals both before and after Joe's murder, Andriano has—until the present proceeding in which she seeks to evade her lawfully-imposed death sentence—*never been diagnosed with a serious mental illness.*[14]   There is no reasonable probability that the outlying

_____

[14] Andriano contends that the post-offense diagnoses are faulty because they were made without the benefit of a comprehensive social history.  (Closing memorandum, at 49.)  But it goes without saying that mental-health experts (and

(continued ...)

opinions offered by Andriano's current mental-health experts would have convinced the jurors that she is mentally ill or persuaded them to impose a life sentence, especially because they are inconsistent with the facts of Joe's murder and other documented behavior by Andriano.

Andriano first sought mental-health treatment in 1996, after she was fired from her job for stealing a significant amount of money.  (PCR Hrg. Exh. 46.)  Her treating mental-health professional entered a diagnosis of adjustment disorder with mixed disturbance of emotions and conduct (which is "a garden variety kind of depression … related to different stressors") and a rule-out diagnosis of major depression.  (*Id.*; R.T. 2/14/14, at 72.)

After Andriano was arrested for killing her husband, a host of medical professionals evaluated her, both in preparation for trial and during the course of treatment at the Maricopa County Jail.  Dr. Jack Potts performed a competency evaluation pursuant to Rule 11 of the Arizona Rules of Criminal Procedure; he recommended additional psychological testing, but found Andriano competent and did not diagnose a major mental illness.  (PCR Hrg. Exh. 6.001.)  Andriano's

───────────────────

( ... continued)

especially treating professionals in a correctional institution, who would not typically receive a social history prepared by counsel) are trained to recognize objective symptoms of major mental disorders, and some of Andriano's claimed symptoms (*e.g.* memory problems) would have been readily apparent.  Moreover, at least one professional retained by Andriano, H. Kandy Rohde, was familiar with her background and history, and still did not diagnose a major mental disorder.

counsel retained Dr. Richard Rosengard to evaluate her prior to trial; Dr. Rosengard diagnosed depression, probable PTSD (which he attributed to Joe's murder), and panic disorder.  (PCR Hrg. Exh. 6.003.)  He also questioned her claim that she suffered from memory deficits.  (*Id.*)

H. Kandy Rohde, a private counselor retained by Andriano's parents, spent a significant amount of time with her at the Maricopa County Jail.[15]   Rohde, however, did not suggest that Andriano suffered from a serious or debilitating mental illness.  Rather, she opined that Andriano was a molestation victim and that she suffered from Depersonalization Disorder, Dissociative Amnesia and, perhaps, certain personality disorders.  (PCR Hrg. Exh. 7.002.)

Dr. Michael Brad Bayless, retained by the State for trial, also evaluated Andriano.  (PCR Hrg. Exh. 6.005.)  Dr. Bayless likewise did not diagnose bipolar disorder, cognitive deficits, or any other significant mental disorder.  (*Id.*)  Instead, he diagnosed Depressive Disorder not otherwise specified (NOS) and Personality Disorder NOS with antisocial and borderline traits.  (*Id.*)

During her pretrial incarceration, Andriano attempted suicide and was

---

[15] Rohde was ultimately banned from having contact visits with Andriano (which had only been authorized in the first place because the Jail was inaccurately led to believe she belonged to the legal team) after supplying Andriano with contraband.  (PCR Response Exhs. BBB (R.T. 12/14/04), at 56–65, 93–94; Tr. Exh. 548.)

admitted to the Jail's psychiatric unit.  (PCR Response, Exh. YY (R.T. 12/8/04), at 68.)  Andriano was not diagnosed with a serious mental illness in the psychiatric unit, and her treating psychologist specifically did not diagnose her with bipolar disorder.  (*Id.* at 71–72, 92, 111, 121–22, 134.)  Instead, she was treated for depression and anxiety with Zoloft (an antidepressant), Ativan (an antianxiety medication), and Seroquel (an antipsychotic also used as a sleep aid).[16]  (*Id.* at 139–40.)  Likewise, since being incarcerated at the Arizona Department of Corrections, Andriano has not been diagnosed with a major mental illness, and has, in fact, informed prison officials that she does not wish to take psychiatric medication.  (R.T. 2/14/14, at 73–74.)

In the present proceeding, Drs. Steven Pitt, a psychiatrist, and Kiran Amin, a neuropsychologist, both retained by the State, evaluated Andriano.  Dr. Amin tested her for cognitive deficits, reviewed prior testing by Dr. Bayless and defense expert Dr. Myla Young, and attended Dr. Pitt's forensic interview of Andriano; based on the foregoing, he concluded that Andriano does not suffer from a serious cognitive disorder.  (R.T. 2/14/14, at 25.)  He also opined that she understood her conduct's wrongfulness and could conform it to the law.  (*Id.* at 25–26.)

After interviewing Andriano for nearly five hours and reviewing voluminous

---

[16] The treating psychiatrist and two staff members were caught giving Andriano preferential treatment and violating policy to accommodate her.  (PCR Response, Exh. BBB (R.T. 12/14/04), at 48–111.)

material contained within approximately five banker's boxes, Dr. Pitt also found that Andriano did not suffer from a serious mental illness.  Dr. Pitt considered several potential diagnoses—including PTSD—and ultimately diagnosed Andriano with a personality disorder NOS with antisocial, borderline, and dependent features, and an adjustment disorder with mixed anxiety and depressed mood. (R.T. 2/14/14, at 77–79.)   Dr. Pitt's diagnosis is consistent with that made by professionals at the Arizona Department of Corrections and the Maricopa County Jail.  (*Id.* at 78.)  It also accounts for the fact that any major mental illness from which Andriano suffers would have followed a chronic course and reference to it should appear in her extensive prior treatment records.  (*Id.* at 71.)   Dr. Pitt analogized his diagnostic process, and the relevance of Andriano's prior diagnoses, to the game of football:

> If you look at the data on this particular case, where's all the data points about mental illness, that she doesn't have a mental illness?  Most of the data points are around the 50-yard line.  Sure, you have some that are at the 40 and some that are at the 20 and you've got a couple in the stands, but the totality of the data points away from this woman having a major mental illness.  The records support that opinion.  The people that treated her at the Maricopa County Jail support that opinion.  And the Arizona Department of Corrections records support that opinion.

(*Id.* at 115.)

Against this backdrop of relatively consistent mental-health evidence, Andriano's retained experts, Dr. George Woods and Dr. Joette James, diagnosed

her with a variety of serious disorders that they believe affected her behavior when she murdered Joe. Dr. Woods opines that Andriano suffers from bipolar disorder, complex PTSD, dependent personality disorder, and cognitive deficits. (R.T. 2/5/14, at 42.) In the months before Joe's murder, Dr. Woods believes, Andriano's disorders had worsened and amplified each other, causing impaired judgment, impulsivity, memory impairment, executive functioning defects, and an inability to function under stress, and resulting in atypical behavior like engaging in insurance fraud, obtaining sodium azide, and murdering Joe. (*Id.* at 63–88, 102–03, 109–11.) Likewise, Dr. James opines—without ever having evaluated, or even spoken to, Andriano—that Andriano suffers from cognitive disorder NOS and has difficulty adjusting her behavior to respond to changing demands, is easily overwhelmed when faced with a large quantity of information, and behaves impulsively. (R.T. 2/10/14, at 24, 31, 37–38, 46–48.)

Not only are Dr. Woods' and Dr. James' opinions inconsistent with Andriano's documented mental-health history,[17] but they are also inconsistent with her social history and the facts of the offense—categories of evidence upon which Dr. Woods relied to form his opinions. Andriano's murder of Joe was not an impulsive act, and was not out of character for her. Rather, Andriano has engaged

_____

[17] Andriano's reliance on observations by Donna Ochoa describing her apparent memory problems and other psychological symptoms is inappropriate because Donna is not a mental-health professional.

in calculating, devious behavior her entire life—it did not suddenly arise in the fall of 2000 and unexpectedly result in Joe's murder.

Andriano's childhood friend and high school boyfriend, Shawn King,[18] testified in a 2011 deposition that, from the time Andriano was a child, she was "devious" and appeared always to have "a plan underneath what she was doing." (PCR Hrg. Exh. 15, at 11.)  She could "get [King] to do anything," including disobey the rules of their strict religious school.  (*Id.* at 15.)  As adults, King believed that he and Andriano were in a monogamous relationship, but later found out she had been with "so many guys" while they were together; he also learned that, at a party, she had had sexual intercourse with a man in front of other persons. (*Id.* at 16–21.)  Although King personally caught Andriano in compromising positions with two other men, she led him to believe "that it was okay."  (*Id.* at 16.) She was adept at using her "feminine wiles" for personal gain, and had a very convincing and persuasive way about her.  (*Id.* at 35–45.)

Although Andriano had no prior record before she killed Joe, unlawful conduct and inappropriate workplace behavior is a consistent theme in her history. She stole from multiple employers, and did not do so by, for example, taking money from a cash register—rather, she engaged in complicated schemes to

---

[18] King's account refutes Dr. Woods' opinion that Andriano did not engage in antisocial behavior prior to marrying Joe Andriano and dealing with the pressure of his illness.  (R.T. 2/5/14, at 126–27.)

embezzle from the companies.  (R.T. 2/5/14, at 120–21; R.T. 2/14/14, at 69–70, 72; PCR Hrg. Exh. 46.)  She also became involved while incarcerated in a scheme to cash forged checks, from which she profited financially.  (R.T. 2/5/14, at 121.) And she lied about her income on an application to reduce her student loan payments, reflecting her willingness to be untruthful when necessary for her personal gain.  (Tr. Exh. 472.)  Further, Andriano was a high-functioning and very capable person who married, raised a family, and developed a successful career as a property manager, which she was able to maintain despite the stress of caring for her terminally-ill husband and two small children, belying any claim that she disintegrates and behaves impulsively under stress.

Andriano also carefully planned and executed Joe's murder.  Weeks before Andriano murdered Joe, she used a fictitious name and shipping address and a falsified business license to purchase sodium azide over the internet.  (PCR Response, Exhs. EE (R.T. 9/8/04), at 65–68; GG (R.T. 9/21/04), at 29–115; HH (R.T. 9/22/04), at 22–146; O (R.T. 9/29/04), at 3–49.)  Concurrently, she contacted several life-insurance companies and applied for a life insurance policy on Joe, falsely reporting that he did not have cancer. *Andriano*, 215 Ariz. at 502, ¶ 20, 161 P.3d at 545.  Andriano offered to pay two men to impersonate Joe so he could pass the physical exam necessary for the insurance.  *Id.*  During this same time period, she engaged in two extramarital affairs, telling one of the men that her husband had

died of cancer.  *Id.* at 503, ¶ 25, 161 P.3d at 546.

Ultimately, Andriano administered the poison to Joe and, when it did not kill him, created a new plan:  she bludgeoned and stabbed him to death and then staged the murder scene to support a self-defense theory.  *Id.* at 544, ¶ 11, 161 P.3d at 501.  After her arrest, during a break in an interview with police, she contacted a coworker and asked her to dispose of incriminating evidence.  *Id.* at 512, ¶ 76 n.12, 161 P.3d at 555.  That Dr. Wood relied on the foregoing information and still diagnosed Andriano with disorders characterized by impulsivity, reactivity, and an inability to function under stress vastly diminishes the credibility of his opinions.  Andriano has not proved by a preponderance of the evidence that she suffers from the severe mental disorders Dr. Woods diagnosed.

Dr. James' opinions suffer the same foundational problems. First, she relied on data from a deceased prior expert, Dr. Myla Young, which she acknowledged contained multiple errors.  (R.T. 2/10/14, at 14–18, 49.)  Second, she failed to review the trial evidence and become familiar with the facts of Joe's murder.  (*Id.* at 51–52.)  In particular, she was unaware of Andriano's conduct in calling her coworker, in the midst of a stressful police interview, and asking her to dispose of evidence—a fact that weighs heavily against Dr. James' opinion that Andriano's cognitive deficits leave her unable to easily adjust her behavior to changing circumstances.  (*Id.*)  No reasonable juror would have been persuaded by the

opinions of Drs. James or Woods.

### iv. Even if Andriano suffers from one or more significant mental illnesses, they do not explain her conduct in planning and executing Joe's murder.

Although Dr. Pitt arrived at psychological diagnoses that he believes are accurate, he emphasized that diagnostic labels are merely "descriptor[s] to describe a series of symptoms" and do not account for an individual's behavior. (R.T. 2/14/14, at 80.) In other words, a defendant may suffer from a particular mental *disorder*, but that disorder does not necessarily drive the *behavior* in which he engages. In Andriano's case, Dr. Pitt opined that, even assuming that Dr. Woods' diagnostic impressions are correct, Andriano's actions before, during, and after Joe's murder "are not explained by a mental illness" and were not caused by one, but are instead "explained by choices that Wendi Andriano made" and constituted "antisocial and selfish acts designed to benefit" her alone. (*Id.* at 81, 84, 94.)

Dr. Woods did not materially dispute this portion of Dr. Pitt's opinion. He did not disagree with Dr. Pitt that Andriano *chose* to commit thefts, kill her husband, and try to escape criminal liability; he simply referred to those choices as "damaged"—a label that could apply to any person's choice to engage in an antisocial act. (R.T. 2/5/14, at 122, 130–32, 137.) He further agreed with Dr. Pitt that Andriano knew it was wrong to kill her husband. (R.T. 2/5/14, at 122–23, 135–36.) And Dr. Woods agreed that Andriano was responsible for her actions

notwithstanding any disorder from which she may suffer.  (*Id.* at 142–43.)

Instead of responding to Dr. Pitt's assertion that Andriano's purported mental illness does not explain her behavior, Andriano chastises him for applying what she considers an inappropriately narrow view of mitigating evidence.[19] (Closing memorandum, at 6–8.)   But whether Andriano's purported mental illnesses explain her conduct is critical in this, and any other, capital case because the absence of an explanatory relationship with the offense severely reduces a mental disorder's mitigating weight.  *See, e.g., Styers*, 227 Ariz. at 189, ¶ 12, 254 P.3d at 1135.  A defendant's knowledge that his conduct is wrong diminishes the disorder's weight even further.  *See Pandeli*, 215 Ariz. at 533, ¶ 81, 161 P.3d at 576 (court considers claim of mental impairment offered as non-statutory mitigation "in proportion to a defendant's ability to conform or appreciate the wrongfulness of his conduct").  And unlike non-statutory mitigation, the A.R.S. § 13–751(G)(1) statutory mitigating factor, to the extent Andriano still alleges it

---

[19] Andriano also quibbles with Dr. Pitt's style of interviewing her and his purported "personal attacks" against her credibility. (Petition, at 50–51.) Dr. Pitt is published on the topic of video forensic interviewing and trains psychiatrists and law-enforcement officers on interviewing techniques.  (R.T. 2/14/14, at 116–17.) And unlike Drs. Woods and Hopper, Dr. Pitt recognized that he was not *treating* Andriano but was instead *evaluating* her objectively, and was not "there to make her a buddy." (*Id.* at 110–11.)  Further, Andriano's credibility was squarely at issue in this proceeding, as all experts except Dr. James relied on their interviews with her, as well as the numerous versions of Joe's murder she has previously given, to formulate their opinions.

applies, requires a defendant to prove a causal nexus.  *See State v. Sansing*, 206 Ariz. 232, 239, ¶ 26, 77 P.3d 30, 37 (2003).

Here, even assuming Andriano suffers the cluster of symptoms her experts describe, including impulsivity, poor judgment, poor memory, and the inability to function under stress, those symptoms do not, for the reasons previously stated, explain her behavior in killing Joe, which involved a calculated plan executed over the course of weeks.  And the fact that Andriano indisputably knew right from wrong further diminishes the weight of any mental-health mitigation.  *See Pandeli*, 215 Ariz. at 533, ¶ 81, 161 P.3d at 576.  Because the weight of Andriano's proffered mental-health mitigation would have been slight, counsel's failure to present it did not prejudice Andriano.

### v. Presenting mental-health evidence would have opened the door to devastating rebuttal evidence.

As previously stated, Patterson withdrew several mitigating factors for the *specific purpose of limiting Dr. Bayless' testimony* and preventing the State from introducing devastating rebuttal evidence, such as her conduct in stealing from several employers through complicated fraudulent schemes.  Presenting mental-health mitigation would have placed at issue various aspects of Andriano's character to which her prior thefts (including one that occurred after trial, in the Maricopa County Jail) were relevant, including her ability to plan, to engage in complicated thought processes, and to obey social norms.  It also would have

placed at issue her mental-health history, which, through counseling records, is inherently tied to at least one of her thefts.  (PCR Hrg. Exh. 46.)  Evidence that Andriano engaged in scheming, fraudulent behavior long before Joe's murder would lay waste to any claim that her purported mental-health difficulties rendered her impulsive or reactive and influenced her decision to kill Joe.

Further, presenting mental-health evidence would have directly resulted in the admission of Dr. Bayless' full report, which recognizes her antisocial traits, discusses at length various maladaptive behaviors, and communicates Dr. Bayless' belief that she is an untruthful, manipulative person.  (PCR. Hrg. Exh. 6.005.)  Or, equally destructive, it would have led to the admission of a comprehensive rebuttal evaluation such as that conducted by Dr. Pitt which, like Dr. Bayless' report, does not ignore Andriano's prior bad acts.  The omission of mitigating evidence is not prejudicial where, as here, that evidence would open the door to compelling rebuttal.  *See, e.g., Belmontes*, 558 U.S. at 387–88.  Andriano has not shown *Strickland* prejudice.

### c. Andriano has failed to show a reasonable probability that, had counsel presented the omitted mitigation, the jury would have imposed a life sentence after balancing the aggravation, mitigation, facts and circumstances of the crime, and rebuttal evidence.

As previously discussed, Andriano fails to provide any analysis of how a jury would have balanced the aggravating, mitigating, and rebuttal evidence, and

supplies no explanation why a reasonable probability exists that a jury would have imposed a life sentence after considering all these factors. *See Pinholster*, 131 S. Ct. at 1408, 1410; *Belmontes*, 558 U.S. at 20; *Wiggins*, 539 U.S. at 534. And Andriano could not have made that showing, even if she had tried, because even if she endured a "harrowing childhood" and suffers from mental disorders, that mitigation is insufficiently substantial to warrant leniency under the facts of this case.

First, the aggravation was extraordinarily weighty. Although the jurors found only one aggravating factor—cruelty under A.R.S. § 13–751(F)(6)—the strength and quality of the aggravation, not merely the number of factors proven, is relevant. *State v. Tucker*, 215 Ariz. 298, 323, ¶ 120, 160 P.3d 177, 202 (2007). Andriano poisoned Joe, pretended to call 911 when he became ill, and watched as he suffered physically for approximately 45 minutes, wondering why help was taking so long to arrive. *Andriano*, 215 Ariz. at 511, ¶ 65, 161 P.3d at 554. During this period, Joe "vomited at least twice, was too weak to sit or stand, and was having difficulty breathing." *Id.* When it became clear Joe was not going to die, Andriano formulated a new plan, excusing the friend she had asked over for assistance and striking him at least 23 times in the back of the head with a bar stool. *Id.* at 511, ¶ 66, 161 P.3d at 554. Joe's hands and wrists bore defensive wounds, reflecting his consciousness for at least some of the attack and his

attendant knowledge that "his wife was attacking him as he lay on the floor, unable to defend himself." *Id.* Joe undoubtedly experienced significant physical and emotional pain. *See* A.R.S. § 13–751(F)(6).

Balanced against this compelling aggravation is the mitigation presented at trial, consisting of the stress of Joe's cancer, Andriano's good deeds and strong religious convictions, her status as a sexual abuse and domestic-violence victim, her efforts to be a good mother, her good behavior while incarcerated, her lack of prior convictions, her potential for rehabilitation and lack of future dangerousness, and her execution's impact on her family and friends. *Andriano*, 215 Ariz. at 511–12, ¶¶ 69–77, 161 P.3d at 554–55. Both the Arizona Supreme Court and the jury have found this mitigation insufficiently substantial to warrant leniency. *Id.* at 512–13, ¶ 78, 161 P.3d at 555–56. The newly-developed mitigation—consisting of, at best, additional sexual abuse, childhood poverty, an oppressive religious environment, and various mental disorders—does not increase the quality or strength of Andriano's mitigation. *See id.* As discussed above, the evidence does not explain the murder, vastly diminishing the weight to which it is entitled. *See, e.g.,* Styers, 227 Ariz. at 189, ¶ 12, 254 P.3d at 1135. And the childhood-related mitigation is remote in time to the offense and thus not particularly compelling. *See Greene*, 192 Ariz. at 442, ¶ 51, 967 P.2d at 117.

The State's rebuttal evidence further shows the mitigation's insignificance.

At trial, the State presented rebuttal testimony from Joe's sister, Jana Clayton, and a former colleague, Timothy Lee, who described several instances on which Andriano had engaged in arguably poor parenting.  (Response to PCR, Exh. BBB (R.T. 12/14/04), at 119–32.)  Likewise, Dr. Bayless testified that Andriano was a manipulative person and that her suicide attempt, good behavior in prison, frequent tears, and general portrayal of herself as a victim were all goal-directed actions. (Response to PCR, Exh. CCC (R.T. 12/15/04), at 10–16.)   And two detention officers testified about Andriano's reputation as a "control freak" in jail who upset other inmates; their belief that Andriano was in charge of the other inmates; Andriano's discipline for possessing contraband; occasions on which the psychiatric unit's staff were caught giving her preferential treatment or violating policy to accommodate her; and inappropriate contact between Andriano and her transsexual cellmate.  (Response to PCR, Exh. BBB (R.T. 12/14/04), at 48–111.)

In addition to the foregoing, evidence of Andriano's thefts from several prior employers and Dr. Bayless' full report, with its reference to Andriano's antisocial acts, are now relevant and admissible given her mitigation evidence and put the lie to any claim that she behaved impulsively or engaged in abnormal behavior in killing Joe.   Rather, such evidence shows that Andriano is a cold, devious, scheming person who will do anything for her own personal gain, which is fully consistent with the well-planned and calculated manner in which she killed Joe.

Moreover, testimony from the State's rebuttal mental-health experts were far more reasonable, objective, and persuasive than that offered by Andriano's experts, and their opinions were far more consistent with her available history.

Given the foregoing, on balance, any reasonable juror would have found Andriano's mitigation insufficiently substantial to warrant leniency in light of the compelling aggravation. Andriano has failed to show *Strickland* prejudice and this Court should dismiss her ineffective-assistance claim.

## B. Claim 2: Alleged Conflict of Interest Claim

Relying on *Cuyler v. Sullivan*, 446 U.S. 335 (1980), Andriano contends that second-chair counsel DeLozier labored under a conflict of interest because he simultaneously represented her in her capital murder trial (which required him to investigate her upbringing and present as mitigation any abusive or neglectful parenting to which she was exposed) and the Ochoas in guardianship and adoption proceedings involving Joe and Andriano's children, N. and A. (which required him to present the Ochoas in the most favorable light possible). The State renews its argument that this claim is precluded and, alternatively, is not a colorable claim for relief.

### 1. Preclusion.

As the State previously argued in its Response to Andriano's Petition, conflict of interest claims are cognizable on direct appeal. *See State v. Moore*,

222 Ariz. 1, 16, ¶¶ 81–83, 213 P.3d 150, 165 (2009) (considering and rejecting claim that counsel had a  conflict of interest where he had formerly represented a statutory victim who possessed information potentially helpful to defendant). Andriano was aware that DeLozier was also representing her parents in the guardianship proceeding. Andriano proffered evidence at the hearing that DeLozier simultaneously represented Andriano and her parents in that proceeding for a period.  In addition, the evidence that DeLozier had represented the Ochoas in the guardianship proceeding was brought to this Court's attention during Andriano's trial, and was included in the record. (R.T. 12/7/04, at 15-26; R.T. 12/8/04, at 6-7.)  Andriano should have raised her conflict of interest claim at trial or on direct appeal.   Because she did not do so, it is precluded under Rule 32.2(a)(3).

### 2.  The claim fails on the merits.

Even if not precluded, Andriano's claim fails on the merits. As a preliminary matter, the Arizona Supreme Court has interpreted *Cuyler v. Sullivan*, 446 U.S. 335 (1980), as limited to the joint representation of co-defendants, which is not at issue here.  *See State v. Martinez- Serna*, 166 Ariz. 423, 425, 803 P.2d 416, 418 (1990); *State v. Jenkins*, 148 Ariz. 463, 465, 715 P.2d 716, 718 (1986). The United States Supreme Court recently noted that some circuits have "unblinkingly" applied *Sullivan* to "all kinds of alleged attorney ethical conflicts."  *Mickens v.*

*Taylor,* 535 U.S. 162, 174–75(2002) (citation and quotation omitted).  The Court made clear, however, that it had never extended the *Sullivan* standard to conflicts other than those arising from joint representation at trial. *Id. Mickens* itself involved a successive representation conflict, and the Court assumed that the case properly proceeded under *Sullivan* in the lower courts. *Id.* The Court cautioned, however, that its decision should not be misconstrued as extending the *Sullivan* rule to conflicts other than joint representation: "In resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation. Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question." *Id.* at 176.

Contrary to Andriano's claim, the standard under *Strickland* should be applied to this conflict of interest claim.  However, regardless of whether this Court applies *Strickland* or *Sullivan*, Andriano has not met her burden of proving ineffective assistance of counsel.

Even if the *Sullivan* standard is controlling – which creates a lesser burden than the *Strickland* standard, Andriano is not entitled to relief because she has failed to show that DeLozier possessed an actual conflict of interest that adversely affected her representation. A defendant's constitutional right to the effective assistance of counsel may be violated when his attorney operates under a conflict

of interest.  *See Martinez- Serna*, 166 Ariz. at 418, 803 P.2d at 425. However, "absent an objection at trial, [a] defendant must demonstrate that (1) an actual conflict existed; and (2) that the conflict had an adverse effect on the representation."  *Id.*; *see Sullivan*, 446 U.S. at 349 (defendant must show that counsel "actively represented conflicting interests" to  establish constitutional violation).  "In order to establish an actual conflict of interest, a defendant must demonstrate that some plausible alternative defense strategy might have been pursued." *See Martinez-Serna*, 166 Ariz. at 418, 803 P.2d at 425 (quotations and alterations omitted). The defendant need not show that the strategy would have been successful, but merely that it was a viable alternative. *Id.*  The defendant must also establish that "the alternative defense was inherently in conflict with the attorney's other loyalties or interests." *Id.*

DeLozier testified at the evidentiary hearing any purported conflict of interest was not actualized at the time he represented Andriano.  "I didn't see a real conflict at the time between the two [Andriano and the Ochoas]," DeLozier stated. (R.T. 2/10/04 at 147-48.)  He testified that at the time of his representation he "felt comfortable" in both cases, and that the interests of Andriano and the Ochoas were aligned. (*Id.*).  With respect to the accusations raised by the Lambeths during the guardianship proceedings, DeLozier stated, "[T]here's always allegations in these kind of cases," and "[I]t was not anything unusual as

far as I was concerned." (*Id*. at 74-75.)   Gary Lowenthal admitted that the Lambeths raised accusations only after the Ochoas had reported the Lambeths to Child Protective Services. (R.T. 2/11/14, at 176-179; *See also* Exh. 97 (Dr. Brian Yee's report).)  The Ochoas reported the Lambeths to CPS after they discovered their grandchildren had "excoriation" on the buttocks area. (Exh. 97.)  Therefore, it requires an unreasonable leap of logic to conclude that this evidence reflected poorly on the Ochoas, and would raise an inference that Alejo Ochoa was a child molester. Yet, that is the argument Andriano raises.

In addition, Andriano wanted the Ochoas to have visitation or custody rights with her children; thus, their interests were aligned. (Exh. 174, at 70-72.) DeLozier also testified that no one ever told him that Andriano suffered any type of abuse, including sexual abuse, from the Ochoas. (R.T. 2/10/14 at 149-50.) Therefore, no actual conflict of interest was realized.  Nothing substantive came to DeLozier's attention during his representation of the Ochoa's that would have caused a conflict with his duty of loyalty to Andriano.

Moreover, no evidence has been presented that Attorney Daphne Budge, who replaced DeLozier as counsel of record for the Ochoas in the Maricopa County guardianship proceeding in July 2002 and continued representing them until November 2004, discovered any evidence that the Ochoas subjected Andriano or any other child to abuse.  Budge had no duty of loyalty to Andriano.

Dr. Brian Yee, a psychologist, was appointed by the Maricopa County Superior Court to provide a report and opinion on the guardianship proceedings of Andriano's children. Dr. Yee found no evidence that Andriano's children were abused, and opined that while the Lambeths should be granted custody of the children, the Ochoas were fit to have visitation rights with the children. (Exh. 97.) In addition, Dan Patterson, who did not have a duty of loyalty to the Ochoas, did not discover evidence that the Ochoas had abused Andriano.  And as previously argued, the various mental health professionals, as well as Dr. Murphy – who interviewed the Ochoas – never discovered any evidence of this alleged abuse. Therefore, a plausible alternative mitigation strategy did not exist at the time DeLozier represented Andriano.  No evidence has been presented that DeLozier failed to investigate potential mitigation for Andriano's case because of his duty of loyalty to the Ochoas. Rather, he simply did not have knowledge that this evidence existed. Andriano cannot charge her trial counsel with knowing information that she either chose to conceal from them, or simply did not exist at the time of her trial. Therefore, Andriano has not shown that an actual conflict existed.  But even if a conflict existed, Andriano has failed to show that it had an adverse effect on the representation.  Relief must be denied.

Furthermore, trial counsel presented  evidence of the oppressive religious environment in which Andriano was raised, of Alejo Ochoa's angry outbursts and

arguably abusive behavior, and of Donna Ochoa's alleged neglect.   The evidence Andriano now  claims  counsel should have presented is cumulative to that evidence.   Although counsel did not present evidence that Alejo may have sexually abused Andriano, such evidence is speculative and refuted by Andriano's own testimony, in which she denied under oath that Alejo had ever touched her inappropriately. The Ochoas never informed DeLozier of any sexual improprieties committed by Alejo Ochoa. Andriano never informed DeLozier that she had suffered sexual abuse from Alejo.  Therefore, Andriano has failed to show that a plausible alternative mitigation strategy existed at the time DeLozier represented Andriano. Thus, even under the *Sullivan* standard, Andriano has not met her burden. Similarly, since Andriano cannot prove that she was prejudiced by trial counsel's failure to investigate an alternative mitigation strategy, relief is inappropriate under *Strickland*.

## IV. CONCLUSION

Based on the foregoing reasons, Andriano has failed to meet her burden on each claim.  This Court should deny Andriano's petition for post-conviction relief.

RESPECTFULLY SUBMITTED this 31st day of July, 2014.

Thomas C. Horne
Attorney General

Jeffrey A. Zick
Chief Counsel

/s/ Gregory Hazard
Assistant Attorney General
Attorneys for Respondent

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2014, I electronically filed the foregoing with the Clerk of the Maricopa County Superior Court by using the Court's eFiling Online System.

Copies of the foregoing were deposited for mailing this date to:

Allen A. Arntsen
Stephan J. Nickels
Matthew R. Lynch
FOLEY & LARDNER, LLP
150 East Gilman Street
Madison, Wisconsin 53703

Scott M. Bennett
COPPERSMITH SCHERMER & BROCKELMAN, PLC
2800 North Central Avenue, Ste. 1200
Phoenix, Arizona 85005

Attorneys for Petitioner

Juan Martinez
Deputy County Attorney
MARICOPA COUNTY ATTORNEY'S OFFICE
301 West Jefferson, 4th Floor
Phoenix, Arizona 85003

Attorney for the State

/s/ Jennifer Mathis
Legal Secretary
Criminal Appeals/
Capital Litigation Sections
1275 West Washington
Phoenix, Arizona  85007–2997
Telephone: (602) 542–4686

4089857

# EXHIBIT VVVVVVVVVV

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
08/06/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          08/04/2014


                                              CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                    K. Sotello-Stevenson
                                                      Deputy



STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD
                                        GREGORY MICHAEL HAZARD
                                        JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)            JAMES J BELANGER
                                        SCOTT M BENNETT
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH
                                        JODI FOX
                                        ALLEN A ARNTSEN
                                        DANIEL G DOWD

                                        COURT ADMIN-CRIMINAL-PCR
                                        MAUREEN MANNING
                                        COHEN KENNEDY DOWD &
                                        QUIGLEY, P.C.
                                        THE CAMELBACK ESPLANADE I
                                        2425 EAST CAMELBACK RD ST 1100
                                        PHOENIX AZ  85016
                                        LAWRENCE J FOX
                                        DRINKER BIDDLE & REATH LLP
                                        ONE LOGAN SQUARE
                                        STE. 200
                                        PHILADELPHIA PA  19103-6996



**MOTION DENIED**


The Court has received and considered:

Docket Code 187                    Form R000A                    Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          08/04/2014


- Motion of the Ethics Bureau at Yale for Leave to File Amicus Curiae Brief in Support of the Petitioner (filed in duplicate on June 5, 2014)
- Response in Opposition to the Ethics Bureau at Yale's Motion for Leave to File Amicus Brief in Support of the Petitioner (filed on June 11, 2014)
- The Ethics Bureau at Yale's Reply in Support of its Motion for Leave to File Amicus Curiae Brief in Support of the Petitioner


The Ethics Bureau at Yale ("Ethics Bureau") seeks leave to file an amicus curiae brief "in support of the Petitioner, Wendi Andriano." The Court is appreciative of the interest of the fourteen future lawyers and their clinic adviser and is mindful of its responsibilities.

Rule 31.25(a), Ariz.R.Crim.P. applies to appeals from Superior Court and makes no provision for use in connection with a petition for post-conviction relief. By its terms, the Rule applies to an appeal from superior court, with a reference in Rule 31.25(b) to the time applicable to an *amicus* brief for a special action petition. Where permitted, an *amicus* brief requires either (1) written consent of all parties or (2) leave of court. Rule 31.24(a).

In connection with the defendant's case, written consent was not provided; in fact, the State has filed its opposition. Consequently, an *amicus* brief may only be filed with the court's permission.

Arizona courts have permitted *amicus curiae* to file a brief to address issues of statewide importance *(State v. Arellano,* 213 Ariz. 474, 143 P.3d 1015(2006)), to address constitutional issues *(State v. Fowler,* 156 Ariz. 408, 409-10, 752 P.2d 497, 498-99 (Ariz.App.,1987)), to provide historical background *(Schecter v. Killingsworth,* 93 Ariz. 273, 278, 380 P.2d 136, 139 (1963)), and to provide supplemental background and context for the court's decision *(State v. McCall,* 139 Ariz. 147, 677 P.2d 920 (1983)).

Arizona courts have declined to permit *amicus* counsel to raise issues which have not been raised by the parties *(Town of Chino Valley v. City of Prescott,* 131 Ariz. 78, 84, 638 P.2d 1324, 1330 (1981)), to inject new issues into a case on appeal *(Id.; City of Tempe v. Prudential Ins. Co. of America,* 109 Ariz. 429, 432, 510 P.2d 745, 748 (1973)), or to create, extend, or enlarge issues beyond those raised and argued by the parties *(Tempe, id)*.

The Court held a multiple-day evidentiary hearing in February, 2014. At the conclusion of the hearing, the Court permitted counsel to file sequential written closing arguments. On June 2, 2014 Defendant filed her initial closing argument ("Petitioner's Post-Hearing Memorandum in Support of Petition for Post-Conviction Relief"). The Court granted an extension to the State to

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    08/04/2014

file its written closing memorandum no later than July 31, 2014 and the Petitioner a rebuttal/final closing memorandum no later than August 22, 2014.  In its initial closing, the defendant argued that "Post-conviction relief is warranted under *Cuyler* because attorney DeLozier suffered from a debilitating conflict of interest."  The defendant specifically claimed that "DeLozier's actual, active conflict of interest adversely affected Wendi's representation."

In its brief, the Ethics Bureau  argues "(1) Lawyers owe their clients fiduciary obligations, the most important of which is the duty of loyalty; (2) Conflicts of interest compromise the duty of loyalty, and thus pose a particularly insidious threat to the lawyer-client relationship; (3)  Mr. DeLozier labored under serious conflicts of interest in his representation of Ms. Andriano; and (4) Mr. DeLozier's conflict of interest also denied Ms. Andriano her constitutional right to effective representation, for which she is entitled to relief."

The Court is aware of no authority that permits a third party, even an *amicus curiae*, to appear in order to support, or bolster, the closing argument of either party.

**IT IS THEREFORE ORDERED** denying the Motion of the Ethics Bureau at Yale for Leave to File Amicus Curiae Brief in Support of the Petitioner.

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

# EXHIBIT WWWWWWWWWW

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Krane, Deputy
8/8/2014 1:57:26 PM
Filing ID 6036903

Scott M. Bennett (022350)
Coppersmith Brocklelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@cblawyers.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 E. Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

| | | |
|---|---|---|
| State of Arizona, | ) | No. CR2000-096032-A |
| | ) | |
| Respondent, | ) | **UNOPPOSED MOTION FOR** |
| v. | ) | **EXTENSION OF TIME TO FILE** |
| | ) | **MS. ANDRIANO'S FINAL** |
| Wendi Elizabeth Andriano, | ) | **CLOSING MEMORANDUM** |
| | ) | |
| Petitioner. | ) | (Hon. Brian Ishikawa) |
| | ) | |
| | ) | |
| | ) | |

Wendi Andriano, the petitioner in this matter, moves for a two-week extension of the deadline for her rebuttal brief.  The extension would move the deadline from the current August 22 to September 5, 2014.

{00135213.1 }

1        At the conclusion of the evidentiary hearing in this capital post-conviction relief

2  case, this Court accepted the parties' suggestion that a schedule of 40 days for Petitioner's

3  opening brief (running from the date the transcripts were completed), 40 days for the

4  State's response, and 20 days for Petitioner's reply would be sufficient.  After Ms.

5  Andriano timely filed her opening brief, this Court granted the State an additional 17 days

6  to respond to accommodate work conflicts that impeded the State's ability to timely

7  complete the response.

8        In part because of the change in the timetable for the State's response, Petitioner's

9  counsel now find themselves in a similar situation.  Since the hearing concluded, several

10  time conflicts have arisen during the current window for Petitioner to prepare its reply to

11  the State's 74-page brief.  Those conflicts will impede the ability of Petitioner's counsel to

12  meet the deadline.  For the attorneys with primary drafting responsibility for the reply,

13  these conflicts include:

14
15
- an appellate response brief due on August 25 that cannot be started until August 11 (the date the appellant's brief is due);

16
17
- a motion to dismiss due August 21;

18
- responses to extensive discovery requests in two civil cases; and

19
20
- other time-sensitive discovery obligations in other matters that could jeopardize trial dates in other cases if delayed.

21        In addition, one of Ms. Andriano's primary attorneys for this matter is unavailable

22  on maternity leave; another has been unavailable to work on the reply due to a previously

23  scheduled family vacation followed by an out-of-state mediation and expert deposition;

24  and another is preparing for a week-long civil trial commencing August 11.

25

26

1    A two-week extension for the final closing memorandum should provide sufficient

2  time for available counsel for Ms. Andriano to prepare the reply brief in this capital

3  proceeding.

4    Gregory Hazard, one of the attorneys for the State in this matter, has confirmed that

5  the State has no objection to this request.

6    A proposed order accompanies this motion.

7    Respectfully submitted August 8, 2014.

8                                     COPPERSMITH BROCKELMAN PLC

9
                                     By /s/ Scott M. Bennett
10                                        James J. Belanger
                                          Scott M. Bennett
11

12                                   FOLEY & LARDNER LLP
                                          Allen A. Arntsen, *Pro Hac Vice*
13                                        Stephan J. Nickels, *Pro Hac Vice*
                                          Matthew R. Lynch, *Pro Hac Vice*
14

15                                        *Attorneys for Petitioner*

16

17
    ORIGINAL e-filed August 8, 2014,
18  with the Clerk of the Maricopa County Superior Court

19
    COPIES mailed on August 8, 2014, to:
20
    Hon. Brian Ishikawa
21  Maricopa County Superior Court
    1810 Lewis Street
22  Mesa AZ 85210-6235
23
    Gregory Hazard
24  Office of the Attorney General
    1275 W. Washington
25  Phoenix, AZ 85007-2997
    *Attorneys for the State of Arizona*
26

{00135213.1 }                                    3

1

2   Ms. Lacey Stover Gard
    Office of the Attorney General
3   400 W. Congress, Suite S-315
    Tuscon, AZ 85701-1367
4   *Attorneys for the State of Arizona*

5
    */s/ Carol Keesee*_____
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT XXXXXXXXXX

MICHAEL N JEANES, CLERK
BY *R. Romero* DEP
FILED

14 AUG 18  AM 8: 34

1   Scott M. Bennett (022350)
2   Coppersmith Brockelman PLC
    2800 North Central Avenue, Suite 1200
3   Phoenix, Arizona 85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
5   sbennett@cblawyers.com

6   Allen A. Arntsen, Admitted *Pro Hac Vice*
    Stephan J. Nickels Admitted *Pro Hac Vice*
7   Matthew R. Lynch Admitted *Pro Hac Vice*
8   Foley & Lardner LLP
    150 E. Gilman Street
9   Madison, WI 53703
10  (608) 257-5035 (office)
    (608) 258-4258 (fax)
11  aarntsen@foley.com

12  *Attorneys for Petitioner Wendi Andriano*

13              SUPERIOR COURT OF ARIZONA
14                COUNTY OF MARICOPA

15  State of Arizona,              )    No. CR2000-096032-A
16                                 )
                   Respondent,     )    **ORDER GRANTING EXTENSION**
17  v.                             )    **OF TIME TO FILE MS.**
                                   )    **ANDRIANO'S FINAL CLOSING**
18  Wendi Elizabeth Andriano,      )    **MEMORANDUM**
19                                 )
                   Petitioner.     )    (Hon. Brian Ishikawa)
20                                 )
21  _____)

22      Based on the unopposed motion by petitioner Wendi Andriano, and for good cause,

23  IT IS ORDERED extending Ms. Andriano's deadline to file her final closing

24  memorandum to September 5, 2014.

25  DATED: 08-14-14                    _____
26                                     Hon. Brian Ishikawa

{00135222.1 }

# EXHIBIT YYYYYYYYY

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
E. Masis, Deputy
9/5/2014 1:33:37 PM
Filing ID 6095468

Scott M. Bennett (Bar No. 022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@cblawyers.com

Allen A. Arntsen, admitted *pro hac vice*
Stephan J. Nickels, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
Jodi K. Fox, admitted *pro hac vice*
Krista J. Sterken, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (office)
(608) 258-4258 (fax)

*Attorneys For Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA | CASE NO:  CR2000-096032-A |
| RESPONDENT, | |
| v. | **PETITIONER'S POST-HEARING REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF** |
| WENDI ELIZABETH ANDRIANO | |
| PETITIONER. | |

{00137731.1 }

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................... v

INTRODUCTION ............................................................................................... 1

SUMMARY OF ARGUMENT ........................................................................... 3

ARGUMENT ...................................................................................................... 4

I.   WENDI IS ENTITLED TO RELIEF ON HER CONFLICT OF INTEREST CLAIM ....................................................................................................... 4

     A.   The Conflict Claim is Properly First Raised in a Petition for Post-Conviction Relief ........................................................................... 5

     B.   *Sullivan* Applies to Wendi's Conflict Claim .................................... 6

     C.   DeLozier Had Several Actual Conflicts of Interest ........................... 7

          1.   DeLozier's Responsibility to Wendi to Investigate and Present Information Harmful to the Ochoas Created an Actual Conflict ............................................................................. 7

          2.   DeLozier Never Sought or Obtained Wendi's Informed Consent to the Conflict ................................................................ 10

          3.   DeLozier's Failure to Appreciate the Conflict at the Time of Wendi's Representation is Irrelevant to Whether the Conflict Existed ........................................................................... 11

     D.   Because of the Conflicts, DeLozier Failed to Pursue the Plausible Alternative Defense Strategy of Investigating and Presenting Wendi's History of Childhood Abuse ........................................................ 12

          1.   A Plausible Alternative Defense Strategy Existed at the Time of DeLozier's Representation .......................................................... 13

               a.   Multiple Sources Informed DeLozier of Their Suspicions of Wendi's Childhood Trauma and Abuse ......... 13

               b.   DeLozier's Role on the Defense Team and Monopoly on Information About the Ochoas Compounded the Harm From the Conflicts ......................................................... 14

{00137731.1 }                                    i

**TABLE OF CONTENTS (cont'd)**

Page

      2.     DeLozier's Failure to Appreciate the Significance of the Abuse Allegations Highlights the Impact of the Conflict of Interest. ........................................................................... 15

      3.     Wendi's History of Childhood Abuse Is Not Cumulative .............. 17

II.   TRIAL COUNSEL'S SUPERFICIAL MITIGATION INVESTIGATION FELL BELOW PREVAILING PROFESSIONAL NORMS ................................ 18

    A.   It is Necessary to Consider the Guidelines in Assessing the Reasonableness of Trial Counsel's Mitigation Investigation .................... 19

    B.   Trial Counsel's Failure to Investigate Potential Childhood Trauma Was Not Reasonable ................................................................... 22

      1.     The State Misstates the Standard of Care for Investigating Childhood Trauma ........................................................... 22

           a.     The State's Reliance Upon Patterson to Establish the Standard of Care is Unreasonable and Mischaracterizes the Record ................................. 22

           b.     The Primary Case Relied Upon by the State Supports Petitioner's Arguments, Not the State's............................... 24

      2.     Even if Evaluated Under the Incorrect Standard of Care Asserted by the State, Trial Counsel Were Ineffective .................. 25

           a.     Trial Counsel Knew That Wendi Had Likely Suffered Childhood Sexual Abuse, But Did Nothing to Investigate ........................................................... 25

           b.     The Fact That the Perpetrators and the Victim of Childhood Abuse and Neglect Did Not Unilaterally Volunteer It Does Not Relieve Trial Counsel of the Duty to Investigate ................................................ 28

    C.   Trial Counsel's Mental Health Investigation Was Unreasonable ............... 30

      1.     Trial Counsel Failed to Provide Any Social History to Dr. Rosengard ........................................................................ 31

**TABLE OF CONTENTS (cont'd)**

Page

2.  Even Without Any Social History Information, Dr. Rosengard Observed Symptoms and Made Tentative Diagnoses that Warranted Further Mental-Health Investigation .......................... 33

3.  Trial Counsel Obtained Additional Mental Health Information After Dr. Rosengard's Report that Warranted Further Mental-Health Investigation ................................ 34

III.  TRIAL COUNSEL'S DEFICIENT MITIGATION INVESTIGATION RESULTED IN PREJUDICE .......................... 36

A.  The Evidence of Childhood Trauma and Mental Health Was Credible and Powerful Mitigating Evidence ............................. 36

1.  The State Offers No Reasonable Grounds for Disregarding the Evidence of Wendi's Childhood Trauma Brought Forth at the Evidentiary Hearing .................................. 36

a.  The State Does Not Address the Full Scope of the Childhood Trauma Suffered by Wendi ............................ 37

b.  The State Fails to Offer Any Reasonable Basis to Disbelieve that Alejo Molested Wendi ............................ 39

c.  The State Does Not Meaningfully Refute Dr. Hopper's Conclusions Regarding the Effects of Wendi's Childhood Trauma ............................ 42

2.  The Mental Health Evidence Was Credible and Powerful Mitigation ............................ 44

B.  As this Court Has Already Found, Mitigating Evidence of Wendi's Traumatic Childhood and Psychiatric Disorders is Not Cumulative and Could Have Resulted in a Different Sentence ............................ 48

1.  Evidence of Wendi's Traumatic Childhood and Psychiatric Disorders is Not Cumulative of Evidence Presented at Trial ......... 48

2.  There is a Reasonable Probability That at Least One Juror Would Have Struck a Difference Balancing in Weighing the Mitigating Evidence Against the Aggravating Evidence ................ 52

{00137731.1 }

iii

PETITIONER'S POST-HEARING REPLY MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

**TABLE OF CONTENTS (cont'd)**

<u>Page</u>

CONCLUSION ............................................................................................................... 55

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Babbitt v. Calderon,*
    151 F.3d 1170 (9th Cir. 1998) ...................................................... 30

*Bobby v. Van Hook,*
    558 U.S. 4 (2009).......................................................................... 20

*Correll v. Ryan,*
    539 F.3d 938 (9th Cir. 2008) ................................................... 21, 52

*Cuyler v. Sullivan,*
    446 U.S. 355 (1980)........................................................... 5, 6, 7, 18

*Doe v. Roe,*
    191 Ariz. 313, 955 P.2d 951 (1998) ....................................... 29, 40

*Duckett v. Mullin,*
    306 F.3d 982 (10th Cir. 2002) ...................................................... 30

*Gregg v. Georgia,*
    428 U.S. 153 (1976)...................................................................... 24

*Grisby v. Blodgett,*
    130 F.3d 365 (9th Cir. 1997) ........................................................ 29

*Hamilton v. Ayers,*
    583 F.3d 1100 (9th Cir. 2009) ...................................................... 35

*Lackey v. Johnson,*
    116 F.3d 149 (5th Cir. 1997) ........................................................ 30

*Leon v. Ryan,*
    No. CV 11-0129-TUC-BPV, 2014 U.S. Dist. LEXIS 9587
    (D. Ariz. Jan. 24, 2014)................................................................ 40

*Mickens v. Taylor,*
    535 U.S. 162 (2002)........................................................................ 7

*Padilla v. Kentucky,*
    559 U.S. 356 (2010)...................................................................... 20

*Porter v. McCollum,*
    558 U.S. 30 (2009)...................................................................................... 55

*Puiatti v. Secretary, Florida Department of Corrections,*
    732 F.3d 1255 (11th Cir. 2013) ................................................... 24, 25, 29

*State v. Bocharski,*
    218 Ariz. 476, 189 P.3d 403 (2008) ........................................................ 21

*State v. Jenkins,*
    148 Ariz. 463, 715 P.2d 716 (1986) ..................................................... 6, 7

*State v. Martinez-Serna,*
    166 Ariz. 423, 803 P.2d 416 (1990) .......................................................... 7

*State v. Moore,*
    222 Ariz. 1, 213 P.3d 150 (2009) ............................................................... 6

*State v. Reimer,*
    189 Ariz. 239, 941 P.2d 912 (Ariz. App. 1997) ...................................... 46

*State v. Salazar-Mercado,*
    234 Ariz. 590, 325 P.3d 996 (2014) ........................................................ 40

*State v. Spreitz,*
    202 Ariz. 1, 39 P.3d 1263 (2002) ............................................................... 2

*State v. Spreitz,*
    39 P.3d 525 (2002).......................................................................................... 5

*State v. Tucker,*
    205 Ariz. 157, 68 P.3d 110 (2003) ....................................................... 5, 6

*Strickland v. Washington,*
    466 U.S. 668 (1984)................................................................................ *passim*

*United States v. Malpiedi,*
    62 F.3d 465 (2d Cir. 1995)........................................................................ 15

*Wiggins v. Smith,*
    539 U.S. 510 (2003)............................................................................... *passim*

*Williams v. Taylor,*
    529 U.S. 362 (2000)............................................................................ 20, 51

*Wong v. Belmontes*,
  558 U.S. 15 (2009) (per curiam)..................................................................47

*Wood v. Georgia*,
  450 U.S. 261 (1981)...............................................................................7, 17

**Statutes**

Ariz. Rev. Stat. § 13-751(G)(1)...................................................................45

Ariz. Rev. Stat. § 13-3620............................................................................40

**Other Authorities**

The American Bar Association Guidelines for the Appointment and
  Performance of Defense Counsel in Death Penalty Cases (the
  "Guidelines") ...............................................................................*passim*

Ariz. R. Prof'l Conduct 1.7 ....................................................................11, 12

Ariz. R. Prof'l Conduct 1.7 cmt. 1 ...............................................................17

Don A. Moore & George Loewenstein, *Self-Interest, Automaticity, and the
  Psychology of Conflict of Interest*, SOCIAL JUSTICE RESEARCH Vol. 17,
  No. 2, at 190-91 (2004).........................................................................11, 17

Don A. Moore, Lloyd Tanlu & Max H. Bazerman, *Conflict of Interest and
  Intrusion of Bias, Judgment and Decision Making*, JUDGMENT &
  DECISION MAKING Vol. 5, No. 1, at 38 (Feb. 2010) .............................11, 16

U.S. Const., Amend. VI.........................................................................5, 6, 17

**INTRODUCTION**

At its core, the State's post-hearing brief seems to misunderstand the purpose of the eight-day evidentiary hearing in this matter.  In its October 30, 2012 Order granting the hearing, this Court determined that the claims addressed in the hearing were "colorable"—that they were claims "which, if taken as true, 'might have changed the outcome'" of the sentencing phase of Wendi's trial.  (Oct. 30, 2012 Order at 4 (quoting *State v. Schrock*, 149 Ariz. 433, 441, 719 P.2d 1049, 1057 (1986)); *see also id.* at 4, 5 (finding claims for ineffective assistance of counsel in failing to investigate certain mitigating evidence and a conflict of interest by trial counsel David DeLozier to be colorable).)  Thus, the purpose of the evidentiary hearing was to assess the truth of those claims, not to reargue whether they were colorable.

Yet the State's post-hearing brief does little to undercut the truth of those claims. The State does not refute the testimony of Wendi's trial counsel regarding their lack of investigation into any potentially negative facts about Wendi's upbringing.  The State does not dispute that David DeLozier, Wendi's trial counsel responsible for developing such mitigation evidence, was representing the primary *perpetrators* of Wendi's childhood abuse and neglect at the same time he should have been investigating those issues in Wendi's case.  The State does not deny that a full social history is fundamental to a proper psychiatric diagnosis—a point upon which every witness to testify on the subject, including the State's expert, agreed.  Nor does it dispute that no mental health expert was provided with such a social history of Wendi until this PCR proceeding, when Drs. George Woods and Jim Hopper evaluated her symptoms in light of her social history.

In fact, the State's brief largely ignores the substance of the evidentiary hearing, other than conclusory assertions that the jury would not have been persuaded by the evidence presented or would have given it little weight.  But this Court presided over the

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1   evidentiary hearing, in which the State had the same opportunity to impeach the

2   testimony and exhibits as it would have upon resentencing.  This Court does not benefit

3   from the State's characterization of the evidence as having "little weight."  Having seen

4   the testimony and evidence firsthand, this Court is well-positioned to determine for itself

5   whether the mitigating evidence presented at the hearing was sufficient to create "a

6   reasonable probability that at least one juror would have struck a different balance" and

7   sentenced Wendi to life in prison rather than death.  *Wiggins v. Smith*, 539 U.S. 510, 537

8   (2003).

9          In lieu of arguing that the claims for post-conviction relief were without basis in

10   fact, the State returns to the same arguments (sometimes word-for-word) that failed to

11   persuade this Court more than two years ago—namely, that the evidence trial counsel

12   failed to develop was cumulative, and that it would not have outweighed the aggravating

13   circumstances and/or some kind of additional rebuttal evidence.  The State even attempts

14   to argue that the conflict claim is precluded as a matter of law for failing to raise it on

15   direct appeal, an argument this Court expressly rejected.  (*See* Oct. 30, 2012 Order at 6

16   ("Finally, regarding defense counsel's alleged conflict of interest, because the issue was

17   not raised at trial and both parties assert facts that were not before the court at trial, it is

18   not an issue that could have been raised on appeal.  *State v. Spreitz*, 202 Ariz. 1, 39, 39

19   P.3d 1263 (2002).").)  The State offers no reasonable grounds to deem any factual aspect

20   of the claims for which this Court granted an evidentiary hearing untrue, and no new

21   basis for this Court to reconsider its prior conclusion that the claims, "if taken as true,

22   'might have changed the outcome' of Wendi's sentence.  (Oct. 30, 2012 Order at 4.)

23          Nor does the State dispute the applicable law.  With one exception,[1] the State does

24   not even attempt to distinguish any of the dozens of United States Supreme Court, Ninth

25   Circuit, and Arizona cases cited in Petitioner's opening brief.  The State simply cites

26   _____

27   [1] *See infra* Argument Section I.B.

{00137731.1 }

28

1   different cases, typically from other federal Circuit Courts of Appeals, all of which are

2   readily distinguishable from the facts at issue here.

3       In sum, evidence regarding Wendi's childhood trauma and subsequent psychiatric

4   disorders is mitigating evidence that could have persuaded at least one juror not to

5   impose the death penalty, but such evidence was not investigated, discovered or

6   presented by her trial counsel despite the well-recognized norms of capital practice and

7   numerous red flags indicating that such an investigation would have been fruitful.

8   <div align="center">**SUMMARY OF ARGUMENT**</div>

9       This reply will first addresses Wendi's claim based on DeLozier's conflict of

10  interest.  Rather than squarely confronting DeLozier's obvious conflict in representing

11  two clients (Donna and Alejo Ochoa) in a child custody proceeding when he owed

12  another client (Wendi) a duty to investigate them for potential child abuse, the State

13  misapplies United States Supreme Court precedent on conflict claims and offers a

14  confusing argument that DeLozier's failure to adequately investigate the Ochoas for

15  potential childhood abuse was excused because he did not know they had abused her.

16  But DeLozier did not know they abused her because he willfully chose not to investigate

17  the issue, despite his duty to do so in Wendi's case and numerous red flags indicating

18  potential abuse.  Had he recognized the numerous red flags and performed the thorough,

19  objective childhood investigation he was duty-bound to perform on Wendi's behalf, he

20  could have discovered the mitigating evidence set forth at the evidentiary hearing.

21      Next, this reply will address the two elements of the ineffective-assistance-of-

22  counsel claim, ineffectiveness and prejudice.  As to ineffectiveness, the State appears to

23  concede (as it must) that Wendi's trial counsel performed almost no investigation into

24  Wendi's traumatic childhood or her subsequent psychiatric disorders.  Instead, it argues

25  that their minimal investigation met the standard of the care, and breezily dismisses the

26  numerous red flags warranting further investigation.  As set forth below, the State's

27  {00137731.1 }   <div align="center">3</div>

28

interpretation of the standard of care directly conflicts with *Wiggins* and a host of other precedent set forth in Petitioner's opening brief, which the State fails to distinguish.  Trial counsel always has a duty to investigate potential mitigating evidence in a capital case, including the "classic" mitigating evidence of childhood abuse and psychiatric disorders. (Petitioner's Post-Hearing Memorandum ("Petr. Br.") at 4-6.)  The red flags provided further reason to conduct a proper investigation, and an indication that such an investigation could be fruitful.

Finally, as to the prejudice prong of the ineffectiveness claim, the State's arguments that the evidence of childhood trauma and psychiatric diagnoses could not have changed any juror's mind at sentencing are unpersuasive.  Mental health evidence, including evidence of the long-term effects of childhood trauma, is clearly connected to the offense; the evidence was brought forth and explained by highly qualified mental health experts; and it certainly could have persuaded a reasonable juror to conclude that a life sentence was more appropriate than death.  Moreover, in addition to explaining the homicide itself, the mitigating evidence also gives context to Wendi's pre-offense affairs and other behaviors the State emphasized in arguing to the jury that death was warranted.

## ARGUMENT

## I.  WENDI IS ENTITLED TO RELIEF ON HER CONFLICT OF INTEREST CLAIM

Before, throughout and after Wendi's capital murder trial, DeLozier represented Wendi's parents in their bid to obtain custody of their grandchildren and also accepted payment from the Ochoas for Wendi's representation.  As a result, DeLozier labored under multiple conflicts of interest, including his inability to view the Ochoas critically, his ethical obligation not to use information he learned against the Ochoas, and his personal interest in obtaining payment from the Ochoas.  DeLozier admits that these conflicts blinded him, preventing him from providing Wendi with the unbiased and

{00137731.1 }

4

1   undivided loyalty required by the Sixth Amendment.  As a result, DeLozier disregarded

2   critical evidence of neglect, exploitation, and abuse of Wendi as a child, instead pursuing

3   a mitigation theme that the Ochoas provided Wendi with a wholesome, loving, Christian

4   upbringing.  Because DeLozier had actual conflicts of interest that adversely affected

5   Wendi's representation, Wendi is entitled to relief.  *Cuyler v. Sullivan*, 446 U.S. 355, 350

6   (1980).

7          The State repeats its preclusion argument in an attempt to avoid the merits of this

8   claim entirely.  The State also attempts to persuade the Court to impose the prejudice

9   requirement of *Strickland v. Washington*, 466 U.S. 668 (1984) rather than *Sullivan*'s

10  requirement of adverse effect, notwithstanding the lack of any authority supporting the

11  application of *Strickland* to Wendi's conflicts claim.  Finally, the State argues that there

12  was no conflict and, if there was, it did not affect the adequacy of Wendi's representation.

13  As explained below, none of these arguments have merit.

14        **A.    The Conflict Claim is Properly First Raised in a Petition for Post-**
15              **Conviction Relief**

16          The State argues that Wendi's conflict claim is precluded because she did not

17  "raise[ ] her conflict of interest claim at trial or on direct appeal."  (State Br. at 69.)

18  However, in *State v. Tucker*, the Arizona Supreme Court emphasized that any request for

19  relief from the defendant's death sentence because of an attorney's conflict *must* be

20  addressed in post-conviction relief proceedings.  205 Ariz. 157, ¶ 26, 68 P.3d 110, 116

21  (Ariz. 2003) (whether attorney "did not pursue a third-party defense [because of a

22  conflict of interest] can only be developed at an evidentiary hearing in a post-conviction

23  relief proceeding"); *State v. Spreitz*, 39 P.3d 525, 527 (2002) ("We reiterate that

24  ineffective assistance of counsel claims are to be brought during Rule 32 proceedings.

25  Any such claims improvidently raised in a direct appeal, henceforth, will not be

26  addressed by appellate courts regardless of merit.").

27

28

The State cites only one case—*State v. Moore*, 222 Ariz. 1, 213 P.3d 150 (2009)—which it contends supports its preclusion argument.  (State Br. at 69.)  This case is inapposite for two reasons.  First, it is factually distinguishable.  In *Moore*, the defendant argued on direct appeal that the trial court erred in denying his counsel's motions to withdraw due to an alleged conflict.  *Id.* ¶ 76, 213 P.3d at 164.  Wendi's conflict claim, in comparison, is not challenging any action taken by the Court during her trial; she is arguing that her conviction violates the Sixth Amendment right to an attorney with undivided loyalty.  Accordingly, she properly followed the Arizona Supreme Court's direction by raising her conflict claim in post-conviction relief proceedings.  *Tucker*, 205 Ariz. 157 at ¶ 26, 68 P.3d at 116.  Second, although *Moore* addressed the defendant's claim regarding the court's denial of the motions to withdraw, it does not contain any discussion even suggesting that a conflict claim is precluded if not raised on direct appeal.  In fact, it does not address preclusion at all.  The State does not identify *any* decisions finding a conflict claim precluded when first raised in post-conviction relief proceedings.

## B.   *Sullivan* Applies to Wendi's Conflict Claim

Under *Sullivan*, a defendant seeking relief in the form of a new trial based on trial counsel's conflict of interest must prove that her counsel had an actual conflict of interest that adversely affected her representation.  *Cuyler v. Sullivan*, 446 U.S. 355, 350 (1980).  Once these requirements are met, the party is entitled to relief.

The State first argues that the *Strickland* prejudice standard—rather than the *Sullivan* standard of adverse effect—is the standard to be applied to the claim arising from DeLozier's conflict.  (State Br. at 69-70.)  In support, the State cites *State v. Jenkins*, 148 Ariz. 463, 715 P.2d 716 (1986), which the State claims holds that *Sullivan* is "limited the joint representation of co-defendants."  (State Br. at 69.)  This is untrue.  *Jenkins* applied *Sullivan* to the defendant's request for post-conviction relief because of

his attorney's concurrent representation of a witness—not a co-defendant—in the witness's divorce case.  148 Ariz. 463 at 465, 715 P.2d at 718.  Not only does *Jenkins* not hold that *Sullivan* is limited to joint representation of co-defendants, but it actually applies *Sullivan* to the same type of conflict at issue here.  *Id.*

The other cases cited by the State also provide no support for its attempt to avoid *Sullivan*.  In *State v. Martinez-Serna*, 166 Ariz. 423, 425, 803 P.2d 416, 418 (1990), the Arizona Supreme Court applied *Sullivan* to a conflict claim involving the joint representation of co-defendants.  However, nothing in *Martinez-Serna* suggests that *Sullivan* only applies to the joint representation of co-defendants; joint representation just happened to be the fact pattern in the case.  *Id.*  The State also notes that the United States Supreme Court declined to "rule upon the need for *Sullivan* prophylaxis in cases of successive representation."  (State Br. at 70 (quoting *Mickens v. Taylor*, 535 U.S. 162, 174-75 (2002)).)  Again, nothing in *Mickens* case suggests that *Sullivan* applies only to cases involving the joint representation of co-defendants.  Indeed, the United States Supreme Court has applied *Sullivan* to conflicts that did not involve joint representation of defendants, such as *Wood v. Georgia*, 450 U.S. 261, 271 (1981), which involved a conflict created by a non-clients' payment of the defendants' attorney fees.

Both the United States Supreme Court and the Arizona Supreme Court have applied *Sullivan* to conflicts other than the joint representation of co-defendants, and the Arizona Supreme Court has applied *Sullivan* to the same type of conflict as in this case.  Accordingly, *Sullivan* governs Wendi's conflict of interest claim.

## C.   DeLozier Had Several Actual Conflicts of Interest

### 1.   DeLozier's Responsibility to Wendi to Investigate and Present Information Harmful to the Ochoas Created an Actual Conflict.

The State argues that because DeLozier "testified that no one ever told him that [Wendi] suffered any type of abuse, including sexual abuse, from the Ochoas . . . no

1   actual conflict of interest was realized.  Nothing came to DeLozier's attention during his

2   representation of the Ochoas that would have caused a conflict with his duty of loyalty to

3   [Wendi]."  (State Br. at 72.)  This argument fails for two reasons.

4          *First*, DeLozier had an obligation to investigate whether Wendi had suffered

5   childhood abuse from the outset of the case.  *See* The American Bar Association

6   Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty

7   Cases (the "Guidelines") (Evidentiary Hearing Ex. 76), at 80-81 ("Because the sentencer

8   in a capital case must consider in mitigation, 'anything in the life of the defendant which

9   might militate against the appropriateness of the death penalty for the defendant,'

10  'penalty phase preparation requires extensive and generally unparalleled investigation

11  into personal and family history," including "physical, sexual, or emotional abuse, family

12  history of mental illness, cognitive impairments . . . poverty, familial instability,

13  neighborhood environment and peer influence.").  Wendi's "interest was in seeking

14  leniency" and she depended on DeLozier to investigate and inform the jury about

15  "anything from childhood that might help the jury understand how she could have

16  behaved the way she did at the time of the offense and in this case in the months

17  preceding the offense."  (2/11/14 Tr. at 164:6-20 (G. Lowenthal).)  In contrast, the

18  Ochoas' effort to gain custody of their grandchildren would have been severely impaired

19  by investigation and disclosure of the abuse and neglect Wendi experienced as a child.

20  (*Id.* at 164:6-20 (G. Lowenthal); *see also* 2/10/14 Tr. at 74:19-75:13 (D. DeLozier) (The

21  Ochoas retained DeLozier to present them as "honorable people" and "appropriate parties

22  to have some time with their grandchildren.").)

23         *Second*, this argument fails because DeLozier was confronted with multiple

24  indicators of Wendi's childhood abuse, yet did nothing to investigate and present this

25  abuse to the jury.  The Lambeths' child abuse allegation against the Ochoas was one such

26  indicator.  This allegation alone raised the issue of whether Wendi was likewise abused,

27

28

8

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1    and should have prompted a diligent investigation that would have uncovered the

2    additional evidence presented during the post-conviction relief hearing.  DeLozier's only

3    reason for not investigating was his disbelief that the Ochoas were anything other than

4    excellent parents and grandparents.  (2/10/14 Tr. at 138-39 (D. DeLozier).)  By his own

5    admission, DeLozier's inability to view the Ochoas objectively was the result of his

6    advocacy for them in the guardianship and adoption cases.  (*Id.* (D. DeLozier) (in family

7    law cases, "you're focusing on anything you know negative about the other side,

8    unfortunately.  It's the nature of the beast.  And anything you know positive about what's

9    going on with the people that you're currently representing . . . So it's possible that

10   focusing on that aspect of the grandparent case kept me from focusing on anything that

11   might have been historical in Wendi's case.").); *see also* 2/11/14 Tr. at 167:13-15 (G.

12   Lowenthal) (DeLozier told Lowenthal he "felt blinded by his zealous advocacy of the

13   Ochoas").)

14           The State attempts to downplay the significance of the abuse allegation,

15   suggesting that it was not worth investigating.  (State Br. at 72.)  However, DeLozier's

16   co-counsel, Dan Patterson, admitted that the allegation "bears upon potential areas of

17   mitigation that should have been developed at a bare minimum under *Wiggins*."  (2/7/14

18   Tr. at 36:16-25 (D. Patterson).)  Furthermore, this allegation was only one of several red

19   flags that should have prompted DeLozier to investigate the possibility of childhood

20   abuse.  For example, DeLozier knew that Alejo solicited sex stories from Wendi to post

21   on the Internet.  (2/10/14 Tr. at 131:14-132:8 (D. DeLozier).)  In addition, Rohde

22   reported Wendi's tendency to dissociate, pervasive memory problems, and lack of sexual

23   responsiveness.  (*Id.* at 112:5-14, 122:23-124:15, 126:21-127:8 (D. DeLozier); Ex. 230 at

24   5; Ex. 7.002 at 1.)  Murphy similarly noted Wendi's dissociation.  (2/10/14 Tr. at 132-16-

25   133:15 (D. DeLozier); Ex. 52.)  Although he seized on these psychological features as

26   important evidence of childhood sexual abuse in his cases against the Catholic Church,

27

28

which he commenced prior to Wendi's trial, DeLozier did nothing to investigate the possibility of childhood sexual abuse in Wendi's case.  (2/10/14 Tr. at 90:25-97:9, 102:3-6 (D. DeLozier).)  Finally, both Rohde and Murphy specifically reported their suspicions of childhood trauma and abuse to DeLozier.  (2/10/14 Tr. at 122:23-124:15, 132:16-133:15 (D. DeLozier); Ex. 7.002 at 1; Ex. 52.)  In short, DeLozier obtained ample evidence suggestive of Wendi's childhood abuse even without the Lambeths' allegation.

DeLozier's overall obligation to conduct a reasonably diligent mitigation investigation, combined with his awareness of facts and allegations indicating that Wendi was abused as a child, were in actual conflict with his presentation of the Ochoas as excellent parents and grandparents in the guardianship proceeding, and with DeLozier's interest in obtaining payment from the Ochoas.  (2/11/14 Tr. at 162:1-25 (G. Lowenthal).)

## 2. DeLozier Never Sought or Obtained Wendi's Informed Consent to the Conflict

The State also argues that Wendi "wanted the Ochoas to have visitation or custody rights with her children; thus, [the interests of Wendi and the Ochoas] were aligned." (State Br. at 72.)

Any preference Wendi might have had regarding the placement of her children is irrelevant to whether a conflict existed.  In order for Wendi to have made a fully informed decision about how DeLozier should proceed, it would have been necessary for DeLozier to:  (a) investigate sources of potential mitigation including the possibility that the Ochoas had abused Wendi; (b) once that investigation was completed, explain to Wendi that the concurrent representation and payment by the Ochoas could impair his ability to advance her interests in avoiding the death penalty; and (c) explain to Wendi that presenting evidence regarding abuse by the Ochoas could strengthen Wendi's mitigation case, but that he would be unable to do so without breaching his ethical

obligations to the Ochoas.  (*See* 2/11/04 Tr. at 163:22-164:5, 165:19-166:6 (G. Lowenthal).)  DeLozier took none of those steps to obtain informed consent to the conflict.  Indeed, DeLozier never raised the possibility of a conflict at all.  (*Id.*)  Therefore, even if Wendi had a generalized desire to have her children raised by the Ochoas, that does not constitute an informed waiver of the conflict created by DeLozier's concurrent representation of the Ochoas and Wendi.

Because Wendi never consented to the conflict (or even knew it existed), the State's speculation regarding Wendi's likely preferences is irrelevant.  *See* Ariz. R. Prof'l Conduct 1.7 (requiring informed consent, confirmed in writing).

### 3.   DeLozier's Failure to Appreciate the Conflict at the Time of Wendi's Representation is Irrelevant to Whether the Conflict Existed

The State argues that comments by DeLozier indicating that he did not perceive a conflict at the time he was representing both Wendi and the Ochoas proves that no conflict existed.[2]  (State Br. at 71-72.)  The State cites no authority in support of its contention that the allegedly conflicted attorney is the arbiter of whether a conflict exists.  The State effectively argues that conflicts are excused if the attorney subjectively believes no conflicts exist, regardless of whether that belief is unreasonable or uninformed.

---

[2] Empirical research shows that professionals often do not recognize when they are conflicted and that "violations of professionalism induced by conflicts of interest often occur automatically and without conscious awareness."  Don A. Moore & George Loewenstein, *Self-Interest, Automaticity, and the Psychology of Conflict of Interest*, SOCIAL JUSTICE RESEARCH Vol. 17, No. 2, at 190-91 (2004) ("Loewenstein").  Furthermore, the failure to recognize the conflict actually magnifies its effect: "Such lack of insight into their own cognitive processes makes it difficult for people to purge biasing information from their judgments even when they desire to do so."  Don A. Moore, Lloyd Tanlu & Max H. Bazerman, *Conflict of Interest and Intrusion of Bias, Judgment and Decision Making*, JUDGMENT & DECISION MAKING Vol. 5, No. 1, at 38 (Feb. 2010) ("Tanlu").

{00137731.1 }

11

That is not the standard.  Nothing in Arizona's professional rules excuse conflicted representation simply because the attorney unreasonably failed to appreciate the conflict.  *See* Ariz. R. Prof'l Conduct 1.7.  DeLozier's failure to appreciate the multiple conflicts posed by his representation of the Ochoas and payment by the Ochoas for Wendi's representation does not mean these conflicts do not exist.

### D.    Because of the Conflicts, DeLozier Failed to Pursue the Plausible Alternative Defense Strategy of Investigating and Presenting Wendi's History of Childhood Abuse

The State argues that DeLozier's conflicts did not adversely affect Wendi's representation for three reasons.  *First*, the State claims that no plausible alternative defense strategy existed because neither the Ochoas nor Wendi reported the abuse to DeLozier and because several other individuals did not conclude that Wendi was abused as a child.  (State Br. at 72-73.)  But no one other than DeLozier had both the responsibility to investigate mitigating evidence in Wendi's case and the primary relationship with the Ochoas.  Furthermore, despite having no role as fact investigators on the defense team, both Rohde and Murphy specifically told DeLozier that they suspected childhood trauma or abuse based on interviews with Wendi.

*Second*, the State argues that DeLozier failed to investigate negative facts about the Ochoas not because he was their lawyer, but rather because he simply disbelieved those allegations.  (State Br. at 71-72.)  This argument ignores DeLozier's testimony that his relationship with the Ochoas blinded him, causing him to discount negative information he received about them.  DeLozier disregarded the allegations against the Ochoas *because of the conflicts*.

*Third*, the State argues that Wendi's history of childhood abuse would have been merely cumulative of the evidence actually presented at trial.  (State Br. at 73-74.)  However, as discussed below, the jury did not hear any evidence regarding the Ochoas' family history of significant mental health issues, Donna's neglect of Wendi since she

1   was an infant, the family's extreme poverty while part of the transient ministry, the

2   oppressive, controlling, and violent fundamental church and school in which Wendi grew

3   up, or Alejo's pervasive sexual abuse of Wendi.

4           1.      **A Plausible Alternative Defense Strategy Existed at the Time of DeLozier's Representation**

5

6               a.      **Multiple Sources Informed DeLozier of Their Suspicions of Wendi's Childhood Trauma and Abuse**

7           The State argues that "[t]he Ochoas never informed DeLozier of any sexual

8   improprieties committed by Alejo Ochoa.  [Wendi] never informed DeLozier that she had

9   suffered sexual abuse from Alejo.  Therefore, [Wendi] has failed to show that a plausible

10  alternative mitigation strategy existed at the time DeLozier represented [her]."  (State Br.

11  at 74.)

12          In making this argument, the State ignores that Rohde and Murphy both reported

13  Wendi's psychological features indicative of abuse and their suspicions that Wendi

14  experienced childhood trauma and/or sexual molestation.  Furthermore, DeLozier knew

15  that the Lambeths had accused the Ochoas of child abuse.  (Ex. 95; 2/11/14 Tr. at 141:9-

16  13 (G. Lowenthal).)  Had he conducted a minimally adequate investigation, DeLozier

17  could have obtained additional evidence of abuse, including testimony from childhood

18  friends of Wendi such as Jeri Lynn Cunningham and Kyre Lorts.  (*See, e.g*., 2/5/14 Tr. at

19  71:6-20 (K. Lorts) (no one from defense team contacted her); *Id*. at 238:24-239:14 (J.

20  Cunningham) (no one from defense team contacted her, she would have testified about

21  abuse if someone had).)

22          The mere fact that the abusers and their victim did not report the abuse to

23  DeLozier does not mean that this abuse could not have been discovered.  Because

24  DeLozier had evidence of abuse from multiple other sources and could have obtained

25  additional evidence with a reasonably diligent investigation, investigating and presenting

26  Wendi's history of abuse was a plausible alternative defense strategy.

27

28

{00137731.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

### b.    DeLozier's Role on the Defense Team and Monopoly on Information About the Ochoas Compounded the Harm From the Conflicts

The State argues that others failed to discover evidence of abuse and that, "[t]herefore, a plausible alternative mitigation strategy did not exist at the time DeLozier represented [Wendi]." (State Br. at 72-73.)  This argument ignores that DeLozier was the primary person with both the responsibility to investigate the possibility of abuse and access to information necessary to do so.

No one else involved in the guardianship proceeding was charged with investigating whether *Wendi* was abused as a child; the guardianship proceeding focused upon the interests of the Ochoas' grandchildren.  Furthermore, no one involved in the guardianship proceeding other than DeLozier had information indicative of the Ochoas' abuse and neglect of Wendi, such as observations from Rohde and Murphy.  And Rohde and Murphy were social workers who met with Wendi, not fact investigators; after they identified indications that Wendi suffered childhood abuse, it was incumbent upon the attorneys to develop evidence of whether such abuse occurred.

Finally, Patterson assigned DeLozier the responsibility for mitigation relating to the Ochoas.  (2/7/14 Tr. at 27:11-21, 48:21-49:1 (D. Patterson).)  As a result, Patterson neither tried to evaluate whether the Ochoas abused Wendi, nor was he in the position to do so.  (*See id.* at 132:15-24 (D. Patterson) (explaining that he discounted evidence of Wendi's childhood abuse or simply "passed [it] on to DeLozier" because "unfortunately, I didn't assist greatly in the development of the mitigation in this case . . .").)  DeLozier's near-monopoly on the defense team's relationship with the Ochoas compounded the effect of the conflict; though DeLozier was in the best position to investigate negative allegations regarding the Ochoas and Wendi's upbringing, he had multiple incentives to dismiss such information rather than share it with the rest of the defense team.  Indeed, DeLozier was the only person on the defense team to learn about the Lambeths' child

{00137731.1 }

14

abuse allegations, and did not communicate this information to anyone else.  (2/10/14 Tr. at 132:75:17-20, 77:6-12 (D. DeLozier); 2/7/14 Tr. at 36:11-15, 37:1-7 (D. Patterson).)

The fact that others did not uncover the evidence of Wendi's childhood abuse does not mean that it did not exist – it means that the impact of DeLozier's conflict was magnified because this evidence never reached an unbiased source.

## 2. DeLozier's Failure to Appreciate the Significance of the Abuse Allegations Highlights the Impact of the Conflict of Interest.

The State cites comments by DeLozier that he saw the abuse allegations against the Ochoas as typical in cases involving child custody.  (State Br. at 71-72.)  From this, the State argues that DeLozier's failure to view these allegations as worthy of investigation proves that any conflict did not impact Wendi's representation.[3]  (*Id*.)  This argument presupposes that DeLozier would have viewed the abuse allegations the same regardless of whether the Ochoas were his clients and regardless of whether the Ochoas were paying for both representations, and that these relationships did not bias his analysis of viable mitigation strategies for Wendi.

DeLozier's unrebutted testimony was exactly to the contrary.  DeLozier explained that his role as the Ochoas' advocate focused his attention towards any positive information about the Ochoas and caused him to disbelieve any negative information:

> [W]hen you're in a family law case, . . . you have two people, people on

---

[3] To the extent that any of DeLozier's comments could be construed as denials that he would have pursued the abuse allegations on Wendi's behalf even if not for his relationship with the Ochoas, any such denials should be viewed with great skepticism:

> [A]fter-the-fact testimony by a lawyer who was precluded by a conflict of interest from pursuing a strategy or tactic is not helpful.  Even the most candid persons may be able to convince themselves that they actually would not have used that strategy or tactic anyway, when the alternative is a confession of ineffective assistance resulting from ethical limitations.

*United States v. Malpiedi*, 62 F.3d 465, 470 (2d Cir. 1995).

{00137731.1 }

15

1
2
3
4
5
6
7

each side, and you've got unfortunately lawyers that are throwing rocks at each other . . . So I never get too concerned about what people are saying because I expect both of them to be exaggerating on both sides . . . So you start off with that, so you're focusing on anything you know negative about the other side, unfortunately.  It's the nature of the beast.  And anything you know positive about what's going on with the people that you're currently representing . . . So it's possible that focusing on that aspect of the grandparent case kept me from focusing on anything that might have been historical in Wendi's case.  Okay?  As far as the things that Rohde and so forth and so forth were telling.

8
9
10
11
12

(2/10/14 Tr. at 138-39 (D. DeLozier); *see also* 2/11/14 Tr. at 167:13-15 (G. Lowenthal) (DeLozier "felt blinded by his zealous advocacy of the Ochoas").)  DeLozier discounted evidence suggestive of Wendi's history of childhood abuse because his attorney/client relationship with the Ochoas prevented him from viewing them in anything but a positive light.  (*Id.*)

13
14
15
16
17
18
19
20
21
22
23
24

        This testimony is consistent with extensive research on conflicts.  For example, in one study, researchers asked all subjects to (1) decide whether to approve their client's internal auditing; and (2) conduct their own independent audit based on the same facts.  Tanlu, *supra*, at 39.  However, half of the subjects were asked to evaluate their client's auditing first, while the other half were asked to conduct an independent audit first.  *Id.*  The study found that subjects who viewed the facts from their client's perspective first were significantly more likely to later reach "independent" valuations favorable to the client.  *Id.* at 39-40 ("When people are accountable to others with known preferences, their judgments tend to assimilate to those preferences.").  Similarly here, DeLozier first encountered the abuse allegations in his role as the Ochoas' attorney, and not surprisingly viewed these allegations from their perspective.  As a result, DeLozier was unable to provide an unbiased evaluation of the same facts on Wendi's behalf.

25
26
27

        Research on conflicts also sheds light on the extent to which DeLozier's personal interest in obtaining payment from the Ochoas for both representations clouded his ability to consider defense strategies that would upset the Ochoas and therefore risk

28

{00137731.1 }                                                   16

nonpayment.  For example, one analysis reviewed several studies and concluded that self-interest skews decision-making even in the absence of any conscious awareness of the biasing effect:

> Self-interest exerts a more automatic influence than do professional responsibilities, which are more likely to be invoked through controlled processing.  Since automatic processing tends to occur outside of conscious awareness, its influence on judgment and decision making is difficult to eliminate or completely correct.  The consequence of this differential processing is that self-interest often prevails . . .

Loewenstein, *supra*, at 190-91; *see also* 2/11/14 Tr. at 189:13-190:4 (G. Lowenthal) (explaining that "there has to be a natural reluctance on someone who wants to continue to get money from [a] person to push them into" talking about whether they abused their child).

The State's argument that the conflicts did not adversely affect Wendi's representation because DeLozier disbelieved the Lambeths' abuse allegations is contrary to both DeLozier's own testimony and empirical research demonstrating the corrosive effect of conflicts on objective reasoning.  It also ignores that the allegations were only one of multiple indicators of Wendi's history of childhood abuse.  The Sixth Amendment guarantees Wendi's right to unbiased counsel, capable of analyzing facts and considering strategies unclouded by his loyalty to other clients or his own financial interests.  *Wood*, 450 U.S. at 271; *see also* Ariz. R. Prof'l Conduct 1.7 cmt. 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client.").  Wendi did not receive this objective, unbiased representation during her capital murder trial.

### 3.    Wendi's History of Childhood Abuse Is Not Cumulative

Finally, the State argues that the new evidence presented at the PCR hearing is merely cumulative of evidence presented at trial (specifically, limited evidence relating to Wendi's religious background and Alejo's angry outbursts).  (State Br. at 73-74.)  Accordingly, the State argues that there was no plausible alternative mitigation strategy

{00137731.1 }

1  that was not pursued because of DeLozier's conflict.  (*Id*.)

2      As addressed more fully below in connection with the ineffective assistance of

3  counsel claim, the State's argument is meritless.  DeLozier's mitigation theme at Wendi's

4  murder trial was that Wendi was "an innocent young girl who lived a sheltered life."

5  (12/8/04 Tr. at 28:30 (D. DeLozier).)  DeLozier presented testimony that Wendi had

6  loving parents, including a stepfather (Alejo) who treated her as his own daughter.  (*See,*

7  *e.g.,* 12/9/04 Tr. at 7:22-9:24 (C. Vargas); 92:9-99:9 (D. Ochoa); 12/13/14 Tr. at 40:9-

8  41:4 (L. Inskeep).)  Among other things, the jury did not learn of Donna's neglect and

9  Skip Robertson's physical and verbal abuse of Wendi during her early childhood (Petr.

10 Br. at 11-16); Wendi's deprivation and extreme poverty, including eating food from

11 dumpsters, while Donna and Alejo participated in a transient ministry (*id.* at 19-20);

12 Alejo's sexual abuse in a variety of forms, from photographing Wendi in lingerie to

13 requiring her to rub his nearly naked body for hours a night to molesting her and her

14 friends (*id.* at 24-30); or any of the resulting psychiatric effects of such abuse, including

15 complex post-traumatic stress disorder (PTSD) and her stunted development of executive

16 functioning, as confirmed through neuropsychological testing (*id.* at 30-48).

17      These are merely examples of the compelling evidence of Wendi's traumatic

18 childhood and its effects that was never presented to the jury.  Allowing the jury to view

19 Wendi's actions in the context of a childhood of pervasive neglect, exploitation, and

20 sexual abuse was a plausible alternative mitigation strategy that was not pursued because

21 of DeLozier's conflicts.

22      Accordingly, Wendi is entitled to relief on her conflicts claim under *Sullivan*.

23 **II.   TRIAL COUNSEL'S SUPERFICIAL MITIGATION INVESTIGATION**
24 **      FELL BELOW PREVAILING PROFESSIONAL NORMS**

25      The State does not dispute that trial counsel's investigation fell below the standard

26 of care established in the Guidelines (Ex. 76).  It does not argue that trial counsel

27

28

{00137731.1 }

18

performed any more thorough mitigation investigation than the cursory and belated one summarized in Petitioner's post-hearing brief.  And the State makes no comment upon, and thus concedes, trial counsel's lack of coordination and dysfunction in preparing the mitigation case.

Instead, the State's brief assumes that the Guidelines are irrelevant, and argues that prevailing professional norms for capital defense are far less demanding than the Guidelines.  As to the failure to investigate childhood trauma, the State argues (1) there is no need for capital defense counsel to investigate potential childhood trauma unless the issue is brought to their attention (State Br. at 17-20); and (2) potential childhood trauma was not brought to trial counsel's attention here (*id.* at 21).

The State's argument as to the mental health investigation follows the same approach.  According to the State:  (1) a single interview with a psychiatrist provided with no social history of the defendant is sufficient investigation of mental health, unless there are indications that the defendant suffers from a "serious" mental illness; and (2) no indications of a "serious" mental illness were brought to trial counsel's attention here. (*Id.* at 14-17.)

For the reasons set forth below, none of the State's efforts to lower the bar for Wendi's trial counsel stand up to scrutiny.

A.      It is Necessary to Consider the Guidelines in Assessing the Reasonableness of Trial Counsel's Mitigation Investigation

Whether Wendi's defense counsel was ineffective depends upon whether their failures of investigation and coordination of Wendi's mitigation case "fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 687-88.  As noted in Petitioner's  post-hearing brief, "[t]hough a deviation from the Guidelines does not automatically constitute ineffective assistance of counsel, they are 'well-defined norms,' *Wiggins*, 539 U.S. at 524, and the United States

{00137731.1 }

1   Supreme Court has found ineffective assistance where attorneys' performance failed to

2   meet the norms expressed in the Guidelines or predecessor provisions in the ABA

3   Standards for Criminal Justice.  *See, e.g.*, *Wiggins*, 539 U.S. at 524-27; *Williams v.*

4   *Taylor*, 529 U.S. 362, 396 (2000)."  (Petr. Br. at 53.)

5         In response, the State simply repeats the first half of Petitioner's point—that a

6   deviation from the Guidelines does not automatically constitute ineffective assistance—

7   and ignores the rest.  (State Br. at 19-20.)  Indeed, after noting that the Guidelines do not

8   impose "mandatory obligations" in all cases (*id.*), the State never mentions them again.

9   Thus, because the Guidelines are not "inexorable commands," *Bobby v. Van Hook*, 558

10   U.S. 4, 8 (2009) (quotation omitted), the State effectively treats the Guidelines as

11   irrelevant to whether trial counsel was ineffective in this case.

12         None of the cases the State cites so casually dismiss the Guidelines, which the

13   United States Supreme Court has characterized as "measures of the prevailing

14   professional norms of effective representation."  *Padilla v. Kentucky*, 559 U.S. 356, 367

15   (2010).  Of the cases quoted by the State, the only one that even questions the relevance

16   of the Guidelines to the standard of care was a concurring opinion in *Van Hook* (quoted

17   in State Br. at 20).  But the issue in *Van Hook* was whether it was fair to apply the

18   Guidelines to the actions of defense counsel in a case that went to trial in 1985—18 years

19   before the Guidelines were issued—without some evidence that the prevailing norms for

20   defense counsel in 1985 were the same as those reflected in the Guidelines.  *See id.* at 8

21   ("Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines—

22   without even pausing to consider whether they reflected the prevailing professional

23   practice at the time of the trial—was error.")  The Court has never suggested that the

24   "well-defined norms" reflected in the 2003 Guidelines, *Wiggins*, 539 U.S. at 524, would

25   be irrelevant to the conduct of defense counsel in *this* case, which went to trial in late

26   2004.

27

{00137731.1 }

<div align="center">20</div>

28

<div align="center">PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A</div>

1    The State makes no argument that trial counsel's superficial mitigation

2    investigation conformed to the Guidelines.  The State does not contend that trial counsel

3    undertook anything close to an "unparalleled investigation into [Wendi's] personal and

4    family history" or conducted interviews of "virtually everyone . . . who knew the client

5    and h[er] family" to compile a thorough "[f]amily and social history."  (Ex. 76, at 80-81,

6    83.)  The State does not contend that trial counsel performed any investigation

7    whatsoever into whether Wendi suffered "physical, sexual, or emotional abuse" in her

8    childhood or whether she had "cognitive impairments" or a "family history of mental

9    illness," nor that they engaged in the "time-consuming and expensive process" of

10   compiling this "extensive historical data"—data necessary to thoroughly investigate

11   potentially mitigating evidence and to obtain a "competent and reliable mental health

12   evaluation."  (*Id.* at 81.)  And the State does not dispute that these steps are a point of

13   emphasis in all capital cases, because "[n]eurological and psychiatric impairment,

14   combined with a history of physical and sexual abuse, are common among persons

15   convicted of violent offenses."  (*Id.* at 30.)  *See also, e.g.*, *Correll v. Ryan*, 539 F.3d 938,

16   950-51 (9th Cir. 2008) (evidence of childhood abuse and neglect, incest, religious

17   indoctrination through corporal punishment, and impulse control problems and impaired

18   judgment at the time of the offense was "precisely th[e] type of evidence that the

19   Supreme Court has termed as 'powerful'" mitigation); *State v. Bocharski*, 218 Ariz. 476,

20   497-99, 189 P.3d 403, 424-26 (2008) (mitigating evidence that the defendant "suffered

21   severe physical, mental and sexual abuse during his childhood" and "came from a

22   severely dysfunctional family" was sufficiently powerful mitigation to warrant reversal of

23   death sentence on independent review).

24          While Petitioner has noted from the outset that a deviation from the Guidelines

25   does not automatically constitute ineffective assistance of counsel (Petr. Br. at 53),

26   neither trial counsel (Patterson and DeLozier) nor the State offered any reason for

27

28

{00137731.1 }

21

1  deviating from the Guidelines in Wendi's case.  Patterson affirmed that he had the

2  resources to "retain anybody that was reasonably needed to properly defend Wendi"

3  (2/7/14 Tr. at 151:23-25 (D. Patterson)), and both Patterson and DeLozier confirmed that

4  there were no strategic reasons not to fully investigate potential childhood trauma or

5  mental health issues in Wendi's case.  (*See, e.g.*, *id.* at 68:11-14, 75:1-3, 177:22-178:15

6  (D. Patterson); 2/10/14 Tr. at 136:18-23 (D. DeLozier).)  Particularly in light of the red

7  flags described in detail in Petitioner's post-hearing brief (at 80-99), there is no

8  justification for trial counsel's failure to perform their mitigation investigation in

9  accordance with the prevailing professional norms set forth in the Guidelines.

### B.    Trial Counsel's Failure to Investigate Potential Childhood Trauma Was Not Reasonable

#### 1.    The State Misstates the Standard of Care for Investigating Childhood Trauma

Rather than assessing trial counsel's mitigation investigation under the

Guidelines—the only set of written professional norms relied upon by the Supreme Court

in assessing ineffectiveness under *Strickland*—the State appears to argue that the

prevailing professional norms at the time of Wendi's case "did not require an attorney to

investigate whether a client had suffered child abuse absent an indication that abuse

occurred."  (State Br. at 20.)  The State offers only two sources of authority for that

proposition:  the testimony of one of the two attorneys who failed to conduct a reasonable

mitigation investigation in this case, and case law from the Eleventh Circuit.  (*Id.* at 20-

21.)  Neither supports the State's position here.

##### a.    The State's Reliance Upon Patterson to Establish the Standard of Care is Unreasonable and Mischaracterizes the Record

According to the State, "Patterson testified that the standard of care at the time of

Andriano's trial did not require an attorney to investigate whether a client had suffered

1   child abuse absent an indication that abuse occurred."  (State Br. at 20 (citing 2/7/14 Tr.

2   at 118-123 (D. Patterson)).)  That is not what Patterson said.  Patterson testified that

3   according to "the standard of care *that existed in my office* back at the time"—or "at least,

4   [his] practice, because I was the only guy out there"— he would take a less active role in

5   mitigation development and rely upon mitigation specialists to a greater degree than his

6   current practice.  (2/7/14 Tr. at 118:24-121:16 (D. Patterson) (emphasis added).)  He did

7   not testify regarding prevailing norms among capital defense attorneys generally, and did

8   not testify that the standard of care "did not require an attorney to investigate whether a

9   client had suffered child abuse absent an indication that abuse occurred," as the State

10   asserts.

11      Moreover, as Larry Hammond testified (and common sense dictates), customs or

12   habits of a given defense lawyer do not establish prevailing professional norms.  (2/11/14

13   Tr. at 16:19-17:4 (L. Hammond).)  The *Strickland* analysis does not ask whether trial

14   counsel met their own personal standards of care or methods of practice, which would

15   render the analysis both circular and hollow.  It asks whether they met "prevailing

16   professional norms," which goes far beyond a given attorney's customs at a given time.

17      To the extent Patterson's beliefs regarding the standard of care at the time of

18   Wendi's trial are pertinent, however, there is far better evidence of those beliefs than his

19   testimony at the evidentiary hearing, which took place almost a decade after Wendi's

20   trial.  As noted in Petitioner's post-hearing brief and Larry Hammond's testimony (but

21   ignored by the State), Patterson filed a motion with this Court in November 2004 in

22   which he discussed at length the standard of care that governed trial counsel's

23   representation in Wendi's case.  (Ex. 54, at 3-4.)  In the motion, Patterson correctly noted

24   that a proper "[m]itigation investigation must include 'efforts to discover *all reasonably*

25   *available* mitigating evidence,'" that it "requires an extensive and unparalleled

26   investigation into the personal and family history of the accused," and it "'normally

27

28

{00137731.1 }

1  requires evidence that sets forth and explains the client's complete social history from

2  before conception to the present.'"  (*Id.* (quoting *Wiggins*, 539 U.S. at 524, and

3  Guidelines 10.7 cmt & 10.11 cmt.).)  These were the prevailing professional norms at the

4  time of Wendi's trial, as contemporaneously acknowledged by Patterson.  The State's

5  efforts to redefine those norms by mischaracterizing Patterson's testimony ten years after

6  the fact are unsupportable.

### b.    The Primary Case Relied Upon by the State Supports Petitioner's Arguments, Not the State's

9      Beyond Patterson's testimony, the State offers only one case to support the

10  proposition that the standard of care "did not require an attorney to investigate whether a

11  client had suffered child abuse absent an indication that abuse occurred":  *Puiatti v.*

12  *Secretary, Florida Department of Corrections*, 732 F.3d 1255 (11th Cir. 2013).  (State Br.

13  at 21.)  *Puiatti* does not stand for that proposition.  In fact, *Puiatti* underscores the

14  inadequacy of trial counsel's mitigation investigation here.

15      In *Puiatti*, the court was charged with evaluating defense counsel's performance

16  under the standard of care in the early 1980s, shortly after *Gregg v. Georgia*, 428 U.S.

17  153 (1976) re-authorized the use of capital punishment in the United States.  The bulk of

18  the *Puiatti* opinion describes the extensive mitigation investigation performed by trial

19  counsel in that case, which included:  (1) multiple interviews with their client specifically

20  regarding his childhood and life history, *id.* at 1260-61; (2) interviews with various

21  people, both family members and others, multiple times in individual settings, *id.* at

22  1261-63; (3) gathering "voluminous records of Puiatti's life," *id.* at 1263; (4) working

23  with two mental health experts (a forensic psychologist and a psychiatrist) for the specific

24  purpose of "perform[ing] an 'in-depth review' of Puiatti's background," *id.* at 1263-64;

25  (5) providing those experts with the social history that trial counsel's investigation had

26  developed through those extensive interviews and records, *id.* at 1264; and (6) having one

27

28

{00137731.1 }

24

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

of those experts interview both the defendant and his parents and "remain in close contact with Puiatti throughout the pre-trial period," *id.* at 1264.

In short, despite operating under the standard of care in place 20 years before Guidelines were compiled (and a year before *Strickland* was decided), Puiatti's counsel conducted an investigation consistent with the Guidelines.  Because nothing in that investigation "suggested that Puiatti was abused as a child," the Eleventh Circuit concluded that Puiatti's counsel was not ineffective for failing to uncover childhood abuse in that investigation.  *Id.* at 1282.  Thus, *Puiatti* stands for the undisputed proposition that an attorney is not ineffective if she actively engages in a thorough investigation of a client's background that nevertheless fails to uncover child abuse.  It does *not* stand for the proposition that an attorney can forgo a reasonable investigation altogether.

Wendi's trial counsel performed none of the steps of the extensive mitigation investigation undertaken by Puiatti's counsel.  Moreover, unlike Puiatti's counsel, Wendi's trial counsel was alerted on many occasions, from many sources, regarding potential childhood trauma suffered by Wendi, and failed to follow up on any of them. (*See generally* Petr. Br. at 68-99.)

> **2.    Even if Evaluated Under the Incorrect Standard of Care Asserted by the State, Trial Counsel Were Ineffective**

>> **a.    Trial Counsel Knew That Wendi Had Likely Suffered Childhood Sexual Abuse, But Did Nothing to Investigate**

The State does not and cannot dispute that trial counsel performed no investigation into potential childhood sexual abuse of Wendi, and took no steps to confirm whether any abuse had occurred.  Instead, the State claims there was no reason for trial counsel to investigate.  According to the State, trial counsel met that lower standard of care because "the alleged 'red flags' of child abuse Andriano contends trial counsel ignored are not actually suggestive of child abuse, or not suggestive of child abuse absent the immaculate

{00137731.1 }                                                    25

1  lens of hindsight."  (State Br. at 21.)

2  　　　The State simply ignores the actual content of the red flags discussed in

3  Petitioner's post-hearing brief.  (Petr. Br. at 80-96.)  Those red flags are not merely

4  "suggestive" of child abuse—they flat-out state that child abuse likely occurred, and

5  often urged trial counsel to investigate further.  To summarize:

6  　　　Certified professional counselor Kandy Rohde met with Wendi at least 90 times

7  between her arrest and trial, took detailed notes of those meetings that she forwarded to

8  trial counsel (Ex. 45), and wrote three separate communications directly to trial counsel

9  (Ex. 230 at 9185; Ex. 7.002; Ex. 6.004).  In February 2001, shortly after she began

10  meeting with Wendi, she informed trial counsel that she observed dissociation in Wendi,

11  which she noted could be the result of childhood sexual abuse.  (Ex. 230 at 9185.)  A

12  month later, she told trial counsel that Wendi's dissociation could be traced to her

13  childhood, and that Rohde believed Wendi was "the victim of childhood molestation."

14  (Ex. 7.002.)  In February 2002, she informed trial counsel that she believed Wendi had

15  suffered from childhood physical and sexual abuse and neglect.  (Ex. 6.004.)

16  　　　Of the potential perpetrators of that abuse, no adult male had more access to

17  Wendi as a child than her stepfather, Alejo Ochoa.  In April 2004, Rohde faxed

18  mitigation specialist Scott MacLeod a particularly sensitive counseling note describing

19  the sexualized relationship between Wendi and Alejo.  (Ex. 45 at PCR112-14.)  That note

20  describes how Wendi's cellmates urged her to read an erotic story to Alejo while she was

21  incarcerated, and notes that (1) Alejo responded by asking his stepdaughter to send more

22  "stories to him for the Internet"; (2) "someone Alejo knows from his photography was his

23  connection into the Internet"; (3) Alejo and his photographer friends would "have lingerie

24  parties, some of which are innocent and some are more provocative"; and (4) that Wendi

25  had no perception that such conduct was inappropriate.

26  　　　Thus, from Kandy Rohde alone, trial counsel knew that Wendi was a likely victim

27

28

{00137731.1 }

26

of childhood sexual abuse, suffered mental health symptoms dating back to her childhood that may have originated from sexual abuse, and still engaged in an inappropriately sexualized relationship with her stepfather as an adult.  The State cannot reasonably contend that Rohde's communications are "not actually suggestive of child abuse." (State Br. at 21.)

In addition, trial counsel received reports from other sources that supported Rohde's conclusions.  Dr. Richard Rosengard, who saw Wendi for one interview without the benefit of any social history or any of Rohde's prior observations, noted that the psychological symptoms Wendi suffered as an adult "occur[] in both children and adults who have been physically or sexually attacked" and that Wendi was "particularly upset in finding out about and dealing with children [who] were sexually abused."  (Ex. 6.003 at 3, 5-6.)  Sharon Murphy, a professor of social work, informed trial counsel that Wendi "learned to di[]ssociate from painful memories a long time ago" and "there's something that happened during childhood" to cause that dissociation.  (Ex. 52.)[4]

If that were not enough to alert trial counsel that investigation into potential childhood sexual abuse of Wendi was necessary, Wendi's biological father, Skip Robertson, was incarcerated for molesting a child.  Trial counsel knew of Skip's offense and incarceration, were provided with his contact information in prison (Ex. 57), and were told as early as February 2001—more than three years before Wendi went to trial— that Donna suspected that Wendi may have been molested by Skip's father, based on information from other members of the Robertson family.  (Ex. 56 at PCR 307.)  An investigation of potential abuse by the Robertsons may not have led to confirmable

---

[4] The State argues that "every mental health expert that evaluated Andriano never discovered any evidence of sexual abuse committed upon" her.  (State Br. at 18.)  Mental health experts are not fact investigators.  As noted above, the mental health experts who examined Wendi discovered the only evidence available to them as mental health professionals—that Wendi suffered mental health symptoms indicative of childhood sexual abuse—and they shared those conclusions with trial counsel.

1  sexual abuse by them specifically, but "it would have been a tantalizing place to start"

2  pulling the threads of potential childhood sexual abuse and other childhood trauma

3  suffered by Wendi.  (2/11/14 Tr. at 71:8-11 (L. Hammond).)  No such investigation, not

4  even an interview of Skip while imprisoned, was undertaken by trial counsel.

5  
6  
7  
              **b.**     **The Fact That the Perpetrators and the Victim of Childhood Abuse and Neglect Did Not Unilaterally Volunteer It Does Not Relieve Trial Counsel of the Duty to Investigate**

8  Rather than addressing these unambiguous calls to investigate childhood sexual

9  abuse or other trauma, the State emphasizes that Wendi, Donna and Alejo did not

10  unilaterally volunteer to trial counsel that Wendi had suffered sexual abuse by Alejo.

11  The State fails to acknowledge that trial counsel *never asked them* about any potential

12  childhood abuse of Wendi, or negative information regarding her upbringing.  (2/10/14

13  Tr. at 135:1-16 (D. DeLozier) (admitting that he took no steps to investigate any

14  potentially negative facts regarding Wendi's upbringing); 2/7/14 Tr. at 43:18-22, 130:4-

15  10, 162:19-163:12 (D. Patterson) (confirming that he focused on guilt-phase issues, did

16  not ask Wendi questions regarding her childhood, "didn't compel her to discuss things

17  that she found distasteful," and never broached the subject of childhood abuse with any

18  witness he interviewed).)  It is not self-evident to individuals without experience in law

19  or the criminal process that sensitive issues of childhood abuse and neglect are relevant

20  and helpful to a criminal defense.  Thus, it should not be surprising to anyone, least of all

21  capital defense counsel, that the perpetrators of childhood neglect (in the case of Donna)

22  and abuse (in the case of Alejo) would not disclose those self-incriminating facts absent

23  some indication that such facts are relevant to Wendi's defense.  Trial counsel simply

24  failed to give any indication that they had any interest in information regarding potential

25  childhood abuse—a message that they reinforced when they declined to interview Skip

26  even though Donna provided them with his prison contact information.  (Ex. 57.)

27  
28

As for Wendi, trial counsel was told as early as February 2001 (and repeatedly thereafter) that Wendi had begun dissociating as a child, possibly as a result of sexual molestation, and thus Wendi "learned to di[]ssociate from painful memories a long time ago" and "was unable to recall large sections of her history."  (Ex. 230 at 9185; Ex. 7.002; Ex. 6.004; Ex. 45 at PCR27; Ex. 52.)  Thus, trial counsel was aware that, while Wendi likely suffered childhood sexual abuse, her defense system was unlikely to allow her to access memory of it—an effect of sexual abuse that was well-recognized in the law well before Wendi's trial.  *Doe v. Roe*, 191 Ariz. 313, 322, 955 P.2d 951 (1998) (applying the discovery rule to "repressed memory cases involving childhood sexual abuse").  Trial counsel knew that they could not depend upon Wendi to confirm or deny the abuse, and therefore they would need to investigate whether it occurred through interviews of family and close childhood friends such as Kyre Lorts and Jeri Lynn Cunningham.[5]  They did not do so.  "Had counsel investigated further, they may well have discovered the sexual abuse later revealed during state postconviction proceedings."  *Wiggins*, 539 U.S. at 525.

Finally, unlike *Puiatti* and other cases cited by the State,[6] this is not a case in

---

[5] That task was not overwhelming:  given the small size and isolation of the church school Wendi attended, there was a limited number of childhood friends to contact and interview.

[6] The State cites (at 40-41) four cases for the proposition that the failure of Donna, Alejo or Wendi to make an unsolicited disclosure of childhood sexual abuse relieves trial counsel of their duty to investigate potential childhood trauma.  None of the cases are on point.  *Grisby v. Blodgett*, 130 F.3d 365 (9th Cir. 1997) concerned a claim for ineffective assistance in failing to retain an expert to perform blood tests on a carpet that was destroyed years after the defendant's conviction; thus, it was speculative as to what such a test would have shown.  *Id.* at 373 (the defendant "had nine years to challenge his counsel's performance by having the carpet tested himself but raised his speculative claim of prejudice only years after the carpet was destroyed").  Here, by contrast, there is nothing speculative about Wendi's childhood trauma; multiple witnesses testified about it at the evidentiary hearing.  Each of the other three cases stand for the same proposition as *Puiatti*:  that trial counsel is not ineffective *if they conduct a reasonable mitigation*

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

which trial counsel actively investigated childhood trauma, interviewed numerous witnesses regarding the subject, and simply came up empty.  Trial counsel here performed no such investigation, yet were nevertheless provided with numerous reports that Wendi likely suffered childhood sexual abuse and neglect.  Thus, even under the incorrect standard of care proposed by the State, trial counsel's mitigation investigation was deficient.

## C.      Trial Counsel's Mental Health Investigation Was Unreasonable

With regard to trial counsel's mental health investigation, the State once again makes a broad characterization—that Wendi's trial counsel "thoroughly investigated [Wendi's] mental health based on Dr. Potts' and Dr. Rosengard's recommendations" (State Br. at 14)—without providing any support.  The State does not refute that the *only* mental health investigation trial counsel undertook was to retain Dr. Rosengard for a single interview with Wendi, without the benefit of any social history.  In arguing that this single visit satisfied the standard of care, the State ignores the detailed provisions of the Guidelines concerning the importance and steps of a reasonable mental health investigation.  Instead, the State appears to assume—without citing any supporting

---

*investigation* and nevertheless fail to uncover certain mitigating evidence.  *See Duckett v. Mullin*, 306 F.3d 982, 998 (10th Cir. 2002) ("It would be unreasonable to deem trial counsel ineffective for failing to discover potential mitigating evidence *when counsel conducted a reasonable investigation* but was stymied by potential witnesses who were not forthcoming.") (emphasis added); *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (noting that trial counsel "hired an experienced death penalty investigator who conducted a thorough investigation into Babbitt's history" and that "counsel is not deficient for failing to find mitigating evidence if, *after a reasonable investigation*, nothing has put the counsel on notice of the existence of that evidence") (emphasis added, quotation omitted); *Lackey v. Johnson*, 116 F.3d 149, 153 (5th Cir. 1997) ("[O]ur review of the record reveals that *there is no evidence that [the defendant]'s attorney knew or should have known* about the prior abuse.") (emphasis added).  Here, in contrast, trial counsel received numerous reports of possible childhood sexual abuse, but performed no investigation whatsoever into that possibility.

{00137731.1 }

30

1   precedent—that Wendi's interview with Dr. Rosengard was good enough.

2       It was not, for the same reasons set forth in Petitioner's post-hearing brief:  (1) Dr.

3   Rosengard was not given the information necessary to make a full and accurate diagnosis

4   from his one visit with Wendi; (2) notwithstanding the lack of information he received,

5   Dr. Rosengard *still* identified symptoms and disorders that warranted further inquiry and

6   investigation; and (3) trial counsel received other information before and after Dr.

7   Rosengard's visit that Wendi suffered symptoms of psychiatric disorders relevant to the

8   offense, which trial counsel declined to share with Dr. Rosengard or otherwise pursue.

9
10                    **1.    Trial Counsel Failed to Provide Any Social History to Dr.
                            Rosengard**

11       Every witness at the PCR hearing who testified on the subject, including the

12   State's expert, confirmed that a social history is a vital component of an accurate mental

13   health diagnosis.  (2/7/14 Tr. at 49:17-50:15 (D. Patterson) ("[A]n expert opinion is only

14   as good as the information upon which he or she derives that opinion.  And so a social

15   history of the client, in my estimation, is essential. . . .  [A] significantly developed social

16   history should be there before your experts go in to begin their evaluations."); 2/5/14 Tr.

17   at 49:16-51:3 (G. Woods); 2/6/14 Tr. at 72:19-73:18 (K. Rohman) ("And the phrase is

18   garbage in/garbage out . . . .  Dr. Rosengard did not have the advantage of knowing the

19   real story of the client's life and background."); 2/11/14 Tr. at 60:15-61:4 (L. Hammond)

20   ("one of the themes that runs through these Guidelines" is that "[f]or your mental health

21   people to be able to do their jobs appropriately, you need to have available for them the

22   history of the client"); 2/14/14 Tr. at 43:4-21, 44:23-45:1, 72:23-25 (S. Pitt) ("you have to

23   review" a subject's mental health history, records of that history are "important," and

24   psychiatrists rely upon them in their diagnoses).)

25       Here, a social history would have revealed that Wendi had a family history of

26   bipolar disorder, and had suffered severe and pervasive childhood trauma that:  (1) even

27
28   {00137731.1 }                                   31

Dr. Pitt conceded could, if true, mean that "some of the symptoms that she has could potentially be tied to post-traumatic stress disorder" (2/14/14 Tr. at 112:17-24 (S. Pitt)); and (2) is linked to the developmental deficits in emotional regulation, impulse control, and executive functioning noted by Drs. Hopper and James.  But trial counsel provided Dr. Rosengard with no such information.  Going into his interview with Wendi, the only information trial counsel provided Dr. Rosengard was a police report, a transcript of her 911 call, and medical reports for Joe.[7]  (Ex. 6.003 at 1.)  As explained in the opening brief, that fails to meet the standard of care.  (Petr. Br. at 77-80.)

The State's only response appears in a footnote, which asserts (without any record or legal support):

> [I]t goes without saying that that mental-health experts . . . are trained to recognize objective symptoms of major mental disorders, and some of Andriano's claimed symptoms (*e.g.* memory problems) would have been readily apparent.  Moreover, at least one professional retained by Andriano, H. Kandy Rohde, was familiar with her background and history, and still did not diagnose a major mental disorder.

(State Br. at 52-53 n.14.)

The State's response only further proves the point that a social history is essential. As noted in Petitioner's post-hearing brief, mental health professionals *did* recognize objective symptoms of the very same disorders diagnosed by Dr. Woods.  (Petr. Br. at 81-83, 86-95.)  They *did* recognize her dissociation, which the State imprecisely characterizes as "memory problems."  (Ex. 7.002; Ex. 6.004; Ex. 6.003 at 5-6; Ex. 52; Ex. 230 at 9185.)  And while the State never explains what it means by a "major" psychiatric disorder or why it would expect Rohde (who was a professional counselor rather than a psychiatrist) to make a diagnosis, Rohde *did* tell trial counsel that she believed "Wendi suffers from serious psychological disorders" and noted symptoms

---

[7] Dr. Rosengard, on his own initiative, obtained a release to review records from Estrella jail indicating that she had been prescribed psychotropic medications, as well as one unremarkable jail provider note from November 2000.  (Ex. 6.003 at 1.)

consistent with the disorders diagnosed by Dr. Woods.  (Ex. 7.002.)  Dr. Rosengard, who was provided with no social history and none of the voluminous materials generated by Rohde, diagnosed her as having "[p]robable post-traumatic stress disorder" and a mood disorder: "major affective disorder – depression."  (Ex. 6.003 at 5.)  And, after trying different medications, jail medical providers ultimately treated Wendi with Seroquel, a drug that "has been specifically indicated for bipolar depression."  (2/5/14 Tr. at 69:7-21 (G. Woods); *see also* 2/10/14 Tr. at 118:10-24 (D. DeLozier) (acknowledging that he was aware that certain of Wendi's medications were used for treating bipolar disorder, that he possessed that knowledge prior to Wendi's trial, but that he failed to review Wendi's jail medical records prior to trial).)

In short, every person with any mental health training who examined Wendi prior to her trial identified symptoms of psychiatric disorders.  But they lacked the social history to give those symptoms context, and Dr. Rosengard—the only psychiatrist trial counsel retained to evaluate Wendi—was not even provided with information from Rohde regarding symptoms she observed in her regular visits with Wendi.  Trial counsel simply failed to provide Dr. Rosengard with the social history that is fundamental to a mitigation investigation, which all agree is necessary for a full and accurate psychiatric diagnosis.

## 2. Even Without Any Social History Information, Dr. Rosengard Observed Symptoms and Made Tentative Diagnoses that Warranted Further Mental-Health Investigation

The State asserts that Dr. Rosengard's report "offers no compelling mitigation, and read in its entirety, does not trigger an obligation of trial counsel to further investigate Andriano's mental health.  Rather, the report is damaging and would have undermined counsel's trial and mitigation strategy of portraying Andriano as a good mother and a timid, submissive woman who endured years of domestic violence from her husband."  (State Br. at 15.)

Petitioner has no idea how the State could read the report that way, and the State offers no further explanation.  Petitioner's post-hearing brief walked through Dr. Rosengard's report at length, detailing the numerous conclusions indicating that Wendi suffered from psychiatric disorders stemming from her childhood that may have been related to the offense.  (Petr. Br. at 90-93.)  The State simply ignores that discussion, and provides no support for its *ipse dixit* mischaracterizations of the report.  Contrary to the State's assertions, Dr. Rosengard *never* "attribute[d]" Wendi's psychiatric disorders to Joe's homicide, *never* "questioned her claim that she suffered from memory deficits," and *never* suggested that further investigation was unnecessary or unwarranted.  (State Br. at 54.)

Indeed, Dr. Rosengard indicated that his conclusions were tentative, labeling them as "diagnostic impressions" and stating that Wendi suffered from "probable post-traumatic stress disorder."  (Ex. 6.003 at 5.)  He noted that Wendi's psychiatric disorders originated from childhood and would "more than explain[] [her] response [to the offense], particularly in light of the fact that she had a past history, apparently, of being abused and symptoms consistent with post-traumatic stress disorder."  (*Id.* at 3 (noting "panic attacks since childhood" and possible childhood molestation), 5.)  Yet trial counsel never contacted Dr. Rosengard again regarding Wendi, and took no further steps to investigate potentially mitigating mental health evidence.

### 3. Trial Counsel Obtained Additional Mental Health Information After Dr. Rosengard's Report that Warranted Further Mental-Health Investigation

In addition, the State appears to assume that Dr. Rosengard was the only person to report to trial counsel regarding Wendi's mental health, and ignores the other red flags identified at length in the evidentiary hearing.  But Dr. Rosengard was not the only source of information available to trial counsel regarding Wendi's mental health, and certainly not the only professional to indicate that she suffered from psychiatric disorders.

1   Even if the State were correct that Dr. Rosengard's report in isolation provided no cause

2   to further investigate Wendi's mental health, his report in combination with multiple

3   reports from Rohde, Murphy, and even jail medical providers amounted to a chorus of

4   professionals all singing variations of the same song:  Wendi suffered from psychiatric

5   disorders that could explain her behavior the night of the offense.  Trial counsel provided

6   none of them with the social history necessary to contextualize all of the symptoms they

7   observed and make a final diagnosis, and did not even provide Dr. Rosengard with the

8   benefit of Rohde's extensive counseling notes and preliminary diagnoses concerning

9   childhood abuse and neglect, resulting dissociation, a history of sleeping for days at a

10  time to avoid emotions, a potential personality disorder, and other red flags.

11        Further, even if the State were correct in its unsupported assertion that Dr.

12  Rosengard's August 2002 report was final, conclusive, and unhelpful, the State offers no

13  justification for trial counsel's failure to revisit the issue of mental health after Wendi's

14  September 2003 suicide attempt.  In the words of the jail medical providers, Wendi

15  "acted out impulsively with a significant suicide attempt in [a] moment of panic."  (Ex.

16  47 at 3.)

17        Wendi's "significant" and "impulsive[]" act of violence in a "moment of panic"

18  should have been a wake-up call to trial counsel that the mental health investigation

19  warranted further attention.  Yet they never contacted Dr. Rosengard or any other mental

20  health professional to evaluate Wendi's mental health in light of that grave new

21  manifestation of her disorders, contrary to prevailing professional norms.  *See Hamilton*

22  *v. Ayers*, 583 F.3d 1100, 1117 (9th Cir. 2009) (where "counsel was aware that [the

23  defendant] tried to commit suicide in prison . . . and that he was taking antidepressant

24  medication at the time of trial," counsel "should have retained a mental health expert and

25  provided that expert with the information needed to form an accurate profile of [the

26  defendant's] mental health").

27

28

{00137731.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

III.   **TRIAL COUNSEL'S DEFICIENT MITIGATION INVESTIGATION RESULTED IN PREJUDICE**

All but conceding trial counsel's ineffective mitigation investigation, the State devotes the bulk of its brief to the prejudice prong of *Strickland*. Its arguments fall into two categories: (1) that the evidence of childhood trauma and psychiatric disorders was not credible or meaningful mitigation; and (2) that the evidence was merely cumulative of the evidence presented at trial, and there is no "reasonable probability that at least one juror would have struck a different balance" in weighing the aggravating evidence against the full scope of mitigating evidence. *Wiggins*, 539 U.S. at 537. This brief addresses each category in turn.

   A.   **The Evidence of Childhood Trauma and Mental Health Was Credible and Powerful Mitigating Evidence**

      1.   **The State Offers No Reasonable Grounds for Disregarding the Evidence of Wendi's Childhood Trauma Brought Forth at the Evidentiary Hearing**

As summarized in Petitioner's post-hearing brief (at 9-34), Wendi suffered extensive childhood trauma from a variety of different sources throughout her childhood, including neglect, social and physical deprivation, physical abuse, and sexual abuse. Dr. Hopper, whose credentials as a leading authority on childhood trauma are unchallenged, explained at length the effects of this accumulation of trauma upon the development of executive functioning, impulse control, emotional regulation, and overall mental health. He then described how and why those developmental effects of childhood trauma would have affected Wendi's ability to control impulse and make decisions under the extreme stress leading up to and including the night of Joe's death. Even Dr. Pitt noted that Wendi's childhood trauma, if true, could have resulted in post-traumatic stress disorder as an adult. (2/14/14 Tr. at 112:17-24 (S. Pitt).)

For the reasons set forth below, the State offers no credible basis to question the

veracity or import of evidence of Wendi's childhood trauma.

### a. The State Does Not Address the Full Scope of the Childhood Trauma Suffered by Wendi

In addressing childhood trauma, the State's brief focuses almost exclusively upon sexual abuse by Alejo, apparently assuming that any other source of childhood trauma had no effect upon Wendi as an adult. In doing so, it ignores:

- Skip's physical abuse of Wendi as an infant, spanking her while she was still in diapers, training her like a dog, using fear to potty-train her at 11 months, and throwing her into a swimming pool at less than two years old to teach her how to swim (Petr. Br. at 14-15);

- Donna's neglect of Wendi on account of Donna's own mental and emotional problems, which included passing a toddler Wendi off to neighbors, day-care providers, and drug addicts while Donna worked, drank, and brought men home (Petr. Br. at 12-14);

- Wendi's subjection to Donna and Alejo's extreme religious beliefs, such as not seeking medical care for Wendi when she came down with a prolonged high fever and isolating her from child peers from ages seven to nine while traveling with a cult-like group (Petr. Br. at 18-20); and

- Wendi's education in an isolated church-school that extolled the virtues of beating children with a large wooden paddle "until they cried softly," shaming them into unquestioning obedience, and directing all aspects of their lives on fear of damnation (Petr. Br. at 22-23).

Even as to sexual abuse, the State appears to disregard any type of sexual abuse short of genital contact. The State repeatedly tries to minimize Alejo's perverted sexualization of his stepdaughter during her teen and pre-teenage years. According to the State, Alejo's regular father-daughter shopping trips for "little lacy underwear and a bra to match and a garter belt, things like that" and visits to the adult sections of novelty stores beginning when Wendi was age 12 (2/4/14 Tr. at 156:2-22), does not "establish any sort of sexual misconduct" (State Br. at 44). But stepfathers do not normally purchase garter belts and lacy underwear for their 12-year-old stepdaughters to wear. Similarly, the State asserts that Alejo dressing Wendi up in lingerie and taking

1   photographs "does not necessarily reveal an inappropriate sexual relationship."  (State Br.

2   at 45.)  Nor does Alejo getting into bed with Wendi and a friend, Jeri Lynn Cunningham,

3   during multiple sleepovers and proceeding to repeatedly fondle Cunningham's breasts.

4   (Petr. Br. at 28-29.)  According to the State, on each of the three or four sleepovers when

5   this conduct occurred (2/4/14 Tr. at 224:20-225:21 (J. Cunningham), Alejo might have

6   just crawled into bed next to his 13-year-old daughter and her friend, fallen asleep, and

7   inadvertently moved his hand under her nightgown and over her breasts multiple times

8   despite Cunningham repeatedly moving his hands away.  (State Br. at 43 & n.10.)  Nor

9   does the State consider Alejo's actions in requiring his teenage stepdaughter to rub his

10  near-naked body for "45 minutes to a couple of hours" each night to be improper; the

11  State dismisses that evidence because "all participants were clothed" and the "ritual did

12  not involve Andriano or Cunningham touching Alejo's genitals, or vice versa."[8]  (State

13  Br. at 44.)  The State makes no mention of Alejo's sexual comments toward his

14  stepdaughter during her pre-teen and teenage years, both at home and as observed by

15  classmates at her school—where he served as the "youth minister," made inappropriate

16  sexual advances toward students and "rub[bed] up on" them, and gave sexual lessons

17  such as "telling boys how to touch breasts."  (Petr. Br. at 24-25.)

18       No reasonable juror would so casually dismiss Alejo's disturbing sexual behavior

19  toward his stepdaughter and her friends, as the State blithely does in its brief.  Dr. Hopper

20  testified at length regarding the adverse, long-term of effects of this "classic incestuous"

21  dynamic of a neglectful mother looking the other way while her husband sexualizes their

22  daughter.  The State's dismissive response to Wendi's plight between ages 9 to 18—

23

24  [8] The State ignores Cunningham's testimony regarding the one time she took part in that
25  ritual, in which she described how Alejo required her and Wendi to wear nightgowns,
    placed his head in Cunningham's lap and repeatedly turned his face toward
26  Cunningham's genitals while pretending to snore.  (2/4/14 Tr. at 232:7-233:25 (J.
    Cunningham).)

27

28

1   trapped in a home and a school with a sexually exploitative stepfather who conditioned

2   her to satisfy his perverted desires while her mother put her head in the sand—is

3   unavailing.  It is difficult to believe that *any* juror would be persuaded by the State's

4   response and decline to consider Wendi's childhood trauma, let alone the entire panel of

5   jurors necessary to impose a death sentence.

              **b.**    **The State Fails to Offer Any Reasonable Basis to**
                      **Disbelieve that Alejo Molested Wendi**

7          Unlike his other inappropriate behavior, the State does not attempt to defend

8   Alejo's overt sexual molestation of Wendi, as described in unsettling detail in the

9   testimony of childhood friend Kyre Lorts.  (Petr. Br. at 27-28.)  Lorts recalled multiple

10  incidents in which she and Wendi (at ages 8 and 10 or 11, respectively) would dress up in

11  lingerie during sleepovers before being invited into Alejo's room, where they were

12  instructed to sit on Alejo's lap while he fondled them and they touched his erection.  (*Id.*)

13  Wendi reassured Lorts during the first such incident, thus implying that it was not an

14  isolated occurrence for Wendi.  (*Id.*)

15         Unable to defend Alejo's conduct, the State asserts that Kyre Lorts lied to this

16  Court.  (State Br. at 41-43.)  It offers absolutely no reason for her to do so.  Lorts was not

17  a friend of Wendi's as an adult; she saw Wendi a total of "maybe five times" after Lorts

18  moved away from Casa Grande after fifth grade, and prior to the evidentiary hearing had

19  not seen Wendi since a funeral 15 years ago.  (2/4/14 Tr. at 61:7-62:2 (K. Lorts).)  Nor

20  does the State point to any inconsistency or implausibility in her testimony.  The State

21  feebly contends that Lorts stated that she and Wendi wore Donna's racy lingerie while

22  Donna testified that she did not personally own the type of racy lingerie Alejo purchased

23  for Wendi (State Br. at 42), but that is a distinction without a difference.  Lorts's

24  understanding of whether the lingerie she wore belonged to Donna or Wendi is

25  immaterial to her recollection of the molestation that occurred.

26         Without any motive to fabricate and no material implausibility or inconsistency in

27

28

1   her testimony, the State is left to argue that Lorts cannot be trusted because she did not

2   "disclose Alejo's conduct to anyone (law enforcement or otherwise) until she was 19

3   years old," convinced herself as a child that she had dreamt the incident (a form of

4   dissociation), "and then told only family members."[9]  (State Br. at 42.)  This argument

5   ignores what has become common knowledge regarding sexual abuse victims.  Lorts was

6   *nine years old* when these horrific events occurred, at the hands of a trusted family friend

7   and youth pastor at her church-school.  The State offered no testimony to suggest that a

8   child not disclosing sexual abuse until adulthood renders it unreliable, nor could it:  when

9   prosecuting perpetrators of childhood molestation, the State frequently calls an expert

10   (such as Dr. Hopper here) to "help[] the jury to understand possible reasons for the

11   delayed and inconsistent reporting" of sexual abuse.  *State v. Salazar-Mercado*, 234 Ariz.

12   590,¶ 15, 325 P.3d 996, 1000 (2014).  *See also, e.g.*, *Leon v. Ryan*, No. CV 11-0129-

13   TUC-BPV, 2014 U.S. Dist. LEXIS 9587, at *48-52 & n.6 (D. Ariz. Jan. 24, 2014)

14   (summarizing testimony of a witness for the State who explained why sexual abuse

15   victims often delay reporting sexual abuse and the prolonged process of disclosure and

16   coming to terms with the abuse).

17       Similarly, the State claims that Lorts's testimony should not be believed because

18   Wendi could not access memories of the abuse.  (State Br. at 41 n.7.)  That too is

19   unsurprising for victims of childhood sexual abuse, as explained by the Arizona Supreme

20   Court.  *See Doe v. Roe*, 191 Ariz. 313, 322, 955 P.2d 951 (1998) ("The policy behind the

21   discovery rule is thus served by application to repressed memory cases involving

22

---

23   [9] The State also claims that the testimony of Lorts and Donna should not be trusted
    because they did not report Alejo's abuse despite being "mandatory reporters of child
24   abuse under Arizona law."  (State Br. at 42, 43 n.9.)  Yet Donna willfully avoided
    witnessing the abuse, nothing in the reporting statute required Lorts to self-report her own
25   abuse years after the fact, and Arizona's reporting statute (Ariz. Rev. Stat. § 13-3620)
    was not enacted until 1998—well after the incidents described by Lorts in the early
26   1980s.

27   {00137731.1 }

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

childhood sexual abuse and is, we believe, logically appropriate given that the intentional act of the tortfeasor caused both the damage and the repression of memory.").  Even the State's expert in this case, Dr. Pitt, agreed that sexual abuse victims may block out painful memories of the abuse.  (2/14/14 Tr. at 97:8-11 (S. Pitt).)

In addition, the State seeks to profit from its own misconduct in sending a detective from the prosecutor's office to Lorts's home on the evening before she was scheduled to testify regarding these painful events, and remaining outside her home after Lorts asked him to leave.  (State Br. at 41-42 n.8; *see also* 2/4/14 Tr. at 4:22-8:12 (summarizing the State's intimidation of Lorts and Alejo on the evening before Lorts's testimony).)  The State had never before expressed any interest in interviewing Lorts despite knowing for months that she was a witness in this matter, "[y]et, on the eve of [her] testimony, while all of us are in the courtroom and can't do anything about it, and while Dr. Hopper is explaining the significance of these folks, they're being contacted" by a man identifying himself as a "detective with the prosecutor's office."  (2/4/14 Tr. at 6:3-24.)  The State's actions undermine the State's credibility in this matter, not the credibility of the sexual abuse victim.

Finally, while Lorts's testimony is credible and believable on its own, it is even more believable in light of the observations of multiple other witnesses regarding Alejo's inappropriate sexual behavior toward Wendi and her friends in a variety of contexts, as described in the preceding section.  Jeri Lynn Cunningham testified that Alejo demanded that she and Wendi wear nightgowns on trips to the desert, and that on multiple occasions Alejo fondled her breasts under her nightgown and placed his face in her crotch (2/4/14 Tr. at 224:1-225:21, 231:1-24, 232:7-233:25 (J. Cunningham)); Jasper Neace noted that Alejo rubbed and flirted inappropriately with Wendi's classmates (2/5/14 Tr. at 18:12-19:13 (J. Neace)); both Donna and Jeri Lynn recounted the ritual of Alejo demanding that Wendi rub his body (2/4/14 Tr. at 153:5-19, 155:4-156:1 (D. Ochoa); *id.* at 232:7-233:25

(J. Cunningham)); Donna testified that he bought Wendi lingerie as early as 12 years old (2/4/14 Tr. at 156:2-22 (D. Ochoa)); Cindy Schaider noted that took photographs of Wendi in lingerie, some of which still exist (2/10/14 Tr. at 159:17-160:12 (C. Schaider); Ex. 72-74); and Kandy Rohde observed an inappropriately sexual relationship between Alejo and Wendi that persisted even while Wendi was incarcerated (Ex. 45 at PCR112-114).  Combining these facts with the multiple observations of mental health professionals noting that Wendi suffered mental health symptoms consistent with childhood sexual abuse, there is no reasonable basis to doubt Lorts's testimony that Alejo molested her and Wendi.

> c.   **The State Does Not Meaningfully Refute Dr. Hopper's Conclusions Regarding the Effects of Wendi's Childhood Trauma**

Next, the State urges this Court to dismiss the opinions of Dr. Hopper regarding the effects of Wendi's traumatic childhood upon her psychological development, solely because the abuse occurred during her childhood rather than sometime more temporally closer to the offense.  It offers no reasonable ground for doing so.

As noted in Petitioner's post-hearing brief, Dr. James Hopper is a clinical psychologist and leading authority in the field of childhood trauma and its effects.  (Petr. Br. at 10.)  In the absence of any basis to challenge Dr. Hopper's credentials or to question his conclusions regarding the effects of childhood trauma in Wendi, the State confusingly dismisses Dr. Hopper's opinions because the jury's "common sense" would necessarily lead it to the conclusion that Wendi's "childhood experiences shed little light on the reasons for her actions at the age of 30."  (State Br. at 47.)  But the State offers no explanation for why the jurors, most of whom presumably were not victims of childhood sexual abuse or other pervasive childhood trauma themselves, would not have benefitted from and been persuaded by the testimony of a recognized expert in that field.  It also offers no reason to believe that the jurors would disregard Dr. Hopper's well-informed

1  testimony in favor of their own armchair opinions on the sensitive subject of childhood

2  sexual abuse and trauma.

3  　　　　Without addressing Dr. Hopper's opinions or the host of binding federal and state

4  precedent establishing that evidence of significant childhood trauma constitutes powerful

5  mitigating evidence with or without a nexus to the offense itself (Petr. Br. at 4-6), the

6  State proceeds to argue that this Court should deem evidence of childhood trauma

7  insignificant because it was "remote in time" to the offense.  (State Br. at 46-52.)  The

8  State's arguments are flawed, in three general respects.

9  　　　　*First*, the mitigating evidence was not "remote in time."  Wendi lived with Alejo

10  until age 18, only 12 years before Joe's homicide, and the sexual nature of her

11  relationship with Alejo persisted throughout her adulthood.  As Rohde noted, as late as

12  2004, Wendi believed there was nothing inappropriate or unusual about her stepfather

13  asking her to send him erotic stories from jail to post on the Internet for his photographer

14  friends, who held provocative "lingerie parties."  (Ex. 45 at PCR112-14.)

15  　　　　*Second*, Dr. Hopper testified in detail about the effects of childhood trauma on

16  brain development and the emotional and cognitive deficits and disorders it causes

17  through adulthood.  (*See generally* Petr. Br. at 11-34.)  The State asked Dr. Hopper to

18  explain how Wendi's childhood trauma and the resulting damage to her emotional and

19  psychological development could have influenced her actions before, during, and after

20  the homicide, and Dr. Hopper gave detailed reasons based on his years of expertise in the

21  field of childhood trauma.  (Petr. Br. at 31-33.)

22  　　　　The State offers *nothing* in rebuttal, other than its own perception of "common

23  sense" unsupported by the opinion of any expert in the field.  For example, the State

24  notes that Wendi was a "high functioning" adult.  (State Br. at 48.)  But no expert

25  testified that Wendi's childhood trauma, or even her resulting cognitive deficits, rendered

26  her mentally retarded or otherwise unable to function.  As Dr. Hopper noted, "unrelenting

27

28

trauma of all kinds throughout [her] entire childhood" left her a damaged adult unable to "regulate [her] emotions and impulses" in situations that were highly stressful to her; it did not render her completely incapable of functioning as an adult in routine daily matters.  (2/3/14 Tr. II at 46:17-47:11 (J. Hopper).)

*Third*, the State simply ignores the value of the mitigating evidence in explaining Wendi's promiscuity as an adult, her inability to fully remember emotionally laden events, and her inability to control impulse in her excessive beating of Joe—all facts that the prosecutor emphasized in urging the jury to impose death.  (Petr. Br. at 34.)

## 2.   The Mental Health Evidence Was Credible and Powerful Mitigation

The State asserts that the "weight of Andriano's proffered mental-health mitigation would have been slight." (State Br. at 63.)  But the State does not and cannot question the credentials of the three mental health experts (Drs. Hopper, Woods, and James) who Petitioner called to testify at the evidentiary hearing.  The State does not dispute that Drs. Hopper and Woods—unlike all prior mental health professionals who interviewed Wendi—received the benefit of her full social history.  The State does not question that Drs. Hopper and Woods were the only psychologists or psychiatrists to interview Wendi on multiple occasions for the purpose of assessing potential psychiatric disorders.  It does not dispute that Dr. James simply scored objective neuropsychological tests, and does not claim that she committed any errors in identifying specific deficits in Wendi's executive functioning.[10]

In lieu of any specific reasons to question their findings, the State makes four

---

[10] The State faults Dr. James for not interviewing Wendi, and because she noticed arithmetic errors in the raw data she reviewed.  (State Br. at 60.)  But Dr. James testified that she found "about three or so" errors that "didn't change the overall analysis," and explained that her role as a neuropsychologist was not to make subjective judgments from an in-person interview of Wendi, but rather to evaluate the raw data obtained from neuropsychological testing.  (2/10/14 Tr. at 14:21-23, 48:3-49:4 (J. James).)

{00137731.1 }                                                  44

1   broad-based arguments—all of which are easily rebutted.

2       *First*, the State appears to attack the concept of mental health evidence altogether,

3   arguing that mental health evidence is irrelevant because Wendi's behavior was the result

4   of "choices [she] made."  (State Br. at 61.)  That is not the standard for relevant mental

5   health evidence in mitigation, and would render all mental health evidence meaningless

6   unless the psychiatric disorder caused the defendant to be possessed.  Indeed, Arizona

7   law lists as a mitigating factor evidence that the defendant's "capacity . . . to conform

8   [her] conduct to the requirements of the law was significantly impaired, but not so

9   impaired as to constitute a defense to prosecution."  Ariz. Rev. Stat. § 13-751(G)(1)

10  (emphasis added).  The issue is not whether Wendi was possessed by some irresistible

11  impulse, which would "constitute a defense to prosecution," but rather whether her

12  *capacity* to conform her conduct to the requirements of the law was impaired by

13  psychiatric disorders.

14      Mental health evidence is inherently connected to any given defendant's offense,

15  and the testimony of the mental health professionals who testified at the PCR hearing

16  amply demonstrates how each of these disorders impaired Wendi's capacity to exercise

17  judgment, control impulse, and conform her conduct to the law under the high-stress

18  circumstances existing at the time of the offense.  (*See generally* Petr. Br. at 36-48.)  By

19  centering its arguments around an impossibly high standard that contradicts Arizona law,

20  the State fails to address the evidence under applicable standards.

21      *Second*, rather than looking to whether her psychiatric disorders impaired Wendi's

22  capacity to conform her conduct to the law at the time of her physical altercation and

23  stabbing of Joe, as the law requires, the State's brief repeatedly looks to whether they

24  impaired her capacity to function in society.  The State presents a number of examples of

25  Wendi acting as a functional adult, such as raising children and having a job.  (State Br.

26  at 51, 59.)  Once again, the State asks and answers the wrong question.  Drs. Woods,

27

28

{00137731.1 }                              45

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

Hopper, and James noted that Wendi's disorders impaired her capacity to make rational judgments and control impulse in situations of high stress for her—not that she would be incapacitated on a daily basis.  Moreover, the State's examples of prior unlawful behavior by Wendi, such as easily detected theft from employers during times of financial hardship for her and Joe (State Br. at 63-64), support those expert opinions rather than undermining them.  They provide further examples of Wendi reacting impulsively, irrationally, and with poor judgment in times of high stress, with impaired capacity to conform her conduct to the law.  (Petr. Br. at 38, 40, 44, 46-47.)

*Third*, the State claims that the opinions of Wendi's experts are unreliable because none of the mental health professionals who examined her previously reached the same conclusions.  (State Br. at 53-57.)  Of course, the same is true of Dr. Pitt's diagnoses, as well as Dr. Rosengard and Dr. Bayless.  None of them reached the same diagnoses as each other, let alone the testifying experts at the evidentiary hearing.  But *all* of them noted that Wendi suffered from psychiatric disorders (Petr. Br. at 49), and they noted symptoms consistent with the diagnoses of Drs. Hopper, Woods, and James (Petr. Br. at 81-94).  Those pre-trial experts simply lacked the social history information to contextualize those symptoms in light of Wendi's childhood and family history of psychiatric disorders, as noted above.  Moreover, no one performed any neuropsychological testing upon Wendi prior this proceeding, and thus no one had objective confirmation of the specific executive functioning deficits she suffered from a lifetime of childhood trauma.

*Fourth*, the State vaguely claims that introduction of mental health evidence in mitigation "would have opened the door to devastating rebuttal evidence" of her prior thefts from employers.[11]  (State Br. at 63.)  The State never explains why mitigating

---

[11] The State also claims that it would have opened the door to testimony from Dr. Bayless regarding his belief that Wendi "is an untruthful, manipulative person."  (State Br. at 64.)  But such testimony would be plainly inadmissible regardless of Wendi's mitigation

1  evidence concerning Wendi's psychiatric disorders would have resulted in admission of

2  those prior bad acts while the mitigating evidence Wendi actually presented did not.  But

3  even assuming that the State's rebuttal evidence would be admitted, there would be no

4  reason for Wendi's counsel to fear it.  At the evidentiary hearing (and in their reports),

5  Drs. Woods and Hopper considered and explained that same "devastating" rebuttal

6  evidence in light of Wendi's psychiatric disorders, in the same manner that her disorders

7  and childhood trauma would have explained the other evidence the State introduced at

8  trial concerning Wendi's promiscuity, increasingly frequent drinking, and other "prior

9  bad acts" that *were* admitted at her trial.

10       The "bad acts" referenced by the State here are nothing like the "devastating"

11  rebuttal in *Wong v. Belmontes*, 558 U.S. 15 (2009) (per curiam), the only case the State

12  cites in support of this argument.  In *Belmontes*, the defendant argued that his trial

13  counsel was ineffective for failing to present evidence of his non-violent character, which

14  would have opened the door to "the strongest possible evidence in rebuttal—the evidence

15  that Belmontes was responsible for not one but two murders," which he bragged about to

16  others.  *Id.* at 18, 25.  That is truly devastating rebuttal.  Wendi's thefts during times of

17  severe financial strain while suffering from disorders that greatly impaired her judgment

18  in times of stress are hardly comparable.

19       Finally, even if the rebuttal evidence were genuinely "devastating," trial "counsel

20  were not in a position to make a reasonable strategic choice" regarding whether to present

21  mental health evidence in mitigation "because the investigation supporting their choice

22  was unreasonable."  *Wiggins*, 539 U.S. at 536.  As Patterson noted:

23       [I]f that evidence existed, it should have been developed.  Whether it would

24  _____

25  presentation.  *See State v. Reimer*, 189 Ariz. 239, 241, 941 P.2d 912 (Ariz. App. 1997)
   ("Arizona courts have expressly determined that neither expert nor lay witnesses assist

26  the trier of fact to understand the evidence or to determine a fact in issue when they
   merely opine on the truthfulness of a statement by another witness.").

27

28

{00137731.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

have been presented at trial, that would have been my call and that truly would have been a strategic call.  That being said, there was an obligation if this information exists, to develop it in advance of trial.

(2/7/14 Tr. at 178:9-15 (D. Patterson).)

**B.    As this Court Has Already Found, Mitigating Evidence of Wendi's Traumatic Childhood and Psychiatric Disorders is Not Cumulative and Could Have Resulted in a Different Sentence**

The State also raises two arguments this Court has already rejected:  (1) that the mitigation evidence presented at the evidentiary hearing was cumulative of the evidence presented at Wendi's trial, and (2) even if not, there is no "reasonable probability that at least one juror would have struck a different balance" in weighing the aggravating evidence against the additional mitigating evidence presented at the evidentiary hearing. *Wiggins*, 539 U.S. at 537.

Neither argument is any more persuasive than it was when presented to this Court in the State's opposition to the Petition.  In fact, they are far less persuasive, because the Petition did not include the sworn testimony of Kyre Lorts regarding Alejo's sexual abuse of Wendi.

**1.    Evidence of Wendi's Traumatic Childhood and Psychiatric Disorders is Not Cumulative of Evidence Presented at Trial**

As it did in opposition to the Petition, the State claims that a "large part" of the evidence presented at the evidentiary hearing was cumulative of evidence presented at her trial.  (State Br. at 22.)  It is a strange assertion, for two reasons.

*First*, the State concedes that most of the mitigating evidence presented at the evidentiary hearing was *not* cumulative.  The State does not and cannot argue that the mental health evidence was cumulative of any evidence presented at trial.  Nor can it argue that Alejo's sexualization and sexual abuse of Wendi was presented at trial in any form.  Indeed, the State conceded at the hearing that the Alejo allegations were "new" evidence.  (*See* 2/5/14 Tr. at 117:2-5 (Attorney Hazard) ("And at least with the sexual

{00137731.1 }                                                    48

1  abuse allegations as to her stepfather, Alejo Ochoa, that's new?  That wasn't presented at

2  her original trial, correct?").)  Wendi's psychiatric disorders and Alejo's sexual abuse, in

3  all its forms, constituted the bulk of the mitigating evidence presented at the evidentiary

4  hearing, and the State cannot reasonably claim that this evidence was cumulative of

5  anything presented at Wendi's trial.

6        *Second*, Wendi's trial counsel testified that one of their mitigation themes was that

7  Wendi had "a good Christian upbringing."  (2/7/14 Tr. at 58:13-23, 123:4-9 (D.

8  Patterson).)  The PowerPoint presentation that formed the centerpiece of that mitigation

9  presentation (Ex. 138) confirms that theme.  Every slide paints an unequivocally positive

10  picture of her childhood, in stark contrast to the reality that trial counsel never attempted

11  to learn.  (*See, e.g.*, 2/10/14 Tr. at 135:1-16 (D. DeLozier); 2/7/14 Tr. at 43:18-22, 130:4-

12  10 (D. Patterson).)  While the mitigation presentation at trial presented Wendi's

13  childhood as idyllic, the mitigation evidence presented at the evidentiary hearing proved

14  her childhood to be a harrowing, relentlessly traumatic experience that resulted in

15  multiple psychiatric disorders and developmental deficits.  Far from cumulative, the two

16  presentations could not be more different.

17        Nevertheless, the State goes to great lengths to argue that certain mitigating

18  evidence was cumulative, exaggerating the truth in the process.  The most egregious

19  example appears on pages 45-46 of the State's brief, when it states the following:

20        Donna Ochoa and [Sharon] Murphy testified at length about their
       suspicions that [Skip Robertson] may have molested her, and Dr. Murphy
21        discussed the potential effects of early sexual abuse molestation [sic] on
       one's behavior.  Even assuming, for the sake of argument, that Alejo also
22        molested Andriano, that fact would have carried minimal additional
       mitigating weight, as adding another offender to the mix would not have
23        made Andriano's status as a molestation victim any more compelling.

24

25  The State gives no citation to the trial record for this testimony, for good reason.

26  Murphy's entire testimony on potential sexual abuse consisted of briefly reporting rumors

27  regarding the Robertson family, in very qualified terms:  "there was a question as to

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1    whether or not her biological father may have sexually molested her.  Whether or not that

2    may have happened.  So we don't know.  There's just some conjecture.  We do know he

3    is serving a prison sentence for sexual molestation of a—a mentally retarded young

4    woman, I believe."  (10/12/04 Tr. at 39:14-40:16; 12/9/04 Tr. at 59:5-24.).)  Murphy also

5    briefly recalled an incident in which a member of the Fishers of Men exposed himself to

6    Wendi.  (*Id.*)  As to potential effects, Murphy said only that "child sexual abuse is

7    significant in a person's life" and "for anybody, I believe that would be traumatic,"

8    without elaboration.  (*Id.*)

9           That is it.  Murphy did not "testif[y] at length" regarding sexual abuse, did not

10   "discuss[] the potential effects of early sexual abuse," and offered the jury no information

11   whatsoever other than secondhand speculation that Skip or his father might have

12   molested Wendi before the age of two, and someone else may have exposed himself to

13   her.  It is absurd for the State to compare Murphy's testimony with the eyewitness

14   accounts of Kyre Lorts and Jeri Lynn Cunningham or the thorough expert opinions of Dr.

15   Hopper, and the State itself demonstrates why.  In Murphy's cross-examination at trial,

16   the prosecutor emphasized that Murphy had "no concrete basis" to believe that Wendi

17   had been the victim of sexual abuse, that any abuse would have happened when Wendi

18   was only "about one year old," and likened the speculative report of possible abuse by

19   Skip as no more reliable than a report that Wendi had been "attacked by Bigfoot."  (*Id.* at

20   81:21-82:13, 83:17-21.)  Witnesses at the evidentiary hearing, by contrast, presented

21   firsthand testimony that Wendi was sexually abused through her pre-teen and teenage

22   years by Alejo, and provided expert opinions on the specific effects of that abuse.  There

23   is no possibility that the jury would have treated that evidence as cumulative of Murphy's

24   speculation that Wendi might have been molested by someone else before she was two

25   years old.

26          Donna's testimony was an even shorter version of the same speculation regarding

27

28

the Robertson family.  (12/13/04 Tr. at 22:14-25.)  But speculation regarding the Robertsons was not the focus of the evidentiary hearing in this matter, other than that it should have alerted trial counsel to further investigate Wendi's childhood and potential sexual abuse.  The evidentiary hearing focused on concrete evidence of Alejo's sexually abusive behavior toward Wendi, the numerous impairments to her development resulting from various verifiable sources of childhood trauma (such as Skip training her like a dog), and expert testimony regarding the effects of that trauma and Wendi's psychiatric disorders as an adult.  Rumors about the Robertsons form at most one piece of a much larger picture of Wendi's traumatic childhood.

The State also claims that other pieces of Wendi's traumatic childhood were touched upon at trial, such as the strictness of the Harvest Family Church, the family's poverty while on the road with the Fishers of Men ministry, and Alejo's temper.  But as Harvest member Cindy Schaider noted (and told the defense team during trial), trial counsel's depiction of Harvest was superficial and incomplete.  (2/10/14 Tr. at 173:16-174:10 (C. Schaider).)  Harvest did not merely impose corporal punishment and shaming of children; its leaders celebrated it.  (*Id.* at 163:15-20, 168:25-169:13.)  As to poverty, the State cites only one passing inference at trial to the Ochoas' poverty while on the road with the Fishers of Men, in which Donna testified that "we couldn't buy shoes because we weren't allowed to have money to buy her shoes."  (10/4/04 Tr. at 16:18-20 (D. Ochoa).)  And while Donna and Wendi each testified as to Alejo's temper, trial counsel presented no evidence of how his temper and volatility served to further his sexual manipulation and control over his stepdaughter.

In sum, there is virtually no overlap between the idyllic picture of Wendi's childhood presented at trial and the true picture of Wendi's horrific childhood presented at the evidentiary hearing.  And the superficial, isolated references to negative facts regarding Wendi's childhood at trial do not begin to create an accurate depiction of the

{00137731.1 }

1   trauma she suffered.  *See Williams v. Taylor*, 529 U.S. 362, 398 (2000) (a "graphic

2   description" of the defendant's childhood, "filled with abuse and privation, . . . might

3   well have influenced the jury's appraisal of his moral culpability"); *Correll v. Ryan*, 539

4   F.3d 938, 953 n.8 (9th Cir. 2008) (without further investigation and presentation of

5   contextual evidence and argument, bare facts "served only to demonize [the defendant]

6   rather than to mitigate the appropriateness of imposing the death penalty for his actions").

7   No reasonable juror would deem the evidence presented at the evidentiary hearing as

8   merely cumulative of the evidence presented at trial.

9
10              **2.      There is a Reasonable Probability That at Least One Juror
                          Would Have Struck a Difference Balancing in Weighing the
                          Mitigating Evidence Against the Aggravating Evidence**

11

12          Finally, the State contends that "Andriano fails to address the omitted mitigation's

13   *effect* on the sentencing equation in light of the aggravation, facts and circumstances of

14   the offense, and potential rebuttal evidence."  (State Br. at 25.)  The State is wrong, in

15   multiple respects.

16          At the outset, as noted in the Introduction to this reply, this argument has already

17   been addressed and decided.  This Court found that the claims of ineffective assistance

18   were colorable, which necessarily required it to conclude that "if taken as true, [they]

19   'might have changed the outcome'" of Wendi's sentence.  (Oct. 30, 2012 Order at 4

20   (quoting *State v. Schrock*, 149 Ariz. 433, 441, 719 P.2d 1049, 1057 (1986)).)  The

21   substance of the evidentiary hearing comported with that ruling.  The State introduced no

22   new rebuttal or aggravating evidence different than what it mentioned in its brief

23   opposing the evidentiary hearing, and it does not do so in its post-hearing brief.  The

24   State offers absolutely no basis for this Court to reconsider its conclusion that these

25   claims, if true, could have changed the outcome.

26          Further, Petitioner's post-hearing brief *did* address the issue of this balancing,

27   repeatedly describing how the mitigating evidence not only outweighs the factors the

28

{00137731.1 }                                            52

1   State relied upon at trial in arguing that Wendi should be executed, but actually

2   undermines them.  (Petr. Br. at 31-34, 38, 40, 43-44, 46-48.)  This is true not only of the

3   single aggravator found by the jury—that Joe's murder was especially cruel—but also of

4   all of the other reasons the State presented at trial for imposing the death penalty.

5   *First*, Drs. Woods and Hopper each explained how Wendi's lifetime of childhood

6   trauma and psychiatric disorders necessarily impaired her ability to act rationally and

7   control impulse on the night of the offense, and explained how such disorders could give

8   rise to the deformed decision-making and excessive violence that led to Joe's death.

9   Cruelty in committing the murder was the only aggravating factor the jury found.  The

10  testimony of experts such as Drs. Woods and Hopper would have reduced the weight of

11  that factor by providing the jury with a credible explanation of how Wendi's actions that

12  evening were not the product of evil scheming, but rather a series of increasingly

13  irrational and impulsive actions by a woman suffering from numerous untreated

14  psychiatric disorders and a lifetime of trauma that deprived her of the executive

15  functioning necessary to navigate and control impulse under highly stressful

16  circumstances.

17  *Second*, the mitigating evidence of Wendi's traumatic childhood and psychiatric

18  disorders also explains and essentially eliminates most of the State's arguments for

19  imposing the death penalty at trial.  To locate those arguments, one need only review the

20  best summary of the State's arguments for imposing the death penalty in this case:  the

21  State's closing argument at the penalty phase of Wendi's trial.  These are not after-the-

22  fact justifications for imposing death, but rather arguments the State actually made and

23  the jury presumably considered when it began its deliberations.

24  Only four of the 55 transcript pages of the State's closing argument related to the

25  actual offense (12/15/04 Tr. at 110:14-114:25); the remainder consisted of attacks upon

26  Wendi's character and credibility in a variety of respects.  Most of those attacks

27

28

1   concerned Wendi "add[ing], if you will, salt to the wound . . . by going out on [Joe], by

2   going out with other men." (*Id.* at 111:20-24, 121:18-25, 126:10-20, 127:17-25, 130:1-

3   13, 138:20-139:2; 12/16/04 Tr. at 9:4-11, 9:16-18, 9:25-10:10, 11:9-14, 16:1-6, 17:13-

4   14.)[12]  Had trial counsel developed and presented evidence that Wendi suffered childhood

5   sexual abuse and psychiatric disorders, however, her promiscuity becomes a sad and

6   predictable symptom of her childhood sexual abuse, PTSD, and bipolar disorder.

7       The next most frequent theme in the State's closing argument related to Wendi's

8   upbringing.  The State repeatedly highlighted the incongruity between the positive

9   upbringing portrayed by her trial counsel and Wendi's actions as an adult, arguing that

10  Wendi "knew better and she knew better from when she was a child.  Look at the

11  upbringing that the Ochoas gave her." (12/15/04 Tr. at 113:14-17, 129:13-21, 130:1-15,

12  131:7-22.)  Again, had trial counsel developed evidence of true circumstances of Wendi's

13  upbringing, then the jury could have understood how Wendi could have made such

14  damaged decisions as an adult.

15      The same holds true for the bulk of the State's other arguments.  The State argued

16  that Wendi was a bad mother for inflicting corporal punishment on her children (*id.* at

17  125:7-17), which her schooling at a church that extolled the virtues of corporal

18  punishment would have explained.  The State noted her inappropriate emotions in her

19  post-offense interrogation (*id.* at 133:3-5), which her stunted emotional regulation and

20  dissociation would have explained.  The State characterized her suicide attempt as

21  manipulative (*id.* at 139:11-16), which her psychiatric disorders would have explained.

22  The State even noted that Alejo did not seem genuine when he told the jury that he would

23  be devastated if Wendi received the death penalty (140:14-20), which his true, predatory

24  relationship with Wendi would have explained.

25  _____

26  [12] These were far from the only references to Wendi's sexual history by the prosecutor at
    trial.  A compilation of some—but not all—of those references was previously filed with
27  this Court as Exhibit 2 to the Petition for Post-Conviction Relief.

28

In sum, the mitigating evidence presented at the evidentiary hearing in this matter does not merely add significant weight to the mitigation side of the scale, but it also substantially "reduce[s] the ballast on the aggravating side of the scale." *Porter v. McCollum*, 558 U.S. 30, 42 (2009).  The jury in this case deliberated on the death penalty for several days despite being provided only a cursory presentation of mitigating evidence, none of which explained or assisted the jury in understanding how Wendi could have engaged in the behaviors that the State relied upon in response.  Left with no basis for understanding those actions other than the conclusion that Wendi was evil, the jury imposed a sentence of death.  If trial counsel had performed the mitigation investigation warranted by professional norms and the numerous indications it received regarding childhood trauma and psychiatric disorders, they could have provided the jury with a credible, logical, and true alternative explanation for Wendi's behavior.  Had they done so, "there is a reasonable probability that at least one juror would have struck a different balance" and declined to sentence Wendi to death.  *Wiggins*, 539 U.S. at 537.

## CONCLUSION

For the reasons stated above, Petitioner proved the strength of her claims at the evidentiary hearing, and the State's arguments in response fail to meaningfully rebut them.  This Petition should be granted.

DATE:  SEPTEMBER 5, 2014          By: /s/ Scott M. Bennett
                                      Scott M. Bennett (022350)
                                      COPPERSMITH BROCKELMAN PLC
                                      2800 North Central Avenue
                                      Phoenix, Arizona  85004
                                      (602) 224-0999 (office)
                                      (602) 224-6020 (fax)
                                      sbennett@cblawyers.com

                                      Allen A. Arntsen, admitted *pro hac vice*
                                      Matthew R. Lynch, admitted *pro hac vice*
                                      FOLEY & LARDNER LLP
                                      150 E. Gilman Street
                                      Madison, WI 53703-1481
                                      (608) 257-5035 (Office)
                                      (608) 258-4258 (Fax)

                                      *Attorneys For Petitioner Wendi Andriano*

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

ORIGINAL e-filed September 5, 2014,
with the Clerk of the Maricopa County Superior Court

COURTESY COPY hand-delivered September 5, 2014, to:

Judge Brian K. Ishikawa
Maricopa County Superior Court
1810 Lewis Street
Mesa, AZ  85210-6235

COPY mailed and e-mailed September 5, 2014, to:

Gregory Hazard
Office of the Attorney General
1275 W. Washington
Phoenix, AZ 85007-2997

Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tucson, AZ  85701-1367

*Attorney for the State of Arizona*

*/s/ Carol Keesee*

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4825-6076-0092.

# EXHIBIT ZZZZZZZZZ

Michael K. Jeanes, Clerk of Court
\*\*\* Filed \*\*\*

11/3/14    8 A.M.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                11/01/2014

                                                    CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                          K. Sotello-Stevenson
                                                            Deputy


STATE OF ARIZONA                        LACEY ALEXANDRA STOVER GARD
                                        GREGORY MICHAEL HAZARD
                                        JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO                WENDI ELIZABETH ANDRIANO
                                        #191593 ASPC PV LUMLEY DEATH R
                                        PO BOX 3300
                                        GOODYEAR AZ  85395



                                        ALLEN A ARNTSEN
                                        SCOTT M BENNETT
                                        STEPHAN J NICKELS
                                        MATTHEW R LYNCH
                                        JODI FOX

                                        CAPITAL CASE MANAGER
                                        COURT ADMIN-CRIMINAL-PCR
                                        OFFICE OF PUBLIC DEFENSE
                                        SERVICES-CCC
                                        VICTIM WITNESS DIV-AG-CCC



                                RULING
          POST-EVIDENTIARY HEARING/PCR MATTER/CAPITAL CASE

     This is the defendant's first Rule 32 proceeding following the Arizona Supreme Court's
affirmance of her conviction and death sentence in *State v. Andriano*, 215 Ariz. 497, 161 P.3d

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

540 (2007). The Court has reviewed the defendant's Petition for Post-Conviction Relief, the State's Response to Petition for Post-Conviction Relief, and the defendant's Reply, as well as the Court's file. The Court has further reviewed and considered evidence (testimony and exhibits) admitted during the eight-day evidentiary hearing held February 3-7, 10-11, and 14, 2014, as well as the written closing arguments of counsel. The Court presided over the original 58-day jury trial that commenced with jury selection on August 23, 2004 and concluded with the penalty phase verdict on December 22, 2004, and has consulted its own notes and recollection of the proceedings. Finally, the Court has considered the closing arguments of counsel, including Petitioner's[1] Post-Hearing Memorandum in Support of Petition for Post-Conviction Relief (filed 6/2/2014), the State's Closing Memorandum (filed 7/31/2014), and Petitioner's Post-Hearing Reply Memorandum in Support of Petition for Post-Conviction Relief. .

The defendant was convicted by a jury of one count of first degree murder. *Andriano*, 215 Ariz. at 501, 161 P.3d at 544. The jury unanimously found at the aggravation phase that the defendant committed the murder in an "especially cruel manner," in violation of A.R.S. § 13-751(F)(6),[2] but did not find that she committed the offense "in expectation of the receipt ... of anything of pecuniary value," in violation of A.R.S. § 13-751(F)(5). Following a penalty phase, the jury determined that the mitigation presented was not sufficiently substantial to call for leniency and returned a verdict of death.

**Claims I(A) and II: Ineffective Assistance of Counsel**
    The defendant raised five claims in her PCR petition.   After reviewing the post-conviction relief pleadings, the Court granted the parties an evidentiary hearing on two penalty phase claims: Claim I(A) (mitigation evidence) and Claim II (conflict of interest of *Knapp* counsel). Specifically, the Court found that the defendant raised a colorable claim warranting an evidentiary hearing as to two of the claims:

> "In claim I(A), defendant allege[d] that her trial counsel was ineffective in the penalty phase by failing to investigate and present expert testimony regarding her mental illness and by failing to investigate and present evidence regarding her harrowing childhood...

> "In claim II, defendant allege[d] that defense counsel DeLozier, who was in charge of the investigation of penalty phase mitigation, had an actual conflict of interest that affected his representation of her. This claim is related to defendant's claim I(A) of ineffective assistance of counsel in the penalty phase, which the Court found to be colorable..."

---

[1] Because Rule 32.3, Ariz.R.Crim.P., identifies post-conviction relief as "part of the original action and not a separate action," the Court will refer to "defendant," rather than "petitioner," in its ruling.

[2] Citations are to the current version of the statute (A.R.S. § 13-751 *et seq.*) rather than the historical version. (A.R.S. § 13-703 *et seq.*).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014


Minute Entry (Ruling) 10/30/2012 at 4, 5.

**Claims I(A) and II ("available mitigation evidence;" credibility)**

To prevail on a claim of ineffective assistance of counsel (IAC), the defendant bears the burden of establishing (1) deficient performance by counsel and (2) prejudice to the defendant attributable to the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 700 (1984). Failure to meet her burden under either prong is fatal to the defendant's claim.

The court "...must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. *Id.*, 466 U.S. at 690, 104 S. Ct. at 2066. The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. *Id.*, 466 U.S. at 691, 104 S. Ct. at 2066. *Rompilla* holds that counsel may have a duty to investigate "available mitigating evidence" (disclosed in documents relied on by the State in aggravation) even where the defendant and family members deny its existence.

In this case, the Court believes that the factual issue of whether trial counsel failed to discover and present mitigating evidence that was readily available is central to its resolution of the PCR claims.

In connection with the issue of whether trial counsel failed to present *available mitigation* evidence at trial, the governing Arizona statute identifies mitigating factors as follows:

The trier of fact shall consider as <u>mitigating circumstances</u> any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, <u>including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense,</u> including but not limited to the following:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.
2. The defendant was under unusual and substantial duress, although not such as to constitute a defense to prosecution.
3. The defendant was legally accountable for the conduct of another under § 13-303, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                              11/01/2014

4. The defendant could not reasonably have foreseen that his conduct in the
course of the commission of the offense for which the defendant was convicted
would cause, or would create a grave risk of causing, death to another person.
5. The defendant's age.

Ariz. Rev. Stat. Ann. § 13-751(G).

### BACKGROUND
### *THE 2004 TRIAL*
The Court presided over the original four-month (58-day) trial in this matter,
commencing with jury selection on August 23, 2004 (Day 1); continuing through guilt-phase
opening statements and evidence on September 8-November 18, 2004 (Days 8-45); continuing
through the aggravation/eligibility phase, and concluding with the penalty/sentencing phase that
culminated in a death verdict on December 22, 2004 (Days 50-58).

At trial, the defendant incorporated much of her mitigating evidence into her guilt phase
presentation, centered around the defendant's allegations of domestic violence.

### *Witnesses at the guilt phase*
The mitigation presentation was "front-loaded." Consequently, the defendant is correct
that the mitigation phase was truncated. The mitigation evidence and witnesses presented by
trial counsel Dan Patterson during the guilt phase included: **Donna Ochoa** (the defendant's
mother; DAYS 22, 23 10/4-5/2004); Patricia Rubio, **Alejo Ochoa** (the defendant's adoptive
father; DAY 24 10/6/2004); **Sharon Murphy** (the defendant's domestic abuse expert; DAYS
25-28 10/7, 12-14/2004); William Joe Collier (DAY 29 10/20/2004); William Joe Collier,
**Brandon Ochoa** (the defendant's younger brother/cousin), Barbara Mitchell (DAY 30
10/21/2004); **Wendi Andriano** (the defendant; DAYS 31-39 10/25-28, 11/1-4, 8/2004); **Alejo
Ochoa** (DAY 39 11/8/2004).

The Court recalls that the defendant presented as a well-prepared and well-spoken young
woman, who remembered and described childhood events and the evening of the murder during
direct examination, and who clashed/disagreed with the prosecutor during cross-examination.

The State's rebuttal witnesses included Dr. Bayless.[3] In response to a defense motion, Dr.
Bayless's testimony was limited by court order to: whether the defendant's characteristics were

---

[3] The State's other guilt phase rebuttal witnesses included: Tina Ayala, Thomas Kulesa (DAY 40 11/9/2004); Dr.
Bayless, Justin Roberts, Joseph Andriano, Sr. (DAY 41 11/10/2004).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                   11/01/2014

consistent with those of domestic violence victims; the characteristics of a person who has been the victim of domestic violence; secondary gain; and the tests conducted. The State was precluded from eliciting testimony related to:

> Whether Dr. Bayless believed the defendant or whether he has an opinion as to whether the defendant is credible or truthful;
> A regurgitation of the police reports he reviewed;
> The allegation of the defendant committing a theft from her employer;
> The fact that the defendant was in jail;
> The issue of the children and the severance of parental rights;
> The defendant's alleged suicidal thoughts and suicide attempt;
> A discussion of clients with a profile of this type characterized by poorly controlled anger and hostility and violent outbursts.

See ME11/10/2004 (DAY 41).

*Witnesses at the sentencing phase*

After the victims Jeanette and Joseph Andriano addressed the jury, the defense witnesses presented by trial counsel DeLozier during the sentencing phase included: Laura King (former social worker at Durango jail), Gerald Perry (clinical psychologist at Durango jail), Joyce Van Every (head nurse at Durango jail) (participation in counselling) (DAY 50 12/8/2004); Chris Vasquez, Jimmy Galyon, Linda Galyon, **Sharon P. Murphy** (dynamics of domestic abuse) (DAY 51 12/9/2004); **Donna Ochoa** (DAYS 51-52 12/9, 13/2004); Lonnie Inskeep, Gia Palicki (took care of the defendant's children for a year; observed the defendant's positive interactions with them), Barbara Mitchell, **Alejo Ochoa** (DAY 52 12/13/2004).

The State's sentencing phase witnesses included: Jana Andriano Clayton, Timothy Lee, Dawna Harris, Bonnie Lose (DAY 53 12/14/2004); and concluded with Dr. Michael Bayless (DAY 54 12/15/2004).

Before closing, the jury heard the defendant's allocution.[4]  "The Defendant addresse[d] the jury" and commented on the testimony provided by a couple of witnesses who preceded her,

---

[4] The defendant herself acknowledged participation in what she characterized as assisting victim in committing suicide. "I feel stained for having participated in that...you and I needed professional help, not a suicide plan. I'm sorry for making the wrong choice, for failing you...[ Insisted that convinced Joe intended to kill her]...I acted and engaged in conduct that I never in my life thought I was capable of and I have never done since or before that. I've never harmed a sole [sic] in my life. The picture will never leave my head. I've never been a violent person. And when I look back at that night, I'm sickened by what happened.  I made a horrible, horrible, horrible choice on that night...I have only begun to understand why I reacted in violence....I can't pretend to fully understand why. That was conduct so unlike me, so foreign to me. ..." She expressed a desire to contribute in a positive manner if her life were spared. PCR Response, Exhibit CCC. RT12/15/2004 50-65, 62-63.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                    11/01/2014

including Dr. Bayless, and then discussed the murder, her children, her work during her incarceration, and sought leniency. The defendant's statement was articulate and coherent, just as her testimony had been.

While listening to trial counsel DeLozier's closing statement addressing the legal issues and the mitigating factors, the jury viewed a PowerPoint (Trial Exhibit 55) that contained photographs of the defendant's past accompanied by text prepared by a third party.

Although the defendant in her PCR characterized this as defense counsel's closing statement, prepared by a third party, in fact the slides were photographs of the defendant's childhood and motherhood years with explanatory text, and were presented while counsel was speaking about legal matters. Counsel permitted the jurors to read and view the slides without comment. [5]

The defendant's sentencing (mitigation) presentation included evidence of mitigating factors from the guilt and sentencing phases, including the testimony of a spousal abuse expert, and was summarized by our Supreme Court on Independent Review:

Domestic violence victim, as to which the Court afforded little weight, finding the claim not relevant to the murder;
Substantial stress, which the Court found to be no greater than the stress sustained two years earlier when defendant was pregnant, her husband's medical condition was diagnosed, and financial concerns existed, so gave no substantial weight to this factor;
Defendant "may have been" sexually abused, but any incidents were remote in time to the murder;
Good mother, which was afforded minimal value as defendant had murdered her children's father;

---

[5] Described by counsel at trial as "…the photographs that have been incorporated into the power point presentation, the time line. I would move the photographs, the actual photographs, as an exhibit to supplement the presentation that 's going to be made at this time." RT 12/15/2004 at 75.

"What we're going to do is show you a series of slides. You've seen some of them in the introduction. Can you read the material with it because I don't really intend to read all that…I'll probably talk about other things while it's going on…

'Obviously the beginning's over here. You remember Texas. That's Wendi in Donna's arms and so forth. Here's Wendi as a baby and so forth.

"As you can see, what we're doing is going through progressively up until October 8[th] with the various events that took place, significant ones in Wendi's and Joe's life and the various stages of family life.

"If you'll scroll through that, I'm going to talk about other things that may or may not have relevance to what's on the screen at any particular time…" RT 12/15/2004 at 76-77.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                              11/01/2014

Good inmate, which was accorded minimal weight, as inmates are expected to follow the
rules;
Strict religious upbringing, but defendant's actions of murdering her husband were
inconsistent with her church's teachings and were accorded minimal value;
Cooperation, remorse, age were determined to be not mitigating, as the Court saw no
cooperation and, in fact, determined defendant denied responsibility, despite her
intelligence (high IQ);
Lack of priors, the impact on her family, friends, and relatives, and the fact that she
would not be a future threat were accorded minimal weight.

*State v. Andriano*, 215 Ariz. 497, 511-12, 161 P.3d 540, 554-55 (2007) *abrogated by State v.
Ferrero*, 229 Ariz. 239, 274 P.3d 509 (2012).

The Court's recollection of the mitigation evidence presented at trial is consistent with
the Supreme Court's assessment of the penalty phase mitigation evidence.

### *THE 2014 PCR EVIDENTIARY HEARING*
Nearly ten years later the Court presided over the eight-day post-conviction Evidentiary
Hearing, held February 3-7, 10-11 and 14, 2014, related to two penalty phase claims.

At the PCR evidentiary hearing, the defendant presented expert testimony about the
effect of childhood experiences on her development from infancy through age eighteen, setting
the stage for her behavior as an adult. The defendant relied upon experts to provide an
explanation for her actions in light of her behavioral development, background and experience
(including impaired executive functioning, impulsivity, PTSD, bi-polar disorder, and
depression), supported with lay testimony to establish the underlying factual claims.[6]

The PCR evidence presented included the preparation of a substantial "social history,"
which –

> Expanded upon the defendant's familial background (Paternal (biological father);
> Maternal; Stepfather; the defendant herself);
>
> Expanded upon the defendant's experiences in a relatively-closed religious
> community, which may have exposed her to sexual abuse by her biological father
> or his family members and to sexually-inappropriate behavior by her stepfather;

---

[6] Testified was that the defendant was so damaged before age 18, that the alleged abuse affected her state of mind
the night she murdered her husband. [EH 2/3/2014 Dr. James Hopper/cross]
Dr. Hopper: Under circumstances of high stress, she would lose access to pre-frontal cortex, remember rules laws,
inhibit impulses...

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

Expanded upon the impact of the defendant's experiences in the context of child
development (depression; executive functioning; decision-making; PTSD;
impulsivity).

The defendant's PCR witnesses[7] also included: Dr. James Hopper (2/3-4/2014);
Kyre Lee Jean Lorts, **Donna Ochoa**, Jeri Cunningham (2/4/2014); Jasper Neace, Dr. George
Woods (2/5/2014); Scott McLeod, Keith Rohman (2/6/2014); Daniel Patterson (2/7/2014); Dr.
Joette James, George David DeLozier, Jr., Cindy Schaider (2/10/2014); and Larry Hammond
(2/11/2014).

### *COMPARING THE TRIAL / PCR EH EVIDENCE         - MERITS*
At trial, the defendant's behavior was described as being consistent with having been a
victim of domestic violence. The defendant's expert testified extensively during the guilt phase
and again during the mitigation phase; her testimony was supported by family members, who
described – and were challenged by the prosecution on – incidents they had witnessed between
defendant and the victim.

At the PCR evidentiary hearing, domestic violence was somewhat marginalized; rather,
because the defendant experienced memory lapses, the defendant's behavior was identified by
her PCR experts as being "consistent with" (1) experiencing a "horrific childhood,"[8] (2) having
been sexually abused,[9][10] and (3) suffering mental health-related issues. As noted in the footnotes,
similar topics were presented at trial.

---

[7] The State called Dr. Kiran Amin and Dr. Steven Pitt (2/14/2014).

[8] "...Wendi and Donna and Alejo told you that Wendi experienced emotional abuse from childhood...These took
the form of yelling, screaming, throwing tings; both in her parent's home and then into her marriage.
      "Donna and Wendi would go into the bathroom or bedroom and hide, if you remember, until Alejo calmed
or left..." TR 12/15/2004 at 93.
      "During the course of the last 15 weeks, you heard from a lot of people, some who have known Wendi all
her life some for many years and some who have known her some portion of the last four years..." DeLozier's
closing argument, sentencing phase, RT12/15/2004 at 90.

[9] RT 12/15/2004 Closing at 95: "...You heard testimony that she was abused as a young child and then later as
Joe's wife. Donna told you various forms of sexual abuse that Wendi suffered from members of Donna's own
family before the age of five. They both told you about Rick, the head of the traveling ministry group...."

[10] *But see, State v. Andriano*, 215 Ariz. at 512, 161 P.3d at 555:  INDEPENDENT REVIEW "Andriano also offered
evidence that she "may have been" sexually abused by her biological father when she was around the age of two,
although she does not recall it, and that a member of the traveling ministry to which her family belonged exposed
himself to Andriano when she was between six and eight years old. Andriano also showed that she maintained good
grades in school and participated in missionary and community work. We do not weigh these mitigating
circumstances heavily because the events are remote in time to the offense and thus their relevance is minimal. *Cf.*

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                    11/01/2014

**(1) The "good girl/good background" theme - trial**

In sworn testimony at trial the defendant's mother, Donna Ochoa, explained that the defendant had a "good home life;" and took exception to the prosecution's characterization of life in an on-the-road ministry as "roaming around," explaining, "Roaming around, that's not -- that's not what we did. We were invited to churches to minister in church." She acknowledged that they travelled "from place to place," and that she was "comfortable with that." PCR Response, Exhibit LL, RT 10/5/2004 at 115-118 (cross).

Donna described as "strict" the manner in which the defendant's natural father, Skip, would discipline the defendant during the three preschool years he was around. When asked if Skip ever hit the defendant, Donna said that he spanked her; he spanked her hard, but acknowledged that CPS was never called. *Id.* Trial witness Barbara Mitchell testified that corporal punishment was imposed, which she termed "swats" rather than "spanking." PCR Response, Exhibit SS, RT 10/21/2004 at 150-151.

Donna described the defendant's stepfather, Alejo Ochoa, who adopted the defendant when she was six having married her mother a few years earlier, as "stable," "funny," "compassionate," "pretty quiet," and agreed that he was "basically a good man." She acknowledged that "[i]t was a good home environment." *Id.* Donna said, "They would go to -- walk to the store together with the dogs. He had two really pretty dogs. They would –sometimes Alejo babysat her and the other child that was living at my apartment while I worked and while the other mother went to school. ...He used to play tea party with the girls. Actually dug them out a little fort, and we were building a house at the time and he would be out there, playing tea party in the middle of the desert while the construction people were watching them, kind of giggling with them." PCR Response, Exhibit KK RT 10/4/2004 at 11-12.

Donna agreed that "...even though she may not have had shoes, she had the spiritual and internal kind of thing that she would need for later on in life." Donna believed that "[t]he things I taught her as far as the word of God, I believe that was correct." *Id.* In testimony that was stricken, Donna acknowledged that she had modified her childrearing practices "so that Brandon would not be so sheltered." [Although stricken in response to the State's objection as being non-responsive, Donna's answer provides insight for purposes of PCR into the closeness of the home/church environment, and her mother's decisions regarding defendant's care when she was young.] PCR Response Exhibit LL, RT 10/5/2004 at 176 (redirect).

---

*Ellison,* 213 Ariz. at 144, ¶ 136, 140 P.3d at 927 (finding defendant's "childhood troubles deserve little value as a mitigator for the murders he committed at age thirty-three")."

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

At trial, the defendant testified, "Because my father was the youth pastor, my home was the one where we would invite a lot of teenagers or younger kids over and we'd have like a fun night at my house and that would be like playing games and doing scavenger hunts and things like that....He also took us camping – him and other couples would take all the kids camping..." She agreed this was "under the "watchful eye of your father?" "And my mom, yeah." PCR Response, Exhibit V RT 10/25/2004 at 24.

**The "harrowing/horrific childhood" theme - PCR**
At the PCR the defendant's witnesses referenced (and showed a photograph of) the "Rod of Correction," and her church's teachings about correcting the behavior of children, essentially to beat a child to a point beyond tears. The defendant's childhood friends (Jasper Neace, Kyre Lorts, Jeri Lynn Cunningham), who testified at the PCR, identified no specific occasion on which the rod was administered to the defendant. (Jeri Lynn did remember being sent with the defendant to the principal's office.)

The defendant's mother stated that she carried a spoon in her purse, implicitly used to discipline defendant; at trial, however, in responding to a question about discipline and whether her mother harmed her physically during her growing-up years, the defendant previously testified at trial that her mother "...would always grab my hair and pull me up by my hair...[not anything else]...that was her thing." PCR Response, Exhibit V RT 10/25/2004 at 41-43.

One photograph was presented at the PCR that had previously been used at trial. The photograph depicts the defendant in a group; at the PCR hearing the defendant introduced the photograph to illustrate her time with a "religious cult," while at trial the same photograph depicted her time with a "travelling ministry." *See* Trial EXH. 550 (ppt. p.1); PCR EH, EXH. 147.

**(2) The sexual abuse claim - trial**
At trial the defense relied on domestic abuse and possible sexual abuse, implicating the defendant's paternal grandfather (access and opportunity) and biological father (subsequent conviction as to stepdaughter).

At trial the defendant specifically denied any improper touching or physical harm by her stepfather. She described an incident where her mother had given her permission to attend a friend's family reunion and her stepfather denied her permission because he thought it was a date and she went anyway. When she returned home she saw her dad in the backyard and determined to face the consequences. Alejo began yelling, pushed her against the house and:

A.    He directed me to get out of his face before he hurt me.
Q.    Okay.
A.    And I took off running to my bedroom and shut the door.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

Q.    Okay. So his anger had gotten to such a point where he was capable, you believe,
      of him hurting you?
A.    That's what I thought, yes.
      [Above answer stricken as non-responsive]
Q.    Why was that?
A.    That was because he had his hands on me and he never put his hands on me
      before.
Q.    Okay.
A.    Besides spanking me.
Q.    Did that affect you in some fashion?
A.    That scared me.
Q.    Okay. *Were there any other incidents where your father touched you improperly
      or harmed you physically?*
A.    *No.*
PCR Response, Exhibit V RT 10/25/2004 at 41-43.[Emphasis added.]

      At trial the defendant described efforts by herself and her mother "to try and placate him
or calm him down" when her stepfather became angry. She said, "My mom and I both did
that...When he'd leave, you know, we – when – we knew that he'd come back in an hour, maybe
an hour and a half or two, and when he got back we'd want to have dinner ready for him. Or, you
know, his favorite thing was he liked to lay on the couch and I'd always play with his hair and
that would calm him down. And just things like that. Just – just talking softly to him and, you
know, just trying to please him." PCR Response, Exhibit V RT 10/25/2004 at 38. This "playing
with his hair" as described at trial took on sexualized overtones at the PCR hearing.

**The sexual abuse claim - PCR**
      At the PCR, the defendant's witnesses.(Jeri Lynn Cunningham; Kyre Lorts, her mother)
implicated her stepfather in sexually abusing the defendant and some of her friends. Evidence of
the claimed sexual abuse toward the defendant, considered by defense experts, James Hopper,
Ph.D. and George Woods, M.D., included:
      Photographs taken in the desert by her stepfather of the defendant as a teenager, backlit
      and scantily-clad, and other photographs taken in a hotel room  (PCR, EH EXH. 72, *not
      offered or admitted*); and

      An inappropriate, sexually-overtoned card sent to defendant by her stepfather during her
      incarceration (PCR, EH Exhibit 75, *not offered or admitted*).
*See* PCR, EH Exhibits 4.002 and 2.001 ("Supplemental documentation...cards; supplemental
documentation...photographs).

Circumstantial evidence introduced included, *inter alia*:

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                            11/01/2014

The testimony of the defendant's girlhood friends about the defendant's stepfather inappropriately touching each of them (Only Kyre Lorts, a somewhat fragile witness, indicated that he had touched defendant, which contradicts the defendant's trial testimony.);

The testimony of the defendant's mother about the defendant's inappropriately-sexualized behavior in preschool, resulting in her withdrawal from that school, and bedwetting.

The young women, who were the defendant's girlhood best friends, indicate that they would have testified back then (at trial) had they known of importance – but this is hindsight and the details differ, calling into question credibility. For example, Ms. Lorts testified that she and the defendant dressed in lingerie from the defendant's mother's closet (EH RT 2/4/2014), while the defendant's mother testified that she did not keep lingerie at her house and returned lingerie given to her by her husband to the shop. (EH RT 2/4/2014).

The credibility of the claim of actual abuse is undermined by the absence of reports to law enforcement; the lack of an outside investigation; and the denial by the defendant at trial. The reports from her girlfriends, are being made many years after the testified-to events, and 8 years after the death penalty was imposed. All acknowledge being aware of the charges during the years preceding trial yet did not come forward.

**(3) The mental health claim**
In connection with her criminal charges, various mental health professionals raised possible areas of concern.   Kandi Rohde, who was hired by the defendant's parents and counselled the defendant in jail, suggested the possibility of sexual abuse. Ms. Rohde was eventually banned from the jail for introducing contraband, and was not called by trial counsel because of concerns about what the defendant may have told her that would be subject to cross-examination.

Trial counsel acknowledged being aware of defendant's "suicide attempt" while in jail, which he discounted as "situational" and resulting from her incarceration. The defendant was deemed competent by Dr. Potts, and later evaluated by Dr. Rosengard Petition. Exhibits 6.A and 6.C.

The defendant faults trial counsel for failing to call an expert to testify about mental health-related matters. The defendant fails to acknowledge that trial counsel secured Dr. Rosengard's evaluation, determined not to call Dr. Rosengard, and successfully limited the testimony of Dr. Bayless, the State's mental health expert, and prevented the admission of testimony damaging to the defendant (theft from her employer; severance of her parental rights;

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                         11/01/2014

discussion of clients with similar profiles who have characteristics of "poorly controlled anger and hostility and violent outbursts"). Trial counsel secured this preclusion while presenting the testimony of its own domestic violence expert.

During the course of the PCR, the defendant presented evidence that she suffers from depression, PTSD, impulsivity and impairment of executive functioning. The Court will accept that this is true. Even so, the State's expert, Dr. Pitt, remained adamant in his opinion that the defendant did not have a mental disease or defect whereby she couldn't appreciate the wrongfulness of her conduct. EH RT 2/14/14 at 114. The Court believes that this is consistent with an opinion that her "capacity to appreciate the wrongfulness of her conduct was [not] significantly impaired." *See* A.R.S. § 13-751(G)(1). This is also consistent with the defendant's allocution, wherein she acknowledged that she had made "a wrong choice…a horrible, horrible, horrible choice."

In fact, the EH evidence tended to demonstrate "…her impaired ability to control impulses and to react and respond appropriately in times of great stress." Petitioner's Post-Hearing Memorandum at 2:12-13. Our Supreme Court would have afforded stress, or even impulsivity, little weight as mitigating factors since the defendant's action of murdering her husband brought on the stress. *Andriano*, 215 Ariz. at 511-12, 161 P.3d at 554-55. *See State v. Brewer*, 170 Ariz. at 506, 826 P.2d at 803 (Evidence did not show that the defendant's impulsive personality rendered him unable to control his conduct. Poor impulse control, standing alone, has little mitigating weight).

**Prejudice - credibility**
The defendant's claim of prejudice relies on a showing that additional mitigation evidence would undermine the Court's confidence in the sentence of death imposed by the jury in 2005. The defendant's mental health experts made a strong case that mental health issues, a harrowing childhood and sexual abuse could impede a child's development and create trauma sufficient to "explain defendant's actions" and mitigate the "circumstances of the crime" and also act as additional mitigation sufficient to support leniency.

The Court is cognizant of the expertise provided to assist in in its determination. The experts' opinions necessarily rely on the believability of background statements made by various witnesses, documents, and records. Consequently, the Court's resolution necessarily relies on an assessment of the *credibility* of evidence presented regarding sexual abuse, harrowing childhood and mental health presented at the PCR hearing. *See State v. Serna*, 167 Ariz. 373, 374-75, 807 P.2d 1109, 1110-11 (1991)(trial judge, rather than jury, could properly determine witnesses' credibility following heating on motion for new trial grounded in newly-discovered evidence, where one of five requirements is whether evidence, if introduced, would probably change the verdict if a new trial were ordered).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                    11/01/2014

Quoting *Serna*:

> Because defendant's motion to vacate relies on witnesses willing to testify at a new trial, those witnesses must appear worthy of belief *to the trial judge* hearing the motion. 17 A.R.S. R.Crim.P. 24.2(a)(2), 32.1(e); *Jeffers*, 135 Ariz. at 426, 661 P.2d at 1127; *Salinas*, 129 Ariz. at 368, 631 P.2d at 523. In judging the potential credibility of a prospective witness, the trial judge does not usurp the function of the jury. *State v. Urry*, 104 Ariz. 244, 245, 450 P.2d 1018, 1019 (1969); *State v. Blankenship*, 99 Ariz. 60, 65, 406 P.2d 729, 734 (1965). Rule 32.1(e) specifically requires the *court* to consider "the probability that such [newly discovered] facts, if introduced would have changed the verdict...."
>
> . . . . . . .
>
> As we stated in *State v. Turner*:
>
>> The new evidence must be such as would have probably resulted in the acquittal of the accused had it been produced at the trial, and it is therefore *necessary that **it shall appear to the court** hearing the motion that it is probably true.* The witness who is expected to testify must appear **to the court** to be credible. *His credibility is to be determined by the judge hearing the motion....* The refusal of a new trial for newly-discovered evidence on an affidavit incredible in view of the claim made and evidence of the trial is not error.
>>
>> . . . . .
>>
>> The trial judge was in a much better position than we are to determine the weight to be given the [testimony] and whether or not the testimony set forth ... would probably change the result in case of a new trial.
>
> 104 Ariz. 469, 471-72, 455 P.2d 443, 445-46 (1969) (citation omitted) (emphasis added).

*State v. Serna*, 167 Ariz. 373, 374-75, 807 P.2d 1109, 1110-11 (1991).

**Prejudice - credibility; "available mitigation evidence" (conclusion)**

Essential to the defendant's post-conviction claims are (1) the availability of the proffered evidence at the time of trial and (2) the credibility of the proffered mitigation evidence and witnesses offered post-conviction. Her IAC claims are grounded in the failure to present available mitigation evidence – that the defendant's childhood was in fact harrowing, as a result of the defendant's upbringing, mental illness and sexual abuse victimization.

The Arizona Supreme Court commented on the change in the defendant's story/theme between her trial and her appeal: "Although Andriano argued at trial that she was assisting Joe in a suicide by poisoning, she argues on appeal that because Joe did not know he was being

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                    11/01/2014

poisoned, mental anguish cannot be proved." *State v. Andriano*, 215 Ariz. at 511, 161 P.3d at 554.

The Court observes that the defendant's trial claim of "domestic violence" as a mitigating factor has been all but abandoned at her PCR; somewhat re-characterized as PTSD and "people-pleaser/lack of boundaries" to the detriment of own needs.

The Court observes that the defendant's ability to remember, recall and describe at trial contrasts sharply with her current memory, especially when interviewed by the State's expert, Dr. Pitt. At trial, the defendant seldom (if at all) claimed an inability to remember, provided narrative responses and detailed answers in response to trial counsel Patterson's questioning. In addition, she responded appropriately, and sometimes aggressively, to the State's trial cross-examination. In contrast, certain PCR interview questions asked of the defendant and memorialized in video clips led to long silences, extended pauses, and an absence of recall or an inability to access memories.

The Court finds the underlying evidence to be less than credible. The most negative evidence relied on that statements of interested third parties (the defendant's mother and her girlhood best friends). The defendant's mother presented evidence of the defendant's "good" childhood at trial and at the post-conviction proceedings offers a dramatically-different characterization of the defendant's childhood. As noted previously, the same photo that was introduced at trial to demonstrate a childhood that included "ministering on the road" was framed at the PCR hearing to suggest a vagabond lifestyle, deprivation, and possible sexual exploitation. *See* Trial EXH. 550 (ppt. p.1); PCR EH. EXH. 147.

The Court also finds that the evidence was not "available" to trial counsel. The defendant herself denied experiencing anything other than a strict, religiously-directed childhood. She testified that she was neither physically nor sexually abused. Although post-conviction experts provide the Court with inferences from testing; describe behaviors that are "consistent with" sexual or physical abuse or mental health issues; and attribute her denials to an inability to access memories, the Court finds the defendant's and her witnesses' words, shared before a death sentence was imposed, to be more credible.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                    11/01/2014

altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. *See United States v. Decoster, supra,* at 372–373, 624 F.2d, at 209–210.

*Strickland,* 466 U.S. at 691, 104 S.Ct. 252.

**Claims I(A) and II**
**(Deficient performance prong under *Strickland; Cuyler v. Sullivan*)**
            In claims I(A) and II, the defendant alleges that trial counsel, Daniel Patterson and David DeLozier, were ineffective in the penalty phase for failing to investigate, locate and present available mitigation evidence; as to Claim II, the defendant claims that the failure resulted from an actual conflict of interest. *See Cuyler v. Sullivan,* 446 U.S. 335, 100 S. Ct. 1708 (1980).

            **BACKGROUND**
            The defendant initially retained two attorneys as private counsel; one of the two was DeLozier. Upon the withdrawal of one of her privately-retained attorneys, The defendant sought appointment of a second attorney to assist DeLozier. The court appointed Patterson's office, which secured for the defendant access to both capital expertise and public resources. Appointed counsel, Patterson, succeeded to the role of lead counsel, with DeLozier, *Knapp* counsel, as second chair.

**Claim I(A) – Deficient performance prong ("Strickland")**
            **The *Strickland* Claim** (Patterson & DeLozier)
            In claim I(A), the defendant alleges that her trial counsel was ineffective in the penalty phase for failing to investigate and present expert testimony regarding her mental illness and by failing to investigate and present evidence regarding her harrowing childhood.

            Patterson took responsibility for the guilt phase, and DeLozier was tasked with responsibility for the mitigation phase. Counsel was assisted initially by mitigation specialist Linderman; several months before trial Scott MacLeod was identified as defendant's mitigation specialist. There is no indication that the team met regularly, assessed progress, identified tasks or shared information; there is testimony about informal meetings and discussion, coupled with DeLozier's regular, supportive visits to the defendant at the jail.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

Potential witnesses, including the defendant's family, belonged to a church that appears
to have had a relatively closed, less-than-forthcoming mindset when dealing with those outside
the community. The church educated its children, who did not mingle with children outside the
community. DeLozier was the closest the defense had to a religious insider; appeared to have
been trusted by the Andriano family, and by the defendant herself; was familiar through other
legal work with abuse victims; and it was reasonable to rely on his ability to secure necessary
information.

Given DeLozier's familiarity with sexual abuse claims gained through an unrelated case
he was handling, his regular meetings with the defendant and his familiarity with her family, her
upbringing, and her background, the close relationship justified that belief and his conclusions;
further, the relationship justified Patterson's reliance at the time on his second chair's work.

Based on the jail visits, Patterson thought DeLozier would handle the direct examination
of the defendant at trial. In fact, the defendant advised Patterson of her concern about DeLozier
conducting her direct examination ("her eyes got] wide open" was Patterson's comparison), at
which point Patterson began prepping her trial testimony himself. RT 2/7/2014 at 41-42.
Nonetheless, the shortcomings were neither apparent at trial nor captured in the record. Patterson
believed that DeLozier's mitigation closing was persuasive. EH RT 2/7/2014 at 47 ("...he gave a
pretty powerful summation in Phase 3.").

Despite the division in responsibility between trial counsel, the Court notes that the
mitigation presentation was not limited to the penalty phase; the presentation of mitigating
evidence was "front-loaded" and began during Patterson's guilt phase presentation.

The Court was not privy to the actual mitigation investigation, has uncertainty regarding
the extent of the mitigation investigation based on the PCR testimony of Scott MacLeod, the
mitigation specialist at trial (who remembered little in 2014), and the PCR expert Keith Rohman,
and can only infer its extent based on the actual evidence presented at trial and at the EH. The
Court has found that certain of the PCR evidence is not credible, or is speculative.

The defendant proposes not only supplementary information, but evidence that
contradicts that originally presented at trial, claiming that it could have been unearthed at the
time of trial. For the reasons stated previously, the Court is not persuaded, first as to the
credibility of the proposed evidence and, second, as to its availability at trial.

The Court finds that there was a lack of communication and coordination between
members of the defense team. Notwithstanding the deficiency, trial counsel secured and
presented that evidence that was readily available at the time of trial.

Docket Code 167                    Form R000A                         Page 17

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                           11/01/2014

**Claim II – Deficient performance prong (*Cuyler v. Sullivan*)**
      ***Knapp* counsel Delozier**
      In claim II, the defendant alleges that defense counsel David DeLozier, who was in charge of investigation of penalty phase mitigation, had an actual conflict of interest that affected his representation of the defendant and his ability to discover and present mitigating evidence.

      Although this claim may be precluded under Rule 32.2(a)(1), as claimed by the State, the Court will address the merits.

      Under *Cuyler v. Sullivan,* the possibility of a conflict is insufficient to overturn a verdict; an actual conflict must exist:

> We hold that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an <u>actual conflict of interest adversely affected his lawyer's performance.</u> Sullivan believes he should prevail even under this standard. He emphasizes Peruto's admission that the decision to rest Sullivan's defense reflected a reluctance to expose witnesses who later might have testified for the other defendants. The petitioner, on the other hand, points to DiBona's contrary testimony and to evidence that Sullivan himself wished to avoid taking the stand. Since the Court of Appeals did not weigh these conflicting contentions under the proper legal standard, its judgment is vacated and the case is remanded for further proceedings consistent with this opinion. [Emphasis added.]

*Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S. Ct. 1708, 1719 (1980).

*Strickland* confirms that only where an actual conflict of interest exists is the restrictive standard of *Cuyler v. Sullivan* ("the *Sullivan* exception") applied.  Where an actual conflict exists, there is a presumption of prejudice:

> One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler v. Sullivan*, 446 U.S., at 345–350, 100 S.Ct., at 1716–1719, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, e.g., Fed.Rule Crim.Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                            11/01/2014

Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan, supra,* 446 U.S., at 350, 348, 100 S.Ct., at 1719, 1718 (footnote omitted).

*Strickland v. Washington*, 466 U.S. 668, 692, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984).

Trial counsel DeLozier's dual representation of the defendant in the criminal action as *Knapp* counsel, and his representation of the defendant's parents in an ongoing guardianship (visitation/adoption/dependency) matter related to the defendant's children/their grandchildren presented the potential for a conflict of interest, **to the extent that their interests diverged.**

However, the Court finds that the interests of the defendant and her parents did not diverge. In March 2001, the defendant withdrew her consent to the guardianship [by the children's paternal aunt and uncle], instead seeking "an Order of Appointment of her parents, Donna Ochoa and Alejo Ochoa, husband and wife, to be guardians of her children." Response, Exhibit E at Bates E000000099 (2CA-JV 2002-0127 Withdrawal of Consent to Guardianship dated 3/19/2001).

Additionally, the defendant, in her allocution (PCR Response Exhibit CCC: RT12/15/2004 at 56-57, 64), spent a great deal of time focusing on her relationship with her two young children, the time they spent together, the positive activities they engaged in, the hope and comfort that she derived from them as their mother. Her emphasis on their importance suggests concern for their well-being and overall development. The defendant wanted the children to be with her parents. It was in her interest to portray her growing-up years as positive, in a favorable light to support such a placement

Based on the defendant's actions and words, the Court believes that rather than being in conflict, the interests of DeLozier's clients, the parents in the guardianship proceedings and the daughter in the criminal action, were aligned at the time of the trial.

Now, ten years later the defendant's parents have been deprived of having a relationship with children and the defendant is facing a death sentence. Their interests have again aligned, this time in favor of portraying negative aspects of her growing-up years.

The Court finds that the interests of the defendant and her parents interests were aligned, rather than conflicting, at the time of trial. Their interests dovetailed, rather than diverged, and no conflict existed.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

The Court agrees that, were the "horrific childhood" and other background information true, and not investigated because of the impact on the parents case, there may have been an actual conflict. However, DeLozier was familiar with sexual abuse victimology; he attributed statements assailing his clients' (the defendant's parents) character to the normal aspersions cast in domestic situations. Further, the defendant denied the existence of abuse.

The Court concludes that, in this case, the "bad facts" background information may not be true (or may be merely speculative – "had access", exhibits "behaviors consistent with…") and/or may have been hidden from investigation (the defendant and family may have been involved in failing to disclose or even active concealment for their own reasons) and that the possibility and speculation do not support the Court finding that an "actual conflict" existed at the time of trial.

**Claims I(A) and II (Prejudice" prong under *Strickland*)**
Although the Court declines to fault the performance of trial counsel, the Court will address the second prong of *Stricklnad*. In addition to a finding of deficient performance, *Strickland* requires that the defendant establish that any deficiency resulted in prejudice sufficient to call into question the jury's verdict of death:

> …When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Strickland v. Washington*, 466 U.S. 668, 695, 104 S. Ct. 2052, 2069 (1984).

> In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense. *Strickland*, 466 U.S., at 692, 104 S.Ct. 2052. In *Strickland*, we made clear that, to establish prejudice, a "defendant must show that there is a reasonable probability[11] that, but for counsel's

---

[11]   We consider first the Ninth Circuit's holding that the California Supreme Court's decision was "contrary to"
our decision in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* held that to prove prejudice the defendant must establish a "*reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.*, at 694, 104 S.Ct. 2052 (emphasis added); it specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered, *id.*, at 693, 104 S.Ct. 2052.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

unprofessional errors, the result of the proceeding would have been different. A
reasonable probability is a probability sufficient to undermine confidence in the
outcome." *Id.*, at 694, 104 S.Ct. 2052. In assessing prejudice, we reweigh the evidence in
aggravation against the totality of available mitigating evidence.

*Wiggins v. Smith*, 539 U.S. 510, 534, 123 S. Ct. 2527, 2542 (2003).

To establish prejudice, Belmontes must show "a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would have been different."
*Strickland*, 466 U.S., at 694, 104 S.Ct. 2052. That showing requires Belmontes to
establish "a reasonable probability that a competent attorney, aware of [the available
mitigating evidence], would have introduced it at sentencing," and "that had the jury been
confronted with this ... mitigating evidence, there is a reasonable probability that it would
have returned with a different sentence." *Wiggins v. Smith*, 539 U.S. 510, 535, 536, 123
S.Ct. 2527 (2003).

*Wong v. Belmontes*, 558 U.S. 15, 19-20, 130 S. Ct. 383, 386 (2009).

We further find that had the jury been confronted with this considerable mitigating
evidence, there is a reasonable probability that it would have returned with a different
sentence. In reaching this conclusion, we need not, as the dissent suggests, *post*, at 2552-
2553, make the state-law evidentiary findings that would have been at issue at
sentencing. Rather, we evaluate the totality of the evidence-"both that adduced at trial,
*and the evidence adduced in the habeas proceeding[s]."* *Williams v. Taylor*, 529 U.S., at
397-398, 120 S.Ct. 1495 (Emphasis added).

The Court concludes that following the PCR presentation the Court had a more complete
understanding of "... aspect[s] of the defendant's character, propensities or record and any of the
circumstances of the offense..." that are "...relevant in determining whether to impose a
sentence less than death." See A.R.S. § 13-751(G).

The Court contrasts the trial presentation, which provided a singular, linear view of
mitigation, with the post-conviction presentation, which provided a global, cumulative overview
of the defendant's development over time. The defendant's evidentiary hearing evidence (the
quantity and the quality of the evidence), especially as supplemented by numerous experts
emphasizing the impact of negative experiences on the defendant's development, served as an
attempt not only to ameliorate the impact of the (F)(6) aggravator but also to give additional

---

*Woodford v. Visciotti*, 537 U.S. 19, 22, 123 S. Ct. 357, 358-59 (2002).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                        11/01/2014

weight to the mitigation evidence. At trial the defendant focused on the positive ("good
person/good background/bad decision") while during the PCR hearing she focused on the impact
of negative (negative experiences impact on her development). The Court is presented with
attempting to reconcile the two.

In its reconciliation, the Court must consider whether the likelihood of a different result,
considering the evidence adduced at trial and during post-conviction proceedings, is substantial:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain
> counsel's performance had no effect on the outcome or whether it is possible a reasonable
> doubt might have been established if counsel acted differently. See *Wong v. Belmontes*,
> 558 U.S. ——, ——, 130 S.Ct. 383, 390, 175 L.Ed.2d 328 (2009) *(per curiam)* (slip op.,
> at 13); *Strickland*, 466 U.S., at 693, 104 S.Ct. 2052. Instead, *Strickland* asks whether it is
> "reasonably likely" the result would have been different. *Id.*, at 696, 104 S.Ct. 2052. This
> does not require a showing that counsel's actions "more likely than not altered the
> outcome," but the difference between *Strickland*'s prejudice standard and a more-
> probable-than-not standard is slight and matters "only in the rarest case." *Id.*, at 693, 697,
> 104 S.Ct. 2052. The likelihood of a different result must be substantial, not just
> conceivable. *Id.*, at 693, 104 S.Ct. 2052.

*Harrington v. Richter*, 131 S. Ct. 770, 791-92 (2011).

The Court, having presided over both the trial and the post-conviction proceedings, is
aware of the mitigation presented during the 2004 trial and the 2014 post-conviction
proceedings. In her post-conviction proceedings the defendant - seeks to explain the
circumstances of the offense in such a way that permits the jury to give it less weight/render the
defendant less culpable for actions the night of the victim's death, to decrease the weight of the
aggravating factor.

At trial, the defense theme was that the defendant was a good person raised with a good
background who made a bad decision – attributable to her being a victim of domestic violence.
At the PCR, the theme is that the defendant was a person shaped by her horrendous childhood –
a victim of sexual abuse, mental health issues who experienced a "horrific" childhood. The Court
concludes that the defendant's childhood was somewhere between "good" and "impoverished,"
but was neither "horrific" nor "harrowing."

> Defendant claims as a mitigating factor that he was reared in a dysfunctional family.
> Nothing in the record substantiates this claim, however, other than his father's alcoholism
> and his family's periodic moves due to military transfers. Defendant failed, moreover, to
> demonstrate how his allegedly poor upbringing related in any way to the murders. *See*

Docket Code 167                    Form R000A                        Page 22

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                11/01/2014

*State v. Wallace,* 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), *cert. denied,* 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990).

*See State v. Wood,* 180 Ariz. 53, 71, 881 P.2d 1158, 1176 (1994).

Prejudice (conclusion)

The Court acknowledges that the defendant is the sum of her experiences, which cumulatively impacted her development; the Court, however, cannot conclude that the evidence presented is sufficiently substantial to call into question the penalty imposed by the jury. This is particularly so because the attributes attributed to the defendant are frequently characterized as "consistent with" someone who has had certain life experiences or are recounted by those whose recollections have varied, if only in emphasis, over time.

The Court had an opportunity to view and consider the witnesses' demeanor and involvement, and in some cases to compare prior testimony at trial (including allocution) with that at the evidentiary hearing (including excerpts of video interviews). The Court viewed much of the post-conviction evidence as cumulative to that presented at trial.

In attributing weight to the mitigating factors, the trier of fact would consider whether the defendant 's "capacity to appreciate wrongfulness/capacity to conform conduct to law" was significantly impaired; Dr. Potts testified that it was not, and at trial the defendant referred to her "horrific, horrific, horrific *choices.*" The trier of fact would further consider the contradictory trial and PCR presentations, made under oath.

The Court finds that the mitigation is not sufficiently substantial to mitigate against the (F)(6) aggravating factor found in this case, where the defendant not only poisoned her husband; but also led him to believe that she had called 911 when she had not, during which time he experienced poisoning symptoms; the defendant then struck him with a bar stool over twenty times.

At the time she murdered her husband, the defendant was an intelligent, thirty-year-old young woman who had completed high school, made good grades, received awards in various competitions (swimming; music), attended college, worked for a living, gotten married and had two children. Because the defendant's act of poisoning her husband coupled with the fact he did not immediately die as anticipated resulted in the stressful situation with which she had to contend, the proffered mitigation testimony would be accorded little weight by any trier of fact. *See Andriano,* 215 Ariz. at 511-512.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                              11/01/2014

The Court finds that the mitigation evidence adduced at the PCR, if offered at trial, would not be sufficiently substantial to warrant leniency, and that a jury – confronted with this evidence – would not have returned with a difference sentence.

In addition, the Ninth Circuit provides guidance in connection with its consideration of "childhood mitigation evidence:"

> Almost all of the childhood mitigation evidence offered by Bonin at the evidentiary hearing was utilized by Charvet during both of the trials. The evidence that was not presented by Charvet would have been of little value. That life at the convent was not pleasant, or that Bonin was often dirty and hungry as a child would have added little to the Bonin's case and might actually have distracted the jury from the more potent mitigation evidence. The only significant evidence presented by Bonin at the evidentiary hearing that Charvet failed to employ was the testimony of experts on the developmental effects of child abuse and neglect. However, while the Constitution requires that a criminal defendant receive effective assistance of counsel, the presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense. Given that such expert testimony would have been of value only to the extent that Bonin could actually show that he had been subject to neglect and abuse, it would have been of slight value at best. Moreover, it would have opened the door to precisely the type of cross-examination that Charvet sought to avoid by refusing to call psychiatric experts—another recitation of all of Bonin's atrocities for the purpose of determining whether, in the expert's opinion, such behavior is the likely product of such abuse. Charvet's presentation of childhood mitigation evidence was clearly reasonable.

*Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995).

> We also conclude that Bonin has failed to establish that he has suffered prejudice as a result of Charvet's allegedly deficient representation. "[I]n cases with overwhelming evidence of guilt, it is especially difficult to show prejudice from a claimed error on the part of trial counsel." *United States v. Coleman*, 707 F.2d 374, 378 (9th Cir.), *cert. denied.* 464 U.S. 854, 104 S.Ct. 171, 78 L.Ed.2d 154 (1983). Similarly, in cases such as this where the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigation evidence.
> In this case, the aggravating circumstances were so numerous and so compelling that it is highly improbable that either jury would have returned a sentence of life

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                            11/01/2014

imprisonment rather than death, even if all of the possible mitigating evidence offered by Bonin at the evidentiary hearing had been presented at his trials. As we explained earlier, Bonin has demonstrated the existence of very little probative evidence of childhood abuse or neglect other than the very evidence employed by Charvet in both trials. The additional childhood evidence offered by Bonin would clearly not have had any effect on either jury's decision to impose the death penalty.

With regard to the omission of expert psychiatric testimony, the district judge concluded that Bonin "has failed to provide persuasive evidence of brain organicity or other psychiatric or neurological disorder." *Bonin v. Vasquez*, 807 F.Supp. at 597. He explained that Bonin "did not demonstrate any correlation between Dr. Pincus' findings, which were obtained in late 1991, and petitioner's mental condition at the time of the murders." *Id.* at 598. The court also found "that Drs. Dietz and Nuwer were more credible than Dr. Pincus," and that the court "cannot help but believe that Dr. Pincus' views on the inappropriateness of the death penalty affect his clinical interpretations in this highly subjective area of medicine." *Id.*

The district court's finding that Bonin did not prove that he had suffered from brain damage or other significant psychiatric or neurological disorder at the time he committed his crimes is amply supported by the record and is not clearly erroneous. Bonin's evidence was insufficient to show that unlimited investigation by Charvet into Bonin's psychiatric condition would have produced anything more significant than the unpersuasive testimony presented by Drs. Pincus and Foster. At best, such testimony would only have initiated a battle of experts on which Bonin would have been on the losing side. At worst, it would have distracted jurors from Charvet's "institutional adjustment" theory and the childhood and Vietnam mitigation evidence, reduced Charvet's credibility with the jury, and opened the door to powerful cross-examination and rebuttal. The aggravating circumstances presented by the prosecution in both trials was overwhelming. Bonin has not proven that the use of expert psychiatrists would likely have changed the outcome, and has therefore failed to meet his burden of proving prejudice.

*Bonin v. Calderon*, 59 F.3d 815, 836 (9th Cir. 1995).

On Independent Review, the ASC determined that the "...quality and strength of Andriano's mitigation evidence is not sufficiently substantial to call for leniency in light of the especially cruel manner in which Andriano murdered her husband..." and affirmed the sentence of death. *State v. Andriano*, 215 Ariz. 497, 512-13, 161 P.3d 540, 555-56 (2007):

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                    11/01/2014

**E. Independent Review**

Because Andriano's offense occurred before August 1, 2002, we independently review the aggravating and mitigating circumstances and the propriety of the death sentence. A.R.S. § 13–703.04(A) (Supp.2006); *see* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7. In conducting our independent review, we "consider the quality and the strength, not simply the number, of aggravating and mitigating factors." *State v. Roque,* 213 Ariz. 193, 230, ¶ 166, 141 P.3d 368, 405 (2006) (quoting *State v. Greene,* 192 Ariz. 431, 443, ¶ 60, 967 P.2d 106, 118 (1998)).

**1. *Aggravation***

The jury found one aggravating factor—that Andriano committed the murder in an especially cruel manner. A.R.S. § 13–703(F)(6). Andriano argues that we should find the evidence insufficient to support the "especially cruel" finding by the jury because (1) Joe experienced only "distress," but not "extreme" physical pain or mental anguish after ingesting the sodium azide; (2) the defensive wounds were "minor and ... not indicative of a great or prolonged struggle," showing that Joe was rendered unconscious "very quickly" after the bar stool attack began; and (3) Joe's distress was not reasonably foreseeable. We review the jury's finding de novo. *Anderson II,* 210 Ariz. at 354, ¶ 119, 111 P.3d at 396 (citing A.R.S. § 13–703.04 (independent review)).

The cruelty prong of the (F)(6) aggravating circumstance may be proved by showing that the defendant knew or should have known that the manner in which the crime was committed would cause the victim to consciously experience either physical pain or mental anguish before death. *Trostle,* 191 Ariz. at 18, 951 P.2d at 883. The evidence showed that Andriano poisoned Joe with sodium azide and left him to suffer for what felt to Joe like a "long time." During that period, Joe vomited at least twice, was too weak to sit or stand, and was having difficulty breathing. After pretending to call 911, Andriano stood by for approximately forty-five minutes as Joe suffered from the effects of sodium azide poisoning. Andriano's Internet research on sodium azide and the warnings accompanying the shipped chemical demonstrate that she knew or should have known that poisoning her husband with sodium azide would cause him physical pain and mental anguish. Joe, who was conscious during this time, as evidenced by his interaction with Chris, undoubtedly "experienced significant uncertainty as to [his] ultimate fate." *See Ellison,* 213 Ariz. at 142, ¶ 120, 140 P.3d at 925 (quoting *State v. Van Adams,* 194 Ariz. 408, 421, ¶ 44, 984 P.2d 16, 29 (1999)) (mental anguish, and hence cruelty, established upon this showing).

Moreover, Andriano struck her terminally ill husband at least twenty-three times in the back of the head with a bar stool. Defensive wounds on Joe's hands and wrists indicate that he was conscious for at least some of the attack and thus knew his wife was attacking

Docket Code 167                    Form R000A                    Page 26

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

him as he lay on the floor, unable to defend himself. Andriano also knew or should have
known that beating her husband with a bar stool would cause him physical pain and
mental anguish.[10]

Andriano asks us to require that the physical or mental pain experienced by the victim be
"extreme." There is no such requirement for a cruelty finding. *See Trostle*, 191 Ariz. at
18, 951 P.2d at 883. Nonetheless, the physical pain and mental anguish Joe experienced
likely were "extreme" by any standards.

Although Andriano argued at trial that she was assisting Joe in a suicide by poisoning,
she argues on appeal that because Joe did not know he was being poisoned, mental
anguish cannot be proved. While a victim's knowledge of the source of physical pain may
be relevant to whether the victim experienced mental anguish, it is not a requisite for a
finding of mental anguish. And on the facts of this case, mental anguish is established
even if Joe did not know he had been poisoned. Moreover, cruelty can be established
upon a showing of either mental anguish or physical pain. *Id.* We thus conclude that
cruelty was established based on either—or both—mental anguish or physical pain.

### 2. *Mitigation*

Andriano presented several mitigating circumstances for the jury's consideration,
including the stress of Joe's cancer, her good grades in school, missionary and community
work, and strong religious convictions. In addition, she presented evidence that she was a
sexual abuse and domestic violence victim, a good mother to two children, married for
six years, and a good inmate.

Although Andriano presented some evidence that she was a domestic violence victim, we
assign little weight to this mitigating circumstance, in part because it is not related to the
murder. *See Roque*, 213 Ariz. at 231, ¶ 169, 141 P.3d at 406 ("[T]he relationship between
mitigating evidence and the murder may affect the weight given to the mitigating
evidence.") (citation omitted); *State v. Newell*, 212 Ariz. 389, 405, ¶ 82, 132 P.3d 833,
849, *cert. denied*, 549 U.S. 1056, 127 S.Ct. 663, 166 L.Ed.2d 521 (2006). The evidence
established that Andriano did not kill Joe while defending against a domestic violence
attack. Instead, she poisoned her terminally ill husband, struck him in the back of the
head twenty-three times, and slit his throat. Joe posed no threat to Andriano at the time of
the attack because he was so weak from the poison and chemotherapy that he could not
get up.

Andriano was under substantial stress from having to deal with Joe's terminal cancer. The
record does not indicate, however, that at the time of the offense, the stress was any
greater than it had been two years earlier when she and Joe first learned he was terminally
ill, and she was pregnant with their second child. Moreover, this is not a case in which

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                11/01/2014

Andriano suddenly "cracked" under extreme stress. Andriano methodically premeditated
Joe's murder, showing that her stress bore little relation to Joe's death. This mitigating
circumstance thus does not warrant substantial weight.

Andriano also offered evidence that she "may have been" sexually abused by her
biological father when she was around the age of two, although she does not recall it, and
that a member of the traveling ministry to which her family belonged exposed himself to
Andriano when she was between six and eight years old. Andriano also showed that she
maintained good grades in school and participated in missionary and community work.
We do not weigh these mitigating circumstances heavily because the events are remote in
time to the offense and thus their relevance is minimal. *Cf. Ellison,* 213 Ariz. at 144, ¶
136, 140 P.3d at 927 (finding defendant's "childhood troubles deserve little value as a
mitigator for the murders he committed at age thirty-three").

The record contains conflicting evidence on whether Andriano was a good mother. In any
event, we afford this mitigating circumstance minimal value in light of the fact that
Andriano murdered her children's father while the children were present in the apartment.
Moreover, neither the fact of Andriano's marriage nor its six-year duration is mitigating
considering that she would have remained married and the marriage would have lasted
longer had she not killed her husband.

Andriano was a good inmate in jail and helpful to staff and inmates from September 2003
until the penalty phase of her trial in December 2004. Because inmates are expected to
behave, however, we assign this mitigating circumstance little weight. *State v. Harrod,*
200 Ariz. 309, 319, ¶ 53, 26 P.3d 492, 502 (2001), *vacated on other grounds,* 536 U.S.
953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002).

Although Andriano had what might be considered a strict religious upbringing, many of
her actions, such as killing her husband and having extramarital affairs, appear
inconsistent with holding strong religious convictions. We thus assign this evidence
minimal value.

Andriano also alleged as mitigating circumstances cooperation with law enforcement
authorities, remorse, and age. The evidence presented, however, contradicts Andriano's
assertion that she cooperated in the investigation of Joe's murder.[12] Moreover, because
Andriano continues to deny responsibility for her conduct, we reject her contention that
she is remorseful. *See State v. Gulbrandson,* 184 Ariz. 46, 70–71, 906 P.2d 579, 603–04
(1995) (noting that defendant continued to deny responsibility in finding that he had not
proven remorse as a mitigating circumstance). We likewise do not find her age—thirty at
the time of the offense—to be mitigating, particularly in light of her above-average I.Q.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                    11/01/2014

We likewise give minimal weight to the remaining mitigating circumstances urged: lack of prior convictions, good candidate for rehabilitation, no future threat to the community, and impact on family and friends.

### 3. *Propriety of the death sentence*

The quality and strength of Andriano's mitigation evidence is not sufficiently substantial to call for leniency in light of the especially cruel manner in which Andriano murdered her husband. We therefore affirm Andriano's sentence of death.

*Andriano*, 215 Ariz. at 510-13, 161 P.3d at 553-56.

The Court finds that, even considering the additional post-conviction evidence, the "quality and strength" of mitigation is insufficient to call for leniency and no reasonable juror could disagree. The defendant suffered no prejudice.

## CONCLUSION

The Court concludes, in accordance with *Strickland*, that with the "overwhelming aggravating factors, there is not reasonable probability that the omitted evidence would have changed...the sentence imposed." As in *Strickland*, the sentencing profile to be considered by the jury would have been altered little with the addition of the PCR evidence:

With respect to the prejudice component, the lack of merit of respondent's claim is even more stark. The evidence that respondent says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge. As the state courts and District Court found, at most this evidence shows that numerous people who knew respondent thought he was generally a good person and that a psychiatrist and a psychologist believed he was under considerable emotional stress that did not rise to the level of extreme disturbance. Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed. Indeed, admission of the evidence respondent now offers might even have been harmful to his case: his "rap sheet" would probably have been admitted into evidence, and the psychological reports would have directly contradicted respondent's claim that the mitigating circumstance of extreme emotional disturbance applied to his case.

Our conclusions on both the prejudice and performance components of the ineffectiveness inquiry do not depend on the trial judge's testimony at the District Court hearing. We therefore need not consider the general admissibility of that testimony, although, as noted supra, at 2069, that testimony is irrelevant to the prejudice inquiry. Moreover, the prejudice question is resolvable, and hence the ineffectiveness claim can

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                              11/01/2014

be rejected, without regard to the evidence presented at the District Court hearing. The state courts properly concluded that the ineffectiveness claim was meritless without holding an evidentiary hearing.

Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. Here there is a double failure. More generally, respondent has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance. Respondent's sentencing proceeding was not fundamentally unfair.

*Strickland v. Washington*, 466 U.S. 668, 699-700, 104 S. Ct. 2052, 2071, 80 L. Ed. 2d 674 (1984).

The Supreme Court identified eight mitigating factors presented at trial, many of which duplicate PCR mitigating factors (possibility of sexual abuse; strict religious upbringing; stress):

Andriano presented several mitigating circumstances for the jury's consideration, including the stress of Joe's cancer, her good grades in school, missionary and community work, and strong religious convictions. In addition, she presented evidence that she was a sexual abuse and domestic violence victim, a good mother to two children, married for six years, and a good inmate.

*State v. Andriano*, 215 Ariz. 497, 511, 161 P.3d 540, 554 (2007) *abrogated by State v. Ferrero*, 229 Ariz. 239, 274 P.3d 509 (2012).

The Court is not persuaded that: a failure to identify; a failure to interview; a failure to create a social history; and/or a failure to consult additional mental health professionals compromised the mitigation presentation, other than as to quantity, depth, or volume. Many of the factors were identified at trial; and, especially as to the sexual abuse allegations, the claim remains speculative.

The Court is not persuaded that the post-conviction mitigation evidence would be substantially sufficient to warrant leniency, in light of the (F)(6) aggravating factor's ("cruelty" prong). The victim, a terminally ill cancer patient, suffered for an extended period of time from symptoms following his spouse's administration of sodium azide (45 minutes); the victim was struck by his spouse more than 20 times with a bar stool.

"...the failure of retained counsel to provide adequate representation can render a trial so fundamentally unfair as to violate the Fourteenth Amendment."

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                        11/01/2014

*Cuyler v. Sullivan*, 446 U.S. 335, 343, 100 S. Ct. 1708, 1715 (1980).

This is not such a case, in which the trial was "...so fundamentally unfair as to violate the Fourteenth Amendment."

**THEREFORE,** for the reasons stated above, the Court finds that the defendant has failed to meet her burden to establish her claims of ineffective assistance of counsel or conflict.

**IT IS ORDERED** dismissing Claims I(A) and II; and

**IT IS FURTHER ORDERED** dismissing defendant's Petition for Post-Conviction Relief in its entirety. Rule 32.9, Ariz.R.Crim.P.

*11-03-14*
Date

Honorable Brian K. Ishikawa

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

Docket Code 167                    Form R000A                    Page 31

# EXHIBIT AAAAAAAAAA

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
R. Montoya, Deputy
11/11/2014 4:44:20 PM
Filing ID 6227168

Scott M. Bennett (022350)
Coppersmith Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@cblawyers.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 E. Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

| | | |
|---|---|---|
| State of Arizona, | ) | No. CR2000-096032-A |
| | ) | |
| Respondent, | ) | **UNOPPOSED MOTION FOR** |
| v. | ) | **EXTENSION OF TIME TO FILE** |
| | ) | **PETITION FOR REVIEW** |
| Wendi Elizabeth Andriano, | ) | |
| | ) | (Hon. Brian Ishikawa) |
| Petitioner. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

     Wendi Andriano, the petitioner in this matter, moves for a 60-day extension of the deadline to file a petition for review of this Court's order dismissing her petition for postconviction relief.  The petition for review is currently due December 3, 2014.  With the extension, the new deadline would be Monday, February 2, 2015.

{00144401.1 }

1         Ms. Andriano requests this extension to give her attorneys adequate time to prepare

2    the petition for review.  Drafting the petition will require a significant amount of time

3    because of the complexity of the legal issues and the volume of evidence, as well as the

4    importance of the appeal because this is a death-penalty case.  The two attorneys with

5    primary responsibility for the petition for review have competing work obligations that

6    will make it impossible for them to complete the petition for review by December 3.  One

7    of those attorneys (Allen Arntsen) has a summary-judgment hearing on December 4; a

8    contested evidentiary hearing on a permanent injunction on December 5; and likely

9    briefing and a hearing in a major patent case in November through January.  The other

10   attorney (Matt Lynch) has two summary-judgment briefs due on December 3; an appellate

11   brief and a separate post-hearing brief due on December 5; another appellate brief due on

12   December 17; and two civil trials scheduled for January.  Simply put, a 60-day extension

13   of the deadline is necessary to ensure that Ms. Andriano's petition for review receives the

14   necessary time and attention from her attorneys.

15        One of the attorneys for the State, Gregory Hazard, has informed Ms. Andriano's

16   counsel that the State does not object to this extension.

17        A proposed order granting the extension accompanies this motion.

18        RESPECTFULLY SUBMITTED November 11, 2014.

19                      COPPERSMITH BROCKELMAN PLC

20

21                      By */s/ Scott M. Bennett*
                          James J. Belanger

22                        Scott M. Bennett

23                    FOLEY & LARDNER LLP

24                        Allen A. Arntsen, *Pro Hac Vice*
                          Stephan J. Nickels, *Pro Hac Vice*

25                        Matthew R. Lynch, *Pro Hac Vice*

26                    *Attorneys for Petitioner*

1

2   ORIGINAL e-filed November 11, 2014,
     with the Clerk of the Maricopa County Superior Court

3
     COPIES mailed on November 12, 2014, to:
4

5   Hon. Brian Ishikawa
     Maricopa County Superior Court

6   1810 Lewis Street
     Mesa AZ 85210-6235

7

8   Gregory Hazard
     Office of the Attorney General

9   1275 W. Washington
     Phoenix, AZ 85007-2997

10   *Attorneys for the State of Arizona*

11

12   Ms. Lacey Stover Gard
     Office of the Attorney General

13   400 W. Congress, Suite S-315
     Tuscon, AZ 85701-1367

14   *Attorneys for the State of Arizona*

15
     */s/ Carol Keesee*

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT BBBBBBBBBB



MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED

.14 NOV 26  AM 8:07

1  Scott M. Bennett (022350)
   Coppersmith Brockelman PLC
2  2800 North Central Avenue, Suite 1200
3  Phoenix, Arizona  85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
5  sbennett@cblawyers.com

6  Allen A. Arntsen, Admitted *Pro Hac Vice*
7  Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
8  Foley & Lardner LLP
   150 E. Gilman Street
9  Madison, WI 53703
10 (608) 257-5035 (office)
   (608) 258-4258 (fax)
11 aarntsen@foley.com

12 *Attorneys for Petitioner Wendi Andriano*

13              SUPERIOR COURT OF ARIZONA
14                COUNTY OF MARICOPA

15 State of Arizona,              )    No. CR2000-096032-A
16                                )
                                  )    **ORDER GRANTING EXTENSION**
17              Respondent,       )    **OF TIME TO FILE PETITION**
   v.                             )    **FOR REVIEW**
18                                )
   Wendi Elizabeth Andriano,      )
19                                )    (Hon. Brian Ishikawa)
                                  )
20              Petitioner.       )
21 _____)

22      Based on the unopposed motion by petitioner Wendi Andriano, and for good cause,

23 IT IS ORDERED extending Ms. Andriano's deadline to file a petition for review to

24 February 2, 2015.

25 DATED: **11-21-14** _____    _____
26                                         Hon. Brian Ishikawa

{00144402.1}

# EXHIBIT CCCCCCCCCC

# SUPERIOR COURT OF
# MARICOPA COUNTY

## *EXHIBIT WORKSHEET*

FILED

12/11/2014 2:00pm
Michael K. Jeanes, Clerk

By: _____
Deputy Clerk

Hearing Officer: **Hon. Brian K. Ishikawa**

Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**

Hearing Date: **02/03/2014**

STATE OF ARIZONA

Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO

Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 1 | DEF | DEF | | DECLARATION OF LARRY A. HAMMOND | |
| 2 | DEF | STIP | 2/3/2014 | REPORT FROM GEORGE W. WOODS, JR., M.D. DATED FEBRUARY 14, 2012 | |
| 2.001 | DEF | STIP | 2/3/2014 | APPENDIX A TO THE EXPERT REPORT FROM GEORGE W. WOODS, JR., M.D. | |
| 2.002 | DEF | STIP | 2/3/2014 | APPENDIX B - OVERVIEW OF THE BIOPSYCHOSOCIAL AND PSYCHIATRIC HISTORY OF WENDI ELIZABETH ANDRIANO AND HER FAMILY | |
| 2.003 | DEF | STIP | 2/3/2014 | CURRICULUM VITAE OF GEORGE W. WOODS, JR., M.D. | |
| 2.004 | DEF | STIP | 2/3/2014 | APPENDIX D - QUALIFICATIONS, EXPERT WITNESS EXPERIENCE AND COMPENSATION RATE IN THIS CASE | |
| 3 | DEF | STIP | 2/3/2014 | EXPERT REPORT OF JAMES HOPPER, PH.D. | |
| 4 | DEF | STIP | 2/3/2014 | APPENDIX TO THE EXPERT REPORT OF JAMES W. HOPPER, PH.D. | |
| 4.001 | DEF | STIP | 2/3/2014 | CURRICULUM VITAE OF JAMES W. HOPPER, PH.D. | |
| 4.002 | DEF | STIP | 2/3/2014 | EXHIBIT B TO THE EXPERT REPORT OF JAMES W. HOPPER, PH.D. | |
| 5 | DEF | STIP | 2/3/2014 | CONFIDENTIAL NEUROPSYCHOLOGICAL TESTING OF WENDI ELIZABETH ANDRIANO FROM MYLA H. YOUNG, PH.D.. ABN DATED JULY 11, 2011 | |
| 5.001 | DEF | STIP | 2/3/2014 | CONFIDENTIAL NEUROPSYCHOLOGICAL EVALUATION TEST SCORES FROM MYLA H. YOUNG, PH.D.. ABN DATED JULY 11, 2011 | |
| 6 | DEF | | | AFFIDAVIT OF DANIEL PATTERSON | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA                    Counsel:  GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO          Counsel:  SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 6.001 | DEF | STIP | 2/3/2014 | LETTER DATED MARCH 28, 2001 FROM THE FORENSIC SERVICES UNIT RE: COMPETENCY SCREENING EVALUATION OF WENDI ELIZABETH ANDRIANO | |
| 6.002 | DEF | DEF | 2/7/2014 | EMAIL FROM DAN PATTERSON TO PATRICK LINDERMAN DATED DECEMBER 20, 2001 | |
| 6.003 | DEF | STIP | 2/3/2014 | EVAULATION REPORT ON WENDI ELIZABETH ANDRIANO DATED AUGUST 27, 2002 FROM RICHARD J. ROSENGARD, D.O. | |
| 6.004 | DEF | DEF | 2/7/2014 | EMAIL FROM DANIEL PATTERSON TO MICHELLE ARVANITAS DATED FEBURARY 14, 2002 | |
| 6.005 | DEF | STIP | 2/3/2014 | PSYCHOLOGICAL REPORT RE: WENDI ANDRIANO DATED AUGUST 4, 2004 FROM MICHAEL B. BAYLESS, PH.D. | |
| 7 | DEF | | | DECLARATION OF G. DAVID DELOZIER | Y |
| 7.001 | DEF | | | LETTER FROM H. KANDY ROHDE, CPC TO G. DAVID DELOZIER DATED FEBRUARY 19, 2001 | Y |
| 7.002 | DEF | DEF | 2/10/2014 | LETTER FROM H. KANDY ROHDE TO G. DAVID DELOZIER DATED MARCH 12, 2001 | |
| 7.003 | DEF | | | LETTER FROM H. KANDY ROHDE TO G. DAVID DELOZIER FAXED DATE SEPTEMBER 30, 2003 | Y |
| 7.004 | DEF | | | ANDRIANO TRIAL SCHEDULE | Y |
| 7.005 | DEF | | | LETTER TO G. DAVID DELOZIER FROM GERALD M. PERRY DATED SEPTEMBER 1, 2004 | Y |
| 8 | DEF | | | AFFIDAVIT OF SCOTT A. MACLEOD | Y |
| 9 | DEF | | | DECLARATION OF WENDI ANDRIANO | Y |
| 10 | DEF | | | DECLARATION OF CONSTANCE BOYS | Y |
| 11 | DEF | | | DECLARATION OF GEORGE CARLIN | Y |
| 12 | DEF | | | DECLARATION OF JERI LYNN CUNNINGHAM | Y |
| 13 | DEF | | | DECLARATION OF MARK KEATING | Y |
| 14 | DEF | | | DECLARATION OF NANCY KEATING | Y |
| 15 | DEF | STIP | 2/3/2014 | DEPOSITION OF SHAWN KING DATED JULY 11, 2011 | |
| 16 | DEF | | | DECLARATION OF BARRY LORTS | Y |
| 17 | DEF | | | DECLARATION OF KELSEY LEON MCGUFFEE, JR. | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA          Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO          Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|------|-------------|---------------------|----------|
| 18 | DEF | | | DECLARATION OF MARJORIE MICEK | Y |
| 19 | DEF | | | DECLARATION OF JEFFREY B. MILLER | Y |
| 19.001 | DEF | | | LETTER FROM JEFFREY B. MILLER DATED OCTOBER 10, 2000 RE:  ANDRIANO MEDICAL MALPRACTICE CLAIM | Y |
| 20 | DEF | | | DECLARATION OF SHARON MURPHY | Y |
| 21 | DEF | | | DECLARATION OF BRENDA NAGORE | Y |
| 22 | DEF | | | DECLARATION OF FRANK NAGORE | Y |
| 23 | DEF | | | DECLARATION OF JASPER NEACE | Y |
| 24 | DEF | STIP | 2/6/2014 | DECLARATION OF ALEJO LORENZANA OCHOA | |
| 25 | DEF | STIP | 2/6/2014 | DECLARATION OF ALEJO OCHOA | |
| 26 | DEF | | | DECLARATION OF BRANDON OCHOA | Y |
| 27 | DEF | DEF | | DECLARATION OF DONNA OCHOA | |
| 28 | DEF | DEF | | SUPPLEMENTAL DECLARATION OF DONNA OCHOA | |
| 29 | DEF | DEF | | SECOND SUPPLEMENTAL DECLARATION OF DONNA ELIZABETH OCHOA | |
| 30 | DEF | | | DRAFT DECLARATION OF DEBLEN OKE | Y |
| 31 | DEF | | | DECLARATION OF GIA PALICKI | Y |
| 32 | DEF | | | DECLARATION OF SHELBY WAYNE "SKIP" ROBERTSON | Y |
| 33 | DEF | | | DECLARATION OF STUART WADE ROBERTSON | Y |
| 34 | DEF | | | DECLARATION OF CYNTHIA DENISE SCHAIDER | Y |
| 35 | DEF | | | DECLARATION OF STEPHEN SCHAIDER | Y |
| 36 | DEF | | | DECLARATION OF JOHN SHADDLE | Y |
| 37 | DEF | | | DECLARATION OF CHRISTOPHER SHANE WEAVER | Y |
| 38 | DEF | | | DECLARATION OF KIMBERLY WILSON | Y |
| 39 | DEF | | | DECLARATION OF BARBARA BAUER | Y |
| 40 | DEF | | | DECLARATION OF MARTHA COLVIN | Y |
| 41 | DEF | | | DECLARATION OF LINDA PERCY | Y |
| 42 | DEF | | | DECLARATION OF JACQUELINE SACAMANO | Y |
| 43 | DEF | | | DECLARATION OF MATTHEW R. LYNCH | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**                    Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**                    Hearing Date: **02/03/2014**

STATE OF ARIZONA                         Counsel:  GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                Counsel:  SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 44 | DEF | STIP | 2/3/2014 | NOTICE OF DEFENSES AND DISCLOSURE BY DEFENDANT AND REQUEST FOR DISCLOSURE OF REBUTTAL WITNESSES DATED JANUARY 16, 2001 | |
| 45 | DEF | STIP | 2/3/2014 | MEETING NOTES WITH WENDI ANDRIANO | |
| 46 | DEF | STIP | 2/3/2014 | INTAKE INFORMATION ON WENDI E. ANDRIANO DATED FEBRUARY 28, 1996 | |
| 47 | DEF | STIP | 2/3/2014 | EXCERPTED MEDICAL NOTES FROM WENDI ANDRIANO'S INCARCERATION (TYPEWRITTEN) | |
| 48 | DEF | STIP | 2/3/2014 | CHS SPECIAL NEEDS TREATMENT PLAN (SNTP) FORM DATED SEPTEMBER 28, 2003 | |
| 49 | DEF | STIP | 2/3/2014 | MARICOPA COUNTY CORRECTIONAL HEALTH SERVICES DOCUMENTS | |
| 50 | DEF | DEF | 2/7/2014 | EMAIL FROM DONNA OCHOA TO PATTERSOND@MAIL.MARICOPA.GOV DATED DECEMBER 4, 2001 | |
| 51 | DEF | DEF | 2/4/2014 | EMAIL FROM DONNA OCHOA TO PATTERSOND@MAIL.MARICOPA.GOV; GDDELOZIER@AOL.COM; ARVANITAS@MAIL.MARICOPA.GOV DATED SEPTEMEBER 30, 2002 | |
| 52 | DEF | DEF | 2/7/2014 | EMAILS FROM SBMURPHYAZ@YAHOO.COM TO GDDELOZIER@AOL.COM; PATTERSOND@MAIL.MARICOPA.GOV DATED MARCH 30, 2003 | |
| 53 | DEF | | | OFFICE OF THE PUBLIC DEFENDER INTEROFFICE MEMORANDUM WITH ATTACHMENTS DATED JANUARY 14, 2002 | Y |
| 54 | DEF | STIP | 2/3/2014 | MOTION FOR COURT ORDER TO ASSIST MITIGATION INVESTIGATION AND PROPOSED ORDER DATED NOVEMBER 19, 2004 | |
| 55 | DEF | | | SEXUAL ABUSE AS MITIGATION DATED JANUARY 17, 2003 | Y |
| 56 | DEF | DEF | 2/4/2014 | EMAIL FROM DONNA OCHOA TO GDDELOZIER@AOL.COM DATD FEBRUARY 12, 2001 | |
| 57 | DEF | DEF | 2/4/2014 | EMAIL FROM DONNA OCHOA TO ARVANITAS@MAIL.MARICOPA.GOV DATED FEBRUARY 26, 2003 | |

Hearing Officer: **Hon. Brian K. Ishikawa**            Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**            Hearing Date: **02/03/2014**

STATE OF ARIZONA                    Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                    Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 58 | DEF | | | INTERVIEW OF CHRIS WEAVER | Y |
| 59 | DEF | | | EMAIL FROM DANIEL PATTERSON TO MICHELLE ARVANITAS DATED FEBRUARY 2, 2004 | Y |
| 60 | DEF | | | ESTATE PLANNING STATEMENT DATED OCTOBER 3, 2000 | Y |
| 61 | DEF | DEF | 2/4/2014 | LETTER FROM G. DAVID DELOZIER TO ALEJO OCHOA AND DONNA OCHOA DATED DECEMBER 14, 2000 | |
| 62 | DEF | | | LETTER FROM LEON THIKOLL TO BETHANNE KLOPP-BRYANT DATED NOVEMBER 29, 2000 | Y |
| 63 | DEF | DEF | 2/10/2014 | EMAIL FROM MICHELLE ARVANITAS TO GDDELOZIER@AOL.COM DATED AUGUST 5, 2002 | |
| 64 | DEF | DEF | 2/11/2014 | EMAIL FROM PATRICIA RUBIO TO DANIEL PATTERSON DATED OCTOBER 23, 2003 | |
| 65 | DEF | STIP | 2/3/2014 | REPORT OF AUTOPSY OF JOSEPH D. ANDRIANO DATED OCTOBER 11, 2000 | |
| 65.001 | DEF | STIP | 2/3/2014 | PHOENIX FIRE DEPARTMENT INCIDENT HISTORY REPORT DATED OCTOBER 16, 2000 | |
| 66 | DEF | | | PHOTOS | Y |
| 67 | DEF | | | DECLARATION OF KRISTEN POWERS | Y |
| 68 | DEF | DEF | 2/4/2014 | ANDRIANO-POVERTY/INCOME CHART WITH WENDI'S AGE | |
| 68.001 | DEF | DEF | 2/4/2014 | ITEMIZED STATEMENT OF EARNINGS | |
| 68.002 | DEF | DEF | 2/4/2014 | ITEMIZED STATEMENT OF EARNINGS | |
| 69 | DEF | | | ANDRIANO WENDI AND JOE INCOME COMPARISON CHART | Y |
| 69.001 | DEF | | | ITEMIZED STATEMENT OF EARNINGS | Y |
| 69.002 | DEF | | | ITEMIZED STATEMENT OF EARNINGS | Y |
| 70 | DEF | | | INFORMATION FOR INMATE #100374 - SHELBY ROBERTSON | Y |
| 71 | DEF | | | INFORMATION FOR INMATE #0099844 - TOMMY ROBERTSON | Y |
| 72 | DEF | | | PHOTO | Y |
| 73 | DEF | DEF | 2/4/2014 | PHOTOGRAPHS | |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA                    Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO          Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 74 | DEF | DEF | 2/4/2014 | PHOTOGRAPHS | |
| 75 | DEF | | | COPY OF GREETING CARD | Y |
| 76 | DEF | DEF | 2/6/2014 | AMERICAN BAR ASSOCIATION GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALY CASES REVISED EDITION FEBRUARY 2003 | |
| 77 | DEF | | | COURT OF APPEALS MANDATE RE:  IN RE THE ADOPTION OF NICHOLAS A. AND ASHLEE A. FILE STAMPED AUGUST 19, 2004 | Y |
| 78 | DEF | DEF | | EXPERT REPORT OF GARY L. LOWENTHAL, J.D. | |
| 79 | DEF | DEF | 2/11/2014 | APPENDIX 1 - GARY LOWENTHAL RESUME | |
| 80 | DEF | DEF | 2/4/2014 | APPENDIX 2 - AGREEMENT REGARDING THE GUARDIANSHIP OF NICHOLAS ANDRIANO AND ASHLEE ANDRIANO | |
| 81 | DEF | DEF | 2/4/2014 | APPENDIX 3 - ORDER APPOINTING GUARDIAN OF MINOR CHILDREN | |
| 82 | DEF | STIP | 2/10/2014 | APPENDIX 4 - INVOICE FROM LAW OFFICES OF G. DAVID DELOZIER, P.C. DATED FEBRUARY 7, 2001 | |
| 83 | DEF | | | APPENDIX 5 - DECLARATION OF JERI LYNN CUNNINGHAM | Y |
| 84 | DEF | DEF | 2/4/2014 | APPENDIX 7 - PROBATE COURT CASE INFORMATION - CASE HISTORY | |
| 85 | DEF | DEF | 2/4/2014 | APPENDIX 8 - LETTERS | |
| 86 | DEF | DEF | 2/4/2014 | APPENDIX 9 - EMAIL FROM DONNA OCHOA TO GDDELOZIER@AOL.COM DATED JULY 15, 2001 | |
| 87 | DEF | DEF | 2/4/2014 | APPENDIX 10 - RULING ON NOTICE OF COMPLIANCE WITH A.R.S. 8-106 AND REQUEST FOR HEARING FILE DATED DECEMBER 27, 2001 | |
| 88 | DEF | DEF | 2/10/2014 | APPENDIX 11 - NOTICE OF CHANCE OF JUDGE DATED JANUARY 2, 2002 | |
| 89 | DEF | DEF | 2/10/2014 | APPENDIX 12 - LETTERS FROM LAW OFFICERS OF G. DAVID DELOZIER, P.C. | |
| 90 | DEF | | | APPENDIX 13 - LETTER FROM JOHN J. JAKUBCZYK TO G. DAVID DELOZIER DATED APRIL 1, 2002 | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA          Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO          Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 91 | DEF | | | APPENDIX 14 - LETTER FROM G. DAVID DELOZIER, P.C. TO JOHN J. JAKUBCYZYK, ESQ. DATED MARCH 20, 2002 | Y |
| 92 | DEF | | | APPENDIX 15 - MOTION TO COMPEL PRODUCTION OF MEDICAL RECORDS FILE DATED MARCH 12, 2002 | Y |
| 93 | DEF | | | APPENDIX 16 - SUBPOENA IN PB 2000-004531 | Y |
| 94 | DEF | | | APPENDIX 17 - LETTER FROM MIKE BARTLEY, LPI TO G. DAVID DELOZIER, P.C. DATED MAY 8, 2002 WITH ATTACHMENTS | Y |
| 95 | DEF | DEF | 2/4/2014 | APPENDIX 18 - LETTER FROM BRAD AND JEANEA LAMBETH TO JOHN JAKUBCZYK DATED MARCH 15, 2002 | |
| 96 | DEF | DEF | 2/4/2014 | APPENDIX 19 - LETTER FROM ALEJO AND DONNA OCHOA TO DR. BRIAN YEE DATED MARCH 28, 2002 | |
| 97 | DEF | PLF | 2/11/2014 | APPENDIX 20 - LETTER FROM BRIAN W. YEE, PH.D TO HONORABLE JANE BAYHAM-LESSELYONG DATED MARCH 13, 2002 | |
| 98 | DEF | | | APPENDIX 21 - LETTER FROM THE CHILDREN'S ADVOCACY CENTER TO THE HONORABLE JANE BAYHAM-LESSELYONG | Y |
| 99 | DEF | DEF | 2/10/2014 | APPENDIX 22 - MINUTE ENTRY DATED AUGUST 1, 2002 | |
| 100 | DEF | DEF | 2/10/2014 | APPENDIX 23 - MOTION TO DISMISS PETITION TO ADOPT / MOTION FOR SANCTIONS FOR FAILURE TO COMPLY WITH COURT ORDER | |
| 101 | DEF | DEF | 2/10/2014 | APPENDIX 24 - MINUTE ENTRY ACTION:  RULING ON MOTION(S) / ISSUE(S) DATED JULY 23, 2002 | |
| 102 | DEF | DEF | 2/4/2014 | APPENDIX 25 - ORDER DATED JULY 31, 2002 | |
| 103 | DEF | | | APPENDIX 26 - G. DAVID DELOZIER (BAR NO. 005237) FILE NO:  01-2071 | Y |
| 104 | DEF | DEF | 2/4/2014 | APPENDIX 27 - MINUTE ENTRY ACTION:  RULING ON MOTION(S) / ISSUE(S) | |
| 105 | DEF | DEF | 2/11/2014 | APPENDIX 28 - MINUTE ENTRY DATED 12/10/2002 | |
| 106 | DEF | | | APPENDIX 29 - MINUTE ENTRY DATED SEPTEMBER 8, 2003 | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**         Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**         Hearing Date: **02/03/2014**

STATE OF ARIZONA                    Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO           Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 107 | DEF | DEF | 2/4/2014 | APPENDIX 30 - EMAIL FROM DONNAEOCHOA@HOTMAIL.COM TO GDDELOZIER@AOL.COM DATED MARCH 3, 2003 | |
| 108 | DEF | DEF | 2/4/2014 | APPENDIX 31 - EMAIL FROM INHISPRESENCE@AOL.COM TO GDDELOZIER@AOL.COM DATED APRIL 14, 2003 | |
| 109 | DEF | DEF | 2/4/2014 | APPENDIX 32 - EMAIL FROM GRANDMAOCHOA@HOTMAIL.COM TO DAPHNEBUDGE@GWEST.NET DATED MAY 16, 2003 | |
| 110 | DEF | DEF | 2/10/2014 | APPENDIX 33 - INVOICES FROM RICH ROBERTSON CONSULTING & INVESTIGATIONS | |
| 111 | DEF | | | APPENDIX 34 - COURT OF APPEALS APPELLANT'S OPENING BRIEF FILE DATED MAY 27, 2003 | Y |
| 112 | DEF | | | APPENDIX 36 - MOTION TO REINSTATE APPEAL FILE DATED FEBRURARY 25, 2004 | Y |
| 113 | DEF | DEF | 2/4/2014 | APPENDIX 38 - LETTER FROM ALEJO AND DONNA OCHOA TO THE HONORABLE JUDGE PRO TEM KAIPIO DATED MARCH 21, 2005 | |
| 114 | DEF | DEF | 2/4/2014 | APPENDIX 40 - NOTICE RE:  REPRESENTATION FILE DATED NOVEMBER 15, 2004 | |
| 115 | DEF | DEF | 2/4/2014 | APPENDIX 42 - LETTER FROM DONNA OCHOA FAX DATED MARCH 7, 2005 | |
| 116 | DEF | STIP | 2/10/2014 | APPENDIX 46 - SUMMARY OF STATEMENT DATED JULY 5, 2002 | |
| 117 | DEF | STIP | 2/10/2014 | APPENDIX 44 - INVOICE FROM G. DAVID DELOZIER DATED OCTOBER 1, 2003 | |
| 118 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED NOVEMBER 3, 2003 | |
| 119 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED DECEMBER 1, 2003 | |
| 120 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED DECEMBER 1, 2003 | |
| 121 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED DECEMBER 31, 2003 | |
| 122 | DEF | STIP | 2/10/2014 | APPENDIX 45 - INVOICE FROM G. DAVID DELOZIER, P.C. DATED DECEMBER 31, 2003 | |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA                    Counsel:  GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                Counsel:  SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 123 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED JANUARY 31, 2004 | |
| 124 | DEF | STIP | 2/10/2014 | APPENDIX 37 - INVOICE FROM G. DAVID DELOZIER, P.C. DATED FEBRUARY 29, 2004 | |
| 125 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED MARCH 31, 2004 | |
| 126 | DEF | STIP | 2/10/2014 | APPENDIX 39 - INVOICE FROM G. DAVID DELOZIER, P.C. DATED APRIL 30, 2004 | |
| 127 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED MAY 31, 2004 | |
| 128 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED JUNE 30, 2004 | |
| 129 | DEF | STIP | 2/10/2014 | INVOICE FROM G. DAVID DELOZIER, P.C. DATED SEPTEMBER 30, 2004 | |
| 130 | DEF | STIP | 2/10/2014 | APPENDIX 41 - INVOICE FROM G. DAVID DELOZIER, P.C. DATED DECEMBER 31, 2004 | |
| 131 | DEF | STIP | 2/3/2014 | COURT OF APPEALS APPELLANT'S OPENING BRIEF FILE DATED MAY 27, 2003 | |
| 132 | DEF | DEF | 2/4/2014 | LETTER FROM ALEJO AND DONNA OCHOA TO JILL ZUBERS DATED MARCH 18, 2003 | |
| 133 | DEF | | | UNITED STATES BANKRUPTCY COURT DOCUMENT IN PROCEEDINGS UNDER CHAPTER 11 | Y |
| 134 | DEF | DEF | | UNITED STATES BANKRUPTCY COURT DOCUMENT IN PROCEEDINGS UNDER CHAPTER 11 FILED ON NOVEMBER 28, 2006 | |
| 135 | DEF | DEF | 2/6/2014 | CURRICULUM VITALE KEITH ROHMAN | |
| 136 | DEF | DEF | 2/6/2014 | EMAIL FROM DANIEL PATTERSON TO SCOTT MACLEOD DATED NOVEMBER 29, 2004 | |
| 137 | DEF | DEF | 2/6/2014 | EMAIL FROM MACLEODS@MAIL.MARICOPA.GOV TO GDDELOZIER@AOL.COM DATED DECEMBER 6, 2004 | |
| 138 | DEF | DEF | 2/7/2014 | WENDI ANDRIANO WHEN VALUE AND WORTH ARE IMPORTANT: THE LIFE WE MUST SAVE WITH ATTACHMENTS | |
| 139 | DEF | | | NEWS ARTICLE TITLED JUSTICE SYSTEM CAN'T COPE WITH BACKLOG OF DEATH PENALTY CASES DATED MARCH 4, 2003 | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**                    Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**                    Hearing Date: **02/03/2014**

STATE OF ARIZONA                                 Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                          Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 140 | DEF | DEF | 2/4/2014 | PHOTO | |
| 141 | DEF | DEF | 2/4/2014 | PHOTO | |
| 142 | DEF | DEF | 2/4/2014 | PHOTO | |
| 143 | DEF | DEF | 2/4/2014 | PHOTO | |
| 144 | DEF | | | PHOTO | Y |
| 145 | DEF | | | PHOTO | Y |
| 146 | DEF | | | PHOTO | Y |
| 147 | DEF | DEF | 2/4/2014 | PHOTO | |
| 148 | DEF | DEF | 2/4/2014 | PHOTO | |
| 149 | DEF | DEF | 2/4/2014 | PHOTO | |
| 150 | DEF | | | PHOTO | Y |
| 151 | DEF | | | PHOTO | Y |
| 152 | DEF | DEF | | ARIZONA DEPARTMENT OF PUBLIC SAFETY DISPOSITION REPORT | |
| 153 | DEF | | | PHOTO | Y |
| 154 | DEF | DEF | 2/4/2014 | PHOTO | |
| 155 | DEF | | | PHOTO | Y |
| 156 | DEF | | | PHOTO | Y |
| 157 | DEF | | | PHOTO | Y |
| 158 | DEF | DEF | 2/4/2014 | PHOTO | |
| 159 | DEF | DEF | 2/4/2014 | PHOTO | |
| 160 | DEF | DEF | 2/4/2014 | PHOTO | |
| 161 | DEF | DEF | 2/4/2014 | PHOTO | |
| 162 | DEF | | | PHOTO | Y |
| 163 | DEF | | | PHOTO | Y |
| 164 | DEF | | | PHOTOS | Y |
| 165 | DEF | DEF | | CD | |
| 166 | DEF | STIP | 2/3/2014 | RESUME FOR JOETTE DEANNA JAMES, PH.D., ABPP-CN | |

Hearing Officer: **Hon. Brian K. Ishikawa**              Case Number: **CR2000-096032**

                                                          Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**              Hearing Date: **02/03/2014**

STATE OF ARIZONA                            Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                     Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 167 | DEF | STIP | 2/3/2014 | REVIEW OF NEUROPSYCHOLOGICAL EVALUATION FROM ALINA ASSESSMENT SERVICES, PLLC | |
| 168 | PLF | PLF | | (2) BINDERS - REPORT OF FORENSIC PSYCHIATRIC EVALUATION OF WENDI ELIZABETH ANDRIANO FROM STEVEN E. PITT, D.O. | |
| 169 | PLF | PLF | 2/14/2014 | LETTER FROM KIRAN AMIN, PH.D. TO STEVEN PITT, D.O. DATED DECEMBER 26, 2013 | |
| 170 | PLF | | | ANDRIANO PHOENIX POLICE DEPARTMENTAL REPORT | Y |
| 171 | PLF | STIP | 2/3/2014 | MEETING SUMMARIES WITH WENDI ANDRIANO | |
| 172 | PLF | | | EMAIL FROM MLYNCH@FOLEY.COM TO LACEY GARD, AARNTSEN@FOLY.COM, SCOTT BENNETT DATED MAY 6, 2013 WITH ATTACHMENTS | Y |
| 173 | PLF | | | INTERVIEW OF DANIEL PATTERSON, ESQ. DATED NOVEMBER 26, 2013 | Y |
| 174 | PLF | PLF | 2/11/2014 | INTERVIEW OF DAVID DELOZIER, ESQ. DATED NOVEMBER 25, 2013 | |
| 175 | PLF | | | MESA POLICE DEPARTMENT CONTINUATION REPORT DR#20011210670 | Y |
| 176 | PLF | | | CASA GRANDE REGIONAL MEDICAL CENTER EMPLOYMENT RECORDS OF WENDI ANDRIANO DATED JUNE 25, 1996 | Y |
| 177 | PLF | | | APPLICATION FOR EMPLOYMENT DATED MAY 21, 1998 | Y |
| 178 | PLF | | | MOUNTAIN STATES CREDIT CORPORATION LETTER DATED OCTOBER 17, 2000 WITH ATTACHMENTS | Y |
| 179 | PLF | STIP | 2/3/2014 | (5) CD'S | |
| 180 | PLF | STIP | 2/3/2014 | TRANSCRIPT WENDI ELIZABETH ANDRIANO POLICE INTERVIEW | |
| 181 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS MEDICAL RECORDS | Y |
| 182 | PLF | | | CASSETTE TAPE | Y |
| 183 | PLF | STIP | 2/3/2014 | SHARON B. MURPHY, PH.D., CISW DOMESTIC VIOLENCE ASSESSMENT DATED SEPTEMBER 22, 2003 | |

Hearing Officer: **Hon. Brian K. Ishikawa**

Hearing Type: **EVIDENTIARY HEARING**

Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Date: **02/03/2014**

STATE OF ARIZONA                    Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO           Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 184 | PLF | STIP | 2/3/2014 | ADMISSION / REGISTRATION RECORD AND SUMMARY DATED SEPTEMEBR 27, 2003 | |
| 185 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS HEALTH NEEDS REQUEST (HNR) DATED JULY 20, 2012 | Y |
| 186 | PLF | PLF | 2/14/2014 | (4) CD'S | |
| 187 | PLF | | | MARICOPA COUNTY SHERIFF'S OFFICE DISCIPLINARY REPORT DATED DECEMBER 3, 2003 | Y |
| 188 | PLF | | | MARICOPA COUNTY SHERIFF'S OFFICE DISCIPLINARY ACTION REPORT DATE DECEMBER 10, 2003 | Y |
| 189 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS DATED AUGUST 10, 2005 | Y |
| 190 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS RELIGIOUS PREFERENCE AND PRIVILEGE REQUEST DATED JULY 6, 2007 | Y |
| 191 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS INFORMATION REPORT DATED JANUARY 20, 2006 | Y |
| 192 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS INMATE DISCIPLINARY REPORT DATED MARCH 6, 2008 | Y |
| 193 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS CONTINUOUS PROGRESS RECORD - MENTAL HEALTH DATED NOVEMBER 23, 2011 | Y |
| 194 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS CONTINUOUS PROGRESS REOCRD - MENTAL HEALTH DATED DECEMBER 12, 2011 | Y |
| 195 | PLF | STIP | 2/3/2014 | CASA GRANDE VALLEY COUNSELING SERVICE, INC. NOTICE OF ASSESSMENT DATED FEBRUARY 27, 1996 | |
| 196 | PLF | | | HANDWRITTEN NOTES | Y |
| 197 | PLF | | | COPY OF EXHIBIT # 548 - MARICOPA COUNTY SHERIFF'S OFFICE DISCIPLINARY ACTION REPORT DATED DECEMBER 5, 2003 | Y |
| 198 | PLF | | | STATEMENT OF FINANCIAL STATUS | Y |
| 199 | PLF | STIP | 2/3/2014 | TRIAL DAY 8 TESTIMONY AND TRIAL DAY 9 - COURT REPORT TRANSCRIPT OF PROCEEDINGS DATED SEPTEMBER 8, 2004 AND SEPTEMBER 9, 2004 | |

Hearing Officer: **Hon. Brian K. Ishikawa**          Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**          Hearing Date: **02/03/2014**

STATE OF ARIZONA                                          Counsel:   GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                                 Counsel:   SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 200 | PLF | STIP | 2/3/2014 | TRIAL DAY 10 - COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS DATED SEPTEMBER 13, 2004 | |
| 201 | PLF | STIP | 2/3/2014 | COURT REPORTER'S TRANSCRIPT OF PROCEEDINGS (TRIAL) DATED DECEMBER 14, 2004 | |
| 202 | PLF | | | ARIZONA DEPARTMENT OF CORRECTIONS INMATE MASTER FILE OF WENDI E. ANDRIANO, #191593 | Y |
| 203 | PLF | PLF | 2/14/2014 | CD | |
| 204 | DEF | DEF | 2/6/2014 | REPORT OF KEITH ROHMAN DATED JANUARY 23, 2014 | |
| 205 | DEF | DEF | 2/4/2014 | PHOTO | |
| 206 | DEF | DEF | 2/6/2014 | SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES | |
| 207 | PLF | | | TRANSCRIPT TRIAL PROCEEDINGS DATED DECEMBER 13, 2004 | Y |
| 208 | PLF | | | TRANSCRIPT TRIAL PROCEEDINGS DATED OCTOBER 4, 2004 | Y |
| 209 | PLF | | | TRANSCRIPT TRIAL PROCEEDINGS DATED OCTOBER 6, 2004 | Y |
| 210 | PLF | | | TRANSCRIPT TRIAL PROCEEDINGS DATED DECEMBER 9, 2004 | Y |
| 211 | PLF | | | INTERVIEW OF DONNA OCHOA / ALEJO OCHOA DATED MAY 17, 2004 | Y |
| 212 | PLF | | | TRANSCRIPT TRIAL PROCEEDINGS DATED DECEMBER 13, 2004 | Y |
| 213 | DEF | STIP | 2/3/2014 | APPENDIX  TO THE EXPERT REPORT OF JAMES W. HOPPER, PH.D. | |
| 214 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED JUNE 8, 2010 | Y |
| 215 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED JUNE 9, 2010 | Y |
| 216 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATE JULY 6, 2010 | Y |
| 217 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED AUGUST 31, 2010 | Y |

Hearing Officer: **Hon. Brian K. Ishikawa**   Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**   Hearing Date: **02/03/2014**

STATE OF ARIZONA   Counsel: GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO   Counsel: SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|-----|-------|-------------|---------------------|----------|
| 218 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED SEPTEMBER 1, 2010 | Y |
| 219 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED NOVEMBER 2, 2010 | Y |
| 220 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED JANUARY 4, 2011 | Y |
| 221 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED JANUARY 5, 2011 | Y |
| 222 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED APRIL 11, 2011 | Y |
| 223 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED APRIL 12, 2011 | Y |
| 224 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED APRIL 13, 2011 | Y |
| 225 | PLF | | | INTERVIEW WITH WENDI ANDRIANO DATED AUGUST 16, 2011 | Y |
| 226 | PLF | | | DECLARATION OF KYRE LORTS | Y |
| 227 | DEF | STIP | 2/6/2014 | MARICOPA COUNTY ATTORNEY'S OFFICE INVESTIGATIONS DIVISION SUPPLEMENTAL REPORT | |
| 228 | DEF | STIP | 2/6/2014 | CD | |
| 229 | DEF | | | TRANSCRIPT TRIAL PROCEEDINGS DATED NOVEMBER 15, 2004 | Y |
| 230 | DEF | DEF | 2/7/2014 | COPY OF MOTION FOR DETERMINATION OF COMPETENCY PURSUANT TO RULE 11, ARIZONA RULES OF CRIMINAL PROCEDURE | |
| 231 | DEF | DEF | 2/10/2014 | COVER LETTER AND REPRESENTATION AGREEMENT DATED DECEMBER 14, 2000 | |
| 232 | DEF | DEF | 2/11/2014 | SENTENCE OF IMPRISONMENT MINUTE ENTRY DATED SEPTEMBER 9, 1993 | |
| 233 | DEF | DEF | 2/11/2014 | SENTENCE OF IMPRISONMENT / LIFETIME PROBATION MINUTE ENTRY DATED AUGUST 13, 1993 | |
| 234 | DEF | DEF | | REPRESENTATION TIMELINE | |
| 235 | DEF | | | STRUCTURED INVENTORY OF MALINGERED SYMPTOMATOLOGY - SIMS INTERPRETIVE REPORT | Y |
| 236 | DEF | STIP | 2/14/2014 | LARRY A. HAMMOND RESUME | |

Hearing Officer: **Hon. Brian K. Ishikawa**                    Case Number: **CR2000-096032**

Co-Defendant: **No**

Hearing Type: **EVIDENTIARY HEARING**                    Hearing Date: **02/03/2014**

STATE OF ARIZONA                                    Counsel:  GREGORY MICHAEL HAZARD

vs

WENDI ELIZABETH ANDRIANO                    Counsel:  SCOTT BENNETT

| Ex # | ID | Off'd | In Evidence | Exhibit Description | Released |
|------|------|------|-------------|---------------------|----------|
| 237 | PLF | PLF | 2/14/2014 | TRANSCRIPT OF FORENSIC PSYCHIATRIC EVALUATION OF WENDI ELIZABETH ANDRIANO DATED NOVEMBER 26, 2013 | |

Received By: _____  _____ Date: 12/30/14

Processed By: _____  _____ Date: 12/30/14

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

### EXHIBIT/RECORD RELEASE FORM

FILED
2/25/14—11:00AM
MICHAEL K. JEANES, Clerk
By _____
Deputy

STATE OF ARIZONA _____          Case No.  CR 2000-096032 A _____

v

WENDI ELIZABETH ANDRIANO _____

Items released: (State) 170, 172, 173, 175, 176, 177, 178, 181, 182, 185, 187, 188, 189, 190, 191, 192, 193, 194, 196, 197, 198, 202, 207, 208, 209, 210, 211, 212, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226

X  Permanent Release

_____  Temporary Release, to be returned on: _____

Released to (please print): *Kim Carter* _____  Date: *2/25/2014* _____

Returned by (please print): _____  Date: _____

*Kim Carter*
Signature of Recipient

*Kim Carter*
Printed Name/Title
On behalf of  STATE _____

*[signature]*
Signature of Deputy Clerk (upon release)

_____
Signature of Deputy Clerk (upon return)

FORM: EXH                                                          LRD: 02/02/2006

*IN THE SUPERIOR COURT OF THE STATE OF ARIZONA*
*IN AND FOR THE COUNTY OF MARICOPA*

**EXHIBIT/RECORD RELEASE FORM**

FILED
2/28/14 7:000AM
MICHAEL K. JEANES, Clerk
By: _____
Deputy

STATE OF ARIZONA                    Case No.  CR 2000-096032 A

v

WENDI ELIZABETH ANDRIANO

Items released: (Defendant) 6, 7, 7.001, 7.003, 7.004, 7.005, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 19.001, 20, 21, 22, 23, 26, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 53, 55, 58, 59, 60, 62, 66, 67, 69, 69.001, 69.002, 70, 71, 72, 75, 77, 83, 90, 91, 92, 93, 94, 98, 103, 106, 111, 112, 133, 139, 144, 145, 146, 150, 151, 153, 155, 156, 157, 162, 163, 164, 229, 235

X_____ Permanent Release

_____ Temporary Release, to be returned on: _____

Released to (please print): Cory Shields     Date: 2/28/14

Returned by (please print): _____     Date: _____

X _____
Signature of Recipient

X    Cory Shields
Printed Name/Title
On behalf of   Coppersmith Brockleman

_____
Signature of Deputy Clerk (upon release)

_____
Signature of Deputy Clerk (upon return)

FORM: EXH                                           LRD: 02/02/2006

# EXHIBIT DDDDDDDDDD

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
12/30/2014 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          12/29/2014


                                              CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA                        L. Mooney
                                                    Deputy



STATE OF ARIZONA                     LACEY ALEXANDRA STOVER GARD
                                     GREGORY MICHAEL HAZARD
                                     JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO (A)         ALLEN A ARNTSEN
                                     SCOTT M BENNETT
                                     STEPHAN J NICKELS
                                     MATTHEW R LYNCH
                                     JODI FOX

                                     APPEALS-CCC
                                     CAPITAL CASE MANAGER
                                     COURT ADMIN-CRIMINAL-PCR
                                     JUDGE ISHIKAWA
                                     SERGEANT SCOTT KELLER
                                     MARICOPA COUNTY SHERIFF'S
                                     OFFICE
                                     175 W. MADISON STREET
                                     PHOENIX AZ  85003


**NUNC PRO TUNC**


        Due to a clerical error,

        IT IS ORDERED nunc pro tunc amending Evidentiary Hearing Day 1 minute entry dated
02/03/2014 with docket code 005 to reflect on Page 4:

        Defendant's Exhibit 213 is marked and admitted into evidence by stipulation

        <u>**Instead of and in place of:**</u>

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          12/29/2014


State's Exhibit 213 is marked and admitted into evidence by stipulation.

The remainder of the minute entry remains unchanged.

IT IS ORDERED nunc pro tunc amending Evidentiary Hearing Day 2 minute entry dated 02/04/2014, with docket code 005 to reflect on Page 4 the addition of:

**Defense Exhibit 74 is admitted into evidence.**

The remainder of the minute entry remains unchanged.

# EXHIBIT EEEEEEEEEE

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
M. Martin, Deputy
1/21/2015 3:05:04 PM
Filing ID 6355982

Scott M. Bennett (022350)
Coppersmith Brockelman PLC
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@cblawyers.com

Allen A. Arntsen, Admitted *Pro Hac Vice*
Stephan J. Nickels Admitted *Pro Hac Vice*
Matthew R. Lynch Admitted *Pro Hac Vice*
Foley & Lardner LLP
150 E. Gilman Street
Madison, WI 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com

*Attorneys for Petitioner Wendi Andriano*

SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA

| | |
|---|---|
| State of Arizona, | No. CR2000-096032-A |
| Respondent, | **UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE PETITION FOR REVIEW** |
| v. | |
| Wendi Elizabeth Andriano, | (Hon. Brian Ishikawa) |
| Petitioner. | |

Wendi Andriano, the petitioner in this matter, moves for a 60-day extension of the deadline to file a petition for review of this Court's order dismissing her petition for postconviction relief.  The current deadline is February 2, 2015.  This extension would move that deadline to April 3, 2015.

{00150749.1 }

1       This Court has granted one previous, 60-day extension of the deadline.  Ms.

2  Andriano's attorneys request this second extension because of the competing work

3  obligations of the attorneys who are drafting the petition for review.

4       One of the attorneys for the State, Gregory Hazard, has informed Ms. Andriano's

5  counsel that the State does not object to this extension.

6       A proposed order granting the extension accompanies this motion.

7       RESPECTFULLY SUBMITTED January 21, 2015.

8
9                    COPPERSMITH BROCKELMAN PLC

10                 By /s/ Scott M. Bennett
                      James J. Belanger

11                    Scott M. Bennett

12                 FOLEY & LARDNER LLP
                    Allen A. Arntsen, *Pro Hac Vice*

13                    Stephan J. Nickels, *Pro Hac Vice*

14                    Matthew R. Lynch, *Pro Hac Vice*

15                 *Attorneys for Petitioner*

16

17  ORIGINAL e-filed January 21, 2015,
    with the Clerk of the Maricopa County Superior Court

18

19  COPIES mailed on January 21, 2015, to:

20  Hon. Brian Ishikawa

21  Maricopa County Superior Court
    1810 Lewis Street

22  Mesa AZ 85210-6235

23
    Gregory Hazard

24  Office of the Attorney General
    1275 W. Washington

25  Phoenix, AZ 85007-2997
    *Attorneys for the State of Arizona*

26

1

2   Ms. Lacey Stover Gard
    Office of the Attorney General
3   400 W. Congress, Suite S-315
    Tuscon, AZ 85701-1367
4   *Attorneys for the State of Arizona*

5
    */s/ Carol Keesee*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT FFFFFFFFFF

MICHAEL K. JEANES, CLERK

BY _____ DEP
FILED

15 JAN 27  PM 5:00

1  Scott M. Bennett (022350)
2  Coppersmith Brockelman PLC
   2800 North Central Avenue, Suite 1200
3  Phoenix, Arizona  85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
5  sbennett@cblawyers.com

6  Allen A. Arntsen, Admitted *Pro Hac Vice*
   Stephan J. Nickels Admitted *Pro Hac Vice*
7  Matthew R. Lynch Admitted *Pro Hac Vice*
8  Foley & Lardner LLP
   150 E. Gilman Street
9  Madison, WI 53703
   (608) 257-5035 (office)
10 (608) 258-4258 (fax)
11 aarntsen@foley.com

12 *Attorneys for Petitioner Wendi Andriano*

13                    SUPERIOR COURT OF ARIZONA
14                       COUNTY OF MARICOPA

15  State of Arizona,                    )        No. CR2000-096032-A
16                                       )
                          Respondent,    )
17  v.                                   )   **ORDER GRANTING EXTENSION**
                                         )   **OF TIME TO FILE PETITION**
18                                       )   **FOR REVIEW**
    Wendi Elizabeth Andriano,            )
19                                       )   (Hon. Brian Ishikawa)
                          Petitioner.    )
20                                       )
    _____   )
21

22        Based on the unopposed motion by petitioner Wendi Andriano, and for good cause,

23  IT IS ORDERED extending Ms. Andriano's deadline to file a petition for review to April

24  3, 2015.

25  DATED:  O1-26-15

26                                          Hon. Brian Ishikawa

{00150754.1 }

# EXHIBIT GGGGGGGGGG

## IN THE ARIZONA SUPREME COURT

| | |
|---|---|
| STATE OF ARIZONA | ) ARIZONA SUPREME COURT |
| RESPONDENT, | ) |
| v. | ) Maricopa County Superior Court |
| WENDI ELIZABETH ANDRIANO | ) No. CR2000-096032-A |
| PETITIONER. | ) |

## MOTION TO FILE OVERLENGTH BRIEF

For the reasons explained below, Appellant Wendi Andriano moves for leave to file a petition for appellate review of post-conviction relief proceedings in excess of the page limit set forth in the Arizona Rules of Criminal Procedure, Rule 32(c)(1). This motion is made in good faith, not for the purposes of harassment or delay, and is brought pursuant to Andriano's state and federal constitutional rights to due process, effective counsel, a full and fair appeal, equal protection and freedom from cruel and unusual punishment. U.S. Const. Amends. V, VI, VIII, XIV; Ariz. Const. Art. 2, §§ 4, 10, 13, 15, 23, 24, 32, 33. *Evitts v. Lucey*, 469 U.S. 387 (1985).

Ariz. R. Crim. P. 32(c)(1) generally limits a petition seeking appellate review of post-conviction relief proceedings to 20 pages.  The undersigned counsel have diligently sought to comply with this limit, but have not been able to do so

without compromising important arguments because of the complexity of Andriano's case and the number of appellate issues before the Court following extensive briefing before the Superior Court for Maricopa County (the "PCR Court") on Andriano's petition for post-conviction relief ("PCR Petition") and a lengthy hearing on the PCR Petition in this capital case.

Andriano's PCR Petition raised multiple claims, and the PCR Court granted Andriano's request to file a 70-page brief to address these issues. The PCR Court similarly granted the State's request to file an oversized brief of 65 pages in response, and granted Andriano's request to file an oversized reply brief of 30 pages. An eight day hearing was held on two of the claims raised by Andriano's PCR Petition, after which Andriano submitted a 115-page post-hearing brief, the State submitted a 74-page response, and Andriano submitted a 55-page reply. To avoid any potential waiver and to adequately address the multiple legal issues before the Court and the extensive record created below, Andriano requires leave to file a petition for appellate review of 57 pages.

This Court has the power to extend the page limits for this petition. *See State v. Payne*, No.CR-09-0081-AP, Order (6/29/2012) (granting motion to exceed word limit for reply brief for a total of 18,336 words); *State v. Wallace*, No. CR-09-0341-AP, Order (08/04/2011) (granting motion to exceed word limit for reply brief for a total of 20,000 words). Andriano respectfully requests that the Court do so

here to provide her with an opportunity for full and fair review and to protect her constitutional rights in this capital case. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Turner v. Murray*, 476 U.S. 28, 37 (1986) (procedures that create unnecessary risk of arbitrary imposition of capital sentence violate Eighth Amendment); *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (due process guarantees meaningful opportunity to be heard); *Dobbs v. Zant*, 113 S. Ct. 835, 836 (1993) (noting "importance of reviewing capital sentences on a complete record").

## CONCLUSION

Andriano respectfully requests that this Court allow her to file a petition of 57 pages. Should this Court decide to deny this motion in whole or in part, Andriano respectfully requests this Court to: 1) order the petition filed with this motion as part of the record, and 2) allow counsel sufficient time to file a revised petition in compliance with this Court's order.

Respectfully submitted this 3rd day of April, 2015.

COPPERSMITH BROCKELMAN PLC


By:   /s/      Scott M. Bennett
Scott M. Bennett (Bar No. 022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted pro hac vice
Matthew R. Lynch, admitted pro hac vice
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, Wisconsin 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com
mlynch@foley.com

Attorneys for Petitioner Wendi Andriano

# EXHIBIT HHHHHHHHHH

# IN THE ARIZONA SUPREME COURT

| | |
|---|---|
| STATE OF ARIZONA | ) ARIZONA SUPREME COURT |
| RESPONDENT, | ) |
| v. | ) Maricopa County Superior Court |
| | ) No. CR2000-096032-A |
| WENDI ELIZABETH ANDRIANO | ) |
| PETITIONER. | ) |
| | ) |

## PETITION FOR REVIEW OF DENIAL OF POST-CONVICTION RELIEF

## (CAPITAL CASE)

Scott M. Bennett (Bar No. 022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona 85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted pro hac vice
Matthew R. Lynch, admitted pro hac vice
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, Wisconsin 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com
mlynch@foley.com

{00158996.1 }

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………...iii

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................1

I.     THE TRIAL COURT'S RULINGS ........................................................................1

II.    ISSUES PETITIONER PRESENTS FOR REVIEW ....................................................1

III.   FACTS MATERIAL TO CONSIDERATION OF THE ISSUES ...................................1

       A.    Procedural History...............................................................1

       B.    Facts...................................................................................3

IV.    REASONS WHY THIS PETITION SHOULD BE GRANTED .....................................3

V.     ARGUMENT ....................................................................................5

       A.    Andriano Was a Victim of Childhood Sexual Abuse ...........................9

       B.    Andriano's Conflict Of Interest Claim (Claim II) .............................17

             1.    DeLozier Was "[A]ctively [R]epresent[ing] [C]onflicting
                   [I]nterests." *Cuyler*, 446 U.S. at 350........................................18

                   a.    DeLozier's representation of the Ochoas in
                         custody proceedings relating to Andriano's
                         children ...........................................................18

                   b.    DeLozier's representation of Andriano in her
                         criminal case ..................................................21

                   c.    DeLozier's concurrent representation of the
                         Ochoas and Andriano created an actual conflict of
                         interest............................................................22

                         (i)    DeLozier's representation of the Ochoas was
                                directly adverse to Andriano's interests in
                                developing all reasonably available mitigating
                                evidence……………………………………22

(ii) DeLozier's representation of Andriano was materially limited by his duty of confidentiality to the Ochoas……………………………………25

(iii) The Ochoas' payment of DeLozier's fees in the custody and criminal cases impaired his judgment………………………………… 26

2. DeLozier's Conflict Of Interest Actually Affected The Adequacy Of Andriano's Representation .................................28

3. The PCR Court Erred As A Matter Of Law And Abused Its Discretion In Rejecting Andriano's Conflict of Interest Claim ..........................................................................32

C. Andriano's IAC - Penalty Phase Claim (Claim I(A)) .........................37

1. The Superficial Mitigation Presentation at Trial ......................38

2. The Mitigation Evidence Based On An Investigation Of Andriano's Childhood And Mental Illnesses Would Have Enabled The Jury To Contextualize Andriano's Behaviors ..................................................................................40

3. The PCR Court Erred In Rejecting Andriano's IAC— Penalty Phase Claim ...............................................................44

D. Andriano's Other PCR Claims ...........................................................48

1. Andriano's IAC—Aggravator Phase Claim (Claim I(B)) ........48

2. Andriano's IAC-Guilt Phase Claim (Claim I(C)) .....................50

3. Andriano's Prosecutorial Misconduct Claim (Claim III) .........52

4. Andriano's Juror Misconduct Claim (Claim IV) ......................54

5. Andriano's IAC Claim On Her Direct Appeal (Claim V) ........55

E. The PCR Court's Evidentiary Errors ..................................................55

VI. CONCLUSION....................................................................................................57

# TABLE OF AUTHORITIES

## Cases

*Boyde v. California*,
    494 U.S. 370 (1990)...................................................................................25

*Correll v. Ryan*,
    539 F.3d 938 ..........................................................................................44

*Cuyler v. Sullivan*,
    446 U.S. 335 (1980)...............................................................18, 28, 32, 35

*Doe v. Roe*,
    191 Ariz. 313, 955 P.2d 951 (1988) ....................................................34

*Fitzpatrick v. McCormick*,
    869 F.2d 1247 (9th Cir. 1989) .............................................................24

*Frierson v. Woodford*,
    463 F.3d 982 (9th Cir. 19999) .............................................................45

*Hamilton v. Ayers*,
    583 F.3d 1100 (9th Cir. 2009) .............................................................44

*Jeffries v. Wood*,
    114 F.3d 1484 (9th Cir. 1997) .............................................................55

*Lambright v. Schriro*,
    490 F.3d 1103 (9th Cir. 2007) .............................................................44

*Libberton v. Ryan*,
    583 F.3d 1147 (9th Cir. 2009) .............................................................44

*Lockhart v. Terhune*,
    250 F.3d 1223 (9th Cir. 2001) ...................................................25, 29, 32

*Porter v. McCollum*,
    558 U.S. 30 (2009) (per curiam)...................................................43, 44

*Ring v. Arizona*,
    536 U.S. 584 (2002)........................................................................................56

*Rompilla v. Beard*,
    545 U.S. 374 (2005)........................................................................................44

*Simmons v. South Carolina*,
    512 U.S. 154 (1994)........................................................................................54

*Stankewitz v. Wong*,
    698 F.3d 1163 (9th Cir. 2012) ........................................................................44

*State v. Andriano*,
    215 Ariz. 497, 161 P.3d 540 (2007) ...........................................2, 39, 40, 51, 53

*State v. Bocharski*,
    218 Ariz. 476, 189 P.3d 403 (2008) ........................................................44, 49

*State v. Christensen*,
    129 Ariz. 32, 628 P.2d 580 (1981) .................................................................50

*State v. Jenkins*,
    148 Ariz. 463, 715 P.2d 716 (1986) ...............................................................29

*State v. Martinez-Serna*,
    166 Ariz. 423, 803 P.2d 416 (1990) ........................................................25, 29

*State v. Moody*,
    208 Ariz. 424, 94 P.3d 1119 (2004) ...............................................................49

*State v. Thomas*,
    545 N.E.2d 654 (Ill. 1989)..............................................................................28

*State v. Walton*,
    159 Ariz. 571, 769 P.2d 1017 (1989) .............................................................56

*Stewart v. Smith*,
    202 Ariz. 446, 46 P.3d 1067 (2002) ...............................................................55

*Strickland v. Washington*,
    466 U.S. 668 (1984)..................................................................................18, 38

*United States v. Henke*,
   222 F.3d 633 (9th Cir. 2000) ................................................................................26

*Wiggins v. Smith*
   539 U.S. 510 (2003).............................................................24, 31, 38, 45, 46

*Wood v. Georgia*,
   450 U.S. 261 (1981)................................................................................17, 27

**Statutes**

Ariz. Rev. Stat. § 13-751(F)(6) ................................................................................2

Ariz. Rev. Stat. § 13-751.C ................................................................................56

Ariz. Rev. Stat. § 13-751.G ................................................................................56

**Rules**

Ariz. R. Crim. P. 32.9.c..........................................................................................1

Ariz. R. Crim. P. 24.1 ........................................................................................54

Ariz. R. Crim. P. 32.2(a)(3) ...............................................................................3, 55

Ariz. R. Evid. 803(3)...........................................................................................52

Ariz. R. of Prof'l Conduct 1.7(a)(1), (b)..........................................................22

Ariz. R. of Prof'l Conduct 1.7(a)(2) ................................................................25

Ariz. R. of Prof'l Conduct 1.8................................................................................25

Ariz. R. of Prof'l Conduct 1.8, Cmt. 11.............................................................27

Ariz. R. of Prof'l Conduct 1.8(f).........................................................................27

Pursuant to Arizona Rule of Criminal Procedure 32.9.c, Wendi Elizabeth Andriano submits this Petition for Review of the denial of her Petition for Post-Conviction Relief, based upon the 5th, 6th, 8th, and 14th Amendments of the United States Constitution, and Article 2 §§ 4, 10, 15, 23, 24, and 30 of the Arizona Constitution.[1]

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   THE TRIAL COURT'S RULINGS

This Petition seeks review of the October 30, 2012 Order ("10/30/12 Order") (Petitioner's Appendix ("P-App") 1-7) of the Maricopa County Superior Court (the "PCR Court"), which granted an evidentiary hearing on two of Andriano's claims for post-conviction relief and denied the remainder, and the PCR Court's November 3, 2014 Order ("11/3/14 Order") (P-App 8-38), which denied the two claims that were the subject of the evidentiary hearing.

### II.   ISSUES PETITIONER PRESENTS FOR REVIEW

Andriano seeks review of the rulings on all of her claims.

### III.   FACTS MATERIAL TO CONSIDERATION OF THE ISSUES

#### A.   Procedural History

Andriano was indicted on October 18, 2000 for murdering her husband Joe

---

[1] Petitioner's Post-Conviction Relief ("PCR") Petition and supporting briefing, and her Post-Hearing Memorandum and Reply, are included in Petitioner's Appendix and incorporated by reference herein.  The Appendix also includes all substantive PCR Court filings and exhibits offered into evidence at or before the hearing, with one exception:  it does not include Exhibit 213, which was duplicative of Exhibit 4.

Andriano, and went to trial in 2004.  The jury found Andriano guilty of one count

of first-degree murder.  During the aggravator phase, the jury rejected the (F)(5)

pecuniary gain aggravating factor, but found that Andriano had committed the

murder in an "especially cruel manner" in violation of A.R.S. § 13-751(F)(6).

Following a penalty phase, the jury determined that the mitigation presented was

not sufficiently substantial to call for leniency and sentenced Andriano to death.

Andriano timely appealed her conviction and sentence, which were affirmed.  *State*

*v. Andriano*, 215 Ariz. 497, 161 P.3d 540 (2007). She filed a timely petition for a

writ of certiorari in the United States Supreme Court, which was denied.

On February 17, 2012, Andriano timely filed her petition for post-conviction

relief and supporting memorandum (P-App 41-170), raising the following claims:

I.    Andriano's right to effective assistance of counsel was violated
      by defense counsel's deficient performance, resulting in
      prejudice during the (A) penalty phase, (B) aggravator phase,
      and (C) guilt phase of the trial;

II.   Defense counsel in charge of Andriano's penalty phase had an
      actual conflict of interest that adversely affected the adequacy
      of Andriano's representation;

III.  Defense counsel's failure to object to pervasive instances of
      prosecutorial misconduct deprived Andriano of due process and
      violated her right to effective assistance of counsel;

IV.   The jury's consideration of a non-statutory aggravating factor
      violated due process; and

V.    Andriano was denied effective assistance of counsel on her
      direct appeal.

On October 30, 2012, the PCR Court ruled that Claims I(A) (ineffective

assistance of counsel during penalty phase) and II (conflict of interest) were "colorable" and warranted an evidentiary hearing.  (10/30/12 Order at 4 (P-App 4).)  The PCR Court dismissed Claims I(B) and I(C), finding that trial counsel was not ineffective during the aggravator and guilt phases of the trial, ruled that Claims III and IV were waived pursuant to Rule 32.2(a)(3), and dismissed Claim V.

The PCR Court held an evidentiary hearing on Claims I(A) and II on February 3-7, 10-11, and 14, 2014.  Subsequently, Andriano and the State filed post-hearing briefs.  On November 3, 2014, the PCR Court ruled that Andriano "failed to meet her burden to establish her claims of ineffective assistance of counsel or conflict[,]" and dismissed the remaining Claims I(A) and II.  (*See* 11/3/14 Order (P-App 8-38).)

On April 3, 2015, Andriano timely filed this petition seeking review of the PCR Court's denial of her PCR Petition.  (P-App 39-40.)

### B.    Facts

The facts relevant to the Claims are contained in Andriano's Memorandum in Support of her PCR Petition, her Post-Hearing Memorandum, and the associated reply briefs.  (*See* P-App 46-125, 240-287, 295-420, 498-562.)

## IV.    REASONS WHY THIS PETITION SHOULD BE GRANTED

With respect to Andriano's conflict of interest claim (Claim II), the PCR Court erred as a matter of law in holding that trial counsel David DeLozier's

representation of Andriano in her capital murder trial—in which he had the duty to investigate all sources of potentially mitigating evidence, including whether Andriano suffered childhood sexual abuse and neglect by her mother and stepfather (Donna and Alejo Ochoa)—while concurrently representing Donna and Alejo in adoption and guardianship proceedings relating to Andriano's children, was not an actual conflict of interest, and abused its discretion in finding that the concurrent representation did not adversely affect Andriano's representation.

With respect to Andriano's claim of ineffective assistance of counsel ("IAC") at the penalty phase (Claim I(A)), the PCR Court erred in applying the incorrect legal standard, in failing to address trial counsel's lack of investigation of any "negative" aspects of Andriano's social history (including mental-health disorders and childhood sexual abuse) despite numerous indications that such an investigation would be fruitful, and in concluding that trial counsel presented the case they did at trial for tactical reasons or because the information identified in this PCR proceeding was unavailable.

With respect to Andriano's other claims—*i.e.*, Claim I(B) (IAC at the aggravator phase), Claim I(C) (IAC at the guilt phase), Claim III (prosecutorial misconduct), Claim IV (jury consideration of non-statutory factor), Claim V (IAC in the direct appeal), the PCR Court erred in denying a hearing on those claims, and in dismissing those claims based on preclusion (Claims III and IV) or other

grounds (Claims I(B), I(C) and V).

## V.    ARGUMENT

At trial, the State made Andriano's promiscuity a major theme of its case, inundating the jury with dozens of references to Andriano's sexual conduct.  As the prosecutor noted during closing arguments for each of the three phases of the trial:

"You've seen what she looked like back then, all sassed up in her pink little outfit."  (11/16/04 Tr. (guilt phase) at 63.)

"I'm sure and Sharon Murphy was quick to point out every time that the defendant has sex with Mr. Andriano, she had to use a lubricant.  I wonder if she had to use a lubricant with Dido Gamez.  I w[o]nder if she had to use a lubricant with Vernon Barnes.  (*Id*. at 75.)

"Why is it that she gets involved with [another man]?  Why is it that they engaged in the most intimate acts that two people can engage in?  Well, because, according to her, she didn't want to be a tease.  Wow.  Just because you have a drink with somebody, just because a man is nice to you, you better be careful you're not a tease.  But if you are, then you can have intercourse with him and you know what, it's not your fault.  It really isn't your fault because that's not, according to the defendant, the way women should act.  According to her, it's worse to be a tease than it is to be a cheat.  I guess that's what she's telling us."  (*Id*. at 84-85.)

"And before the song is over, probably before he even knows her name, they're kissing. . . . And when she started to grab him in the various places, he, again, responded accordingly.  She's the one that initiated—this demure little lotus blossom we have here—she's the one that is all that."  (*Id*. at 87-88.)

"What's happening is that she starts to grope him under the table.  I guess the woman has needs and she's going to do something about it because she's so goal oriented and what ends up happening is he takes her home.  According to him, he didn't think anything was going to happen.  She invited him in.  He does not invite himself in.  Again, she is the aggressor."  (*Id*. at 88.)

"Perhaps she's going to experience another one of these dalliances that is not an affair. . . . This is the woman who kisses men on the way home." (*Id.* at 93.)

"She's goal-oriented and by God, she's going to do whatever she wants.  It doesn't matter if it's her father that's telling her not to do something or if it's her husband that's counseling her not to do this or asking her not to do it or if it's her God that's telling you ['] you shall not go out and cheat with other men.[']  She doesn't care.  She's going to do whatever she wants.  What does she care about the Ten Commandments.  Those are just words to her.  They're just words that are written down that tell her how to act and she didn't care.  She's going to violate them at every turn.  The reason we know that is because she did it." (*Id.* at 97.)

"Husband is dying.  Terminally ill with cancer.  Rather than spending time with him, what do you do?  Let's go out and look for the young bucks we have out here on the dance floor.  Maybe we can take one home.  That's exactly what's going on." (*Id.* at 101.)

"How about the people that she was most intimate with, her paramours.  I'm talking about Rick Freeland and Travis Black.  Was she honest with them?  Well, we know with regard to Rick Freeland she didn't tell him the truth.  She told him that she was not married.  And, in fact, that's what created the big rift between them because once he found out she was married, he didn't want anything to do with her.  And on July 21st she sent him that e-mail saying you know what, I don't know why I keep pushing it.  We know why you keep pushing it because that's your nature.  You have a goal, you want to be with him.  That's why you stand outside of the door for an hour on the cell phone saying I'm not leaving, I'll get the pass key unless you let me in. . . .  How about Travis Black.  What did she tell him?  Well, she lied to him too.  Didn't tell him she was married." (*Id.* at 111.)

"But she's in a fantasy world. . . .  Wants to be out on the dance floor.  Wants to be out kissing guys.  Wants to be out in this fantasy world that seems so real to her with the strobe lights going on.  That's where she wants to be." (*Id.* at 151.)

"You've seen it, how she's all sassed up over there by the pool.  And you know how she's out . . . .  Going over to the dance floor." (*Id.* at 152.)

"[S]he tells us, well, it's okay to be unfaithful.  It's okay to cheat on

your husband.  It's okay to go to bars and kiss other men as long as in this fantasy world of hers, you don't tease the men.  Because, that's an unforgivable sin to her; that's the teasing of men."  (11/17/04 Tr. at 4.)

"[Joe] allows her to go out twice a week.  Stay out . . . until midnight. We know that, of course, that curfew was violated constantly.  We also know that during the curfew she was kissing other men.  And, in fact, she has one affair of some duration; one she admits to. Additionally, the day after he has chemotherapy, she has intercourse with a guy by the name of Travis Black.  At one point she says, 'Well, that's no big deal.  It's not any affair.  There wasn't the emotional attachment.'  But we do know she does classify it as an affair.  So we have that as a backdrop."  (12/1/04 Tr. (aggravator phase) at 15.)

"[D]uring that time she's making life miserable for [Joe] by going out, by having affairs, by being with other people and embarrassing him in front of other people.  Going to the pool, hanging out there while he takes care of the kids."  (*Id.* at 16.)

"All murder is senseless.  But this one goes way beyond that.  Of course.

Not only is she out there being the bell[e] of the ball, not only is he being a house husband, if you will, not only is she having total freedom, having affairs doing whatever she wants, going out with her friends, not only is she doing all of that . . . but does she need to kill him?"  (*Id.* at 38.)

"The facts and circumstances indicate to you that she added, if you will, salt to the wound.  And the way that she did that was by going out on him, by going out with other men."  (12/15/04 Tr. (penalty phase) at 111.)

"Additionally, she's the same one who says, 'You know, when I was riding home in the limo'—she denied it was her request to pick up this other individual—'there was no other place for me to sit other than between Chris's legs,' the young man.  And that, you know, 'I may have been kissing him but I didn't mean any disrespect.'  No disrespect to the marriage.  That's okay."  (*Id.* at 127.)

"[H]ow can she say that she has strong religious convictions when she's going out and committing adultery, she's lying, cheating and she's being violent.  For example, Rick Freeland."  (*Id.* at 130.)

"What was she doing?  Do you think she's carrying that cross out

there at the Rockin' Rodeo?  Do you think she was carrying his cross
as she was kissing Rick Freeland?  Do you think that she was carrying
his cross as she's having sexual intercourse with Travis Black?
Absolutely not.  She was having a gay old time on her birthday,
coming home late . . . giggling, even though she had just been kissing
another guy.  But that's no disrespect.  No disrespect at all."
(12/16/04 Tr. (penalty phase) at 9-10.)

"And if it's so stressful, why is she going out and hanging out at
bars[?] . . .  We know that she's having a pretty a good time of her life
right then."  (*Id*. at 11.)

"You know, do you think that when she was out there dancing and
kissing men, do you think she was thinking about her kids just like
they show here?  Do you think that she was thinking about anyone
other than self-gratification, making herself feel good?  That's all she
cared about."  (*Id*. at 16.)

Thus, during all three phases of the trial, the State repeatedly urged the jury to

condemn Andriano for her promiscuity, in essence turning her sexual conduct into

a non-statutory factor in support of a death sentence.  Absent any explanation from

her trial counsel, the jury was left to conclude that Andriano's promiscuous and

impulsive behavior was the product of selfish and vicious motives against her

husband, as the prosecutor contended.

There is an explanation for Andriano's promiscuity and seeming inability to

interact with men in a non-sexual way,[2] but the jury never heard it, because

---

[2]  The State's expert, Dr. Michael Bayless, testified that he "felt as though Mrs.
Andriano was being very flirtatious."  (12/15/04 Tr. at 14; *see id.* at 38 ("Q.  Let
me be more direct.  Did she flirt with you?  A.  Yes.").)  *See also* 11/17/04 Tr. at 5
("Even at some point, it appears she went almost as far as to attempt to flirt with
Detective David Lucero, the person that was questioning her."); (12/15/04 Tr. at
108 ("You saw it when she spoke to the police officer.  We don't need to sit here

Andriano's trial counsel made no effort to develop and present evidence of the sexual abuse, physical abuse, and privation Andriano experienced throughout her childhood and adolescence, or the profound psychiatric and behavioral consequences it had upon her as an adult.  Having failed to perform more than a cursory investigation of their client's background—despite numerous red flags, observations of multiple mental-health professionals that she likely suffered childhood sexual abuse and psychiatric disorders, and their urging that trial counsel dig deeper—Andriano's counsel was ill-equipped at trial to confront and contextualize the barrage of attacks on her promiscuous behavior.

### A.    Andriano Was a Victim of Childhood Sexual Abuse

As Andriano's clinical psychology expert, Dr. James Hopper,[3] explained at the hearing, Andriano "suffered severe and pervasive trauma throughout her childhood, including, but not limited to, severe neglect by her mother, emotional and physical abuse by her mother, her biological father and her stepfather and sexual abuse by her stepfather."  (2/3/14 Tr. I at 25 (P-App 587).)  As an adult, Andriano suffered from multiple psychiatric disorders, including the more severe

---

and discuss the fact that she was trying to manipulate the police officer, that she laughed coquettishly with him.").

[3] Dr. Hopper has taught in the Department of Psychiatry at Harvard Medical School, conducted research at Harvard Medical School and at Boston University School of Medicine, and published more than a dozen papers in peer-reviewed journals on various aspects of the effects of childhood trauma, trauma-related memory, and post-traumatic stress disorder.

Type 2 post-traumatic stress disorder (common among victims of chronic childhood sexual abuse), specific cognitive deficits from privation and trauma during brain development, bipolar disorder, and dependent personality disorder. (Post-Hearing Mem. at 35-48 (P-App 338-51); Ex. 2 (P-App 1997-2061).)

Andriano's biological father, Shelby ("Skip") Robertson, suffered from post-traumatic stress disorder marked by violent nightmares (2/4/14 Tr. at 85 (P-App 886)), drank heavily (*id.* at 86-87 (P-App 887-88)), and fought with Andriano's mother, Donna (*id.* at 87-88 (P-App 888-89)).  In 1993, Skip was convicted and served 17 years in prison for molesting his third wife's 12-year-old stepdaughter. (2/4/14 Tr. at 100-01 (P-App 901-02); Ex. 232 (P-App 7082-86).)  Skip also was accused of molesting two other nieces.  (2/4/14 Tr. at 102 (P-App 903); 2/3/14 Tr. I at 51-52 (P-App 613-14).)

In 1993, Skip's brother, Tommy Robertson, was convicted and served 4 years in prison for sexual exploitation of Skip's stepdaughter.  (2/4/14 Tr. at 100, 101 (P-App 901, 902); Ex. 233 (P-App 7087-93).) Skip himself believed that Tommy may have molested Andriano.  (2/4/14 Tr. at 103 (P-App 904).)  Skip's father, Boyd Robertson, was sufficiently notorious for pedophilia that Skip's sisters-in-law warned Donna to "keep [Andriano] away from grandpa" because "they knew he had been messing around with some of the granddaughters."  (*Id*. at 99 (P-App 900).)  Boyd also had access to Andriano as a young child.  (*Id.*)

As a young child, Andriano exhibited symptoms of potential abuse.  She refused to sleep in any bed but her own (consistent with a child who had suffered abuse elsewhere) (2/3/14 Tr. I at 55-56 (P-App 617-18)), and one of her day-care providers reported two incidents in which Andriano instigated inappropriate sexual behavior with other children, which were sufficiently abnormal to cause the day care center to expel Andriano.  (2/4/14 Tr. at 114-15, 200 (P-App 915-16, 1001).) As Dr. Hopper testified, "[w]hen it's this kind of extreme inappropriate sexual play that goes beyond what's developmentally normal, that . . . is seen as evidence of sexual abuse."  (2/3/14 Tr. I at 56-57 (P-App 618-19).)

Dr. Hopper explained that molestation during the early stages of childhood development may lead to "premature sexualization, even kind of a hypersexualization, so that the child may do things like engage in inappropriate sexual behavior with other kids."  (2/3/14 Tr. I at 57-58 (P-App 619-20).)  The effects of that early sexualization are "etch[ed]" into children's developing brains, creating an expectation that they exist, in part, for the sexual gratification of others. (*Id.* at 59 (P-App 621).)  From his interviews with Andriano, Dr. Hopper noted this early sexualization:  "just from as early as she could remember, she had this awareness of sexual energy or chemistry coming from men … that was always there and she always experienced."  (*Id.* at 58-59 (P-App 620-21).)

Andriano's stepfather, Alejo Ochoa—who exercised his Fifth Amendment

right against self-incrimination at the hearing[4]—also was a damaged person.  As a young child, he was subject to persistent sexual teasing by a number of family members (Ex. 24 ¶ 8 (P-App 2655)), and was teased and beaten by his father (*id.* ¶ 10 (P-App 2656)).  He was introduced to sex by older women as a teenager (*id.* ¶¶ 20-21 (P-App 2659-60)), began using marijuana, LSD and cocaine in high school (*id.* ¶¶ 32-34 (P-App 2664-65)), started trafficking drugs across the Mexican border at age 16 (*id.* ¶¶ 24-25 (P-App 2661-62)), and was beaten and raped in a Mexican jail at age 18 (*id.* ¶ 26 (P-App 2662)).

Alejo met Donna in 1974 (2/4/14 Tr. at 120 (P-App 921)), and they soon began a sexual relationship (Ex. 24 ¶ 48 (P-App 2670)), sleeping together in the same bed as Andriano.  (2/4/14 Tr. at 122 (P-App 923).)  Andriano began wetting the bed on a regular basis, several nights per week for months.  (*Id.* at 122-23 (P-App 923-24).)  As Dr. Hopper noted, while "[k]ids can wet the bed for various reasons," from a developmental standpoint it "doesn't usually suddenly start at age four-and-a-half" and sudden bedwetting is "not an uncommon response to sexual abuse."  (2/3/14 Tr. I at 69-71 (P-App 631-33).)

---

[4]  On the first day of the PCR evidentiary hearing, Alejo received a visit from a detective with the prosecutor's office.  Following that visit, the PCR Court appointed counsel for Alejo, and that counsel indicated that Alejo would exercise his Fifth Amendment rights.  The PCR Court treated Alejo's indication that he would take the Fifth "the same as if he came in and here took the Fifth," and admitted Alejo's sworn declarations (Exs. 24 & 25) into evidence.  (*See* 2/4/14 Tr. at 4-19 (P-App 805-20); 2/6/14 Tr. at 67-69 (P-App 1258-60).)

Two of Andriano's childhood friends confirmed that Alejo actively engaged in childhood sexual abuse of them and of Andriano. Kyre Lorts began sleeping over at the Ochoas' house in 1980, when Lorts was eight years old and Andriano was 10 or 11. (2/4/14 Tr. at 51 (P-App 852).) The "first few" sleepovers had a routine pattern: after dinner, Andriano would take Lorts to Donna's bedroom to play dress-up in Donna's lingerie, look at themselves in the mirror and "parade around the house." (*Id.* at 47, 49, 50 (P-App 848, 850, 851).)

At the third or fourth sleepover, after dressing up, Andriano and Lorts "were invited to come into Alejo's room." (*Id.* at 52, 53 (P-App 853, 854).) Lorts followed Andriano into the room, where she saw Alejo wearing only a pair of red shorts, sitting in a large recliner and watching "videos with naked people" on a small television. (*Id.* at 52-54 (P-App 853-55).)

The eight-year-old Lorts initially recoiled at the scene and retreated to the bathroom, "shaking and confused and [unsure] how to feel." (*Id.* at 53-54 (P-App 854-55).) Andriano reassured Lorts that "it was okay"—confirming the ritual was not unusual for Andriano—and Lorts and Andriano returned to Alejo's room, where he remained sitting in his red shorts, watching an adult video. (*Id.*)

The girls sat on Alejo's lap, and Lorts saw him "grow or g[e]t big down there" as he fondled their legs, chests, and Andriano's genital area. (*Id.* at 54-56 (P-App 855-57).) Lorts saw Andriano touching Alejo "in the genital area," as

well.  (*Id.* at 56 (P-App 857).)  Though the incident seemed to last "forever" to Lorts, she estimated that it continued for "probably ten minutes."  (*Id.*)

Lorts, not knowing how to describe what had occurred and wanting to remain friends with one of her only female peers at school, continued to sleep over at Andriano's house for another year.  (*Id.* at 57-59 (P-App 858-60).)  Each time, she and Andriano were subjected to the same routine of dressing up in lingerie, being summoned to Alejo's room, and being fondled.  (*Id.* at 60 (P-App 861).)  By the third time, Alejo began putting her "hand on his thing" and touching her in the genital area.  (*Id.* at 59-60 (P-App 860-61).)

Jeri Lynn Cunningham was the same age as Andriano, and testified regarding a series of sleepovers that occurred in 1982 and 1983, when they were 12 or 13 years old.  (2/4/14 Tr. at 228-29 (P-App 1029-30).)  During the sleepovers, Andriano and Cunningham slept in the same bed in their nightgowns.  (*Id.* at 224 (P-App 1025).)  On three or four different sleepovers, Cunningham awoke in the night to find Alejo under the covers between her and Andriano, with his hand down Cunningham's nightgown.  (*Id.* at 224-25, 228 (P-App 1025-26, 1029).)  She moved his hand away multiple times; each time, his hand would return to her chest.  (*Id.* at 225 (P-App 1026).)[5]

---

[5]  Neither Lorts nor Cunningham told their parents about the abuse at the time—Lorts because her father was a pastor and she lacked the vocabulary or sexual knowledge to understand or describe what had occurred (2/4/14 Tr. at 57-58 (P-

When Andriano was a pre-teen, Alejo began taking her on father-daughter shopping trips for lingerie, such as "little lacy underwear and a bra to match and a garter belt, things like that." (*Id.* at 156 (P-App 957).)  He also took Andriano to the adult section of novelty store Spencer's Gifts, directing her attention to sex-themed items that were not "age appropriate." (*Id.* at 157-59 (P-App 958-60).) Alejo also had Andriano assume a "duty" that Donna increasingly refused to perform:  the ritual of "ministering to him." (*Id.* at 153 (P-App 954).)  Alejo would wear workout shorts or sweats without underwear and lay on the couch; it was Andriano's "duty, and literally duty, to be the one to rub his head, scratch his head, rub his legs, rub his back" from "[a]nywhere from 45 minutes to a couple of hours" a night. (*Id.* at 153, 155-156 (P-App 954, 956-57).)  "[N]ormally, and especially as [Andriano] got older, he would lay on the couch and [she] would have to sit on the end of the couch and he would put his head on her lap and, you know, say:  Touch me.  Touch me." (*Id.* at 155 (P-App 956).)

Cunningham testified about one of these "ministering" sessions during a sleepover. (*Id.* at 232 (P-App 1033).)  She and Andriano sat at either end of the

App 858-59)), and the older Cunningham because she was afraid her father "would kill Alejo" and that her parents would no longer let her see Andriano (*Id.* at 227 (P-App 1028).)  Lorts, who is now a special needs teacher, disclosed Alejo's abuse to family members in the early 1990s, when she was 19 years old. (*Id.* at 39, 66-67 (P-App 840, 867-68).)  Cunningham, who is now a second-grade teacher, had not previously disclosed the abuse, but noted in her testimony that she would have disclosed it had Andriano's trial counsel contacted her regarding Andriano's childhood. (*Id.* at 238-39 (P-App 1039-40).)

couch, with Alejo laying on the couch with his head in Cunningham's lap.  (*Id*.)

Alejo gradually turned his face toward Cunningham's crotch area and pretended to

snore; Cunningham pushed his face away, but Alejo would repeatedly return his

face to Cunningham's crotch.  (*Id*. at 233 (P-App 1034).)

Alejo also began photographing Andriano in lingerie.  Some of the surviving

photographs show Andriano—likely in her *mid- to late teens*—on her hands and

knees, and in other suggestive poses:





(Ex. 73 (P-App 3435); *see also* 2/10/14 Tr. at 159-60 (P-App 1623-24) (Cindy

Schaider testified that Alejo showed her photographs of Andriano between ages 15

to 17 "in a teddy, women's underwear . . . taken out in the desert[.]").

As Dr. Hopper testified:

This kind of hypersexualization . . . for a child to be continually
exposed to this kind of treatment over and over again . . . conditions

their brain . . . .  Some kids just completely refuse to have anything to do with any kind of sexual stuff and *others are kind of hyper-sexualized, or at least vulnerable to being responsive to sexual attention they're getting from men, to go ahead and have sex with men because, hey, that's what men want from me.  That's what makes them happy.  I don't have an orgasm.  I don't enjoy it, but, you know, that's my role is to have sex.* . . .  So, . . . on the one hand she describes this experience of, you know, noticing and being attentive to that sexual energy coming from men and wanting to please men in that way and wanting them to like her in that way because that's kind of the role that men had related to her.

But, on the other hand, then when she got that attention and when it did become sexual, then feeling kind of disgusted and dirty with herself.

This is a really awful dilemma that a lot of sexually abused boys and girls get into.

(2/3/14 Tr. II at 43-44 (P-App 701-02) (emphasis added).)

Thus, as explained by Dr. Hopper, Andriano had a compelling explanation to rebut the prosecutor's repeated argument that Andriano should be condemned for her promiscuity and sexual conduct:  that she was a highly damaged, hypersexualized person based on years of physical and sexual abuse during her childhood and adolescence.  But, it was an explanation that the jury never heard, because it was based on mitigation evidence—and *expert testimony needed to make sense of that evidence*—that trial counsel, who was laboring under an actual conflict of interest, failed to investigate or develop.

## B.   Andriano's Conflict Of Interest Claim (Claim II)

A criminal defendant's Sixth Amendment right to counsel includes the right to be represented by an attorney with undivided loyalty.  *See Wood v. Georgia*, 450

U.S. 261, 271 (1981). This guarantee is so important that, unlike other Sixth Amendment claims, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation *need not demonstrate prejudice* in order to obtain relief," *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) (emphasis added), and harmless error analysis does not apply. *Id.* at 349; *see also Strickland v. Washington,* 466 U.S. 668, 692 (1984); 11/3/14 Order at 19 (P-App 26).

In this case, David DeLozier was the attorney who was responsible for investigating mitigation issues for Andriano's defense during the trial. At the same time, however, DeLozier also was representing Andriano's mother and stepfather (Donna and Alejo Ochoa) in legal disputes with Joe's sister and brother-in-law (the Lambeths) regarding the custody of Andriano's and Joe's two children.

### 1. DeLozier Was "[A]ctively [R]epresent[ing] [C]onflicting [I]nterests." *Cuyler*, 446 U.S. at 350.

#### a. DeLozier's representation of the Ochoas in custody proceedings relating to Andriano's children

Shortly after Andriano's arrest in the fall of 2000, Andriano, the Ochoas, and the Lambeths agreed that the Lambeths would have custody of Andriano's children during the pendency of the criminal case, and that the Ochoas would be permitted regular visitation. (2/4/14 Tr. at 165-66 (P-App 966-67); Ex. 80 (P-App 3638-39).) Based on this agreement, the Lambeths were appointed the children's guardians. (2/4/14 Tr. at 166 (P-App 967); Ex. 81 (P-App 3640-41).)

The Ochoas soon regretted agreeing to the Lambeths' guardianship and retained an attorney, Leon Thikoll, to assist them in obtaining custody of Andriano's children.  (2/4/14 Tr. at 166-67 (P-App 967-68); Ex. 84 (P-App 3651).)  Thikoll, who filed a motion to terminate the Lambeths' guardianship, became ill and resigned as the Ochoas' attorney in June 2001.  (*Id*.; 2/10/14 Tr. at 64 (P-App 1528).)  The Ochoas then retained DeLozier to represent them in the guardianship case.  (2/4/14 Tr. at 167-68 (P-App 968-69); Ex. 84 (P-App 3651); 2/11/14 at 129-30 (P-App 1781-82).)

One of DeLozier's first acts as the Ochoas' counsel of record was to instruct them to collect letters from friends and family stating that they were "upstanding people," "good parents and . . . good grandparents" to prove that they were "suitable to take care of" Andriano's children.  (2/4/14 Tr. at 168-69 (P-App 969-70).)  DeLozier's instruction was consistent with his approach throughout the guardianship case: he viewed his responsibility as persuading the court that the Ochoas "were appropriate parties to have some time with their grandchildren . . . [t]hat they were honorable people and that they would raise or help assist in raising these children appropriately."  (2/10/14 Tr. at 74-75 (P-App 1538-39).)

The Lambeths disputed the Ochoas' suitability as guardians, and accused the Ochoas of child abuse.  In March 2002, the children developed bright red marks on their bottoms.  (Ex. 95 (P-App 3694-97).)  When questioned about the redness,

Andriano's daughter reported to Jeanea Lambeth on a number of occasions that "*Grandpa Alejo touched [her] butt*" and that "*Grandma Donna says to keep secrets.*"  (*Id.* (emphasis added).)  Jeanea documented these accusations in a letter to her attorney.  (*Id.*)  DeLozier promptly learned of these allegations and assisted Donna in preparing a written response.  (2/4/14 Tr. at 175 (P-App 976); Ex. 96 (P-App 3698-3703).)  On another occasion, Brad Lambeth accused Alejo of taking naked photographs of the children—an allegation that was reported to DeLozier.  (2/11/14 Tr. at 141 (P-App 1793).)

In August 2001 (while the guardianship case was still pending), DeLozier initiated an adoption case on behalf of the Ochoas in Pinal County, without notifying the Lambeths.  (2/4/14 Tr. at 170 (P-App 971); 2/10/14 Tr. at 73 (P-App 1537); Ex. 87 (P-App 3665-66), 104 (P-App 3720-21).)  The Lambeths eventually learned about the attempted adoption and in July 2002 sought sanctions.  (Ex. 100 (P-App 3713-15).)  In October 2002, the court granted the Lambeths' request, sanctioned DeLozier, dismissed the adoption petition, and notified the Superior Court of the Ochoas' actions.  (Ex. 104 (P-App 3720-21).)  A month later, the Superior Court suspended the Ochoas' visitation rights based on the recommendations of two mental healthcare providers so that "supervised therapeutic sessions [could] occur with a counselor and the Ochoa grandparents." (Ex. 99 (P-App 3710-12); *see also* 2/4/14 Tr. at 172 (P-App 973); 2/11/14 Tr. at

141-42 (P-App 1793-94).)  In December 2002, the Superior Court denied the

Ochoas' request for guardianship of the children.  (*Id.*)

   While the Lambeths' sanctions motion prompted DeLozier to withdraw as

formal counsel of record in the guardianship case, both Donna and DeLozier

testified that he remained the Ochoas' lawyer and consulted with them on

numerous issues pertaining to the guardianship proceeding until its conclusion in

2005.  (2/4/14 Tr. at 177 (P-App 978); 2/10/14 Tr. at 83 (P-App 1547); Ex. 102 (P-

App 3718).)  Documents from DeLozier's file confirm that he continued to

represent Donna and Alejo until 2005.  (*See* Exs. 107-110, 114-15, 130-32 (P-App

3727-32, 3745-47, 3765-3827); 2/4/14 Tr. at 177-84 (P-App 978-85); 2/10/14 Tr.

at 81-85 (P-App 1545-48); 2/11/14 Tr. at 151-52 (P-App 1803-04).)

### b.   DeLozier's representation of Andriano in her criminal case

   While representing the Ochoas in seeking to obtain custody of the Andriano

children, DeLozier simultaneously represented Andriano in her criminal case.

   DeLozier started representing Andriano in December 2000, when the

Ochoas agreed to pay DeLozier a non-refundable, $30,000 retainer ($5,400 of

which was paid up-front, with the remainder personally guaranteed by Alejo).  (Ex.

231 (P-App 7075-81); 2/10/14 Tr. at 65 (P-App 1529).)  DeLozier remained

Andriano's attorney from December 2000 through her conviction and death

sentence in December 2004.  (2/10/14 Tr. at 103-04 (P-App 1567-68); 2/4/14 Tr. at

187 (P-App 988).)  Andriano's other trial counsel, Dan Patterson, assigned

DeLozier the responsibility for developing mitigation evidence.  (2/7/14 Tr. at 27,

48-49 (P-App 1310, 1331-32).)  As a result, Patterson neither tried to evaluate

whether the Ochoas abused Andriano, nor was he in the position to do so.  (*See id.*

at 132 (P-App 1415) (Patterson "passed [information] on to DeLozier" because "I

didn't assist greatly in the development of the mitigation in this case . . .").)

> ### c.     DeLozier's concurrent representation of the Ochoas and Andriano created an actual conflict of interest

DeLozier suffered from an actual conflict of interest throughout Andriano's

representation for three reasons.

> ### (i)     DeLozier's representation of the Ochoas was directly adverse to Andriano's interests in developing all reasonably available mitigating evidence

A conflict of interest exists if a lawyer's representation of one client is

directly adverse to the interests of another client.  Ariz. R. of Prof'l Conduct

1.7(a)(1), (b).[6]  Here, the Ochoas' interest in obtaining custody of their

grandchildren was in direct conflict with Andriano's interest in providing the jury

with all possible reasons to consider leniency, including a history of childhood

---

[6] Although representation of two parties with directly adverse interests may be
permissible if both parties provide informed consent, neither Andriano nor the
Ochoas were informed of the conflict or provided any consent.  (2/11/04 Tr. at
163-64 (P-App 1815-16).)

abuse and neglect by Donna and Alejo.  (2/11/14 Tr. at 164 (G. Lowenthal[7]) (P-App 1816).)

The Ochoas retained DeLozier to assist them in obtaining guardianship of their grandchildren.  This required DeLozier to present the Ochoas as strong parents and grandparents who would provide a wholesome, nurturing, safe environment for their grandchildren.  (*Id*.)  Indeed, DeLozier understood this to be his objective—he had to persuade the court that the Ochoas "were appropriate parties to have some time with their grandchildren . . . [t]hat they were honorable people and that they would raise or help assist in raising these children appropriately."  (2/10/14 Tr. at 74-75 (P-App 1538-39).)  By contrast,

> [Andriano's] *interest was in seeking leniency*.  Her life was at stake. She was on trial for a capital offense.  And because her interest is in seeking leniency, she had an interest in the jury learning about *anything from childhood that might help the jury understand how she could have behaved the way she did at the time of the offense and in this case in the months preceding the offense*.  That was her interest.

(2/11/14 Tr. at 164 (P-App 1816) (emphasis added).)  *See* Am. Bar Ass'n Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (the "ABA Guidelines") (Ex. 76), at 80-81 (P-App 3522-23)

---

[7]  Lowenthal is an attorney and retired law professor who taught at Arizona State University for over 30 years.  (2/11/14 Tr. at 117, 119-20 (P-App 1769, 1771-72); Ex. 79 (P-App 3635-37).)  His area of expertise is attorney conflicts of interest, and he has conducted several empirical studies on conflicts that have been cited by the United States Supreme Court.  (2/11/14 Tr. at 120-21 (P-App 1772-73); Ex. 79 (P-App 3635-37).)

("Because the sentencer in a capital case must consider in mitigation, 'anything in the life of the defendant which might militate against the appropriateness of the death penalty for the defendant,' 'penalty phase preparation requires *extensive* and generally *unparalleled investigation* into personal and family history," including "physical, sexual, or emotional abuse, family history of mental illness, cognitive impairments . . . poverty, familial instability, neighborhood environment and peer influence.") (emphasis added); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (The ABA Guidelines reflect "well defined norms" for capital representation).

Any efforts DeLozier might have taken to investigate and present evidence that Andriano experienced childhood abuse or neglect would have unavoidably compromised the Ochoas' efforts to obtain custody of their grandchildren. (2/11/14 Tr. at 164 (P-App 1816).)  Confronted with this irreconcilable conflict, DeLozier put his head in the sand.  He "chose to disbelieve the allegations against [the Ochoas] and to believe the good things about [the Ochoas] instead," ignored the multiple clues suggestive of Andriano's troubled childhood, and never developed Andriano's history of childhood physical, psychological, and sexual abuse as a potential mitigation theme.  (2/11/14 Tr. at 165, 184 (P-App 1817, 1836).)[8]   Specifically, DeLozier told the jury that Andriano was "an innocent

---

[8]  *See Fitzpatrick v. McCormick*, 869 F.2d 1247, 1251-54 (9th Cir. 1989) (ordering new trial because counsel's prior representation of another person involved in the charged offense caused him to disbelieve the defendant's version of events in favor

young girl who lived a sheltered life" (12/8/04 Tr. at 28), and elicited repeated

testimony praising the Ochoas as good, Christian parents.  (*See* 12/9/04 Tr. at 7-9,

92-99; 12/13/04 Tr. at 40-41.)  This approach was entirely consistent with the

Ochoas' objectives in the guardianship case, but wholly inconsistent with the

requirements for Andriano's capital representation.[9]

<div style="text-align:center">

**(ii)    DeLozier's representation of Andriano was materially limited by his duty of confidentiality to the Ochoas**

</div>

A conflict of interest exists when a client's representation is materially

limited by her attorney's responsibilities to another client.  Ariz. R. of Prof'l

Conduct 1.7(a)(2). Arizona law forbids attorneys from "us[ing] information

relating to representation of the client to the disadvantage of the client unless the

client gives informed consent . . ."  Ariz. R. of Prof'l Conduct 1.8.  Because

DeLozier had to refrain from using any information relating to the Ochoas'

representation to their detriment, Andriano's representation was materially limited.

---

of the prior client's report).

[9]  *See Boyde v. California*, 494 U.S. 370, 382 (1990) ("defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse").  *See also Lockhart v. Terhune*, 250 F.3d 1223, 1229-30 (9th Cir. 2001) (ordering new trial because defense counsel refrained from presenting evidence that would have been favorable to defendant but harmful to another client in related matter); *State v. Martinez-Serna*, 166 Ariz. 423, 426, 803 P.2d 416, 419 (1990) (ordering new trial because the "conflict 'occurred not in presenting the defense chosen by . . . counsel, but in selecting defenses and strategies in the first place.'").

While representing the Ochoas, DeLozier learned of the Lambeths' vigorous objections to the Ochoas' suitability as caregivers as well as their allegations of possible child abuse.  (2/11/04 Tr. at 166 (P-App 1818).)  DeLozier also was aware that the court suspended the Ochoas' visitation rights until the Ochoas received therapeutic counseling and ultimately denied their request to serve as the children's guardians or to obtain continuing visitation rights.  (*Id.* at 141-42 (P-App 1793-94).)  All of this information should have raised questions about the Ochoas' parenting practices and prompted inquiry into Andriano's history of childhood abuse as mitigation evidence.  (*Id.* at 166-67 (P-App 1818-19).)  However, DeLozier was ethically constrained from using information learned from his representation of the Ochoas to their disadvantage, even if it could have assisted in developing a compelling mitigation case for Andriano.  As a result, DeLozier's ethical obligations materially limited his representation of Andriano.  (*Id.* at 162 (P-App 1814).)[10]

> **(iii)** **The Ochoas' payment of DeLozier's fees in the custody and criminal cases impaired his judgment**

The Ochoas' obligation to pay DeLozier's fees incurred in representing the Ochoas and Andriano interfered with his exercise of independent professional

---

[10]  *See United States v. Henke*, 222 F.3d 633, 636-38 (9th Cir. 2000) (ordering new trial because counsel was ethically barred from using information obtained during joint defense meetings against witness in cross-examination).

judgment on Andriano's behalf.  Although a lawyer may, under some circumstances, accept compensation for representing a client from someone other than the client, this situation is fraught with "inherent dangers," especially when the payer has interests that conflict with the client's interests.[11]  *Wood*, 450 U.S. at 271-72.  An impermissible conflict exists if the lawyer enters into or continues a fee arrangement when "there is a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's own interest in the fee arrangement or by the lawyer's responsibilities to the third-party payer."  Ariz. R. of Prof'l Conduct 1.8, Cmt. 11.

At the outset of Andriano's representation, DeLozier entered into a fee agreement under which the Ochoas made an initial cash payment and Alejo remained solely responsible the remaining amount owed.  (Ex. 231 (P-App 7075-81); 2/10/14 Tr. at 65 (P-App 1529).)  Andriano never made any payments towards the costs of her representation; the only payments DeLozier ever received were from the Ochoas.  (2/10/14 Tr. at 65 (P-App 1529).)

Because of this fee arrangement, DeLozier had a strong personal interest in maintaining an amicable relationship with the Ochoas.  Any critical investigation into their parenting practices or efforts to inform the jury about Andriano's history

---

[11]  Although Arizona permits payment by a non-client in some circumstances if the client provides informed consent, Ariz. R. of Prof'l Conduct 1.8(f), neither Andriano nor the Ochoas ever consented to the conflict.  (2/11/04 Tr. at 166 (P-App 1818).)

of childhood abuse would have inevitably compromised this relationship.  As explained by Lowenthal,

> . . . [DeLozier] knew he was going to have to investigate mitigation. And investigating mitigation is to find out about the client's childhood.  And that means that you're going to . . .  have to sit down with the family and say . . .  – I know this is really painful.  I know this is really difficult, but we really have to find out what really happened here.  And forcing someone to talk about very painful experiences is difficult on that person, and there has to be a natural reluctance on someone who wants to continue to get money from that person to push them into that situation.

(2/11/14 Tr. at 189-90 (P-App. 1841-42).)  Relatedly, the Ochoas had retained DeLozier to represent them as well.  As a result, DeLozier also had an interest in ensuring continued payment from them on the custody case, which would similarly dissuade him from confronting the Ochoas or developing damaging information about them.  *See State v. Thomas*, 545 N.E.2d 654, 657 (Ill. 1989) (ordering new trial because counsel's concurrent representation of prosecution witness may have caused him to avoid questioning the witness "for fear of offending her in the course of examination and losing her business").

### 2.   DeLozier's Conflict Of Interest Actually Affected The Adequacy Of Andriano's Representation

Unlike other Sixth Amendment claims, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief."  *Cuyler*, 446 U.S. at 350.  Rather, a new trial is required once a defendant proves that a "plausible defense strategy"

was not pursued because of the conflict.  *Lockhart*, 250 F.3d at 1229-30; *Martinez-Serna*, 166 Ariz. at 425, 803 P.2d at 418; *State v. Jenkins*, 148 Ariz. 463, 466, 715 P.2d 716, 720 (1986).  A plausible defense strategy is one that would have been a "viable alternative" to the strategy actually taken, regardless of whether the alternative strategy might have been successful.  (*Id.*)

DeLozier was presented with numerous indications that Andriano suffered from a traumatic childhood.  Mental health providers informed DeLozier about her dissociation dating back to childhood and several potential psychiatric disorders, and they specifically raised the possibility of childhood sexual abuse.[12]  In the fall of 2003, Andriano attempted suicide while incarcerated.[13]  DeLozier knew that

---

[12]  *See* Ex. 7.002 (P-App 2483-84), letter from certified professional counsel Kandy Rohde ("In addition to my belief that [Andriano] is the victim of sexual molestation and that she suffers from Depersonalization Disorder as well as Dissociative Amnesia . . . she exhibits the symptoms of the Cluster C Personality Disorders."); Ex. 45 at PCR73 (P-App 3115), Aug. 7, 2002 Rohde note ("it was normal for [Andriano] to fall asleep in the midst of chaos and that she could sleep literally for days without food or water to avoid emotions" and Andriano could "remember doing it in her teens"); Ex. 45 at PCR112-14 (P-App 3154-56), Apr. 26, 2004 Rohde note (Andriano "said that Alejo said that she should send [sexy] stories to him for the Internet" and she had "open knowledge" of "lingerie parties" that Alejo and other photographers attended); Ex. 52 (P-App 3308-09), March 30, 2003 Sharon Murphy email (Andriano "learned to di[]ssociate from painful memories a long time ago—that is very clear to me. . . .  I know there's something that happened during childhood that she hasn't told me yet . . . .").

[13]  *See* Ex. 47 at 1-3 (P-App 3165-67) (prison medical records note that Andriano slashed the inside crook of her arm, lost 200 cc of blood, required emergency medical attention, and was transferred to a psychiatric unit.  Two days after the suicide attempt, Andriano's medical provider wrote that she had "acted out impulsively with [a] significant suicide attempt in [a] moment of panic.").

these behaviors and diagnoses were suggestive of childhood abuse and mental illness because DeLozier had represented victims of childhood sexual abuse in other lawsuits, and knew from those cases that impaired memories, dissociation, depression, and post-traumatic stress disorder were common effects of childhood sexual abuse.  (2/10/14 Tr. at 88-97, 102 (P-App 1552-61, 1566).)  DeLozier also knew that the Lambeths had accused the Ochoas of child abuse and taking naked pictures of the children, and that the court had mandated "therapeutic counseling" for the Ochoas and ultimately terminated the Ochoas' visitation rights entirely. (Ex. 99, 105 (P-App 3710-12, 3722-24); 2/11/14 Tr. at 141-42 (P-App 1793-94).)

Despite multiple clues pointing towards the possibility of childhood abuse, DeLozier never investigated any negative aspects of Andriano's childhood or upbringing, the cause of Andriano's dissociation as an adult, or the reasons behind Andriano's maladaptive reactions to stress.  (2/10/14 Tr. at 112-13, 122-24, 127, 129-30, 133 (P-App 1576-77, 1586-88, 1591, 1593-94, 1597).)  DeLozier never asked Donna whether Andriano may have suffered abuse as a child.  (2/4/14 Tr. at 191 (P-App 992).)  DeLozier never investigated whether Alejo's relationship with Andriano was sexually inappropriate (even though he knew about Alejo's "lingerie parties" and his request for Andriano to send him "sexy" stories during her pre-trial incarceration (2/10/14 Tr. at 132 (P-App 1596))), or whether *any* members of Andriano's family may have sexually abused her (*id.* at 134-35 (P-App 1598-99)),

even though her biological father was incarcerated for child molestation throughout the course of his representation of Andriano.  DeLozier also never informed anyone that the Lambeths had accused the Ochoas of child abuse.  (*Id.* at 75, 77 (P-App 1539, 1541; 2/7/14 Tr. at 36-37 (P-App 1319-20)).)  In fact, DeLozier never brought anything negative about the Ochoas to Patterson's attention at any time (2/7/14 Tr. at 37 (P-App 1320)), and never even disclosed to Patterson that he was representing the Ochoas in the custody case until midway through Andriano's trial.  (*See id.* at 25-27 (P-App 1308-10).)

Investigating these matters—by asking the Ochoas and others whether Andriano had been subjected to childhood abuse, investigating the Ochoas' parenting practices, or seeking further mental health evaluations of Andriano targeted at the issue of childhood abuse—would have been a viable alternative approach.  (2/11/14 Tr. at 173-74 (P-App 1825-26).)  *See Wiggins*, 539 U.S. at 525 ("Had counsel investigated further, they may well have discovered the sexual abuse later revealed during state postconviction proceedings.").  Indeed, Patterson admitted that the Lambeths' child abuse allegations "bear upon potential areas of mitigation that should have been developed at a bare minimum under *Wiggins*." (2/7/14 Tr. at 36 (P-App 1319).)

DeLozier failed to investigate *anything* negative about the Ochoas.  (*Id.* at 37 (P-App 1320).)  Had DeLozier objectively investigated Andriano's childhood

and the Ochoas' parenting choices, the defense could have provided the jury with an explanation for the behaviors the prosecution highlighted in arguing for the death penalty.  Rather than the actions of a promiscuous, sex-crazed woman, Andriano's conduct in the months leading up to Joe's death demonstrate why leniency is appropriate:  she was a highly damaged, hyper-sexualized person due to a history of abuse and neglect.

Because DeLozier's conflicted representation deprived Andriano of the opportunity to provide an alternative explanation for her behavior in the months leading up to Joe's death, she is entitled to a new trial.  *See Cuyler*, 446 U.S. at 350; *Lockhart*, 250 F.3d at 1229-30.

> **3.    The PCR Court Erred As A Matter Of Law And Abused Its Discretion In Rejecting Andriano's Conflict of Interest Claim**

In rejecting Andriano's conflict of interest claim, the PCR Court ruled that, although DeLozier's dual representation of Andriano in her criminal case and the Ochoas in the guardianship case posed a "potential for a conflict of interest," no actual "conflict existed" because Andriano and the Ochoas all "wanted the children to be with" the Ochoas, and therefore, "the interests of the defendant and her parents did not diverge."  (11/3/14 Order at 19 (P-App 26).)  This is erroneous.

*First*, the PCR Court incorrectly framed the conflict issue.  As Lowenthal explained, Andriano's interest in the penalty phase of her capital murder trial was

to present to the jury *any* evidence that would support leniency, in order to save her life.  (2/11/14 Tr. at 164 (P-App 1816).)  Thus, consistent with the ABA Guidelines, *any* non-conflicted trial counsel would have investigated the possibility that Andriano was sexually and physically abused by the Ochoas and other family members during her childhood and adolescence, and suffered related psychiatric effects as an adult, in view of the numerous red flags discussed above.

*Second*, the PCR Court stated that the reason Andriano's childhood and background were not investigated was *not* because of an actual conflict, but because "DeLozier was familiar with sexual abuse victimology; he attributed statements assailing his clients' (the defendant's parents) character to the normal aspersions cast in domestic situations" and Andriano "denied the existence of abuse."  (11/3/14 Order at 20 (P-App 27).)  However, that ruling ignored all evidence to the contrary.  For example, DeLozier testified that his inability to view the Ochoas objectively was the result of his advocacy for them in the guardianship and adoption cases:

> [in family law cases,] you're focusing on anything you know negative about the other side, unfortunately. . . .  And anything you know positive about what's going on with the people that you're currently representing . . . So *it's possible that focusing on that aspect of the grandparent case kept me from focusing on anything that might have been historical in Andriano's case*.

(2/10/14 Tr. at 138-39 (P-App 1602-03) (emphasis added); *see also* 2/11/14 Tr. at

167 (P-App 1819) (DeLozier told Lowenthal he "felt blinded by his zealous

advocacy of the Ochoas").)

Likewise, the PCR Court repeatedly noted that Andriano testified at trial that

she had not been abused by Alejo.  (11/3/14 Order at 20 (P-App 27); *see id*. at 10-

12, 15 (P-App 17-19, 22).)  However, as this Court has recognized (and as

DeLozier acknowledged), it is not uncommon for victims of childhood sexual

abuse to repress those traumatic memories.  *See Doe v. Roe*, 191 Ariz. 313, 322,

955 P.2d 951 (1988) ("The policy behind the discovery rule is thus served by

application to repressed memory cases involving childhood sexual abuse and is, we

believe, logically appropriate given that the intentional act of the tortfeasor caused

both the damage and the repression of memory.").  The PCR Court also ignored

the testimony of Dr. Hopper that Andriano "*had some of the most, if not the most,*

*severe memory deficits that* [*he*] *had ever encountered*," including "major gaps" in

her memories from childhood, and that "*you just don't see these kinds of major*

*memory deficits unless someone has been through very significant trauma*."

(2/3/14 Tr. I at 81-83, 93 (P-App 643-45, 655) (emphasis added); *see also* Ex.

7.002 (P-App 2483-84) (in March 2001, counselor Rohde noted that she believed

that Andriano had been sexually molested and suffered from dissociative amnesia

and other mental illnesses).)

*Third*, the PCR Court's reasoning—that the "bad facts" introduced at the hearing "may not be true" or "may be merely speculative" —is flawed both legally and factually.

Legally, under *Cuyler*, a defendant who "shows that a conflict of interest actually affected the adequacy of his representation *need not demonstrate prejudice* in order to obtain relief." *Cuyler*, 446 U.S. at 350 (emphasis added). Here, as explained above, there was a "plausible defense strategy" that was not pursued because of the conflict, namely a defense based on an investigation of Andriano's social history that explained how Andriano became the person she was as an adult, and rebutted the prosecutor's theme of smearing Andriano at every turn with her promiscuity and sexual conduct.

Factually, the PCR Court either ignored or discounted evidence supporting Andriano's Petition that was not presented to the jury.  For example, the PCR Court notes that evidence of the "claimed sexual abuse" relied on by Andriano's experts included:

> Photographs taken in the desert by her stepfather of the defendant as a teenager, backlit and scantily-clad, and other photographs taken in a hotel room (PCR EH EXH. 72, *not offered or admitted*); and
>
> An inappropriate, sexually-overtoned card sent to defendant by her stepfather during her incarceration (PCR, EH Exhibit 75, *not offered or admitted*).

(11/3/14 Order at 11 (P-App 18) (emphasis in original).)

However, the PCR Court made no mention of the photographs (in negative

form) excerpted earlier in this Memorandum (Ex. 73-74) (P-App 3434-36), which *were* offered and admitted into evidence (*see* 2/4/14 Tr. at 159-60 (P-App 960-61)), and which show Andriano—in her *mid* or *late teen* years—being photographed by Alejo on her hands and knees and in other sexually suggestive poses.[14]  There is nothing "speculative" about those photographs, and *no person* could fairly view them and not be disturbed about the true nature of the relationship between Alejo and Andriano.

Similarly, the PCR Court discounted Lorts' testimony that Alejo sexually abused her and Andriano when they were children, noting that Lorts' testimony lacked credibility because she failed to report the abuse to "law enforcement; the lack of an outside investigation; and the denial by the defendant at trial."  (11/3/14 Order at 12 (P-App 19).)  However, Lorts' description of Alejo's abuse (when Lorts was *eight years old*) was both graphic and detailed, and the State did not dispute her testimony that she disclosed the abuse to family members when she was 19 years old.  (2/4/14 Tr. at 39, 49-60, 66-67 (P-App 840, 850-61, 867-68).)

The PCR Court noted that Lorts testified that she dressed in lingerie from Donna's closet, while Donna testified that she did not keep lingerie at her house,

---

[14]  The PCR Court also made no mention of Schaider's undisputed testimony that Alejo showed her photographs of Andriano between ages 15 to 17 "in a teddy, women's underwear . . . taken out in the desert[.]"  (2/10/14 Tr. at 159-60 (P-App 1623-24).)  Moreover, Andriano did move for pre-hearing admission of the other photographs into evidence, which the PCR Court erroneously denied for the reasons noted in Section V.D, *infra*.

and concluded that this inconsistency undermines Lorts' credibility.  (11/3/14 Order at 12 (P-App 19) (citing Donna's testimony on 2/4/14).)  However, setting aside the question why such an inconsistency would undermine Lorts' credibility (rather than Donna's), Donna herself said that Alejo bought lingerie for Andriano as a pre-teen (2/4/14 Tr. at 156 (P-App 957)), so the issue of whether the lingerie was Andriano's or Donna's is a minor one.  Because DeLozier failed to perform *any* meaningful mitigation investigation, Lorts was never contacted by Andriano's defense team (2/4/14 Tr. at 71 (P-App 872)), and her testimony that Alejo sexually abused her and Andriano was never presented to the jury.  Lorts was a childhood (as opposed to a current) friend of Andriano with no motive or incentive to lie, and it was an abuse of discretion for the PCR Court to discount her testimony entirely.

Likewise, the PCR Court dismissed Cunningham's testimony that Alejo sexually molested her, but offered no basis (other than the fact that she failed to report the molestation to law enforcement) that would undermine her credibility. (11/3/14 Order at 12 (P-App 19).)  In fact, portions of Cunningham's testimony— that Alejo had Andriano and her "minister[]" to him by rubbing his body all over, while his head was in Cunningham's crotch—was corroborated by Donna's testimony that Andriano inherited those daily "ministering" duties from Donna.

## C.    Andriano's IAC - Penalty Phase Claim (Claim I(A))

Andriano must show that counsel's performance was deficient and that she

was prejudiced. *Strickland*, 466 U.S. at 687. The "prevailing norms of practice as reflected in [the ABA Guidelines] ... are guides to determining what is reasonable." *Id.* at 687-88; *Wiggins*, 539 U.S. at 524. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

## 1.    The Superficial Mitigation Presentation at Trial

DeLozier's mitigation theme at Andriano's trial was that Andriano was "an innocent young girl who lived a sheltered life."  (12/8/04 Tr. at 28:30.)  DeLozier presented testimony that Andriano had loving parents, including a stepfather (Alejo) who treated her as his own daughter.  (*See* 12/9/04 Tr. at 7-9; 92-99; 12/13/04 Tr. at 40-41.)

In affirming Andriano's conviction and death sentence, this Court highlighted the superficial and limited nature of the mitigating evidence presented by trial counsel, and rejected it because it was undeveloped, inconsequential, or contradicted by the murder for which Andriano had been convicted.  For example, with respect to stress related to Joe's cancer, the Court noted:

> [t]he record does not indicate. . . that at the time of the offense, the stress was any greater than it had been two years earlier when she and Joe first learned he was terminally ill, and she was pregnant with their second child. Moreover, *this is not a case in which Andriano suddenly "cracked" under extreme stress*. . . .

*Id.* at 512, ¶ 71, 161 P.3d at 555 (emphasis added).  The Petition and evidentiary hearing proved that evidence of Andriano's psychiatric disorders manifesting themselves prior to Joe's death *does* exist, but was never investigated or developed by Andriano's trial counsel.  (*See* Andriano Post-Hearing Mem. at 30-51, 77-80 (P-App 333-54, 380-83).)

Likewise, the limited and anecdotal evidence of sexual abuse offered at trial—that Andriano "'*may have been*' sexually abused by her biological father when she was around the age of two" and "a member of the traveling ministry to which her family belonged exposed himself to Andriano when she was between six and eight years old"—was accorded minimal significance.  *Id.* at 512, ¶ 72, 161 P.3d at 555.  But this highlights Andriano's point:  because trial counsel failed to develop a social history for Andriano, or to present mental health expert testimony to *connect the dots* and explain how Andriano's childhood turned her into the damaged, promiscuous adult that the prosecutor vilified at trial, it is no wonder that this Court dismissed the scant evidence of abuse as isolated events too "remote in time to the offense."  (*Id.*)

Finally, other mitigation evidence highlighted how disconnected the mitigation case was from the crime for which Andriano had been convicted:

> . . . whether Andriano was a good mother . . . [is of] minimal value in light of the fact that Andriano murdered her children's father while the children were present in the apartment.  Moreover, neither the fact of Andriano's marriage nor its six-year duration is mitigating

considering that she would have remained married and the marriage would have lasted longer had she not killed her husband.

<center>* * *</center>

Although Andriano had what might be considered a strict religious upbringing, many of her actions, such as killing her husband and having extramarital affairs, appear inconsistent with holding strong religious convictions.

*Id.* at 512, ¶¶ 73, 75, 161 P.3d at 555.

<div align="center">

**2.    The Mitigation Evidence Based On An Investigation Of Andriano's Childhood And Mental Illnesses Would Have Enabled The Jury To Contextualize Andriano's Behaviors**

</div>

Among other things, the jury did not learn of Donna's neglect;[15] Skip's physical and verbal abuse of Andriano during her early childhood;[16] Andriano's deprivation and extreme poverty;[17] Alejo's sexual abuse in a variety of forms, from

---

[15]  At the time of Andriano's birth, Donna was struggling with depression (2/4/14 Tr. at 78 (P-App 879)), one of two primary mental health disorders (the other being bipolar disorder) that ran in her family (*id.* at 76-77 (P-App 877-78)). Donna acknowledged that she "wouldn't have anything to do with" Andriano, admitting that "at that moment in [her] life," she "was more concerned about [a lost family dog] than I was the baby." (*Id.* at 91-92, 94 (P-App 892-93, 895).)

[16]  Skip approached child-rearing "like training a dog," and began spanking Andriano while she was still in diapers if she did not obey his commands. (2/4/14 Tr. at 95, 96-97 (P-App 896, 897-98).)  At only eleven months old, Skip potty-trained Andriano by putting her on the toilet and commanding her, "in a real strong, strict voice," to go. (*Id.* at 95 (P-App 896).)  At a Robertson family gathering when Andriano was less than two years old, Skip and his brothers "decided she needed to learn how to swim."  They threw her into a swimming pool, "toss[ing] her around" despite her crying and letting her sink before one would "finally pick her up." (*Id.* at 105 (P-App 906).)

[17]  According to tax records, between 1975 (when Andriano was age 4-5), and 1988 (when she was age 17-18), Donna and Alejo's total annual income averaged *$5,617* per year. (Ex. 68 (P-App 3408-09).)

photographing Andriano on her hands and knees in lingerie and bikinis, to

requiring her to rub his nearly naked body for hours a night, to molesting her and

her friends (*see* discussion *supra*); or any of the resulting psychiatric effects of

such abuse, including complex post-traumatic stress disorder (PTSD) and her

stunted development of executive functioning.[18]

Beyond shedding light on Andriano's actions in causing Joe's death, the

evidence regarding her childhood trauma and its effects also lends context to a

number of the facts that the State emphasized in urging the jury to impose a death

sentence.  For example, the State repeatedly referenced Andriano's sexual

intercourse with two other men in the months prior to Joe's death as evidence that

she wanted to "go out and goof around with other men."  (12/15/04 Tr. at 121.)

But the jury never heard about the childhood sexual abuse she suffered, which

causes the very hypersexuality that the State repeatedly noted in arguing that

Andriano should be put to death.

The State also referenced her purportedly wholesome and religious

---

[18]  *See* 2/5/14 Tr. at 102-03 (P-App 1148-49) (Andriano's disorders are co-morbid, meaning that they "amplify on each other":  "You've got bipolar disorder.  You've got impaired judgment.  You've got cognitive deficits that lend themselves to impaired judgment.  You've got dependent personality that can create anger and hostility.  You've got numbing of post-traumatic stress disorder.  All of these interact. . . .  They interact and they interact in ways that create more severe behavior and behavior that frankly you often do not see until you see that kind of co-morbid interaction.");  11/3/14 PCR Order at 13 (P-App 20) (accepting as "true" that Andriano "suffers from depression, PTSD, impulsivity and impairment of executive functioning").

upbringing, arguing to the jury that her actions leading up to Joe's death were completely inconsistent with her Christian upbringing.  (*See, e.g.*, 12/15/04 Tr. at 129-30.)  A true, legitimate social history would have shown how Andriano's actions were completely consistent with someone who had suffered the pervasive trauma she experienced throughout her developmental years.  As Dr. Hopper noted during cross-examination:

> So, of course, if all that I've just presented . . . was not presented at trial, then, of course, it's easy to paint her as a conniving bitch, who's off sleeping around and drinking and having fun as her husband is dying. . . .
>
> The whole point—the reason why I'm here is because there is such evidence.  We have now done a thorough investigation. . . .  There is so much—so much evidence of trauma and the effect this would have on someone's brain.  It was never presented at trial and that's why she would be presented as a conniving person.
>
> What I'm saying is 52 hours with her, looking at all the evidence, my own professional integrity as a therapist, a scientist, and somebody who testifies in court, it just doesn't—it just doesn't compute.

(2/4/14 Tr. at 32-33 (P-App 833-34).)

In sum, evidence of Andriano's childhood and the effects of such trauma establishes a lens through which the jurors would have viewed all of her subsequent actions—a lens through which Andriano's actions are not the result of purely vicious or selfish desires, but rather the byproduct of suffering repeated molestation, physical abuse, deprivation, and neglect through at least the first 18 of her 30 years prior to Joe's death.  Had this evidence been presented, her sexual

acquiescence and flirtation with other men becomes a sad and predictable consequence of childhood sexual abuse, rather than evidence that "[s]he's going to do what she wants. What does she care about the Ten Commandments?" (11/16/04 Tr. at 97.) Her increasingly deformed decision making leading up to Joe's death becomes a product of her stunted executive functioning under stress, rather than part of her "character . . . to try and achieve her goal in any way possible." (12/15/04 Tr. at 113.) Her memory deficits regarding emotionally laden events have a scientific explanation, rather than a target for the prosecutor to ask the jury, "If that's the truth and that was such a traumatic event . . . don't you think she would have remembered?" (11/16/04 Tr. at 94.) The beating with the barstool and subsequent cut with the knife that caused Joe's death become the product of a lack of impulse control arising from psychiatric disorders, rather than part of a considered effort to "not . . . leave the job undone." (12/15/04 Tr. at 114.)

Evidence of Andriano's childhood and mental illness provides a response to all of the reasons underlying the State's argument for death. There is a reasonable probability that this evidence could have persuaded at least one member of the jury—which deliberated at the penalty phase for four days even *without* this evidence—to impose a sentence of life in prison rather than death.[19]

---

[19]  *See Porter v. McCollum*, 558 U.S. 30, 33 (2009) (per curiam) ("Unlike the evidence presented during [defendant's] penalty hearing . . . the new evidence described his abusive childhood," his post-traumatic stress disorder arising out of

### 3.    The PCR Court Erred In Rejecting Andriano's IAC—Penalty Phase Claim

In rejecting Andriano's claim of IAC at the penalty phase, the PCR Court erred in a number of respects.

*First*, the PCR Court noted that, even though it accepted as "true" the fact that Andriano "suffers from depression, PTSD, impulsivity and impairment of

---

military service, "and his impaired mental health and mental capacity"); *id.* at 43 (evidence of childhood abuse "may have particular salience" in a case involving the murder of a loved one); *Rompilla v. Beard*, 545 U.S. 374, 392-93 (2005) (evidence of childhood neglect and impairment of "several of [the defendant's] cognitive functions" constituted mitigating evidence that "might well have influenced the jury's appraisal of . . . culpability" and therefore constituted prejudice); *Stankewitz v. Wong*, 698 F.3d 1163, 1174 (9th Cir. 2012) (prejudice found where the jury "heard next to nothing about [the defendant's] traumatic childhood" of abuse and neglect or his history of mental illness); *Libberton v. Ryan*, 583 F.3d 1147, 1172-73 (9th Cir. 2009) (prejudice found where defense counsel failed to investigate and present evidence that the defendant was "seriously abused during his childhood," and noting that "[t]he Supreme Court has repeatedly held that evidence of childhood abuse is a relevant mitigating factor"); *Hamilton v. Ayers*, 583 F.3d 1100, 1131-33 (9th Cir. 2009) (defense counsel's failure to pursue the "classic mitigating evidence" of childhood sexual abuse by family members and evidence that the defendant "had suffered from serious mental illnesses throughout most of his life" constituted prejudice); *Lambright v. Schriro*, 490 F.3d 1103, 1118 (9th Cir. 2007) (failure to investigate and present "classic mitigation evidence" of mental health problems, including post-traumatic stress disorder and a personality disorder, constituted prejudice); *Correll v. Ryan*, 539 F.3d 938, 950-51 (9th Cir. 2008) (failure to investigate and present evidence of childhood abuse and neglect, religious teaching enforced by corporal punishment, incest in the family, and impulse control problems and impaired judgment at the time of the offense was "precisely th[e] type of evidence that the Supreme Court has termed as 'powerful'" mitigating evidence, constituting prejudice).  *See also State v. Bocharski*, 218 Ariz. 476, 497-99, 189 P.3d 403, 424-26 (2008) (reducing defendant's sentence to life imprisonment based on mitigating evidence that defendant "suffered severe physical, mental and sexual abuse during his childhood" and "came from a severely dysfunctional family").

executive functioning"—none of which were investigated or brought forth at her trial—other evidence indicated that Andriano "did not have a mental disease or defect whereby she couldn't appreciate the wrongfulness of her conduct." (11/3/14 Order at 13 (P-App 20).) However, this is not the correct legal standard for assessing an ineffective assistance of counsel claim. *See Wiggins*, 539 U.S. at 524 (A mitigation investigation "should comprise efforts to discover *all* reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."); *Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 19999) ("The imperative to cast a wide net for *all* relevant mitigating evidence is heightened at a capital sentencing hearing because '[t]he Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy.'") (emphases added).

*Second*, the PCR Court compared the mitigation evidence presented at trial versus the mitigation evidence presented at the evidentiary hearing, and noted that inconsistencies cast doubt on the credibility of the new evidence. (11/3/14 Order at 9-15 (P-App 16-23).) For example, the PCR Court noted that Andriano's "ability to remember, recall and describe at trial contrasts sharply with her current memory, especially when interviewed by the State's expert, Dr. Pitt." (11/3/14 Order at 15 (P-App 22).) However, as explained above, there is nothing uncommon about child abuse victims repressing memories related to those traumas

while retaining memories of other events, and Dr. Hopper testified that Andriano had one of the most acute inabilities to recall childhood memories of any person he had ever seen.  (2/3/14 Tr. I at 81-83, 93 (P-App 643-45, 655).)

*Third*, the PCR Court found that the evidence presented at the evidentiary hearing was "not 'available' to trial counsel" because Andriano "testified that she was neither physically nor sexually abused."  (11/3/14 Order at 15, 17 (P-App 22, 24).)  However, this finding ignores the numerous other red flags, discussed above, which would have led *any* non-conflicted trial counsel to investigate childhood abuse issues, notwithstanding Andriano's inability to access memories of those traumatic events.  *See Wiggins*, 539 U.S. at 521 (The "deference owed such strategic judgments" of trial counsel is "defined . . . in terms of the adequacy of the investigations supporting those judgments.").

Here, trial counsel never investigated Donna's, Skip's or Alejo's backgrounds or whether they had mental health or substance abuse issues; never interviewed Skip (who served 17 years in prison for sexually molesting his stepdaughter); never interviewed Tommy Robertson (who served 4 years in prison for sexual exploitation of a minor) or any of the other alleged pedophiles in Andriano's paternal family; never followed up on suggestions from mental-health providers that Andriano may have suffered childhood sexual abuse that affected her behavior as an adult; never developed or provided any mental-health providers

with any information regarding Andriano's social history, a fundamental element of a proper diagnosis; never followed up on the preliminary mental-health information those providers sent them, even after Andriano attempted suicide while incarcerated; never interviewed Andriano's childhood friends (including Lorts and Cunningham); never investigated the Lambeths' allegation that Alejo had abused Andriano's children and had taken naked pictures of them; and never investigated *any* negative aspects of Andriano's childhood whatsoever.

The PCR Court also noted that "the presentation of mitigating evidence was 'front-loaded' and began during Patterson's guilt phase presentation." (11/3/14 Order at 17 (P-App 24).)  That finding ignores the fact that her trial counsel did not even seek relevant mitigation documents until *November 19, 2004*—more than four years after Andriano's arrest, *after* the jury's guilt phase verdict, and *less than three weeks* before the penalty phase began on December 8, 2004—when they filed a Motion for Court Order to Assist Mitigation Investigation, which sought "*any records relating to Ms. Andriano or her family*" from state and local agencies because "*the defense needs to obtain them to conduct an independent and thorough mitigation investigation* in this capital case."  (Ex. 54 at 1 (P-App 3339) (emphasis added).)[20]  Thus, contrary to the PCR Court's characterization of the record, trial

---

[20]  *See also* Ex. 137 (P-App 3866-67) (On December 6, 2004—*two days* before the penalty phase began—mitigation specialist Scott MacLeod emailed Patterson and DeLozier to brainstorm themes for their mitigation presentation).

counsel did not even have pertinent records relating to Andriano or her family at the time they supposedly "front-loaded" the presentation of mitigation evidence during the guilt phase of the trial.

Both Larry Hammond, an expert on the standard of care for attorneys in capital cases, and Keith Rohman, an expert on the standard of care for mitigation specialists, found the timing of trial counsel's November 19, 2004 motion (and subsequent emails) "breathtaking" and "almost useless" at that late stage of the case; that motion is perhaps the "strongest indication" that the mitigation investigation was superficial and inadequate.  (2/11/14 Tr. at 61, 90 (P-App 1713, 1742); 2/6/14 Tr. at 60-61 (P-App 1251-52).)

### D.   Andriano's Other PCR Claims

#### 1.   Andriano's IAC—Aggravator Phase Claim (Claim I(B))

In Claim I(B), Andriano argued that her trial counsel was ineffective during the aggravator phase by failing to investigate and present expert testimony regarding her mental illness and by failing to object to the jury's consideration of the prosecutor's argument that Andriano poisoned Joe with sodium azide.

The PCR Court ruled that the mental illness claim was not colorable because the "especially cruel" aggravator "focuses on the . . . suffering of the victim rather than on the actions or mental state of the defendant.  It is determined by reference to an objective standard[.]"  (10/30/12 Order at 4 (P-App 4).)  This is not the law.

In *State v. Moody*, 208 Ariz. 424, 472, ¶ 226, 94 P.3d 1119, 1167 (2004), this Court reversed an "especially cruel" finding "because evidence was presented that Moody was in a 'dissociated state'" at the time of the murders—just as Andriano was here. *See, e.g.*, Ex. 2 at 55-60 (P-App 2051-56). *See also Bocharski*, 218 Ariz. at 494, ¶ 85 n.15, 189 P.3d at 421 n.15 (holding that the "especially cruel" factor "imposes an intent requirement. The State must show that the perpetrator knew or should have known that the victim would suffer.") (quotation omitted).

With respect to evidence relating to sodium azide poisoning, the PCR Court ruled that because the evidence was admitted during the guilt phase, it was admissible during the aggravator phase. (10/30/12 Order at 4-5 (P-App 4-5).) But the PCR Petition did not argue that the sodium azide evidence was inadmissible for any purpose; the argument is that trial counsel should have objected to the State's argument that Andriano *poisoned* Joe, because the State's own evidence showed that *such poisoning was impossible*. (*See* Pet. Mem. at 56-59 (P-App 110-13).) Specifically, the State argued that Andriano poisoned Joe with *21 grams* of sodium azide, but given the State's witness's testimony about the trace amounts of sodium azide present in the pot of beef stew he purportedly ingested, Joe would have had to eat *40 kilograms* of stew (i.e., roughly *88 pounds*) to ingest just *one gram* of sodium azide. (*Id.*) Thus, if Joe actually consumed 21 grams of sodium azide, as the State argued (11/30/04 Tr. at 23, 32), he was not tricked into doing so.

## 2.    Andriano's IAC-Guilt Phase Claim (Claim I(C))

In Claim I(C), Andriano alleged ineffective assistance of counsel during the guilt phase by failing to:  (1) present evidence of her mental illness; (2) present evidence that Joe was aware of her efforts to obtain life insurance; (3) present evidence that Joe was depressed; and (4) seek a jury instruction on lesser-included offenses, due to her mental illness.

*First,* with respect to evidence of mental illness, the PCR Court ruled that, because Andriano "did not raise an insanity defense, evidence of mental illness was inadmissible to negate the *mens rea* element of the charge."  (10/30/12 Order at 5 (P-App 5).)  But, the evidence is relevant to a defense under *State v. Christensen*, 129 Ariz. 32, 35-36, 628 P.2d 580, 583-84 (1981), based on Andriano's "character trait for impulsivity" (*i.e.*, acting reflexively in response to stress).  Moreover, the mental health evidence could have *rebutted* many of the State's assertions that Andriano's affairs and other conduct were driven by criminal intent, rather than mental illness.

*Second*, with respect to Joe's awareness of Andriano's efforts to obtain life insurance, the PCR Court stated that "Gia Palicki's purported testimony relates to a conversation she had with defendant and Joe in the summer or fall of 1999 and therefore . . . would not have rebutted the defendant's *later* attempts to obtain life insurance for Joe without his knowledge."  (10/30/12 Order at 5 (P-App 5).)

However, Palicki was the nanny for the Andriano children for approximately *one year*—from the "late summer or early fall" of 1999 "until the time of Joe's death" in early October 2000—and her declaration does not make clear *when* during that *one year* period she "knew that Joe was trying to obtain a life insurance policy." (*See* Ex. 31 ¶¶ 1, 8 (P-App 2944, 2946).) This Court noted in Andriano's direct appeal that "[e]vidence of Andriano's attempts to obtain insurance on Joe's life was admissible to show her plan, knowledge, and intent to kill Joe" and that the "*significant probative value of such damaging evidence*" substantially outweighed any risk of prejudice to Andriano. *Andriano*, 215 Ariz. at 503, ¶ 23, 161 P.3d at 546 (emphasis added). But for trial counsel's ineffective assistance, they would have elicited from Palicki the fact that Joe knew that Andriano was trying to obtain life insurance, and rebutted what this Court noted was such "damaging evidence."

*Third*, attorney Jeffrey Miller contacted Joe and told him that his family members were concerned about his mental state and worried he was contemplating suicide. (Ex. 19 ¶ 5 (P-App 2601).) In response, Joe acknowledged the concern, and did not deny that he was contemplating suicide. (*Id*.) At trial, the State's hearsay objection to Miller's testimony was sustained. The PCR Court ruled that Jeffrey Miller's testimony about Joe's depression was properly excluded because it was inadmissible hearsay. (10/30/12 Order at 5 (P-App 5).) But, trial counsel failed to note that Joe's responses to Miller's questions regarding his state of mind

necessarily fall within the hearsay exception for statements of the declarant's "[t]hen existing mental, emotional, or physical condition."  Ariz. R. Evid. 803(3). By failing to assert this clearly applicable hearsay exception, the jury never heard Miller's corroboration of Andriano's testimony that Joe was depressed and potentially suicidal in the months before his death.

*Finally*, the PCR Court noted that, on appeal, this Court ruled that the evidence presented did not support any lesser-included offenses.  (10/30/12 Order at 5 (P-App 5).)  However, if trial counsel had done a proper investigation of guilt phase issues (discussed above), they would have requested a jury instruction as to lesser included offenses.  The failure to do so constitutes ineffective assistance.

### 3.    Andriano's Prosecutorial Misconduct Claim (Claim III)

The prosecutor's misconduct fell into three general categories:  (a) references to the details of Andriano's sexual conduct and related disparagement of her character, in all three phases of the trial; (b) asserting or implying that the State possessed evidence of factual matters that was never introduced at trial; and (c) making unfounded accusations that a defense expert was unethical.  (*See* Pet. Mem. at 63-69 (P-App 117-23).)

The PCR Court erred in finding that Claim III(a) was precluded.[21]  *First*, the

---

[21]  The PCR Court did not address Claims III(b) or III(c) other than to note that these claims could have been raised in the direct appeal.  However, trial counsel was ineffective for failing to object to many instances of prosecutorial misconduct,

PCR Court noted that, in Andriano's direct appeal, this Court ruled that evidence of Andriano's extramarital affairs was admissible to establish motive and to rebut her self-defense theory.  (10/30/12 Order at 3 (P-App 3) (citing *Andriano*, 215 Ariz. at 503, 161 P.3d at 546).)  However, this does not address Andriano's argument that the prosecutor went well beyond either of these stated purposes, or the fact that the prosecutor himself argued that Andriano's motive for the murder was greed, and *not* the desire to pursue other relationships.

> "In this case we have . . . *proven* that the defendant engaged in some tryst[s] with people, for example, like Rick Freeland. . . .  And, additionally, we also have the issue of Mr. Travis Black . . . .  [T]here are two points to be made with regard to that.  Number one, the attraction or the love or whatever emotion she had . . . with Rick Freeland, wasn't so strong that it prevented her from finding other men.  So *that really couldn't be the motive*.  [Number two] . . . if she really wanted to go out there and be a free girl, go out there every night and dance the night away or do whatever it is she wanted to do without restriction, . . . that doesn't preclude you when you go back there in your deliberations from finding that the *motive here was pecuniary gain*. . . .  The *real reason that she wanted him dead is because she wanted money*. . . .  The bottom line here is that *this all happened because of money.  Greed.  That's all this is about for her*."

(12/1/04 Tr. (aggravator phase) at 10-11.)

*Second*, the PCR Court cited this Court's statement that most of the prosecutor's comments came during closing arguments, which are not evidence.  (10/30/12 Order at 3 (P-App 3) (citing *Andriano*, 215 Ariz. at 503 n.3, 161 P.3d at 546).)  However, many of the statements relating to Andriano's sexual conduct

---

and appellate counsel was ineffective for failing to pursue these claims.

were not raised during argument, and ranged from details regarding each sexual encounter (for example, asking whether Andriano had sex with Freeland under a bridge (11/1/04 Tr. at 53-54)), to the details of sexual encounters or relationships with other men before Andriano even met Joe (10/5/04 Tr. at 154-55; 10/21/04 Tr. at 181-82; 10/28/04 Tr. at 75, 77; 11/1/04 Tr. at 90-91, 105-110), to whether she wore provocative clothing on a given night.

In sum, trial (and appellate) counsel's failure to object to the prosecutor's misconduct was unreasonable, and deprived Andriano of a fair trial.

### 4.    Andriano's Juror Misconduct Claim (Claim IV)

The PCR Court ruled that Andriano's Claim IV—that the jury's consideration of a non-statutory factor (*i.e.*, not wanting Andriano to get out of prison) was improper—was precluded because the claim could have been raised in Andriano's direct appeal and therefore was waived.  (10/30/12 Order at 3 (P-App 3).)  Factually, the PCR Court relied on a newspaper article where a juror said they did not want Andriano to get out of prison.  But, this is very different than knowing that the jurors prepared and relied upon a "table" of potential sentencing outcomes at the *aggravator* stage of the trial, and found the "especially cruel" aggravator due to concerns regarding the possibility of parole.  (*See* Pet. Mem. at 69-70 (P-App 123-24).)  Juror misconduct implicates due process rights that are broader than the narrow grounds for juror misconduct available under Rule 24.1, *Simmons v. South*

*Carolina*, 512 U.S. 154, 161 (1994); they are thus properly the subject of post-conviction relief proceedings, *see, e.g.*, *Jeffries v. Wood*, 114 F.3d 1484, 1490 (9th Cir. 1997), and the State has not proved that Andriano knowingly, intelligently, and voluntarily waived such claims, *Stewart v. Smith*, 202 Ariz. 446, 46 P.3d 1067, 1070 (2002) (citing Comment to Rule 32.2.a.(3)).  The claim was not precluded.

### 5.    Andriano's IAC Claim On Her Direct Appeal (Claim V)

Appellate counsel's failure to raise DeLozier's actual conflict of interest, prosecutorial misconduct, and the exclusion of Jeffrey Miller's non-hearsay testimony in Andriano's direct appeal was constitutionally deficient and was prejudicial.  To the extent this Court ultimately decides any of Andriano's meritorious constitutional claims for relief are waived on account of Andriano's appellate counsel's failure to raise them, Andriano has suffered prejudice.

### E.    The PCR Court's Evidentiary Errors

On January 24, 2014, Andriano filed a Motion to Admit Exhibits Pertaining To Mitigation Evidence at the PCR hearing (P-App 288-94), which the PCR Court denied (2/4/14 Tr. at 3 (P-App 804)).

The PCR Court erred in denying Andriano's motion because the evidentiary standards for the penalty phase of capital cases differ significantly from the standards for admitting evidence in other phases of other criminal cases.  "[T]he trier of fact shall consider as mitigating circumstances *any* factors proffered by the

defendant or the state that are relevant in determining whether to impose a sentence less than death[.]" Ariz. Rev. Stat. § 13-751.G (emphasis added).  The parties may present such evidence "regardless of its admissibility under the rules governing admission of evidence at criminal trials." Ariz. Rev. Stat. § 13-751.C; *see also State v. Walton*, 159 Ariz. 571, 583, 769 P.2d 1017, 1029 (1989) ("The defendant complains that admitting the report violated the foundation and hearsay rules of evidence.  However, information relevant to mitigation can be presented at a sentencing hearing without regard to its admissibility under the rules of evidence for criminal trials."), *overruled in part on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002).  Thus, all information pertinent to the sentencing decision should be considered, regardless of its admissibility in other contexts.

Among other things, the excluded exhibits included declarations that provided further evidence of Alejo's sexual abuse of Andriano,[22] details about the pedophilia that was rampant among the Robertson men,[23] the history of mental

---

[22]  *See* Ex. 13 ¶ 6 (P-App 2544-45) ("There were things about Alejo's dynamic with Wendi that did not sit right with me.  I used to live in an A-frame house on the church property with [my wife] Nancy.  One night, I was standing on the balcony . . . .  I looked into the parking lot and I saw Wendi and Alejo.  Wendi leaned into Alejo and they kissed on the mouth.  Something was weird about it.  It was not a father-daughter kiss."); Ex. 11 ¶ 10 (P-App 2527-28) ("I was concerned that Alejo had been sexually molesting Wendi. . . .  At the beginning of our conversation, Alejo denied everything.  He denied it several times until he finally confessed to his inappropriate behavior and admitted he had a problem sexually.").
[23] *See* Ex. 30 ¶ 1 (P-App 2937); Ex. 32 ¶¶ 57, 60, 64, 65 (P-App 2971-72, 2974) (Skip describing molestation by himself and family members).

illness on both sides of Andriano's family, and the abuse she and other classmates suffered in the cult-like church and school where Alejo taught.

## VI.   CONCLUSION

For the foregoing reasons, Andriano respectfully requests that this Court reverse the PCR Court's dismissal of her claims for post-conviction relief.

Respectfully submitted this 3rd day of April, 2015.

COPPERSMITH BROCKELMAN PLC

By:   /s/  Scott M. Bennett
Scott M. Bennett (Bar No. 022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted pro hac vice
Matthew R. Lynch, admitted pro hac vice
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, Wisconsin 53703
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com
mlynch@foley.com

Attorneys for Petitioner Wendi Andriano

# EXHIBIT IIIIIIIIII

April 9, 2015

Scott M. Bennett
c/o Verna Colwell
Coppersmith Brockelman PLC
2800 North Central Ave
Phoenix, AZ 85004

Case No: CR-15-0115-PC
RE:  Sealed Appendix

Dear Mr. Bennett:

On April 3, 2015, the Arizona Supreme Court Clerk's Office received the Appendix to your Petition for Review, containing both sealed and unsealed documents. As previously discussed, we are unable to separate the sealed and unsealed files; therefore, I am returning your document to you for your processing. Please submit the sealed and unsealed portions separately, per my conversation with Ms. Colwell.

Sincerely,


Brandon Powell
Deputy Clerk II


bp

enclosures

# EXHIBIT JJJJJJJJJJ



STATE BAR
OF ARIZONA

---

April 08, 2015


Scott M Bennett
Coppersmith Brockelman PLC
2800 N Central Ave Ste 1200
Phoenix, AZ 85004-1009

**RE:   Pro Hac Vice Applicant - Matthew Lynch P172429**
       **Pro Hac Application # 1004915**

Dear Mr Bennett:

Please accept this letter as confirmation that Mr. Lynch originally applied for Pro Hac Vice status
with the State Bar of Arizona on August 24, 2009. Our records indicate that an order granting
admission dated October 21, 2009 was received, and the application has been renewed each year,
with the last renewal paid on August 05, 2014. The application is current as of the date of this letter,
with renewal due August 24, 2015.

Should you need any further information, please contact me at jennifer.ford@staff.azbar.org or 602-
340-7387.


Sincerely,


Jennifer Ford, CAP
Member Resources Administrator



STATE BAR
OF ARIZONA



# EXHIBIT KKKKKKKKKK



April 08, 2015


Scott M Bennett
Coppersmith Brockelman PLC
2800 N Central Ave Ste 1200
Phoenix, AZ 85004-1009

**RE:   Pro Hac Vice Applicant – Allen Arntsen P172399**
**        Pro Hac Application # 1004913**

Dear Mr Bennett:

Please accept this letter as confirmation that Mr. Arntsen originally applied for Pro Hac Vice status with the State Bar of Arizona on August 24, 2009. Our records indicate that an order granting admission dated October 21, 2009 was received, and the application has been renewed each year, with the last renewal paid on August 13, 2014. The application is current as of the date of this letter, with renewal due August 24, 2015.

Should you need any further information, please contact me at jennifer.ford@staff.azbar.org or 602-340-7387.


Sincerely,


Jennifer Ford, CAP
Member Resources Administrator





# EXHIBIT LLLLLLLLLL PART 1

# IN THE ARIZONA SUPREME COURT

| | | |
|---|---|---|
| STATE OF ARIZONA | ) | ARIZONA SUPREME COURT |
| RESPONDENT, | ) | |
| | ) | |
| v. | ) | |
| | ) | Maricopa County Superior Court |
| WENDI ELIZABETH ANDRIANO | ) | No. CR2000-096032-A |
| | ) | |
| PETITIONER. | ) | |
| | ) | |

## PETITIONER'S APPENDIX TO
## PETITION FOR REVIEW OF DENIAL OF POST-CONVICTION RELIEF

## (CAPITAL CASE)

Scott M. Bennett (Bar No. 022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (OFFICE)
(602) 224-6020 (FAX)
sbennett@csblaw.com

Allen A. Arntsen, admitted pro hac vice
Matthew R. Lynch, admitted pro hac vice
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, Wisconsin 53703
(608) 257-5035 (office)

(608) 258-4258 (fax)
aarntsen@foley.com
mlynch@foley.com

2

# APPENDIX TABLE OF CONTENTS

## Orders

A.    Court's Minute Order, filed October 30, 2012 .........................................P-App. 000001-7

B.    Court's Ruling on Evidentiary Hearing, dated November 3, 2014 .........P-App. 000008-38

C.    Order Granting Extension of Time to File Petition For Review,
       dated November 21, 2014 .........................................................................P-App. 000039

D.    Order Granting Extension of Time to File Petition
       For Review, dated January 26, 2015............................................................P-App. 000040

## Briefs and Motions

E.    Petition for Post-Conviction Relief, dated February 17, 2012.................P-App. 000041-45

F.    Memorandum in Support of Petition for Post-Conviction
       Relief, filed February 17, 2012 (including all Exhibits 1-77
       also listed below as s) .........................................................................P-App. 000046-125

       a.    Memorandum Ex 1: Robertson/Worsham family trees .............P-App. 000126-131

       b.    Memorandum Ex 2: Examples of Prosecutor's Statements
              and Lines of Questioning Relating to Wendi Andriano's
              Sexual Behavior........................................................................P-App. 000132-170

G.    Response to Petition for Post-Conviction Relief,
       filed July 23, 2012 ...............................................................................P-App. 000171-239

H.    Reply Memorandum in Support of Petition for Post-Conviction
       Relief, filed September 4, 2012 ...........................................................P-App. 000240-287

I.     Motion to Admit Exhibits Pertaining To Mitigation
       Evidence, filed January 24, 2014 ........................................................P-App. 000288-294

J.     Petitioner's Post-Hearing Memorandum in
       Support of Petition for Post-Conviction Relief,
       filed June 2, 2014 ................................................................................P-App. 000295-420

K.    State's Closing Memorandum, filed July 31, 2014...............................P-App. 000421-497

L.    Petitioner's Post-Hearing Reply Memorandum in Support of
       Petition for Post-Conviction Relief, dated September 5, 2014 ..............P-App. 000498-562

## **Transcripts**

M.     Evidentiary Hearing Transcript of Proceedings-
       Day 1, Volume I of II, dated February 3, 2014......................................P-App. 000563-658

N.     Evidentiary Hearing Transcript of Proceedings-
       Day 1, Volume II of II, dated February 3, 2014 ..................................P-App. 000659-801

O.     Evidentiary Hearing Transcript of Proceedings-
       Day 2, dated February 4, 2014 ...........................................................P-App. 000802-1046

P.     Evidentiary Hearing Transcript of Proceedings-
       Day 3, dated February 5, 2014 ...........................................................P-App. 001047-1191

Q.     Evidentiary Hearing Transcript of Proceedings-
       Day 4, dated February 6, 2014............................................................P-App. 001192-1283

R.     Evidentiary Hearing Transcript of Proceedings-
       Day 5, dated February 7, 2014............................................................P-App. 001284-1464

S.     Evidentiary Hearing Transcript of Proceedings-
       Day 6, dated February 10, 2014..........................................................P-App. 001465-1652

T.     Evidentiary Hearing Transcript of Proceedings-
       Day 7, dated February 11, 2014..........................................................P-App. 001653-1847

U.     Evidentiary Hearing Transcript of Proceedings-
       Day 8, dated February 14, 2014..........................................................P-App. 001848-1973

## **Exhibits**

V.     Hearing Exhibits

       1.     Expert Report of Larry Hammond (Petition Tab 1).................P-App. 001974-1996

       2.     Expert Report of Dr. George W. Woods (Petition Tab 2) .......P-App. 001997-2061

              2.001.  Appendix A to Woods Report:
              List of Documents Reviewed (Petition Tab 2.A.)....................P-App. 002062-2063

              2.002.  Appendix B to Woods Report:
              Overview of the Biopsychosocial and
              Psychiatric History of Wendi Elizabeth Andriano
              and Her Family (Petition Tab 2.B.)..................................P-App. 002064-2080

              2.003.  Appendix C to Woods Report:
              Curriculum Vitae (Petition Tab 2.C.) ......................................P-App. 002081-2095

2.004.  Appendix D to Woods Report:
Qualifications, Background and Experience
(Petition Tab 2.D.) ..................................................................P-App. 001096-2101

3.       Expert Report of James Hopper, Ph.D.
         (Executive Summary) (Petition Tab 3) ....................................P-App. 002102-2128

4.       Appendix to Expert Report of James Hopper, Ph.D.
         (Full Report) (Petition Tab 4) ....................................................P-App. 002129-2382

         4.001.  Exhibit A to Hopper Report:  Curriculum Vitae
         (Petition Tab 4.A.) ....................................................................P-App. 002383-2388

         4.002.  Exhibit B to Hopper Report:
         List of Documents Reviewed (Petition Tab 4.B.)....................P-App. 002389-2405

5.       Confidential Expert Report
         of Myla Young, Ph.D. (Petition Tab 5) ....................................P-App. 002406-2419

         5.001.   Addendum to Expert Report of Myla Young
         (Petition Tab 5.A.) ....................................................................P-App. 002420-2425

6.       Affidavit of Daniel Patterson
         (Petition Tab 6) ..........................................................................P-App. 002426-2434

         6.001.  Exhibit A to Patterson Affidavit:
         Assessment by Dr. Jack Potts (Petition Tab 6.A.) ...................P-App. 002435-2437

         6.002.  Exhibit B to Patterson Affidavit:
         12/20/01 Email to Patrick Linderman (Petition Tab 6.B.)................ P-App. 002438

         6.003.  Exhibit C to Patterson Affidavit:
         Assessment by Dr. Richard Rosengard (Petition Tab 6.C.).....P-App. 002439-2444

         6.004.  Exhibit D to Patterson Affidavit:
         2/14/02 Email from Michelle Arvanitas (Petition Tab 6.D.) ............ P-App. 002445

         6.005.  Exhibit E to Patterson Affidavit:
         Report of Dr. Michael Bayless (Petition Tab 6.E.)..................P-App. 002446-2473

7.       Declaration of G. David DeLozier (Petition Tab 7) ...............P-App. 002474-2481

         7.001.  Exhibit A to DeLozier Declaration:
         2/19/01 Letter from Certified Professional Counselor
         Kandy Rohde (Petition Tab 7.A.) ....................................................... P-App. 002482

         7.002.  Exhibit B to DeLozier Declaration:
         3/12/01 Letter from Certified Professional Counselor

Kandy Rohde (Petition Tab 7.B.) .............................................P-App. 002483-2484

7.003.  Exhibit C to DeLozier Declaration:
Notes from Certified Professional Counselor Kandy Rohde
 (Petition Tab 7.C.)...................................................................P-App. 002485-2489

7.004.   7.004. – Exhibit F to
DeLozier Declaration:  Trial Note from Client
(Petition Tab 7.F.) ...................................................................P-App. 002490-2491

7.005.  Exhibit G to DeLozier Declaration:
9/1/04 Letter from Dr. Gerald Perry and
Dr. Pamela Drapeau (Petition Tab 7.G.)...........................................P-App. 002492

8.      Affidavit of Scott A. Mac Leod (Petition Tab 8)....................P-App. 002493-2498

9.      Declaration of Wendi Andriano (Petition Tab 9) ...................P-App. 002499-2506

10.     Declaration of Constance Boys (Petition Tab 10) ..................P-App. 002507-2523

11.     Declaration of George Carlin (Petition Tab 11) .....................P-App. 002524-2530

12.     Declaration of Jeri Lynn Cunningham (Petition Tab 12) ........P-App. 002531-2542

13.     Declaration of Mark Keating (Petition Tab 12).....................P-App. 002543-2547

14.     Declaration of Nancy Keating (Petition Tab 14) ...................P-App. 002548-2553

15.     Deposition Testimony of Shawn King (Petition Tab 15) ........P-App. 002554-2578

16.     Declaration of Barry Lorts (Petition Tab 16)..........................P-App. 002579-2583

17.     Declaration of Kelsey Leon McGuffee, Jr.
(Petition Tab 17) ......................................................................P-App. 002584-2591

18.     Declaration of Marjorie Micek (Petition Tab 18)....................P-App. 002592-2599

19.     Declaration of Jeffrey B. Miller (Petition Tab 19) .................P-App. 002600-2603

19.001. Exhibit 1 to Miller Declaration:
10/10/00 Letter to Client (Petition Tab 19.A.)..........................P-App. 002604-2606

20.     Declaration of Sharon Murphy
(Petition Tab 20) ......................................................................P-App. 002607-2611

21.     Declaration of Brenda Nagore (Petition Tab 21).....................P-App. 002162-2621

22.     Declaration of Frank Nagore (Petition Tab 22) ......................P-App. 002622-2627

6

23.     Declaration of Jasper Neace (Petition Tab 23) ........................P-App. 002628-2652

24.     Declaration of Alejo Ochoa (Petition Tab 24) ........................P-App. 002653-2710

25.     Supplemental Declaration of Alejo Ochoa
        (Petition Tab 25) .........................................................P-App. 002711-2712

26.     Declaration of Brandon Ochoa (Petition Tab 26) ....................P-App. 002713-2725

27.     First Declaration of Donna Ochoa (Petition Tab 27)..............P-App. 002726-2887

28.     Second Declaration of Donna Ochoa (Petition Tab 28) ..........P-App. 002888-2932

29.     Third Declaration of Donna Ochoa (Petition Tab 29) .............P-App. 002933-2936

30.     Declaration of Deblen Oke (Petition Tab 30) .........................P-App. 002937-2943

31.     Declaration of Gia Palicki (Petition Tab 31) ...........................P-App. 002944-2951

32.     Declaration of Shelby "Skip" Robertson
        (Petition Tab 32) .........................................................P-App. 002952-2977

33.     Declaration of Stuart Wade Robertson (Petition Tab 33)........P-App. 002978-2984

34.     Declaration of Cynthia Schaider (Petition Tab 34)...............P-App. 002985-03001

35.     Declaration of Stephen Schaider (Petition Tab 35) ................P-App. 003002-3012

36.     Declaration of John Shaddle (Petition Tab 36) ........................P-App. 003031-3018

37.     Declaration of Christopher Weaver (Petition Tab 37).............P-App. 003019-3020

38.     Declaration of Kimberly Wilson (Petition Tab 38) ................P-App. 003021-3027

39.     Declaration of Barbara Bauer (Petition Tab 39) .....................P-App. 003028-3031

40.     Declaration of Martha Colvin (Petition Tab 40).....................P-App. 003032-3036

41.     Declaration of Linda Percy (Petition Tab 41) .........................P-App. 003037-3039

42.     Declaration of Jacqueline Sacamano (Petition Tab 42)...........P-App. 003040-3042

43.     Authenticating Declaration of Matthew R. Lynch
        (Petition Tab 42) .........................................................P-App. 003043-3045

44.     Notice of Defenses, Indicating (1) Intent to Raise
        Temporary Insanity Defense, and (2) Need for Expert
        Psychologist (filed 1/16/01) (Petition Tab 44)........................P-App. 003046-3048

45.     Counseling Session Notes from Certified Professional
        Counsel Kandy Rohde (January 2001 to April 2004)
        (Petition Tab 45) ...........................................................P-App. 003049-3157

46.     Counseling Session Notes from Casa Grande Valley
        Counseling Service (2/27/96 to 3/6/96)
        (Petition Tab 46) ...........................................................P-App. 003158-3164

47.     Notes from Estrella Jail and Durango Psychiatric
        Unit Medical Providers (Excerpts)
        (11/3/00 to 9/30/04) (Petition Tab 47) ......................P-App. 003165-3193

48.     Special Needs Treatment Plan from Durango Psychiatric
        Unit Medical Providers (Petition Tab 48)................P-App. 003194-3221

49.     Medication Records During Pre-Sentencing
        Incarceration (November 2000 to November 2004)
        (Petition Tab 49) ...........................................................P-App. 003222-3305

50.     Email from Donna Ochoa to Trial Counsel (12/4/01)
        (Petition Tab 50) ................................................................. P-App. 003306

51.     Email from Donna Ochoa to Trial Counsel (9/30/02)
        (Petition Tab 51) ................................................................. P-App. 003307

52.     Emails from Sharon Murphy to Trial Counsel
        (3/25/03 and 3/30/03) (Petition Tab 52) ...................P-App. 003308-3309

53.     General Medical and Public Record Release Forms
        (obtained by Public Defender's Office in January 2002,
        March 2002, August 2002, April 2003, May 2003,
        November 2003, and April 2004) (Petition Tab 53)...............P-App. 003310-3338

54.     Motion for Court Order to Assist Mitigation Investigation
        and Proposed Order, seeking "order directing state and local
        agencies to provide  records regarding Ms. Andriano to the
        defense" (filed 11/19/04) (Petition Tab 54) ............................P-App. 003339-3344

55.     Article, "Sexual Abuse as Mitigation" (printed 1/17/03)
        (Petition Tab 55) ...........................................................P-App. 003345-3346

56.     Email from Donna Ochoa to Trial Counsel (2/12/01)
        (Petition Tab 56) ...........................................................P-App.003347-3351

57.     Email from Donna Ochoa to Trial Counsel (2/26/03)
        (Petition Tab 57) ...........................................................P-App. 003352

58.     Transcribed Interview and Voice Message of Chris Weaver
by Michelle Arvanitas (1/30/04) (Petition Tab 58)...............P-App. 003353-3373

59.     Emails Regarding Interview of Chris Weaver (1/30/04 and
2/02/04) (Petition Tab 59)................................................... P-App. 003374

60.     Invoice from Goldman & Kaplan, Ltd. to Joseph Andriano
"In Reference To:  Estate Planning" (10/3/00)
(Petition Tab 60) ............................................................... P-App. 003375

61.     Letter from G. David DeLozier to Alejo and Donna
Ochoa (12/14/00) (Petition Tab 61).........................................P-App. 003376-3377

62.     Letter from Leon Thikoll to Bethanne Klopp-Bryant
(11/29/00) (Petition Tab 62) ............................................ P-App. 003378

63.     Emails Between G. David DeLozier and the Public
Defender's Office (8/2/02 to 8/5/02) (Petition Tab 63)...........P-App. 003379-3380

64.     Email Regarding G. David DeLozier Not Receiving Files
(10/23/03) (Petition Tab 64) ............................................. P-App. 003381

65.     Report of Autopsy (11/28/00) and Amendment (1/5/01)
(Petition Tab 65) .............................................................P-App. 003382-3395

        65.001. Phoenix Fire Department Incident History
Printout for 10/8/00  (Petition Tab 65.A.)...............................P-App. 003396-3397

66.     Police Photographs of Defendant's Pre-Arrest Injuries
(10/8/00) (Petition Tab 66) ......................................................P-App. 003398-3404

67.      Authenticating Declaration of Kristen Powers
(Petition Tab 68) ................................................................P-App. 003405-3407

68.     Summary Chart and Earnings of Alejo and
Donna Ochoa, 1975 to 1995  (Petition Tab 68).......................P-App. 003408-3409

        68.001. Social Security Earnings Statements of
Alejo Ochoa (Petition Tab 68.A.)............................................P-App. 003410-3413

        68.002. Social Security Earnings Statements of
Donna Ochoa (Petition Tab 68.B.) ........................................P-App. 003414-3419

69.     Summary Chart and Earnings Statements of Joe and
Wendi Andriano, 1983 to 2000 (Petition Tab 69) ...........................P-App. 003420

        69.001. Social Security Earnings Statements of
Joe Andriano (Petition Tab 69.A.).......................................... P-App. 003421-3424

69.002. Social Security Earnings Statements of
Wendi Andriano (Petition Tab 69.B.)......................................P-App. 003425-3428

70.    Inmate Record Summary for Shelby Robertson
(Petition Tab 70) ..................................................................P-App. 003429-3431

71.    Inmate Record Summary for Tommy Robertson
(Petition Tab 71) ..................................................................P-App. 003432-3433

72.    Photograph of Wendi Andriano by Alejo Ochoa
(Petition Tab 72) ............................................................................P-App. 003434

73.    Proof Sheet of Photographs of Wendi Andriano
by Alejo Ochoa (Petition Tab 73)....................................................P-App. 003435

74.    Proof Sheet of Photographs of Wendi Andriano
and Others by Alejo Ochoa (Petition Tab 74) .................................P-App. 003436

75.    Card Sent to Wendi Andriano from Alejo Ochoa
(Petition Tab 75) ............................................................................P-App. 003437

76.    American Bar Association Guidelines for the
Appointment and Performance of Defense Counsel
l in Death Penalty Cases (February 2003)
(Petition Tab 76) ..................................................................P-App. 003438-3573

77.    Mandate from Court of Appeals to Attorney DeLozier
in In Re the Adoption of  Nicholas A. and Ashlee A.
(08/19/04) (Petition Tab 77) ................................................P-App. 003574-3584

78.    Expert Report of Gary Lowenthal............................................P-App.003585-3634

79.    Lowenthal Report Appx. 1 – Curriculum Vitae,
Gary T. Lowenthal .................................................................P-App. 003635-3637

80.    Lowenthal Report Appx. 2 –
Guardianship agreement, 11/00 .............................................P-App. 003638-3639

81.    Lowenthal Report Appx. 3 –
Minute entry, 11/15/00............................................................P-App. 003640-3641

82.    Lowenthal Report Appx. 4 –
DeLozier invoice to Ochoas, p. 1, 2/7/01 .........................................P-App. 003642

83.    Lowenthal Report Appx. 5 –
Cover letter and fee agreement, 12/14/01 ...............................P-App. 003643-3649

10

84.     Lowenthal Report Appx. 7 –
        Stipulation for Substitution of Counsel, 6/12/01 ....................P-App. 003650-3651

85.     Lowenthal Report Appx. 8 – Letters recommending
        Donna and  Alejo Ochoa, 7/01 - 8/01 ......................................P-App. 003652-3663

86.     Lowenthal Report Appx. 9 – Correspondence
        between Donna Ochoa and David DeLozier, 7/01 .......................... P-App. 003664

87.     Lowenthal Report Appx. 10 – Pinal County
        Superior Court Minute Entry, 12/18/01 ...................................P-App. 003665-3666

88.     Lowenthal Report Appx. 11 – Notice of Change
        of Judge, 1/2/02................................................................... P-App. 003667

89.     Lowenthal Report Appx. 12 – Correspondence,
        DeLozier to Jakubczyk, 1/21/02, 2/7/02, 3/6/02....................P-App. 003668-3679

90.     Lowenthal Report Appx. 13 – Correspondence,
        Jakubczyk to DeLozier, 4/1/02 ......................................... P-App. 003680

91.     Lowenthal Report Appx. 14 – Correspondence,
        DeLozier's office to Jakubczyk, 3/20/02 ......................... P-App. 003681

92.     Lowenthal Report Appx. 15 – Motion to Compel
        Production of Medical Records, 3/12/02 ................................P-App. 003682-3688

93.     Lowenthal Report Appx. 16 – Subpoena, 4/16/02..................P-App. 003689-3690

94.     Lowenthal Report Appx. 17 – Investigator's cover letter
        and excerpts from  investigative report, 5/8/02 ......................P-App. 003697-3693

95.     Lowenthal Report Appx. 18 – Jeanea Lambeth letter
        to Jakubczyk, 3/15/02 .............................................P-App. 003694-3697

96.     Lowenthal Report Appx. 19 – Donna Ochoa letter
        to Dr. Yee, 3/28/02....................................................P-App. 003698-3703

97.     Lowenthal Report Appx. 20 – Brian Yee letter
        to Superior Court, 3/13/02 ......................................P-App. 003704-3707

98.     Lowenthal Report Appx. 21 – Linda Gray letter to
        Superior Court, 4/17/02 ..........................................P-App.003708-3709

99.     Lowenthal Report Appx. 22 – Maricopa County
        Superior Court Minute Entry, 8/1/02......................P-App. 003710-3712

100.    Lowenthal Report Appx. 23 – Motion for Sanctions,
        7/15/02 .................................................................P-App. 003713-3715

101.    Lowenthal Report Appx. 24 – Pinal County Superior
        Court Minute Entry, 7/23/02.....................................................P-App. 003716-3717

102.    Lowenthal Report Appx. 25 – Maricopa County Superior
        Court Order, 7/31/02 ................................................................P-App. 003718

103.    Lowenthal Report Appx. 26 – Arizona Supreme Court,
        Summary of Judgment, 3/25/04 ...............................................P-App. 003719

104.    Lowenthal Report Appx. 27 – Pinal County Superior Court
        Minute Entry, 10/15/02 .............................................................P-App. 003720-3721

105.    Lowenthal Report Appx. 28 – Maricopa County Superior
        Court Minute Entry, 12/20/02 ...................................................P-App. 003722-3724

106.    Lowenthal Report Appx. 29 – Maricopa County Superior
        Court Minute Entry, 9/8/03.........................................................P-App. 003725-3726

107.    Lowenthal Report Appx. 30 – Exchange of emails,
        DeLozier and Donna Ochoa, 3/3/03 .......................................P-App. 003727

108.    Lowenthal Report Appx. 31 – Exchange of emails,
        DeLozier and Donna Ochoa, 4/14/03 ......................................P-App. 003728

109.    Lowenthal Report Appx. 32 – DeLozier's blind copy
        of email from Donna Ochoa to Budge, 5/17/03.......................P-App. 003729

110.    Lowenthal Report Appx. 33 – Rich Robertson investigation
        billing to DeLozier, 5/03 and 10/03 .........................................P-App. 003730-3732

111.    Lowenthal Report Appx. 34 – Excerpts, DeLozier's
        Court of Appeals Opening Brief, 5/27/03................................P-App. 003733-3737

112.    Lowenthal Report Appx. 36 – Budge Motion to
        Reinstate Appeal, 2/25/04 .........................................................P-App. 003738-3741

113.    Lowenthal Report Appx. 38 – Ochoa letter to
        Superior Court, 3/21/05 .............................................................P-App. 003742-3744

114.    Lowenthal Report Appx. 40 – Notice of pro se
        representation, 11/15/04.............................................................P-App. 003745-3746

115.    Lowenthal Report Appx. 42 – Handwritten notes
        faxed to DeLozier, 3/7/05 ..........................................................P-App. 003747

116.    Lowenthal Report Appx. 46 – DeLozier billing record
        for custody representation, July, 2002 .....................................P-App. 003748

117.  Lowenthal Report Appx. 44 – DeLozier billing record,
      October 2003 ................................................................. P-App. 003749

118.  DeLozier billing record, November 3, 2003 ..................................... P-App. 003750

119.  DeLozier billing record for custody representation,
      December 1, 2003 ............................................................. P-App. 003751

120.  DeLozier billing record for criminal representation,
      December 1, 2003 ............................................................. P-App. 003752

121.  DeLozier billing record for custody representation,
      December 31, 2003 ............................................................ P-App. 003753

122.  Lowenthal Report Appx. 45 – DeLozier billing record
      for criminal representation, December 31, 2003 .............................. P-App. 003754

123.  DeLozier billing record, January 2004 .......................................... P-App. 003755

124.  Lowenthal Report Appx. 37 – DeLozier billing record,
      February 2004 ................................................................ P-App. 003756

125.  DeLozier billing record, March 2004 ............................................ P-App. 003757

126.  Lowenthal Report Appx. 39 – DeLozier billing record,
      April 2004 ................................................................... P-App. 003758

127.  DeLozier billing record, May 2004 .............................................. P-App. 003759

128.  DeLozier billing record, June 2004 ............................................. P-App. 003760

129.  DeLozier billing record, September 2004 ............................... P-App. 003761-3764

130.  Lowenthal Report Appx. 41 – DeLozier billing record,
      December 2004 ............................................................... P-App. 003765

131.  State Petition Response Ex. E, Pages E39-E67,
      E110-E136 – 2003 Appellate Briefing
      from Custody Proceeding ............................................... P-App. 003766-3821

132.  March 18, 2003 Letter from Ochoas to Arizona Family
      Adoption Services ..................................................... P-App. 003822-3827

133.  Stipulation filed 12/21/04 in *John Doe XXIII v.*
      *The Roman Catholic Church of Diocese of Tucson* ................. P-App. 003828-3833

134.  Motion for Reconsideration filed 11/28/06 in
      *John Doe XXIII v. The Roman Catholic Church*
      *of Diocese of Tucson* ................................................. P-App. 003834-3855

13

135.    Keith Rohman, Curriculum Vitae ...............................P-App. 03856-3864

136.    11/29/04 email from S. MacLeod to D. Patterson ...........................P-App. 003865

137.    12/06/04 emails from S. MacLeod to D. Patterson
        and D. DeLozier......................................................P-App. 003866-3867

138.    Demonstrative Exhibit from Penalty Phase –
        Powerpoint presentation slides ................................P-App. 003868-3904

139.    March 4, 2003 East Valley Tribune article,
        "Justice System Can't Cope With
        Backlog of Death Penalty Cases" ............................P-App. 003905-3907

140.    Photograph of W. Andriano and S. Robertson,
        circa 1970 ...........................................................P-App. 003908

141.    Photograph of W. Andriano, circa 1970 ...........................P-App. 003909

142.    Photograph of W. Andriano and S. Robertson, circa 1972..............P-App. 003910

143.    Photograph of W. Andriano, circa 1972 or 1973............................P-App.  003911

144.    Photograph of W. Andriano, D. Ochoa, and S. Robertson,
        circa 1973 ...........................................................P-App. 003912

145.    Photograph of W. Andriano and S. Robertson,
        circa 1973 or 1974 ..........................................................P-App. 003913

146.    Photograph of W. Andriano and A. Worsham, circa 1975...............P-App. 003914

147.    Photograph of W. Andriano with Ochoas and
        Fishers of Men, 1979 ......................................................P-App. 003915

148.    Photograph of W. Andriano and A. Ochoa, circa fall 1979..............P-App. 003916

149.    Photograph of W. Andriano and A. Ochoa, circa winter 1979.........P-App. 003917

150.    Photograph of W. Andriano and A. Ochoa, circa 1981 ...................P-App. 003918

151.    Photograph of Robertson siblings, circa 1987 ................................P-App. 003919

152.    12/08/92 arrest report for S. Robertson and
        T. Robertson.......................................................P-App. 003920-3921

153.    Photograph of W. Andriano and Ochoas, circa 1978 ......................P-App. 003922

154.    Photograph of W. Andriano and A. Ochoa,
        circa 1978 or 1979 .........................................................P-App. 003923

155.  Photograph of W. Andriano, circa 1980 ........................................... P-App. 003924

156.  Photograph of W. Andriano, circa 1980 or 1981 ............................. P-App. 003925

157.  Photograph of W. Andriano and Ochoas, circa 1981 ...................... P-App. 003926

158.  Photograph of W. Andriano and A. Ochoa, circa 1986 ................... P-App. 003927

159.  Photograph of W. Andriano, L. Bell, and A. Ochoa,
      circa late 1980s ................................................................................ P-App. 003928

160.  Photograph of K. Lorts, circa 1979 or 1980 ................................... P-App. 003929

161.  Photograph of J. Casey, circa 1980 .................................................. P-App. 003930

162.  Photograph of J. Neace, circa 1980 or 1981 ................................... P-App. 003931

163.  Photograph of B. Ochoa, circa 1991 ................................................ P-App. 003932

164.  Photograph of B. Ochoa, circa 1993 ................................................ P-App. 003933

165.  Audio Recording, sermon of Pastor T. King,
      Harvest Family Church (11/16/1988) ............................................... P-App. 003934

166.  Dr. Joette James, Curriculum Vitae ........................................ P-App. 003935-3946

167.  Report of Dr. Joette James (tentative) .................................... P-App. 003947-3958

168.  Report of Dr. Steven Pitt (including exhibits) ........................ P-App. 003959-4981

169.  Report of Dr. Kiran Amin ....................................................... P-App. 004982-4986

170.  Phoenix Police Department Report (Bates #9256-9715) ......... P-App. 004987-5446

171.  Records from H. Kandy Rohde .............................................. P-App. 005447-5487

172.  Records from Maricopa County Jail (#1173-11799) .............. P-App. 005488-5584

173.  Interview transcript of Daniel Patterson ................................ P-App. 005585-5681

174.  Interview transcript of G. David DeLozier ............................ P-App. 005682-5796

175.  Records from Mesa Police Department and court
      documents regarding Cynthia Edwards investigation
      (Bates # 4366-4390) ............................................................... P-App. 005797-5822

176.  Wendi Andriano's employment records from Casa Grande
      Regional Medical Center (Bates # 4221-4339) ...................... P-App. 005823-5941

15

177.  Wendi Andriano's Employment Application for
      First West Properties Corporation
      (Released Trial Exhibit 487/Bates #4401–02) ........................ P-App. 005942-5943

178.  Records relating to Wendi Andriano's theft from
      Courtyard Apartments (Bates # 4341-4364) ........................... P-App. 005944-5967

179.  DVDs of Wendi Andriano's interview with Detectives
      David Lucero and Sally Dillian ...................................................... P-App. 005968

180.  Transcript of Wendi Andriano's interview with Detectives
      David Lucero and Sally Dillian (Bates #11500-11702) .......... P-App. 005969-6171

181.  Medical Records from Arizona Department of
      Corrections (#11952–12250) .................................................... P-App. 006172-6470

182.  Cassette tape of Wendi Andriano's Telephone Call with
      CIGI insurance company ................................................................. P-App. 006471

183.  Report of Dr. Sharon Murphy, dated September 22, 2003 ...... P-App. 006472-6503

184.  Medical records relating to Wendi Andriano's suicide
      attempt (Bates 9722-9745) ....................................................... P-App. 006504-6527

185.  Arizona Department of Corrections
      Medical Record Excerpt (Bates # 12152) ......................................... P-App. 006528

186.  DVD of forensic interview of Wendi Andriano by
      Drs. Steven Pitt and Kiran Amin  ..................................................... P-App. 006529

187.  Maricopa County Jail Disciplinary Report
      (Defense Bates # PCRDIS-PCR001722) .......................................... P-App. 006530

188.  Maricopa County Jail Disciplinary Report
      (Defense Bates # P001723–P001724) .................................... P-App. 006531-6532

189.  Arizona Department of Corrections inmate letter
      (Bates #11386) ................................................................................. P-App. 006533

190.  Arizona Department of Corrections inmate letter
       (Bates # 11377) ............................................................................... P-App. 006534

191.  Arizona Department of Corrections Disciplinary Report
      (Bates # 11365) ................................................................................ P-App. 006535

192.  Arizona Department of Corrections Disciplinary Report
      (Bates #11360) ................................................................................. P-App. 006536

193.   Arizona Department of Corrections mental health progress
       note dated November 23, 2011 (Bates # 12221).............................. P-App. 006537

194.   Arizona Department of Corrections mental health progress
       note dated December 12, 2011 (Bates # 12219) ............................. P-App. 006538

195.   Wendi Andriano's records from Casa Grande Valley
       Counseling Service, Inc.
       (Trial Exhibit 544/Bates # 4212-4214) .................................... P-App. 006539-6541

196.   Notes from Maricopa County Jail (Bates # 4216-4219) .......... P-App. 006542-6545

197.   Maricopa County Jail disciplinary report
       (Trial Exhibit 548/Bates # 4392–4393) ................................... P-App. 006546-6547

198.   Statement of financial status
       (Trial Exhibit 472/Bates #4396–98) ...................................... P-App. 006548-6550

199.   Trial testimony of Chris Hashisaki
       September 8 and 9, 2004........................................................... P-App. 006551-6729

200.   Trial testimony of Rick Freeland ............................................ P-App. 006730-6802

201.   Trial testimony of Dawna Harris (December 14, 2004) .......... P-App. 006803-6861

202.   Arizona Department of Corrections Inmate Master File
       (Bates # 191593)...................................................................... P-App. 006862-7017

203.   Audio recording of call between W. Andriano and
       D. Ochoa dated 11/3/2013 ................................................... P-App. 007018

204.   Expert Report of Keith Rohman, dated January 23, 2014 ....... P-App. 007019-7046

205.   Photo of Jeri Lyn Wilkirson (Cunningham) .................................... P-App. 007047

206.   Supplementary Guidelines for the Mitigation Function
       of Defense Teams in Death Penalty Cases ............................ P-App. 007048-7063

227.   Maricopa County Attorney's Office Investigations
       Division Supplemental Report ............................................... P-App. 007064-7065

228.   CD ............................................................................................ P-App. 007066

230.   Copy of Motion for Determination of Competency
       Pursuant to Rule 11, Arizona Rules of Criminal Procedure .... P-App. 007067-7074

231.   Cover letter and Representation Agreement,
       dated December 14, 2000 ...................................................... P-App. 007075-7081

4833-8828-2658.

232.    Sentence of Imprisonment Minute Entry,
        dated September 9, 1993............................................................P-App. 007082-7086

233.    Sentence of Imprisonment/Lifetime Probation
        Minute Entry, dated August 13, 1993 ......................................P-App. 007087-7093

234.    Representation Timeline ...........................................................P-App. 007094-7102

236.    Larry A. Hammond Resume ....................................................P-App. 007103-7106

237.    Transcript of Forensic Psychiatric Evaluation of
        Wendi Elizabeth Andriano, dated November 26, 2013 ...........P-App. 007107-7347

18

Michael K. Jeanes, Clerk of Court
*** Filed ***
10/31/2012 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                    10/30/2012


                                      CLERK OF THE COURT
HONORABLE BRIAN K. ISHIKAWA              L. Mooney
                                          Deputy



STATE OF ARIZONA                  LACEY ALEXANDRA STOVER GARD

v.

WENDI ELIZABETH ANDRIANO (A)      JAMES J BELANGER
                                  SCOTT M BENNETT
                                  ALLEN A ARNTSEN
                                  MATTHEW R LYNCH

                                  APPEALS-PCR
                                  CAPITAL CASE MANAGER
                                  COURT ADMIN-CRIMINAL-PCR


**MINUTE ENTRY**


        The Court has reviewed the defendant's Petition for Post-Conviction Relief, the State's Response to Petition for Post-Conviction Relief, and the defendant's Reply, as well as the Court's file. This is the defendant's first Rule 32 proceeding following the Arizona Supreme Court's affirmance of her conviction and death sentence in *State v. Andriano*, 215 Ariz. 497, 161 P.3d 540 (2007).

        The defendant was convicted by a jury of one count of first degree murder. *Andriano*, 215 Ariz. at 501, 161 P.3d at 544. The jury unanimously found at the aggravation phase that the defendant committed the murder in an "especially cruel manner," in violation of A.R.S. § 13-751(F)(6),[1] but did not find that she committed the offense "in expectation of the receipt … of anything of pecuniary value," in violation of A.R.S. § 13-751(F)(5). Following a penalty phase, the jury determined that the mitigation presented was not sufficiently substantial to call for leniency and returned a verdict of death.

_____
[1] Citations are to the current versions of the statutes (A.R.S. § 13-751 *et seq*.) rather than the historical versions (A.R.S. § 13-703 *et seq*.).

Docket Code 595                    Form R000A                              Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          10/30/2012

On direct appeal, the defendant raised eleven claims of error:
    (1) the trial court violated her constitutional rights and the Arizona Rules of Evidence by admitting evidence of her extramarital affairs and attempts to obtain life insurance;
    (2) fundamental error occurred when the trial court failed to *sua sponte* instruct the jury on second-degree murder and manslaughter as lesser-included offenses of first-degree murder;
    (3) the A.R.S. § 13-751(F)(6) "especially cruel" aggravating factor is facially vague;
    (4) the trial court's jury instruction defining cruelty was insufficient to channel the jurors' discretion;
    (5) the evidence was insufficient to support the jury's finding of cruelty;
    (6) the trial court violated her constitutional rights by precluding evidence of residual doubt as mitigation;
    (7) the trial court violated her constitutional rights by refusing to permit mercy as mitigation;
    (8) the trial court violated her constitutional rights by erroneously instructing the jurors regarding the need for finding mitigation unanimously;
    (9) the trial court coerced a death verdict by giving the jury an impasse instruction prematurely;
    (10) the trial court violated her constitutional rights by instructing the jury about its duty to deliberate in the penalty phase; and
    (11) Arizona's statute providing for execution by lethal injection constitutes cruel and unusual punishment.

The defendant raises the following five claims in her petition:
I.    The defendant's right to effective assistance of counsel was violated by defense counsel's deficient performance, resulting in prejudice during all phases of the trial;
II.    Defense counsel in charge of the defendant's penalty phase had an actual conflict of interest that affected the adequacy of the defendant's representation;
III.    Defense counsel's failure to object to pervasive instances of prosecutorial misconduct deprived the defendant of due process and violated her right to effective assistance of counsel;
IV.    The jury's consideration of a non-statutory aggravating factor violated due process;
V.    The defendant was denied the effective assistance of counsel on her direct appeal.

P-App. 000002

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      10/30/2012

Pursuant to Rule 32.6(c), the Court first identifies all claims that are procedurally precluded from Rule 32 relief. An issue is precluded if it was raised, or could have been raised, on direct appeal or in prior Rule 32 proceedings.  *State v. Towery,* 204 Ariz. 386, 64 P.3d 828 (2003); *Stewart v. Smith*, 202 Ariz. 446, 46 P.3d 1067 (2002); *State v. Mata*, 185 Ariz. 319, 334, 916 P.2d 1035 (1996).

Pursuant to this authority and Rule 32.2(a), the Court finds the defendant's claims III and IV to be precluded from relief.

In claim III, the defendant alleges that numerous instances of prosecutorial misconduct deprived her of due process and violated her right to effective assistance of counsel. Specifically, she claims that references to her extramarital lifestyle were improper.  However, the defendant raised and the Supreme Court addressed the admissibility of other act evidence regarding her extramarital affairs on direct appeal.  That Court concluded that this Rule 404(b) evidence served to establish a motive for the murder and to rebut the defendant's domestic violence victim/self-defense theory. *Andriano*, 215 Ariz. at 503, 161 P.3d at 546.  Comment upon properly-admitted evidence by a prosecutor is appropriate.

Although noting that the defendant did not allege prosecutorial misconduct on appeal, the Supreme Court nonetheless addressed the prosecutor's statements about defendant's actions and observed that the majority of them occurred during the guilt phase closing arguments. *Id*. at 503 & n.3.  The Court noted that "[c]omments in closing arguments, however, are not evidence, as the jury was instructed, and thus the comments do not render unfairly prejudicial evidence that is otherwise properly admitted." *Id*. A claim of prosecutorial misconduct could have been raised on appeal, and as it was not, it has been waived pursuant to Rule 32.2(a)(3).

In claim IV, the defendant alleges that "the jury improperly considered, and was influenced by, an impermissible consideration unrelated to the nature of the crime. During deliberations at the aggravator stage, the jurors 'made a chart outlining the different possible outcomes ... depending on whether they found an aggravator, which made their decision 'a lot clearer.'" (Memorandum in Support of Petition at 69). As noted by the State, the defendant had notice of facts related to this allegation of jury misconduct and could have investigated and raised the issue at an earlier stage:  in a Motion for New Trial (Rule 24.1(c)), a Motion to Vacate Judgment (Rule 24.2(a)), or on direct appeal. (State's Response at 16-17).  Because the claim of jury misconduct could have been raised at an earlier stage or on appeal, and was not, it has been waived pursuant to Rule 32.2(a)(3).

In her remaining claims (I and V), the defendant alleges that she was denied effective assistance of counsel at trial and on direct appeal. To avoid summary dismissal and achieve an evidentiary hearing on a post-conviction claim of ineffective assistance of counsel, a defendant

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                      10/30/2012

must present a colorable claim (1) that counsel's representation was unreasonable or deficient under the circumstances and (2) that she was prejudiced by counsel's deficient performance. *State v. Fillmore,* 187 Ariz. 174, 180, 927 P.2d 1303, 1309 (App.1996), *citing* Ariz. R.Crim. P. 32.6(c) ("court shall order … petition dismissed" if claims present no "material issue of fact or law which would entitle defendant to relief"), 32.8(a)(evidentiary hearing required "to determine issues of material fact"); *see also Strickland v. Washington,* 466 U.S. 668, 687 (1984)(to prevail on claim of ineffective assistance of counsel, defendant must show both deficient performance and resulting prejudice).

A colorable claim entitling the defendant to an evidentiary hearing is one which, if taken as true, "might have changed the outcome." *State v. Schrock,* 149 Ariz. 433, 441, 719 P.2d 1049, 1057 (1986). Like the ultimate decision whether to grant or deny post-conviction relief, whether a claim is colorable, warranting an evidentiary hearing "is, to some extent, a discretionary decision for the trial court." *State v. D'Ambrosio,* 156 Ariz. 71, 73, 750 P.2d 14, 16 (1988).

In claim I(A), the defendant alleges that her trial counsel was ineffective in the penalty phase by failing to investigate and present expert testimony regarding her mental illness and by failing to investigate and present evidence regarding her harrowing childhood. The Court finds that the defendant has raised a colorable claim warranting an evidentiary hearing concerning this claim.

In claim I(B), the defendant alleges that her trial counsel was ineffective in the aggravation phase by failing to investigate and present expert testimony regarding her mental illness and by failing to object to the jury's consideration of evidence related to sodium azide poisoning. The Court finds these claims are not colorable. As noted, the sole aggravator was "especially cruel."  This aggravator focuses on the physical and mental suffering of the victim rather than on the actions or mental state of the defendant.  It is determined by reference to an objective standard, and whether the defendant was aware or should have been aware of the victim's suffering is judged from the perspective of a reasonable person in the defendant's position.   *State v. Carlson,* 202 Ariz. 570, ¶ 44, 48 P.3d 1180 (2002)("Foreseeability in connection with the cruelty factor has been based on an objective rather than subjective standard. We have held that the physical pain or mental anguish suffered by a victim before death must only be reasonably foreseeable, regardless of whether the defendant actually foresaw it. *State v. Djerf,* 191 Ariz. 583, 595 ¶ 45, 959 P.2d 1274, 1286 ¶ 45 (1998); *State v. Adamson,* 136 Ariz. 250, 266, 665 P.2d 972, 988 (1983).")).  Thus, the defendant's mental health evidence would not have been relevant or admissible in the aggravation phase and trial counsel was not ineffective for failing to present it.

Similarly, trial counsel was not ineffective for failing to seek an order precluding the jury from considering Joe's ingestion of sodium azide in determining whether cruelty was

Docket Code 595                        Form R000A                        Page 4

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                        10/30/2012

established. The defendant did not contest the admissibility of this evidence in the guilt phase
because it played a key role in her self-defense theory. Pursuant to A.R.S. § 13-752(I), any
evidence admitted in the guilt phase is deemed admitted as evidence in the aggravation phase.
Thus, counsel could not allow evidence to be admitted in the guilt phase without objection and
subsequently seek its preclusion in the aggravation phase.

In claim I(C), the defendant alleges that trial counsel provided ineffective assistance in
the guilt phase by failing to (1) present evidence of her mental illness; (2) present evidence that
Joe was aware of her efforts to obtain life insurance; (3) present evidence that Joe was depressed;
and (4) seek a jury instruction on lesser-included offenses. Concerning the mental illness
evidence, the defendant argues that this evidence would have established "whether she
formulated the mental state necessary to be convicted of first-degree murder." (Memorandum in
Support of Petition at 59-60). However, because she did not raise an insanity defense, evidence
of mental illness was inadmissible to negate the *mens rea* element of the charge. *State v. Mott*,
187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997). Thus, counsel was not ineffective for failing to
seek admission of evidence precluded by Arizona law.

The defendant's assertions about Joe's awareness of life insurance applications and Joe's
depression also are not colorable. Gia Palicki's purported testimony relates to a conversation she
had with defendant and Joe in the summer or fall of 1999 and therefore was remote in time to the
murder and would not have rebutted the defendant's later attempts to obtain life insurance for
Joe without his knowledge. Jeffrey Miller's testimony about Joe's depression was excluded
because it was inadmissible hearsay. Similarly, Chris Weaver's purported testimony does not
establish that Joe was depressed. Decisions concerning trial strategy and tactics, including what
witnesses to call, motions to file, and objections to make, are entrusted to trial counsel. *State v.
Lee*, 142 Ariz. 210, 689 P2d 153 (1984). The Court finds that the defendant has failed to show a
colorable claim of deficient performance or prejudice regarding these trial strategies.

As to the alleged failure to seek a jury instruction on lesser-included offenses, the
defendant raised this issue on appeal and the Supreme Court held that the evidence did not
support any lesser-included offenses. *Andriano*, 215 Ariz. at ¶¶32-36. Therefore, defense counsel
was not ineffective for failing to request such instructions.

In claim II, the defendant alleges that defense counsel DeLozier, who was in charge of
investigation of penalty phase mitigation, had an actual conflict of interest that affected his
representation of her. This claim is related to the defendant's claim I(A) of ineffective assistance
of counsel in the penalty phase, which the Court has found to be colorable.  Because the issue
was not raised at trial and both parties assert facts that are outside the record, an evidentiary
hearing also is warranted on this claim.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                          10/30/2012

        In claim V, the defendant asserts that her appellate counsel provided ineffective
assistance because he failed to raise on appeal trial counsel's conflict of interest, the alleged
prosecutorial misconduct asserted in claim III, and the trial court's ruling on witness Jeffrey
Miller's testimony in defendant's direct appeal.  (Memorandum in Support of Petition at 70).

        To avoid summary dismissal and achieve an evidentiary hearing on a post-conviction
claim of ineffective assistance of appellate counsel, the defendant must demonstrate a reasonable
probability that but for counsel's deficient performance, the outcome of the appeal would have
been different.  *State v. Herrera*, 183 Ariz. 642, 647, 905 P.2d 1377, 1381 (App. 1995).
Appellate counsel is not ineffective for selecting some issues and rejecting others.  Once the
issues have been narrowed and presented, appellant counsel's waiver of other possible issues
binds the defendant. *Id. See also, State v. Febles*, 210 Ariz. 589, ¶¶18-19, 115 P.3d 629 (App.
2006).

        The Court finds that respecting appellate counsel, none of these claims have merit.
Regarding any alleged prosecutorial misconduct, as previously noted in rejecting the defendant's
claim III, the prosecutor did not commit misconduct. Therefore, the Supreme Court would not
have reversed the defendant's conviction on that basis. Similarly, although the defendant
characterizes this Court as having "excluded" Mr. Miller's testimony, in fact, Mr. Miller took the
stand and testified.  After discussion at the bench, the Court sustained the prosecutor's objection
to hearsay testimony. Because the testimony would have elicited inadmissible hearsay, the
Supreme Court would have found no error in this Court's ruling. Finally, regarding defense
counsel's alleged conflict of interest, because the issue was not raised at trial and both parties
assert facts that were not before the court at trial, it is not an issue that could have been raised on
appeal. *State v. Spreitz*, 202 Ariz. 1, 39 P.3d 1263 (2002). In any event, the Court has determined
that an evidentiary hearing is warranted on defendant's related claim II.  The defendant has failed
to make a colorable claim that the outcome of her appeal would have been different.

        Based on the foregoing,

        IT IS THEREFORE ORDERED dismissing claims I(B) and (C), III, IV and V.

        IT IS FURTHER ORDERED granting an evidentiary hearing regarding claims I(A) and
II.

        IT IS FURTHER ORDERED setting an Informal Conference on **November 29, 2012 at
3:00 p.m.** before Judge Brian K. Ishikawa to address scheduling of the evidentiary hearing.
Pursuant to Rule 32.7, the defendant need not be present at this conference as she is represented
by counsel.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 2000-096032                                                    10/30/2012


DATED this 30th day of October, 2012.


_____
HONORABLE  BRIAN K. ISHIKAWA
JUDGE OF THE SUPERIOR COURT

P-App. 000007

Michael K. Jeanes, Clerk of Court
*** Filed ***
11/3/14   8 A.M.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                    11/01/2014


HONORABLE BRIAN K. ISHIKAWA          CLERK OF THE COURT
                                      K. Sotello-Stevenson
                                      Deputy


STATE OF ARIZONA                      LACEY ALEXANDRA STOVER GARD
                                      GREGORY MICHAEL HAZARD
                                      JUAN M MARTINEZ

v.

WENDI ELIZABETH ANDRIANO             WENDI ELIZABETH ANDRIANO
                                      #191593 ASPC PV LUMLEY DEATH R
                                      PO BOX 3300
                                      GOODYEAR AZ  85395



                                      ALLEN A ARNTSEN
                                      SCOTT M BENNETT
                                      STEPHAN J NICKELS
                                      MATTHEW R LYNCH
                                      JODI FOX

                                      CAPITAL CASE MANAGER
                                      COURT ADMIN-CRIMINAL-PCR
                                      OFFICE OF PUBLIC DEFENSE
                                      SERVICES-CCC
                                      VICTIM WITNESS DIV-AG-CCC



RULING
POST-EVIDENTIARY HEARING/PCR MATTER/CAPITAL CASE

This is the defendant's first Rule 32 proceeding following the Arizona Supreme Court's affirmance of her conviction and death sentence in *State v. Andriano*, 215 Ariz. 497, 161 P.3d

Docket Code 167                Form R000A                        Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                11/01/2014

540 (2007). The Court has reviewed the defendant's Petition for Post-Conviction Relief, the State's Response to Petition for Post-Conviction Relief, and the defendant's Reply, as well as the Court's file. The Court has further reviewed and considered evidence (testimony and exhibits) admitted during the eight-day evidentiary hearing held February 3-7, 10-11, and 14, 2014, as well as the written closing arguments of counsel. The Court presided over the original 58-day jury trial that commenced with jury selection on August 23, 2004 and concluded with the penalty phase verdict on December 22, 2004, and has consulted its own notes and recollection of the proceedings. Finally, the Court has considered the closing arguments of counsel, including Petitioner's[1] Post-Hearing Memorandum in Support of Petition for Post-Conviction Relief (filed 6/2/2014), the State's Closing Memorandum (filed 7/31/2014), and Petitioner's Post-Hearing Reply Memorandum in Support of Petition for Post-Conviction Relief. .

The defendant was convicted by a jury of one count of first degree murder. *Andriano*, 215 Ariz. at 501, 161 P.3d at 544. The jury unanimously found at the aggravation phase that the defendant committed the murder in an "especially cruel manner," in violation of A.R.S. § 13-751(F)(6),[2] but did not find that she committed the offense "in expectation of the receipt ... of anything of pecuniary value," in violation of A.R.S. § 13-751(F)(5). Following a penalty phase, the jury determined that the mitigation presented was not sufficiently substantial to call for leniency and returned a verdict of death.

## Claims I(A) and II: Ineffective Assistance of Counsel

The defendant raised five claims in her PCR petition. After reviewing the post-conviction relief pleadings, the Court granted the parties an evidentiary hearing on two penalty phase claims: Claim I(A) (mitigation evidence) and Claim II (conflict of interest of *Knapp* counsel). Specifically, the Court found that the defendant raised a colorable claim warranting an evidentiary hearing as to two of the claims:

> "In claim I(A), defendant allege[d] that her trial counsel was ineffective in the penalty phase by failing to investigate and present expert testimony regarding her mental illness and by failing to investigate and present evidence regarding her harrowing childhood...

> "In claim II, defendant allege[d] that defense counsel DeLozier, who was in charge of the investigation of penalty phase mitigation, had an actual conflict of interest that affected his representation of her. This claim is related to defendant's claim I(A) of ineffective assistance of counsel in the penalty phase, which the Court found to be colorable..."

---

[1] Because Rule 32.3, Ariz.R.Crim.P., identifies post-conviction relief as "part of the original action and not a separate action," the Court will refer to "defendant," rather than "petitioner," in its ruling.

[2] Citations are to the current version of the statute (A.R.S. § 13-751 *et seq.*) rather than the historical version. (A.R.S. § 13-703 *et seq.*).

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                               11/01/2014

Minute Entry (Ruling) 10/30/2012 at 4, 5.

**Claims I(A) and II ("available mitigation evidence;" credibility)**

To prevail on a claim of ineffective assistance of counsel (IAC), the defendant bears the burden of establishing (1) deficient performance by counsel and (2) prejudice to the defendant attributable to the deficient performance. *Strickland v. Washington,* 466 U.S. 668, 700 (1984). Failure to meet her burden under either prong is fatal to the defendant's claim.

The court "…must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. *Id.,* 466 U.S. at 690, 104 S. Ct. at 2066. The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. *Id.,* 466 U.S. at 691, 104 S. Ct. at 2066. *Rompilla* holds that counsel may have a duty to investigate "available mitigating evidence" (disclosed in documents relied on by the State in aggravation) even where the defendant and family members deny its existence.

In this case, the Court believes that the factual issue of whether trial counsel failed to discover and present mitigating evidence that was readily available is central to its resolution of the PCR claims.

In connection with the issue of whether trial counsel failed to present *available mitigation* evidence at trial, the governing Arizona statute identifies mitigating factors as follows:

The trier of fact shall consider as mitigating circumstances any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.
2. The defendant was under unusual and substantial duress, although not such as to constitute a defense to prosecution.
3. The defendant was legally accountable for the conduct of another under § 13-303, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution.

Docket Code 167                          Form R000A                          Page 3

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                           11/01/2014

4. The defendant could not reasonably have foreseen that his conduct in the course of the commission of the offense for which the defendant was convicted would cause, or would create a grave risk of causing, death to another person.
5. The defendant's age.

Ariz. Rev. Stat. Ann. § 13-751(G).


## BACKGROUND
### *THE 2004 TRIAL*

The Court presided over the original four-month (58-day) trial in this matter, commencing with jury selection on August 23, 2004 (Day 1); continuing through guilt-phase opening statements and evidence on September 8-November 18, 2004 (Days 8-45); continuing through the aggravation/eligibility phase, and concluding with the penalty/sentencing phase that culminated in a death verdict on December 22, 2004 (Days 50-58).

At trial, the defendant incorporated much of her mitigating evidence into her guilt phase presentation, centered around the defendant's allegations of domestic violence.

*Witnesses at the guilt phase*

The mitigation presentation was "front-loaded." Consequently, the defendant is correct that the mitigation phase was truncated. The mitigation evidence and witnesses presented by trial counsel Dan Patterson during the guilt phase included: **Donna Ochoa** (the defendant's mother; DAYS 22, 23 10/4-5/2004); Patricia Rubio, **Alejo Ochoa** (the defendant's adoptive father; DAY 24 10/6/2004); **Sharon Murphy** (the defendant's domestic abuse expert; DAYS 25-28 10/7, 12-14/2004); William Joe Collier (DAY 29 10/20/2004); William Joe Collier, **Brandon Ochoa** (the defendant's younger brother/cousin), Barbara Mitchell (DAY 30 10/21/2004); **Wendi Andriano** (the defendant; DAYS 31-39 10/25-28, 11/1-4, 8/2004); **Alejo Ochoa** (DAY 39 11/8/2004.

The Court recalls that the defendant presented as a well-prepared and well-spoken young woman, who remembered and described childhood events and the evening of the murder during direct examination, and who clashed/disagreed with the prosecutor during cross-examination.

The State's rebuttal witnesses included Dr. Bayless.[3] In response to a defense motion, Dr. Bayless's testimony was limited by court order to: whether the defendant's characteristics were

---

[3] The State's other guilt phase rebuttal witnesses included: Tina Ayala, Thomas Kulesa (DAY 40 11/9/2004); Dr. Bayless, Justin Roberts, Joseph Andriano, Sr. (DAY 41 11/10/2004).

P-App. 000011

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

consistent with those of domestic violence victims; the characteristics of a person who has been
the victim of domestic violence; secondary gain; and the tests conducted. The State was
precluded from eliciting testimony related to:

> Whether Dr. Bayless believed the defendant or whether he has an opinion as to
> whether the defendant is credible or truthful;
> A regurgitation of the police reports he reviewed;
> The allegation of the defendant committing a theft from her employer;
> The fact that the defendant was in jail;
> The issue of the children and the severance of parental rights;
> The defendant's alleged suicidal thoughts and suicide attempt;
> A discussion of clients with a profile of this type characterized by poorly
> controlled anger and hostility and violent outbursts.

See ME11/10/2004 (DAY 41).

*Witnesses at the sentencing phase*

After the victims Jeanette and Joseph Andriano addressed the jury, the defense witnesses
presented by trial counsel DeLozier during the sentencing phase included: Laura King (former
social worker at Durango jail), Gerald Perry (clinical psychologist at Durango jail), Joyce Van
Every (head nurse at Durango jail) (participation in counselling) (DAY 50 12/8/2004); Chris
Vasquez, Jimmy Galyon, Linda Galyon, **Sharon P. Murphy** (dynamics of domestic abuse)
(DAY 51 12/9/2004); **Donna Ochoa** (DAYS 51-52 12/9, 13/2004); Lonnie Inskeep, Gia Palicki
(took care of the defendant's children for a year; observed the defendant's positive interactions
with them), Barbara Mitchell, **Alejo Ochoa** (DAY 52 12/13/2004).

The State's sentencing phase witnesses included: Jana Andriano Clayton, Timothy Lee,
Dawna Harris, Bonnie Lose (DAY 53 12/14/2004); and concluded with Dr. Michael Bayless
(DAY 54 12/15/2004).

Before closing, the jury heard the defendant's allocution.[4] "The Defendant addresse[d]
the jury" and commented on the testimony provided by a couple of witnesses who preceded her,

---

[4] The defendant herself acknowledged participation in what she characterized as assisting victim in committing
suicide. "I feel stained for having participated in that...you and I needed professional help, not a suicide plan. I'm
sorry for making the wrong choice, for failing you...[ Insisted that convinced Joe intended to kill her]...I acted and
engaged in conduct that I never in my life thought I was capable of and I have never done since or before that. I've
never harmed a sole [sic] in my life. The picture will never leave my head. I've never been a violent person. And
when I look back at that night, I'm sickened by what happened. I made a horrible, horrible, horrible choice on that
night...I have only begun to understand why I reacted in violence....I can't pretend to fully understand why. That
was conduct so unlike me, so foreign to me. ..." She expressed a desire to contribute in a positive manner if her life
were spared. PCR Response, Exhibit CCC. RT12/15/2004 50-65, 62-63.

Docket Code 167                          Form R000A                          Page 5

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                              11/01/2014

including Dr. Bayless, and then discussed the murder, her children, her work during her incarceration, and sought leniency. The defendant's statement was articulate and coherent, just as her testimony had been.

While listening to trial counsel DeLozier's closing statement addressing the legal issues and the mitigating factors, the jury viewed a PowerPoint (Trial Exhibit 55) that contained photographs of the defendant's past accompanied by text prepared by a third party.

Although the defendant in her PCR characterized this as defense counsel's closing statement, prepared by a third party, in fact the slides were photographs of the defendant's childhood and motherhood years with explanatory text, and were presented while counsel was speaking about legal matters. Counsel permitted the jurors to read and view the slides without comment. [5]

The defendant's sentencing (mitigation) presentation included evidence of mitigating factors from the guilt and sentencing phases, including the testimony of a spousal abuse expert, and was summarized by our Supreme Court on Independent Review:

> Domestic violence victim, as to which the Court afforded little weight, finding the claim not relevant to the murder;
> Substantial stress, which the Court found to be no greater than the stress sustained two years earlier when defendant was pregnant, her husband's medical condition was diagnosed, and financial concerns existed, so gave no substantial weight to this factor;
> Defendant "may have been" sexually abused, but any incidents were remote in time to the murder;
> Good mother, which was afforded minimal value as defendant had murdered her children's father;

---

[5] Described by counsel at trial as "…the photographs that have been incorporated into the power point presentation, the time line. I would move the photographs, the actual photographs, as an exhibit to supplement the presentation that 's going to be made at this time." RT 12/15/2004 at 75.

"What we're going to do is show you a series of slides. You've seen some of them in the introduction. Can you read the material with it because I don't really intend to read all that…I'll probably talk about other things while it's going on…

'Obviously the beginning's over here. You remember Texas. That's Wendi in Donna's arms and so forth. Here's Wendi as a baby and so forth.

"As you can see, what we're doing is going through progressively up until October 8[th] with the various events that took place, significant ones in Wendi's and Joe's life and the various stages of family life.

"If you'll scroll through that, I'm going to talk about other things that may or may not have relevance to what's on the screen at any particular time…" RT 12/15/2004 at 76-77.

Docket Code 167                      Form R000A                              Page 6

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                    11/01/2014

Good inmate, which was accorded minimal weight, as inmates are expected to follow the rules;
Strict religious upbringing, but defendant's actions of murdering her husband were inconsistent with her church's teachings and were accorded minimal value;
Cooperation, remorse, age were determined to be not mitigating, as the Court saw no cooperation and, in fact, determined defendant denied responsibility, despite her intelligence (high IQ);
Lack of priors, the impact on her family, friends, and relatives, and the fact that she would not be a future threat were accorded minimal weight.

*State v. Andriano*, 215 Ariz. 497, 511-12, 161 P.3d 540, 554-55 (2007) *abrogated by State v. Ferrero*, 229 Ariz. 239, 274 P.3d 509 (2012).

The Court's recollection of the mitigation evidence presented at trial is consistent with the Supreme Court's assessment of the penalty phase mitigation evidence.

### THE 2014 PCR EVIDENTIARY HEARING
Nearly ten years later the Court presided over the eight-day post-conviction Evidentiary Hearing, held February 3-7, 10-11 and 14, 2014, related to two penalty phase claims.

At the PCR evidentiary hearing, the defendant presented expert testimony about the effect of childhood experiences on her development from infancy through age eighteen, setting the stage for her behavior as an adult. The defendant relied upon experts to provide an explanation for her actions in light of her behavioral development, background and experience (including impaired executive functioning, impulsivity, PTSD, bi-polar disorder, and depression), supported with lay testimony to establish the underlying factual claims.[6]

The PCR evidence presented included the preparation of a substantial "social history," which –

Expanded upon the defendant's familial background (Paternal (biological father); Maternal; Stepfather; the defendant herself);

Expanded upon the defendant's experiences in a relatively-closed religious community, which may have exposed her to sexual abuse by her biological father or his family members and to sexually-inappropriate behavior by her stepfather;

---

[6] Testified was that the defendant was so damaged before age 18, that the alleged abuse affected her state of mind the night she murdered her husband. [EH 2/3/2014 Dr. James Hopper/cross]
Dr. Hopper: Under circumstances of high stress, she would lose access to pre-frontal cortex, remember rules laws, inhibit impulses…

Docket Code 167                          Form R000A                          Page 7

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                              11/01/2014

Expanded upon the impact of the defendant's experiences in the context of child development (depression; executive functioning; decision-making; PTSD; impulsivity).

The defendant's PCR witnesses[7] also included: Dr. James Hopper (2/3-4/2014); Kyre Lee Jean Lorts, **Donna Ochoa**, Jeri Cunningham (2/4/2014); Jasper Neace, Dr. George Woods (2/5/2014); Scott McLeod, Keith Rohman (2/6/2014); Daniel Patterson (2/7/2014); Dr. Joette James, George David DeLozier, Jr., Cindy Schaider (2/10/2014); and Larry Hammond (2/11/2014).

### *COMPARING THE TRIAL / PCR EH EVIDENCE      - MERITS*

At trial, the defendant's behavior was described as being consistent with having been a victim of domestic violence. The defendant's expert testified extensively during the guilt phase and again during the mitigation phase; her testimony was supported by family members, who described – and were challenged by the prosecution on – incidents they had witnessed between defendant and the victim.

At the PCR evidentiary hearing, domestic violence was somewhat marginalized; rather, because the defendant experienced memory lapses, the defendant's behavior was identified by her PCR experts as being "consistent with" (1) experiencing a "horrific childhood,"[8] (2) having been sexually abused,[9][10] and (3) suffering mental health-related issues. As noted in the footnotes, similar topics were presented at trial.

---

[7] The State called Dr. Kiran Amin and Dr. Steven Pitt (2/14/2014).

[8] "...Wendi and Donna and Alejo told you that Wendi experienced emotional abuse from childhood...These took the form of yelling, screaming, throwing tings; both in her parent's home and then into her marriage.
    "Donna and Wendi would go into the bathroom or bedroom and hide, if you remember, until Alejo calmed or left..." TR 12/15/2004 at 93.
    "During the course of the last 15 weeks, you heard from a lot of people, some who have known Wendi all her life some for many years and some who have known her some portion of the last four years..." DeLozier's closing argument, sentencing phase, RT 12/15/2004 at 90.

[9] RT 12/15/2004 Closing at 95: "...You heard testimony that she was abused as a young child and then later as Joe's wife. Donna told you various forms of sexual abuse that Wendi suffered from members of Donna's own family before the age of five. They both told you about Rick, the head of the traveling ministry group...."

[10] *But see, State v. Andriano*, 215 Ariz. at 512, 161 P.3d at 555: INDEPENDENT REVIEW "Andriano also offered evidence that she "may have been" sexually abused by her biological father when she was around the age of two, although she does not recall it, and that a member of the traveling ministry to which her family belonged exposed himself to Andriano when she was between six and eight years old. Andriano also showed that she maintained good grades in school and participated in missionary and community work. We do not weigh these mitigating circumstances heavily because the events are remote in time to the offense and thus their relevance is minimal. *Cf.*

Docket Code 167                          Form R000A                          Page 8

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                 11/01/2014

**(1) The "good girl/good background" theme - trial**

In sworn testimony at trial the defendant's mother, Donna Ochoa, explained that the defendant had a "good home life;" and took exception to the prosecution's characterization of life in an on-the-road ministry as "roaming around," explaining, "Roaming around, that's not -- that's not what we did. We were invited to churches to minister in church." She acknowledged that they travelled "from place to place," and that she was "comfortable with that." PCR Response, Exhibit LL, RT 10/5/2004 at 115-118 (cross).

Donna described as "strict" the manner in which the defendant's natural father, Skip, would discipline the defendant during the three preschool years he was around. When asked if Skip ever hit the defendant, Donna said that he spanked her; he spanked her hard, but acknowledged that CPS was never called. *Id.* Trial witness Barbara Mitchell testified that corporal punishment was imposed, which she termed "swats" rather than "spanking." PCR Response, Exhibit SS, RT 10/21/2004 at 150-151.

Donna described the defendant's stepfather, Alejo Ochoa, who adopted the defendant when she was six having married her mother a few years earlier, as "stable," "funny," "compassionate," "pretty quiet," and agreed that he was "basically a good man." She acknowledged that "[i]t was a good home environment." *Id.* Donna said, "They would go to -- walk to the store together with the dogs. He had two really pretty dogs. They would –sometimes Alejo babysat me and the other child that was living at my apartment while I worked and while the other mother went to school. ...He used to play tea party with the girls. Actually dug them out a little fort, and we were building a house at the time and he would be out there, playing tea party in the middle of the desert while the construction people were watching them, kind of giggling with them." PCR Response, Exhibit KK RT 10/4/2004 at 11-12.

Donna agreed that "...even though she may not have had shoes, she had the spiritual and internal kind of thing that she would need for later on in life." Donna believed that "[t]he things I taught her as far as the word of God, I believe that was correct." *Id.* In testimony that was stricken, Donna acknowledged that she had modified her childrearing practices "so that Brandon would not be so sheltered." [Although stricken in response to the State's objection as being non-responsive, Donna's answer provides insight for purposes of PCR into the closeness of the home/church environment, and her mother's decisions regarding defendant's care when she was young.] PCR Response Exhibit LL, RT 10/5/2004 at 176 (redirect).

---

*Ellison,* 213 Ariz. at 144, ¶ 136, 140 P.3d at 927 (finding defendant's "childhood troubles deserve little value as a mitigator for the murders he committed at age thirty-three")."

P-App. 000016

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                      11/01/2014

At trial, the defendant testified, "Because my father was the youth pastor, my home was the one where we would invite a lot of teenagers or younger kids over and we'd have like a fun night at my house and that would be like playing games and doing scavenger hunts and things like that....He also took us camping – him and other couples would take all the kids camping..." She agreed this was "under the "watchful eye of your father?" "And my mom, yeah." PCR Response, Exhibit V RT 10/25/2004 at 24.

**The "harrowing/horrific childhood" theme - PCR**

At the PCR the defendant's witnesses referenced (and showed a photograph of) the "Rod of Correction," and her church's teachings about correcting the behavior of children, essentially to beat a child to a point beyond tears. The defendant's childhood friends (Jasper Neace, Kyre Lorts, Jeri Lynn Cunningham), who testified at the PCR, identified no specific occasion on which the rod was administered to the defendant. (Jeri Lynn did remember being sent with the defendant to the principal's office.)

The defendant's mother stated that she carried a spoon in her purse, implicitly used to discipline defendant; at trial, however, in responding to a question about discipline and whether her mother harmed her physically during her growing-up years, the defendant previously testified at trial that her mother "...would always grab my hair and pull me up by my hair...[not anything else]...that was her thing." PCR Response, Exhibit V RT 10/25/2004 at 41-43.

One photograph was presented at the PCR that had previously been used at trial. The photograph depicts the defendant in a group; at the PCR hearing the defendant introduced the photograph to illustrate her time with a "religious cult," while at trial the same photograph depicted her time with a "travelling ministry." *See* Trial EXH. 550 (ppt. p.1); PCR EH, EXH. 147.

**(2) The sexual abuse claim - trial**

At trial the defense relied on domestic abuse and possible sexual abuse, implicating the defendant's paternal grandfather (access and opportunity) and biological father (subsequent conviction as to stepdaughter).

At trial the defendant specifically denied any improper touching or physical harm by her stepfather. She described an incident where her mother had given her permission to attend a friend's family reunion and her stepfather denied her permission because he thought it was a date and she went anyway. When she returned home she saw her dad in the backyard and determined to face the consequences. Alejo began yelling, pushed her against the house and:

A.    He directed me to get out of his face before he hurt me.
Q.    Okay.
A.    And I took off running to my bedroom and shut the door.

Docket Code 167                    Form R000A                         Page 10

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                          11/01/2014

Q.    Okay. So his anger had gotten to such a point where he was capable, you believe, of him hurting you?

A.    That's what I thought, yes.
      [Above answer stricken as non-responsive]

Q.    Why was that?

A.    That was because he had his hands on me and he never put his hands on me before.

Q.    Okay.

A.    Besides spanking me.

Q.    Did that affect you in some fashion?

A.    That scared me.

Q.    Okay. *Were there any other incidents where your father touched you improperly or harmed you physically?*

A.    *No.*

PCR Response, Exhibit V RT 10/25/2004 at 41-43.[Emphasis added.]

At trial the defendant described efforts by herself and her mother "to try and placate him or calm him down" when her stepfather became angry. She said, "My mom and I both did that…When he'd leave, you know, we – when – we knew that he'd come back in an hour, maybe an hour and a half or two, and when he got back we'd want to have dinner ready for him. Or, you know, his favorite thing was he liked to lay on the couch and I'd always play with his hair and that would calm him down. And just things like that. Just – just talking softly to him and, you know, just trying to please him." PCR Response, Exhibit V RT 10/25/2004 at 38. This "playing with his hair" as described at trial took on sexualized overtones at the PCR hearing.

**The sexual abuse claim - PCR**

At the PCR, the defendant's witnesses.(Jeri Lynn Cunningham; Kyre Lorts, her mother) implicated her stepfather in sexually abusing the defendant and some of her friends. Evidence of the claimed sexual abuse toward the defendant, considered by defense experts, James Hopper, Ph.D. and George Woods, M.D., included:

Photographs taken in the desert by her stepfather of the defendant as a teenager, backlit and scantily-clad, and other photographs taken in a hotel room  (PCR, EH EXH. 72, *not offered or admitted*); and

An inappropriate, sexually-overtoned card sent to defendant by her stepfather during her incarceration (PCR, EH Exhibit 75, *not offered or admitted*).

*See* PCR, EH Exhibits 4.002 and 2.001 ("Supplemental documentation…cards; supplemental documentation…photographs).

Circumstantial evidence introduced included, *inter alia*:

Docket Code 167                     Form R000A                             Page 11

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                11/01/2014

The testimony of the defendant's girlhood friends about the defendant's stepfather inappropriately touching each of them (Only Kyre Lorts, a somewhat fragile witness, indicated that he had touched defendant, which contradicts the defendant's trial testimony.);

The testimony of the defendant's mother about the defendant's inappropriately-sexualized behavior in preschool, resulting in her withdrawal from that school, and bedwetting.

The young women, who were the defendant's girlhood best friends, indicate that they would have testified back then (at trial) had they known of importance – but this is hindsight and the details differ, calling into question credibility. For example, Ms. Lorts testified that she and the defendant dressed in lingerie from the defendant's mother's closet (EH RT 2/4/2014), while the defendant's mother testified that she did not keep lingerie at her house and returned lingerie given to her by her husband to the shop. (EH RT 2/4/2014).

The credibility of the claim of actual abuse is undermined by the absence of reports to law enforcement; the lack of an outside investigation; and the denial by the defendant at trial. The reports from her girlfriends, are being made many years after the testified-to events, and 8 years after the death penalty was imposed. All acknowledge being aware of the charges during the years preceding trial yet did not come forward.

**(3) The mental health claim**
In connection with her criminal charges, various mental health professionals raised possible areas of concern. Kandi Rohde, who was hired by the defendant's parents and counselled the defendant in jail, suggested the possibility of sexual abuse. Ms. Rohde was eventually banned from the jail for introducing contraband, and was not called by trial counsel because of concerns about what the defendant may have told her that would be subject to cross-examination.

Trial counsel acknowledged being aware of defendant's "suicide attempt" while in jail, which he discounted as "situational" and resulting from her incarceration. The defendant was deemed competent by Dr. Potts, and later evaluated by Dr. Rosengard Petition. Exhibits 6.A and 6.C.

The defendant faults trial counsel for failing to call an expert to testify about mental health-related matters. The defendant fails to acknowledge that trial counsel secured Dr. Rosengard's evaluation, determined not to call Dr. Rosengard, and successfully limited the testimony of Dr. Bayless, the State's mental health expert, and prevented the admission of testimony damaging to the defendant (theft from her employer; severance of her parental rights;

Docket Code 167                        Form R000A                        Page 12

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                    11/01/2014

discussion of clients with similar profiles who have characteristics of "poorly controlled anger and hostility and violent outbursts"). Trial counsel secured this preclusion while presenting the testimony of its own domestic violence expert.

During the course of the PCR, the defendant presented evidence that she suffers from depression, PTSD, impulsivity and impairment of executive functioning. The Court will accept that this is true. Even so, the State's expert, Dr. Pitt, remained adamant in his opinion that the defendant did not have a mental disease or defect whereby she couldn't appreciate the wrongfulness of her conduct. EH RT 2/14/14 at 114. The Court believes that this is consistent with an opinion that her "capacity to appreciate the wrongfulness of her conduct was [not] significantly impaired." See A.R.S. § 13-751(G)(1). This is also consistent with the defendant's allocution, wherein she acknowledged that she had made "a wrong choice...a horrible, horrible, horrible choice."

In fact, the EH evidence tended to demonstrate "...her impaired ability to control impulses and to react and respond appropriately in times of great stress." Petitioner's Post-Hearing Memorandum at 2:12-13. Our Supreme Court would have afforded stress, or even impulsivity, little weight as mitigating factors since the defendant's action of murdering her husband brought on the stress. *Andriano*, 215 Ariz. at 511-12, 161 P.3d at 554-55. *See State v. Brewer*, 170 Ariz. at 506, 826 P.2d at 803 (Evidence did not show that the defendant's impulsive personality rendered him unable to control his conduct. Poor impulse control, standing alone, has little mitigating weight).

**Prejudice - credibility**
The defendant's claim of prejudice relies on a showing that additional mitigation evidence would undermine the Court's confidence in the sentence of death imposed by the jury in 2005. The defendant's mental health experts made a strong case that mental health issues, a harrowing childhood and sexual abuse could impede a child's development and create trauma sufficient to "explain defendant's actions" and mitigate the "circumstances of the crime" and also act as additional mitigation sufficient to support leniency.

The Court is cognizant of the expertise provided to assist in in its determination. The experts' opinions necessarily rely on the believability of background statements made by various witnesses, documents, and records. Consequently, the Court's resolution necessarily relies on an assessment of the *credibility* of evidence presented regarding sexual abuse, harrowing childhood and mental health presented at the PCR hearing. *See State v. Serna*, 167 Ariz. 373, 374-75, 807 P.2d 1109, 1110-11 (1991)(trial judge, rather than jury, could properly determine witnesses' credibility following heating on motion for new trial grounded in newly-discovered evidence, where one of five requirements is whether evidence, if introduced, would probably change the verdict if a new trial were ordered).

Docket Code 167                          Form R000A                          Page 13

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                            11/01/2014

Quoting *Serna*:

> Because defendant's motion to vacate relies on witnesses willing to testify at a new trial, those witnesses must appear worthy of belief *to the trial judge* hearing the motion. 17 A.R.S. R.Crim.P. 24.2(a)(2), 32.1(e); *Jeffers,* 135 Ariz. at 426, 661 P.2d at 1127; *Salinas,* 129 Ariz. at 368, 631 P.2d at 523. In judging the potential credibility of a prospective witness, the trial judge does not usurp the function of the jury. *State v. Urry,* 104 Ariz. 244, 245, 450 P.2d 1018, 1019 (1969); *State v. Blankenship,* 99 Ariz. 60, 65, 406 P.2d 729, 734 (1965). Rule 32.1(e) specifically requires the *court* to consider "the probability that such [newly discovered] facts, if introduced would have changed the verdict...."
>
> . . . . . . .
>
> As we stated in *State v. Turner:*
>
>> The new evidence must be such as would have probably resulted in the acquittal of the accused had it been produced at the trial, and it is therefore *necessary that **it shall appear to the court** hearing the motion that it is probably true.* The witness who is expected to testify must appear **to the court** to be credible. *His credibility is to be determined **by the judge** hearing the motion....* The refusal of a new trial for newly-discovered evidence on an affidavit incredible in view of the claim made and evidence of the trial is not error.
>>
>> . . . . .
>>
>> The trial judge was in a much better position than we are to determine the weight to be given the [testimony] and whether or not the testimony set forth ... would probably change the result in case of a new trial.
>
> 104 Ariz. 469, 471-72, 455 P.2d 443, 445-46 (1969) (citation omitted) (emphasis added).

*State v. Serna,* 167 Ariz. 373, 374-75, 807 P.2d 1109, 1110-11 (1991).

**Prejudice - credibility; "available mitigation evidence" (conclusion)**
Essential to the defendant's post-conviction claims are (1) the availability of the proffered evidence at the time of trial and (2) the credibility of the proffered mitigation evidence and witnesses offered post-conviction. Her IAC claims are grounded in the failure to present available mitigation evidence – that the defendant's childhood was in fact harrowing, as a result of the defendant's upbringing, mental illness and sexual abuse victimization.

The Arizona Supreme Court commented on the change in the defendant's story/theme between her trial and her appeal: "Although Andriano argued at trial that she was assisting Joe in a suicide by poisoning, she argues on appeal that because Joe did not know he was being

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

poisoned, mental anguish cannot be proved." *State v. Andriano*, 215 Ariz. at 511, 161 P.3d at 554.

The Court observes that the defendant's trial claim of "domestic violence" as a mitigating factor has been all but abandoned at her PCR; somewhat re-characterized as PTSD and "people-pleaser/lack of boundaries" to the detriment of own needs.

The Court observes that the defendant's ability to remember, recall and describe at trial contrasts sharply with her current memory, especially when interviewed by the State's expert, Dr. Pitt. At trial, the defendant seldom (if at all) claimed an inability to remember, provided narrative responses and detailed answers in response to trial counsel Patterson's questioning. In addition, she responded appropriately, and sometimes aggressively, to the State's trial cross-examination. In contrast, certain PCR interview questions asked of the defendant and memorialized in video clips led to long silences, extended pauses, and an absence of recall or an inability to access memories.

The Court finds the underlying evidence to be less than credible. The most negative evidence relied on that statements of interested third parties (the defendant's mother and her girlhood best friends). The defendant's mother presented evidence of the defendant's "good" childhood at trial and at the post-conviction proceedings offers a dramatically-different characterization of the defendant's childhood. As noted previously, the same photo that was introduced at trial to demonstrate a childhood that included "ministering on the road" was framed at the PCR hearing to suggest a vagabond lifestyle, deprivation, and possible sexual exploitation. *See* Trial EXH. 550 (ppt. p.1); PCR EH, EXH. 147.

The Court also finds that the evidence was not "available" to trial counsel. The defendant herself denied experiencing anything other than a strict, religiously-directed childhood. She testified that she was neither physically nor sexually abused. Although post-conviction experts provide the Court with inferences from testing; describe behaviors that are "consistent with" sexual or physical abuse or mental health issues; and attribute her denials to an inability to access memories, the Court finds the defendant's and her witnesses' words, shared before a death sentence was imposed, to be more credible.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated

Docket Code 167                    Form R000A                         Page 15

P-App. 000022

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. *See United States v. Decoster, supra*, at 372–373, 624 F.2d, at 209–210.

*Strickland*, 466 U.S. at 691, 104 S.Ct. 252.

**Claims I(A) and II**
**(Deficient performance prong under *Strickland; Cuyler v. Sullivan*)**
        In claims I(A) and II, the defendant alleges that trial counsel, Daniel Patterson and David DeLozier, were ineffective in the penalty phase for failing to investigate, locate and present available mitigation evidence; as to Claim II, the defendant claims that the failure resulted from an actual conflict of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708 (1980).

**BACKGROUND**
        The defendant initially retained two attorneys as private counsel; one of the two was DeLozier. Upon the withdrawal of one of her privately-retained attorneys, The defendant sought appointment of a second attorney to assist DeLozier. The court appointed Patterson's office, which secured for the defendant access to both capital expertise and public resources. Appointed counsel, Patterson, succeeded to the role of lead counsel, with DeLozier, *Knapp* counsel, as second chair.

**Claim I(A) – Deficient performance prong ("Strickland")**
        **The *Strickland* Claim** (Patterson & DeLozier)
        In claim I(A), the defendant alleges that her trial counsel was ineffective in the penalty phase for failing to investigate and present expert testimony regarding her mental illness and by failing to investigate and present evidence regarding her harrowing childhood.

        Patterson took responsibility for the guilt phase, and Delozier was tasked with responsibility for the mitigation phase. Counsel was assisted initially by mitigation specialist Linderman; several months before trial Scott MacLeod was identified as defendant's mitigation specialist. There is no indication that the team met regularly, assessed progress, identified tasks or shared information; there is testimony about informal meetings and discussion, coupled with DeLozier's regular, supportive visits to the defendant at the jail.

Docket Code 167                  Form R000A                        Page 16

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                      11/01/2014

Potential witnesses, including the defendant's family, belonged to a church that appears to have had a relatively closed, less-than-forthcoming mindset when dealing with those outside the community. The church educated its children, who did not mingle with children outside the community. DeLozier was the closest the defense had to a religious insider; appeared to have been trusted by the Andriano family, and by the defendant herself; was familiar through other legal work with abuse victims; and it was reasonable to rely on his ability to secure necessary information.

Given DeLozier's familiarity with sexual abuse claims gained through an unrelated case he was handling, his regular meetings with the defendant and his familiarity with her family, her upbringing, and her background, the close relationship justified that belief and his conclusions; further, the relationship justified Patterson's reliance at the time on his second chair's work.

Based on the jail visits, Patterson thought DeLozier would handle the direct examination of the defendant at trial. In fact, the defendant advised Patterson of her concern about DeLozier conducting her direct examination ("her eyes got] wide open" was Patterson's comparison), at which point Patterson began prepping her trial testimony himself. RT 2/7/2014 at 41-42. Nonetheless, the shortcomings were neither apparent at trial nor captured in the record. Patterson believed that DeLozier's mitigation closing was persuasive. EH RT 2/7/2014 at 47 ("…he gave a pretty powerful summation in Phase 3.").

Despite the division in responsibility between trial counsel, the Court notes that the mitigation presentation was not limited to the penalty phase; the presentation of mitigating evidence was "front-loaded" and began during Patterson's guilt phase presentation.

The Court was not privy to the actual mitigation investigation, has uncertainty regarding the extent of the mitigation investigation based on the PCR testimony of Scott MacLeod, the mitigation specialist at trial (who remembered little in 2014), and the PCR expert Keith Rohman, and can only infer its extent based on the actual evidence presented at trial and at the EH. The Court has found that certain of the PCR evidence is not credible, or is speculative.

The defendant proposes not only supplementary information, but evidence that contradicts that originally presented at trial, claiming that it could have been unearthed at the time of trial. For the reasons stated previously, the Court is not persuaded, first as to the credibility of the proposed evidence and, second, as to its availability at trial.

The Court finds that there was a lack of communication and coordination between members of the defense team. Notwithstanding the deficiency, trial counsel secured and presented that evidence that was readily available at the time of trial.

Docket Code 167                    Form R000A                        Page 17

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                  11/01/2014

**Claim II – Deficient performance prong (*Cuyler v. Sullivan*)**
        ***Knapp* counsel Delozier**
        In claim II, the defendant alleges that defense counsel David DeLozier, who was in charge of investigation of penalty phase mitigation, had an actual conflict of interest that affected his representation of the defendant and his ability to discover and present mitigating evidence.

        Although this claim may be precluded under Rule 32.2(a)(1), as claimed by the State, the Court will address the merits.
        .
        Under *Cuyler v. Sullivan*, the possibility of a conflict is insufficient to overturn a verdict; an actual conflict must exist:

> We hold that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance. Sullivan believes he should prevail even under this standard. He emphasizes Peruto's admission that the decision to rest Sullivan's defense reflected a reluctance to expose witnesses who later might have testified for the other defendants. The petitioner, on the other hand, points to DiBona's contrary testimony and to evidence that Sullivan himself wished to avoid taking the stand. Since the Court of Appeals did not weigh these conflicting contentions under the proper legal standard, its judgment is vacated and the case is remanded for further proceedings consistent with this opinion. [Emphasis added.]

*Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S. Ct. 1708, 1719 (1980).

*Strickland* confirms that only where an actual conflict of interest exists is the restrictive standard of *Cuyler v. Sullivan* ("the *Sullivan* exception") applied.  Where an actual conflict exists, there is a presumption of prejudice:

> One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler v. Sullivan*, 446 U.S., at 345–350, 100 S.Ct., at 1716–1719, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, see, e.g., Fed.Rule Crim.Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the per se rule of prejudice that exists for the Sixth Amendment claims mentioned above.

Docket Code 167                          Form R000A                          Page 18

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                    11/01/2014

Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan, supra,* 446 U.S., at 350, 348, 100 S.Ct., at 1719, 1718 (footnote omitted).

*Strickland v. Washington,* 466 U.S. 668, 692, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984).

Trial counsel DeLozier's dual representation of the defendant in the criminal action as *Knapp* counsel, and his representation of the defendant's parents in an ongoing guardianship (visitation/adoption/dependency) matter related to the defendant's children/their grandchildren presented the potential for a conflict of interest, **to the extent that their interests diverged.**

However, the Court finds that the interests of the defendant and her parents did not diverge.  In March 2001, the defendant withdrew her consent to the guardianship [by the children's paternal aunt and uncle], instead seeking "an Order of Appointment of her parents, Donna Ochoa and Alejo Ochoa, husband and wife, to be guardians of her children." Response, Exhibit E at Bates E000000099 (2CA-JV 2002-0127 Withdrawal of Consent to Guardianship dated 3/19/2001).

Additionally, the defendant,  in her allocution (PCR Response Exhibit CCC: RT12/15/2004 at 56-57, 64), spent a great deal of time focusing on her relationship with her two young children, the time they spent together, the positive activities they engaged in, the hope and comfort that she derived from them as their mother.  Her emphasis on their importance suggests concern for their well-being and overall development. The defendant wanted the children to be with her parents.  It was in her interest to portray her growing-up years as positive, in a favorable light to support such a placement

Based on the defendant's actions and words, the Court believes that rather than being in conflict, the interests of DeLozier's clients, the parents in the guardianship proceedings and the daughter in the criminal action, were aligned at the time of the trial.

Now, ten years later the defendant's parents have been deprived of having a relationship with children and the defendant is facing a death sentence. Their interests have again aligned, this time in favor of portraying negative aspects of her growing-up years.

The Court finds that the interests of the defendant and her parents interests were aligned, rather than conflicting, at the time of trial.  Their interests dovetailed, rather than diverged, and no conflict existed.

Docket Code 167                          Form R000A                          Page 19

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                    11/01/2014

The Court agrees that, were the "horrific childhood" and other background information true, and not investigated because of the impact on the parents case, there may have been an actual conflict.  However, DeLozier was familiar with sexual abuse victimology; he attributed statements assailing his clients' (the defendant's parents) character to the normal aspersions cast in domestic situations.  Further, the defendant denied the existence of abuse.

The Court concludes that, in this case, the "bad facts" background information may not be true (or may be merely speculative – "had access", exhibits "behaviors consistent with…") and/or may have been hidden from investigation (the defendant and family may have been involved in failing to disclose or even active concealment for their own reasons) and that the possibility and speculation do not support the Court finding that an "actual conflict" existed at the time of trial.

**Claims I(A) and II (Prejudice" prong under *Strickland*)**
Although the Court declines to fault the performance of trial counsel, the Court will address the second prong of *Stricklnad*. In addition to a finding of deficient performance, *Strickland* requires that the defendant establish that any deficiency resulted in prejudice sufficient to call into question the jury's verdict of death:

> …When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Strickland v. Washington*, 466 U.S. 668, 695, 104 S. Ct. 2052, 2069 (1984).

In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense. *Strickland*, 466 U.S., at 692, 104 S.Ct. 2052. In *Strickland*, we made clear that, to establish prejudice, a "defendant must show that there is a reasonable probability[11] that, but for counsel's

---

[11]    We consider first the Ninth Circuit's holding that the California Supreme Court's decision was "contrary to"
        our decision in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
        (1984). *Strickland* held that to prove prejudice the defendant must establish a "*reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.,* at 694, 104 S.Ct. 2052 (emphasis added); it specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered, *id.,* at 693, 104 S.Ct. 2052.

P-App. 000027

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

unprofessional errors, the result of the proceeding would have been different. A
reasonable probability is a probability sufficient to undermine confidence in the
outcome." *Id.,* at 694, 104 S.Ct. 2052. In assessing prejudice, we reweigh the evidence in
aggravation against the totality of available mitigating evidence.

*Wiggins v. Smith,* 539 U.S. 510, 534, 123 S. Ct. 2527, 2542 (2003).

To establish prejudice, Belmontes must show "a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would have been different."
*Strickland,* 466 U.S., at 694, 104 S.Ct. 2052. That showing requires Belmontes to
establish "a reasonable probability that a competent attorney, aware of [the available
mitigating evidence], would have introduced it at sentencing," and "that had the jury been
confronted with this ... mitigating evidence, there is a reasonable probability that it would
have returned with a different sentence." *Wiggins v. Smith,* 539 U.S. 510, 535, 536, 123
S.Ct. 2527 (2003).

*Wong v. Belmontes,* 558 U.S. 15, 19-20, 130 S. Ct. 383, 386 (2009).

We further find that had the jury been confronted with this considerable mitigating
evidence, there is a reasonable probability that it would have returned with a different
sentence. In reaching this conclusion, we need not, as the dissent suggests, *post.* at 2552-
2553, make the state-law evidentiary findings that would have been at issue at
sentencing. Rather, we evaluate the totality of the evidence-"both that adduced at trial,
*and the evidence adduced in the habeas proceeding[s]." Williams v. Taylor,* 529 U.S., at
397-398, 120 S.Ct. 1495 (Emphasis added).

The Court concludes that following the PCR presentation the Court had a more complete
understanding of "... aspect[s] of the defendant's character, propensities or record and any of the
circumstances of the offense..." that are "...relevant in determining whether to impose a
sentence less than death." See A.R.S. § 13-751(G).

The Court contrasts the trial presentation, which provided a singular, linear view of
mitigation, with the post-conviction presentation, which provided a global, cumulative overview
of the defendant's development over time.  The defendant's evidentiary hearing evidence (the
quantity and the quality of the evidence), especially as supplemented by numerous experts
emphasizing the impact of negative experiences on the defendant's development, served as an
attempt not only to ameliorate the impact of the (F)(6) aggravator but also to give additional

---

*Woodford v. Visciotti,* 537 U.S. 19, 22, 123 S. Ct. 357, 358-59 (2002).

Docket Code 167                         Form R000A                         Page 21

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                              11/01/2014

weight to the mitigation evidence. At trial the defendant focused on the positive ("good person/good background/bad decision") while during the PCR hearing she focused on the impact of negative (negative experiences impact on her development). The Court is presented with attempting to reconcile the two.

In its reconciliation, the Court must consider whether the likelihood of a different result, considering the evidence adduced at trial and during post-conviction proceedings, is substantial:

> In assessing prejudice under *Strickland,* the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. See *Wong v. Belmontes,* 558 U.S. ——, ——, 130 S.Ct. 383, 390, 175 L.Ed.2d 328 (2009) *(per curiam)* (slip op., at 13); *Strickland,* 466 U.S., at 693, 104 S.Ct. 2052. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. *Id.,* at 696, 104 S.Ct. 2052. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." *Id.,* at 693, 697, 104 S.Ct. 2052. The likelihood of a different result must be substantial, not just conceivable. *Id.,* at 693, 104 S.Ct. 2052.

*Harrington v. Richter,* 131 S. Ct. 770, 791-92 (2011).

The Court, having presided over both the trial and the post-conviction proceedings, is aware of the mitigation presented during the 2004 trial and the 2014 post-conviction proceedings. In her post-conviction proceedings the defendant - seeks to explain the circumstances of the offense in such a way that permits the jury to give it less weight/render the defendant less culpable for actions the night of the victim's death, to decrease the weight of the aggravating factor.

At trial, the defense theme was that the defendant was a good person raised with a good background who made a bad decision – attributable to her being a victim of domestic violence. At the PCR, the theme is that the defendant was a person shaped by her horrendous childhood – a victim of sexual abuse, mental health issues who experienced a "horrific" childhood. The Court concludes that the defendant's childhood was somewhere between "good" and "impoverished," but was neither "horrific" nor "harrowing."

Defendant claims as a mitigating factor that he was reared in a dysfunctional family. Nothing in the record substantiates this claim, however, other than his father's alcoholism and his family's periodic moves due to military transfers. Defendant failed, moreover, to demonstrate how his allegedly poor upbringing related in any way to the murders. *See*

Docket Code 167                          Form R000A                          Page 22

P-App. 000029

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                              11/01/2014

*State v. Wallace,* 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), *cert. denied,* 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990).

*See State v. Wood,* 180 Ariz. 53, 71, 881 P.2d 1158, 1176 (1994).

Prejudice (conclusion)
The Court acknowledges that the defendant is the sum of her experiences, which cumulatively impacted her development; the Court, however, cannot conclude that the evidence presented is sufficiently substantial to call into question the penalty imposed by the jury. This is particularly so because the attributes attributed to the defendant are frequently characterized as "consistent with" someone who has had certain life experiences or are recounted by those whose recollections have varied, if only in emphasis, over time.

The Court had an opportunity to view and consider the witnesses' demeanor and involvement, and in some cases to compare prior testimony at trial (including allocution) with that at the evidentiary hearing (including excerpts of video interviews). The Court viewed much of the post-conviction evidence as cumulative to that presented at trial.

In attributing weight to the mitigating factors, the trier of fact would consider whether the defendant 's "capacity to appreciate wrongfulness/capacity to conform conduct to law" was significantly impaired; Dr. Potts testified that it was not, and at trial the defendant referred to her "horrific, horrific, horrific *choices.*" The trier of fact would further consider the contradictory trial and PCR presentations, made under oath.

The Court finds that the mitigation is not sufficiently substantial to mitigate against the (F)(6) aggravating factor found in this case, where the defendant not only poisoned her husband; but also led him to believe that she had called 911 when she had not, during which time he experienced poisoning symptoms; the defendant then struck him with a bar stool over twenty times.

At the time she murdered her husband, the defendant was an intelligent, thirty-year-old young woman who had completed high school, made good grades, received awards in various competitions (swimming; music), attended college, worked for a living, gotten married and had two children. Because the defendant's act of poisoning her husband coupled with the fact he did not immediately die as anticipated resulted in the stressful situation with which she had to contend, the proffered mitigation testimony would be accorded little weight by any trier of fact. *See Andriano*, 215 Ariz. at 511-512.

P-App. 000030

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                11/01/2014

The Court finds that the mitigation evidence adduced at the PCR, if offered at trial, would not be sufficiently substantial to warrant leniency, and that a jury – confronted with this evidence – would not have returned with a difference sentence.

In addition, the Ninth Circuit provides guidance in connection with its consideration of "childhood mitigation evidence:"

> Almost all of the childhood mitigation evidence offered by Bonin at the evidentiary hearing was utilized by Charvet during both of the trials. The evidence that was not presented by Charvet would have been of little value. That life at the convent was not pleasant, or that Bonin was often dirty and hungry as a child would have added little to the Bonin's case and might actually have distracted the jury from the more potent mitigation evidence. The only significant evidence presented by Bonin at the evidentiary hearing that Charvet failed to employ was the testimony of experts on the developmental effects of child abuse and neglect. However, while the Constitution requires that a criminal defendant receive effective assistance of counsel, the presentation of expert testimony is not necessarily an essential ingredient of a reasonably competent defense. Given that such expert testimony would have been of value only to the extent that Bonin could actually show that he had been subject to neglect and abuse, it would have been of slight value at best. Moreover, it would have opened the door to precisely the type of cross-examination that Charvet sought to avoid by refusing to call psychiatric experts—another recitation of all of Bonin's atrocities for the purpose of determining whether, in the expert's opinion, such behavior is the likely product of such abuse. Charvet's presentation of childhood mitigation evidence was clearly reasonable.

*Bonin v. Calderon,* 59 F.3d 815, 834 (9th Cir. 1995).

> We also conclude that Bonin has failed to establish that he has suffered prejudice as a result of Charvet's allegedly deficient representation. "[I]n cases with overwhelming evidence of guilt, it is especially difficult to show prejudice from a claimed error on the part of trial counsel." *United States v. Coleman,* 707 F.2d 374, 378 (9th Cir.), *cert. denied,* 464 U.S. 854, 104 S.Ct. 171, 78 L.Ed.2d 154 (1983). Similarly, in cases such as this where the aggravating circumstances are overwhelming, it is particularly difficult to show prejudice at sentencing due to the alleged failure to present mitigation evidence.
> In this case, the aggravating circumstances were so numerous and so compelling that it is highly improbable that either jury would have returned a sentence of life

Docket Code 167                    Form R000A                          Page 24

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                        11/01/2014

imprisonment rather than death, even if all of the possible mitigating evidence offered by Bonin at the evidentiary hearing had been presented at his trials. As we explained earlier, Bonin has demonstrated the existence of very little probative evidence of childhood abuse or neglect other than the very evidence employed by Charvet in both trials. The additional childhood evidence offered by Bonin would clearly not have had any effect on either jury's decision to impose the death penalty.

With regard to the omission of expert psychiatric testimony, the district judge concluded that Bonin "has failed to provide persuasive evidence of brain organicity or other psychiatric or neurological disorder." *Bonin v. Vasquez,* 807 F.Supp. at 597. He explained that Bonin "did not demonstrate any correlation between Dr. Pincus' findings, which were obtained in late 1991, and petitioner's mental condition at the time of the murders." *Id.* at 598. The court also found "that Drs. Dietz and Nuwer were more credible than Dr. Pincus," and that the court "cannot help but believe that Dr. Pincus' views on the inappropriateness of the death penalty affect his clinical interpretations in this highly subjective area of medicine." *Id.*

The district court's finding that Bonin did not prove that he had suffered from brain damage or other significant psychiatric or neurological disorder at the time he committed his crimes is amply supported by the record and is not clearly erroneous. Bonin's evidence was insufficient to show that unlimited investigation by Charvet into Bonin's psychiatric condition would have produced anything more significant than the unpersuasive testimony presented by Drs. Pincus and Foster. At best, such testimony would only have initiated a battle of experts on which Bonin would have been on the losing side. At worst, it would have distracted jurors from Charvet's "institutional adjustment" theory and the childhood and Vietnam mitigation evidence, reduced Charvet's credibility with the jury, and opened the door to powerful cross-examination and rebuttal. The aggravating circumstances presented by the prosecution in both trials was overwhelming. Bonin has not proven that the use of expert psychiatrists would likely have changed the outcome, and has therefore failed to meet his burden of proving prejudice.

*Bonin v. Calderon,* 59 F.3d 815, 836 (9th Cir. 1995).

On Independent Review, the ASC determined that the "...quality and strength of Andriano's mitigation evidence is not sufficiently substantial to call for leniency in light of the especially cruel manner in which Andriano murdered her husband..." and affirmed the sentence of death. *State v. Andriano,* 215 Ariz. 497, 512-13, 161 P.3d 540, 555-56 (2007):

P-App. 000032

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

him as he lay on the floor, unable to defend himself. Andriano also knew or should have
known that beating her husband with a bar stool would cause him physical pain and
mental anguish.[10]

Andriano asks us to require that the physical or mental pain experienced by the victim be
"extreme." There is no such requirement for a cruelty finding. *See Trostle*, 191 Ariz. at
18, 951 P.2d at 883. Nonetheless, the physical pain and mental anguish Joe experienced
likely were "extreme" by any standards.

Although Andriano argued at trial that she was assisting Joe in a suicide by poisoning,
she argues on appeal that because Joe did not know he was being poisoned, mental
anguish cannot be proved. While a victim's knowledge of the source of physical pain may
be relevant to whether the victim experienced mental anguish, it is not a requisite for a
finding of mental anguish. And on the facts of this case, mental anguish is established
even if Joe did not know he had been poisoned. Moreover, cruelty can be established
upon a showing of either mental anguish or physical pain. *Id.* We thus conclude that
cruelty was established based on either—or both—mental anguish or physical pain.

### 2. *Mitigation*

Andriano presented several mitigating circumstances for the jury's consideration,
including the stress of Joe's cancer, her good grades in school, missionary and community
work, and strong religious convictions. In addition, she presented evidence that she was a
sexual abuse and domestic violence victim, a good mother to two children, married for
six years, and a good inmate.

Although Andriano presented some evidence that she was a domestic violence victim, we
assign little weight to this mitigating circumstance, in part because it is not related to the
murder. *See Roque*, 213 Ariz. at 231, ¶ 169, 141 P.3d at 406 ("[T]he relationship between
mitigating evidence and the murder may affect the weight given to the mitigating
evidence.") (citation omitted); *State v. Newell*, 212 Ariz. 389, 405, ¶ 82, 132 P.3d 833,
849, *cert. denied*, 549 U.S. 1056, 127 S.Ct. 663, 166 L.Ed.2d 521 (2006). The evidence
established that Andriano did not kill Joe while defending against a domestic violence
attack. Instead, she poisoned her terminally ill husband, struck him in the back of the
head twenty-three times, and slit his throat. Joe posed no threat to Andriano at the time of
the attack because he was so weak from the poison and chemotherapy that he could not
get up.

Andriano was under substantial stress from having to deal with Joe's terminal cancer. The
record does not indicate, however, that at the time of the offense, the stress was any
greater than it had been two years earlier when she and Joe first learned he was terminally
ill, and she was pregnant with their second child. Moreover, this is not a case in which

Docket Code 167                    Form R000A                         Page 27

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                            11/01/2014

Andriano suddenly "cracked" under extreme stress. Andriano methodically premeditated Joe's murder, showing that her stress bore little relation to Joe's death. This mitigating circumstance thus does not warrant substantial weight.

Andriano also offered evidence that she "may have been" sexually abused by her biological father when she was around the age of two, although she does not recall it, and that a member of the traveling ministry to which her family belonged exposed himself to Andriano when she was between six and eight years old. Andriano also showed that she maintained good grades in school and participated in missionary and community work. We do not weigh these mitigating circumstances heavily because the events are remote in time to the offense and thus their relevance is minimal. *Cf. Ellison*, 213 Ariz. at 144, ¶ 136, 140 P.3d at 927 (finding defendant's "childhood troubles deserve little value as a mitigator for the murders he committed at age thirty-three").

The record contains conflicting evidence on whether Andriano was a good mother. In any event, we afford this mitigating circumstance minimal value in light of the fact that Andriano murdered her children's father while the children were present in the apartment. Moreover, neither the fact of Andriano's marriage nor its six-year duration is mitigating considering that she would have remained married and the marriage would have lasted longer had she not killed her husband.

Andriano was a good inmate in jail and helpful to staff and inmates from September 2003 until the penalty phase of her trial in December 2004. Because inmates are expected to behave, however, we assign this mitigating circumstance little weight. *State v. Harrod*, 200 Ariz. 309, 319, ¶ 53, 26 P.3d 492, 502 (2001), *vacated on other grounds*, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002).

Although Andriano had what might be considered a strict religious upbringing, many of her actions, such as killing her husband and having extramarital affairs, appear inconsistent with holding strong religious convictions. We thus assign this evidence minimal value.

Andriano also alleged as mitigating circumstances cooperation with law enforcement authorities, remorse, and age. The evidence presented, however, contradicts Andriano's assertion that she cooperated in the investigation of Joe's murder.[12] Moreover, because Andriano continues to deny responsibility for her conduct, we reject her contention that she is remorseful. *See State v. Gulbrandson*, 184 Ariz. 46, 70–71, 906 P.2d 579, 603–04 (1995) (noting that defendant continued to deny responsibility in finding that he had not proven remorse as a mitigating circumstance). We likewise do not find her age—thirty at the time of the offense—to be mitigating, particularly in light of her above-average I.Q.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                                11/01/2014

We likewise give minimal weight to the remaining mitigating circumstances urged: lack of prior convictions, good candidate for rehabilitation, no future threat to the community, and impact on family and friends.

### 3. *Propriety of the death sentence*

The quality and strength of Andriano's mitigation evidence is not sufficiently substantial to call for leniency in light of the especially cruel manner in which Andriano murdered her husband. We therefore affirm Andriano's sentence of death.

*Andriano*, 215 Ariz. at 510-13, 161 P.3d at 553-56.

The Court finds that, even considering the additional post-conviction evidence, the "quality and strength" of mitigation is insufficient to call for leniency and no reasonable juror could disagree. The defendant suffered no prejudice.

## CONCLUSION

The Court concludes, in accordance with *Strickland,* that with the "overwhelming aggravating factors, there is not reasonable probability that the omitted evidence would have changed…the sentence imposed." As in *Strickland*, the sentencing profile to be considered by the jury would have been altered little with the addition of the PCR evidence:

> With respect to the prejudice component, the lack of merit of respondent's claim is even more stark. The evidence that respondent says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented to the sentencing judge. As the state courts and District Court found, at most this evidence shows that numerous people who knew respondent thought he was generally a good person and that a psychiatrist and a psychologist believed he was under considerable emotional stress that did not rise to the level of extreme disturbance. Given the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed. Indeed, admission of the evidence respondent now offers might even have been harmful to his case: his "rap sheet" would probably have been admitted into evidence, and the psychological reports would have directly contradicted respondent's claim that the mitigating circumstance of extreme emotional disturbance applied to his case.

> Our conclusions on both the prejudice and performance components of the ineffectiveness inquiry do not depend on the trial judge's testimony at the District Court hearing. We therefore need not consider the general admissibility of that testimony, although, as noted supra, at 2069, that testimony is irrelevant to the prejudice inquiry. Moreover, the prejudice question is resolvable, and hence the ineffectiveness claim can

Docket Code 167                      Form R000A                      Page 29

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                          11/01/2014

be rejected, without regard to the evidence presented at the District Court hearing. The
state courts properly concluded that the ineffectiveness claim was meritless without
holding an evidentiary hearing.

Failure to make the required showing of either deficient performance or sufficient
prejudice defeats the ineffectiveness claim. Here there is a double failure. More
generally, respondent has made no showing that the justice of his sentence was rendered
unreliable by a breakdown in the adversary process caused by deficiencies in counsel's
assistance. Respondent's sentencing proceeding was not fundamentally unfair.

*Strickland v. Washington*, 466 U.S. 668, 699-700, 104 S. Ct. 2052, 2071, 80 L. Ed. 2d 674
(1984).

The Supreme Court identified eight mitigating factors presented at trial, many of which
duplicate PCR mitigating factors (possibility of sexual abuse; strict religious upbringing; stress):

Andriano presented several mitigating circumstances for the jury's consideration,
including the stress of Joe's cancer, her good grades in school, missionary and community
work, and strong religious convictions. In addition, she presented evidence that she was a
sexual abuse and domestic violence victim, a good mother to two children, married for
six years, and a good inmate.

*State v. Andriano*, 215 Ariz. 497, 511, 161 P.3d 540, 554 (2007) *abrogated by State v. Ferrero*,
229 Ariz. 239, 274 P.3d 509 (2012).

The Court is not persuaded that: a failure to identify; a failure to interview; a failure to
create a social history; and/or a failure to consult additional mental health professionals
compromised the mitigation presentation, other than as to quantity, depth, or volume. Many of
the factors were identified at trial; and, especially as to the sexual abuse allegations, the claim
remains speculative.

The Court is not persuaded that the post-conviction mitigation evidence would be
substantially sufficient to warrant leniency, in light of the (F)(6) aggravating factor's ("cruelty"
prong). The victim, a terminally ill cancer patient, suffered for an extended period of time from
symptoms following his spouse's administration of sodium azide (45 minutes); the victim was
struck by his spouse more than 20 times with a bar stool.

"...the failure of retained counsel to provide adequate representation can render a trial so
fundamentally unfair as to violate the Fourteenth Amendment."

Docket Code 167                    Form R000A                         Page 30

P-App. 000037

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2000096032                                         11/01/2014

*Cuyler v. Sullivan*, 446 U.S. 335, 343, 100 S. Ct. 1708, 1715 (1980).

This is not such a case, in which the trial was "...so fundamentally unfair as to violate the Fourteenth Amendment."

**THEREFORE**, for the reasons stated above, the Court finds that the defendant has failed to meet her burden to establish her claims of ineffective assistance of counsel or conflict.

**IT IS ORDERED** dismissing Claims I(A) and II; and

**IT IS FURTHER ORDERED** dismissing defendant's Petition for Post-Conviction Relief in its entirety. Rule 32.9, Ariz.R.Crim.P.

*11-03-14*
_____
Date

_____
Honorable Brian K. Ishikawa

This case is eFiling eligible: http://www.clerkofcourt.maricopa.gov/efiling/default.asp. Attorneys are encouraged to review Supreme Court Administrative Order 2011-140 to determine their mandatory participation in eFiling through AZTurboCourt.

Docket Code 167                 Form R000A                      Page 31



MICHAEL K. JEANES, CLERK
BY _____ DEP
FILED

14 NOV 26  AM 8:07

1 | Scott M. Bennett (022350)
2 | Coppersmith Brockelman PLC
  | 2800 North Central Avenue, Suite 1200
3 | Phoenix, Arizona 85004
  | (602) 224-0999 (office)
4 | (602) 224-6020 (fax)
5 | sbennett@cblawyers.com

6 | Allen A. Arntsen, Admitted *Pro Hac Vice*
  | Stephan J. Nickels Admitted *Pro Hac Vice*
7 | Matthew R. Lynch Admitted *Pro Hac Vice*
8 | Foley & Lardner LLP
  | 150 E. Gilman Street
9 | Madison, WI 53703
  | (608) 257-5035 (office)
10 | (608) 258-4258 (fax)
11 | aarntsen@foley.com

12 | *Attorneys for Petitioner Wendi Andriano*

13 |

14 | SUPERIOR COURT OF ARIZONA
   | COUNTY OF MARICOPA

15 |

16 | State of Arizona,                  )     No. CR2000-096032-A
                                        )
17 |                    Respondent,     )     **ORDER GRANTING EXTENSION**
   | v.                                 )     **OF TIME TO FILE PETITION**
18 |                                    )     **FOR REVIEW**
   | Wendi Elizabeth Andriano,          )
19 |                                    )     (Hon. Brian Ishikawa)
                                        )
20 |                    Petitioner.     )
   | _____     )

21 |

22 |        Based on the unopposed motion by petitioner Wendi Andriano, and for good cause,

23 | IT IS ORDERED extending Ms. Andriano's deadline to file a petition for review to

24 | February 2, 2015.

25 | DATED: **11-21-14**                 _____

26 |                                     Hon. Brian Ishikawa

{00144402.1}

P-App. 000039

MICHAEL K. JEANES, CLERK

BY _____ DEP
FILED

15 JAN 27  PM 5:00

1  Scott M. Bennett (022350)
2  Coppersmith Brockelman PLC
   2800 North Central Avenue, Suite 1200
3  Phoenix, Arizona  85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
5  sbennett@cblawyers.com

6  Allen A. Arntsen, Admitted *Pro Hac Vice*
7  Stephan J. Nickels Admitted *Pro Hac Vice*
   Matthew R. Lynch Admitted *Pro Hac Vice*
8  Foley & Lardner LLP
   150 E. Gilman Street
9  Madison, WI 53703
10  (608) 257-5035 (office)
   (608) 258-4258 (fax)
11  aarntsen@foley.com

12
   *Attorneys for Petitioner Wendi Andriano*

13               SUPERIOR COURT OF ARIZONA
14                 COUNTY OF MARICOPA

15  State of Arizona,                )    No. CR2000-096032-A
16                                   )
              Respondent,            )    **ORDER GRANTING EXTENSION**
17  v.                               )    **OF TIME TO FILE PETITION**
                                     )    **FOR REVIEW**
18  Wendi Elizabeth Andriano,        )
19                                   )    (Hon. Brian Ishikawa)
              Petitioner.            )
20                                   )
   _____  )
21

22       Based on the unopposed motion by petitioner Wendi Andriano, and for good cause,

23  IT IS ORDERED extending Ms. Andriano's deadline to file a petition for review to April

24  3, 2015.

25  DATED: _O 1 - 2 6 - 1 5_          _____
26                                    Hon. Brian Ishikawa

{00150754.1 }

FEB 17 2012   **FILED**
5:00 pm
MICHAEL K. JEANES, Clerk
By
Deputy

1  Scott M. Bennett (Bar No. 022350)
2  COPPERSMITH SCHERMER & BROCKELMAN PLC
   2800 North Central Avenue
3  Phoenix, Arizona  85004
   (602) 224-0999 (office)
4  (602) 224-6020 (fax)
5  sbennett@csblaw.com

6  Allen A. Arntsen, admitted *pro hac vice*
7  Matthew R. Lynch, admitted *pro hac vice*
   FOLEY & LARDNER LLP
8  150 E. Gilman Street
   Madison, WI 53703-1481
9  (608) 257-5035 (office)
   (608) 258-4258 (fax)
10

11  *Attorneys For Petitioner Wendi Andriano*

12

13                 **SUPERIOR COURT OF ARIZONA**
                      **COUNTY OF MARICOPA**
14

15  STATE OF ARIZONA                    )    CASE NO: CR2000-096032-A
                                        )
16          RESPONDENT,                 )
                                        )    **PETITION FOR POST-CONVICTION**
17      V.                              )    **RELIEF**
                                        )
18  WENDI ELIZABETH ANDRIANO            )
                                        )
19          PETITIONER.                 )
                                        )
20  ─────────────────────────────

21  I.      Petitioner's Name:   Wendi E. Andriano

22          Petitioner's ADOC Number:    191593

23  II.     Petitioner is now:   A. ( ) On Parole

24                               B. ( ) On Probation

25                               C. ( X ) Confined in ASPC Perryville

26  III.    (A)     Petitioner was convicted of first-degree murder.

27

28

1        (B)     Petitioner was sentenced on December 22, 2004, following a trial by jury

2                in the Superior Court for Maricopa County, with Judge Ishikawa presiding.

3    IV.    Petitioner is eligible for relief because:

4        •      She was denied her right to effective assistance of counsel at every critical

5               stage of the proceeding.  U.S. Const. Amends. V, VI, VIII, XIV; Ariz.

6               Const. Art. 2, §§ 4, 15, 24; Ariz. R. Crim. P. 32.1.a.

7        •      The abridgement of any other right guaranteed by the constitution or the

8               laws of this State, or the Constitution of the United States, including a right

9               that was not recognized as existing at the time of the trial if retrospective

10              application of that right is required.  *Id.*

11       •      Any other ground within the scope of Rule 32.1 of the Arizona Rules of

12              Criminal Procedure, including Rules 32.1.a. and 32.1.h.  *See* accompanying

13              Memorandum in Support of Petition for Post-Conviction Relief.

14   V.     The facts in support of the alleged error(s) upon which this petition is based are

15          contained in the accompanying Memorandum in Support of Post-Conviction

16          Relief, Exhibits 1 and 2 to the Memorandum, Tabs 1-77 to the Memorandum, and

17          the trial transcripts, which are part of the original criminal case docket.

18   VI.    Supporting Exhibits:  The accompanying Memorandum in Support of Petition for

19          Post-Conviction Relief includes two demonstrative exhibits, as well as multiple

20          expert reports (Tabs 1-5), affidavits/declarations (Tabs 6-42), and other document

21          evidence (Tabs 43-77).

22   VII.   Petitioner has taken the following actions to secure relief from her convictions or

23          sentences:

24       (A)     Direct Appeal:  ( X ) Yes  (  ) No

25               Arizona Supreme Court, No. CR-05-0005-AP.  Appeal filed

26               12/22/04.  Affirmed 7/9/07.

27                                                 2

28   ────────────────────────────────────────────────────────
                      PETITION FOR POST-CONVICTION RELIEF
                           CASE NO. CR2000-096032-A

1      (B)    Previous Rule 32 Proceedings: ( ) Yes  (X) No

2      (C)    Previous Habeas Corpus or Special Action Proceedings in the Courts of

3              Arizona: ( ) Yes  (X) No

4      (D)    Habeas Corpus of Other Petitions in Federal Courts:

5              ( ) Yes  (X) No

6  VIII.   Petitioner was represented by the following lawyers:

7      Arraignment and Plea:  Bethanne Klopp-Bryant, 570 West Brown Rd.,

8          Mesa, AZ 85201-3227

9      Trial:  Daniel Patterson, 620 W. Jackson St., Phoenix, AZ 85003; and G. David

10          DeLozier, 4016 East Forest Pleasant Pl., Cave Creek, AZ 85331

11      Sentencing Hearing:  Daniel Patterson, 620 W. Jackson St., Phoenix, AZ 85003;

12          and G. David DeLozier, 4016 East Forest Pleasant Pl., Cave Creek, AZ

13          85331

14      Appeal:  Brent Graham, PO Box 11483, Glendale, AZ 85318; and

15          Margaret Green, 620 W. Jackson St., Phoenix, AZ 85003

16      Petitioner has not previously prepared, presented or received consideration of any

17      petition or motion for post-conviction relief.

18  IX.    The issues which are raised in this Petition have not been finally decided nor

19      raised before because, as explained in the accompanying Memorandum,

20      Petitioner's trial and/or appellate counsel were ineffective in failing to investigate

21      and present them to the courts.

22  X.     The relief requested by Petitioner is correction of sentence, a new trial or reversal

23      of conviction.

24  XI.    Petitioner is presently represented by counsel:

25

26

27                          3

28          PETITION FOR POST-CONVICTION RELIEF
                  CASE NO. CR2000-096032-A

Scott M. Bennett (022350)
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona 85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (office)
(608) 258-4258 (fax)
aarntsen@foley.com
mlynch@foley.com

I affirm that this Petition includes all the claims and grounds for post-conviction relief that are known to me, that I understand that no further petitions concerning this conviction may be filed on any ground of which I am aware but do not raise at this time, and that the information contained in this form and in any attachments is true, to the best of my knowledge or belief.

4

PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1

DATE: February 17, 2012

By: _____
Scott M. Bennett (022350)
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona 85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (Office)
(608) 258-4258 (Fax)
aartnsen@foley.com
mlynch@foley.com

*Attorneys For Petitioner Wendi Andriano*

5

PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

Scott M. Bennett (Bar No. 022350)
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (office)
(608) 258-4258 (fax)

*Attorneys For Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA | CASE NO:  CR2000-096032-A |
| RESPONDENT, | |
| v. | **MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF** |
| WENDI ELIZABETH ANDRIANO | |
| PETITIONER. | |

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. v

INTRODUCTION ............................................................................................... 1

CASE BACKGROUND ...................................................................................... 2

I.     OVERVIEW .............................................................................................. 2

II.    WENDI ANDRIANO'S LIFE ................................................................... 2

    A.    CHILDHOOD ................................................................................ 2

        1.    Wendi Was Born Into A Family Marked By Mental Illness, Substance Abuse And Violence ........................................... 2

        2.    Wendi Was Raised By A Series Of Child Molesters And Pedophiles ............................................................................ 3

        3.    Wendi Was Physically And Psychologically Abused Her Entire Childhood .................................................................. 5

        4.    Wendi Was Raised In Poverty .................................................. 7

    B.    WENDI DEVELOPED PSYCHIATRIC DISORDERS ............................. 7

        1.    Impaired Cognitive Development ............................................. 8

        2.    Impaired Emotional Functioning Due To Childhood Trauma ......... 9

        3.    Wendi Suffers From Severe Psychiatric Disorders, Which Became Worse Leading Up To Joe's Death ................................... 11

            a.    Bipolar Disorder ................................................... 11

            b.    Complex PTSD .................................................... 12

            c.    Dependent Personality Disorder ............................ 12

    C.    ADULT LIFE AND MARRIAGE ...................................................... 13

    D.    JOE ANDRIANO'S DEATH ........................................................... 17

    E.    WENDI'S MENTAL STATE DURING THE NIGHT OF JOE'S DEATH ............... 20

i

1

<div align="center"><b>TABLE OF CONTENTS (cont'd)</b></div>

2
<div align="right"><b><u>Page</u></b></div>

3

III.     PRE-TRIAL REPRESENTATION ........................................................................ 21

4
        A.     DEFENSE TEAM ................................................................................... 21

5
        B.     DEFENSE TEAM'S DYSFUNCTION ................................................. 22

6
               1.     The Failure To Investigate Wendi's Mental Illness ......................... 23

7
               2.     The Failure To Conduct A Meaningful Investigation ...................... 26

8
                      a.     Patterson's Non-Involvement ................................................. 26

9
                      b.     DeLozier's Role as Spiritual Advisor .................................... 27

10

11
                      c.     Mac Leod's Lack of Experience ........................................... 28

12
               3.     The Failure To Identify And Interview Mitigation Witnesses ......... 29

13
               4.     The Failure To Adequately Prepare For Trial .................................. 30

14
IV.     THE TRIAL AND VERDICT ......................................................................... 32

15
        A.     GUILT PHASE ..................................................................................... 32

16
               1.     The Defense's Case ............................................................................ 32

17

18
                      a.     The State's Focus on Wendi's Sexual Behavior ................... 33

19
                      b.     Wendi's Dissociation and Repression ................................... 35

20
               2.     The State's Case ................................................................................. 37

21
        B.     AGGRAVATION PHASE ................................................................... 39

22
        C.     PENALTY PHASE ............................................................................... 40

23
LEGAL STANDARD ................................................................................................ 43

24
CLAIMS ...................................................................................................................... 45

25

26

27

<div align="center">ii</div>

28

4838-2894-9006

**TABLE OF CONTENTS (cont'd)**

<u>Page</u>

I.  WENDI'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS
    VIOLATED BY DEFENSE COUNSEL'S DEFICIENT PERFORMANCE
    AND RESULTING PREJUDICE DURING ALL PHASES OF THE
    TRIAL ............................................................................................................ 46

    A.  PENALTY PHASE .......................................................................... 46

        1.  Defense Counsel's Failure To Investigate And Present Expert
            Testimony Regarding Wendi's Mental Illness................................. 46

            a.  Deficient Performance ......................................... 46

            b.  Prejudice.............................................................. 48

        2.  Defense Counsel's Failure To Investigate And Present
            Evidence Regarding Wendi's Harrowing Childhood ...................... 50

            a.  Deficient Performance ......................................... 50

            b.  Prejudice.............................................................. 52

    B.  AGGRAVATION PHASE .................................................................. 55

        1.  Defense Counsel's Failure To Investigate And Present Expert
            Testimony Regarding Wendi's Mental Illness................................. 55

        2.  Defense Counsel's Failure To Object To The Jury's
            Consideration Of Evidence Related To The Alleged Sodium
            Azide Poisoning as Improper, Inaccurate, and Misleading ............ 55

    C.  GUILT PHASE .............................................................................. 59

        1.  Defense Counsel's Failure To Investigate And Present Expert
            Testimony Regarding Wendi's Mental Illness................................. 59

        2.  Defense Counsel's Failure To Identify Corroborating
            Evidence That Joe Knew That Wendi Was Trying To Obtain
            A Life Insurance Policy ...................................................... 60

        3.  Defense Counsel's Failure To Introduce Evidence That Joe
            Was Severely Depressed In The Period Leading Up To His
            Death ............................................................................... 60

iii

4838-2894-9006

P-App. 000049

**TABLE OF CONTENTS (cont'd)**

**Page**

        4.     Defense Counsel's Failure To Seek A Jury Instruction As To Lesser Included Offenses ................................................................. 61

II.    THE DEFENSE COUNSEL IN CHARGE OF WENDI'S PENALTY PHASE DEFENSE HAD AN ACTUAL CONFLICT OF INTEREST THAT AFFECTED THE ADEQUACY OF WENDI'S REPRESENTATION ....................................................................................... 61

III.   DEFENSE COUNSEL'S FAILURE TO OBJECT TO PERVASIVE INSTANCES OF PROSECUTORIAL MISCONDUCT DEPRIVED WENDI OF DUE PROCESS AND VIOLATED HER RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ........................................... 63

IV.   THE JURY'S CONSIDERATION OF A NON-STATUTORY AGGRAVATING FACTOR VIOLATED DUE PROCESS ................................ 69

V.    WENDI WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL ON HER DIRECT APPEAL ................................................................... 70

CONCLUSION .......................................................................................... 70

iv

1

# TABLE OF AUTHORITIES

2
**Page**

3

**FEDERAL CASES**

4

*Ainsworth v. Woodford*,

5
    268 F.3d 868 (9th Cir. 2001) .................................................................51, 54

6
*Arave v. Creech*,

7
    507 U.S. 463 (1993)...................................................................................70

8
*Bean v. Calderon*,
    163 F.3d 1073 (9th Cir. 1998) .................................................................52, 58

9
*Bloom v. Calderon*,

10
    132 F.3d 1267 (9th Cir. 1997) .................................................................48

11
*Bobby v. Van Hook*,
    130 S. Ct. 13 (2009)...............................................................................44, 47

12

13
*Caro v. Woodford*,
    280 F.3d 1247 (9th Cir. 2002) .................................................................45

14

15
*Correll v. Ryan*,
    539 F.3d 938 (9th Cir. 2008) ...............................................................43-44, 52

16
*Cuyler v. Sullivan*,
    446 U.S. 335 (1980)................................................................................61-63

17

18
*Douglas v. Woodford*,
    316 F.3d 1079 (9th Cir. 2003) .................................................................45, 54, 62

19

20
*Evans v. Lewis*,
    855 F.2d 631 (9th Cir. 1988) ...................................................................59

21
*Evitts v. Lucy*,
    469 U.S. 387 (1985).................................................................................70

22

23
*Florida v. Nixon*,
    543 U.S. 175 (2004).................................................................................44

24

25
*Frierson v. Woodford*,
    463 F.3d 982 (9th Cir. 1999) ...................................................................44, 52

26
*Girts v. Yanai*,
    501 F.3d 743 (6th Cir. 2007) ...................................................................57

27
28

v

**TABLE OF AUTHORITIES (cont'd)**

**Page**

*Glasser v. United States,*
   315 U.S. 60 (1942) ........................................................................................ 62

*Harris ex rel. Ramseyer v. Wood,*
   64 F.3d 1432 (9th Cir. 1995) ........................................................................ 45

*Jennings v. Woodford,*
   290 F.3d 1006 (9th Cir. 2002) ...................................................................... 59

*Lockett v. Ohio,*
   438 U.S. 586 (1978) ...................................................................................... 43

*Lockhart v. Terhune,*
   250 F.3d 1223 (9th Cir. 2001) ...................................................................... 62

*Padilla v. Kentucky,*
   130 S. Ct. 1473 (2010) .................................................................................. 44

*Porter v. McCollum,*
   130 S. Ct. 447 (2009) .................................................................................... 54

*Robinson v. Schriro,*
   595 F.3d 1086 (9th Cir. 2010) ................................................................ 45, 58

*Rompilla v. Beard,*
   545 U.S. 374 (2005) ................................................................................ 54, 58

*Sears v. Upton,*
   130 S. Ct. 3259 (2010) .................................................................................. 53

*Smith v. Stewart,*
   189 F.3d 1004 (9th Cir. 1999) ...................................................................... 59

*Strickland v. Washington,*
   466 U.S. 668 (1984) .............................................................................. Passim

*United States v. Lopez-Avila,*
   --- F.3d ---, 2012 WL 450314 (9th Cir. Feb. 14, 2012) ............................. 63

*United States v. Younger,*
   398 F.3d 1179 (9th Cir. 2005) ...................................................................... 67

*Wiggins v. Smith,*
   539 U.S. 510 (2003) .............................................................................. Passim

vi

1

**TABLE OF AUTHORITIES (cont'd)**

2

**Page**

3

*Williams v. Taylor*,
    529 U.S. 362 (2000) .................................................................................. 44-45, 58

4

5

*Wood v. Georgia*,
    450 U.S. 261 (1981) ............................................................................................ 61

6

*Woodson v. North Carolina*,
    428 U.S. 280 (1976) ............................................................................................ 69

7

8

*Zant v. Stephens*,
    462 U.S. 862 (1983) ....................................................................................... 69-70

9

**STATE CASES**

10

*Knapp v. Hardy*,
    111 Ariz. 107, 523 P.2d 1308 (1974) .................................................... 21, 23-25

11

12

*State v. Andriano*,
    215 Ariz. 497, 161 P.3d 540 (2007) ............................................................*Passim*

13

14

*State v. Bocharski*,
    218 Ariz. 476, 189 P.3d 403 (2008) .............................................51, 54, 58, 64

15

16

*State v. Greenawalt*,
    128 Ariz. 150, 624 P.2d 828 (1981) ................................................................... 69

17

*State v. Hughes*,
    193 Ariz. 72, 969 P.2d 1184 (1998) .......................................................64, 66, 68

18

19

*State v. Jimenez*,
    165 Ariz. 444, 799 P.2d 785 (1990) ................................................................... 55

20

21

*State v. Ring*,
    204 Ariz. 534, 65 P.3d 915 (2003) ..................................................................... 70

22

**STATE STATUTES**

23

A.R.S. § 13-703 ..................................................................................................... 39

24

A.R.S. § 13-751 ................................................................................................*Passim*

25

A.R.S. § 13-752(H) ............................................................................................... 45

26

27

28

vii

4838-2894-9006

**TABLE OF AUTHORITIES (cont'd)**

**Page**

RULES

Ariz. R. Evid. 803(3)........................................................................................38

Ariz. R. Crim. Proc. 32.6.................................................................................70

Ariz. R. Crim. Proc. 32.8.................................................................................70

CONSTITUTIONAL PROVISIONS

Ariz. Const. Art. 2, §§ 4, 15, 24..........................................................46, 55, 59

U.S. Const. Amend. XIV ............................................................................55, 70

U.S. Const. Amend. VI .........................................................................43, 55, 61

U.S. Const. Amend. V ...........................................................................46, 55, 59

U.S. Const. Amends. VIII......................................................................46, 55, 59

U.S. Const. Amend. XIV ............................................................................55, 70

OTHER AUTHORITIES

American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003) ..........................................26, 44, 47, 58, 62

Corr. Death Row Demographics, http://www.azcorrections.gov/inmate_datasearch /Minh_NewDeathRow.aspx (last visited Feb. 7, 2012).......................................46

Victor L. Streib, *Death Penalty for Female Offenders, January 1, 1973, Through December 31, 2011*, at 3 (2012), available at http://deathpenaltyinfo.org/documents/FemDeathDec2011.pdf (last visited Feb. 7, 2012) ....................................................................................................................46

*State v. Gallardo*, No. 09-0171-AP, Video of Nov. 2, 2010 Oral Argument, *available at* http://supremestateaz.granicus.com/MediaPlayer.php?view ..................................63

viii

4838-2894-9006

P-App. 000054

**INTRODUCTION**

1
2       Wendi Andriano[1] was born into a family plagued by mental illness and substance
3   abuse, was raised in abject poverty by child molesters, was physically abused her entire
4   childhood at home and in the cult-like school she attended, and was subjected to the
5   perverted impulses of her pedophile stepfather while her mother turned a blind eye.

6       Every mental-health professional who saw Wendi from 1996 through the present
7   recognized that she showed symptoms of potentially serious psychological disorders, and
8   many suspected that she was the victim of major childhood trauma.  As explained below,
9   these suspicions understated the severity:  Wendi has several serious psychiatric
10  disorders, which likely played a substantial role in the events that led to the death of her
11  terminally ill husband (Joe), and impaired her ability to control and manage her feelings
12  and reactions as the events on the night of the offense unfolded.

13      The jury, however, heard *none* of this information before sentencing Wendi to
14  death for Joe's murder.  Defense counsel inexplicably failed to investigate the depth of
15  Wendi's horrific childhood, to ascertain the extent and manifestations of her mental
16  illness, or to present expert testimony at trial showing that Wendi's worsening mental
17  state was a significant contributing factor in Joe's death.  Defense counsel's failure to
18  present the evidence set forth in this Petition[2] was not the product of strategic planning or
19  measured deliberation.  Defense counsel's representation fell below "an objective
20  standard of reasonableness," and their errors were "so serious as to deprive [Wendi] of a
21  fair trial[.]"  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).[3]

22
23
24  [1]  For ease of reference, this Petition will refer to Petitioner and members of her family by their first names (*e.g.*, Wendi, Joe, Donna, Skip and Alejo).
25  [2]  The accompanying expert reports, declarations and documents are separately identified by Tab number.  The two exhibits attached to this Memorandum (without Tabs) are
26  referred to as EXHIBITS 1 and 2.
27  [3]  Wendi reserves the right to supplement her Petition in the event that additional facts and legal violations are later discovered.
28

1

<div align="center"><b>CASE BACKGROUND</b></div>

**I.     OVERVIEW**

In 2004, Wendi was convicted of murdering Joe and sentenced to death.  Her conviction and sentence were affirmed by the Arizona Supreme Court.  *State v. Andriano*, 215 Ariz. 497, 161 P.3d 540 (2007).

The scant mitigation evidence offered at trial suggested that Wendi was a product of a good family and home life.  That story, however, is completely inaccurate, the product of a cursory investigation that treated mitigation as an afterthought, and failed to explore the extent of Wendi's mental illness and her mental state on the night of Joe's death. The jury that sentenced Wendi to death never heard the harrowing story of her life or the relationship between her psychiatric disorders and the crime, which would have undercut the Prosecutor's central themes in the case, and presented a compelling case for leniency.

**II.     WENDI ANDRIANO'S LIFE**

    **A.     CHILDHOOD**

        **1.     Wendi Was Born Into A Family Marked By Mental Illness, Substance Abuse And Violence**

Wendi came from a severely dysfunctional family, plagued by multigenerational mental illness, childhood physical and sexual abuse, and substance abuse on both sides of her family, including her biological parents, Shelby Robertson ("Skip") and Donna Worsham Alejo ("Donna").  (*See* Tab 2B and Tab 4 at 6-61 (describing the extent of the dysfunction in Wendi's family and the factors that cause higher incidence of mental illness in such families).)

Attached as **EXHIBIT 1** to this Petition are Robertson/Worsham family trees, which show the extent to which mental illness, substance abuse, and childhood physical and sexual abuse affected generations of relatives on both sides of Wendi's family.

<div align="center">2</div>

4838-2894-9006

### 2.   Wendi Was Raised By A Series Of Child Molesters And Pedophiles

Wendi's father (Skip), his father (Boyd Gravely Robertson), and Skip's brothers (Burl Boyd ("Buck"), Glen, Jerry Don, AV and Tommie), were all child molesters.

- According ██████████████████, Buck, "his father, and all of his brothers, including Skip[], his youngest brother, raped ██ from the time I was ten until ██████████████████ the age of eighteen."  (██████ ¶ 1.)

- Skip himself stated that his "father molested ██████████████", and ██████████████, and that his brother "AV molested ████████."  (Tab 32 ¶¶ 57, 60.)

- Skip sexually molested ██████████████ before Wendi was born in 1970.  (Tab 27 ¶ 104.)

- In 1992, Skip had sex with ██████████ 12 year old ██████: "Back then, I felt like I loved her in the way I felt love for an adult woman."  (Tab 32 ¶ 64.)  Skip was convicted of child molestation, and spent 17 years (1993-2010) in prison in Arizona.  (Tab 70.)

- In 1993, Skip's brother, Tommie, was arrested because he had Polaroid pictures, "taken in the sleeper compartment of his truck," of ██████████████, then 13 years old, and "in them it looked like she was sleeping and Tommie was holding his penis in front of her face."  (Tab 32 ¶ 65.)  Tommie was convicted of sexual exploitation of a minor, and spent 4 years in prison.  (Tab 71.)

Skip, his father, and his five brothers all had access to Wendi at various times when she was an infant and young child.  (Tab 27 ¶ 161, 165; Tab 32 ¶ 47.)

- When Wendi was an infant and toddler, she was left alone with Skip's father, and it was a foregone conclusion among the Robertson family women that he molested Wendi.  (Tab 27 ¶ 167.)

- Skip stated that, "[a]round the time Donna and I were going through our divorce [1974] . . . Tommie and I took Wendi on the road in our rig to Texas. . . .  We were gone for a few days.  I did not think anything of it at the time but Wendi, who was *three, maybe four years old*, was in the sleeper compartment of the truck, in bed with Tommie.  Looking back on it, *I would not be surprised if Tommie molested her*."  (Tab 32 ¶ 50 (emphasis added).)

After divorcing Skip, Donna married Alejo Ochoa ("Alejo"), who sexualized Wendi from an early age until she left home as a young adult, and treated Wendi as his

3

1    girlfriend/spouse rather than a daughter.  (Tab 27 ¶¶ 246-47; Tab 12 ¶ 14; Tab 13 ¶ 6.)

2        •    From age 10 or 11 until Wendi left the house as a young adult,
3             Wendi spent a couple of hours rubbing Alejo's head, back, and legs
             almost every night.  "Alejo really liked to have his head in Wendi's
             lap while she rubbed him beginning when she was nine years old
4             and throughout her teens."  (Tab 27 ¶¶ 276-77.)

5        •    During these sessions, which they characterized as Wendi
             "ministering" to him, Alejo began with his shirt off, then stripped
6             down to his briefs.  Alejo required Wendi to be scantily clad as well
             while at home (whether "ministering" to him or not).  She often
7             wore only an old T-shirt and "little tiny, sexy underwear," which
             Alejo bought for her on frequent father-daughter shopping trips.  By
8             the time Wendi was a teen, lacy, sexy underwear was the only kind
             of underwear Wendi owned.  (Tab 27 ¶¶ 276-79.)
9
10       •    Alejo bought inappropriate clothing for Wendi when she was a pre-
             teen and, by the time she was 12 years old, Alejo was taking her to
             stores like Frederick's of Hollywood and Victoria's Secret to buy
11            her lingerie, including garter belts, nylons and high heels.  (Tab 27
             ¶¶ 259, 262, 266-67, 270.)
12
13       •    By the time Wendi was 14 or 15 years old, she looked older than she
             really was and Alejo began "dragg[ing] Wendi into hard-core porn
14            stores."  He "always took Wendi right into the main part of the store
             where the triple-x and hardcore sex magazines, videos, toys, and
15            other hardcore items were displayed and sold."  (Tab 27 ¶¶ 280-82.)

16       •    At least by the time Wendi was 15 or 16, Alejo (an amateur
             photographer) began taking photos of Wendi posed in lingerie or
17            bikinis.  (Tab 34 ¶ 7.)  A few examples of such photographs still
             exist.  (*See* Tab 67 ¶¶ 4-5; Tabs 72-74.)

18       •    When Wendi's adopted brother, Brandon, found six sheets of proofs
             of pictures in Alejo's photography cabinet showing a teenage Wendi
19            posed in "Victoria's Secret type stuff" in the desert, he recalls that
             "Donna slapped me across the face and Alejo beat me . . . more
20            severe[ly] than usual.  I was all bruised and bloody."  (Tab 26 ¶ 18.)

21       •    ████████████████████████████████████████████
22            ████████████████████████████████████████████
23            ████████████████████████████████████████████
24            ████████████████████████████████████████████
25            ████████████████████████████████  (Tab 12 ¶ 18.)

26       •    One former principal of the high school Wendi attended noted:
27            "There were things about Alejo's dynamic with Wendi that did not

4

sit right with me.  I used to live in an A-frame house on the church property with [my wife].  One night, I was standing on the balcony as I got ready for Wednesday night services.  I looked into the parking lot and I saw Wendi and Alejo.  Wendi leaned into Alejo and they kissed on the mouth.  Something was weird about it.  It was not a father-daughter kiss.  After the kiss, Wendi went in one direction and Alejo went in the other direction. This stuck out in my mind so much, I told [my wife] about it."  (Tab 13 ¶ 6.)

- A member of the church stated, that around 1987, when Wendi was 17 years old, "I was concerned that Alejo had been sexually molesting Wendi.  I was so upset with Alejo's behavior, I called him up on the phone and arranged a meeting between us.  When I spoke with Alejo, I told him the reason I was calling and I asked him to meet me at church to discuss it further.  He agreed to come meet me.  When I arrived at the church, Alejo was standing outside. . . .  At the beginning of our conversation, Alejo denied everything.  He denied it several times until he finally confessed to his inappropriate behavior and admitted he had a problem sexually.  Alejo asked me, 'What should I do?  Should I resign from the church?'  Looking back on it, I wish I would have just told him to resign, but instead I told him that he needed to ask forgiveness . . . ."  (Tab 11 ¶ 10.)

Donna also turned a blind eye to Alejo's inappropriate sexual behavior toward Wendi because:

I didn't see myself as being able to do anything about it and I never let myself become aware that it might be a problem.  Alejo was the head of our household and one of the main ten[e]ts of our religion was that as the head of the household he set the rules and it was our place to obey the rules, so that's what we did.

(Tab 27 ¶ 283.)

### 3. Wendi Was Physically And Psychologically Abused Her Entire Childhood

From her infancy, Skip trained Wendi "*like she was a dog*, not a baby."  (Tab 27 ¶ 164 (emphasis added).)

He spanked her from the time she was an infant and toddler, including when he was potty training her from the time she was a few months old until she was ten months old.  If she didn't obey or do something right when he told her to, for example if she was crying and he told her to stop, he spanked her, a good smack with his hand on her butt.

(*Id*.)  Donna also physically abused Wendi, noting that she gave Wendi swats with a wooden spoon from the time she was a toddler until age 6 or 7—remembering to "pull

5

4838-2894-9006

1    down the diaper to hit [her]; always hit [her] with the diaper off."  (Tab 27 ¶ 236.)

2         The physical and psychological abuse of Wendi continued throughout her

3    childhood.

4    •    Alejo and Donna started using a paddle on Wendi when she was six
          or seven years old.  Donna stated: "Since Wendi was born, I've
5         always been to-the-letter, black-and-white when it comes to
          following church rules, including rules about disciplining kids, by
6         which we meant spanking or swatting them.  If the church
          authorities say to spank the kids, I spank them, and do it how I'm
7         told to do it.  *You have to spank them hard enough so that they're
          not just angry; it has to go beyond that so you break them.*"  (Tab 27
8         ¶ 237 (emphasis added); *see* Tab 24 ¶ 126.)

9    •    In 1977, Donna, Alejo and Wendi sold all of their possessions, gave
          up their house, cut off all contacts with everyone they had previously
10        known, and traveled with the Fishers of Men traveling ministry[4] for
          over two years.  (Tab 27 ¶ 204.)  During that time, Donna and Alejo
11        swatted Wendi about once per week, "hard enough so it made an
          impression and so she knew it was serious."  The leaders of that cult
12        also had permission to swat kids.  "They taught that you should swat
          kids hard and fast, and pull the paddle away after you hit, not swat
13        them heavy or slow so the paddle stays on them after you hit them."
          (Tab 27 ¶ 238.)

14   •    After they left Fishers of Men in 1979, Donna and Alejo continued
          to swat Wendi during her pre-teen and teen years, using a sixteen
15        inch long, four inch wide paddle etched with scripture.[5]  (Tab 27
          ¶¶ 239-241.)
16
     •    Wendi also was beaten with a paddle over many years at the Harvest
17        (formerly 91st Psalm) church/school, which she attended from 1980
          until she left home as a young adult.  According to Donna, Harvest
18        members believed "that physical punishment of children was
          necessary to drive sin from them. . . . You name it and we swatted
19        them for it . . . ."  (Tab 27 ¶¶ 231-33; Tab 34 ¶ 9.)

20   •    The abuse and isolation of children at Harvest was pervasive.  (Tab
          12 ¶ 6; Tab 23 ¶ 28; Tab 26 ¶ 16; Tab 27 ¶¶ 231-32; Tab 34 ¶¶ 25-
21        26; Tab 35 ¶¶ 11-12; Tab 38 ¶ 12.)

22   •    Alejo, the "teen and children's pastor" at Harvest (Tab 24 ¶ 76), was
          particularly abusive to the children there; he would "whoop" them

23

24   [4]  One former member of Fishers of Men noted:  "We did not subscribe to organized
     religion, rather, we took to the streets preaching, singing songs, and living communally
25   with each other.  We gave up our material possessions and sold them to fund the ministry.
     In hindsight, the group was pretty far out there and today I would describe it as a cult."
26   (Tab 36 ¶ 3; *see also* Tab 27 ¶ 212 ("It got so that we never really thought about
     anything, just did what we were told all day, from one day to the next.  I can see in
27   retrospect how it got to be like a cult.").)

28

4838-2894-9006

during the week and during Sunday school.  (Tab 23 ¶ 33.)

- Tom King, the leader at Harvest, taught Alejo to drill holes in the paddle in order to make the paddling hurt more.  (Tab 26 ¶ 16.)

- Wendi was kicked out of school for months at a time and forced to pull weeds for minor infractions.  (Tab 10 ¶ 7; Tab 27 ¶ 324.) Wendi was frequently punished, and was required to do manual labor where no one was allowed to speak to her.  (Tab 10 ¶ 7.)

### 4. Wendi Was Raised In Poverty

Between 1975 (when Wendi was age 4-5), and 1988 (when she was age 17-18), Donna and Alejo's total annual income averaged $5,617 per year.  (Tab 68.)  In three of those years (1980, 1981 and 1982), they reported no annual income.  In two others (1975 and 1979), their annual income was less than $2,000.  (*Id*.)

- While Donna worked at a drug treatment center starting in late 1974, Wendi (then age 4) went out into the streets to panhandle.  "She was a cute little blonde and people gave her money when she begged. *She was by herself* but people in the area knew her."  (Tab 27 ¶¶ 183, 245 (emphasis added); Tab 24 ¶ 50; Tab 34 ¶ 3.)

- While traveling with Fishers of Men, Donna, Alejo and Wendi were often hungry, eating "old food out of the trash" or searching for money on the street to buy a bag of beans.  (Tab 27 ¶ 213.)

- Donna and Alejo didn't believe in getting Wendi medical treatment because they thought God would heal her.  (Tab 27 ¶¶ 185-90.)

### B. WENDI DEVELOPED PSYCHIATRIC DISORDERS

By the time Wendi reached age 18, her childhood had profound effects on her brain circuitry and emotional state.  Childhood trauma stunted Wendi's cognitive and emotional development in certain key areas and gave rise to chronic psychiatric disorders that would impair her functioning throughout her adult life.  These disorders and organic brain deficits explain her abnormal actions and reactions to trauma as an adult.  As described below, several events and conditions of Wendi's adult life, combined with the disorders she suffered, led to her acute psychiatric deterioration in the last year of Joe's life, culminating in her extreme, dissociated actions on the night of his death.

7

4838-2894-9006

1

### 1.      Impaired Cognitive Development

Persistent childhood abuse, neglect and anxiety disrupts and damages cognitive development in several fundamental ways.  (Tab 5 at 6-7.)  The primary damage threat arises in the prefrontal cortex and related areas responsible for what neuropsychologists call "executive functioning"—the ability to guide and direct one's thoughts and regulate one's emotions.  (*Id.* at 6-7, 11-12.)  "Adequate and mature prefrontal cortex development is required for just about every aspect of adult functioning—judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions."  (*Id.* at 11-12.)

In late 2010 and early 2011, neuropsychologist Myla Young evaluated Wendi, administering tests aimed at isolating and assessing certain functions of her brain to identify specific deficits in brain functioning.

Dr. Young noted significant impairment in each of the regions most likely to be affected by childhood and adolescent abuse and neglect.  (Tab 5 at 8-13.)  Most pronounced, however, was Wendi's impairment in executive functioning.  (*Id.* at 11-13.)  Wendi's performance on tests requiring the use of executive functioning—namely, the ability to guide, direct, and manage thinking, actions, and emotions—were "quite severely impaired," as low as the 2nd to 5th percentile in some areas.  (*Id.*)  The speed of her mental processing and visual-perceptual skills were so impaired (the 5th percentile) as to qualify as borderline mentally disabled in that specific brain function.  (*Id.* at 8.)

As an adult, particularly in the last year before her arrest, these fundamental impairments would impede Wendi's ability to respond appropriately to increasingly severe external stressors and to regulate her own emotional responses, including responses arising out of other psychiatric disorders described below.  Notably, the last person to see Joe and Wendi together—who saw Wendi call 911 from their apartment—

8

4838-2894-9006

1    described Wendi's demeanor in a single word: "Confused."  (9/8/04 Tr.[5] at 11.)

2          **2.      Impaired Emotional Functioning Due To Childhood Trauma**

3          Wendi's childhood experiences affected the content of her brain as well as its

4    functional development.  Specifically, her childhood trauma embedded certain responses

5    and dysfunctional emotional reactions—"trauma-based ways of relating to others"—that

6    rendered her unable to function in psychologically healthy ways as an adult.  (Tab 3 at

7    15-17, 24-26.)  These effects manifested themselves in several detrimental ways over the

8    course of Wendi's life, causing inflexible neuroses and self-defeating coping mechanisms

9    that rendered the impact of her psychiatric disorders more profound.

10          Dr. James Hopper, a clinical psychologist and instructor at Harvard Medical

11    School whose research and clinical work focuses on the long-term effects of childhood

12    abuse, conducted interviews of Wendi and others, reviewed materials relevant to Wendi's

13    social history, and has submitted a summary report (Tab 3) and a comprehensive report

14    (Tab 4) regarding Wendi's childhood and its profound impact on her psychological and

15    social functioning as an adult.  Dr. Hopper concluded that Wendi "entered adulthood as a

16    severely traumatized and damaged person" who was and remains "extremely traumatized

17    from childhood neglect and abuse."  (Tab 4 at 131, 251.)

18          Dr. Hopper identified five general categories of childhood abuse that had

19    traumatizing effects on Wendi:  (1) neglect by her mother; (2) physical abuse, including

20    Wendi being "beaten into submission;" (3) emotional abuse; (4) sexual abuse; and

21    (5) traumatizing relationship patterns with caregivers from a very early age.  (*See*

22    *generally* Tab 3 at 4-17.)

23          The impact of this abuse on her emotional development is extensively detailed in

24    Dr. Hopper's reports, but a few general categories of effects warrant special emphasis

25    _____

26    [5]  Cites to the trial transcript are given as "[Date of Proceeding] Tr. at [Page]."  The date
of this particular citation, 9/8/04, is the sole date where there are two transcript
volumes—one for opening statements, and one for testimony.

27                                                9

28

4838-2894-9006

here.  *First*, Alejo's abuse and relentless sexualizing of Wendi as a child (coupled with

her mother's willful neglect) had predictably severe effects.  (Tab 3 at 21-22, Tab 4 at

215-18, 246-47.)  As Dr. Hopper notes, "[c]hildren need to be *protected* from the

sexuality of adults, and not to have it used against them in exploitative and abusive ways"

because it can lead them to focus on sexualized attention as a substitute for healthy

affection, caring and love.  (Tab 4 at 106.)  As an adult, Wendi exhibited "classic

symptoms" of such childhood sexual exploitation, including the subconscious, incessant

need for men's sexual attention, despite feeling disgust, shame, and a lack of pleasure in

sex itself.  (Tab 4 at 132-33.)

    *Second*, the trauma accompanying such abuse damaged Wendi's ability to break

away from reliving her past torment through self-regulation of negative emotions and

impulses.  (Tab 3 at 24; Tab 4 at 247-49.)  Rather than acknowledging those painful

memories and coping with them, Wendi suffers from emotional dysregulation, causing

her to attempt to hide the emotions they cause from herself and others, or to "dissociate"

and become disconnected from them.  (Tab 4 at 247-48.)  In damaged individuals,

dissociation can sometimes include "whole realms of experience and identity, such that

personality and identity are highly fragmented."  (*Id.* at 130.)  Throughout her life,

Wendi's brain has engaged in "pathological alterations of consciousness," such that,

when confronted with traumatic experiences or the memory of them, "her mind

temporarily [goes] blank and she [is] unable to feel any emotions or even sensations in

her body."  (*Id.* at 248; *see also id.* at 129-31; Tab 27 ¶¶ 329-35.)

    For Wendi, this dissociation is pervasive.  (Tab 4 at 131.)  In Dr. Hopper's words,

"*I have never before encountered a patient or defendant with such a severe disturbance

of the capacity to recall autobiographical memories, not only of specific incidents but . . .

of the kinds of experiences she typically had*."  (*Id.* (emphasis added).)

### 3. Wendi Suffers From Severe Psychiatric Disorders, Which Became Worse Leading Up To Joe's Death

The accumulation of abuse and neglect, coupled with her family history, rendered Wendi highly vulnerable to developing psychiatric disorders. (Tab 4 at 251.)

In his report (Tab 2), Dr. George Woods describes how Wendi developed multiple psychiatric disorders by age 18, including the cognitive disorder identified by Dr. Young as well as three others: bipolar disorder; complex post-traumatic stress disorder ("complex PTSD"); and dependent personality disorder. These disorders are "co-morbid" in Wendi—meaning that "their effects and symptoms intensified in combination and in aggregate," particularly "in times of extreme stress and novel circumstances." (Tab 2 at 3.) As Dr. Woods explains, "[a]ll were in play at the time of the offense, a synergy of trauma, cognitive deficits, and mood defects, impairing her ability to conform her behavior to the requirements of the law." (*Id.* at 7.)

These disorders went untreated until Wendi's arrest (and were misdiagnosed thereafter), but their symptoms were increasingly evident leading up to and including the time of Joe's death. (Tab 2 at 46-60.) The reason for this lack of prior diagnosis rests in part on the fact that "the substantiation of many of Wendi's symptoms" depended upon a thorough inquiry into her social history. (Tab 2 at 49.) Because it had never been investigated by defense counsel, neither Wendi's family history of mental illness nor the full extent of her childhood trauma was made available to diagnosing psychiatrists prior to being presented to Dr. Woods in this post-conviction proceeding.

#### a. Bipolar Disorder

Wendi had bipolar disorder, marked by abnormal manic and depressive states. (Tab 2 at 12-15; Tab 4 at 245-46.) In addition, the development of bipolar disorder is strongly related to traumatic stress and genetic vulnerability. (Tab 2 at 15; Tab 2B at 1.) Both correlating factors existed for Wendi. (*See* Tab 4; Tab 2B; **EXHIBIT 1**).

11

4838-2894-9006

1    Wendi's erratic behavior in the period leading up to Joe's death—including

2    extramarital affairs and hyper-sexual behavior, inappropriate relationships with

3    subordinate employees and tenants at the apartment complex she managed, wide mood

4    swings, increased alcohol use and public displays of drunkenness, and openly engaging in

5    unlawful activity at her workplace—were textbook symptoms of a severe manic bipolar

6    state.  (Tab 2 at 15-16, 48-57.)  The extreme stress of Joe's terminal cancer, and the self-

7    created stresses of her own manic behavior, further "unleashed her mood symptoms" and

8    exacerbated her mania—which, in combination with other disorders, created "atypical

9    and more severe behavior than would be seen in a given disorder alone."  (Tab 2 at 50.)

10                    **b.     Complex PTSD**

11    While PTSD refers to the effects of exposure to a single traumatic incident,

12    "complex PTSD" is characterized by ongoing, chronic exposure to a traumatic stressor.

13    (Tab 2 at 16-17.)  Symptoms of complex PTSD include emotional numbing and

14    dissociation, affective dysregulation (*e.g.*, failing to register emotional responses in

15    situations where normal people would do so, or overreacting emotionally in situations

16    where normal people would be calm), extreme acquiescence (the inability to break free

17    from actual or perceived controls of others), and becoming easily overwhelmed by even

18    slightly stressful situations.  (*Id.* at 17-19.)

19    Wendi exhibits all of these effects of complex PTSD (*id.*), and its presence

20    functioned to increase the severity of her bipolar disorder in her acutely manic state

21    leading up to Joe's death.  (Tab 2 at 48-49, 54-60.)  Wendi's complex PTSD symptoms at

22    the time of Joe's death were "pronounced," including affective numbing and significant

23    dissociation.  (*Id.* at 56-60.)

24                    **c.     Dependent Personality Disorder**

25    Dependent personality disorder is characterized by pervasive psychological

26    dependence upon and acquiescence to other people, to the extent that a sufferer's own

27                                        12

28

4838-2894-9006

identity is lost.  (Tab 2 at 21.)  The dependence on approval and reassurance from others creates exaggerated fears of being left alone.  (*Id.*)  Sufferers may respond with pathological anger when their dependency needs are thwarted—that is, when they are incapable of pleasing or "fixing" others through whom they define themselves—leaving them feeling "caught in the grips of powerful forces with which they cannot deal" and "vulnerable to spiraling into a homicidal state."  (Tab 2 at 22-23 (internal quotations omitted); *see also id.* at 61 n.92.)

Like her other psychiatric problems, Wendi's dependent personality disorder stems from her upbringing.  (Tab 2 at 22; Tab 4 at 248.)  Being trained "like she was a dog" to give total obedience to her caregivers had psychiatric consequences:  Wendi became "terrified" of losing relationships (Tab 4 at 248), particularly her relationships with men (Tab 2 at 53-54).  These symptoms permeated the early years of Wendi's marriage to Joe (*id.* at 32-35), and became more detrimental as her "dependence, her need to not be alone and maintain a dependent relationship, was turned upside down" in the face of Joe's worsening cancer (*id.* at 48).

C.   ADULT LIFE AND MARRIAGE

After graduating high school in 1989, Wendi volunteered for roughly six months at a Mexican church.  (10/25/04 Tr. at 59.)  She spent her time there in a funk, staying in bed for weeks at a time, consistent with a depressed bipolar state.  (Tab 2 at 14.)

After her return from Mexico, and a brief stint working for a family friend while living with her parents, Wendi took a position as an on-site apartment leasing agent in Casa Grande.  (10/25/04 Tr. at 66.)  She began drinking (10/21/04 Tr. at 180-81) and engaged in repeated hyper-sexual behavior (Tab 15 at 18-23)—both symptoms of a manic bipolar state.  (Tab 2 at 15.)

Wendi also was "gullible and trusting . . . to the point of sheer stupidity[.]"  (Tab 27 ¶ 365.)  Wendi gave away possessions, freely loaned what little money she had to

13

1   people making empty promises of repayment, and became an easy target for

2   manipulation (*id. ¶¶* 361-69)—all indicators of dependent personality disorder.  (Tab 2 at

3   22.)  Wendi also continued to experience dissociation regarding unpleasant events,

4   "blanking out" a large number of negative memories, ranging from how she acquired a

5   scar to remembering that her jacket was stolen.  (Tab 27 ¶¶ 329-35.)

6       In early 1992, Wendi met and began dating Joe.  Within a matter of weeks, Joe

7   moved in with her—which is consistent with Wendi's dependent personality disorder—

8   and they were married in 1994.  (Tab 2 at 30-35.)

9       Wendi and Joe struggled for money throughout their marriage.  (Tab 2 at 40-47;

10  Tab 69.)  The money they did acquire they tended to squander, from buying a failed glass

11  repair business, to buying a timeshare they could not afford, to purchasing fuel and

12  upgraded parts for Joe's racing boats, his weekend hobby.  (Tab 2 at 42-45; Tab 24 ¶ 139;

13  10/26/04 Tr. at 41-42.)

14      The jury heard evidence of Joe physically intimidating or verbally abusing Wendi

15  during their marriage.  As Dr. Woods noted, Wendi's response to those incidents of

16  abuse—as well as Wendi's other behavior in their relationship—"mirrored, in many

17  ways" her relationship with her stepfather Alejo and were manifestations of her disorders.

18  (Tab 2 at 33-34.)  This included Wendi's sexual acquiescence.  Joe permitted her to go

19  out with her friends on condition that she "participate in whatever he had planned when

20  she returned home"—typically sex, including the use of sex toys against her will.

21  (10/26/04 Tr. at 88-93.)

22      In 1996, Wendi was caught stealing from an employer, and was referred for

23  psychological counseling.  (Tab 2 at 40.)  Treatment notes indicate that Wendi was

24  depressed and had problems sleeping and focusing.  (Tab 46 at PCR117.)  She was

25  prescribed an anti-depressant, but that only made her sleep problems *worse* (*id.* at

26  PCR121); because Wendi was bi-polar (rather than suffering from depression alone), the

27                                         14

28  _____

4838-2894-9006

1   anti-depressant likely triggered a manic episode, a common reaction of bi-polar

2   individuals to such medication.  (Tab 2 at 40-41.)

3       After her firing, Wendi and Joe obtained an interest in a glass-repair business.

4   Within a year, they were forced out due to their embezzlement, accompanied by Joe's

5   threats to kill the majority owner.  (10/26/04 Tr. at 6-8.)  Amid this turmoil, Wendi and

6   Joe had their first child, Nicholas, in 1997, and a daughter, Ashlee, the next year.

7       Between the births of their children, a recurring lump on Joe's neck that had been

8   surgically removed three times previously was finally diagnosed as malignant cancer.

9   Joe had surgery in mid-1998, but by that time the cancer had spread to Joe's lungs and his

10  prognosis was terminal.  (10/26/04 Tr. at 110-15.)  Joe and Wendi hired a local attorney,

11  Jeffrey Miller, to represent them in a medical malpractice action against the providers

12  who had failed to correctly diagnose his cancer.  (Tab 19 ¶ 1.)

13      Joe and Wendi tried a number of nontraditional treatments in 1998 and 1999,

14  including a trip to a holistic healing center in Colorado and faith-based healing.

15  (10/26/04 Tr. at 124-29.)  However, a CT scan in early 2000 indicated that the

16  nontraditional therapies had not slowed Joe's cancer, and he was given "a few months to

17  a few years to live," even with chemotherapy, before the cancer would cause him to

18  suffocate to death.  (9/28/04 Tr. at 11-15.)

19      Although Joe agreed to undergo chemotherapy (10/26/04 at 132-33), Wendi

20  testified that he also expressed to her his desire to "die the way [he] want[s] to die,"

21  rather than suffering the agonizing suffocation from cancer foretold by his doctors.

22  (10/27/04 Tr. at 84-85.)  He told her of his intent to commit suicide (*id.* at 84), and took

23  trips to visit out-of-state relatives in Tennessee and Oklahoma to "say[] goodbye to

24  everybody without saying goodbye."  (*Id*. at 111-16.)

25      The news sent Wendi on a downward spiral.  In the midst of raising a toddler and

26  infant, bearing the full weight of supporting the family financially, and caring for a

27

28

15

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

1  terminally ill and increasingly depressed husband, Wendi developed a psychiatric

2  condition known as "caregiver burden"—a state of psychological distress and

3  hopelessness often linked to caring for the terminally ill, which magnifies any underlying

4  preexisting psychiatric disorders of the caregiver.  (Tab 2 at 24-28.)

5      Wendi began to drink more heavily.  (Tab 2 at 52.)  Several months earlier, she

6  had obtained a position as a resident manager of the new San Riva apartment complex in

7  Phoenix, with supervision over employees and responsibility for relationships with

8  tenants.  (*Id.* at 47.)  She placed her job in jeopardy by regularly going to bars with her

9  co-workers and tenants, and by providing unauthorized discounts and incentives to them.

10  (*Id.* at 52-54.)  Faced with the certain death of her husband and unable to meet her

11  dependency needs—a panic-inducing situation for one suffering from dependent

12  personality disorder (*id.* at 22-23, 48)—Wendi began to seek new relationships.

13      Predictably, Wendi fulfilled this dependency crisis by reverting to hyper-sexual

14  behavior, the same type of behavior she learned from a young age as a means to

15  effectively meet the needs of Alejo.  In the summer of 2000, she had an affair with a

16  tenant at the complex, Rick Freeland (9/8/04 Tr. at 53; 9/13/04 Tr. at 42-43), who

17  provided the emotional attachment Wendi's dependent personality disorder craved.  (Tab

18  2 at 48-49, 53-54.)  When asked why she became sexually intimate with Freeland, Wendi

19  testified at her trial:  "I didn't want to be a tease. . . .  I couldn't imagine saying no.  It just

20  wouldn't have been right."  (10/27/04 Tr. at 66.)  After Freeland broke off the affair in

21  July 2000, Wendi responded with extreme efforts to "fix" the relationship:  she persisted

22  in trying to talk with Freeland, including pounding on his door loud enough for neighbors

23  to hear (9/8/04 Tr. at 47-48, 54), "causing a scene" and threatening to obtain an office

24  key to get into his apartment (9/15/04 Tr. at 42).

25      Wendi subsequently had a one-night stand with a man she met at a bar—again, in

26  her words, "because I know that's what guys like" and "how could you turn around and

27

28

16

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

P-App. 000070

say no" (10/27/04 Tr. at 82-83)—and generally engaged in overly flirtatious behavior while out with her co-workers throughout the summer and early fall of 2000. (*See, e.g.*, 9/8/04 Tr. at 8-9; 9/9/04 Tr. at 14-15; 9/15/04 Tr. at 33-36.)  In their totality, Wendi's "affairs, her drinking, and her impaired judgment were the products of her emerging bipolar disorder, symptoms augmented by her longstanding trauma and pathological dependency."  (Tab 2 at 49.)

### D.    JOE ANDRIANO'S DEATH

At the same time the effects of Wendi's disorders were becoming more and more profound, Joe's own depression and sense of foreboding deepened.  (Tab 37 ¶ 4; 10/27/04 Tr. at 13-14.)  Since the spring of 2000, Wendi had tried to talk Joe out of his plan to commit suicide before his cancer worsened (10/27/04 Tr. at 13-14, 84, 89), going so far as to contact their lawyer to tell him of Joe's suicidal state, and to urge him to speak with Joe to (1) recommend a counselor and (2) remind Joe that suicide would eliminate the possibility of any recovery on the malpractice claim.  (Tab 19 ¶¶ 4-5.)

After further discussions with Joe, Wendi testified that she acquiesced in Joe's desire to commit suicide, and began researching cyanide at his suggestion.  (10/27/04 Tr. at 85.)  Unable to purchase cyanide over the Internet, Wendi obtained the name of an alternative chemical available for purchase—sodium azide—that would "accomplish what he was trying to do." (*Id.* at 86, 91.)   In the stated hope of possibly preserving the malpractice suit for his family, and to meet Joe's wishes of sparing his parents and siblings from knowledge of his suicide, Wendi purchased the sodium azide over the Internet using a fictitious name and business license.  (*Id.* at 92-93.)

Around the same time (August/September 2000), Wendi also attempted to obtain additional life insurance for Joe—at his behest, according to Wendi and others. (10/27/04 Tr. at 32-36; Tab 31 ¶ 8.)  Wendi made some preliminary inquiries, including having a conversation with a resident as to whether he would stand-in for Joe's insurance

4838-2894-9006

1   physical, but was unsuccessful.  (10/27/04 Tr. at 38-42.)

2       The sodium azide arrived on Thursday, October 5, 2000.  (10/27/04 Tr. at 101.)

3   According to Wendi, the next day she and Joe emptied the contents of gelatin capsules

4   containing elderberry (an herbal supplement), and, using plastic bowls from the kitchen,

5   filled roughly 15 of the capsules with sodium azide.  (*Id*. at 103-110.)

6       On the evening of Saturday, October 7, 2000, Wendi, Joe, and their children went

7   to a family gathering at Joe's parents' home in Casa Grande.  (10/28/04 Tr. at 22-25.)  On

8   the late-night drive back to their apartment, while the children were asleep in the vehicle,

9   Joe told Wendi that "it was . . . time," and he planned on committing suicide that night.

10  (*Id*. at 25-26.)  They returned home to their apartment around midnight and put the

11  children to bed.  (*Id.* at 26-27.)

12      Thereafter, Joe took the elderberry bottle from the bedroom closet, poured a

13  handful of capsules into his palm, said "here it goes," and ingested them with Gatorade.

14  (10/28/04 Tr. at 29.)  Wendi believed that they would stop his heart and cause a painless

15  death within minutes.  (*Id.* at 30.)

16      Contrary to those expectations, Joe began experiencing dizziness and nausea

17  within 15 to 20 minutes.  (10/28/04 Tr. at 30.)  He began vomiting, and Wendi called co-

18  workers who lived at the apartment complex for help.  She eventually reached Chris

19  Hashisaki, and asked her to come over to watch the kids while Wendi and Joe went to the

20  emergency room.  (*Id.* at 32-33.)  After several minutes, Hashisaki arrived, observed Joe,

21  and urged Wendi to call 911.  (*Id.* at 33-36.)  Wendi did so, telling dispatchers that she

22  believed her husband was having a heart attack, and Chris left the apartment to wait for

23  the paramedics.  (*Id.* at 37.)  The paramedics were dispatched at 2:25 a.m., and arrived at

24  2:33 a.m.  (Tab 65A at PCR354.)

25      In the interim, Wendi recalls that Joe began feeling better, regained his resolve to

26  commit suicide, and ultimately determined to let the sodium azide "finish doing what [it]

27                                          18

28

1  was doing to him." (10/28/04 Tr. at 38-39.)  Wendi later testified that Joe instructed her

2  not to open the door for the paramedics; after minutes of knocking, Wendi slipped out the

3  patio door to inform the paramedics that Joe was refusing service. (*Id.* at 39-43.)  The

4  paramedics and Chris then left by 2:45 a.m.  (*Id.* at 43-44; Tab 65A at PCR354.)

5         They returned less than an hour later, to find Joe dead on the floor, beaten and

6  bloody, and Wendi curled up nearby against the wall, staring into space.  (9/15/04 Tr. at

7  114.)  The living room was in disarray:  a wedding display cabinet was smashed, a bar

8  stool lay broken, a garbage can and items from their countertop were knocked to the

9  floor, and a blood-smeared kitchen knife rested next to Joe's body.  (9/9/04 Tr. at 109,

10  9/13/04 Tr. at 77, 79-81, 84, 108.)

11        The medical examiner later determined that Joe suffered repeated blows to the

12  head—possibly with the bar stool—and a laceration to his carotid artery from the knife,

13  which ultimately caused his death.  (Tab 65.)  The examiner also noted that Joe's cancer

14  had spread to his brain and kidneys.  (Tab 65 at PCR346-47.)  Wendi suffered injuries to

15  her neck and hands; multiple acrylic fingernails were torn off, and Joe's hand still

16  clutched her hair, ripped out from the roots.  (Tab 66; 9/13/04 Tr. at 121; 9/14/04 Tr. at

17  41; 9/23/04 Tr. at 107-08.)

18        No one knows the full story of what occurred to cause this scene, including Wendi

19  herself.  Wendi experienced dissociation to such an extent that many of her memories of

20  the incident are intermittent and non-temporal.  (Tab 2 at 56-59.)  She recalls Joe

21  questioning her about affairs with other men, her confession to him, Joe's resulting rage,

22  and a violent physical confrontation between them.  (10/28/04 Tr. at 45-63; Tab 45 at

23  PCR20, PCR26, PCR91-94, PCR111.)

24        The State would later posit a different theory.  It contended that Wendi

25  surreptitiously poisoned Joe with a lethal dose of 21 grams of sodium azide (the

26  equivalent of 21 packets of Sweet and Low); then, after calling Hashisaki and the

27                                              19

28  MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

1  paramedics ("We don't know exactly why," admitted the prosecutor (11/30/04 Tr. at

2  32)),Wendi simply got impatient waiting for the sodium azide to work and beat Joe with

3  the stool, then stabbed him with the knife.  (12/1/04 Tr. at 23, 31-32.)  The prosecutor

4  argued that Wendi staged the damage to the apartment, and that her wounds were self-

5  inflicted.  (11/16/04 at 71, 115-16.)

6       **E.**    **WENDI'S MENTAL STATE DURING THE NIGHT OF JOE'S DEATH**

7       Because defense counsel never investigated Wendi's family history of mental

8  illness or her harrowing childhood, and because they never retained mental-health experts

9  to determine the effect of such abuse on her psychiatric health and how it may have

10  affected her mental state at the time of the offense, the jury never heard that Wendi

11  suffered from *any* psychiatric disorders—let alone a combination of them, all of which

12  were acute leading up to and including the night of Joe's death.  Dr. Woods concluded

13  that the collective impact of all of these disorders—cognitive disorder, bipolar disorder,

14  complex PTSD, dependent personality disorder and caregiver burden—likely had a

15  substantial impact on her actions the night of Joe's death:

16  > Wendi was experiencing pronounced symptoms of her mental
17  > illness during the period leading up to Joe's death, and the
     > night of the offense involved the convergence of severe
18  > symptoms of each of Wendi's disorders, which, because of
     > their co-morbid nature, would have fed off each other to
19  > exponentially worsen their collective severity.  The
     > manifestations of her psychiatric disorders, including
20  > dissociation, likely played a substantial role in the events that
     > caused Joe's death.  A person in Wendi's state would have
21  > been unable to control and manage her emotions and
     > responses to the events as they unfolded.  Moreover, those
22  > disorders in conjunction—and particularly dependent
     > personality disorder when the sufferer's dependency needs
     > are thwarted—likely would have substantially impaired
23  > Wendi's ability to accurately judge how to "help" her
     > terminally ill husband, who was the focus of Wendi's
24  > pathological dependence needs.  Her ability to judge whether
     > her behavior was right was marred by her multiple mental and
25  > cognitive symptoms.

26  (Tab 2 at 56-57.)  As described below, defense counsel's failure to discover such crucial

27  <div align="center">20</div>

28

4838-2894-9006

1  evidence, applicable to all three phases of Wendi's capital murder trial, was inexcusable.

2  **III.   PRE-TRIAL REPRESENTATION**

3      **A.   DEFENSE TEAM**

4      For the first five months after her arrest, Wendi was at various points represented

5  by Bethanne Klopp-Bryant, Gerald Gavin, and Wes Peterson of the Public Defender's

6  Office; private practitioner Leon Thikoll, a Tucson lawyer who had previously

7  represented Joe and Wendi in connection with a failed business venture; and private

8  practitioner David DeLozier.  (Tab 6 ¶ 4; Tab 7 ¶ 3; Tab 9 ¶ 6; Tab 62.)

9      By early 2001, DeLozier was the only attorney still on the case.  (Tab 7 ¶ 3.)

10  DeLozier had started taking criminal cases in the mid-1990s.  (Tab 7 ¶ 2.)  He had no

11  first-chair experience in any murder case, no death-penalty experience in any capacity,

12  and no experience in any criminal matter comparable in magnitude to Wendi's case.  (*Id.*)

13  DeLozier learned about the case from one of Donna and Alejo's friends and, in late 2000,

14  Donna and Alejo retained DeLozier to represent Wendi in her capital trial (and agreed to

15  pay DeLozier's legal bills).  (Tab 61.)

16      Concurrent with his representation of Wendi in her capital trial, DeLozier also

17  represented Donna and Alejo with respect to guardianship and adoption proceedings in

18  which Donna and Alejo were seeking visitation rights and/or custody of Wendi and Joe's

19  two children.  (*See generally* Tab 77.)

20      DeLozier eventually recognized that Wendi's family lacked sufficient resources to

21  pursue the criminal case solely with private counsel.  (Tab 7 ¶¶ 3-4); Tab 6 ¶ 4.)  In mid-

22  2001, the Public Defender's Office resumed its representation and assigned Wendi's case

23  to the newest member of its office, Dan Patterson, who would serve as lead counsel with

24  DeLozier as private co-counsel pursuant to *Knapp v. Hardy*, 111 Ariz. 107, 523 P.2d

25  1308 (1974).  (Tab 6 ¶¶ 2, 4.)

26      Patterson had a full plate upon commencing his employment at the Public

27  <center>21</center>

28
<center>MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF<br>CASE NO. CR2000-096032-A</center>

4838-2894-9006

1  Defender's Office in 2001.  Wendi's case was one of seven capital cases he was assigned

2  upon joining the office, and two months later he was assigned to represent Frank Roque,

3  a man charged with  murder purportedly motivated by retaliation for the 9/11 terrorist

4  attacks.  (Tab 6 ¶¶ 2-3.)  The *Roque* case garnered national media headlines and a Court

5  TV camera during trial, and demanded a substantial amount of Patterson's time between

6  2001 and Roque's trial in the fall of 2003.  (Tab 6 ¶ 3.)  As a result, Patterson performed

7  only "minimal" work on Wendi's case before the end of 2003.  (Tab 6 ¶ 3.)

8  Even after Patterson became more engaged in the matter, he was never actively

9  engaged in the investigation of mitigating evidence.  He did not personally investigate

10  mitigating circumstances, and he "largely left the development of the mitigation case"—

11  including the investigation of Wendi's childhood —to DeLozier and/or non-lawyer

12  mitigation specialist Scott Mac Leod.  (Tab 6 ¶¶ 17, 21-22.)

13  **B.   DEFENSE TEAM'S DYSFUNCTION**

14  Throughout the time between Wendi's arrest and trial, Wendi's defense team was

15  a dysfunctional unit.  Patterson and DeLozier had no regularly scheduled meetings and

16  communicated "rarely" and "infrequently" until 2004.  (Tab 6 ¶ 9; Tab 7 ¶ 6.)  According

17  to DeLozier, "Attorney Patterson frequently failed to return my calls and correspondence

18  when I attempted to contact him about Wendi's case.  Attorney Patterson did not inform

19  me which witnesses he wanted me to examine until after the trial was underway."  (Tab 7

20  ¶ 6; *see also* Tabs 63-64.)

21  The formation of a properly coordinated and functioning defense team is

22  fundamental to the defense of a capital case, and Wendi's representation in this case

23  presents numerous examples of the pitfalls when a defense team is not functioning as

24  such.  (*See generally* Tab 1.)  The adverse consequences were abundant, and fall into at

25  least four categories.

26

27
                                                      22
28

4838-2894-9006

### 1.      The Failure To Investigate Wendi's Mental Illness

Patterson, DeLozier and Mac Leod, the non-lawyer mitigation specialist, all admit that they did not investigate Wendi's mental health, childhood abuse, or related issues, other than possible spousal abuse.  (Tab 6 ¶¶ 15-17, 30-32; Tab 7 ¶¶ 23-24; Tab 8 ¶¶ 19-20, 26.)  They also acknowledge that there was no strategic reason not to investigate those issues.  (Tab 6 ¶¶ 30-32; Tab 7 ¶¶ 23-24; Tab 8 ¶¶ 11, 23.)  Given the numerous indications that such investigation would be fruitful, as described below, there was no constitutionally sound basis for neglecting such an investigation.

Roughly three months after Wendi's arrest, Wendi began meeting with private counselor Kandy Rohde,[6] who was retained by the Ochoas.  In February 2001, Rohde wrote DeLozier to inform him that she believed:  (1) Wendi exhibited symptoms of personality disorder; (2) Wendi dissociated in a manner that suggested childhood sexual abuse; and (3) Wendi should be comprehensively examined by a psychiatrist.  (Tab 7A.)  One month later, after eight counseling sessions with Wendi, Rohde again wrote DeLozier to request the retention of a psychiatrist.  (Tab 7B.)  She informed DeLozier that Wendi's dissociation was extensive and may have stemmed from childhood molestation, and concluded:  "I think Wendi suffers from serious psychological disorders and am anxious to have her examined by another professional for a second opinion."  (*Id.*)  In February 2002, Rohde informed the Public Defender's Office (and ultimately Patterson) that she believed Wendi had suffered childhood physical and/or sexual abuse and neglect, as well as dissociative amnesia and a personality disorder.  (Tab 6D.)

Rohde stayed on as Wendi's counselor through trial and frequently contacted DeLozier regarding Wendi's mental health.  (Tab 7 ¶ 15.)  Rohde took copious notes of her sessions with Wendi, which she forwarded to DeLozier and Patterson.  (Tab 7 ¶ 17; Tab 45 (notes); Tab 43 ¶ 4.)  Though those notes repeatedly describe symptoms of one or

---

[6]  Rohde died in 2006.

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

P-App. 000077

1   more psychiatric disorders, Patterson and DeLozier failed to act upon them.

2   Numerous other medical professionals outlined the need for a comprehensive pre-

3   trial psychiatric evaluation of Wendi.  In March 2001, Dr. Jack Potts completed his court-

4   ordered competency evaluation of Wendi, which was sent to DeLozier and provided to

5   Patterson after he became involved in the case.  (Tab 7 ¶ 18; Tab 6 ¶ 23.)  Potts found

6   Wendi competent to stand trial, but noted the presence of a family history of suicide and

7   Wendi's amnesia regarding certain events.  (Tab 6A)  He concluded:

8       Defense counsel may wish to independently retain an expert to evaluate his
        client's state of mind around the time of the offense. *Certainly there is*
9       *something quite bizarre about what allegedly occurred.*  If Ms. Rhode [sic]
        is accurate in her diagnostic assessment, *then the criminal culpability of the*
10      *defendant and her state of mind at the time of the alleged offense should be*
        *evaluated independently*, outside the scope of a Rule 11 examination.

11  (Tab 6A at 2-3. (emphasis added).)

12  This request was never fulfilled, at least not by a comprehensive psychiatric

13  evaluation.  Instead, the Public Defender's Office engaged Dr. Richard Rosengard for a

14  single visit with Wendi, which he summarized in an August 2002 report to Patterson.

15  (Tab 6C.)  Like Potts before him, Rosengard found Wendi competent to stand trial but

16  also noted:  (1) she had been prescribed psychotropic medications while incarcerated;

17  (2) Wendi suffered from symptoms of major affective disorder and probable post-

18  traumatic stress disorder; (3) there were indications of childhood sexual abuse; and (4)

19  her inability to clearly remember certain events (namely her husband's death) is a

20  phenomenon that "occurs in both children and adults who have been physically or

21  sexually attacked and more than explains the Defendant's response, particularly in light

22  of the fact that she had a past history, apparently, of being abused and symptoms

23  consistent with posttraumatic stress disorder."  (*Id.*)  Trial counsel did not pursue the

24  mental health investigation or signs of childhood sexual abuse (Tab 6 ¶ 30; Tab 7 ¶¶ 23-

25  24), and Rosengard was not retained to pursue the issues further or testify at trial.

26  Instead, defense counsel retained domestic violence expert Sharon Murphy, who

27                                          24

28

was given the narrow charge of assessing whether Wendi was a victim of domestic

violence by Joe and determining the effects of *that* abuse, rather than any preexisting

conditions or disorders Wendi had prior to her marriage.  (Tab 20 ¶¶ 2, 7.)  Despite her

limited role, Murphy began to suspect that:  (1) Wendi was suffering from one or more

psychiatric disorders, and (2) Wendi had suffered sexual abuse or other trauma as a

child.[7]  (Tab 20 ¶¶ 5, 7; Tab 52 at PCR266.)  Murphy did not pursue either line of inquiry

because they were outside the scope of her charge from Patterson and her expertise.  (*Id.*)

But she passed her suspicions along to Patterson and other members of the defense team,

who failed to investigate further.[8]  (*Id.*)

In September 2003, Wendi was admitted to the Durango Jail psychiatric unit after

being found on the floor of her jail cell, bleeding severely following an attempt to commit

suicide by slitting her wrist.  (Tab-47 at PCR123-126.)  Jail personnel found a suicide

note in her cell.  (*Id.* at PCR124.)  After months of treatment, the mental-health

professionals at the Durango psychiatric unit determined that her mental state justified

keeping her there until after her trial.  (*Id.* at PCR130-31; Tab 48.)

Defense counsel knew that Wendi had been "feeling suicidal on occasion" prior to

her suicide attempt (Tab 52 at PCR267), and they learned of Wendi's attempted suicide

and placement in the psychiatric unit.  (Tab 6 ¶ 28; Tab 7 ¶ 17.)  They had also obtained

numerous medical record releases on at least seven different dates from January 2002 to

---

[7] Even the State's expert, Dr. Michael Bayless—who rebutted Murphy's testimony that Wendi was a battered spouse—disclosed to defense counsel before trial that he had diagnosed Wendi with a depressive disorder and a personality disorder, and noted the possibility of childhood sexual abuse.  (Tab 6E at 2, 9.)

[8] Murphy noted two anecdotal incidents of possible sexual abuse at trial:  that a man with the Fishers of Men group exposed himself to Wendi, and that Wendi may have been sexually abused by one of the Robertsons when she was young.  (10/12/04 Tr. at 39-40.) Murphy admitted on cross-examination that she failed to investigate or develop any concrete basis for the latter incident of abuse, and she was savaged for it on cross-examination; according to the prosecutor, the failure to investigate further rendered the abuse allegation no more reliable than a statement that Wendi had been "attacked by Bigfoot."  (10/14/04 Tr. at 81-83.)

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4838-2894-9006

April 2004, authorizing them to obtain and review Wendi's medical records, including jail records.  (Tab 53.)  But defense counsel made no effort to obtain those records—which detail (among other things) Wendi's dissociation, her prescriptions for psychotropic medication, and her use of those medications from her arrest through the time of trial (Tabs 47-49)—until *after* the jury found her guilty.  (11/23/04 Tr. at 6-7.)

In sum, defense counsel did not merely fail to recognize red flags of possible abuse or mental health problems warranting further investigation.  They neglected repeated requests and invitations to investigate further, made by every mental health professional who came in contact with Wendi, as well as Wendi herself.  Defense counsel could not make a strategic decision whether such evidence would be a part of Wendi's case—as it plainly should have been—because they did not make the effort to determine whether the preliminary diagnoses of these professionals were well-founded.

### 2.     The Failure To Conduct A Meaningful Investigation

Defense counsel's failure to conduct a meaningful investigation is highlighted by the following fact:  even though Joe's death occurred in October 2000, defense counsel waited until November 19, 2004—*after* the jury found Wendi guilty of first-degree murder, and *before* the start of the aggravation and penalty phases of her trial, the latter of which began on December 7, 2004—to file a "Motion for Court Order to Assist Mitigation Investigation," requesting access to certain medical and other records.  (Tab 54.)  *See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.7, cmt. (Tab 76 at PCR 482) ("ABA Guidelines") ("[t]he mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses").

#### a.     Patterson's Non-Involvement

Patterson, who had the primary responsibility for the guilt phase investigation, did not perform any investigation into potentially mitigating evidence.  (Tab 6 ¶¶ 17, 30-32.)

26

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

By early 2004, Patterson gave DeLozier primary responsibility for preparing and presenting Wendi's mitigation case, and Scott Mac Leod, was assigned to assist DeLozier in investigating mitigating evidence.  (Tab 6 ¶¶ 17, 22; Tab 7 ¶ 12.)  From there, the defense team members' understandings of their roles diverge.

According to Patterson, he "gave limited direction to Mr. Linderman [the prior mitigation specialist] and Mr. MacLeod as to developing themes and theories of mitigation," leaving "the development of the mitigation case to the discretion of Mr. Mac Leod and Attorney DeLozier, who had the primary relationship with Wendi and her family."  (Tab 6 ¶ 21.)

According to Mac Leod, however, he lacked such discretion; Mac Leod saw his role as simply "tak[ing] direction from the lawyers," who would tell him "what they wanted in terms of mitigation evidence, and [he] would investigate accordingly."  (Tab 8 ¶¶ 11-12.)  Mac Leod took the narrow scope of his role seriously.  For example, despite having "some sense" that Wendi's childhood church/school "had what some might consider to be strange teachings," he did not investigate further "because no one on the case asked [him] to do so."  (Tab 8 ¶ 25.)

DeLozier did not provide direction to Mac Leod, either.  According to DeLozier, he and Mac Leod communicated infrequently before trial and did not coordinate what they were doing on the mitigation investigation.  (Tab 7 ¶ 14.)

### b.     DeLozier's Role as Spiritual Advisor

Although DeLozier met regularly with Wendi, the meetings involved Bible study and were not related to the substance of her case or a mitigation investigation.  (Tab 7 ¶ 8; Tab 9 ¶¶ 7, 21-22.)  As DeLozier explained:

> These meetings were primarily to discuss topics unrelated to her case, such as family and our belief in God.  *I viewed my role with Wendi as a combination of an attorney and a spiritual counselor.  One of the primary goals of my meetings with Wendi was to provide psychological and religious support*.  Because I was not routinely kept "in the loop" on case

27

4838-2894-9006

strategy and progress by Attorney Patterson, *I generally did not communicate with her regarding matters relating to the substance of her case.*

(Tab 7 ¶ 8 (emphasis added); *see also* Tab 6 ¶ 12; Tab 9 ¶ 7.)

Although he was in charge of the mitigation case (Tab 6 ¶ 22), DeLozier spoke to only a limited number of Wendi's friends and family, and he performed no investigation of Wendi's personal and family history of mental health problems or childhood abuse. (Tab 7 ¶¶ 15, 23-24.)

### c.    Mac Leod's Lack of Experience

Mac Leod, a non-lawyer, was in no position to fill the void left by Patterson's non-involvement and DeLozier's failure to investigate mental health and abuse issues.

Prior to Wendi's case, Mac Leod had no experience or training in death penalty cases or jury sentencing.  (Tab 8 ¶¶ 5-6, 9.)  Indeed, shortly before trial, he admitted he "did not know how to do his job" after Arizona's implementation of a jury sentencing regime.  (Tab 29 ¶ 3.)  Even though Mac Leod characterized mitigation-specialist training in the Public Defender's Office as "on-the job" with the involvement of more senior mitigation specialists, Patterson did not assign any senior capital mitigation specialist to assist Mac Leod, and he declined at least one other mitigation specialist's offer to help Mac Leod.  (Tab 20 ¶ 14.)

Mac Leod had joined the Public Defender's Office as a mitigation specialist in mid-2001, without any educational background in sociology, social work or other behavioral sciences, and no formal training in mitigation work once he began.  (Tab 8 ¶¶ 2-5.)  When he took over as mitigation specialist, Mac Leod handled standard felonies, "very few" of which went to trial.  (Tab 8 ¶¶ 6-7.)

In doing mitigation work for standard felonies without jury sentencing, Mac Leod typically reviewed the police reports, interviewed the client, family members, and wrote reports advocating sentences focused on rehabilitative options, typically submitted to the

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

sentencing judge months after the verdict.  (Tab 8 ¶¶ 2, 6.)  He viewed his role in capital cases no differently; in his words, "there is nothing that I would not have done in standard felony cases that I would otherwise do in capital cases."  (Tab 8 ¶ 10.)

Mac Leod does not recall performing a number of other tasks integral to the role of a capital mitigation specialist under the ABA Guidelines, such as preparing a comprehensive life history and/or psycho-social history, recommending the use of experts, providing social history information to such experts, and developing mitigation themes based on factual investigation.  (Tab 8 ¶¶ 18-26.)  Mac Leod simply submitted evidence that fit the themes he was provided by the lawyers:  "Wendi's good upbringing and character and her good behavior in jail."  (Tab 6 ¶ 33; Tab 8 ¶ 23.)  Indeed, Mac Leod does not specifically recall doing anything beyond meeting with Wendi and her parents to review family photographs for a presentation depicting Wendi's good character and happy upbringing.  (Tab 8 ¶ 16.)

Mac Leod never asked the tough questions of Wendi, Donna and Alejo.  When he met with Wendi, they "talked more gossip about the Public Defender's Office and his plans to go to law school than [they] discussed [the] case."  (Tab 9 ¶ 17.)  When he did discuss the case with Wendi or her parents, Mac Leod again focused on identifying family photographs, and did not inquire into any possible childhood trauma or abuse, or the mental health history of Wendi and her family.  (Tab 8 ¶¶ 19-20; Tab 9 ¶¶ 18, 20-21; Tab 25 ¶ 2; Tab 29 ¶ 2.)

**3.**      **The Failure To Identify And Interview Mitigation Witnesses**

As a result of Patterson's non-involvement in mitigation-related issues, DeLozier's focus on non-case-related issues (and his concurrent conflict in representing Donna and Alejo in adoption and guardianship proceedings), and Mac Leod's inexperience, the majority of the witnesses who are submitting declarations in support of this Petition were

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

never interviewed by defense counsel as part of their pre-trial investigation.[9]  Other witnesses spoke with DeLozier or Mac Leod, but their conversations were "very brief" and did not touch on mental health or childhood abuse issues.[10]

Among the potential mitigation witnesses, the failure to interview Wendi's biological father, Skip, stands out.  Even though defense counsel knew that Skip was Wendi's father, knew that he was in prison in Arizona for child molestation, knew that Wendi may have been sexually abused by him (or members of his family), and had even been provided his prison contact information by Donna (Tab 57), no one ever interviewed Skip or any other members of the Robertson family.[11]  (Tab 32 ¶ 74.)  If they had, they would learned of Skip's physical abuse of Wendi, the scope of the Robertson family's mental health problems, the rampant child molestation in his family, and those molesters' access to Wendi at a very young age.  (*See generally* Tab 32.)

### 4.   The Failure To Adequately Prepare For Trial

Defense counsel also neglected to properly prepare for trial.  *First*, they engaged in minimal witness preparation.  They spent no time preparing Donna and Alejo to testify (Tab 25 ¶ 6; Tab 29 ¶ 11), and no time with Wendi on the allocution she prepared for sentencing (Tab 9 ¶¶ 14-15).  The defense team called Gia Palicki, a key witness who had a close relationship with both Joe and Wendi as their babysitter, without even explaining to her what the proceeding was about; while on the stand, Palicki *thought she was testifying at a custody proceeding* rather than a capital murder trial.  (Tab 31 ¶ 26.)

*Second*, defense counsel paid no attention to Wendi's medication regimen while incarcerated (Tab 6 ¶ 29, Tab 7 ¶ 21), and failed to take steps to address her extreme

---

[9]   *See* Tab 10 ¶ 44; Tab 11 ¶ 16; Tab 12 ¶ 26; Tab 13 ¶ 15; Tab 14 ¶ 18; Tab 17 ¶ 20; Tab 18 ¶ 15; Tab 22 ¶ 19; Tab 23 ¶ 60; Tab 30 ¶ 21; Tab 32 ¶ 74; Tab 33 ¶ 24; Tab 36 ¶ 14; Tab 38 ¶ 16.

[10]   *See* Tab 21 ¶ 31; Tab 35 ¶ 36-37.

[11]   Skip did not learn of Wendi's arrest and conviction until 2009, and expressed disbelief that he was never contacted regarding Wendi's murder charge.  (Tab 32 ¶¶ 1-2.)

30

4838-2894-9006

schedule during the course of the trial.  Wendi took three psychotropic medications during trial (Tab 47 at PCR131-32; Tab 49 at PCR257-63), and, the weekend before her testimony, was given an *increased* dose of the very drug (Seroquel) that caused her grogginess and disrupted cognitive function when taking it previously.  (Tab 47 at PCR128, PCR132.)  Moreover, her grueling trial schedule involved waking up at 1 a.m. at the Durango psychiatric unit to prepare for transportation to the Madison jail, waiting in a holding cell in Madison for five hours before going to court, waiting in a holding cell at the courthouse until trial, then finally participating in her trial until the end of the day—all without food other than a sack lunch provided at the Madison jail.  (Tab 7F; Tab 9 ¶¶ 23-24.)  Both Wendi and her healthcare providers at the psychiatric unit noted that this schedule impeded her "ability to maintain her physical and mental health throughout the . . . trial," including her ability to focus.  (Tab 7G; Tab 9 ¶ 24.)

Given the combination of psychotropic medications, hunger, and sleep deprivation, it is not surprising that jurors found her to be expressionless and not "engaged" in her own trial.  (Tab 40 ¶ 10; Tab 39 ¶ 4.)  That impression was both foreseeable and avoidable before trial, by meeting with Wendi's mental-health providers well in advance of trial, moving the trial court for some form of relief from her schedule, or at least introducing testimony to explain Wendi's cold and uninvolved affect to the jurors.  Defense counsel did not take these steps.

*Third*, DeLozier voluntarily impaired his own physical health upon the commencement of Wendi's trial.  He fasted for *70 days* during Wendi's trial to, in his words, "*provide spiritual insight*," eating no solid food during that period.  (Tab 7 ¶ 9 (emphasis added).)  With his only calories coming from fruit juices (*id.* ¶ 9), DeLozier became "increasingly thin and weak" over the course of the trial (Tab 7 ¶ 13), to the point where his suits no longer fit him and he "did not appear to be functioning on all cylinders."  (Tab 34 ¶¶ 41-42; *see also* Tab 9 ¶ 10; Tab 29 ¶ 12.)  DeLozier's mental

31

4838-2894-9006

condition became worse when a colleague was tragically murdered in October 2004, midway through Wendi's trial.  (Tab 7 ¶ 10.)  The loss devastated DeLozier and made it "very difficult to focus on Wendi's case" afterward.  (*Id.*)  During the guilt phase of the trial, DeLozier felt weak to such an extent that he began to trail off during direct examination of a witness, and was unable to follow along during the prosecutor's cross-examination.  (*Id.* ¶ 11.)

DeLozier asked Donna to write the closing argument for the penalty phase, the last opportunity to make Wendi's case for avoiding a death sentence.  Because Donna already was on "emotional overload at that point" and felt unqualified to write a closing argument, she referred DeLozier to her friend Cindy Schaider, "because she had experience *writing requests for grants at her work*."  (Tab 29 ¶ 10 (emphasis added); Tab 34 ¶ 44.)  According to Schaider,

> David DeLozier[] approached me and my husband, Steve, in the hallway after court.  He said that *he needed help*, that *he was having trouble knowing what to say*. . . .  I spent a couple of hours working on the closing argument the evening before David had to use it, and then emailed it to him.  It was very affirming for me to get to do that, but it is an example of how inadequate David was.  In court the next day, he read it like a grocery list.  There was no passion or emphasis.

(Tab 34 ¶ 44 (emphasis added); *see also* Tab 35 ¶ 34 (DeLozier read the closing to the jury "as if he was reading from the Encyclopedia Brittanica.").)

## IV.    THE TRIAL AND VERDICT

### A.    GUILT PHASE

#### 1.    The Defense's Case

At the guilt phase, virtually all of the evidence focused on the question of *mens rea*.  Defense counsel focused almost exclusively on attempting to show that Joe was physically and/or emotionally abusive to Wendi, and that she ultimately killed Joe out of fear for her own safety.  To support this theory, the defense presented numerous incidents of emotional abuse, intimidation, and sexual coercion by Joe during their marriage, and a

32

4838-2894-9006

1    handful of incidents of moderate physical abuse.[12]

2        The defense's theory of the case had several holes, however, because defense

3    counsel did not perform a sufficient pre-trial investigation of her social history and

4    psychiatric disorders.  The State exploited all of these holes, using what we now know

5    are symptoms of Wendi's mental illness to incessantly attack her character and veracity,

6    without any meaningful response from defense counsel.  Had defense counsel uncovered

7    Wendi's history of abuse and psychiatric disorders stemming from childhood—and

8    thereby recognized that Wendi's deteriorating relationship with Joe was not just a product

9    of a dysfunctional marriage but also an outgrowth of chronic, deep-rooted disorders—

10   their responses to the State's evidence would have been compelling.  Because they did

11   not perform these fundamental tasks, defense counsel instead presented essentially no

12   response at all.

13                  a.       The State's Focus on Wendi's Sexual Behavior

14       The prosecutor endeavored at every opportunity to paint Wendi as an abuser

15   through her promiscuity.  The jury was inundated with talk of Wendi's hyper-sexual

16   behavior before and during her marriage to Joe.  **EXHIBIT 2** offers dozens of excerpts

17   from the trial transcript, in all three phases, highlighting the pervasiveness of the

18   prosecutor's attacks.

19       Even a limited subset, taken from the first day of the prosecutor's guilt phase

20   closing, gives a sense of the State's thematic bent and the severe implications of defense

21   counsel's failure to conduct an adequate investigation.  For starters, the prosecutor

22   argued, in reference to Wendi, "But you weren't in love with Joe because you could not

23   even bring yourself to the point of enjoying the most intimate thing that two people in

24   _____

25   [12] As explained below, there would have been no strategic reason for defense counsel to
     avoid introducing evidence that Wendi was affected by severe psychiatric disorders at the
26   time of this violent confrontation with Joe.  Such evidence would have complemented
     and bolstered the self-defense claim.

27                                            33

28   MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                        CASE NO. CR2000-096032-A

4838-2894-9006

love do, that's enjoy sexual intercourse.  Couldn't do it."  (11/16/04 Tr. at 76.)  The

prosecutor further asked the jury to ponder whether Wendi had to use lubricants during

sex with other partners, as she had with Joe.  (*Id.* at 75.)  Had defense counsel done a

proper investigation, it could have responded simply and powerfully:  after a childhood

fraught with sexualization and molestation, Wendi was incapable of enjoying intercourse

with *anyone*.  (Tab 4 at 132, 217.)

The prosecutor further argued, in numerous ways, that Wendi was sex-crazed,

"never missing an opportunity" to kiss other men and take them home.  (11/16/04 Tr. at

91.)  This argument persisted through almost every day of the trial, and was especially

reinforced during closing argument.  In the prosecutor's words:

> "And before the song is over, probably before he even knows her name,
> they're kissing. . . . And when she started to grab him in the various places,
> he, again, responded accordingly.  She's the one that initiated—this demure
> little lotus blossom we have here—she's the one that is all that."  (*Id.* at 87.)

> "What's happening is that she starts to grope him under the table.  I guess
> the woman has needs and she's going to do something about it . . . ."  (*Id.* at
> 88.)

> "Perhaps she's going to experience another one of these dalliances that is
> not an affair. . .  This is the woman who kisses men on the way home."  (*Id.*
> at 93.)

> "You've seen what she looked like back then, all sassed up in her pink little
> outfit."  (*Id.* at 63.)

> Describing Wendi's supposed thought process, "Let's go out and look for
> the young bucks we have out here on the dance floor.  Maybe we can take
> one home.  That's exactly what's going on."  (*Id.* at 101.)

> "You've seen it, how she's all sassed up over there by the pool.  And you
> know she's going out . . . .  Going over to the dance floor."  (*Id.* at 152.)

> Wendi "[w]ants to be out on the dance floor.  Wants to be out kissing guys.
> Wants to be out in this fantasy world that seems so real to her with the
> strobe lights going on."  (*Id.* at 151.)

> "Why is it that she gets involved with [another man]?  Why is it that they
> engaged in the most intimate acts that two people can engage in?  Well,
> because, according to her, she didn't want to be a tease.  Wow."  (*Id.* at 84-85.)

The defense offered no substantive response, and issued no objections to any of the above

statements.

34

The prosecutor argued that Wendi's sexual behavior was especially abhorrent because of her religious upbringing.  (*Id.* at 14 (prefacing insinuations of promiscuity by stating, "Let's take a look at what this incredibly quote, unquote religious person did"), 18 ("Of course, when they're married, it's all right to go out and have affairs.  But right now, it's against the wishes of my God to do that."), 97 ("It doesn't matter . . . if it's her God that's telling you 'you shall not go out and cheat with other men.'  She doesn't care.  She's going to do whatever she wants.  What does she care about the Ten Commandments?").)  If the jury had known that Wendi's religious upbringing was not a traditional Christian education—but rather a cult-like atmosphere of psychological control, physical abuse and sexual perversion (Tab 4 at 146-69, 226-30)—then the prosecutor's flippant argument that "she didn't care" about her soul would not have been effective.  (11/16/04 Tr. at 97.)

In sum, had defense counsel performed an adequate investigation, they could have provided a compelling response to the prosecutor's primary theme in arguing for her *mens rea* and in attacking her credibility and morality.  Having failed to do so, defense counsel offered no direct response to the prosecutor's attacks, leaving jurors to conclude that Wendi was in reality more assertive and confident than she appeared in court (Tab 39 ¶ 3, Tab 41 ¶ 4, Tab 42 ¶ 4)—when, in fact, the opposite was true.  (Tab 2 at 13-29.)

### b.  Wendi's Dissociation and Repression

Wendi's psychiatric disorders caused her to repress and dissociate from traumatic experiences in her life, and to act in a manner consistent with her disorders but inconsistent with the psychologically healthy person her defense counsel portrayed her to be.  Rather than explain these symptoms to the jury in the context of her disorders—as defense counsel could have done had they followed through on a comprehensive psychiatric evaluation—they stood idly by while the prosecutor took full advantage.

Throughout the trial (particularly during Wendi's cross-examination) the

35

4838-2894-9006

1    prosecutor used Wendi's lack of memory of traumatic events against her, repeatedly

2    questioning her about lapses in memory of traumatic moments, and how her memory

3    could improve over time.  (*See, e.g.*, 10/28/04 Tr. at 113; 11/1/04 Tr. at 77, 81-82, 85;

4    11/2/04 Tr. at 91-93, 162; 11/3/04 Tr. at 9-12, 15, 48.)  In closing, the prosecutor

5    hammered these issues home, summing up his purpose (twice) in his closing argument:

6    "With the truth ya ain't got to remember nothing."  (11/16/04 Tr. at 22, 78.)  To

7    punctuate this point, he asked the jury, in regard to her testimony:  "If that's the truth and

8    that was such a traumatic event when that happened at the end of August of the year

9    2000, don't you think she would have remembered?"  (*Id.* at 95.)

10         Had defense counsel properly investigated Wendi's mental health, they could have

11   answered simply, "No," for all the reasons described in the reports of Dr. Woods and

12   Dr. Hopper.  They could have noted she suffered these disorders without treatment for

13   years before her police interrogation the morning after the most traumatic event

14   imaginable, and had received more than a year of treatment at the Durango psychiatric

15   ward between her arrest and her testimony.  But again, because defense counsel did not

16   investigate and therefore did not know the extent of Wendi's mental disorders, the

17   prosecutor could argue these points unchecked.  Indeed, the prosecutor noted that the

18   defense had not presented testimony of any witnesses who employed a "scientific

19   psychiatric approach."  (11/16/04 Tr. at 86.)

20         The prosecutor concluded his argument to the jury by listing off numerous actions

21   by Wendi in the months before Joe's death that appeared contrary to reality, asserting that

22   she was living in "a fantasy world" with her affairs and frequent visits to bars.  (*Id.* at

23   152-54.)  As Dr. Woods notes, the actions identified by the prosecutor were in fact

24   symptoms of Wendi's worsening psychiatric state.  Had defense counsel performed an

25   adequate investigation, all of these positions of the State at trial would have aided

26   Wendi's defense, rather than undermining it.

27                                            36

28   MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                    CASE NO. CR2000-096032-A

4838-2894-9006

## 2.      The State's Case

Having undermined Wendi's credibility without rebuttal, the State contended that the jury should disbelieve her testimony that Joe sought and knew about her efforts to assist him in committing suicide, and to obtain life insurance to help the family after his death.  These were crucial statements that the State could not rebut with direct evidence of its own.  Corroborating evidence supporting Wendi's testimony on these two key points existed, but defense counsel failed to either find or present it.

*First*, regarding the applications for life insurance, babysitter Gia Palicki—who cared for the Andrianos' children "almost every day" during the year before Joe's death and "developed a close friendship with both Wendi and Joe"—"knew that Joe was trying to obtain a life insurance policy"  because "[b]oth Joe and Wendi talked to her about it." (Tab 31 ¶ 8.)  At the time, Palicki observed that Joe "wanted all of that taken care of before he passed" because he wanted to help his family financially.  (*Id.*)

But defense counsel did not call Palicki to testify at the guilt phase of the trial. When she finally *was* called to testify (at the penalty phase), it was after so little contact with defense counsel that she thought she was testifying at a custody hearing rather than a murder trial.  (*Id.* ¶ 26.)  Defense counsel questioned her about Wendi's skills as a mother; they did not ask her about the life insurance issue.

*Second*, the State attempted to rebut Wendi's statements that Joe sought to commit suicide and enlisted Wendi's help in doing so by offering testimony of witnesses who did not perceive Joe to be suicidal.  On this point, defense counsel could have responded with the testimony of two witnesses with unimpeachable credibility, both of whom would have supported the reasonable conclusion that Joe was contemplating suicide.

Phoenix attorney Jeffrey Miller served as counsel for Joe and Wendi in their malpractice suit, and had periodic contact with both Joe and Wendi from the fall of 1998 through the time of Joe's death.  (Tab 19 ¶¶ 1, 4.)  In the months prior to Joe's death,

4838-2894-9006

1   Miller received multiple distressed calls from Wendi expressing concern over Joe's

2   worsening depression and expressions of his intent to take his own life, and she asked

3   Miller to contact Joe and recommend a counselor.  (*Id.* ¶ 4.)  Miller did so:  he contacted

4   Joe directly and told him that Joe's family members were concerned about his mental

5   state and worried he was contemplating suicide.  (*Id.* ¶ 5 & Tab 19A at 1.)  Joe was

6   neither surprised nor dismissive; he acknowledged the concerns, and did not deny that he

7   was or had been contemplating suicide.  (Tab 19 ¶ 5.)  Miller provided Joe with a

8   recommendation for a counselor to address these issues.  (*Id.*)

9        Miller was called as a witness by the State (presumably in an attempt to establish a

10   financial motive for the crime).  On cross-examination, defense counsel attempted to

11   elicit this important testimony regarding Joe's mental state, but drew a hearsay objection,

12   which was sustained.  Rather than restating the questions in a manner that would not

13   elicit hearsay, or laying the groundwork for the applicability of an exception to the

14   hearsay rule that would apply to the conversations at issue,[13] defense counsel dropped the

15   subject entirely and moved on.

16        In addition, defense counsel briefly interviewed but never called as a witness Chris

17   Weaver, a longtime friend of Joe dating back to high school.  (Tab 37 ¶ 1.)  Weaver had

18   telephoned an investigator for defense counsel to say that Joe had contacted Weaver two

19   to three weeks before his death to ask Weaver to help take care of Joe's family after he

20   died.  (Tab 58 at PCR327-30; Tab 59.)  Despite knowledge of this key fact, there is no

21   indication from their files that defense counsel ever contacted Weaver to follow-up on

22   this information, and they never called him as a witness.  Had they done so, Weaver

23   would have told defense counsel and the jury that he spoke with Joe in the months

24   preceding his death; in those discussions, Joe uncharacteristically rejected long-term

---

25
26   [13]   Joe's response to Miller's questions about his state of mind were necessarily representations of Joe's then-existing state of mind, an exception to the hearsay rule, Ariz. R. Evid. 803(3).

27                                          38

28

4838-2894-9006

1    plans with Weaver because, in Joe's words, "I only have a few weeks to live." (Tab 37

2    ¶ 4.) According to Weaver, "it appeared to me that Joe knew he was dying and it didn't

3    really matter to him anymore." (*Id.*)

4         Without hearing the evidence outlined in this Petition, the jury found Wendi guilty

5    of first-degree murder on November 18, 2004. Defense counsel had not requested or

6    received instructions on lesser-included offenses.

7         **B.    AGGRAVATION PHASE**

8         At the aggravation phase, the State presented two aggravating factors:  that the

9    murder was committed for pecuniary gain, A.R.S. § 13-751(F)(4), and the murder was

10   committed in an especially heinous, cruel, or depraved manner, A.R.S. § 13-751(F)(6).[14]

11   The State called only one witness—medical examiner Phillip Keen, who performed the

12   autopsy—while the defense called none. Keen testified as to the manner of Joe's death.

13   He believed any one of eight to ten blows from the barstool would have been sufficient to

14   render Joe unconscious (11/30/04 Tr. at 58-59, 63-66), and that Joe died "within a matter

15   a minutes" (*id.* at 69).

16        Though not relevant to any aggravating factor, the prosecutor again referenced

17   Wendi's affairs during his closing argument at this phase. (12/1/04 Tr. at 15, 16, 38.)

18        The jury did not find that Wendi committed the murder for pecuniary gain, or that

19   the murder was especially heinous or depraved. The jury did find that the murder was

20   especially cruel, but not for any reason relating to the manner of the crime. During

21   deliberations at the aggravation phase, the jurors "made a chart outlining the different

22   possible outcomes" for Wendi depending on whether they found an aggravator, which

23   made their decision "a lot clearer." (Tab 39 ¶ 8.) According to one juror,

24        [W]hen we decided on the aggravator, we talked about what

25   _____

26   [14] Citations to statutory aggravating and mitigating factors are to the current versions of
     the statutes (at A.R.S. § 13-751) rather than the historical versions (at A.R.S. § 13-703).

27                                              39

28

4838-2894-9006

might happen if we didn't find an aggravating circumstance.
We discussed how her sentencing would go back to the judge
and agreed that none of us wanted that.  We talked about how
we didn't want to see Wendi get out of prison, and that was a
key reason we decided on the cruelty aggravator.

(Tab 41 ¶ 6.)

**C.    PENALTY PHASE**

One week later, the penalty phase of the trial commenced.  Because they did not

know about Wendi's childhood abuse, dysfunctional upbringing, or deep-rooted

disorders, defense counsel called no witnesses to testify about those issues.  Instead, they

focused on three themes:  (1) Wendi had a good upbringing and good character;

(2) Wendi was a good candidate for rehabilitation; and (3) Joe was abusive to Wendi.

Even as to those generic themes, defense counsel's mitigation presentation was

superficial.  *First*, with regard to Wendi's character and upbringing, they called Donna

and Alejo; Jimmy and Linda Galyon (a couple who used Wendi as a babysitter in the late

1980s and early 1990s and had no contact with her since); and two friends of Donna and

Alejo who knew Wendi for limited periods in the 1980s and testified that she was an

obedient and bright teenager (Chris Vargas and Lonnie Inskeep).  Defense counsel also

called Gia Palicki and Wendi's cousin, Barbara Mitchell, to testify that Wendi was a

good mother and cared about others.  None of these witnesses were asked about

childhood abuse or other trauma.

*Second*, with regard to Wendi's prospects for rehabilitation, defense counsel called

three current or former members of the healthcare staff at the Durango psychiatric unit:

Gerald Perry, Joyce Van Every and Laura King.  They testified that Wendi was a

cooperative inmate and helpful to prison staff, which the prosecutor characterized as

being a "snitch."  (12/15/04 Tr. at 134.)  They also testified that Wendi suffered from

depression and severe anxiety; without knowing Wendi's full family history and

childhood, they attributed these effects as a response to being incarcerated rather than a

40

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

1    major mental illness stemming from her childhood.  (12/8/04 Tr. at 122.)

2        Finally, Sharon Murphy testified again, essentially rehashing her testimony that

3    Wendi was a victim of domestic violence by Joe.

4        In the 75 minutes the prosecutor was allotted for closing argument (12/15/04 Tr. at

5    74), he asserted that Wendi "laughed coquettishly" during her interrogation and was

6    "having affairs," "going out with other men," "goof[ing] around with other men,"

7    "kiss[ing] lots of guys," "fraterniz[ing] with other men," "dancing and kissing men," and

8    "having the time of her life" doing it.  (*Id.* at 108, 130, 111, 121, 126; 12/16/04 Tr. at 16,

9    9, 11.)  The prosecutor further used evidence of Wendi's purportedly "good upbringing"

10   against her, contending that Wendi should have known better.  (12/15/04 Tr. at 131-32.)

11       Despite defense counsel's failure to present any compelling mitigation evidence,

12   however, the sentencing decision was not a slam-dunk death-penalty conviction for the

13   State.  The jurors became deadlocked at one point in the deliberations (12/20/04 Tr. at 4),

14   and at least one alternate juror would not have imposed the death penalty.  As she stated,

15           If given the opportunity to make a decision at the penalty phase, I would
             not have sentenced Wendi to death, but not because the defense was
16           compelling in any way.  I thought their performance was horrid.  [But] I
             personally felt the crime that Wendi was found guilty of was the result of
17           Wendi cracking under the pressure of her overwhelming life.

18   (Tab 40 ¶ 2.)  The alternate juror only reached that conclusion, however, by *rejecting*

19   defense counsel's mitigation themes:  "It sounded like Wendi was raised like a gypsy,

20   never had a stable home, and wasn't afforded a decent education, but the defense lawyers

21   didn't drive any of that home.  The defense lawyers kept focusing on how great Wendi's

22   family was."  (*Id.* ¶ 9.)

23       Other jurors confirmed they would have been open to evidence of childhood abuse

24   and psychiatric problems, had it been put forth:  "For example, if we had been presented

25   with evidence that Wendi had been sexually abused in her childhood, or that she had a

26   history of psychiatric problems, we would have given those things consideration, because

27                                        41

28   MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                    CASE NO. CR2000-096032-A

4838-2894-9006

1   they would have explained some of the negative facts that were out there."  (Tab 39 ¶ 11;

2   Tab 41 ¶ 7.)

3          In affirming Wendi's conviction and death sentence, the Arizona Supreme Court

4   highlighted the superficial and limited nature of the mitigating evidence presented by

5   defense counsel at trial, including:

6          the stress of Joe's cancer, [Wendi's] good grades in school, missionary and
           community work, and strong religious convictions[,] . . . evidence that she
7          was a sexual abuse and domestic violence victim, a good mother to two
           children, married for six years, and a good inmate.
8

9   *Andriano*, 215 Ariz. 497, 511, ¶ 69, 161 P.3d 540, 554 (2007).

10         The Court rejected the evidence in the record because it was:  (a) undeveloped;

11  (b) inconsequential; or (c) directly contradicted by the murder for which Wendi had been

12  convicted.  With respect to the stress related to Joe's cancer, the Court noted:

13         [*t*]*he record does not indicate*. . . that at the time of the offense, [Wendi's]
           stress was any greater than it had been two years earlier when she and Joe
14         first learned he was terminally ill . . . .  Moreover, *this is not a case in
           which Andriano suddenly "cracked" under extreme stress*. . . .
15

16  *Id.* at 512, ¶ 71, 161 P.3d at 555 (emphasis added).

17         Likewise, the limited and anecdotal evidence of sexual abuse offered at trial—that

18  Wendi "'may have been' sexually abused by her biological father when she was around

19  the age of two" and "a member of the traveling ministry to which her family belonged

20  exposed himself to Andriano when she was between six and eight years old"—was

21  accorded minimal significance because "the events [we]re remote in time to the offense"

22  and there was no attempt to relate those events to the person Wendi was at the time of the

23  crime.  *Id.* at 512, ¶ 72, 161 P.3d at 555.

24         The Court also found that the fact that Wendi "maintained good grades in school

25  and participated in missionary and community work" and "was a good inmate in jail"

26  were inconsequential.  *Id.* at 512, ¶¶ 72, 74, 161 P.3d at 555.

27                                         42

28

Finally, other evidence offered as mitigating circumstances merely highlighted how disconnected the mitigation case was from the crime for which Wendi had been convicted:

> . . . whether Andriano was a good mother . . . [is of] minimal value in light of the fact that Andriano murdered her children's father while the children were present in the apartment.  Moreover, neither the fact of Andriano's marriage nor its six-year duration is mitigating considering that she would have remained married and the marriage would have lasted longer had she not killed her husband.
>
> *     *     *
>
> Although Andriano had what might be considered a strict religious upbringing, many of her actions, such as killing her husband and having extramarital affairs, appear inconsistent with holding strong religious convictions.

*Id.* at 512, ¶¶ 73, 75, 161 P.3d at 555.

## LEGAL STANDARD

The Sixth Amendment to the United States Constitution guarantees a person accused of a crime the right to the effective assistance of counsel.  *Strickland*, 466 U.S. at 685-686.[15]  "This right extends to 'all critical stages of the criminal process,' including capital sentencing."  *Correll v. Ryan*, 539 F.3d 938, 942 (9th Cir. 2008) (internal citation and quotation marks omitted).

To prove a claim of ineffective assistance of counsel, Petitioner must show that: (1) "counsel's performance was deficient"; and (2) "the deficient performance prejudiced the defense."  *Strickland*, 466 U.S. at 687.

To satisfy the "deficiency" prong of the *Strickland* test, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  *Id.* at 688.  The United States Supreme Court has recognized that "prevailing norms of practice as reflected in American Bar Association

---

[15]  The Eighth and Fourteenth Amendments also demand that all relevant evidence bearing on a defendant's character, propensities, and record be considered by the sentencer in determining the appropriateness of the penalty in capital cases.  *Lockett v. Ohio*, 438 U.S. 586, 604-605 (1978).

43

4838-2894-9006

standards and the like . . . are guides to determining what is reasonable . . . ." *Id.*; *Bobby* v. *Van Hook*, 130 S. Ct. 13, 16-17 (2009); *Florida* v. *Nixon*, 543 U.S. 175, 191 n.6 (2004); *Wiggins* v. *Smith,* 539 U.S. 510, 524 (2003); *Williams* v. *Taylor*, 529 U.S. 362, 396 (2000).  Although they are "only guides," *Strickland*, 466 U.S. at 688, and not "inexorable commands," *Bobby*, 130 Sup. Ct. at 17, "these standards may be valuable measures of the prevailing professional norms of effective representation[.]"  *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010).

According to the ABA standards in effect at the time of Wendi's trial, "[c]ounsel's duty to investigate and present mitigating evidence is now well established."  ABA Guideline 10.7 cmt. (Tab 76 at PCR480).  Such investigations "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."  *Wiggins*, 539 U.S. at 524; *see also Correll*, 539 F.3d at 942.

"The imperative to cast a wide net for all relevant mitigating evidence is heightened at a capital sentencing hearing because '[t]he Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy.'"  *Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 1999) (quoting *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999)).

"Because the sentencer in a capital case must consider in mitigation, 'anything in the life of a defendant which might militate against the appropriateness of the death penalty for the defendant,' 'penalty phase preparation requires *extensive* and generally *unparalleled* investigation into personal and family history.'"  ABA Guideline 10.7 cmt. (Tab 76 at PCR481) (emphasis added, citations omitted); *id*. at PCR483.  "Evidence regarding social background and mental health is significant, as there is a 'belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable

<div style="text-align:center">44</div>

1  than defendants who have no such excuse.'"  *Douglas v. Woodford*, 316 F.3d 1079, 1090

2  (9th Cir. 2003).

3      Counsel has a duty to retain and consult with the appropriate experts to assess their

4  client's mental health.  *Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002).  Expert

5  testimony should be introduced to explain the effects of defendants' background on their

6  behavior.  (*Id.* at 1255-57.)

7      To satisfy the "prejudice" prong of the *Strickland* test, a petitioner "must show that

8  there is a reasonable probability that, but for counsel's unprofessional errors, the result of

9  the proceeding would have been different."  466 U.S. at 694.  "A reasonable probability

10  is a probability sufficient to undermine confidence in the outcome."  (*Id.*)  In a capital

11  case, this requires a determination of "whether there is a reasonable probability that,

12  absent the errors, the sentencer . . . would have concluded that the balance of aggravating

13  and mitigating circumstances did not warrant death."  (*Id.* at 695.)  This inquiry requires

14  evaluating "the totality of the available mitigation evidence—both that adduced at trial,

15  and the evidence adduced in the [post-conviction] proceeding—in reweighing it against

16  the evidence in aggravation."  *Williams*, 529 U.S. at 397–98.[16]  The ultimate question is

17  whether, taking into account all the mitigating and aggravating evidence, "there is a

18  reasonable probability that at least one juror would have struck a different balance."

19  *Wiggins*, 539 U.S. at 537; *see* A.R.S. § 13-752(H) (requiring a unanimous jury verdict to

20  impose a death sentence).

## CLAIMS

21

22      Wendi's constitutional right to counsel was violated by multiple acts and

23  omissions that fell well below the standard of care and prejudiced her in a capital case.

24  [16]  *See Robinson v. Schriro*, 595 F.3d 1086, 1111 (9th Cir. 2010) ("[I]t is not necessary

25  for the . . . petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances.").  Even if counsel's errors, viewed

26  independently, do not demonstrate prejudice, "prejudice may result from the cumulative impact of multiple deficiencies."  *Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438

27  (9th Cir. 1995).

45

28

4838-2894-9006

U.S. Const. Amends. V, VI, VIII, XIV; Ariz. Const. Art. 2, §§ 4, 15, 24.  Weighing all of the available evidence discussed below cumulatively, there is more than a reasonable probability that Wendi would not have been sentenced to death.[17]

## I. WENDI'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED BY DEFENSE COUNSEL'S DEFICIENT PERFORMANCE AND RESULTING PREJUDICE DURING ALL PHASES OF THE TRIAL[18]

Patterson, DeLozier and Mac Leod all admit that they did not investigate Wendi's mental health, childhood abuse, or related issues, other than spousal abuse.  (Tab 6 ¶¶ 17, 21-22, 30-32; Tab 7 ¶¶ 23-24; Tab 8 ¶¶ 19-20, 26.)  They also acknowledge that there was no strategic reason not to investigate those issues.  (Tab 6 ¶¶ 30-32; Tab 7 ¶¶ 23-24; Tab 8 ¶¶ 11, 23, 25.)

### A.   PENALTY PHASE

#### 1.   Defense Counsel's Failure To Investigate And Present Expert Testimony Regarding Wendi's Mental Illness

##### a.   Deficient Performance

Every mental health professional that interviewed or examined Wendi concluded that she was likely suffering from mental illness and/or childhood sexual abuse.  For example, Dr. Potts stated that, given the bizarre nature of the crime and Kandy Rohde's

---

[17]  In the United States, it is an infrequent occurrence for a woman who has been convicted of murder to be sentenced to death.  Women account for about 10% of murder arrests annually, but account for only 2.1% (174 out of 8,392) of the death sentences imposed at the trial level between 1973 and 2011.  *See* Victor L. Streib, *Death Penalty for Female Offenders, January 1, 1973, Through December 31, 2011*, at 3 (2012), available at http://deathpenaltyinfo.org/documents/FemDeathDec2011.pdf (last visited Feb. 7, 2012).  Of the 167 women sentenced to death in the United States during this period, 83 (49.7%) had their conviction or sentence reversed, and 12 (7.1%) others had their sentence commuted.  (*Id*. at 10-16 (App'x A).)  As of the end of 2011, only 58 women (1.8% of all inmates) remained on death row in the United States.  (*Id*. at 9 & Table 5.)  There are presently three women (2.3% of the 130 inmates) on Arizona's death row.  *See* Ariz. Dept. of Corr. Death Row Demographics, http://www.azcorrections.gov/inmate_datasearch /Minh_NewDeathRow.aspx (last visited Feb. 7, 2012).

[18]  Attorney Larry Hammond has submitted a "*Strickland*" expert declaration describing how defense counsel's performance failed to meet the applicable standard of care for Arizona practitioners in a capital case.  (Tab 1.)

46

4838-2894-9006

1    treatment notes, "*the criminal culpability of the defendant and her state of mind at the*

2    *time of the alleged offense should be evaluated independently*[.]"  (Tab 6D (emphasis

3    added).)  Given the numerous indications that such investigation would be fruitful, "any

4    reasonably competent attorney would have realized that pursuing" the leads suggested by

5    this information "was necessary to making an informed choice among possible defenses."

6    *Wiggins*, 539 U.S. at 525.  Yet defense counsel failed to retain a psychiatrist to

7    thoroughly examine Wendi to determine if she suffered from any mental diseases or

8    defects as a result of sexual abuse, physical abuse, and neglect of her childhood, and

9    failed to perform the social history investigation required for an informed diagnosis.

10          As a result, defense counsel did not learn that Wendi's erratic behavior in the

11   period leading up to Joe's death, was evidence of her worsening psychiatric disorders,

12   each compounding the symptoms of the other and converging to affect her actions on the

13   night of the crime.  (Tab 2 at 3, 7, 15-16, 55-59.)  In light of the co-morbid nature of her

14   disorders, by which they "fed off each other to exponentially worsen their collective

15   severity" leading up to the offense, Dr. Woods explains:

16          The manifestations of her psychiatric disorders, including dissociation,
        *likely played a substantial role in the events that caused Joe's death.*  A
17      person in Wendi's state would have been *unable to control and manage her
        emotions and responses* to the events as they unfolded.  Moreover, those
18      disorders in conjunction—and particularly dependent personality disorder
        when the sufferer's dependency needs are thwarted—*likely would have
19      substantially impaired Wendi's ability to accurately judge how to "help"
        her terminally ill husband,* who was the focus of Wendi's pathological
20      dependence needs.  *Her ability to judge whether her behavior was right
        was marred by her multiple mental and cognitive symptoms.*
21

22   (Tab 2 at 56-57 (emphasis added).)  *See* ABA Guideline 10.11 cmt. (Tab 76 at PCR508)

23   ("[E]xpert testimony may explain the permanent neurological damage caused by . . .

24   childhood abuse, or the hereditary nature of mental illness, and the effects of these

25   impairments on the client's judgment and impulse control.").  Put simply, counsel "failed

26   to act while potentially powerful mitigating evidence stared them in the face."  *Bobby*,

27                                              47

28

4838-2894-9006

1   130 S. Ct. at 19 (citing *Wiggins*, 539 U.S. at 525).

2       The defense theory of the case was that Joe wanted to commit suicide, and that his

3   murder arose out of a violent confrontation between Wendi and Joe that followed his

4   voluntary ingestion of poison.  There is no reason why such a defense would have

5   precluded defense counsel from also presenting evidence regarding the manifestations of

6   Wendi's mental illness both before and on the night of Joe's death.  Having failed to

7   undertake the requisite investigation, defense counsel had no basis to make a strategic

8   decision whether to introduce such evidence at trial.  *See Bloom v. Calderon*, 132 F.3d

9   1267, 1277 (9th Cir. 1997) ("Describing [counsel's] conduct as 'strategic' strips that term

10  of all substance.").  The deficiency prong under *Strickland* is met.

11                          **b.      Prejudice**

12      There is a reasonable probability that, but for defense counsel's errors in failing to

13  develop evidence relating to Wendi's mental illness, "the result of the proceeding would

14  have been different."  *Strickland*, 466 U.S. at 694.

15      Section 13-751(G)(1) is a statutory mitigating factor, which requires the sentencer

16  to consider whether Wendi's "capacity to appreciate the wrongfulness of h[er] conduct or

17  to conform h[er] conduct to the requirements of law was significantly impaired, but not

18  so impaired as to constitute a defense to prosecution." A.R.S. § 13-751(G)(1).  As

19  explained above, but for defense counsel's ineffective assistance, the jury would have

20  heard expert testimony (such as that contained in Tabs 2 through 5) proving this statutory

21  mitigating factor by a preponderance of the evidence.  A.R.S. § 13-751(C).[19]

22      The Arizona Supreme Court's decision in *Andriano* highlights the prejudicial

23  effect of defense counsel's failure to adequately investigate and present expert testimony

24  regarding Wendi's mental illness.  Specifically, the Court noted:

---

26  [19]  The extent and manifestations of Wendi's mental illness also is a non-statutory
    mitigating factor.

27                                          48

> [*t*]*he record does not indicate*. . . that at the time of the offense, [Wendi's]
> stress was any greater than it had been two years earlier when she and Joe
> first learned he was terminally ill . . . .  Moreover, *this is not a case in
> which Andriano suddenly "cracked" under extreme stress*. . . .

*Andriano*, 215 Ariz. at 512, ¶ 71, 161 P.3d at 555 (emphasis added).  However, the

reason the "record [did] not indicate" that Wendi was under increasing stress at the time

of Joe's death, and the reason the Supreme Court was left with the misimpression that

"this is not a case in which Andriano suddenly 'cracked[,]'" is because defense counsel

inexplicably failed to develop the social history evidence (family mental health,

childhood abuse and neglect) needed for a complete and accurate diagnosis of her

disorders, and failed to present any expert testimony addressing those topics.  (*Id.*)

Furthermore, the expert testimony of Dr. Woods and Dr. Hopper directly address

two core prosecution themes at trial:  (1) that Wendi was a liar who selectively forgot

details, including the details surrounding Joe's death; and (2) that Wendi was a

promiscuous adulteress who deserved to be condemned.

*First*, as Dr. Hopper explained, psychological dissociation is a disconnection from

painful memories, sometimes including "whole realms of experience and identity, such

that personality and identity are highly fragmented."  (Tab 4 at 130.)  Wendi has the most

severe dissociation that Dr. Hopper has ever seen.  (Tab 4 at 131 ("*I have never before

encountered a patient or defendant with such a severe disturbance of the capacity to

recall autobiographical memories* . . . .") (emphasis added).)

*Second*, Wendi's promiscuity and inability to say "no" to sexual advances are

"classic symptoms" of childhood sexual exploitation and a manic bipolar state.  (*Id.* at

132-33.)  Had defense counsel performed an adequate investigation, the prosecutor's

efforts to paint Wendi as detestably promiscuous would have fallen flat, or at least been

met with greater understanding, in light of evidence that Wendi was raised by child

molesters and pedophiles and treated by her own stepfather as a sexual plaything from the

time she was a young child.  Instead, the prosecutor's grossly improper characterizations

49

1   went largely unanswered and unexplained.

2          Thus, but for defense counsel's errors, Wendi would have presented powerful

3   evidence that her mental illness contributed to her actions before and on the night of Joe's

4   death, and would have rebutted two core attacks on her veracity and credibility.  There is

5   a reasonable probability that a jury hearing this evidence would not have sentenced

6   Wendi to death.

7                    **2.    Defense Counsel's Failure To Investigate And Present Evidence
                             Regarding Wendi's Harrowing Childhood**
8

9          As explained above, the two attorneys (Patterson and DeLozier) and the mitigation

10  specialist (Mac Leod) failed to work in a coordinated fashion.  Patterson, who was

11  occupied until late 2003 with a high-profile death penalty case, focused on the guilt phase

12  of Wendi's trial and delegated (without instructions) the mitigation investigation of the

13  case to DeLozier and Mac Leod.  DeLozier spent his time with Wendi reading the Bible.

14  Mac Leod did little more than identify facts to show "Wendi's good upbringing and

15  character and her good behavior in jail."  (Tab 6 ¶ 33; Tab 8 ¶ 23.)  In other words, rather

16  than undertake an in-depth look at Wendi's life—and base the mitigation case on the life

17  story that emerged—Mac Leod was instructed to look for evidence (*e.g*., family vacation

18  pictures) that supported the defense team's preconceived, superficial and *completely*

19  *inaccurate* story of Wendi's upbringing.

20                          **a.    Deficient Performance**

21         Defense counsel failed to interview key witnesses—including Skip, members of

22  his family, Wendi's childhood friends, people who were members of the Fishers of Men

23  cult, and people who knew Wendi and her family at the Harvest school—and did not

24  even request Wendi's jail records until after the guilt phase of her trial was over.  As a

25  result, defense counsel failed to uncover:

26          •    the extent and manifestations of Wendi's mental illness;

27          •    the extent of the mental illness, substance abuse and multi-

                                        50

28  MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
    CASE NO. CR2000-096032-A

4838-2894-9006

generational violence that plagued both sides of Wendi's family;

- Wendi was raised by—and spent her entire childhood in the company of—child molesters and pedophiles, including her father (Skip), his father, his brothers, and Alejo, who treated her as a sexual object and shaped her into the promiscuous, hyper-sexualized adult that the State vilified at trial;

- Wendi was subject to physical abuse from the day she was born: trained like "a dog" by Skip, who spanked her to get her to stop crying and to obey; physically beaten with wooden paddles by Donna and Alejo throughout her childhood, the object of which was to "break her"; indoctrinated in environments (Fishers of Men, and then Harvest) where the abuse of children was pervasive ("You name it and we swatted them for it"); and

- Wendi was raised in abject poverty, isolation and neglect, and was panhandling on her own at the age of 4.

The information set forth above—which defense counsel failed to learn or present to the jury—is precisely the type of evidence that historically has convinced juries to not impose the death penalty. *See, e.g.*, *State v. Bocharski*, 218 Ariz. 476, 189 P.3d 403 (2008); *Ainsworth v. Woodford*, 268 F.3d 868, 877 (9th Cir. 2001) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.") (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)).

Finally, "[t]he record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526. Defense counsel neglected to make basic inquiries into their client's background, such as her family mental health history and history of abuse, inexplicably ignored clear indications that such an investigation would be fruitful, and failed to respond to the pleas of numerous professionals to examine those issues further. They did not even request Wendi's full jail records (including medical records) until after she had been convicted.

51

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

1    The mitigation case that counsel eventually put on can be described, at best, as

2    "halfhearted."  *Wiggins*, 539 U.S. at 526.  Wendi's closing was given by DeLozier, who

3    had been fasting for 70 days, who was still traumatized by the murder of a co-worker in

4    the midst of Wendi's trial, and who was *at such a loss to know what to say in Wendi's*

5    *defense* that he asked two non-lawyers to write the closing argument the day before he

6    read it to the jury as if it were a grocery list.  The text of the closing argument contained

7    no rebuttal to the State's arguments—that Wendi was a conniving, selectively forgetful,

8    promiscuous adulteress whose life was not worth sparing—because defense counsel

9    never investigated the extent of the sexual and physical abuse, isolation and neglect that

10   Wendi experienced throughout her childhood, which made her the person she was at the

11   time of the crime.

12         Defense counsel admit that their shortcomings were not based on a reasonable

13   strategic judgment, nor could they have been.  "An uninformed strategy is not a reasoned

14   strategy.  It is, in fact, no strategy at all."  *Correll*, 539 F.3d at 949; *see also Bean v.*

15   *Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998) ("[F]ailure to develop a penalty phase

16   presentation can only be characterized as a deficiency in trial preparation, *not a strategic*

17   *decision*[.]") (emphasis added).  Accordingly, no "reasoned professional judgment" could

18   be offered to support defense counsel's minimal investigation.  *Frierson*, 463 F.3d at 992

19   ("Because strategy presupposes investigation, [defense counsel's] actions cannot be

20   attributed to strategy").

21                         **b.     Prejudice**

22         As discussed above (and detailed in **EXHIBIT 2**), the prosecution theme that

23   permeated all three phases of Wendi's trial related to her extramarital affairs and

24   promiscuity.  The prosecutor vilified Wendi over and over again for the casual nature

25   with which she would kiss or sleep with people she met in bars (while Joe was at home

26   dying of cancer), and made Wendi's immorality and hyper-sexual behavior the

27                                      52

28

4838-2894-9006

1    centerpiece of the State's closing argument during the penalty phase.

2          But there is a rebuttal that explains Wendi's behavior and testimony, a rebuttal that

3    defense counsel missed entirely.  Consider the facts regarding her sexuality in view of the

4    mitigation evidence presented in this Petition:  that Wendi was raised by child molesters

5    and pedophiles, was treated as a sexual plaything by Alejo, and was physically and

6    sexually abused from the day she was born, with profound effects on her sexuality and

7    relationships with men as an adult.  Viewed through that lens, Wendi's testimony

8    expressing wonderment about how she could say no to a man who wanted to have sex

9    (10/27/04 at 66), only proves her mental illness and history of abuse. [20]  (*See, e.g.*, Tab 2

10   at 22, 34, 48-49; Tab 4 at 132-33, 248-51.)  At a minimum, such rebuttal evidence would

11   have explained to the jury how Wendi became the person she was, and would have made

12   her a much less likely candidate for the jury's condemnation.  *See Sears v. Upton*, 130 S.

13   Ct. 3259, 3264 (2010) ("This evidence might not have made Sears any more likable to

14   the jury, but it might well have helped the jury understand Sears, and his horrendous

15   acts—especially in light of his purportedly stable upbringing").

16         Had defense counsel performed reasonably, the compelling mitigating evidence

17   discussed in this Petition would have been discovered and presented to the jury.  This

18   evidence would have placed Wendi's life story before the jury and enabled them to make

---

[20] To illustrate the prejudice arising from defense counsel's failure to investigate her childhood sexual abuse and its impact on her sexuality, consider the following example. As noted above, Wendi testified that she "couldn't imagine saying no" to sex with Rick Freeland and Travis Black, because it "wouldn't have been right" and she "didn't want to be a tease." (10/27/04 Tr. at 66, 82-83.)  The prosecutor mocked these statements in various ways throughout trial, most pointedly in his guilt-phase closing:  "Why is it that she gets involved with [other men]?  Why is it that they engaged in the most intimate acts that two people can engage in?  Well, because, according to her, she didn't want to be a tease.  *Wow*. . . .  According to her, it's worse to be a tease than it is to be a cheat.  I guess that's what she's telling us." (11/16/04 Tr. at 84-85.)  Thus, because of defense counsel's failure to investigate the childhood and resulting psychiatric disorders of their client, the jury was left to conclude that Wendi's inability to say "no" was the product of condemnable immorality, rather than a tell-tale symptom of her childhood sexual abuse and psychiatric disorders.

53

4838-2894-9006

P-App. 000107

1  an individualized assessment of the appropriateness of the death penalty.  It is precisely

2  the type of evidence that has been found "critical for a jury to consider when deciding

3  whether to impose a death sentence."  *Douglas v. Woodford*, 316 F.3d at 1090.[21]

4      *State v. Bocharski*, 218 Ariz. 476, 189 P.3d 403 (2008), is on point.  In *Bocharski*,

5  the Arizona Supreme Court reduced defendant's death sentence to life imprisonment

6  because "[t]estimony from numerous witnesses supports the conclusion that Bocharski

7  suffered severe physical, mental and sexual abuse during his childhood[,]" Bocharski

8  "came from a severely dysfunctional family" with "evidence of multigenerational

9  violence in both his mother's and father's families[,]" and Bocharski presented evidence

10  of a nexus between the mitigating factors and the crime:

11          [Dr. Beaver] testified that Bocharski's emotional and
            alcoholic state likely played a substantial role in the events
12          that led to the murder of Brown and that a person in his state
            would have been far less able than others to control and
13          manage his feelings and reactions.

14  *Bocharski*, 218 Ariz. at 497-499, ¶¶ 101-02, 104-05, 110, 189 P.3d at 424-26.[22]

15      Likewise, Wendi suffered a childhood and family history that is markedly similar

16  to Bocharski's (although evidence of such was entirely missed by defense counsel) and,

17  as explained by Dr. Woods, Wendi's mental illness likely played a substantial role in

18  Joe's murder, which again, is an issue that defense counsel entirely missed.

19  _____

20  [21]  Applying *Strickland*, the United States Supreme Court has found "[a] reasonable
    probability," 466 U.S. at 694, that the sentencer would have reached a different result had
21  counsel presented similar evidence.  *See, e.g.*, *Porter v. McCollum*, 130 S. Ct. 447, 454
    (2009) (evidence of the defendant's childhood history of physical abuse, brain
22  abnormality, limited schooling and military service); *Rompilla v. Beard*, 545 U.S. 374,
    392 (2005) (evidence of severe abuse and neglect as a child, as well as brain damage);
23  *Wiggins*, 539 U.S. at 535 (evidence of the defendant's "severe privation and abuse" as a
    child, homelessness, and "diminished mental capacities").

24  [22]  *See also Ainsworth*, 268 F.3d at 878 (Based on defense counsel's failure "to
    investigate, develop and present the wealth of evidence available concerning Ainsworth's
25  troubled background and his emotional stability and what led to the development of the
    person who committed the crime," the prejudice prong under *Strickland* was satisfied
26  because "there is a reasonable probability that the jury would have rendered a [different]
    verdict.").

27                                          54

28

4838-2894-9006

Wendi is entitled to an evidentiary hearing at minimum, and ultimately, a new sentencing.  *Strickland*, 466 U.S. 668; *Wiggins*, 539 U.S. 510; U.S. Const. Amend. V, VI, VIII, XIV; Ariz. Const. Art. 2, §§4, 15, 24.

**B.   AGGRAVATION PHASE**

**1.   Defense Counsel's Failure To Investigate And Present Expert Testimony Regarding Wendi's Mental Illness**

Expert testimony regarding Wendi's mental illness on the night of Joe's death also would have undermined the one aggravating factor that was found to exist.

"The jury found one aggravating factor—that Andriano committed the murder in an especially cruel manner.  A.R.S. § 13-7[51](F)(6)."  *Andriano*, 215 Ariz. at 510, ¶ 64, 161 P.3d at 553.  "The cruelty prong of the (F)(6) aggravating circumstance may be proved by showing that the defendant *knew or should have known* that the manner in which the crime was committed would cause the victim to consciously experience either physical pain or mental anguish before death."  *Id.* at 511, ¶ 65, 161 P.3d at 554 (emphasis added, citation omitted).  To properly find cruelty, the State must prove beyond a reasonable doubt that the aggravating circumstance is met.  *State v. Jimenez,* 165 Ariz. 444, 453, 799 P.2d 785, 794 (1990) (citation omitted); A.R.S. 13-751(B).

In view of the manifestations of Wendi's mental illness on the night of the crime, discussed by Dr. Woods, there is more than a reasonable probability that at least one juror would have concluded that Wendi did not know or have the capacity to have known that her actions would cause Joe to suffer (rather than alleviate) further physical pain or mental anguish.  (Tab 2 at 57 (combination of acute disorders "likely would have substantially impaired Wendi's ability to accurately judge how to 'help' her terminally ill husband, who was the focus of her dependence needs"); Tab 45 at PCR20 ("In her head she said she was helping him.").)

**2.   Defense Counsel's Failure To Object To The Jury's Consideration Of Evidence Related To The Alleged Sodium**

55

4838-2894-9006

**Azide Poisoning as Improper, Inaccurate, and Misleading**

In Wendi's direct appeal, the Arizona Supreme Court placed significant weight on the alleged sodium azide poisoning in concluding that the (F)(6) cruelty aggravator was met.

> The evidence showed that Andriano poisoned Joe with sodium azide and left him to suffer for what felt to Joe like a "long time." During that period, Joe vomited at least twice, was too weak to sit or stand, and was having difficulty breathing. After pretending to call 911, Andriano stood by for approximately forty-five minutes as Joe suffered from the effects of sodium azide poisoning. . . . Joe, who was conscious during this time . . . undoubtedly "experienced significant uncertainty as to [his] ultimate fate."

*Andriano*, 215 Ariz. at 511, ¶ 65, 161 P.3d at 554 (citations omitted).

However, because the State never introduced evidence—consistent with its "poisoning" theory—explaining how the sodium azide got into Joe's system, defense counsel should have sought a court ruling precluding the jury from considering the alleged "poisoning" in deciding whether the (F)(6) cruelty aggravator was satisfied.

In the State's opening statement during the aggravation phase, the prosecutor argued:

> [Joe] Andriano was given this poison. And we know the amount of poison that is unaccounted for is approximately 21 grams which is the equivalent o[f] 21 packets of Sweet and Low. That's sort of what you can get a feel to what's missing.
>
> We also know that that's ten times what they call the lethal do[s]e in 50 percent of the people that may take it and weigh that much. *So we know she gave him at least ten times the amount that was necessary to kill him.*
>
> \*   \*   \*
>
> . . . the poison would have killed him. We know that from Dr. French, there's ten times the amount of lethal dose missing. *So it's in his body, that's where it is. So he would have died from it anyway.*

(11/30/04 Tr. at 23, 32 (emphasis added).)[23]

Wendi testified that, as part of Joe's decision to commit suicide, he took a handful

---

[23] As discussed below, the lack of evidentiary support for the prosecutor's assertion—that Joe consumed ten times the dose of sodium azide needed to kill him—supports Wendi's claim of prosecutorial misconduct.

56

of the approximately 15 capsules that Wendi and Joe together had filled with sodium azide, and he voluntarily ingested a handful of them with Gatorade.  (10/24/04 Tr. at 29.)

The State presented *no alternate explanation* for how the sodium azide got into Joe's system.

- The State's witness, Joseph Richmond, found that there was "a trace amount" of sodium azide in a pot of beef stew (25 parts per million (ppm)), and clarified that the amount observed was "near the detection limit" and was at "a very small level.  It's at very small quantities."  (9/27/04 Tr. at 41, 54-55, 66.)

  To illustrate how small of a quantity this is, consider how much stew Joe would have had to eat in order to consume *one* gram of sodium azide, the equivalent of just *one* Sweet and Low packet.  (9/22/04 Tr. at 142.)  Given that 25 ppm is the same as 25 milligrams per kilogram (a milligram is one-millionth of a kilogram), and one gram is a thousand milligrams, Joe would have had to have consumed *40 kilograms* of stew (roughly 88 pounds) to ingest the equivalent of just a single Sweet and Low packet of sodium azide.  Defense counsel indicated that Wendi's explanation for Joe's ingestion of the sodium azide made sense, but never pointed out the impossibility of the State's alternative theory.

- There was no evidence that Joe ate the stew on the night of his death.

- There also was no explanation by the State as to how Wendi could have either *forced* or *tricked* Joe into taking what the prosecutor argued in the aggravation phase was an amount of sodium azide that was the equivalent of "*21 packets of Sweet and Low*."

Because the State failed to prove—under any standard, and certainly not beyond a reasonable doubt (*see* A.R.S. § 13-751(B))—that Joe was poisoned (without his knowledge) by Wendi, the jury should not have been permitted to consider the alleged poisoning as part of its deliberation during the aggravation phase.

The failure of the defense counsel to object to the introduction of evidence or argument relating to the alleged poisoning during the aggravation phase deprived Wendi of a fair trial under *Strickland*.  *First*, given the prominent role the issue of whether Joe had been poisoned played during the guilt phase, defense counsel's error in failing to seek to exclude evidence of poisoning during the aggravation phase fell below an objective standard of reasonableness.  *See, e.g., Girts v. Yanai*, 501 F.3d 743, 757 (6th

57

1   Cir. 2007) (counsel ineffective for failing to object to improper argument; failure had "no

2   conceivable benefit" to the defense and resulted in the jury hearing prejudicial

3   arguments); ABA Guideline 10.8 cmt. (Tab 76 at PCR489).

4           *Second*, there is a reasonable probability that, but for counsel's error, the jury

5   would not have found that the (F)(6) cruelty aggravator was met.  As noted above, the

6   State emphasized the alleged "poisoning" in it opening statement in the aggravation

7   phase, and the Arizona Supreme Court did as well in its *de novo* review of the

8   aggravation phase.  Moreover, if the evidence of "poisoning" had properly been

9   excluded, the only testimony as to the (F)(6) aggravator was medical examiner Keen's

10  testimony that he believed any one of eight to ten blows from the barstool were sufficient

11  to render Joe unconscious, and that he died "within a matter a minutes."  (11/30/04 Tr. at

12  58-59, 63-66, 69).[24]  Because at least one juror could have concluded that those facts, on

13  their own, did not support the "especially cruel" aggravator, Wendi is entitled to a new

14  trial as to aggravation and sentencing.  *See Bean*, 163 F.3d at 1081 (citing as one of the

15  factors undermining confidence in the outcome of trial, the fact that "this is not a case in

16  which a death sentence was inevitable because of the enormity of the aggravating

17  circumstances").

18          Finally, confidence in the jury's imposition of the death sentence is further

19  undermined when the addition of new evidence to the mitigation side of the ledger

20  (discussed above) is coupled with the removal of evidence from the aggravation side of

21  the ledger.  *Robinson*, 595 F.3d at 1113 (finding prejudice where the state court weighed

22

23  _____

24  [24] This aggravation evidence is no stronger than the evidence in *Rompilla*, *Williams* or
    *Bocharski*.  *See Rompilla*, 545 U.S. at 378, 383 (the defendant committed murder by
    torture and had a significant history of violent felonies, including a rape); *Williams*, 529
25  U.S. at 418 (Rehnquist, C. J., concurring in part and dissenting in part) (the defendant had
    a lifetime of crime, and after the murder he "savagely beat an elderly woman," set a home
26  on fire, and stabbed a man (citations and internal quotation marks omitted)); *Bocharski*,
    218 Ariz. at 494, ¶ 86, 189 P.3d at 421 ("Bocharski inflicted twenty-four knife wounds to
27  the head and face of Brown").

28
                                           58

1   the proffered evidence against two statutory aggravating circumstances when it should

2   have only weighed against one).  But for defense counsel's deficient performance, the

3   abundance of mitigation evidence identified in this Petition would have been balanced

4   against far less compelling evidence relating to the "especially cruel" (F)(6) aggravator,

5   and there is more than a reasonable probability that at least one juror would have weighed

6   these considerations differently.  *Wiggins*, 539 U.S. at 537.

7        Wendi is entitled to relief under *Strickland*, U.S. Const. Amends. V, VI, VIII,

8   XIV, and Ariz. Const. Art. 2, §§ 4, 15, 24.

9        **C.   GUILT PHASE**

10           **1.   Defense Counsel's Failure To Investigate And Present Expert
                    Testimony Regarding Wendi's Mental Illness**

11       The manifestations of Wendi's mental illness on the night of the crime, as

12   described by Dr. Woods, also call into question whether she formulated the mental state

13   necessary to be convicted of first-degree murder.  Defense counsel was "obliged to

14   thoroughly investigate [Wendi's] case in order to *determine* whether a mental state

15   defense might have been better than [or complementary to] the . . . defense" they had

16   settled on.  *Jennings v. Woodford*, 290 F.3d 1006, 1015 (9th Cir. 2002); *see also Evans v.*

17   *Lewis*, 855 F.2d 631, 636-37 (9th Cir. 1988); *Smith v. Stewart*, 189 F.3d 1004, 1009-1014

18   (9th Cir. 1999).

19       In *Jennings*, prior counsel had engaged a psychiatrist who conducted a 2-hour

20   "preliminary interview" with Jennings that "was meant as a preliminary assessment of

21   Mr. Jennings' competency and as a tool to establish a baseline for Mr. Jennings shortly

22   after his arrest."  *Jennings*, 290 F.3d at 1013.  Trial counsel never pursued a possible

23   mental health defense, despite being aware of drug and mental health issues.  (*Id.* at

24   1013-14.)  The Ninth Circuit found ineffective assistance and ordered *habeas* relief under

25   such circumstances.  (*Id.* at 1019-20.)  Likewise, Dr. Potts urged defense counsel to

26   evaluate Wendi's mental state at the time of the crime, and they failed to do so.  If they

27                                                 59

28   ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━
     MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
     CASE NO. CR2000-096032-A

had, then the expert testimony would have called into question whether Wendi had the

requisite mental state for premeditated murder.

**2.     Defense Counsel's Failure To Identify Corroborating Evidence That Joe Knew That Wendi Was Trying To Obtain A Life Insurance Policy**

The Arizona Supreme Court noted the significance and damaging nature of the

evidence that Wendi attempted to obtain insurance on Joe's life:

> Evidence of Andriano's attempts to obtain insurance on Joe's life was admissible to show her plan, knowledge, and intent to kill Joe, and also to show that she premeditated Joe's murder.  Moreover, the *significant probative value* of *such damaging evidence* is not substantially outweighed by the danger of unfair prejudice to Andriano.

*Andriano*, 215 Ariz. at 503, ¶ 23, 161 P.3d at 546 (emphasis added).

Gia Palicki, Wendi and Joe's babysitter, testified during the penalty phase about

Wendi's attributes as a mother, but defense counsel failed to learn that Palicki "*knew* that

*Joe* was trying to obtain a life insurance policy" with Wendi's help, because both Joe and

Wendi had discussed it with her.  (Tab 31 ¶ 8 (emphasis added.)  But for defense

counsel's ineffective assistance, the jury would have heard Palicki's testimony

corroborating Wendi's testimony on that critical point.  Palicki's testimony would have

negated "such damaging evidence" that Wendi was surreptitiously attempting to obtain

insurance on Joe's life, which the State emphasized was the motive for Joe's murder.

(11/30/04 Tr. at 20-21 ("The motivation in this case for her to get rid of him is that he

was worth more dead than alive.").)  The failure of defense counsel to identify and

present this evidence prejudiced Wendi and denied her a fair trial.

**3.     Defense Counsel's Failure To Introduce Evidence That Joe Was Severely Depressed In The Period Leading Up To His Death**

Wendi's testimony that Joe was depressed and had decided to commit suicide by

consuming sodium azide was uncorroborated at trial.  If defense counsel had called Chris

Weaver as a witness, and had prepared Jeff Miller properly to get his testimony admitted,

60

4838-2894-9006

the jury would have heard evidence that Joe was in fact depressed in the period leading up to his death.  There is no strategic reason why defense counsel failed to call Weaver or to make further efforts to get his testimony admitted into evidence.

### 4. Defense Counsel's Failure To Seek A Jury Instruction As To Lesser Included Offenses

At trial, defense counsel did not seek a lesser-included offense instruction.  But because defense counsel's numerous inadequacies—failing to adequately investigate Wendi's abusive childhood, failing to present expert testimony regarding Wendi's mental illness and mental state at the time of the crime, failing to object to the jury's consideration of the alleged poisoning during the aggravation phase, failing to identify or elicit key testimony from Palicki, Miller and Weaver, and generally failing to adequately prepare for trial—defense counsel knew too little about their own case and client to make (or advise their client regarding) an informed decision on whether to seek lesser-included offense instructions.  Had they done a proper investigation, they would have requested such an instruction; and, for the reasons stated in this Petition and the accompanying reports, declarations, and other evidence undercutting premeditation, they would have received such an instruction.

In sum, in view of the cumulative errors during the guilt phase, Wendi is entitled to a new guilt phase trial.

## II. THE DEFENSE COUNSEL IN CHARGE OF WENDI'S PENALTY PHASE DEFENSE HAD AN ACTUAL CONFLICT OF INTEREST THAT AFFECTED THE ADEQUACY OF WENDI'S REPRESENTATION

A criminal defendant's Sixth Amendment right to counsel includes the right to be represented by an attorney with undivided loyalty.  *See Wood v. Georgia*, 450 U.S. 261, 271 (1981).  This guarantee is so important that, unlike other Sixth Amendment claims, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief," *Cuyler v.*

61

4838-2894-9006

*Sullivan*, 446 U.S. 335, 350 (1980), and harmless error analysis does not apply.  *Id.* at 349; *see also Glasser v. United States*, 315 U.S. 60, 76 (1942).  "If a defendant fails to object to representation by an attorney with a conflict, but shows on appeal that 'an actual conflict of interest adversely affected his lawyer's performance,' reversal is required." *Lockhart v. Terhune*, 250 F.3d 1223, 1229-30 (9th Cir. 2001) (quotation omitted).

In this case, DeLozier was the lawyer who was responsible for investigating mitigation issues for Wendi's defense during the penalty phase of the trial.  At the same time he was supposed to be conducting that investigation, however, DeLozier also was representing Wendi's mother and stepfather (Donna and Alejo) in legal disputes with Joe's family regarding the custody of Wendi and Joe's two children.  (*See* Tab 77.)

*First,* DeLozier was "actively represent[ing] conflicting interests."  *Cuyler*, 446 U.S. at 350.

- In Wendi's capital case, DeLozier was charged with penalty phase preparation, which "requires *extensive* and generally *unparalleled* investigation into personal and family history[,]" including instances of childhood abuse, neglect or deprivation.  ABA Guideline 10.7 cmt. (Tab 76 at PCR 481) (emphasis added, citations omitted); *id*. at PCR483; *Douglas*, 316 F.3d at 1090.

- In Donna and Alejo's adoption and guardianship cases, DeLozier was charged with portraying Donna and Alejo in the best possible light, as they were seeking to adopt or obtain visitation rights regarding Wendi and Joe's children.

This conflict was further compounded by the fact that Donna and Alejo retained DeLozier to represent Wendi in her capital case, and they paid DeLozier in that matter. (Tab 61; *see also* Tab 29 ¶ 10 (DeLozier asked Donna to write his closing argument for the penalty phase of Wendi's trial).)

*Second*, DeLozier's conflict "actually affected the adequacy of" Wendi's representation.  *Cuyler*, 446 U.S. at 349; *see also Lockhart*, 250 F.3d at 1231 (requiring petitioner to show "that the attorney's behavior seems to have been influenced by the conflict").  DeLozier simply did not ask Donna, Alejo or Wendi about childhood abuse or

62

4838-2894-9006

mental health history.  (Tab 29 ¶¶ 4-8; Tab 25 ¶¶ 3-5; Tab 9 ¶¶ 21-22.)  DeLozier did not investigate whether Donna or Alejo had mental health or substance abuse issues.  Even though an interview with Wendi's childhood friends or Harvest school officials would have exposed the fact that Alejo had a sexually abusive and perverse relationship with Wendi (*see* Tab 7 ¶¶ 23-24; Tab 11 ¶ 10; Tab 12 ¶¶ 15, 18; Tab 13 ¶ 6), DeLozier never asked the "hard questions" to uncover that readily available evidence.

In view of DeLozier's conflict of interest (and his general lack of competence), it is not surprising that the mitigation story that was told at Wendi's capital trial was that she was the product of a good family and a good upbringing—which while consistent with the story DeLozier had an interest in presenting on Donna and Alejo's behalf in their child custody battle, was *completely inaccurate* (and led to Wendi's death sentence).

Because Wendi "need not demonstrate prejudice in order to obtain relief," *Cuyler*, 446 U.S. at 349-50, she is entitled to a new sentencing hearing under *Cuyler*.

**III.  DEFENSE COUNSEL'S FAILURE TO OBJECT TO PERVASIVE INSTANCES OF PROSECUTORIAL MISCONDUCT DEPRIVED WENDI OF DUE PROCESS AND VIOLATED HER RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL**

"Prosecutors, as servants of the law, are subject to constraints and responsibilities that do not apply to other lawyers; they must serve truth and justice first.  Their job is not just to win, but to win fairly, staying within the rules."  *United States v. Lopez-Avila*, --- F.3d ---, 2012 WL 450314, at *1 (9th Cir. Feb. 14, 2012).  The prosecutor in this case did not "win fairly," and it was not the first time.  In a recent oral argument, Justice Ryan of the Arizona Supreme Court (retired, sitting by designation) observed:  "Well, this prosecutor I recollect from several cases.  This same prosecutor has been accused of fairly serious misconduct but ultimately we decided it did not rise to the level of requiring a reversal. . . .  There's something about this prosecutor, Mr. [Juan] Martinez."[25]

---

[25] *State v. Gallardo*, No. 09-0171-AP, Video of Nov. 2, 2010 Oral Argument at 30:50 to

4838-2894-9006

As described below, the prosecutor's conduct in this trial pushed well beyond the limits of fairness, at times bordering on the outrageous.  Having failed to adequately investigate the case and prepare for trial, defense counsel was ill-suited to protect Wendi from the prosecutor's incessant and pervasive misconduct.  The trial court also was in no position to control the misconduct, because most instances *did not even draw an objection* from defense counsel.  Moreover, appellate counsel inexplicably failed to raise prosecutorial misconduct as an appellate issue, even as an issue for fundamental error review—which the Arizona Supreme Court noted in the direct appeal.  *See Andriano*, 215 Ariz. at 503, ¶ 28 n.3, 161 P.3d at 546 n.3.

"To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26, 969 P.2d 1184, 1191 (1998) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "Even if the alleged acts of misconduct do not individually warrant reversal, we must determine whether the acts 'contribute to a finding of persistent and pervasive misconduct.'"  *Bocharski*, 218 Ariz. at 491-92, ¶ 74, 189 P.3d at 418-19 (citation omitted).  "We will reverse a conviction because of prosecutorial misconduct if the cumulative effect of the alleged acts of misconduct 'shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant." (*Id.* (citation omitted).)

The prosecutor's misconduct here fell into three general categories:  (1) references to the details of Wendi's hyper-sexual behavior and related disparagement of her character, in all three phases of the trial; (2) asserting or implying that the State possessed evidence of factual matters that was never introduced at trial; and (3) making unfounded

---

31:20, *available at* http://supremestateaz.granicus.com/MediaPlayer.php?view_id=2&clip_id=566.  The Court's full discussion of the prosecutor's alleged misconduct is addressed at 29:05 to 37:50 of the video.

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

1   accusations that a defense expert was unethical.[26]

2       *First*, as explained above, a central theme of the prosecutor's case against Wendi

3   was to attack her for her promiscuity.  Before trial, the State successfully opposed a

4   motion *in limine* to preclude evidence "relating to the relationship the defendant allegedly

5   had with regard to Rick Freeland and Travis Black" (9/7/07 Tr. at 13), purportedly

6   because those relationships were "motivation, if you will, or the reason why she wanted

7   her husband dead" (2/27/04 Tr. at 17).  From his opening statement forward, however,

8   the prosecutor went far beyond this limited purpose.  He inundated the jury with

9   discussion of those affairs and a host of other hyper-sexual conduct *not* to prove

10  motive—indeed, the prosecutor unequivocally argued to the jury that the affairs "couldn't

11  really be the motive" (11/30/04 Tr. at 20; 12/1/04 Tr. at 10-11)—but rather to show that

12  Wendi was a person worthy of punishment for offenses other than the crime itself.

13      Because it is difficult to appreciate the full extent and improper nature of the

14  prosecutor's comments and questions without reading them for one's self, **EXHIBIT 2** to

15  this Petition provides relevant excerpts from the prosecutor's opening statements, closing

16  arguments, and questioning of witnesses.  As that exhibit shows, the breadth and

17  pervasiveness of the prosecutor's statements and questions pertaining to Wendi's

18  sexuality go far beyond merely establishing that she had affairs with Freeland and Black.

19  Indeed, the prosecutor's questioning ranged from details regarding each sexual encounter

20  with both men (for example, asking whether Wendi had sex with Freeland under a bridge,

21  or whether she used lubricants in her sexual encounters with them), to the details of

22  sexual encounters with other men *before* Wendi even met Joe, to whether she wore

23  provocative clothing on a given night.  In many of his questions (and all of his opening

24  statements and closing arguments), the prosecutor invited the jury's moral condemnation

25
    _____
26  [26] These categories cover the most blatant instances of prosecutorial misconduct at trial, but are by no means exhaustive of the various improper statements and arguments the prosecutor made to the jury.

27
                                          65

28

4838-2894-9006

1   of Wendi as a promiscuous adulteress—even attempting to create the impression that the

2   affairs themselves were an aggravating factor.[27]

3          The prosecutor's repeated statements emphasizing the same conduct or testimony

4   over and over again (literally dozens of separate references to her promiscuity in his

5   statements and arguments, and an even greater number of questions of witnesses on the

6   subject) were objectionable because they were cumulative and because any probative

7   value was outweighed by the prejudicial effect of the statements.  Given that Wendi was

8   not on trial for adultery (or promiscuity), the prominence the prosecutor placed upon

9   Wendi's sexual conduct could not help but confuse the jury and inject improper character

10  considerations into its deliberations.

11         *Second*, the prosecutor on multiple occasions ignored the fundamental requirement

12  that his "questioning and argument, however, cannot make insinuations that are not

13  supported by the evidence."  *Hughes*, 193 Ariz. at 85, 969 P.2d at 1197.  Going well

14  beyond "insinuations" not based on the evidence, the prosecutor here essentially injected

15  himself as a witness by either prefacing questions with assertions of fact never introduced

16  into evidence (*e.g.*, "Did you know that part of the reason that [an ex-boyfriend] actually

17  broke up with [Wendi] was because . . . he caught her in front of the television in a state

18  of undress with another male?" (10/13/04 Tr. at 51)), or by asserting that the State was in

19  possession of additional facts or evidence not presented to the jury.

20         For example, at trial, Wendi testified that Shawn King had assisted her and Joe in

21  researching sodium azide (10/27/04 Tr. at 87-91), and the State introduced no evidence

22  regarding King's alleged role in the crime and did not call him as a witness.

23  Nevertheless, in his guilt phase closing argument, the prosecutor addressed King's

24  _____

[27]  In his aggravation phase closing argument, the prosecutor repeatedly implied that the
25  affairs themselves were aggravating factors, noting that the murder was "way beyond"
    senseless because she made "life miserable for [Joe] by going out, by having affairs" and
26  "[n]ot only is she out there being the belle of the ball" and "having affairs doing whatever
    she wants . . . but does she need to kill him?"  (12/1/04 Tr. at 16, 38.)

27                                                66

28

4838-2894-9006

1   absence at trial by stating:  "We're not here to judge his conduct.  If he were to be judged,

2   he would be judged as an accomplice."  (11/17/04 Tr. at 81.)

3        Thus, the prosecutor implied that the State had some undisclosed evidence that

4   Wendi and King conspired together to murder Joe, and that the evidence was sufficiently

5   strong that King would be convicted if the State filed charges against him.  The jury was

6   left to ponder what undisclosed evidence the State might possess that made the

7   prosecutor so certain of their conspiracy to commit murder (and thus undermine Wendi's

8   defense).  The prosecutor's statement was particularly outrageous because the resulting

9   inference of additional investigatory knowledge was plainly false:  Shawn King was

10  never charged with any crime in connection to Wendi's case, and he was *never even*

11  *interviewed* by anyone associated with the prosecutor's office or law enforcement

12  regarding his alleged involvement in Joe's death.  (Tab 15 at 32.)

13       The prosecutor also improperly implied the State's inside knowledge of the facts

14  in other ways.   Courts have "emphasize[d] that prosecutors should not use 'we know'

15  statements in closing argument" because it "readily blurs the line between improper

16  vouching and legitimate summary," in that "the question for the jury is not what a

17  prosecutor believes to be true or what 'we know,' [but] rather, the jury must decide what

18  may be inferred from the evidence."  *United States v. Younger*, 398 F.3d 1179, 1191 (9th

19  Cir. 2005).  Here, the prosecutor prefaced factual assertions with "we know" *more than*

20  *140 times* in his openings and closings.  Worse, he often applied the "we know"

21  imprimatur to factual assertions that lacked evidentiary support or were wholly

22  contradicted by the evidence.

23       For example, with regard to the night of the offense the prosecutor stated, "Well,

24  [Joe] never used any physical force on her.  We know that."  (11/16/04 Tr. at 140.)  Yet

25  the State introduced no evidence explaining how the State "kn[ew] that" some other

26  physical force caused Wendi's substantial injuries from the night of Joe's death (*see* Tab

27

28

67

4838-2894-9006

66), or how Joe could have been clutching Wendi's hair in his hands when he died, without having used physical force on her.  Similarly, the prosecutor repeatedly used the "we know" phraseology when asserting that Joe ingested a "large dose" of sodium azide that absorbed into his tissues, even in some cases attributing that fact to his expert witness (*see, e.g.*, 11/30/04 Tr. at 23-24)—even though that expert witness testified that the chemical's absorption properties were unknown and had never been studied, and that "one conclusion that we can draw is that we have no idea how much was ingested." (9/23/04 Tr. at 27, 59.)  The sheer number of instances where the prosecutor used "you know" to add weight to the State's evidence, and to vouch for alleged facts not in evidence, highlights the extent to which his misconduct permeated the entire trial.

*Third*, the prosecutor not only *implied* unethical conduct by the defense's expert witness, Sharon Murphy, without an evidentiary basis for doing so—which in itself constitutes prosecutorial misconduct, *see Hughes*, 193 Ariz. at 86, 969 P.2d at 1194—but he also expressly impugned her ethics to the jury.  Without pointing to a single instance in which Sharon Murphy testified falsely, the prosecutor argued that Murphy was "in the defendant's pocket," (12/16/04 Tr. at 6) and a "liar" who "can't keep her story straight" (12/01/04 Tr. at 61) and "made misrepresentations to everyone" (11/16/04 Tr. at 153).  After noting the fact that Murphy refused to change her opinions following his cross-examination of her, the prosecutor further asserted that she failed to live up to her "ethical[] . . . duty to consider both sides."  (*Id.* at 7.)  While the source of that purported ethical duty is unclear (and was never explained by the prosecutor or any witness), the prosecutor presented absolutely no evidence that she had violated it.  In essence, he disparaged her as unethical because she found the questions posed by prosecutor—which included delving into such issues as whether Wendi used lubricants with Freeland, whether "she was constantly kissing on men," and whether her one-night stand with Black should be characterized as an affair or something else (10/13/04 Tr. at 68-69,

4838-2894-9006

157)—to be irrelevant to her opinion in the case.

In sum, defense counsel's (and appellate counsel's) failure to object to the prosecutor's misconduct was unreasonable, and deprived Wendi of a fair trial under *Strickland*.  Wendi is entitled to the reversal of her conviction based on prosecutorial misconduct or, at a minimum, a new trial.

## IV.    THE JURY'S CONSIDERATION OF A NON-STATUTORY AGGRAVATING FACTOR VIOLATED DUE PROCESS

Due process requires that aggravating factors "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) ("Because of th[e] qualitative difference [in the penalty of death from a sentence of imprisonment], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.")

Arizona's death penalty statute enumerates fourteen aggravating circumstances that the trier of fact is permitted to consider in determining whether to impose the death penalty.  A.R.S. § 13-751(E), (F).  Jurors are not permitted to consider non-statutory aggravating factors, outside of the fourteen expressly enumerated.  *State v. Greenawalt*, 128 Ariz. 150, 174, 624 P.2d 828, 852 (1981) ("[O]ur death penalty is carried out [by statute] and not by any judicially imposed penalty.").

In finding that the murder was "especially cruel" under the (F)(6) aggravator, the jury improperly considered, and was influenced by, an impermissible consideration unrelated to the nature of the crime.  During deliberations at the aggravator phase, the jurors "made a chart outlining the different possible outcomes" for Wendi depending on whether they found an aggravator, which made their decision "a lot clearer."  (Tab 39 ¶ 8.)  According to one juror,

[W]hen we decided on the aggravator, we talked about what might happen

69

MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4838-2894-9006

if we didn't find an aggravating circumstance.  We discussed how her
sentencing would go back to the judge and agreed that none of us wanted
that.  We talked about how we didn't want to see Wendi get out of prison,
and that was a key reason we decided on the cruelty aggravator.

(Tab 41 ¶ 6.)  Consideration of such a non-statutory factor—not wanting Wendi to get

out of prison—is impermissible under Arizona's death penalty scheme.  A.R.S. §13-

751(E), (F); *State v. Ring*, 204 Ariz. 534, 562, ¶ 89, 65 P.3d 915 (2003) (noting that

"[n]either a judge, under the superseded statutes, nor the jury, under the new statutes, can

impose the death penalty" outside the legislatively defined scheme).  Moreover, this

consideration does not genuinely narrow the class of persons eligible for the death

penalty and is therefore constitutionally infirm.  *Arave v. Creech*, 507 U.S. 463, 474

(1993); *Zant*, 462 U.S. at 877.

**V.     WENDI WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL
        ON HER DIRECT APPEAL**

Due process under the Fourteenth Amendment requires that a defendant receive

effective assistance of counsel on appeal.  *Evitts v. Lucy*, 469 U.S. 387, 396 (1985).

Appellate counsel's failure to raise DeLozier's actual conflict of interest, prosecutorial

misconduct, and the exclusion of Jeffrey Miller's testimony in Wendi's direct appeal was

constitutionally deficient and was prejudicial.

To the extent this Court ultimately decides any of Wendi's meritorious

constitutional claims for relief are waived on account of Andriano's appellate counsel's

failure to raise them, Wendi has suffered undeniable prejudice.

**CONCLUSION**

For the reasons stated above, this Petition should be granted.  Moreover, the

evidence submitted in support of this Petition satisfies the requirement pursuant to Rules

32.6 and 32.8 that a colorable claim be made in order for the Court to grant an

evidentiary hearing.

70

4838-2894-9006

DATE: February 17, 2012              By: _____
                                           Scott M. Bennett (022350)
                                           COPPERSMITH SCHERMER & BROCKELMAN PLC
                                           2800 North Central Avenue
                                           Phoenix, Arizona  85004
                                           (602) 224-0999 (office)
                                           (602) 224-6020 (fax)
                                           sbennett@csblaw.com

                                           Allen A. Arntsen, admitted *pro hac vice*
                                           Matthew R. Lynch, admitted *pro hac vice*
                                           FOLEY & LARDNER LLP
                                           150 E. Gilman Street
                                           Madison, WI 53703-1481
                                           (608) 257-5035 (Office)
                                           (608) 258-4258 (Fax)

                                           *Attorneys For Petitioner Wendi Andriano*

ORIGINAL filed February 17, 2012, with:

Clerk of the Arizona Supreme Court
1501 West Washington, Suite 402
Phoenix, AZ 85007-3232

COURTESY COPY hand-delivered February 17, 2012, to:

Judge Douglas Rayes
Maricopa County Superior Court
101 W. Jefferson St., Room 511
Phoenix, AZ  85003-2243

COPY mailed February 17, 2012 (courtesy copy of Petition and Memorandum emailed), to:

Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tucson, AZ  85701-1367

*Attorney for the State of Arizona*

<div align="center">71</div>

---

<div align="center">MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF</div>
<div align="center">CASE NO. CR2000-096032-A</div>

4838-2894-9006

# PETITION EXHIBIT 1, PAGE 1 WAS SEALED DUE TO THIRD PARTY MEDICAL INFORMATION

# PETITION EXHIBIT 1, PAGE 2 WAS SEALED DUE TO THIRD PARTY MEDICAL INFORMATION

P-App. 000127

**Source Material for Disorders of Relatives of Wendi Andriano:**

| | |
|---|---|
| **Bednorz, Clark Jr.** | Tab 2.B., at p. 6<br>Tab 18, at ¶4, 5, 6, 7, 8, 9, 10<br>Tab 27, at ¶414 |
| **Bednorz, Nadine Zens** | Tab 2.B., at p. 1, 5, 6<br>Tab 18, at ¶3 |
| **McGuffee, Alice** | Tab 4, at ¶ 29, 59<br>Tab 17, at ¶13<br>Tab 27, at ¶165<br>Tab 28, at ¶11, 12, 13 |
| **McGuffee, Charlotte** | Tab 4, at ¶ 25, 27, 28, 29, 59<br>Tab 17, at ¶ 11, 13, 14, 15<br>Tab 27, at ¶165<br>Tab 28, at ¶ 10, 12, 13<br>Tab 30, at ¶ 10 |
| **McGuffee, Bonita (Deblen Oke)** | Tab 4, at ¶21, 22, 23, 29, 30, 31, 59<br>Tab 17, at ¶13, 14, 15<br>Tab 27, at ¶165<br>Tab 28, at ¶12, 13<br>Tab 30, at ¶1, 4, 6, 12 |
| **Micek, Brett** | Tab 2.B., at p. 7<br>Tab 18, at ¶13<br>Tab 27, at ¶416 |
| **Micek, Kayla** | Tab 2.B., at p. 7<br>Tab 18, at ¶13<br>Tab 27, at ¶416 |
| **Micek, Marjorie Zens** | Tab 2.B., at p. 6, 7<br>Tab 27, ¶406, 413 |
| **Micek, Tyler** | Tab 2.B., at p. 7<br>Tab 18, at ¶13<br>Tab 27, at ¶416 |
| **Ochoa, Brandon** | Tab 2.B., at p. 6 |
| **Ochoa, Donna Worsham** | Tab 2.B., at p. 1, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15<br>Tab 4, at ¶66, 81, 82, 88, 90, 91, 92, 96, 97, 98, 99, 100, 101, 103, 107, 108, 109, 111, 116, 119, 120, 121, 140, 153, 156, 160, |

| | |
|---|---|
| | 164, 166, 201, 202, 203, 206, 217, 225, 288<br>Tab 27, at ¶31, 34, 35, 37, 44, 45, 46, 48, 73, 74, 76, 77, 78, 81, 82, 83, 84, 85, 86, 87, 88, 99, 106, 107, 121, 169, 180, 181, 182, 244, 246,  304<br>Tab 28, at ¶14 |
| **Ochoa, Alejo Lorenzana** | Tab 2.B., at p. 1<br>Tab 4, at ¶ 243, 245, 247, 248, 251, 252, 253, 254, 259, 260, 261, 262, 263, 264, 265, 266, 274, 279, 283, 285, 357, 376, 383, 384, 398, 399, 401, 402, 403, 404, 406, 407, 408, 409, 410, 411, 412, 418, 419, 426, 432, 433, 436, 437, 439, 440, 441, 442, 444, 445, 447, 466, 467, 488, 490, 495, 496, 497, 501, 502, 503, 506, 507, 512, 514, 521, 522, 523<br>Tab 10, at ¶7, 24<br>Tab 11, at ¶10<br>Tab 12, at ¶8, 14, 15, 16, 17, 18, 19<br>Tab 13, at ¶6, 7, 8, 10<br>Tab 14, at ¶7, 10, 11<br>Tab 23, at ¶25, 40, 42<br>Tab 24, at ¶26, 27, 28, 98<br>Tab 27, at ¶85, 262, 263, 264, 267, 270, 271, 272, 273, 275, 276, 277, 278, 280, 281, 282, 283<br>Tab 34, ¶7 |
| **Overpeck, Julie** | Tab 4, at ¶45, 46, 47, 48, 49, 59, 60<br>Tab 70 |
| **Roberts, Ina Rebecca** | Tab 2.B., at p. 2, 3<br>Tab 4, at ¶68, 69<br>Tab 27, at ¶6, 9 |
| **Robertson, AV** | Tab 4, at ¶22, 23, 25, 28, 29, 31, 45, 59<br>Tab 17, at ¶13, 14<br>Tab 27, at ¶165<br>Tab 28, at ¶12, 13<br>Tab 30, at ¶6<br>Tab 32, at ¶47, 60 |
| **Robertson, Boyd Gravely** | Tab 4, at ¶22, 35, 186, 189, 190, 191<br>Tab 27, at ¶165, 167<br>Tab 28, at ¶20<br>Tab 30, at ¶1<br>Tab 32, at ¶47 |
| **Robertson, Burl Boyd "Buck"** | Tab 4, at ¶21, 22, 23, 25, 26, 28, 29, 31, 45, 59<br>Tab 17, at ¶13, 14 |

2

P-App. 000129

| | |
|---|---|
| | Tab 27, at ¶165 |
| | Tab 28, at ¶12, 13 |
| | Tab 30, at ¶1, 4, 6 |
| | Tab 32, at ¶47 |
| **Robertson, Glen Franklin** | Tab 4, at ¶22, 23, 25, 28, 29, 31, 45, 59 |
| | Tab 17, at ¶13, 14 |
| | Tab 27, at ¶165 |
| | Tab 28, at ¶12, 13 |
| | Tab 30, at ¶6 |
| | Tab 32, at ¶47 |
| **Robertson, Jerry Don** | Tab 4, at ¶22, 23, 25, 26, 28, 29, 31, 45, 189 |
| | Tab 17, at ¶13, 14 |
| | Tab 27, at ¶165 |
| | Tab 28, at ¶12, 13 |
| | Tab 30, at ¶6 |
| | Tab 32, at ¶47 |
| **Robertson, Shelby "Skip"** | Tab 2.B., at p. 1, 8, 15, 16, 17 |
| | Tab 4, at ¶21, 22, 23, 25, 28, 29, 31, 38, 45, 46, 47, 49, 52, 53, 55, 56, 57, 58, 59, 60, 61, 62, 64, 65, 121, 122, 123, 124, 126, 127, 128, 129, 131, 132, 133, 159, 167, 169, 211, 251 |
| | Tab 17, at ¶5, 13, 14 |
| | Tab 27, at ¶91, 99, 101, 102, 103, 104, 106, 110, 165 |
| | Tab 28, at ¶11, 12, 13 |
| | Tab 30, at ¶1 |
| | Tab 32, at ¶11, 13, 20, 21, 22, 23, 42, 47, 63, 64, 67, 71 |
| | Tab 70 |
| **Robertson, Stuart Wade** | Tab 4, at ¶40 |
| | Tab 33, at ¶3 |
| **Robertson, Tommie Lee** | Tab 2.B., at p. 16 |
| | Tab 4, at ¶22, 23, 25, 28, 29, 31, 45, 59, 193 |
| | Tab 17, at ¶13, 14 |
| | Tab 27, at ¶165 |
| | Tab 28, at ¶12, 13 |
| | Tab 30, at ¶6 |
| | Tab 32, at ¶47, 50, 65, 67 |
| | Tab 71 |
| **Tilley, Sanford** | Tab 4, at ¶69 |
| **Worsham, Henry Jr.** | Tab 2.B., at p. 1, 3, 7, 10 |
| | Tab 4, at ¶78, 84, 85 |

3

| | |
|---|---|
| | Tab 27, at ¶23, 29, 30, 65 |
| **Worsham, Henry Sr.** | Tab 2.B., at p. 2, 7, 8<br>Tab 4, at ¶73<br>Tab 27, at ¶4, 5 |
| **Worsham, Kathy** | Tab 2.B., at p. 5, 8<br>Tab 4, at ¶94 |
| **Worsham, Laverne "Ann"** | Tab 2.B., at p. 3, 5, 10<br>Tab 4, at ¶70<br>Tab 27, at ¶12, 13, 14, 44, 45, 46, 304<br>Tab 28, at ¶14 |
| **Zens, Theodore Edward** | Tab 2.B., at p. 8<br>Tab 4, at ¶70<br>Tab 27, at ¶12, 13, 14 |

4

**<u>EXHIBIT 2</u>**

**EXAMPLES OF PROSECUTOR'S STATEMENTS AND LINES OF QUESTIONING RELATING TO WENDI ANDRIANO'S SEXUAL BEHAVIOR, FLIRTATIOUSNESS, ATTIRE AND OTHER ISSUES PERTAINING TO HER SEXUALITY**

**<u>TABLE OF CONTENTS</u>**

I.    PREFACE:  ARGUMENT BY PROSECUTOR REGARDING IRRELEVANCE OF AFFAIRS TO DEFENDANT'S MOTIVE .................................................... 1

II.   PROSECUTOR'S STATEMENTS AND ARGUMENT .................................................... 1

   a.    Prosecutor's Opening Statement (Guilt Phase) .................................................... 1

   b.    Prosecutor's Closing Argument (Guilt Phase) – Day 1 ......................................... 2

   c.    Prosecutor's Closing Argument (Guilt Phase) – Day 2 ......................................... 6

   d.    Prosecutor's Closing Argument (Aggravation Phase) ........................................... 7

   e.    Prosecutor's Closing Argument (Penalty Phase) – Day 1 ..................................... 8

   f.    Prosecutor's Closing Argument (Penalty Phase) – Day 2 ..................................... 9

III.  PROSECUTOR'S QUESTIONING OF WITNESSES .................................................... 10

   a.    Examination of Wendi Andriano .................................................... 11

      i.    Cross Examination of Wendi Andriano (October 28, 2004) ................... 11

      ii.   Cross Examination of Wendi Andriano (November 1, 2004) ................. 13

      iii.  Cross Examination of Wendi Andriano (November 2, 2004) ................. 20

   b.    Direct Examination of Michael Brad Bayless (December 15, 2004) ................... 21

   c.    Direct and Redirect Examination of Travis Clinton Black (September 16, 2004) .................................................... 22

   d.    Direct Examination of  Rick Freeland (September 13, 2004) ............................. 24

   e.    Examination of Chris Hashisaki .................................................... 25

      i.    Direct Examination of Chris Hashisaki (September 8, 2004) .................. 25

      ii.   Direct and Redirect Examination of Chris Hashisaki (September 9, 2004) .................................................... 26

f.     Cross Examination of Barbara Mitchell ............................................................. 27

    i.     Cross Examination of Barbara Mitchell (October 21, 2004)................... 27

    ii.    Cross Examination of  Barbara Mitchell (December 13, 2004) .............. 28

g.    Cross Examination of Sharon Murphy ............................................................. 29

    i.     Cross Examination of  Sharon Murphy (October 13, 2004)................... 29

    ii.    Continued Cross-Examination of Sharon Murphy (October 14, 2004) ...................................................................................................... 32

    iii.   Cross-Examination of  Sharon Murphy (December 9, 2004) ................. 32

h.    Cross Examination of Donna Ochoa (October 5, 2004) ...................................... 33

i.     Cross-Examination of Gia Palicki (December 13, 2004) ..................................... 34

j.     Direct and Redirect Examination of Shannon Sweeney (September 15, 2004) ............................................................................................................. 35

P-App. 000133

## I.    PREFACE:  ARGUMENT BY PROSECUTOR REGARDING IRRELEVANCE OF AFFAIRS TO DEFENDANT'S MOTIVE

The following is an excerpt from the prosecutor's opening statement in the aggravation phase of the trial of Wendi Andriano, taken from the official transcript of the proceedings for November 30, 2004:

> And the only reason that she's doing all of this is because she wants the money.  That's why she did all this.  She did it in expectation of pecuniary gain. . . .
>
> *There is no other motive in this case other than that*.  That is the overriding motive.  Even though she wanted to go out with other men, it wasn't like they were the love of her life in the sense she was with one individual now and later she hooked up with another individual.

(20:9-22 (emphasis added).)

## II.    PROSECUTOR'S STATEMENTS AND ARGUMENT

### a.    Prosecutor's Opening Statement (Guilt Phase)

The following excerpts of the prosecutor's opening statement in the guilt phase of the trial of Wendi Andriano are taken from the official transcript of the proceedings for September 7, 2004:

> And then somewhere around, oh, March of the year 2000, there was an individual by the name of Rick Freeland who moved into the San Riva Apartments, and this individual and the defendant first, of course, got to know each other and it seemed that the defendant took a liking to this individual.  She was the pursuer.  He was the one being pursued.
>
> And she was doing just about anything she could do to get this individual.  And some of the things that she would do, for example, . . . [include getting him] a sofa.  She wants him comfortable.  She wants him comfortable because they begin to have a sexual relationship, the two of them.

(25:2-19.)

--------------------------------

> At about 2:00 or 3:00 in the morning, she's banging away on the door, "Rick, I want you to let me in.  Rick, I want you to let me in. I want—you know, I want to talk to you.  I want to be with you."

(29:23-30:1.)

--------------------------------

> According to the witnesses, as soon as she got [to the bars] and as soon as she started going and she saw a guy, according to their accounts, she would start kissing on them.

(31:17-20.)

--------------------------------

> [T]hat night she goes out to a bar called the Rockin' Rodeo. And now she needs a new individual, even though she's still interested in, as you have seen, Rick Freeland, and asking for a drink. She sees this Travis Clinton Black. And Travis will tell you as soon as he got out there, she got out on the dance floor with him, she started grabbing him all over the place, started kissing him, started doing all kinds of things, so he decided to just go and keep dancing with her.

> At some point he left the bar with her and a friend of his, and they went to a Denny's to have breakfast. Well, after having breakfast they dropped off the friend and he went to take her over to her apartment over at the San Riva apartments, number 132. He was walking her to the door and she asked him to go inside, and there in that apartment on the floor, on the couch, they had sex.

(55:2-17.)


### b.   Prosecutor's Closing Argument (Guilt Phase) – Day 1

The following excerpts of the prosecutor's closing argument in the guilt phase of the trial of Wendi Andriano are taken from the official transcript of the proceedings for November 16, 2004:

> So then she has Joseph Andriano move in [with her]. And one of the things she's quick to tell us, it wasn't a sexual relationship to start with. Again, she's minimizing. They're living together. ["]And no, it wasn't a sexual relationship. I don't want you to think anything bad. I don't want you to think I'm going against the wishes of my God. Of course, when they're married, it's all right to go out and have affairs. But right now, it's against the wishes of my God to do that. I'm not going to do that. Plus, my father would be really upset with me even though I am living with this boy Joseph Andriano. ["]

2

(18:10-20.)

---------------------------------

>Well, it didn't take long, we don't know exactly how long, for the defendant and Joseph Andriano to become intimate.  That's a very telling sort of sordid little story that she told you because according to her and according to Sharon Murphy, what happened after this wondrous experience as she put it, she cried.

(18:21-19:1.)

---------------------------------

>I mean, it's so basic that with regards to the virginity issue, something so private as that.  She said, "Well, you know what, yes, I was chaste but, you know what, I didn't want to be.  So what I did basically is make sort of an agreement with Dido Gamez to get rid of it because [sic] it wasn't my fault.  Barbara Mitchell was kidding me about it." . . .

>Even the most private of things, the most things that happen between a man and woman, even that's not her fault because Barbara Mitchell was teasing her about it.  And she needed to get rid of it like it was some sort of bad thing that was hanging around her neck.

(37:6-20.)

---------------------------------

>I'm sure and Sharon Murphy was quick to point out every time that the defendant has sex with Mr. Andriano, she had to use a lubricant.  I wonder if she had to use a lubricant with Dido Gamez.  I wonder if she had to use a lubricant with Vernon Barnes.

(75:18-22.)

---------------------------------

>You [Wendi] may us [you loved Joe] right now.  But you weren't in love with him because you could not even bring yourself to the point of enjoying the most intimate thing that two people in love do, that's enjoy sexual intercourse.  Could do it.

(76:5-9.)

---------------------------------

3

Certainly [Joe] wasn't like Rick Freeland, right?  That good looking guy that she really loved from her little statement.  That guy that was her best friend and that would listen to her.  Yeah, he wasn't like [Joe] at all.  He was real healthy.  Certainly [Joe] wasn't like Travis Black who has arms the size of legs that she met one night and had a one-night stand.

(76:11-17.)

--------------------------------

Blamed him for the affairs.  Blamed him for having to go out.  Blamed him for wanting to go out dancing.  Blamed him for wanting to go out and kiss guys.  Blamed him for sitting between guys' legs.  Blamed him for kissing this guy.

(61:9-15.)

--------------------------------

You've seen what she looked like back then [in 2000], all sassed up in her pink little outfit.  You've seen what she looked like.

(63:17-19.)

--------------------------------

[T]he last couple two or three months of [Joe's] life that for two or three months, two times a week, minimum, the defendant was going out; Tuesdays and Saturday or Fridays.  Remember that?  Rockin' Rodeo on the weekends and Tijuana Country Club in the middle of the week.  What kind of marriage is that? . . .  Rather than spending time with [Joe], what do you do?  Let's go out and look for the young bucks we have out here on the dance floor.  Maybe we can take one home.  That's exactly what's going on.

(101:15-25.)

--------------------------------

You've seen it, how she's all sassed up out there by the pool.  And you know how she's out, changing clothing from Rustler's Roost according to Mrs. Green.  Going over to the dance floor.

(152:7-152:12)

--------------------------------

4

Let's talk about the affair.  Well, she indicated that she only had one affair.  That's all she had.  That's all she said she had.  Because the intimate moment she shared with Travis Black, outside of marriage, even though she's a good Christian woman, is not an affair.  You can now all go home, those of you who are married, and say to your significant other, ["]that's okay, I'm going to go ahead and do that because it's not an affair.  I was in court and I heard that.["]

(83:10-18.)

---------------------------------

Let's talk a little bit about Rick Freeland. . . .  Why is it that she gets involved with him?  Why is it that they engaged in the most intimate acts that two people can engage in?  Well, because, according to her, she didn't want to be a tease.  Wow.  Just because you have a drink with somebody, just because a man is nice to you, you better be careful you're not a tease.  But if you are, then you can have intercourse with him and you know what, it's not your fault.  It really isn't your fault because that's not, according to the defendant, the way women should act.  According to her, it's worse to be a tease than it is to be a cheat.  I guess that's what she's telling us.

(84:16-85:9.)

---------------------------------

And what did she do?  She goes to dancing at Rockin' Rodeo[, a bar]. . . .  What happens is there's a last dance that they have.  And at this last dance, there's a good-looking guy.  Let me go on over.  And before the song is over, probably before he even knows her name, they're kissing. . . .  The bottom line is she starts kissing him and he returns the favor.  That's what he said.  And when she started to grab him in the various places, he, again, responded accordingly.  She's the one that initiated—this demure little lotus blossom here—she's the one that is all that.

(87:13-88:3.)

---------------------------------

So they leave the night club. . .  When they're [at a Denny's restaurant] things are happening.  What's happening is that she starts to grope him under the table.  I guess the woman has needs and she's going to do something about it because she's so goal-oriented and what ends up happening is he takes her home.

5

(88:7-15.)

--------------------------------

        So, on their way back they stop in Tempe and they picked [two men] up.  And one of the things we know is that the defendant, never missing an opportunity, starts to make out, kiss, whatever term you want to use.

(91:12-15.)

--------------------------------

        How about the people that she was most intimate with, her paramours.  I'm talking about Rick Freeland and Travis Black.  Was she honest with them?

(111:1-3.)

--------------------------------

        Just for an example, we'll pick Travis Black.  One of the things she said is that, no, I got the condom.  He's absolutely wrong, I did.  According to him he's on the dance floor by himself and she comes up to him and starts kissing him.

(155:12-16.)

--------------------------------

        But she's in a fantasy world. . . .  Wants to be out on the dance floor.  Wants to be out kissing guys.  Wants to be out in this fantasy world that seems so real to her with the strobe lights going on.  That's where she wants to be.

(151:8-16.)

      **c.**      **Prosecutor's Closing Argument (Guilt Phase) – Day 2**

      The following excerpts of the prosecutor's closing argument in the guilt phase of the trial of Wendi Andriano are taken from the official transcript of the proceedings for November 17, 2004:

        And on the other hand, she tells us, well, it's okay to be unfaithful.  It's okay to cheat on your husband.  It's okay to go to bars and kiss other men as long as in this fantasy world of hers, you don't tease



the men.  Because, that's an unforgivable sin to her; that's the
teasing of men.

(4:2-7.)

--------------------------------

Even at some point, it appears she went almost as far as to attempt
to flirt with Detective David Lucero, the person that was
questioning her.

(5:13-15.)

--------------------------------

[Y]es, she did have an affair with Rick Freeland, they said.  ["]But
you know what, that's different than the tryst, that one-night stand,
she had with Travis Black.  Nobody would call that an affair.["]
That's what they told you.

(78:12-16.)

--------------------------------

They want you to start looking at this and say, well, you know,
maybe what she did wasn't so bad.  You know, the affairs weren't
so bad.  Maybe her conduct in front of the police wasn't so bad.

(82:16-19.)


### d.    Prosecutor's Closing Argument (Aggravation Phase)

The following excerpts of the prosecutor's closing argument in the aggravation phase of
the trial of Wendi Andriano are taken from the official transcript of the proceedings for
December 1, 2004:

And some of you may go back there and say, ["]well, perhaps the
motive for this was that she wanted to be with Rick Freeland.
You, Mr. Martinez, you presented us with e-mails dated as late as
July—I'm sorry, September—where she's asking him to join her
for a drink.  And additionally, we also have the issue of Mr. Travis
Black, a one-night stand, that she engaged in where perhaps that's
what she wanted to do. ["]

The point—there are two points to be made with regard to that.
Number one, the attraction or the love or whatever emotion she
had, will, the friendship, whatever she wants to call it with Rick



Freeland, wasn't so strong that it prevented her from finding other men.  So that couldn't really be the motive.

(10:9-10:22.)

--------------------------------

Additionally, during that time she's making life miserable for [Joe] by going out, by having affairs, by being with other people and embarrassing him in front of other people.

(16:15-18.)

--------------------------------

All murder is senseless.  But this one goes way beyond that.  Of course.

Not only is she out there being the belle of the ball, not only is he being a house husband, if you will, not only is she having total freedom, having affairs doing whatever she wants, going out with her friends, not only is she doing all of that . . . but does she need to kill him?

(38:6-13.)


### e.      Prosecutor's Closing Argument (Penalty Phase) – Day 1

The following excerpts of the prosecutor's closing argument in the penalty phase of the trial of Wendi Andriano are taken from the official transcript of the proceedings for December 15, 2004:

You saw it when she spoke to the police officer.  We don't need to sit here and discuss the fact that she was trying to manipulate the police officer, that she laughed coquettishly with him.

(108:9-12.)

--------------------------------

The facts and circumstances indicate to you that she added, if you will, salt to the wound.  And the way that she did that was by going out on him, by going out with other men.

(111:20-23.)

--------------------------------

8



A good mother, even if she wants to go out and goof around with other men says, ["]you know what, play with them honey.["]

(121:18-20.)

--------------------------------

Additionally, not only were there two affairs, Gia Palicki, their own witness, came in and told you when they went to bars, she kissed lots of guys. According to Chris Hashisaki, that's the same thing that happened. Do you give her Brownie points for going out and kissing guys and having affairs with them? Well, that certainly governs this particular thing and indicates that no you do not do that sort of thing.

(126:13-20.)

--------------------------------

Additionally, [Wendi]'s the same one who says, "You know, when I was riding home in the limo"—she denied it was her request to pick up this other individual—"there was no other place for me to sit other than between Chris's legs," the young man. And that, you know, "I may have been kissing him but I didn't mean any disrespect."

No disrespect to the marriage. That's okay.

(127:17-23.)

--------------------------------

 [H]ow can she say that she has strong religious convictions when she's going out and committing adultery, she's lying, cheating and she's being violent. For example, Rick Freeland.

(130:3-6.)

### f.      Prosecutor's Closing Argument (Penalty Phase) – Day 2

The following excerpts of the prosecutor's closing argument in the penalty phase of the trial of Wendi Andriano are taken from the official transcript of the proceedings for December 16, 2004:

But how affected was she [by Joe's cancer]? Well, she was affected to the point to say, you know what, I'm going to go out every night or two, to be honest, two nights a week, at least. . . .

9

Was she affected so much she didn't go out even though her husband had just had a chemotherapy treatment[?]  There is no effect on her.

(9:4-11.)

---------------------------------

She had to wait for him to die and would stop her from being this woman that could go out and fraternize with other men.  Maybe.  And, of course, I'm being tongue-in-cheek when I say that.

(9:16-20.)

---------------------------------

What was she doing?  Do you think she's carrying that cross out there at the Rockin' Rodeo?  Do you think she was carrying his cross as she was kissing Rick Freeland?  Do you think that she was carrying his cross as she's having sexual intercourse with Travis Black?  Absolutely not.  She was having a gay old time on her birthday, coming home late . . . giggling, even though she had just been kissing another guy.  But that's no disrespect.  No disrespect at all.

(9:25-10:9.)

---------------------------------

And if it's so stressful, why is she going out and hanging out at bars[?] . . .  We know that she's having a pretty a good time of her life right then.

(11:9-14.)

---------------------------------

You know, do you think that when she was out there dancing and kissing men, do you think she was thinking about her kids just like they show here?  Do you think that she was thinking about anyone other than self-gratification, making herself feel good?  That's all she cared about.

(16:1-6.)


III.     PROSECUTOR'S QUESTIONING OF WITNESSES

### a. Examination of Wendi Andriano

#### i. Cross Examination of Wendi Andriano (October 28, 2004)

Q.   Now, the other thing that you told us previously was that the reason that you decided to have sexual intercourse with Dido Gamez was because, well, you indicated that Barbara Mitchell was chiding you about it.  In other words, sort of teasing you about it.  Do you remember that?

A.   Yes.

Q.   And that you decided that you would go ahead and have sexual intercourse with Dido Gamez, right?

A.   Yes, sir.

(75:13-21.)

---------------------------------

Q.   Actually, do you know someone by the name of Pete Munoz?

A.   Yes, I do.

\*       \*       \*

Q.   As a matter of fact, you and he developed a friendship, didn't you?

A.   Not really.

Q.   Well, isn't it true that you may not have developed a friendship in the traditional sense, but he was actually the first person that you had intercourse with.  Isn't that true?

A.   That is not.

Q.   Isn't it true you and he talked because you indicated that you were tired of being that way and you wanted to know what actually was going on?

A.   Absolutely not.

Q.   So that's not true then, right?

A.   That is not.

(76:11-13, 76:19-77:7.)

---------------------------------

Q.   But you do agree that you did have intercourse with Vernon Barnes, right?

A.   Yes, sir.

(77:8-10.)

11

---------------------------------

Q.      How about Jonathon Householder?  Did you tell us about him?

A.      Never had sex with him.

(77:11-13.)

---------------------------------

Q.      Did you also forget to tell us about Chris Barnes?  Did you tell us about him?

A.      No.  There was no need to.

Q.      Actually, after you were married, didn't you have occasion to be with him in July of 1996, ma'am?

A.      With him in what manner?

Q.      Intimate?

A.      No.

(77:16-23.)

---------------------------------

Q.      And so one of the other things that we know is that you were kissing Chris on the way in right?

A.      No.

Q.      Well, you did tell us that you were pretty much toasted that night, didn't you?

A.      Yes, I was.

Q.      And you did indicate to us further on down the line that you were in a similar circumstance involving Travis Black.  Do you remember this?

A.      Similar?  No, it is not similar.

Q.      You weren't drunk when you were with Travis Black?

A.      Yes, I was drunk.

Q.      He is a male, right?

A.      Yes.

Q.      And so is – so is Chris, isn't he?

A.      Yes, he is.

12

Q.   And so could it be that you just don't remember since you, according to your description, your own description, you were really pretty drunk and that maybe you were kissing Chris?

A.   No.  I said there might have been some flirtatious stuff, but no, I did not kiss Chris.

(98:18-99:15.)

--------------------------------

Q.   And – but you did say something else yesterday about sitting between his legs and sort of flirting with him was no – was not meant as a sign of disrespect at all, was it?

A.   No.

Q.   It was nothing to you, right?  I mean, it was just good old fun, right?

A.   It wasn't – no it was not – it wasn't anything.

Q.   Right.  It was anything.  It was just you being a girl, right?

A.   I don't know if I'd phrase it like that, but –

Q.   It was no big deal to you.

A.   No, it was not.

Q.   And the reason it wasn't any big deal to you is because when you would go out – you would go out and start kissing guys.  It's something you did all the time, right?

A.   That is incorrect.

(99:21-100:13.)

### ii.   Cross Examination of Wendi Andriano (November 1, 2004)

Q.   In fact you had sexual intercourse [with Rick Freeland] under a bridge.  Do you remember that?

A.   No.

Q.   You never had sexual intercourse with him under a bridge near a golf course?

A.   No.

Q.   Oh, so all of the times that you had sexual relations with him, it was in his apartment, right?

A.   No.  There was one time outside.

Q.   And so one time outside and the rest were inside of his apartment then, right?

A.   4 or 5 times.

13

Q.    Some of them were really late, right?

A.    Yes.

Q.    When your kids were being either taken care of by Joe or somebody else, right?

A.    Not by Joe, no.

Q.    Well, the third time, where was it that you had sexual intercourse?

A.    In his apartment.

Q.    What time of the night was it?

A.    Around 2:00.

Q.    In the morning then, right?

A.    Yes.

Q.    And you are not watching your kids at 2:00 in the morning, at that time that you're having intercourse with him, right?

A.    I am not.

Q.    Somebody else is taking care of your kids, right?

A.    Yes.

Q.    These kids that you cried for on the witness stand these last couple days, that brought you to tears, right?

A.    Yes.

Q.    Those are the same ones, right?

A.    Yes.

Q.    And it was the same – you had the same reaction about your husband.  That brought you to tears when you were telling us how cute he was, right?

A.    Yes.

Q.    And yet you were still out there with this other individual, right?

A.    Yes.

Q.    Because you didn't love him anymore, right?

A.    I loved Joe very much.

Q.    That's how you showed for your Joe going and having sex with another person?

(53:2-54:24.)

14

--------------------------------

Q.     And so you are taking the opportunity when your husband's out of town to ask another man to have a drink with you, right?

A.     Not like you said, no.

(57:9-12.)

--------------------------------

Q.     You were still interested in [Travis Black] at that time, weren't you?

A.     No, I was not.

Q.     And it was just seven days after that that you and Travis Black became friends, right?

A.     We were not necessarily friends.

Q.     You were just lovers then?

A.     It was a one-night stand.

(57:21-25.)

--------------------------------

Q.     Okay.  One of the other things that you told or that you talked to Sharon Murphy about was – was your extramarital affairs, right?  Do you remember talking to her about that?

A.     An affair, yes.

Q.     And according to you, having intercourse then calling the individual sometime after that and receiving calls from that individual, and then meeting them at a bar after that, that does not, in your mind, constitute an affair, right?

A.     No.

Q.     Because in your mind the only thing that constitutes an affair is the emotional involvement, right?

A.     For me, yes.

Q.     So you could go out and have sex with a bunch of guys on one-night stands and those would not be affairs, right, by your definition?

A.     Yes, sir.

(89:23-90:15.)

--------------------------------

Q.     Now, did you have an emotional bond to somebody named Chris Barnes back in July of 1996?

15

A.      An emotional bond?

Q.      Well, you were friends, weren't you?

A.      He was Joe's friend.  I—I would call him a friend, an acquaintance.

Q.      Right now I'm just asking specifically about you.  You did know Chris Barnes back in July of 1996, right?

A.      Yes.

Q.      And you and he were friends, right?

A.      Yes.

Q.      And when Joe would go to the lake, you and he got together, didn't you?

A.      No.

Q.      You weren't in a parking lot in a truck at 4:00 the morning on July of 1996?

A.      No, I was not.

(90:16-91:7.)

--------------------------------

Q.      I'm going to show you Exhibit Number 454.  I want you to take a look at what is there, Number 161.  Do you see the listing there involving extramarital affairs?

A.      On 161?

Q.      Let me show you.

A.      Yes.

Q.      Okay.  And you did list that you had one extramarital affair, right?

A.      Yes.

Q.      And the reason that you didn't list Travis Black is because you didn't have an emotional attachment to him, right?

A.      As I said before, it was a one-night stand.  It was not an affair.

Q.      And you're not denying that you had sexual intercourse with him, are you?

A.      I'm not denying that.

(91:8–91:24.)

--------------------------------

16

Q.    And it's your definition that we're talking about as to why there is only one mentioned rather than two or three, right?

A.    There was never three.

Q.    Well, according to you, there was never two, right?

A.    There was one affair and one one-night stand.

(92:5-11.)

--------------------------------

Q.    And she was also asked on cross-examination about the issue about crying and – actually, she was asked on direct examination by Mr. Patterson.  She was asked was that her first sexual experience, and do you remember Sharon Murphy saying yes?

A.    No, I don't remember that.

Q.    So if everybody else's recollection – let's do it this way.  Why did you cry with Mr. Andriano?

A.    As I indicated to her, I didn't know why either.  It was—it was really strange.

Q.    Did you cry with Didos Gamez?

A.    No.

Q.    Did you cry with Didos Gamez all the times you made love to him or had sex with him?

A.    I didn't have sex with him.  I only had sex with him once.

Q.    Ma'am, didn't you have sex with him over four times, between four and five times?

A.    I don't recall.  I—I'm just not – I don't recall.

Q.    Do you remember that in the – when it was very late at night you would go over to his apartment.  You went over to his apartment on at least two occasions and had sex with him?

A.    No, I don't recall.

Q.    Do you recall that on at least two occasions he came over to your apartment at night and had sex with you?

A.    No.  I recall one time that he did.

Q.    So you only remember having sex with him one time total?

A.    Yes.

Q.    And you indicated that he's the individual that you were with first, correct?

A.    Yes.

P-App. 000150

Q.      But he was before Mr. Andriano, correct?

A.      Yes.

(105:12-106:22.)

--------------------------------

Q.      And somebody else that you indicated that you may have been intimate with was Vernon Barnes, right?

A.      Yes.

Q.      And he was also before Mr. Andriano, right?

A.      Yes.

Q.      You didn't cry with him either, right?

A.      No.

(106:23-107:4.)

--------------------------------

Q.      And with regard to Mr. Gamez, he never took you out to the movies, did he?

A.      No,  Our—it was a bar thing.

Q.      Well, he—he never took you out to dinner, right?

A.      No.  I think we would just eat fast food together.

Q.      Actually, you indicate—you just indicated it was a bar thing between you and him, right?

A.      Uh-huh, yes.

Q.      What that means is he met you at a bar one night and the two of you went home, right?

A.      That's not what that means.

(107:5-17.)

--------------------------------

Q.      And with regard to Vernon Barnes, he never took you out to dinner either, did he?

A.      No, we didn't go out to dinner.

Q.      Never went out to a movie or anything like that, right?

A.      No.

P-App. 000151

Q.    And you indicated that with him it was the girls or whatever girls may have been that caused you two to break up, right?

A.    Me finding out he had a girlfriend, yes.

(107:18-108:2.)

--------------------------------

Q.    And after meeting [Vernon Barnes] at Mel's Bar, didn't you go home with him?  Or whatever bar it was, didn't you go home with him that night?

A.    No.

Q.    And didn't you have sex with him that night?

A.    No, I did not.

Q.    And the reason that you broke up actually was because he found you or caught you, whatever term you want to use, having relations or in bed with Jonathan Householder, didn't he?

A.    No, not at all.  I've never had a relationship with Jonathan Householder.

(108:22-109:8.)

--------------------------------

Q.    How about Pete Munoz?  Do you know him?

A.    I do.

Q.    And he also lived at the Quail Garden Apartments, didn't he?

A.    Yes.

Q.    And you also had relations with him, didn't you?

A.    No, I did not.

Q.    Isn't it true that you never went to the movies with him either, right?

A.    That's correct.

Q.    You never went to dinner with him?

A.    That's correct.

Q.    But you did enjoy a drink with him, right?

A.    No.

Q.    And for two or three months you and he did not enjoy having—you and he did not have sexual relations?

19

A.      No, we did not.

(109:17-110:8.)


### iii.      Cross Examination of Wendi Andriano (November 2, 2004)

Q.      One thing that you said, with regard to Mr. Black, I just want to clear that up, you indicated that you met him at the Rockin' Rodeo, right?

A.      Yes.

Q.      And that you were there and somehow the two of you met, right?

A.      Chris introduced us, yes.

Q.      It wasn't the case that he was out there dancing and you approached him, was it?

A.      No.

Q.      It wasn't the case that it was next or close to the last song of the evening, was it, when you approached him on the dance floor, was it?

A.      No, it wasn't.

Q.      And it wasn't while you were out there dancing on the dance floor and before the song was over you kissed him.  It wasn't like that, right?

A.      Yes, sir.

Q.      It wasn't that you groped him at all?

A.      No, sir.

Q.      And it wasn't that when he went to drop you off at your house, it wasn't that you asked him to come up to your apartment?

A.      Yes, I did ask him in.

Q.      Is that when you became the tease or when did you become the tease as you told us?

A.      As the evening progressed.

Q.      So it's just flirtation that's going on at the Rockin' Rodeo?

A.      Yes.

Q.      There's a flirtation continuing on at Denny's when you're having breakfast?

A.      Actually, we had more conversation there than flirting.

20

Q.     But even—if you were intoxicated by the time you got to Denny's and you had breakfast, the effects of the alcohol were wearing off, weren't they?

A.     Starting to.

Q.     And so then you asked him or he took you to your apartment, right?

A.     Yes.

Q.     You asked him in, didn't you?

A.     Yes, I did.

(34:15 – 36:7.)


    b.     **Direct Examination of Michael Brad Bayless (December 15, 2004)**

Q.     And tell me what happened that you considered to be unusual?

A.     When we were leaving the interview, Dr. Amico—

Q.     No, not what do you think happened.  Tell us what you saw?

A.     Okay.  I felt as though Mrs. Andriano was being very flirtatious.

(14:8-14.)

--------------------------------

Q.     Let me be more direct.  Did she flirt with you?

A.     Yes.

(38:20-21.)

--------------------------------

Q.     Okay.  What does it say after the S?

A.     "I'm down to 112 pounds.  I'm so happy."  States "Zoloft is helping."

Q.     Okay.  I'm going to have some questions about that statement.  She indicates that she's happy that she's losing weight, doesn't she?

A.     Yes.

Q.     Again, we've been talking about her flirting with you.  Now we're talking about wanting to go to general population, not wanting to go to general population and now is happy that her weight is dropped.  What does that tell you about her?

*       *       *

21

A.      What that tells me is that there's, just by simply that note alone, it tells me there is some, typically some reason why she wants to be down to 112 pounds.  One could speculate—

Q.      —Don't speculate.  But there is a reason why she wants to go down.  That's what it appears to be, right?

A.      Yes.

Q.      And we don't know the reason, but it appears that there is a secondary motive here, right?

A.      Yes.

(21:2-13, 21:23-8.)


**c.      Direct and Redirect Examination of Travis Clinton Black (September 16, 2004)**

.Q.     And why don't you describe for me how it was that the two of you met?

A.      I had been drinking, dancing, very intoxicated.  I was dancing.  She came up to me.  I was dancing on the dance floor and she just came out of nowhere and we just started dancing.

Q.      What happened then?

A.      We danced a little, very provocatively, and then before the dance was finished, she was – we were kissing.

Q.      So this was during the first song that you danced, correct?

A.      Yes.

Q.      The woman's name, did you learn it during the dance or after the dance?

A.      It was after.

Q.      And how much after the dance did you learn her name?

A.      Probably two minutes.

Q.      And so the kissing and the dancing was before you knew her name?

A.      Yes.

(89:14-90:10.)

--------------------------------

Q.      Did you at any time go out of your way to go get that woman to come over and kiss you?

A.      No, sir.

22

Q.      Had you even seen her before she came up to you and started dancing and kissing you?

A.      I would say I walked by her a couple of times, but that's about it.  I didn't—

Q.      When you walked by her, did you say anything to her?

A.      No, sir.

Q.      So did you ever ask her to dance before she came over to you?

A.      No, sir.

Q.      So you're dancing and your friend is also out on the dance floor as I understand it, right?

A.      Yes, sir.

Q.      And then describe for me what happened.

A.      We're out there dancing.  She just comes out of nowhere and grabs me and just starts dancing with me.

Q.      Okay.  Go ahead.  And was there any kissing that occurred during that song?

A.      Yes, sir, right at the end.

Q.      Did she kiss you or did you kiss her?

A.      She kissed me.

(107:15-108:13.)

--------------------------------

Q.      So you and the defendant have now had this dance.  What happens afterwards?

A.      We ended up leaving the bar, going to breakfast.

                                        *        *        *

Q.      Any—anything of note that happened while you guys were sitting there having breakfast?

A.      Just some under the table groping.  Just stuff like that.

(90:25-91:3, 91:19-22.)

--------------------------------

Q.      You were asked about whether or not there was any hanky panky thoughts, in your thoughts, in your mind, as you drove in the truck.  Do you remember that question?

A.      Yes, sir.

Q.      Do you know whether or not she had hanky panky in her thoughts?

P-App. 000156

A.      There was a lot of groping, so I'm guessing there was.

(108:14-21.)


        **d.      Direct Examination of  Rick Freeland (September 13, 2004)**

Q.      So you indicated that you started to have this relationship with her.  Would you – as part of that relationship, did that include going out to dinner?

A.      I don't believe that we went to – went out to dinner.

Q.      Did that include going out to nightclubs?

A.      Yes.

(20:14-20.)

--------------------------------

Q.      And this—these instances that you were with her, can—can you put a number on them, how many times you were together?

A.      Around 5, 7.

Q.      And where did they take place?

A.      My apartment.

Q.      Did any of them take place outside?

A.      Yes.

Q.      Where?

A.      Right beside the [apartment] complex.

Q.      Was that underneath a bridge?

A.      Yes.

Q.      And describe a little bit more what this bridge has to do with the complex?

A.      I don't think it has anything to do with the complex.

Q.      Is it associated with a golf course?

A.      It's just right next to the complex.

(21:3-20.)

--------------------------------

P-App. 000157

Q.      Now, when you were having these relations with her at your apartment, did they take place during the day or did they usually take place at night?

A.      Mainly at night, evening.

Q.      Did any of them take place during the day?

A.      I don't believe so.

Q.      And did any of them take place deep into the night, somewhere around midnight or thereafter, or were they all in the early evening?

A.      No.  It was evening up to midnight, I think, 1:00 a.m.

Q.      Was that a couple of times it took place that late or was it earlier?

A.      I think probably a couple of times.

Q.      Okay.  And the others were in the earlier evening then, correct?

A.      Yes.

(21:21-22:12.)

--------------------------------

Q.      Okay.  Now, with regard to this one on one situation, when you and she were alone in your bedroom having sex, was that one on one or not?

A.      Yes, one on one.

(66:14-17.)


        **e.      Examination of Chris Hashisaki**

                **i.      Direct Examination of Chris Hashisaki (September 8, 2004)**

Q.      When you went to these places, were you able to see the defendant's actions while she was out there that June—sorry, that July or August of the year 2000 when she was out there interacting on that social basis?

A.      Yes.

Q.      And how was she with the other men that were there?

A.      Flirtatious.

Q.      Would she ever have any physical contact with them, for example kissing them?

A.      Yes, she would.

Q.      Would she have other physical contact, for example touching then, that sort of thing?

A.      Yes.

Q.      Would they touch her back?

A.      Yes.

(9:10-25.)

--------------------------------

Q.      And when you went out, was there some dancing that took place?

A.      Yes.

Q.      Did you see the defendant's demeanor?

A.      Yes.

Q.      And you indicated previously that when you'd gone out with her she would kiss men and perhaps touch them.  Did that happen that night?

A.      Yes.

(44:12-20.)


                ii.      **Direct and Redirect Examination of Chris Hashisaki (September 9, 2004)**

.Q.     And when you were coming back that night, was the defendant and this individual doing anything?

A.      Yes.  They were kissing in the limo.

Q.      And was this throughout the whole ride back or just a couple pecks on the cheek, or was it the amorous kind of kissing?

(14:7-12.)

--------------------------------

Q.      And during that 20 minutes, was there this kissing going on with the defendant?

A.      Correct.

Q.      Did she ever make any statements herself as to what she thought about what she was doing?

A.      We asked her what she was doing.

Q.     What was her response?

A.     She said, "We're just kissing."

Q.     Pardon?

A.     She said, "We're just kissing."

(14:25-15:9.)

--------------------------------

Q.     One of the things you were telling defense counsel or he was asking about was the defendant's demeanor when she was out with the girls.  Do you remember talking about that?

A.     Yes.

Q.     What were the terms that were used?  I can't even remember those—

A.     Sweet, outgoing, flirty.

Q.     Had she been drinking when she was quote, unquote, sweet, outgoing and flirty?

A.     Yes.

(74:12-22.)

--------------------------------

Q.     Was her husband present when she was kissing on this guy that was a friend of Shannon's boyfriend?

A.     No.

Q.     Was her husband present when she was flirty with the men at this bar?

A.     No.

(75:1-6.)


                f.        Cross Examination of Barbara Mitchell

                        i.        Cross Examination of Barbara Mitchell (October 21, 2004)

Q.     You indicated that when she was dating you were familiar with her dating somebody by the name of Shawn King, right?

A.     Yes.

Q.     And did you know her to ever go out with somebody by the name of Didos Gamez?

27

A.      Yes.

Q.      How about Pete Munoz.  She also went out with him too, didn't she?

A.      No.  I don't recall him.

Q.      How about Vernon Barnes.  She also went out with him?

A.      No.

Q.      Not that you know?

A.      Not that I know.

(181:14-182:6.)


ii.      **Cross Examination of  Barbara Mitchell (December 13, 2004)**

Q.      She didn't tell you of the affairs she was having, did she?

A.      Yes, she did.

Q.      What did she tell you about?

A.      His name was Ricky or Rick.

Q.      When did she tell you about him?

A.      During the Vegas trip, which would have been in 2000.

Q.      In May of 2000?

A.      Yes.

Q.      Was she happy about the affair she was having?

A.      No.

Q.      She was just being forced to have an affair, is that what's going on?

A.      No.

Q.      Subsequent to that, did she ever tell you about any other affair she was having?

A.      No.

Q.      Did she tell you about Travis Black?

A.      No.

28

Q.   Did she tell you about going out and kissing other men while she was out at bars?  Did she tell you about that?

A.   No.

(76:13-77:11.)


      **g.**      **Cross Examination of Sharon Murphy**

          **i.**      **Cross Examination of  Sharon Murphy (October 13, 2004)**

Q.   Right.  Well, ma'am, did you know that actually when [Wendi] was dating the pastor's son, she was also having sex with other individuals?

A.   No.  I did not know that.

Q.   Did you know that it was more than one?

A.   No.

Q.   Did you know that it was more than two?

A.   No.

Q.   Did you know that part of the reason that Mr. King actually broke up with her was because he came over to the apartments, which were the Quail Apartments, and he caught her in front of the television in a state of undress with another male.  Did you know that?

A.   No.

(50:20-51:8.)

--------------------------------

Q.   Now, you also said that, well, you know, it was a sad day for her when she broke up with Mr. Freeland because it was as if—as if she'd lost a friend, right?

A.   Right.

Q.   Wouldn't you agree that this conduct that we're talking about is not one that friends do amongst each other when they obsess over them, they want to be with them?

A.   I think you're asking me about friendship and how one person might affect a person.  Is that what your question is?

Q.   I'm asking you whether or not friends go and stand in front of each other's door and, the whole thing I laid out for you, wanting to get together with them and have sex?

(65:7-20.)

--------------------------------

P-App. 000162

Q.     We were talking about how, and you indicated that—that there were these issues that she
       had with sex involving Mr. Andriano, do you remember that?

A.     Yes.

Q.     And you indicated, you became very graphic, and you indicated she even had to use
       lubricant with him.  Do you remember telling us that?

A.     Yes.

                                    *        *        *

Q.     Do you know whether or not she had to use any lubricant with regard to Rick Freeland?

A.     I don't know.

Q.     Don't you think it would have been important to this inquiry to see whether or not she
       actually needed lubricant with Rick Freeland to determine whether or not it was just sex
       that she indicated or it was just sex with an icky, gross guy?

A.     As I recall, the purpose of my questioning her and interviewing her was to get a picture,
       and I didn't ask specifics about the nature of the sex acts with Rick Freeland.

(67:14-21, 68:23-69:9.)

--------------------------------

Q.     Okay.  While we're talking about sex and the defendant, did you know that when she
       went out to bars that she was constantly kissing on men?

A.     No.

Q.     Did you know that according to the women that she went out with that they almost
       became embarrassed because, according to then, Wendi had to be the center of attention,
       and if she wasn't, then she was coming on to men?

(69:13-69:20.)

--------------------------------

Q.     And one of the things you also indicated in the power and control wheel, she would do
       anything because that's what the Bible tells her to do?

A.     Yes.

Q.     But it's clear, ma'am, if she's doing what she's doing with Mr. Black, she's not taking
       care of him in a Christian sense as she defined it to you, is she?

A.     That's correct.

(73:2-9.)

--------------------------------

Q.     How about when she was having sex from Rick Freeland?  Did [Joe] also ask for sex on a daily basis then?

A.     I don't believe I asked her for dates of when – when it was daily and when it wasn't.

Q.     Would it be important to know if she was having sex, for example, with Rick Freeland today and her husband was then asking for sex in the evening because maybe she didn't want to have sex with her husband because she'd already had it.  Wouldn't that be important to know?

A.     Yes.

Q.     Because it wouldn't be—then it wouldn't be domestic violence.  It would then be that she'd already had her fill, right, one of the reasons, right?

A.     It's just the way you said that.

Q.     Ma'am, why don't you go ahead and answer the question for me.

A.     That she may not want to engage in sex for a second time in a day, yes.

Q.     Okay.  And you indicated that you didn't like the way that I said it.  Ma'am, the bottom line is, let's be open about this.  She was having sex with Rick Freeland, wasn't she?

A.     Yes.

Q.     And you did say that Mr. Andriano did want sex on a daily basis, right?

A.     Yes.

(77:1-78:1.)

---------------------------------

Q.     Did you know that on the way home that the defendant actually stopped and picked up another man?

A.     No.

Q.     Per the other witnesses, did you know that on the way home that she was kissing this other man?

A.     No.

(104:1-6.)

---------------------------------

Q.     And you—you have two examples of where she had sexual intercourse with men, right?

A.     Correct.

Q.     And there are many examples of her kissing men on dance floors.  You knew about that, right?

A.      I'm not sure I know that.

Q.      And you don't know anything about the limo of her kissing anybody in the limo, right?

A.      No, sir.

(123:14-22.)

--------------------------------

Q.      You would agree based on your discussions with her that's what happened?

A.      Say it again to me.

Q.      That she had affairs with Rick Freeland and Travis?

A.      Yes.

Q.      Okay.  Let's call it seeing other men.  Social contact.

(148:14-21.)


### ii.      Continued Cross-Examination of Sharon Murphy (October 14, 2004)

Q.      And, for example, with regard to sexual abuse, she wrote "I never liked to have sex," right?

A.      Right.

Q.      She doesn't describe how many partners she had before him or anything like that.  She just tells you she doesn't like sex, right?

A.      Right.

Q.      That would presumably include sex with Travis Black and Rick Freeland, right?

A.      Right.

(33:14-23.)


### iii.      Cross-Examination of  Sharon Murphy (December 9, 2004)

Q.      One of the other things that we know from the people that were there was that on the ride home that night she was kissing another man.  She didn't tell you that.  That's a lie by omission.

A.      She did not tell me that.

Q.      Right.  One of the other things that she didn't tell you, per the witnesses, was that she was the one that night that sort of precipitated the incident by walking after the person, the man that she was with.  She didn't tell you that, did she?

A.      No.

(69:22- 70:7.)


###### h.      Cross Examination of Donna Ochoa (October 5, 2004)

Q.      You can't remember it, can you?

A.      I remember I told about—about the bruises I saw—

Q.      No—

A.      —in 2000.

Q.      But you don't know [Joe] did that.  For all you know, somebody named Rick Freeland did that while they were making love.  You don't know it wasn't [Rick], do you?

(98:22-99:4.)

--------------------------------

Q.      Okay.  And, ma'am, did she ever confide in you and every say to you, you know, "I'm having this religious epiphany, I'm being unfaithful."  Did she ever come to you with that?

A.      No.

Q.      Did she ever come to you and say, you know, "I'm just going out all the time every—you know, twice a week."  Did she ever come and tell you about that?

A.      No.

Q.      Did she ever come to you and say, "You know what?  In addition to staying out late at night, I go and stand outside my boyfriend's door for up to an hour until I get him to answer the door.  Can you help me?"  Did she ever ask you for any help like that?

A.      No.

(151:21 – 152:10.)

--------------------------------

Q.      I'm asking about, you know, "I'm having issues with other men, I want to leave him, I think that Joseph is icky and gross and I don't want to be with him."  Did she ever tell you that?

A.      No.  She told me—

33

Q.     The answer is "yes" or "no," ma'am.

A.     No, she—

Q.     The—"yes" or "no"?

A.     No.

(153:18-154:1.)

--------------------------------

Q.     Ma'am while we're still talking about it, you indicated that she broke up with Shawn King.  Do you know why she broke up with Shawn King?

A.     I—only what she told me.

Q.     So you didn't see anything with your eyes, right?

A.     I saw the windshields and the window.

Q.     But you didn't see what led up to it, did you?

A.     No.

Q.     You didn't see perhaps she was caught in a compromising activity in skimpy clothing on with a Hispanic male by Mr. King.  You didn't see that, did you?

A.     I don't know that happened.

(154:21-155:8.)


      **i.     Cross-Examination of Gia Palicki (December 13, 2004)**

Q.     Did she also talk to you about the sex life and problems, yes or no?

A.     Yes.

Q.     Did she also tell you that she was also going out and having affairs with other men?

A.     She told me about going out, yes.

Q.     No.  No.  No.  Having affairs, sexual intercourse with other men.  Did she tell you about that?

A.     I'm confused.  I don't – she didn't tell me the physical details.  But I know she went out and saw other men.

Q.     I'm asking you whether or not she ever told you she had sexual intercourse with other men while she was still married to Joe?

34

A.      No.

Q.      So she didn't go that far?

A.      No.

Q.      Did she tell you that she would, at least on one occasion that we know, she brought them home to Apartment 132 and had sex with another man?  Did she tell you about that?

A.      No.

Q.      But that she met him at the Rockin' Rodeo and brought him home that night?

A.      No.

Q.      Did she tell you that when she would go out, at those times, did she tell you she would kiss other men?

A.      Yes.

Q.      And this was when she would actually go out to bars, right?

A.      Yes.

(61:4 - 62:9.)


            **j.      Direct and Redirect Examination of Shannon Sweeney (September 15, 2004)**

Q.      Both of them?  And at these nights when you would go out, would you observe the defendant's demeanor and how she interacted with other men while she was at the [Tijuana Country Club and Rockin Rodeo]?

A.      Yes.

Q.      Tell me about it.

A.      Wendi liked attention from men, so she was always dancing with men.  And if she didn't feel like she was getting attention, she wasn't having a good time.

(33:20-34:2.)

--------------------------------

Q.      In terms of this issue of how many times you may or may not have gone out, the term often was thrown around.  Putting that term aside, back then how many times would the defendant go out on a weekly basis?

A.      Twice a week.

Q.      And that twice a week would be, I think you said, what day of the week?

A.     Tuesday and then at least one weekend night.

Q.     And Tuesdays – I think there as a special term.  I think – was that ladies night?

A.     Yes.

Q.     During this time when you were asked about ladies night, did any men go with you guys?

A.     Sometimes.

Q.     Who would be the men that would go with you?

A.     Erik Vaillant in particular, my boyfriend Ryan, his roommate, and Rick would be there sometimes.

Q.     At any of those times that these people may have been present at ladies night, did Joseph Andriano go with you guys?

A.     No.

(73:22-74:17.)

---------------------------------

Q.     Was there any physical—during these times, was there physical contact between her and these men?

A.     Very much, yes.

Q.     Describe the physical contact.

A.     She would kiss someone every night.

(34:3-7.)

---------------------------------

Q.     And would there also be other type of touching?

A.     While they were dancing, she—yes, she would grab people in different places.

(34:8-10.)

---------------------------------

Q.     Did you see whether or not there was any physical contact between Chris and Wendi?

A.     Yes.

Q.     What kind of physical contact was there?

A.     They began kissing.

Q.     And this is a person that had just gotten into the car?

P-App. 000169

A.     Yes.

(36:7-36:14.)

1  THOMAS C. HORNE
   ATTORNEY GENERAL
2  (FIRM STATE BAR NO. 14000)

3  LACEY STOVER GARD
   ASSISTANT ATTORNEY GENERAL
   CAPITAL LITIGATION DIVISION
4  400 WEST CONGRESS, BLDG. S–315
   TUCSON, ARIZONA 85701–1367
5  TELEPHONE: (520) 628–6520
   Lacey.Gard@azag.gov
6  (STATE BAR NUMBER 22714)

7  ATTORNEYS FOR PLAINTIFF/RESPONDENT

8
                    SUPERIOR COURT OF ARIZONA
9
                        COUNTY OF MARICOPA
10

11  State of Arizona,                    CR2000-096032-A

12         Plaintiff,

13         -vs-                          RESPONSE TO PETITION FOR
                                         POST-CONVICTION RELIEF
14  Wendi Elizabeth Andriano,

15         Defendant.

16         Pursuant to Rule 32.6(a) of the Arizona Rules of Criminal Procedure, the

17  State hereby opposes Defendant/Petitioner Wendi Elizabeth Andriano's Petition for

18  Post-Conviction Relief.  As set forth in the following Memorandum of Points and

19  Authorities, Andriano's claims are either precluded or are not colorable claims for

20  relief.  Accordingly, this Court should deny and dismiss the petition.

21         DATED this 23rd day of July, 2012.

22
                              RESPECTFULLY SUBMITTED,
23
                              THOMAS C. HORNE
24                            ATTORNEY GENERAL

25

26                            /S/LACEY STOVER GARD
                              ASSISTANT ATTORNEY GENERAL
27                            ATTORNEYS FOR PLAINTIFF/RESPONDENT

28

                                         1

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I. FACTUAL AND PROCEDURAL BACKGROUND.**

3

On October 18, 2000, the Maricopa County Grand Jurors indicted

4 Defendant/Petitioner Wendi Elizabeth Andriano ("Andriano") for the first-degree,

5 premeditated murder of her husband, Joe Andriano ("Joe").  (Exh. A, at 1–4.[1])  A

6 jury found Andriano guilty as charged and, after finding the existence of the A.R.S.

7 § 13–751(F)(6)[2] especially cruel aggravating factor and no mitigation sufficiently

8 substantial to warrant leniency, sentenced her to death on December 22, 2004.  (*Id.*

9 at 254, 289, 314.)  *See State v. Andriano*, 215 Ariz. 497, 500, ¶ 1, 161 P.3d 540, 543

10 (2007).

11

**A. *Facts of Joe's murder.***

12

In its opinion affirming Andriano's conviction and sentence on direct appeal,

13 the Arizona Supreme Court summarized the facts of Joe's murder as follows:

14

15

16 _____

17

[1] Throughout this document, the State will cite the exhibits to its response as
18 "Exh.," followed by the exhibit letter and the applicable Bates number.  The State
refers to trial exhibits as "Trial Exh.," followed by the exhibit letter, and has
19 appended them to this response as exhibits where relevant.  The State cites the
exhibits to Andriano's post-conviction relief (PCR) petition as "Petition, at Tab,"
20 followed by the tab number and any applicable page or paragraph number.  The
State has also attached as exhibits the trial transcripts cited in this response.  In
21 undersigned counsel's experience, the Arizona Supreme Court retains custody of
the trial transcripts and does not transmit them back to superior court for PCR
22 proceedings.

23

24 [2] In 2008, the Arizona Legislature renumbered and reorganized Arizona's
25 capital sentencing statutes.  *State v. Chappell*, 225 Ariz. 229, 234, ¶ 7 n.3, 236 P.3d
1176, 1181 (2010).  Because the portions of the statute relevant to the present
26 appeal do not differ materially from the previous version, the State cites the current
version.  *See id.*

27

28

2

Wendi Andriano, her terminally ill husband, Joe, and their two small children attended a barbeque on October 7, 2000. They returned to their apartment around midnight and put the children to bed.

At about 2:15 a.m. on October 8, Andriano called Chris, a coworker who also lived at the apartment complex, and asked her to watch the children while Andriano took Joe to the doctor. When Chris arrived, Andriano met her outside the apartment. She told Chris, "I have a problem. Don't ask any questions. My husband's in on the floor dying and I haven't called 911 yet." When Andriano cautioned, "He doesn't know I haven't called 911," Chris urged her to make the call.

Upon entering the apartment, Chris found Joe lying on the living room floor in the fetal position. He had vomited, appeared weak, and was having difficulty breathing. While Andriano was in another room calling 911, Joe told Chris that he needed help and had "for a long time." He asked why it was taking forty-five minutes for the paramedics to arrive.

Andriano returned to the room and told Chris she needed to get Joe to the car so she could drive him to the hospital because the paramedics were responding to another call. Joe said he could not get up, so Andriano tried to lift him. When she could not, she became irritated and yelled at Joe, using profanities. Hearing sirens approaching, Chris went out to direct the paramedics to the apartment as Joe began to vomit again.

As the paramedics were unloading their equipment, Andriano came out of the apartment screaming at them to go away. She then slammed the door. Chris and four paramedics knocked on the apartment door, but no one answered. After five to ten minutes of knocking, the Phoenix Fire Department alarm room called the Andrianos' home telephone in an attempt to get Andriano to open the door. The alarm room notified the paramedics that contact had been made with someone in the apartment who would come out to speak with them. Rather than coming through the front door, which opened to the living room, Andriano went out through her back door, climbed over the back patio wall, and walked around the apartment building to the front door, where Chris and the paramedics were standing. Andriano had changed her shirt and her hair was wet. She told the

3

paramedics that Joe was dying of cancer and had a do-not-resuscitate order. She explained that "this was not the way that he wanted to go." The paramedics and Chris left without going into the apartment.

Andriano called 911 again at 3:39 a.m. The same paramedics responded and saw Andriano, wearing a bloody shirt, standing outside the apartment talking to a police officer.

When the paramedics entered the apartment, they found Joe lying on the floor in a pool of blood. He had a deep stab wound to the left side of his neck and lacerations on his head that exposed some brain matter. A police detective observed at 3:52 a.m. that the blood surrounding Joe's head was already starting to dry. A broken bar stool covered in blood was found near Joe's body, as were pieces of a lamp,[3] a kitchen knife with blood on the sharp edge, a bloody pillow, and a belt.

A search of the Andrianos' storage unit revealed an open cardboard shipping box containing a 500-gram bottle of sodium azide,[4] two Tupperware containers containing sodium azide, nine Q-tips, a plastic knife and fork, and two pairs of latex gloves. Andriano's fingerprints were on the plastic knife and the vacuum-packed bag in

---

[3] The remainder of this lamp was never found, although its shade remained in the apartment. (Exh. FF, at 16–17, 28–32.) Presumably, Andriano (or someone assisting her, suggested at trial to be her father) removed it from the apartment after she murdered Joe but before she reported her crime. As the supreme court found, the evidence suggested that "Andriano staged the scene of the murder to make it appear as though she acted in self-defense." *Andriano*, 215 Ariz. at 512, ¶ 76 n.12, 161 P.3d at 555. That the large quantity of blood inside the apartment was already beginning to dry when police arrived supports the inference that she killed Joe long before she called them; similarly, that she changed clothes and showered after Chris left the apartment, and exited the residence through the patio door to speak to paramedics, supports the inference that she killed Joe as the paramedics waited outside. *Id.* at 500–02, ¶¶ 2–14, 161 P.3d at 543–45.

[4] Andriano purchased this poison over the internet from a chemical distributer, using a fictitious name and shipping address and a falsified business license. (Exhs. EE, at 65–68; GG, at 29–115; HH, at 22–146; O, at 3–49.)

4

which the cardboard box was shipped. During a search of the Andrianos' apartment, the police found gelatin capsules filled with sodium azide in a bottle labeled for an herbal supplement. Trace amounts of sodium azide were also discovered in the contents of a pot and two soup bowls in the kitchen. In all, 20.8 grams of sodium azide could not be accounted for.

The medical examiner determined that Joe sustained brain hemorrhaging caused by no fewer than twenty-three blows to the back of his head, eight to ten of which independently could have rendered Joe unconscious. Defensive wounds on Joe's hands and wrists indicated, however, that he was conscious for at least part of the attack. Joe also sustained a 3 and 3/4-inch-long by 2-inch-wide stab wound to the left side of his neck that extended to his spine and severed his carotid artery. The medical examiner opined that the blows to the head were sustained before the stab wound to the neck and that Joe was still alive, although likely unconscious, when he was stabbed. Trace amounts of sodium azide were found in Joe's blood and gastric contents. The cause of death was attributed to blunt force trauma and the stab wound.[5]

Based on the blood spatter and other evidence, a Phoenix police detective opined that Joe was lying down while he was being struck and did not get up during the attack. He further opined, based on the absence of arterial spurting on the belt and the knife, that both items were placed beside Joe's body after he died. Blood spatter on the bar stool, on the other hand, suggested that the stool was present when the arterial spurting began.

After being taken into custody, Andriano called one of her coworkers and asked her to hide certain items that were in Andriano's business office. Andriano's adoptive father told a police detective on the day of the murder, "I remember [Andriano] telling me that she stabbed [Joe]."

_____

[5] Additionally, a pillow found near Joe's body bore a blood pattern consistent with blood being exhaled.  (Exh FF, at 21–24.)  This pattern likely resulted from Andriano placing the pillow over Joe's face.

5

1   *Andriano*, 215 Ariz. at 500–02, ¶¶ 2–14, 161 P.3d at 543–45.   Based on the

2   foregoing facts, the jurors found Andriano guilty of first-degree murder.  *Id.* at 502,

3   ¶ 14, 161 P.3d at 545.

4                 **B.  *Representation.***

5      Immediately after her indictment, Andriano, who was indigent, was

6   represented by Deputy Maricopa County Public Defenders Bethenne Klopp-Bryant

7   and Gerald Gavin.  (Petition, at Tab 6, ¶ 4.)  In November 2000, Attorney Leon

8   Thikoll—who had been retained to represent Andriano by her parents, Alejo and

9   Donna Ochoa—filed a notice of appearance as co-counsel pursuant to *Knapp v.*

10   *Hardy*, 111 Ariz. 107, 523 P.2d 1308 (1974).  (Exh. A, at 5–7.)  Andriano consented

11   in writing to this arrangement.  (*Id.* at 7.)

12      In January 2001, private attorney David DeLozier began appearing on

13   Andriano's behalf, filing various motions seeking funding for experts, including a

14   mental-health expert.  (*Id.* at 8–40.)  On February 13, 2001, DeLozier and Klopp-

15   Bryant filed a formal stipulation substituting, with Andriano's written consent,

16   DeLozier as Andriano's counsel of record.[6]  (*Id.* at 41–42; *see* also Exh P, at 3–10.)

17   On March 13, 2001, DeLozier filed an additional motion seeking funding for

18   various   additional   experts,   including   a   forensic   pathologist,   oncologist,

19   hematologist, forensic chemist, and forensic computer expert.  (Exh. A, at 51–55;

20   *see also id.*, at 66–71 (response), 72–86 (reply).)  In the same pleading, DeLozier

21   requested that the court order the Office of Court-Appointed Counsel (OCAC) to

22   appoint second-chair counsel, as Thikoll had withdrawn with the written consent of

23   Andriano and the Ochoas.  (*Id.* at 51–65, 79.)

24

25

26   _____

27      [6] This stipulation is dated December 18, 2000, but was not filed until

28   February 13, 2001.  (Exh. A, at 41–42.)

DeLozier's request for expert funding led to a dispute between him, OCAC, and the Public Defender's Office regarding which agency would pay for Andriano's experts.  (Petition, at Tab 6, ¶ 4; Tab 7, ¶ 3; Exhs. A, at 87–98; Q–S.)  At an April 13, 2001, status conference, DeLozier and the trial court[7] discussed the possibility of the Public Defender's Office assuming the role of lead counsel, and DeLozier continuing to appear as *Knapp* counsel.  (Exh. R, at 3–5.)  The Public Defender's Office, through attorney Wes Peterson, made clear that, if his office served as lead counsel, it—not DeLozier—would have the final authority to make all case-related decisions.  (*Id.* at 6–9.)  The court advised Andriano that, if she elected to proceed with DeLozier as retained counsel, it would not appoint second-chair counsel, as it considered that requirement to apply only to court-appointed counsel.  (*Id.* at 13.)  *See* Ariz. R. Crim. P. 6.2, 6.8.

Three days later, the trial court revisited the issue of Andriano's representation.  (Exh. S, at 2.).  Andriano initially declined to be represented by the Public Defender.  (*Id.*)  However, after the court expressed concern with affording privately-retained counsel public funding for experts, Andriano reversed her decision and accepted the Public Defender as her attorney.  (*Id.* at 27–28.)  DeLozier explained to the court that Andriano had previously declined the Public Defender's representation because the attorney initially assigned to her case had allegedly told Donna Ochoa that Andriano was "dead meat" and there was "no way to defend her."[8]  (*Id.* at 17–19.)  DeLozier remained on the case as *Knapp* counsel.  (*Id.* at 28.)

---

[7] The Honorable Daniel Barker, presiding.

[8] If this claim is true, which is questionable, it is certainly a realistic assessment of the case.  As discussed throughout this response, the evidence overwhelmingly shows that Andriano murdered Joe with premeditation.  From the beginning, there was no reasonable probability that counsel could have succeeded

(continued ...)

7

1     Shortly thereafter, Deputy Public Defender Daniel Patterson was assigned as

2  lead counsel.  (*See* Exh. T, at 4–5.)  Patterson was an experienced capital defense

3  attorney, and had represented a capital defendant in a post-*Ring*[9] jury sentencing

4  trial.[10]   (Petition, at Tab 6, ¶¶ 1–3, 10, 18.)   He was assisted for 3 years by

5  mitigation specialist Patrick Linderman and, beginning in 2004, by mitigation

6  specialist Scott MacLeod.  (*Id.* at ¶ 21; Petition, at Tab 8, ¶ 1; Exh. A, at 101–02;

7  Exh U, at 3–4.)

8     **C. *Guilt phase.***

9     To establish Andriano's guilt for first-degree murder, the State presented the

10  evidence summarized in Section I(A), above.  Patterson and Delozier pursued a

11  battered-woman self-defense theory.  (*See* Exh. KK, at 16–74.)  During her 9 days

12  of testimony, Andriano painted Joe as verbally, sexually, physically, and

13  emotionally abusive and prone to "rages" in which he senselessly destroyed

14  inanimate objects, even while terminally ill.  (Exhs. V–DD.)  She described Joe's

15  murder as follows:

16       Andriano testified that she was attempting to assist Joe in committing
17       suicide when they got scared and decided to call for help. She claimed
18       that after 911 was called and Chris left the apartment to meet the
        paramedics, Joe decided that he wanted to follow through with the

19

_____
( ... continued )

20  in defending against either the murder charge or the A.R.S. § 13–751(F)(6)

21  especially cruel aggravating factor.  (*See also* Petition, at Tab 34, ¶ 43 (family

22  friend recalling Patterson's comment that Andriano's case was "a difficult case to
    win").

23

24     [9] *Ring v. Arizona*, 536 U.S. 584 (2002).

25     [10] Patterson represented Frank Roque.  (Petition, at Tab 6, at ¶¶ 3, 9, 18.)

26  Although a jury sentenced Roque to death, the Arizona Supreme Court reduced his

27  sentence to life on independent review based on the mitigating evidence Patterson
    presented at trial.  *State v. Roque*, 213 Ariz. 193, 202, 230, ¶¶ 1, 166–71, 141 P.3d

28  368, 377, 405 (2006).

1
2
3
4
5
6

> suicide. She testified that, after the paramedics left, she admitted to Joe that she had an affair. Joe then became violent and tried to choke her with a phone cord, but she was able to reach a knife, cut the cord, and free herself. When she put the knife down, Joe bent down to pick it up, so she hit him with the bar stool until he stopped moving. Ultimately, Joe picked up the knife and said he was going to kill himself. Andriano tried to stop him, but her hand slipped off the knife. Suddenly there was blood everywhere, but she had not stabbed Joe.

7   *Andriano*, 215 Ariz. at 504, ¶ 32, 161 P.3d at 547.  Dr. Sharon Murphy, a professor

8   of social work and a domestic-violence expert, also testified for multiple days, and

9   opined that Andriano was a domestic violence victim.  (Exh. NN–QQ.)

10   Counsel also presented testimony from Andriano's parents, brother, and

11   cousin, who collectively described her sheltered and religious upbringing and what

12   they characterized as years of abuse at Joe's hands.   (Exhs. KK–MM, SS.)

13   Counsel also called William Joe Collier, a forensic scientist who opined that,

14   because sodium azide is highly acidic, one cannot ingest it unknowingly, and that

15   Joe would have had to ingest at least 13 of the tainted capsules to account for the

16   amount of chemical missing from the bottle Andriano ordered.  (Exhs RR, SS.)

17   ## D. *Aggravation phase.*

18   Prior to trial, the State alleged two aggravating factors:  Andriano murdered

19   Joe with the expectation of receiving pecuniary gain, *see* A.R.S. § 13–751(F)(5),

20   and Andriano murdered Joe in an especially cruel, heinous, or depraved manner,

21   *see* A.R.S. § 13–751(F)(6).  (Exh A, at 94–95.)  With respect to the (F)(6) factor,

22   the State alleged both cruelty and heinousness and depravity (as shown through the

23   *Gretzler*[11] factors of mutilation and gratuitous violence).  (*Id.* at 284–86.)

24   The State relied primarily on the guilt-phase evidence to prove the

25   aggravating factors, but recalled a detective and the medical examiner to establish,

26   _____

27

28   [11] *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1 (1983).

9

1  in support of the cruelty allegation, that Joe had died with his eyes open, increasing

2  the likelihood that he perceived Andriano striking him before he lost

3  consciousness.  (Exh. VV, at 40–48.)   The medical examiner also described

4  defensive wounds to Joe's hands that were consistent with strikes from the bar

5  stool and that reflected his consciousness during a portion of the bludgeoning.  (*Id.*

6  at 53–57.)  The jurors found cruelty proven beyond a reasonable doubt, but were

7  unable to reach a verdict on pecuniary gain or on heinousness or depravity.  (Exh.

8  A, at 289.)

9                    **E.  *Penalty phase.***

10       At the penalty phase, counsel offered evidence of several mitigating

11  circumstances, including Andriano's missionary work and religious convictions;

12  purported status as a domestic violence and abuse victim; stress of Joe's terminal

13  cancer, initial misdiagnosis, and the family's financial problems; purportedly being

14  a good mother; good behavior in jail; and potential for rehabilitation.  (Exh. A, at

15  290–92, 287–98, 306–08.)  To establish this mitigation, counsel relied partially on

16  the guilt-phase evidence, but also called several of Andriano's friends and recalled

17  her parents to offer additional information about her character and upbringing, and

18  describe how her execution would affect them.  (Exhs. ZZ, AAA.)   They also

19  characterized Andriano as an excellent mother, who was devoted to her children.

20  (Exhs. ZZ, AAA.)

21       Counsel also presented testimony from several individuals who knew

22  Andriano as a child and young adult, and described her as passive, meek, friendly,

23  and nonviolent.  (Exh. ZZ, at 7–45; Exh. AAA.)  Counsel further recalled Dr.

24  Murphy, who offered additional testimony on domestic violence, testified that

25  Andriano may have been sexually abused as a child and that a man exposed

26  himself to her as a child, and opined that she may have been dissociating during

27  her police interview.  (Exh. AAA, at 47–83.)

28

                                        10

1    Andriano also presented testimony from three jail employees:   a mental

2    health counselor, Laura King; a psychologist, Dr. Gerald Perry; and a psychiatric

3    nurse, Joyce Van Every.[12]   Andriano was admitted to the jail's psychiatric unit after

4    a suicide attempt in September 2003.   (Exh. YY, at 68.)   All three witnesses

5    characterized Andriano as desperate to help others and to have others like her; if

6    she were unable to help a person in need, she would became severely depressed.

7    (*Id.* at 73–74; 85–85.)   They characterized Andriano as trusting and easily-

8    deceived, and claimed that she was valuable to the unit because she helped

9    troubled inmates and brought problems to the attention of the psychiatric staff.   (*Id.*

10   at 81–83, 142–43)

11   However, both Dr. Perry[13] and King conceded that Andriano was never

12   diagnosed with a serious mental illness in jail; she was treated only for depression

13   and anxiety.   (*Id.* at 71–72, 92, 134, 111, 121–22.)   These conditions, King and Van

14   Every opined, stemmed from the trauma of killing Joe.   (*Id.* at 111, 146.)   Dr. Perry

15   opined that they resulted from the stress inherent in the jail environment.   (*Id.* at

16   122.)   Andriano was treated with Zoloft (an antidepressant), Ativan (an antianxiety

17   medication) and Seroquel (an antipsychotic also used as a sleep aid).   (*Id.* at 139–

18   40.)

19   In rebuttal, Joe's sister, Jana Clayton, described several instances on which

20   Andriano had placed the burden of caring for her children on others; described her

21   use of a paddle to discipline her son; and recalled Andriano's sadness when she

22   became pregnant with her daughter, because she did not want to gain weight.

23   _____

24   [12] These individuals testified as lay witnesses.

25

26   [13] Dr. Perry specifically did not diagnose Andriano with bipolar disorder.
     (Exh. YY, at 121–22.)   He also opined that she was the highest-functioning inmate

27   in the unit.   (*Id.* at 135.)

28

11

1   (Exh. BBB, at 119–32.)  Likewise, Timothy Lee testified about Andriano's refusal

2   to leave work to attend to her seriously injured son, which directly contradicted her

3   trial testimony that she had immediately rushed to the hospital to see him.  (*Id.*)

4       The State also called Dr. Michael Brad Bayless (who had testified in the

5   guilt phase for the limited purpose of expressing his opinion that Andriano was not

6   a domestic violence victim), who opined that Andriano was a manipulative

7   individual and that her suicide attempt, helpful behavior in prison, frequent tears,

8   and general portrayal of herself as a victim were all goal-directed actions. (Exh.

9   CCC, at 10–16.)  And, two detention officers testified about Andriano's reputation

10  as a "control freak" in prison who upset other inmates; their belief that Andriano

11  was in charge of the other inmates; Andriano's discipline for possessing

12  contraband[14]; occasions on which Van Every, King, and Dr. Perry were caught

13  giving Andriano preferential treatment or violating policy to accommodate her; and

14  inappropriate contact between Andriano and her transsexual cellmate.[15]   (Exh.

15  BBB, at 48–111.)

16       **F. *Direct appeal.***

17       On direct appeal, Andriano raised eleven claims of error[16]:  1) this Court

18  violated Andriano's constitutional rights and the Arizona Rules of Evidence by

19

20  _____

21       [14] King admitted that Andriano had been disciplined, but implied that she

22  was only cited because the detention officers disliked her and wanted to return her
    to general population.  (Exh. YY, at 81, 103–04, 115–16.)  Van Every expressed a

23  similar opinion.  (*Id.* at 144–45.)

24       [15] The inmate was transitioning from female to male.  (R.T. 12/14/04, at 48–

25  111.)

26       [16] Andriano also presented several previously-rejected constitutional

27  challenges to the death penalty in order to preserve them for federal review.  (Exh.
    C, at 129–33.)

28

12

1 admitting evidence of her extramarital affairs and attempts to obtain life insurance;

2 2) fundamental error occurred when this Court failed to *sua sponte* instruct the jury

3 on second-degree murder and manslaughter as lesser-included offenses of first-

4 degree murder; 3) the A.R.S. § 13–751(F)(6) especially cruel aggravating factor is

5 facially vague; 4) this Court's jury instruction defining cruelty was insufficient to

6 channel the jurors' discretion; 5) the evidence was insufficient to support the jury's

7 finding of cruelty; 6) this Court violated Andriano's constitutional rights by

8 precluding evidence of residual doubt as mitigation; 7) this Court violated

9 Andriano's constitutional rights by refusing to permit mercy as mitigation; 8) this

10 Court violated Andriano's constitutional rights by erroneously instructing the

11 jurors regarding the need for finding mitigation unanimously; 9) this Court coerced

12 a death verdict by giving the jury an impasse instruction prematurely; 10) this

13 Court violated Andriano's constitutional rights by instructing the jury about its

14 duty to deliberate in the penalty phase; and 11) Arizona's statute providing for

15 execution by lethal injection constitutes cruel and unusual punishment.  (Exh. C.)

16      The Arizona Supreme Court rejected Andriano's conviction-related claims.

17 *Andriano*, 215 Ariz. at 502–04, ¶¶ 16–31, 161 P.3d at 545–47.  The court also

18 rejected Andriano's claims of trial court error at sentencing.  *Id.* at 505–10, ¶¶ 37–

19 60, 161 P.3d at 548–53.  After independently reviewing the aggravating and

20 mitigating circumstances, the court affirmed Andriano's death sentence, finding

21 the "quality and strength of Andriano's mitigation evidence … not sufficiently

22 substantial to call for leniency in light of the especially cruel manner in which

23 Andriano murdered her husband."  *Id.* at 510–13, ¶¶ 63–78, 161 P.3d at 553–56.

24 Andriano petitioned the United States Supreme Court for a writ of certiorari; the

25 Court denied certiorari on October 11, 2007.  *Andriano v. Arizona*, 552 U.S. 923

26 (2007) (mem.).

27

28

**1**    II. APPLICABLE LAW.[17]

**2**    When evaluating a PCR petition, this Court should first "identify all claims

**3**    that are procedurally precluded" under Rule 32.  Ariz. R. Crim. P. 32.6(c).  The

**4**    preclusion rule "'prevent[s] endless or nearly endless reviews of the same case in

**5**    the same trial court."  *State v. Shrum*, 220 Ariz. 115, 118, ¶ 12, 203 P.3d 1175,

**6**    1178 (2009) (quoting *Stewart v. Smith*, 202 Ariz. 446, 450, ¶ 11, 46 P.3d 1067,

**7**    1071 (2002)).  "Because the general rule of preclusion serves important societal

**8**    interests, Rule 32 recognizes few exceptions."  *Shrum*, 220 Ariz. at 118, ¶ 13, 203

**9**    P.3d at 1178; *see* Ariz. R. Crim. P. 32.2(b) (enumerating exceptions).  The State

**10**   must typically "plead and prove any ground of preclusion by a preponderance of

**11**   the evidence," but this Court may find a claim precluded regardless whether the

**12**   State raises that defense.  Ariz. R. Crim. P. 32.2(c).

**13**   Rule 32.2(a) states that a defendant "shall be precluded from relief under this

**14**   rule based upon any ground":

**15**
**16**   (1) Raisable on direct appeal under Rule 31 or on post-trial
         motion under Rule 24;

**17**
**18**   (2) Finally adjudicated on the merits on appeal or in any
         previous collateral proceeding;

**19**
**20**   (3) That has been waived at trial, on appeal, or in any previous
         collateral proceeding.

**21**
**22**   *See also* Ariz. R. Crim. P. 32.2(a)(3), cmt. ("For most claims of trial error, the state
**23**   may simply show that the defendant did not raise the error at trial, on appeal, or in

**24**
**25**   _____

**26**   [17] The Legislature has codified a defendant's right to bring a PCR petition at
**27**   A.R.S. §§ 13–4231 through 13–4239.  The language of Rule 32 tracks the statutory
**28**   language, and the State cites only the Rule herein.

14

1   a previous collateral proceeding, and that would be sufficient to show that the

2   defendant has waived the claim.").

3        If, after excluding all precluded claims, this Court "determines that no

4   remaining claim presents a material issue of fact or law which would entitle the

5   defendant to relief under this rule," it should dismiss the petition.  Ariz. R. Crim. P.

6   32.6.  This Court should order an evidentiary hearing only if it finds that Andriano

7   has presented "a colorable claim, that is a claim which if [her] allegations are true

8   might have changed the outcome."  *State v. Schrock*, 149 Ariz. 433, 441, 719 P.2d

9   1049, 1057 (1986).  The decision whether Andriano has advanced a colorable

10   claim "is, to some extent, a discretionary decision" for this Court, and only when

11   doubt exists should this Court order a hearing "'to allow the defendant to raise the

12   relevant issues, to resolve the matter, and to make a record for review."  *State v.*

13   *Bowers*, 192 Ariz. 419, 422, ¶ 10, 966 P.2d 1023, 1026 (App. 1998) (quoting

14   *Schrock*, 149 Ariz. at 441, 719 P.2d at 1057).  This Court should not grant an

15   evidentiary hearing "based on mere generalizations and unsubstantiated claims."

16   *State v. Borbon*, 146 Ariz. 392, 399, 706 P.2d 718, 725 (1985).

17        If this Court orders an evidentiary hearing, the Arizona Rules of Evidence

18   apply, and Andriano bears the "burden of proving the allegations of fact by a

19   preponderance of the evidence."  Ariz. R. Crim. P. 32.8(b), (c).  If Andriano proves

20   at a hearing that a constitutional defect occurred, the State bears the burden of

21   proving that error harmless beyond a reasonable doubt.  Ariz. R. Crim. P. 32.8(c).

22   **III.**    **PRECLUDED CLAIMS (CLAIMS IV AND II).**

23        Andriano's claims that the jurors improperly found the A.R.S. § 13–

24   751(F)(6) cruelty factor in part so she would not be released from prison (Petition,

25

26

27

28

P-App. 000185

1  at 69–70) and that DeLozier labored under an actual conflict of interest (*Id.* at 61–
2  63) are precluded under Rule 32.2(a)(3).[18]

3       **A. *Considering improper information to find cruelty (Claim IV).***

4       Andriano contends that, in finding the (F)(6) factor, the jurors were
5  improperly influenced by their desire that she not receive a parole-eligible
6  sentence, conduct that purportedly violates due process and the Eighth
7  Amendment.[19]   (Petition, at 69–70.)   This claim is 1) precluded under Rule
8  32.2(a)(3); 2) not supported by competent evidence, as it rests entirely on
9  inadmissible juror declarations that this Court should strike from the record; and 3)
10  meritless, even assuming the juror declarations are admissible.

11       **1. Preclusion.**

12       This claim is precluded under Rule 32.2(a)(3).  With reasonable diligence,
13  Andriano could have presented it in a motion for a new trial under Arizona Rule of
14  Criminal Procedure 24.1(c), a motion to vacate the judgment under Rule 24.2(a),
15  or on direct appeal.  Grounds for attacking the jurors' conduct during deliberations
16  typically arise during trial or immediately thereafter, and should be addressed at

17
18  ───────────────────

19       [18] Because these claims alternatively fail on their merits, appellate counsel
20  was not ineffective for failing to raise them.  (*See* Petition, at 70 (attributing any
   claims found precluded to appellate counsel's ineffectiveness).)  *See Smith v.*
21  *Robbins*, 528 U.S. 259, 285–86 (2000) (to show appellate counsel's
   ineffectiveness, defendant must establish that counsel "unreasonably failed to
22  discover nonfrivolous issues and to file a merits brief raising them," and that, but
23  for this failure, the defendant "would have prevailed on his appeal").

24       [19] Andriano refers in connection with this claim to the jury's purported
25  consideration of a non-statutory aggravating factor. (Petition, at 69–70.) However,
   her claim is limited to the aggravation-phase deliberations and is more aptly
26  characterized as asserting that the jurors were influenced by improper
27  considerations in finding the *statutory* aggravating factor.  (*Id.*)

28

1    that point.  In fact, Andriano was aware shortly after trial that, during the penalty-
2    phase deliberations, at least one juror may have been influenced by her desire that
3    Andriano not receive a parole-eligible sentence.

4         In support of her motion for a new trial under Rule 24.1,[20] Andriano attached
5    an Arizona Republic article dated January 24, 2005, for which juror L.P. (a
6    declarant in the present proceeding) and five other jurors were interviewed.  (Exh.
7    A, at 363–68.)  The article attributes to L.P. information that "[w]hile jurors were
8    discussing whether to execute Andriano, they considered that they would have no
9    control over whether the trial judge … would give her life in prison with or without
10   parole," and that the jurors "did not want to see a 25 years to life sentence." (*Id.* at
11   367.)  Although L.P.'s statements to the reporter relate to the penalty phase, they
12   reasonably should have spurred Andriano to investigate the jurors' conduct in all
13   three phases and challenge it, if appropriate, in a post-trial motion.  By failing to do
14   so, Andriano waived her claim, and this Court should dismiss it as precluded under
15   Rule 32.2(a)(3).

16                    **2. Inadmissibility of juror declarations.**

17        Preclusion aside, Andriano's claim is not supported by competent evidence
18   and thus fails on the merits.  The claim rests entirely on declarations from Jurors
19

20   _____

21        [20] This motion challenged as coercive this Court's impasse instruction to the
22   jurors during the penalty phase.  (Exh. A, at 345–48, 359–68; Exh. P, at 6–7; *see*
23   Exh. A, at 49–54 (response).)  Andriano argued that the jurors' consideration of her
24   parole eligibility, as well as other factors mentioned in the article, was
     inappropriate and resulted from the purportedly coercive impasse instruction.
25   (Exh. A, at 345–48, 359–68; Exh. P, at 6–7; *see* Exh. A, at 49–54 (response).)  This
26   Court denied the motion.  (Exh. B, at 24.)  The Arizona Supreme Court likewise
     rejected Andriano's challenges to the impasse instruction.  *See Andriano*, 215 Ariz.
27   at 508–10, ¶¶ 53–60, 161 P.3d at 551–53.

28

                                          17

1   L.P.[21] and B.B. describing the jury's deliberative process in finding the A.R.S. §

2   13–751(F)(6) factor.  (Petition, at 69–70 & Tabs 39, 41.)  This Court should strike

3   the jurors' declarations, as well as those authored by Jurors M.C.[22] and J.S.

4   (Petition, at Tabs 39–42), because they are inadmissible.  At a minimum, this Court

5   should refuse to consider the declarations.

6        A juror's testimony is not admissible to impeach a verdict.  *See State v. Cruz*,

7   218 Ariz. 149, 159, ¶ 33, 181 P.3d 196, 206 (2008); *State v. Dickens*, 187 Ariz. 1,

8   15, 926 P.2d 468, 482 (1996).  The purpose of this rule is to protect the finality of

9   jury verdicts and to ensure that jurors are not unduly disturbed, as at least one juror

10   _____

11        [21] While inadmissible, L.P.'s declaration nonetheless includes interesting

12   content.  She suggests that evidence of Andriano's alleged sexual molestation

13   could have affected the jury's decision-making process.  (Petition, at Tab 41, ¶ 7.)

14   L.P. clearly did not draft her declaration, as the type-written document states that

15   molestation evidence "would have weighed heavily" on the decision-making

16   process, and L.P. crossed out the word "heavily" and initialed the alteration.  (*Id.*)

17   This alteration makes sense, given that L.P. told the Arizona Republic that

18   Andriano's post-verdict conduct reassured her that death was the appropriate

19   punishment:

18           P[.] said a telling look from Andriano was reassuring after a

19        clerk read the verdict.

20           "She gave us a look like, 'How dare you?'" P[.] said.  "I

21        thought, 'I made the right decision.'"

22   (Exh. A, at 368.)

23

24        [22] M.C.'s declaration is even less relevant than the other three, as she served

25   as an alternate and did not deliberate.  (Petition, at Tab 40, ¶ 1.)  This Court should

26   disregard Andriano's reference in her factual statement to M.C.'s comment that she

27   would not have imposed the death penalty had she deliberated.  (Petition, at 41 &

28   Tab 40, ¶¶ 2, 9.)  Likewise, the jurors' various opinions regarding what mitigating

     evidence they would have found compelling are neither admissible nor relevant.

     (Petition, at 41–42 & Tabs 39–42.)

18

was in this case.[23]  *See State v. Callahan*, 119 Ariz. 217, 219, 580 P.2d 355, 357 (App. 1978); *State v. Landrum*, 25 Ariz. App. 446, 448, 544 P.2d 270, 272 (1975). Juror evidence is admissible *only* when offered to prove a claim of jury misconduct, and then only to the extent that it does not disclose the jurors' motives or mental processes in reaching a verdict:

> Whenever the validity of a verdict is challenged under Rule 24.1(c)(3) [which sets forth grounds for finding juror misconduct], the court may receive the testimony or affidavit of any witness, including members of the jury, which relates to the conduct of a juror, official of the court, or third person. *No testimony or affidavit shall be received which inquires into the subjective motives or mental processes which led a juror to assent or dissent from the verdict.*

Ariz. R. Crim. P. 24.1(d) (emphasis added).

Andriano does not allege any type of juror misconduct enumerated in Rule 24.1(c)(3).  Nor does she argue that counsel was ineffective for failing to raise a jury misconduct claim in a post-verdict motion.  Rather, she presents juror declarations disclosing their "subjective motives or mental processes," Ariz. R. Crim. P. 24.1(c)(3), in finding the (F)(6) factor proven and asserts that such motives and mental processes violated her constitutional rights.  (Petition, at 69–70.)  By its express terms, Rule 24.1(d) precludes this Court from considering this evidence.  And, absent the jurors' declarations, Andriano's claim lacks a factual basis and should be dismissed.

### 3. Even if the declarations are admissible, the claim fails on the merits.

Even if this Court considers the juror declarations, Andriano's claim fails on the merits.  Juror L.P. claims that the jurors' desire that Andriano not receive a parole-eligible sentence was "a key reason" they found the (F)(6) factor.  (Petition

---

[23] *See* Minute Entry filed 7/11/11 and Sealed Juror Letter, filed 7/8/11.

1   at Tab 41, ¶ 6.)   Likewise, B.B. attests that the jurors discussed Andriano's

2   potential punishment in both the aggravation and penalty phase, and constructed a

3   chart "outlining the different possible [sentencing] outcomes." (Petition, at Tab 37,

4   ¶ 8.)   However, neither juror claims that the jury found the aggravating factor

5   proven solely to qualify Andriano for a death sentence, or that the elements of

6   cruelty were not proven beyond a reasonable doubt.  (*Id.* at Tabs 37, 41.)  Juror J.S.

7   likewise does not make that assertion.  (*Id.* at Tab 42.)  And, as set forth in Section

8   D, below, the evidence overwhelmingly showed cruelty.  If not precluded and if

9   supported by competent evidence, Andriano's claim fails on the merits.

10          **B.** *DeLozier's purported conflict of interest (Claim II).*

11        Relying on *Cuyler v. Sullivan*, 446 U.S. 335 (1980), Andriano contends that

12   second-chair counsel DeLozier labored under a conflict of interest because he

13   simultaneously represented her in her capital murder trial (which required him to

14   investigate her upbringing and present as mitigation any abusive or neglectful

15   parenting to which she was exposed) and the Ochoas in guardianship and adoption

16   proceedings involving Joe and Andriano's children, N. and A. (which required him

17   to present the Ochoas in the most favorable light possible).  (Petition, at 61–63.)

18   This claim is precluded and, alternatively, is not a colorable claim for relief.

19          **1. Preclusion.**

20        Conflict of interest claims are cognizable on direct appeal.  *See State v.*

21   *Moore*, 222 Ariz. 1, 16, ¶¶ 81–83, 213 P.3d 150, 165 (2009) (considering and

22   rejecting claim that counsel had a conflict of interest where he had formerly

23   represented a statutory victim who possessed information potentially helpful to

24   defendant).  Andriano was aware that DeLozier was also representing her parents

25   in the guardianship proceeding; in fact, he appears to have simultaneously

26   represented Andriano and her parents in that proceeding for a period.  (*See* Exh. D,

27   at  2 (first page of pleading in which DeLozier identifies himself as the attorney for

28   Andriano and the Ochoas).)  Andriano should have raised her conflict of interest

20

1  claim at trial or on direct appeal.  Because she did not do so, it is precluded under

2  Rule 32.2(a)(3).

3  **2.  The claim fails on the merits.**

4  Even if not precluded, Andriano's claim fails on the merits.  As a preliminary

5  matter, the Arizona Supreme Court has interpreted *Cuyler* as limited to the joint

6  representation of co-defendants, which is not at issue here.  *See State v. Martinez-*

7  *Serna*, 166 Ariz. 423, 425, 803 P.2d 416, 418 (1990); *State v. Jenkins*, 148 Ariz.

8  463, 465, 715 P.2d 716, 718 (1986).  But to the extent *Cuyler* applies to the present

9  factual scenario, Andriano is not entitled to relief because she has failed to show

10  that DeLozier possessed an actual conflict of interest that adversely affected her

11  representation.

12  A defendant's constitutional right to the effective assistance of counsel may

13  be violated when his attorney operates under a conflict of interest.  *See Martinez-*

14  *Serna*, 166 Ariz. at 418, 803 P.2d at 425.  However, "absent an objection at trial, [a]

15  defendant must demonstrate that (1) an actual conflict existed; and (2) that the

16  conflict had an adverse effect on the representation."  *Id.*; *see Cuyler*, 446 U.S. at

17  349 (defendant must show that counsel "actively represented conflicting interests"

18  to establish constitutional violation).  "In order to establish an actual conflict of

19  interest, a defendant must demonstrate that some plausible alternative defense

20  strategy might have been pursued."  *See Martinez-Serna*, 166 Ariz. at 418, 803

21  P.2d at 425 (quotations and alterations omitted).  The defendant need not show that

22  the strategy would have been successful, but merely that it was a viable alternative.

23  *Id.*  The defendant must also establish that "the alternative defense was inherently

24  in conflict with the attorney's other loyalties or interests."  *Id.*

25  Beginning on June 11, 2001, DeLozier represented the Ochoas in the

26  guardianship proceeding between them and Joe's sister and brother-in-law (who

27  were the children's legal guardians, pursuant to Andriano's initial consent) in

28  Maricopa County Superior Court.  (Exh. D, at 1; Exh. E, at 90–94.)  He also

21

1   represented them in adoption proceedings in Pinal County Superior Court.  (Exh.

2   E.)  However, attorney Daphne Budge replaced DeLozier as counsel of record for

3   the Ochoas in the Maricopa County proceeding in July 2002—*over 2 years* before

4   Andriano's trial—and continued representing them until November 2004, when

5   they began appearing *in propria persona*.  (Exh. D, at 3–10.)  The Pinal County

6   proceeding was dismissed on October 16, 2002, after the court found that DeLozier

7   and the Ochoas had willfully violated a court order and engaged in deceitful

8   conduct calculated to permanently sever Joe's family's legal relationship with the

9   children.[24]  (Exh. E, at 105–06.)

10          Assuming for the sake of argument that Andriano's interests conflicted with

11   her parents' (a fact Andriano has not convincingly established), DeLozier was not

12   actively representing both parties during Andriano's trial and the 2 years preceding

13   it; he was only representing Andriano.[25]   Further, neither Patterson nor DeLozier

_____

15          [24] The Arizona Court of Appeals decision Andriano includes in her exhibits
16   and cites in connection with this claim (Petition, at Tab 77) relates to DeLozier's
17   appeal of a $6,000 personal sanction the Pinal County court imposed.  (Exh. E, at
18   106.)  The Ochoas do not appear to have been parties to that appeal.  (*See id.* at
19   115, 135.)  The Pinal County court's findings in the adoption matter are relevant
20   here, as they bear on the credibility of more than one of Andriano's declarants,
21   including DeLozier, who has "fallen on the sword" in this proceeding, as he did in
22   the Pinal County proceeding.  (*Id.* at 7, 119.)  The court found that DeLozier
23   "intentionally and surreptitiously avoided th[e] [c]ourt's orders with the intentions
24   of permanently severing the paternal interest of the children and that he
     intentionally disregarded th[e] [c]ourt's orders."  (*Id.* at 105.)  And, the court found
     that the Ochoas knew that the court's orders "were not being abided by, [and] that
     the actions were done to thwart the orders of the Maricopa Superior Court."  (*Id.* at
     106.)   The court sanctioned DeLozier monetarily, as set forth above, and
     sanctioned the Ochoas by dismissing their adoption petition with prejudice.  (*Id.*)

26          [25] DeLozier may arguably have been ethically-bound not to represent both
27   Andriano and the Ochoas.  *See* Ariz. R. Sup. Ct. 42, E.R. 1.7–1.9.  However, a
28   violation of the Arizona Rules of Professional Conduct does not automatically

(continued …)

22

1    claim in their declarations that DeLozier's loyalty to the Ochoas prevented them
2    from discovering or presenting additional mitigation; they imply instead that this
3    failure was the result of their negligence.  (Petition, at Tabs 6, 7.)

4          Further, as discussed below, counsel presented at trial and sentencing
5    extensive evidence of the oppressive religious environment in which Andriano was
6    raised, of Alejo Ochoa's angry outbursts and arguably abusive behavior, and of
7    Donna Ochoa's alleged neglect.   The evidence Andriano now claims counsel
8    should have presented is cumulative to that evidence.  Although counsel did not
9    present evidence that Alejo may have sexually abused Andriano, such evidence is
10   speculative and refuted by Andriano's own testimony, in which she denied under
11   oath that Alejo had ever touched her inappropriately.  Andriano therefore has failed
12   to show that a plausible alternative mitigation strategy existed.  If not precluded,
13   Andriano's conflict of interest claim is meritless.

14   **IV.   INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS (CLAIMS I(A)–(C),**
15       **III, AND V).**

16         Andriano contends that trial and appellate counsel were ineffective for
17   multiple reasons.  (Petition, at 46–70.)  Andriano's claims are not colorable, and
18   this Court should deny and dismiss them.

19         **A.  *Law of ineffective assistance of counsel.***

20         To merit relief under *Strickland v. Washington*, 466 U.S. 668, 686 (1984),
21   Andriano must show that "counsel's conduct so undermined the proper functioning
22   of the adversarial process that the trial cannot be relied on as having produced a
23   just result."  "'Surmounting *Strickland*'s high bar is never an easy task.'"
24   *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 788 (2001) (quoting *Padilla v.*
25   *Kentucky*, 559 U.S. __, __, 130 S.Ct. 1473, 1485 (2010)).  To do so, Andriano must

26   _____
              ( ... continued)
27   render counsel constitutionally ineffective.  *See Jenkins*, 148 Ariz. at 465, 715 P.2d
28   at 718.

                                    23

1  show that (1) counsel's performance was deficient under prevailing professional
2  standards and (2) he suffered prejudice as a result.  *Strickland*, 466 U.S. at 687–88.
3  This Court "is not required to address both components of the *Strickland* test in
4  deciding an ineffective assistance of counsel claim 'if the defendant makes an
5  insufficient showing on one.'"  *LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir.
6  1998) (quoting *Strickland*, 466 U.S. at 697).   Claims of trial and appellate
7  counsel's ineffectiveness are each reviewed under *Strickland*'s standard.   *See*
8  *Robbins*, 528 U.S. at 285; *Cockett v. Ray*, 333 F.3d 938, 944 (9th Cir. 2003).

9      To establish deficient performance, Andriano must show "that counsel's
10  representation fell below an objective standard of reasonableness."[26]  *Strickland*,
11  466 U.S. at 699; *see also State v. Santanna*, 153 Ariz. 147, 149, 735 P.2d 757, 759
12  (1987).   Her allegations and supporting evidence must withstand this Court's
13  "highly deferential" scrutiny of counsel's performance, and overcome its "strong
14  presumption" that counsel "rendered adequate assistance and made all significant
15  decisions in the exercise of reasonable professional judgment."  *Strickland*, 466
16  U.S. at 689–90; *see also State v. Gerlaugh*, 144 Ariz. 449, 454, 698 P.2d 694, 700
17  (1985).   Under this deferential standard, Andriano bears the heavy burden of
18  showing that counsel's assistance was "neither reasonable nor the result of sound
19  trial strategy," *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001), and
20  actions by counsel that "'might be considered sound trial strategy'" do not
21  constitute ineffective assistance.  *Strickland*, 466 U.S. at 689 (quoting *Michel v.
22  Louisiana*, 350 U.S. 91, 101 (1955)); *see also Yarborough v. Gentry*, 540 U.S. 1, 5–

23  _____

24      [26] As Andriano acknowledges (Petition, at 43–45), the American Bar
25  Association's Guidelines for the Appointment and Performance of Defense
26  Counsel in Capital Cases ("ABA Guidelines") are guides to what constitutes
   reasonable conduct, and do not impose particular duties on defense counsel.  *See,*
27  *e.g., Bobby v. Van Hook*, __ U.S. __, __, 130 S.Ct. 13, 16–17 (2009); *see also id.* at
28  20 (Alito, J., concurring).

6 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").

Additionally, this Court should "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994) (en banc). Rather, as *Strickland* holds, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. The test for deficient performance "has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done." *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998), *rev'd on other grounds*, 525 U.S. 141 (1998) (internal quotations omitted). Instead, this Court asks "only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.*

Even if Andriano establishes that counsel performed deficiently, this Court should not grant relief unless she also proves prejudice. *Strickland*, 466 U.S. at 691–92 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). The prejudice requirement recognizes that a defendant is entitled to "*effective* (not mistake-free) representation." *United States v. Gonzales-Lopez*, 548 U.S. 140, 147 (2006) (emphasis in original). This Court should not presume prejudice, *see Jackson v. Calderon*, 211 F.3d 1148, 1155 (9th Cir. 2000), but should require Andriano to affirmatively prove actual prejudice. *See Cooper v. Calderon*, 255 F.3d 1104, 1109 (9th Cir. 2001) ("[A petitioner] must 'affirmatively prove prejudice.' … This requires showing more than the possibility that he was prejudiced by counsel's errors; he must demonstrate that the errors

25

1    *actually* prejudiced him.") (quoting *Strickland*, 466 U.S. at 693) (emphasis in
2    original)

3         To carry this burden, Andriano must show a "reasonable probability that, but
4    for counsel's unprofessional errors, the result of the proceeding would have been
5    different." *Strickland*, 466 U.S. at 694; *see Lockhart v. Fretwell*, 506 U.S. 364, 372
6    (1993) (prejudice prong concerned with whether "counsel's deficient performance
7    render[ed] the result of the trial unreliable or the proceeding fundamentally unfair
8    … [u]nreliability or unfairness does not result if the ineffectiveness of counsel does
9    not deprive the defendant of any substantive or procedural right"). A "reasonable
10   probability" is one "sufficient to undermine confidence in the outcome."
11   *Strickland*, 466 U.S. at 694.

12        **B.** *Preliminary matters.*

13        In support of her petition, Andriano submits declarations from defense
14   attorney Larry Hammond and Andriano's trial counsel, Patterson and Delozier.
15   (Petition, at Tabs 1, 6, 7.) Hammond's declaration is irrelevant and should not be
16   considered. Patterson and Delozier's declarations are not dispositive and are
17   entitled to minimal weight in this Court's analysis.

18        **1.   Declaration of Larry Hammond.**

19        Andriano offers a declaration from Larry Hammond to establish the standard
20   of care applicable to defense attorneys at the time of Andriano's trial. (Petition,
21   Tab 1.) Hammond opines that Andriano "received constitutionally ineffective
22   assistance of counsel at both the trial and sentencing phases of her case." (*Id.* at 9,
23   ¶ 23.) Hammond's opinion is irrelevant, as set forth below.

24        Rule 702 of the Arizona Rules of Evidence permits expert testimony under
25   limited circumstances to help the trier of fact resolve factual issues:

26              A witness who is qualified as an expert by knowledge,
27           skill, experience, training, or education may testify in the
28           form of an opinion or otherwise if:

26

1

2      (a) the expert's scientific, technical, or other specialized
3      knowledge will help the trier of fact to understand the
       evidence or to determine a fact in issue;
4

5      (b) the testimony is based on sufficient facts or data;

6      (c) the testimony is the product of reliable principles and
       methods; and
7

8      (d) the expert has reliably applied the principles and
       methods to the facts of the case.
9

10     The State does not contest that Hammond is an experienced and well-

11   respected defense attorney; however, his opinion is immaterial.   First, whether

12   counsel's trial tactics were reasonable under prevailing professional norms is one

13   of *law*, not one of *fact*.  *See Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th

14   Cir. 1998) ("The question of whether an attorney's actions were actually the

15   product of a tactical or strategic decision is an issue of fact….   By contrast, the

16   question of whether the strategic or tactical decision is reasonable enough to fall

17   within the wide range of professional competence is an issue of law not one of

18   fact…."); *see also Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007);

19   *United States v. Swanson*, 943 F.2d 1070, 1072 (9th Cir. 1991); *Horton v. Zant*, 941

20   F.2d 1449, 1462 (11th Cir. 1991); *Smith v. Ylst*, 826 F.2d 872, 875 (9th Cir. 1987);

21   *Lytle v. Jordan*, 22 P.3d 666, 679 (N.M. 2001); *Jefferson v. Zant*, 431 S.E.2d 110,

22   112 (Ga. 1993).

23     Because expert testimony is admissible only to help the trier of fact resolve

24   *factual* issues, *see* Ariz. R. Evid. 702, it is not admissible to establish that counsel's

25   actions fell below the relevant standard of care.  *See Provezano*, 148 F.3d at 1331–

26   32 ("[I]it would not matter if a petitioner could assemble affidavits from a dozen

27   attorneys swearing that the strategy used at his trial was unreasonable.   The

28

1   question is not one to be decided by plebiscite, by affidavits, by deposition or by
2   live testimony.  It is a question of law to be decided by the … courts …."); *Lytle*,
3   22 P.3d at 680 ("We believe it is superfluous for expert witnesses to advise a court
4   … about the proper application of existing law to the established historical facts
5   and about the ultimate issue of trial counsel's effectiveness."); *Jefferson*, 431
6   S.E.2d at 112 ("[T]he court correctly determined that opinion testimony from other
7   attorneys concerning the performance of [the defendant's] trial attorneys was
8   irrelevant.").

9        Second, even if the reasonableness of trial counsel's performance is a factual
10  issue, expert testimony on that topic is nonetheless irrelevant in this case because it
11  would not assist the trier of fact.  *See* Ariz. R. Evid. 702.  Hammond is no more
12  qualified than this Court to determine whether counsel's acts or omissions were
13  objectively reasonable under prevailing professional norms.  *See Clemmons v.*
14  *State*, 785 S.W.2d 524, 531 (Mo. 1990) ("A motion court is at least as capable as
15  another attorney in reaching a decision [on counsel's alleged ineffectiveness] based
16  on the evidence presented, and therefore the opinion of an attorney on the same
17  subject is irrelevant and incompetent."); *Parkus v. State*, 781 S.W.2d 545, 548 (Mo.
18  1989) (same); *State v. Ohler*, 366 N.W.2d 771, 775 (Neb. 1985) (rejecting
19  defendant's argument that lower court erred by refusing to permit expert testimony
20  "regarding what a 'reasonably prudent criminal trial attorney would have done'"
21  and concluding that "[g]enerally, expert testimony is not admissible as proof that
22  the assistance of counsel in a criminal case was ineffective").  To resolve the
23  deficient performance element of Andriano's IAC claims, this Court need only
24  apply governing law to the relevant facts.  Hammond's opinion would not facilitate
25  this exercise.  His affidavit is therefore irrelevant and should not be considered.

26        **2.  Declarations of counsel.**

27        Patterson and DeLozier have submitted declarations claiming that they
28  lacked strategic reasons for various acts and omissions at trial.  (Petition, at Tabs 6,

28

7.)  This Court should view these declarations with skepticism.  *See Edwards*, 475 F.3d at 1126 (court is "not obligated to accept a self-proclaimed assertion by trial counsel of inadequate performance") (quotations omitted); *Allen v. Mullin*, 368 F.3d 1220, 1240 (10th Cir. 2004) (counsel's "about-face on the [disputed] issue strongly suggests a willingness to 'fall on the sword' in order to derail a death sentence"); *Hendricks v. Calderon*, 864 F. Supp. 929, 944 (N.D. Cal. 1994) ("The court recognizes that trial counsel may have an incentive to admit error in the hope of assisting a former client who has been sentenced to death.").

Moreover, the declarations, while relevant to the extent they disclose counsel's decision-making process, are not dispositive of *Strickland*'s inquiry.  *See, e.g., Atkins v. Singletary*, 965 F.2d 952, 959–60 (11th Cir. 1992) ("[Counsel's] affidavit alone establishes nothing. It admits no ineffective performance; and even if it did admit ineffectiveness, we would give the affidavit no substantial weight 'because ineffectiveness is a question which we must decide, [so] admissions of deficient performance by attorneys are not decisive.") (quoting *Harris v. Dugger*, 874 F.2d 756, 761 n.4); *see also Burris v. Parke*, 948 F.Supp. 1310, 1333 (N.D. Ind. 1996) (acknowledging counsel's testimony that he lacked a strategic reason for the challenged decision, but stating, "when the only record on which a claim of ineffective assistance is based is the trial record, every indulgence will be given to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight") (quotations omitted).  Under *Strickland*, this Court must determine whether counsel's decisions were *objectively reasonable*. 466 U.S. at 688.  It should do so by determining—without applying the benefit of hindsight—whether any reasonable attorney could have made the decisions Patterson and Delozier made at trial.  *See Coleman*, 150 F.3d at 1113.

**C. *Failure to present mitigation (Claim I(A)).***

Andriano contends that Patterson and Delozier were ineffective at the penalty phase for failing to investigate and present as mitigation 1) expert

1   testimony regarding her purported mental illnesses, and 2) evidence of her

2   "harrowing" childhood.  (Petition, at 50–55.)  Andriano's claims fail because she

3   has shown neither deficient performance nor prejudice.

4   **1.  Mental illness (Claim I(A)(1).**

5   Andriano asserts that counsel was ineffective for failing to present expert

6   testimony that she suffered from bipolar disorder, complex post-traumatic stress

7   disorder ("Complex PTSD"), cognitive disorder not otherwise specified, and

8   "caregiver burden."  (Petition, at 7–13, 46–50 & Tabs 2–5.)  She further asserts that

9   counsel should have presented evidence of her family's mental health history, and

10  explained how that history, combined with her purported childhood trauma,

11  predisposed her to mental illness.  (*Id.*)  Additionally, she claims that counsel

12  should have argued that the unforeseeable collision of her various mental disorders

13  led her to murder Joe.  (*Id.*)  Andriano has not carried her burden under *Strickland*.

14  **a.  Deficient performance.**

15  Andriano contends counsel was ineffective for failing to investigate and

16  present mental health evidence because Dr. Jack Potts, who performed a

17  competency evaluation pursuant to Arizona Rule of Criminal Procedure 11, and

18  Andriano's personal counselor, the late Kandy Rhode,[27] suggested in 2001 that

19  Andriano be assessed by other mental-health professionals to rule out serious

20  mental illnesses and evaluate her mental state at the time she murdered Joe.

21  _____

22  [27] Rhode was a private counselor funded by Andriano's parents who visited

23  her frequently in jail.  (Exh. BBB, at 56–60.)  When Andriano was housed in the
    jail's psychiatric unit, detention officers became aware that Rhode had somehow

24  obtained several contact visits with Andriano, an "unprecedented" occurrence that

25  violated jail protocol.  (*Id.* at 57, 93–94.)  Jail staff had been incorrectly led to
    believe that Rhode was a member of Andriano's legal team.  (*Id.*)  The jail

26  terminated Rhode's contact visits Andriano after officials discovered that she had

27  furnished Andriano with pens and contraband cosmetic items, including a makeup

28  compact with a glass mirror.  (*Id.* at 56–60, 63–65; *see also* Exh. H, at 2; Exh. L.)

1   (Petition, at 46–48.)   However, the record demonstrates that counsel thoroughly

2   investigated Andriano's mental health based on Rhode's and Dr. Potts'

3   recommendations.   The record further confirms what this Court should presume

4   under *Strickland*:  that counsel made a strategic decision not to offer mental-health

5   evidence and to instead focus on other areas of mitigation.

6                    i.      *Mental-health investigation.*

7        DeLozier sought a Rule 11 evaluation in early 2001, and supported his

8   request with a February 19, 2001, letter from Rhode containing the following

9   impressions:

10

11        I believe that [Andriano's] willingness to give up her will to others is
          a symptom of some kind of personality disorder.  I also suspect that
12        her defense system includes dissociation.  Her mother's reference to
          possible abuse by [Andriano's] paternal grandfather could be the
13        origin of that dissociation.  The intense sense of peace she describes
          since her arrest is sufficiently inappropriate to cause me to ask for
14        collaboration from another professional.
15

16        It would assist me greatly in diagnosis and treatment if she could be
          evaluated by a psychiatrist.  Ideally I would like to have him or her
17        administer personality tests and perhaps interview [Andriano] under
          hypnosis.  I would also hope she could be evaluated for medication.
18

19   (*See* Exh. A, at 43–50.)

20        Approximately 1 month later, Rhode again wrote DeLozier, reaffirming her

21   opinion that Andriano was prone to dissociation and had been molested by her

22   grandfather.  (Petition, at Tab 7B.)  Rhode stated, "[i]n addition to my belief that

23   she is the victim of sexual molestation and that she suffers from Depersonalization

24   Disorder as well as Dissociative Amnesia, I believe she exhibits the symptoms of

25

26

27

28

                              31

the Cluster C Personality Disorders."[28]   (*Id.*)   She further opined that Andriano "was the victim of emotional abuse as well as some physical abuse during her marriage" and that she "was able to cope by dissociating and rationalizing."  (*Id.*)

Dr. Potts, a psychiatrist, performed the competency evaluation, and the defense team provided at least one of Rhode's letters to him to review.  (*See* Petition, at Tab 6A, p.1.)  Dr. Potts also consulted with one of Andriano's treating psychiatrists in jail, Dr. Leonardo Garcia-Bunuel.[29]  (*Id.*)  Ultimately, in a report authored March 28, 2001, Dr. Potts found Andriano competent to stand trial.  (*Id.* at pp. 1–3.)  Having apparently been apprised, perhaps from Rhode's letter, of a potential defense that Andriano suffered amnesia for the time of Joe's murder, Dr. Potts recommended that a second expert inquire into that possibility:

> Whether or not she has "amnesia" for the time around the alleged offense is something I cannot determine.  Defense counsel may wish to independently retain an expert to evaluate his client's state of mind around the time of the offense.  Certainly there is something quite bizarre about what allegedly occurred.  If Ms. Rhode is accurate in her diagnostic assessment, then the criminal culpability of the defendant and her state of mind at the time of the alleged offense should be evaluated independently, outside the scope of a Rule 11 evaluation.

(*Id.* at pp. 2–3.)

On December 20, 2001, Patterson emailed mitigation specialist Linderman and stated his intention to seek a mental health examination of Andriano "not because [he] believe[d] [she] suffere[d] from mental illness," but because, in a

---

[28]  Consisting of obsessive-compulsive personality disorder, avoidant personality disorder, and dependent personality disorder.  (Exh. F, at 35–45.)

[29] Dr. Potts noted that Dr. Garcia-Bunuel was attempting to treat Andriano for a depressive disorder.  (Petition, at Tab 6A, p.3.)  In an apparent attempt to thwart this treatment, one of Andriano's early attorneys (not DeLozier or Patterson) had instructed her not to cooperate with Dr. Garcia-Bunuel.  (*Id.*)

P-App. 000202

death penalty case, "*a mental health exam can provide a source for mitigation*." (Petition, at Tab 6B, emphasis added.)  Patterson thereafter engaged Dr. Richard Rosengard, a psychiatrist, to evaluate Andriano.[30]  (Petition, at Tab 6C.)  On June 23, 2002, Dr. Rosengard authored a report, which contains no compelling mitigation; in fact, the report is largely damaging and would have undercut counsel's trial and mitigation strategy of portraying Andriano as a good mother and a meek, dutiful woman who endured years of abuse from her terminally-ill husband.  (*Id.*)

Contrary to the detailed recollection of Joe's murder she recounted at trial, Andriano told Dr. Rosengard that she remembered fighting with Joe, and "[t]he next thing that [she] recalled was sitting on the living room floor with her husband. Thereafter, she called her parents and told her father and then called the police." (Petition, at Tab 6C, p. 2.)  She "denied symptoms that would be consistent with manic episodes but did admit to panic attacks"; denied "symptoms consistent with phobias, obsessive-compulsive disorder, organicity, eating disorders, or thought process disorders"; denied hallucinations or paranoia; claimed that her mother and therapist had told her that her biological grandfather molested her as a toddler, but she could not recall that abuse; and denied having a family history of psychiatric disorders.  (*Id.* at pp. 3–4.)  Dr. Rosengard observed "no psychotic thought processes."  (*Id.* at p. 5.)

Additionally—and in direct contrast to the image created at trial—Andriano reported having been expelled from school because she was "really hardheaded,"

_____

[30] Both Patterson and DeLozier characterize Dr. Rosengard's evaluation as merely a competency assessment.  (Petition, at Tabs 6, ¶ 25; 7, ¶ 19.)  His report, however, is a comprehensive mental health assessment that contains psychiatric diagnoses; it is not limited to analyzing Andriano's understanding of the criminal proceeding.  (Petition, at Tab 6C.)

33

1    and having quit a job answering phones because she "had a temper." (*Id.* at p.4.)

2    Ultimately, Rosengard diagnosed Andriano with depression, "[p]robable" PTSD,

3    and panic disorder. (*Id.* at 5.) Although Rosengard acknowledged the possibility

4    that Andriano suffered an "amnestic response" to Joe's murder and opined that the

5    murder was not premeditated, he also recognized, "Questions could arise as to how

6    somebody who *had a sound mind prior to and after the event* could now have

7    blocked what had occurred, specifically at that juncture, *and the issue of amnesia*

8    *for the subject appears all to convenient."* (*Id.*, emphasis added.)

9                              ii.    *Strategic decision to focus elsewhere.*

10         In light of the foregoing, counsel's decision to forego additional mental

11   health investigation, evaluated from their perspective at the time, was objectively

12   reasonable. *See Strickland*, 466 U.S. at 688. Counsel followed Rhode's

13   recommendation by seeking a Rule 11 evaluation, and followed Dr. Potts'

14   recommendation by consulting with Dr. Rosengard. In his report, Dr. Rosengard

15   did not recommend consulting with yet another expert. (Petition, at Tab 6C.)

16   Counsel was not, as Andriano suggests, obligated to retain additional mental health

17   experts to in the hope they could offer a more favorable diagnosis for mitigation

18   purposes. *See, e.g., Turner v. Calderon*, 281 F.3d 851, 875–76 (9th Cir. 1998)

19   ("The choice of what type of expert to use is one of trial strategy and deserves a

20   heavy measure of deference. [Counsel's] reliance on Dr. Hamm, a properly

21   selected expert, was within the wide range of professionally competent

22   assistance.") (quotations omitted); *see also Worthington v. Roper*, 631 F.3d 487,

23   501–02 (8th Cir. 2011) ("Where counsel has obtained the assistance of a qualified

24   expert on the issue of the defendant's sanity and nothing has happened that should

25   have alerted counsel to any reason why the expert's advice was inadequate, counsel

26   has no obligation to shop for a better opinion."). When their mental-health

27   investigation failed to yield favorable results, there was no reason for counsel to

28   inquire further into that topic and their focus on other areas of mitigation—

1    including presenting extensive expert testimony that Andriano was a domestic

2    violence victim—was objectively reasonable.  *See Strickland*, 466 U.S. at 688.

3        To the extent Andriano argues otherwise, counsel's decision not to present

4    Dr. Rosengard's testimony was also reasonable.   During Dr. Rosengard's

5    evaluation, Andriano apparently attempted to lay the groundwork for an amnesia

6    theory that she abandoned when Dr. Rosengard did not accept it.  She also told Dr.

7    Rosengard information that appeared to conflict with the weak-willed, meek, and

8    easily-victimized image she portrayed at trial.   Such evidence would have

9    damaged, rather than helped, her case.  It would also have shored up the State's

10   argument that she was a manipulative and chronically untruthful person, and that

11   neither her testimony nor her statements to Dr. Murphy could be believed.

12       Moreover, the record suggests that counsel declined to present mental health

13   evidence in part to limit the scope of Dr. Bayless' rebuttal testimony; as set forth

14   below, Dr. Bayless's opinions, if presented in full, would have devastated

15   Andriano's case.  Prior to trial and over Andriano's objection (Exh. A, at 121), this

16   Court permitted Dr. Bayless, who the State had retained to conduct a domestic

17   violence assessment, to administer psychological tests (including the Minnesota

18   Multiphasic Personality Inventory-2 (MMPI-2)) during his evaluation to assist him

19   in forming an opinion on Andriano's veracity.   (Exh. B, at 10.)   Dr. Bayless

20   thereafter authored a report (discussed in detail below), containing several

21   psychological diagnoses.  (Petition, at Tab 6E.)  Patterson moved to preclude Dr.

22   Bayless as a witness in the penalty phase, arguing that *since counsel had not

23   presented psychological testimony*, that type of evidence was irrelevant in rebuttal.

24   (Exh. BBB, at 5–18, 33–46.)  Patterson's argument succeeded, and this Court

25   precluded Dr. Bayless from testifying regarding his diagnoses.  (*Id.* at 33–46.)

26       Patterson's assertion that he lacked a strategic decision for not further

27   investigating Andriano's mental health is not dispositive of the analysis.  *See

28   Atkins*, 965 F.2d at 959–60; *Burns*, 948 F. Supp. at 1313.  (Petition, at Tab 6, ¶ 30.)

35

1   Moreover, Patterson admits to having a strategic reason for focusing on areas of

2   mitigation other than mental health:  "Based on the information then known to me,

3   *I did not believe that there was a viable mitigation theme based on [Andriano's]*

4   *mental health*."  (*Id.* at ¶ 30, emphasis added.)  *See Wright v. Hopper*, 169 F.3d

5   695, 707 (11th Cir. 1999) (although counsel denied strategic basis for decision, his

6   description of his reasoning revealed his "process of making strategic decisions").

7   Further, although he claims to have lacked a strategic reason for not further

8   *investigating* Andriano's personal and family mental health history, Patterson does

9   not admit that he lacked a strategic reason for not *presenting* the expert opinion he

10  had obtained from Dr. Rosengard.  (*Id.*)

11      DeLozier likewise disclaims a strategic reason for not investigating

12  Andriano's personal and familial mental health history.  (Petition, at Tab 7, ¶ 23.)

13  However, DeLozier's role in the case appears to have been limited.  Although he

14  claims to have been assigned primary responsibility for preparing the mitigation

15  case (*id.* at ¶ 12), he also states that his role, as a whole, was "passive" and limited

16  to following specific instructions from Patterson, the experienced capital defense

17  attorney.[31]  (*Id.* at ¶ 5.)  Likewise, mitigation specialist MacLeod states that he did

18  not identify or investigate mental health issues, recommend experts, provide

19  Andriano's social history to experts, or investigate the reasons for Andriano's "out-

20  of-character" affairs and other actions around the time she murdered Joe.[32]

21  _____

22      [31] Significantly, Delozier claims to have been unaware of Dr. Rosengard's

23  evaluation.  (Petition, at Tab 7, ¶ 19.)  This assertion is curious, as Dr. Murphy

24  relied on that report and it was the subject of the State's hotly-contested and

25  ultimately unsuccessful motion to compel disclosure.  (Exh. A, at 130–58; Exh. B,

    at 15.)

26      [32] One of Andriano's declarants attests that MacLeod told her that he had

27  forgotten to ask about Andriano's mental-health history, and advised the declarant

28  to tell Andriano's appellate counsel about this fact, presumably to lay the

(continued ...)

1   (Petition, at Tab 8, ¶¶ 21–26.)  But MacLeod was not assigned to the case until

2   April 2004, only a few months before trial and approximately 2 years after the

3   retention of Dr. Rosengard; he therefore cannot speak to what may or may not have

4   transpired in the first few years of the investigation.  In light of the foregoing,

5   Andriano has not shown that counsel's performance fell below an objective

6   standard of reasonableness.  She has therefore failed to show deficient performance

7   under *Strickland*.

8                           **b.  <u>Prejudice.</u>**

9          Andriano has also failed to show a reasonable probability of a different

10   result had counsel discovered and presented the expert opinions she proffers with

11   her PCR petition.  Andriano argues that testimony from Dr. James Hopper, a

12   psychologist specializing in the effects of child abuse, and Dr. George Woods, a

13   psychiatrist, could have established the A.R.S § 13–751(G)(1)[33] mitigating factor.

14   (Petition, at 48–50.)  She further asserts that these experts could have rebutted the

15   suggestion that she was untruthful and "was a promiscuous adulteress who

16   deserved to be condemned."[34]  (*Id.*)  This evidence would not have resulted in a life

17   sentence.

18

19   _____

          ( ... continued)

20   groundwork for the present ineffective-assistance-of-counsel claim.  (Petition, at
     Tab 29, ¶ 7.)

21

22   [33] Establishing as a mitigating factor that the "defendant's capacity to
     appreciate the wrongfulness of his conduct or to conform his conduct to the

23   requirements of law was significantly impaired, but not so impaired as to constitute

24   a defense to prosecution."  A.R.S. § 13–751(G)(1).

25   [34] Contrary to this assertion, the State did not encourage the jury to

26   "condemn" Andriano because of her promiscuity and multiple acts of adultery.  As
     the Arizona Supreme Court found, her conduct in having extramarital relationships

27   with many men was relevant to establish her motive for killing Joe and to rebut the

28   claim that she was a domestic violence victim.  *Andriano*, 215 Ariz. at 503–04, ¶¶

                                                                    (continued ...)

37

1          i.      *The mitigation is not weighty.*

2          Andriano's newly-proffered evidence does not establish the (G)(1) factor,

3     and is not entitled to significant weight as non-statutory mitigation.  Andriano

4     suggests that her alleged multiple comorbid mental disorders rendered her unable

5     to control her actions and determine "how to 'help'" Joe.  (Petition, at 47 & Tab 2,

6     at p. 56–57.)  As a result, she proposes, she was unable to conform her conduct to

7     the law, thereby satisfying the A.R.S. § 13–751(G)(1) factor.

8          But the nature of Andriano's crime refutes the claim that she could not

9     control her actions and did not know right from wrong.  Andriano meticulously

10    planned Joe's murder over a substantial period of time, obtaining poison under a

11    false identity and hiding it from Joe.  Although she claims otherwise, substantial

12    evidence suggests that she administered the poison surreptitiously.  While Joe

13    suffered the poison's effects, Andriano falsely told him that she had called the

14    paramedics, and then summoned a friend, presumably to serve as a witness to Joe's

15    ultimate "natural" death.

16         The plan went awry when the friend insisted that Andriano call the

17    paramedics.  Andriano compensated for this hindrance by excluding her friend and

18    the paramedics from the house, bludgeoning Joe with two separate instruments,

19    placing a pillow over his face, and stabbing him in the neck.  Before interacting

20    with paramedics, she washed her hair and changed out of her bloody clothes.  She

21    exited her apartment through the back patio door and walked around the building

22    to the front door to avoid allowing anyone to see Joe's body.  After she successfully

23    _____
                    ( ... continued)

24    24–31, 161 P.3d at 546–47.  Andriano's conduct in having at least two extramarital

25    affairs and aggressively pursuing at least one man who ended his relationship with

26    her—banging on his door for an extended period late at night and threatening to
      obtain a master key and gain entry—were relevant to Andriano's motive and to

27    rebut the image that she was a meek and oppressed victim who lived in fear of her

28    husband.  *Id.*

38

1   convinced the paramedics to leave, she returned to the apartment and, as shown by

2   the blood spatter evidence, staged the scene to make it appear as though a fight had

3   occurred.  She somehow discarded the lamp with which she had struck Joe.  Then,

4   although Joe's blood was starting to dry, she called police and pretended that the

5   altercation had just occurred.  The evidence set forth above shows Andriano's

6   consciousness of guilt and ability to control her actions.  The (G)(1) factor has not

7   been satisfied.

8       For largely the same reasons, Andriano's mental-health evidence would have

9   carried little weight as non-statutory mitigation.  This Court should consider a

10  claim of mental impairment—even when offered as non-statutory mitigation—"in

11  proportion to a defendant's ability to conform or appreciate the wrongfulness of his

12  conduct."  *State v. Pandeli*, 215 Ariz. 514, 533, ¶ 81, 161 P.3d 557, 576 (2007).  As

13  set forth above, Andriano was well aware of her conduct's wrongfulness, and killed

14  her husband in a carefully-planned, deliberate manner.

15      In an attempt to draw a causal nexus between her mitigation and the offense,

16  and thereby increase the weight to which it is entitled, *see id.* at 532, ¶ 72, 161 P.3d

17  at 575, Andriano suggests that her mental disorders had worsened in the weeks

18  prior to Joe's death.  As evidence of this fact, she cites her "extramarital affairs and

19  hyper-sexual behavior, inappropriate relationships with subordinate employees and

20  tenants at the apartment complex she managed, wide mood swings, increased

21  alcohol use and public displays of drunkenness, and openly engaging in unlawful

22  activity at her workplace."  (Petition, at 12 & Tab 2.)  But Andriano has engaged in

23  this type of behavior her entire life; it did not arise suddenly in the fall of 2000 and

24  unexpectedly result in Joe's murder.

25      Andriano's childhood friend and high school boyfriend, Shawn King,

26  testified in a 2011 deposition that, from the time Andriano was a child, she was

27  "devious" and appeared always to have "a plan underneath what she was doing."

28  (Petition, at Tab 15, p.11.)  She could "get [King] to do anything," including

1   disobey the rules of their strict religious school.  (*Id.* at 15.)  As adults, King

2   believed that he and Andriano were in a monogamous relationship, but later found

3   out she had been with "so many guys" while they were together; he also learned

4   that, at a party, she had had sexual intercourse with a man in front of others.  (*Id.* at

5   16–21.)  Although King personally caught Andriano in compromising positions

6   with two other men, she "g[o]t him to believe … that it was okay."  (*Id.* at 16.)  She

7   was adept at using "feminine wiles" for personal gain, and had a very convincing

8   and persuasive way about her.  (*Id.* at 35–45.)

9       Andriano's unlawful conduct and inappropriate work-place behavior is also

10   a consistent theme in her history.  She was fired from two jobs for stealing; she

11   stole $18,000 from one, and up to $30,000 from the other.  (Exhs. I, J.)  She lied

12   about her income on an application to reduce her student loan payments.  (Exh. M.)

13   She lied about having a Bachelor's Degree on an employment application.  (Exh.

14   N.)  During her incarceration—where she received mental-health treatment—she

15   was implicated in a check-cashing scheme that resulted in the theft of $40,000.

16   (Exh. K.)  She engaged in controlling, manipulative, and deceitful behavior in jail.

17   (Exh. H; Exh BBB, at 48–111.)  She is of above-average intelligence and has a

18   special talent for deception.  Andriano's behavior is not attributable to her mental

19   illness; it is attributable, as Dr. Bayless found (see below), to her anti-social traits

20   and lack of respect for the rights and welfare of others.

21       Moreover, despite being evaluated multiple times in multiple contexts, no

22   mental health professional has previously diagnosed Andriano with a serious

23   mental illness, until now, when she seeks to escape her death sentence in this

24   proceeding.  This fact—combined with Andriano's well-established talent for

25   manipulation—calls into question the diagnoses she now proffers.

26       On March 1, 1996, Andriano was assessed during therapeutic treatment,

27   which she commenced after she was terminated from one job for theft.  (Exh. G.)

28   The evaluating clinician diagnosed her with Adjustment Disorder with Mixed

1    Disturbance of Emotions and Conduct,[35] defined as a "psychological response to

2    an identifiable stressor or stressors that results in the development of clinically

3    significant emotional or behavioral symptoms." (*Id.*; Exh. F, at 7–11.) Andriano's

4    particular subtype involves emotional symptoms such as depression or anxiety, and

5    conduct disturbance involving "*violation of the rights of others or of major age-*

6    *appropriate social norms and rules.*" (Exh. F, at 8, emphasis added.) The doctor

7    also recommended ruling out major depression. (Exh. G.) The assessment

8    contains no mention of bipolar disorder, caregiver burden,[36] PTSD, or cognitive

9    impairment. (*Id.*)

10          Additionally, as previously stated, jail mental health officials diagnosed only

11   depression and anxiety after her suicide attempt. Neither Dr. Potts, nor Dr.

12   Rosengard, nor Dr. Bayless diagnosed a severe or debilitating mental illness. Even

13   her personally-funded counselor, Rhode (who apparently supplied her with

14   contraband in prison) did not diagnose bipolar disorder, as have her current

15   experts. In light of the foregoing, Andriano's newly-proffered mental health

16   mitigation would have carried little weight, and the jury would still have sentenced

17   her to death.

18   _____

19   [35] The psychiatrist recorded the *Diagnostic and Statistical Manual of Mental*
20   *Disorders, Fourth Edition* (DSM-IV) diagnosis code of 309.40, which denotes
     Adjustment Disorder with Mixed Disturbance of Emotions and Conduct. (Exhs.
21   G; F, at 7–11.)

22   [36] This diagnosis is particularly dubious, as the trial evidence establishes that
23   Andriano avoided caring for Joe during his illness. After his most invasive
     surgery, she declared herself unable to care for his open wounds and clean his
24   drainage tube and left that responsibility to her parents. Joe's family—not
     Andriano—took Joe to the majority of his chemotherapy treatments and cared for
25   him thereafter. Joe, Andriano's parents, a babysitter, or Joe's family cared for her
26   children while she went out with friends, became intoxicated, and danced with,
27   kissed, and had sex with other men.

28

                                          41

1    ii.    *The evidence would have opened the door to*
2           *damaging rebuttal.*

3    This Court precluded Dr. Bayless from testifying regarding his
4    psychological diagnoses because Andriano had not presented mental health
5    evidence and thus had not opened the door to that type of evidence in rebuttal.[37]
6    (Exh. B, at 22.)  Had counsel presented psychological evidence, they would have
7    opened the door to Dr. Bayless' full evaluation, in which he relied upon
8    Andriano's prior theft of $18,000 from an employer and opined that she had a
9    "tendency to be less than truthful" and the "ability to be manipulative." (Petition,
10   at Tab 6E, p.7.)  He further opined that those with MMPI-2 profiles similar to
11   Andriano's "typically have behavioral problems in school and are likely to have
12   been in trouble with the law'"; have poor prognoses due to their resistance to
13   change; exhibit "poorly controlled anger and hostility that is expressed in cyclic
14   fashion"; and are often incarcerated for violent behavior.  (*Id.*)  He summarized her
15   profile as follows:

16         Typically, these clients are quiet, withdrawn individuals, and their
17         sudden outbursts come as a surprise to others.  They display poor
         judgment under stress, but their emotional or violent outbursts may be
18         only minimally related to external stress or provocation.  The cyclic
19         pattern of violent outbursts with intermittent periods of appropriate
         behavior represents a chronic and stable personality disorder that is
20         extremely difficult to change.

21

22   _____

23   [37] This Court ruled that the State's penalty-phase rebuttal evidence was
24   required to be directly relevant to the mitigation presented.  (Exhibit B, at ___.)
     Subsequent to this Court's ruling in Andriano's case (one of the first post-*Ring* jury
25   sentencing trials), the Arizona Supreme Court clarified that this is not an accurate
     statement of the law.  *See, e.g., State v. Prince*, 226 Ariz. 516, 526, ¶ 16, 250 P.3d
26   1145, 1155 (2011).  This Court's ruling limiting the scope of rebuttal was
27   therefore, respectfully, erroneous, but beneficial to Andriano and not prejudicial to
     her case.
28

42

1   (*Id.* at 8.)  Ultimately, Dr. Bayless diagnosed Andriano with Depressive Disorder

2   Not Otherwise Specified, and Personality Disorder Not Otherwise Specified, with

3   anti-social and borderline traits.  (*Id.* at 9; *see* Exh. F, at 18–30, 46.)

4           In addition, the newly-proffered mental health evidence would have opened

5   the door to the evidence set forth above, relating to Andriano's pre–and-post-

6   murder unlawful conduct. And, in light of the exceptionally cruel manner in which

7   Andriano killed Joe, and the facts and circumstances of the offense as a whole, the

8   jury would still have imposed the death penalty, even if these factors had been

9   proved.  Any alleged mental illness would not have resulted in a life sentence in

10  light of these compelling facts.

11          **2.  "Harrowing" childhood (Claim I(A)(2)).**

12          Andriano contends that counsel was ineffective for failing to interview

13  extended family members and acquaintances and discover evidence of her 1)

14  alleged family history of mental illness, substance abuse, and violence; 2) early

15  exposure to "child molesters and pedophiles"; 3) physical abuse as a child; and 4)

16  impoverished and neglected early childhood.  But with the exception of the sexual-

17  abuse allegations against Alejo Ochoa, counsel already had presented evidence of

18  the above-listed factors at trial.  The omission of additional, cumulative evidence

19  was neither deficient nor prejudicial.  Similarly, the allegations now levied against

20  Alejo are speculative, unsubstantiated, refuted by Andriano's testimony at trial,

21  and, even if true, so remote and disconnected from Joe's murder that they would be

22  entitled to little mitigating weight.

23  . . . .

24  . . . .

25  . . . .

26  . . . .

27  . . . .

28

43

### a.  Evidence presented at trial and sentencing

At the guilt phase,[38] Andriano, her parents, brother, and cousin testified at length regarding her childhood and the conditions in which she was raised; her parents also testified at sentencing.  Andriano's family described her early years with her "strict" biological father, who was a harsh disciplinarian.  Her biological father or grandfather may have molested her; however, Andriano learned of this event from her mother and does not remember it.[39]  After divorcing Andriano's father, Donna married Alejo Ochoa, who legally adopted Andriano.  (Exh. KK.) When Andriano was very young, the Ochoas joined a traveling ministry, the Fishers of Men.  (*Id.* at 14–15.)  The ministry was a patriarchic organization, and the female members could take virtually no action without approval of the males. (*Id.*; 10/5, at 157.)   During this period, the Ochoas lived a transient lifestyle, sleeping in a fifth-wheel trailer or a bus.  (*Id.* at 15.)  Also during this period, one of the ministry's adult male members exposed his genitals to Andriano.

After leaving the Fishers of Men, the Ochoas settled in Casa Grande and enrolled Andriano at the 91st Psalm Ministry School, which subsequently changed

_____

[38] This Court properly instructed the jurors at the penalty phase to consider any mitigation they found in the guilt-phase evidence.  (Exh. A, at 308.)  The jurors are presumed to have followed this instruction.  *See State v. Newell*, 212 Ariz. 403, ¶ 68, 132 P.3d 833, 847 (2006).

[39] Notably, none of Andriano's PCR declarants claims to have witnessed this alleged molestation or have firsthand knowledge of it.  It appears that Andriano's family members speculate that this may have occurred because of unrelated acts of molestation performed by Andriano's biological father, grandfather, and other family members.  Although Andriano has submitted several declarations discussing these unrelated molestations, she does not persuasively explain their relevance or why they are entitled to significant mitigating weight, where she did not witness them and had been separated from her father's side of the family since she was a very young child.

1   its name to the Harvest Family Church School.  (Exh. KK, at 17.)  The school was

2   very small (approximately 24 students), very traditional, very strict and, initially,

3   had no extracurricular activities.  (*Id.* at 18–19).  Classes were held in a one-room

4   school house and were of a self-study format; Andriano was the only student in her

5   graduating class.  (*Id.* at 21.)  She was only permitted to socialize with children

6   who belonged to the same church and, consequently, had very few friends.  (*Id.* at

7   20–21.)  As a result of this limited social contact, Andriano grew to be an overly-

8   generous young adult, and would frequently give away her belongings to her peers

9   to gain acceptance.  (*Id.* at 20.)

10      Alejo was the church's youth minister.  (*Id.* at 24.)  He did not allow

11   Andriano to attend dances, wear makeup to school, or socialize with friends

12   without an adult chaperone.  (*Id.* at 32.)  He also required her to dress modestly.

13   (*Id.* at 33.)  Alejo had a temper and was prone to angry outbursts; when this

14   occurred, Donna and Andriano hid in another room until he calmed down, and then

15   attempted to placate him.  (*Id.* at 36–38.)  He was not physically violent, aside

16   from one instance where he grabbed Andriano by the arms and shook her.  (*Id.* at

17   36–39; Exh. LL, at 61–64, 73.)  Andriano testified that Alejo never touched her

18   inappropriately.  (Exh. V, at 42.)  She told Dr. Murphy the same thing.  (Exh. OO,

19   at 41.)

20          **b.  Cumulative childhood evidence.**

21      As set forth above, counsel presented evidence that Andriano may have been

22   molested by her biological father and grandfather, that she was exposed to Alejo's

23   angry outbursts, that she lived a transient and impoverished early childhood, and

24   that she was raised in an isolated religious community with strict rules.   The

25   declarations she submits with her PCR petition offer more details of this

26   upbringing, but they are cumulative to the evidence presented at trial.  Counsel is

27   not ineffective for failing to present cumulative mitigation.  *See Wong v. Belmontes*,

28   __ U.S. __, 130 S.Ct. 383, 387–88 (2009).

45

1    Additionally, as the supreme court found, Andriano's childhood difficulties
2  are entitled to minimal mitigating weight because she killed Joe at the age of 30,
3  after she had lived an adult lifestyle for years and started a family of her own.
4  *Andriano*, 215 Ariz. at 512, ¶ 72, 161 P.3d at 555.  Presenting a greater magnitude
5  of childhood-related evidence would not have cured this defect or made the
6  mitigation any more weighty.  *See Prince*, 226 Ariz. at 543, ¶ 109, 250 P.3d at 1144
7  ("Difficult childhood circumstances … receive less weight as more time passes
8  between the defendant's childhood and the offense.").  And, for the reasons
9  previously stated, Andriano has failed to draw a persuasive connection between her
10  childhood, her alleged mental health issues, and the crime.

11    Moreover, the evidence at trial—and as set forth in her informants'
12  declarations—also shows that, despite their shortcomings, Andriano's family loved
13  her and that her parents were well-intentioned and raised her in the best way they
14  knew how.  For example, she had the opportunity to participate in music and
15  athletic activities, and excelled at those activities.  She also excelled academically.
16  Although Andriano's parents may not have been perfect, they were not so abusive
17  as to account for her pattern of antisocial behavior as an adult.  This evidence
18  would have been entitled to little weight in mitigation.

19                    **c.  Alleged sexual abuse by Alejo Ochoa.**

20    Counsel was not ineffective for failing to present evidence that Alejo Ochoa
21  sexually abused Andriano.  That allegation is speculative and unsubstantiated, and
22  Andriano has given no reason—other than a reference to a general and non-
23  existent duty to conduct a "scorched-earth" mitigation investigation—that counsel
24  should have been aware of such information.  Despite extensive psychological
25  counseling and forensic evaluation by at least three mental-health experts and a
26  social worker, it does not appear that Andriano ever disclosed this alleged
27  molestation before trial.  DeLozier, Patterson, and MacLeod do not claim that

28

1   Andriano ever disclosed this fact to them.  Counsel was therefore not deficient for

2   failing to pursue this theory.

3        As a preliminary matter, Andriano's claim is couched in vague terms.  She

4   does not directly accuse Alejo of molesting her or touching her inappropriately;

5   rather, she makes nondescript allegations such as, "[Alejo] treated her as a sexual

6   plaything," and accuses him of purchasing inappropriate clothing and taking

7   inappropriate photographs.[40]  To support her claim in the PCR petition, Andriano

8   presents myriad declarants from individuals *speculating* that Alejo Ochoa may

9   have molested Andriano as a child.  It appears that these informants have deduced

10  the existence of impropriety between Andriano and Alejo based on four primary

11  factors:  1) Alejo's propensity to make inappropriate jokes with sexual undertones;

12  2) his arguably unusual father-daughter relationship with Andriano (the two

13  appeared to be friends, rather than father and child);, 3) his conduct in purchasing

14  clothing for her that the informants deem inappropriate and purportedly taking her

15  into pornography shops; and 4) the allegation that he molested other children.

16       Significantly, none of the declarants observed Alejo sexually abuse

17  Andriano.  Although two declarants claim to have personal knowledge that

18  Andriano was molested by Alejo, they give no specifics.  And, Andriano does not

19  attest in her declaration that Alejo molested her, although this would certainly be a

20  fact within her personal knowledge.  *See* Ariz. R. Crim. P. 32.5 ("Facts within the

21  defendant's personal knowledge shall be noted separately from other allegations of

22  _____

23

24  [40] The photographs Andriano has supplied with the PCR petition do not
    support this assertion.  Some depict her clothed in a bathing suit and are not
25  exploitive or obscene.  Another is a black-and-white photograph showing her
    silhouette against a lightning storm.  Although Andriano's defense team believes
26  she is not wearing clothing, this is not evident from the photograph.  Moreover, as
    noted above, Andriano does not substantiate this allegation claim in her
27  declaration.  *See* Ariz. R. Crim. P. 32.5

28

47

P-App. 000217

1   fact and shall be under oath."). In fact, she testified otherwise at trial, and
2   expressly denied that Alejo had ever touched her inappropriately. Andriano has
3   therefore offered no evidence to substantiate her claim that Alejo molested her.
4   This Court should not hold an evidentiary hearing on unsubstantiated claims.
5   *Borbon*, 146 Ariz. at 399, 706 P.2d at 725.

6       But even assuming Alejo sexually abused Andriano, such evidence would
7   not have resulted in a life sentence. As previously discussed, Andriano murdered
8   Joe at the age of 30. Any childhood sexual abuse she suffered is so attenuated that
9   it is entitled to minimal weight in mitigation. *See Prince*, 226 Ariz. at 543, ¶ 109,
10  250 P.3d at 1144. Counsel was not ineffective for failing to present such evidence.

11      **D.** ***Failure to present mental health evidence and object to sodium***
12      ***azide evidence in aggravation phase (Claim I(B)).***

13      Andriano asserts that counsel was ineffective in the aggravation phase for
14  failing to present expert testimony relating to her alleged mental illness, and for
15  failing to object to the admissibility of the sodium azide evidence to prove the
16  cruelty under A.R.S. § 13–751(F)(6). (Petition, at 55–59.) Andriano has failed to
17  meet her burden under *Strickland*.

18      **1. Cruelty: applicable law and pertinent facts.**

19      A.R.S. § 13–751(F)(6) establishes a capital aggravating factor where a
20  defendant murders a victim in "an especially heinous, cruel or depraved manner."
21  "A murder is especially cruel under A.R.S. § 13–751(F)(6) when the victim
22  consciously suffered physical pain or mental anguish during at least some portion
23  of the crime and the defendant knew or should have known that the victim would
24  suffer." *State v. Dixon*, 226 Ariz. 545, 556, ¶ 61, 250 P.3d 1174, 1185 (2011). A
25  victim need not be conscious for each wound for cruelty to exist. *State v. Sansing*,
26  206 Ariz. 232, 235, ¶ 7, 77 P.3d 30, 33 (2003). And, "[n]o set period of suffering is
27  required" to establish cruelty. *State v. Cropper*, 223 Ariz. 522, 526, ¶ 13, 225 P.3d
28  579, 583 (2010).

48

On independent review in this case, the Arizona Supreme Court found that the following facts established cruelty beyond a reasonable doubt:

> The evidence showed that Andriano poisoned Joe with sodium azide and left him to suffer for what felt to Joe like a "long time." During that period, Joe vomited at least twice, was too weak to sit or stand, and was having difficulty breathing. After pretending to call 911, Andriano stood by for approximately forty-five minutes as Joe suffered from the effects of sodium azide poisoning. Andriano's Internet research on sodium azide and the warnings accompanying the shipped chemical demonstrate that she knew or should have known that poisoning her husband with sodium azide would cause him physical pain and mental anguish. Joe, who was conscious during this time, as evidenced by his interaction with Chris, undoubtedly experienced significant uncertainty as to his ultimate fate.
>
> Moreover, Andriano struck her terminally ill husband at least twenty-three times in the back of the head with a bar stool. Defensive wounds on Joe's hands and wrists indicate that he was conscious for at least some of the attack and thus knew his wife was attacking him as he lay on the floor, unable to defend himself. Andriano also knew or should have known that beating her husband with a bar stool would cause him physical pain and mental anguish. [FN10]
>
> > FN10. The evidence established that Joe was likely unconscious when his throat was slashed. We therefore do not consider whether the stabbing caused physical pain or mental anguish.
>
> Andriano asks us to require that the physical or mental pain experienced by the victim be "extreme." There is no such requirement for a cruelty finding. Nonetheless, the physical pain and mental anguish Joe experienced likely were "extreme" by any standards.
>
> Although Andriano argued at trial that she was assisting Joe in a suicide by poisoning, she argues on appeal that because Joe did not know he was being poisoned, mental anguish cannot be proved. While a victim's knowledge of the source of physical pain may be relevant to whether the victim experienced mental anguish, it is not a requisite for a finding of mental anguish. And on the facts of this case, mental

49

anguish is established even if Joe did not know he had been poisoned. Moreover, cruelty can be established upon a showing of either mental anguish or physical pain. We thus conclude that cruelty was established based on either—or both—mental anguish or physical pain.

*Andriano*, 215 Ariz. at 511, ¶¶ 65–68, 161 P.3d at 554 (quotations and citations omitted).

> **2. Failure to present expert testimony regarding mental illness (Claim I(B)(I)).**

Andriano contends that counsel should have investigated and presented mental health evidence in the aggravation phase to show that she lacked "the capacity to have known that her actions would cause Joe to suffer (rather than alleviate) further physical pain or mental anguish." (Petition, at 55.) Counsel's failure to present this evidence was neither deficient performance nor prejudicial.

First, the mental-health evidence would have been irrelevant and inadmissible in the aggravation phase. Cruelty is determined by reference to an *objective* standard, and whether the defendant was aware or should have been aware of the victim's suffering is judged from the perspective of a *reasonable person* in the defendant's position. *See State v. Bocharski*, 218 Ariz. 476, 494, ¶ 85 n.15, 189 P.3d 403, 421 (2008) (recognizing the "knew or should have known" standard as cruelty's "intent requirement"); *see also State v. Wallace*, 229 Ariz. 155, 158, ¶ 10 n.5, 272 P.3d 1046, 1049 (2012) (rejecting argument that gratuitous violence *Gretzler* factor, which also contains a "knew or should have known" requirement, contained a "distinct element of 'actual knowledge and intent' in addition to [the] … requirement of actual or constructive knowledge or intent"); *see generally State v. Lefevre*, 193 Ariz. 385, 390, ¶ 21, 972 P.2d 1021, 1026 (1998) (phrase "having reason to know" "establishes an objective standard of guilt and

1 Defendant is guilty if a reasonable person would have known the relevant fact").[41]
2 Any factors that impaired Andriano relate to her moral culpability and are properly
3 considered in mitigation; they are not admissible to defend against the aggravating
4 factor.

5      Second, even if admissible, Andriano's mental-health evidence does not
6 establish that she did not know and could not have known that Joe consciously
7 suffered physical pain or mental anguish.  Andriano cites a portion of Dr. Wood's
8 report and portions of Rhode's notes to establish that she believed she was helping
9 Joe by killing him.  (Petition, at 55, citing Tabs 2, p.57, and 45, p.20.)  But even if
10 this is true, which is doubtful, it does not establish that Andriano could not
11 perceive Joe's conscious suffering; in fact, it establishes that she *knew* Joe was
12 suffering but, for reasons not relevant to the cruelty aggravator, perceived a need to
13 end that suffering, even if it caused additional suffering.

14      Further, Andriano's actions were inconsistent with those of someone
15 engaging in a "mercy killing."  Andriano watched Joe suffer the effects of the
16 poison—which involved vomiting, breathing difficulty, and extreme weakness—
17 for 45 minutes; during this period, she led Joe to believe that she had called 911
18 and that paramedics were en route.  *Andriano*, 215 Ariz. at 511, ¶¶ 65–68, 161 P.3d
19 at 554.  Stricken with cancer, undergoing chemotherapy treatment, and already
20 contemplating his mortality, Joe undoubtedly wondered, as he experienced the
21 poison's effects, whether his death were imminent.

22 _____

23

24 [41] *Cf. State v. Moody*, 208 Ariz. 424, 472, ¶ 226, 94 P.3d 1119, 1167 (2004)
(*Ring* error in cruelty finding prejudicial where jury may have arrived at different
25 decision than trial judge on "knew or should have known" prong in light of
defendant's potential mental and drug impairment at the time of the crime).  *Moody*
26 predates *Bocharski*.  It also involves a *Ring* harmless error review; not an
27 independent review or other construction of the aggravating factor.

28

51

1    After Andriano's friend arrived and forced Andriano to call paramedics,

2    Andriano cursed at Joe as she tried to forcibly lift him from the floor under the

3    pretense of taking him to the hospital.  *Id.* at 500, ¶ 5, 161 P.3d at 543.  As sirens

4    approached and the friend went outside to meet the emergency responders, Joe

5    unquestionably felt relieved and optimistic that he would be saved; when Andriano

6    excluded the friend and the paramedics from the apartment and picked up the bar

7    stool, he likely realized her malicious intentions.  *Id.* at 500–01, ¶¶ 5–56, 161 P.3d

8    at 543–44.  Weakened by poison and chemotherapy, Joe could only raise his hands

9    and attempt to deflect the blows his wife delivered.  *Id.* at 511, ¶ 66, 131 P.3d at

10   554.  Under these facts, Andriano has not shown a reasonable probability that the

11   jurors would not have found cruelty proven had counsel presented mental-health

12   evidence in the aggravation phase.[42]  This Court should reject this ineffective-

13   assistance-of-counsel claim.

14               **3.  Failure to object to sodium azide (Claim I(B)(2)).**

15   Andriano asserts that counsel was ineffective for failing to ask this Court for

16   an order "precluding the jury from considering" Joe's ingestion of sodium azide in

17   determining whether cruelty was established.  (Petition, at 56–59.)  Andriano

18   reasons that the State failed to prove conclusively how Joe came to ingest the

19   poison, and presented no alternate explanation to her assertion that he had

20   voluntarily ingested a handful of the poison-laced herbal capsules.  (*Id.*)  Because

21   the State purportedly failed to show that Joe was poisoned without his knowledge,

22   she continues, the sodium azide evidence should have been precluded in the

23   aggravation phase.  (*Id.*)

24   _____

25

26   [42] Given the facts set forth above, there was no reasonable theory available

27   to defend against the cruelty factor.  However, counsel successfully defended

28   against both the A.R.S. § 13–751(F)(5) pecuniary gain and the A.R.S. § 13–

751(F)(6) heinous or depraved factors.

52

1    Counsel was not deficient for failing to seek an order precluding
2  consideration of the sodium azide.  Andriano does not contest that evidence of the
3  poison was properly admitted during the guilt phase; in fact, that evidence played a
4  key role in her self-defense theory.  Any evidence admitted in the guilt phase is
5  deemed admitted in the aggravation phase.  *See* A.R.S. § 13–752(I) ("If the trier of
6  fact at any prior phase of the trial is the same trier of fact at the subsequent phase,
7  any evidence that was presented at any prior phase of the trial shall be deemed
8  admitted as evidence at any subsequent phase of the trial.").  Precluding the jury
9  from considering the sodium azide evidence would thus have contravened the
10  relevant Arizona statute.

11    Counsel likewise did not perform deficiently by failing to move to preclude
12  evidence of the sodium azide on the ground that the State did not disprove that Joe
13  consumed it voluntarily.  Guilt may be established based "solely on circumstantial
14  proof."  *State v. Nash*, 143 Ariz. 392, 404, 694 P.2d 222, 234 (1985).  And, contrary
15  to Andriano's position, "it is unnecessary for the prosecution to negate every
16  conceivable hypothesis of innocence when guilt has been established by
17  circumstantial evidence."  *Id.*  Here, significant circumstantial evidence suggests
18  that Andriano administered the poison without Joe's knowledge.  Her
19  fingerprints—not Joe's—were on the packaging material for the poison and on a
20  plastic knife found with it in the storage unit where it was concealed.  *Andriano*,
21  215 Ariz. at 501, ¶ 9, 161 P.3d at 544.  When speaking to Andriano's friend as he
22  lay dying, Joe did not mention having consumed sodium azide, and appeared to
23  desperately want medical attention.  *Id.* at 500, ¶ 4, 161 P.3d at 543.  The question
24  whether Joe consumed the poison voluntarily or Andriano administered it
25  surreptitiously was one of fact for the jury to resolve, and abundant evidence
26  existed from which the jurors could have determined that Andriano poisoned Joe
27  without his knowledge.  Counsel did not perform deficiently by failing to move to
28  preclude this evidence.

1    Nor did Andriano suffer prejudice.  As set forth above, the sodium azide

2  evidence was relevant and admissible at the aggravation phase, and any motion to

3  preclude it would have failed.  Further, although the poison was important to the

4  finding of cruelty, it was not dispositive of it.  Andriano correctly observes that the

5  Arizona Supreme Court cited the poison's effects in finding the factor proven.

6  (Petition, at 56–59.)  But the court also noted Joe's defensive wounds, which

7  revealed his consciousness during the bludgeoning and his resultant knowledge

8  that he was being attacked by his wife while incapacitated and defenseless.  *See*

9  *Andriano*, 215 Ariz. at 511, ¶¶ 65–66, 161 P.3d at 554.  The court found that the

10  bludgeoning established both mental and physical cruelty.  *Id.*  And, with respect to

11  the sodium azide, the court concluded that Joe's knowledge of the source of his

12  physical pain was irrelevant and that mental anguish was established regardless

13  whether he knew he had been poisoned.  *Id.* at 511, ¶ 68, 161 P.3d at 554.  On the

14  basis of the foregoing, both the jurors and the Arizona Supreme Court would have

15  found cruelty proven, notwithstanding inferences that Andriano poisoned Joe.

16    Finally, in a footnote, Andriano cites the prosecutor's opening statement, in

17  which he noted that 21 grams of sodium azide were unaccounted for, observed that

18  21 grams is 10 times the lethal dose of that poison, and concluded from this

19  evidence that Andriano had given Joe 10 times the lethal dose of sodium azide.

20  (Petition, at 56–57 & n.23; Exh. VV, at 23, 32)  To the extent Andriano alleges

21  prosecutorial misconduct, that claim is precluded under Rule 32.2(a)(3) because

22  she should have raised it at trial or on direct appeal.[43]  To the extent Andriano

23  alleges counsel was ineffective for failing to object to the prosecutor's comments,

24  that claim likewise fails because the comments were supported by the evidence:

25

26  _____

27  [43] Alternatively, the claim is meritless for the reasons set forth above.  The

28  State has set forth the law governing prosecutorial misconduct, *infra*.

1    21 grams of sodium azide was unaccounted for, *see Andriano*, 215 Ariz. at 501, ¶
2    10, 161 P.3d at 544, the lethal dose of sodium azide is 2.1 grams, and the amount
3    Joe had ingested could not be quantified.  (Exh. HH, at 146).  The challenged
4    statements were a reasonable inference from these facts.  This Court should reject
5    Andriano's claim.

6         **E.  *Guilt phase (Claim I(C)).***

7         Andriano argues that counsel were ineffective for failing to 1) present
8    evidence of her purported mental illness to negate the *mens rea* for first-degree
9    murder, 2) present testimony from Gia Palicki to establish hat Joe was aware of
10   Andriano's efforts to obtain life insurance, 3) present testimony from Jeffrey Miller
11   and Chris Weaver to establish that Joe was depressed, and 4) seek a jury instruction
12   on lesser-included offenses.  (Petition, at 59–61.)

13        **1.  Mental-health evidence (Claim I(C)(1)).**

14        Andriano claims that counsel was ineffective for failing to introduce
15   evidence of her purported mental health difficulties in the guilt phase.  (Petition, at
16   59–60.)  She asserts that Dr. Woods' testimony could have established "whether
17   she formulated the mental state necessary to be convicted of first-degree murder."
18   (*Id.* at 59.)  This evidence would not have been admissible, and counsel was not
19   ineffective for failing to present it.

20        "Arizona does not allow evidence of a defendant's metal disorder short of
21   insanity either as an affirmative defense or to negate the *mens rea* element of a
22   crime."[44]   *State v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997); *see also*

23   _____

24        [44] A limited exception exists in the context of premeditation, where Arizona
25   law permits "limited" expert testimony regarding "a *character trait* of acting
     reflexively in response to stress." *Mott*, 187 Ariz. at 544, 931 P.2d at 1054 (citing
26   *State v. Christensen*, 129 Ariz. 32, 34–36, 628 P.2d 580, 582–84 (1981)) (emphasis
27   added).  Andriano does not cite *Christensen* or claim that she possesses such a
     character trait.  (Petition, at 59–60.)  Rather, she offers expert mental-health
28
                                                                    (continued ...)

                                        55

1  *Clark v. Arizona*, 548 U.S. 735, 756 (2006).   Expert testimony regarding a

2  defendant's mental health is thus probative of guilt only if the defendant pursues an

3  insanity defense, which requires her to prove by clear and convincing evidence that

4  she "was afflicted with a mental disease or defect of such severity that [she] did not

5  know the criminal act was wrong."  A.R.S. § 13–501(A), (C).

6      Andriano does not claim that counsel should have pursued an insanity

7  defense.  Nor does Dr. Woods' report—or any other evidence—even remotely

8  establish that she did not know that killing Joe was wrong, such that she could

9  carry her burden under A.R.S. § 13–502.  Counsel's failure to offer mental-health

10 evidence in the guilt phase was thus neither deficient nor prejudicial, and this

11 Court should dismiss this ineffective-assistance-of-counsel claim.

12  **2.  Evidence   of   Joe's   awareness   of   life   insurance**
13  **applications (Claim I(C)(2)).**

14      Andriano faults counsel for failing to present testimony from Gia Palicki in

15 the guilt phase.[45]   (Petition, at 60.)   Counsel was not ineffective for failing to

16 present this testimony, because the incident Palicki recalls was remote in time from

17 the murder and thus would not have cast doubt upon evidence that Andriano

18 attempted to obtain a life insurance policy without Joe's knowledge.

19      In her declaration, Palicki explains that she met Joe sometime in the summer

20 or fall of 1999, and became a nanny for the Andriano children shortly thereafter.

21  _____
    ( ... continued)
22  evidence to negate specific intent, which is precluded by *Mott*, 187 Ariz. at 544–
    45, 931 P.2d at 1054–55.

23

24  [45] Palicki testified in the penalty phase as a defense witness.  (*See* Petition, at
    Tab 31, ¶ 26.)   In her declaration, Palicki criticizes counsel for not properly
25  preparing her for trial, and recalls being "under the impression that [she] was
    testifying at a custody hearing, not a criminal trial."  (*Id.*)  The relevance of this
26  alleged failure is unclear, as Palicki presumably testified truthfully, and the truth
27  would not depend on the type of court proceeding at issue.

28

1  (Petition, at Tab 31, ¶ 1.)  She also describes the couple's desire to obtain life

2  insurance:

3

4      I know that Joe was trying to obtain a life insurance policy.  Both
5      [Andriano] and Joe talked to me about it.  *That was really soon after*
       *we met*, because they told me about looking for life insurance and
6      about a malpractice lawsuit when they first told me that Joe was sick
       with cancer.  One of Joe's biggest concerns was that he might die
7      before he obtained life insurance or the malpractice suit went through.
8      He wanted all of that taken care of before he passed.  Joe and
       [Andriano] were trying to get a life insurance policy and they told me
9      they were running into difficulties because of Joe's cancer.  Joe[']s
       concern was that [Andriano] and the kids would not be financially set
10     after he was gone.
11
12 (*Id.* at ¶ 8, emphasis added.)  Thus, the life insurance conversation appears to have

13 occurred shortly after Palicki met Joe, which was in the summer or fall of 1999.

14     Conversely, Andriano made her clandestine attempts to obtain life insurance

15 in August and September of 2000.  *Andriano*, 215 Ariz. at 502, ¶ 20, 161 P.3d at

16 545.  An insurance agent contacted Joe in response to one of Andriano's inquiries,

17 and Joe stated he was not interested in insurance.  *Id.*  Three days later, Andriano

18 emailed the agent asking him to reinstate Joe's application and instructing the

19 agent to contact her with all future inquiries.  *Id.*  She also asked two friends to

20 pose as Joe and take a requisite physical, in order to conceal Joe's cancer from the

21 insurance company.  *Id.* In light of the foregoing, and the timing of the

22 conversation between Joe and Palicki, there is no reasonable probability that her

23 testimony would have changed the verdict.  Andriano has failed to carry her burden

24 under *Strickland*.

25         **3.  Evidence of Joe's depression (Claim I(C)(3)).**

26     Andriano contends that counsel should have presented testimony from

27 Jeffrey Miller (the attorney who represented the Andrianos in a medical

28 malpractice lawsuit) and Joe's friend Chris Weaver to corroborate her claim that

57

1  Joe was depressed and suicidal.  Andriano has failed to carry her burden under

2  *Strickland*.

3  **a.  Jeffrey Miller.**

4  Miller, who also testified in the guilt phase as a State witness, has submitted

5  a declaration in support of the PCR petition, claiming that Andriano contacted him

6  on up to three occasions and reported that Joe was suicidal.[46]  (Petition, at Tab 19, ¶

7  4.)  Miller recalls that he contacted Joe about these concerns; Joe "acknowledged"

8  them and "did not deny" their accuracy, but told Miller he understood that his non-

9  cancer-related death would terminate the lawsuit and told Miller "not to worry."

10  (*Id.* at ¶ 5.)  Counsel did not *fail* to introduce this evidence at trial; rather, he

11  *attempted* to elicit it from Miller, but this Court properly sustained the State's

12  hearsay objection.  (Exh. O, at 89–91.)  Counsel was not deficient merely because

13  this Court ruled against him.[47]

14  Andriano has also failed to show prejudice under *Strickland*.  Miller does not

15  disclose in his declaration when Andriano reported her concerns about Joe; he

16  simply states that she did so "[i]n the months prior" to Joe's murder.  (Petition, at

17  Tab 19, ¶ 4.)  In any event, it is not surprising that Joe—diagnosed with terminal

18  cancer and undergoing tortuous chemotherapy treatments—would be depressed

19  and perhaps, at times, contemplate suicide.  However, Joe told Miller "not to

20  worry," suggesting that he did not intend to follow through with any suicidal

21  ───────────────

22  [46] In these conversations, Andriano revealed her true motive in reporting

23  these concerns.  Miller recalls that she "asked [him] to remind Joe that, from a

legal perspective, he would be hurting his family by committing suicide because

24  the malpractice claim would be dismissed."  (Petition, at Tab 19, ¶ 4.)

25  [47] Andriano suggests that counsel should have "prepared … Miller properly

26  to get his testimony admitted."  (Petition, at 60–61.)  Andriano does not explain,

27  however, what type of preparation would have succeeded in converting rank

28  hearsay into admissible evidence.

58

1    ideation.  (*Id.* at ¶ 5.)  And, Joe's conduct in undergoing chemotherapy (which

2    served only to prolong, not save, his life) reveals his desire to continue living as

3    long as possible.  Further, even if counsel had corroborated Andriano's claim that

4    Joe had, at some point, spoke of suicide, that fact would not have established his

5    involvement in acquiring and ingesting the sodium azide.  Nor would it have

6    negated Andriano's conduct in bludgeoning and stabbing Joe, which caused his

7    death.  *See Andriano*, 215 Ariz. at 501, ¶10, 161 P.3d at 544.  Andriano has not

8    shown deficient performance or prejudice.

9                          **b. <u>Chris Weaver</u>**

10        Andriano also faults counsel for failing to present testimony from Joe's

11   friend Chris Weaver to corroborate her claims that Joe was depressed.  In his

12   declaration, Weaver states that, in the last several months of his life, Joe

13   commented more than once on having limited time left to live, and gave the

14   impression that he "knew he was dying and it didn't really matter to him

15   anymore."  (Petition, at Tab 37, ¶ 4.)  Weaver's statements, however, do not

16   necessarily reflect Joe's depression; they are more reasonably construed as

17   reflecting his acceptance of an unavoidable fate.  Counsel was not ineffective for

18   failing to present Weaver's testimony at trial.

19        Moreover, counsel interviewed Weaver at length prior to trial, and Weaver

20   stated that Joe did not discuss suicide, but instead "always acted like he wasn't

21   gonna die" and remained "in super spirits."  (Petition, at Tab 58, p. 9.)  Weaver also

22   claimed that, approximately 2 months before the murder, Joe had called him,

23   informed him that he and Andriano were composing a will, and asked Weaver to

24   take care of his family after he died.  (*Id.* at 16–18.)  Joe did not indicate that he

25   believed his death was imminent, but thought "he'd better make [a will] so that he

26   would have one when he did die."  (*Id.*)  These comments also appear to reflect no

27   more than Joe's acceptance of his terminal illness and preparation for his inevitable

28

59

1    death.  They do not establish that he was depressed.[48]  Andriano has not carried her

2    burden under *Strickland*.

3               **4.  Lesser-included offense instruction.**

4         Andriano contends that counsel was ineffective for failing to request that the

5    jury be instructed on lesser-included offenses to first-degree murder.  (Petition, at

6    61.)   However, counsel's failure to do so was neither deficient nor prejudicial

7    because—as the Arizona Supreme Court expressly concluded on direct appeal—

8    Andriano advanced an "all-or-nothing" defense, and the evidence did not support a

9    lesser-included instruction.  *Andriano*, 215 Ariz. at 504–05, ¶¶ 32–36, 161 P.3d at

10    547–58.

11         The   evidence   Andriano   offers   in   her   PCR   proceeding   allegedly

12    "undercutting premeditation" (Petition, at 61) is irrelevant:  *Strickland* requires this

13    Court to evaluate counsel's failure to request a lesser-included instruction from

14    their perspective at the time of trial, without the benefit of hindsight or subsequent

15    investigation.  466 U.S. at 689; *see also Coleman*, 150 F.3d at 1113; *Campbell*, 18

16    F.3d at 673.  Further, as discussed previously, Andriano's mental health evidence

17    would not have been admissible at the guilt phase.   And, evidence of Joe's

18    purported depression and his alleged knowledge of Andriano's efforts to obtain life

19    insurance were minimally probative, as also set forth above.  This Court should

20    reject Andriano's claim.

21

22    _____

23

24         [48] Additionally, Weaver would have offered potentially damaging testimony
on cross-examination.  During his interview, he told counsel that he had frequently

25    seen Andriano out at bars, that Joe believed she had a boyfriend, and that Andriano
had called him in late August or early September 2000 and told him that Joe's

26    cancer was spreading and that he had approximately 1 month to live.  (Petition, at

27    Tab 58, p.5–6, 8–9.)  Andriano "didn't really seem upset about" that news.  (*Id.* at

28    6.)

**F.** *Failure to object to prosecutorial misconduct (Claim III).*

Andriano argues that counsel was ineffective for failing to object to "pervasive instances of prosecutorial misconduct" at all three phases of trial. (Petition, at 63–69.)  She further asserts that appellate counsel was ineffective for failing to argue prosecutorial misconduct on appeal.   Specifically, Andriano contends that the prosecutor behaved improperly by 1) portraying her as a "promiscuous adulteress" and thus "disparaging" her character, 2) engaging in vouching during his guilt-phase closing argument, and 3) improperly "impugning" Dr. Murphy's ethics.[49]  (*Id.*)  The prosecutor's comments were supported by the evidence and well within the bounds of permissible argument.  Counsel therefore was not ineffective for failing to object to those comments, and appellate counsel was not ineffective for failing to challenge them on appeal.

**1.  Applicable law.**

"To prevail on a claim of prosecutorial misconduct, a defendant must demonstrate that the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Morris*, 215 Ariz. 324, 335, ¶ 46, 160 P.3d 203, 214 (2007) (quotations omitted); *accord Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  "The misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial."

---

[49] In connection with this argument, Andriano gratuitously cites comments from the late Arizona Supreme Court Justice Michael Ryan during a direct appeal oral argument in an unrelated capital case involving the same trial prosecutor. (Petition, at 63–64.)  But the question when addressing a prosecutorial misconduct claim is the trial's fairness, not the prosecutor's culpability, even in this case.  The prosecutor's alleged impropriety in another case is therefore of no consequence.  Moreover, in the case in question, the Arizona Supreme Court—in an opinion in which Justice Ryan joined—found only a single arguably improper act and no pervasive prosecutorial misconduct.  *See State v. Gallardo*, 225 Ariz. 560, 568–70, ¶¶ 34–47, 242 P.3d 159, 167–69 (2010).

61

1  *Morris*, 215 Ariz. at 335, ¶ 46, 160 P.3d at 214 (quotations omitted).  This Court
2  should not reverse based on prosecutorial misconduct unless "two conditions are
3  satisfied:  (1) misconduct is indeed present; and (2) a reasonable likelihood exists
4  that the misconduct could have affected the jury's verdict, thereby denying
5  defendant a fair trial."  *Anderson*, 210 Ariz. at 340–41, ¶ 45, 111 P.3d at 382–83
6  (quotations omitted).

7       Standing alone, neither legal error, negligence, mistake, or insignificant
8  impropriety constitutes prosecutorial misconduct.  *See State v. Aguilar*, 217 Ariz.
9  235, 238–39, ¶ 11, 171 P.3d 423, 426–27 (App. 2007).  Prosecutorial misconduct
10  only occurs when, "taken as a whole," the prosecutor engages in "intentional
11  conduct which the prosecutor knows to be improper and prejudicial, and which he
12  pursues for any improper purpose with indifference to a significant resulting
13  danger of mistrial.  *Id.* (quoting *Pool v. Superior Court*, 139 Ariz. 98, 108–09, 677
14  P.2d 261, 271–72 (1984)).

15       **2.  Andriano as "promiscuous adulteress."**

16       Andriano argues that the prosecutor improperly highlighted aspects of her
17  extensive sexual history; in particular, she laments references to her affairs with
18  Rick Freeland and Travis Black; "details" of her sexual encounters with Freeland
19  and Black, including that she did not use a personal lubricant; her sexual history
20  prior to meeting Joe; and whether she dressed in "provocative clothing."  (Petition,
21  at 65–66.)  Andriano suggests that the prosecutor unduly emphasized this evidence,
22  and that it was more prejudicial than probative.[50]  (*Id.*)  The prosecutor's

23
24  _____

25       [50] This argument is puzzling, as a central theme of Andriano's PCR petition
26  and expert reports is that she is "hyper-sexual" and that this behavior is somehow
    mitigating; in essence, she admits to being a "promiscuous adulteress" but attempts
27  to convince this Court that this quality warrants leniency.  The evidence was not
28  unfairly prejudicial.  *See* Ariz. R. Evid. 403.

62

1    comments, however, were not inappropriate, and neither trial nor appellate counsel

2    was ineffective for failing to challenge them.

3        The prosecutor's discussion of Andriano's affairs was based on evidence

4    properly admitted at trial.  As Andriano concedes, the trial court denied her pretrial

5    motion to preclude evidence of her affairs with Freeland and Black.  (Petition, at

6    65.)  The Arizona Supreme Court affirmed this ruling on direct appeal, finding

7    Andriano's affairs relevant to prove both her motive for killing Joe, and to rebut

8    her claim that she "was a domestic violence victim who lived in fear of her abusive

9    husband, whom she bludgeoned to death in self-defense."  *Andriano*, 215 Ariz. at

10   503–04,  ¶¶  24–31,  161 P.3d at  546–47.    Moreover,  although  prosecutorial

11   misconduct was not at issue on direct appeal, the Arizona Supreme Court found

12   that the *arguments* Andriano now attacks were "not evidence, as the jury was

13   instructed, and thus the comments do not render unfairly prejudicial evidence that

14   is otherwise properly admitted."  *Id.* at 503, ¶ 28, 161 P.3d at 546.  Andriano has

15   not carried her burden under *Strickland*.

16       **3.  Vouching**

17       Andriano also contends that the prosecutor engaged in misconduct by

18   vouching  during  questioning  and  closing  argument,  and  that  counsel  was

19   ineffective for failing to object to this impropriety.  (Petition, at 66–68.)  She first

20   claims that the prosecutor, in cross-examining Dr. Murphy, improperly asked her

21   whether  an  ex-boyfriend  had  caught  Andriano  undressed  with  another  man.

22   (Petition, at 66–68.)  The prosecutor, however, had a good-faith basis for asking

23   this question; in fact, Shawn King has since confirmed the story is true.  (Petition,

24   at Tab 15.)  The prosecutor had already announced his intention to call Shawn King

25   as a witness in rebuttal; that he did not do so is of no moment.

26       Andriano also alleges that the prosecutor engaged in misconduct by stating

27   during closing that the jury was not here "to judge [King's] conduct.  If he were to

28   be judged, he would be judged as an accomplice."  (Petition, at 67.)  This argument

63

1   was not improper, given that *Andriano* implicated King during her testimony,

2   claiming that he had helped her identify and locate the sodium azide.

3       Andriano also faults the prosecutor for using the term "we know" repeatedly

4   in closing argument.  But the prosecutor used "we know" to refer to the *evidence*

5   *presented*; not to refer to facts not presented to the jury.  This type of argument is

6   permissible and not objectionable.   Additionally, none of the acts above are

7   prejudicial because the trial court instructed the jurors that counsel's argument was

8   not evidence.  *Andriano*, 215 Ariz. at 503, ¶ 28, 161 P.3d at 546.  Andriano has not

9   carried her burden under *Strickland*.

10           **4. Attack on Dr. Murphy**

11       Andriano contends that the prosecutor improperly impugned Dr. Murphy's

12   ethics, in violation of *State v. Hughes*, 193 Ariz. 72, 86, 969 P.2d 1184, 1198 (1998)

13   ("It is improper for counsel to imply unethical conduct on the part of an expert

14   witness without having evidence to support the accusation.").   He points to a

15   comment that Dr. Murphy violated her "ethical duty to consider both sides."  This

16   comment was a reasonable inference from the evidence, which suggested that Dr.

17   Murphy approached her evaluation with the preconceived notion that Andriano

18   was a domestic violence victim.  Dr. Bayless took issue with many of her methods.

19   Thus, unlike in *Hughes*, the prosecutor's argument was supported by the evidence.

20   And, even when confronted with dramatic discrepancies in Andriano's self-

21   reporting, Dr. Murphy did not change her opinion, and considered Andriano's

22   untruthfulness irrelevant.  This argument was not objectionable.

23       Andriano further claims that the prosecutor called Dr. Murphy a "liar" who

24   "can't keep her story straight."  But those statements referenced *Andriano*, whose

25   self-report had formed virtually the entire basis of Dr. Murphy's opinion.  And,

26   they were supported by the evidence, because Andriano told myriad different

27   versions of Joe's murder and of many other events in her life.  Notwithstanding

28   these inconsistencies, Dr. Murphy believed her wholeheartedly.  The prosecutor

P-App. 000234

1  was justified in highlighting this unreasonable reliance.  Finally, as stated above,
2  the acts of alleged misconduct are not prejudicial because the trial court instructed
3  the jurors that counsel's argument was not evidence.  *Andriano*, 215 Ariz. at 503, ¶
4  28, 161 P.3d at 546.  This Court should reject Andriano's claim.

5      **G.** ***Ineffective assistance of appellate counsel (Claim V).***

6      Andriano contends that appellate counsel was ineffective for failing to raise
7  on appeal any claims found precluded, and specifically for failing to raise 1)
8  DeLozier's alleged conflict of interest, 2) prosecutorial misconduct, and 3) this
9  Court's order sustaining the State's hearsay objection to Miller's testimony.
10 (Petition, at 70.)  As set forth above, these claims fail on their merits, and appellate
11 counsel is not ineffective for failing to raise meritless claims.  *See Pope v. Wood*,
12 93 F.3d 1434, 1445 (9th Cir. 1996)).  Any other ineffective-assistance-of-appellate-
13 counsel claim Andriano intends to present is waived for insufficient argument.  *See*
14 Ariz. R. Crim. P. 32.5; *Borbon*, 146 Ariz. at 399, 706 P.2d at 725.

15     **V. CONCLUSION.**

16     For the foregoing reasons, this Court should deny and dismiss the PCR
17 petition.

18     DATED this 23rd day of July, 2012.

19                                    RESPECTFULLY SUBMITTED,

20                                    THOMAS C. HORNE
21                                    ATTORNEY GENERAL

22

23                                    /S/LACEY STOVER GARD
                                      ASSISTANT ATTORNEY GENERAL
24                                    ATTORNEYS FOR DEFENDANT

25

26

27

28

65

1  Copy of the foregoing mailed
   this 23rd day of July, 2012, to:

2

3  Scott M. Bennett
   Lewis and Roca LLP
4  40 N. Central Ave., Suite 1900
   Phoenix, AZ   85004

5

   Todd E. Hale
6  Lewis and Roca LLP
   One S. Church Avenue, Suite 700
7  Tucson, AZ   85701

8  Allen A. Arntsen
   Foley & Lardner LLP
9  150 East Gilman Street
   P.O. Box 1497
10 Madison, WI   53701-1497

11 Stephen J. Nickels
   Foley & Lardner LLP
12 150 East Gilman Street
   P.O. Box 1497
13 Madison, WI   53701-1497

14 Matthew R. Lynch
   Foley & Lardner LLP
15 150 East Gilman Street
   P.O. Box 1497
16 Madison, WI   53701-1497

17 Attorneys for Defendant

18

   /s/Linda Yrrizarry
19

20

21 #764873

22

23

24

25

26

27

28

66

**EXHIBIT LIST**

Exhibit A:  Excerpts from Record on Appeal (Photostated Instruments).

Exhibit B:  Excerpts from Record on Appeal (Minute Entries)

Exhibit C:  Direct Appeal Opening Brief

Exhibit D:  Documents from Maricopa County guardianship proceeding (No. PB2000–004531).

Exhibit E:  Documents from Pinal County adoption proceeding (No. AD–20010058) and appeal (No. 2 CA–JV 2002–0127).

Exhibit F:  Excerpts from DSM–IV.

Exhibit G:  Trial Exhibit 544

Exhibit H:  Notes from Maricopa County Jail (including released Trial Exhibit 546)

Exhibit I:  Defendant's employment records from Casa Grande Regional Medical Center (personal identifying information redacted).

Exhibit J:  Defendant's employment records from Schomac Property Management (personal identifying information and third-party financial and termination information redacted).

Exhibit K:  Excerpts from Mesa Police Departmental Report (DR # 20011210670) and Maricopa County Superior Court documents (No. CR–2002–000712) regarding Cynthia Edwards prosecution

Exhibit L:  Trial Exhibit 548.

Exhibit M:  Trial Exhibit 472.

Exhibit N:  Trial Exhibit 487.

Exhibit O:  R.T. 9/29/04.

Exhibit P:  R.T. 2/4/05.

67

Exhibit Q:  R.T. 2/5/01.

Exhibit R:  R.T. 4/13/01.

Exhibit S:  R.T. 4/16/01.

Exhibit T:  R.T. 7/27/01.

Exhibit U:  R.T. 5/21/04.

Exhibit V:  R.T. 10/25/04.

Exhibit W:  R.T. 10/26/04.

Exhibit X:  R.T. 11/1/04.

Exhibit Y:  R.T. 11/2/04.

Exhibit Z:  R.T. 10/27/04.

Exhibit AA:  R.T. 10/28/04.

Exhibit BB:  R.T. 11/3/04.

Exhibit CC:  R.T. 11/4/04.

Exhibit DD:  R.T. 11/8/04.

Exhibit EE:  R.T. 9/8/04.

Exhibit FF:  R.T. 9/14/04.

Exhibit GG:  R.T. 9/21/04.

Exhibit HH:  R.T. 9/22/04.

Exhibit II:  R.T. 11/16/04.

Exhibit JJ:  R.T. 11/17/04.

Exhibit KK:  R.T. 10/4/04.

68

Exhibit LL:  R.T. 10/5/04.

Exhibit MM:  R.T. 10/6/04.

Exhibit NN:  R.T. 10/7/04.

Exhibit OO:  R.T. 10/12/04.

Exhibit PP:  R.T. 10/13/04.

Exhibit QQ:  R.T. 10/14/04.

Exhibit R:  R.T. 10/20/04.

Exhibit SS:  R.T. 10/21/04.

Exhibit TT:  R.T. 11/10/04.

Exhibit UU:  R.T. 11/15/04.

Exhibit VV:  R.T. 11/30/04.

Exhibit WW:  R.T. 12/1/04.

Exhibit XX:  R.T. 12/7/04.

Exhibit YY:  R.T. 12/8/04.

Exhibit ZZ:  R.T. 12/9/04.

Exhibit AAA:  R.T. 12/13/04.

Exhibit BBB:  R.T. 12/14/04.

Exhibit CCC:  R.T. 12/15/04.

Exhibit DDD:  R.T. 12/16/04.

Exhibit EEE:  R.T. 12/16/04.

69

Scott M. Bennett (Bar No. 022350)
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona 85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (office)
(608) 258-4258 (fax)

*Attorneys For Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA | ) | CASE NO: CR2000-096032-A |
| RESPONDENT, | ) | |
| | ) | **REPLY MEMORANDUM IN SUPPORT OF** |
| V. | ) | **PETITION FOR POST-CONVICTION** |
| | ) | **RELIEF** |
| WENDI ELIZABETH ANDRIANO | ) | |
| PETITIONER. | ) | |
| | ) | |

REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1

**TABLE OF CONTENTS**

2

**Page**

3

TABLE OF AUTHORITIES ............................................................................................ iii

4

INTRODUCTION ........................................................................................................... 1

5

ARGUMENT .................................................................................................................. 1

6

7  I.   WENDI'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS
        VIOLATED BY DEFENSE COUNSEL'S DEFICIENT PERFORMANCE
8       AND RESULTING PREJUDICE DURING ALL PHASES OF THE
        TRIAL ................................................................................................................. 1

9

10       A.   Uninformed Choices Cannot Be Strategic ................................................... 1

11       B.   Defense Counsel's Performance Was Deficient In Numerous
              Respects ....................................................................................................... 3

12

13            1.   Failure To Investigate Wendi's Social History ................................... 3

14            2.   Failure To Investigate Wendi's Psychiatric Disorders ...................... 5

15            3.   Failure To Object To Evidence And Argument Related To
                   The Alleged Sodium Azide Poisoning ............................................... 7

16

17            4.   Failure To Elicit Key Corroborative Testimony ................................ 8

18       C.   Defense Counsel's Deficient Performance Was Prejudicial ....................... 10

19            1.   Prejudice Due To Failure To Investigate Wendi's Social
                   History ............................................................................................. 10

20

21            2.   Prejudice Due To Failure To Investigate Wendi's Psychiatric
                   Disorders ......................................................................................... 13

22

23            3.   Prejudice Due To Failure To Object To Evidence and
                   Argument Related To The Alleged Sodium Azide Poisoning ......... 16

24            4.   Prejudice Due To Failure To Elicit Corroborative Testimony ........ 16

25       D.   A Reweighing Of The Mitigating And Aggravating Evidence Shows
              That Wendi Has Demonstrated A Reasonable Probability Of A
26            Different Outcome .................................................................................... 18

27

28

i

4851-6029-7232

**TABLE OF CONTENTS (cont'd)**

<u>Page</u>

II.   COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE
PERVASIVE PROSECUTORIAL MISCONDUCT, WHICH DEPRIVED
WENDI OF DUE PROCESS ................................................................. 19

    A.   "Verbal Guerrilla Warfare" Regarding Wendi's Promiscuity ................... 19

    B.   Implying Extrajudicial Evidence ................................................. 20

    C.   The Prosecutor's Baseless Attack On A Defense Expert's Ethics ............. 22

III.   ATTORNEY DELOZIER HAD AN ACTUAL CONFLICT OF
INTEREST THAT AFFECTED THE ADEQUACY OF WENDI'S
REPRESENTATION ........................................................................ 22

        1.   The Conflict Claims Are Not Precluded ........................................... 23

        2.   DeLozier Was Conflicted During The Entire Time He Was
Supposed To Be Preparing The Mitigation Case ............................. 24

        3.   DeLozier's Conflict Rendered Him Incapable Of Pursuing A
Plausible Alternative Defense Strategy .......................................... 26

IV.   THE JUROR MISCONDUCT CLAIM IS NOT PRECLUDED, AND THE
STATE'S ATTEMPT TO MINIMIZE JUROR MISCONDUCT FAILS ............. 26

V.   THE INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL
CLAIM IS NOT WAIVED .................................................................. 28

VI.   THE COURT SHOULD CONSIDER LARRY HAMMOND'S EXPERT
OPINION .................................................................................... 29

CONCLUSION ...................................................................................... 30

ii

1

**TABLE OF AUTHORITIES**

2
                                                                                        <u>Page</u>

3

**FEDERAL CASES**

4

*Ainsworth v. Calderon,*
5    138 F.3d 787 (9th Cir. 1998) .................................................................... 29

6

*Bean v. Calderon,*
7    163 F.3d 1073 (9th Cir. 1998) ....................................................... 6-7, 14-15

8

*Beardslee v. Woodford,*
9    358 F.3d 560 (9th Cir. 2004) .................................................................... 29

10

*Boyde v. Brown,*
    404 F.3d 1159 (9th Cir. 2005) .................................................................. 18
11

*Caro v. Calderon,*
12    165 F.3d 1223 (9th Cir. 1999) .................................................................. 14

13

*Chambers v. Armontrout,*
14    907 F.2d 825 (8th Cir. 1990) ...................................................................... 3

15

*Correll v. Ryan,*
16    539 F.3d 938 (9th Cir. 2008) ........................................................... 2, 10-11

17

*Cunningham v. Zant,*
    928 F.2d 1006 (11th Cir. 1991) .................................................................. 2
18

*Cuyler v. Sullivan,*
19    446 U.S. 335 (1980).......................................................................... 23, 26

20

*Daniels v. Woodford,*
21    428 F.3d 1181 (9th Cir. 2005) .................................................................. 14

22

*Deutscher v. Whitley,*
23    884 F.2d 1152 (9th Cir. 1989) .................................................................... 2

24

*Douglas v. Woodford,*
    316 F.3d 1079 (9th Cir. 2003) .................................................................. 14
25

*Frierson v. Woodford,*
26    463 F.3d 982 (9th Cir. 2006) ...................................................................... 2

27

28

4851-6029-7232

*Hale v. Gibson*,
  227 F.3d 1298 (10th Cir. 2000) ............................................................. 29

*Hamilton v. Ayers*,
  583 F.3d 1100 (9th Cir. 2009) ............................................................ 3, 7

*Harris ex rel. Ramseyer v. Wood*,
  64 F.3d 1432 (9th Cir. 1995) ................................................................ 17

*Harris v. Dugger*,
  874 F.2d 756 (11th Cir. 1989) ............................................................. 2-3

*Hendricks v. Calderon*,
  70 F.3d 1032 (9th Cir. 1995) ................................................................ 15

*Hovey v. Ayers*,
  458 F.3d 892 (9th Cir. 2006) ................................................................ 10

*Jeffries v. Wood*,
  114 F.3d 1484 (9th Cir. 1997) .............................................................. 27

*Jones v. United States*,
  327 F.2d 867 (D.C. Cir. 1963) ................................................................ 5

*Marzullo v. Maryland*,
  561 F.2d 540 (4th Cir. 1977) ................................................................ 29

*Pavel v. Hollins*,
  261 F.3d 210 (2d Cir. 2001) ................................................................... 8

*Pickens v. Lockhart*,
  714 F.2d 1455 (8th Cir. 1983) .............................................................. 29

*Porter v. McCollum*,
  130 S. Ct 447 (2009) .................................................................... *passim*

*Provenzano v. Singletary*,
  148 F.3d 1327 (11th Cir. 1998) ............................................................ 30

*Ramonez v. Berghuis*,
  490 F.3d 482 (6th Cir. 2007) .................................................................. 2

iv

PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4851-6029-7232

*Rompilla v. Beard,*
    545 U.S. 374 (2005) ........................................................................... 3, 10, 13

*Sears v. Upton,*
    130 S. Ct. 3259 (2010) ................................................................................ 13

*Silva v. Woodford,*
    279 F.3d 825 (9th Cir. 2002) ...................................................................... 28

*Simmons v. South Carolina,*
    512 U.S. 154 (1994) ..................................................................................... 27

*Summerlin v. Schriro,*
    427 F.3d 623 (9th Cir. 2005) (en banc) ............................................... *passim*

*United States v. Withers,*
    638 F.3d 1055 (9th Cir. 2010) ..................................................................... 29

*United States v. Younger,*
    398 F.3d 1179 (9th Cir. 2005) ..................................................................... 21

*Wheat v. United States,*
    486 U.S. 153 (1988) ..................................................................................... 26

*Wiggins v. Smith,*
    539 U.S. 510 (2003) ............................................................................... 1-3, 30

*Williams v. Taylor,*
    529 U.S. 362 (2000) .............................................................................. 11, 25

*Wood v. Georgia,*
    450 U.S. 261 (1981) ..................................................................................... 26

**STATE CASES**

*Dwyer v. Comm'r,*
    No. CV 980357949S, 2000 Conn. Super. LEXIS 1934
    (Conn. Super. Ct. July 26, 2000) ................................................................ 29

*Foulke v. Knuck,*
    162 Ariz. 517, 784 P.2d 723 (Ct. App. 1989) ............................................ 25

v

4851-6029-7232

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Harris v. Commonwealth,*
   408 S.E.2d 599 (Va. App. 1991) ............................................................... 27

*In re Cordero,*
   756 P.2d 1370 (Cal. 1988) ......................................................................... 29

*Lashonda M. v. Dep't of Economic Security.,*
   210 Ariz. 77, 107 P.3d 923 (Ct. App. 2005) ............................................. 28

*Musgrove v. State,*
   986 S.W.2d 738 (Tex. App. 1999) .............................................................. 27

*People v. Thomas,*
   867 P.2d 880 (Colo. 1994) ......................................................................... 29

*People v. Walker,*
   440 N.E.2d 83 (Ill. 1982) ........................................................................... 28

*Pool v. Superior Ct.,*
   139 Ariz. 98, 677 P.2d 261 (1984) ...................................................... 19, 20

*Quick v. State,*
   353 S.E.2d 497 (Ga. 1987)....................................................................27-28

*State v. Allen,*
   223 Ariz. 125, 220 P.3d 245 (2009) .......................................................... 24

*State v. Bocharski,*
   218 Ariz. 476, 189 P.3d 403 (2008) ..................................................... 14, 19

*State v. Carlson,*
   202 Ariz. 570, 48 P.3d 1180 (2002) .......................................................... 16

*State v. Christensen,*
   129 Ariz. 32, 628 P.2d 580 (1981) .......................................................14-15

*State v. DiFrisco,*
   804 A.2d 507 (N.J. 2002).......................................................................... 29

*State v. Hall,*
   204 Ariz. 442, 65 P.3d 90 (2003) .............................................................. 28

vi

PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4851-6029-7232

*State v. Hughes,*
    193 Ariz. 72, 969 P.2d 1184 (1998) ..................................................................... 19, 22

*State v. Jenkins,*
    148 Ariz. 463, 715 P.2d 716 (1986) ......................................................................... 23

*State v. Mincey,*
    115 Ariz. 472, 566 P.2d 273 (1977) ......................................................................... 20

*State v. Moody,*
    208 Ariz. 424, 94 P.3d 1119 (2004) ......................................................................... 14

*State v. Moore,*
    222 Ariz. 1, 213 P.3d 150 (2009) ............................................................................. 23

*State v. Morris,*
    215 Ariz. 324, 160 P.3d 203 (2007) ......................................................................... 20

*State v. Roque,*
    213 Ariz. 193, 141 P.3d 368 (2006) ................................................................11-12, 20

*State v. Soto-Fong,*
    187 Ariz. 186, 928 P.2d 610 (1996) ......................................................................... 16

*State v. Wallace,*
    --- Ariz. ---, 272 P.3d 1046 (2012) ......................................................................... 14

**RULES**

ARIZ. R. CRIM. P. 15.1(b) ...................................................................................... 21

ARIZ. R. CRIM. P. 24.1 ...................................................................................... 27, 28

ARIZ. R. CRIM. P. 32.2(b) ...................................................................................... 23

ARIZ. R. EVID. 803(3) ............................................................................................ 9

ARIZ. R. PROF. COND. 1.9 ....................................................................................... 25

ARIZ. R. PROF. COND. 3.1, 3.3 ................................................................................. 23

FED. R. EVID. 412 ................................................................................................. 20

vii

PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4851-6029-7232

P-App. 000247

**INTRODUCTION**

The State tries to dismiss the evidence presented in the Petition in broad strokes, by asserting that the evidence is cumulative or was omitted by defense counsel for strategic reasons.  None of these arguments withstands scrutiny.  Defense counsel completely missed:  (a) Wendi's actual life story, shaped by her social history; (b) her psychiatric disorders, and the manifestations of those disorders leading up to, and on the night of, Joe's death, as discussed in detail in the expert reports of Dr. Woods and Dr. Hopper (*see* Pet. Tabs 2 & 4); (c) the impossibility of the State's poisoning theory, which was the principal basis for the findings of premeditation and the especially cruel aggravating factor; and (d) key corroborative third party testimony.

Aside from these and other defense counsel errors, Wendi's trial was tainted by the prosecutor's attempts to inflame the jury by making over 100 references to her sexual history and promiscuity, even after having acknowledged that such facts were not relevant to motive (and thus not relevant to the case), and by her defense counsel's conflict of interest (*i.e.*, his representation of Wendi's parents in a custody proceeding involving Wendi and Joe's children at the same time he was supposed to be investigating childhood abuse as mitigating evidence to save Wendi's life).  The State's other arguments regarding preclusion, juror misconduct, the performance of appellate counsel, and Wendi's *Strickland* expert, all lack merit.

For the reasons stated in the Petition and supporting materials, and this Reply, Wendi is entitled to post-conviction relief.

**ARGUMENT**

I. **WENDI'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED BY DEFENSE COUNSEL'S DEFICIENT PERFORMANCE AND RESULTING PREJUDICE DURING ALL PHASES OF THE TRIAL**

A. **Uninformed Choices Cannot Be Strategic**

Much of the State's response can be answered by "the central teaching of *Strickland*, as reaffirmed by *Wiggins*," which was set forth in the Petition but ignored in

1

4851-6029-7232

1   the Response: "An uninformed strategy is not a reasoned strategy.  It is, in fact, no

2   strategy at all." *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008); *Ramonez v.*

3   *Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007) ("[T]he state court ignored the central

4   teaching of *Strickland*, as reaffirmed by *Wiggins*, that the investigation leading to the

5   choice of a so-called trial strategy must itself have been reasonably conducted lest the

6   'strategic' choice erected upon it rest on a rotten foundation.") (citation omitted);

7   *Frierson v. Woodford*, 463 F.3d 982, 992 (9th Cir. 2006) ("Because strategy presupposes

8   investigation, [defense counsel's] actions cannot be attributed to strategy.").  *See also*

9   *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) ("[O]ur principal concern in deciding

10  whether [defense counsel] exercised reasonable professional judgment is . . . whether the

11  investigation supporting defense counsel's decision not to introduce mitigating evidence

12  of Wiggins' background *was itself reasonable*.") (internal quotation & brackets omitted).

13       Virtually all aspects of defense counsel's ineffectiveness at trial stem from their

14  pre-trial failures to reasonably investigate the case, ranging from failures to interview key

15  witnesses regarding key issues, to failures to investigate Wendi's social history for

16  mitigating and potentially exculpatory evidence, to failures to follow-up on psychiatric

17  red flags, to failures to even determine who among them was actually responsible for

18  different aspects of the case.  For example, defense counsel's decision not to seek an

19  instruction on lesser-included offenses was made without a reasonable pre-trial

20  investigation, which would have showed the availability of psychiatric and other defenses

21  to premeditation.  Such failures render subsequent decision-making at trial uninformed,

22  and thereby non-strategic.[1]  By repeatedly characterizing defense counsel's decisions as

23  ─────────────────────
    [1]  *See, e.g., Cunningham v. Zant*, 928 F.2d 1006, 1017-19 (11th Cir. 1991) (decision
24  "cannot be deemed tactical" when counsel failed to "present and argue readily available
    additional evidence" to bolster the mitigation presented at trial, and had reason to believe
25  more mental-health evidence existed); *Deutscher v. Whitley*, 884 F.2d 1152, 1160 (9th
    Cir. 1989) ("Counsel could not have chosen to avoid psychiatric evidence because of
26  potentially damaging rebuttal testimony.  Counsel did not even know what evidence was
    available."), *vacated on other grounds*, 111 S.Ct. 1678 (1991), *and subsequently*
27  *reaffirmed*, 16 F.3d 981 (9th Cir. 1994); *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir.
    1989) (not a strategic decision when "counsel's failure to present or investigate

28                                             2
    ─────────────────────

4851-6029-7232

1 "strategic" without addressing their lack of investigation, the State's response *assumes*

2 the very issue (the adequacy of the investigation) in dispute—and thus offers no response

3 at all.

4    **B.    Defense Counsel's Performance Was Deficient In Numerous Respects**

5       **1.    Failure To Investigate Wendi's Social History**

6    As explained in the Petition, Wendi's defense counsel failed to conduct any

7 meaningful investigation of her social history.[2]  It is undisputed that defense counsel

8 never interviewed Wendi's biological father, Shelby "Skip" Robertson, who was serving

9 a 17-year sentence for child molestation in an Arizona prison, or any other members of

10 the Robertson family, never interviewed the majority of the witnesses who submitted

11 declarations in support of the Petition, and only had brief discussions with other

12 witnesses, which did not even touch on abuse or mental health issues.[3]  (Pet. at 29-30).

13 *Cf. Chambers v. Armontrout*, 907 F.2d 825, 828 (8th Cir. 1990) ("The decision to

14 interview a potential witness is not a decision related to trial strategy.  Rather, it is a

15 decision related to adequate preparation for trial.").

16    These failures constitute deficient representation under *Strickland*.  *See Wiggins*,

17 539 U.S. at 524-25 (deficient performance where counsel "abandoned their investigation

18 _____

19 mitigation evidence resulted not from an informed judgment, but from neglect" in failing
to communicate among themselves regarding mitigation case).

20 [2]  It is "unquestioned" that capital defense counsel has an "obligation to conduct a
thorough investigation of the defendant's background."  *Porter v. McCollum*, 130 S. Ct
21 447, 452 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000); *see also
Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins*, 539 U.S. at 522-23.  This
22 obligation was clear at the time of Wendi's trial.  *See Hamilton v. Ayers*, 583 F.3d 1100,
1130 (9th Cir. 2009) ("undisputed that counsel was required to obtain the type of
23 available information that a social history report would contain, such as family and social
background and mental health"); *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005)
24 (en banc) ("[T]he investigation should include inquiries into social background and
evidence of family abuse.").
25
[3]  The State contends that, during the penalty phase, defense counsel "called several of
26 Andriano's friends and recalled her parents to offer additional information about her
character and upbringing."  (Resp. at 10.)  In fact, for those points defense counsel called
27 only Wendi's parents and *their* friends.  None of them presented any evidence remotely
close to what defense counsel could have and should have found.  (Pet. at 40.)
28                                3

4851-6029-7232

1  of [defendant's] background after having acquired only a rudimentary knowledge of his

2  history from a narrow set of sources" that nonetheless revealed that "[defendant's]

3  mother was a chronic alcoholic; [and defendant] was shuttled from foster home to foster

4  home and displayed some emotional difficulties while there"). *See also Porter,* 130 S.

5  Ct. at 453; *Summerlin,* 427 F.3d at 631.

6        These gross deficiencies in defense counsel's mitigation investigation are proven

7  by comparing the mitigation story that was told at Wendi's trial (*i.e.,* that she was the

8  product of a good family and a good upbringing, *see* Pet. at 29, 40) with Wendi's actual

9  life story (*see* Pet. at 2-17).  For example, the jury that sentenced Wendi to death:

10   (a)   did not hear that Wendi's father (Skip), his father, and Skip's five brothers
11       were all child molesters, who all had access to Wendi when she was an
         infant and young child (Pet. at 2-3);

12   (b)   did not hear about the perverted sexual relationship that Alejo, Wendi's
         stepfather, had with Wendi (Pet. at 3-5);

13   (c)   did not hear that Wendi was physically and psychologically abused her
         entire childhood, starting with Skip, who trained Wendi "like she was a
14       dog, not a baby" by spanking her if she cried or didn't obey; continuing
         with Donna, who thought it was important to pull Wendi's diaper down
15       when she was hitting her with a wooden spoon, and understood from
         church rules that the point of swatting Wendi was to "break her"; then
16       Alejo, who also swatted Wendi and learned the sadistic trick (from church
         leader Tom King) of drilling holes in the paddle to make the paddling hurt
17       more; and continuing with leaders at the Fishers of Men cult and the
         Harvest church/school, where swatting was "necessary to drive the sin from
18       [her]" (Pet. at 5-7);[4]

19   (d)   did not hear the extent of the abject poverty Wendi was subjected to,
         including the fact that she was panhandling by herself at the age of 4, and
20       was eating food out of the trash and searching for money on the street after
         Donna and Alejo sold all of their possessions and joined the Fishers of Men
21       (Pet. at 7); and

22   (e)   did not hear that Wendi's religious upbringing was not a traditional
         Christian education, but rather a cult-like atmosphere of social
23       experimentation, psychological control, physical abuse and sexual abuse
         (Tab 4 at 146-69, 226-30).

24

25 [4] Wendi's actual life story highlights how superficial and deficient aspects of the
   mitigation story told at trial were.  For example, at trial, defense counsel called two
26 witnesses who knew the Ochoas for limited periods in the 1980s to testify that Wendi
   was an obedient teenager.  But the jury never heard that her "obedience" was the result of
27 having been trained like a dog from the day she was born, and having been subject to a
   lifetime of abuse and ritualistic beatings at home and in school.
28                                        4

4851-6029-7232

### 2.    Failure To Investigate Wendi's Psychiatric Disorders

The duty to investigate a capital defendant's background for mitigating evidence includes the duty to assess her mental health. (Pet. at 44-45.) Here, defense counsel possessed evidence of Wendi's mental illness that should have prompted further investigation. Kandy Rohde, Dr. Potts and Dr. Rosengard all raised concerns about her mental health, noting indications of childhood sexual and/or physical abuse and evidence of mental illness. (Pet. at 23-24.) Defense counsel also knew that Wendi had attempted suicide in prison in 2003, and was housed in the Durango psychiatric unit. (*Id.* at 25.) Yet, defense counsel did not pursue the mental health investigation or signs of childhood abuse, and did not even seek to obtain certain medical and other records until *after* the guilt-phase of Wendi's trial was over. (Pet. at 26; Tab 6 ¶ 30; Tab 7 ¶¶ 23-24.)

In response, the State tries to minimize Wendi's mental illnesses by relying on Dr. Rosengard's August 2002 report.[5] (Resp. at 33-34.) Aside from omitting the fact that Dr. Rosengard diagnosed Wendi as having "major affective disorder," in addition to depression and probable post-traumatic stress disorder (*id.* at 34; *cf.* Tab 6C at 5), the State asserts that Dr. Rosengard recognized that:

> Questions could arise as to how somebody who *had a sound mind prior to and after the event* could now have blocked what had occurred, specifically at that juncture, *and the issue of amnesia for the subject appears all too convenient.*

(Resp. at 34 (quoting Tab 6C at 5) (emphasis added by State).) The State relies on this

---

[5] The State argues that Dr. Rosengard's report is a "comprehensive mental health assessment" and "contains no compelling mitigation" (Resp. at 33 & 33 n.30), but it is wrong on both counts. *First*, Dr. Rosengard made a single visit to Wendi, and defense counsel could not provide Dr. Rosengard with the "critical" social history needed for a complete diagnosis, because they had not done that social history investigation. *See Jones v. United States*, 327 F.2d 867, 880 (D.C. Cir. 1963) ("[A] responsible psychiatric evaluation is not limited to interviewing the patient . . . . A social history of the patient should be obtained, the family background studied and members thereof interviewed."). *Second*, Dr. Rosengard concluded that Wendi's inability to remember the events leading to Joe's death was genuine, and that it was "more probable" that "her actions were a matter of self-defense" and "less probable" that "they were purposeful attacks in the heat of a momentary aggressive outburst." (Tab 6C at 6.) There is no conceivable "strategic" reason for defense counsel's inexcusable failure to follow up on these opinions.

5

4851-6029-7232

1  statement by Dr. Rosengard as the basis for its argument that Wendi "was a manipulative

2  and chronically untruthful person" and that she "apparently attempted to lay the

3  groundwork for an amnesia theory that she abandoned when Dr. Rosengard *did not*

4  *accept it*." (Resp. at 35 (emphasis added).)

5      But it is the State that is being untruthful here.  Three sentences later in the same

6  paragraph of his report, Dr. Rosengard explained:

7       An individual who goes through a traumatic event will often forget that
        extreme situation, because an individual is unable to deal with the thoughts
8       on an emotional basis.  This occurs in both children and adults who have
        been physically or sexually attacked and *more than explains the*
9       *Defendant's response*, particularly in light of the fact that she has had a past
        history, apparently, of being abused and symptoms consistent with
10      posttraumatic stress disorder.

11  (Tab 6C at 5-6 (emphasis added).)  In other words, Dr. Rosengard *did* accept that

12  Wendi's amnesia was real, which is the exact opposite of what the State asserts based on

13  its misleading excerpt of the Rosengard report.

14      The State also argues that Patterson had a strategic reason for not focusing on

15  Wendi's mental health as a mitigation theme.  (Resp. at 36.)  However, setting aside the

16  fact that DeLozier, not Patterson, was delegated responsibility for the mitigation portion

17  of Wendi's case (Tab 6 ¶ 22, Tab 7 ¶ 12), the quoted sentence from Patterson's

18  declaration does not support that conclusion.[6]  Specifically, Patterson stated:  "*Based on*

19  *the information then known to me*, I did not believe that there was a viable mitigation

20  theme based on [Wendi's] mental health."  (Resp. at 36 (quoting Tab 6, ¶ 30 (emphasis

21  added)).)  The relevant part of this statement is the first clause, which begs the question:

22  did the information then known to Patterson constitute a reasonable mitigation

23  investigation?  As explained in the Petition and this Reply, the answer is "no."  *See Bean*

24  _____

25  [6]  The State argues that defense counsel has "fallen on the sword" in this proceeding, and
    that their declarations should be viewed with skepticism.  (Resp. at 22 n.24, 29.)
26  However, this ignores what the declarations actually say.  Specifically, defense counsel
    describe what they did (and did not do) in preparing for Wendi's trial, but they do not
27  admit error or draw legal conclusions about their performance as counsel.  (*See* Tabs 6,
    7.)  Thus, the State uses the "fallen on the sword" characterization without factual basis.

28                                          6
    _____
        REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                        CASE NO. CR2000-096032-A

4851-6029-7232

1    *v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998) (failure to adequately investigate social

2    history for use in psychiatric diagnosis was "a deficiency in trial preparation, not a

3    strategic decision").

4        Thus, there was no strategic reason for defense counsel to fail to further

5    investigate Wendi's mental health.  Even without access to the social history needed for a

6    complete diagnosis, every qualified professional who examined Wendi raised concerns

7    about her mental health, and defense counsel knew that she had attempted suicide in jail.

8    *See Summerlin*, 427 F.3d at 632 ("[W]here counsel is on notice that his client may be

9    mentally impaired, counsel's failure to investigate his client's mental condition as a

10    mitigating factor in a penalty phase hearing, without a supporting strategic reason,

11    constitutes deficient performance.") (quotation omitted).  *See also Porter*, 130 S. Ct. at

12    453; *Hamilton,* 583 F.3d at 1117 (where "counsel was aware that [the defendant] tried to

13    commit suicide in prison . . . and that he was taking antidepressant medication at the time

14    of trial," counsel "should have retained a mental health expert and provided the expert

15    with the information needed to form an accurate profile of [the defendant's] mental

16    health").

17                **3.**     **Failure To Object To Evidence And Argument Related To The Alleged Sodium Azide Poisoning**

18        At trial, on appeal, and now, the State stands behind the prosecutor's assertion that

19    Wendi poisoned Joe with 21 grams of sodium azide, the equivalent of 21 Sweet and Low

20    packets.  (11/30/04 Tr. at 23, 32; Resp. at 54-55.)  The Petition pointed out that the

21    State's theory of poisoning was factually impossible.  Based on the "trace" concentration

22    of sodium azide found in the pot of stew on the stove of the Andrianos' apartment, Joe

23    would have had to eat roughly 88 pounds of stew to consume the equivalent of just *one*

24    gram of sodium azide.  (Pet. at 57.)  Moreover, it was undisputed at trial that it took four

25    to five pill capsules to account for a single gram of sodium azide (10/20/04 Tr. at 34-

26    35)—thus requiring Joes to consume 84 to 105 capsules to account for the 21 grams of

27

28

<center>7</center>

---

4851-6029-7232

1 missing sodium azide.[7]

2      The State does not dispute these facts, or the impossibility of its theory.  Instead,

3 the State distracts from the issue by pointing to what it calls "significant circumstantial

4 evidence":  (1) Wendi's fingerprints were on the packaging material for the sodium azide,

5 and (2) Joe did not tell Wendi's neighbor, Chris Hashisaki, about the sodium azide when

6 Hashisaki came to their apartment the night of Joe's death. (Resp. at 53.)  This evidence

7 is hardly "significant," because Wendi never denied that she assisted Joe in handling the

8 sodium azide, and Hashisaki never testified that she sought or received any information

9 from Joe as to why Joe believed he was feeling ill.

10      From these facts, it is a reasonable probability that at least one juror would *not*

11 find that Wendi secretly poisoned Joe—particularly when combined with additional

12 evidence that Joe was contemplating suicide (*see* Pet. at 37-39, 60-61, and *infra*), which

13 defense counsel neglected to put before the jury.  Defense counsel was inadequate at both

14 the guilt and aggravation phases in failing to make this impossibility argument to the

15 jury, and failing to object to the prosecutor's assertions based on this fiction.

16            **4.      Failure To Elicit Key Corroborative Testimony**

17      The State's evidence of premeditation—Wendi's *efforts* to obtain an insurance

18 policy on Joe's life and the sodium azide he ingested—was circumstantial, and the State's

19 theory of premeditation depended entirely upon attacking Wendi's testimony that she

20 made those efforts at the behest of her terminally ill husband.  Though "it should be

21 perfectly obvious" that "readily-available fact witnesses whose non-cumulative testimony

22 would directly corroborate the defense's theory of important disputes" would be crucial

23 to Wendi's defense, *Pavel v. Hollins*, 261 F.3d 210, 221 (2d Cir. 2001), defense counsel

24

25 ────────────────
[7] The State's ignores this portion of the testimony and instead focuses on the same
witness's testimony asserting that Joe would have had to ingest 13 to 17 capsules filled

26 with sodium azide to account for the amount missing. (Resp. at 9 (citing, presumably,
10/20/04 Tr. at 35).)  While this is a discrepancy in the testimony indicating some witness

27 confusion about the question, it is immaterial:  whether it is 13-17 capsules or 84-105,
Wendi could not surreptitiously trick Joe into consuming so many capsules of anything.

28                                    8
      ───────────────────────────────────────────
      REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                     CASE NO. CR2000-096032-A

4851-6029-7232

1   inexplicably failed to elicit key corroborative testimony of at least three witnesses.

2       *First*, defense counsel failed to interview Gia Palicki—the day-care provider for

3   Joe and Wendi's children, who had "developed a close friendship with both Wendi and

4   Joe"—regarding her direct knowledge of several facts in dispute at trial. (Tab 31 ¶¶ 1,

5   26.) Had they done so, they would have learned that Joe informed Palicki that he wanted

6   to obtain life insurance despite his terminal cancer, because he was anxious regarding the

7   financial condition of his family after he died, which would have undermined the State's

8   theory of motive. (*Id.* ¶ 8.) The State does not appear to dispute that defense counsel's

9   failure to obtain this information from Palicki was deficient.

10      *Second*, attorney Jeffrey Miller spoke with Joe prior to his death regarding Joe's

11  suicidal mindset. (Pet. at 37-38, Tab 19.) Defense counsel called Miller as a witness and

12  drew a hearsay objection to that testimony; rather than noting that Joe's responses to

13  questions regarding his state of mind necessarily fall within the hearsay exception for

14  statements of the declarant's "[t]hen existing mental, emotional, or physical condition,"

15  ARIZ. R. EVID. 803(3), counsel ineffectively moved on without eliciting Miller's crucial

16  testimony. (Pet. at 37-38.) The State's response ignores this argument, asserting without

17  explanation that Miller's statements were "rank hearsay" and that defense "[c]ounsel was

18  not deficient merely because this Court ruled against him." (Resp. at 58 & n.47.) The

19  State does not address defense counsel's failure to argue the obvious applicability of the

20  state-of-mind exception to the hearsay rule, as raised in the Petition.

21      *Third*, defense counsel failed to conduct any follow-up after an initial interview

22  with Chris Weaver, a longtime friend of Joe's, who Joe contacted shortly before his death

23  to ask Weaver to help take care of Joe's family after he died. (Pet. at 38.) Had they done

24  so, they would have learned that Joe had rejected long-term plans with Weaver leading

25  up to his death, telling Weaver that he had only "a few weeks to live." (Tab 37 ¶ 4.) The

26  State does not address the deficiency of defense counsel to follow-up with Weaver.

27

28

9

4851-6029-7232

C.     **Defense Counsel's Deficient Performance Was Prejudicial**

Under *Strickland,* counsel's deficient performance prejudices a defendant if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 694 (1984). "To assess that probability, we consider 'the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding' -- and 'reweig[h] it against the evidence in aggravation.'" *Porter*, 130 S. Ct. at 453-54 (quoting *Williams*, 529 U.S. at 397-398). The measure of prejudice is "the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented." *Hovey v. Ayers*, 458 F.3d 892, 929 (9th Cir. 2006) (quoting *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004)). A "reasonable probability" is "less than the preponderance more-likely-than-not standard." *Summerlin,* 427 F.3d at 643. Rather, it is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[I]t is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances." *Correll v. Ryan*, 539 F.3d 938, 951-52 (9th Cir. 2008); *see also Rompilla*, 545 U.S. at 393.

As explained in detail in the Petition, the cumulative effect of defense counsel's errors prejudiced Wendi during all three phases of her trial.

1.     **Prejudice Due To Failure To Investigate Wendi's Social History**

The State's response on prejudice makes stock arguments that it recycles in all capital cases, which have no application here.

*First*, the State asserts that much of the evidence cited in the Petition is "cumulative" of evidence introduced at trial. (Resp. at 45.) For example, the State notes that, at trial, it came out that Wendi "may have been molested" by one or more relatives. (*Id.*) The transcript itself reveals the weakness of this argument. Although Sharon Murphy testified that Wendi may have been sexually abused by one of the Robertsons

10

4851-6029-7232

1  when she was young (10/12/04 Tr. at 39-40), she admitted on cross-examination that she

2  was not aware of any investigation or factual basis for that speculation.  The prosecutor

3  noted that the failure to investigate further rendered the abuse allegation no more reliable

4  than a statement that Wendi had been "attacked by Bigfoot." (10/14/04 Tr. at 81-83.)  Of

5  course, defense counsel could have easily investigated further:  Skip was sitting in an

6  Arizona prison, and other members of both Skip's and Donna's families were easy to

7  locate.

8      Likewise, the passing references at trial to Skip being "strict" (Resp. at 44), Wendi

9  being "exposed to Alejo's angry outbursts" (*id.* at 45), and the Harvest school being

10  "very strict" with "no extracurricular activities" (*id.*), do not begin to capture the extent of

11  the physical and sexual abuse, ritualistic beatings and psychological manipulation Wendi

12  endured her entire childhood, from the day she was born.  *See Williams*, 529 U.S. at 398

13  (a "graphic description" of defendant's childhood, "filled with abuse and privation, . . .

14  might well have influenced the  jury's appraisal of his moral culpability") (citation

15  omitted); *Correll*, 539 F.3d at 953 n.8 (without further investigation and presentation of

16  contextual evidence and argument, bare facts "served only to demonize [defendant] rather

17  than to mitigate the appropriateness of imposing the death penalty for his actions").

18      *Second*, the State argues that the abuse and privation of Wendi's childhood carry

19  less weight, given the passage of time.  (Resp. at 46, 48.)  The problem with this

20  argument is that it completely ignores the expert reports of Dr. Woods (Tab 2) and Dr.

21  Hopper (Tab 4), which explain the nexus between:  (a) Wendi's social history, childhood

22  trauma and mental illnesses—none of which were adequately investigated, developed or

23  presented by defense counsel; and (b) Wendi's actions on the night of Joe's death.  As

24  Dr. Woods explained, by age 18, Wendi suffered from cognitive disorder, bipolar

25  disorder, complex PTSD and dependent personality disorder, and "[a]ll were in play *at*

26  *the time of the offense*, a synergy of trauma, cognitive deficits, and mood defects,

27  *impairing her ability to conform her behavior to the requirements of the law*." (Tab 2 at

28                                   11

REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4851-6029-7232

1    7 (emphasis added); *see State v. Roque*, 213 Ariz. 193, 231, ¶ 169, 141 P.3d 368, 406

2    (2006) ("[T]he relationship between mitigating evidence and the murder may affect the

3    weight given to the mitigating evidence.") (citation omitted).)

4         *Third*, with respect to Alejo's abusive sexual relationship with Wendi, the State

5    expresses skepticism that it ever happened.  (*See* Resp. at 45 ("Andriano testified that

6    Alejo never touched her inappropriately."); 46 ("it does not appear that Andriano ever

7    disclosed this alleged molestation before trial"); 47 ("Andriano does not attest in her

8    declaration that Alejo molested her, although this would certainly be a fact within her

9    personal knowledge.").)  However, this reflects a profound misunderstanding of the

10   effects of childhood sexual abuse on its victims.  In his report (completely ignored by the

11   State), Dr. Hopper explained that psychological dissociation is a disconnection from

12   painful memories, sometimes including "whole realms of experience and identity, such

13   that personality and identity are highly fragmented."  (Tab 4 at 130.)  In Wendi's case,

14   Dr. Hopper concluded that:  "*I have never before encountered a patient or defendant with*

15   *such a severe disturbance of the capacity to recall autobiographical memories . . . .*"

16   (Tab 4 at 131 (emphasis added)); *see also* Tab 7A (Kandy Rohde noted that Wendi

17   dissociated in a manner that suggested childhood sexual abuse, and should be

18   comprehensively examined by a psychiatrist; Tab 6C at 5-6 (Dr. Rosengard stated that

19   victims of sexual attack frequently repress those memories).)

20        Moreover, the State does not dispute the evidence that Alejo required a scantily-

21   clad Wendi to rub his head, back and legs for hours almost every night from age

22   10 or 11, took Wendi to lingerie stores and dressed her in garter belts, nylons and heels

23   by age 12, took Wendi to pornography stores by age 14, took highly suggestive photos of

24   Wendi wearing lingerie or bikinis,[8] kissed Wendi in public on the mouth in what a

---

25   [8]  The State argues that Alejo's photographs of Wendi as a teenager "are not exploitative
26   or obscene."  (Resp. at 47 n. 40.)  But, a number of the photos show Wendi on her hands
     and knees with an arched back; others show her on her knees, with her hands in her hair,
27   looking upward.  (Tab 73.)  Moreover, the State ignores Wendi's adopted brother's
     declaration that he found six sheets of pictures in Alejo's photo cabinet showing Wendi
28                                                          12

REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4851-6029-7232

1  declarant described as "not a father-daughter kiss," and admitted to a member of the

2  church, who was concerned that Alejo had been sexually molesting Wendi, that he had a

3  problem sexually.  (Pet. at 3-5.)

4       *Finally*, in the face of the compelling mitigation evidence regarding Wendi's

5  harrowing childhood and upbringing that was missed by defense counsel, the State's

6  Pollyannaish response—that Wendi's "parents may not have been perfect," but they

7  "were well-intentioned and raised her in the best way they knew how" (Resp. at 46)—is

8  absurd.  *See Sears v. Upton,* 130 S. Ct. 3259, 3261 (2010) (prejudice where defendant's

9  childhood was inaccurately portrayed as "stable, loving, and essentially without

10  incident"); *Rompilla*, 545 U.S. at 391 (evidence of childhood in "slum environment,"

11  discontinuation of education at age 16, and teenage alcohol consumption "would have

12  destroyed the benign conception of [the defendant's] upbringing . . . counsel had formed

13  from talking with [the defendant] himself and some of his family members").

14          **2.    Prejudice Due To Failure To Investigate Wendi's Psychiatric Disorders**

15       The expert reports of Dr. Woods and Dr. Hopper present a detailed picture of

16  Wendi's troubled childhood, her psychiatric disorders and the downward spiral she

17  experienced in the period leading to Joe's death.  As Dr. Woods explained,

18       The manifestations of her psychiatric disorders, including dissociation,
19  likely played a substantial role in the events that caused Joe's death.  A
     person in Wendi's state would have been unable to control and manage her
20  emotions and responses to the events as they unfolded.  Moreover, those
     disorders in conjunction—and particularly dependent personality disorder
21  when the sufferer's dependency needs are thwarted—*likely would have
     substantially impaired Wendi's ability to accurately judge how to "help"
22  her terminally ill husband,* who was the focus of Wendi's pathological
     dependence needs.  *Her ability to judge whether her behavior was right
23  was marred by her multiple mental and cognitive symptoms.*

24  (Tab 2 at 56-57 (emphasis added).)

25       This mitigation evidence is significant, in all three phases.[9]  In the penalty phase,

26  _____

27  in lingerie, and he was savagely beaten for it.  (Tab 26 ¶ 18.)

28  [9]  Defense counsel's failure to present evidence of Wendi's mental illness as a mitigating

13

4851-6029-7232

1  instead of a mish-mash of inconsistent and inconsequential statements about Wendi's

2  childhood, disconnected in time from Joe's death, Dr. Woods and Dr. Hopper explain the

3  nexus between Wendi's childhood, her disorders, and Joe's death, and also provide a

4  powerful rebuttal to the prosecutor's themes that:  (a) Wendi was promiscuous and hyper-

5  sexual; and (b) she was a manipulative liar who feigned lack of memory of certain events.

6       Defense counsel's failure to investigate and introduce evidence of Wendi's

7  psychiatric disorders also had an impact at the aggravation phase, where their

8  introduction would have further eroded the cruelty finding by undermining the intent

9  requirement of that factor.  (Pet. at 55.)[10]

10       In the guilt phase, the evidence is relevant to a defense under *State v. Christensen*,

11  129 Ariz. 32, 35-36, 628 P.2d 580, 583-84 (1981), based on Wendi's "character trait for

12  impulsivity" (*i.e.*, acting reflexively in response to stress), particularly given evidence of

13  organic brain damage.[11]  As set forth at length in the psychiatric reports, the evidence

---

15  circumstance is a deficiency that has repeatedly been found prejudicial.  *See, e.g., Porter,*
130 S. Ct. at 454 (brain abnormality and cognitive defects); *Rompilla*, 545 U.S. at 392
16  ("organic brain damage" and "extreme mental disturbance significantly impairing several
of [the defendant's] cognitive functions"); *Daniels v. Woodford*, 428 F.3d 1181, 1209
17  (9th Cir. 2005) (family history of mental illness); *Summerlin*, 427 F.3d at 641 ("lack of
impulse and emotional control and organic brain dysfunction").  Courts have also found
18  ineffectiveness in the failure to employ a mental health expert to explain the effect of
traumatic experiences on a defendant's conduct.  *See, e.g., Douglas v. Woodford,* 316
19  F.3d 1079, 1090 (9th Cir. 2003); *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999).

[10]  The State tries to dispense with the "intent requirement," arguing that "[c]ruelty is
20  determined by reference to an *objective* standard" and "judged from the perspective of a
*reasonable person* in the defendant's position," rather than a person suffering under the
21  psychiatric disorders or conditions of the defendant.  (Resp. at 50.)  This is not the law in
Arizona.  In *State v. Moody*, 208 Ariz. 424, 472, ¶ 226, 94 P.3d 1119 at 1167 (2004), the
22  Supreme Court reversed an "especially cruel" finding "because evidence was presented
that Moody was in a 'dissociated state'" at the time of the murders—just as Wendi was
23  here.  The State infers that *Moody* has been overruled, but neither of the cases cited by
the State support that inference.  *See State v. Bocharski*, 218 Ariz. 476, 494, ¶ 85 n.15,
24  189 P.3d 403, 421 n.15 (2008) (holding that "[t]he third F.6 factor, especially cruel, also
imposes an intent requirement.  The State must show that the perpetrator knew or should
25  have known that the victim would suffer.") (quotation omitted); *State v. Wallace*, ---
Ariz. ---, ¶¶ 22-27, 272 P.3d 1046, 1052 (2012) (noting defendant's characteristics in
26  reversing aggravator finding, concluding that the blows occurred in a "clumsy" attempt to
kill the victim rather than inflict gratuitous violence).

27  [11]  The fact that Wendi was found competent to stand trial does not change the fact that
she was suffering from serious mental illnesses at the time of Joe's death.  A defendant

14

4851-6029-7232

1   here would have established the same trait of "acting without reflection" relevant to

2   premeditation as the psychiatric evidence in *Christensen*.  (Pet. at 8-13; Tab 5.)

3          The State's response to these arguments is unpersuasive.  *First*, the State does not

4   even attempt to distinguish *Bocharski*, where the Arizona Supreme Court reduced

5   defendant's death sentence to life imprisonment on strikingly similar facts.  (Pet. at 54.)

6          *Second*, the State's criticisms of Dr. Woods and Dr. Hopper rest not on expert

7   analysis, but rather on lawyer argument based on snippets of evidence taken out of

8   context.  (Resp. at 38-43.)  For example, the State asserts that Dr. Woods' opinion that

9   Wendi's "mental disorders had worsened in the weeks prior to Joe's death" is entitled to

10  little weight because she "has engaged in this type of behavior her entire life; it did not

11  arise suddenly in the fall of 2000[.]"  (Resp. at 39; *id.* at 40.)  However, this

12  misunderstands what it means to be bipolar.  By its nature, manic bipolar states can

13  periodically spike (or be dormant), and Dr. Woods does not take the position that Wendi

14  has never experienced such episodes before.  Rather, Dr. Woods' opinion is that Wendi's

15  erratic behavior in the period leading up to Joe's death were textbook symptoms of a

16  severe manic bipolar state.  (Tab 2 at 15-16, 48-57.)

17         *Third*, the State argues that the testimony of Dr. Hopper and Dr. Woods would

18  have opened the door to "damaging rebuttal" by Dr. Bayless.  (Resp. at 42.)  The State

19  fails to recognize that Dr. Bayless's findings actually corroborate Dr. Woods' opinion:

20  "The *cyclic pattern* of violent outbursts with intermittent periods of appropriate behavior

21  represents a chronic and stable personality disorder that is extremely difficult to change."

22  (Resp. at 42 (emphasis added).)  Furthermore, Dr. Bayless, who (like all other mental

23  health professionals who examined Wendi) did not have knowledge of her social history,

24  disclosed to defense counsel before trial that he had diagnosed Wendi with a depressive

25  ─────────────────────

26  who is mentally competent for trial may nonetheless suffer a mental illness that is severe
    enough to mitigate her culpability. *See Summerlin,* 427 F.3d at 631; *Bean,* 163 F.3d at
27  1078; *Hendricks v. Calderon,* 70 F.3d 1032, 1043 (9th Cir. 1995).

28                                          15

4851-6029-7232

1  disorder and a personality disorder, and noted the possibility of childhood sexual abuse.

2  (Tab 6E at 2, 9.)  Thus, there is nothing in Dr. Bayless' report that would have led

3  defense counsel not to present the mental health opinions in the Woods and Hopper

4  reports, if defense counsel had performed an adequate mitigation investigation.

5  **3.    Prejudice Due To Failure To Object To Evidence and Argument Related To The Alleged Sodium Azide Poisoning**

6  The alleged poisoning of Joe was the cornerstone of the State's argument that

7  Joe's murder was *premeditated*.  Had defense counsel cast doubt on the State's poisoning

8  theory in the guilt and aggravation phases, the State would have been left to argue

9  premeditation (and cruelty) on the basis of Wendi hitting Joe with a stool (any one of

10  eight to ten blows from which would have rendered him unconscious) and stabbing him,

11  leading to his death "within a matter of minutes."  (11/30/04 Tr. at 58-59, 63-66, 69.)

12  Though violent, this manner of death—particularly when combined with the injuries

13  inflicted against Wendi (Tab 66), is not only *not* "above the norm of first-degree

14  murders," as required for the imposition of the death penalty, *State v. Carlson*, 202 Ariz.

15  570, 582, ¶ 45, 48 P.3d 1180, 1192 (2002); *State v. Soto-Fong*, 187 Ariz. 186, 204, 928

16  P.2d 610, 628 (1996), but also highlights defense counsel's error in not seeking an

17  instruction related to lesser included offenses.

18  Anticipating that outcome, the State grasps at one final straw, contending that it

19  recalled an expert during the aggravation phase "to establish, in support of the cruelty

20  allegation, that Joe had died with his eyes open, increasing the likelihood that he

21  perceived Andriano striking him before he lost consciousness."  (Resp. at 9-10.)  Again,

22  the State misrepresents the record:  the expert testified that "[t]he fact that the eyes are

23  open or closed gives us no insight as to whether or not this gentleman was conscious or

24  unconscious at the time[.]"  (11/30/04 Tr. at 45-46.)

25  **4.    Prejudice Due To Failure To Elicit Corroborative Testimony**

26  At trial, the jury was left without any testimony from a neutral third-party that

27  supported Wendi's explanation of the State's circumstantial evidence.  Thus, the above-

28

16

REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4851-6029-7232

1  referenced corroborating testimony from Palicki, Miller, and Weaver—the credibility of
2  which cannot not be reasonably attacked—was crucial.

3      Rather than addressing "the cumulative impact of [these] multiple deficiencies," as
4  *Strickland* requires, *see Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir.
5  1995), the State divides them up and argues that none, in and of itself, proves that Wendi
6  *did not* commit premeditated murder.  However, this is not the *Strickland* standard.  *See*
7  *Strickland*, 466 U.S. at 694 ("The result of a proceeding can be rendered unreliable, and
8  hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a
9  preponderance of the evidence to have determined the outcome.").

10     *First*, the State attempts to downplay the value of Palicki's testimony, noting that
11  Palicki remembers those conversations occurring shortly after she met Joe and Wendi in
12  the summer or fall of 1999, while the State introduced evidence of Wendi's efforts to
13  obtain life insurance for Joe in the summer of 2000.  (Resp. at 56-57.)  The State's timing
14  argument glosses over the true import of this evidence.  *Without* Palicki's testimony, the
15  State was free to plausibly argue (as it did) that Wendi sought a life insurance policy so
16  she could economically benefit from Joe's death, and that Joe never knew or approved of
17  her clandestine efforts.  But if defense counsel had properly investigated and elicited
18  Palicki's testimony, then the State's theory becomes far less plausible:  without any
19  evidence, the State would have to contend that Joe changed his mind in the intervening
20  months and told Wendi *not* to try to obtain life insurance, but Wendi did so anyway.

21     *Second*, the State contends that Miller's and Weaver's recollections of different
22  discussions with Joe regarding depression and suicide were immaterial because they
23  would not necessarily establish Joe's involvement in acquiring and ingesting the sodium
24  azide.  (Resp. at 59-60.)  Again, that is not the *Strickland* standard, which asks only
25  whether the cumulative impact of defense counsel's failures undermine confidence in the
26  outcome.  Given that the State's theory of the case relied entirely upon circumstantial
27  evidence that Wendi surreptitiously poisoned Joe, evidence that Joe was openly
28

17

4851-6029-7232

1  discussing suicide and informing a close friend that he expected to die within a few

2  weeks (coupled with the practical impossibility of him being "tricked" into ingesting such

3  a quantity of sodium azide, as noted above), certainly undermines confidence in the

4  State's theory of a premeditated, especially cruel, poisoning and murder by Wendi.

5      **D.    A Reweighing Of The Mitigating And Aggravating Evidence Shows
        That Wendi Has Demonstrated A Reasonable Probability Of A
6       Different Outcome**

7          To ascertain whether Wendi has shown a reasonable probability of a different

8  outcome, courts "consider 'the totality of the available mitigation evidence—both that

9  adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it

10 against the evidence in aggravation.'" *Porter*, 130 S. Ct. at 453-54 (quoting *Williams*, 529

11 U.S. at 397-98).  In doing so, this Court should weigh the mitigating evidence an

12 effective defense counsel would have found (as set forth in the Petition and *infra*) against

13 the cruelty aggravating circumstance based on the alleged sodium azide poisoning, and

14 assess what reasonably could have happened after "appropriately reduc[ing] the ballast

15 on the aggravating side of the scale." *Porter*, 130 S. Ct. at 454; *see also Boyde v. Brown*,

16 404 F.3d 1159, 1179-80 (9th Cir. 2005).

17         As explained above, the evidence related to Wendi's social history, her psychiatric

18 disorders, the impossibility of the State's poisoning theory, and the testimony of third-

19 party witnesses that was available but not presented during all three phases of the trial

20 was significant.  Had defense counsel provided effective representation, the State would

21 have been left to argue that the beating and stabbing of a husband (Joe) who was suicidal,

22 by a wife (Wendi) who was in a dissociative mental state, which caused Joe's

23 unconsciousness within eight to ten blows and his death in a matter of minutes, was

24 premeditated and "especially cruel" (*i.e.*, beyond the norm of other first-degree murders).

25 Had they done so, there is a reasonable probability that at least one juror would have

26 found that premeditation was not established, that the aggravator was not met, or that the

27 mitigating evidence showing Wendi's lifetime of abuse and privation outweighed the sole

28                                        18

1  aggravating factor.

2          In sum, Wendi is entitled to relief under *Strickland*.

3  **II.    COUNSEL WAS INEFFECTIVE IN FAILING TO OBJECT TO THE PERVASIVE PROSECUTORIAL MISCONDUCT, WHICH DEPRIVED WENDI OF DUE PROCESS**

4

5          Based on the pervasive prosecutorial misconduct in this case, Wendi is entitled to

6  reversal of her conviction or, at a minimum, a new trial. *Bocharski*, 218 Ariz. at 491-92,

7  ¶ 74, 189 P.3d at 418-19.

8          **A.    "Verbal Guerrilla Warfare" Regarding Wendi's Promiscuity**

9          The prosecutor acknowledged at trial that Wendi's sexual history was *not relevant*

10  to motive, and therefore *not relevant* to the case.[12]  Nevertheless, the prosecutor made

11  over 100 references to her sexual history during all three phases of the trial (see Pet.

12  **EXHIBIT 2**), characterizing Wendi as a promiscuous and sex-crazed adulteress in order to

13  inflame the passions and prejudices of the jury.  That misconduct "so infected the trial

14  with unfairness as to make the resulting conviction a denial of due process." *State v.*

15  *Hughes*, 193 Ariz. 72, 78, ¶ 26, 969 P.2d 1184, 1191 (1998) (quotation omitted).[13]

16          The State half-heartedly defends the prosecutor's conduct, stating only that his

17  repeated references to Wendi's sexual history were "based on evidence properly admitted

18  at trial" and that his statements to the jury were argument rather than evidence.  (Resp. at

19  63.)  Neither are sufficient justifications for the prosecutor's tactical decision to engage in

20  "verbal guerrilla warfare," *Pool v. Superior Ct.*, 139 Ariz. 98, 103, 677 P.2d 261, 266

---

21  [12]  Prior to trial, evidence that Wendi had sexual relationships with two men when

22  married was deemed admissible for the purpose of showing, in the prosecutor's words at the time, the "motivation, if you will, or the reason why she wanted her husband dead."

23  (2/27/04 Tr. at 17.)  At trial, however, the prosecutor flatly disclaimed their relevance for that purpose, stating in open court that Wendi's affairs "couldn't really be the motive."

24  (11/30/04 Tr. at 20; 12/1/04 Tr. at 10-11.)

25  [13]  If defense counsel had investigated Wendi's social history and psychiatric disorders, they could have explained that Wendi's attitudes toward men and promiscuity were the

26  product of a lifetime of sexual and physical abuse.  Even having failed to do that, defense counsel also inexplicably failed to object to the vast majority of the prosecutor's

27  improper, cumulative and highly prejudicial questions and argument about Wendi's sexual history.

28                                              19

4851-6029-7232

1    (1984), by referencing Wendi's sexuality at every conceivable opportunity.  (*See* Pet.

2    **EXHIBIT 2**.)

3         Prosecutorial misconduct occurs when the prosecutor "appeal[s] to the fears or

4    passions of the jury," regardless of whether such appeals occur in argument to the jury

5    and regardless of whether they are based on admissible evidence.  *State v. Morris*, 215

6    Ariz. 324, 337, 160 P.3d 203, 216 (2007).  *See also State v. Mincey*, 115 Ariz. 472, 484,

7    566 P.2d 273, 285 (1977) (finding prosecutorial misconduct based on one statement that

8    improperly appealed to jurors' fears, even though "[t]he statement in question [was]

9    based on the evidence"), *rev'd on other grounds*, 437 U.S. 385 (1978).  As the Arizona

10   Supreme Court has explained:

11        even if there was no error or an error was harmless and so by itself does not
          warrant reversal, an incident may nonetheless contribute to a finding of
12        persistent and pervasive misconduct, if the cumulative effect of the
          incidents shows that the prosecutor intentionally engaged in improper
13        conduct and did so with indifference, if not a specific intent, to prejudice
          the defendant.
14

15   *Roque*, 213 Ariz. at 228 ¶ 155, 141 P.3d at 403 (internal quotation and citation omitted).[14]

16        Considering that "[t]he prosecutor's interest in a criminal prosecution 'is not that it

17   shall win a case, but that justice shall be done,'" *Pool*, 139 Ariz. at 103, 677 P.2d at 266

18   (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)), the prosecutor's tactic of

19   carpet-bombing the jury with references to Wendi's promiscuity had the effect of turning

20   Wendi's sexual history into a non-statutory (and unconstitutional) factor in the State's

21   quest to obtain a death sentence.

22        **B.    Implying Extrajudicial Evidence**

23        A prosecutor at trial "cannot make insinuations that are not supported by the

24

25   ─────────────────
     [14] Arizona recognizes the threat of unfair prejudice posed by references to a witness's
26   promiscuity, as evidenced by its passage of a rape-shield statute modeled after Federal
     Rule of Evidence 412, which was intended to prevent the "infusion of sexual innuendo
27   into the factfinding process" and appeals to "sexual stereotyping."  FED. R. EVID. 412,
     1994 Advisory Committee Note.

28                                            20

     REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                        CASE NO. CR2000-096032-A

4851-6029-7232

1  evidence." *Hughes*, 193 Ariz. at 85, ¶ 59, 969 P.2d at 1197.  Going beyond mere

2  insinuations, the prosecutor repeatedly implied that the State possessed extrajudicial

3  *knowledge* of factual matters that were for the jury to decide, frequently by prefacing

4  mere assertions, theories, or disputed facts with the improper endorsement, "we know."

5        Citing no law, the State makes the blanket assertion that the prosecutor's

6  statements  were based on the evidence presented.  (Resp. at 64.)  To the contrary, even if

7  the prosecutor was making statements that had evidentiary support—and in many

8  instances, he was not—prefacing such references with the phrase "we know" is still

9  improper, because it implies that the State *knows* the truth of facts within the province of

10  the jury to decide.  *See United States v. Younger*, 398 F.3d 1179, 1191 (9th Cir. 2005).

11        The State's only specific response concerns the prosecutor's statements regarding

12  Shawn King, but that response raises more questions of prosecutorial misconduct than it

13  answers.  King was never called as a witness and supposedly never interviewed by the

14  State (Tab 15 at 32), yet the State contends that the prosecutor planned to call King as a

15  witness and had a "good faith basis" for asserting at trial that King caught Wendi "in a

16  state of undress with another male."  (10/13/04 at 51.)  If the State withheld statements or

17  reports regarding King, then it committed prosecutorial misconduct of a different variety.

18  *See* ARIZ. R. CRIM. P. 15.1(b)(1, 3).

19        In addition, the State contends that the prosecutor was justified in proclaiming to

20  the jury that King "would be judged as an accomplice" in Joe's murder, despite the fact

21  he was never charged with such a crime, because Wendi noted that King assisted her in

22  locating the sodium azide.  (Resp. at 63-64.)  But there is a vast difference between:  (1)

23  noting that Wendi received King's help in locating the sodium azide for the purpose of

24  helping Joe commit suicide, which *was* supported by the evidence; and (2) asserting that

25  King would be convicted as an accomplice to murder, which implied that the State

26  possessed evidence that King conspired with Wendi for the purpose of murdering her

27  husband.  The effect of the latter assertion cannot be overstated; no witness ever told the

28  

<div align="center">21</div>

4851-6029-7232

1  jury that Wendi ever expressed any intent to murder her husband, an evidentiary gap the

2  prosecutor conveniently and improperly filled by telling the jury that the State had

3  evidence of King's guilt, and thus his purported knowledge of Wendi's intent.

4          **C.**    **The Prosecutor's Baseless Attack On A Defense Expert's Ethics**

5         It is prosecutorial misconduct to even "*imply* unethical conduct on the part of an

6  expert witness without having evidence to support the accusation." *Hughes*, 193 Ariz. at

7  86 ¶ 59, 969 P.2d at 1194 (emphasis added).  Here, the Petition noted that the prosecutor

8  described defense expert Sharon Murphy as a "liar" who "can't keep her story straight,"

9  without pointing to any instance of perjury by Dr. Murphy.

10         Rather than defend this clear-cut prosecutorial misconduct, the State denies that it

11  occurred, claiming—without citation to the record—that the prosecutor's "statements

12  referenced *Andriano*, whose self-report had formed virtually the entire basis of Dr.

13  Murphy's opinion." (Resp. at 64.)  But the prosecutor's statement speaks for itself:

14             If there's anybody that's conjuring anything up, if there is anybody here
           that can be labeled a conjurer or liar, it isn't the prosecutor.  It certainly

15             isn't.  He's not the one that's the liar here.  It may be someone else here in
           this courtroom, *the one who can't keep her story straight, Sharon Murphy*.

16  (12/1/04 Tr. at 61 (emphasis added).)

17  **III.**   **ATTORNEY DELOZIER HAD AN ACTUAL CONFLICT OF INTEREST**
       **THAT AFFECTED THE ADEQUACY OF WENDI'S REPRESENTATION**

18

19         From mid-2001 through the time of the verdict, DeLozier had sole responsibility

20  for the mitigation investigation (Tab 6 ¶¶ 17, 21-22; Tab 7 ¶ 12), including the

21  responsibility to investigate childhood abuse and neglect—issues fundamental to any

22  mitigation investigation, but especially important here given the red flags and suspicions

23  of all of Wendi's mental-health evaluators.  But in also concurrently representing

24  Wendi's parents in child custody and adoption proceedings, DeLozier had undertaken

25  two diametrically opposed roles: (1) in representing Wendi's parents, he was charged

26  with advocating their quality as caregivers; and (2) in representing Wendi, he had a duty

27  to investigate and uncover evidence of childhood abuse and privation by those same

28                        22

4851-6029-7232

1   parents (and their relatives).  In doing so, DeLozier was incapable of providing adequate

2   representation to both sets of clients.[15]

3       The State asserts that:  (1) DeLozier's ethical conflict should have been raised on

4   direct appeal and is therefore precluded; (2) any conflict was "cured" by the fact that

5   DeLozier no longer represented Wendi's parents by the time Wendi's trial began; and

6   (3) the conflict claim lacks merit, because "no plausible alternative mitigation strategy

7   existed" for DeLozier to pursue.  All of these arguments are baseless.[16]

8           **1.    The Conflict Claims Are Not Precluded**

9       The State contends that appellate counsel should have raised DeLozier's conflict

10  as a basis for reversal on direct appeal.  Though the State has the burden of proving

11  preclusion, ARIZ. R. CRIM. P. 32.2(b), the State cites no case ever holding conflict claims

12  precluded for failure to raise them on direct appeal, and it fails to explain how appellate

13  counsel could have raised such claims on direct appeal here.

14      It is axiomatic that appellate counsel is bound by the record on direct appeal, and

15  the Arizona Supreme Court advises defense attorneys that Rule 32 proceedings are the

16  proper forum for issues dependent upon evidence outside the record.  *See, e.g.*, *State v.*

17

18  [15] For example, if DeLozier represented that Wendi's parents were quality caregivers in
19  the custody proceeding (as he did), he could not argue that they were abusive in Wendi's
    trial without correcting the record in the custody proceeding.  ARIZ. R. PROF. COND. 3.1,
20  3.3.  Moreover, even if DeLozier *had* performed a reasonable investigation into abuse
    and neglect by Wendi's parents, his attorney-client relationship with them meant that any
21  information he learned from them would have been subject to confidentiality restrictions,
    *id.* 1.6, 1.9(C), and disclosure thereof would violate his continuing duty of loyalty to
22  Wendi's parents, *id.* 1.7(a)(2), 1.9(a, c).

23  [16] The State also contends that a defendant's Sixth Amendment right to conflict-free
    counsel under *Cuyler v. Sullivan*, 446 U.S. 335 (1980) is "limited to the joint
24  representation of co-defendants, which is not at issue here."  (Resp. at 21.)  The basis for
    this assertion is unclear; neither the Arizona Supreme Court nor the United States
25  Supreme Court have ever so held, and the very cases the State cites in the conflict section
    of its response do not limit *Cuyler* to that context.  *See State v. Moore*, 222 Ariz. 1, 15-16,
26  ¶¶ 76-83, 213 P.3d 150, 164-65 (2009) (analyzing alleged conflict of defense counsel
    who represented a defense witness in another matter on its merits); *State v. Jenkins*, 148
27  Ariz. 463, 467, 715 P.2d 716, 720 (1986) (analyzing alleged conflict of defense counsel
    who represented a prosecution witness in his unrelated divorce proceeding).

28                                        23

4851-6029-7232

1  *Allen*, 223 Ariz. 125, 129 ¶ 21, 220 P.3d 245, 249 (2009).  There was no development of

2  the record below on the conflict issue, which is a corollary to the ineffective assistance

3  claim generally, and thus it could not have been raised on direct appeal.  DeLozier did not

4  disclose his conflict in the record below, and appellate counsel had no basis for arguing

5  the nature of any harm relating to the conflict, because *no one* had yet investigated the

6  pervasive childhood abuse that Wendi suffered.  Therefore, the State has failed to show

7  preclusion under Rule 32.2.

8              **2.    DeLozier Was Conflicted During The Entire Time He Was
                      Supposed To Be Preparing The Mitigation Case**

9

10         Next, the State contends that DeLozier's conflict does not matter, because

11  DeLozier "was not actively representing both parties during Andriano's trial and the 2

12  years preceding it; he was only representing Andriano."  The State is incorrect.  DeLozier

13  ceased being Wendi's parents' *counsel of record* in the custody proceeding in 2002, but

14  he continued *representing* them in that matter at least until the time of Wendi's trial.

15         Between 2002 and the time of Wendi's trial in 2004, DeLozier filed two appellate

16  briefs in the Court of Appeals, followed by a petition for review, which emphasized the

17  Ochoas' fitness as caregivers and asked the appellate courts to "reverse the trial court's

18  award of sanctions against him *and the Ochoas*."  (*See, e.g.*, State Ex. E at 39-69

19  (emphasis added).)  The mandate from the Arizona Supreme Court was filed on August

20  19, 2004—less than a week before jury selection began in Wendi's trial.  (Tab 77.)  Thus,

21  during the *entire time* DeLozier was supposed to be engaging in a thorough pre-trial

22  investigation of mitigating evidence on Wendi's behalf—including her harrowing

23  childhood with the Ochoas—he was hobbled by his competing responsibility to represent

24  those same individuals as quality parents in another proceeding.

25         The State's brief assumes that DeLozier's conflict was cured because he no longer

26  actively represented the Ochoas during Wendi's trial, but that argument misunderstands

27  the nature of DeLozier's conflict.  It is well settled that the "unparalleled investigation

28                                          24

REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4851-6029-7232

1   into personal and family history" of the defendant that is required in a capital case

2   "should begin as quickly as possible," and certainly take place *before* the capital trial

3   commences. (Tab 76 at PCR480-84.) *See also Williams*, 529 U.S. at 395-96 (finding

4   ineffective assistance when "[t]he record establishes that counsel did not begin to prepare

5   for that [penalty] phase of the proceeding until a week before the trial."). Thus, by the

6   time the trial began here, the damage from DeLozier's concurrent representation of

7   Wendi and the Ochoas already had been done.

8       Moreover, the Ochoas were at least former clients *during* Wendi's trial, and

9   therefore DeLozier owed them continuing duties of loyalty and confidentiality. ARIZ. R.

10  PROF. COND. 1.9 & cmt.  Therefore, DeLozier was prohibited from representing another

11  client in a "substantially related matter in which that person's interests are materially

12  adverse to the interests of the former client" without written consent, which apparently

13  was not obtained here. *Id.* 1.9(a).  Wendi's mitigation case was "substantially related" to

14  the Ochoas' custody proceeding under this standard, because the Ochoas' parenting was a

15  primary issue in the custody proceeding and, for the reasons set forth in the Petition,

16  should have been a primary issue in Wendi's mitigation case. *See Foulke v. Knuck*, 162

17  Ariz. 517, 521, 784 P.2d 723, 727 (Ct. App. 1989) (matters are "substantially related"

18  when "the general subject matter [of the prior representation] is substantially related to

19  the issues which must necessarily be resolved" in the present action).[17]

20      Tacitly conceding DeLozier's violation of the Rules, the State argues in a footnote

21  that "a violation of the Arizona Rules of Professional Conduct does not automatically

22

23  [17] In addition, matters are "substantially related" when there is "a substantial risk that that
24  confidential factual information as would normally have been obtained in the prior
    representation would materially advance the client's position in the subsequent matter."
    ARIZ. R. PROF. COND. 1.9 cmt.  Here, there is little question that information regarding
25  the Ochoas' rearing of Wendi "would in ordinary practice be learned by a lawyer"
    representing them in a child custody dispute.  Whether DeLozier actually learned such
26  confidential information is immaterial; the risk alone, "based on the nature of the services
    the lawyer provided the former client and information that would in ordinary practice be
27  learned by a lawyer providing such services," is disqualifying.  *Id.*

28                                          25

4851-6029-7232

1  render counsel constitutionally ineffective." (Resp. at 22 n.25.)  But actual conflicts are

2  different than other Rules violations: "Where a constitutional right to counsel exists, our

3  Sixth Amendment cases hold that there is a correlative right to representation that is free

4  from conflicts of interest," *Wood v. Georgia*, 450 U.S. 261, 271 (1981), which is so

5  fundamental that defendants are limited in their ability to waive it, *Wheat v. United*

6  *States*, 486 U.S. 153, 162 (1988).

### 3.   DeLozier's Conflict Rendered Him Incapable Of Pursuing A Plausible Alternative Defense Strategy

7
8
9          As noted in the Petition, "a defendant who shows that a conflict of interest actually

10  affected the adequacy of his representation need not demonstrate prejudice in order to

11  obtain relief."  *Cuyler*, 446 U.S. at 349-50.  The State argues that Wendi fails to meet this

12  standard because her Petition fails to show that "some other plausible defense strategy

13  might have been pursued" by non-conflicted counsel. (Resp. at 21.)  To the contrary, the

14  Petition provides a detailed discussion comparing the path that DeLozier actually pursued

15  with the one that non-conflicted counsel should have pursued.  (*See* Pet. at 2-17, 29-30,

16  40, 63).  Non-conflicted counsel should have investigated and presented evidence that

17  Wendi's upbringing was in fact horrific, marked by abuse, sexual manipulation and

18  molestation, and extreme deprivation.  As the State concedes, the mere existence of this

19  alternative path proves adverse effect.  (Resp. at 21 ("The defendant need not show that

20  the strategy would have been successful, but merely that it was a viable alternative.").)

### IV.   THE JUROR MISCONDUCT CLAIM IS NOT PRECLUDED, AND THE STATE'S ATTEMPT TO MINIMIZE JUROR MISCONDUCT FAILS

21
22          The Petition included the declarations of multiple jurors, which provide two areas

23  of relevant testimony:  (1) corroboration of prejudice, such as neutral, firsthand

24  observations of the effects of Wendi's medications and sleep deprivation during the trial

25  (Tab 39 ¶ 4; Tab 40 ¶ 10), which were neither monitored nor addressed by defense

26  counsel (Pet. at 30-31); and (2) proof of juror misconduct, namely the jurors' creation of

27  a chart showing sentencing outcomes during the *aggravation phase* deliberations and

28
                                        26

4851-6029-7232

1  their focus upon an external, non-evidentiary consideration (the assumption that Wendi

2  would "get out of prison" if they did not find an aggravator) as a "key reason" for its

3  finding of especial cruelty.  (Tab 41 ¶ 6; *see also* Tab 39 ¶ 8.)

4       The State offers no response to the first purpose of the juror declarations, and

5  thereby concedes their admissibility to show prejudice.  As to the second—evidence of

6  juror misconduct—the State contends that:  (1) juror misconduct claims are precluded

7  now because they were not presented in a post-verdict motion under Rule 24.1; (2) the

8  jurors' statements showing misconduct are an inadmissible attempt to impeach the

9  verdict; and (3) the jurors' statements do not sufficiently show prejudice from the

10 misconduct.  None of these arguments hold up to closer examination.

11      *First*, the State's preclusion argument rests on the incorrect assumption that the

12 grounds for relief based on juror misconduct in this Rule 32 proceeding are limited to the

13 grounds for relief in a Rule 24.1 motion.  In fact, Rule 24.1 exists for the narrow purpose

14 of raising certain specified trial errors "for reconsideration," ARIZ. R. CRIM. P. 24.1 cmt.,

15 while Rule 32 requires a petitioner to raise "*every* ground known to him or her for

16 vacating, reducing, correcting or otherwise changing all judgments or sentences imposed

17 upon him or her," *id.* 32.5, including any challenge based on the U.S. Constitution, *id.*

18 32.1(a).

19      Here, the misconduct consisted of deciding an aggravating factor based on

20 extraneous information—the chart relating to parole availability—that the trial court had

21 precluded it from considering.  (7/30/04 Tr. at 6.)  That claim does not squarely fall

22 within the enumerated types of misconduct listed in Rule 24.1(c), but it is in fact a

23 violation of due process, as numerous courts have held.[18]  Parole speculation pervaded

---

[18] *See Simmons v. South Carolina*, 512 U.S. 154, 161 (1994) (due process violated when
parole issue injected into jury deliberations without providing defendant an opportunity
to address it).  *See also Jeffries v. Wood*, 114 F.3d 1484, 1490 (9th Cir. 1997) ("[T]he
introduction of prejudicial information to a juror violated a defendant's right to a fair trial
regardless of whether the source of that information was internal (*e.g.*, another juror) or
external (*e.g.*, a bailiff).");  *Musgrove v. State*, 986 S.W.2d 738 (Tex. App. 1999) (juror
discussion and consideration of parole possibilities in sentencing constitutes misconduct),

27

1 | the jury deliberations to an even greater extent here than the cases cited in the preceding

2 | footnote, in that it affected the jury's decision-making not only at the *sentencing* phase

3 | (which can be permissible under certain circumstances), but also at the *aggravation*

4 | phase.  Moreover, the jurors here went beyond merely mentioning parole in their

5 | deliberations; they actually made and displayed a chart to consider what sentence Wendi

6 | may receive if they did or did not find an aggravating factor.  (Tab 39 ¶ 8.)

7 |        *Second*, as numerous decisions have acknowledged,[19] juror declarations are a

8 | legitimate means of showing that misconduct occurred.  As these cases implicitly

9 | recognize, there is a difference between impeaching the verdict and unearthing evidence

10 | of juror misconduct; the State's expansive reading of Rule 24.1(d) would effectively

11 | allow the exception (barring affidavits that impeach the verdict) to swallow the rule that

12 | juror misconduct is a basis for relief.

13 |        *Third*, the State's fallback argument of a lack of prejudice lacks any factual or

14 | legal basis.  The parole issue and the accompanying chart were considered by the entire

15 | jury and were a "key reason" the jury found the cruelty aggravator; without that, there is

16 | a reasonable probability at least one juror would not have found the aggravator.

**V.    THE INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL CLAIM IS NOT WAIVED**

*Harris v. Commonwealth*, 408 S.E.2d 599, 601-02 (Va. App. 1991) (requiring evidentiary inquiry into alleged misconduct in juror deliberations regarding parole eligibility); *Quick v. State*, 353 S.E.2d 497, 503 (Ga. 1987) (reversing sentence when jury improperly considered implications of parole, because "a defendant's parole eligibility is not, and ought not be, an issue considered by the jury in the sentencing phase of a death penalty case"); *People v. Walker*, 440 N.E.2d 83, 89-90 (Ill. 1982) (vacating death sentence where, "[b]y injecting the parole consideration into the penalty determination, the jury [wa]s diverting its attention from the offense and the offender, and [wa]s focusing upon a speculative possibility that may or may not occur. . . .  Whether or not the defendant may, at some future time, be paroled is not a proper aggravating factor to consider in determining whether the death penalty should be imposed.").

[19] *See* note 18 *supra*; *see also Silva v. Woodford*, 279 F.3d 825, 850 (9th Cir. 2002) (relying upon juror declaration describing closeness of deliberations in reaching verdict to bolster finding of prejudice); *State v. Hall*, 204 Ariz. 442, 446-49, ¶¶ 10-25, 65 P.3d 90, 94-97 (2003) (relying on juror affidavits to find juror misconduct); *Lashonda M. v. Dep't of Economic Security.*, 210 Ariz. 77, 84, ¶ 25, 107 P.3d 923, 930 (Ct. App. 2005) (rejecting claim of juror misconduct because it was *not* supported by a juror affidavit).

28

1    The State argues that the ineffective assistance of appellate counsel claim is

2   waived for insufficient argument (Resp. at 65), but never identifies what else the Petition

3   could or would need to say on the topic.  The legal issues raised in the Petition are

4   meritorious; to the extent this Court finds that any of those issues were preserved by

5   defense counsel, then appellate counsel's failure to raise those meritorious issues on

6   direct appeal was prejudicial and falls below the prevailing standard for capital cases.

7   *See United States v. Withers*, 638 F.3d 1055, 1064-65 (9th Cir. 2010) (*Strickland* standard

8   applies to claims of ineffective assistance of appellate counsel); Tab 76 at PCR440, 526-

9   27 (the prevailing standard for appellate counsel requires it "to raise every potential

10  ground of error that might result in a reversal of the defendant's conviction or

11  punishment," and to present all "arguably meritorious" issues).

12  **VI.    THE COURT SHOULD CONSIDER LARRY HAMMOND'S EXPERT
        OPINION**

13

14           The State argues that Attorney Hammond's opinions are "irrelevant" because

15  *Strickland* involves only a question of law, for which no expert testimony is needed.

16  (Resp. at 27.)  To the contrary, as *Strickland* itself makes clear, "both the performance

17  and prejudice components of the ineffectiveness inquiry are mixed questions of law and

    fact."  466 U.S. at 698.

18

19           Just as courts permit attorney experts to testify in legal malpractice cases, federal[20]

20  and state[21] courts routinely rely on the opinions of attorney *Strickland* experts in

21  assessing the performance of trial counsel in capital cases.  Of note, in the *Murdaugh*

22  [20]  *See Wiggins*, 539 U.S. at 524 (noting testimony of attorney expert on "professional
    standards that prevailed" at time); *Beardslee v. Woodford*, 358 F.3d 560, 570 n.1, 583

23  (9th Cir. 2004) ( "*Strickland* expert" testified at hearing); *Ainsworth v. Calderon*, 138
    F.3d 787, 791 (9th Cir. 1998) (district court did not err in permitting expert testimony in

24  the form of two attorney declarations on ineffective counsel issue); *see also Hale v.
    Gibson*, 227 F.3d 1298, 1319 (10th Cir. 2000); *Pickens v. Lockhart*, 714 F.2d 1455,

25  1466-68 (8th Cir. 1983); *Marzullo v. Maryland*, 561 F.2d 540, 544-45 (4th Cir. 1977).

26  [21]  *See* Ex. B.  *See also State v. DiFrisco*, 804 A.2d 507, 533-34 (N.J. 2002); *Dwyer v.
    Comm'r*, No. CV 980357949S, 2000 Conn. Super. LEXIS 1934, *11-12 (Conn. Super.

27  Ct. July 26, 2000); *People v. Thomas*, 867 P.2d 880, 886 (Colo. 1994); *In re Cordero*,
    756 P.2d 1370, 1376 (Cal. 1988).

28
                                                    29
    REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                              CASE NO. CR2000-096032-A

4851-6029-7232

P-App. 000276

1 | capital case, the State tried to exclude Attorney Hammond from testifying as a *Strickland*
2 | expert based on the same exact argument that it advances here, and the court (Granville,
3 | J.) summarily denied the State's request. (*See* Exs. A & B to this Reply (State's motion
4 | to exclude Attorney Hammond in *Murdaugh* and order denying same).)

5 | Finally, the cases the State relies upon are distinguishable because they address the
6 | narrow question of "whether an attorney's actions were actually the product of a *tactical*
7 | *or strategic decision*," *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998)
8 | (emphasis added), which is different than the performance inquiry under *Strickland*.

9 | **CONCLUSION**

10 | For the reasons stated above, this Petition should be granted.

11 |

12 | DATE: SEPTEMBER 4, 2012    By: _____

13 |                              Scott M. Bennett (022350)
                                 COPPERSMITH SCHERMER & BROCKELMAN PLC
14 |                              2800 North Central Avenue
                                 Phoenix, Arizona 85004
15 |                              (602) 224-0999 (office)
                                 (602) 224-6020 (fax)
16 |                              sbennett@csblaw.com

17 |

18 |                              Allen A. Arntsen, admitted *pro hac vice*
                                 Matthew R. Lynch, admitted *pro hac vice*
19 |                              FOLEY & LARDNER LLP
                                 150 E. Gilman Street
20 |                              Madison, WI 53703-1481
                                 (608) 257-5035 (Office)
21 |                              (608) 258-4258 (Fax)

22 |

23 |                              *Attorneys For Petitioner Wendi Andriano*

24 |

25 |

26 |

27 |

28 |                                             30

REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4851-6029-7232



1  ORIGINAL filed September 4, 2012, with:

2  Clerk of the Maricopa County Superior Court
   South Court Tower
3  175 West Madison
   Phoenix, AZ 85007

4
   COURTESY COPY hand-delivered September 4, 2012, to:
5
   Judge Douglas Rayes
6  Maricopa County Superior Court
   101 W. Jefferson St., Room 511
7  Phoenix, AZ 85003-2243

8  COPY mailed September 4, 2012 to:

9  Lacey Stover Gard
   Office of the Attorney General
10 400 W. Congress, Suite S-315
   Tucson, AZ 85701-1367
11
   *Attorney for the State of Arizona*

12

13  Carol Keesee

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                             31

                REPLY MEMORANDUM IN SUPPORT OF PETITION FOR POST-CONVICTION RELIEF
                                 CASE NO. CR2000-096032-A

4851-6029-7232

# Exhibit A

MICHAEL K. JEANES, CLERK
BY S. Keinon DEP

FILED

2007 OCT 18  PM 1: 47

TERRY GODDARD
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

SHERRI TOLAR ROLLISON
ASSISTANT ATTORNEYS GENERAL
CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, ARIZONA 85007–2997
TELEPHONE: (602) 542–4686
(STATE BAR NUMBER 013657)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
## COUNTY OF MARICOPA

STATE OF ARIZONA,

    RESPONDENT/PLAINTIFF,

-vs-

MICHAEL J. MURDAUGH,

    PETITIONER/DEFENDANT.

CR-95-006472

MOTION TO PRECLUDE EXPERT TESTIMONY CONCERNING INEFFECTIVE ASSISTANCE OF COUNSEL.

THE HON. WARREN J. GRANVILLE

    Pursuant to Rule 32.8 of the Arizona Rules of Criminal Procedure and Rule 702 of the Arizona Rules of Evidence, Respondent respectfully requests that this Court preclude expert testimony concerning ineffective assistance of counsel. This motion is supported by the accompanying memorandum of points and authorities.

. . . .
. . . .

1

−66−

Respectfully submitted this 18th day of October, 2007.

TERRY GODDARD
ATTORNEY GENERAL

SHERRI TOLAR ROLLISON
ASSISTANT ATTORNEY GENERAL

## MEMORANDUM OF POINTS AND AUTHORITIES

On October 2, 2007, Petitioner noticed Larry Hammond as an expert witness on ineffective assistance of counsel for Petitioner's upcoming post-conviction relief evidentiary hearing.  Respondent requests that this Court preclude expert testimony concerning ineffective assistance of counsel.  Such testimony is not necessary to assist the trier of fact, and is therefore, irrelevant.

Rule 702 of the Arizona Rules of Evidence permits expert testimony under limited circumstances:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to *understand the evidence or to determine a fact in issue,* a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(Emphasis added.)

In order to prevail on an ineffective assistance of counsel claim, Petitioner must satisfy the two-prong test enunciated in *Strickland v. Washington,* 466 U.S. 668, 687–88 (1984), by proving that (1) counsel rendered deficient performance

2

under prevailing professional standards, and (2) Petitioner suffered prejudice. And, to prove deficient performance, Petitioner must convince this Court that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. As numerous courts have recognized, whether counsel's trial tactics are reasonable is a question of law, not a question of fact. *See United States v. Swanson*, 943 F.2d 1070, 1072 (9th Cir. 1991); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991); *Smith v. Ylst*, 826 F.2d 872, 875 (9th Cir. 1987); *Lytle v. Jordan*, 22 P.3d 666, 679 (N.M. 2001); *Jefferson v. Zant*, 431 S.E.2d 110, 112 (Ga. 1993). As the United States Court of Appeals for the Eleventh Circuit stated:

> Inquiries into strategic or tactical decisions challenged as ineffective assistance of counsel involve both a factual and a legal component. The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact . . . . By contrast, the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact . . . .

*Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998).

In this case, expert testimony to establish *Strickland*'s deficient-performance prong would be irrelevant and would not "assist the trier of fact." Ariz. R. Evid. 702. As noted above, the question whether an attorney's performance fell below objective standards of reasonableness is one of *law* for this Court to determine. *See Swanson*, 943 F.2d at 1072; *Horton*, 941 F.2d at 1462; *Smith*, 826 F.2d at 875; *Lytle*, 22 P.3d at 679; *Jefferson*, 431 S.E.2d at 112. Expert testimony is admissible only to assist the trier of fact in resolving *factual* issues; legal questions are

3

inappropriate for such testimony.   *See generally* Ariz. R. Evid. 702.   In *Provenzano*, for example, the Eleventh Circuit rejected a defendant's attempt to secure an evidentiary hearing on the reasonableness of counsel's decision not to seek a change of venue.   148 F.3d at 1330–31.   The defendant supported his argument with an affidavit from a defense attorney questioning trial counsel's decisions.   *Id.* at 1331.   The Eleventh Circuit concluded that the affidavit did not entitle the defendant to an evidentiary hearing:

> [T]he reasonableness of a strategic choice is a question of law to be decided by the court, not a matter subject to factual inquiry and evidentiary proof.   Accordingly, it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable.   The question is not one to be decided by plebiscite, by affidavits, by deposition or by live testimony.   It is a question of law to be decided by the . . . courts . . . .

*Provenzano*, 148 F.3d at 1331–32; *see also Lytle*, 22 P.3d at 680 ("We believe it is superfluous for expert witnesses to advise a court . . . about the proper application of existing law to the established historical facts and about the ultimate issue of trial counsel's effectiveness."); *Jefferson*, 431 S.E.2d at 112 ("[T]he court correctly determined that opinion testimony from other attorneys concerning the performance of [the defendant's] trial attorneys was irrelevant.").

Additionally, expert testimony on *Strickland*'s deficient performance prong would not "assist the trier of fact to understand the evidence or to determine a fact in issue." Ariz. R. Evid. 702. As a retired Yavapai County Superior Court judge, this Court is undoubtedly familiar with the standard of care for a defense attorney,

4

and does not require expert testimony to resolve Petitioner's ineffective assistance of counsel claims. *See Clemmons v. State*, 785 S.W.2d 524, 531 (Mo. 1990) ("A motion court is at least as capable as another attorney in reaching a decision [on counsel's alleged ineffectiveness] based on the evidence presented, and therefore the opinion of an attorney on the same subject is irrelevant and incompetent."); *Parkus v. State*, 781 S.W.2d 545, 548 (Mo. 1989) (same); *State v. Ohler*, 366 N.W.2d 771, 775 (Neb. 1985) (rejecting defendant's argument that lower court erred in refusing to permit expert testimony "regarding what a 'reasonably prudent criminal trial attorney would have done'" and concluding that "[g]enerally, expert testimony is not admissible as proof that the assistance of counsel in a criminal case was ineffective"). To resolve the deficient performance aspect of Petitioner's ineffective assistance of counsel claim, this Court must apply the governing law to the facts elicited at the evidentiary hearing. Expert testimony would not facilitate this exercise.

Thus, expert testimony regarding the reasonableness of counsel's decisions is irrelevant and would not assist this Court in determining whether counsel was ineffective. For the foregoing reasons, Respondent respectfully requests that this Court preclude such testimony.

5

RESPECTFULLY SUBMITTED this 18th day of October, 2007.

TERRY GODDARD
ATTORNEY GENERAL

SHERRI TOLAR ROLLISON
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION

ATTORNEYS FOR RESPONDENT

COPIES of the foregoing were deposited for mailing this 18th day of October, 2007.

Thomas J. Phalen
45 W. Jefferson, Suite 506
Phoenix, Arizona  85003

Gilbert H. Levy
2001 Western, Suite 200
Seattle, Washington  98121-2114

Attorneys for PETITIONER/DEFENDANT

Barbara Lindsay

CRM01-1027
78134

6

# Exhibit B

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
11/02/2007 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR 1995-006472                                    11/01/2007


                                          CLERK OF THE COURT
HONORABLE WARREN J. GRANVILLE              J. Kosaka
                                              Deputy


STATE OF ARIZONA                          SHERRI T ROLLISON

v.

MICHAEL JOE MURDAUGH (A)                   THOMAS J PHALEN

                                          VICTIM WITNESS DIV-AG-CCC
                                          GILBERT LEVEY
                                          2001 WESTERN, SUITE 200
                                          SEATTLE WASHINGTON  98121-2114


ORDER ENTERED BY COURT


    The Court having received and considered State's Motion to Preclude Expert Testimony
Concerning Ineffective Assistance of Counsel,

    IT IS ORDERED denying State's motion.


Docket Code 023                  Form R000A                        Page 1

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
K. Curtner, Deputy
1/24/2014 11:27:51 AM
Filing ID 5672219

Scott M. Bennett (Bar No. 022350)
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (office)
(608) 258-4258 (fax)

*Attorneys For Petitioner Wendi Andriano*

**SUPERIOR COURT OF ARIZONA
COUNTY OF MARICOPA**

| STATE OF ARIZONA | ) | CASE NO:  CR2000-096032-A |
|---|---|---|
| RESPONDENT, | ) | |
| v. | ) | **MOTION TO ADMIT EXHIBITS PERTAINING TO MITIGATION EVIDENCE** |
| WENDI ELIZABETH ANDRIANO | ) | |
| PETITIONER. | ) | |

Pursuant to this Court's order granting the upcoming evidentiary hearing in this post-conviction relief proceeding, Petitioner Wendi Andriano will submit three general categories of evidence at the hearing:  (1) evidence of ineffective assistance of her trial counsel with regard to the investigation and presentation of mitigating evidence at the penalty phase of her trial; (2) evidence that her trial counsel suffered from a conflict of interest; and (3) the mitigating evidence that trial counsel could and would have

{00115096.1 }

1   discovered and presented to the jury absent their ineffectiveness and/or conflict.

2        Because a defendant at the penalty phase would be entitled to "present any

3   information that is relevant to any of the mitigating circumstances [listed in the statute,

4   which includes "any factors proffered by the defendant or the state that are relevant in

5   determining whether to impose a sentence less than death"], regardless of its

6   admissibility under the rules governing admission of evidence at criminal trials," Ariz.

7   Rev. Stat. § 13-751.C, G, Ms. Andriano hereby moves for admission of all exhibits that

8   relate to the third category of evidence set forth above.  Specifically, Ms. Andriano

9   moves this Court to admit Exhibit Nos. 7A, 7B, 10-14, 16-18, 21-38, 51-52, 56-57, 68-

10  75, 95, and 140-164, all of which constitute mitigating evidence that trial counsel could

11  have presented in Ms. Andriano's trial.

12       The grounds for this Motion are set forth more fully in the following

13  Memorandum of Points and Authorities.

14

15               **MEMORANDUM OF POINTS AND AUTHORITIES**

16  **I.**     **DISCUSSION**

17       On October 30, 2012, this Court ordered an evidentiary hearing in this post-

18  conviction relief matter on the following issues:  (1) whether trial counsel David

19  DeLozier had suffered from a conflict of interest pertaining to his representation of Ms.

20  Andriano (the "Conflict Claim"); and (2) whether Ms. Andriano's trial counsel was

21  ineffective with regard to the penalty phase of the trial in "failing to investigate and

22  present expert testimony regarding her mental illness and by failing to investigate and

23  present evidence regarding her harrowing childhood" (the "Ineffective Assistance

24  Claim").  (Order at 4-6.)

25       To prove the Ineffective Assistance Claim under *Strickland v. Washington*, 466

26  U.S. 668 (1984), Ms. Andriano must show both deficient performance of trial counsel

27

28  {00115096.1 }                        2

1  and resulting prejudice.[1]  To prove prejudice, she must show a "reasonable probability"

2  that the sentencer would have reached a different result absent the ineffectiveness of trial

3  counsel in investigating and presenting mitigating circumstances at the penalty phase.  *Id.*

4  at 694.  To assess prejudice, courts "consider 'the totality of the available mitigation

5  evidence—both that adduced at trial, and the evidence adduced in the habeas

6  proceeding'—and 'reweig[h] it against the evidence in aggravation.'"  *Porter v.*

7  *McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98

8  (2000)).

9          Thus, Ms. Andriano's presentation at the evidentiary hearing will consist of three

10  parts:  (1) evidence pertaining to the Conflict Claim; (2) evidence pertaining to the

11  deficiency prong of the Ineffective Assistance Claim; and (3) evidence pertaining to the

12  prejudice prong of the Ineffective Assistance Claim—that is, mitigating evidence that her

13  trial counsel could and should have investigated, discovered, and presented to the jury

14  had they performed a proper mitigation investigation in accordance with the American

15  Bar Association Guidelines for the Appointment and Performance of Defense Counsel in

16  Death Penalty Cases and prevailing norms for capital defense counsel.

17          To show the mitigation evidence that should have been investigated and presented

18  by Ms. Andriano's trial counsel for purposes of the prejudice prong of the Ineffective

19  Assistance Claim, Ms. Andriano will present the testimony of mental-health experts and

20  certain key fact witnesses with direct knowledge of childhood abuse, neglect, and other

21  trauma suffered by Ms. Andriano.  In addition, Ms. Andriano will ask this Court to

22  consider many exhibits relating to Ms. Andriano's childhood, social history, and mental

23  health history.

24          Because the prejudice requirement calls for this Court to assess whether there is a

25  "reasonable probability" that the jury may not have sentenced Ms. Andriano to death had

26
27  [1] Prejudice is not an element of the Conflict Claim.  *See Cuyler v. Sullivan*, 446 U.S. 345, 349-50 (1980) ("[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.").

28  {00115096.1 }                                             3

4849-9891-4840.

1  it heard such evidence, the admission of such evidence in the evidentiary hearing should

2  be governed by the same evidentiary standards that would govern its admission if it were

3  presented to the jury at the penalty phase.  If this Court were to exclude evidence from

4  consideration in this evidentiary hearing that would have been admissible in the penalty

5  phase, then it would be incapable of considering the "totality of the available mitigation

6  evidence" that could have been presented to the jury.

7  　　　　The evidentiary standards for the penalty phase of capital cases differ significantly

8  from the evidentiary standards for admission of evidence in other phases or other

9  criminal cases.  Under Arizona law, "[t]he trier of fact shall consider as mitigating

10  circumstances *any* factors proffered by the defendant or the state that are relevant in

11  determining whether to impose a sentence less than death[.]"  Ariz. Rev. Stat. § 13-751.G

12  (emphasis added).  The parties may present such evidence "regardless of its admissibility

13  under the rules governing admission of evidence at criminal trials."  Ariz. Rev. Stat. § 13-

14  751.C.  *See also, e.g.*, *State v. Walton*, 159 Ariz. 571, 583, 769 P.2d 1017, 1029 (1989)

15  ("The defendant complains that admitting the report violated the foundation and hearsay

16  rules of evidence. However, information relevant to mitigation can be presented at a

17  sentencing hearing without regard to its admissibility under the rules of evidence for

18  criminal trials."), *overruled in part on other grounds*, *Ring v. Arizona*, 536 U.S. 584

19  (2002).  In short, Arizona law seeks to ensure that the jury in a capital case has the

20  opportunity to weigh all information pertinent to the sentencing decision, regardless of its

21  admissibility in other contexts.

22  　　　　While the State has stipulated to the admissibility of some of Ms. Andriano's

23  proposed exhibits for the hearing, the State has not conceded admissibility as to many

24  exhibits on Ms. Andriano's exhibit list that pertain to mitigating evidence.  Therefore,

25  Ms. Andriano moves for the admission of the following exhibits from the parties' joint

26  witness and exhibit list, all of which pertain (in full or in part) to the prejudice prong of

27  the Ineffective Assistance Claim.

28  {00115096.1 }                                        4

*Letters from Counseling Professionals:  Exhibits 7A, 7B, and 52.*  These exhibits consist of correspondence from the late H. Kandy Rohde, Certified Professional Counselor, and Sharon Murphy, Ph.D, to trial counsel regarding potential issues concerning Ms. Andriano's mental health and childhood trauma.  All were exhibits to the Petition filed with this Court on February 17, 2012.

*Sworn Declarations of Mitigation Witnesses:  Exhibits 10-14, 16-18, and 21-38.*  These exhibits consist of declarations from fact witnesses disclosing information pertaining to Ms. Andriano's personal and family history, her family mental health history, the environment of her upbringing, childhood abuse and neglect, and other matters pertinent to a proper social history and mental health evaluation.  All were exhibits to the Petition filed with this Court on February 17, 2012.

*Unsworn Correspondence from Potential Mitigation Witnesses:  Exhibits 51, 56-57, 95.*  These exhibits consist of four items of correspondence sent to trial counsel before Ms. Andriano's trial—three from Ms. Andriano's mother, and another from the victim's sister—disclosing mitigating evidence pertinent to potential childhood abuse of Ms. Andriano and mental health issues.  The three emails from Ms. Andriano's mother were exhibits to the Petition filed with this Court.

*Social History Records:  Exhibits 68-71, 152.*  These exhibits consist of three types of documents:  (1) Social Security Administration earnings records for Ms. Andriano, her husband, and her parents, relevant to Ms. Andriano's social history and a proper mental health diagnosis; (2) summary records establishing the arrest, conviction, and incarceration of Ms. Andriano's biological father and uncle for child molestation.  These are records kept by public agencies, and all but one of which was exhibit to the Petition filed with this Court.

*Social History Photographs and Cards:  Exhibits 72-75, 140-151, 153-164.*  These exhibits consist of photographs of Ms. Andriano and key individuals in her life at certain time periods (to provide context); inappropriately sexual photographs of Ms.

4849-9891-4840.

Andriano and her friends taken by her stepfather, Alejo Ochoa; and inappropriately sexual cards sent by Alejo Ochoa to Ms. Andriano during her incarceration.

## II.    CONCLUSION

Because this Court is tasked with assessing whether Ms. Andriano has shown a reasonable probability that a jury may not have imposed a death sentence in the penalty phase had her trial counsel performed an effective investigation and presentation of mitigating evidence, this Court should consider "any information that is relevant to any of the mitigating circumstances" at issue in this evidentiary hearing—namely, Ms. Andriano's mental health and harrowing childhood—"regardless of its admissibility under the rules governing admission of evidence at criminal trials."  Ariz. Rev. Stat. § 13-751.C.  Therefore, Ms. Andriano respectfully requests that this Court admit Exhibits 7A, 7B, 10-14, 16-18, 21-38, 51-52, 56-57, 68-75, 95, and 140-164 into evidence in this proceeding.

RESPECTFULLY SUBMITTED this 24th day of January, 2014.

By: */s/ Scott M. Bennett*_____
Scott M. Bennett (022350)
COPPERSMITH SCHERMER & BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@csblaw.com

Allen A. Arntsen, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (Office)
(608) 258-4258 (Fax)

*Attorneys For Petitioner Wendi Andriano*

{00115096.1 }

6

MOTION TO ADMIT EXHIBITS PERTAINING TO MITIGATION EVIDENCE
CASE NO. CR2000-096032-A

4849-9891-4840.

1   ORIGINAL e-filed January 24, 2014,
2   with the Clerk of the Maricopa County Superior Court

3   COURTESY COPY mailed January 24, 2014, to:

4   Judge Brian Ishikawa
    Maricopa County Superior Court
5   1810 S. Lewis St.
    Mesa, AZ  85210-6235
6

7   COPY mailed and emailed January 24, 2014, to:

8   Lacey Stover Gard
    Office of the Attorney General
9   400 W. Congress, Suite S-315
    Tucson, AZ  85701-1367
10  *Attorney for the State of Arizona*

11

12  */s/ Carol Keesee*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  {00115096.1 }                                    7

1   Scott M. Bennett (Bar No. 022350)
2   COPPERSMITH BROCKELMAN PLC
    2800 North Central Avenue
3   Phoenix, Arizona  85004
    (602) 224-0999 (office)
4   (602) 224-6020 (fax)
    sbennett@cblawyers.com
5
6   Allen A. Arntsen, admitted *pro hac vice*
7   Stephan J. Nickels, admitted *pro hac vice*
    Matthew R. Lynch, admitted *pro hac vice*
8   Jodi K. Fox, admitted *pro hac vice*
    Krista J. Sterken, admitted *pro hac vice*
9   FOLEY & LARDNER LLP
10  150 E. Gilman Street
    Madison, WI 53703-1481
11  (608) 257-5035 (office)
    (608) 258-4258 (fax)
12
13  *Attorneys For Petitioner Wendi Andriano*

14

15                 **SUPERIOR COURT OF ARIZONA**
16                     **COUNTY OF MARICOPA**

17  STATE OF ARIZONA,              )   CASE NO:  CR2000-096032-A
                                   )
18          RESPONDENT,            )
                                   )   **PETITIONER'S POST-HEARING**
19      V.                         )   **MEMORANDUM IN SUPPORT OF**
                                   )   **PETITION FOR POST-CONVICTION**
20  WENDI ELIZABETH ANDRIANO,      )   **RELIEF**
                                   )
21          PETITIONER.            )
                                   )
22  ─────────────────────────────

23

24

25

26  {00128370.1 }
    ─────────────────────────────────────────────
27      PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
                PETITION FOR POST-CONVICTION RELIEF
28                 CASE NO. CR2000-096032-A

4843-7819-0105.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. vi

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 3

I.  WENDI'S TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO
    DEVELOP EVIDENCE OF WENDI'S HARROWING CHILDHOOD,
    HER MENTAL DISORDERS, AND THE IMPACT UPON HER
    BEHAVIOR AS AN ADULT ......................................................................... 3

    A.  Prejudice ................................................................................................ 3

        1.  Analytical Framework ...................................................................... 3

            a.  Wendi's Harrowing Childhood and Psychiatric
                Disorders and Defects Are Relevant Mitigation, With
                or Without Any Nexus to the Offense ..................................... 4

            b.  The State's Expert Applied an Incorrect, Narrow
                Standard in Assessing Whether Wendi's Mental
                Health Evidence was Mitigating ............................................. 6

            c.  We Cannot Assume the Jury Agreed With the State's
                Position on Facts Not Necessary to the Verdict .................... 8

        2.  Wendi's Traumatic Childhood and Its Effects ................................. 9

            a.  Dr. James Hopper ................................................................... 10

            b.  Birth to Age 4.5 ..................................................................... 11

                (i)    Donna's Neglect ........................................................ 12

                (ii)   Emotional and Physical Abuse ................................. 14

                (iii)  Exposure to Pedophiles ............................................ 15

            c.  Ages 4.5 to Nine ................................................................... 17

                (i)    Alejo Ochoa, and the Psychological Effects of
                       Trauma Accumulation in Wendi ............................... 17

[00128370.1 ]                                           i

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000296

**TABLE OF CONTENTS (cont'd)**

Page

(ii)    Fishers of Men ........................................................... 19

(iii)   Wendi's Dissociation and Memory Deficits............. 20

d.    Ages Nine to 18........................................................ 21

(i)    The Environment of Abuse at Wendi's School ........ 22

(ii)   Alejo's Sexual Abuse................................................. 24

(1)   "Dressing Up" and Photographing
Wendi in Lingerie. ................................................ 25

(2)   "Ministering" to Alejo ................................... 26

(3)   Overt Molestation by Alejo ............................ 27

e.    The Connection Between Wendi's Traumatic
Childhood and Joe's Death .................................................. 30

(i)    The State Did Not Rebut the Facts Regarding
Wendi's Harrowing Childhood or Their Effects ....... 30

(ii)   Evidence of Wendi's Childhood Trauma Could
Have Persuaded the Jury Not to Impose a Death
Sentence ...................................................................... 31

3.    Wendi's Psychological Disorders and Their Effects ...................... 34

a.    PTSD .............................................................................. 36

b.    Bipolar Disorder.............................................................. 38

c.    Cognitive Disorder ......................................................... 40

(i)    Diagnosis............................................................... 40

(ii)   Effects ................................................................... 43

(iii)  Dr. Amin Failed to Materially Rebut the
Findings of Dr. Young and Dr. James ...................... 44

d.    Dependent Personality Disorder ......................................... 46

e.    The Interaction of Multiple Disorders ................................. 47

f.    Dr. Pitt Failed to Materially Rebut the Findings of Dr.

{00128370.1 }

ii

**TABLE OF CONTENTS (cont'd)**

**Page**

Woods and Dr. Hopper ........................................................ 48

B.    TRIAL COUNSEL'S PERFORMANCE WAS DEFICIENT .................. 52

1.    Standards ........................................................................ 52

2.    The Composition and Operation of the Defense Team Was
      Deficient in Several Respects ......................................... 55

      a.    The Composition of the Defense Team Was Deficient
            to Perform an Adequate Mitigation Investigation .............. 56

      b.    The Operation of the Defense Team Was
            Dysfunctional ...................................................... 61

            (i)    No One Took Responsibility to Investigate
                   Mitigating Evidence .................................. 61

            (ii)   Wendi's Attorneys Failed to Work Together ........... 64

3.    The Defense Team Failed to Adequately Investigate All
      Reasonably Available Mitigating Evidence ..................................... 66

      a.    Standard of Care ............................................ 66

      b.    The Mitigation Investigation Was Deficient ........................ 68

            (i)    The Defense Team Was Ineffective in Failing to
                   Substantively Begin the Mitigation
                   Investigation Until Far Too Late in the
                   Proceeding ............................................. 68

            (ii)   The Social History Investigation Was Deficient ... 70

                   (1)   Attorneys Patterson and DeLozier ............... 71

                   (2)   Mitigation Specialists MacLeod and
                         Linderman ...................................... 73

            (iii)  The Mental Health Investigation Was Deficient ...... 77

      c.    Trial Counsel Failed to Investigate and Develop
            Potential Mitigating Evidence That Came to Their
            Attention ................................................... 80

            (i)    Early History from Donna (Exhibit 56) .................... 81

iii

{00128370.1 }

**TABLE OF CONTENTS (cont'd)**

Page

(ii)   February 2001 Letter from Kandy Rohde
       (Exhibit 230) .................................................... 81

(iii)  March 2001 Kandy Rohde Letter (Exhibit
       7.002) ........................................................... 83

(iv)   Potts Letter (Exhibit 6.001) ...................... 84

(v)    Request to Contact Rohde (Exhibit 50) ..................... 84

(vi)   February 2002 Rohde Communication (Exhibit
       6.004) ........................................................... 86

(vii)  Rohde Notes Throughout Wendi's Pre-Trial
       Incarceration (Exhibit 45).......................... 87

(viii) Rosengard Report (Exhibit 6.003) ............................ 90

(ix)   Sharon Murphy Email (Exhibit 52) ......................... 93

(x)    Wendi's Suicide Attempt (Exhibit 47) ..................... 94

(xi)   Wendi's Pre-Trial Medications (Exhibit 49) ............ 95

(xii)  Skip Robertson Information (Exhibit 57) .................. 95

(xiii) Schaider Comments ................................... 96

d.     There Were No Strategic Reasons for Failing to
       Investigate and Develop Mitigating Evidence of
       Wendi's Traumatic Childhood and Psychiatric
       Disorders ........................................................ 96

II.   POST-CONVICTION RELIEF IS WARRANTED UNDER *CUYLER*
      BECAUSE ATTORNEY DELOZIER SUFFERED FROM A
      DEBILITATING CONFLICT OF INTEREST ...................................... 99

      A.   DeLozier's Representation of the Ochoas................ 100

      B.   DeLozier's Representation of Wendi...................... 104

      C.   DeLozier's Actual, Active Conflict of Interest Adversely Affected
           Wendi's Representation ......................................... 107

           1.   DeLozier Had Actual Conflict of Interest..................... 108

4843-7819-0105.

**TABLE OF CONTENTS (cont'd)**

**Page**

        a.    DeLozier's Representation of the Ochoas' Interests in Custody Proceedings Was Directly Adverse to Wendi's Interests in Developing All Reasonably Available Mitigating Evidence ........................................... 108

        b.    DeLozier's Representation of Wendi Was Materially Limited by His Duty of Confidentiality to the Ochoas ....... 110

        c.    The Payment Obligations of the Ochoas Interfered with DeLozier's Independent Judgment ............................ 111

    2.    DeLozier's Conflict Affected the Representation of Wendi.......... 113

CONCLUSION ........................................................................................................... 115

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF LIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Bean v. Calderon,*
   163 F.3d 1073 (9th Cir. 1998) ........................................................................96

*Boyde v. California,*
   494 U.S. 370 (1990)..........................................................................4, 9, 110

*Correll v. Ryan,*
   539 F.3d 938 (9th Cir. 2008) ....................................................................5, 96

*Cuyler v. Sullivan,*
   446 U.S. 335 (1980)...........................................................2, 99, 113, 115

*Deutscher v. Whitley,*
   884 F.2d 1152 (9th Cir. 1989), *vacated on other grounds*, 111 S.Ct. 1678
   (1991), *and subsequently reaffirmed*, 16 F.3d 981 (9th Cir. 1994) ........................96

*Douglas v. Woodford,*
   316 F.3d 1079 (9th Cir. 2003) ......................................................................4

*Eddings v. Oklahoma,*
   455 U.S. 104 (1982).............................................................................6, 53

*Fitzpatrick v. McCormick,*
   869 F.2d 1247 (9th Cir. 1989) .................................................................99, 109

*Foxworth v. Wainwright,*
   516 F.2d 1072 (5th Cir. 1975) ................................................................100, 110

*Frierson v. Woodford,*
   463 F.3d 982 (9th Cir. 2006) ......................................................................96

*Furman v. Georgia,*
   408 U.S. 238 (1972)...............................................................................53

*Hamilton v. Ayers,*
   583 F.3d 1100 (9th Cir. 2009) ..................................................................5, 94

*Hitchcock v. Dugger,*
   481 U.S. 393 (1987)..............................................................................53

*Hovey v. Ayers,*
   458 F.3d 892 ..........................................................................................4

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Lambright v. Schriro*,
    490 F.3d 1103 (9th Cir. 2007) ....................................................................5, 6

*Libberton v. Ryan*,
    583 F.3d 1147 (9th Cir. 2009) .......................................................................5

*Lockett v. Ohio*,
    438 U.S. 586 (1978)................................................................................6, 53

*Lockhart v. Terhune*,
    250 F.3d 1223 (9th Cir. 2001) .................................................99, 110, 113, 115

*Padilla v. Kentucky*,
    559 U.S. 356 (2010)....................................................................................52

*Porter v. McCollum*,
    558 U.S. 30 (2009) (per curiam) ....................................................................5

*Ramonez v. Berghuis*,
    490 F.3d 482 (6th Cir. 2007) ......................................................................96

*Rompilla v. Beard*,
    545 U.S. 374 (2005)...............................................................................4, 5

*Sears v. Upton*,
    130 S. Ct. 3259 (2010)................................................................................4

*Stankewitz v. Wong*,
    698 F.3d 1163 (9th Cir. 2012) .......................................................................5

*Strickland v. Washington*,
    466 U.S. 668 (1984).......................................................................... *passim*

*Summerlin v. Schriro*,
    427 F.3d 623 (9th Cir. 2005) (en banc) ......................................................4, 80

*United States v. Henke*,
    222 F.3d 633 (9th Cir. 2000) ...............................................................99, 111

*Wiggins v. Smith*,
    539 U.S. 510 (2003).......................................................................... *passim*

*Williams v. Taylor*,
    529 U.S. 362 (2000)....................................................................................53

*Wood v. Georgia*,
    450 U.S. 261 (1981)...............................................................................99, 111

[00128370.1 ]

vii

PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**State Cases**

*State v. Bocharski,*
    218 Ariz. 476, 189 P.3d 403 (2008)..................................................................6, 7

*State v. Jenkins,*
    148 Ariz. 463, 715 P.2d 716 (1986)..................................................................113

*Knapp v. Hardy,*
    111 Ariz. 107, 523 P.2d 1308 (1974)..................................................................54

*State v. Martinez-Serna,*
    166 Ariz. 423 (1990)..................................................................100, 110, 113

*State v. Nordstrom,*
    206 Ariz. 242, 77 P.3d 40 (2003)..................................................................7, 8

*State v. Stewart,*
    126 A.D.2d 943 (N.Y. 1987) ..................................................................100

*State v. Thomas,*
    545 N.E.2d 654 (Ill. 1989) ..................................................................100, 110, 112

**State Statutes**

Ariz. Rev. Stat. § 13-751(G)(1) ..................................................................7

Ariz. Rev. Stat. § 13-752(H)..................................................................3

**Rules**

Ariz. R. Crim. Proc. 6.8 ..................................................................52

Ariz. R. Crim. Proc. 6.8(b)(1)(iii)..................................................................53

Ariz. R. Crim. Proc. 11.1 ..................................................................84

Ariz. R. of Prof'l Conduct 1.7(a)(1), (b)..................................................................108

Ariz. R. of Prof'l Conduct 1.7(a)(2) ..................................................................110

Ariz. R. of Prof'l Conduct 1.8..................................................................110

Ariz. R. of Prof'l Conduct 1.8, Comment 11..................................................................112

Ariz. R. of Prof'l Conduct 1.8(f)..................................................................111

4843-7819-0105.

**INTRODUCTION**

The eight-day evidentiary hearing held from February 3 to 14, 2014 confirmed the merit of the two post-conviction relief claims at issue:  (1) Petitioner Wendi Andriano's "trial counsel was ineffective in the penalty phase by failing to investigate and present expert testimony regarding her mental illness and by failing to investigate and present evidence regarding her harrowing childhood"; and (2) one of her trial counsel, David DeLozier, "had an actual conflict of interest that affected his representation of her."  (Oct. 30, 2012 Order Granting Evidentiary Hearing at 4, 5.)

Wendi's trial counsel, Daniel Patterson and David DeLozier, admitted that they did not investigate or develop mitigating evidence regarding her harrowing childhood and mental health issues, and ignored (or assumed that someone else would address) a number of "red flags" indicating that such an investigation would be fruitful.  As Attorney Patterson summarized during the State's examination of him:

> Apparently, I was presented with these things that [were] brought up on direct.  But I either discounted them or passed them onto DeLozier, or DeLozier was notified contemporaneous with me, and I assumed that he would have been—you know, was going to be forthcoming and responsible to follow up, if need be.  You know, I didn't—unfortunately, I didn't assist greatly in the development of the mitigation in this case other than she's a good woman and her story is a credible story.

(2/7/14 Tr. at 132:15-24 (D. Patterson) (Cross).)

Attorney DeLozier's ability to undertake an investigation into Wendi's abusive childhood and the resulting psychological effects was limited by his concurrent representation of Wendi's mother, Donna Ochoa, and stepfather, Alejo Ochoa, in custody proceedings concerning their grandchildren.  After confirming his knowledge of the severe impact of childhood sexual abuse upon adults—after all, DeLozier was also concurrently seeking damages on behalf of victims of childhood sexual abuse in civil cases—DeLozier acknowledged that "it's possible that focusing on [the Ochoas' good qualities in] the grandparent case kept me from focusing on . . . the things that Rohde and so forth and so forth were telling" DeLozier regarding Wendi's childhood.  (2/10/14 Tr.

{00128370.1 }

1

1  at 138:4-139:8 (D. DeLozier).)

2      Three legal experts—Attorney Larry Hammond, Professor Gary Lowenthal, and

3  mitigation specialist Keith Rohman—concluded that these failures fell far below the

4  standard of care for effective assistance of counsel under *Strickland v. Washington*, 466

5  U.S. 668 (1984) and *Wiggins v. Smith*, 539 U.S. 510 (2003), and, as to DeLozier, gave

6  rise to an impermissible conflict of interest under *Cuyler v. Sullivan*, 446 U.S. 335

7  (1980).

8      The evidence submitted at the hearing also confirmed that these failures mattered,

9  because the mitigating evidence that Wendi's trial counsel failed to develop and present

10  was compelling.  Three mental health experts—Dr. James Hopper, Dr. George Woods,

11  and Dr. Joette James—detailed the severe impact of Wendi's childhood and related

12  mental health disorders upon her life as an adult, including her impaired ability control

13  impulse and to react and respond appropriately in times of great stress.  Multiple

14  witnesses confirmed the social history supporting those experts' findings, including the

15  gut-wrenching testimony of Kyre Lorts and Jeri Lynn Cunningham, two childhood

16  friends of Wendi who were firsthand witnesses to (and victims of) sexual abuse by

17  Wendi's stepfather.

18      None of the evidence submitted at the hearing undermined the colorable claims of

19  the Petition in any respect.  The factual evidence was essentially undisputed.  The State

20  could not and did not meaningfully attack the credibility of any witness called by the

21  Petitioner, nor did it introduce any conflicting factual evidence.  Its primary witness, Dr.

22  Stephen Pitt, did not opine that the evidence of childhood trauma and mental health was

23  not mitigating; he opined only that Wendi was able to appreciate that her conduct was

24  wrongful, a far narrower question than the prejudice inquiry under *Strickland*, *Wiggins*,

25  and the cases applying them.

26      The record following the hearing is even more compelling than the evidentiary

27

28

{00128370.1 }

2

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

1  record submitted with the Petition.  For the reasons set forth below, that record

2  demonstrates that post-conviction relief on these claims is warranted.

3  **ARGUMENT**

4  **I.   WENDI'S TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO
5        DEVELOP EVIDENCE OF WENDI'S HARROWING CHILDHOOD, HER
6        MENTAL DISORDERS, AND THE IMPACT UPON HER BEHAVIOR AS
       AN ADULT**

7       The Sixth Amendment to the United States Constitution guarantees a criminal

8  defendant the right to effective assistance of counsel, *Strickland*, 466 U.S. at 685-86,

9  including effective assistance at the sentencing stage of a capital case, *Wiggins*, 539 U.S.

10 at 521.  To prove an ineffective assistance claim, the petitioner must show that (1)

11 "counsel's performance was deficient"; and (2) "the deficient performance prejudiced the

12 defense."  *Strickland*, 466 U.S. at 687.

13      To remain consistent with the general sequence of the evidentiary presentation at

14 the hearing, this brief will address the two prongs of the *Strickland* analysis in reverse

15 order.

16 **A.   PREJUDICE**

17 **1.   Analytical Framework**

18      The prejudice prong of *Strickland* is satisfied when "there is a reasonable

19 probability that, but for counsel's unprofessional errors, the result of the proceeding

20 would have been different."  *Id.* at 694.  In a case involving the failure to investigate and

21 present mitigating evidence, the ultimate question is whether "there is a reasonable

22 probability that at least one juror would have struck a different balance" in weighing the

23 aggravating and mitigating evidence.  *Wiggins*, 539 U.S. at 537.  *See also* Ariz. Rev. Stat.

24 § 13-752(H) (requiring unanimous jury verdict to impose death sentence).  A "reasonable

25 probability" is a "probability sufficient to undermine confidence in the outcome,"

26 *Strickland*, 466 U.S. at 694, which is "less than the preponderance more-likely-than-not

27

28

{00128370.1 }

3

4843-7819-0105.

1   standard." *Summerlin v. Schriro*, 427 F.3d 623, 643 (9th Cir. 2005) (en banc).

2        In cases alleging prejudice from the failure to investigate, the measure of prejudice

3   is "the magnitude of the discrepancy between what counsel did investigate and present

4   and what counsel could have investigated and presented." *Hovey v. Ayers*, 458 F.3d 892,

5   929 (9th Cir. 2006 (quotation omitted).  Here, there is no dispute that trial counsel's

6   mitigation presentation centered upon portraying Wendi as the product of "[a] solid,

7   familial support system, a mother and father who loved her, who cared about her, who

8   guided her, who instructed her, that kind of thing."  (2/7/14 Tr. at 174:23-175:1 (D.

9   Patterson) (Redirect).)    The United States Supreme Court has found prejudice in such

10  inaccurately positive portrayals, such as where trial counsel presented a defendant's

11  childhood as "stable, loving, and essentially without incident" when a reasonable

12  investigation would have shown it to be "anything but tranquil" and marked by verbal

13  and sexual abuse.  *Sears v. Upton*, 130 S. Ct. 3259, 3261 (2010).  *See also Rompilla v.

14  Beard*, 545 U.S. 374, 391 (2005) (evidence that defendant was raised in "slum

15  environment," discontinued school at age 16, and consumed alcohol as a teen "would

16  have destroyed the benign conception of [the defendant's] upbringing . . . [that] counsel

17  had formed from talking with [the defendant] himself and some of his family members").

18          a.      **Wendi's Harrowing Childhood and Psychiatric Disorders
19                  and Defects Are Relevant Mitigation, With or Without
                    Any Nexus to the Offense**

20        "Evidence regarding social background and mental health is significant, as there is

21  a 'belief, long held by this society, that defendants who commit criminal acts that are

22  attributable to a disadvantaged background or to emotional and mental problems, may be

23  less culpable than defendants who have no such excuse.'" *Douglas v. Woodford*, 316

24  F.3d 1079, 1090 (9th Cir. 2003) (quoting *Boyde v. California*, 494 U.S. 370, 382 (1990)).

25        Since *Wiggins*, the United States Supreme Court and the United States Court of

26  Appeal for the Ninth Circuit have repeatedly found that the failure to investigate and

27  {00128370.1 }                                    4

28  PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
    PETITION FOR POST-CONVICTION RELIEF
    CASE NO. CR2000-096032-A

4843-7819-0105.

1    present the type of mitigating evidence presented at the evidentiary hearing in this case

2    (and summarized below) constitutes prejudice for the purpose of a Sixth Amendment

3    claim.  *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 33 (2009) (per curiam) ("Unlike the

4    evidence presented during [the defendant's] penalty hearing . . . the new evidence

5    described his abusive childhood," his post-traumatic stress disorder arising out of military

6    service, "and his impaired mental health and mental capacity"); *id.* at 43 (evidence of

7    childhood abuse "may have particular salience" in a case involving the murder of a loved

8    one); *Rompilla*, 545 U.S. at 392-93 (evidence of childhood neglect and impairment of

9    "several of [the defendant's] cognitive functions" constituted mitigating evidence that

10   "might well have influenced the jury's appraisal of . . . culpability" and therefore

11   constituted prejudice); *Stankewitz v. Wong*, 698 F.3d 1163, 1174 (9th Cir. 2012)

12   (prejudice found where the jury "heard next to nothing about [the defendant's] traumatic

13   childhood" of abuse and neglect or his history of mental illness); *Libberton v. Ryan*, 583

14   F.3d 1147, 1172-73 (9th Cir. 2009) (prejudice found where defense counsel failed to

15   investigate and present evidence that the defendant was "seriously abused during his

16   childhood," and noting that "[t]he Supreme Court has repeatedly held that evidence of

17   childhood abuse is a relevant mitigating factor"); *Hamilton v. Ayers*, 583 F.3d 1100,

18   1131-33 (9th Cir. 2009) (defense counsel's failure to pursue the "classic mitigating

19   evidence" of childhood sexual abuse by family members and evidence that the defendant

20   "had suffered from serious mental illnesses throughout most of his life" constituted

21   prejudice); *Lambright v. Schriro*, 490 F.3d 1103, 1118 (9th Cir. 2007) (failure to

22   investigate and present "classic mitigation evidence" of mental health problems,

23   including post-traumatic stress disorder and a personality disorder, constituted prejudice);

24   *Correll v. Ryan*, 539 F.3d 938, 950-51 (9th Cir. 2008) (failure to investigate and present

25   evidence of childhood abuse and neglect, religious teaching enforced by corporal

26   punishment, incest in the family, and impulse control problems and impaired judgment at

27

28

4843-7819-0105.

the time of the offense was "precisely th[e] type of evidence that the Supreme Court has termed as 'powerful'" mitigating evidence, constituting prejudice). *See also State v. Bocharski*, 218 Ariz. 476, 497-99, 189 P.3d 403, 424-26 (2008) (reducing defendant's sentence to life imprisonment on independent review, on account of mitigating evidence that the defendant "suffered severe physical, mental and sexual abuse during his childhood" and "came from a severely dysfunctional family").

"[T]o develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual[,]" the Supreme Court has held "that the sentencer in capital cases *must* be permitted to consider any relevant mitigating factor" regardless of whether it is enumerated in a statute or has a causal nexus with the offense itself. *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982) (emphasis added). Indeed, "[t]o meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). *See also Lambright*, 490 F.3d at 1115 ("If evidence relating to life circumstances with no causal relationship to the crime were to be eliminated, significant aspects of a defendant's disadvantaged background, emotional and mental problems, and adverse history . . . would not be considered, even though some of these factors . . . might cause a sentencer to determine that a life sentence, rather than death at the hands of the state, is the appropriate punishment for the particular defendant.").

> **b.    The State's Expert Applied an Incorrect, Narrow Standard in Assessing Whether Wendi's Mental Health Evidence was Mitigating**

As illustrated in the numerous cases cited above, the "classic mitigation evidence" of childhood trauma and mental health disorders plainly qualifies as relevant mitigating evidence. For that reason, it is odd that the State's primary witness, Dr. Stephen Pitt, looked only to the issue of whether Wendi was capable of appreciating the wrongfulness of her conduct. As he claimed: "If she was a victim of sexual abuse, that's a terrible

{00128370.1 }                                          6

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000309

1   thing and I feel sorry for her.  But the reality is this isn't about:  Was she a victim of

2   sexual abuse?  This is about:  Does she have a mental disease or defect whereby she

3   couldn't appreciate the wrongfulness of her conduct?"  (2/14/14 Tr. at 114:2-8 (S. Pitt)

4   (Redirect).)

5        As noted above, that is not the standard for relevance of mitigation evidence.  It is

6   true that Arizona *courts* on independent review (though not necessarily jurors in the first

7   instance) weigh mitigating evidence of mental health more strongly when that evidence

8   fits within the terms of Ariz. Rev. Stat. § 13-751(G)(1), which lists as a mitigating factor

9   whether the "defendant's capacity to appreciate the wrongfulness of his conduct or to

10   conform his conduct to the requirements of law was significantly impaired, but not so

11   impaired as to constitute a defense to prosecution."  *See State v. Nordstrom*, 206 Ariz.

12   242, 248, 77 P.3d 40 (2003).  But Dr. Pitt's testimony was narrower than even that

13   standard.  By focusing his inquiry on whether Wendi could appreciate that her actions

14   were wrongful, he ignores the rest of the statute:  (1) whether her *capacity* to do so was

15   significantly *impaired*, and (2) whether her ability to conform her conduct to the

16   requirements of the law was significantly *impaired*.  *See Bocharski*, 218 Ariz. at 497-99

17   (finding mitigating evidence had causal connection where defendant's expert testified

18   that "a person in [defendant's] state would have been far less able than others to control

19   and manage his feelings and reactions" at the time of the offense).

20        Wendi called three expert witnesses with expertise in different fields of mental

21   health—Dr. James Hopper, Dr. George Woods, and Dr. Joette James—who testified

22   regarding her extensive childhood trauma, psychiatric disorders, and cognitive deficits.

23   Each of them tied their conclusions to the homicide itself, noting that Wendi's disorders

24   impaired her ability to exercise judgment, control impulse, and conform her conduct to

25   the requirements of the law under the circumstances existing at the time of the offense.

26   Even in cases where such expert testimony is "not particularly compelling"—and that is

27

28   {00128370.1 }

<div align="center">7</div>

<div align="center">PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A</div>

4843-7819-0105.

not the case here—the Arizona Supreme Court has found it sufficient to establish that a jury could have weighed the evidence differently. *Nordstrom*, 206 Ariz. at 248.

### c. We Cannot Assume the Jury Agreed With the State's Position on Facts Not Necessary to the Verdict

As a final introductory matter, in order to accurately evaluate the prejudice established by trial counsel's failure to develop this evidence, it is necessary to begin with what the jury actually found. Though the State's counsel prefaced some questions regarding the State's contentions concerning the run-up to the offense by asserting that "the jury must have believed it" (*see, e.g.*, 2/3/14 Tr. II at 140:7-9), in fact the jury made no such findings adopting those contentions. Wendi was convicted of first-degree murder; as noted in the State's autopsy report (Ex. 65), Joe's death was caused by "multiple blunt force and incised injuries" attributable to being struck with a barstool and cut with a kitchen knife. Thus, the *only* conclusions we can draw from the jury verdict are that (1) Wendi beat and stabbed Joe, causing the injuries that killed him; (2) she formed the intent to kill him at some point before completing those actions; and (3) she was not justifiably acting in self-defense when doing so.

We do not know what else the jury may or may not have believed. The jury may have believed that the evening began as an assisted suicide (consistent with Wendi's testimony), turned into a physical fight (consistent with Wendi's testimony and the physical injuries she suffered), and at some point her actions in that fight escalated beyond self-defense to the point of cruelty in excessively beating and then stabbing him. The State's only evidence to the contrary was circumstantial—namely, the absence of verification of Joe's involvement in the preparations for the assisted suicide. Thus, the State and Dr. Pitt were incorrect in assuming that the jury must have believed that Wendi had ordered sodium azide as part of a plan to murder her dying husband weeks before his actual death.

It is that final moment—the act of actually committing the homicide—that matters

{00128370.1 }

8

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1  for the purpose of assessing impairments to Wendi's ability to appreciate the

2  wrongfulness of her conduct or conform her conduct to the law, not the moments or

3  weeks before in ordering sodium azide.[1]  Dr. Pitt's analysis ignores that crucial moment

4  of the homicide itself; Dr. Hopper, Dr. Woods, and Dr. James do not.

5       Having addressed the analytical framework through which the prejudice in this

6  case must be assessed, this brief turns to the evidence of prejudice itself.

7              **2.    Wendi's Traumatic Childhood and Its Effects**

8       Though there is a well-recognized "belief, long held by this society, that

9  defendants who commit criminal acts that are attributable to a disadvantaged background

10 or to emotional and mental problems, may be less culpable than defendants who have no

11 such excuse," *Boyde*, 494 U.S. at 382, trial counsel failed to look for or present such

12 evidence.  Instead, the presentation of Wendi's childhood at trial emphasized

13 "establish[ing] the proposition that she was a good woman, had a good Christian

14 upbringing, and she had the support and love of her family." (2/7/14 Tr. at 123:4-9 (D.

15 Patterson) (Cross).).  It failed to provide the jury with an answer to an obvious question:

16 if Wendi's upbringing was so strong, how could she engage in such abnormal, irrational,

17 and ultimately violent behavior as an adult?

18      The evidentiary hearing showed that the deeper truth—uncovered by conducting

19 an adequate mitigation investigation and following up on red flags that trial counsel

20 disregarded—is far different.  It sheds far more light upon Wendi's conduct as an adult,

---

[1] This is true even if the jury had accepted the State's theory that Wendi initially set out to poison him.  Wendi necessarily abandoned any such plan to poison Joe when she called a neighbor to watch the children, attempted to take Joe to the hospital, and ultimately called an ambulance for Joe.  The State's theory depends upon Wendi changing her mind at some point after the ambulance was called, turning away the paramedics, and forming a new plan to end his life that ultimately succeeded.  Thus, even under that theory it is the point *after* her alleged change of heart in which all elements of the first-degree murder occurred, and it is that point in which her ability to appreciate the wrongfulness of her conduct is relevant.

{00128370.1 }                                    9

1   and reveals how her capacities became impaired through incessant emotional, physical,

2   and sexual trauma throughout her formative years.

3                  **a.      Dr. James Hopper**

4          Dr. James Hopper is a clinical psychologist specializing in the effects of trauma

5   upon its victims, particularly childhood trauma.  (2/3/14 Tr. I at 24:14-19, 26:5-27:3 (J.

6   Hopper).)  After obtaining his Ph.D., Hopper focused his "research in this realm on

7   traumatic memories, on treatment for child abuse or related trauma, on what's going on in

8   people's brains when they're overwhelmed by being reminded of their traumas." (*Id.* at

9   26:25-27:3.)  He is a leading scholar in the field, having taught in the Department of

10  Psychiatry at Harvard Medical School, conducted research at Harvard Medical School

11  and the Boston University School of Medicine, and published more than a dozen papers

12  in peer-reviewed journals on various aspects of the effects of childhood trauma, trauma-

13  related memory, and post-traumatic stress disorder.  (Ex. 3 at 1-2.)  Dr. Hopper also

14  performs clinical work, conducting assessments and providing therapy to adults suffering

15  from the effects of childhood neglect and abuse.  (*Id.*)

16         Dr. Hopper evaluated Wendi using the same process he would follow when

17  analyzing a trauma patient (2/3/14 Tr. I at 33:9-16 (J. Hopper)), though he noted that

18  there was more information available to him regarding Wendi than in most cases (*id.*; *see*

19  *also id.* at 29:16-21).  That information—virtually none of which was retrieved or

20  developed until *after* Wendi's death sentence—included more than 20 declarations from

21  family members and others who knew Wendi as a child; a variety of records regarding

22  Wendi, her biological parents and her stepfather; six interviews of Wendi encompassing

23  more than 50 hours; and interviews of her biological parents, her stepfather, and two

24  close childhood friends:  Kyre Lorts and Jeri Lynn Cunningham.  (*Id.* at 28:22-30:16.)

25         Dr. Hopper concluded that "Wendi suffered severe and pervasive trauma

26  throughout her childhood, including, but not limited to, severe neglect by her mother,

27

28

[00128370.1 ]                                    10

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

emotional and physical abuse by her mother, her biological father and her stepfather and sexual abuse by her stepfather." (*Id.* at 25:8-12.) As a result, she "entered adulthood as a severely damaged person, who was not able to properly respond to situations involving complex emotions or high stress, and she was also unable to have normal, healthy, closer intimate relationships." (*Id.* at 25:14-18.) According to Dr. Hopper, "[t]here is no way [the effects of her childhood trauma] couldn't" have affected Wendi's behavior in connection with her husband's death. (*Id.* at 25:22.)

Dr. Hopper broke down Wendi's childhood into three developmentally significant periods (birth to age 4.5, ages 4.5 to nine, and ages nine to 18), each marked by its own sources of trauma impairing Wendi's development. (*Id.* at 34:5-35:1.) This brief summarizes the evidence pertaining to each.

### b.    Birth to Age 4.5

As Dr. Hopper noted, infants and young children are "in a very vulnerable state," unable to "regulate their own emotions and physiological states without the help of caregivers." (2/3/14 Tr. I at 35:6-17 (J. Hopper).) Because "this is a time where they're having kind of etched into their brains basic patterns and habits for the emotions they experience and how they relate to those emotions," attentive caregiving is essential to proper development of that self-regulation. (*Id.*)

Wendi Andriano was not born into promising circumstances for that development to occur. At the time of Wendi's birth, her mother, Donna, was in the throes of a psychological breakdown attributable to depression (2/4/14 Tr. at 78:10-23 (D. Ochoa)), one of two primary mental health disorders (the other being bipolar disorder) that ran in her family (*id.* at 76:19-77:7).[2] Donna acknowledged that she "wouldn't have anything

---

[2] Donna, her nephew (and adopted son) Brandon Ochoa, and her sister Nadine Bednorz suffer from depression. (*Id.* at 77:1-7.) Donna's niece, her great niece, and Bednorz suffer from bipolar disorder; Donna believes her mother may have had that condition, as well. (*Id.* at 76:19-25.)

4843-7819-0105.

1    to do with" Wendi, admitting that "at that moment in [her] life," she "was more

2    concerned about [a lost family dog] than I was the baby." (*Id.* at 91:22-92:7, 94:10-18.)

3    For the several weeks after Wendi was born, Donna left Wendi largely in the care of her

4    husband, Skip Robertson, and her mother (*id.* at 92:14-15, 93:12-16)—the first instance

5    of what Dr. Hopper noted became a pattern of Donna "handing off" Wendi to others.

6    (2/3/14 Tr. I at 37:10-22 (J. Hopper).)

7         Skip Robertson, like many of those to whom Donna "handed off" Wendi during

8    her childhood, was a poor choice.  He suffered from post-traumatic stress disorder

9    marked by violent nightmares (2/4/14 Tr. at 85:9-23 (D. Ochoa)), drank heavily (*id.* at

10   86:20-87:4), and fought with Donna (*id.* at 87:8-88:4).  He also came from a family of

11   multiple pedophiles, two of whom (including Skip) were later convicted of sexual

12   molestation of a child.  (*Id.* at 99:3-8, 100:6-11, 102:20-21; Ex. 232, 233.)

13        Five or six weeks after Wendi's birth, Donna, Skip, and Wendi moved from Texas

14   to Phoenix, "because the girl that [Skip] had been having an affair with said that she was

15   pregnant and was trying to pin it on Skip." (2/4/14 Tr. at 93:14-24 (D. Ochoa).)  For the

16   next four-and-a-half years, Wendi suffered three ongoing sources of trauma:  (1) her

17   mother's neglect; (2) emotional and physical abuse by both parents; and (3) as a result of

18   the neglect, being "handed off" to several people with a history of childhood sexual

19   abuse.  (2/3/14 Tr. I at 35:21-36:3.)  As noted by Dr. Hopper, each had a substantial

20   impact on Wendi's ability to regulate her behavior as an adult.

21                          **(i)     Donna's Neglect**

22        Following their move to Phoenix, Donna began working full-time at a title

23   company, socializing, and leaving her daughter in the care of others for all but an hour or

24   two per day.  (2/3/14 Tr. I at 38:1-11 (J. Hopper).)  Neither Donna nor Skip was an

25   attentive parent, sometimes leaving Wendi to cry for an hour-and-a-half at Skip's urging

26   to "[l]eave her alone." (2/4/14 Tr. at 96:1-18 (D. Ochoa).)

27

28

[00128370.1 ]                              12

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1    After they moved to Tempe, and with Skip absent much of the time as a trucker

2   (*id.* at 108:2-16), Donna's inattention to her toddler daughter became more severe.  After

3   working 9-to-5, she would take Wendi to a 24-hour day care facility or ask a neighbor to

4   keep an eye on Wendi while she went out drinking several nights a week (including every

5   weekend) and was promiscuous with other men, bringing them home or staying at their

6   houses overnight.  (*Id.* at 109:6-110:25, 112:20-24.)  In addition to her full-time job,

7   Donna also began taking counseling classes at Phoenix College and volunteering "from

8   ten to 30 hours or more a week at Terros," a drug abuse prevention organization,

9   depending upon "what kind of babysitter I could get."  (*Id.* at 111:1-14, 112:13-16.)  As

10  Donna tearfully admitted, Wendi was "[n]ot very high" on her list of priorities.  (*Id.* at

11  112:25-113:3.)

12    Over time, Donna began to leave Wendi with no babysitter at all.  She took a new

13  job writing grants and performing accounting work for CODAC, a local drug treatment

14  clinic.  (*Id.* at 113:12-23.)  While working overtime, Donna would leave Wendi in the

15  downstairs portion of the building—a detox center and methadone clinic—while she

16  worked in the offices upstairs.  (*Id.* at 114:2-21.)

17    This pattern continued after Donna divorced Skip, accepted a new job at PADAC

18  (a faith-based drug counseling center in Pinal County), and moved to Casa Grande when

19  Wendi was approximately four years old.  (*Id.* at 116:5-117:1, 118:25-119:5.)  When

20  Donna began at PADAC, she worked from Friday night until Monday morning

21  continuously while Wendi would play with "some of the adults that would be around the

22  drug treatment center," or "wander around" the neighborhood to panhandle.  (*Id.* at

23  119:6-120:6.)

24    In sum, Wendi spent the first four-and-a-half years of her life as an afterthought of

25  her mother, being passed off by Donna to anyone she could find (ranging from 24-hour

26  day care providers and neighbors to drug counseling patients to no one at all) while

27

28  {00128370.1 }                                    13

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1    Donna handled her depression through work, alcohol, and men.  As Dr. Hopper

2    explained, this level of neglect has a significant impact on development of crucial aspects

3    of emotional regulation:

4         Executive functioning is a way of thinking about it in a more technical and
          even neuroscientific way that we know from decades of research . . . that
5         this front area of our brain, the prefrontal cortex is kind of like the CEO of
          our brain and it has these capacities we call executive functioning.

6         These include the ability to inhibit impulses, the ability to remember our
          rules that we're supposed to follow when we're trying to navigate a
7         situation, especially an emotional situation, very important functions to be
          able to reflect on what you're doing and stop if it's not working or to
8         change your behavior if things aren't working out.

9         . . . [C]ertainly an infant and a young child doesn't have that many
          executive functions, but what they're dependent on is a parent to help
10        cultivate the emergence of these executive functions.

11        And if you're neglected and you're left to cry for hours and things like
          Wendi went through, then those executive functions are not developing the
12        way they need to be.  And, instead, what happens, is the . . . brain resorts to
          these extreme attempts to deal with the overwhelming emotions by just
13        shutting down in a depressive state or going out of control with anxiety . . .
          .  But it really undermines those executive functions.

14   (2/3/14 Tr. I at 44:13-45:16 (J. Hopper).)

15                    **(ii)      Emotional and Physical Abuse**

16        When Skip and Donna did give attention to their young daughter, it often came in

17   the form of physical and emotional abuse.  Skip, in particular, approached child-rearing

18   "like training a dog," and began spanking her while she was still in diapers if she did not

19   obey his commands.  (2/4/14 Tr. at 95:18-22, 96:19-97:2 (D. Ochoa).)  She was not in

20   diapers for long, however:  at only eleven months old, Skip potty-trained Wendi by

21   putting her on the toilet and commanding her, "in a real strong, strict voice," to go.  (*Id.*

22   at 95:5-22.)  At a Robertson family gathering when Wendi was less than two years old,

23   Skip and his brothers "decided she needed to learn how to swim."  They threw her into a

24   swimming pool, "toss[ing] her around" despite her crying and letting her sink before one

25   would "finally pick her up."  (*Id.* at 105:8-23.)

26        As Dr. Hopper opined, training an infant like a dog can have self-defeating

27

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1   consequences for that child's ability to internalize rules and regulate her own behavior

2   later in life:

> [I]t's going to make it hard for a child to regulate their own emotions.  Not
> only do they have the emotions that they're going through because they're
> neglected and no one is helping soothe them, but now they've got horrible
> emotions from being thrown into a pool, from being beaten, from being
> yelled at. . . .  If you've got your whole first five years of this kind of
> treatment, it's going to cause problems with your ability to regulate your
> emotions . . . .
>
> . . . Even from toddler to age four-and-a-half or five, kids can start to take
> on . . . rules and they want to do them and be able to regulate their own
> behavior a little bit.  But if a child is being beaten and fear and pain and
> beatings are used constantly to get the child to instantly comply with what
> the parents want, then this actually makes it harder for the child to take in
> the very values and rules that the parents are trying to teach them.

10   (2/3/14 Tr. I at 50:6-51:16 (J. Hopper).)

11   **(iii)   Exposure to Pedophiles**

12   The stakes of Donna's neglect were particularly high for Wendi, because

13   numerous individuals with access to Wendi during this time period were pedophiles.

14   (2/3/14 Tr. I at 51:21-55:11 (J. Hopper).)  In the Robertson family, both Skip and his

15   brother Tommy were ultimately convicted and sentenced to extensive prison terms for

16   molesting a relative.  (2/4/14 Tr. at 99:3-8, 100:6-11, 102:20-21 (D. Ochoa); Ex. 232,

17   233.)  Skip was also accused of molesting two other nieces (*id.* at 102:20-21; 2/3/14 Tr. I

18   at 51:21-52:11 (J. Hopper)), and Skip himself speculated that Tommy may have molested

19   Wendi (2/4/14 Tr. at 103:10-17 (D. Ochoa)).  Their father and Wendi's grandfather,

20   Boyd, was sufficiently notorious for pedophilia that Skip's sisters warned Donna to "keep

21   Wendi away from grandpa" because "they knew he had been messing around with some

22   of the granddaughters."  (*Id.* at 99:3-8.)  Boyd also had access to Wendi as a young child.

23   (*Id.* at 99:14-100:4.)

24   Even after Donna's divorce from Skip, she continued to leave Wendi in the care of

25   alleged pedophiles.  Donna and Wendi spent multiple nights and weekends at the home

26   of Donna's boss at PADAC, Rick Barnes, and Wendi spent time alone with him.  (*Id.* at

27

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

116:17-117:5.)  Later on in their work relationship, Donna came across a letter in a box in Barnes's office indicating that Barnes had been fired from a teaching position in Thailand for sexual misconduct with young girls.  (*Id.* at 117:14-21.)

While Donna did not personally observe molestation of Wendi by the Robertsons or Rick Barnes, Wendi did begin to exhibit symptoms of potential abuse.  Wendi refused to sleep in any bed but her own (consistent with a child who had suffered abuse elsewhere (2/3/14 Tr. I at 55:15-56:16 (J. Hopper))), and one of her day-care providers reported two incidents in which Wendi instigated inappropriate sexual behavior with other children, which were sufficiently abnormal to cause the day care to expel Wendi. (2/4/14 Tr. at 114:22-115:23, 200:7-13 (Cross) (D. Ochoa).)  As Dr. Hopper observed, "[w]hen it's this kind of extreme inappropriate sexual play that goes beyond what's developmentally normal, that . . . is seen as evidence of sexual abuse."  (2/3/14 Tr. I at 56:19-57:1 (J. Hopper).)  Consistent with Donna's neglect, she did not inquire further or obtain treatment for Wendi.  (2/4/14 Tr. at 115:24-116:4 (D. Ochoa).)

In addition to causing many of the same adverse effects as neglect and physical abuse, molestation at the early stages of childhood development may lead to "premature sexualization, even kind of a hypersexualization, so that the child may do things like engage in inappropriate sexual behavior with other kids."  (2/3/14 Tr. I at 57:18-58:22 (J. Hopper).)  The effects of that early sexualization are "etch[ed]" into children's developing brains, creating an expectation that they exist, in part, for the sexual gratification of others.  (*Id.* at 59:6-18.)  Wendi appears to have suffered that early sexualization:  as she described in her interviews with Dr. Hopper, "just from as early as she could remember, she had this awareness of sexual energy or chemistry coming from men and this was just something that was always there and she always experienced."  (*Id.* at 58:23-59:2.)

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

### c.      Ages 4.5 to Nine

Unlike the "habit learning" that marks development from birth until roughly age 4.5, children between ages 4.5 and nine expand more into the world of their peers, develop a sense of self-identity and, "if development is going well, what they should be learning is how to take the rules and values that should be being imparted [by] their family and how to enact those in their relationships with peers . . . ." (*Id.* at 62:6-63:14.) But "if the neglect and the emotion and the physical and the sexual abuse continue," then it can worsen their cumulative impact on executive functioning through the "piling on effect of trauma upon trauma." (*Id.* at 61:24-62:3.)

For Wendi, that trauma continued unabated through the next stage of her development.  It presented much the same instability and neglect as the first stage— including a poverty-stricken two-year stretch on the road with a traveling cult— but introduced a new and much more pervasive source of abuse:  Alejo Ochoa.

### (i)      Alejo Ochoa, and the Psychological Effects of Trauma Accumulation in Wendi

Alejo Ochoa entered Wendi's life as a damaged person himself.  As a young child, he was tormented by persistent sexual teasing by a wide variety of family members (Ex. 24[3] at 3 (¶ 8)), and was teased and beaten by his father (*id.* at 4 (¶ 10)).  He was introduced to sex by older women when he was between the ages of 13 and 16 (*id.* at 7-8 (¶¶ 20-21)), began using marijuana, LSD and cocaine in high school (*id.* at 12-13 (¶¶ 32-34)), started trafficking drugs across the Mexican border at age 16 (*id.* at 9-10 (¶¶ 24-

---

[3] On the first day of the evidentiary hearing, Alejo received a visit from Dennis Olson, who identified himself as a detective with the prosecutor's office.  Following that visit, this Court appointed counsel for Alejo, and that counsel indicated that Alejo would exercise his Fifth Amendment right against self-incrimination if called to testify.  This Court addressed those events by treating Alejo's indication that he would take the Fifth "the same as if he came in and here took the Fifth," and admitted Alejo's sworn declaration (Ex. 24) into evidence.  (*See* 2/4/14 Tr. at 4:22-19:13; 2/6/14 Tr. at 67:19-69:10.)

{00128370.1 }

4843-7819-0105.

25)), and was beaten and raped in a Mexican jail at age 18 (*id.* at 10 (¶ 26).).  Roughly

five years later—after curbing his drug use, meeting Calvin Lorts and having a religious

moment he likened to a "sexual experience" culminating in an orgasm—Alejo

participated in helping to found PADAC.  (*Id.* at 15-16 (¶¶ 40, 42-44).)

Alejo befriended Wendi after Donna joined PADAC in 1974 (2/4/14 Tr. at 120:7-

23 (D. Ochoa)), and he and Donna soon began a sexual relationship (Ex. 25 at 18 (¶ 48)).

Alejo and Donna slept together in Donna's apartment, with Wendi in the same bed.

(2/4/14 Tr. at 122:2-17 (D. Ochoa).)  For the first time since being potty-trained at less

than a year old, Wendi began wetting the bed on a regular basis, several nights per week

for months.  (*Id.* at 122:18-123:9.)  As Dr. Hopper acknowledged, while "[k]ids can wet

the bed for various reasons," from a developmental standpoint it "doesn't usually

suddenly start at age four-and-a-half" and sudden bedwetting is "not an uncommon

response to sexual abuse."  (2/3/14 Tr. I at 69:24-71:1 (J. Hopper).)

Alejo was a volatile presence in the home.  According to him, 90 percent of his

arguments with Donna were about sex; she would refuse him in the morning, and "it built

and built all day and [he] spent the day hoping she would change her mind until [he] was

ready to explode."  (Ex. 24 at 44-45 (¶¶ 123-24).)  Donna "never said anything and just

clammed up," he responded with anger, and Wendi "took [his outbursts] hard."  (*Id.*)

According to Donna, "You never knew when it would happen.  And it could be like every

night that week or we might be able to go a whole week" without one occurring, "but

never more than a week."  (2/4/14 Tr. at 151:16-18 (D. Ochoa).)  "Most of the screaming

[Alejo] did was [directed] at Donna"; as for Wendi, Alejo sought to instill discipline by

spanking her with a wooden paddle, during which "she always cried."  (Ex. 24 at 45 (¶

126).)

Donna's neglect of Wendi continued as she and Alejo soon fell under the

influence of Rick Farmer and Al Miller, two self-styled missionaries who hosted Bible

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

studies at their home. (2/4/14 Tr. at 124:24-125:19 (D. Ochoa).) That influence was profound, to the point that Donna "burned barrels" of photographs and other household items following a sermon on idolatry and evil spirits. (*Id.*) Donna and Alejo did not seek medical care when Wendi came down with a prolonged, "really high" fever, relying upon prayer to heal her. (*Id.* at 127:1-22.) Indeed, in 1975, Donna and Alejo married because Farmer and Miller told them they could not continue sleeping together otherwise. (*Id.* at 126:1-7.)

**(ii) Fishers of Men**

After marriage, the Ochoas' religious zeal and attachment to Farmer and Miller intensified. Donna quit her job at PADAC because the government grants it obtained restricted her from talking about religion (2/4/14 Tr. at 128:1-6 (D. Ochoa)), pulled Wendi out of first grade in Casa Grande, and left with Alejo and Wendi to live under the same roof as other families devoted to Farmer's and Miller's ministry in a home in Willcox, Arizona. (*Id.* at 128:24-130:4.) It soon became a transient ministry, spending time in another home in Tucson before living in a travel trailer in various locations in California over the next two years. (*Id.* at 132:4-133:11.) Their daily routine on the road consisted of church, Bible study, and attempting to find food. (*Id.* at 139:12-18.)

Wendi lived in abject poverty throughout that time, "looking for pennies on the ground to buy beans," going barefoot for almost a year, and eating food retrieved from dumpsters. (*Id.* at 131:6-132:1, 136:3-14.) The group believed in corporal punishment, and Wendi was spanked by Donna, Alejo, or "whoever the elde[st] male was" around at the time of her disobedience. (*Id.* at 134:5-13.) Wendi was not in school and was the only child in the group, leaving her with no peers whatsoever from ages seven to nine. (*Id.* at 130:5-23, 133:12-134:4.)

By the time the Ochoas left the group and Wendi returned to Casa Grande at age nine, she was "different" and "more withdrawn." (*Id.* at 137:22-138:10.) With Donna's

neglect continuing, Wendi became closer to a parent more willing to give her attention: Alejo.  (*Id.* at 148:4-22.)

### (iii)    Wendi's Dissociation and Memory Deficits

The accumulation of trauma through age nine continued to thwart Wendi's ability to develop proper executive functioning (2/3/14 Tr. I at 77:20-79:4 (J. Hopper)), but also had new psychological effects on Wendi.  After leaving the Fishers of Men and returning to Casa Grande, Donna began to notice Wendi suffering from memory lapses on a daily basis.  (2/4/14 Tr. at 163:1-12 (D. Ochoa).)  These were not mere instances of absent-mindedness or forgetfulness but rather black holes in biographical memories.  As Donna recalled:  "That was one thing that I always thought was really strange.  Something would happen to her . . . normally, it was bad.  And I would ask her about it a few weeks later.  Like maybe she got a whoopin', a spanking, you know, at school or from [Alejo] or something, and I would make a comment about it," but Wendi would have no memory of it.  (*Id.* at 161:22-162:25.)

The 4.5 to nine year-old stage of development is when children retain memories, but "very serious overwhelming trauma of this sort for many years on end . . . often results" in "dissociation and . . . serious memory deficits."  (2/3/14 Tr. I at 79:18-80:2 (J. Hopper).)  Dissociation is "a disintegration of experience"—that is, a "disconnect[ion]" of normally integrated parts of identity, such as "your memories and your emotions or your ability to feel your emotions, what that feels like in your body as you're having it and things like that."  (*Id.* at 80:3-81:3.)  Dr. Hopper witnessed Wendi experiencing symptoms of dissociation firsthand in his 50-plus hours of interviews with her, finding that she would respond to distressing subjects by "check[ing] out," being unable to think clearly, unable to access the emotions stirred up by those subjects, and even unable to feel her body.  (*Id.*)

With regard to memory deficits, Dr. Hopper—who has "done a lot of clinical work

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

in this area, a lot of research"—found that "Wendi really had some of the most, if not the most, severe memory deficits that [he] had ever encountered," including "major gaps" in her memories from childhood.  (*Id.* at 81:7-83:7.)  Those memory deficits are not the kind we normally associate with memory loss due to age or mere forgetfulness, but rather "events that have some emotional content to them.  It's not like remembering a football score or an address."  (2/5/14 Tr. at 55:18-24 (G. Woods).)

During the evidentiary hearing, Dr. Hopper showed multiple examples of Wendi's memory deficits during distressing portions of her videotaped interview with Dr. Pitt.  (2/3/14 Tr. I at 86:11-23, 87:17-89:14, 90:25-91:18, 91:23-92:21 (J. Hopper).)  Absent serious head injuries, research shows that "you just don't see these kinds of major memory deficits unless someone has been through very significant trauma."  (*Id.* at 93:3-15.)

> During times of stress, that defense mechanism can have severe effects:
>
> For people who have been so traumatized and who have these memories that are split off and they can't access them even when they're trying, they've blocked out the really bad stuff . . . .  But under certain circumstances, high stress, frightening and confusing circumstances, this stuff can come rushing back in.  And we talked about that executive functioning and the CEO.  It can . . . just knock the CEO out and then the person is left to whatever bad stuff is coming in and whatever impulses are arising and they're just reacting to the situation without being able to think it through.

(*Id.* at 93:21-94:10.)  Even for normal individuals, research indicates that in highly stressful situations "there are chemicals that hit your prefrontal cortex that impair the ability of the nerves to communicate with each other," impairing the ability to inhibit impulse; for an individual whose executive functioning development was stunted by years of childhood trauma, that impairment is far more severe.  (*Id.* at 94:13-95:2.)

### d.     Ages Nine to 18

The time period between ages nine to 18 is "when you want to launch someone into being an adult," a stage in which "it is well-known through research that new cognitive capacities are emerging, especially for certain reasoning processes associated

[00128370.1 ]

4843-7819-0105.

with the prefrontal cortex." (2/4/14 Tr. II at 5:4-20 (J. Hopper).)  Healthy social and emotional development in this time period renders one "capable of managing difficult emotions and relationships and making good decisions in very stressful situations." (*Id.*)

Unhealthy development, such as development affected by ongoing sexual abuse, constitutes "one more massive kind of continuous sexual trauma over nine to 18 years, piled on top of everything else.  So it's going to have the same kind of effects of depression, anxiety, emotion regulation problems, intimacy problems" as prior ongoing childhood trauma.  (*Id.* at 43:1-44:15.)  But it also creates "confusion . . . about sexual desires and impulses" for the victims during this time of sexual development, leading some to become "hypersexualized" and acquiescent to sexual attention because it conditions their brains that their "role is to have sex." (*Id.*)

As recounted by multiple eyewitnesses, including three of Wendi's childhood friends and classmates during this stage, Wendi suffered persistent trauma on two fronts: (1) the environment of physical and emotional abuse in the strict fundamentalist school she attended; and (2) the sexual, emotional, and physical abuse inflicted upon her by Alejo at home, enabled by Donna's continued neglect.

<div align="center">

**(i)      The Environment of Abuse at Wendi's School**

</div>

Upon their return to Casa Grande, the Ochoas joined the 91st Psalm Church of Pastor Calvin Lorts, a friend Alejo had met shortly after ceasing his drug trafficking. (Ex. 24 at 13 (¶¶ 35-36), 15 (¶ 41); 2/4/2014 Tr. at 138:16-139:11 (D. Ochoa).)  Like the Fishers of Men, Lorts preached a fundamentalist version of the Bible with firm beliefs regarding the proper roles of men and women.  (2/4/14 Tr. at 139:20-140:10 (D. Ochoa).) In 1980, Alejo and Donna enrolled Wendi in the church's school.  (*Id.* at 141:5-9.)

After Lorts resigned his leadership position in 1983 or 1984 and moved away, the church changed its name (from 91st Psalm to Harvest Family Church) and took on more extreme views.  Tom King, the church's new leader, was a firebrand:  he gave "[v]ery

<div align="center">

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

</div>

4843-7819-0105.

<div align="center">

**P-App. 000325**

</div>

1    damning" sermons (2/4/14 Tr. at 46:8-13 (K. Lorts)), condemned non-members to hell

2    (2/5/14 Tr. at 15:2-5 (J. Neace)), and promoted isolation by warning members against

3    associating with non-members (2/10/14 Tr. at 163:25-164:8 (C. Schaider)).  As multiple

4    witnesses testified, King instructed them on all aspects of their daily lives, from

5    condemning television and sugar (2/5/14 Tr. at 13:1-9 (J. Neace)) to instructing women

6    to quit their jobs and assume their proper roles as homemakers (2/10/14 Tr. at 163:6-10

7    (C. Schaider)), to giving parents detailed instructions on how to beat their children "until

8    they cried and beat them until they cried softly" to "break their spirit" and produce

9    unquestioning obedience (*id.* at 163:15-20, 168:25-169:13).  He enforced these

10   instructions through shame, such as one incident in which he encouraged the

11   congregation to mock Wendi's 11 or 12 year-old cousin as a "faggot" for dying his hair

12   orange.  (*Id.* at 165:15-25.)

13        The church put its strict principles into practice in its school.  Other than a

14   "devotions" class taught by Alejo (2/4/14 Tr. at 44:22-45:14), their classes did not have

15   teachers but rather "monitors"—parents or older students who maintained order while the

16   children completed workbooks on their own.  (2/4/14 Tr. at 216:3-15 (J. Cunningham);

17   2/4/14 Tr. at 43:1-25 (K. Lorts).)  Infractions were punished by swats from the "rod of

18   correction," a large wooden "paddle or a two-by-four turned into a paddle" resembling

19   the blade of an oar.  (2/4/14 Tr. at 216:16-217:3 (J. Cunningham); 2/5/14 Tr. at 13:25-

20   14:8 (J. Neace); *see also* Ex. 161.)  Disobedience was loosely defined; one classmate

21   recalled that his deaf brother was beaten for failing to recite 15 verses of scripture from

22   memory.  (2/5/14 Tr. at 16:21-17:5 (J. Neace).)

23        Upon the Ochoas' return from the Fishers of Men, Alejo took a maintenance job

24   with 91st Psalm that he quickly expanded into a role as its children's pastor.  (2/10/14 Tr.

25   at 158:22-159:4 (C. Schaider); 2/4/14 Tr. at 141:25-142:8 (D. Ochoa).)  In that position,

26   he was responsible for conducting children's services twice a week, teaching the

27

28   {00128370.1 }

23

"devotions" class at the school, and generally "advising or keeping an eye on the kids." (2/10/14 Tr. at 158:22-159:4 (C. Schaider).)  He used the "rod of correction" with the students, though with "inconsistent boundaries" reflective of his volatility.  (2/5/14 Tr. at 16:13-18 (J. Neace); 2/10/14 Tr. at 159:11-16 (C. Schaider).)

While "stern and gruff" with students generally (2/4/14 Tr. at 44:22-23 (K. Lorts)), multiple witnesses reported sexually inappropriate advances by Alejo toward his students.  Alejo was "touchy, real flirty" with female students and would "rub up on" them while they were at their desks.  (2/5/14 Tr. at 18:12-19:13 (J. Neace).)  His lessons "often" devolved into sexual topics:  "he would just say weird things to us kids," such as transforming a lesson on the Song of Solomon into "[t]elling the boys how to touch breasts or talking about kissing with your tongue."  (2/4/14 Tr. at 44:22-45:17 (K. Lorts).)  When Jasper Neace reported facts pertaining to Alejo's sexual nature to Tom King—specifically, that Wendi had "brought a Playboy book to school" that belonged to Alejo—King called Neace a liar, expelled him, told him never to return, and condemned him to "burn in hell."  (2/5/14 Tr. at 25:20-26:16 (J. Neace).)

For a child who had already suffered extensive trauma and showed "great difficulty managing her emotions," the church-school's environment of fear, isolation, and sexualization without recourse served as yet another source of "unrelenting trauma" for Wendi.  (2/3/14 Tr. II at 13:9-14:10 (J. Hopper).)  It left Wendi without anyone "really helping her deal with all the terrible stuff she [had] inside" (*id.*)—an accumulation of "terrible stuff" that did not cease when she came home from school.

**(ii)    Alejo's Sexual Abuse**

Alejo's sexual comments and teasing continued outside of school, with Wendi as the target.  He was "very derogatory" toward Wendi and made sexual statements and jokes to his pre-teen stepdaughter, speaking with her about sex as early as ten years old. (2/4/14 Tr. at 150:9-152:24 (D. Ochoa).)  He frequently took Wendi to the adult section

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

of novelty store Spencer's Gifts, directing her attention to sex-themed items that were not "age appropriate." (*Id.* at 157:18-159:6.) The pattern has continued into adulthood, as reflected in the sexual messages he sent her while incarcerated (Ex. 75) and his request that she send him erotic stories from prison (Ex. 45 at PCR114).

Yet Alejo's sexual relationship with his stepdaughter went well beyond uncomfortable comments or jokes. Several witnesses testified to various aspects of his systematic manipulation and sexualization of Wendi from her pre-pubescent years onward, up to and including sexual assault.

> **(1)** **"Dressing Up" and Photographing Wendi in Lingerie.**

Both Kyre Lorts and Jeri Lynn Cunningham, two friends of Wendi between the time Wendi was nine and 13, reported that their sleepovers at Wendi's house included dressing up in nightgowns for Alejo's pleasure. Lorts, who slept over at the Ochoas' home roughly twice a month when Wendi was 10 or 11 years old (2/4/14 Tr. at 47:3-15, 48:12-15 (K. Lorts)), noted that their sleepovers regularly included "play[ing] dress-up" in Donna's lingerie, after which they would be "invited" to Alejo's room. (*Id.* at 47:16-19, 50:19-21, 51:15-52:11, 53:19-22.) Cunningham, who slept over at Wendi's house roughly once a month when Wendi was 12 to 13 years old (2/4/14 Tr. at 218:23-219:11 (J. Cunningham)), recalled that they "liked to have Alejo take us out to the desert at night because we liked to tell each other scary stories." (*Id.* at 231:1-24.) "Every time" they did so, however, Alejo "would make [them] put our nightgowns on first." (*Id.*)

Around the time Wendi was 12, Alejo began taking her on father-daughter shopping trips for lingerie, such as "little lacy underwear and a bra to match and a garter belt, things like that." (2/4/14 Tr. at 156:2-22 (D. Ochoa).) Alejo took up photography around the same time (*id.* at 159:7-14), and began photographing his teenage stepdaughter in lingerie. Some photos, likely from her late teens, still survive (Ex. 72-74); Alejo also showed Cindy Schaider photographs of Wendi between ages 15 to 17 "in

25

a teddy, in women's underwear . . . taken out in the desert."  (2/10/14 Tr. at 159:17-160:12 (C. Schaider).)  Dr. Hopper recounted another incident from his interviews, in which a 17- or 18-year-old Wendi acquiesced in Alejo's requests to meet him in a hotel room, where he had brought with him a bag of lingerie:

> So this is an incident that Wendi partially remembers, like many other things.  You know, doesn't remember, but she remembers pieces of it.  But this one she remembers not wanting to do it.  She remembers getting to the hotel room and him pulling out the bag and starting to pull lingerie out of the bag and just being freaked out and thinking, "Oh, my God, I don't want to put that on," but she doesn't remember anything after that.  She's pretty sure she complied with his wishes, as she did usually, to do this sexual thing, but she doesn't remember anything after that pulling the lingerie out of the bag.

(2/3/14 Tr. II at 30:7-31:3 (J. Hopper).)

Alejo snapped photos surreptitiously, as well.  Jeri Lynn Cunningham recalled accompanying the Ochoas camping on the beach in San Diego, where she caught Alejo taking pictures of her and Wendi in their swimsuits as they showered.  (2/4/14 Tr. at 222:4-7 (J. Cunningham).)

Donna, as had become her custom, did not protest Alejo's sexual actions toward her daughter:  "I ignored a lot of things—a lot of things that I should not have ignored." (2/4/14 Tr. at 197:18-24 (D. Ochoa) (Cross).)

### (2)   "Ministering" to Alejo

Alejo's sexualization of Wendi went beyond the verbal and visual.  After their return to Casa Grande, Alejo demanded that Wendi assume a "duty" that Donna increasingly refused to perform:  the ritual of "ministering to him."  (2/4/14 Tr. at 153:5-19 (D. Ochoa).)  Alejo would wear workout shorts or sweats without underwear and lay on the couch; it was Wendi's "duty, and literally duty, to be the one to rub" his body and head from "[a]nywhere from 45 minutes to a couple of hours" a night.  (*Id.* at 153:5-13, 155:4-156:1.)  "[N]ormally, and especially as [Wendi] got older, he would lay on the couch and [she] would have to sit on the end of the couch and he would put his head on her lap and, you know, say:  Touch me.  Touch me."  (*Id.* at 155:14-18.)

4843-7819-0105.

Childhood friend Jeri Lynn Cunningham was subjected to one of these sessions during a sleepover, as a condition for Alejo taking her and Wendi to the desert. (2/4/14 Tr. at 232:7-10 (J. Cunningham).) She and Wendi sat at either end of the couch, with Alejo laying on the couch with his head in Cunningham's lap. (*Id.* at 232:11-24.) Alejo gradually turned his face toward Cunningham's crotch area and pretended to snore; Cunningham pushed his face away, but Alejo would repeatedly feign snoring and return his face to the 12- or 13-year-old Cunningham's genitals. (*Id.* at 233:6-25.)

Dr. Hopper cited this ritual as a textbook indication of an incestuous family dynamic:

> Donna actually said she was relieved to hand this duty off to Wendi, that it was a relief for her. And this is an example of what we call, . . . a classic incestuous family. You've got two really damaged adults. In this case, the mother is depressed and withdrawn and isn't interested in being involved with the father anymore sexually or intimately . . . . And so we have Donna basically handing Wendi over to Alejo and glad that she's taking care of Alejo's stuff and glad that, you know, she doesn't have to deal with it. So it was worse than just not looking away. She was actually relieved. . . . [H]orrible as it is, unfortunately, this is not an uncommon dynamic in some of these really disturbed incestuous families.

(2/3/14 Tr. II at 26:18-27:9 (J. Hopper).)

### (3)   Overt Molestation by Alejo

Alejo's sexual abuse went further. In light of Wendi's memory deficits relating to trauma and Donna's neglect, no two witnesses were better positioned to testify about Alejo's abuse than Lorts and Cunningham—two close childhood friends of Wendi, who saw Wendi on a daily basis and slept over at her house one to two times per month when Wendi was roughly 10 to 13 years old. (2/4/14 Tr. at 40:14-24, 46:17-22, 52:5-11 60:2-5 (K. Lorts); 218:8-219:11 (J. Cunningham).)

Lorts began sleeping over at the Ochoas' house shortly after Wendi began school at 91st Psalm in 1980, when Lorts was eight years old and Wendi was 10 or 11. (2/4/14 Tr. at 51:15-20 (K. Lorts).) The "first few" sleepovers had a routine pattern: after dinner, Wendi would take Lorts to Donna's bedroom to play dress-up in Donna's

4843-7819-0105.

1  lingerie, look at themselves in the mirror and "parade around the house." (*Id.* at 47:16-
2  19, 49:6-24, 50:8-21.)

3      At the third or fourth sleepover, the pattern changed.  After dressing up, Wendi
4  and Lorts (who was dressed in Donna's nightie, with no underwear) "were invited to
5  come into Alejo's room." (*Id.* at 52:5-11, 53:19-22.)  Lorts followed Wendi into the
6  room, where she saw Alejo wearing only a pair of red shorts, sitting in a large recliner
7  and watching "videos with naked people" on a small television. (*Id.* at 52:5-11, 53:3-9,
8  53:19-22, 54:18-24.)

9      Lorts initially recoiled at the scene and retreated to the bathroom, "shaking and
10 confused and [unsure] how to feel." (*Id.* at 53:12-18.)  Wendi followed and told her that
11 "it was okay," and the eight-year-old Lorts felt calmer after her 11-year-old friend's
12 reassurance. (*Id.* at 53:25-54:2.)  Lorts and Wendi returned to Alejo's room, where he
13 remained sitting in his red shorts, watching an adult video. (*Id.* at 53:25-54:14.)

14     The girls sat on Alejo's lap, and Lorts saw him "grow or g[e]t big down there" as
15 he fondled their legs, chests, and Wendi's genital area. (*Id.* at 54:15-56:9.)  Lorts saw
16 Wendi touching Alejo "in the genital area," as well. (*Id.* at 56:20-22.)  Though the
17 incident seemed to last "forever" to Lorts, who was in third grade at the time, she
18 estimated that the fondling continued for "probably ten minutes." (*Id.* at 56:10-11.)

19     Lorts, not knowing how to describe what had occurred and wanting to remain
20 friends with one of her only female peers at the church-school, continued to sleep over at
21 Wendi's house for another year. (*Id.* at 57:21-58:4, 58:22-59:3.)  Each time, she and
22 Wendi were subjected to the same routine of dressing up in lingerie, being summoned to
23 Alejo's room, and being fondled. (*Id.* at 60:2-5.)  By the third time, Alejo had grown
24 bolder with Lorts, putting her "hand on his thing" and touching her in the genital area.
25 (*Id.* at 59:12-60:1.)

26     Cunningham was the same age as Wendi, and testified regarding a series of

[00128370.1 ]                                    28
PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1   sleepovers that occurred in 1982 and 1983, when they were 12 to 13 years old.  (2/4/14

2   Tr. at 228:8-229:25 (J. Cunningham).)  During the sleepovers, Wendi and Cunningham

3   slept in the same bed in their nightgowns.  (*Id.* at 224:1-16.)  On three or four different

4   sleepovers, Cunningham awoke in the night to find Alejo under the covers between her

5   and Wendi, with his hand down Cunningham's nightgown.  (*Id.* at 224:20-225:21,

6   228:14-20.)  She moved his hand away multiple times; each time, his hand would return

7   to her chest.  (*Id.* at 225:5-21.)  She would eventually fall back asleep, and awake in the

8   morning to find Alejo gone from the bed.  (*Id.* at 226:21-227:3.)

9        Neither Lorts nor Cunningham told their parents about the abuse at the time—

10  Lorts because Alejo was (like her own father) a pastor and she lacked the vocabulary or

11  sexual knowledge to understand or describe what had occurred (2/4/14 Tr. at 57:21-58:4

12  (K. Lorts)), and the older Cunningham because she was afraid her father "would kill

13  Alejo" and that her parents would no longer let her see her best friend, Wendi (2/4/14 Tr.

14  at 227:12-15 (J. Cunningham)).  But while both were traumatized by the events, both

15  were also able to speak about them long before Wendi's trial.  Lorts, who is now a

16  special needs teacher in San Tan Valley, first disclosed Alejo's abuse to family members

17  in the early 1990s, when she was 19 years old.  (2/4/14 Tr. at 39:3-12, 66:23-67:5 (Cross)

18  (K. Lorts).)  Cunningham, who is now a second-grade teacher, had not previously

19  disclosed the abuse, but was willing to do so had anyone from Wendi's defense team

20  contacted her regarding Wendi's childhood.  (2/4/14 Tr. at 238:10-239:19 (J.

21  Cunningham).)

22        As reflected in their testimony, Alejo's molestation of Lorts and Cunningham still

23  carries an emotional impact for them.  But unlike Lorts and Cunningham, who were

24  subjected to abuse on a limited number of circumstances over discrete time periods,

25  Wendi had no respite.  Alejo was with her at school each day, and at home each night.

26  He was her stepfather and adoptive father; unlike Cunningham and Lorts, Wendi had no

27

28  {00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

other father figure in her life with whom she could feel safe.  As Dr. Hopper testified,

ongoing sexual abuse by a parent is more psychologically destructive than any other

form:

> [E]ven a really horrific single trauma, even a . . . violent brutal rape . . .
> pales in comparison to ongoing sexual abuse day-in, day-out.  As a child,
> when things happen to you, the younger you are, the more this kind of
> abuse is more devastating. . . .  It has been documented [that the] closer you
> are to the [abuser], the more power they have over you, like a parent, the
> more destructive this kind of abuse is.

(2/3/14 Tr. II at 16:10-17:7 (J. Hopper).)

### e. The Connection Between Wendi's Traumatic Childhood and Joe's Death

#### (i) The State Did Not Rebut the Facts Regarding Wendi's Harrowing Childhood or Their Effects

The State offered no rebuttal to Dr. Hopper's conclusion that Wendi suffered

severe and ongoing childhood trauma.  Nor could it.  Multiple witnesses testified

regarding various aspects of the same types of trauma inflicted upon Wendi as a child,

and—as evidenced by the dozens of declarations filed with the Petition—many more

could have offered further corroboration if the State had opted to dispute the facts of her

traumatic childhood.

Nor did the State dispute that the types of trauma Wendi suffered impairs the

development of crucial executive functions necessary to self-regulate, control impulse,

and make sound decisions under stress.  Dr. Hopper is a leading expert in the field who

has devoted his career to the study and treatment of childhood trauma and its effects, and

his opinions were buttressed by widely accepted literature.  Dr. Pitt did not (and could not

have) challenged Dr. Hopper's testimony regarding the effects of pervasive childhood

trauma on brain development and adult behavior, nor could he challenge Dr. Hopper's

observation that such extensive trauma generally requires years of therapy just "to be able

to navigate in certain relationships in a safe way" (2/3/14 Tr. II at 48:4-17 (J. Hopper))—

therapy that Wendi never received.

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000333

And the State did not meaningfully contend that many symptoms Wendi exhibited as an adult, such as memory deficits concerning emotionally laden events and acquiescence to the sexual attentions of men, were natural consequences of her harrowing childhood.  The State half-heartedly sought to raise an inference that her memory deficits could be mere fabrications to bolster her mental health defense, but there is no credible support for that argument.  *First*, Wendi's memory deficits with regard to emotionally laden effects were noted by her mother as early as age 9 or 10, and by professional counselor Kandy Rohde as early as February 2001 and throughout her pre-trial incarceration—long before any psychologist or psychiatrist had examined her in connection with Joe's death.  *Second*, the State never explains how it would have been in Wendi's self-interest to feign lack of memory regarding traumatic events.  *Third*, the State quibbles by noting that Wendi could remember certain biographical details but not others, but this line of argument ignores the undisputed testimony of Drs. Hopper and Woods that the presence or absence of a memory deficit is a function of the emotional impact it carries for the trauma victim—*not* whether it is an event that the average person would believe to be memorable or non-memorable, emotional or non-emotional.

> **(ii)    Evidence of Wendi's Childhood Trauma Could Have Persuaded the Jury Not to Impose a Death Sentence**

The unrebutted evidence regarding Wendi's traumatic childhood and its effects likely would have had a significant impact upon the jury, in two main respects.

*First*, the impact of childhood trauma upon executive functions explains Wendi's behavior during the offense itself, which began with a physical confrontation with Joe, as a product of impaired impulse control.  It also explains her behavior before and after the offense not as a product of evil, premeditated scheming, but rather a series of actions by a damaged individual incapable of sound, deliberate decision making under stress.

Dr. Hopper explained how such evidence bears upon Wendi's culpability:

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1

2          [W]hen you've been subjected to this kind of unrelenting trauma of all
           kinds throughout your entire childhood, and at the hands of parents, then it .
           . . warps your capacities and stunts them in various ways . . . . You can't
3          regulate your emotions and impulses when you're stressed and you can't do
           all kinds of things and your system is not functioning well.  You're just
4          trying to block things out. . . .  And then when . . . a very complex situation
           hits with a lot of stress, it's kind of like the system crashes and that CEO,
5          that prefrontal cortex is just offline and all that lifetime of trauma and any
           impulses that go with it can just kind of come out and take over.

6   (2/3/14 Tr. II at 46:17-47:11 (J. Hopper).)

7          After a long series of questions on cross-examination regarding various facts of

8   the case—none of which concerned the homicide itself—the State again asked Dr.

9   Hopper how Wendi's behavior prior to and after the homicide related to her childhood

10  trauma.  Dr. Hopper referenced his prior testimony regarding the impact of ongoing

11  childhood trauma on the development of executive functions in the prefrontal cortex

12  (2/4/14 Tr. at 28:10-31:14 (J. Hopper) (Cross))—the part of the brain responsible for

13  "modulating impulses and emotions and keeping things in check" (2/3/14 Tr. I at 78:19-

14  79:4 (J. Hopper)).  Healthy executive functioning is also necessary for decision making.

15  (2/4/14 Tr. at 28:10-31:14 (J. Hopper) (Cross).)  "[B]ad decision making is the first thing

16  you see as someone is becoming overwhelmed" due to the close connection between

17  decision making and emotions, but individuals whose ability to regulate emotions is

18  impaired due to persistent childhood trauma find their decision making "going downhill

19  dramatically" as stressors (including their own bad decisions) accumulate.  (*Id.*)  When

20  those stressors culminated in a physical confrontation between Wendi and Joe, "that's

21  when you get the total shutdown of the prefrontal cortex," including the inability to

22  control impulse.  (*Id.*)

23         As Dr. Hopper summarized, Wendi's actions before, during, and after the

24  homicide are "absolutely consistent" with one whose executive functioning had been

25  impaired by "a childhood of trauma":  "So it's absolutely a perfect example of how

26  decision making goes first in all of us, but especially in someone who has been through

27  the overwhelming trauma that she has been through.  That's exactly what you would

28  {00128370.1 }                                    32

1   expect.  So it is completely consistent with everything I know as a therapist, as a scientist

2   and everything I've studied for the last 20 years." (*Id.* at 31:5-14.)

3          But beyond shedding light on Wendi's actions in causing Joe's death, the evidence

4   regarding her childhood trauma and its effects also lends context to a number of the facts

5   that the State emphasized in urging the jury to impose a death sentence.  For example, in

6   the penalty phase of her trial, the State repeatedly referenced Wendi's sexual intercourse

7   with two other men in the months prior to Joe's death as evidence that she wanted to "go

8   out and goof around with other men." (12/15/04 Tr. at 121:18-20.)  But the jury never

9   heard about the childhood sexual abuse she suffered, which causes the very

10  hypersexuality that the State emphasized in arguing that the death penalty was

11  appropriate.

12         The State also referenced her purportedly wholesome and religious upbringing,

13  arguing to the jury that her actions leading up to Joe's death were completely inconsistent

14  with her Christian upbringing.  (*See, e.g.*, 12/15/04 Tr. at 129:23-130:21.)  A true,

15  legitimate social history would have shown how her actions were completely consistent

16  with someone who had suffered the pervasive trauma she experienced throughout her

17  developmental years.  As Dr. Hopper noted during cross-examination:

18         So, of course, if all that I've just presented and all the expertise that I'm
           trying to share with the Court was not presented at trial, then, of course, it's
19         easy to paint her as a conniving bitch, who's off sleeping around and
           drinking and having fun as her husband is dying.  You know, prosecutors
20         can do that sort of thing when this kind of evidence is not presented.

21         The whole point—the reason why I'm here is because there is such
           evidence.  We have now done a thorough investigation. . . .  There is so
22         much—so much evidence of trauma and the effect this would have on
           someone's brain.  It was never presented at trial and that's why she would
23         be presented as a conniving person.  What I'm saying is 52 hours with her,
           looking at all the evidence, my own professional integrity as a therapist, a
24         scientist, and somebody who testifies in court, it just doesn't—it just
           doesn't compute.

25  (2/4/14 Tr. at 32:8-33:6 (J. Hopper) (Cross).)

26         In sum, evidence of Wendi's harrowing childhood and the effects of such trauma

27  {00128370.1 }                                    33

28  ───────────────────────────────────────────────
    PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
    PETITION FOR POST-CONVICTION RELIEF
    CASE NO. CR2000-096032-A

4843-7819-0105.

establishes a lens through which the jurors would have viewed all of her subsequent actions—a lens through which Wendi's actions are not the result of purely vicious or selfish desires, but rather the byproduct of suffering repeated molestation, physical abuse, deprivation, and neglect through at least the first 18 of her 30 years prior to Joe's death. Had this evidence been presented, her sexual acquiescence to other men becomes a sad and predictable consequence of childhood sexual abuse by her stepfather, rather than evidence that "[s]he's going to do what she wants.  What does she care about the Ten Commandments?"  (11/16/04 Tr. at 97:19-20.)  Her increasingly deformed decision making leading up to Joe's death becomes a product of her stunted executive functioning under stress, rather than part of her "character . . . to try and achieve her goal in any way possible."  (12/15/04 Tr. at 113:1-3.)  Her memory deficits regarding emotionally laden events have a scientific explanation, rather than a target for the prosecutor to ask the jury, "If that's the truth and that was such a traumatic event . . . don't you think she would have remembered?"  (11/16/04 Tr. at 94:23-25.)  The beating with the barstool and subsequent cut with the knife become the product of a lack of impulse control naturally arising from 18 years of abuse and neglect, rather than part of a considered effort to "not . . . leave the job undone."  (12/15/04 Tr. at 114:17-18.)

Evidence of Wendi's harrowing childhood speaks to all of the reasons underlying the State's argument for death.  It certainly could have persuaded the jury—which deliberated at the penalty phase for four days even *without* this evidence—to impose a sentence of life in prison rather than death.

### 3.    Wendi's Psychological Disorders and Their Effects

In March 2001, Dr. Jack Potts was given the narrow task of assessing whether Wendi was competent to assist trial counsel.  (Ex. 6.001.)  He concluded that she was, but could not help but comment that something seemed amiss with regard to her mental health in connection with the offense:

Certainly there is something quite bizarre about what allegedly occurred.  If

34

{00128370.1 }

4843-7819-0105.

P-App. 000337

Ms. Rohde is accurate in her diagnostic assessment, then the criminal culpability of the defendant and her state of mind at the time of the alleged offense should be evaluated independently, outside the scope of a [competency] evaluation.

(*Id.* at 2-3.)

As noted in more detail in the portion of this brief concerning ineffective assistance of counsel, prior to this post-conviction relief proceeding no psychiatrist was given the task of assessing Wendi in light of the diagnostic impressions of Kandy Rohde, the certified professional counselor Wendi was seeing on a regular basis while incarcerated.[4]  In addition, every witness who testified on the subject at the evidentiary hearing—including Dr. Pitt and Patterson—emphasized the importance of an accurate and complete social history to a proper diagnosis.  (*See, e.g.*, 2/5/14 Tr. at 49:16-51:3 (G. Woods); 2/6/14 Tr. at 72:19-73:18 (K. Rohman); 2/7/14 Tr. at 49:6-50:15 (D. Patterson); 2/11/14 Tr. at 60:15-61:4 (L. Hammond); 2/14/14 Tr. at 43:4-21, 44:23-45:1, 72:23-25 (S. Pitt).)  Prior to this proceeding, no one had compiled an accurate social history of Wendi that included the extensive childhood trauma referenced above.  The only social history compiled by the defense team was the superficial and unequivocally positive portrayal of Wendi's upbringing captured in the PowerPoint presentation it made at trial. (2/7/14 Tr. at 60:24-61:18 (D. Patterson).)

Thus, Dr. George Woods,[5] who was retained in connection with this post-conviction relief proceeding, was the first psychiatrist given the task of assessing Wendi

---

[4] Dr. Richard Rosengard, who performed a one-visit diagnostic assessment in 2002, did not review (and apparently was not provided) any materials from Rohde.  (Ex. 6.003 at 1 (noting materials reviewed, which consisted of police reports and other evidence regarding the offense itself).)

[5] Dr. Woods has been a practicing psychiatrist for more than 35 years, is a fellow with the American Psychiatric Association, serves on the advisory boards for the International Association of Trauma Professionals and the International Association for Specialized Study of Developmental Disorders, and currently teaches psychiatry at the Morehouse School of Medicine in Atlanta.  (*Id.* at 43:8-47:18.)

{00128370.1 }

35

1   in light of the diagnostic impressions of Rohde and others, and the first to have the

2   benefit of a full social history in making that diagnosis, including the social and mental

3   health history of her family.  Dr. Woods relied upon "a comprehensive social history of

4   Wendi that really went back to before her birth that had significant information about"

5   both the paternal and maternal sides of her family.  (2/5/14 Tr. at 49:16-50:6 (G.

6   Woods).)  Dr. Woods was also the first—and still the only—evaluating psychiatrist to

7   spend more than a single visit with Wendi, evaluating her on three different occasions

8   and conducting a separate interview of Donna.  (*Id.* at 48:15-24, 49:11-14.)

9        With all of this relevant information at hand, Dr. Woods diagnosed Wendi with

10  four disorders:  (1) complex post-traumatic stress disorder, a severe form of PTSD that

11  results from exposure to continuous, ongoing trauma; (2) bipolar disorder, a mood

12  disorder prevalent on the maternal side of her family; (3) cognitive disorder not otherwise

13  specified, an impairment of the executive functioning in her brain that was confirmed by

14  additional neuropsychological testing; and (4) dependent personality disorder, a

15  pathological need to attempt to satisfy the needs of others, deriving from a childhood

16  punctuated by neglect, abuse, and coercion by adults.[6]

17       The following sections address each of the four conditions identified by Dr.

18  Woods and their effect on Wendi's behavior, both individually and cumulatively.

19                    **a.   PTSD**

20       Post-traumatic stress disorder, or PTSD, has at least two variations.  Type 1 PTSD

21  "is the type of PTSD that is reflected by a single incident . . . that leaves a person reliving

22  that experience," such as a traumatic rape or great bodily injury.  (*Id.* at 54:13-23.)  Type

23

24  [6] In addition, Dr. Woods also noted that over years of helping to care for Joe's cancer,
25  Wendi suffered from "caregiver burden"—an umbrella term describing specific stressors
    and disruptions to mental health faced by those who assume the primary role of caring for
26  chronically or terminally ill family members, which exacerbates the symptoms of other
27  disorders suffered by the caregiver.  (*Id.* at 52:25-54:3.)

{00128370.1 }                                    36

28

4843-7819-0105.

1 PTSD "dysregulates the emotions so that people tend to overrespond or underrespond"

2 to specific circumstances, such as being in the area where the traumatic events occurred.

3 (*Id.*)

4        Type 2, or "complex PTSD," is a form of PTSD often associated with ongoing

5 trauma over a longer duration, such as ongoing sexual or physical abuse.  (*Id.* at 55:3-14.)

6 Because its sufferers faced the same or related trauma on a day-to-day basis, the effects

7 of Type 2 PTSD are more disruptive than Type 1 PTSD:  "you find that complex PTSD

8 really creates . . . long-lasting symptoms of what we call rumination, having these things

9 go on over and over.  And complex PTSD, more than Type 1 PTSD, disrupts day-to-day

10 functioning."  (*Id.* at 55:3-14.)

11        Childhood sexual abuse and neglect are common sources of complex PTSD.  (*Id.*

12 at 57:15-59:7.)  Even the State's expert, Dr. Pitt, conceded that if the traumatic childhood

13 events outlined in the Petition were true—as the testimony at the hearing proved them to

14 be—then "maybe some of the symptoms that she has could potentially be tied to post-

15 traumatic stress disorder."  (2/14/14 Tr. at 112:17-24 (S. Pitt.) (Redirect).)

16        Memory deficits and dissociation are manifestations of complex PTSD, and Dr.

17 Woods observed both in his interviews of Wendi.  (2/5/14 Tr. at 55:18-24, 56:9-57:10 (G.

18 Woods).)  Complex PTSD is also marked by sleep disruption of the kind reported by

19 Wendi.  (*Id.* at 75:11-76:8.)  Further, complex PTSD causes "numbing" in its sufferers, in

20 which "behaviors that are so inappropriate, that are so beyond the pale"—such as

21 acquiescing to a stepfather's sexual advances—"become normalized."  (*Id.* at 58:22-

22 59:7.)  "It doesn't mean that the person doesn't feel.  It means that in order to fight off the

23 multiple stresses, they cocoon themselves."  (*Id.* at 61:24-62:9.)  Sufferers often self-

24 medicate by abusing alcohol or other drugs.  (*Id.* at 64:9-17.)

25        But the "primary impact of post-traumatic stress disorder" again relates to "what's

26 happened in the brain" as a result of the trauma.  (*Id.* at 62:14-63:1.)  As explained by Dr.

27

28

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

1   Woods:  "[PTSD] throws off one's ability to respond accurately and effectively.  People

2   that have severe [PTSD], they either overrespond or underrespond.  And I'm not saying

3   in each and every situation, but certainly in emotionally laden situations.  They often just

4   miss the bar."  (*Id.* at 62:14-21.)  In such situations, "[t]heir ability to really effectively

5   weigh and deliberate what's going on is impaired, their ability to kind of add up all the

6   figures to determine what's the best course of action."  (*Id.* at 62:22-63:1.)

7        Wendi's PTSD resulting from a lifetime of trauma explains many behaviors that

8   went largely unexplained at trial.  It explains her excessive drinking in the months prior

9   to Joe's death, not as "having the time of her life" but rather a form of self-medication for

10  a significant mental disorder.  (12/16/04 Tr. at 11:12-14.) It explains her "[c]onfused"

11  affect when she asked Chris Hashisaki to watch her children while she accompanied Joe

12  to the hospital on the night of the homicide (9/8/04 Tr. II at 11:22-23 (C. Hashisaki))—

13  followed by irrational actions in calling and then dismissing paramedics for Joe—as a

14  function of her inability to weigh and deliberate her actions at that moment of extreme

15  stress.  The numbing effect of PTSD explains why "[s]he didn't shed a tear" during the

16  police interrogation that followed.  (12/15/04 Tr. at 108:12-13.)  And, most of all, it

17  explains Wendi's overresponse in her physical altercation with Joe, resulting in his death.

18       Had the jury been provided the medical explanation of complex PTSD for these

19  otherwise inexplicable acts—a diagnosis that the State's own expert does not refute—it

20  could have reached a different result at the penalty phase.

### b.      Bipolar Disorder

22       While "PTSD occurs because something happens in the environment to you[,]"

23  bipolar disorder (like other mood disorders such as depression) is a "disorder[] that run[s]

24  in families."  (*Id.* at 64:21-65:7.)  Both sides of Wendi's biological family suffer from

25  mood disorders:  Wendi's maternal aunt and possibly grandmother suffered from bipolar

26  disorder (2/4/14 Tr. at 76:19-25 (D. Ochoa)), Skip had the mood disorder of depression,

27

28

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

and Donna suffers from depression with some indications of bipolar disorder.  (2/5/14 Tr. at 66:9-22 (G. Woods).)

"Bipolar disorder is by definition a disorder of impaired judgment.  It's by definition a disorder where you do things that you just wouldn't do if you weren't experiencing and suffering from these symptoms at that time." (*Id.* at 87:23-88:2.)  As its name suggests, bipolar disorder is marked by swings between two poles:  depression (marked by feelings of hopelessness, isolation, excessive sleep, and feeling unable to function) and periods of mania, which was historically thought to refer to grandiosity but "really reflects more irritability, impaired judgment, [and] impulsivity." (*Id.* at 65:9-25.) While in the midst of either pole, individuals with bipolar disorder "have significantly impaired judgment. . . .  Their ability to effectively weigh and deliberate, think their way through a problem, is significantly impaired." (*Id.* at 77:21-78:2.)  The mood disruption can lead to bizarre and irrational behavior, the "loss of understanding of social boundaries," and hypersexuality.  (*Id.* at 78:7-79:1, 121:14-122:1 (Cross), 125:6-9 (Cross), 126:22-127:3 (Cross).)  As with PTSD, people with bipolar disorder also tend to self-medicate.  (*Id.* at 79:4-8.)

Bipolar disorder usually begins to manifest itself in adolescence, and "the first symptom that you see, particularly in women, is depression." (*Id.* at 68:7-22.)  Wendi exhibited those symptoms at least by her teenage missionary trip to Mexico, where she went through a period where she was in bed for weeks.  (*Id.*)  She also exhibited periods of the opposite pole of mania as an adult, marked by the key symptoms of sexual impulsivity and "bursts of energy not tied to any particular activity." (*Id.* at 74:9-16.) While incarcerated, her medical providers noted that she experienced racing thoughts, a "type of thinking that occurs in bipolar disorder that is not really consistent with any other type of psychiatric disorder.  It's the shift that your thoughts are going so fast that you just aren't able to hold onto them. . . .  This describes a specific constellation of

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1  symptoms that is just not found" in other disorders.  (*Id.* at 76:15-77:13.)  Moreover, after

2  going through a variety of medications while in pre-trial incarceration, prison medical

3  providers eventually began treating her mental health symptoms with Seroquel—a drug

4  that "has been specifically indicated for bipolar depression."  (*Id.* at 69:7-21.)

5      Dr. Woods noted that several of her behaviors after the onset of the disorder in her

6  late teens, including actions leading up to the time of the offense, were "the very types of

7  irrational behaviors that one sees in bipolar disorder."  (*Id.* at 121-14-122:1.)  Dr. Pitt

8  agreed that Wendi was experiencing mood disorder symptoms prior to the homicide:

9  "Now what I do say in that part of my report is that she did in the run-up to the offense . .

10 . experienc[e] some depressive symptoms and was experiencing some anxiety symptoms.

11 And I believe that.  I think she was."  (2/14/14 Tr. at 74:5-9 (S. Pitt).)

12      Wendi's trial counsel attempted to rationalize Wendi's irrational behaviors leading

13 up to Joe's death.  But some of those actions simply cannot be rationalized.  For example,

14 asking a neighbor to pose as Joe to try to obtain a life insurance policy for the family,

15 even with Joe's knowledge and consent, was a misguided and irrational decision doomed

16 to failure.  Had the jury been provided a sound medical explanation for her increasingly

17 abnormal conduct in the months leading up to and including Joe's death, ranging from

18 the socially inappropriate (such as openly flirting and kissing men in front of co-

19 workers), to the bizarre (such as hare-brained efforts to obtain insurance for someone in

20 the advanced stages of terminal cancer), to the utterly irrational (such as her excessive

21 violence in her altercation with Joe, resulting in his death), it is reasonable to believe that

22 it would not have imposed a death sentence.

23          **c.**      **Cognitive Disorder**

24              **(i)**      **Diagnosis**

25      In light of Wendi's severe childhood trauma and mental disorders, Dr. Woods

26 enlisted the assistance of the late Dr. Myla Young, a neuropsychologist, to evaluate

27

{00128370.1 }                                           40

28 ────────────────────────────────────────────────────────
   PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
   PETITION FOR POST-CONVICTION RELIEF
   CASE NO. CR2000-096032-A

Wendi's neuropsychological functioning.  Neuropsychologists assess different areas of

brain functioning by administering various standardized tests aimed at assessing specific

functions (2/10/14 Tr. at 12:18-13:24 (J. James)), and Dr. Young administered what the

State's expert characterized as "a huge—a very large number of [neuropsychological]

tests three years prior" to the hearing.  (2/14/14 Tr. at 13:13-18 (K. Amin).)  Specifically,

Dr. Young administered an "extraordinarily thorough battery" of 35 tests, spending 25

hours over five visits with Wendi in the process. (2/10/14 Tr. at 14:3-14 (J. James).)

"[T]here was significant consistency in Wendi's performance in terms of strengths and

weaknesses" across the tests, many of which were computer-scored or, in the case of tests

requiring verbal responses, recorded and transcribed.  (2/10/14 Tr. at 12:2-13, 15:10-22

(J. James).)

     After Dr. Young's passing a few months before the hearing (*id.* at 11:19-22), Dr.

Joette James reviewed the raw neuropsychological testing data and Dr. Young's analysis,

conducted her own independent scoring analysis of the data, and performed a fresh

reanalysis of Dr. Young's interpretations.  (*Id.* at 5:13-18, 11:9-18.)  Dr. James is a

clinical neuropsychologist who received her Ph.D. in clinical psychology from

Northwestern, served an internship at Boston Children's Hospital through Harvard

Medical School, and spent two years in fellowship and seven years on the faculty at the

Children's National Medical Center in Washington, D.C.  (*Id.* at 6:23-7:8, 9:16-10:1.)

She also maintained a clinical practice in neuropsychology and was certified by the

American Board of Professional Psychology in Clinical Neuropsychology, a credential

held by only four percent of her peers in the field.  (*Id.* at 7:11-8:4, 9:16-10:1.)

     Consistent with the testimony of Dr. Hopper regarding the impact of pervasive

childhood trauma on brain development, the neuropsychological tests confirmed that

Wendi's cognitive functions were impaired in three specific respects:  executive

functioning, information processing speed, and attention.  (*Id.* at 5:22-25.)  As described

{00128370.1 }

41

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000344

below, all of these deficits relate to her brain's inability to function properly under stress.

*Executive Functioning.*  Dr. Young administered "a number of measures" that tested various aspects of executive functioning, which is "the bridge to real world functioning and it includes abilities such as working memory, the short-term memory, the ability to hold information in your mind, and then use it to guide behavior" and to "control impulses."  (*Id.* at 24:18-25:19.)  The results showed that Wendi performed "fine" when the tasks involved in the testing were relatively simple; when complexity was introduced, however, her performance plummeted dramatically.  (*Id.* at 25:21-26:3.)  She scored in the 7th percentile or less in all four trials of one test for executive functioning (*id.* at 26:4-16); she performed in the 2nd to 5th percentile in another complex test (*id.* at 30:1-31:9) and the 7th percentile in a third (*id.* at 32:9-33:3), all illustrating her inability to function when "overloaded by a large amount of information" (*id.* at 31:14-24).

*Information Processing Speed.*  A number of the neuropsychological tests included a time component, which "puts stress on the prefrontal cortex systems."  (*Id.* at 37:15-38:2.)  In reviewing the testing data, Dr. James found "that in just about every test where there was a time component . . . [s]he performed poorly.  And when I say poorly, I mean less than the 1st percentile, the 2nd percentile, the 9th percentile, the 5[th] percentile. There were a number of tests."  (2/10/14 Tr. at 35:6-23 (J. James).)  "[I]t was really the addition of the timing element that derailed her," as illustrated by one vocabulary test in which she scored in the 50th percentile when not timed, but her performance fell to the 9th percentile when Dr. Young added a timing component to the test.  (*Id.* at 36:1-37:6.)

*Attention.*  Similarly, Wendi's performance on tests of different types of attention was normal when the tests were simple, but "[s]he had more difficulty with the more complex aspects of attention, shifting attention back and forth between two different types of cognitive tasks or being able to selectively attend to one or divide her attention

4843-7819-0105.

1  between the two"—with scores ranging from the 18th percentile to less than the 1st

2  percentile.  (*Id.* at 21:9-23:2.)  In particular, Wendi was "unable to keep up" with changes

3  in the tests, scoring at less than the 1st percentile upon a task that provided stimuli at

4  random varying intervals.  (*Id.* at 23:7-24:4.)  As Dr. James explained, "what that means

5  in real life is that . . . as the task changes, as the demand changes, as what's required

6  changes, she is unable to keep up with—keep pace with the task."  (*Id.*)

7                              **(ii)    Effects**

8            Individuals with these types of cognitive deficits are subject to becoming easily

9  overwhelmed (*id.* at 33:8-17); when that occurs, they may respond by shutting down, by

10  "acting out" with "emotional outbursts," and by becoming "increasingly impulsive."  (*Id.*

11  at 33:20-34:5.)  When that "shutdown" of executive functioning occurs, "then there is

12  really a breakdown in communication between . . . that part of the brain and other parts,

13  recruiting language, being able to recruit memories, being able to put a stop on impulses,

14  being able to consider plans of actions, think ahead.  You know, all of those abilities are

15  sort of run and managed by this CEO [of the brain], and when that CEO is not working,

16  then you have a breakdown in the system."  (*Id.* at 38:10-39:1.)

17           The testing may not fully capture the extent of Wendi's crash in cognitive function

18  under the stressful circumstances leading up to Joe's death, because while there is "some

19  stress associated with being tested," that stress is mild compared to a truly "complex or

20  high stress situation, [in which] you would expect her to deteriorate further in terms of

21  her ability to change with the changing demands or situation."  (*Id.* at 24:7-14.)  Indeed,

22  as Dr. Woods noted, medical records from Wendi's pre-trial incarceration (such as

23  records pertaining to her suicide attempt) indicated her inability to function cognitively

24  when faced with "multiple stressors at the same time."  (2/5/14 Tr. at 85:1-18 (G.

25  Woods).)

26           Because Wendi is capable of functioning normally on straightforward tasks, her

27

28  {00128370.1 }

                                              43

cognitive deficits "are not as obvious on a day-to-day basis." (*Id.* at 86:17-87:3.)  But "[i]n situations that are high stress where emotions are running high, she is more likely to become overloaded and overwhelmed.  And when that happens, she shuts down.  Her neurological system shuts down and she has difficult engaging in a thoughtful goal-directed decisions making process.  And as a result, she tend to then act on impulse." (2/10/14 Tr. at 6:10-16 (J. James); *see also* 2/5/14 Tr. at 87:23-88:10 (G. Woods) ("Cognitive defects are very similar [to bipolar disorder], in that, you, when under stress, can't martial up the forces" to make reasoned decisions).)

As with her complex PTSD and bipolar disorder, Wendi's cognitive deficits under stress provide further context for her increasingly impulsive and irrational behavior leading up to and including Joe's death.  But the results of her neuropsychological testing also provide concrete, measurable verification of her impairments in executive functioning arising from a childhood of repetitive trauma.  Even if a jury disagreed regarding the particular cause of her cognitive deficits, the fact that those cognitive deficits exist weighs upon how the jury considers all of her actions under the exceptionally stressful circumstances of caring for Joe as his cancer progressed, while raising two young children and serving as the family's sole breadwinner.

### (iii)    Dr. Amin Failed to Materially Rebut the Findings of Dr. Young and Dr. James

The State's neuropsychologist, Dr. Kiran Amin, did not endeavor to rebut the findings of Dr. Young and Dr. James that Wendi suffered cognitive deficits in executive functioning, information processing, and attention under stress.  Indeed, Amin did not specifically test for executive functioning (2/10/14 Tr. at 39:19-40:8 (J. James)), and did not dispute that the results of the comprehensive battery of tests administered by Dr. Young showed the cognitive deficits identified by both Dr. Young and Dr. James.

Instead, Dr. Amin "was more interested in seeing what changes, if any, had occurred since that testing by Dr. Young" (2/14/14 Tr. at 13:14-18 (K. Amin)) to assess

44

[00128370.1 ]

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000347

1   the possibility that Wendi was malingering—or faking—her cognitive deficits.

2          Dr. Amin's evidence of malingering was flimsy at best, for several reasons.  Dr.

3   Young had previously given Wendi seven different "performance validity tests" to spot

4   malingering during the testing relied upon by her and Dr. James, as well as numerous

5   checks for malingering embedded in tests on other functions.  (2/10/14 Tr. at 17:21-18:12

6   (J. James).)  *None* of those tests indicated malingering by Wendi during the battery of

7   tests administered by Dr. Young.  (*Id.*)  Thus, the most Dr. Amin could show was that

8   Wendi was malingering during his administration of the tests he conducted—not the tests

9   that produced the raw data relied upon by Dr. Young and Dr. James.

10         Dr. Amin failed to show that Wendi was malingering during his test

11  administration, either.  Dr. Amin administered two stand-alone tests for malingering.  He

12  acknowledged that on the first, "which had not previously been administered to Ms.

13  Andriano, she performed within normal limits.  In other words, she put forth normal

14  effort."  (2/14/14 Tr. at 14:23-15:1 (K. Amin).)  On the second, the Structured Inventory

15  of Malingered Symptomology (SIMS)—a test that specifically warns that it cannot be

16  used alone to determine whether one is candidly responding (*id.* at 29:9-12 (Cross))—

17  Wendi had a combined score of 15, only one point away from being considered normal

18  under the test's own criteria.  (*Id.* at 28:20-29:4 (Cross).)  Moreover, those criteria are

19  inaccurate.  As Dr. James noted, a 2007 study showed that people performing credibly on

20  the test had an average score of 14.9—one-tenth of a point from Wendi's score—and that

21  the test had a false positive rate of 40 percent.  (2/10/14 Tr. at 44:5-45:5 (J. James).)[7]

22         Finally, had Wendi been malingering with Dr. Amin in an effort to exaggerate her

---

[7] Dr. Amin also administered the MMPI, a personality test that had been previously
administered by Dr. Bayless prior to Wendi's trial, and noted that there were elevations in
some areas as compared to prior administration a decade earlier.  (2/14/14 Tr. at 16:2-9
(K. Amin).)  But as Dr. Amin acknowledged, those elevations simply indicate that Wendi
was in a "considerably greater level of distress" when Dr. Amin tested her.  (*Id.*)

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

cognitive deficits, one would expect her to perform worse on certain tests than she had

with Dr. Young three years earlier.  Yet in the sole test he administered that captures

executive functioning—the complex figure test—her performance improved.  (*Id.* at

39:19-40:8, 40:21-41:18.)  That improvement is expected, due to the "practice effect" of

having performed the same unusual task before.  (*Id.*)  The complex figure test is

particularly susceptible to the practice effect.  (*Id.* at 42:10-14.)

### d.    Dependent Personality Disorder

Dependent personality disorder is a psychiatric disorder marked by a pathological

dependence upon and acquiescence to others, including an insatiable need to satisfy the

perceived needs of others.  (2/5/14 Tr. at 91:7-11 (G. Woods); *see also* Ex. 2 at 21-23.)

When one suffering from dependent personality disorder proves unable to continue to

fulfill those needs or feels the focus of their dependence withdrawing, she "fall[s] apart"

(2/5/14 Tr. at 92:1-7 (G. Woods)) and responds not with meek acquiescence but "often

[with] anger, [with] explosive responses."  (*Id.* at 97:14-98:7.)

"Wendi was groomed, so to speak, to be dependent," from being educated in a

church that believed acquiescence to be a woman's duty to submitting to Alejo's

sexualized needs to facing corporal punishment throughout her childhood for

disobedience or rebelliousness.  (*Id.* at 92:11-20.)  She exhibited symptoms of dependent

personality disorder early on in her relationship with Joe (*id.* at 93:25-94:21), in her

sexual relationships with other men (*id.* at 96:16-18), and even in her interview with Dr.

Pitt (*id.* at 95:7-15).  Dr. Pitt agreed that she "definitely . . . has features of someone

who's a dependent personality.  And I also think she has features insofar as she needs to

be around other people.  I don't think she does really well when people leave her, per se."

(2/14/14 Tr. at 77:8-13 (S. Pitt).)

Wendi's dependent personality disorder would have helped the jury understand the

dysfunction underlying Wendi's drastic shift in behavior in the months prior to Joe's

4843-7819-0105.

1   death—when the cancer progressed despite all of the surgeries, chemotherapy, holistic

2   healing, and even seeking spiritual healing through Pastor Tom King and the Harvest

3   Family Church.  It was, as Dr. Woods described, a situation in which "[t]he needs that

4   Mr. Andriano had tragically could not have been resolved. . . .  [W]hat you saw in this

5   relationship was . . . someone that had real needs who was medically ill, who was in fact

6   grieving themselves and fearful for their own life, and, yet, Wendi could not meet those

7   needs.  It just wasn't possible."  (2/5/14 Tr. at 99:18-100:2 (G. Woods).)  Her

8   pathological dependency needs thwarted, she responded by seeking the approval of other

9   men, succumbing to stresses that accelerated her other disorders, and, ultimately,

10  violence.  Had the jury been given this psychiatric context when judging those behaviors

11  in the penalty phase deliberations, it could have reached a different result.

                        e.      The Interaction of Multiple Disorders

13          As noted above, each of Wendi's disorders individually has the impact of

14  impairing her ability to deliberate, exercise rational judgment, and control impulse under

15  certain stressors that were most abundant in the time leading up to Joe's death,

16  culminating in the physical fight and resulting overresponse of Wendi in causing his

17  death.  Evaluating the impact of each disorder in isolation, however, fails to capture the

18  full extent of her impairment.  As Dr. Woods explained, Wendi's disorders are co-

19  morbid, meaning that they "amplify on each other":

20          You've got bipolar disorder.  You've got impaired judgment.  You've got
            cognitive deficits that lend themselves to impaired judgment.  You've got
21          dependent personality that can create anger and hostility.  You've got
            numbing of post-traumatic stress disorder.  All of these interact. . . .  They
22          interact and they interact in ways that create more severe behavior and
            behavior that frankly you often do not see until you see that kind of co-
23          morbid interaction.

24  (2/5/14 Tr. at 102:13-103:20 (G. Woods).)

25          The stressors giving rise to this co-morbid interaction in Wendi were beyond those

26  faced previously in her adult life, in part due to the cumulative effect of caring for Joe's

27  terminal cancer for several years prior to his death.  The stressors of caring for the

{00128370.1 }                                    47

1   chronically and terminally ill are captured by the umbrella term "caregiver burden,"

2   which is not a diagnosis but a "disrupter" that "exacerbates and disrupts symptoms that

3   that . . . a caregiver may have." (*Id.* at 53:2-23.) Over time, Wendi's caregiving stressors

4   were profound. Joe was "increasingly ill with brief moments of respite when he would

5   have surgery" between 1994 and 1998; after that time, he was "increasingly debilitated,

6   increasingly ill" and unable to work. (*Id.* at 100:19-101:21.) Thus, in addition to caring

7   for Joe, Wendi was primarily responsible for caring for their two young children and

8   providing the sole income for the family's mounting medical and other expenses. (*Id.*) It

9   is in this context of these extreme stresses on a day-to-day basis, which serve as triggers

10  for her various co-morbid disorders, that "[w]e really start to see these symptoms of

11  mood disorder and PTSD crop up and we see decisions that are significantly different

12  than decisions she's ever made in her life." (*Id.* at 101:14-21.)

13          **f.    Dr. Pitt Failed to Materially Rebut the Findings of Dr.
14                  Woods and Dr. Hopper**

15          Dr. Pitt reached different diagnoses following his single visit with Wendi, which

16  totaled less than five hours (2/14/14 Tr. at 94:10-16 (S. Pitt) (Cross)), but (as noted

17  above) he did not claim that the diagnoses of Dr. Woods were incorrect. He conceded

18  that complex PTSD was possible if allegations regarding her traumatic childhood were

19  shown to be accurate. (*Id.* at 75:2-4.) He did not dispute that Wendi has a family history

20  of mood disorders such as bipolar, and noted that she was experiencing symptoms

21  consistent with a mood disorder (namely, "some depressive symptoms" and "some

22  anxiety symptoms") "in the run-up to the offense." (*Id.* at 74:5-9.)[8] He noted that she

23  ---

[8] Dr. Pitt attributed those symptoms to an "adjustment disorder" in dealing with the stress
24  of Joe's cancer (*id.* at 78:4-13), but that diagnosis is not sustainable. As Dr. Woods
     noted, "adjustment disorders are by definition time-limited," lasting a matter of months
25  before "coming back to a homeostatic basis." (2/5/14 Tr. at 108:4-109:2 (G. Woods).)
     When Wendi was arrested, her medical providers noted that her depression had been
26  ongoing for at least a year prior to the offense. (*Id.*) It continued after her incarceration,
     as set forth in the jail records: "What really you saw were a number of different

27

{00128370.1 }                                    48

28  ---

4843-7819-0105.

1  has "features of someone with a dependent personality," though he characterized it as a

2  personality disorder with "borderline and dependent features" rather than dependent

3  personality disorder.  (*Id.* at 77:8-22.)  He did not opine regarding Wendi's cognitive

4  disorder, deferring to Dr. Amin.  (*Id.* at 75:12-14.)

5       Dr. Pitt's only substantive criticism of Dr. Woods' diagnoses was that, while her

6  pre-trial jail records saw "different diagnoses bandied about, including [PTSD and]

7  bipolar disorder," Wendi had not previously been "definitely, nor conclusively,

8  diagnose[d] with a major mental illness" before her trial.  (*Id.* at 73:2-8.)  That is not

9  surprising.  As noted above, an accurate social history and family mental-health history

10  are key components to a conclusive psychiatric diagnosis.  Every mental health provider

11  who ever treated or evaluated Wendi prior to trial—from her brief employer-mandated

12  counseling in 1996 (*id.* at 71:16-72:9), to Kandy Rohde's pre-trial counseling, to Dr.

13  Potts's competency evaluation, to Dr. Rosengard's initial assessment, to Dr. Bayless's

14  assessment for the State, to her jail medical providers who prescribed psychotropic drugs

15  for her and treated her following her suicide attempt—noted that Wendi suffered from

16  psychiatric disorders.  But because of trial counsel's inadequate mitigation investigation,

17  they made those assessments without the benefit of an accurate and complete social

18  history, including a family mental health history, and often from single-visit evaluations.

19  Dr. Woods and Dr. Hopper, by contrast, had access to a full family mental health and

20  social history for Wendi and made a combined nine visits with Wendi covering several

21  dozen hours.  (2/3/14 Tr. I at 29:5-10 (J. Hopper); 2/5/14 Tr. at 48:15-18 (G. Woods).)

22  They had the information necessary to make conclusive diagnoses, information that was

23  not investigated or provided to those assessing her before her trial.

24  _____

25  medications being used to treat her depression and eventually them moving on to drugs

   that are specifically for bipolar depression and her being on those off and on for about

26  three years.  So we don't have the resolution that one gets when you just have an

27  adjustment disorder."  (*Id.*)

{00128370.1 }

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

1    In short, Dr. Pitt offered no substantive rebuttal to the analysis of Dr. Woods, Dr.

2    Hopper, and Dr. James.  Instead, he devoted the bulk of his testimony to unscientific

3    attacks on Wendi's credibility and his personal impressions of the State's evidence at

4    trial.  Dr. Pitt dismissed responses from Wendi that were consistent with the diagnoses of

5    Dr. Woods as false answers from a "savvy" defendant, without explanation.  The extent

6    of Wendi's purported "savviness" appeared to grow through the course of Dr. Pitt's

7    testimony, in which Wendi went from "a fairly savvy person when it comes to being

8    interviewed" (*id.* at 53:23-24) to being "in the top 10 percent" in terms of "having some

9    savvy and having a little game" (*id.* at 64:5-6) to being a "a very, very savvy defendant"

10   (*id.* at 116:19-20) by the time of his redirect examination.  Yet, as described more fully in

11   following sections regarding mental health red flags that trial counsel did not pursue,

12   Wendi reported the same symptoms relied upon by Dr. Woods long before her trial.

13   Labeling her consistent reports of those symptoms today as "savvy" is not a credible

14   rebuttal, and is inconsistent with the emotion she showed in the various video clips of Dr.

15   Pitt's interview that were aired during the evidentiary hearing.

16   Similarly, as Dr. Hopper noted, Dr. Pitt's interview of Wendi was not structured to

17   obtain psychiatrically pertinent information, but was "a textbook case of how to not

18   interview for traumatic memory."  (2/3/14 Tr. II at 93:10-15 (J. Hopper) (Cross).)[9]  Dr.

19   Pitt himself acknowledged that he approached the interview as an interrogation regarding

20   factual events rather than a psychiatric assessment of her disorders and their effects:  "I'm

21   not there to build rapport.  I'm there to get to the truth, to get the information, to hear her

---

[9] For example, though Dr. Pitt agreed with Dr. Hopper that interviewing sexual abuse victims regarding the abuse is a delicate matter and that victims often block out memories of abuse (*id.* at 96:24-97:11 (Cross); 2/3/14 Tr. I at 90:4-20 (J. Hopper)), Dr. Pitt opened his discussion of sexual abuse with Wendi by bluntly asking whether she and Alejo were "sexually involved."  (2/14/14 Tr. at 102:9-106:2 (S. Pitt).)  Wendi stated that she did not remember when they had a physically sexual relationship, but knew they had an emotionally sexual one; Dr. Pitt did not follow up on the answer, and instead proceeded to ask whether she remembered other physical aspects of Alejo's sexual abuse.  (*Id.*)

50

22

23

24

25

26

27

28

4843-7819-0105.

1  version of the events."  (2/14/14 Tr. at 101:8-13 (S. Pitt) (Cross).)

2          Consistent with that interrogative objective, much of Dr. Pitt's testimony consisted

3  not of psychiatric opinions, but whether Wendi's recitation of the guilt-phase facts

4  comported with his own beliefs or the testimony of others at her trial.  (*See id.* at 59:20-

5  60:7 ("Wendi Andriano's version of what happened here just doesn't make sense."); *id.*

6  at 61:6-11 ("And so you sit here and you think this through and you're like, so let me

7  make sure I get this straight.  Your husband, being cognizant of the civil lawsuit, is going

8  to somehow get together with you and have ordered the sodium azide to help him take his

9  own life?  That just doesn't make sense.");[10] *id.* at 64:20-65:2 (asking Wendi additional

10  factual questions "[b]ecause her version of the offense didn't make sense . . . the pieces

11  don't add up.  The data just doesn't add up.").)  Dr. Pitt's armchair analysis of the facts of

12  the offense and whether they "make sense" are not psychiatric opinions.  From a

13  psychiatric standpoint, Wendi taking actions that do not make sense around the time of

14  the offense are consistent with all of the diagnoses identified by Dr. Woods, all of which

15  cause impaired judgment and irrational, impulsive, and sometimes bizarre behavior,

16  particularly when triggered at the same time.

17          For all of these reasons, evidence of Wendi's harrowing childhood and mental

18  disorders constituted highly probative mitigating evidence.  The jury should have had an

19  opportunity to hear this evidence before sentencing Wendi to death; had it been provided

20  that opportunity, "there is a reasonable probability"—that is, a "probability sufficient to

21  undermine confidence in the outcome"—"that at least one juror" would not have imposed

22  the death penalty.  *Wiggins*, 539 U.S. at 537; *Strickland*, 466 U.S. at 694.

---

[10] Actually, it does make sense.  It is hardly irrational for one with an increasingly
debilitating terminal illness that would eventually lead to death by suffocation (10/27/04
Tr. at 30:1-7 (W. Andriano)) to wish to die on his own terms, and it is not irrational for
him to seek a means of doing so that would preserve his family's right to take action
against the doctors who negligently failed to diagnose his cancer when it was still
treatable.

{00128370.1 }

51

4843-7819-0105.

**B.     TRIAL COUNSEL'S PERFORMANCE WAS DEFICIENT**

**1.     Standards**

The deficiency prong of *Strickland* looks to whether the prejudice was a product of "deficient" performance by trial counsel—that is, whether "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 687-88.  "[P]revailing professional norms" are not the same as customs or habits that may have developed among lawyers performing criminal defense work, which may or may not conform to the standard of care; norms are "an objective guide to the performance of lawyers who do capital cases and do them proficiently."  (2/11/14 Tr. at 16:19-17:4 (L. Hammond).)

The "prevailing norms of practice as reflected in American Bar Association standards . . . are guides to determining what is reasonable." *Strickland*, 466 U.S. at 687-88.  The American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (the "Guidelines") (Ex. 76), which were "a collaborative effort between the ABA and the National Criminal Defense Lawyer and Indigent Defense Lawyer organizations" (2/11/14 Tr. at 19:17-20 (L. Hammond)), are "measures of the prevailing professional norms of effective representation" in capital cases. *Padilla v. Kentucky*, 559 U.S. 356, 367 (2010).  The Guidelines are particularly important to establishing the standard of care in Arizona, which is one of only three states (along with Oregon and Ohio) to specifically refer to the Guidelines in its criminal rules governing the appointment and performance of defense counsel. *See* Ariz. R. Crim. P. 6.8.

The Guidelines reflected the standard of care for capital defense work from Wendi's 2000 arrest through her trial.  (2/11/14 Tr. at 26:19-23 (L. Hammond).)  Though Wendi's trial counsel failed to comply with the Guidelines in several respects, they accurately described the standard of care for the mitigation investigation of a capital case

{00128370.1 }

52

4843-7819-0105.

in a November 2004 motion they filed in Wendi's case:

> The investigation into the existence of any mitigating circumstances must be conducted in accordance with the recently revised guidelines for defense counsel in capital cases. *See* [Guidelines]. The Guidelines "are not aspirational . . . [but rather] embody the current consensus about what is required to provide effective defense representation in capital cases." [Guidelines 1.1 cmt.] The United States Supreme Court has affirmed that the Guidelines are the established standards for capital defense counsel. *Wiggins v. Smith*, [539] U.S. [510, 524] (2003) (The [Guidelines] are "well defined norms."). *See also* Ariz. R. Crim. P. 6.8(b)(1)(iii).

> . . . Penalty phase preparation requires an extensive and unparalleled investigation into the personal and family history of the accused. [Guidelines 10.7 cmt.] Mitigation investigation must include "efforts to discover *all reasonably available* mitigating evidence" and evidence to rebut aggravating evidence that may be introduced by the prosecutor. *Wiggins*, 123 S.Ct. at 2537 (emphasis in original). This is because the sentencer in a capital case may not refuse to consider or be precluded from considering any relevant mitigating evidence. *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987). *See also Eddings v Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).

> A significant step in the mitigation investigation is the creation of a social history, which is used to identify events and circumstances of a capital defendant's life. A social history is required "to construct a persuasive narrative, rather than to simply present a catalog of seemingly unrelated mitigating factors." [Guidelines 10.11 cmt.] Construction of the narrative "normally requires evidence that sets forth and explains the client's complete social history from before conception to the present." *Id.*

(Ex. 54 at 3-4.) Though a deviation from the Guidelines does not automatically constitute ineffective assistance of counsel, they are "well-defined norms," *Wiggins*, 539 U.S. at 524, and the United States Supreme Court has found ineffective assistance where attorneys' performance failed to meet the norms expressed in the Guidelines or predecessor provisions in the ABA Standards for Criminal Justice. *See, e.g.*, *Wiggins*, 539 U.S. at 524-27; *Williams v. Taylor*, 529 U.S. 362, 396 (2000).

Larry Hammond is uniquely well-qualified to testify regarding the standards for capital defense counsel. Following law school, Hammond clerked for the United States Supreme Court and spent six months working on Justice Powell's dissent in *Furman v. Georgia*, 408 U.S. 238 (1972). (2/11/14 Tr. at 7:18-8:14 (L. Hammond).) After taking a position in the White House Office of Legal Counsel, he was tasked with leading a team to research and compile a summary of the death penalty in the United States for the

[00128370.1 ]

53

1    President and his advisors.  (*Id.* at 8:15-23.)  Hammond returned to Arizona in 1981 and

2    immediately began taking capital cases in Arizona.  (*Id.* at 9:3-23.)  He has served as lead

3    counsel in a number of capital cases (*id.* at 9:25-10:2), and served as private counsel

4    pursuant to *Knapp v. Hardy*, 111 Ariz. 107, 523 P.2d 1308 (1974), in two others.  (*Id.* at

5    10:23-12:1.)  Hammond was a founding member of the Arizona Capital Representation

6    Project, a group that provides legal resources and education to capital defense counsel

7    (*id.* at 17:17-18:9), was appointed Chair of the Indigent Defense Task Force in 1995 (*id.*),

8    and has taught courses on the death penalty at the Arizona State College of Law and Elon

9    University Law School (*id.* at 18:10-21).  He was actively involved in the creation and

10   amendment of the Guidelines.  (*Id.* at 19:8-12.)

11        Since 1989, Hammond has reviewed "hundreds" of cases (both capital and non-

12   capital) to assess whether there was ineffective assistance of counsel, and was "primarily

13   responsible for reviewing ineffective assistance of counsel claims on behalf of the

14   Arizona Justice Project" in numerous cases.  (*Id.* at 14:1-8.)  In "hundreds" of the cases

15   he has reviewed in his career, Hammond concluded that trial counsel met the standards

16   for effective assistance.  (*Id.* at 93:19-94:11 (Cross).)

17        Wendi's case was not one of them.  After reviewing the trial transcripts, witness

18   declarations, and expert reports, as well as observing the testimony of Wendi's trial

19   counsel (*id.* at 15:7-16:12), Hammond concluded:  (1) "the composition and operation of

20   the defense team fell woefully below even the most minimal standards of preparation and

21   coordination necessary to defend a capital case"  (*id.* at 89:18-25); and (2) the defense

22   team performed a constitutionally defective mitigation investigation in several respects

23   (*id.* at 88:1-15).

24        This brief addresses both of these related categories of deficiencies in turn.

25

26

27                                                      54
     {00128370.1 }

28   ────────────────────────────────────────────────
                PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
                     PETITION FOR POST-CONVICTION RELIEF
                          CASE NO. CR2000-096032-A

## 2. The Composition and Operation of the Defense Team Was Deficient in Several Respects

Wendi's trial counsel consisted of Attorney David DeLozier, who her family retained to represent her in December 2000 (Ex. 231), and Attorney Daniel Patterson, who assumed the role of lead counsel when the Public Defender's Office was assigned Wendi's case in July 2001 (2/7/14 Tr. at 8:1-6 (D. Patterson)).  The Public Defender's Office assigned Patrick Linderman to serve as mitigation specialist for Wendi's case in December 2001 (Ex. 6.002); after Linderman resigned his position in early 2004 (2/7/14 Tr. at 55:11-13 (D. Patterson)), Scott MacLeod replaced him in that role (*id.* at 55:24-56:10).  Patterson, DeLozier, and MacLeod testified at the hearing.

As was evident from their testimony and the relevant exhibits, they did not function as a cohesive team.  Time and again, one testified that he assumed a certain task relating to mitigation was being performed by someone else, while that other person assumed it was the responsibility of another.  Each had pieces of information that could and should have formed the basis of follow-up investigation for mitigating evidence, but none took the responsibility—nor, in some instances, had the qualifications—to put them together and follow through with the level of investigation required by *Wiggins* and the Guidelines.

In short, the defense team failed to put itself in a position to conduct an adequate mitigation investigation, in two main respects:  (1) for different reasons, each of its members were ill-suited to perform an adequate mitigation investigation in Wendi's case; and (2) lack of communication and coordination by its members led to a dysfunctional investigation in which no one took responsibility for following mitigation leads, interviewing mitigation witnesses, and making "efforts to discover *all reasonably available* mitigating evidence" prior to her sentencing.  *Wiggins*, 539 U.S. at 524 (quotation omitted; emphasis in original).

{00128370.1 }

55

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000358

### a. The Composition of the Defense Team Was Deficient to Perform an Adequate Mitigation Investigation

For various reasons, each of the members of Wendi's defense team had obstacles or deficiencies that impeded the performance of the time-consuming and challenging task of a competent investigation sufficient to discover all reasonably available mitigating evidence in Wendi's case.

***Attorney Patterson.*** While Wendi's case was included among the first group of capital cases assigned to Patterson upon re-joining[11] the Public Defender's Office in July 2001 (2/7/14 Tr. at 7:3-8:6 (D. Patterson)), Patterson had previously gained experience in court-appointed capital cases while in private practice. (*Id.* at 6:1-24.) Thus, as a general matter, he was qualified to serve as counsel in a capital case. (2/11/14 Tr. at 49:13-17 (L. Hammond).)

But while Patterson could put his capital experience to use in the guilt and aggravator phases of the case, he conceded that his experience was not sufficient to make him competent at the penalty phase once Arizona amended its law to provide for jury sentencing. (2/7/14 Tr. at 8:7-11, 10:22-11:2 (D. Patterson).) Patterson had participated in only one trial with jury sentencing prior to Wendi's—*State v. Roque*—but that case was sufficiently unique that he did not learn lessons from the experience that he was able to carry over into Wendi's representation. (*Id.* at 19:5-20:2.)

In any event, Patterson simply did not have time to meaningfully participate in the mitigation investigation. He testified that the *Roque* case was likely the most high-profile he ever tried, requiring a significant time commitment; as a result, he let Wendi's case "languish" while preparing for *Roque*, which went to trial in the fall of 2003. (*Id.* at 15:20-16:5, 17:4-18:18.) After the conclusion of *Roque*, and with less than a year until

---

[11] Patterson served as a general trial attorney with the Public Defender's Office from 1990 to 1993, but did not recall performing any capital work during that period. (*Id.* at 5:14-25.)

{00128370.1 }

56

1   Wendi's trial, Patterson focused his attention on guilt-phase issues and interviewing the

2   large number of guilt-phase witnesses identified by the State.  (*Id.* at 119:8-23 (Cross).)

3   He delegated responsibility over the mitigation development to the other members of the

4   team:  DeLozier, mitigation specialist Patrick Linderman, and Linderman's successor,

5   Scott MacLeod.  (*Id.*; *id.* at 39:9-16, 62:4-9.)

6       ***Attorney DeLozier.***  DeLozier had no experience whatsoever in capital defense

7   work, and thus no experience developing mitigating evidence in a capital case.  (2/10/14

8   Tr. at 57:5-11 (D. DeLozier).)  His firm first began taking criminal cases in the 1990s, but

9   prior to Wendi its practice was limited to misdemeanors and some non-capital felonies,

10  and its criminal work accounted for only a quarter of the firm's practice.  (*Id.* at 56:22-

11  57:4.)  Patterson provided DeLozier with no guidance on capital defense work or

12  instruction on how to conduct a mitigation investigation (*id.* at 104:17-22); indeed, as

13  noted in more detail below, the two barely communicated in the three years between the

14  time Patterson was assigned the case and the date of Wendi's trial.

15      After trial began, DeLozier faced two further impediments to his ability to

16  meaningfully and adequately participate in the case, one self-imposed and one tragic.

17  *First*, DeLozier made the unusual decision to fast during the course of Wendi's four-

18  month trial, consuming only fruit juices, because he was "not real thrilled with some of

19  the things that were being done and weren't being done and I thought it might help me

20  focus."  (*Id.* at 140:1-17.)  As Patterson observed, DeLozier "lost a considerable amount

21  of weight" over the course of the trial and his clothing was "just hanging on him."

22  (2/7/14 Tr. at 44:24-45:14 (D. Patterson); *see also* 2/11/14 Tr. at 44:2-21 (L. Hammond)

23  ("I must tell you I was horrified when I heard that. . . . [A] trial in which someone's life is

24  at issue is not a time to experiment" with such matters.).)

25      *Second*, midway through the trial Justin Blair, an associate in DeLozier's office

26  who was "like a son to [him] and [his] wife," was tragically murdered.  (2/10/14 Tr. at

27

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1   141:12-20 (D. DeLozier).)  DeLozier admits he never recovered "his bearings"

2   throughout the rest of the trial (*id.* at 141:14-25)—a significant impairment given that the

3   mitigation investigation had barely commenced at the time of Blair's murder, as outlined

4   in the following sections of this brief.

5   **Patrick Linderman.**  Linderman's qualifications were unknown even to the

6   attorneys relying upon him as a mitigation specialist.  As Patterson explained, "in today's

7   environment, we hire people that we believe can develop mitigation in the capital

8   context.  That wasn't how the folks were hired back then.  These persons . . . weren't

9   specifically trained to be capital mitigation people. . . .  Quite frankly, I don't think I ever

10  viewed his resume or his credentials."  (2/7/14 Tr. at 30:3-20 (D. Patterson).)  Whatever

11  Linderman's qualifications may have been, it is clear he did not put them to use in

12  conducting a thorough mitigation investigation.  Upon reviewing the file and

13  interviewing witnesses, experts Larry Hammond and Keith Rohman failed to find any

14  evidence that Linderman made any material contribution to the development of

15  mitigating evidence (2/6/14 Tr. at 58:3-16 (K. Rohman); *see also* 2/11/14 Tr. at 49:5-12

16  (L. Hammond)), and Patterson could not recall any (2/7/14 Tr. at 55:14-23 (D.

17  Patterson)).

18  **Scott MacLeod.**  Scott MacLeod was assigned to replace Linderman as the

19  mitigation specialist for Wendi's case in April 2004, with less than five months to

20  complete a mitigation investigation prior to Wendi's trial.  (2/6/14 Tr. at 13:8-14, 21:4-8

21  (S. MacLeod).)  Other than one community college sociology class, MacLeod had no

22  education in social work, psychology, or any other behavioral science.  (*Id.* at 7:19-8:13.)

23  He worked as a probation officer prior to the joining the Public Defender's Office in

24  August 2001, where he worked as a mitigation specialist on lesser felonies.  (*Id.* at 8:17-

25  10:25.)  Wendi's was one of "[p]robably a couple" of the first capital cases to which he

26  had been assigned, and it was the first capital trial in which he served as a mitigation

27

28  {00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

specialist.  (*Id.* at 13:22-14:16.)  MacLeod received no kind of "formal training classes" on capital mitigation work, and assumed that capital mitigation meant that he would do the same tasks as other mitigation work but just perform them "more thorough[ly]."  (*Id.* at 19:18-20:15.)

MacLeod's training and experience were insufficient to warrant the faith that trial counsel apparently placed in him to perform an adequate mitigation investigation. "Mitigation investigation . . . in a capital case is different from that in a noncapital case in such a matter of degree that it's difficult to put them in the same category."  (2/6/14 Tr. at 44:23-45:15 (K. Rohman).)  While "everybody has to do a first case," for mitigation specialists that first capital case must be handled under close oversight and training from both the attorneys and others experienced in capital mitigation work.  (*Id.* at 52:2-53:2.) Here, however, MacLeod was given no instructions by trial counsel (who did not know what his credentials were) and met only "[i]rregularly" with them prior to trial.  (*Id.*; 2/7/14 Tr. at 56:11-57:12 (D. Patterson).)  Moreover, for even an experienced mitigation specialist, four to five months prior to trial is "not nearly enough time" to conduct a thorough mitigation investigation.  (2/6/14 Tr. at 57:13-58:2 (K. Rohman).)

***No one qualified in mental health issues.***  Finally, the defense team did not "contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments," as the Guidelines demand.  (Ex. 76 at 28.)  The need for a team member with mental health training is well-established:  "In particular, mental health experts are *essential* to defending capital cases," because "[n]eurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses" and the client's mental status "is relevant to numerous issues that arise at various junctures during the proceedings . . . ."  (*Id.* at 30 (emphasis added).)

The defense team included no such professionals.  (2/11/14 Tr. at 34:16-20 (L.

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1   Hammond).)  Its entire inquiry into mental health consisted of a single-visit evaluation of

2   Wendi's competency to stand trial by Dr. Jack Potts in March 2001 (Ex. 6.001) and a

3   single-visit preliminary report of her mental health by Dr. Richard Rosengard in August

4   2002, made without any consideration of her social history (Ex. 6.003, at 1; 2/7/14 Tr. at

5   53:3-21 (D. Patterson)).  Neither professional was consulted again regarding any issues in

6   Wendi's case as they arose in the pre-trial preparations (2/7/14 Tr. at 70:12-16 (D.

7   Patterson); 2/10/14 Tr. at 70:13-17 (D. DeLozier))—a glaring breach of the standard of

8   care (2/11/14 Tr. at 105:3-12 (L. Hammond) (Cross) ("[I]t's more than simply a matter of

9   having a mental health evaluation.  That's why the rest of this is so important.  The social

10  history, the opportunity to look at the jail records, life history records, all of those things

11  are an important part.  It wouldn't be adequate just to say that I've hired a mental health

12  person and that person has conducted an examination.")).

13       Instead, the lawyers of the defense team responded to pertinent information

14  regarding Wendi's mental health—such as notes and letters from her counselor (Exs.

15  6.004, 7.002, 45, 230), suggestions from others involved in the case (Ex. 52, 6.001,

16  6.003), and news of her suicide attempt—with uninformed and incorrect armchair

17  analysis that failed to recognize their significance.  (*See infra* Part I.B.3.c-d.)  That is

18  precisely the reason the Guidelines call for the inclusion of one qualified in mental health

19  issues on the defense team  (*See* Ex. 76 at 31 ("Counsel's own observations of the client's

20  mental status, while necessary, can hardly be expected to be sufficient to detect the array

21  of conditions (*e.g.*, post-traumatic stress disorder . . . ) that could be of critical

22  importance.  Accordingly, Subsection A(2) mandates that at least one member of the

23  defense team" have qualifications in mental health.).)

24       In short, the defense team was not set up to succeed in performing an adequate

25  mitigation investigation.  Indeed, in light of these deficiencies, the lack of a thorough and

26  competent mitigation investigation was almost a foregone conclusion.

27

28

{00128370.1 }

60

### b.   The Operation of the Defense Team Was Dysfunctional

####    (i)   No One Took Responsibility to Investigate Mitigating Evidence

Several basic elements of a standard mitigation investigation slipped through the cracks in Wendi's case, and the dysfunction of the defense team sheds some light as to why.  As the testimony of Patterson, DeLozier, and MacLeod made clear, no one took ownership over the development of mitigating evidence.

According to Patterson, his "primary assignment" was preparation for the guilt and aggravator phases of the case (2/7/14 Tr. at 39:9-16 (D. Patterson); he delegated the responsibility for the mitigation investigation to DeLozier and to MacLeod:  "I believed at the time, the primary responsibility for developing mitigation was the mitigation specialist and David DeLozier who was in a better position to develop the theme that she was a wonderful daughter, a wonderful mom, a good student, a good citizen.  So, yeah, it was their responsibility."  (*Id.* at 48:18-49:1; *see also id.* at 62:4-9, 121:17-20 (Cross), 122:15-22 (Cross) ("[DeLozier] was tasked with doing the mitigation function . . . ."), 152:3-23 (Cross).)

DeLozier had "no authority" over the mitigation specialists, but Patterson believed that DeLozier would be "more actively involved in the mitigation" investigation "by virtue of his special relationship with the family."  (*Id.* at 30:21-31:13.)  Patterson was "[n]ot specifically" aware of what (if any) mitigation investigation others were undertaking (*id.* at 32:24-33:6), received no reports from DeLozier regarding the mitigation investigation (*id.*), and assumed that any mitigation development by DeLozier would have been "given to the mitigation [specialist]"—though he admitted he "wouldn't expect anything other than" mitigation evidence consistent with his perception that Wendi was "a wonderful lady."  (*Id.* at 33:18-34:7.)

DeLozier did not share Patterson's understanding of the division of labor.  According to DeLozier, he had no understanding of his role on the defense team after the

61

{00128370.1 }

Public Defender's Office assumed representation of Wendi in July 2001, other than "just to continue to meet with [the Ochoas] and answer any questions I could and hold their hands, basically." (2/10/14 Tr. at 103:15-19, 104:4-9 (D. DeLozier).)  He "wasn't asked to interview anybody" by Patterson, and did not interview any potential mitigation witnesses other than his "hand-holding" with the Ochoas and meetings with Wendi, during which they "didn't talk about the case." (*Id.* at 143:16-144:4, 149:21-150:1 (Cross).)

        MacLeod believed that Patterson was "in charge" of the mitigation investigation, and looked to him "for direction as to where to take the mitigation investigation[.]" (2/6/14 Tr. at 22:22-23:11 (S. MacLeod).)  But Patterson gave no such directions: according to Patterson, he gave MacLeod "free reign to develop what he thought was the appropriate mitigation package for Ms. Andriano." (2/7/14 Tr. at 57:3-7 (D. Patterson).) Though Patterson had no familiarity with MacLeod or his credentials—"Just a name and a new personality" (2/7/14 Tr. at 56:3-10 (D. Patterson))—Patterson did not actively supervise his work.  He gave MacLeod no specific directions (*id.* at 54:7-13, 57:3-7), received no reports regarding any mitigation investigation he or Linderman had performed (*id.* at 32:24-33:6), had no scheduled meetings or list of tasks or witnesses, and met with MacLeod only "[i]rregularly" (*id.* at 56:11-57:2).  Patterson admits this was a mistake:  "my error was not—not riding more closely Mr. MacLeod and Mr. DeLozier in the development of mitigation.  So those are lessons I've learned." (*Id.* at 20:12-15.)

        In short, all members of the defense team assumed that someone else was in charge of the mitigation investigation, and no one took responsibility to ensure that the investigation was coordinated and issues were not neglected.  As expert mitigation specialist Keith Rohman observed:  "So nobody here is running the mitigation.  Not the lawyers.  Not the investigator.  It's just not happening." (2/6/14 Tr. at 62:15-63:5 (K. Rohman).)

4843-7819-0105.

That is not the team approach envisioned by the Guidelines, and Patterson's

wholesale delegation of the mitigation case to DeLozier, who had no capital experience,

and to Linderman and MacLeod was inappropriate:

> [F]irst of all, he didn't know what their skills were, either one of them.  He had not ever—according to his testimony, he had not interviewed them.  He had not developed an understanding of the level of their knowledge and experience and he didn't supervise them.  He didn't direct them.  He left them out on their own.  As he said, he didn't ride—he didn't ride-herd on them. . . .  [F]oundational to the criminal defense capital team is communication and coordination.  You can't just send somebody out and say:  Okay.  You're in charge of mitigation.  You go do your thing for the next couple of years and come back and we will talk about it.  *That just can't happen in capital cases*."

(2/11/14 Tr. at 48:8-49:4 (L. Hammond) (emphasis added).)

The effect of this dysfunction culminated in the penalty phase presentation.

During the penalty phase, DeLozier conducted the direct examinations of five witnesses

he had *never even met* before they took the stand; he did not know who made the decision

to call them.  (2/10/14 Tr. at 143:4-15 (D. DeLozier).)  In addition, the focal point of the

mitigation presentation was a PowerPoint prepared by MacLeod (Ex. 138), which (to

Patterson's knowledge) constituted the only social history of Wendi that MacLeod had

compiled.  (2/7/14 Tr. at 61:3-18 (D. Patterson).)  Patterson had no role in preparing it

and reviewed it once prior to its presentation, making no changes (*id.* at 60:1-11), while

DeLozier "saw that one time" before he presented it to the jury.  (2/10/14 Tr. at 142:7-11

(D. DeLozier).)  The day before he was to present argument at the penalty phase,

DeLozier asked Donna to help draft the argument to accompany the PowerPoint

presentation; Donna passed that duty along to friend Cindy Schaider, and DeLozier read

Schaider's work as the bulk of his closing argument.  (2/10/14 Tr. at 142:14-23 (D.

DeLozier); 2/4/14 Tr. at 192:1-25 (D. Ochoa); 2/10/14 Tr. at 175:19-177:3 (C.

Schaider).)

Such last-minute scrambling, which was the product of a failure to develop any

kind of communication, coordination, and accountability for the mitigation case, is

4843-7819-0105.

1  wholly inappropriate in a capital case.  (*See, e.g.*, 2/11/14 Tr. at 43:19-44:1 (L.

2  Hammond).)

3  **(ii)     Wendi's Attorneys Failed to Work Together**

4  While communication and oversight over the mitigation investigation was

5  virtually nonexistent, the communication problems between Wendi's two attorneys were

6  especially problematic.  As a result, DeLozier—who was ostensibly charged with

7  providing mitigating information from Wendi and her family—did not meaningfully

8  contribute to the defense and performed virtually no substantive work on the case in the

9  almost three years between July 2001, when the Public Defender's Office was engaged,

10  and April 2004, mere months before trial.

11  At the outset, DeLozier informed Patterson that he had no capital experience.

12  (2/7/14 Tr. at 151:11-19 (D. Patterson); 2/10/14 Tr. at 104:10-16 (D. DeLozier).)  Rather

13  than forming a working relationship in which DeLozier sought (and Patterson provided)

14  guidance and specific direction (2/10/14 Tr. at 104:17-22 (D. DeLozier)), the two

15  essentially ceased communications about the case.  DeLozier could recall only two in-

16  person meetings with Patterson prior to the commencement of trial (*id.* at 105:7-106:1),

17  and testified that his phone calls to the Public Defender's Office were not returned and he

18  did not recall ever receiving an email from Patterson directly (*id.* at 104:23-105:6).

19  In August 2002, more than one year after Patterson assumed the role as lead

20  counsel, DeLozier sent an exasperated email to the Public Defender's Office, copying

21  Patterson:

22  > Donna Ochoa called me today around noon to advise that the scheduled
> hearing for 1:30 pm was postponed.  I am glad I did not make a trip to
23  > Mesa!!  Also, as we discussed when you were at my office, I am still not
> receiving any of the filings nor the previous ones filed.  What do you
24  > suggest on how I might be able to keep informed on what is going on.  I am
> working on keeping this from being frustrating.  But [Patterson] made it
25  > very clear that I was second chair and that the PD's office was not going to
> put anyone else on the case.  And, *I am completely without knowledge of*
26  > *case developments*.  Please advise.  I am copying [Patterson], just in case he
> is unaware of these issues.

27

28

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

(Ex. 63 (emphasis added).)  According to DeLozier, his email did not resolve the communication issues; he simply "didn't bother to document" them after that point. (2/10/14 Tr. at 110:13-23 (D. DeLozier).)  As he describes, he essentially abandoned any effort to be a part of the defense team:  "I knew that I was not going to have the kind of communication that I would expect and I just went along with whatever I got. . . .  [Y]ou figure the other people know what they're doing.  They've had experience. . . .  They don't really need me, in other words."  (*Id.* at 110:13-23.)

As it turned out, the team plainly did need DeLozier.  While out of the loop in Wendi's case, DeLozier had undertaken the first of the more than 20 civil suits he has handled on behalf of victims of childhood sexual abuse against the Catholic Church.  (*Id.* at 88:7-90:24.)  By April 2004, when he filed the first of those lawsuits, he had educated himself regarding the patterns, symptoms, and lifelong effects of childhood sexual abuse, including dissociation, memory deficits, self-destructive behaviors, depression, and PTSD.  (*Id.* at 92:20-102:6.)  He was also aware of the need to involve mental health professionals with expertise in childhood sexual abuse to diagnose and treat the client, and to explain the effects of that abuse (and the client's memory deficits) to the finder of fact.  (*Id.* at 94:10-95:17.)

In short, DeLozier obtained knowledge the defense team desperately needed, particularly given its failure to involve a mental-health professional on an ongoing basis. It is shocking—and a sign of the significant impact of his conflict of interest in representing the Ochoas—that DeLozier apparently did not make the connection on his own between Wendi's dissociation, memory deficits, and other symptoms various individuals reported that she suffered and childhood sexual abuse.  But it is also clear that his isolation from the rest of the team enabled his blindness:  "I was not in a position, in my opinion, to force the public defender to do anything."  (*Id.* at 136:24-137:12.)

The standard of care in a capital case "requires a team approach that combines the

4843-7819-0105.

different skills, experience, and perspectives of several disciplines" (Ex. 76 at 65) and
demands "[f]requent meetings, consulting, providing notes to each other" to ensure that
information is shared and lines of investigation do not slip through the cracks (2/11/14
Tr. at 53:14-21 (L. Hammond)).  As Hammond observed, "None of [that] happened
here[.]"  (*Id.*)

### 3. The Defense Team Failed to Adequately Investigate All Reasonably Available Mitigating Evidence

#### a. Standard of Care

The Guidelines emphasize the gravity of the "well-established" duty to conduct a
thorough investigation of mitigating evidence in a capital case:  "Because the sentencer in
a capital case must consider in mitigation, 'anything in the life of the defendant which
might militate against the appropriateness of the death penalty for the defendant,'
'penalty phase preparation requires extensive and generally unparalleled investigation
into personal and family history.'"  (Ex. 76, at 80-81 (citations omitted).)  Neither the
client's desires nor the belief that such an investigation would be futile excuse the failure
to complete this substantial duty, because "[c]ounsel cannot responsibly advise a client
about the merits of different courses of action . . . unless counsel has first conducted a
thorough investigation with respect to both [guilt and penalty] phases of the case."  (*Id.*)

An "unparalleled investigation" includes medical history and a "[f]amily and
social history (including physical, sexual, or emotional abuse, family history of mental
illness, cognitive impairments, substance abuse or domestic violence; poverty, familial
instability, neighborhood environment and peer influence); [and] other traumatic events .
. . ."  (*Id.* at 81.)  To obtain that information, "it is necessary to locate and interview the
client's family members (who may suffer from some of the same impairments as the
client), and virtually everyone else who knew the client and h[er] family, including
neighbors, teachers, clergy, . . . and others."  (*Id.* at 83.)  Given the magnitude of the task
and its relationship with other phases of the case, the Guidelines counsel that the

{00128370.1 }

66

1  mitigation investigation "should begin as quickly as possible" after the client's arrest.

2  (*Id.* at 82.)[12]

3         In addition, the Guidelines discuss at length the importance of a thorough

4  investigation into the defendant's mental health.  "[M]ental health experts are essential to

5  defending capital cases[,]" because "[n]eurological and psychiatric impairment,

6  combined with a history of physical and sexual abuse, are common among persons

7  convicted of violent offenses."  (*Id.* at 30.)   Though "[e]vidence concerning the

8  defendant's mental status is relevant to numerous issues that arise at various junctures

9  during the proceedings," "the defendant's psychological and social history and h[er]

10  emotional and mental health are often of vital importance to the jury's decision at the

11  punishment phase."  (*Id.* at 30-31.)  A cursory glance at mental health issues is

12  insufficient:

13         Creating a competent and reliable mental health evaluation consistent with
       prevailing standards of practice is a time-consuming and expensive process.

14         Counsel must compile extensive historical data, as well as obtaining a
       thorough physical and neurological examination.  Diagnostic studies,

15         neuropsychological testing, appropriate brain scans, blood tests or genetic
       studies, and consultation with additional mental health experts may be

16         necessary.

17  (*Id.* at 31.)

18         Trial counsel's investigation fell far below those norms.  They reiterated

19  throughout the evidentiary hearing that they did no investigation into potential childhood

20  physical, sexual and emotional abuse, failed to interview numerous individuals likely to

21  possess mitigating evidence, and failed to follow up on evidence suggesting significant

22  mental health issues.  In addition, it is evident that they did not begin to truly prepare for

23  the mitigation portion of the case until *after* the jury found Wendi guilty of first-degree

24  murder—far too late to perform a thorough investigation, and obviously too late to

25  incorporate any mitigating evidence into the guilt phase of the case.  As Hammond

26  ───────────────

27  [12] As with all Guidelines provisions, these represented the standard of care from the time
of Wendi's arrest through her trial.  (2/11/14 Tr. at 55:11-57:15 (L. Hammond).)

28

1   summarized:

2   > [I]t again was obvious that neither [Attorney DeLozier], nor Mr. Patterson
    > approached the case as a whole as a case in which the mitigation themes
3   > had to be understood and developed prior to trial.  That just didn't happen
    > here at all.  I mean, other than portraying the client as a good person who
4   > had had a good life, they did no other development and certainly no
    > presentation of any other mitigating circumstances.

5   (2/11/14 Tr. at 43:5-13 (L. Hammond).)

6               **b.      The Mitigation Investigation Was Deficient**

7           The defense team failed to meet the standard of care for investigating all

8   reasonably available mitigating evidence in least three general respects:  (1) it did not

9   focus upon the mitigation investigation until after the guilty verdict, much too late to

10  adequately develop the mitigation case; (2) its social history investigation was cursory

11  and far short of the "unparalleled investigation" the Guidelines demand; and (3) it failed

12  to adequately investigate potential mitigating evidence relating to Wendi's mental health.

13          **(i)      The Defense Team Was Ineffective in Failing to**
14                   **Substantively Begin the Mitigation Investigation**
                     **Until Far Too Late in the Proceeding**
15

16          On November 19, 2004—more than four years after Wendi's arrest, and *after* the

17  jury's guilty verdict—the defense team filed a Motion for Court Order to Assist

18  Mitigation Investigation, which referenced the social history required by the Guidelines

19  and sought "any records relating to Ms. Andriano or her family that may be in the

20  possession of state or local agencies" because they "are necessary to *build* [t]his social

21  history."  (Ex. 54 at 5 (emphasis added).)

22          Ten days later, and a little over a week before the penalty phase began, MacLeod

23  emailed Patterson a list of mitigation witnesses, with the caveat that it was "not a

24  complete, nor exhaustive list, [but] simply my list of witnesses."  (Ex. 136.)  MacLeod

25  acknowledged that he had not yet interviewed all of the witnesses on the list, was hoping

26  to "schedule[e] follow-up interviews sometime this week," and would submit summaries

27  of their interviews later that week.  (*Id.*)  Then, on December 6, 2004—a mere two days

28  {00128370.1 }

                                              68

1  before the penalty phase began—MacLeod emailed Patterson and DeLozier to brainstorm

2  themes for their mitigation presentation.  (Ex. 137.)

3  These are documents one would expect to see at the outset of a mitigation

4  investigation years prior to trial, not on the eve of the penalty phase of a capital trial.

5  (2/11/14 Tr. at 61:24-62:13, 63:23-66:21 (L. Hammond).)  Both Hammond, as an expert

6  on the standard of care for the attorneys in capital cases, and Keith Rohman, as an expert

7  on the standard of care for mitigation specialists, found the timing of these documents

8  "breathtaking" and "almost useless" at that stage of the case.  (2/6/14 Tr. at 60:9-23 (K.

9  Rohman); 2/11/14 Tr. at 61:5-17 (L. Hammond).)

10  A proper social history can take "years" of investigation, and obtaining records

11  and interviewing witnesses is the *first* step.  Rohman explained why:

12  The reason is because, first of all, you're delving back years into
    somebody's life and history.  So, for instance, the collection of those
13  documents is not something [where] you send out . . . a letter and the
    documents come back.  That process is time-consuming.  But, more
14  importantly, the kind of information that we're seeking in these cases is
    private, personal, humiliating even and certainly embarrassing to the
15  family.  It is the family secrets that have been kept under wraps for a long
    time.  You don't just walk into someone's living room and ask them about
16  it.  It takes time to build up a rapport, to build confidence, to elicit that kind
    of information.  So it is not untypical to have several years to prepare a
17  capital case for trial.

18  (2/6/14 Tr. at 55:6-22 (K. Rohman).)

19  The Guidelines state that a "mitigation investigation should begin as quickly as

20  possible" (Ex. 76 at 82), and that early start is especially important for obtaining

21  mitigating evidence regarding childhood physical and sexual abuse, neglect, and family

22  mental health issues.  Like all of us, defendants and their family members may easily and

23  readily disclose positive biographical facts, but "where there are delicate issues involved,

24  as there is in most of the cases that I've been around, it takes time to peel the onion, so to

25  speak."  (2/11/14 Tr. at 60:6-14 (L. Hammond); *see also id.* at 58:1-59:9 (noting that

26  "most of the things that wind up being relevant to the mental health of a client are things

27  that people don't freely want to talk about," and it takes time to build trust and probe

28

{00128370.1 }                                      69

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

these lines of inquiry).)  "Many, if not most, family secrets will come out" eventually "given enough time and an effective investigation" (2/6/14 Tr. at 87:15-17 (K. Rohman) (Cross))—namely, an investigation that includes interviews of all family members and all who were closely acquainted with the defendant at various points of her life, as the Guidelines require.  (Ex. 76 at 83.)

But such an investigation, which "*begins* with gathering the records" sought in the November 19, 2004 Motion to Assist Mitigation (2/11/14 Tr. at 60:6-14 (L. Hammond) (emphasis added)), takes significant time.  At the evidentiary hearing, Patterson admitted that, "in retrospect, obviously, I think mitigation should be more seriously developed in the early moments of the case."  (2/7/14 Tr. at 19:25-20:2 (D. Patterson).)

Patterson is correct.  "The standard of care in this field is that [mitigation] work needs to begin as soon as possible after the client's arrest."  (2/6/14 Tr. at 53:7-54:10 (K. Rohman).)  The motion and MacLeod's emails, all from the eve of the penalty phase, provide evidence of basic tasks the defense team had yet to perform and key decisions it had not yet considered during the previous four years since Wendi's arrest, and are perhaps the "strongest indication" that their mitigation investigation was superficial and inadequate.  (2/11/14 Tr. at 90:13-24 (L. Hammond); *see also* 2/6/14 Tr. at 61:5-23 (K. Rohman) (mitigation witness lists and interview summaries are information "you would have wanted two years before trial," rather than mere days before the sentencing hearing, and was "well below any reasonable standard for how you would want these cases to be handled").)  The defense team's failure to undertake fundamental steps of a mitigation investigation until after the jury had already returned its guilty verdict was not "even close" to compliant with the standard of care.  (2/11/14 Tr. at 66:22-67:8 (L. Hammond).)

**(ii)     The Social History Investigation Was Deficient**

Given their apparent failure to focus attention on the mitigation investigation until the eve of Wendi's sentencing, it is not surprising that neither the attorneys nor the

[00128370.1 ]

70

4843-7819-0105.

mitigation specialists who worked on Wendi's case between 2001 and 2004 conducted any meaningful social history investigation.  In particular, none took any steps whatsoever to embark upon the time-consuming task of "peel[ing] the onion" (2/11/14 Tr. at 60:6-14 (L. Hammond)) to investigate Wendi's childhood to determine whether she suffered "physical, sexual, or emotional abuse" or "other traumatic events," as the Guidelines require.  (Ex. 76 at 81.)

As noted by expert witness Keith Rohman, a mitigation specialist with over 25 years' experience in capital cases across the western United States and an instructor of mitigation investigation at CLE seminars and the Loyola College of Law (2/6/14 Tr. at 37:19-38:6, 39:18-40:5 (K. Rohman)), who reviewed the mitigation investigation undertaken by Wendi's trial team (*id.* at 49:8-50:1), "the mitigation investigation was well below the standard of care for what anyone would want in a capital case, below the standard as laid out in the ABA Guidelines and below the standard of practice in the field."  (*Id.* at 79:12-23.)

### (1)    Attorneys Patterson and DeLozier

Both Patterson and DeLozier believed others to be responsible for developing mitigating evidence, and therefore neither took it upon himself to ask difficult questions or interview witnesses to develop her social history.

Patterson believed that "his end of the proposition" and "primary function" was preparation for guilt-phase issues.  (2/7/14 Tr. at 29:5-14, 39:9-13 (D. Patterson).)  He stuck to that role.  He interviewed Wendi extensively in preparation for her testimony during the guilt phase, but those meetings focused entirely upon the guilt-phase issues of Joe's spousal abuse and the events leading up to and including the homicide.  (*Id.* at 43:3-20 (D. Patterson).)  He does not recall asking her any questions regarding her childhood because he "didn't see the relevance of childhood" to guilt-phase issues, and confirmed that his meetings with Wendi "were dedicated and devoted to prepping her for" the guilt

[00128370.1 ]

71

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000374

and aggravator phase, *not* mitigation.  (*Id.* at 42:10-44:10.)  Patterson did not ask Wendi any questions regarding potential sexual abuse (*id.* at 162:19-163:12 (Redirect)); in his words, "I didn't compel her to discuss things that she found distasteful" (*id.* at 130:4-10 (Cross)).

Patterson also met with Donna, Alejo, Brandon Ochoa, and Shawn King, Wendi's childhood boyfriend who assisted in obtaining the sodium azide, but the purpose of those meetings "was to gather information that might be beneficial in assisting [guilt phase] or [aggravator phase] issues."  (*Id.* at 63:11-64:20.)  He did not ask questions aimed at developing mitigating evidence, and "nothing specific came up" regarding mitigation. (*Id.*)  Though Patterson emphasized at several points in his testimony that no one ever told him about potential childhood abuse—a recollection that was mistaken, as this brief discusses in a subsequent section—he admitted on redirect examination that he never broached the subject of childhood abuse with anyone he interviewed.[13]  (2/7/14 Tr. at 162:19-163:12 (D. Patterson) (Redirect).)  Accordingly, he also never investigated whether Wendi was a victim of childhood sexual abuse.  (*Id.* at 62:16-18.)

After Patterson's office assumed representation of Wendi in July 2001, DeLozier understood his role with the family as "just to continue to meet with them and answer any questions that I could and hold their hands, basically."  (2/10/14 Tr. at 104:4-9 (D. DeLozier).)  He met frequently with Wendi, but those meetings concerned whatever Wendi "had on her mind the day we were there. . . .  We didn't talk about the case.  The majority of the time, we never talked about the case."  (*Id.* at 149:17-25 (Cross).) DeLozier took no steps to identify or investigate *any* potentially negative facts regarding Wendi's upbringing (*id.* at 135:1-16), and he did not interview any potential mitigation

---

[13] Donna agreed, testifying at the evidentiary hearing that Patterson never asked her any questions regarding trauma in Wendi's childhood or questions pertaining to the mental health history of Wendi and her family.  (2/4/14 Tr. at 190:2-191:25, 193:1-6 (D. Ochoa).)

{00128370.1 }

72

witnesses other than his clients:  Wendi and the Ochoas (*id.* at 143:4-144:4).  As noted by DeLozier, who viewed his role as subordinate to Patterson, "I wasn't asked to interview anybody."  (*Id.* at 143:23-144:1.)

Though they were aware that Skip Robertson was Wendi's biological father, aware that he was serving time in an Arizona prison for child molestation, and even given his prison contact information (Ex. 57), neither Patterson nor DeLozier interviewed Wendi's biological father, Skip Robertson.  (2/7/14 Tr. at 170:21-171:1 (D. Patterson) (Redirect); 2/10/14 Tr. at 128:8-18 (D. DeLozier).)

<div align="center">

**(2)     Mitigation Specialists MacLeod and Linderman**

</div>

Though he did not actively monitor their work, Patterson testified that he "assumed" or was "led to believe" that DeLozier, MacLeod or MacLeod's predecessor in the mitigation specialist role, Patrick Linderman, was conducting a thorough mitigation investigation while Patterson focused on evidence of the crime itself.  (*See, e.g.*, 2/7/14 Tr. at 28:11-15 ("I was led to believe that Patrick was in contact with the family and was accessing the witnesses and sources of information in an effort develop the mitigation presentation for Ms. Andriano."); 31:9-11 ("But I assumed [DeLozier and Linderman] had a working relationship . . . ."); 40:9-41:3 ("I was led to believe" DeLozier was meeting with Wendi on a weekly basis, and "I assumed they were talking about the facts and circumstances of the case and they were talking about mitigation issues . . . ."); 132:15-24 ("I assumed that [DeLozier] would have been – you know, was going to be forthcoming and responsible to follow up, if need be."); 135:1-16 ("Scott MacLeod or Patrick Linderman had access to this report, as did Mr. DeLozier, and if they felt that follow-up was necessary, I assumed they would have done it.  Maybe I abdicated my responsibilities there.") (D. Patterson).)

As evidenced by the emails MacLeod issued on the eve of the sentencing hearing (Ex. 136 & 137), those assumptions were misguided.  Though the defense team had

{00128370.1 }

73

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000376

1   almost four years between the date of Wendi's arrest and the commencement of her trial

2   in which to conduct the mitigation investigation, it squandered essentially all of that time

3   and never engaged in the difficult and time-consuming tasks of compiling a multi-

4   generational investigation of Wendi's family, interviewing those close to Wendi at

5   various points of her life, or asking difficult questions regarding potential childhood

6   abuse and other trauma, all of which are required by the Guidelines.  (Ex. 76 at 83.)

7          Linderman was not assigned as a mitigation specialist until late December 2001

8   (Ex. 6.002), more than a year after Wendi's arrest and five months after the Public

9   Defender's Office took control of the representation.  Rohman "saw no evidence in any

10  part of [defense counsel's] file . . . that Patrick Linderman played any significant role"

11  during the two-and-a-half years he served as mitigation specialist for Wendi's case.

12  (2/6/14 Tr. at 58:3-16 (K. Rohman).)  Members of the defense team agreed.  Attorney

13  DeLozier does not recall ever meeting Linderman (2/10/14 Tr. at 108:6-10 (D.

14  DeLozier), while Patterson could not recall any specific mitigation work that Linderman

15  performed, other than "the general notion" that Wendi "was a nice woman" (2/7/14 Tr. at

16  55:14-23 (D. Patterson)).  When MacLeod took over as mitigation specialist upon

17  Linderman's resignation from the Public Defender's Office, he believed Linderman had

18  left behind "some folders with notes," and had made a family tree of Wendi, but could

19  not recall what if any documents Linderman had compiled or witnesses he had

20  interviewed.  (2/6/14 Tr. 16:17-17:15 (S. MacLeod).)  Donna recalls meeting with

21  Linderman, but Linderman never asked any questions regarding childhood abuse or

22  mental health.  (2/4/14 Tr. at 190:2-14 (D. Ochoa).)  Neither Kyre Lorts nor Jeri Lynn

23  Cunningham were contacted by Linderman or any other members of the defense team.

24  (2/4/14 Tr. at 71:6-20 (K. Lorts), 238:19-239:9 (J. Cunningham).)

25         MacLeod assumed Linderman's responsibilities as mitigation specialist for

26  Wendi's case in April 2004.  (2/6/14 Tr. at 13:8-14 (S. MacLeod).)  Given the lack of

27

28  [00128370.1 ]

<center>74</center>

<center>PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF<br>PETITION FOR POST-CONVICTION RELIEF<br>CASE NO. CR2000-096032-A</center>

4843-7819-0105.

attention to the mitigation investigation prior to that time, four months was "not nearly enough time" to conduct a thorough investigation even if MacLeod had made a concerted effort to conduct a Guidelines-compliant investigation.  (2/6/14 Tr. at 57:13-58:2 (K. Rohman).)

It is clear that MacLeod did not make that effort, though his own testimony sheds little light on the subject.  MacLeod refused to confirm or deny almost anything regarding his mitigation investigation after assuming the role of mitigation specialist on the case, even to the point of refusing to acknowledge that an email regarding the case from macleods@mail.maricopa.gov—MacLeod's email address at the Public Defender's Office—came from him.  (2/6/14 Tr. at 34:23-35:22 (S. MacLeod); *see also id.* at 26:3-10 (no recollection of when he finished interviewing witnesses); *id.* at 26:14-27:9 ("I can't tell you this is my email."); *id.* at 27:23-28:3 (no recollection of whether he or anyone else prepared a comprehensive life history for Wendi); *id.* at 31:19-32:4 (does not recall investigating any childhood trauma); *id.* at 32:5-14 (does not recall investigating Wendi's mental health or any other explanations for abnormal behavior leading up to the offense); *id.* at 32:15-17 (does not recall investigation as to whether Wendi suffered childhood abuse); *id.* at 33:22-34:2 ("I don't recall identifying or investigating potential issues" relating to sexual abuse).)  Though one would think Wendi's case would have been memorable for MacLeod—it was his first capital trial (*id.* at 13:25-14:6) —MacLeod did not even remember the PowerPoint presentation regarding Wendi's positive upbringing that defense counsel presented at the penalty phase (Ex. 138), which both Patterson and DeLozier agreed that he had prepared.  (*Compare* 2/6/14 Tr. at 343:3-22 (S. MacLeod) *with* 2/7/14 Tr. at 60:12-17 (D. Patterson) *and* 2/10/14 Tr. at 142:7-11 (D. DeLozier).)

MacLeod's lack of memory notwithstanding, there is no evidence that he actually conducted the depth of investigation required by the Guidelines.  *First*, he did not interview nearly enough people to conduct an "unparalleled investigation" into Wendi's

4843-7819-0105.

social history.  The list of potential mitigation witnesses he sent to counsel on November 29, 2004 consists of what Rohman characterized as "the low hanging fruit"—namely, immediate family (including Donna, Alejo, and Brandon), three jail employees (Laura King, Joyce Van Every, and Gerald Perry), Wendi's babysitter, and a handful of individuals who had little interaction with Wendi, some of whom MacLeod had not even interviewed.  (Ex. 136; 2/6/14 Tr. at 77:23-78:8 (K. Rohman).)  Rohman testified that this scope of investigation was "[n]ot at all" adequate, and MacLeod's list showed that he was "not actually getting out and talking to family members and people in the community who would know her, doing the kind of extensive, and what the Guidelines refer to as an exhaustive social history investigation."  (*Id.*)

A proper mitigation investigation includes interviews of extended family (because it "frequently discloses significant patterns of family dysfunction" and may help establish "the hereditary nature of a particular impairment," such as bipolar disorder (Ex. 76 at 83; *see also* 2/6/14 Tr. at 75:12-20 (K. Rohman); 2/11/14 Tr. at 57:10-21 (L. Hammond))), as well as "the whole realm of people who came in contact with the family," such as teachers, neighbors, and classmates.  (2/6/14 Tr. at 75:4-11 (K. Rohman).)  "Childhood friends would be a perfect example of people who might be close to the client inside the family structure but would be perhaps more able to talk honestly about it because they are not actually in the family."  (*Id.* at 75:24-76:3.)  In reviewing the materials available to MacLeod, Rohman identified 40 to 50 potential sources of documentation and "upwards of a hundred potential witnesses who could have been interviewed:  Family members, people in the traveling religious group, neighbors, school friends, childhood friends and the like."  (*Id.* at 78:20-79:11.)

MacLeod did undertake that scope of work.  All of the mitigation witnesses the defense team ultimately called to testify were included on MacLeod's November 29, 2004 list, and the minimal probative value of the testimony from some of those witnesses

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

indicates that MacLeod did not interview anyone else.  For example, during the sentencing phase the defense team called witnesses Jimmy and Linda Galyon, who testified that Wendi served as their babysitter in the 1980s and early 1990s, without incident; they had no further information to report.  Family acquaintances Chris Vargas and Lonnie Inskeep testified that Wendi was an obedient and bright teenager, but knew nothing more.  If MacLeod's investigation led him to suggest calling these minimally knowledgeable witnesses to shed light on Wendi's upbringing, then clearly that investigation was insufficiently narrow.

*Second*, it is apparent that MacLeod conducted no investigation into potential childhood abuse, neglect, or other trauma.  Investigating childhood sexual abuse, in particular, often begins with hints or passing references and ultimately requires multiple interviews with the same witnesses, and ideally "corroboration coming from people outside the immediate family circle."  (*Id.* at 56:1-11, 76:8-19.)  MacLeod did not have sufficient time in the four months between his appointment as mitigation specialist and Wendi's trial to conduct that level of investigation, and it does not appear that he tried.  He brought no information regarding potential physical or sexual abuse to the attention of trial counsel (2/7/14 Tr. at 58:7-12, 68:15-17 (D. Patterson)), and never even raised the subject with Wendi's mother.  (2/4/14 Tr. at 190:15-191:2 (D. Ochoa).)

### (iii)     The Mental Health Investigation Was Deficient

Finally, the defense team made no meaningful investigation into Wendi's mental health.  It focused a great deal of attention on the issue of domestic violence with Joe, engaging two testifying experts on the subject (Sharon Murphy and Mindi Mechanic).  But neither examined Wendi for mental health issues:  Murphy had a degree in social work with a focus on domestic violence, not psychology or psychiatry (2/7/14 Tr. at 87:18-88:9 (D. Patterson); 2/10/14 Tr. at 133:2-8 (D. DeLozier)), while Mechanic's testimony was focused on rebutting the opinion of the State's expert regarding domestic

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

violence.  (2/7/14 Tr. at 72:22-73:4 (D. Patterson).)  Mechanic never examined Wendi or evaluated her for mental health.  (*Id.*)

In the four years between Wendi's arrest and her trial, only one mental health expert—Dr. Richard Rosengard—examined Wendi for mental health issues.[14]  He did so in a single visit with Wendi in 2002.  (Ex. 6.003 at 1.)

No one at the evidentiary hearing testified that a psychiatric opinion in the absence of a social history is reliable, least of all Patterson himself:

> [A]n expert opinion is only as good as the information upon which he or she derives that opinion.  And so a social history of the client, in my estimation, is essential.  In a perfect world, you have an absolutely 100 percent developed social history.  I don't think in practice, you're able to do that.  But we try to get as well developed a social history as we can before we bring the experts to begin their evaluations of the client . . . .  That social history – a significantly developed social history should be there before your experts go in to begin their evaluations.

(2/7/14 Tr. at 49:17-50:15 (D. Patterson); *see also* 2/5/14 Tr. at 49:16-51:3 (G. Woods); 2/6/14 Tr. at 72:19-73:18 (K. Rohman); 2/11/14 Tr. at 60:15-61:4 (L. Hammond); 2/14/14 Tr. at 43:4-21, 44:23-45:1, 72:23-25 (S. Pitt).)

Yet Dr. Rosengard was provided with no social history of Wendi whatsoever prior to his visit with her.  (Ex. 6.003 at 1; 2/7/14 Tr. at 53:3-21, 76:15-77:6 (D. Patterson).)  Moreover, despite having letters (Ex. 230 & 7.002), notes (Ex. 45), and summaries (Ex. 6.004) of mental health observations regarding Wendi from certified professional counselor Kandy Rohde following dozens of sessions with Wendi, Wendi's trial counsel provided *none* of that material to Dr. Rosengard.  (Ex. 6.003 at 1; 2/7/14 Tr. at 76:15-77:6 (D. Patterson).)  Instead, Dr. Rosengard went into his single visit with Wendi essentially cold, provided with only a police report, a transcript of Wendi's 911 calls on the night of the homicide, and medical records for Joe.  (Ex. 6.003 at 1.)

---

[14] Dr. Jack Potts examined Wendi to determine whether she was competent to understand the proceedings against her and assist counsel; he did not perform a diagnostic evaluation.  (Ex. 6.001.)

{00128370.1 }

78

The Guidelines recognize that "provid[ing] social history information to experts" is necessary to "enable them to conduct competent and reliable evaluations." (Ex. 76 at 33.) As noted by Rohman, a mitigation specialist with experience in compiling clients' social histories and collaborating with mental health professionals in criminal matters:

> [T]he phrase is garbage in/garbage out . . . . Dr. Rosengard did not have the advantage of knowing the real story of the client's life and background. For instance, a very basic fact about the client's life, her natural father was in state prison at the time while she was growing up for the crime of molesting children. Dr. Rosengard didn't have that very basic piece of information. All the other information about the client's background and history, he was relying on the client's self-report. The nature of a mental health examination suggests that the self-reporting of the client should be examined with a certain skepticism. A properly prepared mental health examination involves providing that examining psychiatrist or psychologist with the kind of detailed social history background that should be prepared in these cases. That's both what the standard and practice has been in mitigation investigation for as long as I can remember and certainly what is outlined in the ABA Guidelines.

(2/6/14 Tr. at 72:19-73:18 (K. Rohman).)

Notwithstanding the lack of a social history, Dr. Rosengard identified numerous avenues for further development in his single visit with Wendi, outlined in more detail in the following section regarding red flags that counsel dismissed or ignored. Though Patterson noted that the Public Defender's Office had sufficient resources "to retain anybody that was reasonably needed to properly defend Wendi" (2/7/14 Tr. at 151:23-25 (D. Patterson) (Cross)), the defense team inexplicably declined to consult further with Dr. Rosengard, did not arrange a second visit between him and Wendi, and did not ask any other experts to examine Wendi's mental health. (*Id.* at 70:12-16, 73:12-16.)

This does not meet the standard of care. "[T]here are very few cases that don't involve mental state issues relevant to the guilt or innocence side of the case" (2/11/14 Tr. at 32:19-33:10 (L. Hammond)), and it is not sufficient to "just to say that I've hired a mental health person and that person has conducted an examination" (*id.* at 105:3-12 (Cross)). Mental health professionals must be given the social history necessary to reliably diagnose the client (*id.* at 60:15-61:4) and consulted throughout the course of the

{00128370.1 }

79

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000382

pre-trial investigation (*id.* at 32:10-18).  There is no reasonable justification for the defense team's failure to do so.  (*Id.* at 81:14-20.)

### c.   Trial Counsel Failed to Investigate and Develop Potential Mitigating Evidence That Came to Their Attention

At the evidentiary hearing, Patterson justified the failure to investigate mental health by asserting that "nobody brought to my attention that there was a fertile area of mitigation in the mental health field."  (2/7/14 Tr. at 137:1-10 (D. Patterson) (Cross).) While that is not the standard of care—the Guidelines mandate that a person with training in mental health be a part of the defense team from the outset, and they note that "mental health issues are so ubiquitous in capital defense representation that the provision of resources in that area should be routine" (Ex. 76 at 31)—the evidence from trial counsel's files plainly shows that information concerning mental health and childhood abuse *did* come to the attention of trial counsel, from a variety of sources, throughout the period between Wendi's arrest and her trial.  (*See, e.g.*, 2/6/14 Tr. at 71:9-21 (K. Rohman) ("[T]he defense had many indications that the client was suffering from severe mental illness, and it received that from people working in contact with them.")

Trial counsel's failure to develop potentially powerful mitigating evidence that stared them in the face is simply inexplicable, and fell far short of the standard of care. *Wiggins*, 539 U.S. at 525 (an attorney complying with the standard of care "would have realized that pursuing these leads [regarding the defendant's traumatic childhood] was necessary to making an informed choice among possible defenses," particularly where "*[h]ad counsel investigated further, they may well have discovered the sexual abuse later revealed during state postconviction proceedings*") (emphasis added); *Summerlin*, 427 F.3d at 632 ("[W]here counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance.")

### (i)      Early History from Donna (Exhibit 56)

On February 12, 2001—two months after DeLozier began his representation of Wendi, and roughly five months before Patterson was assigned—Donna sent DeLozier a "short early history on Wendi."  (Ex. 56 at PCR305.)  Her history gives a large number of biographical facts regarding the first nine years of Wendi's life.  They do not provide the level of detail elicited by numerous witnesses at the evidentiary hearing in this matter, of course; as Donna noted, it was a "short early history" and she was unsure "what sort of details" would be helpful.  But as Hammond noted, "it would have been a tantalizing place to start" a social history investigation.  (2/11/14 Tr. at 71:8-11 (L. Hammond).)

There is no indication that trial counsel pulled any of the threads Donna's initial history provided to them.  (*Id.*)  Among those threads was Donna's disclosure that "[s]ometime in 1972 rumors were flying through the family that the grandpa, Skip's dad, was touching the granddaughters inappropriately," but Donna did not want to believe it was true because "Wendi had been around the grandpa numerous times.  And I had thought of it through the years, and have been scared about it."  (Ex. 56 at PCR307.)  Despite receiving that disclosure more than three-and-a-half years before Wendi's trial, DeLozier made no investigation into potential sexual abuse of Wendi by any members of her family at any time.  (2/10/14 Tr. at 134:11-135:13 (D. DeLozier).)

### (ii)      February 2001 Letter from Kandy Rohde (Exhibit 230)

In the opening sentence of Exhibit 56, Donna mentions the late Kandy Rohde, a certified professional counselor with a master's in counseling psychology who was retained by Donna to treat Wendi after her incarceration.  (2/4/14 Tr. at 187:14-188:5 (D. Ochoa); (2/10/14 Tr. at 122:3-7 (D. DeLozier); Ex. 230 at 9187.)  One week after Donna's email—still more than three-and-a-half years before Wendi's trial—Rohde shared her observations with DeLozier.

I have been meeting with Wendi Andriano, and I recommend that a

{00128370.1 }

81

1
2
3

psychiatrist be called in to examine her.  I believe that her willingness to
give up her will to others is a symptom of some kind of personality
disorder.  I also suspect that her defense system includes dissociation.  Her
mother's reference to possible abuse by Wendi's paternal grandfather could
be the origin of that dissociation.

4    (Ex. 230 at 9185.)

5        DeLozier attached Rohde's letter as an exhibit to a Motion for Determination of

6    Competency Pursuant to Rule 11 (Ex. 230), which ultimately led to the competency

7    evaluation by Dr. Potts, discussed below.  Ms. Rohde's observations do not relate to

8    Wendi's competency to assist her counsel, however; they relate to the same psychiatric

9    diagnoses and childhood trauma that formed the substance of the testimony of Dr.

10   Hopper and Dr. Woods.  Beyond attaching Rohde's letter to that competency motion, and

11   later forwarding that motion (together with all other materials concerning Rohde) to

12   Patterson, DeLozier did not follow up in any way on Rohde's observations.  (2/10/14 Tr.

13   at 112:5-113:5 (D. DeLozier).)

14       Patterson acknowledges that he "must have reviewed" the letter as part of the file

15   when he assumed representation of Wendi.  (2/7/14 Tr. at 82:18-24 (D. Patterson).)

16   Patterson had no independent understanding of connections between childhood abuse and

17   dissociation as an adult, and he did not seek any expert to evaluate those symptoms in

18   Wendi or direct anyone to investigate potential childhood causes of her dissociation.  (*Id.*

19   at 84:4-7, 84:16-24.)  Patterson simply did not "accept [the] premise" that dissociation

20   and childhood abuse "were causally related.  There was some suggestion that a

21   grandfather may have improperly touched her and that a stepfather may have improperly

22   touched her, but it was never confirmable."  (2/7/14 Tr. at 165:12-20 (D. Patterson)

23   (Redirect).)

24       As shown at the evidentiary hearing, however, Wendi's childhood sexual abuse

25   *was* confirmable; her defense team simply made no attempt to confirm it.  Indeed,

26   Patterson acknowledged that he never interviewed any childhood friends or others in a

27   position to provide evidence regarding such abuse, and he never even broached the

{00128370.1 }
82

28
PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

subject with Wendi, Donna, or Alejo.  (2/7/14 Tr. at 163:4-12 (D. Patterson) (Redirect).)

"Had counsel investigated further, they may well have discovered the sexual abuse later

revealed during state postconviction proceedings."  *Wiggins*, 539 U.S. at 525.

**(iii)    March 2001 Kandy Rohde Letter (Exhibit 7.002)**

On March 12, 2001—around the same time DeLozier began representing Donna

and Alejo in proceedings regarding the custody of their grandchildren—Rohde wrote a

more detailed letter to DeLozier.  (Ex. 7.002.)  Rohde told him that Wendi "seems to

have begun dissociating as a defense beginning as a very young child and continuing

until today," and that she suspected that the source of that dissociation was childhood

molestation.  (*Id.*)  Rohde also noted memory deficits in Wendi, stating that while Wendi

claimed to have a good memory, when "asked about her childhood, her marriage and her

imprisonment she was unable to recall large sections of her history."  (*Id.*)  Donna

confirmed that Wendi's memory deficits dated back to childhood.  (*Id.*)

"In addition to my belief that she is the victim of sexual molestation and that she

suffers from Depersonalization Disorder as well as Dissociative Amnesia," Rohde

continued, "I believe she exhibits the symptoms of the Cluster C Personality Disorders."

(*Id.*)  Rohde then gave a description of symptoms consistent with dependent personality

disorder (*id.*), which the Diagnostic and Statistical Manual of Mental Disorders ("DSM")

recognizes as a cluster C personality disorder.  Rohde concluded by noting that she

believed "Wendi suffers from serious psychological disorders and am anxious to have her

examined by another professional for a second opinion."

DeLozier did not follow Rohde's advice.  Despite receiving notice from a mental

health professional who had been treating Wendi for months that his client likely suffered

from "serious psychological disorders," DeLozier took no steps to follow up beyond

forwarding Rohde's observations to the Public Defender's Office and retaining Dr. Potts

for an evaluation of Wendi's *competency to stand trial*—not whether she suffered from

serious disorders.  (2/10/14 Tr. at 123:16-124:15 (D. DeLozier).)  In addition, though Wendi's mental health symptoms caused Rohde to suspect childhood molestation, DeLozier never investigated whether she was a victim of childhood sexual abuse at the hands of any of the male members of her family.  (*Id.* at 123:2-15.)

### (iv)    Potts Letter (Exhibit 6.001)

DeLozier's sole step to investigate Wendi's mental health was to engage Dr. Potts to examine Wendi's competency to stand trial, a narrow inquiry that looks only to whether the defendant "is unable to understand the proceedings against him or her or to assist in his or her own defense."  Ariz. R. Crim. Proc. 11.1.  In March 2001, Dr. Potts issued a two-and-a-half page letter to the court that reached the obvious conclusion that she had an "understanding of the proceedings she is facing" and was able to assist her attorneys in her defense.  (Ex. 6.001 at 2.)  But Dr. Potts concluded his letter by noting the narrow focus of his task in assessing competency, and urging further investigation by the defense team:  "If Ms. R[oh]de is accurate in her diagnostic assessment, then the criminal culpability of the defendant and her state of mind at the time of the alleged offense should be evaluated independently, outside the scope of a Rule 11 evaluation." (*Id.* at 3.)  Dr. Potts was presumably referring to the "diagnostic assessment" in the letter from Rohde submitted with the motion for a competency evaluation (Ex. 230), which is referenced in the first page of Dr. Potts's letter (Ex. 6.001 at 1).

Contrary to Dr. Potts's advice, DeLozier never retained anyone to determine whether "Ms. Rohde's diagnostic assessment [was] correct."  (2/10/14 Tr. at 70:13-17, 113:17-114:5 (D. DeLozier).)

### (v)    Request to Contact Rohde (Exhibit 50)

After Patterson became involved in Wendi's case in July 2001, DeLozier forwarded a copy of his case file to Patterson's office (2/10/14 Tr. at 103:8-14 (D. DeLozier)), which included "[e]verything that [he] had, including Kandy Rohde's entire

84

1   file, for example." (*Id.* at 108:11-18.)  Patterson had no reason to believe that his office

2   did not receive the materials from Rohde throughout the case.  (2/7/14 Tr. at 168:12-14

3   (D. Patterson) (Redirect).)

4        On December 4, 2001, Donna wrote Patterson to state that Rohde "would really

5   like to hear from your office," and urged Patterson to "please give [Rohde] a call"

6   because "[s]he has good information."  (Ex. 50.)  Donna made clear that Rohde sought to

7   consult with him rather than to testify—she did not want to "appear to be part of the

8   defense"—but that she had information that would be helpful in establishing that "there is

9   a lot more to this than the prosecut[o]r has shown."  (*Id.*)

10       Patterson has no recollection of contacting Rohde (2/7/14 Tr. at 85:9-22 (D.

11  Patterson)), and given his comments regarding Rohde in his testimony, it is unlikely he

12  did so.  During his cross-examination, Patterson stated that he did not rely upon her

13  because he "never had a really good understanding of her function here.  She certainly

14  wasn't a treating mental health person.  She didn't have the credentials.  I don't even

15  know if she had a master's in social work."  (*Id.* at 141:3-6 (D. Patterson) (Cross).)

16  When reminded on redirect that Rohde's credentials were in fact attached to the

17  competency motion that he had reviewed upon his assuming his representation of Wendi

18  (Ex. 230), and that those credentials included a masters in counseling psychology,

19  Patterson conceded that he "did not investigate her credentials" (2/7/14 Tr. at 164:22-

20  165:6 (D. Patterson) (Redirect)) but simply "didn't have a great deal of co[nfid]ence in

21  Kandy Rohde" (*id.* at 166:16-25 (Redirect).  Though he acknowledged his understanding

22  that Rohde was meeting with Wendi "frequently," he stated that his lack of confidence

23  arose from "her limited participation in the case, her function in the case.  She was not an

24  evaluating or treating physician."  (*Id.* at 167:1-11 (Redirect).)

25       This exchange illustrates the lack of any reasonable justification for the defense

26  team's failure to follow up on information it received from Rohde.  Patterson asserts that

27

28    {00128370.1 }

85

he did not consult with Rohde because of her limited function, but her function was limited precisely because Patterson did not consult with her.  Patterson says he did not consult with her because he did not know her credentials, but those credentials were provided to him and he apparently did not review them.  And he claims that he did not trust her opinions because she was not an evaluating or treating psychiatrist—even though he received repeated entreaties from Rohde (Ex. 230 and Ex. 7.002) and Dr. Potts (Ex. 6.001 at 3) urging the defense team to obtain a psychiatrist to determine whether her diagnostic impressions, informed by her training with a master's degree in counseling psychology, were correct.

As Hammond testified, the defense team's dismissive attitude toward Rohde was a significant error.  From February 2001 until Wendi's trial in 2004, Rohde consistently provided the defense team with "a gold mine of information [that] would set off – I think with any trained professional and most lawyers, these would be just a series of red flags, things that you would have to be concerned about and would want to follow up on." (2/11/14 Tr. at 75:16-76:12 (L. Hammond).)  Yet this "gold mine" of information from Rohde "didn't have much of an effect on the team.  And I think Mr. Patterson had no interest in communicating with her and no involvement with her, as far as I can tell." (2/11/14 Tr. at 38:18-39:23 (L. Hammond).)

### (vi)   February 2002 Rohde Communication (Exhibit 6.004)

The defense team's pattern of ignoring Rohde—who visited with Wendi at least 90 times prior to trial (Ex. 45), 89 more than any other defense-affiliated mental health professional—continued for years prior to Wendi's trial, even when the information did not come from Rohde herself.  On February 13, 2002, Michelle Arvanitas, an employee at that the Public Defender's Office, relayed further information from Rohde to Patterson. (Ex. 6.004.)

According to Arvanitas, Rohde believed Wendi suffered from depersonalization

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

disorder ("persistent . . . feeling[s] of detachment or estrangement from one's self"), dissociative amnesia (an "inability to recall important personal information, usually of a traumatic or stressful nature, that is too extensive to be explained by normal forgetfulness"), and childhood physical and sexual abuse and neglect. (*Id.*)  In addition, Arvanitas noted that "[s]upposedly, her biol[ogical] father is in prison for molestation." (*Id.*)

Patterson did not retain any expert to evaluate the psychiatric symptoms noted by Rohde and relayed by Arvanitas (2/7/14 Tr. at 87:4-7 (D. Patterson)), nor did he personally investigate (or direct anyone else to investigate) whether Rohde was correct in her conclusion that Wendi had suffered physical and sexual abuse and neglect as a child (*Id.* at 62:16-18, 64:21-65:7).  He did not interview and did not direct anyone else to interview Wendi's biological father, Skip Robertson, despite Arvanitas's disclosure that he was in prison for child molestation.  (*Id.* at 170:21-171:1 (Redirect).)  No one at the Public Defender's Office forwarded those diagnostic impressions to DeLozier, who acknowledged that the email indicated that Wendi "had suffered some sort of mental trauma or emotional trauma."  (2/10/14 Tr. at 117:1-17 (D. DeLozier).)

### (vii)   Rohde Notes Throughout Wendi's Pre-Trial Incarceration (Exhibit 45)

The "gold mine" of leads from Rohde on potentially mitigating evidence continued throughout Wendi's pre-trial incarceration.  From January 19, 2001 to April 26, 2004, Rohde regularly saw Wendi and sent notes from 90 of her visits to Wendi's trial counsel.  (Ex. 45.)  The notes included a wealth of information and diagnostic impressions that should have led the defense team to investigate further into potentially mitigating evidence.  As DeLozier candidly summarized on cross-examination, Kandy Rohde "knew Wendi, in my opinion better than anybody," she had provided her records to the defense team, "[a]nd nobody did anything with them."  (2/10/14 Tr. at 150:25-151:10 (D. DeLozier) (Cross).)

{00128370.1 }

87

1    Examples of red flags that Rohde noted and relayed to the defense team include

2  the following:

3    **March 28, 2001:**  In response to learning that Wendi had never "had a sexual

4  feeling" or an orgasm, Rohde noted that Wendi's "dissociation and the lack of sexual

5  responsiveness fit a profile for early molestation, but that is not proof."  (Ex. 45 at

6  PCR27.)

7    Despite learning that Wendi's adult symptoms "fit a profile" for victims of

8  childhood sexual abuse, Patterson and DeLozier took no steps to develop such proof of

9  childhood molestation, such as interviewing childhood friends or others in a position to

10 witness it.  (2/7/14 Tr. at 170:15-20, 171:11-18 (D. Patterson) (Redirect); 2/10/14 Tr. at

11 126:21-127:8 (D. DeLozier).)  Nor did they engage any experts to determine whether

12 childhood sexual abuse may have been the source of Wendi's dissociation and lack of

13 sexual responsiveness as an adult.  (2/7/14 Tr. at 169:11-23 (D. Patterson) (Redirect) ("I

14 did not direct that any expert investigate a relationship between dissociative personality

15 and an early molestation that had—that may have occurred to Ms. Andriano.  No.  I did

16 not investigate that aspect of her case more fully.").)

17   **February 28, 2002:**  Rohde noted that "[Wendi] said that she is disappointed that

18 Michelle and the PD's psychologist have not been in contact with her despite their

19 promises.  We talked about the possibility that her father might testify to his abuse of her

20 or his family's abuse of her."  (Ex. 45 at PCR62.)

21   Though Wendi and Rohde were openly discussing the possibility that her father

22 might be willing to testify regarding his and/or his family's abuse of her as a child,

23 neither DeLozier nor Patterson ever contacted Wendi's biological father.  (2/7/14 Tr. at

24 170:21-171:1 (D. Patterson) (Redirect); 2/10/14 Tr. at 128:3-18 (D. DeLozier).)

25   **August 7, 2002:**  Rohde noted that "it was normal for [Wendi] to fall asleep in the

26 midst of chaos and that she could sleep *literally for days without food or water to avoid*

27

28

{00128370.1 }                                      88

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1    *emotions*." (Ex. 45 at PCR73 (emphasis added).) This was not a mere reaction to Joe's

2    cancer or the homicide; Wendi "could remember doing it in her teens." (*Id.*) Rohde

3    noted that Wendi's "history of sleeping while angry is a willful dissociation from anger,"

4    and that she "dissociate[d] and left her body when her fear turned into anger" during the

5    homicide. (*Id.* at PCR74.)

6        Though Wendi's periods of excessive sleep since her teens was evidence that her

7    mental health symptoms dated back to her childhood, Patterson continued to assume that

8    all of Wendi's symptoms were a product of the homicide and/or Joe's cancer. (2/7/14 Tr.

9    at 79:10-25, 80:1-22, 81:17-82:4, 94:6-23 (D. Patterson).) DeLozier made no further

10    inquiry with Wendi or her family regarding these periods of excessive sleep or their

11    origin, and made no inquiry into Wendi's dissociation. (2/10/14 Tr. at 128:19-130:7 (D.

12    DeLozier).)

13    ***April 26, 2004:*** In April 2004—shortly after Scott MacLeod replaced Patrick

14    Linderman as mitigation specialist—Rohde faxed a particularly sensitive set of notes to

15    MacLeod's attention at the Public Defender's Office. In them, Rohde provided the

16    defense team with a clear-cut example of the inappropriately sexual nature of Alejo's

17    relationship with his stepdaughter, Wendi, and Wendi's normalization of such sexualized

18    behavior:

> Wendi said that she got into the sexy stories through a roommate in jail
> named Kelly. . . . Wendi said that she put Kelly up to reading her story to
> Alejo. . . . Wendi said that Alejo said that she should send stories to him
> for the Internet. Wendi said that someone Alejo knows from his
> photography was his connection into the Internet. Wendi said that these
> photographers have lingerie parties, some of which are innocent and some
> are more provocative. Wendi seems to have open knowledge of these
> enterprises and does not think they are inappropriate.

(Ex. 45 at PCR112-114.)

       These were the last set of notes received from Rohde, and they should have been

an eye-opener: a client with mental health symptoms that "fit a profile" for victims of

childhood sexual abuse (*id.* at PCR27) had "open knowledge" of her stepfather's

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000392

"lingerie parties" with other photographers, and her stepfather was urging Wendi to send him erotic stories while she was incarcerated (*id.* at PCR112-114).  This entry should have shattered any of trial counsel's misperceptions that Alejo and Wendi had a normal stepfather-stepdaughter relationship, and it certainly warranted further investigation.

It received none.  No member of the defense team made any inquiry into any sexual aspects of Wendi's relationship with Alejo.  (2/7/14 Tr. at 62:16-18, 68:15-17 (D. Patterson); 2/10/14 Tr. at 131:19-132:15 (D. DeLozier).)

### (viii)   Rosengard Report (Exhibit 6.003)

On June 23, 2002, for the first and only time, Wendi was examined by a defense-retained psychiatrist, Dr. Richard Rosengard.  Two months later, Dr. Rosengard issued a five-and-a-half page letter to Patterson regarding his diagnostic impressions (Ex. 6.003 (the "Rosengard Report)), which Patterson cited several times in his testimony at the evidentiary hearing as a justification for not further investigating Wendi's mental health and/or childhood trauma.  (*See, e.g.*, 2/4/14 Tr. at 67:4-18, 74:2-23, 135:1-136:13 (Cross) (D. Patterson).)

Patterson's reliance upon the Rosengard Report to justify failing to investigate potentially mitigating evidence is unreasonable.  Patterson admitted that an "expert opinion is only as good as the information upon which he or she derives that opinion.  And so a social history of the client, in my estimation, is essential."  (*Id.* at 49:17-50:15.)  As noted above, Dr. Rosengard had a single visit with Wendi, and was not provided any social history or any of the observations of mental health providers (such as Rohde) who had seen her previously.  Thus, it was unreasonable to Patterson to rely upon the Rosengard Report as a reason for not further investigating mental health.

But despite being provided nothing more than a single interview with Wendi (Ex. 6.003 at 1; 2/7/14 Tr. at 75:16-23 (D. Patterson)), the Rosengard Report still identifies a plethora of potential mitigating evidence relating to Wendi's childhood and mental health

{00128370.1 }

4843-7819-0105.

that were not pursued.  That report was plainly preliminary, because "there are places in [it] where Dr. Rosengard says that further work is necessary and that these are his impressions but not formal findings," which would lead defense counsel performing at or above the standard of care to "follow up on the specific things that Dr. Rosengard found." (2/11/14 Tr. at 83:13-25 (L. Hammond).)  As noted below, Wendi's trial counsel did not do so.

*First*, and foremost, Dr. Rosengard noted that while Wendi's memory deficits could "appear[] all too convenient," he believed those deficits were genuine and rooted in Wendi's PTSD:

> I do not believe that there is any evidence that would conclude that what had occurred was premeditated; and certainly, the actions were regretted from the very beginning, as witnessed by the Defendant's response when answering questions posed to her when she called the emergency numbers. Because of what she saw, she surmised that she actually had killed her husband and admitted to feeling badly about it.  An individual who goes through a traumatic event will often forget that extreme situation, because an individual is unable to deal with the thoughts on an emotional basis. ***This occurs in both children and adults who have been physically or sexually attacked and more than explains the Defendant's response, particularly in light of the fact that she had a past history, apparently, of being abused and symptoms consistent with post-traumatic stress disorder.***

(Ex. 6.003 at 5-6 (emphasis added).)  Elsewhere in his report, Dr. Rosengard concluded that Wendi had "[p]robable post-traumatic stress disorder."  (*Id.* at 5.)

Patterson, who neither made nor directed any inquiry into when and whether Wendi developed PTSD, assumed that it was a product of Joe's cancer and the events of the homicide.  (2/7/14 Tr. at 80:1-13 (D. Patterson).)  The Rosengard Report makes no such finding, and Patterson offered no basis for his personal conclusion regarding the origin of Wendi's PTSD.  If anything, the Rosengard Report suggests that Wendi's PTSD arose from childhood sexual abuse, noting that her mother and therapist indicated that Wendi may have been molested and that Wendi was "particularly upset in finding out about and dealing with children that were sexually abused."  (Ex. 6.003 at 3 ("Other Psychiatric Conditions").)

{00128370.1 }

91

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

*Second*, though Dr. Rosengard was at least the third person to suggest to the defense team that Wendi may have been molested as a child (following Donna and Rohde), and though Patterson knew that Wendi's biological father was in prison for child molestation (Ex. 6.004), Patterson did not interview Wendi's biological father, did not interview anyone else who had regular access to her as a child regarding potential sexual abuse, and made no investigation into the subject whatsoever. (2/7/14 Tr. at 78:4-79:4 (D. Patterson).)

*Third*, Dr. Rosengard preliminarily diagnosed Wendi with a panic disorder. (Ex. 6.003 at 5.) Though the Rosengard Report specifically noted that Wendi had suffered symptoms consistent with "panic attacks since childhood" (*id.* at 3), Patterson testified that he did not investigate further because he assumed her panic attacks were a product of Joe's cancer. (2/7/14 Tr. at 80:14-22 (D. Patterson).) Patterson made no investigation into the origin of Wendi's "panic attacks since childhood." (2/7/14 Tr. at 81:8-16 (D. Patterson).)

*Fourth*, Dr. Rosengard preliminarily diagnosed Wendi with a mood disorder: major affective disorder – depression. (Ex. 6.003 at 5.) Again, Patterson assumed that any such psychiatric disorder "was situational as a result of dealing with [Joe's] cancer" and the homicide, and he did not investigate further. (2/7/14 Tr. at 79:10-25 (D. Patterson).) In his (inaccurate) summary of Rosengard's conclusion, Patterson testified that Dr. Rosengard "suggested that [Wendi's major affective disorder] can be treated with a pill. So, I didn't find that to be a significant mental health issue."[15] (2/7/14 Tr. at 79:10-19 (D. Patterson).) Patterson did not investigate further into the nature of Wendi's mood disorder symptoms, and did not direct anyone else to do so. (*Id.* at 79:20-25.)

---

[15] Dr. Rosengard did not suggest that her disorders could be "treated with a pill"; he stated that Wendi should receive individual therapy and that an antidepressant "could be beneficial both for her depression and traits of post-traumatic stress disorder." (Ex. 6.003 at 6.)

{00128370.1 }

92

After receiving the Rosengard Report, Patterson rested upon his assumptions regarding the findings and did not ask Dr. Rosengard to perform any additional work on Wendi's case. (*Id.* at 70:12-16.) From receipt of the Rosengard Report through Wendi's trial, Patterson directed no further investigation into Wendi's psychiatric disorders as mitigating evidence, and instead retained experts for the sole purpose of establishing Wendi as a victim of domestic violence. (2/7/14 Tr. at 69:16-70:11, 73:12-74:1 (D. Patterson).) Indeed, according to DeLozier, Patterson did not even share Dr. Rosengard's findings with him prior to Wendi's sentence. (2/10/14 Tr. at 114:22-115:9 (D. DeLozier).)

Obtaining and then ignoring a psychiatric report that raises issues for further investigation—particularly one that is necessarily preliminary (because no social history had been provided)—did not meet the applicable standard of care for capital defense counsel at the time of Wendi's case. (2/11/14 Tr. at 85:19-23 (L. Hammond).)

### (ix)   Sharon Murphy Email (Exhibit 52)

On March 30, 2003, domestic violence consultant Sharon Murphy informed Patterson and DeLozier by email that Wendi "learned to di[]ssociate from painful memories a long time ago—that is very clear to me. . . . I know there's something that happened during childhood that she hasn't told me yet—I'll get at it before we're finished." (Ex. 52.)

No one followed up on Murphy's observations, which apparently fell through the cracks of pre-trial investigation. Patterson took no steps to investigate her dissociation or whether there was "something that happened during her childhood" to cause it, but he "note[d] that it was apparently sent to [DeLozier] as well, who I relied upon to develop the mitigation aspect of this case." (2/7/14 Tr. at 89:5-10 (D. Patterson).) Patterson's reliance was unfounded: according to DeLozier, he took no steps to investigate source of painful memories from childhood because "at that point, I was second chair and not

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1  really involved."  (2/10/14 Tr. at 133:9-22 (D. DeLozier).)

2  <div align="center">(x)      **Wendi's Suicide Attempt (Exhibit 47)**</div>

3        Another "big red flag," and perhaps "the strongest indication that there are some

4  [mental health] issues here" came six months after Murphy's email, when Wendi

5  attempted suicide while incarcerated.  (2/6/14 Tr. at 72:1-7 (K. Rohman).)  The jail

6  medical records regarding the event indicate that Wendi slashed the inside crook of her

7  arm, causing her to lose 200 cc of blood, go pale, and require emergency medical

8  attention.  (Ex. 47 at 1-2.)  She was hospitalized, then transferred to the Durango

9  Psychiatric Unit, where she remained until her sentencing.  Two days after the suicide

10  attempt, Wendi's medical provider wrote that Wendi had "acted out impulsively with [a]

11  significant suicide attempt in [a] moment of panic."  (*Id.* at 3.)

12        Rather than viewing Wendi's impulsive violence in a moment of panic as a red

13  flag warranting further investigation into potentially mitigating mental health evidence,

14  Wendi's trial counsel largely dismissed it.  DeLozier was aware of the suicide attempt,

15  but did not know "much more about it other than I know she was put on a watch and she

16  might have been moved to a different area of the facility that she was being held in at the

17  time."  (2/10/14 Tr. at 119:9-21 (D. DeLozier).)  Patterson also knew of the suicide

18  attempt, but he "did not feel that it was a serious effort on her part to kill herself" and

19  assumed that it was a product of Wendi not "dealing with incarceration in a good

20  manner" rather than a "mental health issue."  (2/7/14 Tr. at 94:5-23 (D. Patterson),

21  137:23-138:11 (Cross).)  Accordingly, Wendi's suicide attempt caused neither Patterson

22  nor DeLozier to engage in any further mental health investigation.  (*Id.*; 2/10/14 Tr. at

23  120:14-121:6 (D. DeLozier).)

24        Trial counsel's dismissiveness toward Wendi's suicide attempt fell well below the

25  standard of care.  *See, e.g.*, *Hamilton*, 583 F.3d at 1117 (where "counsel was aware that

26  [the defendant] tried to commit suicide in prison . . . and that he was taking

27

28  <div align="center">94</div>
{00128370.1 }

<div align="center">PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF<br>PETITION FOR POST-CONVICTION RELIEF<br>CASE NO. CR2000-096032-A</div>

4843-7819-0105.

<div align="center">P-App. 000397</div>

1    antidepressant medication at the time of trial," counsel "should have retained a mental

2    health expert and provided the expert with the information needed to form an accurate

3    profile of [the defendant's] mental health").

4              **(xi)    Wendi's Pre-Trial Medications (Exhibit 49)**

5         Medication records from Wendi's pre-trial incarceration reveal that her jail

6    medical providers prescribed her psychotropic medications throughout the four years

7    between her arrest and her sentencing, including Ativan, Zoloft, and Seroquel.  (*See, e.g.*,

8    Ex. 49 at PCR253-54.)  At the evidentiary hearing, DeLozier noted that he was "familiar

9    with almost all" of the medications prescribed, that he would have had that familiarity by

10   2004, and that he specifically recognized that some of them were used for the treatment

11   of bipolar disorder.  (2/10/14 Tr. at 118:10-24 (D. DeLozier).)

12        But DeLozier did not retrieve, and was not provided with, Wendi's jail medication

13   records at any time during his representation of Wendi.  (2/10/14 Tr. at 118:25-119:2 (D.

14   DeLozier).)  The Public Defender's Office obtained them at some point, presumably as a

15   result of its post-verdict Motion to Assist Mitigation (Ex. 54), which was far too late to

16   provide assistance to a mental health expert or develop further mitigating evidence.

17            **(xii)   Skip Robertson Information (Exhibit 57)**

18        More than two years after Wendi's arrest and still 18 months before her trial

19   began, Donna emailed Patterson and DeLozier to provide the prison contact information

20   for Wendi's biological father, Skip Robertson.  (Ex. 57.)  As noted above, no one from

21   the defense team attempted to contact him prior to Wendi's trial.  (2/7/14 Tr. at 170:21-

22   171:1 (D. Patterson) (Redirect); 2/10/14 Tr. at 128:3-18 (D. DeLozier).)

23        As Attorney Hammond testified, that failure falls far below the standard of care:

24        I mean, he's the biological father.  He participated for some period of time
          in raising Wendi.  Whatever his offense was, you would interview him.
25        But having any indication that there might have been sexual abuse in his
          background would have required it.  It wouldn't have been close, to answer
26        your question.

27

28

{00128370.1 }                                           95

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

(2/11/14 Tr. at 71:17-72:12 (L. Hammond).)

### (xiii)   Schaider Comments

Finally, Cindy Schaider testified that she raised a red flag for the defense team during the trial itself.  After hearing a depiction of Harvest on one day of the trial, Schaider pulled aside Scott MacLeod during a break.  As she recalled:

> I was really kind of upset because the culture was very complex and what you saw on the surface was not always what was going on behind the scenes. . . .  He said:  "What difference does that make?  What point will it make?"

(2/10/14 at 173:16-174:10 (C. Schaider).)

### d.   There Were No Strategic Reasons for Failing to Investigate and Develop Mitigating Evidence of Wendi's Traumatic Childhood and Psychiatric Disorders

Neither Patterson nor DeLozier identified any strategic reasons for dismissing these red flags and failing to develop evidence of Wendi's traumatic childhood and psychiatric disorders, nor could they.  Simply put, there was no strategic decision for them to make, because they failed to conduct an investigation sufficient to develop such evidence in the first place.

"[S]trategy presupposes investigation," *Frierson v. Woodford*, 463 F.3d 982, 992 (9th Cir. 2006), and thus "[a]n uninformed strategy is not a reasoned strategy.  It is, in fact, no strategy at all."  *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008).  *See also Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007) ("[T]he central teaching of *Strickland*, as reaffirmed by *Wiggins*, [is] that the investigation leading to the choice of a so-called trial strategy must itself have been reasonably conducted lest the 'strategic' choice erected upon it rest on a rotten foundation."); *Bean v. Calderon*, 163 F.3d 1073, 1079 (9th Cir. 1998) (failure to adequately investigate social history for use in psychiatric diagnosis was "a deficiency in trial preparation, not a strategic decision"); *Deutscher v. Whitley*, 884 F.2d 1152, 1160 (9th Cir. 1989) ("Counsel could not have chosen to avoid psychiatric evidence because of potentially damaging rebuttal testimony.  Counsel did not

{00128370.1 }

96

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000399

1    even know what evidence was available."), *vacated on other grounds*, 111 S.Ct. 1678

2    (1991), *and subsequently reaffirmed*, 16 F.3d 981 (9th Cir. 1994).

3           Here, as in *Wiggins*, "counsel were not in a position to make a reasonable strategic

4    choice . . . because the investigation supporting their choice was unreasonable." *Wiggins*,

5    539 U.S. at 536.  In their testimony, trial counsel stated time and again that they had no

6    idea that Wendi had actually been the victim of sexual abuse and neglect throughout her

7    childhood and had no understanding that she was suffering from significant psychiatric

8    disorders that affected her ability to control impulse, make rational decisions, and

9    conform her conduct to the law at the time of the offense.  Thus, they never faced the

10   choice of whether to present the type of mitigating evidence submitted at the evidentiary

11   hearing in this matter, because (in spite of the red flags noted above) they failed to

12   investigate whether it existed.  As Patterson acknowledged, "you can't develop a strategy

13   to not introduce something you don't know exists.  So it wasn't a strategic or tactical

14   issue."  (2/7/14 Tr. at 75:1-3 (D. Patterson); *see also id.* at 68:18-25 ("No, you can't

15   exercise or make a strategic decision absent some information.  And I didn't have any

16   information that sexual abuse was an issue in Ms. Andriano's case.").)

17          As trial counsel testified, the mitigation presentation at trial was not the product of

18   a strategic choice, but was dictated by the information that MacLeod and DeLozier

19   brought to his attention.  (2/7/14 Tr. at 31:24-32:9 (D. Patterson).)  "So, by default,

20   theory or the theme became she's a good woman, she's a good mom, she's a hard worker,

21   she provides for the family, those kinds of things."  (*Id.* at 59:6-25.)  Because Attorney

22   DeLozier "had a special relationship with Donna and Alejo," he was given responsibility

23   for "securing information to substantiate that position."  (*Id.* at 31:24-32:9.)

24          Neither Patterson nor DeLozier expressed any kind of tactical reasons for not

25   investigating evidence of mental health or childhood trauma as a potential theme in

26   mitigation.  Patterson simply assumed there was nothing worth pursuing, and that

27

28

{00128370.1 }

97

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

1  MacLeod or DeLozier would bring it to his attention if there was.  (*See, e.g.*, *id.* at 68:11-

2  14 ("Sexual abuse history can be a significant mitigator.  But I had no – no reporters

3  advising me that it was an issue . . . .").)  DeLozier, meanwhile, believed both then and

4  now that the red flags warranted further investigation (2/10/14 Tr. at 136:18-23 (D.

5  DeLozier)), but stated that he did not investigate further because:  (1) the Public

6  Defender's Office had taken over the representation and he "was not in a position, in my

7  opinion, to force the public defender to do anything" (*id.* at 136:24-137:12); and (2) "it's

8  possible that focusing on [the positive aspects of the Ochoas in the custody] case kept me

9  from focusing on anything that might have been historical in Wendi's case" (*id.* at 138:4-

10  139:8).

11         None of those explanations offer a strategic reason for not investigating further.

12  As Patterson acknowledged:

13         I absolutely agree . . . that if – if that evidence existed, it should have been
           developed.  Whether it would have been presented at trial, that would have

14         been my call and that truly would have been a strategic call.  That being
           said, there was an obligation if this information exists, to develop it in

15         advance of trial.

16  (2/7/14 Tr. at 177:22-178:15 (D. Patterson) (Redirect).)

17         The State suggested no strategic reasons not to investigate childhood trauma and

18  mental health as potentially mitigating evidence, and no strategic reasons for failing to

19  follow up on the red flags identified above.  During Patterson's cross-examination, the

20  State seemed to suggest reasons why Patterson may not have wanted to present the

21  information he possessed regarding mental health or childhood trauma.  But that line of

22  questioning misses the point.  No one is arguing that trial counsel should have called

23  Kandy Rohde as an expert witness, or that the defense team should have presented

24  preliminary and incomplete evidence of mental health disorders and childhood trauma

25  without further investigation.  The argument on post-conviction relief is simply that trial

26  counsel should have investigated and developed that information, so that it could then

27  make an informed choice as to whether it would be presented—a choice that trial counsel

28

{00128370.1 }                                    98

1  did not put themselves in a position to make.  (*Id.*; *see also, e.g.*, 2/11/14 Tr. at 81:14-20

2  (L. Hammond) (under the standard of care, "there is not a good strategic or tactical

3  reason not to consult and work with mental health people as part of the investigation");

4  *id.* at 82:5-22 ("[T]here's no valid reason that I know of not to conduct an investigation

5  for all of the reasons that we've talked about.  It is very important that you know as well

6  as you can what may be down the road before you make those more refined strategic and

7  tactical reasons.  You can't make them in the blind, so to speak."); *id.* at 89:9-13

8  (possibility of rebuttal evidence is not a strategic reason for failing to investigate in the

9  first instance).)

10  **II.     POST-CONVICTION RELIEF IS WARRANTED UNDER *CUYLER***
11  **BECAUSE ATTORNEY DELOZIER SUFFERED FROM A**
       **DEBILITATING CONFLICT OF INTEREST**

12       A criminal defendant has a Sixth Amendment right to an attorney with undivided

13  loyalty.  *See Wood v. Georgia*, 450 U.S. 261, 271 (1981).  If a defendant shows that her

14  attorney's conflict of interest actually affected the adequacy of her representation, she is

15  entitled to a new trial.  *Cuyler v. Sullivan*, 446 U.S. at 350; *see also Lockhart v. Terhune*,

16  250 F.3d 1223, 1229-30 (9th Cir. 2001) (if a defendant "shows on appeal that 'an actual

17  conflict of interest adversely affected his lawyer's performance,' reversal is required").

18  Courts have repeatedly ordered a new trial where a conflict of interest adversely affected

19  a defendant's representation under facts similar to those presented here.  *See, e.g.,*

20  *Lockhart*, 250 F.3d at 1229-30 (ordering new trial because defense counsel refrained

21  from presenting evidence that would have been favorable to defendant but harmful to

22  another client in a related matter); *United States v. Henke*, 222 F.3d 633, 636-38 (9th Cir.

23  2000) (ordering a new trial because defense counsel was ethically barred from using

24  information obtained during joint defense meetings against the witness in cross-

25  examination); *Fitzpatrick v. McCormick*, 869 F.2d 1247, 1251-54 (9th Cir. 1989)

26  (ordering new trial because counsel's prior representation of another person involved in

27  {00128370.1 }                                       99

28

4843-7819-0105.

the charged offense caused him to disbelieve the defendant's version of events in favor of the prior client's report); *State v. Martinez-Serna*, 166 Ariz. 423, 425 (1990) (ordering new trial because counsel's concurrent representation of two defendants altered his "select[ion] [of] defenses and strategies"); *Foxworth v. Wainwright*, 516 F.2d 1072, 1079 (5th Cir. 1975) (same); *State v. Thomas*, 545 N.E.2d 654, 657 (Ill. 1989) (ordering new trial because defense counsel's concurrent representation of a prosecution witness may have caused him to avoid questioning the witness "for fear of offending her in the course of examination and losing her business" or because "an attack on her veracity might later come to haunt [her] in her felony case"); *State v. Stewart*, 126 A.D.2d 943, 943 (N.Y. 1987) (ordering new trial because defense counsel's representation of a prosecution witness may have contributed to her decision not to attempt to impeach the witness).

DeLozier represented the Ochoas in seeking to obtain custody of Wendi's children (Nicholas and Ashlee) while also representing Wendi in her criminal case. This concurrent representation created an irreconcilable conflict of interest. As the Ochoas' attorney, DeLozier's duty was to persuade the court that the Ochoas were excellent parents and grandparents and would be suitable caretakers for their grandchildren. As Wendi's attorney, DeLozier was responsible for developing mitigation evidence that might sway the jury towards leniency—including evidence that Wendi was a victim of childhood abuse and neglect by the Ochoas. DeLozier had an ethical obligation not to act against the Ochoas' interests and a personal interest in receiving payment from the Ochoas for both representations, which impaired his ability to adequately investigate and present Wendi's history of childhood abuse as part of the penalty phase of Wendi's trial. Because DeLozier's active representation of conflicting interests adversely affected Wendi's representation, she is entitled to a new trial.

## A.   DELOZIER'S REPRESENTATION OF THE OCHOAS

Shortly after Wendi's arrest in the fall of 2000, Wendi, the Ochoas and the

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

1    Lambeths (Joe's sister and brother-in-law) agreed that the Lambeths would have custody

2    of Wendi's children through the pendency of the criminal case, and that the Ochoas

3    would be permitted regular visitation.  (2/4/14 Tr. at 165:18-166:5 (D. Ochoa); Ex. 80.)

4    Based on this agreement, the Maricopa County Superior Court appointed the Lambeths as

5    the children's guardians.  (2/4/14 Tr. at 166:11-13 (D. Ochoa); Ex. 81.)

6         The Ochoas soon regretted agreeing to the Lambeths' guardianship and retained

7    an attorney, Leon Thikoll, to assist them in obtaining custody of Wendi's children.

8    (2/4/14 Tr. at 166:24-167:4 (D. Ochoa); Ex. 84.)  Thikoll, who filed a motion to terminate

9    the Lambeths' guardianship, fell ill and resigned as the Ochoas' attorney in June 2001.

10   (*Id.*; 2/10/14 Tr. at 64:11-18 (D. DeLozier).)  The Ochoas then retained DeLozier (who

11   was already informally advising them regarding the children) to represent them in the

12   guardianship case.  (2/4/14 Tr. at 167:8-168:13 (D. Ochoa); Ex. 84; 2/11/14 at 129:13-

13   130:1 (G. Lowenthal).)

14        One of DeLozier's first acts as the Ochoas' counsel of record was to instruct them

15   to collect letters from friends and family stating that they were "upstanding people,"

16   "good parents and . . . good grandparents" to prove that they were "suitable to take care

17   of Nicholas and Ashlee."  (2/4/14 Tr. at 168:21-169:8 (D. Ochoa).)  DeLozier's

18   instruction was consistent with his approach throughout the guardianship case: he viewed

19   his responsibility as persuading the court that the Ochoas "were appropriate parties to

20   have some time with their grandchildren . . . [t]hat they were honorable people and that

21   they would raise or help assist in raising these children appropriately."  (2/10/14 Tr. at

22   74:19-75:13 (D. DeLozier).)

23        The Lambeths vigorously disputed the Ochoas' suitability as guardians, going so

24   far as to accuse the Ochoas of child abuse.  In March 2002, the children developed bright

25   red marks on their bottoms.  (Ex. 95.)  When questioned about the redness, Ashlee

26   reported to Jeanea Lambeth on a number of occasions that "Grandpa Alejo touched [her]

27

28

{00128370.1 }

101

butt" and that "Grandma Donna says to keep secrets."  (*Id.*)  Jeanea documented these

accusations in a letter to her attorney.  (*Id.*)  DeLozier promptly learned of these

allegations and assisted Donna in preparing a written response.  (2/4/14 Tr. at 175:14-25

(D. Ochoa); Ex. 96.)  On another occasion, Brad Lambeth accused Alejo of taking naked

photographs of the children – an allegation that was reported to DeLozier.  (2/11/14 Tr. at

141:9-13 (G. Lowenthal).)

        In August 2001 (while the guardianship case was still pending), DeLozier initiated

an adoption case on behalf of the Ochoas in Pinal County.  (2/4/14 Tr. at 170:19-23 (D.

Ochoa); 2/10/14 Tr. at 73:1-9 (D. DeLozier).)  He did not, however, notify the Lambeths

about the adoption case, even after the court ordered him to do so.  (Ex. 87, 104.)  The

Lambeths eventually learned about the attempted adoption and in July 2002 sought

sanctions.  (Ex. 100.)  In October 2002, the court granted the Lambeths' request,

sanctioned DeLozier, dismissed the adoption petition, and notified the Maricopa County

Superior Court of the Ochoas' actions.  (Ex. 104.)  A month later, the Maricopa County

Superior Court suspended the Ochoas' visitation rights upon the recommendations of two

mental health providers "so supervised therapeutic sessions [could] occur with a

counselor and the Ochoa grandparents."  (Ex. 99; *see also* 2/4/14 Tr. at 172:19-24 (D.

Ochoa); 2/11/14 Tr. at 141:18-142:7 (G. Lowenthal).)  In December 2002, the court

denied the Ochoas' request for guardianship of the children.  (*See* 2/11/14 Tr. at 141:18-

142:7 (G. Lowenthal).)

        While the Lambeths' sanctions motion prompted DeLozier to withdraw as formal

counsel of record in the guardianship case, both he and Donna acknowledge that he

remained the Ochoas' lawyer and consulted with them on numerous issues pertaining to

the guardianship proceeding until its conclusion in 2005.  (2/4/14 Tr. at 177:14-18 (D.

Ochoa); 2/10/14 Tr. at 83:2-13 (D. DeLozier); Ex. 102.)  Documents from DeLozier's

file verify that relationship:

{00128370.1 }

102

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

- On March 3, 2003, Donna emailed DeLozier the date, time, and location of a hearing on the Lambeths' motion to sever Wendi's parental rights "[b]ecause [DeLozier] was always my attorney and I considered him—I still considered him to be." (2/4/14 Tr. at 177:19-178:9 (D. Ochoa); Ex. 107.)

- On March 18, 2003, DeLozier assisted Donna in writing a letter to Arizona Family Adoption Services, urging that the Lambeths' adoption of the children and severance of Wendi's parental rights not occur. (2/4/14 Tr. at 179:6-180:1 (D. Ochoa); Ex. 132.)

- On April 14, 2003, DeLozier emailed Donna seeking an update regarding a hearing that had been held that day in the guardianship case. (2/4/14 Tr. at 180:13-181:6 (D. Ochoa); Ex. 108.) Donna responded with a summary of the hearing, which she did "[b]ecause, you know, I just kept [DeLozier] in the loop. He had been our attorney through all of this." (2/4/14 Tr. at 181:5-6 (D. Ochoa).)

- On May 16, 2003, Donna forwarded DeLozier questions about supervised visitation with the children. (2/4/14 Tr. at 182:3-9 (D. Ochoa); Ex. 109.)

- On May 27, 2003, DeLozier filed a brief with the Court of Appeals, requesting that it overturn the sanctions imposed by the Pinal County Superior Court against him and the Ochoas. (Ex. 131.) As explained by DeLozier, although he was no longer the Ochoas' attorney of record, "[he] felt that [he] still should represent [the Ochoas'] interests regardless of whether [he] was officially of the court record or not." (2/10/14 Tr. at 81:17-82:7 (D. DeLozier).)

- In June 2003, DeLozier paid a private investigator for work he had performed the month before in the guardianship case. (2/10/14 Tr. at 83:17-84:13 (D. DeLozier); Ex. 110.) He did the same in November 2003. (*Id.*)

- On April 17, 2004, the Ochoas had multiple communications with DeLozier regarding the Lambeths' failure to bring the children to a scheduled visit. (2/11/14 Tr. at 151:7-152:7 (G. Lowenthal).)

- On November 15, 2004, the Ochoas filed a notice that they would be representing themselves in the guardianship going forward. (2/4/14 Tr. at 182:19-183:3 (D. Ochoa); Ex. 114.) The notice was drafted by DeLozier. (2/4/14 Tr. at 183:2-3 (D. Ochoa).)

- On December 7, 2004, DeLozier reviewed medical records and photographs of the children's red bottoms. (2/10/14 Tr. at 85:11-23 (D. DeLozier); Ex. 130.)

- On December 8, 2004, DeLozier met with Alejo to discuss the guardianship and adoption files. (*Id.*)

{00128370.1 }

103

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000406

- On March 7, 2005, Donna faxed a letter to DeLozier regarding an upcoming hearing in the guardianship case. (2/4/14 Tr. at 183:10-184:2 (D. Ochoa); Ex. 114.)

- On March 21, 2005, DeLozier assisted the Ochoas in drafting a letter to be placed in the guardianship case file, documenting their efforts to maintain contact with the children. (2/4/14 Tr. at 184:12-20 (D. Ochoa); Ex. 115.)

## B.   DELOZIER'S REPRESENTATION OF WENDI

While representing the Ochoas in seeking to obtain custody of their grandchildren, DeLozier simultaneously represented Wendi in her criminal case. DeLozier assumed Wendi's representation in December 2000, when the Ochoas agreed to pay DeLozier a non-refundable, $30,000 retainer ($5,400 of which was paid up-front, with the remainder personally guaranteed by Alejo). (Ex. 61; Ex. 231 ¶ 2; 2/10/14 Tr. at 65:3-10 (D. DeLozier).) DeLozier remained Wendi's attorney from December 2000 through her conviction and death sentence in December 2004, serving as the primary contact for both Wendi and her parents throughout this time. (2/10/14 Tr. at 103:20-104:9 (D. DeLozier); 2/7/14 Tr. at 28:16-19, 31:4-6, 48:21-49:1 (D. Patterson)); 2/4/14 Tr. at 187:5-13 (D. Ochoa).) In particular, DeLozier was responsible for working with Wendi and the Ochoas to develop possible mitigation evidence, since he had the closest relationship with the Ochoas. (2/7/14 Tr. at 27:11-21, 48:21-49:1 (D. Patterson).)

Over the course of Wendi's representation, DeLozier repeatedly received reports that she may have experienced childhood trauma or abuse. *See generally supra* Section I.B.3.c (discussing the numerous "red flags" suggestive of a history of childhood abuse that DeLozier never took any steps to investigate).

Despite multiple clues pointing towards the possibility of childhood abuse, DeLozier never investigated any negative aspects of Wendi's childhood or upbringing, the cause of Wendi's dissociation, or the reasons behind Wendi's maladaptive reactions to stress. (2/10/14 Tr. at 112:19-113:5, 122:23-124:15, 127:2-8, 129:25-130:7, 133:9-18 (D. DeLozier).) DeLozier never asked Donna whether Wendi may have suffered abuse

{00128370.1 }

104

as a child.  (2/4/14 Tr. at 191:23-25 (D. Ochoa).)  DeLozier never investigated whether Alejo's relationship with Wendi was sexually inappropriate (notwithstanding Wendi's "open knowledge" of Alejo's "lingerie parties" and Alejo's request to his daughter for erotic stories) (2/10/14 Tr. at 132:7-9 (D. DeLozier)) or whether *any* members of Wendi's family may have sexually abused her (*id.* at 134:11-135:13).  DeLozier also never informed Patterson, MacLeod, or anyone else that the Lambeths vigorously disputed the Ochoas' ability to serve as appropriate caregivers for their grandchildren or that they had accused the Ochoas of child abuse.  (*Id.* at 75:17-21, 77:6-12; 2/7/14 Tr. at 36:11-15, 37:1-7 (D. Patterson).)  In fact, DeLozier never brought anything negative about the Ochoas to Patterson's attention at any time (2/7/14 Tr. at 37:5-7 (D. Patterson)) and never even disclosed that he was representing the Ochoas in the guardianship/adoption cases.  (*See id.* at 25:17-27:2 (explaining that he did not learn about DeLozier's representation of the Ochoas until the issue was raised by the prosecutor in the midst of Wendi's trial).)

Instead, he pursued a mitigation theme consistent with the interests of the Ochoas in the guardianship case:  that Wendi had a strong Christian upbringing, with no suggestion of any childhood abuse.  Consistent with this theme, DeLozier described Wendi as "an innocent young girl who lived a sheltered life" during his opening statement in the mitigation phase.  (12/8/04 Tr. at 28:30.)  DeLozier then elicited positive testimony about the Ochoas from multiple witnesses that knew them from church during the 1980s.  Tellingly, DeLozier's first substantive question to each of these witnesses was whether they knew the *Ochoa family* – not whether they knew *Wendi*.  (12/9/04 Tr. at 7:22-23 (to Chris Vargas: "Are you familiar with the Ochoa family, Donna, Alejo, and Wendi?"); 12/9/04 Tr. at 37:1 (to Jimmy Galyon: "And do you know the Ochoa family?"); 12/9/04 Tr. at 37:1 (to Linda Galyon: "Do you know the Ochoa family?"); 12/13/04 Tr. at 37:14 (to Lonnie Inskeep: "And do you know the Ochoa family?").)  The

{00128370.1 }

4843-7819-0105.

P-App. 000408

1  witnesses – none of whom were in a position to know Wendi well or to witness the

2  Ochoas' abuse of Wendi—testified regarding their positive experiences with Donna and

3  Alejo instead.  For example, Chris Vargas testified that the Ochoas influenced his

4  "Christian upbringing" (12/9/04 Tr. at 7:22-9:24) and Lonnie Inskeep described Alejo's

5  role as youth pastor at the church and Donna's role as a monitor at the church school

6  (12/13/04 Tr. at 40:9-41:4).  Similarly, DeLozier's direct examination of Donna focused

7  on highlighting the Ochoas' various charitable acts.  (12/9/04 Tr. at 92:9-99:9 (D.

8  Ochoa).)

9       The prosecutor capitalized on this approach, reinforcing testimony about the

10  Ochoas as excellent parents and contrasting Wendi's apparently idyllic, wholesome

11  childhood with her adult actions.  For example, Martinez asked Jimmy Galyon:

12      Q:   . . . [Y]ou do know about the church back then, right?

13      A:   Yes.

14      Q:   They didn't teach people to lie, did they?

15      A:   No.

16      Q:   In fact, that's something that's frowned upon, they were taught not

17          to, right?

18      A:   They were taught basic Bible principles, yes.

19      Q:   And that's one of the basic Bible principles, right?

20      A:   Yes.

21      Q:   How about cheating.  Did they teach them to cheat?

22      A:   No.

                            . . .

23      Q:   So if she did those things, she learned those things, it wasn't part of

24          the church upbringing, was it?

25      A:   I don't know.

26      Q:   Or maybe she just didn't assimilate the church upbringing?

27      A:   I don't know.

28

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000409

(12/9/04 Tr. at 31:12-32:12.)

## C.   DELOZIER'S ACTUAL, ACTIVE CONFLICT OF INTEREST ADVERSELY AFFECTED WENDI'S REPRESENTATION

Gary Lowenthal was retained to determine whether DeLozier had an actual conflict while representing both Wendi and her parents and whether any such conflict adversely affected Wendi's representation.  (2/11/14 Tr. at 112:14-20 (G. Lowenthal).) Lowenthal is an attorney and retired law professor who taught at Arizona State University for over thirty years.  (*Id.* at 117:6-7, 119:24-120:1; Ex. 79.)  His teaching and research has focused on attorney conflicts of interest, and he has conducted several empirical studies on conflicts that were published in the University of Virginia Law Review and the Yale Law Journal and cited by the United States Supreme Court. (2/11/14 Tr. at 120:2-121:12 (G. Lowenthal); Ex. 79.)  Lowenthal has also served as a consultant on conflicts in multiple cases and has represented a criminal defendant in post-conviction proceedings.  (2/11/14 Tr. at 121:13-122:19 (G. Lowenthal).)

In evaluating the existence and effect of a conflict of interest, Lowenthal reviewed the parties' briefing on Wendi's petition for post-conviction relief (including the attached declarations and expert reports), the Arizona Supreme Court's decision in *State v. Andriano*, and multiple additional witness declarations (including one by Keith Rohman and one by Kyre Lorts).  (2/11/14 Tr. at 113:25-114:14 (G. Lowenthal).)  Lowenthal also conducted in-person interviews of Donna, Alejo, Wendi, DeLozier, and Patterson. (2/11/14 Tr. at 115:2-116:6 (G. Lowenthal).)  For the reasons explained in greater detail below, Lowenthal concluded that DeLozier had an actual, active conflict of interest while representing Wendi as a result of his concurrent representation of her parents and that this conflict had an adverse effect on Wendi's representation.  (2/11/14 Tr. at 112:22-113:5 (G. Lowenthal).)

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

## 1.     DeLozier Had Actual Conflict of Interest

DeLozier suffered from an actual conflict of interest throughout Wendi's representation for three reasons:  (1)  his representation of the Ochoas, which required him to present the Ochoas as excellent parents and grandparents, was directly adverse to Wendi's interests in having counsel investigate and present any evidence "which might militate against the appropriateness of the death penalty," "including physical ,sexual, or emotional abuse . . . [and] other traumatic events" (Ex. 76 at 80-81); (2) DeLozier's representation of Wendi was materially limited by his responsibility not to disclose information learned while representing the Ochoas; and (3) the Ochoas' ongoing obligation to pay fees incurred by DeLozier in representing Wendi, as well as their obligation to compensate DeLozier for the work he was performing for them in the guardianship/adoption matters, impaired his ability to thoroughly investigate certain matters and exercise independent professional judgment on Wendi's behalf.

### a.     DeLozier's Representation of the Ochoas' Interests in Custody Proceedings Was Directly Adverse to Wendi's Interests in Developing All Reasonably Available Mitigating Evidence

Under Arizona law, a conflict of interest exists if a lawyer's representation of one client is directly adverse to the interests of another client.  Ariz. R. of Prof'l Conduct 1.7(a)(1), (b).[16]  Here, the Ochoas' interest in obtaining custody of their grandchildren was in direct conflict with Wendi's interest in providing the jury with all possible reasons to consider leniency, including a history of childhood abuse and neglect by the Ochoas. (2/11/14 Tr. at 164:6-20 (G. Lowenthal).)

---

[16] Although representation of two parties with directly adverse interests may be permissible if both parties provide informed consent, neither Wendi nor the Ochoas were informed of the conflict or provided any consent.  (2/11/04 Tr. at 163:22-164:5 (G. Lowenthal).)

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

The Ochoas retained DeLozier to assist them in obtaining guardianship of their grandchildren.  This required DeLozier to present the Ochoas as strong parents and grandparents who would provide a wholesome, nurturing, safe environment for their grandchildren.  (2/11/14 Tr. at 164:6-20 (G. Lowenthal).)  Indeed, DeLozier understood this to be his objective – he had to persuade the court that the Ochoas "were appropriate parties to have some time with their grandchildren . . . [t]hat they were honorable people and that they would raise or help assist in raising these children appropriately."  (2/10/14 Tr. at 74:19-75:13 (D. DeLozier).)  In contrast, Wendi's

> interest was in seeking leniency.  Her life was at stake.  She was on trial for a capital offense.  And because her interest is in seeking leniency, she had an interest in the jury learning about anything from childhood that might help the jury understand how she could have behaved the way she did at the time of the offense and in this case in the months preceding the offense.  That was her interest.

(2/11/14 Tr. at 164:6-20 (G. Lowenthal).)

Any efforts DeLozier might have taken to investigate and present evidence that Wendi experienced childhood abuse or neglect would have unavoidably compromised the Ochoas' efforts to obtain custody of their grandchildren.  Confronted with this irreconcilable conflict, DeLozier put his head in the sand.  He "chose to disbelieve the allegations against [the Ochoas] and to believe the good things about [the Ochoas] instead," ignored the multiple clues suggestive of Wendi's troubled childhood, and never developed Wendi's history of childhood physical, psychological, and sexual abuse as a potential mitigation theme.  (2/11/14 Tr. at 165:5-14, 184:14-17 (G. Lowenthal).)  *See also Fitzpatrick*, 869 F.2d at 1251-54 (ordering new trial because counsel's prior representation of another person involved in the charged offense caused him to disbelieve the defendant's version of events in favor of the prior client's report).  Specifically, DeLozier told the jury that Wendi had a wholesome, sheltered childhood and elicited repeated testimony praising the Ochoas as good, Christian parents.  (*See, e.g.*, 12/8/04 Tr. at 28:30; 12/9/04 Tr. at 7:22-9:24 (C. Vargas), 92:9-99:9 (D. Ochoa); 12/13/04 Tr. at

{00128370.1 }

109

40:9-41:4 (L. Inskeep).)  This approach was entirely consistent with the Ochoas' objectives in the guardianship case, but wholly inconsistent with the requirements for Wendi's capital representation.  *See Boyde*, 494 U.S. at 382 (noting the "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse").  *See also Lockhart*, 250 F.3d at 1229-30 (ordering new trial because defense counsel refrained from presenting evidence that would have been favorable to defendant but harmful to another client in a related matter);  *Martinez-Serna*, 166 Ariz. at 425 (ordering new trial because counsel's concurrent representation of two defendants altered his "select[ion] [of] defenses and strategies");  *Foxworth*, 516 F.2d at 1079 (5th Cir. 1975) (same); *Thomas*, 545 N.E.2d at 657 (ordering new trial because defense counsel's concurrent representation of a prosecution witness may have caused him to avoid questioning the witness because "an attack on her veracity might later come to haunt [her] in her felony case").

> **b.    DeLozier's Representation of Wendi Was Materially Limited by His Duty of Confidentiality to the Ochoas**

A conflict of interest exists when a client's representation is materially limited by her attorney's responsibilities to another client or former client.  Ariz. R. of Prof'l Conduct 1.7(a)(2). Arizona law forbids attorneys from "us[ing] information relating to representation of the client to the disadvantage of the client unless the client gives informed consent . . ."  Ariz. R. of Prof'l Conduct 1.8.  Because DeLozier had to refrain from using any information relating to the Ochoas' representation to their detriment, Wendi's representation was materially limited.

While representing the Ochoas, DeLozier learned of the Lambeths' vigorous objections to the Ochoas' suitability as caregivers as well as their allegations of possible child abuse.  (2/11/04 Tr. at 166:7-15 (G. Lowenthal).)  He was also aware that the court suspended the Ochoas' visitation rights until the Ochoas received therapeutic counseling

{00128370.1 }                                           110

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

P-App. 000413

and ultimately denied their request to serve as the children's guardians or to obtain continuing visitation rights.  (*Id.* at 141:14-142:7.)  All of this information should have raised questions about the Ochoas' parenting practices and could have been used to develop Wendi's history of childhood abuse as mitigation evidence.  (*Id.* at 166:19-167:6.)  However, DeLozier was ethically constrained from using information learned from his representation of the Ochoas to their disadvantage, even if it could have assisted in developing a compelling mitigation case for Wendi.  As a result, DeLozier's ethical obligations materially limited his representation of Wendi.  (*Id.* at 162:7-13.)  *See Henke*, 222 F.3d at 636-38 (ordering a new trial because defense counsel was ethically barred from using information obtained during joint defense meetings against the witness in cross-examination).

### c.  The Payment Obligations of the Ochoas Interfered with DeLozier's Independent Judgment

Finally, the Ochoas' ongoing obligation to pay fees incurred by DeLozier in representing the Ochoas and Wendi interfered with his exercise of independent professional judgment on Wendi's behalf.  Although a lawyer may, under some circumstances, accept compensation for representing a client from someone other than the client, this situation is fraught with "inherent dangers," especially when the person paying the fees has interests in conflict with the client's interests.[17]  *Wood v. Georgia*, 450 U.S. 261, 271-72 (1981) ("Courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party . . .").  An impermissible conflict exists if the lawyer enters into or continues such a fee arrangement when "there is a significant risk that the lawyer's representation

---

[17] Although Arizona permits payment by a non-client in some circumstances if the client provides informed consent,  Ariz. R. of Prof'l Conduct 1.8(f),  neither Wendi nor the Ochoas ever consented to the conflict.  (2/11/04 Tr. at 166:2-6 (G. Lowenthal)).

{00128370.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

4843-7819-0105.

of the client will be materially limited by the lawyer's own interest in the fee arrangement or by the lawyer's responsibilities to the third-party payer."  Ariz. R. of Prof'l Conduct 1.8, Comment 11.

At the outset of Wendi's representation, DeLozier entered into a fee agreement under which the Ochoas made an initial cash payment and Alejo remained solely responsible the remaining amount owed.  (Ex. 61; Exhibit 231 at ¶ 2; 2/10/14 Tr. at 65:3-10 (D. DeLozier).)  Wendi never made any payments towards the costs of her representation; the only payment DeLozier ever received was from her parents.   (2/10/14 Tr. at 65:11-20 (D. DeLozier).)

Because of this arrangement, DeLozier had a strong personal interest in maintaining an amicable relationship with the Ochoas.  Any critical investigation into their parenting practices or efforts to inform the jury about Wendi's history of childhood abuse would have inevitably compromised this relationship.  As explained by Lowenthal,

> . . . taking on that case, [DeLozier] knew he was going to have to investigate mitigation.  And investigating mitigation is to find out about the client's childhood.  And that means that you're going to – very often, as you're going to have to – you or your mitigation specialists are going to have to sit down with the family and say I don't know how – I know this is really painful.  I know this is really difficult, but we really have to find out what really happened here.  And forcing someone to talk about very painful experiences is difficult on that person, and there has to be a natural reluctance on someone who wants to continue to get money from that person to push them into that situation.

(2/11/14 Tr. at 189:13-190:4 (G. Lowenthal).)  Relatedly, the Ochoas had retained DeLozier to represent them as well.  As a result, DeLozier also had an interest in ensuring continued payment from them on the guardianship/adoption matter, which would similarly dissuade him from confronting the Ochoas or developing damaging information about them.  *Thomas*, 545 N.E.2d at 657 (ordering new trial because defense counsel's concurrent representation of a prosecution witness may have caused him to avoid questioning the witness "for fear of offending her in the course of examination and losing her business").

{00128370.1 }

112

4843-7819-0105.

### 2.      DeLozier's Conflict Affected the Representation of Wendi

The right to representation by an attorney with undivided loyalty is so important that, unlike other Sixth Amendment claims, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler*, 446 U.S. at 350.  Rather, reversal is required once a defendant proves that a "plausible defense strategy" was not pursued because of the conflict. *Lockhart*, 250 F.3d at 1229-30; *Martinez-Serna*, 166 Ariz. at 425; *State v. Jenkins*, 148 Ariz. 463, 466, 715 P.2d 716, 720 (1986).  A plausible defense strategy is one that would have been a "viable alternative" to the strategy actually taken, regardless of whether the alternative strategy might have been successful. *Martinez-Serna*, 166 Ariz. at 425, 803 P.2d at 418; *Jenkins*, 148 Ariz. at 466, 715 P.2d at 710.

DeLozier was presented with numerous indications that Wendi suffered from a traumatic childhood.  Mental health providers informed DeLozier about her dissociation dating back to childhood and several potential psychiatric disorders, and they specifically raised the possibility of childhood sexual abuse.  (Ex. 230, 7.002, 45, 52.)  Wendi also impulsively attempted suicide while incarcerated.  DeLozier knew that these behaviors and diagnoses were suggestive of childhood abuse; beginning in 2003, he represented numerous victims of childhood sexual abuse in lawsuits against the Catholic Church.  (2/10/14 Tr. at 88:7-90:24 (D. DeLozier).)  As a result of these cases, DeLozier knew that impaired memories, dissociation, depression, and post-traumatic stress disorder were common effects of childhood sexual abuse.  (*Id.* at 90:25-97:9, 102:3-6.)

DeLozier was also presented with numerous indications that the Ochoas were flawed parents.  DeLozier knew that the Lambeths strongly contested the Ochoas' ability to appropriately care for their grandchildren, seeking not only to retain guardianship of the children themselves but also to severely limit (and ultimately end) any visitation rights.  (*See, e.g.*, Ex. 95, 96.)  DeLozier also knew that the Lambeths had accused the

113

{00128370.1 }

1    Ochoas of child abuse and that the court had imposed supervised visitation, mandated

2    "therapeutic counseling," and ultimately terminated the Ochoas' visitation rights entirely.

3    (Ex. 99, 105; 2/11/14 Tr. at 141:18-142:7 (G. Lowenthal).)

4        Although DeLozier was aware that Wendi may have endured childhood abuse and

5    that the Ochoas' parenting practices had been the subject of considerable concern, he did

6    nothing to investigate whether this information could be used in Wendi's defense.

7    (2/10/14 Tr. at 112:19-25, 122:23-124:15, 127:2-8, 129:25-130:7, 133:9-18 (D.

8    DeLozier).)  Following up on these matters—by asking the Ochoas and others whether

9    Wendi had been subjected to childhood abuse, investigating the Ochoas' parenting

10   practices, or seeking further mental health evaluation of Wendi targeted at the issue of

11   childhood abuse—would have been a viable alternative approach.  (2/11/14 Tr. at 173:13-

12   174:8 (G. Lowenthal).)  *See also Wiggins*, 539 U.S. at 525 ("Had counsel investigated

13   further, they may well have discovered the sexual abuse later revealed during state

14   postconviction proceedings.").  Indeed, Patterson readily admitted that the Lambeths'

15   child abuse allegations "bear upon potential areas of mitigation that should have been

16   developed at a bare minimum under *Wiggins*." (2/7/14 Tr. at 36:16-25 (D. Patterson).)

17       DeLozier elected not to develop this in mitigation and never informed Patterson

18   about the abuse allegations or *anything* negative about the Ochoas.  (2/7/14 Tr. at 37:1-7

19   (Patterson).)  Had DeLozier objectively investigated Wendi's childhood and the Ochoas'

20   parenting choices, the defense could have provided the jury with an explanation for the

21   behaviors the prosecution highlighted in arguing for the death penalty.  Rather than the

22   actions of a promiscuous, dishonest, self-centered woman, Wendi's conduct in the

23   months leading up to Joe's death demonstrate why leniency is appropriate – her decision-

24   making has been profoundly impaired by a history of childhood abuse and neglect.

25       When questioned why he did not pursue the possibility of childhood abuse,

26   DeLozier admitted that he was focused on the Ochoas' positive attributes while serving

27

28

{00128370.1 }                                    114

as their attorney and

> it's possible that focusing on that aspect of the grandparent case kept me from focusing on anything that might have been historical in Wendi's case. Okay?  As far as the things that Rohde and so forth and so forth were telling.

(2/10/14 Tr. at 138:23-139:8 (D. DeLozier).)  As explained by Lowenthal, DeLozier's report of being "blinded by his zealous advocacy of the Ochoas" and therefore incapable of critically evaluating their conduct in the context of Wendi's case is "very classic behavior for a person with a conflict of interest."  (2/11/14 Tr. at 166:21-167:25 (G. Lowenthal).)

In short, DeLozier assumed the role of championing the Ochoas as good parents at the very outset of Wendi's case, and as a result lost his ability to view them objectively when developing mitigation evidence for Wendi.  The blinding effect of his loyalty to the Ochoas was further compounded by his ethical obligations not to use information he learned against them and by his own personal interest in obtaining payment from the Ochoas both for Wendi's representation as well as their own.  As a result, the attorney tasked with developing mitigation evidence from Wendi's family did nothing to follow up on repeated indications that Wendi had a history of childhood abuse.  Because DeLozier's conflicted representation deprived Wendi of the opportunity to provide an alternative explanation for her behavior in the months leading up to Joe's death, she is entitled to a new trial.  *See, e.g., Cuyler*, 446 U.S. at 350; *Lockhart*, 250 F.3d at 1229-30.

## CONCLUSION

Trial counsel's failure to adequately investigate and develop evidence of Wendi's childhood trauma and psychiatric disorders constituted deficient and conflicted performance, which deprived the jury of an opportunity to consider significant mitigating evidence prior to sentencing Wendi to death.  Had the jury been given the opportunity to consider the mitigating evidence elicited in the evidentiary hearing and summarized herein, there is a reasonable probability that it would not have imposed a death sentence.

{00128370.1 }

4843-7819-0105.

For the reasons stated above, this Petition should be granted.

DATE: JUNE 2, 2014                    By: */s/ Scott M. Bennett* _____
                                          Scott M. Bennett (022350)
                                          COPPERSMITH BROCKELMAN PLC
                                          2800 North Central Avenue
                                          Phoenix, Arizona  85004
                                          (602) 224-0999 (office)
                                          (602) 224-6020 (fax)
                                          sbennett@cblawyers.com

                                          Allen A. Arntsen, admitted *pro hac vice*
                                          Stephan J. Nickels, admitted *pro hac vice*
                                          Matthew R. Lynch, admitted *pro hac vice*
                                          Jodi K. Fox, admitted *pro hac vice*
                                          Krista J. Sterken, admitted *pro hac vice*
                                          FOLEY & LARDNER LLP
                                          150 E. Gilman Street
                                          Madison, WI 53703-1481
                                          (608) 257-5035 (Office)
                                          (608) 258-4258 (Fax)

                                          *Attorneys For Petitioner Wendi Andriano*

{00128370.1 }

116

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4843-7819-0105.

ORIGINAL e-filed June 2, 2014,
with the Clerk of the Maricopa County Superior Court

COURTESY COPY hand-delivered
on June 2, 2014, to:

Judge Brian K. Ishikawa
Maricopa County Superior Court
Southeast Juvenile Division
1810 S. Lewis
Mesa, AZ. 85210-6234

COPY mailed on June 2, 2014, to:

Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tucson, AZ  85701-1367

Gregory Hazard
Office of the Attorney General
1275 W. Washington
Phoenix, AZ  85007-2997

*Attorney for the State of Arizona*

*/s/ Carol Keesee*

[00128370.1 ]

117

THOMAS C. HORNE
ATTORNEY GENERAL
(FIRM STATE BAR NO. 14000)

GREGORY HAZARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
1275 W. WASHINGTON
PHOENIX, ARIZONA 85007–2997
TELEPHONE:  (602) 542–4686
gregory.hazard@azag.gov
CADOCKET@AZAG.GOV
(STATE BAR NUMBER 23258)

LACEY STOVER GARD
ASSISTANT ATTORNEY GENERAL
CAPITAL LITIGATION SECTION
400 WEST CONGREDD, BLDG. S-315
TUCSON, ARIZONA 85701-1367
TELEPHONE: (520) 628-6520
lacey.gard@azag.gov
(STATE BAR NUMBER 22714)

ATTORNEYS FOR RESPONDENT

# ARIZONA SUPERIOR COURT
# COUNTY OF MARICOPA

STATE OF ARIZONA,

                Respondent,

        -VS-

WENDI ELIZABETH ANDRIANO,

                Petitioner.

CR2000–096032–A

**STATE'S CLOSING MEMORANDUM**

The Hon. Brian K. Ishikawa

**[DEATH PENALTY CASE]**

The State of Arizona, by and through undersigned counsel, submits the following post-hearing brief.  For the reasons stated in the following memorandum of points and authorities, Petitioner Wendi Andriano has not met her burden of showing ineffective assistance of counsel.  This Court should deny relief.

RESPECTFULLY SUBMITTED this 31st day of July, 2014.

Thomas C. Horne
Attorney General

Jeffrey A. Zick
Chief Counsel

/s/ Gregory Hazard
Assistant Attorney General
Attorneys for Respondent

P-App. 000422

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Arizona Supreme Court summarized the factual history as follows:

Wendi Andriano, her terminally ill husband, Joe, and their two small children attended a barbeque on October 7, 2000. They returned to their apartment around midnight and put the children to bed.

At about 2:15 a.m. on October 8, Andriano called Chris, a coworker who also lived at the apartment complex, and asked her to watch the children while Andriano took Joe to the doctor. When Chris arrived, Andriano met her outside the apartment. She told Chris, "I have a problem. Don't ask any questions. My husband's in on the floor dying and I haven't called 911 yet." When Andriano cautioned, "He doesn't know I haven't called 911," Chris urged her to make the call.

Upon entering the apartment, Chris found Joe lying on the living room floor in the fetal position. He had vomited, appeared weak, and was having difficulty breathing. While Andriano was in another room calling 911, Joe told Chris that he needed help and had "for a long time." He asked why it was taking forty-five minutes for the paramedics to arrive.

Andriano returned to the room and told Chris she needed to get Joe to the car so she could drive him to the hospital because the paramedics were responding to another call. Joe said he could not get up, so Andriano tried to lift him. When she could not, she became irritated and yelled at Joe, using profanities. Hearing sirens approaching, Chris went out to direct the paramedics to the apartment as Joe began to vomit again.

As the paramedics were unloading their equipment, Andriano came out of the apartment screaming at them to go away. She then slammed the door. Chris and four paramedics knocked on the apartment door, but no one answered. After five to ten minutes of knocking, the Phoenix Fire Department alarm room called the Andrianos' home telephone in an attempt to get Andriano to open the door. The alarm room notified the

3

paramedics that contact had been made with someone in the apartment who would come out to speak with them. Rather than coming through the front door, which opened to the living room, Andriano went out through her back door, climbed over the back patio wall, and walked around the apartment building to the front door, where Chris and the paramedics were standing.

Andriano had changed her shirt and her hair was wet. She told the paramedics that Joe was dying of cancer and had a do-not-resuscitate order. She explained that "this was not the way that he wanted to go." The paramedics and Chris left without going into the apartment.

Andriano called 911 again at 3:39 a.m. The same paramedics responded and saw Andriano, wearing a bloody shirt, standing outside the apartment talking to a police officer.

When the paramedics entered the apartment, they found Joe lying on the floor in a pool of blood. He had a deep stab wound to the left side of his neck and lacerations on his head that exposed some brain matter. A police detective observed at 3:52 a.m. that the blood surrounding Joe's head was already starting to dry. A broken bar stool covered in blood was found near Joe's body, as were pieces of a lamp,[1] a kitchen knife with blood on the sharp edge, a bloody pillow, and a belt.

---

[1] The remainder of this lamp was never found, but its shade remained in the apartment. (R.T. 9/14/04, at 16–17, 28–32.) It is a reasonable inference that Andriano (or someone assisting her, suggested at trial to be Alejo Ochoa) removed it from the apartment after she murdered Joe but before she reported her crime. As the supreme court found, the evidence suggested that "Andriano staged the scene of the murder to make it appear as though she acted in self-defense." *Andriano*, 215 Ariz. at 512, ¶ 76 n.12, 161 P.3d at 555. The blood inside the apartment was already beginning to dry when police arrived, thus supporting the inference that Andriano killed Joe long before she called 9-1-1. Andriano also changed clothes and showered after Chris left the apartment, and exited the residence through the back patio door to speak to paramedics. These facts support the

(continued ...)

A search of the Andrianos' storage unit revealed an open cardboard shipping box containing a 500-gram bottle of sodium azide,[2] two Tupperware containers containing sodium azide, nine Q-tips, a plastic knife and fork, and two pairs of latex gloves. Andriano's fingerprints were on the plastic knife and the vacuum-packed bag in which the cardboard box was shipped. During a search of the Andrianos' apartment, the police found gelatin capsules filled with sodium azide in a bottle labeled for an herbal supplement. Trace amounts of sodium azide were also discovered in the contents of a pot and two soup bowls in the kitchen. In all, 20.8 grams of sodium azide could not be accounted for.

The medical examiner determined that Joe sustained brain hemorrhaging caused by no fewer than twenty-three blows to the back of his head, eight to ten of which independently could have rendered Joe  unconscious.  Defensive wounds on Joe's hands and wrists indicated, however, that he was conscious for at least part of the attack. Joe also sustained a 3 and 3/4-inch-long by 2-inch-wide stab wound to the left side of his neck that extended to his spine and severed his carotid artery. The medical examiner opined that the blows to the head were sustained before the stab wound to the neck and that Joe was still alive, although likely unconscious, when he was stabbed. Trace amounts of sodium azide were found in Joe's blood and gastric contents. The cause of death was attributed to blunt force trauma and the stab wound.[3]

_____

( ... continued)

inference that Andriano attacked and killed Joe as the paramedics waited outside. *Id.* at 500–02, ¶¶ 2–14, 161 P.3d at 543–45.

[2] Andriano purchased this poison over the internet from a business, using a fictitious name and shipping address and a forged business license. (R.T. 9/8/04,  at 65–68; R.T. 9/21/04, at 29–115; R.T. 9/22/04, at 22–146; R.T. 9/29/04 at 3–49.)

[3] A pillow found near Joe's body bore a blood pattern consistent with blood being exhaled. (R.T. 9/14/04, at 21–24.) This pattern likely resulted from Andriano placing the pillow over Joe's face.

Based on the blood spatter and other evidence, a Phoenix police detective opined that Joe was lying down while he was being struck and did not get up during the attack. He further opined, based on the absence of arterial spurting on the belt and the knife, that both items were placed beside Joe's body after he died. Blood spatter on the bar stool, on the other hand, suggested that the stool was present when the arterial spurting began.

After being taken into custody, Andriano called one of her coworkers and asked her to hide certain items that were in Andriano's business office. Andriano's adoptive father told a police detective on the day of the murder, "I remember [Andriano] telling me that she stabbed [Joe]."

*State v. Andriano*, 215 Ariz. 497, 500–02, ¶¶ 2–14, 161 P.3d 540, 543 – 45 (2007).

Based on the foregoing facts, the jurors found Andriano guilty of first-degree premeditated murder. *Id.* at 502, ¶ 14, 161 P.3d at 545.

At the penalty phase, Andriano's trial counsel proffered evidence of several mitigating circumstances, including Andriano's missionary work and religious convictions; her purported status as a domestic violence and abuse victim; the stress of Joe's terminal cancer, initial misdiagnosis, and the family's financial problems; purportedly being a good mother; good behavior while she was in custody pending trial; and her potential for rehabilitation. (R.T. 12/8/04; R.T. 12/9/04; R.T. 12/13/04; R.T. 12/14/04.) To establish this mitigation, trial counsel relied partially on the guilt-phase evidence, but also called several of Andriano's friends and recalled Donna and Alejo Ochoa to offer additional information about her character and upbringing, and describe how her execution would affect them.

(R.T. 12/9/04; R.T. 12/13/04.) They also offered evidence characterizing Andriano as an excellent mother, who was devoted to her children. (*Id.*)

Andriano's trial counsel also presented testimony from several people who knew Andriano as a child and young adult, and described her as passive, demure, friendly, and nonviolent. (R.T. 12/9/04, at 7–45; R.T. 12/13/04.)  Trial counsel further recalled Dr. Sharon Murphy, who offered additional testimony on domestic violence, and testified that Andriano may have been sexually abused as a child and that a man exposed himself to her as a child.  Dr. Murphy opined that Andriano  may have been dissociating during her police interview. (R.T. 12/13/04, at 47–83.)

Andriano also presented testimony from three individuals who treated Andriano while she was in the jail's psychiatric unit:  a mental health counselor, Laura King; a psychologist, Dr. Gerald Perry; and a psychiatric nurse, Joyce Van Every. (R.T. 12/8/04.) All three witnesses characterized Andriano as being helpful and generous to others. (*Id.* at 73–74, 85.) They further characterized Andriano as naive and credulous, and claimed that she was valuable to the psychiatric unit because  she  helped troubled inmates and brought problems to the attention of the psychiatric staff. (*Id.* at 81–83, 142–43.) Dr. Perry and King testified that Andriano was never diagnosed with a serious mental illness in jail, and that she was treated only for depression and anxiety. (*Id.* at 71–72, 92, 134, 111, 121–22.)

King opined that these circumstances stemmed from the trauma of killing Joe. (*Id.* at 111.)  Dr. Perry opined that they resulted from the stress inherent in the jail environment.  (*Id*. at 122.) Andriano was treated with Zoloft (an antidepressant), Ativan (an antianxiety medication) and Seroquel (an antipsychotic also used as a sleep aid).  (*Id.* at 139–40.)

In rebuttal, the State called Joe's sister, Jana Clayton, who described several instances in which Andriano had placed the burden of caring for her children on others; described her use of a paddle to discipline her son; and recalled Andriano's sadness when she became pregnant with her daughter, because she did not want to gain weight. (R.T. 12/13/04, at 119–32.)  Timothy Lee, Andriano's boss when she worked at the Courtyard Apartments, testified about Andriano's refusal to leave work to attend to her seriously injured son, which directly contradicted her trial testimony that she had immediately rushed to the hospital to see him. (R.T. 12/14/04, at 25-27.)

The State also called Dr. Michael Brad Bayless in rebuttal, who opined  that Andriano was manipulative, and that her suicide attempt while in the custody of the jail, helpful behavior in prison, frequent tears, and general portrayal of herself as a victim were all goal-directed actions. (R.T. 12/15/04, at 12–27.)  In addition, two detention officers testified about Andriano's reputation as a "control freak" in prison who upset other inmates; their belief that Andriano was in charge of the

other inmates; Andriano's discipline for possessing contraband; occasions on which Van Every, King, and Dr. Perry were caught giving Andriano preferential treatment or violating policy to accommodate her; and inappropriate contact between Andriano and her transsexual cellmate. (R.T. 12/14/04, at 48–111.)

After finding the existence of the  especially cruel aggravating factor, and following completion of the penalty phase, the jury found no mitigation sufficiently substantial to warrant leniency and sentenced Andriano to death.  *See Andriano*, 215 Ariz. at 500, ¶ 1, 161 P.3d at 543.

On direct appeal, the Arizona Supreme Court affirmed Andriano's conviction and independently reviewed her death sentence. The court affirmed Andriano's death sentence, finding the "quality and strength of Andriano's mitigation evidence … not sufficiently substantial to call for leniency in light of the especially cruel manner in which Andriano murdered her husband."  *Id.* at 510–13, ¶¶ 63–78, 161 P.3d at 553–56. Andriano petitioned the United States Supreme Court for a writ of certiorari; the Court denied certiorari on October 11, 2007.  *Andriano v. Arizona*, 552 U.S. 923 (2007) (mem.)

Andriano thereafter filed a petition for post-conviction relief ("PCR"), raising several claims.  This Court granted a limited evidentiary hearing on two claims: (1) whether trial counsel was ineffective in the penalty phase "by failing to investigate and present expert testimony regarding [Andriano's] mental illness and

by failing to investigate and present evidence regarding her harrowing childhood";

and (2) whether David DeLozier "had an actual conflict of interest that affected his

representation of her." (M.E. 10/30/12 granting evidentiary hearing.) In February

2014, this Court heard eight days of testimony on these claims.

## II. APPLICABLE LAW

To obtain relief under *Strickland v. Washington*, 466 U.S. 668, 686 (1984),

Andriano must show that "counsel's conduct so undermined the proper functioning

of the adversarial process that the trial cannot be relied on as having produced a

just result."  Andriano must show that (1) counsel's performance was deficient

under prevailing professional standards and (2) she suffered prejudice as a result.

*Strickland*, 466 U.S. at 687–88. This Court "is not required to address both

components of the *Strickland* test in deciding an ineffective assistance of counsel

claim 'if the defendant makes an insufficient showing on one.'"  *LaGrand v.

Stewart*, 133 F.3d 1253, 1270 (9th Cir.1998) (quoting *Strickland*, 466 U.S. at 697).

"'Surmounting *Strickland*'s high bar is never an easy task.'" *Harrington v. Richter*,

131 S.Ct. 770, 788 (2001) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371, 130

S.Ct. 1473, 1485 (2010)).

To establish deficient performance, Andriano must show "that counsel's

representation fell below an objective standard of reasonableness." *Strickland*, 466

U.S. at 699; *see also State v. Santanna*, 153 Ariz. 147, 149, 735 P.2d 757, 759

(1987). Her allegations and supporting evidence must withstand this Court's "highly deferential" scrutiny of counsel's performance, and overcome its "strong presumption" that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 689–90; *see also State v. Gerlaugh*, 144 Ariz. 449, 454, 698 P.2d 694, 700 (1985). Under this deferential standard, Andriano bears the heavy burden of showing that counsel's assistance was "neither reasonable nor the result of sound trial strategy," *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001), and actions by counsel that "'might be considered sound trial strategy'" do not constitute ineffective assistance. *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").

Additionally, this Court should "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Campbell v. Wood*, 18 F.3d 662, 673 (9th Cir. 1994)(en banc). Rather, as *Strickland* holds, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

perspective at the time." *Id.* at 689.   The test for deficient performance "has nothing to do with what the best lawyers would have done.   Nor is the test even what most good lawyers would have done."   *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998), *rev'd on other grounds*, 525 U.S. 141 (1998)  (internal quotations  omitted).  Instead, this Court examines "only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Id.*

Even if Andriano establishes that counsel performed deficiently, this Court should not grant relief unless she also proves prejudice.  *Strickland*, 466 U.S. at 691–92 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").  The prejudice requirement recognizes that a defendant is entitled to "*effective* (not mistake-free) representation." *United States v. Gonzales-Lopez*, 548 U.S. 140, 147 (2006) (emphasis in original).   This Court should not presume prejudice, *see Jackson v. Calderon*, 211 F.3d 1148, 1155 (9th Cir.  2000), but should require Andriano to affirmatively prove actual prejudice. *See Cooper v. Calderon*, 255 F.3d 1104, 1109 (9th Cir. 2001) ("[A petitioner] must 'affirmatively prove prejudice.' … This requires showing more than the possibility that he was prejudiced by counsel's errors; he must demonstrate that the errors *actually* prejudiced him.") (quoting *Strickland*, 466 U.S. at 693) (emphasis in

original).

To carry this burden, Andriano must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (prejudice prong concerned with whether "counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair … [u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right"). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

If a post-conviction claim proceeds to an evidentiary hearing, the defendant/petitioner bears the burden of proving the claim by a preponderance of the evidence. Ariz. R. Crim. Proc. 32.8(c). The United States Supreme Court has held that "*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." *Wong v. Belmontes*, 558 U.S. 15, 26-28 (2009). Andriano has not met her burden to prove that her trial counsel was ineffective.

…

…

…

## III. ARGUMENT

### A. Claim 1: Alleged failure to investigate and present mitigation evidence regarding Andriano's mental health and childhood.

Andriano contends that her trial counsel was ineffective at the penalty phase for failing to investigate and present expert testimony regarding her purported mental illnesses, and evidence of her "harrowing" childhood. At the evidentiary hearing, Andriano called trial counsel Patterson and DeLozier, mitigation specialists Scott MacLeod and Keith Rohman, legal experts Larry Hammond and Gary Lowenthal, psychologist Dr. James Hopper, psychiatrist Dr. George Woods, neuropsychologist Dr. Joette James, and several of Andriano's family members or friends: Kyre Lorts, Donna Ochoa, Jeri Cunningham, Jasper Neace, and Cindy Schaider. In rebuttal, the State presented neuropsychologist Dr. Kiran Amin and psychologist Dr. Steven Pitt. Andriano's claims fail because she has shown neither deficient performance nor prejudice.

#### 1. Andriano has not proven deficient performance of trial counsel for allegedly failing to investigate and present expert testimony regarding her mental health.

Andriano asserts that counsel made no meaningful investigation into her mental health. She argues that information provided by Dr. Potts's competency evaluation, and correspondence written by Andriano's personal counselor Kandy Rohde, were "red flags" for trial counsel to conduct a mental health investigation. But contrary to Andriano's argument, her trial counsel thoroughly investigated

Andriano's mental health based on Dr. Potts' and Rohde's recommendations. More than two years before trial, Patterson retained Dr. Richard Rosengard, a psychiatrist, to evaluate Andriano and complete a report. (Exh. 6.003.) Contrary to Andriano's contention, this report offers no compelling mitigation, and, read in its entirety, did not trigger an obligation of trial counsel to further investigate Andriano's mental health. Rather, the report is damaging and would have undermined counsel's trial and mitigation strategy of portraying Andriano as a good mother and a timid, submissive woman who endured years of domestic violence from her husband. (*Id.*)

Andriano further argues that her counsel was ineffective because the "defense team inexplicably decline to consult further with Dr. Rosengard, did not arrange a second visit between him and Wendi, and did not ask any other experts to examine Wendi's mental health." However, in his report Dr. Rosengard did not recommend consulting with another expert. (*Id.*) Andriano has produced no evidence that Dr. Rosengard requested another visit with Andriano. But the law does not impose a duty on trial counsel to retain additional mental health experts in the hope they could offer a more favorable diagnosis for mitigation purposes. *See, e.g., Turner v. Calderon*, 281 F.3d 851, 875–76 (9th Cir. 1998) ("The choice of what type of expert to use is one of trial strategy and deserves a heavy measure of deference. [Counsel's] reliance on Dr.  Hamm, a properly selected   expert,

was within the wide range of professionally competent assistance.")
(quotations omitted); *see also Worthington v. Roper*, 631 F.3d 487, 501–02 (8th
Cir. 2011) ("Where counsel has obtained the assistance of a qualified expert on the
issue of the defendant's sanity and nothing has happened that should have alerted
counsel to any reason why the expert's advice was inadequate, counsel has  no
obligation to shop for a better opinion."). When their mental-health
investigation failed to yield favorable results, there was no reason for counsel to
inquire further into that topic and their focus on other areas of mitigation—
including presenting extensive expert testimony that Andriano was a domestic
violence victim—was objectively reasonable. *See Strickland*, 466 U.S. at 688.

Moreover, at the evidentiary hearing, Patterson explained why he did not
pursue a mental health investigation following Dr. Rosengard's report:

> Based upon Dr. Rosengard's report, I didn't see [mental
> health mitigation] to be an issue in her case.  The facts and
> circumstances of her conduct and the defense that we had chosen
> were not wholly consistent with mental disease, defect or illness.
> None of the persons involved in the case brought to my attention
> any need for further mental health inquiry.
>
> My experiences person-to-person with Ms. Andriano didn't
> lead me to believe that there was an issue – mental health issue.
> None of her close relatives or family suggested there was a
> mental health issue.  Her history, her performance in high school
> suggested that if she had mental health issues, she had certainly
> adapted to them.

(R.T. 2/7/14, at 74.)

In light of the foregoing, Andriano has not shown that counsel's performance fell below an objective standard of reasonableness in choosing not to pursue any further investigation into Andriano's mental health. She has therefore failed to show deficient performance under *Strickland*.

### 2. Andriano has not proven her trial counsel performed deficiently in allegedly failing to investigate and present mitigating evidence regarding her childhood.

Andriano contends that counsel was also ineffective for failing to interview extended family members and acquaintances and discover evidence of her "harrowing" childhood. But no one, including Andriano, disclosed an allegation of sexual abuse by Alejo Ochoa to any member of Andriano's trial defense team. In addition, Andriano never revealed to her trial counsel that she suffered abuse from anyone other than her husband – and that information was thoroughly investigated and presented at her trial. "We have repeatedly held that "[a]n attorney does not render ineffective assistance by failing to discover and develop childhood abuse that his client does not mention to him (internal quotations omitted)." *Puiatti*, 732 F.3d at 1281 (citing *DeYoung v. Schofield*, 609 F.3d 1260, 1287-88 (11th Cir. 2010) (holding that counsel's investigation was reasonable in light of the fact that there was "no evidence that DeYoung mentioned to his trial or appellate counsel or to any mental health experts... that there was significant internal strife or dysfunction in his family"); *Newland v. Hall*, 527 F.3d 1162, 1202 (11th Cir. 2008)

P-App. 000437

(noting that "[b]ecause information about childhood abuse supplied by a defendant is extremely important in determining reasonable performance, '[w]hen a petitioner ... does not mention a history of physical abuse, a lawyer is not ineffective for failing to discover or to offer evidence of abuse as mitigation'" (alterations in original) (additional internal quotation marks omitted)).

In addition, every mental health expert that evaluated Andriano never discovered any evidence of sexual abuse committed upon Wendi Ochoa (aside from the allegation regarding her biological father, and the evidence related to the domestic violence investigation involving Andriano's husband – all of which was presented at her trial).  Thus, even experts on mental health and abuse failed to discover the abuse Andriano alleges was available to be discovered by trial counsel, if they had only investigated it.  "It strains credulity to think that not only was trial counsel ineffective as an attorney in investigating Puiatti's background in 1984, but so too were [mental health experts] Drs. Meadow[s] and DelBeato incompetent and unable to evoke pivotal information regarding Puiatti's allegedly abusive childhood." *Puiatti*, 732 F.3d at 1285 (quoting the district court and affirming its finding of no ineffective assistance of counsel).

Andriano further argues that her trial counsel failed to conduct "any meaningful social history investigation," and repeatedly asserts that her trial counsel did not meet the standards that the ABA Guidelines "require."  Larry

Hammond and Keith Rohman repeatedly echoed this sentiment in their testimony at the evidentiary hearing. However, the Arizona Supreme Court and the United States Supreme Court have rejected the view that the Guidelines impose mandatory obligations on counsel. *Bobby v. Van Hook*, 558 U.S. 4, 7–9 (2009); *id.* at 13–14 (Alito, J., concurring) ("The views of the [ABA]'s members, not to mention the views of the advisory committee that formulated the 2003 Guidelines, do not necessarily reflect the views of the American bar as a whole.  It is the responsibility of the courts to determine the nature of the work that a defense attorney must do in a capital case in order to meet the obligations imposed by the Constitution, and I see no reason why the ABA Guidelines should be given a privileged position in making that determination."); *Rompilla v. Beard*, 545 U.S. 374, 400 (2005) (Kennedy, J., dissenting) ("[W]hile we have referred to the ABA Standards for Criminal Justice as a useful point of reference, we have been careful to say these standards are only guides and do not establish the constitutional baseline for effective assistance of counsel.") (quotations omitted); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (noting that court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms") (quotations omitted); *Strickland*, 466 U.S. at 688–89 ("Prevailing norms of practice as reflected in American Bar Association

standards and the like are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."); *State v. Kiles*, 222 Ariz. 25, 35, ¶ 45 n.13, 213 P.3d 174, 184 (2009) ("Although this Court has subscribed to the ABA Capital Standards under Arizona Rule of Criminal Procedure 6.8(b)(1)(iii), the comment to the rule itself makes clear '[a] deviation from the guidelines . . . is not per se ineffective assistance of counsel. The standard for evaluating counsel's performance continues to be that set forth in *Strickland*  . . . .' Ariz. R. Crim. P. 6.8, 2006 cmt."); *State v. Nash*, 143 Ariz. 392, 397–98, 694 P.2d 222, 227–28 (1985) ("Obviously, [the ABA Standards] are merely guides and do not represent rules counsel must follow.").

At the evidentiary hearing, Patterson testified about the standard of care at the time he represented Andriano. (R.T. 2/7/14, at 118-123.)   In summary, Patterson testified that the standard of care at the time of Andriano's trial did not require an attorney to investigate whether a client had suffered child abuse absent an indication that abuse occurred.  Both Patterson and DeLozier denied that anyone they spoke to mentioned anything that would suggest Andriano suffered abuse – aside from the conjecture regarding her biological father or grandfather which was presented to the jury at Andriano's trial.  (R.T. 2/10/14, at 149-150; R.T. 2/7/14, at

148-49.)  And the alleged "red flags" of child abuse Andriano contends that trial counsel ignored are either not actually suggestive of child abuse, or are not suggestive of child abuse absent the immaculate lens of hindsight.  Rather, as Patterson explained, the alleged "red flags" were reasonably explained by Andriano's circumstances of being in jail, charged with a capital crime, unable to be with her children, and the trauma associated with murdering her husband.  (R.T. 2/7/14, at 79-81.)  *See Puiatti v. Secretary, Florida Dept. of Corrections*, 732 F.3d 1255, 1281 (11th Cir. 2013) (Affirming that trial counsel for Defendant was not ineffective and holding "Indeed, trial counsel reasonably chose her mitigation strategy based primarily on the information that she received from Puiatti, his family members, and two mental health experts. Puiatti told counsel he came from a good family and he never wanted for anything. Puiatti told the sentencing judge he came from a "good and crime-free" family. In all of the interviews defense counsel conducted of Puiatti and his family members, no one ever disclosed the pattern of systemic child abuse endured by Puiatti, which came to light only years after Puiatti was sentenced.").

In light of the foregoing evidence, Andriano has not met her burden that trial counsel's performance was deficient for failing to investigate or present mitigation evidence regarding her childhood.

### 3. Andriano did not suffer prejudice from any deficient performance.

Even if Andriano has proved deficient performance, she has not proved prejudice and is not entitled to relief under *Strickland*. In fact, her claim fails for largely the same reasons the petitioner could not show prejudice in *Wong v. Belmontes*, 558 U.S. 15, 22 (2009):

> Some of the evidence was merely cumulative of the humanizing evidence [counsel] actually presented; adding it to what was already there would have made little difference. Other evidence proposed … would have put into play aspects of [Andriano's] character that would have triggered admission of … powerful … evidence in rebuttal. This evidence would have made a difference, but in the wrong direction for [Andriano]. In either event, [Andriano] cannot establish *Strickland* prejudice.

Specifically, the evidence Andriano presented at the PCR hearing regarding her upbringing was, in large part, cumulative to that she presented at trial. Further, Andriano failed to prove by a preponderance of the evidence that she suffers from mental disorders but, even if she does, offering them as mitigation would have led to the admission of damaging rebuttal evidence that counsel had successfully asked this Court to exclude. Further, none of the mitigation is significantly weighty given the absence of a persuasive explanatory relationship between it and Joe's murder. After balancing the aggravating and mitigating factors, the horrific facts and circumstances of the crime, and the State's rebuttal evidence, there is no reasonable probability that the jurors would have imposed a life sentence.

### a. Preliminary matters.

In her closing memorandum, Andriano misstates the *Strickland* prejudice standard and reveals her fundamental misunderstanding of the role of mitigation in Arizona's capital sentencing scheme.  (Closing memorandum, at 7–8.)  She also inappropriately invites this Court to ignore certain material facts in resolving the prejudice inquiry based on no more than speculation about the jurors' deliberative process.  (*Id.* at 8–9.)  This Court should apply *Strickland*'s well-established prejudice test and, in so doing, should consider *all* trial and post-conviction evidence to determine whether Andriano has shown a reasonable probability that the omitted mitigation would have resulted in the jurors imposing a life sentence.

### i. Andriano misstates and misapplies *Strickland*'s prejudice standard.

According to Andriano, "[i]n cases alleging prejudice from [counsel's] failure to investigate, the measure of prejudice is 'the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented.'"  (Closing memorandum at 4 (quoting *Hovey v. Ayers*, 458 F.3d 892, 929 (9th Cir. 2006).)  Andriano presents her prejudice argument in a manner consistent with this perceived standard, highlighting the *quantity* of additional evidence that counsel could have presented, with little focus on the likely *effect* of that evidence on the sentencing equation.  (*Id.* at 9–51.)

But when assessing a claim that counsel failed to investigate and present mitigation in a death-penalty case, this Court should not consider the omitted mitigation in a vacuum, as Andriano encourages. Rather, under *Strickland*, the "'question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that *the balance of aggravating and mitigating circumstances* did not warrant death.'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1408 (2011) (quoting *Strickland*, 468 U.S. at 695). This analysis requires this Court to "'reweigh the evidence in aggravation against the totality of available mitigating evidence.'" *Pinholster*, 131 S. Ct. at 1408 (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).[4]

Further, where, as here, counsel's selection of a particular mitigation theme would have opened the door to rebuttal evidence, this Court should, in assessing prejudice, "consider *all* the relevant evidence that the jury would have had before it if [counsel] had pursued [a] different path—not just the mitigation evidence [counsel] could have presented, but also the [rebuttal] evidence that almost

_____

[4] Even in *Hovey*, upon which Andriano relies, the United States Court of Appeals for the Ninth Circuit did not simply compare the quantity of new evidence to old evidence and stop there. Rather, the court also found that counsel's failures led to the "devastating cross-examination" of a critical defense witness and that the aggravating factors were "strong, but … not so overwhelming as to preclude the possibility of a life sentence." 458 F.3d at 930. The court ultimately granted habeas relief because it found "a reasonable probability that [the] jury would have concluded that the *balance of aggravating and mitigating circumstances did not warrant death*." *Id.* at 931 (emphasis added).

certainly would have come in with it." *Belmontes*, 558 U.S. at 20. "Thus, to establish prejudice, [a petitioner] must show a reasonable probability that the jury would have rejected a capital sentence after it weighed the entire body of mitigating evidence (including the additional testimony [counsel] could have presented) against the entire body of aggravating" and rebuttal evidence. *Id.*; *see also Pinholster*, 131 S. Ct. at 1410.

In her closing memorandum, Andriano fails to address the omitted mitigation's *effect* on the sentencing equation in light of the aggravation, facts and circumstances of the crime, and potential rebuttal evidence—in fact, she all but ignores the latter three categories of evidence. (Closing memorandum, at 9–51.) Instead, she pursues a "'more-evidence-is-better' approach," arguing simply that counsel should have presented an additional *quantity* of mitigating evidence, without acknowledging or accounting for the risks inherent in that strategy. (*Id.*) *See Belmontes*, 558 U.S. at 25 (petitioner's argument that counsel should have taken a "'more-evidence-is-better' approach" ignored that there "was a lot to lose" from that tactic because it would have invited damaging rebuttal evidence about petitioner's prior murder). Absent some showing that the omitted mitigation would have changed the sentencing calculus, Andriano cannot carry her burden under *Strickland*.

P-App. 000445

Andriano also contends that *Strickland*'s reasonable-probability standard is "'less than the preponderance more-likely-than-not standard.'" (Closing memorandum at 3–4 (quoting *Summerlin v. Schriro*, 427 F.3d 623, 643 (9th Cir. 2005)). However, "the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011) (quoting *Strickland*, 466 U.S. at 693). Further, Arizona Rule of Criminal Procedure 32.8(c) requires Andriano to prove her factual allegations by a preponderance of the evidence. And at a sentencing hearing, she would be required to prove her proffered mitigating circumstances by a preponderance of the evidence. A.R.S. § 13–751(C).

Overall, *Strickland* "places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different" absent counsel's purported errors." *Belmontes*, 558 U.S. at 27 (quoting *Strickland*, 466 U.S. at 694). And "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. 792. In general, "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Id.* at 787 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). This Court should hold Andriano to her heavy burden and should, for the reasons set forth below, conclude that she has not carried it.

### ii. Andriano misunderstands the effect on the sentencing equation between a defendant's mitigation and her offense.

Citing a number of cases in which petitioners have obtained federal habeas relief based on counsel's ineffectiveness, and one case in which the Arizona Supreme Court reduced a sentence to life imprisonment on independent review, Andriano contends that her purportedly "harrowing childhood and psychiatric disorders and defects are relevant mitigation, with or without any nexus to the offense." (Closing memorandum at 4–6.)

The State does not dispute this principle:  a sentencer—as well as this Court in determining the effect of any hypothetical deficient performance on Andriano's sentence—must *consider* a capital defendant's relevant mitigating evidence, regardless whether it is causally connected to the offense of conviction.  *See, e.g., Tennard v. Dretke*, 542 U.S. 274, 284–86 (2004); *Eddings v. Oklahoma*, 455 U.S. 104, 113–14 (1982) *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  And evidence of a defendant's troubled childhood or mental disorders would (if proven) be relevant mitigation.  *See, e.g., Eddings*, 455 U.S. at 110 ("'[T]he 'Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'") (quoting *Lockett*, 438 U.S. at 604) (emphasis deleted); *State v.*

P-App. 000447

*Kayer*, 194 Ariz. 423, 440, ¶ 62, 984 P.2d 31, 48 (1999) ("[M]itigating factors must relate to the 'defendant's character, propensities or record and any of the circumstances of the offense.'") (quoting A.R.S. § 13–751(G)).

But Andriano fails to acknowledge that merely because a sentencer must *consider* relevant mitigation does not mean it must give that mitigation any particular *weight*.  In fact, after *considering* a defendant's mitigation, a sentencer may—consistent with the constitution— conclude that it is unproven or entitled to little or no *weight* in mitigation.  *See Harris v. Alabama*, 513 U.S. 504, 512 (1995) ("[T]he Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer."); *Eddings*, 455 U.S. at 114–15 ("The sentencer, and the [appellate court] on review, may determine the weight to be given relevant mitigating evidence.  But they may not give it no weight *by excluding such evidence from their consideration*.") (emphasis added); *see generally Kansas v. Marsh*, 548 U.S. 163, 175 (2006) ("In aggregate, [this Court's] precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence. The thrust of our mitigation jurisprudence ends here.").

Consistent with these principles, the Arizona Supreme Court has recognized that the lack of a causal relationship between a defendant's mitigation and her

offense lessens the mitigation's weight.  *See, e.g., State v. Styers*, 227 Ariz. 186, 189, ¶ 12, 254 P.3d 1132, 1135 (2011) ("Although we do not require establishment of a nexus between the mitigating factors and the crime before we consider the mitigation evidence, we may consider the failure to show such a connection as we assess the quality and strength of the mitigation evidence, and may attribute less weight to the mitigating effect of a disorder if the defendant fails to establish a relationship between the disorder and the criminal conduct.") (quotations and citation omitted).  Thus, while Andriano is correct that the absence of a causal or explanatory relationship between the mitigation and the offense does not preclude *consideration* of the mitigation, it diminishes the *weight* to which that mitigation is entitled.[5]

### iii. This Court should not disregard relevant trial evidence based on speculation that the jurors may not have found it persuasive.

Andriano asserts that this Court "cannot assume the jury agreed with the State's position on facts not necessary to the verdict," and speculates about various scenarios the jurors could have believed in which she murdered Joe with premeditation by bludgeoning and stabbing him but did not engage in certain

---

[5] Along the same lines, Andriano contends that Dr. Stephen Pitt, who testified on the State's behalf, erroneously "looked only to the issue … whether [Andriano] was capable of appreciating the wrongfulness of her conduct.  (Closing memorandum, at 6–7.)

actions leading up to that crime, such as ordering sodium azide. (Closing memorandum, at 8–9.) Accordingly, she continues, "the State and Dr. Pitt were incorrect in assuming that the jury must have believed that [she] had ordered sodium azide as part of a plan to murder her dying husband weeks before his actual death." (*Id.* at 8.) She therefore suggests that this Court disregard that and other evidence not directly related to Joe's cause of death. (*Id.* at 8–9.) Perhaps not coincidentally, the evidence she attacks is that which? most convincingly rebuts her proffered mental-health evidence.

As a threshold matter, the Arizona Supreme Court considered arguments similar to those Andriano now advances in resolving whether she was entitled to jury instructions on the lesser-included offenses of second-degree murder and manslaughter. *Compare* Closing memorandum at 8–9 & n. 1 *with Andriano*, 215 Ariz. at 504–05, ¶¶ 32–36, 161 P.3d at 547–48. The court concluded that the evidence did not support the instructions. *Andriano*, 215 Ariz. at 504–05, ¶¶ 32–36, 161 P.3d at 547–48. The court also found, during its independent, *de novo* review of the death penalty, that Andriano had "poisoned her terminally ill husband, struck him in the back of the head twenty-three times, and slit his throat." *Id.* at 512, ¶ 70, 161 P.3d at 555. This finding is not surprising, given that the evidence established—beyond a reasonable doubt—that Andriano ordered sodium azide under a false name, administered it to Joe surreptitiously, bludgeoned and

P-App. 000450

stabbed him to death when the poison failed to kill him, and staged the murder scene to make it appear as though she had acted in self-defense. *See id.* at 500–02, 512, ¶¶ 2–15, 76 n. 12, 161 P.3d at 543–45, 556. That the jurors found both premeditation (*see* Response to PCR, Exh. A, at 244, 254) and the cruelty aggravating factor, *see id.* at 502, ¶ 15, 161 P.3d at 545, proven beyond a reasonable doubt underscores this point, and the decision of Andriano's experts to largely ignore conduct occurring prior to the night of Joe's death bears upon the credibility of their opinions.

Regardless, this Court should not disregard relevant evidence based on Andriano's speculation that jurors *might* not have found it compelling. In fact, doing so in the context of this ineffective-assistance-at-sentencing claim would be akin to considering residual-doubt evidence, which is inadmissible in the penalty phase. *See, e.g., State v. Moore*, 222 Ariz. 1, 22, ¶ 133, 213 P.3d 150, 171 (2009); *State v. Harrod*, 218 Ariz. 268, 279, ¶ 40, 183 P.3d 519, 530 (2008); *Andriano*, 215 Ariz. at 506–07, ¶¶ 44–46, 161 P.3d at 549–50.

Disregarding evidence of Andriano's pre-offense behavior would also be inconsistent with the well-established principle of appellate law that a reviewing court views the facts in the light most favorable to sustaining the jury's verdict and resolves all reasonable inferences and evidentiary conflicts against the defendant. *See, e.g., State v. Forde*, 233 Ariz. 543, 552 n.2, 315 P.3d 1200, 1209 (2014); *State*

*v. Lopez*, 174 Ariz. 131, 134, 847 P.2d. 1078, 1081 (1992).  This principle is even more appropriate on collateral review than direct appeal because Andriano's convictions have been affirmed and are presumed valid.  *See Dist. Atty's Office v. Osborne*, 557 U.S. 52, 68–69 (2009); *Canion v. Cole*, 210 Ariz. 598, 600, ¶ 13, 115 P.3d 1261, 1263 (2005).  This Court should therefore presume that the jurors resolved all reasonable inferences against Andriano, and should conduct its *Strickland* analysis from that perspective.  It should not disregard relevant evidence merely because a juror *could* have found it unpersuasive.

### b. Counsel presented evidence of Andriano's childhood difficulties, and the additional details developed at the PCR hearing would not have affected the sentencing equation.

Andriano contends that counsel should have presented evidence that her early childhood was marked by poverty, abuse, and neglect; that she was raised in a draconian religious environment an adolescent; and that her stepfather, Alejo Ochoa, sexually abused her. (Closing memorandum, at 9–29.)  But with the exception of the allegations against Alejo, counsel presented this information to the jurors, albeit in less detail, and they found it insufficiently substantial to warrant leniency.  Here, as in *Belmontes*, 558 U.S. at 23 "[t]he sentencing jury was 'well acquainted' with [Andriano's] background and humanizing features" and "[a]dditional evidence on these points would have offered an insignificant benefit, if any at all," especially where Andriano failed to draw a persuasive explanatory

relationship between her childhood and her offense.  Similarly, Andriano has failed to prove her allegation that Alejo sexually abused her and, even if he did, that fact carries minimal mitigating weight.

### i. With the exception of the sexual-abuse allegations against Alejo Ochoa, the jurors were aware of Andriano's childhood difficulties.

As previously stated, a defendant is not prejudiced by counsel's omission of cumulative evidence at sentencing.  *See Belmontes*, 558 U.S. at 23; *see also Cox v. Ayers*, 613 F.3d 883, 900 (9th Cir. 2009) (no prejudice from counsel's failure to present additional mitigating evidence where evidence was cumulative of penalty phase evidence); *Matylinsky v. Budge*, 577 F.3d 1083, 1096–97 (9th Cir. 2009) (where counsel presented humanizing evidence, petitioner could not show prejudice from failure to present additional, cumulative evidence); *Babbitt v. Calderon*, 151 F.3d 1170, 1176 (9th Cir. 1998) (finding no reasonable probability of a life sentence where evidence not presented would have been cumulative) (collecting cases).  Although one of counsel's mitigation themes was that Andriano was a good person from a good household, they nonetheless presented evidence that her upbringing was less than ideal, in part to further their theory that she was a victim of domestic violence.

During the guilt phase of Andriano's trial, Donna Ochoa described Andriano's early childhood, including how, when Andriano was a young child, her

family joined a traveling ministry, slept in a fifth wheel, and had insufficient money even to purchase shoes. (Response to PCR, Exh. KK (R.T. 10/4/04), at 15–17.) Donna also described the isolationist atmosphere at 91st Psalm/Harvest Family Church in Casa Grande, where the family attended church and Andriano attended school as an older child and young adult. (*Id.* at 21, 32–36.) And she exposed Andriano's uncomfortable home life as an adolescent, which was marked by Alejo's volatile temper and arguably verbally abusive behavior. (*Id.* at 36–38.)

Similarly, during her nine days of testimony, Andriano described her time living in the traveling ministry and under Harvest's strict rules, and Alejo's volatility. (Response to PCR, Exh. V (R.T. 10/25/04), at 9–42.) Andriano's adopted brother, Brandon, and her cousin, Barbara Mitchell, likewise testified about the restrictive environment at Harvest, describing how its leaders corporally punished schoolchildren and isolated the church's congregants from outside influences. (Response to PCR, Exh. SS (R.T. 10/21/04), at 55–58, 149–53.) And Dr. Sharon Murphy, Andriano's domestic-violence expert, testified that Andriano had been part of a traveling ministry, that another individual in the ministry had exposed himself to her when she was a very young child (a "traumatic experience," according to Dr. Murphy), that her biological father may have molested her, that Alejo was prone to violent verbal outbursts, and that Andriano endured a strict religious upbringing at Harvest. (Response to PCR, Exh. OO (R.T. 10/12/04), at

39–47.)

Dr. Murphy reminded the jurors in the penalty phase that Andriano may have been sexually abused and that a man had exposed himself to her.  (Response to PCR, Exh. ZZ (R.T. 12/9/04), at 59–65.)  She described how this early abuse, combined with her isolation at Harvest and other factors, constituted "building blocks to trauma" that affected Andriano's actions when she killed Joe.  (*Id.*)  And Donna Ochoa stated expressly, "I do not believe that [Andriano] had an idyllic or perfect childhood," and explained that Andriano's biological father was verbally and physically abusive; that he and other family members were child molesters; that the family lived in poverty with the traveling ministry; that she had sent Andriano to a day care facility that ultimately was closed due to abuse allegations[6]; and that that Andriano had been raised in such a strict, sheltered environment that "[s]he had no clue how to survive" in the outside world.  (Response to PCR, Exh. AAA (R.T. 12/13/04), at 22–27.)

At the PCR hearing, Andriano presented additional details on the themes above through various witnesses, but their testimony did not strengthen, or otherwise materially alter, the picture of her upbringing presented to the jurors.

---

[6] At the PCR hearing, Donna mentioned nothing about a day-care facility being closed due to abuse allegations.  Instead, she claimed that Andriano had nearly been expelled from day care after engaging in inappropriate, sexual-type behavior with other students.  (R.T. 2/4/14, at 115–16.)

Donna Ochoa—who has been chastised by the Pinal County Superior Court for engaging in dishonest and deceitful behavior (*see* R.T. 2/4/14, at 205; PCR Hrg. Exh. 104)—regurgitated her trial testimony, albeit in greater detail.  She claimed that Andriano's biological father, Skip Robertson, his brother and their father were child molesters who had access to Andriano and may have molested her as a very young child; however, she had no personal knowledge whether this occurred. (R.T. 2/4/14, at 99–105, 200–01.)  She described having left Andriano alone with a man named Rick Barnes who had a history of child molestation but, again, had no personal knowledge whether he molested Andriano.  (*Id.* at 116–18, 200–01.)  She recounted, as she did at trial, the family's transient and impoverished lifestyle in the traveling ministry.  (*Id.* at 128–39.)  She described, as she did at trial, joining the 91st Psalm Church, which later became Harvest Family Church, and recalled its strict rules and use of corporal punishment.  (*Id.* at 139–45.)   And she recounted, as she did at trial, Alejo's explosive temper.  (*Id.* at 150–51.)

Donna also provided several minute details about Andriano's birth, infancy, and toddler years.  She claimed to have been a detached, depressed, neglectful parent, engulfed in a dysfunctional relationship with Robertson and more concerned with her dog's welfare than her child's.  (*Id.* at 78–109.)  She stated that she placed Andriano in day care, or left her in the care of whoever was available, while she worked or socialized.  (*Id.* at 109–10.)  But she also admitted that her

mother and Robertson (until the couple separated) cared for Andriano when Donna was unable to do so.  (*Id.* at 199.)  And Donna did not, as Andriano suggests in her closing memorandum, entirely neglect Andriano:  for example, she nursed her as a baby, rocked her when she developed colic and, when Andriano was an older child, home-schooled her for a period.  (*Id.* at 209.)

Several other church members testified at the PCR hearing.  Jasper Neace— a four-time convicted felon currently serving a prison sentence for a felony conviction, described (as did Brandon Ochoa, Barbara Mitchell, and Donna Ochoa at trial) Harvest's strict, controlling environment and use of a paddle to discipline children.  (*Id.* at 7–17.)  Notably, however, he never saw Andriano paddled.  (*Id.*)  Kyre Lorts and Jeri Lynn Cunningham supplied additional details about the church environment before it changed from 91st Psalm to Harvest Family Church.  They recalled the pastors using a paddle to discipline students.  (R.T. 2/4/14, at 43–44, 217.)  Neither Lorts nor Cunningham attended the church after Tom King took over and renamed it Harvest, but Andriano remained.  (*Id.* at 45–46, 218.)  Cindy Schaider, a family friend, described King's promotion of physical discipline, endorsement of traditional gender roles, suspicion of persons outside of the church, and efforts to control the congregants' through processes.  (R.T. 2/4/04, at 163–70.)

The evidence above merely expands upon what the jurors already knew:

that Andriano experienced a transient and impoverished early childhood; that she was left in the care of various child abusers; that she, at a minimum, was victimized by a man exposing himself to her and may have been sexually molested; and that she was raised in a controlling religious environment.  And the evidence does not negate the positive aspects of Andriano's upbringing presented at trial and reaffirmed in the PCR proceeding, including her ability to spend time with friends, take music lessons, excel academically, and (in her adolescent years) live in a financially secure and socially stable family.  (R.T. 2/4/14, at 205–07.) None of the foregoing evidence persuaded the jurors to impose a life sentence. There is no reasonable probability that adding additional, cumulative details to the story already presented would have changed this result.  *See Belmontes*, 558 U.S. at 23; *Cox*, 613 F.3d at 900; *Matylinsky*, 577 F.3d at 1096–97; *Babbit*, 151 F.3d at 1176.

### ii. Andriano has not proved that Alejo Ochoa sexually abused her and, even if he did, that fact would have added little in to the sentencing calculus.

The allegation that Alejo sexually abused Andriano was the only new circumstance of her upbringing presented at the PCR hearing, and Andriano has failed to prove by a preponderance of the evidence that it is true.  *See* Ariz. R. Crimp. P. 32.8(c).  First, the allegation did not emerge until *after* Andriano was convicted and sentenced to death and the timing of it, standing alone, calls into

question its veracity.  Andriano's family, and her mother in particular, worked tirelessly before trial to ensure that she did not receive a death sentence.  To this end, Donna disclosed voluminous information to counsel about Andriano's upbringing—including potential sexual abuse by Robertson's family and Alejo's propensity to engage in verbal tirades—but never once reported any suspicion that Alejo sexually abused Andriano.  (PCR Hrg. Exh. 56; R.T. 2/7/14, at 128–26; R.T. 2/10/14, at 149–50; R.T. 2/14/14, at 193–95.)  Likewise, neither Alejo nor Brandon Ochoa reported any impropriety involving Alejo and Andriano.  (R.T. 2/10/14, at 149–50; R.T. 2/14/04, at 149–50.)

And despite her numerous visits with counselor H. Kandy Rohde and domestic-violence expert Dr. Sharon Murphy—during which she  disclosed other sensitive information, such as her potential early childhood molestation, the details of her sexual relationship with Joe, and Alejo's verbal outbursts—Andriano failed to disclose that Alejo sexually abused her.  (Response to PCR, Exh. OO (R.T. 10/12/04), at 40–41.)  She also never told counsel that Alejo had sexually abused her.  (R.T. 2/7/14, at 123–26; R.T. 2/10/14, at 149–50.)  Even more significant, Andriano testified under oath—unequivocally—that Alejo had *never touched her improperly*, save one occasion when he grabbed her shoulders and shook her. (Response to PCR, Exh. V (R.T. 10/25/04), at 39–42.)  These in-court statements are entitled to a strong presumption of verity.  *Cf. Blackledge v. Allison*, 431 U.S.

63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."). Donna likewise testified that Andriano had never claimed to have been touched inappropriately. (R.T. 12/9/04, at 124.)

The failure of Andriano, Donna, Alejo, and Brandon to disclose this information prior to trial is significant not only because it gives rise to the inference that the allegation is recently created, but also because, even if it is true, there is no reasonable probability counsel could have learned of it and presented it at trial. Despite multiple opportunities to do so, and despite their willingness to disclose equally sensitive information of a similar nature to the present allegations, none of the four individuals living in the Ochoa household divulged what had purportedly happened between Andriano and Alejo. Andriano cannot carry her burden under *Strickland* by speculating that they would have disclosed the information if asked different questions. *See generally Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (speculation is insufficient to establish *Strickland* prejudice); *cf. Duckett v. Mullin*, 306 F.3d 982, 998 (10th Cir. 2002) ("It would be unreasonable to deem trial counsel ineffective for failing to discover potential mitigating evidence when counsel conducted a reasonable investigation but was stymied by potential witnesses who were not forthcoming."); *Babbitt*, 151 F.3d at

1174 (no ineffectiveness where counsel's investigator spoke with petitioner's "family members and friends and others who might have had such information, but none of them indicated there was any history of mental illness in [the petitioner's] family"); *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997) ("In general, counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel.").

Second, only one witness,[7] Kyre Lorts, claims to have personal knowledge that Alejo sexually abused Andriano, and several factors cast doubt upon her testimony.[8]  Lorts claimed that Alejo sexually abused both her and Andriano

---

[7] The two best witnesses to what may or may not have occurred between Andriano and Alejo are, of course, Andriano and Alejo.  Andriano declined, at the last minute, to testify at the PCR hearing.  (R.T. 2/5/14, at 36–40.)  However, she told both Dr. Hopper and Dr. Pitt that Alejo did not sexually abuse her.  (PCR Hrg. Exh. 237, at 109–112, 173; R.T. 2/3/14 (Vol. II), at 42.)  Alejo invoked the Fifth Amendment privilege and refused to testify (R.T. 2/6/14, at 3–5, 67–69), but his declaration and a statement he made to the State's investigator were admitted into evidence:  Alejo did not address the allegations in his declaration, and he denied them to the State's investigator.  (PCR Hrg. Exhs. 24, 25, 227, 228.)  However, regardless what Alejo has said or not said during this proceeding, historical events prove that he will do or say anything he believes will help Andriano.  For example, the trial evidence established that he falsified photographic evidence to support Andriano's self-defense claim.  (PCR Response Exh. MM (R.T. 10/6/04), at 80–93.)  And Andriano told Dr. Hopper that Alejo had offered to lie and admit that he sexually abused her to ensure that she received a new sentencing proceeding.  (R.T. 2/3/14, at 117.)

[8] Notably, Lorts refused to be interviewed by the State's investigator prior to her testimony.  (R.T. 2/4/14, a 4–5.)  Afterward, Andriano's defense team collected
(continued ...)

41
P-App. 000461

during sleepovers during their pre-adolescent years.   (R.T. 2/4/14, at 38–61.) According to Lorts, she and Andriano played "dress-up" with Donna's "lacy or see-through" lingerie and watched pornographic movies with Alejo.  (*Id.*)  During these encounters, Alejo purportedly touched Andriano's and Lorts' genitals and breasts, and they touched his genitals.  (*Id.*)

But Donna testified at the PCR hearing that she did not possess any nightgowns of the type Lorts described and that, to her knowledge, there were no pornographic movies in her home.  (R.T. 2/4/14, at 197–98.)  And Lorts admitted that, despite claiming to be a teacher and acknowledging that she is a mandatory reporter of child abuse under Arizona law, she has never reported Alejo's alleged conduct to any law enforcement or child-welfare agency.  (*Id.* at 68–70.)  She also admitted that she failed to disclose Alejo's conduct to anyone (law enforcement or otherwise) until she was 19 years old—despite moving away from Casa Grande, and escaping Alejo's influence, several years earlier—and then told only family members.  (*Id.* at 67–70.)

Lorts further conceded that, for a long time, she believed that she had "made … up" or "dreamt" the memories.  (*Id.* at 67.)  Even more critically, Dr. Hopper explained that he did not interview Lorts before writing his report because she was

_____
( ... continued)
her from her home and took her to the hotel at which the team was staying, "where she just felt more safe and comfortable."  (*Id.* at 5.)

"mentally unstable." (R.T. 2/3/04 (Vol. I), at 32, R.T. 2/3/04 (Vol. II, at 131.)
And during her testimony, Lorts' demeanor changed visibly between direct and
cross-examination: while being questioned by Andriano's attorney, Lorts appeared
tearful and insecure, but while being questioned by the State's attorney, she
appeared defensive, defiant, and resilient.

No other witness claimed to have directly observed any type of sexual
contact between Alejo and Andriano; accordingly, if this Court finds Lorts
unreliable, as it should, Andriano's claim is based entirely on speculation and
innuendo and does not warrant relief. Donna Ochoa never saw any such activity.[9]
(R.T. 2/4/14, at 195–97.) Likewise, Andriano's friend, Jeri Lynn Cunningham,
who claimed that Alejo touched her breasts when he may or may not have been
sleeping,[10] never saw any such activity. (*Id.* at 240.) Donna and Cunningham
described a regular "touching-on" ritual that involved Andriano, and sometimes

---

[9] Nor did she ever report her suspicions to any law enforcement agency
despite being a healthcare worker and legally obligated to do so. Donna was well
aware of her obligation, as she testified that it was one of the reasons she reported
Joe's sister and her husband to Child Protective Services after Andriano's children
developed rashes Donna considered suspicious. (R.T. 2/4/14, at 204–05.)

[10] The breast-touching incidents occurred during sleepovers at the Ochoa
residence. (R.T. 2/4/14, at 223–30.) Alejo was audibly snoring when he allegedly
touched Cunningham's breasts. (*Id.* at 225, 241.)

P-App. 000463

Cunningham, massaging Alejo.[11]   (*Id.* at 155, 231–34.)   However, this ritual did not involve Andriano or Cunningham touching Alejo's genitals, or vice-versa.  (*Id.* at 195–97.)   And all participants were clothed.  (*Id.* at 155–56, 231–35.)   This conduct in no way establishes that Alejo sexually abused Andriano.

Nor does Alejo's alleged purchase of what Donna considered risqué lingerie for Andriano, or his purported conduct in showing her sexually-themed material in mainstream novelty stores such as Spencer's Gifts, establish any sort of sexual misconduct.  (*Id.* at 156–60.)   In fact, it is a reasonable inference from the evidence that Andriano desired risqué lingerie but knew that her mother would not purchase them for her—in fact, Donna confirmed at the PCR hearing that, had Andriano asked her to purchase such items, she would have declined and instead bought her conservative cotton underwear.  (*Id.* at 197.)   Andriano also told Dr. Hopper that she disliked wearing the conservative bras Donna purchased for her, and wanted to wear the same type as her friend Laura; she recalled a "big tug-of-war" between her parents over what clothing she was permitted to wear.  (R.T. 2/3/14 (Vol. II), at 112–13.)

---

[11] The trial evidence established that Donna and Andriano would massage Alejo's head in an effort to placate him after his angry outbursts, an account that differs markedly from that presented at the PCR hearing.  (PCR Response, Exh. OO (R.T 10/12/04), at 41–42.)

Likewise, Cindy Schaider[12] claimed that Alejo took what she considered inappropriate photographs of Andriano wearing lingerie as a teenager.  (R.T. 2/10/14, at 159.)  And Cunningham testified that Alejo once photographed her and Andriano in bathing suits as they showered in an open, public beach shower on a California vacation.  (R.T. 2/4/14, at 221–22.)  Although the practice may be unusual or unseemly, there is nothing *illegal* about photographing a teenager in lingerie, when her genitals are covered, and the act of doing so does not necessarily reveal an inappropriate sexual relationship.  And taking photographs of one's child and her friend on vacation at the beach clad in swimsuits is not particularly unusual, and is certainly not illegal or indicative of sexual impropriety.

Third, even if Alejo sexually abused Andriano, that fact would be cumulative to evidence presented at trial that Andriano may have been molested as a child.  As set forth above, Donna Ochoa and Dr. Murphy testified at length about their suspicions that Andriano's biological father may have molested her, and Dr. Murphy discussed the potential effects of early sexual abuse molestation on one's behavior.  Even assuming, for the sake of argument, that Alejo also molested Andriano, that fact would have carried minimal additional mitigating weight, as

---

[12] At the PCR hearing, Schaider branded Alejo a "drug burnout"-type, and called him "sneaky."  (R.T. 2/10/14, at 158.)  Years earlier, however, she wrote a glowing recommendation letter on behalf of the Ochoas when they sought custody of Andriano's two children after Joe's death and Andriano's arrest.  (*Id.* at 179–85.)

adding another offender to the mix would not have made Andriano's status as a molestation victim any more compelling.   This is particularly true where, as discussed at length below, over a decade passed between the time Andriano reached adulthood and the night she murdered Joe.   Andriano has not shown prejudice from counsel's failure to present evidence that Alejo sexually abused her.

### iii. Andriano has failed to show how her childhood experiences explain her conduct in murdering Joe.

As the Arizona Supreme Court has already determined, Andriano's childhood circumstances carry little mitigating weight because "the events are remote in time to the offense and thus their relevance is minimal."  *Andriano*, 215 Ariz. at 512, ¶ 72, 161 P.3d at 555.  The new details Andriano has submitted do not remedy this deficiency, and she has not shown a reasonable probability of a different result had counsel presented them.

### 1. Dr. James Hopper's opinions were based on selective facts.

Andriano attempted to establish an explanatory relationship between her purported childhood difficulties and Joe's murder through developmental specialist Dr. James Hopper.[13]  (R.T. 2/3/14 (Vol. II), at 50.)  Dr. Hopper's testimony, in general, adds little to the sentencing calculus.  Andriano's negative childhood

---

[13]  Drs. Woods and James relied on Dr. Hopper's opinions regarding Andriano's childhood development to make their psychiatric/psychological diagnoses.

46

experiences and their potential effect are concepts that are "neither complex nor technical" and the jury "did not need expert testimony to understand the … evidence; it could use its common sense …." *Belmontes*, 558 U.S. at 23–24. Common sense dictates—as the Arizona Supreme Court has already found—that Andriano's childhood experiences shed little light on the reasons for her actions at the age of 30 and are entitled to minimal mitigating weight. *See Andriano*, 215 Ariz. at 512, ¶ 72, 76, 161 P.3d at 555.

Common sense also defeats the connection Dr. Hopper attempted to draw between Andriano's background and her offense.  Dr. Hopper presented a lengthy social-history recitation—most of which duplicated testimony from Donna and other lay witnesses which, in turn, largely duplicated the trial evidence —including instances of alleged neglect by Donna, physical and emotional abuse by various persons, exposure to known child molesters, sexual abuse by Alejo, and involvement with a strict religious sect.  (R.T. 2/3/14 (Vol. I); R.T. 2/3/14 (Vol. II).)  From this history, Dr. Hopper concluded that Andriano's childhood "trauma" affected her decision-making ability and executive functioning and led to memory problems and periods of dissociation.  (R.T. 2/3/14 (Vol. I), at 80–81, 86–89, 97; R.T. 2/4/14, at 19–32.)   In circumstances of high stress, Dr. Hopper opined, Andriano loses the ability to regulate her behavior and succumbs to "whatever impulses are arising."  (R.T. 2/3/04 (Vol. I), at 93–94.)   As a result of her

"trauma," he continued, Andriano "entered adulthood as a severely damaged person," predisposed to mental illness and unable to regulate her emotions. (R.T. 2/3/04 (Vol. II), at 44–47.)  Dr. Hopper conceded, however, that Andriano is able to conform her conduct to social norms, and that she knows right from wrong. (*Id.* at 102.)

The trial evidence belies Dr. Hopper's opinion that Joe's murder is causally connected to Andriano's upbringing.  Andriano was a high-functioning and very capable adult.  She married and raised a family for 6 years.  *Andriano*, 215 Ariz. at 512, ¶ 72, 161 P.3d at 555.  She established a successful career as a property manager, which she maintained despite the stress of having two children and a terminally-ill husband.  She executed several complicated criminal enterprises, both in the community and from jail, resulting in the theft of tens of thousands of dollars. (R.T. 2/5/14, at 119–21; R.T. 2/14/14, at 72.)  She carefully planned Joe's murder over the course of several weeks, creating a false identity and business license to obtain the sodium azide she intended to use for the deed.  (PCR Response, Exh. EE (R.T. 9/8/04) at 65–68; GG (R.T. 9/21/04), at 29–115; HH (R.T. 9/22/04), at 22–146; O (R.T. 9/29/04), at 3–49; R.T. 2/14/14, at 81–87.)  And after she killed Joe, she manipulated evidence to fabricate a self-defense claim and—during a break in a police interview, unquestionably a highly stressful time— had the presence of mind to call a friend and direct her to remove incriminating

material from Andriano's office.  (R.T. 2/14/14, at 86.)  *Id.* at 512, ¶ 72 n.12, 161 P.3d at 556.

Further, Dr. Hopper based his opinion on selective information and facts of questionable veracity.  For example, Dr. Hopper relied heavily on Cunningham's account of Alejo groping her breasts, but discounted Andriano's statements that she could not remember the events Cunningham described.  (*Id.* at 94.)  He gave undue prominence to a card Alejo sent Andriano when she was an adult— introducing it with a dramatic warning to spectators that it was "pretty disturbing" and suggesting it was evidence of an untoward relationship between the two— when any reasonable observer would immediately recognize its contents as no more than an off-color riddle about a housecat.  (*Id.* at 20–21.)  He highlighted Andriano's exposure to corporal punishment, but discounted her statement that she did not "live her life in fear" of being spanked by her parents and that spanking was not an everyday occurrence.  (*Id.* at 94.)  He opined that Andriano was unable to perform adequately under pressure, but discounted her statement that, absent pressure, she is not "motivated or interested enough to do anything."  (*Id.* at 110.)

Dr. Hopper also relied heavily on Kyre Lorts' account, despite conceding her mental instability and being aware of other facts bearing on her credibility, such as her unsubstantiated and bizarre claim that she and Andriano engaged in a sexual act beneath the camera's view in a yearbook photograph, and her admission

that she had engaged in an act of animal cruelty, attacking a dog because it licked itself and unwittingly reminded her of an unrelated act of sexual abuse she had purportedly experienced.  (*Id.* at 133–34.) He discounted the fact that Alejo had offered to lie and admit to abusing Andriano to get her off death row, explaining that the comment merely reflected Alejo's "disturbed" nature.  (*Id.* at 117.)  He coordinated his report with Dr. George Woods' report:  each claimed to rely on the other's work, but their reports were signed and dated the same day.  (R.T. 2/3/14 (Vol. II), at 50–51.)  And incredibly, he diagnosed Alejo as a pedophile based on speculative and unverified information, without ever forensically evaluating him. (*Id.* at 68–69.)   Dr. Hopper's opinion is unpersuasive, and no reasonable probability exists that presenting his testimony would have led the jurors to impose a life sentence.

> ## 2. Andriano murdered Joe at age 30, dramatically reducing the weight to which a jury would have given her childhood-related mitigation.

As previously stated, the absence of an explanatory relationship between Andriano's upbringing and her offense does not *preclude* her upbringing's consideration as mitigation, it dramatically reduces the *weight* to which that factor is entitled.  *E.g. Styers*, 227 Ariz. at 189, ¶ 12, 254 P.3d at 1135.  In particular, the relevance and mitigating weight of childhood-related difficulties diminishes as a defendant's age increases.  *See State v. Greene*, 192 Ariz. 431, 442, ¶ 51, 967 P.2d

106, 117 (1998) ("[B]ecause adults have personal responsibility for their actions, adult offenders have a difficult burden of proving a connection between family background and offense-related conduct….").

Here, Andriano killed Joe when she was 30 years of age, over a decade after she reached adulthood and escaped her parents' influence. *See Andriano*, 215 Ariz. at 512, ¶¶ 72, 76, 161 P.3d at 555. As previously noted, since reaching adulthood, she had married, borne two children, maintained her own household, and developed a successful career as a property manager. Although she had engaged in criminal behavior, she had incurred no criminal record. It is undisputed that she can tell right from wrong, and that she knew it was wrong to kill her husband. Thus, even taking as true Andriano's allegations about her childhood, they would be entitled to minimal mitigating weight given the passage of time and the intervening events between the end of her childhood and Joe's murder. *See State v. Pandeli*, 215 Ariz. 514, 531–32, ¶¶ 71–72, 161 P.3d 557, 574–75 (2007) ("Pandeli's difficult childhood and extensive sexual abuse [which included abuse by at least four men, including his uncle], while compelling, are not causally connected to the crime. Moreover, Pandeli murdered Iler when he was in his late twenties, reducing the relevance of his traumatic childhood. We do not give this mitigating evidence significant weight."); *State v. Anderson*, 210 Ariz. 327, 399, ¶ 136, 111 P.3d 369, 357 (2005) ("Anderson's childhood troubles do not in any way

explain his decision, decades later at age forty-eight, to kill three innocent people to steal a pickup.").  This Court should reject Andriano's claim.

### 3. Andriano does not suffer from serious psychological disorders and, even if she does, they carry little mitigating weight, would have invited damaging rebuttal, and would not have resulted in a life sentence.

The evidentiary hearing confirmed that Andriano has not proved that she suffers from a serious mental illness, either now or at the time she killed Joe. (Response, at 40–43.)  And even if she has a serious mental illness, she has not shown that her illness explains why she killed Joe, dramatically reducing the mitigating weight the jury would have given it.  Further, presenting mental-health mitigation would have opened the door to compelling rebuttal evidence.  It would not have benefitted Andriano's case, but would, instead, have detracted from it.  Andriano has failed to prove that she suffers from a serious mental illness.

Despite having been evaluated by multiple professionals both before and after Joe's murder, Andriano has—until the present proceeding in which she seeks to evade her lawfully-imposed death sentence—*never been diagnosed with a serious mental illness*.[14]  There is no reasonable probability that the outlying

---

[14] Andriano contends that the post-offense diagnoses are faulty because they were made without the benefit of a comprehensive social history.  (Closing memorandum, at 49.)  But it goes without saying that mental-health experts (and

(continued ...)

opinions offered by Andriano's current mental-health experts would have convinced the jurors that she is mentally ill or persuaded them to impose a life sentence, especially because they are inconsistent with the facts of Joe's murder and other documented behavior by Andriano.

Andriano first sought mental-health treatment in 1996, after she was fired from her job for stealing a significant amount of money.  (PCR Hrg. Exh. 46.)  Her treating mental-health professional entered a diagnosis of adjustment disorder with mixed disturbance of emotions and conduct (which is "a garden variety kind of depression … related to different stressors") and a rule-out diagnosis of major depression.  (*Id.*; R.T. 2/14/14, at 72.)

After Andriano was arrested for killing her husband, a host of medical professionals evaluated her, both in preparation for trial and during the course of treatment at the Maricopa County Jail.  Dr. Jack Potts performed a competency evaluation pursuant to Rule 11 of the Arizona Rules of Criminal Procedure; he recommended additional psychological testing, but found Andriano competent and did not diagnose a major mental illness.  (PCR Hrg. Exh. 6.001.)  Andriano's

_____

(... continued)

especially treating professionals in a correctional institution, who would not typically receive a social history prepared by counsel) are trained to recognize objective symptoms of major mental disorders, and some of Andriano's claimed symptoms (*e.g.* memory problems) would have been readily apparent.  Moreover, at least one professional retained by Andriano, H. Kandy Rohde, was familiar with her background and history, and still did not diagnose a major mental disorder.

counsel retained Dr. Richard Rosengard to evaluate her prior to trial; Dr. Rosengard diagnosed depression, probable PTSD (which he attributed to Joe's murder), and panic disorder. (PCR Hrg. Exh. 6.003.) He also questioned her claim that she suffered from memory deficits. (*Id.*)

H. Kandy Rohde, a private counselor retained by Andriano's parents, spent a significant amount of time with her at the Maricopa County Jail.[15] Rohde, however, did not suggest that Andriano suffered from a serious or debilitating mental illness. Rather, she opined that Andriano was a molestation victim and that she suffered from Depersonalization Disorder, Dissociative Amnesia and, perhaps, certain personality disorders. (PCR Hrg. Exh. 7.002.)

Dr. Michael Brad Bayless, retained by the State for trial, also evaluated Andriano. (PCR Hrg. Exh. 6.005.) Dr. Bayless likewise did not diagnose bipolar disorder, cognitive deficits, or any other significant mental disorder. (*Id.*) Instead, he diagnosed Depressive Disorder not otherwise specified (NOS) and Personality Disorder NOS with antisocial and borderline traits. (*Id.*)

During her pretrial incarceration, Andriano attempted suicide and was

---

[15] Rohde was ultimately banned from having contact visits with Andriano (which had only been authorized in the first place because the Jail was inaccurately led to believe she belonged to the legal team) after supplying Andriano with contraband. (PCR Response Exhs. BBB (R.T. 12/14/04), at 56–65, 93–94; Tr. Exh. 548.)

admitted to the Jail's psychiatric unit.  (PCR Response, Exh. YY (R.T. 12/8/04), at 68.)  Andriano was not diagnosed with a serious mental illness in the psychiatric unit, and her treating psychologist specifically did not diagnose her with bipolar disorder.  (*Id.* at 71–72, 92, 111, 121–22, 134.)  Instead, she was treated for depression and anxiety with Zoloft (an antidepressant), Ativan (an antianxiety medication), and Seroquel (an antipsychotic also used as a sleep aid).[16]  (*Id.* at 139–40.)  Likewise, since being incarcerated at the Arizona Department of Corrections, Andriano has not been diagnosed with a major mental illness, and has, in fact, informed prison officials that she does not wish to take psychiatric medication.  (R.T. 2/14/14, at 73–74.)

In the present proceeding, Drs. Steven Pitt, a psychiatrist, and Kiran Amin, a neuropsychologist, both retained by the State, evaluated Andriano.  Dr. Amin tested her for cognitive deficits, reviewed prior testing by Dr. Bayless and defense expert Dr. Myla Young, and attended Dr. Pitt's forensic interview of Andriano; based on the foregoing, he concluded that Andriano does not suffer from a serious cognitive disorder.  (R.T. 2/14/14, at 25.)  He also opined that she understood her conduct's wrongfulness and could conform it to the law.  (*Id.* at 25–26.)

After interviewing Andriano for nearly five hours and reviewing voluminous

---

[16] The treating psychiatrist and two staff members were caught giving Andriano preferential treatment and violating policy to accommodate her.  (PCR Response, Exh. BBB (R.T. 12/14/04), at 48–111.)

material contained within approximately five banker's boxes, Dr. Pitt also found that Andriano did not suffer from a serious mental illness. Dr. Pitt considered several potential diagnoses—including PTSD—and ultimately diagnosed Andriano with a personality disorder NOS with antisocial, borderline, and dependent features, and an adjustment disorder with mixed anxiety and depressed mood. (R.T. 2/14/14, at 77–79.) Dr. Pitt's diagnosis is consistent with that made by professionals at the Arizona Department of Corrections and the Maricopa County Jail. (*Id.* at 78.) It also accounts for the fact that any major mental illness from which Andriano suffers would have followed a chronic course and reference to it should appear in her extensive prior treatment records. (*Id.* at 71.) Dr. Pitt analogized his diagnostic process, and the relevance of Andriano's prior diagnoses, to the game of football:

> If you look at the data on this particular case, where's all the data points about mental illness, that she doesn't have a mental illness? Most of the data points are around the 50-yard line. Sure, you have some that are at the 40 and some that are at the 20 and you've got a couple in the stands, but the totality of the data points away from this woman having a major mental illness. The records support that opinion. The people that treated her at the Maricopa County Jail support that opinion. And the Arizona Department of Corrections records support that opinion.

(*Id.* at 115.)

Against this backdrop of relatively consistent mental-health evidence, Andriano's retained experts, Dr. George Woods and Dr. Joette James, diagnosed

her with a variety of serious disorders that they believe affected her behavior when she murdered Joe. Dr. Woods opines that Andriano suffers from bipolar disorder, complex PTSD, dependent personality disorder, and cognitive deficits. (R.T. 2/5/14, at 42.) In the months before Joe's murder, Dr. Woods believes, Andriano's disorders had worsened and amplified each other, causing impaired judgment, impulsivity, memory impairment, executive functioning defects, and an inability to function under stress, and resulting in atypical behavior like engaging in insurance fraud, obtaining sodium azide, and murdering Joe. (*Id.* at 63–88, 102–03, 109–11.) Likewise, Dr. James opines—without ever having evaluated, or even spoken to, Andriano—that Andriano suffers from cognitive disorder NOS and has difficulty adjusting her behavior to respond to changing demands, is easily overwhelmed when faced with a large quantity of information, and behaves impulsively. (R.T. 2/10/14, at 24, 31, 37–38, 46–48.)

Not only are Dr. Woods' and Dr. James' opinions inconsistent with Andriano's documented mental-health history,[17] but they are also inconsistent with her social history and the facts of the offense—categories of evidence upon which Dr. Woods relied to form his opinions. Andriano's murder of Joe was not an impulsive act, and was not out of character for her. Rather, Andriano has engaged

---

[17] Andriano's reliance on observations by Donna Ochoa describing her apparent memory problems and other psychological symptoms is inappropriate because Donna is not a mental-health professional.

in calculating, devious behavior her entire life—it did not suddenly arise in the fall of 2000 and unexpectedly result in Joe's murder.

Andriano's childhood friend and high school boyfriend, Shawn King,[18] testified in a 2011 deposition that, from the time Andriano was a child, she was "devious" and appeared always to have "a plan underneath what she was doing." (PCR Hrg. Exh. 15, at 11.)  She could "get [King] to do anything," including disobey the rules of their strict religious school.  (*Id.* at 15.)  As adults, King believed that he and Andriano were in a monogamous relationship, but later found out she had been with "so many guys" while they were together; he also learned that, at a party, she had had sexual intercourse with a man in front of other persons. (*Id.* at 16–21.)  Although King personally caught Andriano in compromising positions with two other men, she led him to believe "that it was okay."  (*Id.* at 16.) She was adept at using her "feminine wiles" for personal gain, and had a very convincing and persuasive way about her.  (*Id.* at 35–45.)

Although Andriano had no prior record before she killed Joe, unlawful conduct and inappropriate workplace behavior is a consistent theme in her history. She stole from multiple employers, and did not do so by, for example, taking money from a cash register—rather, she engaged in complicated schemes to

---

[18] King's account refutes Dr. Woods' opinion that Andriano did not engage in antisocial behavior prior to marrying Joe Andriano and dealing with the pressure of his illness.  (R.T. 2/5/14, at 126–27.)

58

**P-App. 000478**

embezzle from the companies.  (R.T. 2/5/14, at 120–21; R.T. 2/14/14, at 69–70, 72; PCR Hrg. Exh. 46.)  She also became involved while incarcerated in a scheme to cash forged checks, from which she profited financially.  (R.T. 2/5/14, at 121.) And she lied about her income on an application to reduce her student loan payments, reflecting her willingness to be untruthful when necessary for her personal gain.  (Tr. Exh. 472.)  Further, Andriano was a high-functioning and very capable person who married, raised a family, and developed a successful career as a property manager, which she was able to maintain despite the stress of caring for her terminally-ill husband and two small children, belying any claim that she disintegrates and behaves impulsively under stress.

Andriano also carefully planned and executed Joe's murder.  Weeks before Andriano murdered Joe, she used a fictitious name and shipping address and a falsified business license to purchase sodium azide over the internet.  (PCR Response, Exhs. EE (R.T. 9/8/04), at 65–68; GG (R.T. 9/21/04), at 29–115; HH (R.T. 9/22/04), at 22–146; O (R.T. 9/29/04), at 3–49.)  Concurrently, she contacted several life-insurance companies and applied for a life insurance policy on Joe, falsely reporting that he did not have cancer. *Andriano*, 215 Ariz. at 502, ¶ 20, 161 P.3d at 545.  Andriano offered to pay two men to impersonate Joe so he could pass the physical exam necessary for the insurance. *Id.*  During this same time period, she engaged in two extramarital affairs, telling one of the men that her husband had

died of cancer.  *Id.* at 503, ¶ 25, 161 P.3d at 546.

Ultimately, Andriano administered the poison to Joe and, when it did not kill him, created a new plan:  she bludgeoned and stabbed him to death and then staged the murder scene to support a self-defense theory.  *Id.* at 544, ¶ 11, 161 P.3d at 501.  After her arrest, during a break in an interview with police, she contacted a coworker and asked her to dispose of incriminating evidence.  *Id.* at 512, ¶ 76 n.12, 161 P.3d at 555.  That Dr. Wood relied on the foregoing information and still diagnosed Andriano with disorders characterized by impulsivity, reactivity, and an inability to function under stress vastly diminishes the credibility of his opinions. Andriano has not proved by a preponderance of the evidence that she suffers from the severe mental disorders Dr. Woods diagnosed.

Dr. James' opinions suffer the same foundational problems. First, she relied on data from a deceased prior expert, Dr. Myla Young, which she acknowledged contained multiple errors.  (R.T. 2/10/14, at 14–18, 49.)  Second, she failed to review the trial evidence and become familiar with the facts of Joe's murder.  (*Id.* at 51–52.)  In particular, she was unaware of Andriano's conduct in calling her coworker, in the midst of a stressful police interview, and asking her to dispose of evidence—a fact that weighs heavily against Dr. James' opinion that Andriano's cognitive deficits leave her unable to easily adjust her behavior to changing circumstances.  (*Id.*)  No reasonable juror would have been persuaded by the

opinions of Drs. James or Woods.

### iv. Even if Andriano suffers from one or more significant mental illnesses, they do not explain her conduct in planning and executing Joe's murder.

Although Dr. Pitt arrived at psychological diagnoses that he believes are accurate, he emphasized that diagnostic labels are merely "descriptor[s] to describe a series of symptoms" and do not account for an individual's behavior. (R.T. 2/14/14, at 80.) In other words, a defendant may suffer from a particular mental *disorder*, but that disorder does not necessarily drive the *behavior* in which he engages. In Andriano's case, Dr. Pitt opined that, even assuming that Dr. Woods' diagnostic impressions are correct, Andriano's actions before, during, and after Joe's murder "are not explained by a mental illness" and were not caused by one, but are instead "explained by choices that Wendi Andriano made" and constituted "antisocial and selfish acts designed to benefit" her alone. (*Id.* at 81, 84, 94.)

Dr. Woods did not materially dispute this portion of Dr. Pitt's opinion. He did not disagree with Dr. Pitt that Andriano *chose* to commit thefts, kill her husband, and try to escape criminal liability; he simply referred to those choices as "damaged"—a label that could apply to any person's choice to engage in an antisocial act. (R.T. 2/5/14, at 122, 130–32, 137.) He further agreed with Dr. Pitt that Andriano knew it was wrong to kill her husband. (R.T. 2/5/14, at 122–23, 135–36.) And Dr. Woods agreed that Andriano was responsible for her actions

notwithstanding any disorder from which she may suffer.  (*Id.* at 142–43.)

Instead of responding to Dr. Pitt's assertion that Andriano's purported mental illness does not explain her behavior, Andriano chastises him for applying what she considers an inappropriately narrow view of mitigating evidence.[19] (Closing memorandum, at 6–8.)    But whether Andriano's purported mental illnesses explain her conduct is critical in this, and any other, capital case because the absence of an explanatory relationship with the offense severely reduces a mental disorder's mitigating weight.  *See, e.g., Styers*, 227 Ariz. at 189, ¶ 12, 254 P.3d at 1135.  A defendant's knowledge that his conduct is wrong diminishes the disorder's weight even further.   *See Pandeli*, 215 Ariz. at 533, ¶ 81, 161 P.3d at 576 (court considers claim of mental impairment offered as non-statutory mitigation "in proportion to a defendant's ability to conform or appreciate the wrongfulness of his conduct").   And unlike non-statutory mitigation, the A.R.S. § 13–751(G)(1) statutory mitigating factor, to the extent Andriano still alleges it

---

[19] Andriano also quibbles with Dr. Pitt's style of interviewing her and his purported "personal attacks" against her credibility. (Petition, at 50–51.) Dr. Pitt is published on the topic of video forensic interviewing and trains psychiatrists and law-enforcement officers on interviewing techniques.  (R.T. 2/14/14, at 116–17.) And unlike Drs. Woods and Hopper, Dr. Pitt recognized that he was not *treating* Andriano but was instead *evaluating* her objectively, and was not "there to make her a buddy."  (*Id.* at 110–11.)  Further, Andriano's credibility was squarely at issue in this proceeding, as all experts except Dr. James relied on their interviews with her, as well as the numerous versions of Joe's murder she has previously given, to formulate their opinions.

applies, requires a defendant to prove a causal nexus. *See State v. Sansing*, 206 Ariz. 232, 239, ¶ 26, 77 P.3d 30, 37 (2003).

Here, even assuming Andriano suffers the cluster of symptoms her experts describe, including impulsivity, poor judgment, poor memory, and the inability to function under stress, those symptoms do not, for the reasons previously stated, explain her behavior in killing Joe, which involved a calculated plan executed over the course of weeks. And the fact that Andriano indisputably knew right from wrong further diminishes the weight of any mental-health mitigation. *See Pandeli*, 215 Ariz. at 533, ¶ 81, 161 P.3d at 576. Because the weight of Andriano's proffered mental-health mitigation would have been slight, counsel's failure to present it did not prejudice Andriano.

### v. Presenting mental-health evidence would have opened the door to devastating rebuttal evidence.

As previously stated, Patterson withdrew several mitigating factors for the *specific purpose of limiting Dr. Bayless' testimony* and preventing the State from introducing devastating rebuttal evidence, such as her conduct in stealing from several employers through complicated fraudulent schemes. Presenting mental-health mitigation would have placed at issue various aspects of Andriano's character to which her prior thefts (including one that occurred after trial, in the Maricopa County Jail) were relevant, including her ability to plan, to engage in complicated thought processes, and to obey social norms. It also would have

placed at issue her mental-health history, which, through counseling records, is inherently tied to at least one of her thefts. (PCR Hrg. Exh. 46.) Evidence that Andriano engaged in scheming, fraudulent behavior long before Joe's murder would lay waste to any claim that her purported mental-health difficulties rendered her impulsive or reactive and influenced her decision to kill Joe.

Further, presenting mental-health evidence would have directly resulted in the admission of Dr. Bayless' full report, which recognizes her antisocial traits, discusses at length various maladaptive behaviors, and communicates Dr. Bayless' belief that she is an untruthful, manipulative person. (PCR. Hrg. Exh. 6.005.) Or, equally destructive, it would have led to the admission of a comprehensive rebuttal evaluation such as that conducted by Dr. Pitt which, like Dr. Bayless' report, does not ignore Andriano's prior bad acts. The omission of mitigating evidence is not prejudicial where, as here, that evidence would open the door to compelling rebuttal. *See, e.g., Belmontes*, 558 U.S. at 387–88. Andriano has not shown *Strickland* prejudice.

### c. Andriano has failed to show a reasonable probability that, had counsel presented the omitted mitigation, the jury would have imposed a life sentence after balancing the aggravation, mitigation, facts and circumstances of the crime, and rebuttal evidence.

As previously discussed, Andriano fails to provide any analysis of how a jury would have balanced the aggravating, mitigating, and rebuttal evidence, and

supplies no explanation why a reasonable probability exists that a jury would have imposed a life sentence after considering all these factors. *See Pinholster*, 131 S. Ct. at 1408, 1410; *Belmontes*, 558 U.S. at 20; *Wiggins*, 539 U.S. at 534.   And Andriano could not have made that showing, even if she had tried, because even if she endured a "harrowing childhood" and suffers from mental disorders, that mitigation is insufficiently substantial to warrant leniency under the facts of this case.

First, the aggravation was extraordinarily weighty.   Although the jurors found only one aggravating factor—cruelty under A.R.S. § 13–751(F)(6)—the strength and quality of the aggravation, not merely the number of factors proven, is relevant.  *State v. Tucker*, 215 Ariz. 298, 323, ¶ 120, 160 P.3d 177, 202 (2007). Andriano poisoned Joe, pretended to call 911 when he became ill, and watched as he suffered physically for approximately 45 minutes, wondering why help was taking so long to arrive. *Andriano*, 215 Ariz. at 511, ¶ 65, 161 P.3d at 554.  During this period, Joe "vomited at least twice, was too weak to sit or stand, and was having difficulty breathing."  *Id.*  When it became clear Joe was not going to die, Andriano formulated a new plan, excusing the friend she had asked over for assistance and striking him at least 23 times in the back of the head with a bar stool.  *Id.* at 511, ¶ 66, 161 P.3d at 554.  Joe's hands and wrists bore defensive wounds, reflecting his consciousness for at least some of the attack and his

attendant knowledge that "his wife was attacking him as he lay on the floor, unable to defend himself." *Id.* Joe undoubtedly experienced significant physical and emotional pain. *See* A.R.S. § 13–751(F)(6).

Balanced against this compelling aggravation is the mitigation presented at trial, consisting of the stress of Joe's cancer, Andriano's good deeds and strong religious convictions, her status as a sexual abuse and domestic-violence victim, her efforts to be a good mother, her good behavior while incarcerated, her lack of prior convictions, her potential for rehabilitation and lack of future dangerousness, and her execution's impact on her family and friends. *Andriano*, 215 Ariz. at 511–12, ¶¶ 69–77, 161 P.3d at 554–55. Both the Arizona Supreme Court and the jury have found this mitigation insufficiently substantial to warrant leniency. *Id.* at 512–13, ¶ 78, 161 P.3d at 555–56. The newly-developed mitigation—consisting of, at best, additional sexual abuse, childhood poverty, an oppressive religious environment, and various mental disorders—does not increase the quality or strength of Andriano's mitigation. *See id.* As discussed above, the evidence does not explain the murder, vastly diminishing the weight to which it is entitled. *See, e.g.,* Styers, 227 Ariz. at 189, ¶ 12, 254 P.3d at 1135. And the childhood-related mitigation is remote in time to the offense and thus not particularly compelling. *See Greene*, 192 Ariz. at 442, ¶ 51, 967 P.2d at 117.

The State's rebuttal evidence further shows the mitigation's insignificance.

At trial, the State presented rebuttal testimony from Joe's sister, Jana Clayton, and a former colleague, Timothy Lee, who described several instances on which Andriano had engaged in arguably poor parenting.  (Response to PCR, Exh. BBB (R.T. 12/14/04), at 119–32.)  Likewise, Dr. Bayless testified that Andriano was a manipulative person and that her suicide attempt, good behavior in prison, frequent tears, and general portrayal of herself as a victim were all goal-directed actions.  (Response to PCR, Exh. CCC (R.T. 12/15/04), at 10–16.)   And two detention officers testified about Andriano's reputation as a "control freak" in jail who upset other inmates; their belief that Andriano was in charge of the other inmates; Andriano's discipline for possessing contraband; occasions on which the psychiatric unit's staff were caught giving her preferential treatment or violating policy to accommodate her; and inappropriate contact between Andriano and her transsexual cellmate.  (Response to PCR, Exh. BBB (R.T. 12/14/04), at 48–111.)

In addition to the foregoing, evidence of Andriano's thefts from several prior employers and Dr. Bayless' full report, with its reference to Andriano's antisocial acts, are now relevant and admissible given her mitigation evidence and put the lie to any claim that she behaved impulsively or engaged in abnormal behavior in killing Joe.   Rather, such evidence shows that Andriano is a cold, devious, scheming person who will do anything for her own personal gain, which is fully consistent with the well-planned and calculated manner in which she killed Joe.

P-App. 000487

Moreover, testimony from the State's rebuttal mental-health experts were far more reasonable, objective, and persuasive than that offered by Andriano's experts, and their opinions were far more consistent with her available history.

Given the foregoing, on balance, any reasonable juror would have found Andriano's mitigation insufficiently substantial to warrant leniency in light of the compelling aggravation. Andriano has failed to show *Strickland* prejudice and this Court should dismiss her ineffective-assistance claim.

### B. Claim 2: Alleged Conflict of Interest Claim

Relying on *Cuyler v. Sullivan*, 446 U.S. 335 (1980), Andriano contends that second-chair counsel DeLozier labored under a conflict of interest because he simultaneously represented her in her capital murder trial (which required him to investigate her upbringing and present as mitigation any abusive or neglectful parenting to which she was exposed) and the Ochoas in guardianship and adoption proceedings involving Joe and Andriano's children, N. and A. (which required him to present the Ochoas in the most favorable light possible). The State renews its argument that this claim is precluded and, alternatively, is not a colorable claim for relief.

#### 1. Preclusion.

As the State previously argued in its Response to Andriano's Petition, conflict of interest claims are cognizable on direct appeal. *See State v. Moore*,

68
P-App. 000488

222 Ariz. 1, 16, ¶¶ 81–83, 213 P.3d 150, 165 (2009) (considering and rejecting claim that counsel had a  conflict of interest where he had formerly represented a statutory victim who possessed information potentially helpful to defendant). Andriano was aware that DeLozier was also representing her parents in the guardianship proceeding. Andriano proffered evidence at the hearing that DeLozier simultaneously represented Andriano and her parents in that proceeding for a period.  In addition, the evidence that DeLozier had represented the Ochoas in the guardianship proceeding was brought to this Court's attention during Andriano's trial, and was included in the record. (R.T. 12/7/04, at 15-26; R.T. 12/8/04, at 6-7.)  Andriano should have raised her conflict of interest claim at trial or on direct appeal.   Because she did not do so, it is precluded under Rule 32.2(a)(3).

### 2.  The claim fails on the merits.

Even if not precluded, Andriano's claim fails on the merits. As a preliminary matter, the Arizona Supreme Court has interpreted *Cuyler v. Sullivan*, 446 U.S. 335 (1980), as limited to the joint representation of co-defendants, which is not at issue here.  *See State v. Martinez- Serna*, 166 Ariz. 423, 425, 803 P.2d 416, 418 (1990); *State v. Jenkins*, 148 Ariz. 463, 465, 715 P.2d 716, 718 (1986). The United States Supreme Court recently noted that some circuits have "unblinkingly" applied *Sullivan* to "all kinds of alleged attorney ethical conflicts." *Mickens v.*

*Taylor,* 535 U.S. 162, 174–75(2002) (citation and quotation omitted).  The Court made clear, however, that it had never extended the *Sullivan* standard to conflicts other than those arising from joint representation at trial. *Id. Mickens* itself involved a successive representation conflict, and the Court assumed that the case properly proceeded under *Sullivan* in the lower courts. *Id.* The Court cautioned, however, that its decision should not be misconstrued as extending the *Sullivan* rule to conflicts other than joint representation: "In resolving this case on the grounds on which it was presented to us, we do not rule upon the need for the *Sullivan* prophylaxis in cases of successive representation. Whether *Sullivan* should be extended to such cases remains, as far as the jurisprudence of this Court is concerned, an open question." *Id*. at 176.

Contrary to Andriano's claim, the standard under *Strickland* should be applied to this conflict of interest claim.  However, regardless of whether this Court applies *Strickland* or *Sullivan*, Andriano has not met her burden of proving ineffective assistance of counsel.

Even if the *Sullivan* standard is controlling – which creates a lesser burden than the *Strickland* standard, Andriano is not entitled to relief because she has failed to show that DeLozier possessed an actual conflict of interest that adversely affected her representation. A defendant's constitutional right to the effective assistance of counsel may be violated when his attorney operates under a conflict

of interest.  *See Martinez- Serna*, 166 Ariz. at 418, 803 P.2d at 425. However, "absent an objection at trial, [a] defendant must demonstrate that (1) an actual conflict existed; and (2) that the conflict had an adverse effect on the representation."  *Id.*; *see Sullivan*, 446 U.S. at 349 (defendant must show that counsel "actively represented conflicting interests" to  establish constitutional violation).  "In order to establish an actual conflict of interest, a defendant must demonstrate that some plausible alternative defense strategy might have been pursued." *See Martinez-Serna*, 166 Ariz. at 418, 803 P.2d at 425 (quotations and alterations omitted). The defendant need not show that the strategy would have been successful, but merely that it was a viable alternative. *Id.*  The defendant must also establish that "the alternative defense was inherently in conflict with the attorney's other loyalties or interests." *Id.*

DeLozier testified at the evidentiary hearing any purported conflict of interest was not actualized at the time he represented Andriano.  "I didn't see a real conflict at the time between the two [Andriano and the Ochoas]," DeLozier stated. (R.T. 2/10/04 at 147-48.)  He testified that at the time of his representation he "felt comfortable" in both cases, and that the interests of Andriano and the Ochoas were aligned. (*Id.*).  With respect to the accusations raised by the Lambeths during the guardianship proceedings, DeLozier stated, "[T]here's always allegations in these kind of cases," and "[I]t was not anything unusual as

far as I was concerned." (*Id*. at 74-75.)   Gary Lowenthal admitted that the Lambeths raised accusations only after the Ochoas had reported the Lambeths to Child Protective Services. (R.T. 2/11/14, at 176-179; *See also* Exh. 97 (Dr. Brian Yee's report).)   The Ochoas reported the Lambeths to CPS after they discovered their grandchildren had "excoriation" on the buttocks area. (Exh. 97.)   Therefore, it requires an unreasonable leap of logic to conclude that this evidence reflected poorly on the Ochoas, and would raise an inference that Alejo Ochoa was a child molester. Yet, that is the argument Andriano raises.

In addition, Andriano wanted the Ochoas to have visitation or custody rights with her children; thus, their interests were aligned. (Exh. 174, at 70-72.) DeLozier also testified that no one ever told him that Andriano suffered any type of abuse, including sexual abuse, from the Ochoas. (R.T. 2/10/14 at 149-50.) Therefore, no actual conflict of interest was realized.  Nothing substantive came to DeLozier's attention during his representation of the Ochoa's that would have caused a conflict with his duty of loyalty to Andriano.

Moreover, no evidence has been presented that Attorney Daphne Budge, who replaced DeLozier as counsel of record for the Ochoas in the Maricopa County guardianship proceeding in July 2002 and continued representing them until November 2004, discovered any evidence that the Ochoas subjected Andriano or any other child to abuse.  Budge had no duty of loyalty to Andriano.

Dr. Brian Yee, a psychologist, was appointed by the Maricopa County Superior Court to provide a report and opinion on the guardianship proceedings of Andriano's children. Dr. Yee found no evidence that Andriano's children were abused, and opined that while the Lambeths should be granted custody of the children, the Ochoas were fit to have visitation rights with the children. (Exh. 97.) In addition, Dan Patterson, who did not have a duty of loyalty to the Ochoas, did not discover evidence that the Ochoas had abused Andriano.  And as previously argued, the various mental health professionals, as well as Dr. Murphy – who interviewed the Ochoas – never discovered any evidence of this alleged abuse. Therefore, a plausible alternative mitigation strategy did not exist at the time DeLozier represented Andriano.  No evidence has been presented that DeLozier failed to investigate potential mitigation for Andriano's case because of his duty of loyalty to the Ochoas. Rather, he simply did not have knowledge that this evidence existed.  Andriano cannot charge her trial counsel with knowing information that she either chose to conceal from them, or simply did not exist at the time of her trial. Therefore, Andriano has not shown that an actual conflict existed.  But even if a conflict existed, Andriano has failed to show that it had an adverse effect on the representation.  Relief must be denied.

Furthermore, trial counsel presented  evidence of the oppressive religious environment in which Andriano was raised, of Alejo Ochoa's angry outbursts and

arguably abusive behavior, and of Donna Ochoa's alleged neglect.   The evidence Andriano now  claims  counsel should have presented is cumulative to that evidence.   Although counsel did not present evidence that Alejo may have sexually abused Andriano, such evidence is speculative and refuted by Andriano's own testimony, in which she denied under oath that Alejo had ever touched her inappropriately. The Ochoas never informed DeLozier of any sexual improprieties committed by Alejo Ochoa. Andriano never informed DeLozier that she had suffered sexual abuse from Alejo.  Therefore, Andriano has failed to show that a plausible alternative mitigation strategy existed at the time DeLozier represented Andriano. Thus, even under the *Sullivan* standard, Andriano has not met her burden. Similarly, since Andriano cannot prove that she was prejudiced by trial counsel's failure to investigate an alternative mitigation strategy, relief is inappropriate under *Strickland*.

## IV. CONCLUSION

Based on the foregoing reasons, Andriano has failed to meet her burden on each claim.  This Court should deny Andriano's petition for post-conviction relief.

P-App. 000494

RESPECTFULLY SUBMITTED this 31st day of July, 2014.

Thomas C. Horne
Attorney General

Jeffrey A. Zick
Chief Counsel

/s/ Gregory Hazard
Assistant Attorney General
Attorneys for Respondent

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2014, I electronically filed the foregoing with the Clerk of the Maricopa County Superior Court by using the Court's eFiling Online System.

Copies of the foregoing were deposited for mailing this date to:

Allen A. Arntsen
Stephan J. Nickels
Matthew R. Lynch
FOLEY & LARDNER, LLP
150 East Gilman Street
Madison, Wisconsin 53703

Scott M. Bennett
COPPERSMITH SCHERMER & BROCKELMAN, PLC
2800 North Central Avenue, Ste. 1200
Phoenix, Arizona 85005

Attorneys for Petitioner

Juan Martinez
Deputy County Attorney
MARICOPA COUNTY ATTORNEY'S OFFICE
301 West Jefferson, 4th Floor
Phoenix, Arizona 85003

Attorney for the State


/s/ Jennifer Mathis
Legal Secretary
Criminal Appeals/
Capital Litigation Sections
1275 West Washington
Phoenix, Arizona  85007–2997
Telephone: (602) 542–4686

4089857

## Filing Details

### Receipt ID: 2439178 Authorized Date: 7/31/2014 5:14:48 PM

| | |
|---|---|
| **Filer's Information** | Gregory  Hazard<br>**Email:** Gregory.Hazard@azag.gov |
| **Firm Information** | Office of the Arizona Attorney General<br>1275 West Washington<br>Phoenix, AZ  85007<br>**Phone:** 602-542-4686 |
| **Case Number** | CR2000-096032 |
| **Case Summary** | State Of Arizona Vs. Wendi Andriano / |
| **Email Copies** | |
| | Jennifer.Mathis@azag.com |
| **Attorney Information** | **Bar No.:** 023258 - **State:** AZ - **Email:** Gregory.Hazard@azag.gov |
| **Filing Fee** | $0 |

### Documents Attached to Filing

| Document Title | Document Type |
|---|---|
| State's Closing Memorandum | Memorandum |

If you have any questions about your filing, please contact us:

**Clerk of Court Address**          **eFiling Support Phone**
201 West Jefferson                    602-506-2565
Phoenix, Arizona 85003

**Clerk of Court Web Site**
http://clerkofcourt.maricopa.gov

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
E. Masis, Deputy
9/5/2014 1:33:37 PM
Filing ID 6095468

Scott M. Bennett (Bar No. 022350)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue
Phoenix, Arizona  85004
(602) 224-0999 (office)
(602) 224-6020 (fax)
sbennett@cblawyers.com

Allen A. Arntsen, admitted *pro hac vice*
Stephan J. Nickels, admitted *pro hac vice*
Matthew R. Lynch, admitted *pro hac vice*
Jodi K. Fox, admitted *pro hac vice*
Krista J. Sterken, admitted *pro hac vice*
FOLEY & LARDNER LLP
150 E. Gilman Street
Madison, WI 53703-1481
(608) 257-5035 (office)
(608) 258-4258 (fax)

*Attorneys For Petitioner Wendi Andriano*

## SUPERIOR COURT OF ARIZONA
## COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA | ) CASE NO:  CR2000-096032-A |
|      RESPONDENT, | ) |
| | ) **PETITIONER'S POST-HEARING REPLY** |
|      V. | ) **MEMORANDUM IN SUPPORT OF** |
| | ) **PETITION FOR POST-CONVICTION** |
| WENDI ELIZABETH ANDRIANO | ) **RELIEF** |
|      PETITIONER. | ) |
| | ) |

{00137731.1 }

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ...................................................................... v

INTRODUCTION ................................................................................... 1

SUMMARY OF ARGUMENT ................................................................. 3

ARGUMENT ......................................................................................... 4

I.  WENDI IS ENTITLED TO RELIEF ON HER CONFLICT OF INTEREST CLAIM ................................................................................ 4

    A.  The Conflict Claim is Properly First Raised in a Petition for Post-Conviction Relief ............................................................................ 5

    B.  *Sullivan* Applies to Wendi's Conflict Claim................................. 6

    C.  DeLozier Had Several Actual Conflicts of Interest ..................... 7

        1.  DeLozier's Responsibility to Wendi to Investigate and Present Information Harmful to the Ochoas Created an Actual Conflict.................................................................................... 7

        2.  DeLozier Never Sought or Obtained Wendi's Informed Consent to the Conflict................................................................ 10

        3.  DeLozier's Failure to Appreciate the Conflict at the Time of Wendi's Representation is Irrelevant to Whether the Conflict Existed ................................................................................... 11

    D.  Because of the Conflicts, DeLozier Failed to Pursue the Plausible Alternative Defense Strategy of Investigating and Presenting Wendi's History of Childhood Abuse.......................................... 12

        1.  A Plausible Alternative Defense Strategy Existed at the Time of DeLozier's Representation ........................................ 13

            a.  Multiple Sources Informed DeLozier of Their Suspicions of Wendi's Childhood Trauma and Abuse ......... 13

            b.  DeLozier's Role on the Defense Team and Monopoly on Information About the Ochoas Compounded the Harm From the Conflicts ................................................... 14

{00137731.1 }

i

**TABLE OF CONTENTS (cont'd)**

Page

2. DeLozier's Failure to Appreciate the Significance of the Abuse Allegations Highlights the Impact of the Conflict of Interest. ................................................................................. 15

3. Wendi's History of Childhood Abuse Is Not Cumulative .............. 17

II. TRIAL COUNSEL'S SUPERFICIAL MITIGATION INVESTIGATION FELL BELOW PREVAILING PROFESSIONAL NORMS ............................... 18

A. It is Necessary to Consider the Guidelines in Assessing the Reasonableness of Trial Counsel's Mitigation Investigation .................... 19

B. Trial Counsel's Failure to Investigate Potential Childhood Trauma Was Not Reasonable ................................................................... 22

   1. The State Misstates the Standard of Care for Investigating Childhood Trauma ................................................................. 22

      a. The State's Reliance Upon Patterson to Establish the Standard of Care is Unreasonable and Mischaracterizes the Record ................................. 22

      b. The Primary Case Relied Upon by the State Supports Petitioner's Arguments, Not the State's ............................... 24

   2. Even if Evaluated Under the Incorrect Standard of Care Asserted by the State, Trial Counsel Were Ineffective .................. 25

      a. Trial Counsel Knew That Wendi Had Likely Suffered Childhood Sexual Abuse, But Did Nothing to Investigate ......................................................... 25

      b. The Fact That the Perpetrators and the Victim of Childhood Abuse and Neglect Did Not Unilaterally Volunteer It Does Not Relieve Trial Counsel of the Duty to Investigate ............................................... 28

C. Trial Counsel's Mental Health Investigation Was Unreasonable ............. 30

   1. Trial Counsel Failed to Provide Any Social History to Dr. Rosengard ....................................................................... 31

{00137731.1 }

ii

**TABLE OF CONTENTS (cont'd)**

Page

    2. Even Without Any Social History Information, Dr. Rosengard Observed Symptoms and Made Tentative Diagnoses that Warranted Further Mental-Health Investigation .............................. 33

    3. Trial Counsel Obtained Additional Mental Health Information After Dr. Rosengard's Report that Warranted Further Mental-Health Investigation ................................................ 34

III. TRIAL COUNSEL'S DEFICIENT MITIGATION INVESTIGATION RESULTED IN PREJUDICE ............................................... 36

  A. The Evidence of Childhood Trauma and Mental Health Was Credible and Powerful Mitigating Evidence ................................ 36

    1. The State Offers No Reasonable Grounds for Disregarding the Evidence of Wendi's Childhood Trauma Brought Forth at the Evidentiary Hearing .................................................. 36

      a. The State Does Not Address the Full Scope of the Childhood Trauma Suffered by Wendi ................................ 37

      b. The State Fails to Offer Any Reasonable Basis to Disbelieve that Alejo Molested Wendi ................................. 39

      c. The State Does Not Meaningfully Refute Dr. Hopper's Conclusions Regarding the Effects of Wendi's Childhood Trauma ............................................... 42

    2. The Mental Health Evidence Was Credible and Powerful Mitigation ..................................................................... 44

  B. As this Court Has Already Found, Mitigating Evidence of Wendi's Traumatic Childhood and Psychiatric Disorders is Not Cumulative and Could Have Resulted in a Different Sentence ..................................... 48

    1. Evidence of Wendi's Traumatic Childhood and Psychiatric Disorders is Not Cumulative of Evidence Presented at Trial ......... 48

    2. There is a Reasonable Probability That at Least One Juror Would Have Struck a Difference Balancing in Weighing the Mitigating Evidence Against the Aggravating Evidence ................ 52

{00137731.1 }

iii

**TABLE OF CONTENTS (cont'd)**

<u>**Page**</u>

CONCLUSION ................................................................................................................ 55

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

{00137731.1 }                                   iv
PETITIONER'S POST-HEARING REPLY MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

P-App. 000502

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Babbitt v. Calderon,*
   151 F.3d 1170 (9th Cir. 1998) ................................................... 30

*Bobby v. Van Hook,*
   558 U.S. 4 (2009) .................................................................... 20

*Correll v. Ryan,*
   539 F.3d 938 (9th Cir. 2008) ............................................. 21, 52

*Cuyler v. Sullivan,*
   446 U.S. 355 (1980) ...................................................... 5, 6, 7, 18

*Doe v. Roe,*
   191 Ariz. 313, 955 P.2d 951 (1998) .................................. 29, 40

*Duckett v. Mullin,*
   306 F.3d 982 (10th Cir. 2002) .................................................. 30

*Gregg v. Georgia,*
   428 U.S. 153 (1976) ................................................................. 24

*Grisby v. Blodgett,*
   130 F.3d 365 (9th Cir. 1997) ................................................... 29

*Hamilton v. Ayers,*
   583 F.3d 1100 (9th Cir. 2009) ................................................. 35

*Lackey v. Johnson,*
   116 F.3d 149 (5th Cir. 1997) ................................................... 30

*Leon v. Ryan,*
   No. CV 11-0129-TUC-BPV, 2014 U.S. Dist. LEXIS 9587
   (D. Ariz. Jan. 24, 2014)........................................................... 40

*Mickens v. Taylor,*
   535 U.S. 162 (2002)................................................................... 7

*Padilla v. Kentucky,*
   559 U.S. 356 (2010) ................................................................. 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

*Porter v. McCollum,*
    558 U.S. 30 (2009)...................................................................... 55

*Puiatti v. Secretary, Florida Department of Corrections,*
    732 F.3d 1255 (11th Cir. 2013) .......................................... 24, 25, 29

*State v. Bocharski,*
    218 Ariz. 476, 189 P.3d 403 (2008) ......................................... 21

*State v. Jenkins,*
    148 Ariz. 463, 715 P.2d 716 (1986) ........................................ 6, 7

*State v. Martinez-Serna,*
    166 Ariz. 423, 803 P.2d 416 (1990) .......................................... 7

*State v. Moore,*
    222 Ariz. 1, 213 P.3d 150 (2009) ............................................. 6

*State v. Reimer,*
    189 Ariz. 239, 941 P.2d 912 (Ariz. App. 1997) ...................... 46

*State v. Salazar-Mercado,*
    234 Ariz. 590, 325 P.3d 996 (2014) ........................................ 40

*State v. Spreitz,*
    202 Ariz. 1, 39 P.3d 1263 (2002) .............................................. 2

*State v. Spreitz,*
    39 P.3d 525 (2002)..................................................................... 5

*State v. Tucker,*
    205 Ariz. 157, 68 P.3d 110 (2003) ......................................... 5, 6

*Strickland v. Washington,*
    466 U.S. 668 (1984)........................................................... *passim*

*United States v. Malpiedi,*
    62 F.3d 465 (2d Cir. 1995)....................................................... 15

*Wiggins v. Smith,*
    539 U.S. 510 (2003)........................................................... *passim*

*Williams v. Taylor,*
    529 U.S. 362 (2000)........................................................... 20, 51

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{00137731.1 }

vi

P-App. 000504

1

2

3

*Wong v. Belmontes*,

4      558 U.S. 15 (2009) (per curiam) ............................................................... 47

5   *Wood v. Georgia*,

6      450 U.S. 261 (1981) ........................................................................... 7, 17

**Statutes**

7

8   Ariz. Rev. Stat. § 13-751(G)(1) ................................................................. 45

9   Ariz. Rev. Stat. § 13-3620 ........................................................................ 40

10   **Other Authorities**

11   The American Bar Association Guidelines for the Appointment and
      Performance of Defense Counsel in Death Penalty Cases (the
12      "Guidelines") ............................................................................... *passim*

13

14   Ariz. R. Prof'l Conduct 1.7 ................................................................. 11, 12

15   Ariz. R. Prof'l Conduct 1.7 cmt. 1 ............................................................ 17

16   Don A. Moore & George Loewenstein, *Self-Interest, Automaticity, and the
      Psychology of Conflict of Interest*, SOCIAL JUSTICE RESEARCH Vol. 17,
17      No. 2, at 190-91 (2004) .................................................................... 11, 17

18   Don A. Moore, Lloyd Tanlu & Max H. Bazerman, *Conflict of Interest and
      Intrusion of Bias, Judgment and Decision Making*, JUDGMENT &
19      DECISION MAKING Vol. 5, No. 1, at 38 (Feb. 2010) ............................ 11, 16

20   U.S. Const., Amend. VI ....................................................................... 5, 6, 17

21

22

23

24

25

26

27

28

**INTRODUCTION**

At its core, the State's post-hearing brief seems to misunderstand the purpose of the eight-day evidentiary hearing in this matter.  In its October 30, 2012 Order granting the hearing, this Court determined that the claims addressed in the hearing were "colorable"—that they were claims "which, if taken as true, 'might have changed the outcome'" of the sentencing phase of Wendi's trial.  (Oct. 30, 2012 Order at 4 (quoting *State v. Schrock*, 149 Ariz. 433, 441, 719 P.2d 1049, 1057 (1986)); *see also id.* at 4, 5 (finding claims for ineffective assistance of counsel in failing to investigate certain mitigating evidence and a conflict of interest by trial counsel David DeLozier to be colorable).)  Thus, the purpose of the evidentiary hearing was to assess the truth of those claims, not to reargue whether they were colorable.

Yet the State's post-hearing brief does little to undercut the truth of those claims. The State does not refute the testimony of Wendi's trial counsel regarding their lack of investigation into any potentially negative facts about Wendi's upbringing.  The State does not dispute that David DeLozier, Wendi's trial counsel responsible for developing such mitigation evidence, was representing the primary *perpetrators* of Wendi's childhood abuse and neglect at the same time he should have been investigating those issues in Wendi's case.  The State does not deny that a full social history is fundamental to a proper psychiatric diagnosis—a point upon which every witness to testify on the subject, including the State's expert, agreed.  Nor does it dispute that no mental health expert was provided with such a social history of Wendi until this PCR proceeding, when Drs. George Woods and Jim Hopper evaluated her symptoms in light of her social history.

In fact, the State's brief largely ignores the substance of the evidentiary hearing, other than conclusory assertions that the jury would not have been persuaded by the evidence presented or would have given it little weight.  But this Court presided over the

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1   evidentiary hearing, in which the State had the same opportunity to impeach the

2   testimony and exhibits as it would have upon resentencing.  This Court does not benefit

3   from the State's characterization of the evidence as having "little weight."  Having seen

4   the testimony and evidence firsthand, this Court is well-positioned to determine for itself

5   whether the mitigating evidence presented at the hearing was sufficient to create "a

6   reasonable probability that at least one juror would have struck a different balance" and

7   sentenced Wendi to life in prison rather than death.  *Wiggins v. Smith*, 539 U.S. 510, 537

8   (2003).

9          In lieu of arguing that the claims for post-conviction relief were without basis in

10   fact, the State returns to the same arguments (sometimes word-for-word) that failed to

11   persuade this Court more than two years ago—namely, that the evidence trial counsel

12   failed to develop was cumulative, and that it would not have outweighed the aggravating

13   circumstances and/or some kind of additional rebuttal evidence.  The State even attempts

14   to argue that the conflict claim is precluded as a matter of law for failing to raise it on

15   direct appeal, an argument this Court expressly rejected.  (*See* Oct. 30, 2012 Order at 6

16   ("Finally, regarding defense counsel's alleged conflict of interest, because the issue was

17   not raised at trial and both parties assert facts that were not before the court at trial, it is

18   not an issue that could have been raised on appeal.  *State v. Spreitz*, 202 Ariz. 1, 39, 39

19   P.3d 1263 (2002).").)  The State offers no reasonable grounds to deem any factual aspect

20   of the claims for which this Court granted an evidentiary hearing untrue, and no new

21   basis for this Court to reconsider its prior conclusion that the claims, "if taken as true,

22   'might have changed the outcome" of Wendi's sentence.  (Oct. 30, 2012 Order at 4.)

23          Nor does the State dispute the applicable law.  With one exception,[1] the State does

24   not even attempt to distinguish any of the dozens of United States Supreme Court, Ninth

25   Circuit, and Arizona cases cited in Petitioner's opening brief.  The State simply cites

26   ───────────────

27   [1] *See infra* Argument Section I.B.

{00137731.1 }

2

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

1  different cases, typically from other federal Circuit Courts of Appeals, all of which are

2  readily distinguishable from the facts at issue here.

3        In sum, evidence regarding Wendi's childhood trauma and subsequent psychiatric

4  disorders is mitigating evidence that could have persuaded at least one juror not to

5  impose the death penalty, but such evidence was not investigated, discovered or

6  presented by her trial counsel despite the well-recognized norms of capital practice and

7  numerous red flags indicating that such an investigation would have been fruitful.

8                              **SUMMARY OF ARGUMENT**

9        This reply will first addresses Wendi's claim based on DeLozier's conflict of

10  interest.  Rather than squarely confronting DeLozier's obvious conflict in representing

11  two clients (Donna and Alejo Ochoa) in a child custody proceeding when he owed

12  another client (Wendi) a duty to investigate them for potential child abuse, the State

13  misapplies United States Supreme Court precedent on conflict claims and offers a

14  confusing argument that DeLozier's failure to adequately investigate the Ochoas for

15  potential childhood abuse was excused because he did not know they had abused her.

16  But DeLozier did not know they abused her because he willfully chose not to investigate

17  the issue, despite his duty to do so in Wendi's case and numerous red flags indicating

18  potential abuse.  Had he recognized the numerous red flags and performed the thorough,

19  objective childhood investigation he was duty-bound to perform on Wendi's behalf, he

20  could have discovered the mitigating evidence set forth at the evidentiary hearing.

21        Next, this reply will address the two elements of the ineffective-assistance-of-

22  counsel claim, ineffectiveness and prejudice.  As to ineffectiveness, the State appears to

23  concede (as it must) that Wendi's trial counsel performed almost no investigation into

24  Wendi's traumatic childhood or her subsequent psychiatric disorders.  Instead, it argues

25  that their minimal investigation met the standard of the care, and breezily dismisses the

26  numerous red flags warranting further investigation.  As set forth below, the State's

27

28

{00137731.1 }

3

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1  interpretation of the standard of care directly conflicts with *Wiggins* and a host of other

2  precedent set forth in Petitioner's opening brief, which the State fails to distinguish.  Trial

3  counsel always has a duty to investigate potential mitigating evidence in a capital case,

4  including the "classic" mitigating evidence of childhood abuse and psychiatric disorders.

5  (Petitioner's Post-Hearing Memorandum ("Petr. Br.") at 4-6.)  The red flags provided

6  further reason to conduct a proper investigation, and an indication that such an

7  investigation could be fruitful.

8          Finally, as to the prejudice prong of the ineffectiveness claim, the State's

9  arguments that the evidence of childhood trauma and psychiatric diagnoses could not

10  have changed any juror's mind at sentencing are unpersuasive.  Mental health evidence,

11  including evidence of the long-term effects of childhood trauma, is clearly connected to

12  the offense; the evidence was brought forth and explained by highly qualified mental

13  health experts; and it certainly could have persuaded a reasonable juror to conclude that a

14  life sentence was more appropriate than death.  Moreover, in addition to explaining the

15  homicide itself, the mitigating evidence also gives context to Wendi's pre-offense affairs

16  and other behaviors the State emphasized in arguing to the jury that death was warranted.

## ARGUMENT

### I.  WENDI IS ENTITLED TO RELIEF ON HER CONFLICT OF INTEREST CLAIM

20          Before, throughout and after Wendi's capital murder trial, DeLozier represented

21  Wendi's parents in their bid to obtain custody of their grandchildren and also accepted

22  payment from the Ochoas for Wendi's representation.  As a result, DeLozier labored

23  under multiple conflicts of interest, including his inability to view the Ochoas critically,

24  his ethical obligation not to use information he learned against the Ochoas, and his

25  personal interest in obtaining payment from the Ochoas.  DeLozier admits that these

26  conflicts blinded him, preventing him from providing Wendi with the unbiased and

{00137731.1 }                                              4

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1  undivided loyalty required by the Sixth Amendment.  As a result, DeLozier disregarded

2  critical evidence of neglect, exploitation, and abuse of Wendi as a child, instead pursuing

3  a mitigation theme that the Ochoas provided Wendi with a wholesome, loving, Christian

4  upbringing.  Because DeLozier had actual conflicts of interest that adversely affected

5  Wendi's representation, Wendi is entitled to relief.  *Cuyler v. Sullivan*, 446 U.S. 355, 350

6  (1980).

7       The State repeats its preclusion argument in an attempt to avoid the merits of this

8  claim entirely.  The State also attempts to persuade the Court to impose the prejudice

9  requirement of *Strickland v. Washington*, 466 U.S. 668 (1984) rather than *Sullivan*'s

10  requirement of adverse effect, notwithstanding the lack of any authority supporting the

11  application of *Strickland* to Wendi's conflicts claim.  Finally, the State argues that there

12  was no conflict and, if there was, it did not affect the adequacy of Wendi's representation.

13  As explained below, none of these arguments have merit.

14       **A.      The Conflict Claim is Properly First Raised in a Petition for Post-
15               Conviction Relief**

16       The State argues that Wendi's conflict claim is precluded because she did not

17  "raise[ ] her conflict of interest claim at trial or on direct appeal."  (State Br. at 69.)

18  However, in *State v. Tucker*, the Arizona Supreme Court emphasized that any request for

19  relief from the defendant's death sentence because of an attorney's conflict *must* be

20  addressed in post-conviction relief proceedings.  205 Ariz. 157, ¶ 26, 68 P.3d 110, 116

21  (Ariz. 2003) (whether attorney "did not pursue a third-party defense [because of a

22  conflict of interest] can only be developed at an evidentiary hearing in a post-conviction

23  relief proceeding"); *State v. Spreitz*, 39 P.3d 525, 527 (2002) ("We reiterate that

24  ineffective assistance of counsel claims are to be brought during Rule 32 proceedings.

25  Any such claims improvidently raised in a direct appeal, henceforth, will not be

26  addressed by appellate courts regardless of merit.").

27

28

{00137731.1 }                                   5

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

The State cites only one case—*State v. Moore*, 222 Ariz. 1, 213 P.3d 150 (2009)—which it contends supports its preclusion argument.  (State Br. at 69.)  This case is inapposite for two reasons.  First, it is factually distinguishable.  In *Moore*, the defendant argued on direct appeal that the trial court erred in denying his counsel's motions to withdraw due to an alleged conflict.  *Id.* ¶ 76, 213 P.3d at 164.  Wendi's conflict claim, in comparison, is not challenging any action taken by the Court during her trial; she is arguing that her conviction violates the Sixth Amendment right to an attorney with undivided loyalty.  Accordingly, she properly followed the Arizona Supreme Court's direction by raising her conflict claim in post-conviction relief proceedings.  *Tucker*, 205 Ariz. 157 at ¶ 26, 68 P.3d at 116.  Second, although *Moore* addressed the defendant's claim regarding the court's denial of the motions to withdraw, it does not contain any discussion even suggesting that a conflict claim is precluded if not raised on direct appeal.  In fact, it does not address preclusion at all.  The State does not identify *any* decisions finding a conflict claim precluded when first raised in post-conviction relief proceedings.

### B.   *Sullivan* Applies to Wendi's Conflict Claim

Under *Sullivan*, a defendant seeking relief in the form of a new trial based on trial counsel's conflict of interest must prove that her counsel had an actual conflict of interest that adversely affected her representation.  *Cuyler v. Sullivan*, 446 U.S. 355, 350 (1980).  Once these requirements are met, the party is entitled to relief.

The State first argues that the *Strickland* prejudice standard—rather than the *Sullivan* standard of adverse effect—is the standard to be applied to the claim arising from DeLozier's conflict.  (State Br. at 69-70.)  In support, the State cites *State v. Jenkins*, 148 Ariz. 463, 715 P.2d 716 (1986), which the State claims holds that *Sullivan* is "limited the joint representation of co-defendants."  (State Br. at 69.)  This is untrue.  *Jenkins* applied *Sullivan* to the defendant's request for post-conviction relief because of

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

his attorney's concurrent representation of a witness—not a co-defendant—in the witness's divorce case.  148 Ariz. 463 at 465, 715 P.2d at 718.  Not only does *Jenkins* not hold that *Sullivan* is limited to joint representation of co-defendants, but it actually applies *Sullivan* to the same type of conflict at issue here.  *Id.*

The other cases cited by the State also provide no support for its attempt to avoid *Sullivan*.  In *State v. Martinez-Serna*, 166 Ariz. 423, 425, 803 P.2d 416, 418 (1990), the Arizona Supreme Court applied *Sullivan* to a conflict claim involving the joint representation of co-defendants.  However, nothing in *Martinez-Serna* suggests that *Sullivan* only applies to the joint representation of co-defendants; joint representation just happened to be the fact pattern in the case.  *Id*.  The State also notes that the United States Supreme Court declined to "rule upon the need for *Sullivan* prophylaxis in cases of successive representation."  (State Br. at 70 (quoting *Mickens v. Taylor*, 535 U.S. 162, 174-75 (2002)).)  Again, nothing in *Mickens* case suggests that *Sullivan* applies only to cases involving the joint representation of co-defendants.  Indeed, the United States Supreme Court has applied *Sullivan* to conflicts that did not involve joint representation of defendants, such as *Wood v. Georgia*, 450 U.S. 261, 271 (1981), which involved a conflict created by a non-clients' payment of the defendants' attorney fees.

Both the United States Supreme Court and the Arizona Supreme Court have applied *Sullivan* to conflicts other than the joint representation of co-defendants, and the Arizona Supreme Court has applied *Sullivan* to the same type of conflict as in this case.  Accordingly, *Sullivan* governs Wendi's conflict of interest claim.

## C.   DeLozier Had Several Actual Conflicts of Interest

### 1.   DeLozier's Responsibility to Wendi to Investigate and Present Information Harmful to the Ochoas Created an Actual Conflict.

The State argues that because DeLozier "testified that no one ever told him that [Wendi] suffered any type of abuse, including sexual abuse, from the Ochoas . . . no

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1   actual conflict of interest was realized.  Nothing came to DeLozier's attention during his

2   representation of the Ochoas that would have caused a conflict with his duty of loyalty to

3   [Wendi]."  (State Br. at 72.)  This argument fails for two reasons.

4       *First*, DeLozier had an obligation to investigate whether Wendi had suffered

5   childhood abuse from the outset of the case.  *See* The American Bar Association

6   Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty

7   Cases (the "Guidelines") (Evidentiary Hearing Ex. 76), at 80-81 ("Because the sentencer

8   in a capital case must consider in mitigation, 'anything in the life of the defendant which

9   might militate against the appropriateness of the death penalty for the defendant,'

10  'penalty phase preparation requires extensive and generally unparalleled investigation

11  into personal and family history," including "physical, sexual, or emotional abuse, family

12  history of mental illness, cognitive impairments . . . poverty, familial instability,

13  neighborhood environment and peer influence.").  Wendi's "interest was in seeking

14  leniency" and she depended on DeLozier to investigate and inform the jury about

15  "anything from childhood that might help the jury understand how she could have

16  behaved the way she did at the time of the offense and in this case in the months

17  preceding the offense."  (2/11/14 Tr. at 164:6-20 (G. Lowenthal).)  In contrast, the

18  Ochoas' effort to gain custody of their grandchildren would have been severely impaired

19  by investigation and disclosure of the abuse and neglect Wendi experienced as a child.

20  (*Id.* at 164:6-20 (G. Lowenthal); *see also* 2/10/14 Tr. at 74:19-75:13 (D. DeLozier) (The

21  Ochoas retained DeLozier to present them as "honorable people" and "appropriate parties

22  to have some time with their grandchildren.").)

23      *Second*, this argument fails because DeLozier was confronted with multiple

24  indicators of Wendi's childhood abuse, yet did nothing to investigate and present this

25  abuse to the jury.  The Lambeths' child abuse allegation against the Ochoas was one such

26  indicator.  This allegation alone raised the issue of whether Wendi was likewise abused,

27

28
{00137731.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

and should have prompted a diligent investigation that would have uncovered the additional evidence presented during the post-conviction relief hearing.  DeLozier's only reason for not investigating was his disbelief that the Ochoas were anything other than excellent parents and grandparents.  (2/10/14 Tr. at 138-39 (D. DeLozier).)  By his own admission, DeLozier's inability to view the Ochoas objectively was the result of his advocacy for them in the guardianship and adoption cases.  (*Id.* (D. DeLozier) (in family law cases, "you're focusing on anything you know negative about the other side, unfortunately.  It's the nature of the beast.  And anything you know positive about what's going on with the people that you're currently representing . . . So it's possible that focusing on that aspect of the grandparent case kept me from focusing on anything that might have been historical in Wendi's case.").); *see also* 2/11/14 Tr. at 167:13-15 (G. Lowenthal) (DeLozier told Lowenthal he "felt blinded by his zealous advocacy of the Ochoas").)

The State attempts to downplay the significance of the abuse allegation, suggesting that it was not worth investigating.  (State Br. at 72.)  However, DeLozier's co-counsel, Dan Patterson, admitted that the allegation "bears upon potential areas of mitigation that should have been developed at a bare minimum under *Wiggins*."  (2/7/14 Tr. at 36:16-25 (D. Patterson).)  Furthermore, this allegation was only one of several red flags that should have prompted DeLozier to investigate the possibility of childhood abuse.  For example, DeLozier knew that Alejo solicited sex stories from Wendi to post on the Internet.  (2/10/14 Tr. at 131:14-132:8 (D. DeLozier).)  In addition, Rohde reported Wendi's tendency to dissociate, pervasive memory problems, and lack of sexual responsiveness.  (*Id.* at 112:5-14, 122:23-124:15, 126:21-127:8 (D. DeLozier); Ex. 230 at 5; Ex. 7.002 at 1.)  Murphy similarly noted Wendi's dissociation.  (2/10/14 Tr. at 132-16-133:15 (D. DeLozier); Ex. 52.)  Although he seized on these psychological features as important evidence of childhood sexual abuse in his cases against the Catholic Church,

{00137731.1 }

9

1   which he commenced prior to Wendi's trial, DeLozier did nothing to investigate the

2   possibility of childhood sexual abuse in Wendi's case.  (2/10/14 Tr. at 90:25-97:9, 102:3-

3   6 (D. DeLozier).)  Finally, both Rohde and Murphy specifically reported their suspicions

4   of childhood trauma and abuse to DeLozier.  (2/10/14 Tr. at 122:23-124:15, 132:16-

5   133:15 (D. DeLozier); Ex. 7.002 at 1; Ex. 52.)  In short, DeLozier obtained ample

6   evidence suggestive of Wendi's childhood abuse even without the Lambeths' allegation.

7       DeLozier's overall obligation to conduct a reasonably diligent mitigation

8   investigation, combined with his awareness of facts and allegations indicating that Wendi

9   was abused as a child, were in actual conflict with his presentation of the Ochoas as

10  excellent parents and grandparents in the guardianship proceeding, and with DeLozier's

11  interest in obtaining payment from the Ochoas.  (2/11/14 Tr. at 162:1-25 (G.

12  Lowenthal).)

13          **2.    DeLozier Never Sought or Obtained Wendi's Informed Consent
14                  to the Conflict**

15      The State also argues that Wendi "wanted the Ochoas to have visitation or custody

16  rights with her children; thus, [the interests of Wendi and the Ochoas] were aligned."

17  (State Br. at 72.)

18      Any preference Wendi might have had regarding the placement of her children is

19  irrelevant to whether a conflict existed.  In order for Wendi to have made a fully

20  informed decision about how DeLozier should proceed, it would have been necessary for

21  DeLozier to:  (a) investigate sources of potential mitigation including the possibility that

22  the Ochoas had abused Wendi; (b) once that investigation was completed, explain to

23  Wendi that the concurrent representation and payment by the Ochoas could impair his

24  ability to advance her interests in avoiding the death penalty; and (c) explain to Wendi

25  that presenting evidence regarding abuse by the Ochoas could strengthen Wendi's

26  mitigation case, but that he would be unable to do so without breaching his ethical

27

28

{00137731.1 }

10

obligations to the Ochoas.  (*See* 2/11/04 Tr. at 163:22-164:5, 165:19-166:6 (G. Lowenthal).)  DeLozier took none of those steps to obtain informed consent to the conflict.  Indeed, DeLozier never raised the possibility of a conflict at all.  (*Id.*) Therefore, even if Wendi had a generalized desire to have her children raised by the Ochoas, that does not constitute an informed waiver of the conflict created by DeLozier's concurrent representation of the Ochoas and Wendi.

Because Wendi never consented to the conflict (or even knew it existed), the State's speculation regarding Wendi's likely preferences is irrelevant.  *See* Ariz. R. Prof'l Conduct 1.7 (requiring informed consent, confirmed in writing).

### 3. DeLozier's Failure to Appreciate the Conflict at the Time of Wendi's Representation is Irrelevant to Whether the Conflict Existed

The State argues that comments by DeLozier indicating that he did not perceive a conflict at the time he was representing both Wendi and the Ochoas proves that no conflict existed.[2]  (State Br. at 71-72.)  The State cites no authority in support of its contention that the allegedly conflicted attorney is the arbiter of whether a conflict exists. The State effectively argues that conflicts are excused if the attorney subjectively believes no conflicts exist, regardless of whether that belief is unreasonable or uninformed.

---

[2] Empirical research shows that professionals often do not recognize when they are conflicted and that "violations of professionalism induced by conflicts of interest often occur automatically and without conscious awareness."  Don A. Moore & George Loewenstein, *Self-Interest, Automaticity, and the Psychology of Conflict of Interest*, SOCIAL JUSTICE RESEARCH Vol. 17, No. 2, at 190-91 (2004) ("Loewenstein"). Furthermore, the failure to recognize the conflict actually magnifies its effect: "Such lack of insight into their own cognitive processes makes it difficult for people to purge biasing information from their judgments even when they desire to do so."  Don A. Moore, Lloyd Tanlu & Max H. Bazerman, *Conflict of Interest and Intrusion of Bias, Judgment and Decision Making*, JUDGMENT & DECISION MAKING Vol. 5, No. 1, at 38 (Feb. 2010) ("Tanlu").

{00137731.1 }

11

That is not the standard.  Nothing in Arizona's professional rules excuse conflicted representation simply because the attorney unreasonably failed to appreciate the conflict.  *See* Ariz. R. Prof'l Conduct 1.7.  DeLozier's failure to appreciate the multiple conflicts posed by his representation of the Ochoas and payment by the Ochoas for Wendi's representation does not mean these conflicts do not exist.

**D.    Because of the Conflicts, DeLozier Failed to Pursue the Plausible Alternative Defense Strategy of Investigating and Presenting Wendi's History of Childhood Abuse**

The State argues that DeLozier's conflicts did not adversely affect Wendi's representation for three reasons.  *First*, the State claims that no plausible alternative defense strategy existed because neither the Ochoas nor Wendi reported the abuse to DeLozier and because several other individuals did not conclude that Wendi was abused as a child.  (State Br. at 72-73.)  But no one other than DeLozier had both the responsibility to investigate mitigating evidence in Wendi's case and the primary relationship with the Ochoas.  Furthermore, despite having no role as fact investigators on the defense team, both Rohde and Murphy specifically told DeLozier that they suspected childhood trauma or abuse based on interviews with Wendi.

*Second*, the State argues that DeLozier failed to investigate negative facts about the Ochoas not because he was their lawyer, but rather because he simply disbelieved those allegations.  (State Br. at 71-72.)  This argument ignores DeLozier's testimony that his relationship with the Ochoas blinded him, causing him to discount negative information he received about them.  DeLozier disregarded the allegations against the Ochoas *because of the conflicts*.

*Third*, the State argues that Wendi's history of childhood abuse would have been merely cumulative of the evidence actually presented at trial.  (State Br. at 73-74.)  However, as discussed below, the jury did not hear any evidence regarding the Ochoas' family history of significant mental health issues, Donna's neglect of Wendi since she

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

was an infant, the family's extreme poverty while part of the transient ministry, the oppressive, controlling, and violent fundamental church and school in which Wendi grew up, or Alejo's pervasive sexual abuse of Wendi.

### 1. A Plausible Alternative Defense Strategy Existed at the Time of DeLozier's Representation

#### a. Multiple Sources Informed DeLozier of Their Suspicions of Wendi's Childhood Trauma and Abuse

The State argues that "[t]he Ochoas never informed DeLozier of any sexual improprieties committed by Alejo Ochoa. [Wendi] never informed DeLozier that she had suffered sexual abuse from Alejo. Therefore, [Wendi] has failed to show that a plausible alternative mitigation strategy existed at the time DeLozier represented [her]." (State Br. at 74.)

In making this argument, the State ignores that Rohde and Murphy both reported Wendi's psychological features indicative of abuse and their suspicions that Wendi experienced childhood trauma and/or sexual molestation. Furthermore, DeLozier knew that the Lambeths had accused the Ochoas of child abuse. (Ex. 95; 2/11/14 Tr. at 141:9-13 (G. Lowenthal).) Had he conducted a minimally adequate investigation, DeLozier could have obtained additional evidence of abuse, including testimony from childhood friends of Wendi such as Jeri Lynn Cunningham and Kyre Lorts. (*See, e.g.*, 2/5/14 Tr. at 71:6-20 (K. Lorts) (no one from defense team contacted her); *Id.* at 238:24-239:14 (J. Cunningham) (no one from defense team contacted her, she would have testified about abuse if someone had).)

The mere fact that the abusers and their victim did not report the abuse to DeLozier does not mean that this abuse could not have been discovered. Because DeLozier had evidence of abuse from multiple other sources and could have obtained additional evidence with a reasonably diligent investigation, investigating and presenting Wendi's history of abuse was a plausible alternative defense strategy.

[00137731.1 ]

13

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**b.     DeLozier's Role on the Defense Team and Monopoly on Information About the Ochoas Compounded the Harm From the Conflicts**

The State argues that others failed to discover evidence of abuse and that, "[t]herefore, a plausible alternative mitigation strategy did not exist at the time DeLozier represented [Wendi]."  (State Br. at 72-73.)  This argument ignores that DeLozier was the primary person with both the responsibility to investigate the possibility of abuse and access to information necessary to do so.

No one else involved in the guardianship proceeding was charged with investigating whether *Wendi* was abused as a child; the guardianship proceeding focused upon the interests of the Ochoas' grandchildren.  Furthermore, no one involved in the guardianship proceeding other than DeLozier had information indicative of the Ochoas' abuse and neglect of Wendi, such as observations from Rohde and Murphy.  And Rohde and Murphy were social workers who met with Wendi, not fact investigators; after they identified indications that Wendi suffered childhood abuse, it was incumbent upon the attorneys to develop evidence of whether such abuse occurred.

Finally, Patterson assigned DeLozier the responsibility for mitigation relating to the Ochoas.  (2/7/14 Tr. at 27:11-21, 48:21-49:1 (D. Patterson).)  As a result, Patterson neither tried to evaluate whether the Ochoas abused Wendi, nor was he in the position to do so.  (*See id.* at 132:15-24 (D. Patterson) (explaining that he discounted evidence of Wendi's childhood abuse or simply "passed [it] on to DeLozier" because "unfortunately, I didn't assist greatly in the development of the mitigation in this case . . .").)  DeLozier's near-monopoly on the defense team's relationship with the Ochoas compounded the effect of the conflict; though DeLozier was in the best position to investigate negative allegations regarding the Ochoas and Wendi's upbringing, he had multiple incentives to dismiss such information rather than share it with the rest of the defense team.  Indeed, DeLozier was the only person on the defense team to learn about the Lambeths' child

{00137731.1 }

14

1  abuse allegations, and did not communicate this information to anyone else.  (2/10/14 Tr.

2  at 132:75:17-20, 77:6-12 (D. DeLozier); 2/7/14 Tr. at 36:11-15, 37:1-7 (D. Patterson).)

3     The fact that others did not uncover the evidence of Wendi's childhood abuse does

4  not mean that it did not exist – it means that the impact of DeLozier's conflict was

5  magnified because this evidence never reached an unbiased source.

6        **2.    DeLozier's Failure to Appreciate the Significance of the Abuse**

7        **Allegations Highlights the Impact of the Conflict of Interest.**

8     The State cites comments by DeLozier that he saw the abuse allegations against

9  the Ochoas as typical in cases involving child custody.  (State Br. at 71-72.)  From this,

10  the State argues that DeLozier's failure to view these allegations as worthy of

11  investigation proves that any conflict did not impact Wendi's representation.[3]  (*Id.*)  This

12  argument presupposes that DeLozier would have viewed the abuse allegations the same

13  regardless of whether the Ochoas were his clients and regardless of whether the Ochoas

14  were paying for both representations, and that these relationships did not bias his analysis

15  of viable mitigation strategies for Wendi.

16     DeLozier's unrebutted testimony was exactly to the contrary.  DeLozier explained

17  that his role as the Ochoas' advocate focused his attention towards any positive

18  information about the Ochoas and caused him to disbelieve any negative information:

19     [W]hen you're in a family law case, . . . you have two people, people on

---

21  [3] To the extent that any of DeLozier's comments could be construed as denials that he
would have pursued the abuse allegations on Wendi's behalf even if not for his
22  relationship with the Ochoas, any such denials should be viewed with great skepticism:

23     [A]fter-the-fact testimony by a lawyer who was precluded by a conflict of
      interest from pursuing a strategy or tactic is not helpful.  Even the most
24     candid persons may be able to convince themselves that they actually
      would not have used that strategy or tactic anyway, when the alternative is
25     a confession of ineffective assistance resulting from ethical limitations.

27  *United States v. Malpiedi*, 62 F.3d 465, 470 (2d Cir. 1995).

{00137731.1 }                         15

each side, and you've got unfortunately lawyers that are throwing rocks at each other . . . So I never get too concerned about what people are saying because I expect both of them to be exaggerating on both sides . . . So you start off with that, so you're focusing on anything you know negative about the other side, unfortunately.  It's the nature of the beast.  And anything you know positive about what's going on with the people that you're currently representing . . . So it's possible that focusing on that aspect of the grandparent case kept me from focusing on anything that might have been historical in Wendi's case.  Okay?  As far as the things that Rohde and so forth and so forth were telling.

(2/10/14 Tr. at 138-39 (D. DeLozier); *see also* 2/11/14 Tr. at 167:13-15 (G. Lowenthal) (DeLozier "felt blinded by his zealous advocacy of the Ochoas").)  DeLozier discounted evidence suggestive of Wendi's history of childhood abuse because his attorney/client relationship with the Ochoas prevented him from viewing them in anything but a positive light.  (*Id*.)

This testimony is consistent with extensive research on conflicts.  For example, in one study, researchers asked all subjects to (1) decide whether to approve their client's internal auditing; and (2) conduct their own independent audit based on the same facts.  Tanlu, *supra*, at 39.  However, half of the subjects were asked to evaluate their client's auditing first, while the other half were asked to conduct an independent audit first.  *Id*.  The study found that subjects who viewed the facts from their client's perspective first were significantly more likely to later reach "independent" valuations favorable to the client.  *Id*. at 39-40 ("When people are accountable to others with known preferences, their judgments tend to assimilate to those preferences.").  Similarly here, DeLozier first encountered the abuse allegations in his role as the Ochoas' attorney, and not surprisingly viewed these allegations from their perspective.  As a result, DeLozier was unable to provide an unbiased evaluation of the same facts on Wendi's behalf.

Research on conflicts also sheds light on the extent to which DeLozier's personal interest in obtaining payment from the Ochoas for both representations clouded his ability to consider defense strategies that would upset the Ochoas and therefore risk

1    nonpayment.  For example, one analysis reviewed several studies and concluded that self-

2    interest skews decision-making even in the absence of any conscious awareness of the

3    biasing effect:

> Self-interest exerts a more automatic influence than do professional
> responsibilities, which are more likely to be invoked through controlled
> processing.  Since automatic processing tends to occur outside of conscious
> awareness, its influence on judgment and decision making is difficult to
> eliminate or completely correct.  The consequence of this differential
> processing is that self-interest often prevails . . .

8    Loewenstein, *supra*, at 190-91; *see also* 2/11/14 Tr. at 189:13-190:4 (G. Lowenthal)

9    (explaining that "there has to be a natural reluctance on someone who wants to continue

10   to get money from [a] person to push them into" talking about whether they abused their

11   child).

12        The State's argument that the conflicts did not adversely affect Wendi's

13   representation because DeLozier disbelieved the Lambeths' abuse allegations is contrary

14   to both DeLozier's own testimony and empirical research demonstrating the corrosive

15   effect of conflicts on objective reasoning.  It also ignores that the allegations were only

16   one of multiple indicators of Wendi's history of childhood abuse.  The Sixth Amendment

17   guarantees Wendi's right to unbiased counsel, capable of analyzing facts and considering

18   strategies unclouded by his loyalty to other clients or his own financial interests.  *Wood,*

19   450 U.S. at 271; *see also* Ariz. R. Prof'l Conduct 1.7 cmt. 1 ("Loyalty and independent

20   judgment are essential elements in the lawyer's relationship to a client.").  Wendi did not

21   receive this objective, unbiased representation during her capital murder trial.

22        **3.      Wendi's History of Childhood Abuse Is Not Cumulative**

23        Finally, the State argues that the new evidence presented at the PCR hearing is

24   merely cumulative of evidence presented at trial (specifically, limited evidence relating to

25   Wendi's religious background and Alejo's angry outbursts.  (State Br. at 73-74.)

26   Accordingly, the State argues that there was no plausible alternative mitigation strategy

27

28   {00137731.1 }                                    17
─────────────────────────────────────────────
PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1  that was not pursued because of DeLozier's conflict.  (*Id.*)

2      As addressed more fully below in connection with the ineffective assistance of

3  counsel claim, the State's argument is meritless.  DeLozier's mitigation theme at Wendi's

4  murder trial was that Wendi was "an innocent young girl who lived a sheltered life."

5  (12/8/04 Tr. at 28:30 (D. DeLozier).)  DeLozier presented testimony that Wendi had

6  loving parents, including a stepfather (Alejo) who treated her as his own daughter.  (*See,*

7  *e.g.,* 12/9/04 Tr. at 7:22-9:24 (C. Vargas); 92:9-99:9 (D. Ochoa); 12/13/14 Tr. at 40:9-

8  41:4 (L. Inskeep).)  Among other things, the jury did not learn of Donna's neglect and

9  Skip Robertson's physical and verbal abuse of Wendi during her early childhood (Petr.

10  Br. at 11-16); Wendi's deprivation and extreme poverty, including eating food from

11  dumpsters, while Donna and Alejo participated in a transient ministry (*id.* at 19-20);

12  Alejo's sexual abuse in a variety of forms, from photographing Wendi in lingerie to

13  requiring her to rub his nearly naked body for hours a night to molesting her and her

14  friends (*id.* at 24-30); or any of the resulting psychiatric effects of such abuse, including

15  complex post-traumatic stress disorder (PTSD) and her stunted development of executive

16  functioning, as confirmed through neuropsychological testing (*id.* at 30-48).

17      These are merely examples of the compelling evidence of Wendi's traumatic

18  childhood and its effects that was never presented to the jury.  Allowing the jury to view

19  Wendi's actions in the context of a childhood of pervasive neglect, exploitation, and

20  sexual abuse was a plausible alternative mitigation strategy that was not pursued because

21  of DeLozier's conflicts.

22      Accordingly, Wendi is entitled to relief on her conflicts claim under *Sullivan*.

23  **II.   TRIAL COUNSEL'S SUPERFICIAL MITIGATION INVESTIGATION**

24  **FELL BELOW PREVAILING PROFESSIONAL NORMS**

25      The State does not dispute that trial counsel's investigation fell below the standard

26  of care established in the Guidelines (Ex. 76).  It does not argue that trial counsel

27

28

{00137731.1 }

18

1    performed any more thorough mitigation investigation than the cursory and belated one

2    summarized in Petitioner's post-hearing brief.  And the State makes no comment upon,

3    and thus concedes, trial counsel's lack of coordination and dysfunction in preparing the

4    mitigation case.

5         Instead, the State's brief assumes that the Guidelines are irrelevant, and argues that

6    prevailing professional norms for capital defense are far less demanding than the

7    Guidelines.  As to the failure to investigate childhood trauma, the State argues (1) there is

8    no need for capital defense counsel to investigate potential childhood trauma unless the

9    issue is brought to their attention (State Br. at 17-20); and (2) potential childhood trauma

10   was not brought to trial counsel's attention here (*id.* at 21).

11        The State's argument as to the mental health investigation follows the same

12   approach.  According to the State:  (1) a single interview with a psychiatrist provided

13   with no social history of the defendant is sufficient investigation of mental health, unless

14   there are indications that the defendant suffers from a "serious" mental illness; and (2) no

15   indications of a "serious" mental illness were brought to trial counsel's attention here.

16   (*Id.* at 14-17.)

17        For the reasons set forth below, none of the State's efforts to lower the bar for

18   Wendi's trial counsel stand up to scrutiny.

19        **A.    It is Necessary to Consider the Guidelines in Assessing the
20                Reasonableness of Trial Counsel's Mitigation Investigation**

21        Whether Wendi's defense counsel was ineffective depends upon whether their

22   failures of investigation and coordination of Wendi's mitigation case "fell below an

23   objective standard of reasonableness . . . under prevailing professional norms."

24   *Strickland*, 466 U.S. at 687-88.  As noted in Petitioner's post-hearing brief, "[t]hough a

25   deviation from the Guidelines does not automatically constitute ineffective assistance of

26   counsel, they are 'well-defined norms,' *Wiggins*, 539 U.S. at 524, and the United States

27

28

{00137731.1 }

                                    19

1  Supreme Court has found ineffective assistance where attorneys' performance failed to

2  meet the norms expressed in the Guidelines or predecessor provisions in the ABA

3  Standards for Criminal Justice.  *See, e.g.*, *Wiggins*, 539 U.S. at 524-27; *Williams v.*

4  *Taylor*, 529 U.S. 362, 396 (2000)."  (Petr. Br. at 53.)

5       In response, the State simply repeats the first half of Petitioner's point—that a

6  deviation from the Guidelines does not automatically constitute ineffective assistance—

7  and ignores the rest.  (State Br. at 19-20.)  Indeed, after noting that the Guidelines do not

8  impose "mandatory obligations" in all cases (*id.*), the State never mentions them again.

9  Thus, because the Guidelines are not "inexorable commands," *Bobby v. Van Hook*, 558

10  U.S. 4, 8 (2009) (quotation omitted), the State effectively treats the Guidelines as

11  irrelevant to whether trial counsel was ineffective in this case.

12       None of the cases the State cites so casually dismiss the Guidelines, which the

13  United States Supreme Court has characterized as "measures of the prevailing

14  professional norms of effective representation."  *Padilla v. Kentucky*, 559 U.S. 356, 367

15  (2010).  Of the cases quoted by the State, the only one that even questions the relevance

16  of the Guidelines to the standard of care was a concurring opinion in *Van Hook* (quoted

17  in State Br. at 20).  But the issue in *Van Hook* was whether it was fair to apply the

18  Guidelines to the actions of defense counsel in a case that went to trial in 1985—18 years

19  before the Guidelines were issued—without some evidence that the prevailing norms for

20  defense counsel in 1985 were the same as those reflected in the Guidelines.  *See id.* at 8

21  ("Judging counsel's conduct in the 1980's on the basis of these 2003 Guidelines—

22  without even pausing to consider whether they reflected the prevailing professional

23  practice at the time of the trial—was error.")  The Court has never suggested that the

24  "well-defined norms" reflected in the 2003 Guidelines, *Wiggins*, 539 U.S. at 524, would

25  be irrelevant to the conduct of defense counsel in *this* case, which went to trial in late

26  2004.

27

28

{00137731.1 }

20

The State makes no argument that trial counsel's superficial mitigation investigation conformed to the Guidelines. The State does not contend that trial counsel undertook anything close to an "unparalleled investigation into [Wendi's] personal and family history" or conducted interviews of "virtually everyone . . . who knew the client and h[er] family" to compile a thorough "[f]amily and social history." (Ex. 76, at 80-81, 83.) The State does not contend that trial counsel performed any investigation whatsoever into whether Wendi suffered "physical, sexual, or emotional abuse" in her childhood or whether she had "cognitive impairments" or a "family history of mental illness," nor that they engaged in the "time-consuming and expensive process" of compiling this "extensive historical data"—data necessary to thoroughly investigate potentially mitigating evidence and to obtain a "competent and reliable mental health evaluation." (*Id.* at 81.) And the State does not dispute that these steps are a point of emphasis in all capital cases, because "[n]eurological and psychiatric impairment, combined with a history of physical and sexual abuse, are common among persons convicted of violent offenses." (*Id.* at 30.) *See also, e.g.*, *Correll v. Ryan*, 539 F.3d 938, 950-51 (9th Cir. 2008) (evidence of childhood abuse and neglect, incest, religious indoctrination through corporal punishment, and impulse control problems and impaired judgment at the time of the offense was "precisely th[e] type of evidence that the Supreme Court has termed as 'powerful'" mitigation); *State v. Bocharski*, 218 Ariz. 476, 497-99, 189 P.3d 403, 424-26 (2008) (mitigating evidence that the defendant "suffered severe physical, mental and sexual abuse during his childhood" and "came from a severely dysfunctional family" was sufficiently powerful mitigation to warrant reversal of death sentence on independent review).

While Petitioner has noted from the outset that a deviation from the Guidelines does not automatically constitute ineffective assistance of counsel (Petr. Br. at 53), neither trial counsel (Patterson and DeLozier) nor the State offered any reason for

21

1   deviating from the Guidelines in Wendi's case.  Patterson affirmed that he had the

2   resources to "retain anybody that was reasonably needed to properly defend Wendi"

3   (2/7/14 Tr. at 151:23-25 (D. Patterson)), and both Patterson and DeLozier confirmed that

4   there were no strategic reasons not to fully investigate potential childhood trauma or

5   mental health issues in Wendi's case.  (*See, e.g.*, *id.* at 68:11-14, 75:1-3, 177:22-178:15

6   (D. Patterson); 2/10/14 Tr. at 136:18-23 (D. DeLozier).)  Particularly in light of the red

7   flags described in detail in Petitioner's post-hearing brief (at 80-99), there is no

8   justification for trial counsel's failure to perform their mitigation investigation in

9   accordance with the prevailing professional norms set forth in the Guidelines.

10   **B.     Trial Counsel's Failure to Investigate Potential Childhood Trauma
11          Was Not Reasonable**

12          **1.     The State Misstates the Standard of Care for Investigating
13                 Childhood Trauma**

14          Rather than assessing trial counsel's mitigation investigation under the

15   Guidelines—the only set of written professional norms relied upon by the Supreme Court

16   in assessing ineffectiveness under *Strickland*—the State appears to argue that the

17   prevailing professional norms at the time of Wendi's case "did not require an attorney to

18   investigate whether a client had suffered child abuse absent an indication that abuse

19   occurred."  (State Br. at 20.)  The State offers only two sources of authority for that

20   proposition:  the testimony of one of the two attorneys who failed to conduct a reasonable

21   mitigation investigation in this case, and case law from the Eleventh Circuit.  (*Id.* at 20-

22   21.)  Neither supports the State's position here.

23          **a.     The State's Reliance Upon Patterson to Establish the
24                 Standard of Care is Unreasonable and Mischaracterizes
25                 the Record**

25          According to the State, "Patterson testified that the standard of care at the time of

26   Andriano's trial did not require an attorney to investigate whether a client had suffered

1   child abuse absent an indication that abuse occurred."  (State Br. at 20 (citing 2/7/14 Tr.

2   at 118-123 (D. Patterson)).)  That is not what Patterson said.  Patterson testified that

3   according to "the standard of care *that existed in my office* back at the time"—or "at least,

4   [his] practice, because I was the only guy out there"— he would take a less active role in

5   mitigation development and rely upon mitigation specialists to a greater degree than his

6   current practice.  (2/7/14 Tr. at 118:24-121:16 (D. Patterson) (emphasis added).)  He did

7   not testify regarding prevailing norms among capital defense attorneys generally, and did

8   not testify that the standard of care "did not require an attorney to investigate whether a

9   client had suffered child abuse absent an indication that abuse occurred," as the State

10   asserts.

11          Moreover, as Larry Hammond testified (and common sense dictates), customs or

12   habits of a given defense lawyer do not establish prevailing professional norms.  (2/11/14

13   Tr. at 16:19-17:4 (L. Hammond).)  The *Strickland* analysis does not ask whether trial

14   counsel met their own personal standards of care or methods of practice, which would

15   render the analysis both circular and hollow.  It asks whether they met "prevailing

16   professional norms," which goes far beyond a given attorney's customs at a given time.

17          To the extent Patterson's beliefs regarding the standard of care at the time of

18   Wendi's trial are pertinent, however, there is far better evidence of those beliefs than his

19   testimony at the evidentiary hearing, which took place almost a decade after Wendi's

20   trial.  As noted in Petitioner's post-hearing brief and Larry Hammond's testimony (but

21   ignored by the State), Patterson filed a motion with this Court in November 2004 in

22   which he discussed at length the standard of care that governed trial counsel's

23   representation in Wendi's case.  (Ex. 54, at 3-4.)  In the motion, Patterson correctly noted

24   that a proper "[m]itigation investigation must include 'efforts to discover *all reasonably*

25   *available* mitigating evidence,'" that it "requires an extensive and unparalleled

26   investigation into the personal and family history of the accused," and it "'normally

27

28   {00137731.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1  requires evidence that sets forth and explains the client's complete social history from

2  before conception to the present.'"  (*Id.* (quoting *Wiggins*, 539 U.S. at 524, and

3  Guidelines 10.7 cmt & 10.11 cmt.).)  These were the prevailing professional norms at the

4  time of Wendi's trial, as contemporaneously acknowledged by Patterson.  The State's

5  efforts to redefine those norms by mischaracterizing Patterson's testimony ten years after

6  the fact are unsupportable.

7
8
                        **b.      The Primary Case Relied Upon by the State Supports
                                  Petitioner's Arguments, Not the State's**

9          Beyond Patterson's testimony, the State offers only one case to support the

10  proposition that the standard of care "did not require an attorney to investigate whether a

11  client had suffered child abuse absent an indication that abuse occurred":  *Puiatti v.*

12  *Secretary, Florida Department of Corrections*, 732 F.3d 1255 (11th Cir. 2013).  (State Br.

13  at 21.)  *Puiatti* does not stand for that proposition.  In fact, *Puiatti* underscores the

14  inadequacy of trial counsel's mitigation investigation here.

15          In *Puiatti*, the court was charged with evaluating defense counsel's performance

16  under the standard of care in the early 1980s, shortly after *Gregg v. Georgia*, 428 U.S.

17  153 (1976) re-authorized the use of capital punishment in the United States.  The bulk of

18  the *Puiatti* opinion describes the extensive mitigation investigation performed by trial

19  counsel in that case, which included:  (1) multiple interviews with their client specifically

20  regarding his childhood and life history, *id.* at 1260-61; (2) interviews with various

21  people, both family members and others, multiple times in individual settings, *id.* at

22  1261-63; (3) gathering "voluminous records of Puiatti's life," *id.* at 1263; (4) working

23  with two mental health experts (a forensic psychologist and a psychiatrist) for the specific

24  purpose of "perform[ing] an 'in-depth review' of Puiatti's background," *id.* at 1263-64;

25  (5) providing those experts with the social history that trial counsel's investigation had

26  developed through those extensive interviews and records, *id.* at 1264; and (6) having one

27
28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1   of those experts interview both the defendant and his parents and "remain in close contact
2   with Puiatti throughout the pre-trial period," *id.* at 1264.

3          In short, despite operating under the standard of care in place 20 years before
4   Guidelines were compiled (and a year before *Strickland* was decided), Puiatti's counsel
5   conducted an investigation consistent with the Guidelines.  Because nothing in that
6   investigation "suggested that Puiatti was abused as a child," the Eleventh Circuit
7   concluded that Puiatti's counsel was not ineffective for failing to uncover childhood
8   abuse in that investigation.  *Id.* at 1282.  Thus, *Puiatti* stands for the undisputed
9   proposition that an attorney is not ineffective if she actively engages in a thorough
10  investigation of a client's background that nevertheless fails to uncover child abuse.  It
11  does *not* stand for the proposition that an attorney can forgo a reasonable investigation
12  altogether.

13         Wendi's trial counsel performed none of the steps of the extensive mitigation
14  investigation undertaken by Puiatti's counsel.  Moreover, unlike Puiatti's counsel,
15  Wendi's trial counsel was alerted on many occasions, from many sources, regarding
16  potential childhood trauma suffered by Wendi, and failed to follow up on any of them.
17  (*See generally* Petr. Br. at 68-99.)

18              **2.      Even if Evaluated Under the Incorrect Standard of Care**
19                        **Asserted by the State, Trial Counsel Were Ineffective**

20                   **a.      Trial Counsel Knew That Wendi Had Likely Suffered**
21                           **Childhood Sexual Abuse, But Did Nothing to Investigate**

22         The State does not and cannot dispute that trial counsel performed no investigation
23  into potential childhood sexual abuse of Wendi, and took no steps to confirm whether any
24  abuse had occurred.  Instead, the State claims there was no reason for trial counsel to
25  investigate.  According to the State, trial counsel met that lower standard of care because
26  "the alleged 'red flags' of child abuse Andriano contends trial counsel ignored are not
27  actually suggestive of child abuse, or not suggestive of child abuse absent the immaculate

{00137731.1 }                                    25

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1    lens of hindsight."  (State Br. at 21.)

2         The State simply ignores the actual content of the red flags discussed in

3    Petitioner's post-hearing brief.  (Petr. Br. at 80-96.)  Those red flags are not merely

4    "suggestive" of child abuse—they flat-out state that child abuse likely occurred, and

5    often urged trial counsel to investigate further.  To summarize:

6         Certified professional counselor Kandy Rohde met with Wendi at least 90 times

7    between her arrest and trial, took detailed notes of those meetings that she forwarded to

8    trial counsel (Ex. 45), and wrote three separate communications directly to trial counsel

9    (Ex. 230 at 9185; Ex. 7.002; Ex. 6.004).  In February 2001, shortly after she began

10   meeting with Wendi, she informed trial counsel that she observed dissociation in Wendi,

11   which she noted could be the result of childhood sexual abuse.  (Ex. 230 at 9185.)  A

12   month later, she told trial counsel that Wendi's dissociation could be traced to her

13   childhood, and that Rohde believed Wendi was "the victim of childhood molestation."

14   (Ex. 7.002.)  In February 2002, she informed trial counsel that she believed Wendi had

15   suffered from childhood physical and sexual abuse and neglect.  (Ex. 6.004.)

16        Of the potential perpetrators of that abuse, no adult male had more access to

17   Wendi as a child than her stepfather, Alejo Ochoa.  In April 2004, Rohde faxed

18   mitigation specialist Scott MacLeod a particularly sensitive counseling note describing

19   the sexualized relationship between Wendi and Alejo.  (Ex. 45 at PCR112-14.)  That note

20   describes how Wendi's cellmates urged her to read an erotic story to Alejo while she was

21   incarcerated, and notes that (1) Alejo responded by asking his stepdaughter to send more

22   "stories to him for the Internet"; (2) "someone Alejo knows from his photography was his

23   connection into the Internet"; (3) Alejo and his photographer friends would "have lingerie

24   parties, some of which are innocent and some are more provocative"; and (4) that Wendi

25   had no perception that such conduct was inappropriate.

26        Thus, from Kandy Rohde alone, trial counsel knew that Wendi was a likely victim

27

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

of childhood sexual abuse, suffered mental health symptoms dating back to her childhood that may have originated from sexual abuse, and still engaged in an inappropriately sexualized relationship with her stepfather as an adult.  The State cannot reasonably contend that Rohde's communications are "not actually suggestive of child abuse." (State Br. at 21.)

In addition, trial counsel received reports from other sources that supported Rohde's conclusions.  Dr. Richard Rosengard, who saw Wendi for one interview without the benefit of any social history or any of Rohde's prior observations, noted that the psychological symptoms Wendi suffered as an adult "occur[] in both children and adults who have been physically or sexually attacked" and that Wendi was "particularly upset in finding out about and dealing with children [who] were sexually abused."  (Ex. 6.003 at 3, 5-6.)  Sharon Murphy, a professor of social work, informed trial counsel that Wendi "learned to di[]ssociate from painful memories a long time ago" and "there's something that happened during childhood" to cause that dissociation.  (Ex. 52.)[4]

If that were not enough to alert trial counsel that investigation into potential childhood sexual abuse of Wendi was necessary, Wendi's biological father, Skip Robertson, was incarcerated for molesting a child.  Trial counsel knew of Skip's offense and incarceration, were provided with his contact information in prison (Ex. 57), and were told as early as February 2001—more than three years before Wendi went to trial— that Donna suspected that Wendi may have been molested by Skip's father, based on information from other members of the Robertson family.  (Ex. 56 at PCR 307.)  An investigation of potential abuse by the Robertsons may not have led to confirmable

---

[4] The State argues that "every mental health expert that evaluated Andriano never discovered any evidence of sexual abuse committed upon" her.  (State Br. at 18.)  Mental health experts are not fact investigators.  As noted above, the mental health experts who examined Wendi discovered the only evidence available to them as mental health professionals—that Wendi suffered mental health symptoms indicative of childhood sexual abuse—and they shared those conclusions with trial counsel.

{00137731.1 }

27

1  sexual abuse by them specifically, but "it would have been a tantalizing place to start"

2  pulling the threads of potential childhood sexual abuse and other childhood trauma

3  suffered by Wendi.  (2/11/14 Tr. at 71:8-11 (L. Hammond).)  No such investigation, not

4  even an interview of Skip while imprisoned, was undertaken by trial counsel.

               **b.**    **The Fact That the Perpetrators and the Victim of Childhood Abuse and Neglect Did Not Unilaterally Volunteer It Does Not Relieve Trial Counsel of the Duty to Investigate**

8        Rather than addressing these unambiguous calls to investigate childhood sexual

9  abuse or other trauma, the State emphasizes that Wendi, Donna and Alejo did not

10  unilaterally volunteer to trial counsel that Wendi had suffered sexual abuse by Alejo.

11  The State fails to acknowledge that trial counsel *never asked them* about any potential

12  childhood abuse of Wendi, or negative information regarding her upbringing.  (2/10/14

13  Tr. at 135:1-16 (D. DeLozier) (admitting that he took no steps to investigate any

14  potentially negative facts regarding Wendi's upbringing); 2/7/14 Tr. at 43:18-22, 130:4-

15  10, 162:19-163:12 (D. Patterson) (confirming that he focused on guilt-phase issues, did

16  not ask Wendi questions regarding her childhood, "didn't compel her to discuss things

17  that she found distasteful," and never broached the subject of childhood abuse with any

18  witness he interviewed).)  It is not self-evident to individuals without experience in law

19  or the criminal process that sensitive issues of childhood abuse and neglect are relevant

20  and helpful to a criminal defense.  Thus, it should not be surprising to anyone, least of all

21  capital defense counsel, that the perpetrators of childhood neglect (in the case of Donna)

22  and abuse (in the case of Alejo) would not disclose those self-incriminating facts absent

23  some indication that such facts are relevant to Wendi's defense.  Trial counsel simply

24  failed to give any indication that they had any interest in information regarding potential

25  childhood abuse—a message that they reinforced when they declined to interview Skip

26  even though Donna provided them with his prison contact information.  (Ex. 57.)

28

As for Wendi, trial counsel was told as early as February 2001 (and repeatedly thereafter) that Wendi had begun dissociating as a child, possibly as a result of sexual molestation, and thus Wendi "learned to di[]ssociate from painful memories a long time ago" and "was unable to recall large sections of her history." (Ex. 230 at 9185; Ex. 7.002; Ex. 6.004; Ex. 45 at PCR27; Ex. 52.)  Thus, trial counsel was aware that, while Wendi likely suffered childhood sexual abuse, her defense system was unlikely to allow her to access memory of it—an effect of sexual abuse that was well-recognized in the law well before Wendi's trial.  *Doe v. Roe*, 191 Ariz. 313, 322, 955 P.2d 951 (1998) (applying the discovery rule to "repressed memory cases involving childhood sexual abuse").  Trial counsel knew that they could not depend upon Wendi to confirm or deny the abuse, and therefore they would need to investigate whether it occurred through interviews of family and close childhood friends such as Kyre Lorts and Jeri Lynn Cunningham.[5]  They did not do so.  "Had counsel investigated further, they may well have discovered the sexual abuse later revealed during state postconviction proceedings." *Wiggins*, 539 U.S. at 525.

Finally, unlike *Puiatti* and other cases cited by the State,[6] this is not a case in

---

[5] That task was not overwhelming:  given the small size and isolation of the church school Wendi attended, there was a limited number of childhood friends to contact and interview.

[6] The State cites (at 40-41) four cases for the proposition that the failure of Donna, Alejo or Wendi to make an unsolicited disclosure of childhood sexual abuse relieves trial counsel of their duty to investigate potential childhood trauma.  None of the cases are on point.  *Grisby v. Blodgett*, 130 F.3d 365 (9th Cir. 1997) concerned a claim for ineffective assistance in failing to retain an expert to perform blood tests on a carpet that was destroyed years after the defendant's conviction; thus, it was speculative as to what such a test would have shown.  *Id.* at 373 (the defendant "had nine years to challenge his counsel's performance by having the carpet tested himself but raised his speculative claim of prejudice only years after the carpet was destroyed").  Here, by contrast, there is nothing speculative about Wendi's childhood trauma; multiple witnesses testified about it at the evidentiary hearing.  Each of the other three cases stand for the same proposition as *Puiatti*:  that trial counsel is not ineffective *if they conduct a reasonable mitigation*

{00137731.1 }                                        29

which trial counsel actively investigated childhood trauma, interviewed numerous witnesses regarding the subject, and simply came up empty.  Trial counsel here performed no such investigation, yet were nevertheless provided with numerous reports that Wendi likely suffered childhood sexual abuse and neglect.  Thus, even under the incorrect standard of care proposed by the State, trial counsel's mitigation investigation was deficient.

### C.   Trial Counsel's Mental Health Investigation Was Unreasonable

With regard to trial counsel's mental health investigation, the State once again makes a broad characterization—that Wendi's trial counsel "thoroughly investigated [Wendi's] mental health based on Dr. Potts' and Dr. Rosengard's recommendations" (State Br. at 14)—without providing any support.  The State does not refute that the *only* mental health investigation trial counsel undertook was to retain Dr. Rosengard for a single interview with Wendi, without the benefit of any social history.  In arguing that this single visit satisfied the standard of care, the State ignores the detailed provisions of the Guidelines concerning the importance and steps of a reasonable mental health investigation.  Instead, the State appears to assume—without citing any supporting

---

*investigation* and nevertheless fail to uncover certain mitigating evidence. *See Duckett v. Mullin*, 306 F.3d 982, 998 (10th Cir. 2002) ("It would be unreasonable to deem trial counsel ineffective for failing to discover potential mitigating evidence *when counsel conducted a reasonable investigation* but was stymied by potential witnesses who were not forthcoming.") (emphasis added); *Babbitt v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (noting that trial counsel "hired an experienced death penalty investigator who conducted a thorough investigation into Babbitt's history" and that "counsel is not deficient for failing to find mitigating evidence if, *after a reasonable investigation*, nothing has put the counsel on notice of the existence of that evidence") (emphasis added, quotation omitted); *Lackey v. Johnson*, 116 F.3d 149, 153 (5th Cir. 1997) ("[O]ur review of the record reveals that *there is no evidence that [the defendant]'s attorney knew or should have known* about the prior abuse.") (emphasis added).  Here, in contrast, trial counsel received numerous reports of possible childhood sexual abuse, but performed no investigation whatsoever into that possibility.

1  precedent—that Wendi's interview with Dr. Rosengard was good enough.

2       It was not, for the same reasons set forth in Petitioner's post-hearing brief:  (1) Dr.

3  Rosengard was not given the information necessary to make a full and accurate diagnosis

4  from his one visit with Wendi; (2) notwithstanding the lack of information he received,

5  Dr. Rosengard *still* identified symptoms and disorders that warranted further inquiry and

6  investigation; and (3) trial counsel received other information before and after Dr.

7  Rosengard's visit that Wendi suffered symptoms of psychiatric disorders relevant to the

8  offense, which trial counsel declined to share with Dr. Rosengard or otherwise pursue.

9
10          **1.     Trial Counsel Failed to Provide Any Social History to Dr. Rosengard**

11       Every witness at the PCR hearing who testified on the subject, including the

12  State's expert, confirmed that a social history is a vital component of an accurate mental

13  health diagnosis.  (2/7/14 Tr. at 49:17-50:15 (D. Patterson) ("[A]n expert opinion is only

14  as good as the information upon which he or she derives that opinion.  And so a social

15  history of the client, in my estimation, is essential. . . .  [A] significantly developed social

16  history should be there before your experts go in to begin their evaluations."); 2/5/14 Tr.

17  at 49:16-51:3 (G. Woods); 2/6/14 Tr. at 72:19-73:18 (K. Rohman) ("And the phrase is

18  garbage in/garbage out . . . .  Dr. Rosengard did not have the advantage of knowing the

19  real story of the client's life and background."); 2/11/14 Tr. at 60:15-61:4 (L. Hammond)

20  ("one of the themes that runs through these Guidelines" is that "[f]or your mental health

21  people to be able to do their jobs appropriately, you need to have available for them the

22  history of the client"); 2/14/14 Tr. at 43:4-21, 44:23-45:1, 72:23-25 (S. Pitt) ("you have to

23  review" a subject's mental health history, records of that history are "important," and

24  psychiatrists rely upon them in their diagnoses).)

25       Here, a social history would have revealed that Wendi had a family history of

26  bipolar disorder, and had suffered severe and pervasive childhood trauma that:  (1) even

27

28  {00137731.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

1  Dr. Pitt conceded could, if true, mean that "some of the symptoms that she has could

2  potentially be tied to post-traumatic stress disorder" (2/14/14 Tr. at 112:17-24 (S. Pitt));

3  and (2) is linked to the developmental deficits in emotional regulation, impulse control,

4  and executive functioning noted by Drs. Hopper and James.  But trial counsel provided

5  Dr. Rosengard with no such information.  Going into his interview with Wendi, the only

6  information trial counsel provided Dr. Rosengard was a police report, a transcript of her

7  911 call, and medical reports for Joe.[7]  (Ex. 6.003 at 1.)  As explained in the opening

8  brief, that fails to meet the standard of care.  (Petr. Br. at 77-80.)

9       The State's only response appears in a footnote, which asserts (without any record

10 or legal support):

11      [I]t goes without saying that that mental-health experts . . . are trained to
        recognize objective symptoms of major mental disorders, and some of
12      Andriano's claimed symptoms (*e.g.* memory problems) would have been
        readily apparent.  Moreover, at least one professional retained by Andriano,
13      H. Kandy Rohde, was familiar with her background and history, and still
        did not diagnose a major mental disorder.
14

15 (State Br. at 52-53 n.14.)

16      The State's response only further proves the point that a social history is essential.

17 As noted in Petitioner's post-hearing brief, mental health professionals *did* recognize

18 objective symptoms of the very same disorders diagnosed by Dr. Woods.  (Petr. Br. at

19 81-83, 86-95.)  They *did* recognize her dissociation, which the State imprecisely

20 characterizes as "memory problems."  (Ex. 7.002; Ex. 6.004; Ex. 6.003 at 5-6; Ex. 52;

21 Ex. 230 at 9185.)  And while the State never explains what it means by a "major"

22 psychiatric disorder or why it would expect Rohde (who was a professional counselor

23 rather than a psychiatrist) to make a diagnosis, Rohde *did* tell trial counsel that she

24 believed "Wendi suffers from serious psychological disorders" and noted symptoms

25 

26 [7] Dr. Rosengard, on his own initiative, obtained a release to review records from Estrella
   jail indicating that she had been prescribed psychotropic medications, as well as one
27 unremarkable jail provider note from November 2000.  (Ex. 6.003 at 1.)

28 {00137731.1 }                              32

consistent with the disorders diagnosed by Dr. Woods.  (Ex. 7.002.)  Dr. Rosengard, who was provided with no social history and none of the voluminous materials generated by Rohde, diagnosed her as having "[p]robable post-traumatic stress disorder" and a mood disorder: "major affective disorder – depression."  (Ex. 6.003 at 5.)  And, after trying different medications, jail medical providers ultimately treated Wendi with Seroquel, a drug that "has been specifically indicated for bipolar depression."  (2/5/14 Tr. at 69:7-21 (G. Woods); *see also* 2/10/14 Tr. at 118:10-24 (D. DeLozier) (acknowledging that he was aware that certain of Wendi's medications were used for treating bipolar disorder, that he possessed that knowledge prior to Wendi's trial, but that he failed to review Wendi's jail medical records prior to trial).)

In short, every person with any mental health training who examined Wendi prior to her trial identified symptoms of psychiatric disorders.  But they lacked the social history to give those symptoms context, and Dr. Rosengard—the only psychiatrist trial counsel retained to evaluate Wendi—was not even provided with information from Rohde regarding symptoms she observed in her regular visits with Wendi.  Trial counsel simply failed to provide Dr. Rosengard with the social history that is fundamental to a mitigation investigation, which all agree is necessary for a full and accurate psychiatric diagnosis.

### 2. Even Without Any Social History Information, Dr. Rosengard Observed Symptoms and Made Tentative Diagnoses that Warranted Further Mental-Health Investigation

The State asserts that Dr. Rosengard's report "offers no compelling mitigation, and read in its entirety, does not trigger an obligation of trial counsel to further investigate Andriano's mental health.  Rather, the report is damaging and would have undermined counsel's trial and mitigation strategy of portraying Andriano as a good mother and a timid, submissive woman who endured years of domestic violence from her husband."  (State Br. at 15.)

Petitioner has no idea how the State could read the report that way, and the State offers no further explanation.  Petitioner's post-hearing brief walked through Dr. Rosengard's report at length, detailing the numerous conclusions indicating that Wendi suffered from psychiatric disorders stemming from her childhood that may have been related to the offense.  (Petr. Br. at 90-93.)  The State simply ignores that discussion, and provides no support for its *ipse dixit* mischaracterizations of the report.  Contrary to the State's assertions, Dr. Rosengard *never* "attribute[d]" Wendi's psychiatric disorders to Joe's homicide, *never* "questioned her claim that she suffered from memory deficits," and *never* suggested that further investigation was unnecessary or unwarranted.  (State Br. at 54.)

Indeed, Dr. Rosengard indicated that his conclusions were tentative, labeling them as "diagnostic impressions" and stating that Wendi suffered from "probable post-traumatic stress disorder."  (Ex. 6.003 at 5.)  He noted that Wendi's psychiatric disorders originated from childhood and would "more than explain[] [her] response [to the offense], particularly in light of the fact that she had a past history, apparently, of being abused and symptoms consistent with post-traumatic stress disorder."  (*Id.* at 3 (noting "panic attacks since childhood" and possible childhood molestation), 5.)  Yet trial counsel never contacted Dr. Rosengard again regarding Wendi, and took no further steps to investigate potentially mitigating mental health evidence.

### 3. Trial Counsel Obtained Additional Mental Health Information After Dr. Rosengard's Report that Warranted Further Mental-Health Investigation

In addition, the State appears to assume that Dr. Rosengard was the only person to report to trial counsel regarding Wendi's mental health, and ignores the other red flags identified at length in the evidentiary hearing.  But Dr. Rosengard was not the only source of information available to trial counsel regarding Wendi's mental health, and certainly not the only professional to indicate that she suffered from psychiatric disorders.

{00137731.1 }

1  Even if the State were correct that Dr. Rosengard's report in isolation provided no cause

2  to further investigate Wendi's mental health, his report in combination with multiple

3  reports from Rohde, Murphy, and even jail medical providers amounted to a chorus of

4  professionals all singing variations of the same song:  Wendi suffered from psychiatric

5  disorders that could explain her behavior the night of the offense.  Trial counsel provided

6  none of them with the social history necessary to contextualize all of the symptoms they

7  observed and make a final diagnosis, and did not even provide Dr. Rosengard with the

8  benefit of Rohde's extensive counseling notes and preliminary diagnoses concerning

9  childhood abuse and neglect, resulting dissociation, a history of sleeping for days at a

10 time to avoid emotions, a potential personality disorder, and other red flags.

11        Further, even if the State were correct in its unsupported assertion that Dr.

12 Rosengard's August 2002 report was final, conclusive, and unhelpful, the State offers no

13 justification for trial counsel's failure to revisit the issue of mental health after Wendi's

14 September 2003 suicide attempt.  In the words of the jail medical providers, Wendi

15 "acted out impulsively with a significant suicide attempt in [a] moment of panic."  (Ex.

16 47 at 3.)

17        Wendi's "significant" and "impulsive[]" act of violence in a "moment of panic"

18 should have been a wake-up call to trial counsel that the mental health investigation

19 warranted further attention.  Yet they never contacted Dr. Rosengard or any other mental

20 health professional to evaluate Wendi's mental health in light of that grave new

21 manifestation of her disorders, contrary to prevailing professional norms.  *See Hamilton

22 v. Ayers*, 583 F.3d 1100, 1117 (9th Cir. 2009) (where "counsel was aware that [the

23 defendant] tried to commit suicide in prison . . . and that he was taking antidepressant

24 medication at the time of trial," counsel "should have retained a mental health expert and

25 provided that expert with the information needed to form an accurate profile of [the

26 defendant's] mental health").

27

28

{00137731.1 }

35

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1
2

**III.    TRIAL COUNSEL'S DEFICIENT MITIGATION INVESTIGATION
RESULTED IN PREJUDICE**

3

4

5

6

7

8

9

10

All but conceding trial counsel's ineffective mitigation investigation, the State devotes the bulk of its brief to the prejudice prong of *Strickland*.  Its arguments fall into two categories:  (1) that the evidence of childhood trauma and psychiatric disorders was not credible or meaningful mitigation; and (2) that the evidence was merely cumulative of the evidence presented at trial, and there is no "reasonable probability that at least one juror would have struck a different balance" in weighing the aggravating evidence against the full scope of mitigating evidence.  *Wiggins*, 539 U.S. at 537.  This brief addresses each category in turn.

11

12

**A.    The Evidence of Childhood Trauma and Mental Health Was Credible
and Powerful Mitigating Evidence**

13

14

**1.    The State Offers No Reasonable Grounds for Disregarding the
Evidence of Wendi's Childhood Trauma Brought Forth at the
Evidentiary Hearing**

15

16

17

18

19

20

21

22

23

24

25

As summarized in Petitioner's post-hearing brief (at 9-34), Wendi suffered extensive childhood trauma from a variety of different sources throughout her childhood, including neglect, social and physical deprivation, physical abuse, and sexual abuse.  Dr. Hopper, whose credentials as a leading authority on childhood trauma are unchallenged, explained at length the effects of this accumulation of trauma upon the development of executive functioning, impulse control, emotional regulation, and overall mental health. He then described how and why those developmental effects of childhood trauma would have affected Wendi's ability to control impulse and make decisions under the extreme stress leading up to and including the night of Joe's death.  Even Dr. Pitt noted that Wendi's childhood trauma, if true, could have resulted in post-traumatic stress disorder as an adult.  (2/14/14 Tr. at 112:17-24 (S. Pitt).)

26

For the reasons set forth below, the State offers no credible basis to question the

27

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

veracity or import of evidence of Wendi's childhood trauma.

### a. The State Does Not Address the Full Scope of the Childhood Trauma Suffered by Wendi

In addressing childhood trauma, the State's brief focuses almost exclusively upon sexual abuse by Alejo, apparently assuming that any other source of childhood trauma had no effect upon Wendi as an adult. In doing so, it ignores:

- Skip's physical abuse of Wendi as an infant, spanking her while she was still in diapers, training her like a dog, using fear to potty-train her at 11 months, and throwing her into a swimming pool at less than two years old to teach her how to swim (Petr. Br. at 14-15);

- Donna's neglect of Wendi on account of Donna's own mental and emotional problems, which included passing a toddler Wendi off to neighbors, day-care providers, and drug addicts while Donna worked, drank, and brought men home (Petr. Br. at 12-14);

- Wendi's subjection to Donna and Alejo's extreme religious beliefs, such as not seeking medical care for Wendi when she came down with a prolonged high fever and isolating her from child peers from ages seven to nine while traveling with a cult-like group (Petr. Br. at 18-20); and

- Wendi's education in an isolated church-school that extolled the virtues of beating children with a large wooden paddle "until they cried softly," shaming them into unquestioning obedience, and directing all aspects of their lives on fear of damnation (Petr. Br. at 22-23).

Even as to sexual abuse, the State appears to disregard any type of sexual abuse short of genital contact. The State repeatedly tries to minimize Alejo's perverted sexualization of his stepdaughter during her teen and pre-teenage years. According to the State, Alejo's regular father-daughter shopping trips for "little lacy underwear and a bra to match and a garter belt, things like that" and visits to the adult sections of novelty stores beginning when Wendi was age 12 (2/4/14 Tr. at 156:2-22), does not "establish any sort of sexual misconduct" (State Br. at 44). But stepfathers do not normally purchase garter belts and lacy underwear for their 12-year-old stepdaughters to wear. Similarly, the State asserts that Alejo dressing Wendi up in lingerie and taking

1   photographs "does not necessarily reveal an inappropriate sexual relationship." (State Br.

2   at 45.) Nor does Alejo getting into bed with Wendi and a friend, Jeri Lynn Cunningham,

3   during multiple sleepovers and proceeding to repeatedly fondle Cunningham's breasts.

4   (Petr. Br. at 28-29.) According to the State, on each of the three or four sleepovers when

5   this conduct occurred (2/4/14 Tr. at 224:20-225:21 (J. Cunningham), Alejo might have

6   just crawled into bed next to his 13-year-old daughter and her friend, fallen asleep, and

7   inadvertently moved his hand under her nightgown and over her breasts multiple times

8   despite Cunningham repeatedly moving his hands away. (State Br. at 43 & n.10.) Nor

9   does the State consider Alejo's actions in requiring his teenage stepdaughter to rub his

10  near-naked body for "45 minutes to a couple of hours" each night to be improper; the

11  State dismisses that evidence because "all participants were clothed" and the "ritual did

12  not involve Andriano or Cunningham touching Alejo's genitals, or vice versa."[8] (State

13  Br. at 44.) The State makes no mention of Alejo's sexual comments toward his

14  stepdaughter during her pre-teen and teenage years, both at home and as observed by

15  classmates at her school—where he served as the "youth minister," made inappropriate

16  sexual advances toward students and "rub[bed] up on" them, and gave sexual lessons

17  such as "telling boys how to touch breasts." (Petr. Br. at 24-25.)

18       No reasonable juror would so casually dismiss Alejo's disturbing sexual behavior

19  toward his stepdaughter and her friends, as the State blithely does in its brief. Dr. Hopper

20  testified at length regarding the adverse, long-term of effects of this "classic incestuous"

21  dynamic of a neglectful mother looking the other way while her husband sexualizes their

22  daughter. The State's dismissive response to Wendi's plight between ages 9 to 18—

23

24  [8] The State ignores Cunningham's testimony regarding the one time she took part in that
25  ritual, in which she described how Alejo required her and Wendi to wear nightgowns,
    placed his head in Cunningham's lap and repeatedly turned his face toward
26  Cunningham's genitals while pretending to snore. (2/4/14 Tr. at 232:7-233:25 (J.
27  Cunningham).)

{00137731.1 }                                    38

28

trapped in a home and a school with a sexually exploitative stepfather who conditioned her to satisfy his perverted desires while her mother put her head in the sand—is unavailing.  It is difficult to believe that *any* juror would be persuaded by the State's response and decline to consider Wendi's childhood trauma, let alone the entire panel of jurors necessary to impose a death sentence.

### b. The State Fails to Offer Any Reasonable Basis to Disbelieve that Alejo Molested Wendi

Unlike his other inappropriate behavior, the State does not attempt to defend Alejo's overt sexual molestation of Wendi, as described in unsettling detail in the testimony of childhood friend Kyre Lorts.  (Petr. Br. at 27-28.)  Lorts recalled multiple incidents in which she and Wendi (at ages 8 and 10 or 11, respectively) would dress up in lingerie during sleepovers before being invited into Alejo's room, where they were instructed to sit on Alejo's lap while he fondled them and they touched his erection.  (*Id.*)  Wendi reassured Lorts during the first such incident, thus implying that it was not an isolated occurrence for Wendi.  (*Id.*)

Unable to defend Alejo's conduct, the State asserts that Kyre Lorts lied to this Court.  (State Br. at 41-43.)  It offers absolutely no reason for her to do so.  Lorts was not a friend of Wendi's as an adult; she saw Wendi a total of "maybe five times" after Lorts moved away from Casa Grande after fifth grade, and prior to the evidentiary hearing had not seen Wendi since a funeral 15 years ago.  (2/4/14 Tr. at 61:7-62:2 (K. Lorts).)  Nor does the State point to any inconsistency or implausibility in her testimony.  The State feebly contends that Lorts stated that she and Wendi wore Donna's racy lingerie while Donna testified that she did not personally own the type of racy lingerie Alejo purchased for Wendi (State Br. at 42), but that is a distinction without a difference.  Lorts's understanding of whether the lingerie she wore belonged to Donna or Wendi is immaterial to her recollection of the molestation that occurred.

Without any motive to fabricate and no material implausibility or inconsistency in

39

1   her testimony, the State is left to argue that Lorts cannot be trusted because she did not

2   "disclose Alejo's conduct to anyone (law enforcement or otherwise) until she was 19

3   years old," convinced herself as a child that she had dreamt the incident (a form of

4   dissociation), "and then told only family members."[9]  (State Br. at 42.)  This argument

5   ignores what has become common knowledge regarding sexual abuse victims.  Lorts was

6   *nine years old* when these horrific events occurred, at the hands of a trusted family friend

7   and youth pastor at her church-school.  The State offered no testimony to suggest that a

8   child not disclosing sexual abuse until adulthood renders it unreliable, nor could it:  when

9   prosecuting perpetrators of childhood molestation, the State frequently calls an expert

10  (such as Dr. Hopper here) to "help[] the jury to understand possible reasons for the

11  delayed and inconsistent reporting" of sexual abuse.  *State v. Salazar-Mercado*, 234 Ariz.

12  590,¶ 15, 325 P.3d 996, 1000 (2014).  *See also, e.g.*, *Leon v. Ryan*, No. CV 11-0129-

13  TUC-BPV, 2014 U.S. Dist. LEXIS 9587, at *48-52 & n.6 (D. Ariz. Jan. 24, 2014)

14  (summarizing testimony of a witness for the State who explained why sexual abuse

15  victims often delay reporting sexual abuse and the prolonged process of disclosure and

16  coming to terms with the abuse).

17       Similarly, the State claims that Lorts's testimony should not be believed because

18  Wendi could not access memories of the abuse.  (State Br. at 41 n.7.)  That too is

19  unsurprising for victims of childhood sexual abuse, as explained by the Arizona Supreme

20  Court.  *See Doe v. Roe*, 191 Ariz. 313, 322, 955 P.2d 951 (1998) ("The policy behind the

21  discovery rule is thus served by application to repressed memory cases involving

---

[9] The State also claims that the testimony of Lorts and Donna should not be trusted because they did not report Alejo's abuse despite being "mandatory reporters of child abuse under Arizona law."  (State Br. at 42, 43 n.9.)  Yet Donna willfully avoided witnessing the abuse, nothing in the reporting statute required Lorts to self-report her own abuse years after the fact, and Arizona's reporting statute (Ariz. Rev. Stat. § 13-3620) was not enacted until 1998—well after the incidents described by Lorts in the early 1980s.

{00137731.1 }                                    40

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

childhood sexual abuse and is, we believe, logically appropriate given that the intentional act of the tortfeasor caused both the damage and the repression of memory.").  Even the State's expert in this case, Dr. Pitt, agreed that sexual abuse victims may block out painful memories of the abuse.  (2/14/14 Tr. at 97:8-11 (S. Pitt).)

In addition, the State seeks to profit from its own misconduct in sending a detective from the prosecutor's office to Lorts's home on the evening before she was scheduled to testify regarding these painful events, and remaining outside her home after Lorts asked him to leave.  (State Br. at 41-42 n.8; *see also* 2/4/14 Tr. at 4:22-8:12 (summarizing the State's intimidation of Lorts and Alejo on the evening before Lorts's testimony).)  The State had never before expressed any interest in interviewing Lorts despite knowing for months that she was a witness in this matter, "[y]et, on the eve of [her] testimony, while all of us are in the courtroom and can't do anything about it, and while Dr. Hopper is explaining the significance of these folks, they're being contacted" by a man identifying himself as a "detective with the prosecutor's office."  (2/4/14 Tr. at 6:3-24.)  The State's actions undermine the State's credibility in this matter, not the credibility of the sexual abuse victim.

Finally, while Lorts's testimony is credible and believable on its own, it is even more believable in light of the observations of multiple other witnesses regarding Alejo's inappropriate sexual behavior toward Wendi and her friends in a variety of contexts, as described in the preceding section.  Jeri Lynn Cunningham testified that Alejo demanded that she and Wendi wear nightgowns on trips to the desert, and that on multiple occasions Alejo fondled her breasts under her nightgown and placed his face in her crotch (2/4/14 Tr. at 224:1-225:21, 231:1-24, 232:7-233:25 (J. Cunningham)); Jasper Neace noted that Alejo rubbed and flirted inappropriately with Wendi's classmates (2/5/14 Tr. at 18:12-19:13 (J. Neace)); both Donna and Jeri Lynn recounted the ritual of Alejo demanding that Wendi rub his body (2/4/14 Tr. at 153:5-19, 155:4-156:1 (D. Ochoa); *id.* at 232:7-233:25

{00137731.1 }

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

P-App. 000546

(J. Cunningham)); Donna testified that he bought Wendi lingerie as early as 12 years old (2/4/14 Tr. at 156:2-22 (D. Ochoa)); Cindy Schaider noted that took photographs of Wendi in lingerie, some of which still exist (2/10/14 Tr. at 159:17-160:12 (C. Schaider); Ex. 72-74); and Kandy Rohde observed an inappropriately sexual relationship between Alejo and Wendi that persisted even while Wendi was incarcerated (Ex. 45 at PCR112-114).  Combining these facts with the multiple observations of mental health professionals noting that Wendi suffered mental health symptoms consistent with childhood sexual abuse, there is no reasonable basis to doubt Lorts's testimony that Alejo molested her and Wendi.

<div style="text-align:center"><b>c.    The State Does Not Meaningfully Refute Dr. Hopper's Conclusions Regarding the Effects of Wendi's Childhood Trauma</b></div>

Next, the State urges this Court to dismiss the opinions of Dr. Hopper regarding the effects of Wendi's traumatic childhood upon her psychological development, solely because the abuse occurred during her childhood rather than sometime more temporally closer to the offense.  It offers no reasonable ground for doing so.

As noted in Petitioner's post-hearing brief, Dr. James Hopper is a clinical psychologist and leading authority in the field of childhood trauma and its effects.  (Petr. Br. at 10.)  In the absence of any basis to challenge Dr. Hopper's credentials or to question his conclusions regarding the effects of childhood trauma in Wendi, the State confusingly dismisses Dr. Hopper's opinions because the jury's "common sense" would necessarily lead it to the conclusion that Wendi's "childhood experiences shed little light on the reasons for her actions at the age of 30."  (State Br. at 47.)  But the State offers no explanation for why the jurors, most of whom presumably were not victims of childhood sexual abuse or other pervasive childhood trauma themselves, would not have benefitted from and been persuaded by the testimony of a recognized expert in that field.  It also offers no reason to believe that the jurors would disregard Dr. Hopper's well-informed

<div style="text-align:center">PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF<br>PETITION FOR POST-CONVICTION RELIEF<br>CASE NO. CR2000-096032-A</div>

1    testimony in favor of their own armchair opinions on the sensitive subject of childhood

2    sexual abuse and trauma.

3        Without addressing Dr. Hopper's opinions or the host of binding federal and state

4    precedent establishing that evidence of significant childhood trauma constitutes powerful

5    mitigating evidence with or without a nexus to the offense itself (Petr. Br. at 4-6), the

6    State proceeds to argue that this Court should deem evidence of childhood trauma

7    insignificant because it was "remote in time" to the offense.  (State Br. at 46-52.)  The

8    State's arguments are flawed, in three general respects.

9        *First*, the mitigating evidence was not "remote in time."  Wendi lived with Alejo

10   until age 18, only 12 years before Joe's homicide, and the sexual nature of her

11   relationship with Alejo persisted throughout her adulthood.  As Rohde noted, as late as

12   2004, Wendi believed there was nothing inappropriate or unusual about her stepfather

13   asking her to send him erotic stories from jail to post on the Internet for his photographer

14   friends, who held provocative "lingerie parties."  (Ex. 45 at PCR112-14.)

15       *Second*, Dr. Hopper testified in detail about the effects of childhood trauma on

16   brain development and the emotional and cognitive deficits and disorders it causes

17   through adulthood.  (*See generally* Petr. Br. at 11-34.)  The State asked Dr. Hopper to

18   explain how Wendi's childhood trauma and the resulting damage to her emotional and

19   psychological development could have influenced her actions before, during, and after

20   the homicide, and Dr. Hopper gave detailed reasons based on his years of expertise in the

21   field of childhood trauma.  (Petr. Br. at 31-33.)

22       The State offers *nothing* in rebuttal, other than its own perception of "common

23   sense" unsupported by the opinion of any expert in the field.  For example, the State

24   notes that Wendi was a "high functioning" adult.  (State Br. at 48.)  But no expert

25   testified that Wendi's childhood trauma, or even her resulting cognitive deficits, rendered

26   her mentally retarded or otherwise unable to function.  As Dr. Hopper noted, "unrelenting

27

28

{00137731.1 }

43

1    trauma of all kinds throughout [her] entire childhood" left her a damaged adult unable to

2    "regulate [her] emotions and impulses" in situations that were highly stressful to her; it

3    did not render her completely incapable of functioning as an adult in routine daily

4    matters.  (2/3/14 Tr. II at 46:17-47:11 (J. Hopper).)

5         *Third*, the State simply ignores the value of the mitigating evidence in explaining

6    Wendi's promiscuity as an adult, her inability to fully remember emotionally laden

7    events, and her inability to control impulse in her excessive beating of Joe—all facts that

8    the prosecutor emphasized in urging the jury to impose death.  (Petr. Br. at 34.)

9              **2.    The Mental Health Evidence Was Credible and Powerful**
                       **Mitigation**
10

11        The State asserts that the "weight of Andriano's proffered mental-health

12   mitigation would have been slight." (State Br. at 63.)  But the State does not and cannot

13   question the credentials of the three mental health experts (Drs. Hopper, Woods, and

14   James) who Petitioner called to testify at the evidentiary hearing.  The State does not

15   dispute that Drs. Hopper and Woods—unlike all prior mental health professionals who

16   interviewed Wendi—received the benefit of her full social history.  The State does not

17   question that Drs. Hopper and Woods were the only psychologists or psychiatrists to

18   interview Wendi on multiple occasions for the purpose of assessing potential psychiatric

19   disorders.  It does not dispute that Dr. James simply scored objective neuropsychological

20   tests, and does not claim that she committed any errors in identifying specific deficits in

21   Wendi's executive functioning.[10]

22        In lieu of any specific reasons to question their findings, the State makes four

23

24   [10] The State faults Dr. James for not interviewing Wendi, and because she noticed
     arithmetic errors in the raw data she reviewed.  (State Br. at 60.)  But Dr. James testified
25   that she found "about three or so" errors that "didn't change the overall analysis," and
     explained that her role as a neuropsychologist was not to make subjective judgments
26   from an in-person interview of Wendi, but rather to evaluate the raw data obtained from
     neuropsychological testing.  (2/10/14 Tr. at 14:21-23, 48:3-49:4 (J. James).)
27
     {00137731.1 }                                        44
28
     ─────────────────────────────────────────────────
           PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
                  PETITION FOR POST-CONVICTION RELIEF
                      CASE NO. CR2000-096032-A

broad-based arguments—all of which are easily rebutted.

*First*, the State appears to attack the concept of mental health evidence altogether, arguing that mental health evidence is irrelevant because Wendi's behavior was the result of "choices [she] made." (State Br. at 61.) That is not the standard for relevant mental health evidence in mitigation, and would render all mental health evidence meaningless unless the psychiatric disorder caused the defendant to be possessed. Indeed, Arizona law lists as a mitigating factor evidence that the defendant's "capacity . . . to conform [her] conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution." Ariz. Rev. Stat. § 13-751(G)(1) (emphasis added). The issue is not whether Wendi was possessed by some irresistible impulse, which would "constitute a defense to prosecution," but rather whether her *capacity* to conform her conduct to the requirements of the law was impaired by psychiatric disorders.

Mental health evidence is inherently connected to any given defendant's offense, and the testimony of the mental health professionals who testified at the PCR hearing amply demonstrates how each of these disorders impaired Wendi's capacity to exercise judgment, control impulse, and conform her conduct to the law under the high-stress circumstances existing at the time of the offense. (*See generally* Petr. Br. at 36-48.) By centering its arguments around an impossibly high standard that contradicts Arizona law, the State fails to address the evidence under applicable standards.

*Second*, rather than looking to whether her psychiatric disorders impaired Wendi's capacity to conform her conduct to the law at the time of her physical altercation and stabbing of Joe, as the law requires, the State's brief repeatedly looks to whether they impaired her capacity to function in society. The State presents a number of examples of Wendi acting as a functional adult, such as raising children and having a job. (State Br. at 51, 59.) Once again, the State asks and answers the wrong question. Drs. Woods,

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1   Hopper, and James noted that Wendi's disorders impaired her capacity to make rational

2   judgments and control impulse in situations of high stress for her—not that she would be

3   incapacitated on a daily basis.  Moreover, the State's examples of prior unlawful behavior

4   by Wendi, such as easily detected theft from employers during times of financial hardship

5   for her and Joe (State Br. at 63-64), support those expert opinions rather than

6   undermining them.  They provide further examples of Wendi reacting impulsively,

7   irrationally, and with poor judgment in times of high stress, with impaired capacity to

8   conform her conduct to the law.  (Petr. Br. at 38, 40, 44, 46-47.)

9       *Third*, the State claims that the opinions of Wendi's experts are unreliable because

10  none of the mental health professionals who examined her previously reached the same

11  conclusions.  (State Br. at 53-57.)  Of course, the same is true of Dr. Pitt's diagnoses, as

12  well as Dr. Rosengard and Dr. Bayless.  None of them reached the same diagnoses as

13  each other, let alone the testifying experts at the evidentiary hearing.  But *all* of them

14  noted that Wendi suffered from psychiatric disorders (Petr. Br. at 49), and they noted

15  symptoms consistent with the diagnoses of Drs. Hopper, Woods, and James (Petr. Br. at

16  81-94).  Those pre-trial experts simply lacked the social history information to

17  contextualize those symptoms in light of Wendi's childhood and family history of

18  psychiatric disorders, as noted above.  Moreover, no one performed any

19  neuropsychological testing upon Wendi prior this proceeding, and thus no one had

20  objective confirmation of the specific executive functioning deficits she suffered from a

21  lifetime of childhood trauma.

22      *Fourth*, the State vaguely claims that introduction of mental health evidence in

23  mitigation "would have opened the door to devastating rebuttal evidence" of her prior

24  thefts from employers.[11]  (State Br. at 63.)  The State never explains why mitigating

25  _____

26  [11] The State also claims that it would have opened the door to testimony from Dr. Bayless
     regarding his belief that Wendi "is an untruthful, manipulative person."  (State Br. at 64.)

27  But such testimony would be plainly inadmissible regardless of Wendi's mitigation

    {00137731.1 }                                   46

28  _____
    PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
    PETITION FOR POST-CONVICTION RELIEF
    CASE NO. CR2000-096032-A

evidence concerning Wendi's psychiatric disorders would have resulted in admission of those prior bad acts while the mitigating evidence Wendi actually presented did not.  But even assuming that the State's rebuttal evidence would be admitted, there would be no reason for Wendi's counsel to fear it.  At the evidentiary hearing (and in their reports), Drs. Woods and Hopper considered and explained that same "devastating" rebuttal evidence in light of Wendi's psychiatric disorders, in the same manner that her disorders and childhood trauma would have explained the other evidence the State introduced at trial concerning Wendi's promiscuity, increasingly frequent drinking, and other "prior bad acts" that *were* admitted at her trial.

The "bad acts" referenced by the State here are nothing like the "devastating" rebuttal in *Wong v. Belmontes*, 558 U.S. 15 (2009) (per curiam), the only case the State cites in support of this argument.  In *Belmontes*, the defendant argued that his trial counsel was ineffective for failing to present evidence of his non-violent character, which would have opened the door to "the strongest possible evidence in rebuttal—the evidence that Belmontes was responsible for not one but two murders," which he bragged about to others.  *Id.* at 18, 25.  That is truly devastating rebuttal.  Wendi's thefts during times of severe financial strain while suffering from disorders that greatly impaired her judgment in times of stress are hardly comparable.

Finally, even if the rebuttal evidence were genuinely "devastating," trial "counsel were not in a position to make a reasonable strategic choice" regarding whether to present mental health evidence in mitigation "because the investigation supporting their choice was unreasonable."  *Wiggins*, 539 U.S. at 536.  As Patterson noted:

[I]f that evidence existed, it should have been developed.  Whether it would

---

presentation.  *See State v. Reimer*, 189 Ariz. 239, 241, 941 P.2d 912 (Ariz. App. 1997) ("Arizona courts have expressly determined that neither expert nor lay witnesses assist the trier of fact to understand the evidence or to determine a fact in issue when they merely opine on the truthfulness of a statement by another witness.").

have been presented at trial, that would have been my call and that truly
would have been a strategic call.  That being said, there was an obligation if
this information exists, to develop it in advance of trial.

(2/7/14 Tr. at 178:9-15 (D. Patterson).)

### B.   As this Court Has Already Found, Mitigating Evidence of Wendi's Traumatic Childhood and Psychiatric Disorders is Not Cumulative and Could Have Resulted in a Different Sentence

The State also raises two arguments this Court has already rejected:  (1) that the
mitigation evidence presented at the evidentiary hearing was cumulative of the evidence
presented at Wendi's trial, and (2) even if not, there is no "reasonable probability that at
least one juror would have struck a different balance" in weighing the aggravating
evidence against the additional mitigating evidence presented at the evidentiary hearing.
*Wiggins*, 539 U.S. at 537.

Neither argument is any more persuasive than it was when presented to this Court
in the State's opposition to the Petition.  In fact, they are far less persuasive, because the
Petition did not include the sworn testimony of Kyre Lorts regarding Alejo's sexual
abuse of Wendi.

### 1.   Evidence of Wendi's Traumatic Childhood and Psychiatric Disorders is Not Cumulative of Evidence Presented at Trial

As it did in opposition to the Petition, the State claims that a "large part" of the
evidence presented at the evidentiary hearing was cumulative of evidence presented at
her trial.  (State Br. at 22.)  It is a strange assertion, for two reasons.

*First*, the State concedes that most of the mitigating evidence presented at the
evidentiary hearing was *not* cumulative.  The State does not and cannot argue that the
mental health evidence was cumulative of any evidence presented at trial.  Nor can it
argue that Alejo's sexualization and sexual abuse of Wendi was presented at trial in any
form.  Indeed, the State conceded at the hearing that the Alejo allegations were "new"
evidence.  (*See* 2/5/14 Tr. at 117:2-5 (Attorney Hazard) ("And at least with the sexual

{00137731.1 }

48

1   abuse allegations as to her stepfather, Alejo Ochoa, that's new?  That wasn't presented at

2   her original trial, correct?").)  Wendi's psychiatric disorders and Alejo's sexual abuse, in

3   all its forms, constituted the bulk of the mitigating evidence presented at the evidentiary

4   hearing, and the State cannot reasonably claim that this evidence was cumulative of

5   anything presented at Wendi's trial.

6         *Second*, Wendi's trial counsel testified that one of their mitigation themes was that

7   Wendi had "a good Christian upbringing."  (2/7/14 Tr. at 58:13-23, 123:4-9 (D.

8   Patterson).)  The PowerPoint presentation that formed the centerpiece of that mitigation

9   presentation (Ex. 138) confirms that theme.  Every slide paints an unequivocally positive

10   picture of her childhood, in stark contrast to the reality that trial counsel never attempted

11   to learn.  (*See, e.g.*, 2/10/14 Tr. at 135:1-16 (D. DeLozier); 2/7/14 Tr. at 43:18-22, 130:4-

12   10 (D. Patterson).)  While the mitigation presentation at trial presented Wendi's

13   childhood as idyllic, the mitigation evidence presented at the evidentiary hearing proved

14   her childhood to be a harrowing, relentlessly traumatic experience that resulted in

15   multiple psychiatric disorders and developmental deficits.  Far from cumulative, the two

16   presentations could not be more different.

17         Nevertheless, the State goes to great lengths to argue that certain mitigating

18   evidence was cumulative, exaggerating the truth in the process.  The most egregious

19   example appears on pages 45-46 of the State's brief, when it states the following:

20         Donna Ochoa and [Sharon] Murphy testified at length about their
21         suspicions that [Skip Robertson] may have molested her, and Dr. Murphy
         discussed the potential effects of early sexual abuse molestation [sic] on
22         one's behavior.  Even assuming, for the sake of argument, that Alejo
         also molested Andriano, that fact would have carried minimal additional
23         mitigating weight, as adding another offender to the mix would not have
         made Andriano's status as a molestation victim any more compelling.
24

25   The State gives no citation to the trial record for this testimony, for good reason.

26   Murphy's entire testimony on potential sexual abuse consisted of briefly reporting rumors

27   regarding the Robertson family, in very qualified terms:  "there was a question as to

28

{00137731.1 }

<div align="center">49</div>

1   whether or not her biological father may have sexually molested her.  Whether or not that

2   may have happened.  So we don't know.  There's just some conjecture.  We do know he

3   is serving a prison sentence for sexual molestation of a—a mentally retarded young

4   woman, I believe." (10/12/04 Tr. at 39:14-40:16; 12/9/04 Tr. at 59:5-24.).)  Murphy also

5   briefly recalled an incident in which a member of the Fishers of Men exposed himself to

6   Wendi.  (*Id.*)  As to potential effects, Murphy said only that "child sexual abuse is

7   significant in a person's life" and "for anybody, I believe that would be traumatic,"

8   without elaboration.  (*Id.*)

9        That is it.  Murphy did not "testif[y] at length" regarding sexual abuse, did not

10  "discuss[] the potential effects of early sexual abuse," and offered the jury no information

11  whatsoever other than secondhand speculation that Skip or his father might have

12  molested Wendi before the age of two, and someone else may have exposed himself to

13  her.  It is absurd for the State to compare Murphy's testimony with the eyewitness

14  accounts of Kyre Lorts and Jeri Lynn Cunningham or the thorough expert opinions of Dr.

15  Hopper, and the State itself demonstrates why.  In Murphy's cross-examination at trial,

16  the prosecutor emphasized that Murphy had "no concrete basis" to believe that Wendi

17  had been the victim of sexual abuse, that any abuse would have happened when Wendi

18  was only "about one year old," and likened the speculative report of possible abuse by

19  Skip as no more reliable than a report that Wendi had been "attacked by Bigfoot."  (*Id.* at

20  81:21-82:13, 83:17-21.)  Witnesses at the evidentiary hearing, by contrast, presented

21  firsthand testimony that Wendi was sexually abused through her pre-teen and teenage

22  years by Alejo, and provided expert opinions on the specific effects of that abuse.  There

23  is no possibility that the jury would have treated that evidence as cumulative of Murphy's

24  speculation that Wendi might have been molested by someone else before she was two

25  years old.

26       Donna's testimony was an even shorter version of the same speculation regarding

27

28

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

the Robertson family.  (12/13/04 Tr. at 22:14-25.)  But speculation regarding the

Robertsons was not the focus of the evidentiary hearing in this matter, other than that it

should have alerted trial counsel to further investigate Wendi's childhood and potential

sexual abuse.  The evidentiary hearing focused on concrete evidence of Alejo's sexually

abusive behavior toward Wendi, the numerous impairments to her development resulting

from various verifiable sources of childhood trauma (such as Skip training her like a

dog), and expert testimony regarding the effects of that trauma and Wendi's psychiatric

disorders as an adult.  Rumors about the Robertsons form at most one piece of a much

larger picture of Wendi's traumatic childhood.

    The State also claims that other pieces of Wendi's traumatic childhood were

touched upon at trial, such as the strictness of the Harvest Family Church, the family's

poverty while on the road with the Fishers of Men ministry, and Alejo's temper.  But as

Harvest member Cindy Schaider noted (and told the defense team during trial), trial

counsel's depiction of Harvest was superficial and incomplete.  (2/10/14 Tr. at 173:16-

174:10 (C. Schaider).)  Harvest did not merely impose corporal punishment and shaming

of children; its leaders celebrated it.  (*Id.* at 163:15-20, 168:25-169:13.)  As to poverty,

the State cites only one passing inference at trial to the Ochoas' poverty while on the road

with the Fishers of Men, in which Donna testified that "we couldn't buy shoes because

we weren't allowed to have money to buy her shoes."  (10/4/04 Tr. at 16:18-20 (D.

Ochoa).)  And while Donna and Wendi each testified as to Alejo's temper, trial counsel

presented no evidence of how his temper and volatility served to further his sexual

manipulation and control over his stepdaughter.

    In sum, there is virtually no overlap between the idyllic picture of Wendi's

childhood presented at trial and the true picture of Wendi's horrific childhood presented

at the evidentiary hearing.  And the superficial, isolated references to negative facts

regarding Wendi's childhood at trial do not begin to create an accurate depiction of the

51

1   trauma she suffered.  *See Williams v. Taylor*, 529 U.S. 362, 398 (2000) (a "graphic

2   description" of the defendant's childhood, "filled with abuse and privation, . . . might

3   well have influenced the jury's appraisal of his moral culpability"); *Correll v. Ryan*, 539

4   F.3d 938, 953 n.8 (9th Cir. 2008) (without further investigation and presentation of

5   contextual evidence and argument, bare facts "served only to demonize [the defendant]

6   rather than to mitigate the appropriateness of imposing the death penalty for his actions").

7   No reasonable juror would deem the evidence presented at the evidentiary hearing as

8   merely cumulative of the evidence presented at trial.

9                   **2.       There is a Reasonable Probability That at Least One Juror
10                             Would Have Struck a Difference Balancing in Weighing the
                               Mitigating Evidence Against the Aggravating Evidence**
11

12          Finally, the State contends that "Andriano fails to address the omitted mitigation's

13   *effect* on the sentencing equation in light of the aggravation, facts and circumstances of

14   the offense, and potential rebuttal evidence."  (State Br. at 25.)  The State is wrong, in

15   multiple respects.

16          At the outset, as noted in the Introduction to this reply, this argument has already

17   been addressed and decided.  This Court found that the claims of ineffective assistance

18   were colorable, which necessarily required it to conclude that "if taken as true, [they]

19   'might have changed the outcome'" of Wendi's sentence.  (Oct. 30, 2012 Order at 4

20   (quoting *State v. Schrock*, 149 Ariz. 433, 441, 719 P.2d 1049, 1057 (1986)).)  The

21   substance of the evidentiary hearing comported with that ruling.  The State introduced no

22   new rebuttal or aggravating evidence different than what it mentioned in its brief

23   opposing the evidentiary hearing, and it does not do so in its post-hearing brief.  The

24   State offers absolutely no basis for this Court to reconsider its conclusion that these

25   claims, if true, could have changed the outcome.

26          Further, Petitioner's post-hearing brief *did* address the issue of this balancing,

27   repeatedly describing how the mitigating evidence not only outweighs the factors the

28   {00137731.1 }                                        52
─────────────────────────────────────────────
            PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
                     PETITION FOR POST-CONVICTION RELIEF
                         CASE NO. CR2000-096032-A

State relied upon at trial in arguing that Wendi should be executed, but actually undermines them.  (Petr. Br. at 31-34, 38, 40, 43-44, 46-48.)  This is true not only of the single aggravator found by the jury—that Joe's murder was especially cruel—but also of all of the other reasons the State presented at trial for imposing the death penalty.

*First*, Drs. Woods and Hopper each explained how Wendi's lifetime of childhood trauma and psychiatric disorders necessarily impaired her ability to act rationally and control impulse on the night of the offense, and explained how such disorders could give rise to the deformed decision-making and excessive violence that led to Joe's death. Cruelty in committing the murder was the only aggravating factor the jury found.  The testimony of experts such as Drs. Woods and Hopper would have reduced the weight of that factor by providing the jury with a credible explanation of how Wendi's actions that evening were not the product of evil scheming, but rather a series of increasingly irrational and impulsive actions by a woman suffering from numerous untreated psychiatric disorders and a lifetime of trauma that deprived her of the executive functioning necessary to navigate and control impulse under highly stressful circumstances.

*Second*, the mitigating evidence of Wendi's traumatic childhood and psychiatric disorders also explains and essentially eliminates most of the State's arguments for imposing the death penalty at trial.  To locate those arguments, one need only review the best summary of the State's arguments for imposing the death penalty in this case:  the State's closing argument at the penalty phase of Wendi's trial.  These are not after-the-fact justifications for imposing death, but rather arguments the State actually made and the jury presumably considered when it began its deliberations.

Only four of the 55 transcript pages of the State's closing argument related to the actual offense (12/15/04 Tr. at 110:14-114:25); the remainder consisted of attacks upon Wendi's character and credibility in a variety of respects.  Most of those attacks

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1    concerned Wendi "add[ing], if you will, salt to the wound . . . by going out on [Joe], by

2    going out with other men." (*Id.* at 111:20-24, 121:18-25, 126:10-20, 127:17-25, 130:1-

3    13, 138:20-139:2; 12/16/04 Tr. at 9:4-11, 9:16-18, 9:25-10:10, 11:9-14, 16:1-6, 17:13-

4    14.)[12]  Had trial counsel developed and presented evidence that Wendi suffered childhood

5    sexual abuse and psychiatric disorders, however, her promiscuity becomes a sad and

6    predictable symptom of her childhood sexual abuse, PTSD, and bipolar disorder.

7        The next most frequent theme in the State's closing argument related to Wendi's

8    upbringing.  The State repeatedly highlighted the incongruity between the positive

9    upbringing portrayed by her trial counsel and Wendi's actions as an adult, arguing that

10   Wendi "knew better and she knew better from when she was a child.  Look at the

11   upbringing that the Ochoas gave her." (12/15/04 Tr. at 113:14-17, 129:13-21, 130:1-15,

12   131:7-22.)  Again, had trial counsel developed evidence of true circumstances of Wendi's

13   upbringing, then the jury could have understood how Wendi could have made such

14   damaged decisions as an adult.

15       The same holds true for the bulk of the State's other arguments.  The State argued

16   that Wendi was a bad mother for inflicting corporal punishment on her children (*id.* at

17   125:7-17), which her schooling at a church that extolled the virtues of corporal

18   punishment would have explained.  The State noted her inappropriate emotions in her

19   post-offense interrogation (*id.* at 133:3-5), which her stunted emotional regulation and

20   dissociation would have explained.  The State characterized her suicide attempt as

21   manipulative (*id.* at 139:11-16), which her psychiatric disorders would have explained.

22   The State even noted that Alejo did not seem genuine when he told the jury that he would

23   be devastated if Wendi received the death penalty (140:14-20), which his true, predatory

24   relationship with Wendi would have explained.

25   _____

26   [12] These were far from the only references to Wendi's sexual history by the prosecutor at
     trial.  A compilation of some—but not all—of those references was previously filed with

27   this Court as Exhibit 2 to the Petition for Post-Conviction Relief.

{00137731.1 }                                54

1    In sum, the mitigating evidence presented at the evidentiary hearing in this matter

2  does not merely add significant weight to the mitigation side of the scale, but it also

3  substantially "reduce[s] the ballast on the aggravating side of the scale." *Porter v.*

4  *McCollum*, 558 U.S. 30, 42 (2009).  The jury in this case deliberated on the death penalty

5  for several days despite being provided only a cursory presentation of mitigating

6  evidence, none of which explained or assisted the jury in understanding how Wendi could

7  have engaged in the behaviors that the State relied upon in response.  Left with no basis

8  for understanding those actions other than the conclusion that Wendi was evil, the jury

9  imposed a sentence of death.  If trial counsel had performed the mitigation investigation

10  warranted by professional norms and the numerous indications it received regarding

11  childhood trauma and psychiatric disorders, they could have provided the jury with a

12  credible, logical, and true alternative explanation for Wendi's behavior.  Had they done

13  so, "there is a reasonable probability that at least one juror would have struck a different

14  balance" and declined to sentence Wendi to death.  *Wiggins*, 539 U.S. at 537.

## CONCLUSION

16    For the reasons stated above, Petitioner proved the strength of her claims at the

17  evidentiary hearing, and the State's arguments in response fail to meaningfully rebut

18  them.  This Petition should be granted.

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF
CASE NO. CR2000-096032-A

1    DATE:  SEPTEMBER 5, 2014            By: /s/ Scott M. Bennett

2                                            Scott M. Bennett (022350)
                                             COPPERSMITH BROCKELMAN PLC
3                                            2800 North Central Avenue
                                             Phoenix, Arizona  85004
4                                            (602) 224-0999 (office)
                                             (602) 224-6020 (fax)
5                                            sbennett@cblawyers.com

6
                                             Allen A. Arntsen, admitted *pro hac vice*
7                                            Matthew R. Lynch, admitted *pro hac vice*
                                             FOLEY & LARDNER LLP
8                                            150 E. Gilman Street
                                             Madison, WI 53703-1481
9                                            (608) 257-5035 (Office)
                                             (608) 258-4258 (Fax)
10
11                                           *Attorneys For Petitioner Wendi Andriano*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{00137731.1 }                          56

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

ORIGINAL e-filed September 5, 2014,
with the Clerk of the Maricopa County Superior Court

COURTESY COPY hand-delivered September 5, 2014, to:

Judge Brian K. Ishikawa
Maricopa County Superior Court
1810 Lewis Street
Mesa, AZ  85210-6235

COPY mailed and e-mailed September 5, 2014, to:

Gregory Hazard
Office of the Attorney General
1275 W. Washington
Phoenix, AZ 85007-2997

Lacey Stover Gard
Office of the Attorney General
400 W. Congress, Suite S-315
Tucson, AZ  85701-1367

*Attorney for the State of Arizona*

*/s/ Carol Keesee*

{00137731.1 }

57

PETITIONER'S POST-HEARING MEMORANDUM IN SUPPORT OF
PETITION FOR POST-CONVICTION RELIEF

CASE NO. CR2000-096032-A

4825-6076-0092.

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,         )
                            )
     Respondent,     )
                            )
vs.                  )  No.
                            )  CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,   )
                            )
     Petitioner.    )
_____)


Phoenix, Arizona
February 3, 2014
9:32 a.m.


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING

DAY 1

VOLUME I OF II


Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500               (COPY)

2

<u>A P P E A R A N C E S</u>

On Behalf of the State:

       Mr. Gregory Hazard
       Assistant Attorney General

       Ms. Lacey Gard
       Assistant Attorney General

On Behalf of the Defendant:

       <u>ATTORNEYS AT LAW</u>:

       Mr. Scott Bennett
       Mr. Allen Arntsen
       Mr. Stephan Nickels
       Mr. Matthew Lynch
       Ms. Krista Sterken
       Ms. Jodi Fox

<u>I N D E X</u>

<u>T E S T I M O N Y</u>

<u>WITNESS</u>:                                                    <u>PAGE</u>

JAMES W. HOPPER, PH.D.

    Direct Examination by Mr. Nickels          24

3

```
 1              P R O C E E D I N G S

 2

 3         THE COURT:  Good morning.  This is

 4  CR 2000-096032, State of Arizona vs. Wendi Elizabeth

 5  Andriano.

 6         Is the State ready?

 7         MR. HAZARD:  Yes, Your Honor.

 8         THE COURT:  Are the Petitioners ready?

 9         MR. ARNTSEN:  Yes, we are, Your Honor.

10         THE COURT:  Just so that we have a clear record,

11  why don't you go ahead and identify yourself, everyone for

12  the State.

13         MS. GARD:  Lacey Gard for the State, Your Honor.

14         MR. HAZARD:  Gregory Hazard for the State.

15         THE COURT:  And?

16         MR. BENNETT:  Scott Bennett for Ms. Andriano.

17         MS. FOX:  Jodi Fox for Ms. Andriano.

18         MR. ARNTSEN:  This is Ms. Andriano.  Allen

19  Arntsen for Ms. Andriano.

20         MR. NICKELS:  Good morning, Your Honor.  Steve

21  Nickels for Ms. Andriano.

22         THE COURT:  Good morning.

23         MS. GARD:  And, Your Honor, the other people at

24  counsel table are our paralegals.

25         THE COURT:  Okay.  Thank you.
```

4

1        MR. ARNTSEN:  Your Honor, also here is Matthew

2   Lynch and Krista Sterken.

3        THE COURT:  Mr. Lynch and Ms. Sterken.  Okay.

4   Thank you.

5        We are set today for Day 1 of a Post-Conviction

6   Relief Evidentiary Hearing.  In our status conferences, it

7   is my understanding that the Petitioner and the State have

8   agreed to waive opening statements; is that correct?

9        MR. ARNTSEN:  That's correct, Your Honor.

10       THE COURT:  Are we ready to proceed at this time?

11       MR. ARNTSEN:  We are.  There are a couple of

12   issues before we start with the evidence that I would like

13   to bring up.

14       THE COURT:  Go ahead.

15       MR. ARNTSEN:  First of all, you may recall we

16   have had some hearings on Ms. Andriano's transportation

17   and feeding, essentially.  And, unfortunately, there are

18   still some issues there.  I thought we would wait until

19   this morning to see what happened rather than speculating

20   as to what might happen.

21       This morning she was woken up at 3:30, taken out

22   of her cell at 4:15, and put in a holding cell in

23   Estrella.  Somewhere between 6:00 and 6:30, she was placed

24   on a bus and taken somewhere.  She assumes downtown, where

25   she was at a holding cell for about five minutes.  Then

5

1   she got back on a bus around 7:00 o'clock to come over

2   here.

3           And what time did you get here?  About 8:00.

4           THE PETITIONER:  8:00.

5           MR. ARNTSEN:  8:00.  And instead of -- she didn't

6   get breakfast before she left Estrella.  And then at

7   downtown, they gave her just one sack when we had

8   understood she would get one sack for breakfast and one

9   sack for lunch here today.

10          So what we would like -- we have kind of gone

11  back and forth on this a number of times.  And, really,

12  what we would ask is an order for the Court setting forth

13  some parameters on Ms. Andriano's transportation.

14          Hopefully, for instance, if the bus doesn't leave

15  Estrella until 6:00 or 6:30, it seems to me like

16  Ms. Andriano ought to be able to not be awoken before

17  5:00.

18          Also, it seems to me that she ought to get two

19  sack lunches, being gone all day like this, which, again,

20  we thought we had an agreement with the county on before,

21  but it just didn't happen.

22          THE COURT:  Well, it was my understanding from

23  the status conference that Mr. Jue attended, who

24  represented the sheriff's office -- it was my

25  understanding from you and from him, that all of these

1   matters had been resolved.  Mr. Jue is not here right now.

2   So I'm reluctant to go into these things without Mr. Jue

3   being present representing the sheriff's office.

4          So what we will do is I'll have my judicial

5   assistant contact Mr. Jue's office and indicate to him

6   that there is an issue, and either we will have him on the

7   telephone or have him come to court here today and we can

8   discuss this towards the end of the day.

9          MR. ARNTSEN:  Okay.  That would be fine.

10          THE COURT:  I'm reluctant to discuss or rule on

11   any matters without Mr. Jue being present.

12          MR. ARNTSEN:  Understood.  The next issue --

13          THE COURT:  Sure.

14          MR. ARNTSEN:  Oh, I'm sorry.

15          SERGEANT KELLER:  Your Honor, if I may, I'm

16   Sergeant Keller with the Maricopa County Sheriff's Office.

17   I'm in charge of the transport detail.  There was a

18   miscommunication this morning for her.  She was supposed

19   to be waiting for me and my crew to bring her here, which

20   would have given her more time.  The secondary sack lunch

21   that he's talking about is being delivered for lunchtime.

22          THE COURT:  Okay.

23          MR. ARNTSEN:  Okay.  So we're probably okay.

24   Maybe what we'll do is we'll just check in on it again

25   tomorrow.

1           THE COURT:  Okay.  Thank you, Deputy.

2           MR. ARNTSEN:  Thank you very much.

3           THE COURT:  So we don't have to contact Mr. Jue

4    it sounds like at this point.

5           MR. ARNTSEN:  Yes.  We will see what happens with

6    tomorrow.  That sounds just fine, Your Honor.

7           THE COURT:  Okay.

8           MR. ARNTSEN:  The second issue is the parties had

9    stipulated to the admission of a number of exhibits as set

10   forth in the Trial Exhibit List.  I was going to go

11   through and move them into evidence before we got started

12   just kind of in mass.  I can give the exhibit numbers and

13   I believe they would show on the Trial Exhibit List that

14   admissibility was stipulated.  Although if that isn't

15   necessary, then that's fine.

16          And that would be on the Joint Witness Schedule

17   and Exhibit List that the parties filed a couple of weeks

18   ago.  I'm ready to go down the list of exhibits whenever

19   everybody else is ready.

20          THE COURT:  Go ahead.

21          MR. ARNTSEN:  Are you ready?  It would be

22   Exhibit 2, 2 A, 2 B, 2 C, 2 D, 3, 4, 4 A, 4 B, 5, 5 A,

23   6 A, 6 C, 6 E.  Give me just a second.  44, 45.

24          THE COURT:  Did you miss 15?  Was 15 going to be

25   admitted?

1          MR. ARNTSEN:  Yes, Your Honor, 15.  44, 45, 46,

2    47, 48, 49, 54.  And then we move up to I believe 131.

3          MS. GARD:  No.  It's 65.

4          MR. ARNTSEN:  65?

5          MS. GARD:  Yes.  And 65 A.

6          MR. ARNTSEN:  65 and 65 A.  131.

7          THE COURT:  Say that one more time.

8          MR. ARNTSEN:  131.  And 166.  And then there are

9    certain of the State's exhibits and I'll let them do that.

10         MS. GARD:  Those exhibits, Your Honor, would be

11   171, 179, 180.

12         THE COURT:  180?

13         MS. GARD:  Yes.  183, 184, 195, 199, 200, 201.

14   And I would also note for the record that we have them on

15   our exhibit schedule.  We have exhibits marked as 7, you

16   know, 7 A, 7 B.  But on the exhibit list, they're actually

17   marked with decimal points after.  So it's like 2.001

18   instead of 2 A.

19         THE CLERK:  That's how the system does it.

20         MS. GARD:  Okay.  So I just wanted to make sure

21   the record is clear what we're talking about.

22         THE COURT:  So those State's exhibits marked for

23   identification, it's a stipulation that they can be

24   admitted; is that correct?

25         MR. ARNTSEN:  Right.  All of the exhibits, yes,

9

1  all of both sides.

2         THE COURT:  Along with what you said; right?

3         MR. ARNTSEN:  Yes.

4         THE COURT:  All right.  Let's just go over that

5  one more time, then.  Okay?  Pursuant to stipulation,

6  then, Exhibit No. 2, 2 A, 2 B, 2 C, 2 D, 3, 4, 4 A, 4 B,

7  5, 5 A, 6 A, 6 C, 6 E, 15, 44, 45, 46, 47, 48, 49, 54, 65,

8  65 A, 131, 166, and then 171, 179, 180, 183, 184, 195,

9  199, 200 and 201 are all admitted into evidence.

10        MR. ARNTSEN:  Yes, Your Honor.  And as we were

11  doing this, Attorney Hazard came over and told me also

12  that the State had no objection to the admission of

13  Exhibit 167.

14        THE COURT:  167?

15        MR. ARNTSEN:  Dr. James' report.

16        THE COURT:  Is that correct, Mr. Hazard?

17        MR. HAZARD:  Yes, Your Honor.

18        THE COURT:  Then also Exhibit No. 167 for

19  identification is admitted into evidence.  Okay.  Is that

20  it?

21        MR. ARNTSEN:  We had filed a motion before trial

22  with regard to certain evidence relating to the mitigation

23  case that we are saying should have been presented.  And

24  just as a very brief overview, we've got kind of three

25  categories of evidence.

1        We have the evidence related to the conflict of

2    interest issue.  We have the evidence relevant to the

3    *Strickland* claim, the ineffective assistance of counsel

4    claim, which is one looks at effectiveness and then the

5    other prong is prejudice.

6        And the prejudice part of that claim is the

7    mitigation case that we're saying should have been

8    presented, but wasn't.  And so, with regard to that

9    evidence -- and in our motion, we list the specific

10   exhibits -- and I can list them later on following the

11   argument here -- that they're admissible irrespective of

12   their admissibility under the Arizona Rule of Evidence

13   based on the rule in Arizona Revised Statute 13-751, that

14   any factors proffered by the defendant or the State that

15   are relevant in determining whether to impose a sentence

16   less than death are admissible regardless of its

17   admissibility under the rules governing admission of

18   evidence in criminal trials.

19       So, again, what this is evidence is the evidence

20   that we're saying should have been presented in the

21   mitigation case under that standard, and that,

22   accordingly, that evidence and, again, the specific

23   exhibits and related testimony as laid out in the motions

24   should be admitted at this stage irrespective of any

25   evidentiary issues under the rules of evidence, that

1   Ms. Andriano has a constitutional right to have her -- any

2   of this mitigation evidence, you know, allowed into

3   evidence here.

4           THE COURT:  It looks like that motion was filed

5   on or about January 24th.  Did the State file a response

6   that I should be aware of?

7           MS. GARD:  We have not filed a response yet,

8   Your Honor, or at all.  I would like to respond orally if

9   that's all right.

10          THE COURT:  Okay.

11          MS. GARD:  First of all, Ms. Andriano has no

12  constitutional right to this proceeding, period.  But

13  settling that side, the rules of evidence apply to a

14  PCR hearing, and I think it's Rule 32.8.  This is not a

15  resentencing.  13-751 would apply if it were.  It is not.

16  This Court is governed by or this hearing is governed by

17  the rules of procedure and they should be applied.

18          THE COURT:  Okay.  Let me think about the motion

19  and the argument that has been made here today and I'll

20  make a ruling.  Okay.

21          MR. ARNTSEN:  Okay.  I anticipate the issue will

22  arise with our second witness, Donna Ochoa.  Our first

23  witness will be Dr. James Hopper.

24          And I spoke with Attorney Hazard before the

25  hearing and, you know, in terms of experts are allowed to

1   rely on nonadmissible evidence if it's the kind of

2   evidence they normally rely on.  Attorney Hazard and I

3   discussed that of a protocol where Dr. Hopper could

4   testify without lots of objections under the understanding

5   that to the extent he was discussing underlying factual

6   evidence, that was being -- that was being used under the

7   expert use of evidence exception to the other evidentiary

8   rules.

9           Greg, I don't think I misrepresented it at all.

10          THE COURT:  Mr. Hazard?

11          MR. HAZARD:  No.  That's correct, Your Honor.  I

12  can make objections to hearsay.  And if it is offered for

13  a basis for Dr. Hopper's opinion --

14          THE COURT:  For opinion.

15          MR. HAZARD:  -- for his opinion, however you want

16  to, so the record is clear that we are objecting to being

17  offered for the truth of the matter asserted.  But we

18  could -- with that understanding, I don't know if I need

19  to make objections every time because it would interrupt

20  the proceedings.

21          THE COURT:  Can we proceed with that

22  understanding?

23          MR. ARNTSEN:  Yes, Your Honor.

24          THE COURT:  Okay.  Then you won't have to make an

25  objection each and every time then.

1          MR. HAZARD:  Thank you, Judge.

2          THE COURT:  Everyone agrees to that?

3          MR. ARNTSEN:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. ARNTSEN:  Then yes.  And the issue with

6    regard to the motion on mitigation evidence, that will

7    come up with Donna Ochoa, who will be our second witness,

8    who we anticipate will start sometime this afternoon.

9          THE COURT:  Okay.  It looks like Dr. Hopper is

10   going to be the first witness this morning; is that

11   correct?

12         MR. ARNTSEN:  Yes, Your Honor.

13         THE COURT:  Then who is going to be asking

14   questions on behalf of the State?

15         MR. HAZARD:  That would be me, Your Honor.

16         THE COURT:  Mr. Hazard.  Who is going to be

17   asking questions on behalf of the Petitioner?

18         MR. NICKELS:  I will, Your Honor.

19         THE COURT:  Okay.  And you're?

20         MR. NICKELS:  Mr. Nickels.

21         THE COURT:  Okay.  Thank you.  I'll get used to

22   everyones' faces and names.

23         MR. NICKELS:  Sure.

24         THE COURT:  Okay.  It would be Mr. Nickels.

25         Then you anticipate that Ms. Ochoa will be later

14

1  this afternoon?

2        MR. ARNTSEN:  That's what we anticipate.

3        THE COURT:  Do you anticipate that we're going to

4  go with Dr. Hopper some time in the afternoon, also?

5        MR. ARNTSEN:  That's what we anticipate, yes,

6  Your Honor.

7        THE COURT:  What I anticipate doing is going up

8  to the noon hour.  We will take about a 10-minute or

9  15-minute break about 10:45 for the court reporter and the

10 staff.  Okay?

11       MR. ARNTSEN:  Yes.  Then one other preliminary

12 matter and this is the last one.

13       THE COURT:  Okay.  That's okay.

14       MR. ARNTSEN:  It actually doesn't need to be

15 resolved today, but it concerns witness sequestration.

16 Specifically what it involves is whether experts may be

17 allowed to be in the courtroom while fact witnesses or

18 other experts testify.

19       We had reached an agreement with Attorney Hazard

20 that our legal experts, Larry Hammond and Gary Lowenthal,

21 could be present for Attorney Patterson and

22 Attorney DeLozier's testimony.

23       What we are asking is that they also be allowed

24 to be present for Mitigation Specialist Scott MacLeod's

25 testimony.

1          The State has objected to Attorney Hammond's and

2    Attorney Lowenthal's presence during Mr. MacLeod's

3    testimony.

4          We submit that their presence should be allowed

5    under Arizona Rule of Evidence 615 (C) as a person -- as

6    their presence is essential to the presentation of our

7    case.

8          And I would cite the *State vs. Williams* case,

9    183 Ariz. 368 at Page 380.  904 P.2d 437 at 449.  It was

10   reversed on other grounds, but this ruling holds up.

11         Also, in *State vs. Barocsi*, 2012, Arizona

12   unpublished Lexis 938 at Page 6.  It's an August 12th,

13   2012 opinion.  The Court applied that in the context of

14   Rule 9.3.

15         And the reasons why it's essential that

16   Attorneys Lowenthal and Hammond also be present during

17   Mr. MacLeod's testimony is that their opinions relate in

18   part to the adequacy of the defense team's work in the

19   underlying trial.  The defense team being made up of

20   Attorneys Patterson and DeLozier and Mitigation Specialist

21   MacLeod.  And we submit that there's nothing -- you're not

22   implicating the reasons for the sequestration rule by them

23   being present.  It's not like they're going to try to

24   align -- you know, they're basing their -- the opinions

25   they have done so far were based on the declarations of

1   these witnesses and interviews with them.

2          It's essential, if the witnesses testify, whether

3   on direct or cross, different from what they said in their

4   declarations or interviews, they ought to be able to

5   incorporate those opinions and say:  Oh, this makes a

6   difference in what my opinions are here.

7          And, again, it's not something like that they're

8   kind of -- you know, typically, you want witness

9   sequestration so that witnesses don't sort of coordinate

10  their testimony.  Fact witnesses don't keep -- you know,

11  so that they don't try to keep their stories straight.  We

12  submit that that just isn't implicated at all in the

13  context of a legal expert observing the testimony of a

14  fact witness.

15         And one other area with sequestration is the

16  parties have agreed that their respective mental health

17  experts, Attorney Woods on our side and -- not Attorney

18  Woods -- Dr. Woods on our side and -- or Drs. Woods and

19  James on our side and Drs. Pitt and Amin on their side can

20  be present during each other's testimony.

21         But we also ask that Dr. Woods be allowed to be

22  present with when Ms. Andriano testifies because his

23  opinions are relating to essentially her mental health

24  condition.  And we are amenable to Dr. Pitt also being

25  present when Ms. Andriano testifies.  We're not looking

1    for a one-sided arrangement here.

2         But, again, we think it's appropriate given that

3    Dr. Woods is going to be testifying as to mental health

4    issues with regard to Ms. Andriano, and that being present

5    during her testimony would help inform his opinion and,

6    again, doesn't run into the concerns you have for

7    sequestration of witnesses keeping their stories straight.

8    He is an expert.  He is basing his opinions on certain

9    assumed facts and it's really important that those facts

10   be right.

11        And if, for instance, he's assuming a certain

12   fact, and for whatever reason, she testifies something

13   different, under the sequestration rules, we can't tell

14   him that, and then he's up here giving opinions that

15   aren't based on the right facts.  And just, to me, it is

16   not helpful for the Court.  It is not helpful for the

17   process.  And, again, there is no issue on people keeping

18   stories straight because it is an expert offering an

19   opinion regarding lay witnesses.

20        THE COURT:  Okay.  Who wants to address this?

21   Mr. Hazard?

22        I should ask, Ms. Gard, should I address you as

23   Ms. Stover Gard or Ms. Gard?

24        MS. GARD:  Ms. Gard, Your Honor.

25        THE COURT:  Ms. Gard.  Okay.  Thank you.

1          Mr. Hazard.

2          MR. HAZARD:   Judge, I can respond to the e-mail

3    communication I had with Mr. Arntsen.   The State was not

4    going to take any position on Mr. Hammond and/or

5    Mr. Lowenthal being in the courtroom when Dan Patterson

6    and David DeLozier are testifying.   We did that as a

7    courtesy to facilitate things.

8          In addition, sort of the experts being present

9    when other experts are testifying, we have done that.   Our

10   office has done that in the past as a courtesy because it

11   certainly facilitates cross-examination when you're

12   dealing with scientific technical or otherwise knowledge

13   that's going to be beyond an attorney having a mental

14   health expert examine and be in the courtroom to assist

15   the attorneys with cross-examination of the opposing

16   expert.   I can understand why that would be beneficial.

17   And that's why we're not taking a position on that.

18          But any other witness on the stand, including the

19   defendant herself, Ms. Andriano, we would object to other

20   witnesses being present in the courtroom.

21          THE COURT:   So, basically, you have no objection

22   to Mr. Hammond and Mr. Lowenthal being present while

23   Mr. Dan Patterson and Mr. David DeLozier testify?

24          MR. HAZARD:   Correct.

25          THE COURT:   You do have a problem with them being

1   present while Mr. MacLeod testifies?

2           MR. HAZARD:  Correct.

3           THE COURT:  And then let me make sure I

4   understand.  And then, did you say that you -- what is the

5   State's position with regard to Dr. Woods being present

6   while Ms. Andriano testifies?

7           MR. HAZARD:  We object to that.

8           THE COURT:  You object?  Okay.

9           That's the only doctor that you're asking as far

10  as being present while the testimony?

11          MR. ARNTSEN:  Yes, Your Honor.  Although,

12  actually, in my initial run-up, I missed one.  We also

13  asked that our Mitigation Specialist Expert Keith Rohman

14  be present when Scott MacLeod testifies.  Again, he's

15  offering an opinion on the work of the mitigation

16  specialist here and, again, it's an expert who is -- it's

17  akin to Attorneys Hammond and Lowenthal being present

18  during Mr. MacLeod's testimony.

19          We ask that our other legal expert, although here

20  as a mitigation specialist expert, be allowed to be

21  present.

22          THE COURT:  And the State objects to that?

23          MR. HAZARD:  Yes, Your Honor.

24          THE COURT:  Let me think about these matters and

25  I'll make a ruling in a timely manner before these

1  actually come up.  Okay?

2       MR. ARNTSEN:  Thank you.  And that's all I have,

3  Your Honor.

4       MS. GARD:  Your Honor, I have two brief

5  housekeeping issues, if I may.

6       THE COURT:  Sure.

7       MS. GARD:  On the subject of Mr. Hammond and also

8  Mr. Lowenthal, in the PCR Petition, I had objected to

9  consideration of Mr. Hammond's opinions on two grounds

10 because he is -- this is a legal determination.  So he

11 shouldn't be offering an expert opinion on a legal

12 determination whether counsel was ineffective.

13      And, also, because it is not necessary to assist

14 the trier of fact because Your Honor is an attorney

15 familiar with the standard of care.

16      I would just like to renew that objection to

17 Larry Hammond's testimony and, also, to apply it to

18 Mr. Lowenthal's testimony as well.

19      THE COURT:  For now, I'm going to deny that

20 motion.

21      MS. GARD:  And the final thing I wanted to

22 address, Your Honor, Ms. Andriano, when these attorneys

23 were appointed to represent her, signed a waiver with the

24 Arizona Supreme Court acknowledging that they were not

25 Rule 6.8 qualified.

1  actually come up.  Okay?

2       MR. ARNTSEN:  Thank you.  And that's all I have,

3  Your Honor.

4       MS. GARD:  Your Honor, I have two brief

5  housekeeping issues, if I may.

6       THE COURT:  Sure.

7       MS. GARD:  On the subject of Mr. Hammond and also

8  Mr. Lowenthal, in the PCR Petition, I had objected to

9  consideration of Mr. Hammond's opinions on two grounds

10  because he is -- this is a legal determination.  So he

11  shouldn't be offering an expert opinion on a legal

12  determination whether counsel was ineffective.

13       And, also, because it is not necessary to assist

14  the trier of fact because Your Honor is an attorney

15  familiar with the standard of care.

16       I would just like to renew that objection to

17  Larry Hammond's testimony and, also, to apply it to

18  Mr. Lowenthal's testimony as well.

19       THE COURT:  For now, I'm going to deny that

20  motion.

21       MS. GARD:  And the final thing I wanted to

22  address, Your Honor, Ms. Andriano, when these attorneys

23  were appointed to represent her, signed a waiver with the

24  Arizona Supreme Court acknowledging that they were not

25  Rule 6.8 qualified.

1          We think it would be beneficial to engage her

2     perhaps in a colloquy, if the Court is willing, to insure

3     and just to reaffirm that waiver and protect the record

4     for future proceedings.

5          THE COURT:  Mr. Arntsen.

6          MR. ARNTSEN:  And I apologize.  This may show my

7     ignorance for not being sure.  I'm not quite sure what she

8     just said.

9          THE COURT:  Do you want to go ahead and repeat

10    it?

11         MR. ARNTSEN:  I would assume to be sure if she

12    repeated it again.

13         MS. GARD:  Under the rules for appointment for

14    capital defense counsel, there's certain minimum

15    qualifications that have to be met.

16         My recollection is that Ms. Andriano signed a

17    written waiver when she accepted this appointment with the

18    Arizona Supreme Court.  We think it would be beneficial to

19    have the Court reaffirm that she consents to

20    representation by these attorneys.

21         THE COURT:  May I address, Ms. Andriano?

22         MR. ARNTSEN:  You may.

23         THE COURT:  Ms. Andriano, you heard what Ms. Gard

24    said?

25         THE PETITIONER:  Yes, sir.

1          THE COURT:  And it's my understanding you did

2    sign a waiver; is that correct?

3          THE PETITIONER:  Yes, sir.

4          THE COURT:  You would like these counsel -- the

5    counsel that are here with you, representing you here

6    today, to represent you in this Post-Conviction Relief

7    Proceeding?

8          THE PETITIONER:  Yes, Your Honor.

9          THE COURT:  And you do so freely, voluntarily and

10   intelligently?

11         THE PETITIONER:  Yes, Your Honor.

12         THE COURT:  You've had the opportunity to discuss

13   this with your counsel and you've had the opportunity to

14   think about this; is that correct?

15         THE PETITIONER:  Yes, Your Honor.

16         THE COURT:  And you did sign the consent freely,

17   voluntarily and intelligently?

18         THE PETITIONER:  Yes.

19         THE COURT:  Okay.  Any further questions?

20         MS. GARD:  No, Judge.

21         THE COURT:  Okay.  Then we will go ahead and

22   proceed then at this time.

23         MR. ARNTSEN:  Thank you, Judge.

24         THE COURT:  The Petitioners may call their first

25   witness.

1          MR. NICKELS:  Thank you, Your Honor.  The

2    Petitioner calls Dr. James Hopper.

3          THE COURT:  Sir, if you would step forward to the

4    witness stand here.  Before you sit down there, please

5    face the clerk.  Raise your right hand and she will swear

6    you in.

7          THE CLERK:  Please state your name and spell your

8    last name for the record.

9          THE WITNESS:  James W. Hopper, H-O-P-P-E-R.

10          (WHEREUPON, the witness was duly sworn by the

11    clerk.)

12          THE COURT:  Okay.  Sir, if you would please have

13    a seat there on the witness stand.  Just a few things to

14    remember while you testify.  Remember to speak up so that

15    everyone can hear you.

16          Also, it is important that you wait until the

17    question is completed before you answer the question.  And

18    also make sure that you give us a verbal response.  Don't

19    just shake your head and say uh-huh or un-huh.  Say yes,

20    no, whatever it might be.

21          Can you do that for us?

22          THE WITNESS:  Yes, I can.

23          THE COURT:  Go ahead and state your name for the

24    record.

25          THE WITNESS:  James Warren Hopper.

1          THE COURT:  You may proceed.

2

3                    JAMES W. HOPPER, PH.D.,

4    having been first duly sworn to tell the truth, the whole

5    truth, and nothing but the truth, testified as follows:

6

7                    DIRECT EXAMINATION

8    BY MR. NICKELS:

9       Q.   Good morning, Dr. Hopper.

10      A.   Hi.

11      Q.   Where do you live?

12      A.   I live in Arlington, Massachusetts.

13      Q.   When do you do for a living?

14      A.   I'm trained as a clinical psychologist and I work

15   as an independent consultant.  I provide training for

16   therapists, for police investigators, for prosecutors,

17   throughout the military.  I consult and provide teaching

18   through Harvard Medical School to an addiction clinic and

19   for psychiatry residents.  I do some clinical work.

20      Q.   Have you done work for this Andriano matter?

21      A.   Yes, I have.

22      Q.   We're going to get into your analysis and

23   conclusions in detail, but can you please provide a

24   summary of what you did for this case?

25      A.   So, for this case, I reviewed the events and

1  relationships of Wendi's life, particularly birth to

2  age 18, to determine whether she suffered traumatic

3  experiences that would affect her as an adult and what

4  effect those traumatic experiences have on her,

5  particularly her psychological functioning and her ability

6  to have close relationships.

7      Q.   And what did you find?

8      A.   Wendi suffered severe and pervasive trauma

9  throughout her childhood, including, but not limited to,

10 severe neglect by her mother, emotional and physical abuse

11 by her mother, her biological father and her stepfather

12 and sexual abuse by her stepfather.

13     Q.   What effect did this have on Wendi?

14     A.   Wendi entered adulthood as a severely damaged

15 person, who was not able to properly respond in situations

16 involving complex emotions or high stress, and she was

17 also unable to have normal, healthy, closer intimate

18 relationships.

19     Q.   In your professional opinion, Dr. Hopper, did the

20 trauma that Wendi suffer affect her in the time leading up

21 to Joe Andriano's death?

22     A.   Absolutely.  There is no way it couldn't happen.

23     Q.   Like I said, we're going to get back to your

24 analysis and discuss it in more detail.  But before we do

25 that, I'm going to have you just tell the Court a little

1  bit more about your background and qualifications.

2      *A.*   Okay.

3      *Q.*   So if you could just start with your educational

4  experience and take us up to the present.

5      *A.*   Sure.  So in college, I was a major in history,

6  but I took a lot of psychology courses.  When I graduated

7  from college, I worked at a mental hospital where I -- it

8  was a Harvard teaching hospital, where I learned a lot

9  about psychological trauma and saw it in the patients in

10  the hospital.  I worked on research, on the effects of

11  childhood trauma and especially this kind of chronic

12  pervasive trauma.

13          Then I went to graduate school at the University

14  of Massachusetts, Boston.  There I did my master's and

15  dissertation research on the effects of childhood trauma,

16  physical abuse, sexual abuse.  There I particularly

17  focused on men and outcomes of violence against others and

18  sexual abuse, child abuse, assault, those sorts of things.

19          Then as a post-doctoral follow, I worked at -- I

20  both got clinical training in working with people with

21  complex major trauma histories like this.

22          I also was the director of the research lab there

23  with a man named Bessel van der Kolk, who is one of the

24  leaders in the field of traumatic stress studies.

25          And then I conducted research in this realm on

1  traumatic memories, on treatment for child abuse or

2  related trauma, on what's going on in peoples' brains when

3  they're overwhelmed by being reminded of their traumas.

4         I also have done work through Harvard Medical

5  School on addictions and how trauma can lead to

6  addictions.  And that's pretty much my main training, you

7  know.

8     Q.   Have you done prior work on capital cases such as

9  this?

10    A.   Yes, I have.

11    Q.   Describe that for us, please.

12    A.   So I've worked on about eight.  I worked on eight

13 cases over the last ten years.  And I've -- you know, I do

14 about one a year, usually.

15    Q.   Was the work in those cases similar to what you

16 have done here, which is to analyze someone's life

17 experiences that determine whether there is trauma, and

18 then offer an opinion as to what effect that would have on

19 that person?

20    A.   Yes.  That's the kind of work I did.  One thing

21 different about this case is that there was such a

22 thorough investigation and so much evidence.  So that's

23 what makes this case stand out.  But all the methods and

24 procedures that I've used in the other cases are the same.

25    Q.   Okay.  Now you'll notice there is a set of

1   exhibit binders down by your feet.  If you could grab the

2   yellow one, please, and if you could look to what's

3   labeled as Exhibit 4 A.

4        *A.*   Okay.  I see it.

5        *Q.*   Could you please tell us what that is?

6        *A.*   This is my curriculum vitae, my CV, dated

7   February 3rd, 2012.  It's substantially the same.

8        *Q.*   Does that essentially describe what you have just

9   testified to to the Court about your educational and

10  professional experience?

11       *A.*   Yes.  I mean, there's definitely a lot more work

12  I've been doing to train in the military in the last

13  couple of years, but, otherwise, yes.

14       *Q.*   Okay.  Well, this is one of the exhibits that has

15  already been admitted into evidence, but I wanted to just

16  highlight it so that everybody knows that's what

17  Exhibit 4 A is.

18            We're now going to turn to the process that you

19  undertook here, what you reviewed, who you talked to,

20  et cetera.  So take us through that now.  Let's start with

21  any in-person interviews that you have done.

22       *A.*   Yes.  So I did in-person interviews with

23  Ms. Andriano and with six other people:  Her mother, her

24  biological father, her stepfather, a woman named Martha

25  England, who was an adult and a parent in a church in a

1    cult community that she was in as a teenager, and then two

2    women who were friends of hers at the time when she was a

3    child in that community, Kyre Lorts and Jeri Lynn

4    Cunningham.

5         Q.    How many interviews did you do with Ms. Andriano?

6         A.    There was six visits I made out here, and some of

7    those were one day with her and some were two or three.

8    So six times out here and 52 hours of interviews.

9         Q.    So that was 52 hours just with Ms. Andriano?

10        A.    Yes.

11        Q.    And then you had the other -- was it six other

12   people that you interviewed?

13        A.    Yes.

14        Q.    In addition to these in-person interviews, did

15   you review other materials?

16        A.    Yes.  I received ten binders of materials.  As I

17   said, this is one of the most thoroughly researched cases.

18   So I had documents on her mother, her biological father,

19   her stepfather, school records, medical records, family

20   records, military records for her father.  So lots of

21   records on her parents.

22             And then, also, many records on Wendi's life as

23   well.  Again, school records, everything from yearbooks

24   from the community she was in, to any records that were --

25   basically, any paper that was generated on her and by her

1  family.

2      *Q.*    In addition to all of those records and documents

3  that were in the binders, did you have an opportunity to

4  review any other witness statements, declarations,

5  affidavits, stuff like that?

6      *A.*    Yes, I did.  There were 25 declarations by people

7  who were family members or acquaintances of hers, many of

8  whom have had no contact with her since she was 18.  There

9  were four other declarations by people who were friends

10  with Joseph Andriano and also a woman who had taken care

11  of her children in the time leading up to the crime.

12      *Q.*    So a total of 29 declarations --

13      *A.*    That's correct.

14      *Q.*    -- in addition to those other documents and

15  witness interviews you've described?

16      *A.*    Yes.

17      *Q.*    Did you prepare a report?

18      *A.*    I did.

19      *Q.*    Let's turn to the same binder, Exhibits 3 --

20  really, 3, 4 and 4 B.  We'll go to 3 first, if you don't

21  mind.

22      *A.*    Sure.

23      *Q.*    What is Exhibit 3?

24      *A.*    This is my report.  It's a 26-page report.  It's

25  sort of like an executive summary because there was

1  another one, you're probably already guessing, was much

2  bigger.  But, yes.

3      Q.    Okay.  So you report, you have this 26-page

4  executive summary, and that's Exhibit 3?

5      A.    Yes.

6      Q.    And then why don't we go ahead and turn to 4 and

7  4 B right now and you can tell us what that is?

8      A.    Okay.

9      Q.    As you suggested, they go together?

10      A.    Sure.  So 4 is labeled:  Appendix to Expert

11  Report of James W. Hopper.  And this is a 250-page report

12  documenting, you know, what I learned about her parents'

13  lives and the traumas they went through and then Wendi's

14  life and the traumas she went through and the effects this

15  had on her.

16      Q.    So is it fair to say Exhibit 3 is sort of the

17  executive summary report and Exhibit 4 is the full long

18  version and the complete version; correct?

19      A.    The full report, yes, that's correct.

20      Q.    And then look at 4 B quickly.  Let's just

21  identify what that is for the Court.

22      A.    So this is a listing of all the -- let's see.

23  Excuse me.  Dr. Woods' CV is in here.  There is a listing

24  of the materials that I did in the beginning of that, all

25  of the materials that I reviewed, apparently.

1    *Q.*    The materials that you've been describing to us?

2    *A.*    Yes.  It's a very concise overview of those

3    materials.

4    *Q.*    Understood.  And, again, these are exhibits that

5    have already been admitted into evidence, but I wanted to

6    just highlight them for the Court.

7          Now I understand that you mentioned about the

8    interviews you did, some were of some of the childhood

9    friends of Wendi's.  Are all of these reflected in your

10   report or did any occur after --

11   *A.*    Sure.

12   *Q.*    -- you finished your report?

13   *A.*    There was one witness who I was only able to

14   interview just this past fall in November of 2013.

15   *Q.*    Do you know why you interviewed this witness?

16   *A.*    Yes.

17   *Q.*    Oh, who was it?

18   *A.*    It was Kyre Lorts.

19   *Q.*    Why did you interview Kyre Lorts after you had

20   finished your report?

21   *A.*    Because she was too mentally unstable to safely

22   interview her about the kind of trauma that she had went

23   through as a child until that point.

24   *Q.*    But she had gotten to that point after the report

25   was done?

1    *A.*    Yes.

2    *Q.*    Please give us your best estimate for the total

3    amount of time you've invested into your work in this

4    matter.

5    *A.*    So all the work up to writing the report and the

6    writing of the report was about 620 hours.  And then since

7    then, the interview with Kyre Lorts and preparation for

8    this testimony, it's been about another 160 or 170 hours.

9    *Q.*    The process that you just described for us, is

10   this consistent with the type of process you would

11   normally undertake when you're doing an analysis of a

12   trauma patient and offering opinions as to what effect

13   trauma may have on that person?

14   *A.*    Yes.  And, as I said, it's more thorough because

15   of all of the evidence that was brought to me by the

16   investigators, but it's the same process.

17   *Q.*    And the materials you relied on here, is it

18   consistent with the type of materials you would typically

19   rely upon to come to your opinions and conclusions as to

20   whether trauma affected Wendi Andriano?

21   *A.*    Yes.

22   *Q.*    We're now going to turn back to your analysis.

23   When you summarized it for us earlier, you said that you

24   had analyzed Wendi's life with a particular emphasis on

25   ages 1 through 18 and the trauma that occurred?

1    *A.*    Yes.

2    *Q.*    Did you find that trauma, whatever may have

3    happened, was consistent throughout or did you break it

4    out in any way?

5    *A.*    Yeah.  So, on the one hand, she was consistently

6    neglected and emotionally and physically, and there's

7    evidence for sexual abuse, throughout, but there were

8    different constellations of people who were doing these

9    things to her at different times.  So that was one reason

10   why I broke it down in that way and then other reasons.

11   We broke it down into birth to 4.5, 4.5 to nine, and then

12   nine to 18.

13            MR. NICKELS:  And for Your Honor and opposing

14   counsel, we just put a slide up on the screen.  We will

15   just use it as a demonstrative from time to time

16   throughout the testimony when we're giving these

17   organizational kind of cues as to what's to come.

18            So go ahead.

19            THE WITNESS:  So, as I said, I broke it down into

20   these age ranges because there were different kinds --

21   different people involved in neglecting her and abusing

22   her during this time, and, also, because these also are

23   known by developmental psychologists as particular stages

24   of development where kids have certain needs and certain

25   things are happening that are really basic to who they're

1    going to become in the next stage and as adults.

2        *Q.*    BY MR. NICKELS:  Let's start with the first time

3    period, birth to 4.5.  Tell us first what is significant

4    about that time period in a child's life from a

5    developmental standpoint.

6        *A.*    So one of the key things is that infants and

7    young children are literally unable to regulate their own

8    emotions and physiological states without the help of

9    caregivers during this phase.  So they're in a very

10   vulnerable state and they really need good caregiving from

11   their parents.

12          And the other, as it says there, is that this is

13   a time where they're having kind of etched into their

14   brains basic patterns and habits for the emotions they

15   experience and how they relate to those emotions and also

16   their close relationship -- relationships, in general, but

17   especially close relationships.

18       *Q.*    And then from a factual standpoint, what was

19   occurring during this time of Wendi's life that you found

20   to be significant?

21       *A.*    So there were three main things.  One was her

22   mother's severe neglect of her throughout this time.

23          Another was that she was exposed to emotional and

24   physical abuse by her mother as well as her biological

25   father.

1          And the third, as a consequence of the neglect,
2  she was exposed to several people who were known and even
3  convicted child molesters.
4      Q.    Let's walk through all three starting with the
5  first one that you mentioned --
6      A.    Sure.
7      Q.    -- which is Donna's neglect.  What happened
8  there?
9      A.    Well, it starts with her birth.  When Wendi's mom
10  gave birth to her in the hospital, she made no effort to
11  visit Wendi in the nursery area.  She was completely
12  freaking out about how her dog had run away and not really
13  able to think about Wendi.
14      Q.    Was that something that happened just in the
15  hospital or did it continue after Wendi came home?
16      A.    Well, then when she got home, she went from this
17  kind of anxious, overwhelmed state, her mother did, to a
18  severe depression where for a few days she wasn't eating
19  and she wasn't getting out of bed.  She wasn't even
20  nursing Wendi at that point.  She was completely
21  incapacitated.
22      Q.    Now, who, if anybody, was there to meet Wendi's
23  needs during this time?  If she is upset or she is crying,
24  were there folks there to comfort her?
25      A.    For the first month, her grandmother, Ann

1    Worshing, was -- so Donna's mother was there in Texas
2    where she was born.  And Skip was working full-time.
3    That's her father, Skip Robertson.  And he was working
4    full-time, but he was around some.  But these were the two
5    people who Donna sort of depended on to take care of Wendi
6    as she couldn't.  Still, we're focusing on those first few
7    days in that first month.  They are things we can talk
8    about in there as well.
9         Q.   Okay.  Well, what are those other things?
10        A.   So even after Donna came out of this depression
11   after the first couple of days, she was still really
12   unable to connect with Wendi, as she had described it.
13   You know, we kind of went through Donna's childhood that
14   her mother never bonded with her.
15            But she was unable to connect with Wendi.  She
16   basically started a pattern that would go through Wendi's
17   entire childhood, which is handing her off to other
18   people.  She wasn't able to think about Wendi.  Literally,
19   she said:  I wasn't thinking about her and her needs.  She
20   was handing her off to other people.  So the first people
21   she handed her off to were her own mother and her
22   biological father, Skip Robertson.
23        Q.   Now you mentioned that this is what was occurring
24   in the first month of Wendi's life.  Did that continue
25   after the first month?

1    *A.*    Yes.   So after the first month, they came back to

2   Arizona, and at this time Donna started working full-time.

3   She was volunteering.  She was doing all kinds of social

4   things.  And she was really -- again, as she said, not

5   really thinking about Wendi.  She spent at most maybe an

6   hour or two a day with her.  And this wasn't the kind of

7   time that an infant needs.  It wasn't an hour or two of

8   focusing on her and playing with her and cuddling her and

9   soothing her when she was upset.  It was an hour or two

10  of, you know, getting her dinner and getting her off to

11  bed kind of thing.

12    *Q.*    Sure.  And the time frame -- what you just

13  described, what time period was that?

14    *A.*    Well, so that was throughout, you know, let's go

15  up to age two before they moved down to Tempe.  So

16  throughout that time, that's what was going on.  And

17  Donna's mother was around.  She lived in the neighborhood

18  and she would -- Wendi would spend some time with her, but

19  just for a couple of hours at a time maybe a couple of

20  days a week.  And Skip was a truck driver at this time.

21  So, often, he wasn't around at all.

22    *Q.*    Now the grandmother being there, Donna's mother,

23  is that an adequate substitute for Donna not being there?

24    *A.*    No.  I mean, it's certainly better than not

25  having her grandmother there.  But there is no way a

39

1  couple of hours a week and a couple of days a week can
2  compensate for your own mother not being able to connect
3  with you, not even thinking about your needs.
4       And the other thing I did mention is her mom
5  would take her to these 24-hour day cares.  So, at any
6  time, day or night, she might just take her to a 24-hour
7  day care.  So, no, it can't compensate for that.
8       *Q.*   Now you mentioned that when they moved back to
9  Arizona, Donna was working a lot and that didn't give her
10  much time with Wendi.  What about what's going on in
11  Donna's life at the time socially?  Is she taking any free
12  time she has and spending that with Wendi?
13      *A.*   No.  As I've said, what the evidence suggests is
14  that she only spent time with Wendi when she absolutely
15  had to.  She was actually off drinking a lot.  She was out
16  drinking a lot, drinking to the point of throwing up
17  several times a week and, also, she was sleeping around
18  with other men.
19      As you know, Wendi's father, Skip, was doing out
20  driving his truck, Donna was doing the same kinds of
21  things, drinking and sleeping around.
22      She looks back on this time and is amazed that
23  she was so sexually active with the number of men at this
24  time as well as all the drinking.
25      *Q.*   You described or you said that this took Wendi up

1  to age two.  What about kind of two to four and-a-half?
2  Again, are we seeing the same kind of pattern?  What is
3  going on in Wendi's life at that time that you found to be
4  significant?
5      *A.*   Well, the neglect is continuing, but some other
6  factors come in.  You know, we can first focus on just the
7  physical and emotional abuse that I mentioned before.  I
8  mean, these actually started before age two.
9        So Wendi's father, Skip -- again, Donna sort of
10 didn't want to be involved, didn't help to potty train
11 Wendi or anything.  So Skip had those responsibilities.
12 The description of that is that Skip was very harsh with
13 Wendi and trained her like a dog, is the phrase that's
14 been used.  Basically, you know, if Wendi didn't
15 immediately do what he wanted, he would scream at her or
16 hit her.
17       Donna also describes hitting Wendi with her hand
18 from when she was a toddler.  And, you know, this isn't
19 just corporal punishment we're talking about here.  The
20 descriptions are that any time that Wendi didn't instantly
21 obey or didn't instantly come when she was called, she was
22 beaten.
23       And, you know, anybody who has had young children
24 or who knows young children, a little two-year-old is not
25 necessarily able to jump up immediately every time they're

1    called if they're absorbed in a game or something.

2          So she was being beaten for things that she

3    couldn't help doing and being beaten for not doing things

4    that she really couldn't do.

5    Q.    And before we focus -- we will focus a little bit

6    more on that emotional and physical abuse, but I had a

7    couple of more questions about Donna and her involvement.

8    You mentioned she was working a lot of the time?

9    A.    Yes.

10   Q.    Where was she working and what kind of schedule

11   was she keeping?

12   A.    Yeah, so she was working.  You know, first she

13   had clerical work, but then she changed to working at

14   these drug treatment centers.  So she worked at two

15   alcohol and drug treatment centers.  And these were places

16   where, you know, the people coming there were prostitutes,

17   drug addicts.  And she would actually bring Wendi along to

18   these places and kind of leave Wendi in the care of the

19   prostitutes and drug addicts or whoever else may or may

20   not be looking out for her.

21   Q.    So how old is Wendi during the time that Donna is

22   working at these drug treatment facilities?

23   A.    Like two to four and-a-half years old.

24   Q.    And you said during this time, Donna frequently

25   brought Wendi to the facility?

1    *A.*    Yeah.

2    *Q.*    And did they have some kind of a day care there

3  or a child care?

4    *A.*    No.

5    *Q.*    So what was Wendi doing while she was at the drug

6  treatment facility?

7    *A.*    In some ways, we really don't know because Donna

8  had no idea.  But we do know some things, that she was

9  actually wandering around out on the streets panhandling

10  as a three or four-year-old kid walking around

11  panhandling.

12    *Q.*    With the prostitutes and other drug addicts

13  coming to the clinic?

14    *A.*    Yeah.  Or maybe on her own.  It's unclear who was

15  watching out for her.

16    *Q.*    As far as you know, are these in kind of a

17  medical research part type of community or neighborhood?

18  Or is this a --

19    *A.*    No.  These are --

20    *Q.*    What kinds of streets is she walking around on?

21    *A.*    Yeah, these were not a safe part of town.

22    *Q.*    Did she ever spend any time -- Wendi, that is --

23  with any of the employees -- the other employees at the

24  drug treatment facility?

25    *A.*    Yes.  In fact, the director of the second

1  facility, a man named Rick Barnes, was someone who Donna

2  actually knew to be a child molester.  When she first got

3  the job from him, she would state she would travel down to

4  stay at his house while she was helping him write grants.

5  She at one point rummaged through some paperwork at his

6  house and discovered these documents saying that he had

7  been kicked out of a school in Thailand for sexually

8  abusing young girls in the seven- to eight-year-old range.

9      Q.    Was Wendi ever left alone with Rick Barnes?

10     A.    Yeah.  Both at his house and sometimes she was in

11  his office alone with him at the drug treatment center.

12  And, again, Donna didn't really know what was going on.

13  She knew this was happening, but she wasn't keeping track.

14  She wasn't thinking about her.

15     Q.    This neglect by Donna that you have just

16  described occurring, you know, in the first four

17  and-a-half years of Wendi's life, what kind of effect does

18  that have on a child at that age?

19     A.    Well, as I said at the beginning, young infants

20  and young children are not able to regulate their emotions

21  and deal with sadness and fear and anger on their own.

22  They need adults to soothe and help them with that.  So if

23  you're severely neglected like this, what happens is the

24  child ends up going through very extreme emotional and

25  biological brain states with no one to help them deal with

1    these.  And it's a very extremely traumatic thing that can

2    cause lifelong effects.  We've seen problems with

3    depression, anxiety with regulating your emotions and

4    impulses, with dealing with close relationships.

5         If the person who you're most supposed to have

6    loving and caring for you in those early years doesn't

7    really even think about your needs and has abandoned you

8    in the various ways that I've described, then that really

9    has a very negative effect on your ability to trust in any

10   way for the rest of your life.

11        *Q.*   You also mentioned executive functioning

12   deficits.  What does that mean?

13        *A.*   Yes.  So I've talked about regulating your

14   emotions and problems with regulating your emotions.

15        Executive functioning is a way of thinking about

16   it in a more technical and even neuroscientific way that

17   we know from decades of research, but especially in the

18   last 10 or 15 years, that this front area of our brain,

19   the prefrontal cortex is kind of like the CEO of our brain

20   and it has these capacities we call executive functioning.

21        These include the ability to inhibit impulses,

22   the ability to remember our rules that we're supposed to

23   following when we're trying to navigate a situation,

24   especially an emotional situation, very important

25   functions to be able to reflect on what you're doing and

1  stop if it's not working or to change your behavior if

2  things aren't working out.

3          So these are executive functions that are known

4  to only in these early years -- you know, certainly an

5  infant and a young child doesn't have that many executive

6  functions, but what they're dependent on is a parent to

7  help cultivate the emergence of these executive functions.

8          And if you're neglected and you're left to cry

9  for hours and things like Wendi went through, then those

10 executive functions are not developing the way they need

11 to be.  And, instead, what happens, is the kid's kind of

12 brain resorts to these extreme attempts to deal with the

13 overwhelming emotions by just shutting down in a

14 depressive state or going out of control with anxiety or

15 kids do different things to try to deal with that.  But it

16 really undermines those executive functions.

17     Q.   And the third one you mentioned, vulnerability to

18 sexual predation.  Tell us about that.  I mean, it's

19 somewhat self-evident.  Explain what that means.

20     A.   Yes.  So if your mom is leaving you around

21 prostitutes and drug addicts -- and we'll talk about some

22 other places she left her, too -- you know, unfortunately,

23 you know, someone who's studied this for many years, there

24 are people who prey on children sexually.  And so it left

25 her very, very vulnerable to being preyed upon.  And we'll

1   hear some more about how that may have played out.

2       Q.    Then let's turn back to where we just started to

3   get to before.  You were talking about the emotional and

4   physical abuse and how some of that which occurred during

5   this first time frame?

6       A.    Yeah.

7       Q.    And you just were starting to describe her

8   father, Skip, and his treatment of her?

9       A.    Yeah.

10      Q.    Why don't you tell us that again.

11      A.    Right.  Yeah, I got a little ahead of myself.  So

12  Skip, Skip Robertson was someone who himself grew up in a

13  very disorganized household.  He didn't really have some

14  contact with his mother and his father.  And, basically,

15  as I started to describe before, Skip was very harsh with

16  Wendi.  Donna didn't want to deal with Wendi and Skip was

17  willing to deal with Wendi, but the way he did it was very

18  harsh.  So he would use a scary tone of voice.  He would

19  be threatening.  He would beat her when she didn't

20  instantly obey him.

21            For example, in my own interview with Skip, he

22  reported to me a time where they had been in a

23  drive-through -- a drive-in movie and Wendi was crying.

24  He brought her home and he actually proudly told me how he

25  had beaten an infant, infant Wendi, in order to get her to

1   shut up and stop crying.  He thought that was a good

2   thing.  So that's one example of what he was doing.

3          As I said before, it's not just corporal

4   punishment.  Beating an infant is not corporal punishment.

5   They're not going to learn anything good from that.

6          Also, beating a child for not instantly obeying

7   or coming when they're absorbed in a game or something

8   like that is very severe physical abusive.

9   *Q.*   Was it just Skip engaging in this kind of

10  behavior or Donna as well?

11  *A.*   Donna as well.  Donna talks about how when Wendi

12  was a toddler, she would beat her with a wooden spoon,

13  again, for something as kind of as crazy as not instantly

14  jumping up and coming when she was called.

15         And then Wendi got older, she was beating her

16  with her hands, again, for any sort of infraction or

17  what -- you know, we'll hear about this more later.

18  Anything that could be construed as disobedience or

19  rebellion -- anything that wasn't instant compliance with

20  the wish of a patient could bring a beating and usually

21  did.

22  *Q.*   I understand that there was an incident at a pool

23  one day that you found particularly significant?

24  *A.*   Yes.  So this would be when Wendi was about two

25  or three years old.  At this point, they had moved down to

1   Tempe and they were in frankly quite a dangerous

2   environment, which was Skip's brothers.  He had five

3   brothers and a father.  The brothers were known -- well,

4   we'll get into that later -- known pedophiles, but also

5   they were hard drinking guys and they were -- at this

6   particular incident, what happened was they were at a

7   pool.  They were all drinking and Donna was there and Skip

8   and his brothers and the brothers were basically goading

9   and taunting Skip to throw Wendi into the middle of the

10  pool:  Oh, come on, she's got to learn to swim sometime,

11  like this kind of thing.

12       Q.    How old was Wendi at the time?

13       A.    About two or three.

14       Q.    And did Skip -- did he give into the goading?

15  Did he throw her in?

16       A.    He did.  He threw her right into the middle of

17  the pool.

18       Q.    As far as you know, did Wendi know how to swim at

19  the time?

20       A.    No, she didn't know how to swim.

21       Q.    Now she's here.  So, presumably, somebody jumped

22  in and got her?

23       A.    Right.

24       Q.    Do you know if it was one of her parents?

25       A.    I mean, Donna, when I talked to her about this

1    incident, she doesn't remember who fished Wendi out of the

2    pool.  But, also, just to highlight, I mean, this kind of,

3    yes, she survived, she didn't drown, but, you know,

4    through millions of years of evolution, it's programmed

5    into your brain, if we can't swim and we're flailing

6    underwater, it's terrifying.  Your brain just feels like

7    you're going to die.

8            So this would be one of the most terrifying

9    experiences that anybody, but especially a young child

10   could have, especially to have your own father throwing

11   you in.

12       *Q.*   Did Donna do anything to intervene or protect

13   Wendi during this incident?

14       *A.*   No.  She talked about how she was afraid to say

15   anything.  And she even used this phrase:  You know, in

16   that family, they're just going to take them.  So she did

17   nothing to intervene.

18           It sounds like she rebuked Skip after she was

19   fished out, something to the effect of like:  I can't

20   believe you did that or something.  And he said:

21   Whatever, she's not hurt.  Don't make a big deal out of

22   it.

23       *Q.*   Just a note for the court reporter, from time to

24   time, slow down.  I have a tendency to go a little fast

25   myself.  I've been scolded by court reporters in the past.

1          So these incidents that you just described, this
2     kind of consistent using physicality when there is not
3     total submission or total compliance and episodes like
4     this pool incident, how does that affect a child, you
5     know, in that age range of zero to four and-a-half?
6          A.   Yeah, so as they put up on here on the slide, you
7     know, like neglect, this kind of physical and emotional
8     abuse, especially, you know, the severity and the
9     constantnous to try to get someone to comply with every
10    wish of a parent, this is known to cause symptoms of
11    depression and anxiety.  Of course, again, it's going to
12    make it hard for a child to regulate their own emotions.
13         Not only do they have the emotions that they're
14    going through because they're neglected and no one is
15    helping soothe them, but now they've got horrible emotions
16    from being thrown into the pool, from being beaten, from
17    being yelled at.
18         And so there is no one -- her parents aren't even
19    able to help her.  So just lifelong problems.  If you've
20    got your whole first five years of this kind of treatment,
21    it's going to cause lifelong problems with your ability to
22    regulate your emotions and then also managing close
23    relationships during that first stage.
24         Q.   What do you mean when you say hinders
25    internalization of rules and values?

1    *A.*    So if you want a child -- disciplining a child,

2    the goal should be that the child wants to follow the

3    rules and they sort of take thing and make them their own.

4    They understand they want they are.  They want to be good.

5    They want to do what their parents want.  Even from

6    toddler to age four and-a-half or five, kids can start to

7    take on these rules and they want to do them and be able

8    to regulate their own behavior a little bit.

9         But if a child is being beaten and fear and pain

10   and beatings are used constantly to get the child to

11   instantly comply with what the parents want, then this

12   actually makes it harder for the child to take in the very

13   values and rules that the parents are trying to teach

14   them.  It's kind of like the tragic, the parents are so

15   confused, that they're actually defeating their own

16   purpose.

17   *Q.*    Now the third sort of set of facts that you said

18   was going on in Wendi's life during this time was you

19   called it sexual abuse or sexualization.  What did you

20   mean by that and what was happening there?

21   *A.*    So here, particularly, again, after they moved

22   down to Tempe, and so they're living in a community where

23   Skip's brothers are there, Skip's father, and these men

24   are known child molesters many years even before Wendi was

25   even born.  There's a lot of evidence, probably more than

1  I can even get to here, but, you know, just to get it in a

2  nutshell, some of it was that her mother Donna's best

3  friend Alice McGuffee -- when she was a teenager, her best

4  friend, she had younger daughters or younger sisters,

5  Charlotte, and a woman by the name of Devlin, and Debbie

6  who reported independently to the brother and even to

7  Donna that -- and we have a declaration from Devlin that

8  for years, Devlin was molested and raped repeatedly by all

9  of Skip's brothers and she named Skip as one of the people

10  who molested and raped her as well when he was a teenager

11  living in the house.

12      Q.   So she said that Skip, who was Wendi's father --

13  Wendi's biological father, and Skip's brother all molested

14  her?

15      A.   Yeah.  And then her sister, Charlotte, reported

16  this, too.  Both Devlin and Charlotte reported it to their

17  brother, Leon.  Charlotte reported it at some point to

18  Donna.  And so, you know, it was known that these guys

19  were, you know, serial child abusers and literally, you

20  know, for years.  And their brother Leon talks about how

21  they used to brag about their sexual exploits with women

22  and girls.

23      Q.   Did Wendi -- did she spend time with these family

24  members?  Was she left alone with them?

25      A.   Yeah.  So in the same pattern of, you know, with

1   the drug treatment center, leaving her around prostitutes

2   and drug addicts, in this situation there were many

3   parties, cookouts, camping trips, fishing trips, hunting

4   trips where Wendi was left vulnerable to these men.

5          And Donna describes, you know, being in the

6   kitchen cooking and talking to the other women, while for

7   hours on end, she had no idea what was going on with Wendi

8   while Skip and his brothers and his father were drinking

9   heavily and had access to her.

10   *Q.*   Did anybody ever observe any inappropriate

11   behavior, you know, by these brothers or Skip's father

12   with any of the -- Wendi or any of the other young

13   children?

14   *A.*   Yes.  So Donna talks about all of the time, you

15   would see the brothers, you know, grabbing at the kids or

16   kissing them in an inappropriate way and grabbing their

17   behinds and kind of doing that sort of thing right out in

18   the open in front of the kids' own mothers.  So that was

19   one thing.

20          She was also told by the other wives of the other

21   brothers that Skip's father was, you know, going to try to

22   sexually abuse their kids, even their infants.  So that

23   was another thing.

24   *Q.*   Did Wendi spend -- what about Skip's father you

25   just mentioned?  Did Wendi spend time with him?  Was she

1  left alone with him?

2      *A.*   Yeah.   Interestingly, this was one of the only

3  attempts that Donna ever made to protect Wendi from this

4  kind of sexual abuse in that family was because she had

5  been told that the father had definitely molested one of

6  the other infants in this network of kids.

7          And so, Donna and Skip went away on a

8  sometimes -- you know, Skip was a trucker.   So sometimes

9  Donna would go with him on these trips and leave Wendi

10  behind for a few days.

11          And so, on one of these trips, when she got

12  back -- and one of the brother's wife's, Ida May, you

13  know, she explicitly told her:   Do not let Skip's father,

14  B.G., he went by, have access to Wendi.   His father had

15  been asking to babysit her repeatedly and he was told no.

16          So when she got back and knocked on the door and

17  she said:   Where's Wendi?   They said:   Oh, she's with

18  Skip's father.   So that was it.   After that, the other

19  mothers said:   Oh, yeah, definitely, she was abused.   So

20  that's a story we have about Skip's father.

21      *Q.*   And what about you said Skip is a trucker.   Was

22  there anytime that Wendi spent time with any of the

23  brothers in any of those kinds of situations?

24      *A.*   Yeah.   So, actually, one time, Skip said that he

25  took a trip with his brother, Tommy.   They were in the

1   truck and they brought Wendi along.  And this is the same

2   brother -- both Skip and his brother Tommy were actually

3   convicted and in prison for many years for sexually

4   abusing Skip's stepdaughter.

5        And what led them to be convicted in that case

6   was that Tommy had taken pictures of the stepdaughter

7   partially clothed in the sleeper cab part of the truck.

8        And Skip said that on this very trip that he and

9   Tommy went with Wendi, that Tommy was sleeping in the

10  sleeper cab with Wendi, and Skip himself said, you know,

11  he probably sexually abused her during that time.

12  *Q.*   Now from your analysis of Wendi during that time,

13  does she show any behavioral evidence of somebody who had

14  been sexually abused?

15  *A.*   Yes.  There were two evidences that came to my

16  attention.  So one was that Donna reported that Wendi was

17  generally a very compliant child, which, you know, you

18  could imagine if she is being beaten for not immediately

19  complying.  But, you know, some kids, they'll try to

20  comply.

21       And but one of the things she said that Wendi did

22  not comply with and the only things that caused her

23  problems was Wendi would refuse to sleep in a bed that

24  wasn't her own bed.  She would refuse to sleep, take a nap

25  in other bedrooms.  And this would be consistent with if

1  during these cookouts and things that, you know, if maybe

2  she had taken a nap and she was sexually abused and she

3  was taken into these rooms to be abused.  So it's not a

4  direct, you know, smoking gun, but it's certainly

5  consistent.

6      And then the other evidence, which is more, you

7  know, a higher threshold is Donna actually got calls from

8  a day care that Wendi was staying in.  She got two calls

9  saying that Wendi had been engaged in very inappropriate

10 sexual behavior with other children and that they had

11 investigated this and they determined that Wendi was the

12 instigator.

13      This was not just the typical child, you know,

14 you show me yours, I'll show you mine sort of thing.  It

15 was very concerning, concerning enough that the day care

16 actually threatened to expel Wendi from the day care.

17 *Q.*   And this is the type of behavior that you would

18 see in somebody who had been sexually abused?

19 *A.*   Yeah, this is a common phrase.  You know, in our

20 field, we call it abuse reactive behavior where a kid who

21 has been sexually abused, then turns around in a

22 reactivate way.  It's not because Wendi wanted to abuse

23 other kids.  She's reacting to the abuse that happened to

24 her.  When it's this kind of extreme inappropriate sexual

25 play that goes beyond what's developmentally normal, that

1  this is seen as evidence of sexual abuse.

2  *Q.*   If there was sexual abuse during this time, how

3  does that affect a child of that age?

4  *A.*   Well, one other point I want to make here is that

5  even though Donna got this call, that Donna made no effort

6  to try to determine whether Wendi had been sexually

7  abused.  She made no effort to have her evaluated.  She

8  made no effort to get her kind of any treatment for this

9  kind of behavior, even though she was threatened with

10 being expelled from the day care.

11      This is just another example of how, you know,

12 Donna kind of, as we'll see, she just didn't think about

13 Wendi, didn't want to know, didn't want to deal with it.

14 *Q.*   Then I'll rephrase my question.  How does the

15 potential sexual abuse, coupled with this continued

16 neglect by her mother -- how does that affect somebody at

17 that age?

18 *A.*   Yeah, so, again, you know, this common refrain

19 I'm going to make during my testimony here is that sexual

20 abuse, too, is known to have the same kind of effects as

21 neglect and physical and emotional abuse.  So this is one

22 of the real findings of a lot of research that, you know,

23 sometimes we like -- you know, we can give a lot of press

24 to sexual abuse and, oh, that's so horrible, and it is,

25 but all of these kinds of neglect and emotional and

1  physical abuse, all these have serious effects on

2  someone's brain and can lead, you know, as I was saying,

3  to depression, anxiety, difficulty regulating your own

4  emotions, the things I'll keep bringing up.

5        And, also, just as you pile trauma on top of each

6  other, you're going to have more severe impacts.  Now

7  we've got the sexual abuse piled on top of the neglect,

8  the emotional and physical.

9        And the other thing, though, the specifics of the

10  sexual abuse, and Bullet 2 there, is that you get this

11  premature sexualization.  Young children, you know, they

12  may have some curiosity about their genitals.  They may

13  notice that it feels good to touch themselves there, but

14  normal healthy young children, that is not where their

15  attention is focused and they're not even thinking about

16  other people being interested in doing things sexual to

17  them.

18        But a child who has been sexually abused, they

19  get this what I'm referring to here as this premature

20  sexualization, even kind of a hypersexualization, so that

21  the child may do things like engage in inappropriate

22  sexual behavior with other kids.

23        But, also, as Wendi described to me herself, just

24  from as early as she could remember, she had sort of this

25  awareness of sexual energy or chemistry coming from men

1   and this was just something that was always there and she

2   always experienced.

3       *Q.*   And how does the third one there -- sexual object

4   for men's gratification -- how is that different than what

5   you just described?

6       *A.*   So one of the points I'll keep making is that

7   these interactions, especially early childhood, really

8   shape and etch into peoples' brains patterns of relating

9   and expectations for what to expect, what people are going

10  to do, what they're going to say to you and how they're

11  going to treat you.  If a child is having, you know,

12  repeated experiences of men using her in a sexual way,

13  then even if she doesn't put any words to it, there is

14  sort of this learning that takes place that this is part

15  of why I'm here for.  And I can't tell you how many

16  patients I've heard over the years tell me that:  Well,

17  like, that's part of what I'm here for.  It's very sad,

18  but it's what they learn.

19       MR. NICKELS:  Your Honor, we're about to turn to

20  the second time period that we had mentioned.  I see it is

21  coming up on what you said would be the morning break.

22       THE COURT:  Why don't we go ahead and take about

23  a ten-minute morning break at this time.  We will be in

24  recess.

25       (WHEREUPON, a recess ensued from 10:43 a.m. to

1  10:59 a.m.)

2       THE COURT:  This is CR 2000-096032, State of

3  Arizona vs. Wendi Elizabeth Andriano.

4       The record will reflect the presence of the

5  parties and counsel.  The record should also reflect that

6  we have on the witness stand James W. Hopper.  We will

7  continue with the examination in just a moment.

8       I should have asked at the beginning of this case

9  whether victims' rights had been complied with.

10      MR. HAZARD:  They have been, Your Honor, and

11  victim representatives are present in the courtroom and

12  are seated behind our counsel table.

13      THE COURT:  Okay.

14      MR. HAZARD:  And I'm not sure exactly who else is

15  in this courtroom, but based on our preliminary

16  discussion, we ask that the rule be in effect subject to

17  those.

18      MR. ARNTSEN:  Yes.  Just to explain, the two

19  women in the second row are investigators, Kristen Powers,

20  but they're not going to be witnesses.

21      THE COURT:  Okay.  Then the Rule of Exclusion of

22  Witnesses will be in effect.  If there is anyone that

23  you're aware of that might be a witness that is sitting in

24  the courtroom, then alert the Court.  Okay?

25      MR. ARNTSEN:  Okay.  We will do that.

1          MR. HAZARD:  Yes.  Thank you.

2          THE COURT:  The record will reflect that

3    James W. Hopper is on the witness stand.  We will continue

4    with the examination by Mr. Lynch; right?

5          MR. NICKELS:  Mr. Nickels.

6          THE COURT:  Mr. Nickels.  I'm sorry.

7          MR. NICKELS:  You'll get it on the third try;

8    right?

9          THE COURT:  I'll get it eventually.

10         MR. NICKELS:  Thank you, Your Honor.

11    *Q.*   BY MR. NICKELS:  Dr. Hopper, when we left off, we

12    were just turning to that second time period that you had

13    found particularly significant in Wendi's life.  And that

14    was four and-a-half to nine?

15    *A.*   Yes.

16    *Q.*   Please tell us what, from a developmental

17    standpoint, is significant in a child's life at that time.

18    *A.*   Yes.  So as I've put in this slide, the first

19    thing to note is that, depending on what kind of

20    experiences a child has in this period of their life, it

21    could really mitigate some of the effects of the kind of

22    trauma that we have already described Wendi as having gone

23    through in the first four and-a-half years.

24         On the other hand, if the trauma continues, if

25    the neglect and the emotional and the physical and the

1  sexual abuse continue, then it can also make them worse

2  and much worse.  As I said before, you have just kind of

3  this cumulative piling on effect of trauma upon trauma.

4      *Q.*   And what else is developmentally significant

5  during this time period?

6      *A.*   So developmental psychologists agree that some

7  key issues going on here are learning how to form stable

8  peer relationships and how to navigate those

9  relationships.  Also, coming into four, a more lasting

10  understanding of yourself and how you relate to others.

11         As I said, in those first four and-a-half years,

12  literally, it's habit learning that's being laid down, and

13  the part of the brain that allows you to remember that

14  hasn't even developed well enough yet.

15         So in those early years, it's habit learning and

16  there's not that much language and the kids can't think

17  very much about this stuff.

18         But now from four and-a-half to nine, the kids

19  are able to retrieve these memories of things that

20  happened to them, good and bad.  They have much more

21  language and ability to think through, well, who am I as a

22  person?  Am I a good boy?  Am I a bad girl?  Am I a good

23  girl?  How am I supposed to be?  What do my mommy and

24  daddy want from me?  They really start telling themselves

25  and elaborating more the story of who they are as a child.

1    So that's a big thing going on.

2         *Q.*    The fourth one, learning to be more

3    self-regulated and independent, what do you mean by that?

4         *A.*    So anybody, and as kids know, there's a time when

5    they go off to kindergarten and first grade and they start

6    to expand more out into the world of their peers.

7              Part of what, if development is going well, what

8    they should be learning is how to take the rules and

9    values that should be being imparted in their family and

10    how to enact those in their relationships with peers and

11    navigating conflict and making friends and all of that

12    sort of stuff.  So that's a fundamental thing that's going

13    on developmentally and really should be during

14    this phase.

15         *Q.*    Let's then turn to the facts.

16         *A.*    Yes.

17         *Q.*    What, from a factual standpoint, was happening in

18    Wendi's life during that time that you found to be

19    significant?

20         *A.*    Again, there's two major things to point to.  I

21    mean, the neglect was ongoing by her mother, of course,

22    but Alejo Ochoa, who was her stepfather, entered into her

23    life and became an extremely disruptive force in

24    emotional, physical and sexual abuse.

25              Then, also, there was this two-year period from

1  age seven to nine, where she was involved in this, what

2  really could just be called a traveling cult, where she

3  was subject to extreme poverty, severe control and

4  everything was regimented.  We will get into the details

5  later.  And, also, some severe physical abuse and there is

6  even some suggestion of sexual abuse going on in that

7  traveling cult.

8      *Q.*  Well, let's take the first one first, Alejo

9  entering her life and the beginning of a pattern of bad

10 behavior.  Let's kind of start at the beginning.  When and

11 how did Alejo come to be part of Wendi's life?

12     *A.*  When Wendi's mother was working at the second

13 drug treatment center, the one where, again, she was left

14 to wander around and panhandling on the streets and things

15 like that, and vulnerable to the director who's a known

16 pedophile, Alejo was volunteering there as well.  Alejo

17 actually knew Wendi.  He knew who Donna was, but he had

18 no -- he didn't talk to her anything.  But he knew who

19 Wendi was.

20          And there was a point at which he -- one night

21 when Donna was on one of her weekend late night shifts,

22 she didn't have a client to process and bring in or a

23 person, he went into the office she was in and they ended

24 up having sex.  And within, you know, a couple of months

25 of this, maybe in a few weeks, he had moved into their

1   house and was just spending a lot of time with Wendi.  We

2   will get into some more of those details later.

3        So Alejo, again, we don't have time to go into

4   his whole history.  But Alejo himself is someone who

5   suffered from serious neglect, physical abuse, emotional

6   abuse, tormenting and sort of sexual teasing from his

7   uncles and things like that, other major traumas, and

8   Alejo is a deeply disturbed guy, again, as we will hear

9   more about later.

10       So here at this point, he comes in and very

11  quickly, in Donna's pattern, she kind of hands Wendi off

12  to this very disturbed sexually predatory guy.

13  *Q.*   And just sort of on a day-to-day basis, how does

14  Alejo treat Wendi?

15  *A.*   So we can break it down into different things.

16  So one of the things is the emotional abuse of Wendi.

17  From the beginning -- and we have other descriptions of

18  other people in other communities we can get to later

19  observing this kind of behavior in Alejo.

20       Alejo was a very immature guy and he would -- on

21  the one hand, he could be playful and acting like a little

22  kid himself, but the next moment, he could be screaming

23  and yelling at either Donna or at Wendi, or in really

24  nasty ways, just teasing her and kind of picking at her in

25  even sadistic ways.  Again, others have observed this, him

1   doing this with other children.

2       So that was kind of -- at any point, he could

3   emotionally abuse in one of two ways.  He could be

4   screaming and yelling at Wendi or he could be kind of

5   picking at her and being cruel to her.

6       And there's another example that I can give that

7   he actually told me himself.

8   *Q.*   What's that example?

9   *A.*   So I did interview Alejo and he talked about how

10  when he first met Wendi how captivated he was with her and

11  how she could melt your heart and things like this and he

12  talked about how innocent she was.

13      Then an example he gave of her innocence was how

14  shortly after he had moved in with Donna and Wendi, he had

15  discovered that she had been drawing on the wall with

16  crayons behind a bedroom door that either Donna didn't

17  notice or didn't care.  When Alejo discovered this, he

18  brought it to Wendi's attention and he said:  You have to

19  clean this up.

20      Now Wendi is a four and-a-half-year-old kid.  So

21  she goes:  Okay.  I'll help clean it up.  So she helps

22  clean it up, but like any four and-a-half-year-old, after

23  five, ten, 15-minutes, you know, she would like a break.

24  She's, you know, this isn't so fun anymore, even though

25  she wants to be a good little girl and do what her parents

1  want.

2         And so what Alejo told me with pride, actually,

3  as if this was an example of good parenting, was that he

4  made Wendi spend the next hour and-a-half scrubbing

5  everything off that wall despite the fact that she was

6  crying and totally upset throughout the whole thing.

7         And, you know, to me this is an example that he's

8  reporting on his own, though he generally denies a lot of

9  things, of just how clueless and cruel he could be to

10 Wendi, and this is just one example.

11     *Q.*   This teasing and the picking at and the provoking

12 and the yelling and screaming, how frequent does this

13 happen?  Is this just a time-to-time thing or is it a

14 consistent pattern of behavior?

15     *A.*   Yes, it's a consistent pattern.  I mean, really,

16 the reports are to this day, Alejo is very volatile and he

17 can yell and scream at any time.

18        And, you know, again, we can get into it a little

19 more later, but Alejo himself in his declaration talks

20 about how he often would wake up in the morning wanting to

21 have sex with Donna back throughout their relationship

22 and, you know, maybe Donna wasn't interested and he would

23 get frustrated and angry.  Then it would build up to a

24 point that halfway through or by the end of the day, he

25 was just likely to explode out this sexual frustration

1    that Wendi and Donna -- and, you know, then we will talk

2    about the things that they had to do to placate him later.

3    So it was very continuous and pervasive.  You know,

4    anytime he could fly out of control and be really cruel.

5         Q.    You just described some emotional abuse.  What

6    about was there any physical abuse by Alejo during this

7    time?

8         A.    Yes.  You know, I've talked before about how Skip

9    and Donna treated Wendi as not merely corporal punishment,

10   but beating her anytime she didn't instantly and

11   mindlessly obey them.  And the same thing was true for

12   Alejo that both he and Donna during this time would beat

13   Wendi first with their hands, but by the time she was six

14   years old, they were beating her with a wooden paddle and

15   what they were starting to learn -- and they had gotten

16   involved in a cult that hadn't taken off on traveling

17   yet -- and they were being taught that like this book,

18   Train Up a Child, that some people may have heard of,

19   they're being taught that you have to beat children and

20   you have to beat any hint of rebelliousness out of them.

21   They must instantly obey you and you have to beat it out

22   of them.

23         This may mean actually beating them to the point

24   where if they're upset and showing any anger, you have to

25   keep beating them until they're crying softly or it may

1  mean other things that we can talk about.

2      Q.   We've got a picture up on the screen right now.

3  Can you just tell us what that is?

4      A.   So this is a picture, as you can see, dated 1979.

5  That's Alejo with Wendi when she was nine years old on the

6  couch.

7      Q.   What you've been describing to us, you know, this

8  emotional and physical abuse, that was occurring during

9  this four and-a-half up to nine period; is that right?

10     A.   Yes.  The one thing we'll talk about in the

11 traveling cult --

12     Q.   Yes, we'll get to that.

13     A.   -- is he may have had some -- well, he had a

14 little less access to her during that time.  But when he

15 was around her, yes, at any time, he could do this stuff.

16     Q.   Any indications that there was sexual abuse

17 during this time period?

18     A.   Yes, we do have indications that that was

19 happening right from the beginning.  We don't have, you

20 know, iron clad direct evidence, which we do have direct

21 evidence for abuses in the nine to 18 period that we'll

22 talk about later.  But, yes, there is some evidence.

23     Q.   What is that?

24     A.   You know, there was kind of a sequence of it.

25 You know, one thing was that Alejo had this prior

1    relationship with Wendi before he had sex with Donna and

2    got involved with her.   He was very fascinated with Wendi.

3    He was more interested in spending time with her than with

4    Donna.   And this was consistent all the way through, and

5    other people and many witnesses and other people reported

6    this.   So he had this fascination and this kind of

7    obsession with her.

8         And soon after he and Donna slept together that

9    first time, he started sleeping in the bed at Wendi and

10   Donna's house -- sleeping in the bed with Wendi and Donna.

11   And it was at this time, for the first time in her life,

12   that Wendi started wetting the bed.

13   *Q.*   What does that mean to you?

14   *A.*   It's not an uncommon response to sexual abuse.

15   It's not -- again, it's not like, oh, definitely that

16   means she was sexually abused.   Kids can wet the bed for

17   various reasons.   But if you look developmentally, that

18   doesn't usually suddenly start at age four and-a-half.   So

19   it's suggestive and it would be consistent with

20   experiencing sexual abuse.

21        Also, some children, they wet the bed as a way of

22   trying to stop the abuse that's actually happened to them

23   because it wakes up -- people have to wake up and change

24   the sheets and things like that.   So I've had patients

25   tell me that they've had to resort to that sort of thing

1    to try and stop themselves from being sexually abused.

2        *Q.*    So this emotional and physical abuse that you

3    described, coupled with potential sexual abuse, what

4    effect is that going to have on a child at this age of the

5    four and-a-half to nine years that Wendi was at the time

6    this was happening to her?

7        *A.*    Yeah, so, you know, that first bullet up there,

8    giving up hope of a relationship with her mother, her

9    mother neglected her all the way along.  But Skip was out

10   driving trucks and things like that and Wendi was at

11   day cares and who knows where.  But here was a different

12   dynamic that was starting.  We'll get back to this several

13   times, I'm sure.  This is what we call an incestuous

14   family dynamic where basically Donna is handing Wendi over

15   to Alejo.  She doesn't want to deal with her and Alejo is

16   taking over, and Donna is relieved.  She literally

17   describes to her being relieved that Wendi was taking care

18   of Alejo and Alejo was taking care of Wendi.

19            So for a child, you know, hope brings eternal for

20   kids usually, but it's not eternal.  I mean, if you've

21   been neglected for four and-a-half, five years, and now

22   this guy comes in and he's totally taking over, then kids

23   can give up hope of their mother really having any

24   interest in them.

25            Donna talks about how, by the time Wendi was nine

1    years old, she wouldn't cuddle with her.  She had no

2    interest in her.  She would reject the few attempts Donna

3    did make to connect in some way.  And so that sort of

4    suggested Wendi just kind of gave up on her mom at that

5    point.

6        Q.    And I see, and you told us that this would be a

7    pattern --

8        A.    Yeah.

9        Q.    -- of more depression and --

10       A.    Yeah, you know, this kind of emotional, physical

11   and possible sexual abuse, especially now from a father

12   figure.  So, before, it was from, you know, maybe brothers

13   and a father and things like that.  Now you're living with

14   someone who is sleeping in the bed with you.  And if

15   they're not sexually abusing you, certainly on a daily

16   basis, they're emotionally and physically abusing you.  So

17   that's going to just exacerbate these kinds of problems

18   with the depression and anxiety and dealing with the

19   emotions that are being triggered by all of that.

20            And then, finally, if sexual abuse is going on at

21   a time like this, and there's the premature sexualization,

22   and now, as I said, in the four and-a-half to nine, the

23   child, you know, may be able to, if they're not blocking

24   everything out -- though, there is evidence that she was

25   able to block a lot of things out -- but they have

1 memories of now these sexual things happening to them and

2 they have maybe some ideas about it.  Even if they're

3 blocking that stuff out, again, there is this sensitivity

4 and this confusion and even disgust that Wendi describes

5 in her interviews with me.

6         Like, even as a young kid in this seven, eight,

7 nine-year-old range, she would find herself being aware of

8 the sexual attention and energy kind of coming from guys

9 and sort of wanting that, which is, you know, a very

10 disturbing thing to think about.  But it, unfortunately,

11 is not an uncommon thing for a kid who has learned that

12 this is what men want from me and if I want people to

13 like me.

14         And when she would get that kind of attention,

15 then she feels disgusted and awful.  So it's just the

16 sexuality is like getting really messed up in this phase,

17 in some kind of layman's terms.

18     Q.   Let's turn to this traveling ministry.  You

19 mentioned that that was something going on in Wendi's life

20 from seven to nine.  Before I have you start telling us

21 what happened there, there is a picture here.  Can you

22 tell us what this?

23     A.   I don't have a pointer, but this is a -- there

24 was a small group of people and some people went in and

25 out.  There were two leaders of this cult, Rick Miller and

1  Al Farmer.  I'm not -- I'm guessing it was one of those

2  guys.  I don't know which one is which.  But Wendi is

3  there in the front in the middle in the white and Donna is

4  directly behind her and Alejo is behind and just to the

5  left of Donna, left in looking at the picture.

6       And so this a group of people that even before

7  they started traveling around, Donna became involved with

8  this group and very quickly, you can start to see some of

9  the disturbing things that were happening.  So they were

10 told that all pictures were idols and literally any

11 pictures she had of family members, including Wendi as a

12 baby, she burned them.  There are other things I can talk

13 about even before they went traveling.

14      Q.   Sure.  One thing you described a lot is that

15 Wendi lived under this whole and sort of this dictatorial

16 system where any lack of compliance was met with severe

17 results?

18      A.   Right.

19      Q.   Was there any relief from that in the traveling

20 ministry?

21      A.   No.  It was the same thing.  And, actually, you

22 know, Donna talks about how the leaders of the group, they

23 were even more severe about it.  They wanted Donna and

24 Wendi to -- I mean, Donna and Alejo to beat Wendi even

25 harder than they were wooden paddles and sort of things

1  like that.

2  *Q.*    Were there other children in this ministry?

3  *A.*    Well, only when they weren't traveling.  So there

4  was a couple of times where they stopped along the way and

5  then some children were involved.  And, actually, you know

6  some of those children were taken away from their parents

7  because this was a group of, you know, pretty confused and

8  disturbed people who were falling under the influence of

9  these cult leaders.  But for the most part, when they

10  traveling, no, Wendi had no children to play with.

11  *Q.*    And that's what I was getting at.  Did Wendi have

12  an opportunity to interact with other kids and do sort of

13  the normal things that kids of this age would do?

14  *A.*    No.  Not only did most of the time she didn't

15  even have any other kids around, but the control that the

16  leaders exerted over the members was so thorough, you

17  know, the classic kind of cult control things.  They would

18  wake them up very early.  They would always have to be

19  doing something, some sort of chore, some sort of

20  construction project.  Wendi did get some home schooling

21  during that time.  But, otherwise, there was no real time

22  to play.  There was chores and things to do constantly.

23  So she really didn't have much time to play, let alone any

24  kids to play with most of the time.

25  *Q.*    Is her only schooling during that time just

1 whatever is being taught to her by the members of the

2 ministry?

3      *A.*   Yeah, they found some old textbooks and things

4 like that.  When they got to California, some guy taught

5 her math for a little while.  But, yeah, there was a

6 couple of hours a day and they were kind of winging it and

7 trying to give her some schooling.

8      *Q.*   But she's not in a normal school and having

9 recess and lunch hour?

10      *A.*   No, no, not at all.  As I said, she was like a

11 little adult.  Alejo talks how about at the end of this --

12 you know, Donna talks about how the end of it, Wendi was

13 depressed.  And Alejo talks about she was like a little

14 adult who, you know, kind of would be his partner,

15 basically.  So, yeah, she was doing adult things, helping

16 with the construction projects and doing various things.

17      Actually, she was panhandling.  There was such

18 poverty, that sometimes all they had was rice and beans

19 and Wendi was out there panhandling.  So, no, she was

20 not -- she was not playing.  She was not playing with

21 other kids.

22      *Q.*   Any evidence of any sexual abuse occurring during

23 this time by any members of the ministry?

24      *A.*   Yeah.  So this is actually interesting and

25 something, you know, that we'll touch on later.  In my

1   52 hours of interviews with Wendi, this was one of the

2   things that I wanted to assess her for was sexual abuse.

3   We knew about Alejo and we suspected, hey, maybe one of

4   these cult leaders would do it, and address that myself,

5   and Dr. Woods I'm sure asked her about that.  And she

6   reported no memories of that.

7           But then just last fall with Dr. Pitt, the

8   prosecution expert, she reported remembering that Rick

9   Miller -- not Rick Barnes -- Rick Miller would touch her

10  in inappropriate sexual ways ostensively under the guise

11  of teaching her how to play the guitar and, also, she

12  remembers him exposing his private parts to her.

13          As we'll talk about, Wendi's memory is not good.

14  So there may have been more going on that we can't know.

15      Q.   This environment that she is in in this traveling

16  ministry or cult, where there is no play, it's very

17  dictatorial and there's physical beatings, and there's

18  even somebody who is touching her inappropriately, can you

19  tell us again how does that affect a child of Wendi's age?

20      A.   Yeah.  So, you know, again, we're just piling on

21  traumas here.  So depression, here, particularly, in terms

22  of this lack of ability to play, you know.  And that's

23  what kids are supposed to do; right?  Kids, a lot of their

24  learning and their joy of life comes though playing.  If

25  they're not able to play, that's dispiriting for a child.

1  That's depressing.  Also, if you're not able to do things
2  with peers, and one of the basic developmental things that
3  you should be doing at this time, you're not really
4  getting any experience of doing that.  So it undermines
5  the development of some of those capacities.

6          And, again, the coercive control of the cult
7  environment, the trained for obedience and beaten when you
8  don't immediately obey, it hinders the development of the
9  ability to regulate your own emotions, to regulate your
10  own impulses, and to take in the very values that these
11  people, again, in their confusion, think they're teaching
12  you.

13  Q.    Now the inability to regulate emotions and
14  reactions, you've mentioned that several times.  Is that
15  the same thing you were talking about with the executive
16  functioning, the CEO of the brain, just the ability to
17  kind of properly process and prioritize in moments of
18  complexity and stress?  Is that the same thing?

19  A.    Yes, definitely.  There's various executive
20  functions and some much them toward the middle parts of
21  the prefrontal cortex are very focused on modulating
22  impulses and emotions and keeping things in check and that
23  sort of thing.

24          But then there's these other executive functions
25  about thinking clearly, being able to make decisions and

1    things like that.  These only develop properly in the

2    context of good relationships in schools and communities.

3    And if you've got this going on, it's seriously

4    undermining these capacities.

5        *Q.*    So we started out this time period by you saying

6    that what is developmentally significant is that you said

7    good can mitigate bad.  If there's some good things that

8    happened during this second time period, it can help

9    repair some of the damage.

10           What you have just described is that we didn't

11   have good.  We had more piling on of the bad?

12       *A.*    Yeah.

13       *Q.*    Tell us, you know, where are we at at this point

14   in Wendi's life and what is sort of some of the cumulative

15   effect of what has been happening to her both in the first

16   time period and the second?

17       *A.*    Yeah, so a lot of it I've already said, but

18   there's two particular things that I like to draw

19   attention to here, what we call dissociation and the

20   serious memory deficits.

21           Now different children, depending on their

22   genetics and biology and their personality, will have

23   different kinds of responses to trauma, but one thing

24   we've learned is that very serious overwhelming trauma of

25   this sort for many years on end starting, you know, from

1  birth, it often results in these kinds of effects.  And
2  I'll talk about each of them.
3        So dissociation is a concept that I'll try to
4  define simply.  One way to think about it is a
5  disintegration of experience, that things that in normal
6  healthy development should be integrated like your
7  memories and your emotions or your ability to feel your
8  emotions, what that feels like in your body as you're
9  having it and things like that.  Those things people who
10 have been severely traumatized in this way, these things
11 get disconnected.
12       Also, what you can see is in the moment.  This is
13 something I saw repeatedly with Wendi, that as I'm talking
14 to her or asking her about some of these more distressing
15 things, she would literally just, as I say, either space
16 out and blank out.  She would just kind of check out.  She
17 wouldn't be able to think clearly anymore.  She wouldn't
18 be able to remember what she was just talking about.  She
19 would not be able to have any access to the emotions that
20 were being stirred up by the distressing things that we
21 were talking about and she literally wouldn't even be able
22 to feel her body at those times.
23       So that's an example of this dissociation.  And
24 it's something that kids who are subjected to this kind of
25 abuse, and especially if it's associated with sexual

1   abuse, it's kind of an intrusion that you just kind of try

2   to split off and blank these things out.  So that's part

3   of it.

4        *Q.*   And how is the memory deficits?  How is that

5   different?

6        *A.*   Yeah, so this is one of the more remarkable

7   things, you know, in my evaluation of Wendi.  And I've

8   done a lot of clinical work in this area, a lot of

9   research.  I've worked on other cases.  And Wendi really

10  had some of the most, or if not the most, severe memory

11  deficits that I had ever encountered.

12       These kinds of -- you know, we don't have any

13  evidence of like massive blows to her head or anything

14  causing this, you know, that kind of brain damage.  So

15  these are things that tend to go with major trauma.

16       So we're going to work through it here.  There is

17  kind of a bit of explaining to do.  The first thing I

18  noticed was that she has just kind of this general lack of

19  memories for her childhood.  She doesn't have zero

20  memories, but compared to other people, she's really got

21  some major gaps, in general.

22       Another thing that I kept observing over and over

23  again, and we can even see it in interviews with Dr. Pitt,

24  is she has what we call over general memories.  And this

25  is when you ask someone to remember something about their

1   past, including about their childhood, perhaps, and, you

2   know:  What was your mother like?  They will say:  Well,

3   you know, she was nice.  She did the best she could or

4   something like that.  But these are just kind of

5   abstractions.

6           And you say:  Well, can you give me an example of

7   your mother being caring toward you?  Or in these cases,

8   can you give an example of Alejo being abusive toward you?

9   All you get is these kind of general abstract schematic

10  things and they're literally unable to get at details.

11          And what the research has shown is that this is

12  something that you see in people suffering from

13  depression, people suffering from post-traumatic stress

14  disorder, which Wendi does.  And the latest research is

15  suggesting that basically what happens is when you're

16  asked to remember something, your prefrontal cortex has to

17  engage in some retrieval, especially if it's just kind of

18  a global question like:  Were you ever sexually abused or

19  something.

20          And when the prefrontal cortex tries to do that,

21  what happens is it just aborts the search because your

22  brain has learned like there's really bad stuff in there

23  and you don't want to get it.  So the recent experimental

24  evidence is showing that when people try to search for

25  these memories, the search gets aborted and they can't do

1  them.

2       So this was something I saw over and over again

3  with Wendi, literally an inability.  And she talked about

4  how, you know, I'm trying and I'm trying to remember and I

5  can't go there, and if I do, my mind just spins around on

6  some meaningless detail.  This is totally consistent with

7  what I've seen in other people who suffer from this.

8       Q.    And you alluded to the interview with Dr. Pitt,

9  the State's expert; right?

10      A.    Yeah.

11      Q.    And we have that.  And you said that that

12 interview demonstrated some of the things you're talking

13 about right now?

14      A.    Yeah.  There is one more point I want to get to

15 before that.

16      Q.    Sure.  Sure.

17      A.    This issue or the last point is fragmented

18 memories in certain types are inaccessible.  Again, in

19 healthy development, you know, a child should grow up with

20 some good experiences and some bad experiences, some good

21 memories and some bad memories.  And the healthy child is

22 able to recall both kinds and they're able to experience

23 themselves as one person who has good memories and bad

24 memories, good feelings and bad feelings.

25      But when a child is severely, severely

1    traumatized and there is no one in their environment who

2    is helping them with it, these memories tend to get split

3    off.  But not only that, but whole ways of thinking and

4    feeling and perceiving other people, they get fragmented.

5    The worst this can get is what people used to call

6    multiple personality disorder.

7         But so in Wendi's case, what we see is that there

8    is some aspects of her memory that she can retrieve, but

9    even then, it is difficult and you get these over general

10   memories.  But when it comes to the traumatic stuff, some

11   of it is just completely inaccessible a lot of the time or

12   even with like the best possible cue you could imagine --

13   we call them cues as memory servers -- to invoke a memory,

14   it's just not coming out because they're split off

15   basically from the rest of her memories in the sense of

16   who she is.

17   *Q.*   Well, now we'll turn to this video, which, as we

18   said, is a video of the State's expert --

19   *A.*   Yes.

20   *Q.*   -- interviewing Wendi.  Can you tell us, do you

21   know when that interview occurred?

22   *A.*   I think it was last November or October,

23   somewhere in that range.

24   *Q.*   And what we're going to show here is a clip from

25   that and then we're going to pause it and you can tell us

1   what we're seeing.

2            THE COURT:  The court reporter won't be taking

3   this down.  Okay?

4            MR. NICKELS:  Understood.  You mean what's being

5   said on the video?

6            THE COURT:  Right, what's being said on the

7   video.

8            There's no objection to this video being shown;

9   is there?

10           MR. HAZARD:  No, Your Honor, as long as there's

11  proper identification on the record of what it is.

12           THE COURT:  This is Dr. Pitt?

13           MR. NICKELS:  This is Dr. Pitt's interview of

14  Wendi.  And like Dr. Hopper said, it happened last fall.

15  It's the video that they sent to us and it's just a

16  handful of clips that's going to be -- I don't think it's

17  ten minutes.

18           THE WITNESS:  It is ten minutes.

19           MS. GARD:  I guess what we're preferring, Judge,

20  is that we know exactly when we're looking at the record

21  and what's being played, which portion of the video it is.

22           MR. NICKELS:  Yes, we can tell you exactly the

23  time mark.

24           THE COURT:  And we'll have you describe that

25  portion or I guess we will get it from the testimony.

1          Was this one of the exhibits that is submitted
2      into evidence?
3          MR. HAZARD:  It is, Your Honor.  There is an
4      entire transcript of the entire interview in that exhibit.
5          THE COURT:  Okay.  Then I'll allow you to
6      proceed, then.
7          MR. NICKELS:  Okay.  Thank you.
8          (WHEREUPON, the video was played.)
9      Q.   BY MR. NICKELS:  So, Dr. Hopper, what did we see
10     there?
11     A.   I guess first I just want to say that I'm sorry.
12     You know, it must be difficult for the family to hear this
13     and I want to acknowledge that.
14          So we see there this she's attempting to retrieve
15     memories and she's got, you know, some images of blood,
16     but there's this resistance, this kind of automatic
17     resistance in her brain to retrieving this kind of awful
18     memory.
19          And this was something that we saw not just when
20     talking about the crime, but when talking about
21     experiences, bad experiences, traumatic experiences she
22     had as a child, she would be really trying to answer my
23     questions and just unable to pull up these memories.
24     Q.   And I understand some of the clips we're going to
25     look at relate to questions she was being asked by

1  Dr. Pitt about the night of the crime?

2      *A.*   Yeah.

3      *Q.*   And then others relate to questions she was asked

4  by Dr. Pitt about her background, frankly some of the

5  stuff that you've been talking about; is that right?

6      *A.*   Yes.  And, to be clear, I put text in there to

7  introduce where that shift takes place.  So that will be

8  very clear.

9      *Q.*   So these first few are questions about the night

10  of the crime; is that right?

11      *A.*   The first one is about the night of the crime.

12  The second one is about general memory problems.  Then

13  back to the night of the crime and then the childhood

14  stuff.

15          (WHEREUPON, the video was played.)

16      *Q.*   BY MR. NICKELS:  What did we see there?

17      *A.*   Again, we saw something that I repeatedly

18  encountered in my 52 hours of interviewing her that not

19  only is she unable to retrieve a memory if you kind of

20  give her like a blanket concept like, did this happen to

21  you, did that happen to you, but even we call at recall,

22  and that's a prefrontal cortex thing where you're trying

23  to retrieve it.

24          But even if presented -- and there was an

25  interview that I did with her in April of 2011 where

1  gradually in a very careful way, so as not to distort or

2  influence her memory, only at the very end did I give her

3  clear descriptions of things that other witnesses had

4  reported.  Even there with that kind of information, which

5  is something when I teach these military investigators how

6  to interview sexual assault victims, you have to get that

7  kind of -- to really get the memories of the assault, you

8  have to ask specific questions.  Even there, she says

9  here, she couldn't recognize or remember even when you

10 gave her details verbatim from other peoples' witness

11 reports.

12         So that really speaks to not just the over

13 general memory of fear of searching for it, but the

14 dissociation and the fragmentation of even if you give

15 like really good cues to remember, even good descriptions

16 of actual events from other people, it doesn't come up.

17     Q.    Okay.  We'll go to the third one.

18         (WHEREUPON, the video was played.)

19     Q.    BY MR. NICKELS:  What did you see there?

20     A.    So I saw something that, you know, that you see

21 in people who have gone through terribly traumatic

22 experiences, not only as a victim, but as a perpetrator of

23 them.  Something that I again teach on a regular basis,

24 teaching investigators and prosecutors about how memory

25 can work in a very traumatized person.  And when someone

1  is asked these kind of global questions, what tends to

2  happen is they get these awful fragments of the memory,

3  blood, horrible sensations in their body, maybe if they

4  were raped, and they can't just narrate something in a

5  sequential order.

6          Here in Wendi's case, we see that she says:  I

7  don't know what's going on.  She is just like those

8  executive functions then are just breaking down before our

9  eyes.  This was again something we saw not just in talking

10  to her about the crime, but in talking about some of these

11  traumatic experiences that she went through, or even if

12  she couldn't remember them, sometimes she would be

13  breaking down and just have little pieces and be very

14  overwhelmed like this.

15      *Q.*   And is that what we see in these next videos?

16      *A.*   Well, I'm going to point out different things

17  that we see.  But it's along these lines, yes.  These next

18  videos are about her childhood experiences, yes.

19      *Q.*   Right.  In fact, I believe one of these starts

20  with a question about a he or a him?

21      *A.*   Yeah, that's flagged.

22      *Q.*   Is that Alejo?

23      *A.*   That's Alejo.

24      *Q.*   That's Alejo they're referring to?

25      *A.*   Yes.

1          (WHEREUPON, the video was played.)

2      *Q.*   BY MR. NICKELS:  What did you see there,

3  Dr. Hopper?

4      *A.*   A few things.  I mean, one general comment just

5  to make is if you just ask someone, if you use the

6  language like sexual relationship and sexual intimacy,

7  it's not clear what that actually means to the person

8  you're asking.  But that's not something someone who works

9  with sex abuse who is obviously trained in these

10  investigations would do.

11          But what we have here is she's asking these

12  questions.  She's saying no response.  She's saying:  I

13  don't know.  I don't remember.  At the beginning, you know

14  there is just kind of confusion.  You see the confusion

15  and not really sure what to think.  But she does refer to

16  what she does remember was the constant sexualized

17  comments.  The sexual environment that this created, we'll

18  get to later.  But you can just see right there, the

19  confusion, the struggles with memory, the not really sure

20  if it happened or not.

21          MR. NICKELS:  Okay.  We'll turn to the next one.

22          (WHEREUPON, the video was played.)

23      *Q.*   BY MR. NICKELS:  What did that clip show us,

24  Dr. Hopper?

25      *A.*   So, as we all saw, it took her like a minute to

1    come up with any kind of example.  Now part of that may be

2    attributable to it was so common, that she's just

3    describing it.  But even when she tries to come up with an

4    example, it takes her literally a minute or so to come up

5    with something.  And that's what I had talked about

6    before, that over general memory.  You ask someone for an

7    example of something that describes, for example, a

8    parent, and they're trying, trying and trying and they

9    can't -- like she kept saying:  I can't get any details.

10   I can't pull up any details.  Until finally after a

11   minute, finally she pulls up a detail.

12        The thing about the ball and pretending those are

13   or, you know, implying those are relating to those male

14   sexual parts, that was an example that she had told me a

15   couple of years ago.  But even that, an example that she

16   had shared before, it still took her over a minute to

17   retrieve that.  So that's just an example of this over

18   general memory and difficulty retrieving memories.

19        MR. NICKELS:  I believe we have one more.

20        THE WITNESS:  There's one more.

21        (WHEREUPON, the video was played.)

22   Q.   BY MR. NICKELS:  What did that show you?

23   A.   Again, it shows that when she's asked a question

24   about, do you remember going to stores with sexual apparel

25   like Frederick's or something like that, when she tries to

1   retrieve this memory, at first she can't.  It doesn't come

2   up.  Then after she starts saying she doesn't have a

3   memory of it, she starts putting some words to it, and

4   then suddenly the memory pops into her head.  And this is

5   something that her mother had reported witnessing, Alejo

6   taking her into a Frederick's of Hollywood.

7          But even when the memory pops into her head of

8   being in the store, then the next comes:  Well, why did

9   you go in there?  What was the purpose?  That might not be

10  the exact wording.  I'm not sure of the exact wording.

11  And she says:  I don't remember.

12         So even when she accesses the memory of going

13  into the store, she still is unable to remember why she

14  was there, which was, you know, as we'll hear a lot more

15  about after lunch, to get lingerie.

16         So it's just an example of the various breakdowns

17  that can occur in her memory along the way, unable to

18  retrieve the detail, even when it pops up, and she still

19  can't access the full thing, especially the most

20  disturbing part about it, which would be looking at the

21  lingerie with her father and actually buying the lingerie.

22     Q.   These memory problems that you just described and

23  the dissociation that you described before that -- and,

24  remember, even though we just saw a video of it still

25  occurring to this day, we started out by you saying this

1  was actually setting in already when she's nine years old.

2  Why is this important and what does it mean to you?

3     *A.*   Well, I would say even before nine years old, but

4  she says as long as she could remember during this time

5  period, that last time period we're talking about.

6        Well, again, we don't see -- barring like, you

7  know, a serious blow to the head or multiple concussions

8  or something like that, you just don't see these kinds of

9  major memory deficits unless someone has been through very

10 significant trauma, at least as far as, you know, the

11 research is showing.  It's either organic damage from a

12 blow or blows to the head or, you know, something like a

13 stroke or something like that or massive trauma is the

14 other thing that is known to cause these kinds of

15 problems.

16    *Q.*   And you've talked about memories being

17 fragmented, not being connected.  How does this -- I

18 understand it's evidence that she was traumatized.  How

19 does it translate, though, to what kind of person she is

20 and how it affects her ability to handle it?

21    *A.*   Right.  So for people -- you know, again, this is

22 something I've seen for many years as a therapist.  For

23 people who have been so traumatized and who have these

24 memories that are split off and they can't access them

25 even when they're trying, they've blocked out this really

1   bad stuff, awful images, awful feelings in their body of

2   being abused and assaulted.

3          But under certain circumstances, high stress,

4   frightening and confusing circumstances, this stuff can

5   come rushing back in.  And we talked about that executive

6   functioning and the CEO.  It can literally just knock the

7   CEO out and then the person is left to whatever bad stuff

8   is coming in and whatever impulses are arising and they're

9   just reacting to the situation without being able to think

10  it through.

11      Q.   Does a person whose CEO has been overwhelmed or

12  knocked out, do they have the ability to control impulse?

13      A.   Not really.  One of the things we know from

14  research by several groups, including one at Yale and

15  Arnsten is that in very stressful and terrifying

16  situations, there are chemicals that hit your prefrontal

17  cortex that impair the ability of the nerves to

18  communicate with each other and literally can shut it

19  down.

20         So when that happens, the very area of your brain

21  that you need to inhibit impulses and to remember rules

22  and laws and things like that, it's not functioning.

23         And with someone who has a major, major trauma

24  history like this, and who already has deficits in

25  executive functioning that have been documented by

1    Dr. James, you know, they don't really stand a chance when

2    awful stuff comes in.

3            MR. NICKELS:  Your Honor, just from a planning

4    standpoint, we're about to turn to the third time period.

5    I can tell you that that time period is broken up into two

6    sections.  One is relatively short and one is a little bit

7    longer.  The short one is probably going to be 15 to

8    20 minutes.  We could maybe get through it now or we could

9    break right now.

10           THE COURT:  Why don't we go ahead and break right

11   now since it's ten minutes until 12:00.  It's about nine

12   minutes until 12:00.  Why don't we go ahead and take a

13   clean break right now.

14           MR. NICKELS:  Okay.

15           THE COURT:  And we will begin again at 1:30.  So

16   we will be in recess until 1:30, then.

17           (WHEREUPON, the lunch recess was taken at

18   11:51 a.m.)

19                        * * * * * * *

20

21

22

23

24

25

1

2

3

4

5

6

7                        C E R T I F I C A T E

8

9

10        I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11   the State of Arizona, do hereby certify that the foregoing

12   95 pages constitute a full, true, and accurate transcript

13   of the proceedings had in the foregoing matter, all done

14   to the best of my skill and ability.

15        SIGNED and dated this 14th day of April, 2014.

16

17

18                    /s/  Renée A. Mobley, RPR

19                    RENÉE A. MOBLEY, RPR

20                    Certified Reporter

21                    Certificate No. 50500

22

23

24

25

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
        Respondent,                  )
                                     )
vs.                                  )   No.
                                     )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,            )
                                     )
        Petitioner.                  )
_____)


Phoenix, Arizona
February 3, 2014
1:33 p.m.

VOLUME II OF II


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


EVIDENTIARY HEARING

DAY 1


Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                        (COPY)

2

1                    A P P E A R A N C E S

2

3

4   On Behalf of the State:

5           Mr. Gregory Hazard
            Assistant Attorney General
6
            Ms. Lacey Gard
7           Assistant Attorney General

8   On Behalf of the Defendant:

9           ATTORNEYS AT LAW:

10
            Mr. Scott Bennett
11          Mr. Allen Arntsen
            Mr. Stephan Nickels
12          Mr. Matthew Lynch
            Ms. Krista Sterken
13          Ms. Jodi Fox

14                    I N D E X

15

16                  T E S T I M O N Y

17
    WITNESS:                                    PAGE
18

19  JAMES W. HOPPER, PH.D.

20
        Direct Examination (Continued) by Mr. Nickels    4
21
        Cross-Examination by Mr. Hazard               50
22

23

24

25

3

1              P R O C E E D I N G S

2

3         THE COURT:  This is CR 2000-096032, State of

4    Arizona vs. Wendi Elizabeth Andriano.

5         The record will reflect the presence of the

6    parties and counsel.

7         The record will also reflect that

8    Dr. James W. Hopper is on the witness stand.  And we will

9    continue with the direct examination by Mr. Nickels.

10        Mr. Nickels.

11        The third time I got it right; right?

12        MR. NICKELS:  That's exactly right.

13        Your Honor, before we go back on one quick point,

14   when we mentioned the video clips, we had a short

15   discussion about the clips before they went on.  The State

16   had asked for knowing exactly where they are.

17        During the lunch break, we actually went through

18   and I note -- well, first off, the video is Exhibit 186

19   and then there is a transcript of that.  That is

20   Exhibit 168.  We identified the page and line number from

21   that transcript, Exhibit 168, and we can provide it to

22   them.  And we can do it right now or we can do it later.

23        MS. GARD:  Later is fine.

24        MR. NICKELS:  Later is fine?

25        MS. GARD:  Yes.

4

1          MR. NICKELS:  So we have that information

2    whenever they want it.

3          MS. GARD:  Thank you.

4          THE COURT:  Thank you.

5          So the record will reflect that James W. Hopper

6    is on the witness stand.

7          Anything further?

8          MR. NICKELS:  Not from us.

9          THE COURT:  We will continue with the direct

10   examination by Mr. Nickels.

11         Mr. Nickels.

12         MR. NICKELS:  Thank you, Your Honor.

13

14              JAMES W. HOPPER, PH.D.,

15   having been previously sworn to tell the truth, the whole

16   truth, and nothing but the truth, testified as follows:

17

18              DIRECT EXAMINATION  (Continued)

19   BY MR. NICKELS:

20     Q.    Dr. Hopper, when we broke for lunch, we had just

21   wrapped up our discussion of the second of those three

22   significant time periods in Wendi's life.  So now we're

23   going to turn to the third time, which was ages nine to

24   18; is that right?

25     A.    Yes.

5

1    *Q.*    As we have done with the other two, let's start
2    off with your telling us what is significant from a
3    developmental standpoint for a child of that age.

4    *A.*    Sure.  Here again, we can refer to the slide.  As
5    we all know, especially as you get 12, 13, 14, physical
6    and psychological changes and challenges of puberty and
7    sexuality in that way are coming in.

8              Also, it is well known through research that new
9    cognitive capacities are emerging, especially for certain
10    reasoning processes associated with the prefrontal cortex.
11    So those are coming out at this time.

12             And, finally, this is kind of a long one, but
13    it's worth absorbing.  During this time period, this is
14    when you want to launch someone into being an adult.  So
15    if things go well, there is potential for emotional and
16    social development that lays the ground work to becoming a
17    healthy adult.

18             That means also being capable of managing
19    difficult emotions and relationships and making good
20    decisions in very stressful situations.

21    *Q.*    Then, again, like we've done before, we'll turn
22    to the facts.  What was occurring in Wendi's life during
23    this time period that had an impact on her development?

24    *A.*    So shortly after returning from traveling with
25    that traveling cult back to Casa Grande, her family joined

1    a church community that over the next couple of years,

2    especially when she was 13, became a very -- as I say, a

3    very abusive cult, especially in a man we're going to hear

4    more about named Tom King, who took over as the leader and

5    the preacher in this community.  So that was one very

6    toxic influence.

7        *Q.*    And what's the second?

8        *A.*    The second is that Alejo, her stepfather's abuse,

9    emotional, physical and sexual was really at its most

10   extreme and unrelenting during this whole time period.

11       *Q.*    Okay.  Well, let's start, then, with this new

12   church community that Wendi was put into.  You said that

13   it started off as one and became worse when Tom King got

14   involved around the age of 13?

15       *A.*    Uh-huh.

16       *Q.*    Explain that, please.

17       *A.*    Yeah, but before I get to Tom King, let me just

18   kind of paint a picture of what kind of community it was.

19   So it was a Fundamentalist Christian Community with the

20   school connected to the church, and most of the children

21   whose families were in the church were going to the

22   school.  Though when we call it a school, we should

23   clarify how it's not your typical school.

24       *Q.*    And what kind of school was it?

25       *A.*    This was a school where there really were no

7

1   teachers.  Kids sat alone in cubicles, not allowed to talk
2   to each other except during recess.  They worked out of
3   workbooks and they had -- instead of teachers, they had
4   what were called monitors.  The monitors were just kind of
5   there to keep order and make sure the kids were handing in
6   their work on time and things like that.  There was also a
7   principal and some new principals came later who we can
8   talk about.
9          So these monitors and the principals weren't
10  really teaching so much as the kids were learning on their
11  own.  But one of the things the monitors and the
12  principals were doing a lot of was unfortunately beating
13  the children.
14      Q.   And was this -- was this similar to what we saw
15  before where it's any lack of compliance, any show of
16  defiance --
17      A.   Yeah.
18      Q.   -- led to a physical rebuke?
19      A.   Yes.  There were -- we have reports from multiple
20  people who were part of that community.  Both they were
21  children at the time as well as adults, and they describe
22  how then kids were beaten for any kind of infraction.  For
23  even a bad attitude could result in a child being beaten.
24  We're talking about being beaten with a big wooden paddle
25  with scripture written on it.  And they would get maybe

8

1   three, four, five, six, they called them swats, as an

2   euphemism for beating a child with a paddle.  They beat

3   them all the way up to 18, so teenagers, and this was a

4   very common part of that experience.

5       *Q.*   Okay.  And --

6       *A.*   And that's just the school so far.  There's other

7   things, too, about the community.

8       *Q.*   Right.  Just to reorient us, the time frame here

9   we're talking about, was this the first couple of years or

10  was this after Tom King gets involved or is this kind of

11  throughout that you've just described?

12      *A.*   So there was definitely corporal punishment and

13  beatings of kids, but it got way worse when Tom King took

14  over and it was like a cruelty and a sadism that he was

15  kind of the driver of, and humiliating kids through

16  beatings and rounding up a whole bunch of teenagers.

17          There's even a really disturbing audiotape that I

18  was able to listen to -- and anyone else could as well

19  here in the room -- of Tom King preaching about beating

20  toddlers and beating some little toddler until the kid's

21  will was broken and also beating a two-month-old infant

22  and talking about rebellion in an infant.  If you've

23  changed his diaper and you've given him the food, and, you

24  know, he just wants some attention, and that that's sin,

25  that's the devil and that needs to be beaten out of a

1    two-month-old infant.  So that's the kind of severity

2    we're talking about from 13 to 18.

3        *Q.*   I just want to confirm.  Now, was that --

4    Tom King arrived when Wendi was 13?

5        *A.*   Yes.

6        *Q.*   And then was she in this community with Tom King

7    and the kind of actions that you just described up until

8    18?

9        *A.*   Yes.

10       *Q.*   Okay.  Tell us more about this community.  What

11   about any other -- what was the attitude towards women?

12       *A.*   Yeah, women were supposed to be just purely

13   subservient to their husbands.  Tom King's wife was sort

14   of an example of a beaten-down, subservient woman.  They

15   were supposed to just follow the orders of their husband.

16   Again, this kind of instant obedience that was expected of

17   children was also expected of women in the church.

18            There were other things going on in terms of

19   disrespectful treatment of women that we can talk about

20   more later and Alejo being involved in that.

21       *Q.*   I understand there was one particular instant

22   involving Brandon, one of Wendi's relatives?

23       *A.*   Yeah.

24       *Q.*   What happened there?

25       *A.*   Well, we can put that in the context of, you

1    know, Tom King used ridicule and humiliation on a regular
2    basis.  He might take a whole family that he felt like
3    wasn't being godly enough or maybe they weren't
4    contributing enough to the church.  Who knows?  And he
5    would humiliate this family in front of the whole
6    congregation and turn people against them.  Or he would
7    not let a family go to the funeral of a family member
8    because the funeral was scheduled at a time when he was
9    preaching.  So there was just these threats, this
10   ostracism, this ridicule, this humiliation.
11          The thing you were talking about is Wendi's
12   cousin who then became her adoptive brother.  When he was
13   a teenager, he was rebellious after years of horrible
14   beatings by Alejo, among other things, and he dyed his
15   hair orange one time.  And so Tom King, in front of the
16   entire congregation, from the pulpit, encourages the whole
17   congregation to ridicule and humiliate Brandon.  He calls
18   him a faggot in front of everybody and encourages other
19   people to call him names and ridicule him.
20          So this is kind of an example of the sadistic
21   treatment of children and teenagers going on literally
22   from the pulpit and from the whole community.  Everyone
23   lived in fear, like is it going to be me next?  So it was
24   a very fearful place to be.
25          Q.   Now we just put a photograph up on the screen.

1  Can you tell us what that is?

2     *A.*   Yes.  This is a picture.  This is out of a page

3  in the 1980 yearbook.  So this would have been when Wendi

4  was ten years old and this was a principal named John

5  Casey, or he's known, as you can see down there, Johnny

6  Casey.  Here we have underneath it, you know, as if it's

7  funny, you know, Johnny's favorite past time and it says

8  Board of Education.  This is kind of representing how

9  common the beating of children was with a big paddle like

10  this.  We're talking young, young kids all the way up to

11  the teenage years.

12     *Q.*   And this environment that Wendi was in, you're

13  saying it was both sort of her church, religious

14  environment, but also the school as well?

15     *A.*   Yeah.  So it was like there wasn't much escape.

16  Also, especially, when Tom King took over, there was this

17  what you see in cults, like don't talk to anybody from

18  outside of the community.  They're not godly.  Don't watch

19  TV.  So this really controlling environment where people

20  are isolated.  And that was -- and her father was a -- you

21  know, Wendi's father, Alejo, was a youth pastor there.  So

22  it was kind of an all encompassing pretty disturbed

23  abusive environment.

24     *Q.*   So Alejo was involved with this community in an

25  instructor or authoritative role?  Is that what you're

1 saying?

2    *A.*    Yeah, at the beginning, he came on really as a

3 volunteer and janitor and they would just give -- and

4 Donna was also helping out maybe with the books or

5 something early on.  And they would just give them enough

6 money to help them survive, basically, but maybe not even

7 enough.  And then -- gosh, I forgot the question.

8    *Q.*    Alejo was involved?

9    *A.*    Yes, yes.  So, anyway, from being the janitor

10 kind of role to being the youth pastor.  And this meant

11 that Alejo, who as we'll hear more about, is an incredibly

12 disturbed, especially sexually guy, who basically these

13 kids were given over to Alejo to, quote, teach them.  And

14 Alejo was very, very sexually abusive in different ways to

15 these kids and harassing them.  I guess we'll get to that

16 later.

17    *Q.*    Yes, we'll get back to that.  I just wanted to --

18 you had mentioned -- I just want you to define or tell us

19 what Alejo's role was with this church/school community.

20    *A.*    Yes.  So he was the youth pastor and sometimes

21 referred to as Tom King's right-hand man.

22    *Q.*    You told us at the outset of this time period

23 that this was a time where folks can be sort of launched

24 into adulthood.

25           And so, then, given what this environment that

1  Wendi is in, this domination of women, this more
2  punishment, lack of any free time, how is that going to
3  affect somebody, you know, in their adolescent and teen
4  years?
5      *A.*   Well, I just wanted to clarify one thing.  The
6  lack of free time, that kind of thing, that was in the
7  traveling cult.  Here, Wendi did have some free time.
8      *Q.*   All right.
9      *A.*   But wherever she was, she was surrounded by this
10  kind of sick, disturbed, abusive community of people
11  beating children and the ridiculing them and humiliating
12  them and things like that.
13         But, yes, so the effects of this, again,
14  depression, you know, it's depressing to be in an
15  environment where children and other people are treated
16  like this where you can't escape from these kind of
17  threats that you're going to hell and things like that.
18         And so depression and anxiety just piling on with
19  what she's had up to this point, and, again, the
20  difficulty in managing emotions and relationships.  There
21  is no one in this community who was helping her any more
22  than anyone did in the first period or the second period
23  through all this time, who is really helping her deal with
24  all the terrible stuff that now she has inside, given all
25  the trauma she's been through.

1        So really a great difficulty managing her

2   emotions involving some really twisted relationships, what

3   we'll talk about.  So definitely problems there.

4        And then as I was saying before, before the

5   break, this kind of unrelenting trauma, this kind of

6   pervasive trauma all around you and abuse and things and

7   beating people, rather than helping them, learned values

8   that they kind of want to take into themselves, beating

9   people into fear, beating into submission, that makes it

10  really hard to control your own behavior in various ways.

11       But, particularly, as I talked about, in times of

12  stress, in times of great stress, the damage that she's

13  had makes it hard to think straight to make good

14  decisions.

15  *Q.*   Let's now turn to Alejo.  You had said that the

16  other significant factual event in this time period was

17  that you said Alejo's emotional, physical and sexual abuse

18  rose to new levels.  Let's, first of all, focus on the

19  emotional and physical abuse.

20  *A.*   Yeah.

21  *Q.*   What happened there?

22  *A.*   So, as I said before, you know, Wendi's mother

23  reports that Alejo and others in the church community

24  witnessed this, too, that Alejo at any time could switch

25  from being playful to being really mean, just mean, cruel

1   teasing.  And so he was often, you know, picking at Wendi,

2   criticizing her, trying to kind of beat her down mentally.

3   So that continued.  And as we'll talk about later, it took

4   on this whole another sexual level, that teasing.

5        The physical beatings for rebellion and things

6   like that, that continued.  Alejo at this point was the

7   one administering them.  Not Donna.  She was pretty much

8   out of the picture.  In general, Donna was pretty much out

9   of the picture at this point.

10        But in terms of the physical abuse, Alejo, also,

11  as I mentioned before, he at any time could fly off the

12  handle.  He is screaming and yelling at Donna or screaming

13  and yelling at Wendi.

14        During this time, Donna had two gynecological

15  surgeries.  She had already pulled back from Alejo a lot

16  in terms of closeness.  You know, Donna is not a person

17  who is really capable of having good intimate

18  relationships in the first place, but she was not

19  interested in sex with Alejo.  Alejo would, as I described

20  before, he would wake up in the morning, be upset that

21  Donna didn't want to have sex with him, get more and more

22  angry as the day went on and then explode in rages on

23  Wendi and Donna and throw things and things like that.  So

24  that was another kind of almost daily occurrence of him

25  just lashing out and him screaming and yelling at Donna.

1    *Q.*    Okay.  You've told us that there was sexual

2   abuse --

3    *A.*    Yeah.

4    *Q.*    -- by Alejo during this time.  What happened?

5    *A.*    Well, there was a whole lot that happened.  And

6   so it ranged from this kind of the emotional abuse really

7   being very sexualized to buying and having Wendi dress up

8   in lingerie and wear it a lot.  There was actual fondling

9   and molestation and sexual abuse of her and her friends.

10   *Q.*    Okay.  And before I have you kind of just walk

11  through some of this subcategory, please explain for the

12  Court sort of like the offset.  What is the effect of this

13  sort of unrelenting sexual abuse that takes many forms as

14  compared to, say, you know, a one time maybe violent or

15  somebody gets violently raped, but it happens just one

16  time versus this?  Give us some context of the impact that

17  can have.

18   *A.*    Sure.  Yeah, this is something that research has

19  been done on that.  You know, even a really horrific

20  single trauma, even a horrible brutal -- violent brutal

21  rape is -- and we don't wish -- we would never wish that

22  on anyone, of course.  But it pales in comparison to

23  ongoing sexual abuse day-in, day-out.

24          As a child, when things happen to you, the

25  younger you are, the more this kind of abuse is more

1   devastating.

2          And then, finally, to be sexually abused by your

3   father is incredibly horrible.  It's a horrible betrayal.

4   There is nowhere safe.  It has been documented many awful

5   effects to have -- the more closer you are to the person,

6   the more power they have over you, like a parent, the more

7   destructive this kind of abuse is.

8       *Q.*   Let's start, then, with that first subcategory,

9   sort of this sexual environment.  What did you mean by

10  that?

11      *A.*   All right.  The first part of that is, as I

12  started to refer to, you know, Alejo all along had been

13  prone to teasing her and picking on her in really cruel

14  and mean ways, as it had been done to him -- again, we

15  don't have time to go into it all -- but relentlessly to

16  him when he was a kid.  And he took this to another level

17  at this age.  Now he's constantly teasing and picking at

18  Wendi and trying to embarrass her about sexual things.

19          So if they're watching television and an ad for a

20  tampon comes on, he's like:  Oh, what are those for?  Oh,

21  what do you want to do with that?  You know, that sort of

22  thing and just this kind of unrelenting -- you know, the

23  teasing now takes on this whole another level of sexual.

24  And this is a form of sexual abuse.  It does not involve

25  penetration of a body, but it is still sexual abuse, and

1  it's a climate of sexual abuse that was there all the way

2  through this time.

3      *Q.*   What about -- and we heard some of this during

4  the video clips.  What about going to some of these shops

5  that have adult clothing or items?

6      *A.*   Yeah.  So we -- you know, just to back up on that

7  for a second, we have reports from a couple of different

8  people who actually report witnessing Wendi dressing up in

9  lingerie when she was nine, ten, 11, 12 years old.

10      So one guy who was a kid at the time, you'll hear

11  describes her prancing around in a thong and lacy

12  stockings.

13      So there is a woman named Martha England who I

14  interviewed myself, whose daughter Suzy was around Wendi's

15  age at the time and she remembers her daughter coming to

16  her and not only telling her how sexually perverted Alejo

17  was and how he's constantly making sexual comments to his

18  daughter, but that Wendi had told her daughter that her

19  daddy liked her to dress up in her nightie doll or baby

20  doll nightie and lie in bed with her.  And Martha

21  remembers being very disturbed by this and visiting the

22  house and thinking what was happening to Wendi.

23      But then Martha had her own history of abuse and

24  she tried to block it out, and because Alejo was a pastor,

25  she didn't feel like she could say anything about it.

1          So that's just some of the witness reports of her

2    wearing the stuff.  Now, in terms of going to the places

3    they went?

4     *Q.*    Yeah, yeah, that's what -- what about just sort

5    of taking her into adult stores or stores that had these

6    adult things that, well --

7     *A.*    Yeah.  So, you know, Donna reports that by the

8    time she was 12 or 13, she had like a whole drawerful of

9    this lingerie.  So she had to get it somewhere.  Where she

10   would get it evidently is going to these lingerie stores

11   like Frederick's of Hollywood.

12          We saw that memory, you know, at first not being

13   able to be accessible to Wendi, and then it would pop in

14   her head, oh, yeah, we went to Frederick's of Hollywood,

15   though she couldn't remember what she got there.

16          But this was an example of, you know, Wendi being

17   taken into these stores to purchase lingerie and something

18   that Donna witnessed sometimes, knew was going on, but

19   just didn't want to know about it.

20   *Q.*    Now we'll talk a little bit more about the

21   lingerie and Wendi being dressed up in that stuff.  But I

22   understand sort of this sexual environment and the

23   frequent talk about it.  Has it continued almost to this

24   day?

25   *A.*    Yeah.

1    *Q.*   We have an exhibit from that?

2    *A.*   Yes, we do, before we put it up.  So even when --

3    even when she was in prison after the crime, she would get

4    cards from her father, from Alejo, that were sexualized.

5         And, here, we actually have an example of one

6    that survived.  We have it right here for us.  Just to

7    warn people, this is pretty disturbing.

8    *Q.*   So this is a card, and where did you get this?

9    *A.*   The investigators.  Capital case private

10   investigators found it and then it was given to me.

11   *Q.*   This is a card that was sent from Alejo to Wendi

12   when Wendi was incarcerated?

13   *A.*   Yes.

14   *Q.*   Obviously, you can see there's some writing on

15   there -- some handwriting that we can't see?

16   *A.*   Yeah.  But we can see what's up there.  You know,

17   you get the pretty filthy stuff.  It's a bright town and

18   cute, witty, and these are just a few of the things that

19   we have in common.

20        And then the other part, we verbatim put it on

21   the next slide.  You can see what he actually said in this

22   card.  So this is what her father says to his daughter in

23   a card he sends her when she's in prison:  This is the

24   first riddle.  I'll send you the answer with the next

25   riddle.  Have fun, double exclamation point.  Dad.  I

1  sometimes get balls caught in my throat.  My box smells.
2  I can have a little pussy.
3      *Q.*   And that was from Alejo to his daughter?
4      *A.*   Yeah.
5      *Q.*   And I can have you look at it, but that's
6  Exhibit 75 in the exhibit binders.  Now, you mentioned
7  that --
8      *A.*   Well, I can say a little bit more about this,
9  that, you know, he's sending these cards now, but they
10  used the make many trips to a place called Spencer's
11  Gifts, which has sections of the store which have these
12  cards and sexualized games and things like that.
13          So from when she was -- oh, I'm forgetting the
14  exact age, but definitely prepubescent and teen years,
15  Alejo would repeatedly -- when they would go to the mall,
16  they would go to this store, and Alejo being the sexually
17  perverted guy that he is, would kind of make a beeline to
18  the sex stuff and he would insist that Donna and Wendi
19  come over with him.  And Donna would pretty quickly walk
20  away and this would leave Wendi with Alejo in the section
21  of the store where he's showing her these kind of cards
22  making who knows what kind of comments about them and
23  forcing her -- though, by all reports, by then Wendi was
24  fairly compliant and just kind of did what Alejo wanted.
25  So hanging out in this section of the store with her

1   father on a regular basis.

2       Q.    You just told us that Alejo also had a teacher

3   type role at the church community and school?

4       A.    Yeah.

5       Q.    Was what you just described as his behavior

6   towards Wendi and sexualization, was that consistent with

7   how he acted at the church with those other kids?

8       A.    Yeah.  Again, people who were children at the

9   time, as well as parents of those children, multiple -- we

10  have declarations.  And I talked myself to both Martha

11  England and to Kyre Lorts about this kind of behavior,

12  that Alejo was constantly making sexualized comments, you

13  know, not just about popsicles and balls, but, you know,

14  about microphones, pretending they're a penis.  He would

15  make gestures simulating sex in front of the whole

16  congregation, in front of four, five, six-year-old kids.

17          He would comment on women's breasts.  He would

18  make all kinds of sexual innuendo comments to women.  It

19  was a general topic in the community.  There were people

20  who were just horrified by this.  And, actually, one

21  person said that years later, after she had gotten, you

22  know, extricated herself from this horrible community,

23  that she met up with someone else who left the community

24  years before and they counted 13 families that had been

25  driven out of the community by Alejo's constant sexual

1    harassment of the mothers and the daughters.

2        *Q.*    Did Alejo ever discuss Wendi with any of the

3    other children?

4        *A.*    Yeah.   There is one particularly disturbing

5    example where -- as I said, Alejo would teach these

6    devotions, they called it.   It's a class where you go over

7    Bible scripture and what does it mean and things like

8    that.

9            And, you know, even when I talked to Alejo

10   himself -- so I interviewed Alejo.   When I asked him what

11   he was teaching, he made this kind of comment -- well, he

12   said:   Well, I'll tell you what I was supposed to be

13   teaching, and then he laughed.   And I kind of thought:

14   Wow, what's that about, you know?

15           So then I followed up and asked him:   What was

16   that laugh about?   What were you teaching that you weren't

17   supposed to be teaching them?   He said:   Track meets.

18           But, you know, this kind of -- what we have,

19   though, is we have direct reports from people that he was

20   teaching about sexual things.

21           So Kyre Lorts reports a time where the kids were

22   like:   What's going on?   Why are you teaching us about

23   this sexual stuff?   And he was talking to the kids about

24   masturbation.   He was talking to them about how they can

25   touch girls down there and it feels good.   If a girl

1    touches you down there and you're a boy, it feels better.
2    And he actually said to the -- to the boys that if they
3    wanted to touch Wendi, they could.
4        *Q.*   So he told the other students -- male students
5    that they could touch Wendi if they wanted to?
6        *A.*   Yeah.
7        *Q.*   Now, let's move onto the next subcategory, this
8    constant -- this touching-on ritual that you had
9    discussed.
10       *A.*   Right.
11       *Q.*   Tell us what that meant.
12       *A.*   Well, again, just to kind of provide some
13   background on that, so when Wendi was in the traveling
14   cult, there were many hours a day where the men were off
15   doing work on projects or whatever when the girls and the
16   leaders of the cult were back around the vehicles.  And so
17   in a way, Wendi had, you know, some respite time from
18   Alejo.
19            But once they got back from the traveling group,
20   you know, they're living in the same house.  They're
21   spending a lot of time together.  From the beginning,
22   Alejo had only wanted to be with Wendi most of the time,
23   not Donna, in the first place.
24            But, here, it took on a whole another level of
25   literally for hours each night, Alejo would lie on the

1  couch or lie on the floor and it would be Wendi's and
2  Donna's job to caress his legs, to caress his hair, play
3  with his hair, to rub his back.  And what Donna reports is
4  that she didn't really want to do this.  And so within,
5  you know, a couple of months of Wendi turning nine and
6  them coming back, she basically pulled herself out of the
7  picture and would retreat to her room to read or whatever
8  as was her habit and leave Wendi spending literally hours
9  a night doing this touching-on again.  And Alejo would
10  whine and say, oh, just touch on me, and things like this.
11  And this is an example of what we can call an incestuous
12  relationship.  I could talk about that now if that's
13  appropriate.
14      Q.   We'll get to that in a moment.  Just a few more
15  details about what's actually happening here.  Is Alejo --
16  is he wearing clothes when they're rubbing him?
17      A.   Yes, he was wearing clothes, but often not much.
18  And Donna's account over the times of the years of doing
19  this ritual, he became more and more scantily clad.  So
20  sometimes he's just lying there with nothing more than a
21  pair of shorts or pair of underwear with his genitals
22  exposed as Wendi is playing, you know, rubbing his legs.
23          And Wendi reported how she used to try not to rub
24  his legs so she wouldn't have to see his penis.  And so
25  she would try and rub his head.  But, unfortunately,

1   rubbing his head had its own costs.

2       *Q.*   What was that?

3       *A.*   Well, then he would put his face like right in

4   front of her genitals.  And one of her friends reported

5   this as well.  So literally hours a night, this is what

6   she was dealing with.

7       *Q.*   So you said once in a while, Wendi had to rub his

8   legs and then she's literally having to see up because

9   he's wearing these shorts?

10      *A.*   Yeah.

11      *Q.*   And then the other option was to rub his head,

12  but then he would put his head --

13      *A.*   -- in her lap.  They called it ministering to

14  him, but it was Alejo's own perverted way of putting his

15  head in his daughter's crotch.

16      *Q.*   Now you said Donna withdraw from this.  Did Wendi

17  or did Donna ever try to intervene and help Wendi?

18      *A.*   No.  I mean, it's worse than that.  I mean, Donna

19  actually said she was relieved to hand this duty off to

20  Wendi, that it was a relief for her.

21          And this is an example of what we call, you know,

22  -- what we call a classic incestuous family.  You've got

23  two really damaged adults.  In this case, the mother is

24  depressed and withdrawn and isn't interested in being

25  involved with the father anymore sexually or intimately

1  and retreating to the room.  And the father is this really

2  damaged sexually perverted pedophile, basically.

3         And so we have Donna basically handing Wendi over

4  to Alejo and glad that she's taking care of Alejo's stuff

5  and glad that, you know, she doesn't have to deal with it.

6         So it was worse than just not looking away.  She

7  was actually relieved.  But, again, this horrible as it

8  is, unfortunately, this is not an uncommon dynamic in some

9  of these really disturbed incestuous families.

10     Q.    Okay.  Now the third subcategory that you

11 mentioned was that Alejo had Wendi dress in lingerie?

12     A.    Right.

13     Q.    Tell us what happened there.

14     A.    Yeah.  So, yeah, I got a little ahead of myself

15 there.  But so he would -- after buying the lingerie, he

16 would -- he would have her dress up in it and sometimes

17 she would be dressed in the lingerie as she was doing this

18 ritual with him.  And he also actually took pictures of

19 her in the lingerie at one point, or several points, it

20 sounds like, actually.  Not one point.

21     Q.    When she is dressed in this, is she home alone or

22 are her friends ever seeing any of this?

23     A.    Yeah.  As I mentioned before, someone who was a

24 boy at the time talked about how Wendi would put this

25 lingerie on when her friends visited the house and say:

1  My daddy likes me to look my best and dress up in these as

2  she's prancing around the house.  Martha England's

3  daughter told her about that as well.

4      *Q.*   Give us a sense of what it is that she's wearing.

5      *A.*   Yeah.  So, you know, as Donna described it, like

6  frilly, lacy, silky underwear, these kind of panties with

7  nylons that attach by a strap, so you see like this sexy

8  strip of thigh at the top.  Just, you know, really as

9  extreme as you can get in terms of sexually provocative

10  lingerie.  She has a whole drawerful of that stuff that

11  she's wearing for Alejo's pleasure.

12      *Q.*   And, again, is Donna doing anything to kind of

13  step in and, you know --

14      *A.*   No.

15      *Q.*   -- stop from having her daughter be pranced

16  around and fondled?

17      *A.*   No.  She said she -- you know, she didn't care to

18  know about it.

19      *Q.*   You mentioned photographs?

20      *A.*   Yes.

21      *Q.*   What happened with that?

22      *A.*   Yeah.  So, you know, Alejo would have Wendi dress

23  up in lingerie.  Sometimes he would take her out into the

24  desert and take pictures of her in lingerie.  And we

25  actually have a picture that he took of her when she was a

1    teenager.

2        Q.    Okay.  Before we -- well, there it is.  It's also

3    Exhibit 72 in the book if anyone wants to look at it.

4            But what are we seeing here, Dr. Hopper?

5            THE COURT:  You know, some of these exhibits

6    haven't been admitted into evidence.

7            Any objection at all for the Court looking at

8    these slides?

9            MR. HAZARD:  Not to look at them, Your Honor.

10           THE COURT:  I'm sorry?

11           MR. HAZARD:  Not to look at them, no, Your Honor.

12           THE COURT:  Okay.  Go ahead.

13           THE WITNESS:  Well, also, it's Alejo was behind

14   the camera.  He had Wendi -- you know, you can see that

15   there's hardly any clothing on her.  And he wanted to get

16   this picture of her out in a lightning storm.  And,

17   actually, Alejo was proud of this picture.

18           The woman named Cynthia Schaider, who was an

19   adult at the time in the community was shown these

20   pictures even though Alejo had promised Wendi he would

21   never show them to anyone, and she remembers being very

22   disturbed seeing these pictures, you know, as anybody is,

23   but this is his daughter.

24       Q.    BY MR. NICKELS:  Do we have any reports about

25   what she's wearing in this picture?

1    *A.*    Yeah.  I think it was like some sort of

2   see-through teddy kind of thing.

3    *Q.*    Any other stories of photographs being taken of

4   Wendi --

5    *A.*    Yeah.  There was --

6    *Q.*    -- when she's wearing lingerie or nothing at all?

7    *A.*    Yeah.  There was another incident later when she

8   was maybe 17 or 18 where Alejo basically kind of cajoled

9   and manipulated her.  She really didn't want to do it, but

10  over like a week or so, you know, to go alone with him to

11  a hotel room where he shows up with a bag of lingerie and

12  wants her to --

13   *Q.*    So he actually got her to go to a hotel room for

14  pictures?

15   *A.*    Yeah, to go to a hotel room and --

16   *Q.*    And then what happened when they got there?

17   *A.*    So this is an incident that Wendi partially

18  remembers, like many other things.  You know, she doesn't

19  remember, but she remembers pieces of it.

20        But this one she remembers not wanting to do it.

21  She remembers getting to the hotel room and him pulling

22  out this bag and starting to pull lingerie out of the bag

23  and just being freaked out and thinking, oh, my God, I

24  don't want to put that on, but she doesn't remember

25  anything after that.  She's pretty sure she complied with

1   his wishes, as she did usually, to do this sexual thing,

2   but she doesn't remember anything after that pulling the

3   lingerie out of the bag.

4        Q.   So her last memory of that is she agrees to go to

5   this hotel room.  It's just her and Alejo and he's got a

6   bagful of lingerie.  He pulls something out and that's --

7        A.   That's her last memory.

8        Q.   -- her last memory is I don't like this, but --

9        A.   Yeah.  Just like the video we saw where she

10  remembers, oh, wow, yeah, I remember going into

11  Frederick's of Hollywood.  Why were you there?  I don't

12  remember.  It's the same kind of thing.

13       Q.   Well, finally, Dr. Hopper, you said that there

14  was -- that Wendi was molested.

15       A.   Yeah.  Sexual abuse involving actual physical

16  contact --

17       Q.   Correct.

18       A.   -- with the pictures and words and cards.

19       Q.   What happened?

20       A.   So we have reports from two women who were girls

21  at the time.  One of them is Jeri Lynn Cunningham.  And

22  this is a sexual abuse that she experienced lying in bed

23  next to Wendi.  So we don't know if Alejo was

24  simultaneously doing it to Wendi.  But it's still

25  important I think for the Court to hear about what

1  Jeri Lynn's experiences were.  And that wasn't the only

2  one.  And then Kyre Lorts.

3      *Q.*    Well, first, tell me who's Jeri Lynn?

4      *A.*    There's a picture of Jeri Lynn.  Jeri Lynn was a

5  friend of Wendi's who was at the church, in the church

6  community.  Well, she arrived when I think Wendi was about

7  ten and Wendi quickly befriended and took care of her in

8  some ways.  And then she left not long after -- you know,

9  she left with Calvin Lorts before, so she didn't

10 experience all the horror of Tom King.

11         So Jeri Lynn was friends for a couple of years

12 with Wendi and she would play at Wendi's house and she did

13 sleepovers at Wendi's house.  So that's who Jeri Lynn was.

14 She's was in the school as well.

15     *Q.*    Okay.  So she's a friend of Wendi's and she was

16 doing sleepovers at Wendi's house?

17     *A.*    Yeah.

18     *Q.*    And what happened during those sleepovers?

19     *A.*    Yeah.  So we'll go from there like from the least

20 worst to the worst.  So Alejo would -- Wendi and Jeri Lynn

21 liked to go out in the desert and tell ghost stories, you

22 know, the night before they were -- on these sleepover

23 nights.  And Alejo would tell them they weren't allowed to

24 go out into the desert unless they first dressed up in

25 their nighties.  So purely for his own satisfaction, he's

1   forcing these 11 -- ten, 11-year-old girls to dress up in

2   their nighties before he will agree to take them out in

3   the desert.  And that happened numerous occasions.  And

4   Jeri Lynn remembers feeling, you know, this just felt

5   wrong.  Why should I have to put this on?  I'm not ready

6   for bed yet.  Why he's doing this to us?  Yeah, so that

7   was the first kind of thing.  He did it numerous

8   occasions.

9       Q.   In addition to forcing them to get dressed up in

10  these nightgowns, what else happened relating to

11  Jeri Lynn?

12      A.   So then there was another time where he insisted

13  that Jeri Lynn participate in this touching-on ritual that

14  I've talked about.  And so, you know, Jeri Lynn was put in

15  the position of rubbing his head and playing with his hair

16  while Alejo lied there and kind of pretended to fall

17  asleep or whatever.  But his face was right up against her

18  genitals, and this was for her a very, very disturbing

19  experience and, you know --

20      Q.   Okay.  Did anything happen during the sleepover

21  portion of the night?

22      A.   Yes.  And then, finally, it sounds like maybe

23  three or four times over this time during these

24  sleepovers, after Wendi and Jeri Lynn had gotten in bed

25  and gone to sleep, they were sleeping in the same bed, and

1  Alejo would come into the bedroom and get into the bed in

2  between them.

3      *Q.*   Okay.  What happened when he got into bed?

4      *A.*   Yeah.  So then literally for hours over the

5  course of the night, Alejo would repeatedly reach over and

6  grasp and fondle Jeri Lynn's breasts.  And she would wake

7  up to this experience of Alejo fondling her breasts and

8  then she would freak out and push him away.  And then he

9  would pretend to be asleep or whatever and she would

10  eventually fall back asleep again, and then again over and

11  over again, like literally throughout the night until the

12  early or late hours of the morning, you know, whatever,

13  6:00 a.m. or something like that, but for many hours over

14  and over again.  And this happened, as I said, three or

15  four times and this was also obviously a horrible

16  experience.

17      *Q.*   Does Jeri Lynn know whether Alejo was doing this

18  to Wendi at the same time?

19      *A.*   She doesn't know.  She just knew what was

20  happening to her.

21      *Q.*   Does she know whether Wendi reacted at all when

22  Alejo got in the bed and was groping her?

23      *A.*   She didn't see anything like that.  And they

24  never talked about it either.  And nor did Jeri Lynn ever

25  tell anybody else about it until just recently.

1    *Q.*   Do you know -- did you talk about that with her?
2    *A.*   Yeah, I did.  You know, she said at the time that
3    she was afraid to tell her father.  She was afraid of what
4    her father would do if she told.  She was afraid to lose
5    her friend.  And we'll hear this from Krye, too.  She sort
6    of felt this was the cost of being with her friend, to put
7    up with the stuff from Alejo.
8          And then, finally, she cared and said she still
9    cares about Alejo and doesn't want to hurt him, and it was
10   really hard for her to talk to guys about this and talk to
11   me about it.
12   *Q.*   You said there were two friends of Wendi's who
13   reported sexual abuse and the other was Kyre Lorts?
14   *A.*   Yeah.
15   *Q.*   Tell us first who is Kyre Lorts?
16   *A.*   So there's a picture of Wendi and Krye.  Kyre is
17   the little girl on the right.  She was about two years
18   younger than Wendi.  So here she's eight years old.  And
19   that's how old she was when the things I'm going to
20   describe to you were happening.
21   *Q.*   Okay.  And what happened?
22   *A.*   Yeah.  So, again, we'll kind of build from bad to
23   the worst.  Krye remembers how when she first became
24   friends with Wendi and started spending time at her house,
25   as they were maybe brushing their hair or combing, or

1  brushing their teeth or combing their hair in front of the

2  bathroom mirror, and Wendi started saying things to her

3  like:  I'm not allowed to close the door when I use the

4  bathroom.  My daddy helps me wipe.  My daddy likes to

5  watch me take showers.  My daddy likes to take showers

6  with me.  My daddy touches me down there.  And my daddy

7  likes to watch bad movies.

8           So these were all things Wendi started telling

9  her as they became friends and Krye is coming into her

10  house.  As an adult looking back, Kyre is thinking Wendi

11  is kind of alerting me to like things aren't -- you know,

12  this is what my house is like.  This is what my daddy is

13  like.

14      Q.   In addition to Wendi telling Krye some of these

15  things about Alejo, did Krye ever experience any of this

16  herself or see it happen to Wendi?

17      A.   Yes, she did.

18      Q.   And what happened?

19      A.   So, you know, we can start with the first

20  experience she had of this.  Krye describes Wendi saying

21  to her:  Hey, let's play dress-up.  And Krye thought to

22  herself:  Oh, hey, dress-up.  I've played dress-up at home

23  with my sisters.  That sounds like fun.  But when they go

24  into Wendi's bedroom to get the dress-up stuff, she's

25  thinking:  Whoa, this isn't how we play dress-up.  What

1   Wendi is doing is pulling out some of that lingerie from

2   that drawerful of more lingerie she has.

3        *Q.*    So did Krye and Wendi --

4        *A.*    Yeah, they put --

5        *Q.*    Did Kyre and Wendi put the lingerie on?

6             THE COURT:  Wait until the question is completed.

7             THE WITNESS:  Yeah.  Sorry.

8             So, yeah, so Kyre remembers trying on one of the

9   lingerie and it was too big.  So she tried on another one

10  that was smaller.  It was still big on her because she was

11  only an eight-year-old little girl.  But, you know, it fit

12  her well enough.  It would hold onto her body.  And then

13  Wendi had put on hers.  And then they walked out of

14  Wendi's room and encountered Donna.

15       *Q.*    BY MR. NICKELS:  What happened when they saw

16  Donna?

17       *A.*    She remembers Donna saying:  Oh, those are cute.

18       *Q.*    And this is with an eight- and a ten-year-old

19  wearing lingerie?

20       *A.*    Dressed up in lingerie.

21       *Q.*    What happened after they walked out of the room

22  and saw Donna and she commented on it?

23       *A.*    So then they walked -- Wendi leads her down the

24  hall and into this room, which Krye noticed before.  A

25  room with a chair in it and there was some pornography

1   magazines in there.  And so Wendi leads her into this room

2   and Alejo is already there and he's sitting on the chair

3   and in these red shorts that she said he always wore when

4   he did this.  To think of them even to this day, she gets

5   nauseous thinking of these red shorts.

6        Q.   And the "she" you're referring to, that's Krye?

7        A.   That's Krye, yeah.

8        Q.   Okay.  Go on.

9        A.   And so then they come into the room and she just

10   knows.  She just has this feeling that this is awful, this

11   is terrible.  She's really freaking out.  She's starting

12   to shake.  And then Alejo makes this signal.  He taps on

13   his knee.  And Wendi knows what this signal means and she

14   walks over and sits on his lap and Wendi reaches over and

15   starts stroking Alejo's penis.

16       Q.   How does Kyre react to this?

17       A.   She was completely freaked out.  She left the

18   room, walked down the hall to the bathroom and got on the

19   toilet and pretended to pee.  She realizes as she sat on

20   the toilet, oh, I'm not allowed to lock or close the door.

21   So here we've got this eight-year-old girl just seeing

22   that horrible thing.  She goes to the bathroom and sits

23   down on the toilet and is shaking, you know, and then

24   Wendi comes to her.

25       Q.   So is Krye able to stay in the bathroom and --

1     *A.*    No.   So then Wendi comes to her and says, you

2   know -- her memory is that Wendi says:  It's okay.  This

3   is just something I like to do with my dad.  And then

4   Wendi --

5     *Q.*    That's what Wendi --

6     *A.*    Said to her.

7     *Q.*    -- said to Krye?

8     *A.*    Yeah.  And then Wendi took her by the hand and

9   led her back to that room.

10    *Q.*    What happened when they got back to there?  And

11  in the room, you mean you're talking about the room where

12  Alejo was?

13    *A.*    Yes.

14    *Q.*    What happened when they got back to the room?

15    *A.*    So then Wendi went back and sat where she had

16  been sitting on Alejo.  And Krye thought to herself:  This

17  is my friend.  You know, she was overwhelmed.  She was

18  confused.  Her friend was leading her back into this

19  situation.  She sat on the other -- the other side of his

20  lap and Alejo proceeded to put his hand in her lingerie

21  and rub her vagina, as he was doing to Wendi.  He would

22  take turns doing that.  He reached up and grabbed at her

23  chest.  She was only eight years old.  She had no breasts,

24  but Alejo was still grabbing at her in that way and doing

25  that to Wendi.

1    *Q.*    So he touched both of them on their vaginas?

2    *A.*    Yeah.

3    *Q.*    You said earlier that before Krye left the room,

4    Wendi was stroking his penis.  When they came back

5    together, did that resume?

6    *A.*    I know that it was part of the ritual to be

7    stroking his penis, and that was something that they

8    repeated, yeah.

9    *Q.*    Is there anything else that Krye remembers

10   from --

11   *A.*    Yeah.

12   *Q.*    -- the room and her reactions to it?

13   *A.*    So this happened several times over the course --

14   she remembers it happening over the course of one school

15   year.  And during these sleepovers over at Wendi's house,

16   they would get dressed in lingerie, go into the room, be

17   abused by Alejo in this way.  And she doesn't remember

18   from the first time, but the other times, she remembers it

19   being a common element that Alejo would turn on the

20   television and there would be pornography playing on the

21   television just several feet away from them while he was

22   molesting them for, you know, maybe ten, 15 minutes in

23   this way.

24   *Q.*    What about Wendi?  Does she remember anything

25   else about what Wendi was doing at this time?

1     *A.*    Yeah, she remembers closing and scrunching her

2   eyes to not look at the pornography, but the sounds -- I

3   mean, she could still hear the sounds.  And she remembers

4   one time looking up to see if Wendi's eyes were open and

5   Wendi's eyes were open looking toward the TV.

6     *Q.*    You said this went on for ten or 15 minutes at a

7   time?

8     *A.*    Yeah.  It's hard to know.  For her, it felt like

9   forever, but it was clearly some drawn-out ritual that

10  involved stroking the penis, rubbing the vagina, grabbing

11  the chest and pornography on.  Sometimes Alejo would be

12  kissing Wendi.  Kyre said he did not kiss or kind of

13  make-out with her, but he did that with Wendi.  So who

14  knows?  But a long time for any child to be going through

15  something like that.

16    *Q.*    Did Alejo ejaculate as part of this ritual?

17    *A.*    No, she does not report that.  And, you know, I

18  asked her about that and she said --

19            THE COURT:  When you said "she", you're talking

20  about Kyre?

21            THE WITNESS:  Oh, Kyre.  I'm sorry.  Yes.  Krye,

22  yes.  That, you know, looking back, it sort of seemed

23  strange to her.  It was more like, you know, as she

24  described it, like a long time make-out, foreplay sort of

25  thing.  And she does not remember that happening, no.

1    *Q.*   BY MR. NICKELS:   Now does Wendi have any -- in
2    your interviews with Wendi, does she remember this
3    happening?
4    *A.*   No.   I mean, she actually, you know, had a
5    visceral response, but one of like, that's impossible.
6    That's absurd.   You know, she just couldn't -- she
7    couldn't fathom it.   Just she had no memory of it and it
8    freaked her out to even hear about it and it was very
9    upsetting for her to hear about this.
10   *Q.*   As a trauma expert, Dr. Hopper, who treats people
11   who have gone through childhood sexual abuse, do you
12   believe Kyre?
13           MR. HAZARD:   Objection, Your Honor.
14           THE COURT:   Sustained.
15   *Q.*   BY MR. NICKELS:   Your Honor -- or not Your Honor.
16   Dr. Hopper --
17           THE COURT:   He's honorable, too.
18           MR. NICKELS:   He's honorable, too.   I'm trying.
19   But it's some kind of a Freudian slip there.
20   *Q.*   BY MR. NICKELS:   So this sexual abuse that you
21   just described from the sexualized environment, the
22   touching-on, the lingerie and the molestation, how is that
23   going to impact, you know, like an adolescent and a
24   teenager that was the age that Wendi was at this time?
25   *A.*   Well, you know, again, we have a slide for this.

1    As I've been saying, you know, throughout, it's just, you

2    know, one more, but now one more massive kind of

3    continuous sexual trauma over nine to 18 years, piled on

4    top of everything else.  So it's going to have the same

5    kind of effects of depression, anxiety, emotion regulation

6    problems, intimacy problems.

7            But, also, you know, this kind of

8    hypersexualization, you know, for a child to be

9    continually exposed to this kind of treatment over and

10   over again, it, you know, conditions their brain to be

11   very -- you know, different kids can have different

12   responses, for sure.  Some kids just completely refuse to

13   have anything to do with any kind of sexual stuff and

14   others are kind of hypersexualized, or at least vulnerable

15   to being responsive to sexual attention they're getting

16   from men, to go ahead and have sex with men because, hey,

17   that's what men want from me.  That's what makes them

18   happy.  I don't have an orgasm.  I don't enjoy it, but,

19   you know, that's my role is to have sex.  So this kind of

20   hypersexualization, this confusion over --

21           THE COURT REPORTER:  This confusion about --

22           THE WITNESS:  I'm sorry.  I'm talking too fast.

23   *Q.*   BY MR. NICKELS:  You got a little fast there.

24   *A.*   Yeah.

25   *Q.*   I would like you to start over on that third one

44

1   because it did come out too fast.

2       *A.*   Yeah.  Confusion about sexual desires and

3   impulses.  So, as I talked about before, on the one hand

4   she describes this experience of, you know, noticing and

5   being attentive to that sexual energy coming from men and

6   wanting to please men in that way and wanting them to like

7   her in that way because that's kind of the role that men

8   had related to her.

9           But, on the other hand, then when she got that

10  attention and when it did become sexual, then feeling kind

11  of disgusted and dirty with herself.

12          This is a really awful dilemma that a lot of

13  sexually abused boys and girls get into.  On the one hand,

14  being vulnerable and like acting on that stuff and then

15  feeling really dirty and horrible about it afterwards.

16      *Q.*   So, Dr. Hopper, let's now kind of pull it all

17  together.  You talked about -- you've described for us

18  various forms of trauma that happened throughout Wendi's

19  first 18 years and you've talked about the cumulative

20  effect.  Now that we're kind of at right at 18 --

21      *A.*   Yeah.

22      *Q.*   -- what do we have?  What is the cumulative

23  effect upon Wendi of the trauma that you've described?

24      *A.*   In a way, you could never sort of do it justice.

25  But, you know, the quickest summary is she entered

1  adulthood as a severely damaged person.

2      Q.   In what ways?

3      A.   Well, we can look at in different ways again and

4  we can never kind of capture it all.  But one way to think

5  about it is in terms of what we call psychopathology or

6  psychiatric disorders and symptoms.  So depression,

7  anxiety, someone like Wendi who has a genetic

8  predisposition to bipolar disorder, those kinds of

9  symptoms coming in.

10         Post-traumatic stress disorder, she has those

11 symptoms.  Something we call complex post-traumatic stress

12 disorder, which has to do with these memory deficits and

13 problems regulating emotions and twisted relationships

14 with the perpetrator, so she has that.  So she has a whole

15 bunch of psychopathology.  That's one way to think

16 about it.

17     Q.   And what about you've talked repeatedly about her

18 ability to regulate her emotions or respond to stresses or

19 complexity.  What's the effect of all this trauma on that

20 as she's entering adulthood?

21     A.   So one way to think about this is, you know, any

22 child who is born has the potential to have different,

23 various kinds of upbringing.  And what we want for

24 children is to have parents who are nurturing and caring,

25 to have schools that are supportive and nurturing of kids

1  in what they're trying to learn and who they're to become

2  and communities that are safe, healthy places where kids

3  can learn how to relate to peers and follow rules and be

4  good people, basically, and be able to regulate their

5  emotions whether there's sadness or fear or shame or

6  anger.

7       And when things go well, you know, we can think

8  of this as, you know, as a ten or the optimal.  You know,

9  anybody who is getting like a 79 or a ten, they're having

10 a pretty good childhood and not everything is perfect, but

11 they have been on a developmental course where, you know,

12 they're going to have these capacities to regulate their

13 emotions, including if they're in a really stressful

14 situation.  They may not be perfect at regulating them,

15 but they won't just completely lose access to their

16 executive functions.

17 *Q.*   So are you saying that it's simply a matter of

18 she didn't develop sort of the positive attributes that

19 would allow you to deal with stress in a complexity?

20 *A.*   Unfortunately, it's worse than that.  It's when

21 you've been subjected to this kind of unrelenting trauma

22 of all kinds throughout your entire childhood, and at the

23 hands of parents, then it actually, you know, kind of

24 warps your capacities and it stunts them in various ways,

25 so you can't remember all of who you are.  You can't

1   regulate your emotions and impulses when you're stressed

2   and you can't do all kinds of things and your system is

3   not functioning well.  You're just trying to block things

4   out.

5            You're just trying to get by, in Wendi's case, by

6   just taking care of other people, doing what they want.

7   And then when, you know, a very complex situation hits

8   with a lot of stress, it's kind of like the system crashes

9   and that CEO, that prefrontal cortex is just offline and

10  all that lifetime of trauma and any impulses that go with

11  it can just kind of come out and take over.

12       Q.   And when that lifetime of trauma comes kind of

13  flooding back, what does happen from the standpoint of the

14  ability to react appropriately?

15       A.   As I said before the lunch break, we know from a

16  lot of research that any of us in very stressful

17  situations, there are chemicals released in the prefrontal

18  cortex that impair it.  And if you've got a history of

19  major abuse and major deficits in these prefrontal

20  executive capacities, and you add that together, like I

21  said, you're not going to be able to think clearly.

22  You're not going to remember rules, laws, and you're just

23  reacting on impulse.

24       Q.   This place that Wendi was, then, as you've just

25  described, sort of entering adulthood, can that be -- can

1  that be fixed?  Can you get treatment and get better?

2      A.    You can definitely get treatment.  And that's

3  what a lot of my training is directed toward.  It takes

4  years.  What we've found is for people who have this

5  massive chronic abuse starting in infancy and going all

6  the way through their childhood, it takes years, and, you

7  know, literally, it can take years just to help the person

8  feel safe in their body and be able to navigate in certain

9  relationships in a safe way, let alone respond to like

10  really stressful situations.

11         So even -- even with the best, even if, say,

12  Wendi had gotten five to ten years of really good trauma

13  therapy, she still would have been vulnerable, as anybody

14  would.  She still would have been vulnerable to if the

15  right stress or if kind of the right buttons get pushed,

16  to really having this kind of breakdown and losing these

17  capacities.

18      Q.    Do you know whether Wendi received any such

19  treatment prior to Joe Andriano's death?

20      A.    No.  I mean, the records I saw and everything

21  I've heard, she maybe had a couple of visits to a

22  counselor through her employment or something like that,

23  but nothing approaching the kind of comprehensive

24  long-term treatment that would be necessary to help

25  someone recover from this kind of horrible trauma.

1    *Q.*   So, as far as you know, the person that you've

2   described who had all these sort of deficiencies and

3   inabilities to react appropriately, that same person would

4   have existed?  That was the same Wendi in the time leading

5   up to Joe's death?

6    *A.*   Yes.  And sadly, to this day, I mean, she hasn't

7   gotten really good treatment to this day.  And even some

8   of the clips we saw just a couple months ago with

9   Dr. Pitt, you can see her breaking down and I can't think

10  straight.  I mean, I can't remember things.  I can't -- so

11  to this day, she's sadly still quite harmed.

12         MR. NICKELS:  Thank you, Dr. Hopper.  I have no

13  more questions.

14         Your Honor, at this time, we would move for the

15  admission of the PowerPoint that we used in connection

16  with Dr. Hopper's testimony.

17         THE COURT:  Any objection?

18         MR. HAZARD:  I'm going to object to that.

19         THE COURT:  Let's see.  And is that marked as

20  a -- which exhibit?

21         MR. NICKELS:  It actually I think was not

22  premarked.  We are in the process of making copies.  We

23  can certainly add it to --

24         THE COURT:  I'm going to deny it, but I allowed

25  you to use it for demonstrative purposes.  Okay?

1           MR. NICKELS:  Okay.

2           THE COURT:  So I'll deny it, but I allowed it for

3    demonstrative purposes today during his testimony.  Okay?

4           MR. NICKELS:  Right.  Very good.

5           MR. ARNTSEN:  Your Honor, I'm just going to step

6    out a second just to call our next witness and arrange for

7    the next witness to come.

8           THE COURT:  Okay.  Can we continue with --

9           MR. ARNTSEN:  Oh, absolutely.

10          THE COURT:  Mr. Hazard, you're going to be doing

11   the questioning?

12          MR. HAZARD:  Yes, Your Honor.

13          THE COURT:  Okay.  I'll turn to Mr. Hazard.

14          Mr. Hazard.

15          MR. HAZARD:  Thank you, Your Honor.

16          THE WITNESS:  Can I get some water real quick?

17          THE COURT:  Okay.  Sure.

18

19                    CROSS-EXAMINATION

20   BY MR. HAZARD:

21     Q.   How much have you been compensated thus far for

22   your work and then also include whatever fee you're

23   charging for today's testimony, please?

24     A.   I don't have an exact number, but I would say

25   around total probably about $200,000.

1    *Q.*    And I see that you finalized your report and

2    signed it on February 14, 2012; is that correct?

3    *A.*    That's correct.

4    *Q.*    And you mentioned a number of things that you

5    have relied upon in that written report?

6    *A.*    Yes.

7    *Q.*    Including Dr. Woods' report; is that correct?

8    *A.*    Yes, I read it, and it was consistent with my

9    conclusions.

10   *Q.*    Sure.  In fact, you referred to his report

11   repeatedly in your written report?

12   *A.*    At the very end, yes, I do refer to that.

13   *Q.*    And Dr. Woods' report was also February 14, 2012?

14   *A.*    I don't -- don't know the date of his report, but

15   I'll believe that, sure.

16   *Q.*    And Dr. Woods states that he relied on your

17   report as well?

18   *A.*    Okay.

19   *Q.*    Well, who had the time machine?  I mean, if you

20   both relied on each other's reports, someone had to finish

21   before the other.  Do you know?

22   *A.*    Well, I saw a draft of his report before it was

23   done.

24   *Q.*    Was it a draft of his report?

25   *A.*    Oh, I don't know if there were any -- you know,

1   maybe it wasn't a draft.  I don't know.  But I know that

2   the attorneys didn't want me to see it until it was either

3   done or very close to done.

4       *Q.*   But whenever you saw it, you stated in your

5   report that it was Dr. Woods' report.  You didn't use the

6   word draft; correct?

7       *A.*   Okay.

8       *Q.*   Is that a yes?

9       *A.*   Yes.

10      *Q.*   Okay.  And that you relied upon it?  I know you

11  can't --

12      *A.*   Can I say word the rely?  I don't know.  Can you

13  show me where I say that?  Can you show me the document

14  where I say that?

15              THE COURT:  Is it marked as an exhibit?

16              MR. HAZARD:  It is an exhibit, Your Honor.  It's

17  admitted.

18              MR. NICKELS:  I think it's Exhibit 3 or 4.  3 is

19  the short version.  4 is the long.

20              THE COURT:  It looks like it's Exhibit No. 3

21  that has been admitted into evidence.  So why don't you

22  refer to Exhibit No. 3 admitted into evidence.

23      *Q.*   BY MR. HAZARD:  And, Dr. Hopper, the date of your

24  report is on the last page, Page 252, and it's the same

25  date that you put on your executive portion as well.

1      *A.*   All right.

2           MR. NICKELS:  Greg, will you be looking at the

3    longer version or the short version?

4           MR. HAZARD:  The longer version, yes.

5           THE WITNESS:  The longer version?  Okay.  I think

6    that was the conclusions.  I'm seeing the shorter one here

7    in 3.  The longer one is 4.

8           MR. HAZARD:  All right, then.

9           THE WITNESS:  So where are you referring to this

10   that I wrote the relying?

11          MR. HAZARD:  On the last page, Page 252 in your

12   long report.  The last page of No. 4.

13          THE WITNESS:  The exhibit I have here is unsigned

14   and dated.  But I remember -- I remember being done

15   substantially before that, but I remember signing it in

16   February.  But the date isn't on it.  My exhibit doesn't

17   have a signature or date on it.

18          THE COURT:  The courtesy copy that I guess

19   counsel provided to the Court in the notebook, under

20   Exhibit No. 3, it has a Page 27, which is a last date and

21   it's dated February 14, 2012, and purportedly signed by

22   Dr. Hopper.

23          Then there is a courtesy copy of Exhibit No. 4,

24   which appears to be a longer report, but it is not dated

25   and it is not signed on the last page.

54

1          THE CLERK:  Did you want me to check the

2   originals?

3          THE COURT:  Okay.

4          MR. HAZARD:  Our copy is signed.

5          MR. NICKELS:  Your Honor, I believe the reason

6   why No. 4 may not be signed is we actually attached that

7   as an appendix to his report.

8          THE COURT:  Right.

9          MR. NICKELS:  So we may have just had him sign

10   the 27-page version and this was an appendix.  There were

11   a couple of other things that were an appendix as well.

12   That may be why it's not signed.

13          THE CLERK:  Here is Exhibit 4.

14          THE COURT:  On the actual Exhibit No. 4 that has

15   been admitted into evidence, on the last page, it's not

16   signed and it's not dated.

17          Do you have Exhibit No. 3?

18          MR. HAZARD:  Judge, if we could mark this as

19   well.  This is signed.  It's a duplicate.

20          THE COURT:  Under Exhibit No. 3, which has been

21   admitted into evidence, on the last page, Page 27, it is

22   dated February 14, 2012, and purportedly signed by

23   Dr. Hopper.

24          Okay.  So, Counsel, you would like to have this

25   marked as an exhibit?

1          MR. HAZARD:  Yes, Your Honor.

2          MR. NICKELS:  And we have no objection to that.

3          THE COURT:  Okay.  Could we have that marked?

4          THE CLERK:  Yes.

5          THE COURT:  What number will that be?

6          THE CLERK:  I believe it will be 213.  213, sir.

7          THE COURT:  So then we'll have Exhibit No. 213

8 marked and by stipulation admitted into evidence.  And

9 what is 213?  Is that an exact copy of Exhibit No. 4

10 except for it's signed and dated on the last page?

11          MR. HAZARD:  Yes, Your Honor.

12          THE COURT:  Is that correct?

13          MR. NICKELS:  I have every reason to believe it

14 is.

15          THE COURT:  Okay.  But there is no objection;

16 right?

17          MR. NICKELS:  There is no objection.

18          THE COURT:  So Exhibit No. 213 for identification

19 is admitted into evidence.

20          And, Mr. Hazard, you may proceed.

21          MR. HAZARD:  Thank you.

22     Q.  BY MR. HAZARD:  And, Dr. Hopper, as you answered

23 earlier, that you do refer towards the end of your long

24 report a number of times to Dr. Woods' report.

25          So turning your attention to Page 242 on your

1   long report, which I think is Exhibit 4 --

2   *A.*   I have it.  I'm there.

3   *Q.*   -- Bates stamp 626?

4   *A.*   Coincidently, I happen to be on 242 already.

5   *Q.*   Okay.  And you can see, for example, No. 530, in

6   addition is addressed by Dr. Woods and then you?

7   *A.*   Uh-huh.

8         THE COURT:  Is that a yes?

9         THE WITNESS:  Yes.  I'm sorry.  Yes.

10  *Q.*   BY MR. HAZARD:  And, also, on Page 246,

11  Bates stamp 630, No. 540, again, you start that paragraph

12  with:  As discussed by Dr. Woods?

13  *A.*   Yes.

14  *Q.*   Correct?

15        THE COURT:  Go ahead and answer the question.

16        THE WITNESS:  I think I did say yes; didn't I?

17  *Q.*   BY MR. HAZARD:  All right.  I'm sorry.  I didn't

18  hear you.

19  *A.*   I'm sorry.

20  *Q.*   And then on Page 248, Bates stamp 632, the same

21  Exhibit No. 544, (sic) you start that paragraph:  As

22  discussed in detail by Dr. Woods, comma?

23  *A.*   Yes.  So, in each, I'm talking about he discussed

24  these things.  I'm aware of what he is saying is

25  consistent with what I discovered.

1      *Q.*    Sure.  But that's coming from his report?

2      *A.*    Sure.  Yes.

3      *Q.*    That was also dated February 14, 2012?

4      *A.*    Yes.

5      *Q.*    Now you mentioned that both in your report here

6   today the scope of your assignment.  And that was that you

7   were asked by counsel for Ms. Andriano to examine

8   psychologically traumatic aspects of Wendi's development

9   from birth to age 18; correct?

10     *A.*    Correct.

11     *Q.*    And you also state a particular focus were, one,

12  experiences of neglect, abuse and other potentially

13  traumatic mistreatment by her parents or other adults;

14  correct?

15     *A.*    Correct.

16     *Q.*    And, two, harmful effects of such traumatic

17  experiences and relationships on her mental health and

18  ways of relating to others; correct?

19     *A.*    Correct.

20     *Q.*    And that was your understanding of the scope, and

21  that's what you did; correct?

22     *A.*    Correct.

23     *Q.*    And so your focus was on traumas in Wendi's life?

24     *A.*    Correct.

25     *Q.*    You weren't focusing on the good things and

1  positive things in her life; correct?

2    *A.*   I asked about those.  I did not -- that was not

3  the focus of the main thing I was supposed to focus on.

4    *Q.*   Sure.  Thank you.  And your scope was also to

5  stop at age 18 when Wendi reached adulthood; correct?

6    *A.*   I was to look at -- as I said earlier today, I

7  was to look at her whole life and focus on birth to 18 in

8  terms of the traumatic events and also to look at the

9  effects that those traumatic events could have on her as

10  an adult.  So to understand the effects that they could

11  have on her as an adult, I needed to look past 18.

12    *Q.*   All right.  How many of those events did you

13  include in your actual written report in Wendi's life

14  after the age of 18?

15    *A.*   Which events?  You said those events.  Which

16  events are you referring to?

17    *Q.*   Yeah.  You mentioned that -- you just testified

18  that you had to consider things that happened after 18 in

19  her life in reaching your opinions; correct?

20    *A.*   Correct.

21    *Q.*   But in your report, there really isn't -- in your

22  actual written report, there isn't really mention of too

23  many things that happened in her adult life; is that fair?

24    MR. NICKELS:  I'm going to object to the extent

25  that I think he's mischaracterizing what the witness has

1  said.

2        THE COURT:  Overruled.

3        You can answer the question.

4        THE WITNESS:  Sure.  Can you repeat the question,

5  please?  I'm sorry.

6     *Q.*   BY MR. HAZARD:  What I'm getting at is in both

7  forms of your written report, Exhibit 3 and Exhibit 4, the

8  executive summary and the long form, you essentially stop

9  in that report at Wendi's age of 18 and then you start

10 making some conclusions and some opinions.  Is that an

11 accurate way of how your report was set up?

12    *A.*    In terms of the events that she experienced, yes,

13 I focus up to 18.  In terms of the consequences of those

14 events, my conclusions actually focus more on the

15 consequences of her -- as I said today, to this day, the

16 consequences on her functioning and relationships in

17 various ways.

18    *Q.*   Okay.  In your report, do you mention anything

19 about Wendi's version of the events on the night of

20 October 7th and going into the early morning hours of

21 October 8, 2000 in your actual written report?

22    *A.*   No.

23    *Q.*   Did you ask Ms. Andriano about the murder and the

24 events leading up to the murder?

25    *A.*   I did.

1     *Q.*   But you did not include that in your written

2  report; correct?

3     *A.*   Correct.

4     *Q.*   And you met -- you said you met with Ms. Andriano

5  a number of times.  I'll just ask you if these dates are

6  accurate.  And if you need to review a copy of your notes,

7  we can provide that for you.

8     *A.*   That would be helpful.

9     *Q.*   Okay.

10          (WHEREUPON, an off-the-record discussion ensued.)

11          MR. HAZARD:  Your Honor, I apologize.  I thought

12  these had been marked, but they haven't been.

13          THE COURT:  Show them to counsel before they're

14  marked.

15          (WHEREUPON, an off-the-record discussion ensued

16  between Mr. Hazard and Mr. Nickels.

17          MR. HAZARD:  Your Honor, I apologize.  Counsel,

18  although they might have an electronic copy, they want a

19  hard copy.  And if it's appropriate to take a brief

20  recess, we can make sure they can follow along.

21          MR. NICKELS:  Or at least give me some time to

22  pull it up.  That's going to take a few minutes for me to

23  get it up on the computer.

24          THE COURT:  Let's take a short break, then.

25  We'll take about a five-minute break.  Okay?

1          MR. NICKELS:  Okay.  Thank you.

2          THE COURT:  We'll be in recess.

3          (WHEREUPON, a recess ensued from 2:45 p.m. to

4     3:10 p.m.)

5          THE COURT:  This is CR 2000-096032, State of

6     Arizona vs. Wendi Elizabeth Andriano.

7          The record will reflect the presence of the

8     parties and counsel.

9          Just a couple of housekeeping measures.  I've

10    been told by my staff that some counsel feel that it's

11    warm in here today.  We'll note for the record that the

12    juvenile attorneys that practice before me, most of them

13    say it's too cold in here.  So I guess over the objection

14    of the juvenile attorneys, we'll indicate for the record

15    that the PCR attorneys are more warm-blooded than the

16    juvenile attorneys.

17         We'll do what we can.  We have to call downtown,

18    believe it or not, to get them to change the controls in

19    here.  So my judicial assistant is going to be working on

20    that.  So I don't want you to think that we're ignoring

21    your wishes.

22         And then, two, I think my staff -- my judicial

23    assistant contacted counsel with regard to the transport

24    of Mr. Neace.

25         MR. ARNTSEN:  Yes.

1          THE COURT:  It's my understanding that we'll need
2     Mr. Neace on Wednesday; correct?
3          MR. ARNTSEN:  Wednesday morning; correct.
4          THE COURT:  Then we're working on getting -- I
5     guess Mr. Neace has hearing impaired requirements.  So
6     we're working on getting some headphones for him.
7          MR. ARNTSEN:  Thank you.
8          THE COURT:  Okay.  Did we get everything taken
9     care of with regard to that exhibit?
10         THE CLERK:  I have them all marked now.
11         THE COURT:  So the record will reflect that
12    Dr. Hopper is still on the witness stand and we'll
13    continue with the cross-examination by Mr. Hazard.
14         Mr. Hazard.
15         MR. HAZARD:  Thank you, Judge.
16    *Q.*   BY MR. HAZARD:  And, Dr. Hopper, I'm just going
17    to ask you a question about and then put on the record the
18    actual dates that you met with Ms. Andriano.  And would
19    reviewing your notes refresh your memory and help you to
20    get that information on the record?
21    *A.*   Yes.
22         MR. HAZARD:  And if I may approach the witness,
23    Your Honor.
24         THE COURT:  Yes.
25    *Q.*   BY MR. HAZARD:  So, Dr. Hopper, I have for

1   identification purposes what have been marked as

2   Exhibits 214 through 225.  And, Dr. Hopper, each exhibit

3   deals with a separate day that you interviewed her.  You

4   testified earlier that you made six or seven actual trips,

5   but some of those visits took more than one day; correct?

6       *A.*   Correct.

7       *Q.*   And is that an accurate copy of your notes?

8       *A.*   Yes.  The bottoms are cut off of some, but

9   otherwise it appears to be so.  I would obviously need to

10  look at them all to know.

11      *Q.*   All I'm asking right now are some dates.

12      *A.*   Sure.

13      *Q.*   So I have that you met with Ms. Andriano on

14  June 8th and June 9th of 2010; is that correct?

15      *A.*   Yes, I see those.

16      *Q.*   July 6th of 2010?

17      *A.*   Correct.

18      *Q.*   And August 31st and September 1st of 2010?

19      *A.*   Correct.

20      *Q.*   November 2nd, 2010?

21      *A.*   Yes.

22      *Q.*   January 4th and January 5th of 2011?

23      *A.*   Yes.

24      *Q.*   April 11th, 12th and 13th also in 2011?

25      *A.*   Yes.

1      *Q.*    And then finally August 16, 2011?

2      *A.*    Yes.

3      *Q.*    And we'll come back later to these notes.  I'll

4   have some questions later.

5      *A.*    Okay.

6      *Q.*    And you mentioned that approximately 52 hours in

7   total over those various visits is how much you spent

8   interviewing Ms. Andriano; is that correct?

9      *A.*    Yes.

10     *Q.*    You mentioned that you've had about eight or so

11  of these types of cases.  Does that mean capital cases?

12     *A.*    Capital mitigation kind of cases, yes.

13     *Q.*    In the last ten or so years; correct?

14     *A.*    Yes.

15     *Q.*    And I take it you've also worked on the

16  mitigation side; is that correct?

17     *A.*    In capital cases; correct.

18     *Q.*    Okay.  Now you've concluded that Ms. Andriano has

19  suffered various types of trauma, including sexual abuse?

20     *A.*    Yes.

21     *Q.*    And you defined sexual abuse kind of broadly to

22  include things like emotional or verbal offensive

23  statements or an environment that might be uncomfortable;

24  is that correct, that's sexualized?

25     *A.*    When it's an inappropriate act toward a child and

1   it involves something sexual, consistent with how it's

2   defined in DSM, for example, yes, that's correct.

3       Q.   And you also concluded that there's actual --

4   you've concluded that Ms. Andriano suffered actual

5   physical sexual abuse when she was a child; correct?

6       A.   The evidence I have to me is consistent with

7   that.

8       Q.   All right.  Let's talk about that evidence.  Were

9   there any police reports that documented Ms. Andriano's

10  alleged misconduct -- sexual misconduct against

11  Ms. Andriano?

12      A.   No.

13      Q.   And any other law enforcement records like Child

14  Protective Services reports?

15      A.   As is typical with most of these cases, no.

16      Q.   No medical findings of course to support?

17      A.   No.

18      Q.   No court records?  For example, the juvenile

19  history of Ms. Andriano?

20      A.   No.

21      Q.   Or family court history?

22      A.   No.

23      Q.   And, in fact, the evidence that you have comes

24  from statements made by people; is that accurate?

25      A.   Correct.

1    *Q.*   And these statements were all made by people who
2    have at least come to your attention after Ms. Andriano
3    was sentenced to death?
4    *A.*   Came to my attention?  Yeah, because I didn't --
5    *Q.*   I'll clarify that.
6    *A.*   Yes.
7    *Q.*   And there's no documentation to support that --
8    aside from some things that may have happened with Wendi's
9    biological father, but as it relates to Alejo Ochoa, no
10   documents that you found to support that anyone came
11   forward until after Ms. Andriano was sentenced to death?
12   *A.*   Correct.
13   *Q.*   Now with respect to Wendi's biological father,
14   that evidence was presented at her trial; correct?
15   *A.*   That's my understanding.
16   *Q.*   Well, you did review some transcripts?
17   *A.*   Yes, I did.  A massive amount of data.  I can't
18   remember everything I saw.
19   *Q.*   Sure.  And do you disagree that, for example,
20   Donna Ochoa testified during Wendi's trial that she was
21   convinced that her biological father abused Wendi because
22   he was a convicted child molester and he had access to
23   her; is that correct?
24   *A.*   Correct.
25   *Q.*   But even as it relates to Skip, Wendi's

1   biological father, there is nothing to document that any

2   abuse actually happened to Wendi?

3       A.   There's the evidence I cited.  In terms of

4   official documents contemporaneously, there is none, as is

5   common in these cases.  It's remarkable when there is

6   documentation.

7       Q.   It's mostly an argument and an inference that

8   because he had demonstrated pedophilic tendencies that

9   caused him a prison sentence against another girl and

10  because he had access to Wendi, that the inference is he

11  could have abused her?

12      A.   Yes.  But as you may have heard, I wasn't -- I

13  actually think more like with the brothers than him.  I

14  didn't focus on Skip as a sexual abuser.

15      Q.   All right.  But it's the same argument with the

16  brothers?  Because of their histories, based on your

17  interviews; correct?

18      A.   My interviews and multiple reports -- convergent

19  reports from several other people.

20      Q.   It still boils down to because they had

21  pedophilic tendencies, they must have abused Wendi because

22  they had access to her?

23      A.   I didn't say they must have.

24      Q.   They could have?

25      A.   I would say they were likely to have.

1    *Q.*    Right.

2    *A.*    Highly likely.  But I can't say they absolutely

3  did, of course.

4    *Q.*    Nevertheless, you still called and you mentioned

5  that that's very similar to what you have as relates to

6  Alejo?  We have statements made by people alleging that

7  Alejo did certain things; correct?

8    *A.*    Correct.

9    *Q.*    And you call Alejo a pedophile in your report?

10   *A.*    What I do is I rely on a large mass of data.  If

11 you want to take any particular person and challenge their

12 credibility, but it would have to be a huge conspiracy of

13 many people telling me that --

14   *Q.*    Doctor, that wasn't my question.

15   *A.*    Okay.  Sorry.  Yes.

16   *Q.*    You called Alejo Ochoa a pedophile in your

17 report; correct?

18   *A.*    Uh-huh.

19        THE COURT:  Is that a yes?  Make sure you give a

20 verbal response.

21        THE WITNESS:  Yes.  Yes.

22   *Q.*    BY MR. HAZARD:  And today you called him a sexual

23 predator; is that correct?

24   *A.*    Yes.

25   *Q.*    Are you making a pedophilia diagnosis?

1      *A.*    Am I making a pedophilia diagnosis?  I guess you

2  could say that I have, yeah.

3      *Q.*    Pedophilia is a clinical term; correct?

4      *A.*    It is.

5      *Q.*    Based on the evidence that you have, is it your

6  opinion that Alejo Ochoa meets the clinical definition of

7  a pedophile?

8      *A.*    Based on all the evidence I've seen, yes.

9      *Q.*    Even though you have no law enforcement reports

10  documenting that people reported Alejo Ochoa of doing

11  improper things with kids; correct?

12      *A.*    Law enforcement reports do not constitute reality

13  in sexual abuse.  I'm sorry.  It's just they're incredibly

14  rare in sexual abuse cases.  So if I was to only rely on

15  law enforcement reports to make this determination when I

16  have a wealth of other evidence, I would consider that

17  malpractice, to tell you the truth.

18      *Q.*    Today no one has reported to the police still

19  that anyone reported to the police that Alejo Ochoa, to

20  your knowledge, molested any child; correct?

21      *A.*    Correct.  I wish -- I wish someone had.

22      *Q.*    And Wendi Andriano in your interviews -- many

23  interviews with her, you spent a lot of time talking to

24  her about Alejo Ochoa; correct?

25      *A.*    Correct.

1      *Q.*    And talking about the topic of sexual abuse in
2   the many ways that you defined it today; correct?
3      *A.*    Correct.
4      *Q.*    And as it relates to actual sexual misconduct,
5   child molestation, Wendi has denied that Alejo Ochoa has
6   ever touched her inappropriately; correct?
7      *A.*    No, that's not correct.
8      *Q.*    It's not correct that she denied?
9      *A.*    She said:  I don't remember.
10     *Q.*    Okay.  Do you remember interviewing her on
11  April 12, 2011?
12     *A.*    I'm sure I could retrieve those memories if I had
13  some documentation to help me do that.
14     *Q.*    Sure.  When you asked her if Alejo Ochoa had ever
15  done anything over-the-line to her, in your words --
16     *A.*    Uh-huh, yes.
17           MR. HAZARD:  And, Your Honor --
18           THE COURT:  Yes.
19           MR. NICKELS:  Is it the 12th or the 11th?
20           MR. HAZARD:  It's the 11th.  April 11th.
21           THE COURT:  April 11th?
22           MR. HAZARD:  April 11th.  And it's Exhibit 222.
23  If I may approach the witness.
24           THE COURT:  Yes.
25           MR. NICKELS:  Greg, if you could tell me where

1   you're going to go and if it's on the first or second page

2   of the notes.  I guess there's nine pages.  So whatever

3   page you'll be on.

4          MR. HAZARD:  It's dated April the 12th.

5   April the 12th.

6          MR. NICKELS:  Oh, now it's April 12th?

7          MR. HAZARD:  It's April the 12th.  I apologize.

8          MR. NICKELS:  Okay.

9          MR. HAZARD:  So it will be 223.

10          THE COURT:  So it will be Exhibit No. 223 marked

11   for identification.

12          MR. NICKELS:  Do you know the page number you'll

13   be on, or if it's multiple, just so I can follow along?

14          MR. HAZARD:  And it's right on that very first

15   page, which is labeled No. 6 on your notes at the top.

16          THE WITNESS:  Yes.

17    *Q.*   BY MR. HAZARD:  You mentioned things that seem to

18   be over-the-line and she talked about sexual overtones

19   that you've testified to; correct?

20    *A.*   Can you point out to me where on the page?

21    *Q.*   It's about two-thirds of the way down.

22    *A.*   Okay.  I see that.  Is there a question about

23   that?

24    *Q.*   Is that what she told you in reference -- on that

25   page?

1    *A.*    Yes.   I asked her that question I think the day

2    before, also.   In this case, I asked it again and she --

3    what I wrote in my notes is everything was sexual

4    overtones on it always, yes; correct.

5    *Q.*    And she also later said, quote:   I can't think of

6    any times my father touched me; correct?   You do remember

7    that?

8    *A.*    Well, of course.   Of course.   I mean, I showed

9    you the videotape of her saying similar things with your

10   expert.

11   *Q.*    And she also stated, I didn't really have

12   specific things, and later said more of emotions and

13   feelings; correct?

14   *A.*    Where are you referring to now?

15   *Q.*    The same context in the same section on that

16   first page.

17   *A.*    Well, I would like to be able to see it.

18          THE COURT:   One at a time.   One at a time.

19          You can approach the witness if you would like.

20          THE WITNESS:   Yeah, you can approach me.

21          MR. NICKELS:   Your Honor, may I approach just to

22   see where he's pointing as well?

23          THE COURT:   Yes.

24          (WHEREUPON, an off-the-record discussion ensued.)

25          MR. NICKELS:   Starting with right here?

1          MR. HAZARD:  Yes.

2          MR. NICKELS:  Okay.

3     *Q.*   BY MR. HAZARD:  And that's when she states:  I

4    can't think of any time my father touched me; correct?

5     *A.*   Correct.

6          THE COURT:  When she made reference to that, is

7    she talking about the biological father or the stepfather?

8          THE WITNESS:  Alejo at that point.

9          THE COURT:  Okay.  I just wanted to make sure I

10   understood.

11         THE WITNESS:  Stepfather.

12         THE COURT:  Okay.

13    *Q.*   BY MR. HAZARD:  And she never said at any time to

14   you that I can remember a specific instance where Alejo

15   sexually, physically abused me; correct?

16    *A.*   Correct.

17    *Q.*   And you talked a number of days about those

18   topics?

19    *A.*   Yes.  I very systematically went through in a way

20   that research suggests is the least suggestive way to try

21   to elicit memories of these things, particularly in people

22   who have difficulty retrieving them like Wendi Andriano.

23    *Q.*   Okay.  But she didn't have difficulty retrieving

24   other things when you talked to her; is that correct?

25    *A.*   Correct.

1    *Q.*    And, in fact, when you talked to her about the

2    incident, the murder, when you met with her on

3    September 1st, 2010, her memory of that event was much

4    better than it was when she was interviewed by Dr. Pitt;

5    correct?

6    *A.*    Her ability to access those memories was better.

7    And it's always easier to access painful traumatic

8    memories when you feel safe because of the effects of the

9    prefrontal cortex that I've been talking about throughout.

10    *Q.*    Well, let's talk about that.  Did she know that

11    you were there hired by her own attorneys?

12    *A.*    Yes.

13    *Q.*    Did you tell her that you were there to help her?

14    *A.*    I told her the scope of the work I was to do to

15    try to understand what she had been through and how it

16    affected her.

17    *Q.*    Right.  And she told you with many details about

18    her account of what happened when she murdered her

19    husband; correct?

20    *A.*    It wasn't quite like that.  That's not an

21    accurate characterization.

22    MR. HAZARD:  All right.  May I approach with

23    Exhibit No. 218?

24    THE COURT:  Yes.

25    *Q.*    BY MR. HAZARD:  Now those are your notes on your

1   interview with Ms. Andriano on September 1st, 2010;

2   correct?

3       *A.*   Correct.

4       *Q.*   And on the second page, about a quarter of the

5   way down, a starting place, do you see that part?

6       *A.*   Yes.

7       *Q.*   Now Ms. Andriano was able to talk at length about

8   Joe's diagnosis and with many details.  For example, that

9   he had a 20 percent chance -- definitely less than a

10  50 percent chance of survival; correct?

11      *A.*   Correct.

12      *Q.*   She talked about the CAT scan that they went to

13  and found out the horrible news?

14      *A.*   Correct.

15      *Q.*   All right.  They found out about the tumor, how

16  it had doubled in size?

17      *A.*   Right.

18      *Q.*   Lots of details about his health -- specific

19  details; correct?

20      *A.*   Yeah, though --

21      *Q.*   Would that be distressing, do you think?

22      *A.*   Not as distressing as killing someone with a

23  barstool, not even close.

24      *Q.*   Okay.  We'll get to that.  But, Doctor, she loved

25  her husband.  So hearing that kind of news would be very

1    distressing; would it not?

2        A.    I don't think that memory works quite the way

3    you're implying here.    There is some misunderstanding.

4        Q.    Okay.    You mentioned that things that are

5    distressing to a person who had the trauma that Wendi

6    experienced in childhood, that that causes memory loss.

7    That was your testimony today?

8        A.    It was more precise than that.

9        Q.    All right.    Well, clarify for me.

10       A.    I would love to.    So research has shown -- and

11   you can see this clinically and you can see it in the tape

12   of Wendi, especially if you have the whole tape -- that

13   there's different degrees of stress, and different degrees

14   of stress, there's different degrees of impairment of the

15   ability to retrieve memories using your prefrontal cortex.

16            Also, with different degrees of stress, there are

17   potentials for these phenomena called dissociation, or for

18   literally blocking memories out from being able to be

19   retrieved.    And there's, you know, a lot of neuroscience

20   and research on that in the top journals.

21            So to equate, quite distressing news about the

22   cancer.    But it was something that they had talked about

23   over and over again and were living with for months.    One

24   of the things we know is that stressful, awful things,

25   when they repeat them over and over again, is what we call

1    habituation.  It's less stressful.  So ten years later,

2    that's not even as close to as stressful as is an incident

3    of horrible violence and blood everywhere.  For the

4    reasons I've described, the way that affects the brain,

5    it's just -- it's a whole another level.  It's a

6    completely different matter.  So to equate them is not

7    correct.

8         Q.    She then talks about trying to get life insurance

9    for Joe in your interview; correct?

10        A.    I remember that she talked about that.

11        Q.    And her story, when she talked to you on

12   September 1st, 2010, was the same story that she told on

13   the witness stand at her trial?  And that was Joe wanted

14   the life insurance; that was his idea; correct?

15        A.    Correct.

16        Q.    And that she just made a couple of phone calls to

17   try to get it, but had no intent to defraud anybody;

18   correct?

19        A.    Now you're referring to --

20        Q.    Just that's what she said, yes?

21        A.    When?  Because you're saying -- it seems like

22   you're saying she said the exact same words on the witness

23   stand and with me.  And I don't remember those exact words

24   and I don't -- I'm not sure that's an accurate

25   characterization of what I heard from her and what's in my

1  notes.

2     Q.   At her trial, and on September 1st, 2010 in your

3  interview with her, she denied trying to defraud an

4  insurance company, that it was her own idea, that this was

5  something that Joe wanted and she was doing it just to

6  please him; correct?

7     A.   To please or help him, yes, that's definitely --

8  that's the essence of what she said; correct.

9     Q.   And, again, she gave you specific details about

10 that account?

11    A.   She gave me some specific details, yes.

12    Q.   She also talked later about just that Joe

13 spending time on the boat and growing distant with her;

14 correct?

15    A.   Yes.

16    Q.   And then turning the page --

17    A.   What page are you on now?

18    Q.   This would be the --

19    A.   Does it say 5 up in the corner maybe or --

20    Q.   This would be the fourth page.

21    A.   Okay.

22         MR. NICKELS:  What page?  Does it say 4 at the

23 top, Greg?

24         THE WITNESS:  No.  You just have to flip through

25 to get to the fourth; right?  Is that what you mean?

1   2, 3 --

2           MR. NICKELS:  What page?  What is the first word?

3           THE COURT:  You can approach and show him.

4           THE WITNESS:  I don't mean to help.

5           THE COURT:  Hold on a second.  You can approach

6   and show him and also show counsel.

7           MR. HAZARD:  Sure.  It starts with:  I agreed.

8           THE WITNESS:  Oh, okay.

9       Q.   BY MR. HAZARD:  I agreed to help him?

10      A.   Yes.

11      Q.   Are you there?

12      A.   Yes, I am.

13      Q.   I agreed to him because I didn't feel like there

14   was any other choice.  That was her statement to you;

15   correct?

16      A.   Yes.  And I know because when I put things in

17   quotes, that means I'm certain that that's what she said.

18   You know, I'm pretty certain.  I try to be very careful

19   about putting quotes around things.

20      Q.   And she then goes on to talk about Joe losing his

21   hair and the effects of cancer and their decision that she

22   claims that Joe and she decided to have this suicide pact

23   where they would obtain poison; correct?

24      A.   Correct.

25      Q.   And, again, she gave you details of that, of

1   everything that she did for Joe to obtain that poison?

2      *A.*   I doubt she told me everything, but she certainly

3   gave me some details.

4      *Q.*   Okay.  She mentioned about October 7th about the

5   dinner she attended; correct?  The party she went to

6   earlier and the dinner later in the evening?

7      *A.*   Just for -- did you flip a page or should we go

8   to the next page?  Because I would like to be able to

9   follow along to what you're pointing to as well as answer

10  your questions.

11     *Q.*   And on Page 7 --

12     *A.*   The one with the No. 7 on it?

13     *Q.*   Yes, the one with the No. 7, she states that on

14  the car ride home, he, meaning Joe, said, quote:  I want

15  to do it tonight, meaning, commit suicide; correct?

16     *A.*   Correct.  I can't find it on here, but I remember

17  her saying that to me.  I remember seeing my notes

18  previously.

19     *Q.*   And, again, maybe not the exact words, but this

20  is also consistent with her trial testimony, to your

21  memory as well; correct?

22     *A.*   Correct.

23     *Q.*   So she's again able to give you details about

24  what started to become the reason she's on death row, the

25  events that led up to her murdering her husband?

1    *A.*    Exactly.  As I explained before, these wouldn't

2  be things we wouldn't expect to have details of, or at

3  least certainly more than in the midst of the worst horror

4  of it.

5    *Q.*    You would agree she had a much harder time

6  talking about that when she was being interviewed by

7  Dr. Pitt?

8    *A.*    About the crime?

9    *Q.*    Yes.

10    *A.*    Oh, yes.

11    *Q.*    Okay.  She also on that same page started talking

12  about how she and Joe got the capsules -- the gel capsules

13  and together on the back patio they put poison in the

14  capsules; correct?

15    *A.*    Correct.

16    *Q.*    She also then, turning the page, started talking

17  about the sexual activity that she had with Joe before the

18  murder; correct?

19    *A.*    Correct.

20    *Q.*    And she gave a number of details about the use of

21  prophylactics and so forth; correct?

22    *A.*    Correct.

23    *Q.*    She talks about, as that page continues going

24  onto Page 8, the next page, about Joe actually taking the

25  poison and waiting for his fate; correct?

1    *A.*    Correct.

2    *Q.*    And, again, that was very consistent with her

3    testimony at trial; is that correct?

4    *A.*    Correct.

5    *Q.*    All right.  She talks about him, continuing on

6    Page 8, remembering Joe throwing up in the living room;

7    correct?

8    *A.*    Again, I don't see it, but I remember her telling

9    me that.  I remember seeing it when I reviewed my notes;

10   correct.

11   *Q.*    All right.  And she also talks about -- she

12   refers to that that's about when she told Joe that she was

13   having an affair or that she had an affair, going onto the

14   next page; correct?

15   *A.*    Can you just -- I want to make sure I understand.

16   Can you repeat that question?

17   *Q.*    Yes.  Going down to the bottom of Page 8 onto the

18   top of Page 9, the next page, that's when she states after

19   he got sick, I told him about Travis, never about Ray;

20   correct?

21   *A.*    Correct.

22   *Q.*    And she's referring to a man she had an affair

23   with; correct?

24   *A.*    Yes, a brief one.  Travis Black I think was his

25   name.  Something like Travis, yeah.

1    *Q.*    So she remembered all of that?

2    *A.*    As would not be unexpected, as I explained

3    before, and as I often explain to military and police

4    investigators about how memory works, yeah, that's not

5    surprising.

6    *Q.*    All right.  Then she starts talking about how

7    angry Joe became.  And this, again, is very much in line

8    with the way she testified in her trial; correct?

9    *A.*    Correct.

10    *Q.*    And that Joe attacked her; correct?  It's still

11    the same page, kind of down in the middle.

12    *A.*    Uh-huh.

13         THE COURT:  Is that a yes?

14         THE WITNESS:  Well, what I want to do is I want

15    to look at the text because I don't know if the word

16    attacked is in there or exactly how she described it to

17    me.

18         MR. HAZARD:  All right.

19         THE WITNESS:  But she was certainly -- she

20    described him as extremely angry in a way that she hadn't

21    encountered before.  I don't -- do you want to point me to

22    where you're --

23    *Q.*    BY MR. HAZARD:  Your notes state the next thing:

24    I don't even want to say this.  He backed me against the

25    wall, busted pots into the wall next to my head, thinking

1 he had hit my head -- or thinking he had hit me.  He had

2 held me down, but nothing like that.  It was crazy.

3 Correct?

4      *A.*   Give me a second to -- I was trying to follow you

5 and I'm just finding it now.  Okay.  Correct.

6      *Q.*   All right.  Then further down, oh, about ten rows

7 up from the bottom, she starts:  Then he was out.  I tried

8 to play it out in my head.  I've had people show me

9 photos, read reports.  Do you see that part?  And that's

10 what she said to you?

11     *A.*   Correct.

12     *Q.*   Then she states two things she knows are not

13 true:  Smothering him with a pillow.  And you write:  And

14 belt; correct?

15     *A.*   Correct.

16     *Q.*   And does that mean or was she referring to her

17 planting the State's evidence that she planted the belt

18 after murdering Joe Andriano?  Is that your understanding

19 of what she was referring to when she mentioned the belt?

20     *A.*   I'm trying to remember back then.  But that

21 sounds plausible, but I can't remember what I thought at

22 the time and my notes don't fully reveal what I -- what

23 that meant.  It's plausible.

24     *Q.*   So she pointed out details of the event and also

25 memories of what she disagreed with that was presented at

1  trial, that was different from her memory?  Is that

2  accurate or her version?

3      *A.*    That was a compound question.  I think there were

4  two parts.  Can you break it down?

5      *Q.*    No, it was a lousy question.  You called me on it

6  and that's fine.  I'll ask it again, Doctor.

7      *A.*    Okay.

8      *Q.*    She pointed out to you that there were things she

9  disagreed with of the State's evidence, arguments made by

10  the State, and this was different from her account of what

11  happened on that night; correct?  Smothering him with a

12  pillow?

13      *A.*    And the belt.

14      *Q.*    And the belt.  Correct?

15      *A.*    Correct.

16      *Q.*    And those are both very distressing things; are

17  they not?

18      *A.*    Well, yeah.  If they happened, I would think that

19  would be -- well, what do you mean those are distressing

20  things?  You described the belt as something that was

21  planted.  So I don't know what you're referring to.  What

22  would be distressing?  The smothering, certainly.

23      *Q.*    Well, she's remembering her husband being a

24  bloody mess and dead; correct?  To conjure up those

25  memories?

1      *A.*    Yeah.  Well, I don't know if that was what she
2   was remembering right there when she was saying two things
3   she knows are not true.  If when she remembers that, as we
4   saw in the videotape, when her brain is full of images of
5   the blood, she breaks down and she can't hardly
6   communicate anything.  So I don't think she was
7   remembering that.  But that would not be consistent with
8   how -- again, how the brain works.
9      *Q.*    She then on the next page, she starts talking
10  about calling 911 and then calling her friend later --
11  calling her friend Chris to come over; correct?
12     *A.*    Correct.  I would also say that one thing she
13  said repeatedly and you can see it in the notes is after
14  that point where she confessed to the affair, she says she
15  has a lot of concerns about her memory and how accurate it
16  is.  She feels like there were so many questions asked of
17  her, she doesn't express confidence in barely anything.
18  But I guess she said she was sure about the pillow and the
19  belt.  But, in general, all of this had the caveat from
20  her of:  I am not sure.  I don't know.  I fear that I
21  could get it wrong.  And something she said about her
22  stepfather, too:  I don't want to say things that aren't
23  true because she's had the experience of an investigation
24  of --
25     *Q.*    Where does she say that, Doctor, in this context

1   of the notes that we just went through?

2      *A.*   I was providing context for the -- for what's

3   going on here because it didn't -- the way you were

4   characterizing it, it wasn't --

5      *Q.*   Dr. Hopper, did she say --

6      THE COURT:  One at a time.  One at a time.

7      MR. NICKELS:  Yeah, I would ask you to let the

8   witness finish his answer.

9      MR. HAZARD:  Nonresponsive, Your Honor.

10     THE COURT:  Ask your next question.

11     THE WITNESS:  I'm sorry.

12     THE COURT:  One at a time.

13     *Q.*   BY MR. HAZARD:  Did she state -- in panic state

14  before throwing up or throw up, he said call 911; correct?

15     *A.*   Correct.

16     *Q.*   She then goes on to state:  Actually, he wanted

17  me to take him.  She's talking about the hospital;

18  correct?

19     *A.*   Correct.

20     *Q.*   That's how he got in the living room and that's

21  why I called Chris because I wanted her to stay with the

22  kids; correct?  That's what she said to you?

23     *A.*   Correct.

24     *Q.*   Then she goes on and says:  After Chris got

25  there, called 911 because he couldn't get up and walk;

1 correct?

2    *A.*   Yes.

3    *Q.*   And then, finally, she says she can't remember

4 what she said in the first of the two 911 calls, but she

5 does remember that the next was much longer; correct?

6    *A.*   Correct.

7    *Q.*   Now these are very minute details of what had to

8 be a very distressing time for her, and, yet, she

9 remembers the length of a second phone call to 911?

10    *A.*   She remembers it was longer.  Time estimation can

11 be --

12    *Q.*   Then she states --

13    *A.*   -- very sensitive.

14    *Q.*   All right.  Then she states that when the EMTs

15 arrive, Joe said, quote:  I don't want that.  She said

16 that; correct?

17    *A.*   That's what she said to me; correct.

18    *Q.*   And he, meaning Joe, didn't want her to open the

19 front door because he thought they would want to, it says

20 check him, meaning take him to the hospital; correct?

21    *A.*   I think check him would be to determine whether

22 he needs to go to the hospital.

23    *Q.*   Sure.

24    *A.*   But, you know, look at him.  They're EMTs.  Sure,

25 check him out.

1    *Q.*    Sure.  And that was her statement to you?

2    *A.*    Correct.

3    *Q.*    Again, this was all -- she was just doing what

4    Joe was telling her to do and giving specific details

5    consistent with her testimony at her trial; correct?

6    *A.*    She was attempting to give me the best memory she

7    could of the events, while giving me the caveat at the

8    beginning was she was shaky about her confidence in these

9    things.

10   *Q.*    And you would agree that the testimony of her

11   friend Chris was much different; correct?

12   *A.*    Correct.

13   *Q.*    And, in fact, Wendi, in another context later

14   mentioned to you that Chris let down.  Do you remember her

15   saying that to you in a different interview?

16   *A.*    Something like that.  I don't -- you know, I

17   would want to see the exact thing to really confirm it.

18   *Q.*    Sure.

19   *A.*    But I remember that, something along those lines.

20   *Q.*    Do you remember her saying that Chris was

21   probably going to get fired from her job and Wendi saved

22   her job, and, yet, she turned on me at trial?  Do you

23   remember that conversation?

24   *A.*    I remember something to that effect, yeah.

25   *Q.*    She then -- still on Page 9; right?

1    *A.*   Hang on.  The one that has the 9 in the corner of
2  it?

3    *Q.*   Yes.  About two-thirds of the way down, she
4  states:  They were saying there were so many blows to the
5  back of his head, but it wasn't that way.  Correct?  She
6  said that to you?

7    *A.*   Well, you're leaving out the second half of that
8  statement.

9    *Q.*   No, I will finish it.  But she said that to you?

10   *A.*   Oh, okay.  She did.

11   *Q.*   It was my attempt to help him; correct?

12   *A.*   Correct.  If I could --

13   *Q.*   So she remembers from her trial the evidence that
14  was presented that Joe had at least 23 blows to the back
15  of his head from that barstool; correct?  That's what
16  she's referencing?

17   *A.*   The evidence from her trial, yes.

18   *Q.*   And that's what she's referencing, and she's
19  telling you that it wasn't that way?

20   *A.*   Well, but if you put it together with that second
21  one, I can explain.  And I was there and I heard her say
22  this to me what she actually meant.  So it's not -- it's
23  not the way you're interpreting it.  And I could clarify
24  what my understanding is of what it means.

25   *Q.*   Sure.  I suppose one way she could be stating it

1  is that it was 23 blows to the head and that's what it
2  took to kill him.  Is that one way to interpret it?  In
3  order to help him?

4      *A.*   She remembers -- yeah, she remembers -- my memory
5  of this what she said to me was that she remembers him
6  suffering from the other blows that she had given him and
7  just trying to get it over with.

8      *Q.*   And, Doctor, I agree with your interpretation
9  because the very next line, she states:  Not like in the
10 books and TV; correct?

11     *A.*   That's pretty much what everybody I've ever
12 interviewed who's murdered someone says:  It's not like
13 TV.

14     *Q.*   Oh, my God, that didn't work.  That's her next
15 statement to you; correct?

16     *A.*   Yes.

17     *Q.*   I have to do that again.  So she was referring to
18 hitting Joe -- defenseless Joe over the head with the
19 barstool again?

20     *A.*   Yeah.

21     *Q.*   That's your understanding?

22     *A.*   Yes.

23     *Q.*   And you don't think that's a distressing fact
24 that she remembered?

25     *A.*   Yeah.  There's this paradox in the way traumatic

1  memories work.  On the one hand, they can be etched in

2  very, very strongly.  We know the neurochemistry of that.

3  And, on the other hand, they can sometimes be

4  inaccessible.

5       And even when they're etched in very strongly --

6  again, this is something I have to teach investigators all

7  the time -- traumatic memories are encoded as fragmentary

8  sensations.  They lack context.  They lack time

9  information and they're missing lots of pieces.  So this

10  is perfectly consistent with that.  Certain pieces can be

11  well-encoded, where others can't, and then there can be

12  distortion.

13       As I said, all of this, she said there were

14  things she wasn't sure of.  So it's consistent with how

15  memory works in these situations, definitely, and how

16  traumatic memory gets encoded and retrieved from the

17  brain.

18  Q.  All right.  The point is, though, she said all of

19  these things to you on September 1st, 2010, or you would

20  not have documented them; correct?

21  A.  Correct.

22  Q.  And you documented them accurately to the best

23  of your ability?

24  A.  Exactly, the best I could.  You know, I'm a

25  note-taker.  I'm not a stenographer.  But, you know --

1    *Q.*   Sure.  You didn't video- and audio-record these

2  interviews; is that correct?

3    *A.*   No, I did not.

4    *Q.*   But as you've testified today, these are as

5  accurate as you could by taking notes of her statements?

6    *A.*   Yes.

7    *Q.*   And that is markedly different than the

8  information she gave to Dr. Pitt just three years later

9  in November of 2013; correct, with that same incident?

10    *A.*   Yeah, not surprisingly if you look at how he

11  conducted the interview.  I mean, it's not one that would

12  lead to someone being able to retrieve information.  It's

13  kind of actually a textbook case of how to not interview

14  for traumatic memory that I could use to teach the

15  investigators that I teach.

16    *Q.*   Well, we'll hear from Dr. Pitt at the end and the

17  judge can decide.

18    *A.*   Yeah.  Yeah.

19    *Q.*   Now you would agree that Alejo Ochoa is immature?

20  In fact, I think you testified to that earlier today?

21    *A.*   Yeah, I mean, there's no one who doesn't say that

22  about Alejo who's met him.

23    *Q.*   In fact, Wendi repeatedly has said to you and

24  others that she felt she had babied him.  If fact, she

25  used the term babied him a lot in how she related to

1  Alejo Ochoa; correct?

2      *A.*   Yeah, it was the term in the family, babying him,

3  babying him.

4      *Q.*   Well, and it's a term that Wendi used herself?

5      *A.*   Oh, yeah.

6      *Q.*   Did she also tell you that she doesn't remember

7  Alejo ever being in bed with her and another friend at the

8  same time; correct?

9      *A.*   She did, yeah.  She told me she didn't remember.

10 Even when we gave her -- at the very last stage, we tried

11 to give her the details that Jeri Lynn reported, and she

12 still couldn't remember it.

13     *Q.*   Did she also say in one of her interviews that,

14 quote:  She didn't live her life in fear of spankings by

15 either Donna or Alejo?

16     *A.*   She did say that.

17     *Q.*   Do you remember her saying that?  Is that yes?

18     *A.*   Yes.

19     *Q.*   And Wendi said that spanking wasn't an everyday

20 occurrence, maybe twice a week that she can recall on

21 average; is that accurate?

22     *A.*   But not just her, but Alejo and Donna described

23 her as overall very compliant and not needing to be beaten

24 very often, is the way they put it.

25     *Q.*   And you use the term beating, but Alejo and Donna

1  and Wendi all used the term spanking; is that accurate?

2      *A.*    No.  They used the term swatting.

3      *Q.*    All right.  You don't think Wendi has used the

4  word spanking as well?

5      *A.*    Not that I remember.  It was a swat, swats.  I

6  might have -- it might be somewhere in there.  But

7  swatting was the term that was used in the cult to

8  describe these beatings.  Even if it was 15 beatings, you

9  know, 15 hits with a huge paddle, they called it swats.

10     *Q.*    Did Wendi spank her own children?

11     *A.*    Not that I'm aware of.

12     *Q.*    She denied that; right, in your interviews with

13 her?

14     *A.*    I don't remember that specific exchange.  If you

15 want to point me to it.

16     *Q.*    Do you have a difference of memory?  Did she

17 ever -- do you remember her ever admitting to spanking or

18 using any form of corporal punishment on her own children?

19     *A.*    I don't remember that, no.

20     *Q.*    Didn't she tell you that she was against that and

21 that's not something she did?

22     *A.*    That sounds right, but, you know, 52 hours, it's

23 hard to remember everything.

24     *Q.*    Okay.  And that's also consistent with what

25 others told you, including Donna, that Wendi didn't spank

1  her kids?

2     *A.*   I don't remember if Donna told me that.  If you

3  want to show me the notes.

4     *Q.*   And you uncovered absolutely no evidence that

5  Wendi sexually abused her own children in any way?

6     *A.*   Right.  There is no evidence of that.

7     *Q.*   There is no suggestion of that?

8     *A.*   No.

9     *Q.*   Based on your investigation, Wendi in practice

10 rejected the teachings of her church and even her own

11 experiences because she did not include corporal

12 punishment of her own children; correct?

13    *A.*   Well, that was again one of those compound

14 statements.  And I don't think everything in it was

15 accurate, so you might need to break it down.

16    *Q.*   All right.  She didn't spank her kids?

17    *A.*   Correct.

18    *Q.*   She didn't use a paddle?

19    *A.*   Correct.

20    *Q.*   Or a wooden spoon?

21    *A.*   Correct.

22    *Q.*   Or a belt?

23    *A.*   Correct.

24    *Q.*   She made it very clear she was against that, and

25 you uncovered no evidence to the contrary to say that she

1  was lying about that; correct?

2      *A.*   Correct.

3      *Q.*   All right.  And, yet, she grew up -- your

4  testimony is she grew up in this environment where she was

5  spanked and swatted with a belt, a paddle, a wooden spoon;

6  correct?

7      *A.*   Correct.

8      *Q.*   By her own parents?

9      *A.*   Yeah.  And the monitors and the principal and the

10 cult leader.

11     *Q.*   Right.

12     *A.*   Sure.

13     *Q.*   But she did not do that with her own children?

14     *A.*   Asked and answered.  I mean, I don't know.  Is

15 there some other -- something else you're trying to ask

16 me?  I really don't know.

17         THE COURT:  No.  Go ahead and answer the

18 question.

19         THE WITNESS:  I already said no.

20     *Q.*   BY MR. HAZARD:  So she did not have any sort of

21 automatic response because she was abused and then

22 inflicted that -- carried on that abuse to her own

23 children; correct?

24     *A.*   No.  Because what she did, which many children

25 do, is instead, they respond to this kind of abuse by

98

1   being a compliant caretaker.  And so that would play out

2   in doing what Alejo wanted sexually and it would play out

3   in trying to be caring toward her own kids and taking care

4   of -- you know, trying to care for other people, in

5   general.

6          That was her MO was to try and care for other

7   people so they wouldn't get angry at her and abandon her

8   and attack her.  So I wouldn't expect to see anything

9   different.  But that was a response that was shaped by the

10  beatings.

11      Q.    You mentioned a couple of instances that you

12  thought were strongly suggestive of that Wendi had been

13  sexually abused as a child.  And I'm referring to the

14  incident that Donna Ochoa reported at day care in the

15  bathroom with the other kids; correct?

16      A.    It was more than one incident.  She got called on

17  two separate occasions.

18      Q.    In two incidents; right?

19      A.    Correct.

20      Q.    And, also, wetting the bed when she shared the

21  bed with her parents?

22      A.    I said that is consistent with, but not per --

23  you know, not certainly.

24      Q.    All right.  Now, again, both of these incidents

25  that were reported by Donna Ochoa, you have no other

1  evidence?  No one else talked about these particular

2  incidents but Donna; correct?

3      *A.*    That's correct.

4      *Q.*    And even -- and Donna wasn't completely specific

5  about what happened in the bathroom when Wendi was four

6  years old in the preschool?  Just that she was with other

7  similarly aged children in there and they were apparently

8  comparing each other private parts; correct?

9      *A.*    No, no, that wasn't it at all.

10     *Q.*    Well, did she tell you that they were acting out

11 a sexual act?

12     *A.*    Yes.

13     *Q.*    What's that sexual act that she told you?

14     *A.*    She didn't tell me one.  If you remember my

15 testimony, she didn't say there was a specific.  What I

16 said was it wasn't -- that the day care people had told

17 her that it wasn't your typical show me yours, I'll show

18 you mine.  It was something that they found very

19 concerning and alarming.  It was not age appropriate or

20 usual sexual touching, so that they were so concerned that

21 they threatened to boot her out of there.  I wish they

22 had referred her to --

23     *Q.*    Were the police called?

24     *A.*    No.  I wish they would have.  And it's a tragedy.

25 If --

1    *Q.*   Doctor, are you telling me that four-year-olds
2    playing doctor is proof of that they've been sexually
3    abused?
4    *A.*   Of course not.  I just explained why that's not
5    what I'm saying.
6    *Q.*   Isn't that perfectly natural behavior for
7    four-year-olds to be engaged in who have never been
8    subject to any form of abuse?
9    *A.*   I just explained how what you're saying is not --
10   no, no, of course not.  No, I'm not because I just
11   explained that they told her it was not age appropriate
12   behavior.
13   *Q.*   This is coming from Donna; correct?
14   *A.*   Yes.
15   *Q.*   Not from anyone at the day care; correct?
16   *A.*   This is how she described what they said to her.
17   *Q.*   All right.  And Donna never said specifically
18   what the act was; correct?
19   *A.*   Donna didn't want to know such things.
20   *Q.*   Did she tell you the act, Doctor?
21   *A.*   No.  I've already explained to you what she told
22   me.
23   *Q.*   Right.  Isn't it perfectly natural for
24   four-year-olds to be curious about their own sexuality,
25   their body parts?

1     *A.*   In my own testimony, I said that.  And I said

2  this was not -- as described by Donna, this was not in

3  that category.  So I don't --

4     *Q.*   You also said that --

5     *A.*   I don't know how many times I can say this.

6          THE COURT:  One at a time.  One at a time.

7          THE WITNESS:  I said it repeatedly.

8     *Q.*   BY MR. HAZARD:  You said after the two incidents,

9  Wendi never repeated it again, whatever it was?

10     *A.*   Not that anyone reported it.  That's a big

11  difference between she never did it and no one ever

12  reported it.  She was quite neglected and who knows.  But

13  it sounds like she didn't do it at that day care and get

14  caught, anyway.

15     *Q.*   Dr. Hopper, didn't you write in your report,

16  quote:  In addition, that Wendi appears to have stopped

17  engaging in those behaviors after being admonished by day

18  care staff and her mother, parentheses, and perhaps beaten

19  by her mother, would be consistent with sexual abuse of

20  Wendi having ended at least for a time, and then you go

21  on; correct?

22     *A.*   Oh, yeah.

23     *Q.*   That's your opinion; correct?

24     *A.*   It was an opinion where I was clear that I was

25  saying perhaps, and that knowing what I knew about Donna

1    and how they raised her and Donna's own admissions for how

2    she beat her, that was a plausible way to understand how

3    she stopped.  But, you know, I wasn't for sure.

4         Q.    And based on -- based on that, if what Donna said

5    was true, Wendi never did it again after being told it was

6    wrong?  That's your understanding; correct, whatever it

7    was?

8         A.    That was -- you know, that was the most plausible

9    explanation that I have of the evidence that I have, yeah.

10        Q.    All right.  Which proves that even at age four,

11   Wendi was able to conform her conduct to what people were

12   telling her was wrong; correct?

13        A.    Oh, sure.  I never said she wasn't.  She was

14   quite compliant with people and what people told her to

15   do, actually, as I've repeated.

16        Q.    And that wetting the bed incident is the only the

17   incident of bedwetting that you have any knowledge of;

18   correct?

19        A.    Correct.  And, well, I wouldn't call it an

20   incident.  It sounded like it was more than one time.  It

21   was a -- it went on for a while.  She didn't say she wet

22   the bed once.  She said she started wetting the bed, I'm

23   pretty sure was the language.

24             I can remember that was the meaning that I had,

25   that it wasn't just that she wet the bed one time.  You

1   know, how many parents would remember if your kid just wet
2   the bed one time at age four and-a-half?  It's when your
3   kid starts wetting the bed repeatedly, that's what's
4   memorable.
5        Q.   All right.  And, again, that is also very common
6   behavior by kids of that age to wet the bed, even those
7   who have not been abused; correct?
8        A.   As I said in my direct testimony, yes, it's a
9   common.  It's also a common response to sexual abuse.  And
10   it's uncommon for it to suddenly start at age
11   four and-a-half.
12        Q.   Is that your medical opinion?
13        A.   That's what I've -- that's what I've learned.  I
14   mean, I'm not a pediatrician.  I have two kids who are six
15   and eight.  I kind of went through some of that stuff and
16   learned some things along the way.  But that's my
17   understanding from years of experience, but I haven't
18   specialized in bedwetting, no.
19        Q.   Let's talk about Myla Young's report and
20   assessment of Wendi Andriano because you refer to that in
21   your report; correct?
22        A.   Correct.
23             MR. HAZARD:  And if I may approach, Your Honor.
24             THE COURT:  Yes.
25             MR. HAZARD:  January 4, 2011.

1    *Q.*   BY MR. HAZARD:  January 4, 2011, you interviewed

2   Ms. Andriano; is that correct?

3    *A.*   It sounds correct.  I'll see the date when you

4   give it to me.  Yeah, I remember that date.

5         MR. HAZARD:  And this is, for identification

6   purposes, Exhibit No. 220.

7         May I approach the witness, Your Honor?

8         THE COURT:  Yes.

9    *Q.*   BY MR. HAZARD:  And that is your notes of the

10  January 4, 2011 interview with Wendi Andriano?

11   *A.*   Yes.

12   *Q.*   All right.  And about halfway down, you have this

13  section of the interview, testing with Myla, and that's

14  obviously Dr. Myla Young; correct?

15   *A.*   Correct.

16   *Q.*   And Wendi said that she hated the testing?

17   *A.*   Yeah.

18   *Q.*   Yes?

19   *A.*   Yes.  I'm sorry.

20   *Q.*   She told you that the first test that Wendi

21  recalled was the, quote, ugly ink blob thing; correct?

22   *A.*   Correct.

23   *Q.*   And that's the Rorschach?

24   *A.*   Rorschach, yes.

25   *Q.*   And she told you that she felt like she was being

1  judged?

2      *A.*   Correct.

3      *Q.*   And with each test that Dr. Young administered,

4  she had that same feeling of being judged; correct?

5      *A.*   I don't know if every single one, but certainly

6  the overall experience in most of them from my memory.  I

7  could review the notes, but I don't know about every

8  single one.  There's probably some innocuous ones.

9      *Q.*   Well, you wrote the fourth bullet point down from

10 testing on Myla, at first excited?

11     *A.*   Uh-huh.

12     *Q.*   Do you see that?

13     *A.*   Yes.

14     *Q.*   And then she talks about the Rorschach exam.  And

15 then after the ellipses, she states:  Felt like being

16 judged, and each test had that feeling.

17     *A.*   Oh, okay.

18     *Q.*   Is that correct?

19     *A.*   Correct.

20     *Q.*   All right.  She later says that the Delayed

21 Memory Test felt like she was being tricked or trapped?

22     *A.*   I don't see it, but I remember that.

23     *Q.*   It's on the very next page at the top.

24     *A.*   Yes.

25     MR. NICKELS:  Greg, when you're going to go to

1   the next page, if you just wouldn't mind letting us know,

2   it would be a little easier to follow along.

3        MR. HAZARD:  All right.

4        MR. NICKELS:  Thank you.

5   *Q.*   BY MR. HAZARD:  During that section of talking

6   about the Delayed Memory Test, Ms. Andriano talked about a

7   number of distractions including the noise from a

8   corrections officer's radio; correct?

9   *A.*   And the dropping of the coins; correct.

10  *Q.*   And dropping coins; correct?

11  *A.*   Correct.

12  *Q.*   And Wendi Andriano's statement was after all of

13  these years in this environment, which meaning prison;

14  correct?

15  *A.*   Correct.

16  *Q.*   To have someone doing something behind me was

17  wigging me out.  That's what she told you; correct?

18  *A.*   Correct.

19  *Q.*   All right.  And then about halfway down that same

20  page, the Gambling Task Test, she talked to you about

21  that; correct?

22  *A.*   Correct.

23  *Q.*   She stated she wanted to give up?  Yes?

24  *A.*   Correct.

25  *Q.*   She thought to push the money losing option just

1  to get it over with; correct?

2      *A.*    Yeah.  And this is actually how that task works.

3  If you -- if you -- it shows a breakdown of decision

4  making under stress and she's just making a bad decision

5  just to try to get it over with --

6      *Q.*    Sure.

7      *A.*    -- because she's stressed and doesn't have those

8  prefrontal cortex functions working too well.

9      *Q.*    It could also mean that she's telling you she

10  deliberately did not put forth her best effort because she

11  was being frustrated?

12      *A.*    That's how the test works.  That's part of how

13  the test works.  It's designed to look at decision making

14  processes.  And, yes, so she's telling me that she did

15  very badly on the test and by impulsively trying to get it

16  over with, yes.

17      *Q.*    But she tells you she intended to do that?  She

18  thought to just do it deliberately to get it over with;

19  correct?

20      *A.*    Correct.  And --

21      *Q.*    Meaning, that she would not be using her best

22  effort on that test; correct, Doctor?

23      *A.*    As I tried to explain, this test in particular is

24  designed to elicit these kinds of impulsive decisions as a

25  test of someone's ability to not make bad decisions and

1   just try and get things over with.

2       *Q.*   Right.

3       *A.*   So it's not a manipulation.  It's actually valid

4   data that this very test is designed to collect on

5   breakdown of decision making when and people's inability

6   to measure punishments versus rewards or bad things versus

7   trying to quickly escape from them in an impulsive way.

8           So it's not accurate to say that there was some

9   sort of -- in this task, that there was some sort of -- I

10  forget your phrase.  But whatever it was, it doesn't

11  accurately describe what she was doing here or how this

12  test works.

13      *Q.*   All right.  And then going onto the very next

14  page at the top, she had been talking about the third day

15  of testing and she continues talking about the third day

16  of testing; correct?

17      *A.*   Uh-huh.

18          THE COURT:  Is that a yes?

19          THE WITNESS:  Yes.  I'm sorry, sir.

20      *Q.*   BY MR. HAZARD:  And she says:  I had a meltdown

21  and refused to do it.  She, meaning Dr. Young, tried to

22  make me do it and I refused; I was angry; correct?

23      *A.*   Meltdown.  I don't see the word angry on there.

24      *Q.*   Refused to do it.  And then a couple of sentences

25  down, I was angry.  The angry line --

1    *A.*   Oh, yeah.  Okay.  Yeah, yeah.  I felt my ears get

2    hot and I was angry.  Yeah.  Okay.

3    *Q.*   And, again, that could be evidence that she

4    wasn't putting forth her best effort because she was

5    angry; correct?

6    *A.*   No.  No.  I don't see it that way.

7    *Q.*   All right.

8    *A.*   I think that's reading an awful lot and it

9    doesn't -- it's not consistent with how these tests work,

10   just as I tried to explain on the last one.  It's evidence

11   actually of strong emotions getting activated and her

12   executive functioning breaking down.  That's what it's

13   evidence of.

14   *Q.*   Sure.

15   *A.*   And that's one of the things these tests are

16   supposed to formally assess for.  And we see it here in

17   the testing and what I've been talking about all day.

18   *Q.*   And the overreaching theme on this that she keeps

19   telling you is that she felt that she was being judged and

20   she related that to other instances in her life; correct?

21   *A.*   Yes.

22   *Q.*   Now you mentioned that in your opinion that

23   Ms. Andriano has a cognitive deficit related to executive

24   functioning; correct?

25   *A.*   Correct.

1    *Q.*    And in layman's terms, that's like thinking on

2    your feet.  Is that at least responding to stressful

3    situations and having to make quick decisions?

4    *A.*    Yes.

5    *Q.*    Showing -- exercising good judgment; correct?

6    *A.*    That doesn't fully capture it.  So I would like

7    to clarify.

8    *Q.*    Well, you can do it on redirect.  Am I --

9    *A.*    The results of the neuropsyche testing were more

10    complex than what you -- what you were describing in terms

11    of executive functioning.  So I don't think what you're

12    saying accurately captures the results of the neuropsyche

13    testing.

14    *Q.*    All right.  When you were discussing her first

15    job -- Ms. Andriano's first job as a leasing agent -- and

16    this is in the same interview.

17    *A.*    The next page.

18    *Q.*    Ms. Andriano stated that:  I am the worst

19    procrastinator.  If I don't have pressure, I won't do it.

20    I wait for the last minute.  Do you remember her telling

21    you that?

22    *A.*    Yes, I do.

23    *Q.*    Okay.  And then she also told you, quote:  If I

24    don't have pressure on me, I won't be motivated or

25    interested enough to do anything; is that correct?

1      *A.*    That's correct.

2      *Q.*    And that was in the context of her first job as a

3   leasing agent?

4      *A.*    Correct.

5      *Q.*    And this is also the interview where she said

6   that Chris had turned on her at trial; correct?

7      *A.*    I don't know.  Do you want to refer me to the

8   page for that?  I'm not disbelieving you, but just off the

9   top of my head, I don't know.  Yeah, I see it.  It's on

10  Page 4, like 4 and-a-half, the back side of Page 4.

11     *Q.*    You came back and interviewed Ms. Andriano the

12  very next day on January 5th of 2011; is that correct?

13     *A.*    That sounds right, yes.

14     *Q.*    And I'll show you January 5th, 2011, which should

15  be No. 221.

16          MR. HAZARD:  May I approach the witness,

17  Your Honor?

18          THE COURT:  Yes.

19     *Q.*    BY MR. HAZARD:  And Exhibit No. 221, that is a

20  copy of your notes on that January 5, 2011 interview of

21  Ms. Andriano; is that correct?

22     *A.*    Correct.

23     *Q.*    Now turning to the second page of that document,

24  you began talking -- you have about halfway down a section

25  buying bras.  Do you see that?

1      *A.*   Yes.

2      *Q.*   All right.  And you mentioned the first thing in

3  that is:  Laura's mother took her.  What do you remember

4  Ms. Andriano referring to with that note, Laura's mother

5  took her?

6      *A.*   I think that Laura's mother took her to buy bras,

7  her and Laura.

8      *Q.*   Who is Laura?

9      *A.*   Her friend at the time, Laura Bell.  I think she

10  has another last name now.

11      *Q.*   Okay.  And the very next sentence is:  Donna

12  bought her, meaning Ms. Andriano, very covering-up, in

13  quote, bras, very conservative; is that correct?

14      *A.*   Yeah.  The ones Donna bought, yeah.

15      *Q.*   Right.  But then Wendi tells you that:  I wanted

16  to wear bras like Laura; correct?

17      *A.*   Yeah.  Yes.

18      *Q.*   She got used to wearing the bras that her mom

19  liked, but Wendi made it clear that's not the type of bras

20  she wanted to wear?

21      *A.*   That's what she said, yeah.

22      *Q.*   And she states:  I remember my dad saying you can

23  just go without a bra and he encouraged her; correct?

24      *A.*   Yes.

25      *Q.*   And then she states:  There was always this big

1  tug-of-war between my mom and my dad; right?

2  *A.*    Correct.  Over what kind of clothing she would

3  wear --

4  *Q.*    Sure.

5  *A.*    -- revealing or sexy or whatever it was.

6  *Q.*    And you made your testimony very clear that you

7  think that is evidence suggesting that Alejo Ochoa had

8  sexually desired Wendi and, therefore, was likely to

9  engage in sexual abuse of her; correct?

10  *A.*    I mean, I saw that an example of, you know,

11  sexualization, sexual exploitation, sexual abuse, in your

12  words, depending on how you want to define them for --

13  but, yes, I saw that as an example, having your young

14  eight, nine, ten-year-old daughter dress up in lingerie

15  and taking photographs of her, yeah, sure.

16  *Q.*    Well, Laura was wearing bras?  Her friend, Laura?

17  *A.*    Yes.

18  *Q.*    And so was Wendi?

19  *A.*    Yes.  But, you know, sometimes maybe she

20  didn't wear a bra.

21  *Q.*    Was she wearing a bra at eight and nine years old

22  there in the context, do you think, or was she talking

23  about later in life?

24  *A.*    Well, you know, this is an interesting question

25  because kids who are -- girls who experience a lot of

1  abuse, especially sexual abuse, tend to go through puberty

2  earlier.  I don't remember when she did.  So she could

3  have developed breasts earlier due to the trauma.  It

4  wouldn't be unusual.

5      *Q.*    Is there anything in your notes to indicate that

6  she was eight or nine?

7      *A.*    Umm, no.  I don't remember when she was --

8  exactly when she was friends with Laura.  It's in -- we

9  could look at the declaration of Laura and see.  I think

10  it's always in the first paragraph when they were friends.

11  So we could get that information.  I wouldn't want to

12  speculate.  I rather be dealing with, you know, what

13  evidence we have.  I don't know exactly how old she was.

14      *Q.*    Okay.

15      *A.*    Can I request that document or am I just going by

16  memory?

17      *Q.*    The point is Wendi wanted to wear bras more like

18  her friend was wearing, however old she was; correct?

19      *A.*    Yes.

20      *Q.*    All right.  And you mentioned about this story of

21  Alejo Ochoa taking Wendi to Frederick's of Hollywood to

22  shop for bras; correct?

23      *A.*    I mentioned it and I showed Wendi retrieving that

24  memory and going, uh, ah-ha in a startled way.  Yes, I

25  talked about it and demonstrated that.

1      *Q.*   Okay.  So based on this interview, isn't it

2   possible that Alejo Ochoa just took Wendi to get the bra

3   because that's what Wendi wanted to be like her friend?

4   Not because he had some sort of sexual perversion.  It was

5   just he wanted to make his daughter happy?

6      *A.*   I mean, to look at all of the evidence before us

7   and everything I've just presented today and draw that

8   conclusion, I don't see how anybody could support that

9   conclusion.  It's utterly implausible.

10     *Q.*   Are there any instances -- other instances where

11   Alejo Ochoa made it very clear that he wanted to keep

12   Wendi happy and do things for her that her mother wouldn't

13   do, like buying the bra she wants, for example?

14     *A.*   Yeah.  It's -- it's not quite like that.  The way

15   you're presenting it isn't really -- it's leaving out so

16   much that Wendi wanted -- I quoted to you how Wendi said

17   she wanted to please her dad.  She did it for her dad.

18   She was in this incestuous relationship taking care of her

19   dad, rubbing his legs for hours, and, you know, doing that

20   with her friends.  She wanted to please her father.  And,

21   sadly, her father wanted her to do these sexual things to

22   please him.

23     *Q.*   That's your opinion?

24     *A.*   Well, that's based on the evidence that I have,

25   yes.

1    *Q.*    Wendi was closer to her father than she was to

2    her mother; correct?

3    *A.*    You could say that, yes.

4    *Q.*    In fact, after she murdered her husband, whom did

5    she call?

6    *A.*    Yeah, her father.

7    *Q.*    Because she was in trouble and needed help;

8    correct?

9    *A.*    Correct.

10    *Q.*    Do you think she did that to please her father --

11    *A.*    No, of course not.

12    *Q.*    -- or to seek his help, his assistance?

13    *A.*    Well, of course it would be to seek his help,

14    yes.  That's obvious.

15    *Q.*    Because she trusted him?

16    *A.*    What do you mean by that?

17    *Q.*    Well, she called him?  In the biggest time of her

18    need, she just murdered her husband, and she called her

19    father; correct?

20    *A.*    It's pretty sad that's who she had to turn to in

21    her time of need, yeah.

22    *Q.*    Well, and he tried to help her; didn't he?

23    *A.*    He tried.  He's not a very competent guy.

24    *Q.*    Sure.

25    *A.*    I don't know what he did, but I doubt it was all

1  that helpful.

2      *Q.*   He tried to fabricate evidence to help her;

3  correct?

4      *A.*   I don't know, but that wouldn't surprise me.

5      *Q.*   That was what came out at trial; correct?

6      *A.*   Yeah.

7      *Q.*   And isn't it a fact that in one of your

8  interviews with Wendi, she brought up the fact that Donna

9  told her Alejo was going to lie and say he abused Wendi so

10  she could get off death row?  Do you remember Wendi

11  telling you that?

12      *A.*   Oh, absolutely.  I remember her saying she was

13  disgusted by that --

14      *Q.*   Right.

15      *A.*   -- and horrified that he would say that.  She

16  didn't want that kind of help from him.

17      *Q.*   In fact, Wendi stated that she heard from her

18  father, from Alejo, that he told her he would be willing

19  to do anything to help her; correct?  That was her quote

20  to you?

21      *A.*   Yeah, but, you know, she --

22      *Q.*   That was what she said?

23      *A.*   Yeah.  He would want to lie and do whatever else

24  someone disturbed like that would do in a court of law.  I

25  mean, yeah.

1     *Q.*    And she said that she found it revolting and told

2     him:  I don't want you to lie for me; correct?

3     *A.*    Yeah.  With fathers like that, who needs enemies?

4     You know what I mean?  Yeah.

5     *Q.*    You made references to photographs.  In your

6     interview on June 8, 2010, Wendi denied ever seeing any

7     pornography in her home at any point; correct?  That was a

8     topic that you wanted to cover.

9     *A.*    Are we going to be going through those notes?

10    Because I would like to have them if you're going to refer

11    to them.

12    *Q.*    That's the only question that I have on June 8,

13    2010.  Do you remember covering that topic to see if there

14    was any pornography -- memories of pornography in the

15    home, and Wendi said:  No, there was never pornography in

16    the home?

17    *A.*    Yeah.  She just remembered the Frederick's of

18    Hollywood catalog behind the couch.

19    *Q.*    Do you remember consider that pornography?

20    *A.*    No.

21    *Q.*    You mentioned an incident involving the shower

22    that Jeri Lynn Cunningham talked to you about; correct?

23    *A.*    Umm, a shower and Jeri Lynn?  I don't think so.

24    *Q.*    All right.

25    *A.*    It might have been Krye.

1    *Q.*    What about --

2    *A.*    Oh, oh, oh, in the notes where they poured the

3    water over?

4    *Q.*    Yes.  And Wendi mentioned an incident as well;

5    correct?  The same incident involving Jeri Lynn?

6    *A.*    I remember Wendi telling me about how they had --

7    in return for Alejo doing a prank to them, they were

8    throwing cold water.  They did it to him, and then it was

9    okay for him to do it, but not them.  I don't remember if

10   I talked to Jeri Lynn about that.  If you want to show me

11   my notes, I would be happy to look at that.

12   *Q.*    But you do remember talking to Wendi about that?

13   *A.*    I do.

14   *Q.*    And she told you that there was a time when Alejo

15   played a prank on them by pouring cold water while

16   Jeri Lynn and she were taking a shower in their bathing

17   suits; correct?

18   *A.*    Oh, oh, okay.  They're very different things.

19   Actually, you're confusing two events.  One was something

20   that happened in Wendi's house where Alejo poured water

21   into it.  The one when they were in their bathing suits.

22   So they would have been naked in the shower when he did

23   that at their house.  So Alejo went in while they were

24   taking a shower naked and poured water.

25   *Q.*    Do your notes say naked anywhere?

1      *A.*   Well, I mean, they were.  But the bathing

2   suits -- when she specifically told me about the bathing

3   suits, that was when Jeri Lynn went with them to

4   California and they were on the beach and --

5      *Q.*   Well, Doctor, let me --

6           THE COURT:  One at a time.  One at a time.

7           THE WITNESS:  I'm just saying there's two

8   separate events.

9           THE COURT:  One at a time.  Ask your question,

10   and then wait until he finishes.

11           Go ahead.

12      *Q.*   BY MR. HAZARD:  Jeri Lynn's account was that this

13   occurred in California, this incident; correct?  Cold

14   water with two girls --

15      *A.*   Two incidents.  Two incidents.

16           THE COURT:  Wait, wait.

17           THE WITNESS:  Oh, I'm sorry.  I've got to wait to

18   answer.

19           THE COURT:  One at a time.

20           THE WITNESS:  I'm sorry.  Okay.

21      *Q.*   BY MR. HAZARD:  That Jeri Lynn told you an

22   incident in the shower involving cold water that happened

23   in California; correct?

24      *A.*   I don't want to answer any more questions until

25   you show me my notes because I know there were two

1    incidents involving a shower, and I want to be clear that

2    I'm not agreeing to things that aren't true and things

3    aren't being mischaracterized.  So I don't feel

4    comfortable answering questions about this without my

5    notes that he's referring to.  It's asymmetrical.

6         Q.   Well, you mentioned Jeri Lynn Cunningham in your

7    report; did you not?

8         A.   Yes.

9         Q.   And that's the incident I'm talking about.

10        A.   Again, what do you mean by the incident, because

11   at the beginning you put two things together?

12        Q.   In California.

13        A.   The incident in California?

14        Q.   Correct.

15        A.   Okay.

16        Q.   And then Wendi talked to you about the shower

17   incident that she remembers occurring at their home on

18   Cedar Street; correct?

19        A.   Correct.  I think Wendi might have talked about

20   the thing in California, too.  It's a separate incident.

21   Again, without my notes, you know, it's kind of gray.

22        Q.   I would be happy to show you your notes, Doctor.

23        A.   Yeah, that would be great.

24        Q.   So you don't remember without looking at them?

25        A.   52 hours worth of notes?  I mean, I'm not savant

1  in that way, no.

2          MR. HAZARD:  This is Exhibit No. 222, Your Honor.

3  May I approach the witness?

4          THE COURT:  Yes.

5      Q.  BY MR. HAZARD:  The February 11, 2011 interview.

6      A.  Okay.

7          MR. NICKELS:  Hold on one second, Greg.  We may

8  not have this one.  February 11th?

9          THE WITNESS:  It would be the second day I think

10 of 4/11, 12 and 13.  So they may be clustered into one.

11         MR. NICKELS:  What is this?

12         THE WITNESS:  4/11/11.

13         MR. ARNTSEN:  Oh, April 11th?

14         MR. NICKELS:  Oh, it's April 11th?  You said

15 February 11th.

16         THE COURT:  When you said February 11th, did you

17 mean April 11th, Mr. Hazard?

18         MR. HAZARD:  I'm sorry.  April 11th.

19         THE COURT:  Okay.  So we're referring to

20 Exhibit No. 222 for identification and we're talking about

21 an April 11, 2011 interview by Dr. Hopper with the

22 Petitioner; is that correct?

23         MR. HAZARD:  Yes.

24         MR. NICKELS:  And that one I do have.  And do you

25 have a page number?

1     *Q.*   BY MR. HAZARD:  Yes.  It's Page 2 on your notes.

2  It would be the third page in on that exhibit and it's

3  going towards the bottom.

4          And you state:  The earliest memory you have with

5  an experience with your father -- and you're referring to

6  Alejo Ochoa at that point; correct?  Not her biological

7  father?

8     *A.*   Correct.  That was uncomfortable.

9     *Q.*   That was uncomfortable; correct?

10    *A.*   Correct.

11    *Q.*   And Wendi states:  My mind is going blank.  And

12  you follow up with:  Any memory; correct?

13    *A.*   Correct.

14    *Q.*   She states nothing at my Nana's house or on

15  12th Street.  And then she talks about the next place she

16  lived was on Cedar; is that correct?

17    *A.*   Correct.

18    *Q.*   And then she states it wasn't uncomfortable, but

19  it's something that she does remember?

20    *A.*   Right.  She was -- as often happens in these kind

21  of interviews, the language can -- the word you use can

22  have a huge effect on what people are able to retrieve.

23  So she was saying to me uncomfortable wouldn't be the

24  right word that she would put on that, which, you know,

25  it's something that I need to pay attention to in these

1  investigations.

2     *Q.*    And, Doctor, she talks about this incident that

3  you referred to in the shower with the practical joke;

4  right?  It goes on for the next couple of pages.

5     *A.*    Right.  And this was not in California.

6     *Q.*    Correct.  But Jeri Lynn is with her?

7     *A.*    Yeah.  That's -- I don't see it on here, but I

8  remember this is -- you know, this is one of the ones

9  that -- I don't know.  Is it?  Let's confirm that.  Where

10  does it say Jeri Lynn?  Yeah, there you go.  Yeah.  Okay.

11     *Q.*    All right.

12        THE COURT:  When you're talking about Jeri Lynn,

13  we're talking about, Jeri, J-E-R-I; Lynn, L-Y-N-N;

14  Cunningham; is that correct?

15        THE WITNESS:  Correct.

16        THE COURT:  Is that who we're referring to?

17        MR. HAZARD:  Yes, Your Honor.

18        THE WITNESS:  Correct.

19        THE COURT:  Okay.  Thank you.

20     *Q.*    BY MR. HAZARD:  And, in summary, as you mentioned

21  earlier, Alejo poured cold water from a bucket onto them

22  over the shower curtain; correct?

23     *A.*    Yes.

24     *Q.*    And Wendi and Jeri Lynn decided to get him back,

25  in her words; correct?

1      *A.*    We just tried to get him back.

2      *Q.*    Okay.  And she talked about how they grabbed a

3   stool and got the key off the doorjamb above Alejo Ochoa's

4   bathroom door; is that correct?

5      *A.*    Yes, they did.

6      *Q.*    You had covered, if not in this interview, but at

7   another time, Wendi had mentioned that Donna and she

8   shared a bathroom and Alejo had his own bathroom; correct?

9      *A.*    So she says, yeah, at Cedar, he had his own

10  bathroom and my mother and I had our own.  So him coming

11  into our bathroom was not normal.  It was in another place

12  where he would routinely be coming in while she was taking

13  a shower.

14     *Q.*    Sure.  And they mentioned that he would take

15  showers in the morning and he would keep the door locked?

16     *A.*    Yeah.  He would take like hour long showers when

17  Jeri Lynn was there.

18     *Q.*    But he locked his own bathroom door?

19     *A.*    Yeah.

20     *Q.*    And on this incident, then actually sneaked up

21  with a stool, Jeri Lynn Cunningham and Wendi Andriano, got

22  the key, opened the door and returned the favor by pouring

23  cold water on him; correct?

24     *A.*    Correct.

25     *Q.*    And that is, like you called it, a prank?

1    *A.*    Yeah.  He did the prank, which in the context of

2    everything else, we know going into his daughter and her

3    friend in the shower.  But then they -- yeah, they tried

4    to get him back.

5    *Q.*    All right.  And Wendi Andriano made it very clear

6    that was not something that made her uncomfortable;

7    correct?

8    *A.*    What was not something that made her

9    uncomfortable?

10   *Q.*    This incident when she started telling you about

11   the memory.

12   *A.*    Uh-huh.

13   *Q.*    Yes?

14   *A.*    Well, it was certainly uncomfortable when he was

15   very mean to her after she did it.  But there were many

16   aspects of this experience.  You're saying the whole

17   thing?

18   *Q.*    Yes.

19   *A.*    She said the word uncomfortable was not a good --

20   let's see.  Let's see what happened.  Yeah, I don't think

21   that refers to this event.  If you look closely at the

22   notes, the uncomfortable comment is followed by me

23   reminding her of something she had said before about how

24   he would repeatedly come into the bathroom when she was

25   taking showers.  And then she said he wasn't able to do

127

1  that at Cedar.

2         I asked her for a specific memory of that.  She

3  remembers screeching and saying:  What are you doing in

4  here?  And him being like:  Oh, what's wrong with you?

5  The shower curtain is closed.  I remember my father always

6  told my mother that we were so uptight.

7         So to connect the uncomfortable on the previous

8  page to the Jeri Lynn thing, I don't know if there is any

9  connection there because the next memory she told of the

10 shower is how her father would repeatedly come into the

11 shower and act like there was something wrong with her for

12 protesting her father coming into the shower with her.

13     Q.   Alejo Ochoa's response was:  I'm your father;

14 it's no big deal; correct?

15     A.   Yeah.  That's a common response and to minimize

16 the reality of his sexual stuff.

17     Q.   And, yet, he would keep the door locked to his

18 own shower, at least in that time when Jeri Lynn

19 Cunningham and Wendi were over at the house?

20     A.   What do you mean by and yet?  I don't know what

21 you're --

22     Q.   No.

23     A.   It totally makes sense to me.  I mean, someone

24 who is routinely invading other peoples' spaces, his own

25 daughter when they're taking a shower, you know, maybe he

doesn't feel so safe in the shower because he knows that showers aren't safe places in this home. And so he locks himself in, but he feels entitled to go into her shower at anytime.

So that's the understanding I have of him locking the shower door is he feels entitled to go into his daughter's shower at anytime, whereas he gets to lock his door.

*Q.* And the next day is when you continue the interview and Wendi said: I can't think of any times my father touched me, as we talked about earlier?

*A.* Where? On what page?

*Q.* That would be April 12, 2011. I think you have that exhibit in front of you.

*A.* Oh, yeah, there it is.

*Q.* It's No. 223.

MR. NICKELS: Did you just say the page number? Did you say Page 3?

THE COURT: No. I think he said Exhibit No. 223 for identification. And we're referring to the April 12, 2011 interview.

*Q.* BY MR. HAZARD: And do you remember earlier testifying to that?

*A.* To what?

*Q.* She stated that I can't think of any times my

1  father touched me when you were talking about examples of

2  over-the-line?

3      A.   Well, again, I prefer to see -- I see, get back

4  to over-the-line -- I see other examples of over-the-line.

5  Are you referring to down at the -- about two-thirds of

6  the way down the page where I say:  Other examples

7  over-the-line with a question mark?

8      Q.   Yes.

9      A.   Where she says I was really searching for, yeah,

10  something more than --

11      Q.   Right.  And then on that same page down at the

12  bottom:  I can't think of any times my father touched me?

13      A.   Yeah, despite searching for memories like that,

14  she couldn't find any, as we saw on the videotape.

15      Q.   And this is after you had told her about

16  Jeri Lynn's report to you, which included the shower

17  incident in California that you talked about, as well as a

18  molestation of Jeri Lynn Cunningham; correct?

19      A.   You know, I would want to make sure.  Was that --

20  now you're referring back to the day before?  That we had

21  talked about those things the day before?

22      Q.   Yes.  During the sequence of interviews on

23  April 11th, April 12th and April 13th of 2011, you did

24  cover that with her; correct?  What Jeri Lynn Cunningham

25  had told you?

1    *A.*    I'm not sure without looking at it.  I see her

2  referring to the shower experiences where her father kept

3  coming in, and I asked her about how did she feel in

4  between that.  But I don't -- if you could point me to

5  where the Jeri Cunningham in California story is, I would

6  appreciate it because I don't know where that is.

7    *Q.*    Well, Doctor, let's go to page -- I believe it

8  would be right before Page 11.  On your notes, it would

9  be --

10   *A.*    What about --

11   *Q.*    -- in between Page 10 and Page 11, that page.

12   *A.*    Yeah.

13   *Q.*    And it starts at the top:  What about your father

14  asking you or your friends to do anything with each other?

15         THE COURT:  Are we still referring to

16  Exhibit No. 223 for identification?

17         MR. HAZARD:  That's correct.  April 12, 2011,

18  Your Honor.

19         THE COURT:  Thank you.

20   *Q.*    BY MR. HAZARD:  Do you see that?

21   *A.*    Yes.

22   *Q.*    And she stated:  No, nothing.  I hadn't heard

23  about that; correct?

24   *A.*    Correct.

25   *Q.*    All right.  And that's when you brought up Kyre

1  Lorts?

2      *A.*    Correct.

3      *Q.*    The person that you described as being -- what

4  were your words?  Psychologically unstable?

5      *A.*    What I said was that she was too unstable in the

6  -- well, here what I said.  She was too unstable

7  psychologically for me to interview her as part of this

8  process until November of -- you know, just last year was

9  what was conveyed to me.

10          But when we say that, it doesn't mean that there

11  is some inequality of her too unstable.  We have to

12  consider that in the context of an investigation.

13          So what I heard from the attorneys was that it

14  had taken a long time for her to feel safe talking to

15  someone like me who's going to ask her in detail about

16  sexual abuse memories, without wanting to kill herself or

17  something like that.

18      *Q.*    Sure.  In your opinion, Krye Lorts was too

19  mentally unstable -- those were the words you used

20  earlier -- to interview before the November 10, 2013

21  interview you had with her?

22      *A.*    You could say mentally unstable or you could say

23  traumatized.

24      *Q.*    These were your words, Doctor.

25      *A.*    Oh, I know.  And I'm saying both of those phrases

1   and others could apply.

2   *Q.*   Okay.  You mentioned earlier that when you shared

3   this, what Kyre Lorts had told you, that Wendi's reaction

4   was that's ridiculous, basically; correct?

5   *A.*   No, not to this.  This is actually an interesting

6   story here that's not quite --

7   *Q.*   Yes or no?

8   *A.*   No is the answer, then.

9   *Q.*   All right.  Kyre Lorts in her -- she gave an

10  earlier declaration that you're familiar with; correct, on

11  June 30th of 2012?

12  *A.*   Yes.

13  *Q.*   Do you know if that was a period of time when she

14  was mentally unstable?  Do you know?

15  *A.*   Yeah, I heard she was pretty vulnerable and it

16  was really hard to get that from her, you know.

17  *Q.*   In that declaration, she mentioned that she and

18  Wendi engaged in all sorts of sexual acts together;

19  correct?

20  *A.*   Yeah.  And she reported that to me, also, when I

21  met with her in person.

22  *Q.*   And Wendi --

23  *A.*   I don't know all sorts, but I could name them.

24  Maybe we should be more specific, but --

25  *Q.*   And the Petitioner Wendi Andriano has never

1  admitted to anything like that happening in her life?  She

2  denied ever having touching, sexual experiences with other

3  girls while growing up like that; correct?

4     *A.*  That's a good question.

5     *Q.*  You asked her about that?

6     *A.*  Well, no, I asked her specifically -- are you

7  referring to the question -- the text here on this page

8  that we're referring to?  That was asking her a very

9  specific question about whether her father Alejo asked:

10  What about your father asking you or your friends to do

11  anything sexually with each other?  That's what that was

12  about.  Not whether they had ever done anything sexually

13  with each other.

14     *Q.*  And Krye Lorts talked about how she was having a

15  sexual act with Wendi during the posing of a yearbook

16  picture; correct?

17     *A.*  Yeah.  That they were, quote, fingering each

18  other, which was she described as something common that

19  these girls did with each other, yeah.

20     *Q.*  Right.  And she also mentioned in her interview

21  that she has a fear of dogs because every time dogs lick

22  themselves, she freaks out; correct?  And, in fact, she

23  admitted that she attacked or hit her sister's dog because

24  it wouldn't stop licking itself; correct?

25     *A.*  Yes, because it reminded her of some other sexual

1  things that she had been through that involved licking,

2  unfortunately.

3      Q.   And Wendi Andriano has never admitted that

4  anything that Kyre Lorts told you about happened; correct?

5      A.   Admitted?  I don't think I would use that word.

6      Q.   Well, she has never said that it happened;

7  correct?

8      A.   She doesn't recall it.  She's not able to

9  retrieve memories of that sort.

10     Q.   But you thought this uncorroborated statement by

11 a person that you say is mentally unstable and has a

12 history of this was important to include in your report

13 and reliable enough to include in your report; correct?

14     A.   Yeah, because it's so sad when people think of it

15 that way that because someone is traumatized, that,

16 therefore, they have no credibility.  This is what allows

17 people to get away with raping children and adults and

18 this is something that all the time I see with these

19 investigations.

20     Q.   Doctor, did you actually include Kyre Lorts in

21 your written report?

22     A.   No, because for me, I was concerned.  And that's

23 one of the reasons I wanted to meet her myself because I

24 wanted to check this out.  And, in fact, as I said before,

25 about this quote here, there was a misunderstanding that I

1   was able to clear up when I met with Kyre.  Because, yes,
2   I was trying to be conservative.  I did not want to
3   overreach.  It was only after I met with Kyre and assessed
4   her myself that I had confidence in the information she
5   gave me is consistent with what we would expect to see in
6   someone who had these experiences.
7          MR. HAZARD:  Your Honor, I have a section of
8   additional questions.  I don't think I'll be able to
9   finish in 15 minutes.  This is a good time to wrap up.
10         THE COURT:  Let me ask, Counsel, how are we doing
11  time wise?  I mean, we had a schedule here that counsel
12  provided to the Court, and the schedule was that we were
13  going to get to Dr. Hopper today and conclude with his
14  testimony and then begin with Donna Ochoa today.
15  Obviously, we still have Dr. Hopper on the stand.
16         How are we doing time wise because I want to keep
17  everyone in line with regard to the two-week schedule that
18  we set because I'm in trial in other matters for a very
19  long time after that and I don't have any free time after
20  the two weeks.
21         MR. NICKELS:  Your Honor, I can tell you with
22  regard to Dr. Hopper, I don't quite know how much longer
23  they have.  But I can tell you we have -- right now I
24  think I have literally one very discreet topic for
25  redirect.  So my redirect is going to be a few minutes.

1          Now I realize that may prompt more from them.

2   Although, it's truly one topic.  I think it may be two or

3   three questions.  So if he's only got 20 or 25 minutes --

4          THE COURT:  Well, we're not going to go past

5   5:00.  What I'm inclined to do is stop each evening before

6   5:00, five of or ten of for the deputy's sake so that we

7   can get the transportation going and what not.  And they

8   actually close this courthouse right at 5:00.  They don't

9   want us going past 5:00.  Okay?

10         So why don't we go for another ten minutes and

11  then we'll conclude at 5:50.  Okay?  Not 5:50.  4:50.

12         MR. HAZARD:  One moment.

13         (WHEREUPON, an off-the-record discussion ensued.)

14      *Q.*  BY MR. HAZARD:  All right.  Your testimony is

15  that because of -- in a nutshell, because Ms. Andriano

16  suffered from various traumas, abuse inflicted by family

17  members that before she was 18, that she was essentially

18  so damaged, that it made her ill-equipped to deal with

19  circumstances that came to fruition in her life as an

20  adult; correct?

21      *A.*  That's very general circumstances that came to

22  fruition.  I'm not sure what you're referring to there.

23      *Q.*  In a nutshell, you're saying that this abuse --

24  this alleged abuse that you have talked about affected

25  Wendi Andriano's state of mind the night she murdered her

1  husband?

2      *A.*    What I said was that under situations of high

3  stress complexity, changing situations, that she would,

4  given what she's been through and what the neuropsyche

5  testing and how human brains work, she would lose access

6  to those prefrontal cortex functions that allow someone to

7  remember rules, laws, to inhibit impulses, those sorts of

8  things.

9      *Q.*    Well, let's talk about the various things that

10  Ms. Andriano -- that we know that she did during her adult

11  life between ages 18 and 30.  All right?  Now let's just

12  talk about some general things.  She moved out of the

13  home; correct?

14      *A.*    Yes.

15      *Q.*    So she was no longer living with people that you

16  alleged abused her; correct?  Alejo Ochoa and Donna Ochoa?

17      *A.*    Correct.

18      *Q.*    And she did what adults do?  She went to college

19  for a bit?  She got her first grown-up job; correct?

20      *A.*    Correct.

21      *Q.*    She started socializing with new friends, going

22  out, sometimes partying; correct?

23      *A.*    Correct.

24      *Q.*    She had some sexual relationships with men?

25      *A.*    Correct.

1    *Q.*    Not that much different than a lot of men and
2    women have when they turn 18; correct?
3    *A.*    No, that's not entirely true.  The sexual
4    relationships were not that --
5    *Q.*    Well, I'm not talking about -- I'm not talking
6    about what went on.  I'm talking about just the things
7    that she did, the milestones she reached as she was a
8    young adult.
9    *A.*    Well, what I'm saying is --
10   *Q.*    Doctor --
11   *A.*    -- until you describe the sexual abuse --
12         THE COURT:  One at a time.
13         THE WITNESS:  Well, he had finished asking.  Do I
14   get to keep going?
15         THE COURT:  Go ahead.
16         THE WITNESS:  Everything you said up until the
17   sexual relationships with others, I could agree with that,
18   but the sexual relationships were not normal or healthy by
19   the evidence.  I have even Dr. Pitt at some point
20   corroborating that.
21         So those were evidence of trauma and consistent
22   with sexual abuse, actually, that she unable to orgasm and
23   she didn't enjoy it.  She did it just to please the guy.
24   So the last part of your question is not at all consistent
25   with healthy entry into adulthood.

1    *Q.*    BY MR. HAZARD:  And, again, that's assuming that

2  Ms. Andriano is being truthful; correct?

3    *A.*    Yeah.  About those things, yeah.

4    *Q.*    All right.  She met Joe Andriano and married him?

5  That also happened during her adult -- young adult life;

6  correct?

7    *A.*    Correct.

8    *Q.*    And she had two children with him?

9    *A.*    Correct.

10   *Q.*    And Joe Andriano developed cancer; correct?

11   *A.*    Yes.  It was detected too late, but --

12   *Q.*    Right.  Now leading up to Joe's murder, Wendi

13  Andriano did a number of things in August and September

14  well in advance of October 8th; correct, as far as, for

15  example, contacting life insurance companies?

16   *A.*    Uh-huh.  Yes.

17   *Q.*    Yes?  And although I understand Ms. Andriano

18  disagrees, but the State's evidence presented at trial was

19  that she was engaging in fraud trying to get other people

20  to pose as her husband to get a life insurance policy,

21  knowing that he had cancer; correct?

22   *A.*    That's what was evidence that was presented at

23  trial; correct.

24   *Q.*    Right.  In fact, she offered one of her

25  co-workers $10,000 to pose as her husband to get the life

insurance exam; correct?

    *A.*   Well, I just --

    *Q.*   That was the evidence presented at trial?

    *A.*   That was what someone told her, just like the things that people told me that you said we can't trust. Someone said that as though documentation.

    *Q.*   Well, a jury -- a jury must have believed it; right?

    *A.*   Well, I already said that.

    *Q.*   Then she asked in September another friend to pose as her husband, again, for the purpose of obtaining life insurance fraudulently; correct?

    *A.*   Evidence was presented.  The jury believed it.  I don't know.  I have no way of knowing.  So I can't say correct.  I don't know.

    *Q.*   She used her computer at work then to research poisons.  I know Ms. Andriano says Joe Andriano was involved in that.  Mr. King was involved in that.  But the evidence was presented at trial that Ms. Andriano was doing this to research poisons; correct?

    *A.*   Yes.  Yes.

    *Q.*   And when one of her co-workers asked her what she was doing, she said she was doing research to write a book; correct?  Do you remember that?

    *A.*   It sounds right, yes.

1    *Q.*   All right.  So how do those so far link to her

2    abuse?

3    *A.*   I can explain, yeah.  I mean, she grew up in an

4    environment where there was so much hypocrisy and lying

5    going on all around, especially in her own family, that --

6    *Q.*   How does that equate with her deficits in

7    executive functioning?

8            MR. NICKELS:  Your Honor, he needs to let him

9    finish the answer.

10           THE COURT:  Go ahead and answer the question.

11           THE WITNESS:  Not the kind of executive functions

12   I was talking about.  That would -- that's a different

13   issue.

14   *Q.*   BY MR. HAZARD:  So that doesn't?  That doesn't at

15   all have anything to do with her alleged what you think

16   are deficits in executive functioning?  Planning

17   fraudulent activity?

18   *A.*   Decision making is called an executive function

19   and is one of them.  And, you know, those were

20   decisions -- you know, seriously bad and impaired

21   decisions under some stressful circumstances, but not like

22   the things I was mostly referring to which would apply to

23   once, you know, in fear and things.  Then you have a

24   massive impairment of the prefrontal cortex.

25           THE COURT:  Okay.  We're going to go ahead and

1  take our evening recess at this time.

2          So I guess, Dr. Hopper, you have to return

3  tomorrow.

4          THE WITNESS:  Okay.

5          THE COURT:  We'll begin promptly at 9:30.  Okay?

6          MR. ARNTSEN:  Thank you, Your Honor.

7          THE COURT:  Thank you.  We will be in recess.

8          (WHEREUPON, the proceedings were concluded at

9  4:51 p.m.)

10                      * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

143

1

2

3

4

5

6

7                        C E R T I F I C A T E

8

9

10        I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11   the State of Arizona, do hereby certify that the foregoing

12   142 pages constitute a full, true, and accurate transcript

13   of the proceedings had in the foregoing matter, all done

14   to the best of my skill and ability.

15        SIGNED and dated this 18th day of April, 2014.

16

17

18                   /s/  Renée A. Mobley, RPR

19                   RENÉE A. MOBLEY, RPR

20                   Certified Reporter

21                   Certificate No. 50500

22

23

24

25

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,         )
                            )
      Respondent,    )
                            )
vs.                  )  No.
                            )  CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,  )
                            )
      Petitioner.    )
_____)

Phoenix, Arizona
February 4, 2014
9:32 a.m.

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING

DAY 2

Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500              (COPY)

2

1                    A P P E A R A N C E S

2

3    On Behalf of the State:

4            Mr. Gregory Hazard
             Assistant Attorney General
5
             Ms. Lacey Gard
6            Assistant Attorney General

7
     On Behalf of the Defendant:
8
             ATTORNEYS AT LAW:
9
             Mr. Scott Bennett
10           Mr. Allen Arntsen
             Mr. Stephan Nickels
11           Mr. Matthew Lynch
             Ms. Krista Sterken
12           Ms. Jodi Fox

13                    I N D E X

14                T E S T I M O N Y

15
     WITNESS:                                          PAGE
16
     JAMES W. HOPPER, PH.D.
17
             Cross-Examination (Continued) by Mr. Hazard   20
18
     KYRE LEE JEAN LORTS
19
             Direct Examination by Ms. Fox              38
20           Cross-Examination by Mr. Hazard            64
             Redirect Examination by Ms. Fox            71
21
     DONNA ELIZABETH OCHOA
22
             Direct Examination by Mr. Arntsen          73
23           Cross-Examination by Ms. Gard             193

24   JERI CUNNINGHAM

25           Direct Examination by Ms. Fox             212
             Cross-Examination by Ms. Gard             240

3

1                    P R O C E E D I N G S

2

3         THE COURT:  Good morning.  This is

4    CR 2000-096032, State of Arizona vs. Wendi Elizabeth

5    Andriano.

6              The record should reflect the presence of the

7    parties and counsel.

8              Just a couple of housekeeping matters before we

9    get started here this morning with the testimony.

10   Yesterday after we recessed, I did inform counsel

11   informally with regard to the Petitioner's Motion to Admit

12   Exhibits Pertaining to Mitigation Evidence.  I indicated

13   to them informally what my ruling would be.  I will go

14   ahead and put that on the record at this time.

15             It is ordered denying Petitioner's Motion to

16   Admit Exhibits Pertaining to Mitigation Evidence.  It is

17   without prejudice as a block.  I'm denying it as a block.

18             The Court will consider, however, each exhibit

19   has to be admitted as each is being introduced and

20   requested to be admitted.

21             Also, yesterday there was some discussion with

22   regard to the Rule of Exclusion of Witnesses and

23   Sequestration.

24             I'm going to make the following order:  It is

25   ordered allowing Larry Hammond and Gary Lowenthal to be

4

1  present in the courtroom during the testimony of Daniel

2  Patterson and David DeLozier, but not Scott MacLeod.

3          I'm also going to order that Keith Rohman can be

4  present in the courtroom during the testimony of Scott

5  MacLeod.

6          I am also going to order allowing Dr. George

7  Woods and Dr. Steven Pitt to be present in the courtroom

8  during the Petitioner Wendi Elizabeth Andriano's

9  testimony.

10         Okay.  Yes, sir.

11         MR. ARNTSEN:  Gary Lowenthal, with regard to

12  Patterson and DeLozier, I believe that was stipulated.

13         THE COURT:  Okay.  Was that stipulated?

14         MS. GARD:  Yes, Your Honor.

15         THE COURT:  Okay.  Yesterday when we recessed, we

16  had Dr. James Hopper on the witness stand.

17         Are we going to continue at this time?

18         MR. NICKELS:  We are.  But, Your Honor, before we

19  do, I have an issue to raise with you and a motion to

20  make.

21         THE COURT:  Okay.

22         MR. NICKELS:  Yesterday at about 4:00 in the

23  afternoon, we received a distressing call.  You may have

24  noticed a number of our lawyers actually left the

25  courtroom.

1          It was a call from Krye Lorts, who as you heard

2     yesterday, is a very important witness in this case.  What

3     she told us is that yesterday afternoon, a detective --

4     not an investigator, a detective -- showed up at her house

5     wanting to question her.  She said that she didn't want to

6     talk to this person.  Instead of leaving, he sat outside

7     of her house in a car, making her feel trapped in her own

8     home.

9          She was extremely upset by this, to the point

10     that we actually had to go get her last night and take her

11     out of her home and bring her to our hotel, where she just

12     felt more safe and comfortable, so she would be ready to

13     testify today.

14          Then about two hours later, we received a call

15     from Alejo Ochoa, another critical witness in this case.

16     He tells us for the first time, out of the blue:  I'm

17     taking the Fifth and I'm not going to testify.

18          It doesn't make any sense to us, Your Honor.  We

19     have been in touch with Alejo during the course of this

20     investigation for the last few years and never before has

21     he told us this.  And now on the eve of trial, he tells us

22     that he is not going to testify.

23          About a half hour later, Donna, his wife, called

24     us and explained what happened.  She said that a detective

25     showed up at their house and talked to Alejo.  And after

1  that conversation, Alejo says:  I'm no longer going to

2  testify.

3          Your Honor, the State has every right to

4  interview our witnesses, but the timing of this and the

5  manner in which it occurs is highly inappropriate.  These

6  are two witnesses that they have known about for, in the

7  Alejo case, years, and in Krye's case, several months.

8  And never during those years or months have they made any

9  attempts to contact them.  They have never done an

10 interview, as far as we know.

11         Yet, on the eve of their testimony, while all of

12 us are in the courtroom and can't do anything about it,

13 and while Dr. Hopper is explaining the significance of

14 these folks, they're being contacted.

15         Now, Your Honor, we actually just -- we actually

16 heard part of the interview with Alejo.  Apparently, there

17 was a recording of that playing on the computer where I

18 listened to it.  When this detective showed up, he does

19 not identify himself as an investigator who's looking at

20 the facts of this case.  He says:  I'm a detective with

21 the prosecutor's office.  And then he goes on to describe

22 allegations of criminal conduct by Alejo.  And then he

23 says:  I'm not here to arrest you.  You're not a suspect,

24 and as an added token, I'm not here to intimidate you.

25         But, at that point, Your Honor, the damage is

1    done.  You show up saying I'm a detective.  You talk about

2    criminal conduct and you use the words arrest and suspect,

3    of course, the witness is intimidated at that point.

4    That's why Alejo is now saying I'm taking the Fifth.

5            So, Your Honor, we believe this is prosecutorial

6    misconduct.  This was not a coincidence that these

7    witnesses were contacted yesterday in the manner that they

8    were.  We believe the intended effect was to intimidate

9    these witnesses, and, frankly, it worked.

10           Now with Krye, she is here.  She is going to

11   testify today.  It didn't completely work.  We're going to

12   have her testify earlier than she otherwise would because

13   we want to make sure she gets done today, and we're

14   concerned, given the length of the cross-examination

15   yesterday, that the examination of Donna Ochoa could go

16   longer.  So we're going to have Kyre go right after

17   Dr. Hopper is done.

18           But this now brings me to the motion part of my

19   position here.  If Alejo Ochoa indeed takes the Fifth and

20   does so likely as a result of this intimidating visit

21   yesterday, we would ask that you admit his declaration

22   into evidence.

23           Two, we want to make sure we have all the audio

24   recordings.  We have what we believe to be the audio

25   recording of Alejo.  If there is one of Krye, we want that

8

1  as well.

2         In addition, Your Honor, we want the opportunity

3  to interview this investigator.  We want to find out what

4  was he wearing.  Did he show a badge?  Was he in a police

5  outfit?  You know, doing the kinds of things that would

6  make the witnesses as scared as they got.

7         And, finally, Your Honor, if they plan to have

8  their folks pay any more visits to our witnesses this week

9  or during the course of this trial, we want 48 hour's

10  notice, so we can have one of our lawyers or our

11  investigators to be there to make sure everything is on

12  the up-and-up.  Thank you, Your Honor.

13         THE COURT:  Ms. Gard or Mr. Hazard, did you want

14  to respond?

15         MR. HAZARD:  Your Honor, I'll respond.  With

16  respect to some of the things and the background with

17  Ms. Lorts, all of this -- a large chunk of it occurred

18  before I was even an employee of the attorney general's

19  office.

20         I know Ms. Gard, if there's anything that she

21  needs to supplement, because she was privy to some things

22  before I came on the case, I ask just for Your Honor to

23  feel free to ask her any questions or follow-up.

24         But I want to make a record as to this very

25  important witness that Petitioner's counsel has brought

1   up, Ms. Lorts.

2         The only thing that was disclosed to the State as

3   part of the materials related to the Petitioner's Petition

4   for Post-Conviction Relief and the appendices was the

5   declaration by Kyre Lorts' uncle, Barry, and that was

6   included in the appendices.

7         In essence, Barry Lorts, as it pertains to

8   Kyre Lorts in his declaration states that sometime -- and

9   I'll just quote this from his declaration -- quote,

10  Sometime after Wendi's arrest, probably about six or seven

11  years ago -- and this declaration is dated August 19th of

12  2010 -- my niece, Krye, confided in me that Alejo was

13  sexually abusive to both Wendi and herself.  Krye

14  frequently spent the night at Wendi's home, and according

15  to Kyre, Alejo molested her and Wendi on a regular basis.

16  Kyre did not go into detail with me about the abuse, and I

17  didn't ask too many questions about it.  She kept it quiet

18  for a long time.  As far as I know, I was the first person

19  she told.  She still had a lot of anger built up about it

20  when she told me and I think she needed to get it off her

21  chest.

22        At that time, she was trying to work things out

23  in her life and come to terms with it.  I know that Kyre

24  and Wendi spent a lot of time with two other girls,

25  Samantha Nichols and Shilo Justice.  So it is possible

1    that Alejo was molesting them as well.  I was very

2    surprised to hear that this had happened.  Alejo never

3    seemed like that kind of person to me.

4            I'm under the impression that it took place after

5    I moved to Phoenix.  I don't know if Donna was aware of

6    what was going on in her home, but I believe that this may

7    be the reason that Alejo has not returned my calls.  Maybe

8    he is afraid of what I would do.  Who knows what he

9    thinks?

10           As far as it relates to Kyre Lorts, that's it.

11           All right.  Now in Mr. Hammond's declaration,

12   Larry Hammond's declaration -- and this was something that

13   Ms. Gard pointed out to me because I didn't see the

14   connection.  Mr. Hammond refers to, in the materials that

15   he relied upon in his declaration, declarations by Krye

16   Martinez, and then in parentheses, through Alexis Bootby.

17           There's no -- nothing was disclosed.  That

18   declaration wasn't disclosed.  There is no quote in

19   Mr. Hammond's, or even specific reference to Krye Lorts in

20   his materials that were disclosed in his declaration.  And

21   so, she has a different name, but we have determined that

22   that is the same as Kyre Lorts.  She also has a third name

23   that we've determined I guess through marriages, Krye Muer

24   or Mayer.

25           MS. GARD:  Mayer.

1      MR. HAZARD:  All we have, though -- we didn't

2   have a date of birth.  We had Kyre Lorts and that's it,

3   just this declaration by her uncle, not very specific.

4   And Mr. Hammond's declaration was dated February 16th of

5   2012.

6      All right.  In March of 2013 -- and this is

7   something that Ms. Gard can supplement if I have my

8   information wrong -- but my understanding is that

9   Petitioner's counsel contacted Ms. Gard and let her know

10  that they were -- they wanted to depose Ms. Lorts, seek a

11  deposition, a court ordered deposition, presumably because

12  she was not being cooperative or they were having a hard

13  time just tracking her down.  I'm not sure about that.

14  But, in any event, they were seeking the court

15  intervention to actually depose her.

16      And Ms. Gard responded and said that she wanted

17  to be a part of that.  When they actually filed the motion

18  with Your Honor, it was a joint motion for both parties to

19  depose Ms. Lorts.  And that was filed I believe in March

20  of 2013.  Your Honor granted the request and this court

21  issued a subpoena for Ms. Lorts.

22      Then we have looked at our e-mails, and starting

23  with e-mails dated June 25th of 2013 -- and I'll just read

24  these into the record, given the allegations by defense

25  counsel.  It looks like the first e-mail on June 25th is

1   from Jodi Fox from Foley and Lardner, Counsel for

2   Petitioner, and she states:  Lacey, I work with Allen

3   Arntsen and Matthew Lynch on the Andriano matter.  We are

4   in the process of attempting to serve Kyre Lorts a

5   subpoena for a deposition to take place July 9, 2013, a

6   day Ms. Lorts has indicated she is available.  Please

7   confirm your availability for that day.  We will confirm

8   with you when we have served Ms. Lorts.  Thank you.

9        Ms. Gard responded the same day:  I have to leave

10  for the Ninth Circuit on July 10th and will likely be

11  unavailable July 9th due to argument and preparation.

12  However, I can have another attorney cover the deposition

13  for me.

14       The next response again is from Ms. Fox:  Thank

15  you, Lacey.  I will keep you updated on service.

16       The following day, on June 26, 2013, Ms. Gard

17  then sends correspondence to counsel and it's Ms. Fox,

18  CC to Mr. Arntsen and Mr. Lynch, and Ms. Gard's question

19  was:  What time do you plan on starting the deposition?

20       And then that same day, June 26th, Scott Bennett,

21  also counsel for Ms. Andriano, local counsel, stated:

22  10:00 a.m.  It will be at my office, and he gives the

23  location of his office.

24       Ms. Gard responds:  Thanks, Scott.  Matt Difford

25  from our office will cover the deposition for me.

1          Then the next correspondence that we have is from
2     Ms. Fox on July 2nd:  Good morning.  Lacey and Matt, we
3     successfully served Krye Lorts yesterday for the
4     deposition on July 9, 2013.  Thanks.

5          All right.  Then on July 8th, Ms. Fox wrote the
6     day before the scheduled deposition in Mr. Bennett's
7     office, Ms. Fox wrote:  Lacey, Ms. Lorts is suffering from
8     some serious medical issues, and, as a result, we need to
9     cancel the deposition scheduled for tomorrow.  I will be
10    in touch to reschedule a new time.  Thank you.  And I
11    apologize for the late cancellation.

12         And that was the last we had heard about Krye
13    Lorts until she was on the witness list that was submitted
14    shortly before, you know, this hearing I believe in either
15    late December or --

16         MS. GARD:  January.

17         MR. HAZARD:  -- January of this year.

18         Now when I interviewed Dr. Hopper telephonically,
19    and all I wanted really on that interview was just to make
20    sure that I had everything that he had and there would be
21    no surprises.  And during that interview on January 30th,
22    it was revealed to me for the first time that they had not
23    only a written declaration that they had not disclosed
24    from Kyre Lorts herself, but that Dr. Hopper had also
25    interviewed Ms. Lorts in November, as he testified

1    yesterday, November 10th and November 11th of 2013.

2            And I obtained some notes on January 30th and the

3    remainder of the notes, including all of those that I kind

4    of fumbled around with yesterday, Your Honor -- I received

5    those on February 2nd for the first time.

6            Now what we know from the declaration of

7    Kyre Lorts is that it is signed June 30th of 2013, which

8    means that on that July 2nd correspondence, the defense

9    had this declaration and didn't mention anything, didn't

10   disclose it, didn't mention it.  And they had it certainly

11   on July 8th when they cancelled the deposition because, as

12   they stated, Ms. Lorts had medical issues.

13           And as Ms. Fox wrote:  I will be in touch to

14   reschedule a new time.  Thank you.  And I apologize for

15   the late cancellation.  And that was never done.  They

16   never contacted us.

17           THE COURT:  Well, when you got the witness

18   schedule and you saw that she was on there, didn't anyone

19   communicate and say:  Hey, I want to talk to -- I want to

20   interview Ms. Lorts?

21           MR. HAZARD:  Well, that leads me to the other

22   thing, Your Honor.  Ms. Lorts was one of the witnesses

23   that when Mr. Martinez, Ms. Gard and I conferred after

24   seeing the witness list and to divide up the workload in

25   preparation for the hearing, because at that point,

1   Ms. Gard was not going to participate and Mr. Martinez was

2   going to help, Ms. Lorts was a witness that he was going

3   to take care of because it had to deal with facts close --

4   even though she had never been a part -- it never came up

5   in the trial proceedings -- it was part of that

6   Ms. Andriano's circle of fact witnesses.  And I was

7   focusing on more of the experts and those sorts of things

8   in preparation for the hearing.  And I don't -- I don't --

9   it doesn't appear that Mr. Martinez made those efforts.

10        THE COURT:  Was Alejo Ochoa ever interviewed?

11        MR. HAZARD:  No.  And, again, that was

12  Mr. Martinez who was going to handle his cross-examination

13  or his --

14        THE COURT:  Okay.  Let's do this.  So what

15  happened yesterday, are the facts correct that someone

16  went out there to try to speak with these individuals?

17        MR. HAZARD:  Yes.  And let me make myself clear

18  about that.  On February 2nd, when I received those notes

19  from Dr. Hopper about his interviews with Ms. Andriano,

20  that's when I discovered this note about Alejo Ochoa

21  saying that he would, through Ms. Andriano, through Donna

22  Ochoa, through Ms. Andriano, he was willing to lie and say

23  that he abused Wendi to help her out.  And then following

24  up Ms. Andriano's comment, Mr. Ochoa would say he would do

25  anything to help Wendi and Wendi Andriano's comment that's

1  revolting.  I told him:  I don't want your help.

2       And so, given that and given the fact that the

3  materials that we had, Mr. Ochoa had never been asked the

4  question directly, given that Ms. Gard and I had concerns

5  about even before that, whether Mr. Ochoa should have to

6  have the Court appoint counsel for him if we're going to

7  ask him, because we intended to ask him those questions

8  directly that he had never been asked before.  I know that

9  was something that was discussed sometime ago.

10      (WHEREUPON, an off-the-record discussion ensued

11  between Mr. Hazard and Ms. Gard.)

12      MR. HAZARD:  Yeah, and we did make that request

13  before we got the notes.  But, especially, when I saw

14  those notes, that it made it clear that we needed help to

15  find out whether he was going to lie and take the stand

16  and commit perjury.

17      THE COURT:  Weren't all of these things, Counsel,

18  things that should have been discussed at the status

19  conferences that we had, instead of wasting our time here

20  at the evidentiary hearing, bringing up these matters to

21  the Court for the very first time?

22      MR. HAZARD:  Well, Your Honor, we tried to make

23  efforts that we wouldn't waste the Court's time.

24      THE COURT:  Well, just from what I hear, these

25  are issues that you knew about and counsel knew about that

1   might be a problem.  When we had the status conference, I

2   asked at the status conference:  Is there anything else

3   that we need to discuss?  No one brought up anything.

4          And here we are Day 2 of this evidentiary

5   hearing.  We're already running behind and we got started

6   at 9:30 promptly, and now we're 22 minutes into the

7   hearing without having heard any additional testimony.

8          So what we're going to do right now is we're

9   going to continue with Dr. Hopper.

10          Is Krye Lorts here?

11          MR. NICKELS:  Is she in the court building?

12          MS. FOX:  I can go check right now, Your Honor.

13          THE COURT:  Well, you don't have to check.  But I

14   assume we're going to finish with Dr. Hopper by the lunch

15   hour; is that correct?

16          MR. NICKELS:  Well, I hope so.

17          THE COURT:  If we don't -- even if we don't,

18   during the lunch hour, I'll allow counsel to sit down and

19   you all can talk with Kyre Lorts.  We're going to continue

20   in the afternoon.

21          Now with regard to Mr. Ochoa, Alejo Ochoa, I'm

22   not sure what he's going to do.  Who knows what he's going

23   to do?  Okay.  I guess we're going to reach that bridge or

24   cross that bridge when we reach that bridge; right?  Okay.

25   It depends upon, you know, what the situation is, and I'll

1   make the ruling.

2       But it is anticipated, you think, that he is

3   going to plead the Fifth?  Is that what you anticipate?

4       MR. NICKELS:  That's what he told us.

5       THE COURT:  And you had him scheduled to testify

6   on Thursday or --

7       MR. NICKELS:  Tomorrow, probably.

8       MR. ARNTSEN:  Probably tomorrow, hopefully.  That

9   was our hope for tomorrow.

10      THE COURT:  Did this investigator or this

11  detective or whoever went to speak with Kyre Lorts and

12  Mr. Ochoa, did he or she record the interview?

13      MR. HAZARD:  We do.  And we have provided a copy.

14  I obtained that this morning.  I drove downtown to pick it

15  up at the Maricopa County Attorney's Office.  They have a

16  copy.  We have a copy.  And I have not had a chance to

17  listen to all of it.

18      THE COURT:  I'm just curious.  Why didn't you say

19  to them:  Hey, I want to speak with this Kyre Lorts and I

20  want to speak with this Alejo Ochoa?  Let's all sit down

21  and do an interview.  I'm just curious.

22      MR. HAZARD:  Well, first of all, Your Honor, we

23  only knew about -- Ms. Gard and I only knew about the

24  issue with Mr. Ochoa, that that was going to take place --

25      THE COURT:  But you probably knew sometime back

1  that these two people were going to be witnesses; correct?

2          MR. HAZARD:  Well, we knew.  Yes, we knew in

3  January.

4          THE COURT:  And in preparation for the

5  evidentiary hearing, I would imagine you would want to

6  interview potential witnesses.  And as soon as I -- if I

7  were in your shoes, and as soon as I made a determination,

8  hey, these people may be called as witnesses, I would

9  contact counsel and say:  Hey, you know, I want to talk to

10 these people before the evidentiary hearing.  Let's set up

11 some interviews.  Was that ever done?

12         MR. HAZARD:  I don't believe Mr. Martinez did

13 that, Your Honor, and --

14         THE COURT:  Okay.  We're going to continue with

15 Dr. Hopper at this time.  And then at the lunch hour, you

16 can interview Kyre Lorts.  We're going to keep this

17 evidentiary hearing moving along right now.

18         With regard to Alejo Ochoa, you know, let's see

19 what he says.  Okay?  If he pleads the Fifth, then we will

20 have to deal with it.  Okay?

21         MR. HAZARD:  Okay.

22         THE COURT:  Then let's proceed.

23         MR. HAZARD:  Thank you, Your Honor.

24         MR. NICKELS:  Thank you, Your Honor.

25         THE COURT:  Okay.  The record will reflect that

1  Dr. James Hopper is back on the witness stand.

2          THE WITNESS:  Do I have to be sworn in again?

3          THE COURT:  No.  You're still under oath.

4          So yesterday when we recessed, Dr. Hopper was on

5  the stand, and Mr. Hazard was in his cross-examination.

6          Go ahead and state your name for the record

7  again.

8          THE WITNESS:  James W. Hopper.

9          THE COURT:  And we will continue with the

10 cross-examination by Mr. Hazard.

11

12                  JAMES W. HOPPER, PH.D.,

13 having been previously sworn to tell the truth, the whole

14 truth, and nothing but the truth, testified as follows:

15

16              CROSS-EXAMINATION  (Continued)

17 BY MR. HAZARD:

18     Q.   Dr. Hopper, where we left off yesterday, I had

19 started asking you questions about Ms. Andriano's conduct

20 in the weeks leading up to October 8, 2000.  And do you

21 remember that that's where we ended?

22     A.   Yes.

23     Q.   All right.  And although I think I covered this

24 with you, you mentioned that Ms. Andriano, the evidence

25 shows that she tried to fraudulently obtain life insurance

1   policies and she also enlisted or reached out to people to
2   try to help her in that fraud; is that correct?
3            MR. NICKELS:  Your Honor, I object to asked and
4   answered, since we're already behind.  That was covered.
5            THE COURT:  Sustained.  Sustained.
6            Let's we'll move on.
7       *Q.*   BY MR. HAZARD:  And with respect to trying to
8   obtain poison, Ms. Andriano, the evidence shows that she
9   did use a false name, Ann Newton; correct?
10      *A.*   I remember seeing that evidence, yes.
11      *Q.*   Right.  And she also made up a company in the
12  effort, the goal to achieve this poison -- to obtain this
13  poison from the company that was selling it; correct?
14      *A.*   Yes.
15      *Q.*   And she even went to the lengths of actually
16  doctoring a business license and faxing that to the
17  company in order to obtain that poison; correct?
18           MR. NICKELS:  Your Honor, I have a foundational
19  objection I just want to make.  I believe he is asking him
20  about what happened at trial and it's not clear that this
21  witness knows that.
22           THE COURT:  Sustained.  Sustained.
23           Let's we'll move on.
24      *Q.*   BY MR. HAZARD:  Did that come out in trial?
25           THE COURT:  If you know from reviewing

1    transcripts or --

2         THE WITNESS:  A variety of horrendous decisions

3    that she made in the time leading up did come out at

4    trial.

5         *Q.*  BY MR. HAZARD:  All right.  One of those maybe

6    horrendous decisions or certainly a decision that she made

7    that I think you talked to her a little bit about was the

8    affair she had with Travis Black a couple of weeks or so

9    before the murder.  You remember that; correct?

10        *A.*  Yes.

11        *Q.*  And whether it was through Wendi's account in

12   your interviews or evidence presented at trial,

13   Ms. Andriano had told Travis Black that her husband in

14   fact actually had died of cancer when that was not true.

15   Do you remember hearing about that?

16        *A.*  I remember hearing about that was one of those

17   bad decisions, yeah.

18        *Q.*  Okay.  And then when we get to the night of

19   October 7th and the early morning hours of October 8,

20   2000, the evidence came out, and I think based on your

21   testimony, it doesn't appear that Ms. Andriano is

22   disputing that she did hit her husband a number of times

23   over the back of the head with a barstool; is that

24   correct?

25        *A.*  That's correct.

1    *Q.*    All right.  And although Ms. Andriano's accounts

2    and memory with respect of how the knife was used, there

3    was evidence presented at trial that Ms. Andriano stabbed

4    her husband in the neck with the knife; correct?

5    *A.*    Correct.

6    *Q.*    And the evidence at the trial was that

7    Ms. Andriano didn't call 911 right away after her husband

8    had been killed.  There was some things that she did and

9    phone calls that she made before calling 911 for that last

10    time.  Do you remember that?  Do you remember hearing

11    about that?

12    *A.*    Yes, I do.

13    *Q.*    Including, the first phone calls she made were to

14    try to get in touch with Alejo Ochoa; correct?

15    *A.*    Correct.

16    *Q.*    And the evidence was they did have a telephone

17    conversation where she sought Mr. Ochoa's advice and

18    assistance; correct?

19    *A.*    I don't know what they said in that conversation.

20    That's quite plausible, but I don't know.  I didn't hear

21    the conversation.  It wasn't record, as far as I'm aware.

22    *Q.*    All right.  But you do remember hearing that

23    evidence of that came out in the trial?

24    *A.*    Yes.

25    *Q.*    And you also remember that evidence came out that

1   even before she called 911, she actually spoke to Chris

2   Hashisaki as well over the phone?

3      A.   Yes.

4      Q.   And this is, again, after her husband had been

5   murdered; correct?  Do you remember that?

6      A.   The time sequence of everything that happened,

7   I'm not solid on that.  I mean, I read these transcripts.

8   That was not the focus, as we know, of what I was supposed

9   to do, but I read these and I tried to absorb as much as I

10  could.  Time sequence and things like that, I can't say

11  I'm confident on those.

12     Q.   Fair enough.  The evidence came out, too, at

13  least from the State's perspective that was presented to

14  the jury through the crime scene experts, was that

15  Ms. Andriano had at least staged a portion of that crime

16  scene with respect to the belt and maybe the knife as well

17  at the location?  Do you remember hearing about that?

18     A.   That evidence suggesting that it happened?

19     Q.   Yes.

20     A.   Yes.

21     Q.   Do you remember also that when she did call 911

22  that last time after the murder to report it, that she

23  told the operator at that point that her husband had

24  gotten into a fight with her and that she thinks that she

25  may have stabbed him?  Do you remember hearing about that

1  coming out in trial?

2      *A.*    I listened to the call.  I listened to the

3  recording of that call.

4      *Q.*    Is that consistent with your memory of that call?

5      *A.*    Yeah.  It's been a long time since I heard it,

6  though.

7      *Q.*    There was evidence presented that during her

8  interactions with Chris Hashisaki that night, when

9  Ms. Hashisaki was called by Ms. Andriano and came over,

10  that at least from Chris Hashisaki's testimony and the

11  evidence presented at her trial, that Wendi deceived

12  Ms. Hashisaki about some things about her and her husband

13  related to the October -- what was going on on October 8,

14  2000?

15           MR. NICKELS:  Your Honor, I object to this on one

16  of two grounds.  I feel this is irrelevant because we have

17  no tie right now on how this plays into Dr. Hopper's

18  analysis.  Or I'm going to object on 403 grounds.  We

19  don't need to retry the, entire you know, underlying case

20  here in order to get to the questions that may be

21  relevant.  On 403 grounds, this is becoming a waste of

22  time.

23           THE COURT:  I'm going to sustain the objection.

24           If you're going to ask the question about

25  something that had occurred at trial, ask how it applies

1   to what he has testified or how it applies to his
2   opinions.  I mean, you're basically just saying this is
3   what happened at trial.  This is what happened at trial.
4   Are you aware of this?  Are you aware of this?  I mean,
5   ask a question and ask how it applies to his opinions.
6           MR. HAZARD:  And, Your Honor, I was planning to
7   do that after getting through this.  I just have a few
8   more facts and then asking him about the opinions.
9           THE COURT:  Okay.  Is that where you're going?
10          MR. HAZARD:  Yes, Your Honor.
11          THE COURT:  Okay.  Let's we'll move on, then.
12          MR. HAZARD:  All right.
13      Q.  BY MR. HAZARD:  There was evidence that she
14  deceived Chris Hashisaki; correct?
15      A.  Evidence was presented of that.  It did not --
16  you know, I'm not a detective.  I looked over that, and as
17  a human, I wanted to try to understand it, but I don't
18  know.  You know, I wasn't there.
19      Q.  BY MR. HAZARD:  And there was evidence, at least,
20  that she deceived the paramedics to get them to go away or
21  tell them half-truths.  Would you agree with that?
22      A.  Testimony to that effect by certain people at
23  trial.  That's my understanding.
24      Q.  And there was also evidence to show that she did
25  lie to the police about some things during her

1  interrogation?

2      *A.*    Yes.   There's a lot that can be said about how

3  interrogations go and how people respond in those kinds of

4  situations and what constitutes a lie and what constitutes

5  what we call confabulation.  You ask the wrong questions

6  and you try to answer them and you end up saying things

7  that can then be used against you.  So I don't think it's

8  so simple as just that.  But there is evidence that she

9  lied about some things, yes.

10     *Q.*    Then my final point as far as things that came

11 out in trial, do you remember also there was evidence that

12 during the break with her police interview, that she

13 called a -- contacted a co-worker at the apartment to go

14 into her office and remove some of the personal papers of

15 Ms. Andriano?  Do you remember hearing about that?

16     *A.*    Yes.

17     *Q.*    In fact, there was testimony that a detective

18 found the co-worker in that office doing that very thing.

19 Do you remember hearing about that?

20     *A.*    Yes.

21     *Q.*    And so, given all of these things that she did to

22 obtain life insurance, to obtain the poison --

23     *A.*    Yeah.

24     *Q.*    -- and this is a weeks before the murder, the

25 lies that she -- and the fraud that she used to attain

1    those goals, and the continuing as the things that

2    happened on the night of October 7th and October 8th,

3    starting with the poisoning of Joe Andriano, the assault

4    and murder of him, and the things she did afterwards,

5    which included some lies and deception, how does this

6    relate to her childhood trauma --

7        A.    I'm so glad you asked that.

8        Q.    -- given that -- given that this happened 12

9    years after she turned 18?

10       A.    Yeah.  That's a great question.  And I would love

11   to answer it and I want to make sure I have the time to do

12   that without interruption.  So I've talked a lot about

13   executive functions of the prefrontal cortex.

14            I've talked about how we know from, not only

15   decades of research on childhood trauma and neglect, but

16   also now 15 years of neuroscience research on executive

17   functioning of the brain, the bases we use in looking at

18   them, people with child abuse, a history of trauma and

19   depression and all kinds of other disorders.

20            One of the things we know that I don't think came

21   through as clear on my direct as I wish it had, which is

22   that decision making is one of the first executive

23   functions to go because of a variety of reasons.  One is

24   dependent on the kind of information you can access.  So

25   it's dependent on being able to retrieve certain kinds of

1  information, which requires other executive functions.
2  But, more important, decision making is the first to go
3  because our decision making is dependent so much of the
4  time on how we feel and our emotions.
5      And so, the decisions we make, even what used to
6  appear to be the most, quote, rational decisions, Antonio
7  Damasio and other neuroscientists have shown, we can't
8  make rational decisions about your daily life unless we
9  consider emotional information.
10     In fact, the decision making areas of the brain
11  are on the bottom and the middle of the prefrontal cortex
12  and they're the most tightly wired into emotional areas.
13  We all know from our own experience, we can make decisions
14  based on habit or we can make decisions based on
15  reasoning.  And bad decision making is the first thing you
16  see as someone is becoming overwhelmed.  And you
17  particularly see it in someone who is as traumatized and
18  damaged as Wendi Andriano, and not only that, but didn't
19  have models of making good decisions throughout her entire
20  childhood.
21     But even apart from that, as we saw from the
22  neuropsych, the very Gambling tasks that you pointed out
23  to me was stark evidence of how when she gets stressed,
24  like many of us do with our children -- hey, I'm stressed
25  out and my child is annoying me, I'm going to yell or use

1  a negative tone of voice.  I might snap at my wife.
2  That's a bad decision.  My decision making goes first.
3          So leading up to the crime, horrendous decisions.
4  Horrendous decisions as her husband is dying, as she is
5  fearing that all kinds of terrible things are going to
6  happen.  As their relationship is deteriorating, she is
7  just trying to escape into alcohol because her other
8  addiction of taking care of people wasn't working for her
9  anymore.
10         So there are so many different things.  Her
11  decision making is going downhill dramatically.  There's
12  no surprise that someone who's this traumatized is going
13  to be making horrific decisions of this sort.
14         Then when we get into like whatever was going on,
15  I don't claim to know, but when someone is killing
16  someone, I can say from past experience, someone is being
17  attacked or attacking someone, blood is everywhere, that's
18  when you get the total shutdown of the prefrontal cortex.
19  Forget about it.  It's not just decision making.  It's
20  impulse control.  It's everything you depended on.
21         And so then the horror partly passes.  You know,
22  if you listen to her voice on those calls, you know, she
23  is incredibly distressed.  But, you know, she is not in a
24  complete shutdown state in terms of the prefrontal cortex.
25  And, yeah, perhaps with the influence of her father and

1   his, quote, advice -- like I said, with fathers like that,

2   who needs enemies?  Then she is going to making some

3   really bad decisions.  In the interrogation room, going to

4   call people to tamper with evidence, things like that.

5           So it is absolutely consistent with what

6   overwhelming lifetime, a childhood of trauma, which takes

7   years of treatment to even get over some of this pretty

8   well.  So it's absolutely a perfect example of how

9   decision making goes first in all of us, but especially in

10  someone who has been through the overwhelming trauma that

11  she has been through.  That's exactly what you would

12  expect.  So it is completely consistent with everything I

13  know as a therapist, as a scientist and everything I've

14  studied for the last 20 years.

15      *Q.*   Doctor, premeditated murder is always an

16  irrational decision, though; correct?

17      *A.*   Depending on what you mean by irrational.

18      *Q.*   It's an exercise of bad judgment; correct,

19  always?

20      *A.*   Yes, it is.

21      *Q.*   And everything that I -- all of the facts,

22  looking objectively just at Ms. Andriano, the facts

23  presented at her trial, one could also reasonably conclude

24  that this is the acts of a person who is conniving and

25  deceitful and calculating?

1      *A.*    That's why -- were you done?  Is it going to be a

2    compound question or --

3      *Q.*    Just a yes or no question.

4      *A.*    I can't answer that yes or no because now I don't

5    -- now, what was presented at trial lacked the very things

6    that we have been talking about for the last all day

7    yesterday.

8            So, of course, if all that I've just presented

9    and all the expertise that I'm trying to share with the

10   Court was not presented at trial, then, of course, it's

11   easy to paint her as a conniving bitch, who's off sleeping

12   around and drinking and having fun as her husband is

13   dying.  You know, prosecutors can do that sort of thing

14   when this kind of evidence is not presented.

15           The whole point -- the reason why I'm here is

16   because there is such evidence.  We have now done a

17   thorough investigation.  As I said, this is the most

18   thorough one I've ever been involved in.  I have mountains

19   of data.  Many people's evidence.  No one piece am I

20   grounding it on.

21           Even Alejo never even touched her, even if

22   Alejo -- Kyre doesn't exist, that kind of your own father

23   doing that stuff to you every day.  There is so much -- so

24   much evidence of trauma and the effect this would have on

25   someone's brain.  It was never presented at trial and

1   that's why she would be presented as a conniving person.

2       What I'm saying is 52 hours with her, looking at

3   all the evidence, my own professional integrity as a

4   therapist, a scientist, and somebody who testifies in

5   court, it just doesn't -- it just doesn't compute.  I'm

6   sorry.

7       *Q.*   There was mitigation presented at her trial,

8   though.  Do you agree with that?

9       *A.*   If you can call it that.  I mean, from what I

10  saw -- what you are you referring and the issues?

11      *Q.*   Domestic violence and the effects of domestic

12  violence that went directly to the statements Ms. Andriano

13  made to police and that she testified to.

14      Do you agree with that?

15      *A.*   I agree with that.  Also, as you know from my

16  notes with her, she said she tried to fight the domestic

17  violence offense because she didn't think it was fair to

18  Joe and she didn't think it was right.

19      *Q.*   But you agree that from the onset, from her first

20  interview with police, and consistent with her testimony

21  at trial, that her testimony was -- her position was she

22  was reacting to violence inflicted upon her by the victim

23  Joe Andriano.  You agree with that; correct?

24      *A.*   Yes.  But that is -- domestic violence, as a

25  whole construct versus violence at the time, I want to be

1  clear that I'm answering to her statement that there was

2  something violent coming at her at the time when she lost

3  her ability to deal with things at that time.

4           MR. HAZARD:  All right.  No further questions.

5           THE COURT:  Redirect?

6           MR. NICKELS:  We have nothing, Your Honor.

7           THE COURT:  May this witness be excused?

8           MR. NICKELS:  Yes.

9           THE COURT:  Thank you very much.  You're excused.

10          THE WITNESS:  Thank you.

11          (WHEREUPON, the witness exited the courtroom.)

12          THE COURT:  Was Krye Lorts going to be the next

13 witness?

14          MR. ARNTSEN:  Yes, Your Honor.

15          THE COURT:  We can take a recess.  Then you can

16 do the interview and then we will proceed.

17          Did you provide some type of transcript or some

18 type of recording of the interview done by the detective

19 or the investigator with Ms. Lorts yesterday?

20          MS. GARD:  My understanding, Your Honor, from

21 Mr. Martinez is that she refused to be interviewed and I

22 don't believe there is any recording.

23          And to make the record clear, I have no knowledge

24 of any detective waiting outside her home or anything like

25 that.

1          THE COURT:  Was an investigator sent out there?

2          MS. GARD:  It was an investigator, yes, from the

3    Maricopa County Attorney's Office, a former detective on

4    this case, Dennis Holgrum.

5          THE COURT:  I'm just curious as to why counsel

6    didn't communicate and say:  Let's interview Ms. Lorts

7    rather than sending an investigator out there on the day

8    of the evidentiary hearing.

9          MS. GARD:  Well, we did not know until after the

10   fact that Ms. Lorts was going to be interviewed.  That was

11   a decision made by Mr. Martinez.  So I don't know if

12   that --

13         THE COURT:  You didn't know what?

14         MS. GARD:  We didn't know that the interview --

15   we knew that the investigator would talk to Mr. Ochoa, but

16   we did not know he was going to talk to Ms. Lorts.

17         THE COURT:  Well, I'm just curious as to both

18   Ms. Lorts and Mr. Ochoa, why wouldn't it be a situation

19   where you called up the Petitioner's counsel and say:

20   Look, you have these people listed as witnesses.  I want

21   to interview these people and let's sit down and interview

22   them together.

23         MS. GARD:  Your Honor, I can't speak to why that

24   wasn't done before the start of the hearing.  Like we

25   said, we divided the labor and this was put on

1   Mr. Martinez.  So I don't really know.

2        THE COURT:  Well, let's go ahead and proceed

3   today.  If you've decided that you weren't going to

4   interview Ms. Lorts, let's go ahead and proceed at this

5   time.

6        MR. ARNTSEN:  Okay.

7        THE COURT:  You knew that she was going to be a

8   witness.  So let's go ahead and proceed.

9        MR. ARNTSEN:  Thank you, Your Honor.

10       MS. GARD:  And, Your Honor, just for the record,

11  we were supposed to be involved in a deposition of her and

12  that was never done.

13       THE COURT:  Right, but that was in July or June.

14       MS. GARD:  I understand.

15       THE COURT:  And that's been months.  So I'm going

16  to allow the Petitioner to proceed with the witness.

17       (WHEREUPON, the witness entered the courtroom.)

18       (WHEREUPON, an off-the-record discussion ensued.)

19       MR. ARNTSEN:  Your Honor, we were just

20  coordinating with witnesses.  What I told Attorney Hazard

21  is that Donna Ochoa will be our next witness.  She is

22  about five minutes from here.  Again, I'm going to call

23  her to come over here when Attorney Hazard starts his

24  cross of Ms. Lorts, just like I did yesterday with

25  Dr. Hopper.

1          THE COURT:  Are you Kyre Lorts?

2          THE WITNESS:  Yes.

3          THE COURT:  Why don't you go ahead and step

4   forward to the witness stand.  Before you sit down there,

5   please face the clerk here.  Raise your right hand and she

6   will swear you in.

7          THE CLERK:  Could you please state your name and

8   spell your name for the record?

9          THE WITNESS:  Kyre Lee Jean Lorts.  K-Y-R-E;

10  L-E-E; J-E-A-N; L-O-R-T-S.

11         THE COURT:  What is the middle name again?

12         THE WITNESS:  Lee Jean.

13         THE COURT:  Can you spell that for me again?

14         THE WITNESS:  L-E-E, next word, J-E-A-N.

15         THE COURT:  Oh, it's separate?

16         THE WITNESS:  Yes.

17         THE COURT:  Okay.

18         (WHEREUPON, the witness was duly sworn by the

19  clerk.)

20         THE COURT:  Go ahead and have a seat there on the

21  witness stand.  Ms. Lorts, there's just a couple of things

22  to remember as you testify.  Remember to speak up so that

23  everyone can hear you.  Also, it's important that you wait

24  until the question is completed before you answer the

25  question.  It is also important that you give us a verbal

1   response.  In other words, don't just shake your head and

2   say uh-huh or uh-huh.  Say yes, no, whatever it might be.

3           Can you do that for us?

4           THE WITNESS:  Yes.

5           THE COURT:  Okay.  Go ahead and state your name

6   for the record.

7           THE WITNESS:  Krye Lee Jean Lorts.

8           THE COURT:  Let's see.  Is it going to be

9   Ms. --

10          MS. FOX:  Fox.

11          THE COURT:  Ms. Fox?

12          MS. FOX:  Yes.

13          THE COURT:  Okay.  Ms. Fox, you may proceed.

14          MS. FOX:  Thank you very much.

15

16                  KYRE LEE JEAN LORTS,

17  having been first duly sworn to tell the truth, the whole

18  truth, and nothing but the truth, testified as follows:

19

20                  DIRECT EXAMINATION

21  BY MS. FOX:

22      Q.   Hi, Kyre.

23      A.   Hi.

24      Q.   Thank you for being here today.  Just to start

25  off, can you please state your date of birth for the

39

1   record?

2       A.   9/16/72.

3       Q.   And how old does that make you?

4       A.   42.

5       Q.   Where do you currently reside?

6       A.   In San Tan Valley.

7       Q.   What is your profession?

8       A.   I'm a teacher.

9       Q.   What kind of teacher do you do?

10      A.   I teach special needs children.

11      Q.   What type of special needs children do you teach?

12      A.   Emotionally disabled.

13      Q.   How long have you been teaching emotionally

14  disabled children?

15      A.   Since about 2010.

16           THE COURT:  You may want to slow down a little,

17  Ms. Fox.

18           MS. FOX:  I'm sorry.  I talk fast.

19           THE COURT:  Just for the court reporter's sake.

20           MS. FOX:  Okay.

21           THE COURT:  Thank you.

22      Q.   BY MS. FOX:  Do you have any children?

23      A.   I have four.

24      Q.   How old are they?

25      A.   23, 19, 18, 16.

1      *Q.*    You do you know the Petitioner, Wendi Andriano?

2      *A.*    I do.

3      *Q.*    How do you know Wendi?

4             THE COURT:  I didn't hear a response to the last

5      question.

6             THE WITNESS:  I do.

7             MS. FOX:  May I approach the witness?

8             THE COURT:  Yes.  There's some Kleenex there,

9      Ms. Lorts.

10            MR. ARNTSEN:  Would you like a glass of water, by

11     the way?

12            THE COURT:  If you would like some water, there's

13     water right there and some cups.

14            THE WITNESS:  I grew up with Wendi.

15     *Q.*    BY MS. FOX:  Are you okay?

16     *A.*    No.

17     *Q.*    Do you need a second?

18     *A.*    Yes.

19     *Q.*    Okay.  So you said you grew up with Wendi?

20     *A.*    Yes.

21     *Q.*    How old were you when you first met Wendi?

22     *A.*    Oh, I was probably seven.

23     *Q.*    How old was Wendi?

24     *A.*    About nine or ten.

25     *Q.*    And where did you first meet Wendi?

1    *A.*    We went to the same school together.

2    *Q.*    And had you heard of Wendi before you started

3    going to school together?

4    *A.*    Had I heard of her?

5    *Q.*    Yes.

6    *A.*    No.

7    *Q.*    Does your family have any relationship with

8    Wendi's family?

9    *A.*    We did.  We did.

10    *Q.*    What was the relationship between your family and

11    Wendi's family?

12    *A.*    My dad owned the church and school that her

13    family went to and my dad employed her dad at first for

14    to be a groundskeeper and maintenance, and then he moved

15    into being a devotions teacher and pastor eventually.

16    *Q.*    Did your dad know Alejo before he started working

17    at the church?

18    *A.*    He did.

19    *Q.*    How did your father know Alejo before he started

20    working at the church?

21    *A.*    My father went to school with him or they were

22    teenage friends.

23    *Q.*    And you said you met Wendi when you were around

24    seven or eight years old.  How often did you see Wendi

25    during the period of time that you knew her?

1      *A.*    Every day during the school days and then Sundays

2   at church.

3      *Q.*    And how long did you attend school with Wendi

4   for?

5      *A.*    Umm, probably three years.

6      *Q.*    So from the time you were seven or eight until

7   you were around 11?

8      *A.*    Yeah.

9      *Q.*    How old was Wendi during that time period?

10      *A.*    She would have been ten to 13 or 14.

11      *Q.*    And what was the name of the school that you

12   attended with Wendi?

13      *A.*    91st Psalm.

14      *Q.*    And what was the name of the church you attended

15   with Wendi?

16      *A.*    91st Psalm.

17      *Q.*    Was the school affiliated with the church?

18      *A.*    Yes.

19      *Q.*    Who was the pastor at 91st Psalm?

20      *A.*    My dad, Pastor Cal Lorts.

21      *Q.*    And who was the principle of the school at

22   91st Psalm?

23      *A.*    My dad as well.

24      *Q.*    And can you describe a typical school day for you

25   at 91st Psalm?

1    *A.*    It was a Christian school.  So we were all in a

2  big room with learning centers.  And the curriculum wasn't

3  teacher-taught like you would if you were in a public

4  school.  It was a self-taught curriculum.  We had paces

5  that we did.  If we needed help, the supervisor or

6  monitors would walk around the room and we were able to

7  ask questions.  We went out to recess, lunch.  We had

8  music, devotions, PE.

9    *Q.*    You said you would sit at learning centers.  Can

10  you please describe what a learning center is?

11    *A.*    It's like a study corral.  You have your own room

12  to work and there was dividers and it was just to minimize

13  distraction.

14    *Q.*    And you stated that monitors or supervisors would

15  be the ones tending to the classroom?

16    *A.*    Yes.

17    *Q.*    Who would act as the monitors or supervisors?

18    *A.*    It would have been the adults that were hired.

19  So my mom, Wendi's mom, just certain people that were

20  hired for those positions.

21    *Q.*    But you just said they didn't act as actual

22  teachers?

23    *A.*    No.

24    *Q.*    You were teaching yourself?

25    *A.*    Yes.

1    *Q.*   What would happen if a student acted out or got

2  in trouble?

3    *A.*   The discipline system was demerits if it wasn't a

4  major offense.  Maybe losing recess or lunch and also

5  getting the rod.

6    *Q.*   What do you mean by getting the rod?

7    *A.*   We would get spanked.

8    *Q.*   What would you be spanked with?

9    *A.*   With a paddle.

10    *Q.*   And who would deliver the spankings?

11    *A.*   The pastors.

12    *Q.*   When you were at school, did you ever encounter

13  Wendi's dad, Alejo?

14    *A.*   Yes.

15    *Q.*   What was Alejo doing around the school?

16    *A.*   Keeping the grounds.  Like I said, he taught

17  devotions.

18    *Q.*   What's devotions?

19    *A.*   It's where we would learn about the Bible and we

20  had devotion books that we used and kind of like a little

21  mini church.

22    *Q.*   And what was Alejo like while teaching devotions?

23    *A.*   Very stern and gruff, harsh.

24    *Q.*   What do you mean by harsh?

25    *A.*   He didn't talk, or when he taught like my dad

1  would preach or teach, he would -- we had a devotion book

2  and he would -- like one time, it was the Song of Solomon

3  and the Song of Solomon has scriptures or verses and it

4  talks about breasts and touching, and he would just say

5  weird things to us kids, and, again, it wasn't like what

6  my dad did.  So it was just -- it wasn't right.

7      Q.   Why was it weird?

8      A.   Telling the boys how to touch breasts.

9           MR. HAZARD:  Objection.  Hearsay.

10          THE COURT:  Overruled.

11          MS. FOX:  Continue.

12          THE WITNESS:  Telling the boys how to touch

13  breasts or talking about kissing with your tongue.  Things

14  I had never heard as a kid.

15     Q.   BY MS. FOX:  And did he often talk about things

16  like touching breasts or kissing in devotions class?

17     A.   Yes.

18     Q.   Was your dad the pastor the entire time that you

19  attended 91st Psalm?

20     A.   Yes.

21     Q.   And at what point did you stop attending 91st

22  Psalm?

23     A.   When we moved up to Tempe.

24     Q.   Who was the pastor that took over?  And when did

25  you we'll move to Tempe?

1       *A.*    Umm, '83, '84.

2       *Q.*    Who was the pastor that took over after your

3  father?

4       *A.*    Pastor Tom King.

5       *Q.*    Did you ever attend the church under Pastor Tom

6  King?

7       *A.*    I visited a few times.

8       *Q.*    And was the church different under Tom King in

9  comparison to how it was under your father?

10      *A.*    Yeah.  It was a lot smaller.  His preachings were

11  very stern and.  Again, I compare it to my dad.  Not like

12  my dad's.  Very damning from the pulpit.  I felt not a lot

13  of love coming through his messages.

14      *Q.*    Did you ever attend 91st Psalm School in

15  Casa Grande when Tom King was pastor?

16      *A.*    No.

17      *Q.*    At school did you spend at any time with Wendi at

18  your recesses or breaks?

19      *A.*    Yes.

20      *Q.*    How often would you spend time with Wendi during

21  lunch or recess?

22      *A.*    Every day.  We were good friends.

23      *Q.*    Who else would spend time with you and Wendi at

24  lunch or recess?

25      *A.*    Shawn, Brad, Lonnie, Laura.  There was a lot of

1   us kids that were pretty close knit.  Jeri Lynn.  I've

2   already said Laura, though.

3       *Q.*   Did you ever see Wendi outside of school?

4       *A.*   Yes.

5       *Q.*   How often would you see Wendi outside of school?

6       *A.*   On Sundays at church.  And then I wasn't really

7   allowed to spend the night with a lot of people, but I

8   would get to stay the night at her house.

9       *Q.*   How old were you when you were able to spend the

10  night at Wendi's house?

11      *A.*   Probably about eight or nine.

12      *Q.*   And how often would you spend the night at

13  Wendi's house?

14      *A.*   Every -- twice a month.  Maybe every other

15  Friday.

16      *Q.*   What would you do at your sleepovers with Wendi?

17      *A.*   We got to dress up, play dress-up, and we would

18  go in her mom's closet and get her mom's nightgowns and

19  put them on and, you know, parade around the house and --

20      *Q.*   I would like to show you Exhibit 160.  It's also

21  in the book right in front of you.  There should be

22  exhibit binders?

23      *A.*   Oh, okay.

24          MR. ARNTSEN:  Your Honor, may I approach the

25  witness --

1          THE COURT:  Yes.

2          MR. ARNTSEN:  -- just to get the witness binder

3    out?

4          THE COURT:  Yes.

5          MR. ARNTSEN:  Thank you.

6          THE WITNESS:  Thank you.

7     Q.   BY MS. FOX:  Have you ever seen this picture

8    before?

9     A.   Yeah.

10    Q.   And can you tell us what this is a picture of?

11    A.   That is a picture of me and in my school uniform.

12    Q.   And how old were you at the time this picture was

13   taken?

14    A.   Umm, five, six.  I was born in '72.  So, seven.

15   I'm not doing the math right.  Yes, seven.

16    Q.   Seven?  Is this approximately the age you were

17   when you started sleeping over at Wendi Andriano's house?

18    A.   Yes.

19          MS. FOX:  I would like to we'll move Exhibit 160

20   into evidence.

21          THE COURT:  Any objection?

22          MR. HAZARD:  No, Your Honor.

23          THE COURT:  Exhibit No. 160 for identification is

24   admitted into evidence.

25    Q.   BY MS. FOX:  So you stated that you would play

1    dress-up when you slept over at Wendi's house.  I would

2    like you to walk me through the first time that every

3    happened.

4            MR. HAZARD:  Objection.  Relevance.

5            THE COURT:  Overruled.

6            THE WITNESS:  I went to her house and ate dinner.

7    I got to go pick out -- or go in her mom's closet and pick

8    out Donna's nightgowns.

9        Q.   BY MS. FOX:  Who suggested that you go play

10   dress-up?

11       A.   Wendi.

12       Q.   And when she said play dress-up, what did you

13   think she meant -- what did you interpret that to mean?

14       A.   Trying on her mom's shoes, her mom's dresses.

15   That's how I would have -- how I did it at my house with

16   my mom's clothes.

17       Q.   So she said let's play dress-up.  And what

18   happened next?

19       A.   So we picked out some stuff of Donna's and it was

20   nightgowns and we tried them on.

21       Q.   Can you please describe the nightgowns that you

22   were trying on?

23       A.   They were lacy or see-through, short, long,

24   different sizes.

25       Q.   And after you tried them on, did you end up

1   putting one on?

2       *A.*   Yes.

3       *Q.*   And were Wendi's parent at home when you were

4   trying on Donna's nightgowns?

5       *A.*   Yes.

6       *Q.*   What happened after you put on the nightgown?

7   Did Wendi put one on as well?

8       *A.*   Yeah, Wendi had one on and we would just go in

9   the bathrooms and look at ourselves.

10      *Q.*   Did you have any underwear on under the

11  nightgown?

12      *A.*   The first time.

13      *Q.*   This time, you did?

14      *A.*   Yes.

15      *Q.*   So you were looking at yourself in the bathroom

16  with Wendi and what happened?  And both of you were

17  wearing Donna's nightgowns.  Were these nightgowns

18  see-through in any way?

19      *A.*   Yeah, they were see-through.  I mean, as an

20  adult, I would call them lingerie.  As a kid, I -- I just

21  called them nighties.

22      *Q.*   So you're in the bathroom with Wendi looking at

23  yourselves in the lingerie.  And what happened next?

24      *A.*   Well, we might -- we just played with each other.

25  We might go play with dolls.  Or the first few times, it

1  was just playing dress-up.

2      *Q.*    You said the first few times.  Did that change at

3  some point in time?

4      *A.*    It did.

5      *Q.*    And how did that change?

6      *A.*    It changed when we had to go into the room with

7  Alejo.

8      *Q.*    What do you mean you had to go into the room with

9  Alejo?

10          MR. HAZARD:  Objection as to when this is.

11          THE COURT:  Sustained.  Lay some foundation.

12      *Q.*   BY MS. FOX:  When did this change?  Your normal

13  playing until the time you said you needed to go into the

14  room with Alejo, do you remember how old you were?

15      *A.*    Oh, I was still seven, eight.  I was still eight.

16  So when we started playing dress-up, the first few times I

17  spent the night with Wendi, it was just that, dress-up

18  with her mom's nighties, but they didn't look like my

19  mom's nightgowns.  And then probably the third or fourth

20  time, that's when it changed.

21      *Q.*    And what grade were you in at this point in time?

22      *A.*    That would have been third.

23      *Q.*    And do you know how far into the school year it

24  was in your third grade year?

25      *A.*    I don't remember.

1    *Q.*    You don't remember?

2    *A.*    No.

3    *Q.*    But you know it was your third grade year?

4    *A.*    Yes.

5    *Q.*    And so you it changed one time.  What happened on

6    that time that it changed?

7    *A.*    We were invited to come into Alejo's room.

8    *Q.*    What was Alejo's room?

9    *A.*    It was the room he sat in a lot.  He had a big

10   chair in there and a tiny TV and watched videos all the

11   time -- videos with naked people.

12   *Q.*    And you said he invited you in.  How did he

13   invite you in?

14   *A.*    I don't remember him saying anything.  We just

15   went in there.

16   *Q.*    We, being you and Wendi?

17   *A.*    Yes.

18   *Q.*    And when you went in, what happened next?

19   *A.*    Wendi sat on his lap and I sat on his lap.  We

20   were both on a knee -- on his knee.

21   *Q.*    Did you immediately go to his lap?

22   *A.*    Wendi went first and then I followed.  The first

23   time, I ran out.

24   *Q.*    Why did you run out?

25   *A.*    I just didn't -- the first time I saw those

1   movies and him sitting there, I just ran into the

2   bathroom.

3        Q.    What type of movies were on that you ran away

4   from?

5        A.    Naked people.

6        Q.    And what was Alejo wearing?

7        A.    He red wore shorts.

8        Q.    Did he have any shirt on?

9        A.    No.

10       Q.    Was he sitting in the chair when you walked in?

11       A.    Yes.

12       Q.    And you said he ran away.  Where did you run to?

13       A.    The bathroom.

14       Q.    The bathroom?

15       A.    Yes.

16       Q.    When you got to the bathroom, what did you do?

17       A.    I was just shaking and confused and I didn't know

18   how to feel.

19       Q.    And what were you wearing?

20       A.    Donna's nightie.

21       Q.    Did you have any underwear on?

22       A.    No.

23       Q.    And so you're in the bathroom shaking, and what

24   happened next?

25       A.    Wendi came in and said it was okay, and I felt

54

1    calmer when she said it was okay.  And then I followed her

2    back into the room.

3        Q.    And when you followed her back in the room, was

4    Alejo still in the chair?

5        A.    Yes.

6        Q.    And was the movie still on?

7        A.    Yes.

8        Q.    The pornography?

9        A.    Uh-huh.

10        MR. HAZARD:  Objection.

11        THE COURT:  Sustained.  Rephrase that question.

12        Q.    BY MS. FOX:  The movie with the naked people on

13    the screen that you had previously mentioned?

14        A.    Yes.

15        Q.    And what happened when you went back in the room

16    with Wendi?

17        A.    Oh, we sat on his lap.

18        Q.    And he was in a chair you stated?

19        A.    Uh-huh, yes.

20        Q.    What type of chair?

21        A.    It was a big brown chair.

22        Q.    Like the type of chair I'm sitting in or

23    like a --

24        A.    Like a recliner.

25        Q.    A recliner.  And so he was sitting on the chair

1  and you both sat on his lap?

2      *A.*    Yes.

3      *Q.*    And you stated he was wearing his red shorts?

4      *A.*    Yes.

5      *Q.*    And you were wearing one of Donna's nighties with

6  no underwear on?

7      *A.*    Yes.

8      *Q.*    What was Wendi wearing?

9      *A.*    She was wearing a nightie, too.

10      *Q.*    And after you sat on his lap, what happened?

11      *A.*    He grew or got big down there and --

12      *Q.*    How could you tell?

13      *A.*    I could see it.

14      *Q.*    Did he have underwear on?

15      *A.*    I don't think he had underwear on.

16      *Q.*    And so you said he grew down there.  And then

17  what was the next thing that happened?

18      *A.*    Oh, he would touch -- touch my legs, touch Wendi,

19  touch my chest.  He just kept touching us.

20          MR. HAZARD:  Your Honor, she has an open notebook

21  in front of her.  What --

22          MS. FOX:  It's the picture.

23          THE COURT:  It's just open.

24          MR. HAZARD:  All right.

25      *Q.*  BY MS. FOX:  And so you said he was touching your

1   legs and your chest.  Was he touching Wendi's legs and

2   chest?

3       *A.*   Yes.

4       *Q.*   Was he touching you anywhere else?

5       *A.*   No.

6       *Q.*   Was he touching Wendi anywhere else?

7       *A.*   Yes.

8       *Q.*   Where else was he touching Wendi?

9       *A.*   In her private part.

10      *Q.*   And how long did this go on for?

11      *A.*   It seemed forever.  It was probably ten minutes.

12      *Q.*   Did you touch him at all?

13      *A.*   Not the first time, but eventually.

14      *Q.*   So this happened more than once?

15      *A.*   Yes.

16      *Q.*   During this first time, you didn't touch him,

17  though?

18      *A.*   I remember accidentally touching it, but it

19  wasn't like what it ended up to be.

20      *Q.*   We will go to that next.  And the first time, did

21  Wendi touch him in his genital area?

22      *A.*   Yes.

23      *Q.*   And so after, you said this lasted probably ten

24  to 15 minutes?

25      *A.*   Yes.

1    *Q.*    What happened?  How did it end?

2    *A.*    We got up and went in the bathroom again and

3  started playing.  I mean, it just --

4    *Q.*    How were you feeling?

5    *A.*    Shaking.  Scared.  I had never seen a man before.

6    *Q.*    And did you say anything to Wendi about what had

7  just happened?

8    *A.*    No.

9    *Q.*    Did you sleep through that night?

10   *A.*    Yes.

11   *Q.*    When you woke up in the morning, was Alejo there?

12   *A.*    Yes.

13   *Q.*    Did you say anything to him?

14   *A.*    No.

15   *Q.*    How did you feel seeing him that morning?

16   *A.*    Nervous.

17   *Q.*    Did he say anything to you?

18   *A.*    No.

19   *Q.*    Did you say anything to Donna?

20   *A.*    No.

21   *Q.*    When you went home from the sleepover that day,

22  did you say anything to either of your parents about what

23  had happened?

24   *A.*    No.

25   *Q.*    Why not?

58

1    *A.*    I didn't know what to tell them.  Alejo was a

2    pastor.  I wasn't even allowed to say the word butt in my

3    household.  So to describe what went on, I wouldn't have

4    known -- I didn't know what to say.

5    *Q.*    When was the next time you saw Alejo?

6    *A.*    After that morning?

7    *Q.*    After that morning.

8    *A.*    It would have been Sunday at church.

9    *Q.*    And how did you feel when you saw him?

10   *A.*    I wanted to avoid him.  I wanted to hide.

11   *Q.*    Did he say anything to you?

12   *A.*    No.

13   *Q.*    And did you see him in school that week?

14   *A.*    Yes.

15   *Q.*    When you saw him, was that difficult for you?

16   *A.*    Yeah.  I wanted to be invisible.

17   *Q.*    Did you think about telling anyone about what had

18   happened to you?

19   *A.*    No.

20   *Q.*    Why not?

21   *A.*    Because I -- I didn't know how.

22   *Q.*    And did you sleep at Wendi's again after that

23   first incident?

24   *A.*    Yes, I did.

25   *Q.*    Why did you go back to Wendi's after what had

1  happened?

2      *A.*    Wendi was my friend and I didn't get to stay the

3  night with anybody.  And I -- I liked being with her.

4      *Q.*    And when you went -- when was the next time you

5  slept at Wendi's after that initial incident?

6      *A.*    I believe it was two weeks later.

7      *Q.*    And what happened when you slept over the next

8  time?

9      *A.*    It was the same.  We got to eat dinner and hang

10  out, play.  And then we would -- we got the nightgowns on

11  again and we went in the room again.

12      *Q.*    And you stated that the first time, you didn't

13  touch him, but you indicated that that changed at some

14  point.  How did that change and at what point did that

15  change?

16      *A.*    Oh, with me, it probably was the third time, and

17  I -- I touched him.

18      *Q.*    How did you touch him?

19      *A.*    I put my hand on his thing.

20      *Q.*    And you stated the first time that he didn't

21  touch you anywhere except your legs and your breasts.  Did

22  that change at any point in time?

23      *A.*    He would touch me just over the nightgown in that

24  area.

25      *Q.*    In that area, do you mean your genital area?

1     *A.*    Yes.

2     *Q.*    And how long did this go on for?

3     *A.*    For that school year.

4     *Q.*    Your third grade school year?

5     *A.*    Yes.

6     *Q.*    And did it stop after the third grade school

7   year?

8     *A.*    Yes.

9     *Q.*    How did you feel when it stopped?

10    *A.*    Well, I was confused.  And I was gaining weight.

11  I didn't know how to feel.  I didn't know if I was still

12  going to be Wendi's friend or still -- I didn't feel good.

13    *Q.*    And during this time period that this was going

14  on for the entire third grade, did you ever talk to Wendi

15  about what was happening?

16    *A.*    No.

17    *Q.*    Did you ever tell your parents?

18    *A.*    No.

19    *Q.*    Did you ever tell any other authority figure?

20    *A.*    No.

21    *Q.*    So after it stopped in the fourth grade, how much

22  longer did you attend 91st Psalm School with Wendi?

23    *A.*    Umm, about two, three more years.

24    *Q.*    And when you stopped attending, you stated you

25  had moved to Tempe?

1    *A.*    Yes.

2    *Q.*    After you moved to Tempe, you said you were about

3    11 years old?

4    *A.*    Yes.

5    *Q.*    Making Wendi 13?

6    *A.*    Yes.

7    *Q.*    How often did you see Wendi after you moved away?

8    *A.*    Not that often.

9    *Q.*    Can you approximate how many times you saw Wendi

10   after you moved away when you were 11 years old?

11   *A.*    Umm, maybe five times.

12   *Q.*    So since you were 11.  And you're 43 now?

13   *A.*    42.

14   *Q.*    42.  You have seen Wendi approximately five

15   times?

16   *A.*    Yes.

17   *Q.*    When was the last time you saw Wendi, before

18   today, that is?

19   *A.*    It would have been at Brad King's funeral.

20           THE COURT:  I'm sorry.  I didn't hear you.

21           THE WITNESS:  Brad King's funeral.

22   *Q.*    BY MS. FOX:  Was that Tom King's son?

23   *A.*    Yes.

24   *Q.*    And when was Brad King's funeral?

25   *A.*    Oh --

1    *Q.*    Approximately?

2    *A.*    15 years ago.

3    *Q.*    So you haven't seen Wendi in over 15 years?

4    *A.*    No.

5    *Q.*    And how has Alejo's abuse affected you?

6          MR. HAZARD:  Objection.  Relevance.

7          THE COURT:  Sustained.

8          THE WITNESS:  Umm --

9          MS. FOX:  You can't answer.

10         THE COURT:  Ask your next question.

11         MS. FOX:  Yes.

12   *Q.*   BY MS. FOX:  When did you first find out about

13   Wendi being in jail for killing Joe Andriano?

14   *A.*   My parents told me.

15   *Q.*   And when they told you, what was your reaction?

16   *A.*   I was not surprised.

17   *Q.*   Why weren't you surprised?

18   *A.*   Because of what we went through when we were

19   young.

20   *Q.*   And why didn't you bring up what Alejo did to you

21   earlier such as during Wendi's initial trial?

22   *A.*   Nobody asked me.  I didn't know I needed to.

23         MS. FOX:  Thank you, Ms. Lorts.  I know this has

24   been very difficult for you to do today.  I really

25   appreciate you coming and sharing your experience.

1              I have no further questions.

2              THE COURT:  Ms. Gard or Mr. Hazard.

3              MR. HAZARD:  It will be me, Your Honor.

4              THE COURT:  Mr. Hazard.

5              MR. ARNTSEN:  Your Honor, I'm just going to step

6       out a second and call the next witness.

7              THE COURT:  Okay.

8              MR. HAZARD:  Your Honor, we're just marking an

9       exhibit.

10             THE COURT:  Okay.

11             (WHEREUPON, an off-the-record discussion ensued.)

12             MS. FOX:  Your Honor, this is something on the

13      exhibit list that I don't have a copy to review, if he's

14      asking the witness.

15             THE COURT:  I'm sorry?

16             MS. FOX:  The exhibit that he is about to mark

17      was not on the exhibit list and I don't have a copy.

18             THE COURT:  Where did that come from?

19             MR. HAZARD:  From them.

20             MS. FOX:  It was a declaration, but since it

21      wasn't on the witness list, I don't have a copy here.

22             THE COURT:  Does someone have a copy?

23             MR. HAZARD:  We might have an extra copy.

24             MS. FOX:  Thank you.

25             MR. HAZARD:  Your Honor, may I approach the

1  witness with Exhibit No. 226 --

2          THE COURT:  Yes.

3          MR. HAZARD:  -- for identification purposes?

4

5                     CROSS-EXAMINATION

6  BY MR. HAZARD:

7      Q.    Ms. Lorts, I'm handing you Exhibit 226.  Do you

8  recognize that?

9      A.    Yes.

10     Q.    That's the declaration that you made and signed

11 on June 30th of 2013; correct?

12     A.    Yes.

13     Q.    And you avow that everything in that declaration

14 is true and correct?

15     A.    I do.

16     Q.    Okay.  How did you come to make this declaration?

17 Who contacted you?

18     A.    Alexis.

19     Q.    Who is Alexis?

20     A.    One of the people on the case.

21     Q.    Can you be more specific?  What does she do?

22     A.    She takes information.

23     Q.    What's her last name?

24     A.    I don't know.

25     Q.    Did you know her before?

1    *A.*    No.

2    *Q.*    How did she approach you?  What did she say?

3    *A.*    She knocked on my door and said she had some

4    questions about Wendi she would like to ask me.

5    *Q.*    When did this happen?

6    *A.*    Oh, I -- I couldn't tell you the actual date.

7    *Q.*    Is it 2012?  2013?

8    *A.*    2010.

9    *Q.*    Okay.  Did she tell you who she was representing

10   or why she was there?

11   *A.*    Yeah.  She said to get information about Wendi's

12   childhood.

13   *Q.*    Okay.  Did you know that she was part of -- she

14   was there to help Wendi?

15   *A.*    Yes.

16   *Q.*    Now tell me about the next time Alexis or anybody

17   from Ms. Andriano's team contacted you after this initial

18   visit.

19   *A.*    She knocked on the door or would call and asked

20   to talk.

21   *Q.*    How many times have you spoken to someone from

22   Ms. Andriano's team, whether it's Alexis or somebody else

23   since 2010?

24   *A.*    I have no idea.

25   *Q.*    More than five?

66

1    A.    Yes.

2    Q.    More than ten?

3    A.    Yes.

4    Q.    Between more than 20?

5    A.    I don't know.

6    Q.    But more than ten?

7    A.    More than ten.

8    Q.    And your testimony is that you knew that
9  Ms. Andriano had been arrested for the murder of her
10  husband when it -- shortly after it happened; is that
11  accurate?

12    A.    Umm, I don't know if it was shortly after.

13    Q.    When do you remember hearing about it?

14    A.    I just remember my parents telling me.

15    Q.    But when?  How old were you?

16    A.    Umm, in my 30s.

17    Q.    Can you be more specific?

18    A.    I can't.  I honestly don't remember.

19    Q.    And did you ever attempt to notify anybody, Wendi
20  or anybody else associated with her when you heard about
21  that she was in jail having murdered her husband?

22    A.    No.

23    Q.    You never told anyone about what you experienced
24  that you testified here today; is that correct?

25    A.    No, that is not correct.

P-App. 000867

1    Q.    All right.  You told family members when you were

2    19?

3    A.    Yes.

4    Q.    But not until you were 19?

5    A.    Correct.

6    Q.    And in your declaration, didn't you state that:

7    Until that time, I had convinced myself that I made it up,

8    that I had dreamt it?  Do you remember stating that?

9    A.    I do.

10   Q.    Okay.  Other than -- did you tell your father?

11   A.    No.

12   Q.    You never told your father?

13   A.    I told him eventually when I was 19.

14   Q.    But not while this was going on?

15   A.    When I was a child?

16   Q.    Yes.

17   A.    No.

18   Q.    You didn't tell anyone?

19   A.    No.

20   Q.    And it sounds like after you were about 11 years

21   old, that's when you moved and went to a different school

22   and a different church; correct?

23   A.    No.  It was the same name of --

24   Q.    But was it the same school in Casa Grande?

25   A.    No.

1    *Q.*   All right.  And where was that school?

2    *A.*   In Tempe.

3    *Q.*   And was Alejo Ochoa employed at that school?

4    *A.*   No.

5    *Q.*   Was he ever around you after the fourth grade.

6  Like you testified to?

7    *A.*   He was around me until I left when I was 11.

8    *Q.*   All right.  But after that point?

9    *A.*   No.

10   *Q.*   And you never came forward until you were 19?

11   *A.*   With?

12   *Q.*   With these allegations?  You never told anybody?

13   *A.*   No.

14   *Q.*   And you never notified anybody from

15  Ms. Andriano's team until they came knocking on your door

16  in 2010?

17   *A.*   Correct.

18   *Q.*   You've never reported it to police to this day;

19  correct?

20   *A.*   Correct.

21   *Q.*   You're a teacher, you said?

22   *A.*   Uh-huh.

23   *Q.*   Is that a yes?

24        THE COURT:  Is that a yes.

25        THE WITNESS:  Yes.

1    *Q.*    BY MR. HAZARD:  Which school do you teach at?

2    *A.*    I would say a private school.

3    *Q.*    What private school?

4    *A.*    Desert Choice.

5    *Q.*    And where is that?

6    *A.*    On Higley.

7    *Q.*    Gilbert?

8    *A.*    Gilbert, yes.

9    *Q.*    You have been doing that since 2010?

10   *A.*    Not with Desert Choice in 2010.

11   *Q.*    What other schools have you worked at?

12   *A.*    Umm, Desert Choice.  Poston Butte High School.

13   *Q.*    So that's a public school; is it not?

14   *A.*    Yes.

15   *Q.*    I take it, then, you're a certified teacher in

16   Arizona?

17   *A.*    Yes.

18   *Q.*    And for elementary education?

19   *A.*    K through 8.

20   *Q.*    And you mentioned you teach special needs

21   children?

22   *A.*    Yes.

23   *Q.*    And that makes you a mandatory reporter --

24   *A.*    Yes.

25   *Q.*    -- under the law; correct?  And you're familiar

1  with that law?

2      *A.*    Yes.

3      *Q.*    But your testimony is you still have never

4  informed anyone other than what you testified today in

5  2010 and that's the only time?  Aside from your parents at

6  19, and the defense team for Ms. Andriano in 2010, those

7  are the only times you have reported it?

8      *A.*    No.

9            MS. FOX:  Objection.  Misstates the witness's

10 prior testimony.

11           THE COURT:  Overruled.

12           Go ahead and answer it.

13           THE WITNESS:  No.  I'm not saying that's the only

14 time.  I've been in counseling several years for this

15 abuse and I have talked about it in counseling several

16 times.

17     *Q.*    BY MR. HAZARD:  Okay.  But, again, while

18 Ms. Andriano was awaiting trial, you never let her know or

19 anybody on her defense team about these allegations;

20 correct?

21     *A.*    I did not think I needed to.

22     *Q.*    That wasn't my question.

23     *A.*    No, I did not.

24           MR. HAZARD:  No further questions.

25           THE COURT:  Ms. Fox, redirect?

1        MS. FOX:  I just have a couple of questions very

2   quickly.

3

4                    REDIRECT EXAMINATION

5   BY MS. FOX:

6        Q.   Around the time of Wendi's trial, did an attorney

7   named Dan Patterson contact you at any point in time about

8   participating in Wendi's trial?

9        A.   No.

10        Q.   Did an attorney named DeLozier contact you at any

11   point in time in order to see if you wanted to participate

12   in Wendi's trial?

13        A.   No.

14        Q.   Did a man named Scott MacLeod contact you at any

15   time to see if you wanted to participate in Wendi's trial?

16        A.   No.

17        Q.   Did anyone, around the time of Wendi's original

18   trial, contact you to see if you had any information

19   regarding Wendi Andriano?

20        A.   No.

21        MS. FOX:  Thank you.  That's all I have.

22        THE COURT:  May this witness be excused?

23        MS. FOX:  Yes, Your Honor.

24        MR. HAZARD:  Yes, Your Honor.

25        THE COURT:  Thank you very much.  You're excused.

1          (WHEREUPON, the witness exited the courtroom.)

2          THE COURT:  Let's go ahead and take a ten-minute

3     recess at this point.  We will be in recess for ten

4     minutes.

5          (WHEREUPON, a recess ensued from 10:59 a.m. to

6     11:13 a.m.)

7          THE COURT:  This is CR 2000-096032, State of

8     Arizona vs. Wendi Elizabeth Andriano.

9          The record will reflect the presence of the

10    parties and counsel.

11         The Petitioner may call its next witness.

12         MR. ARNTSEN:  The Petitioner calls Donna Ochoa.

13         THE COURT:  Ms. Ochoa, if you would please step

14    forward.  Please step forward to the witness stand here.

15    And before you sit down, please face the clerk.  Please

16    give her your full name and raise your right hand and she

17    will swear you in.

18         THE CLERK:  Ma'am, can you please state your name

19    for the record and spell your last name?

20         THE WITNESS:  My name is Donna Elizabeth Ochoa,

21    O-C-H-O-A.

22         THE CLERK:  Raise your right hand, please.

23         (WHEREUPON, the witness was duly sworn by the

24    clerk.)

25         THE COURT:  Please be seated.  Just a few things,

1   Ms. Ochoa, before you start to testify.

2          THE WITNESS:  Yes.

3          THE COURT:  Remember to speak so that everyone

4   can hear you.  Also, please wait until the question is

5   completed before you answer the question.  And please make

6   sure that you give us a verbal response.  In other words,

7   don't just shake your head and uh-huh or un-huh.  Say yes,

8   no or whatever it might be.

9          Can you do that for us?

10          THE WITNESS:  Yes, I can.

11          THE COURT:  Go ahead and state your name for the

12   record.

13          THE WITNESS:  Donna Elizabeth Ochoa.

14          THE COURT:  Ms. Fox, you may proceed.

15          MR. ARNTSEN:  No, Judge.  I'm going to do it.

16          THE COURT:  I'm sorry.  Mr. Arntsen, you may

17   proceed.

18

19                   DONNA ELIZABETH OCHOA,

20   having been first duly sworn to tell the truth, the whole

21   truth, and nothing but the truth, testified as follows:

22

23                   DIRECT EXAMINATION

24   BY MR. ARNTSEN:

25      Q.   Donna, what is your relation to Wendi Andriano?

1      *A.*    I'm Wendi's mother.

2      *Q.*    Did you execute some declarations in connection

3   with this proceeding?

4      *A.*    Yes, I did.

5      *Q.*    Can you take a look at the folders that are there

6   in front of you?  You'll see one is marked Exhibit 27.

7   One is marked Exhibit 28 and one is marked Exhibit 29.

8      *A.*    These are my declarations.

9      *Q.*    Have you reviewed your declarations in connection

10  with your testimony?

11     *A.*    Yes, I have.

12     *Q.*    In reviewing those declarations, did you see any

13  portion that you wanted to correct?

14     *A.*    Yes, I did.

15     *Q.*    And what portion is that?  And I'll turn your

16  attention to it.  You and I talked about this; correct?

17     *A.*    Yes.  Yes, we did.

18     *Q.*    I'll turn your attention to Exhibit 27, on

19  Paragraphs 280 through 282.

20     *A.*    Yes.

21     *Q.*    And do you want to take a minute to review the

22  contest of those paragraphs or are you familiar with them?

23  And take whatever time you need.

24     *A.*    Okay.  Thank you.  Okay.

25     *Q.*    Okay.  What correction would you like to make to

1   that portion of your declaration?

2      *A.*   I would like to make a correction with some --

3   with the verbiage in there where it spoke of hardcore,

4   triple X adult porno and sex stores and explain that.

5      *Q.*   Okay.  Please do so.

6      *A.*   Okay.  To me, anything that was sexually -- had

7   anything to do, you know, with sex and stuff like that, I

8   just always considered it was porno or anything.  Uh, an

9   example?

10     *Q.*   Sure.

11     *A.*   Like, say, in Spencer's, you know, they would

12  have items there that were on the shelves or in the back

13  of the store such as like, an example, soaps in the shape

14  of male genitalia.  And, especially, you know, being where

15  I was with the church, you know, to me all of that was

16  very offensive.

17         And so that's -- that like Victoria Secrets,

18  Frederick's, parts in the Spencer's.  There was a lingerie

19  store in Chandler that had, you know, fancy women's

20  lingerie and they had, you know, cards and stuff that were

21  to me inappropriate and offensive, as well as the back

22  room where they sold other things.

23     *Q.*   So is that what you were referring to?

24     *A.*   Yes.

25     *Q.*   With those corrections, are the statements in

1   Exhibits 27, 28 and 29 true and correct?

2      *A.*   Yes, they are.

3         MR. ARNTSEN:  We would we'll move Exhibits 27

4   through 29 into evidence.

5         THE COURT:  Any objection?

6         MS. GARD:  Yes, Your Honor.  Hearsay.

7         THE COURT:  I'll sustain the objection.

8         MR. ARNTSEN:  Your Honor, just I guess in the

9   nature of an offer of proof, which there will probably be

10  a number of those today, I would just offer the

11  declarations as part of the offer of proof.

12        THE COURT:  Okay.  I'll sustain the objection.

13        MR. ARNTSEN:  Understood.  Thank you.

14     *Q.*   BY MR. ARNTSEN:  What I want to focus on right

15  now is family history of your family, of your birth

16  family, and particularly issues of mental health issues

17  relating to your family.  Okay?

18     *A.*   Yes.

19     *Q.*   Is there any history of bipolar disorder in your

20  family?

21     *A.*   Yes, there is.

22     *Q.*   Who?

23     *A.*   My sister, Nadine.  Her daughter, Marjorie

24  Edmonds, and her -- my sister's granddaughter, Kayla, and

25  possibly my mom.

1      *Q.*    Is there any history of depression in your

2    family?

3      *A.*    Yes, there is.

4      *Q.*    Who?

5      *A.*    Myself, Brandon, my sister, Nadine.

6      *Q.*    And, Brandon, who are you referring to?

7      *A.*    Brandon Ochoa, my adopted son.

8      *Q.*    Thank you.  How does the depression that you

9    suffer evidence itself, generally?

10     *A.*    Generally, it at times -- well, the worst times

11   are times when I would have like meltdowns, what I always

12   thought of as meltdowns or thoughts of suicide and things

13   like that.

14     *Q.*    And tell me about the first -- describe what one

15   of these meltdowns consists of.  What happens?

16     *A.*    Okay.  For an example, the first one that I

17   really recall was when I was somewhere as a preteen, 11,

18   12, 13, somewhere around there.  My parents would fight

19   all the time.  My father was an alcoholic.  And one time,

20   I think I just had enough and I just shut down.  I

21   wouldn't talk to anybody.  I wouldn't eat anything.  My

22   parents finally took me to a doctor friend of my father's.

23     *Q.*    How long did this shutdown last before you pulled

24   out of it?

25     *A.*    A couple of weeks.

1    *Q.*    And you indicate that was -- you were about how

2    old then?

3    *A.*    I was preteen, maybe around 11, 12, 13, something

4    like that.

5    *Q.*    When was the next time you had one of these

6    meltdowns, that you can recall?

7    *A.*    The next big one that I remember was when Wendi

8    was born.

9    *Q.*    And tell us about that.

10    *A.*    I had Wendi in a little hospital in Texas.  And

11    prior to that, I had a little dog, a little Cockapoo that

12    was my baby.  My dad had given him to me.  And I slept

13    with him and everything like that.  And when -- back then,

14    you stayed in the hospital, you know, three days or

15    whatever.

16          When I came -- when they brought me home, they

17    told me that the dog was gone and I got all hysterical.  I

18    wouldn't have anything to do with the baby, with Wendi.  I

19    just shut down again.  I wasn't eating I couldn't -- I

20    wouldn't talk to anybody.  I was just broken up about the

21    dog.

22    *Q.*    About how long were you in that condition?

23    *A.*    A week or two.

24    *Q.*    And then describe the process of pulling out of

25    it.

1    *A.*    My mom was staying with us in Texas.  She had

2   come out earlier.  Skip was there and they kept trying to

3   talk to me to get me to, you know, snap out of it and take

4   care of the baby, Wendi.

5    *Q.*    Have you had meltdowns since --

6    *A.*    Yes.

7    *Q.*    -- Wendi was born?

8    *A.*    Yes.

9    *Q.*    Why don't you describe the next one that you can

10   recall.

11   *A.*    One time when Skip and I were still married --

12   and excuse me -- I may be referring to him as Skip or

13   Shelby.

14   *Q.*    Oh, by the way, if you want a glass of water, the

15   pitcher and the glasses are right behind you there.  I can

16   help you pour it if your hand gets in the way.

17   *A.*    Okay.

18   *Q.*    Go ahead.  Continue.

19   *A.*    We had had a fight.  Mainly, it was him yelling

20   and pushing around.  And I usually would, you know, fight

21   for a little bit and then I -- or yell back and then I

22   would go into the bathroom and hide.

23          And when he left that evening, I went to the

24   refrigerator.  And I remembered my mom doing this.  And I

25   went to the refrigerator and get took out ketchup and

1  other bottles of things in the refrigerator and I went

2  outside and started throwing them on the concrete driveway

3  and then just sort of fell to the ground and I don't know

4  how long I stayed there.  I know that I was a mess for a

5  while afterwards.

6       Q.   About how long before you pulled out of that one?

7       A.   I -- I don't really know how long it was.

8       Q.   The next time you can recall having one of these

9  meltdowns.

10      A.   After -- I'm sorry.

11      Q.   That's okay.

12      A.   After Wendi was arrested.

13      Q.   What happened then?

14      A.   For the first few days, it was like, you know,

15  like -- you know, like just cruising through.  And then

16  all of a sudden, it hit me that Joe was gone, Wendi was in

17  jail, and I probably wasn't going to get my grandchildren.

18  And I just -- I just remember hitting the floor in the

19  living room and Alejo came in the house and found me and

20  he called one of the girls from work.  And I know that

21  they got me to bed.  I know that they called the counselor

22  that I had been talking to and I remember taking

23  medications.  I just don't remember a whole lot.

24      Q.   Understood.  Have you had any meltdowns since

25  then?

1    *A.*    A couple of times, yeah.

2    *Q.*    And just briefly tell us about those.

3    *A.*    They were times after I would have a conversation

4    with Jeanea about, you know, the kids and things.  And I

5    just melted down.

6    *Q.*    Similar kind of process?

7    *A.*    A similar kind of thing, right.  Then I just

8    would take the pills to help float my way through it.

9    *Q.*    And what pills are you referring to?  Do you know

10   what they were?

11   *A.*    I had several different ones that they had given

12   me back then.  I think I had Klonopin.  I'm don't know

13   exactly how to say all the right names.  But similar to

14   like Lorazepam, Ambien, Ativan, things like that.

15   *Q.*    Thank you.  Have you ever contemplated suicide?

16   *A.*    Yes, I have.

17   *Q.*    Tell us about that.

18   *A.*    Well, I've thought about it lots in my life.

19   I've just always, you know, thought, oh, it would be

20   really easy, you know, to just go head-on into a car or

21   drive off the side of the road.  I just thought that was

22   normal.  I guess it was normal for me.

23   *Q.*    And ultimately --

24   *A.*    But the time that I made a plan was -- I started

25   making a plan during Wendi's trial and had stacked up on

1   all the medications that I had been getting.  And when
2   they came back, you know, with the verdict and everything,
3   I just knew I was going to do it.
4        And I had a conversation with my executive at
5   work and she got me to a counselor right away, like within
6   the next few hours.  I spent time with the counselor and
7   she said, you know, that not to be thinking like that
8   because you've got Wendi that needs you.  And that's what
9   kept me going.
10   Q.   Thank you.  Now I'm going to change topics here
11   and start with sort of some things that have happened in
12   your life.  I'm going to start with your first marriage.
13   Okay?
14   A.   Okay.  Yes.
15        MR. ARNTSEN:  Your Honor, what I did is I --
16   because Ms. Ochoa had some hand surgery, what I did is I
17   pulled out the exhibits that I intend to talk with her
18   about and they're in that small, white binder.  I spoke
19   with counsel for the State about it.  And so she will be
20   using that instead of the big binders.  Okay?
21        THE COURT:  Okay.
22   Q.   BY MR. ARNTSEN:  So, Donna, can you -- actually,
23   I'm just going to pull the declarations off her table
24   because she doesn't need them anymore.  Can you turn to
25   Exhibit 140, please?

1          MR. ARNTSEN:  And, Matt, can you put 140 up on
2    the screen?

3      *Q.*    BY MR. ARNTSEN:  Looking at Exhibit 140, what's
4    that a picture of?

5      *A.*    That's a picture of Skip and Wendi when Wendi was
6    a baby.

7      *Q.*    Who is Skip?

8      *A.*    Skip is Shelby.  Skip Robertson, my husband -- my
9    first husband.

10     *Q.*    Is that Wendi's natural father?

11     *A.*    Yes, it is.

12         MR. ARNTSEN:  I we'll move Exhibit 140 into
13    evidence.

14         THE COURT:  Any objection?

15         MS. GARD:  No, Your Honor.

16         THE COURT:  Exhibit No. 140 for identification is
17    admitted into evidence.

18     *Q.*    BY MR. ARNTSEN:  Why don't you tell us about
19    Skip?

20     *A.*    Skip was the youngest of a family of eight.

21     *Q.*    How did you meet him?

22     *A.*    My best friend's mom married his older brother.
23    My best friend, Alice.  And her mom -- her mom had lost
24    her husband to a mining accident down in San Manuel.  And
25    a few years later, she met Buck and married Buck.  And

1   that's how I came to know the Robertson family.

2        *Q.*   How old were you when you first met Skip?

3        *A.*   I was probably maybe 12, 13, 14, somewhere around

4   in there.

5        *Q.*   And, obviously, you didn't marry him at around

6   that time; correct?

7        *A.*   No.  I didn't like him then.

8        *Q.*   Describe the circumstances essentially that led

9   to your marriage to Skip.  How old you were, how old he

10   was, what he had been doing, how you met, that sort of

11   thing.

12        *A.*   Okay.  I was 18 years old.  I was going to

13   college down at Eastern Arizona in Thatcher, Arizona.  And

14   I had come home for from -- or for Christmas break and I

15   had just broken up with my boyfriend at college.  And I

16   think it was Christmas Eve.  My family didn't do anything

17   special.  They were probably working.  And I had gone over

18   to Alice's house and a couple of the brothers and Alice's

19   mom and them said:  Well, you know, Skip is getting home

20   today from the Marine Corps.  He's flying in.  You're

21   going to go up there with us and we're going to have a

22   family thing up there.  They kind of adopted me in their

23   family.  And so I said:  Sure.  Why not?

24            So I went up there with them and I saw Skip.

25   And, of course, you know, he was this nice marine that had

1   come home from fighting in Vietnam.  And we just kind of

2   hit it off and, of course, both us were drinking.  And so

3   that's how we met.

4        *Q.*   How long after that did you marry him?

5        *A.*   How long after that?  Two months.

6        *Q.*   Okay.  Tell me a little bit about life with Skip.

7   Did he sort of manifest any sort of symptoms you had to

8   watch out for?

9        *A.*   Yes, right away.  Like I said, he had just gotten

10  back from Vietnam in December.  And when we got married,

11  we went over -- we lived in San Clemente and not on the

12  base.  He would sleep at night and I remember the first

13  morning that I went to wake him up, you know, I did it

14  just like you would anyone else.  You go up to their

15  shoulder:  Wake up, Honey, whatever.  And he came up

16  swinging.  And, you know, I was like:  What?  And so, you

17  know, we talked about it.  He said, you know:  If you're

18  going to wake me up, you need to stand at the end of the

19  bed, just wiggle my foot a little bit, and he goes and

20  then step back.  And, plus, at nighttime, he would be

21  thrashing around.  Sometimes, you know, he would take

22  swings and stuff and you could hear him having nightmares

23  and stuff.

24       *Q.*   What do you mean hear him having nightmares?

25       *A.*   Well, because he would be talking out and crying

1    out in his sleep and yelling like for his buddies and

2    stuff.

3        *Q.*    Did Skip have a drinking problem?

4        *A.*    Yes.

5        *Q.*    Why don't you tell us about that?

6        *A.*    Okay.  His family, the Robertson family were from

7    Texas.  They drove trucks and they were a pretty rough and

8    rowdy group and they drank a lot.  All of them did.  And

9    so, you know, and Skip had drank a lot in high school and

10    things like that.  He always ran around with the bad boys.

11            So, of course, you know, that behavior continued

12    because we would have some of the other guys from the base

13    come over, you know, week nights, weekends, whatever, and

14    they all would get drunk.

15        *Q.*    Did they all -- did that include you?

16        *A.*    Not at that time, no.  You know, it was one thing

17    to go out and get drunk when you went to the bar or

18    something like that, but, not -- these guys were, you

19    know, drinking their memories away.

20            And he would start out happy, you know, kind of a

21    happy drunk and then he would start getting really mean

22    and antagonistic.  I just had to learn how to stay away

23    from him.

24        *Q.*    How would he act when he was in the mean and

25    antagonistic stage of being drunk?

1    *A.*    He would start yelling, saying:  Well, you don't

2  know how to do this.  You don't know how to do that.  And

3  then just, you know, talking -- just talking ugly,

4  degrading.

5    *Q.*    Did you guys fight much?

6    *A.*    As the time went on, yes.

7    *Q.*    Tell me about the fights.

8    *A.*    Okay.  He had promised that when we got married,

9  that he wasn't going to be like his brothers and he wasn't

10  going to drive trucks.  So when we came back -- after he

11  was discharged from the marines, we came back to Arizona

12  and he went to refrigeration school.  He did pretty well

13  at it.  But he wanted the money and his brothers were

14  always, you know, harping on him to come, you know, drive

15  trucks with us.  We make lots of money, et cetera,

16  et cetera.

17       And, finally, he just broke down because they had

18  put so much pressure on him.  Then once -- so when they

19  were starting to do that is when things got rougher around

20  the house because I just had not envisioned having all of

21  these brothers and everything up in our -- in our lives

22  and basically, you know, telling us how to live our lives.

23       So he would drink and I would push and he would

24  physically push back at me and he'd go, well, you know,

25  just -- and then he was drinking and smoking and

1  everything and wanted sex all the time.  And I would --

2  until I would tell push him away.  I would tell him, no, I

3  just don't want you until he finally just kept harping

4  on me.

5      *Q.*    And I want to talk in relation to your marriage

6  with Skip.  About how long after that, did you find out

7  that you were pregnant with Wendi?

8      *A.*    Right around November or December of 1969.

9      *Q.*    And were you in any motor vehicle accidents while

10  you were pregnant?

11      *A.*    Yes, I was.

12      *Q.*    Why don't you tell us about that?

13      *A.*    Skip had just gotten back from California.  They

14  had -- him and his brother had had a great big truck

15  accident on the Grapevine and they had come back home.

16  Then him and I were driving over to another brother's,

17  Buck, the one that was my girlfriend's stepfather.  On our

18  way over there, an ACME wrecking truck ran a stop sign and

19  T-boned us, spun us around.  Bob went flying out the

20  window.  The car was destroyed and I was bounced around,

21  you know, in the car.

22      *Q.*    About how pregnant were you then?

23      *A.*    I was about three months pregnant.

24      *Q.*    Did you go to the hospital?

25      *A.*    No.

1    *Q.*    Why not?

2    *A.*    I just didn't do that.

3    *Q.*    Why don't you tell us about Wendi's birth?

4    *A.*    Okay.  When I was about six months pregnant or so

5    in June of 1970, Skip decided that we were going to -- we

6    were living in Tucson at the time.  He decided that he

7    wanted us to live in Broom, Texas, that he was going to

8    stop driving his truck and he was going to work at a truck

9    stop there.  Because we had, you know, kind of separated a

10   couple of times and he always came back with, you know,

11   I'm going to try harder.

12           So we went to Texas and he would go out at night.

13   Sometimes he wouldn't come back, you know, until the next

14   day afterward.  He was drinking pretty hard.  And it was

15   getting really stressful on me.  I mean, I'm out in the

16   middle of nowhere.  I know no one except the people that

17   owned the truck stop.  And I started having labor pains in

18   July and the little country doctor there thought that I

19   would probably deliver early because I was, you know,

20   getting down to five minutes on the pains.

21           So I asked my mom to come out.  Actually, I think

22   Skip did, too, to help, you know, until the baby was born,

23   thinking she was going to be born early.

24   *Q.*    Okay.  And then what happened?  So your mom came

25   out to live with you?

1    *A.*    So my mom came out and moved in with us and

2    basically took care of us financially.  Skip was still out

3    running around.  Finally my mom said, you know:  He's

4    cheating on you.  And I must have just walk around with

5    blinders.  I don't know.  And it turned out, he was.  He

6    was having an affair with a waitress there.

7         And so I've got all that stress going on.  It was

8    a couple of weeks into August and the doctor said:  Well,

9    you know what?  He was he was a DO, a small town, and he

10   had 12 kids of his own.  And he said:  Let's try the

11   old-fashioned way and we will give you some --

12   *Q.*    Caster oil?

13   *A.*    Thank you.  Caster oil and orange juice, the most

14   horrible thing in the world.  And he goes:  If

15   you're ready to -- if she's ready to come out, if she's

16   ready to deliver, then it will happen.  Well, I end up in

17   the hospital with all the cramps and everything, but she

18   didn't and it was another couple of weeks before she did.

19        So I'm thinking, oh, my gosh, if this is just the

20   start of it.  You know, I didn't know anything about

21   babies.  Nobody that I had grown up with, you know -- a

22   lot of girls were pregnant, but they were all back in

23   Tucson.  So I didn't have anyone to talk to or know

24   anything.  My mother would never tell me anything.  And

25   so, one day, Skip and I had gone fishing out on a little

1  pond for some catfish.  And when we were coming back out

2  of the field, a bull started to run after me.  Well, I

3  never did gain very much weight with Wendi.  I was a stick

4  with a ball.  And so, you know, I ran as fast as I could

5  and I was able to get out through the fence because I

6  hadn't been that far from the fence.

7          And then a few hours later, contractions started

8  going and everything.  I went to the doctor.  He goes:

9  You know what?  You need to check into the hospital.  And

10  he goes:  And I'll see you in eight, ten, 12 hours,

11  however long it takes.  So I checked in I think at -- I

12  don't know.  It was early evening, 5:00 or 6:00.  And my

13  mom was there with me.

14          They were trying to find Skip.  They didn't know

15  where he was.  And, finally, I guess he came, you know,

16  when I went in to deliver her.  And they said:  Well, how

17  far apart are the contractions?  And I go:  I don't know.

18  I can't tell the difference.  And she was born, from the

19  time I got to the hospital, in about two and-a-half hours.

20  *Q.*  Okay.  And then describe your first few days with

21  Wendi in the hospital.

22  *A.*  Okay.  Well, first of all, I was upset because

23  she was a girl because I knew that Skip wanted a boy.  And

24  in those first few days, like I said, a small town, a

25  small hospital.  She was the only baby there at the time.

1  And, at that time, you didn't keep your babies with you.

2  And so, most of the time that I was in the hospital, she

3  was in the nursery with the nurses.

4       And then, you know, we into the situation where I

5  came home and found out that the puppy was gone.  And, at

6  that moment in my life, I was more concerned about the

7  puppy than I was the baby.

8       Q.   And so how did that affect your interactions with

9  Wendi when you first came home from the hospital?

10      A.   I wouldn't have anything to do with her.  I was

11  hysterical about the dog.  And I had people all over town

12  looking for the dog, you know, because this woman that

13  just had a baby won't do anything.  So, yeah, I was --

14      Q.   Who took care of Wendi?

15      A.   My mom and Skip.

16      Q.   Can you take a look Exhibit 141, please?  Do you

17  have it there in front of you?

18      A.   Yes, I do.

19      Q.   And is it up on the screen?

20      A.   Yes, it is.

21      Q.   Who is that picture of?

22      A.   It's a picture of Wendi and my mom.

23      Q.   What role did your mom play in taking care of

24  Wendi in Texas?

25      A.   Mom and -- my mom basically took care of her.

1  Wendi had croup or, you know, I don't know if it was

2  croup.  It was colicky, you know, where she cried all the

3  time.  So my mom would sit and rock her and she would give

4  her to me and Wendi would never stop crying.  She would

5  only stop crying when mom held her.

6          MR. ARNTSEN:  I would we'll move Exhibit 141 into

7  evidence.

8          THE COURT:  Any objection?

9          MS. GARD:  No, Your Honor.

10         THE COURT:  Exhibit No. 141 for identification is

11  admitted into evidence.

12     *Q.*  BY MR. ARNTSEN:  And so, then, how long did your

13  mom stay with you after Wendi was born in Texas?

14     *A.*  She stayed with us the whole time I was still in

15  Texas, which wasn't that long.  We moved back to Phoenix

16  probably when Wendi was about five or six weeks old.

17     *Q.*  How come?

18     *A.*  Well, there were two stories.

19     *Q.*  Go ahead.

20     *A.*  The first one is because it snowed on Labor Day

21  and I just freaked out because I'm not used to snow.  The

22  real story was because the girl that he had been having an

23  affair with said that she was pregnant and was trying to

24  pin it on Skip.

25     *Q.*  So Skip was motivated to we'll move back to

1  Arizona?

2       *A.*   (No oral response.)

3       *Q.*   You have to use words.

4       *A.*   Oh, I'm sorry.  Yes, he was very motivated to

5  leave Texas and we'll move back to Arizona.

6       *Q.*   Let's talk a little bit about Skip's child

7  rearing.  First off, can you take a look at Exhibit 140,

8  which we had looked at a little earlier.  As evidenced

9  from Exhibit 140, was Skip involved in feeding Wendi?

10      *A.*   Yes.  The first, you know, week or so, I would

11 nurse Wendi just a little bit because I was still so

12 upset.  And so they were giving her additional in a

13 bottle.  And then, you know, after that, I had wanted to

14 nurse her for a long time, but I probably was just too

15 stressed.  And so he fed her a lot and he bathed her.  Him

16 and my mom gave Wendi her first bath.  I probably didn't

17 bathe her until she was a couple of months old.  I was

18 scared of her.

19      *Q.*   Why was it that Skip played this larger role in

20 Wendi's infancy?

21      *A.*   Well, as I said, Skip was the youngest in the

22 family of eight.  So all of his siblings, you know, had

23 had children, or most all.  But he was around them a lot

24 when he was growing up and he took care of the kids and he

25 knew how to be around children.

1    *Q.*    What was Skip's approach to child raising with

2  young children?

3    *A.*    Pretty rough.

4    *Q.*    What do you mean by that?

5    *A.*    Well, his whole family was, you know, just kind

6  of really rough around the edges.  And he would tell her

7  to do something only like in a loud commanding voice.

8  Skip potty trained her.  I was --

9    *Q.*    Well, yeah, go ahead and tell us about that.

10    *A.*    I was -- I was working and he --

11    *Q.*    How old was Wendi?

12    *A.*    She was around 11 months.  He started when she

13  was around ten months.  And I would come home and he says

14  goes:  Oh, she is going to the bathroom on the toilet.  I

15  said:  Well, what are you doing?  How are you doing that:

16  Because, like I said, I didn't know anything.  He goes:

17  Watch.  And he would put her on the toilet and he would

18  go:  Go to the bathroom.  And she would sit there a little

19  bit and she would go to the bathroom.  Only he would say

20  it in a real strong, strict voice and kind of like if you

21  were -- the way I've always thought about it was like

22  training a dog.  I've always thought that.

23    *Q.*    How about if like comforting Wendi when she was

24  crying?  What was your and -- how did you and Skip handle

25  that?

1    *A.*   Well, going back to Broom, Texas, the doctor had

2    always told us that you need to put your baby down by

3    8:00 o'clock no matter what.  So we would put Wendi down

4    to bed.  And, you know, she would be crying for a while.

5    And then I would start getting nervous going, you know, we

6    need to go check on her or something.  He goes:  You can

7    go check and see if she's dry, see if she's hungry.  And

8    if she's not, then you just leave her be and you let her

9    cry.  He goes:  Don't be picking her up.

10           And so that's what would happen.  Sometimes, you

11   know, she might quit crying after 15 minutes.  Sometimes

12   an hour.  Sometimes an hour and-a-half.  By then, I'm

13   frantic and he's just going:  Leave her alone.  You know,

14   just -- and I didn't do anything else but do what he told

15   me.  You know, I just left her alone.

16    *Q.*   Why was that?  You're her mom.

17    *A.*   But he knew about kids and I was scared.  You

18   know, I didn't want to make him upset.

19    *Q.*   How did you guys discipline Wendi?

20    *A.*   Spanked her.

21    *Q.*   From what age about?

22    *A.*   Oh, when she was in diapers.

23    *Q.*   And do you have any sense as to how often?

24    *A.*   Skip would spank her if she wouldn't do what he

25   told her to do.  So you can imagine a little kid.  You

1  know, they're not going to do everything you tell them to.

2  So it was probably often.

3      Q.   Take a look at Exhibit 142, please.  What is

4  Exhibit 142?

5      A.   Again, that's Wendi and Skip.

6      Q.   And where are you living then?

7      A.   I'm not really sure.  I know it was up in

8  Phoenix.  I'm not sure.  We moved several times, though.

9          MR. ARNTSEN:  I we'll move Exhibit 142 into

10 evidence.

11         THE COURT:  Any objection?

12         MS. GARD:  No, Your Honor.

13         THE COURT:  Exhibit No. 142 for identification is

14 admitted into evidence.

15         MR. ARNTSEN:  Your Honor, I'm just going to start

16 in another outline section here.  It's probably ten or

17 15 minutes, either way.

18         THE COURT:  Why don't we go ahead and take our

19 lunch break then at this time and we will resume promptly

20 at 1:30.

21         MR. ARNTSEN:  Thank you, Your Honor.

22         THE COURT:  We will be in recess.

23         (WHEREUPON, the lunch recess ensued from

24 11:51 a.m. to 1:30 p.m.)

25         THE COURT:  Good afternoon.  This is

1   CR 2000-096032, State of Arizona vs. Wendi Elizabeth

2   Andriano.

3            The record will reflect the presence of the

4   parties and counsel.

5            The record will reflect that when we took our

6   recess, Donna Ochoa was on the witness stand.  She is now

7   on the witness stand.

8            You are still under oath.  We will continue the

9   direct examination by Mr. Arntsen.

10           Mr. Arntsen.

11           MR. ARNTSEN:  Thank you, Your Honor.

12   *Q.*   BY MR. ARNTSEN:  Donna, what I want to turn to

13   now is Skip's family.  Okay?  First of all, tell us

14   generally about Skip's family.

15   *A.*   Six boys, two girls.

16   *Q.*   Where was Skip in the birth order?

17   *A.*   He was the baby.

18   *Q.*   What can you tell us about child abuse issues in

19   Skip's family?

20           MS. GARD:  Objection.  Vague.  I mean we need

21   more.

22           THE COURT:  Sustained.

23           Rephrase the question.

24   *Q.*   BY MR. ARNTSEN:  Did you ever hear stories about

25   child sexual molestation in Skip's family?

1    *A.*    Yes, I did.

2    *Q.*    Tell us what you heard.

3    *A.*    Okay.  The one story was that after Skip and I
4 were married and had Wendi, and my sister-in-laws, of
5 course, all older than I were, told me to keep Wendi away
6 from grandpa because grandpa was a dirty old man and they
7 knew that he had been messing around with some of the
8 granddaughters.

9    *Q.*    Did Wendi ever spend time alone with her
10 grandfather?

11    *A.*    Yes, she did.

12    *Q.*    Can you tell us -- first of all, did you try to
13 keep that from happening?

14    *A.*    Yes, I did.  I tried to, you know, keep her away
15 from him.  And one time we went to -- I went with Skip on
16 the truck to LA.  We were only supposed to be gone two
17 days.  That was the weekend that I believe it was in '71
18 when the big LA earthquake hit.  And so we couldn't get
19 the load in and couldn't get the load back out for a
20 couple of days while they were checking all th freeways.
21 And when I got back, I expected to see Wendi over at my
22 sister-in-law's house and she wasn't.  She was at
23 grandpa's house.

24    *Q.*    How did that come to be?

25    *A.*    Pardon?

1    *Q.*    How did that come to be?

2    *A.*    Evidently, Ida maybe decided she needed to go do

3    some things and she was busy, so she just dropped her off

4    over at grandpa's.

5    *Q.*    How about Skip's brothers?

6    *A.*    Skip's brothers, several of them had been in jail

7    once or twice for different things.  His older brother,

8    one year or so older than him, Tommy, was accused of child

9    molestation or abusing the child, and it was Skip's

10   stepdaughter.  And Skip was, too.  Both were sent to

11   prison for that.

12   *Q.*    Take a look at Exhibit 152.  Is Exhibit 152

13   what's up on the screen?

14   *A.*    Yes.

15   *Q.*    And you see that that's a two-page document?

16   *A.*    Yes.

17   *Q.*    What does the first page set forth?

18   *A.*    The first page is for Shelby Wayne Robertson,

19   Skip.  It's for molesting a child and sexual conduct with

20   a minor.

21   *Q.*    Was Skip convicted of that?

22   *A.*    Yes, he was.

23   *Q.*    Did he go to prison?

24   *A.*    Yes, he did.

25   *Q.*    Do you know for about how long?

1      *A.*    Umm, ten or 15 years.  I'm not sure.

2      *Q.*    What was Skip's relationship with the child he

3  was convicted of molesting?

4      *A.*    His stepdaughter.

5      *Q.*    And what was he convicted of doing to his

6  stepdaughter?

7      *A.*    Intercourse.

8      *Q.*    Can you look at the second page of Exhibit 152?

9  Do you see that?

10     *A.*    Yes.

11     *Q.*    Does that relate to Skip's brother, Tommy?

12     *A.*    Yes, that's Tommy.

13     *Q.*    And is that also a sexual abuse conviction

14  relating to Tommy?

15     *A.*    Yes, it is.

16     *Q.*    Is the victim the same as Skip's?  As was the

17  victim of Skip's?

18     *A.*    Yes, the same victim.

19          MR. ARNTSEN:  We'll move Exhibit 152 into

20  evidence.

21          MS. GARD:  Objection.  It's hearsay.

22          THE COURT:  I'm going to sustain the objection on

23  Exhibit 152.

24          MR. ARNTSEN:  Just to make the record, Your

25  Honor, I believe first of all that it is properly

1   admissible under the public records exception 8038 and we

2   also believe that it is properly admissible as mitigation

3   evidence that would have gone in during Wendi's sentencing

4   under the *Strickland* rule and the Arizona rule.

5          THE COURT:  Anything further from the State you

6   want to put on the record?

7          MS. GARD:  No, Your Honor.

8          THE COURT:  I'm still going to sustain the

9   objection.

10          MR. ARNTSEN:  Understood.  Again, we will just --

11          THE COURT:  Right.

12          MR. ARNTSEN:  The actual documents are an offer

13   of proof right now.

14          THE COURT:  Right.  Go ahead.

15          MR. ARNTSEN:  Thank you.

16      *Q.*   BY MR. ARNTSEN:  Was Skip ever accused of

17   molesting any of his nieces?

18      *A.*   Yes, he was.

19      *Q.*   Tell us about that.

20      *A.*   My sister-in-law told me several years later that

21   Skip had molested her two daughters.

22      *Q.*   Under what circumstances?

23      *A.*   They were in the -- they were in the car.  I was

24   in the car.  We were coming back from California.  They

25   had gone over and picked us up and brought us back to

1  Arizona.

2     *Q.*   Did Skip ever indicate to you that he believed

3  that one of his brothers molested Wendi?

4         MS. GARD:  Objection.  Hearsay.

5         MR. ARNTSEN:  Your Honor --

6         THE COURT:  Overruled.

7         Go ahead and answer the question.

8         MR. ARNTSEN:  Go ahead.

9         THE WITNESS:  Would you ask that again?

10    *Q.*   BY MR. ARNTSEN:  Did Skip ever indicate to you

11  that he believed one of his brothers may have molested

12  Wendi?  I'm referring to his brother Tommy.

13        THE COURT:  That's a yes or no question.

14        THE WITNESS:  That's a yes.

15    *Q.*   BY MR. ARNTSEN:  What did he tell you?

16    *A.*   He told me that he thought that Tommy was

17  probably messing around with Wendi.

18    *Q.*   Under what circumstances?  Do you recall?

19        MS. GARD:  Judge, I object.  This is speculative.

20        THE COURT:  I'll sustain the objection.

21        Let's move on.

22    *Q.*   BY MR. ARNTSEN:  In terms of an offer of proof,

23  have you exhausted your recollection in connection with

24  that?  Do you recall anything else?

25    *A.*   No.

1    *Q.*    You don't recall anything else?

2    *A.*    No.

3    *Q.*    Okay.  Do you recall anything else?  That was a

4    bad question.

5    *A.*    Okay.  In reference --

6         THE COURT:  That's a yes or no question.

7         THE WITNESS:  Yes.  Yes, I do recall.

8    *Q.*    BY MR. ARNTSEN:  Can you please tell us, again,

9    in the context of an offer of proof, what you recall about

10   the circumstances under which Skip said he suspected Tommy

11   molested Wendi?

12   *A.*    When we were talking about it after he was out of

13   jail.

14   *Q.*    What did he tell you?

15   *A.*    He told me that he thought that the times that

16   Wendi was with grandpa and Tommy, that Tommy did, too.

17   *Q.*    Thank you.  Now, at or around the time when Wendi

18   was little, did she have a concern about sleeping in beds

19   other than her own?

20   *A.*    From the time that -- yes.

21   *Q.*    What can you tell us about that?

22   *A.*    When she was little, and I'm talking real little,

23   less than a year, we would take her other places, like

24   maybe over to the in-laws or something, and she would not

25   sleep anywhere but in her own crib.  You could put her

1   down with some of the other kids or in a bed by herself,

2   but she would not go to sleep.

3        *Q.*   Thank you.  Now do you recall an incident

4   involving Skip and his brothers and Wendi in a swimming

5   pool?

6        *A.*   Yes, I do.

7        *Q.*   Why don't you tell us about that?

8        *A.*   Wendi was around a year -- between a year and two

9   years old and we had gone for like a family get-together

10  and they were all playing -- the brothers and some of the

11  kids were playing in the pool.  It was a big pool like at

12  a -- it was a big pool.  And the brothers got a hold of

13  Wendi and decided that she needed to learn how to swim.

14  And, of course, they had been drinking.  So they started

15  to -- they put her in the pool and then they just started

16  to toss her around and they would just throw her in the

17  water and she couldn't swim.  You know, she would go down

18  and then somebody would finally pick her up.  She was just

19  crying her little heart out.

20            And, you know, I just asked them to stop.  I

21  didn't yell or scream and I looked to the sister-in-laws

22  to help me and everyone just sort of let them do what they

23  wanted to do.

24       *Q.*   Thank you.  Now I want to talk a little more --

25  well, first of all, when did you and Skip split up?

1     *A.*   We were divorced in 1974.

2     *Q.*   Okay.  Thank you.  So Wendi would have been three

3  or four?

4     *A.*   Yeah, three or four.

5     *Q.*   Can you take a look at Exhibit 143?  What is

6  Exhibit 143 show?  And is that what's up on the screen?

7     *A.*   Yes.

8     *Q.*   What's this a picture of?

9     *A.*   That's a picture of Wendi sitting on top of my

10  car.

11     *Q.*   Do you know where she is?

12     *A.*   That was in Tempe, Arizona.

13     *Q.*   I want to talk some about --

14           MR. ARNTSEN:  Oh, we'll move Exhibit 143 in.

15           MS. GARD:  No objection.

16           THE COURT:  Exhibit No. 143 for identification is

17  admitted into evidence.

18     *Q.*   BY MR. ARNTSEN:  Did you move around a lot while

19  Wendi was a toddler?

20     *A.*   Yes, I did.  Yes, I did.

21     *Q.*   Could you just generally describe the reasons for

22  and the circumstances of the moves, say, taking her up to

23  age four or so?

24     *A.*   Okay.  Well, we moved from Texas back to Phoenix.

25  In Phoenix, I know that we lived in one, two, three houses

1  within a year and-a-half.  Then we moved over to Tempe.

2  And then after I got my divorce, then I moved back to

3  Phoenix with my mom.  Then we moved to Casa Grande.

4      Q.   Okay.  That pretty well covers it.  Were you

5  working during this time?

6      A.   I started working again when Wendi was a few

7  months old.

8      Q.   Doing what?

9      A.   I worked for a title company.

10      Q.   And what -- how was Wendi taken care of?  Strike

11  that?  I apologize.  What were your work hours with the

12  title company?

13      A.   Normally 8:00 to 5:00.

14      Q.   And how was Wendi taken care of when you were at

15  work?

16      A.   Okay.  If Skip was home from driving trucks, he

17  would take care of her.  Otherwise, my mother worked

18  nights at a Mexican food restaurant.  And so she would

19  take care of Wendi during the daytime.  And then there was

20  a span of a few hours where before I would get home and

21  mom would have to be at work.  So she would drop her off

22  at a day care and I would pick her up.

23      Q.   Did you have any social life during this period

24  of time?

25      A.   Not when we were in Phoenix.  But when we were in

1  Tempe, yes.

2      *Q.*    How old was Wendi when you moved to Tempe?

3      *A.*    She was about two, two and-a-half.

4      *Q.*    Was Skip still around?

5      *A.*    Yes.  He was driving a truck.  So he was gone a

6  lot of the time.

7      *Q.*    How much of the time?  Was he gone most of the

8  time?

9      *A.*    Yes, most of the time because the type of hauling

10  that he did, back in the day, it was called garbage

11  hauling because they had refrigerator trucks and they

12  would take a load to someplace across the country and then

13  they would have to wait until the broker could find them a

14  load to come back.  Sometimes they could head to one

15  straight and travel all around the country for weeks

16  before they ever got back to home base.

17      *Q.*    And you indicated you and Skip got divorced in

18  1974.  How long before you got divorced, did he move out?

19      *A.*    He was sort of in and out.  And I knew at one

20  point that he was living with his girlfriend.

21      *Q.*    While you were still married?

22      *A.*    Yes.

23      *Q.*    And so, I mean, really what I'm asking is in the

24  context of how Wendi is being looked after.  You indicated

25  while Skip was still living with you and while he was not

1    on the road, he would look after her.  When did that end?

2        A.    Okay.  Probably a month or two before we got

3    divorced.

4        Q.    Okay.  Not long?

5        A.    Not long, no.

6        Q.    So then you had indicated you moved to Tempe.

7    Did your mom still take care of Wendi on a regular basis

8    when you were in Tempe?

9        A.    No.  My mom stayed in Phoenix.

10        Q.    And so, then, were you still working at the title

11    company?

12        A.    I was still working at the title company.  I had

13    transferred to Tempe.  And, at that time, I would have her

14    in day care.  But also right down the street from where I

15    lived was a Montessori school that I put her into day care

16    there.

17        Q.    Were your work hours still pretty much 9:00 to

18    5:00?

19        A.    Yes.

20        Q.    Did you go out at night much?

21        A.    Yes, I did towards -- yes, I did.

22        Q.    How frequently?  And are we talking about you

23    going out to the bars and that sort of thing?

24        A.    Yes.

25        Q.    How frequently?

1    *A.*    Several nights a week.  Always on the weekend.

2    *Q.*    Always on the weekend, plus some week nights; is

3    that what you're saying?

4    *A.*    Uh-huh, yes.

5    *Q.*    And how would Wendi be taken care of when you

6    went out for the evening?

7    *A.*    I'm sorry.  It's just real hard to look back and

8    see what I did.  The neighbor next door, I would -- well,

9    especially if it was a work night, I would put Wendi down

10   to bed at 8:00 o'clock and wait for a little bit.  And

11   then I would go over and ask her -- you know, I would tell

12   her:  Hey, I'm going downtown.  Would you keep an eye on

13   Wendi?  And she said:  Yeah, sure.  I'll keep an eye on

14   her.

15   *Q.*    Was this a period of your life where you were

16   somewhat promiscuous?

17   *A.*    Yes, it is.

18   *Q.*    And would you bring men back to your apartment?

19   *A.*    On occasion.

20   *Q.*    And would you sometimes find yourself ending up

21   in other peoples' apartments?

22   *A.*    On occasion.

23   *Q.*    And, again, how was Wendi taken care of while you

24   were doing this?

25   *A.*    A neighbor.

1    *Q.*   Thank you.  And I believe we're getting around in

2    the 1973, 1974 period of time here.  You were still

3    working at the title company?

4    *A.*   Yes.

5    *Q.*   And then did you start volunteering or taking on

6    a significant volunteer commitment?

7    *A.*   Yes, I did.  One of the girls that I worked with

8    at the title company was dating the program manager for

9    Terros.

10   *Q.*   What's Terros?

11   *A.*   Terros was or is a drug abuse prevention

12   organization under the umbrella company.  It used to be of

13   CODAC, which is Community Organization for Drug Abuse

14   Corporation or something like that.  And --

15   *Q.*   So what was --

16   *A.*   And --

17   *Q.*   Go ahead.  I'm sorry.

18   *A.*   Okay.  And so I started going to Terros in the

19   evening times or on the weekends to see what it was all

20   about and I ended up going to some counseling there.  I

21   thought, wow, this is really cool.  I want to be a

22   counselor, too.  So I enrolled in Phoenix College and was

23   taking classes for counseling.  And I also received my

24   EMT and worked the ambulances at Terros.

25   *Q.*   First of all, your classes at Phoenix College,

1  was that -- are those classes that you took at home or did

2  you go out for those classes?

3     *A.*   No.  I went to Phoenix college because it wasn't

4  very far from where Terros was located on Roosevelt.

5     *Q.*   And over what period of time were going to school

6  at Phoenix College while you were working at the title

7  company?

8     *A.*   Umm, '73, '74, through there.

9     *Q.*   About what sort of time commitment was your

10  school work?

11     *A.*   A lot of the stuff I would do when I was at

12  Terros, the homework.

13     *Q.*   What was your time commitment at Terros?

14     *A.*   I would spend anywhere from ten to 30 hours or

15  more a week at Terros, depending on what kind of time I

16  had and what kind of babysitter I could get.

17     *Q.*   And that leads to my next question.  How was

18  Wendi taken care of when you're spending all of this time

19  at Terros?

20     *A.*   There were overnights -- there were 24-hour

21  day care facilities in Phoenix.  If I could impose on my

22  mother, you know, like if I wanted to be there for like a

23  whole weekend or something, then I would do that.  But

24  mainly day care.

25     *Q.*   So during this time in your life, where did Wendi

1  rank on your priority list?  I'm sorry these are hard

2  questions.

3       *A.*   Not very high.

4       *Q.*   Thank you.  Now at some point in time, did your

5  volunteer work at Terros lead to a regular job in the drug

6  and alcohol counseling field?

7       *A.*   Yes, it did.  I was offered a position to work in

8  CODAC at the main office on McDowell.  I started working

9  there in the accounting and they groomed me to write

10 grants because I had always done pretty well with stuff

11 like that.

12      *Q.*   What were your hours at CODAC?

13      *A.*   8:00 to 5:00.

14      *Q.*   Did you work at CODAC at all in addition to those

15 8:00 to 5:00 hours?

16      *A.*   Yes.  If we were working on trying to get a grant

17 done for monies and stuff, then I would work late at night

18 or even on Saturdays and Sundays.

19      *Q.*   When did you start at CODAC?  What year about, if

20 you know?

21      *A.*   Probably '73, '74, I think maybe.

22      *Q.*   So Wendi is about four?  Three or four?

23      *A.*   Uh-huh.

24           THE COURT:  Is that a yes?  Is that a yes?

25           THE WITNESS:  Yes, it is.  I'm sorry.

1          MR. ARNTSEN:  I apologize.

2      *Q.*   BY MR. ARNTSEN:  How was Wendi being taken care

3  of other than by you while you were at CODAC?

4      *A.*   If I was working overtime, I had to pick her up

5  by a certain time at the one day care.  And so I would

6  just bring her back to CODAC with me, or on the weekends,

7  I would just bring her with me.

8          Downstairs was another part of Terros, which was

9  a detox center and a methadone clinic.  And, also, the one

10  part was detox for those first few days and then the other

11  part was for women where they had, you know, finished the

12  hard detox and they were getting cleaned up until they

13  were allowed to leave.

14      *Q.*   And so where would Wendi be?

15      *A.*   Down in the women's section.

16      *Q.*   And where were you?

17      *A.*   I was upstairs in the offices.

18      *Q.*   And for how long might Wendi be downstairs while

19  you were upstairs?

20      *A.*   Well, if I stayed all day on Saturday, that's

21  where she would be.

22      *Q.*   Thank you.  And Wendi was also going to day care

23  during that time?

24      *A.*   Yes.

25      *Q.*   Do you recall an incident coming up which caused

1  Wendi to get kicked out of day care?

2      *A.*    Yes, I do.

3      *Q.*    Can you tell us about that?

4      *A.*    I got a -- I went to pick up Wendi one day from

5  day care.  And it wasn't too far from where I worked.  And

6  they asked me to come inside and they wanted to have a

7  talk with me.  And they said, you know:  Wendi and a

8  couple of other kids were in the bathroom today and they

9  were showing off each others' private parts to each other.

10  And we can't tolerate behavior like that.  Basically, if

11  it happened again -- you know, because they felt like

12  Wendi was the instigator.  And they said, you know, if

13  something like that happens again, that they were going to

14  take stronger steps.

15     *Q.*    Did they take stronger steps?

16     *A.*    Yes.

17     *Q.*    What happened?

18     *A.*    It wasn't too long after that, they called me at

19  work and said that I needed to come down and pick Wendi

20  up, that the same scenario had happened again and that

21  they felt that it was Wendi that had instigated it.  So I

22  needed to come and pick her up and she wasn't welcome

23  anymore.

24     *Q.*    Did you do anything further to investigate what

25  happened there?

1    *A.*    No, I did not.

2    *Q.*    Did you ever get Wendi any treatment relating to

3    that?

4    *A.*    No, I did not.

5    *Q.*    Now at some point in time -- and I believe we're

6    getting there chronologically -- did you shift to a job

7    down in Casa Grande?

8    *A.*    Yes, I did.  I went to a conference in Scottsdale

9    and met a -- a behavioral health type conference.  And I

10   met Rick Barnes and he offered me a position in

11   Casa Grande.  I said, well, you know, I would think about

12   it.  I would go down there and check it out and see what I

13   thought about it and, you know, let him know later on

14   because I didn't know much about Casa Grande and I like

15   the city.

16   *Q.*    So then did you do that?  Did you explore it?

17   *A.*    Yes, I did.  I went down there and I spent a few

18   nights down there, a few weekends down there at Rick's

19   house with Wendi.  And I decided, yeah, that after the end

20   of the year, that I would -- I think it was the end of the

21   year, somewhere around December, January, that I would

22   start working for them as a grant writer and also in the

23   position of -- there were a lot of drug addicts, that at

24   the time if they were in Pinal County, had to come down

25   and there and drop urine specimens according to their

1  parole provisions.

2      Q.   So you indicated you stayed with Rick Barnes?

3      A.   Yes, I did.

4      Q.   Was Wendi ever alone with Rick Barnes?

5      A.   Yes.

6      Q.   Did you find out that Rick Barnes had a history

7  of sexual abuse with children?

8          MS. GARD:  Objection.  Hearsay.

9          MR. ARNTSEN:  Mitigation.

10         THE COURT:  Overruled.

11         Just this question is a yes or no answer.

12         THE WITNESS:  Yes.

13     Q.   BY MR. ARNTSEN:  Tell us what you found out.

14     A.   Rick was gone one day and he had told me to find

15 some papers and medication or stuff that we needed

16 downtown for the office.  And so I went looking for it and

17 I came across a box that had letters and things in there

18 and found that he had been working in Thailand previous to

19 coming to Casa Grande and that he was fired from his

20 teaching position in Thailand for sexual misconduct with

21 young girls.

22     Q.   You moved down to Casa Grande; correct?

23     A.   Yes, that is correct.

24     Q.   And who did you live with?

25     A.   Rick suggested that I live with Nicky Barnes, his

1   ex-wife because Nicky didn't have anyone to take care of

2   her.  And so Nicky had a young child and, of course, I had

3   Wendi.  So Nicky and I rented an apartment together.

4        Q.   What was Nicky's daughter's name?

5        A.   Tasha.

6        Q.   And about how old was she in relation to Wendi?

7        A.   She was a year and-a-half, two years younger than

8   Wendi, somewhere around there.

9        Q.   Did you ever come to hear that Rick Barnes was

10  accused of molesting Tasha?

11       A.   Yes, I did.

12            MS. GARD:  Objection.  Hearsay.

13            THE COURT:  Sustained.

14       Q.   BY MR. ARNTSEN:  In connection with an offer of

15  proof, what you did hear in that regard?

16       A.   I heard from several people that I knew later on

17  after Rick and his second -- his next wife moved to

18  California that he had molested both Linda's daughter as

19  well as his own daughter, Tasha.

20       Q.   Thank you.

21       A.   And he left the country.

22       Q.   What was Rick's position at PADAC?

23       A.   He was the boss.

24       Q.   What was your job at PADAC?

25       A.   Several things.  I did counseling.  You know, I

1   was there for when they needed to drop a urine sample.  I

2   wrote grants.  I worked pretty much on everything.  If

3   they brought a drunk in at nighttime, the police, then we

4   had a van that would take them to Eloy and sometimes I

5   would have to go in the van with them.

6        *Q.*   What were your work hours at PADAC?

7        *A.*   When I first started down there, I worked from

8   Friday night around 6:00 o'clock until Monday morning.

9        *Q.*   About how long was that?

10       *A.*   Definitely more than 48 hours.

11       *Q.*   What would you do with Wendi during this time?

12       *A.*   I would bring her to work with me on Friday

13  evening.  And then when Nicky got out of school, then she

14  would come and she would pick up Wendi and then for the

15  nighttime.  And then maybe in the daytime, she would bring

16  her back on Saturdays and Sundays because she needed to

17  study.

18       *Q.*   Bring her back where?

19       *A.*   Bring her back down where I was at at PADAC.

20       *Q.*   And then what would Wendi to do while she was

21  with you at PADAC?

22       *A.*   She would play with, you know, some of the adults

23  that would be around there.

24       *Q.*   Did she spend all of her time in the building?

25       *A.*   No, she didn't.  She would go outside of the

1   building on the big sidewalk and then go around the

2   corner.  There was a jewelry store there at the time and

3   around the corner was a place was called Stoney's

4   Furniture.  So she would wander around through there.

5       Q.   What would she be doing while she was out there?

6       A.   Panhandling.

7       Q.   Now, I want to talk -- was it about this time

8   that you met Alejo Ochoa?

9       A.   Yes.  Alejo was on the board of directors for

10  PADAC and that's how I met him.

11      Q.   Tell me about Alejo's reaction -- did Alejo come

12  to know Wendi because of your working at PADAC?

13      A.   Yes, he was one of the guys -- Alejo would come

14  down and check on me and then he would hang around and

15  play with Wendi.  Sometimes, you know, his cousin would

16  come and they would entertain her.  That's how I found out

17  she was panhandling.

18      Q.   Did Alejo and Wendi seem to hit it off pretty

19  quickly?

20      A.   Yes, they did, she really liked him because he

21  played with her.  He paid attention to her.  And they

22  just -- she just became attached to his hip, I guess you

23  could say.  She just really liked him.

24      Q.   How did you and Alejo get together?

25      A.   Oh, probably the biggest reason that I decided to

1   go ahead and take the job in Casa Grande was that one
2   night, I was driving home from Terros.  It was about
3   2:00 o'clock in the morning and I was driving along and
4   then, all of a sudden, I thought I saw somebody standing
5   and just pop up in front of me.  And I slammed on the
6   brakes.  I thought I hit something.  I looked back and
7   that was back when there would be no cars at 2:00 o'clock
8   in the morning.  And I didn't see anything.  And I knew
9   that my life was just getting totally out of control.  And
10  I went back to my apartment and I thought, you know, I've
11  got to change.  I've got to change.  I've got to get back
12  to God.  I've got to go to church.  I've got to do
13  something.  This is not -- this isn't right.
14          And so one of the young men that would come up
15  from Casa Grande from Terros had told me about, you know,
16  that he was going to church down there and stuff.  So I
17  just kind of connected all the pieces and I thought:
18  Okay, I'm going down there.  You know, I've got a job down
19  there.  You know, maybe there's a church down there.
20  Randy thinks there's a good place to go.  So I started
21  going to -- at the Christian bookstore in Casa Grande,
22  they were having church meetings in the back, full gospel
23  meetings.  So I started going there with Randy and I
24  started dragging Tasha and Nicky and, you know, I just
25  really liked it.  And so, slowly, Alejo started to come

1   with us, too.

2       *Q.*   At about this time, did you and Alejo start

3   sleeping together?

4       *A.*   Yes, we did.

5       *Q.*   And where were you sleeping at this time?

6       *A.*   I had -- well, in the apartment.  We were

7   sleeping in my bedroom in the apartment.

8       *Q.*   Where would Wendi sleep?

9       *A.*   She slept there, too, because Wendi and I had

10  always slept -- we were sleeping together.

11      *Q.*   In the same bed?

12      *A.*   In the same bed.

13      *Q.*   So did you and Alejo sleep together at the

14  apartment?

15      *A.*   Yes.

16      *Q.*   With Wendi in the bed?

17      *A.*   Yes.

18      *Q.*   And do you recall a bedwetting issue arising with

19  Wendi at this time?

20      *A.*   Yes.  Like I said, you know, Skip had potty

21  trained her and she never had accidents.  And then, all of

22  a sudden -- she never had accidents that I recall.  And

23  then, all of a sudden, she started wetting the bed.  I

24  woke up one night and she was in the middle between Alejo

25  and I.  I woke up and like the bed was just soaking wet.

1    It took me a little bit because it just, you know, hadn't

2    happened before.  And then probably two, three or four

3    nights a week, she kept doing that for a matter of a

4    couple of months.

5         Q.    From her starting her bedwetting, what's the

6    relation in time between this and when Alejo started

7    sleeping with the two of you?

8         A.    She didn't start bedwetting until after Alejo

9    started sleeping with us.

10        Q.    I believe you were testifying a little bit about

11   your essentially finding religion about this time?

12        A.    Yes.

13        Q.    Can you take a look at Exhibit 147?  Do you see

14   that?

15        A.    Yes.

16        Q.    Are some of the people in this picture -- and

17   we're going to get into another chapter.  But are some of

18   these people in this picture people who you were involved

19   with in this sort of religious awakening while you were in

20   Casa Grande?

21        A.    Yes, they are some of them.

22        Q.    Can you tell us who is pictured in Exhibit 147?

23        A.    In the front row is Rosalie and then Wendi.  I'm

24   right behind Wendi.  Then Rebecca.  And then the two

25   people, the young man and the lady at the end, were some

1  homeless people that we had ministered to.  And in the

2  back row is Rick and then Alejo and then Al.

3         MR. ARNTSEN:  We'll move Exhibit 147 in.

4         THE COURT:  Any objection?

5         MS. GARD:  I'm just looking at the text

6  underneath.  No objection.

7         THE COURT:  Exhibit No. 147 for identification is

8  admitted into evidence.

9         MR. ARNTSEN:  Thank you.

10     Q.   BY MR. ARNTSEN:  Is this about the time you met

11  Rick and Al?

12     A.   Umm --

13     Q.   Again, not the time of the photo.

14     A.   Oh, okay.

15     Q.   But, really, the time we're talking about in

16  Casa Grande and around the time when you and Alejo became

17  a couple.

18     A.   Yes.  Rick and Al would stop at the -- they were

19  traveling between Willcox and Northern California.  And

20  when they would stop through there, they would have

21  services at the Christian bookstore.

22     Q.   Tell us about your religious faith development

23  during this period of time.

24     A.   Nicky and I got really involved with listening to

25  Rick and Al.  And I remember -- I remember one time, they

1   had taught on idolatry and things like that and you know

2   how -- how do I put this?  That certain items that you

3   might have may carry bad spirits with them, stuff like

4   that.  So Nicky and I went back to our apartment and we

5   went through the apartment and we took out all kinds of

6   stuff.  We had bagfuls of all of our pictures.  We had --

7   back then I was really into I'm Okay, You're Okay and all

8   of that with the counseling.  And I got all of those books

9   so that the only kind of books that we had in the house

10   were Bibles or, you know, things that went with the Bible.

11   We got rid of all of her stuff that she had brought back

12   with her from Thailand because she was married to Rick at

13   that time.  And we took it out to CG Mountain and burned

14   barrels of stuff because we thought, you know, we're just

15   being really faithful by getting rid of all of this stuff

16   that was of the devil.

17      *Q.*   And was religion becoming a more and more

18   important part of your life during this period?

19      *A.*   Yes, it was.

20      *Q.*   Where are we talking about in terms of years or

21   Wendi's ages?

22      *A.*   That would have been probably when Wendi was

23   about four and-a-half all through Wendi's high school and

24   everything.

25      *Q.*   Did you and Alejo get married around this time?

1       *A.*    Yes, we did.  We were sleeping together and Rick

2   and Al came and they -- one time they came over and really

3   to see Nicky and I and they realized that Alejo was there.

4   They go:  Are you guys sleeping together?  And, you know,

5   yeah.  And so they had taken Alejo off and told him:  You

6   guys have to get married.  You can't be sleeping together,

7   you know, without you being married.

8       *Q.*    Did you move out of Nicky's apartment then or did

9   you and Alejo move somewhere?

10      *A.*    No.  Alejo and I got married and we stayed in the

11  apartment until the lease went out and then we had a house

12  built.

13      *Q.*    Had a house built?

14      *A.*    Right.  There was a program back when.  It was

15  kind of like a HUD.  It's a program for low income people

16  that live out in THE rural areas where they'll build a

17  house, you know, and the interest rate is very low and

18  it's usually outside of the town.  That's where we were

19  living.  So we paid rent according to what our income was.

20      *Q.*    When was this about when you had this house built

21  for you?

22      *A.*    It was the summer of 1975.

23      *Q.*    So Wendi was five?

24      *A.*    Yeah, that's right.  Yeah, she probably turned

25  five right about the time that we were moving in.

1    *Q.*    In terms of your religious beliefs, how did that

2    relate to your health care philosophy?

3    *A.*    Well, we believed that everything in the Bible

4    was true.  And so, if it was, then that meant that you

5    could pray and you would be healed.

6    *Q.*    Did that ever affect any illnesses that Wendi

7    came down with?

8    *A.*    Yes, it did.

9    *Q.*    Can you please explain that?

10   *A.*    Yes.  One time when we were living out there in

11   the house, Wendi became really ill.  She had a fever that

12   was really high.  I don't know how high because we didn't

13   keep thermometers or anything.  I kept asking her -- you

14   know, we kept praying that she would be healed.  I kept

15   asking -- finally, I was so scared because she had been

16   hot -- you know, so hot for so long.  And I said:  Do you

17   want to go the -- do you want to go to the doctor?  Do you

18   want to go to the doctor?  And she's five years old.  And

19   she's going:  No, I don't want to go to the doctor.  Jesus

20   is going to heal me.  And, you know, I'm turning to Alejo.

21   He goes:  Well, she can -- she can decide.  And so I let a

22   five-year-old make a decision.

23   *Q.*    Now at around this time -- or strike that.

24        Did your religious beliefs cause you to quit your

25   job at PADAC?

1    *A.*   Yes.  Because with government grants, you can't

2    talk about religion.  And, you know, I was determined that

3    if I was going to be a counselor, I was going to have to

4    tell them about God.  If they wouldn't let me, then I

5    wasn't going to work for them anymore.  So I quit working

6    for them.

7    *Q.*   And about what time was this?

8    *A.*   That was about the time that Alejo and I got

9    married.

10   *Q.*   And then what did you guys do to get by with you

11   having quit your job?

12   *A.*   Well, at that time, it turned out that the week

13   that we got married, his mother had sold the tortilla

14   factory to his aunt.  So that left him without a job.  And

15   he didn't know that that was going to happen.  So he

16   started working for I believe Foxworth.  And that's what

17   we lived on, what he made.

18   *Q.*   Now, as I understand it, you lived for a period

19   of time in Casa Grande and then you sort of went on the

20   road again; correct?

21   *A.*   That is correct.

22   *Q.*   How long did you -- how old is Wendi at the

23   time -- at the end of this time in Casa Grande?

24   *A.*   Okay.  Wendi went to kindergarten and first grade

25   in Casa Grande.  And then when she was out of

1   kindergarten -- and during this time, we were having house

2   meetings.  We didn't go to churches because we didn't

3   believe in denominations.  And so we had been talking with

4   everyone and having the meetings at home and somebody said

5   that they felt that we were -- that God was saying that we

6   should go on the road with Rick and Al, that we needed to.

7   And so Rick and Al came by and we said:  Well, you know,

8   we feel like God is leading us to do that.  What do you

9   think?  And so, basically, we gave our house away.  You

10  can't sell those kind of houses.  And we packed up

11  everything that would fit in a Volkswagen van.  I think I

12  left my china at his mother's, but that was it and the

13  dog.  And Rick and Al took us down to Willcox.

14      Q.   And what did you do in Willcox?

15      A.   In Willcox we lived in a large house that had

16  several families in it.  Some of the women had husbands.

17  Some did not, but they had children.  So we were staying

18  there and we stayed there for a couple of months I think

19  until about the end of the summer.  And then, all of a

20  sudden one night, everyone said, you know, that we had to

21  pack up and leave.  And Alejo and I and Wendi and we also

22  ended up taking Rick and Rosalie, the two other young

23  ladies that are in that picture.  We took them with us as

24  well as Mike and Mary.  And they had just gotten married

25  because it was prophesied they were supposed to get

1    married.  Mary had a house in Tucson and that's where we

2    went.

3        Q.    How long were you in Tucson?

4        A.    We were in Tucson around a year.

5        Q.    So now at the end of your time in Tucson, Wendi

6    is how old?

7        A.    Probably around six.  Going on six or going on

8    seven.

9        Q.    Probably six or seven.  When you left Casa

10   Grande, she had finished first grade; correct?

11       A.    Right.

12       Q.    Now you're a little over a year past that;

13   correct?

14       A.    Right.

15       Q.    What did you to in Tucson?

16       A.    In Tucson, Alejo and Mike went out on jobs

17   through like ADECO, you day jobs like that to make money.

18   Myself and Mary and Rick and Rosalie stayed at the home.

19   I was teaching Wendi, home schooling Wendi at the time.

20   And, at that time, Rosalie had two children.  But when we

21   left Willcox, she had left her children in Willcox.

22       Q.    So in Tucson, there any other kids in the house

23   besides Wendi?

24       A.    No, there was not.  Just Wendi.

25       Q.    And what role did religion play in your

1  household?

2      *A.*    We were doing it like we thought was correct in

3  the Bible, that the man was the head of the house.  So

4  Mike and Alejo were the bosses, I guess you would say, and

5  that basically we followed whatever they said.

6      *Q.*    When you left Tucson, what do you do next?

7      *A.*    Okay.  We were really struggling in Tucson as far

8  as financially and everything.  And Rick and Al were

9  coming back and forth and back and forth.  And so, you

10  know, finally, Mike and Alejo said:  You know, can we just

11  go to California with you guys?  Is that okay?  Because we

12  had talked about that they were going to be building a

13  church up outside of Walnut Creek or actually in Walnut

14  Creek.  You know, eventually we would go up there.  We

15  said, you know, that we really need to leave because there

16  were times that Rick and Rosalie and Wendi and I would

17  walk up to the store to go, you know, to try and buy some

18  food or whatever and we would be looking for pennies on

19  the ground to buy beans.  And I had -- at one point, I was

20  teaching Wendi her math, you know, with beans and

21  macaroni, and we actually ended up taking them off the

22  paper and using them for dinner.

23      *Q.*    So money was tight?

24      *A.*    Money was very tight.  You would open a cabinet

25  and usually we had some flour and beans and that's what we

132

1   would eat.

2       *Q.*   So then what was your life like over the next

3   year or so?

4       *A.*   The next year or so, we headed up to California.

5   We broke down in Flagstaff and ended up having to leave a

6   bunch of things there.  Then we went to California and we

7   stayed at one lady's house, Val's house for a few weeks.

8   Then we had to move out of there and we stayed -- we were

9   living in like a panel truck, in the Volkswagen van, and

10  Rick and Al had a bus -- an old bus.  Alejo and I owned a

11  truck.  Eventually, they traded -- Rick and Al took the

12  truck and we took the Volkswagen van.  And so we were

13  sleeping in those kinds of arrangements, you know, taking

14  turns sleeping in the different vehicles.

15          At one time, we lived in a house in Martinez.

16  Another time we landed in a trailer court where Rick and

17  Al or Ashley and Rick decided to buy one of the old

18  trailers.  And so we lived in a trailer while they were

19  fixing it.  And then after they fixed it up, they decided

20  they wanted to make a fifth wheel out of it so that that

21  could be used to travel with, also.

22          The goal was that eventually Rick was going to

23  marry Rosalie and Al would marry Rebecca and so that they

24  would each have two homes, too.

25      *Q.*   Were you traveling around during this time?

1    *A.*   After we got the fifth wheel ready, we went down

2    to Santa Anna, down into Orange County.  We worked with a

3    mission down there, Orange County Rescue Mission with

4    Dr. Whitehead.  And with any other churches, you know,

5    that wanted speakers, we would go there.  We worked with

6    Melody Bland.

7         And then we went to San Diego and we couldn't

8    find any churches that would have anything to do with us.

9    So, at that point, we turned around and came back up to

10   Santa Anna.  We did a lot of street ministry working, you

11   know, in the barrios and things like that.

12   *Q.*   What was Wendi doing during this period?

13   *A.*   Wendi would be hanging out with all of us.  I

14   would be, you know, home schooling her.  And, at that

15   point, once we got to California, Rosalie and Rebecca each

16   took a subject and they worked with her.  We had gotten

17   schoolbooks down in Tucson from the Tucson Public School

18   District.  They gave us access to old textbooks and

19   encyclopedias and everything like that.  So we had

20   material.  We would send our information -- our curriculum

21   to an alternative site in New Mexico that had been

22   basically set up for hippies that wanted to home school

23   their kids.

24   *Q.*   Were there any other kids besides Wendi with you

25   at that time?

1    *A.*   No.   For a little while, Lisa's daughter -- I'm

2    sorry.   Val's daughter Lisa and Wendi played together.

3    But that was just for a short period of time, maybe a

4    month or so, maybe two, at the very most.

5    *Q.*   If Wendi acted up or misbehaved, how was that

6    handled?

7    *A.*   She was disciplined by spanking.

8    *Q.*   How?

9    *A.*   By spanking.

10   *Q.*   And who would discipline her?

11   *A.*   If Alejo and I were around, it would be one of

12   us.   If we weren't around, then it would be whoever the

13   elder male was.

14   *Q.*   How would you guys make a living during this

15   period?

16   *A.*   As I found out later, Rick basically took money

17   from Val to buy -- you know, to the make the fifth wheel

18   an do all of these things.   And Mike and Alejo would go

19   out and do day labor.

20   *Q.*   Can you take a look at Exhibit 68?

21   *A.*   Yes.

22   *Q.*   Do you recognize Exhibit 68 as being what's

23   sideways up on the screen?

24   *A.*   Yes.

25   *Q.*   What is that?   You can take a look at your

1   exhibit.

2       *A.*   Yes.

3       *Q.*   Do you recognize what that is?

4       *A.*   It's a chart showing what our earnings were

5   compared to the poverty level.

6       *Q.*   Can you take a look just at Exhibit 68 A and 68 B

7   behind us.  Actually, what I'll represent to you is this.

8   We prepared this summary.  Those are the Social Security

9   records from which Exhibit 68 was prepared.

10          Does Exhibit 68 appear to accurately reflect your

11  income during the periods of time that it is set forth

12  there?

13      *A.*   Yes, it does.

14          MR. ARNTSEN:  We'll move Exhibit 68 and 68 A and

15  B into evidence.

16          THE COURT:  Any objection?

17          MS. GARD:  No, Your Honor.

18          THE COURT:  It would usually run A and B, but it

19  looks like from the actual exhibit worksheet, we're doing

20  1 and .001 and .002.

21          MR. ARNTSEN:  Right.  I understand.

22          THE COURT:  So, just to be clear, then, it will

23  be Exhibit No. 68, Exhibit No. 68.001 and then

24  Exhibit No. 68.002 are admitted into evidence.

25          MR. ARNTSEN:  Thank you, Your Honor.

1    *Q.*   BY MR. ARNTSEN:   So how did this Fishers of Men

2    period end?

3    *A.*   I think about the time that we were in San Diego

4    and, you know, trying to hook up with churches down there,

5    and no one would have anything to do with us, there was

6    very little money.  I actually found out when Rick and Al

7    would bring food home, it turned out that it had been food

8    that they had gone Dumpster diving for.  You know, I need

9    to get out.  I need to leave.  This isn't right.  Wendi

10   went barefoot for almost a year when we first got there

11   because there was no money to buy her shoes.  And, yet,

12   there was money to make a fifth wheel.  You know, it was

13   like -- it was just I guess some of the shine wore off

14   and I just wanted to leave.  I just wanted to leave.

15   *Q.*   And did you and Alejo leave?

16   *A.*   Not at first.  Alejo said:  Nope, we can't leave

17   until I know that God tells us we can leave.

18   *Q.*   And did God tell you that you could leave?

19   *A.*   Not for a while, not until after we got back up

20   to Santa Anna.  And Rick and Al, the brothers -- we always

21   called each other brother and sister.  The brothers

22   decided it was time for them to marry Rosalie and Rebecca.

23   And as soon as they got married, then Alejo told Rick and

24   Al -- he said:  We're leaving now.  We're going back to

25   Arizona.  And then he told me, he just wanted to wait

1  until he knew that they were married so that it wasn't

2  just for single people.

3      *Q.*    I understand that there were a couple of stops

4  along the way, but then did you end up back in

5  Casa Grande?

6      *A.*    Yes, we did.

7      *Q.*    When did you get -- when did you resettle in

8  Casa Grande?

9      *A.*    We eventually -- after we left, we got down to

10  Tucson to my dad's, and somehow Alejo's father had gotten

11  in contact with him I think through his mother and offered

12  to pay for Alejo to go to school to be in the union for

13  training.  I don't know how that works.

14          And so I stayed at my dad for a week or so.  And

15  then I thought:  Well, you know what?  Because Alejo was

16  up in training outside of Prescott.  And so I said:  Why

17  don't I just go back up to Casa Grande and that way it

18  would be closer for you to come home on the weekends.  And

19  that's how we ended up back in Casa Grande at his mom's.

20      *Q.*    Did Wendi seem changed at all as a result of your

21  experience with the Fishers of Men?

22      *A.*    Yes.  When she was younger and even in Tucson,

23  she was this bubbly little kid.  I remember she had the

24  nickname of Happy Jack and she was just always happy.  She

25  would, you know, come up and cuddle with anybody and

1  everybody.  Just, you know, this cute little chunky-faced
2  kid.
3           And, on the road, I could tell that she was
4  starting to act like a little adult.  You know, I just
5  figured, well, she's around grown-ups.  She didn't get to
6  play with kids or anything.
7           And we got back to Casa Grande and she was -- she
8  was different.  She didn't even want to cuddle with me.
9  She was more withdrawn.  She wasn't like open with people
10 like she had been.  Yeah, you could see a difference.
11     Q.   Now when you got back to Casa Grande, did you
12 become involved in a church known as the 91st Psalm
13 Church?
14     A.   Yes, I did.
15     Q.   How did that happen?
16     A.   The 91st Psalm Church, Calvin Lorts was the
17 pastor and Calvin had been a friend with Alejo.  He was
18 the one that had, you know, spent time with Alejo talking
19 about God and everything.  And Calvin's brother Barry was
20 also there and Barry and Alejo had been close when they
21 were growing up in high school.  So, you know, I missed
22 being around church.  Not so much church.  I missed being
23 around the Word and the Bible.
24           And so in talking with Alejo's mom, she goes:
25 Well, you know what?  You ought to go to Calvin's church.

1  I went to it when it was down the street at the junior

2  high cafeteria, and she goes, I really liked it.  And so I

3  thought okay.

4       So I went on a Saturday with mom, with Alejo's

5  mother and Wendi and we went to the church and I went:

6  Okay.  I like the music.  It's the kind of music that we

7  used to, you know, sing and do when we would be in

8  churches and the message.  You know, it felt pretty good.

9  They seemed kind of a lot looser and freer, you know, than

10  we had.  I had an attitude like, well, you guys aren't

11  really very strict Christians.

12       But that was because of the atmosphere I had come

13  out of where Rick and Al went around every morning singing

14  and waking us all up and the first thing we would do is we

15  would have church.  Then we would eat breakfast.  Then we

16  would have some more Bible studies, ate lunch, and then

17  school with Wendi, supper, as long as we had food and into

18  the Bible again, and then we would go to bed.

19     Q.   What was the theology of the 91st Psalm Church?

20     A.   Real similar to what my first or the Fishers of

21  Men was, in that, you know, they believed that the Word of

22  God was right, you know, and believed in the Trinity and

23  salvation and baptism and fire and water -- and water and

24  fire, meaning baptizing in the spirit, in the Holy Ghost,

25  with speaking -- evidence of speaking in tongues and such,

1  which is everything that we had believed with the Fishers

2  of Men.

3       *Q.*   How about gender roles?

4       *A.*   It was basically the same.  The man is the head

5  of the house.  The woman is his partner.  But when you

6  think of his helpmate is how the old King James says.

7  That the woman is the helpmate.  So it was kind of taken

8  more like, you know, you're the -- you're the doormat that

9  the husband steps on, but it's a sweet saver, you know, up

10 to Heaven.  That's what we believed.

11      *Q.*   Was there a school associated with the 91st Psalm

12 Church?

13      *A.*   Yes.  91st Psalm Academy.

14      *Q.*   And did Wendi start school at 91st Psalm?

15      *A.*   Yes, she did.  Not at first.  I think we were

16 living in Casa Grande for a couple of months.  And I

17 didn't have the money to send her to the school because

18 you pay for it.  And so Calvin came around one day and

19 said that he would like give her a scholarship or

20 whatever.

21           I was kind of scared because here I had been home

22 schooling for a couple of years.  And they tested her and

23 it's an accelerated SEC program.  So it's Christian

24 education from a Baptist church in Texas.  And so they

25 tested her and she was way above, you know, what her grade

1  level was.  So I was happy with that.

2      *Q.*  Can you take a look at Exhibit 161 in your

3  binder?

4      *A.*  Oh, sorry.

5      *Q.*  That's okay.  So what year did Wendi start at

6  91st Psalm School?

7      *A.*  161?

8      *Q.*  161, yes.

9      *A.*  1980.

10     *Q.*  Look at Exhibit 161.  Who is that a picture of?

11     *A.*  That's a picture of John Casey.

12     *Q.*  What was John Casey's role at the school when

13  Wendi started there?

14     *A.*  He was the school principal.

15     *Q.*  What's that he's got in his hand?

16     *A.*  He has a paddle.

17     *Q.*  What was that paddle used for?

18     *A.*  Spanking the children.

19         MR. ARNTSEN:  We'll move Exhibit 161 into

20  evidence.

21         THE COURT:  Any objection?

22         MS. GARD:  No, Your Honor.

23         THE COURT:  Exhibit No. 161 for identification is

24  admitted into evidence.

25     *Q.*  BY MR. ARNTSEN:  Did you and Alejo come to work

1   at the 91st Psalm Church and School as well as being

2   church members and Wendi going to school there?

3        A.   Yes, we did.

4        Q.   In what positions?

5        A.   Alejo, Calvin asked him to be the youth pastor.

6   And I was working in the school.

7        Q.   And then you --

8        A.   In the office.

9        Q.   And then Wendi started school?

10       A.   Yes.  Wendi started school before Alejo and I

11   started working there.

12       Q.   Did Wendi acquire some friends through her going

13   to school there?

14       A.   Yes, she did.  It was hard for her at first, but

15   then she made friends, yes.

16       Q.   Take a look at Exhibit 160.  Who is that?

17       A.   That's Kyre Lorts.

18       Q.   Were Kyre and Wendi friends?

19       A.   Yes, they were.

20       Q.   Did Kyre and Wendi run away together a couple of

21   times?

22       A.   Yes, they did.  Yes, they did.  It seems like I

23   was always the last to know, but I found out that they had

24   taken off from school.  Nobody knew where they were.  And

25   so they started looking for them and they were a couple of

1    miles away down at Foxworth.  I think they had stopped
2    there for some water.  And I heard later that they were
3    headed to Flagstaff.
4              MR. ARNTSEN:  We'll move Exhibit 160 into
5    evidence.
6              THE COURT:  I think that's already been admitted
7    into evidence.
8              MR. ARNTSEN:  Has it?  Okay.  Thank you.
9        Q.   BY MR. ARNTSEN:  Can you take a look at
10   Exhibit 205.  Do you know who that is?
11       A.   That's Jeri Lynn Wilkerson.
12       Q.   Do you know what Jeri Lynn's last name is now?
13       A.   I believe it's Cunningham.
14       Q.   Were Jeri Lynn and Wendi friends?
15       A.   Yes, they were.
16       Q.   Oh, by the way, would Krye sleep over at your
17   house on occasion?
18       A.   Yes.
19       Q.   On a regular basis?
20       A.   Pretty much.  She was there a whole lot.
21       Q.   How about Jeri Lynn?
22       A.   The same thing.  They were a little bit different
23   time periods, but --
24       Q.   Was Jeri Lynn after Krye?
25       A.   Yes.

1          MR. ARNTSEN:  We'll move Exhibit 205 into

2    evidence.

3          THE COURT:  Any objection?

4          MS. GARD:  Relevance.

5          THE COURT:  I'm sorry?

6          MS. GARD:  It's irrelevant.

7          THE COURT:  This Jeri Lynn Cunningham is going to

8    be testifying?

9          MR. ARNTSEN:  Yes.

10         THE COURT:  Over the objection, Exhibit No. 205

11   is admitted into evidence.

12    *Q.*   BY MR. ARNTSEN:  Take a look at Exhibit 159.

13         THE COURT:  What number?

14         MR. ARNTSEN:  159.

15    *Q.*   BY MR. ARNTSEN:  Who is that a picture of?

16    *A.*   That's Wendi and Alejo and Laura Bell.

17    *Q.*   Who is Laura Bell?

18    *A.*   Laura Bell was another close friend of Wendi's.

19         MR. ARNTSEN:  We'll move Exhibit 159 into

20   evidence.

21         THE COURT:  Any objection?

22         MS. GARD:  No, Your Honor.

23         THE COURT:  Exhibit No. 159 for identification is

24   admitted into evidence.

25         MR. ARNTSEN:  Thank you.

1    *Q.*    BY MR. ARNTSEN:  Now, when you're in Casa Grande,

2    tell me about Wendi and Alejo's relationship.  You're back

3    in Casa Grande.  Actually, let me ask one sort of

4    background line of questioning.  When you started church

5    and school, it was called 91st Psalm Church and School; is

6    that correct?

7    *A.*    Yes.  That is correct.

8    *Q.*    Then did the name change at some point in time?

9    *A.*    Yes, it did, to Harvest Family Church and Harvest

10   Academy, I believe.

11   *Q.*    About when did that happen?

12   *A.*    Sometime in the -- oh, gosh, in the 80's.

13   *Q.*    And did that change -- was that in connection

14   with the change in who the pastor of the church was?

15   *A.*    Yes, it was.  Calvin started a church.  Calvin

16   Lorts started a church up in Tempe and he would go up

17   there on Sunday afternoons after having church on Sunday

18   mornings, and him and the Alejo would.  And, finally,

19   Calvin got a building and after he got enough, you know,

20   people involved in the church up there.  He expected Tom

21   to help finance the new Tempe church even know, you know,

22   it was already started.  And, finally, Tom and him parted

23   ways and Tom took over 91st Psalm in Casa Grande and

24   changed it to Harvest Family.

25   *Q.*    Did you continue working?  Were you continuing

1    working at the church and school at this time?

2       *A.*    At Harvest?

3       *Q.*    Right.  Did you change jobs?

4       *A.*    No, I didn't change jobs.

5       *Q.*    About when did you change jobs so you weren't

6    working at Harvest anymore?

7       *A.*    Maybe around '84, '85, somewhere in there.

8       *Q.*    What was your job?  What did you change to doing?

9       *A.*    I went to work for a company.

10      *Q.*    Doing what?

11      *A.*    I was doing office work, office manager.

12      *Q.*    And from that time on, have you worked at other

13   at various companies over the years?

14      *A.*    Yes, I have.  I did at one point come back and

15   work at Harvest in the 90's for a couple of years.

16      *Q.*    Doing what?

17      *A.*    Teaching or helping in the school room.

18      *Q.*    I was starting to ask a line of questions in

19   connection with Alejo's and Wendi's relationship during

20   your time at Harvest School.

21           First of all, can you take a look at Exhibit 148?

22   Can you identify what that is?

23      *A.*    That's a picture of Wendi and Alejo.

24      *Q.*    And it says on it November 1979.  Does that seem

25   about right?

1     *A.*   Yes.  That was at his mother's house.

2          MR. ARNTSEN:  We'll move Exhibit 148 into

3   evidence.

4          THE COURT:  Any objection?

5          MS. GARD:  No, Your Honor.

6          THE COURT:  Exhibit No. 148 for identification is

7   admitted into evidence.

8     *Q.*   BY MR. ARNTSEN:  Can you take a look at

9   Exhibit 149, please?

10    *A.*   Okay.

11    *Q.*   Who is that a picture of?

12    *A.*   Again, that's Wendi and Alejo.

13    *Q.*   Again, around the end of the year of 1979?

14    *A.*   Yes.

15         MR. ARNTSEN:  We'll move Exhibit 149 into

16  evidence.

17         THE COURT:  Any objection?

18         MS. GARD:  No, Your Honor.

19         THE COURT:  Exhibit No. 149 for identification is

20  admitted into evidence.

21    *Q.*   BY MR. ARNTSEN:  Tell me about your sort of

22  family dynamics during this time when you're back in

23  Casa Grande in terms of who was doing what with whom and

24  kind of what your day looks like?

25         MS. GARD:  Objection.  Foundation.  What exact

1   time period?

2           THE COURT:  Sustained.

3           Lay some foundation.

4       Q.   BY MR. ARNTSEN:  In 1980, again, this time when

5   you're getting back into Casa Grande and staring up Wendi

6   going to the 91st Psalm School.

7       A.   Okay.  I was doing some day care for the state

8   at this time before I started -- before Alejo started with

9   them, 91st Psalm.  And so Wendi would -- Alejo normally

10  took her to school before he went to work and picked her

11  up after school because we only had one car.  And so I was

12  basically at home and they spent a lot of time together.

13      Q.   During this period of time, would you say that

14  Wendi was closer to Alejo or to you?

15      A.   She was closer to Alejo.

16      Q.   And can you just provide some details on that?

17      A.   Because like they spent a lot of time playing.

18  If she had her friends over, he always played with them.

19  Usually, you know, if dinner was already over or anything,

20  I usually went off to the bedroom to read.  We didn't have

21  a television at the time.  And so they just spent -- they

22  spent a lot of time together.

23      Q.   Would Wendi's friends sleep over on occasion?

24      A.   Yes.  Yes, Wendi's did sleep over from the time

25  she was that age when we had our own house through being a

1   teenager.

2       Q.   And during these sleepovers, were they

3   interacting more with Alejo or with you?

4       A.   Oh, definitely with Alejo.  Alejo was the one

5   that always, you know, played with them, tickled them,

6   teased them, watched TV when we got a TV, and took them

7   out to drive, you know, go driving.  He was the one that

8   would be scaring them in the middle of the night and, you

9   know, things like that.  So he definitely spent more time.

10      Q.   What would you be doing during these sleepovers?

11      A.   Usually, I didn't really want to be hanging out

12  with them, you know, in the living room or whatever.  So I

13  just went off and read my books and went to bed.

14      Q.   In your room?

15      A.   In my room.

16      Q.   Thank you.  Now were there any negative -- what

17  you viewed as negative aspects of how Alejo treated Wendi

18  during again this same period of time?  And I'm looking at

19  the 1980, early 1980's period.

20           MS. GARD:  Objection.  Vague.

21           THE COURT:  Overruled.

22           Go ahead and answer the question.

23           THE WITNESS:  Okay.  Would you state it again?

24      Q.   BY MR. ARNTSEN:  Were there any negative aspects

25  of Alejo and how Alejo treated Wendi during this period of

1  time, the early 1980's?

2      *A.*   Okay.  Alejo was always -- I don't if it's a good

3  word or not -- but volatile.  You never knew when he was

4  going to come in and be yelling about something that

5  happened at church or school or down the street or, you

6  know, or something that we didn't do right -- you know,

7  that Wendi and I didn't do right, because he always looked

8  mean anyway.

9          And he was also very derogatory.  He teased her a

10  lot, especially about being blond.  And, you know, maybe

11  they watched a show and she would be like:  Oh, did that

12  really happen?  And he would be like:  Wendi, do you

13  really think that happened?  Come on.  Don't be dumb.

14  Don't be blond.

15          And the thing that I witnessed a lot was the fact

16  that like when commercials would come on TV and it might

17  be for like sanitary pads or Tampax or things like that,

18  he would always -- he would start making comments about:

19  Well, do you use those?  What are those for?  Come on.

20  Wendi tell me.  And it was not like he would just leave it

21  alone.  He just kept pushing the buttons.  You know, it's

22  like he didn't know when to stop, somebody who that

23  just -- and he was like that with a lot of things where,

24  you know, if you would tease a kid and you would stop, you

25  know, after a little bit, instead of just keep pushing on

1  them.  And he just wouldn't.  And, to me, it always seemed

2  really mean.  But I would say something to him and he

3  would go:  Oh, no, they like it.  They like it.  And, you

4  know, there just gets to a point where you just don't

5  fight anymore, you know, or try to stop him.  There really

6  wasn't anything -- he didn't listen to me and he didn't

7  listen to the kids.  He would do the same thing --

8          MS. GARD:  Judge, I object.  This is a narrative.

9          THE COURT:  Sustained.

10          Ask your next question.

11          MR. ARNTSEN:  That's fine.

12     Q.   BY MR. ARNTSEN:  Turning to first looking at

13  where you referenced Alejo's explosiveness or volatility,

14  about how often or what was the frequency of these

15  explosions?

16     A.   You would never know when it would happen.  And

17  it could be like every night that week or we might be able

18  to go a whole week, but never more than a week.

19     Q.   Were any of those explosions related to sex at

20  all?

21     A.   Yes.

22     Q.   And can you explain your answer?

23     A.   Alejo and I fought a lot about sex.

24     Q.   And what was the nature of the fights?

25     A.   That I didn't want to have sex as much as he did.

1    *Q.*   How would that connect to these explosions that
2  you mentioned?

3    *A.*   Then he would start getting angry and he would
4  say:  Well, you're supposed to do what your husband says.
5  And, you know, just a lot of guilt trips on me.  You know,
6  I would --

7    *Q.*   Talking about what you indicated about Alejo
8  teasing her or demeaning Wendi, did any of that have a
9  sexual content to it?

10   *A.*   Yes.  The things like the Tampax and things like
11 that.  We might be driving by a store or in a store, like
12 a lingerie store and, you know, he would go:  Oh, look,
13 you can see everything.  And, you know, he was just making
14 inappropriate comments.  I mean, even as -- I know it's
15 hard to believe that I was straitlaced in this time period
16 of my life, but I was.  And, you know, I just thought, you
17 just don't talk to your daughter about things like that.
18 But, yet, I don't know.  I'm sorry.

19   *Q.*   Between you and Alejo, who was it that instructed
20 Wendi -- who provided sex education to Wendi?

21   *A.*   Alejo did.

22   *Q.*   Do you know about how old Wendi was when this
23 happened?

24   *A.*   Oh, she was probably 11, 10, 12, around there.

25   *Q.*   Thank you.  Now I want to turn your attention to

1  what I believe has been referred to as rubbing on or

2  touching on Alejo.  Do you know what I'm referring to?

3       A.   Yes, I do.

4       Q.   And tell me what that meant in your household.

5       A.   That meant that Alejo wanted us to sit down and

6  spend time, what at that time was called ministering to

7  him, to rub his head or rub his shoulders, rub his legs.

8  And I did that for a long time.  Excuse me.  And it got to

9  where, especially when, you know, I was working and

10 everything, I said:  You know, I just don't want to do

11 that.  And so it became Wendi's duty, and literally duty,

12 to be the one to rub his head, scratch his head, rub his

13 legs, rub his back.

14      Q.   About how old was Wendi when she started assuming

15 this duty?

16      A.   Well, she was doing it, you know, from like the

17 time that we got back to Casa Grande.  And then gradually,

18 as the years passed, she was the one that was doing it a

19 lot more than I was.

20      Q.   Can you take a look at Exhibit 154, please?

21      A.   Yes.

22      Q.   What's that a picture of?

23      A.   That's a picture of Alejo and Wendi.

24      Q.   Is this about the time when she's starting this

25 rubbing-on?

1      *A.*   Yes.

2            MR. ARNTSEN:  We'll move Exhibit 154 into

3    evidence.

4            THE COURT:  Any objection?

5            MS. GARD:  No, Your Honor.

6            THE COURT:  Exhibit No. 154 for identification is

7    admitted into evidence.

8      *Q.*   BY MR. ARNTSEN:  Can you take a look at

9    Exhibit 158, please?

10     *A.*   Yes.

11     *Q.*   Can you identify what that is?

12     *A.*   That's a picture of Alejo and Wendi.

13     *Q.*   And it says circa 1986.  Does that look about

14   right?

15     *A.*   Yes, it does.

16           MR. ARNTSEN:  We'll move Exhibit 158 into

17   evidence.

18           THE COURT:  Any objection?

19           MS. GARD:  No, Your Honor.

20           THE COURT:  Exhibit No. 158 for identification is

21   admitted into evidence.

22     *Q.*   BY MR. ARNTSEN:  And, again, is Wendi's rubbing

23   on Alejo continuing throughout the period of time of the

24   pictures we just looked at?

25     *A.*   Oh, yes.

155

1    *Q.*    About how long would that be in a particular

2    evening?  Are we talking about ten minutes?  What are we

3    talking about?

4    *A.*    No.  We're talking a longer length of time.

5    Anywhere from 45 minutes to a couple of hours because, you

6    would get tired.  She would get tired or I would have and

7    it was like:  No, please, just touch me.  Touch me.  You

8    know, and that's what -- you know, and don't you love me.

9    Touch me.

10   *Q.*    When Wendi would rub Alejo's head, where would

11   his head be?

12   *A.*    Usually, one of two different places.  He may be

13   sitting on the floor like he was in the previous pictures,

14   and she would rub his head that way.  But, normally, and

15   especially as she got older, he would lay on the couch and

16   you would have to sit on the end of the couch and he would

17   put his head on her lap and, you know, say:  Touch me.

18   Touch me.  And rub his head and rub his back.

19   *Q.*    What would Alejo be wearing during these touching

20   experiences?

21   *A.*    Normally like a pair of like, you know, workout

22   shorts, you know, the baggie -- you know, sweatpants, you

23   know, like that are cut off or whatever.

24   *Q.*    Do you know if he would have underwear on under

25   it?

1    *A.*   No.  He didn't like wearing underwear.

2    *Q.*   Did Alejo ever buy lingerie for Wendi?

3    *A.*   Yes, he did.

4    *Q.*   And starting when she was about how old?

5    *A.*   I would say around 12.

6    *Q.*   And what types of lingerie?

7    *A.*   Little bikini things because I remember her being

8 around 13, and he had bought her like little lacy

9 underwear and a bra to match and a garter belt, things

10 like that.

11    *Q.*   Did you accompany them on these shopping trips?

12    *A.*   No.

13    *Q.*   Why not?

14    *A.*   Because Alejo usually would take her on Mondays,

15 which is a day that I worked and that he was off at the

16 church.  And he would just say, you know:  Wendi is going

17 to take the day off and we're going to go up and just, you

18 know, go window shopping.  Or if it was on a weekend, he

19 would go:  You know what, you don't need to go.  We know

20 you're tired.  They always made it sound -- or he always

21 made it sound like it was about me.  Oh, you're tired.

22 Stay here.  You don't have to go.

23    *Q.*   And Frederick's of Hollywood catalogs, were they

24 in your house?

25    *A.*   Yes, they were.

1    *Q.*    Who ordered them?

2    *A.*    Alejo did.

3    *Q.*    Did Alejo and Wendi ever go to a Frederick's

4    store, if you know?

5    *A.*    Yes, they did.

6    *Q.*    And describe that circumstance.

7    *A.*    Okay.  One time when we were going over to

8    California to go see a ministry over there, one of the

9    prime stops that Alejo wanted to make was to go to

10   Frederick's of Hollywood, the main store down in

11   downtown -- I don't know.  Wherever it is, in Hollywood.

12   And so that was one of the first things that we did when

13   we got there is went to Frederick's.  He's trying to drag

14   her around or saying: Come here.  Come here.  Look at

15   this.  Look at that.  He's not asking me.  No, he's not

16   asking me.  He's showing Wendi.  To me, the type of stuff

17   in there -- and I don't -- it was really risqué.

18   *Q.*    Were there any other stores that Alejo took Wendi

19   to that you thought were inappropriate?

20   *A.*    Yes.  There was -- well, for her age, there was a

21   lingerie store -- kind of an adult lingerie store that had

22   been on the corner of Arizona Avenue down where Downtown

23   Chandler is or was and he would take her there.  I went

24   there once with them.  And Wendi said:  Yeah, he takes me

25   here always.  We always stop here.  You know, we stop here

1   a lot or whatever.  And that's the one where they have

2   like lots of off-color cards and things like that and --

3       Q.    How about Spencer's?

4       A.    What?

5       Q.    How about Spencer's?

6       A.    Definitely Spencer's.  You know, Spencer's was

7   always kind of a knickknacky store.  But they did have

8   a -- they always had a section, you know, at least one

9   little aisle there where, you know, things were -- you

10  know, it could be something as simple as like having a

11  little toilet that had a little penis that shot water out

12  of it or, you know, other things that were a lot more

13  inappropriate.  It wasn't age-appropriate for Wendi.

14          And they also had a back part that was kind of

15  shielded off a little bit where there were other things

16  that were a little bit stronger.  That's been a while.

17  I've been in a Spencer's since and it's a lot different

18  now than it used to be.

19      Q.    And were you concerned about the parts of the

20  Spencer's store that Alejo was directing Wendi?

21      A.    Yes.  You know, there was like a lot of cute

22  gadgets and stuff there.  But he always -- the first place

23  he went was back to that one section.  I'll always

24  remember you come in on the right-hand side and he went

25  straight back and that's where he would go:  Come here.

1    Let's look at this.  Oh, look at all the cards.  He would

2    start reading, you know, all these cards that, again, you

3    know, they were adult themes and inappropriate for a

4    child --

5        Q.    Sure.

6        A.    -- your daughter.

7        Q.    At some point in time, did Alejo take up

8    photography?

9        A.    Yes, he did.

10       Q.    And about when was this?

11       A.    It was sometime in the 80's.

12       Q.    About how old was Wendi?

13       A.    She was like maybe 13, 14, somewhere around

14   there.

15       Q.    And would you take a look at Exhibit 73?  Can you

16   identify what that is?

17       A.    Those are some of Alejo's photos.

18       Q.    And is Wendi depicted in Exhibit 73?

19       A.    Yes, she is.

20       Q.    In what part of it?  If you want to take a look

21   at that.  It looks like there are lines of films.

22       A.    Yeah, there's different lines.  Well, she's in

23   this line, this line, this line.

24       Q.    So the top three lines, for sure?  Which lines,

25   just for the record?

1    *A.*    Just for the record, she's in the second, third

2  and fourth lines.

3         MR. ARNTSEN:  We'll move Exhibit 73 into

4  evidence.

5         THE COURT:  Any objection?

6         MS. GARD:  No, Your Honor.

7         THE COURT:  Exhibit No. 73 for identification is

8  admitted into evidence.

9    *Q.*    BY MR. ARNTSEN:  Can you take a look at

10  Exhibit 74?  Can you identify what that is?

11    *A.*    Those are pictures of Wendi.

12    *Q.*    And in Exhibit 74, sort of which rows again show

13  pictures of Wendi?

14    *A.*    All of them.

15         MR. ARNTSEN:  We'll move Exhibit 74 into

16  evidence.

17         THE COURT:  Any objection?

18         MS. GARD:  No, Your Honor.

19         THE COURT:  Exhibit No. 74 for identification is

20  admitted into evidence.

21    *Q.*    BY MR. ARNTSEN:  Now, as Wendi was growing up,

22  did she evidence any symptoms or activities that you

23  associate with mental health issues?

24         MS. GARD:  Objection.  Foundation.

25         THE COURT:  Sustained.

1    *Q.*   BY MR. ARNTSEN:  Did Wendi have -- did Wendi's

2    sleep patterns vary as she was growing up?

3    *A.*   Yes, they did.  When she was little, she was

4    always the kind that, you know, was up and bouncing in the

5    mornings and waking me up and things like that.

6          And when we came back from California -- and, of

7    course, in California, we were getting woken up every day

8    early.  And we came back from California and it totally

9    changed.  It was like she wanted to sleep.  There would be

10   time periods when, you know, she would go to bed early and

11   sleep for a long time and I would have to go and wake her

12   up.  It was really hard to wake her up.  She would come

13   home from school.  She would want to lay down and take a

14   nap.

15   *Q.*   And over what period of time of her excessive

16   sleepiness would she evidence this?

17   *A.*   Umm, you mean as far as --

18   *Q.*   Years?

19   *A.*   The years?  For as long as I can recall --

20   *Q.*   Would it come and go?

21   *A.*   -- even up into her adulthood.

22   *Q.*   Did she ever evidence any memory lapses?

23   *A.*   Yes.

24   *Q.*   Can you describe that?

25   *A.*   Yes.  That was the thing that I always thought

1  was really strange.  Something could happen to her and it

2  could be bad or it could be good -- normally, it was bad.

3  And I would ask her about it a few weeks later.  Like

4  maybe she got a whoopin', a spanking, you know, at school

5  or from her dad or something, and I would make a comment

6  about it, and she goes:  Well, I don't remember that.  I'm

7  going what?

8          I remember a time that I saw her when she -- this

9  was when she was an adult and she was grown and her knee

10 was just all mangled up, you know, just -- and I said:

11 What happened to you?  And she told me what happened.  Her

12 and Joe had a fight and she had gotten out of the truck

13 and whatever and didn't tell me a whole lot.

14         And so six months later, I'm saying:  Man, that

15 turned into a nasty scar.  Now you didn't tell me exactly

16 what happened.  What happened?  And she goes:  I don't

17 know.  I don't know.  What do you mean?  I must have got

18 this when I was a kid.  Just bizarre.

19   *Q.*   I mean, you've given a couple of examples.  Were

20 there a lot more examples like that?

21   *A.*   There were.  There were a lot more, a lot more.

22 I know that I have a tendency to do that, also, but Wendi

23 was just weird.  I mean, it's like:  What do you mean you

24 don't remember?  This was such a big deal.  Why don't you

25 remember this?

1    *Q.*   And over what period of her life did Wendi

2    evidence these memory lapses?

3    *A.*   Again, I would say after we came back from

4    California is when I noticed it.  You know, she was

5    younger.  You know, before that.  And California was just

6    an intense thing.  And she didn't -- and we didn't always

7    even sleep in the same place, Alejo and I and Wendi.  She

8    always slept with Rick and Rosalie -- or not Rick and

9    Rosalie.  I'm sorry.  With Rebecca and Rosalie.

10   *Q.*   And so, starting when you got back from

11   California, was Wendi evidencing this per what?  Per day?

12   *A.*   She was.

13        MR. ARNTSEN:  Your Honor, this is a good time for

14   a break because what I'm going to switch into is the

15   interaction with the lawyers.  We don't have to take a

16   break now, but if you want.

17        HE COURT:  We will go ahead and take our

18   afternoon break right now.

19        MR. ARNTSEN:  Thank you, Your Honor.

20        THE COURT:  We'll be at recess.

21        (WHEREUPON, a recess ensued from 3:00 p.m. to

22   3:14 p.m.)

23        THE COURT:  This is CR 2000-096032, State of

24   Arizona vs. Wendi Elizabeth Andriano.

25        The record will reflect the presence of counsel

1    and the parties.

2         The record will reflect that Donna Ochoa is on

3    the witness stand.  We will continue with the direct

4    examination of Mr. Arntsen.

5         Mr. Arntsen.

6         Q.   BY MR. ARNTSEN:  Donna, now I want to sort of

7    fast-forward to October of 2000 after Joe's death and

8    Wendi's arrest.  And then did you get involved in some

9    custody issues relating to Wendi's children?

10        A.   Yes, we did.  Yes, I did.

11        Q.   And just in terms of setting a context, what

12   happened with Wendi's children immediately following

13   Wendi's arrest?

14        A.   I had gone up to Wendi's apartment while, you

15   know, when the police were there.  And the police put

16   Nicholas and Ashlee into my custody and I took them back

17   to Casa Grande with me.  Jeanea had asked that.

18        Q.   Jeanea who?

19        A.   Jeanea Lambeth had asked --

20        Q.   What is her -- is she --

21        A.   Jeanea is Joe's sister.  Joe Andriano's sister.

22   And she had asked if I could meet -- bring my pastor and

23   the kids and meet at her mother's house in Casa Grande and

24   she was going to bring her priest and we were going to,

25   you know, talk.

1          And so I did.  And my pastor, Pastor Tom came.
2    When I got there, we didn't really, you know, talk because
3    the priest didn't come.  So we didn't talk like that.  But
4    they did ask me -- the Andrianos and the Lambeths asked me
5    if they could keep Nicholas and Ashlee until the funeral
6    because they were having family come into town and they
7    wanted the family to be able to see the kids.  And I said:
8    Yes.  You know, and then they will come back with me, you
9    know, after the funeral.
10          Then we had the funeral on Friday, Joe's funeral.
11   And, afterwards, we were over at the Rebecca Hall and I
12   was getting ready to leave.  So I was going to take the
13   kids.  They said:  No, you can't take the kids.  We're
14   going to keep them longer.  And Brad had told me:  I'm
15   going to go down to the jail and I'll talk to Wendi and,
16   you know, whatever.  And so that's where everything kind
17   of started.
18       Q.   Were the Lambeths appointed the guardians of
19   Nicholas and Ashlee?
20       A.   Yes, they were.
21       Q.   Can you take a look at Exhibit 80, please?  Do
22   you have it in front of you?
23       A.   Yes, I do.
24       Q.   And that document is entitled Agreement Regarding
25   the Guardianship of Nicholas Andriano and Ashlee Andriano;

1   is that correct?

2       *A.*   That is correct.

3       *Q.*   And is your signature on the second page of

4   Exhibit 80?

5       *A.*   Yes, it is.

6           MR. ARNTSEN:  We'll move Exhibit 80 into

7   evidence.

8           MS. GARD:  No objection.

9           THE COURT:  Exhibit 80 for identification is

10   admitted into evidence.

11       *Q.*   BY MR. ARNTSEN:  And then was that guardianship

12   affirmed by a court order?

13       *A.*   Yes, it was.

14       *Q.*   Can you take a look at Exhibit 81?  And is

15   Exhibit 81 the order appointing the Lambeths guardians of

16   Nicholas and Ashlee Andriano?

17       *A.*   Yes, it is.

18           MR. ARNTSEN:  We'll move Exhibit 81 into

19   evidence.

20           THE COURT:  Any objection?

21           MS. GARD:  No, Your Honor.

22           THE COURT:  Exhibit No. 81 for identification is

23   admitted into evidence.

24       *Q.*   BY MR. ARNTSEN:  Now did you hire a lawyer to

25   take some efforts to get the kids back?

1     *A.*     Yes, we did.

2     *Q.*     Who did you hire?

3     *A.*     At the beginning, we had hired Leon Thikoll to

4     help us, you know, with the children.

5     *Q.*     And at some point in time, did David DeLozier

6     replace Attorney Thikoll as your counsel?

7     *A.*     Yes, he did.

8     *Q.*     Can you take a look at Exhibit 84, please?  And

9     look at the second page of Exhibit 84.  You see that

10    that's a July 12, 2001 letter to a Mrs. Gray?  Do you see

11    that?  It's the second page of Exhibit 84.

12    *A.*     Yes.

13    *Q.*     And is that your signature on the bottom of the

14    letter?

15    *A.*     Yes, it is.

16    *Q.*     And I'm just going to read into the record the

17    first two sentences:  Dear, Mrs. Gray, we have changed

18    attorneys due to Mr. Thikoll's illness.  Our new counsel

19    is G. David DeLozier.  Did I read that correctly?

20    *A.*     Yes, you did.

21    *Q.*     How did you --

22            MR. ARNTSEN:  We'll move Exhibit 84 into

23    evidence.

24            THE COURT:  Any objection?

25            MS. GARD:  No, Your Honor.

1       THE COURT:  Exhibit No. 84 for identification is

2  admitted into evidence.

3       *Q.*   BY MR. ARNTSEN:  And who is Mrs. Gray?

4       *A.*   She was the counselor that was working with

5  Nicholas and Ashlee.

6       *Q.*   And what were the circumstances by which you

7  retained -- well, why did you retain Attorney DeLozier to

8  represent you regarding in connection with the children?

9       *A.*   To be the attorney of record?  Or do you mean

10 what else I had --

11      *Q.*   Was he your lawyer in connection with these

12 proceedings?

13      *A.*   Yes, he was.

14      *Q.*   And can you take a look at Exhibit 86?  Do you

15 recognize that that is an e-mail from you to David

16 DeLozier?

17      *A.*   Yes, it is.

18      *Q.*   And it's dated July 15, 2001?

19      *A.*   Yes, it is.

20      *Q.*   And what's this e-mail concern or relate to?

21      *A.*   I had sent some letters over to David DeLozier

22 that people had written for me.  He had asked that I have

23 people that we knew -- that knew us to write some letters.

24      *Q.*   What kind of letters?

25      *A.*   Letters saying that we were good parents and we

1  were good grandparents, like that.

2      Q.    What was your understanding of the purpose for

3  obtaining these letters?

4      A.    The purpose was just to prove that we, you know,

5  we're suitable to take care of Nicholas and Ashlee.  And

6  they were given to -- they're supposed to be given to the

7  counselors so that they could read them and see that we

8  were upstanding people, I guess.  I don't know.

9          MR. ARNTSEN:  I we'll move Exhibit 86 into

10  evidence.

11         THE COURT:  Any objection?

12         MS. GARD:  I have a hearsay objection.

13         THE COURT:  Are they letters?

14         MR. ARNTSEN:  That's actually 85, which I'll get

15  to in a minute.  86 is the e-mail.

16         THE COURT:  It's just the e-mail itself?

17         MR. ARNTSEN:  Yes.

18         THE COURT:  Exhibit No. 86 for identification is

19  admitted into evidence.

20      Q.    BY MR. ARNTSEN:  Okay.  Can you take a look at

21  Exhibit No. 85?  What are these?  It's a group exhibit

22  with a number of documents.  Are what are these?

23      A.    These are letters from people that we knew

24  stating -- telling about Alejo and I that were --

25      Q.    And these people who you asked to write these

1    letters on this topic?

2        *A.*   Yes, they are.

3        *Q.*   And had Attorney DeLozier asked you to obtain

4    these letters?

5        *A.*   Yes, he did.

6        *Q.*   And then after you obtained the letters, did you

7    forward them onto Attorney DeLozier?

8        *A.*   Yes, I did.

9            MR. ARNTSEN:  We'll move Exhibit 85 into

10   evidence.

11           THE COURT:  Any objection?

12           MS. GARD:  No, Your Honor.

13           THE COURT:  Exhibit No. 85 for identification is

14   admitted into evidence.

15       *Q.*   BY MR. ARNTSEN:  The guardianship matter relating

16   to Nicholas and Ashlee, that was proceeding in Maricopa

17   County; is that correct?

18       *A.*   That is correct.

19       *Q.*   Did Attorney DeLozier start a related proceeding

20   in Pinal County?

21       *A.*   Yes, he did.

22       *Q.*   What was the nature of that proceeding?

23       *A.*   That we could adopt Nicholas and Ashlee.

24       *Q.*   Take a look at Exhibit 87, please.  Does

25   Exhibit 87 relate to that adoption proceeding?

1    *A.*    Yes, it does.

2    *Q.*    And was Judge O'Neill the judge presiding over

3    that adoption?

4    *A.*    Yes, he was.

5         MR. ARNTSEN:  We'll move Exhibit 87 into

6    evidence.

7         THE COURT:  Any objection?

8         MS. GARD:  No, Your Honor.

9         THE COURT:  Exhibit No. 87 for identification is

10   admitted into evidence.

11   *Q.*    BY MR. ARNTSEN:  And how was that adoption

12   proceeding resolved?

13   *A.*    It was denied with I think the word sanctions.

14   They put sanctions on us.  I'm not sure of what the

15   terminology is.

16   *Q.*    But, in a nutshell, it did not end successfully

17   for you; is that correct?

18   *A.*    That is correct.

19   *Q.*    Can you take a look at Exhibit 104, please?  Can

20   you identify what this is?  Is this another order in the

21   adoption proceedings?  If you would take a look at the top

22   of the first page.

23   *A.*    Yes.

24        MR. ARNTSEN:  We'll move Exhibit 104 into

25   evidence.

1          THE COURT:  Any objection?

2          MS. GARD:  No, Your Honor.

3          THE COURT:  Exhibit No. 104 for identification is

4     admitted into evidence.

5          Q.    BY MR. ARNTSEN:  Now, in connection with the

6     Maricopa County proceedings, the custody issues, what were

7     the issues that you were dealing with and using

8     Attorney DeLozier for in that proceeding?

9          A.    To be able to see my grandchildren.

10         Q.    Was the nature of the -- was this something you

11    were in a dispute with the Lambeths?

12         A.    Yes.  At different times, it was set up that we

13    were supposed to see them so many times and that wasn't

14    happening.  So I wasn't able to see my grandchildren as it

15    was supposed to have -- as it was laid out in the

16    different times.

17         Q.    How were you interfacing with the court or social

18    service agencies in connection with this dispute?

19         A.    There was a time where the court went ahead and

20    said that we needed to have supervised visits.  And even

21    after, you know, the professional would say that we didn't

22    need to have supervised visits anymore, then something was

23    always thrown up and said, and then we -- I haven't seen

24    my kids since the spring of 2004.  That's how it ended.

25         Q.    Can you take a look at Exhibit 95, please?  In

1   the course of these proceedings, were there some

2   allegations back and forth as to potential abuse of

3   Nicholas or Ashlee?

4       A.   Yes, there was.

5       Q.   And you see that Exhibit 95, it states at the

6   top, it's apparently from Brad and Jeanea Lambeth and to

7   John Jakubczyk.  Do you who John Jakubczyk was?

8       A.   Yes.  He was Brad and Jeanea's attorney.

9       Q.   And I also notice up at the top -- do you see at

10  the top the header, it looks like a fax --

11      A.   Yes.

12      Q.   -- marker for G. David DeLozier?

13      A.   That's correct.  That's the attorney.

14      Q.   Did you receive Exhibit 95 at some point in time?

15      A.   Yes, I did.

16      Q.   Who did you receive it from?

17      A.   From David.

18      Q.   David DeLozier?

19      A.   David DeLozier.

20      Q.   And looking at Exhibit 95, can you take a look at

21  the first full paragraph or the second paragraph on the

22  first page of Exhibit 95?  And I'm just -- can you read

23  along with me?  I'm just going to read a small portion of

24  this into the record.

25           I first noticed that Ashlee had a red bottom

1   after a visit on Thursday, November 29, 2001.  The Ochoas

2   took the kids at 5:00 p.m. and returned them at 7:00 p.m.

3   When I was getting them ready for a bath, I noticed that

4   Ashlee's bottom was red.  She said:  Grandpa Alejo touched

5   her butt, in quotes.  I asked her if he helped her go to

6   the bathroom and she said she didn't know.

7          And then going down into that paragraph a little

8   further down, she says:  During the following week, Ashlee

9   was really emotional and said on several occasions:

10  Grandma Donna says keep secrets.  Did I read that

11  correctly?

12      *A.*   Yes, you did.

13         MR. ARNTSEN:  And we'll move Exhibit 95 into

14  evidence.

15         THE COURT:  Any objection?

16         MS. GARD:  Judge, I don't object, but the

17  victim's address is on it and it needs to be redacted.

18         MR. ARNTSEN:  That's fine, of course.  I

19  apologize.

20         THE COURT:  Okay.  With the understanding that

21  the address will be redacted, Exhibit No. 95 --

22         THE CLERK:  Did counsel want to do this?

23         THE COURT:  Why don't you take a look at -- look

24  at it together and I'll allow you to do that.

25         MR. ARNTSEN:  We can do it now or at the close of

1   proceedings.  It is really very straightforward redacting

2   it I believe.  It's essentially the second and third lines

3   at the top left-hand page.

4         MS. GARD:  Correct.

5         THE COURT:  I'll hand it to you.  Why don't you

6   do it right now.

7         MR. ARNTSEN:  I don't know if I have a marker.

8         THE CLERK:  We do.

9         MR. ARNTSEN:  Thank you.

10        (WHEREUPON, an off-the-record discussion ensued.)

11        THE COURT:  Okay.  Thank you.  With the address

12  redacted, then, Exhibit No. 95 for identification is

13  admitted into evidence.

14    *Q.*  BY MR. ARNTSEN:  And then can you take a look at

15  Exhibit 96?  Do you see that?

16    *A.*  Yes, I do.

17    *Q.*  And is that a letter -- it indicates it's a

18  letter to Dr. Brian Yee.  Who is Dr. Brian Yee?

19    *A.*  He was the therapist that both Brad and Jeanea

20  and Alejo and I had to go and be interviewed with and --

21    *Q.*  And Exhibit 96 isn't signed, but you see at the

22  end, it says:  Sincerely, Alejo and Donna Ochoa?

23    *A.*  Yes.

24    *Q.*  Did you write this letter?

25    *A.*  I did with the help of David DeLozier.

1        MR. ARNTSEN:  We'll move Exhibit 96 into
2    evidence.
3        THE COURT:  Any objection?
4        MS. GARD:  One moment, Your Honor.
5        THE COURT:  Yes.
6        MS. GARD:  No.
7        THE COURT:  Exhibit No. 96 for identification is
8    admitted into evidence.
9        Q.   BY MR. ARNTSEN:  And at some point in time, was
10   Attorney DeLozier substituted out as your attorney of
11   record in the guardianship proceeding?
12       A.   Yes, he was.
13       Q.   And then who replaced him as your attorney?
14       A.   Daphne Budge.
15       Q.   And can you particular take a look at
16   Exhibit 102, please?  Do you have that in front of you?
17       A.   Yes, I do.
18       Q.   And I'll just read into the record the start of
19   the second full paragraph:  It is hereby ordered
20   substituting Daphne Budge for G. David DeLozier as Counsel
21   of Record for the maternal grandparents, et cetera, and
22   it's dated July 31, 2002.  Do you so that?
23       A.   Yes, I do.
24       Q.   Is this the order substituting Daphne Budge for
25   David DeLozier in that proceeding?

1    *A.*   Yes, it is.

2        MR. ARNTSEN:  We'll move Exhibit 102 into

3    evidence.

4        THE COURT:  Any objection?

5        MS. GARD:  No, Your Honor.

6        THE COURT:  Exhibit No. 102 for identification is

7    admitted into evidence.

8    *Q.*   BY MR. ARNTSEN:  And why did you substitute --

9    why was Attorney Budge -- why did you substitute

10   Attorney Budge as your counsel of record for

11   Attorney DeLozier?

12   *A.*   Because there were issues with the Pinal County

13   proceedings with the grandchildren.

14   *Q.*   Even after Attorney Budge substituted in as your

15   attorney of record in the guardianship proceedings, did

16   you continue to consult with Attorney DeLozier relating to

17   those proceedings?

18   *A.*   Yes, I did.

19   *Q.*   Can you take a look at Exhibit 107, please?  Can

20   you identify what that is?

21   *A.*   That is an e-mail from me to David DeLozier.

22   *Q.*   And what was the subject -- what was the subject

23   that was being discussed in that e-mail?

24   *A.*   It was regarding the severance hearing.

25   *Q.*   By the severance hearing, what are you referring

1  to?

2      *A.*    Wendi's rights being severed from the children.

3      *Q.*    And how would that affect you?

4      *A.*    If she -- if her rights were severed, then mine

5  were, too.

6      *Q.*    And why were you sending this to

7  Attorney DeLozier in March of 2003?

8      *A.*    Because he was always my attorney and I

9  considered him -- I still considered him to be.

10         MR. ARNTSEN:  We'll move Exhibit 107 into

11  evidence.

12         THE COURT:  Any objection?

13         MS. GARD:  Hearsay.

14         THE COURT:  Can I see the exhibit?

15         THE CLERK:  107?

16         THE COURT:  107.

17         MR. ARNTSEN:  If you want some argument, I'll

18  provide it.

19         MS. GARD:  I'm sorry, Your Honor.  I'll withdraw

20  it and just not object.

21         THE COURT:  The objection is withdrawn?

22         MS. GARD:  Yes.

23         THE COURT:  Exhibit No. 107 for identification is

24  admitted.

25      *Q.*   BY MR. ARNTSEN:  Can take a look at Exhibit 132,

1  please?  Do you have that in front of you?

2  *A.*   Yes, I do.

3       THE COURT:  What number?  What number?

4       MR. ARNTSEN:  132.

5       THE COURT:  Okay.  Thank you.

6  *Q.*   BY MR. ARNTSEN:  And you see at the top left

7  corner, it indicates this is a letter from you and Alejo;

8  is that correct?

9  *A.*   That is correct.

10  *Q.*   And do you see at the end, it says:  Respectfully

11  submitted, Alejo and Donna Ochoa?

12  *A.*   Yes.

13  *Q.*   And it's to Jill Zubers.  Who is Jill Zubers at

14  the Arizona Family Adoption Services?

15  *A.*   Correct.

16  *Q.*   And why were you -- who wrote this letter?

17  *A.*   I did with the help of David DeLozier.

18  *Q.*   And what was the purpose of the letter?

19  *A.*   The purpose was to -- it was after the severance

20  or during the time of all that, and I was just trying to

21  explain to them that I felt like the children needed all

22  of us.

23  *Q.*   And how did Attorney DeLozier assist you with

24  this letter?

25  *A.*   He helped me with the language and he reviewed it

1  before I sent it.

2         MR. ARNTSEN:  We'll move Exhibit 132 into

3  evidence.

4         THE COURT:  Any objection?

5         MS. GARD:  Well, Judge, if I could just clarify.

6  This isn't being offered for the truth but for the fact

7  that it's being disclosure?

8         MR. ARNTSEN:  For the fact that, yes, it was

9  co-written by Donna and Attorney DeLozier.

10        MS. GARD:  No objection, Your Honor.

11        THE COURT:  Exhibit No. 132 for identification is

12 admitted into evidence.

13    Q.   BY MR. ARNTSEN:  Can you take a look at

14 Exhibit 108, please?  Is that an e-mail exchange between

15 you and Attorney DeLozier?

16    A.   Yes, it is.

17    Q.   I see it is from inhispresence@hotmail.com.  Is

18 that --

19    A.   That's one of my hotmail accounts.

20    Q.   What caused this e-mail exchange?  Strike that.

21 Do you see at the bottom typically indicating the first

22 e-mail, it says, Donna, what happened today at court, by

23 Attorney DeLozier to you?

24    A.   Yes.

25    Q.   And is the top your response to this?

1    *A.*    Yes, and the top is my response letting him know
2    what had happened in court.
3    *Q.*    And why were you having this exchange with
4    Attorney DeLozier?
5    *A.*    Because, you know, I just kept David in the loop.
6    He had been our attorney through all of this.
7           MR. ARNTSEN:  We'll move Exhibit 108 into
8    evidence.
9           THE COURT:  Any objection?
10          MS. GARD:  No, subject to the same record I made
11   before.
12          THE COURT:  Right.  It is to show that she was
13   keeping in contact with Attorney DeLozier?
14          MR. ARNTSEN:  Yes, exactly.  I mean, ultimately,
15   the point of it is it's not going attorney-client
16   privilege.
17          THE COURT:  Right.  Exhibit No. 108 for
18   identification is admitted into evidence.
19   *Q.*    BY MR. ARNTSEN:  Can you take a look at
20   Exhibit 109, please?  And I'll represent to you that this
21   came from Attorney DeLozier's file.  Okay?
22   *A.*    Okay.
23   *Q.*    As indicated by the base number at the bottom and
24   also the footer.  Do you see at the bottom, it says:
25   Saturday, May 17, 2003, americanonline gddelozier.  Do you

1  see that?

2    *A.*   Yes.

3    *Q.*   This looks to be a May 16, 2003 e-mail from you

4  to Daphne Budge; is that correct?

5    *A.*   That is correct.

6    *Q.*   And do you know how this would have gotten in

7  Attorney DeLozier's file?

8    *A.*   I would have given it to him.  I probably blind

9  copied him.

10         MR. ARNTSEN:  We'll move Exhibit 109 into

11  evidence.

12         THE COURT:  Any objection?

13         MS. GARD:  No, Your Honor, subject to the prior

14  record.

15         THE COURT:  Is that correct?

16         MR. ARNTSEN:  The same thing, yes, Your Honor.

17         THE COURT:  Exhibit No. 109 for identification is

18  admitted into evidence.

19    *Q.*   BY MR. ARNTSEN:  Can you take a look at

20  Exhibit 114, please?  Can you identify what that is?

21    *A.*   That's where we're letting the court know that

22  we're not being represented by Daphne Budge anymore but by

23  ourselves.

24    *Q.*   And how did that come about that Attorney Budge

25  was no longer your counsel of record?

1       *A.*    She went to work for the state, I believe.

2       *Q.*    Who prepared Exhibit 114?

3       *A.*    David Delozier did.

4               MR. ARNTSEN:  We'll move Exhibit 114 into

5       evidence.

6               THE COURT:  Any objection?

7               MS. GARD:  No, Your Honor.

8               THE COURT:  Exhibit No. 114 for identification is

9       admitted into evidence.

10      *Q.*    BY MR. ARNTSEN:  Can you take a look at

11      Exhibit 115, please.  First of all, you see this appears

12      to be a fax from Attorney DeLozier at the top?  Do you see

13      that?

14      *A.*    Yes.

15      *Q.*    3/7/2005, the date.  Do you see that?

16      *A.*    Yes, I do.

17      *Q.*    Do you recognize the handwriting on this?

18      *A.*    The top half of the page is Wendi's handwriting.

19      *Q.*    And then the bottom half?

20      *A.*    And the bottom half is my handwriting.

21      *Q.*    Is this something that you sent to

22      Attorney DeLozier?

23      *A.*    Yes, it is.

24      *Q.*    For what purpose?  What did it relate to?

25      *A.*    It related to Wendi and her representation.

1    *Q.*   Did it relate to the guardianship proceeding?

2    *A.*   Yes, it did.  Yes, it did.  The grandchildren.

3         MR. ARNTSEN:  We'll move Exhibit 115 into

4    evidence.

5         THE COURT:  Any objection?

6         MS. GARD:  No objection subject to the prior

7    limitations.

8         THE COURT:  Is that correct, Mr. Arntsen?

9         MR. ARNTSEN:  That's fine.

10        THE COURT:  Okay.  Exhibit No. 115 for

11   identification is admitted into evidence.

12   *Q.*   BY MR. ARNTSEN:  Can you take look at

13   Exhibit 113, please.  You see that that's a March 21,

14   2005, letter to the Maricopa County Superior Court case

15   number -- to the Maricopa County Superior Court signed by

16   you and Alejo?

17   *A.*   Yes, it is.

18   *Q.*   Who wrote this letter?

19   *A.*   I wrote it with David DeLozier's help.  Actually,

20   he wrote most of it.

21   *Q.*   And so we have just gone through a series of

22   documents with starting from Exhibit 84, which is July 12,

23   2001, a letter indicating that Attorney DeLozier was

24   substituting for Attorney Thikoll as your counsel in the

25   guardianship, and through Exhibit 113, which is this

1  March 21, 2005 letter that you indicated that you and

2  Attorney DeLozier wrote in connection with the

3  guardianship proceedings.

4       In your view, was Attorney DeLozier your lawyer

5  in those guardianship proceedings during this entire

6  period?

7  *A.*  Yes, he was.

8       MR. ARNTSEN:  We'll move Exhibit 113 into

9  evidence.

10      THE COURT:  Any objection?

11      MS. GARD:  No, Your Honor, subject to the prior

12 record made.

13      MR. ARNTSEN:  That's fine.

14      THE COURT:  Exhibit No. 113 for identification is

15 admitted into evidence.

16 *Q.*  BY MR. ARNTSEN:  Okay.  Now I want to turn to

17 Attorney DeLozier's representation of Wendi in the

18 criminal proceedings.  Okay?

19 *A.*  Yes.

20 *Q.*  Were you involved in essentially

21 Attorney DeLozier coming to represent Wendi in the

22 criminal proceedings?

23 *A.*  Yes.

24 *Q.*  And describe how that came about.

25 *A.*  A friend of Wendi's had seen Wendi's picture on

1   the TV after her arrest.  She asked her husband --

2       Q.   And what was this friend's name?

3       A.   Jeri Lynn Wilkerson-Cunningham.

4       Q.   Is Cunningham her married name?

5       A.   Yes, Cunningham is her married name.

6       Q.   Is that one of the girls whose pictures was up

7   earlier?

8       A.   Yes, it is.

9       Q.   Okay.  And continue.

10      A.   She asked her -- husband is a --  at the time, he

11  was a minister and he sat on a board of directors along

12  with David DeLozier.  And she asked her husband if he knew

13  of anyone, you know, that could help Wendi.  And so he

14  talked to David.

15           And, in turn, David went down and talked to Wendi

16  and said that he would be willing to help on her case to

17  be her attorney.  And then we -- then we connected with

18  David and Alejo met David and gave him a retainer.

19      Q.   Can you take a look at Exhibit 61, please?  Is

20  this a December 14, 2000 letter from Attorney DeLozier to

21  you and Alejo relating to his engagement as Wendi's lawyer

22  in these criminal proceedings?

23      A.   Yes, it is.

24           MR. ARNTSEN:  We'll move Exhibit 61 into

25  evidence.

1          THE COURT:  Any objection?

2          MS. GARD:  No, Your Honor.

3          THE COURT:  Exhibit No. 61 for identification is

4     admitted into evidence.

5          *Q.*   BY MR. ARNTSEN:  And during the course of the

6     proceedings between Wendi's arrest and her trial -- her

7     arrest in 2000 and her trial in 2004 -- did you have

8     occasion to interact with Attorney DeLozier in connection

9     with Wendi's defense?

10         *A.*   Yes, I did.

11         *Q.*   Who was your principal contact on Wendi's defense

12    team?

13         *A.*   David was.

14         *Q.*   Can you take a look at Exhibit 56, please.  It

15    indicates from the header line, it looks like a

16    February 12, 2001 e-mail from you to David DeLozier; is

17    that correct?

18         *A.*   That is correct.

19         *Q.*   And looking at the second sentence, you see it

20    says:  If more is needed, please ask Kandy what sort of

21    details she would like.  Do you see that?

22         *A.*   Yes, I do.

23         *Q.*   Who is Kandy?

24         *A.*   Kandy was Wendi's therapist.

25         *Q.*   And how did Kandy come to become Wendi's

1  therapist?

2      *A.*   David suggested that Kandy would become -- that

3  Kandy would see Wendi as a therapist.

4      *Q.*   Who paid for Kandy's services?

5      *A.*   I did.

6          MR. ARNTSEN:  We'll move Exhibit 56 into

7  evidence.

8          THE COURT:  Any objection?

9          MS. GARD:  No, Your Honor.

10         THE COURT:  Exhibit No. 56 for identification is

11 admitted into evidence.

12     *Q.*   BY MR. ARNTSEN:  Can you take a look at

13 Exhibit No. 51, please.  That appears to be an e-mail from

14 you to -- who is the e-mail to?

15     *A.*   Okay.  I sent it to Dan Patterson, to David

16 DeLozier and Michelle Arvanitas.

17     *Q.*   And who is Michelle Arvanitas?

18     *A.*   Michelle Arvanitas was part of the legal team I

19 think for Wendi.  She worked for Dan.

20     *Q.*   Okay.  And it states at the start:  Just to keep

21 you updated.  Do you see that?

22     *A.*   Yes.

23     *Q.*   And did you have regular communications with

24 Wendi's legal team?

25     *A.*   I would send them e-mails a lot.

1          MR. ARNTSEN:  We'll move Exhibit No. 51 into
2    evidence.
3          THE COURT:  Any objection?
4          MS. GARD:  No, Your Honor.
5          THE COURT:  Exhibit No. 51 for identification is
6    admitted into evidence.
7      Q.   BY MR. ARNTSEN:  Can you take a look at
8    Exhibit 57, please?  Can you identify what that is?
9      A.   This is an e-mail that I sent to Michelle and to
10   Dan Patterson and to David and this was information on
11   Skip and where he was located.  I had found out that he
12   had gone to prison.
13         MR. ARNTSEN:  We'll move Exhibit 57 into
14   evidence.
15         THE COURT:  Any objection?
16         MS. GARD:  No, Your Honor.
17         THE COURT:  Exhibit No. 57 for identification is
18   admitted into evidence.
19     Q.   BY MR. ARNTSEN:  You testified earlier today some
20   about Skip's family and the child abuse issues and the
21   criminal problems it caused for them.  Did you tell that
22   to Wendi's legal team?
23     A.   I had mentioned about the grandpa -- you know,
24   granddad and what Skip was in jail for.
25     Q.   Thank you.

1     *A.*    You're welcome.

2     *Q.*    Did you ever talk with a man by the name of

3    Patrick Linderman?

4     *A.*    Yes, I did.

5     *Q.*    What was your understanding of his role in

6    Wendi's defense team?

7     *A.*    My understanding was that he was supposed to go

8    out and talk to people about Wendi.

9     *Q.*    Did he ever ask you any questions about anything

10    about mental health issues?

11     *A.*    No, he did not.

12     *Q.*    Did he ever ask you any questions relating to

13    childhood abuse that Wendi may have suffered?

14     *A.*    No, he did not.

15     *Q.*    Did you ever talk with a man by the name of Scott

16    MacLeod?

17     *A.*    Yes, I did.

18     *Q.*    What did you understand his role was on Wendi's

19    defense team?

20     *A.*    I understand that he's supposed to be to

21    mitigation specialist, which I don't really understand.

22     *Q.*    Did he ever ask you any questions about Wendi's

23    mental health?

24     *A.*    No, he did not.

25     *Q.*    Did he ever ask you any questions about childhood

1  abuse Wendi may have suffered?

2      *A.*    No, he did not.

3      *Q.*    Generally, what were your interactions with

4  Attorney Dan Patterson?

5      *A.*    I met with him a couple of times before the trial

6  and, you know, they would just ask if I had any more

7  questions, and, you know, I asked him if -- obviously, I

8  had sent them e-mails with attachments, you know, with

9  information about history and stuff like that and, you

10  know, I told them, you know, if you need anything else.

11  And not ever having done anything like this before, you

12  know, I didn't know what to expect, you know,

13  if they were --

14      *Q.*    Do you ever recall Dan Patterson asking you any

15  questions of Wendi's mental health?

16      *A.*    No, he did not.

17      *Q.*    Did he ever ask any questions about any abuse

18  Wendi may have suffered as a child?

19      *A.*    No.

20      *Q.*    Did David DeLozier ever ask you any questions

21  about Wendi's mental health?

22      *A.*    No.

23      *Q.*    Did he ever ask you any questions about abuse she

24  may have suffered as a child?

25      *A.*    No, he did not.

1     *Q.*    In the penalty phase of Wendi's trial, did

2   Attorney DeLozier ask you for some assistance?

3     *A.*    Yes, he did.

4     *Q.*    What did he ask you for assistance with?

5     *A.*    He said that was trying to put together -- and I

6   don't remember if it was the opening, the closing,

7   whatever it was, but, you know, to present Wendi and her

8   life.  And he asked if I could help him write it, you

9   know.  And he said:  Well, this is what you do.  And I'd

10  sit there at home and I'm going:  I have no experience in

11  this.  I don't know what to do.

12          So I called a friend of mine, Cindy Schaider, who

13  writes grants and works and asked, you know:  This is what

14  the attorney is asking me, but I don't know what to do

15  with this.  Can maybe you contact him and maybe you can

16  help him?  You know, because I knew that she was real good

17  with words.

18          THE COURT:  What was her name again?

19          THE WITNESS:  Cindy Schaider.

20          THE COURT:  And who is she?

21          THE WITNESS:  A friend of mine.

22          THE COURT:  Go ahead.  I'm sorry.

23          MR. ARNTSEN:  She will also be a witness, Your

24  Honor.

25          THE COURT:  Okay.

1     *Q.*   BY MR. ARNTSEN:  Donna, we have talked about a
2  lot of topics here today relating to Wendi's childhood and
3  growing up.  And is this information that you would have
4  provided in the initial trial if you would have been
5  asked?
6     *A.*   Yes, I would have, certainly.
7          MR. ARNTSEN:  No further questions.
8          THE COURT:  Is it going to be Ms. Gard?
9          MS. GARD:  Yes, Your Honor.
10          THE COURT:  Ms. Gard.
11
12                    CROSS-EXAMINATION
13  BY MS. GARD:
14     *Q.*   Mrs. Ochoa, if I could get you to turn back to
15  Exhibit 56, which has been admitted and is your history of
16  Wendi's early years that you gave to Mr. DeLozier.
17     *A.*   Uh-huh.
18     *Q.*   And you mentioned in there -- you mentioned on
19  page -- let me get you a Bates number so you can follow
20  along.  Just a moment.  I have a copy that's not quite
21  lined up with this one.  So that's why it's not
22  matching up.
23          Okay.  The page with the Bates number on the
24  bottom right-hand corner of -- the first Bates number on
25  the very top, 8351.

1    *A.*   Yes.

2    *Q.*   You talk in there about the --

3          THE COURT:  Which exhibit is this?  I'm sorry.

4          MS. GARD:  I'm sorry, Your Honor?

5          THE COURT:  Which exhibit number is this?

6          MS. GARD:  It's Exhibit 56.

7          THE COURT:  Thank you.

8    *Q.*   BY MS. GARD:  About midway through the page,

9    there's a paragraph that starts:  This part is hard?

10   *A.*   Yes.

11   *Q.*   Then you go on to tell counsel in that paragraph

12   about the allegations about Skip's grandfather; is that

13   correct?

14   *A.*   Yes.

15   *Q.*   And you said today that you told counsel what

16   Skip was in prison for; that's correct?

17   *A.*   That is correct.

18   *Q.*   So you understood that there was some potential

19   importance to those facts; right?  Or else you wouldn't

20   have told counsel about them?

21   *A.*   I'm sorry?

22   *Q.*   You understood that those were potentially

23   important to your daughter's defense and that's why you

24   told counsel about them?

25   *A.*   Well, I just told him everything, you know, that

1   I -- yes.

2       *Q.*   Okay.  But you didn't tell them about the

3   lingerie shopping with Alejo that you found unusual?  You

4   never told counsel about that; right?

5       *A.*   No.

6       *Q.*   And you never told counsel about this touching-on

7   ritual; right?

8       *A.*   That, I believe I did.

9       *Q.*   You did?  Who did you tell?

10      *A.*   Probably David.

11      *Q.*   Do you remember when?

12      *A.*   No.

13      *Q.*   Do you remember where this conversation happened?

14      *A.*   No.

15      *Q.*   Okay.  So this touching-on ritual, it didn't

16  involve -- and apologize for getting so graphic here.  But

17  it didn't involve your daughter touching Alejo's penis;

18  right?

19      *A.*   No, that I'm aware of.

20      *Q.*   That you ever saw happened?

21      *A.*   That I ever saw.

22      *Q.*   It didn't involve Alejo touching your daughter's

23  genitals; right?

24      *A.*   Not that I ever saw.

25      *Q.*   That you ever saw.  All I want to know is what

1   you actually saw.  Okay.  From what you saw, you never saw

2   your husband touch your daughter's breasts; right?

3        *A.*    I had seen him many cuddle up to her and hold

4   her, you know, maybe just a little bit too much.

5        *Q.*    But in a sexual manner?

6        *A.*    I would say sometimes, it appeared uncomfortable

7   to me.

8        *Q.*    It appeared uncomfortable to you how so?

9        *A.*    Like maybe, you know, just too much hugging.

10       *Q.*    But it was in a hugging-type situation?

11       *A.*    I don't understand what you mean by a hugging

12   type situation.

13       *Q.*    Well, not to get too graphic here, but did you

14   ever see your husband -- I'll use the word fondle -- reach

15   out and fondle your daughter's breasts?

16       *A.*    No.

17       *Q.*    Nothing like that?

18       *A.*    No.

19       *Q.*    What about any of her friends?  Did you see that

20   happen?

21       *A.*    No.

22       *Q.*    Did you ever she anything -- when your daughter

23   would have sleepovers with Krye Lorts, did you ever

24   witness any sexual contact between your husband and Kyre

25   Lorts?

1    *A.*   No.  But, again, I'm in the room most of the

2    time.

3    *Q.*   Outside from the touching-on ritual just in

4    general, did you ever see any sexual contact between your

5    husband and your daughter?  And by sexual contact, I

6    define that as sexual intercourse.

7    *A.*   No.

8    *Q.*   Oral sex or sexual contact?

9    *A.*   No.

10   *Q.*   Nothing like that?  Okay.  Did your daughter ever

11   ask you to purchase lingerie for her?

12   *A.*   No.

13   *Q.*   Would you have purchased it if she had asked you

14   that?

15   *A.*   I would have purchased nice cotton underwear.

16   *Q.*   Conservative cotton underwear?

17   *A.*   Yes.

18   *Q.*   Did you object to her wearing the more risqué

19   lingerie?

20   *A.*   Well, let me put it this way:  I ignored a lot of

21   things -- a lot of things that I should not have ignored.

22   *Q.*   You had objections, then, that you didn't

23   communicate to her wearing the lingerie?

24   *A.*   Exactly.

25   *Q.*   And, again, not to get too personal, but do you

1    or did you in the time period -- and I'm talking about the

2    time period when your daughter was growing up in

3    Casa Grande.  Did you own any type of risqué nightgowns?

4        *A.*    A couple of times Alejo, you know, bought me some

5    and I took them back.

6        *Q.*    So you didn't keep them in the house?

7        *A.*    No.

8        *Q.*    To your knowledge, was there pornography kept in

9    your home?  And by pornography, I define as images or

10   videotapes depicting sexual contact between individuals.

11       *A.*    Not like -- not the Victoria Secrets catalogs;

12   right?

13       *Q.*    No, I'm not considering Victoria Secrets or

14   anything like that.

15       *A.*    Not to my knowledge.

16       *Q.*    And, again, you clarified on direct that some of

17   your prior statements relating to your daughter being

18   taken into pornography stores, you're referring to things

19   like Spencer's Gifts?

20       *A.*    Spencer's Gifts, the lingerie stores that would

21   maybe have like, you know, the back part, you know, where

22   things might be for sale that aren't out in the public

23   parts, yes.

24       *Q.*    The kind of novelty stores with kind of trinkets

25   that may have sexual themes to them?

1    *A.*   Yes.

2    *Q.*   Is that fair?  Okay.  When Wendi was first born,

3    you discussed how you feel that you were unavailable to

4    her because of your emotional problems.  But it's true,

5    isn't it, that you always made sure that she was cared

6    for; right?  Your mother was there, for example, when she

7    was first born to take care of her?

8    *A.*   Yes.

9    *Q.*   And Skip took care of her as well?

10   *A.*   Yes.

11   *Q.*   And when you were going out late at night as she

12   was older, you did arrange for people to watch her; right?

13   *A.*   I don't know if the lady ever went inside my

14   house to watch her or not.  She was inside my house alone.

15   *Q.*   Okay.  But in that time period, you left her in

16   the house alone.  But, for example, then you started

17   taking her to the 24-hour day cares; right?

18   *A.*   For a short period of time.

19   *Q.*   For a short period of time where people would

20   watch her 24 hours a day; right?

21   *A.*   Right.

22   *Q.*   Okay.  The incident with the day care, did the

23   day care give you any kind of specifics why this was so

24   disturbing to them?

25   *A.*   Because they were in the bathroom showing -- the

1    kids were in the bathroom showing each other their private

2    parts.

3        *Q.*    Do you consider it unusual for four-year-old

4    children to maybe be curious about why a girl might have a

5    different part than a boy, for example?

6        *A.*    That is kind of a hard question.

7        *Q.*    Well, I mean, you've been around children; right?

8    You've raised children.  Children are curious.  What about

9    this made it abnormal?  Did the day care communicate that

10   to you?

11       *A.*    They were touching each other.

12       *Q.*    They were touching each other?

13       *A.*    Yeah.

14       *Q.*    Did you put that fact in your declaration?

15       *A.*    No.

16       *Q.*    Did you mention it on direct?

17       *A.*    I don't know if I did or not.

18       *Q.*    Okay.  Did you tell Dr. Hopper about that part of

19   the story when he interviewed you?

20       *A.*    I don't recall.

21       *Q.*    You have no personal knowledge or you never

22   witnessed Rick Barnes molest your daughter; right?

23       *A.*    Correct.

24       *Q.*    And you have no personal knowledge whether that

25   happened or not; right?

1     *A.*    That is true.

2     *Q.*    And the same is true, is it not, of her

3     grandfather, Skip's father; right?  That you have no

4     personal knowledge that may have happened?

5     *A.*    No, I did not see anything happen.

6     *Q.*    You did not see any of that happen over there.

7     Okay.  And the same is true really of any of Skip's family

8     members; right?  That you have no personal knowledge that

9     your daughter was molested by any of Skip's family

10    members; right?

11    *A.*    Not where I saw anything, no.

12    *Q.*    You told the jury at trial -- do you recall

13    telling the jury at trial that Alejo was a good man?

14    *A.*    I probably did.

15    *Q.*    Do you still believe Alejo is a good man?

16    *A.*    No, I don't.

17    *Q.*    Are you still married to him?

18    *A.*    Yes, I am.

19    *Q.*    Have you reported any of your suspicions about

20    anyone involving your daughter to CPS?  Did you ever make

21    a report?

22    *A.*    No, I did not.

23    *Q.*    Did you ever say:  My husband is taking my

24    daughter into lingerie shops and I don't feel comfortable

25    about that?

1      *A.*    No, I did not.

2      *Q.*    You never reported that to any law enforcement

3   agencies, nothing like that?

4      *A.*    No.

5      *Q.*    And, again, you never reported it to counsel at

6   the time of trial?  Wendi's counsel?

7      *A.*    No.

8            THE COURT:  What's the answer?

9            THE WITNESS:  No.

10     *Q.*    BY MS. GARD:  You would agree, wouldn't you, that

11  Ms. Andriano was closer to Alejo growing up than she was

12  to you; right?

13     *A.*    Yes.

14     *Q.*    And, in fact, on the night of the offense, she

15  called Alejo for help; right, after she murdered Joe?

16     *A.*    She called to our house.

17     *Q.*    And she spoke to him and he went to help her;

18  right?

19     *A.*    He went up there.

20     *Q.*    Before you did; right?

21     *A.*    Yes.

22     *Q.*    Do you recall at trial -- were you present when

23  evidence was presented suggesting that he falsified some

24  evidence?

25     *A.*    I was not in the court at any time except for

1  when I testified.

2      *Q.*   Would you agree that the defendant could

3  manipulate your husband?

4      *A.*   I'm sorry?

5      *Q.*   Would you agree that the defendant could get your

6  husband to do things she wanted him to do?  If she wanted

7  something, she could ask your husband for it and he would

8  give it to her?

9      *A.*   Can you give me an example?  I don't --

10     *Q.*   Let me just pull up one of your exhibits.

11         MS. GARD:  Can I have a moment, Your Honor?

12         THE COURT:  Yes.

13     *Q.*   BY MS. GARD:  It's back in Exhibit 56.  If you go

14  to the page that's marked 8532, the second paragraph from

15  the bottom.

16     *A.*   Yes.

17     *Q.*   Okay.  Wendi and Alejo loved each other from the

18  start.  I'm reading this from the document.  Okay?  When

19  we were dating, he would tell her something to do and she

20  would look at him with her hands on her hips and say:  You

21  can't tell me what to do.  You're not my boss.  He would

22  just laugh and say:  Okay.  Wouldn't you like to do this?

23  She would do it, you know, like she had won the contest.

24         So did the defendant engage in that type of

25  flirty kind of behavior with your husband to get what she

1  wanted?

2      *A.*    No.  I don't see where a four-year-old would be

3  flirting.  I'm sorry.  That's --

4      *Q.*    After the murder, you say you paid for Wendi's

5  mental health treatment; right?  You paid for her

6  counselor, for Kandy Rohde?

7      *A.*    Yes, I did.

8      *Q.*    What was the purpose of hiring Kandy Rohde?

9      *A.*    To help Wendi through what all was going on.

10  That was my purpose.

11      *Q.*    Just to provide therapy for her?

12      *A.*    Yes.  Because it was suggested to me.

13      *Q.*    By Mr. DeLozier?

14      *A.*    Yes.

15      *Q.*    With respect to the adoption issue between you

16  and the Lambeths, you in fact filed a report with CPS

17  accusing them of injuring the children; did you not?

18      *A.*    Yes, I did.

19      *Q.*    Why did you file the report?

20      *A.*    Because at the time, I -- in the State of

21  Arizona, if you're a health care worker and you suspect

22  something, then you are supposed to report that, and that

23  is what I did.

24      *Q.*    So in that instance, you reported the Lambeths

25  because you believed that they had injured the child;

1  right?

2      *A.*    Yes.

3      *Q.*    And, in addition, if you could turn back to

4  Exhibit 104, which is the petition that Mr. DeLozier filed

5  or an order relating to the petition that Mr. DeLozier

6  filed in Pinal County, which has been admitted into

7  evidence, on the second page of that document, the Court

8  made a finding, did it not, that you had engaged in

9  conduct done to thwart the orders of the Maricopa Superior

10 Court; right?  You and Alejo personally?

11     *A.*    That's what it says, yes.

12     *Q.*    And that's why the petition was dismissed with

13 prejudice and the sanctions; right?

14     *A.*    Yes.

15     *Q.*    Your daughter grew up in a loving household;

16 right?  You loved your daughter?

17     *A.*    I loved her.

18     *Q.*    You still love your daughter; right?

19     *A.*    I still love my daughter, of course.

20     *Q.*    And you're still pretty close to her; right?

21     *A.*    Well, as close as you can be under the

22 circumstances.

23     *Q.*    You talk to her on the phone?  You have a

24 relationship with her?  You visit her?

25     *A.*    Yes.

1    *Q.*   And as she was growing up, she had opportunities;

2    right?  She took music lessons; right, for example?  Is

3    that correct?

4    *A.*   From one of the associative pastors -- from the

5    music ministry gentleman, yes.

6    *Q.*   In fact, she excelled in school as well?  Didn't

7    she win an academic award and things like that?

8    *A.*   Yes.

9    *Q.*   She's very intelligent and a good student; right?

10   *A.*   Yes.

11   *Q.*   And aside from the time that you were in the

12   traveling ministry, when she was growing up in Casa Grande

13   during her teenage years she, you typically had food to

14   eat; right?

15   *A.*   Typically, yes.  In Casa Grande, yes.

16   *Q.*   And a roof over her head; right?

17   *A.*   Yes.

18   *Q.*   And, obviously, she had clothes to wear; right?

19   She was getting -- your husband was purchasing extras, you

20   know, lingerie, things she didn't need; right?

21   *A.*   Yes.

22   *Q.*   So she got things that she wanted?  She got

23   things --

24   *A.*   Well, we shopped -- we did a lot of shopping down

25   in Tucson at the secondhand stores, yes.

1    *Q.*    Okay.  But she had clothes to wear?

2    *A.*    Yes.

3    *Q.*    She was always fully clothed.  And you tried to

4    teach her?  In fact, you raised her in a religious

5    environment; right?

6    *A.*    Yes.

7    *Q.*    And you tried to teach her values as part of that

8    environment; correct?

9    *A.*    Yes.

10    *Q.*    And Harvest Family Church in fact, whatever

11    other, you know, disagreements you may have with it, they

12    still taught Christian values; correct?

13    *A.*    Yes.

14    *Q.*    Okay.  Do you still attend that church, by the

15    way?

16    *A.*    No.

17    *Q.*    Can you explain to me a little bit more about how

18    it came to divide from 91st Psalm to Harvest, how the two

19    split apart?

20    *A.*    The only thing that I know is that there was some

21    disagreements about the money situation.  That's all I

22    know.  I don't know any details.

23    *Q.*    Did it lead to -- was it a contentious split

24    between Tom King and Cal Lorts?

25    *A.*    No.

1    *Q.*    Was there bad blood occurring afterwards?

2    *A.*    I don't know.

3    *Q.*    Well, you alluded to a financial dispute that

4    Cal Lorts thought --

5    *A.*    Right, because Tom didn't want to keep sending

6    money, you know, like tithes up to the Tempe church.

7    *Q.*    Okay.  And that --

8    *A.*    And then when they, you know, divided it up, then

9    that money flow stopped.

10   *Q.*    And, to your knowledge, did that cause any bad

11   feelings between the two of them?

12   *A.*    No.

13          MS. GARD:  Your Honor, may I have just one

14   moment?

15          THE COURT:  Yes.

16          (WHEREUPON, an off-the-record discussion ensued.)

17   *Q.*    BY MS. GARD:  Can you turn back to Exhibit 56,

18   please, Bates No. 1668 at the very bottom corner, the very

19   lowest page from there.

20          MR. ARNTSEN:  What's the number?

21          THE WITNESS:  What's --

22          MS. GARD:  Okay.  It's Bates No. 1668 on

23   Exhibit 56.

24          MR. ARNTSEN:  I don't think those Bates numbers

25   are on that exhibit.

1          MS. GARD:  Okay.  I'll pull up the --

2          MR. ARNTSEN:  There's a couple -- there's one

3    that starts PCR and one that starts O083.

4          (WHEREUPON, an off-the-record discussion ensued.)

5          MS. GARD:  It's 8350, the top Bates number.

6          MR. ARNTSEN:  There we go.

7          THE WITNESS:  Oh, okay.

8     *Q.*    BY MS. GARD:  Okay.  At the bottom, there's a

9    paragraph that starts:  Wendi was a really good baby.

10    *A.*    Yes, I see that.

11    *Q.*    She had colic and, in fact, my mom and I would

12    take turns rocking her.  So your mom -- you did rock her

13    some; right?

14    *A.*    Yes, I did.

15    *Q.*    You did spend time, then, with her?  And your mom

16    did as well?

17    *A.*    My mom did a whole lot more.

18    *Q.*    But someone was rocking her; right?

19    *A.*    Yes.

20    *Q.*    When she's crying, someone is picking her up?

21    *A.*    Yes.

22    *Q.*    Then it says you nursed her for four months and

23    then she went on a bottle; right?

24    *A.*    Yes.  Actually, she was taking food through a

25    bottle before that at a couple of months old because I

1  was -- the milk that I was giving out wasn't good.  It

2  wasn't good enough.

3      *Q.*   So you were supplementing it?

4      *A.*   Yes.

5      *Q.*   But you were still nursing her in addition to the

6  supplements?

7      *A.*   I was trying to as much as I could.

8      *Q.*   As much as you could.  Okay.

9          MS. GARD:  I don't have anything else.  Thank

10  you.

11          MR. ARNTSEN:  No redirect, Your Honor.

12          THE COURT:  May this witness be excuse?

13          MR. ARNTSEN:  Yes, Your Honor.

14          THE COURT:  Thank you very much.  You're excused.

15          You may call your next witness.

16          (WHEREUPON, the witness entered the courtroom.)

17          MS. FOX:  The Petitioner calls Jeri Lynn

18  Cunningham to the stand.

19          THE COURT:  Ms. Cunningham, if you can please

20  step forward to the witness stand.  Before you sit down

21  there, please face the clerk.  Please give her your name

22  and spell your name and raise your right hand and she will

23  swear you in.

24          THE CLERK:  Would you please state your name for

25  the record and spell your name?

1          THE WITNESS:  Jeri Cunningham.  J-E-R-I;

2  C-U-N-N-I-N-G-H-A-M.

3          THE CLERK:  Raise your right hand, please.

4          (WHEREUPON, the witness was duly sworn by the

5  clerk.)

6          THE COURT:  Please be seated.  Ms. Cunningham,

7  just a few things to remember.  Remember to speak up so

8  that everyone can hear you.  Also, it's important that you

9  wait until the question is completed before you answer the

10 question.  And make sure that you give us a verbal

11 response.  Okay?  Don't just shake your head and say

12 uh-huh or un-huh.  Say, yes, no, whatever it might be.

13          Can you do that for us?

14          THE WITNESS:  Yes.

15          THE COURT:  Go ahead and state your name for the

16 record.

17          THE WITNESS:  Jeri Cunningham.

18          THE COURT:  And Ms. Fox.

19          MS. FOX:  There you go.

20          THE COURT:  You may proceed.

21          MS. FOX:  Thank you.

22

23                  JERI CUNNINGHAM,

24 having been first duly sworn to tell the truth, the whole

25 truth, and nothing but the truth, testified as follows:

```
1                    DIRECT EXAMINATION

2   BY MS. FOX:

3        Q.    Jeri, thank you so much for being here today.

4   Sorry for keeping you waiting.  To start off, if you could

5   just state your date of birth.

6        A.    May 20, 1970.

7        Q.    How old are you?

8        A.    43.

9        Q.    Where do you currently reside?

10       A.    I live in Laveen, Arizona.

11       Q.    And are you married?

12       A.    Yes, I am.

13       Q.    How long have you been married?

14       A.    Almost 25 years.

15       Q.    What's your maiden name?

16       A.    Wilkerson.

17       Q.    What does your husband do for a living?

18       A.    She is a pastor at Southgate Church.

19       Q.    How many parishioners attend his church?

20       A.    Around 150 to 200.

21       Q.    How long has he been the pastor at that church?

22       A.    Over 25 years.

23       Q.    Do you work?

24       A.    Yes, I do.

25       Q.    What's your profession?
```

1    *A.*    I'm a teacher at 91st Psalm Christian School.

2    *Q.*    When you say 91st Psalm Christian School, is that

3    the one located in Casa Grande?

4    *A.*    No, it's not.  It's in Phoenix at my husband's

5    church.

6    *Q.*    What grade did you say you taught?

7    *A.*    Second grade.

8    *Q.*    And how many children attend this school that you

9    teach at?

10    *A.*    There's around 150 students.

11    *Q.*    How long have you been teaching?

12    *A.*    For eight years.

13    *Q.*    Do you and your husband have any children?

14    *A.*    Yes, we do.

15    *Q.*    How many children do you have?

16    *A.*    We have five children.

17    *Q.*    And how old are those children?

18    *A.*    Our oldest is 19.  And we have a 16-year-old, a

19    13-year-old, a 11-year-old and a nine-year-old.

20    *Q.*    And do those children attend the school that you

21    teach at?

22    *A.*    Four of them do.  My oldest is in the

23    United States Air Force right now.

24    *Q.*    Do you know the Petitioner Wendi Andriano?

25    *A.*    Yes, I do.

214

1    *Q.*    When did you first meet Wendi?

2    *A.*    I met her when I was around ten years old in

3    1980.

4    *Q.*    And are you the same age as Wendi?

5    *A.*    Yes, I am.

6    *Q.*    So you were both ten at the time?

7    *A.*    Yes.

8    *Q.*    And where did you meet Wendi?

9    *A.*    I met her at 91st Psalm Church in Casa Grande.

10   *Q.*    Can you describe the circumstances surrounding

11   your first meeting?

12   *A.*    I attended children's church with her and her

13   mother, Donna Ochoa, introduced us.

14   *Q.*    And what was children's church.

15   *A.*    Children's church is when all the kids would be

16   in a room and hear Bible stories and puppet shows while

17   the adults were in the main service.

18   *Q.*    Who taught children's church at this time in 1980

19   when you first met Wendi?

20   *A.*    Alejo Ochoa and Mike Long.

21   *Q.*    What interactions did you have with Wendi at

22   church during this time period when you first met Wendi in

23   1980?

24   *A.*    Well, Wendi, when we first introduced, we

25   started -- usually I would go to her house after church

1    and then I would go back -- I would spend the afternoon --

2    Sunday afternoons with her until the Sunday evening

3    service.  And, yeah, at first, it was just an occasionally

4    going to her house or maybe her going to my house.

5        *Q.*    And you said that was between a morning and an

6    and evening church service?

7        *A.*    Yes.

8        *Q.*    So you would go to church twice on Sundays?

9        *A.*    Yes.

10       *Q.*    And in the time period in between, occasionally,

11   you and Wendi would play together?

12       *A.*    Yes.

13       *Q.*    At any point in time, did you start seeing Wendi

14   more often than at church on Sundays and the occasional

15   times when you would go to her house in between the two

16   services?

17       *A.*    Yes.  My sixth grade year, I began going to

18   school at 91st Psalm Christian School in Casa Grande.

19       *Q.*    And do you know exactly what year that would have

20   been or month when you would have started sixth grade?

21       *A.*    It would have been September of 1981, I believe.

22       *Q.*    How long did you attend school with Wendi at

23   91st Psalm in Casa Grande?

24       *A.*    Until the end of my eighth grade year.

25       *Q.*    Who was the pastor at 91st Psalm during that time

1  period?

2      *A.*    Pastor Cal Lorts.

3      *Q.*    Can you please describe a typical school day at

4  91st Psalm during this period of time?

5      *A.*    Yes.  We would get to school in the morning and

6  play outside until all the students came in.  Most of the

7  students were in one room.  We had multiple grades.  I

8  believe it was first through sixth grade in one room.  And

9  we had cubicles that faced the walls with dividers

10  in between.

11          We didn't have a typical classroom setting.

12  There wasn't a teacher to teach the lessons.  We completed

13  PACES, which were little workbooks for each subject.  We

14  would complete 12 workbooks I believe per subject

15  per school year.

16      *Q.*    And what would happen if the student acted out or

17  got in trouble?

18      *A.*    Either there was a supervisor that could take

19  care of it and handle it.  If it was something more

20  serious, then we would be sent to the office.

21      *Q.*    And what type of discipline was used at the

22  school?

23      *A.*    There was corporal punishment.

24      *Q.*    What type of corporal punishment?

25      *A.*    It was known as the Rod of Correction.  We would

1   get a swat or two.

2        *Q.*   And what was the Rod of Correction?

3        *A.*   It was a paddle.

4        *Q.*   Were you ever disciplined?

5        *A.*   I never received the rod at school.  Wendi and I

6   got called into the office one time for having bad

7   attitudes.

8        *Q.*   What was your bad attitude?

9        *A.*   We weren't really sure.  We were just told that

10  we had bad attitudes and that we needed to have better

11  attitudes or we would get the rod.

12       *Q.*   And did you have a better attitude after that.

13       *A.*   I was really solemn after that and Wendi was

14  trying to cheer me up and tell me:  You better put a smile

15  on your face or you're going to get the rod.  But, yeah,

16  we never got called back into the office.  So I guess our

17  attitudes improved.

18       *Q.*   Was Cal Lorts the pastor the entire time that you

19  attended 91st Psalm?

20       *A.*   Yes, he was.

21       *Q.*   Did that change at any point in time, Cal Lorts

22  being the pastor at 91st Psalm?

23       *A.*   Yes.  In 1984, Pastor Cal began a church in

24  Tempe, Arizona, and my family also moved to Tempe when

25  Pastor Cal moved.

1    *Q.*    Do you know who was the pastor after Cal Lorts?

2    *A.*    Yes.  Pastor Cal turned the church over to Tom

3   King.

4    *Q.*    Did you ever attend the church when Tom King was

5   the pastor?

6    *A.*    No.  My last service there was the service that

7   he turned it over to Tom King.

8    *Q.*    So did you spend any time with Wendi while you

9   were at school during the school day?

10    *A.*    Yes, I did.

11    *Q.*    When would you see Wendi during the school day?

12    *A.*    All day.  We would play together during our break

13   time and have lunch together.

14    *Q.*    And did you play with anyone else except Wendi

15   during these breaks?

16    *A.*    We had a group of people that played together or

17   we would sit and eat lunch together.  We usually played

18   tag and basketball and just ran around and were active.

19    *Q.*    Who else would you sit you or play with you

20   during lunch breaks?

21    *A.*    Kyre Lorts was there.  Brad and Shawn King.

22   Laura Bell, that I remember.

23    *Q.*    Once you started school at 91st Psalm, which you

24   said was around September '81, I believe?

25    *A.*    Yes.

219

1    *Q.*    Did you ever see Wendi outside of school?

2    *A.*    Yes.  I started -- we started having play dates

3    more often and I eventually began to have sleepovers at

4    her house.

5    *Q.*    How often would you and Wendi have play dates

6    let's say during this first year of sixth grade?

7    *A.*    Probably around once a month maybe.

8    *Q.*    How often would you and Wendi have sleepovers

9    during this first year?

10   *A.*    It was the same.  I would go to her house and

11   spend the night maybe once a month.

12   *Q.*    And where was Wendi living at this time?

13   *A.*    In the Downtown Casa Grande area.

14   *Q.*    And were Wendi's parents at home when you would

15   sleep over at her house?

16   *A.*    Yes, they were usually at home or one person at

17   least would be home.

18   *Q.*    And where would Alejo, Wendi's stepfather, be

19   when you were playing at Wendi's?

20   *A.*    He would be coming in and out.  Sometimes he

21   would join us whenever we were playing or talking.  He

22   would come in and joke around with us.

23   *Q.*    And would Donna be around when you were playing

24   at Wendi's?

25   *A.*    Yeah, she would be around.  A lot of times, she

1  would be in her room reading or being busy doing

2  something.

3      *Q.*    Did she ever play with you and Wendi?

4      *A.*    Not that I recall.

5      *Q.*    And during that first year at Wendi's house, what

6  would you and Wendi do when you were playing?

7      *A.*    We just like to go in her room and we would just

8  giggle and talk.  We would talk about boys and doing

9  makeup and hair and talk about hairstyles and music, just

10 typical 11- and 12-year-old girl things.

11     *Q.*    And what did Wendi's bedroom look like at this

12 house?

13     *A.*    It was a small room.  It had about a full-size

14 bed.  There wasn't very much room or space in the room.

15 Enough room for the bed and dresser.

16     *Q.*    And during this first time period, were you

17 sleeping at her house the whole time or was some of this

18 time just daytime play?

19     *A.*    Sometimes it would be daytime play.  We would go

20 to the mall or something like that.

21     *Q.*    Who would you go to the mall with?

22     *A.*    Alejo would take us.

23     *Q.*    Would Alejo spend time with you when you were at

24 the mall with Wendi?

25     *A.*    Yes, he did.

1    *Q.*    And what was he like when he was spending time
2    with you and Wendi at the mall?
3    *A.*    He would just walk around with us and he would
4    always like to joke around and play.  He was very playful.
5    *Q.*    Besides the sleepovers that you discussed and
6    playing at Wendi's occasionally during the day and going
7    to the mall, did you spend any other time with Wendi and
8    her family outside of church or school?
9    *A.*    I did go on vacation with them to California one
10   time.
11   *Q.*    And where in California did you go?
12   *A.*    We went to San Diego.
13   *Q.*    How did you get there?
14   *A.*    We drove.  I drove with Donna and Alejo and
15   Wendi.
16   *Q.*    And when you were in San Diego, where did you
17   stay?
18   *A.*    We camped out on the beach in tents.
19   *Q.*    How many tents did you have?
20   *A.*    Wendi and I had our own tent and Donna and Alejo
21   had their own tent.
22   *Q.*    And is there anything that stands out in your
23   memory about this trip?
24   *A.*    We just spent a lot of time playing at the beach.
25   We had a lot of fun at the beach.  I remember going

1   everywhere in our swimsuits.  We lived in our swimsuits.

2   I remember going to stores thinking it was odd that we

3   were -- that everyone went to stores in swimsuits.

4          Another thing that stands out is the time when we

5   had to take showers outside at the camp grounds.  So we

6   had our swimsuits on and we were talking showers, washing

7   our hair and Alejo was taking pictures of us.

8       *Q.*   How did you feel when Alejo was taking pictures

9   of you while you showered?

10      *A.*   We were both yelling at him to stop taking our

11  pictures, that we were embarrassed.

12      *Q.*   Did he continue?

13      *A.*   He took a few more pictures and then stopped.

14      *Q.*   Between church, playing at Wendi's, vacation with

15  the Ochoas, did you get to observe Wendi's relationship

16  with her parents?

17      *A.*   Yes, I did.

18      *Q.*   What did you think of Donna?

19      *A.*   She was -- Donna was more of the serious parent.

20  She made sure that we didn't say words -- like, she didn't

21  like us to say sick or, you know, or gross.  She was more

22  strict, but she was like a typical mom.  You know, a

23  typical mom with her daughter.

24      *Q.*   And what did you think of Alejo?

25      *A.*   He was more of the playful parent, I thought,

1  and, you know, he always liked to joke around with us and

2  play around.  He would sometimes bang on a window to try

3  to scare us.  He was just very playful and teased a lot.

4       *Q.*   Let's go and move to your sleepovers at Wendi's

5  house.  You stated that you slept over at Wendi's house

6  about once a month?

7       *A.*   Yes, I did.

8       *Q.*   And for what time period did you sleep over at

9  Wendi's about once a month?

10      *A.*   It probably started when I was between 11 and

11  12 years old up until -- until I moved to Phoenix.

12      *Q.*   What would you and Wendi do at the sleepovers?

13      *A.*   We would sit in her room and talk and play and

14  just laugh and be silly.  We would just like -- we would

15  just like to talk about things and have fun.

16      *Q.*   Where would Wendi's parents be when you slept at

17  Wendi's?

18      *A.*   Donna usually went to bed early.  Alejo sometimes

19  would come in the room at the same time.

20      *Q.*   What would Alejo do when he came in the room?

21      *A.*   He would pop in his head.  We would just pop his

22  head in to see what we were doing.  Sometimes he would

23  just come into the room while we were talking and he

24  would -- he would just -- he just -- he always had a

25  presence there.  He would always be around.

1    *Q.*    So when you slept at Wendi's, where would you
2    sleep?
3    *A.*    I slept in Wendi's bed.
4    *Q.*    And what type of bed was this?
5    *A.*    It was a full-size bed.
6    *Q.*    And was it against a wall or in the middle of the
7    room?
8    *A.*    It was in the middle of the room.
9    *Q.*    And did you usually sleep on a certain side?
10   *A.*    I remember sleeping on -- it would have been the
11   east side of the room.
12   *Q.*    And what would you wear when you slept at Wendi's
13   house to sleep in?
14   *A.*    I wore like a nylon-type nightgown.
15   *Q.*    And what would Wendi wear to sleep in?
16   *A.*    It was the same type style of nightgown.
17   *Q.*    And besides Alejo popping his head at night, did
18   you see him at all at any other time during your
19   sleepovers?
20   *A.*    Yes.  I remember the first time being asleep and
21   waking up and finding Alejo in bed between Wendi and I.
22   *Q.*    And you said you woke up and Alejo was in bed
23   between you and Wendi?
24   *A.*    Yes.
25   *Q.*    How old were you?

1      *A.*    I was probably about 12 years old.

2      *Q.*    And was he above the covers or under the covers?

3      *A.*    He was under the covers.

4      *Q.*    When you woke up, did you say anything?

5      *A.*    No.  I noticed -- I woke up.  I had my back to

6   him.  I was facing the wall.  And I noticed that his hand

7   was down my shirt.

8      *Q.*    And what did you do when you realized his hand

9   was down your shirt?

10     *A.*    I moved his hand.  He was snoring.  So I thought

11  he was asleep.

12     *Q.*    And what happened after you moved his hand?

13     *A.*    He put his hand back.

14     *Q.*    And did you move it again?

15     *A.*    Yes, I did.

16     *Q.*    And how many times did this happen?

17     *A.*    It happened probably four -- three or four times,

18  that I remember.  Oh, you mean --

19     *Q.*    You mean like him moving his hand back?

20     *A.*    Yeah, I probably moved his hand away probably

21  three or four times before he stopped.

22     *Q.*    And when he was -- do you know what Alejo was

23  wearing when he was in bed between the two of you?

24     *A.*    I think he was wearing a T-shirt and shorts.

25     *Q.*    And what was your reaction when you realized he

1   was in bed and his hand was under your nightgown?

2        A.   I was trying to figure out if he was really

3   sleeping.  Ad first, I thought he was asleep.  But when he

4   kept putting his hand back, I thought he was faking being

5   asleep, so that he could put his hand there.

6        Q.   Did it upset you when he was putting his hand

7   under your nightgown?

8        A.   Yes, it did.

9        Q.   And did Wendi move or stir or react at all to him

10  being in bed with the two of you?

11       A.   I don't recall.  I couldn't tell because he was

12  between us.

13       Q.   But she didn't say anything?

14       A.   No.

15       Q.   And you didn't hear her react?

16       A.   No, I didn't.

17       Q.   After three or four times, you said he stopped

18  putting his hand under your nightgown?

19       A.   Yes, he did.

20       Q.   And what happened next?

21       A.   Eventually, I fell asleep.

22       Q.   How long did it take you to fall asleep?

23       A.   It took me a while to fall back asleep.  But

24  eventually -- I don't know.  It took a while, but I

25  eventually fell back asleep.

1    *Q.*    And then was he in the bed with the two of you

2    when you woke up the next morning?

3    *A.*    No.  He was gone when I woke up the next morning.

4    *Q.*    And did you see him when you woke up and got out

5    of the bed that morning like in the house?

6    *A.*    I don't recall seeing him in the house.  I don't

7    recall.

8    *Q.*    When you went home, did you say anything to your

9    mother or father about what had happened?

10   *A.*    No, I didn't.

11   *Q.*    Why not?

12   *A.*    I was -- I was afraid they wouldn't let me go to

13   Wendi's house anymore and she was my best friend.  And,

14   also, I was afraid my dad -- I was afraid of what my dad

15   would do to Alejo.  I thought my dad would kill Alejo.

16   *Q.*    And when was the next time you saw Alejo after

17   that happened?

18   *A.*    I would see Alejo -- he worked -- he worked for

19   the church and the school.  So I would see him either at

20   church or every day at school because he taught our

21   devotions class.

22   *Q.*    And did he ever say anything to you?

23   *A.*    No, he didn't.

24   *Q.*    And how did it feel when you saw him around

25   school and church?

1        MS. GARD:  Objection.  Relevance.

2        THE COURT:  Overruled.

3        Go ahead and answer the question.

4        THE WITNESS:  I just -- I felt, umm -- I felt

5   awkward that he acted like nothing happened.  So I just

6   would tell myself that he was sleeping and he didn't know

7   what he was doing.

8        Q.   BY MS. FOX:  And did you sleep over at Wendi's

9   again?

10       A.   Yes, I did.

11       Q.   How long after this incident did you sleep at

12  Wendi's again?

13       A.   It was probably another month or two.

14       Q.   And then when you slept over again, did the same

15  thing happen?

16       A.   I don't know if it happened the very next time,

17  but it did happen again on other occasions.

18       Q.   How many times total did it happen?

19       A.   I can remember -- I can remember it happening at

20  least three or four times.

21       Q.   And each time, he would get into bed between you

22  guys and put his hand under your nightgown on your

23  breasts?

24       A.   Yes.  One time he came into bed, though, while we

25  were still awake.

1    *Q.*    What happened that time?

2    *A.*    We were sitting on her bed and we were talking

3  and then he comes inside and he said:  I'm sleeping in

4  here tonight.

5    *Q.*    And did you or Wendi react at all?

6    *A.*    Yeah.  Wendi said:  No, dad, don't sleep in here.

7  Go on, dad.  And he said:  No, you girls are never going

8  to sleep.  So I'm sleeping in here tonight.  So we didn't

9  argue.  We just laid down and tried to go to sleep.

10    *Q.*    And did he get into bed with you under the

11  covers?

12    *A.*    Yes, he did.

13    *Q.*    And did he go through the same ritual of trying

14  to put his hand on your breasts?

15    *A.*    Yes, he did.

16    *Q.*    And did you remove it?

17    *A.*    Yes, I did.

18    *Q.*    How many times did you need to do it that time?

19    *A.*    It was probably the same amount of times that I

20  recall.

21    *Q.*    And, total, this happened three or four times?

22    *A.*    Yes.

23    *Q.*    Was this all during that first year, sixth grade?

24    *A.*    It probably happened from the time I was 12 and

25  also when I was 13.

1    *Q.*   And you never talked -- did you ever talk to

2    Wendi about this?

3    *A.*   No, I didn't.

4    *Q.*   Why not?

5    *A.*   I -- I didn't know what she would think about it.

6    And I was just really uncomfortable talking about it.  So

7    I never brought that up.

8    *Q.*   Why were you uncomfortable talking about it?

9    *A.*   I was embarrassed that it happened.  And Alejo

10   was her dad.  I didn't want to say anything and I didn't

11   want to talk to my parents about it either.

12   *Q.*   Why didn't you want to talk to your parents about

13   it?

14   *A.*   Just, well, because I wanted to be able to remain

15   friends with her and I didn't believe that would be

16   possible if my parents knew.  And, also, my dad.  I know

17   my dad would have tried to kill Alejo.

18   *Q.*   Was Wendi at the same house during the time

19   period that this was occurring or did she move at any

20   point?

21   *A.*   When I was around 13, she moved to a different

22   house.

23   *Q.*   And besides Alejo getting into bed with you and

24   you and Wendi talking, were there any other activities you

25   and Wendi liked to do at your sleepovers at either house?

1      *A.*    We liked to -- we liked to have Alejo take us out

2   to the desert at night because we liked to tell each other

3   scary stories.  So we liked to go out in the desert when

4   it was dark.

5      *Q.*    And would Alejo take you to the desert?

6      *A.*    He would, but he would make us put our nightgowns

7   on first.

8      *Q.*    So before he would take you to the desert, he

9   made you put your nightgowns on?

10      *A.*    Yes.

11      *Q.*    What was your reaction to that request?

12      *A.*    We wanted to go to the desert, so we put on our

13   nightgowns.

14      *Q.*    Did you think it was an odd request?

15      *A.*    I thought maybe he just wanted us ready for bed

16   so that we would be ready for bed when we got back.  But

17   when the incidents in the bed started happening when he

18   was touching me, it made me think otherwise, that he just

19   wanted to see us in our nightgowns.

20      *Q.*    And how many times would he take you into the

21   desert, but make you put on your nightgowns first?

22      *A.*    Every time we went.  Every time he took us to the

23   desert, he would always have us put our nightgowns on

24   first.

25      *Q.*    And how often would you ask to go to the desert?

1     *A.*    I can remember going probably five times.  I

2    don't know.  Multiple times, we went to the desert.

3     *Q.*    And besides making you guys get on your

4    nightgowns, at any time when he took you into the desert,

5    did he impose any other conditions before he would take

6    you?

7     *A.*    One time when he was living -- when they were

8    living at their other house, he wanted me to rub his head.

9    He wanted -- he wanted Wendi and I to rub his head and his

10   feet before he took us to the desert.

11    *Q.*    And did you rub his head and feet?

12    *A.*    Yeah.  We sat on the couch and Wendi rubbed his

13   feet while I rubbed his head.

14    *Q.*    How big was the couch?

15    *A.*    It wasn't very bug.  Maybe -- maybe three

16   cushions.

17    *Q.*    Do you remember what color it was?

18    *A.*    I don't recall.  Some kind of -- I don't recall.

19    *Q.*    So how logistically did this occur with you

20   rubbing his head and her rubbing his feet?  Can you

21   describe how everyone was sitting?

22    *A.*    I would be sitting where Wendi is sitting now and

23   Wendi was sitting where you would be.  Alejo had his head

24   on my lap and his feet on Wendi's lap.

25    *Q.*    And what was Alejo wearing?

1      *A.*    I think he was wearing a T-shirt and shorts

2   maybe.  I believe a T-shirt and shorts.

3      *Q.*    And you said he had his head in your lap?

4      *A.*    Yes.

5      *Q.*    Was his head face up or face down?

6      *A.*    After a while, I could hear him snoring and his

7   face was gradually turning towards my crotch area.

8      *Q.*    And when his face turned to your crotch area, how

9   did that make you feel?

10     *A.*    I pushed his head the other way.

11     *Q.*    Why?

12     *A.*    It made me very uncomfortable.

13     *Q.*    Why did it make you feel uncomfortable?

14     *A.*    I could -- I could feel his breath on me and I

15  could feel -- and I didn't believe he was sleeping

16  because it was -- his face was so much in my crotch, I

17  didn't believe he was sleeping.  So I kept shoving his

18  head away in the other direction.

19     *Q.*    And did he eventually -- how long did this go on

20  for?

21     *A.*    It seemed like forever.  I don't remember.  It

22  just seemed like it lasted a long time.

23     *Q.*    And did you say anything about you being

24  uncomfortable?

25     *A.*    No.  I just would move his head.

1    *Q.*    Why didn't you say anything?

2    *A.*    I don't know.  I wish I would have.  I -- I

3    didn't.

4    *Q.*    And after this incident stopped which you said

5    felt like forever with his head in your crotch, breathing

6    in your crotch, did he eventually take you to the desert?

7    *A.*    Yeah.  Eventually, he acted like -- he got up

8    saying, oh, I fell asleep, but I didn't believe that he

9    was asleep.  And he told us to get our nightgowns on and

10   he would take us to the desert.

11   *Q.*    So when you were massaging his head, you weren't

12   in your nightgown?

13   *A.*    No.  I was wearing -- I believe I was wearing

14   shorts.

15   *Q.*    And did you say anything to anyone about Alejo

16   putting his head in your crotch and you feeling

17   uncomfortable?

18   *A.*    No, I didn't.

19   *Q.*    Did you ever talk about it with Wendi?

20   *A.*    No, I didn't.

21   *Q.*    Did you ever talk about it with your parents?

22   *A.*    No, I didn't.

23   *Q.*    Why didn't you tell anyone about what happened

24   with him putting his head in your crotch?

25   *A.*    The same reasons I stated before, just --

235

1      *Q.*    You felt uncomfortable?

2      *A.*    Yeah.  I was very uncomfortable and embarrassed

3  by it.  And, you know, I just never said anything.  I kept

4  it a secret.

5      *Q.*    You stated you stopped going to school with Wendi

6  and was it -- how old were you?

7      *A.*    I was 14.

8      *Q.*    14?

9      *A.*    Yes.

10     *Q.*    And you moved to Tempe, you said?

11     *A.*    Yes.

12     *Q.*    And after you moved to Tempe, how often did you

13  see Wendi?

14     *A.*    I would still go and see her if I -- every -- if

15  we had an extended break at school, I would have my

16  parents drive me to go spend the weekends with her.

17     *Q.*    Did it scare you to spend the night there

18  considering what would happen sometimes when you spent the

19  night there?

20     *A.*    It -- it used to scare me.  Before we had moved,

21  like my mom was sick at one time and my dad wanted me to

22  spend a week there while she was in the hospital.  And I

23  didn't want to spend a whole week there because I was

24  worried that it would happen again.  And I made up a story

25  to my dad that it was because I wouldn't have time to do

1  my makeup.  So I know I had to be around 13 because that

2  was when I was allowed to wear makeup.

3       But after -- some time after I was 14 and we had

4  moved, it hadn't happened in a while, so I figured it

5  was -- I became more comfortable going over there.

6    Q.   And how many times would you say you saw Wendi

7  during the period of when you were, say, 14 to 16?

8    A.   It just -- at first, I saw her more frequently.

9  But then by the time I was -- by the time I was 16, I was

10  only seeing her maybe once a year by the time I was 16.

11   Q.   So from time you were 16 to the present, how --

12  or from the time you were 16 until the time that you heard

13  that Wendi killed Joe, which we'll get into in a second,

14  how many times did you see Wendi?

15   A.   I had seen her at a wedding when I was 18 or 19.

16  And then I saw her again when I was pregnant with my first

17  child, when I was 24, at Brad's funeral.

18   Q.   So from the time you were 16 until the time Wendi

19  got arrested, you only saw her twice?

20   A.   Yes.

21   Q.   How did you find out about Wendi's arrest?

22   A.   A friend of mine called me.  And they had heard

23  about it on the news and they called and told me about it.

24   Q.   And after you found out about Wendi's arrest, did

25  you get in contact with her?

1    *A.*   Yes.  I called Donna and just let her know that I

2   was very sorry and I asked her if Wendi would want any --

3   would want to see any guests or have a visitor, and she

4   thought Wendi would like that.

5    *Q.*   How many times did you see Wendi around the time

6   of her trial?

7    *A.*   I probably came and visited her four or five

8   times maybe.

9    *Q.*   And then you just stopped visiting her?

10   *A.*   Yeah.  I didn't see her after -- I'm trying to

11   remember if it was my third child or fourth child.  I was

12   pregnant.

13   *Q.*   Oh, you were pregnant at the time?

14   *A.*   Yes.

15   *Q.*   So you were visiting her and then you had your

16   baby?

17   *A.*   Yes.

18   *Q.*   And the visits stopped?

19   *A.*   Yes.

20   *Q.*   And then so the last time -- how old is that

21   child now?

22   *A.*   I'm trying to remember which child I was pregnant

23   with.  So it was either -- I have a 13-year-old and I have

24   a nearly 12-year-old.  So it was 12 or 13 years ago.

25   *Q.*   So you haven't, until today, seen Wendi in 12 to

1   13 years?

2      *A.*   No, I haven't.

3      *Q.*   And did you in any way assist in Wendi's trial?

4      *A.*   Someone from our church had given my husband

5   information on an attorney that did pro bono cases.  So we

6   gave the information to the Ochoas.

7      *Q.*   And do you know if they ended up using that

8   attorney?

9      *A.*   Yes, they did.

10     *Q.*   Why didn't you bring up this abuse earlier around

11  the time of Wendi's trial?

12     *A.*   I thought about it.  It was in my mind.  I had

13  never told anybody about it, not even my husband.  So it

14  was in my mind, but I -- I didn't want to bring any

15  more pain into the family by bringing these accusations

16  against Alejo.

17         And but, at the same time, I was wondering if it

18  would help bring more light into her state of mind.  So I

19  was torn about what to do.  I wasn't sure if it would be

20  relevant or not.  And so I decided not to say anything.

21     *Q.*   And did Wendi's attorney contact you at any point

22  about helping with the proceedings?

23     *A.*   No, they did not.

24     *Q.*   So did Mr. DeLozier -- Attorney DeLozier ever

25  contact you to ask you anything about Wendi?

1    *A.*    No.  I've never spoken to him.

2    *Q.*    Or did Attorney Patterson ever contact you about

3    speaking with Wendi?

4    *A.*    No, he didn't.

5    *Q.*    And did Scott MacLeod, a mitigation specialist,

6    ever contact you about your life with Wendi?

7    *A.*    No.

8    *Q.*    What about a man named Patrick Linderman?

9    *A.*    No.

10    *Q.*    If they had asked you, would you have shared with

11    them the information that you shared with the Court today?

12           MS. GARD:  Objection.  Speculation.

13           THE COURT:  Overruled.

14           Go ahead and answer the question.

15           THE WITNESS:  If they -- if they would have asked

16    me about it, I would have.  The only reason I didn't say

17    anything is because I thought:  Well, it probably isn't

18    relevant.  So if they would have asked me about it, I

19    would have said something.

20           MS. FOX:  That's all I have for you.  I really

21    appreciate you coming.  I know this wasn't easy for you

22    today.

23           THE WITNESS:  Okay.

24           THE COURT:  Ms. Gard.

25           MS. GARD:  Just very briefly.

1          THE WITNESS:  Okay.

2

3                    CROSS-EXAMINATION

4     BY MS. GARD:

5          *Q.*   You never saw Alejo touch Wendi the same way that

6     he touched you; right?

7          *A.*   I couldn't tell.  He was between us.  He had one

8     hand on me.  I don't know where his other hand would have

9     been.

10         *Q.*   But so the answer is, no, you never saw him touch

11    her that way?

12         *A.*   I never did see that.

13         *Q.*   Okay.  The incident in California with the

14    photographs that you described --

15         *A.*   Yes.

16         *Q.*   -- that Alejo took, can you describe those

17    showers to me?  Were they public showers?

18         *A.*   Yes.  It was -- it was -- yeah, they were public

19    showers out in the open.

20         *Q.*   So was there any kind of partition around the

21    shower or was it just one of those at the beach that

22    just a --

23         *A.*   Yeah, I don't remember a partition being around

24    it.

25         *Q.*   And when he took the photographs, you were

1   wearing a bathing suit; is that right?

2       *A.*   Yes.

3       *Q.*   When Alejo placed his hand on your breasts, I

4   think it was the first time, you described hearing him

5   snoring?

6       *A.*   Uh-huh.

7       *Q.*   Are you sure he was not asleep?  How do you know

8   he wasn't asleep?

9       *A.*   At first, I thought he was asleep, but it kept

10  happening so frequently, that I just believed that -- I

11  thought -- I wondered -- I wondered if he was really

12  asleep.

13      *Q.*   But you don't know for sure?  You're just

14  speculating that he was -- that he was really awake;

15  right?

16      *A.*   It became very -- especially when it happened

17  multiple times, it became very hard to believe that he was

18  actually sleeping.

19      *Q.*   Okay.  Did you tell him to stop?  Did you say

20  anything to him?

21      *A.*   No.  I just kept pushing his hand away.

22      *Q.*   Okay.  And you didn't say anything to Donna;

23  right?

24      *A.*   No, I did not.

25      *Q.*   And in terms of one of the reasons -- you

1    testified at the end of your direct that you would have

2    probably told Wendi's attorneys if they had asked you?

3         *A.*   Yes.

4         *Q.*   Because your reason for not coming forward was

5    that you didn't consider it relevant.  But you had also

6    said earlier that you didn't want to bring more pain into

7    the family; right?  Was that another consideration?

8         *A.*   I didn't want to bring more pain into the family

9    if it wasn't necessary.  But if I would have known that

10   was necessary, I would have had to do it.

11        *Q.*   But you thought about coming forward with the

12   information, but you decided not to; is that fair?

13        *A.*   I weighed it in my -- in my mind.  I never talked

14   about it to anybody, but I did weigh it in my thinking.

15             MS. GARD:  I don't have anything else, Judge.

16             THE COURT:  Redirect?

17             MS. FOX:  I don't have anything else.

18             THE COURT:  May this witness be excused?

19             MS. FOX:  Yes.

20             THE COURT:  Thank you very much.  You're excused.

21             THE WITNESS:  Okay.  Thank you.

22             (WHEREUPON, the witness exited the courtroom.)

23             THE COURT:  Before we take our evening recess,

24   based upon what Mr. Arntsen indicated to the Court this

25   morning about Alejo Ochoa, what I'm going to do is I'm

1  going to appoint counsel for him with regard to any Fifth

2  Amendment issues that might come up tomorrow.  So I've had

3  my judicial assistant to get him appointed counsel

4  tomorrow.

5       It's my understanding he is scheduled to testify

6  tomorrow afternoon?

7       MR. ARNTSEN:  He's scheduled to be our third

8  witness tomorrow.  Jasper Neace will be first, first thing

9  in the morning coming from the prison, and then Wendi and

10 then Alejo.

11      THE COURT:  So he is probably not going to be

12 until the afternoon?

13      MR. ARNTSEN:  It could be late morning, but

14 probably not until the afternoon.

15      THE COURT:  Okay.  I think you spoke with my

16 judicial assistant with regard to Jasper Neace to make

17 sure he is available tomorrow morning?

18      MR. ARNTSEN:  Right.  And when I spoke with her,

19 I wasn't sure if Ms. Cunningham would be done today or

20 not, and she is.  So Jasper Neace will be first thing

21 tomorrow.

22      THE COURT:  I think my judicial assistant made

23 arrangements.

24      MR. ARNTSEN:  I know she made arrangements for

25 the morning.

1        THE COURT:  Right.  Okay.

2        MS. FOX:  Really quickly about Mr. Neace, I know

3   he was very concerned about his hearing problem.

4        THE COURT:  Right.  You know what?  I think

5   earlier today, I saw someone deliver a headset --

6        MS. FOX:  Okay.

7        THE COURT:  -- from court administration or

8   somewhere.  And so I think we have a headset for him.

9        MS. FOX:  Okay.  Wonderful.  I just know he was

10  very concerned about it.

11       THE COURT:  Okay.  So we have something for him.

12       MS. FOX:  Okay.  Great.  Thank you.

13       THE COURT:  Okay.  Everyone have a nice evening.

14  We will be in recess, then.

15       (WHEREUPON, the proceedings were concluded at

16  4:46 p.m.)

17                    *  *  *  *  *  *  *

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9

10          I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11   the State of Arizona, do hereby certify that the foregoing

12   244 pages constitute a full, true, and accurate transcript

13   of the proceedings had in the foregoing matter, all done

14   to the best of my skill and ability.

15          SIGNED and dated this 12th day of April, 2014

16

17

18                    /s/  Renée A. Mobley, RPR

19                    RENÉE A. MOBLEY, RPR

20                    Certified Reporter

21                    Certificate No. 50500

22

23

24

25

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,               )
                                )
        Respondent,             )
                                )
vs.                             )   No.
                                )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,       )
                                )
        Petitioner.             )
_____ )


Phoenix, Arizona
February 5, 2014
9:31 a.m.


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


EVIDENTIARY HEARING

DAY 3


Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                        (COPY)

2

1                    A P P E A R A N C E S

2

3

4    On Behalf of the State:

5            Mr. Gregory Hazard
             Assistant Attorney General
6
             Ms. Lacey Gard
7            Assistant Attorney General

8
     On Behalf of the Defendant:
9
             ATTORNEYS AT LAW:
10
             Mr. Scott Bennett
11           Mr. Allen Arntsen
             Mr. Stephan Nickels
12           Mr. Matthew Lynch
             Ms. Krista Sterken
13           Ms. Jodi Fox

14                    I N D E X

15

16                 T E S T I M O N Y

17
     WITNESS:                              PAGE
18
     JASPER C. NEACE
19
         Direct Examination by Ms. Fox        8
20
         Cross-Examination by Mr. Hazard     29
21

22   GEORGE W. WOODS, JR., M.D.

23       Direct Examination by Mr. Nickels   41

24       Cross-Examination by Mr. Hazard    112

25

1                    P R O C E E D I N G S

2

3          THE COURT:  Good morning.  This is

4    CR 2000-096032, State of Arizona vs. Wendi Elizabeth

5    Andriano.

6          The record will reflect the presence of the

7    parties and counsel.

8          Before we get started here this morning, we do

9    have Mr. Jasper Neace here, who's seated in the witness

10   stand.  He has some audio equipment that's going to assist

11   him in hearing and we have a microphone that -- we don't

12   have 2014 up-to-date equipment, but I think we have

13   sufficient equipment here that will assist Mr. Neace.

14         But, anyway, we have him with headphones.  Then

15   there's a speaker microphone there that what I'll do is

16   when the Petitioner is asking questions, then we'll have

17   that on your desk.  When the State is asking questions,

18   we'll have that on the State's desk.

19         Mr. Neace, are you able to hear me?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Okay.  If at anytime you feel that

22   you cannot hear what's being said, will you please let us

23   know?

24         THE WITNESS:  Yes, sir.

25         THE COURT:  Okay.  Why don't we go ahead and have

4

1   Mr. Neace stand and be sworn.

2           Or is there anything we need to discuss before we

3   begin?

4           MR. ARNTSEN:  Very briefly, Your Honor.

5           THE COURT:  Go ahead.

6           MR. ARNTSEN:  We won't be calling Alejo Ochoa to

7   testify.  We did speak briefly with his appointed lawyer

8   last night, who hadn't met with him and didn't know

9   anything about him.

10          THE COURT:  It's Mr. Miller.

11          MR. ARNTSEN:  Mr. Miller; correct.

12          THE COURT:  Mr. Rick Miller.

13          MR. ARNTSEN:  Yes.  And so he won't be here to

14   testify.

15          In fact, we have a proposal to the State

16   concerning Ms. Andriano that I'm waiting to hear back from

17   them on.  But we have then George Woods would be the next

18   witness and he'll be over here shortly.

19          THE COURT:  Dr. George Woods?

20          MR. ARNTSEN:  Yes.

21          MS. GARD:  Judge, if we could have until the

22   break to -- the lunch break to make our decision on

23   Ms. Andriano.

24          THE COURT:  Okay.

25          MR. ARNTSEN:  She'll be the witness right after

1  Mr. Neace.

2        MS. GARD:  So, Your Honor, if we could just break

3  briefly after Mr. Neace.

4        THE COURT:  Sure.

5        MS. GARD:  Okay.

6        THE COURT:  So just as a housekeeping measure,

7  then, Samantha Nichols will not be testifying.  Brandon

8  Ochoa will not be testifying and Alejo Ochoa will not be

9  testifying.

10        MR. ARNTSEN:  Correct.  Then after Dr. Woods,

11  it's Scott MacLeod and then Keith Rohman and then

12  Dan Patterson.  We're in pretty good shape on the schedule

13  this week.

14        THE COURT:  Okay.  So we expect Dr. Woods this

15  afternoon?

16        MR. ARNTSEN:  Yes.  Or perhaps even this morning,

17  depending.  He will be here this morning either to testify

18  or to listen to Ms. Andriano's testimony, and we'll go on.

19        THE COURT:  What about Dr. James?

20        MR. ARNTSEN:  She can't come until Monday.  So

21  she's had a schedule.

22        THE COURT:  And then when do we anticipate

23  Mr. Patterson and Mr. MacLeod?

24        MR. ARNTSEN:  Mr. MacLeod will be Thursday

25  afternoon, depending.  And we'll know better at the end of

1   the day today.  We might have a gap tomorrow morning if

2   Dr. Woods is done.  But, again, it's good.  It's just

3   Mr. MacLeod can't come until the afternoon.  He and

4   Mr. Rohman will be tomorrow afternoon.  Attorney Patterson

5   will be starting Friday morning.

6           THE COURT:  Let's do this.  We will proceed with

7   the testimony of Mr. Neace.  Then we'll take a break so

8   that counsel can speak.

9           MR. ARNTSEN:  Thank you.

10          THE COURT:  Does that sound right?

11          MS. GARD:  Yes.  And, Your Honor, just to give

12  notice, we may call Alejo Ochoa in our case once we have

13  an opportunity to talk to his appointed counsel and find

14  out what he's going to say.

15          MR. ARNTSEN:  Okay.  That's understood.

16          THE COURT:  Okay.  Let's go ahead and proceed,

17  then.

18          We will have, Mr. Neace, if you can please stand

19  and face the clerk.  Give her your name and she'll swear

20  you in.

21          THE WITNESS:  My name is Jasper Charles Neace.

22          THE CLERK:  Could you please spell your name for

23  the record?

24          THE WITNESS:  What?

25          THE COURT:  Can you spell your name, please?

7

1          THE WITNESS:  Yes.  J-A-S-P-E-R.  Charles,

2  C-H-A-R-L-E-S.  Neace, N-E-A-C-E.

3          THE CLERK:  Raise your right hand, please.

4          (WHEREUPON, the witness was duly sworn by the

5  clerk.)

6          THE COURT:  You can be seated there, Mr. Neace.

7  Again, Mr. Neace, if you have any difficulty hearing

8  what's being said, will you please let us know?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  Sir, another thing I want you to

11  remember is to speak up so that everyone can hear you.

12          THE WITNESS:  Okay.

13          THE COURT:  Also, please wait until the question

14  is completed before you answer the question.

15          THE WITNESS:  Yes.

16          THE COURT:  Then also make sure that you give us

17  a verbal response.  Don't just shake your head and say

18  uh-huh or un-huh.  Say, yes, no, or whatever it might be.

19          Can you do that for us?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Thank you.  Go ahead and state your

22  name for the record.

23          THE WITNESS:  Jasper Charles Neace.

24          THE COURT:  And, Ms. Fox, you may -- is it going

25  to be Ms. Fox?

1        MS. FOX:  Yes, it will be.

2        THE COURT:  Ms. Fox, you may proceed.

3        MS. FOX:  Thank you.

4

5                    JASPER CHARLES NEACE.

6  having been first duly sworn to tell the truth, the whole

7  truth, and nothing but the truth, testified as follows:

8

9                    DIRECT EXAMINATION

10  BY MS. FOX:

11     Q.   Mr. Neace, thank you for being here today.  I

12  understand county is not quite as nice as where you

13  usually are.  I appreciate your taking the time for a

14  couple of days to be up here.

15          First of all, do you know the defendant, Wendi

16  Andriano?

17     A.   Yes, I do.

18     Q.   And how do you know Wendi?

19     A.   From school and church.

20     Q.   How old were you when you first met Wendi?

21     A.   I was probably about 12 or 13.

22     Q.   And how old was Wendi when you met her?

23     A.   I would say probably about maybe ten, 11.

24     Q.   And what year would that have been?

25     A.   Around 1980.

9

1     *Q.*    And you said you knew Wendi from church and
2   school?
3     *A.*    Yes.
4     *Q.*    What was the name of the church?
5     *A.*    91st Psalm at the time.
6     *Q.*    And what was the name of the school?
7     *A.*    91st Psalm School.
8     *Q.*    And the church and school were affiliated?
9     *A.*    Yes.
10    *Q.*    How often would you see Wendi?
11    *A.*    Pretty much every day at school and then on
12  church days, too, like Sunday.
13    *Q.*    And would you see Wendi besides during the school
14  day at school and at church?
15    *A.*    Well, I would see her also at work because I
16  worked for the school.  After school would be out, I would
17  work for four hours a day, usually.  And I would see her
18  because she would be waiting for to get a ride home from
19  her stepdad at the time, which was Alejo.
20    *Q.*    And you said you were working at the school?
21    *A.*    Yes.
22    *Q.*    And you were 12, 13 years old?
23    *A.*    Yes.
24    *Q.*    Why were you working at the school at age 12, 13
25  for four hours a day after school?

1      *A.*      To help pay the tuition for me and my brothers

2  and sisters that were going to school at the time.

3      *Q.*      How many brothers and sisters do you have?

4      *A.*      I have five sisters and three brothers.

5      *Q.*      And you said you worked four hours a day.  Was

6  that every day after school?

7      *A.*      Yes, ma'am.

8      *Q.*      And did you work on weekends at all?

9      *A.*      Yes, I did on Sundays.  Sometimes Saturdays.  It

10  depends on what's going on.

11      *Q.*      And what type of work did you do at the school?

12      *A.*      I did groundskeeping, watering trees, things like

13  that.  Just general basic keeping the carpet clean,

14  dusting, keeping it ready for the church services,

15  bathrooms, things like that.

16      *Q.*      So is it fair to say that you spent a lot of time

17  with Ms. Andriano?

18      *A.*      Yes.  Yes.

19      *Q.*      And from what ages were you spending time with

20  Ms. Andriano?

21      *A.*      For -- what was the question again?

22      *Q.*      How old were you during this time period where

23  you saw Wendi every day at school, churches on Sundays and

24  after school while you were working and she was waiting

25  for Alejo?

1    *A.*    Probably -- I mean, I saw her a lot, but when we

2  started talking was more when she was probably a couple of

3  years into it.

4    *Q.*    A couple years into it?  So how old were you at

5  that point?

6    *A.*    I would probably have been about 14.

7    *Q.*    And how old was Wendi then?  12?

8    *A.*    Yeah, probably 12.  She was getting older,

9  anyway.

10    *Q.*    And you said around that time, you started to

11  talking to Wendi more?

12    *A.*    Yeah, because she would work sometimes, too,

13  after school.

14    *Q.*    How long did you attend 91st Psalm?

15    *A.*    Right at five years.

16    *Q.*    Five years.  So you were around from 1980 to

17  about 1985?

18    *A.*    Yes.

19    *Q.*    And you were maybe 15 or 16 at the time you

20  stopped attending?

21    *A.*    No.  I was older.  I was probably about 17.

22    *Q.*    17?  Sorry, my math.  That's why I went into law.

23  Okay.  So who was the pastor at 91st Psalm in 1980 when

24  you and Wendi first met?

25    *A.*    Calvin Lorts.

1    *Q.*    Was he the pastor the entire time you attended

2    the church?

3    *A.*    No, ma'am.

4    *Q.*    When did that change?

5    *A.*    About two to three years into being there.

6    *Q.*    So '82, '83?

7    *A.*    I can't be for sure, but pretty close.

8    *Q.*    Can you describe what the church was like under

9    the pastor?  Did you say that was Calvin Lorts?

10    *A.*    Yes, ma'am.  It was good.  It was, you know, a

11    lot of fun, a lot of activities.  We were always busy

12    doing different things.  It was a real good atmosphere.

13    It was great.

14    *Q.*    And you said you left around approximately 1983?

15    *A.*    Yeah.

16    *Q.*    And you said a new pastor took over?  Tom King?

17    *A.*    Yes.

18    *Q.*    What was the church like under Tom?

19    *A.*    That's -- it all changed real fast.  It was

20    different.  Immediately, he took over everything and just

21    like started controlling my family more and my mom and my

22    brothers and sisters and me.

23    *Q.*    Did he control just you and your family or the

24    congregation as a whole?

25    *A.*    He seemed to be controlling everything.

13

1    Q.   What types of things did Tom try to control?

2    A.   Our music, our TV.  He went all the way down to

3    eating sugar.  He wanted us -- we were supposed to have

4    honey with our cereal, just all kinds of things like that.

5    Q.   What did he control with your TV and music?

6    A.   Well, first of all, the TV was a big deal.  He

7    said it was the devil's box and that it had nothing but

8    garbage coming out of it.  Music was the same thing.  No

9    music, no country, no rock.  Just Christian music.

10   He controlled even -- for instance, I bought a

11   motorcycle once and he found out I didn't have insurance

12   on it.  So he told me -- he called me into the office and

13   told me that I needed to sell it because I was committing

14   a sin riding without insurance and that I needed to sell

15   it and give the money to the church for a good cause and

16   all that.  So, very controlling.

17   Q.   How was Tom's preaching style?

18   A.   Brimstone and condemning, I guess you could say.

19   Real hard, real -- just it was different than what we were

20   used to, or I was used to, anyway.

21   Q.   And did Tom insert himself in any way into how

22   the parishioners raised their children?

23   A.   Oh, very much so.

24   Q.   In what way?

25   A.   The Rod of Correction.  That was one of the big

1   topics there.  It was a paddle or a 2 x 4 turned into a

2   paddle, I guess you could say, and it had these scriptures

3   written on it.  I still remember them today, a lot of

4   them.  It was beat a child when he's young, and when he's

5   old, he won't depart from it.  Honor they father and

6   mother.  With long life, don't stray aside.  Them kind of

7   things would be written on it.  And he encouraged our

8   parents to use them and not to be scared to use them.

9        Q.   Did the parishioners obey Tom and paddle their

10  children or beat their children with the Rod of

11  Correction?

12       A.   I can speak for my household.  I know that my

13  mother did.  And I heard, you know, rumors throughout the

14  church from other kids because they would complain about

15  it.  But I did witness it firsthand.

16       Q.   And did Tom take any position on whether or not

17  the congregation should have any friends that didn't

18  attend the church?

19       A.   Oh, the friendship out-of-the-church thing?

20       Q.   Yes.

21       A.   Oh, that was one of the no-no's.  We were not to

22  hang out with heathens or ungodly people because they

23  would be a bad influence on our lives and we didn't need

24  that, he would tell her.  So my mom, he would tell and the

25  whole church, too.  And so we were pretty much isolated

15

1   from everybody but the church people.

2        Q.   So did he consider anyone who wasn't a church

3   member a heathen?

4        A.   Yeah, pretty much.  They were going to hell,

5   basically.

6        Q.   How long did you attend school at 91st Psalm,

7   which eventually I believe changed to the name of Harvest

8   when Tom King took over?

9        A.   Yeah, up to my last year.  He kicked me out.

10       Q.   We will get to that in a little bit.

11       A.   Okay.

12       Q.   So let's just start talking generally about what

13   it was like to attend Harvest or 91st Psalm.  Well, let's

14   concentrate, actually, on the Harvest time period.  What

15   would happen if a student acted out or got in trouble?

16       A.   The Rod of Correction and they would be beaten.

17       Q.   And who would administer the punishments?

18       A.   Tom, Alejo and Johnny Casey.

19       Q.   And so Tom, Tom King; Alejo, Alejo Ochoa; and

20   Johnny Casey?

21       A.   Yes, ma'am.

22       Q.   And did they all beat children in the same way or

23   were there different levels of severity between the three?

24       A.   Umm, I'm not sure how to answer that exactly, but

25   I know that --

16

1    MR. HAZARD:  Objection as to how he knows.  Is

2 this his personal knowledge?

3    THE COURT:  Sustained.  Sustained.

4    Q.   BY MS. FOX:  Do you know if there was a

5 difference between how the three men beat the children?

6    A.   Umm, I believe they all used the Rod of

7 Correction on them.  Umm, what else?

8    Q.   Okay.  And do you know if the beatings ever

9 caused children to have bruises or welts?

10    A.   Yes, ma'am.

11    Q.   And how do you know this?

12    A.   Because of my brothers and sisters.

13    Q.   And did Alejo ever beat your brothers and

14 sisters?

15    A.   Yes, ma'am.

16    Q.   And when Alejo beat your brothers and sisters, do

17 you know if it ever caused bruising or welts?

18    A.   Yes, ma'am, it did.

19    Q.   What type of behavior would cause a kid to get

20 beaten with the Rod of Correction?

21    A.   Well, there's a lot of rules.  But, I could think

22 of a few, I guess.  For instance, my brother, he is also

23 deaf.  He's much worse than I am.  But we had to memorize

24 15 verses of the Bible every month and recite them in

25 front of the whole class.  And when he wouldn't be able to

1   do that, he would get a whoopin' for that.  Him and my

2   sister both got whoopin's for not doing their work, you

3   know, diligently and doing it right when we were working.

4   They went to work when they got older, too, with me.  Just

5   a variety of things, you know.

6       *Q.*   Do you know if Wendi was ever disciplined?

7       *A.*   Do I?  I never saw it with my own eyes, but I was

8   told by her that she was.

9           MR. HAZARD:  Objection.  Hearsay.

10          THE COURT:  Sustained.

11          THE WITNESS:  Pardon me?

12          THE COURT:  Go ahead and restate the question.

13      *Q.*   BY MS. FOX:  Were you ever told that Wendi was

14  beaten?

15          MR. HAZARD:  Objection.  Calls for hearsay.

16          THE COURT:  Sustained.

17          MS. FOX:  I would like to do an offer of proof --

18          THE COURT:  Go ahead.

19          MS. FOX:  -- for mitigation evidence.

20          THE COURT:  Go ahead.

21      *Q.*   BY MS. FOX:  You can answer the question.

22      *A.*   Umm, yes, we would -- I was told that, yes.

23      *Q.*   And what were you told about Wendi being beaten?

24      *A.*   That she had gotten beaten, whooped, beaten from

25  a paddle.

1    *Q.*    Who told you that?

2    *A.*    She did.

3    *Q.*    When you were at school, you stated that Alejo

4    was one of the people that disciplined the children.  Did

5    you often see Alejo at the school and church?

6    *A.*    Every day.

7    *Q.*    Where would you see Alejo?

8    *A.*    He would sometimes play teacher and then he was

9    always the maintenance man and the worker around there.

10   And that's what I was doing.  So I was with him every day

11   pretty much.

12   *Q.*    What was Alejo like with the students?

13   *A.*    He -- you know, it -- he was real, umm -- real

14   touchy, real flirty, real outgoing.  Just, you know, just

15   real active with them, touching them, different things.

16   *Q.*    What do you mean by he was real touchy with the

17   students?

18   *A.*    Well, we had a lot of kids that complained about

19   him.  And I saw a lot of it with my own eyes.  But he

20   would lick his fingers and touch them on the neck, behind

21   their ears, flirt with them.  Just real -- I mean, he even

22   did that with the older -- with the staff members, too,

23   some of the prettier ladies.  I remember seeing him do

24   stuff like that.

25   *Q.*    The students that he was touching and flirting

1    with, was this girls or boys or both?

2        *A.*    No, I never seen it with boys.  Just girls.

3        *Q.*    And besides licking the finger and putting it to

4    the girls' necks, did you ever see him touch the female

5    students in any other way?

6        *A.*    Yeah, I'd seen -- he would rub up on some of the

7    older ones when he would come into class and bend over at

8    their desks and help them out on their math or social

9    studies or whatever they was doing.  And then a lot of

10   times, they would complain about it, you know, and how he

11   was rubbing on them and how his breath smelled and just

12   stuff like that.  Just typical teenage stuff, you know,

13   about him being a little too close to them and stuff.

14       *Q.*    And did he ever say inappropriate things to any

15   of the students?

16           MR. HAZARD:  Objection.  Calls for hearsay.

17           THE COURT:  Sustained.

18           MS. FOX:  I'm going to do an offer of proof for

19   the mitigation evidence on this portion.

20           THE COURT:  Go ahead.

21           MS. FOX:  You can answer.

22           THE WITNESS:  What was the question again?

23       *Q.*   BY MS. FOX:  Did you ever hear him say anything

24   inappropriate?

25           MR. FOX:  And, also, I would also like to say for

1   the record that it's not coming in for the truth of the

2   matter asserted.  It's just that he heard these things

3   stated.

4            THE COURT:  Go ahead and answer the question.

5            MS. FOX:  Yes.

6            THE WITNESS:  Okay.  Yeah, he -- I can't -- I can

7   just say that just he would flirt with the girls and the

8   women.  Just he would always stop short of -- you know,

9   just -- it was just the way he would just congest them.

10  You know, the way he would act, it was -- it was -- I

11  wouldn't want my mom or my sisters or my children, my

12  daughters to be around that.  But I don't really know how

13  to explain it.  It was just weird how he -- you know, he

14  just -- he said things, you know, but I can't really

15  remember exactly, you know.

16       Q.   BY MS. FOX:  And how did the students feel about

17  Alejo?

18       A.   Well --

19            MR. HAZARD:  Objection.  Calls for speculation.

20            THE COURT:  Sustained.

21            MS. FOX:  He was part of the community and he

22  knows his general reputation and all of that.

23            THE COURT:  You can ask him how he felt about

24  him.

25       Q.   BY MS. FOX:  How did you feel about Alejo?

1      *A.*   At first when I went there, I didn't really know

2    about him, I guess.  But as time went by and I saw how he

3    was acting with the kids and the girls and stuff and

4    beating on my brothers and sisters and other kids, he

5    seemed like a pervert.

6          Basically, I wouldn't doubt if he was a child

7    molester or something.  You know, I mean, I just -- I

8    mean, he just -- he was sick, I think.  I'm not for sure.

9    But, in my opinion, I think there's something wrong with

10   the man.

11     *Q.*   And you stated previously that you spent a fair

12   amount of time with Wendi at the school, during school, at

13   church and after school.  And at a certain point in time

14   around I believe you said two years after you met her,

15   around when she was 12, you started spending even more

16   time with her and talking to her more; correct?

17     *A.*   Yes, ma'am.

18     *Q.*   Did you witness Wendi and Alejo together?

19     *A.*   Yes, I did.

20     *Q.*   How often would you see Wendi and Alejo together?

21     *A.*   Umm, you know, it just depended.  At least once a

22   day, I mean, when they would give me a ride home from

23   work.  But just here and there, you know, through the

24   church, school or whatever it was, I would see them

25   together a few times a day.

1    *Q.*    So a few times a day?

2    *A.*    Yeah.

3    *Q.*    For five, six years?

4    *A.*    For a good five, yeah.

5    *Q.*    What was Wendi's and Alejo's relationship like?

6          MR. HAZARD:  Objection.

7          MS. FOX:  He witnessed it firsthand.

8          THE COURT:  Be more specific on the question.

9    *Q.*    BY MS. FOX:  What was -- what did you view

10   Wendi's and Alejo's relationship as?

11   *A.*    Well, I knew he was the stepfather.  But it --

12   you know, she was more like how she acted than him.  But

13   like when we would be talking about just everyday things

14   you know, that kids talk about, and then sometimes things

15   that everyday kids don't talk about.  But he would come

16   into the room and she would get nervous and give me the

17   signal to, you know, time to shut up and be quiet, don't

18   talk no more.  She was scared and nervous around him.

19   That's what I saw.

20   *Q.*    Did you and Wendi ever talk about her

21   relationship with Alejo?

22   *A.*    Yes, we did, on several occasions.

23   *Q.*    And what did you discuss about Alejo?

24   *A.*    Umm, she told me that --

25         MR. HAZARD:  Objection.  Calls for hearsay.

1          THE COURT:  Sustained.

2          MS. FOX:  I would like to do this as an offer of

3     proof for the mitigation evidence.

4          THE COURT:  You may proceed.  Go ahead.

5          MS. FOX:  Please continue.

6          THE WITNESS:  She told me about some incidents

7     that was disgusting her and making her feel nervous around

8     him.  She said that he used to make her give him massages

9     and she felt like that he was, you know, getting off of on

10    it, being perverted.  She didn't like doing it.  He made

11    her -- he would lay his head in her lap and have her comb

12    his hair, just different things like that.

13         I even heard him when he hurt his back at work

14    one day, he told her that when she got home, her work

15    wasn't done until she got home and gave him a back rub.

16    So I heard him say things like that.  Umm, so things like

17    that.

18    Q.   BY MS. FOX:  You stated earlier that you were

19    kicked out of Harvest at a certain point?

20    A.   Yes.

21    Q.   How old were you when you were kicked out of

22    Harvest?

23    A.   I was -- man, it's been a long time.  I was

24    pretty close to being 18.  I was 17, somewhere around

25    there.

1      *Q.*   And can you please describe the circumstances

2   surrounding your getting kicked out of Harvest?

3      *A.*   Well, it's kind of a long story, but I'll try to

4   make it short here.  Basically, I got kicked out.  We had

5   been talking about Alejo again and Wendi had told me

6   that --

7            MR. HAZARD:  Objection.  Calls for hearsay.

8            THE COURT:  Sustained.

9            MS. FOX:  I would like to argue that we would

10   like to do this not only as for mitigation, but this also

11   just conforms his actions moving forward.  And so it's not

12   coming in for the truth of the matter asserted, but it's

13   coming in to show why he did the things he did.

14            THE COURT:  Well --

15            MR. HAZARD:  And, Your Honor -- oh, I'm sorry.

16            THE COURT:  Go ahead.

17            MR. HAZARD:  I also object to relevance as to

18   why -- how he got kicked out of the church is even

19   relevant.

20            THE COURT:  Well, why don't you get into how he

21   got kicked out first.  Then let me hear what he has to say

22   and then I may or may not let you go into this other area.

23            MS. FOX:  Well, this directly is part of the

24   story of how he got kicked out.  I'll show that --

25   the relevance will be apparent and --

1        THE COURT:  Why don't you get into who kicked him

2   out and those circumstances first.

3        *Q.*    BY MS. FOX:  Okay.  Who kicked you out of the

4   school?

5        *A.*    Tom King and Alejo Ochoa.

6        *Q.*    What was the infraction that you allegedly got

7   kicked out for?

8        *A.*    Well, after all the -- after a period of time of

9   me and the kids talking and somebody wanting to stand

10  up -- and stand up for us.  So I decided to do that.  And

11  when I did, they just booted me out -- kicked me out of

12  the church.

13       *Q.*    What were you doing to stand up for the kids?

14       *A.*    Well, that's where Wendi comes in.

15       THE COURT:  Okay.  I'll allow him to proceed.  Go

16  ahead.

17       MS. FOX:  Okay.  Continue.

18       THE WITNESS:  It's all right?

19       MS. FOX:  Yes.

20       THE WITNESS:  She had brought a Playboy book to

21  school and said that it had came from Alejo's property,

22  his belongings.  We were raised that that was a sin and we

23  weren't allowed to do it.  He was beating on my brothers

24  and sisters and whoever else and doing what he was doing.

25            And I decided that I was going to take it and

1    confront Tom with it and let him know what we had going on

2    because it needed to be dealt with, I felt.

3           I had told Tom's son Brad about it, too, at PE.

4    I told him I had it in my locker.  Anyway, they called me

5    into the office for a meeting that I had set up with Tom.

6    I didn't know Alejo was going to be there.  And I go by my

7    locker and the book is gone.  Wendi didn't know what

8    happened to it because I asked her.  So I had assumed -- I

9    still don't really know what happened to it, but I assume

10   Brad must have told him or something.

11          But I go into the office and sat down for a

12   second with Tom and Alejo.  We was talking and Tom asked

13   me what I had to say, and so I told him.  And he called me

14   a liar and asked me where my proof was.  He condemned me

15   to burn in hell and told me to leave and to never come to

16   the school or the church.

17   *Q.*   BY MS. FOX:  And did you ever go back to the

18   school or the church?

19   *A.*   No, ma'am.

20   *Q.*   At the point in time when you got kicked out, was

21   your family still attending the church?

22   *A.*   No.  My mom and brothers and sisters had got

23   kicked out a few months before, maybe like two months.

24   *Q.*   What for?

25   *A.*   Because my mother got married without his

1   permission.

2      *Q.*   So your mother got kicked out of the church for
3   getting married to someone?

4      *A.*   Yes.  Because they weren't attending the church
5   or were a part of the church.

6      *Q.*   After you got kicked out of Harvest, where did
7   you go?

8      *A.*   I went to -- actually, I got a phone call from
9   Calvin Lorts and he asked me to come and stay with him and
10  his family and finish up high school, and I did.

11     *Q.*   After you got kicked out of Harvest, when you
12  were, you said -- what year was that in?

13     *A.*   It would have been in '84 or kind of in between
14  '84 and '85 because the school went into '85.  So it was
15  in between '84 and '85.

16     *Q.*   So since, let's use the later date, 1985, how
17  many times have you seen Wendi?

18     *A.*   I've never seen Wendi but just once and that was
19  at a restaurant.

20     *Q.*   And when was that?

21     *A.*   I believe that would have been -- umm, that was
22  in the late 90's.  I saw her at the Casa Grande Cafe
23  Restaurant.  But that was the last time.

24     *Q.*   And so you've seen Wendi once since 1985?

25     *A.*   One time just for about ten minutes maybe.

1    *Q.*   When were you first told about Wendi killing her

2    husband?

3    *A.*   I think it was probably a couple of weeks later,

4    maybe a month later.  I had heard it from my mother and my

5    ex-wife.

6    *Q.*   What was your reaction?

7    *A.*   I was shocked.  I didn't believe it at first, but

8    they said it was true, and pretty much that was the end

9    of it.

10   *Q.*   And why haven't you come forward previously with

11   this information?

12   *A.*   I've never been asked, for one.  And, you know, I

13   didn't know that anybody needed to hear it.  I mean, it

14   was -- it's not something that I'm proud of, you know,

15   because my brothers and sisters were done dirty, and I was

16   older than them and I should have been there for them

17   more, I guess.  But it still bothers me, you know.

18   *Q.*   What bothers you about it?

19        MR. HAZARD:  Objection.

20        THE WITNESS:  Well, I should have stood up more

21   for them and --

22        MR. HAZARD:  Objection.

23        THE COURT:  Hold on a second.

24        MR. HAZARD:  Objection as to the relevance of why

25   it bothers him.

1          THE COURT:  Sustained.  Let's move on.

2     *Q.*   BY MS. FOX:  So around the time of Wendi's trial

3  and in the years prior, did anyone from Wendi's defense

4  team ever contact you?

5     *A.*   No.

6     *Q.*   So did an attorney named Dan Patterson ever

7  contact you?

8     *A.*   Nobody ever did.

9     *Q.*   So a David DeLozier never contacted you?

10    *A.*   No, ma'am.

11    *Q.*   A Scott MacLeod never contacted you?

12    *A.*   No, ma'am.

13    *Q.*   A Patrick Linderman never contacted you?

14    *A.*   No, ma'am.

15    *Q.*   If any of these people had contacted you, would

16  have told them what you've told the Court today?

17    *A.*   I would have.

18         MS. FOX:  Thank you.  I have no further questions

19  for this witness.

20         THE COURT:  Mr. Hazard?

21         MR. HAZARD:  Yes.

22

23                    CROSS-EXAMINATION

24  BY MR. HAZARD:

25    *Q.*   Mr. Neace, you're currently in the Department of

1  Corrections?

2      *A.*   Yes, sir.

3      *Q.*   And you're serving a prison sentence for a felony

4  conviction; is that correct?

5      *A.*   Yes, sir.

6      *Q.*   And that's not your first felony conviction;

7  correct?

8      *A.*   No, sir.

9      *Q.*   Do you have three other felony convictions?

10      *A.*   Yes, sir.

11      *Q.*   Okay.  And one was in 2002 out of Pinal County,

12  CR 2002-00120, and you served two and-a-quarter years.  Do

13  you remember that?

14      *A.*   Yes, sir.

15      *Q.*   And the next one was also in Pinal County

16  Superior Court, CR 2006-00335, and you served one

17  and-a-half years in prison for that felony conviction?

18      *A.*   Yes, sir.

19      *Q.*   And then, finally, in 2009, also out of Pinal

20  County Superior Court, CR 2009-00618, you served

21  1.75 years in prison for that one; correct?

22      *A.*   Yes, sir.

23      *Q.*   All right.  And when you knew Ms. Andriano, when

24  you met her when you were going to school together, I read

25  in your written statement that you called her the

1  All American Girl; is that accurate?

2      *A.*   Yes.

3      *Q.*   She was funny?

4      *A.*   Yes.

5      *Q.*   Outgoing?

6      *A.*   Yes.

7      *Q.*   Smart?

8      *A.*   Yes.

9      *Q.*   She was popular with other kids at the school and

10 church, from what you could see?

11     *A.*   I don't remember saying that.

12     *Q.*   All right.  She got along with everyone, though?

13     *A.*   I don't remember saying that.

14     *Q.*   Okay.  Was there a time when you moved away from

15 Casa Grande and moved to Georgia right around 12 or

16 13 years old?

17     *A.*   Umm, for about three months, we had moved there.

18     *Q.*   And then you came back?

19     *A.*   Yes.

20     *Q.*   And during that time you were away in Georgia, I

21 assume you didn't interact with Ms. Andriano; correct?

22 You didn't see her?

23     *A.*   No.  I couldn't see her from Georgia, no.

24     *Q.*   All right.  With respect to when you got kicked

25 out of the church by the Pastor Tom King, you testified

1   about how you confronted him about the Playboy magazine

2   and told him about it; correct?

3        *A.*   Yes, sir.

4        *Q.*   Isn't it a fact that you also punched Mr. King in

5   the chest as hard as you could?

6        *A.*   Umm, not as hard as I could, no, but I -- he

7   grabbed me, yes, and for trying to hold me down, telling

8   me just didn't different things.  I didn't have my hearing

9   aids on at the time, but he was telling me that I was

10  condemned to hell and I was going to burn.  And he had

11  already kicked my parents out -- my mother out.  And I had

12  a lot of anger in me for him, yes, I did.  But I did hit

13  him.  I pushed him and hit him towards the doors so I

14  could get out and leave.

15            (WHEREUPON, an off-the-record discussion ensued.)

16            MR. HAZARD:  Your Honor, if I may approach the

17  witness with Exhibit No. 23 for identification purposes.

18            THE COURT:  Yes.

19            MR. HAZARD:  And if I may approach the witness.

20            THE COURT:  Yes.

21       *Q.*   BY MR. HAZARD:  Mr. Neace, do you recognize

22  Exhibit No. 23?  Do you recognize that, sir?

23       *A.*   Yes.

24       *Q.*   Turn to the last page.  Is that your signature at

25  the bottom where it says Jasper Neace?

1    *A.*   Yes, it is.

2    *Q.*   And you signed that declaring under penalty of

3    perjury under the laws of the State of Arizona, United

4    States of America, that everything that was in that

5    document was true and correct?

6    *A.*   To the best of my knowledge and to the best of my

7    remembering, yes, I did.

8    *Q.*   All right.  And you signed that on the 7th day of

9    June of 2010; correct?

10   *A.*   Yes, sir.

11   *Q.*   And was this declaration prepared for you by

12   someone from Ms. Andriano's team?

13   *A.*   Umm, it was just I guess what they wrote out when

14   they was taking my statement and what I could remember

15   that day.

16   *Q.*   All right.  And if you would turn to what's

17   marked as Page 22 in that exhibit at the very bottom.  And

18   that's where you were -- in your written statement, that's

19   discussing your confrontation with Pastor King; correct?

20   *A.*   Yes, sir.

21   *Q.*   And at the bottom you state:  I punched him in

22   the chest as hard as I could and then I turned around and

23   knocked Alejo down, going onto the next page?

24   *A.*   Yeah.

25   *Q.*   Is that correct?

1    *A.*    Yes, I did say that.

2    *Q.*    I ran out the door and hopped on my motorcycle;

3  correct?

4    *A.*    Yes, sir.

5    *Q.*    Now after reviewing that, is that what happened?

6    *A.*    Umm, yeah.  I mean, I did hit him, but I didn't

7  know that I said as hard as I could.  But I meant I was a

8  kid, you know.  But I hit him and then, yeah, I did, and

9  then I had to turn around and run out the other door and

10  get on my motorcycle.  That's what I did.  I don't

11  remember -- I think that Alejo either fell down or I

12  pushed him down going out the door.  I don't remember

13  exactly how it went because he tried to grab the door, but

14  I made it out the door.  But, yeah, that's pretty close

15  to it.

16    *Q.*    And then you got kicked out of the church?

17    *A.*    Well, yeah.  That day, that was it.

18    *Q.*    And you said a number of your family members were

19  kicked out of this church; correct?

20    *A.*    Yeah.

21    *Q.*    Do you blame that church in part for the problems

22  you've had with your criminal history?

23    *A.*    I believe that -- you know, I would have to

24  explain myself to say yes or no to that question.  But, I

25  mean, if you want to hear it, I can tell you.

1    *Q.*   Your words in that declaration were:  I feel like

2    they put me through hell; is that accurate?

3    *A.*   I did.  Yes, I did some of it -- some parts of

4    it.  Not all of it was bad.

5    *Q.*   And you don't like Pastor Tom King; correct?

6    *A.*   I don't -- it's not that I don't like him.  It's

7    that I disapprove of the way he -- you know, my mother has

8    passed away now.  But the way he brainwashed her to raise

9    us and to take us -- you know, we were a poor family and

10   she had to pay tithes with her food stamps, and every time

11   we'd go shopping, we had to get two carts and give him the

12   best of it.  And, yeah, there's a lot of things that I

13   disagree with in that man.

14           MR. HAZARD:  No further questions.

15           THE COURT:  Redirect?

16           MS. FOX:  Nothing, Your Honor.

17           THE COURT:  May this witness be excused?

18           MS. FOX:  Yes.  Thank you very much.

19           THE COURT:  Mr. Neace, thank you very much.

20   You're excused.

21           THE WITNESS:  Thank you.

22           THE COURT:  Then I'm going to order that

23   Mr. Neace be transported back to the Department of

24   Corrections.

25           And then, Deputies, thank you for assisting here

1   with Mr. Neace.

2           (WHEREUPON, the witness was excused and exited

3   the courtroom.)

4           THE COURT:  We will go ahead and take a break

5   now.  We'll be in recess.

6           (WHEREUPON, a recess ensued from 10:09 a.m. to

7   10:24 a.m.)

8           THE COURT:  This is CR 2000-096032, State of

9   Arizona vs. Wendi Elizabeth Andriano.

10          The record will reflect the presence of the

11  parties and counsel.

12          Counsel.

13          MR. ARNTSEN:  Yes, Your Honor.  We conferred with

14  the State's counsel during the break and we reached an

15  agreement with them.  Essentially, we agreed we would not

16  call Ms. Andriano in our case if they agreed they would

17  not call her in their case, and we have that agreement and

18  Ms. Andriano will not be called as a witness.

19          THE COURT:  By either --

20          MR. ARNTSEN:  By either side.

21          THE COURT:  -- the Petitioner or by the State; is

22  that correct?

23          MR. ARNTSEN:  That's correct, Your Honor.

24          MR. HAZARD:  That's correct, Your Honor.

25          THE COURT:  Then another housekeeping measure is

1    the State indicated that they might be calling Alejo

2    Ochoa, even though the Petitioners are not.

3              We have Mr. Miller, who is representing Mr. Ochoa

4    on the Fifth Amendment issue, on standby for this

5    afternoon.  If you do call Alejo Ochoa, would it be this

6    afternoon or out-of-order or would it be some time next

7    week?

8              MS. GARD:  Your Honor, I haven't consulted with

9    counsel on that, but my thinking would be it would be

10   during our case next week unless they have a preference.

11             MR. NICKELS:  No.  I mean, well, for what it's

12   worth, Your Honor, we don't want to overly pressure them

13   on time.  The schedule is a little back-loaded next week.

14   Our next witness is going to be Dr. Woods.  His direct is

15   going to be in the 90-minute range.  So I don't know how

16   long the cross is, but I suspect we will get done with him

17   today and would have time to slot in Alejo this afternoon

18   or even tomorrow.

19             And so, from the time standpoint, this afternoon

20   or tomorrow work very well for him.  Now, again, I can't

21   force them to call in somebody.  I'm just letting you know

22   that and letting them know that.

23             MR. ARNTSEN:  He's under subpoena for today and

24   tomorrow, but, again, it's fundamentally your call.

25             MS. GARD:  Have you released him from the

1  subpoena?  Is he still under subpoena?

2        MR. BENNETT:  We told his lawyer he was released

3  for the moment, but subject to being called.

4        MS. GARD:  Your Honor, if we could try to get a

5  hold of Mr. Miller over the lunch break and maybe then we

6  can have a little bit better idea.

7        THE COURT:  Okay.  What I'll do is I'll notify my

8  judicial assistant to contact Mr. Miller and indicate that

9  you may be contacting him during the lunch hour.

10        MS. GARD:  Yes, Your Honor.  Does your judicial

11  assistant have his cell phone number or something so we

12  can get a hold of him quickly?

13        MR. BENNETT:  I have that.  I can provide it.

14        THE COURT:  For Mr. Miller?

15        MS. GARD:  Mr. Bennett has it.  So he can provide

16  the number.

17        THE COURT:  Okay.  Gina, if you can hear me, go

18  ahead and call Mr. Miller and indicate to him that the

19  State may be calling him during the lunch hour.

20        Okay.  The Petitioner may call their next

21  witness.

22        MR. NICKELS:  Thank you, Your Honor.  We call

23  Dr. George Woods.

24        And as he's setting up, I just wanted to let the

25  Court know that we have conferred with counsel as to

1  evidentiary objections to this witness, and like was the

2  case with Dr. Hopper, I believe they are preserving their

3  objections as to admissibility of certain evidence.

4      We believe it goes under the mitigation rule and

5  703, but that they're not going to assert the objection or

6  make the objection again, again and again throughout the

7  testimony, so as to not slow it down too much.

8      THE COURT:  Ms. Gard or Mr. Hazard?

9      MR. HAZARD:  Yes.  My objection would be as to

10  hearsay, it goes to the truth of the matter asserted.  If

11  it's being offered to form the basis of any opinions, then

12  it would come in under that rule.  So that's kind of a

13  standing objection that we would have.

14      THE COURT:  Okay.  Sir, if you could please state

15  your name and face the clerk and raise your right hand,

16  the clerk will swear you in.

17      THE WITNESS:  Thank you, Your Honor.

18      THE CLERK:  Sir, could you please state your name

19  and spell your name for the record?

20      THE WITNESS:  Yes.  George Woods.  G-E-O-R-G-E;

21  W-O-O-D-S.

22      THE CLERK:  Thank you.

23      (WHEREUPON, the witness was duly sworn by the

24  clerk.)

25      THE COURT:  Sir, if you would please be seated on

1    the witness stand there.

2              THE WITNESS:  Thank you, Your Honor.

3              THE COURT:  And, sir, just a few things to

4    remember.  Go ahead and be seated.  If you need water,

5    there's water right there.

6              Just a few things to remember.  Speak up so that

7    everyone can hear you.  Also, please wait until the

8    question is completed before you answer the question and

9    please make sure that you give us a verbal response.

10             Is that all agreeable to you?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Go ahead and state your name for the

13   record.

14             THE WITNESS:  George Woods.

15             THE COURT:  And Mr. Nickels?

16             MR. NICKELS:  Yes.

17             THE COURT:  Okay.  You may proceed.

18             MR. NICKELS:  Thank you.

19             THE WITNESS:  May I just take a moment,

20   Mr. Nickels, to get organized?  I apologize.

21             MR. NICKELS:  Of course.

22             THE WITNESS:  Thank you.

23             MR. NICKELS:  All set?

24             THE WITNESS:  Yes.

25

41

```
1                    GEORGE W. WOODS, JR., M.D.,
2     having been first duly sworn to tell the truth, the whole
3     truth, and nothing but the truth, testified as follows:
4
5                         DIRECT EXAMINATION
6     BY MR. NICKELS:
7          Q.   Okay.  Well, where do you live, Dr. Woods?
8          A.   My practice is in San Francisco.  I live in
9     Oakland, California.
10         Q.   What do you do for a living?
11         A.   I'm a neuropsychiatrist.
12         Q.   Have you done work for this matter?
13         A.   Yes, I have.
14         Q.   What did you do?
15         A.   I interviewed Wendi on three different occasions.
16    I interviewed her mother, Donna Ochoa.  I reviewed a
17    number of documents, including employment records and
18    medical records both of Mr. Andriano and of Wendi.  I
19    reviewed school records.  There were nine volumes of
20    mitigation records that I reviewed that included
21    everything from records of her father to biological
22    father's family, school records, a number of records.
23         Q.   We'll get into a little more detailed discussion
24    of the process you undertook in a few minutes.  But,
25    first, if you could just start off by giving a summary of
```

1    what you were asked to do for this case.

2        A.    Excuse me.  Yes, I was asked to do a

3    neuropsychiatric evaluation of Wendi in order to determine

4    whether she suffered from any psychiatric disorders or

5    cognitive deficits.

6        Q.    And please give us a summary of what you found.

7        A.    Well, I also was asked to determine if she had

8    any -- well, I said cognitive deficits; right?

9        Q.    Yes.

10       A.    I found that Wendi suffered from a number of

11   psychiatric disorders, including post-traumatic stress

12   disorder, complex type; bipolar disorder; dependent

13   personality disorder.

14             I also found that Wendi suffered from

15   dependent -- from what's called caregiver burden.  And,

16   also, that she did have cognitive deficits.

17       Q.    And we'll get into those in more detail later,

18   but, briefly now, if you could tell us what effect did

19   these disorders have on Wendi?

20       A.    Well, it's my professional opinion that they,

21   in league, undermined her ability to function effectively,

22   to weigh and deliberate effectively, and to handle

23   emotionally complex and stressful circumstances.

24       Q.    In your professional opinion, Dr. Woods, did

25   these neuropsychiatric disorders and cognitive deficits

1    that Wendi suffered affect her in the time leading up to

2    Joe Andriano's death?

3        *A.*   Yes.

4        *Q.*   Okay.  Like I said, we'll go through that in more

5    detail.  But now let's just turn back to your

6    qualifications.

7        *A.*   Sure.

8        *Q.*   Why don't you just start with your educational

9    experiences and take it from there to explaining your

10   qualifications in this area?

11       *A.*   Sure.  I went to Westminster College in Salt Lake

12   City, Utah.  And I majored in psychology, English history

13   and biology.  I'm sorry.  Psychology, English history and

14   biology.

15           I then left the academic arena and worked for IBM

16   for four years in San Francisco.  I returned to medical

17   school at the University of Utah and completed my medical

18   degree in 1976.  I then did a medical internship at

19   Alameda County Hospital in Oakland, California.

20           And I then did a psychiatric residency at

21   Pacific Presbyterian Hospital in San Francisco,

22   California.  I was chief resident my last year.

23       *Q.*   Once you finished your residency, did you go into

24   private practice?

25       *A.*   No.  I started a fellowship with the National

1  Institute of Mental Health and the American Psychiatric

2  Association.  And the fellowship was in geriatric

3  psychopharmacology.

4      Q.  How long was that?

5      A.  That was approximately two years.  I then --

6  during at that time and actually in my last year, I was

7  working as a family physician.  I had a medical practice

8  and actually practiced in right under the Arizona and

9  California borders in Blythe, California, and Parker,

10  Arizona.

11      Q.  What has been the focus of your medical practice

12  since that time?

13      A.  Since that time, it's been neuropsychiatry.

14      Q.  In this matter, you're serving as an expert

15  witness and a consultant.  Have you done that before?

16      A.  Yes, I have.

17      Q.  About how many times?

18      A.  I've testified probably about 85 times.  And I

19  testify in approximately 11 percent of the cases that I'm

20  consulted on.  So I've consulted on a number of cases over

21  time.

22      Q.  Now the cases in which you serve as an expert

23  witness or as a consultant, is it always capital cases

24  like this matter?

25      A.  No.

1    *Q.*    What other kind of work is it?

2    *A.*    Most of my forensic work -- besides my clinical

3    practice, most of my forensic work is actually civil.  I

4    do civil, both plaintiff and defense work, primarily

5    around issues of employment law and family law.  I'm a

6    certified mediator by the State of California.  I do

7    mediation.  So that's the bulk of my practice -- of my

8    forensic practice.

9    *Q.*    Of the times -- you've just told us how many

10   times overall you've served an expert witness or

11   consultant.  Can you give us your best guess as to how

12   many times it has been a capital case like this?

13   *A.*    That really referred to my capital case

14   experience.

15   *Q.*    Oh, the 85 times?

16   *A.*    Yes.

17   *Q.*    Okay.  In those cases, do you work on the capital

18   cases more work for the plaintiff or for the defense?

19   *A.*    I've never been retained by the government.  In

20   those 85 cases, they have been for the defense.

21   *Q.*    Okay.  Now in addition to your practice and your

22   forensic work, do you do anything else like teaching or

23   any of that type of work?

24   *A.*    Yes.  I'm a fellow of the American Psychiatric

25   Association.  I'm also a member of the American

1   Psychological Association.  Excuse me.  I'm the

2   president-elect of the International Academy of Law and

3   Mental Health based at the University of Montreal.

4           I'm also on the advisory board of the

5   International Association of Trauma Professionals, which

6   is an organization that's based in Nashville, Tennessee,

7   but is international in scope where we do teaching around

8   trauma.  We do research around various types of trauma,

9   both disaster trauma as well as interpersonal trauma.

10          I'm on the executive committee of the

11  International Association for Specialized Study of

12  Developmental Disorders.  And there we look at people that

13  have what we call challenging behaviors, but primarily in

14  areas of fetal alcohol spectrum disorder or Fragile X high

15  intellectual disability.

16      Q.    Now there should be a set of four binders down by

17  your feet.  Do you see that?

18      A.    Yes.

19      Q.    Does one of them say Binder 1, or the first set,

20  Exhibits 1 through 25?

21      A.    Yes.

22      Q.    If you could grab that, please.

23      A.    Okay.

24      Q.    And if you could take a look at the exhibits in

25  there that are marked 2 C and 2 D.  For the official

1  exhibit list, these would be 2.003 and 2.004.  But,

2  Dr. Woods, for you, they're 2 C and 2 D.

3       *A.*   Yes.

4       *Q.*   Can you please just tell us what those are?

5       *A.*   These are -- and I apologize for this.  These are

6  CV's.  These are a bit dated.  I've been updated.  And if

7  I may just add the things that should be on these CV's.

8       *Q.*   Oh, sure.

9       *A.*   I teach currently at FOTOL, the University of

10 California Berkeley School of Law.  I teach second year

11 law students a course called Law and Mental Health.  I've

12 been teaching that since 2012.  I actually started right

13 after this.

14            I also teach at Morehouse School of Medicine in

15 Atlanta, Georgia, and I've been teaching there for

16 approximately 12 years.  So I think that would be captured

17 here.  And I teach two courses:  Introduction to Forensic

18 Psychiatry and Introduction to Geriatric Psychiatry.

19      *Q.*   Okay.  So 2 C, or 2.003, is your CV.  And then in

20 2 D, what is that?

21      *A.*   This is a declaration that outlines, again, some

22 of my background and training.

23      *Q.*   And is it the two -- generally speaking, the two

24 documents you've just looked at, they're consistent with

25 the experience that you've just described for us in your

48

1 testimony?

2     *A.*   Yes.

3     *Q.*   Okay.  Now, Dr. Woods, these are both already

4 admitted into evidence.  So we don't need to move them in

5 now.  I just wanted to have you tell the Court what they

6 are.

7            Now, Dr. Woods, let's turn back to what you had

8 previewed for us, which is the process you undertook --

9     *A.*   Yes.

10     *Q.*   -- in this matter.  We're not now talking about

11 your analysis or conclusions.  I just want you to tell us

12 what you did when you interviewed, materials you reviewed,

13 et cetera.  So I know you started this before, but, if you

14 could, tell us again what you all did in this case.

15     *A.*   Sure.  First I -- and I'm not sure this is first

16 in terms of time, but in terms of priority, I had the

17 opportunity to examine Wendi.  And I did that on three

18 different occasions over the course of about a year.

19            I think it's important, if possible, to be able

20 to see someone on a number of occasions because

21 psychiatric disorders and brain disorders can often

22 change, and it's important to be able to see if things --

23 people change over time.  So I saw her on three different

24 occasions.

25            I then -- based upon that, I recommended that

1   neuropsychological testing be completed because there
2   appeared to be some subtle but significant cognitive
3   impairments that I felt needed to be evaluated more
4   thoroughly.
5       Q.   And was that done?
6       A.   Yes, it was.
7       Q.   Are you referring to the neuropsyche testing that
8   was performed by Dr. Myla Young and analyzed by Dr. Joette
9   James?
10      A.   That's correct.
11      Q.   In addition to interviewing or examining Wendi,
12  did you interview anybody else?
13      A.   I interviewed her mother, Ms. Ochoa, Donna Ochoa,
14  on April 27th, I believe it was, 2011.
15      Q.   What else did you look at?
16      A.   I looked at a comprehensive social history of
17  Wendi that really went back to before her birth that had
18  significant information about her father, his family,
19  about the structure of his family, about the medical
20  history of his family, about the social history of his
21  family, that there had been several members of the family
22  that had been incarcerated.  There was a history of sexual
23  molestation in that family.  It actually ended up with her
24  father being incarcerated for about 17 years secondary to
25  child sexual molestation.

1           I also was able to look at Ms. Ochoa's family and
2   see what I thought was relevant medical history about her
3   family as well, about the makeup of her family, the
4   relationship between her mother and father, their tense
5   relationship, the history of alcohol with her father, for
6   example.

7       Q.    And this information, you're describing looking
8   at Wendi's life history and then both of her parents.  Are
9   you getting this information through, you know, records,
10  medical records, declarations?  What kinds of documents
11  are you looking at?

12      A.    Yes.  In this particular case, although the
13  methodology is the same in every case, you would like to
14  have medical records, employment records, school records
15  and family medical records.

16          In this case, it was particularly rich.  There
17  were, frankly, many, many more records than I'm normally
18  used to having in this type of case.

19      Q.    But the types of documents you reviewed are
20  consistent with what you would normally review in a case
21  like this?

22      A.    That's correct.

23      Q.    And the process overall that you went through, is
24  that consistent with the process that you would typically
25  undertake in a case like this?

1      *A.*   Yes, if possible.

2      *Q.*   And in this case was it possible?

3      *A.*   Yes.

4      *Q.*   Did you prepare a report?

5      *A.*   Yes, I did.

6      *Q.*   And if you could look at the same exhibit binder.

7   I'm going to direct you to Exhibits 2, 2 A and 2 B.   And

8   then on the official exhibit list, it's 2, 2.001 and

9   2.002.

10     *A.*   2 B?   2.001?

11     *Q.*   Oh, no.   You're looking at 2, 2 A and 2 B.   And I

12  don't want to be confusing.

13     *A.*   Right.   Okay.

14     *Q.*   Unfortunately, that binder does not match up

15  exactly.

16     *A.*   I see.

17     *Q.*   Essentially, the 001 takes the place of the A.

18  The 002 takes the place of the B.   So you're looking for

19  2, 2 A and 2 B.   Could you tell us what those are?

20     *A.*   Yes.   2 A is Appendix A to my report.   This goes

21  through the materials reviewed.   And I see there are

22  actually many things that I didn't capture:   The writings

23  of Wendi; crime scene photographs; the trial testimony of

24  a number of people; Donna's testing and school records;

25  photographs that were taken by Mr. Ochoa; and other

1  declarations as well as expert reports of Mr. Hopper --

2  Dr. Hopper.

3      *Q.*   So 2 A of the list of materials that you reviewed

4  is Exhibit 2.  Is that your actual report?

5      *A.*   Yes.

6      *Q.*   Okay.  And what's 2 B?

7      *A.*   2 B is an overview of the biopsychosocial history

8  of Wendi and her family.  So this really is a -- it

9  captures the family history of Wendi and her biological

10  dad and her mother.

11      *Q.*   Okay.  And, again, these are already into

12  evidence, but I wanted to just highlight for the Court

13  where they are and what they are.

14          Dr. Woods, let's now turn to your analysis.  In

15  your opening remarks, you said that Wendi suffers from

16  multiple disorders and deficits and you named several.

17  Could you please tell us again what those are?

18      *A.*   Sure.  Post-traumatic stress disorder.  The type

19  that Wendi suffers from is what is entitled complex

20  post-traumatic stress disorder.  There are several types

21  of traumatic stress.  Bipolar disorder.  Dependent

22  personality disorder.  It's my belief that Wendi suffers

23  from specific cognitive impairments.  And I use the term

24  in the literature of caregiver burden.

25      *Q.*   Yes, caregiver burden, is that a diagnosis like

1  the other four that you mentioned?

2      *A.*   Caregiver burden is not a diagnosis.  Caregiver

3  burden has been used for the last 25 years as a term --

4  it's an umbrella term to talk about the specific stressors

5  that occur when people take up the role of caring for

6  chronically ill persons, most commonly terminally ill

7  persons.

8          This term was initially utilized by Hazelton in

9  1978 looking actually at schizophrene and family members

10 that took care of schizophrene.

11     *Q.*   So is caregiver burden its own diagnosis or is it

12 more something that can exacerbate other disorders?

13     *A.*   That is a good question.  Caregiver burden is a

14 disrupter.  Caregiver burden undermines a person's ability

15 to care for themselves, to solve problems.

16          It's one of the reasons why today you see with

17 the explosion of Alzheimer's, for example, that you have

18 multiple caregiver groups because it's become understood

19 that caregiver burden undermines that person's ability to

20 function effectively, but it also exacerbates and disrupts

21 symptoms that that person may -- that caregiver may have.

22 It may in fact enhance the difficulties that that

23 caregiver brings to the situation.

24     *Q.*   But it's your opinion, just to summarize it,

25 Wendi suffered from sort of four disorders or deficits and

1  then has this caregiver burden that can exacerbate those

2  deficits?

3      *A.*   Yes.

4      *Q.*   Let's walk through each of them starting with

5  complex PTSD.  If you could just start off by telling us

6  what is complex PTSD?

7      *A.*   Bessel van der Kolk and Judith Herman first

8  coined the term complex PTSD in around 1985.  And it was

9  really designed to separate out what we now recognize as

10  Type 1 PTSD and Type 2 PTSD.

11      *Q.*   What's the different between Type 1 and Type 2

12  PTSD?

13      *A.*   Type 1 PTSD is the type of PTSD that is reflected

14  by a single incident, an assault, a rape, either with

15  great bodily injury or seeing someone and particularly

16  someone that is close to you, have that type of

17  experience.  But, more commonly, it's a singular

18  experience that leaves a person reliving that experience,

19  that leaves them not wanting to perhaps be in areas where

20  that experience occurred, although, they may have to.  It

21  may have been something that happened at work.  They have

22  no choice of going back.  It dysregulates the emotions so

23  that people tend to underrespond or overrespond.

24      *Q.*   How is Type 2 or complex PTSD different from what

25  you just described?

1      *A.*    Complex PTSD Type 2 is an ongoing trauma as
2  opposed to the singular event.
3          Complex PTSD is the ongoing sexual abuse or
4  ongoing physical abuse or ongoing domestic violence, and
5  it presents differently.  People often with the complex
6  PTSD, they don't really have to relive the act, the
7  experience in their minds because they're reliving it from
8  day-to-day.  They don't have to move away from the
9  experience quite so much because it's ongoing.  And so you
10 find that complex PTSD really creates symptoms that are
11 more long lasting symptoms of what we call rumination,
12 having these things go on over and over.  And complex
13 PTSD, more than Type 1 PTSD, disrupts day-to-day
14 functioning.
15     *Q.*    And you believe Wendi suffers from complex PTSD?
16     *A.*    Yes, I do.
17     *Q.*    Why do you believe that?
18     *A.*    Because when I had the opportunity to examine
19 Wendi, she manifested some of the symptoms of complex
20 PTSD.  She had problems with remembering affectively
21 laden events.  And what I mean by that are events that
22 have some emotional content to them.  It's not like
23 remembering a football score or an address.  It's
24 something that is -- that pulls for the emotions.
25     *Q.*    Did she have trouble with those memories?

1      *A.*    Yes.

2      *Q.*    Is that something you typically see in folks who

3  suffer from complex PTSD?

4      *A.*    Yes.

5      *Q.*    What else did you see in your interview

6  examination of Wendi that caused you to believe she

7  suffers from complex PTSD?

8      *A.*    Wendi described -- and this in some ways derives

9  from the memory problems.  Wendi describes dissociative

10  experiences.  And dissociation is a perceptual disorder.

11  It's a disorder of perceiving things accurately.  The most

12  common dissociative experience that we probably all have

13  had are déjà vu experiences.  I think I've been here

14  before.  I think I've experienced this before.  That is a

15  type of dissociation.  But the most pathological

16  dissociative experiences are those that come from trauma.

17          And the one that really I think that captured it

18  for me were photographs that had been taken by Wendi's

19  biological -- by her adopted father.  And these were

20  photographs that were very suggestive.  They were

21  photographs of her in a nightgown with a light shining

22  behind her, so that you could actually see the silhouette

23  of her body -- her naked body through the nightgown.  On

24  several occasions -- on at least two occasions, I talked

25  to Wendi about these photographs, and on one occasion,

1    showed them to her.

2        Q.   Did she remember these pictures being taken?

3        A.   She remembered going up the mountain.  She said

4    she did recall going up the mountain.  She did not recall

5    having the pictures taken.

6            And there are other pictures of Wendi in

7    lingerie, again, in her early teens being taken in a hotel

8    room.  And, again, she recalled being in the hotel room

9    with her adopted father, but she didn't recall having the

10   pictures taken.

11       Q.   In addition to these memory problems and the

12   dissociation you've just described and that you observed

13   in Wendi, you said you also reviewed her social history?

14       A.   Yes.

15       Q.   Anything from that that causes you to conclude

16   she suffers from complex PTSD?

17       A.   The social history, yes.

18       Q.   What is that?

19       A.   The social history, as described by Ms. Ochoa and

20   as described by Wendi was a social history of sexual

21   pressures.  A social history -- and there were

22   declarations of others, people within the church that saw

23   the sexual pressures that Wendi was subject to from her

24   biological father.  And these included dressing in

25   clothing that perhaps is not only inappropriate for their

1   church, a very fundamentalist Christian church, but

2   certainly may have been inappropriate for anyone at that

3   age, of a very -- someone ten years old to 12 years old,

4   13.   Inappropriate types of touching, soothing.

5        And even before Mr. Ochoa was in her life, there

6   were instances of neglect that were every bit as important

7   as the abuse.   The trauma literature is very clear that

8   neglect can have the same type of impact as trauma.

9        And so we have these stories of Wendi wandering

10  the streets when her mother is working in very, very tough

11  neighborhoods with -- and her mother is working with

12  people that are drug abusers and a very difficult crowd.

13  Wendi is on the streets.   She's three years old.   She's

14  wandering on the streets.

15  Q.   These kinds of traumatic experiences, then, that

16  were a pervasive part of Wendi's life, are these the types

17  of things that could cause a complex PTSD, in your

18  experience?

19  A.   They can cause -- they are the basis for the

20  types of behaviors that derive from complex PTSD.

21  Q.   What do you mean by that?

22  A.   What one sees with PTSD are behaviors like

23  numbing.   Numbing is -- it's just what it sounds.   When we

24  think of being numb, we think of not being able to -- you

25  know, if we get something -- if we get a shot or

1  something, we can't feel it.

2       And that's what happens with complex PTSD.  It

3  happens to some degree with Type 1, but where you really

4  get numbing is when these behaviors occur over and over

5  and over again.  And one of the things that happens with

6  numbing is these behaviors that are so inappropriate, that

7  are so beyond the pale, become normalized.

8    Q.   In addition to -- well, you just talked about the

9  traumas that Wendi suffered in her childhood.  By that, I

10  mean, you know, zero up to age 18.

11   A.   Right.

12   Q.   Is there anything in Wendi's life beyond that?

13  Any traumas or other experiences that could have impacted

14  or exacerbated her complex PTSD?

15   A.   Yes.

16   Q.   What is that?

17   A.   Certainly, the illness of Mr. Andriano.

18   Q.   And how would that affect her?

19   A.   When someone is -- when someone has a history of

20  trauma, it makes them vulnerable to new types of trauma.

21  And when we see the course of Mr. Andriano's medical

22  history, it is a terrifying and extraordinarily sad

23  history, even more so than the idea of someone getting a

24  diagnosis -- a terminal diagnosis and then having to live

25  with that diagnosis.

1    *Q.*   What makes this history -- this medical history

2    for Mr. Andriano more difficult, particularly from the

3    standpoint of having to handle that of somebody who is

4    already dealing with PTSD?

5    *A.*   Wendi and Mr. Andriano were married I believe on

6    January 22nd of 1994.  And within a very short period of

7    time, within months, perhaps -- I think it was four or

8    five months; it may have been a bit longer than that --

9    Mr. Andriano went in for his first surgery.  That surgery

10   only took a small part of the area away.  The pathology

11   reports said that they were in fact benign.  And so we

12   have a young couple that gets a scare, but are able to

13   kind of get through it.  They're trying to get their life

14   together.  They're both trying to work.

15        And then the pain comes back and he's feeling

16   this pain and he's recognizing that something is again

17   going awry, at which point they have the second surgery.

18   And in the second surgery, there's a wider swath that is

19   taken.  This is common in these types of surgery where

20   they try to get as many lymph nodes, as much of that area,

21   that there's a wider swath that's taken.  And, again, the

22   pathology report says that the pathology was benign.

23        And by the time you get to the third surgery,

24   which is what's really called a radical surgery, they take

25   significant parts of his neck.  He has a tracheostomy.

1    For a period of time, he has to have a tube through his

2    tracheostomy.  They have had children, Nicholas and then

3    Ashlee.  They have moved a number of times from the

4    Andriano family home to a condominium to apartments that

5    Wendi had been working at, to The Biltmore, where she

6    can't work -- she can't have an apartment there.  So they

7    get a separate apartment, but the distance in going back

8    and forth becomes problematic.

9         So you see multiple disruptions of their life,

10   and it's this sawtooth pattern that is in my opinion even

11   more difficult to adjust to, even more pressurized than

12   just a trajectory of terminal illness.

13       Q.   Dr. Woods, let's now turn to the effects of

14   complex PTSD.  Somebody who suffers from this, as Wendi

15   did, what is going to be the effect on that person, on

16   Wendi, and how she kind of handles day-to-day life?

17            MR. NICKELS:  And, opposing counsel and Your

18   Honor, as with Dr. Woods -- or with Dr. Hopper, we have a

19   slide after this.

20            THE COURT:  Okay.

21            THE WITNESS:  These are the -- there are multiple

22   effects of complex PTSD, but I felt these were the ones

23   that were most relevant to our description here.

24            First of all, numbing of emotions.  And I've

25   talked about that.  And numbing of emotions, it's

1  surprising to many people because they feel like if a

2  person is involved in this traumatic situation, then, you

3  know, you will always be reactive.  You should always be

4  -- you should always feel it.

5       Yet, when something is chronic, when something is

6  ongoing, the pattern of PTSD, there is this numbing of

7  emotion.  It doesn't mean that the person doesn't feel.

8  It means that in order to fight off the multiple stresses,

9  they cocoon themselves.

10      Q.  BY MR. NICKELS:  What do you mean by your second

11  point there, dysregulation?

12      A.  And I apologize.  I spelled this wrong.  It's

13  D-Y-S instead of D-I-S.  I apologize for that.

14  Dysregulation is one post-traumatic stress loader.  It's

15  really the primary impact of post-traumatic stress

16  disorder.  Dysregulation -- post-traumatic stress disorder

17  throws off one's ability to respond accurately and

18  effectively.  People that have severe traumatic stress,

19  they either overrespond or they underrespond.  And I'm not

20  saying in each and every situation, but certainly in

21  emotional laden situations.  They often just miss the bar.

22      And it's because of the third one:  Their ability

23  to really effectively weigh and deliberate what's going on

24  is impaired, their ability to kind of add up all the

25  figures to determine what's the best course of action.  A

1  part of that is because of what's happened in the brain.

2      Q.    What does happen in the brain?

3      A.    When someone experiences a traumatic event, it's

4  really a shift.  It's really a shift from left brain to

5  right brain.  And this is kind of a gross generalization.

6  But most of us, most times we sit in our left brain.  We

7  sit in kind of that part of the brain that's rational and

8  organized.  The left side of the brain is where we learn

9  how to weigh and deliberate.  That's where we -- where our

10  reading skills are, our math skills, those things that

11  kind of keep us together.

12          The right side of the brain is really more

13  emotion.  It's really the side of the brain that really

14  handles emotions, where people may become impulsive, where

15  it -- because the right side of the brain, it's actually a

16  part of the brain as you look at the big picture.

17          And so the best studies show that when people

18  have been traumatized, and particularly traumatized over

19  time, you see impairments in that right brain, in that

20  right parietal lobe, in that right frontal lobe.  You see

21  impairments in being able to really understand and

22  recognize social situations.  So that's where it would

23  occur.

24      Q.    And the final point, what do you mean by a high

25  co-morbidity with substance abuse?

1    *A.*    So often when we're talking about a
2 neuropsychiatric disorder, it's interesting, we think of
3 one disorder.  A person has schizophrenia or a person has
4 PTSD.  But when you think of going to the doctor, that's
5 not really how it happens.  You may have some allergies.
6 You may have a cough, a flu.  You may have hypertension.
7            And that's really how it is with psychiatric
8 disorders as well.  Psychiatric disorders occur together.
9 And substance abuse, drinking, drug use occur more
10 commonly in people that have post-traumatic stress
11 disorder than in any other psychiatric disorder except for
12 bipolar disorder.
13           So if you have a diagnosis of post-traumatic
14 stress disorder, 65 percent of people that carry a
15 diagnosis of post-traumatic distress disorder, at some
16 time in their life will also meet the criteria for a
17 diagnosis of chemical dependency.  They go hand-in-hand.
18    *Q.*    Let's turn now to the one you just mentioned,
19 bipolar disorder.  What does it mean for someone to have
20 bipolar disorder?
21    *A.*    Bipolar disorder is a genetic or familial
22 disorder as opposed to PTSD, which is really an
23 environmentally-derived disorder, when you stop and think
24 about it.  PTSD occurs because something happens in the
25 environment to you.

1    Bipolar disorder and all mood disorders,
2   including depression, have really been found to be
3   disorders that run in families.  If a mother or a father
4   or a sibling or an aunt or uncle have a mood disorder like
5   depression or like bipolar disorder, it increases one's
6   ability, one's potential of inheriting that disorder four
7   to six times.
8    *Q.*   What are the symptoms of bipolar disorder?
9    *A.*   Well, the bipolar obviously refers to two poles.
10  And the first pole is really depression.  People that have
11  bipolar disorder at some time in their life have to have
12  met the criteria of being depressed, of having feelings of
13  hopelessness, of isolation.  If it's a retarded
14  depression, of sleeping excessive amounts, of feeling
15  almost physically unable to function.
16    But the other pole is a little different.
17  Historically, it was thought that mania, which is the
18  other pole, was grandiosity.  You're up and you're active
19  and you're running around and you think you're the king of
20  England or what have you.  But we now know that that's not
21  correct.
22    That bipolar disorder really reflects more
23  irritability, impaired judgment, impulsivity.  There are
24  what we call neurovegetative signs.  There's problems
25  sleeping.  There may be problems eating as well.

1        So bipolar disorder -- and there may be some
2   grandiosity, but we now recognize that in bipolar
3   disorder, it's much more identified by irritability, by
4   problems sleeping, by impulsivity, by impaired judgment.
5        Q.   What did you see in Wendi either in your direct
6   observations of her or your analysis of the family history
7   that caused you to conclude she suffers from bipolar
8   disorder?
9        A.   Well, the first thing that one looks at is family
10   history.  And we have a biological father that has a
11   history of a mood disorder of depression.  We have a
12   maternal aunt who was diagnosed with bipolar disorder and
13   lived with that psychiatric disorder her entire life, was
14   treated for it, was hospitalized a number of times for
15   bipolar disorder, was treated with a number of medications
16   into her 70's.
17        And we have Ms. Ochoa who gives a history of
18   depression, as well as a history of periods of increased
19   activity, periods of increased spending when you don't
20   have it, that are consistent with periods of -- periods of
21   what we call anxiety, panic attacks that also are
22   consistent with by bipolar disorder.
23        Q.   And what --
24        A.   Excuse me.  And one other that I had mentioned,
25   there are particular types of depression that are also

1  associated with the potential of bipolar disorder.  One of

2  them is a postpartum depression.  People that have --

3  women that have postpartum depression, there's about a

4  20 to 25 percent greater incidence of postpartum

5  depression in women that have bipolar disorder.

6      Q.   What does the research and what do the numbers

7  show as to the odds that somebody will suffer from bipolar

8  disorder when there are others in their family who also

9  suffer from that?

10     A.   The incidence of bipolar disorder in the United

11 States is about 4 percent.  It's a little bit higher

12 internationally.  If you look at the Diagnostic and

13 Statistical Manual, it's about 4 percent.  If you look at

14 the International Classification of Disease, it's about

15 6.7 percent in the general population.

16          If you look, however, at one family member, that

17 pretty much doubles the incidence.  It comes to about to

18 8 percent.  If you have two family members, it goes to

19 about 12 to 14 percent.

20     Q.   So you're saying that if there's no history of

21 bipolar in your family, you've got about a 4 percent

22 chance?

23     A.   That's correct.

24     Q.   It goes up to 8 percent if you have one other

25 family member who suffers from it, and then up to 12 if

1   you have two family members who suffer from it?

2       *A.*   And that includes depression as well as bipolar.

3   It doesn't have to be specific to bipolar.

4       *Q.*   What did you see in Wendi herself in your

5   observations and examination of her that caused you to

6   believe she suffers from bipolar disorder?

7       *A.*   Well, the first thing -- and I didn't -- this

8   wasn't directly in examining Wendi.  But in her history,

9   there was a history of depression.  Wendi, even as a young

10  child, would hide in the closet.  And as she got older

11  while doing missionary work in Mexico, she was in bed for

12  days at a time, and I believe in one period, for a couple

13  of weeks.

14          This early period, usually in adolescence, is

15  what's called a prodromal period, and the prodromal period

16  is a period that is kind of like the -- I think it was

17  kind of like the bubble, bubble, 12 and trouble.  It's a

18  period that comes before the crystallization of the

19  disorder.  It's typically adolescence.  For mood

20  disorders, the first symptom that you see, particularly in

21  women, is depression.  And this is what's been described

22  with Wendi.

23      *Q.*   What about the other pole, the mania side of

24  things, did you see anything -- did you see signs of that?

25      *A.*   The mania was really captured more after her

1   incarceration.  During the time of her incarceration from
2   about 2002 to about 2005, Wendi was actually on a
3   psychiatric unit within the jail setting.  And while on
4   that unit, she was treated with medications that were
5   consistent with a mood disorder, both antidepressants as
6   well as other medications.
7       Q.   Was she ever treated with any medications that
8   were specific to bipolar?
9       A.   She was.
10      Q.   What's that?
11      A.   Seroquel.  There are really only two indications
12  to Seroquel.  Seroquel is what is described as an atypical
13  antipsychotic.  It is a medication that is within a class
14  of antipsychotic medications where the mechanism is
15  poorly -- the physiological mechanism is poorly
16  understood.  And so it's called an atypical antipsychotic,
17  Abilify, Clozaril, there are a number of others.
18          Seroquel initially started out in use with
19  someone who's psychotic, someone that has impaired
20  contact with reality.  Over the last ten years, however,
21  it has been specifically indicated for bipolar depression.
22      Q.   And that's what she was being treated with by the
23  medical professionals through the prison/jail system; is
24  that right?
25      A.   That's correct.  She was initially started on

1    about 50 milligrams, which is a relatively small dose of

2    Seroquel, which increased over time to about

3    200 milligrams.

4            Now if we look at Wendi's -- excuse me.  But if

5    we look at Wendi's history, you know, in the jail setting,

6    we see that she is initially treated with Trazodone.

7    Trazodone is an antidepressant.  However, it is such an

8    extraordinarily sedating antidepressant, that it is not

9    used for depression.  It's actually used for sleep.

10           And so she was initially treated with an

11   antidepressant, but you can't really say that a mood

12   disorder was being treated because they were trying to

13   help her sleep.

14           Secondly, she was treated with Prozac, an

15   antidepressant.  Next, she was treated with Remeron.

16   Remeron is again an antidepressant.  And these were

17   treatments for significant depression.  It was around this

18   time that she had a suicide attempt and they switched her

19   to the Seroquel.

20   *Q.*   Now, Dr. Woods, you're describing symptoms and

21   treatment once Wendi was incarcerated.  Could someone just

22   say, well, of course, she was depressed?  She was in jail

23   facing life in prison and the death penalty.  Anybody

24   would be depressed from that.  Could that be the cause?

25   *A.*   Well, Mr. Nickels, first, of course, someone

1  could say that.  But, first, what we have is a history of

2  depression, symptoms of depression before she was

3  incarcerated.

4          Secondly, the forensic literature, and

5  particularly the literature of Adrian Raine, for example,

6  or even Reed Malloy really looks at the fact of what

7  occurs in those early stages of incarceration is anxiety

8  because in fact they have not been sentenced.  They have

9  not been tried yet.

10         And what we see with Wendi was that they were

11  treating her during this period of time before -- before

12  she came to trial, during the time that she came to trial.

13  And within the medical records, themselves, there are

14  indications that they saw her as fragile, that they were

15  concerned about her ability to handle multiple stresses.

16         I've taken a moment to pull some of the notes --

17  medical records out that I think illustrate these periods,

18  and if I could -- I couldn't commit them to memory.  I'm

19  sorry.  But if I could -- if I could look at those

20  quickly.

21     Q.   Certainly.  Go ahead.

22     A.   On September 30th of 2003, the Maricopa County

23  medical records note that Wendi was, quote, overwhelmed by

24  multiple circumstances.  On 9/30 of 2003 -- and I think

25  this really kind of goes to her cognitive state.  We'll

1    talk more about that.  The increasing stress of

2    incarceration, legal status and toxic environment have

3    combined to erode Wendi's ability to cope.

4           On October 10, 2003, she is good at covering and

5    appears less distressed than she really is.

6           Again, I think that speaks to cognition, and

7    we'll talk about that.

8           On October 17, 2003, Wendi has multiple serious

9    stressors.  Although, she is high functioning, she is too

10   fragile for general population.

11   *Q.*   What does that one mean?  I know we're jumping

12   ahead a little bit to the cognitive issues, but what is

13   that high functioning coupled with fragility?  What does

14   that mean to you?

15   *A.*   Well, I think if you look at Wendi before the --

16   before she married Mr. Andriano and before the terrible

17   events happened to him and his illness, she was well

18   functioning.  She was going to college.  She got good

19   grades.  She worked.  So I think that you could look at

20   that period as a period where she was not under the

21   stressors.  She wasn't even under the stressors that she

22   had had at home.  She had moved out of her home.  And so

23   she was functioning much more effectively.

24          What this describes and what we've seen in the

25   neuropsychological testing is an erosion of skills as one

1    starts to see Wendi in more complex and more emotional

2    situations.  That as she walks down into complexity or

3    what we call affectively laden, emotionally laden

4    circumstances, she starts to fall apart.

5        Q.    I understand we have some video clips from

6    when -- as you understand, the State has an expert,

7    Dr. Pitt, and the counterpart to you, who interviewed

8    Wendi this past fall.  Is that consistent with your

9    understanding?

10       A.    Yes.

11       Q.    And we have some clips from that interview that I

12   understand demonstrate some of the behaviors or issues

13   that we're talking about now; is that right?

14       A.    That's my opinion, yes.

15            THE COURT:  No objection?

16            MR. HAZARD:  No, as long as the record is

17   supplemented at some point before the close of these

18   proceedings exactly which clips and where they are.

19            MR. NICKELS:  Yes.  We can do the same thing with

20   Dr. Woods like we did with Dr. Hopper, which is tell them

21   exactly where it is in the transcript.

22            THE COURT:  Can we do that?

23            MR. HAZARD:  Yes.

24            THE COURT:  This is with the understanding that

25   the court reporter will not be taking down what's being

1   said on the video; is that correct?

2          MR. NICKELS:  That's correct.

3          THE COURT:  Okay.

4          MR. NICKELS:  Before we hit play, we're just

5   going to make sure the speakers are properly hooked up.

6          (WHEREUPON, the video was played.)

7       *Q.*   BY MR. NICKELS:  So what did we see there,

8   Dr. Woods?

9       *A.*   We saw Wendi describing symptoms of mania,

10  difficulty sleeping, bursts of energy that really were not

11  tied to any particular activity.

12         The last question about sexuality is an important

13  question because what you see in at least the National

14  Institute of Mental Health describes impulsivity and

15  sexual impulsivity as being one of the key symptoms that

16  one sees in bipolar disorder.

17         MR. NICKELS:  Okay.  Let's go to the next video.

18         (WHEREUPON, the video was played.)

19      *Q.*   BY MR. NICKELS:  What did we see there,

20  Dr. Woods?

21      *A.*   What we saw there was a description of the sleep

22  disruption that occurs with post-traumatic distress

23  disorder.  One of the symptoms that is common in

24  post-traumatic distress disorder, and really in all

25  psychiatric disorders, are disruptions of sleep.

1    And in the late 90's, I ran a sleep disorder
2    program in Northern California.  And what you really are
3    seeing here are a -- dreams occur -- and I'll do this very
4    quickly.

5    Q.   Take your time.

6    A.   Dreams occur early in the morning right before
7    you wake up.  It's called rapid eye movement, or REM
8    sleep, and it's the period of time that you -- that most
9    people dream.  You have small pieces of that earlier in
10   the evening and it gets fine, it gives up.

11   Disorders of stress or disorders of anxiety
12   disrupt your sleep architecture.  And so it makes it more
13   difficult both to fall asleep, and by making it more
14   difficult to fall asleep, the normal stages of sleep are
15   disrupted.

16   But what you're hearing here are really pretty
17   classic symptoms of post-traumatic distress disorder,
18   which for years was defined as anxiety disorder.  Now it's
19   become a separate category of a stress disorder in
20   DSM-5, but for years, it was defined as an anxiety
21   disorder because it has symptoms that are very consistent
22   with anxiety.

23   The important part of this is that when you're
24   trying to make a diagnosis, particularly in a forensic
25   setting, you want to hear both classic symptoms, but you

1   also want to hear the small cues.  You want to hear these

2   little things that people say that they couldn't have read

3   in a book about post-traumatic stress disorder.  And,

4   certainly, the type of disruption in sleep is not

5   something that you're going to get in a Today or, you

6   know, the Wall Street Journal.  So there are these little

7   clues that really tell you she's accurately describing a

8   sleep disorder.

9          MR. NICKELS:  Okay.  I understand we have one

10  more video in this segment.

11         (WHEREUPON, the video was played.)

12     *Q.*   BY MR. NICKELS:  What do we have in that video,

13  Dr. Woods?

14     *A.*   We have -- and I'm sorry.  I should have said

15  something while the video was going.  But, at one point,

16  Mr. Nickels, perhaps you heard her talk about her mind is

17  racing.  Racing thoughts is a term of art in looking at

18  mood disorders.  Racing thoughts are a type of thinking

19  that occurs in bipolar disorder that is not really

20  consistent with any other type of psychiatric disorder.

21  It's the shift that your thoughts are going so fast that

22  you just aren't able to hold onto them.

23         And it's ironic, because within the Maricopa

24  County medical records -- and this is what really made me

25  understand that the treatment with Seroquel was for

1   symptoms of a mood disorder.  I'm not sure that they ever

2   used the diagnosis of bipolar disorder.  But they talk on

3   November 25th, 2003:  Thoughts are mildly racing.

4       Q.   That's from the Maricopa County medical records?

5       A.   That's correct.

6       Q.   Okay.  So they're using the same terminology of

7   what we saw from Wendi on the video?

8       A.   That's exactly right.  These are the progress

9   notes from Maricopa County:  Thoughts are mildly racing.

10  That really describes a specific constellation of symptoms

11  that is just not found.  You don't have racing thoughts in

12  schizophrenia.  You don't have racing thoughts in

13  depression.  You don't have racing thoughts even in PTSD.

14      Q.   Now let's turn to -- you've described the reasons

15  you believe Wendi suffers from bipolar disorder.  Let's

16  turn to the effects.

17      A.   Sure.

18      Q.   What happens to somebody?  What is the effect on

19  someone of this disorder?

20      A.   The first one up there is really the -- it's the

21  big one, and that is impaired judgment.  People that have

22  bipolar disorder have significantly impaired judgment.

23  These are people -- and it can occur on either pole.  It

24  can occur with people that are depressed.  It can occur

25  with people that are manic.  Their ability to effectively

1   weigh and deliberate, think their way through a problem,

2   is significantly impaired.

3       *Q.*   What do you mean by unusual and flagrant

4   behavior?  Is that sort of the result of this impaired

5   judgment?

6       *A.*   Umm, that's a good question.  Is a result of an

7   impaired judgment?  It is, yes.  It's a factor, though,

8   not only of the impaired judgment, but of -- and I don't

9   have this here -- their loss of understanding of social

10  boundaries, their ability to under context.  They may be

11  very intrusive.  They may have been involved in sexual

12  activity or other types of behavior.

13          I once had a patient that sold her two million

14  dollar house for 50 bucks because she had enough money,

15  she thought.  So you get this just amazingly impulsive,

16  flagrant and behavior that's unusual outside of the

17  confines of their disorder.

18          If this person is what we call euthymic, which

19  means they are kind of at their baseline, they're not

20  really that elevated, they're not depressed, you know,

21  they do very, very well.  We know that some of our

22  greatest writers and other people have had bipolar

23  disorder.

24          But if they move into that mania, we see

25  impulsivity, impaired judgment, real inability to

1  effectively weigh and deliberate.

2     *Q.*   Then I see again we've got that high co-morbidity

3  that you talked about with PTSD?

4     *A.*   Yes.  Bipolar disorder and PTSD have the greatest

5  relationship to chemical dependency.  People that have

6  bipolar disorder self-medicate.  People that have PTSD

7  self-medicate and they do it to a greater level than any

8  other psychiatric diagnosis.

9     *Q.*   Let's turn now, Dr. Woods, to the third disorder

10 you talked about, which is the cognitive deficits.

11    *A.*   Sure.

12    *Q.*   You mentioned a little bit of that as we've gone

13 through your analysis.  What causes you to conclude that

14 Wendi suffers from cognitive deficits?

15    *A.*   Well, you know, I'm going to say, Mr. Nickels,

16 that, you know, the neuropsychological testing as well as

17 the examination that I performed showed Wendi's ability to

18 read, write, function in those ways to be pretty intact.

19 There were specific areas -- not global impairment, but

20 there were specific areas that she showed erosion of

21 performance.

22    *Q.*   What were those areas?

23    *A.*   The first was memory.  Her memory was impaired.

24 But I need to take a moment to kind of talk about memory,

25 if that's okay.

1    *Q.*   Sure.

2    *A.*   There are multiple types of memory.  There are

3    claritive memory:  What did you eat last night?  There's

4    explicit memory:  What is your telephone number?  There's

5    implicit memory:  Your date of birth.  These are all in

6    different parts of the brain.  And there's memory for

7    verbal things as opposed to memory for written things.

8    These are all in different parts of the brain.

9        So when we talk about memory, I want to be

10   specific.  Her ability to remember baseball scores and

11   that type of thing is probably relatively intact.  Where

12   her memory breaks down are in emotionally laden

13   situations.  And this is primarily verbal memory, being

14   able to hear things accurately, being able to understand

15   them appropriately.  So it's her verbal memory.

16   *Q.*   What about the concept of working memory, the

17   ability to kind of remember in the moment as you're

18   processing information?  How did she do in that area?

19   *A.*   Working memory was one of her weaknesses.  And

20   working memory is the ability to hold several things in

21   mind while doing something else.  You know, we call it

22   multitasking.  But it's the ability to hold things in your

23   mind, to know I've got my pen here and I've got to write

24   and I've got to answer your question and I need to think

25   about the paperwork here.  Am I thirsty?  I need to pick

1  up the water.  Don't drink too much water or I'll have to

2  go to the bathroom.  You know, all of these things you

3  keep in your mind.

4        What happens in working memory -- in Wendi's

5  working memory is that in tasks that are not complex or

6  that -- and that don't have significantly emotional

7  valence, she can do pretty well.

8        As the task decreases -- or increases in

9  complexity or stress, her ability to remember and to

10  function falls apart.  And so what you see with Wendi,

11  it's a pattern that you really see in her other cognitive

12  impairments.  If you look at them superficially, they're

13  intact.  If you start to walk through them and see her

14  presented with more complex tasks, you know, multiple

15  things to do, multiple emotions, her ability to remember,

16  to hold that in her working memory, it becomes less and

17  less effective.

18    Q.   What in addition to working memory was the

19  problem for Wendi on these neuropsyche tests?

20    A.   Processing speed.  Processing speed is the speed

21  by which you pick things up, the speed by which you are

22  able to line your ducks up.  How long does it take you.

23  So if someone is giving you instructions and you're

24  processing speed is too slow, you may not be able to

25  capture all of the instructions.  Hold that thought.  Can

1  you say that again?  I didn't quite -- I didn't quite

2  catch that.

3          So it's your processing speed that, again, is

4  captured or captive to -- at least with Wendi, it's

5  captive to the complexity of the event and the emotional

6  valence of the event.

7          If it's something simple like what we call trails

8  making where there's only one or two things that you have

9  to do, she is able to do that pretty well, but on tests

10 that required more complexity of thought where you had to

11 have whole things in mind, she did less successfully on

12 those.

13     *Q.*   And any other areas of weakness in the

14 neuropsyche testing?

15     *A.*   Well, those were the important areas in the

16 testing.  The quality of testing is only as good as what

17 we've called ethological validity.  And that means:  How

18 does this work on the streets?  You know, how does this

19 translate to her ability to function on the streets?

20     *Q.*   Before you do that, was there any testing of

21 executive functioning in the neuropsyche testing?

22     *A.*   Yes.

23     *Q.*   How did Wendi do in that area?

24     *A.*   She -- may I just quickly just kind of describe

25 what executive functioning is?  Dr. Hopper may have talked

1  about that.

2      *Q.*   Of course.

3      *A.*   Executive functioning is the ability to

4  effectively weight and deliberate; to effectively sequence

5  your behavior and your motor behavior as well as thinking;

6  to effectively understand the big picture; to get the

7  gestalt of the situation; to effectively inhibit unwanted

8  behavior and to recognize and respond appropriately to

9  social cues.

10         And there are three periods within life that you

11  see executive functioning:  From zero to two; from

12  approximately seven to nine; and usually after about 16 up

13  to 25 is when you see the development of executive

14  functioning.

15     *Q.*   And how did Wendi do in that portion of the

16  testing?

17     *A.*   Mr. Nickels, she did the same as she did in terms

18  of working memory and processing speed.  When the tasks

19  were rather straightforward and simplistic, she did okay.

20  When the tasks involved decision making and decision

21  making in complex circumstances, she did less

22  successfully.

23     *Q.*   Now, in addition to the neuropsyche testing, you

24  mentioned -- you were reading actually some of the medical

25  records before that had observations from previous medical

1  professionals that you believe show deficits in the

2  cognitive areas?  Do you remember that?

3      *A.*   Yes.

4      *Q.*   Why don't you go back to that and tell us what's

5  in there that also supports this conclusion of yours?

6      *A.*   Sure.  I think the ones that were particularly

7  meaningful to me was -- I'll start with one that actually

8  I didn't read, if you don't mind.

9         November 6, 2003, this is a progress note.  It

10  states:  Her fragility and affective mood warrant

11  continued housing in Durango.

12         Her fragility -- and this is a term that, as I

13  look at the ones that I've pulled out, is used at least

14  two or three times.

15      *Q.*   Fragility?

16      *A.*   Fragility.  Fragile.  Fragility.  So they're

17  saying that her appearance is not as though she's falling

18  apart, but she's fragile.  It's not as though she's

19  presenting at that moment as someone that just that can't

20  handle it, but that she's fragile, and that that and her

21  mood warrant continued stay in the psychiatric unit.

22         Her stay within the psychiatric unit for this

23  period of time -- and I may be wrong about this, but I

24  believe it was about three years -- was relatively

25  unprecedented in Maricopa County.

1    *Q.*   Anything else in those prior medical records that
2    you found to be significant from the standpoint of
3    illustrating a cognitive deficit in Wendi?

4    *A.*   Yes.   The September 30 of 2003 medical record
5    progress note says -- and I've read this one -- increasing
6    stress of incarceration, legal status and toxic
7    environment have combined to erode Wendi's ability to
8    cope.

9         And that really captures what we saw in her
10   neuropsychological testing is that if you've only got one
11   stress, Wendi can handle it pretty well.   If you have
12   multiple stressors at the same time, her ability to
13   function effectively is eroded.

14        10/10/2003, they note -- and I mentioned this
15   before -- she is good at covering and appears less
16   distressed than she really is.

17        Again, this is what we see in the cognitive
18   testing.

19        MR. NICKELS:  Now we have a video for this as
20   well.   And before we turn to that, Your Honor --

21        THE COURT:  Is this a good time to take a lunch
22   break before we go to the video?  Or do you want to play
23   the video first?

24        MR. NICKELS:  Well, it's a three and-a-half
25   minute video.   And then we have the wrap-up with effects.

1   I think we can hit it right at the 12:00 o'clock mark.

2       THE COURT:  Okay.  That's fine.  Let's go ahead.

3       MR. NICKELS:  Okay.

4       (WHEREUPON, the video was played.)

5   *Q.*  BY MR. NICKELS:  So, Dr. Woods, what did we see

6   in that video?

7   *A.*  I think what the video illustrates to me was

8   exactly what we're talking about here.  And, that is, the

9   erosion of decision making, the making of bad decisions.

10  Not a lack of awareness, but rather multiple factors that

11  led to terrible decisions and terrible decision making.

12  *Q.*  Well, let's then wrap up this section by talking

13  about what the effects are.  You've already alluded to

14  this throughout, but to summarize for the Court, when

15  somebody suffers from these cognitive deficits, what

16  effect is that going to have on them?

17  *A.*  Cognitive deficits are at their worst in moments

18  of new, novel and stressful circumstances.  If what we're

19  doing is relatively straightforward and relatively

20  simplistic, people can function very, very well.

21      Cognitive deficits also are not as obvious on a

22  day-to-day basis unless someone is significantly -- this

23  is why we have such difficulty with people that are mildly

24  mentally retarded because there's nothing that identifies

25  them.  They can work from day-to-day and do extremely

1   well.  But when strain is put on with someone that has the
2   type of cognitive impairments that Wendi has, the first
3   thing you see is that inability to martial up the forces.
4        *Q.*   What do you mean by that?
5        *A.*   Most of us have a level of resiliency.  That
6   resiliency is created from our past experiences.  Our
7   parents taught us how to cope with things.  They gave us
8   directions.  When we overresponded, they let us know.
9   When we underresponded, they made us get up there and do
10  it.
11        When you don't have that resiliency, either
12  because of the psychiatric disorders that you have or the
13  cognitive impairments that you have, you're unable to
14  martial up the forces when they're needed.  You're unable
15  to kind of pull out the things that are needed to make you
16  win the day.  And that leads to a real failure to
17  recognizance social circumstances.
18        *Q.*   What do you mean by that?  You actually alluded
19  to that in some of your earlier testimony.
20        *A.*   Bipolar disorder, particularly cognitive
21  deficits -- and this is where the co-morbidity becomes
22  really intertwined.  It's synergistic.
23        Bipolar disorder is by definition a disorder of
24  impaired judgment.  It's by definition a disorder where
25  you do things that you just wouldn't do if you weren't

1    experiencing and suffering from these symptoms at that

2    time.

3            Cognitive defects are very similar, in that, you,

4    when under stress, can't martial up the forces.  You can't

5    understand, well, wait a minute, this is not the -- this

6    is not the place to do this.  This is not the time to do

7    this particular thing.  And so it's truly a

8    misunderstanding of social circumstances, doing things in

9    a situation in a place and environment where you would

10   never do that or have that kind of behavior core.

11       Q.   And, finally, I see once again we're seeing

12   inability to effectively weigh and deliberate?

13       A.   Yes.

14       Q.   And after the lunch break, we'll talk a little

15   bit more about sort of the overlap of some of these

16   symptoms and how that -- what kind of cumulative effect

17   that has.

18       A.   Sure.

19            MR. NICKELS:  So, Your Honor, we're actually done

20   with that section.  I'm sorry.  We ran four minutes over

21   the 12:00 o'clock hour.

22            THE COURT:  We'll go ahead and take our lunch

23   recess now.  We'll be in recess.  Have a nice lunch,

24   everyone.

25            (WHEREUPON, a recess ensued from 12:03 p.m. to

1  1:29 p.m.)

2          THE COURT:  Good afternoon.  This is

3  CR 2000-096032, State of Arizona vs. Wendi Elizabeth

4  Andriano.

5          The record will reflect the presence of the

6  parties and counsel.

7          Is there anything we need to discuss with regard

8  to scheduling and Mr. Miller?

9          MS. GARD:  Your Honor, I spoke to Mr. Miller over

10  the lunch break.  He had met with Mr. Ochoa.  I think

11  telephonically, he had spoken to him, but he was meeting

12  with him again tomorrow.  So he was going to contact me

13  tomorrow after that.  And I suppose we can try to fit him

14  in next week sometime.

15          I notified counsel today we were no longer

16  calling Shawn King.  So we can remove him from the witness

17  list.  He was scheduled on the 13th.

18          THE COURT:  Okay.

19          MR. ARNTSEN:  Then, Your Honor, we mentioned it

20  this morning, but, I mean, really we're in the good

21  position of being basically ahead of schedule.

22          THE COURT:  Right.

23          MR. ARNTSEN:  And, tomorrow, again, Mr. MacLeod,

24  the mitigation specialist, we had him coming up early, but

25  he can come tomorrow but not until the afternoon.

1          THE COURT:  Okay.

2          MR. ARNTSEN:  So, tomorrow, depending on when

3   Dr. Woods is done, we may have an open morning.

4          THE COURT:  Okay.

5          MR. ARNTSEN:  And then tomorrow afternoon would

6   be Mr. MacLeod and then Keith Rohman, the mitigation

7   expert.  And then Friday is Dan Patterson.  He's the only

8   witness here, but then we're a day ahead, basically.

9          THE COURT:  Okay.  That sounds good.  Thank you.

10   I appreciate counsels' efforts.

11          MR. ARNTSEN:  And I apologize for the gaps, but

12   they're kind of good gaps.

13          THE COURT:  Okay.  Thank you.

14          The record will reflect that Dr. George Woods is

15   on the witness stand.

16          You're still under oath, Dr. Woods.  We'll

17   continue with the direct examination by Mr. Nickels.

18          Mr. Nickels.

19          MR. NICKELS:  Thank you, Your Honor.

20     Q.   BY MR. NICKELS:  Dr. Woods, when we broke for

21   lunch, we were just turning to the fourth diagnosis that

22   is contained in your opinions, and that's dependent

23   personality disorder; is that right?

24     A.   Yes.

25     Q.   What is dependent personality disorder?

1    *A.*    Personality disorders are, oh, a pervasive way of
2    being in the world that causes you conflict with others
3    and often interpersonal conflict as well.

4    *Q.*    And what does it -- what you just described as
5    personality disorders, in general, what does it mean to
6    have a dependent personality disorder?

7    *A.*    Someone that has a dependent personality disorder
8    has dependency needs that are pathological.  Their need to
9    care for others, to some degree their need to be cared
10   for, but certainly their need to care for others is
11   difficult to satisfy.

12   *Q.*    And tell us what you mean by that.  So with a
13   dependency, they depend on caring for others, but that
14   becomes difficult to satisfy.  What does that mean?

15   *A.*    What happens in dependent personalities is that
16   they are just not able to provide the care that someone
17   else might need.  They are unable to provide the quality
18   of care.  It's really a dichotomy because, on the one
19   hand, they are acquiescent really to the other person.  On
20   the other hand, there's a certain loss of self of who they
21   are and how they react and how they live in the world in
22   that acquiescence.  That really leads to inner turmoil of
23   their own.

24   *Q.*    Does somebody with dependent personality disorder
25   -- what do they do to meet their own needs?

1    *A.*    Unfortunately, they often ignore their own needs

2    until a critical moment, a moment in which they can't

3    continue to fulfill this other person's needs, and the

4    person may draw away from them, or the needs may become

5    overwhelming, and no one could in fact perform that

6    Herculean task.  So it's at that point that you often see

7    dependent personalities really fall apart.

8    *Q.*    What did you see in Wendi that caused you to

9    conclude that she suffers from a dependent personality

10    disorder?

11    *A.*    Mr. Nickels, it's really Wendi's history.  Wendi

12    was groomed, so to speak, to be dependent.  She was

13    groomed by her adopted father to take care of his soothing

14    and his -- at least some sexualized needs.  She was

15    groomed by the cult that she actually grew up in to adhere

16    to the religious tenets and the corporal tenets.  You

17    could be corporally punished, spanked for looking the

18    wrong way, for acting the wrong way.  And so this grooming

19    started very, very early and continued with the neglect

20    that you saw within the family.

21        Wendi has been seen as and describes herself as

22    the peacemaker in the family, the one that would intervene

23    between Mr. and Mrs. Ochoa to keep the yelling and

24    screaming and anger under control.  And certainly in

25    Ms. Ochoa's declaration, she describes handing off many of

1   the responsibilities of her relationship with her husband

2   to Wendi.

3        *Q.*   So is it fair to say that the dependency you're

4   describing is that it becomes -- you become dependent on

5   your need to always be serving others, fulfilling others'

6   needs as opposed to your own?

7        *A.*   Yes.

8        *Q.*   Now I understand there is a term normalization

9   that relates to this phenomena you're describing.  What

10  does that mean?

11       *A.*   Normalization is when the abnormal experiences

12  that you are having suddenly -- not suddenly because

13  that's not true -- over time occurs so frequently and you

14  make these adjustments to them, and so you begin to see

15  these as normal.  So you normalize by, you normalize this

16  sexualizing behavior of your adopted father.  You

17  normalize, and when placed in other situations where that

18  type of violence or anger or aggression occurs, you don't

19  overrespond to it.  You see it as just normal.

20       *Q.*   And this dependency that you describe that you

21  said she was groomed for as a child, did you see it play

22  out in her relationship with Joe Andriano?

23       *A.*   Yes.

24       *Q.*   How?

25       *A.*   Early in her relationship with Mr. Andriano, she

1    describes him moving in.  She says he needed a place to

2    stay.  When she talks with Dr. Pitt and myself, she also

3    says there was no sex for several months during that.  So

4    it wasn't as though he moved in and immediately

5    established this sexual relationship both because she saw

6    this relationship as potentially being something special

7    because she was struggling with her own religious beliefs.

8    But even during that time, she started to move away from

9    her friends, move away from her family.

10          One of the stories that I think really is telling

11   in terms of dependency is a story of I believe it was a

12   cousin who was to be best man at the wedding, but there

13   was some tension between this person.  It may have been

14   her best friend.  There was some tension between her and

15   Mr. Andriano.  And over time, she decided not to ask this

16   person to be her maid of honor at the wedding.

17          So you see some things that many people do in

18   relationships, maybe change their hair or change their

19   style of dress over time.  But with Wendi it was even --

20   it was even more than that.  It was kind of a loss of

21   self.

22   Q.    So when we look at it, what you describe is Wendi

23   has sort of this need to please?

24   A.    Yes.

25   Q.    How, if at all, could that impact -- you know,

1  she's met with and was interviewed by a number of experts,

2  you, Dr. Hopper, the State's experts.

3       But could this need to please cause her to just

4  say whatever she thinks that the expert wants to hear at

5  the time, and, therefore, leads to unreliable data,

6  answers, observations?

7       A.   Certainly her need to please -- and even in the

8  tape here that you see with Dr. Pitt, she says:  Tell me

9  what you want -- what you're trying to get from me.  I'll

10  try to answer that.

11       That reflects a couple of things.  It really

12  reflects this kind of inability to broaden your own

13  perspective and kind of think of multiple areas.  We

14  already know that that's a problem in terms of working

15  memory.

16       But what we've seen over time is we've got

17  numbers of instruments in the neuropsychological testing.

18  For example, there are instruments of effort.  There are

19  embedded instruments.  There are what we call embedded

20  instruments within the testing itself that speaks to her

21  effort.

22       We have history that Wendi cannot create.  She

23  can't create the history of her aunt who was diagnosed

24  with bipolar disorder and treated with Lithium and

25  Tegretol and these medications over the course of her

1  life.

2       She cannot create the Seroquel that was given to

3  her over a period of time.  These are issues that really

4  speak both against her being able to manipulate that

5  particular system as well as issues of malingering.

6       Q.   We will get back to that malingering issue in a

7  bit, but first we have a couple of videos.

8       A.   Sure.

9       Q.   Again, this is from Dr. Pitt's interview just

10 this last November.

11      A.   Sure.

12           (WHEREUPON, an off-the-record discussion ensued.)

13           (WHEREUPON, the video was played.)

14      Q.   BY MR. NICKELS:  Dr. Woods, what did we see in

15 that video?

16      A.   We see acquiescence.  And I think when we talk

17 about sexuality, we see acquiescence in her affairs as

18 well.  So we see this, yes.

19      Q.   Tell us what you -- you're talking about what she

20 was describing there was sex with her husband?

21      A.   Right.

22      Q.   Right?

23      A.   Yes.

24      Q.   You're saying there was acquiescence there?

25      A.   Yes.

1     *Q.*   You mentioned in the affairs.  What did you mean
2  by that?
3     *A.*   Well, when you -- when I talked with her, when
4  Dr. Pitt talked with her, and the question came up:  Why
5  did you have sex?  Well, it's something I thought you
6  should do.  It's something I thought that he wanted.  And
7  that was pretty consistently her response, even at times
8  when that was within a very impulsive response.  So you
9  see this acquiescence that is really the danger of
10 dependent personality disorder.
11          MR. NICKELS:  We have one more video.
12          (WHEREUPON, the video was played.)
13    *Q.*   BY MR. NICKELS:  What did that show us?
14    *A.*   It showed us Wendi thinking back on those things
15 that she felt she didn't have a backbone, the ability to
16 make good decisions for herself and for her family.
17          It's important to note that having a dependent
18 personality is not the same as being a milquetoast.  It's
19 not the same as just kind of going away and, oh, okay,
20 you've done this to me again or I put myself in this
21 position again.  So I'm just going away, when that may be
22 -- that may be what someone that is involved in a
23 relationship that maybe -- they're maybe getting dominated
24 or they're not comfortable in the relationship.  They see
25 it's not working.  They may just say, you know, I'm

1   cutting my loss.  I'm getting out of here.

2           But you have to keep in mind that personality

3   disorders are by definition pathological, and when

4   dependent personalities are not able to make that, the

5   response is often one of anger, one of explosive

6   responses.  It's not one of just, okay, I'm just going to

7   go away.  It doesn't -- it doesn't work that way.

8       *Q.*   Well, Dr. Woods, that leads into the effects of

9   the dependent personality disorder and what that can do to

10  somebody?

11      *A.*   Right.

12      *Q.*   You just alluded to it, that you could see anger

13  and frustration when it's not working, and, you know,

14  aside to that, the ability to be dependent dissolves.

15  Tell us what you mean by the first part of that sentence,

16  that the ability to be dependent dissolves.

17      *A.*   With dependent personality disorder, the need,

18  the ability to be dependent is ongoing, and people that

19  are involved in relationships with others that have

20  dependent personality disorders, that can be very, very

21  difficult.  It's also very, very difficult for the person

22  that is dependent.  They see their needs not being met,

23  and, yet, that's a way they have learned how to function.

24  They don't know other ways how to function.  Personality

25  disorders are very pervasive.

1    So when we talk about Wendi having a personality
2  disorder, we're not saying that at 21, this just kind of
3  just happened.  We're talking about seeing the abuse and
4  neglect at three and seeing the sexualizing at four or
5  five, six and seven.  All of that daily grooming is the
6  only word that I can really use that leads to that.

7    Q.   And just to be clear, is what you're describing
8  here, the person who has the personality disorder and a
9  dependent personality disorder like Wendi, you're saying
10 that they have a need to fulfill the needs of others?
11 They're going to depend on fulfilling the needs other?

12    A.   Yes.

13    Q.   On this issue of it dissolving or you're no
14 longer going to do it, let's talk about how that played
15 out in Wendi and in her relationship with Joe Andriano.
16 How did that ability to be dependent and to meet his needs
17 dissolve?

18    A.   Well, I think that it was an unsolvable
19 situation.  The needs that Mr. Andriano had tragically
20 could not have been resolved.  Perhaps earlier if the
21 adrenal tumor had been found at an earlier time, perhaps.
22 But certainly what you saw in this relationship was real
23 needs, not just someone that was demanding, but someone
24 that had real needs who was medically ill, who was in fact
25 grieving themselves and fearful for their own life, and,

1  yet, Wendi could not meet those needs.  It just wasn't
2  possible.
3      *Q.*   And then that as he's -- obviously, she can't
4  cure his cancer, but also can't meet his emotional needs.
5  You're saying that then -- will that have an effect on her
6  because her own need is to fulfill his, and she can't?
7      *A.*   Everything is being thwarted and it's the
8  situation rather than the individual.
9      *Q.*   Let's turn finally to caregiver burden.
10     *A.*   Sure.
11     *Q.*   You said earlier this is not a separate disorder
12  or diagnosis of its own?
13     *A.*   Correct.
14     *Q.*   But it's something -- and I think you refer to it
15  as destabilizer?
16     *A.*   Exactly.
17     *Q.*   Why do you believe Wendi had a caregiver burden
18  and what effect did that have on her?
19     *A.*   She had no choice but to have a caregiver burden.
20  She was attempting to care for someone that was dying.  We
21  have to -- I think it may be helpful to understand the
22  context as I -- as I see the caregiver.  There are
23  multiple places in which care needed to be given.
24          From 1994 through 1998, not only was Mr. Andriano
25  increasingly ill with brief moments of respite when he

1   would have surgery, but they had two children.  So by
2   1998, he is increasingly debilitated, increasingly ill,
3   not being able to work, not being able to provide for his
4   family or for himself.

5        They have two very young children.  I believe
6   Nicholas was born in '95 and Ashlee I believe was maybe
7   '94 and '97.  I'm sorry.  I don't know the dates, but,
8   certainly, in that period of time.  They were moving from
9   place to place.  Their home life was unstable.  Their
10  financial life was unstable.  There were times when they
11  had no health insurance.  Mr. and Mrs. Ochoa provided for
12  prenatal care for one of the children because they didn't
13  have health insurance.

14       So that's the context, and within that context,
15  we see Wendi trying to provide for just everyday finances,
16  trying to provide for her children, trying to provide for
17  Mr. Andriano.  And in the end, we see her -- and I mean in
18  the months before, we see her pathologically.  We really
19  start to see these symptoms of mood disorder and PTSD crop
20  up and we see decisions that are significantly different
21  than decisions she's ever made in her life.

22       Q.   And is it your opinion that, you know, this
23  massive burden, financial, child caring, caring for her
24  husband and then just coping with his degrading health,
25  all of which is falling on her, that then exacerbates.

1    You just mentioned the symptoms of the other disorders?

2        *A.*    Right.

3        *Q.*    Does that caregiver burden exacerbate those

4    symptoms?

5        *A.*    That's what -- that's what caregiver burden does.

6    It unravels the strength that one has.

7        *Q.*    Well, Dr. Woods, then let's summarize, and we'll

8    be doing a slide for this.  I want you to talk about --

9    you told us now about these four disorders that Wendi

10   suffered from and the caregiver burden, which is

11   amplified.  You called it a destabilizer.  What is the

12   cumulative effect of all of this?

13       *A.*    Well, the cumulative effect is, first of all,

14   atypical behavior.  Behavior that is beyond the pale.

15   Behavior that is unusual in this person's life.  And when

16   we look at Wendi Andriano's life with Mr. Andriano, Joe

17   Andriano, we see behavior that we've never seen before.

18   That's because you've got multiple disorders that create

19   this synergistic relationship.  You've got bipolar

20   disorder.  You've got impaired judgment.  You've got

21   cognitive deficits that lend themselves to impaired

22   judgment.  You've got dependent personality that can

23   create anger and hostility.  You've got numbing of

24   post-traumatic stress disorder.  All of these interact.

25       *Q.*    Well, and on that point, I was going to ask you,

1  you know, as we went through each disorder, everybody

2  could see there was overlap?

3      *A.*   Yes.

4      *Q.*   For example, inability to weigh and deliberate,

5  impaired decision making.  We've heard these again and

6  again?

7      *A.*   Yes.

8      *Q.*   When you have multiple disorders that cause these

9  same effects, you know, does it sort of even out or do

10 those amplify?  Do they kind of build on each other and

11 amplify and become even worse?

12     *A.*   They amplify on each other.  And that's where you

13 get really more severe behavior.  You know, they really --

14 you can't look at them separately.  You can't look at,

15 okay, well, there's bipolar disorder symptoms, so there's

16 this.  So there's post-traumatic stress disorder, so

17 there's this.  They interact and they interact in ways

18 that create more severe behavior and behavior that frankly

19 you often do not see until you see that kind of co-morbid

20 interaction.

21     *Q.*   Dr. Woods, now for the final segment of your

22 testimony, we're going to spend some time talking about

23 Dr. Pitt's report --

24     *A.*   Yes.

25     *Q.*   -- and the opinions he provided.  Did you have a

1   chance to read Dr. Pitt's report?

2        *A.*   I did.

3        *Q.*   So you're familiar with it?

4        *A.*   Yes.

5        *Q.*   What I want to start out with is -- well, first

6   off, were there any areas in that report where he agreed

7   with you?

8        *A.*   Well, I think Dr. Pitt noted that, for example,

9   under post-traumatic stress disorder, that if in fact this

10  history that Wendi described to him was accurate, then

11  post-traumatic stress disorder is a diagnosis that should

12  be considered.

13            Dr. Pitt also noted that Wendi had a history -- a

14  family history of mood disorders, and that her

15  descriptions of mood problems were consistent with having

16  a mood disorder.

17       *Q.*   So he acknowledged the family history of mood

18  disorders, that Wendi's own behavior would be consistent

19  with mood disorders, but did he diagnose one?

20       *A.*   No, he did not.

21       *Q.*   Do you know why or what was his explanation?

22       *A.*   Well, it was just his belief that her symptom

23  complex did not meet the criteria for a bipolar disorder

24  or a major depressive disorder.  I did not see Dr. Pitt's

25  analysis, for example, of the medication treatment.

1    *Q.*   That's just -- as far as you know, that wasn't in

2    there or you didn't see it?

3    *A.*   I don't -- I don't recall that.

4    *Q.*   Okay.  And then you also say that he acknowledged

5    that PTSD would be an appropriate diagnosis if the social

6    history that has been described is accurate?

7    *A.*   Yes.

8    *Q.*   Now I understand that he did offer a couple of

9    opinions that certainly are different than yours.  One of

10   them is this issue of malingering?

11   *A.*   Yes.

12   *Q.*   What is your understanding of what he meant by

13   that?

14   *A.*   Malingering is not a diagnosis.  Malingering is

15   the absence of a diagnosis.  Malingering is the expression

16   of symptoms or exaggeration of symptoms for secondary

17   gain.

18   *Q.*   Is that a scientific way of saying she's faking

19   it?

20   *A.*   Yeah.  The area of inaccurate reporting is

21   actually called dissimulation.  You can fake it two ways.

22   You can fake it either you can minimize symptoms or you

23   can maximize symptoms.  Malingering is when you maximize

24   symptoms.

25   *Q.*   Do you believe Wendi is malingering?

1    *A.*    No, I don't.

2    *Q.*    Why not?

3    *A.*    Well, I think there are a number of factors.

4    No. 1, there is a family history that Wendi could not have

5    malingered.  There is a family history of mood disorders

6    with her dad, her biological father.  There's a family

7    history of bipolar disorder in her maternal aunt and one

8    other cousin.  Her mother gives a very solid history of

9    postpartum depression.  So that is impossible to

10   malinger -- for Wendi to malinger.

11       We also see the ongoing history of sexualization

12   and inappropriate behavior that has been -- there have

13   been a number of people that have talked about Mr. Ochoa's

14   behavior, including not only family members, but also

15   members of the church, other friends of Wendi's who had

16   the opportunity to visit her at her home at one time or

17   another.

18       The third part is that there are times when it

19   would have been to her advantage to say that something had

20   happened.  It was certainly to her advantage to say

21   potentially that my father had sexualized behavior with me

22   or that he had taken me to take these really inappropriate

23   photographs.

24   *Q.*    And here, or let's face it, for all of this sort

25   of the worst stuff, she's saying she doesn't remember any

1  of it; right?

2      *A.*    Certainly in those instances, that's correct.

3      *Q.*    What about this issue of an adjustment disorder.

4  That is another -- that's something else that Dr. Pitt

5  talks about.  What is your understanding of that?

6      *A.*    An adjustment disorder is most commonly -- it's

7  an interesting diagnosis.  It's most commonly an

8  adjustment to a known stressor, but that it's -- and your

9  adjustment is greater than would be expected from that

10  stressor, and that adjustment can be either in mood or in

11  behavior.

12          And so, typically, adjustment disorders are

13  time-limited, six months.  You can't have chronic

14  adjustment disorder.  But, typically, they're

15  time-limited.

16      *Q.*    What does Dr. Pitt say with regards to Wendi and

17  adjustment disorders?

18      *A.*    It's his belief that she experienced an

19  adjustment disorder during the period of the end and

20  during the offense and during the period of with

21  Mr. Andriano when she was under such tremendous pressures.

22      *Q.*    Is he saying that she was just kind of

23  overreacting while it was happening?

24      *A.*    Well, an adjustment disorder is a diagnosis.  So

25  it's not necessarily just, you know, I'm having a bad hair

1  day.  It's a serious diagnostic.  Does it capture

2  everything that was going on at that time?  No.  Why?  I'm

3  sorry.  Now I'm asking myself questions.

4      *Q.*   Well, let me ask you this:  Do you agree with

5  this opinion that she had an adjustment disorder?

6      *A.*   No, I would have to disagree with that.

7      *Q.*   Why would you disagree?

8      *A.*   Umm, well, first of all, adjustment disorders are

9  by definition time-limited.  They can become chronic, but

10  that's very rare.

11      If we look at the first months of Wendi being

12  treated under the Durango facility, the psychiatrists note

13  that it was their belief that her depression has been

14  going on for at least a year.  So this is really longer

15  than what we would normally look at when we talk about

16  adjustment disorders.

17      The other piece, of course, is that we see

18  adjustment disorders typically coming under control over

19  time and coming back to a homeostatic basis.

20      And that's not really true.  That's not what

21  happened with Wendi.  What really you saw were a number of

22  different medications being used to treat her depression

23  and eventually them moving to on drugs that are

24  specifically for bipolar depression and her being on those

25  off and on for about three years.  So we don't have the

1   resolution that one gets when you just have an adjustment

2   disorder.

3        *Q.*   Dr. Pitt also, then, he has a section of his

4   report where he cites several of Wendi's actions leading

5   up to and on the night of the offense that he claims shows

6   she was thinking clearly, knew what she was doing, and was

7   not in fact being affected by a mood disorder or other

8   deficits.

9        Are you familiar with that part of his analysis?

10       *A.*   Yes, a series of bullet points.

11       *Q.*   Yes.  And to kind of summarize them, he's talking

12  about, you know, sort of these allegations of insurance

13  fraud, the steps that were taken to procure the

14  sodium azide, things like that, and then the things that

15  happened the night of the offense, that staging of this

16  crime scene, telling lies.  He said those facts show, no,

17  she knew what she was doing.  This wasn't some disorder.

18  You're familiar with that?

19       *A.*   Yes.

20       *Q.*   How do you explain those actions?  That kind of

21  series of facts, how do you explain that?

22       *A.*   The symptoms that we described of bipolar

23  disorder, post-traumatic stress disorder, her cognitive

24  impairments were at their greatest and she was at her most

25  vulnerable, as anyone would be facing this situation.

1          We have to look at the situation.  This is a
2    terrible situation that she's facing.  This is a terrible
3    situation that Mr. Andriano is facing.  He is dying.  And
4    during this period of time, it wasn't just this smooth
5    situation where he's diagnosed, you go through the various
6    steps, he gets a chance to grieve, she gets a chance to
7    grieve.  The children are really too young to know what's
8    going on.

9          It was this sawtooth pattern of him being
10   diagnosed and a little bit gets taken away and he's okay,
11   and as a family, they're better.  And then it happens
12   again and they say this one is also benign, and a little
13   bit more gets taken out.  And they try to be a family
14   again.  And then it comes back again and it comes back and
15   it's in his lungs and he's facing a terrible death.
16   That's the context.

17         Within that, we see the symptoms of Wendi's
18   bipolar disorder, the impulsivity.  We see the numbing.
19   We see the incredibly bad decisions both personal and
20   professional.  There's no question about that.  But
21   they're within that time period.  They're not -- this is
22   not the Wendi that was before the marriage of Joe and
23   Wendi Andriano.  They are within that context, and you
24   can't separate them from that context.

25         Q.   When you said earlier, Dr. Woods, that -- you

1    discussed this context of the caregiver burden triggering

2    or exacerbating the symptoms?

3    *A.*    Right.

4    *Q.*    Were they at their greatest as this ordeal went

5    on?

6    *A.*    They were clearly at their most severe.  We see

7    the impulsivity of bipolar disorder.  We see the numbing

8    of post-traumatic stress disorder.  We see the inability

9    to effectively weigh and deliberate in the decision

10   making, her cognitive impairments.  It's really all there.

11   *Q.*    In your professional opinion, Dr. Woods, were

12   Wendi's multiple disorders and deficits present and, in

13   fact, heightened at the time leading up to Joe Andriano's

14   death?

15   *A.*    Yes.

16   *Q.*    And, in fact, do they actually explain Wendi's

17   behavior leading up to and including the night of the

18   offense?

19   *A.*    In my professional opinion, yes.

20         MR. NICKELS:  We have no further questions,

21   Your Honor.

22         THE COURT:  Is it going to be Mr. Hazard?

23         MR. HAZARD:  Yes, Your Honor.

24         (WHEREUPON, an off-the-record discussion ensued.)

25         MR. HAZARD:  May I approach the witness,

1    Your Honor?

2            THE COURT:  Yes.

3

4                    CROSS-EXAMINATION

5    BY MR. HAZARD:

6        Q.   Dr. Woods, I'm handing you Exhibits 185, 181, 49,

7    48, 47, 46, 6 A and 6 C.  And for the sake of time, those

8    are counseling and medical records, psychiatric records

9    for Ms. Andriano that are germane to this case?

10       A.   Yes, sir.

11       Q.   Okay?

12       A.   Yes, sir.

13       Q.   Could you -- and you don't need to review those

14   actual records and it's going off of your report or

15   memory.  Can you show me where there's documented in those

16   records a diagnosis of bipolar disorder?

17       A.   There is not a documented record that I was able

18   to find of bipolar disorder.

19       Q.   And you mentioned that -- is there a number of

20   records, a rich history of records that you frequently

21   don't have in the cases that you have to work up?  And

22   that wasn't the case here?  There's a lot of records to

23   review?

24       A.   Sure.

25       Q.   Is that correct?

1    *A.*    Yes, sir.

2    *Q.*    And one of the primary sources is the fact that

3    Ms. Andriano has been in custody for 13 years now and has

4    had various mental health professionals and treatment and

5    evaluations during that time; is that correct?

6    *A.*    Yes.

7    *Q.*    And records that have been kept?

8    *A.*    That's correct.

9    *Q.*    Now bipolar disorder is a serious disorder,

10   right, and it's generally something that is lifelong;

11   correct?

12   *A.*    It certainly is lifelong, yes.

13   *Q.*    And so, isn't the absence of bipolar disorder

14   being documented telling in this case, because wouldn't

15   you expect to see over the context of Ms. Andriano's life,

16   bipolar disorder diagnoses popping up?

17   *A.*    Not necessarily, no, because 78 percent -- the

18   best epidemiological studies note that 78 percent of

19   people that have suffered psychiatric disorders have never

20   been seen, let alone diagnosed, so --

21   *Q.*    But, Dr. Woods, she has been diagnosed over the

22   years, and things that have come up are things like

23   depression?

24   *A.*    Right.

25   *Q.*    Anxiety-related --

1    *A.*    Right.

2    *Q.*    -- disorders.  And so your testimony is the

3  absence of bipolar disorder as a diagnosis documented does

4  not affect your opinion on this case; correct?

5    *A.*    That's correct.

6    *Q.*    All right.  Diagnoses, whatever -- and Dr. Pitt

7  made his diagnoses?  You made yours?

8    *A.*    Yes.

9    *Q.*    We can disagree on that.  But, in essence,

10  Doctor, isn't a diagnosis just a label to put on that

11  describes symptoms that have manifested themselves?

12    *A.*    Yes.

13    *Q.*    Okay.  And would you agree that symptoms of

14  disorders are different than behavioral choices?

15    *A.*    No.

16    *Q.*    You think they're the same thing?

17    *A.*    It depends upon the symptom.  Symptoms lead to

18  behavioral choices.

19    *Q.*    Okay.  But there's a gap; is there not?

20    *A.*    No.

21    *Q.*    Doesn't a person have to make a decision, a

22  choice, and then act upon it?

23    *A.*    That's exactly what is damaged in psychiatric

24  disorders, particularly in bipolar disorders, that

25  relationship you're discussing.

1    *Q.*   All right.  You're familiar -- you reviewed a

2   number of materials related to, including transcripts of

3   Ms. Andriano's trial; correct?

4    *A.*   Yes.

5    *Q.*   And at trial, she raised a justification defense

6   based on history of domestic violence; is that correct?

7    *A.*   I didn't know there was a specific name for it,

8   but that seemed to be what the -- yes.

9    *Q.*   Do you remember that her defense both at the

10  guilt phase and mitigation phase relied heavily on a

11  history of domestic violence with her husband, the victim,

12  Joe Andriano; correct?

13   *A.*   Yes.

14   *Q.*   And in that trial case, didn't that evidence come

15  largely from statements made by Donna Ochoa, Ms. Andriano

16  herself, the Petitioner?

17   *A.*   I don't recall as many from Donna Ochoa, but

18  obviously, they did come from Ms. Andriano.

19   *Q.*   Okay.  And, in fact, Ms. Andriano -- wasn't the

20  first time that domestic violence was raised in the actual

21  murder itself came through a phone call that she made to

22  her friend, Chris Hashisaki, right before she called

23  911 after the murder?  Do you recall seeing that?

24   *A.*   I remember the call.  I don't remember the

25  reference to domestic violence.

1    *Q.*    Do you remember in that call that Ms. Andriano

2    told Chris Hashisaki:  I'm going to tell you the whole

3    story; Joe attacked me and I had to defend myself?

4    *A.*    Yes.

5    *Q.*    Okay.  And then shortly after that phone call is

6    when Ms. Andriano called 911 and reported the same thing,

7    that her husband attacked her and she thought she stabbed

8    him acting in self-defense; is that correct?

9    *A.*    It's close.  It's not quite, but that is close.

10   *Q.*    Okay.  What would you say to change that to be

11   more accurate?

12   *A.*    I just am not sure that that was -- I'm not sure

13   that you can synopsize the conversation.  But it did -- it

14   did appear that that's what she said.

15   *Q.*    Okay.  And then in her police interview, it was,

16   although she did give varying accounts of some details --

17   *A.*    Uh-huh.

18   *Q.*    -- she did say that her husband attacked her and

19   she had to fight him off and that ultimately led to his

20   death; correct?

21   *A.*    Yes.  Concisely, yes.

22   *Q.*    And now in these proceedings, Ms. -- the

23   Petitioner has raised the history of childhood trauma

24   largely related to sexual abuse.  Do you agree with that?

25   As well as physical abuse?

1    A.    Yes.

2    Q.    And at least with the sexual abuse allegations as

3    to her stepfather, Alejo Ochoa, that's new?  That was not

4    part of her trial case; correct?

5    A.    Yes.

6    Q.    And, again, you relied in your investigation --

7    Dr. Hopper's investigation -- developing the social

8    history of Ms. Andriano that you did, you relied heavily

9    on statements by her mom, Donna Ochoa; correct?

10   A.    She was one of the persons that -- certainly, one

11   of the informants that I relied upon.

12   Q.    And the allegations of abuse also came from

13   friends of Ms. Andriano's --

14   A.    Yes.

15   Q.    -- from her childhood; correct?

16   A.    Yes.

17   Q.    These are people that on their surface probably

18   have a bias towards Ms. Andriano?  You would agree with

19   that; correct, based on family relationship or friendship?

20   A.    I'm not clear why that would lend one to a bias.

21   Q.    Well, would you agree that her friends and her

22   family members maybe may have a bias in hope that she gets

23   off death row?

24   A.    Well, I could see that.  I'm not sure that would

25   -- I just don't -- I'm not clear that that would lend to

1   them, umm -- yes, I'll just say I can see where this is

2   going.  I'm sorry.  Yes, I could see that perhaps.

3       Q.   Okay.  Fair enough.  In Arizona we have victims'

4   rights, and you're familiar that; correct?

5       A.   Yes.

6       Q.   And we're always -- attorneys who represent the

7   State are always appreciative when opposing counsel

8   respect victims' rights.

9            But, in this case, did you personally ever think

10  of requesting permission to speak to the victim Joe

11  Andriano's family about their observations of Ms. Andriano

12  during the time they knew her, including right at the time

13  of the murder?

14      A.   I didn't think that was possible in Arizona.

15      Q.   Okay.  Is that something that, thinking back now,

16  that might have been helpful to you?  Let me put it this

17  way:  Ms. Andriano and Joe Andriano were a couple for

18  about eight years; correct?

19      A.   Yes.

20      Q.   And, therefore, Joe Andriano's family certainly

21  interacted with Ms. Andriano during that time, especially

22  after they were married?

23      A.   Yes.

24      Q.   Okay.  And, in fact, hours before the murder,

25  members of Joe Andriano's family saw and interacted with

119

1  Wendi Andriano; correct?

2      *A.*    That's correct.

3      *Q.*    And so maybe their observations could have been

4  helpful in determining whether Ms. Andriano really was in

5  this depressed, bipolar state, or what have you?

6      *A.*    All information may be helpful.  So I think

7  that's what I would say.

8      *Q.*    All right.  Let's look at the actual choices and

9  actions that Ms. Andriano made in the weeks and months

10  leading up to October 8th, 2000.

11      *A.*    Sure.

12      *Q.*    Okay.  But even before I do that, let's just

13  spend a little bit of time about some other things that we

14  know Ms. Andriano did after she turned 18.  And, first, do

15  you remember in your materials learning about

16  Ms. Andriano's employment history with the Casa Grande

17  Regional Hospital?

18      *A.*    Yes.

19      *Q.*    And she was about 24, 25 years old during that

20  time; is that correct?

21      *A.*    That's correct.  Can you give me a year on that?

22      *Q.*    Sure.

23      *A.*    Was that 1995?

24      *Q.*    1995 to 1996.

25      *A.*    All right.

1      *Q.*   She was a bookkeeper or secretary for the

2   hospital; correct?

3      *A.*   That's correct.

4      *Q.*   And an investigation revealed that she stole from

5   her employer; correct?

6      *A.*   Yes.

7      *Q.*   It wasn't like a waitress reaching into the till

8   and pocketing some cash?  It was something that was more

9   gradual and more clever; correct?

10     *A.*   I believe so.

11     *Q.*   It involved forgery, checks that she was

12   essentially cashing from the hospital to herself over a

13   period of time?

14     *A.*   That's correct.

15     *Q.*   Now, and there was also a history of her other --

16   of stealing in some form with her other places of

17   employment; is that correct?

18     *A.*   At least one other, as I recall.

19     *Q.*   All right.  At the Courtyard Apartments when she

20   was a leasing agent -- and this is when she was about

21   28 years old in 1999 -- it was kind of the same thing.

22   There was some theft by conversion; was there not?

23     *A.*   That's correct.

24     *Q.*   And even at San Rivas Apartments, her last

25   employer when she was manager, after her arrest, they

1  discovered that she was giving some tenants, friends of

2  hers, free rent or reduced rent; correct?  Do you remember

3  seeing that?

4      *A.*   I -- I don't recall that.  But what I recalled

5  was perhaps some furniture, but I don't recall reduced

6  rent or free rent.

7      *Q.*   And then while she was in jail awaiting trial,

8  there was this investigation involving a church friend of

9  hers, Cynthia Edwards.  Do you remember about that?

10     *A.*   Yes.

11     *Q.*   And cashing forged checks and Ms. Andriano

12  receiving some money on her books; correct?

13     *A.*   Yes.

14     *Q.*   Okay.  Now just taking those in the whole over a

15  period of time, these dishonest acts of stealing from her

16  employers, does bipolar disorder cause that?

17     *A.*   Does bipolar disorder cause that?  Umm, persons

18  that have bipolar disorder, and if you actually look at

19  the DSM V, these are just the kinds of behaviors that one

20  sees with bipolar disorder.  These are the very types of

21  irrational behaviors that one sees in a bipolar disorder,

22  particularly in the hypomanic and manic phase.

23         So to say that it causes it is not quite it.  To

24  say that it disrupts the person's mood so that they would

25  then commit these acts that are so dissimilar to who they

1    have been in the past is probably more accurate.

2       *Q.*    Doctor, let's assume for the sake of argument

3    that Ms. Andriano was suffering from all of the disorders

4    that you diagnosed.

5       *A.*    Sure.

6       *Q.*    And let's go ahead and assume for the sake of

7    argument that she was victimized by the abuse that she

8    alleges in these proceedings.

9       *A.*    All right.

10      *Q.*    Okay?

11      *A.*    Sure.

12      *Q.*    With respect to that series of thefts over a

13   period of years, including right up and even after her

14   arrest for murder, those were choices that she made

15   regardless of disorders or abuse in her past; correct?

16   They're choices that she made and actions that she took?

17      *A.*    Damaged choices.

18      *Q.*    Okay.

19             THE COURT:  What did you just say?

20             THE WITNESS:  Damaged choices.

21      *Q.*    BY MR. HAZARD:  Is there any evidence that

22   suggests that Ms. Andriano didn't know that was wrong to

23   do, to steal from her employer, as damaged as her choices

24   may have been?

25      *A.*    I don't see any evidence that suggests that she

1   didn't know that it was wrong.  She certainly --

2   certainly, after she stole from the regional center, she

3   was in therapy and acknowledged this in therapy, along

4   with the other pressures and difficulties that she had.

5   The question is:  What impact did her symptoms have on her

6   decision making?

7        Q.   Okay.  Doctor, that's fair enough.  But would you

8   agree with me that just the sheer nature, the fraudulent

9   activity, the sneakiness of it, is an indication that she

10  knew it was wrong, but did it any way?

11       A.   I would agree with that.

12       Q.   All right.  And then now leading up to October 8,

13  2000, do you remember seeing the evidence that was

14  presented in her trial and any other materials that you

15  reviewed --

16       A.   Yes.

17       Q.   -- police reports and what have you, that about

18  four months before, Ms. Andriano made efforts to either

19  increase her life -- Joe Andriano's life insurance policy

20  or get new life insurance policies; correct?

21       A.   Yes.

22       Q.   In fact, she contacted three different types of

23  agencies to try to obtain life insurance policies on Joe

24  Andriano's life.  Do you remember that?

25       A.   Yes.

1    *Q.*    And she made efforts reaching out to others, two

2    people?  In fact, she offered one friend, a co-worker,

3    $10,000?

4    *A.*    I think that was Mr. Yost.

5    *Q.*    James Yost; correct.

6    *A.*    Yes.

7    *Q.*    And you remember that?

8    *A.*    Yes.

9    *Q.*    To pose as her husband in order to pass a

10   physical exam to obtain the life insurance policy;

11   correct?

12   *A.*    Yes.

13   *Q.*    And then she also asked another friend?

14   *A.*    Eric Valiant.

15   *Q.*    Correct.

16   *A.*    Yes.

17   *Q.*    To do the same?

18   *A.*    Yes.

19   *Q.*    To pose; correct?

20   *A.*    Uh, yeah.

21   *Q.*    All right.  Do any of these disorders cause that

22   type of -- those types of choices and actions?

23   *A.*    These are the very types of choices and actions

24   that derive from this type of disorder.

25   *Q.*    Well, how does bipolar disorder cause that?

1     *A.*   When we looked at the context of each of these,

2    Mr. Yost -- you can correct me if I'm wrong.  Mr. Yost was

3    in fact her assistant manager at San Rivas or had some

4    relationship at San Rivas.  Eric Valiant was a friend of

5    Mr. Andriano's as well as in this situation.

6          So what we see Wendi doing over and over is

7    within this confined area really of San Rivas in many

8    ways, she is asking people these pretty bizarre kinds of

9    things.

10          I mean, first of all, if we go back through the

11   trial transcripts, I think it was pretty clear that it was

12   going to be impossible.  The reason why she was doing this

13   was because it was going to impossible to get life

14   insurance given his health.  And so there was a question

15   of trying to find someone else that might pose as him.

16          As I recall, they contacted someone whose either

17   wife or friend was an insurance broker or knew about

18   insurance, and they said:  That's never going to fly.  You

19   know, you're not going to be able to do that.

20          So Wendi is trying to doing these things.  I

21   guess it's completely on her own.  I'm not clear about

22   that whether it's actually, truly completely on her own,

23   but, certainly, she was the one calling the person,

24   calling Mr. Valiant, a friend of Joe's that they knew.

25   They had his telephone number in Mr. Andriano's book.

1  Calling Mr. Yost, who was her assistant manager in the

2  very business that she works in, trying to get them

3  involved.  And that's fairly bizarre behavior.

4       Q.   Well, Doctor, it would be bizarre if she asked

5  strangers to do this sort of thing; correct?  That would

6  be bizarre?

7       A.   It --

8       Q.   Would it be bizarre to ask strangers on the

9  street to pose as her husband, letting them know that she

10  was trying to get more life insurance on her dying

11  husband?

12      A.   I don't know exactly how people do this.  So I

13  can't really say.  What I -- I mean, from what I do more

14  commonly see is that they try to -- people try to find

15  someone that isn't somehow related to this situation.  The

16  things that Ms. Andriano did -- that Wendi did were all

17  within this complex and --

18      Q.   Well, Doctor, if you're going to engage in

19  this --

20      A.   I'm sorry.  May I --

21      Q.   I'm sorry to cut you off.

22      A.   May I just finish?  I apologize.  And what we see

23  is that prior to her marriage to Mr. Andriano, we did not

24  see this kind of behavior.  We did not see this stealing.

25  We did not see -- after the pressures of Mr. Andriano

1  dying and these things, we see this behavior.

2          Within that context, to me, these behaviors are

3  clearly -- could clearly be related to this.

4          MR. HAZARD:  One moment, Your Honor.

5          THE COURT:  Yes.

6          (WHEREUPON, an off-the-record discussion ensued.)

7      Q.   BY MR. HAZARD:  Now, Dr. Woods, if a person is

8  going to engage in fraud, wouldn't they want to -- and

9  they needed someone's help, they would go to someone that

10  they trusted; correct?

11     A.   I -- I can't really answer that.

12     Q.   Okay.  Rather than a stranger?

13     A.   I -- I just can't answer that.  I -- I don't

14  know.

15     Q.   Do you remember reviewing a transcript of a

16  deposition of Shawn King?

17     A.   Yes.

18     Q.   Okay.  And do you recall --

19          (WHEREUPON, an off-the-record discussion ensued.)

20          MR. HAZARD:  May I approach, Your Honor?

21          THE COURT:  Yes.

22          MR. ARNTSEN:  What page and line are we talking

23  about?

24          MR. HAZARD:  Page 11, starting with the question

25  on Line 17 going down.

1    MR. ARNTSEN:  Okay.

2    *Q.*  BY MR. HAZARD:  Dr. Woods, I'm going to hand you

3 Exhibit No. 15.  And turn your attention to Page 11 on

4 that deposition.

5    *A.*  Okay.

6    *Q.*  Line 17, the question.  Do you see that comment

7 by Mr. King?

8    *A.*  Yes, I do.  Yes.

9    *Q.*  About the deviousness of Ms. Andriano?

10    *A.*  Yes.

11    *Q.*  And that was before she was married; correct?

12    *A.*  Well, if you go onto the next page, you'll notice

13 they'll ask him what kind of devious things that -- can

14 you give me an example?

15    And you go to Page 12, and he says:  I'm trying

16 to think.  Well, she got away with anything, like

17 pinching.  That was a big thing I remember from one time

18 whenever people would be pinching each other and girls

19 were pinching guys, and she never got caught.

20    So I guess that's what he was talking about.

21    *Q.*  And then on Page 16, if you would.

22    *A.*  Yes.

23    *Q.*  And, again, the same sorts of comments.

24 Mr. King is referring to Ms. Andriano when she was very

25 young, getting people to do what she wants?

1          MR. NICKELS:  Can you be more specific?  Are you

2     referring to a specific line on Page 16?  You just

3     mischaracterized it.

4          MR. HAZARD:  It's Page 15, Line 19.

5          THE WITNESS:  Line 19.

6          MR. HAZARD:  I apologize.  Our technology is --

7          THE WITNESS:  I see what he's saying there, yes.

8          MR. NICKELS:  Just to be clear, I mean, Page 15,

9     Line 19?  Is that what you're reading from?  Because if

10    that's what it is, I would like the witness to read it out

11    loud because it's not at all consistent with the

12    characterization you just gave it.

13        Q.   BY MR. HAZARD:  Yeah, the page numbers are

14    covered on this.  I believe it's Page 16 starting even as

15    far as Line 5 up, all the way down.

16        THE COURT:  We're talking about Page 16?

17        MR. HAZARD:  16.  To Line 23.

18        THE WITNESS:  Shall I read that?

19        MR. HAZARD:  Yes.

20        THE WITNESS:  I caught her --

21        THE COURT:  Why don't you read it to yourself

22    first and then ask the question.

23        THE WITNESS:  Okay.

24        MR. HAZARD:  Okay.

25        THE WITNESS:  Okay.

1    *Q.*    BY MR. HAZARD:  And he's talking about how -- in

2    that section of testimony, how he believed Ms. Andriano

3    that they were monogamous and he found out that that was

4    not the case; correct?

5    *A.*    That -- in his opinion, that was not the case.

6    *Q.*    Correct?

7    *A.*    Yes.

8    *Q.*    And that he was going back to his devious comment

9    that her ability to fool people and gain trust from

10   people; correct?  That's what he was talking about with

11   devious?

12   *A.*    I don't know that they're related.

13   *Q.*    Okay.

14   *A.*    Umm, this seems more related to their

15   relationship rather than some overall idea.

16   *Q.*    All right.  You remember reading that

17   Ms. Andriano researched poisons using a computer at work;

18   correct?

19   *A.*    Yes.

20   *Q.*    And she used a false name to contact the sellers

21   of that poison; correct?

22   *A.*    Ann Newton, as I recall.

23   *Q.*    Correct.  And she also used a business that was

24   defunct, actually her father-in-law's old business;

25   correct?

1      *A.*     Yes.

2      *Q.*     And doctored a business license in order to

3  obtain that poison; correct?

4      *A.*     Yes.

5      *Q.*     Then she obtained that poison and hid it in a

6  storage facility at her apartment complex; correct?   There

7  was evidence presented at trial?

8      *A.*     I thought she initially brought it back to her

9  office.

10     *Q.*     Correct.   And then she eventually put it in a

11  storage facility?

12     *A.*     Eventually, yes.

13     *Q.*     All right.   And at least from the State's

14  perspective of that evidence, she administered that poison

15  on Joe Andriano without him knowing it; correct?

16     *A.*     From the State's perspective; that's correct.

17     *Q.*     Does bipolar disorder cause that type of

18  behavior?

19     *A.*     Absolutely.   There's nothing -- I think the

20  confusion here is that somehow people that have

21  psychiatric disorders, their behavior is completely

22  fragmented and that there may not be any particular focus.

23  There may be a focus of someone that has bipolar disorder

24  or that's making these types of impaired decisions.   It's

25  just a bad focus.   It's a damaged focus.

1    *Q.*  Well, Doctor --

2    *A.*  It's not --

3          MR. NICKELS:  Your Honor --

4          THE COURT:  Ask your next question.  Ask your

5    next question.

6          MR. NICKELS:  Well, Your Honor, I would like --

7          MR. HAZARD:  It's nonresponsive.  Objection.

8          THE COURT:  All right.  Sustained.  Ask your next

9    question.

10         MR. NICKELS:  Your Honor, if I may, it was

11   responsive.  It was refuting his question.  It was

12   certainly responsive.

13         THE COURT:  Ask your next question.  You can

14   follow up on cross.

15         Go ahead.  Ask your next question.

16   *Q.*  BY MR. HAZARD:  This isn't a choice that

17   Ms. Andriano made and actions that she took?

18   *A.*  A damaged choice.

19   *Q.*  But isn't every crime a damaged choice?

20   *A.*  If someone --

21   *Q.*  Doctor, yes or no?  Isn't every crime a damaged

22   choice?

23   *A.*  It's not an answer that I can answer yes or no.

24   *Q.*  All right.

25   *A.*  I can't -- if I can say -- if I can complete my

1  answer.

2         THE COURT:  Go ahead.

3         THE WITNESS:  Thank you, Your Honor.

4         If someone does not have a psychiatric disorder

5  and they commit a crime, obviously crimes are bad choices.

6  They're things that we don't want to do.  But if someone

7  has the types of psychiatric disorders that Ms. Andriano

8  has, that has to be taken into the context of the crime.

9         MR. HAZARD:  So --

10        THE WITNESS:  So, yes, it's a damaged choice.

11 And, yes, there are criminals that may make -- but this is

12 different because she has a psychiatric disorder that

13 lends itself to the very types of behavior that we're

14 discussing.

15    Q.   BY MR. HAZARD:  Doctor, that wasn't my question.

16 My question was causation.  Do any of these disorders

17 cause Ms. Andriano to poison her husband?

18    A.   I don't understand cause in this sense.  What do

19 you mean?

20    Q.   Did the disorder, whatever she had, cause her to

21 choose and act out in poisoning her husband?

22    A.   I'm just not sure how to answer it any other way

23 than the way I already have.

24    Q.   Okay.  And using fraudulent means to obtain that

25 poison, is it your testimony that that is also caused by

1  bipolar disorder?

2  *A.*  Well, it wasn't my testimony at first that it was

3  caused.  It was that it was consistent with someone having

4  bipolar disorder.

5  *Q.*  Then the answer is, no, it's not caused by it;

6  correct?

7  *A.*  No, that's not my answer.

8  *Q.*  Okay.  Did bipolar disorder cause Ms. Andriano to

9  pick up a bar stool and hit her husband over the back of

10  the head once?

11  *A.*  I'm sorry.  I'm struggling with this idea of

12  causation.

13  *Q.*  Okay.

14  *A.*  Okay.  Because if you're asking, did her bipolar

15  disorder undermine her decision making, so that that

16  was -- that act was done?  Yes.

17  *Q.*  Doctor, given your testimony here, can anyone who

18  has -- whether it's the history of abuse or bipolar

19  disorder, doesn't that give them a get-out-of-jail-free

20  card, given your testimony?

21  *A.*  Of course not.

22  *Q.*  Okay.  Isn't the act of murder always an action

23  of impaired judgment, regardless of what's going on in the

24  person's history, whether it be mental health diagnoses or

25  instances of trauma that they've had?

1    *A.*   Well, that's a -- that's a hypothetical that's

2   very difficult.  Yeah, of course, it's an impaired -- an

3   impaired judgment.  But the cause -- but the question is:

4   What caused the impaired judgment?  That's what the law is

5   all about is if there are other reasons for that impaired

6   judgment, they should be taken into consideration.

7    *Q.*   Well, Doctor, let me put it another way.  Let's

8   assume that consistent with the State's theory, and

9   obviously a jury's verdict, that Ms. Andriano had the goal

10  to kill her husband that night.  All right?  Let's assume

11  that.  And her goal was to get away with it.

12        What does bipolar disorder have to do with that

13  or any other mental health diagnosis or trauma experienced

14  in a childhood, if her goal is to kill her husband and act

15  on that and take measures to cover it up?

16   *A.*   If we accept that position, the development of

17  that goal -- and I'm certainly not suggesting it.  But the

18  development of that goal, if it were developed under the

19  types of severe psychiatric distress that Ms. Andriano was

20  under, then it has to relate to her psychiatric disorder.

21   *Q.*   Do you think she failed to appreciate that it was

22  wrong to hit her husband 23 times in the head with a

23  bar stool?

24   *A.*   I think she said that she knew that it was wrong.

25   *Q.*   Okay.  Do you think she failed to appreciate the

1  wrongfulness and could not appreciate the wrongfulness of

2  stabbing her husband in the neck?

3      *A.*    I think she said that she knew that it was wrong.

4      *Q.*    And there was evidence that she staged the crime

5  scene by adding a belt after she murdered her husband;

6  correct?  Evidence was presented in her trial?

7      *A.*    Evidence was presented.

8      *Q.*    Right.  And given that that was done close in

9  time to the murder, that is a goal to get away with

10 murder; correct?  She's covering her tracks?  That's

11 evidence of that; correct?

12     *A.*    I -- I would hardly say that she was covering her

13 tracks, but she certainly introduced something into the

14 crime scene, assuming that position.

15     *Q.*    She told police that he came after her with a

16 belt?

17     *A.*    Yes.

18     *Q.*    So having a belt near him would help with that

19 defense; correct?

20     *A.*    Yes.

21     *Q.*    And according to the State's theory, that was

22 staged by Ms. Andriano after the murder; correct?

23     *A.*    That's correct.

24     *Q.*    All right.  And then she called Alejo Ochoa after

25 the murder; correct?