# TABLE OF CONTENTS (INTERACTIVE)

| LLLLLLLLLLL PART 2 | Petitioner's Appendix to Petition for Review |
| --- | --- |

# EXHIBIT LLLLLLLLLL PART 2

1    *A.*    Yes.

2    *Q.*    And she sought his advice?  There was evidence

3    presented that she sought his advice during that phone

4    call?

5    *A.*    Yes.

6    *Q.*    She also called her friend Chris Hashisaki;

7    correct?

8    *A.*    Yes.

9    *Q.*    And told her about the story about Joe Andriano

10   attacking her and acting in self-defense?

11   *A.*    Yes.

12   *Q.*    Okay.  And, again, those were choices that she

13   made to try to get away with murder; correct, according to

14   the State's theory?

15   *A.*    Those are certainly choices that she made.

16   *Q.*    If the jury were to believe that Ms. Andriano --

17   -- Mr. Andriano had attacked the defendant with the belt

18   beforehand, and that she acted in self-defense, that would

19   have been a good result for Ms. Andriano; correct?

20   *A.*    Yes.

21   *Q.*    So her actions show a -- reflect a goal she had

22   during a time of serious distress; correct, if you believe

23   the State's theory?

24   *A.*    Yes.

25   *Q.*    And, again, does bipolar disorder cause that type

1   of behavior?

2       *A.*   It caused the formation of those kinds of damaged

3   goals.

4       *Q.*   Does PTSD cause that type of behavior?

5       *A.*   It caused the formation of those kinds of damaged

6   goals.

7       *Q.*   What about caregiver burden?

8       *A.*   Well, you know, we have cases in the courts all

9   the time about caregivers who take the lives of the person

10  that they are in fact caring for.  Often that is a -- it's

11  a reflection of both the illness of the person and the

12  stress that that person is under.

13      *Q.*   Ms. Andriano --

14      *A.*   So -- so, again, those kinds of obviously poor

15  decisions -- damaged decisions can reflect that kind of

16  burden and that kind of disorder.

17      *Q.*   Ms. Andriano's testimony at trial was that her

18  husband took the poison himself knowingly to commit

19  suicide; correct?

20      *A.*   Yes.

21      *Q.*   All right.  And while they were waiting for his

22  last moments on Earth, according to Ms. Andriano's

23  testimony, that's when she told him about the affair with

24  Travis Black?  Do you remember that?

25      *A.*   Yes.

1    *Q.*   Now, does caregiver burden explain that type of
2    behavior or is that just evidence of being mean, if it's
3    to be believed?

4    *A.*   It's really much more consistent with bipolar
5    disorder, as was the affair with Travis Black.

6    *Q.*   Okay.  These were his last moments on Earth,
7    which according to her testimony, that's what she wanted.
8    She wanted to give Joe peace and for him to die on his
9    terms.  Do you remember that?

10   *A.*   I don't recall that.  I'm sorry.  I just don't
11   recall that.

12   *Q.*   Okay.  Let's assume that was consistent with her
13   testimony.

14   *A.*   Sure.

15   *Q.*   All right.  What would that serve to help her
16   husband to let him know in his last moments that she
17   cheated on him?

18   *A.*   I recall it a bit differently.  But I don't
19   recall -- I don't see any particular benefit that it would
20   serve.

21   *Q.*   There was a benefit that she used in her defense,
22   though; correct?  Well, didn't she say that that's what
23   set her husband off and caused him to attack her?

24   *A.*   Yes.

25   *Q.*   Right.  So that was a way -- under the State's

1    theory, that was a way of formulating a defense to murder

2    by giving her husband a reason to attack her, if you

3    accept the State's theory of evidence; correct?

4        *A.*    Under the State's theory, yes.

5        *Q.*    And is that evidence of a cognitive deficit?

6    Isn't that clever?

7        *A.*    I'm sorry, Mr. Hazard.  I don't -- I don't see it

8    as clever.  I may have to --

9        *Q.*    Well, Doctor --

10       *A.*    I'm sorry.  Let me finish.

11               THE COURT:  One at a time.

12               THE WITNESS:  Okay.  Thank you.

13               I -- I don't see it as clever.  It's, again,

14   pretty impaired thinking.

15       *Q.*    BY MR. HAZARD:  Murder is pretty impaired

16   thinking?

17       *A.*    That's not what I said.  I was responding to your

18   question.

19       *Q.*    Okay.  Her husband had 23 blows to his head;

20   correct?

21       *A.*    Yes.

22       *Q.*    That's what the autopsy revealed?

23       *A.*    Yes.

24       *Q.*    And a gaping stab wound in his neck; correct?

25       *A.*    Right.

1     *Q.*   And given the circumstances involving the

2   paramedics, Chris Hashisaki before, there was no way for

3   Ms. Andriano to say a stranger committed that offense;

4   correct, given the evidence?

5     *A.*   Well, given her prior behavior.

6     *Q.*   Correct.  Therefore, given that she knew that

7   police were going to discover her husband in that state,

8   would it having -- staging evidence of a struggle help her

9   to achieve her goal of getting away with murder?

10    *A.*   I'm just not sure how to answer that.  I don't

11  know -- I don't know the answer to that.

12    *Q.*   Dr. Woods, did you write the entire contents of

13  your report?

14    *A.*   Yes.

15    *Q.*   Including the citations in the footnotes?

16    *A.*   I think probably some of the footnotes were -- I

17  received help from the attorney's office.  But the rest of

18  the report, I wrote.

19    *Q.*   All right.

20    *A.*   Formatted.

21    *Q.*   If you would look at your report, I see on

22  Page 65 that you have a date of February 14, 2012?

23          THE COURT:  Let's refer to the exhibit.  What

24  exhibit is that?

25          MR. HAZARD:  It is Exhibit No. 2, I believe,

1   Your Honor.

2          THE WITNESS:  Yes.

3      *Q.*   BY MR. HAZARD:  And, Doctor, did you rely on

4   Dr. Hopper's report?  You mentioned that you did in your

5   report; correct?

6      *A.*   Yes.

7      *Q.*   And Dr. Hopper, also -- his report is also dated

8   February 14, 2012?

9      *A.*   Okay.

10     *Q.*   How does that work?  How can you both rely on

11  each other's report when they were both dated the same

12  day?

13     *A.*   I think that prior to that, Dr. Hopper and I had

14  discussed his findings.  And so if -- I think that's

15  really what I meant.  I may have misspoken when I said

16  report exactly.  But we had discussed the findings.

17     *Q.*   Is it your testimony that a person with bipolar

18  disorder cannot be held responsible for her actions?

19     *A.*   Oh, no.

20     *Q.*   Is it your testimony that a person with a history

21  of sexual abuse and physical abuse cannot be held

22  responsible for her actions?

23     *A.*   No.  And I don't think I was asked the question

24  of responsibility.

25     *Q.*   Okay.  And that's why I'm asking you now.

1       *A.*     Fine.  So, no.

2       *Q.*     The jails are filled with people with histories

3  of -- prisons are filled with people with histories of

4  sexual abuse and physical abuse in their past; is that

5  correct, based on your experience?

6       *A.*     The largest psychiatric hospitals in the

7  United States are prisons -- are a prison.

8       *Q.*     Well, I'm talking about actual prisons, Doctor.

9       *A.*     I'm talking about actual prisons.

10      *Q.*     And prisons are also filled with people who have

11  serious mental disorders; correct?

12      *A.*     That's what I meant, yes.

13           (WHEREUPON, an off-the-record discussion ensued.)

14           MR. HAZARD:  Thank you, Your Honor.  No further

15  questions.

16           THE COURT:  Is this a good time to take our

17  afternoon break?

18           MR. NICKELS:  It is.  I can tell you we don't

19  have any redirect.

20           THE COURT:  No redirect?

21           MR. NICKELS:  So the afternoon break may turn

22  into the end-of-day break.

23           THE COURT:  May this witness be excused?

24           MR. NICKELS:  Yes.

25           THE COURT:  Thank you very much, sir.  You're

1  excused.  Don't walk off with any of the exhibits, though.

2          THE WITNESS:  Okay.

3          THE COURT:  Thank you.

4          THE WITNESS:  Thank you.

5          THE COURT:  So what is the situation of -- I

6  guess no more witnesses for today?

7          MR. ARNTSEN:  Right, Your Honor.

8          THE COURT:  And then no witnesses for tomorrow

9  morning?

10         MR. ARNTSEN:  Right.

11         THE COURT:  So we're going to reconvene tomorrow

12 afternoon at 1:30 sharp?

13         MR. ARNTSEN:  Yes.  We wanted to reconvene a

14 little earlier but, again, our problem is that the next

15 witness, Mr. Bennett, isn't available in the morning.

16         Do you know when he's available, Scott?

17         MR. BENNETT:  Mr. MacLeod.

18         MR. ARNTSEN:  Or Mr. MacLeod.

19         MR. BENNETT:  1:30.

20         MR. ARNTSEN:  It's 1:30 tomorrow.  I'm sorry.

21         THE COURT:  Okay.  Then we'll go ahead and take

22 our recess until 1:30 tomorrow afternoon.  Everyone have

23 a nice evening.  Thank you.

24         (WHEREUPON, the proceedings were concluded at

25 3:04 p.m.)

1                    * * * * * * *

2

3

4                    C E R T I F I C A T E

5

6

7           I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

8    the State of Arizona, do hereby certify that the foregoing

9    144 pages constitute a full, true, and accurate transcript

10   of the proceedings had in the foregoing matter, all done

11   to the best of my skill and ability.

12           SIGNED and dated this 28th day of February, 2014.

13

14

15                    /s/  Renée A. Mobley, RPR

16                    RENÉE A. MOBLEY, RPR

17                    Certified Reporter

18                    Certificate No. 50500

19

20

21

22

23

24

25

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,           )
                            )
     Respondent,      )
                            )
vs.                    )  No.
                            )  CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,  )
                            )
     Petitioner.      )
_____)

Phoenix, Arizona
February 6, 2014
1:30 p.m.

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING

DAY 4

Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500               (COPY)

2

1            <u>A P P E A R A N C E S</u>

2

3

4  On Behalf of the State:

5            Mr. Gregory Hazard
             Assistant Attorney General
6
             Ms. Lacey Gard
7            Assistant Attorney General

8
   On Behalf of the Defendant:
9
             <u>ATTORNEYS AT LAW</u>:
10
             Mr. Scott Bennett
11           Mr. Allen Arntsen
             Mr. Stephan Nickels
12           Mr. Matthew Lynch
             Ms. Krista Sterken
13           Ms. Jodi Fox

14                  <u>I N D E X</u>

15

16            <u>T E S T I M O N Y</u>

17
   <u>WITNESS</u>:                            <u>PAGE</u>
18

19  SCOTT A. MACLEOD

20       Direct Examination by Mr. Bennett      7

21
   KEITH ROHMAN
22
         Direct Examination by Mr. Bennett     37
23
         Cross-Examination by Ms. Gard         80
24
         Redirect Examination by Mr. Bennett   90
25

<u>P R O C E E D I N G S</u>

THE COURT:  Good afternoon.  This is CR 2000-096032, State of Arizona vs. Wendi Elizabeth Andriano.

The record will reflect the presence of the parties and counsel.

Are there any things that we need to discuss before we get started?

MR. ARNTSEN:  Just one thing from the Petitioner's side, Your Honor.

THE COURT:  Yes, sir.

MR. ARNTSEN:  Over the lunch hour, we interviewed Detective Dennis Olson, who was the detective who interviewed Mr. Ochoa and Ms. Lorts on Monday.  And we have here that we have marked as exhibits both Detective Olson's report, which is marked as Exhibit 227, and the CD of his interview with Mr. Ochoa, which is Exhibit 228.  So we have that in the record here.

And we received -- Attorney Bennett received a text message from Attorney Miller, which stated that -- this morning, which stated that Mr. Ochoa would take the Fifth as to any questions asked of him in this proceeding.

He also confirmed that he had sent a similar text to Attorney Gard, and Attorney Gard confirmed that to me.

4

1           So I wanted to, one, make this a record, and,
2   two, see if the Court wanted anything else to sort of nail
3   down and kind of, you know, wrap up this issue for this
4   record.
5           I suppose we could have Mr. Ochoa come up here
6   and say that, if the Court thinks that is necessary.  The
7   Court is the audience for this and the record, but I'll
8   make that representation.
9           And then, second, what we would also ask is that
10  in light of this, we would ask that Mr. Ochoa's
11  declarations submitted in connection with the petition,
12  which are Exhibits 24 and 25, be received into evidence.
13          THE COURT:  Ms. Gard or Mr. Hazard.
14          MS. GARD:  One moment, Judge.
15          THE COURT:  Okay.
16          (WHEREUPON, an off-the-record discussion ensued.)
17          MS. GARD:  Your Honor, if we could have until
18  after the break to give our position on that.  It is
19  hearsay, but we're considering, you know, agreeing to
20  that.
21          THE COURT:  With regards to Exhibit Nos. 24 and
22  25?
23          MS. GARD:  That being the declarations; right?
24          THE COURT:  Right.
25          MS. GARD:  Yes.

1          THE COURT:  Then let me make sure I understand.

2   Exhibit 227 marked for identification, was it a transcript

3   of the interview with Kyre Lorts?

4          MR. ARNTSEN:  Exhibit 227 is Detective Olson's

5   report on his interview with Mr. Ochoa.

6          THE COURT:  Okay.

7          MR. ARNTSEN:  And then Exhibit 228 is a CD with

8   the recording of that interview.  There was no recording

9   of the interview with Ms. Lorts.

10          THE COURT:  Okay.  It was my understanding

11   yesterday that the Petitioner decided not to call

12   Mr. Ochoa and then the State was going to think about it

13   and maybe speak to Mr. Miller about the situation before

14   they made a final decision.  We will wait until the break

15   and we will let you discuss the matter.  Okay?

16          MS. GARD:  Okay.  Thank you, Judge.

17          MR. ARNTSEN:  Thank you.

18          THE COURT:  Okay.  Go ahead.

19          MR. BENNETT:  Good morning, Your Honor.  Our next

20   witness is Scott MacLeod.  I'll go retrieve him.

21          THE COURT:  Okay.  Thank you.

22          (WHEREUPON, the witness entered the courtroom.)

23          THE COURT:  Mr. MacLeod, if you could please step

24   forward right up here to the witness stand.  Before you

25   sit down there, if you could please face the clerk and

6

1   give the clerk your full name and raise your right hand

2   and she will swear you in.

3         THE WITNESS:  I shall, Your Honor.

4   thank you.

5         THE CLERK:  Sir, please state your name and spell

6   your name for the record.

7         THE WITNESS:  Scott A. MacLeod.  S-C-O-T-T.  The

8   middle initial is A.  The last name is MacLeod,

9   M-A-C-L-E-O-D.

10         (WHEREUPON, the witness was duly sworn by the

11   clerk.)

12         THE COURT:  Go ahead and have a seat there.  Just

13   a few things I remind each witness, Mr. MacLeod, is that

14   remember to speak up so that everyone can hear you.  Also,

15   please wait until the question is completed before you

16   answer the question and please make sure that you give us

17   a verbal response.

18         Is that all agreeable to you?

19         THE WITNESS:  It is, Your Honor.

20         THE COURT:  If you need some water, there's some

21   water over here to the side.  Okay?

22         THE WITNESS:  Sure.  Thank you.

23         THE COURT:  Mr. Bennett.

24         MR. BENNETT:  Thank you, Your Honor.

25

1                       SCOTT A. MACLEOD,

2   having been first duly sworn to tell the truth, the whole

3   truth, and nothing but the truth, testified as follows:

4

5                      DIRECT EXAMINATION

6   BY MR. BENNETT:

7       *Q.*    Mr. MacLeod, were you the mitigation specialist

8   in Wendi Andriano's murder trial?

9       *A.*    I was one of the mitigation specialists who

10  worked on her case, yes, Mr. Bennett.

11      *Q.*    Let's talk a little bit about your background.

12  Now I know you've received a law degree since then.  Let's

13  talk about the education you had at the time you worked on

14  Ms. Andriano's case.

15      *A.*    Yes, sir.

16      *Q.*    What was that?

17      *A.*    How far back do you want to go?

18      *Q.*    College, please.

19      *A.*    College, yes, sir.  I got my undergraduate degree

20  from ASU.  I went to community college for a couple of

21  semesters before that.  I got an undergrad degree from

22  ASU in 1997 in political science with a minor in English.

23      *Q.*    Do you have any formal education in social work?

24      *A.*    By formal education, if you mean college, I took

25  a sociology class at a community college.  And, you know,

1  I was thinking about this in the last couple of days.  I

2  think I took a psychology course as well, but that would

3  be about the extent of my, if you will, social work

4  studies during my undergrad years, but they were very

5  limited.

6      *Q.*    Do you have any degrees in social work?

7      *A.*    I do not.

8      *Q.*    Any degrees in sociology?

9      *A.*    I do not.

10     *Q.*    Psychology?

11     *A.*    I do not.

12     *Q.*    Any other behavioral science?

13     *A.*    I do not.

14     *Q.*    Before you went to work for the public defender's

15 office, what did you do?

16     *A.*    How far back do you want me to go, Mr. Bennett?

17     *Q.*    What was your job immediately before you started

18 with the public defender's office?

19     *A.*    I would say probation officer as an Adult II

20 Probation Officer with the Maricopa County Adult Probation

21 Department.

22     *Q.*    How long did you hold that job?

23     *A.*    I believe about two and-a-half years.

24     *Q.*    And what were your duties as a Probation II

25 Officer?

1      *A.*    Well, I started out as a typical probation

2   officer.   And if you need me to define typical, I'll be

3   happy to do that.   But I oversaw a caseload of about 60 to

4   70 felony offenders.   I did that for about a year, a year

5   and-a-half.

6            Then they put me on a team of adult probation

7   officers where we worked to -- I think we supervised,

8   goodness, a couple hundred adult offenders.   And I was the

9   field probation officer.   I would go to clients' homes,

10   their places of work, things like that, and supervise

11   their work activities and their activities at home,

12   et cetera.

13            Also, as a probation officer, I authored

14   presentence reports and investigations to the Court.   I

15   enjoyed doing that.   I couldn't tell you how many of those

16   I did.   It was dozens, if not even more.   But the sort of

17   typical duties of a probation officer.

18      *Q.*    When did you start as a probation officer?

19      *A.*    I want to say -- I will say 1998.   August of

20   1998, I think.

21      *Q.*    And when did you leave that job?

22      *A.*    December of 2000, I think, Mr. Bennett.

23      *Q.*    And what did you do in December of 2000?

24      *A.*    I was working on a master's degree.

25      *Q.*    What was your next job?

1      *A.*   Mitigation specialist with the public defender's

2   office.

3      *Q.*   When did you start that?

4      *A.*   August of 2001, I believe.

5      *Q.*   When you first started as a mitigation specialist

6   with the public defender's office, what sort of cases were

7   you handling?

8      *A.*   I was given the gamut of felony cases, you know,

9   everything short of first degree murders.  Well, you know

10   that first month or two, I want to say I wasn't given

11   particularly serious felonies.  But I was entrusted to be

12   the mitigation specialist on Class 6, 5, 4, 3 and 2

13   felonies, and loved it.  I absolutely loved it.

14      *Q.*   So is it fair to say that when you first joined

15   the office, you did mitigation work on noncapital felony

16   cases?

17      *A.*   Yes, sir.  That is correct.

18      *Q.*   Did that change at some point?

19      *A.*   Yes, it did.  After about two and-a-half years,

20   three years of employment with the public defender's

21   office, I was approached by a supervisor director there

22   with the department, with the public defender's office,

23   who asked me:  Scott, will you be interested in doing

24   death penalty mitigation work?  And, at first, I was

25   hesitant to do so, but then I said yes.

1    *Q.*   Take a step back.  When you became a mitigation
2  specialist for the noncapital cases, what sort of training
3  did you receive from the public defender's office about
4  doing the job of a mitigation specialist?
5    *A.*   Yeah, most of it was hands-on training, shadowing
6  other veteran, if you will, mitigation specialists.  There
7  was not a formal training program as in, you know, I
8  attended classes or workshops or anything like that.
9       Although the public defender's office, during my
10 five and-a-half years there, did send me to seminars and
11 workshops.  But as a starting mitigation specialist, there
12 wasn't -- I wouldn't call it a particular type of formal
13 training.  But I did shadow, follow around and probably
14 pester veteran mitigation specialists my first few months
15 on the job.
16   *Q.*   And then when did you become a capital mitigation
17 specialist with that office?
18   *A.*   I think it was after about two and-a-half to
19 three years, I believe.
20   *Q.*   When were you assigned to Wendi Andriano's case?
21   *A.*   Going back and asking me months and years
22 attached to those months, I'm not exactly sure.  I want to
23 say, oh, goodness, when did we -- when did we go to trial?
24 I think I was asked to be -- to work on her case about six
25 months before we went to trial, something like that.

1           She had a previous probation -- or excuse me --
2   mitigation specialist working on her case named Patrick.
3   And I'm afraid I can't recall Patrick's last name.  I
4   believe Patrick was leaving the public defender's office.
5   And so they asked me:  Could you please, you know, now
6   take over Patrick's duties?  Which I was more than happy
7   to do.
8       Q.   Before that, had you ever dealt with mitigation
9   work for cases where the defendant would be sentenced by
10  a jury as opposed to a judge?
11      A.   I don't think so.  I don't think so.
12      Q.   If you could take a look, there are some exhibit
13  binders, and I think they're on the floor right in front
14  of you.  Not the black one but the colored ones.
15      A.   Yeah, those are exhibits binders.  Sure.
16      Q.   Could you grab the first volume, the one that
17  would contain Exhibit 8, please?
18      A.   And I'm sorry.  Which exhibit, Counsel?
19      Q.   Exhibit 8.
20      A.   Okay.  I think I'm on Exhibit 8.
21      Q.   Okay.  Great.  Do you recognize this document?
22      A.   Yes.  It seems to mirror an affidavit you sent to
23  me yesterday and also one that I've had in my possession
24  for the last couple of years.
25      Q.   And this is an affidavit that you signed?

1    *A.*    Yes, sir.

2    *Q.*    Would you take a look at Paragraph 1 of the

3    affidavit and tell me if it refreshes your recollection

4    about when you were assigned Ms. Andriano's case?

5    *A.*    Yes, sir.  Yes, sir, it does.

6    *Q.*    And when was that that you were assigned to her

7    case?

8    *A.*    I've noted in the affidavit that it was April of

9    2004.

10   *Q.*    Do you have an independent recollection of that

11   or are you having to rely on the affidavit?

12   *A.*    Well, I noted to you I thought it was about six

13   months -- I was assigned to Wendi's case about six months

14   before it went to trial.

15   *Q.*    When did her case go to trial?

16   *A.*    If my memory serves, it was sometime in the fall

17   of 2004.

18   *Q.*    Does August of 2004 sound correct?

19   *A.*    It seemed like it was a little bit later than

20   that, but, sure, yes, sir.  It might have been a month or

21   two later, to my memory.

22   *Q.*    Okay.  When you were assigned to Ms. Andriano's

23   case, was it the first capital case that you were assigned

24   to as a mitigation specialist?

25   *A.*    You know, I've thought about -- I've thought

1    about that as well in the intervening years since you took

2    this affidavit.  I can't say that is true any longer.  I

3    might have been assigned to another case or two.  I do

4    know that Wendi's case was the first one that I went to

5    trial -- that the legal team I was working with went to

6    trial.  I know that.

7        *Q.*    At the time you were assigned to be the

8    mitigation person on Ms. Andriano's case, how many other

9    capital cases were you assigned to?

10       *A.*    Probably a couple, one or two more.  It

11   couldn't -- it couldn't have been more than a handful.

12       *Q.*    And at the time you were assigned Ms. Andriano's

13   case, were you still finishing up your caseload of the

14   noncapital felony cases?

15       *A.*    I did.  I think -- I had some noncapital cases I

16   was still working on, yes, sir.

17       *Q.*    Was Ms. Andriano's case the first case you

18   handled as a mitigation specialist that involved potential

19   jury sentencing as opposed to judge sentencing?

20       *A.*    I don't know.  I don't recall.

21       *Q.*    If you could take a look at Paragraph 8 of

22   Exhibit 8, please.  Please read that to yourself.

23       *A.*    Okay.  I've reviewed that.

24       *Q.*    Does that refresh your recollection about whether

25   Ms. Andriano's case was the first case you worked on with

1   potential jury sentencing?

2       A.    Again, I have reviewed this affidavit within the

3   last couple of days and a few weeks ago, and, of course,

4   after I signed it, after you sent it to me.  And I'm not

5   sure that statement is accurate as of this time.

6       Q.    Because you believed that you had taken on

7   another capital case before Ms. Andriano's?

8       A.    I may have.  I may have been working on one or

9   two other capital cases, yes, sir.

10      Q.    Now once you went into the role of capital

11  mitigation specialist, what training did you receive

12  regarding mitigation work in a death penalty case?

13      A.    Again, that training was somewhat similar to the

14  training that I participated in when first becoming a

15  mitigation specialist, mainly shadowing.  I think I was

16  shadowing Patrick and our supervisor at the time, who did

17  capital cases as well, Pam Davis.  I was shadowing them,

18  learning from them.

19           I did attend a couple of seminars.  I think I

20  might have attended a seminar in Chicago that summer while

21  I was working on Wendi's case.  But as far as, you know,

22  formal -- any sort of formal training classes, those were

23  absent.

24      Q.    A moment ago, you had mentioned a prior

25  mitigation specialist on Ms. Andriano's case?  A Patrick,

1  you mentioned?

2      *A.*   Yes.

3      *Q.*   Is that Patrick Linderman?

4      *A.*   Yes, that's it.  Thank you.  That's his name.

5  Sorry, I couldn't recall.

6      *Q.*   When you took over as the mitigation specialist

7  on this case, what work had Patrick Linderman done on the

8  mitigation investigation?

9      *A.*   I think he had done quite a bit.  I remember him

10 delving pretty deeply into Wendi's social history.

11 Patrick was a very thorough well thought of employee.  I

12 certainly thought well of him.  He cared for his clients.

13 I remember that being reflected in the work that he did on

14 behalf of Wendi.  As memory serves strong from almost nine

15 years ago, he seemed to know Wendi's history pretty well,

16 pretty well.

17     *Q.*   And what information did he provide you?  How did

18 he provide you the workup that he had done?  How did he

19 pass that along to you?

20     *A.*   He had -- he had notes.  I want to say there were

21 some folders with notes, documents that he had collected,

22 et cetera, which I reviewed.  To get more specific than

23 that, I can't.  I can't recall exactly what documents or

24 evidence he may have handed me, but there were -- there

25 were documents and there was evidence.

1    *Q.*   Okay.  So --

2    *A.*   I remember -- I remember, also, if I may -- I'm

3    sorry to cut off your question, Counsel.  I do remember

4    him creating a large genealogy, like a map.  I don't

5    remember us ever using it at trial, but I remember him

6    creating a large poster board genealogy of Wendi.  I

7    remember reviewing that with him out in the Mesa office.

8    *Q.*   What witnesses had Mr. Linderman interviewed

9    before you took over?

10   *A.*   I couldn't tell you that.  I'm not sure.  I don't

11   remember.

12   *Q.*   What life history documents, such as medical

13   records, school records, work records had Mr. Linderman

14   collected before you took over?

15   *A.*   I don't recall.

16   *Q.*   Do you recall anything else about the work

17   Mr. Linderman had done before you took over?

18   *A.*   I'm pretty certain he had interviewed family

19   members.  I can remember him, you know, referring to

20   family members by their first names.  I think I recall him

21   visiting the family members at their homes, friends at

22   their homes, things like that, because he knew Casa

23   Grande -- Grande, excuse me, I think which is where Wendi

24   lived at one point or something.  I think one time Patrick

25   and I visited the family members in Casa Grande.  I think

1   we did that once.  I can't recall all of the things as of

2   right now, Mr. Bennett.

3       Q.   Who in Casa Grande did you visit with

4   Mr. Linderman?

5       A.   It was Wendi's family members.  I want to say her

6   mom, but, I'm sorry -- I just -- my memory is not serving

7   me well enough to be positive with that.

8       Q.   All right.  Let's talk now about the difference

9   between the noncapital case work that you had been doing

10  and then the capital cases, including Ms. Andriano's case.

11      A.   Yes, sir.

12      Q.   Overall, do you view your role as a mitigation

13  specialist differently in death penalty cases than in

14  regular penalty cases?

15      A.   I did.  I did.  Do you want me to expound on

16  that?

17      Q.   Please.

18      A.   Okay.  Thank you.  With the standard mitigation

19  specialist position that I had, of course you tried to do

20  as thorough background investigation of your client and

21  social history, et cetera, that you could.  We had a much

22  larger caseload.  And, also, you would -- as a standard

23  mitigation specialist, you would -- 90 percent of the

24  time, you would create a report, author a report and

25  submit the report to the Superior Court.  And sometimes

1  you would then also orally advocate during sentencing.

2          And those two latter responsibilities, of course,

3  were not a part of being a death penalty mitigation

4  specialist.  A death penalty mitigation specialist was

5  much more tasked and chore-factored.  You have to much

6  more thoroughly examine, review and research your

7  client's, the defendant's, social history and their

8  background.

9          Essentially, what kind of person they were, how

10 they came to be the type of person they were, their family

11 involvement, their social history, their education,

12 et cetera.  It was just much more thorough, much more

13 in-depth.

14     Q.   Overall, though, aside from the presentence

15 report which you would create for noncapital cases, which

16 you obviously don't do for capital cases; right?

17     A.   I did not.  That's correct.

18     Q.   Was there anything that you would not do in a

19 noncapital case that you would do in the investigation of

20 a capital case?

21     A.   Well, in the investigation of a capital case,

22 again, it would be much more thorough.  You just didn't

23 have the time as a noncapital mitigation specialist to put

24 into the background investigation research that you could

25 or had to as a death penalty mitigation specialist.

1           As a death penalty mitigation specialist, in the

2    couple of years I did it, I think four or five cases were

3    the most I ever had.  Whereas, a noncapital case

4    mitigation specialist, I often had a caseload of 15, 16,

5    17 -- 17 cases and those were cases that were going to go

6    to sentencing usually within a month or two after they

7    were assigned to you.  Whereas, of course, with a death

8    penalty mitigation case, it could be years before we got

9    to -- got to trial or were in a sentencing setting.

10       Q.   So, if I understand your testimony correctly, the

11   difference between the noncapital cases and the capital

12   cases was not that you would do different tasks, but then

13   you would do them on a more involved level with the

14   capital cases?

15       A.   At the very least, yes.

16       Q.   Would you mind taking a look at Exhibit 8.

17   Paragraph 17, please?

18       A.   Okay.  I've reviewed that.

19       Q.   All right.  Did that refresh your recollection

20   about the time the trial started in Ms. Andriano's case?

21       A.   It does not.

22       Q.   It does not?

23       A.   It does not.

24       Q.   Okay.  So you don't recall when the trial started

25   in Ms. Andriano's case?

1    *A.*    No, I'm not saying that.  I'm saying I don't

2    recall it starting in August of 2004.  I thought it

3    started a little bit later, but okay.

4    *Q.*    Assuming that it started in August of 2004, that

5    would have meant that you would have had four to five

6    months to complete the mitigation investigation from the

7    time you were assigned it in April of 2004?

8    *A.*    Yes.

9    *Q.*    When did you start your investigation in

10   Ms. Andriano's matter?

11   *A.*    The second I was assigned the case.

12   *Q.*    Do you recall the date of the guilty verdict in

13   Ms. Andriano's case?

14   *A.*    I thought we were in trial for three or for

15   months.  It seems like we mainly did afternoons.  So was

16   it December?  I want to say December of 2004.  Excuse me.

17   *Q.*    If I were to say it was November 18th of 2004,

18   does that sound correct?

19   *A.*    Sure.  Yes, sir.

20   *Q.*    Do you recall when the defense attorneys filed a

21   motion asking the Court to order state and local

22   government entities to produce records relating to

23   Ms. Andriano?

24   *A.*    No, I don't recall that.

25   *Q.*    You're going to have to switch binders.  It would

1   be the blue one.

2       *A.*   Is there a chance I'll be coming back to No. 1?

3       *Q.*   Probably.

4       *A.*   Okay.  So we'll just set No. 1 aside.

5       *Q.*   All right.  It is Exhibit 54, please.  What is

6   this document?

7       *A.*   It appears to be a motion.

8       *Q.*   Okay.  And when was this motion filed?

9       *A.*   It looks like Danny submitted it on

10  November 19th.

11      *Q.*   Okay.

12      *A.*   2004.  Excuse me.

13      *Q.*   Does this refresh your recollection of when the

14  attorneys filed a motion asking for a court order for

15  production of state and local government records of

16  Ms. Andriano?

17      *A.*   It does not.

18      *Q.*   Do you remember this motion?

19      *A.*   I do not.

20      *Q.*   All right.  You can put that binder away for the

21  moment.  Maybe put it to the side.

22          Let's talk now about the substance of the

23  mitigation investigation.  In your mind, who was in charge

24  of the mitigation?  Who was the director?

25      *A.*   Dan -- Dan Peterson.  Patterson.  Excuse me.

1     *Q.*     And then who was Dan Patterson?

2     *A.*     He was the lead attorney in Wendi's initial

3    trial.

4     *Q.*     Did you look to Mr. Patterson for direction as to

5    where to take the mitigation investigation?

6     *A.*     I did.  And those were my instructions as a death

7    penalty mitigation specialist is that, if you will, the

8    lead attorney was in charge and, of course, I should do my

9    utmost and best to investigate and research Wendi's

10   background history.  But, ultimately, yes, Daniel

11   Patterson made those decisions.

12    *Q.*     How often -- and there was another attorney on

13   Wendi's case, yes?

14    *A.*     Yes, there was.

15    *Q.*     Okay.  And that was?

16    *A.*     I'm sorry.  I don't recall that person's name.

17    *Q.*     Okay.  So how often did you and Dan Patterson and

18   the other attorney communicate about Ms. Andriano's case?

19    *A.*     My office during -- while I was assigned to

20   Danny's team, my office was right next door to Danny's and

21   on purpose.  Of course, Danny, being Daniel Patterson.

22   Thank you.  And I probably conferred with Danny at least a

23   couple of times a week.  He and I were also just plain

24   friends.  So I would stop in his office or he would stop

25   in mine.  I couldn't tell you how many times a week we

1  would talk about Wendi's case from April until -- because

2  now, as I understand it, being November of 2004, it was --

3  it was our last.  It was all encompassing.

4      Q.   How often did you communicate with the attorney

5  whose name you can't remember about Ms. Andriano's case?

6      A.   Very rarely.  Very rare.

7      Q.   How often did you and Mr. Patterson and the other

8  attorney have meetings to discuss Ms. Andriano's name?

9      A.   If you could tell me that gentleman's name, it

10 would make it a little bit easier for me to recall things.

11 I think that would just serve me in a pneumatic device.

12 What is that guy's first name?  That counsel's first name?

13     Q.   David DeLozier.

14     A.   Okay.  David.  Thank you.  Your question again,

15 please?

16     Q.   How often did you and Mr. Patterson and

17 Mr. DeLozier meet to discuss Ms. Andriano's case?

18     A.   What time frame are you asking me, Counsel?

19     Q.   From the time you were assigned the case until

20 the conclusion of the case.

21     A.   It was probably a handful of times all three of

22 us met.

23     Q.   Let's talk about witness interviews.  Who did you

24 interview as part of the mitigation investigation in this

25 case?

1    *A.*    I really don't recall.

2    *Q.*    Do you recall interviewing any family members?

3    *A.*    Well, there's at least that episode where I

4    recall myself and Patrick going out and interviewing some

5    family members.  And I want to say I interviewed mom --

6    Wendi's mom.  Excuse me.  And, yeah, I think I interviewed

7    others, but I can't -- I can't tell you names.

8    *Q.*    How many people did you interview in the course

9    of the mitigation investigation?

10    *A.*    I don't recall.

11    *Q.*    Does the name Kyre Lorts ring a bell with you?

12    *A.*    Kyre Lawrence?

13    *Q.*    Kyre Lorts.

14    *A.*    It does not.

15    *Q.*    So is it fair to assume that you did not

16    interview Ms. Lorts as part of this investigation?

17    *A.*    No, I don't think that's fair to assume.

18    *Q.*    Do you remember interviewing Ms. Lorts?

19    *A.*    I do not remember interviewing Ms. Lorts.

20    *Q.*    Do you remember interviewing a woman named

21    Jeri Lynn Cunningham?

22    *A.*    I do not remember doing that.

23    *Q.*    Do you remember interviewing a man named Jasper

24    Neace?

25    *A.*    Jasper Neace?

1    *Q.*    Yes.

2    *A.*    I do not recall that name.

3    *Q.*    When did you finish interviewing witnesses in

4    Ms. Andriano's case?

5    *A.*    I don't recall.

6    *Q.*    Was it before the guilty/not guilty phase

7    verdict?

8    *A.*    I don't recall.

9    *Q.*    Was it before the penalty phase started?

10   *A.*    I don't recall.

11   *Q.*    I apologize for making you do this again, but

12   could you grab the pink binder, please?

13   *A.*    That's okay.

14   *Q.*    Exhibit 136, please.  What is this document,

15   Exhibit 136?

16   *A.*    Give me some time to review it, please.

17   *Q.*    Sure.

18   *A.*    It appears to be the e-mail correspondence.

19   *Q.*    Okay.  Does this e-mail refresh your recollection

20   about when you finished interviewing the witnesses in

21   Ms. Andriano's case?

22   *A.*    It does not.

23   *Q.*    It does not?  Do you have any independent

24   recollection of what you laid out here in this e-mail, as

25   we sit here today?

1    *A.*    Let me review it again, please.  I do not.  I do

2    not recall this e-mail.

3    *Q.*    Okay.  At the time that you wrote this e-mail, do

4    you believe you had knowledge of what you were writing

5    about in the e-mail?

6    *A.*    Assuming this is my e-mail, Counsel, I would hope

7    so.  I can't tell you this is my e-mail.

8    *Q.*    Okay.  You don't remember writing this e-mail?

9    *A.*    I don't remember writing this.

10        MR. BENNETT:  Your Honor, I move for the

11    admission of this e-mail under Rule 8035 as a recorded

12    recollection.

13        MR. HAZARD:  Your Honor, I don't think he has

14    laid the foundation, but I don't have an objection to

15    admitting it.

16        THE COURT:  No objection?

17        MR. HAZARD:  No objection.

18        THE COURT:  If there is no objection, then

19    Exhibit No. 136 for identification is admitted into

20    evidence.

21        MR. BENNETT:  We're done with that binder for the

22    moment.  You can put that to the side.

23    *Q.*    BY MR. BENNETT:  All right.  Mr. MacLeod, during

24    the course of your mitigation work for Ms. Andriano, did

25    you prepare a comprehensive life history of her?

1    *A.*    I don't recall.

2    *Q.*    Did anyone on the defense team do that?

3    *A.*    I don't recall.

4    *Q.*    Did you assist the attorneys, Mr. Patterson and

5    Mr. DeLozier, in identifying appropriate experts to help

6    the defense?

7    *A.*    Help with the mitigation or defense?

8    *Q.*    To help either.

9    *A.*    I believe we had discussions about expert

10   witnesses that could help with mitigation, yes, sir.

11   *Q.*    Please take a look at Exhibit 8 once again.  Now,

12   on the list -- and this is your affidavit, yes?

13   *A.*    Yes, sir.

14   *Q.*    Okay.  On Page 6, is that your signature?

15   *A.*    Yes, sir.

16   *Q.*    And you are an attorney?

17   *A.*    Yes, sir, I am.

18   *Q.*    So you're aware of the importance of an affidavit

19   like this?

20   *A.*    Yes, sir.

21   *Q.*    Okay.  And were you aware at the time you signed

22   this, that there was a possibility that this affidavit

23   would be submitted to a court?

24   *A.*    Oh, certainly, yes.

25   *Q.*    Would you please take a look at Paragraph 21?

1    Have you read that?

2        *A.*    I have, sir.

3        *Q.*    Does that refresh your recollection about whether

4    you recommended the retention of any experts in this case

5    or assisted in identifying appropriate experts?

6        *A.*    It does not.

7        *Q.*    In Paragraph 21, it states:  I do not recall

8    recommending the retention of any experts in this case or

9    identifying assisting appropriate experts.  Did I read

10   that correctly?

11       *A.*    Yes, sir.

12       *Q.*    And you signed this affidavit?

13       *A.*    Yes, sir, I did.

14            MR. HAZARD:  Your Honor, I object.  That's

15   exactly what he said in court today.  It's not a prior

16   inconsistent statement.  He doesn't recall.  He didn't

17   recall then.

18            THE COURT:  Sustained.

19            MR. HAZARD:  Thank you.

20            MR. BENNETT:  Your Honor, if I may, what he said

21   was he recalled having discussions with the attorneys

22   about appropriate experts.  And in a prior statement, he

23   specifically said:  I did not assist in identifying any

24   appropriate experts.  I believe that is inconsistent.

25            THE COURT:  Is the word assist or identify in the

1  affidavit?

2         MR. BENNETT:  Yes.

3         MR. HAZARD:  Your Honor, the --

4         THE WITNESS:  If I may, Your Honor, on

5  Section No. 21, which counsel pointed to, it says:  I do

6  not recall recommending the retention.  Mr. Bennett's

7  question to me did not ask recommending.

8         THE COURT:  I'll sustain the objection.

9     Q.   BY MR. BENNETT:  Mr. MacLeod, did you ever

10 suggest mitigation themes to the attorneys based upon your

11 investigation?

12    A.   Yes, I did.

13    Q.   Please take a look at Paragraph 23 of your

14 declaration or affidavit.  Please read that to yourself,

15 sir.

16    A.   Okay.  I've reviewed that.

17    Q.   All right.  Does that refresh your recollection

18 about whether you suggested mitigation themes to the

19 attorneys?

20    A.   Yes, it does.

21    Q.   Did you suggest mitigation themes to the

22 attorneys?

23    A.   Yes, I believe I did.

24    Q.   In Paragraph 23, the first sentence says:  The

25 themes for mitigation were provided to me by Dan

1   Patterson.  Mitigation strategy was always his call as far

2   as I was concerned.

3              And the third sentence -- the second sentence:

4   Discussed the theme of domestic violence provided by

5   Mr. Patterson.  The third sentence says:  I do not recall

6   working with counsel to include additional themes or facts

7   based on my investigation.

8              Did I read that correctly?

9   *A.*   Yes, sir, you did.

10  *Q.*   Mr. MacLeod, what themes did you suggest to the

11  defense attorneys?

12  *A.*   I don't recall.

13  *Q.*   Now we know that the defense at trial included an

14  allegation of domestic violence; is that correct?

15  *A.*   I recall that, yes, sir.

16  *Q.*   And did you do investigation into that allegation

17  of domestic violence?

18  *A.*   I don't recall.

19  *Q.*   Did you ever do any investigation into any

20  potential trauma experienced by Ms. Andriano?

21  *A.*   Can you be more specific what you mean by trauma,

22  Mr. Bennett?

23  *Q.*   Sure.  Why don't you take a look at Paragraph 19

24  of your affidavit?  I'm simply using your words.

25  *A.*   I've reviewed that.

1    *Q.*    All right.  Mr. MacLeod, did you ever investigate

2  any potential trauma experienced by Ms. Andriano other

3  than potential domestic violence?

4    *A.*    Not that I can recall.

5    *Q.*    Aside from the domestic violence, did you ever

6  investigate any other potential explanations for

7  Ms. Andriano's extramarital affairs in the months leading

8  up to her husband's death?

9    *A.*    I don't recall doing that.

10    *Q.*    Aside from the domestic violence, did you ever

11  investigate any possible explanations for any other

12  potentially out-of-character actions by Ms. Andriano in

13  the months leading up to her husband's death?

14    *A.*    I don't recall.

15    *Q.*    Did you ever investigate the possibility that

16  Ms. Andriano suffered physical abuse as a child?

17    *A.*    I don't recall.

18    *Q.*    How about sexual abuse?

19    *A.*    It seems like we did some investigation and

20  research into that.  I can't recall more specifically.

21    *Q.*    Do you remember which witnesses you spoke to

22  to investigate potential sexual abuse?

23    *A.*    I do not recall.

24    *Q.*    Do you remember what documents you collected to

25  investigate potential sexual abuse?

1    *A.*    I do not recall.

2    *Q.*    Do you recall what other work you did to

3    investigate potential sexual abuse?

4    *A.*    I do not recall.

5    *Q.*    Did you investigate any issues related to

6    Ms. Andriano's mental health?

7    *A.*    Yeah, I'm rather certain we did.  That would have

8    been an important part -- was an important part to her

9    mitigation defense.

10   *Q.*    Mr. MacLeod please take a look at Paragraph 20 of

11   your affidavit, the one you signed.

12   *A.*    I've reviewed it.

13   *Q.*    I'm sorry.  I gave you the wrong paragraph

14   number.  Paragraph 26, please.  Have you read that?

15   *A.*    I have, sir.

16   *Q.*    Does this refresh your recollection as to whether

17   you investigated any issues relating to Ms. Andriano's

18   mental health?

19   *A.*    Yes, it does.

20   *Q.*    And did you?

21   *A.*    My answer is the same.  I don't recall.

22   *Q.*    So you don't recall whether you investigated -- I

23   just want to make the record clear.  You don't recall

24   whether you did any investigation into Ms. Andriano's

25   mental health?

34

1    *A.*    No.  I don't recall identifying or investigating
2    potential issues.
3    *Q.*    Back to the pink binder, please.  Exhibit 138.
4    *A.*    Okay.  I think I'm on 138, Counsel.
5    *Q.*    What is this document?
6    *A.*    Can you give me a moment, please?  It appears to
7    be a printed version of a PowerPoint presentation.
8    *Q.*    Do you recall using this PowerPoint presentation
9    during the trial?
10   *A.*    I haven't reviewed its entirety.  Would you like
11   me to take the time to do that?  Because as of right now,
12   I do not.
13   *Q.*    Do you have any independent memory of this
14   PowerPoint presentation?
15   *A.*    After going through the first ten pages, I do
16   not, Counsel.
17   *Q.*    Do you know who prepared the slides for this
18   PowerPoint presentation?
19   *A.*    I do not.
20   *Q.*    Is it fair to say you have no memory at all of
21   this PowerPoint presentation?
22   *A.*    As of this time, yes, I do not recall this.
23   *Q.*    If you could tab back one to Exhibit 137, please.
24   Are you with me?
25   *A.*    I believe, yes, I'm on 137.

35

1    *Q.*   Okay.  What is this document?

2    *A.*   Give me some time to review it, please.  It

3   appears to be an e-mail from -- we call it a thread,

4   because there seems to be multiple parties involved in the

5   two-page exhibit.

6    *Q.*   Is this an e-mail that you sent to Daniel

7   Patterson on December 6th of 2004?

8    *A.*   I don't know.

9    *Q.*   Do you have any memory of this e-mail?

10    *A.*   I do not.

11    *Q.*   At the top of the page, you'll see there is an

12   e-mail account, macleod@mail.maricopa.gov, or mcleods, I

13   suppose.

14    *A.*   I see that, sir.

15    *Q.*   Okay.  Was that your e-mail account when you

16   worked at the public defender's office?

17    *A.*   I couldn't tell you.

18    *Q.*   You don't recall your e-mail address?

19    *A.*   I don't recall my e-mail address.

20    *Q.*   You don't recall the format for the e-mail

21   addresses at the public defender's office?

22    *A.*   I do not.

23         MR. BENNETT:  Your Honor, I move for the

24   admission of 137.

25         MR. HAZARD:  We have no objection.

 1          THE COURT:  Exhibit No. 137 for identification is

 2    admitted into evidence.

 3          MR. BENNETT:  Nothing further, Your Honor.

 4          MR. HAZARD:  I have no questions, Your Honor.

 5          THE COURT:  May this witness be excused?

 6          MR. BENNETT:  Yes, Your Honor.

 7          THE COURT:  Thank you very much, sir.  You are

 8    excused.  Don't walk off with any of the exhibits.

 9          THE WITNESS:  No.  If I may take the time to

10    clean up my mess.

11          THE COURT:  Okay.  Thank you.

12          THE WITNESS:  Thank you, Judge.

13          (WHEREUPON, the witness exited the courtroom.)

14          THE COURT:  The Petitioner may call her next

15    witness.

16          MR. BENNETT:  Thank you, Your Honor.  Our next

17    witness is Keith Rohman.

18          THE COURT:  Sir, before you sit down there,

19    please face the clerk.  Give the clerk your full name and

20    she will swear you in.

21          THE CLERK:  Please state your name and spell your

22    name for the record.

23          THE WITNESS:  Keith Rohman, R-O-H-M-A-N.

24          THE CLERK:  Raise your right hand, please.

25          (WHEREUPON, the witness was duly sworn by the

1  clerk.)

2         THE COURT:  Sir, you can make yourself

3  comfortable there on the witness stand.

4         THE WITNESS:  Thank you.

5         THE COURT:  Remember to speak up so that everyone

6  can hear you.  Wait until the question is completed before

7  you answer the question and make sure that you give us a

8  verbal response.

9         THE WITNESS:  Thank you, Your Honor.

10         THE COURT:  Mr. Bennett.

11

12                     KEITH ROHMAN,

13  having been first duly sworn to tell the truth, the whole

14  truth, and nothing but the truth, testified as follows:

15

16                  DIRECT EXAMINATION

17  BY MR. BENNETT:

18    Q.   Mr. Rohman, what do you do for a living?

19    A.   I'm the President of Public Interest

20  Investigations and I'm employed as a mitigation

21  specialist.

22    Q.   How long have you been doing that?

23    A.   I've been President of Public Interest

24  Investigations for 30 years and I've been involved in

25  mitigation investigation for approximately the last

1   25 to 27 years.

2       *Q.*   During those 25 to 27 years, how many capital

3   cases have you worked on as a mitigation specialist?

4       *A.*   I have been involved in one way or another in

5   probably 40 or 50 capital cases in Arizona, California,

6   Alaska, Utah and a number of other states.

7       *Q.*   Have you ever -- yeah, please help yourself to

8   the water.

9       *A.*   I've got a little cold.  Pardon me.

10          THE COURT:  For the record, we did work on the

11   temperature in the courtroom here and I think it's

12   considerably cooler.  So we will note that for the record,

13   at the request of counsel, or at least some counsel.  I

14   think Mr. Arntsen wanted it to be closer to his weather.

15          MR. ARNTSEN:  No.  It was Attorney Gard.

16          THE COURT:  Oh, okay.  It was Attorney Gard.

17          I thought Mr. Arntsen wanted it closer to his

18   northern-type temperature.

19          MR. ARNTSEN:  I think it was five below zero this

20   morning.  So I'm really not aiming for that.

21          THE COURT:  Thank you.  Mr. Bennett.

22       *Q.*   BY MR. BENNETT:  All right.  So, Mr. Rohman, have

23   you ever received any sort of training as to doing

24   mitigation investigations in a death penalty case?

25       *A.*   Yes, I have.

1    *Q.*    Please explain that to the Court.

2    *A.*    Sure.  As a mitigation specialist, I regularly

3    attend trainings in capital litigation on at least an

4    annual basis and have for the last probably 20 years.

5    These are usually -- one of the ones that I've attended

6    most consistently is the annual Capital Case Defense

7    Seminar in Monterey, California.  It's a four-day long

8    marathon of training put on by psychiatrists,

9    psychologists, experienced capital litigators, mitigation

10   specialists and investigators, covering all ranges of

11   issues related to capital litigation, including mitigation

12   investigation.

13          In addition, I have had the opportunity to work

14   with an experienced mitigation specialist and to work with

15   capital lawyers who are experienced as well.

16   *Q.*    Have you ever taught on the topic of mitigation

17   investigation?

18   *A.*    I am an adjunct professor at the Loyola College

19   of Law in Los Angeles and I teach a class on -- generally

20   on the subject of fact investigation.  As part of that

21   work, mitigation investigation and the techniques that are

22   used in mitigation are part of that presentation.

23          In addition, I have lectured at law schools and

24   to attorney groups CLEs, Continuing Legal Education.  I

25   lectured here in Phoenix I think in 2008 to a gathering of

1   the Mexican Capital Legal -- MCLAP.  It's the -- I

2   can't -- I'm not going to remember the initials right now,

3   but it was a gathering here of capital litigators involved

4   in the defense of Mexican nationals on capital cases.  So

5   I've done those trainings and others as well.

6       Q.   Thank you.  Would you please grab the pink

7   binder?  It's the one with Exhibits 101 to 167.

8       A.   Got it.

9       Q.   Can you please take a look at Exhibit 135?

10      A.   Yes.

11      Q.   What is this?

12      A.   This a copy of my curriculum vitae.

13           MR. BENNETT:  Your Honor, I move for the

14   admission of Exhibit 135.

15           THE COURT:  Any objection?

16           MS. GARD:  No, Your Honor.

17           THE COURT:  Exhibit No. 135 for identification is

18   admitted into evidence.

19      Q.   BY MR. BENNETT:  All right.  Mr. Rohman, could

20   you please explain to me in the context of a death penalty

21   case what is mitigation?

22      A.   Well, mitigation assumes that the client has been

23   convicted of a crime, which is outside the experience of

24   most people and outside the experience of most jurors.

25   They have heard a lengthy presentation both in the guilt

1  phase and then in the case in aggravation about a terrible
2  crime which the client has now been convicted of.
3          Your mitigation process is the process of trying
4  to not excuse that conduct, but put some context around it
5  to explain what happened by talking about a broader
6  concept of the client's life.
7          The trial up to that point has covered obviously
8  the date of the crime and the events that preceded it, but
9  it's a relatively narrow window into the client's life.
10          I think the defendant was approximately 30 years
11  old at the time of this crime.
12          What mitigation does is seeks to broaden the view
13  of that person's life to look at all of the influences and
14  factors that have come into that person's life that might
15  have affected them and perhaps give some explanation and
16  some understanding to why the crime happened in the way
17  that it did.
18      Q.   What are the skills that are necessary for a
19  mitigation specialist in a capital case?
20      A.   Mitigation specialists have a different job than
21  anybody else on the defense team.  While they interact
22  with them, they have a separate set of skills that they
23  need to have to be effective.  The first is some
24  particular skills in the area of witness interviews.  Much
25  of mitigation brings you into context with contact with

1    families and family systems where there have been abuse,

2    trauma, neglect, and you are really called upon to elicit

3    really essentially often embarrassing, even humiliating

4    family stories.

5            So the first skill that a mitigation specialist

6    really needs to have is some training and some experience

7    and some skills in eliciting that kind of testimony.

8            The second piece that's probably critical is the

9    collection of life history documents.  The standard of

10   care in mitigation involves a collection of life history

11   documents both from the client and from the people in the

12   client's family.  And many times, those records are not

13   ones that are easily or readily available.

14           You want -- you have a 30-year-old defendant and

15   you want her ten-year-old school records because they may

16   contain information that is relevant to that person's

17   life.  You don't just send over a letter and get those

18   records mailed back.  You have to have a set of skills and

19   certain persistence at collecting records of the scope

20   needed in a mitigation investigation.

21           You also then generally are called upon to be the

22   person on the defense team who plays a role in identifying

23   mental health potential symptoms or indications that the

24   client may suffer from some sort of mental disease or

25   defect.  While the professional standard calls for at

1   least one person on the team to be that, that role often

2   falls to the mitigation specialist, first and foremost.

3           The mitigation specialist also recommends experts

4   to the team based on his or her observations of the issues

5   related to the case.  And, finally, mitigation specialists

6   -- well, they also identify themes for mitigation because

7   the mitigation specialist is sort of the first one on the

8   ground.  The first responder is the wrong phrase.  But the

9   first person to have contact with perhaps these stories

10  from the family and will have some of the earliest

11  insights as to what may be themes the defense wants to

12  put on.

13          And then, finally, there is a set of documents

14  and materials which mitigation specialists are called upon

15  to develop.  The most significant of those is the social

16  history life chronology, which lists in considerable

17  detail all of the information collected in the mitigation

18  investigation both from interviews, from documents, and

19  any other -- and court records and any ancillary

20  documents.

21          And, also, to utilize -- to give the defense team

22  other sorts of life history documents, family trees and

23  the like that might be used in the case in these

24  presentations.

25      Q.   Now you heard Mr. MacLeod's testimony about his

1   understanding of the difference between mitigation work in

2   a noncapital case and a capital case?

3       *A.*   I did.

4       *Q.*   Do you agree with that?

5       *A.*   Well, you know, if you can refresh my

6   recollection, I remember that he testified -- that his

7   declaration said that he saw no difference.  And I was

8   confused because I thought he testified here today that he

9   saw a difference.

10          MS. GARD:  Objection, Judge.  That was hearsay.

11  Move to strike that comment.

12          THE COURT:  Sustained.

13      *Q.*   BY MR. BENNETT:  Well, all right.  So

14  Mr. MacLeod testified that his understanding -- he

15  testified that his understanding was that mitigation in a

16  capital case was more in-depth than in a noncapital case,

17  but otherwise essentially the same?

18          MS. GARD:  Object to counsel testifying.

19          THE COURT:  Overruled.

20      *Q.*   BY MR. BENNETT:  Do you agree with that?

21      *A.*   No, I do not.

22      *Q.*   Why not?

23      *A.*   Mitigation investigation in a noncapital case --

24  in a capital case is different from that in a noncapital

25  case in such a matter of degree that it's difficult to put

1   them in the same category.

2          If a noncapital mitigation investigation is

3   setting a splint on an arm, capital mitigation is doing

4   heart surgery or brain surgery.  I'm not a heart surgeon

5   or brain surgeon, but I'm trying to emphasize the

6   difference in degree and the difference in the amount of

7   information that you're going to gather.

8          Under Arizona law, I'm not a lawyer here today,

9   but the statute -- the capital statute allows for a

10  different set of rules of evidence to be considered -- to

11  be utilized in the penalty phase of a trial.  The scope

12  and spectrum of work and information that you would bring

13  into a non -- excuse me -- into a capital -- into a

14  capital presentation is so much broader than that of a

15  noncapital, that it's hard to put them on the same list.

16    *Q.*   And is there a difference on mitigation work that

17  must be done when a jury is going to be doing the

18  sentencing as opposed to a judge?

19    *A.*   Well, I've worked in Arizona before the *Ring*

20  decision and I've worked in Arizona after the *Ring*

21  decision.  And the standard for how capital work should

22  have been done was the same before and the same after.

23         However, as a practical matter, the kinds of

24  evidence that would be significant to a jury, that would

25  appeal to a jury, that would move a jury would be

1  different and was different.  And an understanding of

2  those differences would be critical to being effective as

3  a mitigation specialist.

4      *Q.*    Let's shift topic.  Are there any kind of written

5  guidelines that set forth what is expected of a mitigation

6  investigation?

7      *A.*    Yes, there are.

8      *Q.*    What are those?

9      *A.*    They are the ABA Guidelines.  There's two

10  iterations that I'm most familiar with.  There's the

11  2003 Guidelines and then the 2008 Guidelines,

12  Supplementary Guidelines for Mitigation Work.

13     *Q.*    Would you please take a look -- and I apologize.

14  It's probably in about two binders.  It's Exhibit 76 and

15  206.

16     *A.*    Got it.  The last one in the box.  Yes.

17     *Q.*    All right.  Exhibit 76, are these the 2003

18  ABA Guidelines that you referred to?

19     *A.*    Yes, they are.

20     *Q.*    And Exhibit 206, are those the 2008 Guidelines

21  that you referred to?

22     *A.*    The Supplementary Guidelines for Mitigation

23  Function, yes.

24     *Q.*    Now these guidelines, either the 2003 or the 2008

25  versions, did they create a new standard for how

1   mitigation investigations should be done?

2       *A.*   No, they did not.  What the '03 Guidelines and

3   the '08 Guidelines did was summarize standards and

4   practices that had been in effect in the area of

5   mitigation for at least a decade before the 2003.

6           You know, the capital punishment came back in

7   this country sometime in the late 70's, early 80's.

8   Through the probably beginning part of the 80's, there's

9   an evolving standard of practice.  But, certainly, by the

10  1990's, there was a clear understanding by both capital

11  litigators and certainly mitigation specialists for the

12  type of work that needed to be done in these cases.

13          What the guidelines did was summarize those,

14  perhaps codify some of those.  But when I remember

15  reviewing the guidelines in '03 and thinking to myself,

16  well, there must be something new in here, and, in fact,

17  there really was not nothing new.  This was sort of a

18  short checklist of what -- some portion of what I had

19  already been doing and what was the standard for care at

20  the time.

21      *Q.*   And what about the 2008 Guidelines?  How could

22  they apply to a case that went to trial in 2004?

23      *A.*   Well, the '08 Guidelines are actually -- I'm

24  pointing to them the wrong way.  The '08 Guidelines are in

25  fact just more specific references to items that are

1    covered in the '03 Guidelines.

2         For instance, the '03 Guidelines say that a

3    mitigation specialist is supposed to be somebody with

4    appropriate training.  The '08 Guidelines talk about how

5    exactly how often that training at a minimum should be

6    conducted.

7         The '03 Guidelines talk about an exhaustive

8    multi-generational investigation of the client's family

9    and social history.

10        The '08 Guidelines, Supplemental Guidelines, say

11   exactly the same thing, but they list as examples what

12   types of witnesses you might want to consider.

13        So they really are just -- they really are just

14   what they say, a supplement.  They don't define anything

15   new.  And there was no change in the patent -- there was

16   no change in the practice or the standards for how this

17   work should have been done between 2003 and 2008.

18        MR. BENNETT:  Your Honor, I move for the

19   admission of Exhibits 76 and 206.

20        THE COURT:  Any objection?

21        MS. GARD:  No, Your Honor.

22        THE COURT:  Exhibit No. 76 and Exhibit No. 206

23   are admitted into evidence.

24        *Q.*  BY MR. BENNETT:  All right.  Mr. Rohman, what

25   information did you review about this case?  What

1  information did you collect, I guess would be a better

2  question?

3      *A.*   You know, if I could refresh my recollection with

4  my report.

5      *Q.*   Please.

6      *A.*   But I don't know where that is in all of this.

7      *Q.*   Exhibit 204.

8      *A.*   Thank you.  I reviewed the guilt and innocence

9  phase and opening and closing statements or arguments by

10  counsel.  I reviewed the penalty phase transcript.  I

11  reviewed e-mails from Patrick Linderman and Scott

12  DeLozier. (Sic)  I reviewed the declaration of David

13  DeLozier, Scott MacLeod, Dan Patterson.

14      And then I reviewed a variety of other materials

15  as well:  A report by Dr. Bayless; correspondence from

16  H. Kandy Rohde; notes of H. Kandy Rohde; a report by

17  Dr. Potts; a report by Dr. Rosengard and a report by

18  Dr. Murphy.

19      In addition, I reviewed visitor logs for Wendi

20  Andriano at the jail facility where she was incarcerated.

21  Then I met with Wendi Andriano, Donna Ochoa and Alejo

22  Ochoa and I interviewed them with a specific agenda.  I

23  did not -- my agenda was not to ask them questions about

24  their social history or life history, but to ask them

25  about their interactions with the defense team regarding

1   mitigation and the role of the mitigation specialist.

2       *Q.*   Did you look at any of the mitigation evidence

3   that has been developed in the Post-Conviction Proceeding?

4       *A.*   No, I did not.

5       *Q.*   Why not?

6       *A.*   I view my role in evaluating what the defense did

7   at trial as what would I have done as a qualified

8   mitigation specialist with the information that I had at

9   hand at that time.  So that, I didn't want to confuse or

10  conflate whatever information the defense had collected --

11  the PCR defense team has collected since the conviction.

12      *Q.*   So let's turn now to the issue of Scott MacLeod's

13  qualifications.

14      *A.*   Sure.

15      *Q.*   What qualifications does someone need to be a

16  mitigation specialist?  Is it the ability you described

17  earlier or something else?

18      *A.*   Yeah.  No, I believe -- you know, we've talked --

19  I talked earlier about the skills and abilities earlier:

20  Interview skills, document collection, familiarity

21  questions, capital law, the ability to develop the

22  relevant kinds of presentation materials.  And those are

23  abilities which you obtain in the process of both

24  professional education and experience working with

25  qualified professionals.

1    *Q.*    Do the ABA Guidelines address the qualifications

2    needed for a mitigation specialist?

3    *A.*    They do.  They do.  They indicate it has to be

4    somebody who by -- well, they have appeared.  They talk

5    about the -- and they're gone now.  They do.  They talk

6    about the need for training.  They talk about the need for

7    experience in these areas, including, for instance, they

8    talk in detail about specific abilities in terms of

9    interview techniques, document collection and the like.

10   *Q.*    Okay.  Thank you.

11        MR. BENNETT:  If you wouldn't mind putting that

12   up again.  Thank you.

13   *Q.*    BY MR. BENNETT:  Is one provision from the

14   guidelines regarding the training necessary for mitigation

15   specialists?

16   *A.*    Yes.  That's accurate.

17   *Q.*    Would you mind reading that for us?

18   *A.*    Sure.  It is the ABA Guidelines under Training.

19   All capital team members should attend and successfully

20   complete at least once a year a specialized training

21   program that focuses on the defense of death penalty

22   cases.

23   *Q.*    Would that be like the seminar you attend in

24   Monterey?

25   *A.*    That's correct.  And in other parts of the

1  country.

2      *Q.*   Based on the information that you have reviewed

3  and the interviews you have conducted, was Scott MacLeod

4  qualified to work as a mitigation specialist on a capital

5  case?

6      *A.*   Not that I could see.

7      *Q.*   Why is that?

8      *A.*   Well, first, he had no prior experience working

9  on a capital case before this case.  And if I review his

10  declaration, he received no special training in how to

11  work on a capital case.

12         He told Wendi Andriano -- when I interviewed

13  Wendi Andriano, she told me that Scott MacLeod had in fact

14  told her that he wasn't qualified.

15         In addition, MacLeod's declaration says that he

16  sees no difference between a noncapital mitigation and

17  capital mitigation.  That statement by itself shows his

18  lack of qualifications.

19         But he had no training.  He had no experience and

20  he had no guidance.

21         The last area where you might -- you know,

22  everybody has to do a first case.  I grant that.  But when

23  you do, you want to do that in the context of somebody who

24  both lawyers and other people on the case or perhaps

25  supervisors or mentors who can give you that information.

1    There is no indication that Mr. MacLeod received any of

2    that kind of training or oversight.

3         *Q.*   Let's turn to another topic, which is the time

4    that was allotted for the investigation.  When does the

5    mitigation investigation in a death penalty case need to

6    start?

7         *A.*   The standard of care in this field is that that

8    work needs to be begin as soon as possible after the

9    client's arrest.  Typically, that should be within weeks,

10   certainly within a month or two following the client's

11   arrest.  And it should be prepared at every stage of the

12   case through the pretrial, through potential plea

13   negotiations, motions work, jury selection, the guilt and

14   innocence phase, the aggravation phase and the penalty

15   phase.

16        That work needs to start as soon as possible.

17   And that's both been the standard of care for years as

18   well is spelled out in the guidelines.

19        My first capital case in Arizona was in 1994.  It

20   was a case in Maricopa County.  I was brought in by

21   counsel at that time to work on a matter called -- a

22   defendant named Damian Curl, who was capitally charged in

23   Maricopa County.  And the work that -- I began mitigation

24   work immediately.

25        MS. GARD:  Objection.  Relevance.

1          THE COURT:  Overruled.

2          Go ahead.

3          THE WITNESS:  I began work immediately on that

4  case.  And the information that we developed led to

5  questions of the defendant's competency, which led to a

6  process, which eventually led to a plea for Mr. Curl to

7  have a life sentence.

8          I tell that story as an example the way in which

9  mitigation work needs to start early to be effective at

10  all stages of the case.

11     Q.  BY MR. BENNETT:  All right.  Are these two

12  portions of the ABA Guidelines that refer to when the

13  investigation needs to commence?

14     A.  Yes.  That's correct.

15     Q.  Would you mind reading those?

16     A.  Sure.  The first is:  The mitigation

17  investigation should begin as quickly as possible.  This

18  is from the 2003 Guidelines.

19          The second says:  The responsibility for the

20  development and presentation of mitigation evidence must

21  be incorporated into the defense at all stages of the

22  proceedings from the moment the client is taken into

23  custody.  And that's from the '08 Supplement.

24     Q.  Putting aside the potential uses of mitigation

25  evidence in other parts of the case, but other than

1  sentencing, why would it take the years that it normally

2  takes for a capital case to go to trial to complete a

3  mitigation investigation?  Does it takes that long?  Do

4  you need that much time, in other words, to collect the

5  information?

6      *A.*    The answer is yes.  The reason is because, first

7  of all, you're delving back years into somebody's life and

8  history.  So, for instance, the collection of those

9  documents is not something you send out -- as I said

10  earlier, you send out a letter and the documents come

11  back.  That process is time-consuming.

12          But, more importantly, the kind of information

13  that we're seeking in these cases is private, personnel,

14  humiliating even and certainly embarrassing to the family.

15  It is the family secrets that have been kept under wraps

16  for a long time.  You don't just walk into someone's

17  living room and ask them about it.  You don't even walk

18  into the defendant's cell or the visiting room and ask him

19  or her about it.  It takes time to build up a rapport, to

20  build confidence, to elicit that kind of information.

21          So it is not untypical to have several years to

22  prepare a capital case for trial.

23      *Q.*  On that note, in your experience, how many

24  conversations are necessary to get people to reveal

25  information about things such as childhood sexual abuse?

1    *A.*    You know, there is no one number, of course, but

2    it is multiple times to get people, because what happens

3    is someone will make a passing reference at one point to

4    an incident that happened with a relative, and then you

5    come back a week or so later and then they tell you a

6    little bit more and then they backtrack.

7           That process can take literally sometimes -- and

8    with our clients, I meet with them dozens and dozens of

9    times, and with important life history witnesses, it's not

10   unusual for me to meet with them eight, nine, ten or 11

11   times.

12   *Q.*    What is a social history and how does that play

13   into a mitigation investigation?

14   *A.*    The social history, or sometimes called the

15   social history chronology, is a document which draws

16   together the broad range of evidence which has been

17   collected in the mitigation investigation.  It brings

18   together the documents provided that you've been able to

19   collect, the interviews with the client, the defendant,

20   interviews with family members, school teachers, social

21   workers, doctors, treating psychiatrists or psychologists

22   and puts that and arranges that in date order.  That

23   process, which is very time-consuming, then creates this

24   document which is a -- first of all, it's a reference tool

25   for the defense team.  It orients everybody to an

1   understanding of the client's life in its full

2   perspective.

3        But it also can be used to then give to whatever

4   mental health specialists may be brought into the case,

5   psychiatrists, psychologists, trauma specialists, because

6   they aren't going to have the time to read all the 50 or

7   100 interviews or whatever the number of interviews you've

8   done.  They're not going to have time to review the

9   thousands hopefully pages of documents or the hundreds of

10  pages of documents you've collected.  This document

11  becomes a summary document that they can then rely upon if

12  it's properly prepared.

13  *Q.*   Based upon the information you received and the

14  people you talked to, did the mitigation investigation in

15  Ms. Andriano's case start soon enough?

16  *A.*   No.

17  *Q.*   Why not?

18  *A.*   Well, the mitigation -- there was enough time to

19  do a mitigation investigation.  They had almost four years

20  from the time of the crime, I think if I have the numbers

21  right, approximately to the trial.  But as far as I can

22  tell, the mitigation investigation did not really

23  begin until -- at least, the mitigation investigation that

24  got used at trial did not begin until Scott MacLeod began

25  his work in, if memory serves me, is it April of 2004?

1 And the trial starts in August of 2004.  So that's just

2 not nearly enough time.

3     *Q.*   By the way, Mr. Rohman, in the materials that you

4 reviewed or the people you talked to, did you get any

5 indication that Patrick Linderman had done any substantive

6 work on this case?

7     *A.*   I saw no evidence in any part of the file that I

8 reviewed, in any e-mails with the defense lawyers, in

9 either of the declarations by either of the attorneys in

10 this case, and in anything -- any of the materials

11 generated by any of the psychologists, that Patrick

12 Linderman played any significant role.

13         I talked with family members and asked them if

14 they had any recollection of -- and Ms. Andriano if they

15 had any recollection of Linderman playing a significant

16 role, and they had no memory either.

17         MS. GARD:  Objection, Your Honor.  I should have

18 made this record probably earlier, but if he's being

19 offered as an expert and if he's testifying to that

20 hearsay for that purpose and for his opinions, that's one

21 thing, but I would object to these statements coming in

22 because it's hearsay.

23         THE COURT:  Is that a basis of your opinions?

24         THE WITNESS:  Oh, yes, sir.

25         THE COURT:  Then the objection is overruled.

1        Go ahead.

2        MR. BENNETT:  Thank you.

3    *Q.*  BY MR. BENNETT:  All right.  Please take a look

4   at the pink binder.

5    *A.*  What number?

6    *Q.*  Exhibit 137, please.

7    *A.*  Yes.

8    *Q.*  All right.  Is this an e-mail that you reviewed

9   in forming your opinions about this matter?

10   *A.*  Yes, it is.

11   *Q.*  In your opinion, does this e-mail give any

12  indication about whether the mitigation investigation

13  started soon enough?

14   *A.*  Yes, it does.

15   *Q.*  And what is that indication?

16   *A.*  Well, I think it's important to note the date of

17  the e-mail is December 6, 2004.  If memory serves me, the

18  aggravation phase has been completed and the penalty phase

19  either has begun or is about to begin.

20       So this is an e-mail from Scott MacLeod to Dan

21  Patterson.  Its subject is -- and it's written on Monday,

22  December 6, 2004.  The subject line is:  Some ideas from

23  Thursday and Friday's seminar.  So I'm assuming these are

24  ideas that he developed the Thursday and Friday before

25  this.

1          MS. GARD:  Objection.  Speculation.

2          THE COURT:  Sustained.

3          Ask your next question.

4     Q.   BY MR. BENNETT:  All right.  So, at this point in

5  time, and it's now December 6th of 2008, with the

6  penalty --

7          THE COURT:  2008, I think you said?

8          MR. BENNETT:  I'm sorry.  I misspoke, yeah.

9     Q.   BY MR. BENNETT:  On December 6th of 2004, with

10 the penalty phase about to begin, based on your

11 experience, would this kind of e-mail have been useful to

12 the defense?

13    A.   No.  This kind of e-mail would have been useful

14 to the defense three or four years earlier.  This is the

15 kind of e-mail that you would expect from mitigation

16 specialists at the beginning of your work on a case.  This

17 is sort of the equivalent of trying to put together a car

18 as it, you know -- putting wheels on a car as it's rolling

19 down the highway at 60 miles an hour.  The horse has left

20 the barn.  The case is underway.  This is -- whether or

21 not these are useful themes and ideas, I don't know, but

22 the timing of them makes them almost useless to the

23 defense.

24    Q.   Yes, please feel free to take a drink.  Please

25 turn one tab back to Exhibit 136, please.  Did you review

1 this e-mail in formulating your opinions about this case?

2 *A.*   Yes, I did.

3 *Q.*   And did this e-mail have any bearing upon your

4 conclusion that the investigation started too late?

5 *A.*   Yes.   This is a memo -- an e-mail dated

6 November 29th, updated list 11/30 of mitigation witnesses

7 and is a list of simply -- what he calls simply:  My list

8 of witnesses of potential people to call in the trial.  He

9 has not interviewed everybody on the list and he provides

10 no data in here about what these witnesses will say or

11 won't say.

12       So the very fact that he's just dropping this

13 information onto the defense team at this late -- to call

14 this the 11th hour, this is really 11:55 p.m. is -- again,

15 this tells me that this is, again, the kind of thing you

16 would have wanted two years before trial, not two days.

17       And if I might add, I also reviewed e-mails which

18 showed Mr. MacLeod sending interview note summaries to the

19 attorneys of some of these witnesses in the days following

20 this.  Again, delivering that information to the attorneys

21 in the form of memos that late in the case is well below

22 any reasonable standard for how you would want these cases

23 to be handled.

24 *Q.*   You have reviewed some of the transcripts from

25 the trial proceedings; correct?

1       *A.*    Yes.

2       *Q.*    Were there any statements by Attorney Daniel

3   Patterson in there that led you to conclude that the

4   mitigation investigation started too late?

5       *A.*    Yes.   I believe at the end of the aggravation

6   stage, Mr. Patterson -- and I know it's referenced in my

7   memo, but I do remember the sum and substance of it.  He

8   said that he had to change mitigation specialists and that

9   Mr. MacLeod was rushed and hurried trying to get ready for

10  this trial.

11      *Q.*    And the final question on this topic, Mr. Rohman,

12  were there any indications in the materials you reviewed

13  about whether the attorneys were involved in the

14  mitigation investigation prior to the spring of 2004?

15      *A.*    Well, the thing that's most striking about this

16  is that there are declarations from three -- both

17  attorneys and from Mr. MacLeod.  Mr. Patterson says that

18  he left the development -- in his declaration, as I

19  recall, he left the development of the mitigation

20  completely to Mr. DeLozier and Mr. MacLeod.

21          Mr. DeLozier says he played no role in making any

22  decisions on the case and waited for assignments from

23  Mr. Patterson until the 11th hour when he's sent to handle

24  mitigation, and they didn't consult with Mr. Patterson

25  about it.

1      Mr. MacLeod says he took all of his direction

2 from Mr. Patterson because Mr. Patterson was the lawyer.

3      So nobody here is running the mitigation.  Not

4 the lawyers.  Not the investigator.  It's just not

5 happening.

6      Q.   Let's turn to the next topic, the need for the

7 mitigation -- the defense to work as a team in

8 investigating mitigation.

9      A.   Sure.

10     Q.   What is the standard there?

11     A.   Well, the concept of the capital litigation is

12 that this is more than one person can do, more than two

13 people can do.  So the ABA Guidelines and the standard and

14 practice make repeated references to the defense team, and

15 that phrase team occurs over and over again.

16     And what that means in practice and in my 20-plus

17 years doing mitigation is that there is regular ongoing

18 consultations between the lawyers, the investigators, the

19 guilt and innocence investigators, the paralegal and the

20 mitigation specialists.

21     It is standard practice on cases that I'm

22 involved in, including as recently as last week, to have

23 team meetings either by phone or in person every two weeks

24 in the run-up to a trial or to preparing a Post-Conviction

25 Appeal.

64

1           So that kind of team approach is both part of the
2    standard and practice of the field, it's what's regularly
3    taught and talked about at these seminars, and it's also
4    laid out in the ABA Guidelines.
5        Q.   I was going to ask:  Do the guidelines address
6    these issues?
7        A.   They do, indeed.
8        Q.   All right.  Based on the materials that you
9    reviewed and the interviews you have conducted, and the
10   testimony here today, did Mr. MacLeod and the defense
11   attorneys work as a team in putting together the
12   mitigation in this case?
13       A.   No, they did not.
14       Q.   What made you come to that conclusion?
15       A.   Well, Mr. Patterson's declaration talks about --
16   and if I might refer back to my report just because I
17   don't want to misquote in his declaration.
18       Q.   Sure.
19       A.   And that is at 1 --
20       Q.   204?
21       A.   204.  Thank you.  I'm refreshing my recollection
22   from that.  In Mr. MacLeod's declaration -- I'm sorry.
23   Mr. Patterson's declaration said -- I'm sorry.  Could you
24   repeat the question?  In any event, I'm -- could you
25   repeat the question?

1    *Q.*   No worries.  Was there anything in the materials

2    that you reviewed and the testimony you heard here today

3    that led you to conclude that the defense did not work

4    together as a team?

5    *A.*   Mr. Patterson's declaration in which he said:  I

6    gave limited direction to Mr. Linderman and Mr. MacLeod as

7    to developing themes and theories of mitigation.  I do not

8    recall giving Mr. MacLeod any specific direction and

9    largely left the development of the mitigation case to the

10   discretion of Mr. MacLeod and Attorney DeLozier.

11        If lead counsel is not in touch with his

12   mitigation specialists, they are not working as a team.

13   They are not -- there is no coordination going on.

14        And this became even more striking at the point

15   during the end of the penalty phase when the defense put

16   on this PowerPoint demonstration, and I believe

17   Mr. MacLeod -- I'm sorry -- Mr. Patterson said that he

18   hadn't had an opportunity to see or review this prior to

19   it being presented in court.

20   *Q.*   And I think you're referring to Exhibit 138, if

21   you could turn there, please.

22   *A.*   Yes, I am.

23   *Q.*   Is this the PowerPoint presentation?

24   *A.*   Yes.  That's correct.

25   *Q.*   What is your understanding of how this was used

1  in the trial?

2      *A.*   Mr. DeLozier's affidavit says that this

3  PowerPoint presentation was prepared -- the photos were

4  put together by Scott MacLeod and that the text of the --

5  the presentation and the text of his argument, to prepare

6  that, he turned to the defendant's mother, Wendi, and

7  asked that she write the text for this.  But as per the

8  declaration, Wendi's mother then asked a family friend,

9  who she felt would be a better writer.  So this was

10  somebody who had I guess experience in drafting grant

11  proposals.  You know, in my --

12      *Q.*   Just to correct the transcript, too, I think a

13  moment ago, you mentioned the defendant's mother as Wendi.

14  I assume you meant Donna?

15      *A.*   Correct.

16      *Q.*   Okay.

17      *A.*   And I'll just say that I've been exposed to

18  obviously the cases I've been involved in and I have as

19  well, just though my professional context, reviewed the

20  work in other capital cases.  I have never seen a capital

21  trial where defense counsel advocated their role to lay

22  people, family members to draft a closing argument.  I've

23  never seen it before.

24      *Q.*   Let's turn to the next issue, the investigation

25  of potential mental health experts.

1          MR. BENNETT:  Your Honor, before we turn to this,
2    would this be a good time for a break?
3          THE COURT:  Okay.  We will go ahead and take our
4    afternoon recess.  We will be in recess.
5          (WHEREUPON, a recess ensued from 3:02 p.m. to
6    3:15 p.m.)
7          THE COURT:  This is CR 2000-096032, State of
8    Arizona vs. Wendi Elizabeth Andriano.
9          The record will reflect the presence of the
10   parties and counsel.  The record will reflect that Keith
11   Rohman is on the witness stand and we will continue with
12   the direct examination by Mr. Bennett.
13         Mr. Bennett.
14         MR. ARNTSEN:  Your Honor, just one thing.  We've
15   got an agreement on the Alejo Ochoa stuff.  We can deal
16   with it later.  We don't need to deal with it now.  I
17   don't know when you would rather deal with it.
18         THE COURT:  Go ahead.  I'll hear it from you.
19         MR. ARNTSEN:  What it is is that counsel are in
20   agreement that both sides essentially accept Alejo Ochoa's
21   lawyer's representation that he will testify as to the
22   Fifth as to everything.  And so, we don't see any point in
23   having him come up here and say this, but we want to
24   essentially have the record be the same as if he had come
25   up here and said that.  We just don't see -- and if the

68

1  Court is comfortable with that, counsel is in agreement on

2  that.

3          And then, similarly, with regards to Exhibits 24

4  and 25, which are his declarations, and Exhibits 227 and

5  228, which are the Detective Olson's recording of the

6  interview and Detective Olson's report of that, that we

7  agree that those may be admitted into evidence, but we are

8  preserving our hearsay, in terms of hearsay as to the

9  truth of the matters asserted therewith.

10         So did I state that right?

11         MS. GARD:  That's correct, Judge.

12         THE COURT:  So, basically, both sides agree that

13  based upon their conversations with Mr. Alejo Ochoa's

14  counsel that I appointed, that he would be asserting the

15  Fifth.  And, based upon that, then both sides agree that

16  you will not be calling him as a witness; correct?

17         MR. ARNTSEN:  Correct.

18         THE COURT:  And then Exhibit Nos. 24, 25, 227 and

19  228 will be admitted into evidence with the understanding

20  that --

21         MR. ARNTSEN:  That the hearsay objections are

22  being preserved.

23         THE COURT:  Is that correct?

24         MS. GARD:  Correct.

25         MR. ARNTSEN:  And, again, Your Honor, this

1   agreement -- we just want to make sure that you are

2   comfortable with the state of the record, so that,

3   essentially, with Mr. Ochoa, it's the same as if he came

4   in here and took the Fifth, essentially.

5        THE COURT:  Right.  I'm comfortable with that.

6        MR. ARNTSEN:  Okay.  Thank you, Your Honor.

7        THE COURT:  So Exhibit Nos. 24, 25, 227 and 228

8   are admitted into evidence with that understanding.

9        MR. ARNTSEN:  Thank you, Your Honor.

10       MS. GARD:  Thank you, Judge.

11       THE COURT:  Okay.  So the record will reflect

12  that Keith Rohman is on the witness stand.  We will

13  continue with the direct examination by Mr. Bennett.

14       Mr. Bennett.

15       MR. BENNETT:  Thank you, Your Honor.

16   *Q.*   BY MR. BENNETT:  All right.  Let's turn to the

17  next topic, this investigation of potential mental health

18  issues.

19   *A.*   Okay.

20   *Q.*   The investigation of the mental health issues, is

21  that the responsibility of a mitigation specialist in

22  every capital case?

23   *A.*   An examination of whether there is the presence

24  of possible mental health issues in the client's life is

25  in fact part of every capital representation in every

1   mitigation specialist's work.

2       Q.    Is this, what we have up on the screen, a

3   relevant provision from the ABA Guidelines on this issue?

4       A.    Yes.  This is from the 2003 Guidelines.

5       Q.    And what does that say?

6       A.    Neurological and psychiatric impairment, combined

7   with a history of physical and sexual abuse, are common

8   among persons convicted of violent offenses on death row.

9   The defendant's psychological and social history and his

10  emotional and mental health are often of vital importance

11  to the jury's decision at the punishment phase.  And

12  that's from the '03 Guidelines.

13      Q.    Thank you.  And that statement at the top about

14  neurological and psychiatric impairment with physical and

15  sexual abuse being common among people on death row, is

16  that consistent with your own experience?

17      A.    Yes.  You know, I can't say that every single one

18  of my clients, but virtually all of my clients who I've

19  been involved in representing on a capital murder charge

20  have had one or any combination of neurological,

21  psychiatric and the types of abuse talked about up there.

22      Q.    Thank you.  Why?  Why does mental health matter?

23  Why is it the important for the mitigation to look into

24  potential mental health issues?

25      A.    Well, mental health goes to giving the jury that

1   overall context of the client's life and background that

2   leads them to an ability to perhaps find for a sentence

3   less than death.  The mitigation specialist's task is to

4   evaluate evidence, gather evidence, and help advise

5   counsel as to whether or not there are some of these

6   issues present and how to go about investigating them,

7   what experts to use and then potentially how to go about

8   presenting this evidence.

9        *Q.*   Based on everything that you have reviewed, was

10  there an adequate investigation into potential mental

11  health issues in this case?

12       *A.*   No, I don't believe there was.

13       *Q.*   Why do you say that?

14       *A.*   Well, first of all, the defense had many

15  indications that the client was suffering from severe

16  mental illness, and it received that from people working

17  in contact with them.  Kandy Rohde wrote to the defense

18  team on more than one occasion at an early point imploring

19  them to bring in somebody with special skills to evaluate

20  and diagnose the client.  That work was not done in an

21  adequate way or in a complete way.

22       *Q.*   In the materials you reviewed, were there any

23  other indications or any other sort of red flags that

24  would have indicated to a mitigation specialist that

25  mental health needed to be looked into?

72

1       *A.*    Sure.   The big red flag was that the client
2   attempted suicide while in the Maricopa County Jail System
3   and spent the bulk of the last couple of years of her
4   confinement there on a psyche ward, so that the client --
5   and under psychiatric care.   That would be the strongest
6   indication that there are some issues here at least worth
7   evaluating.
8           But, in addition, there was a Rule 11 evaluation
9   by Dr. Jack Potts, in which Dr. Potts, while ruling that
10  she was competent to stand trial -- and I would have to
11  refresh my recollection of the exact words -- but
12  indicated that there were in fact potentially more serious
13  psychological issues which should be examined by the
14  defense.
15      *Q.*    And you're aware that Ms. Andriano was evaluated
16  by a Dr. Rosengard?
17      *A.*    Yes.   That's correct.
18      *Q.*    So why was that not satisfactory?
19      *A.*    Well, Dr. Rosengard evaluated the client in I
20  believe the summer of 2002, if memory serves me, which was
21  a very early stage in the defense's preparation of the
22  case and before any mitigation investigation had been done
23  at all.   And the phrase is garbage in/garbage out, vacuum
24  in/less out.   Dr. Rosengard did not have the advantage of
25  knowing the real story of the client's life and

1   background.

2        For instance, a very basic fact about the

3   client's life, her natural father was in state prison at

4   the time while she was growing up for the crime of

5   molesting children.  Dr. Rosengard didn't have that very

6   basic piece of information.  All the other information

7   about the client's background and history, he was relying

8   on the client's self-report.

9        The nature of a mental health examination

10  suggests that the self-reporting of the client should be

11  examined with a certain skepticism.  A properly prepared

12  mental health examination involves providing that

13  examining psychiatrist or psychologist with the kind of

14  detailed social history background that should be prepared

15  in these cases.  That's both what the standard and

16  practice has been in mitigation investigation for as long

17  as I can remember and certainly what is outlined in the

18  ABA Guidelines.

19       *Q.*   Let's turn now to our final area, the

20  investigation into Ms. Andriano's family history.

21       *A.*   Sure.

22       *Q.*   Is it the standard of care in mitigation

23  investigation to investigate a defendant's -- a capital

24  defendant's family history?

25       *A.*   Yes, it is.

1    *Q.*    Is that reflected in the ABA Guidelines?

2    *A.*    Yes, it is.

3    *Q.*    All right.  Are these a couple of the relevant

4    guideline provisions?

5    *A.*    Right.  That's correct.  They're both from the

6    '03 Guidelines.

7    *Q.*    Would you mind reading what we have on the

8    screen?

9    *A.*    Because the sentencer in a capital case must

10   consider mitigation, anything in the life of the defendant

11   which might militate against the appropriateness of the

12   death penalty for the defendant, penalty phase preparation

13   requires extensive and generally unparalleled

14   investigation into personal and family history.  That's

15   from Page 81 of the '03 Guidelines.

16        And on Page 83, it states:  Must investigate at

17   least three generations.

18   *Q.*    All right.  Thank you.  On a related note, in

19   addition to investigating family history, is it a

20   necessary part of a mitigation investigation to interview

21   nonfamily members who knew the defendant?

22   *A.*    Indeed.  In fact, it's really a vital part of

23   that process.  Jurors have a tendency to look askance at

24   family members.  They assume that perhaps they have a bias

25   in favor of the defendant.  Sometimes the most --

1          MS. GARD:  Objection.  Foundation.

2          THE COURT:  Overruled.

3          Go ahead.

4          THE WITNESS:  Many times in my experience and

5     observation, the most effective witnesses in a penalty

6     phase are nonfamily members, school teachers who witnessed

7     something or a medical doctor who examined them as a young

8     person or some neighbor or family member who or less

9     immediate family member who observed acts of misconduct in

10    the home or around the home, social workers, the whole

11    realm of people who came in contact with the family.

12         In addition, I just want to clarify, that when we

13    talk about three generations, the guidelines talk about

14    doing the family history and the family background both

15    horizontally and vertically -- sorry -- both vertically

16    and horizontally.  And so that, you're not just looking at

17    the client's parents and grandparents you're looking at

18    the client's cousins and then aunts and uncles and then

19    great uncles and great aunts as well over the three

20    generations.

21    *Q.*  BY MR. BENNETT:  Should a mitigation

22    investigation include interviewing childhood friends of

23    the defendant?

24    *A.*   Absolutely.  Childhood friends would be a perfect

25    example of people who might be close to the client inside

1  the family structure but would be perhaps more able to

2  talk honestly about it because they are not actually in

3  the family.

4      Q.    When it becomes to investigating potential sexual

5  abuse of someone, is it important then to interview people

6  who are not part of the family or not living in the same

7  household?

8      A.    Yes, it is.  You're talking again about the most

9  private of things that happen in a home and sometimes the

10  most shameful.  Getting people in that immediate circle to

11  talk about these things is difficult.  And but there are

12  often people who witness aspects of it or who heard

13  contemporaneous reports back in the day or there is a

14  school record that makes reference to the child missing

15  many days of school.

16          There are a lot of different ways you can seek

17  corroboration and it often involves the most important

18  corroboration coming from people outside the immediate

19  family circle.

20      Q.    Based on all of the information you've reviewed,

21  did Scott MacLeod and the defense conduct an adequate

22  investigation into Ms. Andriano's family history?

23      A.    No, they did not.

24      Q.    Why not?

25      A.    Well, I don't think they collected the kinds of

1  documents that you would need.  There is no indication

2  that they did.  I noted, for instance, that they did

3  not -- this was touched upon in Mr. MacLeod's testimony.

4  That they did not request jail records of the client until

5  I believe the aggravation phase of the case was already

6  underway and I don't believe they received those until the

7  eve of the penalty trial.  That's emblematic of an effort

8  that is starting too little, too late.

9          In addition, they didn't seek a broad enough

10  group of records, nor did they interview nearly enough

11  witnesses, which is not surprising since they had about

12  four to 16 weeks to do their job, if you give them about

13  four months' worth of work.

14          I reviewed the records based on what was

15  available at the time of the trial and saw many additional

16  witnesses could have been obtained and interviewed by the

17  defense.

18      Q.    If you could take a look at Exhibit 136, please.

19      A.    Yes.

20      Q.    You see here that Mr. MacLeod has listed a number

21  of potential witnesses for the penalty phase?

22      A.    Yes.  Yes.

23      Q.    Is this an adequate list of the number of

24  witnesses to interview for the penalty phase of a capital

25  murder case?

1      *A.*   Not at all.  Not at all.  And I note that at

2  least two of them are employees of Durango Jail.  So they

3  would have been -- I mean, that's just -- that's just

4  picking off the low hanging fruit.  It's not actually

5  getting out and talking to family members and people in

6  the community who would know her, doing the kind of

7  extensive, and what the guidelines refer to as an

8  exhaustive social history investigation.

9      *Q.*   And, on that note, when this investigation is

10  done and the investigation that you referred to involved

11  talking to dozens or more than a hundred people and

12  collecting thousands of pages of documents, is all that of

13  information presented in the penalty phase at trial?

14      *A.*   No, not necessarily.  It's presented to the

15  attorneys so they have the ability to review it and then

16  make a judgment about what evidence would be most

17  appropriate and most effective as part of the trial.  So

18  it becomes a resource for the attorneys and they are

19  indeed the final decision maker about who gets called.

20      *Q.*   Based on your review of the materials that were

21  available to Mr. MacLeod and to his attorneys, did you

22  identify potential sources of documents about

23  Ms. Andriano's life?

24      *A.*   I did.

25      *Q.*   How many potential sources of documents did you

1  identify?

2  *A.*   You know, anywhere upwards of 40 or 50 potential

3  sources of documents, such as schools, employers, medical

4  facilities and the like.

5  *Q.*   Similarly, did you identify potential witnesses

6  who might have useful information for mitigation?

7  *A.*   Again, based on my review, there's upwards of a

8  hundred potential witnesses who could have been

9  interviewed:  Family members, people in the traveling

10 religious group, neighbors, school friends, childhood

11 friends and the like.

12 *Q.*   So to wrap this up, Mr. Rohman, what is your

13 general conclusion about the mitigation investigation that

14 was done in Ms. Andriano's case?

15 *A.*   My considered opinion is that the mitigation

16 investigation was well below the standard of care for what

17 anyone would want in a capital case, below the standard as

18 laid out in the ABA Guidelines and below the standard of

19 the practice in the field.

20      It was work done by unqualified individuals who

21 did not have enough time, even if they were qualified, and

22 who then put on a completely deficient presentation about

23 the client's life and background.

24      MR. BENNETT:  Thank you.

25      Your Honor, I move for the admission of

1   Exhibit 204, Mr. Rohman's report.

2           MS. GARD:  No objection.

3           THE COURT:  Exhibit No. 204 for identification is

4   admitted into evidence.

5           MR. BENNETT:  No further questions.

6           THE COURT:  Ms. Gard.

7           MS. GARD:  Thank you, Judge.

8

9                        CROSS-EXAMINATION

10  BY MS. GARD:

11      Q.   Mr. Rohman, you are licensed as a private

12  investigator in California; is that right?

13      A.   That's correct.

14      Q.   And there's no separate licensing scheme for

15  mitigation specialists; right?

16      A.   That's correct.

17      Q.   So there is no one who would monitor a mitigation

18  specialist's training or to make sure that he complies

19  with minimum educational requirements or anything like

20  that?  There is no board?

21      A.   No, there is no board.

22      Q.   There is no one that they report to other than

23  their employer, whoever that may be?

24      A.   Generally, the attorney who has retained them on

25  the case or had gotten them appointed, yes.

1    *Q.*    Now you have handled a number of cases in

2   Arizona; is that right?

3    *A.*    That's correct.

4    *Q.*    We talked at the break about the Sharp case in

5   Cochise County?

6    *A.*    That's right.

7    *Q.*    And the Michael White case in Yavapai County?

8    *A.*    That's correct.

9    *Q.*    What other cases have you helped investigate?

10   *A.*    Okay.  Ruben Garza.

11   *Q.*    I'm sorry.  Let me stop you and just clarify on

12   Post-Conviction -- Post-Conviction Relief cases.

13   *A.*    Do you want their names or would a number do?

14   *Q.*    A number would be fine.

15   *A.*    Yeah, I think approximately ten.

16   *Q.*    And in any of those cases, have you found the

17   trial mitigation investigation to be adequate?

18   *A.*    Well, in those cases, I have not been asked to

19   testify as an expert to evaluate necessarily the

20   mitigation.  This is one of the first opportunities where

21   I've really testified directly to reviewing the

22   mitigation.

23   *Q.*    Okay.  I should have been more precise, then.

24   You said one of the first that you've offered -- or one of

25   the cases that you've done.  How many others have there

1  been?

2      *A.*   Probably three or four.

3      *Q.*   Are they in this state or other states?

4      *A.*   This state.

5      *Q.*   And have you found the mitigation to be adequate

6  in those cases?

7      *A.*   No, I have not.

8      *Q.*   In none of those cases where you have been

9  retained for that purpose?

10     *A.*   Correct.

11     *Q.*   Okay.  You have a Bachelor of Arts; is that

12  right?

13     *A.*   That's right.

14     *Q.*   And is that in Liberal Arts?

15     *A.*   Yes.

16     *Q.*   Did you have a particular concentration?

17     *A.*   History was my area of concentration.

18     *Q.*   So you don't have a degree also in psychology?

19     *A.*   No, I do.

20     *Q.*   Or in social work?

21     *A.*   No.

22     *Q.*   Or in any other type of behavioral science?

23     *A.*   Correct.

24     *Q.*   In your report, you spoke about formal training

25  and Mr. MacLeod lacking formal training?

1    *A.*    Correct.

2    *Q.*    And that he received his training on-the-job or

3    training on-the-job.  You would agree, though, that

4    on-the-job training is valuable in this context?

5    *A.*    If on-the-job training means that you're being

6    supervised and having your work directed by somebody who

7    is trained and experienced in this field, yes, I would.

8    *Q.*    You were present when Mr. MacLeod testified

9    today; right?

10   *A.*    Yes.

11   *Q.*    And you were present when he testified that he

12   had undergone training with Patrick Linderman; correct?

13   *A.*    Yes, that he shadowed Patrick Linderman.

14   *Q.*    That he showed Patrick Linderman.  I believe he

15   also mentioned Pamela Davis as well; is that right?

16   *A.*    He mentioned Pamela Davis.

17   *Q.*    Do you know who she is?

18   *A.*    No, I do not.

19   *Q.*    You were also present when Mr. MacLeod this

20   morning or earlier today testified that he met regularly

21   with Dan Patterson; correct?

22   *A.*    Yes.

23   *Q.*    Okay.  You spoke at length about the

24   ABA Guidelines.  Is it your position that those are

25   imposed mandatory duties on a defense team?

1    *A.*    It's my position that they describe the standard

2    of care for capital work.  I'm not sure I would adopt your

3    mandatory duties.  They describe what is considered the

4    minimum level of work that should be done on a capital

5    case.

6    *Q.*    And you're familiar with *Strickland vs.*

7    *Washington*?

8    *A.*    Yes, I am.

9    *Q.*    And you've read that?

10    *A.*    Yes, I have.

11    *Q.*    And you're aware that *Strickland* states that the

12    ABA Guidelines are only guides to what is reasonable?

13    *A.*    I do.

14    *Q.*    And that there are no particular duties that

15    govern counsel's performance?

16    *A.*    Umm --

17    MR. BENNETT:  Objection to any testimony about

18    the duties of an attorney.

19    THE COURT:  Overruled.

20    Go ahead and answer it if you can.

21    THE WITNESS:  You know, I would have to look at

22    *Strickland* again and review it more closely to answer your

23    question accurately.

24    *Q.*    BY MS. GARD:  You stated in your report as well

25    that a mitigation specialist, and today testifying, that

1   one of your roles is to screen for potential mental

2   impairments or mental health problems?

3       *A.*   Yes.  That's correct.

4       *Q.*   But there is no requirement, is there, that a

5   mitigation specialist be a trained psychologist?

6       *A.*   Oh, no, not at all.  Indeed, no.

7       *Q.*   Or psychiatrist?

8       *A.*   Correct.

9       *Q.*   So a mitigation specialist would not necessarily

10  have the training to spot more subtle mental health

11  issues; right?

12      *A.*   We don't have the training to diagnose.  We

13  should have the training to be able to identify mental

14  health symptoms that are -- and we receive training.  When

15  you go to these seminars, that's part of what the training

16  is.  It's given by psychiatrists and psychologists about

17  how to identify, because we can't afford to have

18  psychiatrists and psychologists all running around doing

19  mitigation.  That work is done by others.

20      *Q.*   And attorneys -- to your knowledge, if you know,

21  attorneys attend some of the same seminars as you;

22  correct?

23      *A.*   Yes.

24      *Q.*   And many criminal defendants, would you agree

25  with this, have mental health issues?

1    *A.*    I think that's probably true.

2    *Q.*    An experienced attorney, then, would come into

3    contact with many people -- an experienced defense

4    attorney may come into contact with many clients who have

5    mental health issues?

6    *A.*    I would think so.

7    *Q.*    And they may also learn how to detect red flags;

8    correct?

9    *A.*    Yes, I think there are certainly attorneys who

10   could do that.

11   *Q.*    And, in this particular case, you did not

12   investigate any mitigation, any of her history; right?

13   The defendant's history?

14   *A.*    That's correct.

15   *Q.*    Okay.  And you offered the opinion that the

16   mitigation specialist or the mitigation investigation

17   essentially started with Scott MacLeod; right?

18   *A.*    That's correct.

19   *Q.*    And that, in your opinion, Mr. Linderman didn't

20   do anything?

21   *A.*    I've seen no evidence in the record to reflect

22   that.

23   *Q.*    Did you speak to Mr. Linderman?

24   *A.*    No, I did not.

25   *Q.*    Did you ask to speak to Mr. Linderman?

1   *A.*   I -- I was told that Mr. Linderman was

2   unavailable.

3   *Q.*   Is there ever a circumstance -- you testified on

4   direct, that mitigation specialists would be skilled at

5   extracting embarrassing information from people; correct?

6   *A.*   Correct.

7   *Q.*   Is there ever a circumstance where someone just

8   might not come -- no know matter what you try, someone

9   just might not tell you something?

10   *A.*   That's correct.

11   *Q.*   That does happen; doesn't it?

12   *A.*   Sure.

13   *Q.*   Especially, with maybe a deeply buried family

14   secret, something like that?

15   *A.*   You know, it's my experience, that given enough

16   time and an effective investigation, many, if not most,

17   family secrets will come out.  In all cases, no,

18   obviously, I can't say that.

19   *Q.*   In this particular case, you would agree that

20   counsel at least consulted with a number of experts;

21   right, including -- let me go down the list -- including

22   Sharon Murphy?

23   *A.*   Yes.

24   *Q.*   Do you recall her?  And you spoke about

25   Dr. Rosengard; correct?

1    *A.*    Yes.

2    *Q.*    A doctor named Mindy Mechanic?

3    *A.*    Yes, I'm aware of her.

4    *Q.*    You mentioned also H. Kandy Rohde?

5    *A.*    Yes.

6    *Q.*    Do you know who she is?

7    *A.*    She's a counselor who was involved in providing

8    some kind of therapy to the defendant during this period.

9    *Q.*    Do you have any information about what kind of

10   qualifications she may have had to diagnose mental

11   illness?

12   *A.*    I'm not familiar with her background and

13   training.

14   *Q.*    Okay.  Were you aware that she ultimately was I

15   believe banned from the jail for bringing in contraband?

16   *A.*    No, I'm not aware of that.

17   *Q.*    And you didn't review Ms. Andriano's correctional

18   records; right, as part of your --

19   *A.*    Her correctional records or her jail records?

20   *Q.*    Her correctional health or her health records and

21   her disciplinary records?

22   *A.*    From her jail incarceration?

23   *Q.*    From jail.

24   *A.*    You know, I'm not sure at this time.  I don't

25   recall reviewing those.

1    *Q.*    And you also did not review the interview

2    transcript of Dan Patterson; right?

3    *A.*    No, I don't recall reviewing that.

4    *Q.*    So you wouldn't be aware, then, if he -- that he

5    may have had strategic reasons for not presenting certain

6    things at sentencing?

7    *A.*    I'm not aware of what's in his transcript.

8    *Q.*    You did review the sentencing transcripts; right?

9    *A.*    Yes.

10   *Q.*    So you're aware that there were several treating

11   mental health professionals that were called; right, from

12   the jail?

13   *A.*    Yes.

14   *Q.*    Dr. Perry being one of them?

15   *A.*    Yes.

16   *Q.*    And a counselor named Laura King?

17   *A.*    Yes.

18   *Q.*    And another, I believe she's a nurse named Joyce

19   VanEvery?

20   *A.*    Yes.

21   *Q.*    Do you have Exhibit 136 in front of you still?

22   *A.*    Yes, I do.

23   *Q.*    And you offered the opinion that that list was

24   inadequate; right?

25   *A.*    Yes.

1    *Q.*    Okay.  But you would acknowledge, would you not,

2    that the e-mail also says right before -- right above the

3    list of names:  This is not a complete, nor exhaustive

4    list; it is simply my list of witnesses; right?

5    *A.*    That's what it says.

6         MS. GARD:  I have nothing further, Judge.

7         THE COURT:  Redirect?

8         MR. BENNETT:  Briefly, Your Honor.

9

10                   REDIRECT EXAMINATION

11   BY MR. BENNETT:

12   *Q.*    Mr. Rohman, in your work as a mitigation

13   specialist, do you suggest mitigation themes to the

14   defense attorneys who you work with?

15   *A.*    Yes, I do.

16        MS. GARD:  Objection.  Beyond the scope.

17        THE COURT:  Overruled.

18        THE WITNESS:  Yes, I do.

19   *Q.*    BY MR. BENNETT:  Based on your experience, is it

20   possible to make competent recommendations about

21   mitigation themes before you have all the relevant

22   information?

23   *A.*    No.  You need to be collecting -- you need to

24   understand what the evidence is before you can make

25   informed recommendations.

1            MR. BENNETT:  All right.  Thank you.  I have
2  nothing further.
3            THE COURT:  May this witness be excused?
4            MR. BENNETT:  Yes, Your Honor.
5            THE COURT:  Thank you very much, sir.  You are
6  excused.  Don't walk off with any of the exhibits.
7            THE WITNESS:  No.  I will reorganize them the
8  best I can.
9            MR. ARNTSEN:  We're done for the day, Your Honor.
10            THE COURT:  We're done for the day?
11            MR. ARNTSEN:  We have Attorney Patterson
12  tomorrow.  And, again, while I apologize for the gaps,
13  we're well ahead of schedule.
14            THE COURT:  We're going to have Mr. Patterson
15  tomorrow.  Is that the only witness we're going to have
16  tomorrow?
17            MR. ARNTSEN:  Yes.
18            THE COURT:  Okay.  Then we will see everyone at
19  9:30 sharp.  I want everyone to have a nice evening.  We
20  will be in recess.
21            (WHEREUPON, the proceedings were concluded at
22  3:42 p.m.)
23                    *  *  *  *  *  *  *
24
25

1

2

3

4

5

6

7                      C E R T I F I C A T E

8

9

10          I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11   the State of Arizona, do hereby certify that the foregoing

12   91 pages constitute a full, true, and accurate transcript

13   of the proceedings had in the foregoing matter, all done

14   to the best of my skill and ability.

15          SIGNED and dated this 14th day of April, 2014.

16

17

18                      /s/  Renée A. Mobley, RPR

19                      RENÉE A. MOBLEY, RPR

20                      Certified Reporter

21                      Certificate No. 50500

22

23

24

25

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                    )
                                     )
        Respondent,                  )
                                     )
vs.                                  )   No.
                                     )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,            )
                                     )
        Petitioner.                  )
_____)


Phoenix, Arizona
February 7, 2014
9:27 a.m.


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


EVIDENTIARY HEARING

DAY 5


Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                        (COPY)

2

1                           A P P E A R A N C E S

2

3

4    On Behalf of the State:

5              Mr. Gregory Hazard
               Assistant Attorney General
6
               Ms. Lacey Gard
7              Assistant Attorney General

8
     On Behalf of the Defendant:
9
               ATTORNEYS AT LAW:
10
               Mr. Scott Bennett
11             Mr. Allen Arntsen
               Mr. Stephan Nickels
12             Mr. Matthew Lynch
               Ms. Krista Sterken
13             Ms. Jodi Fox

14

15                             I N D E X

16
                           T E S T I M O N Y
17

18   WITNESS:                                          PAGE

19
     DANIEL BRYANT PATTERSON
20
           Direct Examination by Mr. Lynch         5
21
           Cross-Examination by Mr. Hazard          97
22
           Redirect Examination by Mr. Lynch       162
23

24

25

1                    P R O C E E D I N G S

2

3            THE COURT:  Good morning.  This is

4    CR 2000-096032, State of Arizona vs. Wendi Elizabeth

5    Andriano.

6            The record will reflect the presence of the

7    parties and counsel.

8            Are there any matters we need to discuss before

9    we proceed with the witnesses?

10           MR. ARNTSEN:  You'll be pleased to hear, no, from

11   the Petitioner.

12           THE COURT:  I'll move on before anyone changes

13   their minds.

14           The Petitioner may call her next witness.

15           MR. LYNCH:  The Petitioner calls Dan Patterson.

16           THE COURT:  Mr. Patterson, if you can step

17   forward right up here by the witness stand.  Before you

18   sit down, please face the clerk.  Give the clerk your full

19   name and she will swear you in.

20           THE CLERK:  Would you please state your name and

21   spell your name for the record?

22           THE WITNESS:  My name is Daniel Bryant Patterson.

23   All three, you want spelled?

24           THE CLERK:  Yes, please.

25           THE WITNESS:  D-A-N-I-E-L; B-R-Y-A-N-T;

1  P-A-T-T-E-R-S-O-N.

2          THE CLERK:  Would you please raise your right

3  hand?

4          (WHEREUPON, the witness was duly sworn by the

5  clerk.)

6          THE COURT:  Mr. Patterson, make yourself

7  comfortable there on the witness stand.  Remember to speak

8  up so that everyone can hear you.  Please wait until the

9  question is completed before you answer the question.

10 Please make sure you give us a verbal response.

11         Is that all agreeable to you?

12         THE WITNESS:  It is.

13         THE COURT:  Anytime you need water, there's some

14 water there on the side.

15         THE WITNESS:  Thank you.

16         THE COURT:  Go ahead and state your name for the

17 record.

18         THE WITNESS:  Daniel Bryant Patterson.

19         THE COURT:  And is it going to be Mr. Lynch?

20         MR. LYNCH:  Yes, it's my turn, Your Honor.

21         THE COURT:  Mr. Lynch, you may proceed.

22

23              DANIEL BRYANT PATTERSON,

24 having been first duly sworn to tell the truth, the whole

25 truth, and nothing but the truth, testified as follows:

1                        DIRECT EXAMINATION

2    BY MR. LYNCH:

3        Q.    Mr. Patterson, good morning.

4        A.    Good morning.

5        Q.    What do you do for a living?

6        A.    I'm an attorney.

7        Q.    Where do you work?

8        A.    I'm currently employed by the Office of the

9    Maricopa County Public Defender.  My current assignment is

10   supervisor of the Capital Unit in that office.

11       Q.    How long have you been the supervisor of the

12   Capital Unit?

13       A.    A little over three years.

14       Q.    How long have you been with the public defender's

15   office total?

16       A.    Two separate tours of duties, if you will from

17   '01 through today, and previously, '90 through '93, in

18   that area.

19       Q.    Let's start with the first tour of duty.  What

20   were your responsibilities during the time you were with

21   the public defender's office between '90 and '93?

22       A.    General trial attorney assignments.  A caseload

23   of about 20, 25, 30 felonies.  I don't recall any specific

24   capital work at the time.  Although, I may have had some

25   capital cases.

6

1    Q.   What did you do after leaving the public

2    defender's office in 1993?

3    A.   I resigned and went back in private practice as a

4    sole practitioner.  My office was in Downtown Phoenix.  I

5    continued for approximately eight years, '93 through 2001.

6    Q.   What kinds of cases did you and handle as a sole

7    practitioner?

8    A.   I had a contract for felony and complex cases

9    with Maricopa County.  I was also on the federal panel.

10   So I got court-appointed cases through the federal system

11   and also through the local Maricopa County system.

12       I also participated in a capital case in Yuma.

13   Bernard Smith was the client's name.  I believe at that

14   time, I participated in a capital case in Pinal County.  I

15   believe that was when Bob Vickers had one of his many

16   trials in Pinal County.

17   Q.   You mentioned a couple of capital cases when you

18   were a sole practitioner.  How many capital cases did you

19   handle during that time period?

20   A.   I have not gone back and cataloged those cases.

21   I started taking and was assigned death penalty cases in

22   the mid-80's.  The structure of the complex case contract

23   with the county included and required you to take capital

24   cases.  So I'm comfortable saying in excess of ten.

25   Q.   When did you rejoin for your second tour of duty

7

1 with the public defender's office?

2     *A.*    July of 2001.

3     *Q.*    At that time, were you assigned any cases?

4     *A.*    Yes.  I had joined the office for the second tour

5 with the expectation again of being just a line trial

6 attorney.

7         At that time, capital cases were assigned

8 geographically within the office.  We had a Mesa office

9 right over there just down the street.  And if the

10 homicide occurred in the East Valley, Mesa, Tempe

11 Scottsdale, those cases were assigned to attorneys who

12 worked out of this location of the Maricopa County Public

13 Defender.

14         If the homicide occurred in Glendale, Phoenix, by

15 and large, they were assigned to downtown lawyers.

16         The lawyer out here when I joined the office was

17 a gentleman by the name of Jerry Gavin, who was assigned

18 the capital caseload.  He resigned shortly after I got

19 here.  I got a phone call from my boss and he asked if I

20 would assume the capital caseload.

21     *Q.*    How many cases were included in that case capital

22 caseload?

23     *A.*    At the time, we were obviously in a *pre-Ring*

24 environment.  So we were doing judge sentencings.  I had

25 an excess of eight cases, I believe.  Let me rephrase

1  that.  Jerry Gavin had at that time about eight cases.  I

2  assumed all eight of his caseloads.

3      *Q.*   Was State vs. Andriano one of those cases?

4      *A.*   I believe it was.

5      *Q.*   In July of 2001?

6      *A.*   I believe it was.

7      *Q.*   Now you mentioned judge sentencing and jury

8  sentencing there.  At the time you were signed

9  Ms. Andriano's case, did you have any experience with jury

10 sentencing in a capital case?

11     *A.*   None whatsoever.

12     *Q.*   From the perspective of defense counsel, are

13 there any differences between trying a capital case under

14 jury sentencings and trying a capital case under judge

15 sentencings?

16     *A.*   Absolutely.

17     *Q.*   What are they?

18     *A.*   I guess primarily the personalities involved.  As

19 a defense attorney, you work in the divisions with the

20 judges who are ultimately going to decide the sentence in

21 a capital case and for all kinds of cases.  And they

22 develop reputations, the reputations that you're aware of.

23 There are certain judges who are death penalty advocates.

24 There are certain judges who are not inclined to give the

25 death sentence.  And that factors into the manner in which

1    you prep the case.

2            When a judge is the finder of fact, he can draw

3    upon or she can draw upon a reservoir of experience and

4    can differentiate amongst capital or potential capital

5    cases, those which are truly capital cases and those which

6    the reality or likelihood of receiving a death sentence is

7    remote.

8            When you have 12 new people to the system,

9    12 jurors who have never done this before, they don't

10   bring with them the life experience that the judge does.

11   And so that's the significant difference, in my

12   estimation.

13           The preparation is different, too.  Under a judge

14   sentencing structure, you can go ahead and do what we now

15   call the Phase 1 and Phase 2 proceedings.

16           If the jury in that proceeding finds your client

17   guilty, then the custom at the time was to allow you of

18   upwards to one, two, two and-a-half years to develop the

19   mitigation.  You would have a separate sentencing hearing

20   in front of the judge.

21           In the jury sentencing system, you have to

22   front-load all that mitigation and sentencing information

23   because the jurors that preside over the guilt/innocence

24   phase also are the arbiters of the sentence.  So those are

25   the significant differences, in my estimation.

1    *Q.*   When did the law change between judge sentencing

2   to jury sentencing?

3    *A.*   It was a combination of two factors.  The U.S.

4   Supreme Court decided in *Ring V. Arizona* that judge

5   sentencing was unconstitutional.  They only -- the holding

6   is limited to the notion that the jurors need to find the

7   aggravators.  You could still have a constitutional judge

8   sentencing system, but our legislature just went ahead and

9   converted it from a judge sentencing system to a jury

10   sentencing system, when they made changes in our statute,

11   to comport with the holding in *Ring V. Arizona*.

12    *Q.*   Do you recall when the *Ring V. Arizona* came down?

13    *A.*   '01, '02.  That's when things structurally

14   changed, by my recollection.  And the rule was even though

15   the homicide occurred -- may have occurred before changes

16   in the statute, that under the decisions and in the new

17   statute cases that were tried after these changes would be

18   tried in the new manner with jury sentencing.

19    *Q.*   This change, do you recall whether that came

20   after were you assigned State vs. Andriano?

21    *A.*   Yes, yes, afterwards.

22    *Q.*   After the switch to jury sentencing, after the

23   *Ring* decision, did you personally feel confident to try

24   capital cases?

25    *A.*   No.  In my estimation, it changed dramatically

1  the manner in which defense attorneys defended capitally

2  accused clients.

3         In that regard, to that end, I went to a number

4  of seminars.  I can't give you an accurate recitation of

5  how many or where.  But after the seminars, yes, they

6  instructed us to change our approach in capital cases and

7  adopt new manners and techniques in trying to persuade

8  jurors as opposed to persuading judges.

9     Q.    How long did you feel not competent to try a jury

10 sentencing case after *Ring*?

11    A.    There was some push on the part of the judiciary

12 at the time to get these cases tried.  But I was

13 successful in my estimation of delaying the prosecution of

14 those cases involving my clients until I got to the point

15 where I felt -- are we ever truly competent?  I don't

16 know.  But I felt better equipped to deal with the changes

17 structurally in the system here in Arizona.  In my first

18 trial in the *post-Ring* environment was *State V. Roque*.

19    Q.    We will talk about *State V. Roque* in a minute,

20 but just, in general, how many capital cases have you

21 taken to trial with jury sentencings since *Ring*?

22    A.    Roque, Andriano, Manuel, Medina twice, Silva.  I

23 think where I was the lead or co-counsel, I think those

24 are the six that I've been involved in since the *Ring*

25 decision.

1    *Q.*    And how many have you overseen in your current

2    position as supervisor of the Capital Unit?

3    *A.*    I can't give you an accurate number, but I can

4    say in the three years, our unit has nine trial teams, two

5    attorneys per team.  Each team is expected to carry three

6    cases.  Obviously, that fluctuates when cases are disposed

7    of.  But I probably personally been involved in over 35,

8    40 capital cases in the last three years -- involved from

9    the supervisorial perspective.

10    *Q.*    Sure.  Over the time from the first jury

11    sentencing cases that you handled through, through all the

12    cases you're supervising now, has your approach to

13    preparing for a jury sentencing case changed?

14    *A.*    Absolutely.

15    *Q.*    How so?

16    *A.*    Wow.  There is far more emphasis on the mental

17    health of the client.  We routinely -- we have kind of a

18    stable, if you will, of mental health experts that we

19    involve in cases.  We give the -- we try to give the

20    client a mental status evaluation at or near the time of

21    the homicide.  We then go through a more thorough

22    psychological evaluation.  If there's indicators of

23    organic problems, we bring in neuropsyche evaluators.  If

24    they confirm the existence of an organic problem, we may

25    resort to a CAT scan, PET scan or MRI evaluation, and

1    that's a significant focus of the unit.

2         There's more lawyer mitigation specialist

3    integration.  We expect that each trial team will have a

4    team meeting at least bi-weekly.  We expect mitigation

5    people, when they do anything, to commit what they have

6    down to a memorandum that becomes part of the file.  Those

7    memorandums are expected to be reviewed by both attorneys.

8         We don't -- we have not adopted the fiction, at

9    least in my office, that there are lead counsel and

10   co-counsel.  We expect both lawyers to be responsible for

11   all aspects of the defense.  We expect both lawyers to go

12   to all witness interviews.  We expect both lawyers to be

13   involved in the development of theme and theory both for

14   defense and for mitigation.

15   *Q.*   You talk about both lawyers.  Is it policy at

16   your office that both lawyers have capital experience?

17   *A.*   Well, in a perfect world, we would do that, but

18   it's impossible, particularly if you're familiar with our

19   Rules of Criminal Procedure, we have a Rule 6.8, which is

20   not recently adopted, but adopted after the Andriano case.

21        That specifically requires, in order to serve as

22   lead counsel, that you have a capital trial.  That's the

23   most difficult complement of that accreditation rule, if

24   you will, for people that we promote to the unit.  Being a

25   distinct Capital Unit, the folks that are eligible for

1   promotion to the unit come from the trial group who don't

2   do capital trials.

3           That being said, we bring them into the unit.  We

4   pair them hopefully with somebody who does have full

5   6.8 qualifications.

6           There's a provision within the rule that persons

7   who have experience, competencies that aren't prescribed

8   expressly by Rule 6.8, they can petition the Supreme Court

9   for certification to serve as capital counsel.  And

10  whoever comes into the unit seeks Supreme Court approval.

11          So to answer your question directly, not like a

12  lawyer, it seems to me that, in my estimation, everybody

13  we promote to our unit, after a brief apprenticeship,

14  becomes qualified within the spirit of Rule 6.8.

15      Q.   At the time -- well, let me just ask this:  Do

16  you recall when Wendi Andriano's case went to trial?

17      A.   I think '04.  That's what I'm thinking.

18      Q.   Does jury selection in August of '04 sound about

19  right?

20      A.   That sounds about right, yes.

21      Q.   In August of 2004, at that time, had you taken

22  any other jury sentencing cases to trial?

23      A.   Roque.

24      Q.   Is that the only one?

25      A.   Yes.

1    *Q.*   Let's talk about that Roque case.  What was Roque

2    about?

3    *A.*   Roque, the allegations involved in the immediate

4    aftermath of the fore of 911 in New York City and then

5    D.C. and Pennsylvania, a local citizen, Frank Roque, was

6    watching TV and seeing the horrors.  He was a New York

7    born and raised guy.  He was in the aviation industry.  It

8    got to him, to put it simply, and he went on a shooting

9    spree and he shot and killed a Sikh, who was wearing the

10   traditional garb of the Sikh religion.  Frank misperceived

11   him and thought he was an Arab and made some horrible

12   comments about the gentleman's ancestry and shot and

13   killed him out in front of his gas station/convenience

14   mart.

15         He proceeded back to the house that he had sold

16   to persons of Middle Eastern extraction and shot through

17   the window and shot into a Mobil gas station where the

18   person -- the proprietors were persons of Middle Eastern

19   ancestry.  That, in a nutshell, was Frank's case.

20   *Q.*   Did the Roque case get any media attention?

21   *A.*   Tremendous.  There was an actual independent

22   movie made of the victims' lives.  Mr. Singh I believe his

23   name was, Singh.  Rodey Singh.  I apologize for not

24   remembering the man's name.  But an independent film was

25   done of his life.  He was a wonderful man.  And the

1  Court TV camera was in the back of the courtroom every day

2  of the proceeding.

3      *Q.*    Was Roque the highest profile case that you've

4  handled?

5      *A.*    Probably.

6      *Q.*    When was the Roque case assigned to you?

7      *A.*    Well, I assumed my role as capital lawyer out in

8  Mesa at or around July of 2001.  911 is obviously

9  September 11th of that year.  And he was arrested shortly

10  after the shooting and assigned our office for defense.

11  So in September or so of 2001, I received Frank Roque in

12  addition to the cases I had.

13          And I think -- I need to also tell you that once

14  the system changed so dramatically, I called my

15  supervisor, the director, Jim Haas, and said that there is

16  no way anybody can carry eight capital cases in a

17  juror-based sentencing scheme.

18          So I received permission from my director to pare

19  my caseload down and I believe I knocked it in half at a

20  minimum.  So I think I probably had four cases at the time

21  that Frank came to my caseload.  So I probably had been

22  carrying five cases at the time.

23      *Q.*    So just for chronology, you were assigned Wendi

24  Andriano's case in July of 2001?

25      *A.*    Correct.

1    *Q.*    And roughly two months later, you were assigned

2    the Roque case?

3    *A.*    Correct.

4    *Q.*    How much time did it require of you to prepare

5    for the Roque case?

6    *A.*    It was significant.  We determined at some point

7    in the preparation of the case, that it would be a GEI

8    defense.  We retained the osteopathic physician,

9    psychiatrist Dr. Rosengard, that participated in Wendi's

10   case, for that case.  He opined that Frank was insane at

11   the time of the event.  A John Shaley, Dr. John Shaley was

12   retained by the government to refute that position.

13   Records collection, yeah, yeah, it required a great deal

14   of preparation.

15   *Q.*    During that time period between the time you were

16   assigned Roque in September 2001 and the time of the Roque

17   trial -- I should back up.  When was the Roque trial?

18   *A.*    It preceded Ms. Andriano's trial.  I'm certain it

19   would be better perhaps if you have done the research, you

20   could probably tell me exactly what days it was.

21   *Q.*    Does September of 2003 sound close?

22   *A.*    Yes.

23   *Q.*    During the period between the time you were

24   assigned the Roque case in September of 2001 and the trial

25   two years a later, how much time were you able to devote

1  to Wendi's case?

2      *A.*    You know, I can't give you a precise minutes,

3  hours.  It was the custom back then to, you know,

4  prioritize your caseloads, which case -- which judge was

5  pushing you more vehemently to get that case prepared and

6  get to trial.

7          Judge Ishikawa did not preside over the case in

8  its early moments.  It was Judge Akers I believe was the

9  first judge assigned.  And I don't recall what other

10  judges were involved before we have got to Judge Ishikawa.

11  But none of those judges for Wendi, in Wendi's case were

12  pushing me to get Wendi's case to the forefront.  So, in

13  that regard, I let it languish, if that's a fair word

14  while I focused on Mr. Roque's case.  Because of its

15  notoriety, if you will, in the newspaper, it was more of a

16  push in Judge Acedo's court to get that case to trial more

17  quickly than Ms. Andriano's case.  So, in that regard,

18  Roque went first and Ms. Andriano went second.

19      *Q.*    Did your involvement in the Roque case conclude

20  right at the end of trial?

21      *A.*    Yes.  I didn't do any direct appeal.  I may have

22  filed a Motion for a New Trial, which would have been a

23  good practice.  But beyond that, I don't -- I didn't do

24  anything hands-on with Mr. Roque's case.  It was passed

25  off to the appellate section of our office for further

1  proceedings.

2      Q.    You mentioned Roque was your first jury

3  sentencing case?

4      A.    Correct.

5      Q.    Were you able -- did you take away any lessons

6  from the Roque case with regard to handling a capital case

7  for jury sentencing?

8      A.    Let me hesitate just for a moment.  Obviously,

9  ten years, 12 years later, yes, I can look back and say

10  these are specific things I learned from Frank's

11  representation.

12          But, at the time, not really because the Roque

13  case was unique.  It blended -- obviously, the things they

14  were telling us back at the seminars were to front-load

15  your mitigation because jurors make determinations early

16  on in the process.

17          That being said, Roque was easy to front-load

18  because the whole defense was mental illness.  The whole

19  defense was mitigation, if you will.  It wasn't too

20  concrete or disparate kind of categories that you had to

21  develop.

22          So I didn't learn a lesson in that first trial,

23  if you will, of separately developing mitigation for a

24  person who doesn't present any mental health defense on

25  the front side.  And, in retrospect, obviously, I think

1    mitigation should be more seriously developed in the early

2    moments of the case.

3          Secondly, assuming her representation in the

4    homicide, Mr. Andriano died -- and can you give me the

5    date of the --

6    Q.    I believe it was October 8th of 2000.

7    A.    Okay.  And I got to the scene, if you will, in

8    2001.  So nothing had been done up to that point in that

9    case.  I think in Ms. Andriano's case, I think that that's

10   a mistake.  Obviously, you can't wait over a year before

11   you begin developing mitigation for the client.  It's a

12   serious and egregious error.  And my error was not -- not

13   riding more closely Mr. MacLeod and Mr. DeLozier in the

14   development of mitigation.  So those are lessons I've

15   learned.

16   Q.    Well, you just mentioned Mr. DeLozier.  And was

17   he your co-counsel in State vs. Andriano?

18   A.    He was, I guess more specifically, Knapp counsel.

19   Q.    What is Knapp?  For the court reporter, it's

20   K-N-A-P-P.

21   A.    It's an anomaly.  I don't think any other state

22   in the union has Knapp counsel.  It is a -- the Supreme

23   Court decision, our state Supreme Court, which holds that

24   defendants can have -- indigent defendants, who have

25   access to resources, may use those resources to retain

21

1   counsel to assist court-appointed counsel.

2        *Q.*    In your career, how many capital cases have you

3   defended with this private co-counsel under Knapp?

4        *A.*    One.

5        *Q.*    Which one?

6        *A.*    Ms. Andriano.

7        *Q.*    Why only one?

8        *A.*    It's not a good, competent defense tactic, in my

9   estimation.  Obviously, Knapp counsel come in a wide range

10  of experience.  And there are cases now in the system

11  where you have competent Knapp counsel like the man, Dan

12  Raynak.  He does some Knapp work.  And because he knows

13  what he's doing, he does serve a valuable function in the

14  defense team.

15        But my understanding of Knapp at the time, and in

16  looking back at Knapp and again rereading Knapp, I think

17  the judiciary and the defense Bar mistakenly believed that

18  Knapp counsel was a right of the defendant.  And rereading

19  Knapp, I don't read it that way now.  My understanding of

20  the holding of Knapp is that it was a way to save the

21  taxpayers some money.

22        And so if an indigent person, who would otherwise

23  require taxpayer funding in an indigent defense, can get

24  mommy or daddy to bring some money in to hire private

25  counsel, that's permissible, but it's not an absolute

1  right, in my estimation.

2       So unless I'm convinced that Knapp counsel is

3  competent under 6.8, I would file a motion with the Court

4  to resist any Knapp association currently.  That wasn't my

5  take at the time.

6       My belief at the time was that if Wendi and

7  Wendi's parents wanted an attorney to help her defend her

8  life, that she was entitled to have that person

9  participate in the defense.  And, to that end,

10  Mr. DeLozier, as Knapp counsel, was my co-counsel.

11     *Q.*   You mentioned some, you know experience issues

12  and that those differ among different Knapp counsel.  Just

13  setting aside the experience for a moment, was your

14  experience working with Knapp counsel different in any

15  ways from other cases where you had co-counsel from the

16  same office?

17     *A.*   Well, just to be precise here, I've only served

18  with Knapp counsel one time and that was this case.  So

19  that's my only experience with Knapp counsel.

20     That being said, a Knapp attorney is a very poor

21  substitute for a full-time agency-trained, unit-trained,

22  unit-supervised co-counsel.

23     And so, and if we were so inclined to accept

24  Knapp's representation as well in a capital case

25  currently, I would insist that the two lawyers -- agency

1   lawyers remain on the case as well.  So, in effect, in

2   this environment, we would have three lawyers on the case.

3          Back then, I believed that the Knapp lawyer

4   served to satisfy the two counsel obligation required by

5   the ABA Guidelines, but I have since reaccessed that

6   position.

7   Q.   Now you mentioned that David DeLozier as Knapp

8   counsel.  When did you first meet David DeLozier?

9   A.   It would have been the first session in

10  Judge Akers' Court when I came on board replacing Jerry

11  Gavin.  It was probably at a pretrial status conference,

12  not a significant court appearance.  You know, it wasn't a

13  substantive motion day.  It think I met -- I don't know if

14  I went over to see Ms. Andriano in advance of that hearing

15  or just met her that day.  It was almost, boom, I got the

16  case and now there's something on the docket.  And so it

17  was one of those propositions.  But that's when I first

18  met Mr. DeLozier.

19  Q.   What was your understanding of how long he had

20  been representing Ms. Andriano at that time?

21  A.   I think he came in at or near the time of the

22  filing of the charges against Ms. Andriano.  There was a

23  gentleman by the name of Leon Thikoll.  I never met him,

24  but looking at the file in my mind's eye, he had filed a

25  notice of appearance.  Then, for some reason, he had some

1  personal issues and he had to resign from the case.

2  Mr. DeLozier was on the case at the time I came into it.

3      Q.   And at that initial meeting you mentioned in

4  Judge Akers' courtroom, did you form any impressions of

5  Mr. DeLozier following that meeting?

6      A.   He spoke competently, but he did expressly say

7  that he had no capital case experience and that he was

8  there at the request of the parents and that he had a very

9  close relationship with the parents and he had been

10  retained as Knapp counsel to serve in Wendi's interests.

11      Q.   At the time of that initial meeting, did

12  Mr. DeLozier disclose to you that he was representing the

13  Ochoas in any other capacity?

14      A.   Not specifically, but I kind of came to the

15  conclusion he was the family lawyer for the Ochoas down in

16  Casa Grande.  But he didn't articulate for me any specific

17  other cases that he was involved in representing Alejo or

18  Donna Ochoa.

19          And, also, I also believed at the time, there was

20  a spiritual kinship between the Ochoas and Mr. DeLozier

21  and Wendi.  That they were all of the same faith and that

22  they -- that was a connection and that was one of the

23  reasons he was involved in this case.

24      Q.   At some point in time in your involvement in the

25  representation of Wendi, did you learn that Mr. DeLozier

1  was representing the Ochoas in another legal matter?

2  *A.*   Yes.

3  *Q.*   When was that?

4  *A.*   It's kind of two-tiered.   In discussions with

5  Wendi, obviously, one of her concerns was the welfare of

6  her children.   And her being incarcerated and, obviously,

7  Mr. Andriano dead, there was a need for a guardianship.

8  And there was a time when the kids were placed with Joseph

9  Andriano's sister.   I believe her name was Jeanea and Brad

10  Lambeth.

11       So I derived from Wendi that David was involved

12  in that in some manner.   But I don't recall that I got the

13  particulars that who he was representing and where the

14  proceeding was.   He came --

15  *Q.*   Let me --

16  *A.*   I'm sorry.

17  *Q.*   Let me just stop you right there.   At the time

18  you came to the understanding that he was involved in some

19  capacity, did Mr. DeLozier ever disclose to you that he

20  was representing the Ochoas specifically?

21  *A.*   I don't recall an expressed discussion with David

22  that he and I discussed the particulars of the -- I think

23  it was a severance or a dependency or whatever the nature

24  of the proceedings involving the children was.

25       No, I never had a particularized discussion with

1 him about the process, the progress, or the results of

2 those cases.

3     *Q.*   Now you mentioned it was some kind of a

4 two-tiered disclosure.  Is that the first tier?

5     *A.*   Yes, that's the first tier.  The second tier,

6 we're right in the middle of trial, and Mr. Martinez comes

7 to court that morning with a bit of a cheshired grin on

8 his face and tells us that he has some information that he

9 wishes to use to impeach Donna Ochoa.

10         And that's when it first came to my attention

11 that Mr. DeLozier apparently had been involved in two

12 separate proceedings, two separate venues involving

13 essentially the same subject matter and had failed to

14 abide by a Pinal County court order, that he was in a bit

15 of a bind.  And that Mr. Martinez sought to use that

16 development for impeachment purposes when Ms. Ochoa was

17 about to testify.

18         We had a hearing, as I recall, in front of

19 Judge Ishikawa and I believe he declined to allow

20 Mr. Martinez to go into that.  That's my recollection.

21     *Q.*   So was this disclosure during trial when Juan

22 Martinez brought this in as impeachment material the first

23 time that you learned that Mr. DeLozier -- the first time

24 that you learned the nature of the proceedings that

25 Mr. DeLozier was handling for the Ochoas?

1    *A.*   Yes.  It came as a complete surprise to me that

2    there was a problem.

3    *Q.*   I just want to go back to a little bit here and

4    talk about Wendi's case at the time it was assigned to

5    you.  How long had it been pending at the time it was

6    assigned to you?

7    *A.*   Well, if the date of the homicide is 2000, I get

8    there in July -- August, September.  So, I mean, do the

9    math.  That's the time frame.

10   *Q.*   Sure.

11   *A.*   And I had a regular relationship with Wendi from

12   the moment I got the case.  But I did not go to see her in

13   the county jail on a regular basis until much later in the

14   course of the representation.  That function was satisfied

15   by Mr. DeLozier.  I was advised by Wendi and David that

16   they were meeting on a weekly basis.  And I believed they

17   were discussing the case, discussing the development of

18   mitigation of the case, discussing family issues in the

19   case.  But I did not get an actual report from

20   Mr. DeLozier, nor from Wendi, as to the facts and

21   circumstances of those weekly discussions.

22   *Q.*   Aside from your initial meeting with Mr. DeLozier

23   after the case was assigned to you, did you do anything

24   else to bring yourself up-to-speed on Wendi's case?

25   *A.*   Well, again, it was --

1   *Q.*   And, just for clarity, I'm talking about sort of

2   the initial few months after the case was assigned to you.

3   *A.*   We had -- in the beginning, we had a mitigation

4   specialist by the name of Patrick Linderman, who was

5   assigned the task of working up the mitigation for Wendi

6   because we recognized obviously with the *Ring* decision and

7   the changes in the statute, that you needed to begin to

8   develop this mitigation.  And I relied upon Patrick to do

9   that.

10        We commissioned Dr. Rosengard at some point to

11   conduct a mental health evaluation of Wendi.  I was led to

12   believe that Patrick was in contact with the family and

13   was accessing the witnesses and sources of information in

14   an effort to develop the mitigation presentation for

15   Ms. Andriano.

16        I was also -- I also believed that Mr. DeLozier

17   was in constant contact with the Ochoas and that he, too,

18   was actively involved in developing that end of the case,

19   that aspect of the case.

20   *Q.*   You mentioned several things there.  Did you also

21   review the pleadings and orders that had been, you know,

22   submitted in the case at the time before you were

23   assigned?

24   *A.*   Yeah.  There wasn't a whole lot in the file, as I

25   recall.  Very little had been done in terms of developing

1  anything in Wendi's case.  I don't recall any substantive

2  motions.  I don't recall accessing the grand jury

3  transcript, filing a motion to remand.  It was a sparse

4  file when I received it.

5       While Mr. DeLozier and Patrick Linderman were

6  doing their tasks, I don't think we really got down,

7  Mr. Martinez and I, and began to interview the government

8  witnesses.  But in advance of trial, that was my primary

9  function in prepping for Phase 1.  And I interviewed --

10 there must have been over 100 government witnesses that we

11 interviewed.  I engaged in our own witness development

12 regarding Phase 1 issues.  I spoke with people.  Wendi

13 gave me some leads, lawyers she had spoken with, that kind

14 of thing.  So that was my end of the proposition.

15  *Q.*  You mentioned you know the roles of Mr. Linderman

16 and Mr. DeLozier and you mentioned your involvement in

17 interviews of witnesses with Mr. Martinez.  I just want to

18 step back a little bit.

19       In the course of this representation, can you

20 kind of summarize what the division of labor was?  Let's

21 start right at the outset, you know, of 2001.

22  *A.*  Well, it was -- in all candor, it was a truly

23 evolutionary process.  Nobody involved in the defense of

24 capital cases had ever done it this way before.  My office

25 promoted kind of a garden variety, for lack of a better

1  term, mitigation people who were serving as mitigation

2  developers for garden variety felony cases.

3      *Q.*   Let me stop you.  When you say garden variety

4  mitigation people, what do you mean?

5      *A.*   Well, I mean, in today's environment, we hire

6  people that we believe can develop mitigation in the

7  capital context.  That wasn't how the folks were hired

8  back then.  These persons were mitigation people,

9  employees of the office, who developed mitigation for

10  burglary clients, for methamphetamine clients, for dope

11  dealers, that kind of thing, and weren't specifically

12  trained to be capital mitigation people.

13          And as a line defense attorney in the unit, I

14  didn't have the luxury of selecting that person which

15  would serve that capacity on my team.  I was told that

16  Patrick, he's your mit specialist.  He's the Mesa mit guy.

17  He's your man.  I was not involved in the hiring of

18  Mr. Linderman.  Quite frankly, I don't think I ever viewed

19  his resumé or his credentials.  I was told that this is

20  your mit specialist and he served that function.

21          As a defense attorney, I didn't have instruction

22  then that to constantly monitor the work product of your

23  mitigation person.  I delegated that responsibility to

24  him, believing him to be qualified and believing him to

25  have far more acumen in that regard than I had.

1        My strength obviously as a trial attorney was
2   developing the Phase 1 aspects.  So I did the Phase 1
3   work.
4        David, by virtue of his special relationship with
5   the family, was more actively involved in the mitigation
6   case.
7        But Patrick Linderman, being my kind of direct
8   line employee, he answered to me rather than to David.
9   David had no authority.  But I assumed they had a working
10  relationship, and so that if David had suggestions,
11  Patrick would follow up on them.  But then if he needed
12  money, he would come to me and I would fill out the forms,
13  that kind of thing.
14    Q.   I would like to know more about Mr. DeLozier's
15  role and how he fell into the mitigation assignment in
16  that case?
17        MR. HAZARD:  Objection as to how he fell in.
18        MR. LYNCH:  How he --
19        THE COURT:  Rephrase the question.
20        MR. LYNCH:  Let me rephrase the question.  That
21  was a bad question.
22    Q.   BY MR. LYNCH:  Can you elaborate on
23  Mr. DeLozier's role in the mitigation development?
24    A.   As I understood the relationship with Patrick and
25  Patrick's successor, Scott MacLeod, he had a special

P-App. 001314

1  relationship with the family.  He had a special

2  relationship with the client.

3        And the theme that was presented to me was that

4  this was a wonderful mom, wonderful human being, hard

5  worker, did well in class, a good Christian woman.  Those

6  were the prevailing themes.  And to that end, securing

7  information to substantiate that position fell upon David

8  because he had a special relationship with Donna and

9  Alejo.

10  Q.    During this time period of 2001 through let's say

11  April of 2004, did you meet regularly with Mr. DeLozier?

12  A.    What was the time frame again?

13  Q.    2001 through April of 2004.

14  A.    Yeah, we -- he was also always available if I

15  needed to see him.  He had a very active law practice.  So

16  he was often in court out in Mesa here, so he would stop

17  by.  He was actively involved in one aspect of the

18  Phase 1, the retention and preparation and development of

19  Joe Collier with regard to the sodium azide issue.

20        Did we have a weekly meeting?  No.  Did we have a

21  monthly meeting?  No.  There was nothing formally

22  scheduled, but he was always accessible, and I believe I

23  was always accessible to him.

24  Q.    During that time period, were you aware of the

25  work that Mr. DeLozier was doing in the mitigation case?

1   *A.*   Not specifically.  Not -- I got no memoranda from

2   either him, nor from Patrick.  There would be contact with

3   Patrick in the hallway:  How's it coming?  Any problems?

4   No specialized reports from either Mr. DeLozier or

5   Mr. Linderman, nor from Mr. Linderman's successor,

6   Scott MacLeod.

7   *Q.*   And when you're talking about reports, what do

8   you mean?

9   *A.*   Well, again, contraposing that era with the

10  current era, mitigation people, when they do something,

11  are expected to document it and expected in your bi-weekly

12  meeting -- the defense team meeting to bring it up,

13  discuss it, go over it, see what it leads to, what is the

14  logical development here, how many additional witnesses

15  now need to be discovered and interviewed bearing upon

16  this particular issue.  So we didn't have that in 2001 in

17  the period of time preceding Wendi's trial.

18  *Q.*   During that time period, 2001 through, again,

19  April of 2004 for a cutoff time, did Mr. DeLozier bring

20  any mitigation evidence to your attention?

21  *A.*   It was all -- it was given to the mitigation

22  person.  That was the conduit by which I became aware

23  of it.

24  *Q.*   Would you expect or did you expect Mr. DeLozier

25  to bring any a potential mitigating evidence to either

1  your attention or the mitigation specialist's attention?

2      *A.*   Yes.   But, quite frankly, I -- I didn't perceive

3  at the time anything that was contrary to the theme that

4  she's a wonderful mom, she's a wonderful lady, she's a

5  wonderful hard worker, good to her kids, beloved by her

6  co-workers.  I mean, that was the theme.  So I wouldn't

7  expect anything other than that.

8      *Q.*   Were you getting that same theme from

9  Mr. DeLozier as well?

10     *A.*   Yes, absolutely.

11     *Q.*   And also from Linderman?

12     *A.*   Yes, uh-huh.

13     *Q.*   Mr. Patterson, would you turn to Exhibit 95?

14  There should be a few binders up there with labels for

15  you.

16     *A.*   Trial exhibits?

17     *Q.*   Yes.

18     *A.*   51 through 100?  95.  Appendix 18.

19     *Q.*   A lot of paper to go through.

20     *A.*   A letter from Brad and Jeanea Lambeth, it

21  appears.

22     *Q.*   Mr. Patterson, would you please take a moment to

23  just review the second paragraph of Exhibit 95, beginning

24  with:  I first noticed that Ashlee?

25     *A.*   Okay.

1           MR. HAZARD:  Your Honor, I object to that being

2    used on the viewfinder.  The victim's address is on it.

3           THE WITNESS:  Oh, okay.  I will avoid --

4           THE COURT:  Okay.  Why don't we use the actual --

5           THE WITNESS:  Is it up there?

6           THE COURT:  Why don't we use the actual exhibit

7    or --

8           MR. HAZARD:  Does Mr. Patterson have a copy of

9    the actual exhibit in front of him?

10          THE CLERK:  The exhibits are all in here.

11          THE COURT:  Why don't we go ahead and get the

12    actual Exhibit No. 95.

13          THE CLERK:  95, sir?

14          THE COURT:  Is it 95?

15          MR. ARNTSEN:  Yes.  He's got it in the binder

16    here.

17          THE WITNESS:  But they're concerned about this

18    address.

19          THE COURT:  I think Mr. Hazard was concerned

20    about what?  An address on the binder copy?

21          THE WITNESS:  If we have a sticky, I could put it

22    over it.

23          THE COURT:  Here, do you need a bigger sticky?

24          MR. ARNTSEN:  I think this sticky will work.

25          THE CLERK:  Or do you want a black marker?

1        MR. ARNTSEN:  As well, a black marker will work.

2   And, actually, a black marker will take care of this for

3   good.

4        THE COURT:  Okay.  So the record will reflect

5   that in the binder copy of Exhibit No. 95, Mr. Arntsen has

6   blacked out the address information.

7        THE WITNESS:  If Your Honor please, there is a

8   lawyer address as well.  Is that problematic?

9        MR. ARNTSEN:  I don't believe so.

10        MR. HAZARD:  It's a business address.  No.

11        THE WITNESS:  Yes, I'm familiar with this exhibit

12   having been given it during the course of our prep for the

13   Rule 32 proceedings.  I had never seen this prior to that

14   point in time.  And I certainly never saw this during the

15   pendency of Ms. Andriano's trial.

16    *Q.*  BY MR. LYNCH:  Do you consider the allegations in

17   that second paragraph to be relevant to the mitigation

18   investigation in Wendi's case?

19        MR. HAZARD:  Objection as to his opinion on that

20   area.

21        THE COURT:  Overruled.

22        Go ahead and answer the question.

23        THE WITNESS:  I think it bears upon potential

24   areas of mitigation that should have been developed at a

25   bear minimum under *Wiggins*.

1    *Q.*    Did Mr. DeLozier -- you know, setting aside this

2    exhibit, did Mr. DeLozier ever bring any allegations of

3    potential abuse by the Ochoas to your attention?

4    *A.*    No.

5    *Q.*    Did Mr. DeLozier ever bring to your attention

6    anything negative about the Ochoas at any time?

7    *A.*    No.

8    *Q.*    We're also talking about this time period where

9    Patrick Linderman was involved; correct?

10    *A.*    Yes.

11    *Q.*    During that same time period, did Mr. Linderman

12    ever bring any negative information about the Ochoas to

13    your attention?

14    *A.*    No.

15    *Q.*    Did Mr. Linderman ever bring any negative

16    information about any other family members to your

17    attention?

18    *A.*    There was -- I don't know where I derived this

19    information.  There was some suggestion that a paternal or

20    maternal grandfather was in prison for improper touching

21    of children.  There was an allegation that Wendi may have

22    been improperly touched by a biological father.  In terms

23    of adverse family information, that was about it.

24    *Q.*    When you heard those allegations regarding

25    Wendi's biological father or grandfather, did you direct

1   Mr. Linderman to investigate further?

2       *A.*   I did not.

3       *Q.*   Why not?

4       *A.*   Well, I think I relied upon the Rosengard report

5   where it was first referenced, at least, and I think

6   probably was the only reference to it.  It certainly --

7   may I ask Judge Ishikawa a question?

8           To what extent can I talk about what Wendi talked

9   to me about?  Is there a victim's waiver here?  Is it

10  limited?

11          THE COURT:  It's my understanding, based upon the

12  issues presented, that he can discuss these matters that

13  were discussed between Ms. Andriano and Mr. Patterson;

14  correct?

15          MR. LYNCH:  That's correct as to this issue.

16          THE COURT:  There is no objection from

17  Ms. Andriano; correct?

18          MS. ANDRIANO:  No.

19          THE COURT:  Thank you.

20          THE WITNESS:  With regard to the improper

21  touching by her biological father, I never derived that

22  information from Wendi.  It was referenced in

23  Dr. Rosengard's report.  And he says:  My recollection is

24  that it had -- she had no specific recall, nor any

25  flashbacks relating to that incident.

1          So, in my estimation, based upon the limited

2     information I had at the time, it was a nonissue.  And so

3     I did not direct anybody to follow up on it.

4          Q.   BY MR. LYNCH:  Prior to the issuance of the

5     Rosengard report, did you direct Patrick Linderman to

6     follow up on the issue of potential abuse by a biological

7     father?

8          A.   I did not.

9          Q.   With regard to your own role in the pretrial

10    investigation of Wendi's case, is there a particular part

11    of Wendi's case that was primarily your responsibility?

12         A.   Phase 1 and Phase 2.  Motion practice, jury

13    selection, those functions were my primary assignment.

14         Q.   Did you conduct an investigation into the guilt

15    phase and aggravator phase of Wendi's trial?

16         A.   Yes, I did.

17         Q.   When did the bulk of your own guilt phase and

18    aggravator phase investigation occur?

19         A.   Probably upon the conclusion of the Roque trial.

20    That trial I recall lasted probably two and-a-half, three

21    months.  So during that time frame, I wasn't involved in

22    any other client case.  In advance of the Roque trial, I

23    may have done some of the investigation that I recall with

24    regard to Phase 1 and Phase 2 for Ms. Andriano.

25              And then I don't know what the time frame between

1  the conclusion of the Roque case and the commencement of

2  the Andriano case was, but I did a lot of things in that

3  interim because it came to my attention in advance of

4  trial, that Mr. DeLozier's meetings with Ms. Andriano were

5  not necessarily related to the trial of the case.

6     *Q.*  Well, let's talk about Mr. DeLozier's meetings

7  with Ms. Andriano.  Were you aware that Mr. DeLozier was

8  meeting with Ms. Andriano prior to trial?

9     *A.*  Yes.  I was led to believe it was -- it was

10  almost on a weekly basis.

11     *Q.*  What was your reaction to knowing that he was

12  meeting with Ms. Andriano on a weekly basis?

13     *A.*  I mean, it's good practice in a capital case to

14  have the frequent meetings with your client.  In our

15  current practice, we have at least one member of the team

16  go over and see the client on a weekly basis.  You need to

17  develop a kinship with the client, a bond with the client

18  in order to develop those things that might be relevant to

19  mitigation.

20     So I was encouraged that he believed he had to

21  meet with her that frequently.  That was a good thing.

22     *Q.*  Prior to April of 2004, did you have any

23  assumptions about the contents of those meetings between

24  Mr. DeLozier and Wendi?

25     *A.*  Yes.  I assumed they were talking about the facts

1    and circumstances of the case and they were talking about

2    mitigation issues, that they were talking about sources of

3    information from the potential witnesses.  Doing the

4    things that you would expect a competent capital defense

5    attorney to do during the course of meeting with a client.

6              Now, certainly in an effort to develop a

7    relationship with the client, you don't always talk about

8    the case.  There have been times that I go over and see a

9    client and we talk about the Diamondbacks.  That being

10   said, you need to touch upon the important things in the

11   case on a regular basis.  My understanding -- do you want

12   me to --

13        Q.   Continue.

14        A.   We were in the process of assigning tasks for

15   trial because it was reasonably certain we were going to

16   go to trial.  And based upon the fact that Mr. DeLozier

17   had this weekly contact with Wendi and had a very good

18   relationship with her and with the parents, he was the

19   logical candidate to do her direct because we had come to

20   the conclusion that in a self-defense case, the defendant

21   has to probably take the stand and that's good practice.

22             When I suggested that to David in front of

23   Ms. Andriano, I recall her eyes getting wide open and she

24   kind of grabbed me by the elbow and she said she needed to

25   talk to me.  Outside the presence of Mr. DeLozier, she

1   said that she doesn't talk about the case with

2   Mr. DeLozier.  That they have a spiritual relationship.

3   And I don't know if it was at this time, but at some time

4   she said and she believed it to be God's will, that God

5   provided her a spiritual counselor to assist her and

6   provided a defense attorney to defend the criminal case.

7           And it made perfect sense to Wendi and apparently

8   made perfect sense to David.  It didn't make perfect sense

9   to me.

10      Q.   Let me backtrack.  I'm sorry if I missed it in

11  your answer.  When did you learn that information?

12      A.   It was three months before trial.  It came to my

13  attention that I had to -- knowing that he couldn't do the

14  direct exam of Wendi, it gave me sufficient time to meet

15  with her.  I met with her, wow, just regularly weeks and

16  weeks and we went over and over and over the facts and

17  circumstances of that night and the facts and

18  circumstances of that day.  They had going down to

19  Casa Grande for a family dinner with the Andrianos.  I

20  recall I had ample time to prep with her.  So it had to

21  have occurred of a period in advance of trial.

22      Q.   During that prep time, was there any particular

23  phase of Ms. Andriano's case that was the focus?

24      A.   I'm sorry.  Repeat.

25      Q.   That was a bad question.  I'll rephrase.  Were

1  you preparing Ms. Andriano for her direct examination

2  during the guilt phase?

3      *A.*   Yes.  That's when she testified was during the

4  guilt phase, yes.  Yes, our preparation was in

5  anticipation of her taking the stand in Phase 1 and

6  explaining the facts and circumstances of the

7  confrontation that night and the background that led to

8  that confrontation, the fact that he was dying of terminal

9  cancer, that there was an effort to locate the poisons to

10  assist him in the process.  That it was anticipated to be

11  a horrible death, that he would suffocate, that she was

12  agreeable to assisting him in committing suicide to avoid

13  that pain.

14        And, yes, so we prepped the events pertaining to

15  Joseph's illness, the plan and scheme to ease his

16  suffering, and her testimony with regard to the actual

17  confrontation that evening.

18      *Q.*   During those prep sessions, was there any focus

19  on childhood?

20      *A.*   No, not to my recollection.

21      *Q.*   And why not at that time?

22      *A.*   Oh, I didn't see the relevance of childhood.  In

23  my estimation, at the time, she told a cogent, believable

24  story about how that evening came about.  And so, I mean,

25  we were on the stand seven to eight days, anyway.  If we

1  would have started the story when she was in elementary

2  school, I think we would still be there.  It just wasn't

3  relevant, Mr. Lynch.

4      *Q.*   I guess, in other words, were those meetings at

5  all focused on developing mitigating --

6      *A.*   No.

7      *Q.*   -- evidence?

8      *A.*   I'm sorry to interrupt.  No, they were not.  They

9  were dedicated and devoted to prepping her for Phase 1 and

10  Phase 2 issues.

11      *Q.*   Now you mentioned this learning about meetings

12  with between Mr. Wendi and Mr. DeLozier not being what you

13  thought they were.  During the course of the trial, did

14  you notice any other performance-related issues with

15  Mr. DeLozier?

16      *A.*   Yes, several.

17      *Q.*   What were they?

18      *A.*   In no particular order, I recall one day during

19  the course of trial, I was with Wendi at counsel table.

20  We turned around, and entering the rear of the courtroom

21  was Mr. DeLozier.  And he was a sharp dressed man,

22  three-piece suit, shine on the shoes, a real dapper

23  looking guy.

24         Well, and this was probably a month into the

25  trial, five weeks into the trial, and he comes in and his

1  suit is just hanging on him.

2      I think I turned to Wendi and I said:  Is David

3  sick?  She said:  No, he's not sick.  I said:  Well, he

4  looks terrible.  And she said:  Well, that's the result of

5  his fasting.  I said:  What's he doing?  And she said that

6  that was David's manner to get closer spiritually to God.

7      And so he was only drinking, I believe it was,

8  apple juice and he had only been drinking apple juice

9  since the commencement of the trial.

10      I talked to him about it I believe at that time.

11  I think he said:  I'm doing fine.  Don't worry about me.

12  I don't recall whether I asked him not to do that or

13  change his conduct.  That, I can't tell you.  But he had

14  lost a considerable amount of weight.

15  *Q.*  Do you recall that fast stopping at any point

16  prior to the sentencing phase in Wendi's case?

17  *A.*  I can't tell you.  I don't recall specifically

18  saying to him, you know:  Cut this out.  This is not

19  helping.  And it was okay with Wendi.  So I just didn't

20  see it was my place to tell a man not to get in touch with

21  his deity.  So I don't recall specifically saying:  Don't

22  do that.  And I don't recall remarking to myself or to

23  Wendi thereafter about his physical appearances.

24      Another incident involved his associate, Justin.

25  I forget Justin's last name.

1    *Q.*   Blair.

2    *A.*   Blair.  Justin Blair.  I came to know that
3    Mr. DeLozier had a one-man operation and he had quite a
4    few clients in quite a few different justice courts,
5    municipal courts, superior courts, and he had a wide
6    ranging kind of civil practice and he did some DUI work
7    and that kind of thing.

8         And Justin was his only associate.  And Justin,
9    by my way of thinking, was more than just his associate.
10   He was also like a son to David.  David was very fond of
11   Justin.

12        One morning I got a call from David and he was
13   crying inconsolably and he said that Justin is dead.  And
14   I don't know if I put two and two together that that was
15   his associate.  I said:  Who died?  Justin, my associate.
16   And he was -- he was emotional visibly -- not visibly
17   because I couldn't see him.  But emotionally on the phone,
18   he was shaken.

19        So we came to court the next day and I don't
20   think David was here.  I think may have phoned into
21   Judge Ishikawa's JA that we had a horrible catastrophic
22   occurrence here and we needed a continuance.
23   Judge Ishikawa was kind enough to afford us that.  I think
24   it was a three-day continuance.

25        When we came back in Mr. DeLozier, one of his

1   tasks was to do a direct exam of -- was it Collier?  Or

2   somebody.  And in the middle of his performance, he's just

3   staring at the table with his head down and he just

4   stopped in the middle of it.  I talked to him.  I pushed

5   him and he just -- he wasn't there.  We went to sidebar

6   and we continued for that day.

7         He came back the next day and continued and

8   completed his task.  But he said it was about, you know,

9   the Justin, the death of his associate, that it was still

10  an emotionally difficult circumstance for him to

11  accommodate.

12      Q.   Did you observe any improvement in Mr. DeLozier's

13  handling of that situation through the end of Wendi's

14  trial?

15      A.   I've got to say I think he gave a pretty powerful

16  summation in Phase 3.  I was -- I didn't notice any defect

17  in performance during his participation in the mitigation

18  presentation.

19         I did some of the witnesses.  He did some of the

20  witnesses and he did the summation and opening.  And I was

21  pleased at the time with his performance.

22         So beyond those two circumstances, I don't recall

23  any specific incidents that I could recount relating to

24  his performance.

25      Q.   Mr. Patterson, I want to talk to you generally

1    about the development of the mitigation case.  And you

2    mentioned this a couple of times, but I want to get all

3    the names and chronology straight.  Who was responsible

4    for developing the mitigation case for Wendi's case?

5         *A.*    Under the circumstances that existed in 2001,

6    2004?

7         *Q.*    The circumstances that you were imploring at that

8    time.

9         *A.*    Well, I think ultimately, I'm responsible as the

10   senior attorney.  And, now, currently, the senior attorney

11   is absolutely responsible for the development of all

12   aspects of the case.

13          Back then, I wasn't as experienced in developing

14   those things as I am now.  So I relied on the mitigation

15   person more than I would today.  I relied on Patrick

16   Linderman.  I relied on Scott MacLeod and I relied on

17   co-counsel.

18        *Q.*    In your case team -- specifically, we're talking

19   about this division of labor -- who was responsible for

20   performing the tasks related to mitigation development?

21        *A.*    I believed at the time, the primary

22   responsibility for developing mitigation was the

23   mitigation specialist and David DeLozier who was in a

24   better position to develop the theme that she was a

25   wonderful daughter, a wonderful mom, a good student, a

1    good citizen.  So, yeah, it was their responsibility.

2        Q.   Mr. Patterson, in your experience as a capital

3    attorney, are you familiar with the term social history?

4        A.   Yes.

5        Q.   What is that?

6        A.   Well, I mean, it's the source of all mitigation

7    information, in my estimation.  You start with the

8    earliest possible moments in a client's life and bring it

9    current and you're constantly updating this social

10   history, developments in the county jail, additional

11   psychological evaluations, new witnesses.

12            It's a kind of a chronological recapitulation of

13   the client's life and all significant events that occurred

14   in the client's life, all significant influences in the

15   client's life, corroborated as much as possible with

16   documents and witnesses and those types of things.

17       Q.   Under your current practice, do you submit social

18   history information to mental health professionals?

19       A.   Yes.

20       Q.   Why?

21       A.   Well, because it -- an expert opinion is only as

22   good as the information upon which he or she derives that

23   opinion.  And so a social history of the client, in my

24   estimation, is essential.

25            In a perfect world, you have an absolutely

1    100 percent developed social history.  I don't think in

2    practice, you're able to do that.  But we try to get as

3    well developed a social history as we can before we bring

4    the experts to begin their evaluations of the client,

5    except for the present status evaluator at or near the

6    time of the homicide.  Obviously, you don't have the

7    luxury of a social history at that time.

8            But they're evaluating the client for other

9    reasons, you know, just to determine whether there are

10   Phase 1 issues.  Or the current mental status may give

11   right rise to a belief that there was something in the

12   past that needs to be developed as well.

13           That social history -- a significantly developed

14   social history should be there before your experts go in

15   to begin their evaluations.

16       Q.   Mr. Patterson, let's take a look at Exhibit 6 B.

17       A.   6 B, as in boy?

18       Q.   B, as in boy.

19       A.   6 B.

20       Q.   Are you with me?

21       A.   Yeah.  It appears to be an e-mail from me to

22   Patrick Linderman.

23       Q.   And is that responding to another e-mail?

24       A.   You know, I don't have what anticipated or

25   precipitated this.

1    *Q.*   Just look right below under original message, if
2    you would.
3    *A.*   Oh, is this like a string?
4    *Q.*   Yes.
5    *A.*   All right.  Yeah, it looks like Patrick contacted
6    me.  And even the terminology.  He was the Client Services
7    Coordinator.  I mean --
8    *Q.*   And I was going to ask, what is the Client
9    Services Coordinator?
10   *A.*   It goes back to this person served several
11   functions.  He wasn't just a dedicated capital mitigation
12   specialist like we have now.  He worked all the range of
13   cases, all manner of cases.  So we gave them the generic
14   kind of title, Client Services Coordinator.
15         And, in fact, I had to reflect to Patrick that,
16   at least according to the e-mail, that these were death
17   penalty cases.  I mean, in this day and age, when I give
18   something to my mit person, they know it's a death penalty
19   case.  It's not unique that it's a death penalty case.
20   *Q.*   Well, Mr. Patterson, I just want to take a look
21   at your response to Mr. Linderman.  And, specifically,
22   this sentence:  Both clients should be examined by mental
23   health professionals, not because I believe they suffer
24   from mental illness, but as death penalty cases, a mental
25   health exam can provide a source for mitigation.

1    *A.*    I apparently said that.

2    *Q.*    When was Patrick Linderman assigned to

3    Ms. Andriano's case?

4    *A.*    Well, I can't give you a precise date, Mr. Lynch.

5    *Q.*    Would reference to the first e-mail give you a

6    hint?

7    *A.*    It appears on Wednesday, December 19, I became --

8    2001, I became aware that he in fact would serve that

9    function for Ms. Andriano.  I directed him, pursuant to my

10   return e-mail, to commence a mental illness review to

11   determine if that could be a potential source of

12   mitigation in the case.

13   *Q.*    Okay.  Did he --

14   *A.*    And that was December 20th of 2001.

15   *Q.*    Sure.  And I'm just establishing the time frame

16   here.  So he was assigned December 19th of 2001?

17   *A.*    At or near that time, yes.

18   *Q.*    Sure.  And did he follow your direction to obtain

19   a mental health exam?

20   *A.*    Yes.  I believe I received a report from a

21   Dr. Richard Rosengard.

22   *Q.*    Do you recall the date of that report?

23   *A.*    Could you refresh my recollection here?  Oh, 6 C?

24   *Q.*    6 C would be it.

25   *A.*    The evaluation apparently was conducted June 23,

53

1  2002, and the report was dictated August 25, 2002.  I have

2  no reason to believe those are incorrect dates.

3      *Q.*    Okay.  During the time period between

4  December 19th of 2001, when Patrick Linderman was

5  assigned, and the date of the evaluation in June of 2002,

6  did Patrick Linderman provide you with a development of

7  any social history done for Ms. Andriano?

8      *A.*    No.

9      *Q.*    Are you aware of Patrick Linderman providing any

10  social history information to Dr. Rosengard?

11      *A.*    I am not aware of any information.  I don't -- I

12  am not aware of anything that Mr. Linderman gave to

13  Dr. Rosengard, except to the extent it might have been

14  recited in his report.

15      *Q.*    Are you aware of any social history information

16  that Mr. DeLozier may have provided to Dr. Rosengard?

17      *A.*    I am not aware of any.

18      *Q.*    Are you aware of any information or social

19  history information for Ms. Andriano that anyone may have

20  provided to Dr. Rosengard before he issued his report?

21      *A.*    Specifically, no.

22          MR. LYNCH:  Your Honor, I would move to admit

23  Exhibit 6 B.

24          THE COURT:  6 what?

25          MR. LYNCH:  6 B, as in boy.

1        THE COURT:  Any objection?

2        MR. HAZARD:  No objection.

3        THE COURT:  It's actually 6.002.

4        MR. LYNCH:  Oh, I apologize.

5        THE COURT:  There being no objection,

6   Exhibit 6.002 is admitted into evidence.

7        Q.   BY MR. LYNCH:  Aside from the e-mail we just

8   looked at in Exhibit 6.002, do you recall giving

9   Mr. Linderman any specific direction on the mitigation

10  investigation?  For example, did you direct him to

11  investigate specific people or to interview specific

12  witnesses?

13       A.   I did not.

14       Q.   At some point, did Mr. Linderman leave the

15  public defender's office?

16       A.   He did.

17       Q.   When was that?

18       A.   Oh, I cannot --

19       Q.   I can help you with your recollection, if you

20  would like.

21       A.   Yeah, please, if you've got something to rekindle

22  my recollection.

23       Q.   Exhibit 6, Paragraph 21.

24       A.   Exhibit 6, Paragraph 21?

25       MR. ARNTSEN:  And 6 comes before 6 B.

1        THE WITNESS:  6 A.  So it's in advance of 6 A?

2        MR. ARNTSEN:  Yes.

3        THE WITNESS:  Is it -- I have my affidavit.

4        MR. ARNTSEN:  Yes.

5        THE WITNESS:  Is that it?  Okay.  Can you direct

6   me to the paragraph?

7        MR. LYNCH:  21.

8        THE WITNESS:  Okay.  It reflects in my

9   affidavit -- and I must have sourced this in some

10  manner -- early 2004.

11     Q.   BY MR. LYNCH:  Early 2004 is when Patrick

12  Linderman left the office?

13     A.   Correct.

14     Q.   Can you recall any significant mitigation work

15  that Mr. Linderman performed on Wendi's case prior to

16  leaving the public defender's office in early 2004?

17     A.   Not specifically, except the general notion, she

18  was a nice woman, a good parent, a good Christian girl,

19  did well in class, that kind of generalized theme.

20     Q.   Other than that generalized theme of a good

21  person, can you think of any other mitigating evidence

22  that he brought to your attention?

23     A.   I recall nothing specifically.

24     Q.   Now after Mr. Linderman left the office in early

25  2004, did anyone take over the mitigation specialist role

1 in Wendi's case?

2     *A.*   Yes.  Scott MacLeod.

3     *Q.*   At the time he became the mitigation specialist,

4 what was your familiarity with Scott MacLeod?

5     *A.*   Just a name and a new personality.  I was not

6 involved in his hire.  I was not involved in his

7 education.  I was not involved in his on-the-job training.

8 He appeared one day and said:  I'm your -- I'm replacing

9 Patrick.  And I understand that you have a caseload and

10 I'm to help you with certain cases on your caseload.

11    *Q.*   Did you meet with Mr. MacLeod once he was

12 assigned -- beyond that initial meeting, did you have

13 further meetings with Mr. MacLeod once he was assigned to

14 your case?

15    *A.*   Irregularly.

16    *Q.*   What does irregularly mean?

17    *A.*   Well, again, we had no -- no protocol that

18 required him to submit any reports.  We had no protocol

19 that required to meet with him in a team meeting context

20 on a weekly or a bi-weekly basis.

21         His office in Mesa was down the hall and I would

22 see him in the hall.  He would update me informally and

23 advise me if there was any specific monetary needs that he

24 may have with regard to my cases.  But, no, we had no

25 specific:  This is what we're going to do next.  This is a

1  punch list that needs to be accomplished.  I did not do it

2  that way with him.

3      Q.   Did you give him any specific direction in the

4  mitigation investigation?

5      A.   I relied upon his expertise and allowed him free

6  reign to develop what he thought was the appropriate

7  mitigation package for Ms. Andriano.

8      Q.   What expertise did Mr. MacLeod have?

9      A.   Mr. MacLeod, again, I didn't go over his

10 particulars or his resumé.  He was hired by my superiors

11 and assigned to assist me in the defense of Ms. Andriano's

12 case.  I don't know what his bona fides were.  Sorry.

13          MR. LYNCH:  Your Honor, this may be a good time

14 for the morning break here.

15          THE COURT:  Okay.  We will go ahead and take our

16 morning recess at this time.  We will be in recess for

17 about 15 minutes.

18          (WHEREUPON, a recess ensued from 10:45 a.m. to

19 11:04 a.m.)

20          THE COURT:  This is CR 2000-096032, State of

21 Arizona vs. Wendi Elizabeth Andriano.

22          The record will reflect the presence of the

23 parties and counsel.

24          The record will reflect that Mr. Daniel Patterson

25 is on the witness stand.  We will continue with the direct

1  examination by Mr. Lynch.

2       Mr. Lynch.

3  *Q.*  BY MR. LYNCH:  Yes.  One more question.  We were

4  talking about Scott MacLeod before the break.  Did

5  Mr. MacLeod ever recommend that you retain any experts?

6  *A.*  No.

7  *Q.*  Did Mr. MacLeod ever provide you with any

8  information regarding the potential childhood abuse of

9  Ms. Andriano?

10  *A.*  He -- directly, no.  The information I received

11  is as I previously discussed with you through

12  Dr. Rosengard's report.

13  *Q.*  Sure.  At some point in the preparation of

14  Ms. Andriano's case, did the defense team settle upon

15  themes for the mitigation portion of the case?

16  *A.*  By default.  I mean, we didn't sit down and say:

17  This is the way it's going to go.  The most plausible

18  mitigating information that I had at the time was, as I

19  said, that she was a good woman, she took care of her

20  kids, and she was a devoted wife, that she was -- I mean,

21  to the extent it integrated with the Phase 1 stuff, that

22  she was in love with her husband and desirous of making

23  his final months as painless as possible.

24  *Q.*  I guess that's what I'm asking is how were those

25  themes that you just mentioned determined?  Were the

1  themes driven by what you found during the mitigation
2  investigation or vice versa?
3      *A.*   I don't quite understand your question.
4      *Q.*   Well, let me --
5      *A.*   Let me answer it in the converse or in the
6  whatever.  Nothing was ever presented to me during the
7  course of my representation of Ms. Andriano that she
8  suffered from a significant mental illness.  No
9  information was presented to me that she had a significant
10 drug problem, that she had a significant sexual abuse
11 dysfunctional development, except to the extent that we
12 did develop it through Sharon Murphy.  She was
13 uncomfortable with certain of the preferences of her
14 husband and that she did it anyway because she thought
15 that was what a good wife should do.
16      I had no independent information that she had
17 a -- had been abused as a child or as a young adult or
18 that any of that kind of stuff was visited upon her by
19 relatives, parents, stepparents, anything of that nature.
20      So, by default, the theory of the theme became
21 she's a good woman, she's a good mom, she's a hard worker,
22 she provides for the family, those kinds of things.
23      *Q.*   And was that theme based on the information that
24 the mitigation specialist provided to you?
25      *A.*   Yes.

1    *Q.*   Why don't you take a look at Exhibit 138?  Sorry
2    to make you keep changing binders here.

3    *A.*   It appears to be the PowerPoint or Excel or
4    spreadsheet, whatever the heck you call it, that was
5    presented during the mitigation phase in Ms. Andriano's
6    trial.

7    *Q.*   Were you personally involved in the preparation
8    of this?

9    *A.*   No.  Well, I did not obtain any of the items that
10   were incorporated in it.  I reviewed it prior to its
11   presentation.  I made no corrections or additions to it.

12   *Q.*   All right.  Who did initially prepare the
13   PowerPoint?

14   *A.*   I think this was produced by Scott MacLeod in
15   conjunction with information supplied to him by David
16   DeLozier or directly from her parents, Alejo and Donna
17   Ochoa.

18   *Q.*   Have you had a chance to just take a look through
19   Exhibit 138?

20   *A.*   Yeah.  It appears to be in some part a social
21   history, if you will, a life story, a chronology of
22   significant events in Ms. Andriano's life up to that point
23   in time.

24   *Q.*   In drawing on your knowledge today and
25   recollection of the PowerPoint at trial, do you recall

1  Mr. MacLeod presenting you with any potentially mitigating
2  evidence that's not included in that PowerPoint?
3      *A.*   No.  Was I -- to paraphrase your question, I did
4  not ask that other things be included in this
5  presentation, nor did I reject any of the things contained
6  therein.  And I know of no other information that should
7  have been included in this presentation, such as it is.
8      *Q.*   Do you recall Mr. MacLeod presenting you with any
9  social history information that's not included in that
10 PowerPoint?
11     *A.*   No.
12     *Q.*   Do you recall Mr. DeLozier presenting you with
13 any information at all about the Ochoas that is
14 inconsistent with what's included in that PowerPoint?
15     *A.*   No.  I derived no information from Mr. DeLozier
16 inconsistent with the presentation of in this PowerPoint,
17 which essentially says she's a good mom, good student,
18 good person, that kind of thing.
19          MR. LYNCH:  Your Honor, I move to admit
20 Exhibit 138.
21          THE COURT:  Any objection?
22          MR. HAZARD:  No objection.
23          THE COURT:  Exhibit No. 138 for identification is
24 admitted into evidence.
25     *Q.*   BY MR. LYNCH:  Mr. Patterson, I'll give you a

1  minute to get the binders out of your way.

2      *A.*   I'm sorry.  There's too many up here.  There we

3  go.  Okay.

4      *Q.*   Mr. Patterson, you mentioned earlier that the

5  mitigation investigation was really delegated to the

6  mitigation specialist?

7      *A.*   Yes.

8      *Q.*   And to Mr. DeLozier?

9      *A.*   Yes.

10     *Q.*   Do you personally have any expertise in

11  interviewing victims of childhood sexual abuse?

12     *A.*   I've never been trained in that regard, but just

13  as a function of doing this for over 30 years, I have some

14  intuitive senses about it.  But, no, I have no specialized

15  training.

16     *Q.*   Did you personally investigate whether Wendi was

17  a victim of childhood sexual abuse?

18     *A.*   I did not.

19     *Q.*   Did you personally investigate whether Wendi had

20  suffered any other childhood trauma?

21     *A.*   To the extent that I went to see a gentleman by

22  the name of Shawn King, the primary purpose of meeting

23  with Mr. King, who was a former boyfriend, had to do with

24  efforts to acquire the sodium azide or similar substance.

25          It wasn't -- the function of the meeting was not

1   to develop mitigation information, but as a former

2   boyfriend, he did allow some information in that regard,

3   but nothing that I recall that would be significant.

4         Beyond that, in terms of interviewing, I did the

5   brother's direct at trial.  I met with Donna and Alejo on

6   a number of occasions, which presented the possibility for

7   mitigation development, but nothing concrete was derived

8   in those meetings with Donna or Alejo, and nothing that I

9   developed did I then give to Scott MacLeod, Patrick

10  Linderman or David DeLozier.

11       *Q.*   In those meetings with you mentioned Wendi and

12  Brandon and Donna and Alejo and Shawn King?

13       *A.*   Shawn King.

14       *Q.*   Is that everyone, I'm thinking?

15       *A.*   Those are the ones that I just referenced in our

16  immediate discussion, yes.

17       *Q.*   Right.  In those interviews, was the focus of

18  those interviews to investigate whether Wendi had suffered

19  any childhood trauma?

20       *A.*   Was that my purpose for meeting with those

21  people?  No.  Obviously, my purpose was to gather

22  information that might be beneficial in assisting in

23  Phase 1 or Phase 2 issues.  To the extent that something

24  may have come up because I was there, it may have had some

25  mitigation function as well.

1          But nothing specific came up.  Nothing adverse
2     about her background development, rearing, if you will,
3     was ever disclosed to me during the course of those
4     meetings with any of those people.
5          Q.   And by use of the term came up, do you mean
6     disclosed by them to you?
7          A.   Right.  Because I didn't go into the meeting
8     knowing, oh, this bad thing has happened to Wendi.  We
9     need to talk about it.  Oh, this happened to her when she
10    was this age.  We need to talk about it.
11         Had I been presented with that kind of
12    information, the substance of our meeting would have been
13    different.  My information was she's a wonder kid, a
14    wonderful student, graduated first in her class, a strong
15    Christian background.  How can you -- you know, that's
16    not -- I'm not concerned about the mitigation now.
17         What was her relationship with Mr. Andriano?
18    What would have precipitated the confrontation that night?
19    Was Mr. Andriano dying of cancer?  Those kinds of things.
20    But that was the focus of my discussions with those folks.
21         Q.   And you talked earlier about discretion given to
22    the mitigation specialist.  But just to confirm, did you
23    give any specific direction to any mitigation specialist
24    to investigate whether Wendi was the victim of childhood
25    molestation or trauma?

1    *A.*   That topic, specifically no.  And other than that

2    initial kind of contact in e-mail with Patrick Linderman

3    to have her evaluated for mental illness, no, I did not

4    have specific daily direction, no input for either

5    Mr. Linderman or Mr. MacLeod.  I was relying upon

6    Mr. DeLozier to assist in that regard and the expertise of

7    the mitigation people.

8    *Q.*   Did you direct Mr. DeLozier to investigate

9    whether Wendi was the victim of childhood molestation or

10   abuse?

11   *A.*   I did not.  I had no reason to believe that -- I

12   guess, as is customary today, yes, these are one or some

13   of the areas we just as a matter of course investigate.

14        In '04, '01, '02, '03, absent some kind of

15   suggestion that there is an issue there, I did not

16   routinely investigate those kinds of situations.

17   *Q.*   Mr. Patterson, my question was just about

18   Mr. DeLozier.  Did you give him any direction?

19   *A.*   Well, because it's connected, Mr. Lynch, if I had

20   reason to believe that that existed, I certainly would

21   have said to Mr. Linderman, Mr. MacLeod or Mr. DeLozier:

22   Hey, we've got a credible witness that says she was abused

23   physically and sexually at the tender age of ten, we need

24   to flush that out.  I had no indication that that was

25   true.  So I did not give him a generalized directive

1  rule out sexual abuse.  Does that answer your question?

2  *Q.*   No, that -- that does.

3  *A.*   Okay.

4  *Q.*   Did you direct any experts to specifically assess

5  whether Wendi manifested any symptoms of childhood sexual

6  abuse?

7  *A.*   Well, again I was -- there were other mental

8  health people involved in the process.  Dr. Potts

9  completed a Rule 11 evaluation by the time I got there.

10  Dr. Rosengard weighed in with his opinions.  Susan --

11  Sharon Murphy, albeit she is not a Ph.D. in the

12  business -- I believe she had master's in social work and

13  certainly dealt with mental health issues.  She developed

14  a number of mental health issues as it related to the

15  relationship that Wendi had with Joseph.

16        Mindy Mechanic, who is a professor at Cal

17  Fullerton or Cal Irvine, one of the two, was brought on

18  board specifically to deal with the issues raised by

19  Dr. Potts, who is a Ph.D., a psychologist.

20        So there were other mental health people involved

21  in the process.  So did I give directive to Mr. MacLeod to

22  bring in experts beyond those people?  No, I did not.

23  *Q.*   My question was a little more specific.  Did you

24  ever give direction to either Dr. Rosengard or any of the

25  other experts you mentioned to specifically assess whether

1  Wendi exhibited any symptoms consistent with childhood

2  sexual abuse?

3      *A.*   I did not.

4      *Q.*   Why didn't -- and I think you've already answered

5  this in question, but I'll ask again.  Why didn't you

6  investigate further into Wendi's -- whether Wendi was the

7  victim of childhood sexual abuse?

8      *A.*   Again, it wasn't something that I believed the

9  standard of care required, as a matter of course, to

10  investigate sexual abuse absent some kind of indication

11  that there was a problem.

12        Dr. Rosengard, in his report, said there may have

13  been, but it didn't appear to him to be psychologically

14  significant or psychiatrically significantly.  So that's

15  why I didn't pursue that any further.  I had no credible

16  witness who supplied information either that she was

17  sexually abused, nor did the client advise me that there

18  was something there.

19      *Q.*   So I understand, you weren't provided with

20  information suggesting that there was childhood sexual

21  abuse for Wendi?  That's the reason you didn't further

22  investigate that?

23      *A.*   Yes.

24      *Q.*   Are there any other reasons why you didn't either

25  personally or direct others to investigate childhood

1 sexual abuse?

2    *A.*   I didn't think it was a significant issue in the

3 development of mitigation or development of the defense

4 for Ms. Andriano.

5    *Q.*   Is that the same as not being presented any

6 information suggesting there was childhood sexual abuse?

7    *A.*   Right.  I think -- I mean, there are certain

8 things now that we do as a matter of course.  I didn't do

9 them as a matter of course back then absent some indicator

10 that it was a fertile area to explore.

11        Sexual abuse history can be a significant

12 mitigator.  But I had no -- no reporters advising me that

13 it was an issue, nor did the client claim that there was

14 an issue.

15    *Q.*   Did Mr. MacLeod advice that it was an issue?

16    *A.*   No, no.  No, he did not tell me.  If he thought

17 it was an issue, he certainly did not report that to me.

18    *Q.*   Were there any other reasons, besides this

19 concept that there was lack of fertile ground, for not

20 further investigating any childhood sexual abuse?

21    *A.*   No.  It certainly wasn't a strategic decision, if

22 that's what you're saying.  No, you can't exercise or make

23 a strategic decision absent some information.  And I

24 didn't have any information that sexual abuse was an issue

25 in Ms. Andriano's case.

1    *Q.*    Just one final question about the childhood

2    sexual abuse.  Did Mr. DeLozier give you any information

3    to suggest there was a childhood sexual abuse theme for

4    mitigation then?

5    *A.*    No, he did not.

6    *Q.*    With regard to mental health, just to confirm

7    with you personally, do you have any expertise in mental

8    health diagnoses?

9    *A.*    Except that derived over 35 years in this

10   business.

11   *Q.*    Sure.  But no education?

12   *A.*    No education, no.  I can talk political science

13   with you, but I don't know.  My training area is not in

14   the area of psychological development or psychological

15   issues.

16   *Q.*    Aside from the report of Dr. Rosengard that you

17   have mention a few times, did you investigate Wendi's

18   mental health as a potential mitigating factor?

19   *A.*    Only to the extent that her relationship with

20   Joseph.  As the defense -- Phase 1 defense/mitigation had

21   to do with her characterizing her relationship with Joseph

22   as that of a domestic violence victim.  That she -- her

23   mental abilities, decision making abilities were

24   overborne, if you will, if that's a word, by this abusive

25   history with her husband, primarily sexually.  He

1  wasn't -- he didn't beat her.  He didn't yell at her, but

2  he forced her to do things that she found distasteful, and

3  in that manner, we believed controlled her conduct.

4           That being said, we brought in Sharon Murphy to

5  attest to that and Mindy Mechanic to corroborate her

6  findings.

7           Independent of that, no, we didn't have any

8  reason to believe that she suffered from a mental illness

9  or disease or defect that either accounted for the

10  incident, nor was compelling mitigation.  So we didn't

11  explore it.

12      Q.   After he issued his report, did you ask

13  Dr. Rosengard to perform any additional work --

14      A.   I did not.

15      Q.   -- related to Wendi's case?

16      A.   I did not.

17      Q.   And other than the investigation of domestic

18  violence issues and potential psychiatric consequences

19  coming from those, did you direct Sharon Murphy or Mindy

20  Mechanic to investigate any other mental health issues?

21      A.   Only to the extent that Mindy Mechanic was

22  primarily rebuttal to the government expert Brad Bayless,

23  who apparently had administered -- as I recall,

24  administered an MMPI, saw an absence of indicators in the

25  MMPI that related to ST, the battle fatigue,

1   post-traumatic stress disorder.  And she had the

2   credentials.  She was a psychology professor.  So she did,

3   in the context of her rebuttal development, assay, if you

4   will, her mental health.

5       Q.   Let's talk about Mindy Mechanic.  Did Mindy

6   Mechanic evaluate Wendi?

7       A.   I don't know that she gave a clinical evaluation,

8   no.  I think her review was limited to the review of

9   materials that Dr. Bayless administered to Ms. Andriano.

10  I don't think she gave an independent psychiatric or

11  psychological evaluation.  That's my recollection.

12      Q.   Other than --

13      A.   And I'm not suggesting that Dr. Mechanic gave her

14  a thorough, you know, cover-to-cover mental health

15  evaluation.  I'm not suggesting that.  Plus, she was a

16  mental health professional who could have given me

17  information if she had reservations about her mental

18  health.

19      Q.   Mr. Patterson, would it be helpful just to

20  revisit the transcript from Mindy Mechanic just to clear

21  up this whole evaluation thing?

22      A.   Please, if I'm missing something, let me know.

23      Q.   All right.

24           MR. LYNCH:  I think this is just an excerpt from

25  a transcript.  I mean, it's already technically in the

1  record for this case, but I would just bring it along to

2  confirm what Mindy Mechanic did.

3          THE COURT:  Why don't you share it with counsel

4  before?  Has it been marked?  Has this portion been marked

5  for identification as an exhibit?

6          MR. LYNCH:  Not yet.

7          THE CLERK:  It's going to be marked as 229.

8          THE COURT:  229 C?

9          THE CLERK:  No.  Just 229.  I'm sorry.

10          MR. LYNCH:  May I approach?

11          THE COURT:  Yes.

12      *Q.*  BY MR. LYNCH:  Mr. Patterson, I can represent to

13  you this is an excerpt from Mindy Mechanic's testimony

14  from November 15, 2004, specifically Page 8 of that

15  testimony.  It has now been marked as Exhibit 229.

16      *A.*  Yeah, I've reviewed it, Mr. Lynch.  I think it's

17  consistent with my testimony.  I'm not asserting that she

18  was given a full battery of tests, instruments that

19  psychologists use to determine mental health disease or

20  defect.  Her function was to review Dr. Bayless's work and

21  weigh in with regard to the validity of his findings.

22      *Q.*  And just to confirm, did she ever evaluate Wendi

23  at all?

24      *A.*  No.  According to the transcript and according to

25  my recollection as refreshed, no, she did not give her a

1  battery of psychological instruments that would allow her

2  to come to any conclusions with regard to her mental

3  health except to the extent she reviewed Dr. Bayless's

4  work product.

5       MR. LYNCH:  Your Honor, as I mentioned, this I

6  guess technically is in the record, but, nevertheless,

7  I'll move Exhibit 229, the excerpt of November 15, 2004.

8       MR. HAZARD:  I object, Your Honor.  It's

9  intrinsic evidence of the witness at this point.

10      THE COURT:  I'll sustain the objection.  He's

11  testified to his recollection.

12   *Q.*   BY MR. LYNCH:  Mr. Patterson, other than you

13  mentioned Sharon Murphy, Mindy Mechanic, Dr. Rosengard,

14  did you engage any other experts to further evaluate

15  Wendi's mental health?

16   *A.*   I did not.

17   *Q.*   Did you direct Patrick Linderman to engage any

18  other experts, other than Dr. Rosengard, to further

19  evaluate Wendi's mental health?

20   *A.*   I did not.

21   *Q.*   Did you direct Scott McLeod to engage any other

22  experts to further evaluate Wendi's mental health?

23   *A.*   I did not.

24   *Q.*   And the same question with David DeLozier.  Did

25  you direct him to engage any other experts?

1    *A.*    The same answer, I did not.

2    *Q.*    Mr. Patterson, why didn't you investigate further

3    into potential mental health issues as a mitigating

4    factor?

5    *A.*    Based upon Dr. Rosengard's report, I didn't see

6    that to be an issue in her case.  The facts and

7    circumstances of her conduct and the defense that we had

8    chosen were not wholly consistent with mental disease,

9    defect or illness.  None of the persons involved in the

10   case brought to my attention any need for further mental

11   health inquiry.

12          My experiences person-to-person with Ms. Andriano

13   didn't lead me to believe that there was an issue --

14   mental health issue.  None of her close relatives or

15   family suggested there was a mental health issue.  Her

16   history, her performance in high school suggested that if

17   she had metal health issues, she had certainly adapted

18   with them.  And to suggest that she had mental health

19   problems, see, I can't say what I would have done with

20   that information had it been developed at the time.  We

21   didn't develop it.  So I don't know, beyond what I just

22   told you, whether it would have had application in the

23   trial.

24   *Q.*    On other than those reasons, did you have any

25   strategic reason not to further investigate?

1    *A.*   No.   Again, you can't develop a strategy to not

2    introduce something that you don't know exists.   So it

3    wasn't a strategic or tactical issue.

4    *Q.*   Okay.   Mr. Patterson, you mentioned Dr. Rosengard

5    a few times.   Can you take a look at his report,

6    Exhibit 6 C?

7    *A.*   6 C.   Okay.   Got it.

8        MR. LYNCH:   And I believe 6 C is admitted as 6 C.

9        THE COURT:   For the record, we're referring to

10    6.002 --

11        MR. LYNCH:   Thank you, Your Honor.

12        THE COURT:   -- for identification.

13    *Q.*   BY MR. LYNCH:   First, Mr. Patterson, can you just

14    confirm the date of Dr. Rosengard's report?

15    *A.*   Dictation date is August 25, 2002.

16    *Q.*   As far as Rosengard's report goes, I would like

17    to draw your attention to the date of the evaluation right

18    underneath the addressee.

19    *A.*   June 23, 2002.

20    *Q.*   Mr. Patterson, is your understanding that

21    Dr. Rosengard only had one meeting with Ms. Andriano?

22    *A.*   It appears, yes, one in-person discussion with

23    her.

24        (WHEREUPON, an off-the-record discussion ensued.)

25        MR. LYNCH:   Your Honor, it's my understanding

1  that this is not reflected.  It's 6.00 --

2          MR. ARNTSEN:  3.

3          MR. LYNCH:  3.  I think in the parties' pretrial

4  list, it was stipulated into evidence.  However, it's not

5  reflected that way now.

6          Is that the right way to understand it, Ms. Gard?

7          THE COURT:  I don't think it was stipulated as

8  far as I know.

9          MR. HAZARD:  Regardless, I have no objection to

10  admitting it.

11          THE COURT:  I don't think it was stipulated in

12  before, but if there is no objection, then

13  Exhibit No. 6.003 for identification is admitted into

14  evidence.

15      Q.   BY MR. LYNCH:  And, Mr. Patterson, I want to draw

16  your attention to the last paragraph on that page, just

17  looking at the first two sentences there.

18      A.   I reviewed the cover letter?  That paragraph?

19      Q.   That paragraph, yes.

20      A.   Okay.  All right.

21      Q.   Let me know when you've had a chance to review

22  those.

23      A.   Yes, I'm familiar with its contents.

24      Q.   Do you have any reason to believe that

25  Dr. Rosengard was provided any additional materials that

1  are not mentioned there?

2      *A.*   I have no reason to believe that other than the

3  materials reflected in the report, those were the

4  materials that he reviewed in advance or in anticipation

5  of his face-to-face meeting with Ms. Andriano in the

6  Estrella Jail.

7      *Q.*   Please turn to Page 3 of the report, if you

8  would.

9      *A.*   Two, 3.  Yes I have that.

10     *Q.*   I've got to catch up with you.  Page 3, under

11  other psychiatric conditions, the second paragraph there.

12     *A.*   I see it.

13     *Q.*   I'm just going to read this into the record:  The

14  defendant indicated that her mother and therapist say that

15  her biological grandfather sexually abused her when she

16  was under the age of three.  Although, she could not

17  recall that and had no dreams or flashbacks.  She had had

18  difficulty in trusting others sexually but was able to

19  enjoy herself with the exception of intercourse --

20         THE COURT:  Slow down.

21         MR. LYNCH:  My apologies.  Was able to enjoy

22  herself with the exception of intercourse and she did not

23  like that.  She got easily upset in dealing with others

24  who were in abusive relationships, and with the aid of

25  therapy, she felt that she was in an abusive relationship

1   with her husband.  She was particularly upset in finding

2   out about and dealing with children who were sexually

3   abused.

4       *Q.*   BY MR. LYNCH:  Mr. Patterson, did you personally

5   investigate whether Wendi had been sexually abused by her

6   biological grandfather?

7       *A.*   We were made -- I was made aware, during the

8   course of the representation, that a grandfather was

9   incarcerated in Arizona.  And the allegation had to do

10  with some sexual abuse allegation.  Whether it was

11  specific to Wendi, that I can't answer.  And I did no

12  further investigation to ascertain whether it was specific

13  to Wendi.

14      *Q.*   Did you interview the grandfather or father who

15  was in prison?

16      *A.*   Well, I think we're talking about two separate

17  people here.  And the answer is, no, I did not interview

18  either of those two individuals, be it the biological

19  grandfather, nor a biological father.

20      *Q.*   Did you investigate whether Wendi had been

21  sexually abused by anyone else who had regular access to

22  her as a child?

23      *A.*   I did not.  Well, I was not -- I was not informed

24  that there were other potential abusers out there that

25  required investigation.  So the answer is, no, I did not

1    talk with anybody else.

2        Q.    And, finally, did you direct anyone else to do

3    so?

4        A.    I did not, for the same reason.

5        Q.    Flip to Page 5, if you would.

6        A.    Got it.

7        Q.    I'm just looking at the diagnostic impression

8    there.

9        A.    Uh-huh.

10       Q.    So the first major affective disorder depression,

11   what did you understand that diagnosis to be?

12       A.    I believed that it was situational as a result of

13   dealing with husband's cancer, the plan to deal with the

14   last days of his life, and the actual confrontation that

15   night resulted in Joseph's death.  That she was depressed

16   as a result of those events.  Well, in the summary

17   opinions and recommendations, the doctor suggested that

18   can be treated with a pill.  So I didn't find that to be a

19   significant mental health issue.

20       Q.    Did you investigate any alternative causes of

21   what Dr. Rosengard believed to be major affective disorder

22   or depression?

23       A.    I did not.  I relied upon the body of his report.

24       Q.    Did you direct anyone else to do so?

25       A.    I did not.

1    *Q.*   The next diagnosis:  Probable post-traumatic

2  stress disorder.

3    *A.*   Again, based upon the report and the totality of

4  the report, I concluded that that was a result of those

5  events:  The cancer of the husband, the discord in the

6  family because of it, the cancer and the events of that

7  evening that resulted in Mr. Andriano's death.  That was

8  the PTSD precipitator, for want of a better term.

9    *Q.*   Did you investigate any further regarding any

10 other potential sources of her PTSD?

11   *A.*   I did not.

12   *Q.*   Did you direct anyone else to do so?

13   *A.*   I did not.

14   *Q.*   Let's turn to, well, I guess the final diagnosis.

15 Sorry.  I almost skipped one.  Panic disorder.

16   *A.*   I would give you the same answer.  That she had

17 no demonstrable mental health issue prior to the

18 chronological events that we have discussed, her husband

19 getting cancer, her dealing with the cancer.  Her

20 developing in context with and in concert with Joseph,

21 they planned to deal with his last days and the

22 confrontation that occurred that evening.

23   *Q.*   Mr. Patterson, if you would just turn back to

24 Page 3.

25   *A.*   Okay.

1    *Q.*   I'm looking at the beginning of the first full
2   paragraph:  The defendant denied simply --
3           THE COURT:  Slow down.  Slow down.  Start over
4   and slow down.
5           MR. ARNTSEN:  You're admonished.
6           THE COURT:  It's a preemptive for the court
7   reporter.
8    *Q.*   BY MR. LYNCH:  The defendant denied symptoms that
9   would be consistent with manic episodes, but did admit to
10  panic attacks since childhood.
11          Did you do any further investigation into what
12  the source of those panic attacks since childhood may have
13  been?
14   *A.*   I personally did not.
15   *Q.*   Did you direct anyone else to do so?
16   *A.*   I did not.
17   *Q.*   Mr. Patterson, during the course of your
18  representation, did you become familiar with an individual
19  named Kandy Rohde?
20   *A.*   Yes.  That individual is familiar to me.
21   *Q.*   Who is she?
22   *A.*   She was a participant in the case when I arrived.
23  She apparently -- her services are were paid for by the
24  parents.  Her contact person primarily was David DeLozier.
25  And her function was to assist Wendi in dealing with the

1    aftermath issues of the homicide, the fact that she was

2    incarcerated, the fact that she didn't have her children,

3    couldn't see her children, to deal with those issues.

4    That was her function.

5         MR. LYNCH:  I'm just going to have one more

6    exhibit for marking.  It's going to be marked as --

7         MR. ARNTSEN:  230.

8         MR. LYNCH:  230.

9         MR. ARNTSEN:  Did he give you one?

10         MS. GARD:  Yes, we got one.  Thank you.

11    *Q.*  BY MR. LYNCH:  Mr. Patterson, what is this

12    document?

13    *A.*  Well, I mean, it kind of speaks for itself.  It

14    appears to be a pleading filed in this case at a time

15    before I became involved with it.  It's dated February 22,

16    2001.  It seeks what appears to be a standard Rule 11

17    evaluation of the client for competency.

18    *Q.*  Would this have been one of the pleadings you

19    reviewed when you took over the case?

20    *A.*  I assume if it was in the file, yes.  It's

21    something that, although -- yes, I must have reviewed it.

22    Do I have a specific independent recollection sitting down

23    with this document?  No.  But if it would have been part

24    of the file, I would have reviewed it.

25         MR. ARNTSEN:  I move for the admission of

1   Exhibit 230.

2            THE COURT:  Any objection?

3            MR. HAZARD:  No objection.

4            THE COURT:  Exhibit No. 230 for identification is

5   admitted into evidence.

6        *Q.*  BY MR. LYNCH:  Mr. Patterson, would you turn to I

7   guess it's marked as what appears as Exhibit 1 to

8   Exhibit 230.  This appears to be a letter from Kandy Rohde

9   to David DeLozier attached to that motion; is that right?

10       *A.*  Yes.  And I have no independent recollection of

11  this document.  It was appended to the Rule 11 Petition.

12  Again, I don't independently remember this.

13       *Q.*  Well, just to confirm, I want you to take a look

14  at just a few diagnoses.  And I'll read this line:  I

15  believe that her willingness to give up her will to others

16  is a symptom of some kind of personality disorder.  I also

17  suspect that her defense system includes dissociation.

18  Her mother's reference to possible abuse by Wendi's

19  paternal grandfather could be the origin of that

20  dissociation.

21            The intense sense of peace she describes since

22  the arrest is sufficiently inappropriate, causing me to

23  ask for collaboration for another specialist.

24            Just to confirm, Mr. Patterson, do you ever ask

25  any mental health professionals to evaluate Wend's

84

1   symptoms of dissociation?

2   A.   I don't remember.  Well, the answer to your

3   question is no.  I did no independent evaluation -- or

4   strike that.  Let me back up.  I did not request any

5   mental health expert to evaluate Wendi Andriano for the

6   expressed purpose of determining whether she had any

7   dissociative traits.

8   Q.   At the time, what was your understanding of

9   dissociation?

10   A.   Again, it's a layman's perspective here.  But

11   being able to remove oneself from circumstances,

12   dissociating yourself from the realties of a current set

13   of stressors.  You know, going off to never, never land

14   to avoid the realities -- harsh realities of life, those

15   kinds of things.

16   Q.   Did you have any familiarity at the time

17   regarding any links between childhood sexual abuse and the

18   subsequent dissociation?

19   A.   Did I specifically have knowledge of those

20   connections?  No, not that I'm aware of.

21   Q.   Did you direct anyone to specifically investigate

22   whether Wendi suffered dissociation caused by childhood

23   sexual abuse?

24   A.   I did not.

25   Q.   Let's turn to what's has been marked as

1  Exhibit 50.  We're keeping your arms busy, Mr. Patterson.

2      *A.*   I need the exercise.  Exhibit 50?

3      *Q.*   Yes.

4      *A.*   It appears to be the last in this binder.  It

5  appears to be another e-mail from Donna Ochoa.  Is that

6  what we're talking about?

7      *Q.*   Yes.

8      *A.*   Bates 009456?

9      *Q.*   Well, I want to direct your attention to the last

10  line or last few sentences here starting with:  Wendi's

11  therapist Kandy Rohde would really like to hear from your

12  office.  She's trying to keep a definite distinction

13  between her relationship with Wendi and the defense, so

14  that she doesn't appear to be part of the defense.  Does

15  that make sense?  Anyway, please give her a call.  She has

16  good information.

17          Do you recall giving Kandy Rohde a call after

18  receiving this e-mail?

19      *A.*   I really can't answer that, no.  I have no

20  specific recollection of initiating a telephone call to

21  Ms. Rohde as a result of receiving, if I did receive this

22  particular e-mail.

23          MR. LYNCH:  Your Honor, I move to admit

24  Exhibit 50.

25          MR. HAZARD:  I have no objection.

1        THE COURT:  Exhibit No. 50 for identification is

2   admitted into evidence.

3        *Q.*   BY MR. LYNCH:  Mr. Patterson, can we make your

4   arms work again and go to Exhibit 6004?  It would be 6 D I

5   believe in the binders.

6        *A.*   Yes, I have it.

7        *Q.*   Mr. Patterson, this appears to be an e-mail

8   exchange between you and Michelle Arvanitas on

9   February 13th of 2002 and February 14th of 2002; is that

10   right?

11        *A.*   It is dated Thursday, February 14, 2002.  It

12   appears to be a response that I received from Michelle

13   after I -- let's see.  Let me get the sequence here.  She

14   sent me an e-mail reciting her discussions with David

15   DeLozier and Kandy Rohde.  And I responded with:  Thank

16   you, Michelle.  So I assume I received it and I assume I

17   responded appropriately.

18        *Q.*   Just looking at the middle of the page where

19   beginning with:  I also spoke with Kandy Rohde, Wendi's

20   counselor.  Wendi was diagnosed with three things,

21   according to Kandy.  And I'll just list them:

22   Depersonalization disorder, dissociative amnesia, and

23   physical, sexual or neglect of a child.  I assume that's

24   supposed to be physical sexual abuse or neglect.

25             Did you specifically follow up on the

1  depersonalization disorder?

2      *A.*   I can't tell you.

3      *Q.*   That, you don't recall?

4      *A.*   I don't recall.  I did not obviously retain any

5  expert with the expressed purpose of evaluating any of the

6  three items mentioned in that e-mail from Michelle

7  Arvanitas.

8          MR. LYNCH:  I move to admit Exhibit 6.004.

9          THE COURT:  Any objection?

10          MR. HAZARD:  Well, I object if it's being offered

11  for the truth of the matter asserted as to Ms. Rohde's

12  conclusions.  But if it's being offered for other reasons,

13  then no.

14          MR. LYNCH:  Your Honor, it's being offered not

15  for the truth of the diagnoses by Kandy Rohde.

16          THE COURT:  Exhibit No. 6.004 then is admitted

17  into evidence.

18      *Q.*   BY MR. LYNCH:  Mr. Patterson, you mentioned

19  Sharon Murphy previously as a domestic violence expert.

20  Can you remind me again what her educational credentials

21  were?

22      *A.*   My belief is that she was an adjunct professor in

23  sociology, women's issues with the Arizona State

24  University in Tempe.  She has since moved to

25  New Hampshire.  In fact, I think she had moved to

1  New Hampshire to be a professor at the University of

2  New Hampshire in advance of the trial.  I think we had to

3  bring her in from New Hampshire, as I recall.  So, you

4  know, that's her credentials.

5       She was recommended to me I believe by a clearing

6  house for abused women issues out of Philadelphia.  I

7  think that's where I derived her name, or from other

8  colleagues in the office who had used her in the domestic

9  violence context previously.

10  *Q.*   Did you work closely with Ms. Murphy during the

11  development of the case?

12  *A.*   Yes.

13  *Q.*   Would you turn to Exhibit 52?  I think it's a new

14  binder again.

15  *A.*   Okay.  It appears to be two e-mails dated 3/30/03

16  and 3/25/03.

17  *Q.*   I just want to focus on the first e-mail, the

18  3/30/2003.

19  *A.*   The first one, 3/30/03?

20  *Q.*   Yes.

21  *A.*   Okay.

22  *Q.*   I want to just start with the middle paragraph:

23  She learned to dissociate from painful memories a long

24  time ago.  That is very clear to me.  Are you going to

25  subpoena her counselor?  I know there is something that

1  happened during childhood, but she hasn't told me yet.

2  I'll get at it before we're finished.

3       Mr. Patterson, did you follow up on dissociation

4  from painful memories a long time ago in this e-mail?

5       A.   As specifically, I don't recall whether I did or

6  not, Mr. Lynch.  I know I worked with Ms. Murphy and she

7  did not present that issue as a significant area to be

8  explored.  So I did not follow up on it.  And I also note

9  that it was apparently sent to David as well, who I relied

10 upon to develop the mitigation aspect of this case.

11      MR. LYNCH:  Your Honor, I move admission of

12 Exhibit 52 subject to the same, not for the truth of the

13 matter.

14      THE COURT:  Any objection?

15      MR. HAZARD:  No objection.

16      THE COURT:  Exhibit No. 52 for identification is

17 admitted into evidence.

18      Q.   BY MR. LYNCH:  Mr. Patterson, I'll keep you in

19 the same binder here.  Exhibit 57.

20      A.   Okay.  It appears to be an e-mail from Donna

21 Ochoa.

22      Q.   Dated February 26, 2003?

23      A.   Yes.

24      Q.   What is this e-mail?

25      A.   It apparently claims that there is a biological

1  father.  His name is Shelby Robertson and he's located at

2  the Eyman Complex and his term is scheduled to expire --

3  well, let's see.  17.  I don't know how to read that

4  whether it's in 2017.  That would make no sense.  So I

5  don't know quite what that series of numbers reflects or

6  was intended to mean.

7      Q.   Mr. Patterson, did you know who Shelby Wayne

8  Robertson was at the time of this e-mail?

9      A.   Well, having read the e-mail, it's easy to

10 conclude who he is, but I don't recall him independently

11 today, nor do I -- I mean, I never had contact with him

12 as well.

13     Q.   Did you direct anyone else to interview him?

14     A.   I did not.

15          MR. LYNCH:  I move to admit Exhibit 57.

16          THE COURT:  It has already been admitted into

17 evidence by stipulation on February 4th.

18          MR. LYNCH:  Okay.  That's fine.  Thank you,

19 Your Honor.

20     Q.   BY MR. LYNCH:  Exhibit 54, Mr. Patterson, which

21 has also already been admitted.  Mr. Patterson, this

22 appears to be a motion to assist mitigation.  And if you

23 look at the last page, you can get the date.

24     A.   Yeah.  It's over my signature.  November 19,

25 2004.

1    *Q.*    Do you recall why this motion was filed?

2    *A.*    Specifically?  No, I cannot tell you why it was

3    filed.  It obviously was in effort to acquire records.  I

4    don't know what precipitated it.  Any number of

5    explanations could be possible.

6    *Q.*    Was the social history for Ms. Andriano

7    incomplete at this stage?

8    *A.*    Let's see.  When did we start trial?  Is this in

9    the middle of trial or -- I can't answer that.  I don't

10   know.  I can't integrate this motion because I can't

11   recall specifically its reason for being.  So I don't know

12   where it lies in the acquisition of social history

13   information.

14         I don't know if this was generated to supplement

15   existing information or needed to fill in gaps in the

16   social history.

17   *Q.*    Mr. Patterson, do you recall a time during your

18   representation of Wendi that there was a suicide attempt

19   in prison?

20   *A.*    Yes, I remember the topic coming up, uh-huh.

21   *Q.*    Suicide attempt by Wendi?

22   *A.*    Yes.  Not by me.

23   *Q.*    Do you recall roughly when that was?

24   *A.*    Specifically, in context, no, I don't, Mr. Lynch.

25   *Q.*    Did you investigate further with regard to her

1  mental health after this suicide attempt?

2      *A.*   I can't recall specifics.

3      *Q.*   But you can take a look at an exhibit,

4  Exhibit 47, which has been admitted into evidence.

5      *A.*   47?

6      *Q.*   Yes.

7      *A.*   Okay.  Yes, I've got a note from November of 2000

8  through September of '03.

9      *Q.*   And I can represent to you that the first part of

10  this exhibit is typewritten excerpts from notes that the

11  illegible handwritten versions appear thereafter.

12      *A.*   So it appears the episode that you're describing

13  occurred in September of '03.

14      *Q.*   The episode, meaning Wendi's suicide attempt?

15      *A.*   Yes.

16      *Q.*   I want to turn your attention -- well, first off,

17  Mr. Patterson, did your office obtain jail medical records

18  for Ms. Andriano?

19      *A.*   I -- I would assume as a matter of course, yes,

20  we would have acquired that information.

21      *Q.*   Did you personally review them?

22      *A.*   I don't recall.  I recall hearing about the

23  suicide effort.  It may have been -- and I spoke with

24  Wendi I think afterwards about it.  But the first reporter

25  may have been Kandy Rohde.  I don't recall the exact

1  circumstances of her suicide effort.

2      *Q.*   Let me draw your attention to the medical records

3  on Page 4 of the notes at the bottom, an entry dated

4  September 30th.  Do you see that?

5      *A.*   Dated November 24th?

6      *Q.*   September 30 of 2003 is the one I'm looking at.

7      *A.*   I'm sorry.  It would be a Dr. Kay Hoffert?

8      *Q.*   Yes.

9      *A.*   Okay.

10     *Q.*   Are you with me?

11     *A.*   I am.

12     *Q.*   The third paragraph:  Wendi apparently could not

13  handle --

14          MR. HAZARD:  Judge, I object.  This is hearsay.

15  It hasn't been admitted into evidence.

16          MR. LYNCH:  I believe it has been admitted by

17  stipulation.

18          THE COURT:  Let me just double-check.  It looks

19  like Exhibit No. 47 was admitted on February 3rd.

20          MR. ARNTSEN:  Yes, it was stipulated.

21          MR. HAZARD:  Okay.

22          THE COURT:  It was admitted on February 3rd.

23          Go ahead, but slow down.

24          MR. LYNCH:  Wendi apparently could not handle the

25  prospect of involuntarily administrative

1  segregation.  Impulsively stabs self, quotes, without

2  thinking.

3         Following Ms. Andriano's suicide attempts, did

4  you engage any mental health experts to examine Wendi's

5  ability to control impulse under stress?

6         THE WITNESS:  I did not.  My belief at the time,

7  I think, was that this was impulsive, episodic.  Not the

8  kind of thing that merited any further investigation.  And

9  I think when I discussed it with Wendi, she said, you

10  know, it was just something stupid.  I didn't -- I don't

11  recall it being a significant mental health issue.

12         And I do recall believing at the time of the

13  situation that she wasn't dealing with incarceration in a

14  good manner, and I think that's reflected that she didn't

15  want to go into ad seg.

16         Again, my belief was that all of her mental

17  health issues derived from the immediate series of events

18  before the confrontation and the actual confrontation.

19  That it didn't -- it didn't compel the conclusion that

20  there was something that happened early in her childhood

21  that was fundamentally wrong with her and occasioned this

22  kind of misbehavior.  That was my evaluation at the time.

23  So did not obtain additional experts in this regard.

24     Q.  And, finally, Mr. Patterson, who would have been

25  given the task of discovering that material early from her

1  childhood?

2      *A.*    Again, I relied upon those persons that I thought

3  were better equipped to deal with these issues,

4  Mr. MacLeod and, certainly, David DeLozier, who had

5  regular access to Alejo and Donna Ochoa to confirm or

6  refute the existence of factors that may have contributed

7  to this episode in September of '03.

8          MR. LYNCH:  Thank you, Mr. Patterson.  I have

9  nothing further.

10          THE COURT:  Okay.  This is a good time to take

11  our lunch break, then.  So we will go ahead and take our

12  lunch break now.  We will begin again promptly at 1:30.

13  Have a nice lunch.

14          (WHEREUPON, the lunch recess ensued from

15  11:59 a.m. to 1:31 p.m.)

16          THE COURT:  Good afternoon.  This is

17  CR 2000-096032, State of Arizona vs. Wendi Elizabeth

18  Andriano.

19          The record will reflect the presence of the

20  parties and counsel.

21          The record will reflect that Mr. Daniel Patterson

22  is on the witness stand.  We will begin the examination by

23  the State.

24          Is it going to be Ms. Gard?

25          MS. GARD:  It's going to be Mr. Hazard.  But I

1  told counsel beforehand, I need to make a record before we

2  start.

3       THE COURT:  Okay.  Go ahead.

4       MS. GARD:  And it has to do with Mr. MacLeod.

5  Over the lunch break, Mr. Vidal, the paralegal, and myself

6  were discussing him and how we recognize him.  We realized

7  that he had been an intern in our office.  That would have

8  been sometime in the 2006, 2007 range.  We don't remember.

9  He would not have worked on this case, and to my

10 recollection and Mr. Vidal's recollection, he didn't work

11 on any capital cases.  And this case, in particular, would

12 have been in the Tucson office.  But I wanted to just make

13 a record of that.

14      THE COURT:  So he was an intern in the attorney

15 general's office?

16      MS. GARD:  Yes.

17      THE COURT:  Sometime probably in 2006?

18      MS. GARD:  Or 2007, yes, in that range.

19      THE COURT:  Okay.  Anything further?

20      MR. LYNCH:  No, Your Honor.

21      THE COURT:  Then the record will reflect that

22 Mr. Daniel Patterson is on the witness stand.  We will

23 begin the examination by Mr. Hazard.

24      Mr. Hazard.

25      MR. HAZARD:  Thank you, Your Honor.

1                     CROSS-EXAMINATION

2  BY MR. HAZARD:

3      Q.   Good afternoon, Mr. Patterson.

4      A.   Good afternoon, sir.

5      Q.   You testified about some of your experience on

6  direct.  I'm going to talk to you about your entire

7  experience as a defense attorney.  After passing the Bar,

8  you began criminal defense work in 1979; is that correct?

9      A.   That's correct.

10     Q.   And up until about 1990 or 1991, you were in

11  private practice and doing exclusively criminal defense

12  work?

13     A.   Not exclusively, but it was certainly 85, 80

14  percent of my practice.  An occasional divorce, an

15  occasional collection, a tort case here and there.  But

16  the bulk of my caseload was criminal.

17     Q.   And it was during that time in the mid-80's when

18  you started also handling capital cases; is that correct?

19     A.   Yes, to the best of my recollection.

20     Q.   And then around 1990 or so through 1993, you

21  worked as a deputy public defender in Maricopa County?

22     A.   Correct.

23     Q.   And then you went back into private practice in

24  1993 till right around September 11th of 2001, in that

25  time frame; is that correct?

98

1    *A.*    Actually, I started with the Maricopa County

2    Public Defender's in July of 2001, my second tour.

3    *Q.*    Okay.  And, again, during that time you were in

4    private practice in those eight years, did you also focus

5    the brunt of your work on criminal defense?

6    *A.*    Absolutely.  I received cases from the federal

7    panel.  I contracted at all times with the county for

8    felony work, and in the last year or two, I had a city

9    court, municipal court contract.

10   *Q.*    And if you remember in your deposition, you

11   estimated that you had -- before Ms. Andriano's case went

12   to trial, you had completed approximately eight to ten or

13   so death penalty cases that went all the way to the

14   sentencing phase; is that correct?

15   *A.*    I think that's a fair surmise.  Some may have

16   resolved by plea agreement before, but, yes, they weren't

17   -- there was some resolution either by trial or by plea

18   agreement.

19   *Q.*    You had mentioned that the cases that you

20   resolved, you weren't including in that number.  You

21   thought it was probably twice as much?

22   *A.*    You're probably accurate.  I had at least

23   probably eight trials.  Given time, I could probably give

24   you the clients' names.  But, yeah, I think that's a fair

25   estimate.

1    *Q.*    So you were an experienced capital defense

2    attorney before you were assigned to represent

3    Ms. Andriano?

4    *A.*    Yes.

5    *Q.*    And you mentioned on direct -- and I wrote it

6    down.  You made a comment that you're not sure even to

7    this day, even though you actually -- I will ask you this.

8    You supervise the deputy public defenders in your office

9    who are handling capital cases?

10    *A.*    We have a dedicated unit, a Capital Unit.  It has

11    18 lawyers divided into two-person teams.  We have nine

12    teams.  Each has a dedicated mit specialist, a dedicated

13    paralegal, and we share the services of about five

14    investigators amongst the cases in the unit.

15    *Q.*    And in spite of that wealth of experience that

16    you had in representing capital defendants, defendants

17    facing capital crimes and now you work as a supervisor,

18    you made the comment that you're not sure even to this day

19    if you are truly competent.  Do you remember saying that?

20    *A.*    This is an evolutionary process.

21    *Q.*    All right.  And I imagine when you make that

22    comment, you're not -- those are standards that you have

23    imposed upon yourself; is that correct?

24    *A.*    Absolutely.

25    *Q.*    And you consider yourself an ethical attorney;

1  correct?

2      *A.*   Absolutely.

3      *Q.*   A thoughtful attorney?

4      *A.*   Absolutely.

5      *Q.*   And you take your job very seriously?

6      *A.*   Absolutely.

7      *Q.*   And so your definition of competent is a much

8  higher standard than what the U.S. Constitution would

9  require; is that fair?

10     *A.*   I would like to think I'm well above the

11 *Strickland* standard, yes.

12     *Q.*   And you've always strived to be above that

13 standard?

14     *A.*   Yes.

15     *Q.*   As an ethical attorney, if you ever felt that you

16 were not adequately prepared or adequately fit to

17 represent a client who's facing the death penalty, then

18 you would move either for a continuance for more time for

19 preparation or move to withdraw altogether; is that

20 correct?

21     *A.*   Yes.

22     *Q.*   And you did not feel that way when you

23 represented Ms. Andriano?

24     *A.*   No.  Judge Ishikawa afforded us what I thought

25 was sufficient time to properly prepare for trial.  My

1  main focus was preparing for Phase 1 and Phase 2.  And
2  nothing that I was aware of at the time led me to believe
3  there was any deficiency in the Phase 3 presentation at
4  the time we commenced the trial.
5      Q.   Thank you, Mr. Patterson.  Given the statements
6  you've made about where you are now in overseeing the
7  capital defense team in your office, I would imagine that
8  you're proud that your office appears to hold its
9  attorneys to higher standards than what *Strickland*
10 requires?
11     A.   Absolutely.
12     Q.   And you do everything you can as a supervisor to
13 maintain those high standards; correct?
14     A.   Absolutely.
15     Q.   And you mentioned a lot on direct about the
16 difference between today and the time when you were
17 representing Ms. Andriano in 2001 through the end of 2004
18 when she had her trial; correct?
19     A.   Yes.  It was significantly different.  We were
20 learning as we were earning, so to speak, back then.  The
21 *Ring* decision changed dramatically the manner in which we
22 defended capital cases.  The team concept alone was an
23 innovation.  The ABA Guidelines suggested it, but
24 colleagues of Judge Ishikawa would suggest that those
25 standards are aspirational rather than operational.

1          And so, that being said, we developed a team
2    concept over time and better trained mitigation people.
3    Yes, it's changed dramatically.
4          Q.    In the almost ten years since Ms. Andriano was
5    tried, you would agree that these practices have evolved?
6          A.    Absolutely.
7          Q.    And I would imagine, although none of us has a
8    crystal ball, that ten years from now, we might be looking
9    back and thinking, well, we could have done more; is that
10   fair?
11         A.    Hindsight is always 20/20, I agree.  And with
12   regard to specifics, the mental health standard of care
13   has evolved.  It's not unusual now to have MRI's routinely
14   done in all cases.  It's not unusual for EEG's to be done
15   routinely in all cases.  That was not the standard of
16   care, at least as I understood it, back in the immediate
17   aftermath of the *Ring* decision.
18         Q.    Which is the time that's really relevant for
19   these proceedings; would you agree, Mr. Patterson?
20         A.    That's the question.  I don't know what standard
21   needs to apply with this case.
22         Q.    It's a relatively small community, and it was the
23   same back in 2004, of criminal defense attorneys who
24   handle capital cases; would agree with that?
25         A.    Yes.  It was a small specialty kind of boutique

1  practice, yes.  In fact, I was the only -- when I first

2  came out to the Mesa office, I never intended to be the

3  capital lawyer.  When the capital lawyer out here

4  resigned, I became the capital lawyer.  And I was the only

5  person out here at that time who could have been the

6  capital lawyer.

7      Q.    Based on your wealth of experience in defending

8  capital defendants?

9      A.    Well, wealth is a --

10     Q.    Well, what we talked about?

11     A.    Significant experience, yes.  It wasn't my first

12  rodeo.

13     Q.    In other words, back in 2004 when Ms. Andriano

14  was tried following -- shortly following *Ring* and

15  everything as it was being settled, you were all kind of

16  in the same boat?

17     A.    Absolutely.  And the entire system was in the

18  same boat.  The judges weren't educated on juror

19  sentencing.  The prosecutors weren't educated on juror

20  sentencing.  We scrambled to go to seminars to try and

21  become as competent as we could.  There were always

22  compelling reasons to get this case to trial.  We had the

23  Victims' Bills of Rights.  And the victims in this

24  particular case attended every court appearance.  And they

25  were very flexible.  I concede in that, but they wanted

1   their day in court as well.  And so that it was a constant

2   tension with the Court to get this thing done.

3   *Q.*   And you also always have a client in a death

4   penalty case sitting in custody awaiting trial; correct?

5   *A.*   Yes.  They're very -- I have never had a client

6   on OR release or bonded release in a capital case.  That

7   would be an extremely unusual circumstance.

8   *Q.*   And Ms. Andriano had been in the custody of the

9   county jail for about four years before her case went to

10  trial; correct?

11  *A.*   That was not unusual.  The practice back when we

12  had eight cases was when you got your eighth case was to

13  go to the eighth client and say, you know, sit tight.

14  Your case is going to trial in about five years.  We did a

15  disservice to the clients.  I'm glad that has changed.

16  But that was the practical situation back then you carried

17  eight clients.

18          It was similar when you had four clients, in

19  that, we were all learning how to do this stuff and it

20  took time.

21  *Q.*   And before you tried the case State V. Andriano,

22  you mentioned that you were able to seek out training

23  seminars related to this new *post-Ring* taking sentencing

24  to the same jury that you did in the guilt phase; correct?

25  *A.*   Yes.

1    *Q.*   And you did that training because you felt it was

2    an obligation to your clients?

3    *A.*   Absolutely.  And I used that need for training as

4    the predicate for a number of continuances in cases.  I

5    told the Court:  I'm not ready -- competently ready to try

6    this kind of capital case because I'm not schooled in

7    juror sentencing.  And that's a significant departure from

8    what we had before.

9    *Q.*   You acted that way in representing Ms. Andriano;

10   correct?

11   *A.*   I did.

12   *Q.*   You, also, I think in the past, you mentioned

13   about going to your boss and making sure that your capital

14   caseload was pared down to something that you could

15   manage; is that fair to say?

16   *A.*   It was the first order of business after I read

17   the *Ring* decision.  And after I -- I don't know.  The *Ring*

18   decision came down and then shortly thereafter there were

19   changes in Title 13.  Putting those two together, it was

20   apparent no capital attorney could handle eight capital

21   cases in a juror sentencing scheme.

22   *Q.*   You mentioned that one of the things you've

23   learned in these early seminars following *Ring* was the

24   idea of front-loading mitigation in the guilt phase if you

25   could?

1    *A.*    If you could.

2    *Q.*    Right?

3    *A.*    Yes.

4    *Q.*    And you were able to adopt that strategy in

5    State V. Andriano; correct?

6    *A.*    Yes.

7    *Q.*    The idea of front-loading?

8    *A.*    Yes.  I think the fact that we portrayed her as a

9    domestic violence victim was in and of itself mitigating.

10   The totality of her circumstances, her compassion for her

11   husband, all of those things I think were compelling

12   mitigation that I introduced -- we introduced in Phase 1.

13   *Q.*    And even ten years after the fact, is that still

14   considered a good idea if you have the evidence to support

15   it and the theories to support it, to front-load if you

16   can?

17   *A.*    Yes.  It's a sound theory based upon the

18   suggestion that the jurors make up their mind about which

19   way they're going shortly after the State's opening

20   statement.

21   *Q.*    In case, you ran in the guilt phase, as you

22   mentioned, a justification-type of defense related to the

23   prior incidents of spousal abuse; correct?

24   *A.*    Obviously, our range of available defenses was

25   limited.  Obviously, alibi was not appropriate.  It was

1  apparent that there was a struggle.  The physical evidence
2  was very compelling.  The back story for Joseph Andriano
3  was very compelling.

4         Our only available defense was that she was
5  justified in doing it.  And that in Arizona, we have a
6  domestic violence statute that gives further dimension to
7  the self-defense affirmative defense because the conduct
8  is then viewed within the eyes of a domestic violence
9  victim.  So, yeah, that was -- that defense almost
10 invented itself, so, I mean.

11    Q.   Well, and I imagine in every case, you choose a
12 defense based on the evidence that you know the State has
13 against you; fair enough?

14    A.   Correct.

15    Q.   And that was no different in this case?  You had
16 the crime scene evidence to contend with; correct?

17    A.   Correct.

18    Q.   Ms. Andriano actually spoke not only to 911
19 operators commensurate with the homicide, but also she
20 interviewed with police; correct?

21    A.   It was apparent that there was no question as to
22 who was involved with the fight with Joseph Andriano.
23 That being said, then that being obvious to us that
24 Phase 1 had to involve an explanation and justification.

25    Q.   And there was also a reason then to carry that

1  Phase 1 defense into a big part of your mitigation

2  strategy; correct?  That, again, reminding the jury, if

3  you got to that penalty phase, that they should grant

4  leniency because of her domestic violence history?

5       *A.*   Absolutely.  I think we renewed a portion of it

6  by having Sharon Murphy come back and repeat her earlier

7  testimony.  There was some risk involved in upsetting the

8  jurors.  But, yeah, that was a continuing theme throughout

9  all three phases of the presentation and what I felt -- in

10 concert with that she was a good person.  She had no -- no

11 history of misconduct.  She had no -- she was a hard

12 worker.  She was the manager of her department.  The

13 family liked her.  The Andrianos liked her prior to the

14 event.

15          So, I mean, the fact that she was good person

16 coupled with her victim status as a domestically abused

17 person, that's a compelling mitigation theme and that was

18 the thrust of our theme.

19      *Q.*   And the reasons you did the combination of

20 domestic violence victim and good character evidence, that

21 was based on the evidence that you had and the

22 investigation that you did; correct?

23      *A.*   Yes, exactly.  Right.  I had no -- on other than

24 what we have talked about, the references in Rosengard's

25 report, and apparently Donna sent me an e-mail that she

1   had also sent perhaps to David or conversed with David

2   about, the things that Mr. Lynch has brought out, yeah,

3   obviously, they were there.

4        But I didn't give them a great deal of

5   consideration and I passed them onto Mr. DeLozier and to

6   Mr. MacLeod or Mr. Linderman for further review.  At the

7   time of the commencement of the trial, I was confident

8   that we had a sufficient mitigation package to persuade

9   the jurors to concede to us for life for her.

10       Q.   You mentioned Sharon Murphy and Dr. Mindy

11  Mechanic in earlier testimony.  Who selected them to be

12  witnesses?

13       A.   I did.

14       Q.   And why did you select them?  What was your

15  rationale in why you selected them, in particular?

16       A.   Dr. Murphy -- and maybe I'm giving her more -- I

17  don't know if actually she is a doctor.

18       Q.   According to her resumé, she has a Ph.D.  That's

19  correct.

20       A.   Okay.  She was recommended to me I think by a

21  clearing house for abused women out of Philadelphia.  I

22  spoke with a person affiliated with that agency and I

23  think she was the first to mention Sharon's name.

24       I also got confirmation from others in the office

25  that she was a domestic violence person.  And I met her in

1   an Einstein's Bagel in the first meet, and we talked about

2   in general what would she need to help me develop a

3   domestic violence defense.  She agreed to talk with Wendi,

4   and ultimately I retained her and --

5       Q.   And I don't mean to interrupt you, but, in

6   reviewing when you spoke with your client in reviewing the

7   evidence that you had before the thought of even reaching

8   out to a domestic violence expert, there were things that

9   you saw that -- some types of red flags or triggers that

10  suggested there might be domestic violence?

11      A.   Dr. Rosengard's report.  In all candor, it was

12  difficult to get Wendi to talk about concrete examples of

13  domestic violence.  But after she discussed it at length

14  with Dr. Murphy, she became more open with me as well.

15  She was never have comfortable speaking about the sexual

16  issues that were at the heart of the domestic violence

17  issues with her husband.

18          So when Dr. Murphy came in, she became more open

19  with Dr. Murphy and she's the one that reported most of

20  the things to Dr. Murphy, who incorporated those things in

21  discussions with me thereafter.

22      Q.   Do you still have Exhibit 183, Dr. Murphy's

23  report in front of you?

24      A.   I don't recall reflecting on it.  But it's --

25  183?

1        MR. HAZARD:  May I approach the witness, Your

2   Honor?

3        THE COURT:  Yes.  And for the record, that

4   exhibit has been admitted into evidence.

5        *Q.*   BY MR. HAZARD:  Mr. Patterson, I'm handing you

6   Exhibit No. 183.

7        *A.*   Okay.

8        *Q.*   And that is Dr. Murphy's report that she prepared

9   for you on this case; correct?

10       *A.*   Okay.  It looks like it, yes.  I have no reason

11   to doubt its authenticity.

12       *Q.*   And then, first off, if you would look at the

13   very top, the information, client's name, case number, and

14   then assessment dates?

15       *A.*   Yes.

16       *Q.*   And you see that.  Could you just read into the

17   record the number -- the dates that Dr. Murphy actually

18   met with Ms. Andriano to do her assessment.

19       *A.*   March 25, 2003; March 26, 2003; March 29, 2003;

20   March 30, 2003; April 8, 2003; April 11, 2003; April 22,

21   2003; June 4, 2003.  Total interview time:  20 hours.

22       *Q.*   Thank you Mr. Patterson.

23       MR. HAZARD:  One moment, Your Honor.

24       THE COURT:  Yes.

25       MR. HAZARD:  May I approach the witness?

1        THE COURT:  Yes.

2        MR. HAZARD:  Mr. Patterson, I'm handing you

3   Exhibit No. 52 for identification purposes.

4        THE CLERK:  It was admitted.

5        MR. HAZARD:  It has been admitted?

6        THE COURT:  Yes.  That was admitted earlier

7   today.

8        THE CLERK:  Yes.

9        THE WITNESS:  This was referenced in the direct

10   examination of Mr. Lynch?

11        Q.  BY MR. HAZARD:  Yeah.  That is the e-mail that

12   Dr. Murphy sent to you and Mr. DeLozier about sort of

13   giving you a brief status update on her work in assessing

14   Ms. Andriano; correct?

15        A.  I agree.

16        Q.  And that e-mail was dated March 30th of 2003?

17        A.  It is.

18        Q.  All right.  So Ms. Murphy continued to meet four

19   additional times with Ms. Andriano after that e-mail was

20   sent; correct, based on her report?

21        A.  It looks like June 8th; June 11th.  I'm sorry.

22   Strike that.  April 8th; April 11th; April 22nd and

23   June 4th.  Yes, I would agree with you.

24        Q.  If you could turn your attention, then, to

25   Exhibit 183, Dr. Murphy's report.

1    *A.*    Yes.

2    *Q.*    And if you go to the second page, which would be

3    Bates stamp I think 7160.

4    *A.*    Yes.

5    *Q.*    And that Paragraph No. 2, the Subsection A, about

6    halfway down the page, what is the title of that?

7    *A.*    Childhood History, Unstructured Interview with

8    Wendi Andriano.

9    *Q.*    Could you take the time and just read to yourself

10   that Paragraph A.  I'm just going to ask a couple of

11   questions.  Let me know when you've read all the way to

12   the next page where Paragraph B begins.

13   *A.*    I've completed Subsection 2 A.

14   *Q.*    And so, during that section, Dr. Murphy talks

15   about -- discusses the alleged abuse that her biological

16   father may have committed on Ms. Andriano; correct?

17   *A.*    Discussion I think gives it too much credit.

18   Touches upon it.

19   *Q.*    Okay.  And, at the very end, Dr. Murphy states:

20   Mom does not have any proof this happened to Wendi, but

21   has thought it might have been a possibility?

22   *A.*    And that comported with my understanding, my

23   knowledge of that act if it occurred at that time.

24   *Q.*    Do you recall if that evidence was presented at

25   Ms. Andriano's trial?

1    *A.*   Well, I don't recall specifically what was

2    presented.  But I recall using Sharon Murphy and her

3    report to touch upon a host of things that may not have

4    been otherwise capable of being admitted because the

5    witnesses weren't available.  The notion may not have been

6    corroborated.

7            But because Dr. Murphy used it in her assessment

8    and evaluation, I think it was admissible pursuant to the

9    rules.  So we did touch upon pretty much, as I recall,

10   everything that's reflected in this report.

11   *Q.*   And so there was a good sound reason to call

12   Dr. Murphy in this case?

13   *A.*   Absolutely.

14   *Q.*   And in spite of all those meetings that

15   Dr. Murphy had, she never discovered a hint of abuse by

16   the Ochoas on Ms. Andriano?

17   *A.*   If she discovered it, she never reported it to

18   me, nor did she report it to anybody that was working with

19   me, nor was it further touched upon by Ms. Andriano and in

20   later meetings that I had with her.

21   *Q.*   Let's talk a little bit just briefly about

22   Dr. Mindy Mechanic.  What was your reason to sort of have

23   the two domestic violence experts in this case?  Was there

24   a reason that you wanted both of them to testify?  And, if

25   so, what is that reason?

1    *A.*   Well, obviously, two witnesses who come to the
2    same conclusion, it seems to me, being that they're
3    experts, it's better for the proposition being proven.
4         That being said, when I noticed Dr. Murphy as my
5    domestic violence expert, Mr. Martinez brought in
6    Dr. Brad Bayless and noticed him as the rebuttal, if you
7    will, expert.
8         After discussions with him, interviews with -- I
9    think after interviews with him and the focus of his -- he
10   rendered a report.  After having reading the report, I
11   realized that I needed somebody to equate in terms of
12   experience with Dr. Bayless.
13        Dr. Mechanic is a professor.  She was a clinical
14   psychologist, I think.  She was familiar with the
15   substance of the MMPI.  I think, as I recall, the MMPI was
16   the bulk of Brad Bayless's -- the basis for his opinions
17   in this case.  He didn't have an independent domestic
18   violence caseload or clientele.  He came in as kind of a
19   clinical psychologist who gave an MMPI to the client and
20   didn't see the things in the scales that he would expect
21   to see of a person who claims to be the victim of domestic
22   violence.
23        I brought in Dr. Mechanic to rebut that
24   contention.  I also filed a motion in front of
25   Judge Ishikawa to preclude Brad Bayless from testifying.

1   Judge Ishikawa denied that motion.  He may have limited
2   Dr. Bayless in some manner.  That, I don't recall.
3        Q.   Do you recall that the testimony of Dr. Bayless
4   was limited to domestic violence and the MMPI scale, but
5   you were able to keep out any mention of anti-social
6   traits of Ms. Andriano?
7        A.   Yes.  It's my recollection that Judge Ishikawa
8   conceded some points to me.  One of which may have been
9   removing the highly inflammatory language, like
10  anti-social personality, that kind of thing.
11            And my recollection, sir, is that his testimony
12  primarily was dedicated and devoted to his evaluation of
13  Wendi's MMPI.
14       Q.   And that was as a result -- obviously, the judge
15  made the ruling, but that was a result of advocacy on your
16  part; correct?
17       A.   Yes, uh-huh.
18       Q.   Why did you seek to preclude Dr. Bayless from
19  testifying altogether and then also seeking to preclude or
20  limit his testimony?
21       A.   If I can be candid.
22       Q.   Well, that's why we're here.
23       A.   Okay.  And I know Brad Bayless.  He used to work
24  on our side of the proposition.  But he had developed, in
25  my estimation, a reputation of providing information to

1  the government that comported with their -- their desired

2  understanding of the case.  And I don't think he was

3  intellectually honest, medically honest or psychologically

4  honest in his evaluations.

5     *Q.*   Was he an effective witness, though?

6     *A.*   You anticipated the next.  He was an

7  extraordinarily effective witness in person.  A very

8  engaging personality.  He had the credential, if you will,

9  of having served both sides of the equation.  And he

10 always let the jurors know that he is not a hired gun.  He

11 has worked for the defense.  He is a very personable man.

12 I think I may have played golf with him at one point.

13 He's just a likable guy.

14     But because he's your adversary, he is the kind

15 of adversary that you have to minimize.  And he didn't

16 have the credentials intellectually, in my estimation, to

17 serve as a domestic violence expert.  And that's why I

18 filed the motion.

19     If you look at his resumé, he had no clinical

20 practice involving domestic violence.  He had no teaching,

21 no courses involving domestic violence.  His primary focus

22 is juvenile conduct.  And I didn't think he was qualified

23 to -- and his opinion did not assist the finders of fact

24 in this case.  I filed a motion.  Judge Ishikawa disagreed

25 with me, but did limit the scope of his testimony.

1    *Q.*    And so, if I can summarize and ask you if this is

2    accurate.  So Dr. Mechanic, then, really served as a

3    number of functions.  No. 1, you could have her to rebut

4    the anticipated testimony of Dr. Bayless?

5    *A.*    Correct.

6    *Q.*    She was also a domestic violence expert that came

7    to similar opinions to corroborate and validate

8    Dr. Murphy; correct?

9    *A.*    Yes.

10    *Q.*    And then it also gave the jury an opportunity, if

11    for whatever reason they weren't persuaded by Dr. Murphy,

12    they had someone with different credentials that they

13    might find more credible; is that fair?

14    *A.*    That's an accurate summation of why I did what I

15    did.

16    *Q.*    And, again, this was -- these were decisions that

17    you made based on the evidence that you had and what you

18    knew?

19    *A.*    Yes.

20    *Q.*    I'm going to just ask you some general questions,

21    well, and specific to this case about the mitigation

22    investigation.  I'm not going to spend too much time on

23    this.

24          But, first off, Mr. Patterson, I think you

25    answered sort of this question on direct.  But do you ever

1  start with a theme for mitigation and then try to collect

2  evidence to support it or is it the other way around?

3      *A.*    It's the other way around.

4      *Q.*    And that was the practice in 2004 when you

5  represented Ms. Andriano and --

6      *A.*    Yes.

7      *Q.*    -- and that's what you followed; correct?

8      *A.*    Yes.  What has changed is I take a more active

9  role in the development of that information in concert

10  with my mitigation specialists.

11          Back then, I delegated -- I guess that's the

12  question.  How much responsibility should I have delegated

13  to Mr. MacLeod?  I delegated a great deal of

14  responsibility to him because I was working diligently in

15  developing Phase 1 defenses, domestic violence defenses,

16  interviewing Mr. Martinez's government witnesses.

17          This was a very onerous case to defend.  There

18  were a lot of witnesses.  There were a lot of issues,

19  domestic violence.  There was blood spatter.  There was --

20  we had to become knowledgeable about sodium azide.  I know

21  more about sodium azide than I really need to know, quite

22  frankly.  It was a very complex case and it took a great

23  deal of my time developing Phase 1 defenses.

24      *Q.*    Obviously, you disagreed with the State's theory

25  of the case.  But, at the time, did you believe that it

1  was a very compelling case that you had to fight?

2      *A.*   Absolutely.  Absolutely.  And I filed some

3  motions to limit the so-called 404 (b) stuff.  The affair

4  that she had with Travis.  The misconduct in the

5  limousine.  And that appeared to be the thrust of

6  Mr. Martinez's case that this was a bad woman who deserves

7  to die and that's the way he structured it.  And

8  Judge Ishikawa denied my motions and that's the way we

9  defended it.

10     *Q.*   And you relied on Patrick Linderman and later

11 Scott MacLeod because they were employed by your office to

12 do the very work that you had them do?

13     *A.*   Yes.

14     *Q.*   And, again, that was the practice when you were

15 adapting to *post-Ring* and when you were defending

16 Ms. Andriano; correct?

17     *A.*   Yes.  At least, my practice, because I was the

18 only guy out there.  As the cases -- the caseloads

19 developed, we had additional cases -- capital cases

20 noticed by the State, Larry Matthew from my office, who is

21 still in our unit, came out.  Lynn Burns became a capital

22 defense attorney.  Joel Brown, Bob Stein.  I was the first

23 and I was joined thereafter, but it was over the course of

24 time.

25         I still -- I think we only had MacLeod as the

1    mitigation person for the entire -- for all of the capital

2    cases out in Mesa, and that didn't change.

3            When we went a more defined unit in the office,

4    we only had one capital mitigation person, a Cupervert.  I

5    forget her first name.

6            But it's only of recent vintage, we have a

7    dedicated mitigation person per team.  That's probably

8    2006 -- '05, '06.  I'm speculating.  But that was a

9    development.  Scott MacLeod did all the capital cases out

10   there.  Patrick Linderman did all the capital cases out

11   there.  He was brought up from trial group as your

12   Client's Services Coordinator.  He wasn't even a defined

13   capital mitigation person.

14           So that was -- that was the standard of care that

15   existed in my office back at the time when it's relevant

16   in Wendi's case.

17      Q.   And although you delegated a lot of that

18   mitigation investigation to Mr. MacLeod, so you could

19   focus on Phase 1 --

20      A.   And Mr. DeLozier.

21      Q.   -- and to Mr. DeLozier, the three of you did

22   discuss the themes and strategies for mitigation; correct?

23      A.   Yes.  We didn't have a formalized every two weeks

24   we were going to meet and go over what happened in the

25   preceding two weeks, which is the standard of care

1  currently.  We didn't do that.  But, yes, I was always

2  available to Scott.  He was always available to me, as was

3  Mr. DeLozier, to bring to my attention things concerning

4  development of mitigation, and we discussed it.

5        And I was led to believe that everything was

6  wonderful.  We've got proof that she was a good woman,

7  proof that she was a good person down in Casa Grande, that

8  Donna and Alejo were great people, and that was my belief

9  when we commenced trial.

10  *Q.*  And as the mitigation case was presented the way

11  it was presented in trial, do you agree that it was

12  consistent with you were all on the same page, and those

13  themes and theories were presented effectively in your

14  mind?

15  *A.*  Yes.  Again, I think David was tasked with doing

16  the mitigation function, which was consistent with the

17  education I received at seminars.  That they told us that

18  the tasks attendant to all three phases in a capital case

19  are too much for one attorney.  You have to allocate those

20  responsibilities, particularly when you get to Phase 3

21  because you may have lost the jurors when you get to

22  Phase 3.

23        I stood up in front of them in two phases and

24  said things and they looked me in the eye and said:

25  You're wrong.  That's not true, Mr. Patterson.

1        And so the conventional wisdom is then you pass

2   it off to a new face to present a compelling argument as

3   to why you should save the client's life.

4        In looking back, David made an eloquent opening,

5   compassionate closing, and we presented all of the

6   witnesses that we had available to establish the

7   proposition that she was a good woman, had a good

8   Christian upbringing, and she had the support and love of

9   her family.

10   Q.   When did you find out about allegations of abuse

11   by Alejo Ochoa and/or Donna Ochoa on Wendi Andriano?

12   A.   In preparation for this proceeding.  And I think

13   it was first brought to my attention by Mr. Arntsen, if

14   I'm pronouncing his last name correctly.  He's the one

15   that brought to my attention the letter that was authored

16   I think by Mr. Lambeth that suggested that during the

17   period of time that the Ochoas had the child in their

18   custody, bad things happened to his bottom and that the

19   bad things were attributed to Alejo.  That was the first I

20   had ever heard that Alejo was other than a wonderful

21   stepfather.

22   Q.   You met with Alejo and Donna Ochoa before Wendi

23   Andriano's trial?

24   A.   On at least two occasions at their home in

25   Casa Grande.  They were very gracious hosts.  Nothing

1   about the domestic environment there led me to believe

2   that she had been brought up in a challenging environment.

3       Q.   What was the house like, just in general?

4       A.   Well-maintained, clean, ordered.  Donna was a

5   very gracious host.  Alejo I think on one occasion had

6   just come back from work.  He was very, very engaging.

7   Nothing about that environment led me to believe that

8   there was domestic violence within that setting or that

9   they had ever visited that kind of stuff on Wendi as

10  bringing up as a child.

11      Q.   And you actually sat in on the pretrial

12  interviews that Juan Martinez, the prosecutor, had with

13  the Ochoas; correct?

14      A.   Yes.

15      Q.   And David DeLozier didn't insist on being there

16  for those interviews?  You were happy to stand in and do

17  them because --

18      A.   My recollection it was an accommodation to

19  Mr. DeLozier.  His office in is -- if you're familiar,

20  obviously, with the Phoenix area.  It's in Cave Creek

21  just off of Cave Creek Road north of Dynamite,

22  approximately Dixileta in that area.

23           The Ochoas live lived in Casa Grande.  At the

24  time, we were officing here in Mesa.  It was a convenience

25  thing.  Juan came out from downtown.  We used the

1   conference room here.  They came up from Casa Grande.  It

2   was just convenient.  And, like I said, Mr. DeLozier had

3   an active practice and he may have had a court appearance

4   that precluded him from participating.

5          But, no, he was not excluded.  It was an

6   accommodation that I would do it and then assist Juan set

7   up a meeting room for him and audit his interviews with

8   the Ochoas.

9      Q.   During your interaction with Donna Ochoa, did she

10  ever mention anything to you about these allegations that

11  had come forward, anything like that, improper conduct by

12  Alejo --

13     A.   No.

14     Q.   -- on Wendi?

15     A.   Never.

16     Q.   And what about Alejo himself?  Alejo Ochoa?

17     A.   Never.  Nor Wendi.

18     Q.   And you also met Brandon Ochoa?

19     A.   Yes.  In fact, I think I did his direct at the

20  mitigation phase.

21     Q.   And he didn't disclose anything?

22     A.   No.  And I prepped with him before his testimony

23  and there were no allegations consistent with what you

24  folks believed may have existed now.  None of that.  No

25  sexual abuse.  No physical abuse.  None of it, un-huh.

1    *Q.*   Were Donna, Alejo and Brandon Ochoa helpful,
2    though, to you every time you met with them?
3    *A.*   Yes.  They were always available.  I would like
4    to think that I had a very good relationship with the
5    Ochoa family, as with Ms. Andriano.
6    *Q.*   They appeared to be forthcoming to you?
7    *A.*   Yes.  Very, very -- very gracious woman, very
8    willing to help her daughter at all times.  And her glass
9    is always 85 percent full.  She is a very positive woman.
10   *Q.*   I'm going to now take some time to talk to you
11   about your meetings, interactions and communications with
12   Ms. Andriano.
13   *A.*   Okay.
14   *Q.*   Did you find her to be helpful in identifying or
15   locating or even finding people that might be beneficial
16   to her defense?
17   *A.*   Yes.
18   *Q.*   And in what way?  If you can give us specific
19   examples or generalized examples.
20   *A.*   Well, one specific example, one of her co-workers
21   was a lady named Chris Hashisaki, who Wendi characterized
22   had to me as a very good friend of hers.  I interviewed
23   her without the participation of the government lawyer at
24   a Denny's or something of that nature and derived
25   information from her.  I recorded the interview.

1        She gave me a list of co-workers at the -- I

2   forget the name of the complex, the apartment complex that

3   she worked at.  She turned me on to -- or she was helpful

4   in assisting us in locating a Shawn King, a former

5   boyfriend.

6        *Q.*   And you chose, after interviewing Mr. King, not

7   to call him as a witness; correct?

8        *A.*   He was difficult to locate initially.  We did

9   find him.  And at the time of the interview, he was

10  represented by counsel.  So the ability to go into certain

11  areas was restricted.  And I think that the stated reason

12  was that one of the things he was a potentially helpful

13  witness for was that he may have assisted Wendi in using

14  the computer in locating sources of sodium azide.

15       He felt that because of the way -- the manner in

16  which that stuff was used ultimately, it may have

17  implicated him in some kind of criminal conspiracy.  He

18  felt he needed to have counsel.  His counsel instructed

19  him not to be forthcoming in our interview.

20       So we talked in general about things,

21  boyfriend/girlfriend things.  He apparently had a horrible

22  accident where his legs were severed by a locomotive, a

23  train.  His father was a pastor, as was Wendi's father.

24  So there was a kinship, a kindred spirit there.

25       Nothing in the content of that interview did I

1  obtain that gave rise to any kind of mitigation or source

2  of other witnesses for potential development of

3  mitigation.  So it was a pretty straightforward interview.

4       *Q.*   So there was a reason not to call him based on

5  everything you told us there?

6       *A.*   Oh, absolutely.  Absolutely.

7       *Q.*   But he was an individual that Ms. Andriano was

8  very helpful in and you able to track him down and talk

9  with him; correct?

10      *A.*   Right.  I think during the course of our

11 deposition, you presented a letter in her handwriting.  I

12 think that was her effort to try and locate this guy for

13 us.

14           Yes, she was very helpful in all regards.  There

15 were certain areas that she didn't discuss.  But, no, she

16 was one of the one -- one of the best clients I've ever

17 had, quite frankly, in terms of communication.  No

18 unreasonable expectations.  No time demands.  Didn't

19 constantly pepper my office with phone calls.  Didn't

20 complain to my supervisor.  She was a very nice client.

21 I'm proud to have represented her.

22      *Q.*   Along those same lines, could you describe just

23 her personality in your meetings with her, just your

24 general observations of Ms. Andriano as a person?

25      *A.*   She had the rosy optimism of her mother.  There

1  was never anything -- she never complained.  She didn't --

2  she never gave me any concrete examples of sexual abuse

3  from persons other than Joseph Andriano.  No information

4  concerning mental health issues or addiction issues, no.

5          And we spent a great deal of time going over the

6  facts and circumstances of the events and the events

7  leading to the event.  She was very forthcoming with

8  information.  She had accurate recall, and I think we

9  spent eight days on the stand going over that stuff.  So I

10  have no complaints about Wendi Andriano.  She was a

11  wonderful client.

12      Q.   So she had a good memory of the events of the

13  homicide and the events leading up to the homicide;

14  correct?

15      A.   Absolutely.

16      Q.   A good memory of things that you might even deem

17  as more collateral to the homicide and things leading up

18  to what she was on trial for?

19      A.   I had no question about her recall with regard to

20  anything.  She could tell us things about the high school.

21  She could tell us things about growing up in Casa Grande.

22  Oh, no, she was an excellent reporter of all things that

23  were relevant in her case.

24      Q.   And you thought she was candid with you?

25      A.   Yes.

1    *Q.*   Other than the domestic violence and her sexual
2    history with Joe Andriano, you thought she was very candid
3    and forthcoming; correct?
4    *A.*   Without exception.  She didn't -- and I didn't
5    press it because, you know, clearly she wasn't comfortable
6    talking about certain things that she was compelled to do
7    with Joseph.
8          But I had Sharon Murphy to go into that stuff.
9    So I didn't compel her to discuss things that she found
10   distasteful.
11   *Q.*   And imagine the way you assessed her credibility
12   would be to take the evidence that you knew existed, that
13   you knew the State was going to put on and compare that
14   with her statements, and based on that, you felt she gave
15   at least reasonable, you know, reasons to explain the
16   evidence, even the incriminating evidence; correct?
17   *A.*   There was low level spatter on the sofa.  She
18   explained that she struck him with the barstool while he
19   was down.  His neck was cut from ear to ear.  She
20   explained a reasonable, plausible explanation for how that
21   happened.  There was sodium azide in soup bowls.  She had
22   a plausible explanation for how that may have occurred.
23         It was an unusual set of circumstances when the
24   first responders first arrived.  She took a shower.  She
25   had an explanation -- a valid explanation for that.  She

1   had a valid explanation for why she called Alejo to come

2   up rather than calling law enforcement or the fire

3   department.

4        She had a plausible explanation for why it came

5   to a head that night.  She talked about the last supper

6   and going down to the Andrianos and then knowing that it

7   was going to be their last family supper.  And it was by

8   Joe's desire that he wanted to go down there and have one

9   last session with his parents.  That was the night that

10  they decided to take the sodium azide.  It didn't work.

11  In fact, just the opposite occurred.  It's the stuff they

12  use to fill air bags in a crash.  And it caused a horrible

13  nitrogen gas development in Mr. Andriano's stomach.  She

14  had a plausible explanation for that and how it angered

15  him, how it -- why she admitted at that time that she had

16  had affairs, just as kind of -- he was dying and she

17  wanted him to go with the full knowledge of who she was as

18  a human being.

19       So, no, her ability to recall details was

20  extraordinary.  And she withstood significant cross-exam

21  from Mr. Martinez in that regard, in my estimation.

22       Q.   And it sounds to me that that's not only because

23  of her abilities, but also because of the preparation, the

24  time that you had with her?

25       A.   We spent a great deal of time going over every

1   aspect of her version of events leading up to the

2   homicide, during the homicide and her conduct thereafter.

3   I have not prepared -- I'm just trying to put that in the

4   scheme of things.  I probably spent more time developing

5   her testimony than any client I've ever had.

6        Q.   So in spite of that unpleasant surprise that you

7   talked about when you found out that Ms. Andriano and

8   Mr. DeLozier were not talking about the case, you still

9   had adequate time?

10       A.   Yes.  Yes.

11       Q.   And in spite of all this time you spent with her,

12  there were just no red flags that she gave to you about

13  past sexual abuse or physical abuse with Alejo Ochoa on

14  her or anyone else; correct?

15       A.   No.  Apparently, I was presented with these

16  things that Mr. Lynch brought up on direct.  But I either

17  discounted them or passed them onto DeLozier, or DeLozier

18  was notified contemporaneous with me, and I assumed that

19  he would have been -- you know, was going to be

20  forthcoming and responsible to follow up, if need be.

21            You know, I didn't -- unfortunately, I didn't

22  assist greatly in the development of mitigation in this

23  case other than she's a good woman and her story is a

24  credible story.

25       Q.   And, likewise, she never gave any indication of

1  prior abuse --

2      *A.*   No.

3      *Q.*   -- other than what was gleaned from Dr. Murphy

4  and following up with Ms. Andriano as it related to

5  domestic violence with the victim, Joe Andriano; correct?

6      *A.*   Absolutely.  She never suggested to me that her

7  biological grandfather touched her improperly, that her

8  biological father touched her improperly, or that any

9  other human being, other than Joseph Andriano, touched her

10  in a manner that she didn't wish to be touched sexually.

11      *Q.*   I'm now going to ask you about the mental health

12  aspect to these proceedings and Ms. Andriano.  First off,

13  can we talk a little bit more about *State V. Roque*.  And

14  that was the first capital trial you took all the way to

15  jury sentencing; correct?

16      *A.*   Correct.

17      *Q.*   And that was -- that trial went approximately a

18  year before Ms. Andriano's trial?

19      *A.*   That's fair, uh-huh.

20      *Q.*   Who was the prosecutor on *State V. Roque*?

21      *A.*   Vince Imbordino.

22      *Q.*   And what defense did you raise in *State V.*

23  *Roque*?

24      *A.*   Guilty except insane.

25      *Q.*   And you talked about that and what psychiatrist

1  did you hire to be your expert on the mental state at the

2  time of the offense and so forth related to the

3  GEI defense?

4       *A.*   Dr. Richard Rosengard, the same doctor who

5  participated in Wendi's workup.  The government hired a

6  Dr. John Shaley.  And the statute allows the Court in a

7  GEI circumstance to appoint its own expert.  Dr. Potts was

8  appointed as an expert by Judge Mark Acedo.

9       *Q.*   So that was a mental health intensive case?

10      *A.*   Absolutely.  And I did -- and I didn't rely on a

11  mitigation person to develop that stuff because that stuff

12  was Phase 1 relevant material.  So I hired Dr. Rosengard.

13  I developed all of the information that I gave to

14  Dr. Rosengard to assist him in developing the GEI.  I did

15  the leg work in that case.

16      *Q.*   And did that impart why you consulted with and

17  hired Dr. Rosengard to evaluate Ms. Andriano, because you

18  had had this prior working relationship with him?

19      *A.*   Partially.  He was an expert that the office

20  respected.  He was an expert who had -- his heart was on

21  our side of the equation, so to speak.  And he was a guy

22  and an expert who was capable of defending his opinions.

23          So, yeah, I mean a number of considerations went

24  into retaining Dr. Rosengard for Wendi's case, based upon

25  my experience with him in the *Roque* case.

1    *Q.*   And based upon your review entirely of his

2    report, you concluded that there were no significant

3    mental health issues that warranted further investigation

4    with Ms. Andriano; correct?

5    *A.*   Nothing jumped out of that report that demanded

6    that we follow up, in my estimation.  Again, Scott MacLeod

7    or Patrick Linderman had access to this report, as did

8    Mr. DeLozier, and if they felt that follow-up was

9    necessary, I assumed they would have done it.  Maybe I

10   advocated my responsibilities there.

11        But there was nothing in Rosengard's report that

12   screamed this woman has a mental health issue.  Nothing in

13   my experience with the woman led me to conclude that she

14   had a mental health issue.  So, no, I did not personally

15   follow up and retain other experts to assess and evaluate.

16   Today, I would have.

17   *Q.*   And there was no hint in Dr. Rosengard's report

18   about any form of child abuse in Ms. Andriano's history;

19   correct?

20   *A.*   My reading of Dr. Rosengard's report is that her

21   dysfunction -- current dysfunction was a situational

22   result of her being incarcerated, having lost her husband

23   in a horrible manner, and being alienated from her family,

24   who lived in Casa Grande, and her children who were warded

25   out to guardians that were aligned with the Andriano

1   family.  That's what I thought caused her this distress,

2   this depression that's reflected in the report, this

3   post-traumatic stress disorder.

4        There was nothing in the report that suggested we

5   should do anything further to rule out post-traumatic

6   stress disorder or rule out any mental illness.  There was

7   no NOS suggestion that this is a series of -- let's see.

8   What word do I want?  A collection of symptoms that we

9   can't define with any particular mental illness, but

10  there's need to go further and try to perhaps do things

11  that might enable you to define what the actual defect is.

12  I don't read anything in Dr. Rosengard's report that leads

13  me in that direction.

14       *Q.*   And So you relied on Dr. Rosengard's report

15  because he was someone whose opinion you trusted in your

16  office and your office trusted; correct --

17       *A.*   Yes.

18       *Q.*   -- as a mental health professional?  You didn't

19  just rely on Dr. Rosengard's report; correct, as far as

20  this mental health issue?

21       *A.*   Well, at this time, you know, we've got -- I

22  don't know if Dr. Murphy is on this.  No, Dr. Murphy is

23  not involved yet.  But there were other people who had far

24  better handles on mental health issues than I ever will

25  who were brought into the team.  Scott MacLeod and Patrick

1   Linderman were working constantly on the case.  And nobody

2   brought to my attention that there was a fertile area of

3   mitigation in the mental health field.  And these were

4   persons -- you know, I respected Dr. Murphy's opinion.  I

5   respected Mindy Mechanic's opinion.

6          I don't respect Brad Bayless's opinion, but even

7   he suggested there's no issue here.  So, no, I didn't get

8   anybody.  I didn't derive any information that in my

9   estimation compelled me to go further.  Today, I would

10  have.

11     *Q.*   And, Mr. Patterson, there was some discussions

12  about Ms. Andriano's suicide attempt.  Or another way --

13  another one's perspective might be, you know, hurting

14  herself while she was in the custody of the jail; correct?

15     *A.*   Well, again, I mean, I'm familiar -- having a

16  host of clients in custody, I'm familiar with the

17  stressors inherent in being in custody and dealing with

18  Joe Arpaio's folks.  The folks here, you're not the

19  problem.  But there are jailers who make life difficult

20  for my clientele.  Okay?  So I recognize that being in

21  custody does have its own set of the stressors and that my

22  clients react.

23          I did not feel that this was a serious effort on

24  her part to kill herself.  It was a situational response

25  to a provocation at that time.  Once the provocation was

1  removed, she went back to being good, old Wendi Andriano.
2  Maybe I shouldn't have minimized this.  Maybe it should
3  have been a -- maybe it should have been something that
4  generated further interest in mental health issues.  It
5  didn't.  I didn't take it as a serious attempted suicide.
6  I spoke with her about it.  She brushed it off.  But, in
7  retrospect, that's her nature.  It's never about Wendi.
8  She doesn't focus undue attention on herself.  She's not
9  needy.  She doesn't -- that's not who she is.  In
10  retrospect, the fact that she minimized its importance to
11  me doesn't surprise me in the least.
12      Q.   After she cut up her arm, she was transferred to
13  the psyche unit in the Durango Jail; right?
14      A.   The standard operating procedure for inmates in
15  these circumstances.
16      Q.   While she was there, she was treated by mental
17  health professionals and seen on a regular basis; correct?
18      A.   I assume so.
19      Q.   And there was no mention of this on direct
20  testimony, but do you recall that on the first day of your
21  mitigation case, you called all three of her primary
22  treating mental health professionals at that psyche unit?
23  You called Laura King, who was her counselor?
24      A.   Oh, okay, now that you mention it, yes.
25      Q.   Dr. Gerald Perry, who was the clinical

1   psychologist that managed her case; is that correct?

2   *A.*   Okay.  Now that you mention it, I have some

3   recollection of that.  But if obviously it was in the

4   transcript, it happened.  I must have had a reason for

5   doing it.

6   *Q.*   And Joyce VanEvery, the nurse -- the psychiatric

7   nurse that cared for her during that time as well?

8   *A.*   Okay.

9   *Q.*   And, Mr. Patterson, would it surprise you that

10  you asked all three of these qualified mental health

11  professionals who actually treated Ms. Andriano during

12  this time, did she have any sort of serious mental disease

13  or defect, and all three of them said no.  Does that

14  surprise you?

15  *A.*   That would not surprise me and it would comport

16  with my understanding from a number of sources.

17  *Q.*   Do you recall, also, that they were -- you

18  elicited testimony in mitigation about Ms. Andriano's

19  behavior while she was in the psyche ward and how she

20  dealt with other inmates and how helpful she was.  Does

21  that refresh your memory?

22  *A.*   She was a model inmate from all sources.  She was

23  a helpful person.  She was helpful to other inmates.

24  *Q.*   Why would Ms. Andriano's conduct while she was in

25  custody be a good thing to let the jury know about when

1   they're deciding whether she lives or dies?

2        *A.*    Well, that is a predictor for future performance

3   for life in prison that she is not going to be a problem

4   for the guards, that she is not going to be a problem for

5   other inmates, that you can warehouse her, to use a

6   cliché, for the balance of her natural life, and that

7   would be a sufficient punishment.  It's an alternative to

8   the death penalty that you raise for consideration by the

9   jurors.

10       *Q.*    And it was also advantageous here because these

11  were people that actually cared for her?

12       *A.*    Yes, absolutely.

13       *Q.*    They weren't hired to render opinions?

14       *A.*    Correct.  One of the -- if we don't have that

15  kind of information, we do retain Aiken -- Ed Aiken out of

16  Avidican.  I forget the gentleman's first name.  It's a

17  former prison -- former prison warden who evaluates the

18  conduct record of the client while in the county jail and

19  renders an opinion as a corrections expert with regard to

20  the manageability of the client in the life in prison

21  environment.

22            I didn't have to do that in this case because of

23  apparently what I already had, that she was a model

24  inmate.

25       *Q.*    You chose not to call Kandy Rohde to the stand?

1    *A.*    Yes.

2    *Q.*    And why is that?

3    *A.*    I never had a really good understanding of her

4    function here.  She certainly wasn't a treating mental

5    health person.  She didn't have the credentials.  I don't

6    even know if she had a master's in social work.

7    *Q.*    Did you consider her part of your defense team?

8    *A.*    No.  She was -- here was her function, as I was

9    led to believe.  She was already on site when I arrived.

10   Her services were paid for by the Ochoas and her contact

11   person primarily was David DeLozier.  My understanding of

12   her function was to visit with Wendi periodically and help

13   her deal with the stressors inherent in her current

14   environment, a county jail inmate, lack of contact with

15   her family, lack of contact with her children.  A big

16   sister, a hand holder, that was what I was led to believe

17   was her function here.  That she had no therapeutic

18   function.  That she had no diagnostic function.

19        And my concern was that having been kind of a big

20   sister with Wendi, that Wendi may have divulged things to

21   her concerning the facts and circumstance of the homicide

22   that she did not divulge to me, and that putting Kandy

23   Rohde on the witness stand and subject to cross-exam by a

24   very adept cross-examiner, Juan Martinez, would have

25   been -- could have been sheer folly.  It could have been a

1   significant mistake because she could have blurted out

2   things that she had obtained from Wendi that I wasn't

3   aware of that could have been devastating to the case.  So

4   I made the election not to call Kandy Rohde.

5       Q.   Do you recall, also, that Ms. Rohde admitted that

6   she smuggled a compact, mirror and makeup to Ms. Andriano?

7       A.   Yes.  There was some impeachment material

8   available for Mr. Martinez, as I recall; you're right.

9   That's correct.

10      Q.   This is a general question.  You've testified and

11  made it very clear that the reason you didn't pursue a

12  mental health investigation -- you've given those reasons

13  and why you wouldn't present mental health as a mitigation

14  theme or theory to Ms. Andriano's case.

15           In general, when you put your client's mental

16  health or mental state at the time of the offense in a

17  capital case, what does that -- what potential problems

18  does that create?

19      A.   Well, this is going to be as a result of having

20  done this for ten years.  Do you want my assessment

21  now or --

22      Q.   Yes.

23      A.   Now, in my experience discussing with my

24  attorneys in the unit, my own personal experience, mental

25  health, unless it's schizophrenia, unless it's the kind of

1  mental health that's palpable, that the average juror can

2  relate to, it is somewhat -- and the prosecution dismisses

3  it as the abuse excuse.  And, unfortunately, it also, in

4  my estimation, portrays your client as a defective human

5  being, which may give a potential juror license to vote to

6  kill your client.  So I'm very, very reserved about the

7  use of mental health information as mitigation.

8          The downside, once you notice it, then you

9  subject your client to evaluation from the government's

10 expert.  And there are a number of local experts who are

11 very adept at portraying your client as an anti-social

12 human being.

13      *Q.*  Was Dr. Brad Bayless one of those?

14      *A.*  Absolutely.  Absolutely.  And, in fact, from my

15 own personal experience afterwards in the *Medina* case,

16 that very thing happened.  We put mental health at issue.

17 He came in, based upon his review of the MMPI, that the

18 client was an anti-social personality.  It may have been a

19 fair diagnosis in that particular case.

20         That being said, when jurors hear those words,

21 they are inflammatory and, again, they portray your client

22 as a social defective who is deserving of being executed.

23         So you have to be very, very circumspect with the

24 use of mental health evidence in the juror sentencing

25 system.

1        By contrast, I would have no reservation if

2   Judge Ishikawa were the arbitrator of the sentencing in

3   the case in giving him all the mental health evaluations

4   available because he can put the information in context

5   and judges find mental health information very compelling.

6        I don't know that it is as compelling in the

7   juror sentencing system.  I only have, you know, ten years

8   of experience in that regard.  I don't have a great deal

9   of statistical information to support it.  But it's just

10  my belief that you have to be careful with mental health

11  information, in general.  But that doesn't -- I'm not

12  saying that you shouldn't develop it.  Once developed,

13  then you need to look at it very closely and determine

14  whether the benefits of presenting it outweigh the

15  possible detriments.

16      Q.   In this case, Mr. Martinez tried to get you to

17  disclose Dr. Rosengard's report.  Do you recall that?

18      A.   It would not surprise me if he did.

19      Q.   And you resisted those efforts?

20      A.   Yes.

21      Q.   Why?

22      A.   Well, because mental health was not noticed as a

23  mitigator.  I did not put it at issue.  If I put that

24  topic at issue, then the case law in Arizona requires me

25  to submit the client to a full evaluation by a government

1   hired expert, and that is very risky behavior.

2      *Q.*   Why did you think that selecting the theme of

3   portraying Ms. Andriano as, in simple terms, a good person

4   who did some very bad things on October 8, 2000 -- why did

5   you think that was a compelling theme or topic to portray

6   to the jury?

7      *A.*   Well, I think you need to include in your

8   question, they were bad things, but they were justified

9   things.  All of the ostensibly bad things that she did

10  had a lawful explanation.  Sure, there was poison on site,

11  but it was to delay the suffering of Joseph Andriano.

12  Yes, she hit him with a barstool, but after he had

13  attacked her with the knife.  His throat was cut after

14  they struggled with the knife.

15         So the notion that she is an otherwise good

16  person who got involved in a set of circumstances in the

17  last few months of Mr. Andriano's life was consistent.  I

18  mean, she was an otherwise -- I mean, and it was rare that

19  we have clients of her lack of bad background.  I mean I

20  usually have to deal with priors.  I usually have to deal

21  with, you know, circumstances.  She had a wonderful

22  background.

23         So I thought that that was something that would

24  save her life and that's why I concluded that it was a

25  viable mitigation theme.  And it was consistent with her

1 efforts to help her husband.

2       We talked to the doctor and the doctor talked

3 about this horrible death that Joe was going to endure by

4 virtue of his -- it was a multi-salivac kind of carcinoma.

5 That, basically, he would suffocate to death and it was a

6 horrible ending to a good man's life.  And for her to help

7 him, you know, go to the next life with the least amount

8 of suffering, I thought was a noble thing.

9       So we had explanations for all of her conduct

10 that were consistent with the facts that she was a good

11 woman.

12    *Q.*  And given that two-pronged strategy, the domestic

13 violence abuse to try to explain her conduct that the jury

14 had already found her guilty --

15    *A.*  Right.

16    *Q.*  -- correct?

17    *A.*  Right.

18    *Q.*  With the prior evidence of good character, was

19 there also a sense that that's the type of mitigation that

20 might get a jury to emphasize with?

21    *A.*  Yes, absolutely.  I had no reservations about the

22 theme we adopted.  I didn't see any downsides to it.  I

23 was shocked when they came back with the verdict.  I mean,

24 I guess that's a new moment, but that's -- it surprised

25 me.

1    *Q.*    And do you recall, you were able to keep some

2    things from Ms. Andriano's past that would reflect maybe

3    not a perfect character with respect to the theft from her

4    employer, Casa Grande Regional Hospital?

5    *A.*    Yeah, I recall that.  And was that -- did that

6    come in?

7    *Q.*    You were able to preclude that --

8    *A.*    Oh, okay.

9    *Q.*    -- from the jury hearing it.  Do you remember

10   that?

11   *A.*    Okay.  If you say so.  I don't specifically

12   recall.  But I do recall now that she had some theft

13   issues.  She was entrusted with some funds and -- yeah, I

14   don't -- I would have made an effort to keep that out.

15   *Q.*    And you would not want the jury to hear that,

16   obviously?

17   *A.*    No, obviously.

18   *Q.*    If there were things -- knowing that that was out

19   there, would that influence the way you would present

20   certain type of good character to make sure you didn't

21   open the door?

22   *A.*    You have to structure your presentation so that

23   you operate consistent with any court pretrial verdict or

24   ruling.  And, yes, you insidiously avoid things that might

25   open that door.  So, yes, I agree with you.

1    *Q.*   Do you recall, also, that during the mitigation

2  phase, the number of people from Ms. Andriano's church,

3  especially during her child and adolescent years,

4  testified?

5    *A.*   Yes.  I thought we had -- we had Brandon was

6  there.  There were other folks that knew her over time in

7  Casa Grande.  Mom and dad testified.

8    *Q.*   Do you recall a Chris Vargas, who was at that

9  point in time the chief deputy of the Pinal County

10  Sheriff's Office, testified?

11    *A.*   Yes, now that you mention it.

12    *Q.*   He was a retired police lieutenant from

13  Casa Grande PD as well?

14    *A.*   Yes.

15    *Q.*   And he went to the same church as Ms. Andriano

16  and knew her for ages eight to up until her early 20's.

17  Do you recall that?

18    *A.*   I don't recall specifics of his testimony, but I

19  do recall in general him being part of the presentation.

20    *Q.*   And, again, none of these witnesses that you

21  spoke to, that you called -- none of them brought up any

22  sort of allegations or hints that Alejo or Donna Ochoa

23  were not the parents that you thought they were?

24    *A.*   I agree.  I received no information that would

25  lead me to believe that she lived in an otherwise -- you

1 know, obviously, it's not a Ward and June Cleaver

2 environment, but, you know, every family has their

3 problems.

4         But the problems that I was advised of went back

5 to the point in time when Alejo was kind of a street

6 preacher and they lived in a Volkswagen minibus and went

7 from town to town preaching the gospel.  Those were lean

8 years according to Donna and Wendi.  But even Wendi said

9 that there was something nice about being with the family.

10 So even, that's Wendi.  She's very optimistic about

11 everything.

12         No, none of those folks ever suggested that there

13 were things going on in that household involving Wendi

14 that shouldn't have been going on.

15    *Q.*   That sort of traveling ministry that you just

16 mentioned, at the time, there was nothing that made you

17 think it was sinister in any way; correct?

18    *A.*   No, not whatsoever.  It was a good thing.  It was

19 a valuable thing.  It was Alejo doing spiritual things for

20 the good of mankind.  That was the way it was portrayed to

21 me.

22    *Q.*   I'm going to ask some questions now about David

23 DeLozier.  You mentioned about the importance of meeting

24 regularly with a client who is facing the death penalty,

25 the death notice, and developing a kinship with that

1  client; correct?

2      *A.*    Absolutely.

3      *Q.*    And, although, you were alarmed that Mr. DeLozier

4  and she were not talking about the case when you

5  discovered that, would you agree that he was developing

6  that kinship at least with her?

7      *A.*    Absolutely.  I was only alarmed to the extent

8  that had I known earlier, then I would have made different

9  decisions about things that I had to do.  It would have

10  given me more lead time to do them.

11          But, no, developing a bond with the client is

12  essential.  It's what they teach at all mitigation

13  development seminars.  You're not going to get the client

14  to talk about horrible things in his or her life from

15  their childhood unless you have a well-established

16  relationship with that client.

17          And we're instructed now, you don't even talk

18  about those things the first year or so with the client.

19  You know, you develop -- you talk about the Diamondbacks.

20  You develop a rapport with the client with the hope and

21  expectation that the things that are truly valuable will

22  be forthcoming because they trust your judgment.  You're

23  not a public defender.  You're not a government lawyer,

24  you know, that's going to sell them out.

25          Sometimes you go with mitigation witnesses and

1  you just sit down and have a cup of tea with the aunt and
2  you don't talk about the case.  You're developing and
3  establishing a relationship with the next-of-kin or with
4  relatives of the client.
5       Now this is a well-defined process and we know
6  far more about it currently than we did back in 2002, '03,
7  '04.
8    Q.   Your work in relationship with Mr. DeLozier was
9  good; correct, on this case?
10   A.   Yes.  Yes.
11   Q.   And you mentioned and when we interviewed you,
12 that your impression was that he was grateful when you
13 were appointed to represent Ms. Andriano?
14   A.   Yes.
15   Q.   Could you tell the Court a little bit about that?
16   A.   Well, he was candid that he had never done this
17 stuff before.  He never had done a capital case.  He felt
18 in over his head and he was glad that there was somebody
19 to help him with the defense of the case.
20   Q.   Not only because of your experience and
21 qualifications, but because of the resources that you had;
22 correct?
23   A.   And that's very true.  I brought with me the
24 power of the public purse.  We could retain anybody that
25 was reasonably needed to properly defend Wendi.

1    *Q.*   And when you got on the case, you limited his
2    work?
3    *A.*   Not by design.  His function -- I mean, again, it
4    was kind of a literal reading of a Knapp lawyer.  You deal
5    with mom and dad.  But as it developed, that was the
6    source of the mitigation information.  And because he had
7    a far better relationship with Donna and Alejo than I ever
8    would, he was the natural conduit to treat or retrieve
9    that information.
10         I didn't limit his participation.  You know, he
11   had his practice.  He had other clients.  Her case was
12   assigned to my office.  I had Scott and Patrick there.  I
13   had Michelle Arvanitas.  I had Patty Moncava.  I had the
14   resources to do the Phase 1 stuff.  So I shouldered that
15   responsibility.
16         You know, I had a good rapport with Juan.  You
17   know, I had been to the county attorney's office before to
18   do witness interviews.  So it was just a natural upshot of
19   my experience versus his experience that I would laden,
20   you know, shoulder the bulk of the Phase 1
21   responsibilities, and he would assist in developing the
22   Phase 3 responsibilities because of his relationship with
23   the family.
24   *Q.*   He never told you at any time that he felt like
25   he was being shut out or pushed aside; correct?

1    *A.*    Apparently, there is some e-mail that he sent to

2    somebody.  No.  That shocks me.  Maybe, you know, because

3    I had a caseload and my focus was with Mr. Roque or my

4    focus was with Mr. Carrion or with some other client.  I

5    may have shut him out in the sense that, no, I'm not going

6    to work on Wendi's case this week.  I've got enough going

7    on.

8          But once we started scheduling interviews of key

9    witnesses, he never expressed a desire to participate, nor

10   did he express a feeling that she was being shut out of

11   the process.  I thought I had a good working relationship

12   with Mr. DeLozier.

13   *Q.*    You thought he was a good advocate for

14   Ms. Andriano?

15   *A.*    Having watched him in Phase 3, I think his

16   performance, in my opinion, was at least *Strickland*

17   performance.

18         MR. LYNCH:  Object to the legal characterization

19   there, the legalese.

20         THE COURT:  Overruled.  Overruled.

21   *Q.*  BY MR. HAZARD:  And you thought he took his job

22   seriously?

23   *A.*    Yes.  He certainly absolutely took responsibility

24   for his performance in this case.  He was a dedicated

25   counselor with Wendi.  I mean, they had an extraordinary

1   relationship.  A very, very good relationship.  So, yeah,
2   I have no -- obviously, he didn't -- I didn't get a report
3   from him as to those things he was accomplishing, but I
4   never ever believed that he was shirking his
5   responsibilities in this case.

6       *Q.*   You mentioned on direct or you made some comments
7   about the Knapp counsel and how today your views on how
8   Knapp counsel should be handled and how it's not a right
9   of the defendant.

10          Putting that aside for a moment, this was
11  Ms. Andriano's choice to have Mr. DeLozier represent her;
12  correct?

13      *A.*   Yes, absolutely.

14      *Q.*   And at least at the time in 2004, your
15  interpretation of Knapp as having this sort of necessary
16  he's there and you've got the defendant's rights, you have
17  to work with him, that was a reasonable interpretation in
18  2004; correct?

19      *A.*   Both from the defense perspective and from the
20  judicial perspective.  I don't recall any judge telling
21  folks in court that your ability, Mr. Client, to have a
22  Knapp counsel is dependent upon the willingness of the
23  public defender to work with that person, and if the
24  public defender objects, you cannot be Knapp counsel.
25  That was not the wisdom in the early 2000's.

1      If a client said, I want a Knapp lawyer and my
2  parents are willing to pay for it, you got Knapp counsel,
3  period.
4      Now, if after Knapp counsel was there for a
5  period of time and you had irreconcilable differences that
6  the Knapp counsel wouldn't abide by or concede to the
7  public defender deputy the right to be the control, if you
8  will, or the lead counsel, or if there was some disputes
9  with regard to strategy and theory in the case, then you
10  could have a Knapp counsel dismissed.
11      But that didn't -- it didn't eliminate the
12  possibility of a new Knapp counsel because everybody
13  believed it was the client's right to have Knapp counsel,
14  which I think is absolutely wrong.  But that's what we
15  thought back then.
16      Q.   And you didn't have any of those types of
17  differences with Mr. DeLozier on this case?
18      A.   No, absolutely not.  He was a good man to work
19  with.
20      Q.   You mentioned on direct your discovery of
21  Mr. DeLozier and his fasting; correct?
22      A.   Yes.
23      Q.   Notwithstanding, there was nothing that you
24  gleaned from that fasting that you thought affected
25  Mr. DeLozier's performance; correct?

1     *A.*   I can't give you a concrete example, no.  Did he

2     fail to do something because he was too weak to do it?

3     No.  But he -- the man had lost a considerable amount of

4     weight.  It was apparent in his face and apparent in the

5     way his suit coat fell from his shoulders.  It was

6     obvious.  And it was a fast that had a duration of

7     five weeks at the time because we were well into the

8     trial.

9     *Q.*   And you also mentioned on direct about the death

10    of his associate and it was someone that he felt was like

11    a son to him?

12    *A.*   Absolutely.

13    *Q.*   And that happened in the middle of the trial?

14    *A.*   Yes.

15    *Q.*   You mentioned about when you saw evidence that he

16    was just not there momentarily; correct?

17    *A.*   Yes.

18    *Q.*   And it was your conclusion, it was just as a

19    result of what he was going through with the grief and

20    everything surrounding that?

21    *A.*   It had to be.  It had to be.  I think we made a

22    record of it.  I remember approaching Judge Ishikawa's

23    bench and we dismissed the jurors and I think we made a

24    record of it.  So it should be there someplace.  But,

25    yeah, he was not equipped that day to deal with the

1   stresses of a capital trial.

2      *Q.*   Judge Ishikawa gave you a break?

3      *A.*   Yes.

4      *Q.*   And when you did return and resume the trial, I

5   think you mentioned that you thought that Mr. DeLozier,

6   quote, soldiered on after the recess and you didn't see

7   deficiency in his performance?

8      *A.*   No.

9      *Q.*   Did Mr. Arntsen also or Mr. Lynch, when they met

10  with you that first time in these proceedings -- did they

11  mention this purported conflict of interest between the

12  Ochoas and Mr. DeLozier at all?

13     *A.*   No.  The substance of that allegation and being

14  one of the issues at this hearing only became apparent to

15  me after Judge Ishikawa granted the part -- the portions

16  of the relief requested and then set the parameters for

17  this hearing.  That's when I discussed with Mr. Lynch and

18  Mr. Arntsen more fully how a potential conflict of

19  interest arose.

20     *Q.*   At the time you were representing Ms. Andriano,

21  you had no idea there was any possible conflict?

22     *A.*   No.  No.  No belief and no information that there

23  was in fact an actual conflict of interest.

24     *Q.*   It has been reported that Mr. DeLozier may have

25  had some help or have actually some other people write his

1  statements or arguments that he presented to the jury in

2  the mitigation phase.  Now does that gel with your memory

3  of the way he presented it?  What was your impression at

4  the time?

5      A.   There was some reference to the fact that Donna

6  may have helped script him with the presentation.  I can't

7  confirm that.  I don't know.  And I don't really recall

8  where I heard that, whether it was an acknowledgement or

9  admission by Mr. DeLozier or something that Ms. Ochoa

10 told me.  I can't -- I would be speculating completely in

11 that regard.

12     Q.   Given that this was at a stage where Mr. DeLozier

13 was essentially arguing for leniency to spare

14 Ms. Andriano's life, would there be anything wrong with

15 taking advice from the people who knew Ms. Andriano well

16 to prepare and draft those types of remarks?

17     A.   You know, absent more information, Counselor, I

18 really can't weigh in on that.  I mean, certainly, you

19 want to include in your opening and in your summation

20 quotes from relatives, family.  You want to humanize the

21 client to the best extent possible and you may enlist the

22 woman who knows the client better than anybody else on the

23 planet in preparing those statements, that presentation.

24          Whether I would delegate that responsibility

25 completely to the mom and then read verbatim what the mom

1    wrote, I don't think that's the standard of care that

2    should be adopted.  But incorporating a mother's influence

3    or input into the closing summation in Phase 3, I don't

4    think that that's too far out of line.

5        Q.    Even if that did happen in this case, which is

6    not consistent with your memory, and Mr. DeLozier had

7    somebody else write out the statements and arguments that

8    he made in the jury mitigation phase, based on what you

9    heard and saw in the courtroom when he was presenting it,

10   was there anything that you thought was deficient?

11       A.    No, not from my perspective.  I, to this day,

12   believe he made a compelling argument for life.

13       Q.    In summary, Mr. Patterson, you and your team

14   relied on Alejo Ochoa to help you with mitigation;

15   correct?

16       A.    Yes.

17       Q.    And Donna Ochoa to give you evidence, advice,

18   suggestions; correct?

19       A.    Yes.

20       Q.    Brandon Ochoa as well?

21       A.    Yes.

22       Q.    Ms. Andriano herself?

23       A.    Yes.

24       Q.    And there were no red flags, aside from an

25   incident regarding Alejo and photographs of furniture,

1  that made you think that there was something to suspect

2  Alejo Ochoa as being a good father?

3       A.   Well, and I need to dissect your predicate here.

4  The incident involving the photographs where he may, at

5  least if you believe Mr. Martinez, took a photograph after

6  the fact and claimed that it was a photograph that showed

7  the domestic violence before the homicide --

8       Q.   It was a furniture in Ms. Andriano's apartment;

9  correct?

10      A.   Right.  And I think it particularly related to a

11 box that had a lamp.  That, at one time, it held a lamp.

12 And that one position was that that lamp had been

13 purchased that morning the day of the homicide at the

14 COSTCO or Wal-Mart.  And so that that damage was not

15 damaged furniture that was occasioned by another domestic

16 violence act, but it was damage that was occasioned or

17 created or staged the day of the homicide to make it

18 appear that there was a fight.

19           That being said, that only led me to believe that

20 he was willing to do things with evidence that may not be

21 appropriate.  It didn't lead me to believe that he was a

22 bad father.  It didn't lead me to believe that he was an

23 abusive father.  It just caused me some concern about the

24 legitimacy of all of the things that he had told me up to

25 that point because he apparently -- I mean, if you believe

1  Mr. Martinez's take on it, he created a bit of evidence to

2  support his daughter's position that was wholly concocted

3  by him and not the way that the apartment looked.

4      *Q.*   If Mr. Martinez's version is accurate, then that

5  reflects that Mr. Ochoa was willing to help out his

6  daughter, although in a very inappropriate way; correct?

7      *A.*   Yes, it does.  Yes.  If Mr. Martinez's take --

8  yes.  But, unfortunately, that occurred late in the

9  process.

10      MR. HAZARD:  Thank you, Mr. Patterson.

11      THE COURT:  Okay.  This is a good time to take

12  our afternoon break.  We will go ahead and take our

13  afternoon break.  We will take 15 minutes.  We will be in

14  recess.

15      (WHEREUPON, a recess ensued from 3:06 p.m. to

16  3:19 p.m.)

17      THE COURT:  This is CR 2000-096032, State of

18  Arizona vs. Wendi Elizabeth Andriano.

19      The record will reflect the presence of the

20  parties and counsel.

21      The record will reflect that Mr. Daniel Patterson

22  is on the witness stand.  We will begin the redirect by

23  Mr. Lynch.

24      Mr. Lynch.

25

REDIRECT EXAMINATION

BY MR. LYNCH:

Q.   Mr. Patterson, in your testimony on cross-examination, you mentioned the *Strickland* case several times; right?

A.   Uh-huh.

Q.   And that was in the context of the case that was presented at trial?

A.   Yes.  I think that was the way it was structured, the question, yes.

Q.   You reviewed the order granting this PCR hearing in this case; correct?

A.   Correct.

Q.   And you're aware that that PCR hearing -- that this case is about *Strickland* in the context of failure to develop mitigating evidence, not failure to present what had been developed previously?

A.   I understand the distinction.

Q.   Okay.  Mr. Patterson, you talked about that Wendi did not disclose sexual abuse to you; is that right?

A.   Correct.

Q.   And that Brandon did not disclose sexual abuse to you?

A.   To the best of my recollection; correct.

Q.   Alejo didn't disclose sexual abuse to you?

1      *A.*     No, definitely not.

2      *Q.*     And Donna didn't disclose sexual abuse to you?

3      *A.*     Correct.

4      *Q.*     As for each of those individuals, did you ask

5      them?

6      *A.*     No, I didn't.  I did not sit them down and say:

7      I need to know about a history of sexual abuse.  No, I did

8      not ask them that question directly.  I, for whatever

9      reason, assumed that it was made known to them that things

10     of significance in their daughter's background and history

11     are important and that it was incumbent upon them to bring

12     those things to our attention.

13     *Q.*     What was the basis of that assumption?

14     *A.*     Because we had good relationships with both Donna

15     and Alejo and they were aware that part of their function

16     to assist us was to bring to us -- to our attention those

17     kinds of issues.  We made it known to them that those are

18     the kinds of things that are admissible.

19     *Q.*     And Donna and Alejo were the primary caregivers

20     for Ms. Andriano growing up?

21     *A.*     To my knowledge, yes, absolutely.

22     *Q.*     So if there had been sexual abuse or neglect or

23     trauma suffered by Ms. Andriano, it's entirely possible

24     they may have been perpetrators of that?

25              MR. HAZARD:  Objection.  Calls for speculation.

1          THE COURT:  Sustained.

2     Q.   BY MR. LYNCH:  Mr. Patterson, you talked about

3  Kandy Rohde and your reliance on her or nonreliance on

4  her.  I'm sorry.

5     A.   That's a better way to state it.

6     Q.   And you stated that one of the reasons was you

7  weren't sure if she had any credentials; right?

8     A.   Correct.

9     Q.   I want you to turn back to what we looked at

10  earlier, Exhibit 230.

11     A.   I believe that's the Rule 11 request?

12     Q.   Yes.

13     A.   Okay.

14     Q.   If you would turn to the last page of that

15  exhibit.

16     A.   Exhibit 2?

17     Q.   Or second to the last page to that exhibit.  I'm

18  sorry.

19     A.   Okay.  I see it.

20     Q.   Did you review this portion of Exhibit 230 when

21  you reviewed the initial pleadings in this case?

22     A.   I have no specific recollection of being aware of

23  these credentials that are described in this particular

24  resumé.

25     Q.   About her education, do you see that Ms. Rohde

1   had an MA in counseling psychology?

2   *A.*   She apparently was a counselor, I agree.

3   *Q.*   And, specifically, counseling psychology?

4   *A.*   As it -- I have no independent knowledge of what

5   I'm reading absent what's said and presented before me.  I

6   did not investigate her credentials.

7   *Q.*   Well, in terms of relying upon Wendi, I think you

8   used that word in the very last sequence of the questions.

9   Relying upon Wendi to report allegations of sexual abuse

10  or something worth investigating?

11  *A.*   Yes.

12  *Q.*   We went through earlier -- and I can through them

13  again -- some notes from Kandy Rohde talking about

14  dissociation associated with childhood sexual abuse.  Do

15  you remember that?

16  *A.*   Well, I don't accept your premise that they were

17  causally related.  There was some suggestion that a

18  grandfather may have improperly touched her and that a

19  stepfather may have improperly touched her, but it was

20  never confirmable.

21  *Q.*   Let's go --

22  *A.*   And she had no specific recollection of any

23  misconduct in that regard as well.

24  *Q.*   Let's just turn back to --

25       MR. HAZARD:  Your Honor, can we have

P-App. 001448

1  clarification as to who he means by the stepfather?

2         THE WITNESS:  Did I say stepfather?  I meant

3  biological father.

4         THE COURT:  When you said father, you meant

5  biological father?

6         THE WITNESS:  Yes.

7         THE COURT:  Okay.

8    *Q.*   BY MR. LYNCH:  Let's turn back two pages in that

9  same exhibit, Exhibit 230.

10   *A.*   Okay.  Is that again the Petition for Rule 11

11  Competency Determination?

12   *Q.*   Yes.

13   *A.*   Okay.

14   *Q.*   It's the letter from Ms. Rohde in that exhibit.

15   *A.*   Okay.

16   *Q.*   Once again, I also suspect that her defense

17  system includes dissociation.  Her mother's reference to

18  possible abuse by Wendi's paternal grandfather could be

19  the origin of that dissociation.

20         Did you consider that dissociation may have been

21  a reason why Wendi was unable to report childhood sexual

22  abuse?

23   *A.*   I did not go through that analysis.  Quite

24  frankly, I didn't have a great deal of competence in

25  Kandy Rohde.

1    *Q.*    Why not?

2    *A.*    Because of her limited participation in the case,

3    her function in the case.  She was not an evaluating or

4    treating physician.  And, again, I don't recall this

5    letter specifically.  So I can't opine with regard to what

6    I did or didn't do having read it, if I did read it.  So I

7    really can't weigh in, Mr. Lynch, on that notion very

8    well.

9    *Q.*    Did you have any knowledge of how often Ms. Rohde

10   was meeting with Ms. Andriano?

11   *A.*    Frequently, from what I understood.

12   *Q.*    Would you turn to exhibit -- what has been

13   admitted as Exhibit 45?

14   *A.*    Okay.  That appears to be some notes, I guess.

15   Wendi Andriano, January 9, 2001.  That one?

16   *Q.*    That would be it.

17   *A.*    Okay.

18   *Q.*    And I would ask you to turn to the page marked

19   PCR 27.

20   *A.*    PCR 8, 9, 14, 24, 27.  27, I have it.  It's

21   Bates 007333?

22   *Q.*    Yes.  Mr. Patterson, you see underneath that the

23   Bates number beginning PAT?

24   *A.*    Correct.

25        MR. LYNCH:  If I can represent to the Court, that

1  receiving files from Mr. Patterson's office, we placed the

2  Bates number PAT on files from Mr. Patterson and

3  Bates number DEL from Mr. DeLozier.  That's in my

4  Exhibit 43, my authenticating declaration.

5      Q.   BY MR. LYNCH:  Mr. Patterson, do you have any

6  reason to doubt that's true?

7      A.   Yeah, could you rephrase or repeat the question?

8      Q.   Do you have any reason to doubt that we got this

9  note from your file?

10      A.   I have no reason to suspect that you created this

11  particular document.

12      Q.   Well, that we received this document from your

13  file?

14      A.   I have no reason to dispute that.

15      Q.   Did you review this document in the pretrial

16  preparation of Ms. Andriano's case?

17      A.   I don't have any specific recall with regard to

18  this particular page.

19      Q.   Mr. Patterson, I would like you to take a look at

20  the middle of the page.  You see the sentence beginning?

21  She said?

22      A.   This, again, are the notes of whom?

23      Q.   Kandy Rohde.

24      A.   Okay.  All right.  Yes, I'm there.

25      Q.   She said that she has never.  Do you see that?

1    *A.*   She said that she has never had an orgasm and

2    that she only enjoys hugs and kisses.  Yes, I was familiar

3    with --

4    *Q.*   I'm sorry to interrupt.  I would like you to read

5    the next line as well.

6    *A.*   Okay.  I told her that the dissociation and the

7    lack of sexual responsiveness fit a profile of early

8    molestation, but that it is not proof.  Shall I read more?

9    *Q.*   No.  That's fine right there, Mr. Patterson.

10   *A.*   Okay.  Thank you.

11   *Q.*   Again, did you ever consult with any experts to

12   determine whether Wendi fit the profile for early

13   molestation?

14   *A.*   I did not.

15   MR. HAZARD:  Objection as to profile.

16   THE WITNESS:  Well --

17   THE COURT:  Overruled.

18   Go ahead and answer the question, if you can.

19   THE WITNESS:  I did not direct that any expert

20   investigate a relationship between dissociative

21   personality and an early molestation that had -- that may

22   have occurred to Ms. Andriano.  No, I did not investigate

23   that aspect of her case more fully.

24   *Q.*   BY MR. LYNCH:  I did note a couple of times in

25   your cross-examination that -- and I believe this is

1  right -- that, you know, you didn't believe there was

2  childhood sexual abuse because of the reports of Dr.

3  Rosengard and Sharon Murphy.  Is that accurate?

4       *A.*    No, I don't know that I said I didn't believe it.

5  I just said there was no confirmation that those facts in

6  fact occurred.  They were not confirmed by the client.

7  They were not confirmed by persons of interest in the

8  case.  So I categorized it as speculation at the time.

9       *Q.*    Did Dr. Rosengard interview anyone other than

10  Ms. Andriano regarding childhood sexual abuse?

11      *A.*    Not to my knowledge.

12      *Q.*    Did Sharon Murphy interview anyone other than

13  Wendi Andriano regarding childhood sexual abuse?

14      *A.*    Not that I'm aware of.

15      *Q.*    Did anyone from your office interview anyone

16  other than Wendi Andriano, Alejo Ochoa, Donna Ochoa,

17  Brandon Ochoa, immediate family regarding potential

18  childhood sexual abuse?

19      *A.*    They may have.  They didn't report it to me if

20  they did.

21      *Q.*    Did anyone from your office interview Skip

22  Robertson, who was incarcerated for childhood sexual

23  abuse?

24      *A.*    No, nobody -- to my knowledge, if they did, that

25  fact was not reported to me.  I did not interview

1   Mr. Robertson.

2       *Q.*   And was Mr. Robinson Ms. Andriano's biological

3   father?

4       *A.*   I've come to realize that when you showed me the

5   e-mail from Ms. Ochoa.  I may have had independent

6   knowledge of that fact back at the time.

7       *Q.*   You also mentioned that you went to the Ochoa's

8   house and didn't get any sense that there was anything

9   wrong?

10      *A.*   Yes.

11      *Q.*   Was that a reason for not investigating potential

12  childhood sexual abuse?

13      *A.*   Again, I did not investigate sexual abuse --

14  childhood sexual abuse because I didn't think there was

15  any validity to the allegation.  If it were to be

16  investigated, it was the function of either Mr. MacLeod or

17  Mr. Linderman under my direction, or Mr. DeLozier.  I did

18  not do that.

19      *Q.*   I guess what I'm sort of -- why didn't you think

20  there was any validity to the allegation?

21      *A.*   Well, and I guess my question to you is:  Why do

22  you think there is?  I have Kandy Rohde reporting to me

23  this theory that because she can't have an orgasm, somehow

24  that has to stem from being wrongfully touched by a

25  grandfather.

1       You know, the standard of care today, maybe we
2  would do that out of an abundance of caution to rule out
3  sexual abuse, to rule out mental health issues.  Nothing
4  that was presented to me set off the notion in my mind
5  that there was something fertile here that could lend
6  itself to a mitigation theme.  It was never reported to me
7  that it was something that we should further investigate.
8       Today, yes, as a matter of course, we probably
9  would.  Back then, I didn't.
10      Q.   Let's go back to Exhibit 52.
11      A.   Motion for Court Order to Assist Mitigation?  No
12  it's 54.  My mistake.  52.  Yes, it's a report from Sharon
13  Murphy of a contact with Wendi.
14      Q.   I understand you --
15      A.   It was sent to both me and David, apparently.
16      Q.   I understand that you at the time did not think
17  that Kandy Rohde had proper credentials.  Did you think
18  Sharon Murphy had better credentials?
19      A.   I didn't make a comparative evaluation.  I had
20  confidence in Sharon Murphy's ability to evaluate.  I
21  didn't share that confidence with regard to Karen's or
22  Ms. Rohde's ability to diagnose and evaluate.
23      Q.   Well, Sharon Murphy wrote that she believed Wendi
24  had learned to dissociate some painful memories a long
25  time ago.  Why didn't you follow up with investigating

1   potential childhood trauma?

2      A.   Well, I mean, that's a quantum leap, it seems to

3   me, Mr. Lynch, that she dissociates from painful childhood

4   memories to the notion that she was sexually abused.  I

5   mean, most of our clients have painful memories and they

6   cope with it by dissociation.

7         Again, with the benefit of the 20/20 vision,

8   Mr. Lynch, you are suggesting that that was a red flag.

9   It wasn't to me at the time.

10     Q.   I guess here's what I'm struggling with,

11  Mr. Patterson.  It seems that we've mentioned a couple of

12  reports where they touch on sexual abuse, but you note

13  that sexual abuse has not been confirmed and it's

14  speculative; correct?

15     A.   Well, I don't even know if it's touched upon.

16  But a report that a grandfather many, many years ago may

17  have done something for which she has no concrete memory,

18  I don't know that that's the kind of information that

19  compels an active investigation.

20     Q.   And you and I miss disagree on that.  But, at the

21  same time, you would confirm that your office was not

22  actively trying to find whether there was evidence that

23  any sort of sexual abuse had occurred in Ms. Andriano's

24  past?

25         MR. HAZARD:  Objection.  Leading.

1          MR. LYNCH:  Your Honor, at this point --

2          THE COURT:  Overruled.

3          Go ahead and answer the question.

4          THE WITNESS:  I don't know to what extent --

5     you'll have to talk with Mr. MacLeod, Mr. Linderman and

6     Mr. DeLozier as to what they may have done with regard to

7     investigating this possibility.  I, myself, was not led to

8     believe that it was a significant basis for a mitigation

9     theme.  So I didn't develop it.  I didn't preclude

10    Mr. DeLozier from developing it, nor did I preclude

11    Mr. Linderman, nor Mr. MacLeod from developing it based

12    upon their expertise and ability to assist in the

13    development of mitigation.

14    *Q.*  BY MR. LYNCH:  Mr. Patterson, you talked about

15    the idea of front-loading mitigation is a good practice;

16    right?

17    *A.*  Yes, sir.

18    *Q.*  And trying to have your mitigation themes

19    consistent with your Phase 3 themes; right?

20    *A.*  It's good practice.

21    *Q.*  And your mitigation theme in this case, I think

22    you used the term, wonderful background?

23    *A.*  Yes.  Wonderful, maybe.  A solid, familial

24    support system, a mother and father who loved her, who

25    cared about her, who guided her, who instructed her, that

1   kind of thing.

2       *Q.*   Do you recall during the trial significant

3   information coming out regarding Ms. Andriano's

4   promiscuity?

5       *A.*   Well, I don't --

6           MR. HAZARD:  Objection as to beyond the scope of

7   cross.

8           THE COURT:  Overruled.

9           Go ahead and answer the question.

10          THE WITNESS:  I didn't conceive it as

11  promiscuity.  I conceived it as a woman seeking

12  companionship with a male to replace that which she no

13  longer had with an abusive husband who was dying of

14  cancer.

15          Her relationship with Travis Black was not a

16  promiscuous act, in my estimation, and I fought hard to

17  keep it out.  It was just her way of dealing with these

18  stressors of her husband's cancer, and that's how I

19  conceptualized it.  I never thought of her as a

20  promiscuous woman.

21      *Q.*   BY MR. LYNCH:  How did you conceptualize the

22  evidence that she also had an affair with Rick Freeland?

23      *A.*   Well, again, I mean, two affairs in her history,

24  I concluded that that was not in this day and age a

25  conduct that manifested some kind of mental disease,

1  defect, lack of character, failure of parental upbringing.

2  It was a woman who had a chance to do some things that may

3  have been not appropriate when your husband is dying of

4  cancer, but that she is a human being and she allowed

5  herself to do those things.

6      Q.   And the evidence that she was frequenting bars

7  while Joe was going through cancer treatment, did that fit

8  with your wonderful person theme?

9           MR. HAZARD:  Objection.  Argumentative.

10          THE COURT:  Sustained.

11          Rephrase the question.

12     Q.   BY MR. LYNCH:  How did the evidence that came out

13  at trial that Wendi was frequenting bars fit with your

14  larger theory of mitigation in the case?

15     A.   Again, it was situational.  It did not occur in

16  the early part of their relationship.  It only happened

17  after his diagnosis of cancer and recurrence of cancer.

18  It apparently was a coping mechanism to deal with the

19  situational stressors at the time, not some indicator of

20  an aberrant sexual development as a child, having been

21  touched improperly by relatives.

22     Q.   And the evidence that Mr. Martinez brought out in

23  Sharon Murphy's cross-examination about prior men that she

24  had been with?

25     A.   Could you more specific?

1    *Q.*   For example, I believe there was a Mr. Gomez.

2    *A.*   I'm not familiar with that name.  I don't

3    recollect that name.

4    *Q.*   And, finally, how did this theory of Wendi is a

5    wonderful person explain the 23 blows with the barstool on

6    the night of Joe's death?

7    *A.*   It may not have.  I can't tell you what persuaded

8    the jurors to vote the three times they were called upon

9    to vote in the manner that they did.  We -- I adopted a

10   theory and theme that I thought would best explain the

11   totality of the evidence in the case.  It's impossible to

12   explain every component -- the evidentiary component of

13   the case.  There were some things that aren't explainable.

14   Or that the government's explanation is more credible.

15        I can't -- but, by the same token, hitting him 18

16   times, under the circumstances as she then perceived them,

17   this gentleman who was enraged as a result of her

18   admission to him that she had been unfaithful to him.  In

19   the middle of that rage, in the midst of that rage,

20   striking him with the barstool more than once is not -- it

21   may be understandable.  It may be understandable.

22   *Q.*   Mr. Patterson, if you had have been presented

23   with evidence of childhood sexual abuse that you deemed

24   sufficient, and had been presented with an alternative

25   mental health theme that explained the affairs, the going

1   out to bars, the barstool hitting, would that have been

2   something that could have been consistent with the case as

3   a whole?

4      *A.*   Absolutely.

5         MR. HAZARD:  Objection.  Relevance.  Assumes

6   facts not in evidence.

7         THE COURT:  Overruled.

8         Go ahead and answer, if you can.

9         THE WITNESS:  I absolutely agree with you,

10  Mr. Lynch, that if -- if that evidence existed, it should

11  have been developed.  Whether it would have been presented

12  at trial, that would have been my call and that truly

13  would have been a strategic call.

14        That being said, there was an obligation if this

15  information exists, to develop it in advance of trial.

16        MR. LYNCH:  I have nothing further.

17        THE COURT:  May this witness be excused?

18        MR. LYNCH:  Yes.

19        THE COURT:  Thank you, Mr. Patterson.  You're

20  excused.

21        THE WITNESS:  Thank you, Judge.

22        THE COURT:  Don't walk off with any of the

23  exhibits, though.

24        THE WITNESS:  I won't.  Thank you.

25        THE COURT:  And is that it for today?

1          MR. ARNTSEN:  It is, Your Honor.

2          THE COURT:  How are we doing time wise, Counsel,

3    with regard to the schedule that we have?

4          MR. ARNTSEN:  On Monday, we are going to have two

5    witnesses who we believe will be relatively short, Joette

6    James, our neuropsychologist, and Cindy Schaider, and then

7    one witness that will be more extensive, David DeLozier.

8          We anticipate we will be done with those three

9    witnesses on Monday.  I suppose it's possible we won't

10   quite be.

11         And then on Tuesday, we have Larry Hammond and

12   Gary Lowenthal.  I anticipate that they will be done on

13   Tuesday.  However, that is kind of neither here nor there

14   because the State has informed me that they don't intend

15   to call any fact witnesses.

16         Is that correct?

17         MR. HAZARD:  That's correct.

18         MR. ARNTSEN:  And so that frees up the day.  The

19   State has also indicated that Drs. Pitt and Amin, while

20   they're going to check, they don't know if they're

21   available before Friday.  And so what it means is we've

22   got extra time next week.  We're in good shape,

23   Your Honor.

24         THE COURT:  I commend counsel for moving things

25   along and alerting the Court to these schedules.  So I

1   appreciate that.

2         Anything further we need to discuss?

3         MR. HAZARD:  Nothing further from the State.

4         MR. ARNTSEN:  No, Your Honor.

5         THE COURT:  Everyone have a nice weekend.  We

6   will be in recess.  Don't walk off with any of the

7   exhibits.

8         We're going to start promptly at 9:30 on Monday.

9   Thank you.

10        (WHEREUPON, the proceedings were concluded at

11  3:43 p.m.)

12                    * * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

181

1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9

10        I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11   the State of Arizona, do hereby certify that the foregoing

12   180 pages constitute a full, true, and accurate transcript

13   of the proceedings had in the foregoing matter, all done

14   to the best of my skill and ability.

15        SIGNED and dated this 12th day of April, 2014.

16

17

18             /s/  Renée A. Mobley, RPR

19             RENÉE A. MOBLEY, RPR

20             Certified Reporter

21             Certificate No. 50500

22

23

24

25

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,              )
                               )
        Respondent,            )
                               )
vs.                            )   No.
                               )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,      )
                               )
        Petitioner.            )
_____)


Phoenix, Arizona
February 10, 2014
9:31 a.m.


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


EVIDENTIARY HEARING

DAY 6


Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                          (COPY)

2

1                    A P P E A R A N C E S

2

3    On Behalf of the State:

4            Mr. Gregory Hazard
             Assistant Attorney General
5
             Ms. Lacey Gard
6            Assistant Attorney General

7
     On Behalf of the Defendant:
8
             ATTORNEYS AT LAW:
9
             Mr. Scott Bennett
10           Mr. Allen Arntsen
             Mr. Stephan Nickels
11           Mr. Matthew Lynch
             Ms. Krista Sterken
12           Ms. Jodi Fox

13                      I N D E X

14

15                  T E S T I M O N Y

16
     WITNESS:                                    PAGE
17
     JOETTE JAMES, PH.D.
18
             Direct Examination by Mr. Nickels      5
19           Cross-Examination by Mr. Hazard       46

20   GEORGE DAVID DELOZIER, JR.

21           Direct Examination by Mr. Lynch       56
             Cross-Examination by Mr. Hazard      144
22
     CINDY SCHAIDER
23
             Direct Examination by Ms. Fox        154
24           Cross-Examination by Mr. Hazard      179

25

3

1                    P R O C E E D I N G S

2

3          THE COURT:  Good morning.  This is

4   CR 2000-096032, State of Arizona vs. Wendi Elizabeth

5   Andriano.

6          The record will reflect the presence of the

7   parties and counsel.

8          Are there any matters we need to discuss before

9   we get started with the witnesses?

10          MR. ARNTSEN:  Not from the Petitioner,

11   Your Honor.

12          MS. GARD:  No, Your Honor.

13          THE COURT:  The Petitioner may call her next

14   witness, then.

15          MR. NICKELS:  Thank you, Your Honor.  Pardon my

16   voice.

17          THE COURT:  Okay.

18          MR. NICKELS:  The Petitioner calls Dr. Joette

19   James.

20          THE COURT:  Okay.  Doctor, if you would please

21   step forward up to the witness stand here.  Before you sit

22   down, if you can please face the clerk.  Please give the

23   clerk your full name and she will swear you in.

24          THE WITNESS:  Sure.  It's Joette Deanna James.

25          THE CLERK:  Would you please spell your name for

4

1  the record?

2          THE WITNESS:  Sure.  It's J-O-E-T-T-E.  And my

3  last name is James, J-A-M-E-S.

4          THE CLERK:  Thank you.  Raise your right hand,

5  please.

6          (WHEREUPON, the witness was duly sworn by the

7  clerk.)

8          THE COURT:  Dr. James, if you could make yourself

9  comfortable there on the witness stand.  Please remember

10 to speak up so that everyone can hear you.  Also, please

11 wait until the question is completed before you answer the

12 question and make sure that you give us a verbal response.

13         Is that all agreeable to you?

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Go ahead and state your name for the

16 record.

17         THE WITNESS:  My name is Joette Deanna

18 James.

19         THE COURT:  And you may proceed.

20

21                  JOETTE JAMES, PH.D.,

22 having been first duly sworn to tell the truth, the whole

23 truth, and nothing but the truth, testified as follows:

24

25

5

1                      DIRECT EXAMINATION

2  BY MR. NICKELS:

3      *Q.*    Good morning, Dr. James.

4      *A.*    Good morning.

5      *Q.*    Where do you live?

6      *A.*    I live in Washington, D.C.

7      *Q.*    What do you do for a living?

8      *A.*    I am a Board certified clinical

9  neuropsychologist.

10     *Q.*    And have you done work for Ms. Andriano's matter?

11     *A.*    Yes, I have.

12     *Q.*    And what were you asked to do?

13     *A.*    I was asked to review the raw data of Dr. Myla

14  Young, who conducted a neuropsychological evaluation of

15  Wendi in 2010 and 2011.  And I was asked to do an

16  independent scoring analysis of that evaluation and come

17  to opinions about whether or not Wendi as any

18  neuropsychological deficits.

19     *Q.*    And we will get into your analysis and

20  conclusions in detail later.  But if you could please

21  provide a summary for us of what you found.

22     *A.*    Sure.  So I found that Wendi did fine in certain

23  parts of the evaluation.  However, she showed cognitive

24  deficits in three particular areas:  In attention,

25  executive functioning and in information processing speed.

6

1    *Q.*    And in attention, executive functioning,

2    information processing, how does that translate into kind

3    of the real world?  Somebody who is affected with that,

4    how will it affect them in their day-to-day life?

5    *A.*    So Wendi performs better on tasks that are simple

6    in nature and has more difficulty when she is faced with

7    complexity.

8    *Q.*    Okay.  So does this affect Wendi's ability to

9    respond to or otherwise handle life situations?

10   *A.*    Yes.  In situations that are high stress where

11   emotions are running high, she is more likely to become

12   overloaded and overwhelmed.  And when that happens, she

13   shuts down.  Her neurological system shuts down and she

14   has difficulty engaging in a thoughtful goal-directed

15   decision making process.  And as a result, she tends to

16   then act on impulse.

17   *Q.*    Okay.  Like I said, we're going to get into that

18   in more detail in a little bit.  But for now I'm going to

19   turn back to your qualifications and have you tell the

20   Court a little bit more about what you do.

21         So why don't you just start with your educational

22   experience and we will walk through it from there.

23   *A.*    Sure.  I completed an undergraduate degree in

24   psychology, in honor psychology at the University of

25   Western Ontario, London, Ontario, Canada.

7

1        I then completed a doctoral degree, a Ph.D., in

2   clinical psychology from Northwestern University Medical

3   School.

4        I then did a year long internship at Boston

5   Children's Hospital, Harvard Medical School.

6        And then I completed a two-year post-doctoral

7   fellowship in pediatric neuropsychology from Children's

8   National Medical Center in Washington, D.C.

9   Q.   What have you done following that education and

10   your internship and fellowship?

11   A.   Sure.  I became Boarded by the American Board of

12   Professional Psychology in Clinical Neuropsychology.  In

13   April of 2013 is when I finished the process.

14        That involves a review of my credentials and

15   education.  Then submission of -- and then a written exam.

16   Then submission of two independent practice samples which

17   are then reviewed by peers and then an oral exam involving

18   ethics, a defense of those practice samples, and a

19   fact-finding novel case.

20   Q.   This Board certification that you just described,

21   is that something that all psychologists in your field

22   have?

23   A.   No.  All psychologists who are in practice are

24   required to be licensed.  And I'm licensed in Virginia,

25   Maryland and the District of Columbia.  Board

1   certification is an additional credential that

2   approximately four percent of psychologists have.

3       *Q.*   And that is something that you have?

4       *A.*   Yes.

5       *Q.*   What have you done professionally since becoming

6   Board certified?

7       *A.*   As a neuropsychologist, what I do is I

8   evaluate -- I conduct evaluations -- comprehensive

9   evaluations of individuals of a range of ages from

10  toddlers through adults who have or are suspected to have

11  developmental or acquired injury to the brain.  That would

12  be -- a developmental injury would be an injury that has

13  been there since birth or since before birth, such as an

14  attention disorder, an intellectual disability or autism.

15          For example, an acquired injury to the brain

16  would be something like a traumatic brain injury, seizure

17  disorder, et cetera.  And to understand how biological

18  factors, psychosocial factors impact learning emotions and

19  behavior.

20      *Q.*   What about work like this?  And this is a case

21  where you're serving as an expert witness.  How long have

22  you been doing that kind of work?

23      *A.*   I've been doing explicitly forensic work either

24  consulting or conducting evaluations with adolescents and

25  adults since 2008, 2009.

1    *Q.*    How many capital cases have you worked on?

2    *A.*    I've worked on approximately I would say between

3    15 and 20 capital cases in Florida, Georgia, Oklahoma,

4    both state and federal.  Maryland, Virginia.  And, yeah,

5    about 15 to 20, I've actually done.

6    *Q.*    And then do you do forensic work and expert

7    consulting work beyond capital cases?

8    *A.*    Yes.  I do forensic work related to competency,

9    competency to waive Miranda, competency to stand trial.

10   I've done some guardianship work on civil cases.  And I've

11   done a lot of work with adolescents who are facing

12   juvenile waiver and transfer hearing.

13   *Q.*    What about your clinical work?  Do you have a

14   practice?  Do you work for a large hospital?  Have you

15   down both?

16   *A.*    So for nine years, I -- or seven years, actually.

17   I was two years as a post-op, but then seven years as a

18   faculty member at Children's National Medical Center where

19   I saw children from, again, from toddlers through young

20   adults with injuries to the brain.  I worked both

21   inpatient and as an outpatient neuropsychologist.

22          I also had a joint assistant professorship at

23   George Washington University.  And then during that time,

24   I was seeing adolescents and adults as well as privately

25   for clinical cases, again, individuals with acquired and

1  developmental brain injuries.

2          And then as of January of 2014, I started an

3  official private practice doing both clinical and forensic

4  work.

5      Q.   Can you give us a percentage currently in your

6  private practice -- and I know it just got started.

7      A.   Yeah.

8      Q.   What percentage of your work is the clinical work

9  versus the forensic work like this?

10     A.   I would say probably half and half.  I see about

11 50 percent clinical and then 50 percent forensic.

12     Q.   Now, Dr. James, there is an exhibit binder in

13 front of you.  If you could please turn to Exhibit 166.

14     A.   Yes.

15     Q.   And it should be a copy of your CV; is that

16 right?

17     A.   Yes.  That is correct.

18     Q.   Okay.  And does the CV that is shown in

19 Exhibit 166, you know, reflect more or less what you just

20 described to the Court?

21     A.   Yes, it does.

22          MR. NICKELS:  Well, and this has already been

23 admitted into evidence, but I wanted to just bring it to

24 the Court's attention.

25     Q.   BY MR. NICKELS:  Now, Dr. James, we're going to

1   shift gears and we're not yet going to turn to your

2   substantive analysis.  Instead, I just want to walk

3   through the process you undertook here, what you all did.

4   Okay?

5        *A.*   Okay.  Yes.

6        *Q.*   So you told us before, you were asked to review

7   the raw data of Dr. Young.  Just kind of take it from

8   there and tell us what you did.

9        *A.*   Sure.  So I reviewed about -- well, it took me

10  six, seven hours or so to review her raw data.  And so,

11  basically, what I did was I took a look at her data and

12  then I just took a look at her scores and interpretations

13  and made interpretations of the scores that saw.  And then

14  I also took a look at her report as well.

15       *Q.*   And then did you come to your own analysis and

16  come to your own conclusions?

17       *A.*   Yes, I did.  I basically did just a reanalysis of

18  the data there.

19       *Q.*   Do you know why Dr. Young is not here?

20       *A.*   Yes.  I believe that I know she's had some

21  longstanding health issues.  I believe, unfortunately, she

22  passed away a couple of months ago.

23       *Q.*   Let's even step back further.  You said you were

24  reviewing the raw data?

25       *A.*   Yes.

1    *Q.*    What do you mean by that?

2    *A.*    Well, raw data is essentially all of the

3    responses that an individual makes.  So they're both

4    written responses that are verbal that are then recorded

5    by the psychologist.  And then responses on other tasks

6    that are more numerical in nature, visual in nature that

7    require not a verbal response, but a written response or a

8    choosing of a particular stimulus over others.

9         Also, there were a number of tasks that were

10   computer-based.  So she would be doing tasks and it would

11   be computer-scored or the computer would be recording her

12   responses.  So, basically, raw data is all of the recorded

13   responses of the individual.

14   *Q.*    And this is neuropsyche testing that's being

15   done.  Give us a sense of what kinds of tests that are

16   being run and what you're looking for, what you're trying

17   to measure.

18   *A.*    Sure.  So what a neuropsychologist does is look

19   at performance in a number of different domains of

20   functioning.  So they will look at memory, for example.

21   They will look at academic achievement.  They will look at

22   overall general intellectual functioning and reasoning.

23   They will look at areas like attention, executive

24   functioning, emotional functioning.

25        So a neuropsychological evaluation spans these

1   areas or domains of cognitive functioning, of brain

2   functioning.  And then there are particular tests that one

3   would do to examine these particular areas.

4        *Q.*   In your field, is there a standard battery of

5   tests that one would administer to measure these various

6   domains or areas?

7        *A.*   There are a number of accepted validated norms,

8   meaning that they have been given to a number of people

9   and then the results are -- so there's a stable pattern of

10  results in terms of people doing well, people doing

11  poorly.  That's what it means when a test is normal.  When

12  a test is standardized, it means it has been given in a

13  particular way.  So there a number of tests that sample

14  each of those domains.

15        So a neuropsychologist may -- often will do --

16  have a certain core battery that is the same for every

17  person.

18        For example, you would almost always give a

19  intelligence test, for example, because that's a

20  fundamental area of knowledge that you want to assess.

21        And then there are tests in each of those other

22  domains that I have mentioned.  That one would sample from

23  and then we have specific well norm tests in each area to

24  choose from.

25        *Q.*   The tests that Dr. Young ran here, and you in

1   turn analyzed --

2      *A.*   Yes.

3      *Q.*   -- were these tests that fall into that category

4   of standard tests that have been run many times, so you've

5   got reliable data and you've got norms, so to speak?

6      *A.*   Yes.  That's correct.  Dr. Young performed more

7   than 35 tests.

8      *Q.*   Now, running 35 tests, in your professional

9   opinion, is that considered sort of a light amount of

10   tests or a more thorough, exhaustive battery of tests?

11      *A.*   A very exhaustive battery.  And she documented

12   25 hours spent with Wendi.  And she saw her over five

13   occasions.  So that would be an extraordinarily thorough

14   battery.

15      *Q.*   Now you mentioned that you rescored the tests.

16   Why did you do that?

17      *A.*   I did that to just check for accuracy.

18      *Q.*   Okay.

19      *A.*   And, yes, that's the primary reason.

20      *Q.*   And what did you find?

21      *A.*   I found that about -- I found some typographical

22   and arithmetic errors, about three or so.  And I found

23   that they didn't change the overall analysis.

24          And there were a couple of more subjective

25   measures, I would say, that I rescored again, not based on

1   errors, just simply my own as another neuropsychologist
2   coming to the table interested in looking at it and I
3   rescored a couple of those.
4       *Q.*   So there were some scoring changes that you
5   needed to make?
6       *A.*   Yes.
7       *Q.*   What about the raw data itself?  Is there any
8   sort of realistic concern that the data itself is
9   unreliable?
10      *A.*   Well, again, it was quite a large amount of data.
11  And a number of the tests were, like I said, administered
12  by computer, so that there wouldn't be that danger of it
13  being recorded incorrectly.  And many of the tests are
14  also computer-scored.
15          As well, Dr. Young, she did some audio recording
16  of the more subjective verbal responses and then those
17  were later transcribed as well.
18          You know, in terms of the integrity of the data,
19  I felt comfortable given that there was significant
20  consistency in Wendi's performance in terms of strengths
21  and weaknesses and they hung together, which made the data
22  very solid.
23      *Q.*   That last point, is that your way of saying, that
24  if there were errors in the recording of the data, they
25  were consistently wrong in a certain way?

16

1      *A.*    Yeah, which would be difficult to do.  Yeah,

2   there would have to be, yeah, consistent errors and

3   consistent patterns of errors, which I just did not see.

4   I mean, her strengths hung together and her weaknesses --

5   areas of weakness also hung together.

6      *Q.*    Do you believe that -- well, let me ask you it

7   this way:  When you do this kind of work, do you typically

8   administer the tests yourself?

9      *A.*    Yes, typically.

10     *Q.*    But, in other instances, have you been asked to

11  review other peoples' raw data, as you have done here?

12     *A.*    Yes, yes.  Yes, I have, as I mentioned before,

13  served in more of a consulting role where the goal was

14  really to review someone else's raw data or someone else's

15  previous evaluations.

16          And, typically, as part of a neuropsychological

17  evaluation that I would conduct myself, especially with

18  adults, there would be previous evaluations that I would

19  be critiquing as well.

20     *Q.*    Do you believe the fact that you were not -- that

21  you just reviewed the raw data here versus administering

22  the test itself has any impact on the validity of your

23  conclusions?

24     *A.*    No, it doesn't.  Again, she conducted an

25  extraordinarily thorough evaluation with many, many hours

1  of available raw data to look at.

2      Q.    Before we turn to exactly what you found, I want

3  to address this issue of effort or malingering.

4          As you saw it from the State's expert report,

5  they have taken a position that generalized here, it says

6  that Wendi may not have been giving her best effort, and,

7  therefore, the results are not reliable.

8          We will talk more later about Dr. Amin's report.

9  But what I want you to tell us now is is there anything in

10  Dr. Young's testing that measures effort and measures

11  whether there is any malingering going on?

12      A.    Yes.  Well, I mean, the field of neuropsychology

13  has changed.  You know, the past 15 or so years, we've

14  really been focused, especially due to research indicating

15  that in particular situations, you know, notably forensic

16  ones, individuals may be more prone to not performing and

17  giving as much effort as they should.

18          And so the field has really moved towards

19  specific tests of efforts.  What we call them are

20  performance validity tests to account for this.

21          And so in Dr. Young's evaluation, again, I think

22  consistent with the thoroughness of the number of tests

23  that she gave, she gave quite a number of performance

24  validity tests.

25          In the field, we distinguish between stand-alone

1  validity tests and ones that are embedded.  Stand-alone

2  tests are tests that are designed just to measure effort.

3  That is their main focus.

4         An embedded test is a test basically that's doing

5  double duty.  It's a test that we would normally give as

6  part of the battery, say, an intelligence test, but that

7  test can also be used as a measure of validity.

8         In the testing of Wendi that Dr. Young conducted,

9  she did seven -- I mean, really, at least seven.  There

10 were actually more, but seven that she identified as

11 measures of effort, several stand-alone measures and also

12 several embedded measures, and Wendi passed all of them.

13 *Q.*    And is seven consistent?  You said 35 is a lot of

14 tests overall?

15 *A.*    Yes.

16 *Q.*    Is seven validity tests also in a high range?

17 *A.*    It's on the high end, yes.

18 *Q.*    Was there anything in the results that you saw?

19 And I don't mean just the validity tests.  Just the

20 results overall that gives you confidence on whether Wendi

21 was exhibiting her best effort.

22 *A.*    So in addition to having the actual effort tests,

23 both the stand-alone ones and embedded ones, the

24 neuropsychologist also looks at the consistency of the

25 testing.  So both in terms of -- we talked about it in

1  terms of the raw data, but also just in terms of the

2  consistency of her results.

3       So what you see are her strengths all in similar

4  domains and then we see weaknesses in similar domains.

5  And that helps us to understand a little bit more in

6  addition to the effort tests about her performance

7  validity simply because it would be nearly impossible,

8  extraordinarily difficult to know what each test was

9  measuring, especially over the course of five sessions and

10 25 hours, and then deliberately perform well or poorly in

11 these different domains and come up with the profile of

12 strengths and weaknesses that she did.

13      Q.   Okay.  Now we are going to turn to your analysis.

14 You told us at the outset that there were three area of

15 deficits:  Attention, executive functioning and processing

16 speed; is that right?

17      A.   That's correct.

18      Q.   Well, then let's start first with attention.

19 While the word may be self-evident, tell us what you mean

20 from a psychological or neuropsyche standpoint.  What do

21 you mean when you refer to attention?

22      A.   Certainly.  So attention is a very basic function

23 in that you need to have -- you need on some level to be

24 alerted, oriented, attentive even at a -- you know, in a

25 short duration in order to really have any other mental

1   activity make sense or even to conduct any other kinds of

2   mental activity.

3           So attention is a very basic function served by

4   very primitive parts of the brain initially.  But then,

5   you know, attention is also served by some of the more

6   sophisticated and more fragile networks of the brain like

7   the prefrontal cortex.

8           So there are different models of attention, but

9   one of the most common models of attention is one that

10  looks at attention from its very basic levels to more

11  sophisticated and more challenging levels.

12          So at the very basic, we have just what I had

13  mentioned, orientation, being able to respond to very

14  discreet stimuli, focused attention.

15          Then we have one's ability to sustain attention

16  over time, sustained vigilance over a period of minutes or

17  hours.

18          Then we have one's ability to alternate

19  attention.  Direct cognitive activity from one task and

20  then shift it to another.

21          Then we have the ability to selectively attend.

22  To attend to one thing in the face of competing stimuli

23  and ignore that stimuli.

24          You could think at the very top level, we have

25  really essentially what is multi-tasking, which is being

1  able to direct equal amounts of attention to something at
2  the same time or divided attention.
3     Q.   Did the tests that Dr. Young administer measure
4  each of those levels of attention from the most simplistic
5  up to the divider, multi-tasking?
6     A.   Yes.  She conducted a number of attention tests
7  that span those various difficulty levels with Wendi.
8     Q.   And how did Wendi do?
9     A.   So, again, hearkening back to the simple versus
10 complex, Wendi did well in the average range.  She had a
11 couple of scores in the low average range, a couple in the
12 above average range on simpler attention tasks.  Simple
13 orientation, quickly canceling numbers that she saw on a
14 page, or being able to repeat a string of numbers
15 backwards and forward.  Very simple oriented attention.
16        She had more difficulty with the more complex
17 aspects of attention, shifting attention back and forth
18 between two different types of cognitive tasks or being
19 able to selectively attend to one or divide her attention
20 between two.
21    Q.   Okay.  Now was there any particular tests that
22 you can describe to us where she had struggles?
23    A.   Yes.  I think the best example would be the
24 Connor's Continuous Performance Test, the second edition
25 of that.  That is a computerized task which it takes

1  usually about 15, 20 minutes, somewhere in that range.  It

2  assesses sustained attention to that vigilance of being

3  able to sustain attention over a period of time,

4  selectively attend, and to alternate attention between two

5  different types of cognitive tasks.  It is computer-based.

6         Essentially what you need to do is every time a

7  certain letter comes up -- every time X comes up, you

8  ignore it.  And every time another letter of the alphabet

9  comes up, you respond to it by pressing a space bar or

10  mouse.

11         Wendi's performance on that was on four of the

12  seven indicators of attention, it indicated problems.  So

13  problems with attention in four of seven subtests of that

14  measure.

15  Q.   When you say she had problems, I believe -- these

16  are all scored; right?

17  A.   Yes.

18  Q.   What was her score on these areas?

19  A.   So the average range for all of these tests

20  essentially is the 25th to 75th percentile.  On this

21  particular attention test, and like I said, there were a

22  number of subtests of this test, Wendi's scores range in

23  the problematic attention areas from less than the first

24  percentile to the 18th percentile, meaning that, you know,

25  at the worst, she was -- more than 99 percent of the

1   population of individuals of her age actually were

2   performing better than she did.

3        Q.   Dr. James, how does this translate to the real

4   world when somebody has problems with these more complex

5   attention functions?  Tell us what that means in everyday

6   life.

7        A.   So I think it's easier to understand that in

8   terms of understanding some of how she performed.  And,

9   really, she had the most difficulty on tasks where, in

10  this particular computer task, in that her responses were

11  slow.  Her reaction time was slow.  And the areas -- and

12  it was also highly variable.  So variable both within her

13  own self, her own performance on the tasks earlier and

14  later and also in comparison to others.

15       What also happened was that as tasks changed, the

16  stimuli is presented at even intervals, one second,

17  sometimes at two-second intervals, sometimes at

18  four-second intervals.

19       When the interstimulus interval changed, so when

20  it went from two seconds to four seconds to one second, it

21  changes randomly, she was unable to keep up with those

22  changes.  And so her scores deteriorated significantly.

23  That's when she actually performed at less than the first

24  percentile.

25       So what that means in real life is that what

1  we're talking about is responding to the changing demands

2  of the situation or the task.  That as the task changes,

3  as the demand changes, as what's required changes, she is

4  unable to keep up with -- keep pace with the task.

5      *Q.*    Okay.  Does she have an ability to adjust her

6  behavior to changing demands?

7      *A.*    It's very difficult.  Her performance on these

8  tests indicate that it is very difficult for her to do so.

9          Again, we're looking at her performance in these

10 tests under relatively a stress-free environment.  I mean,

11 there is some stress being associated with being tested.

12 But you in a more complex or high stress situation, you

13 would expect her to deteriorate further in terms of her

14 ability to change with the changing demands or situation.

15     *Q.*    We will now turn to the second area of deficit

16 that you noted was executive functioning.  Give us kind of

17 an overview of what you mean by executive functioning.

18     *A.*    Sure.  So executive functioning a little bit of a

19 complex concept.  I mean, it's not unitary and it really

20 involves a number of different types of abilities that

21 fall under this umbrella.

22         We're really talking about mental -- the mental

23 organizational processes involved in initiating,

24 implementing, being able to revise and monitor a plan of

25 action.  So we're talking about goal-directed behavior and

1  all of the factors involved in being able to function

2  efficiently and effectively.

3        It's really the bridge to real world functioning

4  and it includes abilities such as working memory, the

5  short-term memory, the ability to hold information in your

6  mind, and then use it to guide behavior.

7        It refers to initiation, being able to get

8  started on the task without being prompted or reminded.

9        It refers to flexibility, being able to shift

10  from one way of thinking or one sort of behavioral plan to

11  another.

12        It involves being able to control impulses and

13  also recruits attention in terms of being able to sustain

14  attention to a task long enough to be able to complete it.

15     Q.   And Dr. Young, did she administer tests that

16  measured executive functioning?

17     A.   Yes.  She administered a number of measures that

18  looked at working memory, particularly organization,

19  decision making, flexibility, et cetera.

20     Q.   How did Wendi do on those tests?

21     A.   So Wendi had again a similar pattern of when the

22  task was relatively simple, again, you could think of like

23  a digit span backwards task where she doesn't have --

24  where she is being read digits backwards, and then she's

25  read digits in a forward sequence and then she has to

1    remember them in a backwards sequence, and she did fine.

2    But when you add more demands, when you increase the load,

3    increase the complexity, then she really struggles.

4        *Q.*   Let's walk through a couple of these tests.  What

5    particular tests did she take and how did they turn out?

6        *A.*   So there is one particular test that is the very

7    high load on working memory.  It's called the Paced

8    Auditory Serial Addition Test.

9            THE COURT:  Can you repeat that?

10           THE WITNESS:  Yes.  It's the Paced Auditory

11   Serial Addition Test, the PASAT.  And Wendi scored in the

12   7th percentile on that test on the first trial; in the

13   4th percentile on the second trial; and in the

14   2nd percentile on the third and fourth trials.  And, in

15   fact, she performed so poorly on the first trial, it could

16   have been discontinued.

17           The test essentially, it's quite challenging, and

18   it basically involves a series of numbers being read

19   aloud.  So like one, two, five at an interval initially at

20   about two seconds -- no, it's 2.6 seconds in between each

21   number.  What the person is required to do is add the

22   numbers together, the first two numbers together.  Then

23   hold in mind the next number that they are hearing and

24   add those last two numbers together.

25           So you're constantly spitting out a response or

1   an answer, but holding in mind the last one so you can add

2   them together.

3       *Q.*   BY MR. NICKELS:  And you had said to me based on

4   the numbers that's now 2, 7, 4 percent.  Again, I think

5   did you say the average for all of these is always 25 to

6   75?

7       *A.*   Yes.  That's correct.

8       *Q.*   What other tests were administered in the

9   executive functioning area?

10      *A.*   Sure.  So what we also saw -- you know, when I

11  looked at this data, what I also saw was that difficulties

12  in this area of decision making.  And that again involves

13  this idea of cognitive flexibility and how one responds in

14  the face of certain -- certain behavioral contingencies,

15  let's say.

16          So the example for that is the Iowa Gambling

17  Test.  That's a measure that looks at the ability to

18  flexibly change your responses depending on the

19  contingency, depending on what's being presented.

20          So the paradigm is really a gambling paradigm.

21  The individual is given a certain amount of money and the

22  task at the end of 100 trials of this test is to end up

23  with more money than you had originally, or at least not

24  to lose money.

25          And there are four different decks of cards from

1  which to choose and each deck has a different win/loss
2  ratio.  It's a different cost benefit ratio.  And so as it
3  goes along, the individual is picking from these decks and
4  making decisions about how to pick from further decks
5  based on their performance.
6      *Q.*   Okay.  So you're getting feedback as you pick
7  from the cards?
8      *A.*   Yes.
9      *Q.*   And so the test is how are you processing the
10 feedback?
11     *A.*   Yes.  How are you responding to it?  How are you
12 making decisions?
13     *Q.*   Okay.  And how did Wendi respond to the feedback
14 processing?
15     *A.*   So her overall score was in the below average
16 range.  But I think that what was more striking was really
17 her tendency to pick from Deck A.  Now Deck A of the four
18 decks has a high -- has a very high -- it's basically a
19 very high risk deck.  It has a high rate of reward or
20 return but also a high rate of punishment.  And,
21 typically, people figure out very quickly that that's not
22 the deck that they want to choose from.
23         In fact, the authors of the Iowa Gambling Test,
24 their research indicates that neurologically intact people
25 rarely continue to pick from Deck A and that a higher

1  number of picks from that deck indicates some real

2  decision making impairment, and that's what we saw with

3  Wendi.

4      *Q.*   She stuck with Deck A?

5      *A.*   Yes.  She had a higher number.  She did pick from

6  other decks, and but she had a somewhat higher pick from

7  Deck A.  It was somewhat unusual in terms of the scoring.

8      *Q.*   What about this Rey-Osterrieth Test?  I

9  understand that was another one that measured executive

10  functioning?

11     *A.*   Yes.  So the Rey-Osterrieth is an old

12  neuropsychological measure that has been used for many,

13  many years that really looks at one's ability to organize

14  their approach to a task.

15          It's a figure that is very complex.  It's

16  visually presented in front of a person and they're

17  required to copy it.  what you're interested in looking at

18  is how they copy it, the approach that they take to

19  copying it.  Do they see the big picture or do they focus

20  on the details?  And the integrity of the copy.

21          There is also a measure of the visual spatial

22  understanding there.  Do they have the proper relationship

23  between the visual spatial elements of the test?  But it's

24  an executive functioning measure in terms of the approach

25  to the task.

1    *Q.*   How did Wendi do when she was asked to copy the

2    picture?

3    *A.*   She actually did quite well when she was asked to

4    copy it and she showed good memory of the figure

5    30 minutes later.

6    *Q.*   Were there any other aspects of this test,

7    though, where she did not do as well?

8    *A.*   Yes.  She had pretty significant difficulty on

9    the recognition aspect of the test.  And what that is

10   basically is after the 30 minutes are over and you've

11   copied it again -- I mean, sorry.  You've produced the

12   figure again from memory without seeing it again.

13   Straight after that, there is a recognition test.

14          Basically what that is is that the original

15   figure is taken and broken up into different pieces and

16   put on four different pieces of paper.  And the trick to

17   it is is that some of the pieces of the figure were really

18   there and then there are drawings that are on the four

19   pieces of paper that actually weren't part of the original

20   figure.

21          And the task is for the person to recognize --

22   that's why it's called a recognition test -- recognize

23   which aspects were part of the original and which were

24   not.

25          On this aspect of the test, she performed very

1    poorly, in the 2nd to 5th percentile for both recognizing

2    in her mind recognizing pieces of the figure that weren't

3    actually there and then identifying pieces being there.

4    I'm sorry.  False for -- not recognizing -- missing,

5    basically, parts of the figure that were there.

6         So she was missing and then she was also saying

7    that pieces were there that actually weren't there.  And

8    she scored at the 2nd to 5th percentiles for both of

9    those.

10    Q.   What does it tell you that Wendi did fine on the

11    part of this test where she had to draw it from memory,

12    but then struggled when, you know, additional parts were

13    added in?

14    A.   Again, it's this idea of being faced with more

15    information, overwhelmed with a larger amount of

16    information.  On four pages, you have quite a number of

17    drawings and you have to distinguish between what was

18    there and what was not there, as opposed to, you know,

19    drawing the figure that you remember after 30 minutes.

20         So it's again back to this idea of complexity and

21    being overloaded by a large amount of information.  When

22    faced with that large amount of information, her ability

23    to distinguish between what was present and what wasn't

24    and accurately remember became -- became lost.

25    Q.   Were there any other executive functioning

1   testing that you found notable?

2       *A.*    Yeah.   Again, this is a measure -- what we also

3   do as neuropsychologists is we look at the executive

4   components of tests that aren't necessarily designed to

5   measure executive functioning directly.

6           So the Rey-Osterrieth is one example of something

7   that is designed to measure executive functioning as well

8   as other things.

9           The California Verbal Learning Test is a verbal

10  memory test, but it has specific executive functioning

11  components.  It's a long list of words, 16 words, that a

12  person is read aloud and then subsequently asked to tell

13  the examiner as many of those words as they can remember.

14          And while Wendi did well on aspects of that test

15  in terms of her delayed recall of the list, for example,

16  she struggled in the beginning when she was given the

17  list, and then asked to tell as many words as she could

18  remember, she was only able to remember about five of

19  16 words on the first trial.  You know, less than a third.

20  And certainly for her age, falling significantly below

21  average in the 7th percentile for her age.

22          And basically what that was is again overload,

23  overwhelmed.  I'm reading a long list of words and then

24  she is only able to give me a few.

25          And what was interesting is that pattern repeated

1  itself.  And so after several trials of the list, she was

2  learning, but then presented with a completely different

3  list, again, only four of 16 remembered.

4      Q.   So you have been stressing this point of overload

5  and overwhelmed.  Somebody who suffers from that,

6  overwhelms easily from the complexity of heavy loads,

7  again, how does that translate to everyday life?

8      A.   Well, again, in situations, particularly when

9  there is high stress, when there are multiple demands

10  being placed on the person, when there is more complexity,

11  any element that can -- another example would be, you

12  know, again, are emotions running high.  When there are

13  any elements that can increase the complexity of the

14  situation, increase the stress of the situation, her

15  threshold for being overwhelmed, and that having her brain

16  function in a way that is not adaptive, not helpful, her

17  threshold is lower.  It's much -- it's much lower.

18      Q.   What happens to somebody when they overwhelm,

19  when things start shutting down?

20      A.   When their neurological system is overwhelmed, a

21  number of things could happen.  One is just a shutdown and

22  a withdrawal from the situation.  You know, it's really

23  just sort of going into yourself.

24          Another is becoming more inflexible and therefore

25  stuck in routines or patterns of behavior that are not

1  adaptive, that are maladaptive, but that you can't get out

2  of.

3       Another is to have, you know, emotional outbursts

4  for it to be displayed, you know, in an acting-out type of

5  manner.  Another is to become increasingly impulsive.

6       *Q.*  Let's wrap up this part of your testimony with

7  the processing speed.  You said that was the third area

8  where Wendi didn't do as well.

9       As we did with the other two, could you start off

10  by explaining to the Court what you mean by processing

11  speed?

12       *A.*  So information processing speed is really, you

13  know, the -- it's really the degree or how quickly in

14  which you're able to input information, take in

15  information, and then to output information.  Essentially,

16  it's efficiency, efficiency learning, how efficient you

17  are in taking information in and then outputting that

18  information.

19       And it's an important component of thinking and

20  learning and behavior because we see in some particular

21  kinds of diagnoses, while someone is able to learn, when

22  you learn more slowly and less efficiently, that can

23  really cause a lot of problems in everyday life, not to

24  mention when the situation is made more complex or

25  stressful.

1        So that's essentially what it is.  It's being

2   able to input information quickly and output information

3   quickly.

4        Q.   And there were tests run here that measured

5   processing speed?

6        A.   Yes.  There were a number of tests that did that.

7   And what I found in terms of looking at the raw data was

8   that in just about every test where there was a time

9   component -- and often in these tests that are timed, the

10  individual being timed is not aware that they're being

11  timed.  So they're not explicitly told you are being timed

12  now or you have 60 seconds to do this.  Sometimes, but

13  often not.

14       She performed poorly.  And when I say poorly, I

15  mean less than the 1st percentile, the 2nd percentile, the

16  9th percentile, the 5th percentile.  There were a number

17  of tests.  I think the combination of that is taking a

18  look at her Intelligence Index Scores.  The intelligence

19  sources is made up of four components:  Her verbal

20  ability; her nonverbal visual ability; her very basic

21  working memory skills; and then processing speed.

22       Processing speed was an overall standard score of

23  76, which is at the 5th percentile range.

24       Q.   I understand there was a particular vocabulary

25  test with a time component that you found notable?

1   *A.*   Yeah.  It was interesting how just simply adding

2   the stress of a timed component to the task would overload

3   Wendi in terms of looking at the scores.

4        So and it is often something that we do again is

5   to look at this distinction between how someone functions

6   on a simpler task versus a more complex one.

7        So the simpler task would be vocabulary as part

8   of the WAIS 4, which is the standard intelligence test.

9        There is a subject called vocabulary where the

10  individual is asked to define vocabulary words.  And Wendi

11  did very well on that test.  She scored at the

12  50th percentile, solidly within the average range for her

13  age.  She was able to define a number of vocabulary words.

14       But then when a test that was given that

15  essentially got at the same kind of component, her

16  vocabulary.  Vocabulary is a big part of this.  And she

17  timed.  It was the timing component that really seemed to

18  derail her.

19       So this latter test is called Verbal Fluency.

20  It's part of a battery of executive functioning measures.

21  She performed I believe at the 9th percentile for that

22  test.

23       Essentially what that is is you're told I'm going

24  to give you a letter and I want you to think of as many

25  words that begin with that letter as you can.  Again, it

1    draws very much on your vocabulary.  Someone with a poor

2    vocabulary wouldn't be able to generate very many words.

3          But Wendi's performance dropped off significantly

4    from the 50th to the 9th percentile despite having a

5    strong vocabulary.  And it was really the addition of the

6    element of the time component that derailed her.

7    Q.   So on the basic vocabulary of just knowing words,

8    she was at the 50th percentile?

9    A.   That's correct.

10   Q.   When you add in the little complexity of timing,

11   she went down to the 9th percentile?

12   A.   That's correct.

13   Q.   And, again, is that showing this lower threshold

14   of being overwhelmed?

15   A.   Yes.  I mean, the time component puts stress on

16   the prefrontal cortex systems, which are not only -- so

17   when you're doing the latter task, you're not only tapping

18   into areas of the brain that control language, which is

19   typically the left hemisphere of the brain is very

20   language centered, but you're also tapping into this

21   prefrontal cortex, which is involved in being able to

22   quickly in an organized way retrieve those words.  So

23   you're tapping into two areas of the brain.

24         And, similarly on other measures in other

25   domains, where there was a combination of brain areas

1   involved, motor and tactile, for example, that's where we

2   see deficits in Wendi's performance.

3       *Q.*   So for all three of these areas, attention,

4   executive functioning, processing speed, you have talked

5   low thresholds being overwhelmed, and how that can lead to

6   a shutdown and impulsive behavior.

7           Is there a cumulative effect?  When you've got

8   deficits in a number of areas, do they work together to

9   make these symptoms even worse?

10      *A.*   Yes.  I mean, in some ways, it's almost artifical

11  to separate these three areas because they just

12  work usually -- they're supposed to work so seamably

13  together.  And the brain -- the brain is extraordinarily

14  complex and the prefrontal cortex is really the boss.

15  It's the CEO of the brain and it brings everything

16  together.  It's tracking all the inputs and then giving

17  instructions to all of the rest of the parts of the brain.

18          So when that area is not functioning properly,

19  then there is really a breakdown in communication between

20  the brain -- that part of the brain and other parts,

21  recruiting language, being able to recruit memories, being

22  able to put a stop on impulses, being able to consider

23  plans of actions, think ahead.

24          You know, all of those abilities are sort of run

25  and managed by this CEO, and when that CEO is not working,

1    then you have a breakdown in the system.

2         Q.    Finally, Dr. James, we're going to talk about,

3    you know, the State's report, which is prepared by

4    a Dr. Amin.  Have you had a chance to review that?

5         A.    Yes, I have.

6         Q.    There's a couple of areas that I want to focus

7    on.  You told us earlier that Dr. Young did a

8    comprehensive battery of tests.

9              What about Dr. Amin?  How does his battery of

10   tests compare to what Dr. Young performed?

11        A.    Well, I mean, his battery of tests was not as

12   comprehensive as Dr. Young's?  It really -- he, for

13   example, did seven measures and documented in his report

14   that he saw Wendi over two occasions, but spent about two

15   hours and 44 minutes in direct testing with her.

16             Again, as I've said, you know, in contrast,

17   Dr. Young spent 25 hours with Wendi over five occasions

18   and conducted over 35 tests with her.

19        Q.    And what about this area in which you just talked

20   about the CEO of the brain, the executive functioning?

21   Did Dr. Amin run tests in that area?

22        A.    Of the seven tests that he gave Wendi, he did

23   repeat the Rey-Osterrieth Complex Figure.  He didn't talk

24   about it as a measure of executive functioning.  Although.

25   I would say most neuropsychologists would consider it

1 primarily a measure of executive functioning.  He talked

2 it about it as a visual memory measure.  So one out of his

3 seven.

4      *Q.*   And that was the only one in your view that

5 tested executive functioning?

6      *A.*   Yes.  It would be the only one that a

7 neuropsychologist would see as a measure of executive

8 functioning, as a primary measure.

9      *Q.*   How did Wendi do on the Rey-Osterrieth Test?  And

10 just to remind the Court, is that the one where you're

11 drawing the figure --

12      *A.*   Yes.

13      *Q.*   -- and you're putting the pieces back together,

14 that test?

15      *A.*   Yes.  And she did well on it and I do believe

16 that she did -- as I mentioned, she previously did well on

17 it and I think she showed the same pattern I believe of

18 more difficulty with the recognition.  But she generally

19 did well or even a little bit better than she did with him

20 -- did for Dr. Young.

21      *Q.*   Overall, her scores on that test with Dr. Amin

22 were higher --

23      *A.*   Yes.

24      *Q.*   -- than they had been with Dr. Young?

25      *A.*   I believe so.

1     *Q.*    What do you attribute that to?

2     *A.*    So generally what you see is this what we call

3    the practice effect.  It's a phenomena in the

4    neuropsychological literature and in assessment literature

5    that's well accepted.

6           It's this idea that when you've been exposed

7    previously to a test, even if you're just exposed not to

8    the materials itself, but even to the method or procedure

9    in taking the tests, there is a likelihood that you will

10   do better the second time around.  And that's known as the

11   practice effect.

12          And, you know, it doesn't mean that you -- we

13   don't -- we don't know how long a practice effect can be

14   in existence.  Sometimes it's over weeks.  Sometimes it's

15   over months or sometimes it's even over years.  So it's

16   important to even note, though, that the practice effect

17   exists to give the test, but then to interpret the results

18   in light of that practice effect.

19    *Q.*    Do all of these tests have a practice effect or

20   are some more susceptible to that phenomena?

21    *A.*    Some are more susceptible.  Memory tests are more

22   susceptible to practice effect.  Tests with more unique

23   solutions, so kind of like a one-shot test where you would

24   see or figure it out, figure the solution out.  And then

25   it's unlikely that, you know, the second time around, if

1  you figured it out the first time -- even if you don't

2  consciously remember it, the fact that it was like a

3  single solution and very unique would make it more likely

4  that you would perform well on it again, even

5  unconsciously.

6      *Q.*   This Rey-Osterrieth Test, which is the sole

7  executive functioning test run by Dr. Amin, how does that

8  one rate in terms of susceptibility to the practice

9  effect?

10     *A.*   Well, it is sort of a single solution test, in

11 that it's very unique looking.  I often have patients tell

12 me that when they see it again:  Oh, that's -- I've seen

13 that, you know, that spaceship looking figure before.

14 It's fairly recognizable.

15     *Q.*   Dr. Amin also offers an opinion on malingering

16 and, again, to be generalized and say he said he believes

17 Wendi may not have been giving her best effort.  Have you

18 reviewed that part of his report?

19     *A.*   Yes.  Again, you know, I had some concerns about

20 the comprehensiveness of Dr. Amin's evaluation in terms of

21 the number of the tests given, and then consistent with

22 that, the number of specific tests of performance validity

23 or effort that were given.  He gave two stand-alone

24 measures of effort in his evaluation, which was

25 considerably less than Dr. Young.

1    *Q.*    Dr. Young did how many?

2    *A.*    Seven.  You could say eight, even.

3    *Q.*    Okay.  And tell us about those two tests of

4    performance validity that were run by Dr. Amin.

5    *A.*    So one is the Validity Indicator Profile, or the

6    VIP.  And Wendi's performance on that test did not

7    indicate any concerns with effort or performance validity.

8    *Q.*    So, essentially, she passed that test?

9    *A.*    She passed that test.

10   *Q.*    And then there was one other test that could

11   measure effort?

12   *A.*    Yes.  That was the Structured Inventory of

13   Malingered Symptoms, which is basically a self-report

14   inventory where one I believe indicates true or false for

15   different kinds of symptoms, mood symptoms, feeling

16   fatigued, memory problems, some problems even associated

17   with psychosis and thought disorder, thinking unusual

18   things.

19   *Q.*    How did Wendi do on that test?

20   *A.*    So her score on that test was a raw score of 15.

21   And the cutoff in terms of thinking about the cutoff that

22   has been typically used as a total score is 14.  So she

23   was just one above the cutoff in terms of thinking about

24   effort.

25   *Q.*    So to the extent she failed, it was sort of --

1    *A.*    Yeah.  It was one point, yeah.

2    *Q.*    Now, stepping back, this self-reporting test you

3   just described, is that considered in your field to be a

4   good measure of effort?

5    *A.*    Well, it's used, but the research around it

6   indicates that it's quite problematic.  But self-report in

7   general for effort is not very good.  It's not very

8   reliable.  And this test, in particular, studies that have

9   been done with it, again, with this total score have found

10   that it has a relatively high error rate in the sense that

11   the error rate is about 40 percent.

12          One study that was done in 2007 found that people

13   who were performing credibly had an average score on the

14   test of 14.9.  So if the cutoff of 14 is used, then those

15   people performing credibly would be seen as not performing

16   credibly and actually malingering.  And that's

17   problematic.

18          It's really an issue of what we call specificity.

19   The test's ability to not only identify and recognize

20   people who are not putting the effort who are performing

21   in a noncredible manner, but tests ability to only to

22   restrict its identification to those people who are

23   performing in a noncredible manner.  To restrict its

24   identification to those people, and not to accidentally

25   identify people who are performing credibly as not.

1       And this test has a high -- what is called a high

2  false positive rate, which is that 40 percent of the

3  people who are performing credibly on the test are

4  misdiagnosed as performing -- as malingering, and that's a

5  problem.

6       Q.   So of all of the effort tests that Wendi took

7  between the two from Dr. Amin and the seven or eight from

8  Dr. Young, the only one she failed was the one that has a

9  high rate of false positives?

10      A.   That's correct.

11      Q.   I have no more substantive questions, but before

12  I let you go, could you just -- you wrote a report; is

13  that right?

14      A.   Yes, I did.

15      Q.   Could you look at Exhibit 167?

16      A.   Yes.  I'm looking at it now.

17      Q.   Is that a copy of your report?

18      A.   Yes, it is.

19      MR. NICKELS:  Okay.  Again, this has already been

20  admitted into evidence, but I just wanted to highlight it

21  in case anybody wants to take a look at it.

22      I have no further questions, Your Honor.

23      THE COURT:  Mr. Hazard.

24      MR. HAZARD:  Thank you, Judge.

25

CROSS-EXAMINATION

1                         CROSS-EXAMINATION

2    BY MR. HAZARD:

3        Q.    You never did an evaluation of Ms. Andriano;

4    correct?

5        A.    That's correct.

6        Q.    You never met with her?

7        A.    That's correct.

8        Q.    You never spoke with her?

9        A.    That's correct.

10       Q.    All right.  And you're familiar I assume with the

11   APA Ethics Code; correct?

12       A.    That's correct.

13       Q.    And what is the APA?  What does that stand for?

14       A.    American Psychological Association.

15       Q.    I'm going to talk to you about the section that

16   deals with the Principle No. 9, assessments.

17       A.    Okay.

18       Q.    In particular, 9.01.  Are you familiar with that,

19   Doctor?

20       A.    Yes, I am.

21       Q.    First, I'll just read 901 (C):  When

22   psychologists conduct a record review or provide

23   consultation or supervision, and an individual examination

24   is not warranted or necessary for the opinion,

25   psychologists explain this and the sources of information

1  on which they base their conclusions and recommendations.

2          You're familiar with that principle; correct?

3      *A.*   Yes.

4      *Q.*   Did you follow that principle with your work

5  here?

6      *A.*   Yes.

7      *Q.*   And then I'll read you now 901 (B):  Except as

8  noted in 901 (C), what we just talked about, psychologists

9  provide opinions of the psychological characteristics of

10 individuals only after they have conducted an examination

11 of the individual adequate to support their statements or

12 conclusions, period.

13         Do you think you followed the principles in your

14 work in this case?

15     *A.*   Yes, I do.

16     *Q.*   Okay.  It goes on:  When, despite reasonable

17 efforts, such an examination is not practical,

18 psychologists document the efforts they made and the

19 result of those efforts, clarify the probable impact of

20 their limited information on the reliability and validity

21 of their opinion and appropriately limit the nature and

22 extent of their conclusions or recommendations.

23         You're familiar with that as well; correct?

24     *A.*   Yes, I am.

25     *Q.*   And you think you followed that principle in your

48

1  work in this case?

2     *A.*   Yes, I do.

3     *Q.*   Can you show me in your report where you mention

4  anything about being limited by not being able to do an

5  evaluation of Ms. Andriano and an actual assessment or an

6  interview?

7     *A.*   Well, I think -- it's not mentioned in my report,

8  but I think I would qualify that by saying that what I did

9  here was a different -- wasn't an assessment as indicated

10 in the ethical principles that you're quoting.  It's

11 really a consultation is what I did.  And I did that based

12 on the information that I had available to me, which was

13 quite extensive.

14    *Q.*   But you're testifying today in court.  So that's

15 more than a consultation; would you agree?

16    *A.*   Well, I'm testifying to the results of my

17 consultation.

18    *Q.*   Okay.  But you also made a diagnosis in your

19 report; did you not?

20    *A.*   Yes, I did.

21    *Q.*   And could you state your diagnosis of

22 Ms. Andriano, what you believe she was suffering from?

23    *A.*   Yes.  Cognitive disorder, not otherwise

24 specified.

25    *Q.*   And is that a consultation or is that more than a

1  consultation?

2     *A.*   It can be included in a consultation.  In this

3  case, I believe that it sufficiently represents that

4  consultation.

5     *Q.*   You testified that you found some errors that

6  Dr.  Myla Young made her in her calculations; is that

7  correct?

8     *A.*   That's correct.

9     *Q.*   But your testimony is, that notwithstanding those

10  errors that you found and corrected, you still agree with

11  Dr. Young's opinions?

12     *A.*   Yes.  That's correct.

13     *Q.*   So those errors that she apparently made do not

14  change your opinion on this case whatsoever; correct?

15     *A.*   No, they do not.

16     *Q.*   And to be fair, you obviously were not there when

17  Dr. Young was administering these various tests to

18  Ms. Andriano?

19     *A.*   That's correct.

20     *Q.*   So do you know for sure that Dr. Young didn't

21  make any sort of errors in administering those tests,

22  since you weren't there?

23     *A.*   I wouldn't know for sure, but, like I had

24  mentioned, the pattern of strengths and weaknesses and it

25  is very consistent and the extensive nature of the

1 evaluation and the raw data really supports the

2 conclusions that I've come to.

3     *Q.*    You mentioned on Page 6 of your report and

4 summary and implications, to go along with the statements

5 you just made.  And I know on direct, counsel talked to

6 you about the deficits that you've found and Dr. Young

7 found, but on Page 6, you also state the strengths of

8 Ms. Andriano; correct?

9     *A.*    That's correct.

10     *Q.*    And you state, quote:  She demonstrates relative

11 strengths in core knowledge and reasoning, particularly in

12 the verbal domain where she shows strong language base,

13 conceptual and problem solving abilities and well

14 developed abstract thinking skills.

15     And you still agree with that opinion; correct?

16     *A.*    Yes.

17     *Q.*    You further state:  She also demonstrates

18 strengths in core academic skills, including reading

19 decoding, reading comprehension and mathematical reasoning

20 and calculation.

21     And you still stand behind that opinion; correct?

22     *A.*    Yes, I do.

23     *Q.*    With respect to these deficits in attention

24 executive functioning and information processing, are your

25 opinions based solely on your analysis of the raw data and

1   drawing your own conclusions from that raw data of the

2   tests that Dr. Young administered?

3       A.   Yes.

4       Q.   Did you ever base any of your opinions or

5   testimony on the conduct that Ms. Andriano, as the State's

6   evidence that was presented at her trial, her conduct in

7   the weeks leading up to October 8th of 2000 and the

8   homicide that occurred in this case?

9       A.   No, I did not.

10      Q.   Well, would you agree that from the -- if the

11  State's evidence was accurate that Ms. Andriano -- I mean,

12  are you aware of the facts of the evidence that was

13  presented at her trial?

14      A.   No.  I really -- my opinions are based on the

15  analysis that I did.

16      Q.   Then you were not aware that when Ms. Andriano

17  was interviewed by police just hours after the homicide,

18  that during a break in that interview, she contacted a

19  co-worker?  Were you aware of that?

20      A.   No, I was not.

21      Q.   That she called this co-worker and told her --

22  asked her to remove some paperwork that Ms. Andriano left

23  behind in the office of the apartment complex she worked

24  for.  You weren't familiar with that?

25      A.   No.

1    *Q.*    And you obviously weren't familiar, then, that

2    there was testimony that a police sergeant went to that

3    office and found that co-worker actually going through

4    that paperwork and stopped her?  You weren't familiar with

5    that fact?

6    *A.*    No, sir.

7    *Q.*    And located within some of that paperwork was

8    evidence that incriminated Ms. Andriano and was used

9    against her in her trial.  You weren't aware of that?

10    *A.*    No.

11    *Q.*    Do you think that during a police interview just

12    hours after the death of her husband, when police are

13    interviewing Ms. Andriano, when she's giving her account

14    of how the death of her husband occurred -- do you think

15    that that would be a situation where Ms. Andriano might be

16    overloaded?

17    *A.*    Potentially.

18    *Q.*    Does the fact that she was able to on a break

19    think about the possibility of incriminating evidence and

20    taking steps to try to get rid of that incriminating

21    evidence, isn't that goal-oriented?

22    *A.*    Again, I think that's a difficult -- that's a

23    difficult question for me to answer not having been

24    there --

25    *Q.*    Okay.

1      *A.*   -- and not knowing the specific circumstances or

2  her responses.

3           MR. HAZARD:  Thank you, Doctor.

4           No further questions.  Thank you.

5           THE COURT:  Mr. Nickels, any redirect?

6           MR. NICKELS:  No, Your Honor.

7           THE COURT:  May this witness be excused?

8           MR. NICKELS:  She may.

9           THE COURT:  Doctor, you are excused.

10          THE WITNESS:  Thank you, sir.

11          THE COURT:  Don't walk off with any exhibits.  I

12  don't think you have any exhibits there.

13          THE WITNESS:  No, I don't.

14          THE COURT:  You're excused.  Thank you very much.

15          THE WITNESS:  Thank you.

16          (WHEREUPON, the witness exited the courtroom.)

17          THE COURT:  Mr. Nickels.

18          MR. NICKELS:  Our next witness is David DeLozier.

19  He's going to be probably a lengthy witness.

20          THE COURT:  Do you want to take our morning break

21  right now?

22          MR. ARNTSEN:  Yes, Your Honor.  They're on their

23  way over here right now.

24          THE COURT:  All right.  Let's go ahead and take

25  our morning break at this time, then.  We will be in

1   recess.

2           (WHEREUPON, a recess ensued from 10:38 a.m. to

3   10:57 a.m.)

4           THE COURT:  This is CR 2000-096032, State of

5   Arizona vs. Wendi Elizabeth Andriano.

6           The record will reflect the presence of the

7   parties and counsel.

8           The Petitioner may call her next witness.

9           MR. LYNCH:  Your Honor, one housekeeping matter

10  before calling the next witness.  There are a number of

11  exhibits that are invoices from David DeLozier to either

12  Wendi Andriano or her parents, the Ochoas.

13          I've spoken with the State, and rather than go

14  through the time of authenticating and admitting each one

15  individually, the State has agreed to stipulate to their

16  admission.

17          THE COURT:  Okay.

18          MR. LYNCH:  Those exhibit numbers are Nos. 82 and

19  Exhibits 116 through 130.

20          THE COURT:  Does that sound correct?

21          MS. GARD:  Yes.

22          THE COURT:  Then Exhibit No. 82 and

23  Exhibit Nos. 116 through 130 for identification are

24  admitted into evidence.

25          Mr. Lynch.

1          MR. LYNCH:  The Petitioner calls David DeLozier.

2          THE COURT:  Mr. DeLozier, if you could please

3   step forward to the witness stand here.  Before you sit

4   down, Mr. DeLozier, if you would please face the clerk and

5   give the clerk your full name.  Raise your right hand and

6   she will swear you in.

7          THE CLERK:  Can you please state your name and

8   spell your name for the record?

9          THE WITNESS:  Sure.  George David DeLozier, Jr.

10  D-E-L-O-Z-I-E-R.

11          (WHEREUPON, the witness was duly sworn by the

12  clerk.)

13          THE COURT:  Make yourself comfortable there on

14  the witness stand.  Please remember to speak up so that

15  everyone can hear you.  Also, please wait until the

16  question is completed before you answer the question and

17  make sure that you give us a verbal response.  Help

18  yourself to the water there.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  Mr. Lynch, you may proceed.

21

22          GEORGE DAVID DELOZIER, JR.,

23  having been first duly sworn to tell the truth, the whole

24  truth, and nothing but the truth, testified as follows:

25

<pre>
 1                    DIRECT EXAMINATION
 2   BY MR. LYNCH:
 3       Q.   Good morning, Mr. DeLozier.
 4       A.   Good morning.
 5       Q.   What do you do for a living?
 6       A.   I'm a lawyer.
 7       Q.   Where?
 8       A.   In Phoenix, Arizona.
 9       Q.   At what firm?
10       A.   In my own firm.
11       Q.   How many attorneys do you have?
12       A.   Presently, just me.
13       Q.   How many attorneys have you had at any time in
14   the past?
15       A.   Five, six.
16       Q.   How long have you had your own firm?
17       A.   Since about 1980.
18       Q.   During the time you've had your own firm, from
19   1980 through the present, has your firm done criminal
20   work?
21       A.   Yes.
22       Q.   When did you begin taking criminal cases?
23       A.   Sometime in the 90's.
24       Q.   What kind of criminal cases did you take in the
25   1990's?
</pre>

1      *A.*    Misdemeanor and some felonies.

2      *Q.*    By the year 2000, approximately what percentage

3  of your practice was devoted to criminal matters?

4      *A.*    Probably 25 percent.

5      *Q.*    Mr. DeLozier, have you ever represented any

6  capital defendants at trial?

7      *A.*    Yes.

8      *Q.*    What was your first capital case?

9      *A.*    This one.

10     *Q.*    By this one, you mean State vs. Andriano?

11     *A.*    Yes.

12     *Q.*    Mr. DeLozier, how did you come to represent Wendi

13  Andriano?

14     *A.*    My recollection is there was a pastor by the name

15  of Andrew Cunningham that called me or had Wendi's parents

16  call me.  I'm not sure which one happened first, how it

17  flowed.  But Andrew Cunningham's name comes to mind.  At

18  the time, I think he was a pastor at some church in the

19  Valley and I can't tell you which one.

20     *Q.*    Mr. DeLozier, would you grab a binder and turn to

21  Exhibit 83?

22     *A.*    Yes, I will.  Sorry.

23     *Q.*    Okay.  When you get to Exhibit 83, you'll see the

24  first two pages appear to be a cover letter; is that

25  right?

1    *A.*    Yes, sir.

2    *Q.*    And after that, it appears to be a Representation

3    Agreement?

4    *A.*    Yes, sir.

5    *Q.*    Is the Representation Agreement in Exhibit 83 the

6    agreement for your representation of Wendi Andriano in

7    this case?

8    *A.*    Yes, sir.

9    *Q.*    Now, Mr. DeLozier, I want you just to take a look

10   at this agreement for one moment here.  I would like you

11   to look at the second page of the Representation

12   Agreement.

13   *A.*    Okay.

14   *Q.*    Paragraph 3 of that agreement.

15   *A.*    Okay.

16   *Q.*    Are you with me?

17   *A.*    Yes, sir.

18   *Q.*    I want you to look at the middle of the page.

19   Well, what are you discussing in Paragraph 3?

20   *A.*    The scope of the representation is part of what

21   we were trying to detail in Paragraph 3.

22   *Q.*    In the middle of the paragraph --

23   *A.*    I should mention this at the time on the first

24   page is a first degree case, not a capital case.  I'm

25   sorry.

1    *Q.*   Understood.  When did you learn that the
2  representation of Ms. Andriano would be a capital case?
3    *A.*   I don't recall the when.  It was sometime later
4  after this agreement.
5    *Q.*   Turning back to Paragraph 3 of that agreement,
6  I'm going to take your attention to the middle of the
7  paragraph with the sentence beginning:  This is especially
8  important.
9    *A.*   Right.
10   *Q.*   It is especially important in the area of fees
11 retaining the services of psychologists and other
12 technical personnel who may be required to assert various
13 potentially appropriate defenses?
14   *A.*   Yes, sir.
15   *Q.*   Why did you include that in the Representation
16 Agreement?
17   *A.*   In this particular case, I don't know that I can
18 give you a specific answer, but when you are faced cases
19 that are complicated, it is often necessary to have
20 technical personnel to participate in the defense or in
21 presenting the case or in fact helping me prepare whatever
22 the case may be.
23        One of those people of course is often a
24 psychologist or psychiatrist or whatever to talk to the
25 person.

1        I think at this time we also had -- I think she

2    had already been seen by a counselor.  What is her name?

3    Kandy Rohde, yes.  But it's just a standard to include

4    something like that when you have some suspicion that that

5    kind of technical personnel might be needed.

6        And you do that in part to make sure that the

7    client is aware that there's going to be expenses beyond

8    whatever my costs are.  Okay?  So because we've got filing

9    fees, service of process.  You know, that's standard

10   language in the first part of that Paragraph 3.

11   *Q.*   Sure.  And, Mr. DeLozier, would you turn back to

12   the cover letter that accompanied the Representation

13   Agreement?

14   *A.*   Yes, sir.

15        THE COURT:  What exhibit number is this again?

16        MR. LYNCH:  This is still Exhibit 83.  It's the

17   cover letter and a retainer agreement kind of combined in

18   the same exhibit number.

19        (WHEREUPON, an off-the-record discussion ensued

20   between Mr. Lynch and Mr. Arntsen.)

21        THE COURT:  You know, I think 83 is something

22   else.

23        MR. LYNCH:  Your Honor, this was -- and

24   Mr. Arntsen just brought this to my attention.  This was a

25   was a mistake in the exhibits that we submitted to the

1  Court prior to the hearing.  The Exhibit 83 that we have

2  and that we meant to submit is the cover letter that is

3  also reflected in --

4          MR. ARNTSEN:  The cover letter is Exhibit 61.

5          MR. LYNCH:  Yes.  But also the retainer agreement

6  is in the remainder of Exhibit 83.

7          THE COURT:  I think 83 has been admitted as

8  the --

9          THE CLERK:  Declaration.

10         THE COURT:  -- declaration of Jeri Lynn

11 Cunningham.  Let's just double-check and make sure we're

12 all on the same page here.  It looks like exhibit

13 number --

14         THE CLERK:  May I step around, sir, to check?

15         THE COURT:  Yes.

16         (WHEREUPON, an off-the-record discussion ensued.)

17         THE COURT:  Exhibit 83 that has been admitted

18 into evidence is the declaration of Jeri Lynn Cunningham.

19         MR. ARNTSEN:  Was it admitted into evidence?

20         THE COURT:  That was -- well, let me double-check

21 here.  That was not admitted into evidence.  It's marked

22 for identification.

23         MR. ARNTSEN:  Right.

24         MS. GARD:  Can we just mark a copy?

25         MR. ARNTSEN:  Yes.  Can we mark it?  This was a

1   copying mistake, Your Honor, and I apologize.  We intended

2   to fix this last week.  Exhibit 61, which is the cover, is

3   fine because Exhibit 61 is in evidence.  But then we

4   notice -- I guess Exhibit 61 doesn't include the actual

5   retainer agreement.  So what we would like to do is

6   substitute this and this is the new Exhibit 83 or we can

7   call it a different number.

8           THE COURT:  Why don't we call it a different

9   number.

10          MR. ARNTSEN:  Why don't we just call it the next

11  number in order.

12          THE CLERK:  I believe that will be 231, but I

13  will I have to verify it.

14          THE COURT:  We'll double-check it, but I believe

15  it will be Exhibit 231 for identification.

16          MR. ARNTSEN:  Okay.

17          THE COURT:  So this will be the cover letter and

18  the agreement?

19          MR. ARNTSEN:  Right.  And the cover letter was

20  already admitted as Exhibit 61.  But this also has the

21  retainer with it.

22          THE COURT:  Right.  So this would be marked for

23  identification as Exhibit No. 231.

24          THE CLERK:  231, yes.

25          THE COURT:  Are you asking that that be admitted

1  into evidence?

2        MR. LYNCH:  Yes, we are, Your Honor.

3        THE COURT:  Is there going to be any objection?

4        MS. GARD:  No objection.

5        THE COURT:  Exhibit No. 231 for identification is

6  admitted into evidence.  That is the letter, which

7  actually has been admitted as Exhibit 61, also, but it's

8  the letter and the agreement.

9        MR. LYNCH:  Yes.

10        THE COURT:  Okay.

11        MR. LYNCH:  Just for clarity for the record,

12  every time Mr. DeLozier or I have mentioned Exhibit 83 in

13  the course of this examination, what we were referring to

14  is now Exhibit 231.

15        THE COURT:  Okay.

16    *Q.*  BY MR. LYNCH:  Mr. DeLozier, sorry for that

17  interruption.

18    *A.*  It's all right.

19    *Q.*  If you would take a look at the third paragraph

20  of the cover letter.

21    *A.*  Okay.

22    *Q.*  And tell me once again why you included that

23  third paragraph in the cover letter.

24    *A.*  It attempts in letting people know in advance

25  what we're looking at and what we're going to have to look

1    at to provide an adequate defense, or know if we have one.

2            But that paragraph basically says there is

3    another lawyer involved, Mr. Thikoll, and if you guys and

4    he feel like you have people that might be helpful, you

5    know, let me know.  It talked about the attorney's fees,

6    but it also talked about the costs again of these other

7    kind of witnesses, experts, you might call them.

8        *Q.*   Are the psychologists, again, one of the other

9    types of witnesses you mean?

10       *A.*   Yes.  Most notably psychologists is what I said.

11       *Q.*   How long did Mr. Thikoll remain involved in the

12   representation?

13       *A.*   I don't know when he started.  Okay?  I know that

14   he had some role when I agreed to be of assistance.  And

15   my recollection is he became quite ill and had to

16   withdraw.  How many months?  That's all it was.  It would

17   be a matter of months.  Three, four, five, six months at

18   the most.

19       *Q.*   Sure.  And, finally, Mr. DeLozier, on

20   Exhibit 231, would you turn to the second to the last page

21   of Exhibit 231 with your signature?

22       *A.*   I'm sorry.  With what?

23       *Q.*   The page with your signature.

24       *A.*   Yes, sir.

25       *Q.*   It would be Page 4 of the Representation

1   Agreement.

2        *A.*   Okay.

3        *Q.*   I note that the Representation Agreement is

4   signed by Alejo Ochoa and Donna Ochoa.  Why did you obtain

5   their signatures?

6        *A.*   Well, anytime you have a client that is unable to

7   pay themselves, you, of course -- or we do, anyway, ask if

8   there is anybody that would be responsible for their

9   payments.  And that would be a personal guarantee by the

10  parents in this case.

11       *Q.*   Did you ever receive any payments from Wendi

12  Andriano directly in this case?

13       *A.*   No.

14       *Q.*   Did you receive payments from Alejo or Donna

15  Ochoa for the criminal representation?

16       *A.*   I don't know about Donna.  I know Alejo met me

17  one time and brought some cash.

18       *Q.*   To this date, have the Ochoas paid the full bill

19  incurred in Wendi's representation?

20       *A.*   I really don't know.

21       *Q.*   Mr. DeLozier, we talked about some mentions in

22  the retainer agreement about psychologists.  Did you take

23  any initial steps to follow through on obtaining a

24  psychologist?

25       *A.*   I'm sure we did.  I can't tell you when that

1  would have happened, though, but I know we did.

2      *Q.*   Mr. DeLozier, would you turn to Exhibit 230 if

3  it's up at the witness table there?

4      *A.*   The book I have just goes to 206.

5          MR. ARNTSEN:  She's got it up there.

6          THE COURT:  I think we have 230 has been admitted

7  into evidence.  It was admitted on February 7th, I

8  believe.

9          MR. LYNCH:  Do you have a copy available?

10         (WHEREUPON, an off-the-record discussion ensued.)

11     *Q.*   BY MR. LYNCH:  Mr. DeLozier, I'm handing you what

12  has been admitted as Exhibit 230.

13     *A.*   Okay.

14     *Q.*   What IS that document?

15     *A.*   You mean the title of it?

16     *Q.*   Sure.

17     *A.*   IT'S State of Arizona vs. Wendi Andriano -- Wendi

18  Elizabeth Andriano.  And it's titled Motion For

19  Determination of Competency Pursuant to Rule 11, Arizona

20  Rules of Criminal Procedure.  It looks like it's filed --

21  it was filed on February 22, 2001, according to the court

22  stamp.

23     *Q.*   It was filed by you?

24     *A.*   Yes.

25     *Q.*   Mr. DeLozier, I just want you to turn to the

1  Memorandum of Points and Authorities on Exhibit 230.  Do

2  you see that?

3      *A.*   Yes, sir.

4      *Q.*   Page 2?

5      *A.*   Yes, sir.

6      *Q.*   If you would look just at the paragraph -- the

7  first paragraph beginning -- well, the last sentence of

8  the first paragraph.  I apologize.  Defendant's counsel

9  believes that there is sufficient evidence to warrant a

10  determination of whether the defendant, one, is competent

11  to stand trial.

12     *A.*   Pardon me.  I'm not sure where you are.

13     *Q.*   I was looking at the Memorandum of Points and

14  Authorities on Exhibit 230.  Do you see that?

15     *A.*   Yes.

16     *Q.*   And the last sentence of the first paragraph

17  under the Memorandum of Points and Authorities.

18     *A.*   Okay.

19     *Q.*   Do you see where I'm at now?

20     *A.*   The word specifically Ms. Rohde?  Is that what

21  you're --

22     *Q.*   No, no.  I'm just looking at that last sentence.

23         MR. ARNTSEN:  First paragraph.

24         THE WITNESS:  Oh, first paragraph.  Sorry.  Yes,

25  I see it now.

1    *Q.*   BY MR. LYNCH:  Defendant's counsel believes that
2  there is sufficient evidence to warrant a determination of
3  whether the defendant, one, is competent to stand trial.
4    *A.*   Yes.
5    *Q.*   Did you follow through in obtaining an expert to
6  determine whether the defendant was competent to stand
7  trial?
8    *A.*   We did.
9    *Q.*   Was that Dr. Jack Potts?
10    *A.*   It was.
11    *Q.*   Continuing on in that sentence, you asked,
12  No. 2, whether the defendant is able to assist him in the
13  preparation of the defense of the case.
14    *A.*   Yes.
15    *Q.*   Is that something Dr. Jack Potts also evaluated?
16    *A.*   No, not in my opinion.  He recommended further
17  analysis.
18    *Q.*   Then No. 3, the mental condition at the time of
19  the offense.
20    *A.*   Right.  That's what it says.
21    *Q.*   To your knowledge, was an expert ever retained
22  for that purpose?
23    *A.*   Not that I recall.
24    *Q.*   Mr. DeLozier, let's turn to what's been admitted
25  as Exhibit 6.001.  It would be 6 A in the binders that you

1  have at the witness table.

2      A.   I'm sorry.  Did you say 60 A?

3      Q.   6 A in the binders in front of you.

4      A.   Okay.  I'm sorry.  All right.

5      Q.   Is this Dr. Potts' report?

6      A.   Yes, apparently so.

7      Q.   Did you receive it at the time you were

8  representing Ms. Andriano?

9      A.   I'm sure I did.  I don't recall actually the

10  receipt of it, but I'm certain it came to me.

11      Q.   Now if you remember back to the motion we were

12  just looking at, Exhibit 230, you had asked three things.

13  I would like you to look at the bottom of Page 2 in

14  Dr. Potts' report.

15      A.   In summary?

16      Q.   Yes.  The paragraph beginning:  In summary.  Let

17  me know when you've had a chance to review that.

18      A.   That paragraph continues onto the next page.  Do

19  you want me to continue?

20      Q.   Please, yes.

21      A.   Okay.  Yes, sir.

22      Q.   As we saw in Exhibit 230, you first asked the

23  Court to evaluate -- for an expert to evaluate the

24  competency of Ms. Andriano.  What was Dr. Potts'

25  conclusion regarding her competency?

1      MR. HAZARD:  Objection.  Hearsay.

2      THE COURT:  Well, I'll allow you to go into it.

3  This exhibit has already been admitted into evidence.

4      Although it speaks for itself, I'll let you go

5  ahead and answer that question.

6      THE WITNESS:  Thank you, Your Honor.

7      It says she is competent to do the things that

8  Rule 11 says.

9   *Q.*   BY MR. LYNCH:  The last item you request in your

10  motion is that the mental states around the time of the

11  offense be evaluated.  Did Dr. Potts look into that?

12  *A.*   No.

13  *Q.*   At any time after receiving Dr. Potts' report,

14  did you personally engage any experts to confirm whether,

15  as Dr. Potts stated, whether Ms. Rohde's diagnostic

16  assessment was correct?

17  *A.*   No.

18  *Q.*   Between the date of Dr. Potts' report of

19  March 28, 2001, and the date of the jury sentencing in

20  Wendi's trial, were you ever made aware of any experts

21  performing such an evaluation?

22  *A.*   No.

23  *Q.*   Did you eventually learn of an expert performing

24  such an evaluation?

25  *A.*   Yes, that's my understanding that there was an

1  examination done.

2      Q.   And did you learn that information before or

3  after Wendi's trial?

4      A.   After.

5      Q.   Mr. DeLozier, I would like to turn to

6  Exhibit 84 and talk about a different matter.

7      A.   Very well.  Okay.  I'm at 84 according to this

8  book.

9      Q.   Okay.  Mr. DeLozier, this has been admitted.  I

10  can represent to you that this is a printout from the

11  document in the guardianship proceedings for Wendi's

12  children.

13      A.   Yes, sir.

14      Q.   I would like to note the bracketed portion of

15  Exhibit 84.  Do you see that right in the middle, with the

16  date June 8, 2001?

17      A.   Yes.

18      Q.   What is that referring to in the document?

19      A.   I had some representation -- I had representation

20  of Alejo and Donna Ochoa regarding the children of Wendi

21  Andriano and there was a person -- I believe this is when

22  the another person substituted in.  I'm not certain,

23  though.  It could be when I came in.  I don't know.

24      Q.   Well, do you recall when you began representing

25  the Ochoas --

1    *A.*    I do not.

2    *Q.*    -- in the guardianship proceedings?

3    *A.*    Sorry.  I do not.

4    *Q.*    Mr. DeLozier, if you would look at the next page

5    of Exhibit 84.

6    *A.*    All right.

7    *Q.*    And tell me if that exhibit -- if that next page

8    refreshes your recollect as to when you began representing

9    the Ochoas in the guardianship proceedings.

10    *A.*    Oh, okay.  It would, yes.

11    *Q.*    When did you begin representing the Ochoas in

12    the guardianship proceedings?

13    *A.*    According to this letter, it was July 12, 2001,

14    is the date of this letter from Alejo.  And that

15    presumably would coincide with the bracketed first page of

16    84.  And I suppose Mrs. Gray, whoever she is, or Ms. Gray

17    was being informed of that.  I don't know who Ms. Gray is.

18    *Q.*    The guardianship proceedings with the Ochoas and

19    your representation of the Ochoas, what did that

20    representation entail?

21    *A.*    What did it entail?  It was a guardianship at the

22    time that apparently Thikoll was involved in, although I

23    don't remember that.  And it was regarding sharing, I

24    guess is the best word, the children's time between the

25    grandparents of both of them.

1    *Q.*   Aside from the guardianship, did you represent

2    the Ochoas in any other proceedings relating to their

3    grandchildren?

4    *A.*   Yes.

5    *Q.*   What was that proceeding?

6    *A.*   There was a filing for an adoption in Pinal

7    County.

8    *Q.*   Adoption of the grandchildren?

9    *A.*   Right.

10   *Q.*   As to those two proceedings in which you

11   represented the Ochoas, the guardianship and the adoption,

12   were they contested?

13   *A.*   Yes.

14   *Q.*   By whom?

15   *A.*   The paternal grandparents.  Is that what you

16   mean?

17   *Q.*   Yes.

18   *A.*   Or were you seeking who their lawyer was?

19   *Q.*   Either/or?

20   *A.*   Okay.  Well, their lawyer was John Jakubczyk.

21   But it was my understanding that at the time, it was the

22   paternal grandparents.

23   *Q.*   What were the contested issues in those

24   proceedings?

25   *A.*   Well --

1    *Q.*    And I apologize.  I should have asked more

2  broadly.  What was the nature of the contested issues in

3  those proceedings?

4    *A.*    Typically, it's grandparents' visitation time or

5  who has the children most of the time or to the exclusion

6  of the other one, if necessary.  You know, it's the

7  typical guardianship-type proceeding where everybody gets

8  a chance to say what they want to say and sometimes the

9  Court, and did in this case, appoint a psychologist to

10  help.

11    *Q.*    Were there any allegations back and forth between

12  the parties?

13    *A.*    Well, there's always allegations in these kind of

14  cases.

15    *Q.*    Was there any dispute in these proceedings

16  regarding the Ochoas caregiving skills?

17    *A.*    Yes.  But that's true in any kind of contested

18  family case.

19    *Q.*    During the course of the guardianship or adoption

20  proceedings, what, if any, positions did you advocate on

21  behalf of the Ochoas?

22    *A.*    That they were appropriate parties to have some

23  time with their grandchildren.

24    *Q.*    Can you be more specific about the arguments

25  raised?

1    *A.*    The stuff that goes on in family law cases was

2    typical of what we had here.  Both people felt like they

3    were better grandparents than the other grandparents and

4    they should have more time.  It's just normal stuff in my

5    mind.  I don't know if that answers your question.  But it

6    was not anything unusual, as far as I was concerned.

7    *Q.*    Did you make any arguments or advocate any

8    positions regarding the Ochoas' parenting skills?

9    *A.*    I'm sure we did.

10    *Q.*    What were those positions or arguments?

11    *A.*    That they were honorable people and that they

12    were would raise or help assist in raising these children

13    appropriately.

14    *Q.*    Did the Lambeths dispute the Ochoas' suitability

15    as caregivers?

16    *A.*    Sure.

17    *Q.*    Did you ever share any of the Lambeths'

18    allegations against the Ochoas in the guardianship

19    proceeding or the adoption proceeding with anyone at the

20    public defender's office at any time?

21    *A.*    I don't recall doing that, no.

22    *Q.*    Mr. DeLozier, let's take a look at Exhibit 89.

23    This appears to be a series of letters, as you page

24    through it, written by you to John Jakubczyk?

25    *A.*    Yes.

1    *Q.*    And just remind me.  Who is John Jakubczyk?

2    *A.*    The attorney for the paternal grandparents is

3    what my recollection is of his role at that time.

4    *Q.*    Would those letters pertain to issues in the

5    guardianship proceedings?

6    *A.*    Yes.

7         MR. LYNCH:  Your Honor, I move to admit

8    Exhibit 89.

9         THE COURT:  Any objection?

10        MR. HAZARD:  No, Your Honor.

11        THE COURT:  Exhibit No. 89 for identification is

12   admitted into evidence.

13   *Q.*    BY MR. LYNCH:  Mr. DeLozier, would you turn to

14   Exhibit 95?  95 has been admitted.  Mr. DeLozier, is

15   Exhibit 95 a document you received during the guardianship

16   proceedings?

17        THE WITNESS:  Yes.

18        MR. HAZARD:  Your Honor, I object again.  Once

19   again, they are putting on the viewfinder the victim's

20   address.

21        THE COURT:  It has already been admitted.  We're

22   referring to Exhibit 95?

23        MR. LYNCH:  I will take it off the viewfinder.

24   We'll deal --

25        MR. HAZARD:  It needs redaction.

1     MR. ARNTSEN:  The problem was the address on the
2 one on the computer.  We redacted everything else but the
3 one on the computer.  I apologize.

4     MR. LYNCH:  Yes.  That's correct.  My apologies
5 as well.

6     Q.   BY MR. LYNCH:  Mr. DeLozier, is Exhibit 95
7 something you reviewed in the guardianship proceedings?

8     A.   It appears to be, yes.

9     Q.   Did you ever communicate any of the allegations
10 in Exhibit 95 to anyone at the public defender's office?

11     A.   No, I don't recall having done so.  It's
12 possible, but I don't recall having done so.

13     Q.   Now, Mr. Mr. DeLozier, you mentioned two
14 proceedings, the guardianship and the adoption.  I want to
15 ask now about the adoption proceedings specifically.
16 Would you turn to Exhibit 88?

17     A.   Okay.

18     Q.   This appears to be a document you filed on behalf
19 of the Petitioners in the adoption proceedings; is that
20 right?

21     A.   Yes, sir.

22     Q.   Who were the Petitioners referred to in this
23 document?

24     A.   Alejo Ochoa and Donna Ochoa.

25     MR. LYNCH:  We'll move to admit Exhibit 88.

1          THE COURT:  Any objection?

2          MR. HAZARD:  No objection.

3          THE COURT:  Exhibit No. 88 for identification is

4     admitted into evidence.

5     *Q.*   BY MR. LYNCH:  I apologize, Mr. DeLozier.  This

6     is a heavy document morning here.  If you would turn to

7     Exhibit 100.  You may have to dig to find it there.

8     *A.*   Okay.

9          THE COURT:  What number are we looking at?

10         MR. LYNCH:  Exhibit 100.

11         THE COURT:  Okay.  Thank you.

12    *Q.*   BY MR. LYNCH:  This Exhibit 100 appears to be a

13    motion for sanctions?

14    *A.*   Right.

15    *Q.*   Do you recall this motion?

16    *A.*   Yes.

17    *Q.*   Very briefly, can you tell us what this sanctions

18    issue was about?

19    *A.*   Mr. Jakubczyk essentially was asking the Court to

20    sanction me for filing the adoption petition in Pinal

21    County.

22    *Q.*   As opposed to what?

23    *A.*   As opposed to what?  I don't understand.

24    *Q.*   Was it a jurisdictional issue?

25    *A.*   I mean, I don't -- I don't recall.  The

1   jurisdiction issue was why I felt like Pinal County was

2   appropriate.  Okay?  And not Maricopa County.  Okay?  So

3   John's position was that, you know, I shouldn't have done

4   this without notification of him.  The statute doesn't

5   require doesn't require notification to him.  Okay?  So

6   that was my argument.

7          MR. LYNCH:  Your Honor, I move to admit

8   Exhibit 100.

9          THE COURT:  Any objection?

10         MR. HAZARD:  No, Your Honor.

11         THE COURT:  Exhibit No. 100 for identification is

12  admitted into evidence.

13     *Q.*  BY MR. LYNCH:  And the next exhibit,

14  Mr. DeLozier, is Exhibit 101.

15     *A.*  One moment.  One moment while I -- okay.

16     *Q.*  Mr. DeLozier, is this the court order on the

17  sanctions motion we were just discussing?

18     *A.*  It looks like it.

19     *Q.*  What was the outcome of the sanctions motion, if

20  you recall?

21     *A.*  The judge ordered me to pay Mr. Jakubczyk $6,000.

22         MR. LYNCH:  Your Honor, I move to admit

23  Exhibit 101.

24         THE COURT:  Any objection?

25         MR. HAZARD:  No objection.

1          THE COURT:  Exhibit No. 101 for identification is

2   admitted into evidence.

3          *Q.*   BY MR. LYNCH:  And let's turn to Exhibit 131.

4          *A.*   Okay.

5          *Q.*   And Exhibit 131 has been admitted.  Do you recall

6   filing this document?

7          *A.*   I do.

8          *Q.*   What is it?

9          *A.*   It is an opening brief at the Court of Appeals.

10         *Q.*   Will you turn to the Page 24 of that brief?

11         *A.*   Yes, I will.  Okay.

12         *Q.*   I want to draw your attention to the conclusion

13  of that brief to the Court of Appeals:  For the foregoing

14  reasons, undersigned respectfully requests that this court

15  reverse the trial court's order of sanctions against me

16  and the Ochoas.

17         *A.*   Yes, sir.

18         *Q.*   In this brief, why did you ask the court to

19  reverse the sanctions against the Ochoas?

20         *A.*   I'm sorry.  I don't remember.  I would have to

21  look back at the order to see what the order said and I

22  don't remember what it said other than I had to pay

23  John Jakubczyk $6,000.

24         *Q.*   Well, let me back up.  After the sanctions

25  motions was filed, did you withdraw as counsel for the

1   Ochoas in the adoption proceedings?

2     *A.*   I don't recall.

3     *Q.*   After the sanctions order was entered, did you

4   withdraw as counsel of record in the adoption proceedings?

5     *A.*   I don't recall.

6     *Q.*   At the time you filed this brief to the Court of

7   Appeals, were you still representing the Ochoas?

8     *A.*   In what?

9     *Q.*   In the adoption proceedings.

10    *A.*   Oh, I don't know.  I know I was substituted out

11  in the guardianship in Maricopa County, but I don't know

12  that I was any kind of further representation by anyone in

13  Pinal County on the adoption.  I don't know if that's what

14  your -- I just don't know other than that.  We would have

15  to look at documents to see or the court docket sheet or

16  whatever.  I don't know.  I don't remember.

17    *Q.*   Well, let me ask it this way:  Regardless of the

18  timing of your status a counsel of record, as of the time

19  of this appellate brief, May 27, 2003, were you still

20  representing the interests of the Ochoas?

21    *A.*   Well, I think what you're -- what's a little

22  confusing for me is there's one -- there's one answer to

23  it if you're talking about does the court recognize a

24  person as a lawyer for of record in the case.  And there's

25  another kind of something beyond what goes in the

1  courtroom, the court files officially.  Is that what

2  you're asking?

3      Q.   Yes.

4      A.   Yes, to answer your question, I felt that I still

5  should represent their interests regardless of whether I

6  was officially of the court record or not.  Is that what

7  you want?  I mean, I don't know if I'm answering your

8  question correctly.

9      Q.   I think you are, Mr. DeLozier.  What types of

10  steps did you take, if any, to represent the Ochoas'

11  interests in the guardianship or adoption proceedings

12  after the sanctions?

13      A.   Okay.  I think I understand what you're saying.

14  Just because I'm not officially of record in the courts,

15  if a person calls me that I have previously represented

16  and has a question or wants to talk to me about their

17  case, I will not hang up on them.  Okay?  I continue to be

18  their contact if they feel like I can provide any

19  information for them.

20          I'll give you an illustration.  I had a fellow

21  that had been in prison for ten or 12 years.  He called me

22  one day and said:  Can you pick me up at the bus station?

23  I've got 50 bucks in my pocket.  I hadn't talked to him in

24  12 years, but he called and wanted me to come and pick him

25  up and take him around so he could get his state ID and

1   food stamps and so forth.  It's just kind of what you do.

2       *Q.*   Did the Ochoas continue to ask questions

3   regarding the guardianship or adoption proceedings?

4       *A.*   Sure.

5       *Q.*   Through what time?

6       *A.*   Oh, I can't tell you the last time I talked to

7   Donna.  I don't -- it probably was sometime -- it would be

8   a guess.  2005 maybe.

9       *Q.*   Did the Ochoas ask you to provide any advice

10  during that time period?

11      *A.*   I don't know.  They may have.  If they asked a

12  question, I would probably tell them what I thought.  But

13  I don't remember anything specific.

14      *Q.*   Let's turn to a few other documents.

15  Exhibit 132.  What has been admitted as Exhibit 132.

16      *A.*   All right.

17      *Q.*   Mr. DeLozier, I apologize.  I directed you to the

18  wrong document.  Let's go to Exhibit 110.

19      *A.*   110?

20      *Q.*   Yes.

21      *A.*   All right.  I'm almost there.  Okay.

22      *Q.*   Do you recognize this document?

23      *A.*   Excuse me.  Yes.

24      *Q.*   What is it?

25      *A.*   Well, this would be billings from a private

1  investigative consulting firm called Rich Robertson

2  Consulting investigation for fees, costs and a copy of our

3  check back to pay for that it looks like.

4      Q.   Do you know what these invoices are referring to,

5  the work performed by Rich Robertson Consulting?

6      A.   It would be the something for the benefit of

7  Alejo and Donna Ochoa, it looks like.

8      Q.   And why was Rich Robertson sending you invoices

9  relating to the guardianship proceedings?

10     A.   Well, there's a variety of people that do

11 process serving and investigative work around the Valley

12 and that just happens to be who we were using at the time.

13 So they were sending their invoice to get paid.

14          MR. LYNCH:  Your Honor, I move to admit

15 Exhibit 110.

16          THE COURT:  Any objection?

17          MR. HAZARD:  No objection.

18          THE COURT:  Exhibit No. 110 for identification is

19 admitted into evidence.

20     Q.   BY MR. LYNCH:  Mr. DeLozier, I want you to turn

21 to what has been admitted as Exhibit 130.

22     A.   Yes, sir.

23          THE COURT:  I don't think 130 has been admitted.

24 Oh, it was admitted today.  Okay.  Go ahead.

25     Q.   BY MR. LYNCH:  Mr. DeLozier, what is this

1  document?

2      *A.*    It's a 12/31/2004 dated invoice from our firm for

3  services in the -- the print is real bad.  I'm sorry.

4  I've got to take a look at it.  It looks like a mixed bag.

5      *Q.*    Well, let me direct you just to a couple of

6  entries specifically.

7      *A.*    It says 12/1, for example.  Pardon me for

8  interrupting you.  It's a 1:00 o'clock, five hours with

9  Judge Ishikawa.  But beyond that, you know, there's other

10  stuff there.  Go ahead.

11     *Q.*    BY MR. LYNCH:  First off, I just want to look at

12  the December 8, 2004 billing entry.

13     *A.*    Okay.

14     *Q.*    Nine hours, and it looks like it's

15  blocked-billed.  So we can't quite tell how much time is

16  spent on each.  But just the first task in that

17  blocked-billed entry --

18     *A.*    Yes, sir.

19     *Q.*    -- do you recall what that related to?

20     *A.*    I have no idea except it talks about guardianship

21  and adoption files.  It may have been that I was taking

22  them or taking whatever I had to them.  I don't know what

23  it is.

24     *Q.*    Do you see the date was December 8, 2004.  Do you

25  remember what was going on in Wendi's case at the time?

1  *A.*   Some sort of a hearing in this case.  I don't

2  know what kind of hearing.  It doesn't say.  It's not

3  specific.  Oral argument on various motions, it says, but

4  I don't know what those motions were.

5  *Q.*   Mr. DeLozier, could you turn to -- finally, just

6  one last document to get admitted.  Could you turn to

7  Exhibit 99?

8  *A.*   All right.

9  *Q.*   Mr. DeLozier, this document does note that you

10  had withdrawn as counsel of record in the guardianship

11  proceedings?

12  *A.*   Yes.

13  *Q.*   When is this document dated?

14  *A.*   August 1, 2002 is the upper left-hand.  It shows

15  field August 13, 2002.

16  *Q.*   Who is Daphne Budge?

17  *A.*   She's a lawyer that apparently substituted in the

18  guardianship case in Maricopa County.

19  *Q.*   Did you communicate with her?

20  *A.*   I'm sure there was some communication, but I

21  don't recall any of the details.  I imagine getting files

22  from standard replacement counsel-type stuff.

23  *Q.*   Did you receive this minute entry relating to the

24  guardianship proceedings?

25  *A.*   There is no indication on any of the documents

1  that it came to me, but I got it somehow.  It's fairly

2  common in those days that courts would mail or e-mail to

3  anybody that had been involved.

4      *Q.*   Do you recall reviewing this minute entry?

5      *A.*   I know it happened.  I don't recall reviewing it,

6  no.

7      *Q.*   Did you communicate any information -- or what

8  did you learn about that hearing at any time?

9      *A.*   I don't understand the question.

10     *Q.*   Let me restate it.  Did you know about this

11  hearing as it was occurring in the guardianship

12  proceedings?

13     *A.*   I don't know.  I really don't.  But the standard

14  procedure is you would sign a piece of paper that says

15  substitute, I'm out, she's in, that type of thing.  So I

16  would assume at that some point, the court would have a

17  hearing on it.  It doesn't reflect that I'm involved in

18  that hearing, though.  It doesn't say I'm there.  It just

19  says that she's there.  So would I have known that it was

20  happening that day?  I doubt it?

21          MR. LYNCH:  I move to admit Exhibit 99 at least

22  as a public record.

23          THE COURT:  Any objection?

24          MR. HAZARD:  No, Your Honor.

25          THE COURT:  Exhibit No. 99 for identification is

1   admitted into evidence.

2       *Q.*   BY MR. LYNCH:  Mr. DeLozier, we have talked about

3   custody and guardianship proceedings that you were

4   handling between 2000 and 2001 through 2005.  I want to

5   talk about one other matter that you were handling during

6   that time period.

7           Do you have any experience representing victims

8   of childhood sexual abuse in the context of civil

9   litigation?

10      *A.*   Yes.

11      *Q.*   How many types of those cases have you handled?

12      *A.*   In the 20's.

13      *Q.*   When did you first represent a victim of

14  childhood sexual abuse?

15      *A.*   Allegations of it?

16      *Q.*   Yes.

17      *A.*   Oh, way back in the early part of '90 in a family

18  law case.

19      *Q.*   And how about in a case in which you sought

20  damages?

21      *A.*   My first one would have begun in 2003.

22      *Q.*   Do you recall the date you first met the

23  plaintiff in that representation?

24      *A.*   I don't recall the date.  I know the

25  circumstances.  Do you want me to give you that?

1    *Q.*   Yes.

2    *A.*   Okay.  I believe in April, early April, is the

3    day that the United State started bombing Baghdad, Iraq.

4    Why that sticks in mind is I had been in court in Bagdad,

5    Arizona, the same day.

6    *Q.*   Did you ultimately file a lawsuit on behalf of

7    that claim?

8    *A.*   Yes.

9    *Q.*   Who was the lawsuit against?

10   *A.*   A laundry list of folks.  The Tucson Dioceses and

11   Catholic Church and the Phoenix Dioceses and Catholic

12   Church, the various people who were bishops at the time

13   and at least one or more priests.

14   *Q.*   What were the allegations in that lawsuit?

15   *A.*   Oh, God, it's a long --

16        MR. HAZARD:  Objection.  Relevance.

17        THE COURT:  Overruled.

18        Go ahead and answer the question.

19        THE WITNESS:  Yes, sir.  It was a long complaint.

20   Racketeering, for one, because of the church cover-up that

21   we believed existed, specific violations, sexual abuse

22   violations.  That statute of limitations was not

23   applicable in this case.  The young man was ten, 11,

24   12 years old when this allegedly occurred.  He then was in

25   his 40's.  Arizona had a case back in the mid-90's that

1   said it's from the time you are aware or remember.

2   Repressed memory, in other words, is another word for it.

3   Suppressed memory some people call it.

4           That the bishops knew about it and basically hid

5   it.  The activities moved people around from various

6   locations so that the information -- you know, this went

7   on and on.  But a variety of allegations.  I don't know

8   that I recall all of them.

9       Q.   BY MR. LYNCH:  Do you recall when that lawsuit

10  was filed?

11      A.   It was in 2004.  Probably close to a year from

12  the time that I met this young man.

13      Q.   Do you recall the exact date?

14      A.   No.

15      Q.   If you would turn to Exhibit 133, just for -- the

16  stipulation filed in that case, might that refresh your

17  recollection as the exact date?  I would point you

18  specifically to Paragraph 2 of Exhibit 133 on the second

19  page.

20      A.   Oh, okay.  April 21, 2004, according to this

21  document.

22      Q.   Is that consistent with your memory of when you

23  filed it?

24      A.   Approximately a year from the time we met, yes.

25      Q.   Now you mentioned earlier that you first met this

1   client in the spring of 2003.  Yet, the lawsuit was filed

2   in April 21, 2004.

3        Why was there a one-year delay between the time

4   you began the representation and the time the lawsuit was

5   filed?

6        *A.*   I told this particular person that I had never

7   had this kind of case before and it was going to take me a

8   while to research what I thought was necessary to be able

9   to present a valid claim in the form of a complaint.

10       *Q.*   What did you do to -- or what kind of research

11  did you do?

12       *A.*   Well, obviously, the Internet was still -- it was

13  up and running in those days, perhaps not as much as it is

14  today.  But I went online to see what else -- what was

15  going on in the rest of the country and, frankly, the

16  world on this kind of subject.  We had heard about stuff

17  like this, frankly, but I had never the opportunity to

18  work with anybody that had this kind of complaint.

19       The first thing we would have to do, of course,

20  is determine if there's a jurisdictional problem.  Okay?

21  Because, obviously, this happened, you know, some 30 years

22  earlier than when the complaint would have been filed.

23       So the first thing is research Arizona law to see

24  what's happening in the typically two-year statute of

25  limitations problem.  For a minor, of course, it's two

1  years after you turn 18.  But, you know, is there any case
2  law that says:  Wait a minute, the door is still open.
3       And we did find a case.  I can't recite it.  I
4  can't give you the name of it.  But it was Jane Doe
5  something or other.  But basically they said two years
6  from the -- the Supreme Court of Arizona said two years
7  from the time that they recovered the memory.
8       So the next problem you've got is how do you
9  determine whether this person is telling the truth.  Okay?
10 And, obviously, I'm not psychologist.  So I take
11 somebody's word for something, but I have to have some
12 expert that knows more about it than is qualified to opine
13 because you have to have that.
14      So then it was finding a person that was somewhat
15 familiar with these kind of issues.  That would be a
16 psychiatrist, psychologist, neuropsychologist or whatever
17 that would put that person's name on the line.  Okay?  So
18 you went through the process of having this person see
19 that individual.
20      I went online and found a law firm in Minnesota
21 had had several of these cases in various parts of the
22 country, and they were very cooperative and shared their
23 pleading and so forth with me.  I read an enormous amount
24 of literature on the subject, both pro and con.
25      There's one or two experts in the country that

1   believe that there is such thing as a memory that has been

2   implanted into it, so you knew what the defense might be

3   is that it's not a recent recovery.  It's something they

4   remembered all their life.  Or the people that are dealing

5   with him, like me or the psychologists in cases, have

6   actually implanted the memory into these people and it's a

7   false memory.  Okay?  It never really happened, in other

8   words.

9        So you do those things.  You read the literature.

10  You read the books.  I've got books on my shelves and I

11  learned more than I wanted to know, to be perfectly

12  candid, about this whole field.

13      Q.   Mr. DeLozier, let me see if I understand.  To

14  gain this knowledge, it sounds like you did two sorts of

15  things.  One was research on your own?

16      A.   Right.

17      Q.   In researching on your own, did you consult any

18  sources that weren't equally available to any lawyer

19  representing a sex abuse victim?

20      A.   I would say that's probably accurate.  Whether

21  that anybody else -- I don't know how to answer that other

22  than it's not anything that is hidden.  Is that what you

23  mean?

24      Q.   Right.

25      A.   It's available.

1    *Q.*    And then the second thing you talked about was

2    mental health professionals?

3    *A.*    I guess that's the right word.

4    *Q.*    Well, what's a better word?

5    *A.*    I don't know that I -- I don't know how to

6    classify people in various pigeon holes.  Okay?  So I'm

7    talking about psychiatrists, psychologists,

8    neuropsychologists, those kind of people.  That's probably

9    the mental health field.  I did something like that.

10   *Q.*    In the time between the spring of 2003 and the

11   complaint filing date, April 21, 2004, did you consult

12   with any psychiatrists regarding childhood sexual abuse?

13   *A.*    Sure.  Over the years, I've used several of them

14   from the east coast to the west coast.

15   *Q.*    Who specifically did you consult with during that

16   period for the John Doe case?

17   *A.*    You know, I don't remember if there was more than

18   one, but there probably was.  But Dr. David Leighton is

19   one that comes readily to mind.

20   *Q.*    Why did you talk to Dr. Leighton?

21   *A.*    I know how I got introduced to him.  I'm sorry.

22   I don't know.

23   *Q.*    Why did you go talk to an expert in that field,

24   to begin with?

25   *A.*    Well, No. 1, if you're going to present this kind

1   of a case, some expert is going to have to have an opinion

2   that it is a recently recalled, or some people use the

3   word flashbacks that are just now happening to a person.

4   I can't do that and neither can my client successfully

5   overcome it.  So, obviously, you've got to have somebody

6   that has the credentials that is able to tell the court

7   because it's a motion to dismiss normally that gets filed

8   and the motion to dismiss will be successful without that

9   person.

10      Q.   Did you and Dr. Leighton have any discussions

11   prior to your filing the John Doe case?

12      A.   I don't know, but I'm sure we did.  One of the

13   things I had one -- of the things that we did in that case

14   was to have him have this individual start seeing

15   Dr. Leighton fairly frequently because, you know, the

16   trauma, if you will, that comes with that kind of thing,

17   especially if it's recently remembered, is enormous.

18      Q.   Let's talk about, Mr. DeLozier, what you have

19   learned, whether through your own research or through

20   Dr. Leighton, between the spring of 2003 and April 21,

21   2004.

22          First, what did you learn -- what, if anything,

23   did you learn about victims of childhood sexual abuse?

24          MR. HAZARD:  Objection.  Relevance.

25          MR. LYNCH:  It goes to the --

1          THE COURT:  Overruled.

2          You can answer the question.

3          THE WITNESS:  No. 1, they don't want to remember

4    it.  Okay?  It comes to them and in painful sequences.

5    Okay?  It is an almost like you wake up in the middle of

6    the night nightmares, if you will.  Okay?  They start

7    visualizing the kinds of things that happened to them.

8    They do not want to relive it.  Okay?  But they are forced

9    to.  And, frankly, a lot of them are angry.  Some of them

10   have spent years not being able to be with people, not

11   being able to be with their parents, their siblings, and

12   often turn to drugs, often turn to crime, often are

13   unemployable or can't keep a job.

14         They're angry and they don't know all who to be

15   angry at.  They're just angry, generally.  They don't

16   understand why their life has been such turmoil.  They

17   don't want to remember it.  Some people call it

18   dissociation.  Some people call it amnesia.  It's

19   difficult to get them to tell the story, if you will,

20   because it is painful.  The phycological terms, you know,

21   are several.

22   *Q.*  BY MR. LYNCH:  What are those psychological

23   terms?

24   *A.*  Obviously, dissociation is one of them.  Amnesia

25   is another.  Angry is another.  Depression is a huge part

1   of the problem.

2       *Q.*   Prior to filing the John Doe complaint on

3   April 21, 2004, did you learn anything regarding when the

4   abuse typically occurred for the victims?

5       *A.*   Well, it's usually in the preteen and teen years.

6   It usually is for a variety of reasons.  I don't find --

7   my experience, anyway, is for the Catholic-type cases,

8   they're in the eight- to 12-type range.  I had one that

9   the young lady was older than that.

10          THE COURT:  Why don't we go ahead and take our

11  lunch break at this time.  Is this good timing?

12          MR. LYNCH:  That's fine.

13          THE COURT:  Let's go ahead and take our lunch

14  break.  We will be in recess.  We will begin promptly at

15  1:30.  We will be in recess.

16          (WHEREUPON, the lunch recess ensued from

17  11:56 a.m. to 1:30 p.m.)

18          THE COURT:  Good afternoon.  This is

19  CR 2000-096032, State of Arizona vs. Wendi Elizabeth

20  Andriano.

21          The record will reflect the presence of the

22  parties and counsel.

23          The record will reflect that Mr. David DeLozier

24  is on the witness stand.

25          We will continue wit the direct examination by

98

1   Mr. Lynch.

2        Mr. Lynch.

3   *Q.*   BY MR. LYNCH:  Mr. DeLozier, do you remember

4   before the break, we were talking about the John Doe case

5   that you filed on April 21, 2004?

6   *A.*   Yes.

7   *Q.*   I want you to turn to Exhibit 134.

8   *A.*   Okay.

9   *Q.*   Do you recognize this document?

10  *A.*   (No response.)

11  *Q.*   Mr. DeLozier, is that a document that you filed

12  in connection with the John Doe case?

13  *A.*   That appears to be the case.  I don't have an

14  independent recollection of it.  This actually was signed

15  by another lawyer in the firm at the time, Lawrence

16  Dunlavey.

17  *Q.*   When you say another lawyer in the firm, which

18  firm?

19  *A.*   I'm sorry.  The one that I own.

20  *Q.*   Were you still working on the case at the time

21  that document was filed?

22  *A.*   Oh, I'm sure.

23  *Q.*   Mr. DeLozier, there is an attachment to that

24  motion.  Do you see that attachment?  I believe it says

25  Page 16 of 22 at the bottom.  The page numbers are at the

1 bottom.

2    *A.*    Okay.  Yes.

3    *Q.*    What is this attachment?

4    *A.*    Well, it's entitled Affidavit of Dr. David

5 Layton.

6    *Q.*    I direct you to Paragraph 5 of that affidavit.

7    *A.*    Yes.

8    *Q.*    I have personally treated John Doe 23 since

9 November 19, 2003?

10    *A.*    Yes.

11    *Q.*    Mr. DeLozier, is that consistent with your

12 recollection of when you engaged Dr. Leighton to treat

13 your client, John Doe?

14    *A.*    I can't -- I can't be for certain about that

15 date, but that probably is correct.

16    *Q.*    It was in and around that time that you were

17 having discussions with Dr. Leighton about effects of

18 childhood sexual abuse that you mentioned earlier?

19    *A.*    More than likely, before that date, but yes.

20    *Q.*    Mr. DeLozier, I would direct you down to the page

21 beginning -- it says Page 17 of 22 at the bottom.  It's

22 actually the next page would be the affidavit?

23    *A.*    Yes.

24    *Q.*    Beginning with the Clinical Description of

25 Injury, if you wouldn't mind just taking a chance to

1  quickly review the information provided there.

2      A.    All of this -- the heading is Clinical

3  Description of Injury?

4      Q.    Correct.

5      A.    Okay.  I've finished the first paragraph.

6      Q.    Mr. DeLozier, is that consistent with your

7  understanding of childhood sexual abuse and discussions

8  with Dr. Leighton prior to filing the John Doe case?

9      A.    Well, I don't think it's -- I don't think it's as

10  thorough as it might be because if you'll notice the list

11  of shocking self-destructive behaviors is the heading that

12  that begins with.  So that is a -- those are some of the

13  self-destructive behaviors that Mary Frawley-O'Dea had

14  indicated in that testimony.

15      Q.    Okay.

16      A.    I'm familiar with that lady.  I've consulted with

17  her.  In fact, I used her on one case as well.

18      Q.    When you say, I don't know if this is that

19  thorough, you mean you had greater knowledge prior to

20  filing the John Doe case?

21      A.    No.  I'm sorry.  I didn't mean to mislead you.

22  What I'm saying is this is a list of what O'Dea made of,

23  quote, shocking self-destructive behaviors.  But that is

24  not all inclusive of all the kinds of things that one

25  sees.  They're just self-destructive behaviors.

1    *Q.*    Sure.  If you would turn to just the next page of

2    that affidavit.

3    *A.*    Yes.

4    *Q.*    The block-intended quotation, is that consistent

5    with your understanding of the grooming process of

6    childhood sexual abuse prior to filing the John Doe case?

7    *A.*    Absolutely.  Yes.

8    *Q.*    And, finally, Mr. DeLozier, if you would turn to

9    the next page of Dr. Leighton's affidavit, Page 19 of 22

10   at the bottom of Exhibit 134, statements regarding

11   dissociation?

12   *A.*    Yes.

13   *Q.*    Are those statements consistent with what you

14   knew regarding childhood sexual abuse prior to filing the

15   John Doe case in April of 2004?

16   *A.*    Yeah.  Yes.  It goes into more than just

17   dissociation, though.  But, yes.

18   *Q.*    What else does it go into?

19   *A.*    Well, relationships with other people is one of

20   the things right about the middle I'm going to pick out.

21   Further down, too often, sex, even with trusted other,

22   triggers terrifying disorganizing flashbacks.  It says

23   several additional areas is my point.

24   *Q.*    I noted also it discusses post-traumatic stress

25   disorder.  Do you see that in the middle of that

1  paragraph?

2      *A.*   Yes.

3      *Q.*   Did you have any knowledge regarding

4  post-traumatic stress disorder as it relates to childhood

5  sexual abuse by April of 2004?

6      *A.*   Yes.

7          MR. LYNCH:  Your Honor, at this time, I would

8  like to move to admit Exhibit 134, not for the truth of

9  the matter, but rather as evidence of Mr. DeLozier's

10  knowledge as of the time of filing the John Doe case.

11          THE COURT:  Mr. Hazard?

12          MR. HAZARD:  I think it is for the truth of the

13  matter asserted.  So I object.

14          THE COURT:  I'm going to sustain the objection.

15      *Q.*   BY MR. LYNCH:  Mr. DeLozier, let's move on to

16  talking about Wendi's case specifically.

17      *A.*   Okay.

18      *Q.*   We talked about these two other cases, the John

19  Doe case and the child guardianship and adoption

20  proceedings case.

21          With regard to Wendi's case, at some point, did

22  you obtain co-counsel in your representation of Wendi?

23      *A.*   I don't know for sure I follow the word

24  co-counsel.  Who are you -- are you referring to someone

25  specifically that came in after Mr. Thikoll was --

1    *Q.*   I'm referring specifically to Mr. Patterson.

2    *A.*   Oh, yes.  I'm sorry.  I don't know that I would

3    use the term co-counsel, but that's fine.

4    *Q.*   Why wouldn't you use that term?

5    *A.*   He became first chair and the public defender's

6    office took over at a point in time.  I think it was in

7    2001.

8    *Q.*   Did you meet with Mr. Patterson after he became

9    first chair on Wendi's case?

10   *A.*   I don't recall a specific meeting early on.

11   There was a, here, I gave my files that I had to that

12   point to someone in that office.  But I know we had

13   meetings later on.  I can't recall if there's one early on

14   or not.

15   *Q.*   Early on, and I'm talking about the period after

16   Mr. Patterson became the first chair, but still, you know,

17   within the years 2001, 2002, did you have an understanding

18   of what your role on Wendi's defense team would be?

19   *A.*   No.

20   *Q.*   Did you have an understanding of certain

21   individuals for which you would be responsible as

22   co-counsel?

23   *A.*   I don't know that there was any kind of role

24   defined early on about it other than he was -- he or the

25   public defender's office was the first chair.  I was

1  second.  And I had, by that time, knowledge of and a

2  relationship with Wendi and her parents, if that's what

3  you mean.

4      Q.   If that is so, what did you understand your role

5  to be with regard to Wendi and her parents as to Wendi's

6  criminal case?

7      A.   Oh just to continue to meet with them and answer

8  any questions that I could and hold their hands,

9  basically.

10      Q.   After Mr. Patterson became lead counsel, did you

11  tell Mr. Patterson that you had no capital experience?

12      A.   Oh, I'm almost certain I did, but I couldn't -- I

13  couldn't possibly tell you that we had that conversation

14  that direct, but I know he was aware of that.  In fact,

15  that's one of the reasons the public defender's office was

16  asked to take over.

17      Q.   Did Mr. Patterson give you any guidance on

18  capital defense work?

19      A.   No.

20      Q.   Did he give any instructions on how to conduct a

21  mitigation investigation?

22      A.   No.

23      Q.   How often did you and Mr. Patterson communicate

24  regarding Wendi's case?

25      A.   I communicated mostly by e-mail because I didn't

1    get return phone calls.  And the people that did respond,

2    I found that was a lady named Michelle and I would often

3    tell Michelle:  I don't know what's going on.  I'm not

4    getting copied on documents.  I don't know what's being

5    filed.  I don't know where we are on the case, those kinds

6    of things.

7        Q.   Well, let's start with in-person meetings.  How

8    often did you meet in person with Mr. Patterson?

9        A.   I can remember prior to the trial two times.

10       Q.   Any times before that?

11       A.   No.  Well, I mean I don't know when those were.

12   But I can remember one meeting at an office somewhere here

13   in this area.  I don't know if the PD's office still has

14   an office here or not and I couldn't tell you where it is,

15   but it was somewhere in this area.  It was not in the main

16   court building.  I can recall that.

17            And I remember another meeting downtown at the

18   PD's office on Jefferson, I think it is.  Those are the

19   only two that I remember for sure.

20            During the second one was when there was the lady

21   named Michelle.  There was another lady named Patricia, I

22   think it was, and there was this Scott something.

23       Q.   MacLeod?

24       A.   Yeah.  And Dan.  And it was sometime I believe

25   after April of 2004 and before the trial started.  How

1  close to the trial starting, I can't tell you.

2      *Q.*    So how often did you and Mr. Patterson

3  communicate by e-mail?

4      *A.*    I don't know that I ever had an e-mail from him.

5  I do know that I was told at one point to direct my

6  communications directly to him by Michelle because she

7  wanted out of the loop, I think.  But I'm not certain how

8  that -- so I don't know that there was -- there was

9  communication.

10         Now we may have gotten documents.  I think there

11  was one e-mail where:  I've already copied these once, but

12  I'll do it again for him if he can't find them, something

13  to that effect, where they claim they had given me stuff

14  that I couldn't find.

15     *Q.*    And you mentioned Michelle?

16     *A.*    You got to remember my office is a long ways from

17  theirs.  Okay?  At that time, I was in a suburb of

18  Cave Creek.  Okay?  To get downtown, it's an hour.  To get

19  to Mesa, it's an hour.  So, you know, it's not next door.

20     *Q.*    How about communications by telephone?

21     *A.*    Like I said, I don't recall having a telephone

22  conversation with Mr. Patterson.

23     *Q.*    You mentioned a couple of other individuals at

24  the PD's office.  One of whom was Scott MacLeod?

25     *A.*    Right.

1    *Q.*   How often did you meet with Scott MacLeod prior

2    to the penalty phase of Wendi's trial?

3    *A.*   Oh, we would have met for the first time I think

4    April or May, somewhere along in there of 2004, when we

5    had that group meeting.  I don't recall having much

6    conversation with him until right before the trial and

7    then he was I believe at the trial most every day that I

8    was there.  So we would have seen each other during that

9    time.  I don't know if that's responsive to your question,

10   though.

11   *Q.*   It is.

12   *A.*   Okay.

13   *Q.*   During that April of 2004 meeting, do you recall

14   what was discussed?

15   *A.*   Well, he was new on the case.  Mr. MacLeod was.

16   And before that, there was a person, if I remember his

17   name was Linderman.  I don't remember ever meeting him or

18   not, but I know, that he was, quote, their mitigation

19   expert in the PD's office.  And MacLeod took over for

20   Linderman.  Okay?

21        And I don't know.  My recollection was that

22   MacLeod did not have any capital experience in mitigation.

23   Frankly, none of us did with the new *Ring* decision, or at

24   least I didn't.  It seems like Mr. Patterson might have

25   had one case before this one on the -- subsequent to the

1   *Ring* decision.

2       *Q.*   When you did meet with Scott MacLeod, you

3   mentioned you saw him in court.  What did you discuss?

4       *A.*   I don't know that we had a discussion.  He was

5   there.  I was there.

6       *Q.*   And how about, you don't remember meeting Patrick

7   Linderman, you said?

8       *A.*   I do not remember meeting him.  It's possible

9   that I did, but I don't remember.  I wouldn't know him if

10  he walked in today.

11      *Q.*   Mr. DeLozier, did you, during the course of your

12  representation of Wendi, provide the public defender's

13  office with any information or materials?

14      *A.*   Everything that I had, including Kandy Rohde's

15  entire file, for example.  What else did I give them

16  besides my file and that, I don't have an independent

17  recollection about what I gave them at the front end.  But

18  I know I gave them my file and all of her records.

19      *Q.*   Mr. DeLozier, would you turn to Exhibit 63?  I

20  want you to start at the second page.

21      *A.*   Just one moment, please.

22      *Q.*   Yes.

23      *A.*   Okay.

24      *Q.*   Is this an e-mail you sent to Michelle Arvanitas

25  on August 2nd, 2002?

1    *A.*    Yes.  It was copied to -- I believe that's Dan

2    Patterson's e-mail address, or was it was at the time.

3    *Q.*    Why did you send this e-mail?

4    *A.*    I don't know.  I'll have to look at it.  Is that

5    okay?

6    *Q.*    Sure.

7    *A.*    What's the question now?  I'm sorry.

8    *Q.*    Why did you send this e-mail?

9    *A.*    Well, No. 1, we independently found out that the

10   hearing was going to be postponed through Donna Ochoa

11   telling me.  And, like I said a moment ago, it's not next

12   door.  So it's a good portion of your day if you drive

13   over and you find out when you get there that the court is

14   not going forward.

15          So, first off, was to tell Michelle, and

16   hopefully through Dan, that they needed to keep me

17   in the loop, so to speak.

18          Secondly was to tell her that I still don't have

19   the documents that have been filed, assuming there are any

20   being filed and that I would like to be kept informed, and

21   I'm working on keeping this from being frustrating, it

22   says.

23          But Dan made it very clear that I'm second chair

24   and the PD's office is not going to put anyone else on the

25   case, but I am completely without knowledge of the case

1  developments.  So I sent it as a way of saying:  Hey, I'm

2  here.

3       *Q.*   Mr. DeLozier, would you look back at the response

4  on the first page?

5       *A.*   Sure.

6       *Q.*   It looks like you have some correspondence back

7  and forth with Michelle Arvanitas shortly after that.

8  Were the issues you raised in your initial e-mail

9  resolved?

10      *A.*   No.

11      *Q.*   Were they ever resolved?

12      *A.*   No.

13      *Q.*   Tell me about any further concerns about

14  communications during the case.

15      *A.*   This is illustrative of I just didn't bother to

16  document after that.  I knew that was not going to have

17  the kind of communication that I would expect and I just

18  went along with whatever I got.

19           At some point, you just -- you know, if you're

20  not going to solve a problem, you just look -- you know,

21  you figure that the other people know what they're doing.

22  They've had experience.  They have a budget, so forth, so

23  forth.  They don't really need me, in other words.

24           MR. LYNCH:  Your Honor, I move to admit

25  Exhibit 63.

1        THE COURT:  Any objection?

2        MR. HAZARD:  No objection.

3        THE COURT:  Exhibit No. 63 for identification is

4  admitted into evidence.

5        *Q.*   BY MR. LYNCH:  Now Mr. DeLozier, we were talking

6  earlier about the knowledge that you acquired regarding

7  childhood sexual abuse prior to filing the John Doe case

8  in April of 2004?

9        *A.*   Yes.

10        *Q.*   In the course of your representation of Wendi,

11  did you ever engage experts such as Dr. Leighton to

12  evaluate her as a potential victim of childhood sexual

13  abuse?

14        *A.*   I did not, other than Dr. Potts.  I think we were

15  involved in that him being or having a role in the case.

16  But beyond that, I did not.

17        *Q.*   To your knowledge, did anyone else do so?

18        *A.*   I don't know if anyone else did at the time.

19        *Q.*   Do you know now?

20        *A.*   Yes.

21        *Q.*   Did they?

22        *A.*   I have seen a Dr. -- what is it?  Rosengard.  I

23  understand he had seen her.

24        *Q.*   Okay.  Well, Mr. DeLozier, let's go back to

25  Exhibit 230, if you would.

1    *A.*    Now was my 83; right?

2    *Q.*    That should be the separate document there, not

3    in the binders.

4    *A.*    Oh, yes.  Okay.  Sorry.  I have it.

5    *Q.*    Now I want to look at the first attachment to

6    Exhibit 230.

7    *A.*    All right.

8    *Q.*    This would have been an attachment to your motion

9    seeking the appointment of Dr. Potts; right?

10   *A.*    Yes.

11   *Q.*    I want to look specifically at the first

12   paragraph:  I also suspect that her defense system

13   includes dissociation?

14   *A.*    Yes.

15   *Q.*    Her mother's reference to possible abuse by

16   Wendi's paternal grandfather could be the origin of that

17   dissociation?

18   *A.*    Yes.

19   *Q.*    Mr. DeLozier, other than filing the motion to

20   which this letter is attached, did you follow up on this

21   letter?

22   *A.*    Other than a motion?  Is that the question?

23   *Q.*    Yes.

24   *A.*    I gave all of Rohde's stuff to Mr. Patterson's

25   office.  But did I hire anybody to follow up on it?  No.

1    *Q.*   To your knowledge, did the public defender's

2    office ever follow up on this statement about

3    dissociation?

4    *A.*   Not that I'm aware of or not that I was aware of

5    at the time.

6    *Q.*   Mr. DeLozier, I want you to turn back to what's

7    Exhibit 6 A in the binder.  It's 6.001 for the record.

8    *A.*   Okay.  I'm at 6.

9    *Q.*   6 A.

10   *A.*   6 A.  Okay.  Thank you.

11   *Q.*   I just want to read --

12   *A.*   What portion?

13   MR. ARNTSEN:  Bottom of Page 2.

14   MR. LYNCH:  Bottom of Page 2, Mr. DeLozier.

15   THE WITNESS:  Bottom of Page 2.  Okay.  Thank

16   you.

17   *Q.*   BY MR. LYNCH:  Dr. Potts:  Whether or not she has

18   amnesia around the time of the alleged offense is

19   something I cannot determine.  Defense counsel may wish to

20   independently retain an expert to evaluate his client's

21   state of mind around the time of the offense.

22   *A.*   Right.

23   *Q.*   Certainly, there is something quite bizarre about

24   what allegedly occurred.  If Ms. Rohde is accurate in her

25   diagnostic assessment, then the criminal culpability of

1  the defendant and her state of mind at the time of the

2  alleged offense should be evaluated independently.

3        Mr. DeLozier, did you ever arrange for an

4  independent evaluation to confirm Kandy Rohde's diagnosis?

5    *A.*   No.

6    *Q.*   Based on your understanding as of April of 2004,

7  at the time you filed the John Doe lawsuit, are the issues

8  set forth in the prior Kandy Rohde letter consistent with

9  victims of childhood sexual abuse?

10        MR. HAZARD:  Objection.  Calls for speculation.

11        THE COURT:  Sustained.

12        MR. LYNCH:  Your Honor, I'm just making an offer

13  of proof.  I have established his knowledge as of April of

14  2004, and that was really the preface of the question.

15    *Q.*   BY MR. LYNCH:  And the offer of proof, your

16  answer, Mr. DeLozier?

17        THE COURT:  Go ahead, as an offer of proof.

18        THE WITNESS:  Oh, absolutely.

19        MR. HAZARD:  I would also object on relevance.

20  It's profiling and it's inadmissible.

21        THE COURT:  Okay.  Let's move on.

22    *Q.*   BY MR. LYNCH:  Mr. DeLozier, I would like you to

23  turn to Exhibit 6 C in your binder.  It's 6.003 in the

24  record.

25    *A.*   Okay.

1    *Q.*   Mr. DeLozier, is this the report from

2   Dr. Rosengard that you mentioned previously?

3    *A.*   It appears to be.  I was aware of one, but I had

4   never seen it.

5    *Q.*   What do you mean by you have never seen it?

6    *A.*   I don't recall ever having a copy of this

7   document in my files or even having been provided a copy

8   by Patterson or whatever.  So I don't know how else to say

9   it or answer.

10   *Q.*   Mr. DeLozier, turn to the diagnoses on Page 5.

11   *A.*   Okay.

12   *Q.*   Major effective disorder, depression?

13   *A.*   Right.

14   *Q.*   Probable post-traumatic stress disorder?

15   *A.*   Right.

16   *Q.*   And panic disorder?

17   *A.*   Right.

18   *Q.*   At any time, before or after April of 2004, did

19   you engage any expert to examine these diagnostic

20   impressions of Dr. Rosengard?

21   *A.*   No.

22   *Q.*   Based on your knowledge as of April of 2004, what

23   is your impression of these diagnoses of Dr. Rosengard?

24          MR. HAZARD:  Objection.

25          THE COURT:  Sustained.

1          MR. LYNCH:  And the same offer of proof, Your

2    Honor.

3          THE COURT:  Go ahead, as an offer of proof.

4          THE WITNESS:  They're consistent with things that

5    I saw in those people that I represented during the

6    20-plus sex abuse cases.

7       *Q.*   BY MR. LYNCH:  If you could also turn to the

8    conclusions of Dr. Rosengard's report.  Starting at the

9    bottom of Page 5, the very last carryover sentence there,

10   I'll read it:  An individual who goes through a traumatic

11   event will often forget that extreme situation because an

12   individual is unable to deal with the thoughts on an

13   emotional basis.  This occurs in both children and adults

14   who have been physically or sexually attacked and more

15   than explains the defendant's response, particularly in

16   light of the fact that she has a past history apparently

17   of being abused and symptoms consistent with

18   post-traumatic stress disorder.

19          Next sentence:  That situation and emotional

20   responses that she has had from that situation make it

21   more likely that she would have had such an amnestic

22   response to her apparent actions.

23          Mr. DeLozier, were you familiar with all of these

24   symptoms and diagnoses discussed here as of April of 2004?

25       *A.*   Yes.

1    *Q.*    Mr. DeLozier, let's turn now to Exhibit 6 D in

2    the binder.  It would be 6.004 for the record.

3    Mr. DeLozier, this has been admitted as 6.004.  It's an

4    e-mail exchange between Michelle Arvanitas and Dan

5    Patterson.  Did they ever send this exchange to you?

6    *A.*    Not that I'm aware of.

7    *Q.*    Mr. DeLozier, looking at the diagnoses in the

8    middle of the page, depersonalization disorder,

9    dissociative amnesia, and physical, sexual or neglect of a

10   child -- presumably, that's is supposed to be physical or

11   sexual abuse or neglect of a child.  Would those

12   diagnoses have had meaning for you in April of 2004?

13   *A.*    Certainly.

14   *Q.*    What would that meaning have been?

15   *A.*    What would it have been?  That this is a person

16   who had suffered some sort of physical or mental trauma or

17   emotional trauma.

18   *Q.*    To your knowledge, was this information disclosed

19   to any psychiatrist before Wendi's trial?

20   *A.*    The only -- the only psychiatrist that I was

21   aware of during that period of time was Potts.  So did he

22   have this information?  He had Rohde's letter, as I recall

23   from looking at -- what was it?  Exhibit 32 or 230.  I

24   don't know what else he had, nor do I know what else

25   anybody else had because I wasn't -- I wasn't part of that

1 loop.

2    Q.   Mr. DeLozier, I want you to turn to what's been
3 admitted as Exhibit 49.  They are jail medical records
4 for Wendi.

5    A.   Excuse me.  I've got to get another book.  You
6 said 49?

7         MR. ARNTSEN:  Yes.

8         MR. LYNCH:  Yes.

9         THE WITNESS:  Okay.

10    Q.   BY MR. LYNCH:  I would like you to turn towards
11 the back of Exhibit 49 around PCR 253 to 254, and just if
12 you would, Mr. DeLozier, just review the medications that
13 are listed there.

14    A.   Okay.

15    Q.   Once you've had an opportunity to do so, please
16 let us know if you're familiar with any of the medications
17 that are listed in Ms. Andriano's jail medical records.

18    A.   I am familiar with almost all of them.

19    Q.   Did you have that familiarity between 2001 and
20 2004?

21    A.   I certainly would have had by 2004, but I believe
22 I knew that she was on several of these things.  And some
23 of the clients I've had over the years who were bipolar
24 had some of these things.

25    Q.   Did you receive these jail medical records at any

1  time during the course of Wendi's representation?

2      A.   No.  No, I didn't have access to them.

3      Q.   Mr. DeLozier, do you have any knowledge of a

4  suicide attempt --

5      A.   I was aware --

6      Q.   -- while she was incarcerated?

7      A.   I'm sorry.  I thought you were finished.  Go

8  ahead.

9      Q.   Mr. DeLozier, did you have any knowledge of a

10 suicide attempt while Wendi was incarcerated prior to her

11 trial?

12     A.   Yes.

13     Q.   What was that knowledge?

14     A.   Well, she was put on suicide watch because of it.

15 I can't tell you when it was.  It wasn't -- it wasn't

16 early, but it wasn't late either, as I recall.  But other

17 than having familiarity with the occurrence, I don't know

18 that I knew much more about it other than I know she was

19 put on a watch and she might have been moved to a

20 different area of the facility that she was being held in

21 at the time.

22     Q.   Mr. DeLozier, were you ever provided with any of

23 Wendi's medical records from the jail relating to the

24 suicide attempt?

25     A.   I don't remember having them, but I don't know.

1    *Q.*   Did the public defender's office ever provide you

2    with those records?

3    *A.*   I don't recall having them, no.

4    *Q.*   I would like to turn to Page 3 of Exhibit 47.

5    *A.*   47?

6    *Q.*   Oh, 49, before we were talking about the jail

7    medication records.  I'm sorry.  I would like you to turn

8    to Page 3 of Exhibit 47 now.

9    *A.*   Okay.  All right.

10   *Q.*   Exhibit 47 has been admitted.  It's her general

11   medical records during prison.  Now the first few pages

12   are typewritten transcripts of a few of those records.

13   *A.*   Okay.

14   *Q.*   I would like you to take a look at the

15   September 29, 2003 medical records.

16   *A.*   Uh-huh, yes.

17   *Q.*   Wendi says quote:  I guess I just panicked.  That

18   officer lied to me and I felt trapped.  I knew I would be

19   in lockdown during my trial and just couldn't do it.  I

20   just freaked out.

21         And it then gives data about Wendi and it says:

22   She came to the Durango Psychiatric Unit after a panicked

23   and impulsive suicidal gesture which was all too

24   successful.

25         Mr. DeLozier, after Wendi's suicide attempt, did

1    you engage any psychiatrist to examine whether her

2    response to panic and stress?

3        *A.*    No.

4        *Q.*    To your knowledge, did anyone from the public

5    defender's office do so?

6        *A.*    No.

7        *Q.*    Mr. DeLozier, we have been talking about several

8    documents that you said you did not receive during the

9    course of Wendi's representation.  I want to turn now to

10   some of the documents that you did.  And that's starting

11   with Exhibit 7 B.  It's a letter -- it would be 7.002 for

12   the record.

13       *A.*    Just one moment, please.

14       *Q.*    Sure.

15       *A.*    This area accommodates one notebook but not two.

16   You said 7; right?

17       *Q.*    Yes, 7 B in your binder.

18       *A.*    Okay.

19       *Q.*    Mr. DeLozier, is this a letter that you received

20   during the course of your representation of Wendi?

21       *A.*    Yes.

22       *Q.*    Who is that letter from?

23       *A.*    It says H. Kandy Rohde at the top.

24       *Q.*    Who is Kandy Rohde?

25       *A.*    Her letterhead says Certified Professional

1  Counselor.  Is that what you mean?

2      *Q.*  Well, I just meant your knowledge of Kandy.

3      *A.*  Oh, I'm sorry.  It's my understanding that the

4  family, Alejo and Donna Ochoa, hired Kandy to counsel

5  Wendi.  That was what I understood how that occurred.  I

6  did not know Ms. Rohde prior to being involved in this

7  case.

8      *Q.*  What was your knowledge, if any, of her

9  qualifications?

10     *A.*  A master level counselor is what I understood she

11  was.

12     *Q.*  Mr. DeLozier, I want to turn to the content of

13  this March 12, 2001, letter.

14         MR. LYNCH:  And, at this time, I would move to

15  admit that letter, again, not for the truth but for

16  counsel's knowledge at the time.

17         MR. HAZARD:  And my objection is for hearsay.

18         THE COURT:  Overruled.  I'll allow

19  Exhibit No. 7.002 to be admitted.

20         THE CLERK:  I'm sorry.  7. --

21         THE COURT:  002.

22         THE CLERK:  Thank you.

23     *Q.*  BY MR. LYNCH:  Mr. DeLozier, I'll read from that

24  first paragraph if you would follow along after the

25  initial couple of sentences.

1    *A.*    Okay.

2    *Q.*    I suspect that she was molested by her natural

3    father and/or grandfather when she was less than four

4    years old.

5              Mr. DeLozier, did you personally investigate

6    whether Wendi was a victim of childhood molestation by her

7    natural grandfather or father?

8    *A.*    No.

9    *Q.*    Do you know whether anyone else ever did?

10   *A.*    I don't know that anyone else ever did.

11   *Q.*    Did you personally investigate whether Wendi was

12   a victim of childhood molestation by her stepfather?

13   *A.*    No.

14   *Q.*    Do you know whether anyone else did?

15   *A.*    Not to my knowledge.

16   *Q.*    The next sentence, Ms. Rohde writes:  She seems

17   to have begun dissociating as a defense beginning at a

18   very young child and continuing until today.  She told me

19   that she has no trouble remembering events in her life,

20   even stressful events.  Yet, when I asked her about her

21   childhood, her marriage, her imprisonment, she was unable

22   to recall large sections of her history.  After I brought

23   that to her attention, she spoke to her mother, who said

24   that Wendi habitually forgot anything that was unpleasant.

25   She said that as a child, Wendi would sit in a large

1 closet to disappear from anything she found stressful.

2        Mr. DeLozier, at any time after receiving this

3 letter from Ms. Rohde, through the time of Wendi's trial,

4 did you engage any experts to work with -- to evaluate

5 Wendi on these memory issues?

6     *A.*   No.  The only one that I had any role in was

7 Dr. Potts and he, of course, additionally mentioned those

8 things in his report.

9     *Q.*   To your knowledge, did anyone at the public

10 defender's office or anyone else examine these issues of

11 memory loss or dissociation in Wendi?

12     *A.*   Not that -- not that I was aware of.  All of

13 this -- all of this stuff I had from Ms. Rohde was

14 provided to the public defender's office.  What they did

15 with it, I don't know.

16     *Q.*   Mr. DeLozier, can you turn to the second page of

17 that exhibit?

18     *A.*   Okay.

19     *Q.*   I just want to look at the last paragraph.  I

20 think Wendi suffers from serious psychological disorders,

21 and I'm anxious to have her examined by another

22 professional for a second opinion.  If I can be of

23 assistance to that person, please let me know.

24        Mr. DeLozier, to your knowledge, was Wendi ever

25 examined by another professional for a second opinion on

1  Ms. Rohde's diagnoses?

2      *A.*    Other than Potts, I have no knowledge of anybody

3  else talking to her.

4      *Q.*    And, to your knowledge, on other than Dr. Potts,

5  did any -- let me start again.

6          Other than Dr. Potts, are you aware of any

7  professionals who were provided with any information from

8  Kandy Rohde with regard to Wendi Andriano?

9      *A.*    No.   It doesn't look like Dr. Rosengard, in his

10  report that I glanced at only today, was provided the

11  information that Rohde had developed.

12         The reason I say that is Potts outlined what he

13  had received.   And Rosengard, the glance I had at his

14  report, he did not outline what he had received, if

15  anything.

16     *Q.*    Mr. DeLozier prior to trial, did Ms. Rohde send

17  you any other notes or materials regarding Ms. Andriano?

18     *A.*    I'm sure she probably did.   I don't have an

19  independent recollection of that, though.   And whatever I

20  got, I provided to the PD's office.

21     *Q.*    Can you open from the binder to Exhibit 45, which

22  what has been admitted as Exhibit 45.

23     *A.*    Sorry.   45; right?

24     *Q.*    Yes.

25     *A.*    All right.

1    *Q.*   Are these notes that Kandy Rohde sent along to

2    you?

3    *A.*   All right.  I would say yes.  I haven't looked at

4    this kind of material in a long time.  So, to be perfectly

5    accurate, I would have to go through the entire exhibit

6    to -- to.

7    *Q.*   Understood, Mr. DeLozier.

8    *A.*   But I mean --

9    *Q.*   And I won't ask you to do that.  I just want to

10   look at a few specific passages.

11   *A.*   Yeah, it looks like it.

12   *Q.*   If you would turn to the page number of

13   Exhibit 45 marked PCR 27.

14   *A.*   Okay.

15   *Q.*   I just want to read from the middle of the page:

16   She said that she cannot talk to her mother frankly

17   because she is monitored.

18   *A.*   Hold on a second.

19   *Q.*   Yeah, right after that sentence.

20   *A.*   Okay.

21   *Q.*   She said that she has never had a sexual feeling

22   and wondered if I thought it had to do with her possibly

23   having been molested.  She said she has never had an

24   orgasm and she only enjoys hugs and kiss.  I told her that

25   the dissociation and the lack of sexual responsiveness fit

1  a profile for early molestation, but that is not proof.

2       Mr. DeLozier, at any time during Wendi's trial,

3  did you take any steps to develop any proof as to whether

4  she was a victim of childhood molestation?

5       A.   No.

6       Q.   To your knowledge, did anyone from the public

7  defender's office do so?

8       A.   Not that I'm aware of.

9       Q.   Mr. DeLozier, if you would turn to the page of

10  Exhibit 45 marked --

11       A.   I'm sorry.

12       Q.   If you could turn to the page of Exhibit 45 that

13  is marked PCR 62.

14       A.   Okay.

15       Q.   I'm going to look at approximately a quarter of

16  the way down the page beginning with:  She said that she

17  is disappointed.  She said that she is disappointed that

18  Michelle and the PD's psychologist have not been in

19  contact with her despite their promises.

20       A.   Hold on.  What page?

21       Q.   Sorry.  It's PCR 62.  I need to be a little more

22  patient.

23       A.   I think I have the right page, but I don't see

24  where you're reading.

25       Q.   Do you see on the screen it's about a quarter of

1   the way down the page?

2      *A.*   Oh, yes.  Okay.

3      *Q.*   I'll start again:  She said that she is

4   disappointed that Michelle and the PD's psychologist have

5   not been in contact with her despite their promises.  We

6   talked about the possibility that her father might testify

7   to his abuse of her or his family's abuse of her.

8          Mr. DeLozier, did you ever speak with Wendi's

9   biological father regarding potential abuse of Wendi?

10     *A.*   No.

11     *Q.*   Did you ever speak with Wendi's stepfather

12  regarding potential abuse of Wendi?

13     *A.*   The stepfather being Alejo?

14     *Q.*   Yes.

15     *A.*   No.

16     *Q.*   To your knowledge, did anyone from the public

17  defender's office do so?

18     *A.*   No.

19     *Q.*   One more of these, Mr. DeLozier.  Go to the

20  page PCR 73 in Exhibit 45.

21     *A.*   Okay.

22     *Q.*   I would like you to look right in the middle of

23  the page:  Since the beginning, Wendi said it was

24  normal -- said that it was normal.  Do you see where I'm

25  at?

1    *A.*    Yes.

2    *Q.*    Wendi said that it was normal for her to fall

3    asleep in the midst of chaos and that she could sleep

4    literally for days without food or water to avoid

5    emotions.  She said that she could remember doing it in

6    her teens and that she did it then because her parents did

7    not allow her to be herself.

8            Mr. DeLozier, did you undergo any investigation

9    into potential causes for Wendi's sleep issues, let's call

10   them?

11   *A.*    No.

12   *Q.*    Do you know whether anyone else did so?

13   *A.*    Not to my knowledge.

14   *Q.*    And, finally, the next page.  Sorry.  I lied and

15   said there is one more.  I want you to look kind of about

16   a quarter of the way down the page or a third of the way

17   down the page:  I continue to believe that Wendi

18   dissociates and left her body when her fear turned into

19   anger.  I think she could tolerate being afraid, but she

20   could not tolerate being angry.  I'm not sure if the anger

21   was at herself or at Joe, but I suspect it was at herself

22   because she was always the responsible one.  Her history

23   of sleeping while angry is a willful dissociation from

24   anger.

25           Mr. DeLozier, do you know whether anyone

1   investigated Wendi's dissociation?

2       *A.*   No.

3       *Q.*   Do you know whether anyone ever investigated

4   potential sources of dissociation?

5       *A.*   No.

6       *Q.*   Did you personally?

7       *A.*   No.

8       *Q.*   Mr. DeLozier, sorry, I keep telling you it's the

9   last one, and this one really is.  If you would go to

10  PCR 112.

11      *A.*   I'm sorry?

12      *Q.*   PCR 112 of Exhibit 45.

13      *A.*   Okay.

14      *Q.*   This appears to be a document from Kandy Rohde to

15  Scott MacLeod.  Do you see that at the top of the page?

16      *A.*   Yes.

17      *Q.*   And this was Scott MacLeod, the mitigation

18  specialist?

19      *A.*   That's -- yes.

20      *Q.*   To your knowledge, were he and Kandy Rohde

21  communicating?

22      *A.*   I don't know.  I frankly believed they were, but

23  that would be today's thought process.  It's not

24  necessarily then's thought process.

25      *Q.*   Do you see the entry of April 26, 2004 --

1    *A.*    Yes.

2    *Q.*    -- in the middle of the page?

3    *A.*    Yes.

4    *Q.*    I want you to follow that entry down the next --

5    the next couple of pages all the way to PCR 114.

6    *A.*    What is it you want me to do?

7    *Q.*    Follow that April 26th entry down to PCR 114.

8    *A.*    Okay.

9    *Q.*    Are you on PCR 114?

10   *A.*    No.  I'm on 112.

11   *Q.*    I would like you to turn to PCR 114.

12   *A.*    Oh, I'm sorry.  I thought I was not following

13   your instructions.  Go ahead.

14   *Q.*    And I would just like to read the -- would you

15   read the first line of the second to the last paragraph of

16   that.  It says Wendi said that --

17   *A.*    Yes.

18   *Q.*    Go ahead.

19   *A.*    Wendi said that she got into the sexy stories

20   through her a roommate in jail named Kelly.

21   *Q.*    Now, if you would -- and I'll read the final

22   paragraph there into the record:  Wendy said that she put

23   Kelly up to reading her story to Alejo.  She said that she

24   told him about the Tina letter.  Wendi said that Alejo

25   said that she should send stories to him for the Internet.

1   Wendi said that someone Alejo knows from his photography

2   was his connection into the Internet.  Wendi said that

3   these photographers have lingerie parties, some of which

4   are innocent and some are more provocative.  Wendi seems

5   to have open knowledge of these enterprises and does not

6   think they are inappropriate.

7           Mr. DeLozier, did you ever investigate any sexual

8   aspects of Wendi's relationship with her stepfather?

9       *A.*   No.

10      *Q.*   To your knowledge, did Scott MacLeod do so?

11      *A.*   I have no idea.  It was never brought to my

12  attention if he did.

13      *Q.*   To your knowledge, did anyone else at the public

14  defender's office do so?

15      *A.*   I'm not aware of any.

16      *Q.*   David, would you -- or Mr. DeLozier, would you

17  turn on Exhibit 52?

18      *A.*   Okay.

19      *Q.*   This is an e-mail from Sharon Murphy to you and

20  Dan Patterson.  Did you have communications with Sharon

21  Murphy?

22      *A.*   Yes.

23      *Q.*   And who was she?

24      *A.*   She was at ASU at the time and her specialty was

25  domestic violence.  And she was someone I had spoken to

1    prior to the public defender being involved, yes.

2        *Q.*    And why was she involved with Wendi's case?

3        *A.*    Well, she is regarded as an expert in that field

4    of domestic violence.  And one of the prongs that I felt

5    like needed to be looked at long before the public

6    defender's office was involved was domestic violence,

7    based on the things that I knew or at least had been told

8    that went on.

9        *Q.*    Mr. DeLozier, on Exhibit 52, I just want to look

10   at the second paragraph of Ms. Murphy's e-mail to you:

11   She learned to dissociate from painful memories a long

12   time ago.  That is very clear to me.  Are you going to

13   subpoena her counselor?  I know that there's something

14   that happened during childhood that she hasn't told me

15   yet.  I'll get at it before we're finished.

16            Mr. DeLozier, did you ever take any steps to

17   investigate anything painful from Wendi's childhood?

18       *A.*    No.  This e-mail is dated March 30th of 2003.  I,

19   at that point, was second chair and being not really

20   involved.

21       *Q.*    Do you know whether --

22       *A.*    No, I did not.  I don't know if anybody else did.

23       *Q.*    Thank you.  Do you know if -- thank you.

24            Finally, Mr. DeLozier, Exhibit 56.

25       *A.*    Okay.

134

1    Q.    I would like you to turn to the third page of

2    Exhibit 56.

3    A.    Okay.

4    Q.    Is this an e-mail from Donna Ochoa to you?

5    A.    That's what it looks like.  It's February 12,

6    2001.  So I would have been her sole lawyer at the time.

7    Q.    Mr. DeLozier, I would like to go down to the

8    paragraph in the middle of the page beginning with:  This

9    part is hard.

10   A.    Okay.

11   Q.    This part is hard.  Sometime in 1972, rumors were

12   flying through the family that the grandpa, Skip's dad,

13   was touching the granddaughters inappropriately.

14   A.    Yes.

15   Q.    Mr. DeLozier, did you ever take any steps to

16   investigate whether Wendi's grandfather had molested her?

17   A.    No.  It seemed like he might have been in prison

18   at that time.  But, no, I didn't take any independent

19   steps to see if he had done anything to her.

20   Q.    Are you referring to Wendi's biological father

21   who was in prison?

22   A.    It could be.  It could be.

23   Q.    Do to your knowledge, did anyone else investigate

24   any members of Wendi's biological family?

25   A.    No, not to my knowledge.

1    *Q.*   Mr. DeLozier, in your representation of Wendi,

2    did you attempt to discover any negative material

3    regarding Wendi's upbringing?

4    *A.*   Well, obviously, when we were communicating with

5    Ms. Rohde, we were being -- she was sharing with me the

6    things and it's one of the things that led to Dr. Potts'

7    initial, okay, review and the kind of things that he did.

8    But, yes, we were on that -- on that page, if you will.

9    *Q.*   And after receiving Dr. Potts' evaluation, did

10   you take any additional steps to further investigate any

11   potentially negative material regarding Wendi's

12   upbringing?

13   *A.*   I did not.

14   *Q.*   And to your knowledge, did anyone else from the

15   public defender's office?

16   *A.*   Not that I'm aware of.

17   *Q.*   Mr. DeLozier, all of the materials we have just

18   discussed, Dr. Potts, Dr. Rosengard, Kandy Rohde, Sharon

19   Murphy, Donna, jail records, suicide attempt, do you

20   believe they warranted further investigation --

21   *A.*   Well, absolutely.

22   *Q.*   -- as part of Wendi's defense?

23   *A.*   Absolutely.

24   *Q.*   Why?

25          MR. HAZARD:  Objection as to what he is

1   referring to.

2          THE COURT:  Restate the question again.

3          MR. LYNCH:  Sure.

4   *Q.*   BY MR. LYNCH:  All of these materials we have

5   just discussed, Dr. Potts, Dr. Rosengard, to Sharon

6   Murphy, Kandy Rohde, to Donna, to the jail records to the

7   suicide attempt -- I'm referring to the entire line of

8   questioning we've been going through for the last half

9   hour or so.  Do you believe the concerns raised in those

10  materials warranted further investigation?

11  *A.*   Absolutely.

12         I didn't know if you were going to object.  I was

13  waiting.

14         MR. HAZARD:  Well, is the question now or back

15  then?

16         THE COURT:  Specify when you're talking about it.

17         MR. LYNCH:  Well, let's ask this.

18  *Q.*   BY MR. LYNCH:  Did you believe that they

19  warranted further investigation then?

20  *A.*   Yes.

21  *Q.*   And do you believe they warranted further

22  investigation now?

23  *A.*   Yes.

24  *Q.*   Mr. DeLozier, why wasn't that investigation done?

25  *A.*   Well, we were on that path.  Okay?

1    *Q.*   When you say we, who are you referring to?

2    *A.*   My staff, my office, Wendi and I, if you will,

3    the people like Potts and Rohde and Sharon Murphy who were

4    all on the path to develop that part of her case.  Okay?

5          To my way of thinking and way of possibly wording

6    it and so forth, there were a number of things that had

7    not been done to determine whether once you believe

8    inculpable.  Okay?  But, certainly, for mitigation

9    purposes, that would have been an integral part of what we

10   would have presented had anybody taken the lead to do so.

11   I was not in a position, in my opinion, to force the

12   public defender to do anything.  Okay?

13   *Q.*   Did you make any efforts to alert the public

14   defender regarding these potential issues?

15   *A.*   They got copies of everything.  Did I -- did I go

16   and grab anybody by the shirt collar and say:  You better

17   do this?  No.

18   *Q.*   After you obtained knowledge in connection with

19   your John Doe lawsuit, why didn't you grab somebody by the

20   shirt collar at the public defender's office and tell them

21   to investigate further?

22   *A.*   I don't know.  I really don't know why I didn't

23   do that.  I can't -- I don't have an explanation for it at

24   all.  I wish I did, but I don't.

25   *Q.*   In retrospect, do you have an understanding of

1  what may have happened?

2          MR. HAZARD:  Objection.  Relevance.

3          THE COURT:  Sustained.

4      *Q.*   BY MR. LYNCH:  Mr. DeLozier, do you believe your

5  representation of Donna and Alejo Ochoa may have affected

6  your noninvestigation of these issues?

7      *A.*   It's possible.

8      *Q.*   Why do you say it's possible?

9      *A.*   Two things.  One is when you're in a family law

10  case, whether it's called guardianship or whatever it's

11  called, and you have two people, people on each side, and

12  you've got unfortunately lawyers that are throwing rocks

13  at each other, and everybody is focused on what they

14  believe is in the best interest of the children,

15  regardless of the position they're taking or the rocks

16  they're throwing.  Okay?  The negativity and so forth.

17  They're still thinking they're doing the right thing for

18  the children.

19          So I never get too concerned about what people

20  are saying because I expect both of them to be

21  exaggerating on both sides.  That's the history of what

22  I've seen in family law, anyway.

23          So you start off with that, so you're focusing on

24  anything you know negative about the other side,

25  unfortunately.  It's the nature of the beast.  And

1    anything you know positive about what's going on with the
2    people that you're currently representing because although
3    they want the grandkids as well.

4           So it's possible that focusing on that aspect of
5    the grandparent case kept me from focusing on anything
6    that might have been historical in Wendi's case. Okay?
7    As far as the things that Rohde and so forth and so forth
8    were telling.

9           But as the footnote to that, frankly, I really
10   wasn't -- that wasn't my job, you know. I was the third
11   wheel, basically, in the criminal case and I only did what
12   I was told to do. I specifically was told that the PD's
13   office is not going to have -- appoint anybody else to
14   help Dan. I'm it. Okay? I'll tell you what I want you
15   to do when I want you to do anything. So I said okay.

16       Q.   How often did Dan Patterson tell you to do
17   something?

18       A.   Right before the trial started, he started
19   telling me that he wanted me to do certain things and who
20   I was going to probably be having as -- what do you call
21   it? Direct testimony. Okay? Those kinds of things.

22       Q.   Mr. DeLozier, let's turn now to what happened at
23   Wendi's trial. At some point in the trial, did you begin
24   fasting?

25       A.   Oh, sure.

1   *Q.*   Why did you start that fast?

2   *A.*   Well, I probably ought to digress a little tiny

3   bit on this because there are lots of different

4   definitions of the word fast.  Okay?  For example, some

5   people don't eat don't animal products.  That's a kind of

6   fast.  So you can have a point in time when you don't have

7   breakfast.  To some people, that's a fast.

8   *Q.*   What did this fast involve for you?

9   *A.*   Well, I did not -- I did not care for some of the

10  things that were going on during the trial and I thought

11  it might be helpful if I could focus on it a little more

12  clearly because that's what happens to me when I fast is

13  my antennas get higher.  Let's put it that way.  I'm more

14  observant and so forth.

15       So I was not real thrilled with some of the

16  things that were being done and weren't being done and I

17  thought it might help me to focus.

18  *Q.*   What were some of the things that you weren't

19  thrilled about?

20  *A.*   Well, this would involve -- you're talking about

21  the trial now as the problem?

22  *Q.*   Yes, the trial specifically.

23  *A.*   I understood the limitations, and I don't try --

24  I'm not trying to be argumentative, but I don't -- we had

25  a crime scene investigator that I put --

1        MR. HAZARD:  Objection.  Relevance.  This goes to

2   the guilt phase.

3        THE COURT:  Sustained.

4        THE WITNESS:  See what I mean?  I did it.

5    *Q.*   BY MR. LYNCH:  Mr. DeLozier, did you have an

6   associate at your firm helping you on Wendi's case?

7    *A.*   Yes.

8    *Q.*   What was his name?

9    *A.*   He was a lawyer, a young -- he had been out of

10  law school only three or four years.  He had been in the

11  PD's office for two or three.  His name is Justin Blair.

12   *Q.*   Tell me what happened with Justin Blair.

13   *A.*   On October 17th, Mr. Blair was murdered.

14   *Q.*   How did that affect you?

15   *A.*   He was like a son to me and my wife.  We had

16  police from Glendale.  We had the newspapers.  We had the

17  TV.  You know, how did it affect me?  I know that we took

18  two or three days off from the trial to allow me some time

19  to get my bearings.  Let's put it that way.  I don't know

20  that I ever did during the trial, personally.

21   *Q.*   When you say, I don't know if I ever did, do you

22  mean get your bearings?

23   *A.*   Yes.

24   *Q.*   Did that include the penalty phase of the trial?

25   *A.*   From October 17th forward, whenever that was,

1   whatever phase we were in at the time.

2        Q.   Let's talk about the penalty phase evidence that

3   was presented at the trial.  Did you coordinate with

4   anyone else from the public defender's office on the

5   presentation of the mitigation phase evidence?

6        A.   MacLeod.  I think he was probably the only one.

7        Q.   What was the extent of your coordination?

8        A.   He told me that he had developed a -- what do you

9   call it?  A PowerPoint presentation that he wanted me --

10  that he thought I ought to do.  And, you know, I think I

11  saw that one time before it was presented.  I think I did.

12       Q.   Did you present the PowerPoint to the jury?

13       A.   Yes.

14       Q.   What did you do to develop the script for the

15  PowerPoint?

16       A.   Well, I think I asked Donna to help and she had

17  somebody else that volunteered to assist me with drafting

18  it.  Because up to that point in time, Justin would have

19  been my ghost writer, if you will, for getting ready for

20  the next day.

21            And that's generally what happened is I would be

22  told the night before what I was supposed to do the next

23  day.

24       Q.   Were you responsible for examining any

25  witnesses --

1    *A.*    Yes.

2    *Q.*    -- at the penalty phase?

3    *A.*    Sorry.  I think so.

4    *Q.*    If I can represent for the record, I just want to

5    make sure these names sound familiar to you.  You

6    conducted the direct examination of Chris Vargas, Jimmy

7    Galleon, Linda Galleon, Lonnie Inskeep, Barbara Mitchell

8    and Donna Ochoa and Alejo Ochoa?  Does that sound correct?

9    *A.*    I don't remember most of the first several, but

10   it sounds right.

11   *Q.*    Other the Ochoas, had you met with any of those

12   witnesses prior to conducting their examinations?

13   *A.*    No.

14   *Q.*    How did those witnesses come to your attention?

15   *A.*    I don't know.

16   *Q.*    Let me just -- one last thing.  Exhibit 136.

17   *A.*    Okay.

18   *Q.*    Mr. DeLozier, this e-mail dated November 29, 2004

19   between Scott MacLeod and Dan Patterson, were you ever

20   provided with a list of witnesses reflected in Scott

21   MacLeod's November 29, 2004 e-mail?

22   *A.*    I don't recall ever seeing this before.

23   *Q.*    Are you aware of anyone who is not included on

24   that list who was interviewed as part of a mitigation

25   investigation in Wendi's case?

1    *A.*    I wasn't asked to interview anybody.

2    *Q.*    And you're not aware of anyone else being

3    interviewed by the public defender's office?

4    *A.*    I wouldn't have any idea who they interviewed.

5    *Q.*    One last question, Mr. DeLozier.  What was your

6    understanding of themes of the mitigation case?

7    *A.*    A good person.  Didn't mean to do it.

8    *Q.*    Let's take a look at the next exhibit,

9    Exhibit 137.

10    *A.*    Okay.

11    *Q.*    It looks like it's a December 6, 2004 e-mail that

12    Scott MacLeod forwarded to you.  In your understanding,

13    this e-mail is providing mitigation themes?

14    *A.*    Yes.

15    *Q.*    Prior to this December 6, 2004 e-mail, do you

16    remember any discussions with Mr. MacLeod regarding the

17    themes for Wendi's penalties phase presentation?

18    *A.*    No.  And I don't remember getting this, but I

19    must have.

20         MR. LYNCH:  I have no further questions.

21         THE COURT:  Cross-examination.

22

23                    CROSS-EXAMINATION

24    BY MR. HAZARD:

25    *Q.*    Mr. DeLozier, do you remember giving an interview

1  with us back on November 25, 2013?

2      *A.*   I don't remember the date, but, yes, I do

3  remember you.

4      *Q.*   And do you remember Ms. Gard and Mr. Martinez

5  asked you some questions about what you knew at the time

6  when you were representing Ms. Andriano as it related to

7  the Ochoas and whether they were good parents or not?  Do

8  you remember those questions?

9      *A.*   I don't.  I'm sorry.  I don't have that

10  independent recollection of what the questions were.

11      *Q.*   Well, do you remember being asked about whether

12  you perceived at the time a possible conflict of interest

13  between your representation of Ms. Andriano and her trial

14  and the Ochoas?

15          MR. LYNCH:  I'm sorry.  Do you have a page number

16  that you're referring to?

17          MR. HAZARD:  It's coming.

18      *Q.*   BY MR. HAZARD:  And the Ochoas and the

19  guardianship or adoption proceedings?

20      *A.*   Do I remember?

21      *Q.*   Being asked whether you perceived at the time a

22  conflict?

23      *A.*   No, I don't remember, but I'm sure -- I'm sure he

24  did or somebody did.

25      *Q.*   Okay.  Do you remember being asked this question:

1  Did you perceive yourself as having a conflict of interest

2  there?

3          MR. LYNCH:  Your Honor, I object.  I would like a

4  page number.

5          THE COURT:  Go ahead and refer to the page and

6  line that you're reading from.

7          MR. HAZARD:  Sure.  It's a reporter's transcript

8  of November 25, 2013, interview with David DeLozier.  It's

9  Exhibit No. 174 for these proceedings, Page 67, Line 14.

10          MR. LYNCH:  And I would also ask that the witness

11  be provided a copy to review.

12          THE WITNESS:  Yeah, it's not in the notebooks

13  here.

14          MR. HAZARD:  This is the way I would like

15  to proceed, Your Honor.

16          THE COURT:  Go ahead.

17          MR. LYNCH:  It would be Exhibit 174.

18          THE COURT:  Go ahead and ask the question, and if

19  he needs to refer to it, then we'll address it.

20      Q.  BY MR. HAZARD:  The question was:  Did you

21  perceive yourself as having a conflict of interest there?

22          And your answer was:  No.  I thought I was

23  presenting the same information both places.

24          Do you remember saying that?

25      A.  No, I don't remember saying it.  I believe it's

147

1    in there if you're reading it.

2       Q.   Were you telling the truth at that time?

3       A.   I beg your pardon?

4       Q.   Were you telling the truth?

5       A.   I -- I swore to tell the truth both times.

6       Q.   Okay.

7       A.   Okay?

8       Q.   That's a little different than what you said here

9    today?

10      A.   How's that?

11      Q.   Well, you testified on direct, that you didn't

12   perceive a conflict?

13           MR. LYNCH:  Object.  Mischaracterizes his prior

14   testimony.  He said in retrospect.  Not at the time.

15           THE COURT:  Overruled.

16           Go ahead and ask your next question.

17      Q.   BY MR. HAZARD:  If you could clarify that,

18   because perhaps I'm not -- I didn't understand it --

19      A.   Of course.

20      Q.   -- Because I thought you said at the time, that

21   you perceived a conflict?

22      A.   At that time, I believed that I was -- that I was

23   telling the truth about both parties, both the Ochoas and

24   Ms. Andriano, that she had a good upbringing and so forth

25   and so on.  I presented the same kind of information, or

1   at least would have, had I been involved at that time.

2   Now that doesn't mean that we didn't have issues

3   in the guardianship case.  We obviously did.  We had

4   issues in her criminal case as well.  Okay?  But based on

5   what I knew about her upbringing with the church she went

6   to, the kinds of things that mommy and daddy were trying

7   to provide, meaning Alejo and Donna, I didn't see a real

8   conflict at that time between the two.  The kinds of

9   things that I felt and believed about her childhood were

10  similar to what was being told about the grandparents and

11  their behavior.

12  Q.    And did I --

13  A.    Do I feel that way today?  I don't know if that's

14  what you're asking or not.

15  Q.    No.  I'm asking about then.

16  A.    Okay.  Then I -- then I felt comfortable with

17  that representation in both cases.

18  Q.    You thought at the time, because of all the

19  information that you had that you believed to be true,

20  that Ms. Andriano's interests were aligned with the

21  Ochoas' interests; is that correct?  That they had the

22  same desires and they weren't using one against the other?

23  A.    Exactly.

24  Q.    And, in fact, did Ms. Andriano want you to

25  represent the Ochoas in the guardianship and whatever

1  other proceedings that you helped the Ochoas in?

2  A.   Yes.

3  Q.   You met with Ms. Andriano numerous times during

4  the four years she was in custody awaiting trial; correct?

5  A.   Yes.

6  Q.   Do you even have an estimate about how regular

7  your visits were with Ms. Andriano in the jail during that

8  time?

9  A.   I do not.

10  Q.   Do you feel like you met enough with her to

11  develop a kinship or a bond appropriate for a lawyer and

12  client?

13  A.   I -- I do that with every -- all my clients.  So

14  there was a bond, yes.

15  Q.   And do you feel like you met with her long enough

16  to develop trust and an open line of communication?

17  A.   I -- I don't know how to answer that.  She shared

18  with me what she had on her mind the day we were there.  I

19  don't know whether you call that a trust relationship or

20  not.

21  Q.   During all of your meetings with her, did she

22  ever tell you anything about inappropriate conduct that

23  Alejo Ochoa may have done with her?

24  A.   We didn't talk about the case.  The majority of

25  the time, we never talked about the case, either one of

1  them.

2      Q.    Did she ever mention anything at all about that?

3      A.    No.

4      Q.    And during your time in representing or knowing

5  Donna Ochoa, did Ms. Ochoa ever tell you anything about

6  sexual improprieties with Alejo Ochoa on Wendi?

7      A.    No.

8      Q.    What about Alejo himself?

9      A.    No.

10     Q.    And you also had some communications with Brandon

11 Ochoa; correct?

12     A.    It seemed like I might have, yes.  It sounds

13 familiar.

14     Q.    Did he ever mention anything like that?

15     A.    No.

16     Q.    And even your discussions with Kandy Rohde, I

17 recall in your interview on November 25th that you stated

18 you -- that if you would have had your druthers, Ms. Rohde

19 would have played a much bigger role in defending

20 Ms. Andriano; is that correct?

21          MR. LYNCH:  Object, again.  I would like him to

22 refer to the actual testimony in the exhibit.

23          THE COURT:  Well, just overruled.

24          Go ahead and answer the question.

25          THE WITNESS:  She knew Wendi, in my opinion,

1   better than anybody.  Okay.  So should she have -- should

2   she have taken a more active role, in using my terminology

3   a moment ago, grabbing somebody's shirt collar and shaking

4   them, I don't know.  Probably.  But I should have

5   probably, also.  Because the kinds of things that she

6   developed, whether Potts knew about.  I don't know about

7   this Rosengard.  There's nothing in his report that seems

8   to indicate that he had her records.  Certainly, Sharon

9   Murphy had the records.  And nobody did anything with

10  them, including me.

11       *Q.*   BY MR. HAZARD:  Well, do you agree that Ms. Rohde

12  was doing -- in her counseling sessions with Ms. Andriano,

13  they were covering a lot of the area with the victim Joe

14  Andriano and incidents of domestic violence?

15       *A.*   Well, of course, yeah.

16       *Q.*   And that was one of the not only defenses in the

17  guilt phase, but also carried through into mitigation,

18  domestic violence?  That Ms. Andriano had been a victim of

19  domestic violence; correct?

20       *A.*   I'm sorry.  You've mentioned two parts there.

21       *Q.*   Okay.

22       *A.*   And I would -- I think based on the fact that

23  we're not dealing with the penalty, you might want to

24  reword that.  I'm not trying to tell you what to do.  I

25  will be glad to answer it if you want to leave it the way

1  it is.

2     *Q.*   Okay.  Was domestic violence a theme that was

3  carried into the mitigation?

4     *A.*   Yes.

5          MR. HAZARD:  One moment, Your Honor.

6          (WHEREUPON, an off-the-record discussion ensued.)

7          MR. HAZARD:  That's all, Your Honor.

8          THE COURT:  Redirect, Mr. Lynch?

9          MR. LYNCH:  No redirect, Your Honor.

10         THE COURT:  May this witness be excused?

11         MR. LYNCH:  Yes.

12         THE WITNESS:  Thank you very much, sir.  You are

13  excused.

14         THE WITNESS:  Good to see you again, Your Honor.

15         THE COURT:  Good to see you.

16         THE WITNESS:  Do you want me to do something with

17  this?

18         THE COURT:  Is that an actual exhibit?

19         THE WITNESS:  Yes.

20         THE COURT:  Don't walk off with it.

21         THE WITNESS:  No.

22         (WHEREUPON, the witness exited the courtroom.)

23         MR. ARNTSEN:  Your Honor, would this be -- it's a

24  little early for the afternoon break.  We've got one more

25  witness.

1        THE COURT:  Is this a good time to take the

2  afternoon break?

3        MR. ARNTSEN:  Yes.

4        THE COURT:  Let's go ahead and take our afternoon

5  break at this time.  We will be in recess.

6        (WHEREUPON, a recess ensued from 2:50 p.m. to

7  3:05 p.m.)

8        THE COURT:  This is CR 2000-096032, State of

9  Arizona vs. Wendi Elizabeth Andriano.

10        The record will reflect the presence of the

11  parties and counsel.

12        Ms. Fox.

13        MS. FOX:  Yes.

14        THE COURT:  You may call your next witness.

15        MS. FOX:  We would like to call Cindy Schaider.

16        THE COURT:  Ms. Schaider, if you could please

17  approach the witness stand there.  Before you sit down, if

18  you could please face the clerk.  Please give her your

19  name, spell your name, raise your right hand and she will

20  swear you in.

21        THE WITNESS:  My name is Cindy Schaider,

22  S-C-H-A-I-D-E-R.

23        THE CLERK:  That's Cindy, C-I-N-D-Y?

24        THE WITNESS:  Yes, ma'am.

25        (WHEREUPON, the witness was duly sworn by the

1  clerk.)

2          THE COURT:  Please have a seat there on the

3  witness stand.  Ms. Schaider, if you can remember to speak

4  up, so that everyone can hear you.  Also, please wait

5  until the question is completed before you answer the

6  question and make sure that you give us a verbal response.

7  Don't just shake your head and say uh-huh or un-huh.  Say

8  yes, no, or whatever it might be.

9          Can you do that for us?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Go ahead and state your name for the

12  record.

13          THE WITNESS:  Cindy Schaider.

14          THE COURT:  And, Ms. Fox, you may proceed.

15

16                    CINDY SCHAIDER,

17  having been first duly sworn to tell the truth, the whole

18  truth, and nothing but the truth, testified as follows:

19

20                  DIRECT EXAMINATION

21  BY MS. FOX:

22     Q.   Hi, Cindy.  Thanks for being here today.

23          I would like to start with your date of birth.

24     A.   July 6, 1957.

25     Q.   Where do you currently reside?

1    *A.*    1169 East Manor Drive, Casa Grande, Arizona.

2    *Q.*    Are you married?

3    *A.*    Yes, I am.

4    *Q.*    And who is your husband?

5    *A.*    My husband is Steve Schaider.

6    *Q.*    How long have you been married to Steve?

7    *A.*    Since 1980.

8    *Q.*    And is Schaider your married name?

9    *A.*    Yes.

10   *Q.*    What's your maiden name?

11   *A.*    McCann, M-C-C-A-N-N.

12   *Q.*    Do you have any children?

13   *A.*    I have one stepchild.

14   *Q.*    How old is your stepdaughter?

15   *A.*    She is 40.  Excuse me.  40.  Wait.  39.

16   *Q.*    39.  And how old was your stepdaughter when you

17   became her stepmother?

18   *A.*    Bree was five.

19   *Q.*    Do you work?

20   *A.*    Yes, I do.

21   *Q.*    And what is your profession?

22   *A.*    I'm the executive director of the Casa Grande

23   Alliance, which is a drug abuse prevention and education

24   agency.

25   *Q.*    Do you know the defendant, Wendi Andriano?

1    *A.*    Yes, I do.

2    *Q.*    When did you first meet Wendi?

3    *A.*    I met Wendi in 1980.

4    *Q.*    And where did you meet Wendi?

5    *A.*    I met Wendi at Harvest Family Church.  That was

6    called 91st Psalm at that time.

7    *Q.*    And did you attend the church prior to 1980?

8    *A.*    No.

9    *Q.*    So you met Wendi when you started attending the

10   church?

11   *A.*    Yes, ma'am.

12   *Q.*    And do you know approximately how old Wendi was

13   in 1980 when you met her?

14   *A.*    I think Wendi was around nine years old.

15   *Q.*    How often did you see Wendi when you first met

16   her around 1980?

17   *A.*    I saw Wendi two or three times a week, when we

18   went to church Sunday morning, Sunday night and Wednesday

19   evenings.

20   *Q.*    So you saw Wendi three times a week at church

21   services?

22   *A.*    Yes, ma'am.

23   *Q.*    And did this frequency of seeing Wendi three

24   times a week continue through the time Wendi was 18?

25   *A.*    Yes.

1    Q.    Do you know Wendi's parents?

2    A.    Yes, I do.

3    Q.    Donna and Alejo Ochoa?

4    A.    Donna and Alejo Ochoa.

5    Q.    How do you Wendi's parents?

6    A.    I met Donna and Alejo at the same time that I met

7    Wendi and we attended the church together?

8    Q.    How often would you see Donna and Alejo?

9    A.    At the same frequency that I saw Wendi.  Usually,

10   twice on Sundays and once on Wednesday nights.  And

11   occasionally on three-day -- we would have three-day

12   weekend revivals and we would all be attending together.

13   Q.    Did you have any contact with Wendi or Donna

14   outside of church?

15   A.    Yes, I did.

16   Q.    What was that?

17   A.    When my stepdaughter, Bree -- that's, B-R-E-E --

18   moved in with us, Donna and Wendi babysat for her during

19   the summer and after school the first year that Bree came,

20   which would have been about 1984.

21   Q.    When Donna and Wendi babysat, was it at your

22   house or at the Ochoa's?

23   A.    It was at the Ochoa's house on Date Street.

24   Q.    And did you ever see Wendi's stepfather Alejo

25   outside of church?

1    *A.*    Perhaps a chance meeting in town, but nothing
2    more than that.
3    *Q.*    What was your -- what was Wendi's stepfather
4    Alejo like?
5    *A.*    The first words that come to mind are drug
6    burnout, which may be because of what I do for a living
7    and I know that he had a drug history.
8    *Q.*    Yeah.
9    *A.*    But I also thought Alejo was kind of sneaky.
10   *Q.*    What do you mean by sneaky?
11   *A.*    I never felt like I was getting the whole story
12   from Alejo.  There was always something that he was
13   hiding.  For example, if we had a workday at the church
14   where we would all come and be painting or cleaning, he
15   would disappear and for virtually no reason that we knew
16   of and just would come back and would sometimes smell of
17   cigarette smoke.
18          And if we would say, Alejo, you smell like you've
19   been smoking, he would say, oh, no, I would never do that.
20   But it was quite clear that he had been.  So that's just
21   an example of kind of sneaky behavior.
22   *Q.*    What was Alejo's role at the church?
23   *A.*    He was the children's pastor.
24   *Q.*    What does it mean to the children's pastor?
25   *A.*    The children's pastor is responsible for the

1   Wednesday night children's service if it was going on.
2   And if there was a children's service on Sunday morning,
3   he would also be in charge of that and was kind of
4   responsible for advising or keeping an eye on the kids.
5       Q.   Did you ever observe Alejo in his role in the
6   children's church?
7       A.   Yes, I did.  I helped on the Wednesday night
8   children's service, the children's church for probably a
9   year.
10      Q.   What was Alejo like with the kids?
11      A.   He seemed to have inconsistent boundaries.  One
12  week, something was okay.  And the next week, it was not
13  okay for them to do.  And if they -- if they misbehaved,
14  he would be harsh with them.  And then the next time, he
15  might act like a big kid and laugh at exactly the same
16  behavior.  So it felt very inconsistent.
17      Q.   Did Alejo have any hobbies that you're aware of?
18      A.   Yes.  He enjoyed photography.
19      Q.   And how do you know that?
20      A.   I saw some of the photographs that he took.
21      Q.   What were the photos of that you saw that Alejo
22  took?
23      A.   Specifically, relevant to our situation today, I
24  saw photographs of Wendi.
25      Q.   What were the photographs of Wendi?

1    *A.*    Wendi was in a teddy, women's underwear and they

2    had been taken -- the pictures had been taken out in the

3    desert near Casa Grande Mountain.

4    *Q.*    And how did you see these pictures?

5    *A.*    Alejo showed them to me.

6    *Q.*    How old was Wendi in the pictures, if you know?

7    *A.*    She looked maybe 15, 16, 17, somewhere in that

8    age.

9    *Q.*    And at what point in time, did you see these

10   pictures?

11   *A.*    It would have been when she was about that same

12   age.  They would have been very recent photographs.

13   *Q.*    And when you saw these pictures, what was your

14   reaction?

15   *A.*    I thought it was creepy and inappropriate.

16   *Q.*    Did you say anything to Alejo about how you

17   thought they were creepy and inappropriate?

18   *A.*    No, ma'am.

19   *Q.*    Why not?

20   *A.*    Because he was one of pastors and you would never

21   say anything reproachful to a pastor.

22   *Q.*    What do you mean by that?

23   *A.*    They were our spiritual leaders and he was one of

24   the men in charge.  I have no right to question what he

25   does.

1    *Q.*   You stated that you knew Wendi from 91st Psalm

2   Church; correct?

3    *A.*   Yes, ma'am.

4    *Q.*   And that you started attending the church in

5   1980?

6    *A.*   Yes, ma'am.

7    *Q.*   Who was the pastor when you first started

8   attending 91st Psalm?

9    *A.*   It was Calvin Lorts.

10    *Q.*   And what was the church like when Cal was pastor?

11    *A.*   When Cal was pastor, it was a great feeling of

12   family and the church was growing and it was kind of the

13   happening place in Casa Grande.  The church grew so much

14   that we had to add a second service on Sunday mornings to

15   accommodate all the people who were coming.

16    *Q.*   And was Cal the pastor the entire time you

17   attended the church?

18    *A.*   No.

19    *Q.*   When did he stop being the pastor at 91st Psalm?

20    *A.*   Cal left in maybe 1983, '84.

21    *Q.*   And when he stopped being pastor, do you know who

22   took over?

23    *A.*   Yes.  It was Tom King.

24    *Q.*   And did you continue to attend this church after

25   Tom King took over?

1    *A.*    Yes.

2    *Q.*    At some point, did the church change its name?

3    *A.*    Yes.  It went from 91st Psalm to Harvest Family

4    Church.

5    *Q.*    When Tom take over the church, did he make any

6    changes at the church?

7    *A.*    They weren't -- yes, he did.  And the changes

8    were not abrupt.  They were kind of subtle over time.

9    They were incremental.

10    *Q.*    And can you describe what those changes were?

11    *A.*    The first thing I think of is the difference in

12    size.  The church went from about 150 people until maybe

13    20 or 25 people were attending when we left.  And Tom's

14    preaching style was much different than Calvin's.

15    *Q.*    How was Tom's preaching style different than

16    Cal's?

17    *A.*    His preaching and his leadership style was more

18    directive.  He told us how to live.  It was more of a

19    bully pulpit.

20    *Q.*    How did Tom tell you how to live?

21    *A.*    He told us what our relationships were supposed

22    to be like between men and women.  He told us how to raise

23    our children, how to conduct our lives, who our friends

24    were supposed to be or not be.

25    *Q.*    Let's parse through those changes and those

1 directives that Tom King was giving you.  You said that he

2 was directive as to the relationships between men and

3 women?

4     *A.*   Yes, ma'am.

5     *Q.*   In what way?

6     *A.*   Women are to be subjective to their husbands and

7 he told us that we -- the women should quit their jobs and

8 stay home and take care of the house and the family.  He

9 was very sexist.  He felt there were specific roles for

10 men and women.

11     *Q.*   And you also stated that he was directive in how

12 to raise your children?

13     *A.*   Yes.

14     *Q.*   What do you mean by that?

15     *A.*   We were not instructed to have close relationship

16 with our children and reason with them.  We were told that

17 they should be obedient and he used scripture, the Rod of

18 Correction.  That foolishness is born in the heart of a

19 child and the Rod of Correction will drive it far from

20 him.  And so we were taught to beat our children.

21     *Q.*   And we'll return to that topic.  You also stated

22 that he was directive as to who you could be friends with?

23     *A.*   Yes, ma'am.

24     *Q.*   Can you explain that statement?

25     *A.*   The scripture used was:  Be not unequally yoked

1   with unbelievers.  And were discouraged from having

2   friendships or relationships with people outside of the

3   church family.  We weren't forbidden, but it was made

4   quite clear we should not be close friends with anyone who

5   was not a Christian and that somehow those who attended

6   our church were better Christians than other Christians.

7   So it was pretty clear we should be friends with just the

8   people in the fellowship.

9       Q.   And you also stated I believe that Tom King gave

10  directives about how to conduct your lives; correct?

11      A.   Yes.

12      Q.   And what do you mean by that?

13      A.   Tom said that the horoscopes were of the devil.

14  And our local paper had the horoscope in it, so we

15  shouldn't be getting the local paper.  And that he didn't

16  like what was on TV.  So he turned his TV to the wall and

17  maybe we should consider doing the same thing.

18      Q.   Did Tom King try to influence any political

19  beliefs of the church?

20      A.   Yes, ma'am.

21      Q.   In what way?

22      A.   There were voting materials in the entryway and

23  he wanted us all to be registered voters, but we were all

24  to be Republicans because good Christians were

25  Republicans.

1    *Q.*   When you said that he was doing this through

2    directives, was this in conversations or through the

3    pulpit?

4    *A.*   Both.

5    *Q.*   Both?

6    *A.*   Through conversations and from the pulpit on

7    Sunday morning or Sunday night or Wednesday night.

8    *Q.*   You also mentioned that Tom King I believe you

9    described it as a bully pulpit?

10   *A.*   Yes, ma'am.

11   *Q.*   What do you mean by that?

12   *A.*   He bullied us and bullied others.  One time

13   Brandon --

14   *Q.*   Brandon is who?

15   *A.*   Wendi's stepbrother.  He was maybe about 11 or

16   12.  He was a preteen doing what preteens do, acting out a

17   little bit and he dyed his hair orange.  And Tom said that

18   he looked like a faggot.  His words.  Not mine.  And that

19   we should all make fun of Brandon so that he knows how

20   wrong it was to have orange hair.

21   *Q.*   So Tom King directed the entire congregation to

22   make fun of an 11-year-old?

23   *A.*   Yes, ma'am.

24   *Q.*   Was this typical of Tom King?

25   *A.*   Not atypical.

1    *Q.*    And what would happen if someone left the church?

2    *A.*    I wouldn't say we were ex-communicated, but it

3    was pretty clear that if you left the church, you were no

4    longer part of the -- part of the fold.  He said:  You're

5    either with me or against me.  If you leave the church,

6    it's like a divorce.  So don't expect to have a

7    relationship.

8    *Q.*    So if someone left the church, would you

9    typically maintain a friendship with them?

10    *A.*    No, ma'am.

11    *Q.*    You mentioned earlier that Tom King, one of his

12    directives that he gave was to beat your children;

13    correct?

14    *A.*    Yes, ma'am.

15    *Q.*    Was through you're his sermons?

16    *A.*    Yes.

17    *Q.*    And do you know whether his sermons at Harvest

18    were recorded?

19    *A.*    Absolutely, they were.

20    *Q.*    How do know that?

21    *A.*    My husband was the sound man for most of the

22    20-plus years we were there and he recorded those sermons.

23    *Q.*    And based on the 20-plus years you attended

24    Harvest, would you recognize Tom King's voice if you heard

25    it?

1    *A.*   Yes, ma'am.

2          MS. FOX:  I would like at this point to play a

3    portion of the recording from 165 to first just

4    authenticate that this is what this recording is of.

5          THE COURT:  Any objection?

6          MR. HAZARD:  At this point, no.

7          MS. FOX:  Okay.  I'm going to play you a portion.

8    If you can please tell me what you hear on the recording.

9    Let's hope the speakers work.

10         (WHEREUPON, Exhibit 165 was played.)

11         MR. HAZARD:  Your Honor, I object.  The witness

12   has been mouthing the statements.  She obviously

13   understands and recognizes the recording.

14         THE COURT:  Stop the recording.

15         Do you recognize the voice?

16         THE WITNESS:  Yes.

17         THE COURT:  Ask your next question.

18   *Q.*   BY MS. FOX:  Who is that?

19   *A.*   It's Tom King.

20   *Q.*   And did you attend this sermon?

21   *A.*   Yes, ma'am.

22   *Q.*   Do you know approximately when this sermon

23   happened?

24   *A.*   The message was so common, it could have been any

25   time.  But I'm guessing mid to late 80's.

1        MS. FOX:  At this point, I would like to offer
2   Exhibit 165 into evidence.
3        MR. HAZARD:  I object as to hearsay.
4        THE COURT:  I'll sustain the objection.
5        MS. FOX:  I would like to -- but it's going --
6   can I ask for an explanation of how this is hearsay when
7   it's just going in for what he was saying to the
8   congregation?
9        THE COURT:  Well, let's move on.
10       MS. FOX:  I would like to do an offer of proof.
11       THE COURT:  Go ahead.
12       MS. FOX:  Okay.  I would like to continue playing
13   this recording.
14       THE COURT:  Now hold on a second.
15       MR. HAZARD:  No.
16       THE COURT:  I'm not going to allow you to
17   continue playing the recording.  She has indicated that
18   she recognizes the voice.  Okay?
19       MS. FOX:  Okay.
20       THE COURT:  Then you basically have already got
21   in testimony from her that it's basically his method and
22   his ways of doing things.  So let's move on.
23   *Q.*   BY MS. FOX:  Okay.  Can you explain to me how you
24   believed you were supposed to beat your children?
25   *A.*   We were supposed to beat them until they cried

1   and beat them until they cried softly.  And we were

2   instructed that if we had a small child like a baby on a

3   changing table, we should use a wooden spoon to beat that

4   child.  And as they grew older, we should use a paddle

5   like a ping pong paddle or a 1 x 2 board to beat our

6   children.  And that we could beat them four or five times

7   and it was okay if they got bruised.

8          His own children got bruised and even beat them

9   as they -- clear into their teenage years.  And he told us

10  that if we would beat them, it would -- we should break

11  their spirit.  And that he had experienced that if he

12  broke their spirit, they would then come around and be

13  thankful to him.

14      *Q.*   And was this preached through his sermons to the

15  entire congregation?

16      *A.*   Yes, ma'am.

17      *Q.*   When did you stop attending Harvest?

18      *A.*   Not soon enough.

19      *Q.*   Can you give me an approximate date?

20      *A.*   2001, maybe 2002.

21      *Q.*   And why did you stop attending Harvest?

22      *A.*   Because I realized I was embarrassed to call

23  Tom King my spiritual leader.

24      *Q.*   Why were you embarrassed to call Tom your

25  spiritual leader?

1  *A.*   I think the watershed moment for me was at a
2  family dinner night.  We had carry-in dinners once a
3  month.  I heard Tom talking to another parishioner and he
4  was saying that the city council was insane.  I said:
5  Tom, they're not insane.  He said:  Oh, yes, they're
6  insane.
7       It's because they were making a decision that he
8  didn't agree with, so he painted them with this broad
9  brush that they were all out of their minds because they
10 somehow disagreed with what he thought should be done.
11      And I thought if I saw this man in town or was in
12 a meeting with him and he said those kinds of things, I
13 would feel embarrassed and ashamed to call him my pastor
14 and I couldn't go there anymore.
15 *Q.*   Did Harvest have a negative effect on the
16 families that attended?
17 *A.*   It did on mine.
18 *Q.*   Can you explain that?
19 *A.*   My stepdaughter Bree is 39 and -- can I get a
20 drink of water?
21 *Q.*   Yeah.  Go ahead.
22 *A.*   Our relationship is broken.  And I think it's
23 because of the teaching that we got and the things that we
24 said and did while she was with us as a child.
25 *Q.*   So you said that you would see Wendi about three

1  times a week during the time that you attended church with

2  her; correct?

3      *A.*   Yes.

4      *Q.*   Up to what point in time, were you seeing Wendi

5  three times a week?

6      *A.*   When Wendi married Joe, Joe liked to go to the

7  lake on Sundays.  And so they didn't come to church as

8  consistently as Wendi did when she was -- before she

9  married because she was spending time with Joe.

10         And then when Joe got sick, I think they started

11  coming back to church more often.  Then they went to

12  Colorado for a season and I didn't see her then.  When

13  they came back from Colorado, they were very consistent

14  until they moved to Ahwatukee for Wendi's job.

15     *Q.*   Do you know about what point in time they moved

16  to Ahwatukee?

17     *A.*   Oh, gosh, maybe late 1990's.

18     *Q.*   And did you lose touch with Wendi at that point

19  in time?

20     *A.*   Yes.

21     *Q.*   When did you first hear about Wendi's arrest?

22     *A.*   Soon after she was arrested, the church secretary

23  Lola called and told me.

24     *Q.*   Were you involved at all in the preparation of

25  Wendi's trial?

1    *A.*    Yes, ma'am.

2    *Q.*    In what way?

3    *A.*    Donna, Wendi's mother, called me and said that

4    she was reviewing the tapes from the police interrogations

5    and she was doing it so she could save money for

6    Wendi's -- on Wendi's defense.  She was doing some work

7    for Mr. DeLozier.  And so she was listening to the tapes

8    and comparing them to the transcripts.  And they were

9    really hard for her to listen to and she wasn't sure if

10   she was going to have time to listen to all of the tapes

11   before he needed the information.  So she asked if I would

12   help.

13        So I brought the tapes to my home and my husband

14   and I listened to the tapes and read the transcripts and

15   marked on the transcripts any places there were

16   discrepancies from what we heard and what we read.

17   *Q.*    Did you attend Wendi's trial?

18   *A.*    Yes, ma'am.

19   *Q.*    How often did you attend Wendi's trial?

20   *A.*    I came to many of the days.  Not all of them.  I

21   was self-employed at the time so I had some freedom in my

22   schedule.  So maybe I would say 80 -- 80 percent of it,

23   maybe better than that.

24   *Q.*    Was that for all of the different portions of

25   Wendi's trial?

1      *A.*    Yes.  Both the guilt phase and the sentencing

2   part.

3      *Q.*    Did you ever meet Wendi's attorneys?

4      *A.*    Yes.

5      *Q.*    How did you meet Wendi's attorneys?

6      *A.*    Well, I met them when we were -- when we attended

7   the trial, and we would -- at the end of each day, we

8   would help carry things out to the car for them and kind

9   of talk about how the day went.  And they would bounce

10  ideas off of us.  I think they were kind of using my

11  husband and I as the average guy, since then couldn't

12  interact with the jury.  And they would say:  You know,

13  how well did we make this point or that point?  And what

14  do you feel like came across strongly?  And that was

15  about it.

16     *Q.*    When you attended the trial, did you hear any

17  testimony about Wendi's good Christian upbringing at

18  Harvest?

19     *A.*    Yes.

20     *Q.*    Did you think that it was presented accurately?

21     *A.*    I actually had some concerns about it.  And one

22  day during one of the breaks, I stopped Scott.

23     *Q.*    Scott MacLeod?

24     *A.*    Yes, ma'am.  And said -- I was really kind of

25  upset because the culture was very complex and what you

1   saw on the surface was not always what was going on behind

2   the scenes.

3           And I said to Scott:  I don't think that the

4   total picture of Harvest has been presented.  And he

5   said -- he kind of got agitated with me and said:  What

6   more needs to be said?  I said:  They're not -- they don't

7   get it.  They don't get what it was really like.

8           He said:  What difference does that make?  What

9   point will it make?  I said:  I don't know, but they're

10  not getting it.

11      *Q.*   And besides that one time, did you try to tell

12  anyone else on the defense team about what it was really

13  like at Harvest?

14      *A.*   No.  I figured if Scott didn't think it was

15  important, nobody else would.

16      *Q.*   Did you ever have any other interactions with

17  Scott MacLeod?

18      *A.*   No.  Well, yes, I did.  The first day we showed

19  up for court to see the trial, he stopped my husband and I

20  before we went into the courtroom and said:  I've been

21  looking for you, which I found surprising since we're in

22  the phone book and we're home every night.

23          But, nevertheless, he said:  I've been looking

24  for you because I want to know if you would be a witness

25  for Wendi.  And I said:  We haven't seen Wendi in a few

1   years.  I don't know what we could add to -- we haven't

2   seen her since she moved to Ahwatukee.  I don't know what

3   we could tell you about her life when all of this

4   happened.  And he said:  Okay.

5        Q.   Did he indicate that Wendi's childhood would be

6   at all relevant?

7        A.   No.

8        Q.   No?  Would you have been willing to talk to him

9   about Wendi's childhood if asked?

10        A.   Yes.

11        Q.   Did you assist at all with the sentencing portion

12   of Wendi's trial?

13        A.   Yes, ma'am.

14        Q.   And can you please tell us what you did?

15        A.   I wrote the opening and closing arguments.

16        Q.   You wrote the opening and closing arguments?

17        A.   Yes.

18        Q.   Why did you do that?

19        A.   After the first part of the sentencing phase,

20   Mr. DeLozier was out in the hallway looking and he came

21   over and he was kind of looking befuddled.  And so I

22   don't -- he said to me:  I don't really know how to get

23   started on this.  I don't know how to put all the pieces

24   together, knowing what Wendi has done and how all this

25   fits together.  I just don't know how to get started.

1       And I said:  Would you -- you want me to write
2  some things up for you?  Some -- a draft for some opening
3  arguments?  Do you want me to write something up?  He
4  said:  Oh, that would be so grateful.  I would be so
5  grateful.  That would be wonderful.
6       So that evening, my husband and I wrote up what
7  we thought the jury needed to hear and gave it to him.
8       And then at the end of that phase, that second
9  part of the sentencing, the same thing kind of went on.  I
10 asked:  Would you like us to write something up?  And he
11 said:  Yes.
12      And we kind of had to hurry because that part
13 came to an end and he was going to have to present like
14 the next day.  So we went home and worked late into the
15 night and typed something up and e-mailed it to him.
16   Q.   Do you have any -- are you a lawyer?
17   A.   No.
18   Q.   Have you had any legal training?
19   A.   No legal training.
20   Q.   Do you have any training as a mitigation
21 specialist or investigator?
22   A.   No.
23   Q.   Did anyone explain to you what should go into a
24 mitigation case?
25   A.   No.

1    *Q.*   And did any of the attorneys inform you what

2    mitigation factors were?

3    *A.*   No.

4    *Q.*   And why didn't you put any of the bad stuff about

5    Harvest in your opening or closing statements?

6    *A.*   Well, it hadn't been talked about in trial at

7    all.  And all I wrote -- I wrote up that I thought

8    Wendi was a -- I wanted the jury to know that Wendi was a

9    good woman who had made a bad choice.  So that's what I

10   wrote in that closing statement.

11   *Q.*   And did you attend the trial at the portion where

12   the closing statement was done?

13   *A.*   Yes.

14   *Q.*   And was what you wrote part of the closing

15   statement?

16   *A.*   I can't swear it was word-for-word, but it felt

17   like it was pretty close.  Mr. DeLozier read it.

18   *Q.*   And what was your opinion of his reading of the

19   closing statement?

20   *A.*   I was really disappointed because we wrote it as

21   an impassionate plea.

22          MR. HAZARD:  Objection to relevancy.

23          THE COURT:  Sustained.

24   *Q.*   BY MS. FOX:  Did you observe Mr. DeLozier's

25   performance during the entirety of the trial?

1    *A.*    Yes.

2    *Q.*    And what was your opinion of it?

3          MR. HAZARD:  Objection.  Relevance.

4          THE COURT:  Sustained.

5    *Q.*  BY MS. FOX:  Do you have any knowledge of how the

6    attorneys on the case were dividing the labor on the case?

7    *A.*    I asked Dan about that during one part of the

8    trial and I think it was that sentencing part.  I was

9    concerned about Mr. DeLozier because he didn't look good.

10   He had gotten really thin.  I think he was fasting during

11   the trial and he had gotten really skinny and he seemed

12   kind of cowed and intimidated by the prosecutor.

13          And I said to Dan after court one day:  Can't you

14   do something?  Can't you step in and do that part because

15   I think David is in over his head?

16          And he said that there had to be a division of

17   labor.  There had to be two lawyers and there had to be a

18   division of labor.  So he had to let David do something is

19   what I remember him saying.

20          MS. FOX:  Okay.  I have no further questions.

21   Thank you very much.

22          THE COURT:  Cross-examination.

23          MR. HAZARD:  Thank you.

24          May I approach the witness, Your Honor?

25          THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. HAZARD:

Q.   Ms. Schaider, I'm handing you Exhibit 85 which
has been admitted.  Let me turn your attention to it ends
up being the second page after the title Appendix 8.  Do
you recognize that letter?

A.   Yes.

Q.   What is that letter?

A.   It's a letter that I wrote on behalf of Donna and
Alejo when they were hoping to get custody of the
grandchildren.

Q.   Do you remember who that letter was addressed to?
It is to whom it may concern, but do you remember who was
going to view that letter?

A.   The Court, I would presume.

Q.   Is it possible, too, that it was the court
appointed psychologist, Dr. Yee, that was going to help
assist the family judge -- the family court judge decide
who should have visitation or guardianship rights to
Ms. Andriano's children?

A.   I don't remember.  I just remember it was going
into a court process.

Q.   All right.  And you knew a judge was going to
review this?

A.   Yes.

1    Q.    Were you honest in that letter?

2    A.    Yes.

3    Q.    Where in that letter do you call Alejo a drug

4    burnout?

5    A.    Nowhere.

6    Q.    Where in that letter do you call him sneaky or

7    refer to him as being sneaky?

8    A.    Nowhere.

9    Q.    Where in that letter do say that he set

10   inconsistent boundaries in the way that he disciplined

11   children in the church?

12   A.    Nowhere.

13   Q.    Where in that letter do you mention these

14   photographs that you apparently were aware of that Alejo

15   took of Ms. Andriano?

16   A.    Nowhere.

17   Q.    Turn the page to Page 2 at the top.  You write:

18   Nicholas stole the heart of everyone in our church family?

19   You wrote that?

20   A.    Yes.

21   Q.    Nicholas is Ms. Andriano's son?

22   A.    Yes.

23   Q.    Then you write:  We all watched and waited as he

24   took his first steps.  As the youngest child in our

25   fellowship, our hearts were tender towards him and pastor

1   frequently allowed him to wander the sanctuary visiting

2   with each of us during the service.  You wrote that;

3   correct?

4       A.   Yes.

5       Q.   Now were you talking about the good pastor or the

6   bad pastor there?  This is 2001.

7       A.   I'm sorry.  I don't understand the question.

8       Q.   Were you talking about the good pastor or the bad

9   pastor?

10          MS. FOX:  Objection.  I don't understand.

11          THE COURT:  Sustained.

12          Be more succinct.

13      Q.   BY MR. HAZARD:  Were you talking about

14   Pastor King?

15      A.   Yes, Pastor Tom King.

16      Q.   You don't mention anything about Pastor King

17   being evil or inappropriate there; correct?

18      A.   No.  I didn't call him evil or inappropriate

19   today either.

20      Q.   All right.  In this letter, you give glowing

21   praise to Donna and Alejo Ochoa; do you not?

22      A.   Yes, I do in this letter.

23      Q.   You talked about -- you wrote Alejo and Donna

24   have always been very dedicated to helping and supporting

25   the children and adolescents in our church fellowship,

1  and, in fact, Alejo is even a pastor there; correct?  You

2  wrote that?

3      *A.*    I wrote that.

4      *Q.*    I worked alongside of him for several years

5  during the 1980's in the children's church.  You wrote

6  that; correct?

7      *A.*    I wrote that.

8      *Q.*    I found them to be very relaxed with the

9  children, able to set appropriate limits for behavior, yet

10  be playful with them.  Are you talking about Alejo and

11  Donna there in that context?

12      *A.*    In that letter, at that time, yes, I was.

13      *Q.*    The children were drawn to them and enjoyed their

14  company?  You wrote that?

15      *A.*    Let me go back.  Yes, that's what I wrote.

16      *Q.*    They use every opportunity to instruct them in

17  appropriate moral values.  You wrote that?

18      *A.*    Yes, I wrote that.

19      *Q.*    You also -- one, two, three, four, five, six

20  paragraphs down on that same page, you start discussing

21  Brandon Ochoa and how wonderful Alejo and Donna were in

22  helping to positively change Brandon Ochoa's life;

23  correct?

24      *A.*    No, that's not precisely what it says, sir.

25      *Q.*    All right.  I will read precisely what you said

1  for the sake of accuracy.  Brandon had been living in

2  deplorable conditions with his natural mother, Donna's

3  sister, and they again opened their hearts and home to a

4  child.  And you're referring to they as Alejo and Donna

5  Ochoa; correct?

6     *A.*   Yes.

7     *Q.*   Growing up in a drug abusing home with a constant

8  stream of men in and out of his mother's life, Brandon

9  came with a great deal of emotional baggage.  I watched

10 the Ochoas patiently and lovingly work with him to feel

11 accepted and loved by who Brandon now calls his mom and

12 dad.  That's what you wrote?

13    *A.*   That is what I wrote.

14    *Q.*   And, again, you wrote this knowing -- on July 18,

15 2001, knowing that a judge was going to consider this in

16 deciding whether the Ochoas were appropriate parental

17 figures for Nicholas and Ashlee, Ms. Andriano's children;

18 correct?

19    *A.*   Yes.

20    *Q.*   You mention that you wrote and assisted

21 Mr. DeLozier in his opening statement and closing argument

22 in what you deemed or what counsel called the sentencing

23 phase; correct?

24    *A.*   Yes.

25    *Q.*   And as I understand your testimony, you were

1  talking about -- can you tell me exactly where in the

2  penalty phase this took place, to your memory?

3      *A.*   If I understand the penalty phase right, there's

4  the aggravating part and the mitigating part.  And I

5  remember it being toward the end of the -- the beginning

6  of the mitigating part and the end of the mitigating part.

7      *Q.*   All right.  And you mentioned in your direct

8  testimony, that after the mitigation had been presented,

9  for closing argument, you assisted Mr. DeLozier in writing

10  that closing argument; correct?

11     *A.*   No.  I wrote up several pages of material and

12  gave it to him.  And he used it for much of his closing

13  argument.

14     *Q.*   On which day because you mentioned that the

15  closing argument was split into two different days, an

16  opening close and a rebuttal close; correct?

17     *A.*   I don't know.

18     *Q.*   You don't know what he used in which phase?

19     *A.*   No, I don't.

20     *Q.*   I assume that you're not -- you don't have

21  psychic powers or can't read minds; correct?  Is that

22  correct?

23     *A.*   That is correct.

24     *Q.*   All right.  And so if there is anything in

25  Mr. DeLozier's rebuttal closing argument that was in

1  response to Mr. Martinez's arguments made just minutes

2  before, you would not have been able to anticipate those;

3  correct, and write those?

4      A.   No.  I don't really understand your question or

5  what you're trying to get at.

6      Q.   When you wrote -- whatever you wrote to

7  Mr. DeLozier, did you write in anticipation of what

8  Mr. Martinez was going to argue?

9      A.   No.  I wrote -- what I wrote down was what I

10  thought I would want the jury to know and understand.

11          MR. HAZARD:  No further questions.

12          THE COURT:  Redirect?

13          MS. FOX:  No.  Thank you, Your Honor.

14          THE COURT:  May this witness be excused?

15          MS. FOX:  Yes.

16          THE COURT:  Thank you very much.  You're excused.

17  Don't walk off with any of the exhibits.  Okay?

18          THE WITNESS:  I won't.

19          THE COURT:  Okay.  Thank you.

20          Is that it for today?

21          MR. ARNTSEN:  That's it for today.

22          THE COURT:  Let me ask counsel, just with

23  regards, to my recollection, I think tomorrow you

24  indicated to me on Friday that Mr. Hammond and

25  Mr. Lowenthal will be testifying?

1        MR. ARNTSEN:  Right.  And that will be the end of

2    our case.

3        THE COURT:  That's Tuesday.  What are we looking

4    at on Wednesday?

5        MR. ARNTSEN:  I believe -- I mean, I suppose it's

6    possible they won't get quite done tomorrow.

7        THE COURT:  Right.

8        MR. ARNTSEN:  But that's it.  We're done.

9        The State can talk about what they've got going.

10       THE COURT:  Mr. Hazard.

11       MR. HAZARD:  Judge, Friday, the 14th, is when

12   Dr. Pitt and Dr. Amin are available.  I contacted them on

13   the weekend, but they did not get back to me to see if

14   they were available earlier.

15       Based on my previous conversations, they aren't.

16   The 14th, they're locked in.  But we have no other

17   witnesses we intend to call.

18       THE COURT:  But we're going to be able to finish

19   on the 14th?

20       MR. HAZARD:  Yes.

21       MR. ARNTSEN:  Yes.

22       THE COURT:  So tomorrow we're going to have

23   Mr. Hammond and Mr. Lowenthal and it may go into

24   Wednesday.  But we're probably going to recess early on

25   Wednesday and not have anything on Thursday.  Is that what

1   I hear?

2          MR. HAZARD:  That is correct.

3          MR. ARNTSEN:  That's correct.  Your Honor, just

4   as kind of a logistics matter, for whatever days, if we're

5   not going to be here for a whole day, one thing we would

6   ask the Court to communicate that to the jail, so that

7   Ms. Andriano isn't hauled over here.

8          THE COURT:  Right.  Then, so each day, we will

9   make sure that we're all on the same page.  Okay?

10          MR. ARNTSEN:  Right.

11          THE COURT:  Okay.  Anything further before we

12   take our evening recess?

13          MR. ARNTSEN:  No, Your Honor.

14          THE COURT:  Okay.  Thank you very much.  Everyone

15   have a nice evening.  We will be in recess until tomorrow

16   at 9:30 a.m.

17          (WHEREUPON, the proceedings were concluded at

18   3:47 p.m.)

19                    *  *  *  *  *  *  *

20

21

22

23

24

25

1

2

3

4

5

6

7                    C E R T I F I C A T E

8

9

10        I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11   the State of Arizona, do hereby certify that the foregoing

12   187 pages constitute a full, true, and accurate transcript

13   of the proceedings had in the foregoing matter, all done

14   to the best of my skill and ability.

15        SIGNED and dated this 12th day of April, 2014.

16

17

18                   /s/  Renée A. Mobley, RPR

19                   RENÉE A. MOBLEY, RPR

20                   Certified Reporter

21                   Certificate No. 50500

22

23

24

25

1

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

STATE OF ARIZONA,                )
                                 )
        Respondent,              )
                                 )
vs.                              )   No.
                                 )   CR 2000-096032 A
WENDI ELIZABETH ANDRIANO,        )
                                 )
        Petitioner.              )
_____ )


Phoenix, Arizona
February 11, 2014
9:32 a.m.


BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS


EVIDENTIARY HEARING

DAY 7


Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                          (COPY)

2

1                    A P P E A R A N C E S

2

3

4   On Behalf of the State:

5           Mr. Gregory Hazard
            Assistant Attorney General
6
            Ms. Lacey Gard
7           Assistant Attorney General

8
    On Behalf of the Defendant:
9
            ATTORNEYS AT LAW:
10
            Mr. Scott Bennett
11          Mr. Allen Arntsen
            Mr. Stephan Nickels
12          Mr. Matthew Lynch
            Ms. Krista Sterken
13          Ms. Jodi Fox

14

15                      I N D E X

16                  T E S T I M O N Y

17

18  WITNESS:                                      PAGE

19
    LARRY A. HAMMOND
20
            Direct Examination by Mr. Arntsen        5
21          Cross-Examination by Ms. Gard           91
            Redirect Examination by Mr. Arntsen    108
22

23  GARY LOWENTHAL

24          Direct Examination by Ms. Sterken      112
            Cross-Examination by Ms. Gard          176
25

3

1                    P R O C E E D I N G S

2

3          THE COURT:  Good morning.  This is

4    CR 2000-096032, State of Arizona vs. Wendi Elizabeth

5    Andriano.

6          The record will reflect the presence of the

7    parties and counsel.

8          Are there any matters we need to discuss before

9    we proceed?

10         MR. BENNETT:  Quickly, Your Honor, we have two

11   exhibits to move into evidence, 232 and 233, certified

12   copies of the minute entries reflecting the convictions

13   and sentences of Skip and Tommy Robertson, Wendi's

14   biological father and uncle, for sexual offenses related

15   to children.

16         THE COURT:  Any objection?

17         MS. GARD:  No, Your Honor.

18         THE COURT:  Exhibit Nos. 232 and 233 for

19   identification are admitted into evidence.

20         The Petitioner may call her next witness.

21         MR. ARNTSEN:  Larry Hammond.

22         THE COURT:  Mr. Hammond, if you would please step

23   forward here.  Please face the clerk.  Raise your right

24   hand and she will swear you in.

25         THE CLERK:  Could you please state your name and

4

1    spell your name for the record, please?

2         THE WITNESS:  Larry A. Hammond, H-A-M-M-O-N-D.

3         THE CLERK:  Thank you.

4         (WHEREUPON, the witness was duly sworn by the

5    clerk.)

6         THE COURT:  Please make yourself comfortable

7    there on the witness stand.  And you've been in court many

8    times, Mr. Hammond.  So I'll just remind you to speak up

9    so that everyone can hear you.  Okay?

10        THE WITNESS:  I'll try to.  May I get some water?

11        THE COURT:  Sure.

12        Is it going to be Mr. Arntsen?

13        MR. ARNTSEN:  Yes, Your Honor.

14        MS. GARD:  Your Honor, before we begin, can I

15   just note for the record my continuing objection on

16   relevance grounds to Mr. Hammond's testimony.

17        THE COURT:  Okay.  We will note that.

18        MS. GARD:  Thank you.

19        THE COURT:  And go ahead and state your full name

20   for the record, Mr. Hammond.

21        THE WITNESS:  Larry A. Hammond,

22   H-A-M-M-O-N-D.

23        THE COURT:  Mr. Arntsen, you may proceed.

24        MR. ARNTSEN:  Thank you.

25

1                        LARRY A. HAMMOND,

2    having been first duly sworn to tell the truth, the whole

3    truth, and nothing but the truth, testified as follows:

4

5                        DIRECT EXAMINATION

6    BY MR. ARNTSEN:

7        Q.    What's your profession, Mr. Hammond?

8        A.    I'm a criminal defense lawyer.

9        Q.    And how long have you been engaged in the defense

10   of capital litigation?

11       A.    I've been continuously engaged in one form or

12   another of capital work since 1981.

13       Q.    We will go back over your qualifications in just

14   a minute.  But can you summarize the opinions that you are

15   offering today?

16       A.    Yes.  My opinions that I've been asked to present

17   here today deal with the development and presentation of

18   the mitigation case or the Phase 3 case.

19       Q.    And what are those opinions?

20       A.    My primary opinions are that the group of defense

21   lawyers and others who worked with them were not properly

22   qualified and organized to serve the function of capital

23   defense counsel.

24              I also am concerned about the lack of appropriate

25   investigation from the outset of this case.  I think those

1  are the primary areas of my testimony.

2     *Q.*    And you frame it in terms of concern.  Is it your

3  opinion that this was constitutionally ineffective

4  representation of Ms. Andriano at the penalty phase?

5     *A.*    Yes, I do.

6     *Q.*    Thank you.  Let's go to your qualifications.  If

7  you would take a look in the white binder there.  Take a

8  look at Exhibit 1.  Is that the report that you prepared

9  in this matter?

10    *A.*    Yes, it is.

11    *Q.*    And is there a curriculum vitae attached to that

12  report?

13    *A.*    Yes, there is.

14    *Q.*    Let's just give the judge a minute to --

15         THE COURT:  Thank you.

16    *Q.*    BY MR. ARNTSEN:  And approximately what is the

17  date of that CV?

18    *A.*    I think the one that you have was last updated at

19  the very beginning of 2012.

20    *Q.*    And in terms of items that would be on your

21  current CV that aren't on the CV attached to Exhibit 1,

22  are there some other things that would be there?

23    *A.*    Well, I thought about this a little bit.  There

24  are three things I might mention that occurred after this

25  CV was written.

1       In the year 2012, I was inducted into the
2  American College of Trial Lawyers.  I take some special
3  pleasure in that because I'm one of the few criminal
4  defense lawyers in Arizona to have been inducted.  It is
5  primarily civil lawyers who are taken into that
6  organization.
7       In 2013, I received the award from the American
8  Bar Association Litigation Section for lifetime
9  achievement in my work in criminal defense and capital
10  defense known as the John Minor Wisdom Award.
11       In the summer of 2013, I was awarded the Arizona
12  State Bar's award for lifetime achievement as a criminal
13  defense lawyer.
14  *Q.*   And so, with those additions, would the CV
15  attached as Exhibit 1 be complete and accurate as to
16  substantial items in your career and resumé?
17  *A.*   Yes, I'm pretty sure it is.
18  *Q.*   Now what I want to do is just take you through
19  your history and involvement in capital case defense.
20  Let's just take it through and start it chronologically.
21  I believe we're talking at the start, that you were a law
22  clerk?
23  *A.*   I graduated from law school in 1970.  In 1971 and
24  '72, I served as a law clerk for Lewis Powell on the
25  Supreme Court.  That was really my first exposure to

1   capital work.  I was assigned to work with Justice Powell

2   on his opinion in *Furman v. Georgia*.

3       *Q.*   Just going back for just a minute, had you

4   clerked for a Supreme Court Justice before Justice Powell?

5       *A.*   Yes.  I was the last law clerk for Justice Hugo

6   Black.

7       *Q.*   But you didn't have any involvement in death

8   penalty matters as part of that clerkship?

9       *A.*   Not that I remember.

10      *Q.*   I apologize for interrupting.

11      *A.*   So I spent six months in late '71 and early '72

12  working almost full-time on the preparation of what became

13  Justice Powell's dissent in affirmance and that was my

14  real exposure to the death penalty.

15          I then did other things for a while.  And when

16  Jimmy Carter was elected, I went to become the deputy in

17  the Office of Legal Counsel.  And during the course of

18  that four years, I was asked to head up a team of people

19  do a White Paper on the state of the death penalty in the

20  United States, both at the federal level and the state

21  level, so that other the president and his advisors could

22  have as complete a picture as possible with the death

23  penalty world in the late 1970's.

24      *Q.*   Now let's turn to your actual practice involving

25  capital litigation.  And, again, if you would just start

1  at chronologically and we will move forward until either

2  someone objects or a chronological change in time.

3      *A.*   Well, I'll try to be a little quick about this.

4  I returned to my law firm here in Arizona in 1981.  I

5  began immediately doing a capital case in that year, a

6  case for a man named John Henry Knapp.

7          I then was involved in one way or another in

8  death penalty work for every time since then.  I've never

9  had a time in the last now 33 or 34 years in which I have

10  not been engaged in representation or consulting on

11  capital cases.

12      *Q.*   You had said your initial case was for John Henry

13  Knapp.  I know that earlier in this case, there have been

14  some references to Knapp counsel.  Is Mr. Knapp the name

15  sake of that concept?

16      *A.*   He is.  His case went to the Supreme Court

17  several years before I was appointed to represent him on

18  the question of whether a defendant could have the

19  assistance of counsel paid for by a third party without

20  disrupting his right to have a public defender.

21      *Q.*   Over what period of time did you represent

22  Mr. Knapp?

23      *A.*   From 1981 until 1992.  11 years.

24      *Q.*   Have you been lead counsel in capital cases?

25      *A.*   Yes.  I've been lead counsel in a number of

1   capital cases.  Three of them have gone to jury trials.
2   But I have been lead counsel in a good many that did not.
3       *Q.*   Any sense as to how many a good many is?
4       *A.*   Well, I was appointed in eight federal death
5   penalty cases in the southwest as what is known as learned
6   counsel as, which is the first chair role I've heard
7   talked about in this proceeding.  Those cases were in
8   Arizona and New Mexico, Nevada and California.
9           I also have been Knapp counsel for two death
10  penalty cases that I did in conjunction with the Office of
11  the Legal Defender here, the second public defender
12  office.
13      *Q.*   Can you tell us something about those cases?
14  When were they?
15      *A.*   Those cases were death penalty cases that were
16  brought in I think in 1999 and 2000.  One of them involved
17  a woman named Valerie Pape who was accused of killing her
18  husband.  The other one was a man named Paul Pilipow, a
19  Canadian who was charged with murdering a 74-year-old
20  woman and burning her.
21      *Q.*   How did you become to be Knapp counsel in those
22  cases?
23      *A.*   We agreed -- my colleagues and I in the law firm
24  agreed to become Knapp counsel with the legal defender's
25  office on a pro bono basis as a way to help deepen our

1  collective understanding of the importance of team work in

2  capital cases.  The Office of Legal Defender had some very

3  competent experienced lawyers, but we thought and they

4  thought that it might be useful to bring some of the

5  expertise that lawyers in a private firm might have with

6  witnesses and experts and things of that sort.  So we

7  partnered in that.

8      *Q.*    So when you say we, were other lawyers in your

9  firm also working in this Knapp counsel basis --

10     *A.*    Yes.

11     *Q.*    -- with you on this?

12     *A.*    Yes.  I was the lawyer primarily responsible in n

13  my firm.  But one of my partners, John Stookey, was my

14  primary colleagues, among others.

15     *Q.*    And because of your and Attorney Stookey's

16  involvement in that case, did you supplant anyone from the

17  Office of Legal Defender's staffing of the case.

18     *A.*    No, quite decidedly not.  In both cases, the

19  Office of Legal Defender had two lawyers assigned to the

20  case.  They had their own mitigation specialist and they

21  had access to such other mental health consultants as

22  proved to be necessary in cases.

23     *Q.*    Over what period of time was this Knapp counsel

24  service on the Pape and Pilipow cases?

25     *A.*    I would say a couple, three years overall from

1   probably 1999 until sometime in 2002.

2       *Q.*   And you mentioned a team concept.  Tell us how

3   the team functioned in those cases.

4       *A.*   Well, the team functioned the way we have seen

5   teams function in virtually all of the capital cases that

6   I've been involved in.  We have operated from some very

7   basic principles that are now set forth in guidelines that

8   I know you've talked about some in this case.  But we had

9   regular team meetings.

10      *Q.*   By regular, what intervals, just a ballpark?

11      *A.*   Almost always weekly.  There was sometimes when

12  we couldn't, but, generally, we tried to meet with all of

13  the team or at least so much of it as was available.

14      *Q.*   Who was the team comprised of?

15      *A.*   The teams in those cases and in all of my federal

16  death penalty cases consisted of at least two other

17  lawyers in addition to myself in those cases.  In both

18  cases, it turned out that both of those lawyers had in

19  fact tried other capital cases.  But we had a mitigation

20  specialist, someone with training in developing the

21  mitigation case.  And then we brought in as necessary

22  consultants on mental health issues.

23      *Q.*   And what were the resolutions of the Pape and

24  Pilipow cases?

25      *A.*   Both of those cases resulted in successful plea

1   arrangements.  Ms. Pape was sentenced to second degree

2   murder and a 16-year sentence.  And Mr. Pilipow was given

3   a life sentence.

4       Q.   But when you began your involvement, those were

5   capital cases?

6       A.   They most decidedly were.  They were both very

7   high profile and cases that on the surface, one would

8   think might very well remain capital cases.

9       Q.   In addition to your service as counsel in capital

10  cases, have you been appointed as experts in

11  ineffective -- in proceedings relating to capital cases?

12      A.   Yes, I've been appointed many times.  I'm not

13  sure of the precise number.  I've testified as an expert

14  on the effectiveness of counsel in six cases.

15           And I think, by the way, Mr. Arntsen, my resumé

16  may say four, but there have been two more in the last

17  year and-a-half.

18      Q.   And on each of the cases that you have testified,

19  was it your opinion that there was ineffective assistance

20  of counsel?

21      A.   Yes.

22      Q.   Let's talk about the cases that you haven't

23  testified.  What's the magnitude we're looking at there in

24  terms of either cases you were appointed or cases that you

25  reviewed?

1    *A.*    Well, that's really almost impossible for me to

2    give you an accurate number.  But I have been involved in

3    looking at questions of ineffective assistance of counsel

4    in capital cases for at least since 1989.  Often on a

5    consulting basis.  But in noncapital cases, I have been

6    primarily responsible for reviewing ineffective assistance

7    of counsel claims on behalf of the Arizona Justice Project

8    in many hundreds of cases.

9    *Q.*    In those cases, you review them and provide your

10   opinion as to whether there was a viable IAC claim?

11   *A.*    I either have provided an opinion or have

12   consulted with other lawyers about why I thought that the

13   conduct of counsel didn't fall below the constitutional

14   requirements.

15   *Q.*    You talked about that you looked at hundreds of

16   cases, and I understand it's impossible to come up with

17   any exact percentages.  But can you explain just sort of

18   where you came out in the bulk of those cases that you

19   reviewed?

20   *A.*    With the bulk of them were cases in which either

21   the performance of counsel did meet constitutional norms

22   or there was -- and this happened in a huge number of

23   cases -- reconsideration of the case was barred --

24   precluded by the laws and statutes.

25   *Q.*    You've also represented lawyers who had been

15

1   found to have been ineffective in providing counsel in

2   subsequent proceedings?

3       A.   Yes, several times.  And the two that I recall

4   where lawyers -- Bar complaints had been filed against

5   lawyers by the attorney general's office for conceding

6   that had been constitutionally effective.

7       Q.   Now I want to turn towards your work in this

8   case.  What materials did you review?  And you may want to

9   take a look at your report and I call your attention to

10  Paragraphs 21 and 22.  Although, that may help refresh

11  your recollection, but this isn't a memory test.

12      A.   Thank you.  I did review the materials listed in

13  Paragraph 21.  Since then, I have reviewed a good number

14  of reports and documents related to the case.

15      Q.   Have you reviewed the filings, the petition,

16  response and reply?

17      A.   Yes, absolutely.

18      Q.   Have you reviewed Mr. Rohman's report?

19      A.   Yes, I reviewed Keith Rohman's report.  And there

20  were reports of -- I don't know if they're mentioned

21  here -- but Dr. Woods and Dr. Hopper.

22      Q.   Did you review the report of Dr. James?

23      A.   Yes, I did.  Thank you.

24      Q.   Did you review transcripts of interviews of

25  Attorneys Patterson and DeLozier?

1    *A.*    Yes, I did.

2    *Q.*    Did you review various declarations that were

3    submitted in this matter?

4    *A.*    Yes, I did.

5    *Q.*    Did you review the reports of the State's

6    experts, Drs. Pitt and Amin?

7    *A.*    Yes, I did.  I read both of those reports and I

8    also reviewed or I viewed a portion of the recorded

9    interview of Ms. Andriano.

10    *Q.*    And then, finally, you were here during the

11    testimony of Attorneys Patterson and DeLozier; correct?

12    *A.*    Yes, I was.

13    *Q.*    Want I want to turn to now is the standard of

14    practice for capital defense counsel in the 2000 through

15    2004 period, which is the period of time between

16    Ms. Andriano's arrest and conviction.

17         First of all, can you explain to the Court the

18    difference between a custom and a standard of care?

19    *A.*    Well, I think it's important to address that

20    question.  The standard of care is what should be seen as

21    an objective guide to the performance of lawyers who do

22    capital cases and do them proficiently.

23         There are certainly habits and customs that have

24    developed among lawyers here in Arizona and elsewhere that

25    may have been in the realm of what lawyers do, but those

1  are not part of the standard of care.  Or stated

2  differently, just because some lawyers do the same thing

3  over and over again, it doesn't make it the standard of

4  care for doing capital work.

5       Q.    Are you knowledgeable about the standard of care

6  for capital defense counsel?  And, again, just so I don't

7  avoid repeating it all the time, but I'm talking about in

8  connection with the penalty phase of a capital case --

9       A.    Yes.

10      Q.    -- in the 2000 through 2004 period.  And, also,

11  just so I don't keep repeating it over and over again,

12  that's the time period we're talking about.  Okay?

13      A.    I believe so.  Yes, I understand.

14      Q.    So are you familiar with the standard of care?

15      A.    I believe I am.

16      Q.    What is the basis for that familiarity?

17      A.    Well, in addition to the specific things I

18  mentioned, I was one of the founding members of the

19  Arizona Capital Representation Project in 1989.  That

20  project, which I helped create and staff, was designed to

21  be a resource for lawyers undertaking capital cases --

22  lawyers and others -- to provide a kind of a ready

23  reference to the existing cases and what was happening in

24  those cases to keep up with changes in the literature,

25  court decisions.  And that project continues today and

1    I've remained on the board throughout the existence of

2    that project.

3             In addition, in 1995, I was appointed by the

4    State Bar to be the chair of what is known as the Indigent

5    Defense Task Force.  It is a task force created by the Bar

6    to essentially explore and help understand the world of

7    indigent representation generally, but our focus

8    primarily, particularly in the first decade, was on

9    indigent defense in capital cases.

10    Q.    Were you also involved in any academic work

11    related to capital defense?

12    A.    Yes, I have taught the death penalty course at

13    the Arizona State College of Law.  And I have taught in

14    the undergraduate school at Arizona State a death penalty

15    class that was actually very much like the one we did at

16    the law school.

17    Q.    Any other teaching in the death penalty area?

18    A.    Yes.  I have very recently in 2008 -- I spent a

19    semester at the Elon University Law School in North

20    Carolina and taught a course then that involved the

21    indigent defense of capital case.

22    Q.    Would you take a look at Exhibit No. 76, which

23    has already been received into evidence?

24    A.    Did you say 76?

25    Q.    76.

19

1    *A.*    Yes.

2    *Q.*    What is that?

3    *A.*    That is the 2003 ABA Death Penalty Guidelines.

4    *Q.*    Are you familiar with this document?

5    *A.*    Yes.

6    *Q.*    Are you familiar with the process that resulted

7    in the creation of this document?

8    *A.*    Yes.  I had been involved in both through the

9    State Bar and directly with the ABA in the process of

10   creating these guidelines to amend and update the

11   guidelines that had been issued by the American Bar

12   Association in 1989.

13   *Q.*    So, as I understand your answer, there were some

14   guidelines issued by the American Bar Association in this

15   area in 1989, and then those were updated that resulted in

16   the 2003 document; correct?

17   *A.*    Yes.  And I think more accurately, I should have

18   said it was a collaborative effort between the ABA and the

19   National Criminal Defense Lawyer and Indigent Defense

20   Lawyer organizations.

21   *Q.*    Looking at the guidelines -- you were here during

22   Attorney Patterson's testimony where he referred to some

23   kind of related to the guidelines being aspirational.  Do

24   you remember that?

25   *A.*    Well, I know there was a little colloquy about

1  that.

2      *Q.*    And are the guidelines aspirational?

3      *A.*    No, they are not.  And the guidelines themselves

4  very clearly state at the outset -- I looked at it

5  again -- it's Page 2 of the guidelines that they are not

6  aspirational.  They reflect norms that existed before 2003

7  and are compiled here.

8          There is one sense in which I would say you could

9  use the word aspirational.  Maybe this goes back to your

10 question about customs.  The very large number of people

11 who worked on this report did have the hope that all

12 lawyers would aspire to do better, and giving them a set

13 of guidelines to work with, would assist in that effort.

14 So, to that extent, I certainly accept the idea that all

15 guidelines are aspirational.

16     *Q.*    And just so the record is clear, could you turn

17 to Page No. 2 or PCR 402 of Exhibit 76 with regard to the

18 aspirational sentence that you were referring to.  And I

19 believe what it is is it's the second sentence under the

20 heading History of the Guidelines; is that correct?

21     *A.*    Yes.

22     *Q.*    And I'll just read it just kind of the last

23 clause of that sentence:  These guidelines are not

24 aspirational.  Is that what is set forth there?

25     *A.*    Yes.  And I think the next sentence is also

1   important.  Instead they embody the current consensus

2   about what is required to provide effective defense

3   representation in capital cases.

4       *Q.*   Thank you.  Now have the guidelines been codified

5   or referenced by rule in Arizona?

6       *A.*   Yes.  In 2005, the Arizona Criminal Rules were

7   amended.  The rule specifically known as Rule 6 E, that

8   governs the qualifications required of death penalty

9   lawyers.  That provision was amended to refer specifically

10   to the guidelines and to say that lawyers -- all lawyers

11   undertaking capital cases must be familiar with and guided

12   by the performance guidelines in the ABA document.

13       *Q.*   That Arizona amendment of rules, is that

14   something that was typically undertaken in the various

15   states resulting from the promulgation of the guidelines?

16       *A.*   No.  And I'm not sure about this, but I at one

17   time understood that Arizona was the only state that had

18   actually changed a criminal rule to refer specifically to

19   the guidelines, but I could be wrong.  Maybe it's happened

20   -- it's happened elsewhere.  But we thought it was very

21   important to put that provision in the Arizona rules.

22       *Q.*   And were you involved in that process to

23   reference the guidelines in the rules?

24       *A.*   Yes.  I was the principle petitioner on behalf of

25   the State Bar Indigent Defense Task Force.

1    *Q.*    And was the exact language of the rule the
2    subject of some debate?

3    *A.*    Yes.   That there was a fair amount of response
4    and some open opposition to the rule over about a
5    six-month period of comments and responses.   All of our
6    rules are adopted eventually by the Arizona Supreme Court.
7    But so there is a process whereby anyone who has an
8    interest can express their concern.

9    *Q.*    What was the nature of the opposition and
10   resolution of the language issues?

11   *A.*    Well, as I look back on that, the most
12   significant argument made and often made by prosecutors
13   was that the rule change was unnecessary because lawyers
14   doing capital cases were already and had for a long time
15   been complying with them.   So why have a provision in the
16   rule that would require it?

17          There were also several judges who also filed a
18   statement.   Their document is referred to as the report of
19   some judges.   And those judges I think expressed some
20   concern that the guidelines would in some way become a
21   straightjacket on the performance of lawyers doing
22   capital cases.

23   *Q.*    And were those various concerns ultimately
24   reflected in the ultimate language of the rule?

25   *A.*    Oh, I think that they are.   There was an

1   amendment process that ended with what you now see in the

2   rule that requires lawyers to be both familiar with and

3   guided by.

4          At one time, the proposed rule also referred

5   specifically to what are called the performance

6   guidelines, which are in Part 10 of these guidelines.

7   That specific reference was deleted and replaced by the

8   notion that lawyers would be guided by the entire

9   documents.

10   *Q.*   And we'll get to some specific guidelines

11   applicable to this matter in just a minute.  But, first, I

12   would like to talk for just a minute on the *Ring* case --

13   and which, again, Attorney Patterson discussed in some

14   detail -- and its impact on penalty phase capital defense.

15   *A.*   It's hard for me to talk about *Ring* in one

16   minute.  Timothy Ring was my client.  I was asked by the

17   Office of the Federal Public Defender to represent Tim

18   Ring and to seek review in the United States Supreme Court

19   of an Arizona Supreme Court decision, which had said that

20   juries need not be involved in fact-finding at sentencing.

21   The cert was granted by the Supreme Court.  My partner,

22   Andy Hurwitz, argued it.  And the case resulted in the

23   reversal of the Arizona Supreme Court and the reversal of

24   other United States Supreme Court cases.  It came down in

25   July -- June -- excuse me -- of 2002.

1    *Q.*   And as a result of the -- did the *Ring* decision

2    again prompt some changes in Arizona Criminal Rules?

3    *A.*   Yes.  And it also resulted in a statutory change

4    that we heard some mention of with Mr. Patterson.  The

5    legislature then developed its own statutory mechanism for

6    the penalty phases of capital cases.

7    *Q.*   Did the *Ring* decision and the resulting statutory

8    changes change the standard of care for capital defense in

9    penalty cases?

10   *A.*   No.  And I think this is very important.  *Ring*

11   did not change the standard of care in Arizona or in any

12   of the other -- there were eight states that had laws

13   similar to Arizona of the 38 states that had the death

14   penalty at the time.

15          It certainly changed the process.  It required

16   the development of presentation skills that might not

17   always come naturally to lawyers.  But it certainly didn't

18   change the basic standards.

19   *Q.*   And I believe you may recall Attorney Patterson

20   stated that it was -- I'm loosely paraphrasing -- but it

21   was generally his practice in capital cases before *Ring* to

22   focus on the Phase 1 guilt phase, and then if there was a

23   guilty verdict, then turn to mitigation because you had

24   time to do -- you know, you would be granted time to do

25   so.  And he typically -- and there were some differences

1 between focusing the penalty arguments on the judge rather

2 than the jury.  Do you recall that testimony?

3     *A.*    Yes.  And I think it was in that context, if I

4 recall correctly, that Mr. Patterson used the word custom.

5 That was, as he described it, his understanding of the

6 custom.

7          I quarrel with the idea that it was the custom.

8 But the basic idea of capital defense before *Ring* was that

9 you need to develop the whole case from the outset and you

10 need to have a functioning team from the outset.  The idea

11 that you could put aside all consideration of the life and

12 experience of the offender and focus just on the offense

13 was never the standard of care.

14     *Q.*    And even prior to *Ring*, was there a substantial

15 practice, and even in this general area, relating to

16 jury -- you know, defensive cases regarding jury

17 sentencing?

18     *A.*    Yes.  And that one of the jury involvement in

19 fact-finding and sentencing was the norm across the

20 United States.  All of our sister states had jury

21 involvement in sentencing.  California, which has over 700

22 people on death row, had it.  New Mexico, Nevada and, of

23 course, at the federal level all of those cases had direct

24 jury involvement in sentencing.

25     *Q.*    So, similarly, you talk about the various capital

1   defense groups.  Even during the *pre-Ring* period, were

2   there a lot of educational programs, seminars, that sort

3   of thing that addressed issues related to presenting

4   penalty issues to juries?

5        *A.*   Yes.  And many of the lawyers in all of our

6   public defender offices participated often as presenters

7   in those conferences.  But there are some very famous

8   ones.  There was a conference called Life in the Balance

9   that was administered every year certainly all the way

10  through the 1990's.

11           There were, as I mentioned earlier, the

12  establishment of the resource centers both here in Arizona

13  and in 20 other states to do exactly this:  To provide the

14  training, to provide the opportunity for people to gather

15  information and share use.  All of that was going on well

16  in the 80's.  I mean, or really from 1978 forward, we

17  began to see a great increase in this kind of educational

18  opportunity.

19       *Q.*   And so, just as a summary, is it your opinion

20  that the ABA Guidelines set forth the standard of care for

21  capital case defense in the 2000 through 2004 period?

22       *A.*   Yes.  They reflect a standard of care that

23  existed at that time and before.

24       *Q.*   And are you also familiar with a 2008

25  Supplemental Guideline?

1     *A.*   Yes.

2     *Q.*   And I'll reference to you they're Exhibit 206.
3  You don't need to look at them.  I'm not going to go into
4  detail.  But did they change anything or just can you
5  explain what they were about?

6     *A.*   Those guidelines are known as the Supplemental
7  Mitigation Guidelines.  The idea behind those guidelines
8  was to focus in more detail on how the mitigation function
9  works, to look at some of the difficulties inherent in
10  conducting an appropriate mitigation investigation and
11  presentation.  So that's what those guidelines do.  And I
12  think they have been very helpful.

13     *Q.*   Now, again, in his testimony last Friday,
14  Attorney Patterson at times appeared to be somewhat
15  equivocal in terms of whether the guidelines -- with the
16  guidelines as to what his practice should be measured by.

17         MS. GARD:  I object to counsel's characterization
18  of Mr. Patterson's testimony.

19         MR. ARNTSEN:  That's fine.

20     *Q.*   BY MR. ARNTSEN:  If you would take a look
21  at Exhibit --

22         THE COURT:  I think you said last Friday.  He
23  testified on Monday.

24         MR. ARNTSEN:  I said Patterson.  It was last
25  Friday.  Dan Patterson.

1      THE COURT:  You mentioned, yes, Mr. Patterson.

2  I'm sorry.

3      MR. ARNTSEN:  I didn't mean to be testifying.  I

4  was just transitioning.

5      THE COURT:  Okay.

6      Q.   BY MR. ARNTSEN:  Can you take a look at

7  Exhibit 54, please.  What is this?

8      A.   Well, this a motion filed by Dan Patterson on the

9  19th of November, 2004.

10     Q.   And what's the subject of the motion?

11     A.   Well, he is asking for assistance from the Court

12  in his investigation of the mitigation case.

13     Q.   And we will get to this in more detail a little

14  later on, but is the timing of this motion significant?

15     A.   Well, it's stunning.  And I'm sure we can talk

16  about it in more detail.  But it clearly acknowledges and

17  embraces the idea that the guidelines are important for a

18  variety of reasons that he correctly summarizes here.

19     Q.   You see that Exhibit 54 is comprised of a

20  two-page motion and then I believe it's a three-page

21  Memorandum of Points and Authorities.  Do you see that?

22     A.   Yes.

23     Q.   And both of which are dated November 19th and

24  signed by Attorney Patterson?

25     A.   Correct.

1      *Q.*   Can you take a look at the first page of the

2      memorandum?  And it's PCR 299.  Really looking at the

3      second paragraph on that page, how is Attorney Patterson

4      representing the guidelines?

5      *A.*   Well, I mean, he says it I think correctly here

6      when he says that the investigation into the existence of

7      any mitigating circumstances must be conducted in

8      accordance with the recently revised guidelines.  And then

9      he cites the guidelines.  He cites what turns out to be I

10     think the same provision I spoke about earlier that says

11     that the guidelines are not simply aspirational.

12          And he cites a couple of very important Supreme

13     Court cases that have defined the role of capital lawyers,

14     but they are cases from 1978, 1982, cases that have been

15     around for a long time.  And then I think importantly, he

16     cites Wiggins, which at that time, had really I think just

17     come down --

18     *Q.*   And then turning --

19     *A.*   -- which also cited the guidelines.  Excuse me.

20     *Q.*   And then turning to the next page, PCR 300 or

21     Page 4 of the document, does he make some specific

22     statements with regard to the standard applicable to

23     penalty phase preparation?

24     *A.*   Yes, he does.  He says that as the guidelines, as

25     what I was referring to as the performance guidelines,

1  require is a thorough and independent investigation of all

2  issues relating to guilt and to penalty.

3           He correctly cites the Supreme Court opinion in

4  Wiggins for the idea that counsel must undertake efforts

5  to discover all reasonably available mitigating evidence

6  and information.

7     Q.   So is there any doubt in your mind, that

8  regardless of what he may have said in terms of his

9  custom, that Attorney Patterson recognized that the

10 guidelines governed his defense of Ms. Andriano in the

11 penalty phase of her case?

12          MS. GARD:  Objection.  Speculation.

13          THE COURT:  Sustained.

14    Q.   BY MR. ARNTSEN:  Now looking at the guidelines,

15 can you -- and it's Exhibit 76 again.

16    A.   Thank you.

17    Q.   I want to talk about your initial opinion

18 relating to the composition and functioning of the defense

19 team.  If you could turn to Guideline 4.1 at Page 28.

20    A.   Yes.

21    Q.   What is the standard with regard to the defense

22 team for capital cases?

23    A.   Well, I think that this part of the guidelines

24 accurately summarizes that you need to have at least a

25 two-lawyer team of people who are qualified to be doing

1  this work.  You need to have a specialist in mitigation

2  related work.  And then you need to be sure that you have

3  someone who has qualification and training in mental and

4  psychological issues.

5      Q.   Now I want to turn our attention to

6  Ms. Andriano's defense team.  I think I'll kind of go in

7  reverse order here.  Was there someone -- and I want to

8  turn to the person with training on mental health and

9  psychological issues.  Okay?

10         First of all, why is that important?  And if you

11  want to turn to Page 30 of the Exhibit 76.  And the last

12  paragraph on that page, that may reference it in terms of

13  the applicable standard.

14     A.   Well, I think this does summarize some of the

15  reason.  I mean, you obviously have to have someone who

16  has training and experience in dealing with psychological

17  and psychiatric impairments.

18     Q.   Why?

19     A.   It's critically important.  The truth is that

20  lawyers, first of all, with really few exceptions, aren't

21  trained in how to explore and develop and understand

22  someone's mental state.

23     Q.   And so --

24     A.   Sometimes we think we have that training, but we,

25  as lawyers, we're just not trained or experienced in the

1  same way that mental health professionals are.

2      Q.   Could you turn to the next page of the

3  guidelines?  And you see the first full paragraph?

4      A.   Yes.

5      Q.   Can you read that sentence?

6      A.   Yes.  Counsel's own observations of the client's

7  mental status, while necessary, can hardly be expected to

8  be sufficient to detect the array of conditions, and then

9  it lists them, that could be of critical importance.

10     Q.   And is one of the conditions listed

11 post-traumatic stress syndrome?

12     A.   It is.

13     Q.   Okay.  And in terms of involving the mental

14 health expert, at what stage in the process should the

15 mental health expert be involved in the team's activities?

16     A.   From as close to the beginning as counsel can do

17 it.  The process of developing and exploring mental state

18 issues really has to begin from the beginning.

19     Q.   And as to what aspects of the defense does the

20 mental health expert contribute to?

21     A.   Well --

22     Q.   Starting from the earliest through the trial?

23     A.   Yeah.  Well, first of all, there are very few

24 cases that don't involve mental state issues relevant to

25 the guilt or innocence side of the case.  But, also, as to

1    the mitigation side --

2        *Q.*    Which is what I want you to focus on.

3        *A.*    Yeah.  And the mitigation side of the case has to

4    be integrated and coordinated from the outset.  And when

5    you talk about there being a custom or a habit of not

6    investigating mitigation until after the verdict, that

7    simply is not what is done in capital cases.  You need to

8    know what the story is of the life history and the mental

9    challenges and experiences of the defendant as you're

10   developing your approach to the trial.

11       *Q.*    Can the mental health professional assist in

12   issue or theme identification for the defense?

13       *A.*    Yes.  And that's a very important part of the

14   job.

15       *Q.*    How about in terms of guiding the investigation

16   or providing investigation avenues?

17       *A.*    Yes.  And one of the reasons why it's critically

18   important to have very frequent meetings and communication

19   is that that's exactly what has to happen in capital

20   cases.  People have to talk to each other so that when

21   someone, who does have knowledge or concerns about the

22   mental state of the client, can tell you:  This is

23   something we need to explore.  We may need a different

24   mental health professional to explore in more detail or we

25   may need to deepen our fact investigation.

1    *Q.*    And this is probably the most straightforward.

2   Mental health professionals get involved in issues of

3   diagnosing conditions or the findings?

4    *A.*    Yes.  Quite obviously, yes.

5    *Q.*    And then how about presentation of the mitigation

6   case?

7    *A.*    And that's also very important.  And not just the

8   calling of an expert to testify, but building the

9   presentation and deciding who your witnesses are going to

10   be is a process that does require I think a fair amount of

11   learning and understanding.  And, again, particularly when

12   you're talking about jurors.  The understanding of mental

13   health issues, it's challenging.  And without the aid of a

14   trained professional or professionals, deciding how to

15   present that would be very difficult.

16    *Q.*    Did Ms. Andriano's defense team contain at least

17   one member qualified by training and experience to screen

18   individuals for the presence of mental or psychological

19   disorders or impairments?

20    *A.*    No.

21    *Q.*    I want to talk about some specific individuals

22   who had some connection to her defense.  Are you familiar

23   with some work done by Dr. Potts?

24    *A.*    Yes.

25    *Q.*    And if it helps, his report is Exhibit 6 A or

1  6.001.

2      *A.*   Well, I can refer to it.  But Dr. Potts did the

3  first preliminary Rule 11, what's called a Rule 11

4  examination.

5      *Q.*   Did he perform any other services, to your

6  knowledge, assisting the defense team?

7      *A.*   I don't see any others.  He did recommend that

8  Dr. Garcia-Bunuel -- I'm not sure I'm pronouncing his last

9  name right -- be consulted.  But I don't believe that Jack

10  Potts -- Dr. Potts did any more than that.

11      *Q.*   Was Dr. Bunuel consulted or engaged by the

12  defense team, to your knowledge?

13      *A.*   I see no evidence that he was.

14      *Q.*   And what is the date of Dr. Potts' report?

15      *A.*   It was very early on.

16      *Q.*   It's 6 A.

17      *A.*   It was report to the Court and it was dated in

18  March of 2001.

19      *Q.*   And, to your knowledge, did Dr. Potts have any

20  ongoing involvement in the defense team after that?

21      *A.*   I don't believe so.

22      *Q.*   Next Dr. Rosengard.

23      *A.*   Yes.

24      *Q.*   So you want to refer to Exhibit 6 B.  Oh, backing

25  up just a second, is Dr. Potts a qualified mental health

1  professional?

2       *A.*   Well, he's been qualified probably hundreds of

3  times.  He's very well-known.  He has been employed by

4  Maricopa County for -- I don't want to do him a

5  disservice, but I'll bet it's more than a quarter of a

6  century.  He has consulted both with prosecutors and

7  defense lawyers.  So, yes, I think he's quite

8  well-qualified.

9       *Q.*   Now, Dr. Rosengard.  Are you familiar with

10  Dr. Rosengard?

11      *A.*   I am.

12      *Q.*   Is he a qualified mental health professional, in

13  your estimation?

14      *A.*   I certainly think so.  My experience with him has

15  been quite good.

16      *Q.*   Take a look at reference to Exhibit 6 B or 6.002.

17  I believe that's Dr. Rosengard's report; is that right?

18  Or did I get the exhibit number wrong?

19      *A.*   I think it's 6 C.

20      *Q.*   6 C.  It is 6 C.  I apologize.  6.003.  Do you

21  recognize that as Dr. Rosengard's report?

22      *A.*   Yes.

23      *Q.*   What is the date of that report?

24      *A.*   This is August 27, 2002.

25      *Q.*   And did --

1    *A.*    So we're now --

2    *Q.*    Go ahead.

3    *A.*    We're now almost two years into the case.

4    *Q.*    And, Dr. Rosengard, did he play a role in the

5    defense team?

6    *A.*    Well, he played the role you can see in this

7    document.  He did see Ms. Andriano and he did write a

8    report.  But I have no information that he was asked to do

9    anything beyond this.

10    *Q.*    Do you know if he had any involvement with

11    Ms. Andriano's defense time after issuing his report of

12    August 27, 2002?

13    *A.*    I believe that Mr. Patterson said that he did

14    not.  And I haven't seen any document to the contrary.

15    *Q.*    Turning now to the name Sharon Murphy.  Are you

16    familiar with Ms. Murphy?

17    *A.*    I'm not personally familiar with her, I don't

18    believe, but I have read her report.

19    *Q.*    What was your understanding of her role in

20    Ms. Andriano's defense?

21    *A.*    Can you show me the document number?

22    *Q.*    I believe that there is -- we actually don't have

23    a report.  There's an e-mail from Ms. Murphy that's marked

24    as Exhibit 52.

25    *A.*    I was just trying to refresh myself on the time

1   frame, which is now another year later.  It's March of

2   2003.  But I understand that she was brought in to do

3   essentially what's called a DMV, or a domestic violence

4   workup.

5       Q.   Do you know whether Dr. Murphy performed any role

6   relating to mental health services other than on the side

7   of the area of domestic violence?

8       A.   I don't see any evidence that she did.  She did

9   meet with Ms. Andriano a number of times, but I don't

10  think she had any continuing role.

11      Q.   And in terms of in connection with advising the

12  defense team in connection with mental health issues

13  generally outside the domestic violence context?

14      A.   No.  There is no evidence of that.  And I think,

15  again, Mr. Patterson said that he didn't consult her in

16  terms of a presentation other than she eventually

17  testified.

18      Q.   Another woman by the name of Kandy Rohde.  Do you

19  recall testimony relating to Kandy Rohde?

20      A.   I do.

21      Q.   And what did --

22      A.   I think her reports --

23      Q.   What?

24      A.   I'm sorry.  I was just going to say I think her

25  reports are Exhibit 45.

1     *Q.*   Her notes?

2     *A.*   Her notes.

3     *Q.*   Yes.  And if you would take a look at

4     Exhibit 7 A or 7.001, you'll see that's a letter from

5     Ms. Rohde?

6     *A.*   Yes.

7     *Q.*   And what was your understanding of her

8     involvement with Ms. Andriano's defense team?

9     *A.*   Well, I can't say that I have a clear

10    understanding of what her role was.  I understand that she

11    was at least one counselor who saw Ms. Andriano very

12    frequently from close to the very outset.  She developed

13    these notes, and as her relationship with

14    Ms. Andriano advanced, she expressed increasing concerns

15    about things that she was seeing and observing in

16    Ms. Andriano.

17    *Q.*   Based on your review of the materials and, also,

18    Attorneys DeLozier's and Patterson's testimony, was she in

19    fact a part of Ms. Andriano's defense team?

20    *A.*   Well, she didn't have much of an effect on the

21    team.  And I think Mr. Patterson had no interest in

22    communicating with her and no involvement with her, as far

23    as I can tell.

24    *Q.*   And then you were here yesterday for

25    Attorney DeLozier's testimony; correct?

1    *A.*   Yes, I was.

2    *Q.*   And do you remember some of his testimony was

3    that he had developed some expertise in the area of child

4    abuse from some cases that he was in the process of

5    bringing against the Catholic Church.  Do you recall that?

6    *A.*   I do.

7    *Q.*   Would Attorney DeLozier's expertise in that area

8    qualify him to fill the mental health professional role on

9    Ms. Andriano's team?

10   *A.*   Well, you know, I don't think he could fill the

11   role.  But I must say -- and I saw this at the time of his

12   interview as well -- I frankly found it very encouraging

13   that here was somebody who had a significant interest in

14   some of the problems that arise when you're dealing with

15   people who have been victims of child sexual abuse.

16          Was he an expert?  No.  Could he perform the

17   whole role of being the mental health person?  Of course

18   not.  But he at least was someone who had a background and

19   interest in at least one phase of the mental health case.

20   *Q.*   But based on the testimony of Attorneys Patterson

21   and DeLozier, was that background -- did that work to

22   inform Ms. Andriano's defense in any way?

23   *A.*   Well, I think that -- I mean, it clearly didn't

24   in any way.  And I think that was obviously one of the

25   consequences of not having a functioning team that

1   actually would meet and confer.

2       Q.   Staying on the topic of Attorney DeLozier, and

3   now I want to focus on the two qualified death penalty

4   counsel portion of the team.

5            Was Attorney DeLozier a qualified counsel for

6   death penalty cases during his period of participating in

7   Ms. Andriano's team?

8       A.   No.

9       Q.   What's your basis for saying that?

10      A.   Well, again, the important concept here for -- I

11  mean, if he was being asked to be second chair, I think

12  it's fair to say that the standard of care at that time

13  would have said, you could have someone as second counsel

14  who hadn't tried a capital case, but you would still want

15  to have someone who had done studying in the field, who

16  had been attending programs, getting education, conferring

17  with other lawyers.  You just can't have a second counsel

18  who comes as a blank slate to doing capital work.

19      Q.   Based on his testimony as to his approach, to his

20  view of his role in Ms. Andriano's defense team, did that

21  also impair Attorney DeLozier's ability to function as one

22  of the two lawyers required for this team?

23      A.   Well, he came to the case, as he said at the time

24  of his recorded interview, with an assumption that some

25  lawyers do have who say:  I'm doing criminal defense work.

1  I've developed mitigating evidence in my other cases.  I

2  can approach this capital case the same way I would

3  approach any other criminal case.

4         That is fundamentally wrong.  And I think now

5  virtually everyone understands that.  But to have someone

6  as your second chair who doesn't identify that there are

7  significant differences between doing capital work and

8  noncapital work is I think sort of emblematic of the

9  problem here.

10     Q.   And then once the public defender's office came

11  in and Attorney DeLozier was assisting -- was designated a

12  second chair as Knapp counsel, do you recall his testimony

13  as to kind of how he went about fulfilling his role in the

14  defense team during the time leading up to trial?

15     A.   Well, what he said is that he wound up having

16  virtually no role for a long period of time.  He expressed

17  some frustration.  When I say a long period of time, I

18  think he said something that may approach years of no

19  communication about what was going on in the case.  He

20  clearly was not a part.  Even if he had had some training

21  or experience, he was not a part of this team in any

22  meaningful way.

23     Q.   So is he fairly filling the role of the second

24  defense lawyer on the team?

25     A.   No.  And he should never have been.

43

1    *Q.*   And turning to Attorney DeLozier's performance

2    during trial, were there some issues there that raised

3    concerns in your mind as to his suitability as a capital

4    defense counsel?

5    *A.*   Well, yes.  I mean, it again was obvious that

6    neither he, nor Mr. Patterson approached the case as a

7    whole as a case in which the mitigation themes had to be

8    understood and developed prior to trial.  That just didn't

9    happen here at all.

10         I mean, other than portraying the client as a

11   good person who had had a good life, they did no other

12   development and certainly no presentation of any other

13   mitigating circumstances.

14   *Q.*   Do you recall Attorney DeLozier's testimony that

15   he would find out the day before that he was going to

16   examine a -- Attorney Patterson was going to ask him to

17   examine a witness that he really had no knowledge of?

18   *A.*   Yes, I did hear him say.

19   *Q.*   Is that appropriate?

20   *A.*   No, of course, it's not.  And, again, one of the

21   reasons you have a team is so that people can communicate,

22   and particularly -- I mean, I've always said at the

23   beginning of the case, the communication is maybe at its

24   most important.  But, certainly, when you get up close to

25   trial, those communications have to be intimate, and they

1  didn't even exist here.

2      *Q.*   Do you recall some testimony and there's some

3  materials in the record relating to Attorney DeLozier's

4  decision to fast during the trial?

5      *A.*   I did.

6      *Q.*   And I believe that the evidence is that he fasted

7  for 70 days in trial, drinking apple juice.  Do you recall

8  that?

9      *A.*   Yes.

10     *Q.*   Is that a problem?

11     *A.*   Well, it's a problem that affects the whole

12  trial, in my opinion.  I must tell you that I was

13  horrified when I heard that.  And I understand or at least

14  I appreciate what Mr. DeLozier had to say about how that

15  enhanced his listening and communicating skills.

16          But, you know, a trial in which someone's life is

17  at issue is not a time to experiment with changes in your

18  diet or changes in your approach to the practice of law.

19  Whatever you may think about how something might make you

20  a better lawyer, the courtroom in a death penalty case is

21  the last place you ought to be experimenting.

22     *Q.*   Do you recall Attorney DeLozier's testimony

23  relating to -- and Attorney Patterson's relating to the

24  death of his associate, Justin Blair, on October 17th of

25  2004 and its impact on him?

1     *A.*    I do.

2     *Q.*    And in your view, should that have been handled

3     differently than it was?

4     *A.*    Again, and this is another one of those things

5     that I think affects the whole trial.  But having a death

6     like that -- and I don't know a lot of the details, but I

7     know enough from what we've heard here and seen a little

8     bit on the record, that this man, Justin Blair, was not

9     only a friend, he was his colleague in the law firm.  He

10    was the ghost writer, I think is the phrase that

11    Mr. DeLozier used.  He was an intimate part of

12    Mr. DeLozier's practice.

13           And then when he died very suddenly, Mr. DeLozier

14    also had responsibilities with respect to caring for his

15    family and dealing with the ongoing criminal investigation

16    into Mr. Blair's death.

17           I don't see how any lawyer, no matter how

18    determined, could go through that kind of an experience

19    and not have it affect not only his stand-up in court

20    abilities, but his ability to prepare and plan and work

21    toward the eventual mitigation side of the case.

22    *Q.*    In your opinion, what should have been the

23    defense team's course of conduct following, given

24    Mr. Blair's murder and its impact on Mr. DeLozier?

25           MS. GARD:  Judge, I object on relevance grounds.

1  This is guilt phase.

2          THE COURT:  I'm going to sustain the objection.

3          Let's move on.

4          MR. ARNTSEN:  If I can make an offer of proof,

5  Your Honor.

6          THE COURT:  Go ahead.

7      Q.   BY MR. ARNTSEN:  What do you think should have

8  happened?

9      A.   I think they should have done internally a little

10 bit more of their own investigation of the circumstances

11 as they affected Mr. DeLozier and they should have then

12 made a record.  I think that they should have asked for a

13 longer postponement or a mistrial so that Mr. DeLozier

14 could either be brought back to where he was before or

15 that some other counsel be subject to perform.

16     Q.   And in light of counsel's objection, did this

17 affect the mitigation phase?

18     A.   I think it did.  Clearly, he was not spending any

19 time preparing for the mitigation side of the case, which

20 he had been told he was going to wind up having

21 responsibility for.

22         MR. ARNTSEN:  Thank you.  That's the conclusion

23 of the offer of proof.

24     Q.   BY MR. ARNTSEN:  Turning your attention now to

25 the mitigation specialist, Scott MacLeod, if you could

1    look at Page 33 of the guidelines, again, Exhibit 76.

2    *A.*    Yes.

3    *Q.*    Does that discuss the role of the mitigation

4    specialist?

5         MS. GARD:   Judge, I object to cumulative to

6    Mr. Rohman.   He has already testified about mitigation

7    specialists and what is required.

8         THE COURT:   I'll let Mr. Arntsen go into it a

9    little bit here.

10    *Q.*    BY MR. ARNTSEN:   Does that discuss the role of a

11    mitigation specialist?

12    *A.*    Yes, it does.

13    *Q.*    Based upon your review of the materials, was

14    Scott MacLeod a qualified mitigation specialist?

15    *A.*    No, he was not.

16         MS. GARD:   Objection.   Foundation.

17    *Q.*    BY MR. ARNTSEN:   Why not?

18         THE COURT:   Overruled.

19         Go ahead.

20    *Q.*    BY MR. ARNTSEN:   Why not?

21    *A.*    The information that we have about Mr. MacLeod

22    both from his declaration and from what other counsel have

23    said about him is he was a Maricopa County probation

24    officer.   He had no specialized training or experience in

25    developing mental health themes, developing information

1   about the life story of the defendant.  And to the extent

2   that counsel -- defense counsel might have thought that

3   the training as a probation officer would qualify someone

4   to do mitigation work in a capital case is simply wrong.

5   They aren't pretrial -- or excuse me -- presentencing fact

6   development for the county is a much different skill than

7   developing a mitigation case.

8       *Q.*   Do you recall Attorney Patterson's testimony

9   relating to his delegation of the mitigation case to

10  Mr. MacLeod and Mr. Linderman?

11      *A.*   I do.  I remember what he said.

12      *Q.*   Was that appropriate?

13      *A.*   No.

14      *Q.*   Why not?

15      *A.*   It wasn't at all because, again, first of all, he

16  didn't know what their skills were, either one of them.

17  He had not ever -- according to his testimony, he had not

18  interviewed them.  He had not developed an understanding

19  of the level of their knowledge and experience and he

20  didn't supervise them.  He didn't direct them.  He left

21  them out on their own.  As he said, he didn't ride -- he

22  didn't ride-herd on them.  There was words to that effect.

23      *Q.*   What's wrong with that?

24      *A.*   Well, again, foundational to the criminal defense

25  capital team is communication and coordination.  You can't

49

1   just send somebody out and say:  Okay.  You're in charge

2   of mitigation.  You go do your thing for the next couple

3   of years and come back and we will talk about it.  That

4   just can't happen in capital cases.

5        Q.   And during the testimony, the name Patrick

6   Linderman came up, who I believe was the mitigation

7   specialist who preceded Mr. MacLeod.  Based on your review

8   of the materials, did you see any significant contribution

9   by Mr. Linderman to Ms. Andriano's defense effort?

10       A.   No.  And I've asked if there were other

11  documents.  And, apparently, there are very few things

12  that indicate that Mr. Linderman did anything.

13       Q.   Okay.  Now let's turn to Attorney Patterson as

14  the lead counsel.  First of all, in your view, was

15  Attorney Patterson a qualified capital defense lawyer in

16  this period?

17       A.   By experience and training, I believe he was.

18       Q.   I want to focus on his role as the leader of the

19  Andriano defense team.  Are you critical of his

20  performance in that regard?

21       A.   Yes.

22       Q.   Can you turn to Page 65 of the guidelines?  And

23  can you read just the first sentence under commentary?

24       A.   It says:  The Commentary to Guideline 4.1 that we

25  spoke about earlier.  It says:  As reflected in

1   Guideline 4.1 and the accompanying commentary, the

2   provision of high quality legal representation in capital

3   cases requires a team approach that combines the

4   difference skills, experience, and perspectives of several

5   disciplines.

6        Q.   And if you would turn back a couple of pages to

7   Page 63, Guideline 10.4 B, do you see where it says lead

8   counsel bears overall responsibility for the performance

9   of the defense team?

10       A.   Yes.

11       Q.   And was Attorney Patterson the lead counsel?

12       A.   Well, he was the lead counsel.  He didn't perform

13   his role, but he was the lead counsel.

14       Q.   You were here during Attorney Patterson's

15   testimony regarding his view of interactions with Knapp

16   counsel.  Do you recall that?

17       A.   Yes.

18       Q.   What did it appear was his approach to how he

19   integrated Attorney DeLozier into his team?

20       A.   Well, he said that he, first of all, thought that

21   Knapp counsel replaced having a second lawyer in his

22   office.  He then, having assumed that Mr. DeLozier was

23   going to be his co-counsel, he gave him for a very long

24   period of time no direction.  They communicated virtually

25   not at all for a very extended period of time.  I think

1  like three years.

2      Q.   Can you take a look at Exhibit 63, please?

3      A.   63.  Yes.

4      Q.   What is that and how does that relate to this

5  topic?

6      A.   This is an e-mail exchange between Mr. DeLozier

7  and Michelle Arvanitas, I think is how her name is

8  pronounced.

9      Q.   That's correct.  She was an investigator with the

10  public defender's office.

11      A.   We're now in August of 2002.  So we're almost two

12  years into the case.  And Mr. DeLozier is complaining that

13  he's had no communication or direction and doesn't really

14  know what's happening with the case.

15      Q.   Can you take a look at Exhibit 64, please?

16      A.   Yes.

17      Q.   And what's the date of that?

18      A.   It says October of 2003.

19      Q.   And does this also discuss this same issue?

20      A.   It does.  And, again, it's another indication of

21  the lack of communication between Mr. DeLozier and the

22  Office of the Public Defender.

23      Q.   Do you see the first clause of the second

24  paragraph, that he was adamant about not having received

25  anything since Attorney Patterson took over the case?

1    *A.*    Yes.

2         MR. ARNTSEN:  I move Exhibit 64 into evidence not

3    for the truth but as support of his opinions.

4         MS. GARD:  For that purpose, I have no objection.

5    For that limited purpose.

6         THE COURT:  Exhibit No. 64 for identification is

7    admitted into evidence.

8         MR. ARNTSEN:  Thank you.

9    *Q.*    BY MR. ARNTSEN:  Do you recall Attorney

10   Patterson's testimony regarding when he spoke with

11   Ms. Andriano with regard to -- in April of 2004 with

12   regard to who was going to examine her at trial?

13   *A.*    Yes.

14   *Q.*    And does that inform your conclusions as to the

15   state of communication between the team or lack thereof?

16   *A.*    Well, I think it must have been a horrifying

17   moment for Mr. Patterson.  But, yes, I think it's very

18   informative.  Mr. Patterson had clearly been under the

19   impression for some lengthy period of time, again,

20   measured in years, that Mr. DeLozier was in frequent --

21   very frequent communication with the client about the

22   case.  And it didn't become clear that that was not the

23   situation until they began to talk about getting ready for

24   trial.

25            And, at that point, according to what you've

1   heard here in court and what Mr. Patterson said in his

2   declaration, I believe, or in his interview, I'm not sure

3   which, it was the client who brought to lead counsel's

4   attention that the lawyer she had been communicating with

5   for the last three years was not someone knowledgeable

6   about the case sufficiently to undertake her examination.

7       Q.   And how does the role played by Attorney DeLozier

8   as Knapp counsel contrast with your role as Knapp counsel

9   in your 2000 to 2002 period in the Pape and Pilipow cases?

10      A.   Well, it's --

11           MS. GARD:  Objection.  Relevance.

12           THE COURT:  Overruled.

13           Go ahead and answer the question.

14           THE WITNESS:  It's fundamentally different.  As I

15   said before, in the cases we did with the Office of the

16   Legal Defender, they did not replace one of their lawyers

17   with me.  They insisted correctly on continuing to do all

18   of the things that a defense team would do:  Frequent

19   meetings, consulting, providing notes to each other.  None

20   of which seemed to happen here from the time that

21   Mr. Patterson became involved.

22           THE COURT:  Is this a good time to take our

23   morning recess?

24           MR. ARNTSEN:  That's fine.

25           THE COURT:  Why don't we go ahead and take our

54

1   morning recess.  We will be in recess.

2       (WHEREUPON, a recess ensued from 11:01 a.m. to

3   11:15 a.m.)

4       THE COURT:  This is CR 2000-096032, State of

5   Arizona vs. Wendi Elizabeth Andriano.

6       The record will reflect the presence of the

7   parties and counsel.

8       The record will reflect that Mr. Larry Hammond is

9   on the witness stand.  We will continue with the direct

10  examination by Mr. Arntsen.

11      Mr. Arntsen.

12  Q.  BY MR. ARNTSEN:  Mr. Hammond, do you recall

13  Attorney Patterson's testimony as to that he focused on

14  Phase 1 and Phase 2 and delegated the mitigation phase to

15  others?

16  A.  Yes.

17  Q.  Is that a problem?

18  A.  Well, it is.  I mean, it's one of the fundamental

19  concerns here that lead counsel certainly needs to

20  delegate responsibilities, but lead counsel has to be

21  involved in and in charge of all phases of the case.

22  Q.  Why?

23  A.  Because of the importance, first of all, of

24  understanding the client.  And for I guess some lawyers

25  out there, they think that if you're just doing the

1  guilt/innocence phase, you don't need to understand the

2  client and the client's challenges and life history.  But

3  that simply can't really be the case in capital

4  litigation.

5       Q.    Now I want to turn to what I believe was your

6  second opinion, which is you were critical of the defense

7  team's investigation of the mitigation case?

8       A.    Yes.

9       Q.    Is that correct?

10      A.    Yes.

11      Q.    Can you take a look at Section 10.7 of the

12  guidelines?  And it's page 76.

13      A.    Yes.

14      Q.    Do you see the first guideline under A?  Counsel

15 at every stage have an obligation to conduct thorough and

16 independent investigations relating to the issues of both

17 guilt and penalty.

18      A.    Yes.

19      Q.    Again, for the purposes of this hearing, we're

20 just focusing on the penalty portion of the case.  Does

21 that set forth the standard governing applicable in 2000

22 to 2004?

23      A.    Yes.

24      Q.    Can you turn to Page 80 of the guidelines, which

25 then discusses specifically the investigation obligation

1  relating to the penalty phase?  Can you just read into the

2  record the first three sentences there under penalty?

3     *A.*  Yes.  I think these are important.  Let me read

4  them out loud.  Counsel's duty to investigate and present

5  mitigating evidence is now well-established.  The duty to

6  investigate exists regardless of the expressed desires of

7  a client.  Nor may counsel, quote, sit idly by thinking

8  that the investigation would be futile, close quote.

9     *Q.*  And, again, does that reflect the standard

10  applicable to the defense of Ms. Andriano's case?

11     *A.*  Yes.  And had been for quite a while before then.

12     *Q.*  Can you turn to the next page, Page 81?  Or,

13  actually, even the sentence running between 80 and 81.  Is

14  this investigation important in order for everybody to

15  make informed decisions as to how to point and frame the

16  defense?

17     *A.*  Yes.  Part of this is, as the comments suggest,

18  is being able to advise the client as well as advise the

19  other members of your team.

20     *Q.*  Then turning to the next paragraph, does that set

21  forth the standard as to the scope of the investigation?

22     *A.*  Yes.

23     *Q.*  And can you read that first sentence of that

24  paragraph into the record, please?

25     *A.*  And, again, quote, because the sentencer in a

1  capital case must consider in mitigation anything in the

2  life of the defendant which might militate against the

3  appropriateness of the death penalty for the defendant,

4  penalty phase preparation requires extensive and generally

5  unparalleled investigation into personal and family

6  history.

7      Q.   In the case of the client, this begins with the

8  moment of conception; correct?

9      A.   Yes.

10     Q.   And, also, in connection with family history,

11 does it even extend back before then?

12     A.   Yes.  And the guidelines make that clear.  They

13 should extend in what is typically referred to as a

14 multigenerational review of the life of the client and the

15 client's family and the acquaintances.

16     Q.   Why is that multigenerational review important

17 for an effective defense?

18     A.   Well, I think it's basic to humanity that we are

19 affected by our backgrounds, by our parents, our living

20 situation, both the places we've lived and the people that

21 we've lived with.

22     Q.   And now turning to the next page as to when this

23 mitigation investigation should begin.  Can you take a

24 look at the first full paragraph on Page 82?

25     A.   Yes.

1     *Q.*     When does it say the mitigation investigation

2     should begin?

3     *A.*     As quickly as possible.

4     *Q.*     And why is that?

5     *A.*     Well, there are several reasons for that.  But

6     one is that we've already talked about, that you need to

7     begin to understand how the client's life and history and

8     psychological and psychiatric problems relate to the rest

9     of the case.

10          But the emphasis on the phrase, at the beginning,

11    has I think a deeper meaning, which is described in these

12    comments.  Understanding the life of a client is not

13    something you can do by simply going out and asking a few

14    questions or reviewing documents.  That may be a place to

15    start, but most of the things that wind up being relevant

16    to the mental health of a client are things that people

17    don't freely want to talk about.

18    *Q.*     Could this also be true of things relevant to the

19    social history of the client?

20    *A.*     Yes.

21    *Q.*     Independent of mental health?

22    *A.*     Yes.  Yes, quite so.  And things like sexual

23    abuse are things that routinely people don't want to talk

24    about.  Their family members don't want to talk about

25    them, quite understandably.

1        So unless you start -- and there's a line in

2    here.  I can't tell you exactly where it is, but it

3    emphasizes the importance of developing a relationship of

4    trust with the client.

5        Well, trust doesn't come in five minutes.  It has

6    to be developed over time and it's developed at least in

7    significant part because you are communicating with the

8    client and the client's family and caring about them --

9    showing that you care about them.

10   Q.   And this topic you were just discussing, is that

11   referenced in the standards here at the bottom of Page 82

12   and then up in the top of Page 83?

13   A.   Yes.  Yes.  This is exactly what I was thinking

14   of, Mr. Arntsen.  I just didn't remember where it was.

15   Q.   Then we were talking for a moment about a social

16   history.  what is a social history?

17   A.   A social history is the full history of the

18   client, the client's family, those who went before, and

19   then a full understanding of the life of the client.  And,

20   again, exploring things like where the client resided,

21   with whom the client resided.  There are often other

22   people who may know more about the client than the family

23   does and sometimes more than the client is willing to

24   freely disclose.

25   Q.   Do you see the text on Pages 83 and 84 of

1  Exhibit 76?  Does that generally talk about the scope and

2  sources of information for a social history?

3       *A.*    Yes, it does.

4       *Q.*    Is a social history a substantial document?

5       *A.*    Yes, it can be.  And, in most cases, it is.

6       *Q.*    And is it something that takes a long time to

7  prepare?

8       *A.*    It often does.  These things can't be done in a

9  month.  And, in many cases, particularly where there are

10 delicate issues involved, as there is in most of the cases

11 that I've been around, it takes time to peel the onion, so

12 to speak, to get to where you have enough understanding to

13 be able to appreciate the things that might not be said.

14 But it begins with gathering the records.

15      *Q.*    And is the social history also something that is

16 a resource for the mental health experts to then look at

17 for their diagnoses?

18      *A.*    Yes.  And that's one of the themes that runs

19 through these guidelines and through the mitigation

20 guidelines that I mentioned earlier.  For your mental

21 health people to be able to do their jobs appropriately,

22 you need to have available for them the history of the

23 client.

24      *Q.*    And, again, when you say the history, this is

25 this multigenerational social history --

1    *A.*    Yes.

2    *Q.*    -- involving with the various sources of

3    information?

4    *A.*    Yes.

5    *Q.*    Okay.  That brings us back to Exhibit 54 again.

6    Can you turn to Exhibit 54?  Do you have that in front of

7    you?

8    *A.*    I do.

9    *Q.*    First of all, is this an appropriate motion to

10   make in connection with gathering information for a social

11   history?

12   *A.*    Yes.

13   *Q.*    Is the timing of concern?

14   *A.*    It's entirely inappropriate.  And that's why I

15   hesitated.  There isn't really a line in this pleading

16   that I would disagree with, but it's breathtaking that

17   it's being filed at this stage of the case.

18   *Q.*    But what is your understanding of the stage of

19   the case as of November 19, 2004?

20   *A.*    They were nearing or close to the end of the

21   trial, I believe, and within which turned out to be no

22   more than -- is it two weeks from the commencement of the

23   Phase 3?

24   *Q.*    Looking first at the motion and then we will turn

25   to the memorandum, the motion seeks an order that if any

1   state or local agency or entity possesses any records

2   relating to Ms. Andriano and/or her family, the defense

3   needs to obtain them to conduct an independent and

4   thorough mitigation investigation in this capital case.

5   Did I read that correctly?

6       *A.*   Yes.  And it's a totally fair statement.  But I

7   don't know how you could be getting these documents at the

8   end of trial and on the eve of sentencing and hope to use

9   them as a foundation for learning anything else about the

10  client.

11      *Q.*   Are these the kinds of documents, again, that are

12  foundational to a social history?

13      *A.*   Routinely.

14      *Q.*   I want to turn to the memorandum for just a

15  second.  Can you look at it's the first page of the

16  memorandum PCR 299.  Can you read into the record the

17  second sentence -- and starting at the start of the second

18  sentence of the first paragraph?

19      *A.*   Are you looking at the sentence that say, quote,

20  in order to conduct?

21      *Q.*   Yeah.  Ms. Andriano is entitled.

22      *A.*   Oh, I'm sorry.  Yeah.  Ms. Andriano is entitled

23  to have her defense attorneys conduct an independent and

24  thorough investigation of potential mitigating information

25  to be used at the sentencing proceeding.  In order to

1  conduct an independent and thorough investigation, the
2  defense must obtain all records documenting Ms. Andriano's
3  life.

4      Q.   When should they have gotten these records in
5  terms of an appropriate defense for a capital case?

6      A.   They should have begun getting them from the very
7  early days and weeks of the representation.

8      Q.   Then can you take a look at the next page,
9  Page 4, the last paragraph?  You see where that talks
10 about the creation of a social history?

11     A.   Yes.

12     Q.   And then take a look at the top of Page 5.

13     A.   Uh-huh.

14     Q.   Do you see where it states:  The reason the
15 defense wants to get these records is to build the social
16 history?

17     A.   Yes.  And that's the point I was making earlier.
18 Mr. Patterson fairly identifies and quotes from the same
19 guidelines that we have been talking about and identifies
20 some of the same principles, but they're not principles
21 that could be effectively employed on the eve of the
22 sentencing phase of the case.

23     Q.   Can you take a look at Exhibit 136, which is also
24 at about this same time?  Have you seen this document
25 before?

1    *A.*    I have.

2    *Q.*    And it's a November 29, 2004 e-mail exchange

3    between Attorney Patterson and Scott MacLeod; is that

4    correct?

5    *A.*    Yes, it is.

6    *Q.*    And does this e-mail raise any concerns about the

7    state of the mitigation investigation as of that date?

8    *A.*    Well, yes, it raises concerns.

9    *Q.*    What are the concerns?

10   *A.*    Well, the primary concern -- most obvious primary

11   concern is that the mitigation person is out there

12   developing a list of witnesses and scheduling follow-up

13   interviews of people who are going to testify or

14   candidates to testify at mitigation right at the end of

15   the trial.

16   *Q.*    You mentioned follow-up interviews.  Can you take

17   a look at the third sentence of Mr. MacLeod's e-mail that

18   starts:  Almost?  Do you see that?

19   *A.*    Yes.

20   *Q.*    Do you see where it says:  Almost every person on

21   this list I have interviewed?

22   *A.*    Yes.

23   *Q.*    What's the problem with that?

24   *A.*    Well, obviously, it's the same problem.  There

25   has been no -- apparently, no coordinated effort to

1    identify witnesses who might testify and to work with

2    them.  To be sending a memo to the head of the team at the

3    end of the trial saying, I've talked to some of these

4    people or maybe even most of them, but clearly not all of

5    them, and I now need to go do follow-up interviews.

6         Q.   And then can you look at the last sentence before

7    the list of the witnesses?  Do you see where, it says:

8    This is not a complete nor exhaustive list; it is simply

9    my list of witnesses?

10        A.   Yes.

11        Q.   What's the problem with that?

12        A.   Well, again, it's very good and helpful and,

13   indeed, I think essential for the members of the team to

14   communicate and to communicate in writing.  So that part

15   of it, if there had been 100 of these over the four years

16   before trial, that would have been encouraging.

17             But to be here at this point and to be saying, I

18   don't really have a complete list yet, they clearly

19   haven't been talking about how this phase of the case is

20   going to work.  So I find that troubling.

21        Q.   Can you take a look at the next exhibit,

22   Exhibit 137, which is also from this time frame?

23        A.   Yes.  Yes, I'm familiar with this.

24        Q.   You recognize this again?  This is a

25   December 6th, 2004 e-mail exchange from between Attorney

1  Patterson and Mr. MacLeod?

2      *A.*   Yes.

3      *Q.*   And you see that if you look at Mr. MacLeod's

4  e-mail, it says sent Monday, December 6th, 2004?

5      *A.*   Yes.

6      *Q.*   Then the title of it is:  Some ideas from

7  Thursday and Friday's seminar?  Do you see that?

8      *A.*   He apparently attended a death penalty seminar

9  just right on the commencement of the sentencing of this

10  case.

11      *Q.*   Is it fair to summarize the content of the e-mail

12  as identifying possible mitigation themes?

13      *A.*   Yes.

14      *Q.*   What's the problem with that?

15      *A.*   Well, again, you can't do it at this stage.  If

16  this had happened three years earlier, we would then begin

17  to have something we could work with.  He should be

18  thinking about themes -- you should be thinking about them

19  in the open-minded way you would if you were building

20  something from scratch as opposed to looking for themes

21  you can present on the eve of sentencing.

22      *Q.*   Do Exhibits 54, 136 and 137, the three documents

23  we were just looking at, indicate to you a substantial

24  deviation from the standard of care of governing capital

25  cases with regard to Ms. Andriano's mitigation?

1    *A.*    Yes.  I think these are examples of the

2    deficiency in the mitigation development and presentation,

3    yes.

4    *Q.*    And is it your opinion that this falls below the

5    standard of care applicable at that time?

6    *A.*    It does.  And that is my opinion.

7    *Q.*    Is it even close?

8    *A.*    I don't think so.

9    *Q.*    Backing up through the mitigation investigation,

10   I want to focus now on the investigation of Ms. Andriano's

11   social history.  Can you take a look at Exhibit 56,

12   please?

13   *A.*    Yes.

14   *Q.*    What is this document?

15   *A.*    Well, this is kind of an interesting memo that

16   Donna Alejo sent to Mr. DeLozier.

17   *Q.*    Is that Donna Ochoa?

18   *A.*    I'm sorry.  Donna Ochoa.  Excuse me.

19   *Q.*    And what's the date of the e-mail?

20   *A.*    I was just reconfirming that.  It's very early

21   on.  It's February of 2001.

22   *Q.*    Do you see the first sentence of the e-mail in

23   the first page?  It says:  I've done a short early history

24   on Wendi?

25   *A.*    Yes.

1     *Q.*   And then if you would take a look in a larger

2   text portion in Pages 2 through 5 of Exhibit 56.  Does

3   that seem like -- is that what that appears to be?

4     *A.*   Yes, it does appear to be kind of a start at

5   Wendi's mother trying to look at the help identified.

6     *Q.*   To help construct a social history?

7     *A.*   Yes.

8     *Q.*   Have you seen -- in terms of now your

9   understanding of Ms. Andriano's case, have you seen any

10   other document in the defense files to concert a better

11   social history than this one?

12     *A.*   Well, the only one that might -- I mean, no, I

13   don't think that there is one.  I've been very interested

14   in the work that Kandy Rohde did.  I think that could form

15   the foundation of a social history.  There's lots of stuff

16   in there that would support that, but I don't know if

17   there is another document other than this one.

18     *Q.*   And we will get to some of Ms. Rohde's work in a

19   moment.  But first looking at this document, looking at

20   Exhibit 56, do you see -- if you look on the first page of

21   the text, do you see where it starts:  Wendi's early

22   years?  This is PCR 306.  Do you see the second page of

23   the exhibit?  Do you see what I'm referring to?  If you

24   look up, the first words on it are:  Wendi's early years?

25     *A.*   Yes.

1    *Q.*    And then if you go to just really the third line

2    there, do you see where she says:  My father was an

3    alcoholic?

4    *A.*    Yes.

5    *Q.*    Then if you turn to the next page, do you see on

6    just about at the end of the first paragraph:  Skip was

7    the one that had Wendi potty trained by 11 months?

8    *A.*    Yes, I see that.

9    *Q.*    Then if you get to the second to the last

10   paragraph, starting:  This part is hard.  Do you see that?

11   *A.*    Yes, I do.

12   *Q.*    And there she's talking about potential sexual

13   abuse of Wendi as a young child?  Do you see that?

14   *A.*    Yes, I have seen that.

15   *Q.*    And then going into the next paragraph, do you

16   see towards the bottom of the paragraph, she is talking

17   about her work at CODAC and she would take Wendi there

18   with her and lots of the -- and the ones that are detoxed

19   would talk to her, et cetera.  Lots of the women had

20   children of their own, usually hookers, and they loved

21   seeing her.  It was almost therapy for them.  Do you see

22   that?

23   *A.*    I do.

24   *Q.*    And if you turn to the next page, if you look in

25   the second full paragraph right above in the middle of the

1  paragraph, it says:  My mother loved Wendi like she was

2  her own.  I remember getting jealous a few times when

3  Wendi would call her mom.  Do you see what I'm referring

4  to?

5      *A.*   I do.

6      *Q.*   And then going into the next paragraph where

7  she's talking about her subsequent work at PADAC in

8  Casa Grade, she says:  The facility I worked at was in

9  Downtown Casa Grande.  Wendi would be down there with me.

10  Sometimes she would sneak out the door and stand there

11  asking people for money.  A couple of times, she wandered

12  over to Stoney's.  If she looked like she was going to go

13  anywhere else, he would walk her back to the center.  Do

14  you see that?

15      *A.*   Yes, I do.

16      *Q.*   And then two paragraphs down, do you see where it

17  says that Wendi and Alejo loved each other from the start?

18      *A.*   I do see that.

19      *Q.*   And then looking at the next page, finally, the

20  middle of the second full paragraph:  She was and is a

21  caretaker.  Do you see what I'm referring to?  It's kind

22  of right above where she mentioned South Dakota.  Second

23  full paragraph on the last page.

24      *A.*   Yes, I see it.

25      *Q.*   And, again, in connection with your review of the

1  materials in this matter, you reviewed Dr. Woods' and

2  Dr. Hopper's reports; correct?

3      *A.*   I did.

4      *Q.*   And are some of the items raised in Exhibit 57

5  items that Dr. Woods and Dr. Hopper give significance to

6  in their reports?

7      *A.*   Yes, they do.

8      *Q.*   Did you see anything to indicate that the defense

9  team followed up on any of this?

10     *A.*   I don't at all.  But this would have been a

11 tantalizing place to start.

12     *Q.*   And this was to Attorney DeLozier.  But do you

13 recall Attorney DeLozier testifying that he made copies of

14 his files for the public defender's office?

15     *A.*   Yes.  He said he passed them on, but he never

16 heard anything from them.

17     *Q.*   Take a look at the next exhibit, Exhibit 57.  Are

18 you there?

19     *A.*   Yes.

20     *Q.*   What is this?

21     *A.*   Well, this is the e-mail passing on the DOC

22 address for Wendi's biological father.

23     *Q.*   Is it your understanding that he was in prison

24 for sexual abuse of his stepdaughter?

25     *A.*   Yes, that's what I've understood.

1    *Q.*   Can you think of any fathomable reason why the

2    defense team did not interview Shelby Robertson?

3    *A.*   No.

4    *Q.*   Again, is this close?

5    *A.*   Well, I mean, he's the biological father.  He

6    participated for some period of time in raising Wendi.

7    Whatever his offense was, you would interview him.  But

8    having any indication that there might have been sexual

9    abuse in his background would have required it.  It

10   wouldn't have been closed, to answer your question.

11   *Q.*   And he wasn't hard to find; was he?

12   *A.*   No.

13   *Q.*   Now I want to turn to information that Kandy

14   Rohde provided to the defense team.  Can you take a look

15   at Exhibit 7 B or 7.002?

16   *A.*   It's actually 7 B?

17   *Q.*   7 B.

18   *A.*   Yes.

19   *Q.*   Do you see that this is a March 12th, 2001 letter

20   from Kandy Rohde to Attorney DeLozier?

21   *A.*   Yes.

22   *Q.*   And is there information in this letter that

23   would have been helpful in connection with building a

24   social history?

25   *A.*   Yes.  I mean, this is another one of those very

1   early communications.  When I said I had focused on Kandy

2   Rohde, this was one of the things that caused me to be

3   concerned.

4        *Q.*   Based on your understanding of the mitigation

5   case, was the information or the themes mentioned in

6   Ms. Rohde's letter, Exhibit 7 B or 7.002, integrated into

7   Ms. Andriano's mitigation case?

8        *A.*   No.

9        *Q.*   Were they followed up on at all, to your

10  knowledge?

11       *A.*   Not that I can tell.  And although I did hear

12  Mr. Patterson say last week that he looked at some of the

13  information in the case and said, well, maybe Wendi was

14  dissociating, that comment appears, and this comment,

15  similarly, that appears in this letter.

16       *Q.*   And do you see also in the middle of the first

17  paragraph, Ms. Rohde talks about Wendi's memory issues?

18       *A.*   Yes.

19       *Q.*   And she says:  She told me she has no trouble

20  remembering events in her life, even stressful events.

21  Yet, when I asked her about her childhood, her marriage

22  and her imprisonment, she was unable to recall large

23  sections of her history.  After I brought that to her

24  attention, she spoke to her mother, who said that Wendi

25  habitually forgot anything that was unpleasant.  Do you

1 see that?

2     *A.*    Yes.

3     *Q.*    Do you recall Attorney Patterson testifying that

4 Wendi had a good memory?

5     *A.*    Yes, I do.

6     *Q.*    The issue of memory issues, based upon your

7 understanding of their interactions and professional

8 qualifications, who would you rely on?  The counselor or

9 the lawyer?

10     *A.*    Well, I would certainly always, as a lawyer, I

11 would want to listen with considerable attention to any

12 trained counselor, and, frankly, to anyone else, but

13 particularly to a trained counselor who expresses concerns

14 about amnesia behavior.

15          And, as I said earlier, when you are trying to

16 peel the onion and gain a better understanding of the

17 defendant and her circumstances, you are very often going

18 to encounter these kinds of issues, where people very

19 honestly and for reasons that mental health people

20 understand, do not remember.  They do not disclose

21 particularly very personal things like sexual abuse and

22 particularly sexual abuse within the family.

23     *Q.*    Turning to some more materials provided by

24 Ms. Rohde, can you take a look at Exhibit 45, please?

25     *A.*    I have it.

1      *Q.*   And I don't think I'm going to go -- you know,

2    these were covered extensively with Attorney DeLozier

3    yesterday and I don't know that we need to go through them

4    in detail.  But these notes -- Ms. Rohde's notes in

5    Exhibit 45, first of all, is it your understanding these

6    were shared with the defense team?

7      *A.*   Well, that's what -- I mean, Mr. DeLozier had

8    them and he said that he gave them to the defense team.

9      *Q.*   Can you actually take a look at quite almost to

10   the end of the document?  The page number is PCR 112.  Do

11   you see what I'm referring to?

12     *A.*   Yes, I have that.

13     *Q.*   Do you see at the top, it says:  To Scott MacLeod

14   from Kandy Rohde?

15     *A.*   Yes.

16     *Q.*   And did you get a chance to review Ms. Rohde's

17   notes?

18     *A.*   Yes, I did.  I spent a couple of hours reading

19   them.

20     *Q.*   Are these the kinds of things that, again, as a

21   defense lawyer, you would find useful in building a social

22   history and identifying mental health issues?

23     *A.*   Yes.  I would say these notes are a gold mine of

24   information and they would set off -- I think with any

25   trained professional and most lawyers, these would be just

1   a series of red flags, things that you would have to be

2   concerned about and would want to follow up on.

3   *Q.*   And based, again, hearkening back to your review

4   of Dr. Hopper's and Dr. Woods' reports, some of the items

5   raised or discussed in Ms. Rohde's notes, were they given

6   significance by Dr. Woods and Dr. Hopper?

7   *A.*   Yes.

8   *Q.*   And, to your knowledge, were they incorporated at

9   all into the mitigation themes that Wendi's defense team

10  used at trial?

11  *A.*   No.  And, indeed, Mr. Patterson I think said

12  that.

13          MR. ARNTSEN:  I would move Exhibit 7.002 into

14  evidence.  I don't know that it has been received yet.

15  Again, it's something he is relying on.

16          THE COURT:  Any objection?

17          MS. GARD:  Let me just pull it up, Judge.

18          MR. ARNTSEN:  That's the Kandy Rohde letter of

19  March 12th.

20          MS. GARD:  Oh, no, objection.

21          THE COURT:  Exhibit No. 7.002 is admitted into

22  evidence.

23          MR. ARNTSEN:  Thank you, Your Honor.

24          Now I want to turn from the social history

25  investigation to the mental health investigation.

1          Actually, Your Honor, it's a good time.

2          THE COURT:  It's a good time?

3          MR. ARNTSEN:  Yes.  It's your call.

4          THE COURT:  It looks like you're moving onto

5   another area.  So we will go ahead and take our lunch

6   break at this time.  We will be in recess until 1:30.

7   Everyone have a nice lunch.

8          (WHEREUPON, the lunch recess ensued from

9   11:52 a.m. to 1:30 p.m.)

10         THE COURT:  Good afternoon.  This is

11  CR 2000-096032-096032, State of Arizona vs. Wendi

12  Elizabeth Andriano.

13         The record will reflect the presence of the

14  parties and counsel.

15         The record will reflect that Mr. Larry Hammond is

16  on the witness stand.  And we will continue with the

17  direct examination by Mr. Arntsen.

18         Mr. Arntsen.

19         MR. ARNTSEN:  Thank you, Your Honor.

20    Q.   BY MR. ARNTSEN:  Mr. Hammond, what we're going to

21  talk about now is the mental health investigation

22  undertaken by Wendi's defense team.

23         Can you take a look at Exhibit 6 B?  It's 6.002

24  for the record, but 6 B in your binder.  Do you have that

25  in front of you, sir?

1      *A.*   Yes, I do.

2      *Q.*   Can you take a minute to read through that?

3      *A.*   Okay.

4      *Q.*   Do you see that this is a December 19 and 20,

5  2001 e-mail exchange between Dan Patterson and Patrick

6  Linderman?

7      *A.*   I do.

8      *Q.*   And then it relates in part to Ms. Andriano's

9  case; correct?

10     *A.*   Yes, it does in part.

11     *Q.*   And I really want to focus your attention on

12  Attorney Patterson's e-mail.  At the top of the page, do

13  you see where he says that:  Both clients should be

14  examined by mental health professionals, not because I

15  believe they suffer from mental illness, but as death

16  penalty cases, a mental health exam can provide a source

17  of mitigation?

18     *A.*   Yes, I do see that.

19     *Q.*   First of all, both under the standards, how much

20  weight should be given Attorney Patterson's belief -- lack

21  of belief that Ms. Andriano suffered from mental illness?

22          MS. GARD:  Objection.  Relevance.

23          THE COURT:  Sustained.

24          MR. ARNTSEN:  Offer proof.  Go ahead an answer

25  the question.

1          THE COURT:  Go ahead.

2          THE WITNESS:  Well, I think that, as I've said

3   before, the lawyers on the team ought to be reluctant to

4   rely on their own impressions about whether a case

5   involves a mental illness without the aid of trained

6   professionals.

7     *Q.*   BY MR. ARNTSEN:  Do you recall that the

8   guidelines expressly comment on this point?  And I'll turn

9   your attention to Page 31 of Exhibit 76, starting with the

10  first full paragraph.

11    *A.*   Yes.

12    *Q.*   What does that refer to?

13    *A.*   Well, it is the point I was making is that

14  lawyers need to be cautioned not to rely excessively on

15  their own impressions of the client's mental state.

16    *Q.*   Thank you.  Did you agree that Ms. Andriano

17  should be examined by mental health professionals?

18    *A.*   Yes.

19    *Q.*   And do you agree that in death penalty cases,

20  mental health can provide a source for mitigation?

21    *A.*   Of course, yes.

22    *Q.*   So in connection with that part of Attorney

23  Patterson -- as opposed to his own opinion of her mental

24  health, that part of Attorney Patterson's e-mail you agree

25  with; is that correct?

1    *A.*   Yes.  And I think it comes a little late, but I

2    do agree with it.

3    *Q.*   Yes, right now, we're a little after -- about

4    five months after Attorney Patterson has come on the case

5    and we're approximately 14 months after the offense; is

6    that right?

7    *A.*   Yes, that's what I was referring to.

8    *Q.*   And as I understand your answer, it's a little

9    late, but it's not irretrievably late in the context of

10   this proceeding; is that correct?

11   *A.*   Well, and I think you never know whether the

12   passage of time is going to do some uncorrectable damage,

13   but I don't have any evidence that -- given the large

14   amount of time that passed between charge and trial, it

15   certainly appears to have been correctable at that point.

16   *Q.*   And can you take a quick look at Exhibit 6 A or

17   6.001.  This is the March 28, 2001 Potts' report.  Do you

18   see that?

19   *A.*   Yes.

20   *Q.*   So this is after that; right?  Attorney

21   Patterson's e-mail to Mr. Linderman --

22   *A.*   Yes --

23   *Q.*   -- is after Dr. Potts' report?

24   *A.*   Yes, it's about eight months after; that's right.

25   *Q.*   And then if you take a look at Exhibit 6 C, which

1   is 6.003, do you see that that's Dr. Rosengard's

2   August 27, 2002 report?

3        *A.*   Yes.

4        *Q.*   Is this the type of examination that there would

5   be appropriate response to Attorney Patterson's e-mail?

6        *A.*   Well, it would have been one of the things that

7   would have been appropriate, yes.

8        *Q.*   And when we talked earlier -- I won't go over it

9   again -- about important reasons to involve health

10  professionals on the team early on.  Do you recall that?

11  Help make tactical decisions, guide investigations,

12  diagnoses, and that sort of thing?

13       *A.*   Yes.

14       *Q.*   Under the standard of care applicable during this

15  period, is it appropriate to make a strategic decision not

16  to have your client examined by a mental health

17  professional in a death penalty case?

18       *A.*   No.  I believe that there is not a good strategic

19  or tactical reason not to consult and work with mental

20  health people as part of the investigation.

21       *Q.*   Do you recall Attorney Patterson's testimony last

22  Friday that he was concerned about how, you know, getting

23  Dr. Bayless involved in the case or doing something that

24  would cause the State to involve Dr. Bayless?

25       *A.*   Yes, I do.

1    *Q.*   Would that support, because of that sort -- is

2    that a valid strategic concern?

3    *A.*   Well, I think it's not at the pretrial

4    investigative stage.

5    *Q.*   Can you explain your answer?

6    *A.*   Well, I think, if I recall correctly what

7    Mr. Patterson was saying, at some point if you have a

8    mental health examination of a various kinds done, the

9    other side, the prosecution will also be given that same

10   opportunity.  And to the extent that Mr. Patterson was

11   saying, well, let's not even start down that road, let's

12   not have a mental health examination because we think at

13   the end of the day, that the prosecution may bring on a

14   competing expert, I think we've long since decided as a

15   Bar and as a community, that that is not a valid reason.

16   *Q.*   Why not?

17   *A.*   Well, there's no valid reason that I know of not

18   to conduct an investigation for all of the reasons that

19   we've talked about.  It is very important that you know as

20   well as you can what may be down the road before you make

21   those more refined strategic and tactical reasons.  You

22   can't make them in the blind, so to speak.

23   *Q.*   And just to be clear, if you could turn back just

24   for a second to Dr. Potts' report, Exhibit 6 A or 6.001,

25   Dr. Potts was not part of the defense team; was he?

1    *A.*    No.   He's a court employee or county employee.

2    *Q.*    So now I want you to take a look at Exhibit 6 C,

3    6.003, Dr. Rosengard's report which was referenced by

4    Attorney Patterson.

5        What would you call this report or this

6    examination and report?  I just want to make sure we have

7    the nomenclature right.

8    *A.*    Well, it might be fairly called a -- I would call

9    it a preliminary investigation or inquiry that was

10   designed to provide some information, a personal history,

11   and then at least a preliminary set of diagnostic

12   impressions from which then the defense team could build.

13   *Q.*    And what makes you call this preliminary?

14   *A.*    Well, I think there are places in here where

15   Dr. Rosengard says that further work is necessary and that

16   these are his impressions but not formal findings.

17   *Q.*    And so for a formal mental health -- and, again,

18   correct me if I'm using the words wrong.  But, really,

19   sort of a final mental health examination to be used in

20   connection with the defense, would you want the mental

21   health professional to have the social history available

22   in connection with the report?

23   *A.*    Yes.  For the reasons I said this morning.  And

24   then you would want -- if you had a report like this, to

25   follow up on the specific things that Dr. Rosengard found.

1    *Q.*    Then if you would take a look at Page 4 of the

2    report.  And it's got a Bates number at the bottom, 7547.

3    Do you see that?

4    *A.*    Yes, I do.

5    *Q.*    Do you see that past personal history there?

6    *A.*    Yes.

7    *Q.*    That section of the middle of the page?

8    *A.*    Yes, I do.

9    *Q.*    Shortly before the break, remember we were

10   looking at the extended e-mail that Donna Ochoa had sent

11   to David DeLozier in early 2012 --

12   *A.*    Yes.

13   *Q.*    -- which we talked about is an early draft of a

14   start of the social history?

15   *A.*    Yes.

16   *Q.*    If you would just kind of briefly peruse the

17   personal history portion of Dr. Rosengard's report, would

18   you agree that there are a lot of items that Donna Ochoa

19   related concerning Wendi's early years that are not

20   reflected in Dr. Rosengard's summary of personal history?

21   *A.*    Yes, there are things.  And you identified some

22   of them this morning.  We identified some of the things

23   that are not -- that are not to have been known by

24   Dr. Rosengard.

25   *Q.*    And the items that we talked about this morning

1   in Donna Ochoa's report, the concerns of childhood abuse
2   and calling her grandma, instead of her mom, mom and the
3   various other things, leaving her running around in the
4   streets, that sort of thing, are those kinds of things
5   that you would expect to see in the personal history
6   portion of a mental health examination?

7        A.   At some point, yes.  And, again, as I've said
8   several times, this is an iterative process.  It's a
9   growing process.  I wouldn't condemn any single report
10  because it hadn't plumbed the full depths of what you need
11  to discover with respect to findings.

12       Q.   As I understand it from both familiarity with the
13  record and Attorney Patterson's testimony, other than the
14  domestic violence work done by Sharon Murphy and then the
15  retention of Dr. Mechanic to respond to some of
16  Dr. Bayless's testing issues, this was really the last
17  psychological evaluation done by the defense team?

18       A.   It's the last one of which I'm aware, yes.

19       Q.   Does that meet the standard applicable to capital
20  defense in this period?

21       A.   No.  And the fact that this is more than -- I
22  think it's still more than two years before the
23  commencement of the trial.

24       Q.   And I won't go over it in detail, but you recall
25  yesterday during Attorney DeLozier's examination,

1    Attorney Lynch put this up on the board and identified a

2    number of what they called red flags pointed out by

3    Dr. Rosengard?

4        *A.*    Yes.

5        *Q.*    And what I say was red flags, would you

6    understand red flags to be things that should be followed

7    up on?

8        *A.*    Yes.  And I alluded to that this morning.  One of

9    the important aspects of the investigative stage is to be

10   looking for things that need to be followed up on.  And

11   then, obviously, in my capacity now as a witness, I look

12   back at the things that were there, the indications that

13   would have led a lawyer to conduct a further

14   investigation, and I find them important and they're many

15   of the things you talked about before.

16       *Q.*    And are these the kinds of things that had the

17   defense team worked more extensively with Dr. Rosengard

18   moving forward in the two years between his report and the

19   trial, that based on your experience with Dr. Rosengard,

20   he could have contributed to as part of this defense?

21       *A.*    I have a high regard for Dr. Rosengard.  I think

22   he could have and would have been helpful.  He's also very

23   good about saying he knows his own limitations, and in

24   some of these areas, he may have suggested a different

25   mental health professional, but he certainly would have

1   been very helpful.

2      *Q.*   And that's the kind of thing, and based on your

3   experience and working with him, that he could contribute

4   to the defense; is that correct?

5      *A.*   I'm sure he could have, yes.

6      *Q.*   Even talking generally about the mental health

7   red flags that were gone over yesterday with

8   Attorney DeLozier, Kandy Rohde's notes, suicide attempt,

9   those sorts of things, are those the kinds of things that

10  if a psychiatrist like Dr. Rosengard had been an integral

11  member of the defense team, that they could have utilized

12  and incorporated into defense themes?

13     *A.*   Well, that's the idea of it.  And I would assume

14  that in a properly functioning team, that would happen in

15  the ordinary course.  You could gain information and

16  evaluate it and then you make decisions about the ultimate

17  incorporation of that information both at trial and at

18  sentencing.

19     *Q.*   And we talked this morning in some detail about

20  the fact that there really wasn't anybody on the team who

21  was in a position to do that; correct?

22     *A.*   That's my understanding.

23     *Q.*   And, again, does that comport with the standard

24  of care applicable at this time?

25     *A.*   No, it does not.

1    *Q.*   Can you summarize your opinion with regard to

2    whether Ms. Andriano's defense team adequately

3    investigated mental health issues in the preparation for

4    her mitigation case?

5    *A.*   Well, I don't want to repeat what I said before.

6    *Q.*   Right.

7    *A.*   But just by way of very quick summary, the

8    absence of a properly constructed approach to the

9    investigation of the case, including primarily the

10   failures to develop a close relationship with the client,

11   the failure to conduct an appropriate social history, the

12   failure to consult with appropriate mental health

13   professionals, all of those are factors that contributed

14   to the ineffectiveness, and I would say, constitutional

15   ineffectiveness, too.

16   *Q.*   And, again, based on your review, do you see any

17   plausible strategic reason for this, that justifies this

18   failure?

19   *A.*   No, no.  I don't think either of the lawyers who

20   were involved in the trial of this case would say that

21   there was either.

22   *Q.*   Were there mitigation themes available that were

23   not presented at Ms. Andriano's trial?

24   *A.*   Well, there were many of them.  We have the

25   benefit now of the work that has been done by

1   post-conviction counsel, which I think would give anyone a

2   kind of a nice comparison chart.  All one needs to do is

3   to read the opening statement of the mitigation case or

4   the closing argument of mitigation and compare that with

5   what has been assembled in the last couple of years during

6   the time that post-conviction counsel and your team have

7   been involved.  I think you can see that there are

8   multiple important themes that were completely left out.

9       Q.   Thank you.  And, again, is the fear at trial of

10  what the State might do in rebuttal to these themes any

11  valid reason not to investigate and pursue them to the

12  fullest extent with regard to the investigation stage?

13      A.   No, I don't believe there is.

14      Q.   Now just wrapping up, Mr. Hammond, what I would

15  like you to do is just again summarize the opinions that

16  you're here to -- that you've offered in connection with

17  this case.

18          First of all, what opinion do you have with

19  regard to whether the composition and operation of

20  Ms. Andriano's defense team comported with the standard of

21  practice applicable during the relevant time?

22      A.   My opinion is that the composition and operation

23  of the defense team fell woefully below even the most

24  minimal standards of preparation and coordination

25  necessary to defend a capital case.

1    *Q.*   And, specifically, do you have -- what is your

2    opinion with regard to whether the use of mental health

3    professionals as part of the defense team comported with

4    the applicable standard?

5    *A.*   No, it clearly didn't.  And we have gone through

6    the few mental health individuals who were involved at

7    some point and you can see that there was no coordinated

8    use of those individuals, no follow-up with respect to

9    mental health information, and that includes Dr. Potts,

10   Kandy Rohde, Dr. Rosengard and others who did provide in

11   one way or another, as we talked about, very important

12   information that should have been presented.

13   *Q.*   And what is your opinion with regard to whether

14   Ms. Andriano's defense team adequately investigated social

15   history and mental health issues relevant to the penalty

16   phase of her trial?

17   *A.*   Well, they clearly did not.  And as I said

18   earlier, maybe the strongest indication of that is the

19   memorandum that Mr. Patterson filed toward the end of the

20   merit's case asking for resources and help in the building

21   of the social history.

22   *Q.*   And is there any colorable strategic reason for

23   the shortcomings that you've just identified?

24   *A.*   No, I don't believe there is.

25        MR. ARNTSEN:  I would move Exhibit 1,

1   Mr. Hammond's report into evidence.

2            THE COURT:  Any objection?

3            MS. GARD:  Yes.  Relevance.

4            THE COURT:  I'll sustain the objection.

5            MR. ARNTSEN:  And the report is the offer of

6   proof, obviously.  No further questions.

7            THE COURT:  Ms. Gard?

8            MS. GARD:  Yes, Judge.

9

10                    CROSS-EXAMINATION

11  BY MS. GARD:

12       Q.   How much have you billed so far in this case,

13  Mr. Hammond?

14       A.   I don't know for sure.  I think the last summary

15  I had seen is somewhere around $40,000.

16       Q.   And you're charging a reduced rate, right,

17  because the attorneys are pro bono?

18       A.   Well, I charge in all of these cases a reduced

19  rate.  I'm charging 250 an hour, yes.

20       Q.   So can you approximate the number of hours you've

21  spent reviewing materials and preparing?

22       A.   I don't know how that arithmetic works, but I

23  would have to assume it's in excess of 100.  I know that.

24       Q.   I want to spend some time talking about your

25  experience.  Certainly, we don't dispute you have done a

1   tremendous amount work for indigents in this state, and

2   we're all very appreciative of that work, but it appears

3   to me at least that one thing you haven't done is

4   represented a defendant in a capital -- for a penalty

5   phase of a capital sentencing before a jury.  Am I correct

6   on that, in the State of Arizona?

7        *A.*   Yes.  That is correct.

8        *Q.*   What about outside of Arizona?  Have you done

9   that?

10       *A.*   Not at the penalty phase of a capital case.

11       *Q.*   Before a jury?

12       *A.*   Before a jury; right.

13       *Q.*   You mentioned there were three cases -- three

14  capital cases here that you served as lead counsel; right?

15       *A.*   Yes.

16       *Q.*   Okay.  And those are all in Arizona; right?

17       *A.*   They are.

18       *Q.*   One was the Knapp case?

19       *A.*   Correct.

20       *Q.*   And was another one a case, a defendant named

21  Dale Burch?

22       *A.*   Yes.

23       *Q.*   And that was out of Pima County; right?

24       *A.*   Yes, it was, Tucson.

25       *Q.*   And the third one that you're referring to, is

1  that the DeMocker case?

2      *A.*    Yes, it is.

3      *Q.*    And in that case, you withdrew during jury

4  selection; is that right?

5      *A.*    No.  No.

6      *Q.*    Is that incorrect?  Okay.  Then clear it up.

7      *A.*    No.  We withdraw with the approval of the Arizona

8  Supreme Court six months into the trial and five months

9  after jury selection.

10     *Q.*    Okay.

11     *A.*    At the end of jury selection, the county attorney

12 removed the death penalty, but we continued on for another

13 five months.

14     *Q.*    So when you tried it, it was no longer a death

15 penalty case?

16     *A.*    When opening statements started, it was a death

17 penalty case all the way up to the opening statements,

18 including the jury selection.

19     *Q.*    The prior cases where you have testified as an

20 expert, you mentioned that there are a number of cases

21 where you have not testified because you found counsel to

22 be effective; right?

23     *A.*    Well, that's not exactly what I intended to say.

24 There are cases in which I have concluded that there was

25 no ineffective assistance of counsel claim that I would

1  support.

2      *Q.*   Can you give us the name of some of those cases?

3      *A.*   I really -- I really don't know that I can.

4      *Q.*   How many do you think there were?

5      *A.*   Well, if you include both capital and noncapital

6  cases, as I think I said this morning, it would hundreds,

7  hundreds of cases.

8      *Q.*   What about just capital cases?

9      *A.*   I don't know.  It would have -- it would be

10 almost a guess, but I think it would have to be more than

11 30 or 40.

12     *Q.*   You testified, according I think to your CV, in

13 the Grant Henry case; right?

14     *A.*   Yes, I did.

15     *Q.*   And you expressed the opinion that his counsel

16 was ineffective?

17     *A.*   Yes.

18     *Q.*   And the trial court disagreed and denied relief;

19 right?

20     *A.*   Yes.  The PCR court disagreed.

21     *Q.*   The PCR court.  I'm sorry.

22     *A.*   Yes.

23     *Q.*   And the same is true of the Murdaugh case where

24 you testified; correct?  The PCR court denied it?

25     *A.*   That's right.

1    *Q.*   And the same is also true of the Kayer case;
2    correct?  You testified in that case?
3    *A.*   Yes.
4    *Q.*   And relief was denied there?
5    *A.*   Yes, at that level.
6    *Q.*   And you also testified in the Hanson case
7    recently; right?
8    *A.*   Yes.
9    *Q.*   And there has been no ruling on that case;
10   correct?
11   *A.*   I don't believe so.
12   *Q.*   In your CV, you talk about the Lacy case that you
13   testified in?
14   *A.*   Yes.
15   *Q.*   Your CV, being Exhibit 1.  And in that, you say
16   it was reversed based in part of ineffective assistance?
17   *A.*   Yes.
18   *Q.*   Can you clear that up?
19   *A.*   Yes.  It was not a capital case, but Byron Lacy
20   was a man who was convicted of first degree murder.  And
21   we eventually discovered -- this was an Arizona Justice
22   Project Case.  We eventually discovered that the bullet
23   hole in the victims skull was smaller than the gun alleged
24   to have killed him.  And so the ineffectiveness counsel in
25   failing to investigate the facts of the case became one of

1   the reasons for the Superior Court to set aside his

2   conviction.

3       Q.   Are you currently doing any state

4   post-convictions?  Are you representing any state court

5   defendants on post-conviction?

6       A.   You mean as counsel?

7       Q.   As counsel.

8       A.   No.

9       Q.   Are you representing them in some other capacity

10  in any way?

11      A.   Well, there are other state post-conviction cases

12  in which I have been appointed as the defense expert.  And

13  there are other cases that I have not accepted an

14  appointment in, but have essentially said I will continue

15  to consult.

16      Q.   When you're appointed as an expert in these

17  cases, do you consider yourself to be part of the defense

18  team?

19      A.   No.

20      Q.   Do you consider yourself to be representing the

21  client?

22      A.   No.

23      Q.   Do you give advice to PCR counsel about how to

24  draft a petition?

25      A.   Yes.

1     *Q.*   Yes.  Do you give advice about what claims to

2  raise in the petition?

3     *A.*   Well, I share my suggestions with them, but --

4     *Q.*   And did you give that advice in this case to

5  counsel about what things to include?

6     *A.*   I'm sure I had -- no doubt that I had

7  conversations with them about that.

8     *Q.*   Are you currently -- well, you're aware that the

9  Arizona Supreme Court maintains a list of qualified PCR

10  counsel; right?

11     *A.*   Yes.

12     *Q.*   Are you on that list currently?

13     *A.*   No.  But we helped to create that list.

14     *Q.*   And you helped to create that list?

15     *A.*   Yes.

16     *Q.*   That is with your work with what committee?

17     *A.*   That has been a combination of both the State Bar

18  Indigent Defense Task Force and the American Bar

19  Association.  It's also a work in progress.

20     *Q.*   You testified that you helped to draft Rule 6.8

21  of the Arizona Rules of Criminal Procedure?

22     *A.*   Yes.  I submitted the application to amend the

23  rule.

24     *Q.*   I'm sorry?

25     *A.*   To amend the rule.

1    *Q.*   To amend the rule.  Okay.  You would agree that

2    the rule does not require second chair counsel to have

3    capital experience?

4    *A.*   It does not.  That's correct.

5    *Q.*   And you would also agree that there is no

6    constitutional entitlement to second chair counsel in a

7    capital case?

8    *A.*   I don't agree with that.

9    *Q.*   You disagree with that?

10   *A.*   I do.

11   *Q.*   But you agree that Mr. Patterson was qualified to

12   be first chair counsel?

13   *A.*   I said he was.  Honestly, I think he was, yes.

14   *Q.*   Staying on the topic of Rule 6.8, there was a

15   comment published to that rule in 2006; correct?  Do you

16   recall that?

17   *A.*   A comment?  There were numerous comments.

18   *Q.*   There was one relating specifically to the

19   American Bar Association Guidelines, that ABA Guidelines

20   we were talking about?

21   *A.*   Well, there were lots of them related to the ABA

22   Guidelines, yes.

23   *Q.*   Okay.  And you would agree that one of those

24   comments states that the guidelines should be considered a

25   continuum of best practices, but that some may not be

1  applicable to Arizona practice or the circumstances of

2  this particular case?

3      *A.*   I'm not sure which comment you're talking about.

4  The attorney general submitted a comment and then there

5  was a comment by some judges.

6      *Q.*   There is comment to the rule, the State Bar,

7  whoever publishes the comments to the rule.

8      *A.*   Oh, I'm sorry.  I'm sorry.  I thought you were

9  talking about the comments that people make.

10     *Q.*   No, not the comments.

11     *A.*   Yes.

12     *Q.*   The actual comment that is published with the

13  rule.

14     *A.*   There's a two-paragraph.

15     *Q.*   Yes.  And you would agree that it essentially

16  says that the guidelines are -- the ABA Guidelines are to

17  be considered best practices, but some may not be

18  applicable in a given case?

19     *A.*   I don't know about the exact wording of that, but

20  that's reasonably accurate.

21     *Q.*   And you would agree that that is consistent with

22  the language in *Strickland vs. Washington*; right?

23     *A.*   Well --

24     *Q.*   Well, let be more precise.  You're familiar with

25  *Strickland vs. Washington*?

1    *A.*    I would say everything is consistent with

2    *Strickland V. Washington*.  But, yes.

3    *Q.*    You're familiar with *Strickland*?  Very familiar,

4    I'm sure; right?

5    *A.*    Well, yes.

6    *Q.*    You would agree with me that *Strickland* tells us

7    that the ABA Guidelines and other professional

8    publications should be concerned as a guide to what is

9    reasonable; right?

10    *A.*    Yes.  But *Strickland* itself, as you know, doesn't

11    talk about the ABA Death Penalty Guidelines.  It predated

12    the Death Penalty Guidelines by some number of years.

13    *Q.*    But it does cite the ABA standards for criminal

14    justice; right?

15    *A.*    It does, yes.

16    *Q.*    It also says that no particular set of detailed

17    rules for counsel's conduct can take into account all of

18    the circumstances that an attorney would make; right?

19    *A.*    It certainly says that, yes.

20    *Q.*    And that there are different ways to defend any

21    given case?

22    *A.*    Yes, it says that.

23    *Q.*    And it also says that the assistance of detailed

24    guidelines can actually be distracting sometimes for

25    counsel from their mission of the client's advocacy;

1   right?

2      *A.*   Yes.  I think there is a straightjacket approach

3   that has been cited coming out of that language.  It says

4   lawyers shouldn't put themselves into a straightjacket.

5      *Q.*   So a deviation from the ABA Guidelines does not

6   necessarily mean, per se, ineffectiveness; right?

7      *A.*   That's correct.  At least, it's correct in my

8   view.

9      *Q.*   You were asked about the *Ring* case and you

10  expressed the opinion that the standard of care did not

11  change between *pre-Ring* and *post-Ring*; correct?

12     *A.*   That's correct.

13     *Q.*   But would you agree that the method of presenting

14  mitigation changed?

15     *A.*   Yes.  And that's what I was trying to say.  I'm

16  not sure if I said it clearly, but I was saying that the

17  method of presentation and the approach to that method did

18  change.

19     *Q.*   And you were present when Mr. Patterson expressed

20  that same opinion yesterday; right?

21     *A.*   Well, he -- last Friday.

22     *Q.*   Or Friday.

23     *A.*   Mr. Patterson expressed a part of that idea, but

24  he also -- he also I think characterized it in a way that

25  I can't agree with.

1    *Q.*   Well, you also are aware that Mr. Patterson

2    testified that he was able to acquire additional training

3    in how to present a case to the jury prior to this

4    defendant's case?

5    *A.*   Yes.  I think he said he went out and attended a

6    number of conferences after *Ring* was decided.

7    *Q.*   Okay.  You were questioned about Dr. Rosengard's

8    report.  Do you still have that in front of you?  I think

9    it's Exhibit 6.003.

10          MR. ARNTSEN:  6 C.

11          MS. GARD:  6 C in your binder.

12          THE WITNESS:  Yes, I do have it.

13   *Q.*   BY MS. GARD:  And you characterized this -- and

14   correct me if I misunderstood your testimony.  But you

15   seemed to characterize this as a preliminary report?

16   *A.*   Yes.  That's my sense of the report, yes.

17   *Q.*   He doesn't say that it's a preliminary report,

18   though; does he?

19   *A.*   No.  But, as I said, he talked about it in terms

20   of his -- I think he called them impressions and

21   recommendations.  That's the kind of report you would

22   expect that is a kind of a preliminary review of what

23   Dr. Rosengard found.

24   *Q.*   Well, he made three diagnoses on Axis 1; right?

25   *A.*   He does.

1    *Q.*   And there are no rule-out diagnoses that he

2    makes; right?

3    *A.*   I do not see any here.

4    *Q.*   And he also expressed some skeptism about the

5    defendant's claim that she had amnesia for the event; is

6    that right?

7    *A.*   Can you show me what you're looking at?

8    *Q.*   I'm looking at the page of the report of

9    Exhibit 6.003 with the Bates stamp 7548 on the bottom

10   right-hand corner.

11   *A.*   Yes.

12   *Q.*   Okay.

13   *A.*   The issue of amnesia, the subject appears all too

14   convenient?

15   *Q.*   Appears all too convenient; correct.

16   *A.*   Yes, I see that he said that.

17   *Q.*   This report, as you understand it, was prepared

18   as a tool for developing mitigation; right?  We know that

19   from the e-mail?

20   *A.*   Well, no.  It was prepared at the request of the

21   Office of the Public Defender.  Whether I would say it was

22   prepared for the specific purpose of mitigation, I can't

23   tell you.  I don't know.

24   *Q.*   And in the guilt phase, you recall there was

25   substantial testimony about the defendant being a victim

1   of domestic violence?

2       *A.*   Yes.

3       *Q.*   And that was her defense to the first degree

4   murder charge; right?

5       *A.*   Yes.

6       *Q.*   And you will recall that that theme was carried

7   over into sentencing; correct?

8       *A.*   Yes.

9       *Q.*   And that there was an additional theme presented

10  in the context of her being a good -- essentially a good

11  person?

12      *A.*   Yes.

13      *Q.*   A good mother?

14      *A.*   A good woman, a good mother.

15      *Q.*   A good Christian.  And you also are aware that

16  Dr. Murphy testified in both phases?

17      *A.*   Sharon Murphy did testify.

18      *Q.*   Correct.  Sharon Murphy.  And that Mr. Patterson

19  also called Mindy Mechanic for both of those findings in

20  the guilt phase; right?

21      *A.*   Yes.

22      *Q.*   Would you agree that once a theme is selected,

23  consultation with mental health experts may not be

24  necessary depending on the theme or presentation of mental

25  health testimony may not be necessary?

1    *A.*   Presentation may not.  Investigation, I think

2  must continue.

3    *Q.*   So you should have your client evaluated

4  by mental health --

5    *A.*   You should do more than just -- as I spoke about

6  earlier today, it's more than simply a matter of having a

7  mental health evaluation.  That's why the rest of this is

8  so important.  The social history, the opportunity to look

9  at the jail records, life history records, all of those

10  things are an important part.  It wouldn't be adequate

11  just to say that I've hired a mental health person and

12  that person has conducted an examination.

13    *Q.*   You're aware from your review of the record that

14  Mr. Patterson was able to keep out some of the defendant's

15  other prior bad acts of theft and things like that by

16  limiting what he presented.  Are you aware of that?

17    *A.*   Well, I can't say I'm intimately aware of that.

18    *Q.*   You're aware that he was able to limit

19  Dr. Bayless's evaluation right?

20    *A.*   Yes.

21    *Q.*   And you, I'm sure, are familiar with Dr. Bayless?

22    *A.*   I am.

23    *Q.*   And he's a pretty devastating witness for the

24  defendant; isn't he?

25    *A.*   Devastating for the defendant?

1    *Q.*    In terms of he's a very compelling witness for
2    the State?

3    *A.*    Let me say that he can be.  It s certainly far
4    from true that he is universally a powerful witness.  Like
5    all experts and maybe like me, you can make mistakes.

6    *Q.*    And in many cases, you would agree that he is a
7    very powerful witness?

8    *A.*    He has a reputation for being a successful
9    witness.

10    *Q.*    You were questioned about Mr. DeLozier's fast and
11    his performance at trial.  I believe you testified this
12    morning that you reviewed Mr. DeLozier's interview?

13    *A.*    Yes, I did.

14    *Q.*    So you're aware that he fasts regularly?  It's
15    something that he does from time to time?

16    *A.*    He has said that he has done different kinds of
17    fasting at different times.  But, yes, he did talk about
18    that.

19    *Q.*    And you're aware that it's his position that
20    fasting actually improves his performance?

21    *A.*    Well, he said that I think here in his testimony
22    that he thought at least in the early stages of his fast,
23    that it sharpened his mind and clarified his thinking.  I
24    did hear him say that.

25    *Q.*    The death of Mr. Blair occurred on October 17th,

1  as I understand it.  Is that your understanding?  Of 2004?

2      *A.*    Yes, uh-huh.

3      *Q.*    The penalty phase, as I understand it, of this

4  trial began in December?

5      *A.*    December.

6      *Q.*    December of that same year?

7      *A.*    December 9th or something like that.

8      *Q.*    So, give or take, that happened two months before

9  the penalty phase; right?

10      *A.*    Yes.

11      *Q.*    And the one time it was brought to the judge's

12  attention that Mr. DeLozier was having problems, the judge

13  continued the trial for that day; right?

14      *A.*    Yes.

15      *Q.*    So he wasn't forced to continue in that state on

16  that day?

17      *A.*    No, he was not.

18      *Q.*    You would agree that *Strickland* directs that a

19  court not apply the benefit of hindsight to counsel's

20  decision making process?

21      *A.*    Yes.  And the court talks about the distorting

22  effects of hindsight.

23      *Q.*    And that you need to -- or the courts need to

24  evaluate counsel's decisions from his perspective at the

25  time?

1      *A.*   Well, both from his perspective and the

2    perspective of an objectively reasonable criminal defense

3    lawyer at the time.

4      *Q.*   At the time of the representation?

5      *A.*   Yes.

6      *Q.*   Okay.  Do you think you complied with that?

7      *A.*   Do I think --

8      *Q.*   Given your opinions here, do you think you're not

9    apply the benefit of hindsight?

10     *A.*   I'm doing what I think Justice O'Connor and the

11   Court had in mind.  I've tried to remove from my own

12   thinking the distorting effects of hindsight.

13          MS. GARD:  Nothing further, Judge.

14          THE COURT:  Redirect?

15          MR. ARNTSEN:  Just a couple for Attorney Hammond.

16

17                    REDIRECT EXAMINATION

18   BY MR. ARNTSEN:

19     *Q.*   Counsel for the State asked you some questions on

20   some Supreme Court cases?

21     *A.*   Yes.

22     *Q.*   Actually, it may help you if you take a look at

23   Exhibit 54.  I want to ask you a question about the

24   Wiggins case.

25     *A.*   Yes.

1        MS. GARD:  Objection.  Beyond the scope.

2        THE COURT:  Overruled.

3        Go ahead.

4    Q.   BY MR. ARNTSEN:  Are you familiar with the

5    Wiggins case?

6    A.   I am.

7    Q.   It was decided in 2003?

8    A.   I believe that's right.

9    Q.   If you take a look at PCR 299 in Exhibit 54.

10   A.   Yes.

11   Q.   The last sentence on the page.

12   A.   Yes.

13   Q.   Can you read that into the record?

14   A.   Yes.  Mr. Patterson says that the United States

15   Supreme Court has affirmed that the guidelines are the

16   established standards for capital defense counsel.

17   Q.   And citing Wiggins?

18   A.   Yes.

19   Q.   And do you agree with that statement?

20   A.   Yes.

21   Q.   Can you take a look at Exhibit 6 C or 6.003,

22   Dr. Rosengard's?

23   A.   Yes, I have it.

24   Q.   And if you can turn to -- and counsel asked you

25   questions on the fifth page of his report, the Bates

1  number is 7548 at the bottom in the summary, opinions and

2  recommendations section.

3      *A.*    Yes.

4      *Q.*    Are you there, sir?

5      *A.*    Yes.

6      *Q.*    Do you recall she asked you some questions

7  concerning possible amnesia?

8      *A.*    Yes.

9      *Q.*    And can you read into the record the sentence

10  that begins at the bottom of the page, an individual, and

11  then through into the top of the page and until it wraps

12  up that topic?

13      *A.*    Yes.  An individual who goes through a traumatic

14  event will often forget the extreme situation because an

15  individual is unable to deal with the thoughts on an

16  emotional basis.  This occurs in both children and adults

17  who have been physically or sexually attacked and more

18  than explains the defendant's response, et cetera.

19          MR. ARNTSEN:  Thank you.  No further questions.

20          THE COURT:  May this witness be excused?

21          MR. ARNTSEN:  Yes.

22          THE COURT:  Thank you very much, sir.  You are

23  excused.

24          THE WITNESS:  Thank you, Your Honor.

25          THE COURT:  The Petitioner may call her next

1  witness.

2          (WHEREUPON, the witness entered the courtroom.)

3          THE COURT:  Please step forward up to the witness

4  stand here.  Face the clerk.  Give her your full name.

5  Raise your right hand and she will swear you in.

6          THE CLERK:  Please state your name for the record

7  and spell your name.

8          THE WITNESS:  Gary Lowenthal, L-O-W-E-N-T-H-A-L.

9          THE CLERK:  Raise your right hand, please.

10          (WHEREUPON, the witness was duly sworn by the

11  clerk.)

12          THE COURT:  Thank you.  Make yourself comfortable

13  there.

14          THE WITNESS:  Thank you.  Good afternoon,

15  Your Honor.

16          THE COURT:  Good afternoon.  Go ahead and make

17  yourself comfortable there.  Remember to speak up so that

18  everyone can hear you.

19          THE WITNESS:  I'll try, Your Honor.

20          THE COURT:  Is it going to be Ms. Sterken?

21          MS. STERKEN:  Yes, Your Honor.

22          THE COURT:  Okay.  And go ahead and state your

23  name for the record.

24          THE WITNESS:  My name is Gary Lowenthal.

25          THE COURT:  Ms. Sterken, you may proceed.

1          MS. STERKEN:  Thank you.

2

3                    GARY LOWENTHAL,

4    having been first duly sworn to tell the truth, the whole

5    truth, and nothing but the truth, testified as follows:

6

7                    DIRECT EXAMINATION

8    BY MS. STERKEN:

9          Q.   Mr. Lowenthal, what's your profession?

10         A.   I'm an attorney and I'm a retired law professor.

11         Q.   I'm going to ask you some more questions about

12    your background in a bit.  But, first of all, what was the

13    scope of your review in this case?

14         A.   I was retained by your firm in these PCR

15    proceedings to investigate whether Attorney David DeLozier

16    had an actual conflict of interest in his representation

17    of Ms. Andriano in Phase 3 of her trial, whether he

18    actively represented conflicting interests, and whether if

19    a conflict of interest adversely affected his

20    representation of Ms. Andriano in Phase 3 of her trial.

21         Q.   And could you briefly state your conclusions?

22         A.   Briefly, I found that after reviewing everything

23    that I could, first, that Mr. DeLozier did in fact have an

24    actual conflict of interest in representing Ms. Andriano

25    in the preparation and presentation of her Phase 3

1  mitigation case.

2        Second, that he actively represented conflicting

3  interests.

4        And, third, that his conflict of interest

5  adversely affected his representation of Ms. Andriano.

6        Do you want me to go into any more detail than

7  that?

8    *Q.*   No.  We will do that later.

9    *A.*   Okay.  Thank you.

10   *Q.*   Did you create a report summarizing your analysis

11  and conclusions?

12   *A.*   I did.

13   *Q.*   Could you please refer to Exhibit 78?  There are

14  some binders underneath you there.

15   *A.*   Oh, thank you.  Well, oh, I see.  Yes.

16   *Q.*   Can you identify that document?

17   *A.*   Obviously, I haven't enough time to read it, but

18  this appears to be the report I submitted to you and all

19  the appendices to the report that I submitted.

20   *Q.*   How did you reach your conclusions in this case?

21  And I'll direct you perhaps to Page 5 of your report to

22  the extent that is helpful.

23   *A.*   All right.  Let me find it.  Yes.

24   *Q.*   How did you reach your conclusions in this case?

25   *A.*   Well, I reviewed a tremendous amount of material.

1   The first thing I did was to review the pleadings that

2   your office submitted and Ms. Gard submitted for the State

3   in this proceeding.

4           Then I read and reviewed the Arizona Supreme

5   Court decision in State V. Andriano.

6           I drew up a list of materials that I wanted to

7   see to help me form an opinion.  I requested those

8   materials from your office.  I received a great many, much

9   more than I would have wanted to, and I reviewed those

10  materials.

11          Then I suggested to Mr. Arntsen that it would be

12  useful for me to interview certain witnesses, which I then

13  did.  And then after I did that, I began to prepare my

14  report and I prepared my report on that basis.

15  Q.   Does Page 5 through 9 of your report provide a

16  complete list of the documents that you reviewed prior to

17  completing your report?

18  A.   Yes, it does.  I want to add that I noticed

19  within the last few days, there an omission on Page 9 --

20  either Page 9 or on 10.  Of the persons -- the interviews

21  I conducted before I prepared the report, I also

22  interviewed Ms. Andriano.  And I refer to that later in

23  the report things that I learned from that interview, but

24  I didn't include it on Pages 5 through 9.

25  Q.   Who are the individuals that you interviewed

1  prior to reaching your conclusions?

2      A.    Oh, I came here from New Mexico and interviewed

3  in late October of 2013 -- I interviewed Donna and Alejo

4  Ochoa in Casa Grande.  I went up to the Cave Creek area to

5  interview Mr. DeLozier.  I went out to Perryville to

6  interview Ms. Andriano.

7          Then I traveled to the office of the Maricopa

8  County Public Defender's and interviewed Mr. Patterson.

9  That was over I think a three-day period.

10     Q.    Did you conduct any other interviews?

11     A.    Yes, I did.  Before preparing my report, I

12 decided that there were two other persons I wanted to

13 interview.  I did not -- for both economic reasons,

14 financial limitations and time constraints, I did not come

15 back to Arizona to conduct those interviews.

16         I interviewed a person named Daphne Budge on the

17 telephone.  And I also interviewed a person named Kathy

18 O'Quinn.

19     Q.    And, briefly, what were Ms. Budge's and

20 Ms. O'Quinn's role in this case?

21     A.    Ms. Budge is an attorney who represented Donna

22 and Alejo Ochoa in proceedings with regard to either the

23 guardianship or adoption or severance of parental and

24 grandparent rights with regard to Ms. Andriano's children.

25 She was counsel of record for them in a proceedings after

1  Mr. DeLozier was.

2        And Ms. O'Quinn was a paralegal working for

3  Mr. DeLozier in 2001 at the time when there was a dispute

4  whether he would be representing Ms. Andriano or the

5  public defender or there would be some other arrangements

6  for her representation.

7     Q.   You've testified that your report provides a

8  complete list of all the documents that your reviewed

9  prior to coming to your conclusions?

10    A.   Yes.

11    Q.   Have you reviewed any additional documents since

12 completing your report?

13    A.   As a matter of fact. I have. I reviewed, I

14 would say, that I can recall, three separate either

15 affidavits or declarations:  One by Keith Rohman, one by a

16 Dr. Leighton and one by a fact witness.  I think her name

17 is Kyre Lorts.

18        I also had an opportunity to review the reports

19 of Dr. Amin and Dr. Pitt.  And I read the transcript of

20 the interview Dr. Pitt conducted with the defendant, the

21 Petitioner.  And, of course, I was present in court when

22 Mr. DeLozier testified yesterday and Mr. Patterson last

23 Friday.

24    Q.   Could I have you refer to Exhibit 79?  Can you

25 identify that document?

1    *A.*    Yeah.  It's my resumé.

2    *Q.*    Is that a current copy?

3    *A.*    Yeah.  I think it's current, yes.

4    *Q.*    Can you tell me a little bit about your

5    educational background?

6    *A.*    I graduated from Harvard College in 1966 and

7    university of Chicago Law School in 1969.

8    *Q.*    And where are you currently admitted to practice?

9    *A.*    I'm currently admitted to practice in the State

10   of California, the United States District Court for the

11   District of Arizona, the Ninth Circuit Court of Appeals

12   and the United States Supreme Court.  That's currently.

13          I was also a member of the State Bar of Arizona

14   for over 20 years while I was a law professor at Arizona

15   State University.

16   *Q.*    Can you tell me a bit about your professional

17   background after law school?

18   *A.*    Yeah.  My first significant employment was as an

19   assistant public defender in Alameda County, California,

20   which is the Oakland, Berkeley East Bay area of the bay

21   area.  And I worked there for about four and-a-half years.

22          And, actually, since my assignment here really

23   involves -- is involving a conflict of interest, it's at

24   that point in time early in my career that I became

25   intensely interested in the issue of conflicts of interest

1  and have remained so for 40 years.

2     *Q.*   Can you tell me what interested you in conflict

3  of interests at that time?

4     *A.*   I experienced, particularly among my colleagues,

5  and one case in particular, a very painful experience

6  involving a conflict of interest.

7        My best friend in the public defender's office

8  was representing a defendant.  And this is in the early

9  1970's.  I was in this office from '70 to '74.  He was

10 representing a defendant who was charged with sexual

11 assault, a rape and robbery of a woman.  It turns out -- I

12 didn't know this at the time, even though I talked to him

13 about the case -- he had represented the woman before.  He

14 had represented her probably three weeks into his career

15 as a public defender.  He represented her on a misdemeanor

16 prostitution charge.

17       And it turns out the defense was that it was a

18 consent defense, that they engaged in an act of

19 prostitution, that the defendant -- they got into a

20 dispute over how much he was to pay her and she claimed

21 that he robbed her and raped her.  He claimed that that

22 wasn't true.

23       The case went to trial.  I was in the courtroom

24 when the case went to trial.  And he did not bring up any

25 facts from her prior representation, but he did bring up

1   of the fact that she had been convicted of prostitution on

2   more than one occasion.  He was aware of her record.  He

3   did not think he was doing anything wrong.  He was a very

4   conscientious guy.  I'm sorry.

5        And, afterwards, his client was acquitted and he

6   was very happy.  The victim complained to the head of our

7   office and she was very upset.  She felt she had been

8   betrayed.  And, as a result of that, he got in trouble and

9   he was put under suspension.  And he honestly believed he

10  had done nothing wrong, but it was his job to zealously

11  represent his client.  From that day forward, I became

12  interested in conflict of interest.

13  *Q.*   And, just to clarify, the attorney had previously

14  represented the woman in prostitution charges; is that

15  correct?

16  *A.*   Yeah.  And, actually, the office continued --

17  although, the office still represented her on probation

18  revocation matters.

19  *Q.*   So you told me about your time in the public

20  defender's office.  What did you do after that?

21  *A.*   I'm sorry for that aside.  I then went into a

22  private practice for a couple of years as a partner in a

23  law firm in the San Francisco, Oakland area.

24       And then in 1976, I moved here to Arizona.  And

25  for the next 31 years, I was a law professor at Arizona

1   State University.

2      *Q.*   Did your teaching or your research focus on any

3   particular areas of law?

4      *A.*   Yes.  In a general sense, I -- well, I wrote

5   about a few other things, but in a general sense, my

6   primary interest was in the ethical problems encountered

7   by both criminal defense lawyers and prosecutors.

8          My teaching was primarily in the area of criminal

9   law and criminal procedure.  And within the area of

10  ethical problems, I specialize in conflicts of interests.

11         I conducted three empirical studies and formed my

12  later research in writing form.  I conducted a national

13  survey of public defender officers as to how they handle a

14  whole range of conflict of interest problems.

15         I also looked at -- I don't remember how many.  I

16  think it was about 500 cases from Superior Court files

17  here in Maricopa County and then followed up on facts from

18  those cases to determine how lawyers dealt with conflict

19  of interest-type problems or problems that could be

20  considered to be a conflict of interest.  Some cases were.

21  Some cases weren't.

22         In a third study, I interviewed a few hundred

23  lawyers or interviews were conducted under my supervision

24  by law students of private -- lawyers in private practice

25  and how they dealt with a range of issues, including

1 conflict of interest problems.

2     *Q.*   What your research on that published?

3     *A.*   Oh, yes, a series of articles.  The two most

4 significant were in the University of Virginia Law Review

5 and the Yale Law Journal.

6     *Q.*   Did the U.S. Supreme Court ever reply upon your

7 fellowship?

8     *A.*   Yes, they did in the -- probably the three cases

9 that are most germane to this proceeding:  *Kyla vs.*

10 *Sullivan; Wood vs. Georgia* and the third one was *Vicken*

11 *vs. Taylor*.  The majority opinion of the Court cited my

12 work in its analysis of the issues in the case.

13     *Q.*   Have you ever represented a capital defendant,

14 Mr. Lowenthal?

15     *A.*   Yes.

16     *Q.*   When?

17     *A.*   In post-conviction proceedings.  In 1993, I was

18 appointed by the Federal District Court for the District

19 of Arizona to represent an individual in a post-conviction

20 habeas corpus proceedings.  I continued to represent that

21 individual and it's 21 years later.

22     *Q.*   What's the principle issue in that case?

23     *A.*   Ineffective assistance of the counsel in the

24 preparation for and presentation of mitigating evidence.

25     *Q.*   Have you served as consultant on conflict of

1   interest issues prior to this case?

2       *A.*   Yes.

3       *Q.*   Can you tell me a bit about that?

4       *A.*   Yes.  Primarily -- and this mostly over the last

5   ten years.  Primarily, at the request of the Arizona

6   Capital Representation Project, I have consulted with

7   lawyers, both public defenders and lawyers in private

8   practice with regard to questions they have as to whether

9   or not a certain situation they were in constituted a

10  conflict of interest.  And, if so, what or if possibly or

11  if definitely what they should do.

12          I've also served as an independent consultant for

13  criminal defendants who were -- generally, I was contacted

14  by their families to provide independent advice as to

15  whether or not they had a conflict of interest with their

16  lawyer, so that they could make an informed judgment based

17  on a weighing of the consequences of different courses of

18  action, to determine whether they should proceed with

19  their lawyer.

20      *Q.*   Mr. Lowenthal, in reaching your conclusions, did

21  you rely on any statements or testimony by

22  Attorney DeLozier?

23      *A.*   Yes.

24      *Q.*   Does this include information about

25  Attorney DeLozier's professional background prior to

1    representing Wendi Andriano?

2        A.    Yeah.   I heard a little bit of that in the

3    courtroom here yesterday.   But when I interviewed him in

4    October -- sorry.   I've got a dry mouth.   When I

5    interviewed him in October, we went into a fair amount of

6    detail about his prior background.

7        Q.    What did he tell that was relevant to your

8    conclusions regarding his professional background?

9        A.    Well, although, he was initially admitted to

10   practice in 1970, he began to practice criminal law

11   probably I would say 1990 or shortly thereafter, early

12   1990's.   By the mid-1990's and the beginning, it was

13   mostly a DUI, misdemeanor-type practice.   Eventually, it

14   evolved into more a felony practice in the mid to late

15   1990's.   I would say it was certainly by no means all of

16   his practice.   Probably 25 percent or more of his

17   practice.

18       Q.    Did you determine whether Attorney DeLozier had

19   any familiarity with mitigation work prior to representing

20   Wendi Andriano?

21       A.    Oh, yeah, we talked about that at length.

22            MS. GARD:   Your Honor, and I just object at this

23   point to the hearsay unless it's being offered as the

24   basis of his opinion.

25            MS. STERKEN:   It is being offered on that basis.

1        THE COURT:  Lay some foundation as to the basis

2   of his opinion and I'll let you go into it.

3        MS. STERKEN:  Sure.

4        Q.   BY MS. STERKEN:  Mr. Lowenthal, did you rely upon

5   statements from Attorney DeLozier regarding his

6   professional background in reaching your opinions in this

7   case?

8        A.   Yes.  It was very important in my opinion to know

9   what his professional background was.

10       Q.   And did that include his experience with

11  mitigation work?

12       A.   Oh, yes.

13       Q.   What did he tell you regarding his experience

14  with mitigation work that was relevant to your

15  conclusions?

16       A.   I don't know whether obviously it's true, but

17  what he told me and what I'm relying on is that he had

18  attended State Bar seminars on mitigation.  That he had

19  presented mitigation evidence in several of his cases,

20  felony cases before his undertaking of representation of

21  Ms. Andriano.

22       That he was -- I specifically asked him if he had

23  any awareness of the impact or potential impact of

24  childhood abuse, trauma, neglect as factors that might

25  help a sentencer understand the defendant's behavior at

125

1   the time of an offense.

2        And he indicated to me that he certainly

3   currently was aware of that and he was aware of that from

4   his training before and his experience before

5   Ms. Andriano's case.

6        Q.   Can you elaborate on Attorney DeLozier's

7   experience with sexual abuse as far as it's relevant to

8   your conclusions?

9        A.   Well, he told me also that some time --

10  approximately around the time that he was beginning to

11  focus on the penalty phase in Ms. Andriano's case, he was

12  very actively involved in the representation of what he

13  told me was up to 20 cases involving individuals who

14  allegedly were sexually abused by Catholic priests.

15       Q.   In the context of these cases did

16  Attorney DeLozier explain to you his understanding of how

17  to develop facts relevant to sexual abuse cases?

18       A.   I don't know if we went into great depth about

19  that.  So I knew he was experienced in that area and had

20  experience in that area.  He did mention that he was

21  aware -- and this I took into consideration in forming my

22  opinion.  He said he was aware of the relationship between

23  childhood abuse, in general, and sexual abuse, in

24  particular, because of his civil case experience with

25  things such as dissociation, memory loss, post-traumatic

1   stress disorder, ability to recall incidents, painful

2   incidents from childhood.  I'm trying to think of what

3   else he might have mentioned.  I think he also mentioned

4   to me his awareness of the difficulty that some of his

5   clients had experienced in forming meaningful

6   relationships as adults.

7       Q.   So I'm going to ask you to kind of walk us

8   through a timeline of the events that are relevant to your

9   opinion.  Did you create any type of summary document of

10  these statements?

11      A.   I did.  I did, yes.

12           MS. STERKEN:  Permission to approach.

13           THE COURT:  Yes.

14           THE WITNESS:  Can I put this aside for a moment?

15           MS. STERKEN:  Yes.

16           THE WITNESS:  Thank you.

17      Q.   BY MS. STERKEN:  Have you had a chance to review

18  that document?

19      A.   Yeah, I just did.

20      Q.   Is this the summary document you created?

21      A.   Yes, I created it.  I can't say it looked as

22  pretty as it looks at this very moment.  When I turn it

23  over, but it's the same document, yes.

24      Q.   What are the two representations that

25  Attorney DeLozier had that are relevant to your conflict

1   of interest analysis?

2       *A.*    Well, above the line in blue is the criminal case

3   representation of Wendi Andriano.  Below the line in

4   green, it reflects the highlights of Mr. DeLozier's

5   representation of Ms. Andriano's mother and adopted

6   father, Donna and Alejo Ochoa.

7       *Q.*    Can you just give me some background on

8   Attorney DeLozier's representation of the Ochoas in the

9   guardianship case?  Perhaps, how did the case start?

10      *A.*    The case started -- actually, it says here

11  November 15, 2000 is a good point.  Two weeks before that,

12  Mr. and Mrs. Ochoa and Joe Andriano's family, and

13  specifically his sister, Jeanea Lambeth and her husband,

14  Brad, reached an agreement and they signed an agreement.

15  They both were represented by counsel at the time, not

16  Mr. DeLozier.  And the agreement provided that the

17  Lambeths would be given guardianship of the children,

18  the two -- Ms. Andriano's two children.  And that the

19  Ochoas would have very liberal overnight visitation.  I

20  think it was at a minimum, every other weekend.

21      *Q.*    Did that agreement deteriorate at any point?

22      *A.*    Very quickly.  As you might expect in a case in

23  which the parties were necessarily thrown together by the

24  tragic events that occurred in this case, and the death of

25  the dad and the accusations of the mom murdered the dad,

1  they became -- acrimony between the families very quickly

2  developed.

3      *Q.*   At the time that there was some acrimony, did the

4  Ochoas retain an attorney to assist them on the case?

5      *A.*   Yes.  His name is Leon Thikoll.

6      *Q.*   And did the Court take any steps around this time

7  to determine what should happen with the children pending

8  this litigation?

9      *A.*   Well, yeah.  what I have here on the timeline is

10  the first thing is the Court sanctioned and put into

11  effect the agreement on November 15th.  Around March of

12  2001, you'll see on the next page, on Page 2, that Thikoll

13  basically filed a motion to terminate the Lambeth's

14  guardianship and to substitute the Ochoas as guardians of

15  the children.

16          There was a quite a bit of hostility between the

17  Ochoas and the Lambeths as to who was rude to whom,

18  whether the Ochoas were getting the overnight visitation

19  that they wanted, whether they were -- should get --

20  whether they were appropriate for overnight visitations,

21  and the Lambeths didn't believe.  And so the case went

22  back to court in the spring of 2001.

23      *Q.*   And did the Court take any steps to determine

24  where the children should reside pending this dispute?

25      *A.*   Yeah.  The Court all along kept the Lambeths as

1  guardians.  But I think it was -- yeah, it was April 5th

2  is the date that I have here on my -- I'm sure that's from

3  the records in the case.  On April 5th, the Court -- and

4  by the Court, it's Commissioner Bayham-Lessel -- I think

5  it's Lesselyong.  I'm not sure if I have that right.

6         THE COURT:  That sounds fine.

7         THE WITNESS:  Yeah.  Okay.

8         The commissioner.  I'll just say the

9  commissioner.  The commissioner appointed a clinical

10  psychologist named Dr. Brian Yee to do an assessment.

11  Initially, that assessment was specifically are the Ochoas

12  appropriate for overnight visitation.

13     *Q.*  BY MS. STERKEN:  Did you reach any conclusions

14  regarding whether Attorney DeLozier functioned as an

15  attorney for the Ochoas during the time that

16  Attorney Thikoll was formally representing them?

17     *A.*  Oh, yes, I did.  And I had two to three sources

18  for that information.  I asked Donna Ochoa.  I asked

19  Mr. DeLozier himself.  And I also saw correspondence that

20  indicated that he was informally but regularly giving her

21  legal advice.  By her, I mean Donna Ochoa during the

22  spring of 2001.

23         As I recall, either in March or April 2001,

24  Mr. Thikoll became ill.  And she increasingly relied on

25  David DeLozier to provide her with insight as to how to

1  proceed with these now contentious court hearings.

2      *Q.*   Did Attorney DeLozier ever undertake the Ochoa's

3  representation in a formal capacity?

4      *A.*   Yes, he did.  I think it shows here June 12th.

5  Yes.  I knew it was in June of 2001.  On June 12th,

6  DeLozier is formally substituted in as counsel of record

7  in the representation of the Ochoas in the guardianship

8  proceeding in Maricopa County.

9      *Q.*   So you told us a bit about how Attorney DeLozier

10 became involved with representing the Ochoas.  Can you

11 tell me a bit about how he ended up being Wendi's attorney

12 in her criminal case?

13     *A.*   Yeah.  If we could flip back here to the first

14 page, the reason it was important to me to have this kind

15 of an exhibit is because you need to see how the events

16 were occurring simultaneously.

17          In late November of 2000, Ms. Andriano was

18 represented -- it's not clear from the records.  She was

19 either represented by the Maricopa County Public Defender

20 or by Leon Thikoll himself in her murder prosecution.

21          But in late November of 2000 -- and it shows here

22 November 24, 2000.  I'm sure this is from the records in

23 the case, Exhibit 82.  Oh, yes, that was an invoice of

24 Mr. -- from an invoice of Mr. DeLozier's, I saw that he

25 was initially contacted by Jeri Lynn Cunningham's husband,

1   Andrew Cunningham, who asked him to go to the jail, the

2   Estrella facility here in Maricopa County, to interview

3   Wendi.  And DeLozier didn't do it immediately.  He made a

4   couple of other phone calls and then had a conversation

5   with Jeri Lynn herself, who explained to him that she had

6   been a childhood friend of Wendi's and she asked him to go

7   interview Wendi in the jail.

8       *Q.*   And did Attorney DeLozier interview Wendi in the

9   jail?

10      *A.*   Yes, he did.

11      *Q.*   How do you know that?

12      *A.*   Well, I know it because of correspondence.  Well,

13  first, I know it because he told me.  Ms. Andriano told me

14  that.  And he also -- the correspondence in his file and

15  his invoice in his file.

16      *Q.*   And I'll just note for the record that the

17  timeline continued citations to various exhibits, these

18  have all been admitted into evidence already with the

19  exception of one or two documents that I'll deal with

20  separately.  But to be efficient, we won't identify each

21  individual exhibit during your testimony.

22          So you said that Attorney DeLozier visited Wendi

23  in jail.  At some point, was there a fee agreement for her

24  representation?

25      *A.*   Yes, there was.  Mid-December -- in fact

1    December 14, 2000, Mr. DeLozier, after visiting with Wendi

2    in the jail and meeting separately with Alejo Ochoa,

3    entered into a formal fee agreement with the Ochoas and

4    Wendi Andriano.

5        *Q.*    Were there any terms of the fee agreement that

6    were relevant to your expert conclusions?

7        *A.*    Yeah, I think some of the terms of the fee

8    agreement are very relevant to the conflict of interest

9    issue.

10       *Q.*    What are those on terms?

11       *A.*    First of all, just to give you an overview of the

12   agreement, the representation was for $30,000 to represent

13   Wendi in her murder case.  And that Alejo Ochoa gave to

14   Mr. Andriano $5,400 as a down payment.

15            THE COURT:  You mean Mr. DeLozier?

16            THE WITNESS:  I'm sorry.  I may have misspoken

17   the name.  Alejo Ochoa gave to Mr. DeLozier -- I don't

18   know.  I probably got it backwards.  $5,400 as a down

19   payment.

20            The agreement specified that the remaining

21   roughly just under $25,000 was fully due and payable upon

22   the execution of the agreement.  And regardless of whether

23   or not there would be a subsequent substitution of

24   counsel, the Ochoas, and specifically Alejo Ochoa, was

25   responsible for paying the full $30,000 to Mr. DeLozier.

1    Those are the terms that I think were most important for

2    the conflict of interest issue which I can get into later

3    on.

4        *Q.*    Okay.  When did Attorney Patterson become

5    involved in Wendi's representation and how?

6        *A.*    If you flip forward -- well, there's some events

7    involving Kandy Rohde I don't need to go into.  But what

8    happened in the spring of 2001 is that the State had

9    now -- well, actually within a week after the fee

10   agreement, the State filed a notice of intent to seek the

11   death penalty.

12       DeLozier, in his -- he actually had been aware of

13   this from the beginning.  In his cover letter to the

14   Ochoas, he stated:  Hey, we're going to need -- for a case

15   like this, we're going to need a lot of expert assistance.

16   We're going to need -- and he said especially a

17   psychologist.  But he said:  We're going to need forensic

18   experts, investigation.  We're going to need a whole range

19   of assistance in resources that go beyond my

20   representation of you.  And I think he mentioned this in

21   his testimony on Monday.

22       Well, he started to get involved in this now

23   capital case and realized that he didn't have those

24   resources in the spring of 2001.  Thikoll was no longer in

25   the picture.  He was representing solo Wendi Andriano at

1    this point.

2            And so there were two hearings in Judge Barker's

3    court here in Maricopa County and they were highly

4    contentious.  DeLozier wanted resources.  He wanted to

5    stay in charge of the case.

6            And then I want to take issue with something that

7    Dan Patterson said last Friday.  He was not happy about

8    someone with more experience coming on the case.  He

9    wanted to be in charge.

10           MS. GARD:  Objection.  Speculation.

11           THE COURT:  I'm sorry?

12           MS. GARD:  Speculation.

13           THE COURT:  Overruled.

14           THE WITNESS:  This is what was in the record.

15   This is in the transcripts -- the transcripts and the

16   records that were turned over to the State that he wanted

17   to be in charge.  He did not want to be a second chair.

18   And the Ochoas wanted him to be in charge of the case.

19           And this is why -- but he needed resources.

20   Office of Court-Appointed Counsel didn't want to give him

21   the resources.  And it there was a push toward getting the

22   public defender's office involved and the public

23   defender's representative who came these hearings said:

24   We will not get involved in this case unless we're first

25   chairing it.

1    And as a result of that, DeLozier went back to --

2  he said:  I need to talk to the Ochoas and I need to talk

3  to Wendi Andriano.  He went back and got their consent to

4  the public defender taking on first chair status and him

5  becoming Knapp counsel as second chair.

6    *Q.*  BY MS. STERKEN:  And when you say Attorney

7  DeLozier got their consent, who do you mean?  Whose

8  consent?

9    *A.*  Oh, I mean all three.  I mean his client,

10  Ms. Andriano in the criminal case, and her parents, who

11  were paying his bill.

12    *Q.*  So you told us a bit about how Attorney DeLozier

13  became involved in these two cases.  I'm going to ask you

14  now to shift back to the guardianship case.  What was one

15  of the first steps that Attorney DeLozier took when he

16  assumed representation of the Ochoas?

17    *A.*  We're back in the guardianship case?

18    *Q.*  Yes.  I know it's confusing.

19    *A.*  Yeah, in June, he substituted in as counsel of

20  record.  One of the first things he did was to tell Donna

21  and Alejo Ochoa that they needed to persuade Dr. Yee.  And

22  I believe also at that time, the children's -- the

23  children were getting counseling from Linda Gray, who's

24  a -- I don't if she still does.  But back then, she was

25  with the Children's Advocacy Center here in Maricopa

P-App. 001787

1   County working with children who are involved in the

2   criminal process.

3        And these people were going to be making

4   recommendations to the commissioner handling the

5   guardianship case.  So his suggestion to the Ochoas was go

6   out and get as many letters as you can.  I want letters

7   that tell me or tell the -- particularly, Dr. Yee and

8   Commissioner Bayham-Lesselyong -- that tell them what

9   wonderful parent figures you are.  If you can focus on

10  your relationship with your grandchildren, great.  If they

11  have any other experiences with you that reflect on your

12  experience as a parent and a parent figure, appropriate

13  custodial figure, that would be great, too.  So they did

14  just that in July and August of 2001.

15       Q.   And have you had an opportunity to review those

16  letters?

17       A.   Yes.

18       Q.   Can you summarize the general content of the

19  letters?

20       A.   Well, they're pretty much along the lines that I

21  just described.  I would say the number one focus of

22  almost all of the letters, not all, but almost all the

23  letters was their relationship with their grandchildren.

24       The second thing was their ability and their

25  qualities as parent figures in general.  And many of the

1   letter writers had known them for 20-plus years.  So they

2   wrote about their experiences or their observations of the

3   Ochoas as parents of Wendi and her adopted brother.

4       Q.   How were these letters used in the guardianship

5   case?

6       A.   I don't know.  I don't know how they were

7   actually used.  I do know the process in which they got to

8   the Court.

9       Q.   Can you tell us a bit about that process?

10      A.   Yes.  Donna and Alejo Ochoa would either hand

11  deliver or fax the letters to Mr. DeLozier, who would

12  review them for their appropriateness.  And at least in

13  one case, one of the letter writers wrote two separate

14  versions very close, but two separate versions of the same

15  letter, and Donna asked David to pick the one that he

16  thought was the more appropriate one.  He would then give

17  his approval and they would then deliver them to whomever.

18  I think it was to Dr. Yee.

19      Q.   Okay.  So Attorney DeLozier is representing the

20  Ochoas in this guardianship matter.  Did Attorney DeLozier

21  ever initiate a second proceeding on behalf of the Ochoas

22  relating to the children?

23      A.   He did.

24      Q.   What was that second proceeding?

25      A.   In August of 2001.  There it is.  August 31,

1   2001.  Mr. DeLozier filed a petition to adopt the children

2   on behalf of his clients, the Ochoas, in Pinal County

3   Superior Court.

4   *Q.*   Did Attorney DeLozier ever notify the Lambeths of

5   this petition?

6   *A.*   No.  He never notified them.  He never served

7   them with process.  They were the guardians of the

8   children.  The Court, Judge O'Neill -- William O'Neill was

9   the judge handling the case.  Judge O'Neill appointed an

10  agency to do a social study.  And DeLozier was directed to

11  provide information about relevant people for the social

12  study and he never provided the Lambeths information to

13  the agency in Pinal County.

14  *Q.*   Did the Pinal County Court have discover

15  Mr. DeLozier's failure to notify the Lambeths?

16  *A.*   According to the record, it did.  Judge O'Neill,

17  in December of 2001, December 18, 2001, issued an order

18  directing Mr. DeLozier to serve the Lambeths with process

19  and also to give their information to the social agency --

20  social services agency.

21  *Q.*   Was there ever any conflict between the Ochoas

22  and Lambeths regarding red marks on the children's bottoms

23  during these proceedings?

24  *A.*   Yes, there was.  There was.

25  *Q.*   Can you tell me what that conflict involved?

1    *A.*   Yeah.  Around December of 2001 -- before I do

2  that, I just wanted to say that Mr. DeLozier decided he

3  wasn't going to follow Judge O'Neill's order.  I mean,

4  instead of notifying the Lambeths, as ordered by

5  Judge O'Neill, he filed a notice of change of judge.  He

6  tried to get O'Neill off the case and that motion was

7  denied.  He just let it go.

8         And then at this time -- while these events were

9  going on in Pinal County, at the very same time, these

10  pretty severe red marks, whether they were bruises or burn

11  marks, it's not clear, appeared on both sides of the

12  buttocks of both children.  And the accusations were made

13  against the Ochoas in a letter.

14         I think it was in March of 2002, Jeanea Lambeth,

15  at the request of her lawyer, provided a summary of how

16  these occurred.  And she indicated in her letter that the

17  red marks appeared every time the children would go to the

18  Ochoas for overnight visitation starting in

19  December of '01.

20         And when she asked the children about it, the

21  younger one, the girl, Ashlee had told her that it

22  occurred when Grandpa Alejo touched my bottom or touched

23  my butt, she said on another occasion.  She used bottom

24  once, butt on another occasion.  And when Jeanea Lambeth

25  inquired further about it, I believe it was Ashlee again,

1   but it may have been both of them, Nicholas and Ashlee

2   said Grandma Donna told us to keep secrets.

3       Q.    In addition to what you have just told me about,

4   were there any other allegations made in the guardianship

5   case that Alejo Ochoa abused the children or acted

6   inappropriately with them?

7       A.    Yeah, there were.  When I interviewed Alejo Ochoa

8   in October of 2013, he was reticence to talk about this.

9   However, he volunteered to me that on another occasion,

10  Brad Lambeth, who was Joseph Andriano's brother-in-law,

11  accused him on the telephone of taking naked photographs

12  of the children.

13          And I said:  Well, you're talking about

14  photographs of the red bottom?  He said:  No, no.  This is

15  something different.  Yeah, there was another accusation.

16      Q.    So.  Turning back to the letter, did

17  Attorney DeLozier ever receive a copy of this letter with

18  these allegations?

19      A.    Oh, yes.  I know that for sure.

20      Q.    And how do you know that?

21      A.    Well, I think if the letter is in evidence, and

22  you'll on the top of the letters either the fax stamp or

23  whatever.  There's DeLozier's office and the day it was

24  received and so on.

25          Second, both DeLozier and -- David DeLozier and

1  Donna Ochoa told me that he received it.  And, third,

2  Donna -- and I think it's -- the letter itself, the Jeanea

3  Lambeth letter is Exhibit 18 attached to my report.

4        Exhibit 19 is a letter from Donna Ochoa and

5  that's a letter that she wrote at the request of David

6  DeLozier trying to rebut the allegations that Jeanea

7  Lambeth had made.  She indicated that she was given

8  Jeanea's letter by David DeLozier.

9    Q.   And what about the allegations of the naked

10 photos?  Did Alejo Ochoa inform Attorney DeLozier of those

11 photos?

12   A.   Yeah.  He told me the first he did was to call

13 Mr. DeLozier on the phone.

14   Q.   Did you identify any other information that

15 Attorney DeLozier learned in the guardianship case

16 suggesting concerns about the Ochoas ability to care for

17 the children?

18   A.   Well, yeah.  I think that consistent with the

19 fact that he went ahead and filed an adoption proceeding

20 in Pinal County, the guardianship proceeding, the minute

21 entries increasingly went just one after another poorly

22 for the Ochoas.  And I think it was right about the time

23 in the midsummer of 2002, the Court discontinued all

24 overnight visitation.  And, to my knowledge, it was never

25 recontinued.  They never got it back, the Ochoas.

1        And the Court suspended -- the commissioner

2    suspended all visitation until the Ochoas underwent

3    therapeutic counseling.  And this is at the

4    recommendation, according to the Court, to the Court

5    commissioner of not just Dr. Yee, but Linda Gray, and I

6    think the gentleman's name is Gary Weiser who was the

7    guardian ad litem for the children.

8        MS. STERKEN:  Judge, I think we're at a good

9    stopping point if you want to --

10        THE COURT:  Okay.  Let's go ahead and take our

11    afternoon break.  We will take a 15-minute break.  We will

12    be in recess.

13        (WHEREUPON, a recess ensued from 3:05 p.m. to

14    3:24 p.m.)

15        THE COURT:  This is CR 2000-096032, in the matter

16    of State of Arizona vs. Wendi Elizabeth Andriano.

17        The record will reflect the presence of the

18    parties and counsel.  We have Mr. Gary Lowenthal on the

19    witness stand.

20        Before we continue with his direct examination, I

21    have spoken with counsel informally.  It's my

22    understanding that counsel feel that if we go until about

23    5:15 or 5:20, at the most, we can complete Mr. Lowenthal's

24    testimony today and not have court tomorrow; is that

25    correct?

1        MR. ARNTSEN:  Correct.  Or Thursday.

2        THE COURT:  Or Thursday.  Then what we will do is

3   I have instructed -- based upon that information, I've

4   instructed my judicial assistant to notify the sheriff's

5   office, and I have spoken to Sergeant Keller about this,

6   that we won't have Ms. Andriano transported tomorrow or

7   Thursday.  And so I think everyone is in agreement with

8   that.

9        We have also contacted court security to notify

10   them that we're going to be going a little bit past

11   5:00 o'clock today.

12        MR. ARNTSEN:  Thank you, Your Honor.

13        THE COURT:  Okay.

14        THE WITNESS:  Please let me know if I'm running

15   on too much.

16        THE COURT:  Okay.  And this notice, this

17   representation time, we should probably have that marked

18   for identification as an exhibit.

19        THE CLERK:  It has been marked.

20        THE COURT:  Oh, it has already been marked?

21        THE CLERK:  It's already been marked as

22   No. 234.

23        THE COURT:  Okay.  234.

24        So the record will reflect that Mr. Lowenthal is

25   on the witness stand.  We will continue with the direct

1   examination by Ms. Sterken.

2   *Q.*   BY MS. STERKEN:   Mr. Lowenthal, before we took

3   our break, you were telling us about the adoption case.

4   You were telling us how Attorney DeLozier did not notify

5   the Lambeths of this case.   Did the Lambeths eventually

6   learn about the adoption case?

7   *A.*   Yes.   John Jakubczyk, their attorney, somehow or

8   another got wind of it.   I don't know how.   In the summer

9   of 2002, six months after the proceedings that I just

10  discussed a few minutes ago.   And he traveled -- he didn't

11  know anything about it.   So he traveled down to Pinal

12  County and he went through court records and discovered

13  the existence of an ongoing adoption proceeding.

14  *Q.*   What did he do when he discovered this adoption

15  proceeding?

16  *A.*   He immediately filed a motion.   I think I have it

17  here.   On July 15, 2002.   And this says move for

18  sanctions.   It was actually a motion -- he filed a motion

19  in Pinal County to dismiss the action and also a motion

20  for sanctions against both David DeLozier and the Ochoas.

21  *Q.*   After he filed this motion, did Attorney DeLozier

22  continue as formal counsel of record for the Ochoas in

23  that case?

24  *A.*   In that case, yes.   In Maricopa County, the

25  immediate aftermath of Mr. Jakubczyk's motion was that

1   Judge O'Neill sent a very angry minute entry to Maricopa

2   County alerting the commissioner here as to what was going

3   on in Pinal County.

4         So a paralegal working for Mr. DeLozier.

5   not Ms. O'Quinn.  It was another one.  Arranged for Daphne

6   Budge to step in as substitute of counsel of record here

7   in Maricopa County.  DeLozier, at least for a few months,

8   continued to participate in the proceedings in Pinal

9   County.

10      Q.   And you said there was a motion for sanctions and

11  to terminating the adoption case.  How was that motion

12  resolved?

13      A.   Well, after a lengthy hearing in September of

14  2002 in Judge O'Neill's court, in which kind of oddly

15  both -- it wasn't clear who was representing the Ochoas.

16  Both Mr. DeLozier and Daphne Budge appeared and they both

17  made arguments for the Ochoas.

18        In October, about a month later -- I have here it

19  as October 18th in Exhibit 104 -- Judge O'Neill issued an

20  order in which he granted the motion to dismiss the case

21  and as sanctions against -- and granted sanctions against

22  both Mr. DeLozier and the Ochoas.  The sanctions against

23  Mr. DeLozier were in essence a fine requiring of $6,000 --

24  requiring him to pay that $6,000 to Jakubczyk as

25  attorney's fee for the Lambeths.  And also, he reported

1   him to the State Bar of Arizona very pretty angrily.

2   He also had sanctions against Mr. and Mrs. Ochoa,

3   dismissed their action with a petition with prejudice, and

4   reported to -- and wrote that they were complicit -- in

5   his view, complicit in DeLozier's actions, and reported it

6   back to the Maricopa County commissioner.

7   Q.   So shortly after the dismissal of the adoption

8   case, what happened in the guardianship case?  You can

9   refer to your --

10   A.   Sure.  There were continuing minute entries over

11   the next year, year and-a-half.  The most important one

12   was in December of 2012, in which -- excuse me -- 2002, I

13   think it was, yeah.  Okay.  In December of 2002, the

14   commissioner -- court commissioner here denied the motion

15   of the Ochoas to substitute -- to break the guardianship

16   of the Lambeths and substitute themselves as guardians.

17   And there were a number of orders over time with regard to

18   supervised visitation.

19   Q.   Can I just stop you there?  Could you refer to

20   Exhibit 105, please?

21   A.   Okay.  You want me to look at it here?

22   Q.   Yeah, if you don't mind.

23   A.   Sure.  All right.  Yeah, this is the minute entry

24   I was just talking about.

25   MS. STERKEN:  I would move for admission of

1  Exhibit 105.

2      THE COURT:  Any objection to Exhibit No. 105 for

3  identification being admitted into evidence?

4      MS. GARD:  No, Judge.

5      THE COURT:  Exhibit No. 105 for identification is

6  admitted into evidence.

7      Q.  BY MS. STERKEN:  Mr. Lowenthal, did you conclude

8  whether Attorney DeLozier continued to represent the

9  Ochoas in the guardianship matter after Attorney Budge

10  formally substituted in on the case?

11      A.  He continued to represent them with regard to

12  their disputes with the Lambeths over issues of custody

13  visitation primarily and severance of parental and

14  secondly grandparental rights.  He was not formally

15  counsel of record in court.

16      Q.  If I could refer you to Page 6 of your timeline.

17      A.  Sure.

18      Q.  Could you give us some examples of the evidence

19  you identified that showed a continuing representation of

20  the Ochoas in the guardianship case?

21      A.  If you don't mind a narrative, I'll go through

22  this as expeditiously as possible, knowing this

23  afternoon's schedule.

24      The first item I have here is March 3rd, 2003.

25  At this point, the Ochoas were represented by Daphne Budge

1   in court.  There was an exchange of e-mails that are

2   Exhibit 107 I guess, in which the DeLozier was asking

3   Donna to tell him information about an upcoming hearing,

4   which was a hearing on a petition to sever the rights of

5   Ms. Andriano and the Ochoas in Judge Damron's court.

6   Apparently, she gave him the paperwork for the pleadings

7   for this hearing.

8           The next one is April 14, 2003.  That was

9   immediately after the hearing in Judge Damron's court

10  exchanging e-mails.  DeLozier wanted to know what happened

11  and Donna Ochoa gave him a description of her

12  interpretation of the events that occurred in court.

13          The next item I have here is May 16th, 2003.

14  Actually this should be May 16th and 17th, 2003.  On

15  May 16th, Donna Ochoa sent an e-mail to her attorney or

16  counsel of record, Daphne Budge, discussing upcoming --

17  strategy with regard to an upcoming mediation and also

18  with regard to other matters in their ongoing case.  That

19  was dated March 16th.

20          On March 17th, she sent DeLozier a blind copy of

21  this.  I found this is an interesting document because she

22  didn't CC David DeLozier on this.  She just on the bottom,

23  there's a file stamp that DeLozier received it on the 17th

24  of May.

25          I asked both -- actually, I asked all three of

1   them.  I asked Daphne Budge as well and Donna Ochoa and

2   David DeLozier if this was an aberration, and Donna Ochoa

3   told me very frankly that she frequently sent him copies

4   or blind copies of e-mails that she had sent to Daphne

5   Budge and DeLozier said the same thing.

6       Daphne Budge was not aware of it, but said that

7   it was consistent with her understanding of what was going

8   on at the time.

9       May 27th is the next item I have here.  As I

10  mentioned earlier, Judge O'Neill -- Judge O'Neill imposed

11  sanctions on Mr. DeLozier the previous October, and

12  DeLozier filed an appeal with the Arizona Court of Appeals

13  contesting those sanctions.  And although the brief was

14  representing himself, a substantial section of the brief

15  argued against sanctions for the Ochoas as well.

16  Q.   Can I --

17  A.   I'm sorry.

18  Q.   Sorry.  Can I just interject here that I think

19  the timeline notes Exhibit 111 for this document.  This is

20  a smaller version of the full brief, which was admitted as

21  Exhibit 131, just so the record is clear.

22  A.   Okay.  Thank you.  June 9th was the first of two

23  instances in which DeLozier hired a private investigator,

24  Rich Robertson, whose practice is -- I think it probably

25  still is here in the East Valley.  And he asked him to do

1    work.  It wasn't clear from the documentation in the file

2    as to what that work consisted of.

3           You see the next item is November 24th, Private

4    Investigator Robertson who DeLozier retained to work on

5    the guardianship case, Exhibit 110.  I had these documents

6    indicating that invoices from Robertson to DeLozier, and I

7    had copies of these and checks from DeLozier's office to

8    Robertson.

9           And I presented them to Mr. DeLozier.  I said:

10   What's this all about?  Was this in connection with your

11   representation of Wendi Andriano or was this something

12   else?  He said:  I don't know.  And I said:  Is there any

13   way you can find out?  And we were having this meeting in

14   his office up in the North Valley.  So he asked his

15   bookkeeper to check and she came back about ten minutes

16   later in my presence and said:  This is in regard to your

17   representation of the Ochoas with regard to the children.

18          So February 27, 2004, there's a prior event two

19   days earlier.  Daphne Budge filed a pleading in court in

20   which she notified the Court that she had left private

21   practice and was now entering the public defender's

22   office -- Maricopa County Public Defender's Office and

23   that she no longer represented the Ochoas in connection

24   with the guardianship proceedings.

25          February 27th, two days after that, the Ochoas

1  met twice with David DeLozier before and after court and

2  in a proceeding in Wendi Andriano's case.  None of them

3  had an independent recollection of meeting.  To me, the

4  timing made it -- to me, I concluded from the timing of

5  the meeting that they must have discussed, among other

6  things, how they were proceeding in the guardianship case.

7       The next item is April 17, 2004.  This is an

8  interesting day.  It's a Saturday, April 17, 2004.  On

9  April 17th, there was a -- at this point in time in 2004,

10 the Ochoas had long since not been allowed overnight

11 visitation.  And their visitation was limited to short

12 supervised visitation in public locations by supervisors

13 chosen by the Lambeths and paid for by the Ochoas.

14       The Ochoas had scheduled that Saturday -- the

15 parties had scheduled a visitation at a restaurant in

16 Casa Grande.  The Ochoas arrived at the restaurant at the

17 appointed time and no one came and they waited for a

18 while.  And then they waited, I don't know, an hour or two

19 and then went home very upset.

20       They contacted Mr. DeLozier.  They e-mailed him.

21 They sent him several e-mails and he e-mailed back.  His

22 invoice records show on that Saturday e-mails going back

23 and forth between him and the Ochoas.  And in a later

24 correspondence in which she described this particular day,

25 in a letter that Donna Ochoa wrote at a later point in

1   time, she described how her attorney tried to help her

2   work through this problem on that day.

3       *Q.*   Did you conclude that that attorney was

4   Attorney DeLozier?

5       *A.*   Oh, yeah, yeah.  August 19th, 2004, is simply --

6   it's significant because it's right on the eve of the

7   beginning of the Andriano murder trial.

8           That's when the Court of Appeals issued its

9   mandate finally dismissing the appeal or denying

10  DeLozier's appeal in which he argued for both himself and

11  the Ochoas.

12          The next item -- and now we're on the last page,

13  happily.  November 15, 2004.  This is a very interesting

14  document.  The Ochoas signed and filed on November 15,

15  2004 -- and this was during Ms. Andriano's trial.  I don't

16  know whether it was before Phase 3.  I don't know whether

17  it was in Phase 2.  I think it was probably during

18  Phase 2, maybe Phase 1.

19          On November 15, 2004, the Ochoas filed a notice

20  on pleading paper of pro se representation that henceforth

21  they would be representing themselves.  Interestingly, it

22  was typed using kind of typical lawyer language and it was

23  on pleading paper -- lined pleading paper.  And it was

24  originally drafted and typed in drafted July 2004.  That

25  was crossed out and someone handwrote in there

1  November 15, 2004, when it was actually filed in court.

2          I asked Donna Ochoa if she had drafted this

3  document.  She said, no, she didn't have the capability in

4  her view to do it.  And she had asked Mr. DeLozier to do

5  it.

6          I asked DeLozier and he said that he wasn't sure,

7  but probably he was the one that drafted it.  It was

8  something he would typically do for a client.

9          I asked Daphne Budge if she had drafted it, even

10 though she was in the public defender's office.  She told

11 me, no, she definitely wouldn't.  The font, the formatting

12 was totally different from her own pleadings.  And so that

13 was further ongoing representation.

14          December 7th -- and December 8, 2004, very

15 significant date.  You'll notice that on the blue side up

16 on the top of the page, December 8, 2004 is the day that

17 David DeLozier presented his opening statement in Phase 3

18 of Ms. Andriano's trial.  And his billing invoice for

19 December 2004 includes entries involving several hours on

20 December 7th and December 8th, the day he gave his opening

21 statement, in which he was going through his files and

22 looking for records with regard to the bruises on the

23 buttocks of the children in medical records and pleadings

24 from court proceedings with regard to the Ochoas, his

25 representation of the Ochoas.

1      *Q.*    Can I stop you for --

2      *A.*    And then on the 8th, he actually met with Alejo

3   and went over those documents.

4      *Q.*    And if I could just stop you there.  What is

5   happening at the same time in Wendi's criminal trial?

6      *A.*    Well, as I mentioned, this is the very beginning

7   of Phase 3 in which DeLozier gave his opening statement.

8   And the next day on December 9th, he started calling

9   witnesses.

10     *Q.*    And the witnesses that he was calling around the

11  same time, what type of testimony did he solicit from

12  these witnesses?

13     *A.*    Well, this is one of the most striking things

14  I've ever seen.  The way that the defense team divided up

15  the Phase 3, when I read through the transcript of this

16  proceeding, was DeLozier gave the opening statement and

17  closing argument and called all the social history

18  witnesses that preceded the marriage with Joe Andriano,

19  childhood, so on.  And there were five of them.

20          And one of them -- the first one was -- the one

21  that was referred to by Mr. Hazard last week when he was

22  examining -- when he was examining Mr. Patterson, it

23  wasn't Mr. Patterson's witness.  It was DeLozier's witness

24  and this -- all of these witnesses, Mr. Vargus.  There was

25  a Mr. and Mrs. Galleon.  There was a woman named Inskeep.

1        And all of these witnesses, DeLozier would call

2   over the next two or three days after his opening

3   statement, and the way one would expect -- I would expect

4   in a mitigation hearing:  Are you familiar with the

5   defendant?  Do you know Wendi Andriano?

6        And he started his examination as:  Do you know

7   the Ochoa family?  How do you know the Ochoa family?  And

8   then each witness went into how they knew Donna and Alejo

9   Ochoa from church in the 1980's.  None of the witnesses

10  had any contact with Wendi Andriano after 1990, ten years

11  before the homicide.  They all talked about what wonderful

12  parents the Ochoas were.  And this is where they were

13  developing the theme that she was raised in a very

14  supportive, wholesome, deeply religious family.

15       And this came right after the opening statement

16  in which he said:  Before she married Joe Andriano, she

17  had led a -- she was an innocent girl who had led a very

18  sheltered life.

19  *Q.*   So following imposition of the death sentence,

20  did you conclude whether Attorney DeLozier continued to

21  represent the Ochoas in the guardianship matter?

22  *A.*   I'm sorry.  Following what?

23  *Q.*   Following imposition of the death sentence in

24  Wendi's case.

25  *A.*   Oh, yeah, yeah.  I think the testimony I heard

1   him say in court the other day is accurate.  At least

2   2005.  Early 2005.  March of 2005.  The Lambeth's petition

3   to become guardian -- to sever parental rights and

4   grandparental -- as an advent to that, grandparent -- all

5   visitation, grandparental, parental visitation finally

6   proceeded after Ms. Andriano's conviction.  This would

7   allow for adoption of the children by the Lambeths.

8            Donna Ochoa in early March of 2005 sent a

9   handwritten pleading to David DeLozier saying:  Is there

10  anything you can do?  Can you help us?  We're desperate.

11  I think it also went to a gentleman named Bell, who was it

12  sounded like connected with post-conviction representation

13  of Ms. Andriano.

14           And two weeks later, according to Mr. DeLozier

15  and Donna Ochoa, he -- she submitted a letter to the

16  Superior Court.  He said basically -- both of them told me

17  that there was really nothing he could do in court to help

18  her, but that he helped her draft a letter that would put

19  on the record for the future, so when the children became

20  older, they would know about it, just how much and how

21  deeply their grandparents cared about them and how much

22  Donna, in particularly, but the grandparents had really

23  worked over the years to be a part of their lives.  And

24  both of them told me that David substantially wrote the

25  letter.

1    *Q.*   We have talked about a number of instances in

2    which Attorney DeLozier provided some assistance or

3    counseling to the Ochoas following the period in which he

4    was no longer formally representing them in this case.

5         Have you reached a conclusion regarding whether

6    Attorney DeLozier continued to have an attorney-client

7    relationship with the Ochoas through March of 2005?

8    *A.*   Oh, absolutely, absolutely.  I mean, you don't

9    define an attorney-client relationship merely by whether

10   someone is an advocate for them in court.  Attorney roles

11   run a pretty wide gamut certainly as an advisor, which is

12   present here, as a drafter of documents, as a negotiator,

13   as an evaluator.

14        And, in fact, the Preamble to the Arizona Rules

15   of Professional Conduct say just that.

16   *Q.*   I'm going to ask you to turn back very briefly to

17   Wendi's representation.  When did Attorney DeLozier start

18   focusing on developing mitigation evidence, based on your

19   review of the record?

20   *A.*   All right.  We're back above on the blue stuff

21   on the top in Wendi's case.  Yeah, I think Patterson said

22   that after the Roque case finished, he started to focus

23   on the Andriano case.  And if you would look at -- and I

24   think it's Exhibit 117 here and this is on Page 7 of my

25   timeline.

1        There is a really indication there that it's in
2   the record, in the invoices that DeLozier -- if you look
3   at the invoices that DeLozier prepared over time, it
4   starts up in October of 2003.  He met -- first he met with
5   Dan Patterson and Patrick Linderman together on a couple
6   of occasions.  I have it here October.  I'm sure it is.
7   October 22nd and October 31st of 2003.
8        And then the next item on December 2nd, 2003,
9   DeLozier's billing invoice indicates that he either made a
10  phone call or sent an e-mail -- I guess it's e-mail to
11  Linderman pestering him as to following up on the
12  mitigation work that he had discussed and that Patterson
13  wanted him to get.
14       Patterson clearly was in charge of the case, and
15  as Patterson indicated, he delegated this responsibility
16  to Mr. DeLozier.
17       It's not on this on my outline.  I wish I had
18  included it.  Linderman continued in the public defender's
19  office until March of 2004.  And in March of 2004,
20  DeLozier's invoice for that month indicates substantial
21  contact with Linderman, exchanging and giving him
22  documents for mitigation purposes.  Receiving documents
23  from Linderman, the mitigation specialist, and having
24  interactions with him.
25       And then in April, of course, Scott MacLeod came

1  on the case and there are several entries of his

2  involvement with MacLeod.

3       Now, sometime in the spring, and it was probably

4  in April of 2004, a decision was made to put together this

5  -- I don't know what it is -- a PowerPoint presentation

6  about Wendi's wonderful life.  So I think when MacLeod

7  came on board, that was a decision already made.

8       *Q.*  Over the course of Attorney DeLozier's

9  representation of Wendi in her criminal trial, did he

10  learn any information to suggest that her childhood might

11  have been troubled in some way?

12      And if I can ask you just to touch on it briefly

13  because I think these are documents that we've gone

14  through.

15      *A.*  During his representation of Ms. Andriano?

16      *Q.*  Yes.

17      *A.*  Oh, yeah, yeah, yeah.  I was in court and heard

18  the testimony about Kandy Rohde.  The communications in

19  February and March, those are probably the most important

20  to me because she made reference to such matters as

21  dissociation, memory loss and so on and referred to the

22  fact that Donna had told her that there was possible

23  childhood abuse by Skip Robertson or his father and that

24  this could have been the reason for these symptoms that

25  she was seeing.

1    *Q.*   Did Attorney DeLozier come across any other

2    evidence while representing Wendi to suggest a troubled

3    childhood?

4    *A.*   I don't think I need to go through item-by-item,

5    but I think you went through them or whoever was at it, I

6    think was doing the direct examination of DeLozier and

7    those are things that I saw in the file.  Sharon Murphy,

8    continuing things from Kandy Rohde and Sharon Murphy,

9    something from Sharon Murphy.  Dr. Potts' preliminary

10   Rule 11 evaluation.  There were several items, yes.

11   *Q.*   You mentioned that you interviewed Attorney

12   Patterson in the course of conducting your analysis; is

13   that correct?

14   *A.*   Yes.

15   *Q.*   Did Attorney Patterson tell you whether he was

16   aware at any time during Wendi's criminal case that

17   Attorney DeLozier was representing her parents in a

18   guardianship matter?

19   *A.*   I'm sorry.  I lost track of your question.

20   Again, please.

21   *Q.*   Yes.  You spoke to Attorney Patterson; correct?

22   *A.*   Yes.

23   *Q.*   Did he tell you whether he was informed by

24   Attorney DeLozier that Attorney DeLozier was representing

25   Wendi's parents in the guardianship case?  Was he aware of

1  that?

2      A.    That was one of the most interesting parts of our

3  interview.  I mean, he -- I was stunned by his revelation.

4  He said the first time he learned about it was when mom --

5  in the middle of the guilt phase of the trial, Donna Ochoa

6  was about to take the stand and Juan Martinez made a

7  request of Judge Ishikawa to be able to bring in

8  impeachment evidence against Donna Ochoa that related to

9  the sanctions that had occurred in Pinal County.

10          Patterson said he was shocked.  He didn't know

11  anything about it.  He didn't know that DeLozier had

12  represented the Ochoas.  He had never been told.

13     Q.    So we talked a bit about the kind of concurrent

14  cases that Attorney DeLozier was involved in.  I would

15  like to turn now to your expert opinions in this case.

16     A.    All right.

17     Q.    First of all, did you reach an opinion with

18  regard to whether there was an actual conflict of

19  interest?

20     A.    Yes, I did.

21     Q.    What were your reasons for making that

22  conclusion?

23     A.    Well, first, the conclusion is -- well, as I said

24  earlier, there was an actual conflict of interest.  And I

25  had three reasons for it.

1    *Q.*    Would you briefly state those three reasons?

2    *A.*    Yeah.  The first reason is that the interests of

3  the two sets of clients, Ms. Andriano on the one hand and

4  the Ochoas on the other, were directly adverse.  That was

5  the first reason why there was an actual conflict of

6  interest.

7          The second one is that Mr. DeLozier had a

8  responsibility, an ethical duty to the Ochoas not to use

9  information he had obtained and had in his possession

10  that related to their representation to their

11  disadvantage.  And this responsibility to the Ochoas

12  materially interfered with his representation of Wendi

13  Andriano in the mitigation phase, Phase 3 of her trial.

14    *Q.*    Did you say there was a third reason?

15    *A.*    Oh, yeah.  The third reason is actually an

16  additional factor that relates to and draws upon the first

17  two reasons.  And that is DeLozier's personal interests in

18  collecting as much of the $25,000 that Alejo Ochoa owed

19  him and the fees that were building up in his

20  representation of the Ochoas in the various proceedings

21  and in his advising the Ochoas and representing them.

22          And because of the information he had in his

23  possession, delicate information and also because their

24  interests were adverse to Wendi Andriano, I think there

25  was definitely an actual conflict of interest.

1    *Q.*   So if we could turn back to the first reason that
2    you gave for finding an actual conflict of interest.   And
3    what was that again?

4    *A.*   The first reason was that the interests of the
5    parties were directly adverse.

6    *Q.*   Okay.  Is it ever permissible for an attorney to
7    represent two clients with directly adverse interests?

8    *A.*   Yes, it can be.  It's possible, first of all,
9    well, at a minimum.  In order to represent two parties
10   with directly adverse interests, one would have to obtain
11   a lawyer -- would have to obtain informed consent reduced
12   to writing from the affected party.

13         This is kind of related to what I was talking
14   about earlier when I have advised capital defendants about
15   whether or not they have conflicts of interests to get an
16   independent assessment of and informed consent.

17         It's even difficult for the lawyer himself or
18   herself to do it.  Sometimes you need a third -- an
19   additional lawyer to come in to do that.  To help the
20   clients sort out whether they can do it.  So it is
21   possible.  It is possible.

22   *Q.*   Did you determine whether the Ochoas or Wendi
23   ever gave their informed consent to this direct adversity?

24   *A.*   I found out that neither party did.  They both
25   told me -- all three, both Ochoas and Wendi Andriano told

1  me that they were never asked for -- never informed of the

2  problem, never asked for informed consent, never gave it.

3  And I found nothing in the DeLozier's files or anything

4  else in the case to contradict that.  No paper to

5  contradict that.

6      *Q.*   Why do you believe the Ochoa's interests were

7  directly adverse to Wendi's interests?

8      *A.*   Oh, you have to look at what are the interests.

9  Wendi Andriano's interests was in seeking leniency.  Her

10  life was at stake.  He she was on trial for a capital

11  offense.  And because her interest is in seeking leniency,

12  she had an interest in the jury learning about anything

13  from her childhood that might help the jury understand how

14  she could have behaved the way she did at the time of the

15  offense and in this case in the months preceding the

16  offense.  That was her interest.

17        The Ochoa's interest that was directly adverse

18  was an interest over this entire period of 2001 to 2005 to

19  be portrayed as wonderful, loving, capable, caring,

20  nurturing parental figures.

21      *Q.*   So as I understand it, you have explained that

22  Attorney DeLozier, for Wendi's interest, should be

23  pursuing anything that could explain her behavior.

24  Whereas, with the Ochoas, he should be pursuing anything

25  that presents them as loving, capable parents; is that

1  correct?

2      *A.*   I think that's a fair assessment.

3      *Q.*   Is that an accurate summary?

4      *A.*   Yes.

5      *Q.*   Did you reach any conclusions regarding which

6  approach Attorney DeLozier decided to take?

7      *A.*   Well, I think the record speaks for itself.  I

8  mean, the theme that we have heard about from several

9  witnesses while I was in the courtroom was that she came

10  from a very nurturing, loving home.  The witnesses that

11  were called in Phase 3 testified to that.  And in both in

12  opening statement and closing argument, that's the

13  approach that DeLozier took.  That basically was choosing

14  the Ochoa's interests in explaining Wendi's behavior.

15      *Q.*   I would like to turn to the second reason you

16  gave for your conclusion that Attorney DeLozier had an

17  actual conflict of interest.  What was that second reason

18  again?

19      *A.*   The second reason was that he had a

20  responsibility to the Ochoas not to use information in his

21  possession or that he had learned that related -- even

22  broader, that related to his representation of the Ochoas

23  to their disadvantage without their informed consent.

24      *Q.*   Did you --

25      *A.*   And I think that materially interfered with

1   his representation of Ms. Andriano.

2       Q.   Did you reach any conclusion regarding whether

3   the Ochoas gave informed consent to this potential issue?

4       A.   Yes, I did reach a conclusion.  They didn't give

5   informed consent.  They were never asked for it and they

6   never gave it.

7       Q.   What information specifically did Attorney

8   DeLozier learn that he had an obligation not to use

9   against the Ochoas?

10      A.   Well, some of the things we went through earlier.

11  Certainly, the March 15th Lambeth letter.  March 15, 2002.

12  The increasingly negative reports from or decisions of the

13  Superior Court to in essence terminate their overnight

14  visitation.  The accusations that Brad Lambeth had made

15  against Alejo Ochoa.  Those are some of the things, yeah.

16      Q.   And how did Attorney DeLozier's obligation not to

17  use that information against the Ochoas materially limit

18  his representation of Wendi?

19      A.   How did it materially limit?

20      Q.   Limit his representation of Wendi.

21      A.   Well, by the time he was placed in or delegated

22  the responsibility by the attorney, the leader of the

23  team, Dan Patterson, to work with the mitigation

24  specialists Linderman and MacLeod, he was already very

25  aware of the information with regard to the relationship

1  between childhood abuse in general and trauma, childhood

2  trauma, and very specifically sexual abuse and some of the

3  very behaviors that he was seeing in Wendi Andriano's

4  file.  And his not using that information is a clear

5  indication that he was influenced by his representation

6  of the Ochoas.

7       Now I asked him specifically -- and I think he

8  was asked on cross-examination yesterday I think it was:

9  Did you think at the time you had a conflict of interest?

10  And he said:  No, I didn't.  Now I have a different view

11  of that, he said.  That's pretty classic.  That's very

12  classic.

13       What he said to me when I asked him these

14  questions was that he felt blinded by his zealous advocacy

15  of the Ochoas.

16       And I think he said the same thing in court in a

17  different way.  He said:  You know, when things are going

18  back and forth and I hear negative things about my client,

19  I want -- I want to see the good and I don't want to see

20  the bad.  I disregard the bad.

21       And he told me he felt he was blinded.  And this

22  is very classic behavior for a person with a conflict of

23  interest, just like my friend in the public defender's

24  office 30 years earlier, who actually didn't realize he

25  had a conflict of interest.

1    *Q.*   Is there any research looking at how conflicts of

2    interests could blind a person to their obligation to

3    different clients?

4    *A.*   On, yeah, there's a huge body of research.

5    *Q.*   Could you provide just a brief summary to us?

6    *A.*   Yeah.  It cuts across social science disciplines,

7    experimental psychology, philosophy, even, and

8    neurobiology.  The idea is that people when they're

9    engaged -- professionals, not just lawyers.  Financial

10   advisors, accountants, whatever --

11         MS. GARD:  Your Honor, I object to foundation.

12   It sounds like it's beyond.

13         THE COURT:  Sustained.

14         THE WITNESS:  Okay.

15   *Q.*   BY MS. STERKEN:  Can you just testify

16   specifically with respect to lawyers?

17   *A.*   With regard to lawyers?

18   *Q.*   Yes.  And how this --

19   *A.*   Yes.  Lawyers frequently in good faith do engage

20   in conduct that amounts to conflict of interest without

21   appreciating at the time that they're engaged in that

22   conduct, but it is a conflict of interest.

23   *Q.*   So turning back to the rule, you're not allowed

24   to represent clients -- two different clients if your

25   representation of one will be materially limited by the

1  obligation not to use information discovered in the other

2  client's representation against them; is that accurate?

3      *A.*   Yes.

4      *Q.*   Does this prohibition apply regardless of whether

5  the clients are current or past clients?

6      *A.*   Oh, yeah, this prohibition exists.  The

7  obligation in ER 1.8 in Arizona is for current clients and

8  the obligation almost identically worded in ER 1.9 has to

9  do with former clients.  And in both cases, the lawyer

10  cannot -- is told you cannot, without informed consent,

11  use information relating to the representation of your

12  current or former client.

13      Then if you go back to ER 1.7, it says regardless

14  of whether it is a current client or a former client, it

15  is a concurrent conflict of interest.

16      *Q.*   If we could turn to the third reason you gave for

17  your conclusion that Attorney DeLozier had an actual

18  conflict of interest, would you mind restating that

19  briefly?

20      *A.*   Yeah, the fee agreements.  I have never seen a

21  written fee agreement with the Ochoas.  I've seen

22  billings.  But, basically, they owed him money.  They owed

23  him money, at least $25,000 or almost $25,000 for his

24  criminal case representation and several thousand dollars

25  for his representation of the Ochoas in conjunction with

1    their ongoing dispute with the Lambeths.  And he had a

2    self-interest in collecting those fees.  He was a solo

3    practitioner.

4        *Q.*   And I think you had said that you believe that

5    that interfered with his independent professional judgment

6    on Wendi's behalf?  Did I state that correctly?

7        *A.*   Yeah, I think that's an accurate statement.

8    Independent professional judgment, yes.  I know we need to

9    move along, but it's not always inappropriate to accept a

10   fee from a third person.

11       *Q.*   You anticipated my next question.

12       *A.*   Okay.  I just didn't want to leave it hanging

13   there because it happens all the time.  Employers pay fees

14   for their employees.  Parents pay criminal lawyer's fees

15   for their children.  I'm in that situation myself.  I've

16   done it.  It happens.

17           The U.S. Supreme Court has said it is not -- it

18   has never prohibited it.  The Arizona Rules of

19   Professional Conduct don't prohibit it.  But the Supreme

20   Court has said very strongly that in *Wood V. Georgia* that

21   this is a situation that is fraught with danger and the

22   professional -- the Rules of Professional Conduct reflect

23   that.

24       *Q.*   Do the rules require informed consent prior to --

25       *A.*   Yeah, that's the issue.  I mean, that's the issue

1  here is when there is as in a case like this where it

2  jumps out -- when there are risks that I have to do a

3  mitigation investigation for one client, and on behalf of

4  another client, I'm doing work and they're the parents of

5  the person whose mitigation investigation I'm doing, it

6  screams for a requirement of informed consent.

7      Q.   And did you determine whether Wendi or the Ochoas

8  ever gave their informed consent to this situation?

9      A.   No.  Neither were asked.  They told -- again,

10  it's the same scenario.  They informed me that they were

11  never asked for informed consent, nor did they give

12  informed consent, specifically Ms. Andriano.

13      Q.   So you have given us the three reasons that you

14  believe Attorney DeLozier had an actual conflict of

15  interest?

16      A.   Yes.

17      Q.   Did you determine whether Attorney DeLozier

18  actively represented conflicting interests?

19      A.   Yes, I did make that determination.

20      Q.   And what was your conclusion?

21      A.   That for two separate reasons, he actively

22  represented conflicting interests.

23      Q.   What were those two reasons?

24          MS. GARD:  Judge, haven't we been over this?

25          THE COURT:  I think we're going over what we have

1  gone over before; aren't we?

2          THE WITNESS:  Okay.

3          MS. STERKEN:  I don't know that we have.

4          THE COURT:  Let me hear where you're going.

5          MS. STERKEN:  I think it's going to be three

6  minutes.

7          THE COURT:  Okay.  Go ahead.

8          THE WITNESS:  I'll try to be brief.  First of

9  all, his representation of the Ochoas lasted from 2001 to

10  2005, which was pretty much the time span, give or take a

11  few months, with Wendi Andriano's.  And he was actively

12  doing things on behalf of both during that period.  That's

13  the first reason.

14          And the second reason relates to the ER 1.8 and

15  1.9 and that is that the responsibility to protect

16  information relating to representation is an ongoing one.

17          Mr. DeLozier not only had the responsibility or a

18  responsibility to the Ochoas in 2004 to protect

19  information he learned in the representation of the

20  Ochoas, he still has that obligation today.

21      Q.  BY MS. STERKEN:  Do you have any opinion

22  regarding whether Attorney DeLozier's active

23  representation of conflicting interests had an adverse

24  impact on Wendi's representation?

25      A.  Yes, I do.

1      *Q.*   What's your opinion?

2      *A.*   My opinion is that it did have an adverse effect

3  on his representation of Ms. Andriano.

4      *Q.*   And why did you reach that conclusion?

5      *A.*   Well, based the governing standards in this

6  state, if he had a plausible alternative approach and

7  didn't follow that approach, then the conflict of interest

8  adversely affected his representation in Phase 3.

9          And a plausible approach doesn't have to make a

10 difference on the outcome or anything like that.  It's

11 just was there an alternative that wasn't followed because

12 of his conflict of interest.

13     *Q.*   And what alternative did Attorney DeLozier not

14 follow because of the conflict?

15     *A.*   Well, the alternative of, well, actually asking

16 the hard questions of the family.  And he was the person

17 on this team, on this defense team by everybody's

18 account -- he was the person who had the close

19 relationship with the family.  He developed a relationship

20 with the family.  Now maybe a mitigation specialist in

21 other cases.  In this case, it was David DeLozier who knew

22 the Ochoas and who was relied upon to provide information

23 from the Ochoas.  He never -- he never asked the hard

24 questions.

25          He never called Jeri Lynn Cunningham.  She was

1  the person who asked him to represent Wendi Andriano.
2  Part of the mitigation factors at the penalty phase of the
3  trial was that she had been a good student in school.  He
4  never contacted Mark Keating, the principal of the school.
5  I think his -- Mr. Keating's declaration is included in
6  the materials.  He never asked the mitigation specialist
7  to follow up on these thing.  He never asked the hard
8  questions of the family himself.
9       Q.   I think you've heard testimony that the
10 mitigation theme was essentially that Wendi is a good
11 person; correct?
12      A.   Yes.
13      Q.   What plausible defense -- alternative defense
14 strategy could Wendi's attorneys have employed if it
15 weren't for the conflict?
16           THE WITNESS:  Well --
17           MS. GARD:  Objection.  Beyond the scope.  This
18 man is being offered as a conflict of interest expert.
19           THE COURT:  Sustained.
20           MS. STERKEN:  Can I do it as an offer of proof?
21           THE COURT:  Go ahead.
22           MS. STERKEN:  You can go ahead.
23           THE WITNESS:  Yeah.  I think the standard for a
24 conflict of interest is:  Is there a viable alternative?
25 And the viable alternative in this case would have been to

1   present evidence to the jury that Ms. Andriano -- that

2   there were factors in her childhood in her relationship

3   with her adoptive father and her mother from when she was

4   a preadolescent and then adolescent that would be helpful

5   in explaining her behavior in the months before and during

6   the offense.

7        *Q.*   BY MS. STERKEN:  And you heard testimony that

8   Attorney DeLozier believed at the time that he did not

9   have a conflict that would impact his representation of

10  Wendi and the Ochoas.  Does that alter your analysis at

11  all?

12       *A.*   Not at all for the reasons I said earlier.

13            MS. STERKEN:  Your Honor, I would ask that

14  Exhibits 78, 79 and 234 be moved into evidence.

15            THE COURT:  Any objection to Exhibit Nos. 78, 79,

16  and 234 for identification being admitted into evidence?

17            MS. GARD:  78 and 79, Judge, I object to

18  relevance.  Actually, I don't object to 79.  78, I object

19  on relevance.  And 234, I object.  I don't have a problem

20  with it being used as a demonstrative exhibit, but,

21  otherwise, it's hearsay.  It's sort of argumentative.

22            THE COURT:  Okay.  I'm going to sustain the

23  objection with regard to Exhibit No. 78.

24            But Exhibit No. 79 for identification is admitted

25  into evidence.

1          And I will sustain the objection with regard to

2    Exhibit No. 234 for identification.  Although, I've

3    allowed it to be used during this direct examination for

4    demonstrative purposes.

5          MS. STERKEN:  I have no further questions.

6          THE COURT:  Ms. Gard?

7          MS. GARD:  Yes, Your Honor.  Thank you.

8

9                    CROSS-EXAMINATION

10   BY MS. GARD:

11   *Q.*    Mr. Lowenthal, the issue with the rash on the

12   children's bottoms that you referred to, from the

13   materials that you reviewed, you learned that the Ochoas

14   actually filed a CPS report against the Lambeths based on

15   those injuries; correct?

16   *A.*    Yeah.  You used the word injuries and rash.

17   They're two different things.

18   *Q.*    But the condition.

19   *A.*    I don't know what they were.  There was a

20   condition on their bottoms.  Yes.  That's correct.

21   *Q.*    And nowhere in the records that you reviewed was

22   that condition determined to be abuse caused by abuse from

23   the Ochoas?

24   *A.*    I don't know what caused it.  All I know is that

25   David DeLozier was aware of allegations that his clients

1   -- his client Alejo Ochoa caused it.

2        *Q.*   And that he was also aware that his clients were

3   the ones that reported it; right, to the authorities?

4        *A.*   They were the initial ones who reported it;

5   that's correct.

6        *Q.*   Okay.  The comment that you consider significant

7   is about one of the children saying that Grandpa Alejo

8   touched her butt; right?

9        *A.*   It was more than one.  That was two or three

10  different occasions, yeah.

11       *Q.*   And that comment was made during the course of

12  when the children had these rashes; right?

13       *A.*   It was during that period in time, yeah.  I

14  think, yes.  In fact, according to the letter I saw, that

15  comment was made in December of 2001.

16       *Q.*   Okay.  And the Ochoas had inspected the

17  children's bottoms to look at the injuries; right?  And

18  they had photographed the injuries as well or the

19  condition?

20       *A.*   I think that's right, they did.  And, of course,

21  at the time that they did that, they were not aware of the

22  allegations that Alejo had done it.

23       *Q.*   Okay.  And you also consider significant the fact

24  that one of the children reported that Donna Ochoa told

25  her to keep secrets; right?

1    *A.*    Yes.  I think it was at least one of the

2  children, maybe both.  But I think it was at least one of

3  them.

4    *Q.*    And you are aware that from the materials, again,

5  that you reviewed, that Mrs. Ochoa denied this pretty

6  vehemently; right?

7    *A.*    Yeah, she did.

8    *Q.*    She denied ever saying that she told the children

9  to keep secrets; right?

10    *A.*    Yes, she did.  She denied it.

11    *Q.*    And Mr. DeLozier would have been aware that she

12  denied that; right?

13    *A.*    That's right.

14    *Q.*    And she also accused -- she also attributed

15  Mrs. Lambeth's statements about her -- about the child

16  saying she had to keep secrets to retaliation for the

17  CPS report; right?

18    *A.*    I think that's the way she saw it at the time or

19  at least she articulated that at the time, yes.

20    *Q.*    And in the materials you reviewed, did Mrs. Ochoa

21  also recognize that she had a duty by law to report what

22  she believed to be abuse to the authorities?

23    *A.*    That's what she said, yes.

24    *Q.*    And, to this day, she maintains -- when you spoke

25  to her to prepare your report, she maintained that the

1  Lambeths caused injuries to the children's bottom; right?

2  And she, being Mrs. Ochoa.

3      A.    I don't think I directly asked her that question.

4  I don't recall that she -- I asked her do you still

5  maintain to this day that the Lambeths caused injury.  I'm

6  not aware of that, no.

7      Q.    You reviewed Dr. Yee's report; right?  Can you

8  turn to Exhibit 97 in your binders?

9      A.    Uh-huh.  What I have as 97 is actually -- oh,

10 Dr. Yee's?

11     Q.    Dr. Yee's.

12     A.    Oh, Dr. Yee's?  Oh, I'm sorry.  Yes, I'm familiar

13 with this.

14     Q.    And Dr. Yee was a court-appointed psychologist,

15 right, who was appointed to investigate the two homes, the

16 Lambeths and the Ochoas; right?

17     A.    Right.

18     Q.    Generally speaking?  Okay.  And Dr. Yee did note

19 adjustment difficulties on the children's part right after

20 visits with the Ochoas?

21     A.    Yeah, he said -- well, again, he is -- what he

22 was doing was just reporting what the Lambeths had said to

23 either him or Linda Gray.  I don't think they were his own

24 observations.  He said that the Lambeths had informed

25 either him or Linda Gray that when the children came back

1   from the Ochoas, that they were -- I don't know.  I don't

2   remember the exact wording in this letter, but I think it

3   is that they were having sleep problems, that they were

4   having anger problems, that they were having bladder

5   problems and they were having bowel problems.

6        Q.   And just before we go any further, you have

7   relied on those documents to form your opinions; right?

8        A.   In part, yes, yes.

9             MS. GARD:  Your Honor, I move to admit this as a

10  basis for his opinions.

11            THE COURT:  Any objection?

12            That's Exhibit No. 97 for identification?

13            MS. GARD:  97.

14            MS. STERKEN:  No.

15            THE COURT:  Exhibit No. 97 for identification is

16  admitted into evidence.

17       Q.   BY MS. GARD:  And Dr. Yee interviewed each of the

18  children individually; right?  It appears on Page 2 of

19  this document.

20       A.   I would have to look at this.  Yeah.

21       Q.   And the children told -- I'm directing you to the

22  third paragraph from the top on Page 2.

23       A.   All right.  The one after the one sentence

24  paragraph?

25       Q.   Yes.  Correct.

1    *A.*    Yes.

2    *Q.*    About the first -- the top third of that

3    paragraph, he reports that both children voiced an

4    enjoyment of their time with the paternal and maternal

5    grandparents; correct?

6    *A.*    Yeah.  I think he wrote a very even-handed report

7    and said that the children seemed comfortable in both

8    homes.

9    *Q.*    And he also reported that the children denied any

10   history of spanking; right, in that same paragraph?

11   *A.*    Yeah.  We're dealing with a four- and a

12   three-year-old self-reporting.  Yeah, I think that's

13   correct.

14   *Q.*    Okay.  And, in addition -- and I'll direct you to

15   the first paragraph.  I'm a little bit of out of order

16   here, but the first paragraph on Page 2.  Dr. Yee

17   interviewed the children's therapist, Linda Gray; right?

18   *A.*    That's right.

19   *Q.*    And Linda Gray reported that the children had

20   disclosed to her that the Ochoas were allowing the

21   children to speak with the defendant; right, on the

22   telephone?

23   *A.*    I think that's correct, yes.

24   *Q.*    And that they were receiving input from the

25   maternal grandparent's household that was contributing to

1   the adjustment difficulties; right?

2       A.   I think that's correct, yes.

3       Q.   And based on these factors, she recommended

4   discontinuing the overnight visitation with the

5   grandparents; right?  Maternal grandparents?

6       A.   I don't know all the reasons because I've never

7   seen -- and these are sealed records -- Linda Gray's

8   recommendations to the Court.

9       Q.   Okay.

10      A.   She apparently had continuing recommendations.  I

11  know that the Court the following year conditioned

12  overnight -- the resumption of overnight visitation on

13  Linda Gray's approval and it never occurred.  That's all I

14  know.

15      Q.   Dr. Yee in his report does not note any abuse

16  from the Ochoas toward the children; right?

17      A.   Other than that reported by the Lambeths.

18      Q.   Other than that reported by the Lambeths?

19      A.   First of all, the Dr. Yee's letter was on

20  November 13th.  I mean, excuse me.  March 13th of 2002.

21  It was two days later that Jeanea Lambeth's letter was

22  written.

23      Q.   Well, but the children's rashes emerged in

24  December of 2001; correct?

25      A.   The injuries or bruises or rashes or whatever

1  they were began appearing in December of 2001.

2      Q.    And, in fact, on Page 2 in that same first

3  paragraph near the end, Dr. Yee discusses the rashes in

4  the CPS report; right?

5      A.    You're going fast for me, Counsel.  Where are we

6  looking?

7      Q.    I'm sorry.  On that first paragraph on Page 2 of

8  Exhibit 97.  And he refers there to the children's rashes

9  on the buttocks?

10     A.    Yes.

11     Q.    And the CPS investigation; right?

12     A.    I -- I don't see that specific language, but I'm

13  sure it's -- I'm not -- I'm not quarreling or quibbling

14  with you.

15     Q.    And he also noted that during this process, the

16  custody proceeding to this point, the parties had made

17  representations of the multiple inadequacies of the other

18  parties?

19     A.    That's correct, yes.

20     Q.    And he noted that there was tension between the

21  households?  And I'm now looking at Page 3 of the report,

22  Bullet Point 4.  There was tension between the households

23  which at times had reached hysterical proportions; right?

24     A.    That's right.  Without reading it, that's the

25  essence of what he was saying.

1    *Q.*    And you were present in court when Mr. DeLozier

2    testified; right?

3    *A.*    Yes.

4    *Q.*    And he had some background in family law matters;

5    right?

6    *A.*    I don't -- yes.  Oh, yes, he does.  He told me he

7    did, yeah.

8    *Q.*    And he testified that people in child custody

9    disputes often levy accusations against each other?

10    *A.*    He said that.  I don't know if it's true.  I

11    assume that sometimes happens, yeah.

12    *Q.*    To him, it was not terribly unusual for these

13    types of things to be thrown around?

14    *A.*    Yeah.  But he also said that, if I may add

15    something there, that he chose to disbelieve the

16    allegations against his clients and to believe the good

17    things about his clients.

18    *Q.*    He was presented with no concrete evidence that

19    his clients had abused the grandchildren; right?

20    *A.*    Well, I think the concrete evidence is in the

21    letter that arrived two days later.

22    *Q.*    The one instructing the children to keep secrets?

23    *A.*    No.  The one that --

24    *Q.*    The one recounting --

25    *A.*    -- the Lambeths wrote to the Court.

1    *Q.*    Recounting the --

2    *A.*    Recounting incidents that Dr. Yee was not aware

3    of.  This letter is dated two days earlier.

4    *Q.*    He was aware of the allegations going back and

5    forth between the parties about those rashes, though;

6    right?

7    *A.*    He was aware that the parties had made

8    allegations, but he was certainly not aware of anything

9    about Grandpa Alejo touched my butt and Grandma Donna told

10   me to keep secrets.

11        And I don't know whether that's true.  I'm not

12   saying that Grandpa Alejo touched her butt or Grandma

13   Donna told her to keep secrets.  All I'm saying is this is

14   information that Mr. DeLozier had in his possession and at

15   the time that he was representing Wendi Andriano, and a

16   year or so later was made responsible to work with the

17   mitigation expert to develop mitigation evidence in the

18   case.

19   *Q.*    I understand that.  And turning to his

20   involvement in investigating mitigation, again, you were

21   present when he testified yesterday?

22   *A.*    Uh-huh.

23   *Q.*    And you have reviewed his interview transcript?

24   *A.*    That's right.  He interview with you and

25   Mr. Martinez?

1    *Q.*   Correct.

2    *A.*   Yes.

3    *Q.*   And Mr. DeLozier expressed the opinion that he

4    was being frozen out of the defense of Ms. Andriano;

5    right?

6    *A.*   On, yeah, I think he pretty much felt that way.

7    *Q.*   And he felt that Mr. Patterson was not delegating

8    him any tasks to do; right?

9    *A.*   Yeah.  I think he said something to that effect,

10   I wasn't getting delegation of facts.  He said that.

11   That's contrary to the record.  If you look at his

12   invoices, it indicates that he was delegated the

13   responsibility to work with the mitigation specialists.

14   *Q.*   He did not attribute his failure to develop

15   mitigation to any feeling of loyalty to the Ochoas; right?

16   *A.*   He told me he was blinded by his representation

17   of the Ochoas.  That he just couldn't see what was in

18   front of him.

19   *Q.*   He told you that in his interview with you?

20   *A.*   Yes.

21   *Q.*   But he did not mention that in --

22   *A.*   In fact, he used the same language in his

23   interview with you.

24   *Q.*   Blinded with the Ochoas?

25   *A.*   He said I was blinded.  I don't know whether I

1    was misled or not, but I was blinded.  He used the word

2    blinded in his interview.  I don't know whether it was a

3    question from you or from Mr. Martinez.

4              MS. GARD:  Your Honor, actually, may I --

5        Q.   BY MS. GARD:  You relied on that transcript to

6    form your opinions; correct?

7        A.   Yeah.  He went into much more detail with me, but

8    he used the same language with you.  I think it was your

9    question, Ms. Gard.

10       Q.   What number is that?

11       A.   I don't have a page.

12             MS. GARD:  Your Honor, since he has relied on

13   that transcript, I would move to admit it as the basis for

14   his opinions.  It is Exhibit 174, for that limited

15   purpose.

16             THE COURT:  Is there any objection to 174 for

17   identification being admitted into evidence?

18             MS. STERKEN:  No.

19             THE COURT:  Exhibit No. 174 for identification is

20   admitted into evidence.

21             THE WITNESS:  It was a basis.  You said the

22   basis.

23       Q.   BY MS. GARD:  A basis?

24       A.   It was a basis that he had told me he was -- that

25   he felt blinded by his representation of the Ochoas.  That

1  he didn't know whether he was being misled or not, but he

2  felt blind-sided or blinded.  And I saw the word blinded

3  in response to a question of yours somewhere around

4  Page 70 or 80 of your interview with him and then you went

5  onto another subject.

6      Q.   While we look for that, let's move onto another

7  subject.  I would like some clarification on -- you went

8  through the three parts of your opinion?

9      A.   Sure.

10     Q.   I would like some clarification on the third

11  part, the financial interests of the Ochoas, because I'm

12  not clear on how that all works.

13     A.   Yeah, I think I stated in my report -- and I

14  wasn't asked on direct exam.  It was not a conflict of

15  interest for the Ochoas to pay or to be responsible for

16  paying the fee because that happens sometimes of

17  necessity.

18         It was a conflict of interest when he had an

19  interest in asking tough questions in trying to find out

20  about her childhood what -- who was the real Wendi

21  Andriano.  And without asking for anyone's informed

22  consent.  He just didn't ask those questions.

23     Q.   Okay.  How does that relate to the payment from

24  the Ochoas or the fee agreement?

25     A.   Oh, the fee?

1  *Q.*   Yes.  That's what I was trying to get at.

2  *A.*   Well, I mean, criminal lawyers in private

3  practice very often ask for their fee up front and then

4  they get what they -- over time, what they can from their

5  clients, whether it's the defendant himself or herself or

6  the parents or some third party.  And there is a real

7  interest on the lawyer's part in maintaining a

8  relationship with the party who is paying the fee in order

9  to continue collecting the fee.

10  *Q.*   How did that affect in your -- I still don't

11  follow how that affected his ability to investigate

12  mitigation, the fee.

13  *A.*   Well, we have a situation where you have -- I

14  can't say in December of 2000 that there was a direct

15  adverse interest.  Oh, there probably was even in 2000

16  because taking on that case, he knew he was going to have

17  to investigate mitigation.  And investigating mitigation

18  is to find out about the client's childhood.  And that

19  means that you're going to -- very often, as you're going

20  to have to -- you or your mitigation specialists are going

21  to have to sit down with the family and say I don't know

22  how -- I know this is really painful.  I know this is

23  really difficult, but we really have to find out what

24  really happened here.

25       And forcing someone to talk about very painful

1    experiences is difficult on that person, and there has to

2    be a natural reluctance on someone who wants to continue

3    to get money from that person to push them into that

4    situation.

5        Q.   All right.  Can I direct you back to Exhibit 174,

6    the transcript of Mr. DeLozier's interview?

7        A.   Yeah.  I haven't looked at this in quite a while,

8    but I -- 174?

9        Q.   I'm not sure that it's in those binders.  It may

10   not be.

11       A.   Well, then can you give me a copy of it?

12            MS. GARD:  Yes, I can.  Your Honor, may I

13   approach the exhibits?

14            THE COURT:  Yes.

15            MS. GARD:  Here's the marked copy.

16            THE WITNESS:  Thank you.

17            MS. GARD:  You're welcome.

18       Q.   BY MS. GARD:  Okay.  If I could direct you to

19   Page 42 of that exhibit.  Are you at Page 42?

20       A.   Uh-huh, yes.

21       Q.   Is this the part you were thinking of that --

22       A.   I think --

23            THE COURT:  One at a time.  Okay.  Go ahead.

24       Q.   BY MS. GARD:  Of being blinded?

25       A.   No.  I think there's a later point in the

1 transcript in which he said:  I was blinded.  And you

2 asked him some questions about being misled.  He said:  I

3 don't know whether I was misled.

4     Q.    And the context of this particular discussion

5 is --

6     A.    He used the word blinded here, yeah.

7     Q.    Yes.  Mr. DeLozier feeling misled by the Ochoas

8 for not disclosing this; right?

9     A.    Yeah.  I think so, yes.

10    Q.    You would agree, wouldn't you, that a violation

11 of ethical rules does not necessarily mean a violation of

12 *Strickland*; right?

13    A.    I don't think we're dealing with *Strickland*.

14 We're dealing with *Kyra vs. Sullivan*.

15    Q.    Okay.  That's the only question that you were

16 asked to answer; right?

17    A.    That's right, yes.

18    Q.    Your position is that Mr. DeLozier violated

19 ethical rules; right?

20    A.    Absolutely.

21    Q.    Have you reported him to the State Bar for an

22 investigation?

23    A.    No.

24    Q.    Is it your intention to do so?

25    A.    I might.  I have definite views about the ethics

1  involved here, very strong views.

2          MS. GARD:  I have nothing further of this

3  witness.

4          THE COURT:  Redirect?

5          (WHEREUPON, an off-the-record discussion ensued.)

6          MS. STERKEN:  No.  No further questions.

7          THE COURT:  May this witness be excused?

8          MS. STERKEN:  Yes.

9          THE COURT:  Mr. Lowenthal, thank you very much.

10  You are excused.

11          THE WITNESS:  Thank you, Your Honor.  Nice seeing

12  you.

13          THE COURT:  Don't walk off with any exhibits.

14          THE WITNESS:  No, I promise.  I don't know who

15  gets this.

16          MR. ARNTSEN:  Just leave it there.

17          THE COURT:  Yes, just go ahead and leave it

18  there.

19          THE WITNESS:  Thank you very much.

20          THE COURT:  Thank you.

21          Then it's my understanding from our discussions,

22  that we will not have trial tomorrow.  We will not have

23  trial on Thursday and we will reconvene at 9:30 on Friday,

24  February 13th.

25          THE CLERK:  14th.

1          THE COURT:  14th.  I'm sorry.  Valentine's Day.

2          MS. GARD:  And, Judge, since we finished a little

3    bit early, can we made a record of our discussion at the

4    bench yesterday after the hearing concluded about doing

5    closing briefs and argument?

6          THE COURT:  Yes.  Can we do that right now?

7          MS. GARD:  Yes, if there's time.

8          THE COURT:  Okay.  So we will not have trial

9    tomorrow, which is February 12th.  We will not have trial

10   on February 13th, which is Thursday.  But we will

11   reconvene at 9:30 on February 14th.

12         Then Ms. Andriano will not be transported to

13   court either tomorrow or Thursday.  I think my judicial

14   assistant has already notified the sheriff's office with

15   regard to that.

16         Then you wanted to put on the record the fact

17   that yesterday, I had an informal discussion with counsel

18   about the fact that after the presentation of the

19   evidence, I would expect that we will have written closing

20   arguments for the Court's consideration.  And it's my

21   understanding that the attorneys would like to have the

22   transcripts of these proceedings before they work on their

23   closing arguments; is that correct?

24         MR. ARNTSEN:  Yes, Your Honor.

25         THE COURT:  Then I guess, in the meantime, when

1   we get closer to Friday, we will ask the court reporter

2   the time frame of when she might be able to complete those

3   transcripts.  Then I'll try to give you a schedule of the

4   closing arguments, then.

5            Is that agreeable to everybody?

6            MR. ARNTSEN:  That is, Your Honor.

7            MS. GARD:  Yes, Judge.

8            THE COURT:  Anything further before we take our

9   evening recess?

10           MR. ARNTSEN:  I don't think so.

11           THE COURT:  Okay.  Thank you very much.  Everyone

12  have a nice evening and the next couple of days.  We will

13  see you on Friday, February 14th, at 9:30.  Thank you.

14           (WHEREUPON, the proceedings were concluded at

15  4:38 p.m.)

16                    * * * * * * *

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7                          C E R T I F I C A T E

8

9

10          I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

11   the State of Arizona, do hereby certify that the foregoing

12   194 pages constitute a full, true, and accurate transcript

13   of the proceedings had in the foregoing matter, all done

14   to the best of my skill and ability.

15          SIGNED and dated this 12th day of April, 2014.

16

17

18                     /s/  Renée A. Mobley, RPR

19                     RENÉE A. MOBLEY, RPR

20                     Certified Reporter

21                     Certificate No. 50500

22

23

24

25

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| STATE OF ARIZONA, ) | |
| ) | |
|     Respondent, ) | |
| ) | |
| vs. ) | No. |
| ) | CR 2000-096032 A |
| WENDI ELIZABETH ANDRIANO, ) | |
| ) | |
|     Petitioner. ) | |
| _____ ) | |

Phoenix, Arizona
February 14, 2014
9:31 a.m.

BEFORE:  THE HONORABLE BRIAN K. ISHIKAWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING

DAY 8

Renée A. Mobley, RPR
Certified Reporter
Certificate No. 50500                    (COPY)

2

1                        A P P E A R A N C E S

2

3

4    On Behalf of the State:

5            Mr. Gregory Hazard
             Assistant Attorney General
6
             Ms. Lacey Gard
7            Assistant Attorney General

8
     On Behalf of the Defendant:
9
             ATTORNEYS AT LAW:
10
             Mr. Scott Bennett
11           Mr. Allen Arntsen
             Mr. Stephan Nickels
12           Mr. Matthew Lynch
             Ms. Krista Sterken
13           Ms. Jodi Fox

14                        I N D E X

15

16                    T E S T I M O N Y

17
     WITNESS:                                    PAGE
18
     KIRAN AMIN, PH.D.
19
         Direct Examination by Mr. Hazard        4
20
         Cross-Examination by Ms. Sterken        27
21

22   STEVEN E. PITT, D.O.

23       Direct Examination by Mr. Hazard        33

24       Cross-Examination by Mr. Nickels        93

25       Redirect Examination by Mr. Hazard      107

P R O C E E D I N G S

1

2       THE COURT:  Good morning.  This is

3   CR 2000-096032, State of Arizona vs. Wendi Elizabeth

4   Andriano.

5       The record will reflect the presence of the

6   parties and counsel.

7       Are there any preliminary matters we need to

8   discuss?

9       MR. ARNTSEN:  Not from the Petitioner.

10       MS. GARD:  No, Your Honor.

11       THE COURT:  The Petitioner rests?

12       MR. ARNTSEN:  The Petitioner rests.

13       THE COURT:  The State may call its first witness.

14       MR. HAZARD:  Thank you, Your Honor.  The State

15   calls Dr. Kiran Amin to the stand.

16       THE COURT:  Sir, if you could please step

17   forward.  Go ahead and step forward up to the witness

18   stand.  Before you sit down, if you could please face the

19   clerk.  Give her your full name and she will swear you in.

20       THE CLERK:  State your name and spell your name

21   for the record, please.

22       THE WITNESS:  Kiran Amin.  K-I-R-A-N; A-M-I-N.

23       THE CLERK:  Raise your right hand, please.

24       (WHEREUPON, the witness was duly sworn by the

25   clerk.)

4

1          THE COURT:  Sir, go ahead and have a seat there
2   on the witness stand.  If at anytime you need water,
3   there's some water behind you there and help yourself.
4   Just remember to speak up so that everyone can hear you.
5   Also, please wait until the question is completed before
6   you answer the question and please make sure that you give
7   us a verbal response.
8          Is that all agreeable to you, sir?
9          THE WITNESS:  Yes.
10         THE COURT:  Go ahead and state your name for the
11  record.
12         THE WITNESS:  Kiran Amin.
13         THE COURT:  Is it going to be Mr. Hazard?
14         MR. HAZARD:  Yes, Your Honor.
15         THE COURT:  Mr. Hazard, you may proceed.
16         MR. HAZARD:  Thank you, Your Honor.
17
18                    KIRAN AMIN, PH.D.
19  having been first duly sworn to tell the truth, the whole
20  truth, and nothing but the truth, testified as follows:
21
22                   DIRECT EXAMINATION
23  BY MR. HAZARD:
24      Q.   What do you do for a living, sir?
25      A.   I'm currently a professor of clinical psychology

1   at Midwestern University on the Glendale campus.

2       *Q.*    And let's talk about your education, training and

3   experience.  First let's start with, can you share with

4   the Court your education?

5       *A.*    Yes.  I have a past degree in mathematics and

6   statistics and then a degree in psychology from Britain.

7   And then I have a Doctorate Degree in Clinical Psychology

8   from McGill University in Montreal, Canada.

9           Subsequent to that, I have completed a

10  post-doctoral fellowship at the Barrow Neurological

11  Institute at St. Joseph's Hospital here in Phoenix in

12  clinical neuropsychology.

13      *Q.*    Are you a member of any boards or organizations

14  that are related to your field of study?

15      *A.*    Yes.  I'm a member of the American Psychological

16  Association and a member of Division 40, which is a

17  division concerned with clinical neuropsychology.  I'm a

18  member of the National Academy of Neuropsychology and I'm

19  also a member of the International Neuropsychological

20  Society.

21      *Q.*    What other experience have you had?  You

22  mentioned your teaching experience.  What other experience

23  have you had related to neuropsychology?

24      *A.*    After completing my post-doctoral training in

25  clinical neuropsychology, I worked for six years at

1  Good Samaritan Regional Medical Center, which is now known

2  as Banner, and I was there as an outpatient

3  neuropsychologist for six years.

4          Thereafter, I worked at Jarvis University as an

5  associate professor and eventually becoming a professor

6  there until four years ago.  And then I've been at

7  Midwestern University as a professor of clinical

8  psychology since that time.

9      Q.   Have you ever worked or been retained as an

10 expert witness in neuropsychology?

11     A.   Yes.

12     Q.   Can you tell the Court a little bit about that

13 experience?

14     A.   Since 1992, I have been retained an as expert

15 initially on matters to do with personal injury

16 evaluations and neuropsychological evaluations in person

17 injury matters.  And, subsequently, I became involved in

18 doing neuropsychological evaluations in criminal matters.

19          And in the last five to ten years, I've become

20 more involved in doing evaluations like the present one

21 where a capital matter is involved.

22     Q.   Have you testified as an expert witness before in

23 court?

24     A.   Yes.

25     Q.   Tell us a little bit about that.

7

1    *A.*    I've testified both for the defense and the

2    prosecution on both personal injury matters, competency

3    evaluations and then criminal matters such as this.

4    *Q.*    Were you retained by the Arizona Attorney

5    General's Office to do a neuropsychological assessment of

6    Ms. Wendi Andriano?

7    *A.*    Yes.

8    *Q.*    And after completing that assessment, did you

9    write a report?

10    *A.*    I did, yes.

11           (WHEREUPON, an off-the-record discussion ensued.)

12           MR. HAZARD:   May I approach the witness?

13           THE COURT:   Yes.

14    *Q.*    BY MR. HAZARD:   Dr. Amin, I'm handing you what

15    has been marked for identification purposes as

16    Exhibit 169.   Do you recognize what's in that exhibit

17    folder?

18    *A.*    Yes.   It is the report I wrote.

19    *Q.*    Okay.   And did you complete that report dated

20    December 26, 2013?

21    *A.*    Correct.

22           MR. HAZARD:   We move to admit Exhibit 169 into

23    evidence.

24           THE COURT:   Any objection?

25           MS. SKERKEN:   Yes.   We would object on hearsay

1  grounds.

2          THE COURT:  I'll sustain the objection.

3      Q.   BY MR. HAZARD:  All right.  Let's talk about

4  first off the records that you reviewed and the materials

5  that you reviewed in preparation for your assessment of

6  Ms. Andriano in writing your report.  Can you tell us a

7  little bit about those types of materials?  Are they

8  listed in your report?

9      A.   Some of them are listed.  I haven't listed them

10  all because I was writing a memorandum effectively to

11  Dr. Pitt.  And as I mentioned in my memorandum, that I'm

12  listing the critical ones that I referred to -- the

13  critical records that I referred to.

14      Q.   What sorts of things do you generally want to

15  have to complete the type of neuropsychological assessment

16  that you did with Ms. Andriano?

17      A.   I would need all previous psychological

18  evaluations and neuropsychological evaluations that I need

19  to review.  I would need to conduct a clinical interview.

20  And I may need to also review any other relevant materials

21  such as school records, past records of any kind of

22  indication of the person's cognitive or neuropsychological

23  functioning.

24      Q.   And you did that in this case?

25      A.   I did, yes.

1      *Q.*   You mentioned Dr. Pitt.  Did you also attend and

2   participate in a forensic interview with Ms. Andriano

3   conducted by Dr. Pitt on November 26, 2013?

4      *A.*   I did, yes.

5      *Q.*   And why did you do that in this case?

6      *A.*   It's always customary, at least for me, to

7   interview the person in question.

8      *Q.*   Then after that forensic interview was completed,

9   did you request additional testing to be conducted on

10   Ms. Andriano?

11      *A.*   Yes.

12      *Q.*   And can you tell the Court how that went about

13   and why you did that?

14      *A.*   After reviewing Dr. Young's report and after the

15   interview, I wanted to test or retest some of the tests

16   that had been given to Ms. Andriano, and, also, to see if

17   currently what level she was currently functioning at,

18   bearing in mind that Dr. Young's report was over almost --

19   almost three years ago.

20          And so I felt it necessary to go back and at

21   least do some of the tests of interest to me to see how

22   Ms. Andriano performed on them and to check out any

23   hypotheses that I constructed based on the actual

24   interview that I was present with with Dr. Pitt of

25   Ms. Andriano.

1    *Q.*    Did you conduct those tests on December 13, 2013?

2    *A.*    Yes.

3    *Q.*    And why did you select the particular tests?

4    First of all, what specific tests did you administer on

5    Ms. Andriano?

6    *A.*    I administered the following tests:  The

7    California Verbal Learning Test, Second Edition; Halstead

8    Finger Tapping Test; Groove Pegboard Test; Minnesota

9    Multiphasic Personality Inventory, Second Edition;

10   Structured Inventory of Malingered Symptoms; the

11   Rey-Osterrieth Complex Figure Test; and the Validity

12   Indicator Profile.

13          And, specifically, I was interested in memory

14   functioning, given that Ms. Andriano had stated that she

15   had difficulties with her memory.

16          And so the first test I gave or that is listed

17   here, sorry, is the California Verbal Learning Test.  It

18   is, as described, as a test of verbal learning and

19   retention over repeated trials.

20          I also gave her a memory test to do with

21   nonverbal material and that is the Rey-Osterrieth Complex

22   Figure Test.

23          So I gave her two memory tests that I was

24   particularly interested in seeing how she functioned on.

25   And as it happened, both tests had been administered to

1  Ms. Andriano over almost three years prior.

2         Additionally, I gave her some motor tests, the

3  Halstead Finger Tapping Test and the Groove Pegboard Test.

4  These are tests of motor functioning that I wanted to see

5  how Ms. Andriano compared with Dr. Young's test results

6  from the previous administration.

7         And then, finally, I gave the personality test,

8  the Minnesota Multiphasic Personality Test, which had not

9  been given by Dr. Young to Ms. Andriano, but it had been

10  given by Dr. Bayless some years prior.

11         I also administered something called a Validity

12  Indicator Profile, which is a measure of how much effort

13  the testee is putting forth.

14         So those are the tests that I -- oh, and the

15  Structured Inventory of Malingered Symptoms is another

16  questionnaire-based measure that attempts to see if the

17  respondent is in any way exaggerating or feigning symptoms

18  that are actually not typically claimed by people with

19  genuine mental or neurological disorders.

20     Q.    During the forensic interview on November 26,

21  2013, did you ask Ms. Andriano some questions related to

22  any head trauma or injuries she may have suffered?

23     A.    I did, yes.

24     Q.    And why did you do that?

25     A.    That is part of my normal clinical interview

1  questions that I check with the client exactly what their

2  prior history is from a neurological and

3  neuropsychological point of view.  So I go repeatedly over

4  some questions to do with any prior head injuries, motor

5  vehicle accidents, falls, episodes of loss of

6  consciousness and so forth.

7      Q.   Did Ms. Andriano report any significant head

8  injuries or loss of consciousness to your questions?

9      A.   No.

10     Q.   When you administered these tests on

11  December 13th on Ms. Andriano, what was her -- did you

12  have the opportunity to observe her mood and affect?

13     A.   She was cooperative, fully present, and I believe

14  on most of the tests, she performed with good effort -- at

15  least on some of the measures I gave her.

16     Q.   Before you administer each test, is there a

17  certain protocol that you follow to inform, in this case,

18  Ms. Andriano about why you're taking the test or anything

19  like that?  And, if so, please tell the Court how that

20  goes.

21     A.   Initially when I start the test administration, I

22  explain to the client that I'm going to be giving them

23  some paper and pencil tests, that the purpose of which is

24  to evaluate their cognitive and neuropsychological

25  functioning.  I explain that that refers to how what their

1  problem solving styles are like, what their memory is

2  like, what their language skills are like and so forth,

3  and, also, to get a picture of their personality

4  functioning.

5      *Q.*   And did Ms. Andriano indicate that she understood

6  what she was supposed to do with these tests?

7      *A.*   Yes.  And she also indicated during the testing

8  that she remembered doing similar tests several years ago

9  with Dr. Young.

10     *Q.*   The tests that you administered, are these tests

11 that experts in your field of neuropsychology reasonably

12 rely upon?

13     *A.*   Yes, as you can see, I gave what?  Seven tests

14 altogether, seven measures.  I would normally do a full

15 assessment, but given that Dr. Young had already

16 administered a huge -- a very large number of tests three

17 years prior, I was more interested in seeing what changes,

18 if any, had occurred since that testing by Dr. Young.

19     *Q.*   And that's why you selected the specific tests

20 you did; correct?

21     *A.*   Yes.  Yes.

22     *Q.*   All right.  Can you take us through the findings

23 that you made after Ms. Andriano completed the tests and

24 you started reviewing the data from those tests?  Can you

25 take us step-by-step as far as findings that you made,

14

1   given Ms. Andriano's performance on the tests you

2   administered, and anything else related to her prior

3   history?

4       A.   Yes.   So first what I do is -- always do is score

5   the tests and generate some results, which indicate to me

6   how Ms. Andriano had been functioning on these tests.   And

7   then I would then go back to any prior testing, as in the

8   case of done by Dr. Young, Dr. Bayless and others, and

9   review those records and compare those findings with mine.

10          And after doing that, I form my own opinions and

11  then write a report.   In the report, I lay out the tests

12  I've given and the results I've obtained.   I also then

13  compare those results with results reported by previous

14  examiners and then comment on any differences or

15  similarities, and then offer my opinions.

16      Q.   What about the VIP test?   Can you tell us about

17  that and what findings you made?

18      A.   Yes.   The VIP stands for the Validity Indicator

19  Profile.   It is a test involving problems to do with both

20  verbal and nonverbal material, and the purpose of the test

21  is to establish if the examinee is responding with

22  adequate effort to the items administered.

23          On the Validity Indicator Profile, which had not

24  previously been administered to Ms. Andriano, she

25  performed within normal limits.   In other words, she put

1  forth normal effort.

2     *Q.*   What about the MMPI-2?

3     *A.*   The MMPI-2 is a personality measure with over --

4  with 567 items, and it generates ten initial scales and

5  then many other subscales.

6          And this measure had been given to her quite a

7  few years ago by Dr. Bayless.  And so I was interested in

8  knowing how Ms. Andriano's performance compared with the

9  performance that she demonstrated at that time with

10 Dr. Bayless.

11         And, as I report, I found that her MMPI-2

12 measures were showing some serious scale elevations,

13 meaning that these were scales in what we would call the

14 clinically significant range on eight of the ten standard

15 scales.

16         The profile also has measures to indicate whether

17 the person was responding adequately and whether the

18 profile was interpretable, and it was interpretable in my

19 opinion.  So I proceeded with the analysis.

20         And what I found was that something called a

21 Symptom Validity Scale, FVS, was elevated, indicating

22 possibly some exaggeration of some symptoms.

23         I then, of course, compared these findings with

24 the ones that Dr. Bayless had obtained.  I don't know the

25 exact date.  I have it written down here.  In 2004, nine

1  years ago.

2        What I found that was noteworthy was that the

3  profile pattern was the same except that the profile I

4  obtained was significantly elevated compared to what

5  Dr. Bayless found.  So that suggests that the profile

6  pattern has not changed, but that on the face of it,

7  Ms. Andriano is in a considerably -- considerably greater

8  level of distress, psychological distress currently when I

9  tested her.

10        Also, as I said, I found the FVS subscale

11  elevated, suggesting that there was a possibility of

12  exaggeration of symptoms.

13    Q.    You mentioned comparing the MMPI to the test that

14  Dr. Bayless administered in 2004?

15    A.    The same one, yeah.

16    Q.    The same one.

17    A.    And which Dr. Young had not administered.  Nobody

18  else had administered the MMPI since Mr. -- Dr. Bayless

19  had administered it in August of 2004.

20    Q.    What was significant -- did you find any

21  significance in comparing the test that Dr. Young

22  administered with the test that you also administered?

23  And, if so, what sort of findings or opinions have you

24  rendered with respect to Dr. Young's work?

25    A.    Right.  There were several areas in which the

1   performance was different and worth comment from me.  So

2   as I go through the list, there was the Structured

3   Inventory of Malingered Symptoms, SIMS, which I explained

4   earlier is a measure to determine whether the individual

5   is endorsing items that are not typically endorsed by

6   people with genuine psychiatric and neurological

7   conditions.

8          This measure was given by Dr. Young.  And, at

9   that time, Ms. Andriano performed within normal limits.

10          However, when I administered it to her, as I

11   report, she was showing symptoms of some kind of

12   exaggeration or claiming symptoms that would not typically

13   have been claimed by people with genuine neurological or

14   psychiatric disorders.

15          So there was evidence and suggestions that of

16   malingering or feigning of symptoms on the SIMS based on

17   my test results compared to those of Dr. Young's three

18   years prior, roughly.

19   *Q.*   After you completed your report, did you have the

20   opportunity to review a report submitted by Dr. Joette

21   James on these proceedings?

22   *A.*   I did, yes.

23   *Q.*   And in that report, Dr. James is critical of you;

24   is that correct?

25   *A.*   On several accounts, yes.

1    Q.   Let's first off talk about the first topic of
2  criticism in Dr. James' report, and that was the time you
3  spent with Ms. Andriano.  Could you comment on that?
4    A.   As I explained, I first did an interview with
5  Dr. Pitt, a clinical interview which lasted I think three
6  or four hours, if I can recall.
7         And then on a subsequent occasion, I went in and
8  administered the tests that we have just been talking
9  about, and as I list, they took a total of two hours and
10  44 minutes.
11         I wasn't giving what we would call a full
12  neuropsychological evaluation for the reasons stated, that
13  on the face of it, Dr. Young had administered a great
14  variety of tests, and this was over three years prior.
15  And so I was more interested in seeing how the selective
16  tests that I gave Ms. Andriano compared with the
17  performance three years prior.
18         Initially, at that time, I had no reason to doubt
19  any of the initial findings reported by Dr. Young.  As it
20  happened, when I started making the comparisons, I have to
21  go through the scoring done by Dr. Young, and as I listed
22  in the report, I did find some errors and inconsistencies
23  which I have listed in that report.
24    Q.   Did Dr. James even bring up the fact that you sat
25  in and participated in Ms. Andriano's forensic interview?

19

1    *A.*    No.  No, she did not.

2    *Q.*    And is that also important in your overall

3    assessment of Ms. Andriano?

4    *A.*    Absolutely, in that, in a forensic assessment,

5    it's important to meet with the client and not just go by

6    a paper review alone.

7    *Q.*    The second kind of topic that Dr. James was

8    critical of had to do with the idea that Ms. Andriano, in

9    your opinion, was showing some issues that call into

10   question whether she put forth her best effort --

11   *A.*    Correct.

12   *Q.*    -- and symptoms consistent with malingering?

13   *A.*    Right.

14   *Q.*    Could you address those criticisms?

15   *A.*    Right.  So there are -- so let me just count.

16   There are at least three tests which we're talking here

17   about.  The Validity Indicator Profile, as I reported just

18   now, showed no attempts of feigning or malingering.  So it

19   was within normal limits.  And so Dr. James had no quibble

20   with that.

21       The next one is the SIMS, which Dr. James herself

22   administered, on which Ms. Andriano performed within

23   normal limits for Dr. Young, but, for me, she was clearly

24   showing some symptoms of feigning.

25       And, at this point, Dr. Young cast doubt on the

1    SIMS as a worthwhile measure, which was the issue as to

2    why Dr. Young herself administered that same test to

3    Ms. Andriano.  Sorry.  I meant Dr. James cast doubt on the

4    SIMS as a worthwhile measure.

5          But I'm in agreement with Dr. Young that it is a

6    worthwhile measure in the context of proper testing.  And

7    so there is a difference of opinion with Dr. James, in

8    that Dr. James doesn't take the -- doesn't feel that the

9    SIMS is valid enough or reliable enough, in her opinion.

10         Then we move to the Rey-Osterrieth Complex Figure

11   Test.  This is a test of nonverbal memory.  And this was

12   administered by Dr. Young, and I administered it, too.

13         And in comparing the results from that

14   administration and mine, I found some interesting things.

15   I found, for instance, that there's something called a

16   Recognition Trial, which is where you ask to state whether

17   you recognize something that you saw before.  And I had

18   given a Recognition Trial, but what I noticed, which

19   Dr. Young had overlooked, was that the Recognition Trial

20   showed that Ms. Andriano was performing significantly less

21   well than other measures of the same test that Dr. Young

22   had administered.  When this occurs, there is an issue of

23   explaining why there is such a discrepancy, and Dr. Young

24   had overlooked that.

25         And I pointed out that there was a possibility

1   here of some degree of malingering because typically,

2   Recognition Trials are a lot easier to do than Recall

3   Trials.  And this was a discrepancy I picked up in

4   Dr. Young's administration.

5        In my opinion, also I noticed that Dr. Young

6   omitted to mention that 30 minutes after the initial

7   administration -- introduction to the stimulus,

8   Ms. Andriano still performed within the normal range,

9   indicating that as far as nonverbal memory goes, she was

10  not showing any significant deficits, but Dr. Young omits

11  to mention that.  So in all of these counts, there are

12  these disagreements between myself and Dr. Young.

13        Dr. James, who reviewed these records, feels that

14  she did not come across any research regarding Recall

15  versus Recognition on the ROCFT.

16  Q.   Do you agree with that?

17  A.   I do not.  In fact, I have about a half a dozen

18  such articles addressing this very issue.  So that was the

19  ROCFT.

20        Then as you note, I mentioned the Minnesota

21  Multiphasic Personality Inventory, Second Edition, and the

22  FVS -- elevated FVS index.

23        Dr. James did not address this at all in her

24  review of this testing as to what it meant and did not

25  address it all in her review, as I said, and the

1  comparison between my results and the results obtained by

2  Dr. Bayless 13 years prior.  So that's where we stand with

3  regard to this.

4         And the California Verbal Learning Test, which

5  was a straightforward test of this learning,

6  Ms. Andriano performed within normal limits on my

7  administration, and I believe she did so also on

8  Dr. Young's administration, but Dr. James didn't comment

9  on that finding.

10    *Q.*   What about Dr. James' criticism that you did not

11  account for the practice effect to explain some of these

12  suspicious findings that you found with Ms. Andriano's

13  test results?  First off, what is the practice effect?

14    *A.*   The practice effect is simply if you give the

15  same test to a person a second or third time, they may

16  typically show improvements on that test.  That's known as

17  a practice effect.  The issue is what kind of time period

18  should elapse before a practice effect is likely to occur.

19         Well, as you can see -- as you know, it's been a

20  good almost three years between when Dr. Young did her

21  administration and when I did it, which I think is more

22  than adequate time to in fact not consider the practice

23  effect as an issue in this matter.

24         And, in fact, I selected these tests bearing that

25  precisely in mind, that I wanted to make sure that there

1   was no issue of practice effects.  Three years had gone

2   by.  And, in fact, during the administration, Ms. Andriano

3   never recalled doing any of these tests.

4          The second issue regarding practice effects is

5   that on some of the tests, there were discrepancies which

6   were to do with possible malingering or feigning of

7   symptoms.  And the practice effect doesn't really apply

8   here because it's in reverse, in the sense that compared

9   to how, for instance, Ms. Andriano performed 13 years ago

10  on the MMPI-2 and when I administered the test to her, she

11  was showing a great increase in her symptoms and distress

12  level, for instance.

13         Likewise with the SIMS, the Structured Inventory

14  of Malingered Symptoms, there, too, she showed an

15  elevation of endorsing items that are not typically

16  endorsed by people with genuine neurological or

17  psychiatric disorders.

18         So given all of these considerations, that's what

19  I can say regarding the practice effect:  That in the

20  instances where it might be possibly relevant, it is not,

21  because, in my opinion, too great of a time period has

22  passed between the previous testing and the current one.

23         Just to give you an example, in rehabilitation

24  settings where individuals going for rehabilitation after

25  brain injury or neurological insult, a period of six

1  months is considered adequate to bypass the possibility of

2  practice effects between the first and second testing.

3       Q.   Now, Dr. Amin, October 8, 2000 is the date of

4  offense, the date of the murder; correct?

5       A.   Yes.

6       Q.   And the tests that you administered in 2013, the

7  tests that Dr. Young administered in 2010 through 2011, in

8  that time frame you talked about, the tests Dr. Bayless

9  administered in 2004, and anything else, how do you use

10 this data, interpreting this data, to make any sort of

11 opinion about Ms. Andriano's mental state at the time of

12 October 8, 2000?

13      A.   Well, for instance, the issue here is how

14 consistent are these findings over three different time

15 periods.  And as I pointed out, there are inconsistencies

16 here, and they cannot be explained by practice effect, and

17 in my testing, I found some evidence of feigning of

18 symptoms and possible malingered amnesia, as I point out.

19           So that's what the comparison over three

20 different time periods is telling me in this matter.  That

21 when I administered the tests that I did, I found

22 inconsistencies compared to prior testing that made me

23 concerned, even after allowing for the fact that I had

24 found some errors in Dr. Young's scoring.

25      Q.   Have you rendered any opinions as it relates to

1   whether Ms. Andriano was suffering a cognitive impairment
2   at the time of October 8, 2000?
3       *A.*   Yes.
4       *Q.*   And what is that opinion?
5       *A.*   Well, as I explained, that I do not believe that
6   at the time of the offense, she was suffering from any
7   serious cognitive disorder.
8       *Q.*   And why is that?
9       *A.*   Because all of her functioning at the time and my
10  test results and the test results of Dr. Young and
11  Dr. Bayless that indicate to me that she was effectively
12  performing within almost normal limits.
13      *Q.*   And since you have -- in your opinion,
14  Ms. Andriano was not suffering from a cognitive impairment
15  at the time of the murder, what is your opinion as to
16  whether she could appreciate the wrongfulness of her
17  conduct and conform her conduct to the requirements of the
18  law?
19      *A.*   Well, I believe that she knew the difference
20  between right and wrong and she knew what was not in
21  conformance with the law at the time.
22      *Q.*   And with respect to any sort of causal connection
23  between whether Ms. Andriano suffered a cognitive
24  impairment at the time of October 8, 2000 and her conduct
25  on that date and the weeks leading up to October 8, 2000,

1  what is your opinion?

2      *A.*    That I do not believe there is such a causal

3  connection there.   Negative as to such a causal

4  connection.

5          MR. HAZARD:   And, Your Honor, I'm going to ask

6  the Court to reconsider admission of Dr. Amin's report

7  under Rule 703 to form the basis of his opinions.   Their

8  experts relied on Dr. Amin's report also to form the basis

9  of their opinions.

10         I want to note for the record that the State

11  stipulated to the admissibility of all mental health

12  experts by the defense in this case for the same reasons.

13  So we're not offering it for the truth of the matter

14  asserted.

15         (WHEREUPON, an off-the-record discussion ensued.)

16         MR. ARNTSEN:   It's hearsay.

17         MS. SKERKEN:   Yeah, I mean, we would still object

18  on hearsay grounds.

19         THE COURT:   I'll sustain the objection.

20         MR. HAZARD:   No further questions.

21         THE COURT:   We'll turn to Ms. Sterken.   Are you

22  going to do the cross?

23         MS. SKERKEN:   Yes.   One moment.

24         (WHEREUPON, an off-the-record discussion ensued.)

25

CROSS-EXAMINATION

1

BY MS. STERKEN:

2

    *Q.*   Dr. Amin, one of your conclusions was that Wendi

3

may not have put forth her best effort on some of your

4

testing; correct?

5

    *A.*   Correct.

6

    *Q.*   And you administered two stand-alone tests, the

7

Validity Indicator Profile, the VIP, and the Structured

8

Inventory of Malingered Symptoms, the SIMS; correct?

9

    *A.*   Yes.  One measures efforts in the sense that you

10

just described.  The other one is seeing if the person is

11

endorsing items that are not typically endorsed by people

12

with genuine psychiatric or neurological disorders.

13

    *Q.*   And both tests, the sole purpose is to determine

14

whether the examinee is putting forth an honest, good

15

faith effort; correct?

16

    *A.*   Correct.

17

    *Q.*   Wendi's performance on the VIP was consistent

18

with her putting forth her best effort?

19

    *A.*   Yes.

20

    *Q.*   But you concluded that Wendi's performance on the

21

SIMS suggested a possibility that she might not have put

22

forth her best effort?

23

    *A.*   Yes.  That she had not responded candidly to the

24

items.  Let's put it that way.  And may I say something?

25

1     *Q.*   Okay.

2     *A.*   In addition, remember, you have to take into

3   consideration the MMPI-2.  That is -- that has a

4   stand-alone scale of malingering in the FVS and what we

5   call the embedded measures of effort.  And, specifically,

6   this refers to the ROCFT, the Rey-Osterrieth Complex

7   Figure test, which I've talked about.

8     *Q.*   Dr. Amin, Wendi scored a 15 on the SIMS.  Do you

9   recall?  Is that correct?

10    *A.*   I'll have to look at my records whatever the

11  number was.

12          MS. SKERKEN:  Permission to approach.

13          THE COURT:  Yes.

14          MS. SKERKEN:  I would just mark that.

15          THE WITNESS:  Thank you.

16          THE CLERK:  235.  I just marked it 235.

17          MS. SKERKEN:  I'm sorry.  What number was

18  the exhibit?

19          THE CLERK:  235.

20    *Q.*   BY MS. SKERKEN:  Have you had a chance to review

21  her test results?

22    *A.*   Yes.

23    *Q.*   And she scored a 15 on the SIMS?

24    *A.*   Correct.

25    *Q.*   And the cutoff is a 14; correct?

1    *A.*    Yes.  That's for the overall score.  The combined
2  score.

3    *Q.*    Okay.  And her combined score was a 15?

4    *A.*    Correct.

5    *Q.*    The SIMS itself warns that it cannot be used as a
6  stand-alone effort indicator; correct?

7    *A.*    It's not so much an effort indicator, but how
8  candid the respondent is in responding to these items.

9    *Q.*    And the SIMS specifically warns that it can't be
10  used alone to determine whether someone is candidly
11  responding; correct?

12    *A.*    Correct.

13    *Q.*    And that was the only stand-alone effort test
14  that Wendi, according to you, did not pass; correct?

15    *A.*    Yes, unless you talk about the embedded measures
16  that I just mentioned.

17          MS. SKERKEN:  I have no further questions.

18          THE COURT:  Redirect?

19          MR. HAZARD:  Nothing further, Your Honor.

20          THE COURT:  May this witness be excused?

21          MR. HAZARD:  Yes.

22          THE COURT:  Thank you very much, sir.  You're
23  excused.  Don't walk off with any exhibits if there are
24  any exhibits up there.

25          THE WITNESS:  Okay.  Thank you.

1    THE COURT:  Thank you.

2    The State may call its next witness.

3    MR. HAZARD:  Judge, our next witness will be here

4 at 11:30.

5    THE COURT:  Okay.  I guess we'll take a recess,

6 then.  Then we can discuss informally some matters about

7 scheduling and whatnot while we're here.

8    MR. HAZARD:  Okay.  Thank you.

9    THE COURT:  Okay.  We'll be in recess, then.

10    (WHEREUPON, a recess ensued from 10:13 a.m. to

11 11:23 a.m.)

12    THE COURT:  This is CR 2000-096032, State of

13 Arizona vs. Wendi Elizabeth Andriano.

14    The record will reflect the presence of the

15 parties and counsel.

16    The State may call its next witness.

17    MR. HAZARD:  Your Honor, may we make a brief oral

18 argument before we call the next witness, by Ms. Gard?

19    THE COURT:  Go ahead.

20    MS. GARD:  Your Honor, I wanted to refer the

21 Court to *State vs. Tucker* as to the matter of admitting

22 the expert reports in this particular case.  The objection

23 was hearsay, but the reports aren't being offered for

24 their truth.  They're being offered for the basis of the

25 expert opinion.  They contain the basis of the opinions.

1   In addition, their experts relied on Dr. Amin's report to

2   form their opinions.

3          So, for that reason, we believe that the reports

4   are admissible.  I just wanted to make that record.  The

5   citation to *Tucker* is 215 Ariz. 298.  And that case

6   analyzed the issue under Rule 703, which is the rule that

7   Greg cited -- or Mr. Hazard cited this morning.  And it

8   would be the end of Paragraph 58 of that case.

9          MR. ARNTSEN:  Just briefly, we haven't seen the

10  case they're citing.  But presuming for the same reason

11  the Court kept out Attorney Hammond's and Attorney

12  Lowenthal's reports, it's not the underlying evidence.  I

13  mean, that's what Rule 703 says, not for the truth.  The

14  reports are there for the truth.  This is what the experts

15  says or what they think.

16         MS. GARD:  Your Honor, if I may respond, our

17  objection to Mr. Hammond's and Mr. Lowenthal's report was

18  on relevance grounds and consistent with our position that

19  they shouldn't have been testifying at all.

20         THE COURT:  Let me think about it and I'll -- I

21  assume we're going to take a lunch break and then we're

22  going to have the continuation of the witness's testimony.

23  Then I'll look at it during the lunch hour.

24         MR. ARNTSEN:  Okay.  Thank you, Your Honor.

25         MS. GARD:  Thank you, Judge.

1          THE COURT:  The State may call its next witness.

2          MR. HAZARD:  Thank you, Your Honor.

3          The State calls Dr. Steven Pitt.

4          THE COURT:  Go ahead and approach the witness

5     stand there.  Before you sit down, if you could please

6     face the clerk and give her your full name, and she will

7     swear you in.

8          THE CLERK:  Can you please state your name and

9     spell your name for the record, sir?

10          THE WITNESS:  Dr. Steven, S-T-E-V-E-N; Errol,

11     E-R-R-O-L; and Pitt, P-I-T-T.

12          (WHEREUPON, the witness was duly sworn by the

13     clerk.)

14          THE COURT:  Go ahead and make yourself

15     comfortable there on the witness stand.

16          THE WITNESS:  Okay.  Thank you, Judge.

17          THE COURT:  If you need any water at anytime,

18     it's right behind you there.

19          THE WITNESS:  Okay.

20          THE COURT:  Go ahead and make yourself

21     comfortable there.  Remember to speak up so that everyone

22     can hear you.  Also, please wait until the question is

23     completed before you answer the question and make sure

24     that you gave us a verbal response.

25          Is that all agreeable to you?

1        THE WITNESS:  Yes, sir, Your Honor.

2        THE COURT:  Go ahead and state your name for the

3    record.

4        THE WITNESS:  Dr. Steven Pitt, P-I-T-T.

5        THE COURT:  And, Mr. Hazard, you may proceed.

6        MR. HAZARD:  Thank you.

7

8                  STEVEN E. PITT, D.O.,

9    having been first duly sworn to tell the truth, the whole

10   truth, and nothing but the truth, testified as follows:

11

12                  DIRECT EXAMINATION

13   BY MR. HAZARD:

14       Q.   What do you do for a living, Dr. Pitt?

15       A.   I'm a physician.  I'm a Board certified

16   psychiatrist with subspecialty training and Board

17   certification in the discipline of forensic psychiatry.

18       Q.   What is forensic psychiatry?

19       A.   Forensic psychiatry is the interface between

20   psychiatry and law.  It's applying psychiatric principles

21   to legal concepts in a variety of contexts, be it civil,

22   criminal, legislative or correctional.

23       Q.   Were you retained by the Arizona Attorney

24   General's Office to do a forensic psychiatric evaluation

25   of Ms. Andriano?

1      *A.*    I was.

2      *Q.*    And let's talk about your education, training and

3  experience.  Let's start with your education.

4      *A.*    I went to Michigan State University where I

5  received my undergraduate degree.  That then was followed

6  by my attendance at the Michigan State University College

7  of Osteopathic Medicine where I received my Doctor of

8  Osteopathic Medicine Degree.

9           THE COURT:  You want might to slow down just a

10  little bit for the court reporter.

11           THE WITNESS:  Sure.  I apologize.  I then did my

12  residency in psychiatry at the University of Michigan

13  Medical Center in Ann Arbor, Michigan.

14           Then that was followed by a fellowship in

15  forensic psychiatry at the University of Maryland School

16  of Medicine.

17           I left out one spot.  After completing my

18  osteopathic education, I did a rotating internship for a

19  year at Oakland General Hospital in Madison Heights,

20  Michigan.

21      *Q.*    BY MR. HAZARD:  And what about your professional

22  experience since you've completed your education and

23  residency?

24      *A.*    Well, my whole career path, if you will, was

25  pretty much geared towards forensics, the discipline of

1  forensic psychiatry once I was exposed to it during my
2  residency in psychiatry.
3          So following my completion of my fellowship in
4  forensic psychiatry, I went to -- I moved to Colorado
5  where I worked as a forensic psychiatrist for a year on a
6  forensic unit.
7          I then moved here to Arizona where I opened up my
8  own practice in forensic and general psychiatry and then
9  simultaneously worked for about the first four and-a-half
10 years as the director of -- well, first for a year
11 and-a-half at the Maricopa County Medical -- it's
12 called -- then it was called ComCare.  It was an
13 outpatient mental health center.  I did that for about a
14 year and-a-half.
15         Then I worked for about four or four and-a-half
16 years as the director of Forensic Psychiatric Services at
17 the Arizona State Hospital.
18         And then I spent a year doing some outpatient
19 forensic work with the county.  And then ever since then,
20 it's been pretty much exclusively private practice, both
21 in forensic and general psychiatry, with along the
22 majority being forensic psychiatry.
23    Q.   Have you ever testified in court as an expert in
24 forensic psychiatry?
25    A.   Yes.

1    *Q.*   What courts have you actually testified in front

2    of?

3    *A.*   Multiple jurisdictions in this state as well as

4    other jurisdictions around the country.

5    *Q.*   Have you also been retained by parties to both

6    civil and criminal actions to do forensic psychiatry work

7    such as consulting or in preparation for testimony?

8    *A.*   Yes.

9    *Q.*   Could you tell us a little bit about your career

10   in that regard?

11   *A.*   Well, in the criminal context, it's been in

12   situations like this where there's an issue about

13   aggravation and mitigation and an appeal issue going on

14   related to someone's mental state at the time of the

15   offense, specifically, in cases that go right to the heart

16   of the mental state at the time of the offense, such as

17   where someone is making a plea for insanity, issues

18   related to someone's competency to stand trial.

19        Pretty much in the criminal context, anything

20   really related to issues having to do with mental health

21   issues or someone's mental state at or around the time of

22   the offense.

23        In the civil arena, it's pretty much been issues

24   related to where someone is making a claim for some type

25   of emotional harm, whether it's from wrongful termination,

1   sexual harassment, medical malpractice or psychiatric

2   malpractice, things of that sort.

3       *Q.*   In the criminal context, have you previously

4   testified as an expert on matters involving the death

5   penalty?

6       *A.*   Yes.

7       *Q.*   And have you previously been retained by other

8   state's attorney's offices or prosecuting attorney's

9   office before this case?

10      *A.*   Yes.

11      *Q.*   And have you also been retained by criminal

12  defense attorneys as well in the past?

13      *A.*   Yes.

14      *Q.*   Let's talk about your retention on this matter,

15  State v. Wendi Andriano for these proceedings.  Could you

16  give us some background as to when you were retained, and

17  did you complete a forensic interview of Ms. Andriano?

18      *A.*   Two things.  I was initially contacted by Lacey

19  Gard from your office back on January 23 of 2013.  I was

20  then sent what I think pretty much now amounts to roughly

21  five Bankers Boxes of material.

22          And then I evaluated and met with Ms. Andriano on

23  November 26, 2013, and interviewed her for about

24  4.9 hours, including breaks.  And with me was my

25  associate, who I think testified prior to me,

1  Dr. Kiran Amin.  And then I authored a report that's dated
2  December 27, 2013.
3      *Q.*   Prior to your forensic evaluation and your
4  interview with Ms. Andriano on November 26, 2013, had you
5  had communications with Ms. Gard regarding the questions
6  that she had that she wanted explored as part of that
7  forensic interview, and then afterwards was a formal
8  referral letter sent to you?
9      *A.*   Yes.  During one of the initial -- in forensic
10 psychiatry, one of the first things that you're taught
11 pretty much is what are you being asked to answer.  What's
12 the referral question?  Oftentimes, when you initially
13 talk with a lawyer, whether it's in a civil or criminal
14 context, they're pretty clear on what the referral
15 question is.  Sometimes it takes a little bit of a
16 dialogue to better understand the four corners of
17 the case.
18          In this particular case with Ms. Gard, what I
19 recall is that the referral questions were pretty clear
20 from the outset.  And then what I asked of Ms. Gard was
21 that she send me in advance of the report -- preparing the
22 report, a referral letter that specifically outlined the
23 referral questions.
24     *Q.*   When you do a forensic psychiatric evaluation,
25 you mentioned a little bit about how the referral

1   questions influence, but is that all you're relying upon
2   or is there more to the forensic evaluation?
3      *A.*   No, no, first of all, I didn't say they influence
4   anything.
5      *Q.*   Okay.
6      *A.*   And they don't influence anything.  All the
7   referral questions do is they help frame the questions
8   that I'm being asked to answer.  More specifically, they
9   frame -- they help frame the report.  They have nothing to
10  do with the evaluation, per se.
11          If you take a civil forensic psychiatric
12  evaluation and a criminal forensic psychiatric evaluation,
13  about 90 percent of it is identical in terms of the kind
14  of core issues that you're going to cover or the core
15  concepts that are going to be covered.  Where it turns on
16  is the referral question or referral questions.
17          So, in this particular case, I know that there
18  was issues having to do with Ms. Andriano's mental state
19  at the time of the offense, whether she could appreciate
20  the wrongfulness of her conduct, issues regarding duress,
21  issues regarding mitigation and aggravation, issues
22  regarding alleged claims of having a major mental illness,
23  and just figure out how that all ties together.
24     *Q.*   Can you take us through and summarize -- did you
25  complete in your report a list of the materials you

1  considered in preparing and writing your report and

2  reaching any opinions?

3     *A.*   I did.  First of all, the report, is -- it's

4  154 pages long, and included with the report are several

5  exhibits, the most significant being the transcript of the

6  evaluation, which is Exhibit B.

7        But with the specific -- with respect to your

8  question of the specific sources that I considered and

9  reviewed, these included, but were not limited to, what's

10 listed on Pages 4 to 21 of my report, or basically

11 Nos. 1 through 112.

12        And then subsequent to completing the report, I

13 received some additional documents.  There's another

14 neuropsychologist's report that I looked at.  I'm blacking

15 on her name.

16    *Q.*   Is it Dr. James?  Joette James?

17    *A.*   Thank you.  And I looked at a mitigation report

18 that was done or a critique of a mitigation report.  Or it

19 was done by a mitigation expert who was critiquing some of

20 the issues that were raised I guess in the previous -- by

21 the previous mitigation folks.

22    *Q.*   Would that be Mr. Rohman's report?

23    *A.*   Thank you.  Yes.  I'm trying to think if there's

24 anything else.

25    *Q.*   Did you also review, after the completion of your

1   report, some interview -- the interview notes taken by

2   Dr. James Hopper?

3       *A.*   I looked at the interview notes and I was also

4   provided the -- and back there, in Dr. Hopper's report,

5   there was -- there's an appendix that was fairly lengthy

6   and there was some pages apparently that were either

7   redacted or missing, and I've since been able to review

8   those and look at those pages as well.

9       *Q.*   Did you also receive a written declaration signed

10  by a Kyre Lorts?

11      *A.*   I did.  Thank you.  Yes.

12      *Q.*   And then in those materials, Pages 4 to 21 where

13  you list -- and, as you testified, that's not an

14  exhaustive list of the materials you reviewed.  But with

15  respect to declarations, written witness statements made

16  by Donna Ochoa, did you review those?

17      *A.*   Yeah.  There's -- I don't know that this is

18  actually -- this may have been an oversight on my part

19  whether or not it's listed in here.  But not only did I

20  review it back when I was preparing the report, but I

21  reviewed it in preparation for our visit here today.

22          There's essentially -- there's three

23  declarations.  There's a declaration from June 19, 2011.

24  There's a declaration from September 11, 2011.  And then

25  there's a declaration from October 29, 2011.

42

1    *Q.*   Both in general in your practice, as well as
2    specifically to this case with Ms. Andriano, do some of
3    the materials you rely upon deal with a personal history
4    of Ms. Andriano or social history?
5    *A.*   Yeah, of course.  Yes, of course.
6    *Q.*   And why is that important to rely upon that
7    information?
8    *A.*   Well, to understand who Wendi Andriano is.  You
9    get a sense of who she is, what her -- what her construct
10   is, how she came to be the person that she is.
11   *Q.*   And during your forensic interview with
12   Ms. Andriano, did you also address questions related to
13   her personal history and social history?
14   *A.*   Of course.
15   *Q.*   The legal history of Ms. Andriano, were those
16   materials that you considered?  And, if you would, define
17   in this context what you mean by legal history.
18   *A.*   Well, whether it's this context or any other
19   context, legal history is just what it sounds like.  It's
20   if the person has been involved in any previous contacts
21   with the law and criminal contacts.  Sometimes we'll ask
22   people about their litigation history as well.
23         In this particular case, we reviewed some of -- I
24   don't believe Ms. Andriano has ever been -- well, other
25   than for the instant offense ever formally charged or

1   arrested with anything -- for anything.  But to be sure

2   she did engage in some unlawful conduct prior to the

3   instant offense.

4   *Q.*   And what about psychiatric history with

5   Ms. Andriano?

6   *A.*   Of course, you have to review that.  I spoke with

7   Ms. Andriano about her psychiatric history prior to the

8   date of the offense as well as subsequent to the date of

9   the offense.  We discussed her treatment history prior to

10  the extent it existed prior to the instant offense.

11       We discussed her treatment history while she was

12  incarcerated both at the Maricopa County Jail as well as

13  in the Arizona Department of Corrections.  And we

14  discussed her symptom complex to the extent it exists both

15  prior to the offense as well as subsequent to the offense.

16  *Q.*   Did you also rely upon documents of the

17  psychiatric history from Ms. Andriano?

18  *A.*   Of course.  We looked at the Maricopa County

19  records from the correctional -- Maricopa County

20  Correctional records as well as the Arizona Department of

21  Corrections medical and mental health records.

22  *Q.*   Did you rely upon testimony that was documented

23  in the actual -- in Ms. Andriano's trial transcripts?

24  *A.*   Yes.

25  *Q.*   Including Ms. Andriano's testimony; correct?

1     *A.*    Including Ms. Andriano's testimony.

2     *Q.*    Did you also rely upon various law enforcement

3  reports, not only related to this offense, but other

4  investigations that may have involved Ms. Andriano?

5     *A.*    Yes.

6     *Q.*    And did you also rely upon facts as stated in the

7  Arizona Supreme Court Opinion regarding this case?

8     *A.*    I did.  And I also relied upon crime scene

9  photographs and I relied upon the interview that

10 Ms. Andriano gave to the detectives following her arrest.

11 I relied upon the audio-taped calls that Ms. Andriano had

12 with an insurance company, the name of which is escaping

13 me.  But those are all things that I considered and relied

14 upon.

15    *Q.*    Did you also review -- aside from psychiatric or

16 medical records that were made available to you from the

17 time Ms. Andriano was incarcerated either at the Maricopa

18 County Jail or in the Arizona Department of Corrections,

19 did you also rely upon other records from those

20 corrections agencies, for example, letters or requests

21 that Ms. Andriano had made?

22    *A.*    I did.

23    *Q.*    And all of these things that we're talking about,

24 these are things that forensic psychiatrists reasonably

25 rely upon; correct?

45

1    *A.*    Yes.

2    *Q.*    All right.  Let's talk about leading up to your

3   forensic interview with Ms. Andriano.  You testified

4   previously the definition of a forensic interview.  Did

5   you video- and audio-record this particular interview with

6   Ms. Andriano?

7    *A.*    I did.

8    *Q.*    And why -- do you always do that?

9    *A.*    I do.

10   *Q.*    And why?

11   *A.*    I shouldn't say -- for the last 15 years, I don't

12  believe I've done an evaluation that hasn't either been

13  video- or audio-recorded.  And the reason I do that is

14  because by video- and audio-recording an evaluation, it

15  leaves no doubt as to who said what.  It holds the

16  defendant up to scrutiny, but, more importantly, it holds

17  me up to scrutiny as well.

18          So, as you know and as I think everyone in this

19  room knows, sometimes how things look on a transcript can

20  be very different than how they look on a video or how

21  they sound.  Affectations are different, facial

22  expressions, behavioral nuances.  And so it's been my

23  experience that by video- and audio-recording an

24  evaluation, we have no doubt as to who said what and to

25  what happened during the course of the evaluation.

1          The other utility and value of video-recording an

2     evaluation is that because I know it's being

3     video-recorded and audio-recorded, and because I know I'm

4     going to have a transcript made of the evaluation, I don't

5     really have to take very many notes.  So it really allows

6     me to focus one-on-one with the individual that I'm

7     evaluating as opposed to when you're constantly taking

8     notes and you're moving up and down and you're not having

9     the same kind of connection.  You're not picking up on

10    certain nuances, certain behavioral pieces that are going

11    on that are important in terms of the interview, in terms

12    of figuring out where to go and how to move along in the

13    process.

14          So the value of that, in addition to having the

15    notes, I have this transcript made, which I then go

16    through like I did in this case, and I put in the various

17    headings of the different topic areas that we were

18    discussing.  So rather than regurgitating all of the

19    information in my report, I summarize the psychosocial

20    history pieces, if you will, and remind readers and

21    encourage readers that, look there's a video.  There's a

22    transcript and you should really take a look at the video

23    and the transcript if you really fully want to understand

24    or come to any -- or have any doubts about what went on

25    during this evaluation.

1    *Q.*   Where was the interview conducted?

2    *A.*   I'm blocking on the name of the place.

3    *Q.*   The Perryville Prison?

4    *A.*   Yeah, the Arizona State Prison Complex at

5    Perryville in Goodyear.  It was in a multi-purpose room.

6    *Q.*   When you arrived, was Ms. Andriano's counsel

7    present to sort of do introductions?

8    *A.*   Yeah.  The gentleman that is sitting right in the

9    middle between Ms. Andriano and the other gentleman.

10        MR. HAZARD:  May the record reflect he's

11    referring to Mr. Arntsen?

12        THE COURT:  Yes, the record may so reflect.

13    *Q.*   BY MR. HAZARD:  And you said that you and

14    Dr. Amin were there.  Was anybody else present besides

15    Mr. Arntsen, Ms. Andriano, Dr. Amin and yourself during

16    the interview?

17    *A.*   No.  As the video reflects and as the transcript

18    reflects, in the beginning, there was -- well, let me back

19    up.  In the beginning, they wanted us to actually do the

20    evaluation in kind of this hallway, and there was too many

21    ambient noise from a -- there were some soda or candy

22    machines and I just knew it wouldn't work there.

23        And the folks there were kind of enough to put us

24    in this multi-purpose room, which worked out fine but for

25    the fact that during the initial part of the evaluation,

1  there was some traffic of some people moving in and out,

2  some correctional officers a couple of times, and it's

3  reflected in the record.  But other than that, it was a

4  perfectly fine place to conduct this evaluation.

5      *Q.*  Before you began your interview, did you explain

6  to Ms. Andriano the purpose of your visit and what you

7  were going to do in your evaluation?

8      *A.*  Well, sort of.

9      *Q.*  Okay.  And explain, please.

10     *A.*  I explained to Ms. Andriano that I'm a forensic

11  psychiatrist, that I'm retained by the State, and that I'm

12  here to do an evaluation.  I explained to her that it's

13  not confidential.  There's no doctor/patient relationship,

14  that it's being video- and audio-recorded.  What I pretty

15  much regularly or assiduously try to strive to do is not

16  specifically tell people why I'm here.

17     *Q.*  And why is that?

18     *A.*  Because I want to hear what they have to say

19  about why I'm here.  I want to hear what their

20  understanding is about the evaluation.  And so after her

21  counsel made introductions, we pretty much started off

22  right there.

23     *Q.*  And did Ms. Andriano indicate to you that she

24  understood and agreed to proceed?

25     *A.*  She agreed to proceed, yes.

1          (WHEREUPON, an off-the-record discussion ensued.)

2          MR. HAZARD:  Your Honor, right now, we're going

3     to go into a -- transition into another area that's going

4     to take longer.  So I don't know if you want to --

5          THE COURT:  Why don't we just go ahead and take

6     our lunch break at this point in time, then.

7          Okay.  We'll go ahead and take our lunch break at

8     this time.  We'll resume promptly at 1:30.  Have a nice

9     lunch.  We'll be in recess.

10          (WHEREUPON, a recess ensued from 11:50 a.m. to

11     1:31 o'clock p.m.)

12          THE COURT:  This is CR 2000-096032, State of

13     Arizona vs. Wendi Elizabeth Andriano.

14          The record will reflect the presence of the

15     parties and counsel.

16          I did during the lunch hour review the

17     *Tucker* case.  I also reviewed Rule 703.  I also looked at

18     Exhibit No. 169 for identification, which was requested to

19     be admitted into evidence.  And I think I am going to

20     order allowing Exhibit No. 169 to be admitted into

21     evidence.

22          The basis for that ruling is the fact that it's

23     my understanding that the purpose of the State, in

24     order -- the purpose of the State in requesting that that

25     exhibit be admitted into evidence is for the limited

1   purpose of showing the basis of Dr. Pitt's opinions; is

2   that correct?

3        MS. GARD:  That's one of the reasons, yes, Judge.

4        THE COURT:  Okay.  Go ahead.

5        MR. ARNTSEN:  Your Honor, in light of that

6   ruling, I guess I would renew our request that Exhibit 1,

7   Attorney Hammond's declaration, and Exhibit 78,

8   Attorney Lowenthal's declaration also be admitted to the

9   same extent.

10        THE COURT:  But with regard to Mr. Hammond's

11  declaration, there was no testimony that he was relying

12  upon anything that is in his declaration for the basis of

13  his opinion; correct?  Or the same would be with regard to

14  Mr. --

15        MR. ARNTSEN:  I believe he testified, for

16  instance, that the list of the materials reviewed in his

17  declaration, that was among the bases for his opinion.

18  You know, I don't have the testimony going back as to the

19  details, but each of the experts had occasion to refer

20  back to their declaration for kind of the detailed

21  underlying parts of their opinions.

22        THE COURT:  I'm going to deny that request, but

23  I'm going to allow Exhibit No. 169 to be admitted into

24  evidence.  And that's for the limited purpose of showing

25  the basis of the doctor's opinions because there's a

1  number of tests that were done by Dr. Amin that he

2  testified to.  So I'm going to allow Exhibit 169 to be

3  admitted into evidence.

4        MS. GARD:  Thank you, Judge.

5        THE COURT:  The record will reflect that, as I

6  indicated, the presence of the parties and counsel.

7        The record will reflect that Dr. Pitt is still on

8  the witness stand, Dr. Steven Pitt.  We will continue with

9  the direct examination by Mr. Nickels.  I'm sorry.

10 By Mr. Hazard.

11        MR. HAZARD:  Thank you, Your Honor.

12  *Q.*  BY MR. HAZARD:  Dr. Pitt, when we had our recess,

13 we were getting ready to talk about Ms. Andriano's

14 forensic interview you conducted of Ms. Andriano.  Do you

15 remember that?

16  *A.*  Yes, sir.

17        (WHEREUPON, an off-the-record discussion ensued.)

18        MR. HAZARD:  May I approach the witness?

19        THE COURT:  Yes.

20  *Q.*  BY MR. HAZARD:  Dr. Pitt, I'm handing you what

21 has been marked for identification purposes as

22 Exhibit 186.  If you could just take a look at the

23 contents in that folder.  What is that?

24  *A.*  These would be the DVD's of the video-recorded

25 evaluation.

1    *Q.*   And are those copies that you actually -- you and

2    your assistants made in conjunction with these

3    proceedings, and are they fair and accurate

4    representations of your interview with Ms. Andriano?

5    *A.*   It would be me.  I run the video room as well.

6          MR. HAZARD:  Okay.  I move to admit Exhibit 186

7    into evidence, Your Honor.

8          MR. NICKELS:  No objection.

9          THE COURT:  Exhibit No. 186 for identification is

10   admitted into evidence.

11   *Q.*   BY MR. HAZARD:  How did you start with the

12   interview with Ms. Andriano?  What were you trying to get

13   her to talk about at the beginning of the interview?

14   *A.*   No two interviews are the same in terms of their

15   format, but they're similar to a certain extent, like I

16   talked about earlier in terms of the content that's

17   covered.

18         So, in this particular case, I'm going to talk to

19   Ms. Andriano about her personal history, her relationship

20   history, her employment history, her legal history, her

21   psychiatric history, her course since her arrest, her

22   educational history.  These are all general areas that are

23   going to be covered.

24         In this particular case, what I'm also going to

25   discuss with her, especially given the first referral

1  question, is Ms. Andriano's version, the defendant's
2  version of the offense.
3      *Q.*   And you said that was because of the referral
4  questions?  Is that why you thought it was important to
5  ask her about that?
6      *A.*   That's why it is important.  The threshold
7  question is essentially:  Does Ms. Andriano have -- that
8  first question.  I'm paraphrasing, but the first question
9  is essentially:  Does she have a mental disease or defect
10 that in some way affected her ability to appreciate the
11 wrongfulness of her conduct.
12          So it seems to me that a logical place to jump
13 off from is to have her talk about the offense.
14     *Q.*   Did you try to get her to -- ask her questions,
15 for example, tell me what you remember, those sorts of
16 questions about that incident?
17     *A.*   Yes.
18     *Q.*   Did you encounter any difficulties getting
19 responses from Ms. Andriano?
20     *A.*   Thematically, one of the things that happened
21 during the course of the interview -- and let me just
22 digress for a second.  Ms. Andriano is a fairly -- I've
23 interviewed a lot of people over time.  She's a fairly
24 savvy person when it comes to being interviewed.  She's
25 been interviewed before and I think she knows her way

54

1  around the process, if you will.

2         Understand, that I was not the first person to

3  evaluate her.  Pretrial she was evaluated by several

4  mental health professionals.  Since she's been convicted,

5  she's been evaluated by several mental health

6  professionals.

7         So the issue that she was having with me was she

8  was claiming that she couldn't really remember certain

9  aspects.  And I think one of her concerns that she

10  expressed to me was that she feared that I was going to

11  hold her to some type of chronological order, that if she

12  left something out, that somehow that was going to be a

13  ding against her.

14         And I told her that that wasn't the case at all.

15  I just wanted to hear her story.  I wanted to hear what

16  she remembered and how she remembered it because I want --

17  I need that information.  I don't have to explain to her

18  why I'm doing it, but I can explain to you why I'm doing

19  it, because I want to see how her information comports

20  with the information that she's previously shared.

21         Understand, contextually, this is a woman who

22  told the police one version at the beginning of the

23  interrogation and changes the version halfway through the

24  interrogation and gives different versions to different

25  people.  She tells the counselor a whole series of stories

1  during the course of therapy.  She has told different

2  people different pieces about the offense.

3        And so it's important for me to hear her version

4  of the offense, so I can put it in a context.  And that's

5  the purpose of why I asked her all of those questions.

6    Q.    Was she reporting to you that she had

7  difficulties remembering?

8    A.    She did.

9    Q.    And could you tell us a little bit about that, in

10  summary?

11   A.    Just, essentially, she was having -- she goes:  I

12  can't remember it like a movie.  I'm having difficulty

13  remembering certain pieces.  These are my words.  Not

14  hers.  But the essence of it was that she was having a

15  difficult time recalling certain pieces.

16        I mean, frankly, she couldn't even recall

17  initially what date the offense occurred.  And so we broke

18  the month of October down into thirds.  She couldn't

19  recall what the poison was that she ordered under the

20  pseudonym of Ann Newton and coming up with a fake

21  business.  She couldn't recall that it was sodium azide.

22  I mean, so she couldn't even recall about whether the --

23  how the stabbing happened or even if she did the stabbing.

24        I mean, of course, that's a story in and of

25  itself if you follow the history of the knife and the

1  stabbing and the different versions that she's given.

2      *Q.*    When you were -- as your interview was

3  progressing, you began asking her questions about whether

4  or not she could appreciate the wrongfulness of her

5  conduct?

6      *A.*    Right.

7      *Q.*    And I would like to turn your attention to

8  Pages 106 -- the bottom of 106 on into 107 of the body of

9  your report.

10     *A.*    Yes.

11     *Q.*    And was there a point when you were having this

12 dialogue where she expressed a sense of frustration?

13     *A.*    Tell me where you are.

14     *Q.*    At the bottom of Page 107.

15     *A.*    Yes.

16     *Q.*    What was happening then?

17     *A.*    Well, we were talking about wrongfulness, issues

18 related to wrongfulness.  For example, I asked her:  Is it

19 wrong to lie to the police?  And she said:  Yes.  Is it

20 wrong to poison somebody?  She said:  Of course.  Is it

21 wrong to steal?  Of course.

22         And she starts to then -- and then she said to

23 me -- she goes:  Look, it's wrong to lie to anybody.  And

24 what happens is she said that I'm learning -- I'm

25 learning -- going through this process, I'm learning who I

1  am and, essentially, I've found that I fill in information

2  at times to just please people.

3       And then she said -- she says:  I don't -- this a

4  quote.  She goes:  I don't -- when I tell you -- when you

5  ask me a question, and I tell you, quote, I don't know,

6  end quote, there's a sense of frustration and then I feel

7  you get upset.  Not you personally, but people in general.

8  And, at that time, that was just my nature.  I would just

9  fill in whatever because I -- I don't want -- I don't want

10  somebody upset at me and I don't want them to be

11  frustrated and think I'm not cooperating.

12       Q.   How does that tie into the query -- the first

13  query of whether Ms. Andriano could appreciate the

14  wrongfulness of her conduct when she gives a statement

15  like that?

16       A.   Well, this statement in isolation doesn't really

17  -- doesn't really tie in so much to the wrongfulness

18  piece.  What it ties into thematically is one of the

19  themes that emerges in Ms. Andriano's iteration of events

20  that have happened throughout her life is that she is the

21  victim.  And one of the themes that emerges when she talks

22  is that, well, I'm not sure quite what I told the police,

23  but if I did tell them stuff, I told them that because,

24  like, I wanted to please them.  Okay?

25       So you get this thematic -- there's this theme

1   that kind of runs through her life, which is even if I

2   don't know, I'll just stay stuff just to please people.

3   That's a separate issue from her appreciation of

4   wrongfulness.

5           When you look at the behavioral evidence in this

6   case, when you frankly -- and I'm sure you're going to get

7   to this in a little bit.  But when you look at her

8   pre-offense behavior, her offense behavior, her

9   post-offense behavior, her behavior in the interrogation,

10   there is no doubt, none, zero that this woman could

11   appreciate the wrongfulness of her conduct.

12       Q.   And, Dr. Pitt, did you also have a transcript

13   prepared of your entire forensic interview of

14   Ms. Andriano?

15       A.   I did.

16       Q.   And is that located in the contents of your

17   report?

18       A.   Yes.  That would be exhibit -- excuse me.  That

19   would be Exhibit B to my report.

20       Q.   Right.  If you would turn your attention to --

21   and it's going to be Page 210, starting with I believe

22   Line 17 on that transcript.

23           THE COURT:  Has the transcript been marked for

24   identification as an exhibit at all?

25           MR. HAZARD:  It's in the report, Your Honor.

1          THE COURT:  What exhibit number is the report?

2          MR. HAZARD:  168.  And if may approach.

3          THE COURT:  Yes.

4     Q.   BY MR. HAZARD:  And, Dr. Pitt, I'm showing you

5  Exhibit 168.  What does that contain?

6     A.   My report and the various exhibits.

7     Q.   Have you found Page 210, Line 17?  Or Line 15?

8     A.   Yes, sir.

9     Q.   In the context of your interview, what precedes

10  that?  What are we getting to?

11    A.   Well, I was asking her earlier -- one of

12  Ms. Andriano's stories is that her husband who was

13  suffering from cancer, that he no longer wanted to live

14  and that she was going to assist him in a suicide attempt.

15  That's the essence of the story.  And that they ordered --

16  that she ordered sodium azide and that he somehow approved

17  the order of this, knew about the order of this, and

18  actually helped her load these capsules with the

19  sodium azide.

20          And so, right before this, I said to her -- I

21  said -- I just kind of asked her:  So if your husband

22  wanted to die, why didn't he just take a gun and kill

23  himself?  And she said:  I don't know that.

24          And then I said:  Well, why this whole elaborate

25  thing of having to put -- and I said, by the way, I

1  believe it was sodium azide.  I said:  Why go through that

2  whole story?

3        This story doesn't make sense.  At the end of the

4  day, when you look at this case from the 10,000 foot view

5  or the 40,000 foot view, Wendi Andriano's version of what

6  happened here just doesn't make sense.  The physical

7  evidence does not comport with the behavioral evidence.

8    *Q.*   What about there has been testimony about

9  Ms. Andriano having, at least in the early stages, a

10  medical malpractice claim --

11   *A.*   Right.

12   *Q.*   -- as related to Joe Andriano's cancer?

13   *A.*   Right.

14   *Q.*   Is there something about the status of that

15  belies the notion that Joe Andriano was involved in a

16  suicide -- alleged suicide pact?

17   *A.*   This is --

18        MR. NICKELS:  Objection.  Leading.

19        THE COURT:  Overruled.

20        Go ahead and answer the question.

21        THE WITNESS:  This is what I understand.  And I

22  may get some of the legalese here wrong.  So forgive me.

23  But I think Mr. Miller, who was representing the Andrianos

24  in a civil litigation that was in its infancy, had either

25  testified to or given a declaration or given a declaration

1    and testified to the fact that essentially if Mr. Andriano

2    died as a result of events tied to his cancer, then the

3    wrongful death case would proceed.  However, if

4    Mr. Andriano died from some other cause, then all bets

5    were essentially off.

6           And so you sit here and you think this through

7    and you're like, so let me make sure I get this straight.

8    Your husband, being cognizant of the civil lawsuit, is

9    going to somehow get together with you and have ordered

10   the sodium azide to help him take his own life?  That just

11   doesn't make sense.

12          MR. HAZARD:  We're going to play -- with the

13   permission of the Court, if we can play a clip about the

14   interview -- the portion of the interview that Dr. Pitt

15   was testifying about.  And, for the record, it starts with

16   Line 17 on Page 210 and goes until Page 212, Line 10.

17          THE COURT:  Of the transcript?

18          MR. HAZARD:  Of the transcript.

19          THE COURT:  What's being played is part of

20   Exhibit No, 186, which has been admitted into evidence.

21          MR. HAZARD:  You're right, Your Honor.  That's

22   186, the DVD's.

23          THE COURT:  Right.  This is part of one of the

24   DVD's; right?

25          MR. HAZARD:  That's correct.

1          THE COURT:  It has already been admitted into

2     evidence.  Okay.  I'll allow the State to play the

3     portions with the understanding that the court reporter is

4     not going to take down what's being said on the video or

5     the DVD portion that you're going to be playing.

6          (WHEREUPON, a portion of Exhibit 186 was played.)

7          MR. HAZARD:  We're going to stop it right here

8     for a moment, Dr. Pitt, because that goes into -- now for

9     reference for the court reporter, on Exhibit 168, marked

10    for identification purposes, the transcript of forensic

11    psychiatric evaluation, this would be Page 211, starting

12    with Line 3 and going into Page 212, Line 10.

13         (WHEREUPON, a portion of Exhibit 186 was played.)

14    Q.    BY MR. HAZARD:  Okay.  Doctor, the first part,

15    when she was expressing to you that -- and this is

16    Page 211, Line 10, about being caught by surprise in her

17    trial about the way the evidence was being played out, do

18    you recall that portion?

19    A.    Yes.  Yes.

20    Q.    Are there statements that she made before the

21    trial that go against that notion that she was caught

22    off guard by the evidence in her case?  For example,

23    statements that she made to police in her interrogation or

24    statements that she made to Ms. Rohde, her counselor?

25    A.    Yes.

1    *Q.*    Could you tell us a little bit about that?

2    *A.*    Well, in the counseling sessions, there's

dialogue about her version of the offense and in the

police reports, or in the interrogation, there's specific

dialogue about the offense.  So I --

6    *Q.*    Do you --

7    *A.*    Go ahead.

8    *Q.*    Do you recall in the police interrogation, did

Ms. Andriano ever bring up anything about poison?

10   *A.*    No.  No.  What happens, if I remember this right

and I think do -- what happens is during the

interrogation, there's a break.  And it's during that

break in the interrogation that Ms. Andriano calls a

co-worker/friend.  I want to say her name is Sharon or

Shannon Sweeney, I think is her last name, if I'm right.

But, regardless, and during the break in the

interrogation, she calls and says:  Hey, can you remove

some stuff out of the office?  And it's those materials

that were moved from the office, if my memory is right

about this, were incriminating evidence that I also

believe went to the sodium azide purchase.

22   *Q.*    We'll come back to Ms. Andriano's conduct that

you just described during the break in the interrogation.

24   *A.*    All right.

25   *Q.*    Back to this clip, it was clear that she was well

1  aware of the status of her case in these proceedings,

2  though; correct?

3      *A.*   Oh, yes.  Like I said, this is a -- I've

4  interviewed a lot of folks over time, and Wendi Andriano,

5  in terms of just having some savvy and having a little

6  game, she is definitely in the top 10 percent.

7      *Q.*   You then moved on in your interview, still on

8  Page 212, now starting with Line 11, and you take her into

9  a summary of the events leading up to October 8, 2000; is

10 that correct?

11     *A.*   Yes.

12         MR. HAZARD:  And we're going to, with the

13 permission of the Court, play that clip.

14         For the record, that would also be located

15 starting on Page 212, Line 13 of the transcript, ending

16 point, Page 221, Line 22.

17         May we play the clip?

18         THE COURT:  Yes.

19         (WHEREUPON, a portion of Exhibit 186 was played.)

20     *Q.*   BY MR. HAZARD:  Why did you ask her about that

21 particular line of questioning in leading up to:  Why if

22 this is true, why kill your husband at that point?

23     *A.*   Because her version of the offense didn't make

24 sense and I wanted to -- I wanted to hear -- just as I was

25 reviewing this information, as I'm sitting there talking

1  to her, what she's telling me, the pieces don't add up.

2  The data just doesn't add up.

3  And this particular clip is -- I'm actually glad

4  you picked it because it's relevant and it's important on

5  several accounts.  Working backwards is this notion of I

6  don't know if I was telling the truth or not.  If I really

7  remembered at that time, I'm not remembering now.

8  I think I may have said this before, but if I

9  didn't, I'll say it.  And if I did, I apologize.  If not,

10 I'll say it now.

11 Thematically, another part of the narrative in

12 this case is that Wendi Andriano is the victim in this

13 story.  It is that Wendi, by way of various things from

14 her upbringing to alleged mental illness, that she is the

15 victim.  And that's the narrative that runs through not

16 only her trial, but it's the narrative that continues

17 post-trial.  And you see that in this -- in that capture

18 -- those series of exchanges there.

19 The other thing that's interesting about this is

20 that Wendi Andriano says that -- she says:  It's not

21 funny, as if I'm laughing.  Now everyone in this courtroom

22 saw that.  I wasn't laughing, but I was -- to use Wendi's

23 words, which I'll come to in a minute, I was incredulous

24 because the story doesn't add up.  And she was stuck

25 there.  She was really, really stuck on that one.  And you

1   can't see it in the video, but you could feel it in the
2   room in terms of how everything changed with that.  She
3   did not see that question coming.
4        And I recall after doing this interview, that we
5   spoke and I recall that we discussed this part, and I
6   said:  As sure as I am talking to you, Wendi Andriano is
7   going to spin this interview and she is going to make some
8   accusations about me and my conduct in this interview.
9   She is going to say that I was laughing at her or that I
10   was doing something.
11       Q.   Did you make a request that we should try to
12   obtain some type of material?
13       A.   I did.  I suggested that you secure the phone --
14   telephone records for the first week following this
15   evaluation, which indeed you did.  And, true to form,
16   Wendi Andriano did not disappoint.  She made me out to be
17   the devil and herself out to be the victim.
18       MR. HAZARD:  May I approach the witness,
19   Your Honor?
20       THE COURT:  Yes.
21       Q.   BY MR. HAZARD:  I'm approaching you with
22   Exhibit 203 marked for identification purposes.  Did you
23   listen to that recorded call from the prison?
24       A.   I did.
25       Q.   And is that a copy of that recording that you

1  also listened to?

2     *A.*   Well, I haven't listened to this particular tape.

3  I'm assuming it is a copy.  It's marked as such, so I will

4  assume that it is.

5     *Q.*   What is the date of that recording?

6     *A.*   November 30, 2013.

7        MR. HAZARD:  I move to admit Exhibit 203 into

8  evidence, Your Honor.

9        THE COURT:  Any objection?

10       MR. NICKELS:  I object.  I'm not sure how this

11  witness can authenticate the call.  He definitely was not

12  a participant to that conversation.

13       THE COURT:  Mr. Hazard.

14       MR. HAZARD:  Well, Your Honor, there will be

15  authentication from the call itself that makes it clear

16  who it is.

17       THE COURT:  Regardless of whether it's

18  authenticated, you relied -- you heard this audio;

19  correct?

20       THE WITNESS:  Yes.

21       THE COURT:  And you're basing some of your

22  opinions on this audio?

23       THE WITNESS:  Yes.

24       THE COURT:  Okay.  I'll allow Exhibit No. 203 for

25  identification be admitted into evidence.

1        MR. HAZARD:  And, Your Honor, permission to play.
2    We're only playing the timestamp on this call,
3    Exhibit 203, starting at O38.  So 38 seconds into 154, one
4    minute and 54 seconds.
5        THE COURT:  Okay.  The court reporter will not be
6    taking this down.
7        (WHEREUPON, a portion of Exhibit 203 was played.)
8    *Q.*    BY MR. HAZARD:  So, Doctor, did you make some
9    diagnoses during your -- as part of your evaluation
10   assessment of Ms. Andriano and in your report, did you
11   have a diagnostic section?
12   *A.*    I did.  I do.
13   *Q.*    And could you summarize first -- well, let me
14   break it down.  Did you in that report -- in your report,
15   did you include the diagnoses from a number of other
16   mental health professionals, including the ones that were
17   retained by the defense in the PCR proceedings?
18   *A.*    Yes, sir.
19   *Q.*    And then why was that important to consider those
20   diagnoses -- various diagnoses in helping you render your
21   own opinion and conclusions in this report?  How did you
22   use those to formulate your own opinions?
23   *A.*    Well, the first part of the process is leave out
24   for a second what the other diagnostic opinions are.  To
25   be sure, I look at that information, but the defendant

1  gets the benefit of the doubt in terms of getting a clean

2  slate and I have to do my own analysis and I have to ask

3  my own questions as it relates to diagnostic issues.

4       So when I'm interviewing Wendi Andriano, I'm

5  moving through what we call a series of questions related

6  to a differential diagnosis.  So I'm talking to her about

7  whether she had depressive symptoms before or whether

8  she's had anxiety symptoms before or whether she's heard

9  voices.  I'm talking to her about her sleep.  I'm talking

10  to her about her energy and her appetite because it's

11  important to kind of critically look at it independent of

12  what other people have said.

13       The second part of that is when I'm synthesizing

14  the information, I have to consider what the other experts

15  are saying and what other diagnoses she has been given,

16  whether it's been by other experts or whether it's been

17  given by people who treated her at the Maricopa County

18  Jail or within the Arizona Department of Corrections.

19       So when you look at -- and anyone who may have

20  treated her prior to the offense, which she was seen I

21  think for two sessions -- counseling sessions in an

22  Employee Assistance Program after she was caught involved

23  in a significant fraud with the Casa Grande Regional

24  Medical Center that involved in excess of $18,000.

25       So I look at these different diagnoses, and in

1   the spirit of being as complete and thorough as I can be,

2   I say at the outset of my report:  These are the diagnoses

3   that he has been given by and large by other people

4   involved in this case, whether they have been treaters or

5   experts.

6          And then what I went ahead and did is I

7   systematically went through and looked at the merits of

8   each of these diagnoses and whether or not I agreed or

9   disagreed with them.

10   Q.   What sort of things are you including in your

11   synthesis to determine whether these diagnoses are -- you

12   agree with them or not?  You mentioned --

13   A.   Right.  That's a terrific -- that's a terrific

14   question because to be sure, one of the things is

15   self-report.  I have to listen to Ms. Andriano and ask her

16   what she's experienced.

17          But we don't look at mental illness and mental

18   illness symptoms simply in a vacuum, especially in a

19   context like this, a legal context where you have to worry

20   about the person gaining the system, if you will.

21          So I factor in what Wendi Andriano says to me.  I

22   look at other records and because what you're really

23   looking for is a longitudinal history.  It's not like --

24   mental illness is not like a broken bone where if I slip

25   walking out of here today, if I slip and trip on the curb

1  and break my ankle and we put up an X-ray, well, it's

2  pretty clear on this date, I broke my ankle.

3       Mental illness, to be sure, there's an onset

4  point, but generally speaking, especially the kind of

5  mental illnesses that were being proffered by some of the

6  defense experts, you would expect to see a chronic course

7  of those conditions, a chronicity of the symptom complex.

8       So that's why it's not just listening to Wendi

9  Andriano, it's not just looking at what the other experts

10  are saying, it's looking at, well, what are some other

11  data points that I can look at?

12       Certainly, the EAP records are an important

13  source of information because that's prior to the offense.

14  There is no other treatment history that I know of prior

15  to the offense.

16  *Q.*   What are the EAP records?  What did they reveal?

17  *A.*   I have to go back.  I have it in the psychiatric

18  history of the report.  The EAP records note that she

19  appeared to be depressed and that she would be a good

20  candidate for a mild antidepressant to help her sleep

21  better and cope with the stresses she is facing at work

22  and at home.  She was given -- oh, it also says that for a

23  brief period of time, Ms. Andriano took an antidepressant

24  medication, but had a bad reaction.

25       Anyhow, she was given a diagnosis of what's

1  called an adjustment disorder with mixed disturbance of

2  emotions and conduct and a rule-out diagnosis of major

3  depression.

4       So adjustment disorder is more of a garden

5  variety kind of depression, if you will, related to

6  different stressors.  A major depressive disorder, a major

7  depressive episode is a much more serious condition where

8  your sleep and appetite and energy and concentration, sex

9  drive are all effected.

10     Q.   And this counseling referral, as you mentioned,

11  that was in response to her employer having discovered

12  that Ms. Andriano was stealing money through a fraudulent

13  means; correct?

14          MR. NICKELS:  Object.  Leading.

15          THE COURT:  Sustained.

16          Rephrase the question.

17     Q.   BY MR. HAZARD:  Why was this referral given?

18     A.   Well, between March 1995 and January 1996, while

19  employed at Casa Grande Regional Medical Center,

20  Ms. Andriano was involved in a fraud scheme by forgery in

21  which she profited $18,336.05.  She was never criminally

22  charged, but she was terminated.

23          So the EAP records are important.  Following her

24  arrest, the jail records are important, the correctional

25  records.  And then following her conviction, the DOC

1   records are important.

2        And so you see different mental health providers

3   treat her over time, and you see different diagnoses

4   bandied about, including post-traumatic stress disorder,

5   including bipolar disorder, including major depressive

6   disorder, but nobody definitively, nor conclusively,

7   diagnoses her with a major mental illness.  Not at the

8   jail.  Not at the DOC.

9        And I believe at the time of trial, three

10  witnesses were called from the jail.  It was her counselor

11  that was called.  I believe her last name is King.  There

12  was a doctor.  I think his name is Dr. Gerald Perry.  And

13  the third person I'm going to forget.  It's a nurse.

14  Joyce, I think.  She's a nurse.

15       *Q.*  Was that Joyce Van Every?

16       *A.*  Thank you.  And all three of these people in

17  their testimony said that while she was incarcerated at

18  the jail, she did not have a major mental illness.

19       If you look at the DOC records, she is not being

20  treated for major mental illness.  In fact, Wendi Andriano

21  in -- let's see.  It's July 20, 2012, Ms. Andriano

22  completed a health needs request form and wrote in part,

23  quote:  I do not wish to take psyche meds, exclamation

24  point, and end quote.

25       So the point of this process is you have to look

1  at whether she's evidencing symptoms across contexts, and

2  as it relates to major depressive disorder, bipolar

3  disorder, and the depressive disorder otherwise specified.

4  I was not impressed with that data.

5         Now what I do say in that part of my report is

6  that she did in the run-up to the offense, was complaining

7  of some -- she was experiencing some depressive symptoms

8  and was experiencing some anxiety symptoms.  And I believe

9  that.  I think that she was.

10        The next diagnosis is post-traumatic stress

11  disorder.  And this one is a little bit more nuanced

12  insofar as if you believe -- one of the claims that

13  Ms. Andriano has made is that she was the victim of

14  emotional, physical and sexual abuse.  If you believe that

15  these things happened in the way that she claims that they

16  happened, then it's reasonable to consider a diagnosis of

17  post-traumatic stress disorder.  But it's a little bit

18  scattered in terms of how this information comes in in

19  terms of the nature of the physical abuse, the emotional

20  abuse and even the sexual abuse.

21        But what I said as it relates to post-traumatic

22  stress disorder and complex post-traumatic stress

23  disorder, which is a -- it's not a diagnosis within a

24  mental health manual, but it's a diagnosis that's

25  mentioned in the literature.  It's a more serious form, a

1  chronic form.

2         Post-traumatic stress disorder, I said if it is

3  conclusively proven that these things happened, then it's

4  reasonable to consider that diagnosis.  But, again, the

5  symptom complex really isn't there.  You don't really see

6  it.

7         Now, you do see it in one of the jail records

8  shortly after Kandy -- or shortly after her therapist at

9  the time is treating her and calls the doctor because she

10 interjects this concept of PTSD, but you don't really see

11 it throughout the records.

12        The next one is cognitive disorder.  I'm going

13 to -- I'm going to pass on it insofar as I suspect that

14 that's what Dr. Amin ably addressed.  But I will say that

15 when you look at her behavior around the time of the

16 offense, whether when she was talking on phone calls with

17 life insurance personnel, 911 operators, the police, her

18 speech was logical.  It was coherent.  It was not at all

19 consistent with someone who's having a cognitive disorder.

20 She had executive functioning, planning, decision making.

21        I mean, how slick is that to remember at a time

22 that's arguably one of the most stressful times for a

23 suspect on an arrest, and in the break of an interrogation

24 has the presence of mind to call someone to help them

25 remove incriminating evidence?  If that's not the epitome

1    of executive functioning that's working at full throttle,

2    I don't know what is.

3         So then we get to anxiety and panic disorder.

4    And Ms. Andriano tells a story of experiencing

5    anxious-like symptoms, anxiety-like symptoms.  And, again,

6    this comes across in the EAP records and you see some of

7    it in the correctional records, both jail and DOC.

8         And what I said in my report is that while

9    there's a dearth of evidence to support like a full-blown

10   anxiety disorder, what I do believe that as a result of

11   economic issues, interpersonal issues, relationships that

12   she was having outside the marriage, that she was having

13   some symptoms of anxiety in the run-up to the offense.

14        What I also talk about is a personality disorder,

15   not otherwise specified, with antisocial borderline and

16   dependent features.

17        Wendi Andriano does not have an antisocial

18   personality disorder.  She doesn't have the history to

19   meet the criteria that we go by.  But make no mistake

20   about it, as an adult, she engaged in some antisocial

21   behavior at Casa Grande Regional Medical Center and there

22   were two different apartment complexes where there was

23   theft by conversion.  And then there's the one while she's

24   incarcerated and she's in cahoots with someone to get

25   checks fraudulently cashed.

1        So there is an anti -- and then let's not forget

2   the offense itself and some of the -- as I understand it,

3   some of the physical evidence was staged.  And just the

4   whole concocted story between the paramedics coming,

5   sending the paramedics on their way, the lies that she

6   told the police.  I mean, she definitely has an antisocial

7   flavor to her personality.

8        Dependent personality disorder, I know that some

9   people have said that she has the full criteria for that.

10  I definitely think she has features of someone who's a

11  dependent personality.  And I also think she has features

12  insofar as she needs to be around other people.  I don't

13  think she does real well when people leave her, per se.

14       But I also think she has features of a borderline

15  personality insofar as she's impulsive.  She can be

16  demissive.  And I'm blacking on it.  Oh, impulsive.  Oh,

17  promiscuity.  There's a period of promiscuity when she was

18  younger.

19       So one of the conclusions I have is that she has

20  these features of a personality disorder, not otherwise

21  specified, with antisocial borderline and dependent

22  features.

23       There's an issue of malingering.  Dr. Amin talked

24  about that, that he thought she may have been malingering

25  amnesia during the actual interview.

1        And then my concluding diagnosis is an adjustment

2    disorder with mixed anxiety and depressed mood in addition

3    to the personality disorder, not otherwise specified.

4        In other words, what I'm saying is that in the

5    run-up to the offense, around the time of the offense,

6    that she was unhappy in her relationship with her husband.

7    She purportedly felt guilty about being involved in

8    an extramarital affair -- two extramarital affairs.  And I

9    believe that the financial stressors, caring for her ill

10   husband, I believe that these things are consistent with

11   what's called an adjustment disorder, and in this

12   particular case, an adjustment disorder with mixed anxiety

13   and depressed mood.

14       And I will tell you that that's a diagnosis that

15   pops up in different places, both at the Arizona

16   Department of Corrections as well as in the Maricopa

17   County Jail records.

18   Q.   Is there a reference -- a material, a reference

19   material that you used to help you synthesize these

20   various symptoms documented over a long period of time

21   with Ms. Andriano in helping you render your diagnoses?

22   A.   Yes.  I had a -- we had a chronology put

23   together.  And then from that chronology, I did -- we did

24   like a subchronology that went through the different

25   symptoms that I'm talking about to you now, both at the

1  jail and at the Department of Corrections.  It's kind of

2  like a hot doc that just kind of points out what the

3  positives were and what the negatives were over the period

4  of time that we're talking about.

5      So at the end of the day, it's my opinion, to a

6  reasonable degree of medical probability, that at the time

7  of the offense, Wendi Andriano had an adjustment disorder

8  in addition to a personality disorder, not otherwise

9  specified, with antisocial borderline and dependent

10 features.  That's the first part of the first question.

11     Q.  Now let's talk about the referral questions that

12 you mentioned previously.

13     A.  Right.

14     Q.  What was the first referral question that our

15 office asked you to consider?

16     A.  Well, the first referral question is:  It says

17 under A.R.S., et cetera, first degree murder can be

18 mitigated if the defendant's capacity to appreciate the

19 wrongfulness of his conduct or to conform his conduct to

20 the requirements of the law was significantly impaired,

21 but not so impaired as to constitute a defense to

22 prosecution.

23     And the question goes on and it says:  In your

24 professional judgment, does Ms. Andriano suffer from a

25 mental illness or cognitive impairment that significantly

1   impairs her capacity to appreciate the wrongfulness of her

2   conduct or conform her conduct to the requirements of the

3   law.

4          So that's why this first question, I break it

5   into two parts because the first threshold question is you

6   have to figure out is there a mental disease or defect?

7   Is there a problem?  That's why I take the time to go

8   through the mental illness piece.

9          The second part of the question, I broke it in

10  and I said:  Did that affect her ability to appreciate the

11  wrongfulness of her conduct?  And the essence of my

12  opinion here is that I believe my diagnostic opinions are

13  correct.

14         But let's assume for a minute that I'm not right.

15  Let's assume that the other doctors are correct.  Whether

16  it's major depressive disorder or bipolar disorder, that

17  is not a get-out-of-jail ticket.  That's simply a

18  descriptor to describe a series of symptoms.  It does not

19  account for the behavior.  And so you have to overlay in

20  this particular case the behavior with the diagnostic

21  opinions.  And so --

22  Q.    In forensic -- I'm sorry to interrupt you,

23  Doctor.  In forensic psychiatry, why are behavioral

24  choices and the actions that ensued from those behavioral

25  choices so important in rendering opinions like the one

1  you're about to do?

2      *A.*    Well, one, because the law sets it up that way.

3  I mean, the statutory language is such that -- I mean, if

4  it wasn't this way, then -- well, sadly, prisons are

5  filled with people that have mental illness.  It's a

6  reality.  But only a very, very, very small portion of

7  people are sent to a state hospital, for example, if

8  they're found insane, you know, not responsible because of

9  mental disease or defect, whereby, they couldn't

10  appreciate the wrongfulness of their conduct.

11          So, in this particular case, I have to look at

12  the behavior and tie it together with whatever mental

13  illness Ms. Andriano may or may not have had.

14          So while I say, I believe that I'm correct

15  diagnostically, for the sake of discussion, I'm willing to

16  concede.  For the sake of discussion, let's assume I'm

17  wrong.  Let's assume that it's bipolar disorder.  Let's

18  assume it is some other condition.  Well, here's the

19  problem:  When you walk through -- I believe there's

20  23 bullet points in my report.  When you walk through

21  these different behaviors that Ms. Andriano engaged in,

22  those are not explained by a mental illness.  Those are

23  explained by choices that Wendi Andriano made.

24          So, for example, mental illness and a major

25  mental illness did not in August and September of 2000

1  cause Wendi Andriano to actively research different life

2  insurance companies to see if she could fraudulently

3  secure a life insurance policy for her husband, who it

4  appears was unaware.

5        Now, I know that the defense says that he

6  actually was a player in this, but just to be extra

7  special sure I was right about this, this morning I went

8  back and I listened to the phone call that Wendi Andriano

9  had with the insurance company.  Because what happens is

10  the insurance adjuster first calls and it's her husband

11  that picks up the phone and he says:  I know nothing about

12  this.  Okay?  So that's one example.

13        Approximately four months prior to the instant

14  offense, she offers co-worker James Yost $10,000 to pose

15  as her husband for a life insurance physical exam.  Yost

16  declined.

17        In September of 2000, she asked Eric Valiant if

18  he would be willing to pose as her husband during the life

19  insurance physical exam.  He passes.

20        Wendi Andriano used her computer at work to

21  research poisons.  And when confronted about her research,

22  she told her co-worker she was doing research for a friend

23  who was writing a book.

24        On September 22, 2000, Wendi Andriano, as Ann

25  Newton, discusses her desire with Wade Boyt, the owner of

1  Boyt Global Distribution in Topeka, Kansas, her desire to

2  purchase sodium cyanide or potassium cyanide mixed with

3  greens in order to kill rodents.

4        On or around September 27, 2000, Wendi Andriano

5  meets Travis Black at the Rock & Rodeo Bar.  The next

6  morning, they have a relation -- they have sexual

7  relations.  And they talk the next few days and

8  Ms. Andriano told Mr. Black that her husband had died of

9  cancer and that she was involved in a medical malpractice

10 suit.  Well, that was 50 percent true.  She was involved

11 in a medical malpractice suit, but Mr. Andriano was still

12 alive.

13       On October 5, 2000, Wendi Andriano picked up and

14 signed the Airborne Express package containing sodium

15 azide that she ordered while using an alias, Ann Newton,

16 and then altered a business license from McCollough's

17 business.

18       This was pretty sophisticated.  I was actually

19 impressed when I went back and really appreciated how

20 sophisticated she was with this.

21       She hid the sodium azide in a storage unit in the

22 apartment complex.

23       During the early morning hours of October 8,

24 Wendi Andriano calls her neighbor, Chris -- I'm going to

25 butcher the last name here.  I'll just spell it.

1  H-A-S-H-I-S-A-K-I.  For help.  And when Chris met with

2  Andriano in the parking lot, she told Chris that she had a

3  problem and not to ask questions.

4         None of these things that I'm talking about are

5  caused by adjustment disorder, bipolar disorder, major

6  depressive disorder.  These are things that are caused by

7  a personality disorder, by a defect in her personality

8  construct.  That's what's causing these things.

9         After she called paramedics to attend to her

10  husband, Ms. Andriano then instructed Chris to tell the

11  paramedics to go away.  She also told Chris to leave and

12  threw her purse outside and then shut the door.

13         As I already talked about, she didn't respond to

14  firefighters when they first responded and then until

15  dispatch calls her apartment, and then she comes out the

16  front door -- instead of coming out the front door, she

17  comes out the back patio door.  And she spoke with

18  firefighters.  She told the firefighters that this was a

19  mistake.  She doesn't need their assistance and that for

20  the last six years, she's been dealing with this problem.

21  She says thank you for coming and please go.

22         I think it's at this time, too, that her hair is

23  wet and maybe her shirt had been changed, but I may be

24  mistaken.

25         Q.  Based on your review of the trial testimony and

1   the reports documenting that particular incident, was

2   Ms. Andriano calm when she was --

3      *A.*  Apparently so.

4      *Q.*  -- when she was speaking to the paramedics?

5      *A.*  Yes.  I'm sorry.  Apparently so.

6         Now Chris, who witnessed Ms. Andriano's

7   interaction with the firefighters, said that the defendant

8   was, quote, extremely confused and not there.  Chris also

9   said that Andriano's hair was wet and that she had changed

10  her clothes before she exited the apartment.

11       So the paramedics leave.  She calls her father on

12  two separate occasions.  I'm sorry.  See called her father

13  and she called Chris on two separate occasions.  And then

14  during the second call, which is about 30 minutes after

15  the first call, she tells Chris that she needed to tell

16  her what really happened.

17      *Q.*  So this is a period of time where, based on the

18  evidence, the victim Joe Andriano is dead?

19      *A.*  Apparently so.

20      *Q.*  And she calls Alejo Ochoa and then speaks to her

21  friend Chris Hashisaki --

22      *A.*  Yes.

23      *Q.*  -- on two different occasions?

24      *A.*  She told Hashisaki that her husband discovered

25  that she was having an affair and that he, quote, lost it

1   and became very, very angry.  She explained that her
2   husband tried to strangle her.  So she hit him on the back
3   of the head with a bar stool, which is why he was in the
4   position he was in when Hashisaki got to the apartment.
5   The problem there is that Hashisaki didn't notice a broken
6   bar stool or blood when she was in the apartment.

7       Following her arrest and during a break in her
8   interrogation, Wendi Andriano calls Sharon -- Shannon.  I
9   said Sharon earlier.  It's Shannon Sweeney.  And asked her
10  to remove her personal belongings from the management
11  office.

12      During her interrogation, Wendi Andriano
13  initially told Detective Lucero that she did not stab her
14  husband, but did admit to having a knife in her hand when
15  her husband collapsed.

16      During her interrogation, Wendi Andriano
17  initially told Detective Lucero that she was not having an
18  extramarital affair.

19      During her interrogation, Wendi Andriano
20  initially told Detective Lucero that she did not change
21  her clothes.

22      Crime scene specialist concluded that Wendi
23  Andriano's alleged physical injuries did not comport with
24  her version of the events.

25      Crime scene specialist concluded the blood

1  spatter evidence did not comport with Wendi Andriano's

2  version of the offense.

3         Crime scene specialist concluded that Wendi

4  Andriano staged a portion of the crime scene.

5         And Wendi Andriano's father told Detective Lucero

6  that after he arrived at his daughter's apartment, the

7  police were already on the scene and his daughter told him

8  that she, quote, screwed up, end quote, and stabbed her

9  husband.

10        Now, in preparation for today's get-together, I

11  went back and I looked at these crime scene photos.  I

12  hadn't done that in a while.  And it's real easy, when the

13  narrative gets going, that Wendi Andriano the victim --

14  it's real easy to forget the real victim in this story.

15  And when you look at these crime scene photos and when you

16  look at the blood spatter evidence and when you look at

17  how this man died and when you look at how many times the

18  injuries to his head, make no mistake about it, a major

19  mental illness did not cause this.  This behavior was not

20  the byproduct of a major mental illness, whether it's a

21  major depressive disorder, a bipolar disorder, or any

22  other major mental illness.  It just did not happen that

23  way.

24        This was driven by Ms. Andriano's character

25  pathology, which was really out of just pure selfishness.

1    But the scene -- I had forgotten just how -- how

2  brutal the crime scene is and the level of overkill

3  almost, if you will, that was at that scene.

4    *Q.*   That takes us to the second query that our office

5  asked you to consider dealing with unusual and/or

6  substantial duress.  Could you tell us about that

7  question and what your conclusions are or opinions are

8  related to that second query?

9    *A.*   Well, to be sure, during the days and the weeks

10  leading up to the offense, as I said earlier, Ms. Andriano

11  was trying to cope with a number of stressors:  Caring for

12  her two young children, her ill husband, financial

13  difficulties, dissatisfaction in her marriage, and in

14  addition to her involvement in these two affairs.

15    But these are stressful events.  Make no mistake

16  about it.  But I don't believe these are stressful events

17  where it reached the point where she was under unusual and

18  substantial duress.

19    And, again, what I say in my report is that when

20  you look at the pre-offense, the offense, and post-offense

21  behavior, you realize that not only did she plan the

22  offense, but she -- as I said earlier, she kept her wits

23  about her.  This is a woman, who following the offense,

24  stages a portion of the crime scene ostensibly to help her

25  version of the offense.

1          I went back and I looked at those photos of the

2    belt.  She laid the belt I think it's over him.  The belt

3    has no blood spatter, none, zero.  So how does -- the

4    place is a bloody mess, but somehow the belt is devoid

5    that supposedly was used to like to go after her.  The

6    belt is devoid of blood spatter.  It makes no sense.

7          MR. NICKELS:  Your Honor, whether the belt had

8    blood on it or not and the descriptions where the blood

9    was --

10         THE COURT:  Sustained.

11         Let's move on.  Ask your next question.

12    *Q.*   BY MR. HAZARD:  Doctor, evidence of staging the

13    crime scene, how does that belie the notion that that was

14    created by some sort of duress or substantial duress?

15    *A.*   The point is that this is someone who kept her

16    wits about her independent of whatever mental issues she

17    may or may not have had at the time of the offense.  And

18    it's my opinion that, to a reasonable degree of medical

19    probability, that Wendi Andriano was not at the time of

20    the instant offense under unusual or substantial duress.

21    And that to the extent she did have stressors, they were

22    not causally connected to her actions that occurred on or

23    about October 8, 2000.

24    *Q.*   And that leads us to the third query that our

25    office asked you to consider, and that was what, if any,

1  causal connection exists between any mental illness or

2  cognitive impairment that Ms. Andriano suffered from or

3  suffers and the murder?

4  *A.*   Well, as I already stated, none of these

5  conditions to the extent they existed, are responsible for

6  the choices, no matter how misguided, that Ms. Andriano

7  made.

8        As I said earlier, these were behaviors that

9  that were driven by anti -- they were antisocial and

10 selfish acts designed to benefit Wendi Andriano.

11       I'm not going to recite all the different

12 behaviors that she engaged in again, but, suffice it to

13 say, what I did in my report is I gave an abridged version

14 of all the same elements, behavioral choices that she

15 made.  I just -- I just believe that these choices were

16 really driven just by her character pathology and not a

17 major mental illness.  She made the choices.

18 *Q.*   Did she also say that, in essence, during your

19 forensic interview?

20 *A.*   Not only did she say it to me, she said it when

21 she testified I think at sentencing.  She tells the jury

22 that she made horrible choices.

23       MR. HAZARD:  Your Honor, at this moment, we would

24 like to play a portion of Ms. Andriano's forensic

25 interview with Dr. Pitts.

1          THE COURT:  Which is part of Exhibit No. 186;

2    correct?

3          MR. HAZARD:  It is.  And, for the record, the

4    transcript starting point would be Page 117, Line 8 and

5    continuing until Page 117, Line 29.

6          THE COURT:  I'll allow the State to present that

7    portion with the understanding that the court reporter

8    will not be taking it down.

9          (WHEREUPON, a portion of Exhibit 186 was played.)

10          (WHEREUPON, an off-the-record discussion ensued.)

11          MR. HAZARD:  Your Honor, I'm also going to at

12    this time move to admit Exhibit 179, which are the DVD's

13    of Ms. Andriano's interview with police at the time of the

14    offense.

15          THE COURT:  Those have already been admitted by

16    stipulation.  You're talking about Exhibit 179?  There's

17    five CD's.  It looks like from my notes and from the

18    clerk's exhibit list, that by stipulation, those five CD's

19    under Exhibit 179 were admitted by stipulation on

20    February 3rd.

21          MR. HAZARD:  Thank you, Judge.  And I also move

22    to admit Exhibit 168, which is Dr. Pitt's report into

23    evidence.

24          MR. NICKELS:  We object, Your Honor, on hearsay

25    grounds.

1        THE COURT:  I'll sustain the objection with

2   regards to 168.

3        MR. HAZARD:  And, Your Honor, again, we ask the

4   Court to admit it not for the truth of the matter

5   asserted.  It was relied upon by other experts in this

6   case, including the experts from the defense.

7        We ask that Your Honor not take into

8   consideration any assertions and opinions as written in

9   the report, only to consider the testimony and separate

10  that.  But there are abundance of materials that not only

11  go to Dr. Pitt, what he relied upon, but also what the

12  other experts here relied upon.  That's what our motion is

13  based on.

14       THE COURT:  Mr. Nickels.

15       MR. NICKELS:  Yeah, Your Honor, I mean, I don't

16  think it can get in as a basis of what he relied on

17  because if that were the case, every report would go in

18  because it's kind of a circular logic.

19       But as far as our experts, they didn't rely on

20  it.  I mean, they spent some time rebutting some of the

21  things, but it's not to be relied on.  It's not that kind

22  of assertion.

23       THE COURT:  I'll sustain the objection.

24       MR. HAZARD:  No further questions, Your Honor.

25       THE COURT:  Mr. Nickels, cross-examination?

1          MR. NICKELS:  Yes, Your Honor.

2

3                    CROSS-EXAMINATION

4   BY MR. NICKELS:

5          Q.    Dr. Pitt, at one point in your examination by

6   Attorney Hazard, you were talking about the materials you

7   reviewed, and you used the phrase:  In the spirit of being

8   as complete and thorough as I can be.  Do you remember

9   saying that?

10          A.    Yes, sir.

11          Q.    And I think you were just referring to the fact

12   that the process you go through reviewing documents,

13   interviewing witnesses and the lead-up to the rendering of

14   an opinion or writing a report, you want that to be as

15   thorough as possible; right?

16          A.    Yes, sir.

17          Q.    You want it to be as complete and comprehensive

18   as possible as well; right?

19          A.    Yes, sir.

20          Q.    And this may include the interviews with

21   collateral sources of information?

22          A.    If indicated, yes, sir.

23          Q.    And by collateral sources, I'm just referring to

24   someone other than the person about who you're offering an

25   opinion?

1    *A.*   Yes, sir.

2    *Q.*   So, in this case, that would be Wendi.  So a

3    collateral source would be somebody other than Wendi

4    Andriano; right?

5    *A.*   I concur.

6    *Q.*   And, overall, I mean, I think you would agree

7    that this review that you performed, you want to do

8    everything you can to make the evaluation complete?

9    *A.*   Yes, sir.

10   *Q.*   Here, you did interview Wendi Andriano, as we

11   saw; right?

12   *A.*   Yes, sir.

13   *Q.*   One time?

14   *A.*   Yes, sir.

15   *Q.*   For less than five hours?

16   *A.*   4.9 hours.

17   *Q.*   By contrast, Dr. Woods and Dr. Hopper, who

18   provided contrary opinions to what you have offered today,

19   interviewed Wendi on nine separate occasions; is that

20   right?

21   *A.*   I'm not going to quibble with you, but, sure, it

22   sounds about right.

23   *Q.*   And for it was a total of 64 and-a-half hours

24   that they interviewed her; is that right?

25   *A.*   I didn't know that, but if you say so, I'll--

1    *Q.*    You have no reason to dispute that?

2    *A.*    No, sir.

3    *Q.*    And Wendi was your only interview that you

4    performed in this evaluation; correct?

5    *A.*    Yes, sir.

6    *Q.*    You didn't interview anybody else?

7    *A.*    No, sir.

8    *Q.*    You didn't interview Wendi's mother Donna, who

9    provided evidence about the neglect and abuse that Wendi

10   suffered as a child?

11   *A.*    No, sir.

12   *Q.*    You didn't interview Alejo Ochoa, Wendi's

13   stepfather, about whom there was evidence that he may have

14   sexually molested Wendi as a child?

15   *A.*    I did not interview him.

16   *Q.*    You didn't interview anybody from these various

17   ministries that Wendi was involved in where there was

18   evidence to show that Wendi suffered further abuse there;

19   is that right?

20   *A.*    Yes, sir.

21   *Q.*    You didn't interview Jeri Lynn Cunningham, who

22   testified that Wendi -- or excuse me -- that Alejo, you

23   know, touched her breasts when she was sleeping over at

24   Wendi's house?

25   *A.*    Yes, I did not interview her.

1    *Q.*   And you didn't interview Kyre Lorts, who

2  testified that Alejo touched her vagina and forced her to

3  rub his penis and who also testified that Wendi was doing

4  the same thing, rubbing Alejo's penis and being touched in

5  the vagina?  You didn't interview Kyre Lorts; did you?

6    *A.*   I did not interview her.

7    *Q.*   Dr. Woods and Dr. Hopper, they did interview

8  additional witnesses; is that right?

9    *A.*   I believe so, yes, sir.

10    *Q.*   And would you have any reason to dispute that it

11  was six additional witnesses?

12    *A.*   I have no reason to dispute that.

13    *Q.*   And that included Jeri Lynn Cunningham and Krye

14  Lorts?

15    *A.*   Yes, sir.

16    *Q.*   Now, you have been doing this kind of work for a

17  long time; right?

18    *A.*   It's relative.  I would like to think that it's a

19  reasonable amount of time.  Go ahead.

20    *Q.*   And in over that time, you've encountered a

21  number of folks who could be victims of sexual abuse or

22  other trauma?

23    *A.*   Absolutely.

24    *Q.*   And would you agree that interviewing a victim of

25  sexual abuse or other trauma can be a delicate matter?

1      *A.*     In certain situations, yes, sir.

2      *Q.*     And because many victims of abuse or other

3   trauma, are just not -- they're not comfortable talking

4   about it; right?

5      *A.*     I concur.

6      *Q.*     These are painful memories?

7      *A.*     They can be.

8      *Q.*     And, in some instances, they could be not

9   memories at all, in the sense that these folks may block

10  them out?

11     *A.*     They may.

12     *Q.*     And so in order -- when you interview these

13  folks, you often have to do some work to bring the

14  information out?

15     *A.*     I don't know what you mean by that.

16     *Q.*     Well, in other words, if you interview a victim

17  of potential sexual abuse, I mean, you don't just walk up

18  and say:  Hi, I'm Steve, have you been sexually abused?

19  You're going to try to work them and maybe build some

20  rapport beforehand?

21     *A.*     Generally speaking, yes.

22     *Q.*     I mean, you would like it if they have some

23  comfort level before talking about the trauma, or sexual

24  abuse or other trauma; right?

25     *A.*     Yes.

1      *Q.*   It's helpful that they have some trust in you

2   before approaching that subject?

3      *A.*   Well, yes and no.

4      *Q.*   Let's now we're going to watch some of the video

5   that was shown over here before.  We're going to watch it

6   over here.  And what I'll represent to you, Dr. Pitt, is

7   what I'm about to show you is three separate clips.  We're

8   going to run them -- there will be a little break in

9   between.  We will run them all and I'll ask you some

10  questions about it.

11      What I'll tell you now is that this is a segment

12  of the interview that occurred in the first couple of

13  hours of your time with Wendi and it occurred before you

14  had asked her any questions about any sexual abuse or

15  anything like that.  Okay?

16      *A.*   Can you tell me where the citations are in the

17  transcript?

18      *Q.*   I don't have that right now, but, certainly, we

19  can provide that to your counsel.  And I don't know if

20  you'll need to follow along in the transcript because it

21  will be on the screen.

22      *A.*   No, because there's context.  Everything is

23  context-related.  And so it's helpful for me if I can

24  appreciate at least minimally let me see in the transcript

25  where I'm talking to her.  I mean, we did that for you in

1    the stuff that we just showed.

2        Q.   Well, I don't have that information.  Here's what

3    we'll do.  We'll show the video, and if you and

4    Attorney Hazard would like to show other parts of the

5    video following this, you'll have an opportunity to do

6    that.

7            MR. HAZARD:  Your Honor, I object.  The witness

8    has asked a simple request to assist him.

9            THE COURT:  Do you have a copy of the transcript?

10   Do we all have a copy of the transcript?

11           MR. NICKELS:  Yes, everybody has a copy of it.

12           THE COURT:  Okay.  You have a copy of it?  Then

13   on your redirect, you can refer to that portion on your

14   redirect.  Okay?

15           THE WITNESS:  Sure.

16           MR. NICKELS:  Thank you.

17           THE COURT:  I'll allow this to be played as part

18   of Exhibit No. 186, which has been admitted into evidence

19   with the understanding the court reporter will not take

20   this down.

21           (WHEREUPON, an off-the-record discussion ensued.)

22           (WHEREUPON, a portion of Exhibit 186 was played.)

23           THE COURT:  Do we know whether that's

24   Disc No. 1?

25           MS. FOX:  It's Disc 1.

1          THE COURT:  Disc 1?

2          MR. NICKELS:  Yes.

3          THE COURT:  Towards the beginning?

4          MS. FOX:  I think it's somewhere -- I have the

5    exact times, which I can get as soon we get done.

6          THE COURT:  But we know it's Disc 1?

7          MS. FOX:  It's Disc 1.  All of these are before

8    the lunch hour.  So it's Disc 1.  And one is from

9    Disc 2.

10          THE COURT:  Okay.  Go ahead.

11          MR. NICKELS:  Like I said, there's going to be

12    three of these.

13          THE COURT:  You're going to play three?

14          MR. NICKELS:  Each about a minute or two.  Then

15    I'll ask the questions following the three.

16          (WHEREUPON, a portion of Exhibit 186 was played.)

17    *Q.*   BY MR. NICKELS:  So, Dr. Pitt, as we saw in those

18    video clips, you know, Wendi was getting upset; right?

19    *A.*   Yes, sir.

20    *Q.*   And she said she was feeling defensive?

21    *A.*   I -- okay.  Yes, sir.

22    *Q.*   And she also described herself as agitated to the

23    point where she could not think?  Did you hear her say

24    that?

25    *A.*   Yes, sir.

1      *Q.*   And then she even said she felt like she was on

2    trial again?

3      *A.*   Yes, sir.

4      *Q.*   And so, you know, whatever you may have been

5    doing to build any rapport or make her feel comfortable,

6    it certainly wasn't working if she was feeling the

7    opposite; correct?

8      *A.*   The question presupposes that I'm there to build

9    rapport and I'm there to win friends and influence people,

10   and that's not the purpose of a forensic evaluation.

11         Wendi Andriano was not my friend.  Okay?  I'm not

12   there to build rapport.  I'm there to get to the truth, to

13   get the information, to hear her version of the events.

14         I'm sorry that Wendi Andriano killed her husband.

15   I'm sorry that it's painful for her to talk about it.  But

16   I've got to ask her these questions.  Otherwise, I'm not

17   doing my job.

18     *Q.*   I'm now going to show you a clip that occurred

19   about two hours into the interview with Wendi.  And what

20   I'll represent to you here is at least based on our -- and

21   we've watched the whole thing.  Based on our review, this

22   is the first time that you mention any potential sexual

23   abuse by Alejo?

24     *A.*   Do you have the citation?

25     *Q.*   Well, again, what we'll do is we'll watch it and

1   we can give you the exact time of the clips, and if you

2   would like to show other parts of the video, you can do

3   that.

4          What we'll do again is I'll just let it play for

5   a few minutes and then I'll ask you some questions after

6   that.

7   *A.*   Okay.

8          (WHEREUPON, a portion of Exhibit 186 was played.)

9   *Q.*   BY MR. NICKELS:   Okay.   Doctor, let's kind of

10  unpack that a little bit.   As you heard there, the first

11  question you asked was were you and he -- and the "he" is

12  Alejo.   Were you and he sexually involved?   Do you

13  remember that?

14  *A.*   Yes, sir.

15  *Q.*   And that was the first question you asked of her

16  on this topic; right?

17  *A.*   Yes, sir.

18  *Q.*   And you didn't -- did you define for Wendi what

19  you meant by sexually involved?

20  *A.*   I did not.

21  *Q.*   Okay.   So for all you knew -- for all you know,

22  she may have thought that meant intercourse?

23  *A.*   Sure.

24  *Q.*   And she responded with:   I don't believe so.   I

25  don't know, and then went on to describe Alejo as a very

1    sexual person where, quote, everything has something to do
2    with something sexual.  Do you remember that answer?
3         A.    Yes, sir.
4         Q.    Now you didn't follow up with her by asking what
5    she meant by:  I don't know or I don't believe so?
6         A.    No, I didn't.
7         Q.    And you didn't follow up by asking how it made
8    Wendi feel that her stepfather was a, quote, very sexual
9    person for whom, quote, everything has something to do
10   with something sexual; did you?
11        A.    No, I did not ask her how it made her feel.
12        Q.    Instead, your next question, and I think you even
13   just -- you actually said it while she was still talking
14   was this, quote:  But did you have a sexual relationship
15   with Alejo, end quote; is that right?
16        A.    That sounds about right.
17        Q.    Then you went on to ask:  Were you ever in a
18   sexually intimate relationship with Alejo?  Do you
19   remember that?
20        A.    Yes, sir.
21        Q.    And, again, you didn't define what you meant by
22   sexually intimate; did you?
23        A.    No, I didn't.
24        Q.    So, for all you know, Wendi thought the word
25   intimacy meant some sort of a consensual or a romantic

1   type of relationship; right?

2       *A.*   It's certainly possible.

3       *Q.*   And then actually she answered with:  I would say

4   emotionally, yes, but, physically, I don't remember.  Do

5   you remember that answer?

6       *A.*   Yes, sir.

7       *Q.*   And, again, you did not follow up on that; did

8   you?

9       *A.*   I did not.

10      *Q.*   You did not ask her what she meant by having an

11  emotional, sexually intimate relationship with Alejo?

12      *A.*   I did not.

13      *Q.*   You didn't ask her how that made her feel?

14      *A.*   I did not.

15      *Q.*   And you didn't follow up with any questions on

16  what effect having an emotional, sexually intimate

17  relationship with her stepfather would have had on Wendi;

18  did you?

19      *A.*   No, I didn't.

20      *Q.*   And then, finally, Dr. Pitt, you asked the

21  question:  Did you ever sleep naked in bed with him?  Do

22  you remember that?

23      *A.*   Yes, sir.

24      *Q.*   And you understand -- you mentioned it

25  before that there's evidence in this case that Alejo

1   touched Jeri Lynn Cunningham's breasts during sleepovers

2   at Wendi's house; right?

3       *A.*   There's testimony -- Jeri Lynn Cunningham says

4   that, yes, sir.

5       *Q.*   Right.  So there's testimony about that; right?

6       *A.*   Yes, sir.

7       *Q.*   And then that occurred while Jeri Lynn was trying

8   to sleep in Wendi's bed, that Alejo would crawl into bed

9   and that's when he would touch her breasts; right?

10      *A.*   Yes, sir, uh-huh.

11      *Q.*   You didn't ask Wendi about that -- about those

12  allegations; did you?

13      *A.*   No, I didn't.

14      *Q.*   You didn't mention Jeri Lynn's name in the entire

15  interview; did you?

16      *A.*   I certainly did not.

17      *Q.*   Nor did you ask Wendi whether anything ever

18  happened in bed, regardless of whether someone was naked

19  or not?

20      *A.*   No.  You're right, I didn't ask that question

21  either.

22      *Q.*   Instead, the one question you asked was -- it

23  included this factual assumption of nakedness that

24  actually no one is alleging has occurred in this case;

25  right?

1    *A.*    Umm, I'll take your word for that.

2    *Q.*    Okay.

3         (WHEREUPON, an off-the-record discussion ensued.)

4         MR. NICKELS:  Your Honor, given the time, I know

5    we're a few minutes past the normal 3:00 o'clock break,

6    and I am transitioning to a new topic.

7         THE COURT:  How are we doing on time today?  Are

8    we doing okay?

9         MR. NICKELS:  I don't have a whole lot left, but

10   I'm assuming they have some redirect.

11        THE COURT:  Okay.  Let's go ahead and take our

12   15-minute break for the afternoon recess.  We'll be in

13   recess.

14        (WHEREUPON, a recess ensued from 3:04 p.m. to

15   3:18 p.m.)

16        THE COURT:  This is CR 2000-096032, State of

17   Arizona vs. Wendi Elizabeth Andriano.

18        The record will reflect the presence of the

19   parties and counsel.

20        The record will reflect that Dr. Steven Pitt is

21   on the witness stand and we will continue with the

22   cross-examination by Mr. Nickels.

23        Mr. Nickels.

24        MR. NICKELS:  Actually, Your Honor, I have

25   nothing further of this witness.

1          THE COURT:  Okay.  Redirect?

2

3                    REDIRECT EXAMINATION

4    BY MR. HAZARD:

5        Q.   Dr. Pitt, counsel for Ms. Andriano took different

6    excerpts from your interview with Ms. Andriano; is that

7    correct?

8        A.   Yes, sir.

9          MR. NICKELS:  If you don't mind, I just want to

10   tell the Court, during the break, we did give them the

11   exact times of the video that we showed him.  Sorry about

12   that.  I meant to mention that before we got back on.

13         THE COURT:  Okay.  Go ahead.

14         MR. HAZARD:  Okay.  May I approach the witness --

15         THE COURT:  Yes.

16         MR. HAZARD:  -- with Exhibit 237?

17       Q.   BY MR. HAZARD:  Dr. Pitt, what is that exhibit?

18   Do you recognize that?

19       A.   Yes.  This is the transcript of my forensic

20   psychiatric evaluation.  It's dated November 26, 2013, and

21   it is 233 pages long.

22       Q.   Is that an accurate transcription of the forensic

23   interview with Ms. Andriano that has already been admitted

24   into evidence?

25       A.   As I -- it's to the best of the ability of my

1   transcriptionist who completed it, yes, sir.

2         MR. HAZARD:  We move to admit Exhibit 237 into

3   evidence, Your Honor.

4         THE COURT:  Any objection?

5         MR. NICKELS:  No, Your Honor.

6         THE COURT:  Exhibit No. 237 for identification is

7   admitted into evidence.

8   Q.    BY MR. HAZARD:  Dr. Pitt, counsel talked about

9   materials that you reviewed and I think his words were in

10  the spirit of being complete and thorough?

11  A.    Yes.

12  Q.    Do you remember that?

13  A.    Yes.

14  Q.    And why didn't you interview other people than

15  Ms. Andriano?

16  A.    Because it wasn't indicated.  It wasn't

17  necessary.

18  Q.    And why is that?

19  A.    Well, in this particular case, you have to

20  remember that, one, it's voluminous.  And by voluminous,

21  what I mean is that there was a trial.  There are trial

22  transcripts.  It's voluminous because there was a police

23  investigation.

24        It's voluminous because there has been an appeal.

25  It's voluminous because, along with that appeal, there has

1  been I don't know how many declarations, but, many, many,

2  many declarations.

3        It's voluminous because mitigation specialists

4  have gone ad nauseam to interview everyone across the

5  country to get input and background on Wendi Andriano.

6  It's voluminous, because as counsel pointed out, his

7  experts spent so much time interviewing not only

8  Ms. Andriano, but collateral sources.

9        So I just didn't think it was indicated.  Trust

10  me, I think I have a good enough reputation, that if I

11  thought it was indicated, I would have done it.  It wasn't

12  necessary.

13     *Q.*   As part of your role as a forensic psychiatrist,

14  can you talk about why you're here and what's important,

15  based on your profession, for the judge to hear?

16     *A.*   Well, with all due respect to the Court, I know

17  that the judge has been on the bench a while.  And, but

18  the discipline of forensic psychiatry, a couple of key

19  points about it is that as a forensic expert, to be sure,

20  I'm retained by you, but I'm not an advocate for you or

21  for the State or for the party that retains me.  I'm an

22  advocate for one thing and one thing only, which is my

23  opinion.

24        And after I authored this report and after I

25  signed this report, I was not only very happy with the

1  work product, but absent some new piece of information

2  that was somehow going to change my opinion, I was and am

3  wedded to my opinion.  I believe I am correct.

4      That's very different than the role of a

5  therapist, who is treating someone who's an advocate for

6  the patient whom they're treating.

7      What happens sometimes in forensic cases,

8  especially -- well, I won't say especially.  But it

9  happens at times in forensic cases, boundaries get blurred

10  and roles get blurred.  People tend to sometimes forget

11  that while they may be retained by the defense or retained

12  by the prosecution, that that's not in service of the

13  party that retained them.

14      They may forget that while sitting and talking to

15  someone like Wendi Andriano, who's every verbally

16  competent and very verbally facile, that she's not --

17  you're not there to win friends and influence people.

18  You're not there to make her a buddy.

19      I take a lot of pride in the fact that regardless

20  of who retains me, the person at the end of the day

21  shouldn't really know.  In other words, the evaluation

22  should be the same.  Whether they like me or don't like me

23  is immaterial.  What's important to me is that was the

24  evaluation thorough?  Did I hit the points?  Did I hit the

25  central elements of the referral questions that I was

1   being asked to answer.

2        I didn't do the evaluation the way that you told

3   me.  I'm going to do it the way I want to do it.  But I

4   have to be thinking about the referral questions.

5        Counsel talks about Dr. Woods and Dr. Hopper.  I

6   don't see in either one of their reports anywhere where

7   statutory language akin to the language that Ms. Gard

8   asked me about and akin to what's before the Court here is

9   even addressed.

10        And so I applaud their efforts to sit with her

11   and interview her for however long they did, but I just

12   didn't feel it was necessary for me to go ahead and

13   interview any other collateral sources.

14   Q.   In forensic psychiatry, is it about keeping score

15   as to how many hours?

16   A.   No.  It's like in your work and in my work, it's

17   no different whether you're the landscaper who cuts the

18   lawn or whether you're a lawyer or whether you're a

19   forensic psychiatrist.  I think it's a -- you know, just

20   because a lawyer does a direct exam or a cross-examination

21   for hours on end, that doesn't necessarily mean that it

22   was good.  There's an art to interviewing and there's a

23   way in which questions need to be asked.

24        So I think it's highly misleading to simply

25   assume that just because someone spends 30 hours with

1 someone, that, therefore, they really understand it better

2 than the person who may spend less, especially in my case

3 when if I thought I needed more time, I would have

4 spent it.

5 　　*Q.*　You asked Ms. Andriano the question in her

6 interview if she had a sexual relationship with Alejo

7 Ochoa?

8 　　*A.*　Right.

9 　　*Q.*　Do you remember that particular question?

10 　　*A.*　I do.

11 　　*Q.*　And what was her answer?

12 　　*A.*　She didn't think so.

13 　　*Q.*　In rendering your opinions, did you also take

14 into consideration that and account for Ms. Andriano

15 actually being the victim of sexual abuse?  And, if so,

16 how?

17 　　*A.*　Yes.  I talked about that in my direct

18 examination.  I say -- I talk about it in my report.  I

19 say that I'm aware that there has been testimony which

20 speaks to allegations that she was the victim of

21 emotional, physical and/or sexual abuse.  And if it can be

22 conclusively proven, then maybe some of the symptoms that

23 she has could potentially be tied to post-traumatic stress

24 disorder.  Could potentially.

25 　　　　But the problem here is that what defense counsel

1   is doing is it's exceedingly misleading because the idea

2   is --

3        MR. NICKELS:  Object, Your Honor, for him to

4   comment on defense counsel.

5        THE COURT:  That last comment will be stricken.

6        But go ahead and give your opinion.

7        THE WITNESS:  I'm sorry, Judge.

8        And, Counsel, I apologize to you as well.

9        THE COURT:  Give your opinion without the

10  editorial comment.

11       THE WITNESS:  Okay.

12  *Q.*  BY MR. HAZARD:  What does sexual abuse, whether

13  Ms. Andriano suffered it as a child or not, have to do

14  with the ultimate determination?

15  *A.*  Right.  The questions presuppose that -- well,

16  let me answer it differently because I think I'm going

17  down the same path.

18       If you assume in this particular case that Wendi

19  Andriano is a victim in this story, in the narrative,

20  there's this idea -- there's this nexus that somehow

21  because of sexual abuse, therefore, it goes she had

22  somehow some psychiatric issues, some psychiatric

23  diagnoses.  And we know that sometimes that does in fact

24  happen for people.  I'm not minimizing people that have

25  been sexually abused.  And, therefore, it goes that she

1   somehow wasn't responsible for the choices that she made.

2        At the end of the day and what my report is

3   saying is that it doesn't matter.  If she was a victim of

4   sexual abuse, that's a terrible thing and I feel sorry for

5   her.  But the reality is this isn't about:  Was she a

6   victim of sexual abuse?  This is about:  Does she have a

7   mental disease or defect whereby she couldn't appreciate

8   the wrongfulness of her conduct?  Question No. 1.

9   Answer:  No.  No.  It's just not there.  You don't see the

10  diagnoses across contexts the way we talked about it.

11        And ditto for Questions No. 2 and

12  Questions No. 3.  So this idea that A leads to B, which

13  leads to C, which kind of gets us to D is a nonstarter for

14  me.

15  *Q.*   Is it appropriate in forensic psychiatry to do

16  reverse engineering?  And do you know what I mean by that?

17  *A.*   I know exactly what you mean by reverse

18  engineering.  No, it's not appropriate.  We don't --

19  what's appropriate in forensic psychiatry is to look at --

20  is to look at the data.  We don't take -- we don't make

21  the data fit our theory.  We look at where the data takes

22  us.  And it's an analogy that I view --

23        MR. NICKELS:  Your Honor, I'm letting some of

24  this go, but I object to this as being well beyond the

25  scope of cross-examination.

1          THE COURT:  Overruled.

2          Go ahead and answer the question.

3          THE WITNESS:  Thank you, Your Honor.

4          Where this goes is that -- is you look at where

5     the data takes you.  And when you look at the data in this

6     particular case -- you all are from Wisconsin, Green Bay

7     Packers.  We'll use the football analogy here, which I've

8     used before.

9          If you look at the data on this particular case,

10    where's all the data points about mental illness, that she

11    doesn't have a mental illness?  Most of the data points

12    are around the 50-yard line.  Sure, you have some that are

13    at the 40 and some that are at the 20 and you've got a

14    couple in the stands, but the totality of the data points

15    away from this woman having a major mental illness.  The

16    records support that opinion.  The people that treated her

17    at the Maricopa County Jail support that opinion.  And the

18    Arizona Department of Corrections records support that

19    opinion.

20    *Q.*   BY MR. HAZARD:  Defense counsel also brought in

21    and played a number of clips from your interview and asked

22    questions -- asked you questions about building rapport

23    and commenting that Ms. Andriano was visibly upset.

24         Could you tell us a little bit about your

25    interview techniques and why you interview the way you do?

1      *A.*    Sure.

2      *Q.*    First off, have you been published on the topic

3    of video forensic interviews?

4      *A.*    Yes, I'm published.  There's only a couple of

5    articles on the value and utility of video-recording

6    forensic evaluations and some others.  I did an article on

7    that.

8      *Q.*    Do you teach others interview techniques --

9      *A.*    I do.

10     *Q.*    -- in forensic psychiatry?  Can tell us a little

11   bit about that?

12     *A.*    I think we were talking over each other.  It was

13   my fault.  I'm sorry.

14           The answer is I do.  And I teach law enforcement

15   officers about interviewing, not interrogation.  I also

16   teach medical students about interviewing.  I also teach

17   other psychiatrists about interviewing.

18           You have to remember that in this particular

19   interview, this is an adversarial context.  I'm dealing

20   with a very, very savvy defendant.  The evaluation

21   starts -- and I'm paraphrasing.  But I essentially ask

22   Ms. Andriano to tell me what happened.  And we get to the

23   spot of:  Why, I don't know what you mean, tell me.  And

24   see comes back to me and essentially says:  Why don't you

25   tell me what you know and you ask me specific questions,

1  and then I'll answer them?  Well, that's not how this
2  works.  It's my interview and I get to ask the questions.
3         And the point is it's adversarial.  To be sure,
4  you want to have some give-and-take and some dialogue and
5  some rapport, but she was very quick on her feet, and I
6  sensed that right out of the box.  And there were only a
7  couple of times that I really, really felt that I caught
8  her completely off guard.  But everything else, make no
9  mistake about it, she was ready for it.  She had been
10 asked about it by other people.  She was ready for it.
11 This was someone who has been practiced in terms of being
12 interviewed.
13        And so, again, I'm not there to win friends and
14 influence people.  I'm there to be respectful, which I
15 believe I was.  I'm there to get information, which I
16 believe I did, that satisfies me, so that I can author a
17 report and render opinions that I can share with the
18 Court.
19     Q.  Do you also take into consideration the
20 reliability of the evidence or proof before you make an
21 opinion?
22     A.  Absolutely.  On a scale of one to ten, if ten is
23 the most important and one is the least important, I think
24 I've said in the past, that I count the interview anywhere
25 between seven, eight, nine depending on the context.  That

1    would be true here.

2          But the beauty of this particular case, in part

3    because it is so voluminous, is you have so much

4    information to pull from, so many different data points

5    that support what I believe -- what are my opinions.  Not

6    what I believe are my opinions, but what are my opinions.

7    And the data -- the records speak for themselves.

8          MR. HAZARD:  One moment, Your Honor.

9          THE COURT:  Yes.

10         (WHEREUPON, an off-the-record discussion ensued.)

11         MR. HAZARD:  That's all, Your Honor.

12         THE COURT:  May this witness be excused?

13         MR. HAZARD:  Yes, Your Honor.

14         THE COURT:  Thank you very much.  You're excused.

15         THE WITNESS:  Thank you, Judge.

16         THE COURT:  Don't walk off with any exhibits.

17         THE WITNESS:  I won't do that, Judge.

18         THE COURT:  Thank you.

19         Anything further from the State?

20         MR. HAZARD:  Your Honor, yes.  Ms. Gard would

21    like to.

22         MS. GARD:  I have two housekeeping matters.

23    Actually, one housekeeping matter.  Then I would like to

24    make a record on his report.

25         THE COURT:  Okay.

1     MS. GARD:  The housekeeping matter deals with

2  Exhibit 6.005, which was the report of Dr. Bayless.  We

3  had in our joint witness schedule and exhibit list filed

4  on January 10th -- we had stipulated to admit that, and I

5  think we overlooked it when we were admitting evidence the

6  first day.  So I would move that exhibit into evidence.

7     THE COURT:  Any objection to Exhibit No. 6.005

8  being admitted into evidence?

9     MR. ARNTSEN:  No objection, Your Honor.

10     THE COURT:  Exhibit No. 6.005 is admitted into

11  evidence.

12     MS. GARD:  And the other issue regards the report

13  and I would like to renew the argument that I made earlier

14  in support or in connection with Dr. Amin's report.  We're

15  not offering Dr. Pitt's report for a hearsay purpose.

16  We're offering it to show, well, it contains facts showing

17  the basis of his opinion.  And I would also like to point

18  that, once again, I know this was pointed out earlier,

19  that we stipulated to all the mental health reports of the

20  defense, and all the rest are in evidence.  I think it's

21  important for this Court to consider the totality of the

22  evidence prior to making a ruling and consider the weight

23  of each opinion in context.

24     THE COURT:  So was that the Exhibit 169 you're

25  referring to?

1       MS. GARD:  No. 168, I believe it is.  168.  So I

2  would just ask for you to reconsider that ruling.

3       MR. ARNTSEN:  Your Honor, we object for the same

4  reasons raised earlier.  It is hearsay.  And just because

5  there are things in it, it's not admissible.  It sets

6  forth his opinions.  And, again, presumably for the same

7  reason this Court granted the State's objections to keep

8  Mr. Lowenthal's and Mr. Hammond's reports out, we would

9  ask that you keep Dr. Pitt's report out.

10       THE COURT:  I'm going to reaffirm the Court's

11  ruling with regard to Exhibit No. 168 not being admitted

12  into evidence.

13       MS. GARD:  And, Your Honor, we do believe this is

14  significant or sufficient purpose for us to bring a

15  special action.  So I would ask for a stay.  Although we

16  don't really need a stay, I would ask that we don't do

17  anything for 60 days, but --

18       THE COURT:  Okay.  I'm going to deny the oral

19  motion for a stay.  We have time.  I'm going to be setting

20  forth a briefing schedule.

21       MS. GARD:  Correct.  And the last matter, I would

22  like to offer Exhibit 168 to lodge it as an offer of

23  proof.

24       THE COURT:  Okay.  Well, 168 will be considered

25  as an offer of proof then by the State.  Okay?

1          MS. GARD:  Okay.

2          THE COURT:  It's not formally admitted into

3     evidence for the purpose of this hearing, but it will be

4     part of -- I guess if they file a special action, then

5     we'll have it.  I guess technically, we would have it as a

6     -- well, I'll have it admitted as an offer of proof only.

7          MR. ARNTSEN:  Okay.  Yes, because there were a

8     number of them.

9          THE COURT:  Right, because I believe there were a

10    number of things that we allowed for an offer of proof.

11    So 168 is not admitted for the purposes of this

12    evidentiary hearing, but only for the purpose of an offer

13    of proof.

14          MS. GARD:  Thank you, Judge.

15          MR. HAZARD:  In that case, the State rests,

16    Your Honor.

17          THE COURT:  Okay.  Anything further from the

18    Petitioner?

19          MR. NICKELS:  No, Your Honor.

20          THE COURT:  Counsel, with regard to exhibits that

21    were marked for identification but have not been admitted,

22    I think the clerk is going to be going over all the

23    exhibits and whatnot on Tuesday.  And so she will be

24    looking at all of that and I guess you can make contact

25    with her about any release of any exhibits not admitted

122

1  into evidence.  Okay?

2          But she won't be doing all of that until Tuesday;

3  is that correct?

4          THE CLERK:  I'm going to begin on Tuesday.  I

5  have my own court on Monday or Tuesday morning.  So it

6  will be Tuesday afternoon, I'll start.

7          MR. ARNTSEN:  There's no particular rush.  I'm

8  assuming Attorney Bennett will handle that; right?

9          MR. BENNETT:  Yes, Your Honor.  Just a point of

10  clarification, Your Honor.  I believe we discussed this

11  earlier, but I just want to make sure we're all on the

12  same page.

13          So our understanding is exhibits that were

14  admitted are part of the record.  Exhibits that were

15  offered, but not admitted, will also become part of the

16  record.  Exhibits that were never offered will simply be

17  returned.  Is that correct?

18          THE COURT:  Right.

19          THE CLERK:  Correct.

20          MR. BENNETT:  Okay.  Thank you.

21          THE COURT:  Any disagreement about that?

22          MS. GARD:  No, Judge.

23          MR. ARNTSEN:  No.

24          THE COURT:  Then, for the record, I did discuss

25  informally with counsel a briefing schedule with the

1  understanding and the anticipation that the transcripts of

2  these proceedings will be available to counsel by

3  April 14, 2014.  And counsel were able to speak informally

4  with the court reporter here that is taking down these

5  proceedings the past two weeks.

6       It was my understanding that counsel have

7  basically agreed to a briefing schedule where in about

8  60 days, when the transcripts are made available to

9  counsel, that the Petitioner will have about 40 days to

10 file an opening closing argument.

11      The State will have another 40 days to file their

12 written closing argument.

13      And then the Petitioner will have an additional

14 20 days to file a concluding written closing argument.

15      Is that correct?  Is that my understanding?

16      MR. ARNTSEN:  Yes, Your Honor.

17      THE COURT:  And if that's the case, I did some

18 calculations.  So what I'm going to do, then, with the

19 anticipation that the transcripts will be available to

20 counsel by April 14, 2014, for right now, I'm going to

21 order giving the Petitioner up to and including May 26,

22 2014, in which to file her initial written closing

23 arguments.

24      I'm going to order giving the State up to and

25 including July 7, 2014, in which to file written closing

P-App. 001970

1   arguments.

2          Then I'm going to order giving the Petitioner up

3   to and including July 28, 2014, in which to file her

4   concluding written closing arguments.

5          So May 26, 2014.  July 28, 2014.  And I'm sorry.

6   May 26, 2014.  July 7, 2014.  And July 28, 2014.

7          And based upon everything that has been presented

8   to the Court, the Court does find extraordinary

9   circumstances exist due to, among other things, the volume

10  of the evidence, the complexity of the issues and the

11  briefing schedule, and, therefore, additional time will be

12  required for the Court's consideration and ruling beyond

13  the time set forth by Rule 32.8 (d) of the Arizona Rules

14  of Criminal Procedure.

15         So upon receipt of the Petitioner's concluding

16  written closing arguments, the Court will take the matter

17  under advisement at that time.  But the rule talks about

18  within X-amount of days.  I'm going to be very careful.

19  I'm going to keep an open mind and I'm going to do my very

20  best to get the ruling out as soon as possible.  Okay?

21         MR. ARNTSEN:  Understood.

22         THE COURT:  Okay.  Then I do want to put on the

23  record, I do -- and I've informed counsel of this.  I

24  commend counsel, all of you, for your professionalism

25  during these proceedings these past two weeks and the

1    professional courtesy that you've shown my staff.

2           I also want to thank the sheriff's office for the

3    transportation and all the issues that we had with regard

4    to making sure that we got started on time with

5    Ms. Andriano here.

6           So I do thank everyone for their professionalism.

7           And then I'm going to order that the Maricopa

8    County Sheriff's Office or any county sheriff's office

9    within the State of Arizona return Petitioner Wendi

10   Elizabeth Andriano to the custody of the Arizona

11   Department of Corrections.  If it can be done on this

12   date, it should be done on this date, but as soon as

13   possible.  Okay?

14          MR. ARNTSEN:  Thank you, Your Honor.

15          THE COURT:  Let me just pause here to make sure

16   we've covered everything.

17          Okay.  Anything further from counsel?

18          MR. ARNTSEN:  Nothing further, Your Honor.

19          MS. GARD:  No, Your Honor.

20          THE COURT:  Okay.  Counsel from out-of-state,

21   have a safe trip back.

22          And, again, I do thank you all.  Thank you.

23   We'll be in recess.

24          (WHEREUPON, the proceedings were concluded at

25   3:42 p.m. )

```
 1                    * * * * * * *

 2

 3

 4

 5                  C E R T I F I C A T E

 6

 7

 8        I, RENÉE A. MOBLEY, RPR, a Certified Reporter in

 9   the State of Arizona, do hereby certify that the foregoing

10   125 pages constitute a full, true, and accurate transcript

11   of the proceedings had in the foregoing matter, all done

12   to the best of my skill and ability.

13        SIGNED and dated this 28th day of February, 2014.

14

15

16                   /s/  Renée A. Mobley, RPR

17                   RENÉE A. MOBLEY, RPR

18                   Certified Reporter

19                   Certificate No. 50500

20

21

22

23

24

25
```

1
2
3
4
5
6          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
7             IN AND FOR THE COUNTY OF MARICOPA
8
STATE OF ARIZONA,                    )   No. CR2000-096032-A
9                                     )
          Plaintiff,                  )
10                                    )   **DECLARATION OF**
vs.                                   )   **LARRY A. HAMMOND**
11                                    )
WENDI ELIZABETH ANDRIANO,             )   (Assigned to the Hon. Presiding
12                                    )   Criminal Judge, Douglas Rayes)
          Defendant.                  )
13  ─────────────────────────────────)
14

15          1.     My name is Larry A. Hammond.  I am a member of the law firm of
16
17  Osborn Maledon, P.A.  I am a member of the Bars of the States of Arizona (1975) and
18  California (1971; inactive).  I am a graduate of the University Of Texas School Of Law
19  (1970).
20          2.     I was asked to review materials in connection with the post-conviction
21
22  proceeding in *State of Arizona v. Wendi Elizabeth Andriano*, Case No. CR2000-096032-
23  A, and provide this Declaration in connection with Wendi Andriano's ("Petitioner")
24  Petition for Post-Conviction Relief.
25          3.     I was retained in August, 2009 to serve as an expert on the issues relating
26
27  to  the  constitutionally  ineffective  assistance  of  Petitioner's  trial  counsel.    This
28  engagement was confirmed in an agreement executed in September, 2009.  I am being

compensated at the rate of $250.00 per hour.  My current hourly rate for criminal defense-related work at Osborn Maledon is $550 per hour.  My background is briefly summarized below. A copy of my CV is attached.

4.      After graduation, I served as a law clerk to the Honorable Carl McGowan on the United States Court of Appeals for the D.C. Circuit in 1970-71.  I then served as the last law clerk for Justice Hugo L. Black and the first law clerk for Justice Lewis F. Powell in 1971 through 1973.  In 1973 and 1974, I served as an Assistant Watergate Special Prosecutor.  In 1974, I began practicing in Arizona.

5.      During the Administration of President Jimmy Carter, I served as First Deputy Assistant Attorney General in the Office of Legal Counsel (OLC) at the Department of Justice (1977-1980).

6.      Both as a Supreme Court law clerk and as a Deputy at OLC I undertook responsibilities with respect to death penalty-related matters.

7.      In 1981, I rejoined my law firm (Osborn Maledon) in Phoenix, Arizona. From 1981 to the present I have been engaged in the practice of law primarily on the criminal defense side.  Throughout that time our law firm has been engaged in death penalty work, including direct representation and policy-related work in that field.

8.      I have been a practicing lawyer for 41 years.  I have been engaged in civil litigation and criminal defense work continuously for the last 30 years.  From 1981 to the present, I have spent at least some portion of my time every year on capital cases. The law firm of Osborn Maledon and its predecessor firm and I have been involved in capital litigation at every stage, including trial, sentencing, direct appeal, post-conviction

2

review, federal habeas corpus and clemency.  The very substantial majority of that work has been in cases involving Arizona defendants and Arizona State prosecutions.

9.    I have tried to verdict two Arizona capital cases and recently concluded a six-month involvement in a case in Yavapai County that began as a capital case but in which the prosecution elected to remove the death penalty as a possible penalty at the end of a one-month jury selection voir dire.  I have also served as trial court counsel in eight federal death penalty cases, two in New Mexico, one in Nevada, four in the District of Arizona, and one on the District of Southern California.  In each case I was appointed as lead counsel to satisfy 18 U.S.C. §3005's requirement that each defendant be assigned two attorneys, one of whom is deemed to be "learned in the law applicable to capital cases."

10.   Within the last 15 years, this law firm has served as co-counsel under *Knapp v. Hardy* in connection with two capital cases assigned to the Office of the Maricopa County Legal Defender (OLD), *State v. Pape* and *State v. Pilipow.*  I served as co-counsel in each case with a member of OLD.

11.   Since 1998, I have served as lead counsel in the federal capital habeas corpus proceeding arising from an Arizona capital conviction (*Atwood v. Stewart,* Case No. CIV96-116 TUC JCC).  That case has recently returned to Federal Court after a stay and abeyance to allow proceedings on a Petition for Post-Conviction Relief (PCR) in the Pima County Superior Court.

12.   In approximately 1989, I participated in the founding of the Arizona Capital Representation Project and I have served as a Board member and/or officer of

3

1    that organization since its inception.   The Capital Representation Project has been

2    involved, at one stage or another, in assisting virtually every member of Arizona's death

3    row population.   Congress defunded all capital resource centers in 1996, but since that

4    time the Project's activities have continued and the Project remains a resource in all

5    phases of capital litigation – particularly at the PCR stage.

6

7        13.    In approximately 1994, I was asked to serve as the Chair of the Arizona

8    State Bar's Indigent Defense Task Force (IDTF) and I have continued in that position

9    since that time.   The IDTF has been engaged in the development of rules promulgated

10   by the Arizona Supreme Court dealing with capital defense funding and indigent defense

11   funding generally.   The IDTF has also been involved in developing and testifying in

12   support of, or in opposition to, legislative proposals dealing with the funding of capital

13   defense in Arizona.   The Task Force participated in the development of legislation

14   creating the standards for the appointment of counsel and for the funding of

15   representation at the state post-conviction stage in capital cases.   Among the most

16   important undertakings of this Task Force has been the successful effort to secure an

17   amendment to Rule 6.8 of the Arizona Rules of Criminal Procedure to require lawyers in

18   capital cases to be guided by the ABA Guidelines for the Appointment and Performance

19   of Defense Counsel in Death Penalty Cases.

20       14.    For several years I also served on the Arizona Supreme Court's Committee

21   for the Appointment of Counsel to represent death row inmates at the State post-

22   conviction relief stage.   The Committee was chaired by the Honorable Justice Michael

23   Ryan.   In the formative months of the work of that Committee, I participated in the

24

25

26

27

28

4

drafting, review and ultimate establishment of the rules governing the appointment of counsel under A.R.S. §13-4041 and Rule 6.8 of the Arizona Rules of Criminal Procedure.   This Committee was later disbanded and its mission never achieved, although the Committee did review the qualifications and conducted interviews of numerous applicants.

15.   I have co-authored several articles that have appeared in the *Arizona Attorney Magazine* relating to the funding of capital defense, and I have spoken and participated in numerous seminars and programs on this subject.  As an adjunct member of the ASU Law School faculty, I team-taught the Death Penalty course in the spring of 2002.  During the 2003-04 and 2006-07 school years, I team-taught along with Professor Robert Bartels a 4-hour credit seminar at ASU on the causes of wrongful convictions in Arizona and nationally.   Included in the curriculum was the study of ineffective assistance of defense counsel.  In the fall of 2008, I taught a course entitled "Criminal Justice Failures and Reforms" at Elon University School of Law in Greensboro, North Carolina.  A significant element of this course was the history of the law and practical realities of systems of indigent defense in capital cases.

16.   For the last 14 years I have served as the Chair of The Justice Project of Arizona Attorneys for Criminal Justice, and in that capacity I have been involved in the evaluation of hundreds of cases alleging ineffective assistance of counsel at trial and sentencing in non-capital cases.  One of the Justice Project's cases, *Martinez v. State,* Case No. 2:08-cv-00785-JAT is pending in the United States Supreme Court and

5

addresses the question of the entitlement to constitutionally effective counsel at the initial PCR stage.

17.    The law firm of Osborn Maledon has served as co-counsel in cases addressing the funding of indigent defense—both capital and non-capital.  I argued on behalf of Mr. Zarabia in a case styled *Zarabia v. Bradshaw,* 185 Ariz. 1, 912 P.2d 5 (1996) in which the Arizona Supreme Court addressed the standards for indigent defense in criminal cases in Yuma County.  We also represented Richard Rivas in connection with the indigent defense funding issues raised in *State v. Rivas*–a case in Maricopa County presided over by the Honorable Judge Fields, in which court appointed counsel, Mr. Mike Terribile, successfully challenged the contract system for compensation of indigent defense counsel in capital cases in Maricopa County.  In 2007 and 2008, Osborn Maledon represented the Mohave County Public Defender's Office in the successful challenge to the indigent defense funding system in that County.  *Arizona v. Lopez,* No. 2007-1544 (Mohave County Superior Court, filed Dec. 17, 2007).

18.    I testified in October, 2002 as an expert witness on ineffective assistance of counsel in a post-conviction relief proceeding in *Lacy v. Arizona*, Case No. CR1995-000713.  In that case, the Maricopa County Superior Court reversed a homicide and assault conviction based in part on ineffective assistance of defense counsel.  I have also testified and served as an expert in the post-conviction proceedings in *Arizona v. Kayer,* CR 94-0694, in the Superior Court of Yavapai County, and as an expert in the post-conviction proceeding in *Arizona v. Murdaugh,* Case No. CR 1995-006472 in the Superior Court of Maricopa County.  In December, 2010, I testified as an expert witness

6

1   in a post-conviction proceeding in Connecticut State Court, in *State v. Wargo*, 53

2   Conn.App. 747, 731 A.2d 768 (1999).

3        19.    During the last several years my involvement in matters related to the

4   death penalty has increased.  I will briefly summarize here those activities that helped

5   inform my opinions with respect to Ms. Andriano's case.  Most relevant is my very

6   recent involvement as co-counsel on behalf of an indigent defendant in Yavapai County

7   Superior Court in *State v. DeMocker*, Case No.P1300CR20081339.  In this case, our

8   defense team endeavored to conform our trial preparation to the ABA Guidelines.  My

9   opinions are informed as well by my continued involvement in efforts in Maricopa

10  County, in this State, and elsewhere.  We have assisted  defense counsel in their efforts

11  to comply with the ABA Guidelines in the course of decision making in their capital

12  cases.  Much of this counsel and advice has been undertaken on an informal basis in

13  conjunction with other experienced capital defense counsel who had volunteered their

14  time and services to the State Bar Indigent Defense Task Force.  We have had the

15  opportunity to meet with and to work with members of all three of the Maricopa County

16  public defender offices as well as with lawyers appointed by the Office of Public

17  Defense Services (ODPS).

18       20.    Finally, my opinions as they relate to this case have been colored by my

19  involvement as a member of the team that represented Timothy Ring in both the United

20  States Supreme Court case, *Ring v. Arizona*, 536 U.S. 584 (2002), and in the subsequent

21  Arizona Supreme Court proceedings that focused on the application of Sixth

7

Amendment jury fact-finding at the aggravation phase of capital trials. *Arizona v. Ring*, 204 Ariz. 534, 65 P.3d 915 (2003).

21.     I have reviewed the following materials in connection with my engagement in Ms. Andriano's post-conviction proceeding:

(a) Trial transcripts

(b) Openings/closings statements at the trial and sentencing phases

(c) Jury instructions

(d) Declarations:

i. Dan Patterson

ii. David DeLozier

iii. Scott MacLeod

iv. Donna Ochoa

v. Alejo Ochoa

vi. Brandon Ochoa

vii. Gia Palicki

viii. Shelby Robinson

ix. Sharon Murphy

x. Kyre Martinez (through Alexis Bootby)

xi. Shawn King

xii. Kimberly Ethington

(e) Expert reports:

i. Kandy Rohde (March 2001)

8

ii. George Woods, Jr./ M.D.

iii. James Hopper, PhD.

iv. Myla Young, PhD.

(f) Jail visitation records

(g) Jail medical records

(h) Initial assessment at jail

22.    In addition to the review of these and other materials, I have also conferred with an experienced expert in mitigation development, Keith Rohman.  For reasons stated below, I have found his observations helpful to the formation of my opinions in this post-conviction proceeding.  I have also met with the Petitioner, Wendi Andriano, and I have read her declaration.

**Opinions**

23.    It is my opinion that Petitioner received constitutionally ineffective assistance of counsel at both the trial and sentencing phases of her case.  Fundamental to the defense of any capital case is the formation of the team that will assume responsibility for the case.  At a minimum, that team should have been composed of two experienced capital defense lawyers, an investigator, a trained mitigation specialist, and such mental health or mental state consultants as the case plainly required.  That team should have met regularly and frequently and the members should have been in communication as the case proceeded toward trial.  This did not occur in this case.  The

9

1    lack of a properly functioning team, in my opinion, contributed to the ineffectiveness of

2    counsel at both the guilt/innocence stage and the aggravation/mitigation phases of the

3

4    case.

5 GUILT/INNOCENCE PHASE

6        24.     The declarations provided by Dan Patterson and David DeLozier describe

7    in general terms the relationship between the two attorneys who represented Wendi

8

9    Andriano at trial of this matter. Mr. DeLozier had no death penalty trial experience. He

10    was retained and compensated on what turned out to be a very limited basis by Ms.

11    Andriano's family. He served as *Knapp* counsel sharing the representation with the

12    Office of Public Defender and Dan Patterson. Although Mr. Patterson recalls he

13

14    assigned Mr. DeLozier to the penalty phase of the case, Mr. DeLozier also recalls that he

15    had been given no specific responsibility for any phase of the case. Yet, he presented

16    the opening statement at the guilt/innocence phase.

17        25.     From the outset of the trial, the defense suffered from the absence of a

18

19    coordinated explanation for the circumstances surrounding the death of Joe Andriano.

20    Variously, the defense argued that his death was the culmination of an assisted suicide,

21    or that Ms. Andriano acted in self-defense, or that she was the victim of domestic

22    violence who responded to years of abuse. The defense failed to develop evidence that

23

24    Ms. Andriano suffered from mental impairments that should have been relevant to the

25    jury's decision that she formed the requisite mental state essential to support a

26    conviction in this case.

27

28

10

26.     The lack of a coordinated defense became more evident at the sentencing stage of the case. I will address the mitigation case later in this Declaration, but the failure of the defense to present a consistent set of themes throughout the trial is apparent and may have had its greatest impact after the jury had already found Ms. Andriano guilty.

27.     According to Mr. DeLozier, a motivating factor for his acceptance of the representation of Ms. Andriano was the common religious or spiritual bond between himself and Ms. Andriano. Although Mr. DeLozier saw the defendant frequently before trial, his visitations with her focused primarily on these religious connections rather than on development of the relevant factual background leading up to Joe Andriano's death or on the defendant's life history. As a consequence, neither the factual record nor the life history of the defendant were properly explored or understood.

28.     The lack of proper trial preparation was compounded by Mr. DeLozier's decision to fast during the trial. It is reported that he decided to fast as a demonstration of his spiritual solidarity with the defendant. He may have failed fully to anticipate the length of the trial or that a lengthy death penalty trial would so significantly sap his stamina, but his breakdown in the second month of the trial should have been foreseen. No one attempting to provide competent representation in a lengthy capital trial should have failed to appreciate the disadvantage this set of events presented for the defendant.

29.     It is quite clear from the transcripts of the trial that the defense team had also failed to appreciate and develop evidence with respect to Ms. Andriano's history of abuse or her mental-health history. Much of that history was known to Ms. Andriano's

11

mother, Donna Ochoa, and to her step-father, Alejo Ochoa, yet neither was interviewed in any meaningful way by Mr. DeLozier.  His failure to thoroughly investigate his client's troubled background may have been due in part to a conflict of interest and divided loyalty arising from the fact that he was retained and paid by Ms. Andriano's parents and by his simultaneous representation of the parents in custody proceedings involving Ms. Andriano's children.  This failure of investigation infected both the guilt/innocence and the mitigation/sentencing phases of the trial.

30.    The prosecution at trial was successful in creating the image of Ms. Andriano as a woman of low moral character and as a person quite capable of planning and carrying out a coldly calculated murder.  It is difficult to imagine a more negative portrayal of a capital defendant's self-indulgent motivations.   That portrayal went largely unaddressed by the defense at trial.

31.    Defense counsel's failure to investigate and develop at trial the full story of Ms. Andriano's mental condition and history may also explain to some extent the failure of the defense to request a jury instruction on lesser included offenses.  Even without more evidence than was already in the record at the end of the trial, however, there was ample evidence to support such an instruction.  I can conceive of no adequate tactical or strategic ground for failing to seek a lesser included offense instruction.  To whatever extent the decision to forego an instruction might have been the result of defense counsel's perception of the client's wishes; this would not be an adequate basis for foregoing an instruction that could have avoided the death penalty.

12

32.     The prosecutor throughout the trial—from opening statement through the end of the mitigation/sentencing stage—engaged in misconduct.  He mischaracterized the record; he argued inferences that had no support in the record; he sought to inflame the jury with arguments about Ms. Andriano's alleged sexual promiscuity; he attacked the motives and integrity of witnesses called by the defense without any evident basis; and he did so without meaningful objection from the defense.  An important core function of defense counsel in the adversary system is to respond and oppose the excesses of the prosecution.  That function was not performed in this case.

## MITIGATION/SENTENCING PHASE

33.     The jury in this case found unanimously in favor of the death penalty based upon finding a single aggravating circumstance.  Neither the jury nor the Arizona Supreme Court found that any substantial mitigation was presented by the defense. It is apparent that this failure may have been in large part attributable to the absence of a qualified and trained mitigation specialist.  As Scott MacLeod (the defense mitigation team member) explained, he had no particular training or expertise in capital cases.  His background was as a probation officer, and he approached his work in this case in much the same way he did in performing mitigation work on other felony cases.

34.     Mr. MacLeod joined the team less than six months before trial.  By that time—despite the passage of more than three years since the death of Joe Andriano—virtually no mitigation work appears to have been undertaken.  Mr. MacLeod did little in the few months before or during trial to undertake a proper mitigation investigation.  Indeed, it appears from the declaration of MacLeod and from the emails in the file that

13

MacLeod may have attended his first substantive mitigation training program during the trial. By that time, the damage that flowed from the absence of a competent defense team had already been done. In particular, he was unequipped to explore or develop any mental and psychological disorders or impairments that might have helped the jury better understand the defendant's conduct and state of mind.

35.     Primary responsibility for assuring that the defense team was properly formed and that it had the requisite expertise belonged to lead counsel. Neither defense counsel made up for the absence of training and performance by the mitigation specialist. Mr. DeLozier, according to his declaration, did not perceive his role as involving any particular focus on the development of the mitigation, although Mr. Paterson seems to recall that he assigned the mitigation case to Mr. DeLozier. As a consequence, no one assumed responsibility for this phase of the case at an early stage.

36.     There is no doubt that even with the very limited knowledge that the defense had accumulated there were ample signs that should have compelled a thorough investigation of the defendant's history, including her psychological and mental state. Very early in the post-indictment stage of this case, the defense was presented with strong indications that the defendant might suffer from serious psychological disorders. The record contains reports and communications from a number of professionals who expressed serious concerns about Ms. Andriano's mental state, including Certified Professional Counselor H. Kandy Rohde, Dr. Jack Potts and Dr. Richard Rosengard. The records from the Maricopa County Jail further reveal the existence of obvious mental state issues that should have been "red flags" to the team members, but it appears that

14

1   records were not even requested until well after the guilty verdict and during the penalty

2   phase, and that even then Ms. Andriano's extensive jail medical records were not

3   obtained or considered.

4   

5       37.    Although Ms. Andriano appears to have been evaluated at an early point

6   during her pretrial incarceration by Dr. Rosengard, there is no indication that he or

7   anyone else undertook a thorough evaluation.   Dr. Sharon Murphy was retained and

8   called as a witness on battered woman's syndrome, and while she did not undertake a

9   thorough evaluation, there are numerous indications in her assessment to suggest the

10  importance of a more thorough investigation of Ms. Andriano's history.  Her declaration

11  reveals that she saw evidence of possible childhood sexual abuse and trauma, but she did

12  not explore these areas.   Therefore, despite these indications and despite the fact that Dr.

13  Murphy's concerns were mentioned to Dan Patterson, no appropriate evaluation was

14  undertaken.

15  

16      38.    I have seen the neuropsychological evaluation performed by Myla H.

17  Young, PhD, which reveals that Ms. Andriano suffers from a cognitive disorder—a

18  disorder never identified or pursued by the defense team.  I have also reviewed the

19  extensive report prepared by James Hopper, PhD, which traces Ms. Andriano's history

20  of physical and psychologically trauma spread throughout Ms. Andriano's history from

21  childhood through age 18.   This social history reveals a long exposure to sexual,

22  psychological, and emotional abuse at the hands of her adoptive father, coupled with

23  disturbing evidence of possible abuse by her biological father—a man never contacted at

24  any stage of the pretrial mitigation investigation.

25  

26  

27  

28  

15

39.     I have also reviewed the report of Dr. George Woods and have considered his clinical findings, which include Bipolar Disorder, Post-Traumatic Stress Disorder (PTSD), Dependent Personality Disorder, Cognitive Disorder (as found by the neuropsychological findings), and caregiver burden.  As Dr. Woods points out, neither in the trial nor sentencing phases of this case was the jury provided with anything approaching an accurate picture of Ms. Andriano's mental illnesses, and what was presented was grossly misrepresented.

40.     As the Arizona Supreme Court observed, the scant evidence offered by the defense in mitigation presented only isolated and unconfirmed suggestions of childhood abuse that the Court deemed to be "remote in time to the offense and thus their relevance is minimal." *Arizona v. Andriano*, 215 Ariz. 497, ¶ 72, 161 P.3d 540 (July 9, 2007). Mitigation evidence presented in the fashion revealed by the testimony in this case could easily have not only failed to persuade the jurors, but could have done more harm than good.

41.     It is my opinion that the evaluations conducted by Young, Hopper and Woods (a) were appropriate parts of any proper mitigation investigation, (b) that there is no legitimate reason evident in the record that would explain why this investigation did not occur prior to trial, (c) had this investigation been conducted and considered by the defense team, both the trial and the sentencing phases of this case would have proceeded in markedly different ways, and (d) that the substantial mitigation gleaned from these evaluations would have provided a powerful response to the single aggravating factor found by the jury in this case.

16

42.     The defense's failure to investigate and develop evidence regarding Ms. Andriano's mental health history affected both the aggravation and mitigation phases of the case. The State successfully persuaded the jury that the evidence supported beyond a reasonable doubt the "cruelty" prong of the (f)(6) aggravator. A central element of this particular aggravating circumstance, however, is that the defendant knew or had reason to know that her conduct would cause the victim to experience extraordinary pain and anguish before death. The evidence now available—all of which could have been known and developed before trial—calls into question whether Ms. Andriano could have formed the mental state necessary to support a jury finding that she acted in an "especially cruel" manner.

43.     I have considered the question whether there is any explanation that would account for the failure of the defense team to properly address and develop the mitigation case. One might suggest that the Andriano case development was hobbled by the change in the law occasioned by *Ring*. The argument might be made that prior to June, 2002 when *Ring* was decided, defense counsel in Arizona capital cases could anticipate that substantial time would be afforded by the sentencing court to conduct a mitigation investigation after the trial and before the sentencing hearing. This would not have been appropriate practice even in the pre-2002 world in Arizona, but it certainly does not explain the absence of a significant mitigation investigation in this case. The death of Joe Andriano occurred in October, 2000, and both Patterson and DeLozier were in place as defense counsel long before trial. The trial did not begin for more than two full years after *Ring*. Most States and the federal system had been accustomed to jury

17

fact-finding and there was no shortage of training programs available to defense lawyers, mitigation specialists and mental health experts. The timing of the *Ring* decision in no way explains or justifies the lack of preparation of the mitigation case.

44.    The argument might also be made that the ABA Guidelines were promulgated in 2003—only one year before the Andriano trial. The Guidelines, however, as many courts have since held, constituted a compilation of then existing standards. The Guidelines were an expression of the basic requirements of reasonable practice by defense counsel, and were not new or unknown to competent defense counsel in this State.

45.    An additional argument voiced in some post-conviction capital proceedings is that funds were not available to conduct a proper mitigation investigation. I have seen no evidence in the files of this case that money in any way restricted the ability of the defense team to do its job. At some point it appears that Mr. DeLozier was no long being paid, but there is no indication that his decision making prior to trial was affected by this, and the ultimate responsibility for the identification and selection of experts and consultants rested with the Public Defender in any event, and there is no indication that Dan Patterson was prevented from retaining such consultants as he deemed appropriate.

46.    Finally, there is no indication here that the defense team lacked sufficient time to conduct a proper pretrial mitigation investigation. Nothing I have seen in the record of this case would suggest that the defense team was hampered by time constraints. I am aware that Mr. Patterson was engaged for a portion of this pretrial time

18

in defending another substantial capital case, but nothing in the record suggests that his engagement in another trial caused the remainder of the team to cease work.  Indeed, it appears that Scott MacLeod was not even assigned to the mitigation role in the case until April, 2004, and that virtually no meaningful mitigation work had been done by the Public Defender's Office before his appointment.

47.     Given all of these considerations, it is my opinion that Wendi Andriano was denied the effective assistance of defense counsel and that the lack of the representation to which she was constitutionally entitled was prejudicial.  Even in the absence of specific evidence of the prejudiciality of counsel's failings in this case, I would conclude that the total lack of a coordinated defense established before trial and maintained throughout the guilt/innocence and sentencing/mitigation phases of the case was tantamount to having no counsel at all in the context of this death penalty case.

I declare the foregoing under penalty of perjury under the laws of the State of Arizona and the United States of America that it is true and correct.

DATED this 16th day of February, 2012.

Larry A. Hammond

3904659v1

19



## Larry A. Hammond

Phone: (602) 640-9361  |  Email: lhammond@omlaw.com

Larry has spent over 30 years practicing in the private sector, but regards his two tours with the Department of Justice as among his most satisfying professional experiences. He served as an Assistant Watergate Special Prosecutor in 1973-1974 and then returned to Justice during the Carter Administration where he worked in the Office of Legal Counsel as the First Deputy Assistant Attorney General under both Attorneys General Griffin Bell and Ben Civiletti.

### Education

- J.D., University of Texas, 1970; *Texas Law Review*, Editor-in-Chief, 1969-1970; Order of the Coif
- B.A., University of Texas, 1967

### Bar Admissions

- Arizona, 1975
- California, 1971

### Court Admissions

- U.S. Court of Appeals, Tenth Circuit, 2004
- U.S. Court of Appeals, Ninth Circuit, 1984
- U.S. Court of Appeals, Sixth Circuit, 1984
- U.S. Supreme Court, 1977
- Arizona Supreme Court, 1975
- California Supreme Court, 1971

### Clerkships

- U.S. Supreme Court, Justice Lewis F. Powell, Jr., 1971 - 1973
- U.S. Supreme Court, Justice Hugo L. Black, 1971
- U.S. Court of Appeals, District of Columbia Circuit, Judge Carl McGowan, 1970 - 1971

### Practice Areas

- Commercial Litigation
- Criminal Defense
- Internal and Governmental Investigations

### Representative Matters

- *State ex rel. Napolitano v. Gravano*, 204 Ariz. 106, 60 P.3d 246 (App. 2002)

### Awards & Recognition

- 23 Osborn Maledon, P.A. Lawyers Named 'Best' in National Publication
  Twenty-three of the 51 attorneys in the Phoenix law firm of Osborn Maledon, P.A. have been singled out for national recognition in the new 2012 edition of Best Lawyers®, the oldest peer-review publication in the legal profession.
- Osborn Maledon, P.A. Attorneys Named to *Super Lawyers* List
  Fourteen of the 49 attorneys at Osborn Maledon, P.A., a Phoenix law firm, have been named to the *Southwest Super Lawyers 2011* list.
- Osborn Maledon, P.A. Practice Groups and Attorneys Ranked as Tops in Chambers Guide
  Three practice areas in the Phoenix law firm of Osborn Maledon, P.A. received the highest possible ranking among Arizona law firms for the seventh year in a row in the 2011 ranking by the prestigious legal resource guide, Chambers USA.

2929 North Central Avenue
Twenty-First Floor
Phoenix, AZ 85012-2793



*Order of the Samaritan for Public Service and Criminal Justice*, University of Alabama School of Law, March 2011

*The International Who's Who of Business Crime Defense Lawyers*, 2011

Morris Dees Justice Award, 2010

Larry Hammond Endowed Criminal Law Scholarship at the James R. Rogers College of Law at the University of Arizona, established in 2008

Justice Award, The American Judicature Society, 2008

John Flynn Award, Arizona Attorneys for Criminal Justice, 2008

Maricopa County Hall of Fame, 2008

Distinguished Honorary Alumnus Award, University of Arizona Law School, May, 2004

Judge Learned Hand Award for Community Service, Arizona Chapter of American Jewish Committee, March, 2003

Arizona State Bar Foundation Walter E. Craig Award for Career Service, 2001

President's Commendation, Arizona Attorneys for Criminal Justice, January, 1997 and 1999

Civil Libertarian of the Year, Arizona Civil Liberties Union, 1993, 2000

Pro Bono Service Award, State Bar of Arizona, 1991

Exceptional Service Award, U.S. Justice Department, 1980

Federal Younger Lawyer of the Year, 1980

Chambers USA, *America's Leading Lawyers for Business*, Litigation: White-Collar Crime & Government Investigations, 2004-2011

*The Best Lawyers in America®*, Appellate Law, Bet-the-Company Litigation, Commercial Litigation, White-Collar Criminal Defense, editions 1995-2012

Best of the Bar, *Business Journal*, Pro Bono, 2005

*Southwest Super Lawyers*, Top 50 Arizona Attorneys, 2007-2010

*Southwest Super Lawyers*, Criminal Defense: White Collar, 2007-2011

*Arizona's Finest Lawyers*

## Professional Activities

American Judicature Society, President and member of Executive Committee, 2003-2005, Board of Directors, 1995-2007, Criminal Justice Reform Committee, Chair 1992-present

Arizona Attorneys for Criminal Justice, Justice Project Chair, 1998-present

American Bar Association, Biological Evidence Task Force, 2003-2005

American Bar Association, Task Force on War Crimes in the Former Yugoslavia, 1993-1995

Arizona Capital Representation Project, of Directors, 1988-present, Vice President, 1988-present

© Copyright Osborn Maledon, P.A. All Rights Reserved



Arizona State Bar Association, Indigent Defense Task Force, 1995-present

Human Rights First, Lawyer Steering Committee (formerly known as the Lawyers' Committee for Human Rights)

Elon University College of Law (Visiting Professor; Advanced Criminal Procedure) 2008

Sandra Day O'Connor College of Law at Arizona State University (Adjunct Professor of Law:   Advanced Criminal Procedure, Death Penalty, Presidential Powers,  Advanced Civil Discovery, and Ethics)

University of Arizona College of Law (Adjunct Professor of Law:  Presidential Powers), 1995

Arizona State University Undergraduate School (Guest Faculty Member:  Death Penalty, Practicum re: The Justice Project)

Birmingham City University, School of Law, United Kingdom, (Visiting Professor; Center for American Legal Studies)

St. John's College, Santa Fe, New Mexico (Tutor:  Seventeenth Century Literature - 1983)

University of New Mexico School of Law (Trial Practice - 1983)

## Publications

- Innocent Until Interrogated
  Law Journal for Social Justice, May 2, 2011
- John Sears, John J. Flynn Lifetime Achievement Award 2011
  The Defender, April 21, 2011
- Why Should You Oppose the Death Penalty?
  The Arizona Republic, April 15, 2011
- Opinion: What Did Jeffrey Landrigan's Execution Teach Us About Respect?
  Maricopa Lawyer, November 6, 2010
- Protecting Moscow from the Soviets – Book Review
  Experience, 2009
- Napolitano will Defend State Death Penalty Law before Supreme Court
  The Arizona Republic, April 21, 2002

Opinion, *Ariz. case to test rights of convicted in Supreme Court*, The Arizona Republic, October 4, 2011

Viewpoint, *The failure of forensic science reform in Arizona*, Judicature, May-June 2010

*Sotomayor is Newest Face in a Long Line of Heroes*, The Arizona Republic, August 10, 2009 (author)

Editorial for Judicature, *Setting Forensic Science on a New Path*, March-April 2009 (unsigned editorial co-authored with Dr. Barry Fisher of the Los Angeles County Crime Laboratory)

*Counsel for The Indigent Accused in Death Penalty Cases*, The Defender (Winter 2006), co-author

Presentation:  Speech to the Harris County Bar *The Landscape of Criminal Justice:  Texas and Beyond*, May 21, 2004

Justice Project Editorial, *Why Gideon Mattered to Hugo Black*, The Champion, January/February 2003 (reprinted in The Defender, April 2003)

Editorial, *Justice Project:  5 Year Report*, The Defender, January 2003

Editorial, *Restoring Confidence in the Criminal Justice System*, Judicature, 2002 (unsigned)

*Justice Project:  Status Report and Update*, The Defender, July 2002

© Copyright Osborn Maledon, P.A. All Rights Reserved



*Scrutiny a Must in Criminal Cases*, The Arizona Republic, January 2002 (Co-author)

*Capital Punishment in Arizona and The "New" Death Penalty Debate*, The Defender, June 2001 (Co-author)

*Popular Culture and The Death Penalty*, The Defender, July 2000 (Co-author)

*Aiding the Incarcerated*, Litigation Magazine, Winter 2000 (Co-author)

*Aryan Brother's legacy is safer prison system*, The Arizona Republic, February 6, 2000 (Co-author)

*The Justice Project: Y2 OK!*, The Defender, January 2000 (Co-author)

*Worldwide Concern: We Should Offer Global Support to Those Fighting for Human Rights Anywhere*, Arizona Journal, August 9, 1999 (Co-author)

Editorial on Felony Murder:  *Bad Law Needs Reining in for Sake of Fairness*, Arizona Republic, May 14, 1999

*May God Have Mercy:  A True Story of Crime and Punishment*, Judicature, November-December 1998

*U.S. Has Everything to Gain From an International Criminal Court*, Nov. 9, 1998 Arizona Journal (reprinted in the Colorado Journal, Nevada Journal, and Washington Journal)

*Prisons Lack Commitment to Safety*, Arizona Republic, April 12, 1998 (Co-author)

*Arizona's Crisis in Indigent Capital Representation*, Arizona Attorney, March 1998 (Co-author)

*Observations on the Mock Impeachment Trial of Abraham Lincoln*, 40 Ariz.L.Rev. 351 (1998)

Editorial on Capital Execution:  *Jose Ceja Didn't Deserve to Die*, Arizona Republic, January 25, 1998

*New Rules, on Indigent Representations*, Arizona Attorney, February, 1997 (Co-author)

© Copyright Osborn Maledon, P.A.  All Rights Reserved

**GWW** GEORGE W. WOODS, JR., M.D.
A PROFESSIONAL CORPORATION
DIPLOMATE OF THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY

1-866-646-0509
E-mail:gwoods@georgewoodsmd.com
Oakland Atlanta

Stephan Nickels, Esq.
Foley and Lardner, LLP
Madison, Wisconsin

      Re: Wendi Elizabeth Andriano

Mr. Nickels,

      In accordance with your request to provide the government with a summary and outline of my testimony, I submit the following report. The purpose of this report is to outline my expert opinion regarding whether Ms. Andriano had any mental defects or impairments at the time of the crime and/or throughout her lifetime.

**MATERIALS RELIED UPON**

      The data or other information considered by me in forming opinions in this case are listed in **Appendix A**, attached. The substance of my opinions as expressed in this report can be summarized in a PowerPoint should you desire one as an Exhibit for court proceedings.

      In order to complete my neuropsychiatric examination, I interviewed Wendi on 11/23/2010, 1/18/2011, and 4/26/2011. I also interviewed her mother, Ms. Donna Ochoa, on 4/27/2011. I reviewed Wendi's academic history, employment history, and medical/mental health history.

      In addition, I reviewed Wendi's paternal and maternal family history, including available medical, school, and prison records and declarations from persons who knew Wendi,

1

including Donna Ochoa, Alejo Ochoa, Shelby Wayne Robertson, family members, church members, pastors, classmates from Wendi's elementary and high school years, and persons who knew Wendi as an adult. The social history of Ms. Andriano created as a part of this report is attached as **Appendix B** and incorporated herein. Much of the comprehensive social history information is summarized in the report of James Hopper, Ph.D., which supplements this report as to the matters contained therein.

I reviewed the police investigation, including Wendi's interrogation, trial transcripts and jail and prison records.

A complete list of records reviewed is included in Appendix A.

## QUALIFICATIONS, EXPERT WITNESS EXPERIENCE, AND COMPENSATION RATE IN THIS CASE

My qualifications, publications, and expert witness experience are fully set forth in my Statement of Qualifications and C.V., attached as **Appendix C**. My compensation rate in this case is $350 per hour.

I am a licensed physician specializing in neuropsychiatry. I am in private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations. My business addresses are 4200 Park Boulevard, #545, Oakland, California 94602, and 220 Renaissance Parkway, #1220, Atlanta, Georgia 30308.

My qualifications, background, experience and expert witness experience are set out in full and attached as **Appendix D** and incorporated herein.

I maintain a private clinical practice in neuropsychiatry, psychopharmacology, and psychotherapy in Oakland, California.

2

## SUMMARY OF FINDINGS

In combination with a familial history of mental illness and a multi-generational history of trauma and abuse, while growing up, Wendi was subjected to emotional and physical neglect, sexual abuse, beatings, isolation, extreme poverty, cultish indoctrinations, exploitation, extraordinarily traumatic events, and marginalization. As a result, Wendi developed neurocognitive deficits, environmental impairments, and psychiatric illnesses, including: (1) bipolar disorder; (2) complex posttraumatic stress disorder; (3) dependent personality disorder; (4) cognitive disorder not otherwise specified; and (5) caregiver burden.

These illnesses are co-morbid in Wendi, with their effects and symptoms intensified in combination and in aggregate. The amalgam of Wendi's neurological impairments and psychiatric illnesses, combined with her social, religious, familial and cultural upbringing, resulted in significantly impaired judgment, extremely limited ability to recognize, understand, and appreciate context in the world around her, and a limited and circumscribed ability to respond self-protectively. These deficits were and are most pronounced in times of extreme stress and novel circumstances.

Wendi's mother, biological father, and adoptive father exhibited symptoms of mental illnesses, addictions, and impairments that were severely damaging to Wendi at every developmental stage from infancy to young adult.[1] Mental illness, alcoholism, drug addiction and cognitive impairments are common in varying presentations and combinations within Wendi's family, extended family, and the insular, isolated communities in which she grew up.[2]

---

[1] School records of Alejo Ochoa; Military Records of Shelby Robertson; Mental Health Records of Shelby Robertson; Criminal History and ADOC records of Shelby Robertson; Mental Health Record of Donna Ochoa; Tabs 10, 12, 16, 24, 27, 30, 32, 36.

[2] School records of Alejo Ochoa; Military Records of Shelby Robertson; Mental Health Records of Shelby Robertson; Criminal History and ADOC records of Shelby Robertson; Mental Health Record of

3

P-App. 001999

Family and community members report a range of symptoms and behaviors including psychotic episodes, depression, mania, suicidal tendencies and attempts, delusional disorders, polysubstance abuse, and many others.[3] These symptoms and behaviors impacted the Ochoa family's daily life and basic functioning, compromised caregiving and parenting, continued unchecked due to a lack of education and awareness among their sufferers, and, for Wendi's caregivers, were never ameliorated by medical or psychiatric treatment until after she was incarcerated, and then only to a limited extent, primarily through medication.[4] While Wendi was growing up, these symptoms and behaviors were intensified by long periods of extreme isolation, poverty, and transience.[5]

Wendi's neurological and cognitive impairments that resulted from her multigenerational and transgenerational[6] family history of mental illness, abuse, trauma, and addiction, as well as the psychological, emotional, physical and sexual abuse, and isolation to which Wendi was subjected for her entire childhood. These impairments manifested themselves more severely after Wendi met and married Joe Andriano in a succession of poor choices that ever more deeply embroiled her in a pattern of alternating dependence and self-sacrificing caregiving.

---

Donna Ochoa; Medical and Mental Health Records of Nadine Bednorz, Clark Bednorz, Jr., Kathy Worsham, LaVerne Ann Worsham, Tabs 10-14, 16, 18, 24, 27, 30, 32-35.

[3] Ibid.

[4] Mental Health Record of Donna Ochoa, Tabs 24, 27.

[5] Address History of Donna Ochoa, Social Security Earnings Records of Shelby Robertson, Arizona Social Services Records; Tabs 24, 27, 36, Tab 10 at ¶ 37, Tab 35, at ¶ 6.

[6] As used in this declaration, "multigenerational" means across multiple generations of ancestors and descendants, while "transgenerational" means across multiple individuals of various parentage within the same generation.

4

By reviewing the trial court proceedings,[7] including testimony presented by Wendi and witnesses, I determined that the nature, severity, and ramifications of Wendi's mental illness, of her family's extensive history of mental illness, and the consequences of the extreme trauma, abuse, and neglect that she survived, were not presented to the jury. The evidence, arguments, and inferences that *were* presented to the jury failed to represent Wendi's biopsychosocial history and her mental state prior to and during the time of the offense for which she was sentenced to death. Further, Wendi's mental state after she was arrested and during the time she was incarcerated in the Maricopa County Jail prior to her sentencing was also mischaracterized and misdiagnosed.

This report is divided into two sections: (1) Clinical Findings, Mental Status Examination, and Diagnostic Conclusion for Wendi Elizabeth Andriano and (2) Forensic Analysis and Formulation of How Wendi Andriano's Mental Disorders Impacted her Behavior in Relation to the Offense, which supports and contributes to my diagnoses. For a complete social history of Wendi Andriano, please see the full report of James Hopper, Ph.D.

### 1.    Clinical Findings, Mental Status Examination, and Diagnostic Conclusion for Wendi Elizabeth Andriano

Wendi Elizabeth Andriano suffers from multiple mental disorders that were present before the offense for which she has been charged and convicted.

#### a.    Clinical Findings

*First*, Wendi suffers from Bipolar Disorder, a prevalent disorder within her maternal extended family. Many individuals, including Wendi's mother, Donna; maternal aunt, Nadine; grandmother, Ann; and multiple cousins have been diagnosed, treated, or have exhibited symptoms for bipolar disorder.

---

[7] See Appendix A.

5

Wendi manifested symptoms of bipolar disorder during the months prior to her husband's death, including hypersexuality, impaired judgment, depression, irritability, increased alcohol use, impaired contextual understanding, and poor mental flexibility. She was treated with medications used in the treatment of bipolar depression for years after her arrest and incarceration.

*Second*, Wendi suffered from Complex Post-Traumatic Stress Disorder ("PTSD"), resulting from ongoing sexual coercing by her father and neglect by her mother. Symptoms of affective dysregulation, anger, dissociation, affective numbing, avoidance, acquiescence, and hyperreactivity mark much of Wendi's life, particularly during her marriage to Joe Andriano. Wendi also meets the criteria for Type I PTSD. She suffered from irritability, rumination, hypervigilance, and hopelessness.

*Third*, Wendi meets the criteria of Dependent Personality Disorder. She was pathologically subservient in relationships, unable to tolerate the loss of relationships, and became emotionally impaired when unable to discern her role in intimate relationships. Her personality structure was formed by the ongoing sexual coercion and neglect of her father and mother during her formative years.

*Fourth*, Myla Young, PhD, documented cognitive deficits in processing speed and understanding social context, as well as impaired decision making. Dr. Young's neuropsychological findings support the diagnosis of Cognitive Disorder Not Otherwise Specified (Cognitive Disorder NOS).

*Fifth*, Wendi suffered from Caregiver Burden, the tremendous emotional strain imposed upon those who take care of the terminally ill. Wendi was the financial, emotional, psychological, and day-to-day functional caregiver for not only her dying husband, but her

6

children as well, in the years leading up to Joe's death. The clinical literature documents the destruction of resiliency that caregiver burden can cause, especially in the face of an emotionally fragile person like Wendi.

Symptoms of each of these disorders include stealing money from her employer, lying on employment applications, becoming sexually provocative, creating false documents in the presence of employees and others, drinking to excess, extreme and spontaneous anger. Each of these symptoms could have been identified at the time of trial by a comprehensive social, medical, and psychiatric history. Many of these symptoms were identified and treated after she was incarcerated.

All were in play at the time of the offense, a synergy of trauma, cognitive deficits, and mood defects, impairing her ability to conform her behavior to the requirements of the law. Below is a discussion of Wendi Andriano's mental status examination and diagnostic impressions, followed by a more detailed description of each of the five symptom complexes and their role in Wendi Andriano's mental state before, during, and after the offense for which she has been tried, convicted, and sentenced to death.

      **b.**    **Mental Status Examination and Diagnostic Impressions of Wendi Elizabeth Andriano**

Wendi Andriano is a white female who looked younger than her stated age. She was regularly dressed in orange prison garb during my evaluations. She was oriented to person, place, date, and circumstances. Her movements were fluid. She used and gestured with her hands a great deal.

Wendi denied perceptual disorders such as hallucinations, illusions, and delusions. She did display occasional thinking which bordered on magical thinking, as well as

7

significant denial. This thinking was specifically around her current adjustment to prison, and is discussed below.

Wendi dissociated on several occasions. Wendi appeared to look away, and did not respond. There were no indications of epileptiform disorder, such as her looking only in one direction or motor involvement. Her dissociation was related to discussions of traumatic events, both in her family, during her marriage, and at the time of the offense.

The first instance was during our first discussion about the sexual coercion by her stepfather, Alejo Ochoa. She dissociated when she was told about sexually provocative photographs taken of her by her father, as reported by Brandon Ochoa and Cynthia Schaider,[8] and when she was shown a picture of herself taken by Alejo ("Lightning Photo"). (*See* Tabs72 – 74.)

When told about the photos described by Cynthia Schaider, Wendi did not recall them having been taken, and did not recall ever having seen them. When I showed her the Lightning Photo, taken when she was a teen, Wendi had no independent recollection of this photo prior to her father giving it to her a couple of years ago. Wendi did remember going to the mountains during a thunderstorm with her father so he could take pictures of her. She also then recalled going to a motel room for the purpose of taking other photographs, but Wendi did not recall the actual taking of these pictures. When questioned further about the photographs, Wendi reported that she did not recall ever seeing them.

Wendi's speech was normal in volume and fluid. She was articulate.

Wendi's insight was impaired. She saw herself currently in the best circumstances of her life, and felt she had learned more on Death Row than she could have experienced in the

---

[8] Tab 34, at ¶7: Tab 26, at ¶ 18.

8

outside world. There was some insight, however, in that Wendi had some recognition of her dependency needs and acquiescence prior to her incarceration, and felt that she has overcome some of these symptoms.

Wendi's judgment remains impaired by her profound trauma and dependency needs, which continue to guide much of her behavior. This impaired judgment was evident during her early incarceration, and her constant desire to please significantly impairs clear thinking.

Wendi described situations in her early jail experiences when she was very gullible. Although she claimed to have become less gullible, her judgment remained impaired during our conversations. Her insight into herself and her trauma history remained impaired over the period of my evaluations. Her understanding of her mental disorders was just beginning to develop. This is particularly true about her early traumatic experiences such as her family's traveling and her mother's early neglect. As part of beginning to cope with the history of her father's sexual coercing and molestation, she has withdrawn from him to an extent.

Neurovegetative signs included sleep disruption, anhedonia (loss of pleasure), and cognitive confusion. She described periods when she would stay in bed for days. These periods would be accompanied by heaviness in her limbs, as though it were difficult to move. She also described periods of not sleeping, without any associated tiredness. Problems with sleep have occurred since childhood.

Wendi denied changes in appetite. She has decreased activity, consistent with her mood disorder, as well as her incarceration. There is no agitation, pain, or alterations in consciousness.

9

She said that aside from the pain of losing her children, coming to prison has been the best thing that had ever happened to her. She said that she has been able to "find herself" while in prison, and had grown in ways that had not been possible for her when she was a child or during her marriage.

Wendi resisted my suggestion that being incarcerated and on Death Row, awaiting her execution, by definition could not be "the best time" in her life. She presented significant denial of her circumstances, consistent with the mood elevation of bipolar disorder.

Her thought processes displayed circumstantiality, the filling in of extraneous details, and flight of ideas, moving from one idea to another without a logical flow, as if the ideas were going from trapeze to trapeze. When under stress, her ability to follow instructions was impaired. This was also captured in Dr. Young's neuropsychological interview.

When she attempted to discuss traumatic events, Wendi's thought processes were often disrupted by dissociative experiences. She would stop talking, often taking a moment or two to respond. She was able to renew the conversation at the point of departure, which is consistent with dissociation, and also consistent with her inability to recall emotionally conflicted circumstances that had nothing in common with the time of the offense, other than the quality of stress Wendi was experiencing.

Wendi's mood was generally apprehensive and anxious. She displayed anticipatory anxiety which persisted throughout my evaluations of her, but which abated somewhat over the course of my time with her. She was always physically tense. Wendi's mood was also labile, ranging from extreme sadness to near euphoria. Wendi's mood was fragile. She described her process for attempting to keep herself together emotionally and not becoming suicidal after discussions of the trauma she experienced in her personal history. Her current

10

process for keeping herself together after these visits consisted of going to her cell, isolating herself and not talking with anyone, and reading until she fell asleep. This process reminded her of going into the closet when she was a child.

While generally apprehensive, Wendi's affect was often extremely—and inappropriately—bright. Her affective range was extremely wide in spite of her anxiety.

In addition to being inappropriately bright in general, given her position on Death Row, Wendi's affect was often inappropriately bright compared to the specific content of our conversations. She smiled when talking about her father buying her a negligee or taking her into pornography shops when she was a teen.

Wendi exhibited strong dependency needs. It was obviously very, very important to her to be both liked and correct in the responses she provided to any questions. When I did not reassure her that any given response from her was acceptable or any given answer was correct, she became anxious and ruminative, going over the issue again and again.

Wendi's thought content reflected significant denial and thought repression. Her belief that Death Row was the best circumstances she has ever had is both grandiose and reflects pathological denial. However, it is also a barometer for the impact of her previous life, an impact that was not truly understood at the time of trial for its significant pathology. She denied experiencing homicidal and suicidal ideation at the time of my interviews with her.

c.    **Clinical and Diagnostic Conclusions**

Wendi was born into a family that suffered from mood disorders, alcohol abuse, sexual abuse, and violence. She suffered for years from sexual coercion and molestation at the hands of her stepfather, causing both trauma and dependency.

Wendi has demonstrated a broad range of co-morbid, interrelated symptoms and clinical disorders, resulting from trauma and abuse, from the familial mental illness as shown in

11

her personal history, and from her multigenerational and transgenerational family history. What follows is a discussion of Wendi's symptoms that are the most relevant contributing factors in Wendi being arrested, charged, convicted and sentenced. These symptoms were not investigated or presented to the jury at any time during her trial, or offered as mitigating factors in her defense or sentencing.

Wendi's clinically identifiable disorders include: (1) Bipolar Disorder, (2) Complex PTSD, (3) Dependent Personality Disorder, and (4) Cognitive Disorder NOS. Additionally, Wendi suffers from the well-documented strain of providing for someone with chronic, in this case terminal, illness. This overwhelming condition is documented in the medical literature as Caregiver Burden.

The Diagnostic and Statistical Manual-Fourth Edition, Text Revised (DSM-IVTR), is the current classification system used in American psychiatry to increase interrater reliability, meaning a set of criteria for each disorder that is felt by treating clinicians to reflect the most common symptoms of a disorder. The DSM-IVTR notes that its use in forensic settings must be taken cautiously. This caveat is especially true, since the DSM-IVTR is over 15 years old, and DSM-V is rapidly approaching, which has shown significant evolution in the diagnoses of Wendi's disorders.

### i.   **Wendi Elizabeth Andriano Suffers from Bipolar Disorder**

#### (1)   **Diagnostic Criteria of Bipolar Disorder**

Bipolar disorder is a disruption of mood. The DSM-IVTR criteria for Bipolar disorder are:

Table 14.6-7. DSM-IVTR Criteria for Manic Episode

- A distinct period of abnormally and persistently elevated, expansive, or irritable mood, lasting at least 1 week (or any duration if hospitalization is necessary).

12

- During the period of mood disturbance, three (or more) of the following symptoms have persisted (four if the mood is only irritable) and have been present to a significant degree:

    o   inflated self-esteem or grandiosity

    o   decreased need for sleep (e.g., feels rested after only 3 hours of sleep)

    o   more talkative than usual or pressure to keep talking

    o   flight of ideas or subjective experience that thoughts are racing

    o   distractibility (i.e., attention too easily drawn to unimportant or irrelevant external stimuli)

    o   increase in goal-directed activity (either socially, at work or school, or sexually) or psychomotor agitation

    o   excessive involvement in pleasurable activities that have a high potential for painful consequences (e.g., engaging in unrestrained buying sprees, sexual indiscretions, or foolish business investments)

- The symptoms do not meet criteria for a mixed episode.

- The mood disturbance is sufficiently severe to cause marked impairment in occupational functioning or in usual social activities or relationships with others, or to necessitate hospitalization to prevent harm to self or others, or there are psychotic features.

- The symptoms are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication, or other treatment) or a general medical condition (e.g., hyperthyroidism).

Note: Manic-like episodes that are clearly caused by somatic antidepressant treatment (e.g., medication, electroconvulsive therapy, light therapy) should not count toward a diagnosis of bipolar I disorder.

### (2)   Evidence of Wendi Elizabeth Andriano Having Bipolar Disorder

Wendi's family is what is known as an "affectively laden family," meaning there are multiple generations of symptoms and diagnoses of mood disorder. Wendi's father, Skip

13

Robertson, was a hypersexual alcoholic. Chemical dependency has a high co-morbidity with bipolar disorder, meaning the two disorders occur together frequently.[9]

Donna Ochoa, Wendi's mother, has had bouts of psychotic depression since she was a child, the latest occurring during Wendi's incarceration. She has a history of hypersexuality, impaired judgment, and currently displays flight of ideas and inappropriate affect. She describes both flight of ideas and inappropriate affect as family traits that have been commented upon over the years.

Donna's oldest half-sister, Nadine, was diagnosed with bipolar disorder and treated with Lithium and other anti-manic drugs for much of her adult life. She functioned successfully as a nurse for many years.

Donna's younger half-sister, Kathie, has also been diagnosed with mood disorders, and has a long-term history of chemical dependency.

Wendi manifested symptoms of depression early in life. On one missionary trip to Mexico while a teenager, Wendi spent several weeks in bed, for no apparent reason.

Wendi was diagnosed with depressive symptoms by the Casa Grande Counseling Services. She was treated, ineffectively, with antidepressants that caused her "increased anxiety," consistent with the manic switch which may be induced in persons suffering from the depressive phase of bipolar disorder.[10]

---

[9] Brady, K. T. & Sinha, R. (2005). Co-Occurring Mental and Substance Use Disorders: The neurological effects of chronic stress. *American Journal of Psychiatry, 162*(8), 1483-1493.

[10] Ghaemi, S. N., Rosenquist, K. J., Ko, J. Y., Baldassano, C. F., Kontos, N. J. & Baldessarini, R. J. (2004). Antidepressant treatment in bipolar versus unipolar depression. *American Journal of Psychiatry, 161*(1), 163-165.

14

Wendi has also complained of "panic attacks," episodes of increased anxiety and energy that do not meet the criteria for true panic disorders. Panic-like attacks are found in bipolar disorder.[11]

The clinical literature clearly identifies a strong relationship between traumatic stress and the manifestation of bipolar disorder.[12]

Wendi's behavior prior to her offense reflects ongoing manic behavior. She had significant irritable mood and mood lability. She increased her alcohol intake, in response to her overwhelming mood disruption.

Wendi also manifested hypersexuality and an increase in goal-directed activity. She became involved in two sexual relationships (one at the apartment complex she managed). Both of these relationships were known to her employees. Wendi also created false business licenses on the business computer in plain sight of her employees.

An excessive involvement in activities with a high potential for negative consequences was also seen during this extraordinarily stressful period, coupled with the other symptoms of her mood disorder.

These symptoms—including irritable mood, impaired judgment, chemical dependency, denial, and impaired decision making[13]—continued for an extended period, and did not only occur during her alcohol use, meeting the criteria for bipolar disorder.

---

[11] MacKinnon, D. F., Zandi, P. P., Cooper, J., Potash, J. B., Simpson, S. G., Gershon, E., Nurnberger, J., Reich, T., & DePaulo, J. R. (2002). Comorbid bipolar disorder and panic disorder in families with a high prevalence of bipolar disorder. *American Journal of Psychiatry*, *159*(1), 30-35.

[13] Kim, E.Y., D.J. Miklowitz, A. Biuckians, K. Mullen. (2006). Life stress and the course of early onset bipolar disorder. *Journal of Affective Disorders*, *99*(1-3), 37-44.

15

Wendi's acute mood disorder symptoms, although always apparent, became increasingly obvious during the period surrounding the offense, and extended for years after.

### ii. Wendi Elizabeth Andriano Suffers from Post-Traumatic Stress Disorder (PTSD)

#### (1) Diagnostic Criteria of PTSD

Wendi suffers from Type II, or complex, post-traumatic stress disorder. Complex PTSD is characterized by ongoing, chronic exposure to one or more traumatic stressors, as opposed to Type I PTSD, which is characterized by exposure to a singular traumatic incident. Complex PTSD differs in significant ways from the single-incident version. Below are criteria for Complex Trauma:

Alterations in:

- Regulation of affect and impulses
- Attention or consciousness
- Self-perception
- Relations to others
- Body functioning and integrity (somatization)
- Systems of meaning[14]

Complex PTSD is a diagnosis that does not appear in the DSM-IVTR, although it was actively studied and the subsequent body of literature has supported an independent diagnosis. The symptoms noted above "result[] from lasting traumatic experiences in which the

---

[13] Murphy, F. C., Rubinsztein, J. S., Michael, A., Rogers, R. D., Robbins, T. W., Paykel, E. S., & Sahakian, B. J. (2001). Decision-making cognition in mania and depression. *Psychological Medicine*, *31*(4), 679-693.

[14] Roth, S., Newman, E., Pelcovitz, D., van der Kolk, B., & Mandel, F. S. (1997). Complex PTSD in victims exposed to sexual and physical abuse: Results from the DSM-IV field trial for posttraumatic stress disorder. *Journal of Traumatic Stress, 10*, 539-556.

16

victim felt-or was-captive and unable to escape."[15] Wendi's experienced two chronic stressors that would create symptoms of complex PTSD. The first is her upbringing, particularly the ongoing sexual coercing of her stepfather and neglect of her mother. The second chronic stressor is her caregiver burden in taking care of her dying husband and just-born children.

### (2) Evidence of Wendi Elizabeth Andriano Having Complex PTSD

Numbing of affect is common in both Complex Trauma and Type I PTSD. The emotional numbing, the self-protective shell, limits emotional connectedness. Wendi has had both an external shell, her closet as a child, and an internal shell, her overwhelming numbing and dissociation.

Wendi also suffers from many of the motor symptoms of traumatic stress. She constantly scans the environment and the person, looking to pick up cues. She is hyperreactive and easily overwhelmed in stressful situations, even when those situations are artificial testing circumstances.

The core symptoms of Wendi's traumatic presentation are avoidance, affective numbing, acquiescence, and dissociation. She has pathological avoidance and denial, and these symptoms, coupled with her active dissociation, impaired her judgment at the time of the offense and continue to do so.

Wendi displays a number of symptoms that are related to or arise from affective dysregulation, including: generally poor coping skills; an inability to recognize her own needs, emotionally and otherwise; and an inability to effectively weigh, deliberate, and formulate options for choices she might make, particularly in circumstances of high stress. All of these are

---

[15] Tab 3, at p. 22.

17

expected clinical symptoms resulting from the trauma and abuse Wendi suffered while growing up.

Wendi exhibits patterns of extreme acquiescence, which means a constant, overriding inability to stand up to or overcome the emotional control of others in intimate relationships. The functional result of this in Wendi's life has been that she has given in to the demands, needs, requirements, and control of others from childhood to the present. Her pattern of acquiescence is the clinically expected and logical result of the sexual coercion, abuse, and molestation, and the other complex and compounded abuse and trauma that Wendi suffered beginning in infancy or very early childhood and throughout her childhood and adolescence. This degree of acquiescence requires the unhinging or disconnecting of emotions to actions, which results in the emotional dysregulation of PTSD.

Wendi's acquiescence to her stepfather's sexual coercion over years set the stage for her difficulty making effective judgments in response to events in the world around her, particularly for novel, stressful, and difficult events, and her inability to protect herself in those circumstances. The patterns of acquiescence that Wendi demonstrated as a young adult and adult in her relationship with Joe are also consistent with dependent personality disorder.

Throughout her life, Wendi has displayed a lack of self-identity, meaning acquiescence to the needs of others to such an extent that she reforms herself in the image others wanted for her, rather than maintaining a consistent identity.

Wendi exhibits affective dysregulation, which means an inability to accurately modulate her emotional reactivity, both in failing to register a self-protective emotional response in situations in which a normal person would do so, a result of years of sexual coercion and molestation; and in overreacting emotionally in situations in which a normal person would be

18

able to respond appropriately. During times of stress, Wendi's capacity to rely on the normal emotional processes that are necessary for effective decision-making is limited.

Affective dysregulation generally arises from poor or nonexistent modeling of appropriate coping mechanisms by parents. Wendi's affective dysregulation is the clinically expected and logical result of the traumatic stress and the neglect she suffered from her mother, biological father, and adoptive father. The denial by Alejo and Donna of Alejo's ongoing coercion and sexual molestation of Wendi while she was growing up illustrates the poor insight and coping skills demonstrated by Wendi's parents, and highlights the poor insight and coping skills that were modeled for Wendi.

In addition to failing to model appropriate behaviors and coping mechanisms, Wendi's parents actively modeled inappropriate behavior.

The extensive abuse and trauma that Wendi experienced growing up are seen in the degree to which Wendi has normalized violence and abuse. Wendi describes events which objectively are extreme and traumatic, as being "normal" and "not unusual" compared to the chronic violence she suffered growing up. She states that even though losing her children has been incredibly difficult, coming to prison as an inmate on Death Row is the best thing that has ever happened to her. "Normalization" of violence and trauma is part of the typical numbing seen in cases of chronic traumatic stress, and, in Wendi, contributes to her emotional disconnect and affect.

Finally, because the trauma is ongoing, neglect can be as damaging as direct trauma. We see this in Wendi's case, with the neglect of Donna Ochoa, Wendi's mother, who, due to her own mental illness, could not marshal the emotional responsibility to protect her daughter from ongoing sexual coercion and intimidation by Wendi's step father, Alejo Ochoa.

19

### iii. Wendi Andriano Suffers from Cognitive Disorder NOS

#### (1) Diagnostic Criteria for Cognitive Disorder NOS

The DSM-IVTR describes Cognitive Disorder NOS as:

**Cognitive Disorder Not Otherwise Specified**

This category is for disorders that are characterized by cognitive dysfunction presumed to be due to the direct physiological effect of a general medical condition that do not meet criteria for any of the specific deliriums, dementias, or amnestic disorders listed in this section and that are not better classified as Delirium Not Otherwise Specified, Dementia Not Otherwise Specified, or Amnestic Disorder Not Otherwise Specified. For cognitive dysfunction due to a specific or unknown substance, the specific Substance-Related Disorder Not Otherwise Specified category should be used.

Mild neurocognitive disorder: impairment in cognitive functioning as evidenced by neuropsychological testing or quantified clinical assessment, accompanied by objective evidence of a systemic general medical condition or central nervous system dysfunction (see Appendix B in DSM-IV-TR for suggested research criteria).

#### (2) Evidence of Wendi Elizabeth Andriano Having Cognitive Disorder NOS

Dr. Young identified areas of cognitive impairment in Wendi's brain functioning. Wendi did well on much of the neuropsychological testing. However, there were areas of cognitive dysfunction that relate directly to her mood and trauma symptoms.

Decision making, particularly under stressful circumstances, was tested on the Iowa Gambling Task. Wendi's ability to develop problem-solving strategies is impaired, when those problem-solving strategies are made under novel, stressful or new conditions.

Dr. Young also found cognitive deficits in Wendi's processing speed, the speed with which she is able to understand, synthesize, and respond effectively. Her understanding of

20

the big picture, as identified by her difficulty with the Reyes Complex Figure instrument, is also impaired.

Wendi's behavior during testing was acquiescent, in the extreme. Dr. Young reported Wendi regularly asked for direction, and became stressed when Dr. Young could not, as part of the testing protocol, provide Wendi feedback on her performance. Her test taking behavior was consistent with the difficulties attending and focusing evident through much of her adult life, especially after her marriage. These problems attending are more consistent with mood disruption than disorders of attention.

Wendi therefore meets the criteria for Cognitive Disorder, Not Otherwise Specified.

### iv. Wendi Elizabeth Andriano Suffers from Dependent Personality Disorder

#### (1) Diagnostic Criteria for Dependant Personality Disorder

Dependent personality disorder is characterized by pervasive psychological dependence upon and acquiescence to other people, to the loss of the sufferer's own identity. Diagnostic criteria for 301.6 Dependent Personality Disorder include:

- A pervasive and excessive need to be taken care of that leads to submissive and clinging behavior and fears of separation, beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:

  o has difficulty making everyday decisions without an excessive amount of advice and reassurance from others

  o needs others to assume responsibility for most major areas of his or her life

  o has difficulty expressing disagreement with others because of fear of loss of support or approval. Note: Do not include realistic fears of retribution

21

- o  has difficulty initiating projects or doing things on his or her own (because of a lack of self-confidence in judgment or abilities rather than a lack of motivation or energy)

- o  goes to excessive lengths to obtain nurturance and support from others, to the point of volunteering to do things that are unpleasant

- o  feels uncomfortable or helpless when alone because of exaggerated fears of being unable to care for himself or herself

- o  urgently seeks another relationship as a source of care and support when a close relationship ends

- o  is unrealistically preoccupied with fears of being left to take care of himself or herself

### (2)  Evidence of Wendi Elizabeth Andriano Having Dependent Personality Disorder

Wendi's presentations for this disorder, beginning in childhood, include abnormal efforts to please others, extreme obedience and acquiescence, impaired self-control within relationships, lack of self-confidence, naiveté, gullibility, and willingness to accept mistreatment. For people suffering from dependent personality disorder, the desire to please others is forefront in their minds and a significant amount of time and of energy is expended trying to achieve this goal. Disagreeing with others may be so unbearable that they will go to great lengths to win people over. The sufferer is prone to being taken advantage of as they consistently place others' needs and desires before their own and will abdicate their own safety and well-being for that of others.

People with dependent personality disorder often experience pathological anger when their dependency needs are thwarted. Malmquist discusses the seemingly paradoxical phenomena:

> Many defects in basic ego function are present, which is what leaves DPD individuals vulnerable to spiraling into a homicidal state and thwarts them from acting on the basis of their sensed needs. Their dependence, with the inability to step out of such

22

destructive relationships, reveals a limited perspective and narrow
focus to their existence....[I]t is a prominent awareness of the
limitations existing in the degrees of freedom they have in their
lives....They have a sense of being caught in the grips of powerful
forces with which they cannot deal.[16]

### v.      Wendi Elizabeth Andriano Suffered From Caregiver Burden

#### (1)      Manifestations of Caregiver Burden

Caregiver burden is a well-documented stressor, with a set of severe

manifestations that magnify underlying preexisting psychiatric conditions.[17]  Caregiver stress

was initially studied in connection with care for those suffering from Alzheimer's disease and

severe mental illnesses like schizophrenia. Only in the last two decades has the literature on

caregiver stress in chronic medical illnesses and terminal conditions like cancer been extensively

reviewed.  As noted in this recent research:

> A cancer diagnosis has a significant impact on the patient and the
> spouse caregiver. Patients are confronted with a life-threatening
> diagnosis and a difficult treatment regimen, while their partners are
> often required to fulfill the demanding role of a spouse caregiver.
> These difficulties are amplified during the terminal phase of cancer
> when patients experience more disease-related factors. Individuals
> with cancer are at an increased risk for persistent depressive
> symptoms when compared with the general population. Feelings of
> hopelessness are also common in patients approaching end-stage
> cancer. A general feeling of hopelessness may reflect end-of-life
> despair, or in extreme cases, may develop into a desire for
> hastened death or suicidal ideation, loss of dignity, and intimate
> dependency. A reported 15–50% of adult cancer patients and their
> spouses present with clinically significant psychological distress,

---

[16]Malmquist, C. (1996). Dependent Personality Disorders and Killing. In *Homicide: A Psychiatric Perspective (157-159)*. Washington, DC: American Psychiatric Press.

[17] Biegel, D. E., Milligan, S. E., Putnam, P. L., &Song, L. Y. (1994). Predictors of burden among lower socioeconomic status caregivers of persons with chronic mental illness. *Community Mental Health Journal, 30*(5), 473-494; Caregiver Burden Assessment, Erie County Department of Senior Services, Caregiver Resource Center, 95 Franklin St., Rm. 1301, Buffalo, NY 14202

23

including depression and hopelessness, and this increases as death approaches.

The majority of studies report that patients and their spouse caregivers have similar levels of distress over time, consistent with the view that common factors impact both partners, and affect the entire family system.[18]

Sales et al. describe the objective as well as the subjective burdens of caregiving, listed below:

1) Objective burden

   a) Direct tasks of care

      i) Helping patient with ADLs

      ii) Supervising the patient

   b) Indirect tasks

      i) Dealing with emotional needs of patient

      ii) Encouraging the patient

      iii) Effects of caregiving on other aspects of life

      iv) Family interaction

      v) Family routine

      vi) Leisure

      vii) Work/employment

---

[18]McClean, L. M., Walton, T., Matthew, A., & Jones, J. M. (2001). Examination of couples' attachment security in relation to depression and hopelessness in maritally distressed patients facing end-stage cancer and their spouse caregivers: A buffer or facilitator of psychosocial distress. *Support Cancer Care, 19*, 1539-1548 (internal citations omitted).

P-App. 002020

viii)  Mental health

ix)  Physical health

x)  Social network

xi)  Others outside household

xii)  Children

xiii)  Financial consequences

2)  Subjective burden

a)  Personal reactions to caregiving Distress

b)  Stigma

c)  Worrying

d)  Shame

e)  Guilt[19]

### (2) Evidence of Wendi Elizabeth Andriano Having Caregiver Burden

Wendi's symptoms of mental disorder were amplified by the strains of her caregiving. She, almost singlehandedly, was responsible for each of the objective burdens described by Sales.

It was Wendi who was primarily responsible, particularly in the last few months, of taking care of her husband's daily care. As Joe became increasingly despondent and withdrawn, refusing to share his plight with others, it was Wendi who became his main emotional outlet, bearing the brunt of his despair, anger, and fear of death.

Jeffrey B. Miller, Joe and Wendi's malpractice attorney, worked with the couple during the 2000 period. He discusses, in his declaration of August 8, 2011, how a distraught

---

[19] Sales, E. (2003). Family burden and quality of life. *Quality of Life Research, 12*(Suppl. 1), 33–41 (internal citations omitted).

25

Wendi called him, concerned about the suicidal urges Joe was having. Mr. Miller talked with

Joe, who acknowledged suicidal ideation.

> In the months prior to Joe's October 2000 death, I received two or
> three distressed phone calls from Wendi relating to her
> observations of Joe. In each of these phone calls, Wendi stated that
> she was feeling very concerned and frightened for Joe. Wendi said
> that she had perceived Joe becoming more depressed, and that he
> had recently expressed a desire to die and an intent to take his own
> life. Wendi told me that she was worried that Joe would hurt
> himself, and asked me to speak with him regarding his mental state
> and recommend a counselor for Joe. Wendi also asked me to
> remind Joe that, from a legal perspective, he would be hurting his
> family by committing suicide because the malpractice claim would
> be dismissed.

> I subsequently spoke with Joe regarding these concerns. I told Joe
> that his family was concerned about his mental state and worried
> that he was contemplating suicide. Joe acknowledged these
> concerns and did not deny that they were accurate. Joe said he
> understood that the malpractice claim would not continue if he
> died from something other than cancer, and told me not to worry. I
> recommended a counselor to Joe, but I do not know if Joe
> ultimately received treatment from that counselor.[20]

Wendi was the primary financial provider, working her full time job and, at times,

being forced to leave her work to change her children's diapers or attend to both her husband's

and her children's needs. Wendi was also responsible for family interaction, which became

increasingly tense as the needs of the children and the needs of her dying husband complicated

her ability to satisfy these often contradictory circumstances.

Wendi's leisure activities reflected the stress of her caregiving and amplified her

mood and trauma symptoms. She drank heavily, became involved in sexual behavior, and

became isolated from her family and any true support system she might have had. Rather than

---

[20] Tab 19, at ¶¶ 4-5.

P-App. 002022

reflecting a lack of caring, these behaviors, actually symptoms of her acute mental illness, clearly illustrate how impaired Wendi had become, and illustrates what little resiliency she had was undermined by the extraordinarily stressful strain of her attempt to provide care to her husband and children.[21]

Sales describes the effects of caregiver strain on other aspects of the caregiver's life as perhaps the most difficult impact of the illness on the caregiver.[22]

Wendi's psychiatric symptoms from her bipolar disorder, dependent personality disorder, and complex trauma were magnified by the stress and novel circumstances of her role during most of her marriage, that of caregiver. Although Wendi had been placed in the role of soother and pacifier during her childhood and adolescence in her sexual interactions with her stepfather, but it was not until her marriage to Joe and his terminal diagnosis that she found herself as a caregiver.

Within a very short time, Wendi experienced an additional stressor, watching her husband become ill, with repeated failures to correctly diagnose cancer. There is extensive documentation of Wendi's multiple interventions to save her husband's life, as well as to care for her children that were born during this tumultuous period.

The overwhelming emotional burden of Wendi's attempts to live, grow, understand, empathize, support, and resolve were never recognized nor presented at her trial. The

---

[21] Sales, E. (2003). Family burden and quality of life. *Quality of Life Research, 12* (Suppl. 1), 33–41.

[22] "In some ways, the impact of caregiving on other central life roles may be its most pervasive and pernicious consequence. The degree to which caregiving demands truncate or create conflict in other role sectors may vary, but most researchers attempt to measure the broad range of impact commonly felt. These include changes in family interactions, family routines, leisure, work, social network involvement, contacts with others outside the household, as well as the financial consequences of illness. These role ramifications are most commonly viewed as additional objective consequences of caregiving, although Braithwaite places them in the subjective burden category." Sales, *supra*, at 37 (internal citations omitted).

27

interaction between her re-traumatization through her role as caregiver for her husband and children, and her emerging symptoms of affective dysregulation, impaired judgment, anger, affective numbing, and slowed realization of her circumstances is the foundation for her inability, due to mental disorder and environmental trauma, to conform her behavior to the law. The behaviors seen in the months before her husband's death were fueled by the destruction of all resiliency and support Wendi had known in her life.

> **d.    Conclusion of Clinical and Diagnostic Findings and Mental Status Examination**

Wendi suffers from multiple mental disorders. She suffers from bipolar disorder, and clearly comes from an affectively laden family, with her father, sister, and mother manifesting symptoms of alcoholism, hypersexuality, impaired judgment, mood swings, chemical dependency, psychosis, suicidality, and depression.

Wendi suffers from complex PTSD, with at least two sources of chronic trauma. The first is the ongoing sexual coercing and abuse by her step-father, which led to her acquiescence, anger, affective numbing, hyperreactivity, and emotional dysregulation. She also underwent the extreme, ongoing trauma of her caregiver strain, while attempting to find ways to help her husband, raise her children, and maintain her family.

Wendi has cognitive impairments that slow down her ability to effectively size up and respond to social situations. In spite of the structure of prison, her cognitive deficit continues to this day.

She also suffers from a longstanding dependent personality disorder, created and coerced by the sexual abuse of her stepfather and neglect and abuse of her mother. Dependent personality disorder has been well documented as a source of anger and self destructive behavior.

28

Each of these disorders was acute during the months before her husband's death. Symptoms of each disorder were synergistic, creating a maelstrom of instability and emotional disruption. This was the mental state Wendi was suffering from at the time of her husband's death, and for some time afterwards, as captured in jail and prison medical records.

It is against this emotional and cognitive backdrop that her behavior at the time of the offense must be considered, and her behavior examined forensically.

### 2. Forensic Analysis and Formulation: How Wendi Andriano's Mental Disorders Impacted Her Behavior in Relation to the Offense

This section includes my forensic analysis of Wendi's history, specifically from the time she met Joseph Andriano ("Joe") on March 17, 1992 until Joe's death on October 8, 2000, and her incarceration following Joe's death from 2000 to the present. This section analyzes how Wendi's mental disorders impacted her behavior in relation to the offense.

In this formulation and analysis, when I describe statements in the present verb tense, such as "Wendi states" or "Donna describes," this indicates that I received the information directly from the person involved during firsthand evaluations conducted during 2010 and 2011. Other statements come from the trial transcripts, declarations, or other sources identified in Appendix A.

#### a. Adulthood from Meeting Joe to the Night of the Offense

##### i. The Beginning of Wendi and Joe's Relationship

Wendi was twenty-one years old when she met Joe on March 17, 1992, at Dell's Pizza in Casa Grande, Arizona.[23] While Wendi maintained steady, regular employment, Joe was having a hard time earning money as a welder and found himself without a place to live. Within weeks of meeting Joe, Wendi (the caregiver and unable to turn anyone away) offered to let Joe

---

[23] Interview of Wendi Andriano by George Woods, MD at ASP Perryville on January 18, 2011.

29

sleep on the couch in her apartment. As underscored by Dr. Hopper, Wendi was coerced from her childhood to feel safe and loved when she was taking care of others, especially during times when they were angry and abusive:

> If someone is angry -- whether that anger is caused by her, directed at her for no good reason, or directed elsewhere and has nothing to do with her – Wendi feels *driven* to make that person feel better, because she believes, "then they will like me." If someone likes her and is nice to her, Wendi strives to be even nicer to them and to take care fo them, because this is the only way she knows to avoid them getting angry at her or abandoning her. . . . In short, the very ways she attempts to avoid neglect and abuse in adult relationships leave her feeling neglected and used.[24]

In the year prior to meeting Joe, Wendi's relationship ended with Shawn King, her childhood sweetheart. Shawn broke up with Wendi in the fall of 1991 and he punctuated the breakup by smashing the windows of Wendi's car.[25] In the year prior to Joe moving into Wendi's apartment, Wendi's paternal cousin, Barbara Mitchell stayed most nights at Wendi's apartment with her. Barbara was still in high school at the time and largely resided with Wendi for about ten months. It was just around this time that Wendi met Joe. One of the defining symptoms of people suffering from dependent personality disorder is the intolerance of being alone. When they are alone they feel helpless and uncomfortable. As soon as a relationship has ended, or even before, they will desperately seek out a new one. Joe Andriano came into Wendi's life at a time when she was most vulnerable to the discomfort and helplessness that she otherwise faced in being alone.

Shortly after Joe began staying with Wendi, he moved in permanently and they officially became a couple. During 1992, the year that Wendi and Joe met, Wendi earned over

---

[24] Tab 4, at ¶ 548.

[25] Tab 15.

30

$15,000 and received her apartment at Quail Gardens as part of her compensation package. Joe, on the other hand, had reported income of just over $2,200. The economic disparity in the earnings between Joe and Wendi continued throughout their relationship and into their marriage with Wendi providing the main financial support.[26] Only one time in their history together did Joe earn more than Wendi and that was in the time frame just after their first child, Nicholas, was born. Wendi's parents provided additional financial support so Wendi could stay home with her infant child.

Joe's inability to provide financial or emotional support for the family reinforced Wendi's self-deprecating behavior and enabled her dependent personality. Wendi's early relationship with Joe was characterized by her acquiescence, the result of both her trauma history and the conditioning she received from the earliest moments of her life to abdicate herself to men in positions of authority while being unprotected by the women in her family.[27] When Wendi first met Joe, he was unlike any of the young men she had previously been acquainted with. He was from a different social group in Casa Grande and compared to Wendi, was much more adept

---

[26] Tab 69 (Social Security Earnings Statements of Wendi and Joe Andriano: 1993 – Wendi - $19,128; Joe - $3,404; 1994 – Wendi - $22,447; Joe - $0; 1995 – Wendi - $24,234; Joe - $0; 1996 – Wendi - $6,648; Joe - $0; 1997 – Wendi - $0; Joe - $5,576; 1998 – Wendi - $17,064; Joe - $11,529; 1999 – Wendi - $31,943; Joe - $0; 2000 – Wendi - $38,682; Joe - $0).

[27] Tab 27, Tab 34 at ¶¶ 8-9, 15, 25 ("Wendi grew up in a male-dominated environment. Tom King frequently preached that a woman's place was in submission to her husband. He often said that women should quit their jobs and stay at home. He was sexist. There were certain roles that men and women were expected to fulfill, and this was embedded in the culture of the church. According to Tom, if a girl wore a bathing suit and a boy got aroused it was the girl's fault. As parents, we were encouraged by the pastor to use corporal punishment on our children. This was presented as the Biblical way to raise children. Wendi had domineering daddy and grew up in a church with a domineering pastor. . . . Tom King used ridicule, humiliation, strong statements, and the fear of God to influence his congregation. . . . Discipline at that school centered around scolding, humiliation, corporal punishment, extreme work punishment, and social isolation.").

31

at navigating the social circles of young adults in the small town of Casa Grande.[28]   Unlike the

Ochoa family, who lived on the periphery of social acceptance and flew far under the radar in

their desire to remain religiously segregated and isolated,[29] the Andriano family was part of the

landholding farming class in Casa Grande, an influential segment of the population that

possessed social status and clout in the community of Casa Grande.

Given her history of being coerced and acquiescent behavior, her relatively

newfound social freedom beyond the boundaries of the church, and her natural curiosity, Wendi

found Joe's attention desirable. Wendi was "surprised" that Joe "loved me."[30] Although Wendi

reports that she "did not want a rigid, religious man who controlled my life," and that her

decision to date Joe was based, in part, on the fact that he was not part of the church,[31] she

discovered over time that Joe and her stepfather, Alejo were similar in terms of their requirement

for her caregiving.[32]

Wendi allowed Joe to move in without a defined commitment or clear agreement

between them about their status as a romantically partnered couple, or any real understanding of

---

[28] In 1990, Casa Grande had a population of 19,954 residents in an area covering 48.2 square miles, making it an extremely low-density population.
http://www.census.gov/epcd/www/92profiles/county/04021.TXT

[29] Tab 27, Tab 34, at ¶¶ 3-4 ("Wendi's parents, Donna and Alejo, had nothing, meaning they were always very poor. They told me that before I knew them, they were part of a street ministry in Northern California. They followed another strong-willed, 'turn or burn' pastor there. It was a different time; the Jesus-freak movement was in full swing: It consisted of born again hippies who traveled around spreading 'Jesus power.' This was in the mid-1970s. Donna and Alejo told me that while they were in the ministry, Wendi panhandled for them. They lived out of a bus and walked the streets preaching and handing out tracts. . . . When we began going to the church in 1980, Donna and Alejo lived in a rental house on the south side of the tracks in Casa Grande. It was a low-income area. Later, Donna, Alejo and Wendi moved to a house in another housing project called 'Hopi Hills,' or 'Indian Hills,' or something like that.")

[30] Interview of Wendi Andriano by George Woods, MD at ASP Perryville on November 23, 2010.

[31] Ibid.

[32] Ibid.

32

the direction in which the relationship was headed. After Joe moved in, Wendi quickly allowed Joe to take a position of increasing control over her. Initially, Wendi was attracted to Joe because she could take care of him and because he was a connection to life outside of the church.[33] Wendi persevered in acquiescing to Joe, and expressed her pathological dependence by allowing him a progressively greater position of control over her. Joe began to dictate how she dressed, and he required her to wear her hair in a different style and color than she had ever used before, specifically blond and short, much different than her naturally brown and historically long hair.[34] Wendi soon started disengaging with her friends and they felt unwelcome in her apartment. As noted by Barbara Mitchell in her interview with Sharon Murphy prior to trial, "Joe isolated Wendi making it very difficult for her to retain her previous relationships."[35] Wendi's interactions were limited to Joe's crowd, even though many of the women in that group rejected her. Even this early in their relationship, Wendi was unable to stand up to Joe and went along with these changes.[36]

Wendi's behavior in her relationship with Joe mirrored, in many ways, the compliant behavior required of her in her relationship with her father and with the adults at 91st Psalm and Harvest Church and School. In both the home and at school, Wendi was coerced to behave in compliance under the threat of severe punishment. She was also required to dress in certain ways. Photographs of Wendi early in life depict her as a miniature version of Donna, with matching hairstyles and outfits. Donna was dying Wendi's hair to match her own by the time

---

[33] Tab 26, at ¶21.

[34] Interview with Donna Ochoa by Woods, G.; Interview with Barbara Mitchell by Sharon Murphy on May 20, 2003.

[35] Interview with Barbara Mitchell by Murphy S. on May 20, 2003.

[36] Interview by Woods, G. on May 26, 2011.

33

Wendi was nine to eleven years old. Alejo preferred Wendi to dress provocatively, and began buying her age-inappropriate attire before she had even reached her teens.[37]

Wendi reports that passion was not a part of her relationship with Joe. She appreciated his laughter and his initial attentiveness to her as opposed to being in love with him. She describes her sexual relationship with Joe during their entire relationship as not satisfying, which is consistent with how she describes all of her sexual encounters throughout her life. She felt that if her partner wanted sex, it was her responsibility to have sex, without considering at all her own feelings, preferences, or concerns about sexuality and having sex with that partner[38]— the automatic behavior created through traumatic sexual coercion and molestation during childhood and adolescence. "Wendi and Joe had a very structured romantic life . . . It was so regimented and controlled. Wendi told me that she wanted her relationship with Joe to be more affectionate and intimate. She told me that Joe refused to kiss her at all."[39]

Despite Wendi's yearning for affection, she was unable to enjoy a fully developed sexual relationship and instead repeated the learned sexual behaviors of submission in her marriage with Joe. Wendi's relationship with her father mirrors this acquiescence without intimacy, the basis of a dependent personality disorder in many cases. Donna describes Wendi and Alejo going into adults-only novelty stores, triple-X pornography stores, and making special family trips to Frederick's of Hollywood, a store with primarily extremely revealing clothing. Even though both Wendi and Donna were conflicted by this behavior, Alejo's intimidation and coercion "normalized" this behavior for Wendi.

---

[37] Tab 27.

[38] Interview by Woods, G. on November 23, 2010; Interview with Barbara Mitchell by Murphy, S. on May 20, 2003.

[39] Tab 31, at ¶11.

P-App. 002030

## ii.   Wendi and Joe Get Married

Wendi's mother and father, with whom Wendi maintained regular contact and who lived close by, were uncertain enough of her interest in and passion for Joe that, as late as Wendi's wedding day, they asked her if the marriage to Joe was really what she wanted, and assured her that she could say "no" to the marriage. Despite their relationship being emotionally disconnected, Wendi married Joe on January 22, 1994. By the time they were married, Wendi had left her employment at Quail Gardens. In May of 1993, she started working at the Casa Grande Regional Medical Center in the accounting department.[40] Wendi and Joe had each moved into the homes of their respective parents prior to their marriage.[41] In deciding to marry Joe, Wendi manifested symptoms of her dependent personality disorder: her inability to recognize her own needs, her inability to recognize options in making decisions, her lack of coping skills, and lack of self-identity in her relationship with Joe.

Donna Ochoa documented difficulties beginning very early between Joe and Wendi. Donna recalls Joe calling Wendi a "fucking bitch," and other instances when Wendi called her parents after sequestering herself in the bedroom, after Joe had become angry and physically intimidating. Wendi felt that the traumatic events occurring between her and Joe were "normal" and "not unusual" compared to the chronic violence she suffered growing up.[42] Wendi's actions and choices from the time she met Joe in 1992 until his death in 2000 demonstrate affective dysregulation, numbing of her own affect responses, her sense of

---

[40] Tabs 69, 69.B. (Employment and Social Security Earnings Records of Wendi Andriano).

[41] Interview by Woods, G on April 26, 2011.

[42] Interview by Woods, G. on April 26, 2011.

35

helplessness, and her increasing inability to respond normally or appropriately to stressful, difficult situations. These are all symptoms of her PTSD.

Wendi states that, "The first part of the marriage was within the bounds of acceptability. I had grown up with an angry father. For the first six months, we lived in a rented townhouse then we moved to Andriano farm property." After that, Joe was "yelling and yelling and yelling and breaking things . . . I did not leave. In the morning, I got up and we did not talk about it." Wendi states that she had and still has no way to determine how to behave or what to do absent demands or requests from others. In characterizing her general behavior, she states, "I need to know what you want from me. If I don't, I don't know how to function or what to do."[43]

The experience of prolonged and severe trauma, particularly trauma that occurs early in the life cycle, as experienced by Wendi, can lead to complex clinical pictures that include disturbances of regulation of affective arousal, an impaired capacity for cognitive integration of experience (as in dissociation), and impairment in the capacity to differentiate relevant from irrelevant information. Research shows that people who suffer from PTSD are prone to suffer from problems with affect regulation, decision making, difficulty modulating anger, chronic self-destructive and suicidal behaviors, impulsive and risk-taking behaviors, and difficulty modulating sexual involvement. Like findings are found in child development literature: as many as 80% of abused infants and children develop disorganized/disoriented attachment patterns. These are associated with an inability to utilize caregivers for soothing and with the emergence of pathological self-regulatory behaviors such as, in Wendi's case, hiding in the closet, obsessive caregiving and later, heavy alcohol consumption. A substantial body of

---

[43] Mental Status evaluation of Wendi Andriano by Woods G., M.D., January 18, 2011.

36

research has shown that early and prolonged trauma in childhood affects the capacity to regulate the intensity of affective responses.[44]

Yet, it was more than Wendi's traumatic environment alone that affected Wendi's responses to stress. Myla Young, PhD's neuropsychological testing documents Wendi's cognitive deficits, specifically her difficulties organizing and processing her thoughts in stressful circumstances.

Dr. Young describes a number of cognitive impairments, including Wendi's inability to effectively attend, and to recall verbal information. The cognitive deficits that most directly impact Wendi's ability to weigh and deliberate, to make good decisions, were her executive functions. Dr. Young describes these executive functions as "an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed

---

[44] Walker, E. A., Katon, W. J., Neraas, K., Jemelka, R. P., & Massoth, D. (1992). Dissociation in women with chronic pelvic pain. *American Journal of Psychiatry, 149*(4), 534-537;

Saxe, G.N., Chinman, G., Berkowtiz, R., Hall, K., Lieberg, G., Schwartz, J., & van der Kolk B. A. (1994). Somatization in patients with dissociative disorders. *American Journal of Psychiatry, 151*(9), 1329-1334;

Cole, P. & Putnam, F. W. (1992). Effect of incest on self and social functioning: A developmental psychopathology perspective. *Journal of Consulting and Clinical Psychology, 60*(2), 174-184;

Adams-Tucker, C. ( 1982). Proximate effects of sexual abuse: A report on 28 children. *American Journal of Psychiatry, 139*(10), 825-837;

Browne, A. & Finkelhor, D. (1986). Impact of child sexual abuse: A review of the research. *Psychology Bulletin, 99*(1), 66-77;

Green, A. H. (1983). Dimensions of psychological trauma in abused children. *American Journal of Psychiatry, 22*(3), 231-237;

Pynoos, R. S. & Nader, K. (1988). Children who witness the sexual assaults of their mothers. *Journal of the American Academy of Child and Adolescent Psychiatry, 27*(5), 567-572.

P-App. 002033

actions. Executive functioning also is the ability to problem solve, and include abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions."[45]

Wendi did well on some executive functioning tests, reflecting a lack of malingering as well as illustrating intact areas of brain functioning. But Dr Young also found that "...her abilities were predominantly impaired."[46] Her cognitive abilities were specifically impaired in those areas that "...required rapid processing of information, flexible thinking, decision making, and/or inhibition...the ability to stop responding to the immediate physical environment...in order to think, consider and plan alternative ways of solving a problem and respond according to the situation."[47]

### iii.   Joe Gets Sick

Once they were married, Wendi and Joe moved to "the shop," a structure located on the Andrianos' farm. It was a small workshop that had been converted for habitation. Joe had learned windshield repair and hoped to make a go of having his own business, "Joe's Windshield Repair." Joe's sister and brother-in-law co-signed for a loan to start the business. Business did not go well for Joe and the young couple faced ongoing financial difficulties.

Within several months of their marriage, Joe noticed a lump on his neck and his neck pathology was discovered. In September 1994 he underwent the first of his surgeries, an outpatient surgery to remove what the doctor noted to be s a benign tumor. Doctors told Wendi

---

[45] Tab 5, at p. 11.

[46] Tab 5, at p. 12.

[47] Tab 5, at p. 13.

38

and Joe that his tumors were not malignant. Wendi reports that she and Joe were obviously relieved to learn that Joe's condition wasn't expected to be serious.[48]

After marrying Joe, in June of 1994, Wendi returned to Central Arizona College where she continued to take classes until June of 1995. She also enrolled at the University of Phoenix in April of 1995 to commence business classes. Even though Joe was minimally ill during this initial period of medical evaluation, he, nevertheless, was not supportive of Wendi's efforts to continue her education or secure more stable employment. Wendi reports that Joe ridiculed her attempts to continue her education and did not see value in it. Wendi acquiesced to Joe's preferences, and ultimately stopped going to school. The pervasiveness of Wendi's dependency needs is apparent in how completely she allowed Joe to control her life, from her appearance to her professional future, from what she ate to whom she befriended.[49]

Within six months of Joe's first surgery in September of 1994, he experienced pain in his neck in the area of the surgery as the result of another lump forming. Wendi reports that, by early 1995, Joe's neck was painful and swollen. Together, Wendi and Joe pursued further medical treatment for Joe. The second surgery, also an outpatient surgery, was performed at the University Medical Center in Tucson, Arizona in August 1995. Joe was required to spend a night in a hotel, but, again, the couple did not yet understand the terminal nature of Joe's illness and the enormity of the effect it would have on their lives. They were again reassured that the tumor removed was benign.

---

[48] Interview of Wendi Andriano by George Woods, MD at ASP Perryville on January 18, 2011

[49] Ibid.

Despite Wendi's income from the hospital and monetary assistance from Donna, Joe and Wendi were unable to manage the glass business or their finances well enough to stay afloat financially as Joe continued to deteriorate physically and emotionally.

### iv.   Pressure on Wendi Increases as Joe Worsens

With mounting financial pressures, and Wendi desperate to provide the care and support for her young family, she took money from her employer. In January 1996, Wendi's doctor placed her on a medical leave of absence during which time Wendi acknowledged that she took $2,000 from her employer, an uncharacteristic act considering her lack of criminal history prior to her experiencing such extreme stress levels about her family's circumstances. The manifestation of trauma and mood symptoms like impaired judgment, impulsivity, numbing of affect, and depression speaks to the increased pressures of Wendi's caregiver burden as well.[50] Wendi's increasing caregiver pressures exposed her vulnerabilities that result from her history of trauma, dependent personality disorder, and bipolar disorder.

In connection with the theft, Wendi was referred for counseling and psychological treatment and was seen at Casa Grande Valley Counseling Service, Inc. ("CGVCSI"). Treatment notes from CGVCSI indicate that Wendi's day-to-day functioning was impaired. She was not sleeping, was unable to focus, and felt unsupported by her husband. It was recommended that she receive anti-depressant medication to "help her sleep better and cope with the stresses she is

---

[50] McClean, L.M., Walton, T., Matthew, A., & Jones, J. M. *Examination of couples' attachment security in relation to depression and hopelessness in maritally distressed patients facing end-stage cancer and their spouse caregivers: A buffer or facilitator of psychosocial distress.* 19 SUPPORT CANCER CARE, 1539-1548 (2001) ("The diagnosis of cancer has profound consequences for both patients and their family members, and its progression brings further challenges for couples that include imposed changes in responsibilities and the threat of mortality. Distress, including depression and hopelessness, is very common in both partners when facing a diagnosis of metastatic cancer . . . Spouses who are less satisfied with the marital relationship may experience more caregiving burden. Caregiver burden refers to both objective caregiving, including care-related tasks and time involved in caregiving, as well as subjective caregiving, including the caregiver's experience and feelings about their role as caregiver.") (internal citations omitted).

40

facing at work and at home."[51] Her therapist notes that, "Wendi appears to be very depressed and very angry at her husband although she has not reported this to him." Wendi was overwhelmed, depressed, and becoming increasingly isolated.[52]

Although Wendi received anti-depressant medication, her therapist noted that Wendi "has had a bad reaction to [the anti-depressants], so plans to recontact her doctor." The therapist also advised Wendi to seek credit-counseling services, but by March of 1996, Wendi reported that she had not followed through with that recommendation because "her husband does not want them to lose their credit cards."

There is a note by Wendi's therapist, Beverly Nichols, MFT, from March 6, 1996. Wendi was taking anti-depressants but reported that "she's having *more* difficulties sleeping." Antidepressants are well known to induce manic episodes, called the "manic switch," in patients that are bipolar, rather than unipolar and merely depressed.[53]

The manic switch is a chemically-induced elevation of mood, most often caused by antidepressants. Bipolar disorder is a chronic, enduring, severe, and often crippling illness that, as we see in Wendi's case, exerts a crushing toll on the individual and the family. Women with bipolar disorder present most commonly with depressive moods, particularly in the early stages of the disorder. Depression appears most commonly before manic symptoms in bipolar disorder, and appears more frequently in women.

---

[51] Tab 46 (Medical Records of Wendi Andriano – Casa Grande Valley Counseling Service Inc., March 1, 1996).

[52] *Ibid.*

[53] Boerlin, H.L., Gitlin, M. J., Zoellner, L. A., & Hammen, C. L. (1998). Bipolar Depression and Antidepressants induced mania: A naturalistic study. *Journal of Clinical Psychiatry, 59*(7), 374-379.

P-App. 002037

In early 1996, Wendi lost her job at the Medical Center. Joe Wendi tried to keep Joe's Windshield Repair going and Wendi began seeking employment.  Meanwhile, Joe began working at a boat shop owned by friends. The money Joe made working there, however, appears to have been used to support his boating hobby and no additional income entered into the family home. Social Security Earnings Reports verify the grave state of financial affairs with Wendi earning just over $6600 in tax year 1996 and Joe with no reported earnings. When Wendi lost her job, she and Joe lost their medical insurance.

By late September 1996, Wendi was pregnant with no way to afford medical care. Her mother, Donna assisted in paying for prenatal care. Joe took out another loan, for $10,000, and purchased another speedboat.

Joe experienced more pain and swelling and had a third surgery with no postoperative care recommended in February 1997. The pathology report again noted "benign pleomorphic adenoma."[54]

In 1997, Wendi continued to scramble to earn enough money to provide for her now growing family. It must be remembered that, in addition to her medically ill husband, Wendi and Joe had a child (and she would soon be pregnant with another) at a time of great emotional and financial insecurity.

Wendi became involved in an at-home marketing program in attempt to earn extra money.  In the initial phases of this endeavor, she wrote to Pat Hyduk, a woman associated with the marketing program, "I need to get $5,000 in one week or the bank is repossessing my car, my

---

[54] Medical Records of Joseph Andriano – Mayo Clinic Revised Report of August 18, 1998

42

phone will be shut off and God knows what else. I am really desperate. Is there something you can do to help me? I [sic] going insane."[55]

This cry for help, to an almost complete stranger, is more than the desperate cry from someone who is just angry. Wendi was overwhelmed, and unable to function effectively. Her own life was unraveling, her husband was seriously ill, she was having to care for her children, and she was beginning to experience symptoms of mental illness to greater and greater degrees.

Joe's glass repair business was hampered by local competition and poor financial management skills. After recovering from his surgery in February 1997, he was never able to regain his footing in the business. Wendi considered leaving Joe in early 1997, and asked her parents for money to move. However, after Joe's surgery, because of his clearly failing health, Wendi was emotionally unable to leave him. She borrowed money from her parents for basic items, such as food.

Nicholas was born on June 20th, 1997. Wendi and Joe were deeply in debt, and Donna and Alejo bought most of Nicholas's clothes, diapers, and furniture.

When Joe was offered the opportunity to purchase an already established business, Accu-Glass, a successful company that Joe had once worked for, Wendi and Joe thought that might be a good option. Already deeply in debt, Wendi and Joe had no independent financial resources or credit to secure conventional business financing to purchase Accu-Glass.

Wendi wanted—and needed—Joe to succeed. She sought help from her father, Alejo, which led to Jerry Robles, an old friend. Jerry had cash from his various enterprises. According to Alejo, Donna, and Wendi, Jerry Robles became partners with Wendi and Joe.

---

[55] Letter from Wendi Andriano to Pat Hyduk , c. 1997 .

43

Jerry put up $85,000 in cash and retained 51% ownership. The remainder of the purchase price of Accu-Glass—an additional $100,000—was to be paid to the sellers, over a five-year period.

Wendi began working with Joe at Accu-Glass, handling the accounting and office functions. They were not effective business people, and Joe once again began experiencing pain and swelling in his neck in September 1997. Jerry Robles was not receiving revenues from Accu-Glass, and, amid turmoil with him regarding the business's financial condition, Wendi and Joe signed the business over to Robles. The high hopes Wendi held for Joe and a successful business venture collapsed. The young couple continued to depend on others for financial support.

In March 1998, Wendi obtained a job at the Courtyard Apartments in Casa Grande. She noted on her application that she had completed a bachelor's degree, even though she had not completed her education. She secured a good compensation package, which included health insurance and a free apartment. Wendi was pregnant again.

In July 1998, with the birth of their second child, Ashlee just two months away, Joe was diagnosed with cancer and a report from the Armed Forces Institute of Pathology confirmed that all of the tumors dating back to the first mass removed in September of 1994 were, indeed, malignant cancers.[56]

Joe had his fourth surgery in the summer of 1998. Shortly thereafter, on September 16, 1998, Ashlee was born. Joe was becoming increasingly depressed, isolated, bitter, and withdrawn. Wendi was the sole financial provider for the family. Because Joe was sick, Wendi had no choice but to return to work right after Ashlee was born. Joe was unable to care for the children so they were in left in the care of a neighbor at the apartment complex. Wendi

---

[56] Medical Records of Joseph Andriano – Armed Forces Institute of Pathology Report dated August 12, 1998.

returned to the apartment at lunch to feed Joe through a feeding tube that had been inserted after the surgery. Alejo came over three times a day to change his bandage.

Overwhelming financial pressures, the increasing pressures of her marriage, and the continuing illness of her husband began to weigh heavily on Wendi, undermining her resiliency and exposing her fragile homeostasis. Holding on by acquiescing no longer worked to keep the effects of Wendi's mood dysregulation and poor coping skills—coupled with the impaired judgment and impulsivity of her mood disorder—from completely disintegrating her ability to rise above her dependence. She had long since abandoned school and had eliminated all social contacts other than with Joe's friends. Her life became dedicated to Joe, her children, and their support and needs.

As noted by Gia Palicki who provided day care for Nicholas and Ashlee in the year before Joe died:

> Wendi and Joe told me that Joe's job was the kids, and Wendi's job was work, but really Joe spent his time doing whatever he wanted. Wendi was responsible for taking care of all the bills as long as Joe made sure that the children were dropped off for daycare. He loved to go boating, and that's what he spent most of his time doing. Wendi encouraged that hobby, and she was glad to have me care for her children so that Joe was free to go have fun. This arrangement was mutually agreed between Wendi and Joe. This was how their family worked.[57]

Though Wendi may have encouraged Joe to "go have fun" after his diagnosis, her tacit permission for Joe to avoid responsibility further worsened Wendi's emotional state. As noted by one study addressing issues related to caregiver burden, female caregivers' level of

---

[57] Tab 31, at ¶3.

45

marital distress increases as the male patient avoidance subscale score increases, such that the more avoidant the male patients are, the more the female caretakers' marital distress increases.[58]

Wendi became even more committed to helping Joe recover. She researched and found a Christian-based alternative naturopathic facility, Health Quarters Ministries in Colorado Springs, Colorado.[59] Joe's family and friends held a benefit dinner to raise money so Joe could go to Health Quarters. The program was based on nutrition. Upon his return, Wendi attempted to support a radical change in the way the young couple ate. She worked during the day and then cared for her children and Joe in the evenings, attempting to follow a strict vegetarian nutritional program that incorporated the use of vitamins, supplements, and fresh juice extracts. Despite Wendi's good intentions, encouragement and support, Joe was unable to maintain the diet and soon returned to his former eating habits.

### v.   Wendi's Symptoms Worsen as Joe's Physical and Mental Condition Deteriorates

On the heels of Joe's diagnoses, Wendi was informed that she was losing her job at Courtyard. For the Andriano family, not only did this mean the loss of income but the loss of their home and health insurance. Wendi once again scrambled to find employment. She obtained a well-paying job at an upscale apartment complex, the Meridian at the Biltmore, in Scottsdale.

---

[58] McClean, L. M., Walton, T., Matthew, A., & Jones, J. M. (2001). Examination of couples' attachment security in relation to depression and hopelessness in maritally distressed patients facing end-stage cancer and their spouse caregivers: A buffer or facilitator of psychosocial distress. *Support Cancer Care, 19*, 1539-1548.

[59] According to its Web site, "The mission of Health Quarters is to help facilitate both physical and spiritual health in the lives of God's people. We focus on building better health by presenting nutritional choices and the principles of nutrition through body cleansing and the rebuilding of the immune system. We firmly believe that illness and disease are caused by toxicity, stress, an inefficient digestive system, biochemical imbalances, mal-absorption of vital nutrients in the body, etc. We also believe that the human body has been designed by God for self-healing of degenerative conditions, given the right dietary and lifestyle changes."
https://www.healthquarters.org/index.php?option=com_content&view=article&id=43&Itemid=2

P-App. 002042

However, housing was not provided. Joe and Wendi returned to live at the Andriano farm property. Wendi worked full days, leaving at six-thirty or seven in the morning and returning home to Casa Grande late at about seven or eight in the evening after a long commute. Joe transported the kids to the babysitter and picked them up each day that Wendi worked.

Wendi's emotional leak was gradual, but unrelenting. She was crumbling under the stress of her marriage and Joe's ever growing discontent at living with his parents. When Joe and Wendi learned of a new apartment complex—San Riva—being opened in the Ahwatukee Foothills in south Phoenix, Wendi applied. She went through three interviews and obtained yet another position at an even higher scale. She received not only an excellent salary and benefits, including health insurance, but a three bedroom, two bath apartment. The young family moved to San Riva in November 1999.

When Wendi started working at San Riva, she initially worked double shifts every day to try and catch up on her family's expenses. Once their health insurance took effect, Joe returned to have a CT Scan of his lungs. In the ten months since the last scan, the tumors had doubled and the prognosis was poor. Joe was, literally, suffocating to death.

During the year leading up to Joe's death, the caregiver burden Wendi experienced and the weight Wendi bore crushed her. As noted by Gia Palicki, Wendi and Joe's babysitter:

> When I met Joe, he was a free spirit, but towards the end he was not that way anymore. His attitude completely changed. Joe changed drastically over the year that I knew him. In the beginning, things were so different. He was all about the kids, having fun, and being happy. As the illness progressed, Wendi became the sole caregiver for the children. She also was the only one working. It got so that Joe was always pissed off, and he was hardly ever at home. Eventually he was almost never around at all

47

and I hardly saw him anymore. I even started picking the kids up in
the morning instead of Joe dropping them off if Wendi couldn't.[60]

Wendi's dependence, her need to not be alone and maintain a dependent relationship, was turned upside down. She could not get praise. Her financial, emotional, physical, and familial life was deteriorating in front of her eyes.

In addition, symptoms of Wendi's bipolar disorder began to further disrupt her ability to modulate her affect and behavior. She started to drink more.[61] She then became involved in a romantic relationship with Rick Freeland, a resident at San Riva, and spoke openly to her employees and tenants about the affair. An open affair with someone in her apartment complex, while she continues as manager, is a manifestation of both dysregulation and bipolar disorders. In Wendi's case, her condition was compounded by her dependent personality. When Rick met Joe and Rick said he could not continue the relationship, Wendi fell apart, consistent with the symptoms seen in dependent personality disorder. Gia Palicki observed:

If it is true that Wendi had an affair, I can understand that. She was afraid to be alone. She did not know anyone different than Joe, and towards the end he was not very affectionate with her, which is about all she would have asked for from him. He was dying, and later on he was always angry even though she was doing everything she could to make his remaining time as comfortable and happy as possible. She was young, and her relationship with Joe was cold physically. If she had an affair, it was not because she did not love Joe.[62]

Then what were her affairs? The very symptoms of trauma and dependence, acquiescence, aiming to please, denial, emotional dyscontrol, and numbing of affect that had

---

[60] Tab 31, at ¶18.

[61] Testimony of Wendi Andriano, October 27, 2004

[62] Tab 31, at ¶21.

48

driven and shaped Wendi's life were undermined. She was increasingly unable to maintain the

facade of normality, of possible triumph, and she was feeling to blame. Traumatic stress, real life

caregiver burden, and mood disorder began to undermine Wendi's identity as the pleaser and

fixer she had been coerced to be. Her affairs, her drinking, and her impaired judgment were the

products of her emerging bipolar disorder, symptoms augmented by her longstanding trauma and

pathological dependency.[63]

       The burden of giving care added to the weight of always trying to keep up. As Joe

became increasingly sick, the weight of caring not only for her husband, but her two children,

eviscerated Wendi's ability to make reasoned choices.

       Wendi suffers co-morbid disorders, disorders that occur in combination or at the

same time. Among all mental disorders, alcohol and substance use is highest in people suffering

from bipolar disorder and PTSD.[64] Alcohol is the most common "self-medication" used by

people suffering from bipolar and PTSD disorders and PTSD is highly correlated with substance

abuse.  In one study, 24% of persons with PTSD also suffered from alcohol abuse.[65]

---

[63] Malmquist (1996), *supra*, p.159  ("A person involved in an intense relationship is disappointed when his or her expectations are not fulfilled. Resentment and anger is inevitably experienced. However, it is the presence of deep and unresolved ambivalence that prevents a DPD person from objectively examining his or her shortcomings in search of the answer as to why a relationship with a friend, employer, lover, spouse, or other is not going well. Only when the ambivalence is not too prominent can the anger be expressed and the processes of detachment begin. However, when anger or hate surface in a relationship between a person with DPD and his or her partner, it is more difficult for that person to step back than it is for others. The lack of sufficient distancing keeps the intensity of his or her ambivalence at a high level as not possible without this other person, no matter what the price . . . .").

[64] Brady, K.T. & Sinha, R. (2005). Co-Occurring Mental and Substance Use Disorders: The neurological effects of chronic stress. *American Journal of Psychiatry*, *162*(8), 1483-1493.

[65] Mills, K.L., Teesson, M., Ross, J., & Peters, L. *Trauma, PTSD, and Substance Use Disorders: Findings from the Australian National Survey of Mental Health and Well-Being*. 163(4) AMERICAN JOURNAL OF PSYCHIATRY, 652-658 (2006).

P-App. 002045

When a person with bipolar disorder is subjected to stress, mood symptoms of mania or depression may become increasingly prevalent. Since alcohol is both a stimulant at low levels and a depressant at higher levels, it serves to anesthetize both poles, while also causing impaired cognitive functioning. The combination of trauma and mood symptoms in co-morbid disorders creates atypical and more severe behavior than would be seen in a given disorder alone. Wendi's co-morbid disorders were intensified by the trauma of her husband's terminal illness, and unleashed her mood symptoms. As discussed, Wendi' symptoms were openly displayed and rarely covered.

Wendi's underlying dependency needs, present since childhood and fostered by her father's coercion, kept her teetering toward the pathological anger seen in dependent personality when those needs are thwarted.

Wendi describes conversations with Joe about his unwillingness to continue to live given his terminal condition and his fear of dying via suffocation, as had been predicted due to the proliferation of the cancer in his lungs. In fact, Wendi reports that Joe did not want anyone to know about his desire to end his life, as his minimization to Jeffrey Miller illustrates.

As a result, Wendi investigated, on her *office computer*, lethal drugs, used primarily for suicide. Wendi reports conversations with Shawn King about types of drugs and places to buy these drugs online.[66] Under the best of circumstances, Wendi's investigation into lethal substances reflects impaired judgment. She had little knowledge of these compounds, and her only computer was at her desk at work in an office shared by other people.

Wendi frequently talked with co-workers about the tremendous pressure she was under, and they saw it. Her family recognized the loss of emotional control and attempted to take

---

[66] Interview of Wendi Andriano by George Woods, MD at ASP Perryville, January 26, 2011.

50

care of the children, pay for medical care, or provide Joe with outlets like paying for him to spend time on his boat.

### vi.    Wendi Becomes More Erratic

As Wendi's stress increased, her behavior became more erratic. Her relative openness at work, particularly about her relationship with Joe, her affairs, her use of the office computer, and her investigation into lethal drugs and substances in a location where she could easily be seen doing so reflects Wendi's impaired decision making and ability to understand context as seen in people suffering from bipolar disorder.[67] As a 2001 study noted:

> This is possibly the first study to have directly compared decision-making performance in manic and depressed patients. The results showed manic and depressed patients' to be impaired on a computerized decision-making task. While the most general indicators of performance showed similarities between these two groups, close examination of the individual components of the task revealed distinct patterns of impairment: although both manic and depressed patients demonstrated similarly delayed deliberation times and altered betting strategies, impairments in the quality of decisions were confined to manic patients.[68]

An impaired mental flexibility to effectively understand social context and make good decisions is reflected in Wendi's open research into lethal drugs and substances on her office computer and in the fact that others' open awareness of Joe's condition might lead them to discern the purpose of her research. This decision making impairment is also captured in Dr. Young's testing.

---

[67] Murphy, F. C., Rubinsztein, J. S., Michael, A., Rogers, R. D., Robbins, T. W., Paykel, E. S., & Sahakian, B. J. (2001). Decision-making cognition in mania and depression. *Psychological Medicine*, *31*(4), 679-693.

[68] Murphy, F. C., Rubinsztein, J. S., Michael, A., Rogers, R. D., Robbins, T. W., Paykel, E. S., & Sahakian B. J. (2001). Decision-making cognition in mania and depression. *Psychological Medicine*, *31*(4), 679-693.

51

Cognitive dysfunction is common in bipolar disorder.[69] Problems with attention and focus, leading to a slower processing of events and circumstances, have been found in persons suffering from bipolar disorder, regardless of mental status and mood state. So, a person with bipolar disorder, even in a euthymic (stable) state, may still manifest symptoms of cognitive impairment.

In the period leading up to Joe's death, Wendi was acutely symptomatic. Symptoms consistent with bipolar disorder began to manifest. The most prominent were her expansive mood, distractibility, increased psychomotor activity, impaired judgment, and willingness to engage in activities with a high risk for problematic endings.

Wendi became inappropriately involved with fellow workers in a way that was historically uncharacteristic for her. Once married to Joe, she limited her social contacts to his friends and activities related to boating and events at the lake. Even though she was responsible for various social events at Quail Gardens and the Courtyard Apartments, she did not become personally involved with the residents and staff. At San Riva, Wendi became a part of the San Riva community. To some degree this may have served as a supportive measure for her, but, in fact, her involvement was inappropriate, showed little ability to judge her role, either as wife or manager, and was much more consistent with mental disease.

Wendi worked at San Riva. She was the boss. Nevertheless, she socialized with co-workers and renters at San Riva. She used her only computer at her office at San Riva, often in plain view of other employees and renters. She had affairs with tenants. She went to parties and barbeques at San Riva, and drank more and more.

---

[69] Martínez-Arán, A., Eduard, V., Reinares, M., Colom, F., Torrent, C., Sánchez-Moreno, J., Benabarre, A…& Salamero, M. *Cognitive Function Across Manic or Hypomanic, Depressed, and Euthymic States in Bipolar Disorder.* 161(2) AMERICAN JOURNAL OF PSYCHIATRY, 262-270 (2004).

Deficits in understanding social circumstances, and the impaired ability to respond appropriately to social circumstances are hallmarks of children and adults with bipolar disorder.[70]

Dr. Young's findings are consistent with the social history and Wendi's behavior. Dr. Young found Wendi has difficulty with decision-making, particularly with decisions that were novel and stressful. Wendi's Iowa Gambling Task demonstrated poor strategies for decision making.

Dr. Young also found that Wendi's ability to process novel information is slowed. Both Wendi and Donna describe this difficulty with understanding context and responding to it in multiple ways. Wendi described developing relationships early in her prison years that indicate decision-making that was impaired beyond mere naiveté.

We see the correlation between Dr. Young's findings of slow processing speed, and Wendi's own impaired judgment, particularly under tremendous stress, stress that had become much greater than the "normal" stress of violence and anger she had grown up with.

Wendi became involved with two men (one of whom, Rick Freeland,  a tenant at the apartment complex she managed). Consistent with the need to be loved, Wendi described herself in her testimony as falling in love with Freeland within months. When they separated, she

---

[70] "Children and adults with bipolar disorder perform differently from comparison subjects and individuals with other disorders on social-cognitive measures, particularly facial expression processing tasks. Symptomatic adults with bipolar disorder also have difficulty using contextual cues to infer others' mental states. Less research has focused on expressive aspects of social cognition; clinical observation of youths with pediatric bipolar disorder, however, suggests that language pragmatics (i.e., appropriate social use of verbal/nonverbal language) may be problematic. This pattern of aberrant social-cognitive skill suggests dysfunction in neural structures thought to mediate social, emotional, and possibly pragmatic linguistic processing. These structures include the ventrolateral and medial prefrontal cortices and the amygdala, which exhibit structural and/or functional anomalies in bipolar disorder." McClure et al. (2005). *Deficits in Social Cognition and Response Flexibility in Pediatric Bipolar Disorder* (internal citations omitted).

53

was overwhelmed, feeling as though she had lost a close friend, someone she could talk with, an interaction of classic symptoms of bipolar disorder and dependent personality disorder.

Wendi was the manager of the San Riva apartments. She not only lived there, with her husband and children, but San Riva was her place of business. She manifested multiple behaviors that portended increasing mental illness, as she continued to work there. These symptoms of elevated mood, poor judgment, impaired impulse control, increased alcohol intake, and increased sexuality, were temporally and causally related to the onset of her extreme level of traumatic stress and subsequent manifestation of bipolar symptoms. There was a change in Wendi.

The extreme stress rent the fabric of Wendi's fragile mental state, already bombarded by affective dysregulation, self-medication, impaired cognitive tools, and defective judgment. Many of the symptoms that were previously subclinical, meaning less obvious, were amplified by Wendi's loss of control, and the destruction of all that she knew, and as a result of the need to keep herself, her children, and her dying husband going.

It is unclear whether Joe participated in a suicide decision, although he had clearly entertained suicide and talked with his malpractice lawyer about his suicidal ideation. Wendi, however, on her office computer, created a false business license, using the address of her actual business office. She found a company that sold lethal compounds. She brought those compounds to her office.

Wendi's competent facade was just that, a facade that quickly crumbled in the face of coercion by her dad, the vulnerabilities of her own mental illnesses, the neglect of her mother, and, now, the extraordinary burdens of caregiving she faced. From childhood, she was isolated from others, unable to effectively socialize, and subject to peer pressure. The series of

54

behaviors prior to the night of the offense captures the range and severity of the mental illnesses Wendi was suffering from, especially when under tremendous stress before the current offense, at the time of the offense, and while being treated in jail after the offense.

### vii.    Wendi's Symptoms on the Night of the Offense

Chris Hashisaki's testimony gives some insight into Wendi's mental symptoms and mental state at the time of the offense. When asked, during cross examination, if Wendi was creating fictitious business licenses on the job, in plain view of other employees, Ms. Hashisaki said "Yes."[71] Ms. Hashisaki acknowledged seeing the package in Wendi's office. When asked by Mr. Martinez to describe Wendi's mental state at the time of the offense, Ms. Hashisaki describes Wendi as "confused."[72]

Ms. Hashisaki made it clear that Wendi was overwhelmed by Joe's illness, not just Wendi and Joe's relationship.[73]

When the emergency medical technicians came the first time, Wendi said her husband was dying and did not want any services. They asked her if she had a DNR (Do not

---

[71] Hashisaki testimony, Page 48 ("Q: In the office set up there, she openly was in the process of creating fictitious business license, correct? A: Yes. Q: You observed that? A: Yes. Q: She made no effort to hide that fact from you in doing it, correct? A: To point. Q: Right. And then when you inquired of it, she basically said it's none of your business, leave me alone? A: Correct. Q: But she did it at time during business hours, correct? A: She did yes. Q: When you were witness to it? A: Yes.").

[72] Hashisaki testimony, Page 11 ("Q: How would you describe her demeanor? A: Confused. Q: And did she have telephone in her hand? A: She did.").

[73] Hashisaki testimony, Page 40 ("Q: The marriage had some problems? A. They were having trouble with his illness, yes. Q: Beyond the illness, they were having other problems? A: Such as what? Q: Such as -- don't know how else to describe it. Difficulty between man and wife in husband and wife kind of relationship? A: She expressed difficulty in the relationship, yes. Q: And she attributed those problems to the conduct of Mr. Andriano correct? A: More so towards his illness. Q: Illness was one of the problems, but there were other items that were causing marital discord between these two individuals, correct? A: That don't know of. Q: Are you telling me that she never suggested that she was having problems with Mr. Andriano? A: No I'm not suggesting that. I'm suggesting that it was more so due to the illness. . .").

P-App. 002051

resuscitate) order.[74] Wendi's executive functioning, her impaired sequencing and understanding of specific social context, had fallen apart. She was suddenly surrounded by people she had called without knowing what to do, the very antithesis of planning, if that were the case.

Again, the emotional disconnect grounded in trauma was documented. Wendi's range of emotions and the quality of the symptoms at play included traumatic dissociation, where she lost and was unable to recollect much of the time during the incident. Wendi's dissociation has a strong foundation in the trauma and neglect of her childhood. As noted above and in the Hopper report, Wendi's father coerced her sexually for many years during her childhood and early adolescence. There are at least two incidents of Wendi being photographed by her father, once in a motel, in sexually-provocative poses and see-through nightgowns. Wendi does not recall either of the photographs, although she does recall going to each place these photographs were taken, and recalls reluctantly agreeing to let Alejo Ochoa, her father, take these pictures.

Wendi's dissociation underlies much of what we know about the actual offense. Studies consistently report a high degree of dissociation in patients who suffer from pathological forms of affective dysregulation as discussed above.[75] Indeed, Wendi was experiencing pronounced symptoms of her mental illness during the period leading up to Joe's death, and the

---

[74] Hashisaki testimony, Page 37 ("A: She walked past the fire department and myself and stood by the front door and explained that she did not want any service, that her husband was dying and this was not the way that he wanted to go, and that she would like us to leave. Q: And what did the fire department people do? A: The fire department said that if you're refusing treatment that was something they understood. They asked her if he had a 'DNR'. She asked them what a 'DNR' was and they said 'DNR' was 'do not resuscitate.'").

[75] Lewis, D. O. (1992). From abuse to violence: Psychophysiological consequences of maltreatment. *Journal of the American Academy of Child and Adolescent Psychiatry, 31*(3), 383-391;

van der Kolk, B. A., Perry, J. C., & Herman, J. L. (1991). Childhood origins of self-destructive behavior. *American Journal of Psychiatry, 148*(12), 1665-1671;

Terr, L. (1991). Childhood traumas: An outline and overview. *American Journal of Psychiatry, 148*, 10-20.

56

P-App. 002052

night of the offense involved the convergence of severe symptoms of each of Wendi's disorders, which, because of their co-morbid nature, would have fed off each other to exponentially worsen their collective severity. The manifestations of her psychiatric disorders, including dissociation, likely played a substantial role in the events that caused Joe's death. A person in Wendi's state would have been unable to control and manage her emotions and responses to the events as they unfolded. Moreover, those disorders in conjunction – and particularly dependent personality disorder when the sufferer's dependency needs are thwarted in the profound manner at issue here – likely would have substantially impaired Wendi's ability to accurately judge how to "help" her terminally ill husband, who was the focus of Wendi's pathological dependence needs. Her ability to judge whether her behavior was right was marred by her multiple mental and cognitive symptoms.

Wendi's post-arrest therapy sessions with private counselor Kandy Rohde provide our best glimpse into her mental state.

> She felt angry and hit him twice with a chair. She believes she continued to hit him with the chair but her recollection is that she watched herself do that. [A classic description of dissociation.] The next memory is of Wendi sitting on the ground next to Joe's body. She thinks she had her hand on him and she knew he was dead. She said they were in the middle of a pool of blood. She got up to wash her face and glasses because they were so bloody she could not see. She said that she does not know how much time passed or what happened. She did not hear the paramedics. The children did not wake up. Chris did not return. She called her parents and her father told her to call the police. She did. Her most chilling memory is that of Joe asking her to help him as she hit him with the chair. In her head she said that she was helping him. She said that she felt relief when she found him dead. She was glad her old life was over.[76]

---

[76] Tab 45 (Kandy Rohde Notes dated February 23, 2001).

57

Consistent with her multiple, interrelated, co-morbid disorders, Wendi describes dissociative symptoms at the time of here greatest stress. Her loss of time, emotional numbing, hyper-reactivity, and anger are all part and parcel of her traumatic disorder. Augmenting her traumatic response, however, is her Dependent Personality Disorder, created from the long term sexual coercion that led to both acquiescence and the anger that comes from overwhelming stress.

Dr. Carl Malmquist describes how individuals with dependent personality disorders are often led to violence.[77] This was certainly the case with Wendi. Her history with men, starting with her sexual coercion by Alejo Ochoa, her stepfather, to her affair with Rick Freeland and subsequent one-night stand with Travis Black, had always been one of dependence. In the impending death of Joe Andriano, Wendi was suffering from emotional abuse, dissociation, affective numbing, anger, hyper reactivity, and the foreshortened sense of the future one sees in complex trauma. She had already become unhinged, displaying manic symptoms of increased drinking, incredibly poor judgment, and sexual dalliances. The multiplicity and interplay of symptoms eroded what little ability she had shown in the past, to maintain cohesive functioning.

Symptoms of dependent personality disorder, acquiescence, difficulty being alone, and extreme neediness, permeated the early years of Wendi's and Joe's marriage. With the introduction of Joe's terminal illness, Wendi began to show new, acute trauma symptoms like numbing of affect, hyper reactivity, anger, irritability, and avoidance. These symptoms are common in caregivers, particularly those who have few resources for support.

---

[77] Malmquist, C. (1996). Dependent personality disorders and killing, in *Homicide: a psychiatric perspective* (p. 145). Washington, DC: American Psychiatric Press.

P-App. 002054

> Pearlin has investigated the role implications of life stressors,
> including family illness. He suggests that concepts such as role
> captivity, which is viewed as being placed in a role involuntarily
> and unwillingly, and role overload, help us to understand many
> dilemmas of caregiving. He also acknowledges the impact of
> caregivers' coping and social support resources on their ability to
> deal with caregiving demands.[78]

Wendi reported many symptoms of traumatic stress when describing the night of

the offense to counselor Kandy Rohde. She described affective numbing, dissociation, and the

overreaction seen when trauma, both acute and chronic, impairs the ability to modulate feelings

and behaviors.

Tragically, the dependent underpinnings of her façade were also crushed, and her

ability to conform her behavior was thwarted.[79] Wendi's mental disorders and the role they

played in the deterioration of her mental state were never examined before or during her trial. A

thorough social history would have pointed out the multigenerational history of mental illness. A

social history would have also chronicled the sexual coercion of her stepfather and neglect of her

mother which led to a lack of coping skills, acquiescence, and lack of appropriate affective

control and response.

---

[78] Sales, E. (2003). Family burden and quality of life. *Quality of Life Research, 12*(Suppl. 1), 33–41.

[79] "A question arises as to why a DPD (Dependent Personality Disorder) cannot simply act more rationally and give up the past relationship and look for a new one. Given that the relationship has had a good deal of pain attached to it, this would seem a logical step. Such a solution would also be parsimonious if available. A person involved in an intense relationship is disappointed when his or her expectations are not fulfilled. Resentment and anger is inevitably experienced. However, it is the presence of deep and unresolved ambivalence that prevents a DPD person from objectively examining his or her shortcomings in search of the answer as to why a relationship with a friend, employer, lover, spouse, or other is not going well. Only when the ambivalence is not too prominent can the anger be expressed and the processes of detachment begin. However, when anger or hate surface in a relationship between a person with DPD and his or her partner, it is more difficult for that person to step back than it is for others. The lack of sufficient distancing keeps the intensity of his or her ambivalence at a high level." Malmquist, C. (1996). Dependent personality disorders and killing. In, *Homicide: a psychiatric perspective* (p. 145). Washington, DC: American Psychiatric Press.

P-App. 002055

In addition, research has consistently demonstrated a connection between affective dysregulation and experiences of early childhood neglect, trauma and attachment failure. Without adequate regulation of the infant's distress states, the nervous system and affect-regulating brain structures fail to respond optimally. Affective dysregulation is a core symptom of post-traumatic stress disorder. Methods to increase self-regulation are crucial to the effectiveness of any treatment for these problems. Traditional therapeutic modalities that address distorted cognitions or focus on emotional expression, attempt to address affect regulation but fail to modify its underlying basis in the nervous system. When Wendi sought and first received psychological treatment in 1996, no historical information was provided to the therapist and there was no treatment recommended to appropriately approach affect dysregulation as a caregiver stress and trauma symptom, and address the underlying causes of Wendi's dysregulation.

The significance of Wendi's affective dysregulation, dissociation, numbing of affect, and other symptoms of PTSD can only be determined by a careful investigation of the total context of a patient's life, and the totality of the patient's functioning. In Wendi's case, the substantiation of many of Wendi's symptoms of bipolar disorder, cognitive dysfunction, dependent personality, and complex trauma rest upon a social history that was not sought nor found by her trial attorneys.

The lack of this social history prevented mental health specialists from understanding the multiple disorders in play as well as the environmental pressures of caregiver burden.

**b.    Post Offense Treatment for Mental Illness**

After Wendi was arrested and charged with Joe's murder, jail mental-health practitioners recognized Wendi's mood disorder, trauma, and personality symptoms. She began

60

to complain of problems sleeping early in her incarceration. Within weeks of her incarceration, she was placed on Prozac, Remeron, and Trazadone; all three antidepressants. Remeron and Trazadone are particularly sedative, and are used to aid in sleep.

On November 3, 2000, Dr. Garcia-Bunel reported that Wendi was extremely depressed, and that she had been depressed for over a year. This year corresponds to Wendi's most illogical, mood-driven acts.

Within months, her medication was changed to Remeron solely. Wendi's attorneys advised her not to talk with Dr. Garcia-Bunel, and those visits were discontinued.

Wendi was first placed on Seroquel, an atypical antipsychotic commonly used in bipolar depression, in April 2002. She was started on 100mg. at night. Seroquel is also highly sedative and an excellent sleep aid in persons that have a psychotic disorder or bipolar disorder.

By November 2002, Wendi was described as still having ongoing insomnia. Dr. Vickie Ayers increased Wendi's Seroquel to 200mg at night. Dr. Ayers also prescribed Ativan, an anti-anxiety agent, and Elavil, a very sedating antidepressant. Over the next months, Wendi was consistently prescribed Seroquel, the atypical antipsychotic, and Elavil, the sedating antidepressant. There is an important clinical question of whether Wendi was actually switched into hypomania by the Elavil. She certainly continued to manifest anxiety and problems sleeping, symptoms that could have been compounded by the very treatment she is receiving.

Vincent Stuart, MD, saw Wendi on October 23, 2003. He felt that she was anxious due to the upcoming trial and, in addition to her Seroquel, he increased her Ativan to a total of 4mg per day.[80]

---

[80] MCCHSD Progress Notes, October 23, 2003.

P-App. 002057

On November 27, 2003, in spite of treatment with antidepressants and medications for her bipolar depression, Wendi attempted suicide. She cut her left wrist, and was taken to the Durango Psych. Unit. D. Anderson, the evaluating nurse, described Wendi's thoughts as "irrational" and felt she was minimizing her attempt.[81] Wendi was placed in four-point restraints.

By the afternoon of November 28th, Wendi was logical. She had been reduced to two-point restraints. K. Hoffert, MD, made the diagnosis of "Adjustment Disorder with mixed features," and continued her medications.

Wendi's discharge criteria, developed on November 29, 2003, were that she not be a danger to herself or others, and that she develop a 25% increase in coping skills.[82] Wendi's pathological dependency needs appear at her most vulnerable times, as Counselor L. King recognized.

King evaluated Wendi on November 29, 2003. King determined that Wendi should remain on the Psychiatric Unit, where she stayed for two more years, through her trial, an extremely unusual occurrence for someone not grossly psychotic. It speaks to Wendi's mental fragility during this period, the result of multiple, overlapping psychiatric symptoms.

King believed that Wendi's need for stabilization justified her stay on the Durango Psych. Unit. Wendi's instability had, as Wendi said, started long before her incarceration. The treatment she needed came too late.

---

[81] Progress notes, MCCHSD, November 27, 2003.

[82] Progress note, MCCHSD, September 29, 2003.

P-App. 002058

c.    **Wendi's Trial**

Wendi's trial testimony was fashioned by extremely poor investigation, and a limited understanding of mental health. Mitigation was not effectively presented, since there was such a limited social history, and the attorneys relied upon incomplete data. Consequently, the symptoms of her trauma—the early childhood and adolescent trauma, the trauma of the years of marriage and her husband's impending death, and the events of his death—were not discussed as mental health symptoms. The events were discussed, but not their impact on her life. A comprehensive explanation of the multiple mental-health symptoms affecting Wendi could not be undertaken, since the social history preparation was so limited.

Many of the witnesses, particularly those from San Riva, accurately describe Wendi's symptoms of increased alcohol intake, sexual acting out, depression, and poor judgment. This behavior was not contextualized into a mental health framework to explain that Wendi was in fact suffering from several acute mental disorders, rather than merely a reaction to abusive behavior by Joe.

Due to the absence of an in-depth understanding of Wendi's family dynamic, a remarkably inaccurate and incomplete picture of Alejo and Donna Ochoa was painted. Rather than the complex, abusive, neglectful, sexually charged atmosphere that led to Wendi's dissociative states in her adolescence, Wendi's upbringing was painted as a good Christian home. Without the proper factual foundation, her attorneys were unaware of the depth of her mental disorder. They could not, therefore, discuss the depth and impact of her mental disorders, since that time treated in prison, on her life as well as at the time of the offense.

Since there was no mental health framework for her behaviors, these symptoms of dissociation, affective numbing, emotional dysregulation, and anger that are so much a part of the trauma symptom constellation were not identified as mental illness.

63

Her dependency needs were used to portray Joe in a negative light when, in fact, her dependency contributed to the instability of the relationship, and limited, as L. King reported, Wendi's coping mechanisms. This dependency was a lifelong personality disorder.

Wendi's attorneys could not effectively prepare or confront Wendi because they knew so little about her, her family, and her mental illnesses.

## CONCLUSION

It is my professional opinion, which I hold to a reasonable degree of medical certainty, that these symptoms were present at the time of offense, impairing Wendi's capacity to conform her behavior to the law, control and manage her emotions and responses to the events as they unfolded, and judge right from wrong in determining how to "help" her terminally ill husband.

P-App. 002060

Date: February 14, 2012

George W. Woods, Jr., M.D.

65

P-App. 002061

## APPENDIX A TO THE EXPERT REPORT OF DR. GEORGE W. WOODS

### Materials reviewed by Dr. George W. Woods

- Wendi Elizabeth Andriano's family documents including photographs, birth certificates, social security cards, adoption documentation, marriage documentation, school records, earnings statements, and employment records.

- Wendi's incarceration records.

- Wendi's medical and psychiatric history records.

- Miscellaneous writings by Wendi.

- Crime scene photographs.

- Audio recordings of 911 calls.

- Video and transcript of Wendi's interrogation by Phoenix Police.

- Trial testimony of Wendi.

- Phoenix Police Department interviews of witnesses.

- Public Defender interviews of witnesses.

- Trial testimony of witnesses.

- Donna Elizabeth Ochoa's family documents, including photographs, birth certificates, social security documentation, marriage documentation, letters, insurance documentation, correspondence to trial counsel, death certificates, military records, divorce records, wills, writings, and employment records.

- Donna's school and testing records.

- Donna's medical records.

- Donna's extended family marriage documentation, birth certificates, baptism documentation, death certificates, educational records, employment records, correspondence, behavioral & mental health records, medical records, psychiatric records, and housing records and documentation.

- Shelby Wayne "Skip" Robertson's photographs, birth, school, earnings statements, financial, divorce, military, arrest and incarceration records, and medical records and documentation.

- Alejo Lorenzana Ochoa's family documents, including photographs, border crossing documentation, birth certificates, death certificates, census records, marriage certificates, and divorce records.

- Alejo's personal birth records, social security documentation, school records, marriage certificate, earnings records, religion and pastorship documentation, personal writings and letters, medical records, police interview, police report and trial testimony.

- Ochoa family home movies.

- Tom King audio recordings of Harvest sermons.

- 91st Psalm and Harvest Pinal County Record documents, yearbook, photographs, documentation, parent materials, handbook, student application, handouts and family agreements.

- Communications regarding Wendi's psychological and psychiatric concerns by Leon Thikoll, Dr. Garcia-Bunuel, H. Kandy Rohde, G. David Delozier, and Jack Potts.

- Supplemental documentation relating to Wendi including letter to parents from Mexico and letter to Pat Hyduk.

- Supplemental documentation relating to Donna including diary, travel log, letters to Alejo, resume, and cards to Wendi.

- Supplemental documentation relating to Alejo including photographs.

- Supplemental documentation relating to Sharon Murphy including email correspondence to trial counsel, report by H. Kandy Rhode, and documentation of interviews of Wendi by Sharon.

- The declarations contained in Tabs 6 to 42 of the Petition.

- The Expert Report and Appendix of James W. Hopper, Ph.D.

- The Expert Report of Myla Young, Ph.D.

2

## APPENDIX B

### Overview of the Biopsychosocial and Psychiatric History of
### Wendi Elizabeth Andriano and Her Family

**1.    Importance of Family Social History and Mental Illness**

Wendi's immediate and extended family members, including her parents, maternal aunt and cousins, and maternal grandmother, all exhibit a history of mental illness. Particularly notable are symptoms consistent with bipolar disorder, major and psychotic depression, attention deficit disorder, post-traumatic stress disorder, and attention deficit hyperactivity disorder. Medical records describe, and family members report, an array of psychiatric symptoms displayed by various family members, including bipolar episodes, depression, mania, suicidal tendencies, suicide attempts, psychosis, obsessive compulsive disorder, and substance abuse.[1] These symptoms interfered with the family's day-to-day functioning, seriously compromised their parenting and care giving abilities, and were rarely ameliorated by any medical or psychiatric treatment.

Wendi's family's multigenerational history is pivotal in determining the genetic and familial components of her mental disorders. Wendi was vulnerable to mood disorders, which were rampant in her family. The incidence of inheriting mood disorders is increased four-fold in the children of persons with bipolar or depressive disorders.[2]

Wendi's maternal grandfather exhibited symptoms of bipolar disorder, including hypersexuality, chemical dependency, irritability, and impaired functioning. We also see Wendi's aunt, Nadine, diagnosed with bipolar disorder. Her mother, Donna Ochoa, has suffered from psychotic breaks on at least four occasions.

During Wendi's earliest years, she was exposed to the extreme neglect, drug use and violence of her parents. Skip Robertson, himself an abused, depressed, traumatized man; surrounded his daughters with his family, rife with childhood sexual abuse. Donna, due to her own limitations and demons, did nothing to protect her child. Wendi manifested inappropriate sexual mannerisms as early as four years of age.

Wendi was sexually traumatized at the hands of her stepfather, Alejo Ochoa. She was also subjected to an authoritarian, cult-like environment for many of her most formative years. These "religious" environments fostered corporal child abuse, and turned a blind eye to child sexual abuse.

---

[1] *See generally* Tabs 18, 27-28, 32.

[2] Schulze, T.G., Hedeker, D, Zandi, P., Rietschel, M. & McMahon, F.J. (2006). What is Familial about Familial Bipolar Disorder. Archives of General Psychiatry, 63 (Dec.).

This genetic/familial/environmental vulnerability to mental illness resulted in Wendi suffering from the seeds of multiple mental disorders.

## 2.    Maternal Biopsychosocial History: Clinical Symptoms and Diagnoses

### a.    Maternal Family Biosocial History

Maternal family declarations and medical, military, and pharmacological records reveal and support a multigenerational and transgenerational history of bipolar disorder, clinical depression, migraine headaches, cognitive disorders, attention deficit hyperactivity disorder ("ADHD"), and alcoholism. Many occurrences of these conditions went untreated. With few exceptions, in the instances up to and including Wendi's generation when treatment was sought and obtained, this was usually done late in the lives of the family members affected, often in middle age.  As a result, during the parents' years of child-rearing and care giving, children were subjected to abuse and neglect resulting from alcohol and drug abuse, psychosis, outbursts and emotional absence due to mania and mood shifts, anxiety, and the despondency of depression. Children across multiple generations of Wendi's maternal family lacked care giving, nurturing, safety, parental attention and guidance, and appropriate modeling. Situational events resulting from these conditions often derailed successful childhood development and the achievement of normal developmental milestones.

Wendi's maternal great-grandfather (her mother's paternal grandfather), Henry Mason Worsham, Sr., was "a big drinker and an alcoholic" who "drank away" his farm.[3] Wendi's mother's paternal grandmother, Mary Elizabeth Fortner, put up with Henry Worsham, Sr.'s lifelong drinking just as Wendi's maternal grandmother, Laverne Ann Tilley (Ann), put up with Henry Worsham, Jr.'s, lifelong drinking.[4]

Wendi's maternal great-grandparents (her mother's maternal grandparents) were Sanford Tilley and Ina Rebecca Roberts. Family stories reveal the severe bipolar symptoms suffered by Ina, including having migraines her whole life[5] and severe, rapid mood changes.

---

[3] Tab 27, at ¶ 4.

[4] Tab 27, at ¶ 5.

[5] Tab 27, at ¶ 406.

2

Ina tried to kill herself on at least one occasion. In a separate incident, when Ina was hospitalized for migraines later in life, she died at the hospital in what her husband at the time considered a successful suicide attempt.[6]

Thyroid disorder is frequently seen and co-morbid in people suffering from depression and bipolar disorder and other mental illness. Wendi's maternal grandmother, Ann, had a lifelong history of thyroid disorder,[7] and later in life was regularly prescribed anxiolytics in the form of Librium and Ativan and was also prescribed Haldol, used to treat psychotic disorders.[8]

Wendi's maternal grandfather (Donna's father), Henry Mason Worsham, Jr. ("Hank") was "the black sheep of his family because he stayed in the Navy and never settled down like the rest of his family."[9] Hank was a lifelong alcoholic, so severe in his alcoholism that he spent most of his money on alcohol, drank regularly for the entire time Donna was growing up, and he continued drinking until the end of his life.[10] Hank lost great potential for a successful career and life because of his drinking:

> [Donna and her parents] moved to Tucson around the time [Donna] was finishing third grade or during the summer before [she] started 4[th] grade. In Tucson [Hank] worked as a recruiter for the Navy. He should have been an officer by then, but he often drank and got into fights, which resulted in his being demoted all the time. Most of the fights he got into were bar fights with other military people while he was drunk, like when Army and Navy men were in the same bar. He ended up spending time in the brig on a Navy ship more than once.

After Donna and her parents moved to Tucson when Donna was about nine years old, Hank prepared Donna to drink alcohol:

> My dad took me around to bars while I was growing up. That was how we spent time together after we moved to Tucson. I

---

[6] Tab 27, at ¶ 407.

[7] Health History of LaVerne Ann Worsham; Medical and Pharmacy records of Laverne Ann Worsham.

[8] Medical and Pharmacy records of Laverne Ann Worsham.

[9] Military and Address History of Nadine A. Zens; Address history by LaVerne A. Worsham.

[10] Tab 27, at ¶ 29; Tab 18, at ¶ 14; Medical and Military Records of Nadine A. Zens.

3

> spent a lot of my youth in bars in downtown Tucson. I sat in
> the bars and drank Shirley Temples, a nonalcoholic drink
> made of 7up, grenadine syrup, and cherries, while my dad
> was drinking alcohol. If I was really lucky I got a cherry
> coke, but usually drank a Shirley Temple because the name
> sounded like a drink for grownups. How pathetic is that:
> preparing a child to drink alcohol by taking her around to bars
> and giving her an adult-sounding cocktail when she's not
> even a teen yet.[11]

Donna started drinking alcohol regularly with her dad when she was fifteen years old.[12]

Hank was unfaithful to Ann and reared a family with another woman, Virgie, while remaining married to Ann.[13] Hank and Ann were unable to either separate or resolve their problems. They subjected each other and Donna to years of violence, vicious fighting, abuse, and neglect. For the first year or two of Hank's affair with Virgie, Ann "dragged" the twelve-or-thirteen-year-old Donna along with her on Sundays while she went around to hotels looking for Hank. Sometimes Ann brought a gun with her, and on one occasion, while Donna waited in the car, Ann entered the hotel room where Hank and Virgie were staying and fired the gun at Virgie, attempting to kill her, then provided no explanation of what had occurred to Donna, leaving Donna wondering whether or not her mom had killed her dad.[14] When Hank came home around midnight after drinking and carousing with waitresses, there was regularly screaming and fighting between Hank and Ann and "they fought so hard that they broke windows." The pre-teen and early-teen Donna became so afraid and anxious that she began keeping a butcher knife by her bed to protect herself from her parents.[15] The problems between her parents escalated over time[16] until in 8th or 9th grade Donna had a psychotic depressive break that included periods of uncontrollable crying and mental absence.[17]

---

[11] Tab 27, at ¶ 30.

[12] Tab 27, at ¶ 83.

[13] Tab 27, at ¶ 49; Tab 18, at ¶ 14.

[14] Tab 27, at ¶ 35.

[15] Tab 27, at ¶¶ 37-38.

[16] Tab 27, at ¶ 38.

[17] Tab 27, at ¶ 48.

4

Ann "became suddenly furious at times, and had rapid mood swings."[18] Ann abruptly ended conversations on the phone. She "just suddenly had to stop talking and get off the phone." Now Donna does the same thing. She stops family members in the middle of conversations and hangs up because she "reach[es] a point where I'm just done talking and the idea of continuing to talk is intolerable."[19]

Donna is aware of a diagnosed history of bipolar disorder within her family.[20] Medical records for Wendi's mother, Donna Ochoa, reveal a history of depression, and in 2001, she was referred for a psychiatric consultation in which she was diagnosed as suffering from severe depression and anxiety disorder.[21] Donna's history of severe trauma, abuse, and neglect is manifested in an array of severe clinical symptoms and disorders that in some cases have extreme presentations in Donna's history, including bipolar disorder, psychotic depressive breaks, extreme dissociation, avoidance, inability to bond and experience intimacy, and her being passively suicidal over a period of many years. *See* "Biopsychosocial History of Wendi's Mother, Donna Elizabeth Ochoa" and "Donna Elizabeth Ochoa: Clinical Symptoms and Diagnostic Conclusions," below in this appendix, for detailed treatment and discussion of Donna's trauma and mental health history.

Wendi's maternal aunt, Kathie E. Worsham, child of Donna's father, Hank, with his second wife, has a significant mental health history.[22]

Wendi's maternal aunt, Nadine Ann Bednorz nee Zens, first child of Ann, had a significant mental health history. Nadine was diagnosed with both clinical depression and bipolar disorder,[23] and struggled with depression while her children grew up.[24] Nadine suffered from migraines[25] for which she received medical and pharmaceutical treatment for most of her life. She was treated with Phenobarbital from the time she was twelve or thirteen years old until she was seventeen, after which the

---

[18] Tab 27, at ¶ 405.

[19] Tab 27, at ¶ 404.

[20] Tab 27, at ¶ 406.

[21] Donna Ochoa Medical Records.

[22] Criminal History and ADOC Records of Kathie Worsham; Tab 27, at ¶¶ 50-61; Tab 26.

[23] Medical Records of Nadine Bednorz; Tab 18, at ¶ 3; Tab 27, at ¶ 406.

[24] Tab 18, at ¶ 3.

[25] Medical Records of Nadine Bednorz; Tab 27, at ¶ 406; Tab 18, at ¶ 3.

5

headaches subsided until she was twenty-five years old.  Thereafter she was prescribed Fioronal, to which she became addicted and was admitted for detoxification at the age of about fifty-nine. [26]

Nadine's medical records from 2001 and 2002 report a familial history of headaches, depression and bipolar disorder.  She was hospitalized three times between 2001 and 2005 for treatment for headaches, depression and bipolar disorder.[27]

Wendi's maternal cousins, including the children and grandchildren of Nadine, and Kathie's son, Brandon, who later became Wendi's adoptive brother, also have significant mental health and alcohol/substance histories. Wendi's maternal cousin, Clark Bednorz, Jr., son of Nadine, who is about a year younger than Wendi,[28] received an Individualized Education Plan ("IEP") in elementary school as a result of being diagnosed with attention-deficit disorder (now characterized in the literature as a type of ADHD).[29] He had mental-health issues as a child and received neuropsychiatric treatment for his behavioral and adjustment difficulties. [30]

Clark's condition has not improved over his lifetime.[31]  Nadine was afraid of him because of his "violent rages."[32] He drank and got into trouble for drinking.[33] As an adult and through the present-day, Clark "literally begins living on the street suddenly if he doesn't take his medication regularly."[34]

Nadine's daughter, Margie (Wendi's maternal cousin), suffers from migraines and has been diagnosed with bipolar disorder.[35] Margie has extreme mood swings so extreme that even Nadine was afraid of her:[36]

---

[26] Medical Records of Nadine Bednorz

[27] Medical Records of Nadine Bednorz

[28] Tab 27, at ¶ 414.

[29] Medical and Scholastic records of Clark Bednorz, Jr.

[30] Medical and Scholastic records of Clark Bednorz, Jr.; Tab 27, at ¶ 414.

[31] Tab 18, at ¶¶ 4-10.

[32] Tab 27, at ¶ 414.

[33] Tab 18, at ¶ 6.

[34] Tab 27, at ¶ 415.

[35] Tab 27, at ¶ 406.

6

At times [Margie] can be the happiest person you could ever
expect to meet and at other times, vicious and violent. She
goes from fits of screaming and cursing to being nice and
docile. She goes into the screaming fits suddenly, and can
transition back to being happy and as calm as can be as
though nothing happened within an hour. When that happens,
family members are often standing around shocked, and
Margie doesn't seem to think it's a big deal. She and her
husband Jeff have been physically abusive toward each other.
Nadine gave Margie thousands of dollars over the years to
encourage her to leave him but still she has not left him
though as far as I know the abuse and violence continues.[37]

Margie has four children: Brett, born 1991; Kayla, born 1993; Tyler, Born
2002; and Logan, born 2010. All of Margie's children except Logan, an infant, have been
prescribed psychiatric medications "for mental health and behavioral issues" from the
time they were small children, before they started grade school.[38] Margie states:

My son Brett and my daughter Kayla have both been
diagnosed with ADHD. My son Tyler is autistic, has a mood
disorder, and also has ADHD. He has a lot of anger problems.
Brett was eleven years old when my dad passed away. They
were very close and Brett was extremely affected by his
grandfather's death. Even though he was only eleven years
old, I was unable to get him to go to school. Eventually, I had
to put him on antidepressant medication, but he didn't take it
for very long. Kayla is currently taking Concerta, for her
ADHD. Tyler takes Adderall, Tenex, Risperdal, and
Depakote.  Because I've had trouble dealing with Tyler's
problems, and with my mom's passing, I currently take
Prozac.[39]

Alcoholism is common among individuals in Wendi's extended family,
including her maternal grandfather, Henry Worsham, Jr., great-grandfather, Henry
Worsham, Sr., and many others:

---

[36] Tab 27, at ¶ 413.

[37] Tab 27, at ¶ 413.

[38] Tab 18, at ¶ 13; Tab 27, at ¶ 416.

[39] Tab 18, at ¶ 13.

7

Many people in Wendi's extended family, both blood relatives and relatives by marriage, are or have been alcoholics, including Wendi's biological father, Skip, for much of his life; [Wendi's mother, Donna] for a couple of periods from the time [she] was a teenager until [she] was in [her] mid-twenties; Alejo, before he turned twenty or twenty-one; my dad and my paternal grandfather; all of Skip's brothers; my half-sister, Nadine, when she was younger and while she was in the service; Nadine's son, Clark, and her grandson, Brett; the husband of Nadine's daughter Marjorie, whose name is "Jeff;" my half-brother, Stevie; my half-sister, Kathie; my stepbrother, Adolfo; my mother's brother, Delmar; my mother's first husband, Theodore Zens; my father's second wife, Virginia, when she was younger; many of the men in my dad's extended family; Alejo's father, Alejo, Sr., who was a rowdy drinker until he was about sixty-five years old; Alejo's mother, Natalie; Wendi's paternal cousin, Natalie; and many other members of Alejo's extended family, including his aunts, uncles, and cousins.[40]

Wendi's life must be viewed through the legacy of her family. Prominent symptoms of impaired sexuality, chemical dependency, psychosis, and mood disruption are the foundations of Wendi's affectively laden family. Her mother, Donna, inherited many of these symptoms, and, as we now see, passed them on to Wendi.

      **b.**     Biopsychosocial History of Wendi's Mother, Donna Elizabeth Ochoa Relevant to the Clinical Diagnosis and Forensic Formulation.

I will not reiterate the full biopsychosocial history of Donna Ochoa, due to the extensive documentation provided by Dr. Hopper's report, but will summarize certain particularly relevant portions here.

Early childhood years are critical for developing a person's capacity for developing and maintaining healthy relationships as an adult. The ability to bond and empathize are typically reinforced by parents during these years. During this time Donna moved frequently and was a loner. Her parents' tumultuous and violent marital history shows their limited capacities for bonding and empathy, and her father's absence and mother's neglect show that Donna received little positive parental reinforcement as a child to establish the foundation needed for adult relationship skills. Donna's rheumatic fever and subsequent hospitalizations reinforced her isolationist tendencies. Medical

---

[40] Tab 28, at ¶ 96.

8

illness in children is a significant cause of traumatic stressors, one that is not often considered when looking at personality and mood disorders in adults that have suffered significant medical afflictions as children.

While growing up and as an adult, Donna was coerced to please her father. Until she was at least six or seven years old, she took showers with her father, and he continued to surprise her while she showered by dumping cold water on her until she was twelve years old and in the 6th grade.[41] This is the earliest incident of self-reported, inappropriate sexual and sex-related behavior by men Donna was close to with underage girls. Inappropriate sex-related behavior and sexual abuse of underage girls by men who were close to Donna and close to Wendi is consistently evident throughout both of their lives.[42]

Donna's childhood friend in Tucson, Alice McGuffee and her sisters were sexually abused by the Robertson brothers, the brothers of Donna's future husband, Wendi's biological father, Skip Robertson.[43]

Donna was "completely oblivious to the sexual abuse going on in [the McGuffee] family" and she "thought that the McGuffees had the perfect happy family" while growing up as Alice's best friend,[44] beginning a life-long pattern of Donna not noticing or comprehending sexual abuse occurring around her or in her household:

> [I, Donna] was an only child, severely neglected by parents
> who had no affection for each other, and I had no clue and no
> way to understand or even notice the sexual abuse that was
> happening in Alice's family, despite the fact that I witnessed
> things that as an adult in retrospect I recognize as being
> inappropriate. I actually always thought that the McGuffees
> had the perfect happy family, the kind of family I always
> wanted, because it was a big family with siblings, lots of
> activities and things going on, and everyone involved in each
> other's lives.
>
> If I had known then what I know now as an adult, and if I had
> had the adult skills and perceptions that I have today, I would

---

[41] Tab 27, at ¶ 18.

[42] *See generally* Tabs 12, 27-28, 30, 32.

[43] Tab 27, at ¶ 27; Tab 28, at ¶¶ 8, 13; Tab 30; Tab 17; Tab 32, at ¶3.

[44] Tab 28, at ¶ 14.

9

have recognized things that were going on in Alice's family
as being odd, and in retrospect I can see some incidents as
definitely being weird, mild things such as inappropriate
grasping or touching of the McGuffee girls by the Robertson
brothers while I was around and the girls had their clothes on,
but at the time I didn't know that any of it was wrong or even
unusual. I had nothing healthy in my own family to compare
it with, and no context in my own life to recognize that
anything was occurring other than the happy, normal family
life that I thought the McGuffees had.[45]

Donna's mother, Laverne Ann Tilley ("Ann"), ignored Donna and
neglected her severely while Donna was growing up.[46] At times Ann lashed out and
slapped or smacked Donna for no reason other than that Donna was nearby and Ann was
angry.[47] Donna's food and survival needs were met, but the relationship between Donna
and her mom was sterile and distant; there was "no emotional connection with [my
mom], no hugging, no cuddling, no warmth, no affection, no bond."[48]

As described in depth above, Donna's father, Hank, drank so much that he
spent most of his money on alcohol for the entire time Donna was growing up, and he
continued drinking until the end of his life.[49] The primary way Donna spent time with her
father, from the time she was about nine years old, in 4th grade, until she was thirteen or
fourteen years old, was in bars—where Hank drank alcohol and she drank nonalcoholic
drinks.[50] Hank thus prepared Donna to drink alcohol while she was still a child, and she
started drinking alcohol regularly with her dad when she was fifteen years old.[51]

As described above, Donna's father had marital affairs with many women
while Donna was growing up.[52] Shortly after the affair began between Hank and Virgie,

---

[45] Tab 28, at ¶ 14.

[46] Tab 27, at ¶¶ 44–46, 304; Tab 28, at ¶ 14.

[47] Tab 27, at ¶ 44.

[48] Tab 27, at ¶ 46, Tab 32, at ¶ 31.

[49] Tab 27, at ¶ 29.

[50] Tab 27, at ¶ 30.

[51] Tab 27, at ¶ 83.

[52] Tab 27, at ¶ 33.

10

while Donna was in 6th or 7th grade, she "didn't want to be Donna anymore, so I decided to change my name to 'Beth,'" and she "went around for a summer telling everyone that I was 'Beth.'"[53] This indicates intense emotional conflict in the pre-teen and early teen Donna.

The stress and fighting between Donna's parents worsened further over time.[54] Ann continued to ignore Donna, and never talked with Donna about anything important, "especially not the difficulties between her and my dad." Ann never admitted to Donna that there was a problem between her and Hank,[55] and despite the intense fighting late at night, Donna and her parents pretended that nothing was wrong. They never talked about the fighting, and during the day acted like things were okay.[56]

Donna "never wanted to do anything to make my dad mad at me."[57] She did things that she knew he would not approve of, but when he found out about them and told her to stop, she stopped: "Whatever my dad told me to do, I did."[58]

A family history of substance abuse, childhood abuse, and isolation are all clearly evident in Donna's childhood, and all strongly support a diagnosis of bipolar disorder in Donna and Wendi.

Two or three years after her parents' severe marital problems began, when Donna was in 8th or 9th grade, she "took it until I couldn't take it anymore," then lost it and "had the breakdown,"[59] the first of at least four psychotic breaks that she has suffered throughout her life. She was unable to stop crying, and then could not respond when people talked to her. She "stayed home from school and everything else" for a week or two.[60]

Donna had a period of hypersexuality beginning in her senior year in high school and continuing after she graduated, while she went to college for a semester, and

---

[53] Tab 27, at ¶ 43.

[54] Tab 27, at ¶ 38.

[55] Tab 27, at ¶ 45.

[56] Tab 27, at ¶ 38.

[57] Tab 27, at ¶ 72.

[58] Tab 27, at ¶¶ 76–77.

[59] Tab 27, at ¶ 48.

[60] Tab 27, at ¶ 48.

11

then met Wendi's biological father, Skip.[61] She was "fresh meat for the partying crowd and the guys who were older than [she] was,"[62] and she went to bars with "partiers and bad boys" who were in their twenties when she was seventeen.[63] Her first sexual intercourse occurred when she was underage with a man who was twenty-three or twenty-four years old.[64]

Donna's periods of hypersexuality and alcohol abuse in late adolescence and early adulthood are typical prodromal symptoms of bipolar disorder. Donna drank so much while attending college, "during the whole semester," that she almost got kicked out of school.[65]

Donna got together with Wendi's biological father, Skip Robertson, in late 1967, when she returned home for Christmas break after her first semester of college. Skip had just returned from Vietnam.[66] She saw him for the first time since high school at a party at which Skip and his brothers started drinking early and stayed drunk all evening.[67] Donna was eighteen years old at the time.[68] Donna and Skip had sex over Christmas break. Donna thought she was pregnant, so she and Skip got married.[69] Skip and Donna were married in February, 1968.[70]

Donna's history of severe trauma, abuse, and neglect is manifested in an array of clinical symptoms and disorders, including bipolar, psychotic depressive breaks, extreme dissociation, avoidance, inability to bond and experience intimacy, and her being passively suicidal over a period of many years. The clinical literature recognizes the

---

[61] Tab 27, at ¶ 179.

[62] Tab 27, at ¶ 78.

[63] Tab 27, at ¶ 77.

[64] Tab 27, at ¶ 179.

[65] Tab 27, at ¶ 85.

[66] Tab 27, at ¶ 90; Tab 32, at ¶ 17.

[67] Tab 27, at ¶ 90.

[68] Tab 27, at ¶ 92; Tab 32, at ¶ 17.

[69] Tab 27, at ¶ 93.

[70] Tab 27, at ¶ 96; Tab 32, at ¶ 24.

12

impact trauma can have in the manifestation of mood symptoms, not only depression but mania as well.[71]

When faced with the severe trauma of her childhood, Donna began to dissociate as a survival mechanism.[72] Her parents subjected her to intense fighting, screaming, and even murderous violence[73] and reinforced her dissociation by avoiding all discussion of what occurred, encouraging "pretending" that things were normal and nothing was wrong.[74] As a teen, the only way she was able to enjoy sex was to dissociate from it and pretend it was not happening.[75] Throughout the time she was married to Skip, Donna's response to years of Skip's extreme alcoholism, drug use, affairs with other women, absence, extreme verbal abuse, and other forms of abuse was to "choke it down somehow, look the other way, pretend it isn't a problem, and all will be fine, or at least that's what I tell myself."[76]

When she had the choice, Donna preferred uppers to alcohol.[77] This predilection is consistent with treating the depressed phase of bipolar disorder. Clinical literature supports gender differences in the presentation of bipolar disorder. One gender difference is the greater amount of depression bipolar women typically experience than bipolar men during a lifetime.

Throughout her life, Donna has adopted the lifestyle, ways, clothing, and attitudes of others in order to fit in, "almost like [she] was a chameleon." All her life she has gone along with whatever group or person she has been with, whether with partiers in high school, Skip and his family, with hippies, with church and ministry groups, or around Joe Andriano after he and Wendi were married. She changes her appearance and behavior in order to be liked and accepted. She avoided development of a cohesive identity and throughout her life "never wanted to make a decision" about who and what she was.[78] Donna has had periods of excessive drug and alcohol abuse beginning when

---

[71] Nolen et al. (2004). Correlates of 1-Year Prospective Outcome in Bipolar Disorder: Results From the Stanley Foundation Bipolar Network. *American Journal of Psychiatry*.

[72] Tab 27, at ¶ 46.

[73] Tab 27, at ¶¶ 34–35, 37–38.

[74] Tab 27, at ¶ 38.

[75] Tab 27, at ¶ 73.

[76] Tab 27, at ¶ 121.

[77] Tab 27, at ¶ 107.

[78] Tab 27, at ¶ 98.

13

she was a teenager, two periods in particular in her late teens and early-to-mid-twenties.[79] These periods of alcohol use coincided with equivalent periods of hypersexuality.[80]

Donna has experienced at least four psychotic depressive breaks during her life: in childhood after the ugliness and fighting between her parents became too much,[81] a few days after Wendi was born when she found that her dog had disappeared while Donna was at the hospital giving birth,[82] late in the marriage with Skip when trying to leave him when Wendi was two or three years old,[83] and after Wendi was arrested in connection with the current matter.[84] When she experiences these breaks, she becomes emotionally labile or cries uncontrollably for a day or two, "usually lasts a day," then shuts down and is completely dissociated for a day or longer, unable to feed herself, recognize when others are around her, or respond to communications.[85] In Donna's words, "My brain completely stops processing . . . I'm completely gone for a couple of days. I don't even have facial expressions. You can't even really talk to me because I'm not there."[86]

Throughout her adulthood, as a result of her trauma history, Donna demonstrated a capacity for extremely poor judgment and poor decision making, as with marrying Skip,[87] her difficulty and inability to leave Skip despite extreme problems,[88] the illogic of becoming pregnant with Wendi to try to solve severe marital problems with Skip despite Skip's alcoholism, absence, affairs, and abuse,[89] and the numerous poor choices Donna made in regard to Wendi's upbringing, as detailed in the report of James

---

[79] Tab 27, at ¶¶ 31, 81–89, 106–107.

[80] Tab 27, at ¶¶ 74, 76–78, 87.

[81] Tab 27, at ¶¶ 48, 143.

[82] Tab 27, at ¶¶ 142–144.

[83] Tab 27, at ¶ 143.

[84] Tab 27, at ¶ 143.

[85] Tab 27, at ¶¶ 48, 143.

[86] Tab 27, at ¶ 143.

[87] Tab 27, at ¶¶ 83, 92-93.

[88] Tab 27, at ¶¶ 103, 109-110, 112-14.

[89] Tab 27, at ¶¶ 115-16, 120, 123.

14

Hopper, Ph.D.  Over the course of her adulthood, Donna's cumulative bad judgment and decision making provides a remarkable narrative of suffering and mental disorder.

3.    Paternal Biopsychosocial History: Clinical Symptoms and Diagnoses

Wendi's biological father, Shelby Wayne "Skip" Robertson, was born April 11, 1948, to Boyd Gravely "BG" Robertson and Flora Pearl Harrison, in Fort Stockton, Texas.[90] Skip was the youngest of eight siblings.[91]

Skip was sexually abused by his brother, Buck, who was almost sixteen years his senior when Skip was eight or nine years old.[92]

Skip attempted suicide at age fifteen or sixteen by overdosing on pills that his brothers took to stay awake and go to sleep while trucking. Skip served in the Marine Corp in Vietnam beginning in 1966.[93] After five or six months in Vietnam, he "was numb."[94]

It was hard for Skip to return from Vietnam and be called a "baby killer."[95] The first few months after he returned were especially bad.[96] Skip was "[always] mental, meaning crazy," in the time period after he returned to Vietnam and during his marriage to Donna. He had "bad nightmares," four to five nights per week, where he thrashed around and called out to people.[97] On one occasion, when lying in bed with Donna, he threw her out of bed because he believed he was under attack. Another time he woke up to find himself on top of her on the floor after she threw her arm across his chest in bed while they were sleeping and he responded as though he were being attacked. Donna woke him up many times from a nightmare because he was "hollering to get down."[98]

---

[90] Tab 32, at ¶ 4.

[91] Tab 27, at ¶ 67;  Tab 32, at ¶ 4.

[92] Tab 32, at ¶ 15.

[93] Tab 27, at ¶ 91.

[94] Tab 32, at ¶ 20.

[95] Tab 32, at ¶ 20.

[96] Tab 32, at ¶ 21.

[97] Tab 27, at ¶¶ 101, 110; Tab 32, at ¶ 21.

[98] Tab 32, at ¶ 21.

15

Skip was very jumpy and easily startled. "[A]ny kind of loud noises or sudden surprises set him off." Skip stayed away from 4th of July celebrations and could watch fireworks only from afar because the loud noise was too much for him.[99] There were several incidents when Skip hit the ground in response to a loud noise.[100] To waken Skip safely, Donna had to crouch at the end of the bed and touch his toes, because he came out of his dreams swinging his fists hard enough to hurt her.

Skip drank steadily and was drunk for much of the time while he and Donna were married, both before and after Wendi was born. He did not "just have a couple of beers or go out and get buzzed, he always drank to get really drunk." Skip remained in Wendi's life until he and Donna were divorced.[101] He saw her only a few times after he and Donna were divorced, until Wendi was six years old.[102]

Skip has had "really bad" depression at times throughout his life, and in addition to the attempted suicide as a teenager, he had had other difficult depressive periods and has thought about committing suicide "every once in a while."[103] In 1987 he had another difficult period while driving trucks with his brother, Tommie. Skip did not attempt suicide directly, but "drank a lot to drown [his] sorrows."

In 1990, Skip married his third wife, Crystal Overpeck. Not long after marrying Crystal, Skip became very depressed.

Skip's brother, Tommie, was arrested for taking photos of Julie, Skip's stepdaughter, including a Polaroid with Tommie holding his penis in front of Julie's face. Julie's brother, James, found the pictures in the sleeper compartment of Tommie's truck, and showed them to his mother. When the pictures were discovered, Skip told Tommie he had to leave. Tommie was arrested a few months later in Tucson, in late 1992.[104]

Skip was also arrested in November, 1992, and went to prison in 1993 after pleading guilty to charges of molesting his stepdaughter.[105] Prior to going to prison, and

---

[99] Tab 32, at ¶ 42.

[100] Tab 27, at ¶ 102.

[101] Tab 28, at ¶¶ 35, 37.

[102] Tab 28, at ¶ 39; Tab 32, at ¶¶ 1, 33.

[103] Tab 32, at ¶¶ 11, 13, 63.

[104] Tab 32, at ¶¶ 65,67; Probation Report – State of Arizona v. Shelby Wayne Robertson.

[105] Tab 32, at ¶ 67.

16

for three years while he was in prison, Skip went to counseling, which has made it easier for him to talk about difficult things that the rest of his family never discussed.[106] He learned in counseling that he has post-traumatic stress disorder. While in prison, if someone slapped shower shoes together, the sudden noise made him jump.[107]

Skip served out his entire seventeen-year sentence until 2010.  While incarcerated, Skip learned a lot, including how to recognize when he is depressed, and that he has "to do things" to bring himself out of it.[108]

From the time Wendi was five or six years old, Skip had no contact whatsoever with her, and until 2009 he was unaware that she was on death row.[109] When he signed his declaration in June 2011, Skip still experienced PTSD symptoms. If he watches war movies, he has nightmares and wakes up "hollering and screaming." He has to be careful what he watches on TV because PBS documentaries or even an advertisement can set him off.[110]

Based on the above, Skip meets the diagnosis of Post-Traumatic Stress Disorder.

---

[106] Tab 32, at ¶¶ 12, 60.

[107] Tab 32, at ¶ 22.

[108] Tab 32, at ¶ 71.

[109] Tab 32, at ¶¶ 1, 33.

[110] Tab 32, at ¶ 22.

17

**CURRICULUM VITAE**

**George W. Woods, Jr., M.D.**

**4200 Park Boulevard, #545**
**Oakland, California 94602**

**57 Executive Park South, #360**
**Atlanta, Georgia 30326**
**United States of America**

EDUCATION

1981-1982: American Psychiatric Association/National Institute of Mental Health
Fellowship Pacific Medical Center
San Francisco, California (Jeanne Spurlock, M.D., Chair)

1981: Residency- Psychiatric - Pacific Medical Center
San Francisco, California (Allen Enelow, M.D., Chair)

1977-1978: Internship—Medical/Surgical, Highland Hospital
Oakland, California

1977: MD, University of Utah
Salt Lake City, Utah

1969: BA, Westminster College
Salt Lake City, Utah

LICENSES & CERTIFICATIONS

2009: Secretary General, International Academy of Law and Mental Health

2008: Certified Mediation Specialist, California State University, Sacramento, California

2004-2005: Interim License, Zanzibar Revolutionary Government

2004: Fellow: American Psychiatric Association

1992: Certified by the American Board of Psychiatry and Neurology

1979: Licensed Physician in California

CLINICAL EXPERIENCE & CONSULTATION

1

2011: San Francisco Police Department Crisis Intervention Training (CIT): Suicide Assessment, Mood disorders, thought disorders, and personality disorders.

2010: Task Force on Mental Retardation and the Death Penalty, American Association for Individuals with Intellectual Disabilities.

2006-2009: Projects Among African Americans Explore Risks for Schizophrenia (PAARTNERS), Consensus Diagnosis Group, Minority Mental Health Research Group, Department of Psychiatry and Behavioral Sciences, Morehouse School of Medicine, Atlanta, Georgia

1996-present: Individual Private Practice, Oakland, California

2006: National Consortium on Disaster Response for the Poor and Underserved, Developmental Task Force for the Minority Mental Health Professions Foundation, Atlanta, Georgia

2006: Georgia Congressional Representative Cynthia McKinney's Post-Katrina Working Task Force

1998-2004: Consultant-the Board of Directors, Crestwood Behavioral Health Systems, Stockton, California

1996: Individual Private Practice, San Francisco, California

1994-1996: Senior Consulting Addictionologist, New Beginnings Programs, San Ramon and Pinole, California

1988-1996: Individual Private Practice, Pinole, California

1994-1995: Chemical Dependency Consultant, Physicians' Advisory Committee, Alameda Contra Costa Medical Association

1990-1995: Consultant, Insomnia Division of the Sleep Disorders Center, Doctors Hospital, Pinole, California

1992-1994: Qualified Medical Examiner, Industrial Medical Council, State of California

1990-1994: Medical Director, Pain Management Program, Doctors Hospital, Pinole, California

1991-1993: Psychiatric/Pharmacologic Consultant, Triumph Over Pain (TOP Program), Kentfield Rehabilitation Hospital, Kentfield, California

1991-1993: Psychiatric Consultation, NeuroCare Corporation, Concord, California

2

1989-1994: Clinical Director, New Beginnings Chemical Dependency Program, Doctors Hospital, Pinole, California

1988-1993: Private Practice, Comprehensive Psychiatric Services, Walnut Creek

1983-1990: Staff Psychiatrist, Crestwood Manor, Vallejo, California

1982-1983: Medical Director, Westside Geriatric Services of Family Service Agency of San Francisco

1982-1983: Staff Psychiatrist, Villa Fairmount Psychiatric Facility, San Leandro, California

1981-1982: Assistant Director of the Inpatient Center, Director of Geriatric Services, Pacific Medical Center, San Francisco, California

1980-1981: Medical Director, Clinica De La Raza, Blythe, California

1979-1981:  Emergency Room Physician, Medical Emergency Services, Fairmount Hospital, San Leandro, California

INTERNATIONAL CLINICAL EXPERIENCE & CONSULTATIONS

2006-2008: Adjunct Professor, Makerere University, Department of Psychiatry, Kampala, Uganda

2006-present: Human Rights Committee, International Academy of Law and Mental Health, Montreal, Quebec, Canada

2006: Visiting Staff Psychiatrist, Butabika National Hospital, Kampala, Uganda

2004: Clinical Consultant, Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania

2004: Scientific Committee, International Academy of Law and Mental Health

1998-2004: Technical Advisor, Documentation Committee, Operation Recovery, Kenya Medical Association

1999-2003: Advisor - the Jomo Kenyatta National Hospital, PTSD Project, Nairobi, Kenya

1998-2003: Technical Advisor- Recovery Services, Ministry of Health, United Republic of Tanzania

ADVISORY BOARDS

2006-present: Executive Committee, International Academy of Law and Mental Health

2004-2007: Advisory Board, Health Law Institute, DePaul University, College of Law

3

2004-present: Advisory Board, Human Dignity and Humiliation Studies, University of Trondheim, Norway

2004-present: Board of Directors, The Center for African Peace and Conflict Resolution, College of Health and Human Services, California State University, Sacramento

2003-present: International Board of Directors, International Academy of Law and Mental Health

FACULTY AND PROFFESIONAL APPOINTMENTS

2008: Secretary, American Psychiatric Association's Africa Action Committee

2003-present: Adjunct Professor, California State University, Sacramento, Department of Educational Leadership and Public Policy, Sacramento, California

2002-present: Adjunct Professor, Morehouse College School of Medicine, Atlanta, Georgia

1999-2004: Affiliate Professor, University of Washington, Bothell Campus, Interdisciplinary Arts and Sciences

1986-2002: Adjunct Professor, University of Nebraska, Omaha, College of Public Affairs

1996-2000: Adjunct Professor, University of California, Davis, Department of Psychiatry, Forensic Fellowship

1992: Summer Faculty, North Central Educational Research Laboratory, Northeastern University

CLINICAL LECTURES

2011: Mood and Thought Disorders in Crisis Intervention: San Francisco County Sheriff's Crisis Intervention Training, San Francisco, California.

2011: Fetal Alcohol Spectrum Disorders and the Criminal Justice System, National Press Club, Washington, DC.

2011: The Epidemiology of Medicalization of Prisoners in the United States, International Academy of Law and Mental Health, Berlin, Germany

2011: Intellectual Disability and Fetal Alcohol Spectrum Disorder: International Academy of Law and Mental Health, Berlin, Germany

4

2011: Neuronal Plasticity: **Cognitive Skills Retraining for students with acquired brain injuries or learning disabilities**. College of Alameda, Alameda, California

2011: "The Neurobiology of Trauma In Children: Lessons About Early Childhood; Families First, Atlanta, Georgia

2010: From the Plantations/Asylums to the Prisons: The Relationship between Humiliation, Stigma, Economics and Correctional Care for the Mentally Ill: 2010 Workshop on Transforming Humiliation and Violent Conflict*□representing the□16th Annual Human DHS Conference□and the Seventh Workshop on Humiliation and Violent Conflict□□ Columbia University, Teachers College, New York

2010: Applying the Institute of Medicine Quality Chasm Framework to Improving Health Care for Mental and Substance Use Conditions; Morehouse School of Medicine, Department of Psychiatry, Journal Club

2010: Psychiatric Manifestations of Physical Disease. Morehouse School of Medicine, Department of Family Practice, Atlanta, Georgia.

2009: Sleep Disorders in Psychiatric Practice: Morehouse School of Medicine, Department of Psychiatry, Atlanta, Georgia

2008: Moderator: The Impact of Mental Health Issues on Aging, Particularly as it Relates to Alzheimer, Dementia, and Parkinson Disease, National Medical Association, Atlanta, Georgia

2008: Aging and Mental Health: What is Wellness and What is Pathology? National Medical Association, Atlanta, Georgia

2007: The Price of Leadership and the Cost of Success: Urban Leadership Program, Graduate School of Educational Leadership and Public Policy, California State University, Sacramento

2007: Cognitive Assessment and Curriculum, Department of Educational Policy, Urban Leadership Program, Graduate School of Educational Leadership, California State University, Sacramento

2007: Complex disorders of trauma and torture: The neurological bases examined through sleep disorders, Padua, Italy

2006: Clinical Aspects of Forensic Evaluation, Makerere University, Department of Psychiatry, Kampala, Uganda

2006: Memory, Medications, and Aging, Crockett, California Women's Club

2006: Cultural Differences: Ethics or Efficacy, Mental Health, Ethics and Social Policy, University of Montreal, Quebec, Canada

2006: An Update on Memory Function, Grand Rounds, Morehouse School of Medicine,

P-App. 002085

Atlanta, Georgia

2006: Moderator & Respondent (Representing Morehouse School of Medicine) Consortium for the Poor and Underserved- Cultural Factors, DePaul University School of Law and Health, Health Law Institute

2005: Constitutional Theory and Medical Rights, Montreal, Quebec, Canada

2005: Medical Diseases with Psychiatric Manifestations: Morrison and Foerster, LLP

2004: Diagnosis and Treatment of Malaria-Induced Altered Mental States: Kidongo Chekundo Mental Hospital, Zanzibar, Tanzania

2003: Law, Mental Health, and Popular Culture: University of San Francisco College of Law

2003: Accommodating Mental Illness in the Workplace: The 28th International Conference, International Academy of Law and Mental Illness, Sydney, Australia

2002: Cultural and Psycho-biological Factors In the Assessment and Treatment of Trauma: Don't Believe Everything You Think: Traumatology 1003, The Trauma Recovery Institute, Morgantown, West Virginia

2002: Trauma, Recovery and Resiliency: University of Washington, Bothell, 2002

2001: Understanding the Relationship Between Neuroimaging, Neuropsychology, and Behavior: National Medical Association 2001 Annual Convention and Scientific Assembly, Nashville, Tennessee, 2001

2001: The Thrill is Gone: Keynote Address, African American History Month, Loras College, Dubuque, Iowa

2001: Disparate Access- Healthcare: University of Washington, Bothell Campus Nursing Program

2000: Anger Management: West Contra Costa Stroke and Aphasia Support Group, Doctors Hospital, San Pablo, California, 2000

2000: Race, Culture and Bioethics: American Society for Bioethics Annual Conference, Panel Discussion, Salt Lake City, Utah

2000: Globalization and Postmodernism: International Congress on Law and Mental Health, Siena, Italy

2000: Globalization and Neuropsychiatry: Answers that Transcend Culture? International Congress on Law and Mental Health, Sienna, Italy

1998: Managed Care in the Kenyan Medical Environment: Kenyan Medical Environment: Kenyan Medical Association, Aga Khan Hospital, Nairobi, Kenya

6

1994: The Relationship Between Holidays and Mood Disorders: Doctors Hospital Pinole, California

1994: The Role of the Mental Health Expert as a Liaison Between Chemical Dependency and Pain Management Programs: American Academy of Pain Management, Vancouver, Canada

1994: Chemical Dependency: Selected Topics: Critical Care Conference, Doctors Hospital, Pinole California

1993: Detox: The First Step to Recovery: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993: Substance Use and Substance Induced Organic Mental Disorders: National Medical Enterprises Management Services Division Annual Conference, Colorado Springs, Colorado

1993: Dual Diagnosis in the Inpatient Setting- Professional Seminar, Doctors Hospital, Pinole, California

1993: Depression and Strokes: Brookside Hospital, San Pablo, California

1992: Drug Interactions in the ICU: Clinical Care Rounds, Doctors Hospital, Pinole, California

1992: Overview of Sleep Disorders: Grand Rounds, Doctor Hospital, Pinole, California

1991: Benzodiazepines: Uses and Abuses: Grand Rounds, Brookside Hospital, San Pablo, California

1990: Sleep Disorders in Schizophrenia: Quarterly Medical Staff Meeting, East Bay Hospital

1987: Afro-Centricity in Psychology: Grand Rounds, San Francisco General Hospital, San Francisco, California

1982: Geriatric Psychiatry-University of Southern California, 1982


PROFESSIONAL AFFILIATIONS

Northern California Psychiatric Society

American Society of Addition Medicine

American Psychiatric Association

Black Psychiatrists of America

American Neuropsychiatric Association

American Psychological Association

7

American Association for Intellectual and Developmental Disabilities

CLINICAL PROFESSIONAL ACTIVITIES

2010: American Association for Intellectual and Developmental Disabilities, Task Force

2007-2009: Neurocognitive Committee, PAARTNERS

2004-present: Scientific Committee, International Academy of Law and Mental Health

1993-1996: Medical Privileges Committee, Doctors Hospital, Pinole, California

1991-1996: Physicians' Advisory Committee, Doctors Hospital, Pinole, California
(Chair, 1994- 1995)

1993-1995: Physicians' Advisory Committee, Alameda Contra Costa Medical Association,
Oakland, California

1993-1994: Board of Directors, Solano Park Hospital, Fairfield, California

1992-1993: Board of Directors, East Bay Hospital, Richmond, California

1992: Chief of Staff, East Bay Hospital, Richmond, California

1992: Chairman, Medical Executive Committee, East Bay Hospital, Richmond, California

1992: Allied Health Committee, Doctors Hospital, Pinole, California

1992: Pharmacy & Therapeutics Committee, Doctors Hospital, Pinole, California

1991: Professional Activities Committee, Easy Bay Hospital, Richmond, California

1990: Psychiatry Committee, Chairman, East Bay Hospital, Richmond, California

HONORS

2009: Secretary General, International Academy of Law and Mental Health

2009: Co-Chair, International Academy of Law and Mental Health Congress, New York
University Law School,

2007: Co-Chair, International Academy of Law and Mental Health Congress, University of
Padua, Padua, Italy.

2007: Executive Committee, International Academy of Law and Mental Health

1993: Outstanding Professor Award, Goodrich Program, Department of Public Policy,

8

University of Nebraska at Omaha

1992: National Medical Enterprises' Outstanding Medical Director of Psychiatric, Rehabilitation and Recovery Hospitals

1992: Chief of Staff Award for Outstanding Service, East Bay Hospital, Richmond, California

CLINICAL PUBLICATIONS

Greenspan, Switzky, Woods: *Intelligence Involves Risk-Awareness and Intellectual Disability Involves Risk-Unawareness: Implications of a Theory of Common Sense*, Journal on Intellectual & Developmental Disability, 2011, in press.

Woods, Greenspan, Agharkar: *Ethnic and Cultural Factors in Identifying Fetal Alcohol Spectrum Disorders:* American Academy of Psychiatry and the Law, 2011, in press.

Bradford, Fresh, Woods: Not all patients are alike: *Ethnopsychopharmacology of Bipolar Disorder in African Americans.* Psychiatric Times, February, 2007.

Abueg, Woods, Watson: Disaster Trauma; Cognitive-Behavioral Strategies in Crisis Intervention: Second Edition, Guilford Press, New York and London; p. 73-290, 2000.

FORENSIC PRACTICE

1981-present: Psychiatric Consultant (Civil, Criminal and Appellate Judicial Proceedings)

1993-2001: Consultant- the Victims' Assistance Program, State Board of Control, State of California, Sacramento, California

1983-2000: Medical Examiner Panel, San Francisco County, Marin County and Contra Costa County Superior Courts

FORENSIC PROFESSIONAL LECTURES

2010:  The Trial of Hamlet, Morrison and Foerster, LLP, Law College, San Diego, California

2009:  Treatment of Mentally Ill Offenders in the United States, Canada, and Japan; Japanese Association of Forensic Psychiatry, Tokyo, Japan

1998-2007: In Association With The National Institute of Trial Advocacy Training, Notre Dame University, South Bend, Indiana; Georgia State Law School, Atlanta, Georgia; New York University Law School, New York City, University of North Carolina Law School, Chapel Hill, North Carolina; University of Houston Law School, Houston, Texas; University

9

of Tennessee Law School, Knoxville, Tennessee; Atlanta, Georgia; University of Texas Law School, Austin, Texas; Temple University School of Law, Philadelphia, Pennsylvania

2006: Aligning Clinical Services with Correctional Treatment, Luzira Prison, Kampala, Uganda

2006: Decision Tree for Forensic Evaluations, Butabika Hospital, Kampala, Uganda

2006: Neuropsychiatry and The Courts: The University of Texas Law School, Austin Texas

2002: Demystifying Emotional Damages Claims: Paul, Hastings, Janofsky & Walker, San Francisco, California

2000: An Introduction-Multi-Axial Assessment and DSM-IV: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

2000: Psychiatric Manifestations of Mental Disorders: Second National Seminar on Mental Illness and the Criminal Law, Miyako Hotel, San Francisco, California

1999: An Introduction-Multi-Axial Assessment and DSM-IV: First National Seminar on Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999: Psychiatric Manifestations of Medical Disorders: First National Seminar of Mental Illness and the Criminal Law, Radisson Hotel, Washington, D.C.

1999: The Kenya/Tanzania Embassy Bombings: When Forensic Science, Politics, and Cultures Collide: International Academy on Law and Mental Health, Toronto, Quebec, Canada

1999: Research Collaboration Between East Africa and the United States: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1999: Trauma/Resiliency In East Africa Workshop: World Psychiatric Association/Kenya Psychiatric Association, First Annual East African Conference, Nairobi, Kenya

1998: Mental Health Litigation and the Workplace: Sponsored by the University of California Davis Health System, Division of Forensic Psychiatry, Department of Psychiatry, and Continuing Medical Education, Napa, California

1998: Psychological Disabilities: Charting A Course Under the ADA and Other Statutes: Yosemite Labor and Employment Conference, Yosemite, California

1998: Current Trends in Psychiatry and the Law: Developing a Forensic Neuro-Psychiatric Team: CLE, Federal Public Defenders for the District of Oregon, Portland, Oregon

1997: The Changing Picture of Habeas Litigation: The National Habeas Training Conference, New Orleans, Louisiana

10

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Orange County

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Palo Alto, California

1997: Accommodating Mental Illness in the Workplace: Employment Law Briefing, Morrison & Foerster, San Francisco

1997: Psychiatric Evaluations in the Appellate Process: Emory University, Department of Psychiatry, Forensic Fellowship, Atlanta, Georgia

1997: So You Wait Until Discovery Is Over to Consult with a Psychiatrist? Can You Tell Me More About That? Morrison and Foerster Labor Law College, Los Angeles, California

1997: The Changing Cultural Perspectives in Forensic Psychiatry, San Francisco General Hospital Grand Rounds, San Francisco, California

1996: Evaluations of an Elementary School Child: Criminal Competency and Criminal Responsibility, Stanford University School of Medicine, Department of Psychiatry and Behavioral Sciences, Division of Child, Psychiatry and Child Development, Grand Rounds, Palo Alto, California

1996: Forensic Psychiatry: Cultural Factors in Criminal Behavior, Malingering, and Expert Testimony: The Black Psychiatrists of America Transcultural Conference, Dakar, Senegal, West Africa

1996: Dangerousness; Evaluation of Risk Assessment: Grand Rounds, Department of Psychiatry, University of California, Davis

1995: Violence in the Workplace: A Psychiatric Perspective of Its Causes and Remedies: The Combined Claims Conference of Northern California, Sacramento, California

1995: Experts: New Ways To Assess Competency- Neurology and Psychopharmacology: Santa Clara University Death Penalty College, Santa Clara, California

1995: Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation:  The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995: Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The American College of Forensic Psychiatry 13th Annual Symposium, San Francisco, California

1995: The Use of Psychologists In Judicial Proceedings: The California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Monterey, California

11

1994: Commonly Seen Mental Disorders in Death Row Populations: The California Appellate Project, Training Session for Legal Fellows and Thurgood Marshall Investigative Interns, San Francisco, California

1994: Anatomy of a Trial: Mock Trial Participant, The California State Bar Annual Convention, Anaheim, California

1994: Developing a Forensic Neuropsychiatric Team: The American College of Forensic Psychiatry 12th Annual Symposium in Forensic Psychiatry, Montreal, Quebec, Canada

1994: Responsibility in Forensic Psychiatry: Department of Criminology Faculty Seminar, University of Nebraska, Omaha

1994: Attorney/Investigator Workshop: Brain Function: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Seminar, Long Beach, California

1994: Appellate and Habeas Attorney/Investigator Workshop: Evaluating Mental Health Issues in Post-Conviction Litigation: The 1994 California Attorneys for Criminal Justice/California Public Defenders Association Capital Case Defense Seminar, Long Beach, California

1993: Psychological Issues in Police Misconduct: Police Misconduct Litigation, National Lawyers Guild, San Francisco

1993: Neuropsychiatry, Neuropsychology and Criminal Law: Maricopa County Office of the Public Defender, Seminar on Investigation for Mitigation and Capital Cases, Phoenix, Arizona

1993: Working With Experts: California Appellate Project, San Francisco, California

1991: Forensic Psychiatry and Ethnicity-Black District Attorneys Association, National Convention

PROFESSIONAL FORENSIC PUBLICATIONS

Psychiatry and Criminal Law, Contra Costa Lawyer, Volume II, No. 8, August 1998.

Mock Trial: Client Competence in a Criminal Case: Testing the Limits of Expertise, The Psychiatrist's Opinion as Scientific, The Expert's Foundation As Sufficient, 1995 (Available from The American College of Forensic Psychiatry and on Audiotape).

Multiple Diagnostic Categories in Children Who Kill: Psychological and Neurological Testing and Forensic Evaluation, 1995. (Available from the American College of Forensic Psychiatry and on Audiotape).

Developing a Forensic Neuropsychiatric Team,1994. (Available from the American College of Forensic Psychiatry on Audiotape).

12

Anatomy of a Trial: 1994 (Available for the California State Bar).

PROFESSIONAL AFFILIATIONS

• International Academy of Law and Mental Health

PROFESSIONAL DEVELOPMENT & CORPORATE SERVICES

2011: Forefront Behavioral Telecare, LLC: Director of Clinical Research

2009-2010: Forefront Behavioral Telecare, LLC: Chief Medical Officer

2009: AgeServe Communications, LLC: Director of Research/Director of Government Programs

2004: Consultant, Corporate Structure, Tostan, Non Governmental Organization, Theis, Senegal

2004: Toward Effective Retention Efforts: The use of narratives in understanding the experiences of racially diverse college students., Narrative Matters, Fredericton, New Brunswick, Canada

2003:    In Association with the Council on Education in Management, Charlotte, North Carolina, Accommodating Psychiatric Disabilities: Avoiding the Legal Pitfalls of the ADA, Human Resources Conference, Palm Springs, California

2001-2003: Consultant, Vulcan Inc., Seattle, Washington

1999: In Association with Matthew Bender Legal Publishing, New York: Psychiatric Disabilities and California Workplace Requirement, With the Bar Association of San Francisco, San Francisco

1998: Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial Strategy, Atlanta, Georgia

1998: Psychiatric Disabilities under the Americans With Disabilities Act: Without Pretrial Strategy, Los Angeles, California

THE CRITICAL MOMENTS CONSULTING GROUP

2001: Part I- Responding Creatively to Cultural Diversity through Case Stories and Part II-Strategies and Challenges for Campus-wide Diversity Project: Models of Integrating Critical Moments, Fourteenth, Annual Conference on Race and Ethnicity in American Higher Education, Seattle Washington

13

2001: Teaching Complex Case Stories, Faculty Development, Loras College, Dubuque, Iowa

2000: Critical Moments: Creating a Diversity Leadership Learning Community, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000: Critical Moments: Practicum on Teaching Diversity Through Case Stories, 13th Annual National Conference on Race and Ethnicity in American Higher Education (sponsored by the University of Oklahoma, Southwestern Center for Human Relations Studies), Santa Fe, New Mexico

2000: Improving Undergraduate Education: Teaching and Learning in the Context of Cultural Differences, The Washington Center for Improving the Quality of Undergraduate Education, Thirteenth Annual Conference, Seattle, Washington

1999: Critical Moments: Deepening Our Understanding of Cultural Diversity through Critical Analysis, Effective Interviewing, Case Writing, and Case Teaching, The Washington Center, Evergreen State College, Olympia, Washington

1999: Teaching Complex Issues with Case Studies: A Workshop for Faculty and Graduate Teaching Assistants, University of Nebraska at Lincoln, Teaching and Learning Center and Critical Moments Project

1999: Critical Moments: Writing the Stories of Diverse Students, Washington Center for Improving the Quality of Undergraduate Education Workshop for College and University Faculty, Administrators, Staff and Students, Evergreen State College, Bothell, Washington

1999: Critical Moments: A Case Study Approach for Easing the Cultural Isolation for Under-represented College Students, Presented at Transforming Campuses Through Learning Communities, National Learning Communities Conference, Seattle, Washington

1993: Contextualism and Multi-Cultural Psychology-Graduate Seminar, University of Nebraska, Omaha, Nebraska

1992: Curriculum and Developmental Stages-North Central Educational Research Lab, Northwestern University

CRITICAL MOMENTS PUBLICATIONS

Diane Gillespie, Ph.D., Gillies Malnarich, and George Woods, M.D. (2006). Critical Moments: Using College Students' Border Narratives as Sites for Cultural Dialogue, In M.B. Lee (Ed.), Ethnicity Matters: Rethinking How Black, Hispanic and Indian Students Prepare for and Succeed in College. (pp. 99-116). New York: Peter Land Publishing Group.

Diane Gillespie, Ph.D. and George Woods, Jr., M.D. (2000). Critical Moments: Responding Creatively Cultural Diversity Through Case Stories; Third Edition.

14

Updated January 8, 2012

15

**APPENDIX D**

**Qualifications, Expert Witness Experience, and Compensation Rate in this Case**

My qualifications, publications, and expert witness experience are fully set forth in my Statement of Qualifications and C.V., attached as Exhibit B. My compensation rate in this case is $350 per hour.

I am a licensed physician specializing in neuropsychiatry. I am in private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations. My business addresses are 4200 Park Boulevard, #545, Oakland, California 94602, and 220 Renaissance Parkway, #1220, Atlanta, Georgia 30308.

I am a Fellow of the American Psychiatric Association, as well as a member of the California Psychiatric Association, and the Northern California Psychiatric Association. I am a member of the American Neuropsychiatric Association, and the American Psychological Association. I am currently Secretary General of the International Academy of Law and Mental Health.

I am on the Scientific and Executive Committees of the International Academy of Law and Mental Health. I am a past member of the Advisory Board of The Health Law Institute of the College of Law, DePaul University. Currently, I am on the Advisory Board of the Center for African Peace and Conflict Resolution, California State University, Sacramento, California; and the Global Advisory Board for Humiliation and Dignity Studies, Trondheim University, Norway, and Columbia University, New York, New York. I teach Clinical Aspects of Forensic Psychiatry and Geriatric Psychiatry to Third and Fourth year residents at Morehouse School of Medicine, Department of Psychiatry.

I was on the Faculty of the Department of Educational Leadership and Public Policy, California State University, Sacramento. I was on the faculty of the University of Washington, Bothell campus, where I have taught a course on Mental Illness and the Law. From 1996 through 2000, I taught in the postgraduate Forensic Psychiatry Fellowship at the Department of Psychiatry at the University of California, Davis, California Medical Center.

I received a Bachelor's degree in 1969 from Westminster College in Salt Lake City, Utah. I received my medical degree from the University of Utah Medical Center in 1977. I completed a medical internship at Alameda County Medical Center, Oakland, California; then completed my residency at the Pacific Medical Center in San Francisco, California in 1981, where I was Chief Resident my senior year. I then participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship in 1982. I received my board certification in psychiatry in 1992. My fellowship was in Geriatric Psychopharmacology.

The American Neuropsychiatric Association delineates the difference between traditional psychiatric practice and the practice of neuropsychiatry: Neuropsychiatry is the area of psychiatry concerned with the biopsychosocial treatment of disorders associated with brain dysfunction. A neuropsychiatric approach permits a broad conceptualization of a clinical problem that transcends a basic psychiatric or neurologic paradigm. The neuropsychiatric

4818-2253-8254.1

assessment is data driven. The collection of the data and their synthesis into a coherent formulation serve to distinguish neuropsychiatry as a unique clinical discipline.

The medical training I have undertaken, since my residency, has been geared toward a neuropsychiatric practice that combines an understanding of the relationships among psychiatric disorders, brain dysfunction, metabolic disruption, and endocrine abnormalities. This medical training has been supplemented with training in neuroanatomy and neuropsychological investigation, psychopharmacology, neuroimaging, and other relevant subjects, such as sleep disorders and dysmorphology (the study of structural abnormalities often related to developmental disorders). The American Neuropsychiatric Association recommends that this depth and breadth of training be required in order to practice neuropsychiatry, and recognizes this type of training as unique from and transcendent of both traditional psychiatric and neurological practice.

The approach represents a fundamental departure from the traditional psychiatry and neurology practice in several ways. The reciprocal influences of psychology and cerebral dysfunction are appreciated. Both processes are, of course, brain-related. However, each has its own unique and significant influence on behavior. Localization of signs and symptoms in the brain takes precedence over standard psychiatric diagnosis. Therefore, a more comprehensive assessment of mental status is undertaken.

My early medical training focused on internal medicine as well as psychiatry. My internship at Alameda County Medical Center (Highland Hospital, Oakland, California) was not in psychiatry. Rather, I chose to complete a rotating medical internship, which included internal medicine, surgery, orthopedic surgery, emergency medicine, and obstetrics/gynecology. During my psychiatric residency at Pacific Presbyterian Hospital (Now California Pacific Presbyterian Hospital), in San Francisco, California, I took specialized neurological electives at Kaiser Permanente Hospital, Oakland, California. These electives were extended, three month clerkships, where I was assigned to the neurology department, conducting neurological examinations and diagnosing neurological disorders, including movement disorders, headache disorders and central nervous dysfunctions, among others.

During the last year of my psychiatric residency, I also practiced general medicine as a family practitioner in Blythe, California. I ran a medical clinic for the Clinica De La Raza, a medical clinic developed by the United Farmworkers of America. After graduation from my psychiatric residency, I worked as an emergency room physician in both medical and psychiatric emergency rooms in Alameda and Contra Costa Countries in California.

I participated in a National Institute of Mental Health/American Psychiatric Association (NIMH/APA) Fellowship directly after my residency. During the fellowship, I developed the first medical/psychiatric unit at Pacific Presbyterian Hospital. This unit administered to patients with either medical illnesses that had psychiatric manifestations or psychiatric patients with severe medical illness that could not be treated effectively on regular medical units. Many of these patients had neurological impairments, significant drug interactions that required diagnosis and monitoring, or unusual symptom presentations due to the multiple disorders from which these patients were suffering.

2

The focus of my American Psychiatric Association/National Institute of Mental Health (APA/NIMH) Fellowship was Geriatric Psychopharmacology, the study of medication use with elderly populations. Geriatric Psychopharmacology is an extremely valuable approach to the study of psychopharmacology in general. The elderly present several pharmacologically-related challenges.

First, many elderly people are on a variety of medications; therefore, an understanding of drug interactions is paramount. Second, changing metabolism and body composition must be taken into consideration when understanding the effect of drugs in the elderly, considerations that may appear to be less important when working with a younger adult population, yet is directly relevant to non-geriatric populations who may be ill or incapacitated in other ways. Third, due to the above factors, neurological phenomena like delirium, confusion, altered states of consciousness, and organically-derived psychotic states occur more commonly in the elderly, and must be appropriately diagnosed and treated. Although this training was with geriatric populations, the medical/psychiatric/neurological/pharmacological training and experience I gained during this period is relevant to other patient populations, particularly forensic populations, who experience a higher incidence and greater interaction of drug, mental and neurocognitive problems than the general population.

After my APA/NIMH Fellowship, I become the Director of Outpatient Geriatric Services for the San Francisco Family Services Agency. In this position, I conducted home visits with elderly patients who manifested psychiatric symptoms. Neurological intervention and medical examinations were frequently required. I still conduct home visits with many of my clinical patients, due to their impairments.

From 1983 through 1990, I provided neuropsychiatric care at Crestwood Manor, Vallejo, California, which is a long term psychiatric facility dedicated to treating severely ill patients. Many of these patients came from state hospitals with atypical presentations. Atypical presentation of psychiatric symptoms is common among forensic populations as well, particularly in this time of decreased community mental health services and limited availability for intensive treatment. Many of Crestwood's clients also had multiple, co-occurring disorders that required an understanding of pharmacology, neurology, and psychiatry, as noted by the American Neuropsychiatric Association.

Neurocare Corporation, a head-injury and neurological disorders treatment facility in Concord, California, hired me in 1991 specifically to work with neurologically impaired individuals who had psychiatric manifestations of their cognitive impairments. A multidisciplinary environment, the Neurocare treatment team consisted of neurologists, neuropsychiatrists, neuropsychologists, and social workers. An intimate knowledge of brain/behavior relationships was required in order to avoid misdiagnosis of atypical symptom presentations. During this same period, I was a psychiatric and pharmacological consultant to the Triumph Over Pain (TOP) Rehabilitation Program in Kentfield, California. Kentfield Rehabilitation Hospital is one of the premier rehabilitation facilities in Northern California. I was responsible for monitoring complex drug regimens with medically ill individuals. Many psychiatric drugs are used in the treatment of pain patients, including antidepressants, anti-anxiety agents, anti-epileptics, and anti-psychotics. Often, these psychiatric drugs are not utilized for their primary psychiatric indication. For example, anti- psychotics, anti-depressants, and anti-

3

P-App. 002098

seizure medications may be effective in diabetic limb and phantom pain. Due to the physical debilitation of many of these patients, as well as the multiple medications necessary for many of these patients' rehabilitative efforts, neurological complications are common. Delirium and agitation appear frequently in this physically comprised population.

Personality Disorders, substance abuse, and malingering are all found more commonly in chronic pain patients, according to the medical literature. Determination of malingering, as well as recognizing the impact of personality disorders, if they were present, was a crucial component of effectively treating this challenging population. Differentiating substance use from substance abuse was also necessary for successful clinical intervention.

During this time period, I also was the Medical Director of a successful pain management program at Doctors Hospital, in Pinole, California. Sleep disorders, the evaluation of disorders in the architecture of sleep is a seminal, although often overlooked, component of medical illness, psychiatric disorders, and pharmacological interventions. Sleep disruption is frequently the first overt symptom of an underlying medical, neurological, or psychiatric disorder. Disruption of sleep can be found in almost all psychiatric disorders. Substance abuse is also often related to impairment of normal sleep patterns.

From 1990 through 1995 I served as the Coordinator and Psychiatric Consultant to the Insomnia Division of the Doctors Hospital, Pinole, California, Sleep Disorders Center. Fred Nachtwey, MD, a Board Certified neurologist, and Richard Sankary, MD, a Board Certified pulmonologist, were the other coordinators of this clinic. We evaluated and treated sleep disordered patients for neuropsychiatric disorders such as anxiety and depression, as well as neurologically-derived disorders related to the dysfunction of the sleep centers of the brain, or pulmonary problems, like Sleep Apnea. A thorough understanding of sleep architecture was required, since the phase of sleep architecture in which the sleep disorder occurs can often be of diagnostic significance. From 1990 through 1995, Doctors Hospital contracted with me to provide Consultation-Liaison services to the general medical hospital. This contract also extended to Brookside Hospital in San Pablo, California. Consultation-Liaison Psychiatry is the practice of neuropsychiatric evaluation of medically ill patients. My evaluation of chronically ill patients, neurologically comprised patients, and sleep disordered patients was a natural outgrowth of my practice and clinical experience.

I served as the Clinical Director of the New Beginnings Chemical Dependency Program at Doctors Hospital from 1990 through 1994. New Beginnings evolved from a program limited to treating solely chemically dependent patients to a program that treated patients with what are called co-occurring disorders. Co-occurring disorders defined persons who have multiple psychiatric disorders, which is the norm, rather than unusual. Many persons with neuropsychiatric disorders attempt to self-medicate their symptoms.

The New Beginnings Program had the advantage of being housed within Doctors Hospital, a general medical hospital. Consequently, I consulted to the general hospital on issues of pharmacological interactions as well as co-occurring disorders.

The Director of Nursing at Doctors Hospital contracted with me to reorganize medical rounds in the Intensive Care Unit, in order to make the Unit more responsive to

4

4818-2253-8254.1

neurological disorders and drug interactions that might appear as neuropsychiatric disorders and neuropsychiatric symptomatology. I rounded with nurses, internists, neurologists, and hospital pharmacologists on all patients in the Intensive Care Unit. During this period I was named Outstanding Medical Director of Psychiatric, Rehabilitation, and Recovery Hospitals for National Medical Enterprises.

Appointed as Senior Consulting Addictionologist by Doctors Hospital in 1994, I oversaw complex withdrawals and detoxifications, and developed research protocols for the use of new medications for opiate withdrawals and sedation in the intensive care units.

I have consulted with neuropsychologists on neuropsychological instruments, including the Halstead Reitan Battery. I have also studied other psychometric instruments, including, but not limited to, the Minnesota Multiphasic Personality Inventory (MMPI, 2, and RF), the Millon Clinical Multiaxial Inventory, the Personality Assessment Inventory, the Rorschach, and instruments measuring effort.

I also studied the Magnetic Resonance Imagining (MRI) and Cathode Scans (CT), focusing on the different uses of structural imaging and functional imaging, like the SPECT and the Positive Emission Tomography (PET).

In the last 10 years, my clinical practice has focused on developmental disorders like Fetal Alcohol Spectrum Disorder and Intellectual Disabilities. I assess and treat patients with psychiatric manifestations of brain impairment, typically congenital, infectious, or acquired brain injury.

I subscribe to various neuropsychiatric journals, including the American Neuropsychiatric Association's journal (The Journal of Neuropsychiatry and Clinical Neurosciences), and CNS Spectrums; as well as the American Journal of Psychiatry, Psychiatric Annals and Journal of Clinical Psychiatry. I also subscribe to the Psychiatric and Neurologic Clinics of North America. I subscribe to the New England Journal of Medicine.

I joined the faculty of the University of California, Davis, Medical School, Department of Psychiatry, in 1996. For the next four years, I taught Forensic Psychiatry and Criminal Responsibility to psychiatrists in the Postgraduate Forensic Fellowship. I am currently on the faculty of Morehouse College of Medicine, Department of Psychiatry in Atlanta, Georgia.

At the request of Kenyan and Tanzanian Medical Societies in 1998, I assisted their nations in developing mental health delivery services after the Kenyan/Tanzanian Embassy bombings. The initial focus of the project centered on the acute trauma suffered by survivors and families of those killed and injured in the bombing. Appropriate diagnosis and treatment for trauma survivors required assessment of and treatment for pre-existing psychiatric and neurologic disorders and an appreciation of the consequences of chronic exposure to trauma that predated the bombings.

In December 2004, I had the privilege of working at Kidongo Chekundu Mental Hospital, Zanzibar, Tanzania. Understanding the culture of your patient as well as their possible disease was drilled into me by the Zanzibarean medical staff. Their persistence reinforced my recognition of the value of knowing your patients, intimately, over time.

4818-2253-8254.1

I was asked by the International Academy of Law and Mental Health to spearhead a joint human rights effort to establish a forensic medicine initiative at Makerere University in Kampala, Uganda. This effort, started in November 2006, is ongoing.

My appointment to Morehouse College of Medicine, as well as my involvement in Tanzania, Uganda, Zanzibar, and Kenya reflect the transition in main stream psychiatric thought from the minimization of culture in determining psychiatric intervention to the recognition that, even in disciplines that appear to be scientifically grounded like psychopharmacology, a deep understanding of the cultural nuances in neuropsychiatric evaluation is absolutely necessary.

I maintain a private clinical practice in neuropsychiatry, psychopharmacology, and psychotherapy in Oakland, California.

48 18-2253-8254.1

## EXPERT REPORT OF JAMES HOPPER, Ph.D.

### I.    QUALIFICATIONS

I am a clinical psychologist licensed to practice in the Commonwealth of
Massachusetts. In 1997, I earned a Doctoral degree (Ph.D.) in clinical psychology from
the University of Massachusetts at Boston. Most of my research and clinical work over
the past 20 years has focused on the long-term effects of childhood abuse.

From 1997 to 1999, I completed a post-doctoral psychology fellowship at the
Trauma Center of HRI Hospital, in Brookline, Massachusetts, an internationally
recognized clinic affiliated with Boston University School of Medicine. I was also the
Assistant Director of Research at the Trauma Center during the same period. In these
capacities, I received training in and provided intensive psychotherapy for severely
traumatized clients and co-designed and managed several research projects on traumatic
memory characteristics and psychological and biological treatments of Posttraumatic
Stress Disorder (PTSD).

I have conducted research at Harvard Medical School, Boston University School
of Medicine and the University of Western Ontario on various aspects of psychological
trauma and PTSD, including characteristics of traumatic memories, emotional and
behavioral effects of child abuse, brain bases of emotion regulation problems in
psychological trauma, and psychological and pharmacological treatments for PTSD
caused by child abuse trauma. I have conducted assessments and provided therapy to
adults suffering from the effects of childhood neglect and abuse in several different
outpatient settings, including hospital clinics, college counseling and mental health
centers, and private practice. Since 2003 I have also worked as an independent consultant

1

in clinical and forensic psychology, including as an expert witness on psychological trauma and its effects for eight capital cases.

From 1995 to 2000 I was an adjunct instructor with the Department of Psychology at the University of Massachusetts at Boston, where I taught undergraduate courses in personality theory, abnormal psychology, and psychological trauma. From 2000 to the present I have given numerous invited teaching presentations, on topics including the diagnosis, clinical phenomenology and treatment of PTSD; the long-term effects of childhood abuse, including sexual abuse; the biology of trauma and PTSD; and the implications of research on traumatic memory characteristics and the biology of PTSD for various lines of work, including psychotherapy and police crime investigations. In addition, I have given talks at numerous conferences of professional psychological and psychiatric associations, as well as to the United States military.

I have authored or co-authored sixteen papers published in peer reviewed journals, on various aspects of psychological trauma and PTSD, including perpetration outcomes in adults with histories of child abuse, characteristics of traumatic memories, and neurobiological aspects of PTSD and reactions to trauma-related stimuli.

In 2007 I was a founding board member of 1in6, Inc., a non-profit organization serving men with histories of child sexual abuse, and from 2008 through 2011 I was a 1in6 Advisory Board member and paid consultant writing the content for 1in6.org, the most comprehensive website in the world on the issue.

From 2006 to 2011, I was an Instructor of Psychology in the Department of Psychiatry of Harvard Medical School. In July of 2001 my appointment with Harvard Medical School became Clinical Instructor of Psychology and I began my current

2

position as psychological trauma consultant for the Outpatient Addictions Service of the
Cambridge Health Alliance.

A copy of my curriculum vitae is attached to this report as Exhibit A.

## II.  SCOPE OF ASSIGNMENT

I was asked by counsel for Wendi Elizabeth Andriano to examine psychologically
traumatic aspects of Ms. Andriano's development from birth to age eighteen.  Of
particular focus were (1) experiences of neglect, abuse and other potentially traumatic
mistreatment by her parents and other adults, and (2) harmful effects of such traumatic
experiences and relationships on her mental health and ways of relating to others.

## III.  MATERIALS REVIEWED

I conducted numerous interviews and reviewed thousands of pages of
documents. My interviews included six visits with Wendi, totaling 52 hours, and
one interview each with the following individuals:

- Wendi's mother, Donna Ochoa;
- Wendi's biological father, Shelby Robertson;
- Wendi's adoptive father, Alejo Ochoa;
- Martha England, an adult member of Ms. Andriano's church when
  Wendi was a child and adolescent; and
- Jeri Lynn Cunningham, a childhood friend     REDACTED

My document review included a copy of Ms. Andriano's videotaped
interrogation by detectives shortly after she was arrested, a transcript of that
interrogation, hundreds of pages of trial testimony and numerous affidavits
obtained by counsel and others throughout the course of Ms. Andriano's post-
conviction relief proceedings, including affidavits from Wendi's direct family,

3

several friends and acquaintances, and many extended family members. A

complete list of the documents I reviewed is attached as Exhibit B.

## IV.   CONCLUSIONS

Wendi Andriano lived a childhood characterized by substantial neglect and abuse

– emotional, physical, and sexual. The most destructive traumas were her mother's

constant emotional neglect and her adoptive father's years of sexual abuse.

As a result, Wendi entered adulthood as a severely traumatized and damaged

person with a greatly increased likelihood of developing – as she has – deficits in

cognitive functioning, psychiatric disorders, deficits in emotional functioning, and

trauma-based patterns of relating to others.

## V.   EVIDENCE AND ANALYSIS

The following is a summary of the evidence and analysis which support my

conclusions. Given the large volume of information and the complexity of this matter, I

am providing this summary to highlight the most significant traumatic experiences and

relationships that shaped Wendi's childhood development and adult life. A full

presentation of the evidence and my analysis is attached as an appendix to this report, and

I will refer to that appendix as I summarize the evidence and analysis below.

### A.   Wendi Andriano's Neglect and Abuse by Her Parents and Other Adults

The most important people in Wendi's life were themselves severely damaged

individuals incapable of providing the caring and nurturing necessary for normal human

development. Wendi's mother, biological father and adopted father all suffered neglect

and abuse in their own childhoods and repeated that pattern with Wendi. When not being

4

neglected or abused by one of her parents, Wendi was turned over to other adults who likewise subjected Wendi to extremely harmful environments.

The neglect and abuse falls into five categories: (1) neglect by Wendi's mother; (2) physical abuse, including Wendi being "beaten into submission;" (3) emotional abuse by Wendi's adoptive father; (4) sexual abuse by her adoptive father and others; and (5) traumatizing relationship patterns. Each category is addressed below.

### 1.   Neglect by her Mother.

Wendi's mother, Donna Ochoa, emotionally neglected her from birth until she left home at age 18. Donna often handed Wendi off to others, including emotionally, physically and sexually abusive men, starting with her first husband, Skip Robertson. Looking back on various phases and traumatic events of Wendi's childhood, Donna repeatedly comments on not knowing and not even wanting to know where Wendi was, who she was with, or whether she was being abused. And when it came to the most abusive relationship of Wendi's life, with Donna's second husband Alejo Ochoa, Donna was *relieved* to have Wendi be the one to deal with Alejo's anger and sexual perversion.

Donna was herself severely neglected by both of her parents. Donna reports that while her mother made sure she was fed and clothed, "I had no emotional connection with her, no hugging, no cuddling, no warmth, no affection, no bond." Donna's father was usually absent -- either working, drinking, or with other women and his parallel family. When he did give her attention, he took her to bars (beginning at age 10) or went drinking with Donna and her teenage friends. Donna also reports being told that her father took showers with her until she was six or seven years old,          REDACTED

(Appendix,

Section III.B.)

5

The neglect Donna experienced was particularly devastating, and rendered her unable to cope with the traumatic experiences of her childhood or to effectively parent Wendi. Donna's parents had brutal fights with screaming, breaking glass, and physical assaults. A particular low point occurred when Donna's mother brought her along when searching for her father (with other women) in local hotels, and Donna heard her mother fire a gun at him and believed he may have been killed. Throughout all of this Donna's parents never helped Donna deal with the emotional effects on her or expressed any concern about her wellbeing. Donna responded by pretending not to notice and acting like everything was OK – just as she would when Wendi was in harm's way and being abused.

The following are representative samples of the ways in which Donna neglected Wendi. A full discussion of Donna's neglect can be found throughout the appendix to this report, particularly in sections IV and VIII.

Immediately after Wendi's birth, Donna made no effort to visit her in the hospital nursery, and "did not bond with Wendi at all." Donna was more worried about her dog, which had gone missing while she was in the hospital, and "couldn't attend to Wendi at all," including to breast feed her. After bringing Wendi home, Donna went into depression and "completely shut down," unable to feed herself, get on her feet, or communicate. After that, nursing was the *only* way that Donna cared for her baby. She otherwise avoided her, and was unable to sooth her colicky baby even when she tried. Almost every night for the first several months of her life, infant Wendi was left to cry in her room for hours, with no contact from her parents.

6

Decades of research have shown that infant brain development depends as much on emotional nurturance as physical care. Maternal neglect is known to exert substantial deleterious effects on developing infants' brains. Experiences like those of Wendi's infancy can have lasting effects on neurotransmitter systems, on circuits involved in attachment to parents, emotion and mood, as well as other brain systems, through a variety of mechanisms including altered gene expression.

Donna did not merely neglect her daughter's emotional needs. She remembers feeling, from the beginning, "I didn't know what to do with Wendi... and I didn't interact with her... My mom had the patience to sit and rock her, but I was like 'No way.'" Donna often handed Wendi over to others, including men likely to abuse her. Her neglect always occurred in the context of triangular relationships, in which Donna's attitude and actions as a mother can be summed up: "I can't handle her. I don't want her. YOU take her."

Until Wendi was four, Donna often handed Wendi over to Wendi's biological father, Skip Robertson. Skip's childhood was also full of neglect and abuse. His family produced at least five sons who sexually abused young girls, with Skip and one brother ultimately serving long sentences for abusing Skip's REDACTED (Appendix, Section III.A.) Skip imposed harsh discipline on Wendi, including potty training her by 10 months of age with punishments and threats. (Appendix, Section IV.) Donna made no attempt to protect her. At Robertson family gatherings, the women cooked, the men got drunk, and Donna had no idea where Wendi was or who she was with, which put Wendi at risk of sexual abuse by Skip's brothers and father, who was notorious among Robertson family women as a "dirty old man." (*Id.*)

7

When Wendi was four years old, day care workers reported that Wendi was initiating unusual and concerning sexual interactions with other children. Donna made no attempt to get Wendi help. Soon thereafter, Donna let Wendi wander the dangerous neighborhood around the drug and alcohol clinic where she worked. She let Wendi spend time alone with the director of the clinic, even after discovering evidence that he had sexually abused girls.

Donna divorced Skip when Wendi was four years old.  Donna then became sexually involved with Alejo Ochoa, an extremely limited and disturbed man REDACTED

(Appendix, Section V.)  From the start Alejo was more interested in Wendi than Donna, and soon he was sleeping in the same bed with them. (Appendix, Section VI.) Then Wendi began wetting the bed for the first time in her life. Donna did not want to know, or even to think about whether Alejo was sexually abusing Wendi.  Within months Donna married Alejo, and he took primary responsibility for parenting Wendi. For the next 13 years, Donna mostly withdrew, looked away and tried not to notice as Wendi was emotionally, physically and sexually abused by Alejo. (Appendix Sections VI-VIII.)

### 2.    Physical Abuse.

Donna's abdication of her parenting duties was not limited to neglect; it included physical abuse as well. Starting when she was a toddler and lasting into her teens, Wendi was regularly subjected to physical beatings by her mother. She was also beaten by her biological and adoptive fathers and authority figures in two religious cults who taught that God wants children beaten into submission. The beatings were not just for bad behavior, but for failure to instantly and automatically obey. The children were even

8

beaten for displaying a "bad attitude," that is, insufficient submissiveness as expressed by facial expression, body language or tone of voice.

Skip proudly reported a time Wendi stopped crying after he beat her. As a toddler Wendi was regularly beaten by Donna and Skip, with their hand or a wooden spoon. Donna recalls beating Wendi for not coming immediately when called. (Appendix, Section IV.) When Alejo assumed the primary parental role, he applied the same "beat into submission" philosophy until Wendi was around 13 years old. (Appendix, Sections VI-VIII.)

Donna and Alejo joined a traveling religious cult when Wendi was 7, in which the leaders gave God's imprimatur to their philosophy of beating children into submission. (Appendix, Section VII.) When Wendi was nine, her family left the traveling cult and joined a stationary one, in which attempts to beat children into total submission were even more extreme. Wendi attended a school controlled by the cult, where children were constantly beaten for any infraction, including having a bad attitude. (Appendix, Section VIII.) An audio recording captures the cult's leader saying things like, "You beat 'em 'til they cry, and you keep on beatin' 'til they cry softly," because if they cry loudly, "it's rebellion, and you gotta get 'em until their spirit is broken" (emphasis in spoken language). By then Wendi had learned to obey and put on a façade of obedience. Rarely beaten outside of her home, she normalized the violence to which children around her were continually subjected.

A complete discussion of the physical abuse suffered by Wendi is included in Sections IV and VI to VIII of the appendix to this report.

9

### 3.    Emotional Abuse by her Adoptive Father.

Alejo Ochoa entered Wendi's life when she was four and a half years old. He immediately became Wendi's primary caretaker. Alejo was a damaged, limited and confused man,                               REDACTED

                                                    , physical and sexual abuse. He began emotionally abusing Wendi almost immediately. This abuse escalated over the years. By the time Wendi was about 10 years old, Alejo was routinely teasing and attempting to degrade and humiliate her, primarily in sexualized ways.

For example, Alejo proudly recalls forcing Wendi, when she was four years old, to clean crayon from a door for an hour and a half straight – despite her not having known that coloring on the door was forbidden (i.e., she didn't even know she had done anything wrong) and despite her crying the entire time. He told this story as an example of her innocence and his allegedly effective parenting. (Appendix, Section VI.)

Donna reports that Alejo "constantly teased, picked at, and provoked Wendi" throughout her childhood and adolescence. He did so "ruthlessly," despite the obvious suffering it caused her, "almost as though he was intentionally trying to break her down and trying to be hurtful and malicious." He pounced on naïve or "clueless" comments she made by saying she was "another dumb blond." (Appendix, Section VIII.)  A parent in the community recalls that Alejo "was real harsh with Wendi and frequently humiliated her in front of everyone, just screamed at her. Wendi reminded me of a whipped pup."

When Wendi was about 10 years old, Alejo's verbal abuse became predominantly sexual in nature. He tried to embarrass and shame her about sexual issues, including commercials for feminine products. If Wendi or Donna protested, Alejo denied their experiences and reality itself, insisting that Wendi *liked* what he was doing.

10

A full discussion of Alejo's emotional abuse of Wendi is included in Sections VI to VIII of the appendix to this report.

### 4.    Sexual Abuse by Her Adoptive Father and Others.

There is evidence that Wendi was sexually abused from infancy through age nine and strong evidence that such abuse occurred from ages 9 to 18. It was during this latter time that Alejo sexualized Wendi in an incestuous relationship that included buying and dressing her in lingerie, making her look at pornographic and "adult" paraphernalia with him, and making her scratch and rub his legs and head for hours while both Wendi and Alejo were barely dressed and with Alejo doing things like putting his head in Wendi's crotch and exposing his genitals. The following is a summary of the evidence that Wendi was sexually abused; a full discussion is included in Sections IV and VI to VIII of the appendix to this report.

The evidence that Wendi was sexually abused before age nine is indirect but suggestive. Given Donna's well-established and acknowledged neglect and that Skip, his brothers and father are well-known child sexual abusers, it is likely Wendi was sexually abused during numerous Robertson family cookouts, parties and camping trips when she was one to four years old. During these events Donna left Wendi unsupervised with drunken men who were known sexual abusers of young girls. (Appendix, Section IV.) Wendi exhibited typical sexual abuse-reactive behaviors at day care when she was four years old.

Donna let Wendi wander alone in a dangerous neighborhood where she worked at a clinic frequented by drug addicts and criminals, and left Wendi alone with the clinic's boss, despite Donna's knowledge of his prior sexual abuse of girls. Around the same

11

time, Alejo began sleeping with Donna and Wendi and she started wetting the bed, not an uncommon reaction of a four year old to sexual abuse. (Appendix, Section VI.)

Once the family left the traveling cult when Wendi was nine years old, they settled in Casa Grande and joined another cult, the 91st Psalm/Harvest Family Church. Alejo's sexual abuse became more obvious and extended to Wendi's friends. He routinely made Wendi spend literally hours scratching and rubbing his legs and head. (Appendix, Section VIII.) He bought her lingerie and sexy nightgowns and other clothing, even when she said it was uncomfortable. He had Wendi wear such clothing while engaged in scratching and rubbing, also known as "babying" and "touching on" him, and over time he progressively wore less and less clothing, including no underwear so that his genitals were exposed.

Beginning when Wendi was 9 or 10, Donna witnessed Alejo engage in many sexualizing and sexually abusive behaviors with Wendi. She saw the night-time "touching on" ritual between scantily clad Alejo and Wendi. She saw and heard Alejo routinely subject Wendi to verbal sexual abuse,                    REDACTED

                                                    . Donna was along on outings when Alejo took Wendi shopping for lingerie and other revealing clothing, and saw much more they had purchased on numerous outings without her. She watched Alejo coerce Wendi into joining him in stores devoted to pornography and "adult" paraphernalia.

Adults and children from the cult community also recall that Wendi wore lingerie around the house and said that Alejo had bought it for her and liked her to wear it. Jeri Lynn Cunningham, a close friend of Wendi's from ages 9 to 13, often slept over at her house. She recalls Alejo forcing her and Wendi to get into their nightgowns well before

12

bedtime. Alejo also demanded that both girls engage in the nightly routine of scratching
his legs and head.                              REDACTED

In the 91st Psalm/Harvest community, several witnesses cited examples of how
Alejo and Wendi did not have a typical father-daughter relationship and acted more like a
"couple." It was commonly known that Alejo routinely subjected other girls and women
to verbal sexual harassment and abuse. He frequently engaged in sexually inappropriate
behavior such as pretending microphones were penises and making gestures of sexual
intercourse in front of the entire congregation, including young children. Alejo was
widely viewed as a "sexual pervert."

The principals of Wendi's school report that when Wendi was 17 years old, she
approached them privately in a room at the school. She did so with great trepidation and
the principals are convinced Wendi intended to disclose Alejo's sexual abuse. Alejo
suddenly appeared, Wendi recoiled in fear, and she never attempted to speak to them
again about whatever she had intended to that day.

One parent reports confronting Alejo about his sexual behavior at the time,
apparently including his sexual abuse of Wendi, and says that Alejo admitted it. It was a
purely personal confrontation; Alejo was not held accountable and continued to act with
impunity. There is no evidence that pastor of the church, Tom King did anything to stop
Alejo from using his "Youth Pastor" role and power within the church to sexually abuse
women and children.

13

More important than the exact forms of sexual abuse Alejo perpetrated is the nature of the incestuous relationship Alejo had with Wendi, how it occurred within an incestuous family in which Donna's role was critical, and how being abandoned and subjected to such incestuous sexual abuse harmed Wendi.

Donna recalls that by age 11 Wendi "was more partnered with Alejo than I was, almost like she was his spouse." Alejo had no adult friends and little emotional connection with Donna. Donna seldom ate dinner with Alejo and Wendi or spent time with them, either singly or together. Wendi was Alejo's only playmate, and he often imposed himself on her and her friends, especially when they slept over at the house.

Alejo Ochoa exemplifies what is known, in the sex offender literature, as a "regressed pedophile." That is, he is an extremely immature man who, even if married, is incapable of a healthy intimate relationship with an adult, and instead seeks emotional intimacy, partnership and sexual pleasure from children – who he experiences, compared to potential adult partners, as innocent and safe, thus the best match for his own child-like immaturity. Alejo appears to truly believe – while unwilling to admit it to others for obvious reasons – that for him to have a sexual relationship with a child is a good thing, and that, all evidence to the contrary, he is actually helping and even loving the child.

In their classic incestuous family dynamic, Donna played a typical neglectful mother role. Because of her own childhood of neglect and trauma, Donna responded to their troubled family by withdrawing from all non-work relationships and retreating into a private world of reading books or sleeping. The angrier Alejo got over Donna's refusal to have sex with him, the more she retreated, resulting in Wendi being Alejo's intimate partner. In Donna's words, "It was easier for me to let Wendi spend so much time with

14

Alejo because I got to ignore him, avoid the unpleasantness of being around him and his anger, and go into my room to read."

Donna also ignored the sexually inappropriate clothes Alejo bought for Wendi. "Wendi had sexy teddies and camisoles as a fourteen or fifteen-year-old that I tried not to notice or think about. … I don't know exactly what they looked at or bought in those stores and didn't care to know. I just know that they weren't buying for me." In typical incestuous family fashion, Donna's relationship with Wendi and Alejo went from "I can't handle her. I don't want her. YOU take her," when Wendi was under 10, to "I can't handle your constant sexualizing and anger. You take HER," and "I can't handle his constant sexualizing and anger. YOU take him." The incestuous relationship between Wendi and Alejo relieved Donna from having to parent Wendi or deal with Alejo. In a perverse way, it was exactly what she wanted.

### 5.    Traumatizing Relationship Patterns.

The neglect and abuse to which Wendi's parents and others subjected her is summarized above; here the focus is on key *relationship patterns* in which their neglect and abuse was embedded. These relationship patterns, involving the most important relationships and most emotionally significant events of her life, are those that shaped how Wendi experienced, thought about, and behaved in the significant relationships of her adulthood.

Wendi's mother neglected her by ignoring her and handing her off to others. Wendi's biological father Skip was usually neglectful (e.g., on the road or out drinking), and when he did focus on Wendi was often coercive and abusive (e.g., demands, threats, beatings, and perhaps sexual abuse). Wendi may have been sexually abused by Skip's father and brothers, by the director of an alcohol and drug treatment clinic where Donna

15

worked, and possibly by drug addicts and criminals who frequented the clinic as well as a traveling cult leader. If Wendi's maternal grandmother and some day care workers were positive influences, those relationships were not reliable or enduring.

These early life relationships established ingrained patterns for Wendi's future relationships – especially with significant people in her life, including her husband – which can be understood as three principal "lessons" she learned. First, do whatever the easily-angered people in her life want and avoid making them unhappy. Second, do not seek help from others, including for what abusive people are doing to you, because they will not help and probably do not even care. Third, the only reliable ways to get attention and affection are to *take care of others and do what they want*. Repeatedly engaging in these relationship patterns was another traumatizing characteristic of Wendi's childhood, related to but distinct from the traumas described elsewhere in this report.

The most important and impactful relationship in Wendi's life was with her adoptive father Alejo. It began when she was four and half, and reinforced the relationship "lessons" she had already absorbed. Alejo was a near constant, imposing and intrusive presence in Wendi's life: her emotionally, physically and sexually abusive parent, her "youth pastor," and her primary playmate. For years Wendi repeatedly went through the cycle of Alejo getting angry, screaming and yelling, then requiring hours of "babying" or "touching on." She learned to prevent Alejo from getting angry by habitually and automatically anticipating and responding to his needs and wishes – which included providing him with sexual stimulation.

Section II of the appendix provides an explanation of the relationship patterns Wendi experienced at a young age. Sections IV, VI, VII, and VIII discuss the manner in

16

which these patterns "trained" Wendi and repeated themselves on other relationships, most notably with Alejo.

**B.     Wendi's Childhood of Neglect and Abuse Left Her a Severely Traumatized and Damaged Adult**

The analysis below is based on my experience and knowledge as a researcher and therapist who has for 20 years studied and worked with adults subjected to neglect and abuse in childhood. As noted above, my analysis draws upon the evidence directly available to me (i.e., my interviews with Wendi, her parents and other witnesses; thousands of pages of documents; and media files); it also relies on findings by the two other experts on this case, neuropsychologist Myla Young, Ph.D., and psychiatrist George Woods, M.D.

From birth until age 18, Wendi Andriano experienced a great deal of neglect and abuse. This included severe emotional neglect by her mother and biological father; physical abuse in which pain was used to compel complete and automatic obedience by her mother, biological father, adoptive father and other adults in her communities; emotional abuse by her biological father, adoptive father and adults in the 91st Psalm/Harvest church/community; likely sexual abuse by a variety of men including her biological father and his father and brothers, her mother's boss at an alcohol and drug services center, and definite sexual abuse by her adoptive father.

In addition, as addressed by Dr. Woods, Wendi inherited a genetic vulnerability to bipolar disorder. By adolescence she suffered from manic and depressive symptoms. Wendi's worst depressive episodes are remarkable for the way her brain appears to "shut down" as she engages in excessive sleep, at times in excess of 36 continuous hours.

17

Wendi's history of childhood neglect and trauma, combined with her biological vulnerability to bipolar disorder, resulted in her leaving home and entering adulthood a severely traumatized and damaged person – which she remains to this day.  The damage includes brain-based deficits in cognitive functioning; psychiatric illnesses and symptoms; problems regulating emotions; and posttraumatic patterns of relating to others.

### 1.    Brain-based deficits in cognitive functioning.

The damage to Wendi's brain from a childhood of neglect and abuse involves the functioning of a variety of brain circuits. However, such damage does not typically manifest as obvious and well-established changes to the size or shape of particular brain regions, which have not been assessed for in this case. Rather, brain damage resulting from chronic childhood neglect and abuse is primarily *functional* (as opposed to grossly anatomical). That damage is most clearly revealed, in a formal way, via neuropsychological assessment like that Dr. Young conducted on Wendi.

Wendi's most significant areas of impairment were attention and concentration, as well as processing speed. As Dr. Young notes, "With the exception of [two simple test of attention and concentration], her abilities on all other measures of attention and concentration were significantly impaired." (Tab 5, at 9)  On some of these tests, Wendi "simply was not able to accomplish the task.... Her abilities throughout this *test were severely impaired, but became more impaired as the test progressed.*" (*Id.*) In addition, on a self-report questionnaire that inquired about behaviors known to be associated with attention problems, Wendi's responses were "significantly like those of individuals who are diagnosed with Attention Deficit Hyperactivity Disorder (ADHD)." As Dr. Young explains, "The entire brain is involved in attention and concentration. Primary neural

P-App. 002119

regions include the prefrontal cortex, reticular activating system, cerebellum and frontosubcortical and orbitofrontal pathways. Attention forms the basis for all cognitive abilities. Her disabilities on tasks of attention and concentration, combined with descriptions of her daily functioning, indicate impairment of these brain regions and structures." (*Id.* at 10)

Dr. Young also found several impairments on test of learning and memory. For example, on a test of verbal learning, "Her ability to learn new information was mild-moderately impaired," and Wendi inaccurately believed that she remembered information that had never been presented. (Tab 5, at 10)  On a test requiring Wendi to copy a complex figure, recall it one minute later, recall it again 30 minutes later and then distinguish between accurate and inaccurate portions, Wendi's 30-minute delayed recall and her ability to distinguish accurate and inaccurate portions 30 minutes later were moderately to severely impaired. (*Id.*) Based on these and other findings, Dr. Young concluded that Wendi has impairment within "all of [the] brain structures and pathways" involved in memory and learning. (*Id.* at 11)

Finally, a third area of significant brain-based impairment Dr. Young's testing revealed was "executive functioning." As Dr. Young explains, "Executive functioning is an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed actions. Executive functioning also is the ability to problem solve, and includes abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions." (Tab 5, at 11) Executive functions depend on the prefrontal cortex and its interactions with various other brain regions, and "adequate

19

mature prefrontal cortex functioning is required for just about every aspect of adult functioning – judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions." (*Id.* at 11-12.) Dr. Young reports that "Although she was successfully able to complete some EFT [Executive Functioning Test] subtests, her abilities were predominantly impaired." (*Id.* at 12) In addition, Dr. Young notes, "Although Wendi Andriano's abilities on tests of executive functioning were quite severely impaired," she was most severely impaired on those "which required rapid processing of information, flexible thinking, decision making, and/or inhibition." (*Id.*) Inhibition is ability "to stop responding to the immediate physical environment… in order to think, consider and plan alternative ways of solving a problem and respond accordingly in that situation." (*Id.* at 13.)

    In summary, neuropsychological testing revealed significant to severe impairments in attention and concentration, learning and memory, and executive functioning, all of which reflect deficient brain functioning in multiple regions and circuits. Neuropsychological findings like these are expected in an adult who was subjected to the chronic neglect and abuse that Wendi experienced throughout her childhood. Indeed, while it is possible that some of these deficits are partly genetically based, severe childhood neglect and abuse can damage the brain regions and circuits underlying attention, concentration, learning and memory, and executive functioning. For example, high levels of stress hormones are known to be toxic to the hippocampus, a region critical for memory and learning. And capacities for attention, concentration and executive functioning are known to develop *in the context of relationships with*

20

*caregivers,* and are particularly vulnerable to damage by neglectful and abusive

relationships.

### 2.    Psychiatric disorders and symptoms.

As assessed and reported by Dr. Woods, Wendi Andriano suffers from several

psychiatric disorders. Specifically, Wendi meets the diagnostic criteria for bipolar I

disorder, posttraumatic stress disorder (PTSD) and complex PTSD, and dependent

personality disorder.

REDACTED

. Wendi's bipolar depressive symptoms include depressed mood,

hypersomnia (i.e., excessive sleeping), fatigue, and feelings of worthlessness. Her most

common manic symptoms include grandiosity, flight of ideas (i.e., tangential thinking),

and "excessive involvement in pleasurable activities that have a high potential for painful

consequences," e.g., sexual indiscretion.

As explained above, the emotional neglect Wendi experienced is known to evoke

extreme emotional and physiological states in young children, including depressive states

that would have been exacerbated by her inherited predisposition for bipolar disorder.

Similarly, Wendi's manic symptoms would have worsened the impaired judgment

already caused by her parents' neglect and abuse, and her tendencies for hyper-sexuality

caused by years of sexual abuse.

As discussed by Dr. Woods, Wendi suffers from PTSD and Complex PTSD

secondary to her history of extensive childhood abuse. PTSD includes symptoms of

reexperiencing, avoidance, numbing and physiological hyperarousal. In terms of re-

experiencing the trauma, Wendi becomes emotionally distressed when reminded of the

abuse she experienced, especially the sexual abuse, and she suffers from nightmares of

21

having sex with her father. She avoids anything that might remind her of Alejo's sexual abuse, including television shows, conversations, memories and trains of thought. Wendi is often emotionally numb, especially with respect to unpleasant feelings associated with troubling memories and relationships, and tends to alternate between feeling nothing at all and being overwhelmed by fear, sadness, shame and guilt. Her main PTSD hyper-arousal symptoms are irritability and difficulty concentrating, both of which overlap with the symptoms of bipolar disorder, and hyper-vigilance, which manifests as Wendi's hyper-attunement to any signs of displeasure in the facial expressions, body language, words or tone of voice in others. All of these PTSD symptoms were constantly on display in each of my interviews with Wendi.

Complex PTSD does not appear in the *Diagnostic and Statistical Manual of Mental Disorders*, but is widely accepted and used by therapists and researchers who work with and study people who have suffered severe and chronic trauma, especially in childhood. Complex PTSD involves a set of symptoms resulting from lasting traumatic experiences in which the victim felt – or was – captive and unable to escape. The symptoms include problems with the following: regulating emotions, consciousness and identity (e.g., dissociation), self-perceptions (e.g., extreme shame, helplessness), preoccupation with the perpetrator (e.g., focus on keeping happy at one's own expense), relationships (e.g., distrust, attempting to rescue others), and one's view of the world (e.g., loss of faith in people, hopelessness). The available evidence indicates that Wendi has suffered from severe complex PTSD at least since adolescence.

For example, to this day Wendi has emotion regulation problems, including a great deal of difficulty tolerating or modulating feelings of sadness and anger. Her main

22

P-App. 002123

strategy for dealing with these feelings is to hide them from herself and others. When that fails Wendi becomes overwhelmed, ashamed, withdrawn, or once again dissociated or consciously disconnected from awareness of those feelings. I repeatedly witnessed Wendi's emotional dysregulation in our interviews. In terms of self-perception, long before she ever met her husband, Wendi recalls being convinced she was a "bad" and "rebellious" person who was unworthy of love, "deserved" every bad thing that happened to her, and was going to hell. Such unshakable feelings of inner badness and un-lovability are common in severely neglected and abused children and the adults they become.

Wendi's Complex PTSD symptoms involving pathological alterations of consciousness and identity consist primarily of her dissociative symptoms, including her inability to remember many childhood experiences. Her memory deficits include almost everything she experienced while in the traveling cult, sexually abusive behaviors by her adoptive father, and disturbing sexual behaviors of her own that were witnessed by multiple people in her church community. Wendi's dissociative symptoms also include her tendency to "space out" when confronted with memories of traumatic experiences or other potentially upsetting information. In our interviews she often spoke of spacing out such that her mind temporarily went blank and she was unable to feel any emotions or even sensations in her body.

As discussed in detail by Dr. Woods, Wendi suffers from dependent personality disorder. By definition the onset of personality disorders is before age 18, and Wendi's dependent personality disorder is clearly rooted in the childhood of neglectful, abusive and exploitive relationships summarized above. She is afraid to disagree with others, pathologically subservient in relationships, terrified of losing relationships, and

23

immediately seeks new relationships when a previous one ends or threatens to end. Importantly, only by understanding Wendi's neglect- and abuse-based relationship patterns can we understand how her dependent personality disorder, combined with traumatizing caregiver burden and psychiatric deterioration in the final year of her husband's life, contributed to her actions and role in Joe's death. Those pathological relationship patterns are addressed below.

### 3.    Deficits in emotional functioning.

Psychiatric diagnoses and symptoms cannot capture the complexity of unique human beings, or the myriad potential effects of chronic and severe childhood neglect and abuse. For example, while the diagnosis of complex PTSD includes problems with emotion regulation, Wendi's problems with emotion regulation cannot be reduced to symptoms of complex PTSD. That is, Wendi has major, long-standing deficits in the following areas: emotional awareness, including awareness of the bodily correlates of emotions; when she is aware of unwanted emotions, tolerating them without becoming immediately overwhelmed; modulating the intensity of her emotions, as opposed to emotions being all-or-nothing affairs; putting her emotions into words and sharing them with other people in order to calm herself and connect with others, understand the situations and interactions that give rise to emotions, and come up with constructive solutions. Importantly, emotion regulation problems are based in the dysfunction of multiple interwoven brain circuitries – including the circuitries that underlie Wendi's memory and executive functioning deficits and her bipolar and dissociative symptoms. All of those circuitries are known to be damaged by childhood neglect and abuse, especially when the neglect and abuse are severe and chronic and perpetrated by parents.

24

### 4.    Trauma-based ways of relating to others.

The neglect and abuse to which Wendi's parents and many other adults subjected her, and some key relationship patterns in which their neglect and abuse was embedded, are summarized above. As a result of those traumatic childhood relationships, Wendi habitually relates to others in specific ways. Critically, these ways of relating to others are *symptoms* of the extreme trauma she suffered. They are also *re-enactments* – of roles she was forced to play in relationships of neglect, abuse and domination; and of how she tried to cope in the midst of those traumatic relationships.

As described above, in those relationships Wendi learned three key principles: Do whatever easily angered people want and avoid making them unhappy. Do not seek help from others, including for what abusive people are doing to you, because they will not help and probably do not even care. The only reliable ways to get attention and affection are to *take care of others and do what they want.* As described above, Wendi's relationship with Alejo reinforced those "lessons" by continually repeating – over years, on a daily basis – the pattern of responding to Alejo's anger by "babying" and "touching on" him, and the pattern of preventing Alejo's anger from arising by habitually and automatically anticipating and responding to his needs and wishes, including sexual stimulation.

All of those relationship patterns created trauma-based ways of relating to others that have manifested throughout Wendi's life. If someone is angry – whether that anger is caused by her, directed at her for no good reason, or directed elsewhere and has nothing to do with her – Wendi feels *driven* to make that person feel better, because she believes, "then they will like me." If someone likes her and is nice to her, Wendi strives to be even nicer to them and to take care of them, because this is the only way she knows to avoid

25

them getting angry at her or abandoning her. Yet these ways of relating leave Wendi feeling, usually implicitly and without reflecting on it, that the other person does not really know or care about her needs and is just using her. In short, the very ways she attempts to avoid neglect and abuse in adult relationships leave her feeling neglected and used.

These are not uncommon childhood trauma-based ways of relating by people whose chronic neglect and abuse entailed being forced to sacrifice their own needs and wants to those of their abusers.

26

Date: _____     _____
                                    James Hopper, Ph.D.

27

P-App. 002128

**APPENDIX TO THE EXPERT REPORT OF JAMES W. HOPPER, PH.D.**

## I.     INTRODUCTION

PROFESSIONAL QUALIFICATIONS

1.     I am a clinical psychologist licensed to practice in the Commonwealth of Massachusetts, Clinical Instructor of Psychology in the Department of Psychiatry of Harvard Medical School, consultant on psychological trauma to the Outpatient Addictions Service of the Cambridge Health Alliance, and an independent consultant in clinical and forensic psychology. Most of my work has focused on the long-term effects of childhood abuse. I have conducted research on various aspects of psychological trauma and PTSD, including characteristics of traumatic memories, emotional and behavioral effects of child abuse, brain bases of emotion regulation problems in psychological trauma, psychological and pharmacological treatments for PTSD caused by child abuse trauma, and the use of alcohol and drugs by those abused in childhood. My qualifications are otherwise set forth in my curriculum vitae attached as Exhibit A. (*See* Tab 4.A.)

SCOPE OF ASSIGNMENT

2.     I was asked by counsel for Wendi Elizabeth Andriano to examine psychologically traumatic aspects of Wendi's development from birth to age eighteen. Of particular focus were (1) experiences of neglect, abuse and other potentially traumatic mistreatment by her parents and other adults, and (2) harmful effects of such traumatic experiences and relationships on her mental health and ways of relating to others.

MATERIALS REVIEWED

3.     I conducted numerous interviews and reviewed thousands of pages of

1

documents. My interviews included six visits with Wendi, totaling 52 hours, and one interview each with the following individuals:

- Wendi's mother, Donna Ochoa;

- Wendi's biological father, Shelby Robertson;

- Wendi's adoptive father, Alejo Ochoa;

- Martha England, an adult member of Wendi's church when she was a child and adolescent; and

- Jeri Lynn Cunningham, a childhood friend     REDACTED

4.     My document review included a copy of Wendi's videotaped interrogation by detectives shortly after she was arrested, a transcript of that interrogation, hundreds of pages of trial testimony and numerous affidavits obtained by counsel and others throughout the course of Wendi's post-conviction relief proceedings, including affidavits from Wendi's direct family, several friends and acquaintances, and many extended family members. A complete list of the documents I reviewed is attached as Exhibit B. (*See* Tab 4.B.)

5.     Throughout our interviews, Wendi exhibited deficits in her ability to remember, and/or to feel safe remembering and reporting, experiences involving sexual content, including incidents witnessed by others and documented in witness declarations. Also, from the outset she expressed a fear that she might remember things from her past, including possible unwanted sexual experiences involving her step-father Alejo Ochoa, that might not be accurate, and she expressed great concern about the possibility of upsetting or causing harm to Alejo, as well as to her mother or anyone else who might become a focus of the investigation and presentation of mitigation evidence.

2

6.     I conducted in-person interviews with Wendi's mother, Donna Ochoa, for two hours on September 1st, 2010; with her biological father, Shelby Robertson, for 2.5 hours on August 15th, 2011; with her adoptive father, Alejo Ochoa, for three hours on August 15th, 2001; with Martha England, who was an adult member of Wendi's church when she was a child and adolescent, for three hours on November 3rd, 2010; and with Jeri Lynn Cunningham, a childhood friend          REDACTED

for 1.5 hours on January 4th, 2011.

7.     Finally, I had several phone conversations with Dr. George Woods, who also spent many hours interviewing Wendi and other witnesses.

## II.     INTRODUCTION TO WENDI ANDRIANO'S CIHLDHOOD

8.     The traumatic – and psychologically and morally destructive – childhood of Wendi Andriano was rooted in the traumatic childhoods of her mother, biological father, and adoptive step-father.  She was born to profoundly disturbed parents who were incapable of providing her with the love and nurturing that every child needs to become an emotionally healthy and morally uncorrupted adult.  From birth until her teenage years Wendi was subjected to neglect and abuse, first by her mother and biological father and his family; then by her mother, adoptive father and two insular religious cults.

9.     Wendi's biological father, Shelby Wayne ("Skip") Robertson, grew up in a disturbed family. In addition to emotional neglect and physical abuse, Skip's father and several brothers engaged in sexual abuse of girls. Skip and his brother Tommie would eventually go to jail for sexual abuse of    REDACTED    , and Skip speaks of his father and brother AV sexually abusing children in the extended Robertson family. By the time Wendi was born, all of Skip's five brothers were men, and over the first four years of

3

Wendi's life they had repeated access to her under conditions that would permit sexual abuse.

10.    Wendi's mother, born Donna Worsham, was neglected by both parents. Her family moved constantly the first ten years of her life, living nowhere more than a year at a time, which prevented her from having any enduring relationship with a caring adult. Her mother kept the house clean but showed no love for, or interest in, her daughter. When Donna's heavy-drinking and womanizing father did give her attention, it was often unhealthy and immoral. By age ten, when the family had settled in Tucson, her father was bringing her to bars, and when she was a teenager he got drunk with her and her friends. From ages twelve to fifteen Donna overheard violent fights between her parents on almost a nightly basis. Her mother dragged her along on Sunday hunts for her father at local hotels, and once went into a hotel and fired shots that Donna was left for hours to fear had killed her father. Donna's peers, to whom she looked for guidance, were from similarly troubled homes.

11.    Wendi's mother was never able – from birth through Wendi's adult life – to emotionally connect with her daughter or to provide her with maternal nurturing and care. Instead, beginning days after Wendi was born, Donna literally handed her over to men, starting with Skip, who Donna knew – but was unwilling or unable to acknowledge – were emotionally, physically and sexually abusive.

12.    When Wendi was four years old, Donna divorced Skip, removing Wendi from the toxic influence of his family. Her mother soon married Alejo Ochoa, a disturbed man who grew up in a family where adults amused themselves by bullying and shaming children and teenagers with sexualized "teasing," and at age fifteen was "taught about

4

girls and sex" by an adult neighbor. Donna was relieved to hand Wendi over to Alejo, who would go on to sexually abuse Wendi and at least one of her friends into her teens.

13.    Over the next thirteen years of ongoing neglect by her mother and sexual (as well as physical and emotional) abuse by her stepfather, layer upon layer of abuse and trauma would be heaped upon Wendi. From ages seven to nine, Wendi and her parents were caught up in a small "traveling ministry" – in reality, a religious cult – in which they experienced poverty, brainwashing and totalitarian control.

14.    After, the family joined another religious cult with even greater moral confusion and hypocrisy, in which children's entire lives revolved around the cult's church and school.   In that church and that school, physical and emotional abuse of children were preached as God's will, and the sexual abuse of children was tolerated, condoned, and even blamed on the children themselves. It was an encapsulated cult community in which Alejo soon became the "Youth Pastor" and engaged in an incestuous relationship with Wendi. Familial and genetically-based vulnerabilities to mental illness, including bipolar disorder, compounded the effects of Wendi's childhood of neglect and abuse at the hands of profoundly morally confused adults.

15.    The effects of that chronic neglect and abuse included severely limited capacities for emotional awareness, regulation of emotions and impulses, decision making, and managing interpersonal conflicts, especially in close relationships. The effects also included an unshakable sense of herself as a bad and unlovable person, almost certainly going to Hell, who could find approval and love only by devoting herself to caring for others.  This neglect- and abuse-based experience of herself, along with the relationship patterns she learned in neglectful and abusive relationships with her parents,

5

would propel Wendi through repetitions of the same basic cycle in her friendships and relationships with men: taking care of the other person, making that other person feel that he is the center of her world, until she suddenly feels exploited and overwhelmed, which leads her to withdraw and the other person to feel abandoned and confused, which in turn leads Wendi to feel bad and guilty, to which she responds by seeking to regain love and redeem herself by devoting herself to the same person or someone new, starting the cycle all over again.

**III.    WENDI ANDRIANO'S TRAUMATIC FAMILY BACKGROUND**

16.    The psychological and physical harm of childhood neglect and abuse are increasingly recognized by scientists and public health experts as causes not only of many psychiatric disorders, addictions, and violent behavior, but also of the leading chronic and fatal diseases in our society, including heart disease and cancer. Furthermore, evidence is accumulating that an individual's "cumulative burden" of "adverse childhood experiences," that is, just how many traumatic experiences they endured – especially abuse and neglect – is the most predictive of psychiatric and behavioral disorders and physical diseases, more than any particular type of trauma.

17.    In the case of Wendi Andriano, there is evidence of extreme neglect and abuse in the generations preceding hers, in all three of her parents' families. Given limits of time and investigational resources, as well as the deaths of many people involved, these stories are necessarily limited both in scope and corroboration by witnesses. However, as we shall see, the evidence is sufficient to paint a picture of not only extreme neglect and abuse, but extreme moral confusion and hypocrisy as well, in the childhoods of her mother, biological father and adoptive father.

6

## A.   WENDI'S BIOLOGICAL FATHER AND PATERNAL BACKGROUND

18.   Wendi's biological father, Shelby Wayne ("Skip") Robertson was born on April 11, 1948 in Fort Stockton, Texas. He was the youngest of eight children born to Flora Pearl Harrison and Boyd Gravely ("BG") Robertson. Skip reports that until twelve years of age he lived with his parents and progressively fewer of his older siblings, moving from Fort Stockton to San Angelo, Texas when he was four years old, where he lived until he was in fifth grade, and then to Chandler, Arizona when he was in sixth grade.

19.   **Mother dies suddenly at age thirteen, no support in aftermath.** Soon thereafter, on Christmas night of 1961 when Skip was thirteen years old, his mother suffered a massive stroke right in front of him and died several hours later. Witnessing the sudden and fatal injury of one's own mother is one of the most devastating and traumatic experiences a child can have. That trauma is compounded when, as was the case for young Skip, the child fails to receive immediate or sustained support and nurturing from other family members. In his declaration, Skip refers to the aftermath of his mother's death in understated language that belies the extreme emotional pain associated with that time in his life: "It was a hard time for me. I was booted around a lot and felt very alone for quite a while." (Tab 32, at ¶ 6.)

20.   Skip recalls continuing to live with his father and two siblings, Tommy and Myrna, for another year or so in Chandler, then the four of them going to live in Tucson "for a while" until his father moved back to Chandler and his siblings moved out, Tommy by joining the army and Myrna by getting married. At that point, when about fourteen or fifteen years old, Skip went to live with his brother Burl Boyd ("Buck") Robertson and his wife Faye McGuffee, as well as three girls and one boy of Faye's from a previous

7

marriage. One of Faye's daughters was Alice McGuffee, the childhood best friend of Wendi Andriano's mother.

21. **A victim of the Robertson men and boys**, REDACT ED , and her nightmarish memories provide a window into Skip's disturbed and sexually violent family. REDACT ED recalls never feeling safe as a child and not talking until she was five years old, when she finally wanted to talk with her younger sister Debbie but no one else, including her own mother. When Buck entered REDACT ED , and brought along his brothers and father, things got worse: "He was a truck driver. Right after   REDACTED   , they went on the road for six weeks. As soon as they got back, Buck raped me for the first time. The rape continued for the next eight years,   REDACTED   ." (Tab 30, at ¶ 3.)

22. Buck was not the only one.   REDACTED

, his father, and all of his brothers, including Skipper, his youngest brother, raped me from the time I was ten until I moved out of my mother's house at the age of eighteen." (Tab 30, at ¶ 1.) She goes on to elaborate:

> "On a regular basis, one of the brothers or Buck's father stayed at our house. Skipper was a teenager at the time, and he came around quite often. Sometimes both Skipper and his father stayed with us.... It was a revolving door, and it seemed like one of the Robertsons was always around. They

8

stayed for three, four, six months at a time.... At one point, Buck's father got

an apartment about a block away from our house." (Tab 30, at ¶ 4.)

23.   Though REDACTED remembers Buck as a "monster" who walked around the house

naked        REDACTED        and "cut the pockets out of his pants to play with

himself," she also has specific memories of how other Robertson brothers and their

father, BG, molested and raped her when they stayed in her house.

"It seemed that every night one of the Robertson brothers came into my

room.  Sometimes they raped or molested me in there.  But I was tiny, so I

could be moved, and so sometimes the rape and molestation occurred in other

parts of the house.... It was a nightly ordeal when Buck or his brothers were

around, and I lived in absolute terror..." (Tab 30, at ¶ 6.)

24.                              REDACTED

. He remembers never liking being

at home once Buck moved in, due to the constant harsh criticism Buck directed at him.

(Tab 17, at ¶ 4.)  He remembers Buck's brothers living at their house a lot, so much that

"it seemed that one of them was always there at any given time... they were constantly in

and out of the house." (Tab 17, at ¶ 6.)  Leon reports that Skip lived in their house for

about a year, sharing a room with him (Tab 17, at ¶ 5), and that Skip, like his brothers,

constantly criticized and teased Leon for being "to 'straight-laced' and not wanting to go

to bars and get drunk with them. (Tab 17, at ¶ 6.)  Leon recalls that Buck and Skip's

father, BG, also "stayed at our house quite a bit," and that he was a "weird duck" who

9

"always talked strangely about women." That is, BG "talked down about them" and "said they were playthings." (Tab 17, at ¶ 8.)

25. Leon reports that he enlisted in the Marines largely to escape from living around Buck and his father and brothers. When he returned from Vietnam in 1970, REDACTED told him that "our stepfather and his brothers, including Skip, were all child molesters" REDACTED More than a decade later, REDACTED independently confirmed to Leon that Buck and "all of his brothers" had sexually abused her. Leon recalls REDACTED telling him that she disclosed this publically at the time, when she took her mother and Buck to court for violently assaulting her (see below), though Buck said she was lying and their mother "backed him up." (Tab 17, at ¶ 14.)

26. REDACTED recounts that a common form of punishment for her was spending a day or weekend being raped by Buck or his brother Jerry. "Most of the time, when I got in trouble, it felt like I then had to go somewhere with one of the Robertsons. I had to go on hunting trips with Buck or Jerry Don, or on some other errand. In reality, they just took me somewhere to rape me." (Tab 30, at ¶ 12).

27. Finally, REDACTED reports a still vivid and upsetting memory of physical violence perpetrated by Buck against her REDACTED witnessed Buck severely beat REDACTED . She remembers fearing that Buck would kill REDACTED and watching, REDACTED , while Buck "hit REDACTED with his fists to where you could not recognize her face any longer." (Tab 30, at ¶ 10.) Leon too recalls this incident. Though he did not witness the assault, he did see REDACTED wounds the following day, including "a black eye and bruises all over her

10

cheeks." (Tab 17, at ¶ 11.)  And as noted above, Leon reports that <sup>REDACTED</sup> took Faye and Buck to court for the assault. (Tab 17, at ¶ 14.)

28.   Wendi's mother Donna also provides corroboration of the Robertson brothers' and father's sexual abuse        REDACTED        . Donna recalls learning of the abuse in 1974 or 1975, around the time she divorced Skip Robertson, Wendi's biological father. REDACTED was the one who told Donna that "many of the adult Robertson brothers sexually abused her and her sisters when they were children," and "talked the most about AV, Jerry Don, and Tommie." (Tab 27, at ¶ 165.)  Although Donna did not ask for details, she recalls a particularly disturbing story told by <sup>REDACTED</sup>. One day when she was about fourteen or fifteen years old, she came home to find one of the Robertson brothers stretched out on the couch, and he "held his hand up and told <sup>REDACTED</sup> that he had female juices on his hand from one of her sisters." (Tab 28, at ¶  10.)

29.   Finally, Donna was also told by       REDACTED       , in conversations they had "a couple of times in the past ten years," that        REDACTED        were sexually abused by the Robertson brothers. (Tab 28, at ¶¶ 12-13.)  Donna also reports that Skip told her, in early 2011, that he had "messed around" and experimented sexually with $\genfrac{}{}{0pt}{}{\text{REDA}}{\text{CTED}}$ when both of them were around thirteen years old, which is during the time        REDACTED        were being sexually abused by Robertson brothers. (Tab 28, at ¶ 11.)  Thus  REDACTED

have reported being sexually abused by the Robertson brothers after Buck        REDACTED        , and Donna says that Skip himself has admitted to sexual activity with $\genfrac{}{}{0pt}{}{\text{REDA}}{\text{CTED}}$ .

30.   **A mother who looked the other way.**  As would be true for Wendi Andriano as a child, <sup>REDACTED</sup> mother made no effort to protect her daughters from continual sexual

11

exploitation by men she brought into her home, nor to protect them from physical

violence.                    REDACTED                    their mother "knew what

was going on" because they had "told her what was happening" at the time, but that she

"denied the whole thing." (Tab 17, at ¶ 15.) REDACTED also told REDACTED that she disclosed

the sexual abuse when she took her parents to court over the brutal physical assault, only

to have REDACTED support Buck's denial and claim that REDACTED was lying. (Tab 17, at

¶ 14.) When REDACTED confronted her mother years later with the reality of the repeated

molestations and rapes and her failure to protect her daughters, REDACTED reportedly replied

that it was "just part of life." When Deblen responded by asking "why it had to be that

way," her mother threw her out of her house and it was nearly thirty years before they

spoke again. (Tab 30, at ¶ 15.)

    31.  **Possibility that Skip sexually abused young girls as a teenager.** REDACTED

explicitly names Skip as one of the sexual tormentors responsible for her "nightly ordeal"

and living "in absolute terror" whenever "Buck or his brothers were around." Leon

reports that both            REDACTED            independently told him about being sexually

abused by "all" of the Robertson brothers.

    32.  However, Donna reports that REDACTED told her it was the "adult" Robertson

brothers who sexually abused her and her sisters. (Tab 28, ¶ 9.) If only REDACTED

account of which brothers sexually abused her sisters, as remembered by Donna, is true,

this would mean that Skip, who was a teenager at the time, did not sexually abuse them,

including REDACTED . However, it is possible that Skip *was* a perpetrator, and (a) REDACTED

did not know, which could have been the case if Skip did so less often than his older

brothers; (b) Skip only abused the second-youngest REDACTED (and possibly the youngest

12

sister, who would have been too young to remember and report it later); or (c)<sup>REDACTED</sup> knew Skip had done so but did not want to tell Donna (e.g., to protect Donna from becoming overwhelmed by the potential implications for Skip's relationship with Wendi). The available evidence does not allow us to know for sure whether Wendi's father was already sexually abusing girls as a teenager.

33.    Not surprisingly, Skip never mentions anything about    REDACTED being sexually abused when he lived there.  However, when Skip refers to having sex with                REDACTED                many years later in 1992, he blames his abusive actions on having at the time felt "isolated and depressed" – the exact same pair of unwanted feelings he recalls experiencing while living in<sup>REDACTED</sup> house as a teenager. (Skip also claims, as many men who sexually abuse children do, and as if it excuses his crimes, that he was always intoxicated when he had sex with <sup>REDACTED</sup>

, and that he "felt like I loved her in the way I felt love for an adult woman" – which begs the question of just what sort of love he was even capable of feeling for an adult woman). (Tab 32, at ¶ 64.)  In short, there is strong evidence that Skip sexually abused the prepubescent <sup>REDACTED</sup> (and perhaps the youngest sister) during the time he was living in her house and struggling with the same feelings that he says triggered his sexual abuse of a twelve year old girl more than twenty years later.

34.    **Sexual abuse in Skip's family.** It is important to consider how Skip (and his brothers) ended up sexually abusing children.

35.    As noted above, Leon McGuffee recalls Skip's father BG as a "weird duck" who set an example for his sons when he "talked down" about women, including referring to them as sexual "playthings."(Tab 17, at ¶ 8.)  Leon goes on to say that the

13

father's attitude toward women "was pretty much standard with all the Robertson men," and that whenever the brothers got together, for example to boat on the lake, "all they talked about all the time was their conquests of women, by which they meant the women who they had sex with." (Tab 17, at ¶ 9.) REDACTED reports that Skip's father repeatedly molested and raped her for several years; it is likely that his sons knew what he was doing, even learned such behavior from him.

36.    There was also sexual abuse in the Robertson's own home. For example, REDACTED reports that Buck "tried to dry hump" him when he was eight or nine years old. Buck was an adult at the time, and had already left home, married and divorced, then returned to live at home for a while. REDACTED and Buck were sharing a bed with their brother "AV," which was not uncommon given the size of their family, and REDACTED "woke up with [Buck] moving his pelvis against me. I did not know what was going on." Confused and frightened by what his brother had done, REDACTED told his mother. Her response? To tell him that "Buck was just having a bad dream." (Tab 32, at ¶ 15.) Here,    REDACTED

, we see a classic pattern in incestuous and sexually abusive families: the mother does not want to know, looks the other way, and then, when both of those strategies fail and she finds herself confronted with an incident of sexual abuse, resorts to denying reality, pretending it did not really happen, and encouraging the victim to do the same.

37.    Thus even before the tragedy of his mother's death, Skip grew up with parents who perpetrated and tolerated the sexual abuse of children. His father viewed women and girls as sexual "playthings," saw neglected and vulnerable children of other families as ideal targets for repeated sexual assault, and had no concern or empathy for the terror and

14

suffering he inflicted. For his mother,          REDACTED          , the sexual abuse of children

was apparently just "part of life," albeit a part of life she thought best to deny and ignore,

along with its consequences for the victims.

38.  **Physical abuse in Skip's Family.** A father like BG Robertson – who is

reported to have routinely molested and raped young girls, with utter indifference to their

experience or well-being – is an unlikely candidate for exercising compassionate

discipline strategies, as opposed to simply relying on fear of violence to compel his

children's obedience. In my interview with Skip, he said that his father, after being

informed by his mother of a child's bad behavior, would hit the child "eight or nine

times" with his belt after making them lie across the bed in their bedroom. Skip added

that he seldom got in trouble because he spent little time in the home where his mother

could know if he had broken any rules. As he put it, "We never was in the house that

much to get in trouble." Skip did tell me of his brothers beating him with belts for

misbehavior, and that whenever he told his mother about such beatings she told him that

he deserved it.

39.  Skip also told me a story that revealed his mother's potential for physical

violence. Once his brother Jerry, an older teenager at the time, drove up to the house with

a friend, to ask if he could spend the night at his friend's house. Their mother said he

needed to ask their father, and soon Jerry emerged from the house and said to his friend,

"My old man won't let me go." Skip remembers his mother jumping from her chair on

the porch, where she had been crocheting, to grab Jerry and "throw him to the ground."

Skip explained that his mother's behavior was totally appropriate and justified, because

he and his siblings were raised to only speak of their parents with respect.

15

40. Recall <sup>REDACTED</sup> account of how Buck treated her and     REDACTED using rape as punishment and nearly beating <sup>REDACTED</sup> to death when she dared to challenge Faye and Buck's authority. It is likely that Buck learned such brutality toward children in his own home. In addition, Buck's son from his marriage to Faye, Stuart Wade Robertson (known as "Wade"), describes how he was beaten with a belt for any and all violations of his parents' rules, including when he "stayed out too late" or went "somewhere I wasn't supposed to be." (Tab 33, at ¶ 3.) Though Wade excuses and even embraces his parents' beatings of him, he also implicitly acknowledges what it was: "I suppose today it would be called abuse, but I think of it as discipline." (Tab 33, at ¶ 3.)

41. **Neglect in Skip's family.** In my interview with Skip, when asked of his earliest memory of his father, he responded, "I was probably six or seven years old before I got to know my father at all." His father worked all day, and when he came home all he wanted to do was sit down for the dinner that his wife had prepared and not hear or see the children, then go off to bed. He described his mother (of eight children, consumed by cooking and otherwise tending the house and chickens) as "always too busy" to spend time with him, and remembered it as "only every once in a while" that she would even let him sit next to her. Skip described a family situation where the children were out of the home as much as possible, with him and his brothers (and youngest sister Myrna) playing far from his mother's view. As long as they were home by dark, they could do whatever they wanted – or at least whatever they could get away with without their mother finding out. And so he and his siblings, who his mother referred to as "wild Indians," would routinely "disappear all day."

16

42.   In his declaration Skip conveys, in general terms and with some poignant examples, a barren emotional landscape that included disconnection between parents and children in his family. After recalling how he and his father "never really spoke" when they lived together during his tenth year of school, Skip continues, "I was brought up that way. Grown ups and kids did not speak to each other much." He then goes on to link this form of neglect to another one found in his family: "You only talked if you were talked to and the kids ate last. The grown-ups all ate first and us kids had to wait and we got the leftovers from what the grownups didn't finish. Sometimes we had to wait hours, especially if there were aunts and uncles over... We stayed outside and went in when they were done." (Tab 32, at ¶ 9.)

43.   Wade Robertson describes a similar situation in his home, with Buck and his mother neglecting him as a child: "My dad was on the road driving trucks most of the time and my mom was working. I was easy to raise and I pretty much raised myself." In families with such parental neglect and abandonment, and so little nurturance, care and love, children are indeed left to their own devices and, as Wade puts it, to raise themselves.

44.   **Sexual violence against others, including by Skip.** Tragically, in such families the children often turn to sexual behaviors, including the sexual abuse of other children, in misguided attempts to find some kind of gratification and to sooth briefly the anxiety, loneliness and depression from which they inevitably suffer. Because the human body and brain are hard-wired for sexual stimulation to feel good and for orgasm to produce not only intense pleasure but a state of soothing satisfaction and relief, severely neglected and abused children – especially those who have been sexually abused themselves and/or

17

have witnessed the sexual abuse of others – are highly vulnerable to becoming perpetrators of sexual abuse. For boys and young men, who have learned from many sources that females are sexual objects for males to use, that achieving sexual conquest means being a "real man," and that domination and aggression, even violence, are acceptable ways to ward off vulnerable feelings like sadness and loneliness, the risk is much higher.

45.   This appears to have been the case in the Robertson family. As REDACTED describes, all of the Robertson brothers, including Skip, raped and molested her. REDACTED affirms that their sister REDACTED reported sexual abuse at the hands of every Robertson brother including Skip. Skip himself reports that his brother AV molested REDACTED (Tab 32, at ¶ 60.) And both Tommie and Skip were REDACTED arrested in December of 1992, and ultimately imprisoned, for sexual assaults REDACTED REDACTED than spanned three or four years. Tommie had taken sexually explicit photographs of REDACTED while she was asleep in his truck (apparently after he had been fondling her, which he often did while taking her on cross country trips). The discovery of Tommie's photographs led to the victim's disclosure of sexual abuse by Skip, including repeated sexual intercourse, with the last incident only weeks before his arrest.

46.   Certain details of the police investigator's initial report merit consideration here, for they shed light on how those who sexually abuse vulnerable and neglected children are able to get away with it, sometimes for years on end, without it ever being reported to the police or child protective services. More specifically, they provide a window into how the Robertson brothers, especially Skip – like so many who sexually abuse children –

18

manipulated their victims into *blaming themselves* for the abuse and fearing that
revealing the truth would only get *themselves* in trouble.

47.   When the investigating sheriff's deputy asked the victim why she had waited
three weeks after discovering the photographs of herself to tell her counselor, she said
that " REDACTED    [Skip] made her feel responsible for what occurred [sic] to her." The
investigator continued, "REDACTED told me that she was tired of keeping everything a secret...
[and that Skip] had known of the photographs for over a year and did nothing." The
investigator then spoke to REDACTED , the victim's brother who first found the photographs.
REDACTED told him that when he told Skip about the photographs Skip's response was
"everything's under control."

48.   The investigator then spoke to the victim again, and explicitly asked her "if any
other sexual activity was occurring in the home." At that point she told him that "over the
past three to four years [that is, beginning at age eight or nine],    REDACTED    , Shelby
Wayne Robertson, had sexual intercourse on at least (25) twenty-five occasions." She
went on to explain that Skip had also done "other sexual things to her." Asked again why
she had "waited so long" to tell anyone, this time about Skip's abuse, the young girl told
the investigator that "she thought it was her fault, after a while she said, she just
consented. [Skip] told her that if she ever did speak out that she would be in trouble
because she had consented." (Upon further investigation, days later, the victim clarified
that when she was eight years old, soon after Skip met her        REDACTED

, Skip fondled her breasts; beginning at age nine, he made her perform oral sex on
him and performed oral sex on her; and finally, when she was twelve years old in June of
1992, Skip asked her if she wanted to "make love," and when she said no "he got mad"

19

and became "so mad that she finally gave in and said, 'Well do whatever you want to do, I really don't want to do this, but you're going to do it anyway.'" (Deputy L. Lignoski, Maricopa Sherriff's Office, Follow Up Investigation Report, December 8, 1992, page 6.).)

49.    The officer confronted the victim's mother,        REDACTED        , with Skip's sexual abuse of her daughter. (<sup>REDACT</sup><sub>ED</sub> later reported her own history of sexual abuse by an uncle. (Jeffrey D. Harrison, Ph.D., Report of Paraphilic Assessment, p. 6 July 1993.)). After acknowledging that her daughter "did complain" in March of 1992 that Skip had touched her breasts and "on one occasion got into bed" with her, <sup>REDACT</sup><sub>ED</sub> "excused Shelby for his actions because he's a drunk" (Deputy L. Lignoski, Maricopa Sherriff's Office, Continuation Report.) With a mother so easily resigned, even dismissive about her being sexually abused, it is no wonder that the young girl had resigned herself to the fondling, then the oral sex and finally the sexual intercourse perpetrated by        REDACTED        .

50.    This young girl's experience is not uncommon. Every day vulnerable and neglected children like her are manipulated and threatened into progressively more intrusive sexual abuse, and manipulated into believing that they are to blame for each and every violation. Every day many children sexually abused by step-fathers know their mothers would rather not know and will probably blame them for the abuse (as <sup>REDACT</sup><sub>ED</sub> did in subsequent interviews, saying her daughter had been "seductive," (e.g., Jeffrey D. Harrison, Ph.D., Report of Paraphilic Assessment, pp. 6-7, July 1993.)). And the younger a child is, due to the cognitive and other limitations of younger children, the more vulnerable that child is to such sexual manipulation and maternal abandonment, even once the abuse is revealed.

20

51.   **Bizarre behaviors, psychopathology, and psychiatric problems.** Skip reports several examples of severe psychiatric problems in his siblings.  For example, as a teenager his brother Tommie suffered from depression, had no friends, and engaged in bizarre behaviors including building model ships and then lighting them on fire or shooting them with a bb gun. (Tab 32, at ¶ 49.)

52.                                        REDACTED

53.                                        REDACTED

21

REDACTED

54.                               REDACTED

He told of his mother suffering a stroke and dying in his presence at age twelve. And he reported that growing up he was "closest" to an uncle who taught him many things but became bizarre and violent when drunk, including chasing Skip with a knife, and that this uncle eventually "disappeared," which was very distressing to him. He denied that there was any physical abuse or other problems in his family, and denied any juvenile arrest history (though military records document his arrest and probation at age fifteen for charges of fighting and carrying a knife, as noted above). (Jeffrey D. Harrison, Ph.D., Report of Paraphilic Assessment, pp. 2-3, July 1993.)

55.   Skip did report to Dr. Harrison some of his early sexual experiences REDACTED , including first exposure to soft-core pornography at age eight or nine. He reported first drinking beer at age five and becoming a "regular user" of beer on weekends at age fifteen. He also told Dr. Harrison of his suicide attempt (described below) at age sixteen. (Jeffrey D. Harrison, Ph.D., Report of Paraphilic Assessment, pp. 3, 5, July 1993.)

56.                               REDACTED

22

REDACTED

57. **Skip's teenage suicide attempt.** Indicative of how depressed and miserable Skip was as a teenager, he has reported making a serious attempt to kill himself when he was fifteen or sixteen years old. Knowing that his father had lots of pills in the medicine cabinet and that his brothers had left behind pills they used to stay awake as truckers, Skip raided the medicine cabinet, searched the house for more, and "took as many pills as I could find." (Tab 32, at ¶ 11.)

58. **Disconnection and denial.** After unsuccessfully attempting to kill himself, Skip awoke in the house of his brother Glen and his wife, who, Skip reports, "nursed me back." The fact that he tried to commit suicide, however, was never talked about with Glen or anyone else in Skip's family. Reflecting on how his suicide attempt was never discussed or even mentioned in his family, and consistent with his previously noted

23

observation that parents and children never spoke about anything of emotional significance, Skip commented, "In my family, we do not discuss things."

59.   As we shall see, Skip's daughter Wendi, thanks to her neglectful mother, would during the first four years of her life repeatedly be left in situations where Skip's father and brothers had opportunities to sexually abuse her. When this possibility is addressed by Skip, he acknowledges that "During the time Donna [Wendi's mother] and I were together, my dad and brothers were often around." Yet he then claims – implausibly, if REDACTED   and Wendi's mother are to be believed on this issue – that "over the years" he had been "told about my father and brothers sexually molesting or abusing children in the family," but that he had only learned this "long since the time had passed that the acts had occurred." (Tab 32, at ¶ 47.)  As if he did not know full well about such sexual abuse from witnessing or overhearing it, for example while he lived with his father at REDACTED house, where his father apparently stayed for the *purpose* of sexually abusing the girls there; or from hearing his brothers bragging about it; or when he knew of Tommie's pictures of his  REDACTED   while he continued to abuse her himself and escalated to sexual intercourse.

60.   Similarly, it is hard to believe that Skip's sexual abuse of his   REDACTED , a crime for which he was caught and imprisoned, was the only child sexual abuse that he perpetrated in his life. More likely, it was the only sexual abuse that he admitted to having committed, and only because it was public knowledge and there was no option of not talking about it.

61.   **Troubled teenage years: Pre-Vietnam.** In addition to living with his father and Buck at times, Skip spent time with his brother AV and his wife Betty, which meant

24

joining them for travels around South Dakota, Idaho and Colorado with their racehorses, and lived with his sister Janey in Chandler, Arizona. (Tab 32, at ¶ 10.) Skip was arrested at ages fourteen and fifteen in Tucson, first for fighting and carrying a switchblade, then for running a stop sign. The latter charge was dropped but for the former Skip remained on probation until his seventeenth birthday (military personnel records). In eleventh grade he quit school by dropping out of Deer Valley High School in Glendale, Arizona (records). Around that time, in 1965 when Skip was sixteen or seventeen years old, Skip attempted suicide (as described above) and                    REDACTED

                                                      his first sexual experience with an adult woman, when "my brothers took me down to Nogales, Mexico and sent me to a prostitute." (Tab 32, at ¶ 16.)

62.    Donna knew Skip during his teenager years, beginning when he lived with Buck and Faye's children, including Deblen and Alice, who was Donna's best friend. He was someone from whom Donna wanted to keep her distance: "In high school Skip was one of the hoodlums or bad boys… I had nothing in common with him at that time. He ditched class, went out with wild girls, and was not someone I hung around with during high school." (Tab 32, at ¶ 66.) Alice's brother Leon also remembers Skip as "always in trouble," and recalls hearing about Skip "stealing, ditching school, and drinking. (Tab 17, at ¶ 3.) Using the same word as Donna, Leon says that Skip was one of the "hoodlums" and that he and his buddies not only drank and did drugs, but "huffed gasoline." Leon himself witnessed Skip and his friends "take the cap off of a motorcycle cap and breath in the fumes." (Tab 17, at ¶ 5.) Inhalation of solvents is extremely dangerous and harmful, and gasoline, among the most hazardous, can cause severe and lasting brain damage.

25

63.   **Troubled teenage years: Vietnam.** Upon turning eighteen in April of 1966, justtenmonths after the first Marines had been dispatched to Vietnam and five months following Johnson's December 1965 major escalation to 200,000 U.S. troops, Skip enlisted with the Marines.  According to Leon, Skip was "forced to choose between the Marine Corps and jail time" after he and his friends were caught stealing a vending machine from a gas station.  (Tab 17, at ¶ 3.)  By October of 1966, Skip had twice gone AWOL; for the second offense his punishment included having his pay docked $25 per month for two months. (Military records, CCP SWR 006-007.) On December 13 of 1966, Skip landed at Da Nang and began a 12.5-month tour of duty in Vietnam, where he served as a Private First Class and participated in 27 combat operations as an infantry mortar man. (Military records, CCP SWR 0015)

64.   Skip succinctly summarizes his own progressive traumatization in Vietnam, which is typical of those who endured combat there: "Everything was face-to-face and very close. The first time that I was out there on an operation and I saw guys getting shot up, I got sick and vomited. After about five months, I was numb. I had to relate the shooting to hunting an animal, like shooting a deer, because I couldn't handle shooting a human being." (Tab 32, at ¶ 20.) He recounts the terror of nights in the jungle:

> "[W]e holed up in dugouts covered with ponchos. The Vietnamese had sachel
> charges with pull pins that had a twenty second delay. So they could pull the
> pin and throw it a long way before it detonated. As we lay there in the night, I
> thought any little movement or sound was a satchel charge. I was always on
> alert and very jumpy." (Tab 32, at ¶ 21.)

26

Skip also recalls the commonly described "high" and "rush" of combat, which he experienced when being "ambushed or under attack and afterwards checking to make sure I was not hit and still alive." (Tab 32, at ¶ 23.) He was also injured in battle, though not seriously, by what he refers to as a "ricochet shot in the leg," and returned to his unit the following day (Tab 32, at ¶ 21.)

65.   Not surprisingly, given the intensity of his combat experiences and the lack of psychological resilience expected of someone who has gone to war straight from a childhood of extreme neglect and abuse, Skip developed severe posttraumatic stress disorder (PTSD), as addressed in some detail below.

66.   **Beginning his relationship with Donna Worsham.** Upon completing his combat tour and returning from Vietnam, within days he was having a welcome-home party, just before Christmas of 1967.  Donna was at the party, having drunk vodka in the back seat with Tommie Robertson on the drive there with Buck and Faye (Tab 27, at ¶ 90.) Skip was pleased to discover that "Donna had grown up from the skinny girl we all used to tease." (Tab 32, at ¶ 17.)  He was eager to start a (sexual) relationship with Donna, and they did so immediately.  At the time Skip, coming straight from Vietnam, was the more traumatized and disturbed of the two. But Donna at eighteen was also entering adulthood emotionally crippled from a childhood of pervasive neglect and violence and untreated bipolar disorder (as documented in Dr. George Wood's report). The tragic consequences of this toxic mixture – for their ill-fated relationship and marriage, and for their future child – would be catastrophic.

27

## B.    WENDI'S MOTHER AND MATERNAL BACKGROUND

67.    Donna Ochoa was born Donna Elizabeth Worsham on September 20, 1949 to Laverne Ann ("Ann") Worsham (nee Tilly) and Henry Mason Worsham in Livermore, California (Notification of Birth Registration of Donna Worsham, California Department of Health Services).

68.    **Wendy's maternal grandmother.** Ann was born in 1915 in South Dakota. According to Donna, her mother's mother, Ina Rebecca Roberts, had three children with her husband, Sanford Tilley, of whom Ann was the oldest.  When Ann was about twelve or thirteen years old, her mother suddenly left her family behind, never to return. To this day Donna is astounded by the magnitude and bizarreness of her grandmother's actions: "It's freaky that she just suddenly walked out on her kids one day, but what's even freakier is that she wasn't even involved with another man and didn't have anywhere to go. She just left her family suddenly and never returned to them. She didn't even communicate with her kids again until they were adults." (Tab 27, at ¶ 6.) Instead, Ina made her way to California, where she created and refined recipes for Betty Crocker. Ina would eventually go on to have three more husbands, remarkable for a woman at any time but especially so in the first half of the 20th century. (Tab 27, at ¶ 9.)

69.    Donna reports that within two years of Ina leaving her husband and children, Sanford remarried. Then, because his new wife wanted nothing to do with Donna's mother or her siblings, "he rejected his own kids and sent them away" to live, separated from each other, with different family members. Thus Donna's mother Ann had suffered the ultimate neglect, abandonment and betrayal by her own mother and father.

P-App. 002156

70.    Ann married "as fast as she could right out of high school," because she wanted
to be free of the extended family she'd been sent to live with. She quickly married
Theodore Edward ("Ted") Zens, without really knowing him. He turned out to be an
alcoholic who routinely beat her for more than eight years, until he suddenly died in a
drunk driving accident by crashing his own vehicle into a bus. Ann and Ted had one
child, Nadine Ann "Deannie" Zens. Deannie was seven or eight years old when her father
died, and Ann immediately began going out to bars, bringing Deannie along and leaving
her alone in the car, sometimes for hours at a time, while she drank inside. This was
during World War II, and Ann typically went to bars frequented by military men, where
she met Henry Mason ("Hank") Worsham, Jr., who was in the Navy. (Tab 27, at ¶¶ 12-
14.)

71.    Upon getting involved with Hank, Ann and he continued to go to bars and leave
Deannie in the car. As Donna recalls, Deannie said that's how she was able to spend time
with their mother and Donna's father at the beginning of their relationship. Yet just as
Ann's own mother and father had done to her, Ann found Deannie inconvenient and
abruptly abandoned her. She did so after bringing Deannie along on a drive across the
country to rejoin Hank after his transfer to the East Coast. Deannie was about thirteen
years old, the same age Ann was when her mother left her, when Ann put her, by herself,
on the first bus of a cross-country, several-day, multiple-bus trip to South Dakota, where
Deannie would live with relatives, just as Ann had to do when her father abandoned her
after finding his new spouse. As Donna notes, this ended up being a "milder version" of
what Ann's parents had done to her, because Deannie was allowed to move back to her
mother and Hank's home a year or two later, though before becoming an adult Deannie

29

lived with them "on and off," as well as with her grandmother Ida and one of Ida's husbands. (Tab 27, at ¶¶ 14-15.)

72.    This intergenerational pattern of parental abandonment would continue in the childhood of Donna, who would ultimately abandon her own daughter, Wendi, by failing to love or care for her and instead handing her over to deeply disturbed men who abused, exploited, and corrupted her.

73.    **Wendi's maternal grandfather.** Donna knew very little of her father, Hank Worsham's childhood or family. Donna recalls that her grandfather, Henry Mason Worsham, Sr., was a farmer and a barber, and "a big drinker and an alcoholic who was given a successful tobacco farm by his own father but "drank it all away." (Tab 27, at ¶ 4.) Of her grandmother, Mary Elizabeth Fortner, Donna says that she "put up with my... grandfather's drinking just like my mom put up with my dad's drinking." (Tab 27, at ¶ 5.) Indeed, Hank's inadequacy and incompetence as a father, his many irresponsible and harmful behaviors toward his daughter, and his betrayals and even violence toward his wife – these are indications of a childhood troubled enough to leave him totally unprepared and unequipped to be a father or husband.

74.    **Donna's childhood of sickness, instability, neglect and trauma.** By the time Donna was born, in September of 1949 in Livermore, California, Ann and Hank were married and living in the Bay Area. Her father continued to be in the Navy and the family moved "constantly" from when she was an infant until she was in 4th grade, mostly because the Navy sent her father to learn at various schools. A residence history created by her and her half-sister Deannie shows them moving back and forth between various parts of California and other states including Virginia, Hawaii, Rhode Island, Kentucky,

30

Florida (CCP DO 000692-000694). In addition, Donna's father was often out to sea and away from her and her mother for months at a time. (Tab 27, at ¶ 19.) Donna spent her 2nd grade of elementary school living with her parents in Panama. (Tab 27, at ¶ 20.)

75.    During these years of constant moving, Donna was often sick, debilitated or otherwise physically unwell. Her parents told her that she suffered from a severe case of rheumatic fever when she was two years old, including suffering a fever-induced "attack of paralysis" and her childhood teeth being "rotted and burned out." From the time of that illness until she was about twelve years old, Donna says she was a "weak, tired, inactive" and "sickly" child. (Tab 27, at ¶ 21.) She had a heart murmur, repeated episodes of extremely high fevers (she was allergic to aspirin and eventually participated in military research on Tylenol or acetaminophen), and multiple hospitalizations from ages two or three to eight or nine. (Tab 27, at ¶ 22.)

76.    **Donna's neglectful mother.** No one can remember much before they are five years old; that's when the hippocampus, the region of the brain responsible for encoding "episodic" memories of particular events and experiences, matures sufficiently to do so. Thus Donna's memories of her childhood begin around that time.

77.    As far back as she can remember, Donna's mother terribly neglected her. This comes as no surprise from a woman who was neglected and then completely abandoned by both of her own parents. Donna recalls how, though her mother did the laundry and the house was clean, "I had no emotional connection with her, no hugging, no cuddling, no warmth, no affection, no bond." (Tab 27, at ¶ 46.) As an adult looking back and struggling to make sense of her own failures as Wendi's mother, Donna observes, "My mom spent a lot of time reading and ignoring me while I was growing up, which I

31

repeated when raising Wendi and other kids." Like Skip and his brothers, Donna was left to her own devices, to raise herself: "My mom never talked to me about anything important... For the most part I learned what I needed to know about life from my peers because my mom wasn't parenting me and wasn't telling me anything." (Tab 27, at ¶ 45.)

78.    The memories Donna reports of her father become clearer and more detailed from age ten on, after her family finally settled in one place (covered below). However, Donna does report that her father "drank a lot" during her "whole childhood," so much that "that's where most of his money went" and like his father he wasted his potential for a successful career. (Tab 27, at ¶ 29.) Hank was "drunk a lot" at home, and hid pint bottles of hard alcohol around the house which, because he was usually drunk when he hid them, he constantly forgot where they were.

79.    For the first ten years of her life, as an only child whose family continually moved from place to place, little Donna was not only sickly and debilitated, but a loner with no friends. (Tab 27, at ¶ 25.) Like other children in that predicament, she may have given up on making friends as a young child. Yet even more importantly, the constant moving deprived Donna of <u>any</u> lasting relationship with an adult she could count on to love and care for her.  For some children with a cold, neglectful mother and heavy drinking, largely absent father, there is a saving grace: a sustained relationship with a loving grandparent, aunt or uncle, parent of a friend, neighbor or adult church member. For Donna, never living anywhere for more than a year, it was simply impossible to have even one adult in her life who she could count on to provide lasting love, support and guidance. Even if Donna was ever lucky enough to find an adult who genuinely took an interest and looked out for her, she knew it would not be long before she must leave

32

them. Therapists have long recognized that during a childhood otherwise pervaded by abuse and neglect, the enduring presence of just one loving adult can be an emotional lifeline that prevents some of the worst potential psychological damage. For the first ten years of her life, this was not an option for Wendi's mother.

80.    Indeed, the exception proves the rule: For a few years starting when she was twelve to fourteen years old, Donna spent a month each summer with her maternal grandparents. Ida was unloving, uninterested, harsh and rejecting. She was "just like my mom... wasn't going to talk about anything with me." Her Grandpa Pete, however, was "calm and stable." Knowing he was safe, Donna would open up and talk about the troubles in her life. Only for a month each year, and only as a teenager, Donna had the experience of being truly listened to and cared about, by "the only adult I was ever able to talk to while growing up." (Tab 27, at ¶ 42.)

81. Major emotional neglect can have equally or greater devastating effects on emotional and relational functioning than physical or sexual abuse, though the latter "get more press." Infants and young children are incapable of regulating and modulating their emotional states without the empathic and responsive help of caregivers. Children whose emotional needs and states are ignored or not responded to with supportive and soothing bodily contact, tones of voice and words, find themselves repeatedly cycling – both experientially and biologically – through intense and extremely distressing states of emotional and physiological arousal. Their brains resort to automatic and radical attempts to curtail such terrifying and traumatic experiences, such as "shut down" states including depression and withdrawal, and "hyper-aroused" states including aggressive behaviors or pathologically repetitive self-stimulation (e.g., incessant thumb sucking, rocking, etc.).

33

82. In short, the deleterious psychological effects of extreme emotional neglect, though often overlooked except in the most extreme cases (e.g., Romanian orphans), are profound and devastating. Both of Wendi's biological parents suffered such neglect as children and into their teen years. And for Donna, there was the additional contribution of her genetic vulnerability to bipolar disorder (as documented by Dr. Woods). Although Donna cannot remember and no witnesses can tell us, during the first five years of her life she would almost certainly have repeatedly cycled though the following brain-based states: extreme depressive lows, which may have largely accounted for her being "weak, tired, [and] inactive;" mania or hypo-mania characterized by runaway thoughts and emotions and disorganized behavior, or less extreme but still quite disturbed irritability and agitation; and "in-between" states involving emotionally numb disconnection from herself and others (as an adolescent and adult, in this state she could come across to others as "ditsy" and a "space cadet").

83. **Family settles in Tucson.** Before Donna started fourth grade, her family moved to Tucson, where they would remain through her high school years. (Tab 27, at ¶ 23.) During her first two years there, Donna remained physically unhealthy and was not permitted to go outside for gym class, but after age twelve her health began to improve. (Tab 27, at ¶ 24.) Though Donna's physical health improved over the next few years, her parents' mental health and their relationship with each other progressively deteriorated, with increasingly traumatic and destructive effects on their daughter.

84. **Continued parental neglect, new corrupting and abusive actions.** Donna notes that her father Hank was a "smart guy" who at times "had a full staff under him," and "should have been an officer by then." Indeed, her father's career and personal life

34

were derailed by alcohol addiction, hypersexual and violent behaviors -- all of which were
no doubt partly fueled by his own troubled childhood. Hank never became a Navy
officer. Instead he was constantly demoted for drinking and getting into fights, and spent
time jailed in the brig of a Navy ship. (Tab 27, at ¶ 23.) Donna recalls him drinking
heavily "during my whole childhood" and throughout her adulthood too, "until the end of
his life." (Tab 27, at ¶ 29.) One consequence of her father's drinking, which continually
frightened her as a child and teenager -- though nothing like the violence between her
parents described below -- was knowing he could burn the house down. She recalls
several times that her father set his mattress on fire by passing out drunk with a lit
cigarette, a few times coming home to find his mattress smoldering out in the backyard,
and once hearing fire engines and looking out a door of her high school to see smoke
billowing from her house. (Tab 27, at ¶ 65.)

    85.   Not surprisingly, after his career stalled and the family stopped moving, her
father continued to drink heavily and neglect Donna. By age ten, when he did spend time
with Donna it was by bringing her along while he went drinking in bars. "That's how we
spent time together after we moved to Tucson," Donna recalls. She remembers drinking
lots of Shirley Temples while sitting with him at the bar. Looking back now, she
recognizes how "pathetic" it was, "preparing a child to drink alcohol by taking her
around to bars and giving her an adult-sounding cocktail when she's not even a teen yet."
(Tab 27, at ¶ 30.)

    86.   Donna euphemistically refers to Hank as her "more permissive parent." Starting
when she was fifteen and throughout high school, she routinely went out drinking with
him and her friends. Often she would pick up her drunken father late at night, after the

35

restaurant and bars had closed, and they would drive around drinking with him in the car. He would even let her and her friends drink his wine (though not if they were driving). Donna sums up her attitude at the time about these escapades: "He let me go out with my friends and on dates while he was with us in the car drunk, which I liked a lot." (Tab 27, at ¶ 69.) Indeed, trying to make the best of her father's alcoholism and wanton irresponsibility as a parent, Donna "turned it into a way to make friends in high school." In addition to driving around drinking with him and other teenagers, she would tell them at school, "I have booze and hard liquor at my house if you want to come over." (Tab 27, at ¶ 68.)

87.   Such rampant neglect, reckless behavior, irresponsibility and bad judgment on the part of adults – with a lot of sexual and physical violence thrown into the mix – was a familiar theme of Donna's childhood, as it was for Skip's childhood and eventually that of Wendi Andriano. These problems are not uncommon in families with parents who experienced significant trauma in their own childhoods and suffer from untreated bipolar disorder.

88.   In terms of neglect, Donna's mother was even worse. "My mother neglected me so badly when I was growing up and sometimes took things out on me so severely that she actually made my dad's parenting look good." (Tab 27, at ¶ 44.) The neglect she remembered from before moving to Tucson only continued. As described above, Donna had "no emotional connection" with her mother – "no warmth, no affection, no bond" – and she "never talked to me about anything important, especially not the difficulties between her and my dad." (Tab 27, at ¶ 45.) Donna was also physically abused by her mother, and this abuse worsened during the years in Tucson. Donna's recalls that her

36

mother often "lashed out at and slapped or smacked me for no reason that I could see, just because I was nearby and she was angry." (Tab 27, at ¶ 44.) Like her own mothers' neglect, such unpredictable and physically abusive lashing out would be something Donna did to Wendi throughout her childhood as well. (Tab 27, at ¶ 44.)

89.   **Parental conflicts spiral out of control.** Soon after moving to Tucson, Ann and Hank settled into a daily routine that ended with Hank coming home late and drunk. Over the following two years his late night returns would be followed by increasingly frequent and increasingly violent fights, which got even worse once he began an affair with a woman he would eventually go on to marry.

90.   Ann worked nine to five managing a restaurant she and Hank owned. During the day Hank worked as a Navy recruiter; at five o'clock he took over from Ann managing the restaurant. Between nine and ten, as the workers cleaned up, Hank drank at a bar attached to their restaurant (Hank and Ann did not own the bar). From there he went out "drinking and carousing with waitresses," sometimes having sex and even carrying on affairs, with multiple women, before returning home sometime after midnight. Ann struck back at her husband in passive aggressive ways at first, for example, knowing he was often "too drunk to find or use his keys," by locking the doors. Hank would respond by breaking a window to get inside, and screaming at Ann in a drunken rage, to which she responded by screaming back. Each night Donna lay in bed waiting with full of fear and dread to hear the breaking glass, hateful screaming, and increasingly common physical violence between her parents. Eventually, Donna feared for her own safety:

"It got really ugly, so when I was in 6th or 7th grade I started keeping a butcher knife by my bed. There was so much anger, ugliness and violence between my

37

mom and dad, with things getting out of hand all the time, that I felt a need to
protect myself.... I either blanked it out of my memory or didn't actually see
much of their physical fighting, but I heard plenty of it. At the time I didn't
form the words or realize that I needed to protect myself from my parents and
their ugliness, but that's how I felt." (Tab 27, at ¶ 37.)

91.   When Donna was in 6th or 7th grade, her father began a sustained affair with one
particular waitress, Virgie, with whom he would eventually have a separate and parallel
family. At that point the screaming and physical fighting got even worse, and it would
remain out of control and very traumatic for Donna throughout her teenage years. It also
began extending beyond their home, and including more terrifying violence. As Donna
recalls, "After my mom learned about the affair, when I was about twelve or thirteen
years old, she dragged me along with her on Sundays while she went around to different
hotels looking for my dad." During the first two years of the affair, Donna and her
mother went through this awful hotel-searching ritual nearly every Sunday. Sometimes
her mother brought a gun with her, and Donna vividly recalls the time Ann actually used
it:

"Once when I was with her we went to some old-time, single-story motels on
old Benson Highway along the I-10. She said something like, 'Stay here.
Don't move,' and left me in the car. She took the gun with her into the hotel
when she went in after him. Somehow she got the hotel manager to tell her
which room my dad was in. I was still sitting in the car when I heard shots, at
least two. Then here comes my mom. She was crying. We took off zooming in
the car. There was no conversation. I was scared, wondering if someone got

38

shot, and my mom said nothing. We drove fast all the way home. I later

learned from my dad that my mom had busted into the room he was in with

Virgie and started shooting. He said Mom was trying to shoot Virgie, but she

wasn't a good shot…" (Tab 27, at ¶ 35.)

92.    It would be impossible to over-estimate the terror of a child who believes that

she may have just heard her mother shoot and possibly kill her father, who she deeply

loves despite his failings. To then have her mother return crying and not tell her what had

actually just happened would only prolong and compound the terror and suffering. Also

clear from Donna's telling of the story is how she *knew* – after years of experience that

had conditioned her into to resignation about ever talking to her mother about anything of

significance – not to bother asking her mother any questions, not even whether or not she

had shot her father.

93.    Equally remarkable is how Donna finishes telling this story: "He said Mom was

trying to shoot Virgie, but she wasn't a very good shot and hit a booze bottle on the

headboard and the wall by the bed instead of Virgie. And then he told me: 'Be nice to

your mom. She's a really good person.' What I wanted to say was, 'Then why do you

treat her like crap?' But I didn't." (Tab 27, at ¶ 35.) Donna's memory is consistent with

the minimal and bizarre ways her father communicated with her, and with her own

implicit understanding of the futility of trying to communicate her own experiences and

needs.

94.    Finally, Donna says that much of her parents' fighting, and her father's spiteful

justification for the affair with Virgie, "centered on the fact that my father wanted more

kids, especially a son." (Tab 27, at ¶ 39.) When Donna was thirteen years old, in

39

September of 1961, Virgie gave birth to a son, Stevie, who Virgie insisted was Hank's child and who was given his last name at his Catholic baptism; years later Hank denied to Donna his paternity of Stevie, saying the boy was a "hook" Virgie used to keep Hank with her because he so wanted a son. Either way, Donna's father went on to father two daughters with Virgie, including Kathie Worsham, who was born in August of 1964 when Donna was fifteen years old (Kathy was a neglected, traumatized and disturbed child who grew up to suffer from extreme mental illness, including bipolar disorder with debilitating symptoms of mania, hallucinations and delusions).

95.    Even with all of the violence and pain between them, Donna recalls that her mother "said she loved my dad and would never leave him no matter what he did." Looking back, Donna views it as "an impossible situation" in which "they couldn't work out their problems and they couldn't move on," that went on for about ten years. (Tab 27, at ¶ 39.) Her parents would not finally divorce until 1969, when Donna was twenty years old and embroiled in her own horrible and doomed marriage to Skip Robertson.

96.    In summary, Donna's memories of her childhood and teenage years in Tucson are dominated by those of violence between her parents and her own attempts to pretend everything was OK. Missing entirely – with the exception of the one-month-a-year supportive ear of her Grandpa Pete – are any memories of any genuine support or help from the adults in her life. Donna recalls, "My parents did nothing to help me emotionally," which was of course impossible given how disturbed and confused they were themselves. (Tab 27, at ¶ 46.) Her mother continued to have no relationship with her, while her father "talked to me a little more than my mom but didn't do much to help me cope." (Tab 27, at ¶ 46.) In response to these overwhelming realities, Donna

40

attempted to cope in the same ways she would years later as she began her relationship with Skip, and as she would when handing over her daughter Wendi to men who sexually and physically abused and exploited her: "I just learned to ignore the constant ugliness, and became really good at not noticing bad traits in people I cared about..." (Tab 27, at ¶ 46.)

97. **Traumatized and troubled peers, beginning drug use, getting by at school.** Heading into her teenage years, with her parents' neglect continuing and their fights escalating, Donna turned to other teenagers in attempt to make sense of her life and respond to the challenges that overwhelmed her. It was the blind leading the blind. The peers from whom she "learned what I needed to know about life" were also neglected, abused, and disturbed. Totally at sea themselves, they could never teach Donna what she actually needed to be emotionally healthy and happy in life, with safe and loving relationships – let alone how to constructively cope with the trauma, suffering and moral confusion in which they were all immersed.

98. Donna has not had any "best" or "close" friends as an adult, which makes sense given her childhood and lack of help overcoming its emotionally destructive effects. As Donna notes, however, from age ten until sometime after marrying Skip at age eighteen, she did have friends who were influential in her life. Among the most influential through her high school years, and the best and closest friend she ever had, was Alice McDuffee, the oldest sister of Deblen Oke and Charlotte and Leon McGuffee. Alice was Donna's age and they became friends shortly after Donna arrived in Tucson. Her brother Leon remembers Donna being at their house a lot, sometimes coming over for breakfast and spending the whole day. Indeed, Leon describes Donna and Alice as "inseparable" and

41

recalls Donna as "like [a] sister" to him. (Tab 17, at ¶ 2.)  Like Donna, Alice was

neglected by her mother, Faye –                     REDACTED

99.    Not surprisingly, with everything going on at home and the troubled peers to

whom she looked for companionship and guidance, Donna started smoking cigarettes and

marijuana when she was only ten years old, in fifth grade. Of starting to smoke cigarettes,

Donna recalls doing so not to rebel, which did not appeal to her, but "because my parents

did and it seemed cool and grown-up to be smoking." (Tab 27, at ¶ 32.) Though Donna

does not say so, it is likely that she smoked marijuana both to fit in with her troubled

peers and to escape from the overwhelming bad feelings and memories stemming from

the neglect and violence she experienced at home.

100.   As Donna moved through her teenage years she was increasingly traumatized

and overwhelmed. By 8th or 9th grade she "lost it and had a breakdown" because she "had

witnessed too much ugliness and violence between my parents." Donna recalls that she

"couldn't stop crying and didn't respond when people talked to me," was taken to a

doctor briefly and then "stayed home from school and everything else to recover for a

week or two." Looking back she says, "It was all too much for me as a child, especially

my parents' fighting. I took it until I couldn't take it anymore, and then had the

breakdown." (Tab 27, at ¶ 48.)

42

101. Yet as noted above, Donna and her family never sought or received any real
help with their emotional problems, with her father's alcoholism and mental illness, with
her mother's mental illness, or with the conflicts between her parents and their utter
inability to care for their daughter -- let alone the extremely negative effects all of this
was having on Donna. And so, like so many other children in similar circumstances,
Donna simply put on a happy façade. "Despite the intense fighting late at night, I
pretended with my parents that things were normal and okay; we never talked about the
fights and for the most part during the day we acted like nothing was wrong." (Tab 27, at
¶ 38.) Deblen Oke,                          REDACTED

remembers how Donna, who was "at our house a lot," was viewed by her and her
sisters and their peers throughout Donna's teenage years: "She reminded me of Goldie
Hawn from the Laugh-In days. She was ditzy, funny, outgoing. Everyone loved her."
(Tab 30, at ¶ 13.)

102. Similarly, despite all that she was going through and the lasting damage it was
causing her, Donna got by at school. She appears not to have generated any special
concern or attention from her teachers. Most of her elementary school grades were
"average" or "above average," (Education Records of Donna Ochoa, Obtained by Capital
Case Project), and she graduated 63rd of 184 in her class at Flowing Wells Junior-Senior
High School (Education Records of Donna Ochoa, Obtained by Capital Case Project).

103. **Distorted perceptions and diminished expectations of people, relationships
and sex.** As Donna's primary method of coping with the insanity and violence of her
home life, she "just learned to ignore the constant ugliness, and became really good at not
noticing bad traits in people I cared about, like my dad." (Tab 27, at ¶ 46.) Following that

43

statement Donna continues, "Despite his drunkenness, disloyalty to my mom, and neglect of me, I worshipped my dad. He seemed like a happy, charismatic figure because he wasn't always irritable and complaining." Perhaps more than anything, these statements show how the young Donna had no adults in her life that truly warranted admiration or emulation (with the partial exception of Grandpa Pete, who was capable of supportive listening).

104. Given the experiences of other girls she knew,                      REDACTED
perhaps Donna "worshipped" her father in part because he directed his sexual obsession at adult women rather than her and other young girls.                      REDACTED

105. Regardless, Donna's description of how she saw her father – especially in comparison to her constantly miserable, irritable, and coldly rejecting mother – suggests that Donna may have learned from her father, and attempted to emulate, his happy-go-lucky façade.

106. Donna says that her mother "had a lot to do" with how she related to men and viewed sex. She recalls that her mother "made everything feel dirty or cheap, even something as simple as holding hands." She tells the story of her mother, upon finding her sitting on the couch holding hands with a high school boyfriend, having "a fit" and caustically saying, "Why are you letting him crawl all over you?" And in a pattern Donna would repeat with her daughter, refusing to talk to Wendi about sex or even her

44

first menstruation, her mother's comment about holding hands was "the only thing she ever said to me about sex." (Tab 27, at ¶ 71.)

107. Not surprisingly, Donna denied and disavowed her own sexual interest and pleasure with her first high school boyfriend. When he "started messing around sexually, like touching my breasts... I pretended I was asleep. That was the only way I liked sex. If I had to take responsibility for sex or admit what was happening, I didn't want to be involved and left the situation." (Tab 27, at ¶ 73.) After breaking up with that boyfriend, Donna decided she was "cute" and "told myself I was going to do my own thing." That meant indiscriminately going out with boys, "partying and drinking more alcohol... anything hard," and eventually having sex. Consistent with her disconnected and disavowed experience of sex, Donna recalls, "By halfway through my senior year I was having sex. It wasn't a big deal. I was never that thrilled about sex." (Tab 27, at ¶ 74.)

108. The clinical term "dissociation" refers to ways that some people, especially those subjected to extreme neglect and abuse in childhood, "split-off" or "dis-associate" from their conscious awareness any perceptions, thoughts, feelings, memories and other experiences that they find disturbing, threatening or overwhelming. Neglected and abused children are subjected to extreme emotions and physiological states. When no adult helps them tolerate such experiences and sooths their distress, their brains resort to extreme methods to prevent such experiences from entering conscious awareness. There are brain regions which evolved to regulate emotional and physiological states. But in the absence of caring and supportive people required to bring those regulatory capacities "on line" in childhood, those same brain regions instead block out the feelings and bodily sensations

45

associated with fear, anxiety, disgust – even forms of pleasure that threaten to be overwhelming, like sexual feelings associated with being exploited, abused or "dirty."

109.  Donna learned to block out feelings evoked by her parents' violent fights, to "ignore the constant ugliness" and pretend during the day that "things were normal and okay." She became "really good at not noticing bad traits" of the people in her life, including the ways they hurt her and others with massive betrayals, corrupting behaviors, and outright abuse and violence. Donna also learned to disconnect from her sexual experiences and desires so she would not have to "take responsibility for sex or admit what was happening." These are all examples of Donna's propensity for extreme dissociation, as would be expected of someone who grew up so neglected and traumatized. And the constellation of things that Donna was capable of dissociating – and motivated to ignore and deny – would lead her to neglect her own daughter and then turn a blind eye to the abuse Wendi suffered. As she had done throughout her life, Donna continued to "ignore the constant ugliness."

110.  Donna reports that her father, despite his own hyper-sexuality, virtually threatened to kill Donna if she had sex before getting married, and that he had his friends around town keeping tabs on her. She recalls, "My dad always said while I was in high school, 'if you're not a virgin when you get married, I'll get a shotgun'…. It wasn't that he intended to make me get married; he intended to shoot me." (Tab 27, at ¶ 72.) The first time Donna ever stayed at a motel to have sex with a boy, Hank was immediately informed. (Tab 27, at ¶ 76.) Again, sexual desire and experience were not safe but threatening, needing to be hidden not only from herself but her father – though neither

was really possible and this only fueled her fears and her motivation to deny and disavow her sexuality.

111. **After high school, drinking out of control.** Donna graduated from high school in 1967 and in the fall of that year, with the financial support of her sister Deannie, began attending Eastern Arizona College. (Tab 27, at ¶ 81.) She reports drinking so much in her first semester of college that she was almost kicked out of school (Tab 27, at ¶ 85.) It was at the end of that semester, Christmas of 1967, that she began a sexual relationship with Skip Robertson, who had just returned from a tour of duty as a Marine in Vietnam.

### C.   DONNA AND SKIP'S RELATIONSHIP BEFORE WENDI'S BIRTH

112. Donna's courtship with Skip was brief and misguided. They were married within two months of beginning a romantic relationship, based on Donna's mistaken belief that she was pregnant. In Donna's reflections on why she began a relationship with Skip and within two months married him, we see on full display the dissociation described above and the willful ignorance and wishful thinking that Donna sees as her main coping strategies.

113. Donna recalls how – despite knowing that Skip had been a "hoodlum and bad boy" before going to Vietnam, despite knowing that he and his brothers "had mouths like sailors" and were "all about sex, alcohol, Levis, and driving trucks," and despite having the sense that "all of Skip's brothers had been in jail" (Tab 27, at ¶ 98) – she focused her attention and thoughts on other, more positive things about him: that he attended church when he was younger and had taught Sunday school at one point, and that he claimed to have "prayed on the beach and read the Bible" in Vietnam. Donna also remembers thinking, in a naïve and magical way that can still characterize her thinking today, "it

47

seemed obvious to me that God gave him a second chance by allowing him to survive when many others around him were killed in 'Nam, and that also attracted me to him." (Tab 27, at ¶ 92.)

114. More pressing and determinative, however, were these two facts: they had sex almost immediately over that Christmas break, and Donna believed (incorrectly it turned out) that she was pregnant. As Donna sums up, "Skip and I had no real courtship and we never dated.... We just had sex and I thought I was pregnant so we got married." (Tab 27, at ¶ 93.) Once she thought she was pregnant, Donna believed she had no choice but to marry Skip. The belief was based in fear: as noted above, her father had always threatened to come after her with a "shotgun" if she was not a virgin when she married, which meant to her that "he would kill me or someone I was dating," and in this case made her "worried about what he might do if he found out that I was pregnant [by Skip]." (Tab 27, at ¶ 94.)

115. After Christmas leave, Skip went to Camp Pendleton in California and she soon called to tell him she was pregnant. When they spoke, Donna says, Skip made a (soon-broken) promise that he would not drive trucks like his brothers, and they agreed to wed. Neither of their parents wanted them to marry or thought the marriage would last. But marry they did, as soon as Skip could get leave from his base, on February 21, 1968 in Silver City, New Mexico, where no blood tests or waiting period were required. (Tab 27, at ¶ 93.)

116. In short, Donna's marriage to Skip was the result of a remarkable and rapidly unfolding sequence of bad choices, poor judgment, substance use, reckless sexual

48

behavior, dissociative pathology, willful ignorance, wishful thinking, mistaken belief, and fear.

117. In Skip's brief account of beginning their relationship and marrying, he focuses on his immediate pleasure at discovering, when he came home for Christmas of 1967, that Donna was no longer "the skinny girl we all used to tease," and on how she "nursed him" when he was sick with the flu at the time. Donna fit Skip's apparent vision of an acceptable woman and wife: worth having sex with and willing to take care of him. Perhaps also, unlike Donna, Skip did not forget or discount the other widely held perceptions of Donna that her current behavior did nothing to contradict; that is, as Deblen Oke described Donna, she was "ditzy, funny, outgoing." When Skip mentions their marriage, it is literally in passing, and he says nothing about why they married so quickly, including nothing about a mistaken belief that she was pregnant. (Tab 32, at ¶ 24.)

118. The marriage day was not auspicious. Donna recalls "waiting in front of the court house, where I threw up and fainted. I woke up and we still got married." She was "scared and sick" but also "relieved" because she would no longer have to worry about what her father would do if he found out she was pregnant before getting married. (Tab 27, at ¶¶ 96-97.) Afterward they had no wedding party and could not even find a hotel room (thanks to a golf tournament in town). They ended up spending the night at one of Skip's brother's houses, where the Robertsons were having a drunken celebration party.

119. **Legacy of severe childhood neglect: Donna the "chameleon."** Then Donna joined Skip in California, where they moved into an apartment in San Clemente, near his

49

military base. Donna remembers immediately adopting Skip and his brother's "lifestyle and ways." Looking back now, Donna says,

> "It was almost like I was a chameleon. I just went along with it and tried to fit in. I have done that all my life with whatever group I was with…. My first reaction when I'm part of a new group is always to get similar clothes as they have, so that I'll be liked. I morph well to be part of whatever group I'm with. Now in retrospect I think that I never wanted to make a decision about who and what I was, exactly, so I shifted to fit in…" (Tab 27, at ¶ 98.)

Donna's self-diagnosis of the roots of her "chameleon" problem, which focuses on what she "wanted" and her "decisions," does not begin to capture the actual and well-understood roots of such behavior. Children who are severely emotionally neglected by their parents miss out on many things crucial for developing the capacities to recognize their own needs, wishes, unique perspectives and abilities. Parents who are too disturbed to care about their child's experiences, who are oblivious to their child's feelings, needs, abilities, wishes and dreams, and who never talk about anything of significance to the child – such parents do not mirror back their child's excitement, or respond with attention and affection to pleas for recognition and pride, or support their child's attempts to identify and achieve goals meaningful for herself. They do not share pride in their child's successes, help her to tolerate disappointments, or help her make sense of either. And they do not help their child figure out how to negotiate the challenges of life and human relationships.

120. The extreme emotional neglect of Donna's childhood meant that she *could not develop her own identity* and thus *changed to fit in with others*. She lacked the

50

psychological capacities, and the mental or emotional foundations, to know who she was, what she really wanted in life, and how to be her own person while in relationship with others. Donna knew many things that she did *not* want, including (continued) neglect, abandonment, betrayal and abuse by an alcoholic-truck-driving-womanizing-money-wasting husband. And she had vague ideas about what she did want, to be loved and to have a happy marriage and family. But Donna had never seen anyone else with any of those things, and she he had no idea who she was as a unique person or how to relate to her husband or anyone else to bring loving relationships and real happiness into her life. At that time (and apparently until very recently) Donna had learned little more than this: she could do her best to put on a happy face and act in ways that would not lead others to reject her; she could withdraw from others when, thanks to bouts of depression and her inability to truly connect with others, she was unable to implement those rudimentary strategies; and she could try to ignore and deny others' bad qualities and harmful behaviors, even when they hurt her and her own child, while hoping for the best. As Donna puts it, even now: "I really don't know who I am. I know some of my attributes. I can be kind, compassionate, and generous, but I don't really know what I want. Who I am is defined by who I'm with, or it's defined by who or what I need to fit in with or give in to." (Tab 27, at ¶ 356.)

121. And so it went for Donna's relationship and marriage to Skip. In addition to adopting the clothing and mannerisms of his family and acquaintances, Donna joined Skip in drinking heavily and taking the amphetamines he got from his trucker brothers. (Tab 27, at ¶ 99.) Donna also quickly adopted behaviors shared by women in the Robertson family's sick culture, behaviors for which she had long been in training as a

51

teenage friend of the McGuffee girls: Looking away and staying silent as the men ran amok with drunkenness, fighting, womanizing, and sexually abusing each others' daughters.

122. **Nightly traumas.** Donna also did her best to cope with Skip's combat-related PTSD, which by both her and Skip's descriptions was severe and disturbing. They both note that he was, as Donna puts it, "very jumpy and easily startled," and there were several incidents in San Clemente where Skip "hit the ground" in response to a loud noise like car backfiring. (Tab 27, at ¶ 102.) This is one of the physiological "hyper-arousal" symptoms of PTSD, which is one of three "symptom clusters" associated with the disorder, and one that Skip continued to suffer from throughout his nineteen years in prison (Tab 32, at ¶¶ 22-23.)

123. Most disturbing of all were Skip's PTSD "re-experiencing" symptoms. These included nightmares of combat from which he would wake up yelling, swinging, even attacking Donna. "I remember laying in bed with Donna in San Clemente and throwing her out of bed, thinking I was under attack. I had nightmares. Another time, I woke up to find myself on top of her on the floor." (Tab 32, at ¶ 21.) Throughout their years together, Donna recalls Skip having "bad nightmares about four or five nights a week where he thrashed around in bed and called out to people," from which he "woke up swinging or woke up violently." Donna remembers in the mornings having "to be very careful when waking him up. I crouched at the end of the bed and touched his toes to wake him because he came out of his dreams swinging his fists hard enough to really hurt me if a punch connected." (Tab 27, at ¶ 101.)

52

124. Skip's middle-of-the-night nightmares and attacks on her also resembled Donna's most traumatic experiences from her childhood: being awakened in the middle of the night by screaming, smashing glass and other sounds of violence between her parents, and fearing for her own safety. Skip's PTSD would have caused Donna to re-experience many of her own traumatized reactions to the violence between her parents, which also happened several nights a week from when she was ten to sixteen years old. Experiencing and fearing such nightly terrors and violence was a source of severe stress throughout Donna and Skip's marriage.

125. **Legacy of severe childhood neglect and war: Skip the addict and "good ole boy."** Just as Donna had been horribly neglected as a child and never developed a sense of her unique identity, needs and capacities, the same was true for Skip. Like Donna, Skip had never known what it was like to be truly talked to, understood, and loved by another human being. But he responded in a very different way. Donna was an only child who put on a happy face and attempted to fit in with changing groups of peers. As the sixth son of the Robertson family, rather than being a chameleon and molding himself to fit changing constellations of people around him, Skip rigidly clung to his family members and the culture and behaviors of his father and brothers.

126. It was a culture of relentless addiction – to alcohol, sex and violence – driven by desperation to escape from the severe and chronic experiences of depression, anxiety, fear, disconnection, and powerlessness from which all severely neglected and abused children and adults suffer. It was a culture of corrupt, macho values and a veritable worship of extreme drunkenness, sexual conquest (including the abuse and rape of women and girls viewed as objects of pleasure and domination), and aggression against

53

other men. As described above, it was a culture in which men believed they were entitled to get away with crimes, including rape and even murder, so long, as Skip learned from his father, they could keep such "private business" to themselves.

127. The work life of the Robertson boys, long-distance truck driving, fit well with that culture and its destructive addictions. Indeed, with its mix of social isolation, drinking and carousing with similar men, and ample opportunities to pursue women and girls in places far from home, the long-distance trucking perpetuated and fueled those addictions and their destructive consequences.

128. In behaving like his brothers, Skip was not "being himself" in any meaningful sense of the phrase. Like Donna, he did not really know who he was. Psychologically speaking, Skip was an ignorant and unreflective man, without genuine understanding, empathy or compassion for himself or anyone else; a bundle of posttraumatic suffering and destructive, addictive attempts to escape that suffering.                    REDACTED

. In contrast, Skip's view of himself (one shared with many severely traumatized antisocial men) as a "good ole boy" who just wanted to be free, not tied down, and having a good time, was at best a self-deluding half-truth. As revealed by his own words, used to explain his suicide attempt as a teenager, being a "good ole boy," aside from all the harm and destruction it caused to others, was ultimately a failure when it came to

54

warding off his own misery: "Ninety percent of the time I am a good ole boy and the rest of the time, I get depressed and things build up." (Tab 32, at ¶ 11.)

129. All of these childhood- and family-based pathologies and behavior patterns were super-charged by a year in Vietnam that immersed Skip in killing, death and constant fear of being killed himself. By the time Skip married Donna he was already spiraling out of control, and beginning work as a truck driver less than a year into their marriage only accelerated the process.

130. **Skip and marriage heading down hill fast.** Donna recalls that just before and for a little while after they married, Skip could be "well mannered or even nice," but only when he was not drinking – which was not very often. Even when he was sober and pleasant, from the beginning they "didn't have normal conversations or discussions about things like common interests." She quickly learned that having such interactions "just wasn't possible" because Skip "had a short attention span and was mostly interested in having sex and drinking alcohol." (Tab 27, at ¶ 108.)

131. And drink he did: "Skip drank steadily and was drunk much of the time I was around him for the whole time we were married." (Tab 27, at ¶ 103.) Donna's recollections are consistent with Wade Robertson's childhood memories of Skip only drinking to get very drunk and then becoming aggressive, and provide additional details of who and what Donna was living with soon after the marriage:

> "He started out happy when he was first drinking, then the more he drank the more ugly, mean and verbally abusive he became. When drunk he was vicious with his words. There was nothing I could see that caused him to act that way and nothing in particular that happened to set him off. He just turned mean all

55

by himself.... He tended to break laws and get into trouble when drunk. Sometimes he stayed out or was gone all night or for multiple days and nights while drinking." (Tab 27, at ¶ 103.)

132. After a few months and a few different jobs for Skip at Camp Pendleton, in mid-1968 Skip and Donna moved to San Diego. Skip worked as a military policeman and Donna as a receptionist at a hair salon. (Tab 32, at¶ 25; Tab 27, at ¶ 105; Military Personnel Records of Shelby Robertson, Obtained by Capital Case Project.) At that time Skip began combining alcohol with amphetamines that he got from his brothers. They remained in San Diego until moving back to Arizona in April of 1969. In the meantime, they made many weekend trips between California and Arizona, and often took "uppers" to stay awake for the long drives. (Tab 27, at ¶ 106.)

133. Donna reports learning years later from                      REDACTED

, that Skip had sexually abused          REDACTED          during one of those Arizona-California trips. REDACTED were six to eight years old at the time, and Skip molested them in the car, in the presence of their mother and Donna, who were sleeping or otherwise unaware at the time. (Tab 27, at ¶ 104.)

134. Skip and Donna remained in San Diego for nine months, until Skip decided to leave the military and received his discharge, when they moved to Phoenix. Looking back Donna says, "We were still in California in 1968 or 1969 when I realized the marriage wasn't working but it took me as long as it did, until 1974, to have the courage to leave him for good." (Tab 27, at ¶ 103.)

135. **Back in Arizona, Skip starts driving trucks.** Upon moving to Phoenix, Skip used V.A. funding to go to "refrigeration school." Donna was afraid Skip would start

56

driving trucks like his brothers, and hoped that he would instead stick with school and

work in refrigeration installation and maintenance. It was not to be. In Skip's telling, he

tried a refrigeration job but quickly realized it was "boring" and it would take years to

"move up through the union" and "be able to go out into the field on my own," where he

would have more freedom and make more money. (Tab 32, at ¶ 40.) By late 1969 Skip

was driving trucks, first short-haul runs, and then cross-country in teams with his brothers

Glen, Jerry, and AV. By early 1970 he was driving cross-country on his own, and often

gone for two to four weeks at a time, and sometimes longer. (Tab 32, at ¶ 26.)

136. On the one hand, Donna was unhappy with Skip driving trucks and being gone

so much. When they agreed to marry she had extracted the promise that he would never

drive trucks for a living. On the other hand, Donna was relieved to have breaks from

Skip's drunkenness, hostility, and demands for sex. "When he was around we fought a

lot about money and sex. A typical fight... included him coming home late, drunk, and

wanting to have sex with me." With him drunk and reeking of "booze and cigarettes,"

Donna found him utterly unappealing, "so he yelled at me until I gave in." (Tab 27, at

¶ 109.) (Donna's words echo those of          REDACTED          , who more than twenty years

later, as described above, would say she first gave in to sexual intercourse with Skip,

despite not wanting to, because he was "so mad" at her for resisting.) Donna also reports

that Skip had by then started "running around with other women." (Tab 27, at ¶ 109.)

And just as Donna's father had always done, Skip was blowing most of the money he did

make on drinking and those other women.

137. By the middle of 1969, not long after moving back to Arizona, this ongoing

ordeal was becoming too much for even Donna to tolerate. She recalls how, growing up,

57

she had always told herself she would never marry a man like her father. But there she was, finding herself married to Skip, who was "even worse when it came to drinking, being irresponsible, being disloyal with other women, and not supporting me in any way whatsoever." (Tab 27, at ¶ 112.) In July of 1969 she left him and went to Tucson to live with a friend from high school. Linda and her husband Jack were "hippies" who grew marijuana in their yard (though they did not smoke it in front of Donna). (Tab 27, at ¶ 112.)

138. **Skip promises to change and Donna gets pregnant.** After a few weeks in Tucson Skip showed up and promised, in Donna's words, to "clean up, stop drinking, and stay away from his brothers." Skip's radical behavior change lasted no more than a few days. Yet they were back together and living in an apartment in Tucson, where Donna got a job while Skip went back to driving trucks and the hard-drinking and womanizing lifestyle he shared with his brothers. Tab 27, at ¶¶ 113-114.) Then Donna decided she wanted a baby and stopped taking her birth control pills. Like so many confused young women who were neglected as children themselves and have no clue what it means to be a parent – let alone a loving and nurturing one – Donna believed that having a baby would "help my marriage and solve problems between Skip and me." Looking back now, she see that she believed "everything would be okay after I got pregnant because I was the person who tried to make everyone else happy and I believed that if I made Skip happy that everything would work out." (Tab 27, at ¶ 116.)

139. By November Donna was pregnant with Wendi, which she confirmed around Christmas of 1969. Donna recalls having no information about pregnancy while carrying Wendi, and constantly fighting with Skip as it dawned on her that being pregnant did not

58

magically lead Skip to "settle down and be home more." Instead, Skip was out driving trucks, drinking and partying away his income with other women, and giving her little or no money for basic living expenses. She bitterly remembers "constantly struggling to get by and survive" throughout the pregnancy. (Tab 27, at ¶ 120.) For the first six or seven months of being pregnant with Wendi, "I almost never knew where Skip was, who he was with, or when I'd see him next, and when he was with me, we were usually fighting." (Tab 27, at ¶ 121.)

140. In the midst of this – Skip's wholesale abdication of his responsibilities as the husband of a pregnant wife, and Donna's extreme day-to-day stress – Wendi was growing inside her mother's womb. There is significant research on the effects of severe maternal stress during pregnancy, including deleterious consequences for prenatal central nervous system development, which is mediated primarily by high levels of stress hormones. The repeated but unpredictable and uncontrollable prolonged abandonments by her husband, punctuated by fights over money and sex whenever Skip briefly appeared back home, constitute extreme and chronic stress – enough to cause significant negative biological effects on both mother and fetus. At a minimum, adverse impacts on Wendi's prenatal brain development would be expected.

141. **From bad to worse: Pregnant in Groom, Texas.** Around June of 1970, six or seven months into Donna's pregnancy with Wendi, she moved to Groom, Texas, where Skip had gotten a job fixing truck tires and pumping gas that, in Skip's telling, "put me home every night." This was Skip's selling point to Donna and, as he self-servingly recalls, "At the time, it seemed like she was all for it." (Tab 32, at ¶ 28.) Donna remembers only agreeing to the move – to a town of under 500 people in middle of

59

nowhere, i.e., in the Texas panhandle and twelve hours drive from Phoenix and Tucson –
because his job was "supposed to be permanent, in one place, so that he could stop
driving trucks." (Tab 27, at ¶ 122.) Within a month or so, the cruel truth was revealed:
Skip only wanted to live in Groom because he was having an affair with a waitress there,
and living and working in Groom meant having his cake and eating it too. (Tab 27, at
¶ 123.) That Donna's father had fooled around with waitresses, and had a parallel family
with one, could only have made Skip's betrayal feel all the more cruel and painful.

142.   From when Donna learned of Skip's affair in July until Wendi's birth in late
August, she was utterly miserable. Donna had no friends in Groom and was terribly
homesick for Phoenix and Tucson. Every day she confronted the reality of Skip cheating
with the waitress right there where they lived, in that extremely small town. Many nights
Skip came home for only a few hours, or not at all. Not surprisingly, Skip paints himself
as a paragon of husbandly virtue at this time: working long hours during the day, coming
home immediately – except for the times he had "a beer or two after work with the boss"
– then having dinner and going to sleep. (Tab 32, at ¶ 28.)

143.   Donna's overwhelming distress at her predicament may have contributed to the
premature uterine contractions that began in early July and continued for nearly two solid
months before Wendi was born. Donna remembers the contractions being the worst late
at night when she was alone, wondering where Skip was, guessing he was having sex
with another woman. The contractions became so frequent – five-to-eight minutes apart,
sometimes only four minutes as typically occurs just before birth – that Donna and her
doctor feared the baby would be born prematurely. The intense and frequent nightly
contractions also meant little sleep, and Donna became extremely sleep-deprived, greatly

60

compounding her distress and deteriorating her always-fragile mental health. (Tab 27, at ¶ 127.)

144. After the contractions began Donna's mother came to live with her. She helped with chores and gave Donna advice and financial support (Skip continued to spend his wages on alcohol and other women). (Tab 27, at ¶¶ 126, 129.) It was Ann who alerted her daughter to Skip's affair and motivation for moving to Texas. (Tab 27, at ¶ 130.) But as had always been the case, Ann was incapable of giving her daughter any emotional warmth or support, or helping her deal with the emotional impact of Skip's betrayals. (Tab 32, at ¶ 31.) Consistent with her mood disorder, her past relationship with her mother, and Donna's miserable and sleep-deprived state, Donna recalls treating her mother "badly" by being "irritable, impatient, and short with her." Indeed, Donna recalls that despite being angry at Skip, she mostly blamed herself, including for Skip's affair. Beating up on herself in this way, in what must have been an extreme depressive episode for the bipolar Donna, could only have compounded her suffering and pumped more stress hormones into her baby. (Tab 27, at ¶¶ 124, 129.)

145. Adding final insult to injury – and no doubt worsening Donna's stress and the cascade of stress hormones impacting her developing baby – her doctor at the time, an osteopathic naturalist, had Donna take cod-liver oil to induce birth. It did not have the desired effect. Instead, it made her sick, with both vomiting and diarrhea. Donna recalls that this experience made her hate her doctor, who should have been a helpful and supportive influence, and led to her seeing him, just when she most needed him, as incompetent and harmful. (Tab 27, at ¶ 133.)

61

## IV.    BIRTH TO AGE 4½ – INFANCY AND EARLY CHILDHOOD

146.  Wendi was born on August 26, 1970, in Groom, Texas. At 7 pounds 11 ounces,
Wendi was a normal weight.  (Certificate of Birth, State Registrar, State of Texas,
Country of Travis, Obtained by Capital Case Project.) Donna reports that she did not find
the birth very difficult physically.

147.  **Donna's immediate panic, depression, and neglect of Wendi.**
Psychologically, however, Donna "freaked out" immediately after Wendi was born, first
in a panic that she was not being spanked to make her breath and second because she
knew that, like her own father, Skip wanted a boy and she had pinned her hopes for the
marriage on giving him one. (Tab 27, at ¶ 137.)

148.  Donna also recalls that Wendi was immediately taken from her and put in the
nursery.  In her first non-acts as the neglectful mother she would be throughout Wendi's
entire childhood, Donna made no effort to visit her baby in the nursery during their time
in the hospital. She comments, "The nurses must have played with her more than I did
while we were in the hospital" – even now betraying her ignorance about how a mother
actually relates to a newborn infant, not by "playing" but by holding, feeding and
soothing. (Tab 27, at ¶ 138.) Donna herself recognizes now that she "did not bond with
Wendi at all after she was born." Instead, she was focused on her dog that had gone
missing when she went into the hospital: "My gosh, when Wendi was born I had a closer
bond to that cockapoo dog... than to my kid." (Tab 27, at ¶ 141.)

149.  Arriving home four days post-birth, with her dog still missing, Donna became
"hysterical" and "couldn't attend to Wendi at all," including to breast feed her. She went
into a depression and "completely shut down," unable to feed herself, get on her feet, or

62

communicate or respond to anyone. She had no interaction with Wendi for the first two or three days upon arriving home. (Tab 27, at ¶ 142.) When Donna emerged from her depressive shut-down it was not too late to resume nursing Wendi, which she did for the first two months of her life. (Tab 27, at ¶ 144.)

150. Nursing Wendi was, by Donna's own admission, literally the *only* way that she cared for her infant daughter: "I didn't know what to do with Wendi after she was born, and I didn't interact with her. All I did was go in where she was sleeping and poke her once in a while to make sure she was still breathing… My mom had the patience to sit and rock her, but I was like 'No way.'" (Tab 27, at ¶ 145.) And so, as she would do for the rest of Wendi's childhood, she abandoned Wendi and handed her over to others, in this case her mother and Skip, who stuck around for a few days after the birth.

151. Although Donna emerged from her severe shut-down depression state, she remained overwhelmed and depressed. She recalls, "I had enough going on with losing my favorite dog, my husband almost never being there [or] providing money… and my mom telling me 'I told you so' about marrying Skip." Making matters worse, Wendi was "colicky for the first few weeks." Donna's default response was to avoid Wendi. When she did hold her crying baby, she was never able to sooth her, and sometimes cried along with her – not in empathy for her child, but in the misery of her own incompetence, helplessness and hopelessness. (Tab 27, at ¶ 148.) Already predisposed to emotionally and physically neglect her new baby – thanks to her own history of childhood neglect and failure to ever bond with her own mother – Donna was additionally overwhelmed by her ongoing miserable and stressful marriage and a major postpartum depression.

152. Such depression and high maternal stress are known to exert major deleterious effects on developing infants. This is particularly true for their brains, which decades of research have shown depend as much for healthy development on emotional nurturance as physical care. Indeed, emotional bonding and nurturance – and lack thereof – can have large and lasting negative effects on neurotransmitter systems, circuits involved in emotion and mood, and other brain systems; this occurs through a variety of mechanisms including altered gene expression, with the quality of early relationships literally controlling which genes are turned on or off. Baby Wendi and her brain were not off to a good start, and what appears from the outside as "neglect" was, for her brain, nothing less than an intense and sustained assault by the very person from whom she was biologically programmed to receive vital nurturance. Fortunately, Donna's mother was able to calm Wendi down, and this almost certainly reduced the damage caused by her mother's depression, disconnection, incompetence and neglect. (Tab 27, at ¶ 149.) However, this was only for a short time.

153. **Donna's basic relationship to Wendi: Handing her off.** Only briefly did Wendi's grandmother give her at least some of the nurturing and soothing she needed but would never get from her mother or father. Donna's pattern of literally handing off her daughter to others – including men who emotionally, physically and sexually abused her – would continue for Wendi's entire childhood. Given how emotionally damaged and traumatized Donna was, an emotionally vulnerable and needy child was just too much for her – at least without intensive and competent support from the kinds of people (e.g., therapist, maternal-infant intervention specialist) who could help Donna develop the emotional and relational capacities required merely to be a *good enough* parent.

64

154. Donna conveys this just-too-much theme in recollections of her thoughts and feelings at the time, including her "No way" at the prospect of sitting and rocking her newborn, and her overall "didn't want to deal with her" attitude. To these disturbing anti-maternal statements we can add another that, even if never explicitly stated by Donna, sums up what can be understood as the "handing off" relationship that Donna always had with Wendi. That relationship necessarily was a triangular one, in which there was always another person to whom Wendi was handed, and in which Donna's thoughts, feelings and actions can be summed up: "I can't handle her. I don't want her. YOU take her."

155. **An infant's nightly terror and trauma.** Although Donna's mother often calmed Wendi down during the day, she did not protect Wendi from the nightly consequences of her parents' rigid interpretation and implementation of one particular piece of their doctor's advice. Donna recalls being told it was best for infants to go sleep early each night, so the parents could have "time for themselves." No matter where Wendi was in the sleeping-eating-wakeful-alertness cycles though which all infants continually go (based on their own internal clock), Donna and Skip put her in bed between seven and eight in the evening and, no matter what, left her there alone. Thus infant Wendi was left alone to "cry herself to sleep" every night.

156. After fifteen minutes or so of Wendi's cries, even Donna wanted to go to her. Skip said no. Although like Donna he had been neglected as a child, Skip was even more hardened and numb to others' suffering, perhaps due to the harsh Robertson family ethos and his combat-related PTSD. According to Donna, Skip would say no, she should not go to Wendi, who "just needs to cry." Donna, having no faith in whatever maternal

P-App. 002193

intuitions she could access, complied. Looking back Donna recalls, "From the time she was born until she was about a year old, it seemed to me that she regularly cried for hours before she went to sleep." (Tab 27, at ¶ 152.)

157. Parents cannot protect their children from all distress. Infants sometimes cannot be soothed, and parents sometimes reach their limits, especially at the end of the day. But being left to cry for hours on end, night after night, with no parental response or soothing of any kind – not even brief contact – constitutes destructive trauma for a developing infant's brain. Human infants and toddlers are incapable of regulating any but the mildest of their emotional and physiological states. That's what parents and caregivers are for. It's something they must consistently do for their babies, albeit imperfectly at times, if brain development is to proceed along a healthy trajectory. Like emotional neglect in general, discussed above, being left to cry for hours leads to cycles of overwhelming terror and disorganizing physiological arousal that give way not only to exhaustion (i.e., "crying herself to sleep") but also to extreme biological "shut-down" mechanisms and associated pathological states, including depression.

158. For an infant like Wendi, already genetically vulnerable to the depressive states of bipolar disorder, those states must have been extreme. When repeatedly subjected to the almost night trauma Wendi experienced, any infant will learn – through indelible conditioning of brain circuitries that mediate fear, attachment to parental figures and related processes – that contrary to millions of years of evolutionarily hard-wired expectancies, even panicked and sustained distress cries will often be met with no response at all. Although for infants such knowledge is not available in words or for conscious reflection (as it could be for an older child), it is no less devastating. In fact, as

66

decades of research on humans and other mammals has shown, because such knowledge is etched into evolutionarily older and more "primitive" brain regions, and because it comes before words or reflective awareness, it has large and permanent negative effects on emotional and relational functioning.

159. Donna also reports that, because Skip was not out on the road trucking when they lived in Groom, many days and nights infant Wendi was exposed to screaming fights between her and Skip. And like Donna as a child, Wendi also overheard or witnessed occasional though not severe physical violence between her parents, usually with Skip pushing Donna or throwing Donna down as she tried to stop him from leaving in the midst of a verbal altercation. (Tab 27, at ¶ 151.)

160. **Return to Phoenix.** Donna remained depressed and miserable in Groom, and recalls that when it snowed there in September, a few weeks after Wendi's birth, she put her foot down and insisted they go back to Phoenix. They moved into a tract house in a Phoenix suburb. Skip returned to truck driving and wasting his earnings on heavy drinking and womanizing. Donna's mother went back to work, but continued living with Donna and Wendi and paying the bills for a few more months. (Tab 27, at ¶ 153.)

161. Being back in Phoenix was a big relief for Donna. She remembers that Wendi "stopped being colicky" and "calmed down" as well. Donna attributes this to the lifting of her own extreme stress and misery, and to Wendi no longer being exposed to Skip "in my face yelling at me all the time" because he was on the road again (Tab 27, at ¶¶ 153-155.)

162. Such changes were relative, however. Thanks to her own history of neglect and trauma and ongoing stressors, Donna remained emotionally disconnected from her baby.

67

She was still uncomfortable giving Wendi baths, which she left to her mother and Skip when he was home. (Tab 27, at ¶ 155.) And although Skip was not around to scream in her mother's face, several of Skip's brothers and his father lived nearby, which for Wendi meant ongoing exposure to a new and much more serious threats – from which her mother would not protect her.

163. **Ongoing neglect by mother.** For the first few months back in Phoenix, Donna did not work and had primary responsibility for Wendi. (Tab 27, at ¶ 154.) This meant that most of the time Wendi was stuck with her emotionally disconnected and neglectful mother. In December of 1970 Donna got an office job and started working full time, five days a week (Tab 27, at ¶ 158; Tab 68; Tab 68B.) With Donna's income, which unlike Skip's would not be wasted on alcohol and other women, they could afford their own home. Donna, Skip and Wendi moved into a house on the west side of Phoenix just before Christmas, and Donna's mother Ann moved into her own place a few blocks away. They would live there until Wendi was about two years old, when they moved because their home was to be demolished for a highway expansion. Donna asked for and was granted a transfer to the Tempe office of her company and they moved there. Donna's mother did not follow them and never came to Tempe to care for Wendi, who went to a Montessori preschool during the day and a 24-hour day care many nights during the week and on weekends. (Tab 28 at ¶¶ 22-23, 25)

164. Indeed, in a pattern that would continue until Wendi started kindergarten, Donna worked full-time during the days and in the evenings was almost always volunteering, working, taking classes or going out to bars. This meant that on weekdays Wendi was in preschool and on nights and weekends she was either with a baby sitter, in

68

24-hour day care (sometimes days at a time), or with random people who happened to be working or hanging around where Donna was volunteering or working. (Tab 28 at ¶¶ 22, 25, 32, 41, 42.)  Looking back on the first five years of Wendi's life, Donna describes herself as "overwhelmed and distanced" from Wendi and "absent a lot." She usually spent no more than an hour or two a day with her daughter, and even then spent little time actually focused on Wendi or interacting with her. Donna acknowledges that during this time she "didn't really think about Wendi." She blames her attitude and behavior then on "trying to help my marriage" and "working so much to try to get by" – with some justification, but also in denial of her limitations as mother stemming from her own neglectful and traumatic childhood. (Tab 27, at ¶¶ 160, 178.)

165.  Despite her emotional and physical neglect of her daughter, Donna recalls being pained that Wendi called her grandmother "Mom" long before ever addressing Donna that way. But given how damaged Donna was, and the absence of support for becoming a competent mother, that pain would not motivate a change of heart or behavior.

166.  Consistent with Donna's account of neglect so severe that she failed to "really think about" her daughter, when I interviewed Donna what was most striking, and most disturbing, was this: When asked for memories of Wendi as a baby and young child, Donna almost exclusively reported memories of Wendi being with *other* people (e.g., her mother Ann, a co-worker, an elderly male owner of a furniture store near where Donna worked, even strangers from whom Wendi panhandled as young as four years old). It was something I had never encountered in ten years of interviewing mothers of people on death row. Yet it was totally consistent with the way Donna always handed off Wendi to others, including people who could be, or definitely were, dangerous to her daughter.

69

167. **"Mental" father, alternately absent and harshly controlling.** Although Skip was around far less than Donna, his mental state and behavior during Wendi's first years of life had direct and indirect effects on her well-being, even when he was on the road. Donna continually refers to Skip as "mental" – that is, crazy – during their time together. She recalls that after Wendi's birth Skip was still "out drinking all the time," even when he was back from trucking runs. Also, although his PTSD was not as bad after Wendi was born, he still regularly had nightmares and woke up "sweating, all tangled up in the sheets and bedding from thrashing around" while dreaming of war. (Tab 27, at ¶ 163.)

168. What Donna means by Skip being "mental" is conveyed by things he did in the year or so after Wendi's birth, both at home and on the road. Donna recalls that Skip was often "creepy" around her. She recounted a specific incident in which he stared through the keyhole in the bathroom door as she used the toilet and through the door asked what she was doing in there; and how, in classic Donna fashion, she tried to ignore him, did not respond, and never asked him about what *he* was doing. (Tab 27, at ¶ 163.)

169. In May of 1971, when Wendi was eight months old, Skip was arrested in Ohio for an episode of drunken, hapless and bizarre criminal behavior. Indeed, the local Ohio newspaper's account of the crime, entitled "If... if...if..." (with such descending font sizes), provides some comic relief in this otherwise serious report:

> "If Shelby Robertson, 23, of Phoenix, Ariz., hadn't parked the truck he was
> driving in Garfiend Heights last Thursday and met some friends in a bar
> and...

70

"If they hadn't dropped him off near Union and Broadway in Bedford, and…

"If he hadn't opened the unlocked back door of the Tilman Goad home at 11

Taylor Road and taken $4 from a purse on the kitchen table, and…

"If he hadn't wakened the husband and wife while continuing through the

house, and…

"If Tilman Goad hadn't chased him out of the house with a baseball bat,

and…

"If the car Robertson flagged down hadn't been a police cruiser…

"Then he would not now be charged with a night burglary of an inhabited

dwelling.

"Robertson told Bedford Police that he sometimes 'does screwy things' when

he drinks. To this, police who saw him trying to eat dollar bills (the evidence)

in the patrol car, can attest." (Ohio Newspaper Article, Obtained by Capital

Case Project.)

170.  In Skip's implausible and also (although less) amusing telling, it was all just a

big misunderstanding on his part: He was duped by some guys he had been drinking with,

who dropped him at the house and told him to go inside because they would be coming in

to have something to eat with him; and only *after* the man came after him with a baseball

bat, but *before* he took off running in fear, did he grab some dollar bills that happened to

be laying on the kitchen table and that he innocently believed he had left there himself.

(Tab 32, at ¶ 38.)

171.  When Skipped returned from Ohio and Wendi was around eleven to fourteen

months old, he tried working a nine-to-five job at the same company as Donna, Stewart

71

Title & Trust. As Skip recalls, he took the job "trying to please Donna.... but it just was not for me. I was not a nine-to-five guy. I had to be outside, doing something." (Tab 32, at ¶ 34.) Skip lasted a week or so (making $150.60) before going back to trucking. (Social Security Earnings Records of Shelby Robertson.). Although Skip was not a daily presence in Wendi's life, when home he implemented the Robertson brand of parenting on his daughter. Donna remembers Skip as extremely hard on Wendi, both physically and emotionally, harshly dominating and controlling her with violence and fear throughout her infancy and early childhood:

> "Whether he was drunk or not, Skip was tough on Wendi when she was an infant and toddler. When he wanted her to do something, she did it. If she was fussy he used a rough voice with her and she stopped it. He trained her like a dog, not a baby. He spanked her from the time she as an infant and toddler, including when he was potty training her from the time she was a few months old until she was ten months old. If she didn't obey or so something when he told her to, for example if she was crying and he told her to stop, he spanked her, a good smack with his hand on her butt." (Tab 27, at ¶ 164.)

172. When I asked Skip whether he "had any role" in Wendi's potty training, he categorically replied, "No. Her mom did all that. Women raised kids, the dad didn't. I just wanted to play with her." But just five minutes later, when asked, with acknowledgment that early potty training was not unusual in those days, how it came about that Wendi was potty trained by twelve months, Skip proudly gave a detailed description of what he had done whenever he was home: whenever he saw "that look on her face" that indicated she was urinating or defecating, he immediately picked her up, took her to the bathroom and

72

put her on the toilet; every time he realized that she had already urinated or defecated in her diaper, he took her to the toilet, made her sit on it, and pointed from the diaper to the toilet to reinforce the message. Skip not only described in detail his potty training behavior with Wendi, but said he had learned these methods by helping to care for his nieces in Texas while living with them for a while as a teenager.

173.  Left out of Skip's account, but elaborated upon by Donna, is the tone of voice Skip used to potty train Wendi and otherwise control her: "He used a rough, angry, harsh voice with her when ordering her or training her while she was younger than a year old. It was more than just a stern voice; it was a voice you would be afraid of." (Tab 27, at ¶ 161.)

174.  Skip himself told a story of getting Wendi to stop crying by spanking her when she was only an infant. As Donna described, Skip was unmoved by baby Wendi's hours of crying and suffering once she was in bed for the night; indeed, he prevented Donna from going to her even briefly, and said that Wendi "needed" to cry herself to sleep. In the story Skip told me, Wendi's crying was a problem for him, but only because he and Donna had brought her to a drive-in movie. They could not hear over her cries, and were forced to go back home without watching the film. Skip recounted with pride how, after they returned home and baby Wendi continued to cry, he harshly said to her, "I'll give you something to cry about" and slapped her behind. He then mimicked her surprised facial expression as she suddenly looked at him in shock, and proudly declared, "That got her attention." He then continued, saying that she stopped crying immediately and did not cry again that night. Skip ended this story with a demeanor of complete confidence, even smugness, about his allegedly highly effective parenting skills.

73

175. Such treatment by a parent has negative effects on any young child. The effects on little Wendi were shaped by her mother's almost complete neglect of her, which created a powerful longing for whatever scraps of love – or at least of attention and affection – she could get. The result was a compliant little girl who sought to please adults who might be sources of attention, affection, or harsh punishment. As Donna recalls, "She was a compliant child and he didn't have to tell her or spank her more than once or twice at any given time to get her to obey. Even at that age Wendi was already trying to make everybody happy." Tab 27, at ¶ 164.) In Donna's interview with me too, she described young Wendi as "very accommodating" and doing whatever Donna said as well. There was, however, one exception, which will be returned to below: "She wouldn't go to sleep in anyone else's bed." Indeed, in Donna's recollection, "That was the only thing she didn't want to do," and "the one thing she wasn't easy with."

176. Here the focus is on Wendi's father's harsh control and dominance and how, along with her mother's neglect, it powerfully shaped her personality and behavior, laying down patterns that would shape her emotional life and relationships into adulthood. From infancy until she was four years old (and through her entire childhood), three powerful messages or "lessons" were conditioned into Wendi's brain: First, do what the easily angered and potentially violent people want, and don't do anything to make them unhappy. Second, you are on own with such people, because your mother – if she even notices – will not protect you, and would rather not know what you are going through. Third, if you do *not* do what others want, i.e., take care of them and meet their needs, then you are bad child, a bad person, and unworthy of love. Such neglect and fear-based domination also cause – by damaging multiple brain circuits – life-long problems

74

with anxiety, social and emotional awareness, regulation of emotions, and management of interpersonal intimacy, including both caring and conflict.

177.  Whenever asked for his memories of Wendi during this time, Skip describes her in his typical superficial way. For instance, "I remember Wendi as a beautiful baby and a good kid. She walked by the time she was a year or less and we took her bottle away when she was a year old.  She was completely toilet trained by fifteen or sixteen months. She jabbered all the time and by two years old she was a pretty good talker. She was a smart kid." (Tab 32, at ¶ 33.)  Another example, which he offered when remembering times that he, Donna and Wendi went boating and fishing when she was three or four years old: She was "a quick learner and never cried," and, strangely, "I loved the devil out of her." (Tab 32, at ¶ 43.)

178.  Although little Wendi had disturbed, neglectful and abusive parents, as well as a genetic vulnerability to depressive states, Donna's and Skip's comments also reveal that like all children Wendi had innate needs – and abilities – to connect with others, to play, and to feel happiness.  Donna recalls that after they moved from Groom to Phoenix Wendi became a "happy baby," and that Skip's brothers, who saw her "every couple of weeks or so," nicknamed her "Happy Jack." (Tab 27, at ¶ 155.) When living in Phoenix for several months neither of Wendi's parents spent much time with her, and she was cared for by others. Although this constituted neglect by her parents, it was not the worst, Romanian-orphanage level of neglect (i.e., being left alone in a crib). Also, it meant Wendi was lucky enough to spend time with some benign and perhaps even positive adults (at least in relationship to her), as well as other playful children.

75

179. **Cruelty by the Robertson men.** By two years of age, on top of the neglect and abuse within Wendi's immediate family, there was repeated exposure to another psychologically toxic environment: the extended Robertson family. It was a family where children were seldom loved or nurtured, especially in any emotional ways. As Skip, Wade Robertson and Deblen Oke have revealed, it was a family where children always "ate last," both literally and figuratively. For adults who had grown up in that family being severely neglected and abused themselves, the emotional needs of children were unfathomable, even threatening. Thus children's feelings – especially vulnerable ones like sadness, fear or shame – were met not with concern, understanding or empathy but with indifference, irritation, scorn, violence, or uncaring bemusement.

180. As Skip recalls, once they moved to Tempe, when Wendi was two years old, her maternal grandmother was not around much and the family "spent a lot of time with my dad and brothers." Skip then indicates, in vague terms, what this meant: "When we all got together, we had backyard cookouts and did lots of drinking." (Tab 32, at ¶ 36.) For little children like Wendi, spending time with the Robertson family meant being surrounded by drunken adults who, even when sober and at their best, were dangerous to children – the men, predatory seekers of sexual and aggressive thrills, the women emotionally disconnected, neglectful and largely resigned to their children being abused by those men.

181. Donna recalls an incident when Wendi was about two years old, where Skip and his brothers took Wendi and her swimming at a mobile home park, and their thrill-seeking took a particularly cruel and heartless turn. In her interview with me, Donna recounted how Skip's brothers, precisely because they knew Wendi could not swim,

76

repeatedly "taunted" and "goaded" Skip to throw Wendi into the middle of the pool. Knowing full well this would terrify Wendi, they kept saying things like "she's gotta learn to swim sometime." Indeed, the very nickname the brothers had given Wendi, "Happy Jack," betrays their bemused sadism. "Happy Jack" was at the time a popular song by "The Who," a big rock and roll band of the late 60s and early 70s. It had this chorus:

"The kids couldn't hurt Jack,

They tried and tried and tried.

They dropped things on his back,

They lied and lied and lied and lied and lied.

But they couldn't stop Jack, or the waters lapping,

And they couldn't prevent Jack from feeling happy."

Apparently, Skip's brother's thought it would be funny to see if little "Happy Jack" would not be so happy when she suddenly found herself in the middle of the pool.

182. Skip obligingly threw her in. Donna still vividly remembers Wendi "screaming, flailing, and going under the water." (Tab 27, at ¶ 176.) She also remembers passively witnessing the entire scene, saying nothing to Skip or his brothers – not as they goaded him into throwing her in, not as they laughed at Wendi's terrified response to what her brain could only process as threat of death by drowning, and not after Wendi was fished out. Still, even Donna could not help but respond with fear and anger to this sadistic abuse of her child right before her eyes. Yet she did nothing. "I didn't dare confront them, especially all of them together at one time, so I didn't intervene to stop them…" (Tab 27, at ¶ 176.) When I asked Donna if she talked with Skip about this incident later,

77

she said no. She then elaborated, revealing another key factor that accounted for her neglect of Wendi, specifically her inability to talk about such things, or any sources of conflict in the marriage, with any competence or effectiveness. Donna explained: "We didn't discuss things, we never knew anyone who discussed things. We just screamed, or pretended it didn't happen, or forgot about it."

183. **Sexual abuse by the Robertson men.** The pool of the mobile home park was a public place, and the brother's abuse of Wendi was out in the open. Cookouts and other events at a Robertson brother's house were an entirely different matter, and much more perilous for little Wendi. As Skip recalls, when Wendi was two to four years old she, Donna and he "spent a lot of time with my dad and brothers," including at "backyard cookouts" that involved "a lot of drinking." (Tab 32, at ¶ 36.) Donna too says they "spent a lot of time around Skip's brothers and dad," including watching ball games at a brother's house and getting together on holidays. Also consistent with Skip, Donna remembers that "the women cooked and the men drank alcohol." (Tab 28, at ¶ 17)

184. For most of the three years Wendi attended these family events, she was the youngest child of the Robertson clan, thus the most vulnerable. Looking back now, Donna acknowledges her neglect and oblivion at the time: "When Wendi was around the Robertson brothers, I usually cooked in the kitchen or talked with the other wives, and didn't pay much attention to Wendi or provide much supervision over what was going on with her. Skip's dad and brothers could easily have had sexual access to Wendi." (Tab 28, at ¶ 17.)

185. Donna recalls going on hunting or fishing trips with Wendi and Skip, on which they were sometimes joined by one or more of Skip's wives and brothers. These trips

78

took place "from time to time" when Wendi was about two to four years old. Looking back now, Donna says, "Again, there were plenty of times while camping or fishing that Skip's brothers could easily have had sexual access to Wendi." (Tab 28, at ¶ 19)

186.   Donna also admits to having heard and seen, despite not wanting to know, plenty of evidence of the danger to Wendi. "Sexual abuse of kids was part of the culture of the Robertson family…. The women in the family, myself included, talked about it on occasions when the men weren't there." (Tab 27, at ¶ 165.) The women were especially aware that Skip's father sexually abused girls, even infants:

> "[I]t was treated as common knowledge in the Robertson family that Skip's
> dad touched babies and toddlers sexually when there was an opportunity.  The
> Robertson family considered Skip's dad a dirty old man. This came up in the
> family in early 1971, when I was twenty-two years old and Wendi was still
> less than a year old, when there was talk among the wives and women in the
> Robertson family that Skip's dad was touching        REDACTED             .
> Within the first few months of moving to Phoenix, while Wendi was still a
> baby, REDACTED told me, 'Don't ever leave Wendi with her grandpa because
> he's a dirty old man and you don't know what he'll do with her.'" (Tab 27, at
> ¶ 165.)

Donna also remembers that from when Wendi was an infant to about two years old, Skip's father frequently asked her to let him babysit Wendi. (Tab 28, ¶ 20.) From her statements it appears that, after having been warned so forcefully by REDACTED, Donna did not allow him to, and that this was the *only* thing Donna did to protect Wendi from sexual abuse during those years.

79

187.  Donna also recalls that she personally witnessed "inappropriate incidents and behaviors" by Skip's father and brothers, including "how [they] regularly hugged and kissed girl children on the mouth" and engaged in "inappropriate grasping or touching" when they held or picked up girl children.  She adds, "Even with me being mostly oblivious and trying not to notice anything I considered creepy, I knew that the ways the adult Robertson men treated girl children in their family were definitely not kosher." (Tab 28, ¶ 18)

188.  Yet Donna repeatedly left Wendi with no supervision in the Robertson brother's houses.  She often had no clue where Wendi was or what she was doing, sometimes for hours at a time, during parties and other events where those same men were drinking heavily. As Donna herself says – and as we shall see, consistent with her behavior throughout Wendi's childhood and adolescence – her *modus operandi* as a neglectful mother was "trying not to notice." In short, she did almost nothing to protect Wendi from being sexual abused in situations where such neglect virtually guaranteed that such abuse would happen, at least sometimes.

189.  Indeed, in Donna's recollections there was *only one time* that she actually became concerned Wendi may have been sexually abused by a man in the Robertson family. It occurred around February of 1971, when Wendi was about six months old. Donna joined Skip for a trucking run to Los Angeles and left Wendi behind with Ida Mae, the wife of Skip's brother Jerry Don. As addressed above, Jerry Don has been named as a repeat molester and rapist by both                REDACTED                . Thus had Jerry Don been home or returned from the road at the time, Wendi would have been at risk for sexual abuse by him.  Donna reports that when she and Skip returned three

80

days later, "we went to pick up Wendi from Ida Mae but found out that Wendi was with Skip's dad." (Tab 27, at ¶ 167.) She recalls that Ophelia told her that Skip's father "would have touched Wendi sexually while he watched her" that time. (Tab 28, ¶ 20). It was too much for Donna to ignore, at least initially, but not too much for her to rapidly push from her awareness: "I was concerned about Skip's dad having touched Wendi sexually while we were gone in LA but couldn't really focus on it." (Tab 27, at ¶ 167.)

190.  Skip recalls that "a few times" Donna joined him on trips to Southern California and other parts of Arizona and they left Wendi with his brothers. (Tab 32, at ¶ 34.) Thus Skip's father and brothers could have abused Wendi during those times too, as well as during the numerous Robertson family cookouts, parties, and holiday get-togethers. There is no evidence that Donna ever considered the risks to Wendi at those times, or did anything to protect her.

191.  Donna recalls, "it was a foregone conclusion among the women within the Robertson family that Skip's dad had touched Wendi sexually while she was an infant and toddler." (Tab 27, at ¶ 167.) Donna also admits:

> "I did not think of it in those terms at the time or have any way to respond because I was doing everything I could to avoid having to deal with it and not noticing what was happening. I was part of the culture of the Robertson family in which the women strongly suspected that the men sexually abused girls and the women considered themselves helpless to do anything about it." (Tab 27, at ¶ 167.)

81

Similarly, in my interview with Donna, when I asked if she had ever attempted to protect Wendi from sexual abuse by the Robertson men, Donna's response was one of resignation: "In that family, they're just gonna take 'em."

192. Even so, Donna reports that eventually, without saying so explicitly to herself, she came to believe that Skip's father and brothers, even Skip himself, had sexually abused Wendi. "I remember that at one point I knew I did not want Skip, his brothers, or their dad to be around Wendi at all. I felt that she wasn't safe with them. With Skip and his dad, I strongly suspected without really saying it clearly to myself that they were touching babies and kids sexually. I didn't let the thought form at the time, but I felt that they had abused Wendi sexually. Many of Skip's brothers were so creepy that way, and I felt that they also touched Wendi sexually when she was a toddler or little girl." (Tab 27, at ¶ 177.)

193. Finally, Skip reports that he brought Wendi along with him and his brother Tommie on a trucking trip. He says Wendi was three or four years old at the time, which was while he and Donna were going through their divorce or soon thereafter. (Tab 32, at ¶ 50.) As presented above, Tommie is the same brother who later sexually abused the same   REDACTED   that Skip did, and like Skip was imprisoned for it. In fact, it was sexually explicit photographs of Skip's   REDACTED   that Tommie had taken as she slept in the sleeper compartment of his truck which led to the abuse being discovered. On the trip when Wendi was three or four years old, Tommie and Skip had Wendi for "a few days." Skip then adds, "I did not think anything of it at the time but Wendi… was in the sleeper compartment of the truck, in bed with Tommie. Looking back on it, I would not be surprised if Tommie molested her." (Tab 32, at ¶ 50.)

82

194. **Behavioral evidence suggesting sexual abuse by age four.** As noted above, in our interview Donna described little Wendi as always "very accommodating," with one exception: "She wouldn't go to sleep in anyone else's bed." In Donna's recollection, "That was the only thing she didn't want to do," and "the one thing she wasn't easy with." This behavior is consistent with Wendi having been sexually abused in the bedrooms of Skip's father's or brothers' houses, including after being left by Donna to nap in those rooms.

195. Stronger evidence is Donna report that just after she divorced Skip, around the time Wendi turned four, she was almost kicked out of daycare for sexual behavior with other children. There were two separate incidents in which daycare staff reported to Donna that Wendi was in the bathroom with other children and "comparing and showing off their private parts in a way that was very unusual for kids of that age." Even after the first incident, Donna recalls that the daycare staff were "really upset" when they called to report what had happened. After the second incident, the daycare staff concluded that Wendi was the instigator, and threatened to expel her from the program. (Tab 27, at ¶ 168.)

196. In children who have been sexually abused, these are known as "abuse-reactive" inappropriate sexual behaviors. This is a common outcome of sexual abuse in young children, and it is not uncommon for the behavior to emerge after the abuse has ended, which would have been the case with here Wendi. In addition, that Wendi appears to have stopped engaging in those behaviors after being admonished by daycare staff and her mother (and perhaps beaten by her mother), would be consistent with sexual abuse of Wendi having ended, at least for a time, once the men of Skip's family no longer had

83

access to her, after the divorce. Either way, Wendi's behavior is consistent with her having been sexually abused, and Donna made no attempt to have Wendi assessed for a history of such abuse and resulting psychological consequences, let alone any attempt to get Wendi any psychological treatment.

197. **Not just physical punishment, but beatings and pain to compel instant and automatic obedience.** Donna acknowledges using physical pain to discipline and control Wendi from when she was a toddler into her teenage years, and says "Wendi was spanked regularly while she grew up." Donna also says that, thanks to Wendi's general obedience and compliance, she did not "need" to be spanked every day or even every week. When Wendi was a toddler, as punishment Donna gave her "one or two swats" on her buttocks with a wooden spoon. When Wendi was three or four, Donna spanked her with her hand. (Tab 27, at ¶¶ 235, 236.)

198. From Donna's description so far, there's nothing to suggest that her physical disciplining of Wendi was unusual, abusive, or particularly harmful. But then Donna reveals this: Behavior that was met with spanking, and the infliction of physical pain, included "if she didn't obey me or didn't come when I called." (Tab 27, at ¶¶ 235, 236.)

199. As research amply documents and parents of young children know, toddlers and three or four year olds get quite absorbed in games and other activities, and it is completely unrealistic to expect them to come immediately every time they are called. Similarly, it is developmentally appropriate – and necessary – for toddlers and young children to experiment with asserting their developing will, and this includes sometimes disobeying their parents or "testing limits." Indeed, normal and healthy children cannot even come close to meeting the unrealistic expectations Donna held and imposed on

84

Wendi; instead, the compliant behavior Donna describes is that seen in children *conditioned to live in fear* of being punished for not instantly obeying whatever parents say. Among the most important developmental tasks for young children, with which they need help and support from adults, is how to gain more autonomous control over their own attention and behavior while internalizing the rules imposed on them by parents. Parents who demand instant obedience and force children to comply with their rules and wishes by inflicting physical punishment and pain -- even if it's not physical abuse involving bodily injury, of which there is no evidence here -- actually *thwart* their children's abilities to develop internal regulation of their own behavior and *prevent* their children from internalizing the very rules and values they most want them to learn. Instead, the children learn only to obey and comply, out of fear, including the fear-based wish to please their parents.

200.  Wendi's parents' domination of her with the use and threat of physical punishment and pain would become more extreme in Wendi's later childhood and pre-teen years. But even in the first several years of Wendi's life, long before her parents as well as church and school staff began beating her regularly with wooden paddles, the pattern was set: Adults used physical force, violence and pain to control her behavior and command obedience, all the while making it harder for Wendi to internalize the very rules and values (other than "might makes right," which she no doubt learned) that her parents were ostensibly imparting to her.

201.  **Donna lost in alcohol, drugs and sex.** For much of the first five years of Wendi's life, Donna's tendency to grossly neglect her daughter was exacerbated by a descent into irresponsible sexual behavior and substance abuse, consistent with her

85

childhood trauma history and bipolar disorder. Donna describes how, from ages 22 to 24, when Wendi was one to three years old, she "drank frequently" and smoked marijuana with a neighbor. (Tab 27, at ¶ 87.) Then, just before and after her divorce from Skip, starting when Wendi was three and continuing until she was five, Donna "drank constantly," including throughout the week while she was working full time. Donna reports often drinking so much that she threw up. (Tab 27, at ¶ 88.)

202. During the period of constant drinking, when Wendi was three to five years old, Donna says she was also "very sexually active, terribly inappropriately so in my own opinion," and had sex "with at least ten different men, and there might have been a few more." (Tab 27, at ¶ 180.) For the most part they were men she met "casually," and the sex was mostly casual too. Indeed, with the exception of one brief boyfriend, Donna recalls that, like sex throughout her life, it was without emotional connection, or pleasure. "I didn't even like most of the men who I slept with," she says, and "I never really enjoyed sex, including during the entire marriage to Skip." Being so sexual was inconsistent with how Donna saw herself, and with how she was seen by people who knew her before that time. To this day Donna wonders how she had so much sex despite not enjoying it. (Tab 27, at ¶¶ 181, 182.)

203. Yet Donna unwittingly hints at what was going on: "Most of the time it was almost like it was going on without me." This speaks to the automatic and disconnected qualities of dissociative behaviors and experiences, which are common among adults severely neglected and traumatized as children. Just as she said, referring to her high school sexual experiences, that she did not want to "take responsibility for sex or admit what was happening," the same dissociative process was going on when Wendi was a

86

young child. It was the same dissociative way of coping that led, in the face of all the evidence that Skip's father and brothers were sexually abusing little Wendi, to Donna's response of "doing everything I could to avoid having to deal with it and not notice what was happening."

204. The one person with whom Donna ever felt emotionally connected while having sex was a boyfriend she had for several months in 1973 or 1974. Still married to Skip but having decided to leave him, Donna had a romantic relationship with Ron and experienced him as her "soul mate and soul companion, the only romantic partner I've ever had who I felt really close to and trusted." Donna would never learn whether this was another example of naïve and wishful thinking on her part, and her one taste of feeling genuinely loved was short lived: Several months into their relationship Ron died in a plane crash. (Tab 28, ¶¶ 26-27.)

205. **Overhearing fights between her parents.** Repeatedly witnessing and overhearing screaming between one's parents is disturbing and traumatic for children. The younger the child, the more confusing, overwhelming and traumatic it is. Donna reports that from Wendi's infancy until she and Skip divorced when Wendi was three years old, whenever Skip was not on the road Wendi regularly overheard fights between her parents. (Tab 27, at ¶ 170.) As noted above, Skip was seldom physically violent toward her, but they both "yelled a lot." (Tab 27, at ¶ 150.) However, Donna describes what Skip said when he screamed as "vicious and verbally abusive," and how she "usually retreated into the bedroom before too long into a fight because I didn't want to say something I might regret," either because it was too "hateful" or because it would "push Skip over the edge to the point that he would hit me." (Tab 27, at ¶¶ 150, 170.) By

87

the time Wendi was born Donna had already learned "what I could get away with in fights without him getting so mad that he snapped and hit me." (Tab 27, at ¶ 151.)

206. According to Donna, a common precipitant of the fights was Skip coming home drunk and wanting to have sex and her not being interested. However, she recalls, in words almost identical to those of the    REDACTED    Skip would sexually abuse twenty years later, "Most of the time I just did it with him anyway because that's what he wanted and if he didn't get it then he became extremely abusive with words and threats." These fights became worse after they moved to Tempe when Wendi was about two years old. (Tab 27, at ¶ 169.) Apparently one of the reasons Donna was less interested in having sex with Skip then was because she was often having sex with other men, including men she met through her neighbors with whom she was drinking heavily and smoking marijuana.

207. Skip's recollections of this time are consistent with Donna's: "We had a hard time communicating. We were also growing apart. She was going to potluck dinners and socializing with people who I did not like back then.... I thought of them as hippies and draft dodgers." (Tab 32, at ¶¶ 35, 44.) Of their sex life, Skip recalls, "I knew things were not good in our sex life anymore because Donna always seemed like she just wanted to get it over with." (Tab 32, at ¶ 45.)

208. Put differently: Donna's chameleon-like conformity to her social surroundings (which in Tempe meant drinking, drugging and casual sex with her early-1970s "hippy" neighbors) clashed with Skip's rigid clinging to his older brothers and their culture of heavy drinking, sexual conquest of women, and sexual abuse of young girls. But it was

88

little Wendi who paid the greatest price for her parents' constant conflicts and screaming

fights, in addition to their more direct neglect and abuse of her.

209. **Divorce.** In May of 1974, when Wendi was three years and eight months old,

her parents divorced. Donna and Skip both claim to have initiated the divorce.

Contemporaneous legal documentation shows that Donna petitioned for it. (Petition for

Dissolution, Superior Court of the State of Arizona, May 2, 1974, Obtained by Capital

Case Project; Decree of Dissolution of Marriage, Superior Court of the State of Arizona,

May 28, 1974, Obtained by Capital Case Project.)

210. Looking back, Skip provides a typically superficial yet revealing summary of

why they divorced. In addition to the comments about her hanging out with hippy friends

and not wanting to have sex with him, Skip acknowledges that he was "drinking too

much" and "generally dissatisfied." He recalls that they both "had a hard time

communicating" and that Donna "held things inside for too long." More importantly, it

appears, was the fact that he "was itchy" and "wanted to get out and live life" when

"things became routine and I felt like we were eighty years old." (Tab 32, at ¶¶ 44, 45.)

211. Given his traumatic childhood and the resulting ongoing addictive and

antisocial behavior he shared with his brothers, Skip never had it in him to be a

physically present, caring and competent parent. Neither did Donna, thanks to her own

awful childhood and the resulting ongoing emotional and behavioral pathologies.

212. But once the divorce happened, Skip ceased trying or pretending. Although he

claims, "if it was not for Wendi, I would have been gone sooner," within a year of the

divorce, after Donna and Wendi moved to Casa Grande, Skip says he "signed my rights

away" when Donna asked him to give up any claim to custody. Skip says he realized at

89

the time that "being on the road all the time was no way to raise a kid," and that when he gave up on being a father to Wendi he thought he was "doing the right thing." (Tab 32, at ¶¶ 45, 46.) Indeed, Skip reports that he only visited Wendi on two occasions after the divorce, when she was five and six years old, in 1976 and early 1977. He never made another attempt, and blames this on Donna, saying that because Donna made him feel unwelcome the last time he spent time with Wendi, he never came again. (Tab 32, at ¶¶ 53, 54.)

213. **Mother's neglect in workplace environments dangerous for unsupervised children.** When Wendi was almost four years old, around the time of the divorce, her mother got a job at Comcare, Inc., a program of Community Organization for Drug and Alcohol Counseling (CODAC), after they had moved from Tempe back to Phoenix and were living with Donna's mother again. (Tab 68; Tab 68.B.; Residence Chronology provided by Donna Ochoa, Obtained by Capital Case Project.)

214. Since Wendi was two Donna had volunteered at Terros House, another CODAC program. In her interview with me, Donna spoke of feeling much more comfortable with the drug counselors and recovering addicts in these programs than with Skip and his family. She remembers feeling, for the first time in her life, "These people love me." When Wendi was two and three years old, Donna volunteered and worked on weekends. During Donna's time working in paid positions at CODAC (not at Terros), she would bring Wendi along on weekends and leave her in the care of the recovering addicts on the premises. Donna remembers not paying attention to where Wendi was, although she knew that the clients, especially the prostitutes, many of whom had lost custody of their own children, "loved Wendi."

90

215. No doubt many of the clients at the drug and alcohol treatment programs felt very affectionate toward little Wendi. Some may have been protective of her. That Donna would bring her daughter to such places and not even attempt to keep track of her whereabouts is just one more example of how neglectful she was as a mother. Looking back now, Donna says "I wasn't really paying attention to what she did and wasn't concerned about her safety with the hookers and drug addicts." At the time Donna rationalized this by focusing on how "there was always a CODAC employee supervising rehab," but looking back now, she says, "I think I was an idiot or very naïve to let Wendi hang out with those people, but at the time I had no clue that it wasn't appropriate." (Tab 28, ¶ 42).

216. Just as Donna had repeatedly given Skip's father and brothers access to Wendi, soon after finally divorcing Skip in the spring of 1974, Donna would give another man she came to know was a pedophile virtually unfettered private access to Wendi. His name was Rick Barnes, and he was the director of the Pinal County Alcohol and Drug Abuse Corporation (PADAC) in Casa Grande.

217. Soon after Wendi turned four years old, in the fall of 1974, Donna met Rick at a conference and he recruited her to work at PADAC. (Tab 28, at ¶ 46)  In November and December of 1974 Donna commuted between Phoenix and Casa Grande working for PADAC (Tab 28, at ¶ 50). Because Rick paid her under the table, as he would for most of her work there over the coming year and a half, there is no Social Security Administration record of those months or most of her other months at PADAC.  Donna's work for PADAC only exacerbated her chronic neglect of Wendi: She worked 60-hour straight weekend shifts in which she received, monitored, and helped drunken alcoholics,

91

with no more than a couple of hours of sleep and sometimes no sleep at all. Then Donna "crashed" and slept most of Monday and Tuesday. She also wrote PADAC grant applications on Tuesdays, Wednesdays and Thursdays, and otherwise slept a lot, right through Friday mornings before the cycle started over again. Inevitably, as Donna recalls, she "had very little energy, time, focus or other personal resources to give to Wendi during this time." (Tab 28, at ¶¶ 51 and 52.)

218. By January of 1975, Donna and Wendi had moved to Casa Grande and were living with Rick's ex-wife Nicki Barnes and her daughter Tascha, who was two years younger than Wendi and quickly her best friend. Both Nicki and Donna were "so busy and overwhelmed that neither of us paid much attention to the girls," who were mostly on their own but sometimes looked after by an older woman neighbor, though Donna was so oblivious that she did not realize this for several months. (Tab 28, at ¶¶ 54, 59.) As had been the case at CODAC, after moving to Casa Grande Donna sometimes brought Wendi along to PADAC on weekdays and weekends and pretty much forgot about her once she started working. Again Wendi was left to wander among the drug addicts and prostitutes hanging around the center, as well as the nearby streets, where she often begged for change – all unbeknownst to her mother until months later, in April. (Tab 27, at ¶ 183; Tab 28, ¶ 56) Looking back now, Donna recognizes just how neglectful she was: "It never dawned on me that having Wendi out there alone, begging in the streets or going over to [the nearby furniture store]... might be dangerous to her because of car traffic or any number of things, or that she might be molested by a stranger or someone she met in the neighborhood." (Tab 28, ¶ 56). (Apparently it did not dawn on her on Donna before Wendi graduated from high school, as indicated by an entry in a "Treasured Memories"

92

booklet she gave Wendi as a graduation present, in which Donna characterized her four

year old daughter's roaming and panhandling alone on dangerous streets as endearingly

"precocious." In the booklet's first entry, Donna completes "Remember when" with a

hand-written "you used to go out from the Drug Center and 'panhandle' on the streets of

Casa Grande. You were such a precocious child!" (Treasured Memories booklet,

obtained by Capital Case Project.)).

219. Rick Barnes, her boss and the director of PADAC, was a pedophile, as Donna

had discovered before even moving to Casa Grande. While commuting to work weekends

during November and December, Donna sometimes slept at Rick's house on Monday

mornings. On one of those Mondays she rummaged through Rick's things and found

paperwork from a school in Thailand where he had lived and worked the prior year,

teaching English to children of Americans. The documents explicitly stated that Rick had

been fired after multiple accusations that he had sexually abused preteen girl students.

(Tab 28, ¶ 62). Donna recalls her response: "I just ignored the whole situation and

stopped thinking about it, like I've done throughout my life when I've known something

bad or unsavory about another person." (Tab 28, ¶ 63). She also discovered that Rick had

a box full of bottles of amphetamines and benzodiazepines, common prescription drugs

of abuse, all prescribed to people who were not PADAC clients, which meant Rick was

illegally obtaining and selling them on the street. (Tab 28, ¶ 61.)

220. Despite these discoveries, Donna decided to continue working for this

dangerous man, moved to Casa Grande with Wendi, and proceeded to bring her four year

old daughter to work, where "Wendi was regularly alone with Rick and spent time alone

with him in his office on weekdays and weekends." (Tab 28, ¶ 65). Wendi also spent time

93

alone with Rick at his house, while Donna slept on Monday mornings after her 60-hour weekend shift or was "otherwise busy and not paying attention." (Tab 28, ¶ 66). Did Wendi being alone with Rick concern Donna? No. Despite what she knew about him being fired for sexually abusing girls in Thailand, "It didn't occur to me that he might abuse her sexually…. I didn't really think about it, but to the extent that I did, I assumed that he wouldn't abuse Wendi sexually because she was so young." (Tab 28, ¶ 65).

221.   By then Wendi knew that her mother was not interested in her, let alone any of her experiences or problems; and by then, thanks her mother's neglect and her father's complete departure from her life, Wendi was vulnerable to sexual predation by adult men who gave her *some kind* of attention and affection.  Indeed, as suggested by ample research on the re-victimization of sexually abused children, as a maternally neglected child who had already manifested signs of sexual abuse, including age-inappropriate sexual behavior, Wendi would likely have been a particularly vulnerable and compliant victim.

222.   Soon after moving to Casa Grande, Wendi caught the attention another deeply disturbed, sexually perverted, pedophilic man.  His name was Alejo Ochoa, and he served on the PADAC Board of Directors. Within a few months, Alejo would be sleeping in the same bed as Wendi. Within six months Donna would marry him.

223.   **Wendi's memories from before age five.** The region of the brain responsible for encoding long-term memories of specific events (i.e., the hippocampus) does not develop sufficiently to reliably encode such memories until around age five. Thus Wendi Andriano should not be expected to have any autobiographical memories (also known as

94

explicit episodic memories because they are self-consciously recognized as memories of prior episodes or experiences) for experiences before she was four and a half years old.

224. Consistent with this, in my interviews with Wendi, when asked for her "earliest memory" she reported a memory from about age four and a half. Wendi remembered her grandmother, Donna's mother Ann, sharing her milk and toast with her one morning. She then added, "If I try to remember a mother figure, I remember her and not my mom," and "I know she loved me."

225. Wendi's comments are also consistent with her mother's severe emotional neglect of her. When asked for early memories of her mother, Wendi remembered her mother sewing clothing for her when she was in kindergarten, but the memory had none of the emotional warmth and feeling of connection associated with the early memory of her grandmother. Sewing her clothes was like keeping her clean, reminiscent Donna's observation that her own mother kept the house clean but "I had no emotional connection with her, no hugging, no cuddling, no warmth, no affection, no bond." (Tab 27, at ¶ 46.) Indeed, when Wendi attempted to remember things she did with her mother, she spontaneously commented, "I don't believe my mom was too emotionally available" and "I don't have that feeling that she loved me," then began crying. Wendi also remembered being very sad when she seldom saw her grandmother after they moved to Casa Grande when she was four year old (see below). Wendi reported no memories at all of her father, who, by the time Wendi was four years old, had divorced from her mother and almost never visited her.

226. Thus consistent with the development of the brain's memory capacities, from before age five Wendi has few explicit, autobiographical memories of the most

95

psychologically important people in her life during that time period, i.e., her parents and grandmother. However, the brain regions and circuits that encode *implicit* memories, of emotional experiences and automatic emotion-related behaviors, are operational from infancy. Those brain regions lay down memories that, although not recognized as memories by the person having them (i.e., this is why they are called "implicit" rather than "explicit" memories), constitute patterns of feeling and responding to others' behavior that shape psychological, emotional and relational functioning for the rest of one's life.

227. To clarify: Implicit memory is a type of memory that people do not consciously experience or recognize as "memory" when it is present. This includes the memories of previous experiences that allow us to perform a current task without having conscious awareness of those previous experiences. For example, riding a bike requires remembering where, when and how to move all four limbs; but we do not remember learning those specific procedures, or even think consciously about most or all of those movements. Importantly, implicit memory also includes bodily and emotional responses to incoming stimuli and situational contexts. Such implicit memories/responses (a) are not consciously experienced or recognized as "memories" and (b) are not consciously associated with memories of past experiences or autobiographical episodes; they may also (c) alter current processing of sensory information, (d) alter the contents and nature of one's current thoughts, and (e) evoke simple and/or complex emotions and behaviors that one has no idea are related to past experiences and memories. For example, as her mother and numerous other witnesses report, Wendi tended to automatically respond to others' anger or displeasure – and even a hint that displeasure or anger might be

96

forthcoming, especially from a man – by placating, submitting or otherwise doing whatever might help that person feel better or at least stop being irritated or angry.

228.   Sometimes all of us, in response to other people's behaviors (as well as their actual and imagined thoughts, emotions and motivations), have reactions (and over-reactions) that are driven by implicit memories associated with past experiences of feeling vulnerable or hurt in important relationships (especially with childhood caregivers). For people with histories of repeated emotional, physical and/or sexual abuse in childhood, such implicit memories of being hurt tend to be triggered often; those implicit memories are also more likely to be extreme in their intensity, and to elicit to behaviors that bring suffering upon themselves and others. And like the rest of us, but to a greater degree, in such situations where implicit memories of a past hurt are triggered, people with histories of major childhood trauma are unaware that they are responding not merely (or even primarily) to the current situation or interaction, but instead are responding mostly to an implicit memory of a past painful (and sometimes traumatic) experience.

229.   Indeed, many of the painful emotions that people experience – or go to great lengths to avoid experiencing, often without realizing it as they reach for a bottle, or in Wendi's case go into automatically appeasement mode – are merely the "tip of the iceberg." That is, many painful emotions we all experience are manifestations of implicit memories of emotions that were first experienced during painful and formative experiences in our pasts. The same is true for many of the avoidance efforts people engage in: these are implicit memories of avoidance strategies first engaged in long before.   In both cases, people are having emotional reactions and engaging in behaviors

97

based on implicit memories of experiences that may or may not (at least at the time) have any corresponding explicit, episodic or autobiographical memories.

230.  A good example is Wendi's habit, observed by her co-workers, of responding to her husband Joe's frequent workday calls to her office by (1) listening in an emotionally disconnected way to his complaints and demands and (2) then uttering a few words and immediately going home to fix his problem. Her colleagues came to see this behavior in two different ways: as Wendi's subservience to Joe, and as Wendi dismissing Joe and "blowing things off," with the latter interpretation appearing to fully replace the former over the weeks and years following Joe's death. (9/15/04 Trial Testimony at 95-97, 103.) However, with knowledge of Wendi's traumatic childhood of neglect and abuse by important adults in her life, and of how implicit memory operates, we can understand these more clearly: They are childhood-conditioned, deeply-ingrained, and automatic habitual responses governed by non-conscious implicit memories of (a) being abused and dominated and (b) avoiding awareness of vulnerable and angry feelings by placating others while emotionally distancing herself from them.

## V.    WENDI'S ADOPTIVE FATHER AND HIS FAMILY BACKGROUND

231.  Alejo Lorenzana Ochoa was born August 1, 1952 in Torrance, California to Alejo Molina Ochoa and Natalia Lorenzana. He has one sibling, Delia Rose Rascon Alvarez, who is about three years old than him. (Tab 24, at ¶ 1.)

232.  Alejo reports that his father had one brother and five sisters who survived infancy, and that his father's brother died in high school after being injured playing football. He reports that his maternal grandparents were both orphans and were "older" when his mother was born.  Alejo is not sure of his grandmother's first name but knows

98

that his mother's parents took their surname, Lorenzana, from the name of the orphanage in Mexico City where they grew up. Similarly, Alejo is unsure how many siblings his mother had, but says he knows of three brothers and two sisters.

233. When Alejo was three years old his family moved to Casa Grande, Arizona, where Alejo spent the remainder of his childhood and has lived much of his adult life. When Alejo was born in California his father worked for a company that makes toilets, and when they moved to Casa Grande his father was self-employed, selling dry good to migrant workers from his own truck; he also delivered newspapers, worked as a meat cutter, and eventually owned a restaurant with Alejo's mother. (Tab 24, at ¶¶ 3, 5; Interview with Alejo Ochoa.)

234. **Poverty, emotional neglect and physical abuse.** None of his father's work paid much, and Alejo's family was poor, especially when he was younger. In our interview Alejo recalled that his parents could seldom afford toys for him. In a poignant example of their poverty, Alejo told of substituting dead mice for toy cars, which his parents could not afford to buy for him. He pushed them around a pretend race track he had created, until his mother found out and he "got in so much trouble." Asked what it meant to get in trouble like that, at first Alejo said, in a deflecting and minimizing tone, "they grounded me, stuff like that."

235. In a recurring pattern, when talking about his relationship with his mother Alejo said one thing, in abstract and vague terms, and then went on to give an example or tell a story that completely contradicted what he had just said. For example, asked to describe his mother before she was very depressed during and after his parents' divorce, Alejo first said three things: "I thought she was a pretty happy lady," "She was easy to talk to,"

99

and "We talked about school." But then, immediately after the "talked about school"
comment, ostensibly to give an example, Alejo added, "I'd come home and tell her 'I got
spanked today' and she'd say, 'Good – you need another one.'" He went on to describe
how his mother, for small infractions or annoyances, would hit him with a fly swatter or
whatever she could reach that would sting but not bruise or cause welts. Mostly,
however, when his mother was angry she gave him the silent treatment, refusing to speak
to him, "at times for an hour and at times for the whole day." Alejo still recalls "how
much that hurt me." (Tab 24, at ¶ 10.)

236. His father was the main dispenser of corporal punishment. If Alejo had done
something "bad" during the day, his mother would make Alejo confess to father when he
got home from work that night. Alejo recalled his father's beatings, which consisted of
several lashes across his rear end with a folded belt, as extremely painful, much more so
than beatings with paddles at school: "They didn't hold back at school, but the belt hurt a
lot more." Also, beatings like those his father gave him can cause painful bruising and
welts that last for days.

237. Like Wade Robertson, who viewed the physical abuse meted out in his family
as "discipline," Alejo told me that "every time" he got beaten at home or at school, he
"deserved it." (The only exceptions, in his eyes, were beatings at the school he attended
in first grade, where he was spanked for speaking Spanish.) A few minutes later,
however, Alejo acknowledged that his father's mood was a "big factor" that determined
whether or not he was beaten. In his declaration, he succinctly states, "We got our
whippings when Dad was angry." (Tab 24, at ¶ 10.) In our interview Alejo also recalled
a time when, just by luck, he narrowly escaped the "beating of my life" from his father,

100

because another child improbably confessed to having provoked Alejo into accidentally shooting out a neighbor's window.

238. The trauma associated with Alejo's father's beatings was not limited to their painfulness and their arbitrary dependence upon his father's mood on any particular night. Until Alejo's parents divorced when he was around twelve years old, anticipation of his father's beatings was a source of considerable fear and dread on a regular basis. Alejo remembered vividly how his mother would say, "Wait 'til your dad gets home" and how from that moment on he would "think about it all day long." While punishing children by hitting them with a belt and the wait 'til your dad gets home" threat are still practiced in some subcultures of this country, this does not change the emotional trauma experienced by a child on the receiving end of such childrearing practices. When the beatings are severe enough to cause intense and lasting physical pain, a child will often attempt to cope with the emotional pain by internalizing his parents' message that they "deserved" such violence. The trauma is considerable, despite being banished from awareness. Like many other children subjected to such abuse, Alejo would grow up to inflict it upon Wendi, her cousin Brandon, and many children whose families were caught in the religious cult where Alejo was a "youth pastor," in which relentless and harsh physical abuse of children was seen as God's will and as every adult's duty.

239. That Alejo was also emotionally neglected by his parents is suggested by the fact that he never provided, in his declaration or interview with me, despite questioning specifically designed to elicit such information, any examples of his mother or father truly listening to him or empathizing with his feelings. There was no indication in anything he said about his parents – except for the vague and immediately contradicted

101

"easy to talk to comment" about his mother – that he felt understood by them, emotionally supported by them, or safe to share his concerns or fears with them. When it came to the youthful fears and insecurities Alejo did discuss in our interview, about "girls and dating," he explicitly said that he knew his parents would use whatever he said against him (by revealing it to his aunts and uncles, who would surely use the information to torment him).

240. **Emotional and sexual abuse by aunts, uncles, and parents**. Alejo recalls spending most of his "family time" in his childhood and early teen years with his mother and his paternal aunts (he seldom saw his maternal aunts). He reports that "all" of his aunts, but particularly Lupe and Celia, were "very harsh in the way they constantly made jokes and teased, primarily about sexually related things." (Tab 24, at ¶¶ 7, 22.) From as early as he can remember, even before he became a focus, "sex talk and sexual jokes were always in my awareness." (Tab 24, at ¶ 22.) When they were eventually directed at him, as he entered puberty at eleven or twelve, his aunts continually teased him – about his alleged sexual desires and designs, and especially about masturbation. (Tab 24, at ¶ 7.) In his interview with me, he gave the example of innocently asking an aunt the question, "how is my niece related to me?" and getting the response, "If you mess with her your uncle will cut it off!" Another example: His aunts asking to check and see if his palm had grown hairs from too much masturbating. (Tab 24, at ¶ 7.)

241. Alejo remembers this constant sexualized teasing – bullying, actually – as "unbearable." It was especially unbearable because no adult even attempted to protect him from this verbal sexual abuse, let alone helped him deal with its effects. His mother and father often joined in, as did his aunts' husbands. Alejo is still pained to remember

102

his early teenage years – the embarrassment of being around his aunt's hyper-sexual conversations and constant teasing, the horror of his own mother joining in the laughter at his expense. (Tab 24, at ¶ 7.)

242.   Although this behavior of his aunts, uncles and parents did not involve physical contact, it was not only emotional abuse but *sexual* abuse.  It was adults exploiting children, purely for their own twisted pleasure, as unwilling recipients of their own perverted sexuality. As Alejo makes clear in his declaration and did in his interview with me, their behavior was aggressive and cruel, disrespectful and shaming. In our interview Alejo recalled, "I found out if you get mad it would just go on and on. It's like a bully on the playground: if you react he's on you." Although Alejo describes learning to walk away as soon as they started in on him, those opening – and often humiliating – attacks were still uncontrollable and inescapable.

243.   The uncontrollable and inescapable aspects are important to highlight, because ample research has shown that abuse (and significant stressors of any kind) with those two characteristics is quite traumatic and can lead to posttraumatic symptoms or full-blown PTSD.  Another critical variable that determines the nature and severity of the effects of sexual abuse is the identity of the perpetrator(s). The more dependent the victim is upon the perpetrators, and more the abuse constitutes a betrayal of trust, which is always the case with family members and most extreme when parents commit the abuse, the greater the negative psychological and biological effects. Obviously, if the variables of controllability, potential for escape, and relationship to perpetrator are "held constant," sexual abuse involving physical contact will be more harmful than noncontact sexual abuse. Nonetheless, noncontact sexual abuse, including the verbal forms to which

103

young Alejo was repeatedly subjected, can be quite harmful to prepubescent children and teenagers, in a variety of lasting ways. Alejo Ochoa constitutes an excellent case study of such harmful effects, including obsession with sexual thoughts and fantasies, compulsive and impulsive sexual comments and behaviors, and repeating against others the same kinds of sexual abuse he experienced as a child.

244.                                   REDACTED

245.                                   REDACTED

Although he probably did not reflect on it consciously, Alejo learned from his relatives' abuse that he, and children in general, could be treated by adults as objects of sexual exploitation.  What he did reflect upon, however, was that adults could be very cruel and sadistic in their sexual abuse of children --                REDACTED

104

REDACTED

246.                              REDACTED

Alejo's first sexual experience involving physical contact occurred when he was thirteen or fourteen years old. A friend's older sister, who was around seventeen years old at the time, directed Alejo and her younger sixteen-year-old sister to have sexual intercourse, and they did. Alejo recalls, "I was so scared not knowing what was going on. The older sister told me not to say anything to anybody. I ran home. The experience was exciting, scary, and confusing." About a year later, the same sisters told him to take his penis out of his pants, then the older sister directed the younger one to perform oral sex on Alejo. Again the experience was extremely unpleasant and frightening: "The older one was laughing and the younger one did not like what she was doing. I recall a lot of laughing and again being told not to say anything to anybody. After that, I would not go over there." (Tab 24, at ¶ 20.)

247. These confusing, disturbing and frightening initial sexual experiences of Alejo's, which involved sudden and intrusive acts of oral and genital intercourse under the orders of an older and more knowledgeable person, were experiences that he had no chance to sort though and understand. He could not tell his parents or adult relatives, who would have ridiculed him and added another layer of abuse and humiliation. At the same time, these experiences made Alejo more vulnerable to sexual predation that involved a kinder and gentler, more gradual and "teaching" approach –     REDACTED

105

248.                                   REDACTED


249.                                   REDACTED


250. **Pathways to becoming an adult perpetrator of child sexual abuse.** Children

need to be *protected* from the sexuality of adults, and not to have it used against them in

exploitive and abusive ways.  Children also need to be protected from situations –

including major emotional neglect – that can lead them to become focused on sexual

stimulation as a substitute for more healthy and age-appropriate pleasures, or focused on

sexualized attention as a substitute for healthy affection, caring and love.

106

P-App. 002234

251. Comparing Alejo's childhood with those of Skip Robertson and his brothers shows two different pathways by which children can be prematurely sexualized by adults and then grow up to become adults who sexually abuse children themselves. As discussed above, because the human brain responds to stimulation of the body's sexual organs as pleasurable, there is great risk that neglected children, like those in the Robertson family, can latch onto sex as a substitute for emotional connection with others, and as an addictive way to sooth themselves. And as was true for Skip and his brothers, to this premature and pathological focus on the pursuit of sexual pleasure can be added layers of hyper-masculine gender socialization, including fixation on sexual conquest and physical aggression, which can lead to sexual exploitation and sexual violence. That was the pathway to becoming a perpetrator of child sexual abuse in the Robertson family.

252. In Alejo's family the pathway was different, and appears to have unfolded in stages. In the first phase, little Alejo learned that sex was something he did not understand but that adults used against children – by teasing, humiliating and otherwise abusing them with harsh words. He implicitly came to understand that sex was a part of him which was somehow important, and something adults imposed on children as a way to make them objects of ridicule. In the second phase, as a pre-teen whose hormones were starting to kick in and who was becoming aware of sexual interests and desires, Alejo became a direct target of the adults' relentless, aggressive and humiliating sexualized comments. His own sexuality became infused with fear and shame, as well as a realization that he had no one to defend him from such attacks and help him feel safe in his changing body and mind – let alone to help him make sense of those changes and their implications for his relationships with peers. In the third phase, early in his teens,

107

P-App. 002235

Alejo was coerced by older teenagers into confusing, frightening and humiliating sexual experiences with peers, and explicitly told, in a threatening way, that he must never tell anyone what had happened. By then he had already despaired of any adults helping him understand and navigate sexuality, and now teenage girls, to whom he was feeling sexually attracted, were simultaneously experienced as dangerous, threatening and potentially sources of even greater humiliation and shame than his aunts, uncles and parents.

253.                              REDACTED

For his whole childhood Alejo had longed for a relationship with an adult who truly listened to him, cared about his problems, helped him through his confusion and taught him things that helped him navigate relationships with his peers.  As a teenager, especially given his history of prior abusive and exploitive sexual experiences, Alejo felt particularly desperate for adult understanding and guidance with regard to his sexuality.                    REDACTED

. Indeed, Alejo falls into what is known, in the sex offender literature, as the "regressed pedophile"

108

type. That is, he can be understood as a profoundly emotionally immature man who, even though married, is incapable of having a healthy intimate relationship with an adult partner, and instead seeks emotional intimacy, partnership and sexual pleasure from children – who he experiences, compared to potential adult partners, as innocent and safe, thus the best match for his own child-like immaturity. In short, Alejo believes that for him to have a sexual relationship with a child is a good thing, and that, all evidence to the contrary, he is actually helping and even loving the child.

254.                                  REDACTED                                  , Alejo

would also become a man who compulsively reenacted, in the role of the perpetrator, sexual abuse which he acknowledges is not caring or helpful in any way to those on the receiving end, especially children. That is, as an adult Alejo regularly engaged in the same kinds of verbal sexual abuse that his aunts, uncles and parents had inflicted on him. As we shall see, several witnesses consistently describe how Alejo – as fellow a church member, youth minister, and parent – constantly made sexualized comments and innuendos, and constantly imposed sexual interpretations on innocuous objects and non-sexual behaviors of others.

255. Indeed, in adulthood Alejo repeatedly cycled through re-enacting all of the forms of sexual abuse to which he was subjected as a child and teenager. Alejo's path to becoming a sexually abusive adult was different from that of Skip Robertson. But the conditioning was, in its own way, just as powerful; and the absence of any help averting that developmental trajectory, just as complete.

256. **Father's affair, parents' ugly divorce, family split in two.** When Alejo reflects on formative negative experiences in his childhood, he puts his parents' "ugly"

109

divorce, which unfolded when he was thirteen or fourteen years old, at the top of the list. The impetus was his mother's discovery of his father's affair with another woman, who his father went on to marry. (Tab 24, at ¶¶ 13, 14.) For months Alejo overheard and directly witnessed "yelling and a lot of fighting with physical violence," and he "spent a lot of time outside our home crying" as his parents battled inside. (Tab 24, at ¶ 14.) Alejo recalls feeling like he could not talk with either parent, and utterly alone with his anguish, fear and confusion.

257. Eventually he was able to reconnect with his mother, but not his father. Alejo lost respect for his father and felt like he no longer loved him. They even had a physical fight, at a family picnic after his father slapped his mother and Alejo responded by punching his father in the mouth. (Tab 24, at ¶¶ 14, 15.) Alejo only saw his father a few times after the divorce, and completely lost touch with him for many years starting when he was eighteen years old. Both children felt forced to take sides and the family was split in two. Alejo aligned with his mother and lived with her. His sister became estranged from their mother, lived with their father and his new wife for awhile, then returned to live with Alejo and their mother but constantly fought with her. (Tab 24, at ¶¶ 16, 17.) Although Alejo continued to feel connected to his mother, at least to the extent possible within the context of their always emotionally neglectful family, he describes his mother as becoming "depressed and bitter" and developing "a drinking problem" after the divorce, first drinking after work and then "all the time." (Tab 24, at ¶ 18.)

258. For Alejo too, the divorce was a "big turning point" that he sees as starting him on a downward spiral. Like many children of divorce, he felt deeply ashamed and blamed himself. Feeling even more alone than he always had, Alejo recalls that he

110

"fended for myself and started getting into trouble," including abusing alcohol and drugs. Previously there were parts of his experience, including his sexuality, which he knew it was pointless and even perilous to share with his parents and adult relatives. After the divorce he learned, in general, "to hold things in and not show how I was truly feeling." This became particularly true as he got deeper into using and then trafficking illegal drugs. (Tab 24, at ¶ 19.)

259. **Teenage alcohol and drug abuse.** In junior high school, even before his parents' divorce, Alejo brought miniature bottles of hard alcohol to junior high school. He drank one during lunch one day, which got the attention of other kids, to whom he started selling the little bottles of whiskey that his father had bought at a liquor store in Nogales, Mexico. (Tab 24, at ¶ 23.) He recalls starting to drink heavily during the divorce, and then using marijuana and, by freshman year of high school, cocaine and hallucinogens. After the divorce there were about thirty large bottles of whiskey that Alejo's father had left behind in the house, and Alejo poured that whiskey into the small bottles, which he then sold, refilled and resold to other kids. (Tab 24, at ¶ 23.)

260. Alejo reported trying marijuana for the first time at about fifteen years old, while on a trip to Mexico with one of his aunts. With the experience of selling little bottles of whiskey from Mexico under his belt, the enterprising (albeit foolish and reckless) teenage Alejo got phone numbers from people he met in Mexico, with whom he "later connected with to arrange deals for the sale of marijuana." He also acquired phony documents and papers claiming he was 21 years old, which allowed him to cross the border on his own, and made his first trip alone at age sixteen. Alejo then learned "how to be the go-between guy and get part of the cut on marijuana deals," a role he continued to

111

play all through high school (Tab 24, at ¶¶ 24, 25), and which, as described below, would end with the most violently traumatic experience of his life.

261.  Early in high school Alejo turned to harder drugs, including cocaine and two powerful hallucinogens, LSD and mescaline.  Barry Lorts, a friend of Alejo's in high school who would later found the fundamentalist Christian church and school where Alejo would become a youth pastor and Wendi would experience totalitarian control and routine beatings, corroborates Alejo's memories. "We hung out together, and we were druggies. We did our share of acid and smoked marijuana." (Tab 16, at ¶ 3.)

262.  Like many cocaine abusers, Alejo liked it because "It felt good and made me confident." Within two years his cocaine use dramatically escalated, to "two or three times a week," and he maintained such frequent use for "a two-to-three year period" from around age sixteen until senior year of high school. (Tab 24, at ¶ 32.) Alejo recalls taking "about thirty hits of LSD" and using mescaline many times as well.  These are extremely powerful drugs known to cause not only hallucinations but severe cognitive and emotional disorganization, often associated with intense confusion and fear in what are known as "bad trips." Yet Alejo insists "I had all good trips on acid," and says it was his "drug of choice," that is, his preferred drug because he liked its effects on him more than those of any other drug. What those effects were, and why he liked them so much, are very telling: "When I did acid, I was in my own little world and I liked that. I did not have to be around people and everything was calm.  It felt like an out of body experience. I never did it in a group setting." (Tab 24, at ¶¶ 33, 34.)

263.  It appears Alejo is still in his own little world when it comes to those experiences. In our interview he professed, with evident sincerity, that he still believes he

112

walked on top of eucalyptus trees during an LSD trip.  Alejo has always been very limited in his capacities to emotionally connect with others and negotiate relationships. So it makes sense that, while Alejo liked the confidence of the cocaine high, he much preferred the LSD-induced experience of being completely in his "own little world," that is, disconnected from reality, including other people and relationships.

264.  Alejo reports that during senior year of high school he "started trying to clean up my drug use," which meant quitting cocaine and hallucinogens but still regularly drinking and smoking marijuana. He recalls drinking the most soon after graduating from high school, when he was nineteen years old, but also that year deciding he did not like being drunk and no longer drinking such large quantities, and then cutting down further until he quit drinking altogether when he was 21 years old. (Tab 24, at ¶ 35.)

265.                                          REDACTED

113

266.                                        REDACTED

267. **Limited intelligence, competence, and motivation to achieve in school or work.** Alejo's school records indicate that, from the very beginning in first grade, he exhibited limited abilities and motivation either to learn or to apply himself. His adult work history reflects the same pattern.

268. Alejo's first grade report card has Ds and Fs in arithmetic, language, reading and penmanship. Though he received satisfactory ratings for "conduct" in all four quarters of first grade, the second half of the year he received "unsatisfactory' marks for "effort." Across all four quarters of first grade Alejo received check marks for "lacks interest" and "work carelessly done" or "no work done" (with the latter being a hand-written category added by his teacher). Lack of effort, however, was not seen as Alejo's main problem: his teacher checked off "work of grade too difficult" for every quarter.

114

Alejo was held back and repeated first grade. (Casa Grande Public Schools, Report to Parents, 1958-1959, Obtained by Capital Case Project.)

269.  In his second round of first grade (i.e., the 1959-1960 school year) Alejo was able to achieve Bs in all graded subjects throughout the year.  He was rated as showing interest but "unsatisfactory" for "effort" in two of the four quarters, and as "capable of doing better" in three of the four. (Casa Grande Public Schools, Report to Parents, 1959-1960, Obtained by Capital Case Project.)  Upon moving on to second grade the following year, however, Alejo's grades were almost entirely Cs and Ds. In three of four quarters that year he got check marks for "lacks interest," "work carelessly done," and "capable of doing better." (Casa Grande Public Schools, Report to Parents, 1960-1961, Obtained by Capital Case Project.)  On the next available report card, for 5th grade, Alejo's grades ranged from Cs to Bs (and two A-minuses out of 39 recorded grades).  Finally, on a comprehensive transcript document covering the school years from 1958 to 1967, Cs and Ds dominate the reported grades and selected teacher comments taken from those years include the following statements from years for which report cards are unavailable: "dreams and plays, has little interest," "no desire to learn," and "needs constant push to do work." (Transcript from Casa Grande Elementary School District, June 2, 1967, Obtained by Capital Case Project.)

270.  Records beyond the elementary school years have not been found. However by all indications – including Alejo's reports of being overwhelmed and distressed during junior high, when his parents were divorcing and he had already begun regularly drinking alcohol, and his corroborated report of spending his high school years heavily abusing marijuana, cocaine and hallucinogens – his academic effort was almost always negligible

115

and his academic performance poor. In addition, Alejo's chronic use of cocaine and hallucinogens could only have further eroded whatever limited intellectual capacities he would have possessed under the best of circumstances.  As Cynthia Schaider, a core member of Harvest Family Church from 1980 to 2001 and someone who works for drug treatment programs, commented, "The first words that come to mind when I think of Alejo are 'drug burn-out.'" (Tab 34, at ¶ 6.)

271.  Not surprisingly, Alejo's adult work history is spotty and unimpressive.  Aside from a string of years in the mid 1990s to 2000s when relatives gave him work in the family's tortilla business, Alejo's history of paid work consists largely of short-lived, part-time jobs in landscaping and construction, including some where he was cheated out of wages by an unscrupulous manager or small business owner. (Tab 24, at ¶¶ 46, 59, 64; Tab 68; Tab 68.A.)

272.  As someone relatively unmotivated and unable to find and sustain productive and profitable work, until 1997 at age 45, Alejo spent much of his work life in volunteer capacities – first in nonprofit drug treatment, in the early 1970s at PADAC, where he met Donna and Wendi, and then for fundamentalist Christian (cult) groups with whom he, Donna and Wendi were involved beginning in 1977.

273.  **A profoundly limited and disturbed man.**  The above account of Alejo Ochoa's childhood and work history does not capture him as a unique and complex human being.  It focuses on his intellectual and emotional limitations; on the neglect, abuse and other traumas he experienced as a child and teenager, especially sexual abuse; and on how those limitations and traumatizing experiences derailed him from any

116

possibility of normal or healthy human development, especially in the realms of emotional intimacy and sexuality.

274. As detailed below, several witnesses who knew Alejo in his 20s and 30s refer to him as a "pervert" and as a sexually "perverted" man who constantly and compulsively subjected women and girls to unwanted sexual comments and physical contact. One of his favorite things to do was to suddenly lick his finger and rub it against a woman's or girl's ear. He repeatedly fondled the breasts of a teenage friend of Wendi. He dressed and photographed Wendi in lingerie, and forced her to look at "adult" toys and pornographic material. More recent examples of Alejo's sexual perversion, from his 50s, are two Valentine's Day cards he sent to his incarcerated daughter (the exact years that he sent them in the 2000s are unknown).

275. The cards are perverted and disturbing – to anyone, although Wendi reports that she has only been able to acknowledge this to herself in the past two years, in the context of the investigation and evaluation leading to this report. Just how perverted and disturbing the cards are can only be conveyed by showing the cards and quoting in full Alejo's hand-written notes on each. Here is the entirety of the first card:

 

117

(Obtained by Capital Case Project)

276. Below is the second card. On the inside Alejo has written, "This is the first riddle. I'll send the answer with the next riddle. Have fun!! Dad." Under that is the text that came written on the card, "These are just a few of the things we have in common!" And under that Alejo has written:

> "• I sometimes get balls caught in my throat.
>
> • My box smells.
>
> • I can have a little pussy."



(Obtained by Capital Case Project, copy attached at Tab 75)

277. A few observations from my August 2011 interview with Alejo are also illustrative, and confirm the much more detailed picture painted by others (presented below). As described earlier, Alejo would often say something in abstract terms only to completely contradict his statement, literally in the next breath, with an example or story. Similarly, Alejo repeatedly averred something about himself in words only to demonstrate that just the opposite was true via compulsive and impulsive behaviors.

118

278.  For example, on the one hand Alejo had defensive radar exquisitely attuned to any question that probed for sexual interest in Wendi or her friends.  He would, as Shakespeare put it, "protest too much," denying any and all such motives or behavior whenever a question implied or barely hinted at them.  When a question *was* explicit, as when I asked if he ever felt attracted teenager girls in his youth ministry and, if so, how he coped with that, Alejo flatly denied *ever* having felt *any* sexual attraction to those girls.  On the other hand, despite himself – and thanks to the sexual obsessions and compulsions that dominate his thoughts and motives to this day, at age 59 – in the span of three hours Alejo made several inappropriate and provocative sexual comments to the female investigator who accompanied me on the interview. For instance, when asked whether he felt awkward the day after having sex with Donna the first time (in a PADAC office), and how they "ended the night" if such awkwardness was present, Alejo mentally latched onto the "ended the night" phase, yanked it out of context and blurted out, "breathing hard, ha ha ha!" He then immediately and excitely looked for a reaction on the female investigator's face.

279.  Such automatic, excited, and pleasure-seeking sexualized behaviors – and not his forced, tense, and implausible denials of ever having felt any attraction at all to Wendi, her friends or other girls in his youth ministry – reveal Alejo's true thoughts, motives, and behaviors with respect to sex.  They are also consistent with the reports (detailed below) from several people who witnessed and were subjected to Alejo's compulsive and abusive sexual behavior in the church community where Wendi spent her older childhood and teenager years.

119

280. As shown below, such behaviors by Alejo Ochoa were probably the most powerful and destructive force in the childhood and adolescence of Wendi Andriano.

## VI.    AGES 4½ TO 7 – DOMINATED AND ADOPTED BY A PEDOPHILE

281. **Donna and Alejo have sex, Alejo moves in, and they marry.** Alejo and Donna both tell the story of how Alejo, on the PADAC board of directors when Donna was hired, decided he did not like Donna after finding remnants of marijuana "joints" under a mattress while helping her move to Casa Grande. (Tab 24, at ¶ 44; Tab 28, ¶¶ 47, 53) Yet within weeks of Donna's arrival, in February of 1975, after having no more than work-related conversations devoid of personal interest or attraction, Alejo and Donna suddenly had sex one night. As mentioned above, it happened in a PADAC office where Donna was working as Wendi slept in a nearby office. According to Alejo, "Late one night I went to the PADAC offices.... Donna and I started talking. The next thing I knew, we were kissing." (Tab 24, at ¶ 48.)

282. Within weeks Alejo was living with Wendi and Donna, and sleeping with them in the same bed, a mattress on the living room floor. (Tab 28, ¶ 69.) Donna recalls, "We never dated or had a courtship; we just had sex and moved in together." (Tab 27, at ¶ 184.) Alejo agrees: "We never really dated. We went from no relationship to being physically intimate in one night and then continued to see each other after that." (Tab 24, at ¶ 48.) On June 6, 1975, less than five months after first having sex, Donna and Alejo were married in a small ceremony. (Marriage License, Pinal County, Obtained by Capital Case Project)  According to Donna, they got married "because Rick Miller and Al Farmer, who were part of our Christian group... told us it wasn't right for us to be Christian and living together without being married." (Tab 27, at ¶ 184.)

120

283. **Alejo's initial relationship with Wendi: More focused on her than Donna, evidence of sexual and emotional abuse.** Alejo says that by the time he first had sex with Donna, he "already had a relationship with Wendi," based on several interactions with her around the PADAC offices where Donna let her four year old daughter roam. (Tab 24, at ¶ 49.) When asked during our interview how Wendi "fit into" his early relationship with Donna, Alejo responded, "I didn't marry Donna for Wendi. That didn't enter my mind" (underline denotes emphasis in his speech). As we shall see, in great detail, from the testimony of several witnesses, it appears that Alejo "doth protest too much." All available evidence suggests that then, and for the rest of Wendi's childhood, Alejo was not only more interested in a relationship with Wendi than with her mother, but that he was focused on having a sexualized relationship with Wendi.

284. Indeed, Donna recalls:

"Alejo was absolutely fascinated with Wendi as we were getting together, and once we were married Alejo's focus was mostly on Wendi. He was so much more interested in spending time with Wendi both before and after I married him than he was in spending time with me that it was almost like he married me to be with my daughter." (Tab 27, at ¶ 246.)

285. Donna also reports that Alejo began sleeping in the same bed with her and Wendi "shortly after they met," and that shortly after that Wendi began wetting the bed, which she had never done before. (Tab 27, at ¶ 244.) Wetting the bed is not an uncommon reaction of young children who are being sexually abused, and for Wendi's it may have been one of her only ways to resist unwanted contact from Alejo in the bed. Donna also recalls that when she awoke in the middle of the night to find that Wendi had

121

wet the bed, "sometimes Alejo was already awake" (Tab 27, at ¶ 244.)  That Alejo had been awake even before Wendi wet the bed, perhaps pretending to be asleep while doing things that led Wendi to wet the bed, would be consistent with the account of Alejo's behavior by a teenage friend of Wendi's, who reports that Alejo repeated fondled her breasts as she and Alejo slept in Wendi's bed, and that Alejo always pretended to be sleeping when abused her.

286.  Looking back on the first several months of 1975, Alejo says he remembers little Wendi as a "sweet, outgoing child" who begged for money after being taught how to panhandle by a 60 or 70 year old man who owned a furniture store next to the PADAC offices. (Tab 24, at ¶ 50.) Donna also notes that even before she and Alejo married, "Alejo spent time with Wendi and knew a lot more about her than I did... He's the one who knew that she was panhandling and going around to beg for money..." (Tab 27, at ¶ 245.) In his interview with me, recalling his first impressions of Wendi as a young child, Alejo exclaimed, "Once she liked you, she could melt your heart. Everybody loved her." Asked for examples of this quality, Alejo spoke of "a lot of innocence in what she did," then went on to tell a story. The story he told reveals Alejo's psychological and moral confusion (at the time and now), and how, as young Wendi's new and – thanks to Donna's ongoing neglect – *primary* parent and disciplinarian, Alejo almost immediately began inflicting his confusion on Wendi in abusive and destructive ways.

287.  The story: Not long after getting involved with Donna and sleeping at their house, Alejo discovered that Wendi had been drawing (apparently for weeks) with crayons on back of a bedroom door.  He called her into the room, pointed at the door and asked her to explain, to which she responded by proudly declaring, "Isn't it beautiful!"  It

was indeed the response of an innocent child, one who had been – in the absence of adult supervision – simply creating a work of art in a spot that felt right to her. As Alejo himself commented, "She didn't know. She didn't think it was a big deal." He told her that crayons could not be used on doors or walls and that she would need to clean the door, to which she did not object. Alejo then gave her a cleaning rag and stood over her, monitoring her progress until, after about five minutes of enjoyably cleaning the door, Wendi declared, as any four year old child would, that she was tired and did not want to clean any more. Alejo's response? He "made her stay there an hour and a half," forcing her to continue cleaning, unmoved by the fact that "she was crying" almost the entire time. For four year olds, being forced to do *anything* they do not like for more than fifteen or twenty minutes is very distressing. A full hour and a half, with constant crying that evokes no compassion in the adult, could only be traumatic. Yet Alejo clearly believed – just as Skip did when proudly telling me of spanking his infant daughter to make her stop crying – that I would be impressed by the wisdom and effectiveness of this example of his parenting.

288. In summary, within weeks of Wendi and her mother moving to Casa Grande in early 1975 Donna had, once again, handed her daughter over to a very confused and disturbed man. Donna was, once again, basically saying, "I don't want her. YOU take her." Alejo was more than happy to do so, and started what from then on would be the most important relationship in his life – and the most destructive one in Wendi's life, in which she would be subjected to Alejo's psychological, sexual and physical abuses for years to come.

123

289. **Donna and Alejo's early relationship, focused on religious fanaticism.** To the extent that Alejo had any interest in Donna, and that Donna and Alejo were connected to each other, their focus was not on their relationship with each other, let alone their shared responsibilities as Wendi's parents. Instead, Donna and Alejo were focused on their increasingly fanatical absorption in a small religious cult led by two men they had met in Casa Grande, Rick Miller and Allen ("Al") Farmer. Right after commenting that they never courted, "just had sex and moved in together," and got married because others told them too, Donna observes, "After I was married to Alejo, we became strict Christians. Rick and Al encouraged us to have meetings at our home…" (Tab 27, at ¶ 184.)

290. Rick and Al may have seen Donna and Alejo as the best candidates to create the local infrastructure for another small group of believers that they could indoctrinate, command and control. For example, Donna recalls, "it was common for Rick or Al to tell someone, 'I've got a Word. God says you have to break off from your family to join the ministry,' or 'God told me you are going into the ministry." (Tab 27, at ¶ 202.) In my interview with her, Donna shared a particularly sad early instance of such control and its potential to harm important relationships, in which Rick and Al ordered their followers to bring all of their family photographs and throw them into a fire. Donna dutifully complied, thereby destroying every picture she had of Wendi, as well as pictures of her sister and parents.

291. Like so many people who are vulnerable to being swept up in a cult, Donna and Alejo longed for someone or something truly and ultimately *good* – to love and care for them, to give them a sense of specialness and value as human beings, to rescue them from

124

the deeply ingrained feelings of un-lovability, unworthiness, and meaninglessness that were enduring legacies of childhoods of neglect, abuse, and demoralizing trauma.  Like so many swept up in cults, for a time Donna and Alejo apparently believed they had been "saved" in those ways by the God and the Jesus of their imaginations, thanks to the beliefs they were taught and the "revelations" they experienced under the tutelage of their zealous and hyper-controlling cult leaders.

292.  Donna recalls that on many occasions throughout her life, beginning when she and Alejo followed Rick and Al, she received "direct communication from God" while praying and speaking in tongues, and "healing and Gifts of the Spirit" in the forms of "being euphoric or held in a euphoric peacefulness." (Tab 27, at ¶ 192.) She describes how speaking in tongues can involve extremely intense positive or negative emotions, depending on what is being channeled through the person. She also notes "It's possible to say the wrong things or have things translated incorrectly, so that's why it's best to be in a gathering of 'saints' [true believers] when you exercise the gift…," and soon thereafter adds, "The pastors and elders of a church are more often the ones both speaking in tongues and translating." (Tab 27, at ¶ 195.) Whether or not speaking in tongues can be a valid religious experience involving revelations from God, Donna and Alejo were extremely confused and limited people, and highly vulnerable to manipulation by the leaders of their religious group.

293.  Alejo describes how, about two years before meeting Wendi and Donna when he was 22 years old, he came to "make Christ my Lord and Savior" with the encouragement of Calvin ("Cal") Lorts, with whom he had drank and used drugs in high school. Alejo's story of his first baptism is bizarre. The story includes Alejo, Cal and

125

Cal's brother Barry picking up a hitchhiker who claimed to be from another world, which
Alejo apparently interpreted as a sign from God. (Tab 24, at ¶ 37.) Like Donna, Alejo
also glowingly describes speaking in tongues. While Donna highly valued the euphoria
and "euphoric peacefulness" she experienced, for Alejo one of the best parts was
speaking "a heavenly language that is between God and me." (Tab 24, at ¶ 38.)  This fits
with what Alejo most loved about his drug of choice, LSD: being in his "own little
world" and not having to be "around people." When speaking in tongues, Alejo is in his
own little world, albeit while imagining God in there with him. Even more telling is
Alejo's account of his first time speaking in tongues: "I felt like a well had opened up... I
was freaking out. I could not stop and I did not want to. The feeling was unbelievable. I
got scared and went out on the road to pray. It felt like a sexual experience started and I
began to feel excited and it felt more and more like I was having an orgasm." (Tab 24, at
¶ 40.)

294.  Despite what Alejo saw as a very auspicious beginning, his initial sexually-
charged religious fervor was short lived.  Not long after Alejo's orgasmic speaking in
tongues experience, Cal Lorts left Casa Grande to study to be a minister. Alejo stopped
going to church well before he moved in with Donna and Wendi in early 1975. It was
Donna who introduced Alejo to Rick and Al. (Tab 24, at ¶ 62.)

295.  In May of 1975, the month before Donna and Alejo were married, Donna quit
her job because of what she saw as a "conflict of interest" between her work at PADAC
and her Christian faith. She became convinced that, given the high recidivism rates of the
drug abusers treated there, that "only Christian programs and finding God actually

126

worked to help drug addicts break free of their addictions and recover from drug use."
(Tab 28, ¶ 71)

296. **Wendi attends kindergarten and first grade in public schools, is adopted by**
**Alejo.** A couple of months after marrying Donna and Alejo left the apartment with Nicki
Barnes and her daughter Tascha and moved in with Alejo's mother; in September they
moved into newly built low-income housing in Indian Hills, on the outskirts of Casa
Grande. (Tab 28, ¶ 72)  Wendi attended public schools for kindergarten and first grade,
and Donna reports that Wendi got along well with her peers at school and continued to
have Tascha as her "main friend." (Tab 28, ¶¶ 72, 73)  Reports by Wendi's kindergarten
and first grade teachers document that she did well in school and progressed in her
learning over each year.  Her kindergarten teacher commented that Wendi was "stubborn
but likes to help peers" and her first grade teacher gave her "satisfactory" or "excellent"
ratings in all academic and social categories. (Saguaro Elementary School, 1975-1976
Kindergarten Report Card, Obtained by Capital Case Project; Evergreen Elementary
School, 1976-1977 First Grade Report Card, Obtained by Capital Case Project.)

297. On July 30, 1976 Donna and Alejo filed papers for him to become Wendi's
adoptive father. On January 31, 1977 the adoption was granted, and to his de facto
authority over Wendi's life, thanks to Donna's neglect, were added legal sanction and
rights. (Superior Court of the State of Arizona, Decree of Adoption, January 31, 1977,
Obtained by Capital Case Project.)

298. **Wendi absorbs religious beliefs of her parents, to her detriment.** Donna
reports that she and Alejo "didn't seek medical treatment" when Wendi was growing up,
because they "believed that God would heal us when we became sick." As Donna

127

acknowledges, this meant that Wendi almost never saw a doctor, even when she was quite sick. (Tab 27, at ¶ 186.)

299.  Donna recalls one instance, when Wendi was about five years old and "so sick that she had been crying and couldn't get up or move around." Already sick for a day or two, her fever started spiking and became "very, very high."  Donna and Alejo had no medicine, not even aspirin. Looking back Donna is aghast at their ignorance and recklessness: "Heaven forbid that we might have had any of the Devil's stuff, which at that time for us meant anything like a thermometer to measure a child's fever or an aspirin to help bring it down." (Tab 27, at ¶ 187.) Wendi's condition worsened over the next few hours, Donna finally got scared enough to break free of her "God will heal us" delusion and finally declared, "I'm taking her to the doctor," to which Wendi replied, "No, I don't want to go to the doctor. Jesus is going to heal me." (Tab 27, at ¶ 188.) Alejo was content to go along with what Wendi said, and Donna did not take her. They prayed together instead, and eventually the fever passed.

300.  Looking back now, Donna notes, "It's hard to believe in retrospect that we listened to a five-year-old and prayed instead of seeking medical attention, but that's how we were at the time." (Tab 27, at ¶ 189.)

301.  **Wendi's autobiographical memory impairments and minimal memories of age five to seven.** As noted previously, before age five the region of the human brain necessary for encoding long-term memories of specific life events has not sufficiently matured to reliably do so, except for highly emotional events that are discussed with others over time (as that part of the brain matures). After age five, however, such memories are continually being encoded, and those with heightened emotional and

128

personal significance will generally be accessible for retrieval for the rest of one's life. Importantly, those memories are not like videotaped representations, or totally accurate renditions of what happened that do not change over time. Rather, the central or most significant details tend to be accurate and resistant to change over time, but in general the memories are malleable and, every time they are retrieved, subject to "editing" processes – based on current emotions, self-understandings, etc. Thus normally an adult will have a large store of personally significant memories beginning at age five, including memories of events that were particularly emotionally significant when the events occurred and that remain emotionally significant, though perhaps in different ways thanks to new adult understandings and interpretations. Finally, although every emotionally significant autobiographical memory may not be easily and instantly accessible under all circumstances, with the right "retrieval cues," including non-suggestive probes from a skilled interviewer, a person should be able to retrieve them into awareness.

302. In my interviews with Wendi, she had remarkably few memories of her *entire* childhood, not just before age five. When Wendi did remember something from those years, she tended to remember in generalities, not in specific episodes. A significant body of research has shown that such "over-general autobiographical memories," or difficulty recalling specific events, is common in people who suffer from depression and/or PTSD. The latest research suggests that the person's brain automatically and prematurely aborts the "strategic search" processes necessary to retrieve such specific "episodic" memories, and does so out of (automatically-arising and usually non-conscious) fear that retrieving such memories will release unwanted, unpleasant, disruptive, and potentially overwhelming emotions.

129

303.   Another well-established explanation of the inability to recall specific memories, particularly ones involving traumatic experiences of abuse and betrayal by parents and caregivers, is that the brain "dissociates" or disconnects such memories and related representations (e.g., images of and beliefs about oneself and others) from representations that constitute more typical and safe ways of perceiving, thinking and remembering in daily life. This dissociation, like the premature aborting of strategic search for memories, includes automatic attempts at self-protection in the moment; it also can involve chronic disconnections from each other of whole realms of experience and identity, such that personality and identity are highly fragmented.  That is, all of us have different ways of thinking, feeling, remembering and relating to others, and some of them – those associated with intense emotions like fear, shame, or anger, or an intoxicated state, for example when one's had too much to drink – are very different from the ones we embody and identify with on a day to day basis. That's why we look back on embarrassing emotional outbursts or other extreme behaviors and think, "I can't believe I did that," or "That's not how I want to be." For highly traumatized people who experienced chronic neglect and abuse in childhood – and never had loving and supportive relationships to help them deal with the feelings and memories – those extreme "not-me" or "another-me-I-don't-like" states can include whole realms of memory (e.g., experiences of sexual abuse by a father) and feeling (e.g., fear, anger); can be much more frightening; and, when they do emerge, can be much more disruptive of thinking and behavior. When this is the case, the person is "highly fragmented" and ordinarily lacks conscious access to feelings and memories associated with childhood neglect and abuse, especially those of fear, shame, sadness or anger.

130

304. Based on my multiple interviews with Wendi Andriano, it is my assessment that she is extremely traumatized from childhood neglect and abuse, and suffers from an extremely fragmented personality. In the constrained context of our interviews, this manifested most clearly in Wendi's remarkably limited ability to retrieve specific autobiographical memories, especially from childhood; in her extreme difficulty accessing specific memories of unpleasant experiences, especially (though not only) from childhood; and in her extreme fear of accessing such memories, including her fear, stated from the outset of our interviews, that such memories might not be accurate and might cause harm to others, especially her adoptive father Alejo. Even when it comes to Wendi's over-general autobiographical memories, she is often unable to access any visual images. She repeatedly said "I feel like" this or that used to happen, but was unable to call up any images or other memory representations (e.g., words spoken) of what she "feels" was said or done. Wendi appeared to be making genuine and concerted attempts recall images and words, but simply drawing blanks. She often apologized and spoke of feeling bad about failing to remember more than such feelings. I have never before encountered a patient or defendant with such a severe disturbance of the capacity to recall autobiographical memories, not only of specific incidents but over-general memories of the kinds of experiences she typically had.

305. With this assessment of Wendi's memory dysfunction and personality fragmentation in mind, we can consider the few memories Wendi does report from the time in her life between first meeting Alejo (at four and a half years old) and completing first grade in Casa Grande. As noted above, she recalls almost nothing of her mother, except of her mother sewing clothing for her when she was in kindergarten, a memory

131

which has no sense of emotional connection to her mother and led to the associated sad recognition, "I don't have that feeling that she loved me." Wendi also recalls feeling sad about not seeing her grandmother any more after the move to Casa Grande. Asked for her earliest memories of Alejo, Wendi replied, "Nothing specific," then added, "I do know that my Grandma didn't like him, and I was aware of that." She also recalls, in general terms, that from as early as she can remember she "always knew his background, that he was not from the church," and that he told her stories of having done drugs and being a "drug mule." Wendi also reported general but not specific memories of kindergarten, specifically of being "motherly" toward the other children and really liking it "because I always had a lot of them around me and got a lot of attention there."

306. Finally, Wendi reported general memories that, since her arrest and before examinations by defense experts, had led her to wonder about sexual abuse by her biological father or other members of his family. From as early as she could remember, she said, "I always had that awareness of sexuality, but you're not supposed to as a child, so why did I have that in my head all the time?" She elaborated further, looking back over her entire childhood, though again, the memories cover from age five on up: "Being aware of that extra something that always comes from men.... Growing up I always used to think that men were always so sexual about everything. Along with the disgust would come this need, because I was always pretty flirtatious to men. It was really important to me that I had their attention. But then, when I would get their attention, I felt like I was nasty. It doesn't make sense to me." These are classic symptoms exhibited by girls sexually exploited and abused from an early age, before their brains could encode specific autobiographical memories that could be retrieved later in childhood or

132

adulthood. Indeed, what Wendi describes – the inexplicable yet ever-present awareness of men's sexual attention, the automatic yet disturbing responses to that attention – are well-known among child abuse researchers and therapists as *implicit* memories of sexual abuse and *procedural* memories of how the child was conditioned to respond to that abuse.

## VII.   AGES SEVEN TO NINE – POVERTY AND FANATICAL CONTROL OF A "TRAVELING MINISTRY" CULT

307.   In the first decade of their adult lives and the early years of Wendi's, Donna and Alejo were particularly confused, and often deluded. This manifested most clearly in their being swept up into the religious cult led by Rick Miller and Al Farmer, and their bringing Wendi along for the ride while never stopping to think seriously about her needs for stability and well-being.

308.   Looking back now, Donna acknowledges just how desperate she and Alejo were to be good, and to serve and be loved by God – and how their desperation was matched by their confusion:

"We were young in the Lord at the time when we entered the traveling ministry and very zealous Christians. In those days after we received revelations from speaking in tongues, we pulled out scriptures to make them match what we wanted to believe or make them mean what we wanted them to mean.... we went over the edge because we were so intent on doing everything right, the way we felt God wanted us to do everything." (Tab 27, at ¶ 203.)

309. **Joining the "Fishers of Men Traveling Ministry."** As noted above, Donna remembers Rick and Al telling people God wanted them to leave their families and otherwise follow Rick and Al's mixture of self-serving and self-deluded visions and demands. Sometime around June of 1977, Donna and Alejo heeded that call. They believed it had first come "from God through prayer in tongues" (Tab 27, at ¶ 204) and that they had received "confirmation while praying in tongues with Rick and Al translating." (Tab 28, ¶ 77.) Donna recounts how she and Aljeo "gave up our house and possessions except for a couple of boxes… and departed to go on the road with Rick Miller and Al Farmer…" (Tab 27, at ¶ 204.) Not only did they leave their few remaining possessions behind, but they "cut off all contact with family and everyone else we had known and stayed out of contact for the entire time, from about June of 1977 until about September of 1979." (Tab 27, at ¶ 204.)

310. Donna also acknowledges that she and Alejo never considered Wendi's needs when making their decision. "Alejo and I never thought about what Wendi wanted or what might be good for her in our decision to join the traveling ministry." As Donna recalls, by that time "Wendi was so obedient, and used to being around adults… that when we told her we were doing what God wanted us to do, she fully and unconditionally accepted that." (Tab 28, ¶ 78)

311. The group's plan or mission was to travel from Arizona to California, teaching their version of the gospel along the way, and recruiting others into their group, until reaching California where they would join Rick and Al, who had another church there. (Tab 24, at ¶ 63.)

134

312. Not surprisingly, their fellow travelers in this "traveling ministry" were apparently as wounded and confused as they were, and those with children were equally incapable as parents. For example, Donna and Alejo report that the group's first stop was Wilcox, Arizona, where Donna recalls staying for a few weeks until they left suddenly, in the middle of the night, "because Child Protective Services [CPS] had been called and a report made about Rick and Rosalie [a woman in the group] abusing Rosalie's baby son and her daughter, who was about two or three years old." (Tab 27, at ¶ 205.) After the CPS visit Rosalie left with the group, abandoning her children to her own mother and, as far as Donna knows, Rosalie never regained custody. (Tab 27, at ¶ 205.)

313. Next they went to Tucson and, for about ten months of 1977 and 1978, stayed in the home of another woman in the group "while trying to get the traveling ministry together." (Tab 27, at ¶ 207.) From that point on the group had a core of nine people including Donna, Alejo and Wendi; others would join temporarily but not continue on to the next destination along the route to California. In Tucson the goal was to amass resources for the journey to California. Alejo and the other men painted houses and did temporary odd jobs to pay for living expenses. (Tab 27, at ¶ 208; Tab 24, at ¶ 64.) Alejo reports that a painting business owner fled to Mexico without paying $12,000 in wages owed to Alejo and another man from the traveling group. (Tab 24, at ¶ 64.) The women did cooking and cleaning and other home-based tasks, including schooling Wendi.

314. **The traveling cult on the road: Poverty, totalitarian control and brainwashing.** Eventually the group left Tucson, in a caravan consisting of a converted school bus pulling a VW van and a pick-up truck pulling a fifth-wheel trailer. (Tab 24, at ¶ 66; Tab 27, at ¶ 207.) The school bus had a kitchen and a "toilet-type thing, like a

135

portapotty." (Tab 27, at ¶ 207.)  From then on, for at least another year, the group would live in extreme poverty. John Shaddle, who joined and traveled with the group while Wendi's family did, for about five months in 1979, recounts how poor the group was. "There wasn't much food around, for one. A meal consisted of tortillas and fried tomatoes." (Tab 36, at ¶ 6) Donna remembers often being so hungry that they "ate old food out of the trash or searched for pennies on streets to try to collect enough money to buy a bag of beans." (Tab 27, at ¶ 213.) Stephen Shaider, who would come to know Wendi's family after they left the traveling cult, recalls Donna telling him the group depended on Wendi's panhandling to support themselves, and that "no one could resist a cute girl begging for money." (Tab 35, at ¶ 6.)

315.  The poverty of freedom and personal autonomy was just as extreme, and perhaps even more harmful to Rick and Al's followers, including young Wendi.  Donna recalls how Rick exerted constant dictatorial control over the group's resources and his followers' behavior and thinking – over all money; over who could do what, and when, including who they were allowed to talk to; and over regimented daily routines that caused chronic sleep deprivation.

316.  As John Shaddle recounts, Rick was "a very charismatic person... the 'big hook,' appealing to many people who took interest in the ministry." (Tab 36, at ¶ 2.) At the time, John was nineteen years old and, having just separated from his wife, vulnerable to being swept up in the group. John notes that Rick and Al were older than their followers, who aside from him were, like Alejo and Donna, in their early to mid-twenties. Looking back, he says, "In hindsight, the group was pretty far out there and today I would describe it as a cult." (Tab 36, at ¶ 3)  Donna goes into some detail:

P-App. 002264

"We woke up at a set time, five o'clock in the morning, when Rick and Al decided we should get up, and the adults and Wendi were expected to wake up singing, 'Glory, glory, rise and shine and give God glory,' and continue singing until everyone was up…. [E]ventually we all just hated to hear them singing and having them wake us up…. We didn't get much sleep for most of the time… It was really a lot like brainwashing. We studied scriptures every day before we ate, washed up, or did anything else other than maybe going to the bathroom. Rick and Al kept us on a very tight routine all day." (Tab 27, at ¶ 210.)

317.  Donna recalls how, in classic cult fashion, "other than the people we ministered to and the occasional prospective members of the ministry, we did not associate or talk to other people or outsiders because Rick and Al did not allow it." (Tab 28, ¶ 84.)  Donna also recalls how Rick and Al "always assigned plenty of chores to keep us busy at all times… Everyone was always so busy that we never had a chance to just sit and relax. With extremely rare exceptions, there was zero leisure or personal time during our years with the traveling ministry…. It got so that we never really thought about anything, just did what we were told all day, from one day to the next. I can see in retrospect how it got to be like a cult." (Tab 27, at ¶ 212.) Indeed, everything Donna describes is consistent with how cults are run, with the leaders exerting totalitarian control over their followers, including when they can eat or sleep. And the chronic imposition of sleep deprivation and indoctrination, in this case constantly reading scriptures interpreted for them by Rick and Al, are standard mind control techniques used by cult leaders.

137

318. This totalitarian control was applied to Wendi too, the only child in the group. She was always assigned chores when she wasn't being schooled. These included washing dishes, cleaning up the living area, helping to wash the vehicles, and being a gofer for the seemingly unending stream of construction projects. (Tab 27, at ¶ 212.) For two years, Wendi had little or no time to simply *play*. Instead, she was forced to serve others, and to make sure the adults, especially the men who ordered everyone else around, were happy.

319. As described above, Wendi had been conditioned to obey and serve adults from the beginning of her life, when Skip harshly imposed his potty training regime on her. When Donna handed Wendi over to Alejo, before the traveling cult, he picked up where Skip had left off. The traveling cult was an extension and intensification of the domination and subservience to which Wendi had always been subjected by her mother's husbands. Before the traveling cult, if no controlling and abusive men were around, Wendi could play with her friend Tascha; when in day care, as well as kindergarten and first grade, Wendi could play with other children in classrooms and on the playground. Before the traveling cult, she had always had opportunities to be free from controlling adults and (often) abusive men. For those two years in the traveling cult, however, there was virtually no escape from control by Rick and Al. There was little or no time for play. This could only have a dispiriting and depressing effect on Wendi – as it would on any child – no matter how much her innate temperament may have inclined toward cheerfulness and playfulness.

320. Finally, Donna and John Shaddle both describe how members of the group, when not doing chores or working to support the group, would go out preaching and

138

"ministering" on the streets, which meant singing, reading scripture and preaching their interpretations of scripture. (Tab 36, at ¶ 6; Tab 27, at ¶ 211.) John recalls that Rick and Al, who sent the younger men to work every day and controlled every penny they made, never worked themselves. Instead, they would stay back with the women and Wendi, reading scripture all day as the females did chores and Wendi was schooled. (Tab 36, at ¶ 7; Tab 27, at ¶ 216.)

321. **Wendi's home and on-the-road schooling.** Wendi was the only child in the traveling group. When she would otherwise have been in second and third grade of formal schooling, she was home-schooled by her mother and other women in the group, who used teaching materials from a private school organization and old textbooks. Donna recalls teaching Wendi English in the mornings, and two other women teaching her Spanish, as well as science (sans evolution) from the textbooks. A man in California briefly taught Wendi math. (Tab 27, at ¶ 215.)

322. **Increased physical abuse of Wendi.** As described above, from when Wendi was a toddler Donna had used spanking and physical pain not only to discipline Wendi in the traditional sense, but whenever she "didn't obey" or "didn't come when I called." (Tab 27, at ¶¶ 235, 236.) And as explained above, this infliction of physical force and pain to command and enforce obedience – obedience that must be instantaneous, unquestioning, and complete – hindered Wendi's development of self-regulation capacities and her internalization of the very rules and values (aside from mindless obedience based in fear) that Donna was trying to teach her. To the extent a child's behavior is governed by force, pain and fear, she will have trouble regulating her own behavior and experiencing the rules and values parents teach as belonging to her, rather

139

than simply *obeying and complying to get her parents' approval and to avoid their rejection and attacks*.

323.  When all of the adults in a child's life responsible for teaching rules and values are punishing and controlling her in this way, the conditioning is more powerful and the negative effects more pervasive. Wendi's entry into the traveling religious cult marked the beginning of near total immersion in fanatical and totalitarian religious micro-cultures where children were constantly dominated and controlled through physical violence, pain and fear – and robbed of their innate potentials to develop healthy self-control, critical thinking, and other essential capacities for growing into emotionally healthy and morally unconfused adults.

324.  Donna describes her own mindless obedience to the commands of church and cult leaders to instill mindless obedience in her own child:

> "Since Wendi was born, I've always been to-the-letter, black-and-white when it comes to following church rules, including rules about disciplining kids, by which we meant spanking or swatting them.  If the church authorities say to spank the kids, I spank them, and I do it how I'm told to do it.  You have to spank them hard enough so they're not just angry; it has to go beyond that so you break them. They have to stop being angry and learn to obey." (Tab 27, at ¶ 237.)

325.  Donna reports that it was after becoming followers of Rick and Al, when Wendi was six or seven year old, that she and Alejo began beating her with a wooden paddle. (Tab 27, at ¶ 237.) Alejo confirms this and explains that, in his mind, beating with a paddle and then reading scriptures together and hugging at the end, which he calls

140

"spanking with instruction," was far better than simply screaming at Wendi when she broke a rule or failed to instantly obey. (Tab 24, at ¶ 126.) As with Alejo's account of forcing a sobbing little Wendi to wash crayon off the bedroom door for an hour and a half, it is notable that Alejo does not consider any other options for discipline, besides screaming at her or "spanking with instruction," that would have been appropriate to Wendi's developmental capacities and needs.

326.   To this day Donna, Alejo, Wendi and many members of the still more violent church/cult they joined later, refer to beating children with a wooden paddle as "swatting" and as each blow as a "swat." Compared to the traditional word, "spank," the euphemistic "swat" sounds innocuous. Yet the violence of hitting a child's body repeatedly with a wooden paddle, the pain inflicted, and the resulting emotional harm are greater than those of hitting a child with one's hand.

327.   Donna recalls how during the traveling ministry, she and Alejo beat Wendi with a wooden paddle about once per week, but Rick and Al "expected us to swat her more often than we wanted to." (Tab 27, at ¶ 238.) In addition, when parents were not around Rick and Al beat Wendi and other children (who lived in houses the group stayed in but did not travel with them). Donna witnessed Rick and Al beating other parents' children, including how "they swatted really hard, a lot harder than Alejo or I did, and harder than I liked Wendi to be hit." Because Rick and Al thought Wendi should be beaten more than her parents did, and Donna and Alejo were "gone a lot and left Wendi with Rick and Al or other adults frequently," it is likely that Wendi received many painful beatings from Rick and Al during the two years she was in their cult. (Tab 27, at ¶ 238.)

141

328. The results of all the beatings were predictable. As Donna recalls, "during the traveling ministry and afterward, Wendi was always a good kid. She acted like a kid who has been adopted, knows it, and is afraid of being turned out. With very few exceptions, she was always trying to please, be nice, give in, and fit in with whatever authority figures around her expected." (Tab 27, at ¶ 219.) That is, if Wendi was a "good kid" in her behavior, it was not because her innate goodness as an innocent child had been supported and nurtured in loving relationships with adults who helped her to assert her own will and think for herself while internalizing those adults' positive values. Wendi was a different kind of "good kid." She was a child whose parents and other adults had beaten down much of her innate goodness, beaten out much of her innate potential to think and act for herself in healthy and age-appropriate ways.

329. Donna continues: "By the end of our time with Rick, Al, and the traveling ministry, by the time Wendi was nine years old, she had changed a lot. She wasn't the same energetic little girl she had been. She didn't want to get up in the morning and she didn't have the same spunk and independence. She didn't talk to me, and she wasn't affectionate with me anymore." (Tab 27, at ¶ 220.) Wendi was depressed after two years of immersion in an impoverished, totalitarian cult where her brain-washed parents and the cult leaders repeatedly beat her into fearful submission. And she was withdrawn, at least from her mother, who – unlike her immature and pedophilic adoptive father, who increasingly forced himself upon Wendi as a playmate and sexualized partner – had always neglected her daughter and yet took for granted that Wendi would keep being affectionate toward her. Sometime during the traveling ministry, "by age eight," Donna reports, Wendi "wasn't cuddly anymore and didn't let me hold her or hug her anymore."

142

Donna says this refusal to be affectionate applied specifically to her (e.g., during the traveling cult Wendi would hug strangers and "cuddled up to Rick a lot"), and it continued through Wendi's teen years. (Tab 27, at ¶ 218.)

330.  Alejo, in contrast, to this day appears oblivious to the harmful effects of the traveling cult experiences on Wendi. When Alejo looks back on this period, he says, "Thinking of Wendi during this time and later on, when we returned from the ministry, when she was eight, nine, and ten years old, she was a bubbly, outgoing, friendly kid." Then he adds: "Wendi always wanted to please me and please others." (Tab 24, at ¶ 70.) In short, as long as Wendi's fear and compliance served his needs, and her depression caused no problems for him, she seemed perfectly fine to him.

331.  **Leaving the traveling cult.** John Shaddle tells the story of when the traveling cult began to dissolve. When the group arrived in Costa Mesa, California, "things changed philosophically." A local pastor there, Chuck Smith, inspired Rick to reconsider traditional organized religion, and as John remembers it, Rick then said to the group, "We have a problem. We have to submit to somebody." Yet when Rick wanted to fold his group into Chuck's church, "Chuck told us that the best thing we could do is split up and go our own ways because we had all been brainwashed." John recalls, "That was enough for me." Already fed up with the "hypocrisy and all of the confidentiality about money," he left the group. (Tab 36, at ¶ 11.)

332.  Neither Donna nor Alejo explain why they decided to leave the traveling cult. Alejo does mention that the plan to start a church was never fulfilled, and says cryptically, "Our decision to travel with the ministry and to return when we did was inspired by God." (Tab 24, at ¶ 69.) Donna mentions that "it did get very weird at times"

143

and that another member of the group told her that, after she and Alejo left, "Rick and Al kept trying to raise people from the dead," even "toting dead people around with them" and "keeping a body with the group for a period of time while they intended to raise it from the dead." (Tab 27, at ¶ 217.) Perhaps things eventually got too bizarre even for Donna and Alejo. Whatever the reasons, Donna, Alejo and Wendi left the traveling cult around September of 1979 and returned to Arizona.

333. Looking back and thinking about the effect the traveling cult had on Wendi, Donna once again reveals how much she neglected her daughter. Donna says that although the hunger and lack of clothing for Wendi "bothered" her,

> "it never even entered my mind that the hunger, always working and having little or no relaxation and playtime, getting very little sleep, most of the time having no other children to play with, and the disciplining we did by swatting Wendi, might be damaging to her. The way we saw it was that it was good for her because we were living the life God wanted for us and Wendi had attention from all the adults in the ministry." (Tab 28, ¶ 86).

334. **Wendi's memories of the traveling ministry.** Consistent with Wendi's generally impaired memory for childhood experiences, in our interviews she reported no memories of Alejo during this time, and only one memory of her mother, in which Donna intentionally broke her own glasses "as an act of faith" and claimed that God would heal her eyes. (Donna continued to need corrective lenses.) The only positive memory Wendi had of the traveling cult was of playing the guitar and singing, which was part of Bible reading and prayer. Otherwise Wendi reported very little memory, even of a very general or schematic kind.

144

335. In some ways, the traveling cult may have protected Wendi from Alejo, since she and the women were typically separated from the men besides Rick and Al. After leaving the traveling cult Wendi's family joined another cult – one with equal or greater confusion, brain-washing, and violent attempts to enforce mindless obedience – and Alejo increasingly imposed his compulsive, perverted and pedophilic sexuality on Wendi and her friends.

## VIII.   AGES NINE TO EIGHTEEN – NO ESCAPE FROM NEGLECT AND EMOTIONAL, PHYSICAL AND SEXUAL ABUSE IN HER HOME, CHURCH AND SCHOOL

336. Upon leaving the traveling cult and returning to Arizona, Donna, Alejo and Wendi lived for a few months in Tuscon, with Donna's father. Donna continued to home school Wendi, who would never again attend public school except for a few community college classes in high school. By the end of 1979 they had moved back to Casa Grande. (Tab 27, at ¶ 221; Tab 24, at ¶ 71.)

337. Alejo had a hard time finding work in Casa Grande, according to him because he was "not well connected" and could not get union jobs. (Tab 24, at ¶ 74.) Donna's source of minimal income was babysitting the children of two friends, paid for by a state babysitting program. (Tab 28, ¶ 87.) For a year or so, Wendi was reunited with her friend Tascha Barnes, with whom she had lived when her mother first moved to Casa Grande, until Donna and Alejo got married and moved out. (Tab 28, ¶ 87.) Although Wendi was finally able to play regularly with other children again, Alejo recalls that, upon their return to Arizona, "it seemed like she was a little adult. As a child, Wendi was always mothering, even me and kids her own age." (Tab 24, at ¶ 73.)

145

338. Soon after arriving in Casa Grande, Donna and Alejo began attending a local church named "91st Psalm Church," led by Cal Lorts, an old high school friend of Alejo, with whom he had done lots of drugs. As described above, along with his brother Barry, Cal was intimately involved in Alejo's conversion to fundamentalist and evangelical Christianity – which had morphed from something akin to a few psychedelic and sexually supercharged trips with Cal and Barry (e.g., hitchhiker from another world, orgasmic first speaking in tongues) into an embrace of cults led by charismatic, deluded and authoritarian leaders. Donna recalls that, after the traveling cult, 91st Psalm seemed "less involved and engaged" and "not strict enough," with church members who were "undisciplined in their faith." Yet she and Alejo decided it was "the best option we could find. Alejo and I were still very young and zealous. If it wasn't for 91st Psalm, I don't know what we would have done because there were no other churches that seemed at all serious to us in or near Casa Grande." (Tab 27, at ¶ 222.) At least, Donna thought, 91st Psalm was a "full gospel church" that included speaking in tongues "to receive direct revelation from God, raising the dead, and everything else that's in the Bible." (Tab 27, at ¶ 223.)

339. Snapshots of Donna and Alejo's zealotry and confusion at the time are contained in letters Donna sent to Alejo while he attended a "Laborer's Union School" in Prescott, Arizona. (Tab 24, at ¶ 72.) While Alejo was away Donna moved from Tucson to Case Grande and began attending 91st Psalm. In one letter Donna describes a Bible study group attended by Alejo's mother and sister, bitterly recounting how a woman in attendance asserted that a verse on the Trinity, which Donna was quite attached to, had been added by English writers and was not in the original text. She criticizes the woman,

146

says she does not want to go back to the group, even though its members are expecting

her to, and asks Alejo, "Should I get in touch with Calvin or what?" (Letters from Donna

to Alejo, Obtained by Capital Case Project.)  A letter from a few days later appears to

document her first visit to 91ˢᵗ Psalm, although Cal is away for a preachers' meeting in

California, which prompts Donna's comment, "Guess the Lord has it in control." (Letter

from Donna to Alejo, Obtained by Capital Case Project.)  Donna's letters are sprinkled

with non sequiturs like, "Praise the Lord. He'll get the glory. Jesus loves you, babe!" and

"Jesus is the God over the way we feel!"  (Letters from Donna to Alejo, Obtained by

Capital Case Project.)  The margins often have scripture citations.

340.  Other passages reveal Donna's longings for recognition as a special person,

which she never experienced as a child. In one she tells a story of receiving some special

treatment at the DMV and ends, "they were real nice to me. Must've thought I was

somebody – and I am – a child of the King!!!" (Letter from Donna to Alejo, Obtained by

Capital Case Project.)  In another Donna reveals how she saw herself and Alejo as not

merely special to God, but an extra-special and extra-powerful team that God was using

in the world:

> "I was thinking how people would be expecting me to be out doing lots for the
>
> Lord and stuff while you're gone. I mean like they would say I have a mind &
>
> life of my own. But I'm part of a team. You and me together are in God's
>
> plan. We can both still minister the Lord and do for God, but like a high wire
>
> team – they can each do tricks but without the other one there they can't do
>
> the big stunts. They need each other. That's how we are – together we can be
>
> and should be one of God's big guns! Hallelujah!" (underline in original;

147

Letter from Donna to Alejo Ochoa, Thursday November 15, 1979, Obtained

by Capital Case Project.)

341. **Family joins 91st Psalm Church, Wendi goes to the church's school.** Soon

Donna and Wendi were attending 91st Psalm. Alejo recalls that, upon his return, Cal

asked him to "teach teens on Sunday mornings." (Tab 24, at ¶ 75.) By early 1980 Wendi

was attending the small, church-run 91st Psalm School. For the rest of Wendi's childhood,

that church and its school would constitute almost the entirely of Wendi's social life

outside of her immediate family, and thanks to Alejo's roles in the church, the boundaries

between family and church were often blurred.

342. There are many witness reports of the culture of 91st Psalm Church and the

school, from when Wendi's family joined right through her teenage years, especially

during its later years, when it was lead by a very disturbed and destructive man, Tom

King. The accounts of these many witnesses, who were themselves parents or children at

the time, are consistent with those of Donna and Wendi, and provide many additional

stories and details.

343. **91st Psalm/Harvest Family Church and school: Power-hungry, charismatic**

**leader followed by power-hungry, non-charismatic leader.** The 91st Psalm church

was led by Cal Lorts from 1975 until sometime in 1983, when Tom King became its

leader and re-named it Harvest Family Church. There were continuities across Cal's and

Tom's leadership, but differences too. What members liked about Cal and the

community was generally lost with him, and Tom exacerbated the negatives – already

numerous – and added many new ones of his own.

148

344. Donna describes how Cal Lorts "tended to be very dictatorial, and that at least fit right in with what we were used to." He was also "very charismatic" and the kind of person who got people "excited about bringing other people into the church." Looking back Donna sees Cal as "exactly the kind of man you drink punch for, like Jim Jones." Indeed, more than one witness has compared Cal Lorts and his successor Tom King either to Jim Jones, an infamous murderous cult leader from the time, or Warren Jeffs, from more recent headlines. Donna recalls that Cal created "God's Special Forces," which involved married men quitting their jobs, leaving their families, and traveling the country for a year to recruit others into their church/cult. (Tab 27, at ¶¶ 224, 225.)

345. Most cult leaders have good intentions intertwined with their desires to control and dominate others. Those with charisma can be very engaging and charming people, even lots of fun. As George Carlin, who joined the church when it was in Cal's living room and helped build it, remembers: "The teachings of the church at that time focused on proselytizing, bringing others into the church. Pastor Cal Lorts was a very charismatic figure. The congregation just loved him. He had a very magnetic personality." Jasper Neace was around twelve years old when he became a member of the church and student of the school, around the time Wendi arrived. He recalls Cal's charisma too, and compares him to Tom King when it came to laying on hands to heal someone during a church service: "Calvin could make you believe anything. He was charismatic." In contrast, when Tom laid on hands, "I saw people pass out. I thought they were faking it." (Tab 11, at ¶ 17.)

346. Tom King is universally described as not only dictatorial and power-hungry – like Cal – but also as cold, harsh, mean, vindictive, humorless, and joyless. Each former

149

church member has their own particular perspective based on their personal experience, with some saying Tom was positive at first and then went downhill, and others recalling him as a nightmare from the start. But every witness agrees that Tom King quickly – and increasingly over time – became a terribly destructive force in their own lives and the lives of others in the church/cult community, especially the children. Parents and their now-grown children, looking back on their years under his domination, tell of being unable, to this day, to speak with each other about their experiences during that time; either the grown child explodes in rage or the adult collapses into tears of remorse.

347. In the recollection of Jeri Lynn Cunningham, a friend of Wendi's until she was about thirteen years old, after Cal's announcement that he was leaving, "Pastor Tom stood up and said, 'I'm glad he's leaving,' and proceeded to tell the congregation that Pastor Cal's leaving provided him with the freedom to do what the Lord called him to do. It was a very memorable statement." (Tab 12, at ¶ 9.) Cynthia Schaider, who remembers Cal as charismatic and liked by everyone, recalls, "When Cal left, there were dramatic changes. I remember people saying that all the good people left with Cal." (Tab 34, at ¶ 12.) She describes how Tom, lacking Cal's charisma, tried to put a positive spin on his shortcomings by seeing himself as a "teacher" rather than a preacher, as a "common man." (Tab 34, at ¶¶ 12, 13.) Ms. Schaider recounts: "Over time, Tom King became more rigid and oppressive, almost tyrannical. He did not preserve the sanctity of the pulpit…. It became a 'bully pulpit' that he used to control the lives of church members. He tried to put the weight of God behind everything he said, even when it was obviously his own opinion." (Tab 34, at ¶ 13.)

150

348. Ms. Schaider provides an example of Tom's public cruelty and sadism: When Wendi's adoptive brother Brandon dyed his hair orange, Tom responded, from the pulpit during a sermon, by saying that the twelve or thirteen year old boy looked like a "faggot." Tom then "instructed" everyone in the congregation to ridicule Brandon. (Tab 34, at ¶ 13.) Alejo confirms that Tom used to call Brandon a "faggot." (Tab 24, at ¶ 138.) Recalling this incident and innumerable others, Ms. Schaider notes that "Tom was socially inept and did or said whatever came to his mind. There was not any social filter in his brain.... Tom King used ridicule, humiliation, strong statements, and the fear of God to influence his congregation." (Tab 34, at ¶¶ 14, 15.)

349. Similarly, George Carlin recalls there being a "major shift" when Tom took over:

> "It became something completely different under Pastor Tom's rule. Pastor Tom was very controlling. He was condemning – literally condemning. He had a number of rules that if broken, meant you were going to Hell. Just the way he looked at me and other members of the church, it was as if he had the ability to say 'you're not living right,' or 'you're not doing right,' just with his gaze. He was scary and the children were scared of him as well." (Tab 11, at ¶¶ 4, 5.)

Though Carlin himself could not bear to pay attention to Tom's sermons, and often slept through them, he remembers "someone saying, 'What has gotten in to Pastor Tom,' referring to how extreme his sermons had become." (Tab 11, at ¶ 6.) Looking back now Mr. Carlin muses, "Pastor Tom had some of his congregation brainwashed. It reminded me of the cult leader Jim Jones, but on a smaller scale." (Tab 11, at ¶ 7.)

151

350. His memory is consistent with that of his ex-wife, Constance Boys: "When Cal Lorts left, the church was different, but not dramatically so. In the beginning Tom's sermons were pretty typical, but they became so harsh over time. The church became very cultish, though it didn't start that way. Everything became so warped." (Tab 10, at ¶ 5.) In recent years, when Ms. Boys saw a television documentary on Warren Jeffs, she thought "that there were many parallels between that religious cult and our own. It was definitely the same type of control." (Tab 10, at ¶ 33.)

351. As many witnesses recall, Tom created a terribly oppressive environment. Jasper Neace remembers how Cal was "more positive and optimistic," and "could make you feel good" with his "shorter and more exciting" sermons. In contrast, Tom revealed himself as a "negative person" who "preached damnation" in sermons that were "long and drawn out and boring" and embedded in church services that typically lasted 2 to 2½ hours. (Tab 23, at ¶¶ 19, 20.) Neace offers other snapshots of the totalitarian control and brainwashing that intensified under Tom King's leadership. "All television was forbidden. They called it the Devil's box…. We didn't watch or hear any news from the world outside, and I knew nothing of politics or world events." (Tab 23, at ¶ 10.) Church members were told that even normal behaviors were sins and would send them to hell: "Thinking negative thoughts was a sin. Gossip was a sin. Engaging in romantic relationships was a sin…. I can still hear the words, 'Sin is pleasure for a season but the end thereof is death.'" (Tab 23, at ¶ 10.) Neace sums up, "Upon reflection, it seemed that as long as Pastor Tom was happy, we were all going to heaven. But, if Tom was not happy for some reason or if he did not like you, anything you did was a sin." (Tab 23, at ¶ 10.)

152

352. George Carlin recalls that whereas Cal had focused on bringing people into the church, Tom wanted to keep the community isolated and insular – and under his control. Like other former church members, Carlin tells a story of his daughter bringing friends to church and Tom condemning her for it. (Tab 11, at ¶ 8.) Recalling the same experience in more detail, their daughter's mother Ms. Boys recalls that Tom "seemed very uncomfortable with having new people in his church. I remember that Tom King referred to my daughter, Sarah, and some other students at the school as 'worldly,' because they participated in activities, and had friends, outside the church. In Tom's mind, this was a sin." (Tab 10, at ¶ 17.)

353. And so, under Tom's influence the church/cult community became increasingly closed in upon itself, to the detriment of everyone involved – most of all those children who, like Wendi, also attended the school. As in totalitarian societies, church/cult members spied on one another to enforce Tom's edicts of domination. Neace recalls:

"[W]e were not permitted to associate with anyone who did not attend the church. Harvest was our whole world; we spent our days there, then we went home. The only recreational activities we were permitted were those put on by the church. For example, if I went to hang out with my neighbor buddy, and someone from the church found out, they reported to my mother that I was hanging out with 'bad people.' A 'bad person' was anyone who did not subscribe to Tom King's way of thinking. Kids who did not attend our church and school were branded this way. They were called bad influences, and to spend time hanging out with them was to 'tempt the Devil.' We were told that they were ungodly and that we would become that way too if we spent our

153

time with them. In this way, the church tried to control every aspect of our

lives." (Tab 23, at ¶ 9.)

354. There are many more such stories in the witness declarations submitted by

people who were caught up in this cult, as adults or children. Many are heartbreaking to

read, especially those in which family members are turned against each other. The

sampling contained in this report cannot do justice to the nature of the isolated cult

community, controlled by increasingly disturbed and dictatorial men, in which Wendi

grew up from age nine through her adolescence. There are, however, some aspects of the

community's leadership and culture that warrant highlighting as particularly destructive

influences on Wendi Andriano. We turn to those now.

355. **91st Psalm/Harvest Family Church and school: Men dominating women,**

**and sexually abusing girls.** Donna recalls that at 91st Psalm/Harvest, as with "all the

churches and ministries that I've been a part of throughout my life," it was the men who

had religious authority. "There were never women pastors, and the woman's role was

basically to be a doormat to her husband and do whatever he told her to do." (Tab 27, at

¶ 191.) Cynthia Shaider remembers, "Tom King frequently preached that a woman's

place was in submission to her husband. He often said that women should quit their jobs

and stay at home." (Tab 34, at ¶ 8.) And he set an example with his own behavior.

Several witnesses describe Tom's wife as totally submissive to him.

356. This culture of male domination, along with the sexual perversions of several

prominent men in the church, including Tom King and Alejo, created a culture in which

some men sexually exploited and abused girls – including their own daughters – with

impunity. Three witnesses tell the story of        REDACTED        being sexually abused

154

by a man who was Tom's friend, his brother in law's business partner, and a major donor

to the church. It was a major scandal in the community, and Tom King's behavior at the

time was so egregious that the other witnesses could no longer keep their heads in the

sand. The girl was seven years old at the time, known to all in the community as a sweet

and happy little girl. Ms. Boys personally witnessed Tom blame the girl for her own

abuse, saying she was "flirty" or something along those lines and had been "asking for

it." Looking back, she remembers his comments as "outrageously shocking.... This was

not only a seven-year-old girl he was talking about,          REDACTED          . That really

sent me over the edge." (Tab 10, at ¶ 20.)

    357. Mark and Nancy Keating, the only two formally trained educators who worked

at the Harvest Family Church School from 1983 to 1988, were deeply disturbed by this

girl's abuse and what they heard about Tom's reaction – which came to their attention as

they struggled with their shared strong suspicion that Wendi was being sexually abused

by Alejo (see below) (Tab 13, at ¶ 10; Tab 14, at ¶ 11.) According to Nancy, it was then

that she decided to leave the school, the church/cult community, and Casa Grande

altogether: "When all of this came to light, I just knew that Mark and I could not start a

family in Casa Grande. Not in that environment. It was not healthy there." (Tab 14, at

¶ 11.)

    358. **91st Psalm/Harvest Family Church and its school: Monitoring and beating
children.** Donna recalls, "We put Wendi into 91st Psalm Christian School in January,

1980 when she was nine years old, and it was a relief to know that she was getting a good

Christian education and not having to worry that as a homeschooler I wasn't teaching her

155

everything she needed to learn." (Tab 27, at ¶ 227.) It was another example of Donna's neglect and wishful thinking, if not willful ignorance, which so harmed her daughter.

359.  Cal Lorts' own brother, Barry Lorts, acknowledges that the school had no teachers, only monitors. Consistent with Wendi's recollections and those of every witness who had been a student in the school, Barry reports:

> "The curriculum used at 91st Psalm was called Accelerated Christian
> Education, or ACE. Learning was mostly independent and students were
> taught by completing PACE booklets... Each book had a test in the back, and
> each classroom had a monitor... who graded it. The monitors weren't really
> teachers, they were mostly to keep order in the classroom and to grade the
> tests... I think the monitors were all volunteers." (Tab 16, at ¶ 6.)

Several parents and former students consistently describe the school environment as isolating, boring and oppressive. Students worked alone in cubicles, and were not allowed to speak to each except during lunch, recess and other non-academic activities. The monitors were volunteers who received no training and often could not answer even basic questions from the students. (e.g., Tab 35, at ¶ 8; Tab 23, at ¶ 22.) Jasper Neace recalls that there was "no formal group instruction except when we were instructed in the Bible, sewing, cooking, welding, physical education ('PE'), or photography. The remainder of our education was self-taught using ACE booklets." (Tab 23, at ¶ 23.)

360.  This would remain the case until Nancy and Mark Keating, who both had a Masters degree in education, were hired as principals in 1983, three years after Wendi arrived. (Tab 13, at ¶ 2; Tab 14, at ¶ 2.)  However, by all reports the Keatings mostly

156

focused on integrating sports into the curriculum; the academic curriculum and the school's operation were essentially unchanged.

361.   With one exception, that is: Tom King took over the church just as the Keatings arrived, and he took a much more active role than Cal Lorts had. This meant that any benefit from the Keatings was more than offset by Tom's dictatorial style and dramatic escalation of corporal punishment, that is, beatings of the children, which had always been practiced in the school.

362.   Not surprisingly, former students are uniformly negative in their accounts. Kimberly Wilson, who only spent three years at the school, from 1986 through 1988, recalls,

> "It was like a cult, in that, if you were a part of the church you had to be in the school. When I started going to school there [at age fifteen], I was not allowed to talk to my old friends from the public high school anymore, because they were 'bad.' Kids of my age, meaning fifteen to eighteen, were still getting 'the rod of correction,' meaning that they were still being hit with wooden paddles. I was intimidated by Tom. He acted as if he was God, or at least as if he had special direction from God." (Tab 38, at ¶ 12.)

Ms. Wilson then notes that, coming from public school at age fifteen, she knew things were different elsewhere, but Wendi and the other children there had never known otherwise.

363.   Jasper Neace had the misfortune of attending for many years, beginning in 1979 when he was twelve years old. He has vivid and detailed memories of the physical abuse:

157

"There were several main principles and guiding scriptures that were taught at the school and to which the school and church adhered. One that sticks out for me referred to us children, 'Beat them when they are young and when they are old, they won't depart from it.' .... Corporal punishment was standard at Harvest. If there was one thing the adults enjoyed, it was beating the hell out of kids. That was the number one thing adults did at the school. Kids at school got whooping for nearly everything; disobeying, not following orders, being unable or unwilling to memorize the scripture assignment… and incomplete homework." (Tab 23, at ¶ 28.)

Neace goes on to describe the beatings children received in the office, including the wooden paddles with scriptures written on them, and how the children had to lean over to receive the beatings, which typically consisted of three to five very hard blows to their behinds. (Tab 23, at ¶ 29.) Neace also recalls the public exposure and humiliation: "After the kids were swatted, they returned to the main classroom. Everyone knew what had happened. There were no opportunities to hide what happened and we were not permitted to have any secrets. The kid came back to the classroom and you could see it on their face. Sometimes they were just red and embarrassed, sometimes they were crying." (Tab 23, at ¶ 29.)

364. Constance Boys, a parent at the time, recalls how fanatical Tom King was about physical punishment, and his repeated exhortations to beat their children: "I remember that Tom King frequently preached that children should be spanked. He encouraged us to spank our children often…. Nearly every transgression warranted a spanking in Tom King's mind. He quoted scriptures about it, such as, 'Foolishness is born in the heart of a

158

child and the rod of correction will drive it far from him.'" (Tab 10, at ¶ 6.) Ms. Boys also remembers an incident in which Tom rounded up and spanked about fifteen teenagers for some minor rule violation. (Tab 10, at ¶ 32.)

365.  In addition to multiple witness reports, there is an audio recording of a sermon Tom King delivered in the midst of these events, when Wendi was a teenager. Consistent with Jasper Neace's recollection of Tom's sermons, it is long and rambling, and includes Tom responding to questions from congregants. For the first eight minutes, Tom appears to free associate: he reads from scripture that he says refers to Jesus; he talks about the form of human "spirit bodies" in heaven, about spirits impregnating humans and creating a race of giants and, during the Salem witch trials, babies born with chicken feet and other bizarre features, which he says "are just a manifestation of a spirit being." (Tom King sermon, 7:53, Obtained by Capital Case Project.) He continues, locking onto one of his favorite topics: "They're a higher order than us. We're a low order. Just the natural man. OK? We're made liken to God, but until our spirit is recreated in the likeness of God, we are [pause] prone [pause] to evil. (7:54 – 8:12, emphasis in spoken language) He continues:

> "And I know that gets over on somebody's problem of inherent sin, and uh, somebody tries to say man is absolutely good and, and, his environment and situation produces evil in him. But explain to me then, how can a two year old – not a two year old, how can a two year old? – how can a two month old throw a screaming fit and rebel against his parents when nothing's wrong – when his diaper's changed, his bottle's fed, his bed's made, everything's cool, accept he wants some attention and 'you're not giving me enough and I'm

159

gonna <u>let you know</u> about it.' See that's a sin nature. [pause] Now is he conscious of that? No. No. I don't think so. But he knows how to <u>get his way</u>." (8:12 – 9:05, emphasis in spoken language)

366. In the world according to the confused and abusive cult leader Tom King, a two month old who needs attention and affection from a parent is "rebelling" against that parent. For those who, so to speak, "drank the Kool-Aid" in Tom King's cult, a two month old who is expressing the most basic human need for affectionate physical contact with a parent (a need that research has shown is as great or greater than the need for food), and expressing that need through vocal signals, is manifesting his "sin nature."

367. Of course it can be stressful, as a parent, when you feel you've done all you can, when you feel physically and emotionally spent, to have your infant cry for more attention, especially if frustration is in his or her voice. Feelings of helplessness and frustration, even anger, may naturally arise in parents. Sometimes they may feel their baby is "rebelling" against them or even "tormenting" them. This is all very human, and understandable. Nonetheless, such attributions are not reality, and sane and healthy parents quickly realize this when the crisis has passed. To call the infant's behavior "rebellion," and to cling to this mistaken belief long after the crying has stopped, is delusion; for the ability to "rebel" is far beyond that of any infant.

368. By all reports Tom King was able to reinforce such delusions already present in some parents among his followers, and to impose them on others who were well-intention but vulnerable. In addition, Tom instructed parents to literally *beat* this alleged sin and rebellion out of their children. He told them it was God's will. Indeed, later in the same sermon he gives detailed instructions, sometimes in response to a congregant's question,

160

on how to beat children of different ages, including two month old infants (with a wooden spoon).

369. But before Tom gets to that, right after the passage quoted above, he condemns and mocks the toddler who says "mine" in an angry tone, then free associates to memories of beating the young children of his followers:

"How come he clenches his [pause] lips, and this six-foot, two-hundred pound pastor beats him on the behind and he's a little forty-pound, two-foot high kid, [pause] clenches his lips – [whispered aside, likely inaudible to congregation] just defiant – 'I shall not cry.' [long pause] And what happens if you just beat him a couple times, couple swats, and let that defiance and rebellion stay? You produce more in him. [long pause] One preacher says, 'You beat 'em 'til they cry, and you keep on beatin' 'til they cry softly.' Because if they go [lets out a long wail], it's rebellion, and you gotta get 'em until their spirit is broken. And it's one – and that happens – and you know when they're spirit is broken – you know what they do? They come by my office, wherever I'm at, they know, and they say, [in whispered, meek tone, as a congregant laughs at his facial expression] 'Hi Pastor Tom.' And they say, 'I'm doin' good.' It changes their spirit. It changes from the inside. It [Old Testament scripture] says, 'The rod will drive foolishness far from them.' If you beat him with a rod, he won't die. You'll beat him with a rod and [voice rising almost to a shout] deliver his soul from Hell.'" (9:25 – 10:42; emphases in spoken language)

370. This insanity is what Donna and Alejo, well into Wendi's teenage years, completely bought into. As Donna puts it, at the time she believed such "punishment" of

161

children was "necessary to drive sin from them and bring them up properly." (Tab 27, at ¶ 231.)

371. As discussed above, Donna and then Alejo had been beating Wendi for even the smallest acts of disobedience (real and imagined) since she was a toddler. In contrast, Jasper Neace's parents never beat him until they began attending 91st Psalm. "I believe my mother thought she was doing the right thing. She was brainwashed by the church's teachings, and she acknowledges that now. Every time I talk to her, she apologizes for what she put us through. I have to be careful not to bring it up, because she cries and cries and feels so badly about it." (Tab 23, at ¶ 30.) Neace notes that, perhaps because he did a lot of work for the school and Tom and Alejo felt they needed him, he was seldom beaten at school. His brother and sister, however, "were some of the hardest hit, both physically and mentally. They were whooped about three times a week." (Tab 23, at ¶ 33.) His brother was deaf and had a hard time memorizing scripture, which in the school meant being "punished hard and beaten severely because of his disability." (Tab 23, at ¶ 34.) As for his sister, an unattractive and awkward girl who never fit in,      REDACTED

: "The church destroyed Sherry."

(Tab 23, at ¶ 35.)

372. Some parents, like Martha England, could not bring themselves to beat their own children, but remained silent as Tom and others attempted to beat them into submission. Mrs. England told me that she now realizes her children, who constantly pleaded with her to leave the church/cult and take them out of the school, in part because of the beatings, were right all along. Constance Boys reports that her son Lonnie cannot even talk to her about his time at the church and school: "[H]e is too traumatized. He is

162

really bitter.... To this day, I rarely speak to my son. We don't have a great relationship."
(Tab 10, at ¶ 25)

373. **Alejo in the church/cult community: Emotional and physical cruelty, sexual perversion and harassment.** As a friend of Cal and Barry invited to be youth pastor, Alejo quickly became one of the church/cult "leaders." In that community, this meant having the authority – or at least claiming it and imposing it whenever he could – to present his own confusion as God's truth and his own cruelty as God's will. As youth pastor Alejo had many opportunities to beat children into submission, and to humiliate those whose "rebellion" he could not stamp out. Youth pastor was also a perfect position from which to inflict his sexual perversions and compulsions on captive children. And when not with the children, he was sexually harassing women throughout the community. Alejo's ability to get away with such behavior was only strengthened over the years, as he became assistant pastor and Tom's "right hand man," while remaining youth pastor. (Tab 23, at ¶ 24; Tab 11, at ¶ 10.)

374. Jasper Neace remembers Alejo as "particularly abusive to the children and to my brother Michael, beating them both during the school week and during Sunday school." (Tab 23, at ¶ 33.) Cynthia Schaider, a parent at the time, gives a more detailed picture of how Alejo related to the children, and the fear and confusion he caused them. She describes his immaturity and childishness, which could be playful and fun but also inappropriate and confusing, and how such behavior unpredictably alternated with harshness and cruelty.

> "Alejo was unpredictable and temperamental. As youth pastor, he could be
> silly, irreverent and playful with the children and they enjoyed him at times

163

because, in many respects, he was a big kid himself. He was goofy. On the

other hand, he created loose and unsteady boundaries with them. Some days

the children could get away with almost anything. The next day, however, the

same behavior wasn't permissible and was punished. He used his authority at

school to bully the children. If they did something to make him angry, he

made sure that they were humiliated. He was so harsh on them." (Tab 34, at

¶ 6.)

375.   Another parent, Constance Boys, also recalls Alejo's unpredictability and

harshness and their effect on the children. "Members of the church were scared of Alejo,

especially the children.... [Y]ou never knew how he was going to be. Sometimes he was

happy-go-lucky and such a goof-off, and other times he got in these black moods.... One

minute he was joking around and having fun... and the next moment he was dark and

moody and anyone around him was afraid to do or say anything." (Tab 10, at ¶ 10.) It

was the same unpredictable mix of immaturity, childishness, ignorance, harshness and

cruelty that Wendi experienced every day at home.  But there was more in the mix, in

both the community and the home: sexual perversion, compulsivity, and pedophilia.

376.   Jasper Neace recalls Alejo's sexualization of the girls in his youth ministry

services and classes on scripture. "Alejo put most of his attention on the girls in the class.

I remember feeling that he was more interested in them. I remember him licking his

finger and touching their ears and acting real flirty. None of the guys liked Alejo; we all

talked about it." (Tab 23, at ¶ 25) Neace remembers talking to the girls as well about

Alejo's unwanted sexual attention and contact. "On numerous occasions I heard many

different girls complain about being alone with Alejo... As I understood it, Alejo...

164

touched the girls in PE class. It was all under the guise of aiding them in stretching and things like that, but the children were under the impression that it was just an excuse to touch them." (Tab 23, at ¶ 40.) Neace also remembers girls telling him they were "creeped out" by the way "Alejo licked his finger and then touched their ears with it." (Tab 23, at ¶ 40.)

377. Kimberly Wilson, a student at the school from 1986 to 1988, remembers being extremely disturbed by Alejo's behavior. "He made a lot of sexual comments; everything was sexual innuendo to him" (Tab 38, at ¶ 5.) Things got so bad, she recalls, that she "went with another student, Lonnie Carlin, to talk to Pastor Tom about Alejo's inappropriate behavior." Tom "seemed to listen" and "appeared to be taken aback," but "nothing ever came of it." (Tab 38, at ¶ 5.) Like Kimberly Wilson, the parent Constance Boys recalls that there was "always a sexual undercurrent to the things Alejo said," and that he "constantly made jokes of a sexual nature around children as well as adults." Ms. Boys also relates specific incidents, including a time she confronted him for saying something about her breasts. Ms. Boys recalls, as well, that "many of the children, when they entered the pubescent stage, complained that Alejo was making sexually inappropriate comments to them." (Tab 10, at ¶ 8.)

378. Alejo himself has implicitly – if unwittingly – admitted to what these now-grown children and their parents describe. At one point in our interview, Alejo said that when he got older he "joked around" with his aunts and uncles (who had previously verbally sexually abused him) about sexual things. I responded by asking, "Is this something you do yourself?" and he said, "No, not with teenagers, no" – even though I had said nothing about teenagers. When asked what he taught as youth minister, he

165

responded, "I'll tell you what they <u>expected</u> of me," let out a big laugh and continued,

"Trying to teach them the life of Christ, how to walk in the life of Christ" (emphasis in

spoken language). When I asked what the laugh was about, what other things he was

teaching, he replied, "track meets."

379. This particular behavior with me corresponds to the memories of Ms. Boys: "I

recall firsthand that he spoke that way to myself and to Cyndee Justus. I recall telling him

time and again, 'That's not funny, Alejo.' He always responded the same way, with

something like, 'You have a dirty mind Connie, you're the one taking it there.'" (Tab 10,

at ¶ 8.)  In his interview with me, the sexual innuendo was completely implicit, in his

"I'll tell you what they <u>expected</u> of me" comment accompanied by a loud laugh; and his

denial and minimization of the sexual meaning were implicit as well, taking an evasive

and non-confrontational form (by implausibly referring to "track meets"). But the

exchange otherwise mirrored the more explicit sexual references and outright denials

("you're the one taking it there") that he routinely directed at Ms. Boys and other female

church members.

380. Ms. Boys also remembers the helpless resignation of other church/cult

members, and the leadership's failure to support Alejo's many victims or hold him

accountable: "Everyone knew how Alejo was, but no one seemed to care. Tom King and

the church leaders did absolutely nothing about it, except to punish children if they

complained." (Tab 10, at ¶ 8.) In her interview with me, Martha England went further,

saying she would not allow herself to know the truth about Alejo, although her daughter

Suzy "was always telling me stuff" about Alejo being "perverted" and always angry

when her mother did not believe her. Looking back on her refusal to listen to her

166

daughter and face reality, Martha,                    REDACTED

, acknowledged that she "didn't want to think something was bad." Like Ms. Boys, her husband at the time, George Carlin, also complained to Tom King about Alejo's behavior. Mr. Carlin reports that Tom "just ignored it and criticized my family's childrearing practices, which he believed were too permissive, instead of doing anything about Alejo." (Tab 11, at ¶ 13.)  After their fourteen or fifteen year old daughter Sarah complained that Alejo had made a reference to oral sex as she and a friend ate popsicles, both parents confronted Alejo, who denied it, after which they told Tom. Ms. Boys remembers his response as a wake-up call: "Tom said, 'If that was true, God would have told me.' That's when I realized just how crazy Tom was." (Tab 10, at ¶ 11.)

381.  Both of the school's well-meaning and universally liked principals, Mark and Nancy Keating, recall Alejo's inappropriate sexual behavior and its effects on the women and families of the church. Mark remembers that Alejo's sexually inappropriate jokes were "not well-received at the church." (Tab 13, at ¶ 5.) Nancy reports:

"Alejo was often side-tracked to perversion. He made perverted jokes in front of and to some adults, including Connie [Boys] and Cindy Justice, both of whom were bothered by Alejo's behavior. Alejo just laughed to himself and found ways to talk about objects as if they were male genitalia. Before a school or recital performance, Alejo made such a joke about one of the microphones, in front of everyone. Sometimes he made gestures imitating intercourse…. He upset a lot of people with his inappropriate behavior." (Tab 14, at ¶ 6.)

167

According to Mark Keating, "Alejo was addressed by a number of fathers at 91st Psalm and Harvest about his sexual gestures made toward some of the adult women at the church, Cindy Justice and Connie Carlin [now Boys], in particular." (Tab 13, at ¶ 5)

382. Ms. Boys says that several years ago she and Cyndee Justice finally talked about those experiences in the 1980s. "We sat down and talked about the church and how crazy it all was. I'm not going to remember everyone now, but we counted thirteen families that left the school directly because of Alejo." They also reflected together on the church's culture of domination by emotionally, physically and sexually abusive men, and how Alejo sexually harassed them and others with impunity. "Many people went to Tom about Alejo's behavior, and Tom refused to believe it. He completely rejected it. It sickens me to even think about it." (Tab 10, at ¶ 23.)

383. Indeed, reflecting on how Alejo was viewed by the entire community, Ms. Boys says, "I think that [Alejo] was a pervert and I think that everyone else thought so too." She then adds, as addressed in detail below, "For years, there were rumors abounding that Alejo was molesting Wendi. Wendi complained about it to other members of the church. I don't remember specifically who knew what, but I do remember that it was generally discussed." (Tab 10, at ¶ 7.)

384. Available witnesses provide only one report of Alejo actually acknowledging his abusive sexual behavior when confronted. George Carlin tells of once directly confronting Alejo, apparently including about the concern that he was sexually abusing Wendi. Carlin says that Alejo at first "denied everything," but after he continued to press him, Alejo "finally confessed to his inappropriate behavior and admitted he had a problem sexually." Carlin continues, "Alejo asked me, 'What should I do, should I resign

168

from the church?' Looking back, I wish I would have just told him to resign, but instead I told him that he needed to ask for forgiveness and stop his inappropriate behavior." (Tab 11, at ¶ 10.) Of course, Alejo was incapable of stopping such behavior without major intervention from others – most likely including treatment in a sex offender program, as well as being held accountable by the legal system. And so, by all reports, after Carlin's single and brief confrontation, nothing changed.

385. **Wendi's family: Views from the outside.** Having established the all-encompassing emotionally, physically and sexually abusive environment in which Wendi's family was immersed when Wendi was nine to eighteen years old, as well as Alejo's use of his position of authority within the cult to emotionally, physically and sexually abuse and harass women and children, we can begin to address what was going on within Wendi's family during those years, starting with accounts of witnesses from the community. The information available from witnesses is limited, for a few main reasons: Donna and Alejo did not socialize with other adults in the community or invite them to their home; Donna generally kept a low profile in the community; and Donna kept her distance from Wendi and Alejo, which meant witnesses had little to observe and remember, aside from an absence of relationship and interactions. Also, witnesses' many observations of Alejo and Wendi's disturbing, inappropriate and sexualized relationship are presented in depth later, in sections specifically addressing Alejo's emotional, physical and sexual abuse of Wendi.

386. When the Ochoa family joined the church, they were renting in a low-income housing development. Cynthia Schaider, who joined the church about a year after Wendi's family, recalls the family's poverty. She remembers them living in the rental and

169

later in a small house they bought in a development where many homes had cracking foundations and some were abandoned and boarded up. (Tab 34, at ¶¶ 4, 5.) Donna and Alejo acknowledge their poverty as well. As noted above, upon moving to Casa Grande in 1980 Donna's minimal source of income was babysitting paid for by the state (Tab 28, ¶ 87), while Alejo did sporadic, low-paying non-union construction work (Tab 24, at ¶ 74). Donna's reported earnings from the babysitting in 1980 were under $1500 (i.e., only "Self Employment" earnings were reported for 1980; Tab 68; Tab 68.B.).

387. In early 1981, the church hired Alejo as a groundskeeper, janitor and youth pastor, and Donna as a bookkeeper. As Donna recalls, "When the church hired Alejo, they really hired both of us. When determining how to pay us, they asked us, 'What are your living expenses?' and they paid us just enough to meet the expenses." (Tab 27, at ¶ 230.) And so the family barely scraped by from 1980 to 1984. Then Donna began working full-time at Ak-Chin farms, a business owned by Donny England, husband of Martha England. From 1985 to 1988, when Wendi graduated from high school and left home, Donna earned between $12,500 and $13,500 per year from Ak-Chin Farms, which, combined with Alejo's meager salary from the church/cult, put them at or above the poverty line. (Tab 68; Tab 68.A.; Tab 68.B.) Constance Boys, who also worked at Ak-Chin Farms from 1983 to 1985, recalls that Wendi's family was "poor as church mice" and that when Donna started working there she repeatedly complained of how much they were struggling financially. (Tab 10, at ¶ 37.)

388. Ms. Boys also describes, in great detail, how Donna embezzled from Ak-Chin farms by using a PriceClub charge account to charge things for her family. Ms. Boys reports that she repeatedly told Donny England about this, but he did nothing and she

170

eventually quit in disgust. Ms. Boys also reports that another employee eventually, in 1988, took evidence of Donna's embezzlement to a local tribal council. This led Donna finally to confess, quit her job, and sign a document promising she would repay $30,000 to the company – although, according to Ms. Boys, via the employee who had brought the information to the tribal council, Donna never did repay anything. (Tab 10, at ¶¶ 37-41.) An additional twist on the story, which is consistent with Donny England looking the other way and Donna receiving special treatment: Ms. Boys reports that on the day Donna finally confessed, Tom King knew within hours and pulled Ms. Boys aside before an evening church service to say, "Don't you dare tell anybody." (Tab 10, at ¶ 41.)

389. Although Martha England's membership in the church/cult dated to 1976, only after her family moved to Casa Grande from Maricopa in 1981 did she enroll her children in the school and get more involved in the community. Looking back on that time, Martha recalls being immediately bombarded by church people, and that Wendi's family, especially, spent a lot of time at her house. Donna liked to cook in the England's big kitchen. In her interview with me, Mrs. England recalled feeling repeatedly put upon by Donna, who appeared to assume that she could come to the England's house and cook in her kitchen whenever she wanted. Martha also recalls that Wendi was very attached to her, and often visited her home alone; Wendi would follow Martha around and help her with chores. Wendi also played with Martha's son, Donny, who was her age.

390. Reflecting on her observations of Wendi's relationship with her mother, Martha recalled that Donna was "so out of the picture for so long." Donna herself admits as much, and as described below, Donna's neglect and abandonment of Wendi only

171

escalated further after surgeries Donna had in the early 1980s and after she starting to
work at Ak-Chin Farms in 1984.

391.  The other witness recollections of publicly visible behavior between members
of Wendi's family, aside from those between Alejo and Wendi, were of Alejo's treatment
of Brandon Ochoa, who was around two years old when he came to live with Wendi's
family in 1987, when Wendi was sixteen or 17 years old.  Constance Boys recalls
observing Alejo's treatment of Brandon and the effects it had on the little boy:

> "I remember when they first got him. They were so strict on that little boy. I
> worked in the church nursery from time to time, so I had Brandon with me
> during some of the services…. I remember that the punishment Brandon
> received from Alejo was always so harsh. It seemed to me that he was beaten
> a lot. I recall that Alejo talked to him with such a harshness to his voice.
> Brandon always seemed nervous when Alejo was around. Brandon was a
> hyper little kid and Alejo yelled at him constantly." (Tab 10, at ¶ 36.)

392.  **Wendi ages nine to thirteen: Observations of adults and children in the
community.** Other members of the church/cult at the time, both adults and children, tend
to speak of Wendi in very positive terms, of how she was friendly and a model student;
but many, especially those who were adults at the time, also remember being concerned
that Wendi was fearful, beaten down, and being sexually abused by Alejo. One friend at
the time,         REDACTED         , not only has both types of recollections, but reports that
she herself was sexually abused by Alejo from ages eleven to thirteen. Finally, the
observations of some who knew Wendi during those years show how Alejo's
pathological and incestuous relationship with her led to what some might view as

172

"manipulative" qualities that are better understood as attempts to cope with pervasive domination and abuse at church, school and home.

393.  Jasper Neace was a few years older than Wendi, but because students of all ages were in the same room for years and both stayed after school to work on the grounds with Alejo, Neace recalls, "We spent so much time there we practically lived there." (Tab 23, at ¶ 36.) He reports learning later, when Wendi was around fifteen years old, that Wendi was being abused by Alejo. In the early years Wendi only confided that she was being beaten at home. (Tab 23, at ¶ 37). Most of Neace's memories of Wendi when she was nine to thirteen years old are of very positive qualities that impressed him as well as other kids at the school. "I remember Wendi as the all-American girl. She was funny and cute. She was talkative, outgoing, and smart. She was what every guy would want.... Wendi was in and out of all the groups [of kids] and was accepted by everybody." (Tab 23, at ¶ 3.)

394.  Apparently Wendi's "all-star" qualities could be intimidating to children who were new to the school, especially girls. Kimberly Wilson (last name Ethington at the time) recalls that when she first met Wendi, she thought she was "snobby" because she was a "good student" who "did all her work."  It seemed to Kim that Wendi set the standard as the star student that the other children were compared too. But before long, "After getting to know Wendi better, I realized she wasn't snobby at all. I liked her and we became friends." (Tab 38, at ¶ 2.) Jeri Lynn, also same age as Wendi, began attending the church and school about a year after Kim and Wendi, when she was ten years old. Jeri Lynn has very fond memories of Wendi, from as soon as she arrived at the school: "Wendi went out of her way to befriend me. I was a shy child and didn't have a lot of

173

friends. Wendi, on the other hand, was very popular and stood out amongst the crowd."
(Tab 12, at ¶ 3.) They "bonded quickly and became inseparable. I began spending a lot of
time at Wendi's house. Sometimes I spent the night there. We were best friends." (Tab
12, at ¶ 3.) Jeri Lynn goes on to relate how Wendi helped her to become more self-
confident, to overcome her shyness to make new friends, and was generally
"compassionate and available to anyone who needed her." (Tab 12, at ¶ 4.)

395.   Clearly Wendi had these positive qualities, which greatly impressed children
like Jasper, Kim and Jeri Lynn, particularly her ability to be compassionate and care for
others. At the same time, this should not be taken as evidence that Wendi was a happy
and healthy, socially and emotionally competent girl. With the history of unrelenting
neglect, emotional, physical and likely sexual abuse she had already endured by age nine,
that is simply impossible. Instead, what Jeri Lynn and the others describe is a young girl
who was always highly social by nature, but also a young girl who had learned to cope
with the neglect, abuse and totalitarian control of her parents and cult environments by
*submitting to authority* and *taking care of others*. As a young child fearful of adults who
could beat her at any time for anything they might construe as disobedience or rebellion,
adults who, in short, demanded complete submission of her will to theirs, Wendi had
learned to align her needs for love and affection with adults' needs (and demands) to be
obeyed and taken care of. It was an imperfect alignment, to say the least, and grossly
inadequate to her needs. But it was the best available option given Wendi's temperament
and personality.

396.   In these years from nine to thirteen, Wendi's cognitive development continued
to unfold (with little help from her impoverished educational environment) and, having

174

left the traveling cult and become trapped in a stationary one, she had other children in her school and community. For Wendi, this meant taking her main survival strategy of caring for others and applying it in new ways, including balancing obedience to adults with caring for other kids. In her friendship with Jeri Lynn, this meant sharing knowledge and teaching skills that, for Wendi, had become second nature. Jeri Lynn tells a story of Wendi coaching her on how to act with an adult who was angry because Wendi and Jeri Lynn allegedly had been exhibiting "bad attitudes." Jeri Lynn recalls, "I was so terrified on the way to the office, I couldn't help but look upset. Wendi told me over and over again, 'You need to smile or we're going to get in trouble again for having a bad attitude.'" Jeri Lynn was still anxious but managed to smile, and they avoided a beating. (Tab 12, at ¶ 6.)

397. Other positive qualities of Wendi's were observed by adults, including Nancy and Mark Keating, principals who arrived when Wendi was twelve or thirteen and were liked and respected by the children. Upon arriving at the school in 1983, Nancy Keating was impressed with Wendi as "a lovely little girl" who was "always very put together" and a "very conscientious student." Wendi stood out as a student who "really pushed herself" and "wanted to make something of herself." (Tab 14, at ¶ 5.) Nancy also immediately noticed that Wendi and Alejo were together "most of the time" before and after the school day, with Wendi helping Alejo with the grounds keeping. She recalls too that neither Wendi nor Alejo spent much time with Donna, who was "more like a once-a-week church goer." (Tab 14, at ¶ 8.)

398. As with his wife, Mark Keating says that Wendi quickly "made a big impression" on him; she put in great effort on the swim team he and Nancy started, and

175

was "the fastest girl out there" in a swim time trial. (Tab 13, at ¶ 4.) Both Nancy and

Mark also quickly perceived that Alejo and Wendi did not have a normal father-daughter

relationship. It seemed too intimate, more like they were a couple. Nancy recalls, "There

was something off about Alejo's relationship with Wendi. It was more of a teasing

relationship, not a father-daughter relationship." She also noticed that while Alejo was

proud of Wendi, it seemed she "needed to be perfect" around him. (Tab 14, at ¶ 7.) Mark

reports "There were things about Alejo's dynamic with Wendi that did not sit right with

me," and goes on to report an incident he witnessed one night: "I looked into the parking

lot and I saw Wendi and Alejo. Wendi leaned into Alejo and they kissed on the mouth.

Something was weird about it. It was not a father-daughter kiss.... This stuck out in my

mind so much, I told Nancy about it." (Tab 13, at ¶ 6.) Exactly when this incident

happened is not clear from his report, and he may not remember. As we shall see, both

Nancy and Mark Keating report that eventually they became convinced Alejo was

sexually abusing Wendi, and recall an incident where they felt certain Wendi was on the

verge of disclosing such abuse to them (but was cut short by Alejo suddenly coming into

the room). Those reports, however, appear to refer to times Wendi was older than

thirteen, and thus are covered below.

399.    Although she did not want to accept it at the time, Martha England was also

presented with information that Alejo and Wendi were "close" in totally inappropriate,

sexually abusive ways. And Mrs. England knew some of the context and contributing

factors as well. She recalled that Donna had problems with an intra-uterine device when

Wendi was about ten, and because church discouraged medical care it got worse and

worse until Donna was in so much pain that she would retreat home to her bedroom. As

176

we shall see, Donna too describes pulling back from Wendi even more during this time, which included two surgeries, the first when Wendi was ten. Mrs. England also said that when Wendi was about ten years old, Wendi told Mrs. England's daughter, Suzy, that when she went home "her Daddy would have her put on her baby doll nighty and lay in bed with her."

400. Yet like almost everyone else, with the exceptions of Jasper Neace, who was only a child, and George Carlin, who only once attempted an ineffective private confrontation with Alejo, Mrs. England neither said nor did anything to protect Wendi. She recalled, "I didn't want to think something was bad," and that like her daughter's other reports of Alejo being "perverted," she did not want to believe it. Trying to make sense of her own response at the time, Mrs. England became pensive and said, "In your mind you cast things out… I knew Alejo loved me," then added, "I was so blinded and brainwashed by the church's teachings."                    REDACTED

401. Other children than Suzy England were seeing evidence of Alejo's sexual relationship with Wendi. One of them was Lonnie Carlin, George Carlin and Constance Boys' son who is Wendi's age, who ultimately did not feel comfortable going on the record with what he reported to an investigator. Still, the evidence warrants consideration here, and is consistent with Mrs. England's recollections of her daughter's reports as well as Donna's (detailed below). A Capital Case Project investigator was told by Lonnie Carlin that, when he visited Wendi's house when they were ten or eleven years old,

177

sometimes with other children present as well, "Wendi frequently dressed in revealing lingerie and showed it off to the other children." When Wendi was asked where she got the lingerie, she told Lonnie and the other children that Alejo "liked her to 'dress up' and that he wanted her to 'look her best.'" Lonnie recalls that Wendi "pranced around in thong panties and stockings."

402. Among the most explicit and extreme reported evidence that Alejo was sexually abusing Wendi during these years comes from Jasper Neace. As noted above, Jasper was three years older than Wendi but often spent time with her after school, where he did grounds work with Alejo. Jasper reports Wendi told him, when she was eleven or twelve years old, "that Alejo touched her in a sexual way," and that "[s]he was really upset and she was crying about it." (Tab 23, at ¶ 42.) Jasper also recalls "being under the impression that Alejo wanted to have sex with Wendi, and lists a variety of comments he says Wendi made to him and behaviors he says he witnessed, all of which led him to that conclusion:

> "She told me things on several occasions that led me to believe that. Often,
> they were just little remarks. She said that her dad was disgusting. She said
> that her dad licked her neck. She said that her dad put his tongue on her and
> rubbed her upper leg.... She often screwed up her face in disgust when Alejo
> was nearby. I got the impression that she was afraid to be alone with him, that
> she was scared of what he might do.... She immediately changed when he
> walked in the room. I recall that she always crossed her legs and kept her
> dress pulled down as far as it would go. She sat there real quiet, and you could
> just feel the tension. She never wanted to sit too close to him, and when she

178

got in the car with him, I recall that she'd get in the back seat. She never sat

next to him in the front." (Tab 23, at ¶ 42.)

403. Thus Jasper reports witnessing myriad evidence that Wendi was disturbed and

repulsed by Alejo, and afraid that Alejo might, at any moment, inflict upon her mind and

body his sexual obsessions, compulsions and perversions – of which everyone in the

community was by then well aware, thanks to Alejo's frequent and often public sexually

inappropriate and harassing comments, jokes, and gestures. Looking back with bitterness,

Jasper comments, "It seemed that no one had the guts to flat out tell on Alejo and what he

was up to with her. It was hard being a kid in that situation because the adults had all the

power." (Tab 23, at ¶ 42.) Jasper Neace was ultimately expelled from the school, under

circumstances (that he and another witness report) included telling Tom King that Alejo

possessed hard-core pornographic magazines and getting into a physical altercation with

Tom and Alejo.

404. Like Mark and Nancy Keating, Jeri Lynn Cunningham reports evidence that is

consistent with most other witnesses' reports. Jeri Lynn recalls that "Wendi and Alejo

had a different kind of relationship – it wasn't a father-daughter relationship." Jeri

Lynn's comment casts light on a dynamic of incestuous father-daughter relationships in

which the sexual abuse does not involve violence but is part of a "coupling" imposed on

the child – not only by the pedophilic father, but by the neglectful mother who withdraws

from both daughter and husband. The details of how this dynamic unfolded in Wendi's

family are provided below, in Donna and Alejo's accounts of these years of Wendi's life.

Here the focus is what adults and children in the community witnessed, including the

Keatings and Jeri Lynn. As the latter recalls, "Looking back now, I would call their

179

relationship 'flirty.' Sometimes when Wendi spoke to Alejo, the tone of her voice changed and she gave him these flirtatious looks, especially if she wanted or needed something from him. Wendi switched between calling Alejo 'dad' and 'Alejo.'" (Tab 12, at ¶ 14.)

405. Finally, another consequence for the social development of children caught in incestuous relationships is captured by the recollections of Shawn King, son of cult leader Tom King. Shawn was Wendi's age and became very close to her during these years, ultimately becoming her boyfriend when they were sixteen or seventeen. In his deposition by Wendi's attorneys, Shawn describes Wendi when he first met her, when she was eight or nine years old, as "very energetic and outgoing" and "happy as a general rule." (Tab 15, at p.11.) He then goes on to say, "But there was always a bit of perhaps question in that from my – I don't know. From my perspective, you know, like a little bit underneath it maybe." (Tab 15, at p.11.) Asked to clarify, Shawn replied, "She was just very – she was very – I don't know how else to say it. She was kind of devious in things. So I always knew she had a kind of a plan underneath what she was doing." Shawn then went on to describe how Wendi would often get away with things that other kids didn't, like pinching other kids, which was a "big thing at one time" among the kids at the school. "[S]he was just good at that on the sly kind of thing." (Tab 15, at p.12.) Shawn's memories are consistent with those of Jeri Lynn, who remembers Wendi coaching her on how to smile and display the attitude that adults wanted to see in order to avoid being beaten. Yet in Shawn's comments are also echoes of his father Tom King's voice, and his fathers' perceptions of "defiance" – along with "rebellion," "sin" and "evil" – whenever a child pursues needs or wishes that fail to perfectly align with *controlling adults'* needs,

180

wishes and demands. Most important here, however, is that Shawn's observations, shorn

of judgmental and condemning connotations, reflects one of Wendi's main strategies for

coping in a cult community and an incestuous family.

406. **Wendi ages nine to thirteen: Close friend sexually abused by Alejo.**

Wendi's friend       REDACTED       was sexually abused by Alejo from ages eleven to

thirteen, but never told anyone, including her parents, until questioned by an investigator

on this case. REDACTED remembers being afraid of what her father would do to Alejo if he

found out, and fearing that if she told she would never see her friend again. (Tab 12, at

¶ 19.) I also spoke directly with REDACTED, in her home, where she recounted the same

details of Alejo sexually abusing her as he lay between Wendi and her in Wendi's bed.

As a researcher who has studied memories of child sexual abuse, and as a therapist who

has worked with many clients with histories of child sexual abuse, it is my opinion that

REDACTED was a completely honest and credible, although (understandably) self-

conscious and reticent, reporter of events she had experienced.

407. Before detailing her account of sexual abuse by Alejo in Wendi's bed, it is

helpful to review and quote from her reports of other sexualized behaviors that Alejo

engaged in toward her and Wendi. One incident occurred when Wendi and REDACTED

were twelve years old in 1982, and REDACTED accompanied Wendi, Alejo and Donna on a

trip to California. They camped at the beach and used outdoor showers. One day Wendi

and REDACTED were taking showers in their bathing suits, feeling freezing cold, when

"Alejo pulled out his camera and took a bunch of pictures of us as we showered. He

laughed and made fun of us until Wendi said, 'Stop, dad!'" In a pattern that appears over

and over, the girls felt violated and angry, but "Alejo thought it was so funny." REDACTED

181

notes that this is one of only two memories she has of the entire trip (the other was of Wendi buying her a trinket at Sea World, which she has always kept because Wendi's act of kindness meant a lot to her). (Tab 12, at ¶ 8.) At least in partial corroboration of this story, in Donna's "Treasured Memories" booklet that she gave Wendi for high school graduation, the entry for the phrase beginning, "Remember when we went" reads "to California in 1982 and REDACTED also went. Taking showers out in front of everyone." (Treasured Memories booklet, Obtained by Capital Case Project.)

408.   Another incident occurred when Wendi and REDACTED wanted Alejo to take them into the desert at night to tell scary stories. Alejo promised to drive them out into the desert, but only if they first did what he wanted:

> "Alejo laid on the couch and forced Wendi and me to rub his feet and rub his head until he fell asleep. As we did this, Alejo laid his head in my crotch, facing my crotch. It felt so wrong. I wanted so badly to lift his head off me and get out from underneath him, but his head was heavy and I was afraid he would wake up. I sometimes wondered if Alejo was actually sleeping or if he was just pretending so he could keep his head in my crotch. It went on for a long time until Wendi 'woke up' Alejo and asked him to hold up his end of the bargain and drive us out to the desert." (Tab 12, at ¶ 16.)

409.   There were many other occasions involving drives to the desert and Alejo demanding the girls provide him with some sexualized gratification. REDACTED recalls, "Alejo drove us out into the desert, about ten minutes away, under the condition that we wear our nightgowns. Wearing my nightgown at Alejo's request made me feel uncomfortable and I knew something wasn't right about it." (Tab 12, at ¶ 17.)  We have

182

already heard of Lonnie Carlin's memory of Wendi "prancing" around her house in lingerie Alejo bought for her, and of Martha England hearing through her daughter of Wendi curled up in her nightgown with Alejo at night. Below we will read Donna's account of Alejo buying Wendi a whole drawer full of lingerie and other highly revealing and sexualized clothing by the time she was thirteen, as well as Alejo cajoling Wendi into posing in lingerie for him to photograph. What is important here is that REDACTED reports *numerous* occasions, repeated over two to three years, where Alejo coerced Wendi and her friend into wearing nightgowns for no other reason than to satisfy him.

410. Where was Wendi's mother while all of this was going on? As REDACTED reports, "I remember so clearly that Donna went to sleep early every night. The reason I remember this so distinctly is because Alejo's mannerisms and actions changed as soon as Donna went to sleep, when it was just the three of us: Alejo, Wendi, and me." (Tab 12, at ¶ 15.)

411. REDACTED continues, "From the time I was about eleven years old until I was approximately thirteen years old, Alejo molested me. He also sexually molested Wendy." (Tab 12, at ¶ 15.) REDACTED provides details of a frequent experience of sexual abuse by Alejo:

> "When I spent the night at Wendi's, Wendi and I slept in her bed in her
> bedroom. Alejo came into the bedroom late at night and laid in bed between
> us. While he laid between us, Alejo touched me sexually by putting his hands
> on my breasts. I moved his hands away from my breasts over and over again
> as I drifted in and out of sleep, but his hands always wound up there again.
> Alejo's behavior made me feel sick and uncomfortable. Alejo laid down

183

between us throughout what seemed like the duration of the night and into the early morning. I don't recall Donna ever waking up to see where Alejo was or what he was doing." (Tab 12, at ¶ 18.)

412. When REDACTED was about thirteen years old, Alejo's middle-of-the-night fondling ended. She had no idea why at the time, nor does she now. (Tab 12, at ¶ 20.) REDACTED says that she never told anyone about this until contacted by investigators retained by Wendi's defense team. She says she thought about telling her parents, but was afraid of what her father would do to Alejo. She was also afraid that she would never see Wendi again. (Tab 12, at ¶ 19.) These are common responses of sexually abused children. In REDACTED words, "It sounds silly saying so now, but that's the way the mind of a child works." Another common response REDACTED had to Alejo's sexual abuse: "Wendi and I never discussed what Alejo did to us. We just didn't." (Tab 12, at ¶ 19.) In my interview with her, REDACTED acknowledged that she never saw Alejo touching Wendi's breasts, but she always assumed this was the case, because "she didn't seem surprised that he was in the bed. It seemed like a normal thing for her."As we shall see, Wendi recalls that she had sleepovers with REDACTED, but reports no memory of Alejo ever being in bed with them.

413. **Wendi ages nine to thirteen: Recollections of Donna and Alejo.** Donna's memories of Wendi and of Wendi's relationships with her and Alejo during this time are consistent with Donna's long-standing pattern of neglecting Wendi and handing her over to others. Donna was not paying attention to Wendi or particularly concerned about what Alejo was doing with her. However, Donna could not help but become aware of – although she attempted to ignore and forget – disturbing evidence of Alejo sexually exploiting and abusing Wendi. As for Alejo's memories, at least those he is willing to

184

share, they are superficial but nonetheless consistent with the classic incestuous relationship to which he subjected Wendi during this time and until she left home.

414. Both Donna and Alejo report that Wendi was subjected to physical beatings in the home during this time, about once a month and sometimes more often. They agree that Alejo was the disciplinarian who administered most beatings, and that the beatings decreased in frequency from when she was nine years old until after she was thirteen, when Wendi seldom "needed" them and Alejo was less enthusiastic about beating her. (Tab 27, at ¶¶ 239, 240; Tab 24, at ¶¶ 85, 126, 127.) Also when Wendi was around thirteen, Alejo introduced the punishment of pulling weeds for hours on the church and school grounds, which Wendi sometimes had to do at school. (Tab 24, at ¶ 128.) Looking back on the beatings, and echoing Tom King's sermon on beating children into submission, Donna says, "You have to spank them hard enough that they're not just angry; it has to go beyond that so you break them. They have to stop being angry and learn to obey." (Tab 27, at ¶ 237.) Donna reports that, by the end of this period of Wendi's life (i.e., after she turned thirteen), "Wendi didn't need swatting very often, only once or twice a year. That was after she finally acquiesced, completely gave in, and obeyed almost all the rules at school, church, and home." (Tab 27, at ¶ 241.)

415. Over this same period, Wendi was being reduced to submission in another way: an incestuous relationship with Alejo. Not surprisingly, Donna provides the most details. Yet Alejo's recollections are consistent with the main elements of Donna's, and many of his statements reveal the incestuous nature of his relationship with Wendi.

416. A first example is Donna's account of how, beginning when they moved to back to Casa Grande, Alejo routinely insisted that Donna and Wendi rub his head, back and

185

legs -- and how Donna was relieved to have Wendi take on responsibility for this unwanted task. Donna's first account of this behavior, immediately below, is consistent with REDACTED story of Alejo making her and Wendi rub his head and legs. (Her second account, presented later, is consistent with REDACTED account of Alejo putting his face in her crotch.) According to Donna:

> "Once we were back in Casa Grande after the traveling ministry, every
> evening, Alejo sat on the floor and wanted Wendi or me to rub his head, back
> and legs. Being at home was almost like being in a harem with Wendi and I
> pampering Alejo, with him in control. The main focus of everyone's attention
> was to soothe him and respond to his every little need.... After a while, maybe
> after the first months or a year back in Casa Grande.... when Wendi was nine
> years old, she took over almost all of the work rubbing Alejo. It was a relief
> to have Wendi rubbing Alejo so that I didn't have to do it." (Tab 27, at ¶ 255.)

417. One of Donna's entries in the "Treasured Memories" high school graduation present suggests that, at least at the beginning, it was not only Alejo who insisted on such behavior. That is, in the "Treasured Memories" booklet Donna completes the phrase "Remember when" with "dad & mom would whine so that you'd rub our backs or legs. Sometimes you'd fall asleep while you were rubbing Dad's legs and I come out and wake you both up." (Treasured Memories booklet, Obtained by Capital Case Project.) However, in his interview with me Alejo acknowledged that Wendi took over responsibility for pampering him as Donna increasingly withdrew from both of them, and that such an arrangement continued to be common until Wendi was in high school.

186

418. Indeed, in my interview with Alejo, when asked about ways Wendi used to "baby" him – a phrase he had used earlier in the interview and I had heard numerous times from Wendi – Alejo replied, "She or Laura would scratch my head. I think they did it to get me to fall asleep." Hearing this, I recalled Donna's account and Jeri Lynn's memory of Alejo having "forced" Wendi and her to rub his feet and head and how it "felt so wrong." After pausing as those words and images went through my head, I asked Alejo, "So it was their idea?" He responded that, yes, it was entirely their idea.  Once again, Alejo's statement is deceptive, self-serving, and inconsistent with multiple other witnesses' declarations. Also notable: Alejo only mentioned that Wendi and Laura scratched his head, but not (as described by Donna, REDACTED and Wendi) his legs, which put the girls' heads and faces closer to his genitals.

419. Nor does Alejo mention, as REDACTED , Donna and Wendi have independently reported, the way he would put his head between Wendi's and her friends' legs so that his face was inches away from their genitals. Below is Donna's more detailed recollection of this perverse and sexually abusive ritual. Based on REDACTED recollection and Wendi's as well, Donna's account appears accurate with respect to how the participants' bodies were clothed and positioned, and what they were doing.

> "From age ten or eleven onward, until she left to go out on her own as an
> adult, almost every night, weekdays and weekends, as long as Alejo was home
> which he was most of the time, Wendi spent a couple of hours rubbing Alejo's
> head, back, and legs. While she rubbed him Alejo was partly dressed. When
> this first started, he had his shirt off. After a while he just wore shorts, and
> then it got so he was stripped down to his briefs all the time while Wendi

187

rubbed him for a couple of hours each night. What Wendi wore while she
rubbed Alejo varied. During the warm weather she wore little pajama shorts
and a pajama top like she wore at the sleepovers with Jeri Lynn and Laura, or
she put on one of Alejo's T-shirts with just her underwear on underneath....
By the time she was eleven or twelve years old, sexy underwear was the only
kind of underwear Wendi owned.... Alejo really liked to have his head in
Wendi's lap while she rubbed him beginning when she was nine years old and
throughout her teens. At the time we called it being in the position of Wendi
'ministering to him,' although there was no religious aspect to it. Another way
we described it was Wendi touching or 'touching on' Alejo. He was
constantly saying to Wendi in a kind of whiny way, 'Just touch me,' or 'Why
don't you just touch on me.'" (Tab 27, at ¶¶ 276-77.)

420. Both Donna and Alejo describe several elements of the process by which Donna
increasingly withdrew from both Alejo and Wendi and Alejo increasingly made Wendi
meet what he experienced as his emotional and sexual needs. In the literature on sex
offenders, what Alejo did to Wendi, including the progression of less and less clothing
worn by each of them during the "touching on" ritual, is known as "grooming." This
refers to a process whereby a pedophile gradually and progressively manipulates a child
into increasingly intrusive sexual acts. As we can see from Donna's account, in
incestuous families like theirs much of the grooming can happen right before the eyes of
the neglectful and withdrawn parent.

421. Another key factor in this process, although a background one, was that neither
Donna nor Alejo had any friends or emotionally significant relationships with other

188

adults. Donna recalls, "We never had any activities or dates with other adults or adult couples, and never had other adults, not even people from the church, into our home to have a meal, spend the evening together, or have an activity." (Tab 27, at ¶ 252.) Alejo says "There were not a lot of things I did with other adults and did not have many adult friendships. I have been very guarded from being hurt too many times in the past." After friendships with two other couples during their first year in the church/cult, which ended when Cal and Barry Lots left, Alejo reports that he "never really had any other adult connections." (Tab 24, at ¶ 93.)

422. In Donna's case, she responded to her childhood of neglect and trauma, and then to her marriages with deeply disturbed men, as well as the bipolar disorder from which she suffered, by withdrawing from all non-work relationships and retreating into her own private world of reading books or sleeping. At one point Donna says that Alejo "broke up" her and Wendi, though as we have seen, from day one Donna had minimal interest in having a relationship with Wendi. Alejo, in contrast, like many sexually obsessed and pedophilic men, upon failing to get his emotional needs met (or at least substituted for) through sexual relationships with adult women, attempted to fulfill those needs via intimate and sexualized relationships with children. Children who were less likely to hurt him, and more likely to gratify him, because he could use his adult authority and power to control them. And so, in a classic pattern of many families plagued by incest, the more Donna withdrew the more Alejo turned to Wendi and coerced her into meeting his emotional and sexual needs.

423. Donna recalls, "Beginning when she was ten or eleven, Wendi cooked for Alejo and they ate meals together and spent evenings together without me." (Tab 27, at ¶ 248.)

189

Confirming Donna's recollections, Alejo notes, "Wendi and I spent a lot of time together. There were many evenings that Wendi and I spent together without Donna because Donna went to sleep so early." (Tab 24, at ¶ 86.) Also, Alejo and Wendi's nighttime routines typically took place after they had already, as other witnessed have reported (see above), spent much of the afternoon together on the church/school grounds.

424.  Donna's and Alejo's written declarations provide a great deal of detail on this incestuous family constellation, only some of which can be addressed here, and most only with a brief mention. A few quick examples: Alejo says he was not just Wendi's father, but her "friend" and "buddy." (Tab 24, at ¶¶ 92-93.) Donna recalls how, on long drives for family vacations, Alejo and Wendi sat in the front seats together, "like they were the married couple and I sat in back, usually sleeping most of the way." (Tab 27, at ¶ 250) Alejo reports, "I often kept Wendi from home on Mondays while Donna was working just for Wendi to have a chance to hang out or for us to go shopping." (Tab 24, at ¶ 85.)

425.  Summing up the situation, Donna says that by age eleven, Wendi "was more partnered with Alejo than I was, almost like she was his spouse," and that "the only social life Alejo had outside of church activities was with Wendi and her girlfriends," including sleepovers with Jeri Lynn and Laura Kelly, when Donna was either not home or "in another room reading or asleep." (Tab 27, at ¶¶ 247, 252.)

426.  Before getting into some details of Alejo's sexual abuse of Wendi, it is helpful to revisit the centrality of sex in Alejo's world.  He does not admit his constant and compulsive sexual comments to women and girls, the ways he loved to lick his finger and rub it against their ears, his repeated fondling of REDACTED  breasts in Wendi's bed, nor a

190

variety of other abusive behaviors described by Donna below. But Alejo does reveal the obsessive sexuality that consumed him and that he imposed on others, including Wendi, during the time covered here, when she was nine to thirteen years old. For example, Alejo describes speaking in tongues during these early years of 91st Psalm: "the spirit would come" in an "amazing experience" that "feels like a rush of cocaine onset... a momentum that starts slow and builds... like a good orgasm." (Tab 24, at ¶ 107.) Another example: What happened when Alejo took off a day each month from his church and school duties to "go into meditation." He says he would "pray and get close to God," and from whom he would receive revelations:

> "Many times after these days in isolation, I came back knowing things about
> Wendi or Donna that they never told me. Here's a cute one – I found at that
> there were certain things Donna wanted me to do in bed and I did them and
> there were explosions. She never told me and when I did them, she asked me
> how I knew that was what she wanted. Sex is from God and I can recall
> praying for revelations of how to please Donna better in the bedroom." (Tab
> 24, at ¶ 111.)

427. In short, when Alejo experiences himself as connecting to "spirit" or God, whether while speaking in tongues or "meditating," it is *sex* that tends to come up and dominate his experience. And if Alejo indeed believes that God also revealed to him things about Wendi (not just Donna) that she had "never told" him, then it's safe to infer that many of those alleged "revelations" were sexual too: Perhaps about the kinds of lingerie Wendi "wanted." Or about how Wendi "wanted" to wear that lingerie to, as Lonnie Carlin recalls her saying, "look her best" for Alejo. Of course it's the opposite:

191

Lonnie Carlin says Wendi told him that *Alejo* wanted those things; REDACTED says Alejo "forced" her and Wendi to wear nightgowns as a condition of taking them into the desert. But in the deluded mind of Alejo Ochoa, it was Wendi who secretly wanted these things, and God who sometimes let him know.

428. Alejo also acknowledges that his obsession with sex, and his frustration at not getting as much sex as he wanted from Donna, was *the* main source the anger he almost constantly directed at Donna and Wendi during these years. As Alejo recalls, "Donna had two surgeries. The first was a partial hysterectomy and the second a complete hysterectomy. After the first surgery, I did not touch her sexually much until she was healed. After the second surgery, she became really cold toward me and I became more and more frustrated." (Tab 24, at ¶ 120.) Even before the surgeries, when Donna was feeling "more discomfort," Alejo says he "always" wanted more sex than she did. He then describes how he responded to this predicament:

> "As a result, I was often frustrated. My frustration led to me losing control and yelling at Donna. Typically, Donna and Wendi retreated to another room and I often left and went out to cool off. What I had a hard time dealing with was that over time in our relationship, Donna refused to do things with me sexually that she previously seemed to enjoy. I tried different things to get her interested in me again but it just did not happen." (Tab 24, at ¶ 121.)

429. Alejo goes on to describe how his sexual frustration and resulting extreme anger were at times daily features of the household. He says Donna "would always have an excuse" for not wanting to be sexual with him, that it "would start in the morning with her refusing me and then it built and built all day and I spent the day hoping she would

192

change her mind until I was ready to explode." He started by "slamming doors to let them

know I was mad." Such angry behavior "only made things worse and turned [Donna] off"

to him sexually, which meant she "clammed up," which only made him more angry.

Alejo says that Wendi – who repeatedly witnessed this cycle of his angry attacks, her

mother's withdrawal, and Alejo's increasing anger until he "exploded" in screaming

rages – "took it hard and did not like it when I exploded." (Tab 24, at ¶ 123.) Alejo also

reports that Wendi often witnessed him and Donna "avoiding each other" for days after

he had exploded. (Tab 24, at ¶ 124.) In contrast to Donna, Alejo says, Wendi "always

forgave me when I apologized and hugged me after blow ups." (Tab 24, at ¶ 123.)

    430. Based on Donna's account of these events, which is consistent with Alejo's

albeit from her perspective, we can see that Wendi accepted Alejo's apologies largely

because Donna was withdrawing not only from Alejo but from Wendi too – and even

more than she had before. Donna remembers that Alejo would become even angrier when

all three of them were together, "so Wendi and I put all our energy into trying to make

him feel better, which ruined the experience of whatever we were trying to do together,

so we got used to interacting with Alejo individually." (Tab 27, at ¶ 251.) Yet Wendi

remembers these times, when she and Donna placated Alejo after his enraged outbursts,

as the only times she felt connected or aligned with her mother rather than Alejo, albeit

briefly and in the shared unhappiness of placating him. Either way, as is clear from

Donna's other recollections, what happened was that Donna withdrew even more from

both Alejo and Wendi, not that both she and Wendi "got used to" spending time alone

with Alejo.

193

431. This meant Wendi was stuck with Alejo as the only parent and the only family member to whom she could turn for any emotional connection or companionship. Donna recalls the time of her surgeries, and her even greater withdrawal from Wendi when she began working full-time when Wendi was fourteen (covered below): "It was easier for me to let Wendi spend so much time with Alejo because I got to ignore him, avoid the unpleasantness of being around him and his anger, and go into my room to read." At the time, however, Donna rationalized her actions and Wendi's predicament – as Alejo always did – as what Wendi *wanted*: "I told myself that was what Wendi wanted, but most of what she did with Alejo was actually to pamper him and make him feel better." (Tab 27, at ¶ 248.)

432. It is a classic incestuous family dynamic: An immature, emotionally damaged, severely limited, sexually obsessive and compulsive (step- or adoptive-) father becomes increasingly frustrated by the attempts of his equally (though differently) damaged and limited wife to resist his sexual advances and generally avoid contact with him; and both parents increasingly convince themselves, in their own self-serving and self-deluding ways, that their daughter *wants* to replace her mother as her father's intimate partner. The daughter, already long neglected and abused thanks to her parents' inabilities (even under the best of circumstances) to love and nurture her, and always desperate for whatever attention and affection she can get within the family, resigns herself to conforming to her parents' pathological wants and wishes. She further subverts her own wants and needs to theirs, and submits to her father's progressively more intrusive sexual abuse, with devastating short- and long-term consequences.

194

433. Beginning when Wendi was nine or ten years old, Donna *did* witness Alejo engaging in plenty of sexualizing and sexually abusive behaviors with Wendi. She saw the nighttime "touching on" ritual between scantily clad Alejo and Wendi. She was along on outings when Alejo took Wendi shopping for lingerie and other revealing clothing. Donna saw and heard Alejo routinely subject Wendi to verbal sexual abuse, just as Alejo's aunts, uncles and parents had done to him beginning when he was the same age. Donna watched Alejo pull Wendi into pornographic sections of stores, and into whole stores devoted to pornography and "adult" paraphernalia.

434. Let us begin with the Donna' recollections of how Alejo "constantly teased, picked at, and provoked Wendi" throughout her childhood and adolescence; how he did so "ruthlessly," keeping at Wendi despite the obvious suffering it caused her, "almost as though he was intentionally trying to break her down and trying to be hurtful and malicious." (Tab 27, at ¶ 257.) Donna recalls, "Beginning when Wendi was a pre-teen, Alejo especially degraded her when she said something clueless, which she did fairly regularly." (Tab 28, ¶ 89.) Donna remembers getting frustrated and angered at the way Alejo "degraded her constantly," and how when Donna told him to stop and leave Wendi alone, he retorted, "No, she likes it." (Tab 27, at ¶ 257.)

435. Beginning when Wendi was about ten years old, Alejo's verbal abuse became predominantly sexual in nature; he "picked at her constantly about sexual topics and feminine hygiene." For example, Alejo relished teasing Wendi when commercials for products like Tampax appeared on TV, asking her questions like, "What are those? Do you need those? What do you use those for?" Donna recalls how Alejo constantly attempted to "embarrass and shame" Wendi in these ways. And whenever Wendi or

P-App. 002323

Donna protested, Alejo insisted that Wendi *liked* – and thus by implication, *wanted* – to be subjected to such shaming, degrading and humiliating verbal sexual abuse. (Tab 27, at ¶ 256.) (Nor did it help that, consistent with the incestuous family dynamic articulated above, Donna never felt comfortable talking with Wendi about sexual or reproductive issues, and even sent Wendi to Alejo when she had her first menses; Donna admits this, but also attempts to deny responsibility and blame it entirely on Alejo. (Tab 27, at ¶ 285.)).

436. Another sexually abusive behavior that Alejo started when Wendi was around ten years old was taking her into the "adult" section of Spencer's Gifts, a store found in most suburban malls. As Donna recalls and remains true today, Spencer's sells "everything from blow up dolls and other sex toys to gadgets like black lights and lava lamps." They visited the store regularly, "maybe once per month," and Donna liked to look at some of the "cute things" in the store. Alejo "always wanted to take Wendi in [the adult section] to see what was new." (Tab 27, at ¶ 271.) When they went in the store, Donna and Wendi "tried to look at the less explicit and cuter things, but he always called us over to look at the adults-only sex stuff.... He loved looking at the sexually themed and explicit greeting cards" (like those he has sent to Wendi in prison, shown above). She continues:

> "Wendi and I always came to look when he called us over. I always gave him
> a disgusted look and took off to look at something else. When Alejo told
> Wendi, 'Look at this!' at first Wendi said, 'Dad!' not wanting to look at the
> stuff, but once Alejo got started she didn't have a choice. He replied, 'Look at
> this. Don't be that way,' and early on, maybe for the first two or three visits,

196

she said, 'I don't want to,' until he ordered her, 'Look at it,' so she gave in and did look at it. After the first few visits, she knew she had to look and didn't argue anymore." (Tab 27, at ¶ 272.)

437. Donna then describes what Alejo did once he had coerced his ten year old adopted daughter, without her mother stopping him or making any effort to protect her, into complete submission to this form of sexual abuse. "Wendi looked at a lot of the sexually explicit adults-only items and spent a lot of time with Alejo in the adult section at Spencer's from the time she was ten years old onward. She spent as much time as Alejo wanted looking at whatever he wanted." This included "everything from adult magazines and cards to board games where the point of playing the game is answering questions about personal sexual preferences, experiences, and practices..." (Tab 27, at ¶ 273.)

438. On the trips to the mall, Donna could see what was going on. But as Alejo himself acknowledges, he spent a lot of time going shopping with Wendi alone, including taking her out of school to do so. (Tab 24, at ¶ 85.) Donna recalls, "By age twelve or thirteen, when Wendi and Alejo went shopping together, they went to lots of different places, and did so fairly regularly, most of it without me." How did Donna think and feel about this at the time? "I didn't care to know where they went or what they did while they were shopping without me." (Tab 27, at ¶ 275.)

439. Many of Alejo's shopping trips with Wendi were about buying her lingerie and other clothing that Alejo found sexy and exciting on his young daughter. Donna recalls, "The clothes Alejo bought for Wendi starting when she was about ten or eleven years old often surprised me because they were a lot tighter, shorter, and provocative than anything

197

I ever bought for her." Some were "not things she could wear around anyone we knew, much less to church activities or the church," and many were "too sexy and inappropriate for her to where anywhere other than when she was at home with Alejo or when the three of us went on trips to California." (Tab 27, at ¶ 262.) She is referring here to the "revealing lingerie," including "thongs and panties," that Lonnie Carlin remembers Wendi frequently dressing in when other children visited her home when she about ten or eleven years old -- which Lonnie remembers Wendi saying Alejo "liked her to 'dress up'" in so she would "look her best."

440. Not surprisingly, Alejo reports taking Wendi clothes shopping but does not reveal what he bought and pretends he was merely giving Wendi what *she* wanted: "I took her clothes shopping. Wendi preferred to go with me because I agreed to what she wanted to buy and did not mind buying things for her." (Tab 24, at ¶ 85.) Donna recalls that whenever she wanted to take Wendi clothes shopping Alejo made excuses for why she could not, and before long she gave up on trying. (Tab 27, at ¶ 264.)

441. Donna also notes the complete contradiction between what Alejo said and did in his role as youth pastor at the church, where he "preached against that kind of inappropriate behavior," and what he did with Wendi at home. (Tab 27, at ¶ 263.) When Wendi's church friends spent the night for sleepovers, Alejo had them dress in such clothing too. Donna remembers, "while I was sleeping or reading, the girls were often in little baby-doll pajamas that included little shorts and sleeveless or spaghetti-strap tops that were loose and open and didn't cover very much when the girls moved around." (Tab 27, at ¶ 263.)

198

442.  Looking back, Donna recalls, "By the time she was twelve or thirteen [and until she left home], Wendi had at least a dresser-drawer, maybe more, full of little frilly bras and lacy, frilly, sexy underwear." Alejo bought Wendi "tiny little shorts, and little halter-top-type T-shirts," and "lots of little sexy outfits" and "lots of high heels." (Tab 27, at ¶ 266.) These were not things that Donna would wear, and she recalls taking back lingerie whenever Alejo bought it for her, to exchange for something more comfortable. She also remembers that when Wendi was twelve to fourteen, Alejo bought her "lacy, silky, or satin garter belts, the corset kind of underwear that comes in separate pieces where the panties or bottoms hook or snap to nylons so there's a sexy gap at the top of the thighs around the panties." Remarkably, Donna continues, "I specifically remember him buying those for Wendi, including the nylons," and then delivers an another stark admission of her neglect and abandonment of Wendi to Alejo's sexual predations: "I had no idea why Alejo was buying Wendi underwear like that when she was a pre-teen and early teen, and didn't think about it." (Tab 27, at ¶ 267.)

443.  Despite Donna's willful ignorance of Alejo's motives, her efforts to look the other way, and her unwillingness to admit what was going on, she remembers even more such detailed stories, too many to include here. But two more should not be omitted. They end this section on Donna's and Alejo's recollections of the period when Wendi was nine to thirteen years old.

444.  The first are Donna's memories of witnessing Alejo taking Wendi into lingerie stores, including Victoria's Secret and Frederick's of Hollywood. Donna recalls, "We all knew when we went into those stores that the purpose of being there was to buy sexy underwear and sexy little outfits for Wendi." (Tab 27, at ¶ 270.) Alejo even planned a trip

199

to the original Frederick's of Hollywood. "Alejo specifically and specially wanted to take Wendi into that store," and "a big part of why we made that trip to California was so Alejo could take Wendi shopping for underwear in the main or original Frederick's of Hollywood store." (Tab 27, at ¶ 270.)

445. Finally, Donna reports many details on how Alejo behaved with Wendi and her friends when they had sleepovers, including not only, as noted above, the skimpy clothes the children wore, but also how Alejo would "cuddle" and "wrestle" with the girls in physically intimate and overpowering ways, such as pinning them to the ground and refusing to get off despite their protests. (Tab 27, at ¶ 278.) These reports of Donna's are consistent with REDACTED reports – of forced wearing of nightgowns, forced rubbing of Alejo's head and legs, and Alejo putting his head and face in her crotch. When it comes to Alejo's memories of these sleepovers and the young girls involved, as would be expected, they are simultaneously superficial and disturbingly revealing. Consider, for example: "I had a very close relationship with REDACTED and she slept over at our house many times. She was a very obedient and a good kid. She did anything I said..." (Tab 24, at ¶ 98.)

446. Let us sum up what we have learned from Donna's and Alejo's recollections of this time, from when Wendi was nine years old and the family joined the 91st Psalm church/cult community, until she reached age fourteen and began to act more like a teenager. Both Donna and Alejo agree that by age thirteen or fourteen Wendi seldom "needed to be swatted" because, at least for a time, she obeyed nearly all rules of their home, school and church. But when had Wendi reached age thirteen her submission, indeed her sacrifice, entailed much more than that. Just as Donna had been relieved to

200

hand Wendi over to Alejo when they first met, when Wendi was nine Donna was relieved to hand over "all the work of rubbing Alejo's head, back and legs," and Donna was even more relieved, after her hysterectomy surgeries when Wendi was ten and eleven, to hand Alejo completely over to Wendi and saddle her with the responsibility of satisfying Alejo's needs for emotional intimacy and sexual pleasure. In short, Donna's relationship with Wendi and Alejo went from "I can't handle her. I don't want her. YOU take her," to "I can't handle his constant sexualizing and anger. YOU take him," and "I can't handle your constant sexualizing and anger. You take HER."

447. **Wendi ages nine to thirteen: Wendi's memories.** As discussed above, Wendi suffers from severe autobiographical memory deficits. Compared to normal healthy adults, she has few specific autobiographical memories, particularly of unpleasant experiences. Instead, she tends to have "over-general" memories that are more like summaries or overviews of types of experiences; even those are typically incomplete and have few visual images. When Wendi does remember experiences of neglect or abuse, she tends to say she "feels" that something happened. Because I conducted several interviews with Wendi, it was possible to acquire a number of general and specific memories that are consistent with reports of witnesses from outside the family and recollections shared by Donna and Alejo.

448. Also as discussed previously, and as is common for adults sexually abused by a parent, the causes of Wendi's memory deficits include motivational ones. In our very first interview, before I had asked for any childhood memories, two of the first things Wendi said were, "I feel like memory is really vulnerable to suggestion," and "I don't want it [her memory] to turn into a monster." That is, she was afraid of have false or distorted

P-App. 002329

memories, and of hurting anyone. At the same time, Wendi suspected there were memories of abuse by Alejo that she could not recall, because she then began crying and said, "I get so worked up every time we talk about my Dad. I don't have a memory, but I know something's wrong," and then cried some more. In one of our last interviews, after Wendi had managed to access and report memories of her father repeatedly making sexual comments to her, but not memories of him buying or making her wear lingerie, Wendi said, "I feel like I'm betraying people, and I feel like that's why my dad isn't coming to see me, because he feels like I'm betraying him." She also said, as she had several times before, that she has no memories of her father touching her sexually, and "If I was to remember something, I feel like I'd be so disloyal."

449. Importantly, this does *not* mean that Wendi was consciously and deliberately withholding memories that she had in fact retrieved into awareness during our interviews. It just means that, like many adults sexually abused by a parent who continues to have a significant place in their lives, Wendi had some very good reasons for not wanting to remember. Such motivations can operate automatically, and outside of awareness, to prevent abuse memories from being retrieved into awareness. Indeed, in these cases, remembering any such abuse experiences, even the mildest and most "borderline" behaviors, requires working against automatic and deeply ingrained habits of not doing so. Also, as discussed previously, all of the evidence suggests that the severe emotional neglect, emotional and physical abuse, as well as sexual abuse, prevented Wendi from developing a healthy, integrated sense of self. Instead, she suffers from significant pathological "dissociation," in which different categories and realms of experience – including memories associated with them – are disconnected from each other. When this

202

is the case, thoughts, feelings, perceptions and memories associated with sexual abuse are disconnected from normal everyday awareness and the sense of self with which one identifies. To clarify, Wendi does not suffer from Dissociative Identity Disorder, formerly known as "Multiple Personality Disorder," which is the most extreme form of dissociative pathology. But she does suffer from significant dissociative pathology, as has just been described, which contributes to her difficulties accessing memories of sexual abuse in usual waking states of consciousness.

450. Consistent with these formulations, Wendi herself said, in one of our final interviews, "One of the things I've realized in this process is that I have to *make* myself remember because it's not in my nature to." She then added, "My thoughts don't go there, and when they do go there it tends to be on a meaningless detail and to go round and round," such that she does not fully access the memory. Here Wendi is describing common and well-known memory processes in many adults who have experienced chronic and pervasive childhood neglect and abuse.

451. In this section on Wendi's memories covering ages nine to thirteen, most of the focus is on incestuous family dynamics and what Wendi can remember of Alejo's sexual abuse, which is but a fraction of what other witnesses and victims, as well as Donna and Alejo, have reported. Less space is devoted to Wendi's memories of her church and school experiences and Alejo's emotional and physical abuse of her. Wendi reported a few specific and many general memories of the 91st Psalm/Harvest church and school environments, including isolation, humiliation, beatings and general harsh domination of children by adults with power in that community. Those memories were either consistent with the memories of witnesses provided above, or contained other details that shed light

203

on her relationship with Alejo. Similarly, Wendi's memories of Alejo physically beating her provide insight into their relationship.

452. I assessed Wendi's memory for most of the incidents of physical and sexual abuse (and strong evidence of sexual abuse) reported by witnesses in the community and her mother. Most but not all of the incidents and evidence reported by others were addressed in three days of interviews specifically focused on potential memories of sexual abuse. In those interviews, as in all of my interviews, I used well-established, research-based methods specifically designed to avoid memory fabrication or distortion.

453. With respect to the church/cult community, Wendi recalls surreptitiously listening, sometimes with Shawn King, to conversations of Cal, Tom, Alejo and others in the main office. From as early as she can remember, Wendi says she "always knew" Alejo's background, that is, "that he was not from the church," because he told her stories of doing drugs, being a "drug mule," etc. But hearing Alejo talk to other adults about such experiences, and in the church office, was an entirely new experience. Wendi remembers being surprised and fascinated by how they spoke of their past substance abuse and related exploits as the most fun and most exciting experiences of their lives. She remembers the excitement of hearing the adults' gossip. "That's how we would learn about who was giving how much money [to the church], who was cheating on who." Wendi was struck, more generally, by the glaring contradiction between church/cult leaders' public statements and personas and what they said and did privately, and by their rank hypocrisy. For example, she remembers that "Grown-ups always said 'love everyone,' but they'd talk mean about other people."

204

454. Although Tom King and other adults' physical brutality toward children was consistent with their church's teachings, Alejo's compulsive sexual harassment of girls and women was widely recognized as against church principles, even if Tom ignored and denied it. But when it came to Alejo's behavior at home, like her mother Wendi could see that the contradiction and hypocrisy were nearly total. Wendi recalls, "My father had two sets of behaviors." On the one hand, "the public presentation was all these strict rules, but I knew a different side that didn't apply these rules to us at home." She remembers that her father "preached not to watch TV but loved Miami Vice," and eventually let her watch it too. She recalls that, before too long, "I was always aware of those silent rules.... What was allowed and what wasn't, with whoever I was around.... Even within the church, there were lax people, and I knew and made adjustments."

455. In short, Wendi recalls continually being confronted, in her community and at home, with massive contradictions, hypocrisy and moral confusion in the adults who were supposed – and claimed – to be instilling morality in her and the other children. And she remembers doing her best to navigate the unwritten rules and adapt herself, chameleon-like, to the demands of different people and situations.

456. Looking back on the sleepovers with her friends, Wendi remembers Alejo being "just a lot more liberal than my mom, and letting me and my friends watch movies with sex and nudity. At the time he was the fun dad in this strict community." She does not remember experiencing discomfort while watching those movies with her father and her friends. Indeed, it was not until years later, in the prison where she is now, that she finally "realized it wasn't appropriate," and only when she "talked to other women about their dads."

205

457.  With respect to Alejo's regular physical beatings of her, Wendi had few specific but several general memories of what it was like to be on the receiving end of the abusive "discipline" preached and practiced by Tom King and her father.  She recalls feeling the (completely natural and healthy) resistance that any child would experience when a parent attempts to impose, though violence, absolute and unquestioning obedience and submission (which, as explained above, actually thwarts the development of age-appropriate capacities for self-regulation and internalization of rules and values). "He'd get stubborn, and I would too…. He could spank me and it's supposed to break you down and make you sorry, but I'd still hold my opinion… I'd clench my jaw… It could be fifteen swats [without her giving in] and then he'd storm off." Other times she pretended to submit. She also remembers that Alejo often beat her with obvious anger while denying he felt any.

458.  Sometimes Wendi cried and gave in because she sincerely "didn't want to be a disappointment" to her parents. She knew, having heard it so often at church and school, "they wanted 'true repentance.'" At times she sincerely tried to give it to them, even when she knew the punishment was unfair.  Wendi also remembers how, when she was left crying after a beating, she had to stay alone in her room, with no one to comfort her. "I wanted to go cry to them but I couldn't… it felt horrible… As long as you were crying and upset, you had to stay in your room… So you had to pretend it was OK, be extra-smiley, extra-cheerful." At that moment, remembering herself as a hurt and confused young girl pretending everything was fine and even (as Jeri Lynn gratefully remembered Wendi teaching her) turning up the fake happiness, Wendi broke down and cried.

206

459. As we can see from the sampling of memories above, the regular beatings from Alejo involved all kinds of painful emotions and relationship dynamics. Thanks to the craziness of the 91st Psalm/Harvest cult, unlike many physically abused children, Wendi's experiences were additionally freighted with extremes of condemnation and attributions of "evil" upon any perceived rebellion against adults' authority and power (recall Tom King's sermon). Like most abused children, though, Wendi had no one to help her safely acknowledge and feel, let alone make sense of, the confusing and contradictory emotions and relationship dynamics – emotions of fear, sadness, shame, and anger; dynamics of domination, submission, resistance, dishonesty, hypocrisy, and isolation. Given her temperament and personality, Wendi blocked all that out as best she could, and pretended everything was OK. She acted "extra-smiley" and "extra-cheerful." She focused on taking care of others – especially Alejo but also other children. And like most abused children, who want more than anything to be loved and happy, Wendi did her best to do well in school and have fun with her friends.

460. As Alejo himself has reported, and consistent with Donna's recollections, his most common (non-sexual) abusive behaviors in the home were yelling and screaming at Donna and Wendi. Recall Alejo's accounts of feeling, from when Wendi was ten years old, sexually rejected and frustrated by Donna pretty much every day, and of responding to that frustration with building anger that led to explosions of rage at Wendi and Donna. Wendi remembers that Alejo "had a very short fuse" and that it was "scary" and upsetting when he screamed at her. Wendi also remembers that her mother never attempted to comfort her, and when recalling this added, "In fact, it was our job to help him calm down." She also remembers working with her mother to calm a raging Alejo as the only

P-App. 002335

times she felt at all close to her mother. Otherwise, Wendi recalls, "It was me and my
Dad together and my Mom over there."

461.   Wendi also remembers – as does her mother, who admits to increasingly
abandoning Wendi to Alejo during these years – that it was increasingly Wendi's job
alone to pacify Alejo, especially after an explosive outburst had passed. Wendi recalls
that Alejo would often rage at her and her mother, abruptly storm out of the house and go
for a ride in the car, and then come back expecting and demanding to be, as Wendi put it,
"babied." When Wendi accessed these memories in our interview, she continued, with a
look and tone of amazement: "I spent *so much time* babying him." She recalled, "He'd lie
on the couch and I'd rub his legs…. I remember my mother doing it a few times. But she
didn't want to. She'd say, 'Wendi, you do it.'" Wendi's memories her are consistent
with those of her mother and Alejo, and with Donna handing Wendi to Alejo and pushing
Alejo toward Wendi while she retreated into working, reading and sleeping.

462.   Reflecting further on her mother's perspective at the time, Wendi remembered,
"She was displeased with him. She was the responsible one [working and bringing in the
money]. She didn't want to be catering to him." Reflecting on the lessons she herself
absorbed from years of repeating, on nearly a daily basis, this cycle of Alejo getting
angry, screaming and yelling, then requiring literally hours of "babying," Wendi said: "If
I get you angry, you care, and I can soothe you." (Indeed, even from Donna's account
alone it is clear that Wendi would have experienced Donna as not caring enough to get
angry or feeling much of anything toward her.) Furthermore, it was not just a matter of
soothing Alejo after he got angry, but attending to his needs and wishes so preemptively
and subserviently that he might not get angry in the first place. Wendi reflected, "You get

208

put in the position of helping him not be mad any more, creating an environment where he won't get mad." In addition, even when Alejo was ostensibly paying attention to her, or doing things for her – whether it was shopping, playing with her and her friends, watching TV together – it was really about *him* and getting *his* needs met, which mostly meant his needs for sexual stimulation and gratification. As Wendi once succinctly put it, a common experience growing up was "getting attention but feeling ignored."

463.  These repeated experiences, Wendi recognizes now, gave rise to patterns of relating to others that have manifested throughout her life, in all of her relationships, large and small, including in prison to this day. If someone is angry – whether that anger is caused by her, directed at her for no good reason, or directed elsewhere and has nothing to do with her – Wendi feels *driven* to make that person feel better, because she believes, "then they will like me." If someone likes her and is nice to her, Wendi strives to be even nicer to them and to take care of them, because this is the only way she knows to avoid them getting angry at her or abandoning her. Yet these ways of relating leave Wendi feeling, usually implicitly and without reflecting on it, that the other person does not really know or care about her needs and is just using her. In short, the very ways she attempts to avoid neglect and abuse in adult relationships leave her feeling neglected and used.

464.  These are not uncommon patterns of relating in people who have suffered chronic childhood neglect and abuse that included being forced to sacrifice their own needs and wants to those of their abuser.

465.  Several times in our interview, consistent with the primarily associative nature of human memory recall, talking about "babying" Alejo elicited unwanted memories of

209

what Wendi now recognizes were his sexually inappropriate behaviors. (Wendi never used the phrase "sexual abuse" to describe any of Alejo's behaviors toward her, though many certainly were.) It is to those sexually abusive experiences – at least those that Wendi can remember, and to the extent she can, that we turn now.

466. After talking about "babying" Alejo, Wendi continued: "I hated scratching his legs… My father would never wear underwear… sometimes you could see his penis." She then recalled how she tried to avoid seeing his genitals: "I could usually end up scratching his head." Asked if Alejo ever had an erection, she replied, "Oh my goodness! I don't recall…." Her comment reveals several things: How she simultaneously submitted to Alejo's demands to do things he found sexually gratifying and attempted to minimize her awareness of the sex involved; how she has blocked herself from remembering the most disturbing and conspicuous sexual aspects of these experiences; and how she hopes others might remember and save her from having to "betray" her father.

467. Wendi then added that she remembers Alejo walking around the house with his robe open, and how "you'd have to look the other way" not to see his genitals. She also recalled that whenever she complained to her mother, the response was inevitably something like, "Well, that's your father." Similarly, when asked about her earliest memory of something "sexual" with father, Wendi recalled how, when they lived in the house of Cedar St. (from ages nine to eleven), although Alejo had his own bathroom and she and her mother had theirs, Alejo often came in when she was talking a shower. "I remember screeching, 'What are you doing in here?!' and him being like, 'What's wrong with you? The shower curtain is closed.'" She continued, "I even have a memory of telling my mother, complaining about my father coming into the bathroom when I was in

210

the shower, and her saying, 'Well, you know your father.' I can hear her saying that to me. And she's just saying it in passing, continuing to do what she was doing and just brushing me off."

468. As described above, in the section on Donna's and Alejo's recollections of this time, there were several factors that contributed to the incestuous family dynamics and Wendi's increasing subjection to Alejo's sexual abuse. These include Donna and Alejo's social isolation; Donna pulling away from Alejo, both emotionally and sexually; Alejo's sexual frustration and anger; Donna pushing Wendi, explicitly to sooth and prevent Alejo's anger, and implicitly to tend to Alejo's sexual wishes; Donna avoiding being in Alejo and Wendi's presence to avoid witnessing his sexual abuse and, when such avoidance was not possible, looking the other way. Although Donna did not report having minimized and dismissed Alejo's behavior when confronted with Wendi's complaints, Wendi's memories of such "brushing off" are consistent with Donna's many other acknowledged behaviors that contributed to the incestuous family dynamic and sexual abuse.

469. Wendi also recalled her parents' social isolation after Cal left the church, and how this, when combined with her mother's withdrawal from her and Alejo, left him "starved for affection," which it became her job to provide. Referring to her mother's withdrawal during this time, Wendi said, "I feel like Mom would come home from work, go into her bedroom to eat and read," and that she and Alejo would eat in the living room and spend the rest of the night together, including hours after her mother fell sleep early.

470. Another big contributor to the incestuous dynamic and abuse: Donna did not want to hear from Wendi anything upsetting or anything about sex. Wendi recalled

211

learning early on not to tell her mother anything potentially upsetting, because "she couldn't deal with it." Whenever she did tell her mother something that was "too much for her," Donna would "disappear into her room." Wendi remembers once asking her mother about dating, "and she just wouldn't answer. Then I'd have to go to my father and I'd get more than I wanted, probably too much information." When Wendi had her first period, she was shocked and went to her mother, who responded not by explaining anything but by telling Alejo to go to the store to get pads and tampons. "She seemed very embarrassed, very uncomfortable, like she said, 'Alejo, you tell her.'" In another interview Wendi recalled, "Everything I know about sex I learned from my dad. My mom was too embarrassed to talk about anything." She then continued, "And now, everything sexual I talk about is linked back to him, and that's what I freak out about, because it gets so twisted in my head. I don't mean to be dramatic, but I feel like if I sit down to write a letter in a romantic way [to her pen-pal boyfriend], he's that shadow in the room."

471. In the interview specifically focused on eliciting memories of sexually inappropriate or abusive behaviors by Alejo, conducted in April of 2011 according to strict procedures to avoid leading questions and anything that could lead to false or distorted memories, Wendi was able to access several memories of Alejo being sexually inappropriate. Importantly, she recalled none of the more serious incidents reported by others, such as her wearing lingerie around the house, Alejo in bed with her and $^{RED}_{ACT}$ $_{ED}$ , or being in the adults-only section of Spencer's gifts. This was even the case when, at the end of the interview, those witness reports were explicitly communicated to her. Nor did Wendi ever remember an incident involving undeniably sexual contact, although

212

she did recall – as did Donna and Alejo – how Alejo would "wrestle" with her, Jeri Lynn and Laura when they wore their nightgowns during sleepovers at her house.

472. After the memory of Alejo coming into the bathroom as she showered (and her mother dismissing her complaints), the next memory to surface was of there always being a Frederick's of Hollywood catalog behind the couch. Wendi spontaneously associated to this memory, of which neither I nor the investigators had heard at that point. Wendi said, "In the living room behind the couch he would keep Frederick's of Hollywood catalogs – it's lingerie, more risqué." She then laughed nervously and added, "There seemed to always be one there.... I remember showing          REDACTED          ." After reporting that memory, Wendi continued:

> "I have to go where my mind's taking me. I remember my parents buying me
> two pairs of pajamas, one with footies and one not, one blue and one cream,
> one loose and one tight. I remember being uncomfortable in the tight one, and
> my father really wanting me to wear the tight one, trying to convince me, and
> I always felt really uncomfortable.... [Alejo's] comments and compliments
> were supposed to make me want to wear it more, but I remember in the back
> of my head, it was too revealing, too much.... I was just starting to wear
> training bras, and with the tight pajamas every little thing was showing."

Wendi remembers expressing her discomfort to her father, and him telling her, although she cannot remember the specific words, that her concerns were "not valid, not a worry, not an issue, or whatever you want to call it."

473. This memory parallels one Wendi had reported in an earlier interview – a memory that had also emerged spontaneously, following her recollection of Donna

213

sending her to Alejo when she had her first period. It was of being out shopping with Alejo and him buying a bathing suit that she did not want. Wendi wanted a yellow one and he wanted her to get a white see-through one that felt physically uncomfortable on her body. Wendi made her dislike of the revealing suit perfectly clear, but Alejo insisted on buying both. When they got home and Donna asked why they had bought the see-through one, Alejo replied, "We couldn't decide."

474. In the later interview, Wendi went on to remember how, in general, her father often bought and pressured her to wear clothing that was physically uncomfortable and revealing. However, she reported no memory of wearing lingerie – even at the end of the interview, after being explicitly asked about this, and after being told a childhood friend had reported that she frequently wore lingerie at home in front of other children and said that Alejo liked her to "dress up" and wanted her to "look her best." Indeed, when told of those reports Wendi said, "My reaction to that is: Go away, that's ridiculous. I can't even relate to that." (At that point Donna had not yet reported all the lingerie that Alejo had bought Wendi, the trips to Frederick's of Hollywood, etc.)

475. The next memory to emerge in that interview, again spontaneously and without specific prompting: "Did he or my mom ever tell you how he always called me 'BBW'?" After the investigator present and I replied that no, they had not, Wendi explained that BBW stands for "baggy butt Wendi." She continued, "No matter what I was wearing he would say that. Even everyone at the church knew." Asked what she understood the phrase to mean, she replied, "I didn't know, but it just made me cry." Wendi then said "BBW" was a name Alejo constantly called her. She also spoke, as Donna has and is described above, of Alejo's "Constant sexual teasing – ten times a day." Consistent with

214

a classic dynamic in incestuous families, in which the perpetrator tells the victim and others that she actually *likes* and *wants* his abuse, and when that tactic fails, claims he is doing nothing wrong and the problem is with them, Wendi commented, "I remember my father always telling my mother and me that we were uptight. Even now I wonder, was it me or him? It was always so hard to know because he denied everything and blamed us." Indicative of how Alejo had brainwashed Wendi and she had come to identify with a humiliating nickname that made her cry when she was a pre-teen and teenager, when Wendi created an email address to communicate with Shawn King in the summer of 2000, it was "Wendi.bbw@usa.net."

476. Asked about a comment she had made during a prior interview, about things she "considered telling Kandy" (her therapist while jailed before trial) but never did, Wendi responded, "I didn't really have specific things, but I felt like the topic we were going down I should bring up my dad, but I guess I just wasn't ready to do all that." She continued, "My hesitation, part of my hesitation, I don't have a specific event. It's more emotions and feelings and things that seem to be over the line... everything with sexual overtones on it, always." This was at the beginning of the second of three days of interviews specifically focused on eliciting potential memories of sexually inappropriate or abusive behavior by Alejo. Wendi continued by saying that during the interview on the prior day, and that night in her cell, after having searched her memory, "I can't think of any times my father touched me."

477. However, Wendi then said that for years she has suffered from nightmares in which her father is having sex with her. She reported having to tell her pen-pal boyfriend to stop putting any sexual references in his letters to her, because it was causing dreams

215

of sex with her father. Asked about the dreams, Wendi replied, "I was trying to find one, but I can't – can't even pull up the details. I don't usually have those dreams because I know how to limit what I watch on TV, what I read. I had to put my friend on hold 'til I get through this [appeal process]. So I know how to make it stop." Asked later in that interview for a sexual dream image or "movie" she can remember, Wendi again said she had no details, and "Most of the stuff that I can see in my head right now is being freaked out and angry when waking up, and being desperate to get that out of my head."

478. The memories that were most clear and numerous, and evoked the strongest emotions and most tears from Wendi, were memories of how Alejo constantly forced his sexual obsessions, compulsions and perversions on her through things he said. As explained above, Wendi could not talk to her mother about sex. Also, Tom King and the church/cult community strictly forbid healthy teaching or conversations about human sexuality, and any talk of teenagers and sex was framed in terms of sin, evil and temptation, and laced with condemnation and threats. When it came to getting their questions answered, Wendi and her friends were stuck with Alejo – and he took full advantage of his self-appointed role. Wendi remembered how, when she and a friend would bring up a sexual topic to Alejo, "it was like, 'I'm your buddy and let's talk about sex.'" Saying this Wendi portrayed the eager excitement in his voice, and I commented on that. Wendi responded, "Yes, absolutely," and spoke of the "excitement in his eyes" at such times. Indeed, she added, she can think of nothing else about which Alejo ever expressed such excitement.

479. Asked how often those sexual conversations happened, and how often Alejo initiated them, Wendi replied, "That's just his nature. It comes out in everything.

216

Watching a movie, reading a book, something someone would say... Someone would say, "Let's go play with the balls today, and he'd be smirking." She continued, "Whatever could be taken in a sexual way, he made sure that awareness was there, so everything was always about sex." Asked what she meant with the balls example, she responded, "He'd say, 'Oh, you're going to go play with the *balls*,' so no one could escape the awareness of his sexual perspective." Consistent with the reports of several witnesses, detailed above, Wendi recalled Alejo doing this constantly, around not just adults and teenagers but children of all ages. Asked how she used to respond to such comments, Wendi said, "It's always been like when someone tells a joke that's not funny and you laugh anyway. With this it was always like that. I tried to pacify him."

480. In the midst of sharing these memories, Wendi expressed anger and hurt, which she rarely did in our interviews. At one point she said, with searing clarity: "He should have *protected* that part of me, not *used* it. It was not for him to use. He should have protected me." Indeed, like all adults who sexually abuse children, and parents most of all, Alejo terribly betrayed her.

481. Another summarizing comment of Wendi's on the effects Alejo's constant sexualizing had on her, which reduced her to tears: "I feel like my dad, because he freely talked about sex my whole life, he's ruined sex for me. Whenever I was interested in a guy, I would think of my dad and feel disgusting." Recovering from crying, Wendi then reflected on how, if somebody was to confront Alejo with what he had done, "He'd say he wasn't doing anything wrong, it was normal. But it wasn't. It got everything mixed up in my head." These are classic dynamics and effects of the incestuous relationship that

217

Alejo (with Donna's acquiescence and even relief) imposed on Wendi, with progressively greater intensity when she was nine to thirteen years old.

482. As addressed above, REDACTED has reported being sexually touched by Alejo as a child, from ages eleven to thirteen. When I first asked Wendi about what REDACTED had reported, I did so only implicitly, and without revealing REDACTED identity, by asking Wendi if she had any memories of Alejo ever being in bed with her and a friend. Wendi replied that she has no memory of her father ever being in her bed at night. She continued, "I remember him wrestling around with us a lot" on the "bed, couch, and floor," just as Donna and Alejo had reported, then said, "But sleeping in the bed, no." When finally told, at the end of the interview, exactly what REDACTED reported, Wendi responded, "What disturbs me is that, in my logical mind, I know REDACTED wouldn't lie or make something like that up, but I can't link it to anything in my mind."

483. Finally, in our last interview, I reviewed with Wendi many of the recollections of her mother's covering those years when she was nine to thirteen years old (as well as ages fourteen to eighteen, covered below). These included Donna's reports, reviewed above, of Alejo buying Wendi lingerie and other inappropriate sexy clothing, of Wendi having an entire drawer full of lingerie by the time she was thirteen, and of Alejo routinely forcing Wendi to look at things in the adults-only section of Spencer's gifts. Wendi had three main responses to this information – all three common responses among adult women who were subjected to repeated sexual abuse in an incestuous family where the mother, as Donna had, essentially handed her daughter over to the perpetrator. First, Wendi said that she genuinely did not remember those things. Second, she said that, despite not remembering herself, she had no trouble believing that those things had

218

happened – given what she has always known, what she has recently been able to admit, and what she has recently learned about Alejo; and given that her mother is, like RED ACT ED , not the kind of person to make up such things, especially not in such detail. Third, Wendi expressed both amazement and intense anger that her mother had actually known, and thus been complicit in, so much more of Alejo's sexual abuse than Wendi had ever realized or could have imagined.

484. **Wendi ages fourteen to eighteen: Observations of adults and children in community.** When Wendi was fourteen, Donna began working full-time at Ak-Chin farms. As Donna herself reports, covered below, this precipitated her final withdrawal from Wendi and Alejo and left Wendi even more vulnerable to Alejo's sexual exploitation and abuse. At the same time, after turning fourteen Wendi increasingly thought and acted like a teenager – though certainly not a normal one given her continued immersion in the cult community and her incestuous relationship with Alejo. Nonetheless, Wendi tried to achieve some freedom and power, in the church and school systems and her relationship with Alejo.

485. Several witnesses' recollections of Wendi during this time include positive qualities and behaviors that had always distinguished her as a child at the cult's church and school. For example, Stephen Shaider recalls entrusting Wendi to babysitting his young daughter Bree, who liked Wendi a lot, and how Stephen and his wife Cindy always felt their daughter was safe with Wendi. (Tab 35, at ¶ 18.) Mr. Shaider also remembers Wendi as a teenager who was "not afraid to work" to make money and did household chores for his family as well (Tab 35, at ¶ 19.) The school principals, Mark

219

and Nancy Keating, continued to have positive views of Wendi as a student and athlete, as described above, as did other children like Jeri Lynn and Jasper Neace.

486. Once Wendi reaches fourteen, however, there are more reports of great concern about her well-being, particularly that she was being sexually abused by Alejo. But it was not so simple, and the available evidence indicates that as Wendi progressed beyond age thirteen she simultaneously gained power and freedom *and* lost them. Furthermore, the gains were partly "benefits" of her losses.

487. This requires some explaining. By all reports, as Donna withdrew even further while working full-time at Ak-Chin farms, Wendi *lost* by being used by Alejo for intimacy and sexual gratification. At the same time, Wendi *gained* freedom and power, in two ways. First, like all teenagers, her cognitive development during that time provided more capacities to negotiate, and at times turn to her advantage, the church/school/cult system and her pathological relationship with Alejo. Second, being Alejo's partner, even in a very subordinate role, meant that Wendi could get things *she* wanted from him by withholding or providing what *he* wanted from her, which was access to her attention, her affection, and most of all, her *body* – which Alejo was obsessed with looking at, dressing in sexy lingerie and clothing, touching, and being touched by in prolonged "touching on" sessions. In summary, like many children caught in a sexually abusive intimate relationship with an adult and no hope of anyone helping them escape it – especially an incestuous relationship with one parent while the other looks away and feels relief – Wendi learned to "make the best of it," though certainly at a high cost. Let us now consider the recollections of several witnesses from outside the family that support this assessment of Wendi's main predicament from ages fourteen to eighteen.

220

488. As addressed above, even before Wendi reached age fourteen, Mark and Nancy Keating and Jeri Lynn Cunningham had all observed that Wendi's relationship with Alejo was "not a father-daughter" one (they even used that same phrase). Nancy calls it "more of a teasing relationship," Mark refers to "things about Alejo's dynamic with Wendi that did not sit right" with him, including a "weird" and disturbing kiss he witnessed, and Jeri Lynn called the relationship "flirty." (Tab 14, at ¶ 7; Tab 13, at ¶ 6; Tab 12, at ¶ 14.) In addition, both Nancy and Jeri Lynn repeatedly witnessed Wendi, as an older teenager, exerting some power over Alejo. Nancy Keating recalls:

"A couple of times when Wendi was a teenager, I observed Alejo trying to get Wendi to pull weeds or do some kind of manual labor on the church grounds. Like a typical teenager, Wendi rolled her eyes or expressed a desire not to do what was asked of her. Instead of telling Wendi not to talk back, Alejo did something very strange with Wendi. He *begged* her to do what was asked of her, sometimes in exchange for something else. He said, 'Please, Wendi. Please...' I cannot recall what he offered her in exchange for performing her required tasks, but it was as if Wendi was his little princess and he needed to entice her to get her to do what he wanted." (Tab 14, at ¶ 9, italics in original.)

Given what is known about how Wendi often spent hours "touching on" Alejo while dressed in skimpy and sexy clothes in their home, and how when Wendi was younger Alejo would, from a position of power, only drive Wendi and REDACTED to the desert if they wore their nightgowns and scratched his head and legs, it is inconceivable that Wendi did not eventually learn to turn the tables. It is inconceivable that Wendi did not sometimes, especially in their home rather than a public place like the church grounds,

221

make Alejo beg to be granted the titillating and sexually gratifying experiences of
Wendi's body with which he was so obsessed and addicted.

489.  As Wendi's close friend who spent lots of time with Wendi and Alejo, including
at their home for sleepovers, Jeri Lynn was well positioned to see Wendi's increasing
assertion of power in her relationship with Alejo: "Sometimes when Wendi spoke to
Alejo, the tone of her voice changed and she gave him these flirtatious looks, especially if
she wanted or needed something from him. Wendi switched between calling Alejo 'dad'
and 'Alejo.'" (Tab 12, at ¶ 14.) Jeri Lynn observed these behaviors throughout her
relationship with Wendi. She saw Wendi use sexually-charged flirting to get things she
wanted from Alejo up until she and Wendi lost connection, when they were both about
sixteen years old (three years after REDACTED family had followed Cal Lorts to Tempe).

490.  Lonnie Carlin reports witnessing an older teenage Wendi demonstrate –
graphically and publicly – her ability to manipulate Alejo by sexually stimulating him.
Lonnie is the fellow student who says that, when they were ten or eleven and children
visited her house, Wendi frequently wore lingerie that she said Alejo had bought and
wanted her to wear to "look her best." As noted previously, and consistent with his
mother's report that he is "too traumatized" to talk with her about his time in the cult
(Tab 10, at ¶ 25), Lonnie spoke to investigators but did not sign a declaration.  He told
the investigator of the following disturbing interaction between Wendi and Alejo, which
he says that he and other children witnessed "a lot" at school when Wendi was fourteen
or fifteen. "Wendi sat on Alejo's lap, wiggled back and forth, and commented aloud that
it 'made him get hard.'"  Lonnie said that Alejo would just look away, sometimes pushed
Wendi off, and seemed "embarrassed" when this happened. However, Lonnie made it

222

clear that he "did not get the impression at all that Alejo thought it was bad that his step-daughter was grinding on his crotch. He just did not want other children to know."

491. It is important to recognize however, that the ability to embarrass Alejo, by doing in public the kinds of things that he trained her to do in private, does not constitute real power. Rather, Wendi was reenacting an abusive interaction into which she had been manipulated and coerced into repeatedly engaging at least since she was nine or ten years old. Indeed, most witnesses do not report seeing Wendi take what might be perceived as an active and assertive role in Alejo's incestuous abuse during these years. They simply recall evidence of Alejo's ongoing sexual abuse of Wendi, and mostly in terms of Wendi as a victim whose sexual exploitation was recognized but never stopped by a community of beaten-down cult members.

492. Looking back on Wendi's teenage years overall, Constance Boys reports, "I recall that when Wendi was a teenager, something in her changed. Something just wasn't right. I recall my daughter, Sarah, telling me that Wendi had shown Sarah some negligees and lingerie that her father had bought for her. Sarah said, 'Isn't that weird?'" (Tab 10, at ¶ 24.) Ms. Boys also recalls, "For years there were rumors abounding that Alejo was molesting Wendi. Wendi complained about it to other members of the church. I don't remember who specifically knew what, but I do remember it was generally discussed." (Tab 10, at ¶ 7.) Ms. Boys goes on to report one rumor she had heard, that Wendi told Mark Keating Alejo was sexually abusing her, and Mark told Tom King, who refused to believe it. (Tab 10, at ¶ 7.) However, Mark Keating says only that Wendi appeared about to disclose to him sexual abuse by Alejo but was cut short (by Alejo entering the room), and does not say he spoke to Tom King about the issue. (Tab 13, at ¶ 7.) Whether or not

223

Wendi disclosed sexual abuse by Alejo to any adults in the church, Ms. Boys'
recollections (and those of others, covered above and below) do indicate a general
awareness and concern in the community that it was happening.

493.  Ms. Boys then focuses on how, aside from getting "the cutest clothes and
shoes," Wendi lost power and freedom in those final years of living at home and
attending the church and school, from about ages sixteen to eighteen:

> "Those last couple of years, it was as if Wendi came to the realization that she
> just couldn't fight it. She completely gave in, and became 'Daddy's little girl'
> and was always hanging on her father. She always seemed like a free-thinking
> little girl before that, and suddenly she was a model student. She became quiet
> and withdrawn. I remember that she had the cutest clothes and shoes – all that
> her dad had purchased for her. He just lavished her with things like that. Of
> course, everyone at the church said, 'Praise God, Wendi finally learned.' They
> said that she had finally 'repented' and had 'got her life right with God,' but I
> feel that they had finally broken her. She had no one to turn to…. I believe she
> must have realized that no one was going to help her, and she finally gave in
> to it – she just threw in the towel, so to speak." (Tab 10, at ¶ 24.)

494.  Mark Keating recalls once seeing Wendi dressed in a "Playboy Bunny workout
outfit" in the Casa Grande fitness center. He continues, "She was just a teenager. Wendi
said that Alejo bought [it] for her. I did not think it was right for her to be walking around
in an outfit like that, but since it appeared that her parents were aware of how Wendi was
dressed and even encouraged it, there was not much I could do." (Tab 13, at ¶ 8.) Both
Nancy and Mark Keating recall how, when Wendi was a junior in high school, Alejo and

Donna pulled her from the swim team because she was losing weight and her breasts were becoming smaller. Nancy recalls, "It was another thing about Wendi and her parents that made me suspect that something was terribly wrong at home." (Tab 13, at ¶ 4; Tab 14, at ¶ 12.)

495. Cynthia Schaider, a parent at the time, recalls that Alejo showed her a series of photographs he took of Wendi when she was fifteen or sixteen years old. Alejo was into modeling, and the pictures were "part of his portfolio, examples of 'modeling shots.'" (Tab 34, at ¶ 7.) Ms Schaider continues:

> "They were part of his portfolio, examples of 'modeling shots.' In the
> pictures, Wendi was dressed in lingerie, a white teddy, and posing in the
> desert. I always took issue with that. I felt it was inappropriate for a stepfather
> to take his beautiful, curvy daughter out into the desert in her underwear and
> take sexy photographs of her. It was unseemly to me, but it was not my place
> to comment on the behavior of one of the pastors of the church." (Tab 34, at
> ¶ 7.)

496. One of those photographs has been preserved and is shown below. Although this particular image shows Wendi's body in silhouette, it is clear that she is scantily clad. Alejo admits to having taken the picture, even expresses pride in having done so: "I enjoy long exposure photography and like taking pictures in the desert electrical storms. I photographed Wendi and was able to capture lightning from an electric storm about fifty miles away..." (Tab 24, at ¶ 165.)

225

P-App. 002353

REDACTED

497.  A number of adult witnesses recall seeing and hearing evidence that Alejo was

sexually abusing of Wendi, yet feeling powerless to do anything about it. Ms. Schaider

explains the subservience and isolation of cult members that let Alejo abuse Wendi with

impunity and left Wendi to her own devices. "We lived in a culture where we were

expected to obey. At the church, we were taught that bad things would befall us if we

didn't 'toe the line.' As a result, no one discussed negative aspects of their lives. It kept

us isolated from one another." Ms. Schaider continues, describing her later realization

that cult members experienced a false sense of family in which "none of us really knew

each other," "everyone ran around pretending life was wonderful," and many "lived a

double life." Community members were also taught that, should they speak negatively of

226

their pastors, including Alejo, "the 'wrath of God' would come upon us." (Tab 34, at ¶¶ 30, 31.)

498. As mentioned above, Jasper Neace was abruptly expelled from the school when he was seventeen or eighteen (and Wendi was fourteen or fifteen), after confronting Alejo and Tom King about Alejo's possession of pornographic magazine and his sexual harassment and abuse of Wendi and other children in the community.

> "Wendi brought the cover of a pornographic magazine to school and told me
> that it belonged to her father, Alejo Ochoa. She gave it to me and I put it in
> my locker, and then I told the pastor, Tom King, that I needed to talk to him
> about something important. My intention was to tell Tom King about the
> magazine. All the other kids were too afraid to say anything. I wanted Alejo to
> face the consequences for all the damage he was doing. I was angry about
> what I saw to be extreme hypocrisy. I was in trouble for buying a motorcycle,
> and my mother got kicked out for getting married, but Alejo faced no
> consequences for his sexual behavior with children, for whooping on kids, and
> for looking at dirty magazines. Tom King called me into his office and asked
> me what I had to say. I told Tom King about the magazine, but Alejo was
> right there and he flatly denied it." (Tab 23, at ¶ 51.)

499. Jasper reports that Tom then asked him, "Are you sure you have the magazine? I'd like to see it." The three of them went to the locker, and it was gone. When they returned to the office, Jasper recalls, Tom and Alejo "looked so smug," which provoked a long-suppressed rage in Jasper, who proceeded to point his finger at Tom and say, "I've always wanted to tell you this: Fuck you, Tom." As Jasper remembers it, Tom then

227

threatened to call the police and "started rattling off scriptures and said that he was rebuking me in the name of Jesus and...turning me over to the devil." A physical altercation followed, and Jasper ran out the door. Looking back on the explosive confrontation that resulted in his expulsion from the school and community, Jasper recalls, "I had intended on telling Tom King about Alejo's inappropriate behavior with Wendi, but I never got the opportunity." (Tab 23, at ¶ 51.)

500.  Mark Keating remembers learning at the time of Jasper's confrontation with Alejo and Tom about the pornography magazine. (Tab 13, at ¶ 5.) So does Constance Boys, who, as noted above, reports that "many people went to Tom about Alejo's behavior, and Tom refused to believe it." (Tab 10, at ¶ 23.)  Ms. Boys reports details of the incident that she heard at the time, including that it was not "*Playboy* or something like that -- it was really hardcore porn," and that Alejo made up a story of having found the magazines, picked them up so the children would not see them and taken them home, then forgotten about them. (Tab 10, at ¶ 16.)

501.  The available evidence indicates only one time that Alejo was confronted over his sexual abuse of Wendi, privately by George Carlin, father of Lonnie Carlin. George recalls that, at about the same time his wife and daughter told him of inappropriate sexual comments Alejo had made to them, "I was concerned that Alejo had been sexually molesting Wendi." Mr. Carlin called Alejo on the phone, told him why he was calling, and asked Alejo to meet him at the church to discuss it further.  They spoke outside of the church, and Mr. Carlin recalls, at the beginning, "Alejo denied everything. He denied it several times until he finally confessed to his inappropriate behavior and admitted he had a problem sexually." As reported above, Mr. Carlin remembers that Alejo then asked

228

what he should do, and whether he should resign from the church. Mr. Carlin told the sexually obsessive, compulsive and addictive Alejo to simply "ask for forgiveness and stop his inappropriate behavior."

502.   Finally, Mark and Nancy Keating report an incident that took place not long before they left the school in 1988, when Wendi was seventeen or eighteen years old, in which Wendi appears to have decided to disclose to them Alejo's sexual abuse – only to be thwarted by a sudden and unexpected appearance by Alejo.   Mark remembers that Wendi approached them "on the heels of a sermon that a guest-minister named Kevin McNulty made about sexual sins and sexual abuse." He and Nancy were alone in a small classroom at the time.

> "Wendi came in and said, 'Can I talk to you?' She looked very anxious and
> concerned. Just as Wendi prepared to tell us what was heavy on her heart,
> Alejo walked in. Within the classroom was a closet and Wendi backed right
> into it, very affected by Alejo's presence. Wendi never did tell us what was on
> her mind. It seemed to be related to the porno Alejo was accused of bringing
> by JC Neace.  I was afraid it had something to do with sexual abuse, having
> observed Alejo's inappropriate behavior and strange dynamic with Wendi."
>
> (Tab 13, at ¶ 7.)

503.   Nancy Keating's account of the incident is almost identical, including her strong belief that Wendi had planned to disclose that Alejo was sexually abusing her:

> "Wendi came in and said she had something she wanted to tell us, but she
> could not get much out. She was very nervous and swallowing a lot. Alejo
> came into the room just as Wendi was about to reveal whatever it was she

229

wanted to talk to us about, and she just shut down. Her eyes got really big. She looked like she had been caught saying something bad. I think Alejo's presence scared Wendi. I thought at the time that maybe she was going to tell us that she was being molested." (Tab 14, at ¶ 10.)

504. Soon thereafter, Mark and Nancy Keating decided to leave the school, as well as the cult community and Casa Grande altogether, after learning that Tom "did not do much" when REDACTED was sexually abused by his friend (see above; Tab 14, at ¶ 11). Mark recalls, "Before I left Harvest, I pulled Wendi into my office because I needed to tell her something. I told Wendi that if something was going on with her at home, if there was anything that was going wrong in her life, she needed to find someone she trusted to share it with. That person did not need to be me, necessarily. I just wanted Wendi to know that if something was not okay with her, there was help." (Tab 13, at ¶ 9.) It may be that Mr. Keating was, without intending to, giving Wendi a mixed message. The evidence suggests that she had *already* attempted to tell him such a thing, and had *already* indicated that she trusted him and his wife enough to do so. Wendi had only been stopped by Alejo's unexpected entrance into the room. Sadly, most adults who suspect sexual abuse of children do not know how to respond appropriately. Whatever exactly transpired in that conversation between Wendi and Mark Keating, all of the evidence indicates that by then Wendi had concluded, correctly, that there was no one she could trust to save her from Alejo's sexual abuse. Indeed, the only adults she had hoped might be able to help were themselves jumping ship – escaping the cult community where such sexual abuse occurred, and leaving her behind.

230

505. **Wendi ages fourteen to eighteen: Recollections of Donna and Alejo.** As noted previously, when Donna started working full-time at Ak-Chin Farm in late 1984, when Wendi had recently turned fourteen, it was Donna's final big withdrawal, both physically and emotionally, from both Wendi and Alejo. Donna recalls, "Beginning in 1984 after I was working full-time outside the church, Alejo and Wendi had dinner together more often than Alejo and I had dinner together or the three of us [did] for the rest of the time Wendi was growing up." As quoted above, and worth repeating here, about each of her progressively greater withdrawals, including this one, Donna said: "It was easier for me to let Wendi spend so much time with Alejo because I got to ignore him, avoid the unpleasantness of being around him and his anger, and go into my room and read." (Tab 27, at ¶ 248.)

506. As discussed above, what Donna most wanted to escape were Alejo's constant pushing for sex (that she did not want, before her hysterectomies and especially after them), and his constant anger over her sexual rejection, which Alejo says caused "ninety percent" of their arguments – until, by all indications, he gave up on Donna and sought sexual gratification primarily from Wendi and her friends. And as discussed above, what Donna did – most of all in her final turning away when Wendi was fourteen years old – with actions that spoke much louder than words, was say to Wendi, "I can't handle his constant sexualizing and anger. YOU take him," and to Alejo, "I can't handle your constant sexualizing and anger. You take HER." It was a classic incestuous family pattern, and it reached a peaked when Wendi was fourteen to eighteen years old.

507. Most Donna's and Alejo's recollections of these years are the same as when Wendi was ten to thirteen. As Donna reports, consistent with other witnesses, Alejo

231

continued his verbal abuse of Wendi, especially verbal sexual abuse; his demands that Wendi scratch and rub his head and legs, sometimes for hours each night, often with his head by her genitals, with each of them dressed in less and less clothing during this "touching on" ritual; his buying Wendi lingerie and other skimpy and sexy clothing; his insistence that Wendi and her friends who slept over wear their nightgowns and "snuggle" and "wrestle" with him; his pulling Wendi into the adults-only section of Spencer's gifts and forcing her to look at sexually explicit greeting cards, games, toys and other paraphernalia. Yet Donna also recalls escalations and new twists on many of these sexually exploitive and abusive behaviors after Wendi turned fourteen and how, facing further abandonment by Donna and increased pressure from Alejo, Wendi resigned herself to the role of Alejo's intimate partner.

508.  Donna reports that Alejo verbally abused and "degraded" Wendi throughout her childhood and adolescence, and that these attacks dramatically escalated when Wendi became a pre-teen. As described above, at that point – and just as his aunts, uncles and parents had done when he became a pre-teen – Alejo became especially relentless and cruel with his sexualized teasing of Wendi, and this form of sexual abuse continued until Wendi left home after high school. (Tab 27, at ¶¶ 256-57.) Added to the mix during Wendi's teenage years, Donna recalls, was the way Alejo would jump on any "clueless" comment by Wendi and use it against her, often telling her she was "another dumb blond" or having "another blonde moment." (Tab 28, ¶ 89) In short, Donna recalls Alejo unleashing a steady stream of emotional abuse against Wendi, with a new form added but most of it still sexualized, throughout these years.

232

509.  Furthermore, Donna reports that Alejo's targeted, predominantly sexualized verbal abuse of Wendi occurred against a backdrop of Alejo's constant yelling at Donna and Wendi.  Donna recalls, "To me, it felt like he was continually yelling at us, almost every day. For all those years he was – and he continues to the present – extremely explosive in his anger. I never know what will set him off.... There's just no warning, then suddenly he's extremely upset, yelling, and even literally screaming." (Tab 27, at ¶ 291)  Donna also recalls that Wendi eventually became inured and numbed to Alejo's abusive verbal outbursts. "When Alejo was on his tirades throughout her teens, Wendi told me, 'It's going to be okay, Mom. He'll come back eventually and things will be okay." (Tab 27, at ¶ 294.) Donna then notes that Wendi was "always the middle person, trying to make things better for me and Alejo." (Tab 27, at ¶ 294.)  In these situations, as both Donna and Wendi recall, that meant not only verbally reassuring Donna when Alejo had stormed off after a tirade and gone for a drive, but hours of rubbing and scratching Alejo's legs and head – "babying" and "touching on" him, often while scantily dressed – once he returned home again.

510.  With respect to Alejo's physical abuse of Wendi, Donna reports, "After about age thirteen, Wendi didn't need swatting very often, only once or twice year. That was after she finally acquiesced, completely gave in, and obeyed almost all the rules at school, church, and home." (Tab 27, at ¶ 241.) Alejo too recalls that "Wendi got fewer swats as she got older." He says beatings were replaced by "pulling weeds or having to do extra chores or being grounded," because he eventually "did not want to be associated with the kind of pain that was inflicted by paddling children." (Tab 24, at ¶ 127.)  Thus Donna's comments appear to accurately reflect a decreasing frequency of physical

233

beatings. However, her comment that Wendi "completely gave in," like the views of women in the community who perceived Wendi as wholly beaten down and defeated during her teenage years, is an oversimplification. As we have seen, others recall Wendi being "flirty" with Alejo to get things she wanted, and at times even reducing Alejo to begging her. Alejo himself acknowledges, "When Wendi became a teenager, she started relating to me in many of the ways Donna did. She told me what shirts to wear and what ties went with them. If I grumbled at something Donna made for dinner, Wendi might retort by telling me, 'Just eat it – there is nothing wrong with it.'" (Tab 24, at ¶ 116.)

511. Donna's recollections of Alejo's sexual abuse of Wendi during this time are of it becoming even more pervasive and intense, and of her responding by pulling away even more, often in denial and sometimes in disgust. For example, Donna recalls, "Wendi had sexy teddies and camisoles as a fourteen or fifteen-year-old that I tried not to notice or think about." (Tab 27, at ¶ 269.) She remembers how, when Alejo showed Wendi things in the adults-only section of Spencer's, "I always gave him a disgusted look and took off to look at something else." (Tab 27, at ¶ 272.) Donna recalls that, in general, "I was working and paying so little attention to what was going on with Wendi that they could have shopped five days a week and I wouldn't have known about it," and "I didn't care to know where they went or what they did while they were shopping without me." (Tab 27, at ¶¶ 265, 275  Such responses of withdrawal and abandonment only provided Alejo with more opportunities to focus his sexual obsessions, compulsions and perversions onto Wendi and to seek sexual gratification from her.

512. However, when the three of them went on family vacations, Donna could not avoid learning of Alejo's escalating abuses during these years. Donna recalls,

234

> "As Wendi got older, by age fourteen and at ages fifteen, sixteen, and older,
> Alejo took Wendi into hardcore, triple-X, adult porno stores and sex stores. It
> was actually more like Alejo dragged Wendi into the hardcore porn stores....
> She said she didn't want to go, but he insisted. It was just like earlier on with
> Spencer's.... He said, 'We'll just go in for a minute,' but then they spent
> longer than a minute, actually fifteen to twenty minutes or even more." (Tab
> 27, at ¶ 280.)

Donna then explains, "The shopping at hardcore porn stores came into my awareness
mostly on vacations because I'd be with them while they were shopping.... I wasn't
really invited when Alejo and Wendi shopped at home." (Tab 27, at ¶ 281.) Thus Donna
went into these stores with Alejo and Wendi "only occasionally, about once or twice per
year," and even then, she only "hung around by the entrance and never went past the
front section where the clothes and less hardcore items are." Donna then describes how
different the experience always was for Wendi – and that just how different, she preferred
not to know:

> "Alejo always took Wendi right into the main part of the store where the
> triple-x and hardcore sex magazines, videos, toys, and other hardcore items
> were displayed and sold. I don't know exactly what they looked at or bought
> in those stores and didn't care to know. I just know that they weren't buying
> for me." (Tab 27, at ¶ 281.)

513. And so, once again, Donna sacrificed Wendi to such abuse in order to spare
herself from dealing with Alejo's sexual perversion. Donna now frankly acknowledges
this is true: "I let Wendi be the one who looked at the hardcore porn stuff in those shops

235

with Alejo instead of having me be the one who had to deal with it." (Tab 27, at ¶ 282.)
Finally, she explains that Alejo got away with bringing Wendi into those shops because
Wendi, "with her hair and makeup done," looked older than the young teenager she
actually was. (Tab 27, at ¶ 282.)

514.  Looking back on all of this, Donna reflects on how it was that she could have
stood by and let her own daughter be so sexually exploited and abused by Alejo:

> "While Wendi was growing up I lived by the old adage, 'What you don't
> know isn't going to hurt you,' and while I knew Alejo was shopping with
> Wendi for explicit, adults-only items by the time she was ten years old and
> taking her into hardcore porn stores by the time she was fourteen years old…,
> I didn't see myself as being able to do anything about it and I never let myself
> aware that it might be a problem. Alejo was the head of our household and
> one of the main tenants of our religion was that as the head of the household
> he set the rules and it was our place to obey the rules, so that's what we did."
> (Tab 27, at ¶ 283.)

515.  While these reflections certainly ring true, Donna here leaves out another factor
that she elsewhere acknowledges: Thanks to her own profound limitations, both
psychological and moral, resulting largely from her own mother's neglect of her and
other major childhood traumas, she was *motivated* to hand Wendi over to Alejo, a man
himself terribly limited and damaged from a childhood of neglect and abuse, especially
sexual abuse, so that Wendi and not she would be the primary object of Alejo's sexual
obsessions, compulsions and perversions. Indeed, as we have seen, Donna was *relieved* to
do so.

236

516. **Wendi's memories of ages fourteen to eighteen.** As reported above, I assessed Wendi's memory for most of the incidents of physical and sexual abuse – or strong evidence of sexual abuse – reported by witnesses in the community and by her mother. Most but not all of the incidents and evidence reported by others were addressed in three days of interviews specifically focused on potential memories of sexual abuse; in those interviews I used well-established, research-based methods specifically designed to avoid memory fabrication or distortion.

517. Wendi confirmed her mother's report that she was seldom physically beaten during this period. When Wendi recalled being made to pull weeds as punishment at school, she said this was because "they realized it was hopeless to just keep spanking me." She also recalled not minding pulling weeds, especially if Alejo wasn't angry at her for whatever had gotten her in trouble at school. Indeed, Wendi said that she often enjoyed pulling weeds with Alejo more than being in school. Asked why she was punished at school during those years, she said, "Me not listening, not doing what I was supposed to." She added that "Tom King's scripture for me," which he was always saying to her, in a tone of judgment and condemnation, was "rebellion is as the sin of witchcraft" (1 Samuel 15:23). She also remembers Tom often saying her rebellion would "send you to hell."

518. When told that one witness had said she seemed to lose her will to rebel at some point, Wendi responded that she had "*always* felt rebellious," from childhood through adulthood, including at work. Of course, growing up in a family and community where children were supposed to automatically, instantly and mindlessly obey their parents and other adults, and to believe whatever church/cult leaders say (no matter how crazy, brutal

237

or hateful), any child would feel rebellious, but especially one who did not completely give up on some independence of thought and action. Wendi added that she also always felt that she "deserved the bad things that happened" to her, and that she believed she deserved them *because* she was rebellious. Again, this is totally consistent with the messages she got in the traveling cult and the 91st Psalm/Harvest church/cult. Wendi did remember that she "put up the façade" of total obedience and submission in high school, but Tom and other adults at the church/cult continued to say she "didn't have the spirit of meekness" (i.e., the meekness Tom King depicted in his sermon, of the children he had beaten into submission). Wendi also remembers how, when she was on swim team and saw kids from Casa Grande Union High School, she thought, "I want that," by which she meant a life with some fun and freedom from the church/cult and her father.

519. Most of Wendi's memories – and lack thereof – of sexually exploitive and abusive behavior by Alejo are addressed above, because Alejo's behavior and other's observations of it were fairly consistent throughout Wendi's time in Casa Grande from ages nine to eighteen. As reported above, Wendi discussed Alejo's constant sexual comments and innuendos; his watching sexually explicit movies with her and her friends; his open invitation to her and her friends to ask him questions about sex and his visible excitement whenever they did.  It was this constant sexualizing of her and everything around them that Wendi recalls vividly and now finds extremely disturbing. She became very upset and cried when commenting that Alejo should have "protected" that sexual part of her, not "used" it, and that he had "ruined" sex for her.

520. Also as described above, Wendi remembers "babying" Alejo by scratching his legs and head, sometimes for hours at a time. She recalls that Alejo often wore no

238

underwear when she did this, that his robe was often open, exposing his genitals, and for that reason she hated to scratch his legs and whenever possible only scratched his head.

521.  Wendi also remembered Alejo looking in her bedroom window when friends did sleepovers, which was almost every weekend with $^{REDAC}_{TED}$ for a year or two. At the time he said and she believed that he was only interested in playfully trying to scare her and her friends, but looking back now she believes he may have been trying to see them naked. Indeed, she remembered an incident where Alejo hid behind her water bed as she and a friend changed into their nightgowns, and how upset she was to discover he had been there all along.

522.  Wendi remembered Alejo taking photographs of her in lingerie when she was age sixteen or seventeen years old. These were apparently the same photographs seen and found so disturbing by Cynthia Schaider, as described above. Wendi was able to recall some details of one lingerie photography incident, which was very unusual for her:

> "I remember going out of town, checking into a hotel room... I remember sitting on top of the bed, and him pulling things out of a bag for me to wear, and me freaking out about it. I have absolutely no memory of taking the actual pictures and all that.... It had taken so long for him to get me to agree, more than a week at least.... I remember [he said] that it was a money issue [i.e., he could not afford to pay a model]. I do remember that I seriously didn't want to.... It's almost like you're embarrassed to do it but you're obligated to do it."

523.  Wendi's final comment there, about feeling "obligated" to do what Alejo pressured, cajoled and demanded of her, is consistent with Donna's reports (above) of

239

Alejo forcing Wendi too look at sexual materials and toys at Spencer's Gifts, which Wendi also remembers. Only when asked about Alejo taking photographs of her in the desert, including with lightning from an electrical storm in the background, did Wendi say she recalled that experience. She did not remember any details of posing and being photographed. However, in contrast to the lingerie photo shoot in the hotel room, Wendi said, "I don't remember thinking, 'I don't want to do this.'"

524. Similarly, Wendi only spoke of the Spencer's Gifts experiences when asked about them. She referred to these experiences as "the sexual gag stuff," and said she had remembered them on her own but had not thought Alejo's behavior was significant or "a big deal." Wendi said that on her own she had also remembered going into Fredericks of Hollywood with Alejo, which she again had not seen as significant. But as noted above, Wendi said she did *not* recall ever buying any lingerie there (or anywhere else), or having any lingerie at home when she was a child or teenager.

525. Indeed, when asked about having lingerie at home, and told that more than one witness had reported seeing her dressed in lingerie at home, with one reporting that she had said her father bought it and liked her to wear it so she could "look her best," Wendi said she had no memories. Appearing genuinely surprised and baffled, she added, "I don't know, because I don't own any lingerie, only flannel pajamas."

526. There were several other reported recollections by her mother and other witnesses of incidents and evidence during this fourteen to eighteen year old period, detailed above, that Wendi was asked about in our interviews and explicitly stated that she could not remember, not even as a vague feeling. For example, she had no memory of giving Jasper Neace a pornography magazine (or magazine cover) that belonged to Alejo

240

– as was not only reported by Jasper, but remembered by Mark Keating and Constance Boys as something they had heard about at the time, either directly from Jasper or from someone else in the community. (I did not ask Wendi about Mark and Nancy Keating's recollections of her approaching them to tell them something of clearly great emotional significance to her, which they believed was sexual abuse by Alejo, only to be cut short by Alejo's sudden appearance. I did not receive the Keatings' declarations until after the interviews focused on potential memories of sexual abuse, and did not inquire about that story during our final interview in August of 2011.)

527. Finally, and further illustrating the incestuous family dynamic repeatedly explained above, in our final interview Wendi commented that she had "always assumed [her mother] didn't know things, and to find out she did" was very disturbing. I then asked what specifically had Wendi always assumed her mother did not know. Wendi could not name anything in particular, but said, "I thought that my mother had the same memory that I did," by which she meant the kind of memory that did not allow knowing one's most painful and hurtful experiences, and that she was amazed that her mother actually remembered so many details. From these reflections Wendi returned, once again, to the feelings of anger and hurt that all children of incestuous families feel about the non-abusing parent having abandoned them and allowed the abuse to go on.

## IX.  WENDI ENDS CHILDHOOD WITH MAJOR, BRAIN-BASED DEFICITS IN EMOTIONAL, COGNITIVE, AND RELATIONSHIP FUNCTIONING

528. The analysis below is based on my experience and knowledge as a researcher and therapist who has for twenty years studied and worked with adults subjected to neglect and abuse in childhood. As noted above, my analysis draws upon the evidence

241

directly available to me (i.e., my interviews with Wendi, her parents and other witnesses; thousands of pages of documents; and media files); it also relies on findings by the two other experts on this case, neuropsychologist Myla Young, Ph.D., and psychiatrist George Woods, M.D.

529.  From birth until age eighteen, Wendi Andriano experienced a great deal of neglect and abuse. This included severe emotional neglect by her mother and biological father; physical abuse in which pain was used to compel complete and automatic obedience by her mother, biological father, adoptive father and other adults in her communities; emotional abuse by her biological father, adoptive father and adults in the 91st Psalm/Harvest church/community; likely sexual abuse by a variety of men including her biological father and his father and brothers, her mother's boss at an alcohol and drug services center, and definite sexual abuse by her adoptive father.

530.  In addition, as addressed by Dr. Woods, Wendi inherited a genetic vulnerability to bipolar disorder. By adolescence she suffered from manic and depressive symptoms. Wendi's worst depressive episodes are remarkable for the way her brain appears to "shut down" as she engages in excessive sleep, at times in excess of 36 continuous hours.

531.  Wendi's history of childhood neglect and trauma, combined with her biological vulnerability to bipolar disorder, resulted in her leaving home and entering adulthood a severely traumatized and damaged person – which she remains to this day.  The damage includes brain-based deficits in cognitive functioning; psychiatric illnesses and symptoms; problems regulating emotions; and posttraumatic patterns of relating to others.

242

532. **Brain-based deficits in cognitive functioning.** The damage to Wendi's brain from a childhood of neglect and abuse involves the functioning of a variety of brain circuits. However, such damage does not typically manifest as obvious and well-established changes to the size or shape of particular brain regions, which have not been assessed for in this case. Rather, brain damage resulting from chronic childhood neglect and abuse is primarily *functional* (as opposed to grossly anatomical). That damage is most clearly revealed, in a formal way, via neuropsychological assessment like that Dr. Young conducted on Wendi.

533. Wendi's most significant areas of impairment were attention and concentration, as well as processing speed. As Dr. Young notes, "With the exception of [two simple test of attention and concentration], her abilities on all other measures of attention and concentration were significantly impaired." (Tab 5, at p.9.) On some of these tests, Wendi "simply was not able to accomplish the task.... Her abilities throughout this *test were severely impaired, but became more impaired as the test progressed.*" (Tab 5, at p.9, italics in original.) In addition, on a self-report questionnaire that inquired about behaviors known to be associated with attention problems, Wendi's responses were "significantly like those of individuals who are diagnosed with Attention Deficit Hyperactivity Disorder (ADHD)." As Dr. Young explains, "The entire brain is involved in attention and concentration. Primary neural regions include the prefrontal cortex, reticular activating system, cerebellum and frontosubcortical and orbitofrontal pathways. Attention forms the basis for all cognitive abilities. Her disabilities on tasks of attention and concentration, combined with descriptions of her daily functioning, indicate impairment of these brain regions and structures." (Tab 5, at p.10.)

243

534. Dr. Young also found several impairments on test of learning and memory. For example, on a test of verbal learning, "Her ability to learn new information was mild-moderately impaired," and Wendi inaccurately believed that she remembered information that had never been presented. (Tab 5, at p.10.) On a test requiring Wendi to copy a complex figure, recall it one minute later, recall it again thirty minutes later and then distinguish between accurate and inaccurate portions, Wendi's thirty-minute delayed recall and her ability to distinguish accurate and inaccurate portions thirty minutes later were moderately to severely impaired. (Tab 5, at p.10.) Based on these and other findings, Dr. Young concluded that Wendi has impairment within "all of [the] brain structures and pathways" involved in memory and learning. (Tab 5, at p.11.)

535. Finally, a third area of significant brain-based impairment Dr. Young's testing revealed was "executive functioning." As Dr. Young explains, "Executive functioning is an umbrella construct that describes processes responsible for guiding, directing, and managing thinking and emotional regulation. Mature executive functioning provides for purposeful, considered, goal directed actions. Executive functioning also is the ability to problem solve, and includes abilities to initiate, attend, inhibit, shift, monitor, organize, and control thinking and actions." (Tab 5, at p.11.) Executive functions depend on the prefrontal cortex and its interactions with various other brain regions, and "adequate mature prefrontal cortex functioning is required for just about every aspect of adult functioning – judgment, self-awareness, decision making, planning, organizing, flexible thinking, and initiating, monitoring, and controlling impulses and actions." (Tab 5, at pp.11-12.) Dr. Young reports that "Although she was successfully able to complete some EFT [Executive Functioning Test] subtests, her abilities were predominantly impaired."

244

(Tab 5, at p.12.)  In addition, Dr. Young notes, "Although Wendi Andriano's abilities on tests of executive functioning were quite severely impaired," she was most severely impaired on those "which required rapid processing of information, flexible thinking, decision making, and/or inhibition." (Tab 5, at p.12.) Inhibition is ability "to stop responding to the immediate physical environment... in order to think, consider and plan alternative ways of solving a problem and respond accordingly in that situation." (Tab 5, at p.13.)

536.  In summary, neuropsychological testing revealed significant to severe impairments in attention and concentration, learning and memory, and executive functioning, all of which reflect deficient brain functioning in multiple regions and circuits. Neuropsychological findings like these are expected in an adult who was subjected to the chronic neglect and abuse that Wendi experienced throughout her childhood. Indeed, while it is possible that some of these deficits are partly genetically based, severe childhood neglect and abuse can damage the brain regions and circuits underlying attention, concentration, learning and memory, and executive functioning. For example, high levels of stress hormones are known to be toxic to the hippocampus, a region critical for memory and learning. And capacities for attention, concentration and executive functioning are known to develop *in the context of relationships with caregivers,* and are particularly vulnerable to damage by neglectful and abusive relationships.

537. **Psychiatric disorders and symptoms.**  As assessed and reported by Dr. Woods, Wendi Andriano suffers from several psychiatric disorders. Specifically, Wendi

245

meets the diagnostic criteria for bipolar I disorder, posttraumatic stress disorder (PTSD) and complex PTSD, and dependent personality disorder.

538. Bipolar disorder runs in Wendi's maternal family, including        REDACTED

. Wendi's bipolar depressive symptoms include depressed mood, hypersomnia (i.e., excessive sleeping), fatigue, and feelings of worthlessness. Her most common manic symptoms include grandiosity, flight of ideas (i.e., tangential thinking), and "excessive involvement in pleasurable activities that have a high potential for painful consequences," e.g., sexual indiscretion.

539. As explained above, the emotional neglect Wendi experienced is known to evoke extreme emotional and physiological states in young children, including depressive states that would have been exacerbated by her inherited predisposition for bipolar disorder. Similarly, Wendi's manic symptoms would have worsened the impaired judgment already caused by her parents' neglect and abuse, and her tendencies for hyper-sexuality caused by years of sexual abuse.

540. As discussed by Dr. Woods, Wendi suffers from PTSD and Complex PTSD secondary to her history of extensive childhood abuse. PTSD includes symptoms of reexperiencing, avoidance, numbing and physiological hyperarousal. In terms of re-experiencing the trauma, Wendi becomes emotionally distressed when reminded of the abuse she experienced, especially the sexual abuse, and she suffers from nightmares of having sex with her father. She avoids anything that might remind her of Alejo's sexual abuse, including television shows, conversations, memories and trains of thought. Wendi is often emotionally numb, especially with respect to unpleasant feelings associated with troubling memories and relationships, and tends to alternate between feeling nothing at

246

all and being overwhelmed by fear, sadness, shame and guilt. Her main PTSD hyper-arousal symptoms are irritability and difficulty concentrating, both of which overlap with the symptoms of bipolar disorder, and hyper-vigilance, which manifests as Wendi's hyper-attunement to any signs of displeasure in the facial expressions, body language, words or tone of voice in others. All of these PTSD symptoms were constantly on display in each of my interviews with Wendi.

541. Complex PTSD does not appear in the *Diagnostic and Statistical Manual of Mental Disorders*, but is widely accepted and used by therapists and researchers who work with and study people who have suffered severe and chronic trauma, especially in childhood. Complex PTSD involves a set of symptoms resulting from lasting traumatic experiences in which the victim felt – or was – captive and unable to escape. The symptoms include problems with the following: regulating emotions, consciousness and identity (e.g., dissociation), self-perceptions (e.g., extreme shame, helplessness), preoccupation with the perpetrator (e.g., focus on keeping happy at one's own expense), relationships (e.g., distrust, attempting to rescue others), and one's view of the world (e.g., loss of faith in people, hopelessness). The available evidence indicates that Wendi has suffered from severe complex PTSD at least since adolescence.

542. For example, to this day Wendi has emotion regulation problems, including a great deal of difficulty tolerating or modulating feelings of sadness and anger. Her main strategy for dealing with these feelings is to hide them from herself and others. When that fails Wendi becomes overwhelmed, ashamed, withdrawn, or once again dissociated or consciously disconnected from awareness of those feelings. I repeatedly witnessed Wendi's emotional dysregulation in our interviews. In terms of self-perception, long

247

before she ever met her husband, Wendi recalls being convinced she was a "bad" and "rebellious" person who was unworthy of love, "deserved" every bad thing that happened to her, and was going to hell. Such unshakable feelings of inner badness and un-lovability are common in severely neglected and abused children and the adults they become.

543. Wendi's Complex PTSD symptoms involving pathological alterations of consciousness and identity consist primarily of her dissociative symptoms, including her inability to remember many childhood experiences. Her memory deficits include almost everything she experienced while in the traveling cult, sexually abusive behaviors by her adoptive father, and disturbing sexual behaviors of her own that were witnessed by multiple people in her church community. Wendi's dissociative symptoms also include her tendency to "space out" when confronted with memories of traumatic experiences or other potentially upsetting information. In our interviews she often spoke of spacing out such that her mind temporarily went blank and she was unable to feel any emotions or even sensations in her body.

544. As discussed in detail by Dr. Woods, Wendi suffers from dependent personality disorder. By definition the onset of personality disorders is before age eighteen, and Wendi's dependent personality disorder is clearly rooted in the childhood of neglectful, abusive and exploitive relationships summarized above. She is afraid to disagree with others, pathologically subservient in relationships, terrified of losing relationships, and immediately seeks new relationships when a previous one ends or threatens to end. Importantly, only by understanding Wendi's neglect- and abuse-based relationship patterns can we understand how her dependent personality disorder, combined with traumatizing caregiver burden and psychiatric deterioration in the final year of her

248

husband's life, contributed to her actions and role in Joe's death. Those pathological relationship patterns are addressed below.

545. **Deficits in emotional functioning.** Psychiatric diagnoses and symptoms cannot capture the complexity of unique human beings, or the myriad potential effects of chronic and severe childhood neglect and abuse. For example, while the diagnosis of complex PTSD includes problems with emotion regulation, Wendi's problems with emotion regulation cannot be reduced to symptoms of complex PTSD. That is, Wendi has major, long-standing deficits in the following areas: emotional awareness, including awareness of the bodily correlates of emotions; when she is aware of unwanted emotions, tolerating them without becoming immediately overwhelmed; modulating the intensity of her emotions, as opposed to emotions being all-or-nothing affairs; putting her emotions into words and sharing them with other people in order to calm herself and connect with others, understand the situations and interactions that give rise to emotions, and come up with constructive solutions. Importantly, emotion regulation problems are based in the dysfunction of multiple interwoven brain circuitries – including the circuitries that underlie Wendi's memory and executive functioning deficits and her bipolar and dissociative symptoms. All of those circuitries are known to be damaged by childhood neglect and abuse, especially when the neglect and abuse are severe and chronic and perpetrated by parents.

546. **Trauma-based ways of relating to others.** The neglect and abuse to which Wendi's parents and many other adults subjected her, and some key relationship patterns in which their neglect and abuse was embedded, are summarized above. As a result of those traumatic childhood relationships, Wendi habitually relates to others in specific

249

ways. Critically, these ways of relating to others are *symptoms* of the extreme trauma she suffered. They are also *re-enactments* – of roles she was forced to play in relationships of neglect, abuse and domination; and of how she tried to cope in the midst of those traumatic relationships.

547. As described above, in those relationships Wendi learned three key principles: Do whatever easily angered people want and avoid making them unhappy. Do not seek help from others, including for what abusive people are doing to you, because they will not help and probably do not even care. The only reliable ways to get attention and affection are to *take care of others and do what they want*. As described above, Wendi's relationship with Alejo reinforced those "lessons" by continually repeating – over years, on a daily basis – the pattern of responding to Alejo's anger by "babying" and "touching on" him, and the pattern of preventing Alejo's anger from arising by habitually and automatically anticipating and responding to his needs and wishes, including sexual stimulation.

548. All of those relationship patterns created trauma-based ways of relating to others that have manifested throughout Wendi's life. If someone is angry – whether that anger is caused by her, directed at her for no good reason, or directed elsewhere and has nothing to do with her – Wendi feels *driven* to make that person feel better, because she believes, "then they will like me." If someone likes her and is nice to her, Wendi strives to be even nicer to them and to take care of them, because this is the only way she knows to avoid them getting angry at her or abandoning her. Yet these ways of relating leave Wendi feeling, usually implicitly and without reflecting on it, that the other person does not really know or care about her needs and is just using her. In short, the very ways she

250

attempts to avoid neglect and abuse in adult relationships leave her feeling neglected and used.

549. These are not uncommon childhood trauma-based ways of relating by people whose chronic neglect and abuse entailed being forced to sacrifice their own needs and wants to those of their abusers.

## X.   CONCLUSIONS

550. Wendi Andriano lived a childhood characterized by substantial neglect and abuse – emotional, physical, and sexual. The most destructive traumas were her mother's constant emotional neglect and her adoptive father's years of sexual abuse.

551. As a result, Wendi entered adulthood as a severely traumatized and damaged person with a greatly increased likelihood of developing – as she has – deficits in cognitive functioning, psychiatric disorders, deficits in emotional functioning, and trauma-based patterns of relating to others.

251

Date: _February 14, 2012_

_____
James W. Hopper, Ph.D.

252

## CURRICULUM VITAE

**Date Prepared**:     February 3, 2012

**Name:**     James W. Hopper, Ph.D.

**Office Address:**     9 Henderson Street
Arlington, MA  02474

**Work Phone:**     617-821-3197

**Work Email:**     jim.hopper10@gmail.com          **Work Fax:**  888-316-2125

**Place of Birth:**     Mountain View, California

### Education:

| 1988 | B.A. | History | University of Rochester |
| 1997 | Ph.D. | Clinical Psychology | University of Massachusetts Boston |

### Postdoctoral Training

| | |
|---|---|
| 1997-1999 | Fellow, The Trauma Center & Boston University School of Medicine |
| 2003-2006 | Fellow, Behavioral Psychopharmacology Research Laboratory McLean Hospital & Harvard Medical School, |

### Faculty Academic Appointments

| | |
|---|---|
| 1995-2000 | Adjunct Instructor, Department of Psychology University of Massachusetts Boston |
| 1997-2003 | Research Associate, Department of Psychiatry Boston University School of Medicine (BUSM) |
| 2001- | Adjunct Instructor, Department of Psychiatry Faculty of Medicine and Dentistry, University of Western Ontario |
| 2006-2011 | Instructor in Psychology, Department of Psychiatry, Harvard Medical School |
| 2011- | Clinical Instructor in Psychology, Department of Psychiatry, Harvard Medical School |

### Appointments at Hospitals/Affiliated Institutions

#### Past

| | |
|---|---|
| 1992-1993 | Half-time Predoctoral Psychology Intern, Counseling Center The New England Conservatory of Music, Boston, MA |
| 1993-1994 | Half-time Predoctoral Psychology Intern, Outpatient Psychiatry Department The Cambridge Hospital |
| 1994-1995 | Psychology Testing Fellow, Outpatient Psychiatry Department The Cambridge Hospital |
| 1996-1997 | Predoctoral Intern, University Health Services Mental Health Division University of Massachusetts Amherst |
| 1997-1999 | Fellow, The Trauma Center & HRI Hospital, Brookline, MA |
| 1997-1999 | Assistant Director of Research, The Trauma Center & HRI Hospital |
| 2008-2010 | Research Associate, Department of Psychiatry, Massachusetts General Hospital |

P-App. 002383

2011

2010-2011   Research Associate, Department of Psychiatry, McLean Hospital

**Current**

2010-   Clinical Instructor, Outpatient Addictions Service, Cambridge Health Alliance

## Other Professional Positions

| 2007 | Board of Directors | 1in6, Inc. |
| 2008-2012 | Advisory Board | 1in6, Inc. |
| 2009-2010 | Leadership Council | Transforming Trauma Initiative, Garrison Inst. |
| 2010- | Board of Directors | Stop It Now |

## Committee Services

### National

| 2004 | Member, Publications Review Committee | International Society for Traumatic Stress Studies |
| 2005-2006 | Member, Website Committee | International Society for Traumatic Stress Studies |

## Professional Societies

| 1991-2009 | Member, American Psychological Association |
| 1996- | Member, International Society for Traumatic Stress Studies |
| 1997- | Member, National Organization on Male Sexual Victimization |
| 1999-2009 | Member, Society for Psychophysiological Research |

## Editorial Activities

| 2005- | Ad hoc reviewer | Journal of Traumatic Stress |
| 2005- | Ad hoc reviewer | Psychological Bulletin |
| 2007- | Ad hoc reviewer | Drug and Alcohol Dependence |
| 2008- | Ad hoc reviewer | Biological Psychology |
| 2008- | Ad hoc reviewer | Journal of Psychiatric Research |

## Honors and Prizes

| 1986 | Donald Park's "Dexter Perkins Prize" in History, | University of Rochester |
| 1994 | "Book Award" for Excellence on the Comprehensive Exam | University of Massachusetts Boston |
| 2004-2005 | Livingston Fellowship | Department of Psychiatry, Harvard Medical School |

## Report of Invited Teaching and Presentations

### Local

Undergraduate Courses, Department of Psychology, University of Massachusetts Boston

| **1994** | Personality Theory, Course Director/Instructor |
| **1995** | Personality Theory, Course Director/Instructor |
| **1995** | Personality Theory, Course Director/Instructor |
| **1995** | Abnormal Psychology, Course Director/Instructor |
| **1996** | Personality Theory, Course Director/Instructor |

2