# TABLE OF CONTENTS (INTERACTIVE)

| LLLLLLLLLLL | |
|---|---|
| PART 4 | Petitioner's Appendix to Petition for Review |

# EXHIBIT LLLLLLLLLL
# PART 4

big circle. They did not interact, and they were not permitted to talk to each other. On

other breaks, and during recess or lunch, they were permitted to interact.

25.     Discipline at that school centered around scolding, humiliation, corporal

punishment, extreme work punishment, and social isolation. One time a student, Seth

Galyon, the son of my best friend Linda, was placed in a chair in a room by himself and

told not to move a muscle. He was made to sit that way for a long time. I was witness to

at least five minutes of it. Seth                   REDACTED

He was a kinesthetic learner, meaning that he needed to move in order to think. Due to

the lack of training in any of the staff at that school, he was misunderstood and

mistreated.

26.     On one occasion, I called Child Protective Services about a situation at the

school. There was a teenage girl at the school, Frances Archuleta, who was caught kissing

a teenage boy, JJ Arp. Frances was the daughter of the church secretary, Lola Archuleta.

Frances and JJ were about fifteen years old at the time. Tom King and Frances' mother,

Lola, had her pulled out of school for one month, and all day for the entire month she

had to hoe weeds in the hot sun. It was April or May when this occurred, so it was very

hot outside. I felt that this was an inappropriate and unsafe punishment. I called CPS,

told them what the situation was, and asked if that was child abuse. CPS sent someone

out to talk to Lola and Tom about it. They told Tom King that he couldn't do things like

that. They told him that he couldn't punish kids in that way and that they needed to be

in school. In his next sermon, Tom King said something like, "Some gutless wonder

Page 10 of 17


Initials

called the state and told on us." This was a pretty clear message that we were not allowed to talk about things "outside the family," meaning the church congregation.

27.  Adults at Harvest School sometimes used corporal punishment, what we called "swatting." Children received corporal punishment in response to most infractions of the rules. Lying, cheating, talking out of turn, being a smart-mouth – all of these things were punishable by swatting. The punishment was always administered by an adult at the school, usually Tom or Pat King. The children were hit with a board or "paddle," with careful effort to stay within the "legal limitations." The official procedure was that children were taken into the nursery with an adult to witness, and an adult to swat. After the swats were delivered, the adults prayed with the child, and then the child was sent back to class. The child was sent home with a "correction paper," illustrating the punishment the child received and why. I didn't realize how pervasive the concept of swatting was until I was at a baby shower with twenty-five women from the church. We each had a piece of paper to write down advice for the soon to be mother. Almost every one of those pieces of paper made reference to the importance of "using the rod."

28.  In addition to the swats that were delivered at the school, we were encouraged by Tom to swat our children in our homes when they were "rebellious." He backed it up with scripture, such as, "Foolishness is born in the heart of a child and the rod of correction will drive it far from him."

29.  Wendi was a young girl growing up in this church-and-school environment. She went to school every day where a man named Tom told her how to think, what to

Page 11 of 17



Initials

eat, what to wear, and where she faced punishment by scolding, humiliation, corporal punishment, and isolation.

30.    We lived in a church culture where we were expected to obey. At the church, we were taught that bad things would befall us if we didn't "toe the line." As a result, no one discussed the negative aspects of their lives. It kept us isolated from one another. It is interesting because as a member of the church, I did develop a sense of family, but I came to the realization that it was a false sense since none of us really knew each other. We were all so wrapped up in our church existence, with the result that everyone ran around pretending life was wonderful. Many people who attended that church lived a double life.

31.    In this Christian cult that we were all so enmeshed in, we were taught not to say anything bad about anyone, especially the pastors. We were expected to keep the negative parts of our lives to ourselves. We were taught that if we did speak badly of the Pastors, the "wrath of God" would come upon us. The accompanying scripture was "touch not God's anointed," meaning, do not speak badly about Tom King or the other church leaders.

32.    To this day I feel fear when I talk with non-members about the things that went on in the church. I fear that I have betrayed a confidence and am at risk of negative spiritual consequences. It is so deeply ingrained in me that, even though I no longer attend church there or subscribe to that way of thinking, I feel guilty when I speak badly of it.

<div align="center">Page 12 of 17</div>



Initials

P-App. 002996

33.     The negative things that went on at the church and amongst and between its members were never discussed; many individuals didn't even know some of the things that went on. For example, many of us were unaware that a girl at the school was being molested by her father. That girl was molested by her father for eleven years. She never told anyone and when I asked her why, she said that it wouldn't have mattered because children were seen and not heard.

34.     When Wendi was a teenager, about seventeen or eighteen, she started taking classes at Central Arizona College (CAC) and made some friends outside the church. When she graduated, she worked as a monitor for a short time, but then got a job managing the Courtyard Apartments in Casa Grande. She still attended church at Harvest, but I didn't see as much of her. In 1992, she met Joe and married him a couple years later. I never got to know him that well because he was not that involved in church activities.

35.     When Joe got sick, Joe and Wendi went to Colorado Springs for a few months to seek medical treatment for Joe. It was an alternative medicine kind of thing. While they were in Colorado Springs, they attended a charismatic church. It was interdenominational, the "Focus on the Family" ministry. It was a tongue-talking, charismatic church. Joe came back on fire for God. He wasn't working, so he started coming to the church.

36.     When Wendi and Joe moved up to Ahwatukee, I lost contact with them. I was very shocked by Joe's death and Wendi's subsequent arrest. Because I thought of

Page 13 of 17


Initials

other church members as my family, and because a good Christian must always help family, I was supportive of Donna and Alejo. Donna gave Steve and I periodic updates about the status of Wendi's case.

37.    Just before the trial began, Donna asked me to help her with some things related to Wendi's case. She told me that Wendi's attorney, David DeLozier, did not have time to listen to all of the tapes from the initial investigation and asked me if I would help. I listened to the tapes of police interviews and compared them to the transcripts to check for discrepancies. I received the tapes from Donna, who received them from Wendi's attorneys. Donna reviewed a lot of stuff for the attorneys. She spent a lot of time with David.

38.    When the trial began, my husband, Steve, was retired, so he had a lot of time on his hands. I was self-employed at the time, so I also had some free time. Steve attended more of the trial than I did, but we both tried to be there as frequently as we could. I did what I could to help as a volunteer with Wendi's defense during the trial, including giving advice and feedback and providing drafts of the opening and closing arguments for the penalty phase. I also provided David and Dan with a document that they ended up using in trial. It was a "domestic violence wheel," which illustrated the cycle of violence in abusive households.

39.    The mitigation specialist, Scott McLeod, was present at the courthouse on the first day of trial. He had never come to talk to us prior to Wendi's trial, but when he saw us there on the first day, he pulled us aside to talk to us about testifying on her behalf.

Page 14 of 17


Initials

We believed that our relationship with her had been too distant, and that we could not have helped as witnesses. During the trial, Wendi's history in the church came up. I approached Scott after a day in court and told him that I didn't think that the jury understood what it was like. He seemed irritated with me, and asked me what difference that would make, or what good it would do.

40.    I was troubled by David's performance in court. At one point I said to Dan, "He's doing a horrible job, why don't you take over?" Dan told me that there was a requirement on death penalty cases that you have two attorneys and that there had to be an equal sharing of the workload. I don't know exactly how Wendi found David, but as I understand it, he was a Christian man with shared values, and Wendi trusted him. He had absolutely no courtroom presence – he was constantly looking down at his notes and reading, without making eye contact with anyone. He seemed so worried and passive. It was as if he was constantly thinking, "How can I say this next thing so he won't object." David had no courtroom skill, agility, presentation ability, or charisma. He could hardly present his case. He was completely outmaneuvered by the prosecutor, Juan Martinez.

41.    At some point during Wendi's trial, I said to David DeLozier's wife that it seemed that David had not handled cases like that before. She responded with something like, "Oh, he does it all the time." This surprised me, because to me he seemed uncomfortable and lost, which made me wonder if he was qualified or had experience with death-penalty cases. He did not seem to be functioning on all cylinders. He was not quick; he was not with it. He seemed in way over his head.

Page 15 of 17


Initials

42.    David DeLozier also fasted during Wendi's trial. He did this because of his Christian faith – Christians believe that fasting and praying helps you find clarity. He lost about forty pounds over the course of his fast during that part of the trial and he wasn't that large of a man to begin with. It got to the point that his suits didn't fit him anymore; they just kind of hung off of him. There were also one or two days when he wasn't there due to some illness, maybe because he was too sick or weak from fasting. He was completely stressed out.

43.    Dan Patterson "debriefed" with Donna, Alejo, my husband Steve, and I every day after trial. We always met in the courtroom or the hallway outside. Dan asked us what our impressions of the day's proceedings were and what points he had made well. He used us as "the everyman," and bounced ideas off of us. He was exhausted from all his other cases and responsibilities, but even so I was generally impressed by his performance, at least at first. As the trial wore on, it seemed that Dan got discouraged. At one point he told me that it was a difficult case to win. Dan and David were hanging a lot of hope on the domestic violence expert, and that didn't pan out the way they hoped it would.

44.    With help from my husband, Steve, I wrote drafts of the defense's opening and closing arguments for the penalty phase of Wendi's trial. Wendi's attorney, David DeLozier, approached me and my husband, Steve, in the hallway after court. He said that he needed help, that he was having trouble knowing what to say. I didn't have much time to write either one of them. I spent a couple of hours working on the closing

Page 16 of 17


Initials

argument the evening before David had to use it, and then emailed it to him.  It was very affirming for me to get to do that, but it is an example of how inadequate David was.  In court the next day, he read it like a grocery list.  There was no passion or emphasis.  He didn't use what I wrote exactly word for word, but it was pretty close.

45.    Tom King made one appearance at Wendi's trial, the day that Alejo testified.  He came late, and he sat with Pastor Chuck Harrell, who was a church member.  While Wendi's dad, Alejo was on the stand, at a trial that was very serious for Wendi and her family, Tom made faces at Alejo and acted goofy while Alejo testified.  At one point, Alejo laughed, which came across as very inappropriate.  After his testimony, I commented to Alejo that I found Tom King's behavior inappropriate.  Alejo said that he was glad that Tom was there because Tom helped him relax.

I have read the foregoing declaration consisting of seventeen (17) pages and forty-five (45) paragraphs and it has been read to me.  I declare under penalty of perjury under the laws of the state of Arizona and the United States of America that it is true and correct. Signed this _19_ day of _May_ 2011 at Pinal County, Arizona.

_Cynthia Schaider_
Cynthia Schaider

Initials

## DECLARATION OF STEPHEN SCHAIDER

I, Stephen Schaider, declare as follows:

1.     I was born on March 8, 1947 in Cleveland, Ohio.  Everyone calls me "Steve."  I have one daughter, Bree Therese Schaider, with my former wife Christina Foster.  Bree was born on December 31, 1974.  I have been married to my second wife, Cynthia Denise Schaider, since November of 1980.

2.     I met Donna, Alejo, and Wendi Ochoa, now Wendi Andriano, through our church in Casa Grande, Arizona. This was in 1980 after my wife, Cindy, and I moved to Casa Grande. Wendi was about nine years old when I met her.

3.     The church we began attending in Casa Grande was called "91st Psalm," *MINISTRIES* " and the head pastor was a man named "Calvin Lorts."  A few years later the church was taken over by Tom King and was renamed "Harvest Family Church."

4.     We attended that church for about twenty-one years.  When we finally did leave, it was because we could not sit under the pastor, Tom King, anymore.  He was a very controlling individual, and we were tired of being told what to think and what was important. According to Tom King, if you did not interpret the Bible his way, you were mistaken.  He was very letter-of-the-law, a my-way-or-the-highway kind of person. According to him, everything was black or white, and I am of the opinion that there's more gray in the world.   Tom King could be very charismatic but he was also very domineering and controlling.  On the other hand, he could be a very good friend, and if you needed something and he could provide it for you, he would.

Page 1 of 11

Initials

5.    I think that the original pastor, Cal Lorts, had "the calling." He was a showman and a good preacher. Tom, on the other hand, had to manufacture it – he really had to work at it. One-on-one, Tom was great, but he didn't connect with an audience the way that Cal did.

6.    I do not know much about Wendi's childhood before I met her. I remember that Donna told me that Wendi panhandled as a child before I knew them, when her family was on the road with the traveling ministry. She said that no one could resist a cute little girl asking for money.

7.    Wendi's father, Alejo, was the youth pastor at the church and school. He helped Cal Lorts get 91st Psalm Ministries off the ground. Alejo was a recovered drug addict, and his family owned a tortilla factory. I believe that Alejo worked at the tortilla ⟨& RESTARAUNT⟩ factory until they closed it down. I was never that close with Alejo, though we did attend the same social events and I interacted with him on a regular basis. I do not remember how I heard about Alejo's prior drug addiction, but I believe I pieced that together over time based on things people said. To my knowledge, Alejo was clean when I met him. I lost contact with him over the last few years, but there are no hard feelings. I never had any troubles with him.

8.    My daughter, Bree, lived with her mother until about 1984 or 1985, when she was nine or ten years old. At that time, she came to live with myself and my second wife, Cindy. We enrolled her in school at the Christian academy run by Harvest Family Church, where Wendi also attended school. It was an ACE school, meaning it followed a

<div style="text-align:center">Page 2 of 11</div>

Initials

Christian curriculum called "Accelerated Christian Education." The education was based on individual, personal achievement. Each child sat in a cubicle and was not allowed to interact with the children next to them. They progressed at their own speed and there were no teachers, just monitors. The monitors were not trained in any way – they were there to keep order in the classroom, and they were available to answer questions if they came up. In retrospect, it was not fair to the kids. The education was not complete because it was too narrowly focused on Christianity. I have nothing against Christianity. I still attend church and consider myself a Christian, but there is more to life than just that. Growing up in that environment, a kid would never know it.

9.     I believe that the adults at the school were well-meaning and did their best, but none of them were trained to instruct. The children really would have benefitted from trained, professional educators. On top of all the other problems, the school was small. There were not a lot of kids to interact with. Of all the kids I know of that went through that school, only two or three went on to college. In my opinion this is in part due to the limited education they received, but also due to the culture shock that occurred when a child went from that school to a college environment. You can't take a child out of a Christian school with twenty other children and limited academic instruction and expect them to succeed at a university with twenty, thirty or forty thousand other students. It's too overwhelming for them.

Page 3 of 11

Initials

10.     At the end of each school day, the children were required to participate in something called "work jobs." The students did their "work jobs" for the last hour of each day. They had to clean the bathrooms, sweep the floors, rake, or pull weeds.

11.     I don't have any firsthand knowledge of the discipline that the children at the school were subjected to, because I was not there. I did not spend much time at the school because I was working, so I wasn't around to observe. I do recall that we received discipline reports when my daughter received punishment. What I gleaned from the reports was that discipline was delivered in the form of corporal punishment or social isolation. Sometimes, a child was forced to sit in a room by his or herself for a period of time – how long, I do not know. Sometimes the child received swats with a paddle.

12.     In addition to the punishment the children received at the school, Tom King encouraged parents to swat their kids at home. Tom supported the use of corporal punishment with scriptural references such as "Spare the rod, spoil the child," and, "Foolishness is born in the heart of a child, but the rod of correction will drive it far from him."

13.     If I were raising a child today, I would do things a lot differently. I was too autocratic – too rigid in my thinking. At the time, the church and the dogma that came out of it was the "biggest thing in the room." I was unable to focus on anything else. If I had stepped back and looked at it in the context of life as a whole, I think I would have realized that it wasn't as important as I thought it was at that time.

Page 4 of 11

Initials

14.     Today, my relationship with my daughter, Bree, is okay. She lives near Ashland, Oregon, so we don't see a lot of each other. We talk once every six weeks or so. There are things that I regret having done as a parent, and I'm sure there are things that she regrets. We don't really talk about it though.

15.     I think that there is a lot that Bree has chosen not to remember. Occasionally, I'll make a comment about someone from the Church, such as, "Do you remember so-and-so?" And, if she remembers at all, she usually says, "Vaguely." She left Casa Grande in 1992 and hasn't had any contact with anyone in this area except for Cindy and I, since then. She was eager to get away.

16.     Bree was always a very talented artist, but, like many artists, she didn't seem to be all there – she wasn't dancing to the same tune as everyone else. I think that, because of this, she had an especially hard time with the rigid and repressive structure at Harvest. As I said, she didn't march to the same drummer, and this was seen as rebellion, as being wrong, and she was punished for it.

17.     I believe that today there are only three children at Harvest Christian Academy. One is the son of Amy ~~King,~~ de LEON(q who is the daughter of Tom King. The other two are the children of Adam Gallegos, who is himself a former student of Harvest. I know that one of his kids is named "AJ" but I don't know the other one's name. Everyone else left for similar reasons to myself. The church had no real structure – the board consisted of Tom, his wife, Patricia, and the church secretary, Lola. Patricia and Lola were completely submitted to Tom, so he was really the only person with any power.

Page 5 of 11

Initials

A friend once told me, "If one person tries to control a crowd, the crowd will shrink to a number they can control." And I believe that's what happened.

18.     I have known Wendi since she was very young and it was such a shock when I heard what happened. Wendi always seemed like a normal young lady to me. I even entrusted her to take care of my daughter, Bree, when they were younger. When Bree first started going to Harvest, Cindy and I were both working, so Bree went home with Wendi after school every day. Bree would have been about nine or ten years old at the time. She stayed at the house with Wendi, Donna, and Alejo, until Cindy or I got off work. This was for the first year that Bree attended the school. After that, we bought a horse for my daughter, which Tom allowed us to keep on the Church property. Once Bree had her horse, she hung out at the horse corrals instead of at Wendi's house. Wendi also babysat on Friday or Saturday nights when Cindy and I went out. Wendi watched Bree until Bree was old enough to be at home by herself, so I think Wendi babysat Bree for about three or four years in all. Bree liked Wendi a lot and I felt that Bree was safe if she was with Wendi. Wendi seemed level-headed enough to deal with any situation that might come up.

19.     I recall that Wendi was not afraid to work, and she worked hard. In addition to babysitting our daughter, she did household chores for us. She and the other students had to raise money to go the ACE conventions, which were annual competitions between Harvest and other ACE schools. Wendi came to our house to cut weeds and wash windows and that kind of thing.

Page 6 of 11

Initials

20.     I did not know Wendi's husband, Joe, or his family, before he and Wendi got involved. I did know the Andriano name, because the family was a very prominent farming family in the community. I worked for UPS, so I knew a lot of names in the area, but the Andrianos were fixtures in the community. I recall that they lived near the water tower.

21.     I don't think that I saw much of Wendi in the four years preceding Joe's death. I do remember that Cindy helped Wendi with her resume when Wendi was trying to get a job in the late 1990s. I believe that Wendi came to our house to work on it. I saw Wendi and Joe from time to time in town for special occasions, such as the Casa Grande Electric Light Parade.

22.     To me, Wendi and Joe seemed like a normal, happily married couple. I remember that when Joe got sick, they sought a lot of treatment for him. As far as I could tell, it did not appear that they were hiding some dark secret.

23.     At the time of Wendi's arrest, Cindy and I were still attending church at Harvest. The congregation had dwindled to about twenty people by that time. Cindy and I gave no indication that we were leaving the church until the day we did so. We made our departure in June of 2001.

24.     After Wendi's arrest, Donna shared with us that Joe hurt Wendi at times. He squeezed her tight and held her so she could not breathe. From what Donna has told me, it sounds like Joe was a very controlling man.

Initials

25.    After Wendi's arrest, Donna gave Cindy and I periodic updates about the case. When the trial began, I was retired and had time on my hands. I had never been to a murder trial, much less one of someone I knew, so I attended.

26.    I was present throughout the duration of Wendi's trial. On the days I was not able to make it, my wife, Cindy, attended. I was there during the opening statements. I remember that the prosecutor went on at length laying out the case to the jury, completely uninterrupted. When it was Wendi's lawyer's, David DeLozier's turn, the prosecutor objected to every other word, and almost all of his objections were sustained. I remember feeling that the prosecutor was intentionally breaking up the rhythm of David's statement. I didn't know David at the time, and so I was not yet aware that he didn't have any rhythm.

27.    As I remember it, Wendi liked David and he was a comfort to her. I do not know what the connection was or how the family met him. David consoled Wendi, and she liked him. He supposedly understood Wendi and had her best interests at heart, but he was in way over his head. Because David was in so far over his head, I don't feel that Wendi had a fair chance at the trial.

28.    When the trial first started, the public defender, Dan Patterson, informed me that during a capital trial there is a requirement that the defendant have at least two attorneys. I had never heard this before, but when I saw the wear and tear over the next several months, I realized that he did need help, and he wasn't getting it. Wendi may have had two attorneys in name, but for all intents and purposes, she really only had one,

<div align="center">Page 8 of 11</div>

Initials

and Dan didn't have the time he needed to defend her. Dan was more competent than David in my opinion, but this was not his only case and he was very overworked.

29.     I was in attendance at more of the trial than Cindy was. Most of what I remember are general impressions. For example, I remember that there was a consensus among the "Wendi-backers" that we hated the prosecutor. He was arrogant and had a bad attitude. I also believe that he played on the sympathies of the jury. He wore an arm brace every day in trial until the day the cameras showed up. Then his arm was miraculously better. I recall that he took advantage of every opportunity to cast dispersions on the defense. I also remember thinking that Wendi's judge, Judge Ishikawa, sided with the prosecution more than he did the defense.

30.     One day after trial, the defense team enlisted our help in carrying things out of the courtroom. They had a lot of paperwork, but they also had a boom box or tape recorder. My understanding was that they intended on playing a tape in court. I cannot remember who was carrying the boom box out, but someone from the Andriano family saw them. The next day in court, the prosecution accused us of recording the proceedings.

31.     Wendi wore a sweater every day at trial and underneath it, she wore a stun belt. I do not know if the jury was aware that she wore a stun belt, but I thought it was pretty obvious that there was something beneath her sweater. It is possible that it was only obvious to me because I knew how thin Wendi was.

Page 9 of 11

Initials

32.     As the trial wore on, I got the distinct impression that they took the wrong defense.  In my opinion, there were two approaches they could have taken: domestic violence, or crime of passion.  They chose to go the domestic violence route and they beat that defense like a dead horse.

33.     Throughout the trial, Cindy and I met with Wendi's attorneys during breaks and in the mornings before trial.  We always met with them at the courthouse; we never went to their offices.  They asked our advice and enlisted our help in constructing a defense.  I believe that they met with us strictly at the courthouse because Dan was too busy to meet us elsewhere.

34.     Cindy and I wrote the closing argument for the penalty phase of the trial. I am not an attorney and have never worked in any legal capacity.  Cindy and I weren't paid to write the closing argument.  I didn't read the applicable law or go over legal arguments with anyone.  Cindy and I just wrote the closing argument because we were Wendi's friends and wanted to help, and her attorneys asked us to.  We wrote the closing argument on our computer and read it aloud to each other.  We acted it out as if it was a script and we were Wendi's attorneys.  We stayed up late finishing it, and we took it to the court in the morning where we gave it to David.  I remember that when he read it, his delivery was such that it sounded as if he was reading from the Encyclopedia Brittanica.  It was monotone, with no inflection.  I would not have believed it if I was on the jury.

Initials

35.     Cindy and I also listened to tapes of the investigation – police interviews and things of that nature. Donna asked us to do this, and I know that she got them from the attorney, whoever that was at that time.

36.     I recall that on the first day of the trial, I was approached by a man who I believe was a mitigation specialist. He asked me how well I knew Wendi, and if I had insight into her life. I told him that there had been a distance, and that I, therefore, would not be able to speak to her state of mind at the time of Joe's death. I wasn't around for much of her marriage to Joe. We left it at that.

37.     Other than the brief exchange with the man who I thought was a mitigation specialist on the first day of trial, no one has contacted me to provide information about Wendi, her life, or our shared community of 91st Psalm and Harvest Family Church. If I had been asked to testify on Wendi's behalf and to what I have stated in this declaration, I would have done so.

I have read the foregoing declaration consisting of eleven (11) pages and thirty-seven (37) paragraphs and it has been read to me. I declare under penalty of perjury under the laws of the State of Arizona and the United States of America that it is true and correct. Signed this 18th day of October 2010 at Pinal County, Arizona.

Stephen Schaider

Page 11 of 11

Initials

P-App. 003012

## DECLARATION OF JOHN SHADDLE

I, John Shaddle, declare as follows:

1.     I was born September 3, 1957.

2.     I came to know Wendi and her parents, Donna and Alejo Ochoa, through a mutual contact, Valarie "Val" Miramonte, who was involved in the Christian ministry called "Fishers of Men" of which Donna, Alejo, Wendi, and me were a part of.  The "Fishers of Men" ministry was a loose collective of individuals led by Richard "Rick" Miller and to a lesser extent, Allen "Al" Farmer.   Rick was a very charismatic person. He was the "big hook," appealing to many people who took interest in the ministry.  He came from a drug background, previously being an addict of heroin, having turned his life around.  Al was more the quiet and studious type.   I recall that Al played a bigger role in the music we played and sang, but he didn't talk very much.

3.     I became involved in the ministry at a very young age—I was about nineteen years old.   With the exceptions of Val, Rick, and Al, the ministry was mostly comprised of young people in their early to mid-twenties. I was drawn to the ministry shortly after I separated from my first wife.  Previously I practiced the Catholic faith, but that didn't suit my spiritual needs anymore.  The ministry offered something different. We did not subscribe to organized religion, rather, we took to the streets preaching, singing songs, and living communally with each other.   We gave up our material possessions and sold them to fund the ministry.  In hindsight, the group was pretty far out there and today I would describe it as a cult.

Page 1 of 6

Initials

4.     For a time, the group stayed at Val's house in Walnut Creek, California. Some of the members—Gavin and Jan Dillard, Rock and Nancy Miramonte, and Allen Miramonte—stayed stationary while the rest of us traveled.   For approximately five months in 1979, I toured with the ministry, preaching with the group up and down California in a caravan of vehicles that included a bus that belonged to Rick, a truck, and a couple other vehicles. The members who traveled included: Rick, Al, Rosalie Gallegos, Rebecca Martinez, Mike Castro, his wife, Maria Castro, Alejo, Donna, Wendi, and myself.   I slept in the van with Rick and Al. Alejo, Donna, and Wendi slept in the back of a truck.   Mike and Maria slept in another car.   We traveled from Walnut Creek, Barstow, Costa Mesa, and San Diego.

5.     There wasn't a lot of money around while we were traveling.  Me, Alejo, and Mike worked when we could.  We used Manpower, Inc. temporary service to get jobs, we worked in a cannery, we worked doing landscaping—we took work wherever we could find it.  Rick and Al didn't work, though.  They stayed back at the caravan studying with the girls during the day.   What little money we made, we turned over to Rick and Al, for the group.  That was the way it was.  Rick and Al were the only ones privy to the group's finances.  Rick often quoted scripture from the Book of Acts, in an effort to compel us to keep funding the group.

6.     Our drifter lifestyle didn't afford many everyday conveniences.   There wasn't much food around, for one.  A meal consisted of tortillas and fried tomatoes.  I often ate tortillas and fried tomatoes in the morning before heading out to work with the

Page 2 of 6

Initials

guys.  We also weren't doing a whole lot of bathing.  We had a toilet, but there was no shower on site.  We bathed using water from the sink.  The great thing, though, was that in many of the communities we visited, people donated to our cause.  They were very generous.  Our clothes were donated or came from the Goodwill.  Wendi's clothes were always kind of funky.  She sometimes wore Donna's clothes, which were too big for her.  I specifically remember her wearing Donna's pants, rolled up.  Nothing ever fit.

7.     When we weren't working, we preached out in the streets.  We went into barrios and spread the gospel, anywhere we could reach out to people.  For about three weeks, we lived in a parking lot, setting up camp where we could.  At night, Rick broke down the Bible to us.  We passed time reading chapters of books aloud.  We read, "Hinds Feet in High Places."  We sang songs together, not hymns, but other kinds of songs.  I used to have a book of songs from the ministry.  Val's daughter, Lisa, who has a lot of artistic talent, drew the cover for it.  I think Wendi colored it in.  I wish I could find that book of songs.  Today, Lisa attributes a lot of her difficulties in life to her time at the ministry.  She is twice divorced.

8.     Wendi was a real sweetheart.  She was about nine or ten years old during the time I traveled with her.  Every morning, Wendi made me hot chocolate.  Most everyone else in the group had a wife or husband.  I didn't really have anyone, so I really appreciated the fact that Wendi went out of her way to do something so thoughtful for me.  I don't really remember Wendi causing much trouble, but I do remember one time

Page 3 of 6

Initials

when Alejo mentioned that he needed to "discipline Wendi." I don't know what that meant. It was something done in private.

9.     Alejo filled a big bill in Wendi's life. From what I recall, Wendi was Donna's child from a previous marriage. Alejo was definitely a father figure to Wendi. I liked Alejo and Donna. I didn't interact with Donna as much as I did with Alejo, since it wasn't my place to talk to Alejo's wife. From what I recall, Alejo and Donna didn't talk bad about the ministry or voice any of their opinions about what was going on. When I talked to Alejo about some of my gripes with the ministry, he seemed resigned to the fact that he was doing what God wanted him to do and I think that was his motivation for continuing to participate. I know Alejo's calling was strong. Years later, I heard he was a pastor at a church in Arizona where he lives.

10.     My opinion about Rick and Al and the ministry really began to shift after an incident in which I borrowed their van for work. While Rick and Al were back with the girls studying, I got into a little fender bender. Though I owed my grandmother money at the time, Rick and Al wouldn't allow me to send her any. They wanted all of my money to go to them, for the ministry and to repay them for the damage to the van.

11.     When we arrived in Costa Mesa, things changed philosophically for the group. Rick met up with a local pastor from the Calvary Chapel named Chuck Smith who inspired Rick to reconsider the idea of organized religion. Rick told the group, "We have a problem. We need to submit to somebody." Although Rick's idea was to turn to Chuck Smith, Chuck told us that the best thing we could do is split up and go our own

Page 4 of 6

Initials

ways because we had all been brainwashed. That was enough for me. I decided I wasn't going to be a part of the ministry anymore. Though there was nothing wrong with the basic principles we taught and lived by, the hypocrisy and all of the confidentiality about the money didn't sit right with me. I talked to Alejo about my decision to leave. Alejo didn't quite see things eye to eye with me, but I remained friends with him. After I left, Alejo was the only person I really kept in touch with.

12.    I was confident in my decision to leave, though many stayed behind. Subsequent to my leaving, the ministry back in Walnut Creek totally unraveled. Val invested so much in the ministry, that she lost her house in Walnut Creek. It was about thirty years ago when that happened. Her house was worth a substantial amount of money, about $400,000. If you talked to her today, she'd probably tell you that the ministry was a cult. She's still resentful about what happened.

13.    Many years later, Donna and Wendi came to visit my wife, Jeanne, and I at our house here in San Leandro while they were staying in Brisbane. That was sometime in the 1990s. I don't remember why there were in Brisbane. I thought maybe they were both living out there, but I might be wrong about that. They stayed the night—just one ~~till 10 pm~~ night. We talked and the next day they were on their way. That was the last time I saw Wendi. Today, I am very surprised to learn of Wendi's conviction and incarceration. She was always a really sweet girl.

Page 5 of 6

Initials

14.    Until now, no one from Wendi's case ever came and talked to me.  If they

had, I would have told them what I have said in this declaration.  If I had been asked to

testify at Wendi's trial, I would have done so.

I have read the foregoing declaration consisting of __ pages and __ paragraphs and it has
been read to me.  I declare under penalty of perjury under the laws of the State of
California and the State of Arizona and the United States of America that it is true and
correct.  Signed this 29ᵗʰ day of July 2011 in San Leando, California.

John Shaddle

Page 6 of 6

Initials

## DECLARATION OF CHRISTOPHER SHANE WEAVER

I, Christopher Shane Weaver, declare as follows:

1.      I am 43 years old and currently work for Qwest Communications as a cable repairman. I first met Joe Andriano in January of 1983 when I moved to Casa Grande and began attending school at Casa Grande Union High School. Joe and I were in the same graduating class and met through a mutual friend, Robby McMahon. I met Joe's future wife, Wendi, sometime after I graduated in 19~~88~~ 86 I didn't know her well until she started dating Joe.

2.      Joe and I were friends throughout high school.   He was very knowledgeable about cars and about welding. He taught me more about welding than my high school classes did. I guess you could say Joe was a "speed-freak," in that the faster he could go, the better he felt.

3.      ~~At some point in 2004, after Joe and Wendi moved up to Ahwatukee,~~
About a year before he was killed
Joe told me that he knew Wendi was having an affair with a guy at their apartment complex. Joe said he had a friend at the apartment complex who ~~kept tabs on~~ Would see Wendi going over to her "Friends" when Joe would leave to ~~Wendi for him.~~ go to the Lake or Casa Grande

4.      In the last several months before Joe died, it seemed to me that he had accepted the fact that he was dying. Sometimes I'd try to make plans with him, like a month in advance. Joe always said something like, "I don't know if I'll

<div align="center">Page 1 of 2</div>

Initials _____

*I only have a few weeks to live,*        *This Part Okay*

be around then; ~~I'll probably be dead in two weeks.~~" ~~This was out-of-character for~~

~~the respect~~ ~~the~~ ~~that~~ ~~I~~ ~~knew~~.  I would try to reassure him, telling him he'd be

around another five years, but it did not seem to have any effect.  As a friend of

Joe's for more than 15 years, it appeared to me that Joe knew he was dying and it

didn't really matter to him anymore.

5.        I have read the foregoing declaration and it has been read to me.  I

declare under penalty of perjury that it is true and correct.


Signed this __14__ day of August 2011.

_____

Christopher Weaver

Initials _____

## DECLARATION OF KIMBERLY WILSON

I, Kimberly Wilson, declare as follows:

1.      I was born "Kimberly Ethington" on March 21, 1971. When I was fifteen years old I transferred from a public school to a small, private, Christian school called "Harvest Christian Academy." Harvest Christian Academy was part of a church called "Harvest Family Church," which was headed by Pastor Tom King. I attended school there until I was eighteen. It was at Harvest that I first met Wendi Andriano. I knew her by her maiden name, Wendi Ochoa.

2.      When I first met Wendi, I had the impression that she was a bit snobby. She was a good student. She did all her work. She may have even been the first student to graduate from that school. School personnel seemed to compare the other students to Wendi. I don't think that anyone ever said, "You need to be more like Wendi," but that was the impression I got as a student there. We were all held to the standard that Wendi set as a student there. After getting to know Wendi a little better, I realized she wasn't really snobby at all. I liked her and we became friends.

3.      Over the course of my friendship with Wendi I spent the night at her house a couple of times. One time when I was staying at Wendi's house, when I was about fifteen or sixteen, Wendi showed me a sex book that she said belonged to her

Page 1 of 7

parents. It was a book that illustrated different sexual positions. She also showed me some "honey dust," a fragrant body powder that people apply to each other to enhance their sexual experiences.

4.      Another time when I spent the night at Wendi's house, we snuck out and TPed Jamie Allen's car, meaning that we put toilet paper all over his car. Jamie Allen was a student at the school. I think he was about a year or two older than me. Wendi and I got caught somehow and we both got into trouble for that. Later on, I found out that Jamie got into trouble for molesting    REDACTED    a couple of young kids that went to the school.

5.      Wendi's stepfather, Alejo, was a pastor at the church. He made a lot of sexual comments; everything was sexual innuendo with him.   It has been a long time, more than twenty years, so I can't remember specifically what he said, but at one point, I went with another student, Lonnie Carlin, to talk to Pastor Tom about Alejo's inappropriate behavior. Pastor Tom seemed to listen to what we had to say and appeared taken aback, but nothing ever came of it. Later, when Lonnie and I were kicked out of school, Pastor Tom accused us of lying about Alejo to deflect attention away from us and the things we were doing.

6.      When I was about seventeen years old, I was suspended from Harvest for about three months for having sex with Lonnie, who was my boyfriend at the time. The experience was very traumatizing. The day that I was suspended, Pastor

Page 2 of 7

Initials

Tom called my mom and told her that we had to have a meeting. It was on a Wednesday, and we had to go to church that day. I didn't really know what the meeting was going to be about, but I knew that I was in trouble. That day, I went into the teen room where I saw Pastor Tom's son, Shawn King. I asked Shawn if he knew what I was in trouble for. Shawn told me that he didn't know but that I should "just be truthful," because whatever it was, it would be worse if I lied.

7.     That day at church, there was a sermon dedicated to the subject of fornication. It made me very nervous. After the sermon, I had to go into the back room where Pastor Tom's "quarters" were. I was humiliated. I felt like I was on trial. I was sitting across from Pastor Tom, Pastor Alejo, the principal, Mark Keating, and his wife, Nancy Keating. I think that Pastor Tom's wife was also there. As soon as I sat down, Pastor Tom asked me how many times I had sex. I was already bawling my eyes out at this point. They asked me all kinds of questions. Pastor Tom asked me where I had sex, he even asked me what positions we had used. The Keatings were present and sat there throughout the interrogation but did not say anything. I could tell that they were thinking, "What the heck is going on?" After Pastor Tom grilled me for a while, he called my parents in and I was required to tell them, in front of everyone, what I had done.

8.     During my suspension, I was not permitted to participate in any school-related activities. I was on the track team at the school, which was coached

Initials

by Nancy Keating. I was really into track at that time; it was my one outlet and I ran six days a week. I wasn't allowed to do that anymore. I was required to sit and read the Bible all the time. It was miserable. On one occasion, my mom caught me writing a letter to Lonnie and tried to "cast the demons" out of me by praying. This was not an uncommon practice at the church. There were whole services devoted to things like that. For example, the pastor might cast a "demon of alcoholism" out of a member of the congregation by praying in tongues and laying his hands on him. It was all very bizarre.

9. Other students were suspended at the same time I was. Some of them never came back. Lonnie Carlin, his sister, Sarah Carlin, a girl named Laura Bell, and my cousin, Lisa Daugherty, were all suspended at that time. Laura Bell was kicked out for something that had occurred years prior. That one really surprised me. I thought, "No way, Laura?"

10. Lonnie turned out to be very strange. Around the time that we were all kicked out of school it came out that Lonnie had REDACTED

REDACTED Later on, after Lonnie and I had broken up, I walked to my car after work one night to find a note from Lonnie written in blood. I didn't even really read the note that he wrote. I saw it and flicked it off my car onto the ground. It really gave me the creeps.

Page 4 of 7

Initials

11.     Mark and Nancy Keating were really great people. They stewarded many activities for the students. Mark coached the swim team, which Wendi was on. During the time I was suspended, I was still attending church, and Nancy asked my mom if she could take me aside and talk to me. Nancy told me that she did not agree with what was happening but that her hands were tied. She told me that she and Mark were going to be leaving the school and moving away. They left before I returned to school. After they left, Pastor Tom took over as principal. He started preaching negative things about Mark and Nancy in his sermons.

12.     Harvest was a very strict environment. We were secluded. There were no teachers, just monitors. We worked independently by completing PACE booklets. Each month, we had to memorize long verses out of the Bible. Everyone had to stand up and recite them. It was like a cult, in that, if you were a part of the church you had to be in the school. When I started going to school there, I was not allowed to talk to my old friends from public school anymore because they were "bad." Kids my age, meaning fifteen to eighteen, were still getting "the rod of correction," meaning that they were still being hit with wooden paddles. I was intimidated by Tom. He acted as if he was God, or at least as if he had special direction from God. I went to public school until my tenth grade year, so I knew different from Harvest. Other kids like Wendi, who grew up in that church environment, didn't know anything different. I left Harvest and moved out of my parent's house when I turned

Page 5 of 7

Initials

eighteen. I obtained my GED. My mom was still trying to spank me at that time and I had had enough.

13.    Wendi liked to party a little bit, and so did I. We were "teens being teens." Not long after I left Harvest, Wendi and I went to a couple of parties together in Casa Grande. On one occasion, I slept with a boy at a party. I was drunk, and I told him, "No" at first, but I eventually gave into his sexual advances. I think that, had I been around normal teenagers, I would have known how to deal with that situation, but I was naïve, due in large part to my involvement with the church school, and I was easily taken advantage of.

14.    While I was at Harvest, I knew that Shawn King really liked Wendi. I do not think that they had any kind of sexual relationship during that time, at least not that I was aware of. After I left Harvest, I lived at an apartment complex called "Quail Gardens" in Casa Grande. Wendi was the apartment manager, but I did not have that much interaction with her during that time. One night, I was outside of my apartment at Quail Gardens and I heard someone calling my name. I turned around and saw Shawn King. I asked him what he was doing there and he said that he was there to see Wendi. He asked me if I knew where she was. I do not remember exactly what I told him, but I said something that conveyed that Wendi was with a guy that I thought she was seeing. Shawn reacted by becoming very upset. He was so upset that he punched the wall or door and hurt his hand. Until then, I didn't

Page 6 of 7

Initials

know that Shawn and Wendi were dating. Even though I lived in the same apartment complex as Wendi, I wasn't really socially involved with her any more. Until that incident, it had been quite a while since I saw Shawn.

15.    I was really shocked to hear about Wendi's arrest. I never would have guessed that something like this would have happened with Wendi. She was just not that kind of person. She was a good student. She was nice. She had a little cousin who she adored and took everywhere.

16.    Until now, no one has come to speak with me about Wendi or our experiences growing up together. If they had, I would have told them what I have said in this declaration. In fact, if someone had come to speak with me sooner, I likely would have remembered more information.

I have read the foregoing declaration consisting of seven (7) pages and sixteen (16) paragraphs and it has been read to me. I declare under penalty of perjury under the laws of the state of Arizona and the United States of America that it is true and correct. Signed this 23 day of July 2011 at Navajo County, Arizona.

Kimberly Wilson

Page 7 of 7

Initials

## DECLARATION OF BARBARA BAUER

I, Barbara Bauer, declare as follows:

1.      I was the jury foreperson at Wendi Andriano's criminal trial in 2004.  We, the jury, found Wendi guilty of first-degree murder, found one aggravator, and ultimately sentenced her to death.

2.      The defense's position was that Wendi killed her husband to protect herself from her husband's abuse.  They stressed that a lot - that she was afraid she was going to get killed and that she was just defending herself.  It was questionable to us because there wasn't a lot of proof, and the testimony of crime scene personnel did not support the self defense plea.

3.      I had the opportunity to observe Wendi during the trial.  The way that Wendi appeared at trial made it seem like she was  presenting herself as a less confident and more easily influenced person than she really was.  It came through as kind of fake. We saw pictures of what she was dressed like before and it was way different from how she appeared during the trial.  During trial, she wore plain dresses.  Her hair was brown and not done up.  She didn't wear much make up.  It was as if they were trying to make her look like somebody who was meek and mild, almost Quakerish.

4.      Wendi did not appear to be actively engaged during the trial.  She sat through the trial, but I don't think she really had a lot of input.  She seemed quiet and shy. She had expressions, I'm sure, but it seemed that she didn't really react to anything.

Page 1 of 4

Initials

5.     Wendi's father testified at trial. I remember thinking at the time "I'm glad he's not my father." He appeared to be a strict and heavy-handed parent, and I could see where that definitely would have affected Wendi.

6.     When Sharon Murphy, the Domestic Violence expert, testified, I thought that she was pretty thorough. She had charts and explained how certain behaviors would affect a person like Wendi. If there had been more of that type of expert testimony on the defense's part, the domestic violence plea would have been given more weight, especially if the defense would have presented evidence that this had occurred in her marriage.

7.     In the first phase of the trial, the guilt phase, we discussed what happened in the courtroom and found Wendi guilty of first-degree murder.

8.     During deliberations at both the aggravation and mitigation phases of the trial, we discussed what the possible outcome would be if the aggravation outweighed the mitigation and vice versa. We considered what her punishment would be. It was hard for us to understand what our decision would mean, so we made a chart outlining the different possible outcomes and put it up, starting when we were determining the aggravator, prior to the sentencing phase. That helped a lot to make it clearer. It was my understanding that if the aggravator outweighed the mitigation factors, she would receive the death penalty rather than life in prison without the possibility of parole.

9.     During deliberations at the mitigation phase of the trial, I wrote a question to the judge asking what would happen if there was not a unanimous decision, i.e. we were deadlocked. His response was something along the lines of, "Keep deliberating."

Page 2 of 4

Initials

So we did. When we made the decision to give Wendi the death penalty there was some discussion about the fact that she was going to have an appeal. We figured that the whole case was going to be reviewed by other people who were more experienced than ourselves. If we had made a mistake, they would correct it.

10.     When we were trying to make the decision about whether or not to give Wendi the death penalty, we considered the facts presented during the mitigation phase. None of them were really very convincing. Some of them seemed to be true, but didn't really mean much. For example, one of the mitigating factors we were presented with was "Married for six years." That's true, she was married for six years, but a lot of people are married and her marriage didn't exactly end well. The mitigating factors definitely did not outweigh the aggravating factors.

11.     If we had been presented with evidence of mitigation that was a little more powerful and convincing, it possibly would have made a difference. For example, if we had been presented with evidence that Wendi had been sexually abused in her childhood, or that she had a history of psychiatric problems, we would have given those things consideration, because they would have explained some of the negative facts that were out there. Likewise, if the domestic violence defense had been proven, that definitely would have had a major effect.

12.     I think that it was a mistake on the defense's part to show the entire interrogation video. It did have a negative effect on the jury. In particular, I noticed,

Page 3 of 4



Initials

while watching it, that Wendi never asked about her kids, which was a factor during the deliberations.

13.    What it really came down to was that the prosecution was more convincing than the defense.

14.    I have read the foregoing declaration consisting of four (4) pages and fourteen (14) paragraphs.  I declare under penalty of perjury under the laws of the state of Arizona and the United States of America that it is true and correct.


Signed this 18th day of June 2011 at Maricopa County, Arizona.

<div style="text-align: right;">

Barbara Bauer

Barbara Bauer
</div>

Page 4 of 4

Initials

# DECLARATION OF MARTHA COLVIN

I, Martha Colvin, declare as follows:

1.    I was an alternate juror at Wendi Andriano's criminal trial in 2004.  I sat through all phases of trial, though I was not a part of or privy to the deliberation process. The jury found Wendi guilty, determined one aggravating factor, and sentenced her to death.

2.    If given the opportunity to make a decision at the penalty phase, I would not have sentenced Wendi to death, but not because the defense was compelling in any way.  I thought their performance was horrid.  I personally felt that the crime Wendi was found guilty of was the result of Wendi cracking under the pressure of her overwhelming life.  In my mind, a more appropriate sentence would have been ten years in prison.

3.    When the jury was selected for Wendi's case, I was asked whether or not I thought I could impose a death sentence.  My brother, who was employed at the men's prison in Florence, worked death row for many years.  He shared a lot of stories with me about some of the prisoners he worked with and I felt that if the defendant was anything like those guys, I would not have a problem sentencing the defendant to death.  After sitting through trial and gleaning my own observations about Wendi and her life leading up to the crime, I felt very strongly that she shouldn't receive the death penalty.  Her crime was not nearly as senseless and cruel as the crimes committed by the prisoners my brother worked with on death row.  I do not know whether any other jurors had the

Page 1 of 5

Initials

unique insight on other capital crimes that I had through my brother, however, and neither the defense lawyers nor the Court ever gave the other jurors an idea of the nature of other crimes that did warrant the death penalty to compare against Wendi's actions.

4.     The trial lasted several months and was held at the Mesa Courthouse. The courtroom where the trial took place was small and stuffy. In fact, one of the jurors fell asleep during trial and the judge questioned him about it.

5.     The prosecutor, Juan Martinez, was a little terrier, meaning that he was very good at what he did and presented his case well. The prosecution put on expert after expert, witness after witness, for weeks and weeks. The State witness who testified about blood spatter evidence testified for quite a long time. During the testimony of all these State witnesses, the defense rarely objected. I expected the defense to object to those portions of testimony, but for the most part, they did not. It just went on and on.

6.     Two defense attorneys represented Wendi—Dan Patterson and David DeLozier. Wendi's attorneys did her a huge disservice. Their only defense was that Wendi was a victim of domestic violence. The case that the prosecution put on was overwhelming and convincing, unlike the defense's theory which was weak and unsubstantiated. Based on my observations, I thought Wendi's attorneys had no business working on a death penalty case and I wondered if either one of them had ever tried a death penalty case before. They didn't call many witnesses to refute the case put on by the prosecution. The majority of people who *did* testify on Wendi's behalf, of which

Page 2 of 5

_MC_
Initials

there were few, went up on the stand and came back down so fast, it was impossible for them to make a real impact on the jury.

7.     Wendi's mother and step-father testified on Wendi's behalf.  Her mom looked hard when she was on the stand.  I watched Wendi when her mom was on the stand and it appeared that there was no bond or warmth between them.  Wendi didn't make a lot of eye-contact with her.  From what I gathered, Wendi's mother had a hard life and just dragged Wendi along with her.

8.     Wendi appeared to have a stronger bond with her step-father, who also testified.  He made a bad and unsettling impression on me.  He laughed during his testimony, and based on his testimony and the body language of him and Wendi throughout the trial, Wendi appeared to be under his control.  I thought it was interesting that one of the first people Wendi contacted on the night of the crime was her *STEP* father and my heart broke thinking about Wendi being influenced for most of her life by someone like him.  By the end of the case, I felt that if Wendi was going to be in prison, her step-father should be there with her.

9.     The defense lawyers tried to make Wendi's parents out to be "great people" and painted a picture of Wendi's upbringing as sweet and sheltered.  They highlighted Wendi's family's involvement in several churches.  One of those churches was a traveling ministry.  It sounded like Wendi was raised like a gypsy, never had a stable home, and wasn't afforded a decent education, but the defense lawyers didn't drive any

Page 3 of 5

*MC*
Initials

of those points home. The defense lawyers kept focusing on how great Wendi's family was. I didn't buy that; neither one of Wendi's parents did anything to help her case.

10.     Wendi looked so young and scared throughout trial. I didn't see a lot of expression on her face, during trial. She talked to her attorneys now and then. When I looked at her, I had to wonder whether or not she understood what was going on and whether or not she knew that a death sentence was a real possibility. I wondered if anyone explained that to her. It seemed that Wendi was going along with whatever her attorneys wanted, whatever her step-father wanted, and none of them were helping her out. It was so painful for me to observe that sometimes during our breaks, I went into the stairwell and just cried. I waited for someone to say something to help her. I waited for someone to better explain Wendi's state of mind, but that moment never came.

11.     I wish that Wendi's case was presented differently at trial. Nothing about the defense's position seemed to be about the truth. It should have been explained that Wendi was a young person who made a bad decision. She was miserable, her husband had cancer, she had two children, she was working, trying to raise a family, and she cracked under the pressure. Those are stresses to which many people can be sympathetic. After the trial, I was interviewed by a television news reporter, and I spoke to that point.

12.     When trial was finished, I was distraught over the outcome. I didn't think Wendi deserved to die. It was incredibly traumatic for me, so I turned to my daughter for comfort. My daughter is an attorney. I talked to her about what a poor job Wendi's attorneys did defending her and I talked with her about how I hoped that Wendi's case

<div style="text-align:center">Page 4 of 5</div>

<div style="text-align:right">

<em>M C</em>
Initials
</div>

would be reviewed because what happened to Wendi just wasn't right. I still feel very strongly about Wendi's case, to this today. It still moves me to tears when I think about it, sometimes.

13.     I have read the foregoing declaration. I declare under penalty of perjury under the laws of the state of Arizona and the United States of America that it is true and correct.

Signed this _31_ day of July, 2011 in Maricopa County, Arizona.

Martha Colvin

Initials

### DECLARATION OF LINDA PERCY

I, Linda Percy, declare as follows:

1.　　In 2004, I was selected and impaneled as a jury member in the criminal trial of Wendi Andriano.  The trial took place at the Mesa Courthouse.  The trial lasted approximately four months.  We, the jury, determined Wendi's guilt, a cruelty aggravator, and a sentence of death.

2.　　During the trial, I made many observations with respect to the prosecution, defense counsel, and the judge.  I was totally impressed with the prosecutor, Juan Martinez.  I was so impressed with him, that I wrote a letter to his office, commending him.  I also had occasion to speak with him over the telephone about the trial, after it was over.  I could listen to him speak all day.  He's very good.  In contrast, Wendi's attorneys weren't of the same caliber as Martinez.

3.　　The case the defense put on was not impressive to me.  I took notes to stay alert.  One of the jurors who sat in front of me, Nino, had a hard time staying awake.  I kicked the back of his chair to wake him up, from time to time.  There was no evidence that Wendi was abused, so the testimony of her domestic violence expert had no effect on me whatsoever.

4.　　The defense's overall angle seemed to focus on making Wendi into this meek, religious person.  It was a real mess and not believable at all.  At trial, Wendi

Page 1 of 3

_SP_
Initials

looked like she had let herself go.  She was ~~heavier~~ DOWDY and her hair was brown.  She was

dressed very conservatively.  She looked way different from the pictures of her when she

lived at San Riva.  The older pictures we saw of Wendi when she lived at San Riva,

showed her in a bikini with a cute blonde haircut.  It looked nothing like the Wendi I saw

in court.  None of it added up.  It seemed put on.

5.    The jury deliberated after the first phase and we found Wendi guilty of

murder.

6.    At the end of the second phase, when we decided on the aggravator, we

talked about what might happen if we didn't find an aggravating circumstance.  We

discussed how her sentencing would go back to the judge and agreed that none of us

wanted that.  We talked about how we didn't want to see Wendi get out of prison, and

that was a key reason why we decided on the cruelty aggravator.

7.    In the final phase, we determined that Wendi's punishment should be death.

We weighed the mitigating factors against the aggravating factors, but there weren't

enough compelling and believable mitigating factors there to spare Wendi's life.  Had we

been presented with evidence that Wendi was sexually molested, for example, that would

have weighed ~~heavily~~ on our decision-making process, but that information simply

wasn't there.

8.    After the trial, ~~Juan Martinez~~ *AZ. REPUBLIC REPORTER* put me in touch with the parents of the victim,

Joe Andriano.  I spoke with them for about an hour and I finally was able to find out

Page 2 of 3

*JBP*
Initials

what happened to Wendi's children. They wound up with Joe's sister and brother-in-law. I was relieved they weren't with Wendi's parents. That was very satisfying for me.

9.   I have read the foregoing declaration consisting of three (3) pages and nine (9) paragraphs. I declare under penalty of perjury under the laws of the state of Arizona, and the United States of America that it is true and correct. Signed July 18, 2011 in Maricopa County, Arizona.

Linda Percy

Page 3 of 3

Initials

## DECLARATION OF JACQUELINE SACAMANO

I, Jacqueline Sacamano, declare as follows:

1.     In 2004, I was a member of the jury in the criminal trial of Wendi Andriano.   The trial took place at the Mesa Courthouse.   The trial lasted approximately four months.  We found Wendi guilty and sentenced her to death.

2.     When I served as a juror on Wendi's case, it was my first experience as a juror.  The experience was kind of scary for me because the case received a lot of media coverage and the media presence at the courthouse was overwhelming.  I had to think about avoiding them every day.

3.     As a juror, I had the opportunity to observe and evaluate the performance of the prosecution and defense.  I felt that the prosecution had "more bullets" than the defense, meaning that the facts seemed to be behind the prosecution and not the defense. The prosecution put on a lot of witnesses and who testified to the facts of the case and presented Wendi as a "devious character." The defense, on the other hand, argued that Wendi was a battered woman and acted in self-defense, but we were presented with no evidence to support that.  A domestic violence expert testified, but because we were not presented with evidence that Wendi was the victim of domestic violence, it was not effective.

<div style="text-align:center">Page 1 of 3</div>

Initials

4.     During trial, Wendi was dressed as a "school marm" type, which was quite different than the way she appeared in photographs prior to her arrest in which she wore modern outfits and her hair was cut differently.   The jury was also presented with the interrogation video of Wendi that showed her just after her arrest.   During her interrogation, Wendi sat funny, with her legs up in front of her. She flirted.  It appeared she wasn't taking her arrest seriously.  Wendi seemed a lot different in the interrogation video than she did in court.

5.     Wendi's mother and step-father testified on her behalf during trial. Wendi's mom testified that Wendi was raised as a Christian and that she was a good girl. Her step-father testified to the same, but he seemed less credible than Wendi's mother. The problem with the information about Wendi as a child was that it didn't really explain what happened with Wendi between the time she was a good Christian girl and her arrest. Wendi's adult life was not addressed or explained.

6.     Trial went on for a long time; several months.  It lasted throughout the holidays and ended right before Christmas, which was tough.  Some days, I doodled during testimony to keep myself alert.  I wouldn't be surprised if other jurors did the same. There were times that the trial was just plain boring.  Nino, the juror who sat next to me, fell asleep more than once during trial.

Initials

7.      When the jury deliberated to determine Wendi's guilt, we were not all in agreement at first. One man on the jury thought that Wendi should be found guilty of second-degree murder and not first-degree murder. He eventually came around and we determined that Wendi was guilty of first-degree murder. We deliberated again, after the second phase of trial, to determine an aggravator. We did find an aggravator. During the third and final phase of the trial, we were presented with mitigating factors. I considered the mitigating factors the jury was presented with, but none of them were applicable, in my opinion. Wendi was still guilty and that's what I based my decision at the penalty phase on; she was an impatient person who couldn't wait for her husband to die. I was comfortable sentencing Wendi to death based on that information, and the law. JS

8.      I have read the foregoing declaration. I declare under penalty of perjury under the laws of the state of Arizona, and the United States of America that it is true and correct.

Signed August _6_ 2011 in Maricopa County, Arizona.

_Jacqueline Sacamano_
Jacqueline Sacamano

Initials

1
2
3
4
5
6
7
8

**SUPERIOR COURT OF ARIZONA**
**COUNTY OF MARICOPA**

9   State of Arizona,                           )
                                               )
10                    Respondent,              )    No. CR2000-096032-A
                                               )
11         vs.                                  )    **DECLARATION OF**
                                               )    **MATTHEW R. LYNCH**
12   Wendi Elizabeth Andriano,                 )
                                               )
13                                              )
                                               )
14                    Petitioner.              )
                                               )
15                                              )

16

17         I, Matthew R. Lynch, declare and state as follows:

18

19         1.      I am one of the attorneys representing Petitioner Wendi Andriano in her

20   post-conviction relief proceedings.  I have personal knowledge of the matters stated

21   herein.

22

23         2.      As noted in the Affidavit of Daniel Patterson (Tab 6, ¶ 34) and Declaration

24   of G. David DeLozier (Tab 7, ¶ 26), Attorneys Patterson and DeLozier provided post-

25   conviction relief counsel with several boxes containing true and correct copies of

26   documents from their respective files relating to Petitioner's criminal trial.

27

28
4835-8174-2882.1

1       3.     The documents included in Tabs 44 through 66 are true and correct copies of

2   documents retrieved from the boxes my firm received from Attorney Patterson and/or

3

4   DeLozier, with two qualifiers. *First*, Tab 47 includes a typed transcription of excerpts of

5   handwritten medical notes, with the handwritten notes following the transcribed pages.

6   This typed transcription was prepared by my firm for the convenience of the Court, given

7   that some of the handwritten notes are difficult to read. *Second*, the photographs in Tab 66

8

9   are printed from digital photograph files and/or photo scans received from the files of

10   Attorney Patterson.  The digital files themselves were not altered in any way prior to

11   printing; the images included in Tab 66 are merely re-sized print-outs of the images

12   contained in those files.

13

14       4.     The counseling session notes included in Tab 45 are a compilation of notes

15   recovered from the files of Attorneys Patterson and DeLozier, which appeared in scattered

16   locations within the boxes they sent to my firm.  Tab 45 endeavors to put these scattered

17

18   notes in chronological order.  We note that in some instances certain pages include

19   material from the prior page, and that there appear to be gaps in the sequence where notes

20   are missing—presumably because Attorneys Patterson or DeLozier did not receive those

21   missing notes, or because they did not retain them in the files my firm obtained.  Tab 45

22

23   represents the fullest and most complete set of notes by counselor Kandy Rohde that we

24   could compile from the records of counsel.

25

26       5.     I declare under penalty of perjury that the foregoing is true and correct.

27

28

4835-8174-2882.1

<div align="center">2</div>

PCR000002

1    DATED this 14th day of February, 2012.

2

3

                      Matthew R. Lynch

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4835-8874-2862.1

3

PCR000003

P-App. 003045

1    **G. DAVID DELOZIER, P.C.**
     4016 East Forest Pleasant Place
2    Cave Creek, AZ 85331
     Phone: (480) 575-6660
3    Fax: (480) 575-6661
     E-Mail: gddelozier@aol.com
4
     G. David DeLozier
5    State Bar of Arizona I.D: 005237
     Attorney for Defendant
6

7          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

8            IN AND FOR THE COUNTY OF MARICOPA

9

10   STATE OF ARIZONA,         Case No. CR2000-096032

11        **Plaintiff,**       **NOTICE OF DEFENSES AND**
                     **DISCLOSURE BY DEFENDANT**
12         Vs.           **AND REQUEST FOR DISCLOSURE**
                     **OF REBUTTAL WITNESSES**
13   WENDI ELIZABETH ADRIANO,

14        **Defendant**

15

16

17       Pursuant to Rule 15.2(b) and (e) of the Arizona Rules of Criminal Procedure, defendant

18   submits the following disclosure.

19

20   A. NOTICE OF DEFENSES.

21

22       Defendant gives notice that defendant may raise the following defenses at trial:

23   [ ] Alibi.

24   [ ] Consent.

25   [ ] Entrapment.

26   [ ] Good Character.

27   [ ] Impotency.

28   [x] Insanity [temporary].

    [ ] Insufficiency of Prior Conviction.

-1-

PCR000004

[ ] Invalidity of Prior Conviction.

[x ] Lack of Intent.

[ ] Marriage.

[ ] Mistaken Identity.

[x ] No Criminal Intent.

[x ] Self-Defense.

[ ] Other: _____.

B. DISCLOSURE BY DEFENDANT.

1. Names and addresses of witnesses for case-in-chief:

    a.    Wendi E. Andriano

    b.    Alejo Ochoa

    c.    Donna Ochoa

    d.    Bill King

    e.    Shawn King

    f.    Others to be identified at a later date.

2. Names and addresses of experts:

    a.    Forensic pathologist [not able to designate at this time]

    b.    Psychologist [not able to designate at this time]

    c.    May be others but not able to designate at this time.

3. Tangible objects of evidence:

    a.    All items in the possession of the State.

    b.    May be others but not able to designate at this time.

C. REQUEST FOR NOTICE OF REBUTTAL WITNESSES.

    Pursuant to Rule 15.1(f) of the Arizona Rules of Criminal Procedure, defendant requests that the state disclose the names and addresses of all persons the state intends to call as rebuttal witnesses, together with their written or recorded statements.

-2-

PCR000005

Dated this _16th_ day of _January_ , 2001.

G. DAVID DELOZIER, P.C.

G. David Delozier
Attorney for Defendant

Original of the foregoing filed this
_16th_ day of _January_, 2000, with:

Clerk of the Superior Court
222 East Javelina
Mesa, AZ 85210-6201

Copies of the foregoing delivered*/mailed** this
_16th_ day of _January_, 2000, to:

The Honorable Daniel A. Barker
Judge, Maricopa County Superior Court
222 East Javelina
Mesa, AZ 85210-6201

John R. Ditsworth, Esquire
Deputy County Attorney
301 West Jefferson
Phoenix, AZ 85003
Attorney for the Plaintiff

By _____

PCR000006

Wendi Andiano January 9, 2001 9:45 a.m. – 11:15 a.m.

Met with client at Durango. Informed client of her right to confidentiality. Client reported that she had minimal experience with counseling. She said that she had relied on the church for solace and had tried counseling. She said that it was not helpful because she could not affect Joe's behavior and that was at the heart of problems. Client cried and said that she thinks the tears are because of being separated from her two children. She said that she had signed their custody over to Joe's sister and brother in law. She said that she had felt confused and overwhelmed and was signing papers obediently when the lawyers presented them. She said that she has had time to evaluate her actions. and she now believes her children would be better off living with her parents. She said that her parents have been closely involved in the upbringing of the children and she believes they would get the attention and the quality of interaction that she wants for them. She said she fears that her in laws are motivated by the malpractice suit that is pending. Wendi said that her parents might have been too upset to manage the kids when she was first incarcerated but that they have adjusted enough now to be able to care for the children. She said that her in laws already have five children and that her kids are not use to living with so many people.

A malpractice suit is pending from the misdiagnosis of a malignant tumor in his salivary gland. By the time a correct diagnosis was made, the cancer had spread into his lungs. Because of the extent of the metastasis, the cancer was inoperable and terminal at the time of accurate diagnosis.

Client said that she was willing to talk and to piece together a history. She said that it is difficult to talk about the case. She said that she feared that the emotions would engulf her if she accessed them at all. She acknowledged that she restrained shedding tears because she feared she might never stop them. Client described her relationship with Joe as that of "best friends." She said that it was never a "passionate" relationship. She said she had grown up reading romance novels so she knew enough to know that the romance was missing from her relationship with Joe. Client said that her father was a pastor and her early experience revolved around the church. She said that she attended Christian high school and it was small and isolated. She said she was an only child until her parents adopted their two-year-old nephew. She said she was 16 when he came into their family and she related to him more like a mother than a sibling. She said that he has recently returned to live with his mother and she feels a little hurt that he has left. She said that she writes to him, but that he has difficulty writing to her. She said that she does speak to him when she calls her parents and that make her feel better. She said that his mother (her aunt) is someone she really likes and someone you cannot help liking, but she is irresponsible.

Wendy described a period in her life when she had moved into her own apartment. She said that she let her cousin move in with her and her cousin introduced her to going to bars and staying out late. Wendi enjoyed partying, but after about six months of it she decided that it was not good for her. She said that she was having difficulty staying out so late and showing up for work in the morning. She said that she remembered one time

DEL012207

PCR000007

when she was hung over and had to show an apartment to two girls who reeked of cigarettes. She said that the smell made her throw up. Wendi then said that she was embarrassed to tell me that and that she had ultimately become friends with the girls. Wendy said that she was also tired of running around with people who did not accept her. She said that she had gone to a small Christian high school where everyone was friendly. She said that she had also attended community college and had found the other students friendly. Wendi described the crowd at the bars as the farmers' kids. She said said the girls were particularly rejecting and she was tired of the treatment. She asked her cousin to move out intending to return to the quieter life she had led before.

On St. Patrick's Day of 1992 her neighbor Maureen, an older woman, invited her out to a bar to celebrate. She met Joe that night and they hit it off immediately. They talked for hours and Wendi accepted my characterization that it felt as if she had known him all her life. Wendi said that it was not a physical attraction, but it was like they were brother and sister. She said they began to see each other every day. She said that there were great differences in the way they were raised. She described her family as supportive. She said they did not have a great deal of money, but that she never wanted for anything. She said they have always been emotionally open and available. In contrast Joe's family was closed. His father was an alcoholic and his mother was "hurt" and silent. Joe had little ability to speak about his feelings even to Wendi. She adapted by keeping things to herself. She said they only had a handful of conversations about emotions and those were when he was drinking. She said that his family did not approve of their relationship probably because she was not part of the farming community. After—————— they were married in January,1994. Both Wendi and Joe cried throughout the ceremony. Wendi said she could not exactly express why they cried, but she accepted my suggestion that it might have been the relief that they were finally allowed to be together.

Wendi said that Joe was well liked and the life of any party. She said that it felt good to be with a man like that. But Joe was irresponsible and Wendi took over the adult duties. Joe never supported her and she had to ask her family for financial assistance. She said that they always came through for her and Joe would promise to repay them, but never did. Wendi and Joe had two children Nicolas and Ashlee, born June, 1997 and Sept.,1998. She said that the children became the center of her life. She loved being a mother.

Bring Kleenex. Find out about books. Wendi said that it was easier to talk about herself than to write and that it was all right to share what we had said with David DeLozier. I said I would type this up and let her read it for accuracy.

January 26, 2001 1:00pm to 2:30p.m.

DEL012208

PCR000008

Met with Wendi who said that she looked forward to talking. She took my narrative of our first session to confirm accuracy as well as the complete adult assessment. She agreed to fill in as much of the info as she could. She talked about the period after she and Joe were married. She said that money was tight because he was inconsistent in earning. He had a business welding the farm tools for the farmers around Casa Grande at the time they met. She said that he did good work but was not aggressive or consistent about getting customers. She said that he would slack off when he did start to succeed rather than building on his base. When farming was going through hard times he switched to working in auto glass repair and replacement. He went to work for a business in Mesa. When he quit the job because he did not want to conform to the restrictions of working in someone else's business, the owners asked if he wanted to buy the store. Wendi said that they were excited about the prospect but did not have the $185,000 to buy. She said that she went to her cousin who was in the drug world and had money to help them. He sent them to another man who happened to be an acquaintance of her father. She told her father and he went with her to meet that man. The man agreed to lend her $35,000 in traceable money and $50,000 in cash and they borrowed the balance from the sellers. They both worked in the business and were able to meet the payments to the sellers but not to the equity partner. Joe had his friends on the payroll and they used the business as place to hang out. They did do work, but Joe chose to spend the money to have fun rather than to meet his commitments. Business went down and Joe did not take his obligation to the equity partner seriously. Finally the equity partner took the store from them. Wendi said Joe was frustrated and seems not to have taken responsibility for the failure. He believed that Wendi's father should have stepped

DEL012209

PCR000009

in and stopped the lender from taking the business. He arranged with their baby's godfather to have the partner killed. Wendi learned of this plan and went to the connection to call it off. He agreed.

During this same time period (Wendi, could put dates into this?) Nicholas was born June, 1996, Joe had two surgeries on his salivary gland and Wendi became pregnant with Ashlee.

Wendi said that she had met a woman in Washington as a result of her efforts to find a source of income. She said that she started working for the woman in sales and they became friends over the phone. Wendi said that she decided that she had to leave Joe in October, 1997, so she and Nicholas could survive. She said that she stayed as long as she did because she believed strongly in the obligation to stay in a marriage for life. When she decided to leave she told her parents. She said that her parents always supported her choices even when they were difficult and against their beliefs. Wendi wrote Joe a letter explaining why she was leaving. He was out with friends who were going daily to boat races and she left the letter on the desk and took a nap. He returned early and unexpectedly and found the letter. He confronted her with it and she said she was not leaving and that she wrote such letter to vent her feelings. She said that she had failed to throw it away as she usually did. He accepted her story. She said that she lied because she was terrified of his rage. She said that she did not see him rage at first, but knew that he had been outside a restaurant when a bum kicked the tire of his truck. Joe responded by running over him. She said that he had raged at her in the house and had broken up the house and broken holes in the walls. This happened about 6 months after they were married. She said that the first time he raged in the house she hid in the bathroom until it

DEL012210

PCR000010

was over. She said she came out and told him she would leave until he was finished and he said that it was over. She said that she trusted that and stayed. Joe never showed any remorse and never apologized. Wendi said that "Joe didn't know how to say I'm sorry, but he would always cleanup his mess." She said that there were no rages at first because she said yes to everything he wanted. She said that she thought if she loved him enough he would be healed from his upbringing. She said she was constantly aware of how emotionally deprived his upbringing was. She described three files the saw in his parents' house in which their father kept an accounting of everything they had given each child. She said that Joe's list was the longest and that his sister had been given a college education and that was not listed. She said that Joe and his sister Jeanea would talk at length about how terrible their parents were. Wendi talked to her own parents about healing him with love. Wendi said that she cut his toenails and fingernails and catered to his every wish. She said that she was able to do that up until she had the second child. She said that she thought he was jealous of the attention and care that the babies got from her. She said that he was unhappy and frustrated that he did not get her fulltime care.(What else did you do for him?  How did he express his jealousy?  How did she avert his anger?)  Wendi was working 10-12 hours a day and Joe was not working. She had lost a job in bookkeeping at a hospital just before the opportunity to buy the auto glass store occurred. (Can you give me a time line for marriage, jobs, births, rages?) For three years they had lived in a three room building on Joe's family's land. She said that originally moved there as a temporary place, but that Joe's failure to earn a living kept them there. Wendi said that she tolerated Joe's behavior because she could not stand confrontation and she felt a duty to stay in her marriage. She said that she went to her

DEL012211

PCR000011

parents for emotional and financial help and they always came through. She said that Joe

expected sex every day and she complied. She said that she had never thought of it as

"rape" until I asked.

Will bring nuts and dried fruit next week.

February 1, 2001, 2:25-4:05 p.m. Wendi said that her parents' efforts to get the children

were meeting opposition from Jenea. She said that she feels hopeful because the children

have a proven history with her parents.

On Joe's rages: the first one was because his parents had not bought him a gift for his

birthday. Wendi said that she would hide out until they ended. She said that he got a

look in his eyes " that was not Joe." She said she knew that if she stayed out of his way it

would pass in several hours. She did not fear for the safety of the children. (Did you

worry about the effects of their hearing his rage?) Wendi said that her parents had argued

when she was growing up and she hated it. She vowed not to have that atmosphere in her

children's home. She and Joe agreed not to argue in front of the kids and they generally

were able to hold off until they were alone. Wendi said there was no debriefing after a

fight or a rage. She said that he had thrown a pot at her which made a big hole in the wall

and they had covered it with a picture. Joe would get up the next day, buy the necessary

supplies and would repair any damage to the house. She said that neither of them would

say anything about what had happened. The next day they would get along and she

would be relieved that there had been no conflict. Wendi said that this way of managing

DEL012212

PCR000012

their relationship worked until she had Ashlee.  With two children and a full-time job she could not find the time or energy to cater to him.

Just before Ashlee's birth Joe discovered another tumor in his neck.  He went to the doctor who took a chest X-ray and found tumor in his lungs.  Joe and Wendi were shocked.  Wendi suspected that it was life threatening but they did not discuss that possibility.  The doctors offered Joe treatment alternatives.  He chose not to have chemotherapy and they embarked on a course of prayer and meditation to treat the tumors.  Wendi read scriptures to Joe and the congregation prayed for his recovery.  Wendi had to support the family and she found an apartment management job near Phoenix.  She worked long hours and Joe cared for the children.  He would not change a diaper and she would have to backstop his childcare.  Wendi confided in a co-worker.  At first she had not gotten along with this woman because the woman was demanding and self-centered.  Wendi used her techniques for getting along with Joe, and she catered to this woman's demands.  Over time they became friends.  Joe went to the doctor and found out that the tumors in his lungs had doubled in size.  She said they were extremely disheartened because they had hoped the prayer would reduce the tumors.  Neither of them articulated the possibility that Joe was going to die.  Wendi said that when she saw the tumors double in size, she felt in her heart that he might be dying.  They did go to a lawyer to write wills, but they never went back to sign them.  When they heard about other people's concern that he was dying they were upset because it did not support the hope that they believed could be curative.  Joe had tried several programs of unorthodox treatment and the tumors still grew.  At that point he decided to try chemo.  His mood became depressed.( I want to know more about the specifics of his mood…and yours.)

DEL012213

PCR000013

He stopped going to church and would not read scripture. He only tried if Wendi did the work for him. She was exhausted and frustrated and could not do it all.

February 7, 2001 1:45-3:45 p.m.

Wendi said that she felt guilty that she had started giving up on Joe. She said she started to feel frustrated that he was not keeping up the prayers and she was too exhausted to carry the load for him. She said that the job in Ahwahtukee was bigger than any job she had had before because she was expected to rent a large complex from scratch. She worked until about 7 p.m. and got home to feed Joe and the children and put the children to bed. She would give Joe a massage and care for him after the kids were in bed. Then she fell asleep. During the days Joe left the kids with sitters. Wendi said that he was good at finding sitters and she viewed that as a contribution. He would go to a boat store in Mesa and hang out. She gave him control of the money she earned and he would spend any extra money on things for himself at the boat store. She started the Ahwahtuckee job in October, 1999. For months she had no life except to tend to Joe and the children. In the spring of 2000 they found out that the tumors had doubled. When Joe was alone with Wendi he expected her to tend to him completely, but to everyone else he put on a front that he was fine. People he knew offered to have a benefit for him to help with the bills, but he did not want to be humiliated by their charity. When he started chemo in June, 2000, he began to lose his hair. He asked Wendi to shave his head, then he told everyone that she made him shave his head. His mood changed around the time he started chemo. He became gloomy and Wendi found it difficult to be around him. Still she continued the schedule of work and caretaking. She said that the redeeming part of their marriage had been the humor. She described Joe as playful and

DEL012214

PCR000014

affable and his disposition was the thing that made life bearable with him. She said that she knew he would not talk about the rages or be unpleasant to her as long as she lived according to his expectations. During the summer his new dark moods were making her so unhappy that she felt she had to get out of the house and have some social contact. She met a tenant and did not tell him she was married and had two kids. Joe had gone to Oklahoma to visit relatives and during that trip he began calling her repeatedly. She said he had never called like that before, but he seemed to sense that she was moving out of his control. She and Rick (the tenant) talked for hours and he listened to her. She said that it felt so good to have someone interested in her. Shortly after their meeting she told him the truth about her situation and still got attention and interest from him. However, soon after that, he told her he could not continue if she chose to stay with Joe, so they ended it. She said that she had fallen in love with him and the break was painful. She said she believes she harbored hope that he would stick around until Joe died and they could be "friends" until that time. She said that she started going out with her girlfriends once a week so she could have some life of her own. Joe would not go out with her and she felt imprisoned at home. She said that she told him she played cards with her friends but they actually went out to the bars. Joe had gone out with a woman before Wendi and she cheated on him. He told Wendi that he would kill her if she ever cheated on him. Wedi said that she had gone out with her friends to celebrate her 30th birthday in August and Joe had called her every 10 minutes. She said that when she left the cell phone in the car, he called around to the bars to track her down. She said that he had been invited to come, but turned her down. (I know he raged at you, but I cannot recall the details)

DEL012215

PCR000015

Joe hated the chemo and he was having more symptoms including chest pains and difficulty breathing. Wendi began to steel herself because she knew death was getting close. She said that she feared walking in after work and finding him dead. Even with the time out with friends, she was spending 6 nights a week tending to him and the household. He began to give up. He said that the chemo was unbearable and he wanted out. Wendi and Joe had an emotional conversation that lasted several hours. She said that it was one of few deep conversations they had in their marriage. She said that she loved him and wanted to please (appease?) him and she supported his intentions. He enlisted a friend (Sean?) to find out the easiest way to end his life. Joe conceived of the idea and Wendi followed his instructions. She did the work to get the cyanide. He decided to make one last visit to his family on the night he planned to take the poison. Wendi said that they had dinner with his family and Joe lay down and did not talk to them. She siad that she felt disconnected from her feelings as she witnessed this final dinner. She said that she kept asking herself why she had no feelings. They went home and sat on the bed. He took the pills and they talked and cried. They took a bath together. Joe started feeling bad. It was not going as easily as he anticipated. He began asking her if she had ever had an affair with Rick. At first she denied it, then admitted it. She said that she thought they could have closure if she admitted it, but she misjudged. He became enraged. She said she felt separated from her own body. She knew she felt anger as he confronted her, but she didn't know why and didn't understand her lack of emotional clarity. She said she remembers hitting him with a chair. She said that it was horrible and could not stand to tell any more of it. She said that she does not understand why she feels relief being in

DEL012216

PCR000016

prison. She said she thinks she should have more feelings about his death and her imprisonment, but she feels peace.

February 14, 2001 1:40-3:45 pm

Wendi said that this is the first week since she got to Durango that she has not felt peace. She said that she has things to do for her defense and she has no interest in doing anything. She said that she feels upset that she cannot get engaged. She said that she recalls a time when she went to Mexico to do church work. When she first arrived she slept for three days because she could not muster the energy to do anything. She said that she was energetic when that period passed. She said that she is conflicted about talking about the night of Joe's death. She said that many people have come to get her account of the evening and she feels like she is supposed to have a story that is complete. She said that she has spent a great deal of time thinking about it and could put a logical story together, but that the truth is unclear. She said that she has lost time that night and she cannot regain it. I asked her if she would consider hypnosis. She said that it is against her religious beliefs, but she would give it thought. She said that she has dreaded having to talk about that night partly because Joe asking her to help him haunts her and partly because she is disgusted and upset over the mental images. She said that Joe took the poison and they waited for something to happen. She said that she thought that "it" was finally over. She defined "it" as the pressure she had felt build up since he had started chemo. Joe's cheerful personality had been the offset for the role she played in the marriage for all the previous years. When his personality changed to glum and grouchy she was unable to get the emotional reward she had been willing to earn before. Wendi

DEL012217

PCR000017

was used to believing that she could keep doing more and make things better for the people around her. When it became apparent to Joe that Wendi was not going to save him, he became angry and hopeless. Rather than reason that he was terminally ill because of happenstance or medical malpractice, he became angry with Wendi. Up to that time she had performed like a magic genie, and he expected it to continue. He became whiny and possessive. She had chosen him as a way of avoiding conflict. Now he was no longer willing to exchange a good-natured affect for Wendi's acquiescence to his will. No matter what she did for him, it would not stop the illness from killing him. She began to pull away from him. She felt attracted to other men and acted on it. He seemed to have sensed that he was losing control of her and that made him angrier. Batterers are at their most dangerous when they suspect their women are leaving. After Joe took the pills they waited. Wendi said she wondered what would happen. She said that she felt like she was watching herself and not understanding that she was not feeling anything. Joe said that he was feeling strange. H e laid his head in her lap. He started to panic. He asked for her help. She called 911 and her friend Chris. Chris waited outside for the paramedics. Wendi and Joe waited. He asked her if she had ever been unfaithful. She thought that if she told him the truth, it would calm him down. She admitted having had an affair. He became enraged and grabbed her. She said that he generally grabbed her head or her neck and threw her on the ground when he raged. This time they were sitting on the ground. She felt angry and hit him twice with a chair. She believes she continued to hit him with the chair but her recollection is that she watched herself do that. The next memory is of Wendi sitting on the ground next to Joe's body. She thinks she had her hand on him and she knew he was dead. She said they were in the

DEL012218

PCR000018

middle of a pool of blood. She got up to wash her face and glasses because they were so bloody she could not see. She said that she does not know how much time passed or what happened. She did not hear the paramedics. The children did not wake up. Chris did not return. She called her parents and her father told her to call the police. She did. Her most chilling memory is that of Joe asking her to help him as she hit him with the chair. In her head she said that she was helping him. She said that she felt relief when she found him dead. She was glad her old life was over. Until this week she has been relieved and at peace.

February 23, 2001  noon-1 p.m.

Wendi asked to have her roommate removed. She had been up all night while the woman had "spells." She is on lots of meds. Wendi tolerated her for 1 ½ weeks while others said they couldn't stand her for more than an hour. Wendi let her stay because the woman said Wendi was a nice person. She said that when someone is appreciative or apologetic she cannot stop herself from giving them another chance. Christians are supposed to be tolerant. She asked why she attracts these people and I tried to distinguish attracting form tolerating. She said that she has not yet read the paper on battered women. It is humiliating to think she was not in control. She felt as if she could fix anything. When she was first arrested her head was running a mile a minute to fix it. When she found out that it was first degree murder she realized that it was too big to fix. It cut her down and she had to face the helplessness and let go. She read the TAPP questions and answered all of them yes. She does not want to be pitied and neither did Joe (except from her). She asked her mother about losing memory and her mother said that she does it. Now Wendi recalls that she does forget things that are painful. Her best

DEL012219

PCR000019

feeling anything. Joe said that he was feeling strange. H e laid his head in her lap. He started to panic. He asked for her help. She called 911 and her friend Chris. Chris waited outside for the paramedics. Wendi and Joe waited. He asked her if she had ever been unfaithful. She thought that if she told him the truth, it would calm him down. She admitted having had an affair. He became enraged and grabbed her. She said that he generally grabbed her head or her neck and threw her on the ground when he raged. This time they were sitting on the ground. She felt angry and hit him twice with a chair. She believes she continued to hit him with the chair but her recollection is that she watched herself do that. The next memory is of Wendi sitting on the ground next to Joe's body. She thinks she had her hand on him and she knew he was dead. She said they were in the middle of a pool of blood. She got up to wash her face and glasses because they were so bloody she could not see. She said that she does not know how much time passed or what happened. She did not hear the paramedics. The children did not wake up. Chris did not return. She called her parents and her father told her to call the police. She did. Her most chilling memory is that of Joe asking her to help him as she hit him with the chair. In her head she said that she was helping him. She said that she felt relief when she found him dead. She was glad her old life was over. Until this week she has been relieved and at peace.

February 23, 2001  noon-1 p.m.

Wendi asked to have her roommate removed. She had been up all night while the woman had "spells." She is on lots of meds. Wendi tolerated her for 1-½ weeks while others said they couldn't stand her for more than an hour. Wendi let her stay because the woman said Wendi was a nice person. She said that when someone is appreciative or

007343

PAT007363

PCR000020

apologetic she cannot stop herself from giving them another chance. Christians are supposed to be tolerant. She asked why she attracts these people and I tried to distinguish attracting form tolerating. She said that she has not yet read the paper on battered women. It seems to be humiliating for her to think she was not in control. She felt as if she could fix anything. When she was first arrested her head was running a mile a minute to fix it. When she found out that it was first degree murder she realized that it was too big to fix. It cut her down and she had to face the helplessness and let go. She read the TAPP questions and answered all of them yes. She does not want to be pitied and neither did Joe (except from her). She asked her mother about losing memory and her mother said that she does it. Now Wendi recalls that she does forget things that are painful. Her best coping is to forget and move on. Wendi signed releases and contract with me. She is leaning on others now and has to learn this concept. She leans on me and Dave and God. She never trusted before even God. She did fire her public defender who was not affable, but abrasive. She is not able to say no when people are "nice." Wendi thinks she is like her mother; knows she is competent and that others cannot do things as well as she can. She thought she made the choices but now sees that Joe did.

Does she "put her best foot forward and make things look like they are good? "

February 27, 2001 noon- 2p.m.

Wendi reported feeling peace of mind again. Worried about her kids who cry that they want to stay with her parents. Suggested that they tape record entire visit.

Wendi said that there were witnesses to Joe's temper but she feared they are all on his side now because he is dead. Before they met he was seen running down the "bum" who

007344

PAT007364

PCR000021

kicked his tires. He had a rage at the Circle K where he spun his truck into the glass
windows and broke all the glass. He was kicked out of Denny's in Casa Grande for
raging. Jenae's boyfriend locked him out one time and Joe broke the windows with a
baseball bat then chased the boyfriend with the bat. Joe jumped his father and tried to kill
him until Brandon Clark and Dale Hartman pulled him off.

Next door neighbors Joel and Melba Vandenberg saw hole in wall that Joe made when he
threw a pot at Wendi. They might have heard him rage at her. Frank and Barbara
Nagore (friend from lake) people from Joe's crowd, saw Joe's temper. Steve and Nola
Barnes: Joe got mad at Steve whose father Bob did not give Joe a bonus. Joe wouldn't
allow Wendi to have Nola as a bridesmaid. Wendi tried to convince Joe to let her have
Nola in the wedding but he insisted that she be uninvited. Wendi sent her a note because
she was so embarrassed and couldn't handle it face to face.

Six months into the marriage they had an argument in the parking lot. Wendi felt bolder
in the relationship because they were married and she thought she was more secure. Joe
came home after she waited for 2 hours and he went to sleep without talking to her. She
had hopes that they could talk it out. She started cleaning and making noise to wake him.
He woke up and raged. It was the first time she had seen his anger first hand. This is
when he threw the pot at her and hit the wall. She vowed never to upset him again. He
always threw things and punched walls in his rages.

Joe wouldn't tell friends that he was sick, then he got mad that they did not inquire about
him. Wendi went to Branden to patch things up and asked him to call Joe.

Wendi picked out his clothes every day as well as bought them.

007345

PAT007365

PCR000022

He controlled the money and gave her 5 or ten dollars. She had a good job prospect in California and she was the family's sole support. He threatened to take the kids if she took the job.

March 6, 2001  3-5 p.m.

Wendi was upset about the children wondering what they were thinking and if they were feeling abandoned by their grandparents. She said that Jenea has them calling her Mom. She said that other than that she felt peace again. Dave was there and he said that he feels like he has come into the twilight zone when he is with her. He said that he does not understand her calm. Wendi said that she has gained 15-20 pounds in jail and that she was down to 100 pounds when she was arrested. She had lost the weight over the last 4 or 5 months, which corresponds to the time of Joe's decline. Joe had been extremely possessive and jealous since his trip to Oklahoma. He checked up on her a lot and accused her of being unfaithful. He said that he would kill her if he caught her cheating and she believed that he meant it literally. Wendi knew that he had felt betrayed by his former girlfriend Shelley and Wendi feared that he couldn't handle a betrayal from her. She remembered that he used the word "kill" after Nov. 2000 when she had the affair with Rick. She thought he might have sensed a difference in her. He did not want her to have her own friends and he got mad when she went out. For most of their marriage she was willing to give up her friends. She wanted to please him and wanted to fit into his group. She felt like he thought her friends were not as good as his were socially. The night that he beat up the furniture he had been angry because she went out with friends of

007346

PAT007366

PCR000023

Nola in the wedding but he insisted that she be uninvited. Wendi sent her a note because she was so embarrassed and couldn't handle it face to face..

Six months into the marriage they had an argument in the parking lot. Wendi felt bolder in the relationship because they were married and she thought she was more secure. Joe came home after she waited for 2 hours and he went to sleep without talking to her. She had hopes that they could talk it out. She started cleaning and making noise to wake him. He woke up and raged. It was the first time she had seen his anger first hand. This is when he threw the pot at her and hit the wall. She vowed never to upset him again. He always threw things and punched walls in his rages.

Joe wouldn't tell friend that he was sick, then he got mad that they did not inquire about him. Wendi went to Branden to patch things up and asked him to call Joe.

Wendi picked out his clothes every day as well as bought them.

He controlled the money and gave her 5 or ten dollars. She had a good job prospect in California and she was the family's sole support. He threatened to take the kids if she took the job.

March 6, 2001 3-5 p.m.

Wendi was upset about the children wondering what they were thinking and if they were feeling abandoned by their grandparents. She said that Jones has them calling her Mom. She said that other than that she felt peace again. Dave was there and he said that he feels like he has come into the twilight zone when he is with her. He said that he does not understand her calm. Wendi said that she has gained 15-20 pounds in jail and that she was down to 100 pounds when she was arrested. She had lost the weight over the last 4



DEL012227

PCR000024

..Mar-28-01  06:24P                    310 836 0695        P.04

or 5 months, which corresponds to the time of Joe's decline. Joe had been extremely possessive and jealous since his trip to Oklahoma. He checked up on her a lot and accused her of being unfaithful. He said that he would kill her if he caught her cheating and she believed that he meant it literally. Wendi knew that he had felt betrayed by his former girlfriend Shelley and Wendi feared that he couldn't handle a betrayal from her She remembered that he used the word "kill" after Nov. 2000 when she had the affair with Rick. She though he might have sensed a difference in her. He did not want her to have her own friends and he got mad when she went out. For most of their marriage she was willing to give up her friends. She wanted to please him and wanted to fit into his group. She felt like he thought her friends were not as good as his were socially. The night that he beat up the furniture he had been angry because she went out with friends of hers. He pinned her down on the bed and called her names like slut, bitch, fucking this and that. He said that she didn't love him.

Wendi said that Joe would not explode in rage, but would work himself up. He would mutter at first, then start to yell. This is why she had time to go into the bathroom and hide. He would go from the yelling into a full-blown rage hitting furniture and walls, throwing things and breaking things. This would go on for hours until he ran out of energy. She knew she could come out of the bathroom at that time. Often in the yelling stage he would ask if she had cheated. "I know you had an affair. You had one. You tell me. You're always lying." He though she hid money. He wanted to control all the money. She would keep a few dollars for herself. Wendi wanted to tell Joe about the affair. She felt very guilty and wanted to be relieved of it. It made her fear of his rages greater. After he took the poison and decided he wanted her to call 911 he started



DEL012228

PCR000025

working himself up about her infidelity. She had made a wedding box with her veil and other tokens from their wedding. It was framed and behind glass. He shattered it and a family picture saying, "You've ruined the family. How could you do this to me? I knew it." He grabbed her hair and she thought he was going to kill her. He yelled abusively at her the whole time. She has gap in memory starting with his grabbing her hair. The next memory is of Wendi picking up a kitchen stool and hitting him. She remembers not being able to stop hitting him. She believed he would kill her at that moment. His cell phone cord was on the kitchen counter. He wrapped it around her neck. (Was he still holding her by the hair?) She had her fingers between her neck and the cord. She grabbed a kitchen knife to cut the cord. She does not remember cutting the phone cord and has no other recall until waking up covered in blood sitting next to Joe's body. Wendi said that she wanted to understand my intent in writing a letter to the court asking for a psych eval. I explained the chronicity of personality disorders and the requirement that an M.D. evaluate for medication.

prenatal vitamins, power bars, bananas, grapes

March 28, 2001  11a.m.-1p.m.

Wendi cries when she thinks about her children. She lives to get out and care for them. When she thinks about anything else including her case and her situation she does not experience emotion. She has been reading about God's grace and is grappling with the realization that she still is trying to earn salvation rather than accepting it. She said that she knows she is trying too hard when she feels frustrated. Dr. Potts examined her briefly with other distractions. He did a mini mental status and told her she is fit to stand trial. She said that she is fit to stand trial and did not understand that he was determining only



DEL012229

PCR000026

she wanted to understand my intent in writing a letter to the court asking for a psych eval.
I explained the chronicity of personality disorders and the requirement that an M.D.
evaluate for medication.

prenatal vitamins, power bars, bananas, grapes

March 28, 2001  11a.m.-1p.m.

Wendi cries when she thinks about her children. She lives to get out and care for them.
When she thinks about anything else including her case and her situation she does not
experience emotion. She has been reading about God's grace and is grappling with the
realization that she still is trying to earn salvation rather than accepting it. She said that
she knows she is trying too hard when she feels frustrated. Dr. Potts examined her briefly
with other distractions. He did a mini mental status and told her she is fit to stand trial.
She said that she is fit to stand trial and did not understand that he was determining only
that. She said that she cannot talk to her mother frankly because she is monitored. She
said that she has never had a sexual feeling and wondered if I thought it had to do with
her possibly have been molested. She said that she has never had an orgasm and that she.
only enjoys hugs and kisses; I told her that the dissociation and the lack of sexual
responsiveness fit a profile for early molestation, but that it is not proof. She said that she
had sex to accommodate Joe (and Rick.) She said that she felt nothing (good or bad) and
just waited to have it over. She did not fake pleasure. She read romance novels and
thought the romance was sweet, but not sexual exciting. She is not attracted to women
either. She said she would try to recall her early thoughts and feelings about sex. She
said that an inmate had come on to her sexually and she had enjoyed the attention. The
woman was bonded out and Wendi never had to tell her no. She felt relieved that the

007333

PAT007353

PCR000027

woman was removed and said that she did not know if she would have said no. She said that it probably would have been similar to allowing Joe to have sex with her. She said that she recognizes the need to say no, but still finds it overwhelmingly difficult to do.

April 4, 2001 3:00-4:45

Wendi said that she was concerned that she was repeating the "Joe" dynamic with a woman who she had met in Durango. She said that 90% of the women are involved in homosexual interaction and that some had come on to her. She said that a woman named Tina had befriended her and had flirted with her. Tina was bonded out and Wendi had no idea what had happened to her. She said that she felt worried about Tina's well-being, thinking that she was responsible for Tina. She said that she felt compelled to find someone to contact Tina and she asked her father. She said that her father is tolerant of the desire to help Tina as long as it is only inquiring about her welfare. Wendi said that she understands that she is not responsible for Tina, but that Tina pulled that rescuer feeling in her. She speculated that the feeling comes when someone "masculine" appears helpless. She said that she would never want sex from Tina, but that she has never wanted sex from a man. She would want to be held and comforted in the same way a man might hold her. She likes to flirt and have her attractiveness confirmed and she likes affection, but sex is always a duty. She turns her mind away and waits for it to end. She fears that her sense that she can protect Tina is an effort to maintain a sense of power or control. Ironically, she feels in control when she gives herself up taking care of another. Wendi said that she could not bring up any early sexual memories, but she had asked her mother about my reference to hiding in a closet. She said that her mother had refreshed her recollection that she had gone into the closet until she was 8 or 10 years old. She said

007334

PAT007354

PCR000028

that she had set up a "safe" place with blankets and she would sleep and hide in there.
She said that she was not aware of having to hide from anything, just that she felt peace
in the closet. She said that she often cannot remember things until her mother tells her
enough detail that her memory is triggered. Her first response is to deny the memory,
then to express surprise that she represses it so successfully. She said that she jokes with
people to contain their anger. It is something she learned to do with her father and she
still does it. She mediated her parents' relationship by joking with her father. Wendi told
me early on that she loved joking with Joe and that it held their marriage together. Wendi
recalled going around with her parents in a bus to preach. She said that she was with
adults and felt like adult behavior was expected of her. She said that their religious
beliefs had mellowed over time and that she had not been allowed to dance in those early
days.

legal pad, file folders


April 9, 2001  2:15-3:45

Wendi said that she had trouble sleeping and is experiencing some of the pressure she
feels in the outside world. She said that she felt peace when she read the Bible all day
and kept to herself. Recently she has felt the need for social contact and is finding herself
acting like the peacemaker and caretaker for the other inmates. She said that she has
friends who are out of DOC who protect her. They are friends of her original friend and
are watching out for her. She said that she does not know how to moderate herself to
give the others some of her attention while holding onto herself for herself. She said that
she has been intending to go back into her room to get away from the pressure. I


007335

PAT007355

PCR000029

suggested that she set aside 3 hours a day to be by herself and see if she can find a midway position. Wendi spoke to her mother about my question about her bruising. She had said that she never bruises and had no bruises from Joe's grabbing her and pushing her around. Her mother said she had witnessed bruises on Wendi's arms. It was during the time Joe was taking chemo. Donna was babysitting so Wendi could go out with friends. She went to a bar and encountered some of Joe's friends. Joe was supposedly at the lake. Joe allowed her to dance with his friends because he did nnot dance. She thought she was allowed to dance with his friends and she was doing so. Joe appeared on the dance floor and grabbed Wendi under the arm and dragged her off the dance floor. He took her home and yelled at her when they were alone. He never yelled in front of others. She went home with him feeling reasonably safe because she knew he would calm down in front of her mother. Her mother saw the bruises the next day. Debbie Rose from the Center Park Apts might recall things about how Joe treated her. Wendi said that she cried to Debbie about Joe. Wendi also thought that Jerry Robles the equity partner in their business might recall things. She said that he used to say sympathetic things to her. His bookkeeper Linda might also have things to say on Wendi's behalf. Wendi was worried that Jerry does not live a law abiding life and might not want to entangled in the legal system even for her.

April 14, 2001 noon-12:45 pm

Wendi said that she had understood court proceedings and felt a little annoyed that she was spoken to as if she were not capable of understanding. She said that she had tried to push the information away, but couldn't. She said that she had felt like Beth Ann had given up on her before she even spoke to Wendi and she could not provide good defense.

007336

PAT007356

PCR000030

Wendi said that she had believed that Dave was meant to be and she was shaken by the possibility that it wasn't so. She thinks her parents are burdened financially and would prefer her to use the PD. She said that she is definitely in touch and is not dissociating and hopes that Dave can remain active in some role.

April 17, 2001  3:15-4:15

Wendi said she is going with PD and felt court went well in a way. She said that Dave brought up the Beth Ann issue and the ombudsman to the court said she would get good defense. There will be a supervised transition of investigators and Dave will continue as nap counsel. I can keep coming under auspices of Dave's office. Wendy said she watched in court as if she were out of her body. Couldn't believe that she was the subject. Prosecution said that she had gotten insurance policy fraudulently on Joe. In fact Joe and Wendi had had a conversation with one of Joe's friends about his posing as Joe. It never happened. Identical policies for Wendi and Joe were going to be applied for. They were to replace existing policies that had been cancelled because they could not afford them. Also reference to poisoned stew on stove. Wendi said they ate at her in-laws and no dinner was being prepared. She could not recall if stew was in frig. She said that poison was in Elderberry Herbs bottle and as far as she knew that was all of the poison. She said that bottle might be covered with Joe's prints because he handled the poison himself. Wendi wishes that Sean would come to talk to her. She hopes he will come forth and tell the truth about who wanted the poison. Asked Wendi if she thought it possible that Joe would set her up. Would he kill her if he could not have her? When he found out about Rick for sure he tried to strangle her. Was the whole "suicide" a plan to

007337

PAT007357

PCR000031

possess her in a final way? (People who seriously plan a suicide don't usually change their minds in the middle of it.) Did he know more about Rick than she knew? Wendi said that she loved Joe and couldn't stand to think of him that way. She said that poisoned stew could kill the kids and that was unthinkable. She said that she wanted Dave to get the lab reports that say the stew was poisoned.

perfume (Joe never allowed it.) mocha lipstick

April 18, 2001 7am

Have been troubled all night over yesterday's session. Am feeling that Joe was setting Wendi up to kill her when it backfired and she killed him.

1. Batterers are most likely to kill when they think their mate is going to leave them.

2. Joe was fixed on the idea that Wendi was having an affair since his trip to Oklahoma. (Did he have information that Wendi is unaware of that substantiated his accusations?)

3. When terminally ill people decide to take their own lives and ask the family to assist they generally have given it much thought and have talked at length with the family who intends to help. The timing is usually carefully arranged and they wait until life becomes unbearable. They do not change their minds in mid-suicide. Mind changers are usually histrionic suicide attempts that are attempts to get noticed and appreciated and these are not done with accomplices. If they have an accomplice, they have enough attention from someone already.

4. Joe had a history of trying to kill his "enemies." He ran a guy down in his truck with others watching. He hired someone to kill Jerry Robles when Jerry took his business for nonpayment of the loan. (Who besides Wendi knew about that?)

<div align="right">007323</div>

PAT007343

PCR000032

5.  Yesterday Wendi said that the prosecutor said there was poison in the stew ( and, possibly other food in the frig). Until then I understood that Joe took 4 pills and no other poison was taken out of the "Elderberry Herbs" bottle. Wendi says that Sean helped them (both Wendi and Joe) get the poison and that there are e-mails in the confiscated paperwork from her office that are to and from Sean. Wendi was unwilling to consider that Joe would poison the stew or other food because it might kill the children. Wendi has defended Joe every time I have asked things that might cast him in a negative light. Over time she asks her parents about their recollections and a picture of Joe emerges that is less than Wendi seems to want to believe. Donna's account of Joe and the kids is that he had very little patience for them and that Wendi did everything. Wendi reported that the one thing she can remember that he did well for the family was to hire babysitters. How much did he care about them or anyone except himself.

6.  Why was Joe so adamant that no one outside the family know how sick he was? Was it pride, denial or did he use it some way to keep Wendi under control?

7.  What would he have done if she had not confessed her affair? Was the "suicide" a way to leverage her into a confession. He had kept asking her to confess during the bathing.

8.  How much poison was in his stomach? A lethal dose? Wendi said she though it took 2 pills to die and he took 4. She saw no symptoms. Did he fake it? Then got scared he would really die?

9.  Joe let Wendi sign for the poison. If she were planning to murder him, would she have signed? If he cared about her, would he let her? It was their pattern for her to do

007324

PAT007344


PCR000033

everything, so maybe she would have signed because neither thought of the

consequences. Or Wendi did not think of the consequences.

April 26, 2001  2-3:30 p.m.

Wendi said that she has been crying and upset about the prospect of not being able to

participate in raising her kids. Her new roommate has been in DOC for 12 years and

talks about her experience of having little part in raising her son. He is the valedictorian

of his class and spoke about her. Wendi said she wished that she could still separate from

her feelings. She used to be able to make herself not think about the things that were too

emotionally taxing. She defined that as "letting go" and giving it over to God. She said

that she tries to do it now and cannot. She said that the separation from social support is

getting to her "making her crazy." She cannot trust fellow inmates to confide in. Her

calls to her family are recorded. I asked if she had thought more about the poisoned stew.

She was shocked when I said that I had asked Dave about it and he confirmed that the

labs said there was poisoned food. She cried and said she felt so angry that Joe could

endanger the children. She said there was a large container of poison and that they had

used less than 2 tablespoons to make a "handful" of capsules of poison. She was not sure

how much he needed to take to commit suicide, but he took four pills. She said that she

had trouble believing that he could want the kids dead, but that she could believe he

wanted her dead. She never feared for her life around him until that night when he tried

to strangle her. She cannot recall the position of her hands or how her fingers were

injured. She wrote to Sean and he has not answered. She said there were businesslike

conversations among the 3 of them about the poison. Joe wanted the least traceable kind

because he wanted the kids to collect on the malpractice suit. Sean did the research and

007325

PAT007345

PCR000034

said this was it. She asked Joe to put the remainder of the poison in the shed and does not know if he did. She said that they did not throw it away because they feared that someone would get hurt if they found it in the garbage. Wendi said that she did not think of assisting in suicide as a legal issue, but rather as a moral issue. She believed it was right to help Joe. She said that she had been open about her feelings for Rick and people in the bar could have seen them and told Joe. She said that he became extremely suspicious from the Oklahoma trip on, which is when she started with Rick. (Wendi seemed surprised that it was odd that she would be so open.) Re: killing Jerry Robles: Joe's friend Billy who owned a body shop where Joe hung out is the "hit man." Wendi thinks he would not have done it, but agreed to the assignment to pacify Joe's rage. Wendi cried thru most of session apologizing for doing it and not seeming to hear my encouragement for feeling what was going on.

April 29, 2001  Approximately 9 a.m.

Received collect call from Wendi. She said that she needed $300 by midnite to cover a debt. She asked if I could give it to her and said that she did not want to call her mother. I told her that I did not want to have her waive privilege by speaking to me on recorded phone call. I asked for her mother's phone number and said I would call her. Told Wendi I would come to Durango to speak to her in private.

1:00 –2:15 p.m.

Met with Wendi and re-explained issues of confidentiality and privilege. She agreed that she had no intention of breaking down that protection and would not attempt to

007326

PAT007346

PCR000035

communicate with me if we were not in a secure setting. She will call and ask for me to visit. I told her that I spoke to Donna and told her that Wendi needed money. Wendi said that she had vouched for other prisoners who needed credit and they had left the jail. Now the woman who runs the "commissary" is holding Wendi financially responsible. Same issue of Wendi being unable to say no, of taking care of anyone who seems needy. Wendi said that she had recently told another inmate no and she call Wendi "mean." When is it mean and when is it appropriate to say no? Wendi is beginning to see her patterns, but is not yet able to stop them. Has conflict over being good Christian and saying no. Had recent insight that God had to discipline man so one can act in God's image and say no. Wendi said that she does not like her parents to protect her by not telling her the bad news, yet she does the same to them.

May 7, 2001  1:30-3:30

Wendi said that she had been in involved in something that she could not disclose to me without clearance from David. She was moved to a different pod. She said that she continues to get herself into trouble by feeling like she can help or "fix" needy people. She questioned why she cannot say no to these people. The girl who had come back to her first pod and Wendi had realized that she was only taking from her had asked for her tweezers. She had asked through the window. Wendi knew that she would never get the tweezers back and she said no. She asked her neighbor to hold the tweezers for her. The next day the guards ransacked Wendi's room looking for the tweezers. She said that she keeps getting proof that the others are out for themselves but she said that she has trouble seeing it ahead. She said that she will try to notice the need to fix others as her cue that she is headed that way again. We discussed structure in her day so that she is not drawn

007327

PAT007347

PCR000036

into the social life. She said that she wishes for the peace she had before. (How much of the peace was numbness?) She said that the new pod is a new beginning and she will try to maintain some distance. She said that the women who have been in DOC are tough and wise in ways she is not. She said that they are often the only ones she can have "intelligent conversation" with and that causes her to let down her guard.

I am surprised at the trust Wendi is willing to give people regardless of their histories. She said that she likes to help and I suggested teaching or counseling as a career choice in the future. She said that she got into trouble at her job when she tried to help people get into apartments they could not afford. (Will look for boundaries handout.)

Power Bars/ no coffee flavors.

May 15, 2001  12:00-1:30 p.m.

Wendy has been on restricted privileges because she got involved with a former DOC inmate (Bev) who offered her financial help. Wendi trusted her and wound up getting her father and her clergyperson Cynthia involved in an illegal scheme. Cynthia has been arrested. Now Wendi is in a different pod with Corey who knew Bev in DOC. Corey has told Wendi that she was surprised that Wendi was close to Bev. Wendi is completely accepting Corey's friendship now. We worked on helping her understand how easily she gives her loyalty to people without analyzing their behavior toward her. She agreed to listen more and talk less when people approach her. She said that she is drawn to people who get her into to trouble. She seems willing to go along with schemes she knows are immoral if she can define them as one step removed from herself or the people she wants to protect. She does not follow her own judgment when faced with a convincing person

007328

PAT007348

PCR000037

who asserts their position. How did her parents switching from the extreme of drug culture to extreme of Christianity affect Wendi? She says that she is drawn to exciting people (risk takers) Did her parents protect her from people like themselves in their hippie period denying her the chance to experience adolescent risk taking? Has she been excluded from trial and error learning of adolescence? Is she doing remedial work in jail? Will risk takers be redefined though these experiences? Is walking the straight and narrow boring? Wendi showed me pictures of her family "when it was normal." She said that she has trouble connecting with the feeling that Joe is dead and sometimes thinks briefly that she can call him on the phone.

May 24, 2001

Wendi said that Corey was going out to the tents and she offered to have Wendi use her as a conduit to the guard Wendi trusts. Wendi said that she intended to send notes through Corey. She said that she was risking being labeled a snitch because her notes would be about Bev. I asked if she were being too trusting of Corey and she said that she had not considered that. I said that she needed to look closely at who she trusts with her safety. We had a discussion about theology. She is contemplating her beliefs about her deeds earning God's goodwill. Is God "micromanaging" her life? Is God's love a gift without quid pro quo? Talked about 60's and God is Dead. Is His plan affected by her behavior in jail?

carbon paper, call Donna

May 31, 2001  11-12:30

Met with Wendi. She met with her dad and he asked many questions about her earlier life. He thinks she was abused in relationships prior to Joe. She said that she had no

**007329**

PAT007349

PCR000038

memory, but that his questions made her upset and she cried and cried. She asked me to speak to her father so I could hear his perspective. She thought it might broaden our work on helping her set and enforce boundaries with abusers. The Bev dynamic continues. Luz, Bev's girlfriend, is in Wendi's pod and is telling about Bev's schemes. Wendi is working on keeping things to herself and not getting in the middle of these dramas. She is aware of staying away from women she has the desire to fix. She is able to see that she gets drawn to people who do bad things because she is able to separate the person from the deed and she can find redeeming qualities in the person. Her ability to be cautious is growing, but it runs against her instincts.

June 7, 2001

Wendi said that Dave had come to see her and wanted her to read the Trauma book. She said that he wants her to write her thoughts and recollections and that it is hard for her to write. She asked if she could tell me and I could tell him. ( I have to find some ethical resolution for this. I want to remain her counselor, not her co-counsel.) She said there are people who saw Joe mistreat her and that the investigator should talk to them. She said that Joe's crowd was very competitive. When they first got together she had a car and he had a small truck. He wanted a full sized truck so he could keep up with his friends, so she agreed to give up her car so they could buy him a truck. He sometimes left her waiting at work while he sat in the bars and drank and she had to call other friends to take her to the bar to meet him. She said that two of his friends Dale and Brandon often said that she was such a good wife to Joe because she accepted his treatment and ever nagged. Being a nagging wife would cause her to lose status in the crowd. She said that she bought into the rules and tried not to nag in front of the others.

007330

PAT007350

PCR000039

She said that she felt it was her victory to make the marriage appear perfect. Wendi's friend Mia poked her head in to say hi. She asked Wendi to get a tattoo to express their undying sisterhood and Wendi agreed. Wendi said that she did not want a tattoo, but she felt that it was a small sacrifice for her and she could not ask Mia to sustain the disappointment. I asked if this was part of a familiar pattern and she laughed and said that she could see that she was doing the same thing as always, giving herself up, but she said that she did not think she could say no to Mia.

June 14, 2001

11am-12:45 pm

Met with Wendi. She got tattoo and thinks it is cute. She is aware of giving in to spare another from doing so. She says she needs to be needed and will do anything for those she cares about. She is struggling with the wisdom of giving everything and can see it in terms of her kids, Joe and Mia. She is self-aware intellectually, but keeps saying that she is inadvertently drawn to those who she needs to help. We talked about how the need to be needed is a false guarantee that we will never be alone. Theologically it is tolerable to be alone because God is always with us, but not in a micromanaging way. We also talked about being given choices by God and having to take responsibility for our actions. Another inmate who was interested in Mia and resentful toward Wendi stole her deodorant is causing Wendi to feel angry. She does not want to confront this woman even tho it is the ethic in here. What is the appropriate line between healthy confrontation and constant facing off? Wendi is considering telling the woman that she knows she has her deodorant but does not intend to fight physically for such a thing.

007331

PAT007351

PCR000040

Wendi says she could argue with the woman but cannot fight. A good sign that she can

stand up for herself to some degree.

lipstick, deodorant, power bars, fruit

June 20, 2001

Met with Wendi who said that she had been crying because it is Nicholas' birthday. She

said that she wants to talk to him, but fears that it would aggravate the conflict over

custody. She said that her mother keeps reminding her to do the things God expects in

order to get the best outcome. Wendi said that she understands her mother's urgings, but

that she is beginning to think differently now that she is alone. She said that she is

thinking more of God's grace than of his judgment. Her mother likened her to Esther in

taking year to prepare and purify herself for the purpose God had for her. Wendi said that

her mother was upset over the tattoo. Wendi likes it and is experiencing some adolescent

joy in rebellion. She seems not to have lost her focus or judgment, but rather she seems

to be struggling to find an ethic that is truly hers.

July 6, 2001

Wendi had placed three collect calls to me while I was away. I called Dave DeLozier to

check on her well-being and he said that she had had some problems, but was fine. I

called Donna who said that Wendi was fine and that she had wanted to go into solitary

for 30 days to avoid the social pressure. I talked to Donna about the wisdom of using

solitary as an easy way to set boundaries that are hard for Wendi to set.

Met with Wendi who said that she had wanted to talk about the return of Tina. Wendi

sorted out the aspects of her friendship with Tina and decided that she could maintain her

composure and distance if she stayed aware of herself. She seemed able to face setting

<div align="right">007313</div>

PAT007333

PCR000041

boundaries and quickly saw the dynamics of the pressure that is brought to bear on her. She said that the guard that she trusts had said that Pat had been loyal to Wendi and had not betrayed her in the Bev check scam. Wendi said that she felt relieved that her trust was valued. Talked about my having spoken to her mother and to David and she repeated that she wanted me to speak freely to them unless she told me specifically not to reveal something. She asked that I not reveal the Tina story. She said that her mother talked to her about hiding from boundary setting and that they both thought it was good for her to face the issue rather than hide.

Wendi is showing insight and growth as she navigates the social structure of jail. The women she encounters seem to embody the dependency and domination issues that she experienced with Joe.

July 10, 2001

Wendi is happy. She set a boundary with Tina and it is holding. She understands what she was able to do and feels good about it. Talked about what ifs. Can she hold the line if Tina wants things from her that she doesn't want to give? She said that she thinks she will be able to maintain.

Wendi said that she tries to stay uninvolved with the outside world. Is that part of the dissociation? Told her that her conscious choice makes it different.

She said that Dave had sent her an article about a woman in another state in a similar circumstance. She will read it and bring it next week.

July 17, 2001

007314

PAT007334

PCR000042

Wendi said that she had been through the worst week. Her roommate Vanity who calls her "mom" became angry with her because Wendi was not giving her the care and attention that she expected. She raged at Wendi and Wendi felt the same feeling that she felt with Joe. She said that she did not see the abuser traits in Vanity, but did see the dependence. She said that Vanity gives her little things but they are never emotional or deeply satisfying. Vanity gave her tennis shoes to wear to court and when Wendi loaned them to Tina, Vanity got upset. Wendi said that it feels like giving gifts with strings attached. Wendi said that she talked to Amy and Tina and they told her to tell me. She said that she would have sloughed over it and made nice on Vanity if they had not encouraged her to stay self-aware. She said that she does not feel like they need her in the way Joe and Vanity have. She acknowledged that she uses the feeling of being needed as an antidote to her fear of abandonment. She said that Amy and Tina could leave her and she feels insecure in those relationships even thought they are more her peers developmentally and intellectually. She acknowledged that their autonomy might be a good thing but that it felt unfamiliar and a bit frightening. We looked at her past and saw abandonment from her natural father followed by her being a good girl and not being abandoned. She said that she has felt in the past that her mediation has maintained her parents' marriage. I suggested that she check out the reality of that feeling with her parents.

No more books or cosmetics. Guard told me that legal papers were the only thing I could bring in.

July 24, 2001 1pm-2pm

007315

PAT007335

PCR000043

Met with Wendi who reported that she was doing well despite court appearance. She liked Judge Akers who looked at her and spoke to her instead of about her. She felt acknowledged as a human being and she cried in court. She said that Joe's family was not there and she kept watching for them. Wendi said that she worried that someone was angry with her and accused her of having drugs. She said that she can lean on Tina and it feels good. She said that Tina was disappointed at not getting bail and that it would be difficult to engage her in conversation about their dynamic at this time. She said the deodorant inside breaks out her skin and she is trying to get a doctor to allow her gentler brands. She said that she feared that she could not see me and that she wanted to give up if she could not. Processed the idea of bending rules versus breaking them. Moral question is does bending a rule matter if no one is hurt? Wendi fears that her rental policies will be viewed as dishonest, but she was following policy and was not hurting anyone. Analogy with airline seats at different prices.

August 2, 2001

Met Wendi in "no contact" booth after she met with her new public defender. She said that she likes him, but did not confide in him that the postponement of her trial is depressing her. She said that she fears the February date will not be met either. She said that she had not felt like going to church and other inmates have challenged her. She explained that she would feel hypocritical if she went. She said that she is looking for a spiritual reason why her trial was postponed. Vanity has moved to another pod and her new roommate is awaiting sentencing. She is feeling comfortable with the status of things with Tina. She said that Dave and her old P.D. had argued in court because the P.D. had not spent any time on her case. She is fourth in line with the new one.

007316

PAT007336

PCR000044

She was teary throughout the session, seems not to have allowed herself to grieve over the delay. Dave suggested that she ask to have her parents adopt her kids as a long-term solution. She says it would make incarceration easier for her. She said that seeing me in the no contact booth is not satisfying and that she will ask to go into the legal booth even if requires a strip search. I have been concerned with the indignity of it. She said that drugs were found in another pod and they were doing UA's on them but not her pod.

August 8, 2001

Met with Wendi in "no contact" booth. When I checked in at the window the guard made a call asking about a notation in the computer that Wendi be seen in a "no contact" booth. It is difficult to maintain emotional connection when there is a glass between us. We discussed how to cope with this. Wendi said that she is angry because we did not do something bad enough to deserve this punishment. She said that she would talk to the guard. I suggested that she speak to her new P.D. She said that Dave seemed to think we had earned this treatment by violating a rule. We agreed that we had two choices either to discontinue therapy or to try to work with what we have. Wendi said that she has been feeling like she doesn't care and doesn't want to engage emotionally. She said that she has been asked by the new PD to watch and listen to the tapes and make notes to help with her defense. She said that she does not want to that she watches other inmates get all involved in their cases to no avail. She said that she does not want to feel the bad feelings. I suggested that she try and that she could bring the work into our sessions if I could give her emotional support. She said the only "real world" things she feels connected to are her kids and the case to get them to her parents. She said that her last visit with her dad was chatty but inconsequential and that is how she has been. It appears

007317

PAT007337

PCR000045

as if she is returning to her first line defenses and is pushing away all difficult emotions. She said she had not intended to tell me this, but she said that she is feeling insecure about her relationship with Tina. She said that Tina fears abandonment and that she is pulling away from Wendi. We talked about Wendi's fear of abandonment and its roots, perhaps her father's leaving. She said that Joe would never leave her. Was that the thing he gave her? She said she always felt like she needed to do more and more for him. Is that because his guarantee never to leave was more valuable than anything she could give in return? Session went deeper than either of us anticipated. Still not satisfying to do this in "no contact." If she needs to use sessions to process work on case, open contact is a necessity therapeutically and practically. Papers will need to be passed and hard feelings will be addressed where touch will make it more possible for her to feel supported and connected. She may not be able to help with her defense if she is left to her own defense (psychological defense) style of dissociation and avoidance.

August 14, 2001 1 pm-2:45 pm

Met with Wendi in regular booth. Brought note from Donna asking about scar on Wendi's knee. Wendi said it was "funny" that her mother was concerned. She said it was nothing then proceeded to recount that Tracy one of Joe's crowd that did not welcome her was trying to create a problem by saying that Wendi had been involved with another guy from their group. Wendi had wanted Joe to defend her loyalty and he hadn't. Finally she said something confrontational to Tracy, then insisted that Joe take her home. In the car they had an argument because he believed Tracy and questioned Wendi's word. Wendi got angry and demanded that he let her out of the truck. He got out, too. They

007318

PAT007338

PCR000046



continued to argue and he pushed her into an irrigation ditch. She cut her knee badly. She insisted that they go to Tracy's house so she could make it clear to Joe in front of Wendi that Tracy's story was a lie. Wendi said that she felt like she had to prove her love to Joe, that she needed to justify herself. She felt like his crowd did not want her for him and she had to earn their approval as well as his. She made a habit of doing what they wanted and striving to live up to their standards to gain acceptance. Wendi said that she can now see that she was willing to make herself into another persona to gain acceptance. She said that she has come to realize that a relationship with someone who does not accept the genuine Wendi is really not worth much. She said that it is hard to keep the reins on that part of herself, but it is getting easier. She said that she does nice things for people and does not know for sure where the line is. Wendi said that she shows different faces to different people. Her father has a "bad boy" streak and she can play into that and her mother expects perfection. Her mother also expects it from herself. Wendi said that her grandfather was a bad man and cheated on her grandmother. He was in the military. She said that her mother learned to kowtow to men and she thinks she picked that up, too. Wendi said that her parents were Jesus freaks and the male dominates in that culture, too. Thought about Military Brats book's comment on women that they become invisible. Wendi said that she felt freer to speak in contact booth and would tolerate a strip search to have the contact. She will talk to new PD.

Ran into Donna in waiting room and asked about her upbringing and the way she treated men. She will make notes and FAX. She said that Wendi's biological father was a truck driver and he abandoned them regularly. Women ate after the men in his family.

007319

PAT007339

PCR000047

August 22, 2001 noon-1:15

Met with Wendi in "no contact" booth. She said that she had had rec this morning and

another inmate had beckoned to her and volunteered to read her palm. She told Wendi

that she would be offered a plea with a 20 year sentence and that Wendi should not

accept it because she would serve considerably less time. She told Wendi that a man was

burning the midnight oil for her and that someone named Jeffrey would be central. She

said that Wendi is missing her kids and that a child draws pictures for her. Wendi said

that she never knows if people are sincere or scamming her. She said that she has been

approached to get involved in things that are questionable and that she is feeling tempted.

I assume they would yield money for her defense or for Dave to get the kids. She said

that she knew it would be foolish and wondered why these things tempt her. We talked

about holes in people's moral fabric and that none of us is perfect, so we do feel tempted.

She said that Dave had visited her and said or implied that I had cut him off. I explained

that I cannot be part of the defense and be her counselor. I must form my own

impressions. She said that she is unusual for not being more involved in her defense.

She said that she cuts off and does not feel emotion about it. I asked if she felt afraid

when others are convicted and she said she is able to keep separate emotionally from it.

She said that Tina said she has to participate in her defense and she though she might

detach and read the documents without allowing the emotion. She said that Tina says she

cuts off when she (Wendi) hears something that she doesn't want to hear. Asked Wendi

to process this more with Tina. Wendi said that Dave has sent religious people in to talk

to Wendi and she doesn't want them bringing up her case. She says she is torn between

thinking she should hand her defense over to God and she should work on it. She said

007320

PAT007340

PCR000048

that she used to walk away from Joe when she felt upset by his friends in the bars. He would not defend her or take her seriously except when she left. Then he would chase after her. I suggested that she was baiting him to prove that he loved her and it appeared that he was. But in reality he was proving his possessiveness. She said she knew the strategy would bring him to her. In their last year when his family and hers came over for a barbecue she had to leave and Joe called her on the cell phone every five minutes. She said that she really wanted to get away then. It seems that he wanted to possess her throughout their relationship and she could not tell that from love. In the end I think she was inadvertently baiting him to follow her and he responded with the ultimate plan to possess her. She said that she does the same thing with Tina, but Tina tells her not to do that. I asked her to process that with Tina. We did better in the no contact booth and we seem to be adjusting to the set up. It is still not as good as contact and we both have some sense that we can be taped. Wendi said that her lack of memory for emotionally charged material scares her. She said that she has prided herself on an excellent memory and she amazed people that she could know who lived in every one of 196 apartments and that she did not have to study to get good grades, yet her memory is full of blanks. She said that she was visited by a friend from childhood who recalled many things that she could not.

August 27, 2001  12-1:15

Met with client in no contact booth. She was tired from sleeping since they were locked down. She said there was a shortage of guards and they had to stay in. She said that she could only get three books a month from the library and that she read them in the first

007321

PAT007341

PCR000049

week. Tina has a lump on her breast and Wendi is concerned about her having cancer.
Tina has requested a visit to the doctor but Wendi says that it takes weeks before the
requests are acknowledged.

Wendi seemed quiet and emotionally disconnected.  Loss of social contact and
intellectual stimulation allows her is "disappear."

September 4, 2001

No lock down. Met in no contact booth. Wendi said that she was upset about Tina who
had been offered a deal of 23 years.  She said that Tina was in a terrible mood.  We talked
about the appropriateness of a terrible mood. Wendi said that she finds it does no good to
be in a bad mood so she gets over it.  I asked if getting over it sometimes allows her to
accept bad things that she might be able to avert if she expressed her bad mood.  She said
that she can recognize that now, but it is not her basic style of coping.  She said that Tina
has not been to the doctor and Wendi has an instinct that Tina is sick.  Tina shaved her
head because she "had broken every promise to the people she cared about."  One
promise was to her "wife" to never cut her hair.  Tina said she was shaving her head to
have a fresh start.  Wendi said that the shaved head made Wendi nauseous and she knew
it had to do with Joe.  She said the words in her head were "poor Joe."  She said that Tina
had cut her scalp while shaving and the blood might have brought on a vision of Joe on
the night he died.  She called it a flashback. Wendi said that she was consciously aware
of it reminding her of Joe when he started chemo.  He "made" her shave his head and
when the children asked what was going on, Joe said that Wendi "made " him do it.  She
said that she hated doing it and it was the thing that made her really believe that he would
die.  She said that she did not want him to die and no matter how bad their life was she

007322

PAT007342

PCR000050

could adapt and she wished he had lived. After the chemo Joe changed and was hostile and their life changed. She said that when Joe was told by the doctor at the Mayo clinic that he was terminal, the doctor said he had one to three years. He said that Joe could have radiation and chemo and would lose his saliva. Joe decided that he would not do those things because he feared the side effects. He sought out alternative treatments, diet and homeopathic treatment through a place in Colorado. Wendi's church also prayed for a cure. In the summer of 2000 Joe decided he had to take the chemo but not the radiation. He feared the damage from the radiation most. Joe's family was angry at them for not doing the chemo earlier, but they switched their view when he started it. Wendi said it was like they disapproved of whichever choice Joe made. She said that she was able to believe that Joe would get better until the chemo. She encouraged him to complete a will, but he never co-operated. She said that they had few possessions but that they wanted to designate a woman from church as their children's guardian. Joe did not trust the kids with his family and they thought that his family would be angry if they left the kids to her parents. The woman was a neutral choice.

September 13, 2001

Met with Wendi in no contact booth. She said that she had not intended to tell me but Tina was in the hole. She said she feels as if she has lost her best friend. Wendi said that Tina has been trying to talk to her through the vent. Wendi said that she is avoiding Tina. She said that she pulls away when the other person pursues her and she doesn't understand. I hypothesized that she loses control when the other person sets the agenda. Wendi said that she had lost interest in Sean when he courted her. Is it tied to self esteem

007354

PAT007374

PCR000051

or control? Tina says she is troubled about getting more involved with Wendi and is disloyal to her wife. Wendi says she wants Tina as her friend but not anything romantic. Tina has asked her to talk straight. Wendi said that she knows she should tell Tina the truth of her intentions. Wendi said that her mother asked if she wanted to change Nicolas' middle name from Joseph. She said that she fears his having to hear comments of recognition about Joe's name. She acknowledged that it would be healthiest for Nicolas to hear the truth from her and from her parents and that an ugly truth is better than an ugly secret.

September 19, 2001

Met with Wendi in no contact booth. It appears as if we will not get access to legal booths again. We have learned to address issues of content and emotion with the barriers of the no contact booth. Sessions seem slower to engage, but they do engage. Wendi said that Dave came to visit and said that the adoption is proceeding well. He thinks it will be complete it about 3 months and can be done without notifying Brad and Janae. She said that this gives her great peace of mind. Wendi said that her emotions are absorbed with the loss of Tina (who was removed from the hole and put in a different pod). She feels as if she has lost her best friend. Wendi describes herself as inclined to become dependent. Last session she called herself codependent and we talked about the distinctions between codependent and dependent. She described intrigue about who "likes" who. There is a quality of teens at school. Wendi seems to have perspective on this, but she does participate. I asked her to contemplate why she prefers to be the person in pursuit rather than pursued. Does it resonate because her birth father was a truck

007355

PAT007375

PCR000052

driver who was always leaving her? Wendi said that she thought she would have dreams about Joe's death as a result of her seeing Tina's shaved scalp, but she hasn't. She said it is funny (which usually means it is difficult for her). Her interest in Tina does not seem to have Joe elements. Tina seems to offer Wendi support and affirmation. She seems able to tolerate Wendi feeling strong. However the "wife" issue creates an escape for Wendi and a reason for Tina not to press Wendi for a sexual relationship. Wendi said that her public defender will be in touch in the next week and that she would like me to talk to him and give my notes. I explained that I would release no information without her written release and that it was not my role to be a legal strategist. We have discussed on numerous occasions that our task is to improve her coping with life in jail as well as preparing her for healthier relationships in the future.

September 25, 2001 1:00-2:00

Met with Wendi in legal booth. She had been sleeping and said that she was sleeping in the day and staying up at night to have her privacy. She said that Tina will not be returning to her pod and she is feeling sad and lonely. Tina is writing her long letters and Wendi is having trouble answering them. I asked her if she is saying what she really thinks, she said that she is not because she does not want to hurt Tina. Tina wants her to make a commitment to her and is now saying that her relationship with her wife is over. Wendi said that it is unrealistic to consider the future because Tina is looking at a long prison term and Wendi is uncertain of her future. Wendi seems to be testing reality and is not following Tina's plans blindly. This seems different from the way she was with Joe where she followed his wishful thinking without question. Wendi said that Dave visited her and said that he likes the PD and the investigator. He also said that her trial will not

007356

PAT007376

PCR000053

take place by Feb. She said that her parents only see the kids about one time a month and at Brad and Janae's discretion. When I said that she will probably experience joy in a new way because she is staying emotionally present, she cried.

October 5, 2001 1:00-2:30

Met in no contact booth. Discussed Wendi's request of cosmetics for her roommate. Told her that I had them in car and would not carry things for anyone who she got involved with. Wendi is conflicted over her mother's instructions about doing God's work in order to earn his blessing. I told Wendi I had talked to Donna. She said that it is harder and harder for her to talk to Donna because she feels bad that she is not doing the religious things that Donna expects. Wendi fears that she is being hypocritical and God will know anyway. I suggested that she simply read the Bible and see how its words affect her personally. She seems to be going through a period of trying to find her own value system and her own system of religious belief. She said that she has tried to be neither too good nor too bad as a tactic to stay between the devil and God's attention. She seems to be reaching for a way of being in which she will take personal responsibility for herself. Her obedience and adolescent rebellion have not been successful strategies. While this discord with Donna is painful and will be painful for Donna it seems to be a real change in Wendi's way of seeing herself. If she is to survive without becoming subject to another Joe she needs to test her own values and experience adulthood as a way of being answerable only to her own ethics and values.

October 26, 2001

Met with Wendi in "no contact" booth. She reports doing well. Dave says that adoption is in 60 day waiting period and he expects it soon. Wendi says it is a great relief. Tina

007357

PAT007377

PCR000054

and Wendi have been corresponding. Wendi says it is enabling her to discuss deeper feelings because she does not have to feel the impact immediately as the spoken word does. She is working on "saying good-bye" to Joe. She says she is able to feel as if he is still alive and she believes that she has never mourned him. She said that she understands the fact of his death but feels little or no emotional experience of it. Donna told her that money is tight so we will meet every two weeks. She will call if there is an emergency. I will call Donna to confirm.

November 14, 2001  noon-1:40 pm

Met with Wendi in "no contact" booth. She said she has been well and that she and Tina are roommates. She said that she was doing well emotionally and that Tina is supportive and a good companion. I told her that I had spoken to Donna who said that a friend of Joe's from the boat place would testify that Joe had said that he expected to live only a few more weeks. She said that she did not know who that would be. She said that she cannot construct a time line of the night of Joe's death because she did not keep track of the time. She knew she had gone to work in the office for about an hour in the morning. She took the kids. She did this regularly on Saturdays. Joe was alone in the apartment and could have expected to be alone. Did he use that time to poison the food? She said that she cannot bear to think of him poisoning the food. She said that they went to Joe's parents' house around 3 or 4 and they got home about 11:30. She said that the police came while it was still dark and she must have sat outside about an hour in the dark. She said that she believed that telling Joe about the affair would calm him down and she was shocked that it upset him more. She said that she knew he suspected it and she thought that she would have preferred the truth to a false denial. She thought they could work it

007358

PAT007378

PCR000055

out if she were truthful. She said that she knows they are testing fingerprints and wonders if his prints will be on the food containers and on the poison. She said that he never cooked and he would not have handled food in the frig. She said that he had opened the box with the poison and his prints could be on it. She said that the poison had been on his nightstand (the elderberry container with the filled capsules). Wendi said that she was glad that her parents were getting the kids. She said that she had sent writing to her mother and father and her mother complimented her ability to write. Wendi said that she had intended the emotion to reach her mother rather than her skill as a writer. She said that she has felt some distance between them as a result of Wendi's having changed in jail. She said that she is no longer in synch with her mother philosophically. She no longer feels that obedience is the best way. She feels like things are less absolute than she did before and she fears she will lose her mother's love. She thinks her father is more flexible and will understand her better. She expressed concern that her kids will turn out like her because they are being reared in the same home as she was. I distinguished her early years with her biological father and the influence of Wendi as their mother. I suggested that she think about a long term plan for visitation if she does have to serve time. She recoiled from the suggestion that they come to prison if it becomes necessary. Her defense attorney arrived and introduced me to the investigator Michele.

November 30, 2001

Met with client in contact booth. She reported that she was doing well. She is enjoying having Tina as her roommate and is able to discuss things of greater depth and relevance. She is continuing to define herself in terms of her relationships with her peers, her mother

007359

PAT007379

PCR000056

and God. She seems to be more confident of her own perceptions and more able to draw boundaries. A former roommate asked her to give her food in exchange for unnamed things she would do for Wendi when she is released. Wendi said that she realizes that she gives to others and does expect something in return. She said that she had not realized that earlier. She does not believe this woman will return to jail to help her and she is not inclined to give her food now. Talked about conditional and unconditional love as it related to Joe and now to her parents. She sees how things were described as unconditional but they were really conditional. She said that she asked her mother to allow her to define her own beliefs and her mother responded well to the boundary. This relates to her struggle with having to do Bible study to earn God's blessing. She said that she is growing more comfortable with her own interpretations of God. Case for adoption awaits court date. There is now a question whether Brad and Janae have to be notified. Dan Patterson has been in contact and Wendi believes work is finally being done on her case.


December 11, 2001 noon-1:30

Met with Wendi who was struggling with the need to help Tina. Discussed it within a framework of addiction...Wendi's addiction to rescuing people. She is having difficulty saying no and Tina has not even asked for the help. Tina advocates independence to Wendi, yet Wendi assumes Tina's dependence. Wendi seems to be trying to fit Tina into a Joe mold by taking the reins of her life. Wendi will offer Tina the help she can actually give and will tell Tina that she feels responsible to fix Tina's crisis. Wendi did call me to come immediately so she did see herself behaving in this way.


007360

PAT007380

PCR000057

January 3, 2002 1:40- 3:40 pm

Met with Wendi in contact booth. She said that the papers for the adoption had been on the judges desk for months and she was worried if there was something wrong. She said that she had had a spat with her mother and she felt tension about calling. We discussed boundaries, even with her mother and I suggested that she thank her mother for any financial help she can give while keeping other help to herself. Dave had called her mother and included her in info that caused Donna discomfort. Wendi winced, but said she would try. Wendi said that she has been reading paper from her lawyer about Joe's death. She said that it does not affect her emotionally and it concerns her. She said that she nearly collapsed with grief when she read Joe's death certificate especially the cause of death. She said that none of this jogs her memory. It seems certain to me that she is still dissociating and is not going to remember that night until she finds a way to cope with knowing. She is quick to deny that Joe might have been planning to kill her, and is as blocked about facing that possibility. She said that the defense has the containers of the poison and is subpoenaing Sean's computer. She said that Sean is a computer whiz and can remove things from his hard drive so she expects little info from him. She talked about grieving and said that she knows she has to, but she lives as if he were alive and out of touch. Talked about punishment, redemption and taking responsibility. She said that she hears other in jail talk about taking responsibility but doesn't see them act as if they feel it. If she killed him even in self defense, can she tolerate the knowledge and is there some way she can find to believe in her own redemption? She is very hard on herself and judges herself harshly for times of anger and frustration with Joe's temper and his illness. She judges herself harshly for participating in his suicide scheme. If she chose herself

007361

PAT007381

PCR000058

over him, can she face the thoughts? Will see her in a week because she promised to entertain these ideas.

January 10, 2002  11:30a-1:30 pm

Wendi said that she had had no more recollections of the night Joe died, but that she had felt irritable all week. She said that she was sad and disappointed that the judge had not signed the adoption papers. She said that she did not understand how he could ignore the law. She said that she has been upset with Tina and was considering asking to be moved away from her. She said that she has begun to repeat her old acquiescent pattern and it is making her unhappy. She said it felt like the old pattern with Joe, but this time she could see it. She said that she would never have acknowledged it with him. She will decide based on her own needs if the relationship with Tina is working. She will not buy into Tina's making Wendi's discomfort seem to be Wendi's problem. She said that she had begun Bible study with Tina and felt like she should stay to continue it. I suggested that she has given Tina a gift and it is Tina's decision whether to use it. I also suggested that she has received a gift from Tina because she has had her interest in the Bible renewed.

January 23, 2002 noon-1:40

Met with Wendi in contact booth. She brought letter from David regarding CPS report by Donna and Alejo. She said that she had no idea that this had happened and she was alarmed. She said that she was aware of an indictment against Cynthia and she was worried that she was one of the unnamed indicted. She said that she had been the first one to report it to the authorities and that she understood that she should not have co-operated with Beverly in the scheme. She said that now she would have been able to say no, but that she was afraid to go against the pressure when this had happened. She said

007362

PAT007382

PCR000059

that she had kept the threatening letters from Beverly and she would turn them over to her attorneys. I said that this is a legal issue but that from a psychological perspective it showed how she has grown in her ability to face reality in evaluating the people who befriend her as well as her ability to set boundaries with them. She said that Tina will be sentenced on Friday and will go to DOC next week. She said that she feels sad to lose her best friend, but that she told Tina that she was able to let her go without promises of continuing loyalty. Wendi said that she understands the difference between a friend in jail and a friend in the outside world. She said that she has been involved in her own defense and while it makes her upset to face, she is doing it and is not avoiding it. She is having computer meetings with Michele weekly. She said that she had a dream the she was taken away by a bunch of lawyers and that it related to Cynthia's indictment. She said that she never used to dream about the subjects she wanted to avoid. She said that she is surprised that she can no longer shut down all feelings like she used to. She said that she still has not remembered the night of Joe's death, but she said that she has been focused on the tasks of defense, adoption, Cynthia, Tina and has not meditated on memory. She said that she is not sure she likes having the feelings because most of them are painful. She asked if her good feelings will be stronger. She said that she has faked intensity of feeling in the past and wondered if everyone does. (When her child took its first steps)

January 29, 2002

Met with Michele at Public Defenders office. Told her my diagnosis of Wendi and why, origins and purpose of our counseling and my suspicions about Joe's behavior as a

007363

PAT007383

PCR000060

controlling abuser. Told her I was not an "expert witness" on abuse, dissociation or memory loss, but could testify clinically.

February 6, 2002 1pm-3:40

Met with Wendi in contact booth. Tina has not left and Wendi is grappling with feelings of loss and jealousy. Suggested that she now is experiencing some of the feelings that Joe had and she acknowledged the parallel. She said that Tina comments on her ability to shut down when she doesn't want to feel a painful emotion. Talked about the effects of early sexual abuse and how she has continued to use the strategy. She continues to remain out of contact with memory of the night. She said that she feels pressure form interviewers to complete the story, but that it would not be her honest recollection. She said that she is aware of consciously staying with a feeling, but that she knows she can escape it if necessary.

February 19, 2002 1:15 – 3:40

Met with Wendi in contact booth. Tina still has not been sentenced. Wendi said that she is conscious of staying with the feelings of Tina's departure. She said that she is aware of having the choice to disappear emotionally and although it is hard to bear the pain, she is staying. She said that she is encouraged about the case for the kids. She saw the material showing the possible abuse and she finds it puzzling and worrisome. She cried and said that she hates feeling helpless. She said that it is confusing that someone who needs to control things could be thought of as abused. Discussed that idea that she could be perfect to control Joe's temper. Her relationship with Tina has more give and take.

February 28, 2002

007390

PAT007410

PCR000061

Met with Wendi in contact booth. The judge in her kids' case is requiring Brad and Janae to give set visitation to the Ochoas. Wendi expressed hope and relief that they are finally being acknowledged. She said the pediatrician said the marks on the kids are chemical burns. Brad has a fertilizer and farm chemical business. Wendi said that Tina has not left yet. She said that she needs some time alone to get back in contact with God and herself, and she plans to do that when Tina leaves. She said that she is disappointed that Michele and the PD's psychologist have not been in contact with her despite their promises. We talked about the possibility that her father might testify to his abuse of her (or his family's abuse of her.) Wendi said that her father had been in touch with Jerry Robles who said that he wanted to be available for any testimony he might have to give. Wendi said that Jerry's wife knew a lot about the things Wendi had put up with from Joe. Wendi said that she had not thought of her before. She could not specifically recall anything that she might have told her. Wendi consistently seems vague in her recollections of complaints she made to friends about Joe's treatment of her. She said that she wrote to some of her old friends to say that she wished to be back in contact. She said that she often felt confused about whether people had already judged her or whether they were uncomfortable facing her because they did not what to say under the circumstances.

March 3, 2002

Got a call from Wendi asking me to put money on her books because her parents could not. She said that her grandfather would repay me. A week earlier she had asked me and I had not had cash so I did not , however, upon reflection I decided that it might appear improper for me to give her money. I told her that I would be the messenger only and

001391

PAT007411

PCR000062

that her grandfather needed to send me the money immediately. She said that he would. My concern is that I have the additional power of being a source of cash and that she feel unable to confront me for fear of losing my financial support. She does not seem aware of such a possibility and I will discuss it with her next session. I did deliver $100 against the money promised.

April 15, 2002 12:15-3:05

Met with Wendi in contact booth. She teared up and cried during much of session. She reported that Tina had left roughly six weeks ago and she had felt alone. She said that she cannot trust other inmates and has to live without the closeness she felt with Tina. She said that she is angry with her mother and it is upsetting her. She asked her mother to put money on someone else's books and her mother refused. She asked David and fears that her mother will get in between. It seems as if Donna wants to protect Wendi from the bad influence of the other inmates. She seems to feel the maternal duty of protecting her child and the situation makes that impossible. Wendi wants to assert her independence from Donna and the restrictions of jail make that nearly impossible. Discussed my bills and made agreement with Wendi that she is responsible to pay me the balance at the end of her term and Donna will make payments monthly until then. Discussed issues of control and helplessness: Wendi in relation to Joe, to Donna and Donna to Alejo. Wendi met a new inmate who is in jail for attempting to kill her boyfriend. She recognizes to passivity and dependence. She sees the difference in herself. She can no longer suppress the emotions at will. Talked about the difference between willfully shutting out emotion and subconsciously doing it. Wendi is upset

007392

PAT007412

PCR000063

about her mother saying that God might not be giving them the kids because Wendi

would give up if she knew that were taken care of.

May 8, 2002 12:15pm-1:50 pm

Met with Wendi in non-contact booth. It felt uncomfortably distant after recent sessions

in contact booth. Wendi had bad cold and felt chilled. She said that she was feeling less

unhappy and restless. She has a new roommate named Carrisa. They have been reading

a book of religion/philosophy/psychology which is helping Wendi stay focused on letting

go of trying to control the things she can't. She said that she is regaining faith that she

will be cleared and will go home before the end of the year. I told her that I had met with

Dan and Michele and that they want me to look at the video of her interrogation. She

said that she knows she lied but she cannot recall any specifics. She said that her

intention was to protect Joe. She did not want anyone to think he would attempt suicide.

She knew how important it was to him to have no one pity him. I asked her what she

thought the alternative explanation for his death might be and she said that she hadn't

thought about it. I told her that I had talked about her being an abused spouse and asked

why she had not communicated that to them. She said that she did not think of herself

this way and so she never brought it up. Wendi expressed frustration at Donna who is

pushing her to remember more. She said that she might have told me things that did not

tell Donna and that is why she wants me in contact with the PD. Wendi is taking

Seraquel to sleep. She was prescribed 100 mg but only takes 50. She said that she does

not want to be on any drugs but cannot sleep. She likes to stay up very late when others

sleep, so she can have privacy. She prefers to sleep in the morning so she misses the time

that others are awake. She is afraid that things she has said on the phone and in the

007393

PAT007413

PCR000064

noncontact booths have been recorded because there was some issue about this. The time
the phones were down for repair are reportedly when the recording was removed. She
has something she wants to tell me and wants me back on Monday. She is afraid of being
overheard. Tina is back in contact with Tracy and Wendi has decided to take one day at a
time. She seems fairly resolved about this. She explained that she had begun to feel the
old Joe feelings about needing to do more as Tina did less. She saw it and is stopping. A
good sign of moving out of the abuse set. I told her that I told the PD about Tina because
they asked about her emotional openness. I said that I would tell them the things I
believe contribute to her defense because I would not collude in her prettying things up to
protect others' sensibilities.

May 13, 2002

Met with Wendi in contact booth. She said that she had wanted to speak privately to me
about her realization that she was uncomfortable with Dave's description of Joe's death.
Dave said that he thought Joe cut his own throat. Wendi said that she did not know that
and did not want to endorse a scenario that she did not recall. She said that she worried
about whether it was up to her to shape her defense or whether the lawyers should be free
to say what they chose. She said that she had a history of trying to control everything and
did not want to continue it. She said that she believes that God sent her the right lawyers
and therefore is testing her ability to allow them free rein. She said that she has trouble
knowing when she is exerting the old kind of control. I suggested that she never had
control and that Joe controlled their life. She did everything but he controlled what she
did. She said that she was inclined to resist that explanation, but that she did see my
point in the context of her only control being to control the things that would upset Joe to

007394

PAT007414

PCR000065

protect him.  I told her that the autopsy showed many stab wounds and she cried.  She said she did not know that and the idea of it upset her.  I suggested that he probably did not stab himself multiple times.  She said that knowing that was terrible.  I suggested that she might be feeling the worst and that letting the memory come back might be less painful than keeping it down.  She said that she understood that but did not know if she could.  I suggested that she pray for the courage and let God make the choice. I told her I would bring the autopsy report next time and she said she would read it. She said that she has been told so many things by different people that she is confused about their scenarios and her recollections.  I asked her about the interrogation tape.  She said that she recalls that the male officer was angry and hostile and the female tried to reassure her.  She said that she was numb and was not connected to anything that went on.  She said that she would not be surprise if she lied because it was foremost in her mind to protect Joe's memory. I asked her about the phone call to the insurance company.  She said that Joe did talk to the agent on the $5000 policy that was paid.  She said that she made the call initially and the agent would not talk to her.  She said that the Andrianos were "insurance type people" and that Joe had initiated the insurance idea. It was always her responsibility to do the work so she called the agent.  When Joe talked to the agent he was told that he would have to have a physical.  Joe knew he couldn't do that.  The agent called Joe several times on Joe's cell but he ignored the calls.  Gave Wendi lipstick and perfume and am concerned about the consequences.

May 23, 2002

Met with Wendi in contact booth.  Told her I would not bring in any more cosmetics because I did not think that it was worth risking my credibility.  Asked how she felt and

007395

PAT007415

PCR000066

she said "disappointed." Working on modeling boundaries. Showed her autopsy report and she said that she did not have any emotional connection. She said that she is often unsure if her knowledge of that night is real or altered by the things others have suggested or asked. I told her that I had watched part of the interrogation tape and that I hoped she would watch it, too. I offered to be there with her and she said she would want me to be there. She said that she had a conversation with Carissa and listened to a story about Carissa's rage. She said that it made her cry. She cried when she told about the experience. She said that she had no recall of the night and yet she connected to the telling of the uncontrollable rage at an emotional level. She could not name the emotion, but said that she felt turmoil. I reassured her that she was actually feeling the things she feared and she is surviving. We talked about theology and her learning of the Bible in a literal way as opposed to my learning in a figurative way.   She said that she had changed her way of believing during her time in jail and that she believed that she was supposed to carry her insights back to her church. She is no less a believer, but she her new beliefs seem to allow her to act from her own instincts rather than from the dictates of others. As she gains autonomy spiritually, it seems to give her the strength to behave more autonomously.

June 6, 2002  1:10 -2:40

Met with Wendi in contact booth. She has not heard from any of the defense team. The ac has been off in her tower and it is over 100 degrees today. She said she felt physically awful. She also feels isolated without Tina there to talk with honestly. She is especially aware of the differences between herself and the others who are products of the prison culture. She said that she is not having any more insight about the night of Joe's death.

007396

PAT007416

PCR000067

She said that she expected to have dreams or feeling and has not. I told her that I doubt if there is anything to be learned from her memory that it shocking enough to continue to repress. She continues to worry about the placement of the children. There is a June court hearing, but she does not expect any changes at least until after her trial. She has had two inmates who claim to have "the sight" predict that she will be out soon and that she will serve 7 years. She said that she does not want to latch onto those predictions and that she needs to keep believing that justice will be done and she will be released. I am concerned about her social isolation because she seems to flatten emotionally without real human connection. She says that she writes to Tina and sometimes eggs Tina on. She said that she wants Tina to need her and Tina will not make herself that vulnerable. Joe needed Wendi and she felt disdain for him. Fostering need to feel secure is not a good basis for a relationship. Understanding that need and independence can co-exist is something Wendi can grasp.

June 25, 2002  12:25 pm – 2:45 pm

Met with Wendi in contact booth. Tina's letters are not getting out of prison and she has realized that Tina is not ignoring her. She is trying to figure ways for Tina to channel the mail. I asked her to see that it is Tina's responsibility to figure this out and that she should exercise herself by remaining patient. Can she allow Tina to be in charge of her own problems? A psychiatrist from the pd's office came to visit her. She said that she probably minimized her troubles when speaking to him. A handwriting expert came to see if she wrote certain things. She said that she could tell from the content that some of it was notes on the phone book that Joe had written about increasing the amount of an

007397

PAT007417

PCR000068

insurance policy. Wendi said she is tired of being in jail and is anxious for the trial. She
seemed fairly unemotional and laughed at things that I expected to bring anxiety.

July 11, 2002  2-3:30 pm

Met with Wendi in contact booth. She that her trial would be delayed because of a legal
issue that affected the death penalty favorably. She said that she did not have a new date.
She said that she had had a computer conference with Michele and that they would get
permission for Wendi and I to view the interrogation. I told her that I was unclear about
the discrepancy between her story and Chris'. She said that she recalled that she had put
the small towels over Joe to cover the vomit. She said that he had vomited while they
were waiting for the paramedics. She said the he seemed to feel better after he vomited
and that he told her that he did not want the paramedics at that time. She said that she
then sent them away and if Chris saw anything, it was Joe's vomit covered with the
towel. She said that she believes there was no blood at that time and that Joe was
certainly alive. She said that his head had been in her lap and she thinks that she changed
her shorts to get rid of the vomit. She said that she had called Sean earlier to find out
why the poison had not worked as she and Joe expected. She said that they both expected
it to work quickly and that he would just drift away. She asked me to contact the pd's
office to see if anything could be done about the lack of a/c in the towers. She said that
the dorms do have a/c. She said that when she "asked" if she needed an attorney, she
thought that was all she had to do. She said that when they said they were just trying to
get the truth that it meant that she did not need an attorney. She said that she relied on
that. I believe that the Wendi of 10/2000 would not have asserted herself in her own
behalf. I think her strategy in the questioning was to lay low until it ended, just the way

007382

PAT007402

PCR000069

she handled Joe's abuse. It was her experience that resisting a powerful man got her beat up and acquiescing would get her farthest.

July 25, 2002

Met with Wendi in a contact booth. She described a lot of social drama in the jail and with Tina. She seemed to be emotionally consumed with the intensity of this. She said that she had not been doing Bible study until recently, but she had started again. She said that she feared God's plan because the court rules against her parents in the custody. She said the judge was angry that her parents had tried to adopt the kids without warning anyone. She said that she thinks her father is depressed and she is calling him to cheer him up. We are tentatively scheduled to view the interrogation tape together on July 31. She said that it is hot in her pod and it is crowded and uncomfortable. She said that she had heard through mail that Beverly is "talking shit" about her and it might not be safe to go on the yard. She said that she has written letters to them and is not sure whether to mail them.

July 31, 2002

Met with Wendi and Patty (legal assistant in PD's office/ phone number 602-506-2133) in contact booth to watch the video of Wendi's interrogation by officer Lucero. At first Wendi said that she felt sick at having to watch it, but then she was able to calm down. She said that she could not remember what she was wearing and if she had changed. She said that the interview made her uncomfortable because she knew so much more now about trusting the police. She said that she thought she was not under arrest and that she was worried about getting done to get to work. She said that she thought if she could steer them away from Joe's wanting to commit suicide that things would be all right. She

007383

PAT007403

PCR000070

said that she knew she was lying when he kept saying that she was, but not about the things he thought. She had not told Chris that Joe was committing suicide that night and it made her sending the ambulance away seem unnatural. Wendi said that her parents have a new attorney for the civil suit and that Wendi likes her. She said that this attorney said that Wendi does have rights as a parent even though she is in jail. Wendi said that she did not want to go to Friday's death penalty hearing because they hold you all day without anything but a bag lunch served at 4 am. Wendi said that she believes she was interrogated by the blonde female officer and there is no tape of it. Tape #1 ends at 10 am and Tape #2 begins at 12:45 pm. Wendi commented at 1:19 pm on Tape 2 "I'm trying to give him a story that flies and I don't know what happened." On Tape #2 at 1:31 pm Wendi makes reference to Lucero's partner asking her questions. At 1:44 pm on Tape #2 Wendi says, "Can your mind make you not see it?"

August 7, 2002  12:30 – 2:30

Met with Wendi in contact booth. She said that Dan had been there yesterday and he had bad news that she would be in jail another year because the motion on the death penalty was denied. She said that it would now be appealed as high as possible. She said that he also said that there were problems in her case including multiple skull fractures on Joe. She said that the fingerprint evidence is being gathered and he hopes to find that Joe's fingerprints are on the box. She said that she was more present with Dan and she participated in the conversations. She said that she laughed and joked with him because that is how she manages her difficult emotions. She said that he said there might be psychological issues that he had not previously emphasized. I asked her to review the night of Joe's death to see if she could recall even one minute more. She said that she has

007384

PAT007404

PCR000071

no more recall, but that as an "outside observer" she sees that she might have killed him but that the only certain thing in her head that night was that she believed that she had to help Joe. She said that the theme of his life was that he had not learned how to love in his family of origin and she was to teach him and fill in all his blanks. She said that she tried to teach him how to hug the children. I asked her if he ever assumed any responsibility for his own maturity and she said that she took it on and he did not have to. When he suggested committing suicide, Wendi said that she understood that he wanted it to end. She said that he had returned from visiting his sister and she had urged him to go to Mexico for unorthodox treatment. Wendi said that he did not want to do any more. Wendi said that she had no more hope to give him. Wendi said that on the night before his death she and Joe cried and she comforted him. She said that she was numb on the night of his death and the first feeling she can recall is fear. She said that happened after the paramedics left and after Joe threw up. She said that she admitted the affair and he became enraged and swore at her and smashed her wedding box. She said that her reaction was "oh, my God!" because he had never struck out at something dear to her. She said that she can remember being afraid for her physical safety. She said that she knew this was serious both because of the pointedness and intensity of his expression and because he had said many time that he would kill her if she had an affair. She said that she knows she felt frustrated and even angry because she was not able to help Joe. She said that she generally expects to succeed and she feels like she should have other ways to get things under control. She said that it was incumbent upon her to rescue him at any given time and the burden was unbearable that night. Wendi said that she does remember feeling angry that night, but she does not know when or exactly why. She said that she

007385

PAT007405

PCR000072

has always kept a lid on her anger. She said that on her birthday (8/26/00) she had gone out drinking with friends and when she came home Joe was fuming because she was a little drunk. She said that she went immediately to bed and he threw a pitcher of Kool-aid on her, stormed around and broke the bed. She said that she lay on the bed at a tilt and he shook her and held her by the throat. She said that she was able to reach the phone and she called Brad and Janae to come over and stop him. She said that he took the phone form her and spoke to them calmly "blowing it off." She said that she was shocked to see that he could change from crazy to still instantly. She said that she believes he was that afraid that others would know. She said that she remained silent and Joe fixed the bed and they both fell asleep. She said they never discussed what happened, but the next day he brought her flowers and balloons. She said she showed this to Donna and he was embarrassed and that he blamed the chemo for his rages. Wendi said that it was normal for her to fall asleep in the midst of chaos and that she could sleep literally for days without food or water to avoid emotions. She said that she could remember doing it in her teens and that she did it then because her parents did not allow her to be herself. She said that she ran away several times and she often felt like she wanted to be with the regular kids in public school who had fun. She said that her church did not allow her to have fun, but that Joe and his crowd had fun. She said that part of the attraction was going to bars and the lake and doing the things she had not been allowed to do. It seems that his irresponsibility originally attracted her and then became a burden. Wendi said that she sometimes rehearsed what her life would be like after Joe died. She said that she knew she could not cry and be weak because she had two kids and responsibilities. She said that she does not like to cry in front of others because she feels

007386

PAT007406

PCR000073

judged and misunderstood and feels like their efforts to console her are false. She said that she planned not to cry at Joe's funeral or at the trial. She said that she wishes she could talk to Joe's family to explain herself. She seems to believe that she failed at her greatest undertaking and does not seem to be worried about her own well being. I asked her to consider changing her refusal to see her kids while she is in jail and she cried and said that they would recover from missing her but that they might see her incarceration as her approval of that way of life. I suggested that she had the chance to tell them the truth about her values and her circumstance and that abandonment, however well meaning might not be easy to get over. I continue to believe that Wendi dissociates and "left" her body when her fear turned into anger. I think she could tolerate being afraid but could not tolerate being angry. I am not sure if the anger was at herself or at Joe, but I suspect it was at herself because she was always the responsible one. Her history of sleeping while angry is a willful dissociation from anger. Her seeming even temper under the stresses on incarceration for first degree murder is a form of dissociation. I do not see evidence of "other Wendis" except perhaps for the power of her fight with him that night.

August 29, 2002   12:15 – 2:30

Met with Wendi in contact booth. She said that she had had a court hearing on Tuesday and that she now had no trial date and the next status hearing was in January. She said that she was sick of wasting her life in jail and did not know how she would cope. She said that she tries to sleep as much as she can but no longer has the ability to sleep for days at a time. She said that she consciously tries to get the old shut down strategies to work but they no longer do. I said that I would get her magazine subscriptions and books and would explore a correspondence course. She said that she had no interest in doing

007387

PAT007407

PCR000074

more Bible study and she needs something to think about. I asked her if I could confer with Mark Hampton about her legal situation and she said I could and signed a release. She said that Dan is exploring a challenge to the Grand Jury indictment and we speculated on whether a reduction in the charge might lead to her getting bail. She said that she believes that the Andrianós are fixed on having her convicted and even executed. She said that Brad and Janae are trying to get her parents sanctioned for trying to adopt the kids. She said that Daphne, her parents' new lawyer, is using Mary Margaret to investigate. She said that everywhere she turns, it is overwhelmingly against her and that she feels desperate. I told her that I would come weekly if that would help and asked her to call if she needs me. She promised that she would not hurt herself and could hold on until January. Will speak to Donna about this and lowering monthly payments to $200 for 3 months.

September 11, 2002  12:30-2:15

Met in no contact booth because a new guard at the front desk (Miller) refused to accept my letter from Dave saying I need a new one every month. I called Dave and he will issue me 7 months worth. I had to go in as a regular visitor, not a legal visitor. Wendi said that she hates these booths and has things to tell me that she fears will be recorded. She said that she is still trying to sleep as much as she can. She said that she was alone in her room for a few days and she felt better, but Baby is back and so is the drama. I told her that I had ordered her fashion magazines. She said that she would read novels and had tried a detective novel and liked it. I will order her books. She said that she is writing to Tina again and that she needs to have contact with someone who is more of a peer. She said that the others in jail are people who she can help but they offer her

007388

PAT007408

PCR000075

nothing. She said that she feels like she is on the back burner again because her trial date

has been indefinitely postponed. I suggested that she write about her experiences in jail

and begin with " I had no idea it was going to be like this on the day I arrived." She said

she might try. I am concerned that she has no goals or direction and that she is truly

wasting away. I spoke to Dave about correspondence courses and he is having a friend of

his send her info on a paralegal course.

September 24, 2002 1pm-2:45

Met with Wendi in contact booth. She said that she had gone to court last Friday in the

custody case. She said that she had walked outside in jail uniform and shackled. She

said that it was uncomfortable, but it felt good to be outside. She said that she had done

well and had been spurred on by the Andrianos accusations. She said that she would not

have been as clear if they had made her feel sorry for them. She said that Dan had sat

with her and she had felt close to him. She said that she was impressed with his brief on

removing the death penalty. Wendi said that she had requested more medication to sleep

and they doubled her dose to 200 mg. She said that she takes half at night and half in the

morning and that she sleeps up to 18 hours a day. She said that she got the paralegal info

from Dave and that she was not going to learn a career that a felony will disqualify her

from. I said that I want her to choose something to focus on because I am concerned

about her choice to sleep. She said that she has a new friend Cheryl who has helped her.

She said that Cheryl is not an addict and is educated and offers Wendi real

companionship. Wendi said that she is not writing to Tina anymore because Tina has not

responded to Wendi's letters. Wendi said that she realizes that the "addict" part of Tina's

personality attracted her and caused her pain. She said that her parents relate to her in the

007389

PAT007409

PCR000076

way that addicts do and she melts inside when she is exposed to that behavior. She said that she has felt responsible to keep her parents marriage together and she continues to even in jail. I asked her about reconsidering her decision to keep her kids away. I told her that I think living honestly is the best thing even when it requires facing pain and shame. I asked her to think about it with no expectations from me. It seems as if having Cheryl has helped Wendi look at some issues she has about rescuing the helpless.

September 28, 2002 noon- 1pm

Met with Wendi in noncontact booth after being assigned to a contact booth. The sergeant moved me. Wendi had called at 8:45 am to tell me that she had "gone crazy" because she had been assigned a new roommate at 3 am. She said that she had taken her whole sleeping pill, but still woke up because of the woman's snoring. Wendi said that it reminded her of Joe's snoring and she couldn't stand hearing it. She said that she hit the bottom of the woman's bed to awaken her, but the woman would fall asleep again and start snoring. Wendi said that the one time she really woke the woman, she was afraid to say anything because she feared the woman would attack her physically. Wendi said that she has seen this woman in jail before and she has "gone off" on others. Wendi said that the woman's temper reminds her of Joe. Wendi said that her feelings were rage and fear. Wendi said that she did not know what to do and she hit the walls. She said that she called Dave to get her out of the room, then she called me. She said that the guards were willing to help her, but the sergeant overrode their decision telling her that she was in jail and that she had already asked to be moved enough. Wendi said that she had asked only once and that was to get away from Beverly so she could stay out of trouble. Wendi said that she felt helpless. She said that she had called her parents for help and her mother

937364

PAT007384

PCR000077

told her to calm down and not to behave in a way that would displease God. Wendi said that her mother offered to read her scripture. Wendi said that her mother's reaction, although well meaning, made it worse. Wendi said it brought up the feelings she had in her marriage when Joe snored and she asked him to stop. She said that he seemed indifferent to her discomfort and never apologized or expressed empathy for her. She said she was expected to fix everything, even to be able to pray him to health. She said that she feels ashamed of her own upset because she knows that this woman and Joe did not intend to snore. She seems to censor her feelings almost as fast as she feels them. She said that she does not expect validation or empathy and that the most helpful person is her father who distracts her. Wendi cried on and off through the session and the phone call. She seemed calm by the end of the session and she said that she felt better having been able to speak and be understood. I told her that I would ask that the psychiatrist see her ASAP. I believe she was having PTSD flashbacks of being with Joe.

October 1, 2002

Spoke to Wendi by phone. She said that the psychiatrist was not sent to her. She said that she waited for the next guard shift and the next shift told her they had authority to move her without asking the sergeant. They moved her and she felt better. No more flashbacks reported.

October 23, 2002

Met with Wendi in contact booth. She has been pc'd since the 10th. She said that she is enjoying the solitude, but she is still sleeping days and waking nights. She said that the psychiatrist has given her Elavil to wean her off the Seraquil. She said that she wants to get off all meds. She said that she is reading a lot and is enjoying it. She said that her

007365

PAT007385

PCR000078

mother is always encouraging her to pray and read the Bible. She said that she got her
mother into the Bible and now her mother is more involved in it than she is. Wendi said
that the hearing for the custody of the kids is today. She said that she tries not to think
about the results. I encouraged her to rehearse her feelings if a ruling does come down
today. I suggested that she review her thoughts about having contact with the kids even
if she is in jail. She cried. I am concerned that time is passing and the children will
forget about her. I am also concerned that she needs a focus to want to continue.

November 5, 2002  1:15 – 2:45

Met with Wendi in contact booth. She was teary and cried saying that she was having
trouble in PC because she felt arbitrarily discriminated against by some of the guards.
She said that she had tried to speak to Jackson but that it took days. She said that Jackson
assumed that it was not urgent. Wendi said that being alone and away from the drama of
the general population has made it harder for her to distract herself from the problems
and worries of her life. She said that she cries when she is reminded of her kids. She
said that the court date has been postponed, but the reports look like they will not move
the kids. She said the kids call Brad and Janae "mother and dad". She said that she
wants to get Cheryl returned to County jail so she can have her company. She said that
she fears that she is doing wrong by wanting her and that she is not pleasing God. She
said that she prefers not to be bonded out because it would be impossible to go back if
convicted. She said that the uncertainty of the timing is wearing on her and that she is
growing more unable to hide from her feelings as time goes on.

November 14, 2002  12:45-1:30

· 007366

PAT007386

PCR000079

Met with Wendi in contact booth. She said that she felt wonderful to be out of PC. She said that she was in a relatively peaceful pod and had found out that she had four keepaways from the high drama pod. She said that she was not sure and was surprised about the number of keepaways including Baby. I encouraged her to stay away from the drama. She said that her father had collapsed with chest pain and it had been diagnosed as exhaustion. He is on SSRI's now. Wendi is off all meds except 1mg of ativan at night. Her spirits seemed better than they had in weeks. She has not been able to contact Cheryl but has had Helen for company.

December 19, 2002  11:30-1 pm

Met with Wendi in contact booth. She said that she is getting mail from Cheryl and is not inclined to answer. She said that she sees that Cheryl is now behaving the way she had with Tina. She said that it has given her insight. She said that she wonders how Cheryl can be so sure she wants Wendi when she hardly knows her. It seems that she is becoming more differentiated and able to maintain comfort living without being attached to someone else. She said that she can see that this is a long way from the dependence she and Joe had. She said that she has given up hope that her parents will get the kids and she wonders why nothing is breaking in her favor. She said that Helen is in trial now and it is reminding her of the inevitability of the trial. She said that things are going so badly that she fears the potential outcome. She said that Dan told her that Joe's fingerprints are not on the box of poison. I asked if hers were and she said that she had not asked. (She had told me earlier that they wore gloves.) I asked her about participation in her own defense and she said that she had avoided it. She agreed that it was time that she get involved in determining her own destiny and she said that she

· 007367

PAT007387

PCR000080

would call Dan and find out what the plan was. She told me that she had planned not to cry today but wound up doing it anyway. I said that it was normal to cry and she said that she feared that she would cry all the time if she let down.

January 2, 2003  11:30 am-12:45 pm

Met with Wendi in contact booth. She seemed tense and reported that she had been taken out of her room around midnite on New Year's Eve to be moved to "security segregation" with Baby. She said that this is usually done as a disciplinary action and she felt wrongly accused and confused. She said that the last time she had had problems getting her room moved she had contacted Dave and it had backfired. She said that she had chosen to try to deal with this herself so as not to bring about a negative reaction from the administration of the jail. She said that she had sent in four tank orders and had not heard a thing in response. She said that she suspected that there was "jailhouse" talk about Baby and her wife planning to break out and that she had been included because she had heard it while she and Baby were roommates. She said that it was nonsense and that there was no chance they would try anything, but rather that they like to keep the drama high. She said that she cannot rat on these people because she has to co-exist. She said that she did not see anything to report anyway. She teared up several times as she talked and she said that she was joking with Baby and was trying not to show anyone how upset she is. She said that she had felt good that she had gone to PC and had stopped all medication and made peace with having to be there longer, and this had set her back. She said that she had taken a seraquel to sleep and she wanted to sleep all the time again. I suggested that she focus on her defense and make notes for Dan to pursue. I said that I would check with Dan about the advisability of his intervention and that I

007368

PAT007388

PCR000081

would talk to Donna to assure her that Wendi was alright.   Wendi reflected on the "keep away" that she had been told existed on herself and Baby and she wondered if it related to this.  Wendi said that she had talked to Dan and that she was more certain that she would have to make a psychological defense.  She said that Joe's mood had become markedly worse after he started chemo in the summer before his death and she wondered if the medication itself caused mood changes.  (Did he get steroids?)  She said that his family blamed her for Joe's not getting chemo earlier, but that it had been his decision after Dr. Green at Mayo had told him how bad the side effects would be.  Joe had declined treatment at that point after learning that his likelihood of survival was only 20%.  When he finally decided to try chemo, the party line was that Wendi had made him do it.  Wendi said that her marriage began with her selling her car and his old truck to get him a big truck that could compete with those that his friends had.  She then had no transportation and dependent on his generosity to take her around.  She said that it was representative of their whole relationship.

Called Donna and left message.  Called Dan.  He said that he did not think he should intervene in " inside" jail events.  I asked him about pursuing a psychological defense. He said that he had sent a doctor to interview her and the doctor said that she had PTSD. I asked him if he had noticed how she remembers and forgets and said that she did and in an odd way.  I said that it is necessary to be with her over time to see her go in and out. He asked me to look for an expert.  I called the National Clearinghouse for the Defense of Battered Women and spoke to Andrea. (800) 903-0111 x3 and she said that they are a legal defense back-up center and they help with case law, social science literature and

007369

PAT007389

PCR000082

referrals for experts. She knew of Kathleen Ferraro at U of A. I gave her Dan's number and left a message for him with her info.

January 16, 2003  12:45- 2:30 pm

Met with Wendi in contact booth. She said that she was frightened by the likelihood of going to trial 4/23/03. She said that Cheryl had come back unexpectedly and she had been able to see the way they were together. She said that Cheryl wants Wendi to be "everything" to her. Wendi said that she can see that Cheryl is acting like she did with Tina and with Joe. Wendi is now able to set and enforce boundaries for her own good. When I point this out, she is able to see the change in herself. She said that she needs to be in relationship where people are honest and straightforward. She said that she is not sure when she is being "mean". I said that honesty especially about her feelings is kind and that she can move away from people she wants out of her life without telling them she doesn't like them. She is taking active interest in her defense and will contact Dan and Dave about the National Clearinghouse. She said that she is inclined to tell the jury that because she has no recollection, she has to entertain the possibility that she might have killed Joe. She said that she wants to be as forthcoming as possible. I encouraged her to discuss strategy with Dan.

January 30, 2003  12:15p-1:45 p

Met with Wendi in contact booth. She reported that she had been very upset because she had received service of Brad and Janae's intention to adopt Ashlee and Nicholas. She said that her pod had been locked down because of construction and she had not had access to a phone. She said that her inability to react to the lawsuit was extremely frustrating. She said that she had been able to use the phone in the psychiatrist's office

00/370

PAT007390

PCR000083

and had called and had spoken to the social worker who was evaluating the case. The papers said that she had had no contact with the kids for two years and had therefore shown herself as unfit. B and J had not admitted that they had stood between her and the kids. Wendi said that Brad and Janae had also denied her parents visitation for a month. Wendi said that she thinks her father is no longer depressed and is ready to fight this. She said that she thinks this is timed to her trial so her parents will have standing if she is convicted. She said that Dan visited her yesterday and she thinks he is finally able to see that her defense is abuse. She said that she does not think he is sophisticated in this area and she has at times felt hopeless that he would never see her point. She said that she hopes to testify and to tell the jury that she does not remember the night, but she does not know what that would add. She said that she wants them to see that she is an honest person. She said that she has had no more memory return. She said that she has had more drama with Cheryl but that she figured it out and has outplayed Cheryl at her own game. Wendi said that she is a different person than when she arrived in jail and that she now can see through people's gameplaying. She said that it frightens her that she will continue to relate in that gameplaying way out in the world. I said that the gameplaying does exist out here, too, but that she had only become aware of it in jail. She said that she sees now how Brad's girl friends played her to get rid of her and how she was too naïve to see it. She said that she hopes to find people who will deal with her "straight up" because that it how she wants her life. She said that her theology has changed, too. She said that she now prays that she sees the plan and makes the most it rather than scripting what God should do and praying for that. I said that the shift seems to mean that she is trying to give up being in control as much. She said that was more and more true. She

007371

PAT007391

PCR000084

said that she hardly recognizes the Wendi in the interrogation tapes because she has become so much stronger and healthier. She said that when she sees women come into jail who are enablers and victims, she sees her old self and she gives them the advice I gave her. (Stay away from the one you want to fix.) It seems as if Wendi has come a long way toward becoming "rehabilitated" in jail in a profound internal way.

March 4, 2003  noon-1:30pm

Met with Wendi in contact booth. She said that she had spoken to Dan and that the trial date might be delayed because the prosecutor was injured. I told her that I had met with Patrick Linderman and that I had liked him because he was trained as a social worker and understood the implications of my observations that she had been abused and was dissociating. She said that she had not felt comfortable talking to him and she did not think she had given him much information. She said that she had spoken to Dan and that he was going to engage Dr. Murphy, an expert on domestic violence. Wendi said that she will talk to Wendi. Wendi said that she is still not sure that Dan believes her when she says that she cannot recall the night that Joe died. She said that she has not remembered any more of that night. She said that she has a new friend in jail (Veronica) and that when she was getting to know Veronica she had to control her laughing when she talked about the night of Joe's death. She said that she fears that she will look like a psychopath with no feelings. She said that she has come to see that she laughs inappropriately when she is uncomfortable. She said that her emotions around the night of Joe's death are blank. She said that she can feel sad when she thinks about her grandmother's death, Joe's death seems removed from her. She said that she knows in her head that he is dead, but cannot feel it in her heart. Wendi said that she has occasionally dreamed about Joe,

007372

PAT007392

PCR000085

but he is always alive and the dreams are pleasant. She said that the one time she cried and felt upset about Joe's death was when Tina Stine shaved her head and Wendi saw the nicks in her head. She said that it made her sob. Wendi's eyes teared up when she told me this. She said that she had tried to write a letter of good-bye to Joe and it had brought up feelings of worthlessness, shame and humiliation over the way she behaved in the marriage. She said that those feelings were so painful that she threw the letter away. She said that when she was with him she felt constantly responsible to make his life all right. She said that she had been willing to give him anything or to do anything to help him. She said that each time she started a new job she vowed to herself that she would do everything right and it would take about 4 months before she was tempted to steal for Joe. She said that she had almost infinite energy to serve him, but that her paycheck was not something she could enlarge for him. I asked her if it was a relief to have him dead and she said that being in jail was a relief at first. She said that the time that Joe had torn up the bedroom in the summer before his death, her parents had come by the next day and had seen the mess. She said that her dad had photographed it.

Wendi told me about her relationship with Veronica and how Veronica could be brought around when Wendi expressed her anger. Wendi said that she was no longer willing to be led around and that she avoids people she meets that remind her of Joe. She said that she is afraid to risk getting close to someone who would want her to tend to their needs at her own expense. She said that now she feels anger when they take advantage of her. She said that she "didn't know how to be mad" before and that she never saw her mother mad. She said that her mother always hid in the bedroom to avoid anger and only her father got mad.

007373

PAT007393

PCR000086

I asked her if Dan might interview Rick Freeland, the man she had the affair with. She said that she had told Rick at the end of the evening that she was married and her kids and a sick husband. She said that he had said that he was ashamed for having gone with a married woman. She said that she thought he had denied the affair to the police, but she didn't know what he might say now.

April 1, 2003  noon-1:30 pm

Met with Wendi in contact booth. She said that she was not feeling well because she had been talking to Sharon Murphy at length about her life with Joe. She said that she was exhausted from talking and from being immersed in the recollections. She said that she was trying to recall as much detail as possible and that it is hard for her to do. She said that she is no longer able to shut down completely and because of that she gets no relief from these interviews. She said that the trial will probably go on April 23 and that there would be a different judge if it did not. She said that Sharon is a domestic violence expert. Wendi said that she had been in court last Friday and Dan had said he was using a domestic violence expert for the first time in front of the Andrianos. She said that emotion was palpable. Wendi said that the prosecution might have their experts talk to her and she would want to have Dan present before she talked. She said that she was so much better educated on domestic violence than she had been and that she feared that the jury would not be educated enough to understand. She said that Sharon had shown interest in her religious upbringing and she feared that it would hurt her mother to hear the implications of that. Wendi said that she has shifted to a belief that allows more letting go and that it is different from her mother's teachings. She said that she has studied the Bible for support of her new beliefs and she feels that she is supported in

007374

PAT007394

PCR000087

Scripture. Wendi said that she is worried and anxious about trial and that she has wanted in the past to reach this time. She said that this is hard without her old defense structure. I told her I would come more often and would sit in court if Dan had no other plans for me. I will see her again on Monday after she returns from court.

April 8, 2003

Met with Wendi in contact booth. She had been to court that day. She said that she felt supported when she is in court because the bailiffs and guards like her and are kind to her. She said that the trial had been postponed until July 7. She said that she had mixed feelings because she had been fearful of starting trial but was anxious for closure. She said that Dan and David and the bailiff had told her that the new judge might be more open to her defense. She said that she expects to be interviewed by the prosecution's expert and she does not want to talk to him/her alone. I asked her to talk to Dan and ask him to be present. She said the she remembered going to therapy during a time of financial pressure. She said that Joe had charged things from Radio Shack on a deal where there were no payments for 12 months and that time had come. She said that the therapist had said that her issues were rooted in Joe's behavior and Wendi had stopped the therapy because she did not want Joe to be criticized. She said that she now realizes that she should have stayed in therapy at that time because she might have learned about the dynamic between Joe and herself and avoided all the pain of the present situation. I asked her to tell Dan about this. She said that she was aware of family counseling done by the Andriano family when Joe was in his teens. She said that he had told her that he left the session because it was unbearable for him to be blamed and shamed in the family.

April 22, 2003  11:30 am -1:30 pm

007375

PAT007395

PCR000088

Met with Wendi in contact booth. She had been in lock down and had not been in contact with family in days. She said that she is enjoying being in A Tower in medium security instead of maximum. She said that she is not searched as often and feels like a human being. She said they had gone outside today, the first time since Christmas. She said that the court had ruled in an encouraging way where the kids are concerned. The new social worker has the ear of the old social worker and is explaining things from the Ochoa's point of view. Wendi said the court will not rule until her trial. She said that the judge will rotate out when her criminal judge does and she hopes for someone fair. I suggested that she consider communicating with the kids and having Nicholas visit. She said that she is terrified of that although she knows that Brad and Janae have told him that she is in jail. I discussed fantasies versus realities in kids' heads. Also gave her some info from web. Wendi said that she recalled that Joe had a gun he got from Billy that had the number shaved off. She said that he had it to kill Jerry. She said that when she told Joe she would tell Jerry, he pointed the gun at her head and said that he would use it on her if she did tell. She said that she knew he would and she kept her mouth closed. I suggested that she controlled Joe with her silence and that caused her to feel safe with him. She said that she did not feel safe the night he was killed because she miscalculated and told him the truth expecting that to calm him. She said that she remembered fear turning to anger, then nothing else. I asked her if being angry was so shameful that she repressed it. She said that she would not repress anger now, but did not know about then. She asked if I thought she would revert to the old ways. I said I did not think so. She said that she is being pursued romantically by a woman in jail and she told her no. She said she can tolerate the woman's anger and her own.

007376

PAT007396

PCR000089

May 5, 2003  12:45-pm -1:45 pm

Met with Wendi in contact booth.  She said that Tina Stine had been brought in and at first she had wanted to go back to B Tower to see her.  She said that she slept on it and realized the next day that she had no interest in resurrecting the drama.  She said that she is learning that she has the power to stay true to herself despite the social and psychological pressures around her.  She said that one woman pushed her to share her "store" with her and the woman asks if Wendi is a Christian when Wendi will not give herself away.  Wendi said that she trusts her instincts now but still argues in her head.  She said that the drug people in jail live a life of lies and I suggested that she might have led a life of lies covering up for Joe and for the way they lived.  She said that she couldn't help doing that and she seemed to realize that the drug addicts would say the same of their powerlessness against drugs.  Wendi said that she is doing well with her dad and is feeling compelled to poke at her mother to get a rise out of her.  It seems that Wendi is feeling angry because her mother's beliefs cause Wendi to feel like she has to do something to be acquitted.  Wendi said that she told her mother that she is strong enough to tolerate incarceration.  Wendi said that she longs to make amends with people who have been hurt as a result of Joe's death and her arrest.  I encouraged her to work within a 12 step model, doing the fearless inventory, making amends and not expecting a result.  She said that she was doing all right and was feeling more resolved about starting trial than she had before.  She said that she had feared going to trial without feeling prepared.

May 12, 2003

Met with Sharon Murphy.  She asked me to ask Wendi about Wendi's having hid in the bathroom the night of Joe's death, whether they used gloves when handling the poison

007377

PAT007397

PCR000090

and who her therapist was that told Wendi that her problems came from Joe. Sharon also
asked me to get the Bible quotations she had asked Wendi to compile.

May 15, 2003  12:30 pm – 2:00 pm

Met with Wendi in contact booth. She said that she had spoken to Tina and felt good
about it. She said that Tina is doing well and is trying to stay clean and serve out her
term without getting involved with people who bring her down. Wendi said that Tina had
not gotten her letters that expressed Wendi's epiphany that she had been co-dependent on
Tina. Wendi said that it did not matter to her now because she felt that she had learned
what she needed to get from the relationship. Wendi said that they parted friends and it
felt complete. Wendi brought pictures of Nicholas and Ashlee. They had been with
Donna and Alejo and appeared healthy and happy in the pictures. Wendi said that she is
able to look at the pictures without having it bring up all the grief about not seeing them.
She said that she had talked to Donna about my suggestion that she consider allowing
them to see her in jail. She said that they had decided that it would be better to wait until
after her trial because if she were convicted, it would be better for them to see her in
prison than in jail. If she were acquitted she would not have to face this at all. She said
that she could have physical contact in prison visitation.

I asked Wendi if she had hidden in the bathroom the night of Joe's death. She said that
she had wondered if she had told me that and I said that she had not. She said that she
had told David early on and had remembered it in her interviews with Sharon. She said
that she had hidden that night in much the same way that she had numerous times when
Joe was raging. I asked her to try to recollect the feelings she had while in the bathroom.
She started to cry and said that she did not want to think about it. I urged her to try.

DEL011239

PCR000091

4803680704

P.2

Wendi started to cry and swallow back the tears. It seems that she cries when she can
make an emotional connection, so I encouraged her to stay with the feelings. She stood
up and paced. She said that she felt nervous and unsure while she was in the bathroom.
She said that she went in there after she hit him with the bar stool. Her practice was to
hide and listen until he stopped banging things around. (Wendi had said that Donna hides
in the bedroom when she argues with Alejo.) She said that normally she knew she was
safe to come out when he quieted down. That night she crouched by the door to hear.
She said that she remembered hearing him breathe heavily. She said that she was
exhausted when she ran into the bathroom and she was in there long enough to catch her
breath. She said that she wondered "What's coming next? Is he still raging? Is he
unconscious?" Wendi said that she could not remember the night in a perfect
chronological way, but that she did remember the feelings. She said that she remembered
Joe grabbing her head and slamming her up against the wall. She said that she thinks that
happened in the dining area near the kitchen. She said that Joe kept the cell phone
charging on the long kitchen counter. She said that she knew it was the phone cord
around her neck because the phone went flying. She said that he had "bear-hugged" her
in the past and it had felt like she could not get oxygen. She said that the cord around her
neck felt similarly. She said that she had an ongoing fear that he would strangle her and
when she felt the cord around her neck, she believed that he would strangle her to death.
She gestured with her fingers and said that Sharon had asked her why she moved her
hand away from her throat. Wendi said that she was pushing the pressure of the cord
away from the front of her neck. She said that she knew that she had to get the knife to
cut the cord or he would kill her. She said that she flailed at the cord with the knife and

DEL011240

PCR000092

she thinks she might have made little cuts in her own hands as she attempted to cut the
cord. She said she remembered cutting the cord, but not what happened immediately
afterward. She said that it was all "craziness." I asked if she considered running away at
that time and she said that it never crossed her mind to leave the apartment. She said that
she thinks she dropped the knife once she got away from him. She said that she wasn't
sure if he tried to strangle her first or broke the wedding box first, but whichever, she said
to herself, "This is way more than you've seen before." She said that Sharon had asked if
she felt fear or anger and Wendi said that it started as fear and turned into anger. She said
that she knew she had to stop him from killing her and she picked up the bar stool to
subdue him. She said that she knew she had to hit him repeatedly because he kept
coming at her. She said that in her head she said, "I don't want to hit you another time.
Just go unconscious so this will stop." Wendi said Joe kept trying to get up. She
said that she thought that after she hit him like she had that "he would get up and beat her
to a pulp." Wendi said that hitting him over the head was awful. "I had no choice. I hit
him as much as I dared. When the fight was out of him, I ran to the bathroom so tired."
Wendi said that she waited in the bathroom for a cue that it was safe to come out. She
said that this was their pattern. She said that he might throw things, bang things around
or pound on the door until he was finished raging. She said that she was good at telling
when he was through and she could come out without starting him up again. She said that
she could hear his breathing through the door. She said that she came out apprehensively
and saw him lying face down on the floor. Wendi said that she thought Joe was
unconscious. She said that she knelt down next to him on the floor to see if he were
breathing. She said that she knows she was crying because Joe was " a mess." She said

DEL011241

PCR000093

May 19 03 11:34a                           4803680704                 p.4

that she saw what she had done to the back of his head and it was a "bloody mess."  She
said that her eyes were on his head.  She said that Joe became aware of her and as he did,
he rolled onto his side to sit up.  Wendi said that she thought "Oh, my God. My poor
baby."  She said that she was no longer angry, but was horrified at what she had done.
She said that she felt sorry for him.  She said that as he sat up she could see that Joe was
holding the knife that she had used to cut the phone cord.  Wendi said that she could not
remember the specific words spoken. But she remembered the feelings.  She said that Joe
threatened to cut himself and she argued with him to make him stop.  She said that she
remembered saying "no" as she struggled with him over the knife.  She said that he said,
"You did this to me."  She said that she felt like it was all her fault, yet she thought at the
time, "All I wanted to do was take you to 911."  Wendi said that because she had not
"fixed" it, all this had happened.  She said that she had never wanted him to commit
suicide in the first place, that she wanted him to live.  She said that if she had wanted to
hurt him, she would have used the knife when she had it.  Wendi said that she
remembered putting her hand on top of Joe's to stop his hand from cutting himself and to
get the knife.  She said that she remembered blood squirting during the struggle and Joe's
slumping over face first.  Wendi said that she just sat there and he was still.  She said that
she had "no feeling at all".  She said that she called her dad to find out what to do.  He
told her to hang up and call the police.  Wendi said that she knew she washed herself off
and doesn't know when.  She said that she called 911 at her father's instruction and they
asked if Joe was breathing.  They told her to roll him over.  She said that it was that most
horrible thing and that Joe looked like a monster.  Blood had settled in his face.  Wendi
said that she couldn't cry.  She said that she remembered police in the house.  She said

DEL011242

PCR000094

that her parents came and she sat on the sidewalk with her dad.  She said that her mom

and dad took the kids.  Wendi said that she had no idea that she was under arrest even

when they brought her in.  She said that she never imagined that she could be arrested for

that.  She said that she wasn't a "bad person" and she had tried to do the best she could.

She said "Now I might lose my kids over this.  It hurts."

Wendi cried and paced through much of this interview.  There were long silences

between sections of her recollections.  She seemed to be shaken by the recollections.

Wendi rarely can stay with an unpleasant topic for long.  She makes a great effort not to

cry in front of other people.  She seems to laugh at the first mention of an uncomfortable

topic, but the laughter changes to tears if she stays with the emotion.  She seems to have

great difficulty experiencing what she calls "a connection" with men.  When I have

encouraged her to tell things to Dan, she has reported that she feels embarrassed to cry

and unable to stay focused on painful information.  The affect she exhibits in her

interrogation tape is the affect I have seen when she is distancing herself from an

experience.  She has said often that suicide is the worst thing in the Andriano family and

it was the most shameful thing that they could learn about Joe.  She has said many times

that she lied in the interrogation to protect Joe's memory form that.  Wendi has been

consistent throughout the marriage in the hiding in the bathroom strategy.

In answer to Sharon's questions:  She and Joe used gloves when they made the capsules.

She said that she assumed that he would not have worn gloves when he put the box in

storage, but she had not witnessed his doing that because she was at work.  Wendi asked

me to help her get the written evidence that there was poison in the food in their

refrigerator.  She said that she heard the prosecutor describe poison in the food, but that

DEL011243

PCR000095

May 19 03 11:34a                    4803680704              p.8

she could not believe it. She described it as sounding so melodramatic that it must be
fiction. She laughed when she talked about the possibility of the food being poisoned.
She apologized for laughing and then shifted to a serious expression when she spoke of
the children being at risk. She said that it was Joe who handled the poison while she was
at work and she was "pissed off" if he had put poison in the food to kill her. She said that
she could understand that he wanted her dead because she had been unfaithful, but she
couldn't understand his putting the babies in danger.

Patrick Linderman is working on finding the counselor who told Wendi that her problems
were Joe's fault. Wendi said that she got the referral from her EAP at Casa Grande
Regional Medical Center. The agency was Casa Grande Counseling Service on
Cottonwood Lane. Wendi said that there might be billing records through the hospital
that would name the counselor.

DEL011244

PCR000096

she could not believe it. She described it as sounding so melodramatic that it must be fiction. She laughed when she talked about the possibility of the food being poisoned. She apologized for laughing and then shifted to a serious expression when she spoke of the children being at risk. She said that it was Joe who handled the poison while she was at work and she was "pissed off" if he had put poison in the food to kill her. She said that she could understand that he wanted her dead because she had been unfaithful, but she couldn't understand his putting the babies in danger.

Patrick Linderman is working on finding the counselor who told Wendi that her problems were Joe's fault. Wendi said that she got the referral from her EAP at Casa Grande Regional Medical Center. The agency was Casa Grande Counseling Service on Cottonwood Lane. Wendi said that there might be billing records through the hospital that would name the counselor.

May 22, 2003  1:00 pm – 2:30 pm

Met with Wendi in contact booth. She said that she had been in a bad mood since our last session. She said that she had not wanted to talk to anyone and had been short with people whom she normally would have tolerated. She said that she had feared that she would have nightmares after our last session, but that she had not, and instead she had had disconnected dreams about her children. She said that she had no interest in Bible study and she questioned the changes in her state of mind. She said that she had not had more material come to memory and she said that she had not rethought her way through the memories that she had last week. She said that she was happy that we were having a less intense session today because she did not want to suffer the feelings she had. She seemed surprised that she had talked for 1 ½ hours last time. She talked about not

007381

PAT007401

PCR000097

receiving her mail and she said that it adds to her isolation. I told her that I had gotten a notice from the magazine that they cannot deliver her subscriptions. Wendi's experience after last week's session seems consistent with her defense structure. She seems to have moved as far away from the upsetting information as she can. She seems unable to close it off entirely. I will attempt to clarify some details if I think she is ready at next session.

June 3, 2003  1:30 -3:00

Met with Wendi in contact booth. She said that she had not read my notes and did not want to talk about the memories today. She said that she was preoccupied with Tina Stine and had manipulated the system to get her moved into A tower. She said that she wanted an apology and to feel like she could get the upper hand in their relationship. She said that she had been willing to go to B tower to see her. It seems that Wendi has a real attachment to Tina and she believes that she can revise that into a flip jailhouse relationship. It seems that her willingness to go to B tower shows how she still allows her own welfare to suffer for another. She promised that she would make herself ready to talk about the night of Joe's death in our next meeting.

June 12, 2003

Met with Wendi in contact booth. She said that Tina had been taken to prison and had never been moved into A Tower. She said that she was disappointed but that she was okay. She said that her current roommate has been upsetting her for awhile and that she had been able to tell her directly that her behavior was crowding Wendi. Wendi said that she had done some Bible study with her and had tried to help her see that it is appropriate to distance herself from other inmates. Wendi said that the confusion stems from equating forgiveness and continuing involvement. She said that she has come to

DEL011245

PCR000098

understand that she can forgive without repeating defeating behaviors that keep her ties to another. Wendi said that she spoke to David and Sharon and that they had asked her many questions about the night of Joe's death. She said that it was a difficult session. She said that when she sits alone and tries to recall more of that night, it is almost impossible for her to remember, but when she is asked "the right" questions, the information starts to come back. She said that she is not sure that she told them the same things she told me. She said that her memories do not run continuously "like a movie." She said that it is choppy. She said that this scares her because in a way she has to recall it all anew each time she is asked. She said that she fears that she will appear inconsistent or incomplete in her recall. I assured her that she would remember only what she was able to bear and that her defenses would protect her from things she was emotionally unable to see. She said that she has been careful for 2 ½ years not to surmise anything, but only to tell the things she can really "see." I suggested that we try to go back into the gaps in that night to see if there are any more feelings and/or pictures that come back. I asked her to tell me what the "wedding cabinet" looked like and how Joe broke it. She drew me a diagram of the apartment and explained that the cabinet was about the size of a kitchen cabinet. She said that it sat on top of a large stereo speaker in the corner of the living room. She said that it had a cherry wood base and was glass on all four sides. She said that there was felt on the inside bottom and peach colored matte board on the back wall. She said that Joe rammed the top of his head into the glass to break it. She said that the glass shattered and was on the floor of the living room. Wendi said that ramming things was one of characteristics of Joe's rages. She said that he had rammed the door in the "farmhouse" when he had also broken a hole in the wall with a

DEL011246

PCR000099

Jun 12 03 07:05p                    4803680704            p.3

pot. Wendi said that when he rammed the door, he injured his head and arms and her father, Billy and Joel Vandenberg saw the damage and injuries. She estimated that this happened in 1996. She said that Joe had rammed the windshield of his truck when he got angry that a rock had hit it and started a crack in it. She said that he rammed it hard enough to break it and it hurt his head. She said that he had scars on his head from the times he rammed things. She thought this happened in 1996 or 97 and Brandon was in the car. She said that Joe had told her of cutting his head while ramming something on a ski trip with his friend before they knew each other.

Wendi said that she treasured the wedding box and a family portrait almost as shrines to their marriage and family. She said that she wanted everybody to think the marriage was "perfect." Wendi cried when she spoke of this. She said that Joe's smashing of the family portrait was even more painful for her than the smashing of the wedding cabinet. She said that he took the portrait off the wall and threw it on the kitchen floor and broke it saying "You fucked our family." Wendi said that she knelt down to look at the broken portrait feeling sick over the loss and his blaming her. She said that Joe put the phone cord around her neck while she was bending down. She said that she reached into the "silverware drawer" to get a knife to stop him from strangling her. She said that after she cut the cord, she continued to hold the knife to keep him at bay. She said that he seemed to calm down and she thought to herself, "I couldn't believe we'd come to this." Wendi said that she tried to reason with Joe, saying that it was not his fault. She said that he was quiet. Wendi said that she felt stupid standing there holding the knife and because he was no longer coming at her, she tossed the knife lightly in Joe's direction. She said that it landed on the living room floor. (Wendi said that she had never used a knife during a

DEL011247

PCR000100

fight with Joe, but that this fight was more menacing than any before because this time she had "committed the unpardonable sin." She said that when she had been in her parents' home and felt afraid that there might be an intruder, she would get a large knife that her father used to cut watermelons. She said that she would fall asleep on the couch with the knife.) Wendi said that when she tossed the knife Joe started to rage again. She said that he bent over to get the knife. She said that she believed he would kill her at that moment and she reached for the closest weapon, the barstool. She said that she hit him until he went down and the stool broke apart. At that point Joe had fallen forward from a kneeling position with his head and shoulders down and his butt in the air. ("like a baby sleeps") She said that she "hurried" down the hall to the master bath. She said that she had hidden in that bathroom during other fights. She said that she could not recall how many times, but "it was more than a few." She said that she chose that bathroom because she knew in the past that Ashlee and Nicholas would be less likely to wake up than if she used their bathroom. She said that she thought of the bathroom as "hers" and the bedroom as "his." She said that she was the one who would sleep in another room if they did not sleep in the same bed. She said that they had sex in "his" room and he thought the bathroom was where you did "girly" things. She said that Joe and his friend peed in the yard. Wendi said that the apartment is small and she could hear into the living room from the bath. Wendi said that when she came out of the bathroom she found Joe on the floor in that same place that he had fallen. She said that he was lying flat. She said that when he sat up and displayed the knife he was not screaming, but spoke in a low voice through clenched teeth as if he were "dead set on doing something". She said that was not the usual "full blown rage" but something more threatening. She said that it was the

DEL011248

PCR000101

Jun 12 03 07:06p                           4803680704              p.5

time she had seen this. She said that when he threatened to turn the knife on himself she
felt guilty and she believed that he would do it. She said that she was confused because
she "thought the whole evening had been about his killing himself." She said that she put
her hand on top of his and they "pushed and pulled" and then the blood spurted and
covered her glasses. She said that she could not recall anything more specific.
Wendi was tearful throughout the session, but not as agitated as she had been in recent
sessions. She said that she believes that she has grown stronger during these years in jail
and that she is becoming more able to handle this extremely difficult material. She said
that she fears that she will have memory problems on the witness stand, but she said that
she wants to tell her story especially so the Andrianos will understand. She said that she
does not allow much of this information to come into her consciousness when she is
alone, but it does not feel like dissociating. I encouraged her to trust herself and believe
that she is able to emotionally contact these experiences when she has to. I asked her to
reconfirm her permission to share this information with her attorneys and with Sharon
Murphy and she said that I should.

DEL011249

PCR000102

Jun. 20 03 06:10a

4803680704

6-20 03 p.1
2pgs

To: David DeLozier
From: Kandy Rohde     CONFIDENTIAL

first time she had seen this. She said that when he threatened to turn the knife on himself
she felt guilty and she believed that he would do it. She said that she was confused
because she "thought the whole evening had been about his killing himself." She said
that she put her hand on top of his and they "pushed and pulled" and then the blood
spurted and covered her glasses. She said that she could not recall anything more
specific.

Wendi was tearful throughout the session, but not as agitated as she had been in recent
sessions. She said that she believes that she has grown stronger during these years in jail
and that she is becoming more able to handle this extremely difficult material. She said
that she fears that she will have memory problems on the witness stand, but she said that
she wants to tell her story especially so the Andrianos will understand. She said that she
does not allow much of this information to come into her consciousness when she is
alone, but it does not feel like dissociating. I encouraged her to trust herself and believe
that she is able to emotionally contact these experiences when she has to. I asked her to
reconfirm her permission to share this information with her attorneys and with Sharon
Murphy and she said that I should.

June 19, 2003  1:15 – 2:30 pm

Met with Wendi in contact booth. She said that she was back in B Tower because A
Tower was now being used for PC of anyone involved in a "child related crime." She
said that there was already "drama" with the girlfriends and wives and she wanted to
sleep her time away again. She appeared groggy and said that she had taken part of a
Seroquel. She said that she was getting Ativan at 10 am and 5 pm and that it helped her
relax. She said that she would try to sleep with the Ativan only and that she did not want

*Handwritten note in right margin:*
Dave –
I need more letters to authorize jail visits. Start by July 2
Tx –
K.

DEL011250

PCR000103

to be taking the Seroquel. She said that David had come to see her and ask her detailed questions about the sodium azide. She said that she did not understand why there were no fingerprints on the box because she thought both she and Joe must have handled it enough to leave prints. I asked if she thought it possible that Joe wiped the prints off and she said that it was her suspicion that the police had. She said that she still couldn't fathom that Joe could have put poison in the food in the refrigerator and that she had at times thought the police had done that, too. She said that she couldn't recall the name on the bottle they used and that David needed to know it. I recalled that she had said "elderberry" and she agreed. Wendi said that she is now more able to tolerate talking about the night of Joe's death. She seemed too sleepy to try to question her about the final struggle, but I asked her to think about it and make notes if anything came to mind. She said that David had said that she would testify and she said that she was afraid of the prosecutor. She said that she had been questioned in the hearing for the children's custody and she had become angry at the opposing counsel because he had tried to put words in her mouth. She said that it is hard to have "someone in your face" and not to get "an attitude." This seems like a different Wendi than the one questioned in the interrogation tape. The connection to feelings and that instinctive refusal to be bullied have been a long time coming.

DEL011251

PCR000104

*To David*
*From Kandy*

4803680704          p.1

CONFIDENTIAL

giving herself up another in codependency and as long as she was asking Robin for the
things that Wendi needs it is not that. She said that she had been in a spiteful adolescent
drama with Robin and acknowledged that it was a power struggle. This seems
appropriate for Wendi because the struggle for power is conscious and she does not feel
guilty trying to get something for herself even when Robin calls her selfish. Wendi cried
and said it had been very unpleasant. I urged her to speak frankly with Robin, not togive
herself up and not to get even if she feels like Robin is engaging in a power play. I asked
to call me if there is any physical violence because I believe it is mandatory that Wendi
not befriend anyone who might abuse her physically. She agreed. She asked me to return
in a week.



September 24, 2003  12:30-1:30

Met with Wendi in contact booth. She said that she had asked David to help Laurie
Warren her former roommate and she was worried that Laurie had not met him this
morning. Wendi said that Laurie had said that she would help Wendi in exchange. It
seems that Wendi is trusting people unworthy of her trust. I asked if she were prepared to
be disappointed and she cried. I suggested that she be aware of the differences between
the jail culture and the outside culture. She said that she still knew how she was and
would be able to return to a less threatening dramatic world. Will speak to Dave. Wendi
said that Dr. Garcia has still not returned. I am concerned that she needs to see him to cut
the ativan down from the 4 mg she is now taking.

September 29, 2003  6:15 pm -8:15 pm

Received a call from David that Wendi was in the psych ward at Durango after a suicide
attempt. Met with Wendi face to face in psych ward. She was very thin and pale. Her

DEL006440

PCR000105

Sep 30 03 05:14p                                      4803660704          P.2

hands were cold. She cried on and off, but generally seemed possessed. She said that she
had reached her breaking point with Robin and her clique who were manipulating and
threatening her. She said that she had begun to feel anxious aand upset Wednesday night.
She said that Baby was in the next pod and she had been talking to her through the glass.
She said that Robin had become angry and possessive. Wendi said that she could not
ignore Robin anymore. She said that she asked the guards to get her out. She asked to be
transferred to the pod that Baby was in. The guard agreed to put Wendi in voluntary lock
down until an evaluator could come and see if it would be safe to drop the "keep away"
from Baby. Wendi said that by the third day she feared that she would be left in lock up
indefinitely. She said that she was terrified of an extended stay there because of the
emotional strain of the last time she had been in solitary. The last time she was in for 30
days and the guards threatened her with 90 days if she ever went back again. It seemed at
the time that the indeterminate sentence along with the lack of a valid reason for isolating
her made her feel out of control of her own life. Wendi tries to find ways of coping that
allow her to feel that there is some order to her life. She seems to become anxious when
she perceives chaos. Wendi asked a guard whom she trusted to check her file and see
when the evaluator was coming. The guard found out that Wendi was in involuntary lock
down and no evaluator was scheduled. Wendi said that the confirmation of her worst fear
set off an extreme sense of anxiety. She said that she felt trapped and could think of no
way to manage her anxiety. She said that she tried listening to Christian music and
praying, but that when the commercial came on she could no longer distract herself. She
said that she calmly wanted to die. She said that she intentionally cut the vein at the fold
of her elbow. She said that she had looked at pictures of her children and had written a

DEL006441

PCR000106

letter and had not cried.  She said that she felt peace about escaping the angst.  Wendi

said that she watched the blood seep out and puddle calmly thinking that she wondered

how long it would take.  She said that she passed out at some point and woke up with

bright lights in her eyes.  She said that she was given blood and fluids in the hospital and

was sent back on the bus to Estrella jail.  She said that she had cut herself Saturday (late

afternoon?) and had been in jail that night.  Wendi said that she slipped in and out of

consciousness on the bus.  She said that they took her back to Durango to the psych

hospital.  At the hospital she was questioned by a nurse (?).  The nurse spoke abusively to

Wendi and insisted that Wendi stop blaming others for her suicide attempt.  She put

Wendi into a black molded restraint chair at about 5 a.m. Sunday.  Wendi said that she

had urinated on herself while she was unconscious.  She said that she was cold and weak.

She said that the woman left her in the restraints for 6 hours during which she would

return and ask Wendi to admit responsibility.  Wendi said that she could not move at all

in the chair.  She said that her body was held in a painful posture as she waited without

knowing if and when the treatment would end.  She said that she got no water or food and

she felt weak, frightened and angry.  She said that she tried to reason with the woman, but

that she would not listen to Wendi's explanation.  Wendi said that at 11 a.m. she was

taken out of the restraint chair and was put in four point restraint on a cot.  She said that

this was also painful and that she could not sleep.  She said that a doctor came out to see

her and remove two of the restraints so that she could move enough to sleep.  Wendi said

that she tried to tell the hospital staff that she was not suicidal and that this was an

impulsive act.  She said that she felt like she was treated like a trouble maker rather than

someone in distress.

DEL006442

PCR000107

I spoke to the nurse on duty and the social worker (Laura). The nurse said that Wendi's medical records were at Estella not Durango. I asked if they were aware of the fact that Wendi had been prescribed 4 mg of ativan. They said that she was on 1mg twice a day. Wendi told me that they had cut her ativan from 4 mg to 2 mg on Wednesday. That was the day she began feeling unable to handle the anxiety. It seems that she would have been feeling rebound anxiety from the cut in her ativan which could reasonably have made it impossible to cope with the social stress of the pressure from Robin and her crowd as well as the fear of indefinite involuntary lock down. Laura assured me that Dr. Garcia was back and would handle Wendi's case at Estrella. Wendi said that she was cold and had asked for an extra blanket, but that they did not have her records authorizing another blanket. I asked the nurse and she said that she would write the request. She also said that Wendi was getting 2 prenatal vitamins as well as 2 mg of ativan and a seroquel for sleep. I am concerned that Wendi's weight is very low and she needs food water and rest to regain her health. Wendi said that she no longer wanted to die and would not do anything to hurt herself.

DEL006443

PCR000108

Oct 03 03 11:19a      ADRIANO      4803680704           p.1

TO: DAVID
FROM: KANDY    CONFIDENTIAL

Wendi Adriano October 2, 2003 3:30 – 4:45pm

Met with Wendi at Durango psych unit. She looked puffy and pale when I arrived and said that she had taken seroquel. She said that she had asked the doctors about it and they said that it was from the blood loss. By the end of the session she seemed less swollen. Wendi detailed the time line of the suicide attempt:

She cut her arm about 5 pm Saturday. She was aware of the second shift of guards when and they leave at 11 pm. She was aware of the third shift of guards who come on at 11 pm. She knows that she was in county hospital for some period of time, but she does not know how long. She knows that she told them that she was well enough to be transported back to jail. She remembers being on the bus to Estrella and that she was very cold. The third shift was on when she returned to Estrella. They go off at 5 am. Wendi recalls that she was put in the chair at Estrella at about 5:30 am. She said that she had no food or water since breakfast Saturday. She was locked in the chair until noon. The nurse scolded her several times telling her that she needed to be punished for what she did so she would not do it again. (Therapeutically, this is inappropriate because driving a suicidal person deeper into despair is more likely to increase suicidality.) Wendi said that she told the nurse that this was inhumane. Wendi said that she was shivering and her nails were blue. Wendi was taken out of the chair at noon and was told to stand up to get on the bus. She was too weak to stand and a guard (Branson) gave her bread. She ate the bread and was still too weak and he offered milk. Wendi said that she still couldn't stand and was in and out of consciousness. They were trying to chain her to another girl when Wendi fell. She said that she saw the milk on the floor. She said that the guards dragged her up the steps onto the bus. She was wet and couldn't lift her head. She said the transportation guards were saying "hurry and Stand" and she kept saying she couldn't and that she was going to pass out. She said that she was wet and too weak to lift her head so she only looked at the ground. Wendi slept on the bus and felt someone poke his finger into her chest to wake her. She said that they pulled her by the arm off the bus and put her into a wheel chair. When she got to D2 at Durango she got to change her wet clothes. She was four pointed on a cot. Wendi told the nurse what had happened and she got a doctor to look at Wendi. He allowed the restraints to be partially removed (two point) saying

Wendi said that the protocol for a suicide attempt is 6 hours in the chair if the attempt is more drama than suicide. Wendi's blood loss seems to have serious enough that this should have been viewed as a medical emergency as much as a psychiatric one. Punishing suicide attempts seems cruel and counterproductive at any rate.

At this visit Wendi expressed optimism about the trial and the attention she getting from the defense. She said that she finally believes the end is in sight. She said that she has adjusted to the current dose of ativan. I encouraged her to talk to Dr. Garcia about slowing weaning it down some more. She said that she is resting and reading and feels better, but is still extremely weak.

DEL006444

PCR000109

Apr-14-2004 08:13am  From-

To: Sharon Murphy                        T-900  P.002/003  F-289
From: Kandy Rohde   480-443-1351  CONFIDENTIAL

2 pages
said that it leads to her feeling like her mother expects her to be perfect in order to earn
God's love to be freed. She said that she no longer believes that she has to keep doing
these tasks to get God's goodwill. She said that she believes that He accepts her even in
imperfection and that He will lead her to the place He believes she belongs. She asked
me to deliver a letter to Dave to have him speak to her parents.

December 3, 2003

Met with Wendi in D-2. She said that she had read all the books. She said that she had
been extremely fearful of going back to Estrella and had been assured by Dr. Perry that
she would not be leaving. Wendi said that she feels strong and healthy. She said that her
roommate had asked to move out and it was the first time that had happened to her. She
said that the roommate worried that Wendi would disclose the woman's bladder problem.
Wendi said that she was feeling better about her parents and she thought that Dave had an
impact. She said that she was meeting more with Dan and Patrick and Dan had
encouraged her about the trial's outcome.

December 16, 2003

Met with Wendi in Durango visitors' room. She said that she was put on 20 days
restriction because they found "contraband" in her room. She said that she cannot have
commissary and is not getting enough food. She said that she might be on another 30
days because the guards found a seroquel on the floor and blamed her. She said that it
was not hers and she is appealing it. She will talk to Donna about buying pants during
after Xmas sales. She said that Dan seems optimistic about the trial outcome and she is
encouraged. She said that she has begun to think about rebuilding a life outside of jail
and she is frightened. She said that it puts her in touch with the old feeling of being
relieved by being in jail. She said that she is thinking of going into a photography studio
with her dad.

January 5, 2004  12:45-3:00

Met with Wendi in Durango visitors' area in contact room. She reported feeling isolated
and unhappy. She will be on restriction until January 24. She said that she has been
obsessing over the trial date. She said that she is not sure that she can tolerate another
continuance. She said that she is having suicidal ideation and she does not want to tell
her attorneys because it will look like she is leveraging them. I urged her to tell them the
truth and to find out if there is any chance that the trial will be delayed again. I urged her
to make a concrete thought of the ways she has to lift herself out of the suicidal thoughts.
She said that she is always happy when she gets a letter and when she can sing to the
radio. She agreed to focus on those solutions when her thoughts start to go to suicide.
She said that she consciously wants to live and is frightened by the thoughts.
Wendi said that restriction is harder than in Estrella because she is with people with
whom she cannot socialize. She said that Christmas without contact from her family was
depressing. She said that she was visited by the lawyer for her child custody case and he
was discouraging about the possibilities of getting the kids back even if she is acquitted.

DEL001813

PCR000110

Wendi said that she is taking her meds as prescribed and that she would make no suicide attempt. She said that she will call me if she needs to talk.

She said that she had spent time trying to reconstruct the last moments of Joe's life. She said that she is feeling responsible for trial preparation and it is motivating her to face the thoughts that she tries hard to avoid. She said that she tries to see the moment of Joe's death and she feels hopeless because she has no visual image. I held my pen in my hand and asked her to move me into Joe's position so she could reenact the moment. She showed me that she was sitting with her legs under her as she knelt over Joe. She said that she had come out of the bathroom when he became quiet. She said that he had been leaning forward when she hit him with the stool and the blood had flowed forward over his face. When she came out of the bathroom and knelt next to him, he rolled over and she saw his face again. She said that the blood had pooled in his face from leaning forward when she beat him with the stool and it looked horrible. She said that she had not expected him to look that bad. She said that she asked if he were ok. She said that as he rolled over she could see the knife in his hand. She said that she felt no fear, only compassion because he looked so bad. She reported that he said "Look what you did to me. I might as well kill myself now." Wendi said that she thought "What does he want?" She said that Joe's emotions during that evening had been a roller coaster from suicide to fear to anger and now what? She said that she remembered thinking "Here we are in another situation where it's my fault again so I'm not going to let him kill himself." She said that she was not sure if he was really going to do it but she did not want to take the chance. She said that she put her hand over his. He was holding the knife in his right fist with the blade facing him. She said that as she put both of her hands over his, he began to struggle for control of the knife. She said that she tried to pull it away from him with both of her hands. She said that the knife was about 4 inches from him. She said that she still couldn't "see" the moment but she could "hear" it. She said that no words were spoken after Joe said that he would kill himself, but there was a thud followed by a "gurgly breath." She said that she felt a warm spray of blood over her. I asked if she had closed her eyes during the struggle and she said that she thinks that she had closed her eyes when she saw the blood pooled in his face.

Wendi seems to have no gap in time in this memory only a gap in what she saw. She said that she is certain that she was not angry but was emotionally numb. She said that she knows that she did not want him dead and she knows that she was afraid that he would kill himself. She said that she remembers thinking that Joe never took responsibility for anything and that he was going to make his suicide her responsibility. It seems highly unlikely that Wendi would have tried to kill Joe if she were not motivated by fear. Her history was to avoid him and be passive, not to be aggressive. Even the beating with the stool was to stop him from killing her.

Wendi said that the 911 operator told her to turn Joe over to make sure he was dead or to give him mouth to mouth. Wendi said that Joe had fallen with one leg over the other and he was hard to turn over. She said that he was heavy and she had to roll his legs to roll him over. She said that his legs were crossed when he was rolled on his back and she recalls the police making an issue of that position.

Wendi said that she was surprised at how strong Joe was that night and she had used all her strength to restrain him and had failed. Wendi sat still in her chair and said that she felt nausea and did not want to go any further.

DEL001814

PCR000111

To: Scott MacLeod/ Sharon Murphy        4pgs
From: Kandy Rohde
                480-443-1351

Met with Wendi in visitation room without privacy. She asked me if I knew about Travis
Black, then proceeded to tell me that she had met him at Rockin' Rodeo and then had
had a one night stand with him. She said that she was rehearsing Joe's death and feeling
single. She said that the sex was not satisfying and that he was kind. She said that she
had cried before they had sex because she felt conflict over doing it, but she did not want
to be a "tease." Wendi seemed to have always taken her "commitments" so seriously that
she used the language to negotiate against herself. She said that Joe must have been
angry about that event and not about Rick because she had used a condom from Joe's
drawer and he knew it was missing. She said that he had many condoms and had to
count to notice. This seems to confirm his sexual possessiveness of her.

Wendi gave me the mitigation document which I have read. I am disappointed in its flat
tone, yet I am not sure that I am the one to comment. Wendi asked to me to read it and
edit. I will talk to the defense. David DeLozier came in to visit her and he sat down with
us. He said that he believed that the defense was coming together and that they were
meeting tomorrow. He said that he would be fine whether he was asked to speak or not.
Could this be true when she is his client in such a personal way? Wendi said that she
believes that things are happening as God intended and she is feeling more and more
confidence in Dan's understanding of the case. She said that she has more confidence
about talking to the prosecution's expert and she knows that she can be calm if she tells
the truth.

April 26, 2004

Met with Wendi in legal booth. She said that she and Dan had realized that she had done
things to get money for Joe's needs while at San Riva. She said that she could not
specifically recall the demand Joe made on her, but did recall the first demand which was
to pay off a $2200 Radio Shack bill. Wendi said that she was working at Sierra
Mechanics on her day off to help them stay afloat financially. She said that Joe expected
her to keep expanding her ability to cover financial demands and she kept trying to
comply. She said that she never told him that it was his responsibility to pay his own
bills. She said that Joe's entire Casa Grande crowd had houses except them and Joe
"made her feel responsible" to get them a house. Joe said that Marcy (his former
girlfriend whose father was a well off builder) would have gotten him a house. Wendi
said that it did not enter her mind that it was Joe's responsibility to provide them a house.
She said that he said "You know you can always get your hands on money." Wendi said
that she went to her parents for money until she could no longer face them.

Wendi said that she spent four hours with the prosecution's psychiatrist. She said that it
was grueling and that she cried several times. She said that he tried to engage her anger
and her flirtation. She said that she believes that she will have another interview with
him. She said that she felt like he was trying to make her afraid of the prosecutor by
saying how tough and theatrical he is.

I wanted to explore Wendi's history with men and sex because Scott brought up issues of
the absence of mention of her fathers in the mitigation document. Wendi said that she
had no recollection of her natural father. I think that Donna is the best source of
information on him. I believe from Wendi's inability to be appropriately sexual as well
as her ability to dissociate is because she was molested by her natural father. Donna told

019564

PAT019619

PCR000112



me that he had (or is now) served time for molestation and there is a history among the men in that family.  This was helpful to me in assessing Wendi as well as Donna.  While I have no direct information about Donna's history, I can see that she has chosen a sexually repressed way of living and of relating to her child.

Wendi said that she remembers Alejo as her father always.  She said that he is more liberal than Donna.  She said that she was always "Daddy's little girl" and that they had a joking and lighthearted way of interacting.  Wendi said that she is a "flirt" but that flirting is not a prelude to sex in her mind.  She said that she flirts with her father and she defines that as being charming and attentive and lighthearted.  She said that she knows that she can use that behavior to get attention.  She said that she was able to get the attention of the best looking man in the room by behaving that way.  She said that she always picked the man and was never the one pursued.  She said that she thought of herself as intimidating to men and that by picking the most attractive man she found someone with enough confidence that she would not intimidate him.  She said that she remembered picking out a boy at a Christian conference when she was a teen.  She said that the other girls were giggling about him but she was the one who approached him.  She said that she spent the conference with him and that nothing sexual happened, not even handholding.  She said that she liked this conquest without sexual obligation.  Wendi said that she did the same thing when she picked Joe.  She said that he could be "the life of the party" in the bars "with a few beers in him".  She said that she wanted his attention but did not want sex with him.  She said that she liked to hug and kiss and cuddle but it was not sexual for her.  She said that she never felt stirrings in her body from contact with men.  She said that she read romance novels and never felt sexually aroused.  She said that other women told her that the romance novels aroused them and Wendi did not comprehend the feeling.  Wendi said that she was able to go to bars in Casa Grande because her Mexican cousins would protect her if any man got too forward.  She said that Billy (Nicholas' godfather) once knocked a guy out in a bar to protect her.  Wendi said that after she was married to Joe she would flirt with him in the bars and his friends were jealous that Joe's wife still flirted with him.  She said that she shut her mind to the idea that she would have to have sex with him later in the evening.  She said that he expected sex whether she flirted or not and that the sex was "wham, bam, thank you ma'am."  She said that she did not think she could say no to Joe because it was her "marital duty" to have sex when he wanted it.  She said that she never had an orgasm with any man, not Joe, Travis or Rick.  Wendi said that shortly after Nicholas was born, Joe insisted on having intercourse with her even though she was not healed from the baby's delivery.  She said that he had insisted on having sex with her at the end of the pregnancy.  She said that Nicholas was overdue and Joe said that sex would help her go into labor.  Wendi said that she asked the doctor to induce because she wanted the sex to end.  She said that she was so big and miserable that she found the sex nearly intolerable, but she did not tell Joe no.  She said that sex really became distasteful during this time.  She said that she had hoped for more consideration from Joe.

Wendi said that Joe gave her no affection.  She said that she initiated hugs and that he put his put his arms limply around her.  She said that he did not like to kiss or hold hands and that one time she sucked on his lip while she was kissing him and he told her never to do that.  She said that it hurt her feelings and she never tried it again.

019565

PAT019620

PCR000113



Wendi said that she became aware of sexual feeling for the first time in jail.  She is extremely concerned about Donna's knowing about this.  She said that she was seduced by a female inmate (Tina Stine) who took months to get her to the point that they had sex.  She said that this woman gave her the touches and caresses that she had craved and that she pursued Wendi openly.  Wendi said that it was the first time anyone pursued her.  It seems that it was the first time that Wendi was aware of being pursued because I doubt if she was as intimidating and off-putting to men as she portrays.  It also seems that the men that her cousins protected her from must have been in pursuit of her.  I think she defines pursuit by her choosing to approach in the first place.  Wendi said that Tina Stine never penetrated her and that she felt safe because of that.  She said that she was able to have an orgasm with Tina giving her oral sex.  Wendi said that she loved it and it was "addicting."  She said that she has a fear of penetration and is not sure if she could enjoy sex with a man now.  She said that she corresponds with a man whom she does find sexually attractive, but that her attraction to him has never been put to the test by sexual contact.  She said that his letters do arouse her sexually.  Wendi said that she never wanted sex with Travis Black or with Rick Freedman sp?.  She said that she was aware that she owed it to them and thought that was always the way with men.  She said that she likes kissing and being held and then it never crossed her mind that she could say no.  She said that "as soon as the clothes are off she wants to stop."

Wendi said that she learned about sex from Alejo and could never talk to Donna about sex.  She said that he has always been the parent she has gone to for open discussions.  She said that when she asks him for guidance, he asks if she wants it as a friend, father or minister.  She said that he is able to reconcile the differences in point of view.  I find that Wendi is more able to open her point of view now than she was 3 years ago.  At that time she clung to a literal Biblical interpretation of appropriate behavior and she went to her mother for authority.

Wendi said that she got into the sexy stories through a roommate in jail named Kelly.  Kelly wrote stores for a guy who put money on her books in exchange for them.  Wendi said that she had read many romance novels and had story ideas from them.  She said that Donna reads a lot of romance novels too.  Wendi tried writing a story and Kelly edited it to make it raunchier ("more ghetto").  Around that time Tina Stine was moved to another pod and was hanging around with another woman.  Wendi said that she was jealous and she wanted to shock Tina into thinking of her as a sexual person.  Wendi wrote a story and Kelly edited it and sent it to Tina.  Tina was amazed and said that she didn't know that Wendi had it in her.

Wendi said that she put Kelly up to reading her story to Alejo.  She said that she told him about the Tina letter.  Wendi said that Alejo said that she should send stories to him for the internet.  Wendi said that someone Alejo knows from his photography was his connection into the internet.  Wendi said that these photographers have "lingerie parties" some of which are innocent and some are more provocative.  Wendi seems to have open knowledge of these enterprises and does not think they are inappropriate.  It seems that Wendi has never connected the "flirtatious" element of Alejo's personality with the actual sex act.  It seems that he was sort of her perfect man, sexually involved without actions.  Wendi said that he continues to be a flirt and she sees him watch the women when he visits her.

019566

PAT019621

PCR000114

APR-28-2004 13:37  FROM:                                      TO:6025060269        P.4

Scott: Wendi has gone out on limb to give me this information and I am expecting it be
used sensitively, given that I understand that it does relate to the underpinning of her
thwarted sexuality.  Wendi asked that David do the power point because he knows her
best, but she wants Dan to do the main part of the opening.  She said that if she has to
choose one of them to do the whole opening, she wants Dan because she believes he has
the charisma.  Please let me know if I can be of help.  Wendi also wanted to be sure that
you were aware that she beat Joe with the detached legs of the barstool which had wood
screws at the end.  She thinks that might be why he has point cuts on his scalp.  She is
certain the she never took the knife to his head and she has never budged on that belief.

019567

PAT019622

PCR000115



## INTAKE INFORMATION

NAME: Wendi E. Andriano          SOCIAL SECURITY # 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-1
DATE 2-28-96   PHONE: Home 426-1C74   Work 426-6582 Ext ___
ADDRESS 2CC52 N. Oiter Rd.
CITY CG          STATE AZ          ZIP 85222
DATE OF BIRTH 8-26-70   AGE 25   SEX: ( )Male (X)Female
ETHNIC ORIGIN (X)Caucasion ()Black ()Native American ()Hispanic ()Oriental
EDUCATION COMPLETED:  8th grade ( ) 12th grade ( ) College 1 2 (3) 4 5 6  +

IF MARRIED OR LIVING WITH SOMEONE:
Person's Name Joe D. Andriano     Age 28  Social Security #527718252
                                  Date of Birth 8-18-67

RELATIONSHIP STATUS:         PEOPLE LIVING IN HOUSEHOLD AT PRESENT:
___ Single            Name  Age  Relationship  Date of Birth  Social Sec.#
(X) Married           _____
___ Widowed           _____
___ Divorced          _____
___ Separated         _____
___ Living with       _____
    Someone
2 yrs Length of time
REFERRAL SOURCE: ( )Self (X)Supervisor ( )Co-worker ( )Family ( )Other
HOW DID YOU HEAR ABOUT OUR SERVICES?   ( ) Brochure  ( ) Yellow Pages
( ) Co-worker (X) Supervisor ( ) Family Member

HAVE YOU PREVIOUSLY USED COUNSELING SERVICES? ( )Yes   (X)No
STATEMENT OF CURRENT PROBLEM  High Stress level

DO YOU HAVE ANY HEALTH PROBLEMS? ( )Yes   (X) No
   If yes, please explain
ARE YOU CURRENTLY TAKING ANY MEDICATION? ( )Yes   (X)No
   If yes, name and amount

EMPLOYER NAME Casa Grande Regional Medical Center JOB TITLE Staff Accountant
COMPANY DIVISION _____ LOCATION CG
LENGTH OF EMPLOYMENT 3yrs
ARE YOU:  ( X)Full-time ( ) Part-time (X)Hourly ( )Salaried
SPOUSES EMPLOYER NAME Self-Employed - (auto glass repair)
YOUR TOTAL FAMILY INCOME: ( )0-10 ( )1-12 ( )13-14 ( )15-16 ( )17-19
(In thousands annual) ( )20-25 ( )25-30 ( )30-35 ( )35-40
                      ( )40-45 ( )45-50 ( )50-55 (X)55-60 ( )60 +.
HEALTH INSURANCE COMPANY NAME REBA/PPO  + UMCC
INSURANCE COMPANY ADDRESS
GROUP # _____   POLICY # _____
VA# _____

AUTHORIZATION TO PAY FACILITY
I authorize Casa Grande Counseling Service to furnish any information require
by the above insurance carrier and I authorize my insurance company to make al
payments for this claim to Casa Grande Counseling Service. A photo copy of th
signature shall be considered valid as the original.
Signed: Wendi C Andriano          Date: 2-28-96
** I understand that the name of Dr. Carlos Vega may appear on my insurance
   as he is supervisor of counseling at Casa Grande Counseling Service.

005436

PCR000116

**CLINICAL ASSESSMENT FORM**
TO BE COMPLETED ON EVERY CLIENT

Date of Assessment Session(s): 2/27/96 & 3/1/96
NEAS Referring Counselor: Edie Pehrson
Client Referred to NEAS by Employer? X Yes ___ No
Client Case #: 960T846

Client(s) attending sessions (Full Names): Wendi Andriano
Company: Casa Grande Regional Medical Center

**Presenting Problem and Precipitant for Change (Please Be Complete):**
*****NOTES THAT CANNOT BE READ WILL BE RETURNED, WHICH WILL DELAY REIMBURSEMENT*****
Wendi cried through most of her first session. Reported she's having problems
with sleeping & focusing @ work. Was referred back to her physician
for possible medication and for evaluation at this session. The second
dmit. session revealed the true nature of her problem when she reported
she had stolen $2,000 from the nursing home within the last month to help
pay off some personal debt. She spoke w/ HR abt this earlier today & is
being on suspension rather than the medical leave of absence. Her M.D.
had an opinion for her. Referred her to Consumer Credit C'ling and to her
school for vocational/career testing.

**Work Problems/Stressors:** Reports she doesn't like her job & all the deadlines
they face. Stole $2,000 last month, but did admit it to her employer.

**Impressions/Treatment Plan:** Wendi appears to be depressed and very tense
at her husband, although she did not report this to him. With financial
& career counseling plus some training in communication skills, a lot of
her stress could be relieved.

**Motivation to seek assistance at this time?** ___ Low ___ Medium _X_ High

| DRUG/ALCOHOL USE | RISK ASSESSMENT (1=low, 5=high) | RELEVANT SOCIAL HISTORY |
|---|---|---|
| Drug(s) Used: None reported except 2-3 drinks/day (ETOH) | Suicidal        1 2 3 4 5 | ___ Significant Family of Origin Issues |
| Family History: ___ Yes _X_ No | Verbal Aggression    1 2 3 4 5 | _X_ Eating Disorders ↑ 10lbs - 2m |
| Related Consequences: | Physical Aggression   1 2 3 4 5 | ___ Sexual Abuse |
| ___ Job Loss/Performance Problems | Depressed Mood    1 2 3 4 5 | ___ Physical Abuse/ Domestic Violence |
| ___ Marital/Family Discord | Anxious Mood     1 2 3 4 5 | ___ Significant Losses |
| ___ Lose/Changed Relationships | Impaired Functioning  1 2 3 4 5 | _X_ Lack of Support Systems |
| ___ DUI/DWI | Substance Abuse    1 2 3 4 5 | |
| ___ Legal Problems | Significant Medical Problems 1 2 3 4 5 | **COUNSELING HISTORY** |
| ___ Health/Medical Problems | | ___ Inpatient |
| ___ Financial Problems | Overall Health: _X_ good ___ fair ___ poor | N/A ___ Outpatient |
| **CONCLUSIONS:** | Medications: none except herbs. | ___ Support Group |
| _X_ Chemical User | | ___ Crisis Only |
| ___ Chemical Abuser | Date of Last Physical: 12/95 | |
| ___ Chemically Dependent | w/ Dr. ___ | Helpful to Client? ___ Yes ___ No |

| TREATMENT RECOMMENDATIONS/REFERRALS: | REFERRAL DATA (Please fill out completely): |
|---|---|
| ___ Continuing EAP Assessment (Addendum form to follow) | ___ No Referral Made |
| _X_ EAP Brief Therapy (Needs Prior Approval) | _X_ Referral Information Pending |
| ___ Outpatient Mental Health | ___ Client Referred To: |
| ___ Inpatient Mental Health | Name: ___ |
| ___ Inpatient Substance Abuse/Detox | Clinic/Service: ___ |
| ___ Psychological Evaluation | Address: ___ |
| _X_ Financial Counseling | City, State, Zip: ___ |
| ___ Legal Assistance ** | Business Phone: ( ) ___ |
| ___ Self Help/Reading Resource | Client(s) receiving referral: ___ |
| ___ Other Resource (Please Specify) | ___ Referral Contacted With Assessment Info |
| _X_ Medical Evaluation | ___ Insurance Verified/Pre-cert done (if necessary) |
| ___ No Referral Needed | |

**Affiliates are NOT to provide legal referrals. All clients requesting legal referrals MUST be referred back to NEAS.

Fill out referral data box for all referrals made. Additional referral should be included on a separate sheet of paper.

| FOLLOW-UP: (Date: ___ ) | YES | NO | N/A |
|---|---|---|---|
| Did you reach the client for follow-up? | | | |
| Did the client follow-through with the referral? | | | |
| Was the client satisfied with your referral services? | | | |
| Follow-up pending/Notes forthcoming | | | |

Beverly A. Nichols M.Ed. 3/1/96
CLINICIAN SIGNATURE/CREDENTIALS/DATE

PCR000117

sent 3/1/96
(@ 2:30 p.

### Casa Grande Valley Counseling Service Inc.
Marriage, Family, Personal Group
835 E. Cottonwood Lane, Casa Grande, Arizona 85222, Ph: (520) 836-0440 Fax (520) 836-0924

FAX TRANSMISSION COVER SHEET          TIME: 2:20 pm

DATE: 3/1/96

TO: Dr. Franklin Baroi

FAX#: (520) 426-9347

FROM: Beverly Nichols, M.Ed, CMFT, CPC
Casa Grande Counseling Service

FAX#: (520) 836-0924

NUMBER OF PAGES INCLUDING COVER SHEET: 2

The documents accompanying this telecopy transmission contain
confidential information belonging to the sender which is legally
privileged. The information is intended only for the use of the
individual or entity named above. If you are not the intended
recipient, you are hereby notified that any disclosure, copying,
distribution or taking of any action in reliance on the contents
of this telecopied information is strictly prohibited. If you
have received this telecopy in error, please immediately notify
us.

MESSAGE/INSTRUCTIONS: Dr. Baroi — I saw Wendi for the
second time today and still feel she would be a
good candidate for a mild anti-depressant to help
her sleep better and cope with the stresses she
is facing at work and at home. Please call me if
I can provide you with any further information.
                              — Beverly Nichols, M.Ed.

BEVERLY A NICHOLS, M. Ed.
Certified Marriage & Family Therapist
Certified Professional Counselor

R. A. CORNELIUS, PH.D.
Certified Marriage & Family
Therapist

PHYLLIS E. WELLS, M.A.
Certified Marriage & Family
Th...

005440

PCR000118

NOTIFICATION OF ASSESSMENT
## CASA GRANDE VALLEY COUNSELING SERVICE INC.
635 E. COTTONWOOD LANE   CASA GRANDE, ARIZONA 85222
PHONE (520) 836 0440   FAX (520) 836 0924

CONTACT PERSON: MARGE SUNDBLOM

RE: _Wendi F. Adriano_   SS _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_  DOB _8-26-70_
(Client Name)

This individual is receiving behavioral health services. The client's
authorized medications and laboratory services, if any, are identified
on the attached Medication Plan. If additional information is
required, please contact the aforementioned person.

DSM Provisional Diagnosis: Date _3/1/96_

AXIS I   _309.40_   ; _R/o Major depression_   Psychiatric Evaluation: Y or (N)

AXIS II   _N/A_   Dr. _____

AXIS III   _N/A_   Outpatient Counseling: (Y) or N

AXIS IV   _Occupational problems +_   Therapist: _Beverly A. Nichols, M.Ed_

_Pblms w/primary support group_   Residential/Inpatient: Y or (N)

_____   (Facility)

AXIS V   _58_

RECOMMENDATIONS: _If Wendi continues to have crying spells and/or sleep_
_difficulties, I would strongly recommend she be considered for_
_anti-depressant medication to help stabilize her at school and work._

_X_  I CONSENT to the above named provider releasing this document on
the date of consent to my Primary Care Physician

_____  I DO NOT consent to the above named provider releasing this
information to my Primary Care Physician.

_Franklin Barci, M.D._   _426-1871_
Primary Care Physician   (Telephone)

_1820 E. Florence Blvd   CG   AZ 85222_   _426-9347_
Physician's Location   (Fax)

_Wendi Andriano_   _2-27-96_
Client/Parent/Guardian Signature   Date

2

012816

PCR000119

*Casa Grande Valley Counseling Service Inc.*

*Marriage, Family, Personal Group*

635 E. Cottonwood Lane, Casa Grande, Arizona 85222, Ph: (520) 836-0440 Fax (520) 836 0924

FAX TRANSMISSION COVER SHEET          TIME: 6:15 p.m.

DATE: 3-6-96

TO: Ellen Pederson or any EAP counselor
    @ NEAS

FAX#: (414) 798-3928

FROM: Beverly Nichols, M. Ed.
      Casa Grande Counseling Svc.

FAX#: (520) 836-0924

NUMBER OF PAGES INCLUDING COVER SHEET: _____1_____

The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this telecopy in error, please immediately notify us.

MESSAGE/INSTRUCTIONS: RE: client - Wendi Andriano
Wendi came in for her appt. today and has rescheduled
for next Thurs. @3pm. (March 14). She reports she signed
a release form which was faxed to you, even though she
was dismissed from her job on Monday, March 4th. She
has started on some anti-depressants, but has had a bad reaction
to them, so plans to re-contact her doctor. We worked alot on
improving her communication skills (esp. w/her husband) at today's session.

008255

Thanks —

| BEVERLY A NICHOLS, M. Ed. | R. A. CORNELIUS, PH.D. | PHYLLIS E. WELLS, M.A. |
| Certified Marriage & Family Therapist | Certified Marriage & Family | Certified Marriage & Family |
| Certified Professional Counselor | Therapist | Therapist |
| Child Specialist | | |

Bev. A H.

PCR000120

#1 BT

PROGRESS NOTES

NAME *Wendi Andriano*          ID #          DATE 3/6/96

OBSERVATIONS (AFFECTIVE-BEHAVIORAL-COGNITIVE)
affect - appropriate to content
mood - slightly anxious but most approp. to content
behavior - pleasant/coop.
cog - unremarkable

NARRATIVE
Wendi rpts. that she was dismissed from her job on Monday by mutual agreement. She said she did not feel she could continue to work there. She has not called CCC yet because her husband does not want them to lose their credit cards. I informed her that would not happen and stressed that they could greatly benefit from starting a definite weekly budget. She is now on antidepressants, but rpts. she's having more difficulty sleeping - I referred her back to her M.D. for a follow-up eval. & possible med. change. Has found out that JTPA has no career testing she could take.

PROGRESS TOWARD OBJECTIVES
Limited, although she now knows she needs to begin a job hunt.

COGNITIVE/BEHAVIORAL/EDUCATIONAL RECOMENDATIONS OR ASSIGNMENTS
Contact CCC, Univ. of Phx, her M.D. & Job Service

NEXT APPOINTMENT Thurs. March 14 @ 3 p.m.          008256

THERAPIST: *Beverly A. Nichols, M.Ed., CMFT*

PCR000121

P-App. 003163

(LRW)

PROGRESS NOTES

NAME Wendi Andriano                    ID #            DATE 3/14/96

OBSERVATIONS (AFFECTIVE–BEHAVIORAL–COGNITIVE)

NARRATIVE

Late reschedule to 3/18/96 @ 2p.m (Mon)
(1:10pm)
3/14
(NS)

PROGRESS TOWARD OBJECTIVES

COGNITIVE/BEHAVIORAL/EDUCATIONAL RECOMENDATIONS OR ASSIGNMENTS

NEXT APPOINTMENT

THERAPIST: Beverly A. Nichols M.Ed.                    008257

PCR000122

## EXCERPTED MEDICAL NOTES FROM WENDI ANDRIANO'S INCARCERATION (TYPEWRITTEN)

*Note:* *For ease of review, this document types up relevant handwritten medical notes from Wendi Andriano's incarceration for the period between her arrest and her sentencing.  Where discernable, abbreviations in the notes are written out in full in this document.  Copies of the original handwritten versions of all notes follow this typewritten document; because some pages have more than one note entry, the handwritten pages may include extraneous material not transcribed below.*

| Date of Note | Prison Medical Provider Who Authored Note | Transcription of Handwritten Text | Bates Nos. |
|---|---|---|---|
| 11/03/00 | Dr. L. Garcia-Bunuel | [Wendi h]as been in jail for about two weeks, charged with murdering her husband. She is extremely depressed but has been so for at least a year. Husband had pulmonary metastasis from a cystoadenoma of a salivary gland and had been dying for months. For obvious reasons and at her attorney's request, she cannot discuss the case against her. <br><br>She cries easily, looks fragile, in despair. <br><br>Diagnosis  Depressive Disorder Not Otherwise Specified. | |
| 12/13/00 | Dr. L. Garcia-Bunuel | [Wendi] is not being seen because her attorney has instructed her not to speak to psychiatrists. Detention officers report, however, she is in a better mood.  Will continue [taking] Remeron. | |
| 09/27/03 <br><br>(2210 hours) | Nurse I. Sweeney | Man down "seizure – possible." <br><br>[Wendi] found lying on floor – DO is holding pressure over a "laceration on [her] left hand" upward from 5th digit towards wrist. Approximately 200 cc estimated blood loss on [her] bed and on floor. | |

1

PCR000123

P-App. 003165

| | | | |
|---|---|---|---|
| | | [Wendi] is awake – eyes closed – stating "help me." Skin is pale/dry. Buccal membranes dry and pale. Bleeding to left hand controlled – DO's "pressure drug." Puncture wound left AC area [inside crook of arm]; bleeding, open area appears 1 cm rounded. 911 called. . . . [vital signs] . . . [Wendi] transported in timely manner to Maricopa Medical Center ER for evaluation of self-inflicted wounds.<br><br>[Wendi] has written a suicide note, which is atop the bunk surrounded by pictures children, reportedly [Wendi's] children. | |
| 09/28/03<br><br>(0920 hours) | Dr. L. Harold and Nurse Donna [last name not provided] | [Wendi] seen in intact 4-point restraint, downgraded to 3-point restraint. [Wendi] states remorse for stabbing her arm. . . .<br><br>Dressing on left forearm CLI. Restraints checked OK. [Vitals]. Toileted and complains of wrist and ankle pressure.<br><br>[Wendi] not able to make solid contract. Danger to self.<br><br>Transfer to [Durango Psychiatric Unit] order from Dr. Wandy obtained. Report given to [Durango Psychiatric Unit] staff. | |
| 09/28/03<br><br>(1115 hours) | Nurse D. Anderson | Female inmate [Wendi] transported to [Durango Psychiatric Unit] . . . . [Wendi is] frail, pale white color – pale mucous membranes. Oriented x3, alert. Complains of feeling dizzy. Under-using the bathroom prior to 4-point [restraints]. [Vitals]. Mood: dysphoric. Affect congruent. Thoughts [are] irrational, minimizing suicide attempt last night ([she] stabbed self on left brachial area with a pencil and was sent to Maricopa Medial Center for sutures[)]. Bandage dry and intact. Good range of motion. [Wendi] states [she] just wants to sleep. Unable to complete her nursing assessment. Increased risk [for being a] danger to others/danger to self. Level I [suicide watch] [and] 4-point [restraints] as | |

PCR000124

| | | |
|---|---|---|
| | | ordered. |
| 09/29/03<br><br>(1600 hours) | Counselor<br>Laura King | [Wendi says]: "I guess I just panicked. That officer lied to me and I felt trapped. I knew I would be in lock down during my trial and I just couldn't do it. I just freaked out." [Wendi] is [a] 33 year-old white female approaching trial on serious charge. She came to [Durango Psychiatric Unit] after panicked and impulsive suicidal gesture which was too successful. [Wendi] has no prior suicide attempts in custody or prior. [She] has no psychiatric history prior to custody except for brief contact through employee assistance program at work. [Wendi] was married for 7 years. Had two children — now 5 [and] 6 [years old]. They live with husband's family, who are trying to terminate [Wendi's] parental rights. [Wendi] denies history of drugs, alcohol abuse, and smoking. [Wendi] has degree in accounting and real estate license. She was working in apartment management prior to arrest. [Wendi] has no history [of] other jail, prison, arrests. [Wendi] has support of family. Her father visits every Wednesday. Mother visits when she can. [Wendi] feels mom is too distressed by jail setting. [Wendi] has counselor that sees her every two weeks ([K]andy R[oh]de 430-443-1351). [Wendi] denies any further danger-to-self intention and reports confidence in defense team, connection to family, and hope at seeing children. She is future-oriented, organized thoughts, and good insight/judgment. Mood dysthemic.<br><br>Assessment Need for psychiatric stabilization justifies [Durango Psychiatric Unit housing] . . . . [Wendi] acted out impulsively with significant suicide attempt in moment of panic. No peers or medical to reality test. [Wendi] simultaneously tearful and anxious, due to extraordinary length of time in jail and severity of upcoming events. [Wendi] would benefit from respit[e] on [Durango Psychiatric Unit]. Also need to verify that |

PCR000125

| | | | |
|---|---|---|---|
| | | suicidal intent has genuinely abated.<br><br>Plan  Assist [Wendi] in locating property from Estrella, especially glasses/radio.  Contact mother regarding cards/coloring books for pod.  Check on double blanket. | |
| 09/30/03<br><br>(0900 hours) | Dr. K. Holfert | [Wendi] seen in day room – 4-point [restraints].  Actually quite articulate, appropriate – open about situation.<br><br>She has been in jail 3 years, goes to trial next 30-45 days.  She [wa]s being treated for anxiety issues and insomnia at Estrella, as well as being seen by a private therapist from outside twice a month.<br><br>[Wendi] apparently could not handle prospect of involuntary administrative segregation – impulsively stabbed self, "without thinking." [Wendi says:]  "I'm normally quite level-headed." . . .<br><br>We agreed [she] would spend short time here – [a] respit[e] – then move back to Estrella.<br><br>Assessment  Adjustment Disorder<br><br>Plan: Above | |
| 11/24/03<br><br>(1300 hours) | Dr. Gerald Perry | [Wendi] stated she has been feeling more anxious and depressed since various staff members have discussed possibility of going to general population.  She is very worried that she will regress to a state of hopelessness and again attempt suicide. Said she surprised and scared herself with previous attempt and did it suddenly and without warning.  Stated she has been unable to sleep with worry and called her outpatient counselor last night for support.<br><br>Received a call from Dr. Garcia in outpatient saying he had received call from outpatient counselor expressing concern that Wendi was suicidal.  Received call | |

PCR000126

| | | | |
|---|---|---|---|
| | | from counselor (Kandy Rohde [phone numbers]) saying she feared Wendi would kill herself. [Wendi] was seen by me at 1300 hours.<br><br>Assessment [Wendi] is not an acute suicide risk at present, but does need to remain [in Durango Psychiatric Unit] to continue her current level of stability.<br><br>Plan (1) Maintain on [Durango Psychiatric Unit] to prevent decompensation. (2) Reassurance as needed. | |
| 1/14/04<br><br>(1330 hours) | Dr. Gerald Perry | [Wendi] tearful discussing her children. Was told she may have long court battle to regain custody of her children. Also discussed her family of origin and step-father's response of "pouting," withdrawing, and withholding attention and affection when he felt hurt or angry. She is learning how these dynamics have affected her and her need to "fix" or help other inmates with their problems. She is saddened by news of custody problems but denies [being a] danger to herself.<br><br>Assessment Not a current danger to self.<br><br>Plan (1) Maintain on [Durango Psychiatric Unit] (2) Supportive counseling through trial (3) Monitor mental status/danger to self. | |
| 1/13/04 | Counselor Laura King | [Wendi states:] "I'm just having a hard time with my sleep. They may keep my kids. I just feel so uncomfortable not helping someone when they're hurt or need something. It's like I can't stand it, but at the same time I don't want to do it." [Wendi] describes increased internal pressure when someone she is close to is in need. [Wendi] tearful when describing her conflict in feeling | |

4843-3638-9902.3

PCR000127

| | | she must help others she is close to. [She is] very uncomfortable saying no, even when she knows it is the "right" thing to do. [Wendi is] tearful, frustrated and anxious, but forthcoming with her struggle. Assessment [Wendi] engaged in conversation showing increase in insight and willingness to disclose painful conflicts. [Wendi is] still on altered sleep pattern. Plan Continue Special Needs Treatment Plan. | |
|---|---|---|---|
| 1/22/04 (1600 hours) | Dr. Gerald Perry | [Wendi] complains of difficulty with slowed thought processes and is concerned about how this might affect her upcoming trial. Feels the Seroquel is making her groggy and is asking for a medication change. During her trial she will be awakened between 1:30 and 2 a.m. for court and will not return to jail until between 5 and 6 p.m., when she will have to go to sleep. Having some anxiety regarding trial but depression under good control. Assessment May be having medication effect. Plan: Have discussed with Dr. Venkatabalaji, who will review her medications. | |
| 1/23/04 | Nurse D. Rhoades | [Wendi] consistently denies suicidal ideation and homicidal ideation. Increased anxiety related to trial (charges are serious). Hygiene and grooming remain good. [Wendi] requested change in medications to prevent drowsiness at trial. No symptoms of psychosis. Conversations are logical, 100% compliant with medications. No management problems. [Wendi has some somatic complaints of a sore throat and trouble sleeping, which will be further | |

PCR000128

| | | |
|---|---|---|
| | | disturbed by court schedule. Eats within normal limits, no bowel complaints.<br><br>Assessment: Fragile but holding up and coping well for her situation.<br><br>Plan: Given Tylenol as required for sore throat as needed. Watch for increased symptoms. Monitor for mood swings. [Wendi] has history of impulsive acting out. |
| 1/23/04<br><br>(2330 hours) | Dr. Gerald Perry | [Wendi] returned from court upset and tearful, being told her trial is being postponed for two months. Not danger to self. Stated decreased Seroquel is helping her focus, but asks for medications to help with emotional stability without causing cognitive slowing.<br><br>Assessment: Not a current danger to self.<br><br>Plan: (1) Maintain on [Durango Psychiatric Unit] (2) Have discussed medications with Dr. Venkatabalaji. He will see her regarding possible medication change. |
| 02/13/04 | Dr. Gerald Perry | [Wendi] stated she is sleeping better and feels Zoloft is helping her. Was unhappy with new mitigator – feels that he does not understand her and won't be able to represent her well, but was concerned she may have hurt his feelings and felt like apologizing. We discussed her learning more assertiveness skills and not needing to take care of everyone.<br><br>Assessment: Doing well with medication change but needs continued stay at [Durango Psychiatric Unit] because of history of a brittle response to stress.<br><br>Plan (1) Maintain on [Durango Psychiatric Unit] (2) Medications as per Dr. Venkatabalaji (3) Continue to work on |

PCR000129

| | | | |
|---|---|---|---|
| | | assertiveness skills. | |
| 03/02/04 (1200 hours) | Dr. Gerald Perry | [Wendi] felt physically and emotionally drained from court appearance Friday and disappointed that no rulings were made. Was tearful and isolative over weekend. Today became tearful when discussing upcoming trial and "having to dig up everything again." Discussed how much she has grown and individuated as a person since being in jail and how she is realizing how much she lacked her own identity and was so co-dependent when married. Assessment Experiencing vicissitudes of her situation, but clinical depression under good control and no danger to self. Plan (1) Maintain on [Durango Psychiatric Unit] for continued stability (2) Medications as per Dr. Venkatabalaji (3) Supportive group counseling. | |
| 3/24/04 | Counselor Laura King | [Wendi states:] "I don't know why I keep doing the same thing over and over again. I want to stop it. I want to learn but it's just so hard." [Wendi] alert and oriented. Discussed strategies for assertiveness with peers and history of exhausting self trying to assist others. Discusses frustration with unknown outcome regarding legal issues and relationships. [Wendi] shifts from giddy to tearful. Assessment: [Wendi] remains fragile and at risk for decompensation due to current legal status. [Wendi] remains stabilizing presence on C pod. Need for psychiatric stabilization justifies [Durango Psychiatric Unit housing]. Plan Continue Special Needs Treatment Plan. | |

PCR000130

| | | | |
|---|---|---|---|
| 3/25/04<br><br>(1300 hours) | Dr. Gerald Perry | [Wendi] continues to show pleasant affect despite feeling anxiety regarding her situation and some interpersonal conflict in her pod. She was tearful speaking of her codependency needs and how hard she has worked to change for the better. She had extra as-needed Ativan recently to deal with stress.<br><br>Assessment  Situational anxiety.<br><br>Plan  (1) Maintain on [Durango Psychiatric Unit] (2) Supportive counseling (3) Continue Special Needs Treatment Plan. | |
| 4/29/04<br><br>(1500 hours) | Counselor Laura King | [Wendi states:]  "I'm doing pretty well. I'm dreaming a lot these days, just about things like making breakfast. My mom puts her head in the sand. I can only hear things for so long from people and then I just have to get up and go." [Wendi] seen in APR. [Wendi is] alert and oriented. Discussed general occurrences during last week. [Wendi reports] increase in ability to detach from anxiety of peers. [She is] housed [in] C pod, medication compliant and participating in all treatment offered. Mood euthymic, affect within normal limits, thoughts organized.<br><br>Assessment  Need for psychiatric stabilization justifies [Durango Psychiatric Unit housing]. [Wendi] making continued efforts to employ coping strategies in the face of stress.<br><br>Plan  Continue Special Needs Treatment Plan. | |
| 9/10/04<br><br>(1330 hours) | Dr. Gerald Perry | [Wendi] has been in court Tuesday through Thursday, awakened at 2 a.m. for transport and returns between 7 and 8 p.m. She has [experienced] increasingly stressed but not a danger to self. Has been tearful at night by her and staff's accounts but seemed more positive today. [Wendi] asked for minor medication change to help get to sleep | |

PCR000131

| | | | |
|---|---|---|---|
| | | sooner.<br><br>Assessment  Adjustment disorder with depressed mood.<br><br>Plan  (1) Maintain on [Durango Psychiatric Unit] to maintain level of functioning (2) Medications as per Dr. Drapeau (have discussed). | |
| 9/10/04<br><br>(1410 hours) | Dr. P. Drapeau | [Wendi] seen per Dr. Perry today.  She said that even with Seroquel 50 mg and Ativan 1 mg at night when she returns from court, she is having trouble sleeping.  She requests that Ativan be increased to 2 mg.  Order written for Ativan 2 mg three times a day as needed for agitation for 28 days. | |
| 9/30/04<br><br>(1840 hours) | Dr. P. Drapeau | [Wendi] seen on her return from court. She said prosecution has rested their case yesterday.  She said defense started today.  She said she is sleeping from 9 p.m. to 1:30 a.m., getting 4.5 hours of sleep at night.  She said she would like to be able to sleep more on the weekend, to get rest prior to her testimony which will begin next week for four afternoons. Wendi requests Seroquel 50 mg twice a day, as needed.  Order written for Seroquel 50 mg twice a day by mouth, as needed for agitation for sixty days.  [Wendi] is alert and appears to be thinking clearly at this time.  No voiced danger-to-self ideation. | |

4843-3638-9902.3

10

PCR000132

**PROGRESS NOTES**

☐ PUBLIC HEALTH
☐ CORRECTIONAL HEALTH

| | PATIENT ID PLATE IMPRINT |
|---|---|
| | ANDRIANO , Wendy |

DT061-6035

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATIONS and
PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. | A63/830 |
|---|---|---|
| 11.3.00 | PSYCH. NOTE | |

Has been in jail for about two weeks, charged with murdering her husband. She is extremely depressed but has been so for at least a year. Husband had pulmonary metastasis from a cystoadenoma (?) of a salivary gland and had been dying for months. For obvious reasons and at her attorney's request, she cannot discuss the case against her.

She cries easily, looks fragile, in despair.

Dx Depressive Disorder NOS.

L. GARGA-GUNCEL MD

| 11.13.00 | PSYCH. NOTE. |
|---|---|

Trazodone is causing a very dry mouth & throat and a stuffy nose. She has, however, been crying less but this could be due to her frequent visits by mother and father and a clergywoman from her nondenominational church.

W't will switch to Remeron.

| 12.13.00 | PSYCH. NOTE | L. GARGA-GUNCEL MD |
|---|---|---|

Pt is not being seen because her attorney has instructed her not to speak to psychiatrists. Det. officer's report, however, she is in a better mood.
Will continue Remeron.                    012691

L. GARGA-GUNCEL MD        (OVER)

061-6035 (Rev. 6/97)

PCR000133

**PROGRESS NOTES**

☐ PUBLIC HEALTH

☐ CORRECTIONAL HEALTH

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖
DT081-8035

PATIENT ID PLATE IMPRINT

Andriano, Wendy
8.26.70
A031830

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATIONS and
PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. | ESTRS R30  NKDA |
|---|---|---|

11-15-02  Inm to clinic C/o Blood in stool
          Inm Refused Medical

3-19-03  (O) Eyeglasses from _____ have arrived. cleared
1305     through Security. Given to PM. Inm signed
         for eyeglasses
         (P) give eyeglasses _____ Dr _____
                                        R.Hernandez RN/Sg

5.13.03  BUCH NOTE:
1400     S- Per Detention staff this Inmate was tearful.
         O - tearful, fragile mood. states saw an old
         friend and were not able to talk to her.
         Denies S.I. H.I. Denies ALL H/H problems
         She wants to go to Dr. Garcia.
         A - Fragile mood / adjustment problems
         P- staff to be supportive. C. Alster Couns III
                                        C Alster CIII #410

8/25/03  S: I'm anxious... on trial for 1st murder. need
1350     to be able to relax to prepare for trial"
Andriano O: Speech clear spontaneous, logical, mood is calm
         affect appropriate. Reports above - wants to one
         Seroquel to achieve desired effect of calming down
         On Seroquel 200mg HS and Ativan 4mg BID. Not
         Psychotic - denies AV hallucinations. No SI.
         A- Anxiety - anticipating trial for 1st murder charge.
         P: Will ↑ Ativan to 8mg BID. follow-up PRN
                                        Vincent Stuart    RN HMP

9/27/03 0210  MaxDown "Seizure-pain"
         ⊙ On knees lying on floor - A.O. is holding pillow
         over a "Loc on ⊙ head" ↑ from 5th digit forward
         with Appar white EBL on bed and on the floor
         Inm is awake- eyes closed states "help me"
                                        _____ (OVER)

081-6035 (Rev. 8/97)

012693

PCR000134

P-App. 003176

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 9/27/03 | (cont'd) Skin is pale 1 day. Buccal membranes dry and pale. Bleeding to (R) hand continues c DO's "accidental day." Bruises around (R) AC area 3 bleeding open area appear 1cm rounded. 911 called AR-134 R-16 100 lbs 97% sat. Pt transported in holy manner to MMC ER for eval of self inflicted wounds. ——— I. Sweeney RN #284 |
|  | (R) Pt has another suicide risk which is stop he will surrounded by various pieces of children repeatedly on children. ——— I. Sweeney RN #284 |
| 9-18-03 0970 | 2 Pm seen in intact yet restraint d'd to ARM. —— a) dressing dR (L) FA ALT. Restraints checked OK. HR 900, RR 20 tol etoal c c/o of wrist and ankle pressure. P) Pm not able to make solid contact. Danger to self. P) transfer to OA order from Dr Wendy obtained. Report given to Dr Wendy RN _____ L, Childs PN |
|  | PSYCHIATRIST NOTE: |

**PROGRESS NOTES**

☐ PUBLIC HEALTH
☐ CORRECTIONAL HEALTH

PATIENT ID PLATE IMPRINT

Andriano, Wendy
A 631830

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATIONS and
PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 9/27/03 | Admitted To Durango Psych. |
| 1115 | S: female inmate transported to D2 by w/c from Estrella. O: pt frail pale white color - pale mucous membranes. oriented x3, alert c/o feeling dizzy under using BP prior to 4 pts. VS: H_4 P.84 T. 97? Mood: dysphoric affect congruent. Thoughts - irrational, minimizing suicide attempt last PM. (pt stabbed self on (L) brachial area c̄ pencil and was sent to PMC for suture. Bandage dry and intact. Good ROM. State just wants to sleep. unable to complete nursing assessment. A: ↑ Risk DTO/DTS. I: Level I 4pt as ordered. —D Anderson RNC #217 |
| 9/27/03 | Nursing note: Level I (4 2pt). |
| 1900 | S: pt awake. Level I c̄ O: pt oriented x3, alert mood: smiling. Thoughts logical currently. O DTO/DTS (L) arm dressing changed. Sutures in place, skin edges approximated on brachial area. bandaid re-applied. Contract to reduce to 2pt. A: 2pt P: cont tx plan as ordered. —Anderson RNC #217 |
| 9/28/03 | Nursing Note Level 3 note - 2point restraint |
| 1926 | S: "I know I have to be here until I see the Doctor. I was angry at being in jail." O: In 2 pt. restraint. Cooperative. Pleasant. A: Remains at risk for DTS. P: Continue Level 1 2pt. restraint for safety. M Sait RN |

CHM - 1600 R 3-93                                      (OVER)

012607

PCR000136

P-App. 003178

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 9/29/03 0600 | Level I Nrsg Note. S: "I'm OK, I just woke up and realized I need to go to the BR" O: Up to BR, gait steady; denies suicidal ideation "for now" A: level I SR A/Continue level I SW — L Brown RN #204 |
| 9-29-03 1800 | SOCIAL WORK NOTE<br>No ub re consumer access line. L King CIII #427 |
| 9-29-03 1030 | INITIAL Rx STAFFING<br>Met with team to review pt status and establish discharge criteria. Pt referred from Estrella. Has been in custody since 10/00. Often on a S/D status. Appears to have taken suicidal action in response to S/D by detention. Pt has court coming up for serious charge. Will keep on unit for brief respit unless behavior changes and she takes advantage of others. Discharge criteria: ① no DTO/DTS/100 3 x 14 days ② reassess for current situation 258 x 14 days. Need for Stabilization justified 1-2 as Lee. L King CIII #427 |
| 9-29-03 1800 | COUNSELOR ADMIT NOTE<br>"I guess I just panicked. That officer lied to me and I felt trapped. I knew it would be in lock down during my trial and I just couldn't do it. I just freaked out." Pt is 33 y.o. white female approaching trial on serious charge. She came to D-2 after panicked and impulsive suicidal gesture which was too successful. Pt has no prior SA in custody or prior. Pt has no Rx prior to custody except for brief contact through EAP at work. Pt was married x 7 years, had two children - now 5/6. They live with husband's family who are trying to terminate pt's parental rights. Pt denies hx of drugs, etoh, and smoking. Pt has degree in accounting and real estate license 012698. She was working in apartment management |

PCR000137

PROGRESS NOTES

☐ PUBLIC HEALTH
☐ CORRECTIONAL HEALTH

ANDRIANO, WENDY
A 631830
D-2
8/26/70

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATIONS and PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 9.29.03 | Prior to arrest. pt has no hx other jail / |
| CONT'D | prison, arrests. pt receiving no entitlement |
| | funds. pt has support of family. Her father |
| | visits every wednesday. Mother visits when she |
| | can, pt feels Mom is too distressed by jail |
| | setting. pt has counselor that sees her |
| | every two weeks (Candy Rhode 480-443-1351) |
| | pt denies any further DTS intention and |
| | reports confidence in defense team, connection |
| | to family, and hope at seeing children. |
| | She is future oriented, organized thoughts, |
| | and good insight/judgment. Mood dysthymic. |
| | (A) Need for stabilization justifies D-2 as |
| | LRE. pt acted out impulsively with signi- |
| | ficant SA in moment of panic. No peers |
| | on medical to reality test. pt situationally |
| | fearful and anxious, due to extraordinary |
| | length of time in jail and severity of upcom- |
| | ing events. pt would benefit from respite |
| | on D-2. Also need to verify that SI has gen- |
| | uinely abated. (P) Assist pt in locating property |
| | from Estrella, especially glasses / radio. Contact |
| | mother regarding cards & coloring books for pt. |
| | Check on double blanket. [signature] |
| | L King CIII #427 |
| 9/29/03 | PSYCHIATRIC ADMIT NOTE |
| | LATE ENTRY 9/29 09:00 |
| | 012699 |
| | I/M SEEN IN DAYROOM — PT — REFLECTIVELY |
| | QUITE ARTICULATE APPROPRIATE — OPEN |
| | ABOUT SITUATION — |
| | SHE HAS BEEN IN JAIL 3 YRS — |

CHM-1600 R 3-03 (OVER)

PCR000138

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| | Goes to trial next 30-45 days - |
| | She is being treated for anxiety |
| | anger & insomnia at Estrella, as |
| | well as being seen by a private |
| | therapist ~~[illegible]~~ from outside |
| | x 21 months |
| | She apparently could not |
| | explain pattern of wildly and |
| | so [illegible] impulsively stabbed |
| | self "I think" - |
| | "I'm normally quite level-headed" |
| | MSE - completely unremarkable |
| | We agreed I'm would spend |
| | short time here - repeat then |
| | move back to Estrella |
| | A - adjustment d/o |
| | P - above |
| | K. Hoffert MD #303 [signature], MD |
| 10/2/03 1000 | MA note - S/O I/m was seen in medical to redo a PPD & RPR test which they were done. |
| | P) Continue as ordering. Dakolli MA #804 |
| 10-3-03 | VS - 98.7 - 109/64 - 89 - 16 |
| | S: states she is having drainage from (L) antecub laceration |
| | O: sutures intact, (L) antecubital (+) mosong. discharge ↑ erythema |
| | A: infected wound |
| | P: see orders, RTC prn 10-6-03 |
| | for suture removal |
| | R. Reynolds PA-C #131 Roxanne Reynolds |
| 10-4-03 0930 | S) Wrm compress (L) antecub given |
| | G. Valdez MA G. VALDEZ MA #719 |

012700

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 10·9·03 (CONT'D) | Need for ↑ stabilization justifies ∂·2 as LEE _____ _____ Laura ___ L King CIII #427 |
| 10/10/03 12:30 | PSYCHIATRIC NOTE 1/M STABLE NERP RENEWED WILL MAINTAIN ON UNIT AT CERAT UNTIL START OF TRIAL — B7 VAMME _____ JARR, MJ _____ _____ #302 |
| 10·10·03 1800 | COUNSELOR WEEKLY NOTE " I'm just afraid that I'll be called to roll up and have no idea where I'm going. I'm just nervous, but I'm doing alright." Alert and oriented. Relayed to pt that due to security issues people could not be told when they were moving. Agreed that pt would be notified at some point that there would be a move, if she is to be transferred. Discussed "keepaway" issue and relayed that housing re: keepaways is at defendants' discretion. This is not a classification issue. Pt reports visit at parents' visit. Pt reports visit at Counselor visit on Tuesday. Mood dysthymic - affect slightly anxious. Pt tearful towards conclusion of encounter. No s/o's at issue now today. Thoughts organized. ⓐ Need for ↑ stabilization justifies ∂·2 as LEE. Pt anxious and under much stress re: expected hor situation. Good at covering - appears more intact and less distressed than she is. ⓟ Continue SNTP. _____ Laura _____ L King CIII #427 |
| 10/15/03 8:30 | /C: MH note - S/o: F/m seen in medical for sick call. W/E S BP regarding a pap smear. V/S: BP: 112/63, P·48, T·98.2, Wt. 112½ ⓐ Contracting for safety. ⓟ Continue as needed. B. Basilli MA #804 _____ |

012702

PCR000140

Put Discharge Date on Front of Form.

| NCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|

1/24/03

1300

S - Stated she has been feeling anxious and depressed since various staff members have discussed possibility of going to GP. She is very worried that she will regress to a state of hopelessness and again attempt suicide. Said she surprised & scared herself in previous attempt and did it suddenly and without warning. Stated she has been unable to sleep & worry & called her outpt counselor last night for support.

O - I recd a call from Dr. Garcia in outpt saying he recd a call from outpt counselor ex-pressing concern that Wendi was suicidal. I recd a call from counselor (Randy Rohde - H(480) 443-1351, cell (602) 312-9587 saying she feared Wendi would kill herself. Pt was seen by me @ 1300.

A - Pt is not an acute suicide risk at present but does need to remain on D-2 to continue her current level of stability.

P - (1) Maintain on D-2 to prevent decompensation (2) Reassurance as needed.

GERALD M. PERRY, PGY D

012710

For Disclosure, Dept. of Prison of Youth.

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 1/14/04 13:20 | PSYCH CONTACT (S/O) Pt tearful discussing her children. Was told she may have long court battle to regain custody of her children. Also discussed her family of origin & step-father response of "partly" withdrawing and withholding attention & affection when he felt hurt or angry. She is learning how these dynamics have affected her & her need to "fix" or help other Eti's w/ their problems. She is saddened by news of custody problems but denies DTS. (A) Dx't a current DTS (P) Maintain on D-2 as well. (2) Supportive counseling thru trial (3) Monitor mental status / DTS. |
|  | G. Perry Psychologist #325 |
| 1/18/04 LE 085³ | Nursing nt'e. weekly. S: pt sleeping most of 4/E days. O: oriented, alert. Mood: dysphoric. affect congruent. Thought logical. s/ ITO / DTS. pt attempting to stay busy by writing, reading and sleeping during the day. Taking meds w/ ordered & no side effect noted. Eating well. A: Sleep pattern defect s/t sleeping more during the day than night. P: cont tx & plans, goals: encourage pt to stay up during the day. J. Henderson nuc |
|  | D Anderson RNC #217 |
| 1.13.04 16:10 Alkenbury 1-20-04 | COUNSELOR WEEKLY NOTE "I'm just having a hard time with my sleep. They may keep my kids. I just feel so uncomfortable not helping someone when they're hurt or need something. It's like I can't stand it, but at the same time I don't want to do it." Pt describes & internal pressure when someone she is close to is in need. It painful when de- scribing her conflict in feeling she must help |

012720

**PROGRESS NOTES**

☐ PUBLIC HEALTH

☐ CORRECTIONAL HEALTH

PATIENT ID PLATE IMPRINT

$8 - 26 - 70$

A 631830-
D-2

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATIONS and
PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 1·13·04 Cont'd | others she is close to. Pt very uncomfortable saying no, even when she knows it is the "right" thing to do. Pt tearful, frustrated and anxious, but forthcoming with her struggle - Pt engaged in conversation showing in insight and willingness to disclose painful conflict. Pt still on altered sleep pattern. Continue SATP. _L. King CIII #428_ Laura |
| 1/27/04 1600 | PSYCHOLOGY NOTE Pt c/o difficulty & slowed thought processes & is concerned about how this might affect her upcoming trial. Feels the Seroquel is making her sleepy & is asking for a med Δ. During her trial she will be awakened x 430 - 5 am for court & will not return to jail until x 5-6 pm, when she will have to go to sleep. Having some anxiety re trial but depression under good control. Pt may be having med effect. Have discussed c Dr. Venkatabalaji who will review meds. _G. Perry Psychologist #325_ |
| 1-23-04 1425 | I/m to medical for treatment. 1) T 979 2) Chart given to provider _M. Estrada_ |

012721

CHH-1400 R 3-01                                                         (OVER)

PCR000143

**PROGRESS NOTES**

☐ PUBLIC HEALTH
☐ CORRECTIONAL HEALTH

PATIENT ID PLATE IMPRINT

ANDRIANO,WENDI
08-20-70   21F
A631830

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATIONS and
PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 1-23-04 2330 | Weekly Nursing Note – (S/o) pt consistently denies SI + HI intent. ↑ Anxiety related to trial (charges are serious) Hygiene and grooming remain good – pt requested to be in med to prevent damage at Trial – No S/o psychosis. Conversation are logical 100% compliant c meds – No management problem – Pt has some somatic Sx - Sore throat and trouble sleeping which will be further disturbing to court scheduling – eats WNL and bowel to (R) Francis but holding up and coping well for her situation – Tylenol PRN for sore throat as needed - watch for ↑ Sx - Monitor for mood swings, pt has Hx of impulsive acts but NP loaded. D. Rhoades, RN |
| | PSYCHOLOGY NOTE (S/o) Pt returned from court upset + tearful 2° being told her trial is being postponed X2 Months. (R) DTS. Stated ↓ Seroquel is helping her focus, but asking for meds to help emotional lability ↓ causing cognitive slowing. (A) Not a current DTS. Tearful + anxious. (P) Maintain on (?)-2, as (?)RE (?) Have discussed meds ē Dr. Venkatakolaji. He will see her re possible med ∆. G. Perry Psychologist #325 |
| 1-26-04 1800 | Nursing Note – Seen in Dayroom S: Talking about necessity of postponing trial for 2 months. Wanting to wean off Seroquel + start on anti-depressant. Talked of problems of being on Prunil (+ how) able is working through them. Con't |

012723 (OVER)

**PROGRESS NOTES**

☐ PUBLIC HEALTH

☐ CORRECTIONAL HEALTH

PATIENT ID PLATE IMPRINT

ANDRIANO, WENDI
8/26/70 c/F

A631830

This form will be used by the medical staff for:
PATIENTS - PERSONAL HISTORY, PHYSICAL EXAMINATIONS and
PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 2-13-04 1000 | D-2 Weekly Nursing Note - S: "I'm down to 112# I'm so happy" States Zoloft is helping - it's allowing her not to stress over things. Denies problems on unit. Is med compliant. O: Alert oriented Good Hygiene Remains fragile - easily tearful Social & Needs Cooperative Articulate A: Compliant c̄ Tx P: Continue SNTP - Joyce Van Every |
| 2/3/04 | (S0) Stated she is sleeping better & feels Zoloft is helping her. Was unhappy c̄ new mitigator - feels that he does not understand her & won't be able to represent her well, but was concerned she may have hurt his feelings, & felt like apologizing. We discussed her learning more assertiveness skills & not needing to take care of everyone. Adjusting well c̄ meds & least upset feels continued. Plan (1) D-2 20 wk brittle response to stress (2) Maintain on D-2 as CRE & meds as per Dr. Venkatalalaji (3) Continue to work on assertiveness skills G. Perry Psychologist #325 |
| 2-20-04 1300 | COUNSELOR WEEKLY NOTE "I can't find my center. It's very upsetting" Pt seen in APR. Discussed establishing boundaries with peers, and feelings surrounding changing relationships. |

CHM - 1800  R 3-93

012772

PCR000145

ENCOUNTER DATE:

PLEASE DATE AND SIGN ALL ENTRIES.

3/2/04
12:00

PSYCHOLOGY NOTE (S) Felt physically & emotionally drained from court appearance. Frustrated & disappointed that no rulings were made. Was tearful & isolative over wkend. Today became tearful when discussing upcoming trial & "having to dig up everything again." Discussed how much she has grown & individuated as a person since being in jail. I hear she is realizing how much she lacked her own identity & was codependent when married. (A) Experiencing vicissitudes of her situation but clinical depression under good control. (P) No DTS. (1) Maintain on D-2 for continued stability (2) Meds as per Dr. Venlataglazine (3) Supportive counseling.

G. Perry Psychologist #225

3-3-04
16:00

COUNSELOR WEEKLY NOTE
"I have some things that I have to read. I'm kind of putting it off because its so hard to re-member that person I was." Seen on ACR. Alert and oriented. Discussed with pt concerns about legal pressures and interaction with peers. Mood euthymic. Affect anxious. Thoughts organized. (A) Need for IP structure/routine justifies D-2 as pt benefits from therapeutic structure of unit. (P) Continue IXTP.

L King CIII #422

712769

PCR000146

P-App. 003188

**PROGRESS NOTES**

☐ PUBLIC HEALTH

☐ CORRECTIONAL HEALTH

PATIENT ID PLATE IMPRINT

This form will be used by the medical staff for:
PATIENTS - PERSONAL HISTORY, PHYSICAL EXAMINATIONS and
PROGRESS NOTES and DISCHARGE SUMMARY.  (In & Out Patients)

ANCH ANC, KEN I
A6 31830
D-2

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 3-23-04 0730 | TREATMENT PLAN STAFFING |
| | Met with SNTP Signers to review pt status. Pt remains housed on C pod, med compliant and participating in add to appoint, pt maintains stability, but remains fragile and will continue to benefit from D-2 as LRA. Discharge Criteria / treatment goals - pt. |
| | L King CIII #427 |
| 3-24-04 1155 | Weekly Nursing Note - Seen in dayroom SO: tearful @ times due to personal situation. Also upset over a needy peer, who keeps bothering her for various needs. Easily upset. Remains pleasant, cooperative. States she does well for a while then "falls apart" over something insignificant. A: Compliant ē tx P: Continue to monitor. Joyce VanEvery RN |
| 3-24-04 | COUNSELOR WEEKLY NOTE |
| | "I don't know why I keep doing the same thing over and over again. I want to stop it. I want to learn, but it's just so hard." pt alert and oriented. discussed strategies for assertiveness with peers and history of behavior - self trying to assist others. Discussed frustration of unknown outcome re: legal issues and relationships, pt shifts from giddy to tearful. ① pt remains fragile and at risk for decompensation due to current legal status. Pt remains stabilizing presence on C pod. Need for ② stabilization justifies D-2 as LRA. ③ Consult SNTP. |
| | L King CIII #427 |
| | #12766 |

CHM - 1500 R 3-03

(OVER)

Put Discharge Date on Front of Chart.

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 3/25/04 1:00 | *(handwritten clinical note, largely illegible)* continues to show pleasant affect despite feeling anxiety... some interpersonal conflict in her pod. She was tearful speaking of her codependency needs and how hard she has worked to change for the better. She had extra PRN Ativan recently to deal with stress @ ① situational anxiety. Plan: ① Continue D-2 an LRE ② Supportive counseling ③ Continue SNTP. |
| | G. Perry Psychologist #325 |
| 1-2-04 0820 | Weekly Nursing Note – Seen in dayroom. S/O: Talking about mixed feelings as trial date gets closer. Feels her thoughts have "changed"... her thoughts so she is better able to assist her lawyer. Still gets caught up in various studies of... STM's? A: Compliant c tx. P: Continue to monitor — ___ VanCury? |
| 4/2/04 | Weekly GSW Note ③⑥ Depression being controlled well generally but having some anxiety re upcoming trial. Does not like having painful memories & events brought to surface again. ① No significant Δ since last wk ② Continue SNTP. |
| | G. Perry Psychologist #325 |
| 4/2/04 1500 | "I'm doing fine, I'm sleeping alright, I'm just trying to relax." Pt alert and oriented. Briefly processed pt's possible concerns about stress on unit this week. Pt asserts that she is fine and remains focused on legal matters. Pt housed C pod, med compliant and treatment compliant. Mood euthymic, affect wnl, thoughts organized. ① Need for psychoeducation, just Rec D-2 as LRE? Pt benefitting from supportive and therapeutic encounters with staff. ② Continue SNTP. ___ King City 325 |

012765

PCR000148

Put Discharge Date on Front of Form.

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|

4/29/04
1500

**COUNSELOR WEEKLY NOTE**
"I'm doing pretty well, I'm dreaming a lot these days, just about things like, making breakfast, My Mom puts her head in the sand. I can only hear things for so long from people and then I just have to get up and go." Pt seen in APU. Pt alert oriented. Discussed general occurrences during past week. Pt ↑ in ability to detach from anxiety of peers. Pt housed C pod V med compliant and participating in all tx offered. Mood euthymic, affect WNL, thoughts organized. (A) Need the ↑ str/stabilization just/this D-2 as LRE. Pt making continued efforts to employ coping strategies in the face of stress. (P) Continue SMTP.

L King CIII #423?

**PSYCHOLOGY ADMISSION NOTE** error

4/30/04 (SP)
0930
**PSYCHOLOGY NOTE** Attempted to see pt but she was GTC. Will see next wk.
G. Perry Psychologist #325

5/7/04 (SP)
0800
**PSYCHOLOGY NOTE** S/pt seen in dayrm. Felt exhausted from court last Fri + she was picked up @ 2 am & did not return until 7PM. She seems to be handling the stress fairly well — cried once talking about the media coverage getting info only from the prosecutor & not being able to respond to/hearing her old conversations of what happened. Says media are here as is. (A) Doing well considering the stress. (P) Continue S/MTP.
G. Perry Psychologist #325

012761

| ENCOUNTER DATE: | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 7-2-04 cont'd | *[illegible handwriting]* water, has been put on the defense table. Rcvd. atty's call + left message for him to call me. m. S. Sudwin MSW, LCSW |

M Lothian CIV #423

**PSYCHOLOGY NOTE**

9/10/04
1730

*[handwritten note, partially illegible]* Pt has been in court Tues → Thurs. Awakened @ 7 am for transport, & returns 7-8 pm. She has been ↑ stressed but not a DTS. Has been teased @ night by her & staff's accounts but seemed more positive today. Asked for minor med → to help get to sleep some. A/Adj. Dis. c depressed mood. P) Maintain on D-2 to maintain level of functioning. 2) Meds as per Dr. Drapeau (have discussed).

G. Perry Psychologist #325

**PSYCHIATRIC NOTE** IM run per Dr. Perry

7/10/04
14/0

today. She said that even with Seroquel 50mg + Ativan 1mg @ HS when she returns from court — she is having trouble sleeping. She requests that Ativan be increased to 2mg —
A/P — Order written for Ativan 2mg TID prn — Agitation x28.
P.K. Drapeau MD

P. Drapeau #311

012737

PCR000150

P-App. 003192

**PROGRESS NOTES**
☐ PUBLIC HEALTH
☐ CORRECTIONAL HEALTH

PATIENT ID PLATE IMPRINT

This form will be used by the medical staff for:
PATIENT'S - PERSONAL HISTORY, PHYSICAL EXAMINATIONS and
PROGRESS NOTES and DISCHARGE SUMMARY. (In & Out Patients)

| ENCOUNTER DATE | PLEASE DATE AND SIGN ALL ENTRIES. |
|---|---|
| 9/30/04 1840 | *Anduano Wendi* PSYCHIATRIC NOTE — *handwritten psychiatric note, largely illegible* ... P. Drapeau #311 ... *P.K. Drapeau MD* |
| 10-8-04 1220 | *Courtesy Nursing Note — handwritten note, largely illegible* ... *Joyce Van Every* |

012736

(OVER)

PCR000151

P-App. 003193

**Wendi Andriano**

Booking Number: A631830
PID Number:   000082785

**CHS Special Needs Treatment Plan (SNTP) Form**

**I. Basic Information**

Date of Admission: _____9/28/2003_____

Booking Number: _____A631830_____

Patient Name: _____Wendi Andriano_____

Age: __30__ Race: _Caucasian_ Sex ☐ Male ☑ Female

Date of Birth: _____08/26/70_____

Social Security Number:_____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_____

☑ English spoken   ☑ English written
☐ Spanish spoken   ☐ Spanish written
What other language?:

Home Address:
2155 E Liberty
Phoenix

Home Phone: (480) 689-2630

**Education**
Highest Grade Completed: __14__

**Employment**
☑ Employed Full-time   ☐ Employed Part-time

Most Recent Jobs Held:
apartment manager

**Financial Information, Entitlements**
☐ SSD  ☐ SSI  ☐ GA  ☐ Worker's Comp  ☐ AFDC
☐ Food Stamps  ☐ VA Benefits  ☐ Unemployment

*I. Significant Other or Relative*

Name: Alejo Ochoa
Relation: father   Phone: (520) 831-6829

Name:
Relation:   Phone:

Name:
Relation:   Phone:

*2. RBHA Contact/NA*

RBHA Casemanager: N/A
Clinic Location:
Clinic Phone:

☐ COT
   **COT Requested Date:**
☐ DTO  ☐ DTS  ☐ GD  ☐ PAD

☐ ISP Requested
ISP Request Date:
☐ Medical Records Requested
Medical Records Request Date:

*3. Attorney Name* PRIVATE ATTY. DAVID DELOZIER
480·575·6660
CELL:-
602·989·1759
FAX:-
480·575·666

Attorney Name: Daniel Patterson
Attorney Phone: (602) 506-2200

*4. Probation/Parole Officer*

Probation/Parole Officer Name:
   N/A
   Phone:

Counselor
Signature:

Date: 9/30/03

012654

**Wendi Andriano**

Booking Number: A631830
PID Number: 000082785

**CHS Special Needs Treatment Plan (SNTP) Form**

**I. Counselor's Assessment continued**

| | | | |
|---|---|---|---|
| ☐ Violent Behavior toward others | 0 | charge: remains unsubstantiated, no other incidents reported or observed |
| ☑ Violent Behavior toward self | 2 | Serious SA led to D-2 admit |
| ☐ Property Destruction | 0 | not observed/reported |
| ☐ Eating Problems | 0 | not observed/reported |
| ☑ Sleep Problems | 1 | difficulty maintaining sleep |
| ☐ Inappropriate Behavior | 0 | not observed/reported |
| ☐ Alcohol Abuse | 0 | denied |
| ☐ Drug Abuse | 0 | denied |
| ☐ Compulsive behaviors (not already specified) | 0 | not observed/reported |
| ☐ Housing Problems | 0 | can return to family home if released |
| ☐ Poor Personal Hygiene/Dress | 0 | good |
| ☐ Social Support | 0 | good; family, legal team |
| ☑ Other | 2 | Significant stress due to facing trial on capital case whose outcome could include death sentence |

*Current Summary of problem:*

Pt coping strategies overwhelmed by multiple circumstances including time in custody, sleep disturbance, severe legal status, and unexpected placement in isolation in GP. Pt frightened by her impulsive decision to suicide.

Counselor
Signature: _____

Date: 9/20/03

2

012655

PCR000153

**Wendi Andriano**
Booking Number: A631830
PID Number: 000082785

**CHS Special Needs Treatment Plan (SNTP) Form**

SNTP3

**II. Counselor's Assessment continued**

**Clinical History**

☐ **Prior Psychiatric Hospitazations**

**Date of Most Recent:**

**Prior Hospitalizations**

| N/A | ROI sent on | |
| | ROI sent on | |
| | ROI sent on | |

☐ **Prior Outpatient Mental Health**

**Date of most Recent OP tx**

**Place of most recent OP**   N/A

☐ **Prior Residental Treatment Program**   N/A
☐ **Hx DeTox Service**
☐ **Prior OP drug/alcohol abuse service**

**Significant family mental health history:**

N/A

**Counselor Impressions:**

Pt comes to D-2 following nearly 3 years in custody. Pt facing capital charge, recently placed in adseg. Pt made serious SA by cutting arm. Cannot say why. Unanticipated by all service providers, family and legal team. Increasing stress of incarceration, legal status, and toxic GP environment have combined to erode pt's ability to cope successfully.

3

012656

PCR000154

CHS Special Needs Treatment Plan (SNTP) Form

Booking Number: ADRIANO, WENDI
PID Number: 08-26-70   C/F

GOCC82785

**III. Psychiatric Assessment (To be completed by psychiatric provider in three working days.)**

| Y | N | Symptoms | Description |
|---|---|---|---|
| ☑ | ☐ | Alert | |
| ☑ | ☐ | Oriented | |
| ☑ | ☐ | Appropriate Grooming | |
| ☑ | ☐ | Clean | |
| ☑ | ☐ | Motor Activity Normal | |
| ☐ | ☑ | Euthymic | |
| ☑ | ☐ | Speech Normal | |
| ☐ | ☑ | Associations Loose | |
| ☐ | ☑ | Flight of Ideas | |
| ☐ | ☑ | Tangential Thoughts | |
| ☐ | ☑ | Concrete Associations | |
| ☐ | ☑ | Blocking | |
| ☐ | ☑ | Auditory Hallucination | |
| ☐ | ☑ | Visual Hallucinations | |
| ☐ | ☑ | Delusions | |
| ☐ | ☑ | Suicidal | |
| ☐ | ☑ | Self Injurious | |
| ☐ | ☑ | Homicidal | |
| ☐ | ☑ | Destructive | |
| ☐ | ☑ | Memory Impaired | |
| ☑ | ☐ | Insight | |
| ☑ | ☐ | Judgement | |
| ☑ | ☐ | Attention Span Normal | |
| ☑ | ☐ | Cognition Intact | |

Axis I: _ADJUSTMENT DM_   Axis IV:
Axis II: _MIXED FEATURES_   Axis V:
Axis III: _DEF_   AIMS test results: ⊖

**Psychiatric Provider Impressions Recommendations:**

VERY ARTICULATE. GOOD VARIETY CONSIDERING 3 YR IN JAIL

Psychiatric Provider: _K. Hoffert MD_

4

K. Hoffert MD #303

012657

PCR000155

**Wendi Andriano**

Booking Number: A631830

PID Number:   000082785

**CHS Special Needs Treatment Plan (SNTP) Form**

**Initial Assessment (Within three working days of admission)   DATE COMPLETED:      9/29/2003**

**A. Discharge Criteria (stated in behavioral/measurable form)**

> No DTO/DTS 100% x 14 days
> Increase coping for current situation 25% x 14 days

**B. Discharge Pl**

To General Population (includes special precautions or supervision/support needs, mental health outpatient, other)

> F/U outpt psych as Rxd by discharging psych MD or PRN

To the Community (include residential, mental health outpatient, vocational, etc.)

> Refferal as appropriate

**Follow-up Assessments (at fourteen working days and monthly therafter)**

| | | |
|---|---|---|
| DATE REVIEWED __/__/__ | DATE REVIEWED __/__/__ | DATE REVIEWED __/__/__ |
| DATE REVIEWED __/__/__ | DATE REVIEWED __/__/__ | DATE REVIEWED __/__/__ |

**A. CHANGES in Discharge Criteria (state in behavioral/measurable te**

_____

_____

**B. CHANGES in Discharge Plans: (To General Population (include special precautions or supervision support needs, mental health outpatient, other)**

_____

_____

**To the Community (include residential, mental health outpatient, vocational, etc.)**

_____

_____

5

012658

PCR000156

000082785
ANDRIANO, WENDI
08 06-70    C/F

Date Initiated: _____

Special Needs Plan *Update* Goals, Objectives and Interventions

Patient's Name _ANDRIANO_   BK # _____ Today's Date __/__/__

| | |
|---|---|
| 1.  Goal Area: Psychiatric Symptoms<br>(Completed by Psychiatric Provider) | 2.  Goal Area: Dangerous to Self/Others<br>(Completed by Primary Counselor) |
| GOAL(s): (1) ↓ DEPRESSION<br>(2) ↑ W/INNT | GOAL(s): No DTO / DTS |
| OBJECTIVES (in behavioral measurable terms): | OBJECTIVES (in behavioral measurable terms): |
| A.  30 W/O ↑ IN<br>SENSE OF PEOPLE | A.  pt will make no plan<br>to harm self / others |
| B.  ADD'D MEDO-<br>CD MD | B.  pt will take no action<br>to harm self / others |
| C. | C.  pt will notify staff of<br>thoughts / feelings / intention<br>to harm |
| INTERVENTIONS (Specify activity & frequency) | INTERVENTIONS (Specify activity & frequency) |
| 1.  MEDS | 1.  1:1 |
| 2.  1:1 | 2.  Groups |
| 3.  GROUP | 3. |

012659

PCR000157

COOLESTES
ANDRIANOPENDI
Date Initiated: 08-26-70    C/F

Special Needs Plan *Update* Goals,
Objectives and Interventions con't

3.   **Goal Area: Behaviors Precluding Less
     Restrictive Placement**
     (Completed by <u>Primary Counselor</u>)

GOAL(s): _A coping skills_
_for current situation._

OBJECTIVES (in behavioral measurable terms):

A. _Identify most pressing_
_issues._

B. _Identify current coping_
_strategies and pros/cons_

C. _generate new or al-_
_ternative strategies_

INTERVENTIONS (Specify activity & frequency)

1. _1:1._

2. _Group S._

3. _____

4.   **Goal Area: Medical Concerns**
     (Completed by <u>Nursing</u> or <u>Medical</u>)

GOAL(s):
_No current_
_medical concerns._

OBJECTIVES (in behavioral measurable terms):

A. _____

B. _____

C. _____

INTERVENTIONS (Specify activity & frequency)

1. _____

2. _____

3. _____

012660

PCR000158

ANDRIANO

ANDRIANO, WENDI
08-26-70   C/F

**Signature for SNTP**

Patient _____ Date _____

Patient comments _____

Date Initiated: _____ 10.9.03 _____

ComCare notified: Yes / No   Date _____ Message left with: _____
(if present, signature)

Psychiatric Provider: _____ K. Hoffert MD #__ Cali CIII #402 Date: __10 / 9 / 03__

Counselor: ___ A. King CII #427 ____ Date: __10 · 9 · 03__

RN/LPN: ___ 7. Mandlaman ___ F Despain LPN #705 Date: __10 - 9 - 03__

Medical Provider: __ D. Anderson RNC #217 __ Reynolds PAC #137 Date: __10-28-03__

Unit Manager: _____ R Lively CIII #422 ___ Date: __10/9/03__

*Full Special Needs Treatment Plan Update Reviews (Must be completed at least every 30 days)*

Review DATE: __11·5·03__

CHS PARTICIPANTS SIGNATURES   P.K. Despain LPN #705
A. King CIII #427
R. Reynolds PA-C #131
R Lively CIII #422
L Cali CIII #402
D. Anderson RNC #217
7. Mandlaman
GERALD M. PERRY PSYD

ComCare Notified: Yes / No   Date __11/6/03__   Message left with: _____
(if present, signature)

PROGRESS AND/OR CHANGES to Goals/Objectives

_____
_____
_____

CHANGES to Interventions

_____
_____

012661

PCR000159

**Wendi Andriano**

Booking Number: A631830
PID Number:       000082785

**CHS Special Needs Treatment Plan (SNTP) Form**

## V. Special needs Plan goals, Objectives and Interventions
(to be completed by clinical team within 14 days of admission)

1. **Goal Area: Psychiatric Symptoms**
   (Completed by Psychiatric Provider)

   **GOAL (s)**

1. **Goal Area: Dangerous to Self/Others**
   (Completed by Primary Counselor)

   **GOAL (s)**

   No DTS/DTO

**OBJECTIVES (in behavioral measurable terms):**

A

B

C

**OBJECTIVES (in behavioral measurable terms):**

A pt will make no plan to harm self/others 100% x 30 days

B Pt will take no action to harm self/others 100% x 30 days

C Pt will notify staff of any thought, feeling, intention to harm self or others 100% x 30 days

**INTERVENTIONS (Specify activity frequency)**

1

2

3

**INTERVENTIONS (Specify activity frequency)**

1 1:1 weekly with counselor at least 30 min weekly

2 participation in all groups offered

3 Support/encouragement by staff

6

012662

PCR000160

**Wendi Andriano**

Booking Number: A631830
PID Number:      000082785

CHS Special Needs Treatment Plan (SNTP) Form

**V. Special needs Plan goals, Objectives and Interventions**
(to be completed by clinical team within 14 days of admission)

| 4. Goal Area: Behaviors Precluding Less Restrictive Placement (Completed by Primary Counselor) | 5. Goal Area: Medical Concerns (Completed by Nursing or Medical) |
|---|---|
| **GOAL (s)** | **GOAL (s)** |
| Increase coping skills for current situation | |
| **OBJECTIVES (in behavioral measurable terms):** | **OBJECTIVES (in behavioral measurable terms** |
| A. Identify pressing issues that lead to distress or negative consequences | A |
| B. Identify current coping strategies and pros/cons of each | B |
| C. Generate alternative strategies and steps by which to apply them to current circumstances | C |
| **INTERVENTIONS (Specify activity frequency)** | **INTERVENTIONS (Specify activity frequency)** |
| 1. 1:1 weekly with counselor at least 30 min per week | 1 |
| 2. Participation all groups weekly | 2 |
| 3. Support/encouragement from staff PRN | 3 |

7

012663

PCR000161

Name ANDRIANO, WENDI-

**CHS Special Needs Treatment Plan (SNTP) Form**

Booking Number:

PID Number:

Signature Page - SNTP                    Date Initiated 12·4·03

**PATIENT**

Patient Signature: _____    Date: _____

Patient Comments: _____

**RBHA**

Notified: [Yes] [No] [NA]    Date: _____    Message Left With: _____

Case Manager _____    Date: _____

**CHS STAFF SIGNATURES:**

Psychiatric Provider: _____ R Venkatabalall MD    Date: 12/30/03

Counselor: _____ L King CII #427 / G Ziegler CIII #404    Date: 12·4·03

RN/LPN: _____ F Despain LPN #705 / D Anderson RNC #217    Date: 12/4/03

Medical Provider: _____    Date: _____

Case Manager: _____ Linda K Llewellyn    Date: 12-4-03

Other: _____ M Lothian CIV #423    Date: 12·4·03

Other: _____ L Call CIII #402 / Lorraine Call    Date: 12/4/03

Other: G. Perry Psychologist #325    Date: 12/4/03

**Update/Reviews**    Date of Update: 12·30·03

*Full Special needs Treatment Plan update Reviews (Must be completed at least monthly)*

CHS PARTICIPANTS SIGNATURES    L King / G Ziegler CIII #404

F Despain LPN #705    G Perry Psychologist #325

**RBHA**

Notified: [Yes] [No] [NA]    Date: _____    Message Left With: _____

Case Manager _____    Date: _____

**PROGRESS AND/OR CHANGES to Goals/Objectives**

_____

_____

_____

**CHANGES to Interventions**

_____

_____

_____

012664

PCR000162

**Wendi Andriano**

Booking Number:  A631830
PID Number:        000082785

**CHS Special Needs Treatment Plan (SNTP) Form**

## V. Special needs Plan goals, Objectives and Interventions
(to be completed by clinical team within 14 days of admission)

1.  **Goal Area: Psychiatric Symptoms**
    (Completed by Psychiatric Provider)

**GOAL (s)**

**OBJECTIVES (in behavioral measurable terms):**

A

B

C

**INTERVENTIONS (Specify activity  frequency)**

1

2

3

1.  **Goal Area: Dangerous to Self/Others**
    (Completed by Primary Counselor)

**GOAL (s)**

No DTS/DTO

**OBJECTIVES (in behavioral measurable terms):**

A  pt will make no plan to harm self/others 100% x 30 days

B  Pt will take no action to harm self/others 100% x 30 days

C  Pt will notify staff of any thought, feeling, intention to harm self or others 100% x 30 days

**INTERVENTIONS (Specify activity  frequency)**

1  1:1 weekly with counselor at least 30 min weekly

2  participation in all groups offered

3  Support/encouragement by staff

6

012665

PCR000163

P-App. 003205

**Wendi Andriano**

**CHS Special Needs Treatment Plan (SNTP) Form**

Booking Number:  A631830
PID Number:   .   000082785

## V. Special needs Plan goals, Objectives and Interventions
(to be completed by clinical team within 14 days of admission)

| 4. Goal Area: Behaviors Precluding Less Restrictive Placement<br>(Completed by Primary Counselor) | 5. Goal Area: Medical Concerns<br>(Completed by Nursing or Medical) |
|---|---|
| **GOAL (s)** | **GOAL (s)** |
| Increase coping skills for current situation | |
| **OBJECTIVES (in behavioral measurable terms):** | **OBJECTIVES (in behavioral measurable terms** |
| A  Identify pressing issues that lead to distress or negative consequences | A |
| B  Identify current coping strategies and pros/cons of each | B |
| C  Generate alternative strategies and steps by which to apply them to current circumstances | C |
| **INTERVENTIONS (Specify activity frequency)** | **INTERVENTIONS (Specify activity frequency)** |
| 1  1:1 weekly with counselor at least 30 min per week | 1 |
| 2  Participation all groups weekly | 2 |
| 3  Support/encouragement from staff PRN | 3 |

7

012666

PCR000164

ANDRIANO, WENDI

Signature for SNTP

Patient _____     Date _____

Patient comments _____

Date Initiated: _____1-27-6A_____     *M Lothian CIV #423* [handwritten signature] MSW

ComCare notified: Yes   No   Date _____   Message left with: _____
(if present, signature)   *G Perry Psychologist #325*

Psychiatric Provider: _____   *R Venkatabalaji MD #109*   Date: 1/27/04
Counselor: _____   *R Lively CIII #422*   Date: 1-27-04
RN/LPN: _____   *D Anderson RNC #217*   *J Easton LPN #729*   Date: 1/27/04
Medical Provider: _____   Date: _____
Unit Manager: _____   Date: _____

*Full Special Needs Treatment Plan Update Reviews (Must be completed at least every 30 days)*

Review DATE: __2-2A-0A__  *G Perry Psychologist #325*   2/24/04

CHS PARTICIPANTS SIGNATURES   *J Easton LPN #729*   *Call CIII #402*   *R Lively CIII #422*

*M Lothian CIV #423*   *King CIII #427*

*G Ziegler CIII #404*   *R Venkatabalaji MD #109*

ComCare Notified: Yes   No   Date _____   Message left with: _____
(if present, signature)

PROGRESS AND/OR CHANGES to Goals/Objectives

_____
_____
_____

CHANGES to Interventions

_____
_____

4

012667

PCR000165

**Wendi Andriano**

Booking Number: A631830
PID Number: 000082785

**CHS Special Needs Treatment Plan (SNTP) Form**

## V. Special needs Plan goals, Objectives and Interventions
(to be completed by clinical team within 14 days of admission)

**1. Goal Area: Psychiatric Symptoms**
(Completed by Psychiatric Provider)

**GOAL (s)**

↓ depression &
anxiety.

**1. Goal Area: Dangerous to Self/Others**
(Completed by Primary Counselor)

**GOAL (s)**

No DTS/DTO

**OBJECTIVES (in behavioral measurable terms):**

A  Pt reports ↓ in depression
and anxiety and
is able to manage her
anxiety.

B  100% medication
compliance &

C  follow pod rules

**OBJECTIVES (in behavioral measurable terms):**

A  pt will make no plan to harm self/others 100% x
30 days

B  Pt will take no action to harm self/others 100%
x 30 days

C  Pt will notify staff of any thought, feeling,
intention to harm self or others 100% x 30 days

**INTERVENTIONS (Specify activity frequency)**

1  medications

2  1:1 intervention c
staff - or as needed.

3  group therapy if
available

**INTERVENTIONS (Specify activity frequency)**

1  1:1 weekly with counselor at least 30 min
weekly

2  participation in all groups offered

3  Support/encouragement by staff

6

012668

PCR000166

**Wendi Andriano**

Booking Number: A631830
PID Number:      000082785

## CHS Special Needs Treatment Plan (SNTP) Form

### V. Special needs Plan goals, Objectives and Interventions
(to be completed by clinical team within 14 days of admission)

**4.  Goal Area: Behaviors Precluding Less Restrictive Placement**
(Completed by Primary Counselor)

**5.  Goal Area: Medical Concerns**
(Completed by Nursing or Medical)

**GOAL (s)**

Increase coping skills for current situation

**GOAL (s)**

**OBJECTIVES (in behavioral measurable terms):**

A | Identify pressing issues that lead to distress or negative consequences

B | Identify current coping strategies and pros/cons of each

C | Generate alternative strategies and steps by which to apply them to current circumstances

**OBJECTIVES (in behavioral measurable terms**

A |

B |

C |

**INTERVENTIONS (Specify activity  frequency)**

1 | 1:1 weekly with counselor at least 30 min per week

2 | Participation all groups weekly

3 | Support/encouragement from staff PRN

**INTERVENTIONS (Specify activity  frequency)**

1 |

2 |

3 |

7

012669

PCR000167

ANDRIANO

Signature for SNTP

PROGRESSNOTES
ANDRIANO, WENDI
08-26-70    C/F

Patient _____   Date _____

Patient comments _____

Date Initiated: ___3-23-04___

ComCare notified:  Yes   No   Date _____   G. Perry Psychologist #525   Message left with: _____   3/23/04
(if present, signature)

Psychiatric Provider: _____   R Venkatabalaji MD #109   Date: ___05.23.04___

Counselor: _____ CIII #427   Loraine Cali _____   Date: ___3-23-04___

RN/LPN: _____ Joyce Van Eyll   Call CIII #402   Date: ___3-23-04___

Medical Provider: _____   Date: _____

Unit Manager: _____   Date: _____
K B Soltian MSW        M Lothian CIV #423

*Full Special Needs Treatment Plan Update Reviews  (Must be completed at least every 30 days)*

Review DATE: ___4/20/04___

CHS PARTICIPANTS SIGNATURES  Perry Psychologist #325  Call CIII #402   Loraine Cali

J Easton LPN #739   R Venkatabalaji MD #109

Doris Escobar RN   _____ CIII #___   H Ivell CIII #___

ComCare Notified:  Yes   No   Date _____   Message left with: _____
(if present, signature)

PROGRESS AND/OR CHANGES to Goals/Objectives

_____

_____

_____

CHANGES to Interventions

_____

_____

4

012670

PCR000168

**Wendi Andriano**

CHS Special Needs Treatment Plan (SNTP) Form

Booking Number:  A631830
PID Number:      000082785

**V. Special needs Plan goals, Objectives and Interventions**
(to be completed by clinical team within 14 days of admission)

1.  Goal Area: Psychiatric Symptoms
    (Completed by Psychiatric Provider)

1.  Goal Area: Dangerous to Self/Others
    (Completed by Primary Counselor)

**GOAL (s)**

*Control depression*

**GOAL (s)**

No DTS/DTO

**OBJECTIVES (in behavioral measurable terms):**

A  *Pt will not any X 5 consecutive mtgs c Y Provider*

B

C

**OBJECTIVES (in behavioral measurable terms):**

A  pt will make no plan to harm self/others 100% x 30 days

B  Pt will take no action to harm self/others 100% x 30 days

C  Pt will notify staff of any thought, feeling, intention to harm self or others 100% x 30 days

**INTERVENTIONS (Specify activity frequency)**

1  *Medication*

2  *ind - counseling*

3

**INTERVENTIONS (Specify activity frequency)**

1  1:1 weekly with counselor at least 30 min weekly

2  participation in all groups offered

3  Support/encouragement by staff

6

012671

PCR000169

P-App. 003211

**Wendi Andriano**

Booking Number: A631830
PID Number:      000082785

CHS Special Needs Treatment Plan (SNTP) Form

## V. Special needs Plan goals, Objectives and Interventions
(to be completed by clinical team within 14 days of admission)

| 4. Goal Area: Behaviors Precluding Less Restrictive Placement (Completed by Primary Counselor) | 5. Goal Area: Medical Concerns (Completed by Nursing or Medical) |
|---|---|
| **GOAL (s)** | **GOAL (s)** |
| Increase coping skills for current situation | no medical concern Safety Status Yes one one |
| **OBJECTIVES (in behavioral measurable terms):** | **OBJECTIVES (in behavioral measurable terms** |
| A Identify pressing issues that lead to distress or negative consequences | A |
| B Identify current coping strategies and pros/cons of each | B |
| C Generate alternative strategies and steps by which to apply them to current circumstances | C |
| **INTERVENTIONS (Specify activity frequency)** | **INTERVENTIONS (Specify activity frequency)** |
| 1 1:1 weekly with counselor at least 30 min per week | 1 |
| 2 Participation all groups weekly | 2 |
| 3 Support/encouragement from staff PRN | 3 |

7

012672

PCR000170

**Wendi Andriano**
Booking Number: A631830
PID Number:    000082785

| CHS Special Needs Treatment Plan (SNTP) Form |
|---|

Signature Page - SNTP          Date Initiated ___5·18·04___

| PATIENT |
|---|

Patient Signature: _____    Date: _____
Patient Comments: _____
_____

| RBHA |
|---|

Notified: [Yes] [No] [NA]    Date: _____    Message Left With: _____
Case Manager _____    Date: _____

| CHS STAFF SIGNATURES: |
|---|

Psychiatric Provider: _____ R Venkataballi MD #109 Date: 05/18/04
Counselor: _____ R New Hill #422  G Ziegler CIII #404   Date: 5-18-04
RN/LPN: _____ J Easton LPN #729   Date: 5-18-04
Medical Provider: _____   Date: 8-31-04
Unit Manager: _____   Date: _____
Other: _____ M Lothian CIV #423   Date: 5·18·04
Other: _____ L Cali CIII #402   Date: _____
Other: _____   Date: _____

| Update/Review |                Date of Update: 6/15/04 |
|---|

*Full Special needs Treatment Plan update Reviews (Must be completed at least monthly)*
CHS PARTICIPANTS SIGNATURES: _____ J Easton LPN #729   R Newell CIII #422
_____ Barbara Espinoza RN 204
G Ziegler CIII #404   _____ R Venkataballi MD #109   Joyce Van Every

| RBHA |
|---|

Notified: [Yes] [No] [NA]   Date: _____    Message Left With: _____
Case Manager _____    Date: _____

| PROGRESS AND/OR CHANGES to Goals/Objectives |
|---|

5/18 @ meeting cont          6/15 @ N/C
② meet 50%          ② N/C

| CHANGES to Interventions |
|---|

5/18 N/C          6/15 N/C

012673

PCR000171

**Name**

Booking Number: *(illegible)* 2785

PID Number: *(illegible)*

**CHS Special Needs Treatment Plan (SNTP) Form**

**V. Special needs Plan goals, Objectives and Interventions**
(to be completed by clinical team within 14 days of admission)

1. **Goal Area: Psychiatric Symptoms**
   (Completed by Psychiatric Provider)

   **GOAL (s)**

   increase assertiveness skills

   **OBJECTIVES (in behavioral measurable terms):**

   A. Pt will accurately describe assertive, aggressive & passive response styles

   B. *(illegible)*

   C. Pt will ↓ passive responses to interpersonal conflict/interactions

   **INTERVENTIONS (Specify activity, frequency)**

   1. by 50% in 30 days ind. counseling

   2. assertiveness literature

   3. 1:1 contact c staff

2. **Goal Area: Dangerous to Self/Others**
   (Completed by Primary Counselor)

   **GOAL (s)**

   **OBJECTIVES (in behavioral measurable terms):**

   A.

   B.

   C.

   **INTERVENTIONS (Specify activity, frequency)**

   1.

   2.

   3.

012674

PCR000172

**Name** OECCK27E5
Booking Number IANO, WENDI
PID Number E-2E-7C

### CHS Special Needs Treatment Plan (SNTP) Form

### V. Special needs Plan goals, Objectives and Interventions
(to be completed by clinical team within 14 days of admission)

**4.  Goal Area: Behaviors Precluding Less Restrictive Placement**
(Completed by Primary Counselor)

**GOAL (s)**

**OBJECTIVES (in behavioral measurable terms):**

A

B

C

**INTERVENTIONS (Specify activity frequency)**

1

2

3

**5.  Goal Area: Medical Concerns**
(Completed by Nursing or Medical)

**GOAL (s)**

**OBJECTIVES (in behavioral measurable terms**

A

B

C

**INTERVENTIONS (Specify activity frequency)**

1

2

3

7

012675

PCR000173

Name

**Booking Number:**

**PID Number:**

CHS Special Needs Treatment Plan (SNTP) Form

**V. Special needs Plan goals, Objectives and Interventions**
(to be completed by clinical team within 14 days of admission)

**5. Goal Area: Other (if needed)**

**GOAL (s)**

**OBJECTIVES (in behavioral measurable terms):**

A

B

C

**INTERVENTIONS (Specify activity _frequency)**

1

2

3

**6. Goal Area: Other (if needed)**

**GOAL (s)**

**OBJECTIVES (in behavioral measurable terms):**

A

B

C

**INTERVENTIONS (Specify activity _frequency)**

1

2

3

8

012676

PCR000174

**CHS Special Needs Treatment Plan (SNTP) Form**

**Name**
Booking Number:
PID Number:

| Signature Page - SNTP | Date Initiated |
|---|---|

**PATIENT**

Patient Signature: _____ Date: _____
Patient Comments: _____

**RBHA**

Notified: [Yes] [No] [NA]   Date: _____   Message Left With: _____
Case Manager _____   Date: _____

**CHS STAFF SIGNATURES:**

Psychiatric Provider: _____ Date: _____
Counselor: _____ Date: _____
RN/LPN: F Despain LPN #705 / Joyce Van Cwey CRN   Date: 7/19/04
Medical Provider: _____ Date: _____
Unit Manager: _____ Date: 7/15/04
Other: L King CIII #427   Date: 7/15/04
Other: G Ziegler CIII   Date: _____
Other: R Lively CIII #424   Date: 7/5/04

| **Update/Reviews** | **Date of Update:** |
|---|---|

*Full Special needs Treatment Plan update Reviews (Must be completed at least monthly)*

**CHS PARTICIPANTS SIGNATURES**

_____
_____
_____

**RBHA**

Notified: [Yes] [No] [NA]   Date: _____   Message Left With: _____
Case Manager _____   Date: _____

**PROGRESS AND/OR CHANGES to Goals/Objectives**

_____
_____
_____

**CHANGES to Interventions**

_____
_____
_____

012677

PCR000175

```
CCCC827B5
ANDRIANO,WENDI
OB/26-7C  C/F
```
PID

Date Initiated: _____

**Special Needs Plan *Update* Goals, Objectives and Interventions**

Patient's Name _____   BK # _____   Today's Date ___/___/___

1.   Goal Area: Psychiatric Symptoms
     (Completed by Psychiatric Provider)

GOAL(s): Control
anxiety

2.   Goal Area: Dangerous to Self/Others
     (Completed by Primary Counselor)

GOAL(s): No DTS

OBJECTIVES (in behavioral measurable terms):

A. Pt will report
≥ 5 hrs conse.
sleep / night x 5nights

B. Pt will develop 2
new coping mech's
within 30 days

C. _____

OBJECTIVES (in behavioral measurable terms):

A. Pt will take no action
to harm self, w/r make
any plans to harm self 100% x 30days

B. Pt will report ↓ in
SI 20% x 30 days

C. _____

INTERVENTIONS (Specify activity & frequency)

1. meds

2. ind counseling

3. art/activities

INTERVENTIONS (Specify activity & frequency)

1. 1:1 a/ counselor

2. participation in
all groups offered

3. _____

012678

PCR000176

C00082785
ANDRIANO, WENDI
06-26-70  PID  2/F

Date Initiated: _____

Special Needs Plan *Update* Goals,
Objectives and Interventions con't

3.   Goal Area: Behaviors Precluding Less
     Restrictive Placement
     (Completed by Primary Counselor)

GOAL(s): *Coping skills for*
*Current situation!*
_____
_____

OBJECTIVES (in behavioral measurable terms):

A. _____
   _____
   _____

B. _____
   _____
   _____

C. _____
   _____
   _____

INTERVENTIONS (Specify activity & frequency)

1. _____
   _____
   _____

2. _____
   _____
   _____

3. _____
   _____
   _____

4.   Goal Area: Medical Concerns
     (Completed by Nursing or Medical)

GOAL(s): _____
_____
_____
_____

OBJECTIVES (in behavioral measurable terms):

A. _____
   _____
   _____

B. _____
   _____
   _____

C. _____
   _____
   _____

INTERVENTIONS (Specify activity & frequency)

1. _____
   _____
   _____

2. _____
   _____
   _____

3. _____
   _____
   _____

012679

PCR000177

COODE2765
ANDRIANO,WENDI
08-26-75   C/F

PID

Date Initiated:_____

Special Needs Plan *Update* Goals, Objectives and Interventions con't

5.   Goal Area: *Other (if needed)*

GOAL(s):

_____
_____
_____
_____

OBJECTIVES (in behavioral measurable terms):
A. _____
_____
_____

B. _____
_____
_____

C. _____
_____
_____

INTERVENTIONS (Specify activity & frequency):

1. _____
_____
_____

2. _____
_____
_____

3. _____
_____
_____

6.   Goal Area:  Other (if needed)

GOAL(s):

_____
_____
_____
_____

OBJECTIVES (in behavioral measurable terms):
A. _____
_____
_____

B. _____
_____
_____

C. _____
_____
_____

INTERVENTIONS (Specify activity & frequency):

1. _____
_____
_____

2. _____
_____
_____

3. _____
_____
_____

012630

PCR000178

ADRIANO

CCC082765
ANDRIANO, WENDI
08-26-70   C/F

Signature for SNTP

Patient _____   Date _____

Patient comments _____

Date Initiated:  8·12·04

ComCare notified: Yes · No   Date _____   Message left with: _____
(if present, signature)

Psychiatric Provider: _Pamela M Dean MD_____   Date:  8-12-04
_____ #404 King CIV #427 / M Lothian CIV #423
Counselor: _____ B _____ M.Ed LC Date:  8/12/04
F Despain LPN #705
RN/LPN: _Despain LPN/McClellan_____   Date:  8/12/04

Medical Provider: _____   Date: _____

Unit Manager: _G. Perry Psychologist #325_____   Date:  8/12/04
R Lively CIII #422
Full Special Needs Treatment Plan Update Reviews (Must be completed at least every 30 days)

Review DATE: _____

CHS PARTICIPANTS SIGNATURES

_____   _____   _____

_____   _____   _____

ComCare Notified: Yes  No   Date _____   Message left with: _____
(if present, signature)

PROGRESS AND/OR CHANGES to Goals/Objectives

_____

_____

CHANGES to Interventions

_____

_____

4

012681

PCR000179

P-App. 003221



USE BALLPOINT PEN ONLY

**MARICOPA COUNTY**
**CORRECTIONAL HEALTH SERVICES**

PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES:   NONE ☐   1.   2.

DATE 11/3/00   TIME   HOURS 11-13-13

PROZAC 20 mgs po q noon   x 30 days

TRAZODONE 50 mgs po qhs x 3 days;
then, 100 mgs po qhs x 27 days;

(please, start tonight!)

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   L. GARZA-BUNUEL MD

SIGNATURE OF R.N.

DATE 11/7/00   TIME   HOURS

D/C PROZAC -

Continue TRAZODONE 50 mgs po qhs x 3 days
then: 100 mgs po qhs x 27 days -

Start tonight, please!

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   L. GARZA-BUNUEL MD

SIGNATURE OF R.N.

DATE 11/13/00   TIME   HOURS

D/C TRAZODONE -

REMERON 30 mgs po qhs x 30 days

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   L. GARZA-BUNUEL MD

SIGNATURE OF R.N.

012302

PAT012972

PCR000180



PCR000181



PAT012650

012625

MARICOPA COUNTY

CORRECTIONAL HEALTH SERVICES

**MEDICATIONS**

C - COURT          NS - NON STOCK
R - REFUSED        T - TRANSFER
NA - NO ANSWER     NG - NOT GIVEN
M - OUT MEDICAL    H - HOLD
                   SO - SECURITY OVERRIDE

LOCATION B3/2  BK# 463 230

MONTH/YR  11-12/00

ALLERGIES: NKDA

Rx DOSAGE, FREQUENCY, ROUTE

11/13  Remeron 30 mg po
       qHS x 30 days



USE BALLPOINT PEN ONLY

MARICOPA COUNTY
CORRECTIONAL HEALTH SERVICES

PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES:   NONE ☐

3.                                                   DATE 12/13/00        TIME

REMERON 30 mgs po qhs

x 60 days

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   L. GARZA-BUNLER MD

1   SIGNATURE OF R.N.

DATE 1/17/01   TIME        HOURS

Dsc. REMERON - pt. non-compliant.

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   L. GARZA-BUNLER MD

2   SIGNATURE OF R.N.   Noted J Barnett LPN  01/18/01  0650

DATE 1/18/01   TIME        HOURS

R/S Tues

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   9/4/01

3   SIGNATURE OF R.N.

012901

PAT012971

PCR000183

P-App. 003225



PA1012689



Correctional Health Services
Keep on Person Medication Delivery Record

012981

PCR000185





USE BALLPOINT PEN ONLY

MARICOPA COUNTY
CORRECTIONAL HEALTH SERVICES

PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES:   NONE ☐   1.                    2.           C. Shamby MA #679

**1**
DATE 3/18/02   TIME

VISTARIL 50 mg po gam — 100 h s.

× 30 days

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   L. GARCIA-BUNUEL MD

SIGNATURE OF R.N.   M Peterman 3/18/02 1835   M Peterman LPN #748

**2**
DATE 4/9/02   TIME   HOURS

VISTARIL 50 mg po gam — 100 hs

× 60 days

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   L. GARCIA-BUNUEL MD   L Garcia-Bunuel MD #301

SIGNATURE OF R.N.        4/9/02  1810

**3**
DATE 4/19/02   TIME 0315 am  HOURS  CS
                                   C Shamby MA #674

D/c VISTARIL

SEROQUEL 100 mg po ghs × 30 days

rel Dunk × duration

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   L. GARCIA-BUNUEL MD   L Garcia-Bunuel MD #301

SIGNATURE OF R.N.        4/18/02   CRN

012899

PAT012969

PCR000187

P-App. 003229





PAT0126B7

012622

Arellano, Wendi
08-26-70  4/F

LOCATION #___  402

MONTH/YR ___

BK • A628232

CORRECTIONAL HEALTH SERVICES          MARICOPA COUNTY

0811-1582  R10-97

MEDICATIONS

C - COURT          NS - NON-STOCK
R - REFUSED        T - TRANSFER
NA - NO ANSWER     NG - NOT GIVEN
M - OUT MEDICAL    H - HOLD
                   SC - SECURITY OVERRIDE



PAT0126686
PCR000190
P-App. 003232



PA1012685

012620

Andiviano, Wendi
08-26-70 4/F

LOCATION ___ BK. A021820
MONTH/YR. 5/02

**MEDICATIONS**

C - COURT
R - REFUSED
NA - NO ANSWER
M - OUT MEDICAL

NS - NON-STOCK
T - TRANSFER
NG - NOT GIVEN
H - HOLD
SC - SECURITY OVERRIDE

CORRECTIONAL HEALTH SERVICES

MARICOPA COUNTY

061-1581 8/11-97



USE BALLPOINT PEN ONLY

**MARICOPA COUNTY**
**CORRECTIONAL HEALTH SERVICES**

PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES:    NONE ☐

3.        DATE 5/16/02    TIME 5 half ten hours

SEROQUEL 100 mg po ghs

X 60 days

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE    L. GARCIA-BUNUEL MD    L. Garcia-Bunuel MD #301

1    SIGNATURE OF R.N.    M Peterman 5/16/02 @ 1950    Peterman LPN #748

DATE 7/14/02    TIME 1030    C Bustamonte HUC #632

Seroquel 100 mg PO QHS x 60 days

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE    Alberts    Alberts

2    SIGNATURE OF R.N.    7/14/02    M McIntosh LPN #733

DATE 9/17/02    TIME 1940    A DeLaTorre HUC #686

① D/C Seroquel
② Seroquel 200 mg PO QHS x 84 days

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE    Alberts

3    SIGNATURE OF R.N.    Alberts LPN 9/17/02 2200

012898

PAT012968

PCR000192



PCR000193



PAT012683



PAT0126B2

012617

BK # A631830

NKDA

LOCATION: 7109

MONTH/YR:

ALLERGIES: NKDA

**MEDICATIONS**

C - COURT
R - REFUSED
NA - NO ANSWER
M - OUT MEDICAL

NS - NON-STOCK
T - TRANSFER
NG - NOT GIVEN
H - HOLD
SC - SECURITY OVERRIDE

Rx: DOSAGE FREQUENCY: ROUTE

7-14-02   Seroquel 100mg
PO QHS x 84 d.
M 10-5-02

CORRECTIONAL HEALTH SERVICES

MARICOPA COUNTY

0841-1562 R10-97

PCR000195

P-App. 003237



PAT012681

PCR000196



012615

PAT012680



# MEDICATIONS

C - COURT
R - REFUSED
NA - NO ANSWER
M - OUT MEDICAL

NS - NON-STOCK
T - TRANSFER
NG - NOT GIVEN
H - HOLD
SC - SECURITY OVERRIDE

LOCATION A BK # A631830
MONTH/YR 10/02
ALLERGIES DATE NKDA

Andriano, Wendi
8/26/70 C/F

012614

PAT012679

Recopied 10/13/02
↑ Renewal 10/13/02

| NURSE INITIAL | ORDER DATE | Rx; DOSAGE; FREQUENCY; ROUTE | TIME | 14–13 (days) |
|---|---|---|---|---|
| Gp | 9/17 | Seroquel 200mg PO qhs x 84 days | 1700 | X D/c |
| WR | 10-16 | Elavil 50mg PO Qhs x 3 days — Then — | 1700 | X … X DC |
| WR | 10-16 | Elavil 100mg PO Qhs x 2 wks. | 1700 | X … X DC |
| WR | 10-16 | Pre-natal Vits # PO QD x 30d. | 1700 | X … renewal 10/29/02 |
| | 9/17/02 | SEROQUEL 200mg PO QHS x 84 DAYS | 1700 | X … |
| | 10-29 | Ativan 1mg PO Qhs x 30 days Start tonight | 1700 | X … |
| | 10-29 | Pre-natal Vits # (2) PO QD x 30d. Start tonight | 1700 | X … |

CORRECTIONAL HEALTH SERVICES
MARICOPA COUNTY

081-1582 R10-97

PCR000198

USE BALLPOINT PEN ONLY

MARICOPA COUNTY
CORRECTIONAL HEALTH SERVICES

PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES:   NONE ☐

C Bustamonte

**1**
DATE 10/16/02   TIME

ELAVIL 50 mg po qhs x 3 days

then: 100 mgs po qhs x 2 weeks

PRE-NATAL VITS; II qd x 30 days

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE  L. GARCIA-BUNUEL MD   L Garcia-Bunuel MD #301

SIGNATURE OF R.N.

**2**
DATE 10/29/02   TIME   C Bustamonte

DC. SEROQUEL + ELAVIL

ATIVAN 1 mg po qhs x 30 days

PRE-NATAL VITS II (2) qd x 30 days

(please, treat tonight!)

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE  L. GARCIA-BUNUEL MD   L Garcia-Bunuel MD #301

SIGNATURE OF R.N.

**3**
DATE 11/22/02   TIME   HOURS

PSYCH. MEDS. REVIEW

Continue: ELAVIL 100 mg

ATIVAN 1 mg po qhs

PRE-NATAL vits II qd

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE  L. GARCIA-BUNUEL MD   L Garcia-Bunuel MD #301

SIGNATURE OF R.N.   A. FAULKNER RN #225

NKDA   012897

PAT012967

PCR000199



PAT012678

012613

MEDICATIONS

G - COURT          NS - NON-STOCK
R - PREPARED       T - TRANSFER
NA - NO ANSWER     NO - NOT GIVEN
M - OUT MEDICAL    H - HOLD
                   SC - SECURITY OVERRIDE

CORRECTIONAL HEALTH SERVICES

MARICOPA COUNTY

091-5251 R10-97

P-App. 003242

PCR000200



PCR000201



MARICOPA COUNTY
USE BALLPOINT PEN ONLY   CORRECTIONAL HEALTH SERVICES   PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES:   NONE ☐   1.                    C Bustamante

3.              DATE 1/6/03   TIME              HOURS

Doc. ATIVAN

PRE NATAL VITS T qd x 6 weeks.

☑ completed

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S
SIGNATURE   L. GARCIA-BUNUEL MD        L Garcia-Bunuel MD #301
SIGNATURE
OF R.N.   noted CRodie LPN 1/6/02
1

DATE 1/8/03   TIME 200   HOURS

SEROQUEL 100 mgs qhs x 4 weeks

(please, start tonight!)

☑ completed

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S
SIGNATURE   L. GARCIA-BUNUEL MD        L Garcia-Bunuel MD #301
SIGNATURE
OF R.N.   1/03 1600 atd hg B nurse
2

DATE 2/3/03   TIME              HOURS

SEROQUEL 200 mgs qhs x 4 weeks

☑ completed

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S
SIGNATURE   L. GARCIA-BUNUEL MD        L Garcia-Bunuel MD #301
SIGNATURE
OF R.N.   noted(l)g.c.e. ct sel/pgh 2/3/03 atl loc
3

012896

PAT012966

PCR000202



PAT0125676

PCR000203



PAT0126T5
012610

Andriano, wendi
81261 70 C1F

LOCATION B305   BK# A631830

MONTH/YR 1-03   NURSE UEDA

## MEDICATIONS

C - COURT          NS - NON-STOCK
R - REFUSED        T - TRANSFER
NA - NO ANSWER     NG - NOT GIVEN
M - OUT MEDICAL    H - HOLD
                   SO - SECURITY OVERRIDE

| ORDER DATE | Rx: DOSAGE, FREQUENCY, ROUTE |
|---|---|
| 14:00 | Prenatal Vits + PO Q day x 8 wks  3/3/03 |
| 12/3/03 | Seroquel 200 mg PO QH5 x 4 wks  3/3/03 |

CORRECTIONAL HEALTH SERVICES

MARICOPA COUNTY

081-1580  R10-97

PCR000204

P-App. 003246



USE BALLPOINT PEN ONLY

MARICOPA COUNTY
CORRECTIONAL HEALTH SERVICES

PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES:    NONE ☐   1.    2.

3.    DATE 2/28/03   TIME    HOURS

Continue SEROQUEL 2cc mg po qhs
                    × 6 weeks.
PRENATAL VIT. 1 q.d. × 6 weeks.

☑ completed

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S
SIGNATURE  L. GARCIA-BUNUEL MD    L Garcia-Bunuel MD #301

1   SIGNATURE
    OF R.N.  M. Lugo 2/28/07  15 M. Lugo LPN #741

DATE 3/7/03   TIME    HOURS

ATIVAN 1 mg po bid × 1 week
(please start tonight) ☑ completed
(please, start tonight!)

L Garcia-Bunuel MD #301

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S
SIGNATURE  L. GARCIA-BUNUEL MD

2   SIGNATURE
    OF R.N.

DATE 3/10/03   TIME    C Bustamonte HUC

D.C. ATIVAN

☑ completed

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S
SIGNATURE  L. GARCIA-BUNUEL MD    L Garcia-Bunuel MD #301

3   SIGNATURE
    OF R.N.  R. Quiroz LPN #723

12895

PAT012965



PAT012674



PAT012673



USE BALLPOINT PEN ONLY

MARICOPA COUNTY
CORRECTIONAL HEALTH SERVICES

PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES: NONE ☐

3.

**DATE** 4/7/03   **TIME**   **HOURS**

M. Vega

— SEROQUEL 200 mg po qhs x 8 wks

PRE-NATAL VITS 1 qhs x 6 wks

ENTERED   ☑ completed

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE L. GARCIA-BUNUEL MD   L Garcia-Bunuel MD #301

**1** SIGNATURE OF R.N.   I. Sweeney RN #284   4/8   0830

**DATE** 5/9/03   **TIME**   **HOURS**

ATIVAN   mg po   completive

ENTERED

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE L. GARCIA-BUNUEL

**2** SIGNATURE OF R.N.   I. Sweeney RN #284   6/9   2320

**DATE** 5/21/03   **TIME**   C Bustamonte HUC #   **HOURS**

SEROQUEL 200 mg qhs x 8 wks —

PRE-NATAL VITS, 1 qd x 8 wks —

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE L. GARCIA-BUNUEL MD   L Garcia-Bunuel MD #301

**3** SIGNATURE OF R.N.   M. Lugo LPN #

Andriano Wendi
08-26-70
A 631830

A 631830
Andriano Wendi
8-26-70

A 631830
Andriano Wendi
8-26-70 C/F

012894

PAT012964

PCR000208



PAT0102672

012607

P-App. 003251

PCR000209



PAT0126?1

012606

P-App. 003252

PCR000210



USE BALLPOINT PEN ONLY          MARICOPA COUNTY          PHYSICIAN'S ORDER FORM
                          CORRECTIONAL HEALTH SERVICES

DRUG SENSITIVITIES:

NONE ☐   1.                    2.

**1**  DATE 5/28/03   TIME

ATIVAN 1 mg bid × 2 wks —

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S
SIGNATURE  L. Garcia-Bunuel MD    L. Garcia-Bunuel MD #301

SIGNATURE
OF R.N.   R. Quiroz LPN #723

**2**  DATE 6/12/03   TIME          HOURS

ATIVAN 1 mg bid × 6 weeks —

(pt. may or use it occasionally)

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S
SIGNATURE  L. GARCIA-BUNUEL MD    L. Garcia-Bunuel MD #301

SIGNATURE
OF R.N.                    N SANDROCK RN #273

**3**  DATE 6/25/03   TIME          HOURS

Psych. MEDS. REVIEW

ATIVAN 1 mg bid

SEROQUEL 200 mg hs

PRE-NATAL VITS ↑ abs

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S
SIGNATURE  L. GARCIA-BUNUEL MD    L. Garcia-Bunuel MD #301

SIGNATURE
OF R.N.   L Sweeney RN #284

012893

PAT012963

PCR000211

P-App. 003253



PAT012670

MEDICATIONS

C - COURT NS - NON-STOCK
R - REFUSED T - TRANSFER
NA - NO ANSWER NG - NOT GIVEN
M - OUT MEDICAL H - HOLD
 SO - SECURITY OVERRIDE

CORRECTIONAL HEALTH SERVICES

MARICOPA COUNTY

081-1383 R10-97

PCR000212



PCR000213



## MEDICATIONS

C - COUNT    NS - NON-STOCK
R - REFUSED    T - TRANSFER
NA - NO ANSWER    NG - NOT GIVEN
M - OUT MEDICAL    H - HOLD
        SC - SECURITY OVERRIDE

LOCATION ___ BK # A631810

MONTH/YR 7-03

ALLERGIES

Andiano, Wendi
8-26-70

PAT012669

012604

CORRECTIONAL HEALTH SERVICES      MARICOPA COUNTY

081-1585 R10-97

PCR000214



PAT012962

PCR000215



PAT0102667

PCR000216



PA1012666

PCR000217



PAT012665

812600

## MEDICATIONS

C = COURT          NS = NONSTOCK
R = REFUSED        T = TRANSFER
NA = NO ANSWER     NG = NOT GIVEN
M = OUT MEDICAL    H = HOLD
                   SO = SECURITY OVERRIDE

LOCATION B213   BK # A631830   Andriano, Wendi
MONTH/YR   9/03   8-26-70

ALLERGIES NKA

| NURSE ORDER/INITIAL DATE | Rx DOSAGE FREQUENCY/ROUTE | TIME | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9/19 | Seroquel 300mg PO ghs ×6wks | 1700 | | | | | | | | | | | XDC | | | | | | | | NA 9/4/09 | | | | | | | | | | | | |
| 9/14 | Prenatal Vitamins 1 po ghs ×6wks | 1700 | | | | | | | | | | | XDC | | | | | | | | NA 9/4/09 | | | | | | | | | | | | |
| 9/25 | Ativan 2mg PO BID ×6wks | 1700 | | | | | | | DC 9/21/15 | | | | XDC | | | | | | | | XDC | | | | | | | | | | | | |

081-1563 R10-97

CORRECTIONAL HEALTH SERVICES          MARICOPA COUNTY

PCR000218



PCR000219



PAT012663

USE BALLPOINT PEN ONLY

**MARICOPA COUNTY**
**CORRECTIONAL HEALTH SERVICES**

CHM-1150 RG-00

PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES:   NONE ☐   1.   2.

**3.** DATE 9/26/03  TIME 2210  HOURS

① Transport to ER I&LS ambulance
s/p S.A. self inflicted lac to ©
hand and © forearm
T. Colpitts MD
J. Sweeney RN #284

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE

**1** SIGNATURE OF R.N.
J Sweeney RN #284
DATE 9/28/03  TIME 0500  HOURS

① a/c dsg △ 3 x 7 days
② S/C for suture removal 14days
10.50?
J. Sweeney RN #284

9-24-03 Noted completed
M Allison

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE

**2** SIGNATURE OF R.N.
DATE 9/28/03  TIME 0520  HOURS

Chair x 6° or until stable to
contact for safety
J. Sweeney RN #284
T.O. Dr. Quayday

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE

**3** SIGNATURE OF R.N.

012891

PAT012961

PCR000221

P-App. 003263



MARICOPA COUNTY
CORRECTIONAL HEALTH SERVICES

USE BALLPOINT PEN ONLY

CH14-1550 Rd-9
PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES:   NONE ☐   1.

2.

3.

DATE 9-28-03   TIME 0920   HOURS

Transfer to D2
level Nur 4 pts x4 hrs

V.O. Dr Wendy

012890

PAT012960

PCR000222

P-App. 003264



USE BALLPOINT PEN ONLY

MARICOPA COUNTY
CORRECTIONAL HEALTH SERVICES

PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES:   NONE ☐   1.                    2.

3.   DATE 9/28/03   TIME 1730   HOURS

(admitted to D2)

① may reduce to 2 pt. S.W.
X 4 hr.
T.O. Dr Wendzig / Anderson RN C

R. Hoffer MD 4303               JoH6, MD

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S
SIGNATURE        D Anderson RNC #2?      9/28/03 1444

SIGNATURE
OF R.N.        Arter D Anderson RN C

1

DATE 9/28/03   TIME 1736   HOURS

Renew Level / S.W.
(2-4 pt) X 4 hrs       JoH6, MD

R. Hoffer MD

T.O. Dr Wendzig / M Aiton

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S
SIGNATURE

SIGNATURE
OF R.N.    MM M Aiton 9/28/03   1747

2

DATE 9/28/03   TIME 2136   HOURS

Renew Level / (2-4 pts)
S.W. X 4 hrs

T.O. Dr Wendzig / M Aiton

R. Hoffer MD #?              JoH6, MD

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S
SIGNATURE

SIGNATURE
OF R.N.    Arter M Aiton 9/28/03   2147

3

012889

PAT012959

PCR000223

P-App. 003265



012888

PAT012958

PCR000224



USE BALLPOINT PEN ONLY

MARICOPA COUNTY
CORRECTIONAL HEALTH SERVICES

CHM-1550 R2-0

PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES:   NONE ☐

DATE 9/29/03   TIME 09:30   HOURS

① D/C S.W.—

Andriano, Wendy
A631830
8-26-76
02

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE

K. Hottett MD #303

1  SIGNATURE OF R.N.   noted on Taitra 9/29/03 1850

012887

PAT012957

PCR000225

P-App. 003267



USE BALLPOINT PEN ONLY

MARICOPA COUNTY
CORRECTIONAL HEALTH SERVICES

PHYSICIAN'S ORDER FOR

DRUG SENSITIVITIES:   NONE ☒

DATE 9/29/03   TIME 1330   HOURS

Ativan 1 mg po Bid
Seroquel 100mg po ē AM  ) 14 days
Seroquel 200mg po ē HS
Prenatal vitamin Ti po ē AM
MAY have AM doses of ABOVE
meds now

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   K. Hoffert MD #303

SIGNATURE OF R.N.   noted M Tait RN #309  9/29/03 1657

DATE 9/29/03   TIME 1600   HOURS

May have 2nd
blanket.

To. Dr. Hoffert/M Tait

GENERIC SUBSTITUTION APPROVED   K. Hoffert MD #303
PHYSICIAN'S SIGNATURE

SIGNATURE OF R.N.   noted M Tait RN 9/29/03 1856

DATE 10/1/03   TIME 1305   HOURS

CBC, CmP 10-2
Schedule for PAP 10-15-03 + uAdip
Keflex 500mg po tid X 7 days
R. Suture removal 10-6-03

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   R. Reynolds PA-C #131

SIGNATURE OF R.N.   noted F Despain LPN 10/6/03 1500
F Despain LPN #705

012886

PAT012956

PCR000226

P-App. 003268



PCR000227

MARICOPA COUNTY
CORRECTIONAL HEALTH SERVICES

USE BALLPOINT PEN ONLY

PHYSICIAN'S ORDER FORM

081 1673 R5-93

DRUG SENSITIVITIES:   NONE ☐   1.                2.

3.                DATE 10/3/03   TIME 1500

Dr Kilby
Augmentin 875 mg po
bid x 10 days
Warm compresses(?) anterior
bid x 2 days
BGAMD & complier

R. Reynolds PA-C #131

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   Rosanne Reynolds PAC

1   SIGNATURE OF R.N.   noted MTait RN 10/3/03  1553

DATE 10/06/03   TIME 15:00   HOURS

D/C Clin/mo 11.6 e

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE   P Avalos DA-C

2   SIGNATURE OF R.N.   1/27   noted   J Eaton RN

DATE 10/10/03   TIME 12:30   HOURS 12:22 O

(1)  ATIVAN  1. m/  PO  Bid
(2)  PERODUEL  //PO m/  PO
D. Q. M. 2  1200  m/
Q. P. M.
Q (3)  PRN  #  PO  Q  Qb
J/NKDA NKO × 2 d

K. Hoffert MD #303

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE

3   SIGNATURE OF R.N.   noted F Despain LPN 10/16/03 1450

F Despain LPN #705

D8A631830 NKDA

D8A631830 NKDA

D8A631830 NKDA

012885

PAT012955

PCR000228

P-App. 003270



MEDICATIONS

C - COUNT
R - REFUSED
NA - NO ANSWER
M - OUT MEDICAL

NS - NON STOCK
T - TRANSFER
N - NOT GIVEN
H - HOLD
SO - SECURITY OVERDOSE

Bk #: A631830
ANDRIANO, WENDI ELIZABETH
Bk Dt: 10-08-2000
DOB: 08-26-1970    Sex: Female

LOCATION: D2   BK: A63/830
MONTH/YR: 10-03    NEDA

CORRECTIONAL HEALTH SERVICES    MARICOPA COUNTY

PATO12661

012596

CHM-1530 RA-X

**MARICOPA COUNTY**
**CORRECTIONAL HEALTH SERVICES**

USE BALLPOINT PEN ONLY

PHYSICIAN'S ORDER FORM

DRUG SENSITIVITIES:   NONE ☐   1.                    2.

3.   DATE 10/16/03   TIME 1240   1435   HRS

PAP, GC, Chlamydia cultures—
done
IC-10C

R Reynolds PAC #131

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE

1   SIGNATURE OF R.N.   noted   F Despain LPN #705 PN   10/16/03   1505

DATE 10/30/03   TIME 1330   HOURS BM CP

DC Extra Blanket
OK

R Reynolds PAC #131   noted

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE

2   SIGNATURE OF R.N.   noted   F Despain LPN #705 PN   10/30/03   1355

DATE 11/5/03   TIME 1330   HOURS N20 CP

DC Prev. order Ativan / Seroquel
+PNV—

Ativan 1mg po   BID X 60.
Seroquel 100mg po AM + 200mg HS
X 60.
PNV—   ii po QD.   X 28.

Pamela Radelaw MD

GENERIC SUBSTITUTION APPROVED
PHYSICIAN'S SIGNATURE

3   SIGNATURE OF R.N.   noted   Alex   PL   11/5/03   1457
F Despain LPN #705

012884

PAT012854

PCR000230



PA1012660

PCR000231



PCR000232



012883

PAT012953

PCR000233



PAT012659

012594

PCR000234



MO./YR. _/-O4_

012592

BOOKING # _A631830_   LOCATION _____

Andrion Pro....
PROBANO, NEV...
68-26...  2/F

| NURSE'S SIGNATURE | INITIALS | NURSE'S SIGNATURE | INITIALS | NURSE'S SIGNATURE | INITIALS |
|---|---|---|---|---|---|
| F. Despain LPN #705 | | | | | |
| | | | | | |
| | | | | | |
| | | | | J. Easton LPN #728 | |

| NURSE INITIAL | ORDER DATE | Rx: DOSAGE, FREQUENCY, ROUTE | TIME | DATE 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 12/6/3 | Motrin 800mg PO TID x 29 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 12-24 | Tylenol 650mg PO BID PRN x 30 | 0900 | | | | | | | | | | | | | | | | | | | | | | | X | | X | X | | | | | |
| | | | 2000 | | | | | | | | | | | | | | | | | | | | | X | | | | | X | | | | | |

PRN MEDICATIONS

STAT & ONE TIME ORDERS



PCR000236



PCR000237



MEDICATIONS

C - COURT
R - REFUSED
NA - NO ANSWER
M - OUT MEDICAL

NS - NON-STOCK
T - TRANSFER
NG - NOT GIVEN
H - HOLD
SC - SECURITY OVERRIDE

Bk#: A631830
ANDRIANO, WENDI ELIZABETH
Bk Dt: 10-08-2000
DOB: 08-26-1970    Sex: Female

LOCATION D9    BK# A63183

MONTH/YR 1/04    NKDA

CORRECTIONAL HEALTH SERVICES

MARICOPA COUNTY

061-1563 R10-97

PCR000238



PCR000239



P-App. 003282

PCR000240



012586

PCR000241



**MEDICATIONS**

C - COURT   NS - NON-STOCK
R - REFUSED   T - TRANSFER
NA - NO ANSWER   NG - NOT GIVEN
M - OUT MEDICAL   H - HOLD
   SG - SECURITY OVERRIDE

LOCATION D2   BK # A631830

MONTH/YR 3-04

ALLERGIES: NKDA

Bk #: **A631830**
ANDRIANO, WENDI ELIZABETH
Bk Dt: 08-08-2000
DOB: 08-26-1970   Sex: Female

| NURSE INITIAL | ORDER DATE | Rx: DOSAGE; FREQUENCY; ROUTE | TIME |
|---|---|---|---|
| A | 3/10/04 | Zoloft 50mg PO @am x28D | 0900 |
| M | 3/10/04 | Ativan 1mg PO BID x28D | 0900 |
| | | | 2000 |
| A | 3/10/04 | Seroquel 100mg PO @HS @x28D | 2000 |
| M | 3/25/04 | PNV-T PO QD x56D | 0800 |

CORRECTIONAL HEALTH SERVICES

MARICOPA COUNTY

011585

PCR000242



PCR000243



PCR000244



PCR000245



PCR000246



MEDICATIONS

C - COURT
R - REFUSED
NA - NO ANSWER
M - OUT MEDICAL

NS - NON-STOCK
T - TRANSFER
NG - NOT GIVEN
H - HOLD
SC - SECURITY OVERRIDE

012530

Bk #: A631830
ANDRIANO, WENDI ELIZABETH
Bk Dt: 10-08-2000
DOB: 08-26-1970      Sex: Female

LOCATION D2   Bk # A631830
MONTH/YR 4-04
ALLERGIES: NKDA

| NURSE INITIAL | ORDER DATE | Rx DOSAGE FREQUENCY/ROUTE | TIME | 28 | 29 | 30 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4/4/04 | Zoloft 50mg PO QAM x 28 R | 0900 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 4/4/04 | Ativan 1mg PO BID x 28 R | 0900 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | 2000 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 4/4/04 | Seroquel 100mg PO @HS x 28 R | 2000 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 5/4/04 | Zoloft 50mg PO QAM x 28 R | 0900 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 5/4/04 | Ativan 1mg PO BID x 28 R | 0900 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | 2000 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 5/4/04 | Seroquel 100mg PO @HS x 28 R | 2000 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 8/4/04 | Prenatal Vitamins ī g.d PO X 84 days | 0800 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

CORRECTIONAL HEALTH SERVICES                    MARICOPA COUNTY

001-1564 11-97

PCR000247

P-App. 003289



BOOKING # A63/630   LOCATION D2   MO/YR 5-04

012579

000027785
ANDRIANO,WENDI
08-26-70  C/F

J Easton LPN #729

NURSE'S SIGNATURE
F. Daspain LPN #705
Julian t. Inserdale RN

Rx: DOSAGE, FREQUENCY, ROUTE

| ORDER DATE | Rx: DOSAGE, FREQUENCY, ROUTE | TIME |
|---|---|---|
| 5/24/4 | Ativan 1mg PO TID PRN for Anxiety X14D to be used PRN as anxiety arises | 0900 / 1400 / 2000 |
| 6/7/04 | Ativan 1mg PO TID PRN X14D Anxiety | 0900 / 1400 / 2000 |

PRN MEDICATIONS

STAT & ONE TIME ORDERS



**MEDICATIONS**

G - COURT    NS - NON-STOCK
R - REFUSED    T - TRANSFER
*A - NO ANSWER    NG - NOT GIVEN
M - OUT MEDICAL    H - HOLD
     SC - SECURITY OVERRIDE

Bk #: A631830
ANDRIANO, WENDI ELIZABETH
Rx Dt: 10-08-2000
DOB: 08-26-1970    Sex: Female

LOCATION: D2
MONTH/YR: 5-04
ALLERGIES: NKDA

012578

| NURSE INITIAL | ORDER DATE | Rx DOSAGE FREQUENCY ROUTE | TIME |
|---|---|---|---|
| | 5-2-04 | Zoloft 50mg PO QAM x 28D | 0900 |
| | 5-2-04 | Ativan 1mg PO BID x 28D | 0900 / 2000 |
| | 5-2-04 | Seroquel 100mg PO QHS x 28D | 2000 |
| | 5-4-04 | Prenatal Vitamins + QD PO x 84D | 0900 |

CORRECTIONAL HEALTH SERVICES      MARICOPA COUNTY

061-1583 R10-67

PCR000249



PCR000250



PCR000251



PCR000252



PCR000253



PCR000254



**MEDICATIONS**

C - COURT
R - REFUSED
NA - NO ANSWER
M - OUT MEDICAL

NS - NON-STOCK
T - TRANSFER
NG - NOT GIVEN
H - HOLD
SG - SECURITY OVERRIDE

LOCATION D2
Bk #: A631830
ANDRIANO, WENDI ELIZABETH
Bk Dt: 10-08-2000
DOB: 08-26-1970   Sex: Female

MONTH/YR 8-04
ALLERGIES NKDA

| ORDER DATE | Rx DOSAGE, FREQUENCY, ROUTE | TIME |
|---|---|---|
| 8/1/04 | Zoloft 50mg PO BID 9am x 90Δ | 0900 / 2000 |
| 8/1/04 | Ativan 1mg PO BID x 90Δ | 0900 / 2000 |
| 8/5/04 | m.vit T PO QD x4wks | 0900 |
| 8/6/04 | Seroquel 75mg PO QHS x2wks | 2000 |

CORRECTIONAL HEALTH SERVICES

MARICOPA COUNTY

061-1581  R/11-07

PCR000255



BOOKING #  H 031830   LOCATION  D-2

Bk #: **A631830**
ANDRIANO, WENDI ELIZABETH
Bk Dt: 10-08-2000
DOB: 08-26-1970   Sex: Female

012571

| NURSE'S SIGNATURE | INITIALS | NURSE'S SIGNATURE | INITIALS | NURSE'S SIGNATURE | INITIALS | NURSE'S SIGNATURE | INITIALS |
|---|---|---|---|---|---|---|---|
| F Despain LPN #705 | | K Nass LPN #807 | | Love Dna RN | | DM Andriano RN | |
| Mccall RN #20 | MC | | | Lone Dna RN | | | |
| Thapando RN #289 | | Son Van Evan | | | | Easton LPN #729 | |

| ORDER DATE | Rx, DOSAGE, FREQUENCY, ROUTE | TIME | 28 | 29 | 30 | 31 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8-12 | Seroquel 50mg Po PRN agitation QHS x 28 days | 2000 | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 8-27 | Motrin 800mg PO PRN BID x 7 days | 0900 2000 | X | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 8-27 | Ativan 1mg po PRN agitation B ID x 28 day | 0900 2000 | X | X | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 8-31-01 | Motrin QHS PRN 400mg PO PRN pain x 28d | 0400 1400 2000 | | X | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 9-04 | Seroquel 50mg PO QHS PRN x 90d agitation | 2000 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 9-04 | Ativan 2mg PO TID PRN x 28d agitation | 0900 1400 2000 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

**PRN MEDICATIONS**

**STAT & ONE TIME ORDERS**

PCR000256

P-App. 003298



PCR000257



012569

BOOKING # A63183

LOCATION ____ Andriano Wendi   08-26-1970   MO/YR 4-04

NURSE'S SIGNATURE
F Despain LPN #705
F Trapanotto RN #289
M. Clark RN #2114

INITIALS / NURSE'S SIGNATURE
K. Nass LPN #807
M. Husband LPN #733
Easton LPN #729

| NURSE INITIAL | ORDER DATE | Rx DOSAGE, FREQUENCY, ROUTE | TIME | 28 | 29 | 30 | 31 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9-2-04 | Seroquel 50 mg qHS prn x90 d agitation | 2000 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 9-10-04 | Ativan 2 mg TID prn x 28 d agitation | 1400 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | 9-30-04 | Seroquel 50 mg BID PO x60 day agitation PRN | 0800 / 2000 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| N | 10-25-04 | Ativan 2 mg PO TID PRN x 28 anxiety | 0900 / 1400 / 2000 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| N | 10-19-04 | Motrin 400mg PO TID PRN x 2 R Pain | 0900 / 1400 / 2000 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

PRN MEDICATIONS

STAT & ONE TIME ORDERS

PCR000258



PCR000259



PCR000260



MEDICATIONS

C - COURT    NS - NON-STOCK
R - REFUSED    T - TRANSFER
NA - NO ANSWER    NG - NOT GIVEN
M - OUT MEDICAL    H - HOLD
SO - SECURITY OVERRIDE

LOCATION 02    BK# A63/830
MONTH/YR 10-04    NICDA

000002785
ANDRIANO,WENDI
08-26-70 C/F

012566

CORRECTIONAL HEALTH SERVICES    MARICOPA COUNTY

081-1583 R10-97

PCR000261



PCR000262



**Daniel Patterson - PDX**

| | |
|---|---|
| From: | Donna Ochoa [grandmaochoa@hotmail.com] |
| Sent: | Tuesday, December 04, 2001 6:54 AM |
| To: | pattersond@mail.maricopa.gov |
| Subject: | Andriano |

Dan,
Thought I'd try this out to see if it gets to you.  I just listened to last
week's messages and heard that Michelle called to introduce herself. Please
let her know that I will try to call her today.  I apologize, we don't always listen to the messages, we just check the caller id.  Thank you for
working with our daughter Wendi.  I know that she doesn't belong in there
and that there is a lot more to this than the prosecuter has shown. Wendi's
therapist, Kandy Rohde would really like to hear from your office.  She is
trying to keep a definite distinction between her relationship with Wendi
and the defense, so that she doesn't appear to be part of the defense. Did
that make sense?  Anyway, please give her a call.  She has good information.

Get your FREE download of MSN Explorer at
http://explorer.msn.com/intl.asp

1

009456

PCR000264

**Michelle Arvanitas - PDX**

| | |
|---|---|
| From: | Donna Ochoa [grandmaochoa@hotmail.com] |
| Sent: | Monday, September 30, 2002 7:44 AM |
| ): | pattersond@mail.maricopa.gov; GDDeLozier@aol.com; arvanitas@mail.maricopa.gov |
| Subject: | Wendi Andriano |

Just to keep you updated. We had a call from Wendi early Sat morning. She
was hysterical. Another inmate was put in her cell Friday night and some of
that girls behaviors almost sent Wendi over the edge. Evidently, Wendi
started having 'flash backs' about her times prior to jail. For Wendi to
call like that is not common, in fact the only other time I recall hearing
her voice like that was 10/8/00, I called Kandy. Wendi said that the guards
were refusing to move wither one of them even tho there were numerous empty
beds. Kandy went over to the jail and was able to get Wendi stable. I
haven't spoken directly to Kandy, but she left a message that Wendi was
having something like Post Traumatic... As Kandy left the jail she spoke
with a guard and demanded that the Psych see Wendi that day (he was at
Estrella on Sat). We had Wendi keep calling us throughout the day. The
guards had her fill out the form to go into PC but they said she had to say
she was in fear of her life and she refused to do that. She knew that he
would be in there for a month's time without contact with us and couldn't do
it. Of course, she couldn't tell us what all happened over the phone. When
the afternoon crew came on she asked again. Finally the head guard said
that they would momve the other girl. We have not heard from Wendi since
she told us that. I don't know if they were in lockdown Sun or what. And
the Dr. never did see her on Saturday, as of 7:00 pm.
Donna

Join the world's largest e-mail service with MSN Hotmail.
http://www.hotmail.com

1

002205

PCR000265

Subj:
Date:      3/30/03 4:05:51 PM US Mountain Standard Time
From:      sbmurphyaz@yahoo.com
To:        mailto:gddelozier@aol.comgddelozier@aol.com,
           pattersond@mail.maricopa.gov

Dan and David:
Spent several hours on Sat and Sun with Wendi - I now have a handle on why she didn't leave Joe.
She learned to disassociate from painful memories a long time ago - that is very clear to me. Are you going to subpoena her counselor? I know there's something that happened during childhood that she hasn't told me yet - I'll get at it before we're finished.
I've now spent over 10 hours with her and I think I have another 10 to go. I will see her on Tuesday but not again until the following week. How sure are we that we're going to get a continuance?
Sharon


Sharon B. Murphy PhD, CISW
Domestic Violence Consultant
Arizona State University
School of Social Work - Faculty Associate
work (480) 965-3525
fax (480) 831-8424

Do you Yahoo!?
Yahoo! Platinum - Watch CBS' NCAA March Madness, live on your desktop!

DEL006449

PCR000266

Subj: **Wendi** *AnJahiAno* — *Murphy work*
Date: 3/25/03 5:28:08 PM US Mountain Standard Time
From: sbmurphyaz@yahoo.com
To: pattersond@mail.maricopa.gov, mailto:gddelozier@aol.com
gddelozier@aol.com

Sent from the Internet (Details)

Hello Dan and David:
I spent a couple of hours with Wendi today and plan to see her again tomorrow, possibly Friday and next Tuesday. I'm hoping that will conclude the interview time. We didn't get very far into the story today (only up to the first year of marriage) because I start with her childhood and work forward - so it's a pretty long process.
I think Wendi was very comfortable with me and I think she is looking forward to seeing me tomorrow as well. This is very difficult as you know - she was very tearful so stopped a number of times. I chose to end the interview after 2 hours because we both needed it to end - draining, very draining.
She alternates between seeing the truth about her husband and not wanting to see it. By the end of our work together she will see "it" which also means that she will become quite depressed. David: it is important for her counselor to be available to her following our meetings (if Wendi needs her) and throughout this process. The process of the assesment is very painful because I'm asking her to talk about difficult things in a very clear and forthright manner. She needs to reconstruct the past in a thoughtful way AND then has to say it all out loud to me, a stranger. Can you communicate that to her counselor for me or to her parents so that they can talk to her counselor? I did assess for suicidality at the end of our time today and she's ok but admits to feeling suicidal on occasion.
Will keep you both informed as I work. Is it OK with both of you for me to update via email or would you prefer another method? When I have finished my work I will ask that we sit down together to go over the key points - is that what you planned also or do you have something else in mind?
Sharon


Sharon B. Murphy PhD, CISW
Domestic Violence Consultant
Arizona State University
School of Social Work - Faculty Associate
work (480) 965-3525
fax (480) 831-8424

Do you Yahoo!?
Yahoo! Platinum - Watch CBS' NCAA March Madness, live on your desktop!

PCR000267

**JAMES J. HAAS**
Public Defender



**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

## Office of the Public Defender

RECEIVED
JAN 1 6 2002

INTEROFFICE MEMORANDUM

TO:        INITIAL SERVICES

FROM:      PATTY

DATE:      January 14, 2002

RE:        State v. Wendi Andriano; CR00-96032

Please have Ms. Andriano sign, but do not date the attached Releases. She is located at:

Wendi Elizabeth Andriano, #A631830
Estrella Jail
2939 W. Durango
Phoenix, AZ

If you have any questions, please contact me at my extension 62133

Thanks :)

~ *Patty* ~
*Legal Assistant Grp. F*
*Ext 62133*

*Completed by - Ken*        1/16/2

019331

LAW FIRM
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

PCR000268

**JAMES J. HAAS**
Public Defender



**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

## Office of the Public Defender

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information: Dan Patterson or any other Representative/Agent of the Maricopa County Public Defender, 1750 S. Mesa Drive, Suite 150, Mesa, AZ 85210-6211.

Patient Name: Wendi Elizabeth Andriano          Date of Birth: 08/26/70
SS#: 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        Purpose for disclosure: Criminal defense
Extent of information to be disclosed: Any and all records including but not limited to medical, physical, psychological records or other.

The undersigned hereby authorizes _____ to provide the above company and/or person identified above with a copy of any and all records, documents, reports, clinical abstracts, histories and charts, of any kind and description, related to care or services provided to the patient named above for the following dates:

In addition to the general authorization to release records, the undersigned further authorizes the individuals or entities listed above to provide a copy of the following records: (please initial)

1.  Records of treatment for drug or alcohol abuse or psychiatric illness:
    X Yes    ___ No

2.  Records of testing diagnosis or treatment for HIV, HIV-related illness, AIDS, AIDS related diseases and communicable disease related information:
    ___ Yes    X No

This authorization shall be considered invalid after six months (or 60 days with respect to drug and alcohol abuse records) from the date of signing. Undersigned may revoke authorization by written notice of revocation. However, undersigned may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease related information, recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by applicable law.

_____    _____    _____    _____
Patient                      Date       Witness                       Date

If patient is unable to consent by reason of age or some other factor, state reasons:

_____

_____    _____    _____
Authorized Representative     Date       Relationship to Patient

_____    _____
Witness                       Date

019332

**LAW FIRM**
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

PCR000269

**JAMES J. HAAS**
Public Defender



**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

## Office of the Public Defender

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information: _Dan Patterson or any other Representative/Agent of the Maricopa County Public Defender, 1750 S. Mesa Drive, Suite 150, Mesa, AZ 85210-6211._

Patient Name: _Wendi Elizabeth Andriano_ Date of Birth: _08/26/70_
SS#: _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_ Purpose for disclosure: _Criminal defense_
Extent of information to be disclosed: _Any and all records including but not limited to medical, physical, psychological records or other._

The undersigned hereby authorizes _____to provide the above company and/or person identified above with a copy of any and all records, documents, reports, clinical abstracts, histories and charts, of any kind and description, related to care or services provided to the patient named above for the following dates:

_____

In addition to the general authorization to release records, the undersigned further authorizes the individuals or entities listed above to provide a copy of the following records: (please initial)

1.    Records of treatment for drug or alcohol abuse or psychiatric illness:
      _X_ Yes    ___ No

2.    Records of testing diagnosis or treatment for HIV, HIV-related illness, AIDS, AIDS related diseases and
      communicable disease related information:
      ___ Yes    _X_ No

This authorization shall be considered invalid after six months (or 60 days with respect to drug and alcohol abuse records) from the date of signing. Undersigned may revoke authorization by written notice of revocation. However, undersigned may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease related information, recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by applicable law.

_Wendi Andriano_____          _____
Patient                    Date          Witness              Date

If patient is unable to consent by reason of age or some other factor, state reasons:

_____

_____

_____          _____
Authorized Representative   Date         Relationship to Patient

_____
Witness                    Date

**LAW FIRM**                                        019333
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

PCR000270

**JAMES J. HAAS**
**Public Defender**



**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

## Office of the Public Defender

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information: _Dan Patterson or any other Representative/Agent of the_ Maricopa County Public Defender, 1750 S. Mesa Drive, Suite 150, Mesa, AZ 85210-6211.

Patient Name: _Wendi Elizabeth Andriano_____ Date of Birth: _08/26/70_
SS#: _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___ Purpose for disclosure: _Criminal defense_
Extent of information to be disclosed: _Any and all records including but not limited to medical, physical, psychological records or other._

The undersigned hereby authorizes _____ to provide the above company and/or person identified above with a copy of any and all records, documents, reports, clinical abstracts, histories and charts, of any kind and description, related to care or services provided to the patient named above for the following dates:

_____

In addition to the general authorization to release records, the undersigned further authorizes the individuals or entities listed above to provide a copy of the following records: (please initial)

1.   Records of treatment for drug or alcohol abuse or psychiatric illness:
      _X_ Yes   ___ No

2.   Records of testing diagnosis or treatment for HIV, HIV-related illness, AIDS, AIDS related diseases and communicable disease related information:
      ___ Yes   _X_ No

This authorization shall be considered invalid after six months (or 60 days with respect to drug and alcohol abuse records) from the date of signing. Undersigned may revoke authorization by written notice of revocation. However, undersigned may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease related information, recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by applicable law.

_____   _____   _____   _____
Patient                Date       Witness                Date

If patient is unable to consent by reason of age or some other factor, state reasons:

_____

_____

_____   _____        _____
Authorized Representative   Date        Relationship to Patient

_____   _____
Witness                Date

019334

**LAW FIRM**
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

PCR000271

**JAMES J. HAAS**
Public Defender



**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

## Office of the Public Defender

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information: __Dan Patterson or any other Representative/Agent of the__
Maricopa County Public Defender, 1750 S. Mesa Drive, Suite 150, Mesa, AZ 85210-6211.

Patient Name: __Wendi Elizabeth Andriano__ _____ Date of Birth: __08/26/70__
SS#: __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__ ___ Purpose for disclosure: __Criminal defense__
Extent of information to be disclosed: __Any and all records including but not limited to medical, physical,__
__psychological records or other.__

The undersigned hereby authorizes _____to provide the above company and/or person identified
above with a copy of any and all records, documents, reports, clinical abstracts, histories and charts, of any kind
and description, related to care or services provided to the patient named above for the following dates:

_____

In addition to the general authorization to release records, the undersigned further authorizes the individuals or
entities listed above to provide a copy of the following records: (please initial)

1.      Records of treatment for drug or alcohol abuse or psychiatric illness:
                                    __X__ Yes    ___ No

2.      Records of testing diagnosis or treatment for HIV, HIV-related illness, AIDS, AIDS related diseases and
        communicable disease related information:
                                    ___ Yes   __X__ No

This authorization shall be considered invalid after six months (or 60 days with respect to drug and alcohol abuse
records) from the date of signing. Undersigned may revoke authorization by written notice of revocation.
However, undersigned may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release
pursuant to this authorization, or records regarding communicable disease related information, recipient of this
information understands that it is prohibited from making any further disclosure of this information unless further
disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by applicable law.

_Wendi Andriano_____  _____  _____  _____
Patient                        Date            Witness                    Date

If patient is unable to consent by reason of age or some other factor, state reasons:

_____

_____

_____   _____    _____
Authorized Representative    Date       Relationship to Patient

_____   _____
Witness                  Date

                                                                019335

**LAW FIRM**
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

PCR000272

**JAMES J. HAAS**
Public Defender



**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

## Office of the Public Defender

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information:__Dan Patterson or any other Representative/Agent of the__ Maricopa County Public Defender, 1750 S. Mesa Drive, Suite 150, Mesa, AZ 85210-6211.

Patient Name:__Wendi Elizabeth Andriano_____ Date of Birth:__08/26/70__
SS#:__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____ Purpose for disclosure: Criminal defense
Extent of information to be disclosed:___Any and all records including but not limited to medical, physical, psychological records or other.__

The undersigned hereby authorizes _____to provide the above company and/or person identified above with a copy of any and all records, documents, reports, clinical abstracts, histories and charts, of any kind and description, related to care or services provided to the patient named above for the following dates:

_____

In addition to the general authorization to release records, the undersigned further authorizes the individuals or entities listed above to provide a copy of the following records: (please initial)

1.  Records of treatment for drug or alcohol abuse or psychiatric illness:
    __X__ Yes ___ No

2.  Records of testing diagnosis or treatment for HIV, HIV-related illness, AIDS, AIDS related diseases and communicable disease related information:
    ___ Yes __X__ No

This authorization shall be considered invalid after six months (or 60 days with respect to drug and alcohol abuse records) from the date of signing. Undersigned may revoke authorization by written notice of revocation. However, undersigned may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease related information, recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by applicable law.

| | | | |
|---|---|---|---|
| Patient | Date | Witness | Date |

If patient is unable to consent by reason of age or some other factor, state reasons:

_____

_____

| | | |
|---|---|---|
| Authorized Representative | Date | Relationship to Patient |

| | |
|---|---|
| Witness | Date |

**019336**

**LAW FIRM**
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

PCR000273

**JAMES J. HAAS**
Interim Public Defender



# Office of
# The Public Defender

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information:_____, Maricopa
County  Public Defender, 1750 S. Mesa Dr., Ste. 150, Mesa, AZ 85210-6211.

Patient Name: _Wendi Andriano_____ Date of Birth: _8-26-70_____
SS#: _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_____ Purpose for disclosure: _Criminal defense_____
Extent of information to be disclosed: _____

The undersigned hereby authorizes _____to provide the
above company and/or person identified above with a copy of any and all records,
documents, reports, clinical abstracts, histories and charts, of any kind and
description, related to care or services provided to the patient named above for
the following dates: _____

In addition to the general authorization to release records, the undersigned
further authorizes the individuals or entitles listed above to provide a copy of
the following records: (please initial)

1.   Records of treatment for drug or alcohol abuse or psychiatric illness:
          _WA_ _/_ Yes      _____ No

2.   Records of testing diagnosis or treatment for HIV, HIV-related illness,
     AIDS, AIDS related diseases and communicable disease related information:
                        _____ Yes     _WA X_ No

This authorization shall be considered invalid after six months (or 60 days with
respect to drug and alcohol abuse records) from the date of signing.  Undersigned
may revoke authorization by written notice of revocation.  However, undersigned
may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal
confidentiality rules and release pursuant to this authorization, or records
regarding communicable disease related information, recipient of this information
understands that it is prohibited from making any further disclosure of this
information unless further disclosure is expressly permitted by written consent
of the undersigned or otherwise permitted by applicable law.

_Wendi Andriano_____ _3-6-02_     _____     _____
Patient                  Date       Witness                 Date

If patient is unable to consent by reason of age or some other factor, state
reasons: _____

_____     _____     _____     _____
Authorized Representative    Date       Witness                 Date

Relationship to Patient _____

**LAW OFFICES**
Southeast Facility • 1750 S. Mesa Drive, Suite 150 • Mesa, Arizona 85210-6211
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

007443

PCR000274

**JAMES J. HAAS**
Interim Public Defender



# Office of
# The Public Defender

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information:_____, Maricopa
County  Public Defender, 1750 S. Mesa Dr., Ste. 150, Mesa, AZ 85210-6211.

Patient Name:_____ Date of Birth: _____
SS#: _____ Purpose for disclosure: _Criminal defense____
Extent of information to be disclosed: _____

The undersigned hereby authorizes _____to provide the
above company and/or person identified above with a copy of any and all records,
documents, reports, clinical abstracts, histories and charts, of any kind and
description, related to care or services provided to the patient named above for
the following dates:  _____

In addition to the general authorization to release records, the undersigned
further authorizes the individuals or entitles listed above to provide a copy of
the following records: (please initial)

1.    Records of treatment for drug or alcohol abuse or psychiatric illness:
      __X_ Yes    _____ No

2.    Records of testing diagnosis or treatment for HIV, HIV-related illness,
      AIDS, AIDS related diseases and communicable disease related information:
      _____ Yes   _X_ No

This authorization shall be considered invalid after six months (or 60 days with
respect to drug and alcohol abuse records) from the date of signing. Undersigned
may revoke authorization by written notice of revocation. However, undersigned
may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal
confidentiality rules and release pursuant to this authorization, or records
regarding communicable disease related information, recipient of this information
understands that it is prohibited from making any further disclosure of this
information unless further disclosure is expressly permitted by written consent
of the undersigned or otherwise permitted by applicable law.

_____ 3-1-02 _____
Patient                  Date    Witness            Date

If patient is unable to consent by reason of age or some other factor, state
reasons: _____

_____ _____  _____
Authorized Representative   Date   Witness            Date

Relationship to Patient _____

**LAW OFFICES**
Southeast Facility • 1750 S. Mesa Drive, Suite 150 • Mesa, Arizona 85210-6211
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

007444

PCR000275

JAMES J. HAAS
Interim Public Defender



## Office of
## The Public Defender

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information:_____, Maricopa
County Public Defender, 1750 S. Mesa Dr., Ste. 150, Mesa, AZ 85210-6211.

Patient Name:_____ Date of Birth: _____
SS#: _____ Purpose for disclosure: _Criminal defense___
Extent of information to be disclosed: _____

The undersigned hereby authorizes _____to provide the
above company and/or person identified above with a copy of any and all records,
documents, reports, clinical abstracts, histories and charts, of any kind and
description, related to care or services provided to the patient named above for
the following dates: _____

In addition to the general authorization to release records, the undersigned
further authorizes the individuals or entitles listed above to provide a copy of
the following records: (please initial)

1.    Records of treatment for drug or alcohol abuse or psychiatric illness:
       __X__ Yes      _____ No

2.    Records of testing diagnosis or treatment for HIV, HIV-related illness,
      AIDS, AIDS related diseases and communicable disease related information:
      _____ Yes   __X__ No

This authorization shall be considered invalid after six months (or 60 days with
respect to drug and alcohol abuse records) from the date of signing.  Undersigned
may revoke authorization by written notice of revocation.  However, undersigned
may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal
confidentiality rules and release pursuant to this authorization, or records
regarding communicable disease related information, recipient of this information
understands that it is prohibited from making any further disclosure of this
information unless further disclosure is expressly permitted by written consent
of the undersigned or otherwise permitted by applicable law.

_____  3-6-02   _____
Patient                    Date      Witness                    Date

If patient is unable to consent by reason of age or some other factor, state
reasons: _____

_____  _____  _____
Authorized Representative   Date    Witness                     Date

Relationship to Patient _____

### LAW OFFICES
Southeast Facility • 1750 S. Mesa Drive, Suite 150 • Mesa, Arizona 85210-6211
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

007116

PCR000276

FEB-04-2003  08:55     CORRECTIONAL HLTH ADMIN          6025062577    P.02

CORRECTIONAL HEALTH SERVICES FOR MARICOPA COUNTY, ARIZONA
225 W. MADISON STREET
ATTENTION: MEDICAL RECORDS DEPARTMENT (4TH FLOOR)
PHOENIX, ARIZONA 85003
PHONE: 602/256-5524    FAX: 602/256-9417

## AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION

FROM: _____   TO: _____
          Name of person or organization              To whom disclosure is to be made.

_____       _____   _____   _____
Address                                              City              State           Zip

PATIENT NAME: _____

DATE OF BIRTH: _____   PATIENT BOOKING OR SS# NUMBER: _____

PURPOSE FOR THE DISCLOSURE: _____

DATES OF SERVICES NEEDED: (TO/FROM): _____

☐   Medication Administration Record       ☐   PROGRESS NOTES
☐   HISTORY and PHYSICAL                   ☐   RADIOLOGY REPORTS
☐   OTHER (Specify): _____          ☐   COMPLETE RECORD
☐

The undersigned hereby authorizes and consents to the disclosure by the above-named clinic to the above-named company or persons, or their representatives, or the bearer of this instrument of any and all information, records, documents, reports, clinical abstracts, histories, and charts, of every kind and description, relating to my condition, care, confinement, and treatment, and consent to the furnishing to them of photostatic copies or other copies of same. I further authorize the clinic listed above to provide information from the following confidential records:

1.  RECORDS OF TREATMENT OR HISTORY OF DRUG OR ALCOHOL ABUSE OR PSYCHIATRIC
    ILLNESS: _____YES _____NO
    Confidential information relating to Mental Health and/or alcohol/drug use under the drug abuse office and treatment act of 1972 (P.L. 92-255) and the comprehensive alcohol abuse and alcoholism prevention treatment, and rehabilitation act of amendments of 1974 (P.L. 93-282).

2.  RECORDS OF TESTING OR HISTORY OF DIAGNOSIS OR TREATMENT FOR HIV, HIV-RELATED
    ILLNESS, AIDS, AIDS-RELATED DISEASE AND COMMUNICABLE DISEASE RELATED
    INFORMATION: _____YES _____NO
    Confidential communicable disease information under ARS 36-661 et seq.

BE IT FURTHER KNOWN that this consent is subject to revocation at any time except to the extent that action has been taken in reliance thereon.

DATE OF CONSENT: _____        DATE OF EXPIRATION OF CONSENT: _____
                                        (90-day limit)

                                        _____
SIGNATURE OF PATIENT                    WITNESS

                                        _____
SIGNATURE OF AUTHORIZED PARTY           WITNESS

Fees: $10.00/first 10 pages and $0.50/page for additional sheets copied. The fee for the record copied for you is $_____ for _____ pages. (There is a $26.00 retrieval fee for records in off-site storage). Please send a cashier's check or money order payable to MARICOPA COUNTY CORRECTIONAL HEALTH SERVICES.

medrel2.doc/ag/1-14-00

007117

PCR000277

FEB-04-2003  09:55      CORRECTIONAL HLTH ADMIN                6025062577    P.02

CORRECTIONAL HEALTH SERVICES FOR MARICOPA COUNTY, ARIZONA
225 W. MADISON STREET
ATTENTION: MEDICAL RECORDS DEPARTMENT (4TH FLOOR)
PHOENIX, ARIZONA 85003
PHONE: 602/256-5524      FAX: 602/256-9417

## AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION

FROM: _____ TO: _____
　　　　Name of person or organization　　　　To whom disclosure is to be made.

_____
Address　　　　　　　　　　　　　　　City　　　　State　　　Zip

PATIENT NAME: _____

DATE OF BIRTH: _____ PATIENT BOOKING OR SS# NUMBER: _____

PURPOSE FOR THE DISCLOSURE: _____

DATES OF SERVICES NEEDED: (TO/FROM): _____

☐　Medication Administration Record　☐　PROGRESS NOTES
☐　HISTORY and PHYSICAL　　　　　　☐　RADIOLOGY REPORTS
☐　OTHER (Specify): _____　☐　COMPLETE RECORD

The undersigned hereby authorizes and consents to the disclosure by the above-named clinic to the above-named company or persons, or their representatives, or the bearer of this instrument of any and all information, records, documents, reports, clinical abstracts, histories, and charts, of every kind and description, relating to my condition, care, confinement, and treatment, and consent to the furnishing to them of photostatic copies or other copies of same. I further authorize the clinic listed above to provide information from the following confidential records:

1. RECORDS OF TREATMENT OR HISTORY OF DRUG OR ALCOHOL ABUSE OR PSYCHIATRIC
   ILLNESS: _____ YES _____ NO
   Confidential information relating to Mental Health and/or alcohol/drug use under the drug abuse office and treatment act of 1972 (P.L. 92-255) and the comprehensive alcohol abuse and alcoholism prevention treatment, and rehabilitation act of amendments of 1974 (P.L. 93-282).

2. RECORDS OF TESTING OR HISTORY OF DIAGNOSIS OR TREATMENT FOR HIV, HIV-RELATED
   ILLNESS, AIDS, AIDS-RELATED DISEASE AND COMMUNICABLE DISEASE RELATED
   INFORMATION: _____ YES _____ NO
   Confidential communicable disease information under ARS 36-661 et seq.

BE IT FURTHER KNOWN that this consent is subject to revocation at any time except to the extent that action has been taken in reliance thereon.

DATE OF CONSENT: _____          DATE OF EXPIRATION OF CONSENT: _____
　　　　　　　　　　　　　　　　　　　　(90-day limit)

　　　　　　　　　　　　　　　　　　　　_____
SIGNATURE OF PATIENT　　　　　　　　　　　WITNESS

_____            WITNESS
SIGNATURE OF AUTHORIZED PARTY

Fees: $10.00/first 10 pages and $0.50/page for additional sheets copied. The fee for the record copied for you is $_____ for _____ pages. (There is a $26.00 retrieval fee for records in off-site storage). Please send a cashier's check or money order payable to MARICOPA COUNTY CORRECTIONAL HEALTH SERVICES.

medrel2.doc/ag/1-14-00

007118

PCR000278

**JAMES J. HAAS**
**Public Defender**



**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

## Office of the Public Defender

INTEROFFICE MEMORANDUM

TO:       INITIAL SERVICES

FROM:     PATTY   Moncada   Group F

DATE:     August 7, 2002

RE:       State v. Wendi Andriano; CR00-96032        Est  B30/-03

Please have Ms. Andriano sign, but do not date the attached Authorizations.  She is located at:

Wendi Elizabeth Andriano, #A631830
Estrella Jail
2939 W. Durango
Phoenix, AZ

If you have any questions, please contact me at my extension 62133

Thanks :)

~Patty~
Legal Assistant Grp. F
Ext 62133

019327

**LAW FIRM**
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

PCR000279

**JAMES J. HAAS**
Public Defender



**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

## Office of the Public Defender

### AUTHORIZATION

Re:   Wendi Andriano   DOB:  08/26/70

To Whom It May Concern:

I hereby request and authorize you to disclose whenever requested to do so by the Office of the Public Defender or its representatives, any and all information you may have relative to my case.

A photocopy of this authorization shall be considered as effective and valid as the original.

_Wendi Andriano_ 8-9-02          _Joceun Lod_ 8/9/02
Client signature (or guardian)   Date          Witness signature          Date

**LAW FIRM**
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

019328

PCR000280

**JAMES J. HAAS**
Public Defender



**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

## Office of the Public Defender

### <u>AUTHORIZATION</u>

Re:   <u>Wendi Andriano    DOB:  08/26/70</u>

To Whom It May Concern:

I hereby request and authorize you to disclose whenever requested to do so by the Office of the Public Defender or its representatives, any and all information you may have relative to my case.

A photocopy of this authorization shall be considered as effective and valid as the original.

_____ 8-9-02            _____ 8/9/02
Client signature (or guardian)   Date         Witness signature         Date

**LAW FIRM**
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

019329

PCR000281

P-App. 003323

**JAMES J. HAAS**
Public Defender



LARRY GRANT
Chief Trial Deputy – East Valley

PETER C. ROSALES
Group F Counsel

## Office of the Public Defender

### AUTHORIZATION

Re:   Wendi Andriano   DOB:  08/26/70

To Whom It May Concern:

I hereby request and authorize you to disclose whenever requested to do so by the Office of the Public Defender or its representatives, any and all information you may have relative to my case.

A photocopy of this authorization shall be considered as effective and valid as the original.

Client signature (or guardian)     Date          Witness signature          Date

$\underline{8\text{-}9\text{-}02}$          $\underline{8/9/02}$

**LAW FIRM**
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

019330

PCR000282

# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

JAMES J. HAAS
Public Defender

**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information:  Dan Patterson or any other Representative/Agent of the
Maricopa County Public Defender, 1750 S. Mesa Drive, Suite 150, Mesa, AZ 85210-6211.

Patient Name:  Wendi Elizabeth Andriano_____  Date of Birth:  08/26/70
SS#:  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 ___  Purpose for disclosure: Criminal defense
Extent of information to be disclosed:  _Any and all records including but not limited to medical, physical,
psychological records or other.

The undersigned hereby authorizes Casa Grande Counseling Center to provide the above company and/or person identified
above with a copy of any and all records, documents, reports, clinical abstracts, histories and charts, of any kind
and description, related to care or services provided to the patient named above for the following dates:
_____January ↔ March  1990_____

In addition to the general authorization to release records, the undersigned further authorizes the individuals or
entitles listed above to provide a copy of the following records: (please initial)

1.      Records of treatment for drug or alcohol abuse or psychiatric illness:
                        _X_ Yes     ___ No .

2.      Records of testing diagnosis or treatment for HIV, HIV-related illness, AIDS, AIDS related diseases and
        communicable disease related information:
                        ___ Yes    _X_ No

This authorization shall be considered invalid after six months (or 60 days with respect to drug and alcohol abuse
records) from the date of signing.  Undersigned may revoke authorization by written notice of revocation.
However, undersigned may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release
pursuant to this authorization, or records regarding communicable disease related information, recipient of this
information understands that it is prohibited from making any further disclosure of this information unless further
disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by applicable law.

_Wendi Andriano_ 4/30/03      _Jennifer Mox_ 4/30/03
Patient              Date         Witness            Date

If patient is unable to consent by reason of age or some other factor, state reasons:

_____

_____    _____    _____
Authorized Representative      Date       Relationship to Patient

_____    _____
Witness              Date

**LAW FIRM**
Southeast Facility • 222 East Javelina, Suite 1300 • Mesa, Arizona 85210-6201  007570
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

PCR000283

# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

### JAMES J. HAAS
Public Defender

LARRY GRANT
Chief Trial Deputy – East Valley

PETER C. ROSALES
Group F Counsel

### AUTHORIZATION

Re:   Wendi Andriano   DOB:   08/26/70

To Whom It May Concern:

I hereby request and authorize you to disclose whenever requested to do so by the Office of the Public Defender or its representatives, any and all information you may have relative to my case.

A photocopy of this authorization shall be considered as effective and valid as the original.

_____        _____
Client signature (or guardian)    Date        Witness signature        Date

LAW FIRM
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • FAX (602) 506-2865 • TT (602) 506-1646

*Delivering America's Promise of Justice for All*

019337

PCR000284

# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

**JAMES J. HAAS**
**Public Defender**

**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

## **AUTHORIZATION**

Re:   Wendi Andriano     DOB:   08/26/70

To Whom It May Concern:

I hereby request and authorize you to disclose whenever requested to do so by the Office of the Public Defender or its representatives, any and all information you may have relative to my case.

A photocopy of this authorization shall be considered as effective and valid as the original.

_____     _____
Client signature (or guardian)     Date

_____     _____
Witness signature     Date

**LAW FIRM**
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • FAX (602) 506-2865 • TT (602) 506-1646

019338

*Delivering America's Promise of Justice for All*

PCR000285

# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

JAMES J. HAAS
Public Defender

**LARRY GRANT**
Chief Trial Deputy – East Valley

**PETER C. ROSALES**
Group F Counsel

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information:  Dan Patterson or any other Representative/Agent of the Maricopa County Public Defender, 1750 S. Mesa Drive, Suite 150, Mesa, AZ 85210-6211.

Patient Name:  Wendi Elizabeth Andriano          Date of Birth:  08/26/70
SS#:  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          Purpose for disclosure: Criminal defense
Extent of information to be disclosed:   Any and all records including but not limited to medical, physical, psychological records or other.

The undersigned hereby authorizes _____to provide the above company and/or person identified above with a copy of any and all records, documents, reports, clinical abstracts, histories and charts, of any kind and description, related to care or services provided to the patient named above for the following dates:

_____

In addition to the general authorization to release records, the undersigned further authorizes the individuals or entities listed above to provide a copy of the following records: (please initial)

1.     Records of treatment for drug or alcohol abuse or psychiatric illness:
                    _X_ Yes   ___ No

2.     Records of testing diagnosis or treatment for HIV, HIV-related illness, AIDS, AIDS related diseases and communicable disease related information:
                    ___ Yes _X_ No

This authorization shall be considered invalid after six months (or 60 days with respect to drug and alcohol abuse records) from the date of signing.  Undersigned may revoke authorization by written notice of revocation.  However, undersigned may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease related information, recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by applicable law.

_____     _____     _____     _____
Patient                                         Date          Witness                                       Date

If patient is unable to consent by reason of age or some other factor, state reasons:

_____

_____

_____     _____     _____
Authorized Representative          Date          Relationship to Patient

_____     _____
Witness                                         Date

**LAW FIRM**
Southeast Facility • 222 East Javelina, Suite 1300 • Mesa, Arizona 85210-6201
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646          019343

PCR000286

# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

JAMES J. HAAS
Public Defender

LARRY GRANT
Chief Trial Deputy – East Valley

PETER C. ROSALES
Group F Counsel

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information: __Dan Patterson or any other Representative/Agent of the__ Maricopa County Public Defender, 1750 S. Mesa Drive, Suite 150, Mesa, AZ 85210-6211.

Patient Name: __Wendi Elizabeth Andriano__ Date of Birth: __08/26/70__
SS#: __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__ Purpose for disclosure: __Criminal defense__
Extent of information to be disclosed: __Any and all records including but not limited to medical, physical,__ __psychological records or other.__

The undersigned hereby authorizes _____ to provide the above company and/or person identified above with a copy of any and all records, documents, reports, clinical abstracts, histories and charts, of any kind and description, related to care or services provided to the patient named above for the following dates:

_____

In addition to the general authorization to release records, the undersigned further authorizes the individuals or entitles listed above to provide a copy of the following records: (please initial)

1.  Records of treatment for drug or alcohol abuse or psychiatric illness:
    __X__ Yes ___ No

2.  Records of testing diagnosis or treatment for HIV, HIV-related illness, AIDS, AIDS related diseases and communicable disease related information:
    ___ Yes __X__ No

This authorization shall be considered invalid after six months (or 60 days with respect to drug and alcohol abuse records) from the date of signing. Undersigned may revoke authorization by written notice of revocation. However, undersigned may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease related information, recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by applicable law.

_____  _____    _____  _____
Patient                    Date           Witness                     Date

If patient is unable to consent by reason of age or some other factor, state reasons:

_____


_____  _____    _____
Authorized Representative   Date           Relationship to Patient


_____  _____
Witness                    Date

**LAW FIRM**                                          019344
Southeast Facility • 222 East Javelina, Suite 1300 • Mesa, Arizona 85210-6201
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

PCR000287

# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

JAMES J. HAAS
Public Defender

**LARRY GRANT**
Chief Trial Deputy – East Valley

PETER C. ROSALES
Group F Counsel

### AUTHORIZATION AND RELEASE TO DISCLOSE MEDICAL RECORDS
### INCLUDING HIV & AIDS RELATED INFORMATION DISCLOSURE

Company/Persons Authorized to Receive Information:  Dan Patterson or any other Representative/Agent of the Maricopa County Public Defender, 1750 S. Mesa Drive, Suite 150, Mesa, AZ 85210-6211.

Patient Name:  Wendi Elizabeth Andriano_____ Date of Birth: 08/26/70
SS#:  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 ___ Purpose for disclosure: Criminal defense
Extent of information to be disclosed:  Any and all records including but not limited to medical, physical, psychological records or other.

The undersigned hereby authorizes _____ to provide the above company and/or person identified above with a copy of any and all records, documents, reports, clinical abstracts, histories and charts, of any kind and description, related to care or services provided to the patient named above for the following dates:

_____

In addition to the general authorization to release records, the undersigned further authorizes the individuals or entities listed above to provide a copy of the following records: (please initial)

1.    Records of treatment for drug or alcohol abuse or psychiatric illness:
            WA _X_ Yes    ___ No

2.    Records of testing diagnosis or treatment for HIV, HIV-related illness, AIDS, AIDS related diseases and
      communicable disease related information:
                  ___ Yes WA _X_ No

This authorization shall be considered invalid after six months (or 60 days with respect to drug and alcohol abuse records) from the date of signing.  Undersigned may revoke authorization by written notice of revocation.  However, undersigned may not revoke authorization retroactively for information already released.

With respect to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease related information, recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by applicable law.

_____     _____     _____     _____
Patient                        Date      Witness                        Date

If patient is unable to consent by reason of age or some other factor, state reasons:

_____

_____


_____     _____     _____
Authorized Representative      Date      Relationship to Patient


_____     _____
Witness                        Date

**019345**

**LAW FIRM**
Southeast Facility • 222 East Javelina, Suite 1300 • Mesa, Arizona 85210-6201
(602) 506-2200 • (FAX) 506-2865 • (TT) 506-1646

PCR000288

May 23 03 09:39a

H.Kandy Rohde
Certified Professional Counselor CC-2814
5507 East Shea Blvd.
Scottsdale AZ 85254
480-443-9313

### Authorization for Release of Information

I, Wendi Andriano, hereby authorize H.Kandy Rohde to release information regarding my treatment to: Dan Patterson or Patrick Linderman of the Public Defenders Office. Release is for all treatment notes.

I understand that I may revoke this authorization at any time, except to the extent that action based on this authorization has already been taken. This consent will expire automatically one year from the date on which it is signed.

_____   Date   5-23-03

005385

PCR000289

P-App. 003331

# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

LARRY GRANT
Chief Trial Deputy – East Valley

JAMES J. HAAS
Public Defender

LANCE C. ANTONSON
Group C Counsel

To:   Hospitals and Medical Facilities
      Treatment Facilities
      Educational Facilities
      Government Agencies

Employers
Counselors/Psychologists
Medical Professionals
Academic

From: _____

RE: _____   DOB: _____   SSN: _____

Date: _____

Please release **all appropriate records** for the above referenced individual for the purpose of criminal defense preparation by the Maricopa County Office of the Public Defender. The approximate date of the requested records is_____.

The undersigned hereby authorizes _____ to provide copies of any and all records (documents, reports, charts, charting notes, evaluations, diagnosis, test score data, grades, etc.) pertaining to family/social and psychological histories, medical psychiatric information, educational (including individual treatment plans) records, treatment facility documentation (both substance-abuse and mental health and employment verification.

Please initial for treatment of substance abuse and/or psychiatric illness: ✓___Yes ___No

This authorization shall be considered invalid after six months (or 60 days with respect to active drug and alcohol abuse records) from the date of signing. The undersigned may revoke authorization by written notice of revocation. However, undersigned may not revoke authorization retroactively for information already released.

With regard to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease-related information, the recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by application of the law.

_____  5-23-03
Client signature (or guardian)     Date

_____ 5-23-03
Witness signature            Date

**LAW FIRM**
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • FAX (602) 506-2865 • TT (602) 506-1646

*Delivering America's Promise of Justice for All*

005386

PCR000290

# OFFICE OF THE PUBLIC DEFENDER
## MARICOPA COUNTY

JAMES J. HAAS
Public Defender

LANCE C. ANTONSON
Group C Counsel

To:   Hospitals and Medical Facilities       Employers
      Treatment Facilities                    Counselors/Psychologists
      Educational Facilities                  Medical Professionals
      Government Agencies                     Academic

From:   Maricopa County Public Defender

RE:  Wendi Andriano         DOB:  8-26-70   SSN:  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

Date:   5-23-2003

Please release **all appropriate records** for the above referenced individual for the purpose of
criminal defense preparation by the Maricopa County Office of the Public Defender. The
approximate date of the requested records is   January 2001 to Present   .

The undersigned hereby authorizes  H. Kandy Rohde   to provide copies of any and all
records (documents, reports, charts, charting notes, evaluations, diagnosis, test score data,
grades, etc.) pertaining to family/social and psychological histories, medical psychiatric
information, educational (including individual treatment plans) records, treatment facility
documentation (both substance-abuse and mental health and employment verification.

Please initial for treatment of substance abuse and/or psychiatric illness:  ✓  Yes  ____No

This authorization shall be considered invalid after six months (or 60 days with respect to active
drug and alcohol abuse records) from the date of signing. The undersigned may revoke
authorization by written notice of revocation. However, undersigned may not revoke
authorization retroactively for information already released.

With regard to any drug/alcohol abuse treatment information protected by federal confidentiality
rules and release pursuant to this authorization, or records regarding communicable disease-
related information, the recipient of this information understands that it is prohibited from
making any further disclosure of this information unless further disclosure is expressly permitted
by written consent of the undersigned or otherwise permitted by application of the law.

Wendi Andriano      5-23-03          Pat S. Funderman  5 - 23 - 03
Client signature (or guardian)   Date .    Witness signature        Date

LAW FIRM
Southeast Facility • 1750 South Mesa Drive, Suite 150 • Mesa, Arizona 85210
(602) 506-2200 • FAX (602) 506-2865 • TT (602) 506-1646

*Delivering America's Promise of Justice for All*

005384

PCR000291

P-App. 003333



CORRECTIONAL HEALTH SERVICES FOR MARICOPA COUNTY, ARIZONA
ATTENTION: MEDICAL RECORDS DEPARTMENT (4TH FLOOR)
225 W. MADISON STREET
PHOENIX, ARIZONA 85003
PHONE: 602/256-5524    FAX: 602/256-9417

## AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION

I, _Wendi Andriano_ _A631830_ _8/26/70_ , hereby authorize
PATIENT NAME          BOOKING No. OR SS No.      DATE OF BIRTH
to disclose the following specific

protected health information from _6/11/03_ to _Present_ at my request to _Maricopa County_
                                     (Date)              (Date)
_Office of the Public Defender_      _1750 S. Mesa Dr., Suite 150,_
                                     NAME AND ADDRESS
_Mesa, Arizona 85210_   c/o _Patrick Linderman_

Specific description of information to be disclosed and purpose for disclosure: _Legal_

The following information may also be disclosed, as applicable (check all that apply):
- _____ CONFIDENTIAL HIV AND AIDS-RELATED INFORMATION.
- _____ CONFIDENTIAL COMMUNICABLE DISEASE-RELATED INFORMATION.
- _____ CONFIDENTIAL ALCOHOL OR DRUG ABUSE-RELATED INFORMATION.
- _X_ CONFIDENTIAL MENTAL HEALTH DIAGNOSIS/TREATMENT INFORMATION.
- _____ CONFIDENTIAL GENETIC TESTING INFORMATION.

I hereby release anyone disclosing or receiving the records or information specified above pursuant to this authorization from any and all liability arising from that disclosure. I understand that I may revoke this authorization by writing, to the covered entity, at any time, except to the extent that action has been taken in reliance upon it. With respect to all information other than HIV and AIDS-related information, this authorization will expire on the earlier of three-hundred-sixty-five (365) days after the date of this signature or the following expiration date, _____. With respect to HIV and AIDS-related information, this authorization will expire six months from the date of signing, or the expiration date, whichever is earlier.

I understand that the covered entity may not condition treatment, payment, enrollment or eligibility for benefits on whether I sign this authorization. I understand that information disclosed pursuant to this authorization may be subject to redisclosure by the recipient and may no longer be protected by federal privacy regulations.

Date _11-3-03_      Signature of Patient _W Andriano_

                    Witness _Patrick Linderman_

If Patient is unable to give consent because of physical condition or age, complete the following:

         Patient is a minor ( ____ Year of age), or is unable to give consent because _____

         _____

Date _____    Signature of Parent/Guardian/POA _____

Relationship _____    Witness _____

PROHIBITION OF REDISCLOSURE: If the information disclosed relates to substance abuse treatment, the confidentiality of these records is protected by federal law. Federal regulations (42 CFR Part 2) prohibit any further disclosure without the specific written consent of the person to whom it pertains, or as otherwise permitted by such regulations. A general authorization for the release of medical or other information is not sufficient to release substance abuse records. The Federal Rule restricts any use of the information to criminally investigate or prosecute any substance abuse patient. State laws may also protect the confidentiality of patient records.    012882

Fees: $10.00/first 10 pages and $0.50/page for additional sheets copied. The fee for the record copied for you is $_____ for _____ pages. (There is a $25.00 retrieval fee for records in off-site storage). Please send a cashier's check or money order payable to MARICOPA COUNTY CORRECTIONAL HEALTH SERVICES.

PCR000292

JAMES J. HAAS
Public Defender



DONNA L. ELM
Chief Trial Deputy - Downtown

SHELLEY T. DAVIS
Group A Supervisor

SUSAN L. COREY
Group A Counsel

## Office of the Public Defender

To:     Hospitals and Medical Facilities        Employers
        Treatment Facilities                    Counselors/Psychologists
        Educational Facilities                  Medical Professionals
        Government Agencies                     Academic

From:   Scott A. Mac Leod, M. Ed .
        Mitigation Specialist

RE: _____ DOB: _____ SSN: _____

Date: _____

Please release **all appropriate records** for the above referenced individual for the
purpose of criminal defense preparation by the Maricopa County Office of the Public
Defender. The approximate date of the requested records is _____.

The undersigned hereby authorizes _____, to provide Scott A. Mac
Leod,M.Ed. with a copy of any and all records (documents, reports, charts, charting
notes, evaluations, diagnosis, test score data, grades, etc.) pertaining to family/social and
psychological histories, medical psychiatric information, educational (including
individual treatment plans) records, treatment facility documentation (both substance
abuse and mental health and employment verification)'.

Please initial for treatment of substance abuse and/or psychiatric illness: _✓_Yes__No

This authorization shall be considered invalid after six months (or 60 days with respect to
active drug and alcohol abuse records) from the date of signing. The undersigned may
revoke authorization by written notice of revocation. However, undersigned may not
revoke authorization retroactively for information already released.

With regard to any drug/alcohol abuse treatment information protected by federal
confidentiality rules and release pursuant to this authorization, or records regarding
communicable disease-related information. the recipient of this information understands
that it is prohibited from making any further disclosure of this information unless further
disclosure is expressly permitted by written consent of the undersigned or otherwise
permitted by application of the law.

_____  4-22-04   _____   4-22-04
Client signature (or guardian)  Date    Witness signature        Date

LAW FIRM
Luhrs Building • 11 West Jefferson, Suite 5 • Phoenix, Arizona 85003-2302
(602) 506-1088 • (FAX) 506-1904 • (TT) 506-1646

004247

PCR000293



JAMES J. HAAS
Public Defender

DONNA L. ELM
Chief Trial Deputy - Downtown

SHELLEY T. DAVIS
Group A Supervisor

SUSAN L. COREY
Group A Counsel

## Office of the Public Defender

To:  Hospitals and Medical Facilities
     Treatment Facilities
     Educational Facilities
     Government Agencies

Employers
Counselors/Psychologists
Medical Professionals
Academic

From: Scott A. Mac Leod, M. Ed
      Mitigation Specialist

RE: _____ DOB: _____ SSN: _____

Date: _____

Please release **all appropriate** records for the above referenced individual for the purpose of criminal defense preparation by the Maricopa County Office of the Public Defender. The approximate date of the requested records is _____.

The undersigned hereby authorizes _____, to provide Scott A. Mac Leod, M.Ed. with a copy of any and all records (documents, reports, charts, charting notes, evaluations, diagnosis, test score data, grades, etc.) pertaining to family/social and psychological histories, medical psychiatric information, educational (including individual treatment plans) records, treatment facility documentation (both substance abuse and mental health and employment verification).

Please initial for treatment of substance abuse and/or psychiatric illness  __ Yes  __ No

This authorization shall be considered invalid after six months (or 60 days with respect to active drug and alcohol abuse records) from the date of signing. The undersigned may revoke authorization by written notice of revocation. However, undersigned may not revoke authorization retroactively for information already released.

With regard to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease-related information, the recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by application of the law.

_____  4-22-04      _____  4-22-04
Client signature (or guardian)  Date      Witness signature  Date

007281

LAW FIRM
Luhrs Building • 11 West Jefferson, Suite 5 • Phoenix, Arizona 85003-2302
(602) 506-1088 • (FAX) 506-1904 • (TT) 506-1646

PCR000294



JAMES J. HAAS
Public Defender

DONNA L. ELM
Chief Trial Deputy - Downtown

SHELLEY T. DAVIS
Group A Supervisor

SUSAN L. COREY
Group A Counsel

## Office of the Public Defender

To:  Hospitals and Medical Facilities
     Treatment Facilities
     Educational Facilities
     Government Agencies

     Employers
     Counselors/Psychologists
     Medical Professionals
     Academic

From: Scott A. Mac Leod, M. Ed
      Mitigation Specialist

RE: _____ DOB: _____ SSN: _____

Date: _____

Please release **all appropriate** records for the above referenced individual for the purpose of criminal defense preparation by the Maricopa County Office of the Public Defender. The approximate date of the requested records is _____.

The undersigned hereby authorizes _____ to provide Scott A. Mac Leod,M.Ed. with a copy of any and all records (documents, reports, charts, charting notes, evaluations, diagnosis, test score data, grades, etc.) pertaining to family/social and psychological histories, medical psychiatric information, educational (including individual treatment plans) records, treatment facility documentation (both substance abuse and mental health and employment verification)'.

Please initial for treatment of substance abuse and/or psychiatric illness: ✓Yes __No

This authorization shall be considered invalid after six months (or 60 days with respect to active drug and alcohol abuse records) from the date of signing. The undersigned may revoke authorization by written notice of revocation. However, undersigned may not revoke authorization retroactively for information already released.

With regard to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease-related information, the recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by application of the law.

_____ 4-22-04    _____ 4-22-04
Client signature (or guardian)  Date    Witness Signature    Date

007282

LAW FIRM
Luhrs Building • 11 West Jefferson, Suite 5 • Phoenix, Arizona 85003-2302
(602) 506-1088 • (FAX) 506-1904 • (TT) 506-1646

PCR000295



JAMES J. HAAS
Public Defender

DONNA L. ELM
Chief Trial Deputy - Downtown

SHELLEY T. DAVIS
Group A Supervisor

SUSAN L. COREY
Group A Counsel

## Office of the Public Defender

To:   Hospitals and Medical Facilities         Employers
      Treatment Facilities                     Counselors/Psychologists
      Educational Facilities                   Medical Professionals
      Government Agencies                       Academic

From: Scott A. Mac Leod, M. Ed
      Mitigation Specialist

RE: _____ DOB: _____ SSN: _____

Date: _____

Please release **all appropriate records** for the above referenced individual for the purpose of criminal defense preparation by the Maricopa County Office of the Public Defender. The approximate date of the requested records is _____.

The undersigned hereby authorizes _____, to provide Scott A. Mac Leod, M.Ed. with a copy of any and all records (documents, reports, charts, charting notes, evaluations, diagnosis, test score data, grades, etc.) pertaining to family/social and psychological histories, medical psychiatric information, educational (including individual treatment plans) records, treatment facility documentation (both substance abuse and mental health and employment verification)'.

Please initial for treatment of substance abuse and/or psychiatric illness: _X_Yes __No

This authorization shall be considered invalid after six months (or 60 days with respect to active drug and alcohol abuse records) from the date of signing. The undersigned may revoke authorization by written notice of revocation. However, undersigned may not revoke authorization retroactively for information already released.

With regard to any drug/alcohol abuse treatment information protected by federal confidentiality rules and release pursuant to this authorization, or records regarding communicable disease-related information, the recipient of this information understands that it is prohibited from making any further disclosure of this information unless further disclosure is expressly permitted by written consent of the undersigned or otherwise permitted by application of the law.

_____   4-22-04      _____   4-22-04
Client signature (or guardian)   Date      Witness signature   Date

UU7283

LAW FIRM
Luhrs Building • 11 West Jefferson, Suite 5 • Phoenix, Arizona 85003-2302
(602) 506-1088 • (FAX) 506-1904 • (TT) 506-1646

PCR000296

DANIEL B. PATTERSON
Deputy Public Defender
11 West Jefferson, Suite 5
Phoenix, AZ  85003
(602) 506-6463
FAX:  (602) 506-5001
Bar No. 005743
Attorney for Defendant

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | No. CR 2000-096032 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MOTION FOR COURT ORDER TO** |
| vs. | ) | **ASSIST MITIGATION** |
| | ) | **INVESTIGATION AND PROPOSED** |
| WENDI ELIZABETH ANDRIANO, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | (Assigned to the Honorable Brian K. |
| | ) | Ishikawa) |
| | ) | |

Defendant Wendi Elizabeth Andriano, by and through undersigned counsel, moves the

court for an order directing state and local agencies and entities to provide records regarding

Ms. Andriano and her family to the defense.  If any state or local agency or entity possesses

any records relating to Ms. Andriano or her family, the defense needs to obtain them to

conduct an independent and thorough mitigation investigation in this capital case.

1

011810

PCR000297

This motion is supported by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 4, 15 and 24 of the Arizona Constitution. This motion is further supported by the attached Memorandum of Points and Authorities.

RESPECTFULLY SUBMITTED this 19th day of November, 2004.

Maricopa County Public Defender

By _____
DANIEL B. PATTERSON
Deputy Public Defender

2

011811

PCR000298

## MEMORANDUM OF POINTS AND AUTHORITIES

Pursuant to her rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 4, 15, and 24 of the Arizona Constitution, Ms. Andriano is entitled to have her defense attorneys conduct an independent and thorough investigation of potential mitigating information to be used at the sentencing proceeding. In order to conduct an independent and thorough investigation, the defense must obtain all records documenting Ms. Andriano's life. This motion seeks the assistance of the court in obtaining such records in the possession of any state or local public agency in the State of Arizona.

A capital defendant has an unqualified right to present any facet of her character, background, or record that might call for a sentence less than death. *See Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982); *Lockett v. Ohio*, 438 U.S. 586, 602-03 (1978) (plurality opinion). The investigation into the existence of any mitigating circumstances must be conducted in accordance with the recently revised guidelines for defense counsel in capital cases. *See* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (revised 2003) [hereinafter "ABA GUIDELINES"]. The Guidelines "are not aspirational, . . . [but rather] embody the current consensus about what is required to provide effective defense representation in capital cases." *History of* ABA GUIDELINE 1.1. The United States Supreme Court has affirmed that the Guidelines are the established standards for capital defense counsel. *Wiggins v. Smith*, _____ U.S. _____,

3

011812

PCR000299

123 S.Ct. 2527, 2537 (2003) (The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases are "well-defined norms."). *See also* Ariz.R.Crim.P. 6.8(b)(1)(iii).

Defense counsel must conduct "thorough and independent" investigations relating to issues of both guilt and penalty. ABA GUIDELINE 10.7. Penalty phase preparation requires an extensive and unparalleled investigation into the personal and family history of the accused. *Commentary to* ABA GUIDELINE 10.7. Mitigation investigations must include "efforts to discover *all reasonably available* mitigating evidence and evidence to rebut aggravating evidence that may be introduced by the prosecutor. *Wiggins*, 123 S.Ct. at 2537 (emphasis in original). This is because the sentencer in a capital case may not refuse to consider or be precluded from considering any relevant mitigating evidence. *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987). *See also Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).

A significant step in the mitigation investigation is the creation of a social history, which is used to identify events and circumstances of a capital defendant's life. A social history is required "to construct a persuasive narrative, rather than to simply present a catalog of seemingly unrelated mitigating factors." Commentary to ABA GUIDELINE 10.11. Construction of the narrative "normally requires evidence that sets forth and explains the client's complete social history from before conception to the present." *Id.*

4

011813

PCR000300

Any records relating to Ms. Andriano or her family that may be in the possession of state or local agencies are necessary to build his social history. The defense must obtain these records in order to conduct the required independent and thorough investigation into Ms. Andriano's background. The proposed Order will assist the defense in obtaining these records without the need to subpoena each individual agency to produce the records.

The proposed Order will also help to keep Ms. Andriano's privileged records from the prosecution and law enforcement until and unless disclosure of the records is required by Rule 15.2 of the Arizona Rules of Criminal Procedure. Just as the prosecution is entitled to conduct its investigation independently from the defense, so, too, Ms. Andriano's defense team is entitled to collect her records without fear that they will be disclosed to the prosecution regardless of their privileged nature. If the records will be used at any phase of the trial, their disclosure to the prosecution should be the decision of defense counsel, rather than that of an employee of a public agency in possession of the records.

For the foregoing reasons, Ms. Andriano asks the court to sign the proposed Order.

RESPECTFULLY SUBMITTED this ____ day of November, 2004.

Maricopa County Public Defender

By _____
DANIEL B. PATTERSON
Deputy Public Defender

5

011814

PCR000301

Copy of the foregoing mailed/
delivered this ___ day of November, 2004, to:

THE HONORABLE BRIAN K. ISHIKAWA
Judge of the Superior Court
Southeast Court Building, 3rd Floor
222 East Javelina
Mesa, Arizona 85210

JUAN MARTINEZ
Deputy County Attorney
Maricopa County Attorney's Office
301 W. Jefferson, 8th Floor
Phoenix, AZ 85003

G. DAVID DELOZIER
Attorney At Law
4016 East Forest Pleasant Place
Cave Creek, AZ 85331

By: _____
     DANIEL B. PATTERSON
     Deputy Public Defender

6

011815

PCR000302

# SEXUAL ABUSE AS MITIGATION

Recently I had the opportunity to attend a seminar on sexual abuse in Lexington, presented by Carondelet Management Institute. This seminar was directed toward helping professionals in various disciplines who may encounter situations of sexual abuse or sexual abuse survivors. My intent in attending the seminar was to gain a deeper understanding of the signs and symptoms presented by survivors, to better identify individuals and/or families in which sexual abuse is present. This subtopic was thoroughly covered, as well as the dysfunctional dynamics that emerge in families with sexual abuse, unhealthy coping mechanisms of survivors, and treatment techniques with the highest success rates. For the purposes of a professional who is attempting to identify areas of mitigation, identification of the abuse survivor and perpetrator is the most important information to share. The following is a compilation of characteristics of the sexual abuse survivor:

1. Fear of the dark and/or sleeping alone
2. Nightmares
3. Lack of physical self-care
4. Eating disorders and related symptoms of such; distorted body image
5. Alcoholism and drug abuse, or total abstinence
6. Various phobias, such as agoraphobia or claustrophobia
7. Striving for perfection that seems obsessive in nature
8. Self-mutilation and self-destructiveness
9. Depression
10. Hysterical physical symptoms of illness
11. Compulsive behaviors
12. Blocking out memories of early years
13. Mistrust of others
14. "Victim" patterns in lifestyle/relationship choices
15. Rigidity in thought processes
16. Anger issues(rage disorders or total inability to express anger)
17. Discrimination against race/gender of perpetrator
18. Sexual issues in adult relationships
19. Gynecological problems; physical/psychosomatic symptoms such as gastrointestinal concerns, headaches, or arthritis
20. Minimization of childhood problems or complete denial of such problems
21. Dissociative (formerly multiple personality) disorders

The characteristics identifying sexual abuse perpetrators are, unfortunately, much less specific. In fact, it was stressed throughout the seminar to be constantly aware that many unlikely individuals are revealed as perpetrators. With that in mind, the following is a descriptive profile of the sexual abuse perpetrator:

1. Male or female
2. Likely to be a sexual abuse survivor
3. Substance abuser
4. Charming demeanor
5. Possibly a pillar of the community
6. Likely from a sexually dysfunctional family system
7. May be a pedophile
8. May be a sex addict
9. Denial
10. Dissociation
11. Rage issues
12. Shame/guilt issues
13. Exhibits antisocial personality traits/ disorder

000219

PCR000303

Besides identifying characteristics of the survivor and perpetrator, a person actively searching for signs of sexual abuse should carefully seek signs of sexual abuse family dynamics when observing interactions amongst family members. This requires an understanding of **trauma bonds**, attachments and acquired roles of family members which are not present in a healthy family. An example of a traumatic bond that often develops in a sexually abusive household is a "surrogate spouse" bond between the perpetrator and victim; this dynamic presents as an unusually close relationship between the perpetrator and victim, with the child victim practically replacing the role of the other parent or adult in the household.

An individual investigating a possibly sexually abusive situation should look for this type of unhealthy dynamic, as well as other unusual child roles, such as a child with decision-making power or control on a level with that of an adult parent.

The power of sexual abuse mitigation is obvious and apparent. It is one area in which no blame typically is placed upon the victim/survivor for the situation. Sexual abuse most often emerges as an issue in childhood, and most people would agree that children are not able to defend themselves against this type of abuse and manipulation. The variety and severity of problems sexual abuse creates for the adult survivor(and possible future perpetrator) can go a long way in explaining inappropriate, dysfunctional and destructive behavior that our clients often exhibit.

If any readers have a particular interest in this area and would like more information about sexual abuse and successful treatment, I would be happy to share the literature I received at the seminar.

**VALERIE BRYAN**
Capital Post-Conviction Branch
100 Fair Oaks Lane, Suite 301
Frankfort, KY 40601
Tel: (502) 564-3948
Fax: (502) 564-3949

The Advocate, Vol. 20, No. 2  (March 1998)

 Return to the Table of Contents

000220

PCR000304

P-App. 003346

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5994          Feb. 12 2001 08:19AM P1

Page 1 of 1

*Andriano*

| | |
|---|---|
| Subj: | **early years** |
| Date: | 2/12/01 7:32:05 AM US Mountain Standard Time |
| From: | grandmaochoa@hotmail.com (Donna Ochoa) |
| To: | GDDeLozier@aol.com |
| File: | **earlyyea.zip** (11507 bytes) DL Time (28800 bps): < 1 minute |

I've done a short early history on Wendi. If more is needed, please ask
Kandy what sort of details she'd like. I have pictures, too.

I added a little to Joe/Wendi's history re: trip to Vegas this past May.
After he grabbed Wendi, Joe grabbed the luggage and started just throwing it
in the back of the Yukon. Didn't care where or how hard, he was angry.

I've attached other concerns re police. Will be done with rest of interviews
in couple days. We do not have Wendi's interviews on paper, do you? I'm
trying real hard not to be anal and realize these are summaries and not
transcribed notes.

We received your faxes.

Praise God and have a blessed day! We pray for all of you daily.

Alejo & Donna

Get your FREE download of MSN Explorer at http://explorer.msn.com

---------------------- Headers ----------------------
Return-Path: <grandmaochoa@hotmail.com>
Received: from rly-xb05.mx.aol.com (rly-xb05.mail.aol.com [172.20.105.106]) by air-xb04.mail.aol.com
(v77_r1.21) with ESMTP; Mon, 12 Feb 2001 09:32:05 -0500
Received: from hotmail.com (f269.law11.hotmail.com [64.4.16.164]) by rly-xb05.mx.aol.com (v77_r1.21) with
ESMTP; Mon, 12 Feb 2001 09:29:25 -0500
Received: from mail pickup service by hotmail.com with Microsoft SMTPSVC;
Mon, 12 Feb 2001 06:29:25 -0800
Received: from 206.165.25.80 by lw11fd.law11.hotmail.msn.com with HTTP;   Mon, 12 Feb 2001 14:29:25
GMT
X-Originating-IP: [206.165.25.80]
From: "Donna Ochoa" <grandmaochoa@hotmail.com>
To: GDDeLozier@aol.com
Subject: early years
Date: Mon, 12 Feb 2001 07:29:25 -0700
Mime-Version: 1.0
Content-Type: multipart/mixed; boundary="----=_NextPart_000_6caf_46fc_52f1"
Message-ID: <F269yl67EKRuYDlrjbu00009a87@hotmail.com>
X-OriginalArrivalTime: 12 Feb 2001 14:29:25.0335 (UTC) FILETIME=[32EDAE70:01C09500]

008349

Monday, February 12, 2001     America Online: GDDeLozier

PCR000305

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5894          Feb. 12 2001 08:19AM P2

*ANDRIANO*

**Wendi's early years:**

I (Donna) was married at 18 years of age. I had lived in Tucson, AZ from age 8. My dad was in the Navy, he worked as a recruiter then retired and became a restaurant owner. I was in the Flowing Wells district all my school years. My father was an alcoholic and my mom was really a good person (though I preferred my dad at the time). They fought all the time. I went with a boy through high school, then broke up when I when he went to college (1 year ahead of me). married Skip (Shelby Robertson), in Feb. 1968. N He had returned from Viet Nam on Dec. 24, 1967. He was my best friend's step uncle. Her father had died in a mining accident when we were 9 and her mother remarried Buck Robertson, Skip's older brother when we were in Jr. Hi I never dated him in school or even thought much of him (he was the kind that was always getting into trouble, skipped school, had sleeves rolled up with cigs in them). The fall of 1967, I was in college. Right before Christmas break I broke up with my boyfriend at school. Christmas eve when Skip returned to Tucson, I was drunk and when he made a pass at me, I caught it. We dated the whole time he was home on leave. Seemed to have changed. By February that year we were married and I moved to San Clemente, CA to be with him.

We had okay marriage until he got out of service (spring of 1969) and we came back to Arizona. His brothers all drove trucks and he had promised he wouldn't. He went to trade school, but didn't finish and then started driving long distance trucks, too. Things got worse, but we had promised each other we wouldn't ever get a divorce because everyone (the families) thought we couldn't make it together. Being stubborn, we were going to show them. The fall of 1969, I got fed up with the drinking and never having any money. He would never have any left after a haul, it all went to expenses. Being young and naive I believed it. I took off and went to Tucson and stayed with a girlfriend. Skip came looking for me and said if I wanted, we could live in Tucson and he'd try to find another job. I was so tired of his father, the father was really old (60's) and he proceeded to get pregnant. I was so tired of his father, the father was really old (60's) and he proceeded to get pregnant. brothers all mooched of his other. (Six brothers, two sisters) (family was from Austin, Texas - all drunks and partying cowboys) Wendi was due in August 1970. In June 1970, he lost my job, packed home and said he had a job in Groom, Texas and that we were moving. I quit my job, packed and we took off. Six months pregnant in a small mustang was a trip. Got there and he had a job at a small truck stop (really a gas station) in Groom (pop. 600, maybe) on Route 66, about 40 miles east of Amarillo. I was miserable and would sit in the car for hours playing the 8 track by Charley Pride about "going back to Phoenix, Arizona." That is where Wendi was born on August 26, 1970. I started having contraction in July, my mother came out the end of July to help. My husband was running around with some older lady and I had no clue, I just knew he didn't come home much, even before mom came out. We lived in a big farm house and my mom was staying in the attic which had a separate entrance (she was working in a restaurant there) Wendi was born on a Wednesday and we stayed in hospital till Saturday morning. She was the only baby in the hospital (in Groom, for surrounding communities) and was spoiled by the nurses. She was 7 pounds 11 ounces and 21 inches long. No hair and black eyes. She was beautiful. Was an easy delivery, the doctor almost didn't make it back to catch her.

On Labor Day, we had snow and Skip decided we needed to move back to Arizona (later found out that the girl he'd been messing around with was pregnant and he didn't want to be named the father). Mom, Skip and I moved into a house in Phoenix (mom usually paid the rent) and I started working at another Stewart Title. We moved houses a couple times and landed in one around 35th Ave. south of McDowell. Mom was working at Garcia's on 35th and had her own place. I was working at US Life Title at that time. Skip was still running around, driving trucks.

Wendi was a really good baby. She had colic in Texas and mom and I would take turns rocking her. I nursed her for 4 months then she went on the bottle. She was a chunk, she started baby cereal at 2 ½ months. The money that I made went to paying bills and food. I

008350

FROM : G. David DeLozier,P.C.        PHONE NO. : 602 867 5894        Feb. 12 2001 08:20PM P3

never expected any from Skip. But by this time he would come home and *tell me* I was gaining weight, or that I wasn't raising Wendi right, etc. I was afraid of him when he drank because he would start swinging, especially if he was thinking about Nam. The first few years we were married I would have to wake him up by touching his feet, because he would come up swinging. He wanted to go to the cowboy bars whenever he was home (I didn't grow up on that, I had liked rock and roll) and I just wanted to please him. [Sounds like history repeated itself - I have just never really faced it before). I felt like I couldn't leave him because I wouldn't be able to make it on my own. He talked down to me so much that I had no self esteem. (didn't know that expression back then) I had always been an 'A' student in school, took college prep classes, had looked forward to doing great things. Had wanted to be a pharmacist and was sharp enough to have done it. Wendi was taken care of by my mom for a while. Wendi would go to a baby-sitter. Skip was the one that had Wendi potty trained by 11 months. He had babysat for his older brothers and sisters all his life. He was good with her those first two years, I think.

We moved to Tempe early 1972. I transferred to the Tempe office of USLife Title. I worked as an Escrow secretary then as the Assistant Escrow Officer. Down the street was a day care center where I took Wendi. She learned dance, French, etc. A Montessori school believe. Occasionally I would go on a weekend run to LA with Skip and his sister-in-laws would watch Wendi. She was a really loving child, loved to hug and cuddle.

During those first years, Wendi was around my mom and me mostly. Skip was not home very often. He drove what was called 'garbage' trucks. They hauled anything and everything. He and his brothers did lots of pills and booze.

In May 1971, Skip was arrested in Ohio for robbery. He had parked his rig, went to a bar. Got drunk and pilled up. He walked into a residence and stole money and was going through the house when the owner woke up chased him out with a baseball bat. Skip flagged down a car, which was a police officer and was busted. My mother paid his way out and the fees. ($5000) In 1972 he destroyed government property with his truck and mom paid that one too ($3000). My mom helped support us many times throughout our 6 years fiasco.

This part is hard. Sometime in 1972 rumors were flying through the family that the grandpa (Skip's dad) was touching the granddaughters inappropriately. (All different ages, from 1 to 14.) Of course, the brothers all said they were crazy, their dad wouldn't do that (macho rednecks from Texas) and the kids were lying. To this day I still do not know how much if true and how much wasn't. And I know that I didn't want to believe it as Wendi had been around the grandpa numerous times. And I have thought of it through the years, and have been scared about it. One of Skip's older brothers had been in prison twice and another one once.

One of the girls in my office was dating the director of Terros (drug program in Phoenix). She talked me into going to counseling there because of my marriage. It was definitely on the rocks. Skip hadn't changed and I was starting to get stronger. I started going over there and went through counseling (Gestalt, I'm OK, You're OK type stuff). Started volunteering at the Terros House. Emergency phone lines for druggies, clinic, ambulance service. I started taking classes at Phoenix College to become and psychologist to help other people. I also took EMT classes and received my EMT II certification. At the time you could not be rated any higher that that, only firefighters could go on to be a paramedic. I worked on the Terros ambulance whenever they needed me. Eventually I quit my job at USLife and went to work for CODAC (Community Organization for Drug and Alcohol Corporation) in the accounting department. I kept records and was learning to write grants. CODAC was the umbrella organization for lots of different substance abuse programs. Right next door to the CODAC office was part of Terros. At this location the handled addicts. It was a place for detox and also for handing out methadone. At times I would take Wendi there with me and the ones that had detoxed would talk to her, etc. Lots of the women had children of their own (usually hookers) and they loved seeing her. It was almost therapy for them. They wanted to be able to see their own children when they were straight like they were seeing Wendi. She was <u>never</u> alone with any of them.

008351

PCR000307

She was such an outgoing child, I always watched over her very closely. She especially loved old people, we'd go to the parks and she's head straight for them. She has continued that love for them through out her entire life. She's always been very patient with the elderly and the young children. Young children have always gravitated to her. She treats them like little people.

Towards the end of 1973 I began telling Skip I wanted out, I wanted a divorce. Her would cry and promise to do better, stop drinking, etc. Never happened and I was still a sucker. Figured be hard to find another husband as I had a child. Sometimes our thought processes are so screwed. Finally, in March of 1974 I told him no more. I was leaving. He tried to talk me out of it but this time he knew I was serious and would do it. (strange, we were driving from Phoenix to Maricopa where I was taking him to meet his brother with a load of cattle) I still did have a hard time standing up for myself and he finally said, won't you think about getting back together in a year or two? Like a chicken I said okay. Prior to this I had started dating a real estate agent I had met at work several years before. We had dated a few times, and I realized I wasn't such a loser. That there were people out there that thought I was worth something. We had a good relationship. No abuse (Skip would get rough with me, he hit me once but not again. He would try to hurt me when we had sex. Or he would just cut me down verbally.)

After the divorce was final in May 1974, I continued working at CODAC. Wendi would go to a nursery downtown that was attended by other whit collar worker's children. It was a good school, I do not recall the name. That summer my mom and I moved in with each other so we both took care of Wendi. My mother loved Wendi like she was her own. I remember getting jealous a few times when Wendi would call her 'mom.' But mom was a good stable influence on Wendi. At Christmas that year, Wendi and I went with a young man I was seeing (he had just returned from Thailand being in the Peace Corp) to his family's home in Flagstaff. It was great. In January I went to work at Casa Grande for PADAC (Pinal Alcohol and Drug Abuse Corporation). I had met the director that fall at a Convention in Scottsdale and had been doing grant work for him on the side. When he got money available to hire me he did so and I moved to Casa Grande. I met my husband, Alejo prior to moving. Alejo was on the Board of Directors for PADAC and had met me and had to approve my hire.

The facility I worked at was downtown Casa Grande. Around the corner was a used furniture store run by one of the old-timers in town (Stoney-his last name). Very nice man, retired, etc. Wendi would be down there with me sometimes. She would sneak out the door and stand there asking people for money. She was so cute they gave it to her. A couple times she wandered over to Stoney's. He'd be sitting on his rocking chair and he'd keep an eye on her. If she looked like she was going to go anywhere else, he'd walk her back to the center. Normally she was at the day care, this would be on the weekends.

Alejo and I were married 6/6/75. We all moved out of our apartment when the lease ran out and moved into his mom's house. We were having a house built and only stayed there a couple months. We had dogs, which Wendi always loved. She has felt she was missing something if she didn't have a dog. The one she grew up with (Toby), she would sit and hold him and tell him all her problems.

Wendi and Alejo loved each other from the start. When we were dating, he tell her something to do and she'd look at him with her hands on her hips and say, "You can't tell me what to do, you're not MY boss." He'd just laugh and say okay, but wouldn't you like to do this? She'd do it, feeling like she had won the contest.

From the time she was small I wanted her to be independent. Able to ask for things by herself. I didn't want her to be like me. Afraid to confront anyone. In some area she did turn out like that. She's bold enough to go after what she wanted in the area of school. In areas where she wasn't connected personally with someone. But she wouldn't stand up for her rights. She always tried to make other people happy.

008352

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5694          Feb. 12 2001 08:22AM P5

She went to kindergarten and first grade in Casa Grande. After that she was home schooled until December 1979. We were in the ministry beginning June 1977 and traveled with an evangelistic group. There were 4 married couples, she was the only child. Her use of the English language really grew at that time with being around adults. She sang with the group and did solos while she played the guitar. When we came back to Casa Grande in November 1979, it took her awhile to get used to kids around all the time. Even when she was small, if someone wanted something of hers, she gave it to them. She did that all through her childhood. When she got her first credit card, she let her friends use it and didn't complain when they didn't pay it. If you needed her dress, it was yours. She gave total strangers money. She had been taught that "give and it shall be given to you." She was always a giver. She was and is a 'care-taker.' When my mother was in the nursing home in South Dakota in 1988 - 1991, Wendi would go back there and hang out at the home. The elderly loved her and she had no problem being around them. It takes a special person to do that. I personally couldn't.

Wendi was even tempered as a child, she loved animals and was always trying to bring puppies and kittens home. We had our share of goldfish, too. She played well with other kids and she shared well.

She wasn't the kind to let you sleep in late on the weekend. She'd get up early and come in my room and want to talk. I'd turn on the TV and cartoons and tell her to watch them. Five minutes later she was back. She wasn't addicted to the TV.

One of my favorite stories has always been this one: When she was around two years old  we were driving over to Mesa on Broadway. She'd ask me a question, I'd answer, she'd say "Why?" I'd answer again, she'd reply, "Why?" Over and over, finally I told her that was enough, no more "Why's?" She looked at me and said, "I thought you wanted me to learn!" Her vocabulary was very good for her age.

She walked at 10 months, was potty trained by 11 months, her first tooth didn't come in till she was 14 months and she had none to very little hair until she was over two years. She was definitely a 'precocious' child.

008353

PCR000309

## Michelle Arvanitas - PDX

| | |
|---|---|
| From: | Donna Ochoa [grandmaochoa@hotmail.com] |
| Sent: | Wednesday, February 26, 2003 5:29 PM |
| To: | arvanitas@mail.maricopa.gov |
| Cc: | pattersond@mail.maricopa.gov; GDDeLozler@aol.com |
| Subject: | Andriano |

Michelle,
I don't remember if I gave you al of this information before.  This is
Wendi's biological father and his location:

Shelby Wayne Robertson
dob - 3/11/48
ADC Inmate No. 100374
ASPC - Eyman
State ID # - 09534466

It states the maximum term is 17/00/00

MSN 8 with e-mail virus protection service: 2 months FREE*
http://join.msn.com/?page=features/virus

1

002173

PCR000310

P-App. 003352

1    <u>STATE VS.WENDI ANDRIANO</u>
                          CR 2000-96032
2
                    INTERVIEW OF CHRIS WEAVER
3                       TAPE 1, SIDE A & B

4    DAN PATTERSON, DEPUTY PUBLIC DEFENDER
                    , DEPUTY COUNTY ATTORNEY
5
     Date of Interview:                    Time:
6
     Present:
7
                    :           , Deputy Public Defender
8                   :           , Deputy County Attorney
                    ??:         Unknown Female Interviewer
9                   CW:         Chris Weaver, Witness

10

11   (Telephone interview began before tape was started.)

12   CW:   Yeah, we were, uh, --

13   ??:   -- Young boys, or? --

14   CW:   Yeah, we were 16, 17 years old when we met. Let's see, we would have been, uh,
           uh, sophomore in high school is when we met.
15
     ??:   Okay. And you said you re, re-met in 83, or is that when you initially met?
16
     CW:   Well that's when we initially met. I, I, I was born in Casa Grande, then we moved
17         away and then moved back in 83.

18   ??:   Okay.

19   CW:   And, uh, that's when I met Joe. I met him thorough some friends at school that I'd
           known when I lived down here previously. And, uh, they introduced me to Joe and
20         we had a lot of the same interests. We were both into motorcycles and quads and
           really anything that was fast, uh, um, we just had a whole lot of the same interests.
21
     ??:   Okay. What was his personality like?
22

                                            1                    000546

PCR000311

1   CW:   Uh, really outgoing. –

2   ??:   -- Coming from a guy. A guy view.

3   CW:   He was, he was a hard worker. He had, uh, he had his own business for years and
         years. He farmed a couple of years, um, he farmed for his dad also. Um, he had a
4        welding business in, uh, he'd help anybody out that needed help. Uh, we wasn't
         afraid to try different things, different types of jobs and whatnot. Um, he was a
5        really outgoing guy.

6   ??:   So he was really friendly with other people, and?

7   CW:   Oh yeah.

8   ??:   Pretty generous?

9   CW:   Yeah, he, he could talk to anybody and talk to them about whatever and, uh, a lot
         of people that he met I think he just met by going up and start talking to them and
10       stuff like that. But, no he was a, he was a real, real personable guy.

11  ??:   Was his temperament, um, calm? Was he, did he get excited easy? Was he
         assertive? Aggressive? Um, violent? Where, where do you place his, you know –
12
    CW:   -- Um –
13
    ??:   -- through that time period. I know you mature and change but what?
14
    CW:   Right. But through high school, I never, never knew him to get into any fights
15       through school. Um, I really can't even think of him getting into a fight after high
         school either. Uh, he'd get mad at his brother but, you know, that, that's brothers
16       that are like that. But he'd, it, he would never be mad to the point where he would
         like try and hit him or, or hurt him or anything like that. He'd yell at him maybe
17       tell him, "Well, get out of here", or whatever there. And sometimes he'd even
         leave, but, no I never knew Joe to be a, a violent guy.
18
    ??:   Now which brother is that?
19
    CW:   James.
20
    ??:   Oh James. Okay.
21
    CW:   (Unintelligible) Yeah, he's only got one brother.
22

2

000547

PCR000312

| | | |
|---|---|---|
| 1 | ??: | That's right. His father and his brother. |
| 2 | CW: | Right. |
| 3 | ??: | And he's a little bit younger wasn't he? James? |
| 4 | CW: | Yeah. James, uh, let me, I'm not sure exactly how old he is. I'd have to say he's probably maybe seven or eight years younger. |
| 5 | ??: | Okay. |
| 6 | CW: | Maybe a little more. I'm, I'm not real sure. |
| 7 | ??: | Would he? Was he, would you say, a ladies man? Did he date a lot? Was he? |
| 8 | CW: | Joe? No, I wouldn't say a ladies man. Um, let's see in high school, in high school, |
| 9 | | I think from the time I knew him, he might have had two, maybe three girlfriends, um, after high school, after high school I can only think of one girl that he dated |
| 10 | | and they didn't date very long. She was kind of real wishy-washy. And, uh, -- |
| 11 | ??: | -- Was that Shelly? |
| 12 | CW: | No, uh, I can't think of the girl's name. Rodriguez I think was her last name. But, |
| 13 | | uh, no he dated Shelly for long time. I don't know how many years to be honest with ya, um – |
| 14 | ??: | -- So that was like his first serious girlfriend? |
| 15 | CW: | Right. Yeah, that's what I would say. And then, uh, after he and Shelly broke up, |
| 16 | | um, I don't think he dated anybody until he met Wendi. Yeah I don't think he met anybod – or dated anybody until he met Wendi. |
| 17 | ??: | Why did he and Shelly break up, do you know? |
| 18 | CW: | Um, I believe it was Shelly was messing around with another guy, uh, I don't |
| 19 | | know what his, his actual name is. We always referred to him as Bo Diddley, for some reason, but don't ask me why, but, that name just always seemed to come |
| 20 | | about whenever we'd talk about it, but, uh, no I think Shelly had another boyfriend and broke up with Joe and had another boyfriend. |
| 21 | ??: | Oh, okay. Now I understand, I don't know – |
| 22 | CW: | -- And it was, he's a quite a bit older guy too. |

000548

3

PCR000313

1  ??:  Oh is that right?

2  CW:  Yeah.

3  ??:  I'm not sure if my information's correct but I, I have it written down that Shelly
4       actually got pregnant and had an abortion?

5  CW:  Yes, that's true.

6  ??:  Is that true? And it was Joe's baby?

7  CW:  Yeah, yeah. It --

8  ??:  -- Was that something Joe talked to you about or?

9  CW:  Yeah, we were, um, in fact, let me think here. I think he might have been living
       with me when that had happened.
10
   ??:  So it was in a year or two out of high school?
11
   CW:  Right.
12
   ??:  So did he want the abortion? Did she kindof go against his will? Did he encourage
13      it or what, what was the situation there?

14 CW:  Um, you know I really can't remember. Uh, --

15 ??:  -- I know it's been awhile.

16 CW:  Yeah. It's been, yes a long time. Probably about 89? Um, I really don't remember.
       I remember finding out that Shelly was pregnant but she -- I, I, do believe that it
17     was a mutual agreement that she did have the abortion. Um, and Joe, I know Joe
       was upset about it. He, he felt bad that she'd got pregnant and that she was getting
18     an abortion, but they knew that, that at the time it was probably the best thing
       because neither one of them, I don't think, were really ready to be parents.
19
   ??:  Okay. So they were fairly young?
20
   CW:  Right. I would say Joes was probably 21 at the time, 20, 21.
21
   ??:  Were you, did you say you were around he and Wendi quite a bit? You knew their
22      relationship? Or was that when you didn't see him as often?

4                                       000549

PCR000314

1  CW:  Um, no I knew em, I knew em pretty well. We'd go out, uh, we'd go out to, uh,
2       this bar up in Chandler and we'd go dancing and whatnot. Um, I'd known Wendi
        before she met Joe. She, she dated a friend of mine that I worked with in, uh, I
3       don't know how long they dated. That's how I, that's how I knew Wendi before
        she met Joe was, um, oh what was that guys name, uh? Johnny? Shoot, I'm blank
4       right now. Anyway, it's a short little Hispanic guy, um, they dated for a little while
        and then they broke up. Um, I didn't know Wendi much while she was dating that
5       other guy but after she met Joe and I started knowing her more because she was
        around Joe all the time and visa versa. Joe was around her all the time. But, um,
6       they always seemed to get along good whenever I was around and after Joe had
        found out that he had cancer, uh, he still tried to work as much as he could. I
7       know he had mentioned to me a lot of times that he just didn't have a whole lot of
        energy when he was going through a lot of his treatments and stuff, and, uh, he'd
8       be tired and whatnot. But he still seemed to be the outgoing type of guy and, uh,
        there'd been a lot of time where, I regret it now but, at the time I wasn't thinking
9       about it, but he'd, he'd say, "Hey, why don't you see if you can get that day off, or
        this day coming up off and we'll go up to the lake?" "Well, I'll see what I can do."
10      And I never, I never did take the time to do it and I wish –

11 ??:  -- Cause you were working? Is that? --

12 CW:  -- Right. I, I wish that I would have taken time out to go do that because I guess I
        was just trying to ignore the fact that yeah, he had cancer, and yeah that he was
13      gonna die that maybe if I didn't do it he would be around longer. And I just, I tried
        to avoid –
14
   ??:  -- So you knew, you knew it was a given that, that he was going to die? Was that
15      pretty much a given?

16 CW:  Yeah, cause –

17 ??:  -- And it was like well he's – will die, it's just when?

18 CW:  Right, um, from what, what I'd heard about the cancer that he had that, that it was
        spreading throughout his body and, uh, that it was (unintelligible) like September.
19      About the middle, the end of August, first part of September. Something like that,
        um, Wendi had called me up and said, "Hey, we're gonna go to Rockin Rodeo
20      tonight with Brandon and Del and supposed to be a bunch of other people there
        and why don't you come up?" I was single at the time, I said, "Oh, okay I'll come
21      up and meet you guys." And she goes, uh, "Have you talked to Joe lately?" I said,
        "Nah, it's been a week or so, why?" She goes, "Well, he had another doctor's
22      appointment." I said, "Oh really. And what'd they say?" She said, "Well the, the

5

000550

PCR000315

| | | |
|---|---|---|
| 1 | | cancer has spread throughout his lungs now and up into his chest and they're only giving him about a month to live." |
| 2 | ??: | Ooh. |
| 3 | CW: | Oh, (unintelligible) Jesus. So. |
| 4 | ??: | And that was in August? |
| 5 | CW: | In Sep – end of September – first part of September, end of August. Somewhere in |
| 6 | | that area. And, uh, I thought ah, geez, so (inaudible) – |
| 7 | ??: | -- How did she take that? Did she seem upset, or what, surprised? – |
| 8 | CW: | -- Um – |
| 9 | ??: | -- Or what was her? |
| 10 | CW: | She didn't, she didn't really seem upset about it, um, I don't know that she was |
| 11 | | surprised about it either cause I think all of us, all of us guys that were all friends with Joe, we all kindof knew that, yeah, we could, we could slowly see him getting into like a, I don't know what you want to call it, uh, more like a downhill |
| 12 | | mode where he didn't have as much energy and stuff and he just – but he always kept good spirits so I had to give him credit for that because that night when we |
| 13 | | were up there and, uh, I'd asked him about it, he just tried to like ignore the fact, more or less ignore what I'd said. And, uh, he kept talking about his boat, yeah, |
| 14 | | well I'm gonna do this and this and I think after the first year I'm going to do this to it and that'll make it go a lot faster and he didn't, it was – I had to give him |
| 15 | | credit for, for ignoring it thinking that, yeah he's, in his own mind, yeah he wasn't gonna die that he was gonna be around longer and that he wasn't afraid of it, but |
| 16 | | he had it whipped. But – |
| 17 | ??: | -- So do you think he thought he was going to live or he just wasn't, didn't want to talk about dieing? |
| 18 | | |
| 19 | CW: | Um, I think he, I think he thought. Hold on just a sec. (He appears to be speaking to someone in the background) Um, I think he knew it but he was just trying to deny the fact that he knew that it was gonna happen and I think that he was trying, |
| 20 | | trying to treat it kindof like I was. Ignoring the fact that yeah it was going to happen. I've already lost, before Joe had died I had a good friend that, uh, was |
| 21 | | killed in a car accident and he was practically like my brother. |
| 22 | ??: | Oh. |

000551

6

PCR000316

1

CW:  In, uh, in. So when I found out Joe was dieing that it me hard. It's like my God,
2        you know it's happening to another good friend of mine and I really haven't, up
          until here recently, probably about the past five, six months, I really haven't tried
3        to get anybody that is a good friend that we go out and do stuff together all the
          time and whatnot because I just felt that you know it, you get attached to a friend
4        and you guys go out and have fun then something happens and then it hurts you
          for a long time.

5

??:   Yeah (unintelligible) getting close when they just die on you.
6

CW:  Right and that's practically the way it was and then I just didn't want to do it
7        anymore. It, it hurt me to see it and then to admit it and know that it was gonna
          happen. And, uh, I just didn't like –

8

??:   -- So you both pretty much just overlooked it and talked about boating or ATVs –
9

CW:  -- Oh yeah, we'd always, we'd always talk about. Cause he had, uh, quads and he,
10       he loved going to the dunes. Um, probably the only thing he like more than going
          to the dunes was going to the lake. And, uh, he loved the lake. He could, he could
11       spend seven days a week at the lake and never have a bad day. But, uh, he loved
          going to the lake.

12

??:   So if he was going to the lake and boating and building his boat, how was he – and
13       he wasn't working, right? At this point?

14    CW:  No, he was still, he was still working. He was working, uh, part-time for, um, uh,
15       can't think of the name of the boat shop. There's a boat shop in, uh, in East Mesa.

??:   Oh, okay.
16

CW:  I can't think of the name. He was, he was, uh, uh, rebuilding jet pumps for em.
17       (Inaudible) –

18    ??:   -- So was he working for parts, or working or money?

19    CW:  No, he was working for money.

20    ??:   Oh, okay. So that, is that how he paid his boat habit so to speak?

21    CW:  Right. That and then, uh, he was also, he would go down and help, uh, Larry's
          Engine and Marine in Tucson. Build motors down there. And, uh, for a while he

22

000552

7

PCR000317

P-App. 003359

1       had his own glass business, he was doing, uh, windshields and stuff like that. And making money –

2

3   ??:   – That was, that was before he moved to, uh, Maricopa County isn't it? Before he got as sick? –

4   CW:   – No, uh, I believe he was still doing it after he moved up there too. Um –

5   ??:   – Okay. Right, real close to when he died was he doing that? Or was it? –

6   CW:   – No he wasn't doing it anymore when he got close to dieing, no.

7   ??:   Oh, okay. How did he treat, uh, Wendi from what you saw?

8   CW:   Um, every time we were around each other, he always treated her real good, uh, never badmouthed her. Nev – they never. Everybody has their little arguments but

9       it was never a, like a heated argument where they really got mad at each other. Um, they never seemed, never seemed like anything was really that big of a deal.

10

11   ??:   Okay.

12   CW:   Um, they never did get into any bad arguments around me, um, I never heard em talk about any of em, uh, and Joe and I, we'd talk quite a bit. I know, I know there

13       towards the end he, he kept making little comments that he thought Wendi had a boyfriend. And then when he would go to the lake he'd take off and from the time

14       he would leave his house to the time he would get on the interstate, like ten minutes and he would call back to the house and the babysitter would be over

15       there and she's already up and gone. And, uh –

16   ??:   – Is that when she was working full time? When she was running the apartment?

17   CW:   The apartments, yeah. But this would be like on a weekend when they, when she wouldn't have to go to the office or anything and, uh, there'd be times where I

18       would go up to Rockin Rodeo and I would see Wendi up there. And I'd "Hey where's Joe?" "Oh, he's at home, or he's at the lake this weekend." "Oh, who you

19       here with?" "Oh, I'm with my friends over here." She had a couple friends, I can't remember what their names were but a couple of them, they weren't the type that

20       you would really want to write home to mom about. They didn't, they didn't appear that way anyways.

21   ??:   Yeah.

22

8

000353

PCR000318

1  CW: And, uh, I never – I'd said anything to Joe about it. I'd, I might mention to him like, "Hey, I saw Wendi up there last weekend and danced with her a couple of

2  times," and whatnot, but I never, I don't know if I should have or what but I never really tried to pay attention to what she was doing because I figure you know,

3  every once in awhile couples need to get out and go out with their friends and have fun. So I didn't really pay attention to if she dance with one guy five or six times

4  or, or where they went after they got off the dance floor or anything like that. I didn't. Cause I had other friends up there too that I would go up and talk to and

5  whatnot. But, um, I know he'd made the comment quite a few times that, uh, that he thought that she had a boyfriend and he just didn't know who it was.

6
   ??: Was this, um, within six months of him dieing? A year? A few months? Or what
7  was the time period? –

8  CW: -- Yeah. Within, within about, within about six months.

9  ??: He started to suspect something? Is that what it was?

10 CW: Yeah, yeah.

11 ??: Okay. What -- did, did he ever mention, "I wish I could find a way to kill myself so I don't have to suffer?" Or, um?
12
   CW: No. He, he never did, um, it, it just really kindof struck me that he had so much
13 faith and willpower that he, that he wasn't gonna die or that he always acted like he wasn't gonna die. Um, I couldn't imagine Joe saying that, that he would just
14 kill himself so he wouldn't have to suffer. I know, uh, I saw him right after he had the operation where they removed a lot of the muscle on his jawbone and, uh, he
15 was just in super spirits. It was like, my God, ya know, the guy that's gone through what you're going through, it's awesome.
16
   ??: You mean almost like he didn't fit, or? –
17
   CW: -- I mean I'd, I'd, I'd be a basket case –
18
   ??: -- Yeah, so would I. So it didn't seem like a normal type of up? Was it too positive
19 considering what he was going through, or?

20 CW: Um, no it just seemed like Joe. He – Joe had got in a car accident. Uh, we were in high school, believe it might have been our junior year.
21
   ??: Yeah.
22

9

UUU554

| | | |
|---|---|---|
| 1 | CW: | He'd wrecked a – he was passing a car and then the car turned in front of him and |
| | | hit him and then he went through a, uh, power pole and, uh, the steering wheel hit |
| 2 | | him on the chest and it left a big bruise up on his chest where he had hit it. Even |
| | | after that he had, he had some sore ribs but Joe was still Mr. Happy-Go-Lucky. |
| 3 | | Always laughing. Make a joke out of a bad situation. He was a riot sometimes to |
| | | be around. |
| 4 | | |
| | ??: | Yeah. I heard he was a pretty fun guy. |
| 5 | | |
| | CW: | He was. He was, he was a lot of fun. |
| 6 | | |
| | ??: | What about, was he a drinker? A nondrinker? Didn't really party or? |
| 7 | | |
| | CW: | Um, after he got, after he got the cancer he didn't, he didn't drink anymore. Um, |
| 8 | | he'd drink a lot of waters. Um, once in awhile a coke but he didn't, he didn't drink |
| | | beers anymore and I'd ask him every once in awhile, hey, when we were up there |
| 9 | | at the bar or whatever, "Hey man you want me to buy you a beer or can I buy you |
| | | a beer?" "No, I'm, I'm alright." Okay, he'd just drink water. Um, I don't know, his |
| 10 | | dad's a, a pretty religious man. So is his mother and, uh, his dad was an alcoholic |
| | | and, uh, I don't know if maybe Joe was afraid that if he did drink that would just |
| 11 | | hurt him more or I don't know if the doctors told him that or what. But, uh, he |
| | | didn't, he stopped drinking after he got the cancer. |
| 12 | | |
| | ??: | Oh, so you saw a definite, he drank before the cancer and once he found out he |
| 13 | | totally stopped, huh? |
| 14 | CW: | Right, right. |
| 15 | ??: | Did he have a close relationship with his dad that you – or parents, I guess I could |
| | | say? |
| 16 | | |
| | CW: | Um, yeah I'd say it was pretty close. They, they talked quite a bit, um, we used to |
| 17 | | always laugh as we always called his dad's office the Waterburger, drink coffee |
| | | and eat breakfast. If you wanted to find his dad, you would go to Waterburger and |
| 18 | | look for him there first before you went anywhere else. But, uh, we'd always go |
| | | down there and his dad would once in awhile come over and hang out with the |
| 19 | | guys and his dad would go to the lake when it was just the guys going and stuff. |
| | | He was, he was a lot of fun to have around and he could, he was about like Joe, he |
| 20 | | could laugh and joke about things that a lot of people wouldn't laugh and joke |
| | | about. Like take a bad situation and make a joke into it or whatever. But, uh, Joe's |
| 21 | | dad – |
| 22 | ??: | -- So the two of them were pretty close? |

10

000535

1   CW:   Yeah. And their, their personalities, um, I'd say their personality, personalities were pretty much alike. They had the same humors, um, had a lot of the same thoughts on stuff. I'd say they were pretty close to almost being a, almost a, a split image.

4   ??:   Oh, okay. Was he close to his mother?

5   CW:   Um, yeah, he, he was always –

6   ??:   -- Or I guess did he appear close to em? –

7   CW:   -- he'd always check. What's that?

8   ??:   I guess I should say did he appear close to them? I guess it's all relative where.

9   CW:   Yeah. He, uh, he and mom always got along. I never, I never heard of them having any cross words or anything, but they always got along good. And, uh, most of our time was spent outside horsing around out at the shop or wherever. But, um, I wasn't around a whole lot when he was around with his mother. So.

11   ??:   Oh, okay.

13   CW:   But like I said, most of our time was outside horsing around in the shop or out fixing something for somebody. There wasn't a whole lot of time that I was at their house when – I would eat dinner with them once in awhile and his mom was always really nice and, but I would say yeah that, just from the way that they appeared, they had a good relationship.

15   ??:   Were they pretty supportive as far as helping him out when he got sick with the cancer and started (inaudible) –

17   CW:   -- Oh yeah. His dad, his dad was very supportive of him. Um, (inaudible) --

18   ??:   -- So they came out to Ahwatukee –

19   CW:   -- Oh yeah –

20   ??:   -- and helped him all the time?

21   CW:   Yeah. He, he'd help him out and, uh, his dad would, uh, help make arrangements for him to get doctor's appointments and whatnot. Yeah they, they were very supportive of it.

11

000556

1

??:   Okay. Did they help with the kids at all, or?

2

CW:   Yeah, um, they'd help watch the kids and, uh, if they needed a babysitter they'd
3      baby-sit for em.

4   ??:   Okay. I know I'm throwing questions out there. I'm just trying to, you know, get a
        picture her of, of, of your relationship I guess. Um, why did he stay with you
5      instead of at his house for the two years that he lived with you?

6   CW:   Um, he just wanted to get out on his own. We were always together and whatnot,
        um, I'd just bought the house and, uh, the other friend of mine that got killed, he
7      was living there at the same time. It was a three-bedroom house and we all had our
        own rooms and we just kindof thought that it'd be neat that since we were always
8      together and whatnot to just stay in one house. And, uh, he was gonna help split
        the bills, or split the – he was paying me rent and that would help make the house
9      payment, the electric and gas, water and whatever. And, then we'd just always be
        right there. We wouldn't have to go over there to see him or whatever.

10
     ??:   Okay. So it was more you had bought a house and you were roommates type of
11      thing, huh?

12   CW:   Right, uh, huh.

13   ??:   Okay. Okay, so I just want to clarify there was never a time where, you, you may
        not have seen because it's not common to see but heard that he was abusive to
14      Shelly or any girlfriends or to Wendi or anyone?

15   CW:   No, huh uh. I never –

16   ??:   Or to his sisters, mother?

17   CW:   Uh, one of my girlfriends was a good friend of Shelly's and that's how I met my
        girlfriend and, uh, shoot we dated probably two, two and a half years, something
18      like that. And, uh, we were around quite a bit. We went camping together. We
        went to the lake together, um (inaudible) –

19
     ??:   -- This is in the early days? When they were first –

20
     CW:   -- Yeah, this –

21
     ??:   -- married?

22

12

000557

PCR000322

1  CW: -- this was like in, uh, be the 86 to 88 era. And, uh, I never, I don't remember Joe
       and, uh, Shelly having any – they would, they would argue, but there was never
2      any, uh, violence involved in it. No pushing or shoving or anything like that.

3  ??: Okay. I'm trying to see – what, what is Shelly's last name? I'm trying to see if –

4  CW: -- Well she, ya know she remarried. It used to be Sour. S-O-U-R. And I'm not sure
       what it is now, but I know she remarried it, or got married I should say. And, uh, I
5      don't know what her new name is. (Unintelligible) –

6  ??: -- Is her real name Michelle?

7  CW: Yes, Michelle. --

8  ??: -- Or is it always Shelly?

9  CW: It's Michelle.

10 ??: Okay. I'm just looking at my notes here to see. Trying to connect people. There's
       just so many players involved here so I'm –
11
   CW: -- Yeah. --
12
   ??: -- separating everyone. And you don't know her married name?
13
   CW: No, I don't.
14
   ??: Okay. Um, did you have a, would you say you had a lot of contact with the two of
15     them in the last year before he died? With Wendi and Joe?

16 CW: Yeah, I'd say I had a pretty good amount of contact with em.

17 ??: Okay, would you say once a month, once every six months, or? Cause, what did –
       did you live in Casa Grande –
18
   CW: Um –
19
   ??: -- at that time? –
20
   CW: -- yeah I did. But Joe, Joe was down here constantly, uh, that's where he kept his
21     boat most of the time. Um, he still came down here and helped his dad out with
       stuff, uh –
22

13                                    000558

| 1 | ??: | -- The last year before he died? |
| 2 | CW: | Yeah, uh huh. |
| 3 | ??: | Okay. |
| 4 | CW: | Yeah, I'd say, yeah, I'd say we still kept in pretty good contact. |
| 5 | ??: | And did Wendi usually go with him or was he by himself? |
| 6 | CW: | Um, no a lot of the times Wendi wouldn't come with him. Uh, a lot of the times it was during the day when I would see him. |
| 7 | | |
| 8 | ??: | And she was a work? |
| | CW: | Right. |
| 9 | ??: | Now would he have the kids with him or? |
| 10 | | |
| 11 | CW: | Um, yeah there was a couple of times where I remember seeing him with the kids inside the, uh, the Tahoe asleep. |
| 12 | ??: | Oh, okay. And he stopped by to say hi to you? That kind of thing? |
| 13 | CW: | Yeah, I'd, I'd be out working and he'd drive by and see me and he'd stop and talk to me and BS about what's been going on and whatnot. |
| 14 | | |
| 15 | ??: | Okay. Is there anything that, um, you want to let me know that I haven't asked, that I haven't thought of asking to kind of fit em all together, I guess? |
| 16 | CW: | No, not that I can think of. |
| 17 | ??: | Okay. Well I sure appreciate you spending time. I know you're at work and I don't want to take too much time at, at one time and make you chitchat. But, uh, you |
| 18 | | have my direct line, don't you? The 2255 number? |
| 19 | CW: | Yeah. Uh huh. |
| 20 | ??: | If there's something that comes up, feel free to call me. |
| 21 | CW: | Okay. |
| 22 | ??: | Um, or if you have any questions on, on something. |

000009

14

PCR000324

1   CW:   Okay.

2   ??:   And then, uh –

3   CW:   Um, do you want my number if you need to get back with me? Cause I know you
4         called my mother the other day and my mother was scared to death for a minute.
          She thought, "My God what has he done."

5   ??:   Oh, no I told her. I said I just wanted to chat about (unintelligible) Andriano. It's
6         no big deal.

7   CW:   Yeah, well when she, when you first introduced yourself, "This is Michelle from,
          uh, Maricopa County Prosecutor's Office", my mother thought, "Oh my God,
8         what's he done?"

9   ??:   Yeah, actually I'm with the public defender's office.

10   CW:   Or public defenders, that's what it was.

11   ??:   Yeah.

12   CW:   I knew it was something to do with law.

13   ??:   Same exact thing, just different side, right?

14   CW:   That's right, that's right.

15   ??:   Okay, what's your number?

16   CW:   Uh, 520-705-2358.

17   ??:   Okay, and that's your home or your cell or?

18   CW:   That's my cell.

19   ??:   Okay.

20   CW:   It's easier to catch me on my cell than it is at my house so.

21   ??:   Okay, sounds good. Hey thanks so much. I do appreciate it and I'll –

22   CW:   -- Alright.

0u0u580

PCR000325

1   ??:   -- probably be calling you another time or two before the trial.

2   CW:   Okay.

3   ??:   Okay. Thanks Chris.

4   CW:   Uh huh, bye-bye.

5   ??:   Bye.

6   (This is the beginning of a new telephone conversation. I do not know a date or time.)

7   CW:   We talked for probably 20, 30 minutes just BS-ing back and forth about different
8         things.

9   ??:   Yeah.

10  CW:   And, uh, I could tell that it, he had something he wanted to say and then all of a
          sudden he said, "Hey, I need to ask you a question." I was like, "Okay." He goes,
11        uh, "When I die would you take care of my family for me?" I was like, whoa it
          just kindof like blind sided me and I was like, uh --

12  ??:   Um, that's at a month? --

13  CW:   -- Well --

14  ??:   Month before he died? --

15  CW:   -- It's about, it's about two months before. I can't remember the exact time. But
16        I'm, I'm thinking that it was right about two months before. And, uh, I said, "Yeah
          Joe if, if that's what you would like, I would be more then happy to do that for ya.
17        I'd be honored to be able to do that for you." I said, "If that's what you want just
          let me know and I'll do it." He goes, "Yeah because Wendi and I've been talking
18        and, uh, we kindof both decided to have you be the one to help take care of the
          family."

19  ??:   Mmm.

20  CW:   I was like, "Oh, okay."

21  ??:   It's like he'd been sitting there talking with Wendi about it huh?

22

16

000561

PCR000326

1   CW:   Right.

2   ??:   Did he say I, I'm feeling like I'm gonna go soon or I'm not feeling well or just –

3   CW:   No, he –

4   ??:   -- like it just occurred to him that he needed to put things in place?

5   CW:   Yeah, he never, he never did say anything like that. He just said that when, he, he
        was sitting down to make out a will and, uh, that he thought he'd better make one
6        up so that he would have one when he did die.

7   ??:   Yeah. That is interesting. Well at least that –

8   CW:   -- Yeah. –

9   ??:   -- showed he was starting to think about it, huh?

10  CW:   Right. And it, it, it really caught me off guard cause I wasn't expecting anything
        like that. And, uh, even after he had died, I'd never mentioned anything to the
11       family about the conversation that Joe and I'd had. (End of tape, side A)

12  ??:   I was eating my sandwich.

13  CW:   What are we eating?

14  ??:   It was a yummy turkey sandwich a little late today. Do you know if it was ever put
        in the will? Or did he say I'm, we're making out the will?
15
16  CW:   I don't know, I. He, yeah, he said they were making out a will.

    ??:   Yeah.
17
    CW:   So, I don't know. Cause his dad's never said anything to me, um, Brad and Janaye
18       have never said anything to me about it and neither has James. So I don't know if
        it ever made it into the will or if –
19
    ??:   -- If they were just talking and didn't carry through with it, huh?
20
    CW:   Right, well he said they were doing it. At the time they were filling one out then.
21       So I don't know if they, if the family never said anything to me about it. I, I, I'm
        not sure. I've never mentioned anything to the family about it because I don't
22

17

000562

| | | |
|---|---|---|
| 1 | | want, I don't want them to think that I'm trying to take Joe's kids away from the family. |
| 2 | ??: | Do you remember exactly when that was? Can you pinpoint it at all? Was it hot |
| 3 | | outside? Was it cooler? |
| 4 | CW: | Um, I would have to say it would, it would have to still be warm. |
| 5 | ??: | So it could have been – |
| 6 | CW: | I, I would think – |
| 7 | ??: | -- March, April, May? -- |
| 8 | CW: | -- it was probably. No, I'm thinking more like, probably July, August. |
| 9 | ??: | Okay. |
| 10 | CW: | Somewhere in there. |
| 11 | ??: | Have you talked to Wendi about that at all? |
| 12 | CW: | No, I never did. I never, after, after, uh, (unintelligible) or however you want me to put it, I'd never talked to her since. Well, before then. Um probably the last I'd |
| 13 | | talked to em, to Joe and Wendi was probably maybe two or three weeks before. |
| 14 | ??: | Um, okay. |
| 15 | CW: | And, I hadn't, I haven't had any contact with Wendi since. |
| 16 | ??: | Okay, so she didn't say, "Remember that promise you made?" Or made any – |
| 17 | CW: | -- Right. – |
| 18 | ??: | -- comment to you because she hasn't had a chance and you as well, huh? |
| 19 | CW: | Right. |
| 20 | ??: | Hum, okay. Well that is interesting. At least he was trying to take care of his family and, uh – |
| 21 | | |
| | CW: | -- Right. – |
| 22 | | |

000563

18

PCR000328

1   ??:   -- Make some, put some plans in, huh?

2   CW:   Yeah.

3   ??:   Okay. Do the kids seem to be doing okay with the –

4   CW:   Um, you know, I, I don't see, I've seen the kids a couple of times but it's just been
        like in passing. I've seen em on the road like going to, uh, Joe and Jeanette's
5       house. But I've never, never stopped to talk to em or anything like that. Um, I just,
        uh, I, I kindof feel weird about it because –

6
    ??:   -- Yeah, you're in a weird situation because –
7
    CW:   -- Right. –
8
    ??:   -- Joe asked you to take care of em. –
9
    CW:   -- Because, because you still, you still got fam –
10
    ??:   -- Yeah. –
11
    CW:   -- (unintelligible) take care of em for em and it, and it just kind of really struck me
12      as -- it, in one way it was a, a very honorable thing for him to ask me to do that for
        him, but yet it also struck me as being odd, well, why wouldn't you have your
13      sister Janaye take care of em or whatever. It just, it, it caught me as being odd.

14  ??:   Yeah, that he would choose you?

15  CW:   Right. Well I – we were good friends and everything and I just thought that it was
        odd that he chose me over one of his own family members.
16
    ??:   Uh, were you married at the time?
17
    CW:   Uh, no I wasn't. I was divorced.
18
    ??:   And he still, still called you and asked you knowing that you --
19
    CW:   -- Right. --
20
    ??:   -- weren't married? Do you have children?
21
    CW:   Uh, yeah, I've got one son. He's, uh, he'll be, in fact he's eight years old today.
22

19                                         ᵁᵁᵁᵕᵕᵕ

PCR000329

1  ??:   Oh, so he knew you had some experience with kids and.

2  CW:   Right, right.

3  ??:   Yeah, usually you do choose a family member but he specifically pointed that out.
       You don't have anything in writing do you?
4
   CW:   No, I don't.
5
   ??:   Okay. I'm just kind of curious if he actually gave you a copy. –
6
   CW:   -- I didn't. It was, it was at nighttime when he had called me at home. I'd have to
7        say it was probably like, maybe 7:30, 8:00 at night, something like that.

8  ??:   Huh. Okay. Yeah that's kindof interesting that he would just, uh, well I guess that
       makes sense, huh? If you're planning on dieing.
9
   CW:   Yeah.
10
   ??:   Okay. Well thanks for sharing that with me. I appreciate you at least thinking
11       about it and taking me serious when I said, "Hey if there's anything you think
       about, can you call me back."
12
   CW:   Yeah. Well if I think of anything else, I'll give you a ring.
13
   ??:   Great. Thanks Chris.
14
   CW:   Uh huh.
15
   ??:   Okay. Bye.
16
   CW:   Bye-bye.
17
   (This is the beginning of a new telephone conversation. I do not know a date or time.)
18
   CW:   (Unintelligible), um, the deal about his will. That had to be in October because,
19       uh, I remember that was the last year I'd got drawn for elk and I was gone every
       weekend so I wasn't able to meet up with him on the weekends. And, uh, he'd
20       called me, I can't remember what day of the week it was. I'm thinking like on a
       Sunday evening he had called me, I'm guessing around 8:30, 9:00 at night. And,
21       uh, it was, I want to say like maybe two to three weeks before, uh, he ended up
       dieing. Um, any questions, give me a call back. Alrighty, thank you, bye-bye.
22

0000565

PCR000330

1   Transcribed by:

2   Jackie Johnson
    Maricopa County Public Defender's Office
3   1750 S. Mesa Drive, Suite 150
    Mesa, Arizona 85210
4   (602) 506-2207

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

21

UUU566

PCR000331

**Michelle Arvanitas - PDX**

| | |
|---|---|
| From: | Daniel Patterson - PDX |
| Sent: | Monday, February 02, 2004 8:55 AM |
| To: | Michelle Arvanitas - PDX |
| Subject: | RE: Andriano |

Thanks for the info-please have your secretary transcribe the interview-send me both the tape and the transcript thereafter-good work-see you later- Dan P.

-----Original Message-----
| | |
|---|---|
| From: | Michelle Arvanitas - PDX |
| Sent: | Friday, January 30, 2004 4:08 PM |
| To: | Daniel Patterson - PDX |
| Subject: | Andriano |

Hi Dan P..

I spoke with Chris Weaver today. I taped the conversation. Would you like my secretary to transcribe it or should I send you a copy of the tape?
He basically said He and Joe were very close. He saw no violence or problems between he and Wendi besides the normal argument occasionally. He said Joe had a good relationship with his Dad.
I did asked him if he remembered anything to call me back. People very seldom call, he did. He said that Joe called him one night and asked him to take care of his family when he died. He was a surprised since it was late. Joe told him, he and Wendi were talking and making out a will. He wanted to put him in their will to take care of the kids. He said he would be honored and certainly would. He thought it strange since he didn't ask a family member.
I thought the last statement may be important due to Joe and Wendi possibly talking that night about him dying (Sodium Azide)?

It will be helpful to read or listen to the full tape.

I am still attempting to get the Boat registration. Will get back to you soon.

Good weekend to you :)

~M

1

002097

PCR000332

**GOLDMAN & KAPLAN, LTD.**
2930 North 7th Street
Phoenix, AZ 85014
(602) 264-9323
TID# 86-0274398

Joseph Andriano
PO Box 12102
Casa Grande, AZ 85222

October 03, 2000

In Reference To: ESTATE PLANNING

| | Amount |
|---|---|
| Previous balance | $200.00 |
| Balance due | $200.00 |

006301
000439

PCR000333

## Law Offices of G. David DeLozier, P.C.

*4016 East Forest Pleasant Place, Cave Creek, Arizona 85331*
*E-Mail: gddelozier@aol.com*
*Phone (480) 575-6660   Facsimile (480) 575-6661*

G. David DeLozier SBAZ #05237
*(Admitted in AZ, PA, TX & Federal Courts)*
Kathy M. O'Quinn SBLA #14195
*(Admitted in LA & Federal Courts)*

**Legal Assistants:**

*General:*
*Ronald Ramirez*
*Kimberly Birdsong*

*Planning & Zoning:*
*Marlene J. Baker*
*Domestic Relations:*
*Tamera Martin*

December 14, 2000

Mr. Alejo Ochoa
Mrs. Donna Ochoa
1104 North Park
Casa Grande, AZ 85222

Re: State v. Wendi E. Andriano

Dear Mr. and Mrs. Ochoa:

It was a pleasure to meet with you today, Mr. Ochoa. Thank you for driving that long distance to meet with me and provide the initial funds, $5,400.00, of the retainer.

As you know, your daughter's request came to me through mutual friends and we are willing to assist her for several reasons, including those friends. We have, however, significantly reduced our normal fees for this representation. However, that does not mean that your daughter will not receive all of the best efforts we are able to make on her behalf.

However, the one aspect that I believe that may be significantly beyond our abilities is that of forensic experts in various areas, most notably psychologists. Thus, I am very hopeful that Mr. Thikoll will advise me expeditiously of his intent in assisting with the case and what his plans are in especially this area of expert witnesses. It is my opinion, that without the use of experts, your daughter's defense is going to be extremely difficult. Thus, while attorney's fees are critical, and I am thankful for all you are doing to raise the funds for these fees, I want to be certain you are aware of these critical areas, as well. Of course, if Mr. Thikoll or you know of persons in these fields of expertise that will work with us on a reduced basis, that would also be helpful to know. But, the defense of the case needs immediate attention.

With that in mind, I have revised the representation agreement and have included two copies of it. I have executed both; please have your wife and you sign one of them and return to me. Please feel free to call with your questions and comments at any time. Again, thank you for driving up to meet with me today.

PCR000334

Mr. Alejo Ochoa
Mrs. Donna Ochoa
Re: State v. Wendi E. Andriano
December 14, 2000
Page 2.

Also, I look forward to those chips and tamales.  Best regards.

Very truly yours,

LAW OFFICES OF G. DAVID DELOZIER, P.C.

G. David DeLozier

enclosures

cc:  Wendi E. Andriano

PCR000335

P-App. 003377



**LEON THIKOLL**

ATTORNEY AT LAW

239 N. MEYER
TUCSON, AZ 85701

TELEPHONE (520) 884-7997
FAX (520) 884-1122

November 29, 2000

Bethanne Klopp-Bryant
Maricopa County Public Defender
11 W. Jefferson, Suite 5
Phoenix, AZ 85003

     Re:   State of Arizona v. Wendi Elizabeth Andriano
           CR2000-096032

Dear Bethanne:

    As of Monday afternoon, November 27th, your associate has not been out to see Wendi, nor has your office sent her any substantive paperwork concerning her charge. Please, be humane, and see her as much as possible, keeping her up to date on the case.

                      Sincerely,

                      Leon Thikoll

LT/llg

001481

PCR000336

**Michelle Arvanitas - PDX**

From:   Michelle Arvanitas - PDX
Sent:   Monday, August 05, 2002 2:59
To:     'GDDeLozier@aol.com'
Subject: RE: andriano

Dave,

Please direct all correspondence with Dan Patterson as he is the one who determines the mailing list.
~Michelle

-----Original Message-----
From: GDDeLozier@aol.com [mailto:GDDeLozier@aol.com]
Sent: Monday, August 05, 2002 12:58 PM
To: Michelle Arvanitas - PDX
Cc: dbpazlawyer@msn.com
Subject: Re: andriano

Michelle:
Thanks for your return e-mail; however, I need to be on your regular mailing list to receive anything that is filed by your offices, any correspondence going to our client, any correspondence going to the prosecution, any filings made by the prosecution, etc. I am "out of the loop". We discussed this when you were here a couple of weeks ago, as you may recall. Thanks.

In a message dated 8/5/02 9:13:53 AM US Mountain Standard Time, arvanitas@mail.maricopa.gov writes:

Subj:**RE: andriano**
Date:8/5/02 9:13:53 AM US Mountain Standard Time
From:arvanitas@mail.maricopa.gov
To:GDDeLozier@aol.com
*Sent from the Internet*

Hi David,

I understand your frustration. I have spoken with Dan about sending you a copy of the last motion. I will speak with him again. As far as I am aware there is not another second chair on the case. Maybe this email will help him understand your frustration.

Michelle

-----Original Message-----
From: GDDeLozier@aol.com [mailto:GDDeLozier@aol.com]
Sent: Friday, August 02, 2002 4:51 PM
To: Michelle Arvanitas - PDX
Cc: dbpazlawyer@msn.com
Subject: andriano

019718

8/5/02

PCR000337

**Michelle Arvanitas - PDX**

From:    GDDeLozier@aol.com
Sent:    Friday, August 02, 2002 4:51 PM
To:      Michelle Arvanitas - PDX
Cc:      dbpazlawyer@msn.com
Subject: andriano

Michelle:
Donna Ochoa called me today around noon to advise that the scheduled hearing for 1:30 pm was postponed. I am glad I did not make a trip to Mesa!! Also, as we discussed when you were at my office, I am still not receiving any of the filings nor the previous ones filed. What do you suggest on how I might be able to keep informed on what is going on. I am working on keeping this from being frustrating. But, Dan made it very clear that I was second chair and that the PD's office was not going to put anyone else on the case. And, I am completely without knowledge of the case developments. Please advise. I am copying Dan, just in case he is unaware of these issues.

## G. David DeLozier
LAW OFFICES OF G. DAVID DELOZIER, P.C.
4016 E. Forest Pleasant Place
Cave Creek, AZ 85331
(480) 575-6660
Fax (480) 575-6661

*This transmission is confidential and may not be reproduced or retransmitted without the express written permission of the author. If you receive this transmission in error, please delete from your computer and notify the sender. Thank you.*

019570

5/10/2004

PCR000338

**Patricia Rublo - PDX**

| | |
|---|---|
| **From:** | Patricia Rublo - PDX |
| **Sent:** | Thursday, October 23, 2003 10:27 AM |
| **To:** | Daniel Patterson - PDX |
| **Subject:** | State v. Andriano |

*Hi Dan....*

*I met with DeLozier yesterday and went over the file.  I will make copies of what he needs of the Original file.  He states you only gave him one stack of papers yesterday which were the Defendant's Pleadings and not the State's Pleadings.*

*Since he was adamant about not having received ANYTHING since you took over the case, I showed a receipt for Discovery materials which were picked up by someone in his office back in May, which included all discovery in the binders.  He said he would look for it in his office when he went back.  He called me and said he could not find any of it.  Soooooo ..I have to copy it for him ALL OVER AGAIN!!!! (Sorry just needed to vent)*

*Anyhow, just keeping you updated.*

*Thanks!*

*~ Patty*

1

019008

PCR000339

**MARICOPA COUNTY**
**OFFICE OF THE MEDICAL EXAMINER**
120 S. 6th Avenue
Phoenix, Arizona 85003

MARICOPA COUNTY
OFFICE OF THE MEDICAL EXAMINER
NOT FOR DUPLICATION

**REPORT OF AUTOPSY**

**DECEDENT:** Joseph D. Andriano

**CASE:** 00-03022

**DATE OF EXAMINATION:** 10/11/2000

**TIME:** 0710 Hours

**PERSONS PRESENT AT AUTOPSY**
Forensic Assistants: . Garn Bailey
Michael Millette
Jarred Sanders

---

### PATHOLOGIC DIAGNOSES

I. Multiple blunt force injuries head and scalp.
   A. Superficial incised wounds scalp, posterior shoulders and both hands.
   B. Contusion dorsum right wrist.
   C. Deep incised wound left lateral neck.
   D. Subarachnoid hemorrhage left temporal lobe brain secondary to blunt force craniocerebral trauma.

II. Moderately well differentiated adenocarcinoma, kidney.

III. Widely metastatic adenocarcinoma involving lungs, mediastinal lymph nodes, periaortic lymph nodes and kidneys.

---

**CAUSE OF DEATH:** Multiple blunt force and incised injuries
   **MANNER:** Homicide

PHILIP E. KEEN, MD
MEDICAL EXAMINER

009073

000445

JOSEPH D. ANDRIANO                                    00-03022

**CIRCUMSTANCES OF DEATH**

This man was found deceased inside his residence the apparent victim of multiple blunt force head injuries and incised wounds. His wife had been in the residence with him and was reportedly tardy in response to emergency personnel arrival at the address. This man had a previous history of metastatic malignancy.

**EXTERNAL EXAMINATION**

The unembalmed body arrives at the Medical Examiner's facility in a zippered body pouch secured by evidence seal #1059117. Delivered to the autopsy suite by Detective Lucero Badge #4913 of the Phoenix Police Department in a separate paper bag is a container of prescription medications issued to the decedent and a pair of green Tommy Hilfiger label shorts with a belt. There are irregular, dried, red-brown, apparent blood stains on the fabric.

The body arrives attired in a pair of brown striped boxer shorts. Brown paper bags encircle each hand. Electrocardiographic electrode pads are present beneath each clavicle.

The body is that of a slender, adult Caucasian man, 70 inches in length, weighing 156 pounds. Rigor mortis is complete. Livor mortis is purple, posterior, dependent and fixed. Scalp hair appears to be brown and the head is bald and possibly shaved. There are multiple traumatic injuries of the scalp to be subsequently described. Irides are light brown. Pupils are round, equal, symmetrical, 4 mm in diameter each. There are no scleral or conjunctival lesions. There are no lesions of external auditory canals or nares. There is a contusion over the bridge of the nose to be subsequently described. There is neither a beard nor moustache. Dentition is natural and in reasonably good state of repair with no acute oral mucosal lesions noted. Trachea is in the midline. There is a gaping incised wound of the left lateral neck to be subsequently described. Thorax is symmetrical with transverse diameter exceeding the anterior-posterior diameter. The abdomen is scaphoid with no palpable intra-abdominal masses or areas of significant skin scarring. Pubic hair appears shaved. External genitalia are those of an adult male with circumcised penis. Two small testes are palpable within the scrotal sac. Extremities are paired and symmetrical with what appears to be old subcutaneous hemorrhage and mild fibrosis in the left antecubital space. Posterior aspects of the torso are symmetrical. General appearance is compatible with a chronically ill man of the reported age of 33 years.

**EXTERNAL EVIDENCES OF TRAUMA**

**Head and Neck:**

There are areas of dried abrasion over the right cheek ranging up to 1-1/4 inches in greatest dimension. Inline with this area of abrasion is a second area of small abrasion 5/16 of an inch in greatest dimension on the infraorbital rib of the lateral extent of the

009074

000446

Page 2 of 8

PCR000341

JOSEPH D. ANDRIANO                                          00-03022

right orbit and a linear area of abrasion of the right upper lid extending to the level of the brow.

There is a contusion over the mid-bridge of the nose ranging up to 1/2 inch in greatest dimension. The overlying skin surfaces are intact.

There is an apparent stabbing/incised wound of the right neck beneath the angle of the jaw paralleling approximately the inferior mandibular axis and extending into the skin and right sternocleidomastoid muscle ranging up to 1-1/4 inches in length with a V-shaped cutting surface oriented anteriorly.

There is a large gaping wound of the left neck extending posteriorly from the anterior border of the left sternocleidomastoid muscle forming a defect 3-3/4 inches x up to 2 inches in maximum width. On the anterior borders of this wound are a series of four superficial incised wounds ("hesitation marks"). This wound extends through the muscle and soft tissue structures of the left lateral neck, severs a branch of the left external carotid artery and at its greatest depth passes into the intervertebral space of C-4 – C-5 and produces a notch-like tool mark on the left lateral surface of the cervical spine. The wound does not penetrate the spinal canal.

There are two superficial linear oblique to horizontal incised wounds of the upper lateral left neck overlying the mastoid and inferior to the mastoid process on the left ranging up to 1-1/2 inches in greatest dimension.

Distributed over the occipital and parietal scalp and concentrated within an area of approximately 6 x 5 inches are a minimum of no less than twenty-three separate wounds. At least eight of these have features of superficial stabbing or incised wound and range from ¼ to 1 inch in length and vary in axis from vertical to horizontal. Center most within this region of the scalp, however, are multiple large intersecting lacerations range up to 3 inches in greatest vertical dimension, up to 3 inches in greatest single horizontal dimension. The wound margins are abraded and irregular. There are bridging fibers across the depths of these wounds. They form two very prominent patterns of a V-shaped laceration over the right parietal scalp and the other is a double Y-shaped laceration in the midline posterior occipital prominence.

Just to the left of the sagittal plane in the left posterior parietal scalp is a 1-1/2 inch linear laceration with contusion and abrasion on the posterior aspect at an acute angle to the breach in the skin. Lateral to this is a 1-3/4 inch flattened omega-shaped laceration of the scalp.

There are two lacerations of the posterior surface of the left ear ranging up to 1-1/2 inches in greatest dimension.

There are two 1/4 inch superficial stabbing-style wounds of the posterior right lateral neck and a 5/8 inch horizontal superficial incised wound with lateral superficial abrasions all concentrated over the right trapezius insertions of the right posterior neck.

009075

000447

PCR000342

JOSEPH D. ANDRIANO                                        00-03022

There is a superficial linear apparently incised wound of the inferior surface of the mid-left mandible 1-1/4 inches in greatest dimension.

There is a superficial linear abrasion of the lateral left neck lying anterior to the sternocleidomastoid muscle and overlying the inferior portions of the left surface of the larynx.

Posterior Shoulders:

There are linear areas of abrasion of the posterior shoulders one over the left 1-1/4 inches in greatest dimension forming a tapering triangular shaped pattern with a vertex oriented medially.

There is a linear area of superficial laceration over the superior-posterior surface of the right shoulder 3/4 of an inch in greatest dimension.

Over the dorsum of the right shoulder is a small 3/8 inch linear superficial stabbing-style wound penetrating only to the level of the dermis.

Between this wound and the 3/4 inch linear abrasion is a linear wound 5/16 of an inch in greatest dimension extending to the level of the subcutaneous fat.

There are a series of four superficial linear mostly vertically oriented incised wounds of the skin of the upper back medial and superior to the scapula. These are 3/8, 1, 5/8, and 3/8 inch in length, respectively lateral to medial.

Hands and Wrists:

Over the dorsum of the right wrist on the radial aspect of this wrist is a 1-1/4 x 1 inch area of recent purple contusion with an intact overlying skin surface.

Over the dorsum of the right hand just distal to the wrist is a linear 1/2 inch superficial incised wound.

There are two superficial linear abrasions and/or lacerations of the dorsum of the left middle finger and the middle phalangeal segment and in the proximal phalangeal segment.

There are two incised defensive style wounds of the dorsum of the right hand. The first of these is 1/2 inch in length over the distal interphalangeal joint of the right ring finger. The second is V-shaped with two 1/2 inch arms over the middle interphalangeal joint of the right middle finger.

009076
000448

Page 4 of 8

PCR000343

JOSEPH D. ANDRIANO                                    00-03022

## INTERNAL EVIDENCES OF TRAUMA

In addition to the hemorrhage on the soft tissue of the left lateral neck and the incised wound on the superficial branch of the left external carotid artery, there are intercranial evidences of trauma consisting of subarachnoid hemorrhage over the right temporal lobe of the brain. There are no grossly or radiographically demonstrable fractures of the skull.

## INTERNAL EXAMINATION

The body is opened by a standard Y-shaped thoracoabdominal incision. Subcutaneous adipose tissue ranges up to 2 cm in thickness at the level of the umbilicus. All viscera occupy their approximate appropriate anatomic relationships. There are multiple metastatic tumor nodules present in both lungs, in the mediastinal lymph nodes, in the cortical zones of both kidneys. A small quantity of serous fluid is present in each pleural space with no significant free fluid accumulation in any body cavities. Inferior margin of the liver extends 8 cm beyond the costal margin in the right midclavicular line. Diaphragmatic leaflets are at the level of the anterior 6th rib bilaterally. Internal viscera are somewhat pale.

## HEART

The 320-gm heart occupies its usual mediastinal site. The chambers are empty of fluid. There is a moderate quantity of epicardial fat present. Epicardial and endocardial surfaces are smooth and glistening. All major vessels arise in their appropriate anatomic relationships. Coronary arteries arise and are distributed in the usual fashion with no significant narrowing or occlusions. Step sections of myocardium reveal moist, uniform, rubbery, red-brown muscle with no localizing areas of softening, hemorrhage, or gross scarring. No abnormal communications exist between the cardiac chambers. The cardiac valves are normally formed with circumferences appropriate to the caliber of the cardiac chambers.

Upon removal of the heart, pulmonary arteries and veins, inferior vena cava and aorta are compressed and all returning blood flow to the pericardial sac is harvested for toxicologic or serologic testing purposes.

## GREAT VESSELS

The aorta is of normal caliber with smooth glistening endothelial surfaces. There is no aneurysmal dilation or dissection. There are no occlusions of major arterial branches. No systemic venous abnormalities or thrombi are identified.

## LUNGS

Weight: left 500 gm, right 540 gm. The lungs are similar. They are moderately well expanded, fluffy, and pink-tan with a few glistening pleural surfaces focally distorted by

009077
000449

Page 5 of 8

PCR000344

JOSEPH D. ANDRIANO                                    00-03022

subpleural and intraparenchymal masses.  These masses are firm and pale gray-white and yellow-white on cut surfaces with a few areas of central yellow necrosis.  The tumor nodules range up to 4 cm maximum diameter.  The bronchi are patent with smooth mucosal surfaces.  All of the nodules within the lungs appear to be metastatic disease. The perihilar lymph nodes are focally replaced by similar firm gray-white tumor.

**NECK ORGANS**

There is hemorrhage in the soft tissue of the left lateral neck with incised injuries of the left sternocleidomastoid muscle, the thyroid artery branch of the carotid artery, superficial branches of the left external jugular vein, and penetration to the level of the cervical spine with separation of the lateral spinous ligaments.  The upper airway is patent.  There is no glottic or epiglottic edema.  There is no penetration of the trachea by the acute injuries.  Thyroid and parathyroid glands are grossly not remarkable.

**THYMUS**

Grossly not remarkable.

**SPLEEN**

The 210-gm spleen occupies its usual anatomic site.  It is moderately congested but otherwise grossly not remarkable.

**LIVER**

The 2000-gm, dome-shaped, red-brown liver occupies its usual anatomic site and is covered by a flat, smooth, glistening capsule.  No metastatic disease is identified in the external or cut surfaces of the liver.  Intrahepatic and extrahepatic biliary ducts are patent and of normal caliber.  The gallbladder is present, intact and contains orange-brown bile and no calculi.

**ADRENAL GLANDS**

The adrenal glands are grossly not remarkable with no evidences of hemorrhage or metastatic tumor.

**PANCREAS**

Grossly not remarkable. The duct system is patent. There are no mass lesions, areas of hemorrhage, fat necrosis or gross scarring.

**KIDNEYS**

Weight: left 170 gm, right 150 gm. The kidneys are similar. The capsules strip with moderate ease from the cortical surfaces which are red-brown and focally have

009078
000450

Page 6 of 8

PCR000345

JOSEPH D. ANDRIANO                                                          00-03022

peripheral cortical nodules ranging up to 1.3 cm in greatest diameter.  The larger of these tumor nodules have umbilication of the surfaces.  There are no gross abnormalities of the renal pyramids or the of the calyceal system. The renal vessels are patent.  The ureters are patent and of normal caliber bilaterally.

## PELVIC ORGANS

The urinary bladder contains 20 ml of cloudy yellow urine. Mucosal surfaces are gray-white, flat and glistening.  Trigone is patent.  The prostate and seminal vesicles are grossly not remarkable.

## GASTROINTESTINAL TRACT

There are no intrinsic lesions of the esophagus.  The esophagus itself is empty.  The mucosal surfaces are gray-tan and glistening.   The cardioesophageal junction is well delineated. The gastric fundus contains approximately 30 ml of cloudy-tan liquid all of which was harvested.   There is a solitary yellow-tan portion of solid material also included in the gastric contents.  There no areas of ulceration, hemorrhage, erosion or even hyperemia of the gastric mucosa.  There are no intrinsic mucosal or mural lesions of small bowel, colon, cecum, or rectum.  Vermiform appendix is present.

## MUSCULOSKELETAL SYSTEM

Other than traumatic injuries noted above, the musculoskeletal system is grossly not remarkable.

## SKULL AND CRANIAL CONTENTS

The scalp is further reflected and the galea is removed from the outer surface of the calvarium in an effort to inspect the pericardial surfaces of the calvarium.  No gross fracture lines are present. The calvarium is of normal to slightly increased thickness. The brain weighs 1450 gm. It is covered by delicate, thin, glistening leptomeninges. There is good preservation of cerebral symmetry throughout. Convolutional patterns are intact. There is a small amount of fresh hemorrhage covering the right temporal lobe over the anterior pole and superior middle and inferior lobules of the temporal lobes on the outer surfaces.  No gross cortical contusions are noted beneath this hemorrhage. No other localizing lesions are identified on multiple coronal sections of cerebrum, cerebellum and brain stem. Ventricular system is symmetrical, nondilated and contains clear fluid. Pituitary is not remarkable. There are no hemorrhages or fractures of the osseous structures of the floor of the cranial vault.

## EVIDENTIARY MATERIALS

There are varying length, fine caliber hairs adherent to dried blood on the palmar surfaces and intertriginous surfaces of both hands and from the surface of the body. No other extraneous foreign material is identified.  These trace items are inventoried

009079
000451

PCR000346

P-App. 003388

JOSEPH D. ANDRIANO                                          00-03022

and released to the Phoenix Police Department. In addition, a purple-top tube of blood and the clothing are inventoried and released.

### TOXICOLOGY

Samples of blood, urine, vitreous humor, gastric contents, bile, liver, gastric mucosa and brain are harvested for toxicologic analysis.

PEK:plf
D:10/13/2000
T:10/31/2000

### MICROSCOPIC DESCRIPTIONS

Histologic sections confirm the presence of the subarachnoid hemorrhage of the left temporal lobe of the brain and further elucidate the character of the metastatic malignancy noted grossly. This tumor has a remarkably consistent gland-forming pattern in all of its sites consisting of pale amphiphilic mucinous secretions contained within variable tumor glands. The morphologic features of the tumor are more consistent with renal primary.

### FINAL SUMMARY

This man died of multiple blunt force and incised injuries.

The manner is homicide.

PEK:plf
F:11/28/2000

000452

PCR000347

**Maricopa County Office of the Medical Examiner**
120 South Sixth Avenue · Phoenix, AZ 85003 - (602) 506-3322

| Hair Color | Br. Bald. | Eye Color | Light Brown |
|---|---|---|---|
| Teeth | Natural | Beard (Y/N) | No |
| Weight | 156 | Moustache (Y/N) | No |
| Height | 70 | Clothing | Yes |
| Rigor | full | | 009081 |
| Livor | atypical | Seal No. | 1059/17 |

00-03022        10/08/2000
~~RIANO, JOSEPH~~

PPD                DR: 01-797848
DOB: 8/18/1967     SSN: 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

000453



### Maricopa County Office of the Medical Examiner
120 South Sixth Avenue - Phoenix, AZ 85003 - (602) 506-3322

MARICOPA COUNTY
OFFICE OF THE MEDICAL EXAMINER
NOT FOR DUPLICATION

00-03022
ANDRIANO, JOSEPH
10/08/2000
PPD
DOB: 8/18/1967
DR: 01-797840
SSN: 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

009082

000454



MARICOPA COUNTY, OFFICE
OF THE MEDICAL EXAMINER

CASE #

MARICOPA COUNTY
OFFICE OF THE MEDICAL EXAMINER
NOT FOR DUPLICATION

000455

009083
10/08/2000

00-03022
ANDRIANO, JOSEPH

PPD                    DR: 01-7
DOB: 8/18/1987         SSN: 527-71-

900-021  10-88

PCR000350