# TABLE OF CONTENTS (INTERACTIVE)

| LLLLLLLLLLL | |
|---|---|
| PART 6 | Petitioner's Appendix to Petition for Review |

# EXHIBIT LLLLLLLLLL
# PART 6

July 11, 2001

To Whom It May Concern:

I submit that Donna Ochoa is an outstanding parental figure.  She and her husband are active in our community, church, and have contributed to the nurturing of my two children, ages four and five.

I have complete trust and admiration for her and her husbands' care giving abilities.  I have no issues with their caring for my children on the occasions when I am unable to be at home with my two children.

I would strongly recommend their grandchildren be made available to them for nurturing on a daily basis.

If you have any questions, or if I can personally testify in support of their parenting skills, please contact me at 602-577-3121.

Sincerely,

Brenden Strack-Robinson
Vice President of Human Resources /
Organizational Development

PCRDIS-D002342

July 11, 2001

To Whom It May Concern:

I have worked with Donna Ochoa on a professional basis as her superior for sometime. I am a professional Human Resources Administrator, skilled in the art of assessing individuals' capability on many levels.

I submit that Donna Ochoa is an outstanding parental figure. She and her husband are active in our community, church, and have contributed to the nurturing of my two children, ages four and five.

I have complete trust and admiration for her and her husbands' care giving abilities. I have no issues with their caring for my children on the occasions when I am unable to be at home with my two children.

I would strongly recommend their grandchildren be made available to them for nurturing on a daily basis.

If you have any questions, or if I can personally testify in support of their parenting skills, please contact me at 602-577-3121.

Sincerely,

Brenden Strack-Robinson
PO Box 1121
Arizona City, AZ 85223

PCRDIS-D002343

July 13, 2001

To Whom It May Concern:

Through our fifteen year friendship with Alejo and Donna Ochoa, we have

known their children Wendi and Brandon and subsequently their grandchildren

Nicholas and Ashley Andriano.

During both Wendi's pregnancies and births Alejo and Donna were faithfully helping

Wendi and Joe and as the children have grown up, Donna and Alejo have been a

big part of the children's lives.  For anyone to suggest that Donna and Alejo

have not been very actively involved in both Nicholas' and Ashleys' lives

is very far from the truth.

Sincerely,

Wayne  and  Karen Settle

26841 W. Desert Crest

Casa Grande, AZ    85222

PCRDIS-D002349

August 12, 2001

To Whom It May Concern:

It is our pleasure to have the opportunity to write this letter.

We have been next door neighbors to the Ochoa family for over 20 years. Their son Brandon and our grandsons always played together. Now that Donna and Alejo have small grandchildren and so do we, our grandchildren beg us to let them go next door to Donna's house to play with Nicholas and Ashlee. They are wonderful neighbors and very caring people. It would be very devastating to the children if they were denied the love and special attention they get from their grandparents.

Dennis and Barbara Mays

PCRDIS-D002364

Dear Doctor Yee,

We would like to tell you of some of the experiences and observations that we have had in the last 20+ years with the Ochoa family.

We live in Texas and Nadine is Donna Ochoa's maternal half-sister.

Around 1980, Donna learned that our son had behavior problems. She offered to have him come to Arizona and stay with them for several weeks. We accepted her offer and had him flown to Arizona. The Ochoa's effected a tremendous change in his attitude and behavior. Their personal relationships and the strong church affiliation showed their love and genuine care for the young man (then about nine years old.) This positive influence still shows in his actions today. We were truly amazed by what was accomplished. About five years later, we visited with the Ochoa's again for several days. My son responded to them in the same way as before and looked forward to going to their church to see the people that he had met before. My daughter was drawn to Donna also. She wanted to stay with them for while, but our schedule wouldn't allow it.

Several years later they took in and later adopted a three-year old son of Donna's paternal half sister, Kathie Worsham Smith. This young boy, named Brandon, was insecure and confused by his removal from his Mother by the Children's Protective Service. The Ochoa's provided a warm and loving home for him. There was a very strong church tie to the family. Brandon and his step nephew and niece, Nicholas and Ashlee, are very attached to each other. When Brandon was about fourteen he began to feel that he was losing ties to his natural family. After a discussion with the Ochoa's, it was agreed that he could go and live with his mother. He could return to the Ochoa's at any time, if he so desired. Brandon was here in Texas with Donna in 1999. I (Clark) sensed his need to understand or relate to his Mexican Heritage. He asked many questions about Mexican culture and customs. Since we live in South Texas with a large Mexican population, I (Clark) was able to answer some of his questions and show him some examples.

After their daughter, Wendi, married Joseph Andriano, we were kept up on the young couples life. We were told of the birth of Nicholas and events that the Ochoa's shared with the young family. Letters, e-mail and phone conversations occurred at least monthly. We saw love for the grandchild and his parents in all of these communications. Events related to us showed a strong family relationship between Nicholas and his maternal grandparents. To us he appears to be "Grandma and Grandpa's" little boy who is very happy when he is with them. This was while at his home or theirs. Donna sent us quite few photographs of Nicholas. After her birth, photographs of Ashlee were added. Some were of individuals and others were of two or more persons. The two children always appeared happy in the photographs.

When Joseph became ill, the Ochoa's offered and gave quite a bit of assistance to the Andriano's. They helped with getting Joe medical care and helping out when he went to the Doctor's and when Wendi was working. When their HMO was holding up Joe's surgery, Donna got very involved in trying to get the surgery approved. She tried many things including contacting the Governors Office before the surgery was approved. After the surgery was performed, fistulas appeared in Joe's neck. Donna and Alejo helped with the cleaning of the fistulas and changing of the dressing on Joe's neck. This had to be done three times a day. Wendi was pregnant and working full time. As Wendi's delivery time drew near, she couldn't provide as much assistance as Joe needed. So, Donna and Alejo did most of Joe's required care, while continuing to work full time at their own jobs. Of course, Nicholas was receiving care, attention, assurance and a lot of love from his grandparents.

