# TABLE OF CONTENTS (INTERACTIVE)

| LLLLLLLLLLL PART 7 | Petitioner's Appendix to Petition for Review |
|---|---|

# EXHIBIT LLLLLLLLLL
# PART 7

mother was arrested and accused of participating in Mr. Andriano's death.  The Phoenix Police Department turned the Children over to Mr. and Mrs. Ochoa, and the Children's maternal grandparents.

Shortly thereafter, the Children's paternal grandparents, Joseph and Jeanette Andriano, requested to see the Children, promising to return the Children in a couple of days.  The Ochoas consented to this request.  However, the Andrianos did not return the Children to the Ochoas as promised.  Indeed, shortly thereafter, Mr. and Mrs. Lambeth, the Children's paternal aunt and uncle, sought to be named the Children's guardians, adding the Children to the five children that Mr. and Mrs. Lambeth have of their own.

The Ochoas consented to this arrangement.  Their consent, however, was based upon an agreement that the Ochoas' rights and interests as the Children's grandparents would be accommodated and protected.  Specifically, the agreement provided that the Lambeths "shall recognize the grandparents' right to customary and reasonable visitation of the children."  *See* Agreement, attached hereto as **Exhibit 1**.  Among other things, the parties agreed that "such customary and reasonable visitation shall include not less than two (2) weekends per month with ALEJO OCHOA and DONNA OCHOA unless more visits otherwise arranged to and agreed by the parties [sic]."  *Id.*

Since entering into this Agreement, the Ochoas have not have had nearly the contact envisioned and required by the Agreement with the Children.  Indeed, recently, weeks and months have passed since without any significant or meaningful contact by the Ochoas.

-3-

In December of 2001, the Ochoas had a brief visit with the Children. During this brief visit, the Ochoas discovered that there may have been reason for the recent lack of contact; specifically, the Ochoas discovered that the Children were experiencing a severe skin condition on their bottoms. Photographs of the skin condition are attached hereto as **Exhibit 2.** Because the visitation with the Children was brief and occurred on a weekend, the Ochoas were unable to have the Children independently diagnosed by a physician.

The Ochoas had a physician examine the photographs and medical records of the children. This expert opined that the condition was a "second decree burn/chemical burn". *See* **Exhibit 3.** [1] Since, undersigned counsel inquired whether any of the other children in the Lambeth household – the five natural children of Mr. and Mrs. Lambeth – had experienced this skin condition. *See* March 6, 2002 letter from G. David DeLozier to John J. Jakubcyzyk, attached hereto as **Exhibit 4.** Undersigned counsel also requested a copy of the other children's pertinent medical records. *Id.* [2]

In response, Mr. Jakubcyzyk indicated that at least one of the other children has developed this skin condition. *See* March 7, 2002 letter from John J. Jakubcyzyk to David DeLozier, attached hereto as **Exhibit 5.** However, Mr. Jakubcyzyk refused to

---

[1]     The Children's pediatrician has suggested that the skin condition was a rash.

[2]     When this skin condition returned, on or about March 6 or 7, 2002, undersigned counsel also orally requested that the Ochoas be able to see the Children during the business day in order to take the Children to their own physician. Counsel for the Guardians indicated that he would check with his clients; he has not gotten back to undersigned counsel regarding this request.

-4-

1  produce any of the pertinent medical records, claiming that such records were simply

2  "irrelevant."

3      The Maternal Grandparents now hereby respectfully request that this Court order

4  the production of these medical records.

5

6

7  II.   Discussion

8      The rules of pre-trial discovery are broad.  Rule 26 of the Arizona Rule of Civil

9  Procedure provides that any information that "appears reasonably calculated to lead to the

10  discovery of admissible evidence."  Ariz.R.Civ.P. 26(b)(1).  "The discovery rules . . .

11  should be liberally construed to permit discovery of information 'relevant to the subject

12

13  matter in the pending action.'"  *State Farm Ins. Co. v. Superior Court*, 167 Ariz. 135,

14  138, 804 P.2d 1323, 1326 (App. 1991) (quoting Ariz.R.Civ.P. 26(b)(1)).  "The goal of

15  broad discovery is to facilitate mutual knowledge of all relevant facts gathered by the

16

17  parties, promote efficient and speedy resolution of disputes and avoid surprise at trial." *Id*

18  (citing *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)).

19      In the present matter, the maternal grandparents have been virtually shut off from

20  their grandchildren.  Moreover, in the one short visit they had, the Ochoas have

21  discovered that not just one, but both of the Children had developed some form of serious

22

23  skin condition on their bottoms, a skin condition that might simply be a "rash", according

24  to one medical person and a "burn" according to another, however, might also have more

25  sinister causes.  According to the Guardians' counsel, other children in the household –

26

-5-

P-App. 003686

non-siblings – have also experienced a skin condition. Thus, any evidence of the cause of this skin condition for any of the children is unquestionably relevant in determining the cause of the condition for the two Minor Children at issue.

### III.   Conclusion

For the foregoing reasons, the Maternal Grandparents respectfully request that this Court issue an order compelling the Guardians to produce or, at the very least, consent to the production, of medical records for all children in the Guardians' household for the period October 1, 2001 to the present. The Maternal Grandparents and counsel will agree to whatever confidentiality provisions this Court deems necessary to protect the privacy of the children.

RESPECTFULLY SUBMITTED this 12th day of March, 2002.

G. DAVID DELOZIER, P.C.

By _____

G. David DeLozier, Esq.
Attorney for the Maternal Grandparents

-6-

## CERTIFICATE OF SERVICE

**THE ORIGINAL** of the foregoing
filed this 12th day of March, 2002 with

Clerk of the Court
Maricopa County Superior Court
201 West Jefferson
Phoenix, Arizona 85003

And **a copy** mailed/delivered* to:

The Honorable Jane Bayham-Lesselyong*
Commissioner, Maricopa County Superior Court
201 West Jefferson
Phoenix, Arizona 85003

John J. Jakubcyzyk, Esquire
2711 North 24th Street, Suite 200
Phoenix, Arizona 85008
Attorney for Guardians

Dr. Brian W. Yee, Ph.D.
7220 North 16th Street, Bldg. K
Phoenix, Arizona 85020

Gary Weiser, Esquire
P.O. Box 16246
Phoenix, Arizona 85011-6246

Linda Gray
2346 North Central Avenue
Phoenix, Arizona 85004

By _____

-7-

1  **G. DAVID DELOZIER, P.C.**
   4016 East Forest Pleasant
2  Cave Creek, AZ 85331-5439
   Phone (480) 575-6660
3  Facsimile (480) 575-6661
   E-mail: gddelozier@aol.com
4

