# TABLE OF CONTENTS (INTERACTIVE)

| LLLLLLLLLLL PART 9 | Petitioner's Appendix to Petition for Review |
|---|---|

# EXHIBIT LLLLLLLLLL
# PART 9

1   Counsel undersigned certifies
    that, on this 25th day of February,
2   2004, the ORIGINAL and four
    copies of the foregoing motion
3   were filed with the Clerk of Court,
    and a copy was faxed and mailed to:
4
    Mr. John Jakupcyzyk
5   2711 N. 24th Street, Suite 200
    Phoenix, AZ 85008
6   Attorney for Appellees

7   A copy was mailed this date to:

8   Mr. Gary A. Wieser
    P.O. Box 16246
9   Phoenix, AZ 85011-6246
    *Guardian ad Litem* for the Children.
10
11
    By: Daphne Budge
12      Daphne Budge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

March 21, 2005

Maricopa County Superior Court Case No. J 5505461
In the Matter of Notice of Hearing on Petition for Termination of Parent-Child Relationship
The Honorable Judge Pro Tem Kaipio

Your Honor,

My husband and I are writing to you on behalf of our only grandchildren, Nicholas and Ashlee Andriano. Alejo L. Ochoa and myself, Donna E. Ochoa are the maternal grandparents to the above children. We would ask that you allow us to have documentation put into their file so that someday they may know how much we tried to keep in contact with them. We understand that with the termination of our daughter's parental rights that we will lose ours also. That was something we did not realize until a couple years ago. We thought that grandparents had rights to see their grandchildren.

Nicholas and Ashlee mean so much to us. We were talking to them before they were born. We were there through their births, their hospital visits, vacations, and their day to day lives. Alejo and I miss them so much. We have not seen Nicholas and Ashlee since March 2004, although we have court-ordered visitation. Unfortunately, the Lambeth's and their attorney have avoided arranging visits. In November and December 2003, February and March 2004 we had been meeting the children at a local McDonalds. A co-worker of Jeanea Lambeth's had been dropping them off and picking them up on the third Saturday of the month and we were paying him (Rod Huston). In April on the court appointed today, Alejo and I went to the McDonalds expecting to have our visit. We called Rod when they didn't show up and he told us that the Lambeth's had not said anything to him about a visit. Our attorney tried to help but nothing was accomplished. By this time, we should have been having longer visits according to the court order. In June, our attorney was told that the Lambeth's would let us have a supervised visit for three hours that week because we hadn't seen the children for a couple months (which was not our fault). And it had to be with a school counselor that Jeanea knew and the cost would be $400 per hour and they would pay half. We did not have that kind of money on that short of notice. Plus we had already done supervised visits according to the court last year. The person that was appointed by the court for us to use was less expensive, plus we had used Parenting Skills also, who were less expensive. Both of these knew all parties involved, but were not acceptable to the Lambeth's. This was not the first time that we had been put off in seeing our grandchildren. According to the court, we were to have twice weekly phone calls and visits beginning again two weeks after our daughter's trial. This did not happen. We sent cards for Christmas and Valentine's Day. Both sets were returned in February showing that the family had moved and left no forwarding address. We tried calling, nothing. I sent a letter to Mr. Jakubcyzyk and Mr. Weiser asking for help in getting our phone calls and visits. To date, we have heard nothing. Then we found out by accident that the Lambeth's had filed again for termination of rights.

PCRDIS-D002274

They had filed June 13, 2003 and rescinded it in October 2004. My husband and I had been involved in that one by permission of Judge Dairman due to the court ordered visitations.

We miss our grandchildren but it is obvious that the Lambeth's and the paternal grandparents do not want us to be involved in Nicholas and Ashlee's lives. We hurt for our family that none of us will be allowed to watch them grow up. We hurt for Nicholas and Ashlee that they won't have our love and memories.

In the Petition for Termination, it mentions on page 2, 8. b., that the mother has had no contact With the children since October 8, 2000. That is not true, they had several conversations with her between October 2000 and December 2000. After that the children's therapist was going to arrange phone calls with Wendi and the children and herself (3-way). This never happened.

On page 2, 8. e., this is a partial statement. The professionals have gone on to also say:

Jeannette Brown, MAE with Parenting Skills Program, on September 10, 2002:
"It is always in the best interests of children to maintain contact with both sides of their families whenever possible. Under the current circumstances it is understandable that the families do not communicate and have a lot of negative feelings toward each other. The children have essentially lost both parents at a very early age. The events that transpired between the parents, did not cause the two sides of the family to love these children any less, but possibly to love them even more. It appears that both sides feel that they are doing what is in the best interest of the children, but the event that placed them in this situation also guides their emotions and actions. It would be my recommendation that the Ochoa's be allowed to visit with the children. It would also be beneficial to the children if the Ochoa's and the Lambeth's participated in some type of mediation or co-parenting sessions to help them focus on the children and not the events that caused the children to be separated from their birth parents."

We asked numerous times for mediation and it was put off by the Lambeth's and their attorney.

Jeannette Brown, MAE with Parenting Skills Program, on October 24, 2002:
"During the two visits, there were no negative comments made by the Ochoa's about any family members and there were no discussion of court in front of the children. The children did not express any negativity toward the Ochoa's during the visit. Both children appear to enjoy the visits. The Ochoa's apparently have many toys at their home that the children remember. The children often ask for specific toys that they want to play with during the next visit." "As stated in the previous report it is always in the best interests of children to maintain contact with both sides of their families when possible. From the observations made during the visits, it would be recommended that the Ochoa's be allowed visitation with both children. The interaction between the Ochoa's and the children is very positive and appropriate and does not warrant further therapeutic visits."

Esther Ruiz, PhD (professional agreed to by the court and parties) on October 21, 2002, after interviewing Lambeth's and Ochoa's:
"…However, they (Nicholas and Ashlee) need consistent and continued contact with their grandparents (Ochoa's). Their grandparents provide a bridge to the less-troubled life they once

PCRDIS-D002275

had.  Contact with the grandparents could help soothe them.  I recommend that visitation with the grandparents be gradually increased to allow unsupervised visits in increments up to 2-3 hours at a time.  If that progresses well, the visits should be increased to 4-6 hours at a time and if those visits progress well then overnight visitation should be allowed.  Visits should be every two weeks, consistent, and rigidly adhered to by both sides.  If the children show signs of stress, the visits should be dropped down to the previous visitation level.  The children's therapist (Linda Gray) can be used to monitor impact upon the children.  If that is not acceptable to both sides, the court may want to appoint a monitor or family court advisor."

Linda Gray, The Children's Advocacy Center on June 6, 2003.
"Recommendations – It is the opinion of this provider that the minor children, Nicholas and Ashlee Andriano have made adequate progress in therapeutically mediated visitation and may begin the next phase, as outlined in the Minute Entry dated 12/10/02, which initiates regular visitation with the maternal grandparents to occur on Saturday, from 11:00 am to 3:00 pm on the third weekend of every month for four months.  Subsequent steps toward the goal of overnight visitation are outlined in the Minute Entry referenced above."

We were not told about this letter until August 2003.  Then the court had to make the Lambeth's let us see them.  It was obvious that they kept postponing visitation so that it would not go up the levels to overnight visitation.  We are so sorry that we have lost valuable time with Nicholas and Ashlee.  The children have been cheated out of loving relationships.

Any of the above mentioned professionals notes can be accessed through the court to show the blocks that have been put up by the guardians.  Even the court in Pinal County stated that we could not adopt Nicholas and Ashlee because it would result in the severance of the paternal grandparents rights.  That is when Alejo and I found out about the lack of 'grandparent rights.'

We urge that you will put documentation into the record for the future if Nicholas or Ashlee want to know why we didn't see them, that we did not abandon them.

Thank you,

*Alejo J. Ochoa*

*Donna E. Ochoa*

Alejo L and Donna E. Ochoa

Case References:
PB2000-004531  Jane Bayham-Lesselyong, Commissioner  Guardianship of Nicholas and Ashlee Andriano
AD200100058  Pinal  William O'Neil  Maternal Grandparents filed for Termination of Parent-Child Relationship and adoption (with mother's approval)
JS 505461 – Honorable Dennis Dairman  6/13/03  Guardians filed for Termination of Parent-Child Relationship
J5505461 -  Judge Pro Tem Kaipio  Guardians filed for Termination of Parent-Child Relationship

PCRDIS-D002276

Print Document                                                          Page 1 of 2

MICHAEL K. JEANES, CLERK
BY _Oliveck_ DEP
FILED

2004 NOV 15  PM 2: 11

1   Alejo and Donna Ochoa
    1104 N. Park
2   Casa Grande, AZ  85222
    520/836-6829
3   Pro Se

4

5              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

6                 IN AND FOR THE COUNTY OF MARICOPA

7

8   In the Matter of the          )    No.  PB 2000-004531
    Guardianship of               )
9                                 )
                                  )    NOTICE RE:  REPRESENTATION
10  NICHOLAS ANDRIANO and         )
    ASHLEE ANDRIANO               )
11                                )
            Minor Children.       )
12                                )    (Hon. Jane Bayham-Lesselyong)

13

14        ALEJO OCHOA and DONNA OCHOA (Ochoa), hereby give notice to this Court that they

15  are no longer being represented in this matter by Daphne Budge.  Alejo and Donna Ochoa will be

16  acting on their own behalf until further notice.  The Court and any other interested parties shall direct

17  any notice to their address, as follows:

18        Alejo and Donna Ochoa
          1104 N. Park
19        Casa Grande, AZ  85222
          520/836-6829
20

21        Ochoa hereby requests that this Court's records be updated to remove Daphne Budge as

22  counsel of record.

23        A copy of this notice has been mailed to counsel for the Guardians of the children.

24

25  DATED this 15 day of ~~July,~~ Nov 2004.

26

27                                         _Alejo J. Ochoa_
                                           Alejo Ochoa
28

29                                         _Donna Ochoa_
                                           Donna Ochoa

D000000008

P-App. 003745

CERTIFICATE OF MAILING

1

2

3      The undersigned states that the Original and Copies of the foregoing document were mailed

4  on the _____ day of July, 2004, to the following persons:

5

6  ORIGINAL of the foregoing mailed to:

7  Clerk of the Probate Court
   Maricopa County Superior Court
8  125 W. Washington
   Phoenix, Arizona  85003

9

10  COPIES of the foregoing mailed to:

11  Honorable Jane Bayham-Lesselyong
    Probate Commissioner
12  Maricopa County Old Courthouse, Courtroom 207
    125 W. Washington, Second Floor
13  Phoenix, Arizona  85003

14  Gary Alan Wieser, Esq.
    4506 N. 12th Street
15  Phoenix, Arizona  85014
    Guardian ad Litem for the Minor Children:
16      Nicholas and Ashlee Andriano

17  Ms. Daphne Budge
    Attorney at Law
18  234 N. Central, Suite 722
    Phoenix, Arizona  85004

19
    John J. Jakubczyk, Esq.
20  2711 N. 24th Street, Suite 200
    Phoenix, Arizona  85008
21  Attorney for Guardians

22
    By_____
23      Aleja/Donna Ochoa

24

25

26

27

28

29

D000000009

David,

What do I do ...

I cannot let this happen!

David Bell was assigned to me but I don't know how to contact him.

Please help me

Mr Bell—
I received this from Wendi. (my daughter) We were not notified of the hearing. Wendi did have phone contact with Nicholas + Ashlee until the counselor stopped it and the the "judge" put it in the Minutes. But the judge did make it known in later minutes that the lack of contact was not Wendi's choice.
Can you get in contact with Wendi?
Wendi Andriano ADC# 191593
ASPC - Perryville B30 D266 Lumley Unit

Please call & let me know if you still represent her. Thank you. Donna Ochoa
602-826-1150 cel 520 836 6529 home 520 381 6679 work

PCRDIS-D002273

P-App. 003747

Mr. Alejo Ochoa
Mrs. Donna Ochoa
**Statement:   Andriano children**
July 5, 2002
Page 3.

**Summary of statement:**

| | | |
|---|---|---|
| GDD:   10.75 hours @ $100.00 per hour = | $1,075.00 | |
| EH time: 8.50 hours @ $50.00 per hour = | $   425.00 | |
| JP time: 0.50 hours @ $50.00 per hour = | $     25.00 | |
| LA time: 1.80 hours @ $25.00 per hour = | $     45.00 | |
| Out-of-pocket expenses: | | |
| June 7, 2002, Service of process (2 subpoenas): | $     60.00 | |
| June 7, 2002, delivery to court: | $     15.00 | |
| June 7, 2002, Issue 2 subpoenas, superior court: | $     36.00 | |
| June 7, 2002, witness fees (2): | $     50.00 | |
| Previous balance due: | $6,079.00 | |
| Payment received dated June 1, 2002: | $   200.00 | |
| Balance due: | $7,610.00 | |
| Thank you. | 100.00 | |

*[handwritten: Balance $ 75 1000 7-25-02]*

*[Image of a handwritten check from Pinal County Federal C.U., Name N. Ochoa, 1104 N. Park, CG AZ 85222, Date 7-25-02, Pay to the Order of G. David Delozier, $100.00, One hundred Dollars]*

PCRDIS-D002763

# G. David DeLozier, P.C.
## Attorney at Law

Tax ID # 86-0712965

1016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439

Ph  480-575-6660    Fx  480-575-6661

gddelozier@aol.com

# Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 10/1/2003 | 1325 | 10/31/2003 |

| Bill To |
|---------|
| Wendi Andriano #A631830<br>Maricopa Co. Durango Jail<br>3225 W. Gibson Lane<br>Phoenix, AZ  85009 |

| Project |
|---------|
|  |

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 10/22/2003 | Attorney | Meet Dan Paterson and Patrick at 11 W. Jefferson, suite 5. public defender's office. review. call parents; call with Wendi; meet with Patty at Mesa's PD office, review documents needed, meet with Kelly look for documents at the office. call with Patty, Dan has second set of photos. she will make copies of other documents, read and review medical examiner Keene's report. call for Joe Collier. out until Friday. | 3 | | 0.00 |
| 10/31/2003 | Attorney | Prepare and attend status hearing. meet with Dan Patterson & Patrick Linderman. Judge Ishikawa. 8:30am. rescheduled to next week since did not transport Wendi; call with Donna & Alejo. call with Wendi. | 1.5 | 0.00 | 0.00 |

| | Total | $0.00 |
|--|-------|-------|

# G. David DeLozier, P.C.
## Attorney at Law

Tax ID # 86-0712965

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439

Ph  480-575-6660   Fx  480-575-6661

gddelozier@aol.com

## Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 11/3/2003 | 1192 | 11/30/2003 |

**Bill To**

Wendi Andriano

**Project**

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 10/22/2003 | Flat Fee | Meet Dan Paterson and Patrick at 11 W. Jefferson, suite 5, public defender's office, review, call parents, call with Wendi, meet with Patty at Mesa's PD office, review documents needed, meet with Kelly look for documents at the office, call with Patty; Dan has second set of photos, she will make copies of other documents, read and review medical examiner Keene's report, call for Joe Collier, out until Friday. | 3 | 0.00 | 0.00 |

| | Total | $0.00 |
|--|-------|-------|

PCRDIS-D001395

# G. David DeLozier, P.C.
## Attorney at Law

Tax ID # 86-0712965

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439

Ph 480-575-6660   Fx 480-575-6661

gddelozier@aol.com

## Invoice

| Date | Invoice # | Due Date |
|---|---|---|
| 12/1/2003 | 1367 | 12/31/2003 |

**Bill To**

Wendi Andriano #A631830
Maricopa Co. Durango Jail
3225 W. Gibson Lane
Phoenix, AZ. 85009

| Project |
|---|
|  |

| Date | Item | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 11/15/2003 | Investig... | Investigation: RR #1046 re Andriano Children | | 112.50 | 112.50 |

*Merry Christmas, Happy New Year !*

| Total | $112.50 |
|---|---|

PCRDIS-D001399

# G. David DeLozier, P.C.
## Attorney at Law

Tax ID # 86-0712965

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439

Ph  480-575-6660     Fx  480-575-6661

gddelozier@aol.com

PAID

## Invoice

| Date | Invoice # | Due Date |
|---|---|---|
| 12/1/2003 | 1350 | 12/31/2003 |

**Bill To**

Wendi Andriano #A631830
Maricopa Co. Durango Jail
3225 W. Gibson Lane
Phoenix, AZ  85009

**Project**

| Date | Item | Description | Hours | Rate | Amount |
|---|---|---|---|---|---|
| 11/6/2003 | Flat Fee | Prepare for meeting with Joe Collier & Dan Patterson. | 0.25 | 0.00 | 0.00 |
| 11/6/2003 | Flat Fee | Conference call Dan Patterson with Kandy Rhode | 0.33333 | 0.00 | 0.00 |
| 11/6/2003 | Flat Fee | Meet with Joe Collier, forensic toxicologist, and Dan Patterson. | 1.5 | 0.00 | 0.00 |
| 11/7/2003 | Flat Fee | Attend 8:30am Andriano status hearing, Judge Ishikawa | 1 | 0.00 | 0.00 |
| 11/10/2003 | Flat Fee | Meet Dan Patterson at 1:30pm, with Det. Lucero, Homicide detective, 602-495-3657, re CR2000-096032. St v. Andriano, review evidence; call from Dan, he checked Elderberry at HiHealth, and the color is not white, asked me to look into others, looking for bottle of same description and color, went to HiHealth and Safeway, neither had what we needed; call Donna, she will look into it. | 1.5 | 0.00 | 0.00 |
| 11/12/2003 | Flat Fee | Call with Joe Collier, 602-787-8281 re elderberry testing. Joe says let the county do it; call with Dan, he is not sure he wants to go that way, is looking into others. | 0.16667 | 0.00 | 0.00 |
| 11/20/2003 | Flat Fee | Received and reviewed letter from Wendi, faxed to me by Kandy Rohde, call Kandy to discuss. | 0.25 | 0.00 | 0.00 |
| 11/21/2003 | Flat Fee | Trip to visit with Wendi; call from Aleja, meeting for breakfast on Saturday morning. | 2 | 0.00 | 0.00 |

*Merry Christmas, Happy New Year!*

| Total | $0.00 |
|---|---|

PCRDIS-D001398

# G. David DeLozier, P.C.
## Attorney at Law

Tax ID # 86-0712965

1016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439

Ph 480-575-6660   Fx 480-575-6661
gddelozier@aol.com



## Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 12/31/2003 | 1521 | 1/31/2004 |

**Bill To**

Wendi Andriano #A631830
c/o G. David DeLozier

**Project**

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 12/7/2003 | Flat Fee | Draft petition for review in light of supplemental legal research; edit to get down to required 12 pages; revise same. | 4.2 | 0.00 | 0.00 |
| 12/8/2003 | Flat Fee | Revise petition, prepare for filling. | .1 | 0.00 | 0.00 |
| 12/31/2003 | Previous... | Previous Balance $112.50 | | 0.00 | |
| | Finance ... | Finance Charge $1.69 | | 0.00 | 0.00 |

Wishing you a Happy New Year!

| | Total | $0.00 |
|--|-------|-------|

PCRDIS-D002766

# G. David DeLozier, P.C.
*Attorney at Law*

Tax ID # 86-0712965

016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439

Ph 480-575-6660  Fx 480-575-6661

gddelozier@aol.com

## Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 12/31/2003 | 1486 | 1/31/2004 |

| Bill To |
|---------|
| Wendi Andriano #A631830
Maricopa Co. Durango Jail
3225 W. Gibson Lane
Phoenix, AZ 85009 |

| Project |
|---------|

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 12/2/2003 | Flat Fee | Received copy of email from Donna re schedule and issues with her health and inquiry re Wendi's "baby book"; emailed Patty that I may have it, she should call to discuss; emailed Patrick Linderman re death penalty issues that Dan had asked him to supply to me; email Dan to ask if he wanted me to do anything to let me know; emailed Donna re her health. | 0.5 | 0.00 | 0.00 |
| 12/12/2003 | Flat Fee | Researched issue of 42 USC 1983 violation for keeping the jail to cold. Contacted D-2 unit at Durango, wrote and faxed letter to D-2 and Ted Howard regarding getting Wendi a blanket. | 1 | 0.00 | 0.00 |
| 12/15/2003 | Flat Fee | Telephone call from Ted Howard re: Wendi's blanket. He advised me to contact county attorney Vigil at 602 506 7727. I called a left a message for Vigil. | 0.2 | 0.00 | 0.00 |
| /15/2003 | Flat Fee | Discussion with Mr. Vigil re: getting Wendi a blanket. He's looking in to it. | 0.1 | 0.00 | 0.00 |
| 12/16/2003 | Flat Fee | Telephone call to Joe Vigil re: Wendi's blanket. | 0.1 | 0.00 | 0.00 |

| ishing you a Happy New Year! | Total | $0.00 |
|------------------------------|-------|-------|

PCRDIS-D002767

# G. David DeLozier, P.C.
## Attorney at Law

Tax ID # 86-0712965

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439

Ph 480-575-6660    Fx 480-575-6661

gddelozier@aol.com

## Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 1/31/2004 | 1809 | 2/15/2004 |

**Bill To**

Wendi Andriano #A631830
Maricopa Co. Durango Jail
3225 W. Gibson Lane
Phoenix, AZ 85009

Project

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 1/12/2004 | Flat Fee | Put 60$ on books of Yolanda Lara at jail for Wendi. | 1.2 | 0.00 | 0.00 |
| 1/20/2004 | Flat Fee | Call for Dan Patterson re trial schedule; call from Dan; trial will be postponed due to a variety of situations; call with Donna re postponement; call with Kandy Rohde, she is very concerned re telling Wendi while still in lockdown, prefers to wait until out, prefers that I do it, and that she may have trouble, calls with Wendi. | 0 | 0.00 | 0.00 |
| 1/26/2004 | Flat Fee | Prepare for meeting with Wendi, trip to Durango, meet Dan Patterson, discuss, visit with Wendi and Dan, visit with Wendi, put $55 on Wendi's books; receive fax from Alejo, call with Donna re documents from Alejo, call with Wendi, she will stay at Durango, mail documents to Wendi. | 2.5 | 0.00 | 0.00 |

| Total | $0.00 |
|-------|-------|

PCRDIS-D002765

# G. David DeLozier, P.C.
## Attorney at Law



Tax ID # 86-0712965

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439

Ph  480-575-6660    Fx  480-575-6661

gddelozier@aol.com

# Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 2/29/2004 | 1857 | 3/15/2004 |

| Bill To |
|---------|
| Wendi Andriano #A631830<br>Maricopa Co. Durango Jail<br>3225 W. Gibson Lane<br>Phoenix, AZ  85009 |

| Project |
|---------|
|  |

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 2/27/2004 | Flat Fee... | Prepare for hearing, read all pending motions, responses, etc., meet with Donna and Alejo, meet with Dan Patterson, meet with Wendi at court, conference with Judge Ishikawa, attend hearing, oral argument on motions, meet with Donna and Alejo after hearing. | 2.5 | 0.00 | 0.00 |

| | | | Total | $0.00 |
|--|--|--|-------|-------|

Thank you for your business.