We knew that Donna and Alejo were getting very tired. So we decided to go to Arizona to give what assistance we could. We arrived in Casa Grande on the day that Wendi came home from the hospital with her newborn daughter, Ashlee. We stayed in Casa Grande for about a week. Nicholas was upset because the baby was moving him out of his crib. We saw to it that he got a bed of his own. The bed was in the shape of a yellow racecar. He was very happy with it and his mother and Donna saw to it that he remembered who got it for him. We have talked to him on the phone and he thanks us for his yellow bed.

PCRDIS-D002331

Joe's parents came by for a short visit in the afternoon of the first day we were there. When Nicholas saw them come through the door, he ran to Donna and climbed into her lap. It seemed to me that he thought they were strangers or someone he didn't trust. He didn't go to them during that visit. Joe's neck was cleaned and redressed by Donna and Wendi while the elder Andriano's were present. I (Clark) didn't see the elder Andriano's again while we were there. I (Clark) don't remember any reference to other kin of Joe's being in Arizona. Once Joe mentioned to me (Clark) that he didn't get along well with his family and was very surprised that we had driven 1100 miles to help out. It seemed like the only help that Joe and Wendi were getting was from the Ochoa's. While we were there, Nadine helped with the filling out of the Social Security forms for supplemental income and his application for Disability. The requests were approved on the first submission.

Donna came to our home in Texas in the latter half of 1999. Her ability to get young people respond to her was shown with my grandchildren. We have four grandchildren who were between the ages of eight and four. She had a profound effect on their behavior. She had the ability get them to trust her and listen to what she said. If necessary, she would sit on the floor and hug them. She did this several times to get them to calm down from whatever problem they had. She was mentally and physically able to do this several times a day. By the time she left they were all in love with her and didn't want her to leave. The behavior modifications are still apparent. She showed genuine love and interest in them. We think that "Pied Piper" applies to her. The Ochoa's adopted son, Brandon, was here also. Brandon got along well with our grandchildren and actually counseled them when conflict occurred. It was obvious that he had received a good upbringing at home.

Donna returned here in June of this year for five days. The actions of the previous visit were repeated. Our grandchildren responded to her again. One granddaughter, in particular, was having emotional problems when Donna was here last year. The youngster improved dramatically after her first visit. They were very close once again this year. Even more improvement has been seen due to the reinforcement of their relationship. Once again cries of "don't go" were heard.

To us, Donna and Alejo have shown themselves to be very able, loving and caring persons. Ashlee and Nicholas are very lucky to have grandparents like them. We have the feeling that Ashlee loves them just as much as Nicholas does.

The traits of love, care and willingness to help others have existed for more than twenty years. We feel that people whom they already know and love should care for Ashlee and Nicholas. We don't feel that there is anyone as qualified for this as are the Ochoa's.

Sincerely,

Nadine Bednorz RN.

Clark Bednorz CWO4 USN  (ret)
101 Elaine St.
Victoria, Texas 77904
(361)576-1030 Home

Page 1 of 1

| Subj: | **Linda Gray letter** |
|---|---|
| Date: | 7/15/01 3:34:28 PM US Mountain Standard Time |
| From: | *grandmaochoa@hotmail.com (Donna Ochoa)* |
| To: | GDDeLozier@aol.com |
| File: | **THEEQUIPPER.zip (34609 bytes) DL Time (28800 bps): < 1 minute** |

David,
I've attached a copy of our letter.  I just faxed some letters from my sister Kathie, Brandon (2 - take your pick, he speaks very well and you may want to chat with him), also from the Mina the CG babysitter.  Mina and her husband saw Wendi today, was a good visit.  Wendi having a rough week since Thursday, will speak with her counselor.  Originals will be sent over night.
 If you cannot read Brandon or Kathie's writing, let me know, I'll try to help.
Am reading book, The Prayer of Jabez.  I Chronicles 4:9 & 10 - "...Oh, that You would bless me indeed, and enlarge my territory, that Your hand be with me, and that You would keep me from evil."  So God granted him what he requested.  Hallelujah!
In Jesus,
Ochoa's

Get your FREE download of MSN Explorer at http://explorer.msn.com

---------------------- Headers --------------------------------
Return-Path: <grandmaochoa@hotmail.com>
Received: from  rly-yh01.mx.aol.com (rly-yh01.mail.aol.com [172.18.147.33]) by air-yh03.mail.aol.com (v79.27) with ESMTP id MAILINYH34-0715183427; Sun, 15 Jul 2001 18:34:27 -0400
Received: from  hotmail.com (f265.law11.hotmail.com [64.4.16.140]) by rly-yh01.mx.aol.com (v79.20) with ESMTP id MAILRELAYINYH110-0715183356; Sun, 15 Jul 2001 18:33:56 -0400
Received: from mail pickup service by hotmail.com with Microsoft SMTPSVC;
   Sun, 15 Jul 2001 15:33:55 -0700
Received: from 162.42.140.242 by lw11fd.law11.hotmail.msn.com with HTTP;   Sun, 15 Jul 2001 22:33:55 GMT
X-Originating-IP: [162.42.140.242]
From: "Donna Ochoa" <grandmaochoa@hotmail.com>
To: GDDeLozier@aol.com
Subject: Linda Gray letter
Date: Sun, 15 Jul 2001 15:33:55 -0700
Mime-Version: 1.0
Content-Type: multipart/mixed; boundary="----=_NextPart_000_4370_6c27_22d5"
Message-ID: <F265ju2iDL6e5f6WVY500003cb8@hotmail.com>
X-OriginalArrivalTime: 15 Jul 2001 22:33:55.0906 (UTC) FILETIME=[3B8A8A20:01C10D7E]

$\mathcal{D}$ 641-2069

OFFICE DISTRIBUTION
[X]      DIVISION 1/

# IN THE SUPERIOR COURT
## OF
### PINAL COUNTY, STATE OF ARIZONA

Filed in Court Record
Date: December 27, 2001
Time: 12:00 p.m.