5  G. David DeLozier
   State Bar of Arizona NO. 005237
6  Attorney for Maternal Grandparents

7              **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

8                  **IN AND FOR THE COUNTY OF MARICOPA**

9
   In the Matter of the Guardianship of        )
10                                              )        **Case No. PB 2000-004531**
                                                )
11 NICHOLAS ANDRIANO and                        )
   ASHLEE ANDRIANO,                             )
12                                              )        **SUBPOENA**
              Minor Children.                   )
13                                              )
                                                )        **(Assigned to the Honorable**
14                                              )        **Jane Bayham-Lesselyong,**
   _____        )        **Commissioner)**
15

16 **THE STATE OF ARIZONA TO:   Ms. Linda Gray**

17

18
         **YOU ARE HEREBY COMMANDED**, pursuant to the provisions of Rule 45, Ariz. R.
19 Civ. P., to appear at the Maricopa County Superior Court, Court Room 007, Phoenix,
   Arizona, **on   April 17,   2002, at 1:30 p.m.** and **April 23, 2002 at 1:30 p.m.** to give
20 testimony.

21       **YOU ARE FURTHER COMMANDED** to bring with you and produce at such time and
   place the following documents:
22

23

24       You have been subpoenaed by the Grandparents, whose attorney's name and
   address appears above.
25

1        If you are not a party to the litigation, or an office of a party; the court will issue an order to protect you from any significant expense resulting from the inspection and copying
2    commanded.  See Rule 45(c)(2)(B) of the Arizona Rules of Civil Procedure.

3

4        You may also file a motion in the Superior Court of the County in which the case is pending to quash or modify the subpoena if the subpoena:

5

6        (i)    Does not provide a reasonable time for compliance;
    (ii)    Request a non-party or office of a party to travel to a county different from the county where the person resides or does business in person; or to travel to a county
7    different from where the subpoena was served; or to travel to a place farther than 40 miles from the place of service; or to travel to a place different from any other convenient place
8    fixed by an order of a court, except that a subpoena for you to appear and testify at trial can command you to travel from any place within the state;
9        (iii)    Requires the disclosure of privileged or protected information and no waiver or exception applied;
10       (iv)    Subjects you to an undue burden.  See Rule (45)(c)(3)(A) of the Arizona Rules
11   of Civil Procedure.

12       If this subpoena:
    (i)    Requires the disclosure of a trade secret or other confidential research,
13   development, or commercial trade information; or
    (ii)    Requires disclosure of an unretained expert's opinion or information not
14   describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party; or
15       (iii)    Requires a person who is not a party or an officer of a party to incur substantial travel expense;
16

17       The court may either quash or modify the subpoena, or the court may order you to appear and produce documents only upon specified conditions, if the party who served the
18   subpoena shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that you will be reasonably compensated.  See
19   Rule 45(c)(3)(B) of the Arizona Rules of Civil Procedure.

20       SIGNED AND SEALED THIS DATE:  _____
    Clerk of the Court COPY
21

22       APR 1 6 2002
    By: _____
23       Deputy Clerk    MICHAEL K. JEANES, CLERK
    R. BROWN
    DEPUTY CLERK
24   **YOU ARE HEREBY NOTIFIED THAT ANY FAILURE TO OBEY THIS SUBPOENA WITHOUT ADEQUATE EXCUSE MAY BE DEEMED AS CONTEMPT.**

25

## SecuriKey Investigations
Investigation/Consulting
P.O. Box 1104
Carefree, AZ 85377

Michael T. Bartley
FBI, Retired
Licensed Private Investigator

Office: 480-488-5771
Fax: 480-488-1897
E-mail:mtdjbart@doitnow.com

May 8, 2002

G. David DeLozier, P. C.
4016 East Forest Pleasant Place
Cave Creek, AZ 85331

Re:    Bradley James Lambeth                    Case File:  02-206
       Jeanea Marie Lambeth

Dear David,

Per your fax request on 04/08/2002, and our telephone conversation with the results on
04/12/2002, the following is being submitted for your records.

If you need any additional information regarding these individuals, please call.

Thank you again for giving me the opportunity to work with you.

Sincerely,

Mike Barcley

Mike Bartley, LPI
SecuriKey Investigations

Enc.    Reports
        Superior Court Record

Thank you for using SecuriKey Investigations. We appreciate your business.
*AZ Lic. #9803006*

P-App. 003691

Background Investigation
for
Jeanea Marie Lambeth
SSAN: [                    ]
DOB: 06/18/1963

| | |
|---|---|
| Criminal: | None listed at Maricopa County Superior Court, Maricopa County Justice Courts City of Phoenix Municipal Court |
| Civil Litigation: | Maricopa County Superior Court Maricopa County Justice Courts none listed for the above individual |
| Federal | U. S. District Court, Phoenix Division for the state of Arizona No criminal or civil files for this subject. |
| Bankruptcy | U. S. District Court. No filings appear for this name or social security number. |

Recorded Documents

| Notice of Lien: | #201-0197022 |
|---|---|
| Date: | 03/14/2001 |
| Grantor: | Kachina Management |
| Grantee: | Bradley Lambeth Jeanea Lambeth |
| Amount: | $283.00 |

Driver's History

| State: | Arizona |
|---|---|
| Operators License: | B14506388 |
| Date of Issue: | 06/06/1997 |
| Expiration: | 06/18/2028 |
| Record: | Clear, no violations |

End of Report

Background Investigation
for
Bradley James Lambeth
SSAN: |_____
DOB: 11/18/1960

| | | |
|---|---|---|
| Criminal | None listed at Maricopa County Superior Court, Maricopa County Justice Courts City of Phoenix Municipal Court | |
| Civil Litigation | Case Number: | CV99-04155 |
| | Date: | 03/09/0999 |
| | Plaintiff | Fertilizer Company of AZ, Inc |
| | Defendant: | Growers AG, Inc. James A. Lambeth Brad Lambeth |
| | Complaint: | Contract dispute |
| | Disposition: | 08/05/1999 Judgment for the Plaintiff, |
| | Amount: | $306,588.12 |
| Federal | U. S. District Court, Phoenix Division for the state of Arizona. No record of criminal or civil files for the subject. | |
| Bankruptcy | U. S. District Court. No filings appear for this name or social security number. | |
| Recorded Documents | Notice of Lien | #2001-0197022 |
| | Date: | 03/14/2001 |
| | Grantor: | Kachina Management |
| | Grantee: | Bradley Lambeth Jeanea Lambeth |
| | Amount: | $238.00 |
| | Civil Judgement: | #99-0872500 |
| | Date: | 08/05/1999 |
| | Grantor: | Ferizona – Casa Grand, LLC |
| | Grantee: | Growers AG, Inc. James A. Lambeth Brad Lambeth |
| Driver's History | State: | Arizona |
| | License Number: | 526292859 |
| | Date of Issue: | 01/18/1994 |
| | Expiration: | 11/15/2025 |
| | Record: | Clear, no violations noted |

End of Report

03/27/2002  17:47    4805756661              SDAVIDELOZIER                    PAGE  03
12345X

Brad & Jeanea Lambeth

█████████████

March 15, 2002

John Jakubczyk
24th Street, Suite 200
Phoenix, AZ

Dear John,

As you have asked, I went through my notes and can document when we started to notice that Nicholas and Ashlee started getting rashes.