# G. David DeLozier, P.C.
*Attorney at Law*

Tax ID # 86-0712965

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439

Ph  480-575-6660   Fx  480-575-6661

gddelozier@aol.com

# Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 3/31/2004 | 2024 | 4/15/2004 |

**Bill To**

Wendi Andriano #A631830
Maricopa Co. Durango Jail
3225 W. Gibson Lane
Phoenix, AZ  85009

| Project |
|---------|
| |

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 3/10/2004 | Flat Fee... | Calls with Wendi re photos, medical records, etc. | 0.5 | 0.00 | 0.00 |
| 3/11/2004 | Flat Fee... | Calls with Wendi and Patrick at PD's office. | 0.5 | 0.00 | 0.00 |
| 3/14/2004 | Flat Fee... | Trip to put money on Wendi's books. | 1 | 0.00 | 0.00 |
| 3/14/2004 | Flat Fee... | Trip to Towers to post $80.00 on Wendi's books. | 1.5 | 0.00 | 0.00 |
| 3/15/2004 | Flat Fee... | Call with Wendi, review. | 0.33333 | 0.00 | 0.00 |
| 3/16/2004 | Flat Fee... | Call from Patrick Linderman, meet with Patrick, review file documents, provide various documents to him, list others that Dan might be interested in, etc. | 1 | 0.00 | 0.00 |
| 3/24/2004 | Flat Fee... | Trip to visit with Abraham Salin at Towers Jail, #A979211, at the request of Wendi; call with Donna. | 1.5 | 0.00 | 0.00 |

| Thank you for your business. | Total | $0.00 |
|------------------------------|-------|-------|

# G. David DeLozier, P.C.
## Attorney at Law

Tax ID # 86-0712965

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439

Ph 480-575-6660   Fx 480-575-6661

gddelozier@aol.com



## Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 4/30/2004 | 2199 | 5/15/2004 |

**Bill To**

Wendi Andriano #A631830
Maricopa Co. Durango Jail
3225 W. Gibson Lane
Phoenix, AZ 85009

Project

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 4/13/2004 | Flat Fee... | Trip to meet with Wendi at Durango, also there was Kandy, discussed documents, brought three to the office and made copies, mailed a copy to Wendi and to Kandy, made others to take to Sharon Murphy and Dan Patterson for tomorrow's meeting, discuss case issues, decided to call Joe Collier re Joe Andriano head butting the wedding display and that could be the cuts in his head, he said the ME would have to testify re whether there was glass in those cuts. | 2 | 0.00 | 0.00 |
| 4/14/2004 | Flat Fee... | Meet with Dan Patterson & staff at his office downtown PD, review, announce that Dan wants me to do opening statement, reviewed witnesses and strategies re Tom and Sean, and others; call with Sharon Murphy, fax documents to her that Kandy wanted her to have, mail others that she and Wendi wanted her to have; received and responded to email from Donna, call with Donna, advised no hearing tomorrow, moved to the 22nd at 11am, told her of other discussions. | 2.5 | 0.00 | 0.00 |
| 4/17/2004 | Flat Fee... | Read and review Chris Weaver's interview transcript. | 0.75 | 0.00 | 0.00 |
| 4/17/2004 | Flat Fee... | Read documents from file; send email to family, read emails from family. | 1 | 0.00 | 0.00 |
| 4/21/2004 | Flat Fee... | Prepare for and meet at 1:30 PM, at Dan Patterson's office downtown PD. | 2.75 | 0.00 | 0.00 |
| 4/22/2004 | Flat Fee... | Prepare for and attend 11:00 am, Ishikawa, evidentiary hearing on defendant's motion in limine of 03/25/03 & 1/20/04, meet with Dan, investigator and Scott, with Wendi, meet with Judge, attend hearing, rescheduled various hearings including the trial. | 2 | 0.00 | 0.00 |
| 4/26/2004 | Flat Fee... | Work on case; call from Wendi, reviewed questions raised at last session with staff. | 1 | 0.00 | 0.00 |
| 4/27/2004 | Flat Fee... | Work on various items, letter to Donna & Alejo to review draft "power point" provided by Scott; review Dr. Murphy's materials, etc. | 0.75 | 0.00 | 0.00 |
| 4/30/2004 | Flat Fee... | Prepare for and attend 1:30pm hearing, Judge Ishikawa, expert witnesses hearing, discuss with Dan, Wendi, & Donna | 2.5 | 0.00 | 0.00 |

Thank you for your business.

| | Total | $0.00 |
|--|-------|-------|

# G. David DeLozier, P.C.
*Attorney at Law*

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439
Ph  (480) 575-6660   Fx  (480) 575-6661
gddelozier@aol.com

# Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 5/31/2004 | 2388 | 6/15/2004 |

| Bill To |
|---------|
| Wendi Andriano #A631830<br>Maricopa Co. Durango Jail<br>3225 W. Gibson Lane<br>Phoenix, AZ  85009 |

| Project |
|---------|
|  |

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 5/21/2004 | Flat Fee- GDD | Attend hearing, Judge Ishikawa, status conference, jury questionnaire, etc., reset to July 13th. | 2 | 0.00 | 0.00 |

Thank you for your business.

| **Total** | $0.00 |
|-----------|-------|

# G. David DeLozier, P.C.
*Attorney at Law*

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439
Ph  (480) 575-6660   Fx  (480) 575-6661
gddelozier@aol.com

# Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 6/30/2004 | 2577 | 7/15/2004 |

| Bill To |
|---------|
| Wendi Andriano #A631830<br>Maricopa Co. Durango Jail<br>3225 W. Gibson Lane<br>Phoenix, AZ  85009 |

| Project |
|---------|
|  |

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 6/7/2004 | Flat Fee- GDD | Trip to Durango facility, put $$s on Wendi's books, call with Donna, call with Dan Patterson, call with Wendi. | 2 | 0.00 | 0.00 |
| 6/16/2004 | Flat Fee- GDD | Received and read pleadings filed by Dan Patterson re responses to motions filed by the State. | 0.5 | 0.00 | 0.00 |
| 6/17/2004 | Flat Fee- GDD | Received and reviewed another response to State's motions from Dan Patterson. | 0.16667 | 0.00 | 0.00 |
| 6/18/2004 | Flat Fee- GDD | Prepared for hearing, reviewed responses filed by Dan Patterson; meet with Judge, Patterson on State's counsel; meet with Wendi and parents, attend hearing, discuss with parents after hearing. | 2 | 0.00 | 0.00 |

Thank you for your business.

| **Total** | $0.00 |
|-----------|-------|

# G. David DeLozier, P.C.
## *Attorney at Law*

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439
Ph (480) 575-6660   Fx (480) 575-6661
gddelozier@aol.com

# Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 9/30/2004 | 3171 | 9/30/2004 |

Bill To:

Wendi Andriano #A631830
Maricopa Co. Durango Jail
3225 W. Gibson Lane
Phoenix, AZ 85009

Project

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 8/28/2004 | Flat Fee-CL | Met with CJB to review all photograph notebooks along with Opening Statement in preparation of trial | 4.3 | 0.00 | 0.00 |
| 9/1/2004 | Flat Fee- ACD | Proof read Opening Statement | 2.86667 | 0.00 | 0.00 |
| 9/1/2004 | Flat Fee- GDD | Prepare for meeting with Dan to continue working on jury selection; meet with Dan and Scott at Patterson's office; attend jury selection at Judge Ishikawa's court; call with Kandy Rhode re whether she has photos, NO; discuss status of her review of the document; discussions with Donna re assisting in selecting photos for opening statement; calls with Donna; resend email copy of opening statement draft to Donna; received and reviewed Kandy's suggestions; call with Wendi to discuss Kandy's suggestions; work with Amy on suggestions she has for additions, revisions, etc; call and email another copy of the draft to Cathy Benson, paralegal; received and reviewed letter from staff at Durango jail re providing snacks to Wendi; not right, will have to have it rewritten; work on opening statement; received and reviewed Donna's suggestions and incorporated them into the draft. | 9.5 | 0.00 | 0.00 |
| 9/2/2004 | Flat Fee Servic... | Review of draft of opening statements; Addition of subtitles to break paragraphs down by subject areas. | 1.16667 | 0.00 | 0.00 |
| 9/2/2004 | Flat Fee-JDB | Researched issues relating to self-defense and prior acts of husband. Printed and highlighted statutes and cases and drafted and discussed a memo summarizing my findings. | 1.25 | 0.00 | 0.00 |
| 9/2/2004 | Flat Fee-CL | To Dan Patterson's office with GDD to meet with attorney's and Donna to discuss all photographs in preparation of Opening Statement | 3.5 | 0.00 | 0.00 |
| 9/3/2004 | Flat Fee- ACD | Read notes to find more input for opening statement | 2.16667 | 0.00 | 0.00 |
| 9/3/2004 | Flat Fee- GDD | Prepare for meeting with Dan; meet at Dan's office re matching photos to opening statement, with Scott, Donna and Carolyn Landers of our office; work on opening statement; calls with Margaret Lothian at Durango re Wendi's food authorizations. | 3.16667 | 0.00 | 0.00 |

| | Total | |
|---|-------|---|

Page 1

PCRDIS-D001469

# G. David DeLozier, P.C.
*Attorney at Law*

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439
Ph (480) 575-6660   Fx (480) 575-6661

gddelozier@aol.com

# Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 9/30/2004 | 3171 | 9/30/2004 |

| Bill To |
|---------|
| Wendi Andriano #A631830 |
| Maricopa Co. Durango Jail |
| 3225 W. Gibson Lane |
| Phoenix, AZ 85009 |

| Project |
|---------|
|         |

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 9/3/2004 | Flat Fee- GDD | Discussions with Carolyn re status of photos; work on opening statement; trip to Mesa to meet with Dan to review exhibits; work on opening statement; call with Kandy Rhode; discussed her schedule and that Wendi had lots of changes that she wants to work into the document; told her I was working on another draft and would forward to her as soon as finished; she said she would work on it first thing in the morning and get to me before noon on Saturday; calls with Carolyn re status of photos, told her I was revising and would forward as soon as finished and would like her to look over first thing in the morning and let me know what she thinks the status is re completing the photos; work on opening statement, incorporating many of the interviews from various people, clarifying certain portions, highlighting certain portions that I need to have Wendi clarify, read transcripts of Chris H and Chris Weaver, Barbara, and others, read 911 calls transcript; finalize another draft of the opening statement and email to Kandy, Donna and Carolyn. | 10.5 | 0.00 | 0.00 |
| 9/3/2004 | Flat Fee-CL | Reviewing, scanning and correlating photographs for preparation of Power Point presentation to go with Opening Statement | 6 | 0.00 | 0.00 |
| 9/4/2004 | Flat Fee-GDD | Continue working on draft opening statement, reading transcripts, etc. | 3 | 0.00 | 0.00 |
| 9/4/2004 | Flat Fee-CL | Continuation of reviewing and scanning of photographs and inserting into Power Point presentation for Opening Statement | 4 | 0.00 | 0.00 |
| 9/5/2004 | Flat Fee- GDD | Work on opening statement, received and reviewed partial submissions by Kandy Rhode, calls with Donna; meet with Donna & Alejo & received more photos; meet with Carolyn and deliver photos, exchanged emails with Kandy and Carolyn; continued work on opening statement. | 7.5 | 0.00 | 0.00 |
| 9/5/2004 | Flat Fee-CL | Review of "final" Opening Statement and from GDD (via e-mail); minor changes in Opening Statement (RE: slide numbers/ location) in document. | 1 | 0.00 | 0.00 |
| 9/6/2004 | Flat Fee- GDD | Work on opening statement; visit Wendi at Durango, discuss portions and get clarification; work on opening statement; call with Carolyn Landers re need more pictures and ready for final; email to Dan; email to Donna; email to Kandy; work on opening statement; reading re legal issues; recite opening statement to family to get their reaction and to practice. | 9.5 | 0.00 | 0.00 |
| 9/6/2004 | Flat Fee-CL | Drive to GDD's office from my home to pick up all photographs for additional insertion into Power Point presentation | 0.75 | 0.00 | 0.00 |
| 9/6/2004 | Flat Fee- GDD | Work on opening statement. | 5 | 0.00 | 0.00 |
| 9/7/2004 | Flat Fee Servic... | Photocopying of Opening Statements. | 0.33333 | 0.00 | 0.00 |

| | Total |
|--|-------|
| | |

Page 2

PCRDIS-D001470

# G. David DeLozier, P.C.
*Attorney at Law*

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439
Ph (480) 575-6660  Fx (480) 575-6661
gddelozier@aol.com

# Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 9/30/2004 | 3171 | 9/30/2004 |

| Bill To |
|---------|
| Wendi Andriano #A631830
Maricopa Co. Durango Jail
3225 W. Gibson Lane
Phoenix, AZ 85009 |

| Project |
|---------|
|  |

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 9/7/2004 | Flat Fee-CL | Drive to Mesa to Court to assist with modification of slide presentation for opening statement; attended hearing and assisted with technical support of presentation set up. | 4.5 | 0.00 | 0.00 |
| 9/7/2004 | Flat Fee-CL | Re-review of photographs and Opening Statement; insertion of additional pictures into PowerPoint presentation | 3 | 0.00 | 0.00 |
| 9/7/2004 | Flat Fee- GDD | Andriano trial, preparation, etc. | 6 | 0.00 | 0.00 |
| 9/8/2004 | Flat Fee- GDD | Andriano trial, preparation, work on finalization of additional issues with opening statement. | 7 | 0.00 | 0.00 |
| 9/2004 | Flat Fee- GDD | Andriano trial. | 6 | 0.00 | 0.00 |
| 9/10/2004 | Flat Fee- ACD | GDD asked for questions drafted for Wendi | 1.45 | 0.00 | 0.00 |
| 9/10/2004 | Flat Fee- GDD | Emailed Sharon Murphy with case notes and copy of edited opening statement; work on questions for Wendi; discuss with Justin Blair to work on questions for Wendi, Alejo and Donna. | 0.5 | 0.00 | 0.00 |
| 9/11/2004 | Flat Fee- GDD | Work on searching files to clarify issues and raise clarification of positions; read police reports; read transcripts; meet with Dan Patterson; receive Rick Freeland's transcript; exchange emails with Donna; continue working on case. | 7 | 0.00 | 0.00 |
| 9/12/2004 | Flat Fee- GDD | Work on case, review documents, review Dennis Olson's reports and transcripts, review Rick Freeland's police reports and transcript. | 4 | 0.00 | 0.00 |
| 9/13/2004 | Flat Fee- GDD | Trial preparation, meet with Dan, meet with Alejo, attend trial | 5.5 | 0.00 | 0.00 |
| 9/14/2004 | Flat Fee- GDD | preparation for trial, attend trial. | 7 | 0.00 | 0.00 |
| 9/15/2004 | Flat Fee- GDD | trial preparation and trial; searching video tapes, call with Dan P.; reading transcripts for Thursday's trial day. | 9 | 0.00 | 0.00 |
| 9/16/2004 | Flat Fee- GDD | Preparation for trial, review Dr. Keen's report and two transcripts, attend trial, discuss with Dan. | 6 | 0.00 | 0.00 |
| 9/18/2004 | Flat Fee- GDD | Review video tapes of witnesses | 7 | 0.00 | 0.00 |
| 9/19/2004 | Flat Fee- GDD | Review video tapes of witnesses. | 6 | 0.00 | 0.00 |
| 9/20/2004 | Flat Fee- GDD | Prepare for and attend Andriano trial. | 6 | 0.00 | 0.00 |
| 9/21/2004 | Flat Fee- GDD | Prepare for and attend trial. | 6 | 0.00 | 0.00 |
| 9/23/2004 | Flat Fee-JDB | Reviewed opening statement and Alejo's interview with the cops. I drafted an outline of talking points for Alejo's examination. This should also serve as a foundation for Donna's and Wendy's outlines. | 5.2 | 0.00 | 0.00 |
| 9/23/2004 | Flat Fee- GDD | Prepare for and attend trial. | 6 | 0.00 | 0.00 |
| 9/24/2004 | Flat Fee-JDB | Reviewed Wendi's tape and concluded initial drafts of testimony outlines for Alejo and Donna | 5.5 | 0.00 | 0.00 |
| 9/25/2004 | Flat Fee- GDD | Prepare for trial | 4 | 0.00 | 0.00 |

| | Total | |
|--|-------|--|

Page 3

PCRDIS-D001471

# G. David DeLozier, P.C.
*Attorney at Law*

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439
Ph (480) 575-6660   Fx (480) 575-6661

gddelozier@aol.com

# Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 9/30/2004 | 3171 | 9/30/2004 |

**Bill To**

Wendi Andriano #A631830
Maricopa Co. Durango Jail
3225 W. Gibson Lane
Phoenix, AZ 85009

Project

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 9/26/2004 | Flat Fee- GDD | Work with Alejo & Donna re testimony for trial. | 8 | 0.00 | 0.00 |
| 9/27/2004 | Flat Fee- GDD | Trial | 6 | 0.00 | 0.00 |
| 9/28/2004 | Flat Fee- GDD | Trial | 6 | 0.00 | 0.00 |
| 9/29/2004 | Flat Fee-JDB | Drafted memo and completed research on methods of introducing evidence of Joe's prior acts of violence. | 2.1 | 0.00 | 0.00 |
| 9/29/2004 | Flat Fee- GDD | Trial | 6 | 0.00 | 0.00 |
| 9/30/2004 | Flat Fee-JDB | Researched issue of Wendy's character, drafted memo and met with Dan Patterson on the topic. | 2.1 | 0.00 | 0.00 |
| 30/2004 | Flat Fee- GDD | Trial, prepare, review issues with Martinez, discuss with Dan, meetings with Judge, decided he needed memos from counsel by 3pm on Friday, October 1st, and hearing at 9:30am on Monday, October 4th; call with Justin; discuss with Dan, meet with family members. | 4 | 0.00 | 0.00 |
| 10/2/2004 | Flat Fee-GDD | Received and reviewed Dan's Memo. | 0.5 | 0.00 | 0.00 |
| 10/3/2004 | Flat Fee- GDD | Meet with Dan and Wendi at Durango Jail | 6 | 0.00 | 0.00 |

| | Total | $0.00 |
|---|-------|-------|

Page 4

PCRDIS-D001472

# G. David DeLozier, P.C.
*Attorney at Law*

4016 E Forest Pleasant Place
Cave Creek, AZ 85331-5439
Ph  (480) 575-6660   Fx (480) 575-6661

gddelozier@aol.com

# Invoice

| Date | Invoice # | Due Date |
|------|-----------|----------|
| 12/31/2004 | 3767 | 1/15/2005 |

1/3/04   Made Customer inactive

| Bill To |
|---------|
| Wendi Andriano #A631830
Maricopa Co. Durango Jail
3225 W. Gibson Lane
Phoenix, AZ  85009 |

| Project |
|---------|
|  |

| Date | Item | Description | Hours | Rate | Amount |
|------|------|-------------|-------|------|--------|
| 12/1/2004 | Flat Fee- GDD | 1:00pm, Andriano, Judge Ishikawa | 5 | 0.00 | 0.00 |
| 12/6/2004 | Flat Fee- GDD | Call from Court, jury has verdict; trip to court; meet with Judge and counsel; attend trial; meet with Wendi, Dan and Scott; calls with Donna; call for Kandy, left messages on voice mail. | 4 | 0.00 | 0.00 |
| 12/7/2004 | Flat Fee-CL | Research files for photographs of children w/burns on buttocks; doctor's report RE: burns due to urine and Pinal County Pleadings | 1.8 | 0.00 | 0.00 |
| 12/7/2004 | Flat Fee- GDD | 1:30pm, Andriano, Judge Ishikawa, calls with Kandy, calls with Donna and Alejo, search files for documents, work on opening statements for mitigation portion. | 7 | 0.00 | 0.00 |
| 12/8/2004 | Flat Fee- GDD | Calls with and meet with Alejo re children's guardianship and adoption files, review files and prepare for hearing, copy, etc.; attend oral argument on various motions at 11:00am with Judge Ishikawa; attend trial. | 9 | 0.00 | 0.00 |
| 12/9/2004 | Flat Fee- GDD | Attend trial | 6 | 0.00 | 0.00 |
| 12/10/2004 | Flat Fee- GDD | Prepare for trial, meet with Alejo and Donna to review preparation for testimony, several calls with Dan and with Court re bomb threat, wait for answer on whether court will be held, advised canceled for Friday, discussions with Alejo and Donna. | 4 | 0.00 | 0.00 |
| 12/13/2004 | Flat Fee- GDD | attend trial. | 6 | 0.00 | 0.00 |
| 12/14/2004 | Flat Fee- GDD | attend trial; prepare for opening statement. | 10 | 0.00 | 0.00 |
| 12/15/2004 | Flat Fee- GDD | Work on opening statement for mitigation portion of trial; attend trial | 8 | 0.00 | 0.00 |
| 12/16/2004 | Flat Fee- GDD | Prepare for hearing, final closing argument in mitigation hearing of trial, attend trial, wait for jury. | 7 | 0.00 | 0.00 |
| 12/21/2004 | Flat Fee- GDD | Sit in cafeteria of SE Superior Court in Mesa and wait for jury. | 5 | 0.00 | 0.00 |

| | Total | $0.00 |
|---|-------|-------|

PCRDIS-D001393

# ORIGINAL

FILED
ARIZONA COURT OF
APPEALS DIV TWO

03 MAY 27  AM 9: 18

JEFFREY P. HANDLER
CLERK

**IN THE**

## COURT OF APPEALS

### STATE OF ARIZONA

### DIVISION TWO

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF ) | No. 2-CA-JV 2002-0127 |
| ) | |
| NICHOLAS ANDRIANO and ) | Pinal County Superior |
| ASHLEE ANDRIANO, ) | Court No. AD2001-0058 |
| ) | |
| Minor Children ) | |
| ) | |
| G. DAVID DELOZIER and ) | |
| G DAVID DELOZIER, P.C., ) | |
| ) | |
| Real Parties In Interest/Appellants.) | |
| ) | |

## APPELLANT'S OPENING BRIEF

**G. DAVID DELOZIER, P.C.**
4016 Forest Pleasant Place
Cave Creek, Arizona 85331
Phone   480-575-6660
Facsimile   480-575-6661
e-mail.  gddelozier@aol com

G. David DeLozier
State Bar No  005237
In pro per

E000000039

# TABLE OF CONTENTS

Table of Authorities ..... iv

Introduction ..... 1

Statement of the Case ..... 3

    A.   Nature of the Case ..... 3

    B.   Course of Proceedings in the Trial Court ..... 4

    C.   This Court's Jurisdiction ..... 7

Statement of Facts ..... 8

Issue Presented For Review ..... 14

Argument ..... 14

I.    Standard of Review ..... 14

II.    Discussion ..... 15

    A.   The Trial Court Lacked Subject Matter Jurisdiction To Consider The Guardians' Motion To Dismiss Or For Sanctions After The Ochoas Filed Their Notice Of Dismissal Under Rule 41(a)(1) On July 12, 2002 ..... 15

    B.   Sanctions Are Not Warranted Against Either The Ochoas Or Undersigned Counsel For Their Adoption Petition And Related Pleadings, Which Complied With Applicable Law In All Respects. ..... 17

    C.   Under The Facts Of This Case, Neither Undersigned Nor The Ochoas Can Be Sanctioned For Failing To Abide By The Court's Orders ..... 22

E000000040

Conclusion                                    24

CERTIFICATE OF COMPLIANCE                      25

CERTIFICATE OF SERVICE                         26

iii

E000000041

# TABLE OF AUTHORITIES

## Cases

*Anderson v Pima County Dept of Public Welfare*, 77 Ariz 339, 271 P 2d 834 (1954) ... 20

*Brown v Pierce Mfg , Inc* , 169 F R.D 118 (E D Wisc. 1996) ... 17

*Crawford v Crawford*, 20 Ariz App 599, 514 P 2d 1050 (App. 1973) ... 15, 17

*Goodman v Gordon*, 103 Ariz 538, 447 P 2d 230 (1968) ... 6, 15

*Harvey Honore' Constr Co , Inc v Louisiana Associated General Contractors, Inc* , 1996 WL 627993, (E.D.La. 1996) ... 17

*Hedlund v Ford Marketing Corp* , 129 Ariz 176, 629 P 2d 1012 (App 1981) ... 16

*Hill v Chubb Life American Ins Co* , 178 Ariz 37, 870 P.2d 1133 (App. 1993) ... 14, 18

*In re Anonymous*, 4 Ariz App, 588, 422 P 2d 419 (1967) ... 20-21

*In re Infant Child Skinner*, 982 P 2d 670 (Wash App 1999) ... 10-11

*In the Matter of Guardianship of Mikrut*, 175 Ariz. 544, 858 P.2d 689 (App. 1993) ... 21-23

*James, Cooke & Hobson, Inc v Lake Havasu Plumbing & Fire Protection*, 177 Ariz. 316, 868 P.2d 329 (App 1993) ... 14

*Matter of West Texas Marketing Corp* , 12 F.3d 497 (5th Cir.1994) ... 16

*Mayer v State*, 908 P.2d 56, 184 Ariz. 242 (App.1995) ... 16

E000000042

*Meinecki v  H & R Block of Houston,* 66 F 3d 77 (5th Cir.1995)      16

*Spring v  Spring,* 3 Ariz.App  381, 414 P.2d 769 (1966)      15

*Thomas v  Thomas,* 198 Ariz  298, 49 P.3d 306 (App  2002)      14

*Williams v  Ezell,* 531 F 2d 1261 (5th Cir.1976)      16

**Statutes**

Arizona Revised Statute § 8-104      4

Arizona Revised Statute § 8-106      1, 5, 11-12, 19-21

Arizona Revised Statute § 12-2101(B)      8

Arizona Rule of Civil Procedure 4(i)      23

Arizona Rule of Civil Procedure 41(a)(1)      6, 15-17, 23

Federal Rule of Civil Procedure 41(a)      16-17

v

E000000043

## INTRODUCTION

In this matter, Alejo and Donna Ochoa, the maternal grandparents of the Nicholas and Ashlee Andriano (the "Children"), sought to adopt their grandchildren  The Children's father had passed away and their mother was incarcerated, accused of killing the father  At the time of the proceedings at issue, the Children were living with a paternal aunt and uncle in the Phoenix area, who had been appointed temporary guardians of the Children

From the outset of the adoption matter, the Ochoas alerted the trial court to the guardianship, and that guardianship proceedings were underway in the Maricopa County Superior Court.  However, the Ochoas informed the trial court of their belief that the guardians did not need to be served because the terms of the guardianship did not include the right to consent to an adoption. Arizona Revised Statute section 8-106(B) provides that consent of a guardian is **not** required unless the guardians were expressly provided authority to consent to an adoption. *See id.*

The trial court, "acknowledg[ing] that A.R.S § 8-106 does not require notice to the guardians," found that "the best interests of the children do " 12/18/01 Minute Entry, **IR 9**, at p  1.[1]  Accordingly, the trial court ordered

---

[1]    References to the index of record shall be referred to as "IR," followed by the applicable reference number  References to transcripts shall

i

E000000044

the Ochoas to serve the guardians, and to cause the social study to be amended to include the guardians  *Id.*

However, by the time of the trial court's order, the Ochoas were both emotionally and financially tapped from the extended guardianship proceedings in Maricopa County.  They lacked the resources to effect the adoption.  Accordingly, believing that the "sanction" for a failure to serve a matter was dismissal, the Ochoas abandoned their adoption proceeding in Pinal County.  They did not serve the petition to adopt on the guardians, nor did they take any other step to advance the adoption proceeding  The matter, the Ochoas reasonably believed, would be dismissed due to failure to effect service and failure to prosecute.    Indeed, on July 12, 2002, the Ochoas formally submitted their Notice of Dismissal

However, the trial court, apparently believing that an adoption proceeding once begun cannot be abandoned, sanctioned both the Ochoas and undersigned counsel.  In a logical nonsequitur, the Court reasoned that "counsel G. David DeLozier intentionally and surreptitiously avoided this Court's orders with the intentions of permanently severing the paternal interest of the children and that he intentionally disregarded this Court's

---

be referred to by the date of the hearing, "RT," and the applicable page number, *i e* , 9/27/02 RT 8.