Date 12-18-2001

JUDGE HONORABLE WILLIAM J. O'NEIL

DIVISION 1
COURT REPORTER None
ADDRESS

ALMA JENNINGS HAUGHT, CLERK

By Jackie K. Greathouse, Deputy

In the Matter of the Adoption of:

NICHOLAS ANDRIANO and
ASHLEE ANDRIANO

A person(s) under the age of 18 years.

)
)
)
)
)
)
)
)

Case No. AD200100058

MINUTE ENTRY ACTION:

RULING   ON   NOTICE   OF
COMPLIANCE WITH A.R.S. 8-106 and
REQUEST FOR HEARING

PRESENT:

A Notice of Compliance with A.R.S. §8-106 and Request for Hearing having been submitted herein on October 9, 2001, and the Court having reviewed the same,

IT IS HEREBY ORDERED the Request for Hearing is DENIED.

While the Court acknowledges that A.R.S. §8-106 does not require notice to the guardians, the best interest of the children do.  The Social Study submitted in support of the adoption states that the Petitioners intend, if the natural mother's trial results in a not guilty verdict, that the children would be returned to the natural mother.   No information with any great specificity is given regarding what charges the mother has been charged with, nor does this Judge know what charges she is facing.  However, the report indicates the potentiality of a prison term.   The adoption would necessarily sever the mother's relationship to the children.

Further, the Social Study states the children live with the guardians and that the paternal grandparents who live in Casa Grande "will be able to visit with the children if they are adopted by the Ochoas."   The adoption by law would terminate any such rights to visit by either the paternal grandparents or the paternal aunt and uncle who presently serve as guardians.   The additional filings by the Petitioners underscore this Court's concern by the refusal of the Petitioners to give notice

Case No. AD200100058                                         Page 2

of their intention to terminate any rights of the paternal side of the
family, including the guardians of these children.  On November 14 an
agreement was made between the Petitioners and the guardians which
included a Consent to Guardianship.  The recitals are telling, "the
parties all recognize the interest of the grandparents and the relatives
regarding the care and custody of Nicholas Andriano and Ashlee
Andriano."  The guardians by stipulation of the Petitioners took custody
of these children and they have lived in that home at least since that
time.  The Social Study makes findings based on interviews of the
Petitioners and not of the guardians or of their present living
arrangements.  This Court under A.R.S. §8-116 must find "that the
adoption is in the best interest of the child. . ."  The best interest
of the children are served by formal notice being given to those
individuals, who the Petitioners themselves have previously both
stipulated to be guardian of the children, and who have further
stipulated such children's best interest is served by those guardians
having the care and custody of them.

IT IS THEREFORE ORDERED directing the Petitioners to serve the guardians
with the Petition for Adoption.

IT IS FURTHER ORDERED directing the Petitioners to cause the Social
Study to be amended to include interviews of the guardians and the
present living arrangements of the children and further to make
recommendations regarding the children"s best interests, in light of a
complete severance of all rights which the guardians and paternal
grandparents presently enjoy pursuant to A.R.S. §8-117.


[X]   SIGNED this _2nd_ day of _January_ , 20_02_.


                              [X]        STEPHEN F. McCARVILLE
                              [X]   JUDGE OF THE SUPERIOR COURT

                                    For Hon. Willison
                                    J. O'Neil

Mailed/distributed copy(s):12-27-2001

cc:  G DAVID DELOZIER, P.C.
     ATTORNEY AT LAW
     4016 E FOREST PLEASANT
     CAVE CREEK AZ  85331

1  **G. DAVID DELOZIER, P.C.**
   4016 East Forest Pleasant Place
2  Cave Creek, Arizona 85331
   Phone: (480) 575-6660
3  Fax: (480) 575-6661
   E-mail: gddelozier@aol.com
4
5  G. David DeLozier
   State Bar of Arizona ID: #005237
6  Attorney for Petitioners

7          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

8          IN AND FOR THE COUNTY OF PINAL, JUVENILE DIVISION

9

10  IN THE MATTER OF THE ADOPTION OF:        )        No. AD100100058
                                             )
11                                           )
                                             )
12  NICHOLAS ANDRIANO and,                   )        **NOTICE OF CHANCE**
    ASHLEE ANDRIANO,                         )        **OF JUDGE**
13          Minor Children.                  )
                                             )        (Assigned to the Honorable
14  _____  )        William J. O'Neil, Judge)

15

16          Undersigned counsel, **G. David DeLozier**, on behalf of Petitioners in this case, file

17  this Notice of Change of Judge, pursuant to **Rule 42(f)(1), Arizona Rules of Civil**

18  **Procedure**, for a change of William J. O'Neil, for all further matters in this case.

19          Undersigned counsel hereby certifies, pursuant to the requirements of **Rule**

20  **42(f)(1), Arizona Rules of Civil Procedure**, that (i) the notice is timely filed, (ii) the

21  Petitioners have not waived the right under subsection (f)(1)(D), and (iii) Petitioners have

22  not previously been granted a change of judge as a matter of right in this case.

23          **RESPECTFULLY SUBMITTED** this ___ day of January, 2002.

24                                           G. DAVID DELOZIER, P.C.

25

26

27                                           _____
                                             G. David DeLozier
28                                           Attorney for Petitioners

                                -1-

## Law Offices of G. David DeLozier, P.C.

*4016 East Forest Pleasant Place, Cave Creek, Arizona 85331*
**E-Mail: gddelozier@aol.com**
*Phone (480) 575-6660    Facsimile (480) 575-6661*

January 21, 2002

John. Jakubcyzyk, Esquire
Attorney at Law
2711 N. 24th Street, Suite 200
Phoenix, AZ 85008

Re:  In the Matter of the Guardianship of NICHOLAS ANDRIANO and ASHLEE
ANDRIANO
No. PB200-004531

Dear Mr. Jakubcyzyk:

Please consider this letter a response to your letter dated January 15th. I continue to be dismayed that you continue to personally attack my clients. John, I am sure you recall our discussions of this; and, I recall your apologizing to me for it. On the other hand, I believe I have been extremely cautious in stating my own opinions and have tried to never personally say anything negative about your clients. As you know, it is my opinion that the preferable pattern is to avoid our personal opinions about our respective clients.