I first noticed that Ashlee had a red bottom after a visit on Thursday, November 29, 2001. The Ochoa's took the kids at 5:00 PM and returned them at 7:00 PM. When I was getting them ready for a bath, I noticed that Ashlee's bottom was bright red. She said, "Grandpa Alejo touched her butt." I asked her if he helped her go to the bathroom, and she said she didn't know. I put Desitin cream on it before I put her pull up on for the night. I checked Nicholas and he did not look red. On Friday the 30th, Ashlee's bottom was still red. I put Desitin on her again at bedtime. During the following week, Ashlee was really emotional and said on several occasions, " Grandma Donna says to keep secrets". When Ashlee said this, I would answer with the answer that the Therapist suggested; "In this family we do not keep secrets, we have no secrets." During the week, the rash got better.

On December 7, 2001, Alejo called and demanded the kids on Saturday. We had plans for the afternoon so I said they could have the kids from 8:00 AM to 12:30. He made a snotty remark and hung up the phone. Donna picked the kids up at 7:50 AM on Saturday. Later that evening, Brad and I went to Phoenix, to finish up some paperwork for the new house, and to do some Christmas shopping. We left the kids with my mom. My mom called as said she needed to go to the store, so we said that Brent could watch the kids for a few hours. Donna showed up after dark, and was trying to force her way into the house. Brent told her that we were out, and Grandma would be back in a little bit. Brent called us to let us know, and then he called my mom. Donna called again later and asked if any one was there, and Brent said that they would be home in a little bit. My mom came home and called Donna to let her know that she was there.

On Monday the 10th, during the evening, while we were bathing the kids, Ashlee said the Grandpa Alejo touched her butt. I asked her if he was helping her go potty, and she said yes. Her rash was getting better. Nick had scratches, where he had scratched himself on the rear.

PCRDIS-D000342

On December 13th, we had to drive up to Glendale to close on our house and that we would be moving, and it would be hard to set up a visit during the weekend. We told the Ochoa's that we would not be back early enough for them to take the kids to dinner, on Thursday night.

December 14th, we got the keys to our new house. We decided to spend the night, the kids were excited to have a "campout" in the new house. I went to Target to pick up some diapers, pull-ups and some other things. I bought a different brand of pull-ups because Target didn't have the right size. Brad and the big kids started moving things in from our storage room. The rest of our furniture would not start coming until the 20th.

December 19th, Brad took Ashlee to the Doctor. She had an ear infection and an upper respiratory infection. The doctor prescribed antibiotics. Ashlee did have a little bit of a rash at this point. I changed back to the laundry detergent that we used to use. I think that using Tide irritates Nicholas and Ashlee. I asked the pharmacist about what kind of ointment would be better for a rash. He sold me some hydrocortisone cream, Cortaid and some anti-fungal cream. He said that the A & D was good and he also suggested the Aquaphor.

December 20th, I brought the three little kids home from school. When I brought the kids into the house, Nicholas was crying that his head hurt. When I felt his forehead, he was warm. I took his temperature, it was 102 degrees. I called Brad so that he could call and tell the Ochoa's that the kids were sick, but Donna already was at the house. She came in and I tried to tell her that Nicholas had a fever, but she insisted that they needed to still go with her. Nicholas cried and begged to stay because he didn't feel good, she decided to only take Ashlee. Ashlee screamed and cried that she did not want to go without Nick or Liam. She asked if Liam could go, I tried to change the subject, but she kept asking. Finally Donna decided to stay and visit. We invited her to eat with us. She then asked if she could bring her friend into the house. The movers were moving in furniture while we ate dinner. My mom brought dinner for us, so that we could focus on getting things moved in. Donna and her friend stayed for two hours. Donna kept the kids secluded from the rest of the family the whole time she was there. Later that night, I noticed that Ashlee's rash is getting more irritated, I started to use A&D ointment and Cortaid.

December 21st, Brad took Nicholas to the Doctor. He had an upper respiratory infection. The doctor prescribed an antibiotic. Nick did have a little bit of a rash, I used A&D ointment and Cortaid.

We noticed that everyday the rashes were getting worse. I had changed laundry detergent from Tide back to the Surf that I used before. I also bought the Pull-ups that we usually buy. I think that maybe the new pull-ups are irritating the kids too.

December 24th, We were at the Andriano's for Christmas Eve. The Ochoa's were going to take the kids from 2:30 to 5:30. I had talked with my mom about the rashes on the kids, and she looked at it and said that both Joe and James had rashes when they were

PCRDIS-D000343

little. Ever since we have had the kids, they have had rashes on and off. I treated it with Cortaid and Desitin or A & D ointment. We were getting worried, because they were so late. The Ochoa's didn't bring the kids back until 6:20 PM. They did not want to talk to us and, they did not explain why they were late. Both kids said that they talked to Mommy Wendi on the phone. While Brad was on the phone to my sister Jana, Donna called and said that Ashlee had two potty accidents, and that she was wearing a pull-up. Brad continued to talk to Jana, and she said that we should not use Cortisone cream because sometimes it makes a rash redder. When she was a Pharmaceutical Company Representative, she had a cortisone product, and she knew that redness was one side affect. We decided to just use the A & D ointment only to help clear up the rash. During the evening, we thought that it was really suspicious that Ashlee would have two potty accidents, and that she was wearing the same long pants home.

December 29th, the Ochoa's picked up the kids at 10:00 AM. Donna came early. Both kids rashes were getting better. They were both finished with the antibiotics. And we were just using the A & D ointment.

January 2, 2002 CPS left a card and a packet of information. Brian Baum asked us to call. We were not home at the time. We had taken the kids to the Science Museum with my mother. Brad called a number to find out what the packet meant.