2

E000000045

orders." **IR 27.**[2]   In fact, by not complying with the trial court's orders, there was no possible way that they matter could proceed.   Since the trial court had made it clear that it would **not** grant the adoption **without** the intervention of the guardians, **there was no possible way that "avoid[ing] th[e] Court's orders" could have achieved the alleged result of "permanently severing the paternal interest of the children."**   The trial court apparently believed that the adoption petition, once filed, could **only** be terminated by a ruling on the merits.   This is obviously incorrect   Thus, for the reasons set forth herein, undersigned counsel respectfully requests that this Court reverse the award of sanctions against both him and his clients

## STATEMENT OF THE CASE

A.   <u>Nature of the Case</u>

This is an appeal from an adoption matter   The issue, however, concerns not the merits of the adoption, but the trial court's October 16,

---

[2]   Ironically, this Court may take judicial notice that the Lambeths have subsequently filed their own petition to adopt the Children in Maricopa County Superior Court.   *See* Maricopa County Superior Court No  JS 505461.   Their request to adopt the Children is without the consent of the Children's mother, and would have the effect on the maternal side of the family – a permanent severance – that the trial court found distasteful in the present matter

3

E000000046

2001, award of sanctions and entry of judgment against the petitioners, Alejo and Donna Ochoa, and undersigned counsel  *See* **IR 27.**

**B.**   **Course of Proceedings in the Trial Court**

On August 31, 2001, Alejo and Donna Ochoa, the maternal grandparents of Nicholas and Ashlee Andriano, filed a petition to adopt Nicholas and Ashlee in Pinal County Superior Court.  **IR 1.**  Since the Ochoas resided in Casa Grande, Pinal County, they filed their petition in Pinal County, as permitted by Arizona law  *See* A.R.S § 8-104 (venue for an adoption proceeding can include county where prospective adoptive parents reside)

In the petition, the Ochoas informed the trial court that they were the maternal grandmother and stepgrandfather of the Children.  **IR 1,** at p  2  In addition, the Ochoas informed the trial court the Children were residing with their paternal aunt and uncle, Bradley James and Jeanea Lambeth, pursuant to a guardianship proceeding in Maricopa County.  *Id.* (referencing *In the Matter of the Guardianship of Nicholas Andriano and Ashlee Andriano*, Maricopa County Superior Court No  PB2000-004531).  The Children's natural mother, Wendi Andriano, consented to the Ochoas' adoption of the Children.  **IR 2.**

4

E000000047

On October 5, 2001, the trial court entered a minute entry indicating that "no consent to the guardianship has been filed by the guardian as required by law." **IR 6** Thereafter, the Ochoas, through counsel, submitted a notice of compliance with A.R.S. § 8-106, noting that "[n]o guardian approval is required since the guardians were not given authority by the court to consent their adoptions." **IR 7,** at p 1 The Agreement regarding the Lambeths' guardianship and the Maricopa County Superior Court's order appointing the Lambeths as guardians was attached to the Notice as exhibits. *Id*

The Ochoas submitted their home study to the trial court on October 17, 2001 In this home study, the Ochoas indicated that the paternal grandparents also reside in Casa Grande, and that the paternal grandparents "will be able to visit with the children, if they are adopted by the Ochoas." **IR 8,** at pp 13-14.

On December 18, 2001[3], the trial court issued a minute entry indicating that "[w]hile the Court acknowledges that A R.S § 8-106 does not require notice to guardians, the best interest of the children do." **IR 9,** at

---

[3]     Although the trial court's minute entry was dated December 18, 2001, it was not signed until January 2, 2002, and then signed by Judge McCarville on behalf of Judge O'Neill. Undersigned counsel did not receive the order until well past the first of the year 2002

5

E000000048

p. 1. Accordingly, the trial court ordered the Ochoas to serve the guardians and to amend the home study to include the guardians, Bradley and Jeanea Lambeth. *Id* at p 2.

Thereafter, nothing happened in the matter for over six months [4]   On January 10, 2002, the counsel for the guardians filed a request for leave to inspect the file   Two days later, the Ochoas, exercising their "absolute, self-executing" right to dismiss their action pursuant to Arizona Rule of Civil Procedure 41(a)(1), *see Goodman v   Gordon*, 103 Ariz. 538, 540, 447 P 2d 230, 232 (1968), filed a notice of dismissal   **IR 15**   Over six days later, the guardians filed a belated motion to dismiss and motion for sanctions   **IR 16.** The trial court did not recognize the Ochoas' dismissal of the adoption proceeding but, rather, set an evidentiary hearing requiring undersigned to explain

> his failure to abide by this Court's direct orders and whether his failure to abide by these orders was a s a result of directives from his clients or his own initiative and why Home Builders for Children, Inc   failed to amend its report as previously ordered.

---

[4]   On Jaunary 2, 2002, undersigned, upon hearing a report that Judge O'Neill was ill, sent a notice of change of judge to Pinal County Superior Court.   **IR 12.**   This notice was filed the next day, on January 3, 2002. Notably, undersigned sent this notice in **prior** to receipt of the December 18, 2001, minute entry that was signed by Judge McCarville on January 2, 2002 Nonetheless, the trial court denied this request for change of judge.   **IR 13.**

E000000049

**IR 18.** As undersigned counsel explained, both in writing and orally, *see, e g , IR 21, 23,* the "orders" were not complied with because the Ochoas no longer desired to "to proceed with the adoption herein." *See* **IR 15** (Notice of Dismissal). Nonetheless, the trial court, apparently believing that the Ochoas did **not** have the right to withdraw their petition to adopt, sanctioned both the Ochoas and undersigned counsel  Specifically, the court found·

> The Court finds it impossible to accept that they [the Ochoas] did not contemplate that the methodology by which these pleadings were submitted and the timing of them would result in paternal interest being severed permanently. The Court finds counsel G. David DeLozier intentionally and surreptitiously avoided this Court's orders with the intentions of permanently severing the paternal interest of the children and that he intentionally disregarded this Court's orders

**IR 27.** The trial court awarded the guardians and their counsel, non-parties to this action, six thousand dollars in attorney's fees  The trial court also "dismissed" the adoption proceeding "with prejudice  *Id*

This appeal followed

### C.   <u>This Court's Jurisdiction</u>

The trial court's signed minute entry of October 18, 2002, expressly provides that its ruling is "reduced to judgment." **IR 27.** The minute entry further purports to dismiss the adoption matter "with prejudice." *Id.*

E000000050

Accordingly, this Court has jurisdiction over this matter pursuant to **A.R.S. § 12-2101(B)**.

## STATEMENT OF FACTS

The Ochoas married on June 6, 1975, and have been together, without any period of separation since *See* **IR 8.** Mrs. Ochoa had one child, Wendi, from a previous marriage  Wendi is the mother of the two minor Children at issue in the present proceeding. Mrs. Ochoa's husband, Reverend Alejo Ochoa, adopted Wendi on January 31, 1977  In addition, on February 25, 1991, the Ochoas adopted Brandon Henry Ochoa, the natural son of Mrs. Ochoa's sister. The Ochoas obtained custody of Brandon when he was 2 ½ years old, and adopted him approximately two years later  *Id*

The Ochoas have always had a close relationship with the Children, Nicholas and Ashlee    Prior to the guardianship appointment, the Ochoas spent literally hundreds of hours annually visiting with and/or, babysitting the Children.    The Ochoas had developed a very close grandparent/grandchild relationship with both of the Children. *Id*

On or about October 8, 2000, the father of the Nicholas and Ashlee Andriano – the minor Children in this matter – died.  Their mother, Wendi Andriano, was arrested and charged with the murder of Mr Andriano. *Id*

8

E000000051

The Ochoas initially cared for the Children.  However, within a few days of Mr Andriano's death, the Children's paternal grandparents requested a visit with the Children.  The Ochoas acquiesced.  *Id.*; *see also* **IR 21** (the Ochoas' Memorandum Regarding Guardians' Motion To Dismiss)

When the time came for the scheduled return of the Children, the paternal grandparents requested a few more days.  When that deadline came and went, with yet another request for additional time, it became clear that the paternal grandparents had no intention of returning the Children.  The Ochoas soon discovered that the Children were staying with the Lambeths, their paternal aunt and uncle  **IR 21.**

At the time, however, the Ochoas were still in shock from the recent death of their son-in-law and incarceration of their daughter.  Moreover, their financial resources, already tapped due to financial assistance for Joseph Andriano's medical bills, were further strained by the present situation   Thus, when the Lambeths sought to become the temporary guardians of the Children, the Ochoas reluctantly agreed, particularly when Wendi Andriano's attorney suggested that she consent to the guardianship to "assist" her in the criminal matter

There is no question that the Ochoas are loving and concerned grandparents.  The expert retained by the **Lambeths** conceded as much

9

E000000052

Specifically, in his report in the Maricopa County action, Dr Brian Yee wrote

> Despite parties' [the Lambeths' and the Ochoas'] distrust, hostility, and negative opinions of each other, neither household is viewed as unfit for the children   Each of the adults is accomplished in their own right, appears to love the children, evidences no diagnosable psychiatric disorder, appears comfortable and skilled in relating to these young children, has a good fund of knowledge regarding children, evidences a seemingly functional approach to discipline and parenting of children, appears a productive member of the community and society, and evidences no issues of substance abuse, adjustment disorder, or antisocial/illegal behavior

*See* **IR 23**, Exhibit A, at p. 4

Following the death of the Children's father and the incarceration of their mother, the Ochoas have always desired to adopt the Children.  **This desire was completely independent and separate from any perceived deficiencies with the Lambeths' guardianship**   The Ochoas' beliefs regarding adoption as a preferable option to a guardianship have been accurately captured by the Washington Court of Appeals in *In re Infant Child Skinner*, 982 P.2d 670 (Wash  App  1999)·

> [W]ith regard to guardianships as an alternative to termination, our courts have consistently held that such placements are only a temporary solution and do not achieve permanence for a child.  Such placements make sense in the dependency context, where the child may need to be temporarily removed from the home.  But a guardianship does not adequately substitute for a permanent placement and, in fact, postpones the child's early

10

E000000053

> integration into a stable and permanent home   We conclude
> that a guardianship would not be an appropriate placement
> when the purpose of the proceeding is to ensure that the child is
> placed in a permanent home

*Id.* at 676.

The purpose of the adoption proceeding was simply to obtain a permanent placement for the Children, not to create a referendum on the Lambeths' guardianship   The petition was filed in Pinal County Superior Court, and undersigned counsel expressly informed the Pinal County Superior Court of the pendency of the guardianship.   In undersigned counsel's October 9, 2001 Notice Of Compliance With A R.S. § 8-106 and Request For Hearing, undersigned counsel attached the following·  (1) the Agreement Regarding the Guardianship of Nicholas Andriano and Ashlee Andriano, (2) the Order Appointing Guardian of Minor Children, filed on November 15, 2000; and (3) this Court's minute entry date November 15, 2000 regarding the hearing on the Petition for Appointment of Co-Guardians for Minors  **IR 7.** Undersigned counsel's disclosure to the trial court in the adoption proceedings was thorough

In this same notice, undersigned counsel explained why the consent of the Guardians was not required.   *Id.*   Specifically, A R.S. § 8-106(B) provides that consent of a guardian is **not** required unless the guardians were

11

E000000054

expressly provided authority to consent to an adoption   *See* A.R.S §§ 8-106(A) & (B).

The trial court agreed with undersigned counsel's reading of the law but, relying on the disclosures made by undersigned counsel, concluded that the best interests of the Children required more.  The court wrote  "While the Court acknowledges that A.R.S. § 8-106 does not require notice to the guardians, the best interest of the children do."  **IR 9.**   In order to proceed with the adoption,[5] this Court required service of the Guardians  *Id*

In short, the adoption proceedings would have become what was already transpiring in Maricopa County, a referendum on the Lambeths' guardianship   In addition, it would have very costly for the Ochoas to maintain these two proceedings  Thus, rather than create duplicitous proceedings regarding the same subject matter, the Ochoas abandoned their adoption proceeding   As the Lambeths themselves have acknowledged, nothing has transpired in the adoption proceedings since January; the Lambeths wrote  "There is nothing further in the Court file after January 23, 2002, except a filing by undersigned counsel [for the Lambeths] requesting an opportunity to review the records."  **IR 16,** at p  3.

---

[5]    Undersigned counsel reasonably construed the Court's order as a "conditional" order, *i e*, in order to proceed with the action, the Guardians must be served

12

The Lambeths and the trial court apparently reason that, having filed a petition to adopt, the Ochoas thereafter had no choice but to proceed with the matter to the bitter end, regardless of any perceived duplication with the present proceedings, regardless of the costs involved, and regardless of any continued desire on their part to continue with the proceedings.

On July 12, 2002, the Ochoas filed a notice of dismissal of the adoption proceeding **IR 15.** Notwithstanding this notice, six days later, the Lambeths (who were not parties to the action at the time) filed a motion to dismiss the petition and a motion for sanctions. **IR 16.** The trial court conducted an evidentiary hearing on the motion for sanctions on September 27, 2002 and, on October 18, 2002, issued a signed minute entry granting sanctions and dismissing the matter with prejudice **IR 27.** As noted above, the trial court expressly provided that its ruling was to be "reduced to judgment" *Id.* Undersigned filed a notice of appeal from this final judgment on October 27, 2002. **IR 29.**

Ironically, it is now the Lambeths who have filed a petition to adopt the Children. On December 31, 2002, the Lambeths filed a petition to adopt in Maricopa County Superior Court, case number JS 505461. The Ochoas, having only recently learned of the petition, have moved to intervene

13

E000000056

## ISSUE PRESENTED FOR REVIEW

**A.** Following the Ochoas' "absolute, self-executing" notice of dismissal pursuant to Arizona Rule of Civil Procedure 41(a)(1) on July 12, 2002, was the trial court divested of jurisdiction to consider the Guardians' motion to dismiss and for sanctions?

**B.** Did the trial court abuse its discretion in sanctioning undersigned counsel and the Ochoas were every action taken by counsel was objectively reasonable in light of well-established law?

## ARGUMENT

**I.   Standard Of Review**

This Court reviews *de novo* whether a trial court had subject matter jurisdiction over the matter at issue. *Thomas v Thomas*, 198 Ariz 298, 299-300, 49 P 3d 306, 307 -308 (App 2002) A trial court's decision to award sanctions is reviewed for an abuse of discretion. *James, Cooke & Hobson, Inc v Lake Havasu Plumbing & Fire Protection*, 177 Ariz. 316, 320, 868 P.2d 329, 333 (App. 1993). "The test to determine whether Rule 11, Arizona Rules of Civil Procedure, has been violated is **not one of subjective good faith but an objective one of reasonableness**." *Hill v Chubb Life American Ins Co*, 178 Ariz 37, 40, 870 P.2d 1133, 1136 (App 1993).

14

E000000057

## II.   Discussion

### A.   The Trial Court Lacked Subject Matter Jurisdiction To Consider The Guardians' Motion To Dismiss Or For Sanctions After The Ochoas Filed Their Notice Of Dismissal Under Rule 41(a)(1) On July 12, 2002.

Arizona Rule of Civil Procedure 41(a)(1) provides in pertinent part that "an action may be dismissed (A) by the plaintiff without order of court by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs " **Ariz.R.Civ.P. 41(a)(1)**   This rule, the Arizona Supreme Court has held, is "absolute, self-executing, and accomplished automatically by plaintiff's filing a notice of dismissal " *Goodman v Gordon*, 103 Ariz. 538, 540, 447 P.2d 230, 232 (1968)   "There need be no notice to defendant, no hearing on the matter, and no order of the court." *Id*

Arizona courts also recognize the "general rule" that "once having dismissed an action, the trial court has no jurisdiction to grant affirmative relief to the parties based on their subsequent petitions for affirmative relief." *Crawford v Crawford*, 20 Ariz App. 599, 600, 514 P.2d 1050, 1051 (App. 1973); *see also Spring v Spring*, 3 Ariz.App 381, 414 P.2d 769 (1966) (holding that the plaintiff-wife's voluntary dismissal, prior to any answer or motion for summary judgment had the same effect as a formal

15

E000000058

dismissal and, therefore, the trial court had no jurisdiction concerning the substitution of attorneys or the awarding of fees)  Federal courts follow the same rule with respect to the federal counterpart of Rule 41(a)(1).[6]  For example, the United States Court of Appeals for the Fifth Circuit has reiterated the rule that after dismissal is entered pursuant to Rule 41(a)(1), any further actions by the court are "superfluous." *See, e g , Meinecki v H & R Block of Houston*, 66 F.3d 77, 82 (5th Cir 1995); *Matter of West Texas Marketing Corp* , 12 F.3d 497, 501 (5th Cir 1994). In *Williams v Ezell*, 531 F.2d 1261 (5th Cir 1976), the Fifth Circuit held that after filing of a notice of voluntary dismissal, a district court not only may not address the merits of an action, it may not entertain applications for attorneys' fees  The court explained:

> The [district] court had no power or discretion to deny plaintiffs' right to dismiss or attach any condition or burden to that right  That was the end of the case and the attempt to deny relief on the merits and dismiss with prejudice was void. Likewise, except for determining appealability, the subsequent orders granting attorneys fees were a nullity

*Id* at 1264

---

[6]    Federal decisions construing analogous rules of civil procedure are highly persuasive in interpreting Arizona counterparts. *See, e g , Mayer v State*, 908 P.2d 56, 184 Ariz. 242 (App.1995); *Hedlund v Ford Marketing Corp* , 129 Ariz. 176, 178, 629 P.2d 1012, 1014 (App. 1981) (nothing that Arizona courts give "great weight" to federal interpretation of analogous rules of procedure).

16

E000000059

Here, the Ochoas had the right to dismiss their adoption matter.  They could not be, nor should not have been, compelled to proceed with an adoption proceeding that they no longer wished to pursue.  Moreover, Arizona Rule of Civil Procedure 41(a)(1) expressly grants to the Ochoas the absolute right to dismiss their adoption proceeding  Accordingly, having exercised this right on July 12, 2002, the trial court thereafter lacked subject matter jurisdiction to enter any further orders in the matter, or to entertain the guardians' untimely motion to dismiss and for sanctions.  *Crawford, supra; see also Brown v  Pierce Mfg , Inc* , 169 F.R.D. 118, 120 (E.D  Wisc 1996) (refusing to award sanctions where plaintiff had voluntarily dismissed complaint under Fed.R Civ P. 41(a)), *Harvey Honore' Constr  Co , Inc  v Louisiana  Associated  General  Contractors. Inc* , 1996  WL  627993,  *3 (E.D.La  1996) (holding that "(1) a court cannot condition the exercise of the plaintiff's absolute right of dismissal on the payment of attorneys' fees and costs; and (2) an order granting an award of attorneys' fees against the plaintiff on the heels of a valid Rule 41(a)(1)(i) dismissal is a nullity").

**B.**  **Sanctions Are Not Warranted Against Either The Ochoas Or Undersigned Counsel For Their Adoption Petition And Related Pleadings, Which Complied With Applicable Law In All Respects.**

E000000060

As noted above, "[t]he test to determine whether Rule 11, Arizona Rules of Civil Procedure, has been violated is **not one of subjective good faith but an objective one of reasonableness**" *Hill v Chubb Life American Ins Co*, 178 Ariz 37, 40, 870 P 2d 1133, 1136 (App 1993). In the present matter, the trial court apparently believed that the Ochoas and/or undersigned counsel were engaged in an effort to "blindside" the paternal grandparents, noting that "the methodology by which these pleadings were submitted and the timing of them would result in paternal interest being severed permanently " IR 27 Undersigned disagrees with the trial court's assessment in this matter, however, it is not necessary to resolve this issue, because neither the trial court nor this court can be concerned with the subjective intent or beliefs of the parties, but whether the legal steps taken were objectively reasonable. *Hill, supra.* In this matter, **every action** taken by the Ochoas and undersigned counsel was supported by well established statutory and case law authority  Accordingly, as a matter of law, the trial court abused its discretion in sanctioning either the Ochoas or undersigned counsel.

1. **Arizona law unquestionably permitted the adoption proceeding to be filed in Pinal County.**  Arizona Revised Statute section 8-104 provides that venue for an adoption proceeding can include county

18

E000000061

where prospective adoptive parents reside  The Ochoas reside in Casa Grande, within Pinal County  Accordingly, their petition was properly filed in the Pinal County Superior Court.

    2    **The Ochoas Disclosed The Guardianship And Related Proceedings To The Trial Court From The Outset Of The Adoption Proceeding.** The trial court's conclusion that undersigned counsel was attempting an impermissible "short circuit" of the paternal grandparents is belied by the fact that undersigned and the Ochoas, from the outset, disclosed the existence of the Children's guardianship to the trial court  The guardianship and related proceedings – including the specific case number – was included in the Ochoas' Petition To Adopt. **IR 1.** In the Ochoas' Notice Of Compliance With A.R S  § 8-106, the Ochoas attached to their notice the (1) guardianship agreement, (2) the Maricopa County Superior Court order appointing the Lambeths as guardians, and (3) the November 15, 2000 Maricopa County Superior Court minute entry regarding the hearing on the petition for appointment of the guardians  *See* **IR 9** (Exhibits 1 through 3).