First, it is my clients' position that your clients have consistently avoided communication with them since my clients signed the agreement in November 2000. They believe this latest is only the worst. They also disagree that your clients' behavior has been "understandable".

I received photos of the children's bottoms today. In attempt at fairness to you, I am assuming that you had not seen the photos when you wrote your letter. I have never seen a child's bottom in such a condition; none of my own three children ever had a condition such as these photos depict. Also, my wife, who is now my officer manager, and who had previously taught preschool for 15 years, principally 4 year olds, says "I have seen a lot of bottoms, but not any like these". Whatever the source of the children's condition, in my opinion, no child should have to live that way.

I am unable to respond to your understanding of the Ochoas' motives or their intent. However, I am curious and somewhat confused: are you being critical of my clients' for reporting the children's condition to CPS; or, for what you believe, apparently based on what you were told by your clients, of the apparent insensitive way CPS handled the investigation, at least as reported by you. Clearly, if you have criticism of the way the CPS handled the investigation, we might wish to join you in that, assuming the visit was as reported by you.

PCRDIS-D000419

John J. Jakubcyzyk, Esquire
Attorney at Law
Re: **In the Matter of the Guardianship of NICHOLAS ANDRIANO and ASHLEE
ANDRIANO**
     **No. PB200-004531**
January 21, 2002
Page 2.

On the other hand, perhaps you would like to explain to me how the way CPS handled the visit can be blamed on my clients, as you have apparently done.

It is my clients' position that if that if your clients had been properly caring for the children, they would not have had the condition, which included identical "marks" on each side of their buttocks. My clients advise that if the children had not been in that condition, there would have been no call to CPS. It is my clients' position that it is the Lambeths who are the ones that are supposed to be caring for the children. And, if the Lambeths knew about the children's condition, they could have easily mentioned it to the Ochoas and advised how the condition was being treated, including providing the appropriate medicines. However, there was no mention of the condition.  My clients are unsure how to measure their silence: were your clients unaware of the condition, or did your clients hope it would not be noticed, are at least two options.  The adults in charge of children are charged with the responsibility of properly caring for them.

I have also been advised that my clients only called CPS after being advised by professionals who each viewed the children's condition and viewed the photos:  one a retired policeman who is also an investigator; one is a co-worker of Mrs. Ochoa from her hospital and another is a family member.  I understand that the pictures were taken on  two separate days and were shown to three healthcare professionals.  One being a Registered Nurse trained in abuse/neglect/rape [this one spoke to the person on the CPS hotline regarding the children's condition, and mentioned marks on both children in the same place and told the CPS hotline that there also appeared to be old bruises]; the other RN is a Clinical Educator who trains clinical staff in recognizing abuse and neglect; the third is an MSW, that formerly worked for CPS.  The reporting to CPS was not done quickly or taken lightly by them, but after consulting with these professionals. They felt they had a responsibility to do so, and were told they did by these professionals.

Additionally, my experience with my clients for over a year is that they are kind and gentle people, who desperately love their grandchildren, and want only the best for them.

My clients do not even talk negative to me about the Lambeths. And, I certainly have not witnessed any hostility toward the Lambeth and Andriano families. However, my clients have often expressed a significant coldness from the Lambeths toward them.  I have been told that Mrs. Lambeth has yelled at both

PCRDIS-D000420

John J. Jakubcyzyk, Esquire
Attorney at Law
Re: **In the Matter of the Guardianship of NICHOLAS ANDRIANO and ASHLEE ANDRIANO**
   **No. PB200-004531**
January 21, 2002
Page 3.

Donna and Alejo while on the telephone on numerous occasions; their understanding was that she was yelling because she wanted them to do things "her way". As an example: she only wanted the Ochoas to visit the grandchildren in the Lambeth home, while the Lambeths were present. I am also told that Mrs. Lambeth has gotten so angry that she has hung up the telephone on Mrs. Ochoa on more than one occasion; Mrs. Ochoa believes this occurred because she wanted to see the children more than once every two weeks for only 2 to 3 hours at a time.

My clients agree that there has definitely been a lack of communication. It is their opinion that the Lambeths go out of their way to avoid any questions that they have. My clients believe that the Lambeths are always on the attack with them. I am told that Mrs. Lambeth refuses to respond to Mr. Ochoa even when he says "hello". They believe that she is an extremely rude person, at least to them. Mrs. Ochoa says she has literally been afraid that if she approaches Mrs. Lambeth that she would be physical with her. She adds that Mr. Lambeth went after Mr. Ochoa to attack him at court last year, and you restrained him.

As far as further attempts at cooperating with the Lambeths, Mrs. Ochoa advises me that they shared pictures of birthday parties with them, gave them copies. However, Donna overheard Mrs. Lambeth telling Mrs. Andriano that she had the children's school pictures done, but never offered any to the Ochoas. Donna never asked for any, since, as she says, "she is not sure how she will respond". It is Donna's opinion that as long as the Ochoas give the Lambeths things they are fine; but, if they ask the Lambeths for anything they "bull up". The Ochoas bought small gifts for the Lambeth children at Christmas so that Nicholas and Ashlee could give them to their cousins.