January 3, 2002, we called John to let him know that we had stuff left from CPS. He called Brian Baum and Brad then called Brian Baum. It was set up that he would come to the house to see the kids later that day. When Mr. Baum came to the door, he didn't tell me what he was going to do. He just walked over to Ashlee and lifted up her shirt and then pulled her pants down to her knees. He was touching her bottom and then turned to look at the front of her body. I was horrified. He then went over to Nicholas. Nicholas was very apprehensive and scared. He did not want Mr. Baum to look at him. Mr. Baum grabbed him by the arm and proceeded to pull Nicholas's shirt up over his head and then pulled his pants off to his ankles. Mr. Baum really didn't say anything when he was finished. He asked where I worked and said that he would like to us later in the week. The rest of the day, Ashlee cried and whined. Nicholas was hitting and acting out all day. We had repair people coming to fix things in the house during the next few days. Everytime the doorbell rang, Ashlee would start crying and freaking out. Nicholas would run upstairs and hide under his bed.

January 4th, 2002, I had to go to Tucson, but my mom took the kids into see Dr. Gentile. He looked at the rash on the kids and said, it is a rash. He said to use Cortaid and aquaphor.

We were so upset about everything that had happened that we told John that we did not want to see the Ochoa's for a while. He agreed.

During the first week of February, we said that Ochoa's could see the kids. But no answer. The rashes cleared up and they are doing fine.

345%

After our Hearing in February, the visits were reinstated. The Ochoa's had a visit on February 28. The first all day visit was on Saturday March 2, 2002. On Sunday evening, we noticed that a rash was occurring again. I took both kids in to the doctor on Monday, March 4th, 2002. He said that it was a rash. He prescribed westcort and Aquaphor.

On March 7 and on March 10th, 2002 the Ochoa's had visits. After the all day visit on Sunday the 10th during bath time, I noticed that Ashlee had a very red bottom. I looked at Nicholas and his bottom was red. When they left this morning, they had clear bottoms. NO RASHES. I took them to Urgent Care in Gilbert. We checked in at 8:10 PM. When we finally saw the doctor, he said it was a rash. He said to put nothing on it and if it gets worse to take them into the doctor.

On March 12th, 2002 I took Clayton in to the Doctor. While I was there, we discussed the rashes again, and he said to call late in the week if they do not clear up.

On March 14th, 2002 the kids had a visit with the Ochoa's. When they got back Ashlee said that Grandma Donna looked at her butt. We asked Nicholas if Grandma Donna looked at his Bottom, and he said yes. He also said other people looked at their bottoms while they were at the Mc Donalds. We asked him if he knew the people, and he said they were friends of Grandma Donna and Grandpa Alejo. Later in the evening, Ashlee said that Grandma Donna says to keep secrets.

March 15th, 2002 I called Dr. Gentile's Office to let them know how the kids are doing. The kids have an appointment on Monday March 18th.

PCRDIS-D000345

March 28, 2002


Dr. Brian Yee
7220 N. 16th Street
Building K
Phoenix, AZ  85020


Re:  Andriano, Nicholas and Ashlee


Dr. Yee,

Our attorney asked that we respond to a letter written by Jeanea Lambeth on March 15, 2002.  I first saw this letter on March 22nd at a status hearing.  The Lambeth's attorney showed it to our attorney, who gave it to me to read.  I was stunned about the things that were said in it.  I truly believe that letter was a direct result of Alejo and I reporting the Lambeths to CPS for the condition of Nicholas and Ashlee, in December 2001.  It was our duty by law to report to CPS and our obligation to our grandchildren to do so.  I have already had to settle that in my heart, and I know that we did the right thing under the circumstances.

I have been in uncomfortable situations at work dealing with employee relations and bad feelings, but I have never had anyone attack me personally like this.  I know that there is always more than 1 or 2 sides to a story, but this is ridiculous.  It is no wonder that I've been scared to say anything to the Lambeth's.  I have found out this past 18 months that everything gets horribly twisted.

We have been lied to from day one and it doesn't stop.  From the day that the Lambeth's and Andrianos asked to see Nicholas and Ashlee.  We get to their house on Monday and they ask if the children can stay with them until Wednesday because they are having company from out of state.  Then I never get them back.  I'm told that they want the best for the children.  Brad tells me that he promises that 'it won't go south.'  I believed him, I trusted him.  Our attorney told us that once we let go of the children we lost them for good.  Everything was a nightmare.  The children would cry and sob when we would leave, no one cared.  Then we meet with the attorneys and the Lambeth's and are told we would have them for at least 2 weekends a month plus any other time. (This is in the guardianship.  Alejo and I understood that it was temporary.)  It was discussed and agreed that when the children's mother would call at our house they could talk to her.  Then later we are told they can't and that we can't keep them overnight any longer.  The family has done everything possible to keep us from these children.  I don't understand why they hate us so much.  The children had never spent the night with the Lambeth before October 2000.  They had spent many, many nights and weekends with us both at our home and at theirs when we would stay there.

The bullet points are responses to things that Jeanea has accused us of in her letter:

- We have NEVER told either of the children "to keep secrets."  I am very upset about this statement.  I have addressed this issue before and again I will say that is a lie.  We never did that with our children, or with any children.  It would only lead to problems for the children and danger.  We have never said that.  It is just not true!

- Jeanea accused us of letting the children talk to their mother on December 24th, 2001.  Again, I will make copies of my phone bills to show that the children have not been present at my home when my daughter has called.  We have not let them speak to her since December 2000, even though no one will give us a straight answer as to why not.  Linda Gray, the children's therapist, was to have done a 3-way call with Wendi and the children in January 2001 and that has not been done to date.  I do understand that Linda can only do what the Lambeth's give her permission to do.

- Alejo has not changed Nicholas or Ashlee's diapers or taken either one of them to the bathroom.  He had made that decision early one, just because he felt that the Lambeth's/Andrianos might try to say something.  I thought he was being silly, I guess he was correct.  Won't this nightmare ever come to an end?!

PCRDIS-D000560

- Here is a copy of what I sent you on December 8, 2002, regarding what happened that evening. I never tried to force my way in to the house. I have been so afraid of doing anything that the family can complain about and it would not have been the right thing to do. I would assume that the children would be told not to let anyone come in and I would not want to put them under pressure like that.