    3.    **Undersigned counsel reasonably believed that service upon the Guardians was not required by law.** In the Ochoas' October 9, 2001 notice regarding compliance with A.R. S. § 8-106, undersigned indicated that

E000000062

it was his belief that service upon the guardians was not required by Arizona law, relying upon the expressly language of section 8-106. Section 8-106(A) specifically provides that

> A  The court shall not grant an adoption of a child unless consent to adopt has been obtained and filed with the court from the following .
>
> 4  Any guardian of the person of the child appointed by a court **and given authority by it to consent to the child's adoption**

*Id* (emphasis added)   Section 8-106(B) of the Arizona Revised Statutes further provides that **"[i]t not necessary for a person to obtain consent to adopt from . . . [a] person whose consent is not required under subsection A of this section "** *Id.* (emphasis added)   In the present matter, there is no dispute that the guardians had no authority to consent to an adoption

The limited case law in this matter reinforces undersigned's legal conclusion  In *In re Anonymous*, 4 Ariz App, 588, 422 P 2d 419 (1967), the Arizona Court of Appeals reiterated that these statutory provisions mean what they say.  The court wrote·

> It is apparent that the court is invested with power to decree the adoption of a child without anyone's consent where, upon a hearing, it appears that the child's welfare will thereby be promoted. *Anderson v Pima County Dept of Public Welfare,* 77 Ariz. 339, 344, 271 P.2d 834 (1954). It is equally apparent from a reading of A R.S § 8-103 [now A.R.S. § 8-106(A)] that

20

E000000063

the consent requirement therein provided comes into play only when applicable.

*Id* at 590, 422 P 2d at 421    Indeed, even the trial court agreed, acknowledging that "A.R.S § 8-106 does not require notice to the guardians " IR 9.[7]

4.    **Undersigned counsel had the express consent of the Children's mother to the adoption, as well as Ms. Andriano's withdrawal of her consent to the guardianship.** Contemporaneously with the adoption petition, the Ochoas submitted the notarized consent of the Children's natural mother to the adoption which counsel reasonably believed, under existing Arizona case law, to be dispositive of the Ochoas' right to adopt. Specifically, in *In the Matter of Guardianship of Mikrut*, 175 Ariz 544, 858 P 2d 689 (App. 1993), a parent had consented to the appointment of a guardian for the parent's child, then subsequently withdrew the consent. The trial court, however, refused to terminate the guardianship

The court of appeals determined that this was error. "Parents," the court observed, "have a fundamental liberty interest in the care, custody, and management of their children." *Id* at 547, 858 P 2d at 689   "[A] state may

---

[7]    Undersigned counsel was also aware of the Iowa Court of Appeals' decision in *In the Matter of Adoption of K T*, 497 N.W 2d 163 (Iowa App. 1992), in which the Iowa appellate court held that the paternal grandparents

21

E000000064

not presume the unfitness of a parent, but instead must provide individualized procedural safeguards (notice, hearing, and proof of unfitness) before the state can terminate parental rights." *Id* (quotation omitted). In the present matter, the Children's mother, Wendi Andriano, had filed a notice of withdrawal of her consent to the guardianship in the Maricopa County Superior Court. She had consented to the Ochoas' adoption of the Children. Accordingly, both the Ochoas and undersigned reasonably believed that they had fulfilled all of the requirements of Arizona law for the adoption of the minor Children.

### C.   Under The Facts Of This Case, Neither Undersigned Nor The Ochoas Can Be Sanctioned For Failing To Abide By The Court's Orders.

The trial court was also apparently troubled by the fact that its orders were not complied with, *i e*, the petition was not served upon the guardians and the home study not updated. However, undersigned counsel reasonably construed the Court's order as a "conditional" order, *i e*, in order to proceed with the action, the guardians must be served. Adoption is a voluntary action by a party or couple, and a couple cannot be compelled to proceed with an adoption. Hence, undersigned counsel reasonably believed that if

---

were not "custodians" entitled to notice of an adoption petition and did not have standing to petition to vacate the adoption decree. *Id* at 164-66.

22

E000000065

the Ochoas did not desire to prosecute the adoption petition while simultaneously contesting the Lambeths' guardianship in Maricopa County Superior Court, they could not be compelled to do so  Obviously, by serving the guardians, the Ochoas would have been proceeding with an adoption proceeding that they did **not** desire to prosecute.[8]

In addition, the Ochoas and undersigned reasonably believed the matter would abate.  Arizona Rule of Civil Procedure 4(i) provides that a matter is to be served within 120 days and, if not, the matter is subject to dismissal.  Simply put, the "sanction" for failing to serve a party is dismissal of the matter  *Id*

The Ochoas did not believe that they needed to serve the guardians, expand the home study, only to inform the court that they had no desire to proceed with the adoption  (Indeed, if any conduct would have been sanctionable, that would have been it )  Accordingly, both undersigned and the Ochoas believed that compliance with the trial court's orders were preconditions to proceeding with the adoption, not orders to be complied with even if they no longer desired to proceed

---

[8]    Obviously, compelling a party to proceed with an action commenced by that party is contrary to both the spirit and letter of Rule 41(a).

23

E000000066

## CONCLUSION

For the foregoing reasons, undersigned respectfully requests that this Court reverse the trial court's award of sanctions against him and the Ochoas.

**RESPECTFULLY SUBMITTED** this 27th day of May, 2003

**G. DAVID DeLOZIER, P.C.**

By _____
    G  David DeLozier

24

E000000067

# ORIGINAL

### IN THE

## COURT OF APPEALS

### STATE OF ARIZONA

### DIVISION TWO



RECEIVED
JUL 10 2003
COURT OF APPEALS
DIVISION TWO

FILED BY CLERK
JUL 10 2003
COURT OF APPEALS
DIVISION TWO

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF )<br><br>NICHOLAS A  and<br>ASHLEE A ,<br><br>    Minor Children,<br><br>G  DAVID DELOZIER and<br>G. DAVID DELOZIER, P.C.,<br><br>    Real Parties In Interest/Appellants | No  2-CA-JV 2002-0127<br><br>Pinal County Superior<br>Court No  AD2001-0058 |

## APPELLEES' ANSWERING BRIEF

**JOHN J. JAKUBCZYK**
2711 N  24th Street, Suite 200
Phoenix, Arizona  85008
Phone   602/468-0030
Facsimile   602/468-0053
e-mail   jakeslaw@ionet net

John J  Jakubczyk
State Bar No.  005894
Attorney for Appellees



RECEIVED
JUL 11 2003
COURT OF APPEALS
DIVISION TWO

#000000110

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.   History of this Matter . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2.   Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    3.   Court's Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

RESPONSE TO APPELLANT'S STATEMENT OF FACTS . . . . . . . . . . 11

ISSUES FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    1.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    2.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        A.   Appellant failed to follow the Court's order
            issued in the 12/18/01 Minute Entry . . . . . . . . . . . . . 13

        B.   Appellant's actions are all subject to *Cooter &*
            *Gell v. Hartmarx Corp.* . . . . . . . . . . . . . . . . . . . . 14

        C.   The trial court retained jurisdiction to consider
            sanctions against Appellant . . . . . . . . . . . . . . . . . . 18

ii

E000000111

## TABLE OF CONTENTS – Page 2

D.   The trial court did not abuse its discretion in
awarding sanctions . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   1)   Sanctions were warranted for Appellant's
conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   2)   The Ochoas have not appealed the sanction . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . 23

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . 24

iii

E000000112

# TABLE OF AUTHORITIES

<u>Cases:</u>

*Brown v. Local 58, Int'l Brotherhood of Electrical Workers
AFL-CIO*, 76 F.3d 762 (6th Cir. 1996) . . . . . . . . . . . . . . . . .  . . 17

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990) . . . . 14, 16, 17, 18, 19

*Crawford v. Crawford*, 20 Ariz.App. 599, 514 P.2d 1050 (App.1973) . . . . . 14

*Floyd v. Ortiz*, ___ F.3d ___ No 01-1295, 2002 WL 1980462
(10th Cir., August 28, 2002) . . . .  . . . . . . . . . . . . . . . . . . . . 20

*Goodman v. Gordon*, 103 Ariz. 538, 447 P.2d 230 (1968) . . . . . . . . . . . 15

*Greenberg v. Sala*, 822 F.2d 882 (CA9 1987) . . . . . . . . . . . . . . . 17

*James, Cooke, & Hobson, Inc., v. Lake Havasu Plumbing & Fire
Protection*, 177 Ariz. 316, 868 P.2d 329 (App.1993) . . . . .  . . . . . 13

*Linder v. Brown & Herrick*, 189 Ariz. 398, 943 P.2d 758
(App.Div.1, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Mark Indus Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730
(9th Cir 1995)  . . . . . . . . . . .   . . . . .  . . . . . .   . 19

*Matter of Ireland*, 146 Ariz. 340, 706 P.2d 352 (1985) . . . . . . . . . . . 16

*Meinecke v. H&R Block*, 66 F.3d 77 (5th Cir. 1995) . . . . . . . . . . . . . 15

*Muthig v. Brant Point Nantucket, Inc.*, 838 F.2d 600 (CA1 1988) . . . . . 18

*Othen v. Ann Arbor School Board*, 699 F.2d 309 (6th Cir. 1983) . . . . . 17

*Santiago v. Victim Servs. Agency of the Metro. Assistance Corp.*,
753 F.2d 219 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . 16

iv

E000000113

**TABLE OF AUTHORITIES – Page 2**

*Spring v. Spring*, 3 Ariz.App. 381, 414 P 2d 769 (1966) . . . . . . . . . . . .   14

*Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073
    (CA7 1987), cert. dism'd, 485 U.S. 901 (1988) . . . . . . . . . . . . . .   17, 18

*Taylor v. Great Lakes Seamen's Union, Local 5000*,
    657 F  Supp. 550 (N.D. Ohio 1984) . . .          . . . . . . . . . . .   17

*Williams v. Ezell*, 531 F.2d 1261 (5th Cir. 1976) . . . . . . . . . . . . . . .   15, 16

**Statutes:**

A.R.S. § 12-122 . . . . . . . . . . . . . . . . . . . . . . . . . . .   15, 16

A.R.S. § 12-2101(B) . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

A.R.S. § 12-349 . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

A.R.S. § 12-861 . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

A.R.S. § 8-117. . . . . . . . . . . . . . . . . . . . . . . . . .   9

**Rules:**

Rule 11, *Ariz.R.Civ.P.* . . . . . . . . . . . . . . . . . . . . . . .   13, 16, 18, 19

Rule 41(a), *Ariz.R.Civ.P.* . . . . . . . . . . . . . . . . . . . . .   16, 17

Rule 41(a)(1), *Ariz.R.Civ.P.* . . . . . . . .   14, 16, 18, 19

Rule 41(a)(1)(i), *Ariz.R.Civ.P.* . . . . . . . . . .   18, 19

Rule 41(a)(1)(ii), *Ariz.R.Civ.P.* . . . . . . . . . . . . . . . . . . . . .   15

Rule 41(a)(2), *Ariz.R.Civ.P.* . . . . . . . . . . .   . . . . . . . .   . . . 17

E000000114

## INTRODUCTION

Appellant, David DeLozier, was sanctioned by Pinal County Judge William J. O'Neil for failing to comply with a Court Order that he provide notice of a Petition to Adopt to the children's guardians, and further for failing to have the social study completed to investigate the children's living arrangements and relationship with the Guardians, and to make recommendations to the Court.

Appellant was ordered to pay $6,000.00 in attorney's fees to the Guardians. He appealed the decision. The Ochoas have not appeared, nor appealed the decision. Appellees are the Guardians and believe the decision should be affirmed.

## STATEMENT OF THE CASE

1   **History of this Matter**

Nicholas and Ashlee Andriano are the natural children of Joseph and Wendi Andriano. Nicholas was born on June 20, 1997. Ashlee was born on September 16, 1998. While Nicholas and Ashlee were three and two years old, their father was murdered. On October 8, 2000, Wendi Andriano was arrested for the murder of her husband. The next day, October 9, 2000, paternal aunt and uncle Jeanea and Bradley Lambeth took custody of the two children, brought them into their home, and have had continuous care, custody and control of their nephew and niece since that time. Following a meeting of the paternal grandparents, the maternal grandparents and Bradley and Jeanea Lambeth, Donna and Alejo Ochoa agreed in

1

E000000115

writing that Bradley and Jeanea Lambeth should be the guardians of the children. With this agreement the Lambeths filed a petition in Maricopa County Superior Court for their appointment as guardians. On November 15, 2000, the Probate Court reviewed the facts of the case, determined that Wendi Andriano's ability to parent her children had been suspended by circumstances, i.e. her incarceration, and found that Brad and Jeanea Lambeth were fit and proper persons to be guardians of the children. The Lambeths were appointed Guardians of the children

A short time after the guardianship had been approved, the children's therapist became concerned about the ability of the children to stabilize in the Lambeth home. The therapist determined that overnight visits to the maternal grandparents were not in the children's best interest, and therefore recommended they be stopped. In heeding the recommendations of the therapist and seeking the support of the Probate Court, the guardians incurred the wrath of Donna and Alejo Ochoa. During the first year, 2001, the Ochoas raised numerous unsubstantiated concerns and sought to have the court revoke the guardianship by the Lambeths. Wendi Andriano submitted her withdrawal of consent to the guardianship, and the Ochoas thought that based on that withdrawal of her consent they would get the children.

When the Probate Court, per Commissioner Jane Bayham-Lesselyong, determined that it was not in the children's best interest to terminate the guardianship or to remove the children from the Lambeth home, and that a court-

E000000116

appointed guardian ad litem should be appointed to represent the children, the Ochoas became even more incensed. Through numerous court filings, they persuaded the court to appoint a psychologist to do an evaluation and determine if overnight visits were appropriate. During the process of this evaluation, the Ochoas argued in court to change the evaluation from being about visitation and overnight visits, to a full-scale evaluation as to whom should have custody of the children. While this was happening, on August 31, 2001, the Ochoas decided, without providing notice to the Maricopa County Superior Court or the guardians or the guardian ad litem or anyone else involved, to file a petition for adoption in Pinal County, Arizona. As the Court can review from the record, the Ochoas had a home study prepared regarding Donna and Alejo Ochoa. The persons conducting the home study never communicated with the guardians or obtained any information from the guardians regarding the welfare of the children, even though the guardians' home was the primary residence of the children. When the adoption petition came before the court for initial hearing, the court expressed concern that there had been no notice provided to the guardians. The Ochoas went to great lengths to argue that notice was not required. They filed pleadings to that effect, and argued that the court could grant the adoption without notice being given to the guardians However, despite these arguments, the court held that notice to the guardians was in the best interest of the children.

3

E000000117

In December 2001, when that order was further articulated by the court, the Ochoas took the unusual step of attempting to change the Judge, and filed a Notice of Change of Judge following the ruling of the court. It was during this time that the Ochoas made allegations to Child Protective Services that the Lambeths had been abusive toward the children. These allegations later became one of the grounds for their filing a petition to remove the Lambeths as guardians in Maricopa County Superior Court. As the record reflects, the Pinal County judge declined to grant the change of judge. The Court ordered the petitioners to serve the guardians and advise the social agency doing the home study that they should interview the guardians.

The Ochoas and their attorney chose not to comply with the court order. Instead, they aggressively pursued removal of the guardians in Maricopa County Superior Court. It was only after numerous hearings that, in July 2002, the guardians' attorney became aware that there may be a pending action in Pinal County. On July 10, 2002, he traveled to Florence, the Pinal County seat, from Phoenix to investigate and review the file. After review of the file, he made contact with the Ochoas' counsel, the guardian ad litem and the Court on July 11, 2002. The guardians then filed a Motion to Dismiss the Petition and a Motion for Sanctions, based upon the Ochoas' failure to comply with the court order. The Ochoas also filed a Notice of Dismissal on July 12, 2002. On September 27, 2002,

4

E000000118

the court held an evidentiary hearing, which primarily consisted of the attorneys making avowals as to what the facts were, given the circumstances. This court has a copy of the transcript of the argument.

After taking the matter under advisement, Judge O'Neil sanctioned the attorney, Mr. DeLozier, $6,000.00, reduced the amount to a judgment and ordered that the judgment be paid to the Lambeths. The court also dismissed the Petition to Adopt with prejudice. It was the guardians' position that such a sanction was mild, given the egregious disregard of the court order and the two years of frustration and expense that the Ochoas caused the Lambeths. As further explained in this brief, the Lambeths had been subjected to incredible pressure by the Ochoas. Their family life had been interrupted on almost a weekly basis by the Ochoas during a period of over two years. They had been required to expend enormous sums of money merely to defend the attacks made by the Ochoas and their attorneys. The $6,000.00 Judgment represented a very modest amount as a sanction. As articulated below, the judgment was appropriate, as was the sanction against the Ochoas. From the testimony it appeared that Mr. DeLozier chose to "fall on his sword" rather than implicate his clients in their decisions. However, counsel believes the court saw through much of the charade, and therefore made its determinations based upon facts, the law and a certain appreciation for justice.

In the introduction submitted by Mr. DeLozier, there were numerous

5

E000000119

inaccuracies, misrepresentations and incorrect facts. One inaccuracy claimed that the Guardianship was temporary. The Guardians were not temporary Guardians. The Court on March 23, 2001 declined to characterize the guardians as temporary. In addition, the Ochoas were not both emotionally and financially tapped at the time of the court order in January 2002. They filed a petition to revoke the guardianship in February 2002 and aggressively pursued the action through many hearings, until the court ruled in the Fall of 2002 that their petition failed. They are incorrect in stating that they lacked the resources to "effect an adoption." They had already paid for the home study, and considering the amount of money that they had paid for attorney's fees between February 2002 and November 2002, it was improbable that they lacked the resources to effect the adoption. Therefore it did not follow that they believed that the "sanction" for failure to serve the matter would be "dismissal." Had the Ochoas truly decided that they did not want to pursue the adoption because they did not want to serve the guardians with notice of the petition, all they had to do was file a motion to dismiss the adoption in January 2002.

Their failure to dismiss supports the argument that their efforts to have the guardianship revoked was in order to have the Ochoas substituted as guardians so that they could have proceeded with the adoption. The only reason that the Ochoas filed the Motion to Dismiss on July 12, 2002, was that counsel for the guardians addressed the issue with Mr. DeLozier, the guardian ad litem and the Court at the

6

E000000120

evidentiary hearing on July 11, 2002.

Appellants cannot speculate as to what the trial court believed in sanctioning both the Ochoas and their counsel, and therefore his comments in the introduction, attempting to set up the straw man, fail.

Why should the court not believe that the failure by DeLozier and his clients to provide notice to Maricopa County Superior Court, the guardians and the guardian ad litem was to prevent the Guardians' participation in the adoption proceeding? Their action was an intentional disregard of a specific court order. Appellant's introduction is somewhat incredulous, because the reason he was sanctioned is that he failed to obey the court order to provide notice. In fact, after the hearing he filed a Notice of Change of Judge.

Six months went by, and only after being discovered by opposing counsel did the Ochoas file a notice to dismiss. Appellant speculates further when he states that the trial court apparently "believed" that the adoption petition, once filed, could only be terminated by a ruling on the merits. The trial court never made that statement. The trial court focused on the failure of the attorney to follow through and obey a court order. It is further interesting that Appellant did not notify the Maricopa County Superior Court initially when the Ochoas filed the petition to adopt in Pinal County, since it concerned the children who were the subject of the guardianship in Maricopa County. Thus, in analyzing both the initial facts of the case and looking

7

E000000121

at the issues of this Appeal, one may conclude that Appellant is attempting to avoid the simple question of whether or not he obeyed the court order   Given the evidentiary hearing and Appellant's explanation, the court was not moved to believe that he was doing so for a legitimate purpose.

2.    **Nature of the Case**

This is an appeal by the attorney for the petitioners, who was sanctioned for failure to obey a court order following a motion by the guardians of the children to dismiss the petition for adoption and to award sanctions against Mr. DeLozier and/or his clients for failure to abide by a specific court order issued by Pinal County Superior Court Judge William J. O'Neil.

Appellant has appealed the sanction of $6,000.00, the amount of the Judgment to be paid to the guardians for attorney's fees.

3.    **Court's Jurisdiction**

This Court has jurisdiction per A.R.S. § 12-2101(B).   The lower court reduced the ruling to a Judgment and dismissed the Ochoas' claim with prejudice.

## STATEMENT OF FACTS

A.    Brad and Jeanea Lambeth have been the Guardians of Nicholas and Ashlee Andriano since November 14, 2000, and have had physical care, custody and control since October 9, 2000.  (IR-16)

B.    The Ochoas filed a Petition to Adopt on August 31, 2001.  (IR-1)

8

E000000122

C.   The Ochoas did not provide notice to the Guardians.  (IR-16, 21)

D   The Ochoas filed a request to schedule a final adoptive hearing through an attorney who had not filed a proper Notice of Appearance.  (IR-6)

E.   On October 5, 2003, the court denied the request to schedule this for final adoptive hearing, and further noted that no consent had been filed by the Guardians as required by law.  (IR-6)

F.   The Ochoas filed a Notice of Compliance and again requested a hearing on October 9, 2001   (IR-7)

G.   On December 18, 2001, the court again denied the Request for Hearing. (IR-9)

H.   In a Minute Entry dated December 18, 2001, the court stated, "It is therefore ordered directing the Petitioners to serve the guardians with the Petition for Adoption." (IR-9)

I.   The court also issued the following order:  "It is further ordered directing the Petitioners to cause the Social Study to be amended to include interviews of the guardians and the present living arrangements of the children and further to make recommendations regarding the children's best interests, in light of a complete severance of all rights which the guardians and paternal grandparents presently enjoy pursuant to A.R.S. §8-117." (IR-9)

J.   The attorney for the Ochoas then filed a Notice of Change of Judge.

9

E000000123

The court ordered the Notice stricken, stated that on two occasions it had denied the request for final hearing and directed that the Guardians were to be served. (IR-12, 13)

K.   The attorney for the Ochoas never served the Petition on the Guardians or the Guardian ad litem, nor notified the Maricopa County Superior Court of the action in Pinal County. (IR-16, 21, 22)

L.   The Ochoas filed a Petition to Revoke Guardianship in Maricopa County, Arizona. (IR-16, 21, 22)

M.   After numerous hearings and thousands of dollars spent, the Superior Court in Maricopa County reaffirmed the Guardianship and denied the Ochoas' Petition. (IR-16)

N   In July 2002, the Guardians' lawyer learned of the Petition to Adopt that was still pending in Pinal County. (IR-16)

O   The Guardians' lawyer advised the Court, the guardian ad litem and counsel for the Ochoas of his awareness of the pendency of the Petition. On July 12, 2002, counsel for the Ochoas filed Notice of Dismissal. (IR-15)

P.   The Guardians filed a Motion to Dismiss the Petition and Motion for Sanctions for Failure to Comply with the Court Order. (IR-16)

Q.   The Lambeths have been taking continuous care of Nicholas and Ashlee Andriano since October 9, 2000. (IR-22)

10

E000000124

R.   All evaluations by court-appointed psychologists have recommended the Lambeths remain as Guardians.  (IR-22)

S.   The Pinal County Superior Court, per Judge O'Neil, held an evidentiary hearing on September 27, 2002, after allowing the parties, including the Ochoas' new lawyer, to submit briefs and memoranda.  (IR-20, 24)

T.   During the hearing, both DeLozier and Budge were permitted to argue to the court.  Neither attorney chose to put on any evidence or testimony.  (IR-27)

U.   The court issued the sanction awarding Guardians the sum of $6,000.00 for attorney's fees.  The court also dismissed the adoption proceeding as it applied to the Ochoas.

V.   DeLozier filed a Notice of Appeal on the issue of the $6,000.00 sanction on November 1, 2002.  (IR-29)

## RESPONSE TO APPELLANT'S STATEMENT OF FACTS

Appellant attempts to argue the entire guardianship in his brief.  His Statement of the Case and Statement of Facts detail the Ochoas' version of what has happened over the last three years.  While an effort to evoke sympathy, it is not germane to the limited issue before the Court.  Appellees therefore will not further burden the Court with the ancillary proceedings, except to say as follows.