How your clients see the Ochoas is not relevant; however, my clients have not had "ordinary contact with the children as grandparents normally do". You and I have discussed the lack of visitation on several occasions. None of those discussions has produced any change in the pattern. As I have repeatedly mentioned, the visitation that your clients have permitted does not even come close to the terms of the agreement or to the statutory grandparent rights provisions. For example, the agreement would have had the children visiting with my clients for about 1,152 hours per year, plus at the time of the agreement Mr. Lambeth promised my clients they could have a vacation schedule with the

PCRDIS-D000421

John J. Jakubcyzyk, Esquire
Attorney at Law
Re: **In the Matter of the Guardianship of NICHOLAS ANDRIANO and ASHLEE ANDRIANO**
     **No. PB200-004531**
January 21, 2002
Page 4.

children.   (The other grandparents were able to have two weeks of vacation with
Nicholas and Ashlee in June/July, 2001.  These grandparents were also able to have the
children live with them for two months.)  Of course, there has been no vacation time for
the Ochoas with the children and the actual number of hours they have had with the
children falls far short of the agreed upon 1,152 hours.  The actual numbers are 137.50
hours for the calendar year 2001.  Mrs. Ochoa documented the visitation in the attached
sheet.  Even the Guardian Ad Litem's schedule has not been followed:  it would have
been a range from 616 hours to 672 hours per year.  However, none of Mrs. Ochoa's
reports to any of the adults involved in this matter has produced any improvement.  The
Ochoas have often wondered if anyone listened; they believe no one apparently was, or
is.

As critical as the limitation on the number of hours of visitation with the grandchildren is to
my clients [it should be remembered that the Lambeths were virtual strangers to these
children when the agreement was reached, having spent almost all of their young lives
with their parents and with the Ochoas], the Lambeths deny visits on Sundays, as was
agreed at the time the agreement was entered into; there has been one Sunday, on
Mother's Day for about four hours.  You state that the Ochoas are not the parents; neither
are the Lambeths.

Your opinion is a conclusion that I believe is not warranted, there was nothing "mean and
thoughtless" in their actions.  Their actions were based solely on an abundance of
concern for the children.  Again, did you see the photos?  These children have clearly
been ignored and have not received the normal caring [parental or grandparental or
guardian] that children deserve.  Otherwise, there would be none of what is evident from
the photos.

John, clearly from at least the date you and Leon Thikoll signed and filed the document
requesting an evaluator to determine who should be the children's guardian, you had to
know that my clients were seeking to be the children's guardian.  The purpose of Dr.
Yee's evaluation, while it has been delayed for several months, is to determine what is in
the children's best interest.

My clients believe they were acting in the children's best interests.  They have never, in
my opinion, sought to escalate any conflicts between any of the family members.  But,
with the death of the children's father and the children's mother being accused of the
death, there is obviously going to be some contention among the family members.  I
believe my clients have attempted to minimize it; I believe the denial of meaningful

PCRDIS-D000422

John J. Jakubcyzyk, Esquire
Attorney at Law
Re: **In the Matter of the Guardianship of NICHOLAS ANDRIANO and ASHLEE
ANDRIANO**
      **No. PB200-004531**
January 21, 2002
Page 5.

visitation time to the Ochoas may have worked to escalate the tensions, including the
failing to follow and honor the parties' agreement from November 2000.

I meant this letter as a response to your letter of January 15th. I am hopeful that it has
been helpful to you in your continuing representation of your clients. I am also hopeful
that you will take a closer look at the visitation schedule that has been provided to you and
recognize that my clients are hardly spending any time with these children, only about 10
hours per month during 2001. It is my understanding that denying children the opportunity
to continue to have regular contacts with the people that they spent a large amount of time
with is very traumatic to their development. There must be a tremendous sense of loss for
these children. They lost their father; can't see or talk with their mother; and the only other
significant people in their lives have been reduced to about 10 hours per month. Are the
children getting any counseling for these conditions in their lives? I will continue to raise
them, hoping that someone listens. And, I realize that you have been advised of these
issues in the past, both by Mrs. Ochoa and by me, and nothing has happened. I always
like to have hope.

Lastly, I understand that it is very unusual that the children would both have the same
condition, in the exact same location on each side of their buttocks. Perhaps someone
should address what the condition is and how both came to have it and how both came to
have it in the same location. I believe such an inquiry may be more productive than
pointing fingers and casting blame. What do you think?

Very truly yours,

G. DAVID DELOZIER, P.C.

G. David DeLozier

Enclosure

Cc:    Mr. & Mrs. Ochoa
       Dr. Brian W. Yee, Ph.D.
       Mr. Gary A. Weiser
       Ms. Linda Gray

PCRDIS-D000423

## *Law Offices of G. David DeLozier, P.C.*

*4016 East Forest Pleasant Place, Cave Creek, Arizona  85331*
*E-Mail: gddelozier@aol.com*
*Phone (480) 575-6660    Facsimile (480) 575-6661*

February 7, 2002

John J. Jakubcyzyk, Esquire
Attorney at Law
2711 N. 24th Street, Suite 200
Phoenix, AZ 85008

Re:  **In the Matter of the Guardianship of NICHOLAS ANDRIANO and ASHLEE ANDRIANO**
**No. PB200-004531**

Dear Mr. Jakubcyzyk:

Please consider this letter a response to your letter dated January 30th and the one
dated February 1st, enclosing the letter from Dr. Gentile, M.D.

John, it is simple:  if your clients had bothered to inform my clients of the children's
"rash", all of this would have been avoided.  However, you indicate "Mrs. Lambeth was
treating the rash with an ointment", while Dr. Gentile states that on January 4th that he
gave "the parents (sic) some simple recommendations to correct this rash."  These two
statements are inconsistent.

"Monday morning quarterbacking" is the easiest job in the world.

Your clients have only permitted my clients to see their grandchildren about 10% of the
agreed upon schedule.  There has been no attempt to meet what "grandparents would
ordinarily see grandchildren".  As we pointed out in our last letter, the hours do not
approach the recommendation of the GAL and certainly are far short of the traditionally
granted grandparent time in domestic relations' cases.