"12/8/01

5:45 p.m. - Stopped by Joe & Jeanette's home to drop off the toothbrush Nicholas had gotten that morning from the Santa visit. I had told Nicholas I would find it and get it to him that day. (He was upset that he forgot it.) I knocked on the door, I heard someone ask, "who is it?" I answered that it was Grandma Donna. The door opened and it was Brent (13 yr old son of Brad & Jeanea). Next to him were Clayton (6 approx), Nicholas (4), Ashlee (3) and Liam (2 approx). Ashlee had been crying, her eyes were red, swollen and tears coming down. I handed Nicholas the toothbrush and told Brent that I had told Nicholas I would bring it over. He looked apprehensive. I said thank you and goodbye to the children and left. I went to the store and returned to my house about 6:25 p.m. I told my husband what I saw. I said I was really concerned and wondered what I should do. I called over to the Andriano house and Brent answered. I asked to speak to his mom or dad, or his grandma or grandpa. He hesitated, then said that they were not there right now. I was upset, it had been at least 40 minutes since I had been to the house and I don't know how long they had been alone."
"

At 8:24 p.m. Jeanette called and left a message (I was one the mobile phone) saying that the kids said I had called for them. I returned the call a few minutes later and spoke to her. I let her know that I was calling to let them know that I had stopped by the house to bring something that Nicholas had left and I wanted them to know that was why I had been there. She said okay, that she had just run out to do some errands. Jeanette not knowing that I knew that the children had been alone for at least 2 ½ hours. I said goodbye and hung up."

- Jeanea said that Alejo called on 12/7/01 and demanded the children. In truth, we had previously asked for the children on the 8th, below is a direct copy of the notes that I sent to you in November 2001.

"11/26/01. Alejo called and asked Jeanea if we could have the children on Thursday evening. She said okay. Then Alejo said that I wanted to ask her something and gave me the phone. I told her that I would like to have the children for the day on Saturday, December 8th. That was going to be the Santa's Visit at the hospital and that I have taken Nicholas and Ashlee every year and would like to do it again. (Last year Nicholas and Ashlee were actually on the local TV channel's coverage of the event.) I could tell that she was startled, but she finally said okay."

- Jeanea addressed visitation time on December 13, 2001. Here is direct from the notes that I had sent to you.

"12/10/01. 6:30 PM approx. Called to Andriano's house, left message asking if we could have the children on Thursday for dinner. I asked for them to give me a call back with their answer.

12/12/01. 5:17 PM. I was just about to pick up the phone and call the Lambeth's about seeing Nicholas & Ashlee on Thursday as they had not returned our call. The phone rang and it was Brad. He said that things had been hectic and that they were going to be signing the papers for their new house on Thursday so that we wouldn't be able to have Nicholas and Ashlee. And then that the next few days would be nuts because they would need to move. I asked if we could see them Friday night or perhaps on Saturday. He said he didn't know. I suggested that it would be a help for them if we had Nicholas and Ashlee. He hemmed around and said that maybe we could have them for a couple hours on Saturday, but then again maybe they wouldn't be able to move in right away. He said that he would call Friday or maybe Thursday. He started to close and I asked him for the address of their new home so we would know where to go. He gave it to me, 873 E. Gemini at McQueen and Riggs. I asked if the children were around so that I could talk to them and he said they were not there yet, but should be on their way back from therapy. I verified that he would call on Thursday or Friday and let us know when we could have them.

12/13/01. No call from Brad.

PCRDIS-D000561

12/14/01. No call from Brad. I guess that means we can't see Nicholas and Ashlee.

12/15/01. No call from Brad.

12/16/01. No call from Brad.

12/17/01. Still no call from Brad regarding when we can visit the children."

- Jeanea said that Ashlee didn't want to go with me and that Nicholas begged to stay. I'm sorry but that is a lie. I can't believe that she is saying these things, I just want to cry. Here is documentation that was done. I have a witness to that night also.

"12/20/01. 5:00 p.m. As I was pulling in to the Lambeth's new neighborhood, Alejo called and said that Brad had just called him to let us know that Nicholas was sick. I pulled up to Brad's house, he was a little surprised to see me and asked if Alejo had contacted me. I said yes, just as I was driving in. He said, I thought you weren't coming until 5:30 and I said no, that we had said 5:00.

Brad said that Ashlee was ready to go. I said I'd like to go in and see Nicholas. I went in and he was on the couch. Jeanea was trying to get shoes on Ashlee so that I could take her. Nicholas gave me a hug and I asked how he was. He was crying and said that he felt better, that his tummy didn't hurt anymore and where was I taking Ashlee. And he wanted to go cause he felt better. He was burning up (Brad said Nicholas' fever was 102), they had given him some Motrin, but evidently it hadn't brought the fever down yet. Jeanea said I could go ahead and take Ashlee. Ashlee wanted Liam to come with us. I told her that I would love to if Aunt Jeanea would let him go. (Jeanea was standing there trying to put a jacket on Ashlee. I said it 3 times, but Jeanea didn't respond.)

Ashlee was crying, too. Jeanea said that she had been crying all the way home. That they had taken Ashlee to the Dr's the day before. I said that I didn't want to take her out if she was still not well. I hugged Nicholas and said, that I wasn't going to take Ashlee out, that I would see if I could stay there with them for a little bit. He kept insisting that he was all better and wanted to go to my house. (I was to have them for 2 hours and wouldn't have been able to take them back down to my house anyway.)

Brad came in and asked why Ashlee was crying. Jeanea looked frustrated and said that she had been crying all the way home from daycare. Brad said that Ashlee had gotten a mega dose of antibiotics the day before and she it was probably hard on her stomach.

Nicholas kept asking if I was going to take Ashlee to my house. I explained that I wasn't going to take her out, that I would try to stay with them for awhile. Ashlee is on my lap crying, saying she wanted to go to my house. I calmed her down and started talking to them both. Ashlee just wanted to be held and cuddled. Nicholas wanted me to stay sitting by him. I kept reassuring him that I wasn't going to take Ashlee out without him, that I was going to stay there. Nicholas wasn't throwing a fit or anything, he just kept having tears run down his hot little face. He asked where grandpa was and was he coming. I told him that grandpa was still at work, but that he would see Nicholas soon."

"I asked if I could stay for awhile with the children and Jeanea said alright. Then I remembered that I had left my friend Alice out in the car. I asked if she could come in, too. All of a sudden Jeanette and Jeanea got friendlier and said yes, she could. I went and told Alice to come in. (I had already introduced her to Brad when I arrived.)

When Alice and I walked in, Jeanea was holding Ashlee. Ashlee was crying again. When she saw me she started reaching out for me. Jeanea was trying to do something with the TV. Brad walked in and noticed that Ashlee was trying to get to me and told Jeanea to give Ashlee to me. She practically flew into my arms."

- Jeanea said that we kept the children 'secluded' from the family. That is not true, especially if you saw how the family room, dining area and kitchen are one open area. And that is where we were at. Jeanea was in the kitchen the whole time and the other children were in and out of the house. We had a lot of interaction with the children. She also said that we stayed 2 hours. Not true, we stayed 1 ½ hours.