A.   The Ochoas did not care for the children after their father's death.  The Lambeths have had exclusive care, custody and control of the children since October

11

E000000125

9, 2000. (IR-16, 20)

B.     The Ochoas agreed that the Lambeths would be best suited to be the guardians of Nicholas and Ashlee. (IR-16, 22)

C     The Ochoas changed their position, and since that change have attempted to undermine the children's placement and their relationship with the Lambeths. (IR-16, 22)

D.     Brian Yee was appointed by the court  not retained by the Lambeths. The court requested Dr. Brian Yee accept the appointment as stated in its April 5, 2001 minute entry. (IR-16, 22)

E.     The Ochoas never gave notice of any other intentions to the court-appointed guardian ad litem.

F.     Wendi Andriano's trial is set now set for September 24, 2003. It was set for July 14, 2003. Prior to that date it was set for April 2, 2003

## ISSUES FOR REVIEW

**A.     Did Appellant fail to follow the trial court Order as directed in the Minute Entry dated December 18, 2001? (IR-9)**

**B.     Did the court have jurisdiction to award sanctions against the attorney for his failure to comply with said court order?**

**C.     Did the court abuse its discretion in awarding the sanction against Appellant?**

12

E000000126

# ARGUMENT

## 1. Standard of Review

The appropriate standard of review of the trial court's imposition of sanctions is abuse of discretion. *James, Cooke, & Hobson, Inc., v. Lake Havasu Plumbing & Fire Protection*, 177 Ariz. 316, 320, 868 P.2d 329, 333 (App.1993). The good faith component of Rule 11 does not turn on whether the attorney subjectively pursues claims in good faith. Instead, that Rule embodies an objective standard about what a professional competent attorney would do in similar circumstances *Linder v. Brown & Herrick*, 189 Ariz. 398, 943 P.2d 758 (App.Div.1, 1997), *reconsideration denied, review denied.*

## 2. Discussion

### A. Appellant failed to follow the Court's order issued in the 12/18/01 Minute Entry.

This statement is uncontroverted. Instead, Appellant justifies his failure to follow the Court Order with a series of excuses as to why failure to comply is not the basis for sanctions. Appellant also argues that the "Notice of Dismissal," filed on July 12, 2002, removed jurisdiction from the trial court. However, the cases cited do not support his argument that the trial court lacked the appropriate authority to sanction him for willful failure to follow a Court Order.

13

E000000127

**B.    Appellant's actions are all subject to *Cooter & Gell v. Hartmarx Corp.***

Appellant does not refer to the U.S. Supreme Court decision of *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990), concerning the ability of a court to sanction the conduct of attorneys. Instead, Appellant cites *Crawford v. Crawford*, 20 Ariz.App. 599, 600, 514 P.2d 1050, 1051 (App.1973). In *Crawford*, the wife's Complaint was dismissed by a "formal written judgment on 20 January 1971." *Id.* at 1051. After the wife filed a petition for an order to show cause to recover attorney's fees, the Court ruled that it had no jurisdiction to enter such an award following an order dismissing the action, granting the husband's motion to quash. However, the general rule cited by Appellant does not apply to the imposition of sanctions. See *Cooter & Gell v. Hartmarx Corp.*

Appellant then cites *Spring v. Spring*, 3 Ariz.App. 381, 414 P.2d 769 (1966). However, the court limited its decision in *Spring* to the specific facts. The court also said, "We do not hold that a dismissal under Rule 41(a)(1), Rules of Civil Procedure 16, A.R.S., would necessarily terminate a case in all situations in which no answer or motion for summary judgment has been filed by the adverse party." *Id.* at 772. In *Spring*, former attorneys for Mrs. Spring were seeking payment of attorney's fees in a divorce action. Prior to any answer, Mrs. Spring, through new counsel, filed a Notice of Dismissal of the divorce action. The Court of Appeals

14

E000000128

reversed the trial court's award of attorney's fees to her former attorneys.

The facts in *Goodman v. Gordon*, 103 Ariz. 538, 447 P.2d 230 (1968), are also different from our facts. In *Goodman*, plaintiff filed an action first in Mohave County Superior Court.    After defendants answered, plaintiff then moved to voluntarily dismiss.  Defendants did not respond and the court granted the motion to dismiss.  When Plaintiff filed in federal court, defendants filed motions to vacate the dismissal order and reinstate the action in state court   The trial judge granted the motion and reinstated the case.  The Supreme Court reversed and granted the dismissal.    However, the Court's ruling involved a Motion to Dismiss.    It recognized the dismissal requested was discretionary with the court <u>and</u> that the court retained jurisdiction, citing A R.S. § 12-122. *Id.* at 231.

Appellant does not fully explain the federal cases cited.  Each case, when reviewed, reveals a serious difference from our set of facts.  In *Meinecke v. H&R Block*, 66 F.3d 77 (5th Cir. 1995), the parties <u>stipulated</u> to a dismissal per Rule 41(a)(1)(ii), even as the trial court was ruling on a motion for summary judgment The Court held that "when the parties file a stipulation of voluntary dismissal pursuant to Rule 41(a)(1)(ii), 'any further actions by the court are superfluous,' " citing *Williams v. Ezell*, 531 F.2d 1261.   Therefore, the district court's order granting summary judgment was void

None of these rulings, however, insulate a lawyer from complying with a

15

E000000129

specific court order or prevent a court from sanctioning a lawyer's conduct.

The superior court has the authority and power to sanction a lawyer's conduct. A.R.S. § 12-122, A.R.S. § 12-349. A.R.S. § 12-861, Rule 11, *Ariz. R.Civ.P.* An attorney is under an obligation not to mislead the court through its intentional omissions. Further, an attorney is not to engage in a pattern of deception and misrepresentation to the superior court. See *Matter of Ireland*, 146 Ariz. 340, 706 P.2d 352 (1985).

Appellant relies upon decisions holding that a voluntary dismissal wrests jurisdiction from the district court and renders a subsequent request for attorney's fees "a nullity." *Santiago v. Victim Servs. Agency of the Metro. Assistance Corp.*, 753 F.2d 219, 221 (2d Cir. 1985); *Williams v. Ezell*, 531 F.2d 1261, 1264 (5th Cir. 1976). The United States Supreme Court, however, recently made clear that it disapproved of the approach taken in *Santiago*. In *Cooter & Gell v. Hartmarx Corp.*, the Court considered whether a plaintiff's voluntary dismissal under Rule 41(a)(1) divested the district court of jurisdiction to assess Rule 11 sanctions. The Court rejected the Second Circuit's reasoning, holding that a district court retains jurisdiction to impose sanctions even after a plaintiff voluntarily dismisses its action under Rule 41 (a). *Id.* at 394, 398. The Court explained,

> "Like the imposition of costs, attorney's fees, and contempt sanctions, the imposition of a Rule 11 sanction is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue.

16

E000000130

whether the attorney has abused the judicial process and if so what sanction would be appropriate   Such a determination may be made after the principal suit has been terminated." *Id.* at 396.

Though dicta, this passage supports the position that a district court retains jurisdiction to consider the question of attorney's fees after a plaintiff has dismissed its suit under Rule 41(a).

Other appellate courts have also reached this conclusion.  In *Othen v. Ann Arbor School Board,* 699 F.2d 309 (6th Cir. 1983), plaintiff brought a civil rights action against defendant but subsequently dismissed the suit pursuant to Rule 41(a)(2).  Plaintiff filed an application for attorneys' fees and costs, arguing that the suit served as a catalyst for defendant's compliance with the civil rights laws.  The court did not address the jurisdictional issue but proceeded directly to consideration of the merits of plaintiff's request for fees and costs.  *Id.* at 313   Despite the voluntary dismissal, the court and the parties assumed that the district court retained jurisdiction to address the request for attorneys' fees.  *See also Taylor v  Great Lakes Seamen's Union, Local 5000,* 657 F. Supp. 550, 563 n.1, 567 (N D. Ohio 1984) (following *Othen* where plaintiff voluntarily dismissed LMRDA claims and subsequently sought attorneys' fees on a common benefit theory).  See also *Brown v. Local 58, Int'l Brotherhood of Electrical Workers AFL-CIO,* 76 F.3d 762 (6th Cir 1996); *Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1076-1079 (CA7 1987), cert. dism'd, 485 U.S. 901 (1988); *Greenberg v. Sala,* 822 F.2d 882,

17

E000000131

885 (CA9 1987); *Muthig v. Brant Point Nantucket, Inc.*, 838 F.2d 600, 603-604 (CA1 1988).

### C.   The trial court retained jurisdiction to consider sanctions against Appellant.

The U. S. Supreme Court in *Cooter & Gell v. Hartmarx Corp.* ruled that a voluntary Rule 41(a)(1)(i), *Ariz.R.Civ.P.*, dismissal does not deprive a district court of jurisdiction to impose a Rule 11 sanction. This view is consistent with Rule 11's purposes of deterring baseless filings and streamlining federal court procedure and is not contradicted by anything in that Rule or Rule 41(a)(1)(i). *Id.* at 393-398.

The Court stated that lower courts may enforce sanctions against the parties or their attorneys even after a plaintiff has filed a notice of dismissal under Rule 41(a)(1). The Court ruled that the district court's jurisdiction, invoked by the filing of the underlying complaint, supports consideration of both the merits of the action and the motion for Rule 11 sanctions arising from that filing, and held that a voluntary dismissal does not expunge the Rule 11 violation. *Szabo Food Service* at 1077. The Supreme Court held that in order to comply with Rule 11's requirement that a court "shall" impose sanctions "[i]f a pleading, motion, or other paper is signed in violation of this rule," a court must have the authority to consider whether there has been a violation of the signing requirement regardless of the dismissal of the underlying action. The Court determined that nothing in the language of Rule

18

E000000132

41(a)(1)(i), Rule 11, or other statute or Federal Rule terminates a lower court's authority to impose sanctions after such a dismissal

The Court explained that since a Rule 11 sanction does not signify a district court's assessment of the legal merits of the complaint, the imposition of such a sanction after a voluntary dismissal does not deprive the plaintiff of his right under Rule 41(a)(1) to dismiss an action without prejudice. The Court also reminded the parties that it has long been established that a federal court may consider collateral issues after an action is no longer pending. See *Cooter & Gell* at 395-397

Finally, the Court of Appeals should apply an "abuse of discretion" standard in reviewing all aspects of the lower court decision. *Id.* at 399.

### D.   The trial court did not abuse its discretion in awarding sanctions.

#### 1.   Sanctions were warranted for Appellant's conduct

The trial court listened to the arguments of Appellant at the evidentiary hearing. The trial court allowed Appellant to make his argument as to why he did not comply with the Court's Order. The court allowed the Ochoas to have their substitute attorney, Daphne Budge, address the court. The trial court took the matter under advisement and then ruled accordingly.

A court abuses its discretion in imposing sanctions when it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence. *Mark Indus Ltd. v. Sea Captain's Choice, Inc.*, 50 F.3d 730, 732 (9th

19

E000000133

Cir. 1995). The standard of review is to sustain the lower court's determination if there is a reasonable basis to support the court's decision. *Floyd v. Ortiz*, ___ F 3d ___ No. 01-1295, 2002 WL 1980462 (10th Cir., August 28, 2002).

Judge O'Neil based his decision on a complete review of the record and the evidence. The trial court made certain findings of fact to support its decision to sanction Appellant in its October 18, 2002, Minute Entry and order:

      a.    The Court's order to notify the guardians was clear and unequivocal.

      b.    Ms. Budge avowed that the Ochoas believed i) the Court in Maricopa County had acted improperly; ii) the counsel appointed for the children had acted improperly; and iii) they were not getting the result they wanted

      c.    The Ochoas chose to file the Petition to adopt through DeLozier.

      d.    DeLozier disregarded the Court Order.

      e.    DeLozier intentionally and surreptitiously avoided the Court's Orders.

The Court heard argument from DeLozier and Budge. It reviewed the pleadings prior to issuing the sanction. The sanction recognized that the Ochoas had instigated legal proceedings which required the Guardians to expend thousands of dollars in attorney's fees to defend same.

20

E000000134

The Court also concluded from the evidence that Appellant and his clients intended to permanently sever the paternal interest of the children. Had Appellant complied with the Court's December 18, 2001, Order, such action would have notified the Superior Court in Maricopa County of these proceedings. That notice would have affected the nature of the legal proceedings and the costs to the guardians. As any financial impact upon the guardians would of necessity affect the children, the Court acted within its discretion in awarding attorney's fees as a sanction for Appellant's total disregard for the Court.

    2.    <u>The Ochoas have not appealed the sanction.</u>

In Appellant's Brief, sections B and C, Appellant asks this Court to reverse not only the sanction against himself but also the sanction against the Ochoas However, this appeal was filed by DeLozier solely on behalf of himself. The Ochoas have not appealed the sanction. Therefore the Court should disregard any reference or request to reverse the Ochoas' sanction.

## CONCLUSION

Appellant and his clients were caught attempting to secure an adoption of Nicholas and Ashlee Andriano without providing notice to the guardians appointed by the Maricopa County Superior Court. When Pinal County Juvenile Court Judge William J. O'Neil ordered Appellant to provide notice and to have the social study include the guardians, he filed a pleading attempting to avoid it. When the court

21

E000000135

again ordered him to provide notice, he filed a Notice of Change of Judge. (IR-12). When that Notice was stricken, Appellant and his clients attempted a different strategy (IR-13). Clearly, Appellant and his clients did not want the guardians, their lawyer, the guardian ad litem, or the Maricopa County court to know that the Ochoas had filed a Petition to Adopt.

When Appellant could not convince the court that the guardians did not have to be notified, he decided to change the guardians. So the Ochoas filed a petition in Maricopa County Superior Court to remove the guardians. During the extended evidentiary hearing, the guardians' attorney learned of the Pinal County proceeding. Only after being discovered did Appellant file a Notice of Dismissal.

This Court should sustain the lower court decision to award attorney's fees to the guardians. The Court should also order an award of attorney's fees to the guardians for filing a Response to this appeal.

RESPECTFULLY SUBMITTED this 10th day of July, 2003.

John J. Jakubezyk, Esq.
Attorney for Appellees

22

E000000136

P-App. 003821

*Andriano children*

Alejo and Donna Ochoa
1104 North Park Avenue
Casa Grande, AZ  85222


March 18, 2003


Jill Zubers
Arizona Family Adoption Services
346 East Palm Lane
Phoenix, AZ  85004

Dear Ms. Zubers;

I would like to introduce myself and my husband, Donna and Alejo Ochoa.  We are parents of Wendi Andriano, the mother of Nicholas and Ashlee Andriano and the maternal grandparents to Nicholas and Ashlee Andriano.  We appreciate the opportunity to have input into this matter.  Our response to the severance of Wendi's parental rights and adoption by the Lambeth's would be an emphatic please don't let this happen.

The whole situation for Nicholas and Ashlee is tragic.  At a very young and tender age they had to face being absent from their deceased father and their mother, who is awaiting trial.  They were taken from their secure world into the unknown.  As you are aware **"It takes a village to raise a child,"** and our grandchildren deserve to have that village support, nature and love them.  They need the love, protection and support from the entire village, which consists of the Lambeth's, the Andriano's and the Ochoa's.

There is also the issue of their mother and our daughter, Wendi which has not been resolved yet.  We believe it would be a detriment to the children to jump into this severance prior to a decision on their mother being resolved.  This situation that we find ourselves in is very tragic for all families involved, including the maternal great-grandparents.  The truth is that regardless of what the Andriano's and Lambeth's feel, Wendi is Nicholas and Ashlee's only living parent, fortunately or unfortunately that path was chosen for them the day they were born.  And nothing can change that fact.  Not attempting to keep us away from Nicholas and Ashlee or trying to keep Wendi away from them.

We appeal to you that someone needs to listen to the cries of the children.  Someone needs to hear that cry.  It has been proven time and again, that a child even under the worst of circumstances wants to have some connection with their mother.  We can only guess that it has to do with the maternal bond that is created at conception.

PCRDIS-D001275

Alejo and I also have a tremendous bond with Nicholas and Ashlee. We were always there for our grandchildren. We took the children and helped raise them during Wendi and Joe's struggle with his illness. They spent thousands of hours with us, overnights, weekends, vacations, with and without their parents. Then to be torn away from us along with their parents has been traumatic for them. It continues to be shown through supervised visits that the children are bonded with us. They continually ask when they can come to our house. Nicholas and Ashlee would beg to let them stay with us.

This is a tough situation but someone needs to step back emotionally and listen to the hearts of the children. The "village" has always been the best way to raise children. We understand that being in this difficult situation makes it hard for the paternal family and our family to see past the emotions, but we must put the children first. They are the utmost priority.

Alejo and I deeply desire to have consistent time to be with Nicholas and Ashlee. We want to be a part of their life, a foundation that they can always turn to. It is so important for them to remain connected with the whole village. Nicholas and Ashlee have a long road to travel and they don't need it to be hindered by adults refusing to acknowledge that the children need everyone. These children have great-grandparents that want to see them and be a part of Nicholas and Ashlee's lives, even if it is just for the short time that they have. They miss seeing the little ones.

Aside from losing their father and potentially their mother, the second tragedy would be to grow up isolated from their mother and their mother's family. How many times has it be shown that children become disruptive to themselves and to society because they don't understand the misfortunes that have happened in their lives in addition to not having the entire village nurture and support them?

The children have not been allowed to have contact with their mother since the spring of 2001. This was ordered by the court and we still aren't sure why, except maybe to this end, to be able to say that Wendi has not had contact with them. Wendi spoke with her children several times prior to December of 2000. On December 27, 2000, the children's therapist, Linda Gray told me that she preferred that Wendi speak with the children while she was on the phone. Ms. Gray stated that she would set up three-way phone calls with Nicholas and Ashlee, Wendi and herself. I voiced my concerns because I knew that three-way calls were not allowed according to the jail, but Ms. Gray assured me that she could make it happen, that she had the authority. It never happened and then the next thing we knew, 2 months down the line, the court states that Wendi cannot have contact with her children.

Wendi has sent cards and pictures to her children. Ms. Gray told me that the children could send their mother pictures if they wanted to. They have done that. We send pictures of her children to Wendi, so she can see them. The children have asked for her so many times, but we would side-step their questions; unsure of how to respond. We have even had Nicholas and Ashlee demand that they see her and we would tell them that she was far away in a safe place; which is what we were told to tell them.

PCRDIS-D001276

Studies have shown that troubled youth in society is predicated on their inability to connect with fathers and mothers and family. We do not want to see this be the path that Nicholas and Ashlee travel. We want them as whole as possible. But unfortunately, prior history with the Lambeth's shows repeatedly that they have blocked us from continuing to build our relationship with Nicholas and Ashlee. Even after visitations being ordered by the courts we have had nothing but problems seeing the children. The Commissioner had expected us to have had the specified number of supervised visits completed and be seeing the children normally by this time. But we have been hindered by the Lambeth's as has happened since the beginning of what was to have been a 'temporary guardianship.' We feel that if the Lambeth's were allowed to adopt Nicholas and Ashlee, that would be the end of us ever seeing them again. We were told by Mr. Lambeth in April, 2002, that "someone was going to get left out in the cold and be unable to see the children and that it wasn't going to be them."

Both families are struggling with pain, but this isn't about the adults and their pain. It is not about the children being raised by only one family or the other. This is about what is best for Nicholas and Ashlee and their future. We don't serve the children best by looking through our eyes of pain, but through their eyes. Again, someone needs to hear the cries of the children, hear the pain of the children. They deserve to be loved and supported by all of us.

The judge in Pinal County stated that it would not be in the best interests of the children to be adopted by Alejo and I, not because we weren't fit or it was against the law, but because the paternal grandparents would lose their rights to Nicholas and Ashlee. The same follows in this situation, we would lose our rights. Previous to that, we believed that grandparents had rights in Arizona, even after adoption. We were even told that by CPS workers, only to find out that it isn't true. There is no reason for an adoption to be completed, except to give the Lambeth's a solid reason to keep Nicholas and Ashlee away from their mother, who loves them dearly and from us, their grandparents.

There are reports out there from Dr. Yee, Dr. Ruiz, notes from Parenting Skills, notes from Kathleen Miholich, the current supervisor for our visits, that show how much the children are bonded to us and care for us. The staff at Parenting Skills was very adamant that their records needed to be looked at as to the relationship with the children.

In closing, Alejo and I asking that the termination of parent-child relationship and adoption by the Lambeth's not be granted. Termination and adoption are not in the best interests of Nicholas and Ashlee.

Sincerely,

Alejo and Donna Ochoa

Alejo and Donna Ochoa
1104 North Park Avenue
Casa Grande, AZ  85222

March 18, 2003

Jill Zubers
Arizona Family Adoption Services
346 East Palm Lane
Phoenix, AZ  85004

Dear Ms. Zubers;

I would like to introduce myself and my husband, Donna and Alejo Ochoa.  We are
parents of Wendi Andriano, the mother of Nicholas and Ashlee Andriano and the
maternal grandparents to Nicholas and Ashlee Andriano.  We appreciate the
opportunity to have input into this matter.  Our response to the severance of Wendi's
parental rights and adoption by the Lambeth's would be an emphatic please don't let
this happen.

The whole situation for Nicholas and Ashlee is tragic.  At a very young and tender age
they have to a face a life without their deceased father and possibly without their
mother, who is awaiting trial.  Without any warning, they were taken from their secure
world into a world unfamiliar to them.  Aside from Wendi, Alejo and I are the only living
relatives that represent what was their secure world.  Alejo and I also have a
tremendous bond with Nicholas and Ashlee.  We were always there for them.  We took
the children and helped raise them during Wendi and Joe's struggle with his illness.
They spent thousands of hours with us, overnights, weekends, vacations, church
functions, doctor and hospital visits with and without their parents.  Then to be torn
away from us along with their parents has been traumatic for them.  It continues to be
shown through supervised visits that the children are bonded with us.  They continually
ask when they can come to our house.

There is also the issue of their mother and our daughter, Wendi which has not been
resolved yet.  We believe it would be a detriment to the children to jump into this
severance prior to a decision on their mother being resolved.  This situation that we all
find ourselves in is very tragic for all families involved, including the maternal great-
grandparents.  The truth is that regardless of what the Andriano's and Lambeth's feel,
Wendi is Nicholas and Ashlee's only living parent fortunately or unfortunately that path
was chosen for them the day they were born.  And nothing can change that fact.  Not
trying to keep us away from Nicholas and Ashlee or keeping Wendi away from them.

As you are aware, **"It takes a village to raise a child"** and our grandchildren deserve to have that village support, nature and love. They need the love, protection and support from the entire village, which consists of the Lambeth's, the Andriano's, and the Ochoa's. This is a tough situation but someone needs to step back emotionally and listen to the hearts of the children. The village has always been the best way to raise children. We understand that being in this difficult situation makes it hard for the paternal family and our family to see past emotions.

We appeal to you that someone must listen to the cries of the children. Someone needs to hear that cry. It has been proven time and again, that a child even under the worst of circumstances, wants to have some connection with their mother. We can only guess that it has to do with the maternal bond that is created at conception. Aside from losing their father and potentially their mother, the second tragedy would be to grow up isolated from their mother and their mother's family. How many times has it been shown that children become disruptive to themselves and to society because they don't understand the misfortunes that have happened in their lives in addition to not having the entire village nurture and support them?

Alejo and I deeply desire to have consistent time to be with Nicholas and Ashlee. We want to be a part of their life, a foundation that they can always turn to. It is so important for them to remain connected with the whole village. Nicholas and Ashlee have a long road to travel and they don't need it to be hindered by adults refusing to acknowledge that the children need everyone. These children also have great-grandparents that want to see them and continue to be a part of their lives, even if it is just for the short time that they have.

The children have not been allowed to have contact with their mother since the spring of 2001. This was ordered by the court and we still aren't sure why, except maybe to this end, to be able to say that Wendi has not had contact with them. Wendi spoke with her children several times prior to December of 2000. On December 27, 2000, the children's therapist, Linda Gray stated that she preferred that Wendi speak with the children while she was on the phone. Unfortunately the telephone calls never took place and two months down the line the court stated that Wendi could not have contact with her children. And according to the court records there was no reason entered as to Wendi's inability to have contact with Nicholas and Ashlee. It must be understood that Wendi has always had and continues to have the desire to remain in contact with her children, but because of the court order she has been unable to.

The children have asked to see their mother so many times, but we would side-step their questions; unsure of how to respond. We have even had Nicholas and Ashlee demand that they see her and we would tell them that she was far away in a safe place; which is what we were told to tell them. Studies have shown that troubled youth in society is predicated on their inability to connect with fathers, mothers and/or other family members. We do not want to see this be the path that Nicholas and Ashlee travel. We want them as whole as possible. But unfortunately, prior history with the Lambeth's shows repeatedly that they have blocked us from continuing to build our

relationship with Nicholas and Ashlee.  Even after being ordered by the courts.  We feel that if they were allowed to adopt Nicholas and Ashlee, that would be the end of us ever seeing them again.  We had even been told by Mr. Lambeth in April, 2002, that someone was going to get left out in the cold and be unable to see the children and that it wasn't going to be them.