What evidence do you have to assert "it appears that your clients were fostering that
disruption".  John, once again, offering your opinion.

Unfortunately, most of what your letter recites in the next couple of paragraphs are
"lies", according to my clients, your or your clients opinions of events, at best.  And, I
believe that it is still the Court's duty to resolve this dispute.   Unfortunately your
inflammatory rhetoric only tends to escalate the problems; not minimize them.

The statement that your clients "needed a time frame where they would not have to
deal with the Ochoas" is significantly puzzling since you now propose that the only way
my clients are to be permitted by your clients to visit with their grandchildren is to do so
in your clients' home.  These statements have to be the most contradictory ones that

John J. Jakubcyzyk, Esquire
Re: **In the Matter of the Guardianship of NICHOLAS ANDRIANO and ASHLEE ANDRIANO**
**No. PB200-004531**
February 7, 2002
Page 2.

have been published in this case to date.  Clearly, an offer to visit in your clients home as the only option to see the children is no option at all, especially under the current circumstances.  This is extraordinarily more complex when you couple it with the requirement that they come alone.  Clearly, such a situation puts my clients in the possibility of being accused of any kind of allegation that may come to someone's mind.  There is no possibility that my clients can agree to such conditions.

It appears that your clients only want everything their way.  My clients believe that there is little likelihood that your clients will ever be cooperative toward them and believe that they were fraudulently misled by your clients in entering to the agreement in November 2000.

Regarding the alleged involvement of your clients in the lives of the children, not only have I provided Mr. & Mrs. Ochoa's statements, enclosed please find letters from the children's babysitters.  Clearly, when they were with your clients is a puzzle to everyone.  However, I am not going to get involved in "selective memory" analysis", which you again allege against my clients.  I believe letting those who lived those days speak what happened.

Of particular note, one of the babysitters, Gia Palicki, says, in her July 13, 2001, letter, that she had met "Brad one time".  She says she "had never met or heard very much about his [Joe's] sister Jeana".  Near the bottom on the first page and the top of the second page of her July 13th letter, she says:

> The day of Joe's death I met Brad and Jeana again.  My concern to them was the kids who were very accustomed to being with me & my family daily.  At that time Brad reassured me that the kids best interest would be at heart and believed they should still see us. . . .

And near the middle of page two, she adds:  "I have not once heard from Jeana."

Gia adds in her second letter, which is also enclosed, and dated in February 2002, that other than one visit to her home to get the children's belongings from her, "[s]ince then I have had no contact with Jeana or Joe's family at all."

The second letter from a babysitter is by Guillermina Mora and is written in Spanish.  I was unable to have it translated at this time.  It is dated July 15, 2001.  I have been informed that it contains language similar to Gia's letter that there was little or no contact with your clients during the times she babysat the children and that there was an abundance of contact by my clients.

PCRDIS-D000411

John J. Jakubcyzyk, Esquire
Re: **In the Matter of the Guardianship of NICHOLAS ANDRIANO and ASHLEE ANDRIANO**
    **No. PB200-004531**
February 7, 2002
Page 3.

John, I agree that "we" should work through these issues; however, since I came on the case about a year ago, I have continually asked that the lack of visitation be addressed. It never has been. There has been no good faith attempts to "work through these issues", in my opinion. It is, also, my clients' opinion.

Regarding the letter from Dr. Gentile, M.D., it clearly states that he saw the children on January 4, 2002. It clearly does not state that he had seen the children prior to January 4, 2002, regarding this "rash". Thus, I assume that he had not seen the children during December 2001. The Ochoas and their witnesses saw the children in December 2001.

We had previously advised that my clients' decision to report the matter to the CPS was not done hastily or taken lightly. And, was only after consultation with various professionals and friends. Apparently, my statements were not believed, or perhaps, simply discounted as a lawyer doing his job. Thus, I am enclosing copies of letters from some of the people who saw the children, or saw the photographs of the children, during December 2001. The photographs were made by Mr. Ochoa on December 24th and December 29th. These were made when no one except the children and my clients were present. As you will see from their enclosed letters, all of these people were alarmed by the children's conditions.

The first letter is jointly, husband and wife, authored by a retired policeman, now investigator, Robert Jordan and Tammy Jordan. Mr. & Mrs. Jordan, upon viewing the children, advised them to "contact C.P.S. or the Casa Grande Police Department with the photos and have it documented."

A second letter is by a Registered Nurse, Samantha Celaya, who is also a SANE trained nurse [Sexual Assault Nurse Examiner]. After viewing photographs, she referred Mrs. Ochoa to a Social Worker who had formerly worked for CPS, Kelli Sieczkowski, MSW. She also "felt Donna should contact CPS because the children's pictures were so very similar." Ms. Celaya notes that the granddaughter: "area near crease of buttocks appeared to be discolored. Brownish/yellow/green. I questioned if it was resolving bruise".

Ms. Celaya adds:

> I asked Donna if the caretakers had informed her (Donna) that the children had this problem, and/or how they were treating it. Donna explained to me, that she had not been made aware of this by the caretakers, and only discovered it, while helping one of the children in the bathroom. I questioned if the caretakers

PCRDIS-D000412

John J. Jakubcyzyk, Esquire
Re: **In the Matter of the Guardianship of NICHOLAS ANDRIANO and ASHLEE ANDRIANO**
   **No. PB200-004531**
February 7, 2002
Page 4.

had any treatment or ointments, etc., that they had sent with the children for
this, she explained that there was no special medications or treatments sent
along with the children. As a nurse this was a concern to me. I do not know
how the injured areas occurred nor if they were inflicted or simply skin reactions
to something, but I do know they required treatment. In my opinion, either these
areas were inflicted by someone/something, and/or these areas of concern on
the children were being neglected and not treated timely or effectively. Nor was
the injuries reported to Donna, so that she could be aware of their needs and
treat the areas effectively. I did speak with a CPS representative and explain
my findings after reviewing the pictures.