PCRDIS-D000562

"Alice and I sat with Nicholas and Ashlee. Julia came over and would talk with us. Liam and Clayton were outside running around. Liam (2) was outside without shoes or a coat on. (I had a coat on, it was cold even in the house because they were moving furniture in and there were no window coverings on the glass yet.) The kids would come in and watch the TV a bit or talk with us then go other places. We cuddled with Nicholas and Ashlee. I sang to Nicholas, one of the songs that I have sung to him since before he was born. Nicholas and Ashlee were used to their mom or me singing to them at nights. He relaxed and melted in my arms. They both love music, all kinds of music."

"I told Nicholas and Ashlee that I was going to be leaving soon. Ashlee started to tear up and asked if I would stay the night with her. I said I couldn't do that. Then she asked if she could come home with me and I told her not today. Nicholas asked if he could come over and I said no, not today, that it was night and almost time for them to go to bed. Nicholas appeared to get frustrated and said, "mom won't let us spend the night over your house." I told him that he could come and visit grandpa and me soon. They held on tight and didn't want to let go. We hugged and kissed them. They walked to the door with us and wanted more hugs and kisses. They are starved for the individual attention. Even Liam and Clayton try to get our attention, so I make an effort to be kind to them, to talk and play with them, too."

"We left at 6:30 p.m."

- Regarding the 'rash.' I had not noticed a 'rash' on either of the children before. And as I have stated in other letters, the children never had anything like this prior to living with the Lambeth's. I have spoken to both previous babysitters and their mother just to be sure.

- On the first page, Jeanea states, "I first noticed that Ashlee had a red bottom after a visit on Thursday, November 29, 2001." Then on page 3 she says, "Ever since we have had the kids, they have had rashes on and off." So which is correct?

December 24, 2001. I picked the children up at the Andriano's house. I arrived about 2:20p.m. and they arrived 10 or 15 minutes later.

- December 24m 2001. The day we saw the children's bottoms. I called the Andriano's house around 5:25 and said that we would be late. By that time, we were trying to get the children out the door. I couldn't find Ashlee's sweater that she had worn. I was frantic trying to locate it. I was upset by what we had seen and heard. I didn't want to take them back, I was afraid for them. We got them to the Andriano's around 5:45 - 5:50 p.m. I am trying to get a copy of the phone records, because as we drove off, I called back to the Andrianos house and spoke to Brad. I let him know that I had changed Ashlee. See below:

"12/24/01. After leaving Nicholas and Ashlee at the Andriano house, I called back over there. Brad answered the phone. I let him know that Ashlee was wearing pull-ups because she had a couple accidents. Brad did not say anything about their bottoms or a 'rash' at that time."

- Ashlee was passing gas and she would get a little BM on her pants. What we used to call "skid marks." She didn't wet her pants, she just got them 'dirty.'

"After we were at my house Ashlee had 2 'accidents' and I had to change her panties, finally putting a pair of pull-ups on her. She was so sad, she looked up at me and asked, "why am I pooping in my pants?" I told her that her stomach was sick, that she probably ate something earlier that day that her tummy didn't like. She hadn't had anything to eat at Lupe's or at our house at that time."

Jeanea states that she asked her sister on 12/24/01, what to put on the children's bottoms. Why didn't she ask the doctor when she had the children there on 12/19/01 and 12/21/01? A physician is better qualified for that then a sales rep.

- On December 29, 2001, Nicholas' bottom was not better, his was worse. The children should have been seen by medical personal long before this.

- The explanation of how the CPS worker came to the house is not what I was told by CPS. If it is true, it needed to be reported and dealt with. From the way Jeanea tells it, the CPS worker acted

PCRDIS-D000563

inappropriately. I did speak with his supervisor and was told that Brian Baum has worked there many years and is very professional and has not had any complaints prior.

I believe that this whole situation just gave the Lambeth's another excuse for us not to see the children. I believe that seeing the children will continue to be a problem for us. The only reason we see them as much now is because the judge ordered it and is keeping a close eye on whether it is being followed. What will happen later? I believe the past 17 months tells all.

- Jeanea states that on December 29, 2001, I picked the children up early. It was 10 minutes early because it was the second time I had driven to their house and was learning to judge the distance and time. I drove around for a little bit before I went to the door. We have since made the effort to arrive a few minutes late so that cannot be used against us any longer. Such silly things.

- It is being said that we took the children to McDonald's on 3/14/02 and let other people see their bottoms. Not true. We did make a stop at a distributors, Donna Knopf at Vegetas, to drop off an order. Never showed her the children's bottoms, though we did introduce her to them. And I do wish that I would have had a camera with me, because of the condition of Ashlee's bottom. It was horrible, peeling and red. And again, I never have said to keep secrets.

"3/14/02. 5:00 p.m. Picked up Nicholas and Ashlee. Jeanea met us at the door. We told her that we really liked how they had the porch done, it looks nice. We headed towards the truck, Jeanea closed the door. A couple seconds later, Clayton (approx. 6 yrs old) opened the door and yelled out, "Yeah, Nicholas and Ashlee are gone!" Then the door slammed shut. We dropped off some chips to a distributor then went to a different McDonalds (the children's choice). This one did not have a playground. We ate and visited. Then we read books (I had brought some books with us). We played with their Happy Meal toys. And as normal, one of the first things they ask is if they are going to our house. Nicholas has discovered 'big' numbers (i.e. 'four thousand', hundred million', etc.) so we played that. Of course he said that he wanted to come live with us for 'a twenty hundred million years.' It is fun watching them learn new things. Ashlee cuddled up and told me that she wanted me to take her 'home to your house.' Maybe I should be taping all of this, but I enjoy the time we have with them, I don't want to be having to be so clinical in our visits. Maybe that's my innocence in the system, but I just want to be able to love these children and give them the best, what they deserve. To have one on one attention and training. Children need to know that someone will be there ready to listen or just hold them when they need it. No matter how good your intentions are, if you have lots of other distractions (lots of children, a fulltime job) you physically cannot give each child much individual time. Time with children is so short anyway, they deserve to get the best from their caregiver.

I took them to the restroom prior to leaving. I started to help Nicholas straightened his shorts when he said, "You can't look at our butts." I asked him who said that and he answered, "Uncle Brad, he said you can't look at our butts." As I pulled his shorts around I could see that both buttocks were a little red. When I helped Ashlee on and off the toilet I noticed that the skin on her right buttock was peeling. It appeared to cover the size of the area of the original lesion. The skin was peeling similar to the way it does after having a bad sunburn and the top layer of skin comes off. It was red and puffy and looked really nasty. What is going on with these children?!