Both families are struggling with pain, but it isn't about the adults and their pain.  This is not about the children being raised by one family or the other.  It is about what is best for Nicholas and Ashlee.  We don't serve the children best interest by looking through our eyes of pain, but through their eyes of understanding and compassion.  Again, someone needs to hear the cries of the children, hear the pain of the children.  They deserve to be loved and supported by all of the family members.

In December 2002, the judge in Pinal County stated that it would not be in the best interests of the children to be adopted by us, because the paternal grandparents would lose their rights to Nicholas and Ashlee.  The same follows in this situation, we would lose our rights.  Previous to that, we believed that grandparents had rights in Arizona, even after adoption.  We were informed by CPS workers, only to find out that it isn't true.  There is no reason for an adoption to be granted, except to give the Lambeth's a legal reason to keep Nicholas and Ashlee away from their mother, who loves them dearly and from us who love them equally.  Since birth, Nicholas and Ashlee have held a special place in our hearts and we don't want that relationship broken.  Nicholas and Ashlee are our only grandchildren and we want to watch them and help them grow.  We are their connection to their past secure life.  The professionals involved with the children also state that it is important that the adults in Nicholas and Ashlee's lives make sure they do not have to suffer any further losses.

There are reports from Dr. Yee, Dr. Ruiz, notes from Kathleen Miholich, the current supervisor for our visits, that clearly articulates how much the children are bonded to us, love us and need us in their lives.  In particular, the staff of Parenting Skills have voiced their concern that records of supervised visitations should be reviewed.

While we agree with the professionals that state it is in the children's best interest to develop a sense of belonging to one cohesive, stable family unit, we see that the cohesive family unit inclusive of all of us and not exclusive to only mean the Lambeth family.

We are asking that the termination of parent-child relationship and adoption not be granted.  It is not in the best interest of Nicholas and Ashlee.  But that the current status of the Lambeth's guardianship remain in place, with continued visitation as the court has ordered.

Respectfully submitted,


Alejo and Donna Ochoa

Quarles & Brady Streich Lang LLP
Firm State Bar No. 00443101
One South Church Avenue
Suite 1700
Tucson, AZ 85701-1621
TELEPHONE 520.770.8700

Attorneys for Debtor, the Roman Catholic Church of
the Diocese of Tucson

Susan G. Boswell (#004791)
Kasey C. Nye (#020610)

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | In Proceedings Under Chapter 11 |
| THE ROMAN CATHOLIC CHURCH OF DIOCESE OF TUCSON *aka* THE DIOCESE OF TUCSON, an Arizona corporation sole, | Case No. 4-04-BK-04721-JMM |
| Debtor. | |
| JOHN DOE XXIII, | Adversary No. 2:04-ap-01259-JMM |
| Plaintiff. | |
| vs. | (Presently pending before Superior Court of the State of Arizona, County of Maricopa under Case No. CV2004-007827; the Hon. Rebecca Albrecht) |
| THE ROMAN CATHOLIC CHURCH OF DIOCESE OF TUCSON, an Arizona corporation sole, et al. | |
| Defendants. | |

**STIPULATION UNDER FED. R. BANKR. P. 9027 AND 9006, (I) EXTENDING THE TIME FOR NON REMOVING PARTIES TO FILE: (A) A MOTION TO REMAND; (B) A STATEMENT REGARDING WHETHER THE MATTER IS CORE OR NON-CORE; AND (C) A STATEMENT OF CONSENT OR NON CONSENT TO THE BANKRUPTCY COURT ENTERING FINAL ORDERS OR JUDGMENTS IN THIS MATTER; AND (II) EXCUSING THE DIOCESE FROM FILING COPIES OF ALL PROCESS AND PROCEEDINGS AS REQUIRED BY FED. R. BANKR. P. 9027(A).**

1   The Roman Catholic Church of the Diocese of Tucson *aka* the Diocese of Tucson

2  ("Diocese"), an Arizona corporation sole, the debtor and debtor in possession in the above

3  captioned Chapter 11 Reorganization proceeding, and Plaintiff, John Doe XXIII, (the "Plaintiff")

4  and the other Defendants, Manuel Moreno, Gerald F. Kicanas, the Roman Catholic Church of

5  Diocese of Phoenix, the St. Gregory's Church and Parish, Gerald F. Kicanas, and Thomas

6  O'Brien, (the Plaintiffs and the other Defendants are referred to collectively in this Stipulation as

7  the "Non-Removing Parties") hereby stipulate to (i) extend the time for Non-Removing Parties to

8  file: (a) a motion to remand, (b) a statement regarding whether the matter is core or non-core, and

9  (c) a statement of consent or non consent to the Bankruptcy Court entering final orders or

10  judgments in this matter; and (ii) excusing the Diocese from filing copies of all process and

11  proceedings as required by Fed. R. Bankr. P. 9027(a).

12            **<u>RECITALS</u>**

13   1.  The Diocese is the debtor and debtor-in-possession in the above-captioned

14  Chapter 11 Reorganization case (the "Reorganization Case") which was commenced by filing a

15  voluntary petition on September 20, 2004 (the "Petition Date").  The Diocese filed the

16  Reorganization Case in order to reorganize its financial affairs pursuant to a plan of

17  reorganization that will, among other things, fairly, justly and equitably compensate the victims

18  of sexual abuse by clergy or others associated with the Diocese while allowing the Diocese to

19  continue its ministry and mission and to attempt to finally bring healing to victims, parishioners

20  and others affected by the past acts of sexual abuse committed by clergy and others.

21   2.  Prior to the Petition Date, on or about April 21, 2004, Plaintiff filed the Complaint

22  in the Maricopa County Superior Court, Case No. CV2004-007827 (the "Removed Action")

23  seeking damages based on allegations that the Diocese is responsible for personal injuries,

24  including claims for emotional distress, because the Plaintiff was sexually abused by clergy or

25  others associated with the Diocese.

26

P-App. 003829

1      3.      On the Petition Date, the Diocese filed a Plan of Reorganization (the "Plan") and

2    its Disclosure Statement (the "Disclosure Statement"), providing, inter alia, for the separate

3    classification of "Tort Claims," defined in the Plan to be claims for personal injury, including

4    claims for emotional distress, arising from acts of sexual abuse committed by clergy or other

5    persons associated with Diocese or any parish within Diocese.  Pursuant to the Plan, a Settlement

6    Trust and a Litigation Trust will be established.  All Tort Claimants will have their Claims treated

7    and resolved under either the Settlement Trust or the Litigation Trust.  The Plan contemplates that

8    Tort Claimants will participate in the Settlement Trust unless they opt out and instead choose the

9    Litigation Trust.  Anyone opting into the Litigation Trust will have the right to have his or her

10    claim determined by a jury.

11      4.      The Removed Action is a Tort Claim that the Diocese contemplates addressing

12    under the Plan either through the Litigation or the Settlement Trust.  Accordingly, the Diocese

13    filed a Notice of Removal with respect to the Removed Action.

14      5.      Removing the Removed Action triggers obligations to act for both the Diocese and

15    the Non-Removing Parties under Fed. R. Bankr. P. 9027(a) and other applicable law.

16      6.      The Diocese and Tort Claimants, including the Plaintiff, are endeavoring to

17    negotiate a consensual plan of reorganization.  In light of these negotiations, both the Diocese and

18    the Non-Removing Parties desire to maintain the *status quo* as the negotiations progress.

19    The Diocese and the Non-Removing Parties therefore agree as follows:

20                         **AGREEMENT**

21    A.     Extension of Deadlines.  Subject only to Bankruptcy Court approval, the time for

22    the Non-Removing Parties to file: (a) a motion to remand the removed action to state court, (b) a

23    statement regarding whether the matter is core or non-core, and (c) a statement of consent or non

24    consent to the Bankruptcy Court entering final orders or judgments in this matter is hereby

25    extended until 15 days after Termination.  For purposes of considering the timeliness of a motion

26

1    for remand filed by Plaintiff, the motion shall be deemed for all purposes as filed on the date of

2    this Stipulation.

3          B.    Relief From Filing Process and Proceedings.   Subject only to Bankruptcy Court

4    approval, the Diocese is hereby relieved of its obligation, as the removing party, to file copies of

5    all process and pleadings from the state court in the Removed Action with this Court.   If

6    Terminated pursuant to paragraph C below, the Diocese must file copies of pleadings and process

7    required under Fed. R. Bankr. P. 9027(a) or as otherwise ordered by the Court within 30 days of

8    Termination.

9          C.    Termination.   Any party to this Stipulation may terminate this agreement by filing

10   a Notice of Termination. The Notice of Termination must be served on all parties to the

11   Stipulation.  The Termination will be effective thirty days after filing and service of the Notice of

12   Termination.

13          DATED this 20th day of December, 2004.

14   MacBan Law Offices                          QUARLES & BRADY STREICH LANG
15   1 S. Church, #2040                          LLP
     Tucson, AZ 858701-1619                      One South Church Avenue
16                                               Suite 1700
                                                 Tucson, AZ 85701-1621
17

18   By: _Susan G. Boswell for_                  By: _Susan G. Boswell_
19       Barry A. MacBan                             Susan G. Boswell
          with permission                            Kasey C. Nye
20
     Attorney for Defendants                     Attorneys for Debtor
21                                               The Roman Catholic Church of the Diocese of
                                                 Tucson
22

23

24

25

26

1   David Delozier
    4016 E. Forest Pleasant
2   Cave Creek, AZ 85331-5439

3

4   By: 

5       David Delozier

6       Attorney for Plaintiff

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Lewis and Roca LLP
40 North Central Avenue
Phoenix, AZ 85004-4429


By: _____
    Foster Robberson

Attorneys for Defendants

-5-

1   David Delozier                          Lewis and Roca LLP
    4016 E. Forest Pleasant                  40 North Central Avenue
2   Cave Creek, AZ 85331-5439                Phoenix, AZ 85004-4429

3

4   By: _____            By: _____
        David Delozier                          Foster Robberson
5
        Attorney for Plaintiff                  Attorneys for the Roman Catholic Church of
6                                               the Diocese of Phoenix and Thomas O'Brien

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

QBTUCS\11017.00003\158238.1              -5-

**G. DAVID DELOZIER, P.C.**
4016 East Forest Pleasant Place
Cave Creek, Arizona 85331-5439
Phone:      480.575.6660
Facsimile:  480.575.6661
E-mail:     gddelozier@aol.com

G. David DeLozier, SBAZ # 005237
J. Lawrence Dunlavey, SBAZ #006332
*Attorneys for Plaintiff*

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | In Proceedings Under Chapter 11 |
| THE ROMAN CATHOLIC CHURCH OF DIOCESE OF TUCSON *aka* THE DIOCESE OF TUCSON, an Arizona corporation sole, | Case No.  4-04-BK-04721-JMM |
| Debtor. | |
| JOHN DOE XXIII, | Adversary No.  2:04-ap-01259-JMM |
| Plaintiff. | |
| vs. | (Removed from the Superior Court of the State of Arizona, County of Maricopa under Case No. CV2004-007827; the Honorable Glenn Davis) |
| THE ROMAN CATHOLIC CHURCH OF DIOCESE OF TUCSON, an Arizona corporation sole, et al. | |
| Defendants. | |

## MOTION FOR RECONSIDERATION

John Doe XXIII ("Movant"), through undersigned counsel, pursuant to Rule 7052

of the Rules of Bankruptcy Procedure, hereby submits his Motion for Reconsideration

1   regarding the November 14, 2006 [entered on November 15, 2006] Order on Remand

2   with Instruction to the Superior Court ("Motion.")   This Motion is supported by the

3   following Memorandum of Points and Authorities.

4

5                         **Memorandum of Points and Authorities**

6   **I.     Introduction.**

7          Movant requests reconsideration of Paragraphs 4 and 5 of the November 14,

8   2006 Order.    Specifically, Movant asserts that the restrictions stated in those

9   paragraphs will prevent Movant from fairly and completely presenting the basic

10  elements of his tort and other claims to the Court and finder of fact in those remanded

11  Superior Court proceedings.

12

13         Movant requests that the Court reconsider and choose another alternative – drop

14  those paragraphs from the Order and rely upon the Superior Court judge to follow the

15  law and Order by making a limiting instruction to the jury (or finder of fact) prohibiting an

16  award of damages for wrongful acts prior to December 2, 1969.

17

18  **II.    Facts.**

19         1.    On November 15, 2006, the Court entered its November 14, 2006 Order

20  on Remand with Instruction to the Superior Court.   Said Order contained the following

21  two paragraphs:

22

23         4.    Plaintiff shall file an amended complaint for his Phoenix Tort Claims
               in the Arizona Superior Court for Maricopa County that omits any and all
24             allegations of misconduct occurring before December 2, 1969, within The
               Roman Catholic Church of the Diocese of Tucson and/or the Phoenix
25             Diocese, and/or their respective Parishes; and

26

5.      Plaintiff shall be prohibited from in any way presenting the events of alleged misconduct occurring before December 2, 1969 in any proceeding arising out of or related to his remanded claims, including references to tortious acts occurring before December 2, 1969, again for the reason that such events have been fully settled and paid, and that to again resurrect them in this remanded case would be unfairly and improperly prejudicial to the remaining Defendants in this action.

2.      Movant filed his October 13, 2006 Motion to Remand on October 13, 2006, together with a proposed form of order.

3.      The Phoenix Diocese filed its October 30, 2006 Objection to Proposed Remand Order and Statement of Non-Opposition to Request to Remand on October 30, 2006.

4.      Movant previously filed his objection to the matters raised by the Phoenix Diocese and their proposed form of order in his November 7, 2006 Reply to Defendant Phoenix Diocese Objection to Proposed Remand Order and Statement of Non-Opposition to Request to Remand filed on November 7, 2006.

5.      A hearing was held on November 13, 2006.  During that hearing the Court stated:

*"JM: I'm a lawyer.  I don't care about the science of psychology as it affects this guy any time other than after December 2nd, 1969.  The science of psychology can convince a judge and jury what the monetary award should be.  But he settled everything prior to that date."*

6.      Dr. David Leighton, Ph.D., an Arizona licensed clinical psychologist and neuropsychologist, has provided his November 25, 2006 Affidavit with CV.  A copy is attached hereto and incorporated herein as **Exhibit "A."**

Dr. Leighton has specifically stated at the paragraphs indicated that:

4.     I have personally reviewed the November 14, 2006 Order on Remand with Instruction to the Superior Court in Case No. 4-04-bk-04721-JMM, Adversary No. 2-04-ap-01259-JMM.

5.     I have personally treated John Doe XXIII since November 19, 2003 and reasonably believe that treatment will continue for several additional years.

6.     Based upon my personal observations and interviews with John Doe XXIII, it is my professional opinion that John Doe XXIII was sexually abused on numerous occasions by a Roman Catholic priest both before and after December 2, 1969.

7.     It is my professional opinion that ¶¶ 4 and 5 of the November 14, 2006 Order so restrict the proper and complete historical description of the events contributing to the existing psychopathology of John Doe XXIII, i.e., the psychogeneses and extent of his injuries, that no trier of fact could reasonably be expected to reach a rational and reasonable understanding or conclusion informed by scientific principles or opinions.

8.     It is my professional opinion that the proper scientifically principled description of the injuries incurred by John Doe XXIII is impossible without delineation of the grooming process he underwent which began before December 2, 1969.  The bifurcation imposed by ¶¶ 4 and 5 of the November 14, 2006 Order, when used in a legal proceeding, trenches upon well-agreed and understood scientific opinions in the science of psychology.

In support thereof Dr. Leighton offered a lengthy presentation of supporting material.

**III. Legal Argument**.

Dr. Leighton's expert professional opinion (SoF ¶¶7&8 above) is four-square in opposition to the Court's comment (SoF ¶5 above), and the content, reach and scope of ¶¶ 4 and 5 of the Order.  In the name of protecting the

Phoenix Diocese by preventing the Movant from so-called "double-dipping," the Court has fashioned a remedy that bifurcates the injuries, and eviscerates the law of Arizona. According to Dr. Leighton, the Court has created an evidentiary impossibility – the science of psychology is violated by the Court's ruling; and thus a legal impossibility – Movant as plaintiff in Superior Court will be unable to present his case to the finder of fact – regardless of damage restrictions.

The Court's evidentiary prohibitions contradict the law of damages in tort and applicable evidence rules in Arizona. Arizona has long recognized the so-called "egg-shell" rule; the tortfeasor is legally responsible for aggravating a prior injury:

1.   *Kalaf v. Assyd*, 130 P.2d 1036 (Ariz., 1942). Where plaintiff's injury was not serious in itself but it had the effect of aggravating a preexisting trench mouth trouble, plaintiff was entitled to be compensated.

2.   *Jordan v. Atchison, Topeka and Santa Fe Ry. Co.*, 934 F.2d 225 (C.A.9.Ariz.,1991.) When defendant's negligence causes injury to plaintiff, defendant is liable for resulting damage to plaintiff, even though plaintiff had preexisting condition that made him more susceptible to injury or made consequences to him more severe.

3.   *Sweet Milk Co. v. Stanfield*, 353 F.2d 811 (C.A.9.Ariz., 1965). Where plaintiff was afflicted with latent disability activated by wrong of defendant, defendant may be held responsible for disability produced by his wrong, even though so great a disability would not have been produced in one not previously afflicted, but defendant cannot be held liable for previously existing, afflicting, latent condition as such, or for such liability as might have eventually developed from latent condition even in absence of external aggravation.

Many other states recognize the same legal rule and principles:

1.   *Ng v. Hudson*, 142 Cal.Rptr. 69 (Cal.App. 2 Dist., 1977.) A tort-feasor may be held liable in an action for damages where the effect of his

1    negligence is to aggravate a preexisting condition or disease.

2        2.    *Perniciaro v. Brinch*, 384 So.2d 392 (La., 1980). Defendant takes
     his victim as he finds him and is responsible for all natural and probable
3    consequences        of        his        tortious        conduct.

4        3.    *Lancaster v. Norfolk and Western Ry. Co.*, 773 F.2d 807 (C.A.7.Ill.,
     1985.)  Under "eggshell-skull rule," tort-feasor takes his victim as he finds
5    him.

6        In  such  cases,  the  plaintiff  is  required  to  show  original  injury  and  later

7    aggravation. Recovery can only be had for the later portion, i.e., the aggravation portion,

8    not the original injury:

9
         1.    *Schore v. Mueller*, 186 N.W.2d 699 (Minn., 1971). Person having
10   preexisting disability is entitled to recover damages for aggravation of that
     condition even though particular consequences would not have followed
11   absent his prior disability, recovery being limited, however, to additional
     injury over and above consequences which normally would have followed
12   from preexisting condition absent defendant's negligence.

13       2.    <u>*Milos v. Sea-Land Service, Inc.*, 478 F. Supp. 1019</u> (S.D.N.Y.,
     1979). When a defendant's wrongful act or omission aggravates or
14   accelerates a plaintiff's preexisting condition and disables a plaintiff, thus
     rendering him unable to continue his work, or said aggravation awakens a
15   dormant condition that causes a plaintiff to experience pain although he
     had suffered no pain from condition prior to the aggravation, such
16   defendant is liable in full for disability and/or pain it caused.  Jones Act, 46
     U.S.C.A. § 688.
17
         Other courts have faced this problem, analyzed it, differentiated the issues, and
18
19   come up with workable solutions. *Chavers v. Travis*, 902 So.2d 389, (La. App. 4

20   Cir., 2005):

21       Differentiating between damages caused by an accident and damages caused by
22       the  normal  progression  of  a  plaintiff's  pre-existing  condition  often  presents
         complex legal and medical issues. *Stein, supra*, § 11.1. The analysis of such
23       complex  issues  can  be  simplified  by  breaking  it  down  into  a  series  of  five
         subsidiary issues; to-wit:
24
25       (1)  What was the plaintiff's actual physical or mental condition at the time of
         injury?
26       (2)  What was the plaintiff's actual physical or mental condition in the pertinent
         period following the accident?

P-App. 003839

(3) To what extent, if any, would the pre-existing condition have worsened or otherwise become more symptomatic in the absence of trauma?
(4)  What was the nature of the impact of the alleged tortious act on the plaintiff's pre-existing status?
(5)  Can the plaintiff's condition at the time of trial be attributable wholly or partially to the incident which allegedly aggravated the pre-existing condition?

The answer to issue (5) must be "yes" to permit liability to be imposed against the alleged tortfeasor for aggravation injuries, and the answer to that determinative issue rests on the analysis required to supply the answers to issues (1)-(4). *Williams v. Patterson,* 681 A.2d 1147, 1150-51 (1996) (quoting M. Minzer, *et al., Damages in Tort Actions,* Vol. 2 § 15.32[4], at 15-71 to 15-72); *Stein, supra,* § 11.1 (noting that "[c]ases involving pre-existing conditions can be divided into three parts, the prior condition, the recovery period (if any), and the subsequent injury.")

In particular, the *Chavers* court noted the real need for the court and the finder of fact to be informed by the expert testimony regarding causation when it is not within common knowledge:

> **Given the complexity of the issue, this analysis generally turns on expert medical evidence.** See *Williams,* 681 A.2d at 1150-51. **Indeed, expert medical testimony is required when the conclusion regarding medical causation is one that is not within common knowledge.** *Hutchinson v. Shah,* 94 0264, p. 3 (La. App. 1 Cir. 12/22/94), 648 So.2d 451, 452 (citing *Lasha,* 625 So.2d at 1005). **[Emphasis Added.]**

In Movant's case it cannot be gainsaid that any of the jurors will have previous personal experience with sexual molestation, or its impact on human beings. They will have to rely upon the testimony of experts.

Many other states have reached the same conclusion:

1. *Diemel v. Weirich,* 58 N.W.2d 651 (Wis., 1953). Generally, where injury is

1   subjective in character and of such nature that a layman cannot with
    reasonable certainty know whether there will be future pain and suffering,
2   competent expert opinion testimony bearing on permanency of such injury or
    likelihood that injured person will endure future pain and suffering must be
3   introduced, before allowing recovery therefore.

4   2. *Gillikin v. Burbage*, 139 S.E.2d 753 (N.C., 1965). Where layman can have
    no well-founded knowledge and can do no more than indulge in mere
5   speculation as to cause of physical condition, there is no proper foundation
    for finding by trier without expert medical testimony.

6
    3. *Turek v. Saint Elizabeth Community Health Center*, 488 N.W.2d 567
7   (Neb., 1992). If character of alleged injury is not objective, cause and extent
    of injury must be established by expert medical testimony; physical injury on
8   which claim for emotional distress is based, if not obvious to laymen, must
    be proven by expert medical testimony and not solely by complaints of
9   alleged victim.

10  4. *Maliszewski v. Rendon*, 542 A.2d 170 (Pa. Super., 1988). With regard to
    tort claims of physical injury or impairment, expert medical testimony is
11  necessary to establish causal nexus of injury to tortious conduct in those
    cases where connection is not obvious.
12

13      But in our case, this Court has prohibited the presentation of matters going

14  directly to the central issue of causation. Therefore, this Court should reconsider as

15  requested by Movant; and the expert opinions of Dr. Leighton should be given great

16  weight:
17
    1. *Maliszewski v. Rendon*, 542 A.2d 170 (Pa. Super., 1988). With regard to
18  tort claims of physical injury or impairment, expert medical testimony is
    necessary to establish causal nexus of injury to tortious conduct in those
19  cases where connection is not obvious.

20  2. *Darnell v. Eastman*, 261 N.E.2d 114 (Ohio, 1970). Except as to questions
    of cause and effect which are so apparent as to be matters of common
21  knowledge, issue of causal connection between injury and specific
    subsequent physical disability involves scientific inquiry and must be
22  established by opinion of medical witnesses competent to express such
    opinion.
23
    3. *Roberts v. Mutual Mfg. & Supply Co.*, 475 N.E.2d 797 (Ohio App. 1 Dist.,
24  1984). In assessing prospective damages, jury should be confined to such
    as are reasonably certain to follow from injury complained of; generally, if
25  injury is of objective nature, jury may draw conclusions as to future pain and
    suffering from that fact alone, whereas there must be expert evidence as to
26

1    future pain and suffering or permanency where injury is subjective in
     character.
2

3        The need for scientific explanation has been recognized for almost a
4
     century.
5

6        1.    *St. Louis Min. & Smelting Co. v. State Indus. Com'n*, 241 P. 170
     (Okla., 1925). If personal injury is of such character as to require professional
7    men to determine cause and extent, question must be proved by testimony of
     such persons.
8
         2.    Oklahoma Hosp. v. Brown, 208 P. 785 (Okla., 1922). Where the
9    personal injury complained of is such as to require skilled and professional men
     to determine its cause and extent, the question is one of science, and must
10   necessarily be proven by the testimony of skilled professional persons.