Ms. Celaya's resume is attached following her notarized statement.

The third letter is by another Registered Nurse, Michelle R. Shuy. Of particular note are
the following points made by Ms. Shuy:

- In photograph #1 resolving bruising near and surrounding the crease of the
  buttocks can be seen.
- In photographs # 1, 2 & 3 on the right upper gluteus region is a suspicious mark
  resembling a looped bruise which also appears to be resolving.
- The skin is extremely excoriated and appears to have bled as evidenced by
  scabbing seen in photographs # 1 & 3. This indicates to me that the skin
  integrity has been severely impaired and this child is at risk for infection.
- The mechanism of the **injury** is unclear. However, the patterns of the **injuries**
  are nearly identical and the areas are well defined. [Emphasis added]

Ms. Shuy concluded:

After extensive examination of these photographs my advice to Mrs. Ochoa was
to seek an immediate intervention with Child Protective Services (CPS) for
these children based upon the suspicious nature of the **injuries**. Mrs. Ochoa
appeared reluctant to contact CPS, however, I told her that if she did not
contact them, as a healthcare provider, I am obligated under law to report
suspected abuse or risk censure of my license. This is a very serious issue and
must be death with accordingly or risk the long-term affects on the children.
[Emphasis added]

Ms. Shuy's resume is attached following her notarized letter.

PCRDIS-D000413

John J. Jakubcyzyk, Esquire
Re: In the Matter of the Guardianship of NICHOLAS ANDRIANO and ASHLEE ANDRIANO
     No. PB200-004531
February 7, 2002
Page 5.

The fourth letter is from Carmen May. Her letter confirms that she saw the children on December 24, 2001. She says, "because I have two children of my own, Donna and Alejo wanted my opinion". She adds:

> My children have never had markings on their bottoms like that. . . My reaction was that it was 'not normal' because both children had the same markings on both sides of their buttocks. I questioned if the children had been spanked. I also questioned why the children would be in that condition. I felt that they (Ochoa's) should contact CPS.

An additional professional witness, Kelli Sieczkowski, MSW, Social Worker (ex-CPS worker), was unable to write a letter as of this time, but agreed to talk with Dr. Yee if he desired to do so. Her number is 520-426-6300. Thus, the Ochoas involved at least six (6) people in the decision making process. Also, once again note, that Dr. Gentile saw the children on January 4th; the others on December 24th, eleven (11) days later.

John, perhaps with the "rest of the story", calmer minds might prevail and avoid the rhetoric of recent days. As one of the writers ended their letter: "It should not hurt to be a child." I am hopeful that some good will come from these efforts. And, that not anyone will now believe that my clients were acting selfishly.

Very truly yours,

G. DAVID DELOZIER, P.C.

G. David DeLozier

Enclosures [as stated, 18 pages]

Cc:   Mr. & Mrs. Ochoa [without enclosures]
       Dr. Brian W. Yee, Ph.D. [with enclosures]
       Mark J. Gentile, M.D. [with enclosures]
       Mr. Gary A. Weiser [with enclosures]
       Ms. Linda Gray [with enclosures]

PCRDIS-D000414

# Law Offices of G. David DeLozier, P.C.

*4016 East Forest Pleasant Place, Cave Creek, Arizona 85331*
*E-Mail: gddelozier@aol.com*
*Phone (480) 575-6660   Facsimile (480) 575-6661*

March 6, 2002

John J. Jakubcyzyk, Esquire
2711 N. 24th Street, Suite 200
Phoenix, AZ 85008

Re: **In the Matter of the Guardianship of NICHOLAS ANDRIANO and ASHLEE ANDRIANO**
     **No. PB200-004531**

Dear Mr. Jakubcyzyk:

I would request that you please ask Dr. Gentile to refer to Mrs. Lambeth as something other than "mom" on his documents. If at a later date the records are needed for other purposes, and the children's Mother, Wendi, is once again reunited with them, there may be some considerable difficulty explaining that "mom" was someone other than Wendi. I just think that the opportunity for confusion should be avoided and that the medical records should be precisely accurate.

I was dismayed to receive the children's medical reports that the "condition" has returned. Of particular interest were Dr. Gentile's notes, which appeared to be "moisture or detergent".

Once again, I request the medical records of the Lambeths' five (5) children for the period October 2001 through March 6, 2002. See my letter of request dated February 25m 2002, enclosed for your convenience. Clearly, if detergent may be blamed for the "condition", at least some of the other children should have the "condition". Please respond by the end of business on Thursday, March 7th, with your intent to provide the records or not to provide them. I believe these records are critical to assisting in coming to a resolution of this perplexing issue. It is not my desire to have to seek the assistance of the Court to obtain these records, as I have previously said.

I, also requested in the February 25th letter, that I would appreciate having the Lambeths' explain, in writing: "how the children came to have the condition, what caused it, what they did to treat it, when did they go to the doctor and what did the doctor prescribe for treatment", the ointment Mrs. Lambeth was using at the time of the Ochoas' discovery of the condition, December 24, 2001, who prescribed the "ointment". If you are unwilling to have them do so, also please let me know by the end of business on Thursday, March 7th. When you do, assuming you are unwilling to permit them to do so, or they refuse, please provide dates in March 2002, from the 20th through the 29th, that are available for your clients and you in order to take their depositions, which I want to do on the same day, one after the other. I am available in the AM on the 20th, PM on the 21st, AM on the 26th, and all day on the 27th, 28th or 29th.