We took them back to the Lambeth's and Brad answered the door. It was 7:30 p.m. I told him that they had gum (sugarfree) so that they wouldn't go to bed with it in their mouths."

On March 22, 2002, the Lambeth's attorney tried to hand the judge a copy of Jeanea's letter at the very end of the hearing. She asked him what it was and he responded that it was a letter that he asked his client to write discussing the 'rash.' She refused to take it. He took it back, walked a few steps then went back to her. He laid it on her desk again and said it has your name on it, my secretary wanted me to give it to you. She looked at him and said, tell your secretary I don't want it and give it back to her. His actions were totally out of line and I feel that is how everything has been. It is getting uglier all the time and I don't want that for my grandchildren.

The Lambeth's and Andrianos would be happy if we would just go away, but we can't desert our babies. We can't just walk away and never see them again. What happened to the statement they made to us over and over, that the children needed all of us?

The Lambeths have agreed to let Dr. Goldenthal see the children and the judge told Alejo and I to go to the appointment also.  The Lambeths have finally made an appointment with a dermatologist in April.  The judge told Alejo and I to go to that one, too.  We are thrilled to be included.  We do appreciate the sensitivity of the judge.

Nicholas and Ashlee's mother wants the children to live with us.  We have a history with them.  Wendi never wanted to agree to the guardianship but was pressured by the attorney.  The first week, Brad said that he would go and talk to Wendi about the children, and he never did.  She never expected to be totally cut off from her children.  Nicholas asks for her and just looks at me for assurance and says, "She's not dead.  She's in a safe place."  These children need a lot of love and positive support.

Sincerely,

Alejo and Donna Ochoa

PCRDIS-D000565

# BRIAN W. YEE, PH.D.

## PSYCHOLOGIST

7220 NORTH 16TH STREET
BUILDING K
PHOENIX, ARIZONA 85020
(602) 943-0447 • FAX (602) 943-9406

March 13, 2002

Honorable Jane Bayham-Lesselyong
Old Court House
125 West Washington
Phoenix, Arizona 85003

Dear Commissioner Bayham-Lesselyong:

Pursuant to the court's order in the matter of the Guardianship of Nicholas Andriano and Ashlee Andriano (minors) (PB 2000-004531), parties Bradley and Jeanea Lambeth and Alejo and Donna Ochoa have been interviewed and observed in interaction with the minor children. Jeanea Lambeth is the paternal aunt of the children. Donna Ochoa is the maternal grandmother of the children. In addition, Joe and Jeanette Andriano the paternal grandparents of the children were interviewed. The children's therapist, Linda Gray, was interviewed. The minor children Ashlee (DOB: 09/06/98) and Nicholas (DOB: 06/20/97) were placed in the guardianship of the Lambeths following the death of the children's biological father and incarceration of the biological mother in October 2000.

The initial minute entry from the court, dated April 5, 2001, identifies as the referral issue, overnight visitation for the maternal grandparents. Counsel for the parties agree that this was the initial intent of the evaluation. This examiner convened with the Lambeths, Ochoas, and Andrianos, and spoke with the children's therapist, Ms. Linda Gray, in July and August of 2001. Subsequently, this examiner was informed that the scope of the consultation had expanded to a full custody study following the Ochoas' petition for custody of the minor children. Controversy arose as to the scope and allocation of cost for the custody evaluation and, consequently, the evaluation was held in abeyance until January 2002.

The Ochoas claim that they were misled regarding the guardianship of the children, having had the expectation that the arrangement was to be brief. Further, they feel that their contact with the children has been obstructed by the Lambeths. It is their position that they are better suited to be the children's guardians and custodial caretakers by virtue of their history of contact with the children, the number of children in the Lambeth household and representations that the Lambeths provide insufficient care and oversight to the minor children in question.

The Lambeths indicate that parties had agreed that the children would stay with them due to the presence of the children's cousins. The Lambeths assumed guardianship of the children November 2000. It was understood that the maternal grandparents would have visitation with the children two weekends per month. The Lambeths report that upon return from maternal grandparent visitation the children manifested a great deal of anger, sleep problems, and bowel and bladder problems. Due to circumstances, the children had been referred to Child Find therapist, Ms. Linda Gray. According to Ms. Gray, the children disclosed, during counseling, phone contacts with the biological mother during visitation with the maternal grandparents, and indications that the children were receiving input from the maternal grandparents' household that was contributing to their adjustment difficulties. Following conferences with both the Lambeths and Ochoas, Ms. Gray issued recommendations to discontinue overnight contact with the maternal grandparents. Tensions between parties increased subsequently and communication became hostile and destructive. The Ochoas feel that they have been prevented from having regular contact with the children. The Lambeths state that they were following therapist recommendations and that they have been unsuccessful in communicating with the Ochoas due to the hostility. During this process parties have made representations of the multiple inadequacies of the other party. This situation culminated with the Ochoas instigating a child protective service referral against the Lambeths in December 2001 when the children were found to have significant excoriation on the buttocks area.

The court's minute entry of February 25, 2002 ordering weekly day visits with the maternal grandparents is noted.

In individual interviews, Nicholas, at 4 and one-half years of age, and Ashlee, at 3 years 3 months of age, present as talkative, polite, and happy. They do not evidence separation concerns from caretakers. They each state that "mommy Wendy is in a safe place", and "daddy is in heaven." In spontaneous conversation they refer to the Lambeths as mommy and daddy. Both children voice an enjoyment of their time with the paternal and maternal grandparents. While they recognize there is the prospect of punishment and spanking in discipline, they deny any history of spanking. When questioned as to the source of the "owie" on the buttocks, each indicated that it was from their pull-ups and denied it to be the result of any accidental or non-accidental injury. The children were observed in interaction with the Lambeths and, again, with the Ochoas. The children evidence comfort, spontaneity, and joy in interaction with both parties. The children were playful with both sets of adults though the tempo of the activity was noticeably higher when the children interacted with the Ochoas, likely as a function of the novelty and personalities of the Ochoas. The children are obviously very familiar and comfortable with the Lambeths and Ochoas. There is no evidence of anxiety with either set of adults. The children are playful and spontaneous, and seek assistance and information from both sides. There are accepting of direction and limit-setting from all of the adults.