11       As previously argued in Movant's Reply, and reasserted here, Movant asserts

12   that ¶¶ 4 and 5 of the November 14, 2006 Order also violate other applicable law:

13
         **1.    U.S. Constitution violations:**
14
             a.    Movant's right to free speech to express his grievances are severely
15
16   restricted.

17           b.    Movant's due process of law rights are severely restricted by Order

18   prescribing what may or may not be said to a superior court judge, or presented to

19   him/her in writing, by way of pleadings, or oral presentations or argument.
20
             c.    Movant's due process of law rights are severely restricted by Order
21
22   prescribing what may or may not be said to a jury in state court regarding the causation

23   and scope of personal injury.

24       **2.    Arizona Constitution violations:**

25           a.    Movant's rights under Article 2 §31 proscribing any limitation of the

26   amount of damages to be recovered for injury.

b.    Movant's due process of law rights are severely restricted by Order prescribing what may or may not be said to a superior court judge, or presented to him/her in writing, by way of pleadings, or oral presentations or argument.

c.    Movant's due process of law rights are severely restricted by Order prescribing what may or may not be said to a jury in state court regarding the causation and scope of personal injury.

**3.    Federal Doctrine of Comity violation:**

Like federal supplemental jurisdiction overly purely state law claims, this Court should not be tempted and violate the notion of comity so important to our dual federal and state system.  As noted in *Verona Partners, LLC v. Tenet Capital Partners Convertible Opportunities Fund LP*, Slip Copy, 2006 WL 2669035 (N.D. Cal., 2006) citing to Acri v. Varian Associates, Inc., 114 F.3d 999, 1001 (C.A.9 (Cal.), 1997):

> The Supreme Court has stated, and we have often repeated, that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors ⋯ will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon*, 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7, 98 L.Ed.2d at 730 n. 7. While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the Gibbs values "of economy, convenience, fairness, and comity." See, e. g., *Allen*, 92 F.3d at 846; *Executive Software N. Am. v. United States Dist. Court*, 24 F.3d 1545, 1557 (9th Cir.1994).

**IV.    Conclusion**.

The evidentiary matters raised herein are best left to the superior court and the finder of fact. The Arizona Superior Court is a court of general jurisdiction.

*Mothershed v. Thomson*, Not Reported in F.Supp.2d, 2006 WL 381679 (D. Ariz., 2006).

There is absolutely no reason for this Bankruptcy Court to supersede the Superior Court's jurisdiction over state law claims of tort; particularly after the Debtor's Plan of Reorganization has been confirmed and strong permanent injunctions already put into place. Phoenix Diocese's fears and anxieties are no reason for this Court to prejudge the future without evidence of wrongdoing by the Movant, his counsel, or the superior court judge, and violate long standing principles of federal restraint absent demonstrable wrongdoing.

This Court should trust that the Superior Court judge is perfectly capable of reading this Bankruptcy Court's orders, and following and enforcing its injunctions. This Court should also trust that the Superior Court judge will make the appropriate evidentiary rulings and make the appropriate instructions to the jury.

**WHEREFORE,** Movant respectfully requests that the Court reconsider and amend its November 14, 2006 Order by deleting ¶¶ 4 and 5 from it.

Respectfully submitted this 26th day of November, 2006.

**G. DAVID DELOZIER, P.C.**

By:    s/J. Lawrence Dunlavey

*///*

1  Original electronically filed with the Clerk of the
   United States Bankruptcy Court and a true and
2  correct copy of the foregoing was served on the
   persons shown on the attached list by their email
3  addresses or by U.S. Mail, first class postage
   prepaid at Phoenix, Arizona, this 26th day of
4  November, 2006.

5  By   s/Cathy Benson

6

| Gerard R. O'Meara<br>GUST ROSENFELD<br>One S. Church Ave., #1900<br>Tucson, AZ 85701<br>gromeara@gustlaw.com<br>*Attorneys for the Diocese of Tucson* | Tom Zlaket<br>Thomas A. Zlaket, P.L.L.C.<br>310 S. Williams Blvd., #170<br>Tucson, AZ 85711-4446<br>tazlaket@qwest.net<br>*Attorneys for the Diocese of Tucson* | C. Taylor Ashworth<br>Stinson Morrison Hecker LLP<br>1850 N. Central Ave. # 2100<br>Phoenix, Arizona 85004-4584<br>tashworth@stinsonmoheck.com<br>rmcgee@stinsonmoheck.com<br>*Attorneys for Official Creditors' Committee of Tort Creditors* |
| Lynne Cadigan<br>Kim E. Williamson<br>504 S. Stone Ave.<br>Tucson, AZ 85701<br>lmcadigan@qwest.net<br>kewilliamson@qwest.net<br>*Co-Counsel for Plaintiffs* | Lowell E. Rothschild<br>Michael McGrath<br>Mesch Clark & Rothschild, P.C<br>259 N, Meyer Avenue<br>Tucson, AZ 85701-1090<br>lrothschild@mcrazlaw.com<br>mmcgrath@mcrazlaw.com<br>*Attorneys for Roman Catholic Parishes* | Rob Charles<br>Lewis and Roca LLP<br>One S. Church Ave., Suite 700<br>Tucson, AZ 85701-1611<br>rcharles@lrlaw.com<br>*Attorneys for Catholic Foundation for the Diocese of Tucson* |
| Neil J. Konigsberg<br>Konigsberg Law Office PLLC<br>2302 E. Speedway Blvd., #104<br>Tucson, AZ 85719-4732<br>Neil.konigsberg@azbar.org<br>*Attorneys for Tucson Electric Power* | Donald L. Gaffney<br>Jonathan M. Saffer<br>Snell & Wilmer L.L.P.<br>One S. Church Ave., #1500<br>Tucson, AZ 85701-1630<br>dgaffney@swlaw.com<br>jmsaffer@swlaw.com<br>*Attorneys for Pacific Employers Insurance Company* | Robert B. Millner<br>Kevin P. Kamraczewski<br>Patrick C. Maxcy<br>Sonnenschein Nath & Rosenthal LLP<br>8000 Sears Tower<br>Chicago, IL 60606<br>rmillner@sonnenschein.com<br>kevink@sonnenschein.com<br>pmaxcy@sonnenschein.com<br>*Attorneys for Pacific Employers Insurance Company* |

| | | |
|---|---|---|
| G. David Delozier, P.C.<br>4016 E. Forest Pleasant Place<br>Cave Creek, AZ 85331<br>gddelozier@aol.com<br>*Attorneys for John Doe XXIII*<br>*Attorneys for Mother of John Doe*<br>*XXIII*<br>*Attorneys for Confidential*<br>*Claimant #86662* | Nancy J. March<br>DeConcini, McDonald, Yetwin &<br>Lacy, P.C.<br>2525 E. Broadway Blvd., #200<br>Tucson, AZ 85716-5300<br>nmarch@dmyl.com<br>*Attorneys for St. Paul Travelers* | Robert K. Malone<br>Michael P. Pompeo<br>Drinker Biddle & Reath LLP<br>500 Campus Drive<br>Florham Park, NJ 07932<br>Robert.malone@dbr.com<br>Michael.pompeo@dbr.com<br>*Attorneys for St. Paul*<br>*Travelers* |
| Christopher R. Kaup<br>Gregory W. Seibt<br>Tiffany & Bosco P.A.<br>Third Floor Camelback<br>Esplanade<br>2525 E. Camelback Road<br>Phoenix, AZ 85016-4237<br>crk@tblaw.com<br>gws@tblaw.com<br>*Attorneys for Biltmore Associates*<br>*as Agent for Certain Creditors* | Craig Goldblatt<br>Wilmer Cutler Pickering Hale and<br>Dorr LLP<br>2445 M Street<br>Washington, D.C. 20037<br>Craig.Goldblatt@wilmerhale.com<br>*Attorneys for Hartford Fire*<br>*Insurance Company and First State*<br>*Insurance Company* | James A. Hayes, Jr.<br>Cummins & White, LLP<br>2424 S.E. Bristol St., #300<br>Newport Beach, CA 92660-<br>0757<br>jhayes@cwlawyers.com<br>*Attorneys for Roman Catholic*<br>*Bishop of Orange*<br>*(California)* |
| Christopher J. Pattock<br>Office of the U.S. Trustee<br>230 N. First Ave., Rm. 204<br>Phoenix, AZ 85003-1725<br>christopher.j.pattoc@usdoj.gov | Marjorie Fisher Cunningham<br>Curtis & Cunningham<br>5610 E. 22nd Street<br>Tucson, AZ 85711-5525<br>mfc@theriver.com<br>*Attorneys for Plaintiffs* | Michael Zimmer<br>Zalkin & Zimmer LLP<br>12555 High Bluff Drive Suite<br>215<br>San Diego, CA 92130<br>mz@zalkin.com<br>*Attorneys for Plaintiffs* |
| A. Bates Butler<br>Fennemore Craig, P.C.<br>One South Church, Suite 100<br>Phoenix, AZ 85012-2615<br>bbutler@fclaw.com<br>*Unknown Claims Representative* | Charles L. Arnold<br>Frazer Ryan Goldberg Arnold &<br>Gittler, LLP<br>3101 N Central, Suite 1600<br>Phoenix, AZ 85012-2615<br>Charles.Arnold@azbar.org<br>*Guardian Ad Litem* | Clifford B. Altfeld<br>Leonard Felker Altfeld<br>Greenberg & Battaile, P.C.<br>250 N. Meyer Avenue<br>Tucson, AZ 85701<br>cbaltfeld@lfagb.com<br>*Attorneys for Plaintiffs* |
| Lawrence S. Viola<br>Knapp & Viola<br>P.O. Box 1290<br>San Mateo, CA 94401<br>lviola@violaw.com<br>*Attorney for Plaintiffs* | David A. Fitzgibbons<br>April P. Elliot<br>Fitzgibbons Law Offices, P.L.C.<br>711 E. Cottonwood Lane, Suite E<br>Casa Grande, AZ 85230<br>david@fitzgibbonslaw.com<br>aelliott@fitzgibbonslaw.com<br>*Attorneys for St. Anthony de Padua*<br>*School* | Sally M. Darcy<br>McEvoy, Daniels & Darcy,<br>P.C.<br>Camp Lowell Corporate Center<br>4560 East Camp Lowell Dr.<br>Tucson, Arizona 85712<br>darcysm@aol.com<br>*Attorneys for Unknown*<br>*Claims Representative* |

P-App. 003846

| | | |
|---|---|---|
| 1 | Walter F. Wood | Ivan S. Abrams | Daniel J. Quigley |
| 2 | Walter F. Wood, LTD. | Law Offices of Ivan S. Abrams | Quigley & Whitehill, P.L.C. |
| | 110 S. Church Ave., Suite 4398 | 177 North Church Ave., Suite 200 | 2730 E. Broadway Blvd. |
| 3 | Tucson, AZ 85701 | Tucson, AZ 85701 | #160 |
| | walterfwood@aol.com | tucson3985@aol.com | Tucson, AZ 85716-5384 |
| 4 | *Attorney for Brian O'Connor* | | Quigley@qw-law.com |
| | | | *Attorneys for St. Augustine* |
| 5 | | | *Catholic High School* |

| | | |
|---|---|---|
| 6 | First Catholic Slovak Ladies | Terri Thiessen | Belen Alderete |
| | 24950 Chagrin Blvd. | 3781 W. Golfcourse Rd. | 215 N. West Moreland |
| 7 | Beachwood, OH 44122 | Thatcher, AZ 85446 | Tucson, AZ 85745 |
| | Thomas Groom | Michael Moylan | Jeanne Metzger |
| 8 | 1700 Tortuga Way | 1724 W. Pineriver Place | 8743 E. Rose Lane |
| | Clarkdale, AZ 86324 | Tucson, AZ 85746 | Scottsdale, AZ 85250 |
| 9 | *Official Creditors Committee* | *Official Creditors Committee* | *Official Creditors Committee* |
| | *of Tort Creditors* | *of Tort Creditors* | *of Tort Creditors* |
| 10 | Diana Holmes | Brian O'Connor | Ronald G. Dandar |
| | P.O. Box 1305 | 3704 S. Marvin | Old Route 22 |
| 11 | Sonoita, AZ 85637 | Tucson, AZ 85730 | P.O. Box A-AP 6933 |
| | *Official Creditors Committee* | *Official Creditors Committee* | Cresson, PA 16699-0001 |
| 12 | *of Tort Creditors* | *of Tort Creditors* | |
| | Susan M. Freeman, Esquire | | |
| 13 | Lewis and Roca, LLP | | |
| | 40 North Central Avenue | | |
| 14 | Phoenix, AZ 85004 | | |

15

16

17

18

19

20

21

22

23

24

25

26

P-App. 003847

# Exhibit "A"

STATE OF ARIZONA    )
                      ) ss:
COUNTY OF MARICOPA  )

## AFFIDAVIT OF DR. DAVID LEIGHTON

**DR. DAVID LEIGHTON**, being first duly sworn upon his oath, deposes and says:

1.     I am over 18 years of age and a resident of Maricopa County, Arizona.

2.     I am an Arizona licensed psychologist.  My practice is located at 4921 E. Bell Rd., #207, Scottsdale, Arizona  85254. [602-482-0048].  I am an active practitioner in clinical psychology and neuropsychology.

3.     My Curriculum Vitae is attached hereto and incorporated herein as Exhibit "A."

4.     I have personally reviewed the November 14, 2006 Order on Remand with Instruction to the Superior Court in Case No. 4-04-bk-04721-JMM, Adversary No. 2-04-ap-01259-JMM.

5.     I have personally treated John Doe XXIII since 11/19/2003 and reasonably believe that treatment will continue for several additional years.

6.     Based upon my personal observations and interviews with John Doe XXIII, it is my professional opinion that John Doe XXIII was sexually abused on numerous occasions by a Roman Catholic priest both before and after December 2, 1969.

7.     It is my professional opinion that ¶¶ 4 and 5 of the November 14, 2006 Order so restrict the proper and complete historical description of the events contributing to the existing psychopathology of John Doe XXIII, i.e., the psychogeneses and extent of his injuries, that no trier of fact could reasonably be expected to reach a rational and reasonable understanding or conclusion informed by scientific principles or opinions.

8.     It is my professional opinion that the proper scientifically principled description of the injuries incurred by John Doe XXIII is impossible without delineation of the grooming process he underwent which began before December 2, 1969. The bifurcation imposed by ¶¶ 4 and 5 of the November 14, 2006 Order, when used in a legal proceeding, trenches upon well-agreed and understood scientific opinions in the science of psychology.

9.     I offer the following to support my professional opinions stated herein:

The Remand Order of November 14, 2006, specifically states that the "Plaintiff shall be prohibited from in any way presenting the events of alleged misconduct occurring before December 2, 1969 in any proceeding arising out of or related to his

1

remanded claims ...." (p. 3, Judge James M. Marlar, United States Bankruptcy Court.)
It is my understanding that this Remand Motion was intended simply to prevent
consideration of damages already compensated in the Tucson litigation.  However, by
virtue of excluding description of the historical "grooming" process, this Remand Motion
also inadvertently renders impossible the clinical description of real injury incurred by
John Doe XXIII.  Further, by virtue of excluding description of the "grooming" process,
this Remand Motion additionally removes for John Doe XXIII the otherwise expectable
psychotherapeutic value inherent in the opportunity to confront his victimizers and their
representatives with their crime.

**CLINICAL DESCRIPTION OF INJURY**:

In her address to the 2002 U.S. Conference of Catholic Bishops, Mary Frawley-
O'Dea, Ph.D., offered a list of "shocking" self-destructive behaviors typical of survivors:

> cutting their arms, thighs, and genitalia with knives, razors, or broken glass
> burning themselves with cigarettes
> pulling out their hair from their heads or pubic areas
> walking through dangerous areas such as parks alone at night
> playing chicken with trains
> picking up strangers in bars to have unprotected and anonymous sex
> driving recklessly at high speeds
> gambling compulsively
> abusing alcohol or street drugs compulsively

It is critical to recognize that these self-destructive behaviors are not typical of
survivors of a single isolated sexual assault perpetrated by a stranger.  Rather, as Dr.
Frawley-O'Dea has asserted, these bizarre self-destructive behaviors are "often"
displayed by survivors of prolonged sexual abuse perpetrated by a trusted family figure.

Dr. Frawley-O'Dea is not the only expert in the field to draw a sharp distinction
between the effects of sexual assault per se versus the effects of sexual assault
perpetrated by a trusted family figure.  Many experts have cited research demonstrating
that the long-term consequences of molestation by a trusted family figure are
significantly more severe than the consequences of an isolated event perpetrated by a
stranger (Molnar et al., 2001; Dominguez, et al., 2001; Frawley-O'Dea, 2002; Hopper,
2006; Mullen and Fleming, 1998.)  Indeed, the true injuries incurred by the victim of
molestation perpetrated by a trusted family figure are only comprehensible through an
in-depth understanding of the "grooming" process.  And, as McAlinden (2006) has
asserted, it is only through understanding the grooming process that one can even
make sense of the child's apparent cooperation with or acquiescence to the
perpetrator's seduction.

McAlinden (2006) defines "grooming" as "...the process by which a would-be
abuser skillfully manipulates a child into a situation where he or she can be more readily
sexually abused and is simultaneously less likely to disclose" (p. 346).  The key variable

2

in the process of grooming is the development and subsequent abuse of "trust" (McAlinden, 2006).  McAlinden, 2006, defines "trust" as an attitude that serves as the basis for risk-taking behavior that is "inversely related to the willingness to become vulnerable to the actions of another person" (p. 344.)  Although somewhat lengthy, it is instructive vis-à-vis the "myth of consent" to study McAlinden's description of the typical process of grooming:

> "First, grooming the child can typically include befriending a potential victim by getting to know their interests and being helpful and confiding in order to gain their confidence and trust.
> "Second, the offender will cultivate a 'special' friendship by bestowing a variety of inducements such as money, comics, or sweets or even unexpected treats such as trips to the cinema or fast-food restaurants.  This emphasis on the exclusivity of the relationship helps to 'distance' the child from their parents or others who may represent a source of safety and prevent the abusive behavior from being discovered.  It also enables the offender to control the victim through the giving or withholding of rewards.  In some cases the use of bribes or rewards may escalate into threats or the use of force to ensure the child's continued secrecy and compliance.
> "Third, the offender will often use 'forbidden fruit' type activities such as cursing, telling 'dirty jokes,' or showing the child pornography to introduce sexual themes into their conversations.  This latter stage not only begins to normalize sexual behavior but may also be used to entrap the child further.  The use of pornography in particular may encourage feelings of shame and guilt which the offender may exploit by persuading the child that they were willing accomplices in their activities.  These factors, in turn, may also make the child less willing to tell others.
> "Finally, the offender will exploit the child's naivete and trust by introducing intimate physical contact such as play acting, tickling or wrestling and even hugging to gradually sexualize contact with the child.  The use of touch is particularly important as this determines whether or not the child is receptive and begins the process of desensitization---gradually the abuser will escalate boundary violations of the child's body which eventually culminates in *enticing* the child to acquiesce to engaging in sexual activity" (p. 347, McAlinden, 2006.)

As Finkelhor has pointed out, "…children lack the information necessary to make an 'informed' decision about the matter … (they cannot know) … what likely consequences it will have for them in the future" (p. 18, Sexual Abuse as a Moral Problem.)  What children come to know through the process of grooming is simply that their future perpetrator is a kind and thoroughly good benefactor; the father figure most wished they had.

In her address to the 2002 U.S. Conference of Catholic Bishops, Mary Frawley-O'Dea, Ph.D., defined molestation perpetrated by a priest as "incest," specifically because in Catholic families the priest is not just euphemistically called "Father," but is truly viewed by parishioners as a trusted father figure.

3

In her address to the 2002 Conference of Catholic Bishops, Dr. Frawley-O'Dea poignantly describes the effects of this abject betrayal of trust. She asserts that it is precisely because the priest-perpetrator has developed a trusting relationship through the grooming process that the victim's initial perception of betrayal is so psychologically overwhelming, often resulting in a "splitting" of personality through the mechanism of "dissociation." It is this dissociative reaction that is the basis for the bizarre self-destructive behavior often exhibited by victims of molestation perpetrated by a trusted family figure. Dr. Frawley-O'Dea's poignant description:

"(Dissociation allows a separate)…state of consciousness while being abused … (thus preserving) … a functional and safe self who is removed from the trauma and is therefore able to learn, grow, play and work … (But, that) … curse of dissociation condemns the state of self who experienced the abuse to a trapped existence in the inner world of the survivor, a place dominated by terror, impotent but seething rage, and grief for which there literally are no words. Because trauma impels the brain to process events quickly and in a state of hyperarousal, verbalizing pathways are bypassed. Instead, the sexual violations are encoded by the child and retrieved by the survivor as non-verbal, often highly disorganizing feelings, somatic states, anxieties, recurring nightmares, flashbacks, and sometimes dangerous behaviors. Often, the adult survivor's life is wracked by unexpected regressions to his victimized self that are triggered by seemingly neutral stimuli … A survivor's relationships with other people are hued and shaded by expectations and anxieties forged during their traumatic experiences. Approaching others from within psychological confines of post-traumatic stress disorder, the trauma survivor exhibits rapidly shifting relational stances, painfully lurching from periods of extremely dependent clinging, to those marked by vicious rage aimed at the same person. Stark terror and tears can switch in an instant to cold aloofness, while warmth and vivacity may turn kaleidoscopically to paranoid suspicion. All of this, of course, leads to many chaotically unstable relationships, often alternating with stretches of the loneliest isolation.… Too often, sex, even with a trusted other, triggers terrifying disorganizing flashbacks during which survivors sometimes literally see the face of their abuser superimposed on the visage of their sexual partner.… In addition, survivors frequently are disgusted by and ashamed of their own bodies and sexual strivings. Unreasonably blaming the abuse on their own sexuality, they often desperately insist that it never would have happened were it not for their self-perceived horribly seductive bodies and deplorable sexual desires. Heterosexual boys abused by men additionally are tormented, wondering what it was about them that attracted the perpetrator.… As adults, therefore, these men and women often spin between periods of promiscuous and self-destructive sexual acting out and times of complete sexual shutdown during which, like burn victims, they experience the gentlest physical conduct as excruciatingly painful.… (T)he hyperarousal of the autonomic nervous system and the body's subsequent attempt to restore order disrupt the brain's neurochemical regulation of emotion.… Both the sexual traumas themselves and the betrayal of an

4

attachment relationship assail the flow of affect modulating neurochemicals.  As an adult, the survivor shifts---sometimes quite rapidly---between states of chaotically intense hyperarousal and deadened states of psychic numbing … (in an) … inability to modulate emotional arousal…" (p. 3, 5, 6 and 7, Frawley-O'Dea, 2002.)

In conclusion, the bizarre, self-destructive behaviors often exhibited by victims of molestation perpetrated by a priest can only be understood through recognition of the abject betrayal of trust inherent in the relationship between priest and child victim.  In turn, the abject betrayal of trust inherent in molestation by a priest can only be understood through exploration of the grooming process.  **Thus, description of injuries incurred by John Doe XXIII is impossible without delineation of the grooming process.**

**THE PSYCHOTHERAPEUTIC VALUE OF THE COURT:**

Children tend to "personalize" their world.  For example, it is widely recognized that children of divorce tend to blame themselves for causing their parents' divorce.  This tendency is so pervasive in our culture that psychotherapists invariably begin their work with children of divorce by exploring these belief systems developed through a child's naïve perspective, lest the resulting repressed attitudes fester into a global view of the world that shapes behavior for the remainder of lifetime.

Child victims of sexual assault also tend to personalize their victimization.  And, particularly, children of molestation perpetrated by a trusted family figure very much tend to blame themselves for the event, however illogical (Dominguez, 2001; Hopper, 2006); the resulting overwhelming sense of shame and personal guilt is one of the primary reasons why so few children of molestation tell their parents about it.  And, just as psychotherapists invariably begin their work with children of divorce by exploring their deeply held attitudes about causing their parents' divorce, psychotherapists who are experienced with children of molestation invariably explore the victim's sense of guilt resulting from the child's naïve perspective of having provoked that sexual assault.  That therapeutic exploration, of course, is invariably the exploration of the perpetrator's manipulative grooming of a child who is typically oblivious of the victimizer's intent and goal.