PCRDIS-D000468

Very truly yours,

**LAW OFFICES OF G. DAVID DELOZIER, P.C.**

G. David DeLozier

Cc: Mr. & Mrs. Ochoa
   Dr. Brian W. Yee, Ph.D.
   Mark J. Gentile, M.D.
   Mr. Gary A. Weiser

PCRDIS-D000469

# JOHN J. JAKUBCZYK

--- ATTORNEY AT LAW ---

2711 N. 24th Street, Suite 200
Phoenix, Arizona 85008
Tel. 602-468-0030
Fax 602-468-0053
E-mail: jakeslaw@ionet.net

April 1, 2002

G. David DeLozier, Esq.
LAW OFFICES OF G. DAVID DeLOZIER, P.C.
4016 East Forest Pleasant Place
Cave Creek, Arizona 85331

> **RE:** *In the Matter of the Guardianship of*
> *NICHOLAS ANDRIANO and ASHLEE ANDRIANO*
> *No. PB 2000-004531*

Dear Mr. DeLozier:

This letter will address your conduct during a telephone call you placed to me on March 27, 2002. I will not suffer your language or insults. Please do not ever talk to me like that again.

With respect to the issue of depositions: As I informed you, the prior counsel for the Ochoas, Mr. Thikoll and I had originally scheduled depositions at his request for all parties last year in March. On the day scheduled, he proposed, and I agreed, that we not take the depositions of the parties. We agreed that in the event we ever decided to do so in the future, all of the parties' depositions would be taken at the same time.

Fast forward to your letter in March, asking for my clients to provide a detailed explanation of what happened concerning the rash. You wanted a written explanation and if they would not comply, you wanted to take their depositions. I answered that they would comply with your request and provided you with an unedited copy of Jeanea's explanation. Apparently this explanation did not satisfy you and so you called on March 27, 2002 wanting to arrange for depositions. The day after our conversation concluded, I received an Amended Notice of Deposition setting the depositions for April 5, 2002 in the afternoon.

The Arizona Rules of Civil Procedure are very clear about scheduling depositions. Your Notice does not comply with the Rules. My clients' schedule will not accommodate the date chosen. Mr. Wieser was not noticed on the Notice of Deposition and I called his office and he is not available. Finally, the date conflicts with a previous engagement on my calendar.

Therefore, please be advised that my clients will not be able to attend the deposition set for April 5, 2002 at 1:30 p.m. and 3:00 p.m.

Yours truly,

John J. Jakubczyk

JJJ/mjf
c:  • Gary Alan Wieser, Esq.
    • clients

PCRDIS-D000464

FROM : G. David DeLozier,P.C.          PHONE NO. : 602 867 5894          Mar. 28 2002 10:33AM P1

## Law Offices of G. David DeLozier, P.C.

*4016 East Forest Pleasant Place, Cave Creek, Arizona 85331*
*E-Mail: gddelozier@aol.com*
*Phone (480) 575-6660   Facsimile (480) 575-6661*

VIA FACSIMILE AND FIRST CLASS MAIL

March 20, 2002

John J. Jakubcyzyk, Esq.
2711 North 24th Street, Suite 200
Phoenix, Arizona 85008

> Re:   **Guardianship of Nicholas and Ashlee Andriano**
>         Case No. No. PB 2000-004531

Dear Mr. Jakubcyzyk:

Mr. DeLozier I would like to take the depositions of your clients, Mr. and Mrs. Lambeth, as some time in early April, and has requested that I seek some potential dates for these depositions that meet your scheduling concerns. Mr. DeLozier anticipates that the depositions would not last too long, and should be completed within a morning or afternoon, depending on your schedule.

Thank you for your attention to this matter.

Sincerely yours,

G. DAVID DELOZIER, P.C.

Evan Haglund
Legal Assistant

/elh

PCRDIS-D000472



COPY

MAR 1 2 2002

1   **G. DAVID DELOZIER, P.C.**
    4016 Forest Pleasant Place
2   Cave Creek, Arizona 85331
    Tel. 480-575-6660
3   Fax 480-575-6661
    e-mail: gddelozier@aol.com
4
    G. David DeLozier
5   State Bar No. 005237
    Attorney for Maternal Grandparents
6

7

8                 IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9                     IN AND FOR THE COUNTY OF MARICOPA

10

11  In the Matter of the Guardianship of          No. PB 2000-004531

12  NICHOLAS ANDRIANO and
    ASHLEE ANDRIANO,                              **MOTION TO COMPEL**
13                                                **PRODUCTION OF MEDICAL**
                  Minor Children.                 **RECORDS**
14
15                                                (Assigned to the Honorable
                                                  Jane Bayham-Lesselyong, Commissioner)
16
17                                                (Oral argument requested)

18

19          Donna and Alejo Ochoa, the Maternal Grandparents of the Minor Children in this

20  matter, hereby move this Court for an order compelling the production of certain medical

21  records of the five additional children in the household of the present court-appointed

22  Guardians, Bradley and Jeanea Lamberth. Both of the Minor Children in this matter have

23  recently experienced a severe skin condition on their bottoms, which has been diagnosed

24  as either (i) a rash, or (ii) a burn. Counsel for the Guardians has confirmed that, in

25  addition to the Minor Children, at least some of the other children in the household have

26

                                          -1-

experienced this same condition.  However, the Guardians refuse to disclose pertinent medical records for the other children, asserting that they are irrelevant.

The nature and source of the Minor Children's skin condition is clearly relevant to whether the Lambeths' guardianship should be continued or terminated.  Accordingly, any evidence that might shed light on the nature and source of this condition, including records from the other children in the household who have also experienced the same condition, are unquestionably relevant.  Accordingly, the Maternal Grandparents respectfully request that this Court enter an order compelling the production of these records.

This motion is based upon the complete file in this matter, as well as the accompanying memorandum of points and authorities.

RESPECTFULLY SUBMITTED this 12th day of March, 2002.

G. DAVID DELOZIER, P.C.

By _____
G. David DeLozier, Esq.
Attorney for the Maternal Grandparents

## MEMORANDUM OF POINTS AND AUTHORITIES

I.    **Factual Background**

On or about October 8, 2000, the two children in this matter, Nicholas and Ashlee Andriano (the "Children"), were taken from their parents when their father died, and their

-2-