It is concluded that the children's history of behavior and adjustment issues likely relate to:

1. The trauma associated with the simultaneous and sudden loss of both parents.

2

2. The dramatic change of living circumstances.

3. The normal emotional reactions of grief and loss.

4. The palpable tension between the households which, at times, has reached hysterical proportions.

5. Response to the reactions and verbalizations of adults in the two households.

6. Possibly, normal transitions associated with transfer related adjustment issues.

Despite parties' distrust, hostility, and negative opinions of each other, neither household is viewed as unfit for the children. Each of the adults is accomplished in their own right, appears to love the children, evidences no diagnosable psychiatric disorder, appears comfortable and skilled in relating to these young children, has a good fund of knowledge regarding children, evidences a seemingly functional approach to discipline and parenting of children, appears a productive member of the community and society, and evidences no issues of substance abuse, adjustment disorder, or antisocial/illegal behavior.

This is a tragic situation. While there are obvious differences in perspective, all suffer as a consequence of the death of the children's father, the unresolved outcome as to mother's criminal case, and the anxiety regarding disposition of the child custody matter. It is a fair assumption that the grief/loss/anger reactions of the adults have exacerbated the communication, negotiation, and, perhaps, judgment of the parties. The task at hand is the normalization of childhood for two young children who suffered the sudden loss of both parents. This would be a formidable challenge in circumstances where all the adults were in consensus and acting in unison with regard to the children. The personalities and dynamics involved, however, may prove these challenges insurmountable. Regardless of how the parties place attribution for the current circumstances, or the outcome of the present court proceedings, the children's emotional chaos and turmoil will not mitigate unless the respective adults commit to a partnership in raising these two children. At this time the children manifest a comfort and attachment to the Lambeths as well as their cousins which is stabilizing for the children. While due consideration is given to the Ochoas' position that they would be in a better parental position by virtue of not having any other children in the household compared to the Lambeth household of seven children in total, the children's cousins are, in effect, surrogate siblings who provide security and important family identity as well. Aside from difficulties parties may have in buffering the children from adult emotions and adult issues there is no reason why the children could not have an active relationship with both sets of grandparents. Indeed, the children would benefit from such involvement. Clearly, as the trial for the children's natural mother is approaching, each side has strong convictions as to appropriate outcome of that criminal matter. These convictions are accompanied by very strong and, perhaps, overwhelming emotions on the part of the adults. It is within that context that there is the greatest potential that the children are exposed to issues that are far beyond their psychological ability to process or integrate. It is difficult to overstate the

3

deleterious effects on the children of their exposure to such inherently and profoundly conflicted ideas and emotions. The general impression is that the Ochoas are substantially under greater duress in this regard.

In view of the above impressions, it is recommended that the court consider granting the Lambeths legal and physical custody of the minor children. It is recommended that the court consider continuing the current schedule of maternal grandparent visitation, with the children monitored by a child therapist. As the children stabilize and mature, overnight grandparent visitation is contemplated. It is recommended that the therapeutic monitoring be conducted by Dr. Mary Ann Lanzilotta.

I am available for conferencing with your Honor and counsel as needed.


Brian W. Yee, Ph.D.
Psychologist

c: G. David DeLozier, Esq.
   John J. Jakubczyk, Esq.
   Gary Alan Wieser, Esq.

4

04/17/2002  05:17   4885756661          GDAVIDELOZIER                    PAGE  01
   04/17/2002  09:11   6023314888          CHILDRENS ADVOCACY C              PAGE  02

# THE CHILDREN'S ADVOCACY CENTER
## 1855 E. Northern Ave.  Suite 202
## Phoenix, AZ 85020

### Linda C. Gray, M.A., C.P.C.

Ans. Svce:   (602) 997-8199              Fax:   (602) 997-1123
Phone:       602-369-8845                E-Mail:  LCGFamHab@aol.com

The Honorable Jane Bayham-Lesselyong
Commissioner, Maricopa County Superior Court
125 West Washington
Phoenix, AZ  85003

Re: Nicholas and Ashlee Andriano
No. PB 2000-004531

Dear Commissioner Bayham-Lesselyong,

I have been the therapist for minor children Nicholas and Ashlee Andriano since
December, 2000. The children were referred to me by Dr. Kathy Coffman at
Childhelp Children's Center for evaluation and treatment following the sudden
and traumatic loss of both parents.  As treating clinician, my role is to assist the
children in adjusting to these major life changes, including complicated grief and
adjustment to their current placement.  It has never been my role to make
recommendations regarding access and custody.

In February, 2000 or thereabout, I made a *therapeutic recommendation* that the
children temporarily suspend overnight visits away from the Lambeth's home to
help reduce stress and manage acute separation anxiety.  The purpose of this
recommendation was to allow the children to stabilize, not to establish access
guidelines.  This was explained to the parties on two occasions.  These
temporary therapeutic recommendations have been distorted and
misrepresented in the ongoing conflict over custody and access. The unfortunate
result is that the children have been placed in the middle of an extremely
confusing and emotionally charged drama that has effectively prevented them
from resolving the original trauma of the loss of their parents.

Dr. Yee was appointed to make recommendations regarding custody and access.
He has accurately represented my clinical input concerning the children's best
interest in his report to the court. I have attempted to contact Dr. Yee for verbal
clarification of my role with respect to Dr. Lansilatta.

PCRDIS-D000427

I was not in receipt of Dr. Yee's report at the time of my conversation with Mr.
DeLozier on Friday, April 12th. The content of that conversation with Mr.
DeLozier is inaccurately summarized in the Motion to Continue (which I received
today, Wednesday, April 17th along with a Subpoena to appear at the Evidentiary
Hearing.) I am at my office Wednesday through Saturday and therefore did not
receive Mr. DeLozier's calls or letters until today.

This letter is intended to clarify any misunderstanding that my have occurred
between myself, the parties or their respective counsel and to define the limits of
my role in this case. I apologize for any inconvenience to the Court and will be
available to appear telephonically between 1:30 and 2:00 p.m. today, April 17th.

I would like to clarify my request to counsel for both parties that I not be
Subpoenaed. It is my duty to maintain the confidentiality of the children's
treatment. Given the current scope of allegations made by the parties and the
repeated escalation of the conflict over access and custody, I am concerned that
the clinical records and my testimony regarding the children's therapy could
misinterpreted or be used in a manner that would be damaging to the children.
Specifically I am concerned that the release of records would:

1)    Place the children in an emotional double bind if they were later
      questioned, sanctioned or coached.

2)    Be used intentionally or unintentionally to impair Nicholas and Ashlee's
      ability to maintain a safe, nurturing and stable relationship with either the
      Lambeth's or the Ochoa's.

3)    Interfere with the established therapeutic relationship which is based on
      trust and emotional safety.

It is therefore respectfully requested that records or testimony concerning
Nicholas and Ashlee Andriano's therapy be subject to In Camera protection by
the Court.

Respectfully Submitted,

Linda C. Gray M.A., C.P.C.

PCRDIS-D000428