For as many years as I have worked as an expert witness, I have attempted to help victims persevere through the often grueling process of litigation by sharing my professional experience that the best possible psychotherapy for personal injury is a successful outcome to litigation.  Particularly for child victims of sexual assault, so often overwhelmed by a confusion of rage and guilt, successful litigation is an opportunity to tell their story to their accuser and to their entire community embodied in the judge and jury.  There is indeed tremendous psychotherapeutic value for adult victims of childhood sexual assault in the experience of the Court recognizing and accepting their developing explanation for how they came to acquiesce to this hideous crime of sexual molestation, a psychotherapeutic value far in excess of any financial award.

5

P-App. 003853

Your Honor, please reconsider your recent decision in John Doe XXIII vs. The Catholic Diocese of Tucson disallowing exploration and delineation of the perpetrator's prolonged grooming.  Not only does this judicial decision remove the victim's opportunity to cleanse himself before his community of the overwhelming guilt for having provoked his molestation, this judicial decision sets a legal precedent that can potentially remove much of the therapeutic value in pursuing legal recourse for countless victims of sexual assault into the future.

FURTHER AFFIANT SAYETH NAUGHT.

DATED this _24th_ day of November, 2006.

Dr. David Leighton
Clinical Psychologist/Neuropsychologist

On this date the person whose name appears above, personally appeared before me and identified himself, and executed the within Affidavit.

Date: _11-25-06_          Notary Public

My Commission Expires _August 02, 2007_

Notary Public State of Arizona
Maricopa County
G. David Delozier
Expires August 02, 2007

6

P-App. 003854

**Dr. DAVID LEIGHTON**
CLINICAL PSYCHOLOGIST
NEUROPSYCHOLOGIST

4921 E. Bell Road #207
Scottsdale, Az 85254
602-482-0048

**EDUCATION**    DOCTORATE DEGREE, CLINICAL PSYCHOLOGY
University of Illinois, 1981.

MASTERS DEGREE, CLINICAL PSYCHOLOGY
University of Illinois, 1975.

BACHELORS DEGREE, PSYCHOLOGY
Wheeler Scholar, Phi Beta Kappa and Departmental Honors
University of California, Berkeley, 1972.

**EMPLOYMENT**
10/81-Present:  PRIVATE PRACTICE, Scottsdale, Arizona.
40% General Clinical Practice offering individual, marital, and family psychotherapy, with a specialty in Behavioral Medicine including treatment of chronic pain, headache, psychophysiological sleep disorders, and attention deficit disorder.  50% Neuropsychological Evaluation of traumatic brain injury and congenital learning disability.  10% Neuropsychological Evaluation of Alzheimer's disease for three pharmaceutical drug studies.

10/80-10/83, Arizona Health Plan, Phoenix, Arizona.
Half-time Coordinator, Pain Management Program, involving the design, implementation and management of a multi-disciplinary program for the treatment of chronic pain and headache within the context of a large health maintenance organization.
Half-time Staff Psychologist, Department of Psychiatry.

9/78-9/80, San Juan Community Services, San Juan Islands, Washington.
Staff Psychotherapist.

9/77-9/78, Child Development Center, University of Washington Medical School, Seattle, Washington.
Staff Evaluator and Psychotherapist.

4/78-6/78, Seattle Public School System, Seattle, Washington.
School Psychologist, involving psychometric evaluation of children with brain-related learning disabilities.

11/72-7/73, "Multiple Risk Factor Intervention Trial," University of California Medical Center, San Francisco, California.
Psychological Technician, involving participation on a research team working to develop a psychometric instrument to assess the psycho-social causes of coronary heart disease.

**AFFILIATIONS** Amercan Psychological Association, Member.
Arizona Psychological Association, Member.
National Academy of Neuropsychology, Professional.

P-App. 003855

# CURRICULUM VITAE

## KEITH ROHMAN

### PUBLIC INTEREST INVESTIGATIONS, INC.

Work Address:         The Bradbury Building
304 S. Broadway, #596
Los Angeles, CA 90013
(213) 482-1780
rohman@pilla.com
www.pilla.com

### Work Experience

**Mitigation Specialist:** Assisted attorneys preparing social histories and mitigation presentations for capital defendants at the trial and post-conviction levels in state and federal courts, including over 40 capital murder cases at the trial and appellate levels, in both state and federal courts in California, Arizona, Alaska, Washington, Utah, New Mexico, Indiana, Ohio, Tennessee, and New York. Worked closely with mental health professionals to prepare mitigating evidence presentations. (1987 to present)

**President: Public Interest Investigations** (PII) an investigations and consulting firm assisting attorneys, non-profits, corporations and governmental entities in all aspects of legal investigations. (1984 to present)

PII's other case work has included:

- Criminal defense investigations on major felony cases.
- Principal investigator for plaintiff's attorneys in *Saleh v. CACI, et al.*, litigation filed on behalf of Iraqis tortured at the Abu Ghraib prison against two American defense contractors, and in *Albazzez et al. v. Blackwater et al.*, litigation filed against Blackwater for killings in Nisoor Square, Baghdad, in September 2007.

**Adjunct Professor:** Loyola School of Law–Los Angeles; Fact Investigation class in techniques of investigations, including mitigation and guilt investigations in capital cases. (January 2004 to present)

**Monitor:** Appointed on June 28, 2011 by U.S. District Court Judge Audrey B. Collins as the Court's monitor in *Fred Pierce, et al v. County of Orange, et al.*, a class-action suit alleging that Orange County jail facilities did not comply with the Americans with Disabilities Act (ADA) and that disabled inmates were denied access to some of the jail's programs and services. (June 2011 to present)

1

**International Monitor:** Observed the hearings and surveyed the investigative staff of the South Africa Truth and Reconciliation Commission as a member of the International Monitoring Project of the National Lawyers Guild Southern Africa Section.  Participated in the drafting of the Monitoring Project Report.  (May to July 1998)

**Staff and Research Director: Local #862.** United Labor Unions (now affiliated with Service Employees International Union), Philadelphia, PA.  Coordinated organizing efforts, investigated unfair labor practice charges, and conducted background and asset checks of employees. (1979 - 1982)

## Presentations/Publications

Co-author, with Elizabeth Rita- "Capturing the Witness Statement," AWI Journal, Association of Workplace Investigators, July 2013.

Author- "Diagnosing and Analyzing Flawed Investigations: Abu Ghraib as a Case Study," Cardozo Law Review de novo, July 2009, Cardozo School of Law, also Penn State International Law Review, August 2009, Penn State School of Law.

Author- "Lost in Translation: Lawyers and Interpreters," presented at the Mexican Capital Legal Assistance Program seminar, Phoenix, AZ., February 29, 2008. Also in Los Angeles Daily Journal, May 5, 2008.

Author- "Do Not Punish the Entire Investigation Trade for HP's Deviant Probe," Los Angeles Daily Journal, November 24, 2006.

Author- "Investigating the Past: An Examination of the Investigative Unit at the South Africa Truth and Reconciliation Commission," Truth and Reconciliation: Exposing Offenses of the South African Apartheid Past, National Lawyers Guild, New York, 2004.

Addressed (By Invitation)- "Conducting Community Based Investigations into Police Misconduct," Rampart Independent Review Panel, Los Angeles Board of Police Commissioners, May 2000.

Author- "Out of the Box- Investigating Juror Misconduct," Los Angeles Daily Journal, February 11, 2000.

Author- "Schools Must Share Environmental Investigations With Public," Los Angeles Daily News, November 18, 1999.

Interviewed on Jury Misconduct Investigations - CBS Evening News, ABC's Good Morning America and Primetime Live, the Oprah Winfrey Show, the Los Angeles Times, and Los Angeles Daily Journal, October 1995 - March 1996.

Author - "The Hardest Cold Call: Interviewing the Victim," California Death Penalty

2

| | |
|---|---|
| November 2012 | **Presenter**, "Beyond the Courthouse Walls: Combining Law, Science, History & Engineering to Build a Better Investigation," Association of Investigators. |
| January 2013 | **Presenter**, "Eliminating The Impact of Cognitive Biases on Our Work and Our Profession" Webinar, MCLE Training, Association of Workplace Investigators. |
| March 2013 | **Faculty**, National Training Institute for Workplace Investigators, Santa Barbara, California. |
| Spring 2013 | **Ongoing Case Consultant**, Juvenile Innocence and Fair Sentencing Clinic, Loyola Law School, Los Angeles, California |
| April 2013 | **Lecturer**, day-long seminar, "Workplace Investigations Basics," Association of Workplace Investigators, Inc., Los Angeles, California |
| June 2013 | **Lecturer**, "Understanding and Addressing the Role of Bias in Investigation," AWI Local Circle- Attorneys and Investigators, Toronto, Ontario, Canada |
| September 2013 | **Presenter**, "The Truth Matters®: Seven Steps to An Effective Investigation," Western Independent Bankers Association, 2013 Education Summit and Expo, Anaheim, California |
| October 2013 | **Presenter**, "Ground Zero: An Expert Approach to Interview Techniques," Association of Human Resources Officers/Equal Employment Officers (ACHRO/EEO) 2013 Fall Training Institute, Newport Beach, California. |
| October 2013 | **Presenter**, with Elizabeth Rita- "Capturing the Witness Statement," Fourth Annual Conference, Association of Workplace Investigators, October 2013, Glendale, California. |

## Lecture and Training Experience

Addressed (By Invitation) - California State Assembly Transportation Committee Interim Hearing on DMV Privacy Legislation, October 4, 1989.

Addressed California Attorneys for Criminal Justice, September, 1990.

Author - "Reciprocal Discovery in a Post-115 World," The Legal Investigator, Official Journal of National Association of Legal Investigators, May, 1991; CACJ Forum, April/May, 1992.

Defense Manual Mitigation Workbook, 1993 Edition, Published by California Attorneys for Criminal Justice and California Public Defenders Association; CALI Newsletter, California Association of Licensed Investigators.

3

4

| February 2003 | **Lecturer**, "Tips from the Professionals on How to Attack or Defend Jury Outcomes," Labor and Employment Law Symposium, Los Angeles County |
| April 2004 | **Program Developer and Lecturer**, "Who's Telling the Truth: Credibility Assessment in Investigation," College of the Canyons, Santa Clarita, CA. |
| January 2005 | **Lecturer**, "Criminal Defense Investigation," Loyola Law School Center for Juvenile Law and Policy, Los Angeles, CA. |
| August 2005 | **Lecturer**, "Thinking Like an Investigator," Loyola Law School Center for Juvenile Law and Policy, Los Angeles, CA. |
| February 2008 | **Lecturer**, "Role of the Mitigation Specialist and Collecting Evidence in Mexico" and "Addressing Language and Cultural Barriers," Mexican Capital Legal Assistance Program: Representing Mexican Nationals in Capital Cases, Phoenix, AZ. |
| May 2008 | **Lecturer**, "Interview Techniques," Training Seminar for the staff of Los Angeles Daily Journal, Los Angeles, CA. |
| December 2010 | **Lecturer**, "Investigation Bias and Interview Techniques," Internal Affairs Bureau (IAB), Los Angeles Sheriff's Department, Commerce, CA. |
| April 2011 | **Lecturer**, "Investigations Strategies and Techniques," Fidler Institute on Criminal Justice, Loyola Law School, Los Angeles, CA. |
| May 2011 | **Lecturer**, "Advanced Interview Techniques," Los Angeles County Advocates Council, Los Angeles, CA. |
| November 2011 | **Lecturer**, "Ground Zero: An Expert Approach to Interview Techniques," General Plenary Session, California Association of Workplace Investigators 2011 Annual Conference, Glendale, CA. |
| July 2012 | **Moderator**, Webinar, "The Interplay Between Workplace Investigation and Criminal Investigation," presented by Association of Workplace Investigators. |
| Fall 2012 | **Guest Lecturer and Case Consultant**, Juvenile Innocence and Fair Sentencing Clinic, Loyola Law School, Los Angeles. |
| August 2012 | **Guest Lecturer**, "The Role of Life Histories in Sentencing," Sentencing and Punishment Class, Loyola Law School, Los Angeles. |

Workplace Investigators Third Annual Conference, Oakland, California.

Bar Association, Los Angeles, CA.

| | |
|---|---|
| November 2002 | **Program Developer and Lecturer,** "Investigative Techniques on Slumlord Cases," Training for staff of non-profit Strategic Alliance for Rational Economy, Los Angeles, CA. |
| June 2002 | **Lecturer,** "Locating Assets and Witnesses for Low Income Clients," CLE training for Bet Tzedek Legal Services, Los Angeles, CA. |
| May 2002 | **Lecturer,** "Best Practices in EEO Investigations," Annual Conference; California Association of Equal Rights Professionals, San Diego, CA. |
| November 2001 | **Program Developer and Lecturer,** "Investigative Techniques for Legal Aid Staff," Legal Aid Foundation of Los Angeles, Los Angeles, CA. |
| October 2001 | **Lecturer,** "Investigative Techniques on Slumlord Cases," CLE Training Seminar, Legal Aid Foundation of Los Angeles, Los Angeles, CA. |
| March 2001 | **Program Developer and Lecturer,** Employment Discrimination Investigator Training. Developed and presented a training curriculum to the staff of the City of Los Angeles, Office of Discrimination Complaint Resolution, Los Angeles, CA. |
| May 2000 | **Lecturer,** "Investigation Techniques," International Research Staff, Hotel and Restaurant Employees Union (HRE), Los Angeles, CA. |
| October 1999/ March 1999 | **Lecturer,** "Misconduct of Death Penalty Juries," Capital Litigation Class, Loyola University School of Law, Los Angeles, CA. |
| July 1998 | **Lecturer,** "The Role of Investigators in the South African Truth Commission," Sociology 101 Class, West Los Angeles College; also at the Office of Civil Rights Monitor, Los Angeles, CA. |
| July 1997 | **Program Developer and Lecturer,** "The Truth Matters™, A Guide to Conducting Internal Investigations," Developed a training curriculum for human resource professionals at the Denny's restaurant chain. |
| November 1996 | **Lecturer,** "Privacy, Community, and Information Work," The Southern California Conference on Technology, Employment & Community, California State University at Los Angeles, CA. |
| October 1996 | **Lecturer,** "Legal Investigation," Capital Litigation Class, Loyola University School of Law, Los Angeles, CA. |

5

| June 1995 | **Lecturer,** "Jury Misconduct and New Trial Motions," Civil Liability Training Class, Office of the City Attorney of Los Angeles. |
| March 1995 | **Lecturer,** "What Are Juries Thinking?," Litigators Luncheon, Law Offices of Mitchell, Silberberg & Knupp. |
| January 1994 | **Lecturer,** "Housing Discrimination Investigations," University of California at Los Angeles (UCLA) School of Law. |
| January 1994 | **Lecturer,** "Investigating Habeas Cases," Central District [of California] Capital Counsel Seminar. |
| February 1993 | **Lecturer,** "Police Reports: Truth and Fiction," Alternative Media Class, California State University at Long Beach. |
| March 1989 | **Lecturer,** "Criminal Defense Investigation," Criminal Procedure Class, Whittier College of Law, Los Angeles, CA. |
| February 1986 | **Lecturer,** "Crime on their Minds," UCLA Extension, Department of Humanities and Social Services. |

## Education

Mt. St. Mary's College, Bachelor of Arts, Los Angeles, CA, May 2001

## Professional Education

Tenth National Seminar on the Development and Integration of Mitigation Evidence: *Ten Years After Wiggins,* Habeas Assistance & Training Counsel Project, April 2013, Baltimore, Maryland.

National Training Institute for Workplace Investigators (certification received), March 2013, Association of Workplace Investigators, Santa Barbara, California.

Capital Case Defense Seminar, February 2013; California Attorneys for Criminal Justice, California Public Defenders Association, Monterey, CA.

Association of Workplace Investigators Third Annual Conference, November 2012, Oakland, California.

Capital Case Defense Seminar, February 2012; California Attorneys for Criminal Justice, California Public Defenders Association, Monterey, CA.

2011 Annual Conference, November 2011, California Association of Workplace

Investigators, Glendale, CA.

Seventh National Seminar on the Development and Integration of Mitigation Evidence, April 2010, Habeas Assistance & Training Counsel Project, Seattle, WA.

Authorized Capital Case Training & Consultation Conference, July 2009, Federal Death Penalty Resource Counsel, Indiana University School of Law, Indianapolis, Indiana.

Fifth National Seminar on the Development and Integration of Mitigation Evidence, April 2009, Habeas Assistance & Training Counsel Project, Philadelphia, PA.

Legal Frameworks for Prosecution and Defense of Terrorism Suspects during the Obama Administration, April 2009, One World Research, New York, NY.

Representing Mexican Nationals in Capital Cases Seminar, February, 2008; Mexican Capital Legal Assistance Program, Phoenix, AZ.

International Justice 60 Years After Nuremberg, Amnesty International Lawyer's Conference, February 2006, Seattle, Washington

Death Penalty Defense Seminar, February, 2005; California Attorneys for Criminal Justice, California Public Defenders Association, Monterey, CA.

Death Penalty Defense Seminar, February, 2004; California Attorneys for Criminal Justice, California Public Defenders Association, Monterey, CA.

Effective Litigation: Investigations & Mitigation, November 2003; International Justice Project and Office of the Federal Public Defender for the District of Arizona, Phoenix, AZ.

Law, Lawsuits and Reasonable Accommodation, March 2003; California Association of Equal Rights Professionals (CAERP), Alhambra, California.

Death Penalty Defense Seminar, February, 2003; California Attorneys for Criminal Justice, California Public Defenders Association, Monterey, CA.

Death Penalty Defense Seminar, February, 2002; California Attorneys for Criminal Justice, California Public Defenders Association, Monterey, CA.

Managing Diversity in Times of Crisis Seminar, January, 2002; California Association of Equal Rights Professionals (CAERP), Diamond Bar, CA.

Investing in Investigations: How to Conduct Defend and Critique Workplace Investigations, October 2001; Labor & Employment Law Section of Los Angeles County Bar Association.

7

8

Mid-Winter Education and Training Conference, January, 1989; California Association of Licensed Investigators.

Death Penalty Defense Seminar, February, 1989; California Attorneys for Criminal Justice.

Proposition 115 Criminal Law Seminar, June 1990; California Attorneys for Criminal Justice.

The Science of Environmental Law, September 1991, Washington, D.C.; Executive Enterprises, Inc.

Mid-Winter Education and Training Conference, January 1992; California Association of Licensed Investigators.

Death Penalty Defense Seminar, February, 1992; California Attorneys for Criminal Justice, California Public Defenders Association.

Environmental Compliance Auditing, May, 1992, Chicago, IL; Executive Enterprises, Inc.

Death Penalty Defense Seminar, February, 1993; California Attorneys for Criminal Justice, California Public Defenders Association.

Criminal Law, Winter 1993; Mt. St. Mary's College, Los Angeles, CA.

Employment Law Seminar, CALI Mid Winter Education and Training Conference, January, 1994.

Death Penalty Defense Seminar, February, 1998; California Attorneys for Criminal Justice, California Public Defenders Association.

Death Penalty Defense Seminar, February, 1999; California Attorneys for Criminal Justice, California Public Defenders Association.

Mid-Winter Education and Training Conference, February 2000; California Association of Licensed Investigators.

Death Penalty Defense Seminar, February, 2000; California Attorneys for Criminal Justice, California Public Defenders Association.

Death Penalty Defense Seminar, February, 2001; California Attorneys for Criminal Justice, California Public Defenders Association.

Abnormal Psychology, Spring 2001, Mt. St. Mary's College, Los Angeles, CA.

6

Medicolegal Investigation of Death Seminar, May 1998; Wayne State University School of Medicine.

Death Penalty Defense Seminar, February, 1998; California Attorneys for Criminal Justice.

**State License**

Licensed Private Investigator, PI#10349, State of California, January, 1984.

**Other Affiliations**

Juvenile Innocence and Fair Sentencing Program, Loyola Law School (Board member)

Los Angeles City Human Relations Commission (Commissioner, Past-President)

California Association of Licensed Investigators

California Attorneys for Criminal Justice (Associate)

**From:** Daniel Patterson - PDX
**Sent:** Monday, November 29, 2004 9:39 AM
**To:** Scott MacLeod - PDX
**Subject:** RE: updated list 11/30 of mitigation witnesses

Thanks-Dan P.

**From:** Scott MacLeod - PDX
**Sent:** Monday, November 29, 2004 9:33 AM
**To:** Daniel Patterson - PDX
**Cc:** Carole Besore - PDX
**Subject:** updated list 11/30 of mitigation witnesses

Hi Dan.

Here is an updated list of mitigation witnesses. I will also provide Carole with a hardcopy. Almost every person on this list I have interviewed, and have scheduled follow up interviews sometime this week.

I will submit summaries of their interviews sometime on Wed or Thurs.

This is not a complete, nor exhaustive list, it is simply my list of witnesses.

Donna Ochoa - 520-836-6829
Alejo Ochoa
Barbara Mitchell - 520-560-0623
Martha England - 520 - 466 - 7527
Sharon Murphy 602 - 369 - 0192
Brandon Ochoa (your call) 520 - 836 – 6829
Laura King (602) 876-1959
Joyce Van Every – nurse at the Durango Jail
Dr. Gerald Perry – psych at the Durango Jail
Linda Galleon (520) 298-4188
Jimmy Galleon (520) 298-4188
Cindy Fike (520) 426-6323 *work*
Chris Vasquez (520) 866-5145 *work* (asst chief of police in Pinal cnty)
Frances Archuleta (she is in school in Alabama)
Email: farchuleta@hotmail.com
Lonnie Inskeep 520 - 568 - 2893

I am currently inclined to NOT ask the correctional expert to help out. With Laura King's testimony, Dr. Perry's and the nurse, I believe we can construct a strong argument supporting Wendi's ability to succeed while incarcerated. Let me know what you think?

If you want to be present during interviews with any of the above, let me know? Many I will be meeting with in the Mesa Court house.

Thanks,

Scott

**From:** Daniel Patterson - PDX

011784

PCR000578

**Subj:**    **RE: Some ideas from Thurs and Friday's seminar**
**Date:**   12/6/2004 8:11:29 AM US Mountain Standard Time
**From:**   macleods@mail.maricopa.gov
**To:**      gddelozier@aol.com

---

**From:** Scott MacLeod - PDX
**Sent:** Monday, December 06, 2004 7:45 AM
**To:** Daniel Patterson - PDX
**Cc:** Patty Lopez - PDX
**Subject:** Some ideas from Thurs and Friday's seminar

-   Why shouldn't the jury be afraid of Wendi any more?

-   Execution Impact: How would the LOSS (and use the word loss, and phrase such as loss of life, or the tragedy of Wendi's possible execution) of life impact Wendi's family? Wendi's friends? If you want, I can provide statistics on how clients on death row have family members who suffer from newly formed mental health conditions, physiological conditions (high blood pressure and heart disease) and emotional estrangement.

-   Why punish the family too?

-   Noted repeatedly throughout the seminar: Experts, doctors, etc do not have the impact that us professionals may often believe they do. Try to illicit emotional, or common sense testimony from experts at this stage.

-   Clergy members. Do we have any clergy who could appear for Wendi? I will check around. Was she seeing any clergy in the jail? Short deadline here, but I will give it my best.

-   Wendi MUST show some sort of remorse. I know we have discussed this lately, but its crucial. At both the seminar, and the research I have reviewed for years suggest that the #1 mitigating factor (short of she didn't do it) is some form of allocution.

-   Explain Wendi's unique situation to the jury. We put on a viable defense for Wendi, so now do not expect Wendi to stand up here and confess to the crime. In addition, explain that what she does allocate to is consistent with our defense. Wendi is NOT damned if she does, damned if she doesn't. Her allocution makes sense.

-   Finally, one very compelling idea:

o   Make a list of aggravators on some sort of visual media (a poster board, etc) and to the left of that, a list of mitigating factors. We can always make up many more mitigating factors than aggravating factors. The visual cue here for the jury is clear -- which ever side has more mitigating factors must be the side who "wins".

It might look something like this:

| **Mitigating Factors** | **Aggravation Factors** |
| --- | --- |
| Wendi's lack of prior history | blah, blah, blah |

Monday, December 06, 2004 America Online: GDDeLozier

PCRDIS-D000101