# TABLE OF CONTENTS (INTERACTIVE)

| LLLLLLLLLLL PART 10 | Petitioner's Appendix to Petition for Review |
|---|---|

# EXHIBIT LLLLLLLLLL
# PART 10

Thanks,

Scott

Monday, December 06, 2004 America Online: GDDeLozier

PCRDIS-D000102

# Wendi Andriano

## When Value and Worth are Important:

### The Life We Must Save

DEL001770

PCR000580





Wendi Andriano

DEL001771

PCR000581

# Wendi Andriano:
## The Developmental Years



- Family Oriented
- Giving
- Fun-loving
- Spiritual
- Talented
- Sheltered

DEL001772

PCR000582

The death penalty is the ultimate statement about the worthlessness of a human life.  When a Juror votes for the death penalty, he/she has concluded that this person's life did not have value, sense or purpose.

DEL001773

PCR000583

How do we understand who Wendi is?  How do we understand her actions?  Why is it important to walk through her life?

DEL001774

PCR000584

# The Law

"The trier of fact shall consider as **mitigating** circumstances any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's **character, propensities or record** and any circumstances of the offense...."

DEL001775

PCR000585

# Family:



Wendi was born in Texas in 1969. Here she is 6 weeks old. At 10 weeks old, they moved to Phoenix.

Wendi celebrated her first Easter in Phoenix at her grandmother's home.



Wendi at age 2.

At age 3, Wendi was learning French at Montessori Daycare School.

DEL001776

PCR000586





Grandpa Henry (Hank) Worsham. Wendi was his first grandchild. He was her favorite because he always had a piece of bubblegum in his pocket for her.

Wendi's school picture. Evergreen Elementary public school. After Evergreen, Wendi traveled with her family and was home schooled until entering private school.

Four Generations: Greatgrandma Ina, Grandma Ann, Mother Ann, and Baby Wendi.



Grandma Ann (Tilly) Worsham. Wendi called her "mom" when she was young. Wendi used to eat burnt toast and coffee-flavored milk with her. Wendi cried at her own wedding because her grandmother wasn't there.

DEL001777

PCR000587

# The Spiritual Beginnings:




- From 1977 to 1979, Wendi and her parents traveled with the "Fisher's of Men". Wendi was home schooled during this time.

- Wendi began school at 91rst Psalm in 1980.  This school follows the Accelerated Christian Education programming. (ACE)

DEL001778

PCR000588





Wendi's school picture at 91rst Psalm. She didn't want to smile because she wanted braces for her teeth.

Wendi, Donna and Alejo have been living in Casa Grande. Here Wendi is living in the retired Fire Chief's house. The Chief's wife made Wendi Raggedy Ann and Andy dolls.

Wendi at her grandparent's home during Christmas. Nana made the red dress for Wendi. Grandpa always gave Wendi and Donna a box of chocolate-covered cherries. When he died in 1992, Wendi and Donna gave each other a box of chocolate-covered cherries. Grandpa taught Wendi how to fish.



DEL001779

# The Birth of Generosity and Talent





(top left)The birth of the annual "Clean and Beautiful" program. School children would help the adults pick up trash along the city roads. Wendi's best friend, Laura Bell is seen also cleaning.

(left) School trip to Sea World. In order to go on the trip each child had to earn their own money. Wendi babysat, cleaned windows, performed lawn work, picked weeds, and helped with car washes. Additionally, to be eligible, Wendi had to qualify scholastically by having above a 3.8 GPA, have memorized selected verses, and finally have perfect school attendance.

(above) Wendi and Chris Vasques dressed as historical characters and won first place at the school Carnival.

DEL001780

PCR000590

Everything coming together:



DEL001781

PCR000591

As Wendi became older, her beautiful spirit touched the lives of everyone around her. Here she is sitting with two children during one of her many, many trips to Mexico. The church would often take bags of food, clothing and toys to underprivileged families. The children always flocked to Wendi. They loved her as much as she loved them.



Wendi loved her relatives. Here she is at church with her Nana, cousin Barbara, aunt Delia and Baby Alejo.



DEL001782

PCR000592



As Wendi developed her talents and academics, she entered numerous competitions. At the ACE State Competition, her school won most of the divisional awards.

Wendi's family always took time away for their annual White Mountains camping trip. Her grandfather taught her how to fish. During this trip Wendi caught the biggest fish and proudly posed for the camera.



Harvest Christian Academy U.S. Swim Team. By this time, 91rst Psalm had already changed it's name to Harvest Christian Academy. (HCA) Swimming was Wendi's favorite sport. She worked very hard to be her best. Lifting weights 3 times a week and practicing twice a day, 5 days a week. Casa Grande H.S. shared their pool facilities with HCA swim team. Her coach had been a runner-up in Olympic trials. He trained Wendi. HCA was a member of the U.S. Swim Organization. They had swim meets at Phoenix Day School, Univ. of Arizona, and numerous community colleges.  Wendi was the first female to earn a Varsity Letter in sports in her school.  She utilized her swimming skills by life-guarding at Central Arizona College during the summers.

DEL001783

PCR000593




Wendi at ACE National Convention. In the center is Mrs. Keating. Because Wendi rarely was exposed to places outside Casa Grande, she styled her wardrobe after Mrs. Keating since she was from North Carolina.



Harvest Christian Academy Class Picture. They are wearing their class uniforms.



Wendi with two classmates singing at the annual Christmas program. Normally Wendi would be playing the piano. She especially enjoyed playing soft contemporary Christian music.



Every Wednesday Wendi would lead Chapel Worship by singing songs.

DEL001784

PCR000594

# State Convention Awards:



Wendi receiving her first place ribbon.



Wendi won first place in formal wear. She learned how to sew and made her own dress. ACE State Competitions, Flagstaff, AZ.

DEL001785

PCR000595





High School Choir competing at the ACE State Competitions in Flagstaff, AZ.

Wendi performing in the Solo competition. She also sang Trio and Duet. She also competed in the Short Story and Poetry Recitation categories.



The Harvest High School Volleyball team receiving an award at the State Competition. Wendi played on the team only because they needed her, but she was not very good. Her sport of choice will always be swimming.





DEL001786

PCR000596

If all those other talents weren't enough, Wendi was also an accomplished pianist. Here she is playing a Command Performance after receiving First Place at the Awards Banquet in the State Competitions in Flagstaff.



DEL001787

PCR000597

# 1987-1990



Wendi sitting with Janelle Yang during the End of the Year School Awards. Wendi often babysat Janelle. Janelle's parents owned their own Dentist practice in Casa Grande.



While she was never a good runner, (actually despised running) she always helped the younger children during the Annual Harvest Track Classic. Here she is with little Robin Settle. She often was a "hugger" or "timer" for the little competitors. One of her responsibilities was to place a "Pin of Participation" on every runner. Later Wendi conducted the awards ceremonies.



Wendi and the Pastor's wife, Pat King, singing a duet for a "Talent Show" during Family Night at Harvest Church.

DEL001788

PCR000598



Wendi was 16 years old when she began attending Central Arizona College part time while still in High School.. Here she is performing with the Choir at the Annual Christmas Program. She was also in the Jazz Choir, a more elite group. Wendi performed in the 1987, '88, '89, and '91 programs. Wendi earned music scholarships and engaged in work study programs in order to earn trips with the College to performances at places like Six Flags and Disneyland. Wendi took individual voice lessons for two years.

Wendi won the most prestigious award for her High School - The School Spirit Award. This award is given to the one person throughout the school who demonstrated the best attitude, participation, contribution, guidance and support to the school.

Wendi does not remember receiving this award.



Wendi at Rutgers University with her classmate Anna Talbot and a friend she met in Pennsylvania, David Dick. They became good friends for years before Wendi met Joe.



DEL001789

PCR000599





Even amongst all her accomplishments and all the work she put into her talents, Wendi never lost sight of how important it was to stay close to her family. (Left) Wendi's parents were unable to afford a nice night out on their wedding anniversary, so Wendi surprised them by making a wonderful candlelight dinner at home that evening.

(Right) Wendi's aunt left Brandon in an apartment. Wendi remembers seeing Brandon sitting and watching a TV that had been turned off. Wendi had warned her parents that Brandon needed assistance. The neighbors eventually called the authorities and Brandon ended up in CPS' care. Wendi's parents adopted Brandon. Brandon became Wendi's "little buddy". He followed her everywhere. Shortly after receiving Brandon from CPS, the family took him up to Big Bear Lake and Wendi taught him how to fish, just like her grandfather had taught her how to fish.

DEL001790

PCR000600



Wendi and her best friend, Laura Bell.



DEL001791

PCR000601

# Graduation: Time to Transition into the Real World

Wendi spoke at her graduation and thanked her parents for placing her in a Christian school.



Wendi pushed Tony Kasa up the aisle during his graduation from Kindergarten. Tony was one of the children she babysat. His father is an orthopedic surgeon. His mother helped teach Wendi how to sew.



DEL001792

PCR000602

# Wendi Ochoa: The Senior

"A merry heart doeth good like a medicine: but a broken spirit drieth the bones." Proverbs 17:22





- School Spirit Award, '87
- Harvest Annual, '89, Editor, '89, Newspaper staff, '87-'89
- Bible Memorization, '81-'89
- Swim Team, '85-'88, (first female to receive Varsity Letter, '87)
- School Musicals: "Love of Another Kind", '85, "Make It Right", '88
- ACE Convention (State): Vocal Solo ('89, '88 - 1rst); Vocal Duet ('87-1rst/Command Performance); Vocal Trio('86-1rst); Piano('86-3rd, '87-1rst); Ensemble ('89); Poetry Recitation ('86-2nd, '88-1rst/Command Performance); Sewing Formal Wear ('89); Volleyball ('89)
- ACE Internationals '86- '89
- Golden Apple Award - 1989

DEL001793

PCR000603

# Wendi Andriano:
# The Adult Years



- Career-minded
- Giving
- Spiritual
- Wife
- Mother
- Abused
- Widow In Waiting

DEL001794

PCR000604

P-App. 003892



After High School, before meeting Joe, Wendi continued to contribute to the community. She continued to take trips to Mexico. In December she would go to Mexico for 4 days, paying her own way. It was always Wendi's goal to buy 200 to 300 toys out of her own money. She had a lot of compassion for the children. She remembers how their eyes would light up over one little doll or toy truck. It was beautiful to her. (above left)

Wendi also helped judge photography at the Flagstaff State Competitions. (above)

Wendi continued to assist in the Harvest Track Classic. (left)

Lastly, Wendi helped in the classroom by assisting younger children when the asked for help with their homework.





DEL001795

PCR000605

Wendi continued to make her family and church an important part of her life after graduating. At age 20, she still attended church on Family Night. She and her mother and father, along with young 5-year-old Brandon, sing a song for the the Church.



Wendi came to Phoenix to immerse herself in the Berlitz School of Language to learn Spanish. While attending the school, she lived with her grandfather. He spoiled her by making her breakfast every morning. She used the schooling to assist her later when she went to Mexico to work for a church there.



DEL001796

PCR000606

# Wendi: Looking for a Career

Wendi, looking very different for the first time. She had decided to begin venturing out into the real world to find her career. She changed her hair and clothes to match what she believed would make her more marketable and professional.

Even though she changed her look, she was still the same Wendi. Here she is in Sedona supervising the youth at Church Camp.

DEL001797

PCR000607

# Wendi: Finding her own Family



DEL001798

PCR000608

 

In the mid 1990s, Wendi had married and begun a family of her own. Wendi tried to remain connected to her church. It was difficult since Joe's family did not approve of her church. For years Wendi participated in the Live Nativity Scene in downtown Casa Grande. First, she played a shepherd, then the king, and finally Mary. The Nativity scene would be available for viewing for 4 days. In 1997, Wendi played Mary and Nicholas played Baby Jesus. Even though this was an important event for Wendi, Joe and Joe's parents never visited the scene. Joe disagreed with the event but did not actively disapprove either. He spent his time in the bars while she remained outdoors. Casa Grande is not a big city. Their lack of interest in Wendi's participation demonstrated how much they disliked Wendi's church.

Wendi is at Church with Ashlee. Wendi is wearing the pearl necklace that Joe bought for her as a wedding gift.

DEL001799

PCR000609

Wendi, Donna and Alejo visited her grandmother, they endearingly called Nana, who lived in a nursing home. Here, in 1997, Wendi had taken her grandmother out to eat Thanksgiving dinner and to allow her to see 5-month old Nicholas. Joe did not attend. He was at the lake with his friends during this time. Nana died in September of 2003.



DEL001800

PCR000610

 

Wendi sits along the lake watching the boat races in California. Nicholas is only 4 weeks old. Wendi did not want to go to the boat races but Joe demanded that she did. They were at the races for 4 days. Donna sent Brandon to help look after Wendi. Joe made everyone sleep in the back of his truck for the four days instead of getting a hotel room.

Not more than 3 weeks later, Joe took Wendi to Elephant Butte, New Mexico, to watch another boat race. Wendi wasn't feeling well, but again Joe demanded that she go. Wendi's mother, Donna, went along this time to watch Wendi. She bought a hotel room for Wendi so that she did not have to sleep in the back of Joe's truck again.

DEL001801

PCR000611

After Wendi had Nicholas, and before she was pregnant with Ashlee, Donna paid for them to get their picture taken together. Donna wanted to do something nice for Wendi to make her feel better. Joe and Wendi were struggling. Wendi wasn't working at the time because she was home with her baby. Wendi's parents were paying Joe and Wendi's bills. Even though they didn't have any money, and her parents were paying the bills, Joe continued to attend boat races and spend money at the events. The winter of 1997, Wendi considered leaving Joe.



DEL001802

PCR000612



By now Wendi was employed again. Feeling better about herself. Nevertheless, stress still found it's way into their marriage.

Wendi never spent Christmas in her own house because Joe did not want to deal with the mess. So, they would go to Donna and Alejo's home on Christmas Eve. Then they would go to church in the morning. They would open presents after church. Finally they would go to Joe's parent's home on Christmas evening. .

During the 1999 Christmas, Donna and Alejo bought the presents for the children for Wendi and Joe because they had used whatever money they had to buy presents for Joe's family.

DEL001803

PCR000613



May of 2000, Donna treated Wendi and Barbara, Wendi's cousin, to a Las Vegas trip for Mother's Day because they deserved a break. They both had been working and taking care of children for the past couple years and had earned a relaxing trip away for the weekend. Unfortunately both Barbara's husband and Wendi's husband were very angry and controlling. Joe was unable to cope with watching the children over the weekend even though he had help with the task. Joe called them on the phone repeatedly asking when she was coming home, making the trip a disaster.

Finally, when they arrived back in Phoenix at the airport, Joe picked them up. Wendi thought she was going to die. She was extremely fearful of Joe. When they came out of the airport, Joe had parked on the far side of the road, blocking traffic. The women had to take their luggage across the traffic and he literally threw the luggage in the car, all the time yelling at Wendi in front of everyone. Then he drove like a madman, reaching dangerously high speeds on the highway.

DEL001804

PCR000614

One of the few things Joe and Wendi enjoyed together was taking family portraits every 6 months. After the 1998 surgery, Joe had progressively become depressed. This is the last family picture of all of them together. July 2000. Joe and Wendi wanted this one last picture before Joe began his chemotherapy. He didn't want any pictures after he lost his hair. He was extremely paranoid about losing his hair. This was the biggest reason he hadn't accepted chemotherapy before now.



DEL001805

PCR000615

# The Law

"The trier of fact (each individual Juror) shall consider as mitigating circumstances any factors proffered by the defendant or by the state that are relevant in determining whether to impose a sentence less than death (Life), including any aspect of the defendant's **character, propensities or record and any circumstances of the offense…**"

DEL001806

PCR000616

# Justice system can't cope with backlog of death penalty cases

**Jennifer Ryan | Posted: Tuesday, March 4, 2003 10:23 pm**

A landmark case that put juries instead of judges in charge of sentencing death penalty cases has left the criminal justice system ill-prepared to cope with a backlog of capital cases, legal authorities say.

As Maricopa County Superior Court sets trial dates for the more than 70 cases on hold since the U.S. Supreme Court's decision in the Timothy Ring case, many lawyers, especially criminal defense lawyers, said they are far from ready to put on their cases.

"I don't want to try a case until I know I'm competent to do that," said Daniel Patterson, a public defender assigned to four capital cases involving East Valley defendants. "I am not competent, and I have been telling judges that."

Prosecutors and defense lawyers alike said they will make mistakes, and some already have. Crunched by limited resources, training and time, lawyers said missteps will result in more appeals, more heartache for victims who have to go through another trial and more costs to an underfunded system in which nearly half of capital cases started over on appeal at least once, according to recent research by Arizona State University.

"I don't think people appreciate how dramatically that (Ring) case changed the landscape," said Mark Kennedy, administrator of Maricopa County's Office of Contract Counsel, which handles the overflow of criminal cases. "We were at least limping along, and then, all of a sudden, kaboom! We're talking about a double whammy unlike any I've ever seen before."

MITIGATION MESS

It's been nearly two years since Michael Sehwani was indicted on murder charges in the death of James Panzarella of Scottsdale. But last month, Tonya McMath, one of Sehwani's defense lawyers, told Superior Court Judge Mark Aceto that she couldn't begin trial because she was not assigned a qualified mitigation specialist, a key member of her defense team.

Aceto agreed to give her more time.

"Given the seriousness of the case, and given the complexity of things that are apparently happening . . . I'm inclined to (postpone) this (trial)," Aceto said.

The Sehwani case is one of many death penalty cases that are testing the capabilities of lawyers and the county's resources in a judicial system created by Ring.

P-App. 003905

Lawyers used to have several months between conviction and sentencing to probe a defendant's life for mitigating evidence to argue against the death penalty. Now sentencing must begin immediately after conviction, forcing lawyers to prepare for the verdict and sentencing before all first-degree murder trials.

The requirement is leaving lawyers short on time, and the county short on mitigation specialists. To offset the shortage, which was delaying cases, Superior Court Judge Ron Reinstein helped develop an arrangement to use former probation officers.

"They know the sentencing process backwards and forwards," he said.

But mitigation specialist Mary Durand said the arrangement puts inexperienced, unqualified people in a job that can influence whether a defendant is sentenced to death or given life in prison.

"It is an arduous, difficult, rapport-building, trust-building task to have people tell you the secrets of their lives," she said. If the job is not done right, cases will be overturned, she said.

In a review of Arizona capital cases from 1975 to 1989, ASU researchers found that one in five cases were reversed, remanded or modified because of mitigation issues. From 1990 to 2002, the most common reason was ineffective assistance of counsel.

CASE CRUNCH

When Richard Glassel opened fire during a homeowners association meeting in April 2000 in Peoria, killing two people, he had more than 30 witnesses and little chance of avoiding the conviction he received in December 2002, lawyers said.

But today, prosecutors are worried that the case, which resulted in a death sentence, will come back on appeal because of an inadequate defense, said Paul Ahler, chief deputy for the Maricopa County Attorney's Office.

Glassel's public defender, Dennis Jones, tried to get more time, saying he was unprepared to represent Glassel. But the trial moved forward, with little mitigating evidence presented at sentencing.

As the first case to be completed after the Ring decision, Glassel's case shows what can happen when lawyers have little training and resources and a high volume of cases, defense attorneys said. Since most defendants facing the death penalty cannot afford a private lawyer, the burden falls on county public defenders. They invest an estimated 800 to 1,000 hours for the trial phase of each capital case, according to county records. Some states have established standards limiting the number of capital cases that lawyers can take each year and restricting them from taking other criminal cases. Legal authorities said three capital cases each year is an acceptable caseload, although Washington limits qualified lawyers to one capital case annually.

P-App. 003906

Arizona has no such limitations. Leaders in the county attorney's and public defender's offices said they want to keep the volume down to three capital cases per lawyer, especially as the transition is made to jury sentencing. But ultimately, it's up to the lawyer to say enough is enough, they said.

Jones' caseload includes three death penalty cases, and he may get two more. Patterson, the public defender with East Valley capital cases, said he has pared down his workload from eight capital cases before Ring to four, but he may get a fifth one. Robert Storrs, a criminal defense lawyer who works on contract with the county, said the six capital cases he has are too many, but he'll keep them as along as judges are understanding.

"They sort of backed up on me," Storrs said. "What I really need is time to do these cases."

FUNDS LACKING

Officials from two of the county's public defender's offices said they have hit capacity on capital cases and have turned new cases away. Since the Ring decision, more capital cases are going to the county's Office of Contract Counsel, where Kennedy scrambles to contract with qualified lawyers to take capital cases.

Officials from all three offices said they are training more lawyers for death penalty cases. But each new capital case, which costs as much as $250,000 through the trial phase, will require more money for personnel, expert witnesses and other resources. Public defenders requested more than $8 million a year from the county. Budget officials have recommended $1.2 million, with a $2 million contingency fund for capital cases that may be resentenced because they were on appeal before the Ring decision.

"If we have enough money . . . we have a better chance of (cases) not coming back (on appeal)," said Jim Haas, director of the Maricopa County Office of the Public Defender. "If they come back, the costs are almost incalculable at that point."

P-App. 003907



Skip and Wendi
Eight Weeks Old
October 1970

PCR000543



Wendi Elizabeth Robertson
Phoenix, Arizona 1970

PCR000544



Wendi and Skip
Circa 1972

PCR000545



Wendi Elizabeth Robertson
Circa 1972-1973
Tempe, Arizona

PCR000546



Robertson Family

Donna, Skip and Wendi

Circa 1973

PCR000553



Wendi and Skip
Circa 1973 - 1974

PCR000547

P-App. 003913



Wendi and Grandma Ann
1975

PCR000548

"Fishers of Men"
Traveling Ministry
September 6, 1979



Back Row Left to Right: Richard "Rick" Miller,
Alejo Lorenzana Ochoa (Adoptive Father of Wendi),
Allen "Al" Farmer
Middle Row Left to Right: Rosalie Gallegos,
Donna Elizabeth Ochoa nee Robertson nee
Worsham (Mother of Wendi),
Rebecca Farmer, Unknown Homeless Person
Front Row: Wendi Elizabeth Ochoa nee Robertson,
Unknown Homeless Child



Alejo and Wendi
November 1979

PCR000550



Wendi and Alejo
Christmas 1979

PCR000551



Alejo and Wendi
August 1981

PCR000552

# Robertson Siblings



## Tommy, Myrna and Skip
## Mesa, Arizona 1987

PCR000554

ARIZONA DEPARTMENT OF PUBLIC SAFETY
## DISPOSITION REPORT

| 1. SID NUMBER AZO | 2. NAME | LAST ROBERTSON | FIRST Shelby | MIDDLE Wayne | 3. DOB MMDDYY 3-11-48 | 4. SEX ☒ MALE ☐ FEMALE |
|---|---|---|---|---|---|---|

3. ARRESTING AGENCY ORI NUMBER  M C S O

6. ARREST NUMBER  419369

7. DATE OF ARREST  12-8-92

2. FBI NUMBER

9. HENRY FINGERPRINT CLASSIFICATION

| 10. CHARGES/REDUCED CHARGES (PLEASE WRITE OUT THE LITERAL) IF MORE THAN 5 CHARGES, LIST ON THE REVERSE SIDE. | 11. OFFENSE CODE | 12. ARIZONA REVISED STATUTE | 13. AMEND TO NO | 14. OFFENSE TYPE | 15. CIRCLE ONE | 16. DISPOSITION APPELLATE | 17. FINE (1) | 18. PAUL | 19. CONFINEMENT | 20. PROBATION |
|---|---|---|---|---|---|---|---|---|---|---|
| 4. APT  Mol  child  2° | | 13-3821 | | M F | GG | | | | | SS1/life |
| 5. Mol o Child  1° | | 13-3821 | | M F | GG | | PB | 174 | | |
| 6. Sex Cond w/ miner | | 13-3521 | | M F | CD | | | | | |
| 1. | | | | M F | | | | | | |
| 2. | | | | M F | | | | | | |
| 3. | | | | M F | | | | | | |
| 4. | | | | M F | | | | | | |
|  | | | | M F | | | | | | |

17. FURTHER EXPLANATION OR MODIFICATIONS (IF NECESSARY)

2. SUBMITTED BY

| DISPOSITION AGENCY ORI: | 23. COURT CASE NUMBER | 24. DISPOSITION DATE |
|---|---|---|
| A7007035J | LOWER COURT | |
| AGENCY NAME  CLERK OF THE SUPERIOR COURT | SUPERIOR COURT  CR 92-93356/B | 9-9-93 |
| STREET  SOUTHEAST JUDICIAL DISTRICT  222 EAST JAVELINA DRIVE | APPEALS COURT | |
| CITY, STATE, ZIP CODE  MESA, AZ 85210-6201 | SUPREME COURT | |

### DISPOSITION REPORT

NOTE: The purpose of this report is to secure a disposition of each arrest at the earliest possible time, from whichever agency makes the disposition decision (arresting agency, prosecutor, court). For the disposition information to be included in Arizona criminal history records, it is ESSENTIAL that the Originating agency identifier (ORI) be included and that this disposition report be COMPLETE and ACCURATE.

IMPORTANT: This vital report must be prepared pursuant to ARS 41-1750 and ARS 41-1751 Rule 37.1 of Arizona Rules of Court. A disposition report must be completed on each individual whose arrest fingerprints have been forwarded to CHRS. MAIL THE COMPLETED DISPOSITION REPORT TO: CRIMINAL HISTORY RECORDS SECTION, ARIZONA DEPARTMENT OF PUBLIC SAFETY, P.O. BOX 6638, PHOENIX, ARIZONA 85005-6638.

SPECIFIC COMPLETION INSTRUCTIONS ARE ON THE REVERSE SIDE.

- CONTRIBUTOR OF FINGERPRINTS

DISPOSITION CODES:
AC – acquitted/not guilty
CD – court dismissal
DP – deferred prosecution
DS – deferred sentencing
GG – guilty
GI – guilty but insane
NF – no complaint filed
NP – nolo contendere pleas
NR – not referred for prosecution
PD – pardoned
PM – pending due to mental incompetence
PO – plea to other charges
RI – not responsible by reason of insanity

CONFINEMENT CODES:
CC – concurrent
CS – consecutive
SS – court suspended sentence
PR – prison
JL – jail
PS – public/community service

APPELLATE CODES:
AF – affirmed
AR – affirmed/remanded for re-sentencing
RR – reversed and remanded
RV – reversed and conviction overturned
SM – sentence modified

26. RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY

DPS 802-03757 REV. 12/93

CCP 005543

PCR000557

**ARIZONA DEPARTMENT OF PUBLIC SAFETY**
**DISPOSITION REPORT**

| 1. SID NUMBER AZO | 2. NAME | LAST ROBERTSON | FIRST TOMMY | MIDDLE LEE | 3. DOB MMDDYY 11-02-83 | 4. SEX ☒ MALE ☐ FEMALE |
|---|---|---|---|---|---|---|

5. ARRESTING AGENCY ORI NUMBER  MCSO

6. ARREST NUMBER  46 213

7. DATE OF ARREST  12-08-92

3. FBI NUMBER  631605

9. HENRY FINGERPRINT CLASSIFICATION

10. CHARGES/REDUCED CHARGES — PLEASE WRITE OUT THE LITERAL, IF MORE THAN 5 CHARGES, LIST ON THE REVERSE SIDE.

| | CHARGE | 11. OFFENSE CODE | 12. ARIZONA REVISED STATUTE | SENTENCE |
|---|---|---|---|---|
| 1 | Att Sex Expl Minr 2° | | 13-3821 | GG PR S2+ 55 /15 |
| 2 | Att Sex Exp Minor 2° | | 13-3821 | GG 55 /15 |
| 3 | Att Sex Expl minor 2° | | 3-3821 | CD |
| 4 | | | | |
| 5 | | | | |
| 6 | DISC PR+B 7-13-98 | | | |

21. FURTHER EXPLANATION OR MODIFICATIONS (IF NECESSARY)

22. SUBMITTED BY:

23. COURT CASE NUMBER

DISPOSITION AGENCY ORI:  A7007035J
AGENCY NAME  CLERK OF THE SUPERIOR COURT
SOUTHEAST JUDICIAL DISTRICT
STREET  222 EAST JAVELINA DRIVE
CITY, STATE, ZIP CODE  MESA, AZ 85210-2201

LOWER COURT
SUPERIOR COURT  CR 92-93356(A)    8-13-93
APPEALS COURT
SUPREME COURT

24. DISPOSITION DATE

**DISPOSITION REPORT**

NOTE: The purpose of this report is to secure a disposition of each arrest at the earliest possible time, from whichever agency makes the disposition decision (arresting agency, prosecutor, court). For the disposition information to be included in Arizona criminal history records, it is ESSENTIAL that the Originating agency Identifier (ORI) be included and that this disposition report be COMPLETE and ACCURATE.

IMPORTANT: This vital report must be prepared pursuant to ARS 41-1750 and ARS 41-1751. Rule 37.1 of Arizona Rules of Court. A disposition report must be completed on each individual whose arrest fingerprints have been forwarded to CHRS. MAIL THE COMPLETED DISPOSITION REPORT TO: CRIMINAL HISTORY RECORDS SECTION, ARIZONA DEPARTMENT OF PUBLIC SAFETY, P.O. BOX 6638, PHOENIX, ARIZONA 85005-6638.

SPECIFIC COMPLETION INSTRUCTIONS ARE ON THE REVERSE SIDE.

1. CONTRIBUTOR OF FINGERPRINTS

DISPOSITION CODES:
AC - acquitted/not guilty
CD - court dismissal
DP - deferred prosecution
DS - deferred sentencing
GG - guilty
GI - guilty but insane
NF - no complaint filed
NP - nolo contendere pleas
NR - not referred for prosecution
PD - pardoned
PM - pending due to mental incompetence
PO - plea to other charges
NI - not responsible by reason of insanity

CONFINEMENT CODES:
CC - concurrent
CS - consecutive
SS - court suspended sentence
PR - prison
JL - jail
PS - public/community service

APPELLATE CODES:
AF - affirmed
AR - affirmed/remanded for re-sentencing
RR - reversed and remanded
RV - reversed and conviction overturned
SM - sentence modified

26. RIGHT FOUR FINGERS TAKEN SIMULTANEOUSLY

DPS 802-03757 REV. 12/93

CCP 005544

PCR000558



Donna Ochoa, Alejo Ochoa, and Wendi Ochoa
1978

PCR000559



Alejo and Wendi
Circa Late 1970s

PCR000560

P-App. 003923



WENDI OCHOA

1980 Class Photo

PCR000569



WENDI OCHOA

1980 - 1981 Class Photo

PCR000574



Alejo, Wendi and Donna
91st Psalm Awards Ceremony
May 1981

PCR000561



Wendi and Alejo
Circa 1986

PCR000563



Wendi, Alejo, and Laura Bell
Circa Late 1980s



KYRE LORTS

# 1979 - 1980 Class Photo



JOHNNY'S FAVORITE PASTIME.

John Casey
91st Psalm Christian School Principal
Posing with Paddle
1980

PCR000571



JASPER NEACE

# 1980 - 1981 Class Photo

PCR000573



Brandon Ochoa: "I want to be a zoo
keeper when I get older so I can be
around all the interesting animals."

# 1991 Yearbook Photo

PCR000575





Brandon Ochoa

# 1993 Yearbook Photos

PCR000576

P-App. 003933

# HEARING EXHIBIT 165

# PLACEHOLDER FOR AUDIO RECORDING

# SERMON OF PASTOR T. KING, HARVEST FAMILY CHURCH, 11/16/1988

## JOETTE DEANNA JAMES, Ph.D., ABPP-CN
**Board-Certified Clinical Neuropsychologist**

**PERSONAL INFORMATION:**

**Address: 639 Keefer Place NW, Washington, DC 20010**
**Phone: 202-525-4899 (Home), 240-424-0073 (Cell)**
**Website: drjoettejames.com**
**E-mail: joettedj@aol.com**
**Psychology Licensure: Maryland License #04216**
                              **District of Columbia License #PSY1000373**
                              **Virginia License #0810004834**

---

**EDUCATION:**

**2003:**

Received Doctor of Philosophy (Ph.D.) in Clinical Psychology from Northwestern University Medical School, Department of Psychiatry and Behavioral Sciences, Division of Psychology, Chicago, Illinois

Dissertation Title: Functional Health Status and Psychological Adjustment in Low Birth Weight Jamaican Preadolescents

Advisor: John Lavigne, Ph.D.

**1995:**

Received Bachelor of Arts (B.A.) in Honors Psychology with Distinction from Huron College, University of Western Ontario, London, Ontario, Canada

**PROFESSIONAL EXPERIENCE:**

**November 2012- present: Training Director, Weinfeld Education Group**

Promoting training at local, state, and national level to address issues related to children with special needs, parents, educators, and administrators. Topics include the nature of assessments, special education advocacy, behavior management, and transition planning. Responsible for planning and coordinating the annual "Diamonds in the Rough" special needs conference.

1

**August 2010-present:**

**Assistant Professor, Depts. Of Pediatrics and Psychiatry & Behavioral Sciences, The George Washington University Medical Center; Pediatric Neuropsychologist, HSC Pediatric Center/Children's National Medical Center (Washington, DC)**

Faculty position at HSC Pediatric Center. Director of pediatric neuropsychological services. Duties include the provision of inpatient and outpatient pediatric neuropsychological evaluations to pre-school, school-age children and young adults. Clinical psychologist for the Transitional Infants & Toddlers Unit. Additional duties include didactics and supervision of pre-doctoral trainees.

**September 2006-August 2010:**

**Assistant Professor, Depts. Of Pediatrics and Psychiatry & Behavioral Sciences, The George Washington University Medical Center; Pediatric Neuropsychologist, Children's National Medical Center (Washington, DC)**

Faculty position within the Pediatric Neuropsychology Program at Children's National Medical Center. Duties involve the provision of pediatric neuropsychological services to several clinical programs, including the Center for Autism Spectrum Disorders and the Inpatient Rehabilitation Unit of the Health Services for Children (HSC) Pediatric Center, as well as participation in ongoing research projects within the Center for Autism Spectrum Disorders (CASD). Additional duties include Extern Coordinator and the supervision of pre-doctoral and postdoctoral trainees.

## SUPERVISED CLINICAL EXPERIENCE:

**September 2004-August 2006:**

**Postdoctoral Fellow in Pediatric Neuropsychology (Children's National Medical Center, Washington, DC)**

Conducting neuropsychological evaluations with school-age children and adolescents with wide range of developmental and acquired neurological difficulties, rotations in epilepsy, traumatic brain injury (National Rehabilitation Hospital), hematology/oncology, Executive Function clinic, member of Autism Team, conducted diagnostic evaluations using the Autism Diagnostic Observation Schedule (50 hours/week)

Supervised by Gerard Gioia, Ph.D., Lauren Kenworthy, Ph.D., Jennifer Janusz, Psy.D., ABPP-Cn; Licensed Pediatric Neuropsychologists

**January 2004-August 2004:**

**Postdoctoral Fellow in Pediatric Neuropsychology (Children's Evaluation Center, Newton, MA)**

Conducted neurodevelopmental and neuropsychological assessments with children from birth to adolescence with wide range of developmental and learning issues (focus on autism spectrum disorders) in private practice setting (40 hours/week)

Supervised by Rafael Castro, Ph.D., Licensed Pediatric Neuropsychologist

**September 2002-July 2003:**

**Advanced Fellow in Pediatric Psychology (Children's Hospital, Boston, Developmental Medicine Center)**

Primary treatment provider for children with emotional, behavioral and academic difficulties in the outpatient primary health care clinic (PHA) of Children's Hospital; Member of multidisciplinary team conducting developmental assessments with children from birth to 3 years; Member of multidisciplinary team conducting psychiatric diagnostic interviews with children from 8 to 11 years. Conducted psychoeducational assessments of school-aged children with learning difficulties. (35 hours/week)

Supervised By Elaine LeClair, Ph.D., Jayne Singer, Ph.D., Licensed Clinical Psychologists

**September 2001 – August 2002:**

**Advanced Fellow in Pediatric Psychology (Children's Hospital, Boston, Developmental Medicine Center)**
**LEND fellow (Leadership Education in Neurodevelopmental Disabilities-Maternal and Child Health Bureau)**

Member of multidisciplinary team conducting developmental assessments and treatment with children from birth to 6 years with range of emotional, behavioral and developmental challenges (including Autism Spectrum Disorders); Participated in several infant and preschool diagnostic clinics; Participated in social skills training group for preschool children with Autism Spectrum Disorders, co-led parent group (children with newly diagnosed ASD) and co-led toilet training group for preschool children; (60 hours/week)

Supervised by Lauren Murphy, Ph.D., Jayne Singer, Ph.D., Elaine LeClair, Ph.D., Licensed Clinical Psychologists

P-App. 003937

**September 2000 - August 2001:**

**Predoctoral Intern, Harvard Medical School (Children's Hospital, Boston)
(**Department of Psychiatry)

Completed 6-month rotation (September 2000-February 2001) in neuropsychological assessment, inpatient medical consultation-liaison, emergency room consultation; 6-month rotation (March 2001-August 2001) in neurodevelopmental assessment, inpatient psychiatry; Full-year rotation in the Behavioral Medicine Clinic (included training in biofeedback); (50-55 hours/week)

Supervised by Celiane Rey-Casserly, Ph.D., Betsy Kammerer, Ph.D., Anthony Rao, Ph.D., Elaine LeClair, Ph.D., Jayne Singer, Ph.D., Peter Hunt, Ph.D., Elizabeth Wharff, Ed.D,  David DeMaso, M.D., Pamela Beasley, M.D., Licensed Clinical Psychologists and Board Certified Child and Adolescent Psychiatrists


**January 1998 – May 2000:**

**School Counselor, United Stand (Chicago, IL)**

Conducted individual, group, and family counseling, teacher consultation, student staffing and psychoeducational assessment with children and adolescents in the Catholic elementary school system (St. Adrian's Elementary, Nativity of the Blessed Virgin Mary, St. Benedict's the African); Participated in in-services for teaching staff. Presenting problems included poor school adjustment, academic difficulties, aggressive behavior, abuse and neglect; Led anger management, social skills and primary prevention groups (8 hours/week); Conducted short and long-term counseling with children, adolescents and families at the United Stand Counseling Center (3 hours/week)

Supervised by Sister Kim Mis, Ph.D., Licensed Clinical Psychologist


**July 1998 - June 1999:**

**Psychology Extern, Cook County Hospital, Provident Hospital (Chicago, IL)**
(Clinical practica sites in the Department of Child Psychiatry)

 Duties included individual, group, family therapy and case management with children and adolescents aged 3 to 17 years. Presenting problems included aggressive behavior, poor academic performance, attention problems, parenting difficulties and effects of abuse and neglect. Attended interdisciplinary school staffings. Member of Child Protective Services team, participated in weekly meetings discussing case dispositions and consulted on inpatient medical floors regarding child maltreatment issues (20 hours/week)

Supervised by Paul Driscoll, Ph.D., Licensed Clinical Psychologist, Gabrielle Woloshin, M.D., Board Certified Child and Adolescent Psychiatrist

4

**July 1997 - June 1998:**

**Psychology Extern, Children's Memorial Hospital (Chicago, IL)**
(Clinical practicum site at the Pediatric Neuropsychology Clinic)

Conducted comprehensive neuropsychological evaluations of preschool, school-aged children with a wide range of psychiatric and neurological diagnoses, interpreted results and prepared reports, communicated findings to parents/caregivers, interacted on child's behalf with caseworkers, teachers, other professionals. Attended weekly assessment seminar (20 hours/week)

Supervised by Frank Zelko, Ph.D., Licensed Clinical Neuropsychologist


**July 1996 - June 1997:**

**Psychology Extern, Lakeside Veterans Administration Hospital (Chicago, IL)**
(Clinical practicum site)

Completed 6-month rotations in Outpatient Substance Abuse and Outpatient Mental Health respectively. Performed individual therapy, group therapy and assessment (neuropsychological, intellectual, and personality) with adults. Conducted weekly intakes during outpatient mental health rotation.  Attended weekly interdisciplinary meetings during substance abuse rotation. Presenting problems included dementia, substance abuse disorders, PTSD and anxiety disorders, mood disorders and disorders of personality (20 hours/week)

Supervised by Eve Gordon, Ph.D. and Luke Shanley, Ph.D., Licensed Clinical Psychologists


**ADDITIONAL CLINICAL EXPERIENCE:**

**November 2011:**

SAMHSA Fetal Alcohol Spectrum Disorders Center for Excellence. FASD—The Course. Center for Substance Abuse Prevention, Substance Abuse and Mental Health Services Administration. 2007. http://fasdcenter.samhsa.gov/educationTraining/courses/FASDTheCourse/index.cfm.  (7 hours)

**December 2010:**

Completed 52 hours (equivalent to 104 hours for board certification purposes) of training in forensic psychology through the American Academy of Forensic Psychology

**December 2005:**

Completed clinical and research reliability training for Autism Diagnostic Interview- Revised (ADI-R); Washington, DC

P-App. 003939

**February 2005:**

Completed clinical and research reliability training for Autism Diagnostic Observation Schedule (ADOS-Modules 1 through 4); Washington, DC

**April 2003:**

Certified in Touchpoints Method by T. Berry Brazelton, M.D. (Individual Level Training), Boston, MA

**July 1999 – March 2000:**

**Crisis Worker, Northwestern Memorial Hospital Emergency Room (Chicago, IL)**

Evaluated psychotic, suicidal and homicidal crises in patients of various ages, determining need for inpatient psychiatric hospitalizations, consulted on ER medical cases, facilitated patient transfers to private & state facilities, conducted chemical dependence assessments, answered crisis telephone calls, referred for community treatment
(20 hours/week)

**1997:**

**Volunteer, Project Hope, Columbus Hospital (Chicago, IL)**

Summer child care worker in a substance abuse recovery program for women; facilitated developmentally appropriate play activities with infants, toddlers and preschoolers (4 hours/week)

**September 1996 - May 1997:**

**Tutor, Cabrini-Green Housing Project Tutoring Program (Chicago, IL)**

Tutored a second grade male student in basic reading and mathematics (2 hours/week)

**September 1994 - April 1995:**

**Volunteer, Children's Psychiatric Research Institute (London, Ontario, Canada)**

Volunteered in the behavior modification clinic of the residential school with 7 to 13-year-old children presenting with physical, intellectual and behavioral handicaps (4 hours/week)

6

**University of Western Ontario (London, Ontario)**

Tutored an 11-year-old boy with a nonverbal learning disability (1 hour/week)
Conducted behavior therapy (systematic desensitization) with a phobic student client (1 hour/week)

**September 1993 - April 1994:**

**Children's Psychiatric Research Institute (London, Ontario)**

Instructed (math, reading and social skills) 13 to 15-year-old boys with behavioral, social and emotional problems in a residential school (4 hours/week)

**TEACHING EXPERIENCE:**

**February 1999 – May 1999:**

**Lecturer, University College, Northwestern University (Evanston, IL)**

Taught freshman/sophomore level course in introduction to social psychology. Responsible for all aspects of teaching including syllabus construction, preparing and delivering lectures, leading discussions, selection of assignments, constructing examinations and assigning grades. Attended five 2-hour teacher-training workshops. Class length: 2½ hours/week

**September 1997 – December 1997:**

**Teaching Assistant, Northwestern University Medical School (Chicago, IL)**

Co-led laboratory portion of introductory statistics course for first-year graduate students. Duties included selecting and presenting assignments, answering questions and working through exercises with students, teaching students to use a computerized statistical program (SPSS for Windows). Class length: 2 hours/week

**September 1993 – April 1994:**

**University of Western Ontario Volunteer-In-Progress Program (London, Ontario)**

Taught the Procrastination Workshop and participated in group and individual counseling with undergraduate students (3 hours/week)

P-App. 003941

## RESEARCH EXPERIENCE:

**January 1999 – April 1999:**

**Evaluator, Child Study Center, National Association for Perinatal Addiction Research and Education (Chicago, IL)**

Conducted neurodevelopmental assessments with infants and preschool children as part of a research study comparing types of treatment management with children removed from their homes due to parental substance abuse; position also involved conducting play observations, giving oral performance feedback to foster parents and writing reports (8 hours/week)

Supervised by Amy Anson, Ph.D., Licensed Clinical Psychologist

**December 1996 - June 1998:**

**Evaluator, Child Study Center, National Association for Perinatal Addiction Research and Education (Chicago, IL)**

Conducted neuropsychological assessments with children 7-11 years of age as part of a research study examining the effects of prenatal drug exposure on child development and learning, position also involved scoring and coding research data, conducting performance feedback sessions with parents and writing reports (15 hours/week)

Supervised by Amy Anson, Ph.D., Licensed Clinical Psychologist

**December 1996 - January 1998:**

**Research Assistant, Northwestern University Medical School, Department of Psychiatry and Behavioral Sciences (Chicago, IL)**

Assisted with all aspects of clinical drug trials, including recruitment, written and verbal communication with the Institutional Review Board and study sponsor, preparation of case report forms for monitoring, contact with patients and caregivers and neuropsychological evaluation of patients with dementia (10 hours/week)

Supervised by Sanford Finkel, M.D., Director of Geriatric Psychiatry

8

**January 1996 - July 1997:**

**Interviewer, ADHD Project, University of Chicago, Adolescent and Child Psychiatry**

Performed intellectual, behavioral and educational assessments of preschool and young school-aged children and semi-structured diagnostic interviews and computerized assessments with parents as part of a research study examining the validity of subtypes of Attention Deficit Hyperactivity Disorder (8 hours/week)

Supervised by Ben Lahey, Ph.D., Licensed Clinical Psychologist

**1995:**

**Summer Research Assistant, Centre for Studies of Children at Risk (Hamilton, Ontario)**

Studied developmental pathways in conduct disorder using data from the Ontario Child Health Study and Follow-Up, conducted literature review on the therapeutic effects of camping on children and adolescents (40 hours/week)

Supervised by Dan Offord, M.D., Child and Adolescent Psychiatrist, Director

**PRESENTATIONS AND PUBLICATIONS (selected):**

James, J.D. "The Many Uses of Neuropsychology." Presentation at the Multi-track Federal Criminal Defense Seminar, Buffalo, New York (August 2013).

James, J.D. "The Many Uses of Neuropsychology." Presentation to the 33rd International Congress on Law and Mental Health, Amsterdam, the Netherlands (July 2013).

James, J.D. "Autism: Most of Us are Still in the Blind." Presentation to the National Alliance of Sentencing Advocates and Mitigating Specialists (NASAMS), at Annual Conference, Baltimore, MD (March 2013).

James, J.D. "Siblings of Children with Special Needs." Presentation to parent group, Advocates for Justice and Education, Inc., Washington, DC (February 2013).

James, J.D. "Educating Children with ADHD: Reconceptualization of ADHD as a Disorder of Executive Functioning." Presentation to the District of Columbia Public Schools, Washington, DC (December 2011).

James, J.D. "Neuropsychology 101: What Every Defense Attorney Should Know." Presentation to the Maryland CJA Attorney Conference, Greenbelt, Maryland (November 2011).

**James, J.D.** "Neuropsychology 101: What Every Defense Attorney Should Know." Presentation to the Federal Defenders District of Alabama, Mobile Alabama (October 2011).

**James, J.D.** "Autism and Behavior Management." Presentation to the Parents Advocacy Leaders Group (PALS), Washington, DC (August 2011).

**James, J.D.** "The Many Uses of Neuropsychology." Presentation to the National Seminar for Federal Defenders, Baltimore, MD (June 2011).

**James, J.D.** "Executive Deficits in Autism Spectrum Disorders." Presentation to the staff at St. Olavs Hospital, Trondheim, Norway (February 2011).

**James, J.D.** "Executive Deficits in Autism Spectrum Disorders." Presentation to the District of Columbia Public Schools, Washington, DC (January 2011).

**James, J.D.** "Intellectual Disabilities: What Every Defense Attorney Should Know" Presentation to the Public Defender Service of the District of Columbia, Washington, DC (June 2010).

Yerys, B.E., Wallace, G.L., Sokoloff, J.L., Shook, D.A., **James, J.D.,** & Kenworthy, L. (2009).  Attention deficit/hyperactivity disorder moderates cognition and behavior in children with autism spectrum disorders.  *Autism Research, 10.1002/aur.103*

Yerys, B.E., Lee, P.S. Foss-Feig, J., Della Rosa, A., **James, J.D.,** Gaillard, W.D., Vaidya, C.J., & Kenworthy, L. (2009).  An fMRI study of response inhibition and working memory in high-functioning children with autism spectrum disorders: Connecting the neural basis of executive function to everyday behaviors *In Preparation*

Anthony, L.G., Kenworthy, L., Yerys, B.E., Jankowski, K.F., Harms, M., **James, J.D.,** & Wallace, G.L. (2009).  Intense interests in high functioning children with autism spectrum disorders. *In Preparation*

**James, J.D.** "ADHD and High Functioning Autism." Presentation to the District of Columbia Chapter of Children and Adults with Attention Deficit Disorder, Washington, DC (January 2008).

Janusz, Jennifer, A., **James, Joette D.,** & Halbower, Ann C. (2008).  Sleep-Disordered Breathing.  In Castillo, C. (ed.) *Children with Complex Medical Issues in Schools: Neuropsychological Descriptions and Interventions.*  New York, NY: Springer Publishing Company, 379-406.

Lee, P.S., Yerys, B.E., Della Rosa, A., Foss-Feig, J., Barnes, K.A., **James, J.D.,** VanMeter, J.W., Gaillard, W.D., Vaidya, C.J., & Kenworthy, L. (2008).  Functional connectivity of the inferior frontal cortex changes with age in children with autism spectrum disorders: Evidence from an fcMRI study of response inhibition.  *Cerebral Cortex, 19,* 1787-1794. doi: 10.1093/cercor/bhn209

Wallace, G.L., Yerys, B.E., Celano, M.J., **James, J.D.,** Sokoloff, J., Kenworthy, L.E., & Giedd, J.S. (2008) Social Attribution to 'Triangles Playing Tricks' Is Diminished And Does Not Improve With Age Among Children with High Functioning Autism Spectrum Disorders.  *Annual Social & Affective Neuroscience Conference, Boston, MA.*

10

Sokoloff, J., Shook, D.A., Yerys, B.E., Wallace, G.L., **James, J.D.,** Kenealy, L., Vaidya, C., & Kenworthy, L.E. (2008). Executive functioning in children with autism spectrum disorders and elevated symptoms of ADHD. *Poster presented at the International Meeting for Autism Research in London, England, UK*

Anthony, L.G., Wallace, G.L., Yerys, B.E., **James, J.D.,** McCracken, S., Della Rosa, A., Harrison, B., & Kenworthy, L.E. (2008).  Repetitive behaviors and intense interests in high functioning children with autism spectrum disorders.  *Poster presented at the International Meeting for Autism Research in London, England, UK*

Wallace, G.L., Yerys, B.E., Celano, M.J., **James, J.D.,** Sokoloff, J., Kenworthy, L.E., & Giedd, J.S. (2008) Children with high functioning autism spectrum disorders demonstrate diminished social attributions to ambiguous visual displays.  *Poster presented at the International Meeting for Autism Research in London, England, UK*

Yerys, B.E., Wallace, G. **James, J.D.,** McCracken, S., Giedd, J.N., & Kenworthy, L.E. (2007). Developmental trajectory of set-shifting in children with autism spectrum disorders. *Poster presented at the annual meeting of the Association for Psychological Science, Washington, DC.*

**James, J.D.** "Classroom Behavior Management and Autism Spectrum Disorders." Presentation to Paul VI High School, Fairfax, VA (November 2006).

Schropp, A., **James, J.D.,** Gilotty, L., Della Rosa, A., Lee, P., & Kenworthy, L. (2006).  An examination of the relationship between attentional load and social functioning in children and adolescents with autism. Poster presented at the International Meeting for Autism Research. Montreal, Quebec, Canada.

Daniolos, P., & **James, J.D.** "The Diagnosis and Treatment of Autism Spectrum Disorders." Presentation to the Washington, DC. Superior Family Court (April 2006).

**James, J.D.**, Gibbs, M.C., Lee, P., Gilotty, L., Wallace, G., & Kenworthy, L. (2005). Executive Functioning and weak central coherence: Exploring the relationship between theories that purport to underlie cognitive processing in children with autism. Poster presented at the International Meeting for Autism Research. Boston, MA.

Presented paper on the psychological effects of war-related trauma in Liberia for Leadership Education in Neurodevelopmental Disabilties (LEND) program, based on research conducted for the nonprofit organization Universal Human Rights Incorporated (April 2002).

**James, J.D.** (1995). Group status: Cognitive and perceptual determinants. Unpublished bachelor's thesis, University of Western Ontario, London, Ontario, Canada.

**James, J.D.** (1993). Proprioceptive stimuli dependence as affected by habituation. The Huron College Journal of Learning and Motivation, 31, 103-119.

P-App. 003945

**PERSONAL ACCOMPLISHMENTS:**

Awarded the University Scholarship through Northwestern University (1995-1996), (1996-1997), (1997-1998)
Awarded the Colonel Ibbotson Leonard Huron College Entrance Scholarship (1991-1995)
Dean's Honors List at the University of Western Ontario (1991-1995)
200 hours volunteer service, Chedoke-McMaster Hospitals (1988)


**PROFESSIONAL ASSOCIATION MEMBERSHIP:**

Member, American Psychological Association, Division 40 (Clinical Neuropsychology)
Member, American Psychological Association, Division 33 (Intellectual and Developmental Disabilities)
Member, American Psychological Association, Division 41 (Psychology & the Law)
Member, International Neuropsychological Society (INS)
Professional Member, National Academy of Neuropsychology (NAN)
Full Member, American Academy of Clinical Neuropsychology (AACN)
Student Affiliate, International Society for Autism Research (2006)


**BOARD MEMBERSHIP:**
School Board Member, The Ivymount School (June 2011- present)
Board Member, District of Columbia Arts Center (February 2013-present)


**SKILLS/COURSES:**

Fluent in French, both written and spoken
Intermediate fluency in Spanish
Proficient in the use of Windows, WordPerfect, Microsoft Office Suite, SPSS for Windows
Current certification in First Aid/CPR


**REFERENCES:**
Available upon request.

P-App. 003946

**ALINA ASSESSMENT SERVICES, PLLC**

412 1ˢᵗ Street SE, Washington, DC 20003
240-424-0073
joettedj@aol.com
drjoettejames.com

**Confidential-Do Not Release Without Permission**
**REVIEW OF NEUROPSYCHOLOGICAL EVALUATION**

**Name:**                     Wendi Elizabeth Andriano
**Date of Birth:**            08/24/1970
**Dates of Evaluation:**      12/06/2010, 12/07/2010, 2/15/2011, 2/16/2011
**Age at Evaluation:**        40 years
**Reviewed By:**              Joette James, Ph.D., ABPP-CN

**REASON FOR REFERRAL:** Ms. Wendi Andriano is a 43-year-old woman who was charged and convicted of the homicide of her husband. Ms. Andriano completed comprehensive neuropsychological testing with Myla Young, Ph.D., ABN, on the dates noted above. I was asked to review the neuropsychological evaluation, make comments on its validity and the findings of that evaluation, and comment on the relationship between Ms. Andriano's neuropsychological profile and functioning in daily life. I was also asked to review Dr. Amin's brief neuropsychological assessment.

**PERFORMANCE VALIDITY:** Dr. Young utilized seven performance validity measures (PVTs) in her evaluation of Ms. Andriano. Ms. Andriano's performance was above recognized cutoffs on all of the PVTs used, which included the Rey 15 item Test, the Test of Memory Malingering (TOMM), the CVLT-II Forced Choice Recognition, the Green Word Memory Test, the Bolter Index of the Category Test, and the Structured Inventory of Malingered Symptoms. As such, the results of the neuropsychological assessment can be viewed as a valid representation of Ms. Andriano's neurocognitive abilities at the time.

**PROTOCOL INTEGRITY:** It should be noted that I did not examine projective testing (Rorschach) in any detail since this is not related to brain functioning; I was also unable to validate scores on a few subtests and measures (i.e. Halsead-Reitan). The great majority of the tests in the evaluation were scored and administered correctly; I made three scoring corrections to the WAIS-IV protocol. The first corrections I made were to the scoring of the Visual Puzzles and Block Design subtests, which effectively change the Perceptual Reasoning Index from 115 (High Average- 84ᵗʰ percentile) to 104 (Average- 61ˢᵗ percentile), changing the Full Scale IQ from 104 (Average- 61ˢᵗ percentile) to 100 (Average- 50ᵗʰ percentile), though it should be noted that the Full Scale IQ does not capture Ms. Andriano's significant processing speed deficits. The third scoring correction I made was on the Picture Completion subtest- the raw score should be 9 and not 10- however, this does not change the scaled score of 7, which remains in the low average range. I rescored the Comprehension subtest and it is my opinion that her performance

warranted a scaled score of 11 (63rd percentile). The "Inferior" classification of Ms. Andriano's performance on all aspects of the Paced Auditory Serial Addition Test (PASAT) was correct, though the scaled scores and corresponding percentages in her test summary section at the end of the report were not. On the CAARS-S:SV, the DSM-IV Inattentive Symptom Index should be a raw score of 12, not 10, elevating the T-score from 60 (Slightly Above Average) to 67 (Much Above Average-indicating a higher level of attention problems). I corrected a typographical error with respect to the Long Delay-Cued Recall trial on the CVLT-II, the standard score was written as ".05," this should be "0.5," and represents Average performance. Ms. Andriano had zero intrusions on the CVLT-II, the -1.0 standard score is a reverse score, and thus the qualitative description should be "Average." Finally, I have concluded that Ms. Andriano's performance on the Wisconsin Card Sorting Test was average. Dr. Young's assessment met the standards of practice in the field of neuropsychology in terms of its comprehensive nature. The assessment sampled numerous domains of cognitive functioning (i.e. language, general intellectual ability, attention, executive functioning, memory, social/emotional functioning, etc.), and utilized multiple measures within domains to assess Ms. Andriano's performance at varying levels of difficulty.

**REVIEW OF RECENT NEUROPSYCHOLOGICAL EVALUATION:** I reviewed the raw data and report of Kiran Amin, Ph.D. Dr. Amin conducted an interview of Ms. Andriano on 11/26/2013. On 12/13/2013, he administered a limited number of neuropsychological and personality measures. In my opinion, the evaluation did not meet the standards of practice in the profession in terms of its comprehensiveness. Dr. Amin spent a total of 2 hours and 44 minutes testing Ms. Andriano, and the testing portion of the evaluation did not cover important core neuropsychological domains such as language-based processing, nor did it adequately assess domains known to be areas of difficulty for Ms. Andriano (e.g. attention and executive functioning). Dr. Amin used two stand-alone measures of effort, the Validity Indicator Profile (VIP) and the Structured Inventory of Malingered Symptoms (SIMS). Dr. Amin indicated that Ms. Andriano's performance on the VIP was consistent with her having put forth her best effort. However, he opined that her performance on the SIMS met criteria for likely feigning, based on her endorsement of symptoms of psychosis, affective disorders and amnestic disorders that were atypical, illogical or inconsistent with the typical reports of individuals with these psychiatric difficulties, as well as moderately elevated scores on the amnestic disorder scale. Dr. Amin, however, failed to note that available data on the use of the SIMS as a measure of effort has focused primarily on the total score, rather than subscale scores. Further, examination of research using the SIMS has revealed that the recommended total score cutoff of >14 produces "unacceptable" specificity (Boone, 2013), with a false positive rate that approaches 40%. That is to say, using the recommended cutoff tends to over identify individuals as malingerers examinees who are actually answering in a credible manner, as such calling into question its use as a measure of effort. Further, Dr. Amin attempt to infer low effort from Ms. Andriano's performance on the Rey-Osterrieth Complex Figure Test (ROCFT), specifically in the discrepancy between her average score on the Delayed Recall of the figure and her low score on the Recognition task. However, I was unable to find any research which substantiates this comparison as a legitimate indicator of effort. In fact, in my clinical practice, I have encountered this particular pattern of performance quite often. Dr. Amin further fails to invoke the well-known testing phenomena of the practice effect (i.e. changes in an examinee's scores, often in an upward direction, after having been previously exposed to the same or similar test and/or procedures) to explain Ms. Andriano's improved performance since Dr. Young's evaluation on measures such as the CVLT-II, Finger Tapping Test, and Rey-Osterrieth Complex Figure Test. In fact, memory tests and tests with unique problem-solving elements are particularly vulnerable to the practice effect (Strauss, Sherman, & Spreen 2006). In summary, I disagree with Dr. Amin's conclusions that Ms. Young did not (and does not) suffer from cognitive impairment.

2

**NEUROPSYCHOLOGICAL FINDINGS:**

**General Cognitive Ability:**  Ms. Andriano's current level of general intellectual functioning was assessed with the WAIS-IV. She earned a Full Scale IQ (SS) of 100 (50th percentile), which falls in the Average range. There was, however, considerable variability among her Index scores, with a significant weakness found in her information processing speed abilities, which were measured in the Borderline range (Processing Speed Index= 76, 5th percentile). Her verbal reasoning skills were measured overall in the High Average range (Verbal Comprehension Index SS=110, 75th percentile), and her nonverbal/visual processing skills were measured in the Average range (Perceptual Reasoning Index SS=104, 61st percentile). Basic working (short-term) memory abilities were also Average (Working Memory Index SS=102, 55th percentile).

**Academics:** Ms. Andriano demonstrates exceptional core academic abilities, with scores ranging from the upper end of the Average range to the Very Superior range on tasks including single-word reading, phonological decoding, reading comprehension, math calculation, and numerical reasoning (WIAT-II Reading Composite- 98th percentile, Mathematics Composite- 79th percentile).

**Verbal Reasoning/Language Functioning:** On the WAIS-IV, Ms. Andriano demonstrated well-developed language-based reasoning abilities, with average to high average performance on measures of verbal concept formation (Similarities- 91st percentile), vocabulary knowledge (Vocabulary- 50th percentile), verbal reasoning (Comprehension- 63rd percentile), and factual knowledge about the world and environment (Information- 75th percentile). In contrast, Ms. Andriano was less efficient on timed language tasks that placed demands on her ability to retrieve information in a quick and organized manner. For example, while average in her ability to rapidly generate words according to categories (D-KEFS Category Fluency- 50th percentile), she was less proficient, with a score in the low average range, when required to produce words according to phonemic (letter) cues, a task more demanding of organized brain networks (D-KEFS Letter Fluency- 9th percentile). Similarly, when asked to produce words from alternating categories, she was able to do so, but lost points for accuracy- this typically occurs when the examinee is not able to hold the switching rule "in mind" in working memory (D-KEFS Category Switching- 75th percentile, Category Switching Accuracy- 9th percentile).

**Visual Processing/Visual-Motor Functioning:** Visually-based processing and reasoning was solidly age-appropriate on WAIS-IV tasks assessing visually-based reasoning and visual-spatial imaging (Visual Puzzles- 75th percentile), quantitative reasoning (Figure Weights- 75th percentile), visual-spatial construction using blocks (Block Design- 50th percentile) and visual reasoning/pattern recognition (Matrix Reasoning- 50th percentile). However, her performance fell below average on a task demanding of attention to visual detail (WAIS-IV Picture Completion- 16th percentile), which seemed less attributable to the visual processing demands and more likely the result of slow processing speed, since her failures were often due to being over the time limit for responses. Further, while basic visual processing appears intact, Ms. Andriano appeared to struggle with more complex visual tasks which recruit her weak executive functioning skills (See Attention/Executive Functioning section below). Her copy of the Rey-Osterrieth Complex Figure Test (a task more demanding of visual organization) was within age-expectations in terms of visual-spatial accuracy, however, her time to copy the figure (at over 7 minutes) greatly exceeded the "normal" time, placing her at the <1st percentile in comparison to age peers.

**Sensory Processing and Sensorimotor Skills:** Ms. Andriano demonstrated normal olfactory function on the Smell Identification Test, and primary sensory functioning (i.e. visual, auditory, tactile) were intact (i.e. see performance on parts of the Sensory Perceptual Examination). However, her performance was weaker on "higher level" perceptual tasks which required her to coordinate processes across cognitive domains (motor + tactile). For example, she obtained scores in the "Mild Impairment" range on finger-tip number writing perception and tactile form perception. Further, she earned scores in the "Mild

3

Impairment" to "Mild to Moderate Impairment" range on finger tapping, a motor task involving pacing, coordination, and speed, and which has been shown through imaging studies to tap into both motor and pre-frontal cortex. Ms. Andriano's performance on the Grooved Pegboard could not be interpreted as the raw data was unclear and conflicted with reported scores.

**New Learning & Memory Functioning:**  Ms. Andriano demonstrated weaknesses in verbal and visual memory and new learning secondary to executive functioning deficits. She performed within the Average to High Average range on the verbal and visual memory subtests of the WMS-IV, both immediately and after a delay (e.g. Auditory Memory Index- 87th percentile, Visual Memory Index- 58th percentile). Visual memory as assessed by the Tactual Performance Test, both for content and location, was also average. In contrast, Ms. Andriano showed inefficiencies in her learning of new verbal material on the CVLT-II, a 16-item list learning task. When presented with the list on the first trial, she was able to recall only 5 of the 16 words, a performance falling at the 7th percentile for age (Borderline Impaired). Similarly, she was only able to recall 4 of 16 words when presented with a new list (Trial B), again with a score in the Borderline Impaired range (7th percentile).  Ms. Andriano did benefit greatly from repeated exposures to the list and showed a strong learning slope and good memory both immediately, and after a 20-minute delay. Inefficient learning and recall was also evident on the Rey-Osterrieth Complex Figure. Her immediate and delayed recall of the figure was average. However, she had significant difficulty distinguishing between which aspects of the figure were present in the original and which were not on a Recognition task. Specifically, Ms. Andriano failed to recognize elements of the figure originally present (2nd to 5th percentile), and identified elements of the figure as not being there when they really were (2nd to 5th percentile). Overall, the results of memory testing show that despite a good capacity for storage of both verbal and visual material, Ms. Andriano is prone to being overwhelmed by information (and thus becoming an inefficient processor) when it is initially presented to her and when she presented with a large amount of material at one time.

**Attention/Executive Functioning:**

Executive functioning refers to the mental organizational processes associated with initiating, implementing, monitoring, and revising strategies and plans of action.  It requires sustained attention and effort, inhibition of impulses, sound working memory (mental manipulation abilities), as well as clerical and conceptual organizational abilities

Ms. Andriano's performance was variable, ranging from the low average to average range on simple measures of attention control, such as those involving quickly scanning a page for information (i.e. Visual Search and Attention Test- Left- 51st percentile, Right- 72nd percentile, D-KEFS Trail Making Tests-Visual Scanning- 37th percentile, WAIS-IV Cancellation- 9th percentile). Her performance was above average on the Speech-Sounds Perception Test, a measure included in the Halstead-Reitan Neuropsychological Battery which purports to measure attention (Reitan & Wolfson ((1993). She nonetheless demonstrated Mild to Moderate Impairment on the Seashore Rhythm Test (which involves listening to and discriminating rhythmic patterns). This is a measure that Lezak et al. (2012) describe as "most sensitive to attention and concentration deficits" (p.460). Further, clear areas of deficit were noted on a more complex measure of sustained attention and vigilance (CPT-II). Her difficulties on this task related primarily to slow and inconsistent reaction times, particularly in response to changing inter-stimulus intervals. In essence, Ms. Andriano struggled to adjust to changing task demands. This pattern of functioning is often seen in individuals with attention difficulties. These findings are also consistent with Ms. Andriano's self-ratings on the CAARS-S: SV, which indicated DSM-IV Inattentive Symptoms in the "Much Above Average" range. Symptoms endorsed as "Pretty Much/Often" included "I am distracted when things are going on around me," "I am forgetful in my daily activities," and "I have trouble finishing job tasks or schoolwork."

4

Working memory, specifically, is the ability to "hold" and manipulate information "in mind" for the purpose of learning and guiding behavior. Working memory is a cornerstone of executive functioning, along with processing speed. Ms. Andriano performed within the average range on the basic working memory tasks of the WAIS-IV which involved reciting digits forwards, backwards, and in sequence (Digit Span- 63rd percentile), and answering arithmetic questions orally (Arithmetic- 50th percentile). However, as seen in other cognitive domains, as tasks became more complex, her performance deteriorated. For example, as noted above, she became "overloaded" on a task of new verbal learning (i.e. CVLT-II), which involved having to "take in" a large amount of information at one time (i.e. a list of 16 words). However, she demonstrated the most striking deficits on a very complex task tapping attention, working memory, and information processing speed,  (PASAT) which required her to listen to numbers paired together and remember the last number heard, adding the number last heard to the number that she previously heard. The numbers are spaced 2.4 seconds apart initially, and the task becomes increasingly difficult, until the numbers are spaced only 1.2 seconds apart on the 4th and final trial. Ms. Andriano struggled with this task from the beginning, performing at the 7th percentile on the first trial, the 4th percentile on the 2nd trial, and at the 2nd percentile on the 3rd and 4th trials. In fact, she performed so poorly that the test could have been discontinued after the 1st trial (Lezak et al. 2012, p. 584).

Ms. Andriano demonstrated variability in her problem-solving approach.  She showed solidly average problem-solving ability on a timed, multi-step measure of planning and organization (D-KEFS Tower Test- 63rd percentile), and was able to effectively utilize deductive reasoning on a "twenty questions" game paradigm (D-KEFS: Twenty Questions Test-Total Questions Asked- 84th percentile). However, she demonstrated low average to average concept formation and abstraction skills (D-KEFS Sorting Test- Confirmed Sorts- 37th percentile, Short Category Test- 18th percentile, Wisconsin Card Sorting Test- Perseverative Errors- 47th percentile). She showed overall "Below Average" decision-making capacity on the Iowa Gambling Task. This is a computerized test which utilizes a gambling paradigm, in which the examinee starts out with a sum of "money," and must choose cards from four different decks, all with different ratios of win to loss. Ms. Andriano chose somewhat disproportionately from Deck A. As described in the IGT Manual (Bechara, 2007) - "Deck A' is almost universally avoided by neurologically intact individuals. A high number of cards selected from this deck is strongly indicative of the presence of decision-making impairments in the examinee (p. 9)."

In terms of information processing speed, I have previously noted that Ms. Andriano's performance was slow, sometimes exceptionally slow, on a number of timed tasks presented to her in the evaluation (e.g. WAIS-IV- Coding- 9th percentile, Cancellation- 9th percentile, Symbol Search- 5th percentile, Rey Time to Copy- <1st percentile). She was also extremely slow to produce verbal responses on simple, overlearned timed tasks such as color naming and word reading (D-KEFS Color-Word Interference- Color Naming- 2nd percentile, Word Reading- 2nd percentile). Interestingly, her performance was less impaired on a few more complex timed tasks (ranging from low average to average) assessing her cognitive flexibility and her ability to "hold" two rules in mind at once and inhibit a pre-potent response (Trails B- "Average," D-KEFS: Trail Making Test- Number-Letter Switching- 37th percentile, Color-Word Interference Inhibition/Switching- 25th percentile), though prior exposure to simpler versions of these tasks may have facilitated her performance.

Self-report of executive functioning yielded clinically significant ratings on the BRIEF in the areas of initiation, task monitoring, and shifting (cognitive flexibility). For example, Ms. Andriano acknowledges difficulties with getting started on tasks, frequently making careless errors, and often having difficulty with unexpected changes in routine and in thinking of alternative ways to solve problems.

**Emotional Functioning:** Ms. Andriano`s emotional functioning was assessed through both projective (Rorschach) and objective, self-report measures (DAPS, DES, MDI). As noted above, I did not review the Rorschach in detail. Dr. Young indicated that Ms. Andriano`s Rorschach protocol indicated emotional

P-App. 003951

vulnerability, introversion, a tendency to internalize feelings as opposed to share them, passivity, emotional dependency upon others, and a pessimistic view of herself. Dr. Young also indicated that Ms. Andriano attempts to avoid emotions. Overall, Dr. Young felt that Ms. Andriano`s profile was consistent with an individuals diagnosed with Dysthymia or Mood Disorder. The MDI indicated clinical-level elevations on the `Low Energy` subscale, characterizing Ms. Andriano as an individual who is often fatigued, and has low levels of arousal, vitality and motivation. The DAPS and DES are measures which capture the effects of trauma. On the DAPS, Ms. Andriano`s Posttraumatic Stress Total score (PTS-T) indicated clinically significant posttraumatic symptomatology, and based on her responses, she was likely to meet diagnostic criteria for a diagnosis of Posttraumatic Stress Disorder (PTSD). The DAPS diagnostic summary further indicated that Ms. Andriano`s clinical presentation "may signal the presence of a more 'complex' PTSD." Her responses on the Posttraumatic Impairment scale indicated that the effects of the trauma are significant, such that her ability to function on an ongoing basis is compromised. Ms. Andriano`s DAPS profile was accompanied by clinically significant scores on the Reexperiencing, Avoidance, and Hyperarousal scales. These scales indicate that she has a tendency to experience intrusive reminders of the traumatic events (i.e. flashbacks, nightmares), tends to cope with the trauma by "shutting down" and becoming emotional numb, and persistently feels "on edge," tense, irritable, and shows difficulties with attention and concentration. Ms. Andriano also had an elevated Suicidality score on the DAPS, indicating clinically significant levels of suicidal ideation. The results of the DES are consistent with the DAPS, and indicate some experiences consistent with dissociation. These included having no memory of important events in her life, experiencing times when she was not sure whether things she remembered really happened or whether she just dreamed them, listening to someone talk and suddenly realizing that she did not hear all or part of what was said, and hearing voices inside her head telling her to do things or commenting on things that she is doing.

Overall, Ms. Andriano`s neuropsychological profile indicates that she is prone to be overwhelmed- by information, by strong emotions- potentially resulting in impulsivity, angry outbursts, and becoming increasingly isolated and withdrawn, and/or inflexible and rigid in her thinking, especially during periods of stress.

All of these neuropsychological findings are consistent with Dr. Hopper`s characterization of Ms. Andriano`s maladaptive emotional and behavioral patterns as in part due to her history of severe child maltreatment. This included neglect by her mother, physical abuse, including Ms. Andriano being "beaten into submission," emotional abuse by her adoptive father, definite sexual abuse by her adoptive father and likely sexual abuse by other males during her childhood, and traumatizing relationship patterns. These findings are also consistent with Dr. Woods` diagnoses of Bipolar Disorder, PTSD/Complex PTSD, and Dependent Personality Disorder.


**SUMMARY & IMPLICATIONS:** Ms. Andriano presents with a complex neuropsychological profile. She demonstrates relative strengths in core knowledge and reasoning, particularly in the verbal domain, where she shows strong language-based conceptual and problem-solving abilities, and well-developed abstract thinking skills. She also demonstrates strengths in core academic skills, including reading decoding, reading comprehension, and mathematical reasoning and calculation.

In contrast, Ms. Andriano presents with clear and significant deficits in multiple, important domains of functioning; the chief areas of deficit are in <u>attention, executive functioning, and information processing speed</u>. Under the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR- 2000), the psychiatric diagnostic manual that was current at the time of Dr. Young`s evaluation, Ms. Andriano would meet criteria for the diagnosis of <u>Cognitive Disorder, Not Otherwise Specified.</u>

6

These three domains - attention, executive functioning, and information processing speed - are areas of cognitive functioning that are highly interrelated. They involve multiple cortical and subcortical networks of the brain. They are all implicated in the coordination, organization, and integration of multiple brain areas, and play key roles in efficient, effective, and adaptive learning, behavior, and management of emotions. Deficits in these areas are linked to inflexibility, poor adaptation to change, poor social cognition and perspective taking, inconsistent learning, emotional reactiveness, and impulsive behavior.

At the most basic level, attention is a pre-condition for most mental activities. The attentional systems of the brain involve multiple areas including the recticular activating system (involved in arousal), the basal ganglia, cerebellum and pre-frontal cortex. The conceptualization of attention is also complex, and there are numerous models of attention. One well-known model, developed by Sohlberg & Mateer (1989), differentiates among types of attention, including focused attention (i.e. orienting to discrete, time-limited stimuli), selective attention (i.e. maintaining a cognitive set in the face of competing or interfering stimuli), sustained attention/vigilance (i.e. attention over time), alternating attention (mental flexibility involved in switching between cognitive tasks of varying difficulty), and divided attention (i.e. the ability to respond simultaneously to multiple task demands). With regards to Ms. Andriano, basic focused and sustained attention were generally intact on cognitive measures, though self-report (CAARS-S:SV) did indicate clinically elevated distraction and weak sustained attention in everyday life. However, what is most striking is how much Ms. Andriano struggled on more complex cognitive tasks requiring her to divide her attention (i.e. PASAT), and keep pace with changing stimulus demands (CPT-II). Impaired attention is a common element of many psychiatric disorders, and problems with attention are frequently noted in patients with depression, anxiety, mania, and thought disorders such as schizophrenia.

There are certain domains of functioning that map particularly well onto an individual's functioning in everyday life, that is to say, one's adaptive functioning. One such domain is that of executive functioning. While variably defined, most researchers in the area (Dennis 1991, Spreen et al., 1995) define the executive functions as part of a higher-order, supervisory system in the brain that when operating successfully, leads to purposeful and goal-directed behavior. These are mental organizational processes associated with initiating, implementing, monitoring, and revising strategies and plans of action.  Good executive functioning requires sustained attention and effort, inhibition of impulses, sound working memory (mental manipulation abilities), as well as clerical and conceptual organizational abilities. Individuals with poor executive control typically have difficulty regulating their emotions, controlling impulses, using good judgment, sustaining attention, making sound decisions, initiating appropriate courses of action, and flexibly changing course when receiving feedback that current plans of action and behavior are not working.

The effects of poor executive functioning on everyday behavior can be striking. As Lezak (2012) states: "When executive functions are impaired, even if only partially, the individual may no longer be capable of satisfactory self-care, of performing remunerative or useful work independently, or of maintaining normal social relationships regardless of how well preserved the cognitive capacities are- or how high are the person's scores on tests of skills, knowledge and abilities….impairments in executive functions tend to show up globally, affecting all aspects of behavior" (p.37).

Dr. Russell Barley, an international expert in the area of attention and executive functioning, goes even further in highlighting the importance of intact executive functioning in daily life, arguing the executive functions are "human self-directed actions," and as such, are types of self-control. In his view:

> "For self-control to occur, some neuropsychological or mental faculty must
> exist that permits this capacity to bind the parts of the [behavioral] contingency
> despite large gaps in time between them. It requires some sense of time and
> the ability to conjecture the future and to put them to use in the organization

7

and execution of behavior. To conjecture the future, the past must be capable
of recall and analysis in order to detect patterns among chains of events and
their behavioral contingencies. It is from the recall of the past that such
hypothetical futures can be constructed. This mental faculty is believed by
Barkley to be working memory." (ADHD in Adults: What the Science Says,
pp.173-174).

In other words, one's ability to engage in future behavior that is useful and adaptive and that changes in a
beneficial way in response to feedback, requires the capacity to visually represent, "hold onto" and "see"
the relationships between past behaviors and their consequences.

Ms. Andriano's test protocol revealed evidence of deficits in multiple aspects of executive functioning,
including decision making, working memory, and organization. She demonstrated below average decision
making capacity (i.e. see NET Total score on Iowa Gambling Test), in that she tended to make poor
decisions on the task despite faced with persistent negative consequences. Consistent with this, she
struggled on measures of increased complexity (i.e. performed well on simple vs. complex tasks), and
those which required organized retrieval and integration across cognitive domains (i.e. D-KEFS Letter
Fluency, Tactile Form Perception, Number Writing Perception). She was easily overwhelmed by tasks of
working memory which required her to "hold onto" and manipulate information quickly in her head (i.e.
see CVLT-II- Trial 1, Trial B; PASAT), and manifested inefficiencies in her learning (i.e. ROCFT).

Ms. Andriano`s attention and executive functioning impairments are compounded by generally slow
information processing speed. This was probably the most consistent finding in Dr. Young`s evaluation,
as Ms. Andriano`s deficits in this domain were severe and apparent on multiple tasks (i.e. WAIS-IV
Processing Speed Index, Rey-Osterrieth Complex Figure Test Time to Copy, CPT-II Hit SE ISI Change,
D-KEFS Color-Word Interference- Color Naming, Word Reading). Her deficits in speed were also
reflected in more complex motor tasks which crossed cognitive domains and included aspects of timing
and pacing (i.e. Finger Tapping Test).

Problems with attention and executive functioning, which have been clearly linked to impaired operation
of the frontal lobe networks of the brain (which also include subcortical structures), act to large extent
independently of one's native intelligence, severely impact one's ability to effectively function in real
world settings, and can result in significant morbidity. The frontal lobes have connections to almost every
brain area, and are critically important in the integration of functioning across domains (i.e. coordinating
what one sees with subsequent motor behavior). Ms. Andriano's attention, executive functioning, and
information processing deficits significantly interfere with organized, efficient learning and recall, in that
she takes information much more slowly and inefficiently than would be expected and reacts and
"outputs" information more slowly as well. This is particularly true in new, novel, and stressful
circumstances, where her ability to effectively function is undermined by multiple tasks of increasing
complexity and emotional color (Godefroy, 2003). Information processing can prove to be extremely
effortful for her. These neurocognitive deficits make her highly vulnerable to overwhelm and overload,
particularly when the situation is novel, complex, and emotionally-laden. In such circumstances, she is
less able to resist the urge to act impulsively and is more likely to be distracted by short-term versus long-
term reward. Her capacity to initiate and develop organized approaches to problems, self-monitor
behaviors and actions, respond to feedback and revise an approach when it no longer seems to be
working, are all likely to deteriorate under such conditions, making her subject to extreme and
inappropriate reactions.

Ms. Andriano has a history of significant difficulties with emotional regulation, including depressive
symptoms, irritable mood, and inappropriate affect, and there is a strong family history of mood disorder.
As such, her neurocognitive impairments should also be seen in the context of an altered mood state.

8

Although the specific nature, etiology, and course of neurocognitive deficits in mood disorders such as Major Depressive Disorder and Bipolar Disorder have yet to be full explained, research in the case of Bipolar Disorder points to stable neuropsychological deficits which exist even when the individual is in a euthymic state (i.e. not presently manic). These include relative sparing of verbal ability and weaker visuospatial abilities, which is likely explained by the demands of motivation, attention, and speed (that is to say, the executive demands of perceptual reasoning tasks), as opposed to the visual aspects per se (Bearden et al, 2001). Specific executive functioning deficits, in terms of working memory, attention, planning, and response inhibition have also been found in patients with bipolar illness, even in a euthymic state (Chowdhury et al, 2003). These neurocognitive deficits are consistent with neuropathological and functional neuroimaging findings which indicate abnormalities in the prefrontal cortex and the disruption of frontostriatal brain circuitry in bipolar patients.  These findings are consistent with the impressions of mood disorder identified in Dr. Young's evaluation, Dr. Woods` diagnosis of Bipolar Disorder, and Ms. Andriano's long history of difficulty with the regulation of mood states.

Finally, it is important to consider the contribution of Ms. Andriano`s history of severe neglect, emotional abuse, physical abuse, and sexual abuse to her neurocognitive profile. Research has shown clear effects of child maltreatment on the development of the brain. Long-term abuse and neglect has been shown to affect brain development at multiple levels, at the level of neurochemical transmission, as well as at the neuroanatomical (structural) level, and is observed, just as with Ms. Andriano, in weaker performance on neuropsychological tasks. For example, Navalta et al. (2006), found that female college students with histories of repeated sexual abuse in childhood showed increased response latency variability on a vigilance task as compared to healthy control subjects.  The researchers also found a relationship between duration of abuse and degree of memory impairment. Maltreatment-related damage often involves regions of the brain critical to mood regulation, impulse control, and memory, and can change the course of brain development as a result of the brain`s attempt to manage extreme stress (Teicher, 2003). In particular, there is a notable effect upon the frontal lobe networks of the brain that are critically important in attention regulation and executive functioning, which includes the regulation of emotions. Again, this reflects the relative fragility of these areas in terms of their protracted development into young adulthood.

In conclusion, it is my opinion that Ms. Andriano's neuropsychological profile clearly shows a profile of neurocognitive impairment, consistent with the DSM-IV-TR diagnosis of Cognitive Disorder, Not Otherwise Specified. Her areas of neuropsychological compromise lie chiefly in attention, executive functioning, and information processing speed. Despite having a strong base of reasoning and knowledge, Ms. Andriano's impairments in these areas significantly interfere with her ability to utilize her cognitive strengths, and make her prone to poor adaptive functioning in real world settings, in that she is far less able than most individuals with her base intellectual ability to regulate her emotions, control her impulses, think quickly and efficiently, respond appropriately to changing stimulus demands, and consider long-term consequences of her actions. This is particularly true in situations that are complex, unfamiliar, fluctuating, present a great information load, and/or are emotionally laden. Ms. Andriano's neuropsychological deficits are highly consistent with her genetic, brain-based vulnerabilities, as well as her history of severe neglect and abuse.

All professional opinions contained herein are stated to a reasonable degree of scientific certainty.

I remain available for consultation at (240) 424-0073 should additional questions or concerns arise. I note that my opinions are subject to amendment in the consideration of new information.

9

Sincerely,

Joette James, Ph.D., ABPP-CN
Licensed Psychologist
Board-Certified Clinical Neuropsychologist
Assistant Professor,
Departments of Pediatrics and Psychiatry and Behavioral Sciences
GWU Medical Center
Children's National Medical Center

10

**REFERENCES**

Barkley, R.A., Murphy, K.R., & Fischer, M. (2008). *ADHD in adults: What the science says.* New York, NY: The Guilford Press.

Bearden, C.E., Hoffman, K.M., & Cannon, T.D. (2001). The neurology and neuroanatomy of bipolar affective disorder: A critical review. *Bipolar Disorders, 3*(106-150).

Bechara, A. (2007). *Iowa Gambling Task (IGT).* Lutz, FL: Psychological Assessment Resources.

Boone, K.B. (2013). *Clinical practice of forensic neuropsychology: An evidence-based approach.* New York, NY: The Guilford Press.

Bush, S.,S., Ruff, R.M., Tröster, A.I., Barth, J.T., Koffler, S.P., Pliskin, N.H., Reynolds, C.R., & Silver, C.H. (2005). Symptom validity assessment: Practice Issues and medical necessity. *Archives of Clinical Psychology, 20,* 419-426.

Chowdhury, R., Ferrier, I.N., & Thompson, J. (2003). Cognitive Dysfunction in Bipolar Disorder. *Current Opinions in Psychiatry,* 16(1), 7-12.

Dennis, M. (1991). Frontal lobe function in childhood and adolescence: A heuristic for assessing attention regulation, executive control, and the intentional states for social discourse. *Developmental Neuropsychology, 7,* 327-358.

Godefroy, O. (2003). Frontal syndrome and disorders of executive functions. *Journal of Neurology,* 250(1), 1-6.

Lezak, M.D., Howeison, D.B., Bigler, E.D., & Tranel, D. (2012). *Neuropsychological Assessment (5th ed.).* New York, NY: Oxford University Press.

Navalta, C.P., Polcari, A., Webster, D.M., Boghossian, A., & Teicher, M. (2006). Effects of childhood sexual abuse on neuropsychological and cognitive function in college women. *The Journal of Neuropsychiatry and Clinical Neurosciences,* 18(1), 45-53.

Reitan, R.M., & Wolfson, D.W. (1997). *The Halstead-Reitan Neuropsychological Test Battery.* South Tucson, AZ: Neuropsychology Press.

Sohlberg, M.M., & Mateer, C.A. (1989). *Introduction to Cognitive Rehabilitation: Theory and Practice.* New York: NY: Guilford Press.

Spreen, O., Risse, A. H., & Edgell, D. (1995). *Developmental Neuropsychology.* New York, NY: Oxford University Press.

Strauss, E., Sherman, E.M.S., & Spreen, O. (2006). *A compendium of neuropsychological tests.* New York, NY: Oxford University Press.

Teicher, M.H., Andersen, S.L., Polcari, A., Anderson, C.M., Navalta, C.P., and Kim, D.M. (2003). The neurobiological consequences of early stress and childhood maltreatment. *Neuroscience & Biobehavioral Reviews*, 27, 33-44.

11

12

# State of Arizona
# v.
# Wendi Elizabeth Andriano

# Report
# of
# Forensic Psychiatric
# Evaluation
# of
# Wendi Elizabeth Andriano
# (Volume I of II)

**Steven E. Pitt, D.O.**

**Steven Pitt & Associates**



**1** REPORT RE: FORENSIC PSYCHIATRIC EVALUATION OF WENDI ELIZABETH ANDRIANO

**2** CORRESPONDENCE FROM: LACEY STOVER GARD, ESQ., TO STEVEN E. PITT, D.O., AND KIRAN AMIN, PH.D., DATED DECEMBER 5, 2103 *(EXHIBIT "A")*

**3** TRANSCRIPT OF FORENSIC PSYCHIATRIC EVALUATION *(EXHIBIT "B")*

**4** TRANSCRIPT OF WENDI ELIZABETH ANDRIANO'S INTERVIEW WITH DETECTIVES DAVID LUCERO AND SALLY DILLIAN *(EXHIBIT "C")*

**5** REPORTS COMPLETED BY: DRS. JACK POTTS, RICHARD ROSENGARD, SHANNON MURPHY, MICHAEL BAYLESS, MYLA YOUNG, GEORGE WOODS AND JAMES HOPPER *(EXHIBITS "D-1" - "D-7")*

**6** REPORT OF NEUROPSYCHOLOGICAL EVALUATION COMPLETED BY KIRAN AMIN, PH.D. *(EXHIBIT "E")*

**7** DSM-IV-TR CRITERIA FOR ADJUSTMENT DISORDERS *(EXHIBIT "F")*

**8** NOTES FROM FORENSIC PSYCHIATRIC EVALUATION *(EXHIBIT "G")*

**9** CURRICULUM VITAE OF STEVEN E. PITT, D.O. *(EXHIBIT "H")*

**10** DVD(S) OF FORENSIC PSYCHIATRIC EVALUATION *(EXHIBIT "I")*



AVERY  READY INDEX



# REPORT RE: FORENSIC PSYCHIATRIC EVALUATION

## WENDI ELIZABETH ANDRIANO

## (DECEMBER 27, 2013)

# WENDI ELIZABETH ANDRIANO
# FORENSIC PSYCHIATRIC EVALUATION
# TABLE OF CONTENTS

**SUBJECT HEADINGS**                                    **PAGE NO.**

**IDENTIFYING INFORMATION** . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**SOURCES OF INFORMATION** . . . . . . . . . . . . . . . . . . . . . . . **4**

**QUALIFICATIONS OF EXAMINER** . . . . . . . . . . . . . . . . . . . **21**

**STATEMENT OF NON-CONFIDENTIALITY** . . . . . . . . . . . . . . . **21**

**PERSONAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

**PSYCHIATRIC HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**LEGAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

**STATE'S VERSION OF THE INSTANT OFFENSE** . . . . . . . . . . . . **31**

**REPORT OF AUTOPSY** . . . . . . . . . . . . . . . . . . . . . . . . . . **35**

**REPORT OF TOXICOLOGICAL EXAMINATION.** . . . . . . . . . . . . **36**

**COURSE SUBSEQUENT TO ARREST.** . . . . . . . . . . . . . . . . . . **36**

**DEFENDANT'S VERSION OF THE OFFENSE** . . . . . . . . . . . . . . **38**
    **As provided to The Phoenix Police Department** . . . . . . . **39**
    **As provided to H. Kandy Rohde, C.P.C..** . . . . . . . . . . . . . **53**
    **As provided to Richard J. Rosengard, D.O.** . . . . . . . . . . . **62**
    **As provided to Sharon B. Murphy, Ph.D., C.I.S.W.** . . . . . **63**
    **As provided toMichael B. Bayless, Ph.D.** . . . . . . . . . . . . . **64**

**DEFENDANT'S VERSION OF THE OFFENSE AS PROVIDED**
    **DURING THE INSTANT EVALUATION** . . . . . . . . . . . . . . . **65**

**DEFENDANT'S APPRECIATION OF WRONGFULNESS** . . . . . . **105**

**WENDI ELIZABETH ANDRIANO**
**FORENSIC PSYCHIATRIC EVALUATION**
**TABLE OF CONTENTS (Cont'd.)**

**SUBJECT HEADINGS**                                    **PAGE NO.**

**ISSUE RE: CULPABILITY**  . . . . . . . . . . . . . . . . . . . . . . . . . . **113**

**REVIEW OF PSYCHIATRIC, PSYCHOLOGICAL,**
    **PHARMACOLOGIC AND NEUROPSYCHOLOGICAL**
        **REPORTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **116**

**REVIEW OF NEUROPSYCHOLOGICAL REPORT COMPLETED**
    **BY KIRAN AMIN, PH.D.** . . . . . . . . . . . . . . . . . . . . . . . **129**

**ISSUE OF DIAGNOSIS/FORENSIC OPINION**  . . . . . . . . . . . . **130**

ii



**STEVEN PITT & ASSOCIATES**
FORENSIC PSYCHIATRY, NURSING,
PSYCHOLOGY & NEUROPSYCHOLOGY
www.stevenpittassociates.com

December 27, 2013

## HAND DELIVERED

Gregory Hazard, Esq.
Assistant Attorney General
Jeffrey A. Zick, Esq.
Assistant Attorney General
c/o Office of the Attorney General – Capital Litigation Section
1275 West Washington
Phoenix, Arizona 85007

Lacey Stover Gard, Esq.
Assistant Attorney General
c/o Office of the Attorney General
Criminal Appeals/Capital Litigation Division
400 West Congress Street
Suite S-315
Tucson, Arizona 85701

   *Re:  State of Arizona v. Wendi Elizabeth Andriano
        (CR2000-096032)*

Dear Counselors:

Pursuant to your request, I recently conducted a forensic psychiatric evaluation of Wendi Elizabeth Andriano as it pertained to the above captioned matter.[1]

_____

[1]  My associate, Dr. Kiran Amin was present and participated in the instant evaluation

Corporate: 15849 N. 71st Street Suite 100 Scottsdale, AZ 85254 p480-281-1638 SEPitt@aol.com

1901 Avenue of the Stars Suite 200 Los Angeles, CA 90067 p310-777-7806 SEPitt@aol.com

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 2

## IDENTIFYING INFORMATION:

Wendi Elizabeth Andriano is a 43 year-old, White female who, on November 18, 2004, was convicted of First Degree Murder. On December 22, 2004, Ms. Andriano was sentenced to death by lethal injection.[2]

Given your familiarity with the events which led to the instant evaluation, I will forego a detailed review of this information. Suffice it to say, in Ms. Gard's correspondence, dated December 5, 2013, she wrote, in part *(Exhibit "A")*:

> As you know, this case has been scheduled for an evidentiary hearing on Wendi Andriano's claim that her counsel was ineffective for failing to present certain mitigation, including mental-health evidence, at sentencing.   This hearing is scheduled to begin on February 3, 2014, and continue through February 14, 2014...

In the same correspondence, Ms. Gard wrote:

> I am aware that the forensic psychiatric interview portion of the examination is complete and that Dr. Amin will be returning on December 13, 2013, to administer some psychometric tests.  For the purpose of your reports, I would like you to answer the following referral questions.
>
>     1.     Under A.R.S. § 13-751(G)(1), a first-degree murder can be mitigated if "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the

---

[2] The instant offense occurred on or about October 8, 2000.  Ms. Andriano was arrested that same day.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 3

requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution." In your professional judgment, does Ms. Andriano suffer from a mental illness or cognitive impairment that significantly impaired her capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law?

2.  Pursuant to A.R.S. § 13-751(G)(2), it is a mitigating circumstance if the defendant was under "unusual and substantial duress" at the time of the murder. Please address whether Ms. Andriano was under "unusual and substantial duress," and, if so, whether there was a causal connection between any unusual or substantial duress and the murder?

3.  A defendant's mental illness or cognitive impairment may still be mitigating even if it does not meet the standards of A.R.S. § 13-751(G)(1) or (G)(2). In assessing what weight to give mitigating factors, the sentencer considers the quality and strength, not simply the number, of the aggravating and mitigating factors. A causal connection between the mitigation and the murder is not required, but the sentencer may consider the lack of any causal connection in assessing the quality and strength of the proffered mitigation. Please address what, if any,

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 4

> causal connection exists between any mental
> illness or cognitive impairment from which
> Ms. Andriano suffers and the murder.

In sum, the instant evaluation was requested in order to provide you with my opinions as to whether or not:

- Wendi Elizabeth Andriano suffered from a mental illness or cognitive impairment that significantly impaired her capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law.

- Wendi Elizabeth Andriano was under "unusual and substantial duress" at the time of the murder.

- Wendi Elizabeth Andriano's proffered mental condition was causally connected to the murder of the victim.

## SOURCES OF INFORMATION:

1. Wendi Elizabeth Andriano was interviewed on Tuesday, November 26, 2013, in a multipurpose room located at Arizona State Prison Complex-Perryville, Goodyear, Arizona for approximately 4.9 hours including breaks;[3]

2. Correspondence from Lacey Stover Gard, Esq., Assistant Attorney General, Criminal Appeals/Capital Litigation Division, to Dr. Steven E. Pitt, *Re: State of Arizona v. Wendi Elizabeth Andriano,* dated January 16, 2013, 3 pages, not including enclosures;

---

[3] My associate, Dr. Kiran Amin was present and participated in the instant evaluation. In addition, on Friday, December 13, 2013, Dr. Amin conducted a neuropsychological evaluation of Ms. Andriano. *(Exhibit "E")*

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 5

3.    Correspondence from Lacey Stover Gard, Esq., Assistant Attorney General, Criminal Appeals/Capital Litigation Division, to Dr. Steven E. Pitt, *Re: State of Arizona v. Wendi Elizabeth Andriano,* dated February 5, 2013, 2 pages, not including enclosures;

4.    Correspondence from Lacey Stover Gard, Esq., Assistant Attorney General, Criminal Appeals/Capital Litigation Division, to Dr. Steven E. Pitt, *Re: State of Arizona v. Wendi Elizabeth Andriano,* dated March 12, 2013, 2 pages;

5.    Correspondence from Lacey Stover Gard, Esq., Assistant Attorney General, Criminal Appeals/Capital Litigation Division, to Dr. Steven E. Pitt, *Re: State of Arizona v. Wendi Elizabeth Andriano,* dated April 9, 2013, 1 page, not including enclosures;

6.    Correspondence from Lacey Stover Gard, Esq., Assistant Attorney General, Criminal Appeals/Capital Litigation Division, to Dr. Steven E. Pitt, *Re: State of Arizona v. Wendi Elizabeth Andriano,* dated April 16, 2013, 2 pages, not including enclosure:

      a.    Order for Production of Petitioner's Trial Counsel Files Relating to Instances of Ineffective Assistance of Counsel as Set For Petitioner's Hearing and Petition for Post Conviction Relief *Re: State of Arizona v. Wendi Elizabeth Andriano*, dated March 8, 2013, 4 pages;

7.    Correspondence from Lacey Stover Gard, Esq., Assistant Attorney General, Criminal Appeals/Capital Litigation Division, to Dr. Steven E. Pitt, *Re: State of Arizona v. Wendi Elizabeth Andriano,* dated May 1, 2013, 1 page, not including enclosures;

8.    Correspondence from Lacey Stover Gard, Esq., Assistant Attorney General, Criminal Appeals/Capital Litigation Division, to Dr. Steven

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 6

E. Pitt, *Re: State of Arizona v. Wendi Elizabeth Andriano,* dated July 22, 2013, 1 page, not including enclosures;

9.    Correspondence from Lacey Stover Gard, Esq., Assistant Attorney General, Criminal Appeals/Capital Litigation Division, to Dr. Steven E. Pitt, *Re: State of Arizona v. Wendi Elizabeth Andriano,* dated October 31, 2013, 1 page, not including enclosures;

10.   Correspondence from Lacey Stover Gard, Esq., Assistant Attorney General, Criminal Appeals/Capital Litigation Division, to Dr. Steven E. Pitt and Dr. Kiran Amin, *Re: State of Arizona v. Wendi Elizabeth Andriano,* dated December 5, 2013, 2 pages (*Exhibit "A"*);

11.   Offense and Supplemental reports from the Phoenix Police Department;

12.   Indictment, dated October 18, 2000, 2 pages;

13.   Records from H. Kandy Rohde, Certified Professional Counselor;

14.   Records from the files of trial counsel, David DeLozier, Esq., and Daniel Patterson, Esq.;

15.   Writings authored by Wendi Elizabeth Andriano;

16.   Records from Maricopa County Sheriff's Office:

a.    Correctional Health Services;

b.    Inmate Property Inventory;

c.    Grievance Reports;

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 7

     d.     Disciplinary Action Report;

     e.     Inmate Movement History;

17.     Trial Transcripts - Guilt Phase, dated:

     a.     September 8, 2004;

     b.     September 9, 2004;

     c.     September 13, 2004;

     d.     September 14, 2004;

     e.     September 15, 2004;

     f.     September 16, 2004;

     g.     September 20, 2004;

     h.     September 21, 2004;

     i.     September 22, 2004;

     j.     September 23, 2004;

     k.     September 27, 2004;

     l.     September 28, 2004;

     m.     September 29, 2004;

     n.     October 4, 2004;

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 8

     o.     October 5, 2004;

     p.     October 6, 2004;

     q.     October 7, 2004;

     r.     October 12, 2004;

     s.     October 13, 2004;

     t.     October 14, 2004;

     u.     October 20, 2004;

     v.     October 21, 2004;

     w.     October 25, 2004;

     x.     October 26, 2004;

     y.     October 27, 2004;

     z.     October 28, 2004;

     aa.     November 1, 2004;

     bb.     November 2, 2004;

     cc.     November 3, 2004;

     dd.     November 4, 2004;

     ee.     November 8, 2004;

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 9

     ff.     November 9, 2004;

     gg.     November 10, 2004;

     hh.     November 15, 2004;

     ii.     November 16, 2004;

     jj.     November 17, 2004;

18.    Trial Transcripts - Penalty Phase, dated:

     a.     November 30, 2004;

     b.     December 1, 2004;

     c.     December 7, 2004;

     d.     December 8, 2004;

     e.     December 9, 2004;

     f.     December 13, 2004;

     g.     December 14, 2004;

     h.     December 15, 2004;

     i.     December 16, 2004;

19.    Trial Minute Entry Day 58 Sentence of Death, dated December 22, 2004, 4 pages;

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 10

20. Records from the Arizona Department of Corrections:

   a.     Master Inmate File;

   b.     Medical Records;

21. Records from Maricopa Integrated Health System *Re: Suicide Attempt*, dated September 27, 2003 - September 29, 2003;

22. Opinion, Re: Appeal from the Superior Court in Maricopa County;

23. Petition for Post Conviction Relief, dated February 17, 2012, 71 pages;

24. Response of Petition for Post Conviction Relief, dated July 23, 2012, 69 pages;

25. Reply Memorandum in Support of Petition for Post Conviction Relief, dated September 4, 2012, 31 pages, not including exhibits;

26. Minute Entry, *Re: Granting Evidentiary Hearing*, dated October 30, 2012, 7 pages;

27. Order Authorizing File of Documents Under Seal, dated February 13, 2012, 2 pages;

28. Minute Entry, *Re: Denying the State's Motion to Unseal Except Tab 75,* dated April 27, 2012, 2 pages;

29. "Sealed" PCR Pages;

30. Declaration of:

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 11

a.  Larry A. Hammond, Esq., dated February 16, 2012, 19 pages, not including exhibit;

b.  G. David DeLozier, Esq., dated June 7, 2011, 8 pages, not including exhibits;

c.  Wendi Andriano, dated February 13, 2012, 8 pages;

d.  Constance Boys, dated November 9, 2010, 17 pages;

e.  George Carlin, dated November 11, 2010, 7 pages;

f.  Jeri Lynn Cunningham, dated November 11, 2010, 12 pages;

g.  Mark Keating, dated May 24, 2011, 5 pages;

h.  Nancy Keating, dated May 24, 2011, 6 pages;

i.  Barry Lorts, dated August 19, 2010, 5 pages;

j.  Kelsey Leon McGuffee, Jr., dated September 9, 2011, 8 pages;

k.  Marjorie Micek, dated August 1, 2011, 8 pages;

l.  Jeffrey B. Miller, Esq., dated July 28, 2011, 4 pages, not including exhibit:

    i.  Correspondence from Jeffrey B. Miller Esq., to Wendi Andriano, dated October 10, 2000, 3 pages;

m.  Sharon Murphy, Ph.D., C.I.S.W., dated September 2, 2011, 5 pages;

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 12


    n.    Brenda Nagore, dated November 9, 2010, 10 pages;

    o.    Frank Nagore, dated November 8, 2010, 6 pages;

    p.    Jasper Neace, dated June 7, 2010, 25 pages;

    q.    Alejo Lorenzana Ochoa:

        i.    Dated June 19, 2011, 2 pages;

        ii.    Dated October 26, 2011, 2 pages;

    r.    Brandon Ochoa, dated May 20, 2011, 13 pages;

    s.    Donna Ochoa, dated October 29, 2011, 4 pages;

    t.    Devlin Oke, dated April 22, 2011, 7 pages;

    u.    Gia Palicki, dated May 29, 2011, 8 pages;

    v.    Shelby Wade "Skip" Robertson, dated June 22, 2011, 26 pages;

    w.    Stewart Wade Robertson, dated October 22, 2010, 7 pages;

    x.    Cynthia Denise Schaider, dated May 19, 2011, 17 pages;

    y.    Steven Schaider, dated October 18, 2010, 11 pages;

    z.    John Shaddle, dated July 29, 2011, 6 pages;

    aa.    Shane Weaver, dated August 14, 2011, 2 pages;

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 13

      bb.   Kimberly Wilson, dated July 23, 2011, 7 pages;

      cc.   Barbara Bauer, dated June 18, 2011, 4 pages;

      dd.   Martha Colvin, dated July 21, 2011, 5 pages;

      ee.   Linda Percey, dated July 18, 2011, 3 pages;

      ff.   Jacqueline Sacamano, dated August 10, 2011, 3 pages;

31.   Affidavit of Daniel Patterson, Esq., dated June 14, 2011, 9 pages, not including exhibits;

32.   Affidavit of Scott A. McCleod, dated March 1, 2011, 6 pages;

33.   Deposition Transcript of Shawn King, dated July 11, 2011, 50 pages;

34.   Notice of Defenses and Disclosure by Defendant in Request for Disclosure of Rebuttal Witnesses, dated January 16, 2001, 3 pages;

35.   Motion for Court Order to Assist Mitigation Investigation and Proposed Order, dated November 19, 2004, 2 pages, not including exhibits;

36.   Transcript of interview of Chris Weaver, 20 pages;

37.   Report of Autopsy from the Office of the Medical Examiner, date of examination October 11, 2000, 8 pages, not including attachments;

38.   Report of Toxicological Examination;

39.   Amendment to Medical Examiner's Report of Investigation;

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: *State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 14

40. Phoenix Fire Department, Incident History Report; Re: October 8, 2000, 2 pages;

41. Declaration of Kristen Powers, Re: Earnings, dated February 12, 2012, 3 pages, not including exhibits;

42. Photocopies of Photographs and Contact Sheets taken by Alejo Ochoa, and photocopy of greeting card purportedly authored by Alejo Ochoa;

43. Court Documents Related to Adoption of Nicholas and Ashlee Andriano;

44. Miscellaneous Pre-trial Minute Entries and Orders that include, but are not limited to:

    a. Application for Funds to Properly Represent Defendant;

    b. Request for Expedited Consideration of Application for Funds to Properly Represent Defendant;

    c. Stipulation for Substitution of Counsel;

    d. Motion for Determination of Competency Pursuant to Rule 11, Arizona Rules of Criminal Procedure;

    e. Motion for, and Request for Expedited Consideration of, Appointment of Additional Counsel and Experts for Defendant;

    f. Petition for Withdrawal of Counsel: Leon Thikoll, as "Knapp" Counsel With Consent of Defendant;

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 15

g.    Withdrawal of Counsel: Leon Thikoll, as "Knapp" Counsel;

h.    Consent of Parents of Defendant to Withdrawal of Leon Thikoll as "Knapp" Counsel;

i.    Consent of G. David DeLozier to Withdrawal of Leon Thikoll as "Knapp" Counsel;

j.    Response to Motion for Consideration of Appointment of Additional Counsel and Experts;

k.    Defendant's Reply Re: Appointment of Counsel and Experts;

45.   Motion in Limine, dated March 25, 2003, 4 pages, not including memorandum;

46.   Response to Motion in Limine, dated April 9, 2003, 1 page, not including Memorandum of Points and Authorities;

47.   Notice of Aggravating Factors, dated August 13, 2002, 3 pages;

48.   Miscellaneous documents related to payment of expert Michael J. Sweedo;

49.   Order for Competency Screening Evaluation Report, dated March 9, 2001, 3 pages;

50.   Pre-trial Conference, dated April 18, 2001, 2 pages;

51.   Minute Entry;

52.   Motion to Limit Evaluation of Defendant by State's Expert Dr. Bayless, dated April 28, 2004, 2 pages;

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 16

53. Motion to Preclude Testimony of Dr. Michael B. Bayless, 1 page, not including Memorandum and Affidavit;

54. Ruling , *Re: Scope of Evaluation of Defendant by Dr. Michael B. Bayless;* dated May 12, 2004, 1 page (additional pages missing);

55. Trial Management Conference, dated July 30, 2004, 3 pages;

56. Trial Minute Entry Day 6, dated September 1, 2004, 3 pages;

57. Trial Minute Entry Day 50, dated December 8, 2004, 4 pages;

58. Trial Minute Entry Day 53, dated December 14, 2004, 3 pages;

59. Minute Entry, *Re: Denying the Defendant's Motion for New Trial,* dated February 7, 2005, 1 page;

60. Motion in Limine, dated January 28, 2004, 5 pages;

61. Response to Motion in Limine, dated February 24, 2004, 1 page, not including Memorandum of Points and Authorities;

62. Motion to Present Evidence in Rebuttal to Mitigation Evidence, dated May 7, 2004, 2 pages, not including Memorandum of Points and Authorities;

63. Motion for Disclosure, dated August 16, 2004, 2 pages;

64. Photocopy of Various Sections from the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Revised (DSM-IV-TR);

65. Records from Mesa Police Department *Re: Passing of Counterfeit and Forged Checks;*

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 17

66.  Wendi Andriano's Employment Records from Casa Grande Regional Medical Center;

67.  Wendi Andriano's Employment Application for First West Properties Corporation;

68.  Records Related to Theft by Conversion - Courtyard Apartments, Casa Grande, Arizona;

69.  Preliminary Jury Instructions - Phase I;

70.  Trial Exhibit Worksheet;

71.  Final Jury Instructions - Phase I;

72.  Verdict Form, 1 page;

73.  Motion for Court Order to Assist Mitigation Investigation and Proposed Order, dated November 19, 2004, 3 pages, not including Memorandum of Points and Authorities;

74.  Order for Mitigation Investigation;

75.  Response to Defendant's Motion for Court Order to Assist Mitigation Investigation and Proposed Order, dated November 22, 2004, 2 pages, not including Memorandum of Points and Authorities;

76.  Preliminary Jury Instructions - Phase II;

77.  Final Jury Instructions - Phase II;

78.  Aggravating Factors, dated December 6, 2004, 1 page;

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 18

79.  List of Mitigating Factors, dated December 7, 2004;

80.  Preliminary Jury Instructions - Phase III;

81.  Final Jury Instructions - Phase III;

82.  Motion for New Trial: Phase III, dated December 29, 2004, 1 page, not including Memorandum of Points and Authorities;

83.  Response to Motion for New Trial (Phase III), dated January 19, 2005, 1 page, not including Memorandum of Points and Authorities and Exhibits;

84.  Motion for New Trial: Phase III, dated January 25, 2005, 1 page, not including Memorandum of Points and Authorities;

85.  Factual Supplement to Motion for New Trial: Phase III, dated February 2, 2005, 2 pages, including enclosure Re: Photocopy of Article from *Arizona Republic* titled "Deciding Life, Death Takes Toll on Jurors," dated January 24, 2005;

86.  Appellant's Opening Brief, dated July 17, 2006, 137 pages, not including appendix;

87.  Correspondence from Officer A. Osolin, Legal Liaison, Compliance Division, Maricopa County Sheriff's Office to Barbara Hilterbrant, Office of the Attorney General, Re: Response to March 5, 2013, Request for Information, *Re: Wendi Andriano*; dated March 26, 2013, 1 page not including attachment;

88.  Proposed Order, *Re: State of Arizona v. Wendi Elizabeth Andriano*, dated March 8, 2013, 3 pages;

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 19

89.   [Proposed] Modified Contact Visit Order, *Re: State of Arizona v. Wendi Elizabeth Andriano*, not dated, 5 pages;

90.   [Proposed] Modified Contact Visit Order, *Re: State of Arizona v. Wendi Elizabeth Andriano*, not dated, 5 pages;

91.   Petitioner Wendi Andriano's Response to State of Arizona's Request for Contact Visit Order, *Re: State of Arizona v. Wendi Elizabeth Andriano*, dated November 5, 2013, 5 pages;

92.   Ruling, *Re: State of Arizona v. Wendi Elizabeth Andriano*, dated November 18, 2013, 4 pages;

93.   Contact Visit Order [Capital Case] The Honorable Brian Ishikawa, *Re: State of Arizona v. Wendi Elizabeth Andriano*, dated November 22, 2013, 6 pages;

94.   DVD(S) of Wendi Elizabeth Andriano's Interview with Detectives David Lucero and Sally Dillian;

95.   CD-R *Re: Transcript of Wendi Elizabeth Andriano's Interview with Detectives David Lucero and Sally Dillian*;

96.   Transcript of Wendi Elizabeth Andriano's Interview with Detectives David Lucero and Sally Dillian (*Exhibit "C"*);

97.   CD-R *Re: Discovery:*

    a.   Bates Nos. 1 - 258;

    b.   Bates Nos. 259 - 9255;

    c.   Bates Nos. 9256 - 9715;

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: State of Arizona v. Wendi Elizabeth Andriano
December 27, 2013
Page 20

     d.    Bates Nos. 9722 - 1328;

98.  CD-R Re: Records from Maricopa County Jail - Medical Records;

99.  Compact Discs Re: Crime Scene Photos 1 - 1124;

100. Compact Disc Re: Department of Corrections File;

101. Audio Cassette Tape of Wendi Andriano's Telephone Call With CIGI Insurance Company;

102. Report Re: Competency to Stand Trial Evaluation, completed by Jack Potts, M.D., dated March 28, 2001, 3 pages (Exhibit "D-1");

103. Report of Forensic Psychiatric Evaluation completed by Richard J. Rosengard, D.O., dated August 27, 2002, 6 pages (Exhibit "D-2");

104. Report of Domestic Violence Assessment completed by Sharon B. Murphy, Ph.D., C.I.S.W., dated September 22, 2003, 23 pages, not including exhibits (Exhibit "D-3");

105. Report of Psychological Evaluation completed by Michael Bayless, Ph.D., dated August 4, 2004, 9 pages (Exhibit "D-4");

106. Report of Neuropsychological Testing Authored By Myla H. Young, Ph.D., dated July 11, 2011, 14 pages, not including exhibits (Exhibit "D-5");

107. Report Authored By George W. Woods, Jr., M.D., dated February 14, 2012, 65 pages, not including appendices (Exhibit "D-6");

108. Report Authored By James Hopper, Ph.D., dated February 14, 2012, 251 pages (Exhibit "D-7");

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 21

109. Transcript of Forensic Psychiatric Evaluation of Wendi Elizabeth Andriano, dated November 26, 2013, 233 pages (*Exhibit "B"*);

110. Report of Neuropsychological Evaluation Completed by Kiran Amin, Ph.D., dated December 26, 2013, 5 pages (*Exhibit "E"*);

111. Notes from Forensic Psychiatric Evaluation (*Exhibit "G"*); and

112. DVD(S) of Forensic Psychiatric Evaluation (*Exhibit "I"*).

**QUALIFICATIONS OF EXAMINER**:

I have enclosed a copy of my curriculum vitae which outlines my qualifications to perform this examination. *(Exhibit "H")*

**STATEMENT OF NON-CONFIDENTIALITY**:

Prior to formally beginning the interview, Wendi Elizabeth Andriano was informed of the purpose of the evaluation, the manner in which it would be reported, and the lack of confidentiality inherent therein. Ms. Andriano understood the aforementioned explanation(s) and agreed to proceed.

**N.B.**:

As part of the instant evaluation, I conducted semi-structured interview that covered subject matter which pertained, but was not limited to, Ms. Andriano's mental state prior, during, and subsequent to the instant offense.

Prior to beginning the interview, I discussed with Ms. Andriano my desire to have the evaluation audio and video recorded. Ms. Andriano was aware the interview was being audio and video recorded and would be transcribed and agreed to proceed. To this end, included as an exhibit to

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 22

this report is a transcript of my interview with Ms. Andriano, in addition to unedited DVD(S) of my evaluation. *(Exhibits "B" and "I")*

**Cautionary Statement: In an effort to avoid repetition of information already included within the transcript, I will not repeat this information in detail in the body of my report. Rather, my report will reference those areas in the transcript where the reader can find the information that was covered in the interview. Failure to read the transcript, and/or watch the DVD(S) of the interview, and therefore rely only on that information included in the Diagnostic and Forensic Opinion sections of this report *may* result in an incomplete understanding about how I reached my conclusions. For this reason, the reader is encouraged to read the transcript and/or watch the DVD(S) of the interview *prior* to reading the Diagnostic and Forensic Opinion sections of this report.**

**This report includes multiple citations. These citations are not meant to be all-inclusive but instead represent a sample of some of the more noteworthy examples used underscore a given point. In addition, some citations (or portions thereof) are used more than once.**

**PERSONAL HISTORY**:

During the instant evaluation, I asked Ms. Andriano a number of questions about her personal history that included, but were not limited to, her developmental history, childhood and upbringing, relationship history (with her parents and her spouse) employment history and sexual history. *(Exhibit "B")* In addition, I reviewed a number of documents (including declarations from persons who have known the defendant) that discuss the defendant's upbringing and her relationship with her spouse. *(See "Sources of Information")* As such, I will not be repeating this

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 23

information in detail.  Suffice it to say, Wendi Elizabeth Andriano was born on August 26, 1970, in Groom Texas.[4]  She is an only child and recalled being raised by her mother, her maternal grandmother and her adoptive father, Alejo Ochoa.[5]  (The defendant had a limited childhood recall of her biological father, Skip Roberston who was incarcerated for more than 15 years after he was found guilty of molesting his step-daughter.[6])  Ms. Andriano was disciplined with corporal punishment and (looking back on her childhood) believed that her punishment(s) were in excess of her transgression(s).[7]

Ms. Andriano described her childhood as "not appropriate, pretty stressful."[8]  In the late 70's she and her parents traveled around the country with the Fishers of Men traveling Ministry.[9]  She recalled a childhood in which there "...was always this fear of not having somewhere to live.  There was always this worry about housing. There was always a worry about how to pay for anything. I remember going hungry a lot...".[10]  Ms. Andriano also believed that she was emotionally and physically abused as a child.  The basis for her opinion was not only worrying about where she was going to get her next meal, but having a mother who while physically present was not emotionally present.  As a result, Ms.

---

[4] *Exhibit "B", Date of Birth and Place of Birth, Page 88.*

[5] *Exhibit "B", Raised By, Page 90.*

[6] *Exhibit "B", Family History - Part I - Father, Pages 98 - 101.*

[7] *Exhibit "B", Childhood Discipline, Pages 90 - 94.*

[8] *Exhibit "B", Defendant's Description of Her Childhood, Pages 118 - 122.*

[9] Petition for Post-Conviction Relief, dated February 17, 2012.

[10] *Exhibit "B", Traumatic Childhood Experiences, Pages 94 - 95.*

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: State of Arizona v. Wendi Elizabeth Andriano
December 27, 2013
Page 24

Andriano "...felt like the expectations of being the mom or being a grown-up or being kind of like a grown-up were put on me by my dad.  And I just remember lots and lots of pressure on me to please him.  And lots of times I would feel uncomfortable but I think as a child you just - I just wanted to please my dad.  And I was aware of - of like - of my mom not being there for my dad and so I always felt like I needed to make it up for her, on her behalf...to keep the peace.  I don't know.  I mean I don't know where I got those ex - expectations, but I remember thinking and feeling that way."[11]

Although Ms. Andriano said that she did not have a sexual relationship with her adoptive father, she described him as a "very sexual person" and said that his "overly sexualized behavior just seemed normal" to her.[12, 13] She also said that while she did not witness her father hit her mother, she did observe him throw things at her mother and break things.  She recalled being the one who would often be called upon to broker the peace between them.[14]

Ms. Andriano was home schooled and later, attended Harvest Christian Academy where she was the only person in her graduation class.  With

---

[11] *Exhibit "B"*, Issue Re: Childhood Physical Abuse or Childhood Emotional Abuse, Pages 95 - 98.

[12] *Exhibit "B"*, Relationship Growing Up With Adoptive Father, Pages 109 - 112.

[13] Later during the instant evaluation, Ms. Andriano told me that she thought she may have been sexually abused insofar as "...there was several different men growing up that I feel treated me in sexually inappropriate way."  She cited her adoptive father, a minister who they traveled with and the principal of the school she attended in Case Grande.  *(Exhibit "B"*, Issue Re: Whether or Not Ms. Andriano Believes That She Was the Victim of Childhood Emotional Abuse, Sexual Abuse or Physical Abuse, Pages 172 - 175.)

[14] *Exhibit "B"*, Mother and Adoptive Father's Relationship, Pages 112 - 117.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: State of Arizona v. Wendi Elizabeth Andriano
December 27, 2013
Page 25

the exception of briefly attending Central Arizona Community College, she has no other formal schooling.[15]

Ms. Andriano's employment history includes working as a secretary, leasing agent (at an apartment complex), property manager (at an apartment complex) and in the accounting department at Casa Grande Regional Medical Center.[16]

When she was approximately 21 years of age and over a period of approximately six - eight months, Ms. Andriano engaged in a period of promiscuity and alcohol consumption.[17] (She does not, however, have a history illicit substance use and she does not have a history of alcohol dependence.)

The defendant met Joseph Andriano when she was 21 years of age and following a courtship that lasted approximately 1.5 years, they married.[18] Although Ms. Andriano described the early part of their relationship in positive terms, she said that while her husband was "lots and lots and lots of fun" when he drank beer, he would become "very mean", argumentative and destroy property when he drank "hard liquor".[19] She also said that she was the victim of domestic violence and that her

---

[15] *Exhibit "B",* Educational History, Pages 129 - 134. (I am aware that on her First West Properties Employment Application dated May 21, 1998, Ms. Andriano indicated that she was a college graduate which is simply not true. Bates No. 00000440)

[16] *Exhibit "B",* Employment History, Pages 152 - 156.

[17] *Exhibit "B",* Issue Re: Number of Lifetime Heterosexual Partners, Pages 178 - 180.

[18] *Exhibit "B",* Second Serious Relationship - Joe Andriano, Page 180, Line 20 - Page 183, Line 17.

[19] *Exhibit "B",* Second Serious Relationship - Joe Andriano, Page 184, Lines 1 - 19.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 26

husband was physically abusive and forced her to into having sexual relations with him.[20]

Shortly after they married, Joseph Andriano was diagnosed with a salivary gland tumor for which he initially did not seek conventional medical treatment. Before he was murdered, the malignancy had metastasized to his lungs.[21] (At the time of his death, he was in the early stages of pursuing a civil action regarding the mis-diagnosis/failed diagnosis of his cancer.) Ms. Andriano said that her relationship with her husband changed after his cancer spread insofar as "he just started pulling away from [her]" and their two children.[22]

Ms. Andriano said that in the year prior to her husband's death, she was involved in two extramarital affairs. She claimed to only remember the first name of one of her paramours (Rick Freeland) and said she was unable to recall the name of the person with whom she had the second relationship (Travis Black). That said, Ms. Andriano was able to recall the approximate length of each relationship and was "surprised" when Mr. Freeland testified at trial that he was unaware that she was married.[23]

---

[20]  *Exhibit "B"*, Issue Re: Alleged Domestic Violence - Part I, Pages 187 - 192 and Part II, Pages 198 - 202.

[21]  The autopsy report also noted "well differentiated adenocarcinoma, kidney." (Bates Nos. PCR000340 - PCR000351)

[22]  *Exhibit "B"*, Issue Re: Alleged Domestic Violence - Part I, Page 191, Lines 6 - 22.

[23]  *Exhibit "B"*, Issue Re: Extramarital Relationships, Pages 202 - 205.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 27


## PSYCHIATRIC HISTORY:

When we met, Ms. Andriano informed me that there was a family history of substance use and mood disorders.[24]  She also told me that she had a pre-offense history of suffering from a mood disturbance and anxiety.[25] That said, the only treatment that Ms. Andriano received prior to the instant offense was two counseling sessions from an Employee Assistance Program after it was discovered that she stole money while employed as a staff accountant at Casa Grande Regional Medical Center. [26] (*See also* "Legal History" and "Issue of Diagnosis") The progress notes from these sessions are noteworthy for Ms. Andriano complaining of "...problems with sleeping [and] focusing [at] work...".  They also note that she "appear[ed] to be depressed" and that "she would be a good candidate for a mild anti-depressant to help her sleep better and cope with the stresses she is facing at work and at home".  These same records note that for a brief period of time, Ms. Andriano took anti-depressant medication "...but had a bad reaction to them...".  She was given a diagnosis of "309.40" (Adjustment Disorder With Mixed Disturbance of Emotions and Conduct) and a rule out diagnosis of "Major Depression".[27]

Following her arrest, Ms. Andriano was booked into the Maricopa County Jail.  A "Correctional Health Services Initial Assessment - Part II" noted that Ms. Andriano claimed that she was an adult abuse victim but not a

---

[24] "*Exhibit "B"*, Family History - Part I (Pages 98 - 117) and Part II (Pages 161 - 164); and Family Psychiatric History, Pages 164 - 167.

[25] "*Exhibit "B"*, Psychiatric History Prior to October 8, 2000, Part I (Pages 61 - 72).

[26] Ms. Andriano informed her counselor that she had stolen $2,000.00 "from the nursing home the last month to hep pay off some of her personal debt." (Bates No. PCRDIS-P000562.)  In reality, the extent of Ms. Andriano's theft was much more substantial.  (*See also* Legal History)

[27] Bates Nos. PCRDIS-P000561 - PCRDIS-P000569.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 28

victim of child abuse.[28]  Subsequent "Health Appraisal and Data Base" forms (dated January 4, 2001, September 24, 2002, October 1, 2003, October 8, 2004) were silent about Ms. Andriano being a victim of childhood or adult abuse and described the defendant's mental status as alert and oriented, and her mood and content of thought as normal.[29]

Notwithstanding the aforementioned entries, a psychiatric progress note dated November 3, 2000, noted that Ms. Andriano had been "extremely depressed" for "at least a year."[30]  The defendant was initially diagnosed with a Depressive Disorder Not Otherwise Specified and over time, her complaints were treated with a variety of psychotropic medications.

In 2002, Ms. Andriano's primary complaints were poor concentration, anxiety, sleep disturbance and stress.[31]  However, on October 3, 2002, there is an entry which states in part, "Inmate requested to speak to psych. due to PTSD."[32]

Late in the evening on September 27, 2003, Ms. Andriano used (I believe) a pencil to cut her left hand and left antecubital area in an apparent impulsive suicide gesture.[33]  The next day, Ms. Andriano

---

[28]  Bates No. PCRDIS - P001111.

[29]  Bates Nos. PCRDIS - P001110; PCRDIS - P001114; PCRDIS - P001109; PCRDIS - P001115; PCRDIS - P001108; PCRDIS - P001116.

[30]  Bates No. PCRDIS - P001120.

[31]  *Ibid.*

[32]  Bates No. PCRDIS - P001121 (This entry follows a September 28, 2002, counseling session Ms. Andriano had with Ms. Rohde which states in part, "I told her that I would ask that the psychiatrist see her ASAP.  I believe she was having PTSD flashbacks of being with Joe." Bates No. PCRDIS - P000269.)

[33]  Bates No. PCRDIS - P001122; and 000009722 - 000009745.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: State of Arizona v. Wendi Elizabeth Andriano
December 27, 2013
Page 29

explained  that she committed the aforementioned act because "[She] was angry at being in jail."[34]

On September 29, 2003, a "Counselor Admit Note" authored by L. King was noteworthy for the defendant's lack of psychiatric history prior to her arrest.  To wit, "...pt. has no [psychiatric] hx., prior to custody except for brief contact through EAP at work."[35]

On December 23, 2004 (one day after she was sentenced to death), Ms. Andriano was transferred to the Arizona Department of Corrections (ADOC).  Ms. Andriano's ADOC medical file is noteworthy for being diagnosed with, and treated for, Depressive Disorder Not Otherwise Specified, in addition to an Adjustment Disorder with Depressed Mood and Anxiety and, panic attacks.  However, on July 20, 2012, Ms. Andriano completed a Health Needs Request form and wrote, in part:[36]

> "I do not wish to take psych meds!"[37]

In addition to the aforementioned mental health issues, on April 1, 2009, Ms. Andriano had a benign mass removed from her right axilla.[38]

---

[34]  Bates No. PCRDIS - P001126; and 000009722 - 000009745.

[35]  Bates no. PCRDIS - P001127.

[36]  Bates No. 000012152.

[37]  At the time of the instant evaluation, Ms. Andriano was taking the anti-anxiety medication, BuSpar®. (*Exhibit "B"*, Medications, Page 58)

[38]  Bates Nos. 000012018 and 000011973.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 30

## LEGAL HISTORY:

Prior to her arrest for the instant offense, Ms. Andriano had never been arrested or charged with a crime.  That said, she did engage in criminal conduct.  To wit:

March 1995 - January 1996:

While employed at Casa Grande Regional Medical Center, Ms. Andriano was involved in a fraud scheme by forgery in which she profited $18, 336.05.  Although she was never criminally charged, Ms. Andriano's employment was terminated.[39]

1999:

In 1999, while employed as a leasing agent at Courtyard Apartments in Casa Grande, Ms. Andriano was involved in theft by conversion.  The extent of the theft ranged from $8,338.17 - $30,000.00.  Although she was never criminally charged, Ms. Andriano was terminated on September 6, 1999, for reasons unrelated to this offense.[40] (Apparently, management learned of the theft after Ms. Andriano was terminated.)

May 2001:

While incarcerated in the Maricopa County Jail and awaiting trial for the instant offense, Ms. Andriano was involved in a scheme to cash fraudulent counterfeit checks.  Although never formerly charged for this offense, contained within the Mesa Police Department records is a letter authored

---

[39]  Bates Nos. 000004221 - 000004339.

[40]  Bates Nos. 000004341 - 000004364.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: State of Arizona v. Wendi Elizabeth Andriano
December 27, 2013
Page 31

by Ms. Andriano instructing her unwitting "friend" how to execute the scheme.[41]

In addition, following her arrest, it was discovered that while employed as the property manager at San Riva's apartments, Ms. Andriano also engaged in theft by conversion.[42]

## STATE'S VERSION OF THE INSTANT OFFENSE:

The State's version of the instant offense is memorialized in the Phoenix Police Department Offense and Supplemental Reports in addition to the trial transcripts. A succinct summary can also be found in the Opinion rendered by the Supreme Court of Arizona in response to the Defendant's Appeal. Specifically, Vice Chief Justice Rebecca White Berch wrote, in part:[43]

> In 2004, Wendi Andriano was found guilty of one count of first degree murder and sentenced to death. This automatic appeal followed...
>
> Wendi Andriano, her terminally ill husband, Joe, and their two small children attended a barbeque on October 7, 2000. They returned to their apartment around midnight and put the children to bed.
>
> At about 2:15 a.m. on October 8, Andriano called Chris, a coworker who also lived at the apartment complex, and asked

---

[41] Bates Nos. 000004366 - 000004390.

[42] Bates No. 000009600.

[43] Vice Chief Justice also noted that, "We view the facts in the light most favorable to sustaining the verdict. *State v. Tucker*, 205 Ariz. 157, 160 n.1, 68 P.3d 110, 113 n.1 (2003)."

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: *State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 32

her to watch the children while Andriano took Joe to the doctor. When Chris arrived, Andriano met her outside the apartment. She told Chris, "I have a problem. Don't ask any questions. My husband's in on the floor dying and I haven't called 911 yet." When Andriano cautioned, "He doesn't know I haven't called 911," Chris urged her to make the call.

Upon entering the apartment, Chris found Joe lying on the living room floor in the fetal position. He had vomited, appeared weak, and was having difficulty breathing. While Andriano was in another room calling 911, Joe told Chris that he needed help and had "for a long time." He asked why it was taking forty-five minutes for the paramedics to arrive.

Andriano returned to the room and told Chris she needed to get Joe to the car so she could drive him to the hospital because the paramedics were responding to another call. Joe said he could not get up, so Andriano tried to lift him. When she could not, she became irritated and yelled at Joe, using profanities. Hearing sirens approaching, Chris went out to direct the paramedics to the apartment as Joe began to vomit again.

As the paramedics were unloading their equipment, Andriano came out of the apartment screaming at them to go away. She then slammed the door. Chris and four paramedics knocked on the apartment door, but no one answered. After five to ten minutes of knocking, the Phoenix Fire Department alarm room called the Andrianos' home telephone in an attempt to get Andriano to open the door. The alarm room notified the paramedics that contact had been made with someone in the apartment who would come out to speak with them. Rather than coming through the front door, which

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 33

opened to the living room, Andriano went out through her back door, climbed over the back patio wall, and walked around the apartment building to the front door, where Chris and the paramedics were standing. Andriano had changed her shirt and her hair was wet. She told the paramedics that Joe was dying of cancer and had a do-not-resuscitate order. She explained that "this was not the way that he wanted to go." The paramedics and Chris left without going into the apartment.

Andriano called 911 again at 3:39 a.m. The same paramedics responded and saw Andriano, wearing a bloody shirt, standing outside the apartment talking to a police officer.

When the paramedics entered the apartment, they found Joe lying on the floor in a pool of blood. He had a deep stab wound to the left side of his neck and lacerations on his head that exposed some brain matter. A police detective observed at 3:52 a.m. that the blood surrounding Joe's head was already starting to dry. A broken bar stool covered in blood was found near Joe's body, as were pieces of a lamp, a kitchen knife with blood on the sharp edge, a bloody pillow, and a belt.

A search of Andrianos' storage unit revealed an open cardboard shipping box containing a 500-gram bottle of sodium azide, two Tupperware containers containing sodium azide, nine Q-tips, a plastic knife and for, and two pairs of latex gloves. Andriano's fingerprints were on the plastic knife and the vacuum-packed bag in which the cardboard box was shipped. During a search of Andrianos' apartment, the police found gelatin capsules filled with sodium azide in a bottle labeled for an herbal supplement. Trace amounts of sodium

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 34

azide were also discovered in the contents of a pot and two soup bowls in the kitchen. In all, 20.8 grams of sodium azide could not be accounted for.

The medical examiner determined that Joe sustained brain hemorrhaging caused by no fewer than twenty-three blows to the back of his head, eight to ten of which independently could have rendered Joe unconscious. Defensive wounds on Joe's hands and wrists indicated, however, that he was conscious for at least part of the attack. Joe also sustained a 3 and 3/4-inch-long by 2-inch-wide stab wound to the left side of his neck that extended to his spine and severed his carotid artery. The medical examiner opined that the blows to the head were sustained before the stab wound to the neck and that Joe was still alive, although likely unconscious, when he was stabbed. Trace amounts of sodium azide were found in Joe's blood and gastric contents. The cause of death was attributed to blunt force trauma and the stab wound.

Based on the blood spatter and other evidence, a Phoenix police detective opined that Joe was lying down while he was being struck and did not get up during the attack. He further opined, based on the absence of arterial spurting on the belt and the knife, that both items were placed beside Joe's body after he died. Blood spatter on the bar stool, on the other hand, suggested that the stool was present when the arterial spurting began.

After being taken into custody, Andriano called one of her coworkers and asked her to hide certain items that were in Andriano's business office. Andriano's adoptive father told a police detective on the day of the murder, "I remember [Andriano] telling me that she stabbed [Joe]."

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 35

...At trial, Andriano testified that after a failed assisted suicide attempt by poison, she and Joe got into a fight, during which she hit Joe with a bar stool in self-defense. She claimed that he ultimately slit his own throat. The jury found Andriano guilty of first degree murder and further found that the murder was a dangerous felony...

## REPORT OF AUTOPSY:

On October 11, 2000, Maricopa County Medical Examiner, Philip E. Keen, M.D., conducted an autopsy on Joseph D. Andriano. In his report, Dr. Keen provided the following pathologic diagnoses:

I.   Multiple blunt force injuries head and scalp.
   A.   Superficial incised wounds scalp, posterior shoulders and both hands.
   B.   Contusion dorsum right wrist.
   C.   Deep incised wound left lateral neck.
   D.   Subarachnoid hemorrhage left temporal lobe brain secondary to blunt force craniocerebral trauma.

II.   Moderately well differentiated adenocarcinoma, kidney.

III.   Widely metastatic adenocarcinoma involving lungs, medlastinal lymph nodes, periaortic lymph nodes and kidneys.

In the same report, Dr. Keen opined that:

The cause of death was "multiple blunt force and incised injuries" and the manner of death was "homicide."

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 36

On January 5, 2001, Dr. Keen amended his report to indicate that the means of death was "blunt force trauma."

## REPORT OF TOXICOLOGICAL EXAMINATION:

On December 27, 2000, toxicology results were returned and were noteworthy for the absence of alcohol, illicit drugs or narcotic analgesic medications. However, results were positive for the presence of Sodium Azide 3.8mg/L.

## COURSE SINCE ARREST:

While incarcerated at the Maricopa County Jail, Ms. Andriano was cited for:

- December 2, 2003 - Possession of Unauthorized Items:[44]

    On December 3, 2003, a search of Ms. Andriano's cell produced "a compact with a glass mirror." Additional contraband included "2 black pens, a new lipstick in a metal case, lipgloss and eyeliner."

Apparently, this was Ms. Andriano's third offense and she received 20 days full restriction.

- December 10, 2003 - Possessing, Hoarding or Misuse of Prescribed Narcotics or Other Dangerous Prescribed Drugs:[45]

---

[44] Bates no PCRDIS - P001722.

[45] Bates No. PCRDIS - P001723 - P001724.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 37

On December 10, 2003, a Seroquel® pill was found on one of Ms. Andriano's blankets.

Ms. Andriano's cellmate said the pill belonged to her and Ms. Andriano filed an appeal.  However, she received a 30 day full restriction.

On December 23, 2004, Ms. Andriano was transferred to the Arizona Department of Corrections. During her incarceration, Ms. Andriano has written myriad inmate letters about a variety of topics.  All of her letters are well written and logical.   In addition, on August 10, 2005, Ms. Andriano wrote:[46]

"According to my religious beliefs, my body is the temple of the Holy Spirit.  I am required to keep it clean and pure.  In doing so, I may not consume the flesh from an animal.  Please remove all meat and/or meat products from my diet."

On July 6, 2007, Ms. Andriano completed a "religious preference and privilege request" and wrote that she was changing her religious preference from Christian to Messianic Jewish and as such, requested a kosher diet.[47] (When we met, she described her present day religious affiliation as "...Christian more than anything." [48])

---

[46] Bates No. 000011386.

[47] Bates No. 000011377.

[48] *Exhibit "B",* Page 85, Lines 6 - 8.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 38

With respect to disciplinary infractions while incarcerated at ADOC, these include:

January 20, 2006:

Ms. Andriano's cell was searched because of information that was secured from a search of another inmate's cell. Contraband in the form of letters were seized from her cell.[49]

March 24, 2008:

Ms. Andriano was cited for "introduction of contraband" after she was found using her "kosher tray" to transport two bags of tobacco.[50]

## DEFENDANT'S VERSION OF THE OFFENSE:

Subsequent to committing the instant offense, the defendant was interviewed by Phoenix Police Department Homicide Detectives David Lucero and Sally Dillian and provided her version of the instant offense.

Subsequent to being charged with murdering her husband, Ms. Andriano provided her version of the offense to several mental health professionals. To this end, I have taken the liberty of including below what Ms. Andriano told Detectives Lucero and Dillian in addition to several mental health professionals.[51]

---

[49] Bates No. 000011365.

[50] Bates No. 000011360.

[51] It does not appear that Drs. Young, Woods or Hopper asked Ms. Andriano to recount her role in the instant offense. Alternatively, if they did, this information was not contained in their reports.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 39


A.    Phoenix Police Department:

In his Supplement, dated October 18, 2000, Detective Lucero wrote, in part:[52]

> This interview began by obtaining Wendi's biographical information.  Wendi is the wife of victim Joseph Andriano.  She had been the manager at the San Riva Apartment Complex where this incident occurred, for approximately one year.

> Wendi asked if she needed an attorney.  I told her that it was up to her and that I could not give her legal advise.  She also asked if she was under arrest.  I told her we were trying to figure everything out and that she was not free to leave.  I told her that because she was not free to leave, I was going to advise her of her rights.

> I advised Wendi of her Miranda warnings per the department issued card.  She stated, "Ya" to understanding.

> I told Wendi that I wanted to record any injuries she might have.  She agreed at which time I left the interview room for a short time to speak with a police photographer.  I returned a couple of minutes later with photographer Tina Ayala #A3894 and documented Wendi's injuries.

> I observed the following injuries on Wendi:

> •     Bruising on the inside of her right wrist.

---

[52] Ms. Andriano's interview was transcribed (*Exhibit "C"*).

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 40

- Small cut on the index finger of her right hand.
- Bruising to index finger on her right hand.
- Broken finger nail on her left hand middle finger.
- Abrasion on right hand middle finger knuckle.
- Small cut and swelling to palm area on left hand.
- Bruising on left hand index finger.
- Bruising on left hand middle finger.
- Superficial scratches on front and both side of neck.
- Broken right thumb nail.
- Complained of pain in rib area.
- Scrape on outside of right calf.
- Complained of a headache and pain at the back of her head.

Wendi who was clothed in a white cotton tee shirt and black jean style shorts, had a large amount of blood spatter on the front of her shirt and shorts.

Wendi and Joe began dating in March of 1992 and married in January of 1994. They lived together for a short time prior to getting married. They have two children, three year old Nicholas and two year old Ashley.

I questioned Wendi about using any type of street drug, prescription medication or alcohol prior to this incident. She denied using any of the three.

Joe had been diagnosed with adenoid cystic carcinoma. He tried the "homopathic way" but this did not appear to be working. Approximately four months ago he began taking chemotherapy treatments. He had four treatments which were taken approximately three weeks apart. His last treatment was approximately one week ago. He had also been getting some unknown type of shot daily...

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 41

On Saturday morning 100700, Wendi, Joe and both children along with Joe's mother, went to the swap meet where they purchased toys for the children. After leaving the swap meet, they drove to the store where they purchased steaks for a barbecue at Joe's mother's house. After leaving the store, they returned home to their apartment.

In the afternoon between 1400 and 1500 hours, Wendi's parents stopped by to visit. There were no problems between Wendi and Joe at this time but Wendi's father was upset at her mother. She believed her father was upset as he wanted to go home and her mother was taking to long. Wendi's father left the apartment and while outside began honking his vehicle horn. This irritated Joe.

After Wendi's parents left, Joe and both children layed down to take a nap. Wendi did not take a nap and read a book instead.

At approximately 1730 hours, Wendi, Joe and both children left their apartment and drove to Casa Grande where they ate dinner with Joe's parents. They stayed and visited after dinner leaving his parents house between 2230 and 2330 hours.

I asked Wendi if there were any problems between her and Joe while at his parents house. She stated she was not around him much and because of this did not know. She also stated she was not concentrating on him.

When they arrived home, they tucked the kids in bed prior to going to their bedroom. Once in their bedroom, Wendi got

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 42

into her pajamas and got into bed.  While in bed, Wendi began reading a book while Joe watched TV.

While lying in bed, Joe began questioning Wendi again about what occurred on the night of her birthday.  Joe continued to ask Wendi why she did not have her wedding ring on.  She stated that this was the "same old what ever".  This irritated Wendi.

After arguing, Joe wanted to have sex with Wendi because he "could not sleep and was frustrated or whatever".  Wendi suggested they go to the bathroom and take a bath.  Joe agreed and they both went to the bathroom where Wendi ran a "bubble bath" for them.  She also lit several candles in the bathroom.  This occurred at approximately 0100 hours.

While sitting in the bathtub together, they began arguing.  This involved Joe asking Wendi several questions about her getting fake fingernails and purchasing a new pair of underwear.  She stated that during this argument, Joe "built himself into a rage".

After arguing in the bathroom for approximately ten minutes, Wendi got out of the bathtub and put on a t-shirt and shorts.  Joe got out a couple of minutes later and attempted to continue the argument.  Wendi states that she did not argue with Joe which upset him more.  Wendi then became "irritated".

As the argument continued, Joe began pushing Wendi.  He pushed her into both the dresser and onto the bed.  She believed he was doing this in an attempt to make her mad.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 43

Wendi told Joe that if he was going to continue to argue, she wanted to go to the living room so the kids would not hear them.

Wendi who had been complaining of a bad headache, stated she was sick to her stomach and needed to use the restroom. Due to this, I stopped the interview and had detective Dillian take Wendi to the restroom. It should be noted that Wendi also asked for aspirin and was given aspirin and water.

Upon returning to the interview room, I continued my interview with Wendi.

Once in the living room, Joe pushed Wendi into their wedding display case shattering it. Joe attempted to grab Wendi around the waist in a bear hug, but Wendi resisted at which time they "wrestled" around. Wendi stated that "from experience" she knew Joe was going to attempt to go for her neck.

Wendi became frightened when Joe broke their wedding display case. In the past, no matter what happened they had never threatened to divorce one another. She described herself as being "freaked out" at this point.

While wrestling, Joe began looking for something to grab which she believed to be a belt. At this point, Wendi was able to "wiggle" away from Joe and grabbed a bar stool. Wendi stated, "My thoughts at that point were knock him unconscious so he can leave my alone because he is in a rage, I don't know what else to do". When Joe bent over to pick up the belt, Wendi "konked" Joe on the head with the bar stool. When she did this, Joe "bellowed" and became "so pissed".

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: State of Arizona v. Wendi Elizabeth Andriano
December 27, 2013
Page 44

She states when he looked up at her, he had "fire in his eyes". Joe then leaned over to pick up the belt again at which time Wendi struck him in the head one or two times with the bar stool which broke in her hands. Joe who had been knocked to the ground, stood up holding the belt in his hand. Wendi began apologizing to Joe who was now bleeding.

Wendi changed her story slightly at this point stating that Joe was now on the ground.

Wendi got a pillow and a blanket and gave it to Joe who was now lying on the living room floor. Wendi states she was trying to make him better but did not know what to do. She also states she knew she needed to take him to the hospital. Wendi called her friend Chris who lives at San Riva. She told Chris she believed Joe was having a heart attack and asked if she could come over and stay with their children while she took Joe to the hospital. She states she told Chris this because she did not want Chris to know what was going on in her personal life.

While waiting for Chris to come over, Wendi covered the blood on the carpet with a towel. She states she did this because she did not want Chris to see what had happened. Wendi described the blood being on the living room floor near Joe. She described Joe at this point as being "dazed" which was "freaking" her out.

When Chris arrived, she told Wendi to call 911 which she did. Wendi told the 911 operator that Joe was having a heart attack. The 911 operator asked Wendi about Joe's color which Wendi described as being "fine". Wendi believed Joe could not "focus" on her which scared her.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 45

After Wendi's 911 call, Chris went out front to wait for the ambulance.  While Chris was outside, Joe "starts coming to" at which time he tells Wendi to get Chris out of here.  She states Joe "sees what's going on" and gets pissed at her.  He also tells her that he is not going to the hospital and to make the ambulance go away.

While inside with Joe, Wendi received a phone call from the fire department.  She was told that she had to go outside and talk to the firemen.  Wendi exited through her bedroom door and met the firemen outside.  She states she told the firemen that her husband was sick and to leave him alone.  She also told them they were having problems and that her husband did not want them here.  Wendi also told Chris to go home and that she would call her later.

When Wendi returned to their apartment Joe was standing up.  Joe who was upset began yelling at her asking her why she hit him.  Joe grabbed his cellular phone which had been attached the a charger and wrapped the charging cord around her neck.  This occurred in the living room.

While Joe was attempting to choke Wendi with the cord, she was able to grab the cord which was "stretchy" and pull it away from her neck.  Wendi states that as this was occurring, she worked her way into the kitchen where she thought about getting a knife to cut the cord.  Wendi reached into the kitchen drawer where she obtained a knife.  Joe attempted to pull her away from the knife at which time she grabbed onto he refrigerator.  After obtaining the knife, Wendi cut the cellular phone cord which was still wrapped around her neck.  I asked Wendi if she was having trouble breathing when the cord was wrapped around her neck.  She states that she was

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 46

and had "almost" blacked out.  She believes this made her very "panicky and scared".  She also believed that if she were to black out, he would kill her because he had been threatening to kill her.

Wendi states the next memory she had, was being back in the living room struggling with Joe.  Wendi states that she still had the knife in her hand and the next thing she knew, she had blood all over her.  The blood was on her glasses, her face and on her clothing.

Wendi described Joe as now being in the living room lying face down on the floor.  She also described there being blood everywhere.

Wendi went into the bathroom where she rinsed off her glasses and her hands.  She then stood in the bath tub where she rinsed the blood off of her legs.  She states she was "disgusted" because she had blood all over her.

After washing, Wendi called her father on the phone from the bathroom.  She did not know if Joe was still alive at this point and was afraid to go back into the living room.  She states the only thing she could think of was that "she hoped to God that Nicholas does not wake up."

It should be noted that Wendi acted as though she was going to cry at this point, but never did.  She showed very little emotion through out the interview.

When Wendi initially called her father the answering machine picked up.  She tried to call him again both on his home phone and on his cellular phone but received no answer.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 47

Between phone calls, Wendi walked into the hallway where she looked into the living room.  Joe was who was still lying on the living room floor was not moving and appeared blue in color.

Wendi was eventually able to reach her aunt, Lupe Garcia who lives in the same home as her father.  She told Lupe that she had an emergency and asked her to get her father.

When Wendi's father called back, she told him that Joe was dead on the living room floor.  She told him they had been in a fight and asked him what to do.  Her father told her she needed to call 911.  She is unsure how long her conversation lasted with her father but states he asked her "fifty million questions".

After hanging up with her father, Wendi returned to the bathroom where she threw up in the toilet.  Wendi then returned to the living room where she called 911.

Wendi states she told the 911 operator that Joe was dead. The operator told Wendi to roll Joe over which she initially refused to do.  The operator told her that after she rolled him over she needed to help Joe b placing a rag on his neck. Wendi stated that the operator was "insane" and had no idea was she was looking at.  Wendi rolled Joe over onto his back and placed a blanket on his neck.  It was at this point that the police arrived.

Wendi said she had no idea how many times Joe was cut with the knife.  She then stated she did not stab him if that is what I was asking.  She denied knowing how he was cut with the

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 48

knife although she admitted to having it in her hand when Joe fell to the ground.

I asked Wendi if Joe choked her with anything other than the cellular phone cord. She began telling me he choked her with a belt prior to him choking her with the cord.

Wendi did not know how long she waited to call her father after Joe had been stabbed. Upon questioning her further about this, she believed it could have been an hour between the time Joe was stabbed and when she was able to speak to her father on the phone. During this time Wendi sat in the bathroom listening to Joe who was making "noises". She said she was able to hear Joe talking and believed he was going to come and "get her". Once the noise stopped, she went to the master bedroom where she called her father.

It should be noted that at one point, she states she had to go into the living room to answer the phone when her father called although she said she had a phone in the bathroom when she attempted to call him earlier.

Wendi said she did not call 911 during the time she spent in the bathroom because she did not have the phone with her. She later said she talked to her father a couple of times on his cellular phone while he was enroute from Casa Grande.

Between the time when Joe was stabbed and the time Wendi called 911, she walked into the living room where she checked on Joe. She described Joe a lying face down on the living room floor not moving. She believed Joe was dead at this point.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 49

Upon going over the incident again, Wendi believed the stabbing occurred fifteen to twenty minutes after the fire department left. I asked Wendi if she ever hit Joe with the bar stool once he was on the ground. She said Joe was on "all fours" on the ground and was going to "still get" her and because of this she continued to hit him with the bar stool. She was unsure how many times she hit him.

I asked Wendi how long the doctors expected Joe to live. The doctor last told Joe that he could continue chemo treatments for nine months. The doctor told him that within a couple of months of the last chemo treatment, the cancer would put him in the hospital as he would be unable to breath. She also had a friend who's father had the same type of cancer and died after three months of treatment. Based on this, she believed Joe would die "soon".

Wendi and Joe both had their own cellular phones. The number for Wendi's phone is (602) 826-0997 and Joe's is (602) 618-9177. She denied using Joe's cellular phone during this incident...

...I asked Wendi how the injuries to her fingers occurred. She said she did not know. I asked her about any type of alcohol or drug use. She admitted to being a social drinker but denied any drug usage. She said Joe did not drink but believed he was possibly using drugs. She said she based this on his personality changes.

...I asked Wendi if she was having an affair. She denied this although she did admit to socializing with male friends outside of work.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 50

At this time in the interview, Wendi's injuries were photographed again to show the development of her injuries.

After photographing Wendi's injuries, she was taken from the interview room to the records and identification bureau where she was fingerprinted.

After being fingerprinted and after the arrival of medical assistant Homer Shaulis, a blood sample and head hair samples were obtained from Wendi...

...Following the blood draw, I continued my interview with Wendi.

I told Wendi that Chris was providing a different story of what occurred. I told her Chris said Joe was not bleeding when she was there. Wendi said Joe was bleeding and that she had covered him with a towel.

I told Wendi that based upon what Chris and the fire department was telling us, it appeared as she had showered and changed when she went out front to meet the firemen. She denied this.

I told Wendi I did not believe her and that she needed to be honest. She continued to maintain that she was telling the truth. I told her I believed she was having an affair and that Joe found out about this which started the fight. Wendi changed her story at this point and admitted to having a sexual affair with a couple of different guys. She also admitted to telling Chris that Joe believed she was having an affair, but continued to deny that Joe actually knew she was.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 51

Wendi changed her story again saying that when the fire department arrived, she asked Joe if he really wanted them to see him in this condition.  While sitting next to Joe talking to him, Joe grabbed Wendi at which time he got blood on her face and in her hair.  Because of this, Wendi dunked her hair in the sink.  She also admitted to changing her shorts prior to going out to speak to the firemen but denied changing her shirt.

I asked Wendi how she was able to cut the cord from her neck without cutting herself.  She said she was able to due this because she had the cord in her hand.

Wendi did admit to hitting Joe repeatedly with the bar stool until it broke.  She continued to say this occurred after the fire department left.  She described Joe being on "all fours" at this time and states she did this because she believed he was going to get up and get her.  She also states he told her he was going to kill her.

I asked Wendi why she did not ask the fire department for help instead of sending them away.  She said she did not because she believed Joe was going to stop.

Wendi changed he story again and said she actually obtained the knife before Chris came over.  She believed the knife was sitting on either the lazy boy chair or on the couch while Chris was there.  She states that Joe had threatened her and because of this, she grabbed the knife and told him that if he were to come near her she would get him.

I told Wendi I believed Joe was on the ground when his neck was cut.  She described him as sitting up and then falling

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 52

forward.  Wendi was sotting on the ground next to Joe at this time.

I asked Wendi why she stabbed Joe.  She said she felt as though she was watching a "zombie still trying to get me, that is why".  She believed she had the knife in her left hand at that time.  She then stated that Joe fell forward onto the knife.  She denied stabbing him anywhere else.  She continued to maintain that the stabbing occurred after the fire department left.

I asked Wendi why she did not try to help Joe after he hade been stabbed.  She said she could not because she had blood all over her.  She denied wanting Joe to die.

Wendi was interviewed further but maintained the same basic story...

...It should be noted that the first video tape recording of Wendi ended at approximately 1107 hours. The second video tape recording began at approximately 1245 hours.  During the time between 1107 and 1245 hours, Wendi was fingerprinted and then returned to the interview room where she waited until the arrival of medical assistant Homer Shaulis.  She was not interviewed during this time.

While in the interview room not being interviewed, Wendi made a phone cal to her coworker Shannon Sweeney.  During this call, Wendi asked Shannon to remove all of her personal paperwork from the office which was stored in a wicker basket.  Wendi was not being recorded at the time the call was made.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 53

Detective Dillian, Officer Marriner and I were able to both hear and see Wendi making this call from the monitoring room. Based on this, I contacted Sergeant Smallman and asked him to secure the office.  Upon entering the office, Sergeant Smallman observed Shannon Sweeney going through papers in the office.  Sergeant Smallman had Shannon leave the papers.

Detective Ballentine contacted Shannon Sweeney.  Shannon confirmed that she had received a phone call from Wendi asking her to remove her personal paper work from the office. Detective Ballentine obtained a search warrant and recovered Wendi's personal paper work.  Refer to Detective Ballentine's Supplement for details...

B.    H. Kandy Rohde, Certified Professional Counselor:

Subsequent to her arrest, Ms. Rohde met with the Defendant on multiple occasions.  In her progress notes, Ms. Rohde memorialized at different times what the Defendant said regarding her role in the instant offense. To wit:

i.    November 14, 2001:

...She said that she cannot construct a time line of the night of Joe's death because she did not keep track of the time. She knew she had gone to work in the office for about an hour in the morning.  She took the kids.  She did this regularly on Saturdays.  Joe was alone in the apartment and could have expected to be alone.  Did he use that time to poison the food?  She said that she cannot bear to think of him poisoning the food.  She said that they went to Joe's parents' house around 3 or 4 and they got home about 11:30.  She said that

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 54

the police came while it was still dark and she must have sat outside about an hour in the dark. She said that she believed that telling Joe about the affair would calm him down and she was shocked that it upset him more. She said that she knew he suspected it and she thought that she would have preferred the truth to a false denial. She thought they could work it out if she were truthful. She said that she knows they are testing fingerprints and wonders if his prints will be on the food containers and on the poison. She said that he never cooked and he would not have handled food in the frig. She said that he had opened the box with the poison and his prints could be on it. She said that the poison had been on his nightstand (the elderberry container with the filled capsules).

ii.    <u>May 23, 2002</u>:

I told her that the autopsy showed many stab wounds and she cried. She said she did not know that and the idea of it upset her. I suggested that he probably did not stab himself multiple times. She said that knowing that was terrible. I suggested that she might be feeling the worst and that letting the memory come back might be less painful than keeping it down. She said that she understood that but did not know if she could. I suggested that she pray for the courage and let God make the choice. I told her I would bring the autopsy report next time and she said she would read it. She said that she has been told so many things by different people that she is confused about their scenarios and her recollections. I asked her about the interrogation tape. She said that she recalls that the male officer was angry and hostile and the female tried to reassure her. She said that she was numb and was not connected to anything that went on. She said that she would not be surprised if she lied because it was foremost

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: State of Arizona v. Wendi Elizabeth Andriano
December 27, 2013
Page 55

in her mind to protect Joe's memory.  I asked her about the
phone call to the insurance company.  She said that Joe did
talk to the agent on the $5000 policy that was paid.  She said
that she made the call initially and the agent would not talk to
her.   She said that the Andrianos were "insurance type
people" and that Joe had initiated the insurance idea.  It was
always her responsibility to do the work so she called the
agent.  When Joe talked to the agent he was told that he
would have to have a physical.  Joe knew he couldn't do that.
The agent called Joe several times on Joe's cell but he ignored
the calls.  Gave Wendi lipstick and perfume and am concerned
about the consequences.

iii.   <u>January 16, 2003</u>:

She said that she is inclined to tell the jury that because she
has no recollection, she has to entertain the possibility that
she might have killed Joe.  She said that she wants to be as
forthcoming as possible.  I encouraged her to discuss strategy
with Dan.

iv.   <u>May 15, 2003</u>:

...I asked Wendi if she had hidden in the bathroom the night
of Joe's death.  She said that she had wondered if she had
told me that and I said that she had not.  She said that she
had told David early on and had remembered it in her
interviews with Sharon.  She said that she had hidden that
night in much the same way that she had numerous times
when Joe was raging.  I asked her to try to recollect the
feelings she had while in the bathroom.  She started to cry
and said that she did not want to think about it.  I urged her
to try.  Wendi started to cry and swallow back the tears.  It

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 56

seems that she cries when she can make an emotional connection, so I encouraged her to stay with the feelings. She stood up and paced. She said that she felt nervous and unsure while she was in the bathroom. She said that she went in there after she hit him with the bar stool. Her practice was to hide and listen until he stopped banging things around. (Wendi had said that Donna hides in the bedroom when she argues with Alejo.) She said that normally she knew she was safe to come out when he quieted down. That night she crouched by the door to hear. She said that she remembered hearing him breathe heavily. She said that she was exhausted when she ran into the bathroom and she was in there long enough to catch her breath. She said that she wondered "What's coming next? Is he still raging? Is he unconscious?" Wendi said that she could not remember the night in a perfect chronological way, but that she did remember the feelings. She said that she remembered Joe grabbing her head and slamming her up against the wall. She said that she thinks that happened in the dining area near the kitchen. She said that Joe kept the cell phone charging on the long kitchen counter. She said that she knew it was the phone cord around her neck because the phone went flying. She said that he had "bear-hugged" her in the past and it had felt like she could not get oxygen. She said that the cord around her neck felt similarly. She said that she had an ongoing fear that he would strangle her and when she felt the cord around her neck, she believed that he would strangle her to death. She gestured with her fingers and said that Sharon hade asked her why she moved her hand away from her throat. Wendi said that she was pushing the pressure of the cord away from the front of her neck. She said that she knew that she had to get the knife to cut the cord or he would kill her. She said that she flailed at the cord with the knife and

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 57

she thinks she might have made little cuts in her own hands as she attempted to cut the cord. She said she remembered cutting the cord, but not what happened immediately afterward. She said that it was all "craziness." I asked if she considered running away at that time and she said that it never crossed her mind to leave the apartment. She said that she thinks she dropped the knife once she got away from him. She said that she wasn't sure if he tried to strangle her first or broke the wedding box first, but whichever, she said to herself, "This is way more than you've seen before." She said that Sharon had asked if she felt fear or anger and Wendi said that it started as fear and turned into anger. She said that she knew she had to stop him from killing her and she picked up the bar stool to subdue him. She said that she knew she had to hit him repeatedly because he kept coming at her. She said that in her head she said, "I don't want to hit you another time. Just go unconscious so this will stop." Wendi said that Joe kept trying to get up. She said that she thought that after she hit him like she had that "he would get up and beat her to a pulp." Wendi said that hitting him over the head was awful. "I had no choice. I hit him as much as I dared. When the fight was out of him, I ran to the bathroom so tired." Wendi said that she waited in the bathroom for a cue that it was safe to come out. She said that this was their pattern. She said that he might throw things, bang things around or pound on the door until he was finished ranging. She said that she was good at telling when he was through and she could come out without starting him up again. She said that she could hear his breathing through the door. She said that she came out apprehensively and saw him lying face down on the floor. Wendi said that she thought Joe was unconscious. She said that she knelt down next to him on the floor to see if he were breathing. She said that she knows she was crying because

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 58

Joe was "a mess."  She said that she saw what she had done to the back of his head and it was a "bloody mess."  She said that her eyes were on his head.  She said that Joe became aware of her and as he did, he rolled onto his side to sit up. Wendi said that she thought "Oh my god.  My poor baby." She said that she was no longer angry, but was horrified at what she had done.  She said that she felt sorry for him.  She said that as he sat up she could see that Joe was holding the knife that she hade used to cut the cord.  Wendi said that she could not remember the specific words spoken.   But she remembered the feelings.  She said that Joe threatened to cut himself and she argued with him to make him stop.  She said that she remembered saying "no" as she struggled with him over the knife.  She said that he said, "You did this to me." She said that she felt like it was all her faut yet she thought at the time, "All I wanted to do was take you to 911."  Wendi said that because she had not "fixed" it, all this had happened. She said that she had never wanted him to commit suicide in the first place, that she wanted him to live.  She said that if she had wanted to hurt him, she would have used the knife when she had it.  Wendi said that she remembered putting her hand on top of Joe's to stop his hand from cutting himself and to get the knife.   She said that she remembered blood squirting during the struggle and Joe's slumping over face first.  Wendi said that she just sat there and he was still.  She said that she had "no feeling at all."  She said that she called her dad to find out what to do.  He told her to hang up and call the police.  Wendi said that she knew she washed herself off and doesn't know when.  She said that she called 911 at her father's instruction and they asked if Joe was breathing. They told her to roll him over.  She said that it was that most horrible thing and that Joe looked like a monster.  Blood had settled in his face.  Wendi said that she couldn't cry.  She said

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 59

that she remembered police in the house.  She said that her
parents came and she sat on the sidewalk with her dad.  She
said that her mom and dad took the kids.  Wendi said that she
had no idea that she was under arrest even when they
brought her in.  She said that she never imagined that she
could be arrested for that.  She said that she wasn't a "bad
person" and she had tried to do the best she could.  She said
"Now I might lose my kids over this.  It hurts."

Wendi cried and paced through much of this interview.  There
were long silences between sections of her recollections.  She
seemed to be shaken by the recollections.  Wendi rarely can
stay with an unpleasant topic for long.  She makes a great
effort not to cry in front of other people.  She seems to laugh
at the first mention of an uncomfortable topic, but the
laughter changes to tears if she stays with the emotion.  She
seems to have great difficulty experiencing what she calls "a
connection" with men.  When I have encouraged her to tell
things to Dan, she has responded that she feels embarrassed
to cry and unable to stay focused on painful information.  The
affect she exhibits in her interrogation tape is the affect I have
seen when she is distancing herself from an experience.  She
has said often that suicide is the worst thing in the Andriano
family and it was the most shameful thing that they could
learn about Joe.  She has said many times that she lied in the
interrogation to protect Joe's memory form that.  Wendi has
been consistent throughout the marriage in the hiding in the
bathroom strategy.

In answer to Sharon's questions: She and Joe used gloves
when they made the capsules.  She said that she assumed
that he would not have worn gloves when he put the box in
storage, but she had not witnessed his doing that because she

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 60

was at work. Wendi asked me to help her get the written evidence that there was poison in the food in their refrigerator. She said that she heard the prosecutor describe poison in the food, but that she could not believe it. She described it as sounding so melodramatic that it must be fiction. She laughed when she talked about the possibility of the food being poisoned. She apologized for laughing and then shifted to a serious expression when she spoke of the children being at risk. She said that it was Joe who handled the poison while she was at work and she was "pissed off" if he had put poison in the food to kill her. She said that she could understand that he wanted her dead because she had been unfaithful, but she couldn't understand his putting the babies in danger...

v.    January 5, 2004:

She said that she had spent time trying to reconstruct the last moments of Joe's life. She said that she is feeling responsible for trial preparation and it is motivating her to face the thoughts that she tries hard to avoid. She said that she tries to see the moment of Joe's death and she feels hopeless because she has no visual image. I held my pen in my hand and asked her to move me into Joe's position so she could reenact the moment. She showed me that she was sitting with her legs under her as she knelt over Joe. She said that she had come out of the bathroom when he became quiet. She said that he had been leaning forward when she hit him with the stool and the blood had flowed forward over his face. When she came out of the bathroom and knelt next to him, he rolled over and she saw his face again. She said that the blood had pooled in his face from leaning forward when she beat him with the stool and it looked horrible. She said that

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 61

she had not expected him to look that bad.  She said that she
asked if he were ok.  She said that as he rolled over she could
see the knife in his hand.  She said that she felt no fear, only
compassion because he looked so bad.  She reported that he
said "Look what you did to me.  I might as well kill myself
now."  Wendi said that she thought "What does he want?"
She said that Joe's emotions during that evening had been a
roller coaster from suicide to fear to anger and now what?
She said that she remembered thinking "Here we are in
another situation where it's my fault again so I'm not going to
let him kill himself."  She said that she was not sure if he was
really going to do it but she did not want to take the chance.
She said that she put her hand over his.  He was holding the
knife in his right fist with the blade facing him.  She said that
as she put both of her hands over his, he began to struggle for
control of the knife.  She said that she tried to pull it away
form him with both of her hands.  She said that the knife was
about 4 inches from him.  She said that she couldn't "see" the
moment but she could "hear" it.  She said that no words were
spoken after Joe said that he would kill himself, but there was
a thud followed by a "gurgly breath."  She said that she felt a
warm spray of blood over her.  I asked if she had closed her
eyes during the struggle and she said that she thinks that she
had closed her eyes when she saw the blood pooled in his
face.

Wendi seems to have no gap in time in this memory only a
gap in what she saw.  She said that she is certain that she
was not angry but was emotionally numb.  She said that she
knows that she did not want him dead and she knows that she
was afraid that he would kill himself.  She said that she
remembers thinking that Joe never took responsibility for
anything and that he was going to make his suicide her

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 62

responsibility. It seems highly unlikely that Wendi would have tried to kill Joe if she were not motivated by fear. Her history was to avoid him and be passive, not to be aggressive. Even the beating with the stool was to stop him from killing her.

Wendi said that the 911 operator told her to turn Joe over to make sure he was dead or to give him mouth to mouth. Wendi said that Joe had fallen with one leg over the other and he was hard to turn over. She said that he was heavy and she had to roll his legs to roll him over. She said that his legs were crossed when he was rolled on his back and she recalls the police making an issue of that position.

Wendi said that she was surprised at how strong Joe was that night and she had used all her strength to restrain him and had failed. Wendi sat still in her chair and said that she felt nausea and did not want to go any further.

C.   Richard J. Rosengard, D.O.:[53]

...The Defendant indicated that she had not pleaded as of yet and knew that she was charged with first degree murder. She indicated that she read the police report accusation synopsis, as well as a newspaper where it was alleged that she had slit her husband's throat and had given him poison over a period of time. She indicated, though, that her husband had been on chemotherapy and was no longer working. She indicates that he took sodium azide and an overdose of pills and wanted to kill himself. She indicates that her husband got mad when a friend, Chris, was called and vacillated about what he wanted to do. She indicates that in March of 2000, she had an affair,

---

[53] Report dated August 27, 2002 (*Exhibit "D-2"*).

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 63

predominantly for companionship but did consummate the relationship sexually. She felt that her husband sensed what was going on and asked her about that, and she answered honestly. He got angry and had a physical fight with her regarding that on the night the night that the incident happened. The next thing that the Defendant recalled was sitting on the living room floor with her husband. Thereafter, she called her parents and told her father and then called the police. She indicated that she could not recall calling the paramedics earlier. She also admitted to making calls to buy sodium azide a few weeks prior to the incident. Her husband wanted that. At first, he apparently wanted cyanide; and then the Defendant had convinced a friend to assist in getting the sodium azide. She indicated that her husband had suicidal thoughts in the past and went through therapy but did not want to go through therapy again...

D.   Sharon B. Murphy, Ph.D., C.I.S.W.:

Dr. Murphy spent over 20 hours with the defendant, however, her report is silent about the defendant's version of the offense. That said, in an electronic mail correspondence to defense counsel, dated April 13, 2003, Dr. Murphy wrote, in part:[54]

Hi Dan and David:

I have now basically finished the assessment/interview process with Wendi. As I put my notes together I'm likely to find areas that need more clarification and will go back to see her again at that time. During the interview on Friday she said she was recalling more of the night of Joe's death. I can't

---

[54] Bates No. PCRDIS - D001452.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 64

> remember which part she said was new memory but she told me that she remembers that Joe tried to strangle her with the telephone cord, they were in the kitchen and she got a knife from the drawer to cut the cord (introduction of the knife). She also remembers hitting him repeatedly with a bar stool from the kitchen......remembers locking herself in the bathroom terrified of him.   That's where the memory ends.........If this is new information to you then maybe her memory is starting to return in bits and pieces..........I think the best shot we have at that might be for me to follow a visit from her counselor.

> David: Can you find out if her counselor is planning to visit her on Thursday?  If so, I'll go on Friday.  I know that she has told me many times that while we're talking she remembers more and more.  I think her counselor can help by priming the pump, so to speak...

E.    Michael B. Bayless, Ph.D.:[55]

Although in appears that in his report Dr. Bayless recounted what Ms. Andriano shared with Detectives Lucero and Dillian about her role in the offense, it is unclear whether or not he asked Ms. Andriano to share her version of the offense with him.  The only exception that I could find was a discussion about sodium azide.  To wit, "...According to Ms. Andriano, her husband wanted her to get the poison because he wanted to commit suicide."  It appears that the version of the offense that Dr. Bayless shares in his report comes directly from what Ms. Andriano shared with the police following the offense.

―――――――――――――

[55] Report dated August 4, 2004 (*Exhibit "D-4"*).

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 65


## **DEFENDANT'S VERSION OF THE OFFENSE AS PROVIDED DURING THE INSTANT EVALUATION:**

When she met with Dr. Amin and me, Ms. Andriano was asked to share her version of the instant offense. However, in recounting her version, Ms. Andriano professed amnesia for a significant portion of the event. To wit:[56]

> SP:  Okay.  And - and so how is it that you - you ended up here?  What happened?

> **WA: I was sentenced to death by the court system and so that's - I'm here.**

> SP:  Okay.  And you say you were sentenced to death by the court system and you're here.  What - what is it that the court system - what were you found guilty of?

> **WA: First degree murder.**

> SP:  Of who?

> **WA: My husband.**

> SP:  And what - what - what is his name?

> **WA: Joe.**

> SP:  And when - first of all, do you admit that you - you - that you committed that offense?

---

[56] *Exhibit "B", Defendant's Versions of the Instant Offense - Part I, Pages 11 - 23.*

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 66

**WA: I admit that I killed my husband.  I don't admit that it's first degree murder.**

SP:  Okay.

WA:  That's my disagreement with the - with what happened.

SP:  Okay.  Well, what did happen?

**WA: Well, my husband was dying from cancer.  And we had had many discussions about him not wanting to suffocate to death and I made the choice to help him take his life.  And that's what the entire situation was based on.  And that night - I've since learned that - I don't even know how to describe it, but - I'm sorry, I don't know how I'm going to put it into words or even talk about it.  That's why I'm like oh.**

SP:  I'm sorry, I didn't hear what you said?

**WA: Well, I don't know.  I don't know how to describe what happened that night.  I don't know.  I don't - but I killed my husband that night and I don't know - I don't - there was a lot of things going on that I don't know how to describe.**

SP:  Okay.  And - and why is it that you don't know how to describe them?

**WA: Because it's hard for me to understand -**

SP:  Okay.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 67

**WA: Everything that happened.**

SP:   Okay.  Well what - well what did happen?

**WA: I killed my husband.**

SP:   Okay.  How?

**WA: Are you just asking me to describe that night to you?  I don't understand what you're asking me to - to -**

SP:   That would - that would be a terrific place.

**WA: You want me to just sit here and - and verbatim tell you the events of that night?  Is that what you're asking me?**

SP:   If - if you would be so kind as to explain to me what happened that evening that would be terrific.

**WA: I don't have a clear memory of what happened that evening.  So when - if you would like to ask me specific questions, I would be - I would try to answer them.  But I can't give you a verbatim recall of the events of that night.**

SP:   Okay.  Can - can you give me any recall of the events of that night?

**WA: I - I'm like - I'm just stuck.  I guess I just would rather if you would ask me questions if you want**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 68

>to know something.  I don't - I can't - I don't even know.  It's all just - it's -

SP:  Well, how about we do this.

**WA: Yeah.  That doesn't - I can't.**

SP:  What - what - what - what is the date that we're talking about?

**WA: It happened in 2000, in October of 2000.**

SP:  What date?

**WA: I can't tell you the exact date.  I don't know.**

SP:  Okay.

**WA: I don't - just - I haven't been talking about that or been asked that question.**

SP:  Okay.  Well let - let's break the - the month up into thirds.  Do - first of all, do you know how many days are in October?

**WA: Well, yes.**

SP:  How many?

**WA: 31.**

SP:  Okay.  So did it happen in the first third, the middle third or the last third?

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 69

**WA: I - I don't know.  I could - I can't even -**

SP:   Okay.  How about we break it up into halves?  Did it happen before or after October 15th?

**WA: It was the beginning of the month.**

SP:   Okay.  What - what - what - what do you remember - just - just - do you remember - well, let's start this way.  Do you remember anything about the offense?

**WA: Yeah.**

SP:   Tell me what you remember.

**WA: Yeah, I remember lots of blood and I remember - I remember that Joe took some pills that were supposed to stop his heart and it was supposed to just be peaceful.  And then things just didn't go that way.**

SP:   What - what kind of pills?

**WA: And I know that we were - I know we ended up arguing over a bunch of stuff.  It was just - I don't know.**

SP:   What kind of pills?

**WA: We had put some - I'm trying to remember what it was called.  We put something in these capsules and he had taken like a handful of them.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 70

SP:   So you had - what were the capsules originally?

**WA: Some health - healthy stuff.  I don't remember. They were just clear capsules that we took out the herb or the - the - I don't remember what it exactly - what it was in it, but -**

SP:   And -

**WA: Like - like a vitamin type of thing.**

SP:   I see.  And what did you replace that with?

**WA: We - we had bought some powder that was supposed to - I can't remember what it was called. I don't know, it was white powder that was supposed to stop your heart.**

SP:   And so where did you get the white powder from?

**WA: From an online store.**

SP:   What's the white powder used for?

**WA: I don't remember, but I think it had some sort of commercial use.**

SP:   And whose idea was it to get the white powder?

**WA: Well, Joe had wanted me to find cyanide and I couldn't.  And that was - seemed to be the alter - the only alternative.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 71

SP:  I see.

**WA: This stuff.  I can't remember what it was called.  I
don't know.**

SP:  So you ordered - you ordered this?

**WA: Uh-huh.**

SP:  Online?

**WA: Yes.**

SP:  From - from where?

**WA: I don't remember the name of the place.**

SP:  No, no.  Maybe my question wasn't very good.  You
ordered it from a computer?

**WA: From an on - with a computer?**

SP:  With a computer.

**WA: Yeah.**

SP:  Whose computer?

**WA: I think the one at work.**

SP:  Uh-huh.  How come you didn't use your computer at
home?

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 72

> **WA: I didn't have a working - like I didn't have - I think computers were kind of new to me back then and so I had only used them for work and that was the one I used was at work.**
>
> SP:  I - I see.  And so - so did you research this powder online?
>
> **WA: I don't know that I researched that specific powder, just the general topic maybe.**
>
> SP:  And - and -
>
> **WA: I don't know.**
>
> SP:  How much did the powder cost?
>
> **WA: I don't remember that.**
>
> SP:  Who was the powder delivered to?
>
> **WA: I don't remember that stuff either.**
>
> SP:  Did -
>
> **WA: I haven't discussed that with anybody.**
>
> SP:  Did - did you have it sent to yourself?
>
> **WA: I don't think I did.  I think it had to be a company that bought - bought it, because it was a commercial whatever.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 73

SP: So what company did you have - have it sent to?

**WA: I don't know.  I don't know.  I can't tell you that either, but I think it was a company name.**

SP: Uh-huh.  Did the - did - what - independent of it being a company, there probably had to be like a person's name attached to it, right?

**WA: I don't remember that.**

SP: So where does the powder end up arriving?

**WA: I don't know.**

SP: Okay.  How - how soon after you ordered the powder did it arrive?

**WA: Oh, and I wouldn't - I don't know that either.**

SP: Okay.  Did you pay for the powder with a credit card?

**WA: I don't - I - I don't know.  I haven't thought about all that stuff.  I don't even - I have no idea.**

SP: Okay.  So anyhow, at some point though you said "we," you - "we" was the word you used.  It sounds like you - you took the powder and you put it in capsules?

**WA: Yes.**

SP: Okay.  And walk me through that process.  Do - because it sounds like you remember some of that.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 74

**WA: Yeah.  I remember doing that.**

SP:   And where was your husband during that time?

**WA: We were at my house.**

SP:   Okay.  And where did you physically do that?

**WA: Outside because there was some concern about the fumes or the smell of it or something.**

SP:   I see.

**WA: And with my babies, I didn't want, you know, them to -**

SP:   And you say your "babies," that would be Nicholas and Ashlee, correct?

**WA: Yes.**

SP:   Okay.  And how old were Nicholas and Ashlee around this time?

**WA: Like two and three.**

SP:   Okay.  And with Nicholas being the older one?

**WA: Yes.**

SP:   Okay.  So - so I've looked at some - some crime scene photos and if my memory is right, you lived in an apartment?

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 75

**WA: Yes.**

SP:    Okay.  So where did you - where did you do this with
       the - with the powder?  Where - where did you - when
       you -

**WA: Out - outside on our little patio.**

SP:    Out on your patio?

**WA: Uh-huh.**

SP:    Got it.  Okay.  And where was your husband while this
       was going on?

**WA: He was doing it with me.**

SP:    Okay.  And what physically were you doing?  Like how -
       walk me through how you mechanically did that.

**WA: Well, we just emptied out the capsules and put the
powder in them.**

SP:    What did you use?

**WA: What do you mean?  I don't -**

SP:    Well, what did you use?

**WA: My hands.  I don't understand what you're asking
me.**

SP:    Well yeah, I mean did you use a tool, an instrument?

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 76

**WA: No.**

SP:   Okay.  So the capsules that you were taking apart, these
were like gel capsules?

**WA: Yeah, they were just clear plastic.**

SP:   And help me understand, what's the logic of - of putting
the - the powder inside the capsules?

**WA: To be able to swallow it.**

SP:   Okay.  So you remember doing that though?

**WA: Uh-huh.**

SP:   Yes?

**WA: Yes.**

SP:   With your husband?

**WA: Yes.**

SP:   Do you know about how long before the offense that
that happened?

**WA: Not exactly.  It wasn't a great amount of time.  I
don't -**

SP:   Okay.

**WA: Really remember.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 77

SP:  Whose - whose Ann Newton?

**WA: Oh.   Thank you.   See, if you would ask me questions, that is the name that I used.**

SP:  Okay.

**WA: Uh-huh.**

SP:  You used for - for what?

**WA: Yeah.  With that whole situation involving the - I can't remember what the stuff is called, whatever the powder was.**

SP:  Okay.  And so I don't - so that's a name that you used to - to purchase -

**WA: Yes.**

SP:  The powder, correct?

**WA: Yes.  Yes.**

SP:  Okay.  How did you come up with that name?

**WA: I don't remember.**

SP:  Okay.

**WA: It was pretty random.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 78

SP:   Okay.  So - so your - your - do you have any memories of what happened on October 8th?  By the way, that is the date, October 8th.

**WA: Okay.**

SP:   2000.

**WA: Okay.  I do have memories, it's just - I - it's not something that - it's like when you ask me the question about it my mind doesn't even want to go there.**

SP:   Uh-huh.

**WA: So I - I'm not sitting here thinking, "Oh this is what happened that night."**

SP:   Okay.

**WA: I don't - that's why I don't - I'm not trying to not cooperate with you, it's just that's how - I'm sitting here not think - I see lots of blood and it's - but it doesn't run like a movie in my head.**

SP:   Okay.  So how does it run?

**WA: Actually I just feel like lots of resistance.**

SP:   Okay.

**WA: And I don't want to think about it.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 79

SP: Okay.  Does - how - how did - how did your - your husband die?  What was the cause of death?

**WA: I don't know what the official thing was.**

SP: Okay.  Do you - ma'am, do - do you - are you going to be okay there?  Is that "yes"?

**WA: Okay.**

SP: Do you - first of all, it's not my intent to upset you.  But - but I -

**WA: Well this is not something that is comfortable to talk about.  This was terrible.**

SP: Well I - I understand that.

**WA: And you guys have all the papers.  You've read everything.  And then you're sitting here ask me just to relive and talk about all that over again and I don't understand the point.**

Later during the instant evaluation, Ms. Andriano claimed that she was unaware of "the official cause of death" and could not remember how her husband sustained a knife injury to his neck. (She later recalled that he was stabbed.)  To wit:[57]

**WA: I don't know what the official cause of death was.**

---

[57] *Exhibit "B"*, Defendant's Versions of the Instant Offense - Part II, Page 25.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 80

>   SP:   What do you think it was?
>
>   **WA: Well, I think from - from when I hit him on the back of the head and then I think from - I - I - from the knife, from the cut on his throat.**
>
>   SP:   How did that happen?
>
>   **WA: I can't remember that specific instance so I'm not sure.**

In response to additional questions about the offense, Ms. Andriano and I had the following dialogue:[58]

>   SP:   Okay.  So what - what time of day did this all - did everything start happening?  Do you recall that?
>
>   **WA: Well, that evening I know that we had gone to his parents' house for a family like dinner barbeque thing.  And then it would've been after we got home from that.**
>
>   SP:   Okay.  And what happened -
>
>   **WA: So late evening.**
>
>   SP:   So - and - and what happened - well first of all, the barbeque thing, did you drink any alcohol?
>
>   **WA: No.**

---

[58]  *Exhibit "B",* Defendant's Versions of the Instant Offense - Part III, Pages 26 -32.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 81

SP:   Did you use any drugs?

**WA: No, I –**

SP:   Did you use any alcohol or drugs that day?

**WA: No.**

SP:   Okay.  Do you feel that alcohol or drugs in any way affected your behavior on October 8, 2000?

**WA: No.**

SP:   Okay.  What about on October 7, 2000, did you drink alcohol?

**WA: I don't know.  I don't remember what I did on –**

SP:   You don't remember?  Okay.  What about did you use any drugs on October 7, 2000?

**WA: No.  I've never used illegal drugs.**

SP:   You've never used any illegal drugs?

**WA: No.**

SP:   Okay.  I'm just repeating some things because there's people there in the yard and we're picking up a lot of the ambient noise.  So - so anyhow, you don't recall exactly what time you got home on - when - on October 8th, correct?

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 82

**WA: No, sir.**

SP:   And do you - do you remember what happened when
you got home?

**WA: No.  I - I - that's - it's been - that's a long time
ago.**

SP:   Okay.  What's your next memory after you got home?

**WA: Oh my God.**

SP:   Why don't you just hold on.   And just for the
transcriptionist, the reason why I told Ms. Andriano to
hang on for a second is that a correction officer was
passing through the in - the area we're doing the
interview.  Do you remember the question?

**WA: I do.  I remember putting the babies to bed.  I
remember - I think what I remember most is - is
after we had everything settled and - and
everything was, you know, I don't know - oh,
that's a lot quieter.**

SP:   Yeah, it makes it better.  The correction officer just
closed the door.  Go - go ahead.  You said every -

**WA: Okay.**

SP:   Oh, hang on a second now.  Let me just say for the
record, apparently the room that we're in is a - I guess -

**WA: General purpose room.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 83

SP: General purpose room and - and it cuts out into the yard which is why some correctional officers apparently are using it to cut across. But go ahead, I'm sorry.

**WA: I remember - I remember Joe and I being on the bed and I remember - I think just because of what was about ready to happen we didn't have - there wasn't like crying and lots of emotion going on. It was just pretty - I don't - it was almost surreal. And I remember Joe had something to drink and he had the bottle of pills on his night stand and we were sitting there and he was leaning up against pillows and so he took a handful of pills and it was - it was just - he had said goodbye to everybody earlier in the evening and it was just time. That's what he was ready to do. And so I remember he put a bunch of pills in his hand and he swallowed them with whatever and then we kind of just lay there and waited to see what would happen.**

SP: How long did you wait?

**WA: I don't know. I can't - I don't have a concept of time.**

SP: Okay. So then what happened?

**WA: I think our expectations were that it would be just something peaceful and like a peaceful passing and then that's not what happened. He started feeling sick. He started to feel - I remember him feeling really just sick. It was like - I can't remember if it was his stomach. I can't remember**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 84

**what it was but I remember him feeling really, really sick and then getting panicky and starting to be upset and how ill he was feeling.**

SP: Okay.  And then what happened?

WA: **And - I don't remember what our decision was or what exactly - what - because it was kind of panicky at that point not knowing what was happening, what next.  And I think that it just became so - where he was feeling so ill that we had gone out to the living room and I don't know - I - see, I don't want to say something that's not true because I don't remember if that point - if he wanted to go to the hospital.  I don't - I don't re - I just can't - I can't - I have little bits and pieces and knowledge of knowing things, but I don't know if it's from hearing it because I've discussed it so many times.  Because I don't exactly recall the -**

SP: Okay.

WA: **And I don't want to say something that's not true.**

SP: And you know what, I appreciate - I appreciate that explanation.  So just tell me what it is you believe that you recall, and if you think it's something that you're not sure, that it's something you read, then just say, "You know what" -

WA: **That's why at this - from - from this point forward I don't have a clear running memory, like a movie,**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 85

**I can't tell you details that I myself recall what happened.**

SP:   Okay.

**WA: Because I went through the trial.   I've went through so many questions that I don't know what –**

SP:   Okay.   And – and I – I appreciate that answer and I appreciate where –

**WA: I don't know what I know to be true.**

SP:   Okay.   That's – that's fair enough.   So – so let me then ask you – let me ask you a couple questions about that then so I – so maybe I can better understand and you – you help me understand.   You, if my memory is correct, you were arrested the same day as the offense, correct?

**WA: Yes, that night.**

SP:   That – that evening, correct?

**WA: I believe so, yes.**

SP:   Okay.   And I also believe that you gave a statement to the police?

**WA: I did.**

SP:   Okay.   Was your memory working fine then?

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 86

**WA: Well, it is my nature to want to answer your questions and I know that. I had never seen the police as against me or bad people. It was - I was raised to - that they're your friends and they're, you know, like the pastor of your church. And so when I was asked questions, I provided answers just trying to show that I was cooperating, even though I wasn't sure what had happened. And I - I don't like to say, "I don't know," because then you don't approve of me, you don't like me, and I just want to answer what you want. So I know that whenever people would ask me questions, I would just fill in whatever.**

SP: I see. So - so are you telling me that you weren't -

**WA: And that's why I'm not going to do that with you today.**

SP: Well, and you know what, I - I don't want you to do that. I just want you to be as truthful with me as you possibly can.

**WA: And that's what I'm trying to do.**

SP: Okay. But let's get back to the interview you gave the police. Are you telling me -

**WA: I don't even remember what exactly I told them. I don't know, I just -**

SP: Okay.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 87

> **WA: I know that I wanted to cooperate and I wanted
> them to -**

When I returned to a discussion about the events that occurred on or about October 8, 2000, Ms. Andriano and I had the following dialogue:[59]

> SP:  So - so let's go back to October 8, 2000.  What I recall you telling me is that your husband wasn't feeling very well and this wasn't going as smoothly or as peacefully as you both had planned, or thought it would.

> **WA: Right.  Right.**

> SP:  Am I correct?

> **WA: You're correct.**

> SP:  Okay.  So then what happens next?

> **WA: I'm not comfortable with the chronological order of events because I can't tell you chronologically what happened that night.**

> SP:  Okay.  Well what do you remember though?  Even if it's out of chronological order.

> **WA: I don't know what is going on.  I feel very agitated right now and I can't even like make myself think about what's going on that night.**

> SP:  Okay.  Would you like to take -

---

[59]  *Exhibit "B",* Defendant's Versions of the Instant Offense - Part IV, Pages 41 - 51.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 88

**WA: I'm so sorry.  I - I'm not -**

SP:  Would you like to take a break?  You're shaking your head "no."

**WA: As we're sitting here right now and you keep asking me about what happened that night, what do I remember, I can't even - I'm not pulling up what's happened that night.  I told you I remember lots of blood.  I know I killed my husband.  I can't sit here and tell you events of that night.**

SP:  Okay.  Do you - but - but you've told other people about those events of that night.

**WA: It took a long time.**

SP:  Okay.  Do - do - how - well how did you kill your husband?

**WA: Can - can - in order for me to answer that question I could just tell you things that I know but not from my memory but just because it's been discussed.**

SP:  Okay.  So you don't have an independent recollection?

**WA: So I don't - that's why I told you I don't want to sit here and say something that I'm not remembering for myself right now.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 89

SP:   Okay.  So let me - let me make sure I understand what you're saying.  As you sit here today on Tuesday, November 26th at about 9:37-ish in the morning, you have - have you told me everything that you personally remember about that night?

**WA: No, I haven't.**

SP:   Okay.  Is there anything else you want to tell me, recognizing -

**WA: I just - look, this is what I'm afraid of.  I feel like if I answer your questions right now and I'm not telling you in chronological order, that I'm a liar again and I'm this and I'm that and so I feel very defensive with you.**

SP:   Right.  And you didn't let me finish my question.  My - my - my question is as we sit here today on Tuesday, November 26th, have we exhausted your memory about what happened on October 8, 2000, putting aside chronology?

**WA: Okay.**

SP:   Have we exhausted your memory?

**WA: No.**

SP:   In other words, I'm giving you -

**WA: Right.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 90

SP:   A pass on chronology.

**WA: Right.**

SP:   Okay.  I just want to know what you remember about that evening.

**WA: No, there are more things that I remember.**

SP:   Okay.  Tell me what you remember.  This is what you remember, not what you've read but what you remember.

**WA: It's so hard.  I remember – I remember Joseph not feeling good.  I remember one time him – him throwing up.  I remember him getting really upset.  I remember us arguing.  I remember wanting to take him to the hospital, him wanting to go to the hospital, him not able to go to the hospital.  I remember calling 9-1-1.  I remember trying to get a coworker to come over to stay with my babies while we went to the hospital.  It's like right now all I see is just lots of blood everywhere.**

SP:   Is there anything else you remember?

**WA: I can see him laying there.**

SP:   Do you remember what your argument was about?

**WA: Yeah, me cheating on him.**

SP:   Okay.  What – what was going on there?

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 91

**WA: I don't know.  I just - we were just spending more and more time apart and he was going to the lake and doing his thing and I was going out.  And it's like we were just trying to run away from each other.**

SP:   And so did - did you tell him about your - the cheating?  Or how did he find out?

**WA: I did finally.**

SP:   That night?  What did you tell him?  What do you re -

**WA: I don't remember the exact words or what.**

SP:   Okay.

**WA: But I finally admitted to it.**

SP:   I see.  How did he respond to that?

**WA: He was really angry.**

SP:   Okay.  And what did he do?

**WA: I just remember him being really angry and yelling at me.**

SP:   Did - did you - did the paramedics ultimately show up at your house?

**WA: Yeah.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 92

SP:   And again -

**WA: They were there.**

SP:   And this is - I'm asking you what you remember.

**WA: No, I remember sitting by Joe and I remember lots of people around.  And I don't know if they were policemen or paramedics, but I remember lots and lots of people around.**

SP:   Was there a time that the paramedics showed up and that you told them that they weren't necessary?

**WA: I do know that.**

SP:   But do you remember that?

**WA: No, I don't know.  I don't know.  But I do know that.**

SP:   So you know -

**WA: It's - I know it and it's really hard to define whether or not I remember it or if it's just because I have been told it so many times.**

SP:   Okay.

**WA: I have a hard time - listen, this has been talked about so much that it gets really hard to distinguish between what I know and what I know - what I know to be true.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 93

SP:   Okay.  Well, all - all I want to know is what you know to be true.

**WA: I know.  I know.  And I'm trying to separate it for you but it's difficult.**

SP:   Okay.  Well, do you know it to be true that you asked the paramedics to leave?

**WA: Right now I don't know.  I can't tell you for certain that I know that to be true.**

SP:   Let's assume that that is true.

**WA: Okay.**

SP:   Let's just assume that -

**WA: I know it is true.**

SP:   Okay.

**WA: I know it's true because I've been - I've seen it and read it and been told it.  I know it, but I'm just telling you because I'm trying to be very honest with you that I personally cannot tell you "yes" or "no" that I know I did that.**

SP:   Let - let me see if I have this - this correct.  And you tell me if I'm - I have this right.  You know about -

**WA: I -**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 94

SP:    That - let me finish.  You know about this issue because you've been told it and/or read about it but you don't independently recall, is that correct?

**WA: And that's not correct either.**

SP:    Okay.  Well what - tell me what's right.

**WA: I'm trying to explain it.  When you have known something for so many years, it's really hard to distinguish between like I know this myself or I have come to know this because it's been told to me so many times that I don't know any longer what I know and what's been told to me.**

SP:    Okay.

**WA: And I know that sounds crazy but it's the - that's really what goes on in my mind.**

SP:    Well let - let's assume that that happened.

**WA: Yeah.**

SP:    Let's just assume it happened.  Are you with me?

**WA: Yes.**

SP:    Why would you have done that?  Let's assume they showed up and you asked them to - that - and told them that their services were not necessary.  Or words to that affect.  Let's assume you did that.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 95

**WA: Right.**

SP:  Why would you have done that?

**WA: I think it was so in my head that Joseph just wanted to die.**

SP:  Okay.  Did you -

**WA: I - I really feel like that was the whole - and so you know, I just - I think it was just to see it through to the end and just do it.**

SP:  Do you have an independent recollection of doing any - engaging in any behaviors to conceal your actions as it relates to the crime - as it relates to the murder?

**WA: To conceal that?**

SP:  No.  Is it -

**WA: No.**

SP:  Let me try asking that question again.  As it relates to the murder of your husband, do you have an independent recollection of doing things that covered your tracks?  In other words, did things that - that - to kind of lead people astray?

**WA: No.**

SP:  So you think it was pretty straightforward crime scene?

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 96

**WA: I think so.**

SP:   Okay.  Did you change your clothes after your husband
was murdered?

**WA: After he - no, I don't think so.**

SP:   Did you take a shower after he died?

**WA: I don't remember doing that, no.**

SP:   Did you clean yourself up after you told the paramedics
to leave but before the police came?

**WA: No, I don't think so.**

SP:   Okay.

**WA: I don't know.  I mean I saw my - my - that my
clothes were bloody, the ones the police had.  So
that's why I'm saying no, I don't think I cleaned
up anything.**

SP:   Okay.  So we haven't gotten to this part about how - we
talked about the capsules that he took, the name of the
substance you don't remember, right?

**WA: Right.**

SP:   So - but how does he - like how does - and it sounds like
there's an argument, correct?

**WA: Right.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 97

SP:   So where's all this blood coming from?  How does that enter into the picture?

**WA: Okay, so I know - I know that there was a stool involved.  I told you I had hit him on the head. And I know that there was a knife involved.  I know these things.  But as far as telling you I recall and can see myself doing everything that happened, I can't tell you that.**

SP:   Okay.  So you don't recall having a knife in your hand?

**WA: I don't.**

SP:   Do you recall stabbing him?

**WA: I don't.**

SP:   Do you recall where he was stabbed?

**WA: Yes.**

SP:   This is something that you recall?

**WA: No.  I do recall it because when he was dead laying beside me I mean I have a very vivid picture of that in my head.**

SP:   And that's it - that's an independent memory that you have?

**WA: I see it right -**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 98

SP:   I'm sorry?

**WA: I can see it right now.**

SP:   So where was he stabbed?

**WA: In his neck.**

Ms. Andriano remained steadfast in her claim that her husband wanted to die. To wit:[60]

SP:   So - but - but as you sit here today, it's your position that your - your husband wanted to die?

**WA: Yes, sir.**

SP:   Correct?

**WA: Not that he wanted, he had no choice.   He had cancer.**

SP:   Yeah, well -

**WA: It was just on how he died.**

In an effort to summarize and clarify Ms. Andriano's version of the offense, we had the following dialogue:[61]

---

[60]   *Exhibit "B", Defendant's Versions of the Instant Offense - Part V, Pages 82 - 83.*

[61]   *Exhibit "B", Defendant's Versions of the Instant Offense - Part VI, Pages 212 - 217..*

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 99

SP: Okay. So - so - so I want to make sure I heard your version right earlier. Okay. Tell me if I - I have this correct. And this is going to be in a summary kind of fashion. But the gist is that you and your husband get the idea that it's time for him to - to die.

WA: **Right.**

SP: He want - he wants to die.

WA: **Well, he wants to die how he wants to die and not how it's going to happen.**

SP: And he - what you're claiming is he enlists your services to secure some type of poison for him to take?

WA: **Yes.**

SP: Do I have that part right?

WA: **Yes.**

SP: And then you find the - the appropriate poison and you order it, correct?

WA: **Right.**

SP: And you order it using a - you set up a fake business name as well as a fake person that's going to receive it, correct?

WA: **Right.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 100

SP:   Okay. Then the - the poison comes and you and he, together, empty out some capsules of whatever and - to go and put the sodium azide in, correct?

**WA: Yes.**

SP:   And then - then on this one particular night, October 8, 2000, he proceeds to take the sodium azide.

**WA: Yes.**

SP:   Knowing full well what he's doing?

**WA: Yes.**

SP:   Okay. But then somehow it doesn't work as well as you all had allegedly planned and he ends up getting sick.

**WA: Right.**

SP:   And it - it's not going well.

**WA: No.**

SP:   And then at some point after it's not going well, that's when you share with him that you've been seeing someone else?

**WA: No.  He was - we - there - because of - I don't know what happened, but he just was starting to get really agitated and mad and then he - of course he starts yelling at me because that's what he does.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 101

SP:   Okay.  So what was he doing?

**WA: So - always accusing me of having an affair.**

SP:   So -

**WA: Which was true, but I had up to that point always told him "no," and I was lying to him.**

SP:   So - so why on -

**WA: And -**

SP:   So - so what - what get - so here you are -

**WA: I know.**

SP:   You're this pretty sophisticated person when it comes to calming him down and the one thing that's going to set him off beyond, is you admitting this.  That doesn't make sense to me.  Here - you're this polished problem solver.

**WA: Yeah.**

SP:   How does that go?  Here you are, you've got your life's work with - between your - your dad and your mom and others as being the problem solver, the peacemaker.

**WA: Yeah.**

SP:   Bringing people together.  So why on that night do you go ahead and - and spill the beans?

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 102

**WA: I don't know.  I just did.**

SP:   Explain that one.

**WA: I can't give you a rational explanation.**

SP:   Give me any explanation.

**WA: Oh, I mean - I - no, see it's not funny.  It really is
not funny.**

SP:   I - I know it's not, but I'm - I'm looking for - for - for
any explanation.  I guess what I'm really getting at is
why - why then?

**WA: I don't know.  I just felt really, really bad and I
just did it.  I don't know.**

SP:   Well, what - what - what - surely you knew that he was
going to get upset, right?

**WA: Well, yes I think that if I had been sitting there
thinking rationally and considering everything,
then I would've made a better decision.  But I
didn't.  So I don't have a rational explanation for
it.**

SP:   Okay.  So - so now you tell him this, right?

**WA: That what?**

SP:   You tell him?

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 103

**WA: Yeah.**

SP:   That you've been having this affair.  And then what does
he do?

**WA: It just - like everything just went to a whole other
level of - of rage and being very, very pissed off.**

SP:   And what is he doing?  Is there -

**WA: And I don't - I - that part of it, it's -**

SP:   That's the part that doesn't run like a film for you.

**WA: No.   I'm like - I just remember this explosive
thinking oh my God what did I just do type of
thing and freaking out because it was just -**

SP:   So is he - so - so why don't you leave the - the
apartment?

**WA: I never left.  I would never leave him.**

SP:   But you somehow get a hold of a knife?

**WA: I don't know.**

SP:   Well, he ends up getting stabbed, right?

**WA: He does.**

SP:   He didn't stab himself, did he?

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 104

**WA: I don't know.**

SP:  You think he may have?

**WA: No, I don't know.  That's why - I - I don't know.  I don't - I can't answer that question.**

SP:  Okay.  So you - you don't have a memory of what happened right then?

**WA: No, I don't.**

SP:  Well, what if there's information in some other statements that you made where it shows your memory was actually pretty good around that time?

**WA: Well, I - and I would sit here today knowing how I am and tell you I don't know if I was telling the truth or not, if I really remembered at that time and I'm not remembering now.  That's what I would tell you.**

SP:  I think I got it.

**WA: Do you?**

SP:  I do.

**WA: Okay.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 105

## DEFENDANT'S APPRECIATION OF WRONGFULNESS:

In addition to discussing her role in the instant offense, Ms. Andriano and I discussed whether or not she appreciated the wrongfulness of her actions. To wit:[62]

SP: Is - is it wrong to kill someone?

**WA: Of course it is.**

SP: Did you know - did you know back at -

**WA: No, I know it's wrong.**

SP: Wait, wait. Let me finish my question because we're talking over each other. So you - you know it's wrong to kill someone, correct?

**WA: Yes.**

SP: Did you know back on October 8, 2000, it was wrong to kill someone?

**WA: I do know that it's wrong to kill someone. That situation I really thought I was doing the best thing possible by agreeing with my husband in helping him.**

---

[62] *Exhibit "B", Issue Re: Defendant's Appreciation of Wrongfulness - Part I, Pages 25 - 26.*

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: *State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 106

> SP:   Okay.  But independent of what you thought you were
> doing was the best thing possible, you were aware back
> on October 8, 2000, that it's wrong to kill your husband?
>
> **WA: Yes.**
>
> SP:   Okay.   So similarly, it would be wrong to poison
> somebody, correct?
>
> **WA: Of course.**
>
> SP:   Similarly, it would be wrong to steal, correct?
>
> **WA: Of course.**
>
> SP:   Similarly, it would be wrong to use an alias to try to
> secure powder to kill someone, correct?
>
> **WA: Of course.**
>
> SP:   Okay.  So those are things that you - you knew back on
> October 8th, correct?
>
> **WA: Yes.**

Ms. Andriano acknowledged that she was less than forthright with the
police and that it is wrong to lie.  To wit:[63]

> SP:   Were you truthful with the police?

---

63   *Exhibit "B", Issue Re: Defendant's Appreciation of Wrongfulness – Part II, Pages 32 - 35.*

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 107

**WA: I doubt it.**

SP:  Is it wrong to lie to the police?

**WA: Yes, it is.**

SP:  I'm sorry, you were covering your nose at that time so
     I'm going to repeat the question.  Is it wrong to lie to
     the police?

**WA: It's wrong to lie to anybody.**

SP:  Okay.  So - so are you telling me that you - I -

**WA: I'm telling you that since I've gone through this
     process of learning how I am, I know that I fill in
     the blanks and I answer questions even if I didn't
     -**

SP:  Excuse me one second.  Is there - excuse me?  Is there
     a possibility that this door stays closed?

CO:  They want the door closed.  Close it?

SP:  Thank you so much.

CO:  Sure.

**WA: I don't - when I tell you - when you ask me a
     question and I tell you, "I don't know," there's a
     sense of frustration and then I feel like you get
     upset.  Not you personally, but people in general.
     And at that time that was just my nature.  I would**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 108

> **just fill in whatever because I don't want - I don't want somebody upset at me and I don't want them to be frustrated and think I'm not cooperating.**

SP:  Okay.

**WA: So did I just sit there and want to lie?  No.**

SP:  Yeah.

**WA: It wasn't that.**

SP:  Okay.  So -

**WA: Even though it is a lie.**

SP:  Yeah.  So -

**WA: In my mind, it wasn't.**

SP:  Okay.  So let - let's - let's - let's - let's - let's set some - some things up here.  One, I - I just want you to be truthful with me here today.

**WA: I am.**

SP:  And - and give it your best shot, okay?  Are you with me?

**WA: Yes, sir.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 109

SP:   Okay.  And I also want you to understand that, "I don't know," is a perfectly fine answer from - from my perspective.  If you don't know -

**WA: And I appreciate that.**

SP:   If you don't know, you don't know.  Okay?  Is that a "yes"?

**WA: Yes.**

SP:   All right.  So - but let's - let's go back though because I'm still a little - I'm still trying to connect the dots on this.  So you - you do this interview with the police, correct?

**WA: Yes.**

SP:   And - and you believe - and by the way, if I summarize something and I get it wrong, you say, "No Dr. Pitt, that's not what I said."  If I have it right - if you don't say anything to me I'm going to assume I have it correct.  Okay?

**WA: Yes.**

SP:   All right.  So did you lie to the police?

**WA: That's such a black and white question.  I know that "yes", I did tell them things that probably I didn't even know what I was - that were not - I don't know.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 110

SP:   Why did you do that?

**WA: I explained to you why I do that already.**

SP:   Oh, that's because you have a need to please people?

**WA: Well, I - I fill in - I just fill it in and try to give you
an answer that makes sense to me.**

Notwithstanding the aforementioned statements Ms. Andriano made
about her appreciation of wrongfulness, she also told me that she was
uncertain if being raised in an allegedly abusive environment effected her
ability appreciate the wrongfulness of her actions.  To wit:[64]

SP:   Well, do you think the abusive childhood is - is - using
your words as you describe it, do you think that didn't
allow you to appreciate the wrongfulness of your
actions?

**WA: No.  No, I almost feel like there's this environment
that it's okay to do wrong things for right reasons.**

SP:   Okay.

**WA: And -**

SP:   Do - do you think that you're not - the childhood you
said that was not appropriate somehow kept you from
appreciating the wrongfulness of your actions on October
8, 2000?

---

[64]   *Exhibit "B",* Issue Re: Defendant's Appreciation of Wrongfulness - Part III, Pages 122 - 124..

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 111

WA: **I don't know.  I just - I don't know.  I - I - I understand what you're asking.  I - I guess I understand what you're asking me, but I don't - it - that - I don't know. It is what it is. My childhood is what it is.  And if - I mean all the events that you go through, every day that you've lived lead up to a point where you make decisions that you make. And apparently I was not making very good decisions at all.  I mean so you're sitting here asking me, "Well, did your childhood affect that?" Of course it did.  That's how I was raised.**

SP: Okay, well -

WA: **I don't understand.**

SP: Well, it's not - I'm not - I'm not quibbling with you about the effect.  What I'm - what I'm to understand is do you think it inhibited your ability to appreciate wrongfulness?

WA: **Well, I think everybody's perspective of life it affects.  How you're raised affects how you make decisions and how you respond to thinks.  Of course.  I mean I don't - I don't know.  I don't know what you're - I - I know it was wrong what I did.  I'm sitting here today, and I've said it to you probably 50 times.  I don't understand what more you're asking me.**

SP: Okay.  Well, here's -

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 112

> **WA: I'm feeling really defensive right now because I feel like you're pushing me for something that I don't understand what you want from me.**
>
> SP:   Well, I don't think I'm - I'm pushing you at all.
>
> **WA: Okay.**
>
> SP:   I think I'm - I'm just trying to understand -
>
> **WA: Well you keep asking about this wrongfulness.  I know what - it was wrong.  Why did I make the decisions I made?  I don't know.  I don't know why.  All I can do is look at the life and this is how circumstances were and that's why I made the decision I made, so -**

In addition, Ms. Andriano was uncertain if she could appreciate the wrongfulness of her actions while allegedly being under "extreme stress". To wit:[65]

> SP:   Even when you're under extreme stress and not make good decisions, do you acknowledge that you could appreciate that decisions are still wrong?
>
> **WA: In that moment I don't know.**
>
> SP:   Okay.
>
> **WA: Sitting here today, absolutely.**

---

[65]  *Exhibit "B", Defendant's Appreciation of Wrongfulness - Part IV, Pages 231 - 232..*

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 113

SP:   So you don't know if in that moment you -

**WA: I don't.**

SP:   You can't tell me if in that moment what you were doing
      you knew was wrong?

**WA: Yeah, I can't tell you that.  Sitting here today, yes
I can tell you that because I'm looking at it and I
know - I - I know.**

SP:   I - I could be wrong about this, but I think there's some
      things that you did after the offense that would actually
      speak to your - the fact that you appreciated that some
      of the things you were doing were wrong.

**WA: Yeah, I don't know.**

SP:   You wouldn't quibble with that if it's in the records?

**WA: No, I can't - I'm not trying to - yeah.**

## ISSUE RE: CULPABILITY:

Notwithstanding Ms. Andriano's ambigous and contradictory statements
about her ability to appreciate the wrongfulness of her actions, she was
quite clear that independent of her upbringing, she was and is responsible
for her actions and choices.  To wit:[66]

SP:   Do you in any way hold your stepdad's actions no matter
      how potentially inappropriate they may have been, or

---

[66] *Exhibit "B",* Issue Re: Culpability - Part I, Page 117, Lines 13 - 28.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 114

> allegedly how inappropriate they may have been, for the
> actions that resulted in your arrest?

**WA:** **No.  It's not for me to hold anybody accountable
but myself.  I really believe that every person,
everybody is who they are.  They make the
decisions that they make because they feel that
that's the right decision.**

**SP:** Okay.

**WA:** **However bad it may be or - or not healthy or not
good for somebody else, they - you know, you
can't - I can't - I can't hold anybody accountable
for anything that's happened to me because it's
my life and I still am the one ultimately who
chooses.**

Ms. Andriano was also quite clear that she does not blame anyone, or for
that matter the circumstances associated with her childhood, for her
actions.  To wit:[67]

**SP:** So do you - do you - this is what I'm trying to
understand.  Do you blame -

**WA:** **I don't blame anybody.**

**SP:** Well let me finish my question.  Do you blame the
circumstances of your childhood, of Alejo being this
sexualized person, of the abuse that you talked about,

---

[67] *Exhibit "B",* Issue Re: Culpability – Part II, Page 124, Line 14 - Page 125, Line 25.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 115

of the stressfulness, do you blame those - those things that you're claiming took place in your childhood as - as what drove you to kill your husband on October 8, 2000?

**WA: I've never said that and I don't blame any - anybody, anything.**

SP: So you accept responsibility?

**WA: But I think - I think that if you're going to sentence somebody to die, I feel like everything should be explained, reality should be presented as it is and as it was and then make a decision.**

SP: Okay.

**WA: And that did not happen in my trial and so I just would like for everything to be explained first and then -**

SP: I - I understand.  I totally -

**WA: I mean -**

SP: No, no.  No, wait a minute.

**WA: I don't blame.  I know that it was wrong.  I accept responsibility.**

SP: Okay.  Well, do you understand why I'm asking that question?

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 116

WA: **I don't. I don't. I guess maybe that's why I'm like why - and you keep asking it and so I'm not - I don't know what you want from me.**

SP: Well, I - well I'm asking it because I've read reports from - from other experts who have evaluated you who are - who are essentially blaming a number of - of these things that happened in your childhood on - on the actions that took place on October 8, 2000. That's why I'm asking. I'm just trying to understand it. Have you read those reports?

WA: **No, I have not.[68]**

## REVIEW OF PSYCHIATRIC/PSYCHOLOGICAL AND NEUROPSYCHOLOGICAL REPORTS:

Subsequent to being charged with First Degree Murder, Ms. Andriano was evaluated by a number of mental health professionals who have authored reports and opined on diagnostic and potential mitigating issues. I have reviewed these reports and included below the conclusions reached by each person.

A.    Report of Competency Screening Evaluation completed by
          Jack Potts, M.D. *(Exhibit "D-1")*:

In his report dated March 28, 2001, Dr. Potts wrote, in part:

---

[68] Notwithstanding Ms. Andriano's avowal that she has not read any of the defense retained expert reports, in the ADOC mental health progress notes (dated November 23, 2011 and December 12, 2011), Psychology Associate M. Page wrote, in part: "...Reported getting psychiatric reports back from her legal team...". (Bates No. 000012221) [and] "Discussed psych. evals. that she got from her lawyer, reported, 'it's a lot to go through and read'." (Bates No. 000012219) (Of the post-conviction reports made available to me, the only completed report dated prior to November 23, 2011, is Dr. Young's report which is dated July 11, 2011.)

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 117

In summary, I do not believe that grounds exist to further question the competency of Ms. Andriano. It would be my opinion, within a reasonable degree of psychiatric certainty, that she has a factual, as well as a rational understanding of the proceedings she is facing. I would also opine that she can effectively assist her attorney in her defense. Whether or not she has "amnesia" for the time around the alleged offense is something I cannot determine. Defense counsel may wish to independently retain an expert to evaluate his client's state of mind around the time of the offense. Certainly there is something quite bizarre about what allegedly occurred. If Ms. Rhode is accurate in her diagnostic assessment, then the criminal culpability of the defendant and her state of mind at the time of the alleged offense should be evaluated independently, outside the scope of a Rule 11 evaluation.

(*For a complete review of Dr. Potts' report, the reader is referred to the Appendix, Exhibit "D-1"*)

B.    Report of Psychiatric Evaluation conducted by Richard D. Rosengard, D.O. (*Exhibit "D-2"*):

In his report dated August 27, 2002, Dr. Rosengard wrote, in part:

DIAGNOSTIC IMPRESSION:

AXIS I:    (a) Major affective disorder, depression.
           (b) Probable posttraumatic stress disorder.
           (c) Panic disorder.
AXIS II:   None.
AXIS III:  None.
AXIS IV:   Stressors: 1) dealing with her husband's cancer
           that was getting worse; 2) dealing with the legal

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 118

              repercussions, as well as personal repercussions, of the loss of her husband; 3) currently being a single parent.

AXIS V:    Current GAF: 62.  Highest GAF in last 12 months: 70.

SUMMARY, OPINIONS, AND RECOMMENDATIONS:

The defendant was going through a considerable amount of stress in dealing with not only the eventual loss of her husband at a very early age and being the sole parent of her two young children but dealing with the slow and painful demise of her husband, while her husband was becoming inappropriately irritable and mistreating her emotionally and physically. She had seen a deterioration in their relationship; and apparently, she had killed him. Perhaps no one will know exactly what occurred in the incident; and several potentials exist, including the potential that she was defending herself to some extent. Questions could arise as to how somebody who had a sound mind prior to and after the event could now have blocked what had occurred, specifically at that juncture; and the issue of amnesia for the subject appears all too convenient. I do not believe that there is any evidence that would conclude that what had occurred was premeditated; and certainly, the actions were regretted from the very beginning, as witnessed by the Defendant's response when answering questions posed to her when she called the emergency numbers. Because of what she saw, she surmised that she actually had killed her husband and admitted to feeling badly about it. An individual who goes through a traumatic event will often forget that extreme situation, because an individual is unable to deal with the thoughts on an emotional basis. This occurs in both children and adults

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 119

who have been physically or sexually attacked and more than explains the Defendant's response, particularly in light of the fact that she had a past history, apparently, of being abused and symptoms that consist with posttraumatic stress disorder. That situation and the emotional responses that she has had from that situation make it more likely that she would have had such an amnestic response to her apparent actions. That is true whether her actions were a matter of self=defense or whether they were purposeful attacks in the heat of a momentary aggressive outburst. The former appears more probable and the latter less probable, based on the Defendant's statements currently and to the emergency crew that she dealt with.

The Defendant certainly should receive appropriate therapeutic treatment, which would include individual therapy and a strong consideration of an antidepressant, which could be beneficial both for her depression and traits of posttraumatic stress disorder.

(*For a complete review of Dr. Rosengard's report, the reader is referred to the Appendix, Exhibit "D-2"*)

C.   Report of Domestic Violence Assessment completed by
        Sharon B. Murphy, Ph.D., C.I.S.W. (*Exhibit "D-3"*):

In her reported dated September 22, 2003, Dr. Murphy wrote, in part:

Determining the veracity of the findings of this assessment:

Wendi was interviewed for 20 hours by this writer. The findings of each of the assessment tools are fully consistent with the interview data. Additionally, Wendi's story, and

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 120

responses to the assessment tools were fully consistent with each of the collateral interviews conducted by this writer (an addition 5 hours of interviews). Results of those interviews are also attached to this document.

<u>Summary</u>

In response to the purpose of the assessment written on page 1:

1.  Wendi Andriano was a victim of domestic violence/abuse by Joseph Andriano as determined by generally accepted definitions. A definition of domestic violence taken from the National Council of Juvenile and Family Court Judges, 1998 follows: "Domestic Violence is a pattern of assaultive and coercive behaviors, often including physical, sexual, and psychological attacks, as well as economic coercion, that adults and adolescents use against their intimate partners."
2.  Wendi Andriano suffered from severe levels of emotional abuse (score was 60 - cutting score is 15) and a significant level of physical violence (score was 16.66 - cutting score is 15). Multiple examples of each type of abuse are documented within this report.
3.  Joseph Andriano appears to have died as a result of a struggle over the knife. Whether that happened as a result of Wendi's attempt at defending herself or as she struggled to stop him from killing himself is not clear.

Wendi Andriano clearly was a victim of abuse/violence at the hands of her husband, Joseph Andriano. Wendi was able to articulate why that night was more frightening than others.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 121

This case, like many others, shows the increase in frequency and severity of the violence/abuse over time.

As in most domestic violence cases, there were numerous opportunities for intervention into the lives of this couple that perhaps may have averted the final outcome. It is highly probable that numerous individuals had the opportunity to witness Joe's treatment of Wendi. It appears that Wendi herself had not identified Joe's treatment of her as domestic violence. This also is not uncommon. Until the community-at-large is educated about what constitutes domestic violence and what can be done about it, domestic violence will continue to proceed at an alarming rate.

<u>Recommendation</u>

The death of Joseph Andriano appears to have occurred either in the act of self-defense of Wendi Andriano or during her failed attempt at stopping Joseph from killing himself. In either case it does not appear that Wendi should be held responsible for the death of Joseph Andriano.

*(For a complete review of Dr. Murphy's report, the reader is referred to the Appendix, Exhibit "D-3")*

D.   <u>Report of Psychological Evaluation completed by Michael B. Bayless, Ph.D. (*Exhibit "D-4"*):</u>

In his report dated August 4, 2002, Dr. Bayless wrote, in part:

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 122

Summary:

Wendy Andriano was raised in a very religious home environment in which there were very strict rules and regulations. She was well protected and was sent to private Christian schools from elementary to high school. After meeting her husband and working out their religious differences, they were married in 1994. Initially, Wendy hung out with her husband's friends and basically lost touch with her own. She claims that her husband was a very sexual person and although it was quite painful for her, she would always comply with his requests. In 1994, after several months of marriage, Joe Andriano found out that he had cancer and after an operation believed that it was all removed. However, the cancer came back in 1996. During this time period, Ms. Andriano reported that they had significant financial problems due to her husband not working. She stated "I felt responsible for our happiness. I was overwhelmed by debt". Consequently, to relieve some of that pressure she stole, over a period of four years, approximate $18,000 from her employer. She was fired from her job as a result of this.

According to witness statements, Ms. Andriano apparently became angry about her responsibility, believing that she did everything and that her husband was doing nothing. She took care of the kids, earned the money, took care of the house, cooked, cleaned, basically did everything. After a failed business attempt (windshield repair), Ms. Andriano seemed to become increasingly resentful and claims she decided to divorce her husband. Apparently her husband was able to talk her out of this. As her disappointment grew and as her husband became increasingly ill, Ms. Andriano seemed to look

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 123

to other sources for enjoyment and support. She began going out with her friends, acting as if she were not married, and had an affair with Rick Freeman. Noteworthy, when Mr. Freeman found out that Ms. Andriano was married, he wanted to end the relationship. According to witness statements, Ms. Andriano became somewhat obsessed with Mr. Freeman and would call him incessantly, go to his door at all hours of the night and bang on his door and at one point threatened to get a passkey and go into his apartment without permission. It is unclear from the documents but it seems as though Mr. Freeman was living free at the apartment complex, which Ms. Andriano was managing.

As her discontent and resentment increased, Ms. Andriano began to scheme such that she asked a couple of her friends to pose as her husband so as to take out a life insurance policy. It was noted that on the life insurance policy she indicated that her husband did not have cancer. Additionally, she began to research poison and how to obtain it without her name being attached to it. She ordered the poison from the Internet through a factitious name and had it sent to a separate business. Noteworthy, according to Ms. Andriano, her husband wanted her to get the poison because he wanted to commit suicide.

Although Ms. Andriano claims that she was physically and psychologically abused by her husband, none of her friends ever witnessed any marks or evidence of the abuse. Her husband apparently was suspicious and somewhat upset about her staying out late and not coming home when she was supposed to. It was reported that he would throw things, yell and sort of go on a tirade about her inappropriate behavior but at no time did he become physically violent. The

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: State of Arizona v. Wendi Elizabeth Andriano
December 27, 2013
Page 124

examiner notes that this is understandable considering Ms.
Andriano's behavior and general response toward her
husband.  During this time period in which Ms. Andriano's
husband was very suspicious of her behavior, she was, in fact,
having an affair.  As a matter of fact, she admits to having
actually two affairs.  This examiner finds this quite interesting
in light of the fact that Ms. Andriano reports that she did not
enjoy sex and that it was quite painful.

In an interview with the police, Ms. Andriano reported that on
the night of the offense she and her husband were engaged in
a physical fight.  She alleged that he had attempted to choke
her with a telephone cord and had earlier pushed her into the
dresser and onto her bed.  He also pushed her into their
wedding display case, shattering it, grabbed her in a bear hug
and they both were wrestling around in the house.  As her
husband began to reach for a belt to hit her, she was able to
wiggle away from him, grab the barstool and hit him on the
back of the head.  Apparently Joe was knocked unconscious
and was severely injured.  She gave him a pillow and blanket.
She called Chris and told her Joe was having a heart attack.
While she was waiting for Chris to come, she covered the
blood on the carpet with a towel.  Chris came over and told
Wendy to call 911.  Wendy told the 911 operator Joe was
having a heart attack.  The Fire Department came and Wendy
sent them away.  She also told Chris to go home.  When she
returned to the apartment and Joe was standing up.  At this
time he wrapped the charging cord from his cell phone around
her neck and as they struggled and moved toward the kitchen
she grabbed a knife and cut the cord from around her neck.
She reported that the next thing she remembers was
struggling with her husband in the living room.  She still had
the knife in her hand and the next thing she knew she had

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 125

blood all over her. Noteworthy, after her husband was cut severely on the neck and appeared to be unconscious on the floor, she waited until he stopped making noises to call her father.

Previously, she calmly talked to the firemen that were there because of her 911 call and calmly told them that she did not need their help. During this time her husband was on the floor bleeding from his injuries. It was also noted that based on Chris's report, it appeared that Wendy had taken a shower and changed when she went out to meet the firemen. Based on the amount of blood noted and the physical condition of her husband, it is unreasonable to believe that Ms. Andriano did not know that her husband was severely injured and in need of help. It is also noteworthy that the firemen and her friend Chris did not report that Wendy appeared to have been attacked or injured in any way.

Further this examiner could not find any evidence to support Wendy Andriano's claim that she was a victim of domestic violence.

Diagnosis:

Axis I:      Depressive disorder NOS.
Axis II:     Personality disorder NOS with antisocial and borderline traits.
Axis III:    None.
Axis IV:    Marital conflict, financial problems.
Axis V:     GAF = 65.

*(For a complete review of Dr. Bayless's report, the reader is referred to the Appendix, Exhibit "D-4")*

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 126

E.   Report of Neuropsychological Testing completed by
     Myla H. Young, Ph.D., A.B.N. (*Exhibit "D-5"*):

In her report dated July 11, 2001, Dr. Young wrote, in part:

Summary

Wendi Andriano's abilities across neuropsychological tests are like those of individuals who experience serious neurological and psychiatric disorders.   From a neuropsychological perspective, early childhood mistreatment and early childhood fear and anxiety are likely brain impairment consequences of Cognitive Disorder.   From a psychiatric perspective these same factors of serious early childhood mistreatment, fear and anxiety, as well as continuing experiences of fear and anxiety into adulthood are likely psychiatric consequences of Depression Disorder and/or Anxiety Disorder.

Disabilities in thinking, reasoning, planning, making decisions, anticipating consequences of plans and actions, maintaining impulse control, attending and concentrating, remembering important information, recognizing emotional problem, seeking help for emotional problems, and consistently communicating information in accurate and meaningful ways would need to be considered.

(*For a complete review of Dr. Young's report, the reader is referred to the Appendix, Exhibit "D-5"*)

F.   Report of Forensic Psychiatric Evaluation completed by
     George W. Woods, Jr., M.D. (*Exhibit "D-6"*):

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 127

In his report dated February 14, 2012, Dr. Woods wrote, in part:

Conclusion of Clinical and Diagnostic Findings and Mental Status Examination:

Wendi suffers from multiple mental disorders.  She suffers from bipolar disorder and clearly comes from an affectively laden family, with her father, sister, and mother manifesting symptoms of alcoholism, hypersexuality, impaired judgment, mood swings, chemical dependency, psychosis, suicidality, and depression.

Wendi suffers from complex PTSD, with at least two sources of chronic trauma.  The first is the ongoing sexual coercing and abuse by her step-father, which led to her acquiescence, anger, affective numbing, hyperreactivity, and emotional dysregulation.  She also underwent the extreme, ongoing trauma of her caregiver strain, while attempting to find ways to help her husband, raise her children, and maintain her family.

Wendi has cognitive impairments that slow down her ability to affectively size up and respond to social situations.  In spite of the structure of prison, her cognitive deficit continues to this day.

She also suffers from a longstanding dependent personality disorder, created and coerced by the sexual abuse of her stepfather and neglect and abuse of her mother.  Dependent personality disorder has been well documented as a source of anger and self destructive behavior.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 128

> Each of these disorders was acute during the months before her husband's death.   Symptoms of each disorder were synergistic, creating a maelstrom of instability and emotional disruption.   This was the mental state Wendi was suffering from at the time of her husband's death, and for some time afterwards, as captured in jail and prison medical records.
>
> It is against this emotional and cognitive backdrop that her behavior at the time of the offense must be considered, and her behavior examined forensically.

In the same report Dr. Woods concluded:

> It is my professional opinion, which I hold to a reasonable degree of medical certainty, that these symptoms were present at the time of the offense, impairing Wendi's capacity to conform her behavior to the law, control and manage her emotions and responses to the events as they unfolded, and judge right from wrong in determining how to "help" her terminally ill husband.

(*For a complete review of Dr. Woods's report, the reader is referred to the Appendix, Exhibit "D-6"*)

G.     Report of Psychological Evaluation completed by
            by James Hopper, Ph.D. (*Exhibit "D-7"*):

In his report dated February 14, 2012, Dr. Hopper concluded:

> Wendi Andriano lived a childhood characterized by substantial neglect and abuse - emotional, physical, and sexual.   The most destructive traumas were her mother's constant

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 129

emotional neglect and her adoptive father's years of sexual abuse.

As a result, Wendi entered adulthood as a severely traumatized and damaged person with a greatly increased likelihood of developing - as she has - deficits in cognitive functioning, psychiatric disorders, deficits in emotional functioning, and trauma-based patterns of relating to others.

*(For a complete review of Dr. Hopper's report the reader is referred to the Appendix, Exhibit "D-7")*

## REVIEW OF NEUROPSYCHOLOGICAL REPORT COMPLETED BY KIRAN AMIN, PH.D. (*Exhibit "E"*):

In his report, dated December 26, 2013, Dr. Kiran Amin wrote, in part:

In conclusion the review of the defendant's current and past neuropsychological and personality testing reveals some serious inconsistencies and the possibility of malingered amnesia.  Specifically, there are indications that, on some tests, the defendant was either exaggerating her amnestic and psychiatric symptoms (SIMS and MMPI-2 administered by myself) or not putting forth her best effort (ROCFT administered by Dr. Young).

Dr. Amin also wrote:

It is my opinion, to a reasonable degree of psychological probability, that at the time of the offense, Wendi Andriano did not suffer from a cognitive impairment.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 130

It is my opinion, to a reasonable degree of psychological probability, that at the time of the offense, Wendi Andriano did not suffer from a cognitive impairment that significantly impaired her capacity to appreciate the wrongfulness of her conduct or conform here conduct to the requirements of the law.

It is my opinion, to a reasonable degree of psychological probability, that since I believe that at the time of the offense Wendi Andriano did not have a cognitive impairment, there is not casual connection between such an impairment and the murder.

*(For a complete review of Dr. Amin's report, the reader is referred to the Appendix, Exhibit "E".)*

## ISSUE OF DIAGNOSIS/FORENSIC OPINION:

**Cautionary Statement: In an effort to avoid repetition of information already included within the transcript, I will not repeat this information in detail in the body of my report. Rather, my report will reference those areas in the transcript where the reader can find the information that was covered in the interview. Failure to read the transcript, and/or watch the DVD(S) of the interview, and therefore rely only on that information included in the Diagnostic and Forensic Opinion sections of this report may result in an incomplete understanding about how I reached my conclusions. For this reason, the reader is encouraged to read the transcript and/or watch the DVD(S) of the interview prior to reading the Diagnostic and Forensic Opinion sections of this report.**

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 131

**This report includes multiple citations. These citations are not meant to be all-inclusive but instead represent a sample of some of the more noteworthy examples used underscore a given point. In addition, some citations (or portions thereof) are used more than once.**

In your correspondence dated December 5, 2013 (*Exhibit "A"*), you asked me to answer several questions. I will now take this opportunity to *summarize* my response to each question.

(1)  Under A.R.S. § 13-751(G)(1), a first-degree murder can be mitigated if "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution." In your professional judgment, does Ms. Andriano suffer from a mental illness or cognitive impairment that significantly impaired her capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law?

In answering this question, I will first address the issue of diagnosis and then discuss what, if any, relationship exists between my diagnostic opinions and Wendi Andriano's behavior on or about October 8, 2000.

A.  Issue of Diagnosis:

During the days and hours leading up to the commission of the offense, Wendi Andriano did not consume alcohol or use illicit drugs. (Indeed, but for some isolated periods of binge drinking of a historical nature, she does not have a history of alcohol abuse or illicit substance use.)

Subsequent to her arrest, Ms. Andriano was evaluated by a number of mental health professionals and diagnosed with a number of psychiatric

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 132

conditions. These include, but are not limited to, "Major affective disorder, depression," "Probable posttraumatic stress disorder," "Panic Disorder" (*Exhibit "D-2"*), "Depressive disorder NOS," "Personality disorder NOS with antisocial and borderline traits," (*Exhibit "D-4"*), "Cognitive Disorder" (*Exhibit "D-5"*) in addition to "Bipolar Disorder," "Complex PTSD," "Cognitive Impairments," and "Dependent Personality Disorder" (*Exhibit "D-6"*)

I will now take this opportunity to review each of these diagnostic conditions and then conclude with my own diagnostic opinions.

     i.     <u>Major Depressive Disorder, Bipolar Disorder and Depressive Disorder Not Otherwise Specified</u>:

When we met, Ms. Andriano endorsed a pre-offense history of suffering from a number of symptoms which are consistent with a depressive disorder.[69] In addition, there appears to be a history of genetic loading for a mood disorder.[70] That said, to the extent Ms. Andriano experienced depressive symptoms in the months prior to the instant offense, she did not seek nor did she receive, psychiatric or psychological treatment for her complaints.[71] To be sure, subsequent to her arrest, it was noted that Ms. Andriano had been "...extremely depressed" for "at least a year" and her complaints were treated with anti-depressant medication.[72] It is also true that while

---

[69] *Exhibit "B,"* Psychiatric History Prior to October 8, 2000 - Part I (Pages 61-72) and Part II (Pages 226-231).

[70] *"Exhibit "B",* Family History - Part I (Pages 98 - 117) and Part II (Pages 161 - 164); and Family Psychiatric History, Pages 164 - 167.

[71] *Exhibit "B,"* Psychiatric History Prior to October 8, 2000 - Part I (Pages 61-72).

[72] Bates No. PCRDIS - P001120.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 133

incarcerated, Ms. Andriano has been given several "rule out" psychiatric diagnoses and received some treatment for complaints of anxiety and depression.[73] However, over time and regardless of whether she was incarcerated at the Maricopa County Jail or the Arizona Department of Corrections, the most consistent post-offense diagnosis appears to be some form of an Adjustment Disorder.[74]

Suffice it say, I am unimpressed with anecdotal non-psychiatric/non-psychological declarations which suggest that on or around October 8, 2000, Ms. Andriano suffered from some form of a major mood or anxiety disorder. Rather, if any inferences can be made from her post-arrest correctional mental health records it is that at the time of the instance offense, Wendi Elizabeth Andriano was (at most) experiencing garden variety depressive and anxiety symptoms that were secondary to economic and interpersonal psychosocial stressors.

ii.   Posttraumatic Stress Disorder (PTSD):

I am aware that some of the defense retained experts involved in this matter have gathered information from Ms. Andriano and/or relied on declarations and/or counseling records from H. Kandy Rohde, C.P.C., which allege that as a child and as an adult she was the victim of emotional, physical and sexual abuse. I am also aware that these same experts have opined that Ms. Andriano was a victim of domestic violence.

---

[73] *See* records from Maricopa County Jail and Arizona Department of Corrections.

[74] *Ibid.*

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 134

The aforementioned history has apparently served, in part (or in whole), as the basis for their diagnostic opinions that Ms. Andriano suffered from Posttraumatic Stress Disorder. That is, she developed characteristic symptoms following exposure to one or more traumatic events.

When we met, Ms. Andriano told me that she believed she was the victim of childhood emotional and physical abuse and thought that she may have been the victim of childhood sexual abuse.[75]  She also said that while married to Joseph Andriano she was the victim of domestic violence.[76]

The defendant's pre-offense medical records (to the extent they exist) and her incarceration records are, for the most part, relatively silent about suffering from a major mental illness or the full symptom complex associated with PTSD. That said, *if* it can be conclusively demonstrated that Ms. Andriano was subjected to repeated emotional, sexual and physical abuse as a child or as an adult, then it would be reasonable to consider such a diagnosis.[77]

---

[75] *Exhibit "B"*, Issue Re: Childhood Physical Abuse or Childhood Emotional Abuse, Pages 95 - 98; Defendant's Description of Her Childhood, Pages 118 - 122; and Issue Re: Whether or Not Ms. Andriano Believes That She Was the Victim of Childhood Emotional Abuse, Sexual Abuse or Physical Abuse, Pages172 - 175,

[76] *Exhibit "B"*, Issue Re: Alleged Domestic Violence - Part I (Pages 187 - 192) and Part II (Pages 198 - 202).

[77] I am aware that on direct testimony, Ms. Andriano testified to being the victim of domestic violence.  I am also aware that during cross-examination, Ms. Andriano admitted that she was, on several occasions, less than truthful with Dr. Murphy about some of the information she shared with her regarding domestic violence. That said, I aware that during her trial testimony stood by the opinions articulated in her report.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 135

iii.    <u>Complex Posttraumatic Stress Disorder</u>:

Complex Posttraumatic Stress Disorder is a term used to describe individuals who have been exposed to extended periods of protracted and extreme trauma and who suffer from a host of interpersonal and emotional problems. It is not a recognized diagnostic condition in the Diagnostic and Statistical Manuel of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR) or Fifth Edition (DSM-V).

Here again, *if* it can be conclusively demonstrated that Ms. Andriano was subjected to repeated emotional, sexual and physical abuse as a child or as an adult, then it would be reasonable to consider that she may have this condition. However, when we met, Ms. Andriano's description of her childhood and adolescence was nowhere near as graphic as the information contained in the declarations. Moreover, Ms. Andriano's correctional records are largely silent about her complaining of the types of symptoms associated with either one of these conditions.

iv.    <u>Cognitive Disorder</u>:

At the time of her arrest, Ms. Andriano shared with detectives a relatively cogent albeit less than truthful version of the events that transpired during the hours leading up to the instant offense, at the time of the offense and following the offense.

With the exception of the opinions of some of the experts involved in this matter, I did not come across data to suggest that Wendi Elizabeth Andriano suffered from a Cognitive Disorder during the weeks, days and hours leading up to the

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 136

instant offense, at the time of the offense or in the hours following the commission of the offense.   Whether Ms. Andriano spoke with life insurance company personnel, 911 operators, or the police, her speech was coherent and logical, and not at all consistent with someone who was suffering from a cognitive disorder.   In addition, her behaviors, albeit, misguided were consistent with someone whose executive function (i.e., planning, decision making, working memory, responding to feedback, etc.) was intact. Moreover, in his report, Dr. Amin opined that Ms. Andriano did not suffer from a cognitive disorder.[78]

v.    Anxiety/Panic Disorder:

When we met, Ms. Andriano told me that prior to the instant offense, she experienced episodic periods of anxiety that may or may not have been associated with panic.[79] In addition, in 1996, while receiving individual counseling from an Employee Assistance Program for theft from Casa Grande Regional Medical Center, Ms. Andriano reported that because of work related deadlines and other stressors such as her debt, she experienced "high anxiety". It was also noted that she appeared "depressed."[80]   Subsequent to her arrest, Ms. Andriano has, at various times, complained of feeling anxious and has, at different times, been treated for her complaints. However, in the jail records that were made available to me,

---

[78]   *Exhibit "E",* Report of Neuropsychological Evaluation completed by Kiran Amin, Ph.D.

[79]   *Exhibit "B,"* Psychiatric History Prior to October 8, 2000 - Part I (Pages 61-72).

[80]   Bates Nos. PCRDIS-P000561 - P000569.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: State of Arizona v. Wendi Elizabeth Andriano
December 27, 2013
Page 137

it appears that Ms. Andriano did not complain of anxiety during at least, the first year of her incarceration.[81]

Suffice it to say, notwithstanding the fact that there is a dearth of medical records to support complaints of anxiety, it is conceivable that as a result of economic and interpersonal stress, the defendant was, at the time of the instant offense, experiencing some ill-defined symptoms of anxiety.

vi.   Personality Disorder Not Otherwise Specified with Antisocial and Borderline Traits and Dependent Personality Disorder:

During the years leading up to the instant offense, Wendi Andriano engaged in a number of antisocial behaviors that included, but were not limited to, theft, theft by conversion and a fraudulent scheme involving forgery. In addition, during the months leading up to the offense, Ms. Andriano concocted the name of a shell company and used an alias in order to purchase the poison sodium azide.  She was also actively involved in fraudulent schemes to secure life insurance policies in her husband's name.

At a minimum, the aforementioned behaviors indicate that Ms. Andriano is someone who engaged in deceitfulness, used an alias, and attempted to con others for her personal profit. [82] Although I do not have data to suggest that Ms. Andriano engaged in a pervasive pattern of disregard for, or violation of, the rights of others occurring since the age of 15 years, I

---

[81]  *See* records from Maricopa County Jail.

[82]  I am aware that in the penalty phase, the jury did not find pecuniary gain as an aggravator.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 138

do believe that, at a bare minimum, the aforementioned behaviors speak to the fact that as an adult she engaged in antisocial behavior.

At the time of the instant offense, I do not believe that Wendi Andriano met the full diagnostic criteria for having dependent or borderline personality disorders. That is, while Ms. Andriano *may* have been involved in a relationship in which she was dominated by her husband, I do not believe that she had a pervasive and excessive need to be taken care of that lead to submissive and clinging behavior and fears of separation beginning by early adulthood and present in a variety of contexts.[83]

Similarly, although it is true that in her early twenties, the defendant engaged in a period of promiscuity and that three years following her arrest, she committed an impulsive suicide gesture,[84] she does not meet the diagnostic criteria for having a borderline personality disorder.[85]   That is, I am unable to

---

[83]   In addition, in order to meet the diagnostic criteria for Dependant Personality Disorder, the subject must have five (or more) of the following: (1) Has difficulty making everyday decisions without an excessive amount of advice and reassurance from others; (2) Needs others to assume responsibility for most major areas of his or her life; (3) Has difficulty expressing disagreement with others because of fear of loss of support or approval. (4) Has difficulty initiating projects or doing things on his or her own. (Because of a lack of self-confidence in judgment or abilities rather than a lack of motivation or energy); (5) Goes to excessive lengths to obtain nurturance and support from others, to the point of volunteering to do things that are unpleasant;  (6) Feels uncomfortable or helpless when alone because of exaggerated fears of being unable to care for him or herself; (7) Urgently seeks another relationship as a source of care and support when a close relationship ends; or (8) Is unrealistically preoccupied with fears of being left to take care of him or herself. (Source, DSM-IV-TR and DSM-V)

[84]   Bates No. PCRDIS-P001122 - P001129; and 000009722 - 000009745.

[85]   In addition, in order to meet the diagnostic criteria for Borderline Personality Disorder, the subject must have five (or more) of the following: (1) Frantic efforts to avoid real or imagined abandonment; (2) A pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation; (3) Identity disturbance: markedly and persistently unstable self-image or sense of self; (4) Impulsivity in at least two areas that are potentially self-damaging (e.g., spending, sex, substance use, reckless

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 139

find data to support the fact that she had a pervasive pattern of instability of interpersonal relationships, self-image and affects, and marked impulsivity, beginning by early adulthood and present in a variety of contexts.

Beginning at an early age, Ms. Andriano learned how to mediate and resolve disputes between her parents.[86] She carried this skill set into her adult life and allegedly used it to settle her disputes with the decedent.[87] Suffice it to say, like a lot of people, Wendy Elizabeth Andriano had a constellation of features that comprised her personality construct which included dependent, borderline and antisocial features. That said, I do not believe that at the time of the offense (or for that matter, at the time of the instant evaluation) Ms. Andriano met the full diagnostic criteria for any of the aforementioned personality disorders.

vii.   <u>Malingering</u>:

Given the medicolegal context of this matter, I would be remiss if I did not consider the diagnosis of malingering. The DSM-IV-TR describes malingering as the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining

---

driving, binge eating); (5) Recurrent suicidal behavior, gestures or threats or self-mutilating behavior. (6) Affective instability due to a marked reactivity of mood (e.g., intense episodic dysphoria, irritability, or anxiety usually lasting a few hours and only rarely more than a few days); (7) Chronic feelings of emptiness; (8) Inappropriate, intense anger or difficulty controlling anger (e.g., frequent displays of temper, constant anger, recurrent physical fights); or (9) Transient stress related paranoid ideation or severe dissociative symptoms. (DSM-IV-TR and DSM-V)

[86]   *Exhibit "B",* Mother and Adoptive Father's Relationship, Pages 112 - 117.

[87]   *Exhibit "B",* Second Serious Relationship - Joe Andriano - Pages 180 - 187.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 140

financial compensation, evading criminal prosecution, or obtaining drugs. According to the DSM-IV-TR, Malingering should be strongly suspected if any combination of the following are noted:

a.   Medicolegal context of presentation (e.g., the person is referred by an attorney to the clinician for examination)

b.   Marked discrepancy between the person's claimed stress or disability and the objective findings.

c.   Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen.

d.   The presence of Antisocial Personality Disorder.

As I indicated earlier in this report, when I asked Ms. Andriano to discuss her version of the instant offense, she claimed that her memory was spotty and she had difficulty recounting relevant information – information that she had previously shared with the police and information that she had previously testified to during her trial. On this point, Dr. Amin opined in his report that Ms. Andriano's presentation during the instant evaluation raised the "possibility of malingered amnesia."[88]

viii.   <u>Adjustment Disorder with Mixed Anxiety and Depressed Mood</u>:

During the time frame leading up to the instant offense, Ms. Andriano experienced psychosocial stress in the form of financial difficulties in addition to raising two young children

---

[88] Exhibit "E", Report authored by Kiran Amin, Ph.D

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 141

and caring for her ill husband. In addition, she was unhappy about her relationship with her husband and purportedly felt guilty about participating in two extramarital affairs. In Ms. Andriano's case, I believe that the aforementioned stressors manifested as relatively mild symptoms of anxiety and depression. That is, I believe that at the time of the offense, in addition to having features of antisocial, borderline and dependent personality disorders, Wendi Elizabeth Andriano met the diagnostic criteria for having an Adjustment Disorder with Mixed Anxiety and Depressed Mood.[89] To wit:

A.   The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s).

B.   These symptoms or behaviors are clinically significant as evidenced either of the following:

  (1)   Marked distress that is in excess of what would be expected from exposure to the stressor.

  (2)   Significant impairment in social or occupational (academic) functioning

*(For a complete review of the DSM-IV criteria for Adjustment Disorders, the reader is referred to the Appendix; Exhibit "F")*

---

[89] In 2000, DSM-IV-TR was the diagnostic mental health manual that was used by mental health professionals. In 2013, the DSM-5 was published. Although the diagnostic criteria for Adjustment Disorders has not substantively changed from DSM-IV-TR to DSM-V, since the issue is the defendant's mental state at the time of the offense, I have referenced the DSM-IV-TR criteria for this condition.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 142

In sum, it is my opinion to a reasonable degree of medical probability, that:

- At the time of the instant offense, Wendi Elizabeth Andriano's actions were not the byproduct of licit or illicit substance use.

- At the time of the instant offense, Wendi Elizabeth Andriano was not suffering from a major mental illness in the form of a thought, mood or cognitive disorder;

- At the time of the instant offense, Wendi Elizabeth Andriano had an Adjustment Disorder with Mixed Anxiety and Depressed mood in addition to features of antisocial, borderline and dependent personality disorders.

B.  <u>Does Ms. Andriano suffer from a mental illness or cognitive impairment that significantly impaired her capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law</u>?

Notwithstanding my opinion that, at the time of the instant offense, Wendi Elizabeth Andriano had an Adjustment Disorder, there is nothing about her overall mental status that significantly impaired her capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law.

Moreover, while I do not (for the reasons explained above) agree with the diagnostic opinions reached by the other mental health professionals involved in this matter, even if I did, there is nothing about these conditions (in this particular case), to indicate that they significantly

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 143

impaired Ms. Andriano's capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law.

That is, in this particular case, whichever diagnostic opinion you adopt, Ms. Andriano's behavior and the choices that she made in the planning and commission of this offense as well as her behavior following the commission of the offense, indicate that her faculties were intact and that appreciated the wrongfulness of her conduct and was able to conform her conduct to the requirements of the law.  To review:

- In August and September 2000, Wendi Andriano was actively researching different life insurance companies to see if she could fraudulently secure a life insurance policy for her husband who (it appears) was unaware of her efforts. (*Bates Nos.* 000009607 - 000009610; and 000009614 - 000009616)

- Approximately four months prior to the instant offense, Wendi Andriano offered co-worker, James Yost $10,000.00, to pose as her husband for a life insurance physical exam.  Yost declined. (*Bates No.* 000009480)

- In September 2000, Wendy Andriano asked Erik Vaillant if he would be wiling to pose as her husband during a life insurance physical exam.  Vaillant demurred. (*Bates Nos.* 000009566 - 000009568)

- Wendi Andriano used her computer at work to research poisons and when confronted about her research, she told her co-worker that she was doing the research for a friend who was writing a book. (*Bates No.* 000009539)

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 144

- On September 22, 2000, Wendi Andriano (as Anne Newton) discussed her desire to with Wade Voigt the owner of Voigt Global Distribution in Topeka, Kansas her desire to purchase sodium cyanide or potassium cyanide mixed with "greens" in order to kill rodents. (*Bates Nos.* 000009591 - 000009592)

- On or around September 27, 2000, Wendi Andrino met Travis Black at the Rockin Rodeo bar. The next morning they had sex. Over the next few days, they talked and during one of their conversations, Ms. Andriano told Mr. Black that her husband had died of cancer and that she was involved in a medical malpractice lawsuit. (*Bates Nos.* 000009589 - 000009590)

- On October 5, 2000, Wendi Andriano picked up and signed for the airborne express package containing sodium azide that she ordered using an alias (Anne Newton) and an altered business license from a closed business (Aztec Creations). (*Bates Nos.* 000009471; 000009539; 000009567; 000009592; and 000009655 - 000009656)

- Wendi Andriano hid the sodium azide a storage unit at the apartment complex where she lived. (*Bates Nos.* 000009331 - 000009332)

- During the early morning hours of October 8, 2000, Wendi Andriano called her neighbor, Chris Hashisaki for help. When Chris met with Andriano in the parking lot near her residence, Andriano "...told Chris that she had a problem and not to ask questions." (*Bates Nos.* 000009297 - 000009300)

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: *State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 145

- After she called paramedics to attend to her husband, Ms. Andriano then instructed Ms. Hashisaki to tell the paramedics to go away.[90],[91] She also told Chris to leave, threw Chris' purse outside and then shut the door. (*Bates Nos*. 000009297 - 000009300)

- Ms. Andriano did not respond to firefighters when they arrived at her residence until such time that dispatch called her apartment. However, instead of coming out the front door, Ms. Andriano came out the back patio door to speak with firefighters. (*Bates Nos.* 000009297 - 000009300) She told Chris Hashisaki and Phoenix Paramedic Trip McKinnon that "This is a mistake. We don't need your assistance, my husband's had cancer for the last six years, we've been dealing with this problem...thank you for coming, please go...". (*Bates Nos.* 000009366 - 000009368)

- Ms. Andriano told firefighters that her husband was "do not resuscitate" and that he wanted to be left alone. Ms. Hashisaki who witnessed Ms. Andriano's interactions with the firefighters also said that the defendant was "extremely confused and not there...". (*Bates Nos.* 000009297 - 000009300; and 000009366 - 000009368)

---

[90] During one of her initial calls to 911, Ms. Andriano informed that operator that her husband said that he felt like was having a heart attack. (160)

[91] During her last call to 911, Ms. Andriano called and informed the operator that her husband was dead, that her husband tried to kill her, that they got into fight and that she thought she hit him with a knife. (164) She later said that she thought she stabbed him because he was trying to strangle her. (165) During this same call, Ms. Andriano told the operator that, "I have my babies here." (165)

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
Re: *State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 146

- Hashisaki also said that Andriano's hair was wet and she had changed her clothes before she exited the apartment. (*Bates Nos.* 000009297 - 000009300)

- After the paramedics left, Andriano called her father and on two separate occassions, Ms. Hashisaki. During the second call which was approximately 30 minutes after the first call, Ms. Andriano told Hashisaki that she needed to tell Hashisaki "what really happened." (*Bates Nos.* 000009297 - 000009300)

- Andriano told Hashisaki that her husband discovered that she was having an affair and that he "...lost it and became very very angry...". She explained that her husband tried to strangle her so she hit him on the back of the head with a bar stool which is why he was in the position he was in when Hashisaki entered her apartment. Hashisaki did not notice a broken bar stool or blood when she entered the apartment. (*Bates Nos.* 000009297 - 000009300)

- Following her arrest and during a break in her interrogation, Wendi Andriano called a friend and co-worker, Shannon Sweeney and asked Sweeney to remove her personal belongings from the management office. (*Bates Nos.* 000009302 - 000009304)

- During her interrogation, Wendi Andriano initially told Detective Lucero that she did not stab her husband but did admit to having the knife in her hand when her husband collapsed. (*Exhibit* "C" and *Bates Nos.* 000009383 - 000009395)

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 147

- During her interrogation, Wendi Andriano initially told Detective Lucero that she was not having an extramarital affair. (*Exhibit "C"* and *Bates Nos.* 000009383 - 000009395)

- During her interrogation, Wendi Andriano initially told Detective Lucero that she did not change her clothes. (*Exhibit "C"* and *Bates Nos.* 000009383 - 000009395)

- Detectives/Crime Scene Specialists concluded that Wendi Andriano's alleged physical injuries did not comport with her version of the events. (*Bates Nos.* 000009383 - 000009395)

- Detectives/Crime Scene Specialists concluded that the blood spatter evidence did not comport with Wendi Andrianos' version of the events. (*Bates Nos.* 000009383 - 000009395)

- Detectives/Crime Scene Specialists concluded that Wendi Andriano staged a portion of the crime scene. (*Bates Nos.* 000009383 - 000009395)

- Wendi Andriano's father Alejo Ochoa told Detective Lucero that after he arrived at this daughter's apartment the police where already on scene and his daughter told him that she "screwed up" and stabbed her husband. (Bates Nos. 000009530 - 000009532)

The aforementioned behaviors and choices were not driven by a major mental illness or a cognitive impairment but rather by a person who was unhappy with her station in life. A person who by way of her character flaws was (and is) manipulative, deceitful, conniving and selfish. To this

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 148

end, Wendi Andriano was acutely aware of what she was doing (and what she needed to do) in order to try and extricate herself from being charged with the death of her husband.  Moreover, her behaviors were planned, designed to conceal her culpability and demonstrate that she appreciated of the wrongfulness of her actions.

In sum, it is my opinion, to a reasonable degree of medical probability, that although Wendi Elizabeth Andriano did, the time of the instant offense, have an Adjustment Disorder with Mixed Anxiety and Depressed Mood in addition to features of Antisocial, Borderline and Dependent personalities, she did not suffer from a mental illness or cognitive impairment that significantly impaired her capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law.

(2)  Pursuant to A.R.S. § 13-751(G)(2), it is a mitigating circumstance if the defendant was under "unusual and substantial duress" at the time of the murder.  Please address whether Ms. Andriano was under "unusual and substantial duress," and, if so, whether there was a causal connection between any unusual or substantial duress and the murder?

During the weeks and days leading up to the commission of the instant offense, Wendi Andriano was trying to cope with a number of psychosocial stressors that included, but were not limited to, caring for her two young children and ill husband, financial difficulties, dissatisfaction with her marriage, in addition to guilt regarding her involvement in two extramarital affairs.  While stressful, these events did not, in my opinion, reach a point whereby Ms. Andriano was, at the time of the offense, experiencing "unusual and substantial duress".

Once again, Ms. Andriano's pre-offense, offense and post-offense behavior speaks volumes about her thought processes.  Wendi Andriano

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 149

not only planned the instant offense, but during the days leading up to the offense, during the offense, and following the offense, kept her wits about her and worked feverishly to conceal those aspects of her actions which could result in her being charged for the murder of her spouse. That is, physical and behavioral evidence demonstrate that independent of whatever stress she was experiencing, Wendi Elizabeth Andriano set out in a calculated manner to murder her spouse.

The argument that Ms. Andriano was, at the time of the murder, under such unusual and substantial duress so as to suggest some sort of causal nexus, does not withstand scrutiny.   This is especially true when you appreciate the fact that prior to the commission of the offense, the defendant carefully went about securing sodium azide and contacted insurance companies in an effort to fraudulently secure a life insurance policy for her terminally ill and unwitting husband. In addition, following the offense, Ms. Andriano staged a portion of the crime scene ostensibly to make the physical evidence comport with her version of the events. Moreover, during a time that is arguably one of the more stressful times for a suspect – Ms. Andriano had the presence of mind, during a break in her interview with police, to contact a co-worker and ask this person to remove incriminating evidence from her office.   Taken separately or together, these are not the behaviors of someone who is under unusual and substantial duress.  Rather, these are the behaviors of someone who wanted out of a marriage (from which she derived little, if any, pleasure) and resorted to antisocial and selfish choices in order to extricate herself from the relationship.

In sum, it is my opinion, to a reasonable degree of medical probability, that Wendi Elizabeth Andriano was not, at the time of the instant offense, under unusual and substantial duress.   It is further my opinion, to a reasonable degree of medical probability, that to the extent Ms. Andriano was coping with some psychosocial stressors, these stressors are not

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 150

causally connected to her actions that occurred on or about October 8, 2000.

(3)   <u>Please address what, if any, causal connection exists between any mental illness or cognitive impairment from which Ms. Andriano suffers and the murder.</u>

As I indicated in my *Answer to Question No. 1*, I do not believe that at the time of the instant offense, Ms. Andriano suffered from a cognitive impairment nor do I believe that she suffered from a major mental illness. That said, I do believe that around the time of the instant offense Ms. Andriano had an Adjustment Disorder with Mixed Anxiety and Depressed Mood in addition to features of Antisocial, Borderline and Dependent personality disorders. However, whether or not you accept my diagnostic conclusions or the diagnostic conclusions of the other experts involved in this case, it is my opinion, to a reasonable degree of medical probability, that with the exception of her character pathology, none of these conditions, to the extent they existed, were causally connected to Ms. Andrianos' pre-offense, offense and post-offense behaviors. That is, none of these conditions, to the extent they existed are responsible for the choices (no matter how misguided), made by Wendi Elizabeth Andriano. In other words, Wendi Andriano's behavior during the time period leading up to the offense, during the offense and following the offense, were driven by antisocial and selfish acts designed to benefit one person and one person only – Wendy Andriano. That is, it was Wendi Andriano's character pathology and *not* an Adjustment Disorder, mood disorder or an anxiety disorder that resulted in her decision to:

- Attempt to fraudulently secure life insurance policies for her spouse who apparently was unaware of her efforts.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 151

- Concoct the name of a fictitious company and use an alias to procure sodium azide.

- Surreptitiously give her husband sodium azide.

- Attack her spouse with a bar stool and stab him in the neck.

- Stage a portion of the crime scene.

- Fabricate lies and half truths to Chris Hashisaki.

- Be less than truthful with paramedics and fire personnel.

- Lie to the police during her interrogation.

- Contact co-worker Shannon Sweeney during a break in her interrogation and instruct Sweeney to remove incriminating evidence from her office.

In the final analysis, Wendi Elizabeth Andriano's actions on or around October 8, 2000, reflect that she was acutely aware of what she was doing. Her actions and behaviors were driven by choices that she made which were independent of her upbringing or whatever other life stressors she may have been experiencing at that time. In other words, as Ms. Andriano explained to me:

> ...It's not for me to hold anybody accountable but myself. I really believe that every person, everybody is who they are. They make the decisions that they make because they feel that that's the right decision...However bad it may be or - or not healthy or not good for somebody else, they - you know, you can't - I can't - I can't hold anybody accountable for

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 152

anything that's happened to me because it's my life and I still am the one ultimately who chooses.[92]

In sum, it is my opinion, to a reasonable degree of medical probability, that no causal connection exists between any mental illness or alleged cognitive impairment and Ms. Andriano's behavior on or around October 8, 2000.

In sum, and for the reasons outlined above, I offer the following opinions, to a reasonable degree of medical probability:

1.   Although Wendi Elizabeth Andriano did, the time of the instant offense, have an Adjustment Disorder with Mixed Anxiety and Depressed Mood in addition to features of Antisocial, Borderline and Dependent personalities, she did not suffer from a mental illness or cognitive impairment that significantly impaired her capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law;

2.   Wendi Elizabeth Andriano was not, at the time of the instant offense, under unusual and substantial duress.  It is further my opinion, to a reasonable degree of medical probability, that to the extent Ms. Andriano was coping with some psychosocial stressors, these stressors are not causally connected to her actions that occurred on or about October 8, 2000; and

3.   No causal connection exists between any mental illness or alleged cognitive impairment and Ms. Andriano's behavior on or around October 8, 2000.

---

[92] *Exhibit "B"*, Page 117, Lines 18 - 28.

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 153


My opinions are based on the information listed at the beginning of this report and included in the body and appendix of this report. The reader should take note that the information included in the transcript is an attempt on the part of my transcriptionist to accurately reflect the Defendant's responses to my questions. In the event I am provided additional information, I reserve the right to modify my opinions. To this end, I ask that you send me additional discovery as it becomes available.

Thank you for allowing me to participate in this most interesting case. Do not hesitate to contact me at 480-281-1638, if I can be of any further assistance.

Respectfully submitted,

SEPQO. 12/27/13

Steven E. Pitt, D.O.
Diplomate, American Board of Psychiatry and Neurology with Subspecialty Certification in Forensic Psychiatry

Enclosures: Correspondence from Lacey Stover Gard, Esq., to
Dr. Steven Pitt and Dr. Kiran Amin, dated
December 5, 2013 (*Exhibit "A"*)
Transcript of Forensic Psychiatric Evaluation (*Exhibit "B"*)
Transcript of Wendi Elizabeth Andriano's interview with
Detectives David Lucero and Sally Dillian (*Exhibit "C"*)
Report of Competency to Stand Trial Evaluation
completed by Jack Potts, M.D. (*Exhibit "D-1"*)
Report of Forensic Psychiatric Evaluation completed by
Richard J. Rosengard, D.O. (*Exhibit "D-2"*)
Report of Domestic Violence Assessment completed by
Sharon B. Murphy, Ph.D., C.I.S.W. (*Exhibit "D-3"*)

Lacey Stover Gard, Esq.
Gregory Hazard, Esq.
Jeffrey A. Zick, Esq.
*Re: State of Arizona v. Wendi Elizabeth Andriano*
December 27, 2013
Page 154

Report of Psychological Evaluation completed by
   Michael B. Bayless, Ph.D. (*Exhibit "D-4"*)
Report of Neuropsychological Evaluation completed by
   Myla H. Young, Ph.D., A.B.N. (*Exhibit "D-5"*)
Report of Forensic Psychiatric Evaluation completed by
   George W. Woods, Jr., M.D. (*Exhibit "D-6"*)
Report of Psychological Evaluation completed by
   James Hopper, Ph.D. (*Exhibit "D-7"*)
Report of Neuropsychological Evaluation completed by
   Kiran Amin, Ph.D. (*Exhibit "E"*)
DSM-IV-TR Criteria for Adjustment Disorders (*Exhibit "F"*)
Notes from Forensic Psychiatric Evaluation (*Exhibit "G"*)
Curriculum Vitae of Steven E. Pitt, D.O. (*Exhibit "H"*)
DVD(S) of Forensic Psychiatric Evaluation (*Exhibit "I"*)

2

**EXHIBIT "A"**



OFFICE OF THE ARIZONA ATTORNEY GENERAL

CRIMINAL APPEALS/CAPITAL LITIGATION
DIVISION

Tucson Office
(520) 628–6520
Fax-(520) 628-6878

TOM HORNE
ATTORNEY GENERAL

December 5, 2013

Dr. Steven Pitt
Steven Pitt & Associates
15849 N. 71st Street, Ste 100
Scottsdale, Arizona 85254-2179

Dr. Kiran Amin
c/o Midwestern University
19555 N. 59th Ave.
Glendale, Arizona 85308

Re:   *State v. Wendi Andriano*

Dear Drs. Pitt and Amin:

As you know, this case has been scheduled for an evidentiary hearing on Wendi Andriano's claim that her counsel was ineffective for failing to present certain mitigation, including mental-health evidence, at sentencing. This hearing is scheduled to begin on February 3, 2014, and continue through February 14, 2014. Your reports are due by the end of December.

I am aware that the forensic psychiatric interview portion of the examination is complete and that Dr. Amin will be returning on December 13, 2013, to administer some psychometric tests. For the purpose of your reports, I would like you to answer the following referral questions:

1. Under A.R.S. § 13-751(G)(1), a first-degree murder can be mitigated if "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution." In your professional judgment, does Ms. Andriano suffer from a mental illness or cognitive impairment that significantly impaired her

400 West Congress, Suite S-315, Tucson, Arizona 85701• Phone: 520-628-6520• Fax: 520-628-6878

Drs. Ptt and Amin letter
*State v. Andriano*
December 5, 2013
Page 2 of 2

capacity to appreciate the wrongfulness of her conduct or conform her conduct to the requirements of the law?

2. Pursuant to A.R.S. § 13–751(G)(2), it is a mitigating circumstance if the defendant was under "unusual and substantial duress" at the time of the murder. Please address whether Ms. Andriano was under "unusual and substantial duress," and, if so, whether there was a causal connection between any unusual or substantial duress and the murder?

3. A defendant's mental illness or cognitive impairment may still be mitigating even if it does not meet the standards of A.R.S. § 13–751(G)(1) or (G)(2). In assessing what weight to give mitigating factors, the sentencer considers the quality and strength, not simply the number, of the aggravating and mitigating factors. A causal connection between the mitigation and the murder is not required, but the sentencer may consider the lack of any causal connection in assessing the quality and strength of the proffered mitigation. Please address what, if any, causal connection exists between any mental illness or cognitive impairment from which Ms. Andriano suffers and the murder.

By no means are the aforementioned questions intended to limit you, so please feel free to comment on anything else that you think is relevant. If you have any questions, my direct number is 520-628-6654 and my email address is lacey.gard@azag.gov. Thank you for your assistance.

Sincerely,

Lacey Stoxen Gard
Assistant Attorney General

cc: Juan Martinez, MCAO (by email)

#3630480

400 West Congress, Suite S-315, Tucson, Arizona 85701. Phone: 520-628-6520. Fax: 520-628-6878

**3**

**EXHIBIT "B"**

# TRANSCRIPT OF FORENSIC PSYCHIATRIC EVALUATION

## WENDI ELIZABETH ANDRIANO

## (NOVEMBER 26, 2013)

# WENDI ELIZABETH ANDRIANO
## FORENSIC PSYCHIATRIC EVALUATION
## TABLE OF CONTENTS

## SUBJECT HEADINGS                    PAGE NO.

INTRODUCTORY REMARKS/ISSUE OF NON-CONFIDENTIAL
   ASPECT OF INSTANT EVALUATION . . . . . . . . . . . . . . . . . . 1

PRESENT DAY LIVING SITUATION . . . . . . . . . . . . . . . . . . 7

ADULT INTERESTS . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

DEFENDANT'S VERSION OF THE INSTANT OFFENSE -
   PART I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

DEFENDANT'S VERSION OF THE INSTANT OFFENSE -
   PART II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

DEFENDANT'S VERSION OF THE INSTANT OFFENSE -
   PART III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

DEFENDANT'S VERSION OF THE INSTANT OFFENSE -
   PART IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

DEFENDANT'S VERSION OF THE INSTANT OFFENSE -
   PART V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

DEFENDANT'S VERSION OF THE INSTANT OFFENSE -
   PART VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

DEFENDANT'S UNDERSTANDING ABOUT THE REASON FOR
   THE INSTANT EVALUATION . . . . . . . . . . . . . . . . . . . 23

ISSUE RE: DEFENDANT'S APPRECIATION OF
   WRONGFULNESS - PART I . . . . . . . . . . . . . . . . . . . . 25

i

# WENDI ELIZABETH ANDRIANO
## FORENSIC PSYCHIATRIC EVALUATION
## TABLE OF CONTENTS

**SUBJECT HEADINGS**                                   **PAGE NO.**

ISSUE RE: DEFENDANT'S APPRECIATION OF
    WRONGFULNESS - PART II . . . . . . . . . . . . . . . . . . . . . . 32

ISSUE RE: DEFENDANT'S APPRECIATION OF
    WRONGFULNESS - PART III . . . . . . . . . . . . . . . . . . 122

ISSUE RE: DEFENDANT'S APPRECIATION OF
    WRONGFULNESS - PART IV . . . . . . . . . . . . . . . . . . 231

DEFENDANT'S RECALL RE: TRIAL AND TRIAL TESTIMONY . . 35

ISSUE RE: ALLEGED PROBLEMS WITH MEMORY . . . . . . . . . . 37

LEGAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CIVIL LITIGATION HISTORY . . . . . . . . . . . . . . . . . . . . . . . 54

DEFENDANT'S DESCRIPTION OF HER CONDUCT WHILE
    INCARCERATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

MEDICATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

ALLERGIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

DEFENDANT'S CONTACT WITH MENTAL HEALTH TREATMENT
    PROVIDERS WHILE INCARCERATED . . . . . . . . . . . . . . . 60

PSYCHIATRIC HISTORY PRIOR TO OCTOBER 8, 2000 -
    PART I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

PSYCHIATRIC HISTORY PRIOR TO OCTOBER 8, 2000 -
    PART II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 226

ii

## WENDI ELIZABETH ANDRIANO
## FORENSIC PSYCHIATRIC EVALUATION
## TABLE OF CONTENTS

**SUBJECT HEADINGS**                                    **PAGE NO.**

**PSYCHIATRIC HISTORY SUBSEQUENT TO OCTOBER 8, 2000 -**
    **PART I** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **72**

**PSYCHIATRIC HISTORY SUBSEQUENT TO OCTOBER 8, 2000 -**
    **PART II** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **139**

**MS. ANDRIANO'S OBSERVATIONS RE: TRIAL** . . . . . . . . . . . . **78**

**MS. ANDRIANO'S OPINION RE: TRIAL COUNSEL** . . . . . . . . . . **83**

**ISSUE RE: SUICIDAL IDEATION** . . . . . . . . . . . . . . . . . . . . . **83**

**RELIGIOUS UPBRINGING AND PRESENT DAY RELIGIOUS**
    **AFFILIATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **84**

**PERSONAL HISTORY - PART I** . . . . . . . . . . . . . . . . . . . . . . . **88**
    **Date of Birth** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **88**
    **Place of Birth** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **88**
    **Birth and Developmental History** . . . . . . . . . . . . . . . . . . **88**
    **Raised By** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **90**
    **Childhood Discipline** . . . . . . . . . . . . . . . . . . . . . . . . . **90**
    **Childhood Interests** . . . . . . . . . . . . . . . . . . . . . . . . . **94**
    **Traumatic Childhood Experiences** . . . . . . . . . . . . . . . . **94**
    **Issue Re: Childhood Physical Abuse or Childhood**
        **Emotional Abuse** . . . . . . . . . . . . . . . . . . . . . . . . . **95**

**PERSONAL HISTORY - PART II** . . . . . . . . . . . . . . . . . . . . . . **126**
    **Juvenile Behavioral History** . . . . . . . . . . . . . . . . . . . **126**
    **Childhood Interests** . . . . . . . . . . . . . . . . . . . . . . . . **126**
    **Socioeconomic Upbringing** . . . . . . . . . . . . . . . . . . . . **127**
    **Geographical History** . . . . . . . . . . . . . . . . . . . . . . . **127**

iii

# WENDI ELIZABETH ANDRIANO
## FORENSIC PSYCHIATRIC EVALUATION
### TABLE OF CONTENTS

<u>SUBJECT HEADINGS</u>                                    <u>PAGE NO.</u>

**FAMILY HISTORY - PART I** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **98**
    **Father** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **98**
    **Mother**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **101**
    **Adoptive Father**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **105**
    **Relationship Growing Up With Adoptive Father** . . . . . . **109**
    **Mother and Adoptive Father's Relationship** . . . . . . . . **112**

**FAMILY HISTORY - PART II** . . . . . . . . . . . . . . . . . . . . . . . . . **161**
    **Siblings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **161**

**ISSUE RE: CULPABILITY - PART I** . . . . . . . . . . . . . . . . . . . . **117**

**ISSUE RE: CULPABILITY - PART II** . . . . . . . . . . . . . . . . . . . **124**

**DEFENDANT'S DESCRIPTION OF HER CHILDHOOD**  . . . . . . . **118**

**EDUCATIONAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . **129**

**MEDICAL HISTORY PRIOR TO OCTOBER 8, 2000** . . . . . . . . **134**

**MEDICAL HISTORY SUBSEQUENT TO OCTOBER 8, 2000**  . . . **136**

**SUBSTANCE USE HISTORY**  . . . . . . . . . . . . . . . . . . . . . . . . . **136**

**TYPICAL DAY**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **143**

**ISSUE RE: NIGHTMARES AND SLEEP DISTURBANCE PRIOR**
    **AND SUBSEQUENT TO OCTOBER 8, 2000** . . . . . . . . . . . **144**

**MILITARY HISTORY**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **147**

**SOURCE OF INCOME** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **148**

iv

**WENDI ELIZABETH ANDRIANO**
**FORENSIC PSYCHIATRIC EVALUATION**
**TABLE OF CONTENTS**

<u>SUBJECT HEADINGS</u>                                       <u>PAGE NO.</u>

**HABITS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

**MEDICATIONS TAKEN PRIOR TO THE INSTANT**
        **EVALUATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

**ISSUE RE: WHAT MS. ANDRIANO HOPES TO GAIN FROM**
        **HER APPEAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

**ISSUE RE: STRESS ASSOCIATED WITH APPEAL** . . . . . . . . . . 152

**EMPLOYMENT HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

**MS. ANDRIANO'S DESCRIPTION OF HERSELF IN THE 30**
        **DAYS PRIOR TO THE INSTANT OFFENSE** . . . . . . . . . . . 156

**MS. ANDRIANO'S PRESENT DAY DESCRIPTION OF**
        **HERSELF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

**ISSUE RE: WHAT MS. ANDRIANO HAS LEARNED ABOUT**
        **HERSELF AS IT RELATES TO HER ROLE IN THE**
                **INSTANT OFFENSE** . . . . . . . . . . . . . . . . . . . . . . . 158

**FAMILY PSYCHIATRIC HISTORY** . . . . . . . . . . . . . . . . . . . . . 164

**FAMILY MEDICAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . 167

v

# WENDI ELIZABETH ANDRIANO
## FORENSIC PSYCHIATRIC EVALUATION
## TABLE OF CONTENTS

**SUBJECT HEADINGS**                                    **PAGE NO.**

**RELATIONSHIP HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . 169
    **Menarche** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169
    **Sexual Orientation** . . . . . . . . . . . . . . . . . . . . . . . 170
    **Issue Re: Whether or Not Ms. Andriano Believes That**
        **She Was the Victim of Childhood Emotional Abuse,**
            **Sexual Abuse or Physical Abuse** . . . . . . . . . 172
    **Issue Re: Whether or Not Ms. Andriano Believes She**
        **Was the Victim of a Sexual Assault** . . . . . . . . . . 175
    **Age of Interest in Sex** . . . . . . . . . . . . . . . . . . . . . . 175
    **First Serious Heterosexual Relationship** . . . . . . . . . . 175
    **Issue Re: Number of Lifetime Serious Heterosexual**
        **Relationships** . . . . . . . . . . . . . . . . . . . . . . . 178
    **Issue Re: Number of Lifetime Heterosexual Partners** . 178
    **Second Serious Relationship - Joe Andriano** . . . . . . . 180
        **Issue Re: Alleged Domestic Violence - Part I** . . . . 187
        **Issue Re: Alleged Domestic Violence - Part II** . . . 198
        **Children** . . . . . . . . . . . . . . . . . . . . . . . . . . . 192
            *Nicholas Andriano* . . . . . . . . . . . . . . . . . . . . 192
            *Ashlee Andriano* . . . . . . . . . . . . . . . . . . . . . 194
        **Issue Re: Joe Andriano's Cancer - Part I** . . . . . . . 194
        **Issue Re: Joe Andriano's Cancer - Part II** . . . . . . 207
        **Source of Income While Married** . . . . . . . . . . . . 196
        **Issue Re: Extramarital Relationships** . . . . . . . . . 202
        **Issue Re: Disclosure of Extramarital Affairs to**
            **Spouse** . . . . . . . . . . . . . . . . . . . . . . . . . . 205
        **Issue Re: Medical Malpractice Litigation** . . . . . . 206
    **Defendant's Description of Her Relationship With**
        **Her Spouse During the Week Leading Up to**
            **the Instant Offense** . . . . . . . . . . . . . . . . 207

P-App. 004131

# WENDI ELIZABETH ANDRIANO
# FORENSIC PSYCHIATRIC EVALUATION
# TABLE OF CONTENTS

**SUBJECT HEADINGS**          **PAGE NO.**

**ISSUE RE: SODIUM AZIDE - PART I** . . . . . . . . . . . . . . . . . . . **208**

**ISSUE RE: SODIUM AZIDE - PART II** . . . . . . . . . . . . . . . . . **210**

**ISSUE RE: DEFENDANT'S EFFORT TO SECURE LIFE
       INSURANCE POLICY FOR JOE ANDRIANO** . . . . . . . . . . **209**

**ISSUE RE: DEFENDANT'S ASSESSMENT OF THE STATE'S
       VERSION OF THE INSTANT OFFENSE** . . . . . . . . . . . . . **211**

**INTERVIEW CONDUCTED BY KIRAN AMIN, PH.D.** . . . . . . . . **217**

**FOLLOW-UP INTERVIEW CONDUCTED BY
       STEVEN E. PITT, D.O.** . . . . . . . . . . . . . . . . . . . . . . . . . **225**

**CONCLUDING REMARKS** . . . . . . . . . . . . . . . . . . . . . . . . . . **232**

P-App. 004132

SP = Steven E. Pitt, D.O.
KA = Karin Amin, Ph.D.
AA = Alan Arntsen, Esq.
WA = Wendi Andriano

## INTRODUCTORY REMARKS/ISSUE OF NON-CONFIDENTIAL
## ASPECT OF INSTANT EVALUATION:

1   SP:  Okay.  The date is Tuesday, November 26th.  It's approximately
2        8:40 AM.  I am at Perryville Prison Complex.  And I'm going to
3        shortly meet - with me is Dr. Kiran, K-I-R-A-N, Amin, A-M-I-N.
4        We're going to shortly be introduced to Wendi Andriano and her
5        lawyer, Alan Arntsen, A-R-N-S - I'm sorry, A-R-N-T-S-E-N, is going
6        to be the one making the introduction.  So the key at the top of the
7        transcript will be A-A for Alan Arntsen, S-P for Steven Pitt, K-A for
8        Karin Amin, and W-A for Wendi Andriano.  We're all set.  Machines
9        are on.
10
11  AA:  You want Wendi right here?
12
13  SP:  That would be terrific if your client sat right there.
14
15  AA:  Yeah.  Yeah.  And again, I'll just - I'll be leaving momentarily then.
16        I'm just here initially.  Here's your seat, Wendi.
17
18  WA:  Okay.
19
20  AA:  Would then just you just give her just a quick overview of what this
21        is going to involve and then I'll just kind of -
22
23  SP:  Well, I was going to do that after you introduced us.
24
25  AA:  Okay.  Yeah, that's fine.
26
27  SP:  I thought -
28
29  AA:  Yeah.  Tell me when you're ready.
30
31  ////////////////////////////////////////////////////////////////////////////
32  ////////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 2

1    SP:   I believe we are ready.  It is 8:40 - by the way I may have
2            misspoke on the time earlier, I think it was 9 - when I said 9:40.
3            It's actually 8 - now it's 8:42 or 8:43.
4

5    AA:   Wendi, this is Dr. Steven Pitt and doctor - is it Kamir [*sic*] Amin?
6

7    KA:   Kiran Amin.
8

9    AA:   Kiran Amin.  Dr. Pitt is a forensic psychiatrist and Dr. Amin is a
10        neuropsychologist that the state is going to be evaluation on behalf
11        of the state.  That's - that - that'll happen over the course of today.
12        Your - your evaluation will be videotaped and audio taped.  Do you
13        have any questions about it?
14

15   WA:   No.
16

17   AA:   Anything else in terms of intro - introductory stuff?
18

19   SP:   I mean are you happy with your introduction?
20

21   AA:   I am.
22

23   SP:   Okay, good.  So then are we done or no?
24

25   AA:   Yeah.  Anything else?  Any questions?
26

27   WA:   No.
28

29   AA:   Okay.
30

31   SP:   Okay.
32

33   AA:   There we go.
34

35   SP:   All right.  Thank - thank you very much.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 3

1   AA:  All right.  Thank you.
2
3   WA:  Okay.
4
5   AA:  Yeah.
6
7   WA:  Thank you.
8
9   SP:  Ms. Andriano, let me introduce myself again, or let me introduce
10       myself.  Your - your lawyer just did an introduction, but my name
11       is Steven Pitt, Dr. Pitt.  I am a forensic psychiatrist.  To my right
12       and - is Dr. Kiran Amin, and that's - Dr. Amin is a
13       neuropsychologist.  As your lawyer indicated, we are both retained
14       by the state as it relates to a proceeding you have going on in the -
15       in the court system.  Okay?
16
17   WA:  Uh-huh.
18
19   SP:  All right.  The evaluation is being audio and video recorded.  It will
20       be transcribed and your lawyer will get a copy of the video record
21       as well as a copy of the transcript.  However, the transcriptionist,
22       she doesn't have the benefit or get the benefit of seeing the
23       evaluation.  She only hears is.  So that requires two things.  One,
24       you're going to have to speak up.  And two, ways of communicating
25       that we're all used to such as head-nods and "uh-huhs" and "uh-
26       uhs," those don't translate very well at all on a transcript.  So
27       periodically I will ask you, "Is that a yes?" or, "Is that a no?"  I will
28       ask you to clarify information.  But I really need you to cooperate
29       insofar as to avoid the head-nods as a way of - of communicating.
30       We're all guilty of it, we all do it.  But I'm pretty sure after a couple
31       times when I - if I catch you doing it, you'll - you'll catch on pretty
32       quickly.
33
34   WA:  Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 4

1    SP:   Is that - all right?

2

3    WA:   Okay.

4

5    SP:   Another thing you need to know is both Dr. Amin and I have been
6           provided, oh, somewhere between 7,000 and 8,000 pages of
7           material, including trial transcripts, offense reports, supplemental
8           offense reports, autopsy reports, various expert reports. But you -
9           and we are meeting with you for - for the first time, and so there's -
10         we want to hear your story. And so there's going to be I'm sure
11         some repetition of information that is already included in some of
12         the records that we already have. But again, that's for the purpose
13         of - of hearing your story from you. Okay?

14

15    WA:  Okay.

16

17    SP:   Periodically you'll see me looking at this device to my right, the
18         video camera, as well as the device in front of me. I'm not doing
19         that to be rude or discourteous or impolite. I'm simply doing it
20         because I want to make sure that we're getting sound. One of the
21         nice things about video and audio recording an examination is that
22         it leaves no doubt as to who said what during the course of an
23         evaluation and I don't need to really - neither one of us really need
24         to take very many notes if we so choose. But we're wholly
25         dependent on the equipment, so that's why we make extra good
26         effort to make sure that the equipment is working. Okay?

27

28    WA:  Okay.

29

30    SP:   Now, another thing that you need to understand is that we are both
31         doctors. But - and normally when you visit with a doctor what you
32         talk about with that doctor remains confidential. A couple things -
33         one, we're not your doctors. We're not here to treat you. And
34         we're seeing you in the context of a legal proceeding. So you need

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 5

1    to understand that anything we talk about here today is not
2    confidential.
3
4    WA:  I understand.
5
6    SP:  Okay.  So if there's something that you don't wish to talk to us
7         about, if there's something that you think is none of our business,
8         if there's something that you think you want to check with your
9         lawyer first, just let - let me know that.  Okay?
10
11   WA:  Okay.
12
13   SP:  I'm going to ask you why, but I'm not going to force you or try to
14        make you answer questions that you don't want to talk about -
15
16   WA:  Okay.
17
18   SP:  The answers to.  Okay?
19
20   WA:  Okay.
21
22   SP:  All right.  After I'm done talking with you today, Dr. Amin, I think -
23        well he'll explain to you what he's going to do, whether he's going
24        to do some testing or not today, whether he's going to do some
25        today and come back another day, I'm not quite sure.  But he will
26        explain all of that to you.
27
28   WA:  Okay.
29
30   SP:  All right.  You - you with us so far?
31
32   WA:  I'm with you.
33
34   SP:  Okay.  Are you comfortable where you're sitting?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 6

1   WA: Uh-huh.
2
3   SP:  Okay.  Is that a "yes"?
4
5   WA: Yes.
6
7   SP:  Okay.  Can you repeat back to me what I said about the non-
8        confidential aspect of the interview?
9
10  WA: Yes. You are doctors, but you're here in a legal aspect.  Therefore,
11       anything you have - and you're not here to treat me, you're not my
12       doctor.  Anything that we discuss is not confidential.
13
14  SP:  Okay.
15
16  WA: And if I don't want to answer something then I don't have to.
17
18  SP:  Okay.  Did you - did you eat today?
19
20  WA: Yes.
21
22  SP:  Okay.  What time did you eat at?
23
24  WA: About 5:30 this morning.
25
26  SP:  All right.  And what is usually lunch?
27
28  WA: I don't know.  I don't know.  10:30-11:00.
29
30  SP:  Okay.
31
32  WA: 11:30-12:00.  I don't - I'm not sure up here.
33
34  ///////////////////////////////////////////////////////////////////////////
35  ///////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 7

1   SP:   Okay.   And that actually brings me to a - another - another
2         question, which is where are we right now?  What's the name of this
3         place?
4
5   WA:   Lumley.
6
7   SP:   Say it again?
8
9   WA:   Lumley.  L-U-M-L-E-Y.
10
11  SP:   Okay.  And what's the complex that we're - that you're -
12
13  **PRESENT DAY LIVING SITUATION:**
14
15  WA:   We're at Perryville.
16
17  SP:   Okay.  And where - where are you - is this the unit you're on?
18
19  WA:   Yes.
20
21  SP:   Is this the complex you're in?
22
23  WA:   Yes.
24
25  SP:   And what pod are you in?  Or how do they -
26
27  WA:   I live on a yard and it's called SMA-30 Yard.
28
29  SP:   Okay.  SMA-30 Yard.  And how many -
30
31  WA:   And it's for maximum custody people.  We're locked down 24/7.
32
33  SP:   Okay.  And - and of the people on that yard - how many people are
34        on that yard?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 8

1   WA: Oh, I don't have a clue.
2
3   SP:  And are you single bunked?
4
5   WA: Yes.
6
7   SP:  Okay.  And you say you get out - how - how much time do you get
8        out during the day?
9
10  WA: Per policy I'm allowed out one hour per day.
11
12  SP:  Okay.  And when you say "per policy," does that - do the folks
13       adhere to the policy?
14
15  WA: Oh, yes.
16
17  SP:  And do you get out?
18
19  WA: I don't.
20
21  SP:  You choose not to?
22
23  WA: Right.
24
25  SP:  And how come you choose not to?
26
27  WA: I just don't like to.  I like to stay in my room.
28
29  SP:  Okay.  And what does your room have?
30
31  WA: I have a bed and a sink and a toilet, shelves, a desk and a chair, a
32       TV.
33
34  SP:  Okay.  And the TV, what channels do you get?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 9

1   WA:  They provide some basic cable channels.
2
3   SP:  And do you -
4
5   WA:  Like local stations.
6
7   SP:  And do you watch TV or?
8
9   WA:  Occasionally.
10
11  **ADULT INTERESTS:**
12
13  SP:  And what do you usually watch?
14
15  WA:  PBS, channel 8, National Geographic, CNN.
16
17  SP:  Okay.  And do - do you read?
18
19  WA:  I read a lot.
20
21  SP:  All right.  You read a lot.  What do you read?
22
23  WA:  Whatever's available.
24
25  SP:  Okay.
26
27  WA:  They have a cart of books and just whatever is there, I read it.
28
29  SP:  Okay.  So what's the last five books you've read, if you know?
30
31  WA:  Well, right now I'm reading The Power of Now by Eckhart Tolle.  I
32       read Beautiful Creatures, which is like a fiction series.  I read Dr.
33       Dyers books, they're just lots of spiritual self-help books.
34
35  SP:  Okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 10

1    WA:  I like those.
2
3    SP:  All right.  Something that I didn't say earlier that I wanted to let
4         you know, which is I suspect we'll be chatting here around four
5         hours, maybe five hours.  It could be a little more, it could be a
6         little less.  I'll - I'll know in a couple hours about how much longer
7         we're going to need.  But this is not an endurance contest.  So if
8         you need to use the restroom, just - just let us know and we'll get
9         one of the correctional officers to - to take care of that.  And if you
10        want some food, just let us know and we'll ask the correctional
11        officer to do that as well.
12
13   WA:  Okay.  I know that their schedule is whenever lunch is served she
14        said already that they would bring me a tray.
15
16   SP:  Okay.
17
18   WA:  And I can take a break to eat.  So I don't know what time, but
19        maybe between 11:00 and 12:00.
20
21   SP:  Works perfectly fine for us.  Okay?
22
23   WA:  Okay.
24
25   SP:  So explain to me - first of all, do you know what today - what the
26        date is today?
27
28   WA:  It's like the 26th, I think.
29
30   SP:  Of - of what month?
31
32   WA:  November.
33
34   SP:  And what year?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 11

1   WA: 2013.

3   SP: And - and what holiday is just around the corner?

5   WA: Thanksgiving.

7   **<u>DEFENDANT'S VERSION OF THE INSTANT OFFENSE - PART I:</u>**

9   SP: Okay. And - and so how is it that you - you ended up here? What
10      happened?

12  WA: I was sentenced to death by the court system and so that's - I'm
13      here.

15  SP: Okay. And you say you were sentenced to death by the court
16      system and you're here. What - what is it that the court system -
17      what were you found guilty of?

19  WA: First degree murder.

21  SP: Of who?

23  WA: My husband.

25  SP: And what - what - what is his name?

27  WA: Joe.

29  SP: And when - first of all, do you admit that you - you - that you
30      committed that offense?

32  WA: I admit that I killed my husband. I don't admit that it's first degree
33      murder.

35  SP: Okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 12


1   WA:  That's my disagreement with the - with what happened.
2
3   SP:  Okay.  Well, what did happen?
4
5   WA:  Well, my husband was dying from cancer.  And we had had many
6        discussions about him not wanting to suffocate to death and I made
7        the choice to help him take his life.  And that's what the entire
8        situation was based on.  And that night - I've since learned that -
9        I don't even know how to describe it, but - I'm sorry, I don't know
10       how I'm going to put it into words or even talk about it.  That's why
11       I'm like oh.
12
13  SP:  I'm sorry, I didn't hear what you said?
14
15  WA:  Well, I don't know.  I don't know how to describe what happened
16       that night.  I don't know.  I don't - but I killed my husband that
17       night and I don't know - I don't - there was a lot of things going on
18       that I don't know how to describe.
19
20  SP:  Okay.  And - and why is it that you don't know how to describe
21       them?
22
23  WA:  Because it's hard for me to understand -
24
25  SP:  Okay.
26
27  WA:  Everything that happened.
28
29  SP:  Okay.  Well what - well what did happen?
30
31  WA:  I killed my husband.
32
33  SP:  Okay.  How?
34
35  ///////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 13

1  WA: Are you just asking me to describe that night to you?  I don't
2      understand what you're asking me to - to -
3
4  SP:  That would - that would be a terrific place.
5
6  WA: You want me to just sit here and - and verbatim tell you the events
7      of that night?  Is that what you're asking me?
8
9  SP:  If - if you would be so kind as to explain to me what happened that
10      evening that would be terrific.
11
12  WA: I don't have a clear memory of what happened that evening.  So
13      when - if you would like to ask me specific questions, I would be -
14      I would try to answer them.  But I can't give you a verbatim recall
15      of the events of that night.
16
17  SP:  Okay.  Can - can you give me any recall of the events of that night?
18
19  WA: I - I'm like - I'm just stuck.  I guess I just would rather if you would
20      ask me questions if you want to know something.  I don't - I can't -
21      I don't even know.  It's all just - it's -
22
23  SP:  Well, how about we do this.
24
25  WA: Yeah.  That doesn't - I can't.
26
27  SP:  What - what - what - what is the date that we're talking about?
28
29  WA: It happened in 2000, in October of 2000.
30
31  SP:  What date?
32
33  WA: I can't tell you the exact date.  I don't know.
34
35  SP:  Okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 14

1   WA: I don't - just - I haven't been talking about that or been asked that
2        question.
3
4   SP: Okay.  Well let - let's break the - the month up into thirds.  Do -
5        first of all, do you know how many days are in October?
6
7   WA: Well, yes.
8
9   SP: How many?
10
11  WA: 31.
12
13  SP: Okay.  So did it happen in the first third, the middle third or the last
14       third?
15
16  WA: I - I don't know.  I could - I can't even -
17
18  SP: Okay.  How about we break it up into halves?  Did it happen before
19       or after October 15th?
20
21  WA: It was the beginning of the month.
22
23  SP: Okay.  What - what - what - what do you remember - just - just -
24       do you remember - well, let's start this way.  Do you remember
25       anything about the offense?
26
27  WA: Yeah.
28
29  SP: Tell me what you remember.
30
31  WA: Yeah, I remember lots of blood and I remember - I remember that
32       Joe took some pills that were supposed to stop his heart and it was
33       supposed to just be peaceful.  And then things just didn't go that
34       way.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 15


1    SP:  What - what kind of pills?
2
3    WA:  And I know that we were - I know we ended up arguing over a
4         bunch of stuff.  It was just - I don't know.
5
6    SP:  What kind of pills?
7
8    WA:  We had put some - I'm trying to remember what it was called.  We
9         put something in these capsules and he had taken like a handful of
10        them.
11
12   SP:  So you had - what were the capsules originally?
13
14   WA:  Some health - healthy stuff.  I don't remember.  They were just
15        clear capsules that we took out the herb or the - the - I don't
16        remember what it exactly - what it was in it, but -
17
18   SP:  And -
19
20   WA:  Like - like a vitamin type of thing.
21
22   SP:  I see.  And what did you replace that with?
23
24   WA:  We - we had bought some powder that was supposed to - I can't
25        remember what it was called.  I don't know, it was white powder
26        that was supposed to stop your heart.
27
28   SP:  And so where did you get the white powder from?
29
30   WA:  From an online store.
31
32   SP:  What's the white powder used for?
33
34   WA:  I don't remember, but I think it had some sort of commercial use.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 16

1    SP:  And whose idea was it to get the white powder?
2
3    WA:  Well, Joe had wanted me to find cyanide and I couldn't.  And that
4         was - seemed to be the alter - the only alternative.
5
6    SP:  I see.
7
8    WA:  This stuff.  I can't remember what it was called.  I don't know.
9
10   SP:  So you ordered - you ordered this?
11
12   WA:  Uh-huh.
13
14   SP:  Online?
15
16   WA:  Yes.
17
18   SP:  From - from where?
19
20   WA:  I don't remember the name of the place.
21
22   SP:  No, no.  Maybe my question wasn't very good.  You ordered it from
23        a computer?
24
25   WA:  From an on - with a computer?
26
27   SP:  With a computer.
28
29   WA:  Yeah.
30
31   SP:  Whose computer?
32
33   WA:  I think the one at work.
34
35   SP:  Uh-huh.  How come you didn't use your computer at home?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 17

1    WA:  I didn't have a working - like I didn't have - I think computers were
2         kind of new to me back then and so I had only used them for work
3         and that was the one I used was at work.
4
5    SP:  I - I see.  And so - so did you research this powder online?
6
7    WA:  I don't know that I researched that specific powder, just the general
8         topic maybe.
9
10   SP:  And - and -
11
12   WA:  I don't know.
13
14   SP:  How much did the powder cost?
15
16   WA:  I don't remember that.
17
18   SP:  Who was the powder delivered to?
19
20   WA:  I don't remember that stuff either.
21
22   SP:  Did -
23
24   WA:  I haven't discussed that with anybody.
25
26   SP:  Did - did you have it sent to yourself?
27
28   WA:  I don't think I did.  I think it had to be a company that bought -
29         bought it, because it was a commercial whatever.
30
31   SP:  So what company did you have - have it sent to?
32
33   WA:  I don't know.  I don't know.  I can't tell you that either, but I think
34         it was a company name.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 18

1   SP:  Uh-huh.  Did the - did - what - independent of it being a company,
2          there probably had to be like a person's name attached to it, right?
3
4   WA:  I don't remember that.
5
6   SP:  So where does the powder end up arriving?
7
8   WA:  I don't know.
9
10  SP:  Okay.  How - how soon after you ordered the powder did it arrive?
11
12  WA:  Oh, and I wouldn't - I don't know that either.
13
14  SP:  Okay.  Did you pay for the powder with a credit card?
15
16  WA:  I don't - I - I don't know.  I haven't thought about all that stuff.  I
17         don't even - I have no idea.
18
19  SP:  Okay.  So anyhow, at some point though you said "we," you - "we"
20         was the word you used.  It sounds like you - you took the powder
21         and you put it in capsules?
22
23  WA:  Yes.
24
25  SP:  Okay.  And walk me through that process.  Do - because it sounds
26         like you remember some of that.
27
28  WA:  Yeah.  I remember doing that.
29
30  SP:  And where was your husband during that time?
31
32  WA:  We were at my house.
33
34  SP:  Okay.  And where did you physically do that?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 19

1    WA:  Outside because there was some concern about the fumes or the
2         smell of it or something.
3
4    SP:  I see.
5
6    WA:  And with my babies, I didn't want, you know, them to -
7
8    SP:  And you say your "babies," that would be Nicholas and Ashlee,
9         correct?
10
11   WA:  Yes.
12
13   SP:  Okay.  And how old were Nicholas and Ashlee around this time?
14
15   WA:  Like two and three.
16
17   SP:  Okay.  And with Nicholas being the older one?
18
19   WA:  Yes.
20
21   SP:  Okay.  So - so I've looked at some - some crime scene photos and
22        if my memory is right, you lived in an apartment?
23
24   WA:  Yes.
25
26   SP:  Okay.  So where did you - where did you do this with the - with the
27        powder?  Where - where did you - when you -
28
29   WA:  Out - outside on our little patio.
30
31   SP:  Out on your patio?
32
33   WA:  Uh-huh.
34
35   /////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 20

1   SP:  Got it.  Okay.  And where was your husband while this was going
2        on?
3
4   WA:  He was doing it with me.
5
6   SP:  Okay.  And what physically were you doing?  Like how - walk me
7        through how you mechanically did that.
8
9   WA:  Well, we just emptied out the capsules and put the powder in them.
10
11  SP:  What did you use?
12
13  WA:  What do you mean?  I don't -
14
15  SP:  Well, what did you use?
16
17  WA:  My hands.  I don't understand what you're asking me.
18
19  SP:  Well yeah, I mean did you use a tool, an instrument?
20
21  WA:  No.
22
23  SP:  Okay.  So the capsules that you were taking apart, these were like
24       gel capsules?
25
26  WA:  Yeah, they were just clear plastic.
27
28  SP:  And help me understand, what's the logic of - of putting the - the
29       powder inside the capsules?
30
31  WA:  To be able to swallow it.
32
33  SP:  Okay.  So you remember doing that though?
34
35  WA:  Uh-huh.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 21

1    SP:  Yes?
2
3    WA:  Yes.
4
5    SP:  With your husband?
6
7    WA:  Yes.
8
9    SP:  Do you know about how long before the offense that that
10        happened?
11
12   WA:  Not exactly.  It wasn't a great amount of time.  I don't -
13
14   SP:  Okay.
15
16   WA:  Really remember.
17
18   SP:  Whose - whose Ann Newton?
19
20   WA:  Oh.  Thank you.  See, if you would ask me questions, that is the
21        name that I used.
22
23   SP:  Okay.
24
25   WA:  Uh-huh.
26
27   SP:  You used for - for what?
28
29   WA:  Yeah.  With that whole situation involving the - I can't remember
30        what the stuff is called, whatever the powder was.
31
32   SP:  Okay.  And so I don't - so that's a name that you used to - to
33        purchase -
34
35   WA:  Yes.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 22

1    SP:  The powder, correct?

3    WA:  Yes.  Yes.

5    SP:  Okay.  How did you come up with that name?

7    WA:  I don't remember.

9    SP:  Okay.

11   WA:  It was pretty random.

13   SP:  Okay.  So - so your - your - do you have any memories of what
14        happened on October 8th?  By the way, that is the date, October 8th.

16   WA:  Okay.

18   SP:  2000.

20   WA:  Okay.  I do have memories, it's just - I - it's not something that -
21        it's like when you ask me the question about it my mind doesn't
22        even want to go there.

24   SP:  Uh-huh.

26   WA:  So I - I'm not sitting here thinking, "Oh this is what happened that
27        night."

29   SP:  Okay.

31   WA:  I don't - that's why I don't - I'm not trying to not cooperate with
32        you, it's just that's how - I'm sitting here not think - I see lots of
33        blood and it's - but it doesn't run like a movie in my head.

35   SP:  Okay.  So how does it run?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 23

| | |
|---|---|
| 1 | WA: Actually I just feel like lots of resistance. |
| 2 | |
| 3 | SP:  Okay. |
| 4 | |
| 5 | WA: And I don't want to think about it. |
| 6 | |
| 7 | SP:  Okay.  Does - how - how did - how did your - your husband die? |
| 8 | What was the cause of death? |
| 9 | |
| 10 | WA: I don't know what the official thing was. |
| 11 | |
| 12 | SP:  Okay.  Do you - ma'am, do - do you - are you going to be okay |
| 13 | there?  Is that "yes"? |
| 14 | |
| 15 | WA: Okay. |
| 16 | |
| 17 | SP:  Do you - first of all, it's not my intent to upset you.  But - but I - |
| 18 | |
| 19 | WA: Well this is not something that is comfortable to talk about.  This |
| 20 | was terrible. |
| 21 | |
| 22 | SP:  Well I - I understand that. |
| 23 | |
| 24 | WA: And you guys have all the papers.  You've read everything.  And |
| 25 | then you're sitting here ask me just to relive and talk about all that |
| 26 | over again and I don't understand the point. |
| 27 | |

**DEFENDANT'S UNDERSTANDING ABOUT THE REASON FOR THE INSTANT EVALUATION:**

| | |
|---|---|
| 30 | |
| 31 | SP:  Okay.  Well, that actually gets me to my next question.  Which is, |
| 32 | do you understand what the purpose of this evaluation is? |
| 33 | |
| 34 | WA: I don't know why - why you - I don't know. |
| 35 | |

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 24

1   SP:  You don't know why we're here?
2
3   WA:  Well I guess because I'm - I'm try - going back to court and so I
4        don't know.
5
6   SP:  What are you going back to court for?
7
8   WA:  To present evidence that wasn't in my trial.
9
10  SP:  Okay.  And what kind of evidence are they looking to present?
11
12  WA:  And you're not asking me anything that was not in trial so I don't
13       understand.
14
15  SP:  Okay.  Well what - what -
16
17  WA:  I feel like I'm in trial again.
18
19  SP:  Yeah.  What - what - what evidence wasn't presented at trial?
20
21  WA:  I guess some childhood stuff and my mental stuff and I don't know.
22
23  SP:  Okay.  Well, you have my word that I'm going to ask you about
24       those issues.
25
26  WA:  Well I don't care if you do, I'm just saying.
27
28  SP:  Okay.  See - see ma'am, one of the issues is - is that - that your -
29       your lawyers, if I understand it correctly, they're - they're saying
30       that these issues - one of the allegations is - is that these issues,
31       your - your childhood and some other things in your life somehow
32       affected your ability to conform your conduct to the requirements
33       of the law or appreciate the wrongfulness of your conduct.  So it -
34       I'm just doing my job by asking you questions about the offense to
35       try to see what you understood.  Which actually, that gets me to

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 25

1    another question.  When - you don't - you said you don't recall what
2    your husband - what the cause of death was?
3
4    **DEFENDANT'S VERSION OF THE INSTANT OFFENSE - PART II:**
5
6    WA:  I don't know what the official cause of death was.
7
8    SP:  What do you think it was?
9
10    WA:  Well, I think from - from when I hit him on the back of the head and
11    then I think from - I - I - from the knife, from the cut on his throat.
12
13    SP:  How did that happen?
14
15    WA:  I can't remember that specific instance so I'm not sure.
16
17    **ISSUE RE: DEFENDANT'S APPRECIATION OF WRONGFULNESS -**
18           **PART I:**
19
20    SP:  Is - is it wrong to kill someone?
21
22    WA:  Of course it is.
23
24    SP:  Did you know - did you know back at -
25
26    WA:  No, I know it's wrong.
27
28    SP:  Wait, wait.  Let me finish my question because we're talking over
29    each other.  So you - you know it's wrong to kill someone, correct?
30
31    WA:  Yes.
32
33    SP:  Did you know back on October 8, 2000, it was wrong to kill
34    someone?
35



Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 26

1    WA:  I do know that it's wrong to kill someone.  That situation I really
2           thought I was doing the best thing possible by agreeing with my
3           husband in helping him.
4

5    SP:  Okay.  But independent of what you thought you were doing was
6           the best thing possible, you were aware back on October 8, 2000,
7           that it's wrong to kill your husband?
8

9    WA:  Yes.
10

11   SP:  Okay.  So similarly, it would be wrong to poison somebody, correct?
12

13   WA:  Of course.
14

15   SP:  Similarly, it would be wrong to steal, correct?
16

17   WA:  Of course.
18

19   SP:  Similarly, it would be wrong to use an alias to try to secure powder
20         to kill someone, correct?
21

22   WA:  Of course.
23

24   SP:  Okay.  So those are things that you - you knew back on October 8th,
25         correct?
26

27   WA:  Yes.
28

29   **<u>DEFENDANT'S VERSION OF THE INSTANT OFFENSE - PART III</u>:**
30

31   SP:  Okay.  So what - what time of day did this all - did everything start
32         happening?  Do you recall that?
33

34   ////////////////////////////////////////////////////////////////////////////////////
35   ////////////////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 27

1   WA: Well, that evening I know that we had gone to his parents' house
2        for a family like dinner barbeque thing.  And then it would've been
3        after we got home from that.
4
5   SP: Okay.  And what happened -
6
7   WA: So late evening.
8
9   SP: So - and - and what happened - well first of all, the barbeque thing,
10       did you drink any alcohol?
11
12  WA: No.
13
14  SP: Did you use any drugs?
15
16  WA: No, I -
17
18  SP: Did you use any alcohol or drugs that day?
19
20  WA: No.
21
22  SP: Okay.  Do you feel that alcohol or drugs in any way affected your
23       behavior on October 8, 2000?
24
25  WA: No.
26
27  SP: Okay.  What about on October 7, 2000, did you drink alcohol?
28
29  WA: I don't know.  I don't remember what I did on -
30
31  SP: You don't remember?  Okay.  What about did you use any drugs on
32       October 7, 2000?
33
34  WA: No.  I've never used illegal drugs.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 28

1    SP:   You've never used any illegal drugs?
2
3    WA:  No.
4
5    SP:   Okay.  I'm just repeating some things because there's people there
6           in the yard and we're picking up a lot of the ambient noise.  So - so
7           anyhow, you don't recall exactly what time you got home on - when
8           - on October 8th, correct?
9
10   WA:  No, sir.
11
12   SP:   And do you - do you remember what happened when you got
13         home?
14
15   WA:  No.  I - I - that's - it's been - that's a long time ago.
16
17   SP:   Okay.  What's your next memory after you got home?
18
19   WA:  Oh my God.
20
21   SP:   Why don't you just hold on.  And just for the transcriptionist, the
22         reason why I told Ms. Andriano to hang on for a second is that a
23         correction officer was passing through the in - the area we're doing
24         the interview.  Do you remember the question?
25
26   WA:  I do.  I remember putting the babies to bed.  I remember - I think
27         what I remember most is - is after we had everything settled and -
28         and everything was, you know, I don't know - oh, that's a lot
29         quieter.
30
31   SP:   Yeah, it makes it better.  The correction officer just closed the door.
32         Go - go ahead.  You said every -
33
34   WA:  Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 29

```
 1   SP:   Oh, hang on a second now.   Let me just say for the record,
 2         apparently the room that we're in is a - I guess -
 3
 4   WA:   General purpose room.
 5
 6   SP:   General purpose room and - and it cuts out into the yard which is
 7         why some correctional officers apparently are using it to cut across.
 8         But go ahead, I'm sorry.
 9
10   WA:   I remember - I remember Joe and I being on the bed and I
11         remember - I think just because of what was about ready to happen
12         we didn't have - there wasn't like crying and lots of emotion going
13         on.   It was just pretty - I don't - it was almost surreal.   And I
14         remember Joe had something to drink and he had the bottle of pills
15         on his night stand and we were sitting there and he was leaning up
16         against pillows and so he took a handful of pills and it was - it was
17         just - he had said goodbye to everybody earlier in the evening and
18         it was just time.   That's what he was ready to do.   And so I
19         remember he put a bunch of pills in his hand and he swallowed
20         them with whatever and then we kind of just lay there and waited
21         to see what would happen.
22
23   SP:   How long did you wait?
24
25   WA:   I don't know.   I can't - I don't have a concept of time.
26
27   SP:   Okay.   So then what happened?
28
29   WA:   I think our expectations were that it would be just something
30         peaceful and like a peaceful passing and then that's not what
31         happened.   He started feeling sick.   He started to feel - I remember
32         him feeling really just sick.   It was like - I can't remember if it was
33         his stomach.   I can't remember what it was but I remember him
34         feeling really, really sick and then getting panicky and starting to be
35         upset and how ill he was feeling.
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 30

1   SP:   Okay.  And then what happened?
2
3   WA:   And - I don't remember what our decision was or what exactly -
4          what - because it was kind of panicky at that point not knowing
5          what was happening, what next.  And I think that it just became so
6          - where he was feeling so ill that we had gone out to the living room
7          and I don't know - I - see, I don't want to say something that's not
8          true because I don't remember if that point - if he wanted to go to
9          the hospital.  I don't - I don't re - I just can't - I can't - I have little
10         bits and pieces and knowledge of knowing things, but I don't know
11         if it's from hearing it because I've discussed it so many times.
12         Because I don't exactly recall the -
13
14  SP:   Okay.
15
16  WA:   And I don't want to say something that's not true.
17
18  SP:   And you know what, I appreciate - I appreciate that explanation.
19         So just tell me what it is you believe that you recall, and if you think
20         it's something that you're not sure, that it's something you read,
21         then just say, "You know what" -
22
23  WA:   That's why at this - from - from this point forward I don't have a
24         clear running memory, like a movie, I can't tell you details that I
25         myself recall what happened.
26
27  SP:   Okay.
28
29  WA:   Because I went through the trial.  I've went through so many
30         questions that I don't know what -
31
32  SP:   Okay.  And - and I - I appreciate that answer and I appreciate
33         where -
34
35  WA:   I don't know what I know to be true.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 31

1   SP:   Okay. That's - that's fair enough. So - so let me then ask you - let
2         me ask you a couple questions about that then so I - so maybe I
3         can better understand and you - you help me understand. You, if
4         my memory is correct, you were arrested the same day as the
5         offense, correct?
6
7   WA:   Yes, that night.
8
9   SP:   That - that evening, correct?
10
11  WA:   I believe so, yes.
12
13  SP:   Okay. And I also believe that you gave a statement to the police?
14
15  WA:   I did.
16
17  SP:   Okay. Was your memory working fine then?
18
19  WA:   Well, it is my nature to want to answer your questions and I know
20        that. I had never seen the police as against me or bad people. It
21        was - I was raised to - that they're your friends and they're, you
22        know, like the pastor of your church. And so when I was asked
23        questions, I provided answers just trying to show that I was
24        cooperating, even though I wasn't sure what had happened. And
25        I - I don't like to say, "I don't know," because then you don't
26        approve of me, you don't like me, and I just want to answer what
27        you want. So I know that whenever people would ask me
28        questions, I would just fill in whatever.
29
30  SP:   I see. So - so are you telling me that you weren't -
31
32  WA:   And that's why I'm not going to do that with you today.
33
34  SP:   Well, and you know what, I - I don't want you to do that. I just
35        want you to be as truthful with me as you possibly can.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 32

1   WA:  And that's what I'm trying to do.
2
3   SP:  Okay.  But let's get back to the interview you gave the police.  Are
4        you telling me -
5
6   WA:  I don't even remember what exactly I told them.  I don't know, I
7        just -
8
9   SP:  Okay.
10
11  WA:  I know that I wanted to cooperate and I wanted them to -
12
13  **ISSUE RE: DEFENDANT'S APPRECIATION OF WRONGFULNESS -**
14  **PART II:**
15
16  SP:  Were you truthful with the police?
17
18  WA:  I doubt it.
19
20  SP:  Is it wrong to lie to the police?
21
22  WA:  Yes, it is.
23
24  SP:  I'm sorry, you were covering your nose at that time so I'm going to
25       repeat the question.  Is it wrong to lie to the police?
26
27  WA:  It's wrong to lie to anybody.
28
29  SP:  Okay.  So - so are you telling me that you - I -
30
31  WA:  I'm telling you that since I've gone through this process of learning
32       how I am, I know that I fill in the blanks and I answer questions
33       even if I didn't -
34
35  /////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 33

1    SP:  Excuse me one second.  Is there - excuse me?  Is there a possibility
2         that this door stays closed?
3
4    CO:  They want the door closed.  Close it?
5
6    SP:  Thank you so much.
7
8    CO:  Sure.
9
10   WA:  I don't - when I tell you - when you ask me a question and I tell
11        you, "I don't know," there's a sense of frustration and then I feel
12        like you get upset.  Not you personally, but people in general.  And
13        at that time that was just my nature.  I would just fill in whatever
14        because I don't want - I don't want somebody upset at me and I
15        don't want them to be frustrated and think I'm not cooperating.
16
17   SP:  Okay.
18
19   WA:  So did I just sit there and want to lie?  No.
20
21   SP:  Yeah.
22
23   WA:  It wasn't that.
24
25   SP:  Okay.  So -
26
27   WA:  Even though it is a lie.
28
29   SP:  Yeah.  So -
30
31   WA:  In my mind, it wasn't.
32
33   SP:  Okay.  So let - let's - let's - let's - let's - let's set some - some
34        things up here.  One, I - I just want you to be truthful with me here
35        today.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 34

1    WA:  I am.
2
3    SP:  And - and give it your best shot, okay?  Are you with me?
4
5    WA:  Yes, sir.
6
7    SP:  Okay.  And I also want you to understand that, "I don't know," is a
8         perfectly fine answer from - from my perspective.  If you don't
9         know -
10
11   WA:  And I appreciate that.
12
13   SP:  If you don't know, you don't know.  Okay?  Is that a "yes"?
14
15   WA:  Yes.
16
17   SP:  All right.  So - but let's - let's go back though because I'm still a
18        little - I'm still trying to connect the dots on this.  So you - you do
19        this interview with the police, correct?
20
21   WA:  Yes.
22
23   SP:  And - and you believe - and by the way, if I summarize something
24        and I get it wrong, you say, "No Dr. Pitt, that's not what I said."  If
25        I have it right - if you don't say anything to me I'm going to assume
26        I have it correct.  Okay?
27
28   WA:  Yes.
29
30   SP:  All right.  So did you lie to the police?
31
32   WA:  That's such a black and white question.  I know that "yes", I did tell
33        them things that probably I didn't even know what I was - that
         were not - I don't know.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 35

1    SP:  Why did you do that?

2

3    WA:  I explained to you why I do that already.

4

5    SP:  Oh, that's because you have a need to please people?

6

7    WA:  Well, I - I fill in - I just fill it in and try to give you an answer that
8           makes sense to me.

9

10  **DEFENDANT'S RECALL RE: TRIAL AND TRIAL TESTIMONY:**

11

12  SP:  Okay.  Now, if my memory is right, do you remember when your
13         trial was?

14

15  WA:  It - that was in 2004.

16

17  SP:  Okay.  Do you remember about how long it lasted?

18

19  WA:  It was like the last half of the year.  It just was the last months of
20         the years.

21

22  SP:  About how long did it go through?

23

24  WA:  Almost four months I think.

25

26  SP:  Four months continuously?

27

28  WA:  I feel - it felt - I think so.  I don't remember.

29

30  SP:  Well unless I'm wrong, it may have felt like four months but - but
31         I - how about from September 1, 2004, to November 17, 2004?

32

33  WA:  Well, I didn't get to prison until after Christmas and so - and I know
34         it was - I was in court the day before I got here.

35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 36

1   SP:  Well, there was a - there was a verdict and then there - I think -
2           believe it was a little bit of a - a delay, and then they had the
3           penalty phase.
4
5   WA:  I don't know.
6
7   SP:  If I'm not mistaken.
8
9   WA:  I don't recall.
10
11  SP:  Okay. And it's possible that I'm -
12
13  WA:  It just seemed like it was the whole -
14
15  SP:  And it's -
16
17  WA:  And I just know I got here right after Christmas and so I know it
18         went to the end of the year.
19
20  SP:  Okay. And it's - and it's possible that - that I could have my dates
21        wrong. But my - my bigger question is that if my memory is right,
22        didn't you take the witness stand at your trial?
23
24  WA:  I did, yeah.
25
26  SP:  Okay. And you - you - you gave direct exam testimony, correct?
27
28  WA:  Yes.
29
30  SP:  And you gave cross-examination testimony, correct?
31
32  WA:  Yes.
33
34  SP:  I mean you were cross-examined, right?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 37

1    WA:  Right.

2

3    SP:  Okay.  Did - was everything that you told at the trial truthful?

4

5    WA:  I don't know.  I haven't read the stuff and I don't even - at that

6          point I don't - I don't - I don't know.

7

8    **ISSUE RE: ALLEGED PROBLEMS WITH MEMORY:**

9

10   SP:  Okay.  Now, it's also my - my recollection that over time both in

11        preparation for the matter that we're meeting about as well as

12        issues related to - during your trial, I believe that you've met with

13        several different types of folks; psychiatrists, psychologists, a

14        counselor, when you met with those people were you - were you

15        truthful with them?

16

17   WA:  Yes.

18

19   SP:  Did you have memory problems with them?

20

21   WA:  Yes.

22

23   SP:  Okay.  Well, let's talk about the memory for a second.  Had you

24        ever had memory problems before?  And when I say "before," I'm

25        talking about before October 8, 2000.

26

27   WA:  Yes.

28

29   SP:  You did have memory problems?

30

31   WA:  Yes.

32

33   SP:  When - when - when was the first time you had a memory problem?

34

35   WA:  I wouldn't be able to tell you that.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 38

1   SP:  Why is that?
2
3   WA:  That - it was just a frequent happening of my entire existence.
4
5   SP:  Really?
6
7   WA:  Yes.
8
9   SP:  Did you ever tell anyone about it?
10
11  WA:  Yes.  My mom and dad know about it because they're the ones that
12       brought it to my attention.  I did not know I had memory problems.
13
14  SP:  Okay.
15
16  WA:  Per se.
17
18  SP:  Give - give me a -
19
20  WA:  But they would recount things and I would have no inclination of
21       what they were talking about, could not remember it.
22
23  SP:  Did - did you ever - did you ever - have you had any mental health
24       treatment for these memory problems?
25
26  WA:  No, that was against my religion.
27
28  SP:  Okay.  And when was the last time before October 8, 2000, you had
29       a memory problem?
30
31  WA:  I wouldn't be able to answer that question.
32
33  SP:  Because you don't remember?
34
35  WA:  Right.  I -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 39

1   SP:   Okay.  But you're saying that you had memory problems beginning
2           at what age at least when your parents started telling you?
3
4   WA:   I don't even - I couldn't tell you that either.  I just know that that
5           was a - a normal theme in my life that, you know, somebody would
6           remind me of something that had happened and I would think they
7           were making it up because I had no - no recognition even of what
8           they were talking about.
9
10  SP:   Okay.  So what about have you ever been bumped - bumped on the
11          head?
12
13  WA:   Not that I'm aware of.
14
15  SP:   You ever had any head injuries?
16
17  WA:   Not that I'm aware of.
18
19  SP:   Okay.  You ever been knocked unconscious?
20
21  WA:   Not that I know of.
22
23  SP:   Okay.  The reason I'm asking is I - I - I seem to remember that
24          somewhere in the records there was an automobile accident that
25          you were involved in.  I want to say you were - it was while you
26          were a teenager but I could be mistaken on my time frame.
27
28  WA:   I was in a car wreck with my mom.  I don't remember how old I
29          was though.
30
31  SP:   What happened in that car wreck?
32
33  WA:   I just remember a car t-boned us on the side where I was sitting.
34
35  SP:   Okay.  And were you injured?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 40

1    WA: I don't know.
2
3    SP:  Okay.  Were you hospitalized?
4
5    WA: We didn't really believe in going to the doctor.
6
7    SP:  So my question was were you hospitalized?
8
9    WA: No, sir.
10
11   SP:  Okay.  Had anyone ever treated you or examined you for memory
12        problems?
13
14   WA: No, sir.
15
16   SP:  Prior to Oct - prior to October 8?
17
18   WA: No.
19
20   SP:  I'm going to just ask the question completely so there's no
21        confusion.  Prior to October 8, 2000, had anyone ever examined
22        you for memory problems?
23
24   WA: No, sir.
25
26   SP:  Okay.  Since October 8, 2000, has anyone examined you for
27        memory problems?
28
29   WA: Yes, sir.
30
31   SP:  Who has examined you for that?
32
33   WA: I believe Dr. Woods and maybe Dr. Young.
34
35   SP:  Okay.  And what did they say?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 41

1  WA: Well they were just asking me lots of questions and they did some
2       tests on me and -
3
4  SP: Did they ever tell you the results?
5
6  WA: I know some, yes.
7
8  SP: What do you know?
9
10 WA: They diagnosed me with some mental health issues and
11      acknowledged my memory problems.
12
13 SP: Okay.  What - what types of mental health issues did they diagnose
14      you with?
15
16 WA: The biggest one I just remember right now is the bipolar.  I know
17      there was a list of them.
18
19 SP: I see.  Okay.  Well we'll come back to that in a little - little bit.
20
21 WA: Okay.
22
23 **DEFENDANT'S VERSION OF THE INSTANT OFFENSE - PART IV:**
24
25 SP: So - so let's go back to October 8, 2000.  What I recall you telling
26      me is that your husband wasn't feeling very well and this wasn't
27      going as smoothly or as peacefully as you both had planned, or
28      thought it would.
29
30 WA: Right.  Right.
31
32 SP: Am I correct?
33
34 WA: You're correct.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 42


 1   SP:   Okay.  So then what happens next?
 2
 3   WA:   I'm not comfortable with the chronological order of events because
 4         I can't tell you chronologically what happened that night.
 5
 6   SP:   Okay.  Well what do you remember though?  Even if it's out of
 7         chronological order.
 8
 9   WA:   I don't know what is going on.  I feel very agitated right now and I
10         can't even like make myself think about what's going on that night.
11
12   SP:   Okay.  Would you like to take -
13
14   WA:   I'm so sorry.  I - I'm not -
15
16   SP:   Would you like to take a break?  You're shaking your head "no."
17
18   WA:   As we're sitting here right now and you keep asking me about what
19         happened that night, what do I remember, I can't even - I'm not
20         pulling up what's happened that night.  I told you I remember lots
21         of blood.  I know I killed my husband.  I can't sit here and tell you
22         events of that night.
23
24   SP:   Okay.  Do you - but - but you've told other people about those
25         events of that night.
26
27   WA:   It took a long time.
28
29   SP:   Okay.  Do - do - how - well how did you kill your husband?
30
31   WA:   Can - can - in order for me to answer that question I could just tell
32         you things that I know but not from my memory but just because
33         it's been discussed.
34
35   SP:   Okay.  So you don't have an independent recollection?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 43

1   WA:  So I don't - that's why I told you I don't want to sit here and say
2        something that I'm not remembering for myself right now.
3
4   SP:  Okay.  So let me - let me make sure I understand what you're
5        saying.  As you sit here today on Tuesday, November 26th at about
6        9:37-ish in the morning, you have - have you told me everything
7        that you personally remember about that night?
8
9   WA:  No, I haven't.
10
11  SP:  Okay.  Is there anything else you want to tell me, recognizing -
12
13  WA:  I just - look, this is what I'm afraid of.  I feel like if I answer your
14       questions right now and I'm not telling you in chronological order,
15       that I'm a liar again and I'm this and I'm that and so I feel very
16       defensive with you.
17
18  SP:  Right.  And you didn't let me finish my question.  My - my - my
19       question is as we sit here today on Tuesday, November 26th, have
20       we exhausted your memory about what happened on October 8,
21       2000, putting aside chronology?
22
23  WA:  Okay.
24
25  SP:  Have we exhausted your memory?
26
27  WA:  No.
28
29  SP:  In other words, I'm giving you -
30
31  WA:  Right.
32
33  SP:  A pass on chronology.
34
35  WA:  Right.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 44

1  SP:  Okay. I just want to know what you remember about that evening.
2
3  WA:  No, there are more things that I remember.
4
5  SP:  Okay. Tell me what you remember. This is what you remember,
6       not what you've read but what you remember.
7
8  WA:  It's so hard. I remember - I remember Joseph not feeling good. I
9       remember - I remember one time him - him throwing up. I
10      remember him getting really upset. I remember us arguing. I
11      remember wanting to take him to the hospital, him wanting to go
12      to the hospital, him not able to go to the hospital. I remember
13      calling 9-1-1. I remember trying to get a coworker to come over to
14      stay with my babies while we went to the hospital. It's like right
15      now all I see is just lots of blood everywhere.
16
17  SP:  Is there anything else you remember?
18
19  WA:  I can see him laying there.
20
21  SP:  Do you remember what your argument was about?
22
23  WA:  Yeah, me cheating on him.
24
25  SP:  Okay. What - what was going on there?
26
27  WA:  I don't know. I just - we were just spending more and more time
28      apart and he was going to the lake and doing his thing and I was
29      going out. And it's like we were just trying to run away from each
30      other.
31
32  SP:  And so did - did you tell him about your - the cheating? Or how did
33      he find out?
34
35  WA:  I did finally.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 45

1    SP:  That night?  What did you tell him?  What do you re -
2
3    WA:  I don't remember the exact words or what.
4
5    SP:  Okay.
6
7    WA:  But I finally admitted to it.
8
9    SP:  I see.  How did he respond to that?
10
11   WA:  He was really angry.
12
13   SP:  Okay.  And what did he do?
14
15   WA:  I just remember him being really angry and yelling at me.
16
17   SP:  Did - did you - did the paramedics ultimately show up at your
18        house?
19
20   WA:  Yeah.
21
22   SP:  And again -
23
24   WA:  They were there.
25
26   SP:  And this is - I'm asking you what you remember.
27
28   WA:  No, I remember sitting by Joe and I remember lots of people
29        around.  And I don't know if they were policemen or paramedics,
30        but I remember lots and lots of people around.
31
32   SP:  Was there a time that the paramedics showed up and that you told
33        them that they weren't necessary?
34
35   WA:  I do know that.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 46

1   SP:  But do you remember that?
2
3   WA:  No, I don't know.  I don't know.  But I do know that.
4
5   SP:  So you know -
6
7   WA:  It's - I know it and it's really hard to define whether or not I
8        remember it or if it's just because I have been told it so many
9        times.
10
11  SP:  Okay.
12
13  WA:  I have a hard time - listen, this has been talked about so much that
14       it gets really hard to distinguish between what I know and what I
15       know - what I know to be true.
16
17  SP:  Okay.  Well, all - all I want to know is what you know to be true.
18
19  WA:  I know.  I know.  And I'm trying to separate it for you but it's
20       difficult.
21
22  SP:  Okay.  Well, do you know it to be true that you asked the
23       paramedics to leave?
24
25  WA:  Right now I don't know.  I can't tell you for certain that I know that
26       to be true.
27
28  SP:  Let's assume that that is true.
29
30  WA:  Okay.
31
32  SP:  Let's just assume that -
33
34  WA:  I know it is true.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 47

1   SP:  Okay.
2
3   WA:  I know it's true because I've been - I've seen it and read it and
4        been told it.  I know it, but I'm just telling you because I'm trying
5        to be very honest with you that I personally cannot tell you "yes" or
6        "no" that I know I did that.
7
8   SP:  Let - let me see if I have this - this correct.  And you tell me if I'm -
9        I have this right.  You know about -
10
11  WA:  I -
12
13  SP:  That - let me finish.  You know about this issue because you've
14       been told it and/or read about it but you don't independently recall,
15       is that correct?
16
17  WA:  And that's not correct either.
18
19  SP:  Okay.  Well what - tell me what's right.
20
21  WA:  I'm trying to explain it.  When you have known something for so
22       many years, it's really hard to distinguish between like I know this
23       myself or I have come to know this because it's been told to me so
24       many times that I don't know any longer what I know and what's
25       been told to me.
26
27  SP:  Okay.
28
29  WA:  And I know that sounds crazy but it's the - that's really what goes
30       on in my mind.
31
32  SP:  Well let - let's assume that that happened.
33
34  WA:  Yeah.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 48


1    SP:   Let's just assume it happened.  Are you with me?
2
3    WA:   Yes.
4
5    SP:   Why would you have done that?  Let's assume they showed up and
6          you asked them to - that - and told them that their services were
7          not necessary.  Or words to that affect.  Let's assume you did that.
8
9    WA:   Right.
10
11   SP:   Why would you have done that?
12
13   WA:   I think it was so in my head that Joseph just wanted to die.
14
15   SP:   Okay.  Did you -
16
17   WA:   I - I really feel like that was the whole - and so you know, I just -
18         I think it was just to see it through to the end and just do it.
19
20   SP:   Do you have an independent recollection of doing any - engaging in
21         any behaviors to conceal your actions as it relates to the crime - as
22         it relates to the murder?
23
24   WA:   To conceal that?
25
26   SP:   No.  Is it -
27
28   WA:   No.
29
30   SP:   Let me try asking that question again.  As it relates to the murder
31         of your husband, do you have an independent recollection of doing
32         things that covered your tracks?  In other words, did things that -
33         that - to kind of lead people astray?
34
35   WA:   No.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 49

1   SP:   So you think it was pretty straightforward crime scene?
2
3   WA:   I think so.
4
5   SP:   Okay.  Did you change your clothes after your husband was
6         murdered?
7
8   WA:   After he - no, I don't think so.
9
10  SP:   Did you take a shower after he died?
11
12  WA:   I don't remember doing that, no.
13
14  SP:   Did you clean yourself up after you told the paramedics to leave but
15        before the police came?
16
17  WA:   No, I don't think so.
18
19  SP:   Okay.
20
21  WA:   I don't know.  I mean I saw my - my - that my clothes were bloody,
22        the ones the police had.  So that's why I'm saying no, I don't think
23        I cleaned up anything.
24
25  SP:   Okay.  So we haven't gotten to this part about how - we talked
26        about the capsules that he took, the name of the substance you
27        don't remember, right?
28
29  WA:   Right.
30
31  SP:   So - but how does he - like how does - and it sounds like there's an
32        argument, correct?
33
34  WA:   Right.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 50

1    SP:  So where's all this blood coming from?  How does that enter into
2         the picture?
3
4    WA:  Okay, so I know - I know that there was a stool involved.  I told
5         you I had hit him on the head.  And I know that there was a knife
6         involved.  I know these things.  But as far as telling you I recall and
7         can see myself doing everything that happened, I can't tell you
8         that.
9
10   SP:  Okay.  So you don't recall having a knife in your hand?
11
12   WA:  I don't.
13
14   SP:  Do you recall stabbing him?
15
16   WA:  I don't.
17
18   SP:  Do you recall where he was stabbed?
19
20   WA:  Yes.
21
22   SP:  This is something that you recall?
23
24   WA:  No.  I do recall it because when he was dead laying beside me I
25         mean I have a very vivid picture of that in my head.
26
27   SP:  And that's it - that's an independent memory that you have?
28
29   WA:  I see it right -
30
31   SP:  I'm sorry?
32
33   WA:  I can see it right now.
34
35   SP:  So where was he stabbed?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 51

1    WA:  In his neck.
2
3    **LEGAL HISTORY:**
4
5    SP:  Okay.  Had you - had you ever been arrested for anything in the
6         past?
7
8    WA:  No.
9
10   SP:  Are you sure?
11
12   WA:  Am I sure?  I think so.  I've - I know I've had tickets.
13
14   SP:  What kind of tickets?
15
16   WA:  Like speeding tickets.
17
18   SP:  Okay.
19
20   WA:  I don't know.
21
22   SP:  Were you ever - were you ever investigated for any criminal
23        behavior?
24
25   WA:  Yes.
26
27   SP:  What were you investi -
28
29   WA:  Well no, I don't know.  I don't know.  I don't think - how do I say
30        this?  I don't know that I've ever had any interaction with law
31        enforcement besides my tickets.
32
33   SP:  Okay.  And have you - prior to October 8, 2000, have you ever
34        spent any time overnight in jail?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 52

1   WA: No.
2
3   SP:  Had you ever been in prison?
4
5   WA: No.
6
7   SP:  You ever been charged with any criminal offenses?
8
9   WA: No.
10
11  SP:  Had you ever been investigated for any criminal behavior?
12
13  WA: Not by the police I don't think.
14
15  SP:  Who were you investigated by?
16
17  WA: Well, one of my - the - my employment.
18
19  SP:  What - what happened there?
20
21  WA: Well, I just took some money from my employment and my bosses
22       found out so I know my boss has investigated me and then I ended
23       up losing my job.
24
25  SP:  What job was that?
26
27  WA: At the hospital.
28
29  SP:  What hospital?
30
31  WA: Casa Grande Regional.
32
33  SP:  And why did you steal the money?
34

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 53

```
 1   WA:  I was just trying to pay for all this stuff when me and Joe were
 2        going through all his surgeries.
 3
 4   SP:  Okay.  How much did you -
 5
 6   WA:  And just to live on.
 7
 8   SP:  How much did you steal?
 9
10   WA:  I don't re - I don't - I don't remember.
11
12   SP:  How did you steal it?
13
14   WA:  I just wrote company checks to myself and cashed them.
15
16   SP:  Okay.  How much - how much money was it about?
17
18   WA:  I don't know.
19
20   SP:  Okay.  Did you know that was wrong to do?
21
22   WA:  Yes.
23
24   SP:  I'm sorry?
25
26   WA:  Yes, I did.
27
28   SP:  Okay.  But you went ahead and did it anyhow?
29
30   WA:  At the time, yes.  I -
31
32   SP:  How many -
33
34   WA:  I felt like it was more important for us to survive than -
35
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 54

1    SP:  How many checks do you think you wrote?
2
3    WA:  I don't know.
4
5    SP:  Okay.  More than a dozen?
6
7    WA:  I - I honest - I don't even remember.
8
9    SP:  More than three dozen?
10
11   WA:  I don't know.
12
13   SP:  And you don't recall the amount?
14
15   WA:  I don't.
16
17   **CIVIL LITIGATION HISTORY:**
18
19   SP:  Okay.  Had you ever been involved in any civil litigation before?
20        Like have you ever been involved in a lawsuit?
21
22   WA:  I don't think so.
23
24   SP:  Have you ever brought a lawsuit against someone?
25
26   WA:  No, I haven't.
27
28   SP:  Had you ever had someone bring a lawsuit against you?
29
30   WA:  Not that I know of.
31
32   ////////////////////////////////////////////////////////////////////
33   ////////////////////////////////////////////////////////////////////
34   ////////////////////////////////////////////////////////////////////
35   ////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 55

1    **DEFENDANT'S DESCRIPTION OF HER CONDUCT WHILE**
2         **INCARCERATED:**
3

4    SP:  Okay.  While you've been in the Department of Corrections, have
5         you gotten any tickets?
6

7    WA:  Yeah.
8

9    SP:  For what?
10

11   WA:  The last - well I just got two recently, and one was for
12        communicating with somebody who's still on paper and the other
13        one is because I had prison contraband.
14

15   SP:  What was the contraband?
16

17   WA:  They sell disposable razors here and I had one to be able to cut my
18        hair because they don't allow anybody to come near me to cut hair.
19        So I had to cut my own hair with something, so I had a razorblade
20        in my room and I gave it to them and told them I had it to cut my
21        hair.  So then I got a ticket for it.
22

23   SP:  And communicating with someone that's "still on paper," so you
24        were communicating with someone outside, is that it?
25

26   WA:  Yeah, it was a neighbor of mine that had lived by me for a few
27        years.  And when she went home, she still had to do some time on
28        paper or -
29

30   SP:  Right.
31

32   WA:  Parole, whatever you call it.  And so I guess while they're on the
33        paper you're not allowed to communicate with them until after
34        they're off the paper.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 56

1    SP:  Right.  What other tickets have you gotten?
2
3    WA:  I feel like I've had two other ones but they've been a long time ago.
4
5    SP:  How - how do you describe yourself as an inmate?
6
7    WA:  A good inmate.
8
9    SP:  If you were to give yourself a letter grade, what would you give?
10
11   WA:  A "B."
12
13   SP:  How come not an "A"?
14
15   WA:  Well because I've had some tickets.
16
17   SP:  Because of the tickets?
18
19   WA:  Yeah.
20
21   SP:  Okay.
22
23   WA:  But I'm not - you can - even all the staff here, I don't cause
24        problems and I really try to help people and -
25
26   SP:  How - who puts money on your books?
27
28   WA:  Some church people.
29
30   SP:  Okay.  Anyone else?
31
32   WA:  No, just friends and church people.
33
34   SP:  Okay.  Who are the friends?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 57

1    WA:  What - just people that I've met and have become friends with.
2
3    SP:  Friends prior to your - prior to your arrest?
4
5    WA:  I'm trying to think.  Well my cousin Alissa, she - I didn't meet her
6         until after I was incarcerated.  So she's a family member friend who
7         helps me out.  Another lady, I've known her like prior to my arrest.
8         And then the other one, Pat, he's - I met him here.  No, so some
9         are from before and some are from in here that I've met.
10
11   SP:  Okay.
12
13   WA:  I just want to be accurate.  I'm trying to -
14
15   SP:  That's okay.
16
17   WA:  Sorry.
18
19   SP:  How did you do - how did you do in - while you were in jail?
20
21   WA:  What do you mean?
22
23   SP:  While you were pre-trial down at the Maricopa County Jail.
24
25   WA:  What are you asking me?
26
27   SP:  What kind of inmate were you there?
28
29   WA:  Oh.  I was fine.
30
31   SP:  Okay.
32
33   WA:  Yeah.
34
35   //////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 58

1   **MEDICATIONS:**
2
3   SP:   Are you on any medication currently?
4
5   WA:   Yes.
6
7   SP:   What medication are you on?
8
9   WA:   BuSpar®.
10
11  SP:   BuSpar®, okay.  And that's - I'm just going to spell it, it's B-U-S -
12
13  WA:   Yeah.
14
15  SP:   P-A-R.  Do you know how much you're taking?
16
17  WA:   I don't remember what the dosage is, no.
18
19  SP:   Okay.  Do you know what you're taking that for?
20
21  WA:   For - well when I went and talked to psych, I just told them that I
22        was having a lot of anxiety and emotional swings and so that's what
23        they put me on.
24
25  SP:   Okay.  And then what - what other medication are you on?
26
27  WA:   That's it.
28
29  **ALLERGIES:**
30
31  SP:   Okay.  Are you allergic to any medication?
32
33  WA:   Not that I know of.
34
35  SP:   Okay.  Have you been on other psychiatric med -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 59

1    WA:  Well, okay, when you say "allergic," I - there is something that I
2            cannot take.
3

4    SP:  What's that?
5

6    WA:  Because they've put me on a couple of things and it really like
7            exacerbated my situation.
8

9    SP:  What was that?
10

11   WA:  I don't remember what they were, but I know they had to do some
12          experiments with me to find something that worked.
13

14   SP:  These were psychiatric medicines?
15

16   WA:  Uh-huh.
17

18   SP:  Was one of them - yeah, that's a "yes"?
19

20   WA:  Yes.
21

22   SP:  Was one of them Seroquel®?
23

24   WA:  No, that was fine.  I could take that.
25

26   SP:  Okay.
27

28   WA:  No, it was here in prison that - I was on medication in county that
29          they don't provide here in prison, so we had to go through some -
30

31   SP:  Some changes.
32

33   WA:  Uh-huh.
34

35   /////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 60

1 **DEFENDANT'S CONTACT WITH MENTAL HEALTH TREATMENT**
2 **PROVIDERS WHILE INCARCERATED:**
3
4 SP:  Okay.  So how often do you see psych while you're here?
5
6 WA:  Well her office is a few doors down from me so whenever I need to
7        see her she's there.
8
9 SP:  What -
10
11 WA:  Oh, like a weekly basis.
12
13 SP:  Okay.  And do - is that - what's the nature of the - the visits?  Is it -
14
15 WA:  Just a wellness check and if I'm having - I think because I live alone
16        and I don't talk to people, I - I - I - I talk with her more just to help
17        relieve the anxiety and - and I build up things in my mind and it
18        helps me just -
19
20 SP:  So how long do you talk to her for?
21
22 WA:  Just -
23
24 SP:  On - on average.
25
26 WA:  Oh, just probably 30 minutes at a time.
27
28 SP:  And you say that's weekly?
29
30 WA:  Yeah.
31
32 SP:  What's her name?
33
34 WA:  Well she's - there's a new lady here now, Dr. Kyle.  They change
35        personnel all the time so it just depends on whoever is -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 61

1    SP:  Do you know how Dr. Kyle spells her name?
2
3    WA:  No.
4
5    SP:  Okay.  Who was before Dr. Kyle?
6
7    WA:  Oh gosh.  Oh my goodness.  There was a lady named Paige, Dr.
8         Paige.  There was - there was a gentleman and then another lady,
9         and I can't recall their names right now.
10
11   SP:  Do you - do you feel that they did right by you?
12
13   WA:  Yes.
14
15   **PSYCHIATRIC HISTORY PRIOR TO OCTOBER 8, 2000 - PART I:**
16
17   SP:  Okay.  Prior to October 8, 2000, had you ever been under the care
18        of a psychiatrist?
19
20   WA:  No.  Well, I think one time I tried to talk to somebody after I lost
21        my job, or got fired from my job, and it didn't sit well with me.  I
22        was really raised where you - where doctors and psychiatrists and
23        psychologists were not Godly and so it wasn't really - you should
24        really go talk to your pastor rather than them.  And so it just really
25        was uncomfortable for me and I stopped going.
26
27   SP:  How many times did you see this person?
28
29   WA:  I think just a couple of times.
30
31   SP:  What was the reason why you saw them?
32
33   WA:  The stress from everything that was going on with my job and my
34        husband and - ´
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 62

```
 1   SP:  That's right, you said the job.
 2
 3   WA:  Yeah.
 4
 5   SP:  That's right.  And then what - was it a male or a female?
 6
 7   WA:  Gosh, I think it was a lady.
 8
 9   SP:  And do you remember where - where her office was?
10
11   WA:  Well, it was in Casa Grande and I think it was like the Casa Grande
12        Counseling Service or something.
13
14   SP:  I see.
15
16   WA:  I've really tried to remember.
17
18   SP:  I see.  And had - had you ever try to kill yourself before October 8,
19        2000?
20
21   WA:  No.
22
23   SP:  Did you ever used to cut on yourself before October 8, 2000?
24
25   WA:  No.
26
27   SP:  Did you ever used to use laxatives or other kinds of like diet pills to
28        keep your weight down?
29
30   WA:  No.
31
32   SP:  Before October 8, 2000?
33
34   WA:  No.
35
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 63

1  SP:  Before October 8, 2000, did you ever - you ever used to binge on
2       food?
3
4  WA:  No.
5
6  SP:  Purge food?
7
8  WA:  No.
9
10  SP:  To keep your weight down?
11
12  WA:  No.
13
14  SP:  Okay.  Did you ever used to break things to relieve tension?
15
16  WA:  No.
17
18  SP:  Before October 8, 2000, did you ever - did you ever have a period
19       of time for say like a run of two weeks or more where your mood
20       was so down and low and - that you didn't feel like get - going out
21       and - and doing things?
22
23  WA:  Yes.
24
25  SP:  How - how often would that happen?
26
27  WA:  It's hard to put a time on it.  Just had lots of anxiety and depression
28       going - you know, just lots of times that I just wanted - I just
29       couldn't - I didn't even want to interact.
30
31  SP:  And how long would that go - for how long a period would that last?
32
33  WA:  Well, I could - because - okay, this is - I had to get up and function
34       and I had people who relied on me and depended on me and so
35       there was this - because I - how do I explain this?  I know now that

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 64

```
 1          I don't have - I'm in a secluded environment.  I'm not getting up
 2          and going to work and having to do something.  I probably have
 3          them like every couple of weeks or I'm - lots of ups and downs, but
 4          before, I had to get up.  I had to go to work and I had to go take
 5          care of people and so I couldn't give in to I'm depressed and I don't
 6          want to but it was just like a constant battle in my mind.
 7
 8  SP:   Well, what - what - what were -
 9
10  WA:   Does that make sense?
11
12  SP:   Sure.   What were - what were the symptoms you were
13          experiencing?
14
15  WA:   Just lots of nervousness, anxiety, I didn't - just not wanting to have
16          to participate in what -
17
18  SP:   Okay.
19
20  WA:   Life was bringing every day.
21
22  SP:   All right, let's - let - let's - let's break this up.
23
24  WA:   Okay.
25
26  SP:   Let's say zero to age 18, did you have periods of - the kinds of
27          things that you're talking about - the depression, the anxiety, did
28          you have - did you experience that between - bef - between the
29          ages of zero and 18 that you remember?
30
31  WA:   I don't really know.
32
33  SP:   Okay.  What about from 18 to 30?
34
35  WA:   Then I can say definitely I did.
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 65

1   SP:  Okay. So - and those symptoms that you experienced consisted of,
2        again, tell me what? You said anxiety.
3
4   WA:  Yeah, lots of anxiety. I was - I worry about everything.
5
6   SP:  Okay. So you're a worrier.
7
8   WA:  Yeah.
9
10  SP:  Right.
11
12  WA:  And just always - just stressed wondering how - how I could take
13       care of everything.
14
15  SP:  Okay.
16
17  WA:  And -
18
19  SP:  You're how old now?
20
21  WA:  43.
22
23  SP:  Okay. And what's your - what's your birth date?
24
25  WA:  8/26/70.
26
27  SP:  Okay. And how old were you when you were arrested?
28
29  WA:  I was 30.
30
31  SP:  Okay. So - so let's talk about this time period - let's kind of really
32       understand this time period between 18 and 30. Are you with me?
33
34  WA:  Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 66

1    SP:  All right.  So anxiety is one of the issues.  What about - sometimes
2         people sit and they tell me that they can be just minding their own
3         business watching television, watching something enjoyable, and
4         then all of a sudden they just get super anxious.  Their heart starts
5         racing and they get sweaty and clammy and they feel pressure on
6         their chest.  Did you ever experience anything like that?
7
8    WA:  So between the ages of 18 and 30 I don't recall that happened.
9
10   SP:  Okay.
11
12   WA:  Yeah, I can't remember just having it for no reason.
13
14   SP:  Okay.  So when you were anxious it was usually tied to something?
15
16   WA:  Yes.
17
18   SP:  That you were worried about?
19
20   WA:  Yes.
21
22   SP:  Okay.  What about - sometimes I talk to people and they tell me
23        that one of the ways that they deal with their anxiety is they - they
24        have like - they have some rituals or things in their head that they
25        have to do "X," "Y," and "Z," they have to like follow some steps,
26        and if they do those things then it relieves their anxiety.
27
28   WA:  No, I wish.
29
30   SP:  You didn't have that?
31
32   WA:  No.
33
34   SP:  What about someone that kind of checks doorknobs and locks
35        repeatedly?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 67

```
 1    WA:  I've never done that.
 2
 3    SP:  Okay.  What about repeated hand washing?  You're - you're going
 4         "no" like this.
 5
 6    WA:  I don't think so.
 7
 8    SP:  Okay.  And again, we're talking about 18 to 30.
 9
10    WA:  Yeah, I don't -
11
12    SP:  Okay.  What about - now let's - let's kind of - what about hearing
13         voices or hearing people talk to you who weren't in the room?
14
15    WA:  That's a funny question.  No.
16
17    SP:  What's so funny about that question?
18
19    WA:  Well, because I want to explain something but I don't want you to
20         think I'm weird.  I believe that God talks to me.  So it's not like
21         some strange voice, like I'm not having a psycho - psychotic
22         moment, but I do believe that God is inside of everybody and he -
23         if you listen, he - there is communication going on.
24
25    SP:  Okay.  So you used a word that I'm familiar with, but I want to
26         make sure you understand it.  You used the word "psychotic."  What
27         is psych -
28
29    WA:  They ask you that here all the time, that's why I know this.
30
31    SP:  Okay.  Let - let me finish my question.  What - what is "psychotic"?
32
33    WA:  Well, when you - I mean they have girls here who actually hear
34         people tell them, "I'm okay."  Tell them to kill themselves and to do
35         crazy things and whatever.  That's what I mean by -
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 68

1   SP:  So that's like hear - like having hallucinations?
2
3   WA:  Right.
4
5   SP:  And you - have you ev -
6
7   WA:  I don't believe I do that.
8
9   SP:  You don't have that?
10
11  WA:  No.
12
13  SP:  Okay.
14
15  WA:  I don't think so.
16
17  SP:  What about - what about visually seeing things other people aren't
18       seeing?
19
20  WA:  No.
21
22  SP:  Okay.  What about - so with - with this depressive stuff that you've
23       experienced, what - when you have it, what's the - what's a typical
24       run, how long will it last?  Again, we're talking between 18 and 30.
25
26  WA:  So like in particular I remember like, you know, you have to work
27       Monday through Friday and then I would ask my mom, "Could you
28       please come get Nicholas and Ashlee," and I would - I would sleep
29       all day.
30
31  SP:  Okay.
32
33  WA:  Just -
34
35  SP:  And how -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 69

1   WA: You know, just to try to get away from my thoughts.
2
3   SP: And then how long - how long was that - how - how long would
4        something like that last?
5
6   WA: It would just - it would - it would be like until I was forced, I have
7        to get up and engage in life again.
8
9   SP: Okay.  So what would your energy level be like during that time?
10
11  WA: Well, I was sleeping so I would sleep - I'd try to sleep it off and just
12       sleep it away and so I would have no energy.
13
14  SP: Okay.  What about your concentration?
15
16  WA: Not good.  It would be very - just my mind all over the place.
17
18  SP: What about your appetite?
19
20  WA: Not good.
21
22  SP: What about your sex drive?
23
24  WA: Not good.
25
26  SP: What about your weight?
27
28  WA: It would fluctuate.
29
30  SP: Okay.
31
32  WA: I don't know.
33
34  SP: What about your interest in doing pleasurable things?
35



Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 70

```
 1   WA:  I know if - I know when - when I would get to where I couldn't even
 2        just deal with it anymore, I would want to just drink some alcohol
 3        and that would help me stop thinking about whatever.
 4
 5   SP:  Okay.  What about - what about just the opposite of - of your mood
 6        being down?  What about your mood being elevated?
 7
 8   WA:  Yeah.
 9
10   SP:  Do you ever experience anything like that?
11
12   WA:  I have.
13
14   SP:  Okay.  Tell me what kind of symptoms you experience there.
15
16   WA:  Where - I don't know, it's almost this feeling of being really full of
17        energy for no reason and just wanting to do all kinds of things.
18
19   SP:  Okay.  And how long would that type of situation last?
20
21   WA:  Not as long as my anxiety.  I feel like I have way more anxiety and
22        depression than I do the other.
23
24   SP:  Okay.  Were you able to sleep when you were having these periods
25        where your - felt like your mood was - I'm going to use the word
26        "elevated"?
27
28   WA:  Yeah.  Not very well.
29
30   SP:  What about your sex drive?
31
32   WA:  I can't say that I ever considered that as a pleasurable activity, so
33        that wouldn't have been included in my -
34
35   /////////////////////////////////////////////////////////////////////
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 71

| | | |
|---|---|---|
| 1 | SP: | Okay.  What about spending - what about your spending habits |
| 2 | | during these periods? |
| 3 | | |
| 4 | WA: | I liked that. |
| 5 | | |
| 6 | SP: | So you would spend money? |
| 7 | | |
| 8 | WA: | Yeah. |
| 9 | | |
| 10 | SP: | Spend money you didn't have? |
| 11 | | |
| 12 | WA: | Yeah. |
| 13 | | |
| 14 | SP: | Buy things you didn't need? |
| 15 | | |
| 16 | WA: | Yes. |
| 17 | | |
| 18 | SP: | Okay. |
| 19 | | |
| 20 | WA: | And it was usually for other people.  If I could make somebody else |
| 21 | | happy and I usually thought I could do that by buying them things, |
| 22 | | that made me feel better. |
| 23 | | |
| 24 | SP: | Was there a seasonal pattern to this? |
| 25 | | |
| 26 | WA: | I don't know. |
| 27 | | |
| 28 | SP: | You don't know? |
| 29 | | |
| 30 | WA: | I don't know.  I think I was - I felt like I was always in debt and |
| 31 | | spending money I didn't have. |
| 32 | | |
| 33 | SP: | Did you - did you ever contemplate taking your life before your |
| 34 | | arrest? |
| 35 | | |

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 72

1  WA: I think at that point I had never thought about taking my own life.
2      I sure had thought about running away though, trying to just get
3      away from it.
4
5  **PSYCHIATRIC HISTORY SUBSEQUENT TO OCTOBER 8, 2000 -**
6      **PART I:**
7
8  SP: Okay.  Since - since your arrest, have you tried to kill yourself?
9      How many times?
10
11 WA: Once.
12
13 SP: And when was that?
14
15 WA: When I was in county jail.
16
17 SP: Okay.  What did you do there?
18
19 WA: I had cut my arm.
20
21 SP: What did you cut it with?
22
23 WA: A mirror.
24
25 SP: Okay.  And what happened?
26
27 WA: Well, I didn't die.  I - I remember coming to and I was in the
28     hospital.  And - and they sent me back to jail.
29
30 SP: How long were you at the hospital for?
31
32 WA: I don't know.
33
34 SP: Did you leave a note?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 73

1  WA: I'm not sure. I know I had thought about it. But I don't know if I
2       ever did it or not.
3
4  SP: Have - have you had - have you tried to kill yourself since you've
5       been in the Department of Corrections?
6
7  WA: I don't want to answer that question.
8
9  SP: I'm going to take that as a "yes." So when was the last time you -
10      you tried to kill yourself?
11
12 WA: I have become aware that when I get in a really depressed state
13      that's something that floats around in my thinking. But because I
14      know that that's what's going on, I - I can talk myself out of it.
15
16 SP: So - so when was the last time you tried to take your life?
17
18 WA: That I - back in county.
19
20 SP: Okay. But you've had thoughts of doing - taking your life while
21      you've been here?
22
23 WA: Numerous times.
24
25 SP: When was the last time?
26
27 WA: Gosh, like maybe a month ago.
28
29 SP: Okay. What - what was going on a month ago for you that - that
30      caused you to have thoughts of taking your life?
31
32 WA: Just some things with my living environment that really distressed
33      me and I felt like it was just the end of the world and then I started
34      having to deal with the depression and the thoughts of - of not
35      wanting to be here.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 74

1
2  SP:  Okay.  What was going on with your living environment?

3  WA:  Somebody that I had lived by my entire time here had left and then
4       somebody that I really don't get along with moved next door to me.
5       And it was - I - it was very hard for me.
6
7  SP:  Is that person still next door to you?
8
9  WA:  Yeah.  And I've adjusted now, but in the moment it was - it's hard
10      to adjust to things.
11
12 SP:  The person who left, they were released?
13
14 WA:  Uh-huh.
15
16 SP:  And were they on - they have a death -
17
18 WA:  They did.
19
20 SP:  So that would be, what, Debra -
21
22 WA:  But not any - yeah.
23
24 SP:  That would be Debra Milke?  Correct?
25
26 WA:  Yes.
27
28 SP:  So she was next door to you?
29
30 WA:  Yes, my entire time I've been in prison.
31
32 SP:  Okay.
33
34 WA:  So that was for nine years and she went home.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 75

1    SP:   Okay.
2
3    WA:   And I think I was okay with that, but then the other person who
4          moved next to me was - creates a lot of stress for me.
5
6    SP:   And how does that person create the stress?
7
8    WA:   Just the things she does.
9
10   SP:   Like what?
11
12   WA:   I don't want to discuss her business.
13
14   SP:   How come?
15
16   WA:   Because she's in court also and anything that I say can hurt her and
17         I'm not trying to hurt her.  That's why.
18
19   SP:   Okay.  So this is a -
20
21   WA:   She is who she is and - and it's distressful for me to be around and
22         -
23
24   SP:   So this is someone who is currently having legal proceedings going
25         on right now?
26
27   WA:   Yes.  Yes.
28
29   SP:   Okay.  Does this person do things intentionally to agitate you?
30
31   WA:   Yes.
32
33   SP:   For - to - to - why?  Why?
34
35   WA:   Because we don't get along.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 76

```
 1   SP:  Why?
 2
 3   WA:  I don't know.  I don't know.  I don't talk to her.  I don't - I don't
 4        know.  I just - there's - prison is full of strange people, some you
 5        get along with, some you don't, and that's just how it is.
 6
 7   SP:  Have you asked - is there any way there can be a move?
 8
 9   WA:  No, because I've - I'm adjusting and I know how to mind my own
10        business and not interact and so I just shut it all out and -
11
12   SP:  Okay.
13
14   WA:  But it took me a little while to get to that point.
15
16   SP:  Help me understand this because I - I really want to - I want to kind
17        of wrap my brain around this.  Is - is the person - what - how does
18        the - how does the - the things that bother you, what form does it
19        take?  Without getting - if you don't want to get into specific -
20
21   WA:  No, I don't.
22
23   SP:  I don't -
24
25   WA:  I don't.
26
27   SP:  Okay.  We're talking over each other.  You don't want to get into
28        specifics, and I'm okay with that, but - but how does the - how does
29        the harassment manifest itself?  Or how does whatever it is bother
30        you manifest itself?  Without - you don't have to be specific.
31
32   WA:  With noise and conversations and gossip and just lots of -
33
34   SP:  Okay.
35
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 77

1    WA: Words that are meant to hurt.
2
3    SP:  Okay, got it.  All right.
4
5    WA: Like people like to talk about my case.
6
7    SP:  Right.
8
9    WA: And then I have you sitting here asking about my case.  And that
10        was a hurtful time.  I mean I took my husband's life and it's just
11        awful what happened.  But now people want to gossip about it
12        because the prosecutor wants to make TV shows about it.  So then
13        the inmates get to watch it.
14
15   SP:  Well, if I remember reading it right, there were a couple - there
16        were a couple TV shows, correct?
17
18   WA: I don't even know.
19
20   SP:  That I think have been made.  But how would they get - how would
21        the inmates get to watch it on the - based on the channels that -
22        that are coming through?  Because I don't think those channels are
23        -
24
25   WA: We have Investigational Discovery Channel coming through and so
26        lots of people got to see him on TV talking about me.
27
28   SP:  But they didn't bring their cameras in here, did they?
29
30   WA: No.  I wasn't part of it.  I don't participate in those.  But he did.
31
32   SP:  Who is "he"?
33
34   WA: Mr. Juan Martinez.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 78

1    SP:  Oh, I see.  You're saying the prosecutor -
2
3    WA:  Yes.
4
5    **MS. ANDRIANO'S OBSERVATIONS RE: TRIAL:**
6
7    SP:  Talked?  Got it.  Got it.  So let - let's kind of - since - since you
8         brought that up, let's - let's - let's talk about that for a second.  You
9         - you had a trial.
10
11   WA:  Yes.
12
13   SP:  And early on what - what - you told me - we talked a little bit about
14        guilt, but what - what was your - what was your opinion of the trial?
15        What did - what did you - what was your take away?
16
17   WA:  I don't - I don't really want to say my opinion about the trial.
18
19   SP:  How come?
20
21   WA:  I was on a lot of medications so I didn't have a whole lot of - and I -
22        I was just after the fact when I have been told about a lot of things
23        that happened and then I have - I'm not - I don't have a good
24        opinion about the trial.
25
26   SP:  What - what did - well first of all, what medications were you on
27        during the trial?
28
29   WA:  I was on an antidepressant, I don't remember which one.  I know
30        I had Seroquel® and Ativan® and I don't know, three or four
31        different meds.
32
33   SP:  Are - are you saying that these medications affected the way you -
34        your ability to think?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 79

1    WA: They helped me get through it, yes.
2
3    SP:  Wait, let me ask my question.  Okay?  Are you saying that these
4         medications affected your ability to pay attention during the trial?
5
6    WA: Yes, sir.
7
8    SP:  Are you saying that the medications somehow caused you to not be
9         aware of what was taking place?
10
11   WA: They did not cause me to be aware, I willingly took the medication
12        and it repressed my ability to comprehend what was going on and
13        to interact and to even be aware of a lot that was happening.
14
15   SP:  So - so do you think that the medications, being on the medications
16        somehow hurt your ability to participate in your trial?
17
18   WA: I know it did.  Yes, sir.
19
20   SP:  How do you know that?
21
22   WA: After I started the appeals process later on and people were
23        bringing trial transcripts and telling me this certain person had
24        taken the stand and testified and I did not even have any memory
25        of them even being up on the stand. So that's how I know, because
26        there was a lot of things that were brought to my attention that I
27        did not even remember.
28
29   SP:  Well, I - I thought we already established that you have memory
30        problems from way back when.  Remember you telling me that?
31
32   WA: Right.
33
34   SP:  That was before you were on medications, right?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 80

```
 1   WA:  Right.
 2
 3   SP:  Because your mom and dad used to tell you about things that you
 4        didn't remember.
 5
 6   WA:  Yes, sir.
 7
 8   SP:  Remember that?
 9
10   WA:  Yes.
11
12   SP:  And you said you don't remember a lot about the offense.
13
14   WA:  Right.
15
16   SP:  And you weren't on medication then.
17
18   WA:  Right.
19
20   SP:  So how do you know that it was the medications that were causing
21        you to not have a memory during the trial?
22
23   WA:  Well, I don't know that.  But I do know that the reason why I took
24        the medications was so I could have control of my anxiety, control
25        of my emotions going on, all this sort of stuff, so I just made the
26        assumption that because I was on all these meds I was - I have no
27        - I can't tell you a whole lot of what happened in my trial.
28
29   SP:  Do you remember taking the witness stand?
30
31   WA:  I do.  I do.
32
33   SP:  What was your opinion about the outcome?
34
35   ///////////////////////////////////////////////////////////////////////
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 81

1   WA:  Well, I feel that - I mean I'm in a legal system and if that's what the
2        decision was, then that's what it is.
3
4   SP:  So then why appeal?
5
6   WA:  I - I feel like - I feel like that the reason - well, the reason why I
7        would like to appeal is just if the jury could've heard everything and
8        had a full - and then they still decide that, then that's okay.  But I
9        don't feel like they were presented with everything.
10
11  SP:  Okay.  What - what was - I think earlier you said you - you - you
12       agreed with the finding of - and I'm going to paraphrase this and I -
13       I will readily admit at the outset I may get this one wrong, you
14       readily admit that you were guilty but I think you said but not of
15       first degree murder?
16
17  WA:  I don't - that's how I feel, yes.
18
19  SP:  Okay.  If not first degree murder, what do you think you were guilty
20       of?
21
22  WA:  Well I don't know.  I don't - that's hard to distinguish.  Like I don't
23       know all the things that go into - and I guess because - how do I
24       explain this?  I just feel like the jury - if the jury could've heard
25       everything and - and - and had a better understanding, then I
26       wouldn't have been found guilty of first degree murder.  I don't
27       know why I think that.  I just do.
28
29  SP:  You know first - first degree murder, the type of murder you were
30       convicted, is premeditated?
31
32  WA:  Right.
33
34  SP:  That means you planned it out.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 82

1    WA:   I know, but that makes it seem as if I just wanted to - I took it
2          upon myself to kill somebody who didn't want to die, and that's not
3          what the situation was.  Why are you looking at me like that?
4
5    SP:   I'm not looking at you in any way.
6
7    WA:   Oh.  I'm like what -
8
9    SP:   I'm just - I'm - I'm just - I'm just pausing to hear - that - to kind of
10         process your answer.  So it's - it's your position that - it's your
11         position that -
12
13   WA:   I don't know.  Look, I don't know what's fair.  I don't know.  I don't
14         have anything against the death penalty or what the conviction is,
15         it's just I didn't know all these things that have been - have been
16         brought up since we've gone through the appeal process.  I didn't
17         have all this information.  I didn't understand why that night went
18         the way it went.  And now that I know a whole lot more, I would
19         like the jury to hear the whole story and then make a decision.
20         That's all.  And then if they still decide that I need to die, then
21         that's what their decision is.
22
23   **<u>DEFENDANT'S VERSION OF THE INSTANT OFFENSE - PART V</u>:**
24
25   SP:   So - but - but as you sit here today, it's your position that your -
26         your husband wanted to die?
27
28   WA:   Yes, sir.
29
30   SP:   Correct?
31
32   WA:   Not that he wanted, he had no choice.  He had cancer.
33
34   SP:   Yeah, well -
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 83


1    WA: It was just on how he died.
2
3    **MS. ANDRIANO'S OPINION RE: TRIAL COUNSEL:**
4
5    SP: Okay.  What was your opinion of your trial counsel, your lawyer?
6
7    WA: Well I saw Mr. David DeLozier just as my - I felt very comfortable
8         with him.  He had the same religious beliefs that I had so I felt
9         comfortable with that as if that was the thing that God wanted to
10        happen.  So I was okay with that.  I never questioned his legal
11        abilities to represent me.  It never occurred to me to even -
12
13   SP: So - so while the process was going on did you think he was doing
14        right by you?
15
16   WA: I - I - I didn't stop to evaluate that because that wasn't my concern.
17
18   SP: Okay.  Are -
19
20   WA: I felt like God was in control of that and that God had sent him to
21        me to represent me and so -
22
23   SP: Okay.
24
25   WA: It wasn't my place to question that.
26
27   **ISSUE RE: SUICIDAL IDEATION:**
28
29   SP: Earlier we were talking about suicidal thoughts.  Remember?
30
31   WA: Yes.
32
33   SP: Okay.  Are you currently having thoughts of suicide?
34
35   WA: No.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 84

1   SP:   Is there a mechanism in place that if you do have those kind of
2         thoughts, that you - to - what - what - what happens, what are you
3         supposed to do?
4
5   WA:   If I feel that way and it's something that I feel like I can't control -
6         see, I - I have a lot of meditation things that I go through now.
7
8   SP:   Right.
9
10  WA:   I have a lot of tools that I now know to use to help me deal with
11        that.
12
13  SP:   Such as?
14
15  WA:   With the meditation and using positive affirmations and I have the
16        psych person that I can talk to.  Because as long as I can, you
17        know, actively use some of my tools, then I - I won't fall into that.
18
19  SP:   Okay.  All right.
20
21  WA:   But see now that I'm aware that this is what's going on with me and
22        I know, then I know I'm starting to feel really depressed, I know
23        that I need to start listening to my meditation.  I need to practice,
24        you know, mindfulness and there's just a lot of things that I use
25        now.
26
27  **RELIGIOUS   UPBRINGING   AND   PRESENT   DAY   RELIGIOUS**
28        **AFFILIATION:**
29
30  SP:   Got it.  Do you - you've talked about religion a few times.  What -
31        what's your current religious affiliation?
32
33  WA:   Well, how do I say?  I - I don't know.  I don't really have a label.
34        I just - I believe that - I believe that everything is connected, that
35        we're all - we all are made of spirit and - and that the purpose of us

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 85

```
 1        being here is to learn how to love and to take care and be respectful
 2        and become more spiritually aware so that way we make this place
 3        that we're in a better place and that everything we go through is a
 4        lesson and a learning -
 5
 6  SP:  Do - do you - do you have a particular religious affiliation though?
 7
 8  WA:  I would say Christian more than anything.
 9
10  SP:  Okay.  And do you - how do you practice your faith here?
11
12  WA:  I spend a lot of time praying and meditating and studying, you
13        know, with my different books and the Bible and listening to church
14        services and -
15
16  SP:  So - so you're reading scripture and what have -
17
18  WA:  I do.  I do.
19
20  SP:  Okay.  Are there particular psalms, prayers, scripture that - that
21        you derive a certain amount of strength from?  Are there certain -
22        I guess what I'm asking if there's certain ones that you look to that
23        are like your go-to?
24
25  WA:  Oh.  Not so much because I was raised in a really strict one and I
26        feel like - I feel like the rigidity of the beliefs I was raised in helped
27        me end up where I'm at.  So I've really tried to separate what was
28        programmed into my mind than what is really true.
29
30  SP:  Okay.
31
32  WA:  What is spiritually true.  So I've had to go on this separating of -
33
34  //////////////////////////////////////////////////////////////////////////
35  //////////////////////////////////////////////////////////////////////////
           //////////////////////////////////////////////////////////////////////////
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 86

1   SP:   Well that actually gets me to my next question, which was about
2         your religious upbringing.  I want to say it was like fundamentalist
3         Christian, I'm - I'm blocking on -
4
5   WA:   Well, I don't know what they called it, but I know that whenever our
6         pastor would say he's - he would say, "We are non-denominational
7         Bible-believing church."
8
9   SP:   Right.
10
11  WA:   So I don't know what the outside world would label that as.
12
13  SP:   But as - if I read this correctly, it sounded like a fairly religious
14        household, correct?
15
16  WA:   Yes, sir.
17
18  SP:   And how often - like was there prayer in the morning?
19
20  WA:   There we had devotions and - on a daily basis, and prayer and
21        going to church three, four times a week.
22
23  SP:   And it -
24
25  WA:   And then my school was also a church school.
26
27  SP:   Right.
28
29  WA:   So I was in it every day.
30
31  SP:   Okay.  And how is it that you believe that the belief system that you
32        were raised in got you to the situation you're in now?
33
34  WA:   There's so many ways.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 87

1   SP:   Well, how about you give me your top three?
2
3   WA:   Okay.  Well number one would be instead of finding out things for
4         myself and actually having knowledge and understanding how the
5         world works, you're just taught just give it to God and let go and
6         he'll - God will work it out.  So you - just like you're putting it off on
7         somebody else and not taking responsibility for yourself.
8
9   SP:   Okay.
10
11  WA:   And I think that - that's not a good - good, healthy thing to do.
12
13  SP:   Okay.  Give me another example.
14
15  WA:   The other one is really this position of authority that men had over
16        women and listening to them and just thinking that God spoke to
17        them and they're God speaking to you now and so you need to
18        follow everything that they say and do.
19
20  SP:   Okay.  And another way?
21
22  WA:   I think the hypocrisy.  The - even though I - I lived under these
23        rigid religious beliefs, I really can't tell you one person who really
24        followed them both in public and private.
25
26  SP:   Okay.
27
28  WA:   There was lots of preaching about something and then when they're
29        out of the public and then in the private home and all of that, that
30        it was completely different.
31
32  SP:   Okay.
33
34  //////////////////////////////////////////////////////////////////////////
35  //////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 88

1    WA:  So it was almost that it was okay to not follow the rules, even
2           though it's follow the rules.  It's - it's just - I don't know.  It's hard
3           to describe.
4
5    **PERSONAL HISTORY - PART I:**
6
7    **Date of Birth:**
8
9    SP:   You were born August 26, 1970, correct?
10
11   WA:  Yes.
12
13   **Place of Birth:**
14
15   SP:   Where were you born?
16
17   WA:  In Texas.
18
19   SP:   Where in Texas?
20
21   WA:  Groom, Texas.
22
23   SP:   G-R-O-O-M?
24
25   WA:  G-R-O-O-M.
26
27   **Birth and Developmental History:**
28
29   SP:   Okay.  And as it was told - as it was told to you, did your mom have
30          any problems with birth or her pregnan - your birth or her
31          pregnancy?
32
33   WA:  I don't know.
34
35   ///////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 89

 1   SP:   Okay.  As it was told to you, were there any difficulties or problems
 2         with your reach - with you reaching your developmental milestones?
 3
 4   WA:   I don't remember.
 5
 6   SP:   Okay.
 7
 8   WA:   I don't know.  I haven't -
 9
10   SP:   You wouldn't -
11
12   WA:   I don't even know.
13
14   SP:   It would be stunning if you remembered.
15
16   WA:   Yeah, I'm like -
17
18   SP:   What I'm - what I'm - what I'm wonder -
19
20   WA:   I don't even know if any of that's ever been discussed.
21
22   SP:   Okay.
23
24   WA:   I've never asked.  I don't know.
25
26   SP:   But you don't have - it has been discussed because I've seen it in
27         some of the other documents.  But -
28
29   WA:   Oh, sorry.
30
31   SP:   But my question to you is was any of that -
32
33   WA:   I'm not aware of it.
34
35   ////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 90

1   **Raised By:**
2
3   SP:  Okay.  Who were you raised by?
4
5   WA:  I remember my grandma a lot.
6
7   SP:  On which side?
8
9   WA:  My mom's mother.
10
11  SP:  Okay.  And who else raised you?
12
13  WA:  And then I remember my mom and then Alejo, who is my stepdad.
14       But he adopted me so I guess he's my - I don't know what the
15       proper label is.
16
17  SP:  And - and tell me if I have this correct, Alejo is spelled A-L -
18
19  WA:  A-L-E-J-O.
20
21  SP:  Right.  Okay.  And who else had a hand in raising you?
22
23  WA:  Then I know we traveled around with a bunch of other ministers and
24       so they all kind of I guess had a hand in raising me.
25
26  SP:  But who were the - the top - the - the ones that you were most
27       closest to?  Is it your mom's mom, your mom and Alejo?
28
29  WA:  Yeah.
30
31  **Childhood Discipline:**
32
33  SP:  Okay.  How were you disciplined as a - as a child?
34
35  WA:  I was spanked.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 91

1    SP:   Did the pun - any other ways?
2
3    WA:   I know I was spanked.  I know that I got grounded.  I think part of
4          - well - I don't - I don't know.  Yeah, I had to - sometimes I'd - we'd
5          have to go do work and things as part of punishment.
6
7    SP:   Okay.  Did - did the punishment usually fit the - I'm going to use
8          the word "crime," but the transgression, did it fit what it is you did
9          wrong?
10
11   WA:   I guess they thought so.  I don't know.  I mean -
12
13   SP:   Well, I'm asking you.  Do you -
14
15   WA:   Oh.  Well, I mean it seemed - I - that's how I was raised, so that
16         was normal to me.  So I - I would -
17
18   SP:   Okay.  So - and were - were you ever hit with like a pan or a pot?
19
20   WA:   No.
21
22   SP:   A spatula?
23
24   WA:   No, I think they always used a paddle and a belt and -
25
26   SP:   A switch?
27
28   WA:   Oh my gosh, I think I have been a couple of times.
29
30   SP:   Okay.  What were you hit with a switch for?
31
32   WA:   Wipe your eye.  Sorry.  Can you wipe your eye?  You have - there
33         you go.  Thank you.  Well, I don't know.  I - just - for just - well if
34         you don't listen and you don't do everything they tell you to do or
35         whatever.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 92

```
 1   SP:  Did - did you - did you think that the punishment though or the way
 2        you were punished - different people have different ideas about
 3        punishment.  Some people believe just in time outs, some people
 4        believe in kind of a corporal punishment model.
 5
 6   WA:  Right.
 7
 8   SP:  Did you think - it sounds like you were raised in an environment
 9        that was more a corporal punishment type of environment.
10
11   WA:  Uh-huh, right.
12
13   SP:  Okay.  Which frankly at your age probably isn't that uncommon.
14        But the - the question is, did you think that the punishment that
15        you received was appropriate?
16
17   WA:  Are you asking me my opinion today or back then?  I mean that's -
18
19   SP:  Today.  You have - you're an adult.
20
21   WA:  Oh.  Well no, as an adult I wouldn't - I don't agree with it at all.
22
23   SP:  Okay.  So did - you thought the punishment then was in excess of
24        what you deserved?
25
26   WA:  Yes.
27
28   SP:  Okay.  How?
29
30   WA:  Well, I guess because now as an adult I believe that the time out
31        and the talking and - and, you know, actually helping people figure
32        out how to think would be a lot more effective than just spanking
33        their bottom.
34
35   /////////////////////////////////////////////////////////////////////
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 93

```
 1   SP:  Okay.  Did you ever end up with any bruises or welts as a result of
 2        the punishments you received?
 3
 4   WA:  I don't know.
 5
 6   SP:  You don't recall?
 7
 8   WA:  I don't recall.
 9
10   SP:  Did - that noise is some type of fan blower.  I'm just going to move
11        this microphone a little closer.  You're fine where you are.
12
13   WA:  Okay.
14
15   SP:  Okay.  Did you ever end up in the hospital as a result of any
16        punishments you received?
17
18   WA:  No.
19
20   SP:  Because you were hurt in a certain way?
21
22   WA:  No.
23
24   SP:  Okay.  Were you ever pun - putting aside - putting aside your
25        beliefs about corporal punishment and how you believe it should've
26        been done, what were the - what were the kinds of things that you
27        got punished for?
28
29   WA:  I'm trying to think of a specific incident.  My goodness.  Oh, this is
30        terrible.  I can't - I don't - I don't remember like specifically what
31        I would do or not do.  I'm not - I'm not - I'm - I just remember that
32        any - anything that they considered disobedience.
33
34   SP:  Okay.
35
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 94

```
1    WA: I don't -
2
3    SP:  Did - did you ever just get randomly hit or punished for - like let's
4         say you're just watching TV and minding your own business or
5         reading a book, did anyone ever just come over to you and just hit
6         you for no reason?
7
8    WA: No.
9
10   SP:  Or bring a belt or switch out?
11
12   WA: I don't think so, no.
13
```

**Childhood Interests:**

```
16   SP:  Okay.  What - what kinds of things did you - what kinds of things
17        did you enjoy doing as a child?
18
19   WA: Reading, I love to read.
20
21   SP:  Okay.  What kinds of things were you reading as a kid?
22
23   WA: Like The Chronicles of Narnia and Little Women and I think Nancy
24        Drew.  I don't know.  My mom would take me to the library and we
25        would pick out books.
26
```

**Traumatic Childhood Experiences:**

```
29   SP:  Okay.  Are there any traumatic childhood experiences that stand out
30        from your upbringing?
31
32   WA: Well - well, I remember that when - like always remember being -
33        there was always this fear of not having somewhere to live.  There
34        was always this worry about housing.  There was always a worry
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 95

1    about how to pay for anything.  I remember going hungry a lot.  I
2    don't know.  I mean -
3
4  SP:  Was the family on food stamps or government assistance?
5
6  WA:  I don't know.
7
8  **Issue Re: Childhood Physical Abuse or Childhood Emotional**
9       **Abuse:**
10
11 SP:  Were you ever the victim of - do you think of any childhood physical
12      abuse or emotional abuse?
13
14 WA:  As a grown up looking at the way I was raised I would say that that
15      wasn't healthy.  Gosh, that's such a general question.  What - what
16      - do you want - I don't know what you want me to speak about
17      specifically.  Like - I don't know.
18
19 SP:  I just want to know if you think you were as a child ever emo - do
20      you believe you were emotionally or physically abused?
21
22 WA:  I do.
23
24 SP:  Okay.
25
26 WA:  As an adult now looking at it, I do.
27
28 SP:  How - how were you emotionally and physically abused?
29
30 WA:  I say that because as a child having to worry about how you're
31      going to eat next and wondering if I was taught that God was the
32      one that if you were being a good person, that God would provide
33      all your needs and he would feed you and put a roof over your
34      head.  And so if that wasn't happening, it's because you're doing
35      something bad.  And I lived with - with parents who chose to kind

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 96

1   of wander around.  And even though like my mom was there
2   physically, I don't feel like she was ever really a mom to me.
3   Because I remember after leaving and not having my grandma
4   around I really felt like my grandma had - had been my mother.
5   And I really felt like the expectations of being the mom or being a
6   grown-up or being kind of like a grown-up were put on me by my
7   dad. And I just remember lots and lots of pressure on me to please
8   him.  And lots of times I would feel uncomfortable but I think as a
9   child you just - I just wanted to please my dad.  And I was aware
10  of - of like - of my mom not being there for my dad and so I always
11  felt like I needed to make it up for her, on her behalf.
12
13  SP:  Okay.
14
15  WA:  To keep the peace.  I don't know.  I mean I don't know where I got
16       those ex - expectations, but I remember thinking and feeling that
17       way.
18
19  SP:  Okay.  Let me just say something for the record here.  It's - it's
20       10:46.  And what I'm going to do right this second is I'm going to
21       stop both of these devices and then turn them right back on.  And
22       the reason for this is that when we make a disc, we can put it on a
23       two hour - a disc that can hold two hours of content.  So just - what
24       I ask is you don't talk while I do this and I'm going to power it right
25       back.
26
27  WA:  Okay.  Let me get some more tissue.
28
29  SP:  Wait a minute.  Wait, wait.  Just - the whole point - I understand
30       that she wants to come but I want to do that while the equipment
31       is -
32
33  WA:  Oh, okay.
34
35  SP:  Re-powered back up.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 97

1     [Break]
2
3     SP:   Okay.  And you would agree it's - that took all of ten seconds.  You
4           would agree we didn't have any conversation while I was doing that,
5           correct?
6
7     WA:   Yes.
8
9     SP:   Do you want to - me to get you some tissue here?
10
11    WA:   Yes.
12
13    SP:   Do you have some tissue?
14
15    WA:   Thank you.  I'll trade you.
16
17    SP:   So - I'm just going to repeat what you said to the correction officer.
18          You - so you said, "Thank you.  I'll trade you."
19
20    WA:   Yes.
21
22    SP:   So what kind of things did you do to please your father?
23
24    WA:   Well, he - I would cook for him and - and clean the house certain
25          ways for him and when he'd get home from work he'd like for me
26          to scratch his head and play with his hair and rub his legs, rub his
27          back, that kind of thing.
28
29    SP:   Okay.  What other kinds of things did you do to please him?
30
31    WA:   He always had a temper and so you just learned, I don't know, you
32          learn how to just pacify him and get - I don't know.  I would laugh
33          at his, you know, I don't know, he would - it's hard to describe
34          because it's not as if you make decisions to do certain things, but

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 98

1  just whenever you - you just learn how to live your life in a way
2  that you know makes them happy.
3
4  **FAMILY HISTORY - PART I:**
5
6  **Father:**
7
8  SP:  Okay.  But let - let's talk about him a little bit.  First of all, let's talk
9  about your - your - your biological father.  His name is what?
10
11  WA:  Skip Robertson.
12
13  SP:  Skip - Skip what?
14
15  WA:  Robertson.
16
17  SP:  Skip Robertson.  And did Skip Robertson have any role -
18
19  WA:  Oh, he used to put some money on my books too.  You were asking
20  about that and I forgot about him.
21
22  SP:  Okay.  So Skip - Skip Robertson puts money on your book?
23
24  WA:  No, he did.  He passed away.
25
26  SP:  Okay.  So he was - he's your biological father, correct?
27
28  WA:  Yes, yes.
29
30  SP:  And what role did he have in your upbringing?
31
32  WA:  I don't remember him in my upbringing.
33
34  SP:  Okay.  When do you remember him?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 99

1  WA:  I remember one time I was little, I don't recall what age, and I
2       remember one time for me it felt like meeting him for the first time.
3       And I spent the weekend with him and his wife and his children.
4       And then I didn't have anything - any interaction with him until here
5       in prison.
6
7  SP:  Okay.  Did he come and visit you?
8
9  WA:  One time.
10
11 SP:  Okay.  And are you allowed a contact visit?  No?
12
13 WA:  No.
14
15 SP:  Okay.  It was through -
16
17 WA:  Glass.
18
19 SP:  Glass.  What was that like for you?
20
21 WA:  It was hard because he was dying from cancer and he was in a
22       wheelchair and -
23
24 SP:  How - how long ago was that?
25
26 WA:  This year.
27
28 SP:  Okay.  How - how - how old was he when he passed away?
29
30 WA:  I don't know his age.
31
32 SP:  What - what - do you know what kind of cancer?
33
34 WA:  Oh my goodness.  I believe he had lung cancer.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 100

1   SP:  And do you know what he did for a living?
2
3   WA:  I don't.
4
5   SP:  And what about -
6
7   WA:  Well I know - well yes, I think he was a truck driver.
8
9   SP:  And do you know how far in school he went?
10
11  WA:  No.
12
13  SP:  Now, did he have any psychiatric or emotional problems that you
14       know of?
15
16  WA:  Well, the thing off the top of my head that I know was he used to
17       suffer with depression and suicidal thoughts too.
18
19  SP:  Okay.
20
21  WA:  So that helped me not feel so -
22
23  SP:  Okay.  Did he ever get any treatment for that?
24
25  WA:  I don't know.  He spent I think 17 years in prison.
26
27  SP:  Okay.  For what?
28
29  WA:  And - I don't know what the official charge was.  But it had to do
30       with his stepdaughter and maybe - I don't know, some sexual stuff.
31       I don't know.
32
33  SP:  Okay.  So you didn't really have a relationship with him growing up?
34
35  WA:  No.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 101

1
2   SP:   And nor did you have a relationship with him as an adult?
3   WA:   Not until prison.
4
5   SP:   How long was that visit?
6
7   WA:   That visit was just a couple hours, or maybe like an hour and a half
8         actually.  That's all he could - his body could handle sitting here.
9         But we used to write back and forth and so that's - is how I had
10        gotten to know him.
11
12  **Mother:**
13
14  SP:   Okay.  And your mother, is she still alive?
15
16  WA:   Yes.
17
18  SP:   And what is her name?
19
20  WA:   Donna.
21
22  SP:   And what's Donna's last name?
23
24  WA:   Ochoa, O-C-H-O-A.
25
26  SP:   And Donna is how old now?
27
28  WA:   64.
29
30  SP:   And how far in school did your mom go?
31
32  WA:   I feel like maybe she's had some college.
33
34  SP:   Okay.  And what kind of - what kind of work does she do or did she
35        do?

Transcript of Forensic Psychiatric Evaluation
Re: Wendi Elizabeth Andriano
November 26, 2013
Page 102

1  WA: She works as a human resource - I don't know what her official title
2       is, but she's in human resources at a hospital.
3
4  SP:  And what - does she have any medical problems?
5
6  WA: I know she takes medication.  I don't know exactly for what.
7
8  SP:  Okay.  What about psychiatric or emotional problems?
9
10 WA: I don't know the details of what she has.
11
12 SP:  Does she have any emotional - do you know if she -
13
14 WA: Well I know she - I know she takes something and I don't - and I
15      know it was for anxiety and depression, but I don't recall - I don't
16      know -
17
18 SP:  Do you - do you know if she's ever been psychiatrically
19      hospitalized?
20
21 WA: I don't think so.
22
23 SP:  Okay.
24
25 WA: I think my aunt, her sister has been.
26
27 SP:  Your -
28
29 WA: My aunt.
30
31 SP:  Your maternal aunt?
32
33 WA: Right.
34
35 SP:  Okay.  Does your mom have a drug or alcohol history?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 103

1   WA: Well, I have learned that she did.
2
3   SP: Okay.  What about - what about trouble with the law?
4
5   WA: No.
6
7   SP: And what was your relationship like growing up with your mom?
8       You already kind of dis -
9
10  WA: Yeah, my mom was there.  I mean she was there.  I -
11
12  SP: But it sounds like it was distant?
13
14  WA: Very distant.
15
16  SP: I think I read -
17
18  WA: I - I try to describe it as, okay so I love to read, my mother loved
19      to read.  So we could sit in the same room and so it seems like
20      you're together, she's reading her book and I'm reading my book.
21      So we would do things and be around each other, but no, we were
22      not connected and did not have conversations about things.
23
24  SP: Do you think she neglected you?
25
26  WA: Well, I don't like to say that word.  I think she was as much there
27      as she could be.
28
29  SP: Do you think you were though?
30
31  WA: But did I get what I needed from her?  No.
32
33  SP: Okay.  Do you - what's your present day relationship like with her?
34
35  WA: It's better.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 104

1   SP:  How often does she come visit?
2
3   WA:  Once a month.
4
5   SP:  And how often does - how else do you communicate with her?
6
7   WA:  Well, we write - she'll send me cards and, you know.  But most of
8        our communication is done when she comes to visit me and she
9        spends four hours with me.
10
11  SP:  How many - how much visitation time are you allowed to get in a
12       month, or in a week?
13
14  WA:  In a week is four hours per week.
15
16  SP:  And you can't - you can't - it's got to be used that week and that's
17       it?
18
19  WA:  Right.
20
21  SP:  Okay.  What about phone?
22
23  WA:  15 minutes.
24
25  SP:  How - how -
26
27  WA:  Per week.
28
29  SP:  Per week?
30
31  WA:  Yes.
32
33  SP:  Okay.
34
35  /////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 105

1   WA: So that - and that really isn't enough to even get into a
2        conversation, so that's why I say most of our conversation is when
3        she comes to see me.
4
5   SP: Okay.  What about before - before your arrest, what was - what was
6        your relationship like with her?
7
8   WA: The same as my whole time growing up.  My mom has always been
9        present in my life and she's always been around.  She did lots of
10       things with Joe and I, would go on trips with us, so she was always
11       around but very not - how do I explain it?  But not emotionally
12       there and not - I don't know how to explain, it's -
13
14  SP: Okay.
15
16  WA: Like I couldn't sit down and talk to her if I had a problem.  I
17       couldn't - we didn't ever have - we had social conversation, we
18       didn't have life conversation.
19
20  SP: All right.  Do you recall anything about your - what - well first of all,
21       was Skip married to your mom?
22
23  WA: Yes.
24
25  SP: Okay.  Do you recall anything about their - their relationship?
26
27  WA: I don't.
28
29  SP: Okay.  And then mom eventually meets -
30
31  **Adoptive Father:**
32
33  WA: Alejo.
34
35  SP: Alejo, okay.  And you're how old when mom meets Alejo?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 106

1   WA: Young.  I don't know the age, but young.
2
3   SP: And then they ultim -
4
5   WA: Because my actual - probably - like right after my grandma I feel
6       like he was there.
7
8   SP: Okay.  So - so Alejo is the father figure for you, correct?
9
10  WA: Yes.  Yes.
11
12  SP: And - and - and Alejo is still alive?
13
14  WA: Yes.
15
16  SP: And Alejo's last name again is?
17
18  WA: Ochoa.
19
20  SP: Och - Ochoa.  And that's the name you end up taking?
21
22  WA: Yes.  I do believe that like they did some adoption process.
23
24  SP: Right.
25
26  WA: And I got his last name legally.
27
28  SP: Okay.  So he's how old now?
29
30  WA: Well, he's a couple years younger than my mom.
31
32  SP: And mom and him are still together?
33
34  WA: Yes.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 107

1   SP:   Okay.  And how far in school did Alejo go?
2
3   WA:   Well, I know he graduated high school and I know he's taken come
4         college, but I don't know.
5
6   SP:   Okay.
7
8   WA:   How much.  I think he has and actually I don't know for a fact.
9
10  SP:   What kind of work does he do?
11
12  WA:   He's disabled.
13
14  SP:   From?
15
16  WA:   An injury to his back.
17
18  SP:   Okay.  What kind of work did he do?
19
20  WA:   Well, he was in the church as a church leader for most of my
21        growing up and then later on - well, I think he did landscaping and
22        I think he did house construction also.
23
24  SP:   What - what's his - what's his cultural background?
25
26  WA:   Latino.
27
28  SP:   Okay.  What - does he have - how is his health?
29
30  WA:   He's not well.
31
32  SP:   What - what - what - she's signaling that there's lunch there?
33
34  WA:   Yeah.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 108

```
 1    SP:  Okay.  Let me just finish up this -
 2
 3    WA:  Yes.
 4
 5    SP:  Section, if you don't mind.
 6
 7    WA:  That's fine.
 8
 9    SP:  He - what - what - what - what's medically wrong with him?
10
11    WA:  Well, I don't know the exact details but I just know he's not doing
12         well.
13
14    SP:  Okay.  Does he have any psychiatric or emotional problems?
15
16    WA:  Not that's been officially diagnosed.
17
18    SP:  Drug or alcohol problems?
19
20    WA:  No, but I know he's on a lot of pain pills so -
21
22    SP:  And he's how old again about?
23
24    WA:  Well, I feel like he's two years younger than my mom or something
25         like that.
26
27    SP:  And she's how old you said?  60 -
28
29    WA:  64.
30
31    SP:  64.  And has he been in trouble with the law?
32
33    WA:  Not that I'm aware of.
34
35    //////////////////////////////////////////////////////////////////////
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 109

1    **<u>Relationship Growing Up With Adoptive Father:</u>**
2
3    SP:   And this is what started this whole thing is we were talking about
4          your relationship growing up.
5
6    WA:   Oh, okay.
7
8    SP:   With him.
9
10   WA:   Oh.
11
12   SP:   And - and so -
13
14   WA:   He was my best friend growing up.
15
16   SP:   Okay.  Were you and him sexually involved?
17
18   WA:   Well, I - what I - what I remem - I don't believe so.  I don't know.
19         Okay.  He's a very sexual person, like everything has something to
20         do with something sexual.
21
22   SP:   Okay.
23
24   WA:   Every joke he tells, all the conversations, I don't know.   And
25         growing up, that seemed normal to me.
26
27   SP:   What?
28
29   WA:   Just the - his like overly sexualized behavior just seemed normal to
30         me so I could -
31
32   SP:   But -
33
34   WA:   I didn't - I don't know.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 110

1    SP:   But did you have a sexual relationship with Alejo?
2
3    WA:   No.
4
5    SP:   Did sex - did Alejo ever fondle you or touch you in a sexual way?
6
7    WA:   Not that I remember.
8
9    SP:   Did you ever perform fellatio on Alejo?
10
11   WA:   Not that I remember.
12
13   SP:   Did you ever - were you ever in any type of sexually intimate
14         relationship with Alejo?
15
16   WA:   Not that I remember.  I - I would say emotionally, yes.   But
17         physically, I don't know.  I don't remember that.
18
19   SP:   Okay.  Did - I read something, and I think it's about him, and you -
20         you correct me if I'm - if this sounds right.  I think I read something
21         where you visited with him or he took you along to - to different
22         kinds of stores that had intimate apparel and sex toys?  Is that - am
23         I right about that?
24
25   WA:   Right.
26
27   SP:   Do you remember that?
28
29   WA:   I - I don't specifically remember that.
30
31   SP:   Okay.   Well, let's stop there.   Let's stop for a second there.
32         Because early on when we were talking about the offense we went
33         through what you know, what you know you know -
34
35   WA:   I know.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 111

1    SP:   And what you remember.  So my ques -
2
3    WA:   I don't - I do not remember physically going inside a store.  That -
4          an adult themed store with him.
5
6    SP:   What about going inside an intimate -
7
8    WA:   Oh, and that's - you know what, I do remember going into some
9          like - I don't know what you want to call it, I think it was like a
10         Frederick's of Hollywood or something.
11
12   SP:   Right.  And -
13
14   WA:   I do remember that.
15
16   SP:   And for what purpose?
17
18   WA:   I don't remember what the purpose was.
19
20   SP:   Did you ever sleep naked in the bed with him?
21
22   WA:   No, not that I know of.
23
24   SP:   Did you ever sleep naked in the bed with him and your mom?
25
26   WA:   Not that I know of.
27
28   SP:   Did you ever sleep naked in the bed with him and someone else?
29
30   WA:   Not that I know of.
31
32   SP:   And "him" I mean Alejo.
33
34   WA:   Right.  Not that I am aware of.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 112

1    SP:  So you have no -
2
3    WA:  I don't remember.
4
5    SP:  You don't remember?
6
7    WA:  I don't.
8
9    SP:  So was Alejo - and I'm almost done with this thread.
10
11   WA:  That's okay.
12
13   SP:  I don't want to - I don't want to keep you from lunch.
14
15   WA:  No, it's okay.
16
17   **Mother and Adoptive Father's Relationship:**
18
19   SP:  Did - what was your - what was Alejo's relationship like with your
20        mom?
21
22   WA:  Well, I don't think it was good.  They used to - lots of fighting and
23        arguing and me being put in the middle of it.
24
25   SP:  Police ever come out?
26
27   WA:  No.
28
29   SP:  Was Alejo running around on your mom?  By that I mean was he
30        cheating on her?
31
32   WA:  Oh, I don't know.
33
34   SP:  Was your mom cheating on him?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 113

1
2
3    SP:   Did - did Alejo beat your mom?
4
5    WA:   No.
6
7    SP:   Hit your mom?
8
9    WA:   No.
10
11   SP:   Throw things at your mom?
12
13   WA:   Yes.
14
15   SP:   Break things?
16
17   WA:   Yes.
18
19   SP:   Did he ever get physical with her?
20
21   WA:   Not that I saw.
22
23   SP:   And they're still together, correct?
24
25   WA:   Yes.
26
27   SP:   When was the last time you saw him?
28
29   WA:   It's been a while, like maybe a year or so.
30
31   SP:   When was the last time you talked to him?
32
33   WA:   It's been a while.  I don't know.
34
35   SP:   Well, when was the last time you communicated by writing?

WA:   No, not that I know of.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 114

1    WA:  Well, I did send him a Father's Day card because -
2
3    SP:  Why is that upsetting you?
4
5    WA:  It just does.
6
7    SP:  I think you said this, and - and correct me if I'm - I'm wrong.  I
8         asked you if he had any psychiatric or emotional history and you
9         said words to the effect of - these are my words, nothing official.
10        You didn't use that word.  But do you think he has psychiatric or
11        emotional problems?
12
13   WA:  I do now.
14
15   SP:  What do you think his problems are?
16
17   WA:  I don't - I'm not qualified to say, but there's something going on.
18
19   SP:  Like what?
20
21   WA:  I don't know.  I'm not - I - I don't know.
22
23   SP:  Well just - just - I'm not asking you to be a psychiatrist or a
24        psychologist, I'm just asking just as a lay person, what do you see?
25        What do you - what makes you think there's a problem?
26
27   WA:  I guess I would say because of how he handles situations and his -
28        either how he - just how he handles problems.
29
30   SP:  Like give me an example.
31
32   WA:  I don't - I can't think of - okay, so earlier I talked about religion and
33        how if you don't have food to feed your family, I know now that you
34        don't just sit there and pray and expect God to bring it to you.  And

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 115

1    yet, that's the belief.  So somebody who has chosen to live a life
2    that way and have children and live that way, something's wrong.
3
4    SP:  Okay.  What would you - how would -
5
6    WA:  I can see - like I was raised in it so I get it, but he wasn't raised in
7    it.  He chose to adopt that belief as an adult.
8
9    SP:  How - how would - how would you - you were - were you like the
10   peace keeper?
11
12   WA:  Yes.
13
14   SP:  The - in the family between Alejo and your mom?
15
16   WA:  Yes.
17
18   SP:  And how would you - how would you -
19
20   WA:  Even - even as an adult they would bring their issues to me and
21   instead of talking to each other about it, it was brought to me and
22   so I would - and not even for advice but just to share in their - their
23   - take their side.
24
25   SP:  I see.
26
27   WA:  Yeah, it was -
28
29   SP:  Okay.  I tell you what, it's - it's 11:10, and there's lunch waiting out
30   there for you.  So what I'm going to do is this, is I'm going to stop
31   this equipment.  When you're - I'm assuming they want you to eat
32   out there, is that it?  When you're ready to come back in, let me
33   know, knock on the door, take your time, and I'll start the
34   equipment back up.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 116

1  WA:  Okay.
2
3  SP:  Does that sound okay?
4
5  WA:  Okay.
6
7  SP:  So it's - I'm just going to mark the time.  It's 11:10.  And once you
8       walk out of here I'm going to shut this off.
9
10 WA:  Okay.
11
12 SP:  All right?
13
14 WA:  Okay.
15
16 SP:  And then like I said just knock on the - knock on the door when
17      you're ready to come back in.
18
19 WA:  Okay.
20
21 [Break]
22
23 SP:  Okay, the time - okay, the time is 11:32, and Ms. Andriano is back
24      from lunch.  Ms. Andriano, you would agree that - that during the
25      break other than me asking you if you were ready to come back in
26      and you telling me that you were waiting for some water, that we
27      didn't have any conversation, correct?
28
29 WA:  Correct.
30
31 SP:  Okay.  All right.  So you were talking about - and you have - you
32      have a cup of water, right?
33
34 WA:  Yes.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 117

1   SP:  Okay.  We were talking about the relationship with your stepdad, do
2        you remember?
3
4   WA:  Yes.
5
6   **ISSUE RE: CULPABILITY - PART I:**
7
8   SP:  Okay.  Do you in any way hold your stepdad accountable for your
9        current predicament?
10
11  WA:  No.
12
13  SP:  Do you in any way hold your stepdad's actions no matter how
14       potentially inappropriate they may have been, or allegedly how
         inappropriate they may have been, for the actions that resulted in
16       your arrest?
17
18  WA:  No.  It's not for me to hold anybody accountable but myself.  I
19       really believe that every person, everybody is who they are.  They
20       make the decisions that they make because they feel that that's the
21       right decision.
22
23  SP:  Okay.
24
25  WA:  However bad it may be or - or not healthy or not good for
26       somebody else, they - you know, you can't - I can't - I can't hold
27       anybody accountable for anything that's happened to me because
28       it's my life and I still am the one ultimately who chooses.
29
30  SP:  Okay.  So with - with - with that - having - having now said that,
31       earlier when we were - we were talking, you were saying there's a -
32       again I'm paraphrasing here a little bit, but you essentially said
33       there was a whole bunch of things that came out afterward,
         meaning after your conviction, that you just wanted a jury to hear.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 118

1    WA:  Explanations.
2
3    SP:  Ex - explanations.  And if -
4
5    WA:  But not trying to put -
6
7    SP:  Wait, wait, wait, let me finish.  And - and explanations that you
8         wanted the jury to hear and if the jury hears them and they come
9         back the same way then so be it, correct?
10
11   WA:  Well of course.
12
13   SP:  All right.
14
15   WA:  That's the system, yeah.
16
17   SP:  Okay.  So what are the things - what are the things that came out
18        that you think are - are important by way of explanation that help
19        us better understand your actions that occurred on or around
20        October 8 of 2000?
21
22   WA:  Well, I know that during my trial, or it was presented to the jury
23        that I had this happy great childhood, which is not true.  That - I
24        don't know, it's so hard for me - I don't -
25
26   SP:  Well I tell you what -
27
28   WA:  Like I don't have any list of things, I don't know, I just -
29
30   **DEFENDANT'S DESCRIPTION OF HER CHILDHOOD:**
31
32   SP:  Well - well I - I would like a list, but if you can't come up with a list,
33        let - let me - let's talk about the childhood piece and maybe others
34        will come back to you or maybe some of my questions will - will jog
35        your memory.  Okay?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 119

1    WA:  Okay.
2
3    SP:  What - what - so how would you describe your childhood then?
4
5    WA:  Not appropriate, pretty stressful.  I think it was abusive.  I think
6         that I was not prepared to - or I was not raised in a way that would
7         really prepare me to go be a healthy adult, to make good decisions
8         on my own.  That - just - I don't - it - I think the job of parents is
9         to help a child become a responsible, wise, healthy adult and that
10        did not happen.
11
12   SP:  Okay.  So let's kind of break these down.  You said your childhood
13        was not appropriate.
14
15   WA:  Right.
16
17   SP:  What was not appropriate about your childhood?
18
19   WA:  Oh my goodness.  Well, I think the overriding the whole religious
20        aspect of it, which was a part of everyday decision making and life.
21        It was I think extreme.  It was not - it doesn't teach somebody how
22        to be a - a responsible adult.  You put everything off on God and
23        you don't make good decisions.  And my parents, like, they're
24        fighting all the time and - and this - all this sexual stuff with Alejo
25        and then my mom not being there emotionally and worrying about
26        adult things as a child.  I - it's - having to always be in the middle
27        of everything and -
28
29   SP:  Any other ways?
30
31   WA:  That's all I can think of off the top of my head.
32
33   SP:  So how was it pretty stressful?
34
35   WA:  I just said how.  I don't - I really -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 120

1    SP:   Well, you told me how it was pretty - you told me how it was not
2          appropriate.
3
4    WA:   Yeah, but stressful too.  I said about having to be a child and worry
5          about adult things, being put in the middle of my parents' fighting,
6          the sexualized nature, I mean that - that's very stressful.
7
8    SP:   Give me an example of the sexualized nature.
9
10   WA:   The - okay, so in everyday life it seems to me that I remember
11         everything - not everything, but a lot of just normal everyday
12         occurrences being made out to be something sexual.  And then - I
13         don't know how to explain it.
14
15   SP:   Can you give me an example?
16
17   WA:   I'm trying to.  So as an adult I could be talking to somebody and
18         maybe you'll say something that could refer to - I don't know, I
19         can't think of a specific example right now.  I'm sorry, I can't think
20         of details.  I don't know, just in - just in conversation, just every -
21         just there was always - if somebody was eating a lollipop or a
22         popsicle or something and - and how that would be funny and - and
23         now in - in a sexual way.  And I don't know how to tell you the
24         exact conversation because I can't repeat it, I don't recall, you
25         know.
26
27   SP:   Okay.
28
29   WA:   But I mean just - just everyday occurrences; playing basketball and
30         something about the ball referring to male parts.  I mean just - just
31         things -
32
33   SP:   Okay.  How was it abusive?
34

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 121

```
 1   WA:  Are you asking me that when an adult talks about sexual things
 2        with a child how is that abusive?
 3
 4   SP:  No.  What I'm saying to you is you said your childhood was "not
 5        appropriate," it was "pretty stressful," it was "abusive," and you
 6        were - it was such that you were not ready to be a "healthy adult,"
 7        "to make good decisions" on your own.  Those were essentially what
 8        you told me.
 9
10   WA:  Okay.
11
12   SP:  Okay.  So I'm asking you, I've moved on now, how was your - how
13        was your childhood abusive?
14
15   WA:  Okay.  Some of - when - when you're hungry, I think that's abusive
16        if you're not feeding your child.  If you are spanking them, I feel like
17        that's abusive.  If you're not there for them emotionally, I think that
18        that's emotionally abusive.  If you're not - I think if you're raising
19        them in a sexually whatever environment, that's abusive.  You
20        know.
21
22   SP:  Okay.  What - what about the child - hang on.  What - that was just
23        an overhead mic.  What about - what about the - what - as you look
24        back, and maybe you've already said this, what about your
25        childhood made you not ready to be a healthy adult, to make good
26        decisions on your own?
27
28   WA:  Well gosh, that's - I think a lot of the things that I've said before
29        would answer that question.  I mean it - it's - when - I don't know
30        how to give you more details.
31
32   SP:  Let - let's - let's -
33
34   WA:  What are you wanting from me?
35
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 122

1   SP:  Well -
2
3   WA:  I'm feeling like -
4
5   SP:  Well I just want the truth.  And -
6
7   WA:  Well, and I'm -
8
9   SP:  And - and if you can't answer the question then - then so be it.  But
10       let me - let me try - try asking this a little bit differently.  Let's
11       assume that everything you're telling me is - is correct, that your
12       childhood wasn't appropriate, that it was pretty stressful, that it was
13       abusive.   How does - how does that, all those things together
14       collectively explain the choices that you made on October 8, 2000,
15       as it relates to killing your husband?
16
17  WA:  Well, I don't know that that's for me to decide because I'm not
18       qualified to do - I don't - haven't had the schooling to do all that.
19       I can just answer questions and then somebody else makes that
20       decision.  Because I can just tell you how my childhood was, and I
21       know now as an adult I've had to really re-learn a lot of things.  I've
22       had to - I don't know, I feel like I've almost had to start from
23       scratch.
24
25  **ISSUE RE: DEFENDANT'S APPRECIATION OF WRONGFULNESS -**
26  **PART III:**
27
28  SP:  Well, do you think the abusive childhood is - is - using your words
29       as you describe it, do you think that didn't allow you to appreciate
30       the wrongfulness of your actions?
31
32  WA:  No.  No, I almost feel like there's this environment that it's okay to
33       do wrong things for right reasons.
34
35  SP:  Okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 123

1   WA: And -

3   SP: Do - do you think that you're not - the childhood you said that was
4       not appropriate somehow kept you from appreciating the
5       wrongfulness of your actions on October 8, 2000?

7   WA: I don't know. I just - I don't know. I - I - I understand what you're
8       asking. I - I guess I understand what you're asking me, but I don't
9       - it - that - I don't know. It is what it is. My childhood is what it is.
10      And if - I mean all the events that you go through, every day that
11      you've lived lead up to a point where you make decisions that you
12      make. And apparently I was not making very good decisions at all.
13      I mean so you're sitting here asking me, "Well, did your childhood
14      affect that?" Of course it did. That's how I was raised.

16  SP: Okay, well -

18  WA: I don't understand.

20  SP: Well, it's not - I'm not - I'm not quibbling with you about the effect.
21      What I'm - what I'm to understand is do you think it inhibited your
22      ability to appreciate wrongfulness?

24  WA: Well, I think everybody's perspective of life it affects. How you're
25      raised affects how you make decisions and how you respond to
26      thinks. Of course. I mean I don't - I don't know. I don't know
27      what you're - I - I know it was wrong·what I did. I'm sitting here
28      today, and I've said it to you probably 50 times. I don't understand
29      what more you're asking me.

31  SP: Okay. Well, here's -

33  WA: I'm feeling really defensive right now because I feel like you're
34      pushing me for something that I don't understand what you want
35      from me.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 124

1   SP:   Well, I don't think I'm - I'm pushing you at all.
2
3   WA:   Okay.
4
5   SP:   I think I'm - I'm just trying to understand -
6
7   WA:   Well you keep asking about this wrongfulness.  I know what - it was
8         wrong.  Why did I make the decisions I made?  I don't know.  I
9         don't know why.  All I can do is look at the life and this is how
10        circumstances were and that's why I made the decision I made, so -
11
12  **ISSUE RE: CULPABILITY - PART II:**
13
14  SP:   So do you - do you - this is what I'm trying to understand.  Do you
15        blame -
16
17  WA:   I don't blame anybody.
18
19  SP:   Well let me finish my question.  Do you blame the circumstances of
20        your childhood, of Alejo being this sexualized person, of the abuse
21        that you talked about, of the stressfulness, do you blame those -
22        those things that you're claiming took place in your childhood as -
23        as what drove you to kill your husband on October 8, 2000?
24
25  WA:   I've never said that and I don't blame any - anybody, anything.
26
27  SP:   So you accept responsibility?
28
29  WA:   But I think - I think that if you're going to sentence somebody to
30        die, I feel like everything should be explained, reality should be
31        presented as it is and as it was and then make a decision.
32
33  SP:   Okay.
34
35  //////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 125

1   WA: And that did not happen in my trial and so I just would like for
2        everything to be explained first and then -
3
4   SP:  I - I understand.  I totally -
5
6   WA: I mean -
7
8   SP:  No, no.  No, wait a minute.
9
10  WA: I don't blame.  I know that it was wrong.  I accept responsibility.
11
12  SP:  Okay.  Well, do you understand why I'm asking that question?
13
14  WA: I don't.  I don't.  I guess maybe that's why I'm like why - and you
15       keep asking it and so I'm not - I don't know what you want from
16       me.
17
18  SP:  Well, I - well I'm asking it because I've read reports from - from
19       other experts who have evaluated you who are - who are essentially
20       blaming a number of - of these things that happened in your
21       childhood on - on the actions that took place on October 8, 2000.
22       That's why I'm asking.  I'm just trying to understand it.  Have you
23       read those reports?
24
25  WA: No, I have not.
26
27  SP:  Okay.
28
29  WA: That's their job.  That's - they're a professional just like you are and
30       you evaluate somebody's childhood, somebody's whatever, how
31       they're raised, what their thinking is.  I don't know.  And then you
32       guys make that decision, I don't.  So you're asking me if I do.  I
33       don't.  That's not my place to.  I'm not a - I'm not a psychiatrist.
34       I'm not a psychologist.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 126

1   SP:  I'm -
2
3   WA:  I don't know.
4
5   SP:  I'm not - I'm not asking you as a psychiatrist or as a psychologist.
6
7   WA:  I just would like to be judged on the facts, that's all.
8
9   SP:  Well, what are the facts?
10
11  WA:  The facts are that the way - the way things were presented in trial
12       were not accurate.  And so let's try again.
13
14  SP:  Okay.  And the parts that weren't presented as accurate were your
15       childhood?  What else?
16
17  WA:  I don't - I don't have a list of them right now.  I - I know my
18       lawyers filed that with the court.  I don't - I can't think of what they
19       are right now.
20
21  **PERSONAL HISTORY - PART II:**
22
23  **Juvenile Behavioral History:**
24
25  SP:  Okay.  Speaking of childhood, were you - did you ever have any
26       trouble with the law as a juvenile?
27
28  WA:  No.
29
30  **Childhood Interests:**
31
32  SP:  Okay.  And - and what were your interests as a kid?
33
34  WA:  Probably music and swimming and I liked school, I liked to read.
35       That's about it.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 127

1   **Socioeconomic Upbringing:**
2
3   SP:   Okay.  And then it sounds like - you've mentioned this a few times,
4         I want to make sure I have it right.  It sounds like the - how would
5         you - it sounds like the socioeconomic upbringing you were raised
6         in was - what would you call, lower class?
7
8   WA:  Yes.
9
10  SP:   And - because at times it sounds like you were worried about when
11        you were going to get a meal?
12
13  WA:  Uh-huh.
14
15  SP:   True?
16
17  WA:  Yes.
18
19  SP:   What about shelter?
20
21  WA:  Yes.
22
23  SP:   Okay.
24
25  WA:  Up to a point.
26
27  **Geographical History:**
28
29  SP:   You were born in Groom, Texas?
30
31  WA:  Right.
32
33  SP:   And then how do you end up in Arizona?  How does -
34
35  ////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 128

1   WA:  I don't know.  I don't - I - I guess my mom, that was her decision.
2        I don't know why.
3
4   SP:  Okay.  How old were you when you moved here?
5
6   WA:  Well, I don't remember moving here so it had to be before - I don't
7        know.
8
9   SP:  Okay.  And then have you lived here your whole life?
10
11  WA:  No.
12
13  SP:  Okay.  Where - where else have you lived?
14
15  WA:  In California.
16
17  SP:  Okay.  And where did you -
18
19  WA:  Well, we lived in vehicles in California -
20
21  SP:  Right.
22
23  WA:  And drove around all over the place.  So -
24
25  SP:  Okay, did -
26
27  WA:  I don't really know where.
28
29  SP:  Did you ever have a permanent - set up a permanent residence
30       anywhere in California?
31
32  WA:  No, we lived in vehicles.
33
34  SP:  Okay.  And this is while you were doing the church work?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 129

1    WA:  My parents were, yeah.
2
3    **EDUCATIONAL HISTORY:**
4
5    SP:  Your parents were. So - okay. So that actually gets me to the next
6         question that - and I think I know a portion of the answer to this,
7         but I - I didn't fully appreciate it. Talk to me about your schooling.
8         You end up graduating high school, correct?
9
10   WA:  Yes.
11
12   SP:  From where?
13
14   WA:  Harvest Christian Academy. It was the church school.
15
16   SP:  And where was that?
17
18   WA:  In Casa Grande.
19
20   SP:  Okay. And I read though - I thought I read that you were home
21         schooled?
22
23   WA:  I was.
24
25   SP:  For what - from when to when?
26
27   WA:  Maybe like what would've been normally first grade up until I was -
28         gosh, I don't know if I was 10 or 11 or so.
29
30   SP:  Okay. And then who did the home schooling?
31
32   WA:  My mom did.
33
34   SP:  Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 130

1    WA:  I think.

2

3    SP:  Did - did - but -

4

5    WA:  So let me say - let me finish answering this.  My mom I know has
6          told me that she did the home schooling while we were living in
7          these vehicles.  I don't really remember any structured learning or
8          anything.  So I don't - I can't say to you that I know my mother
9          schooled me.

10

11   SP:  Okay.  But - but at some point the home schooling stops and -

12

13   WA:  Uh-huh.

14

15   SP:  You end up in like -

16

17   WA:  In the church school.

18

19   SP:  At the - it's church academy - I'm - I'm missing a word.

20

21   WA:  Right.  Harvest Christian Academy.

22

23   SP:  Bright - Bright Harvest?

24

25   WA:  Huh?

26

27   SP:  What's it called?

28

29   WA:  Just Harvest Christian Academy.

30

31   SP:  Oh.  Harvest Christian Academy.  And how many kids were in your
32         graduating class?

33

34   WA:  I was the only one.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 131

1    SP:   Okay.
2
3    WA:   Yeah.
4
5    SP:   How many kids went to the school?
6
7    WA:   I think the numbers fluctuated according to church attendance.  And
8          so sometimes there were between kindergarten and high school
9          there might - I think the highest number I ever remember was
10         about 60 children.  But then sometimes it would drop to 20.
11
12   SP:   And how many were like in your grade?
13
14   WA:   Well, I was the only one in my grade because I -
15
16   SP:   Well - right.  You said you were the only one that graduated, but
17         how - were there - was it - it wasn't a good question.  How many -
18         were there different times when there was more than just you in
19         your grade?
20
21   WA:   No.  There were a couple who were ahead of me so the entire high
22         school would've been in one room.  And in - within the room was
23         about anywhere from 8 to 12 people.
24
25   SP:   Got it.
26
27   WA:   And then we each - like the year after me where two people
28         graduated.
29
30   SP:   Was there like sports or extracurricular activities?
31
32   WA:   I was - they did have a track team and a swim team and I was part
33         of the swim team.
34
35   SP:   And what did you swim?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 132

 1    WA: Freestyle, long distance.
 2
 3    SP:  Okay.  Did you have any schooling after high school?
 4
 5    WA: Yes.  I went to the community college there a little bit.
 6
 7    SP:  What's that?
 8
 9    WA: Well actually - actually during high school I went.
10
11    SP:  Is that Central Arizona Community College?
12
13    WA: Yes.
14
15    SP:  Okay.  And what did -
16
17    WA: And then - I don't even remember what classes I took there, but I
18         took some classes there and then - then I ended up going to Mexico
19         on a - like a missionary trip.  So I did that.  And then it wasn't until
20         I came back and had a full time job that I started taking some
21         University of Phoenix classes at night.
22
23    SP:  So do you - do you have a college degree?
24
25    WA: I do not.
26
27    SP:  How much col - how many college credits do you think you have?
28
29    WA: Well, I remember - it's hard to say because the University of
30         Phoenix works a little bit differently, but I was signed up for one of
31         their programs and I know that I had like a year left of - with them
32         and I could've had my Bachelor in something, and I can't remember
33         what it was, but -
34
35    ////////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 133

1   SP:  Do you remember what you were taking up, what you were
2        studying?
3
4   WA:  It was some business classes, and I don't remember the official title
5        of the degree.
6
7   SP:  Okay.  Do you have any vocational educational training?
8
9   WA:  No.
10
11  SP:  Okay.
12
13  WA:  Well, I took real estate classes.  I don't know if that counts.
14
15  SP:  Did - did you get a real estate license?
16
17  WA:  No.  I took all the classes and then I did not go take the test.
18
19  SP:  How come you didn't do - how come that happened?
20
21  WA:  Life interfered.
22
23  SP:  How?
24
25  WA:  It was right around the time that Ashlee was being born and we had
26       found out that my husband had cancer and not just benign tumors.
27
28  SP:  I see.  So did you grow up in Casa Grande?
29
30  WA:  I would say yes, from the time of like 10-11.
31
32  SP:  To - to when?
33
34  WA:  Until - until after my marriage.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 134

1    SP:  Okay.  And - and help me - I - I've heard people say Casa Grande
2            and Casa Grande.  What - what's the correct -
3

4    WA:  I don't know what the correct - I mean - oh, I guess the correct is
5            Casa Grande, but everybody just says Casa Grande.
6

7    SP:  Okay.  All right.  Do you - did you prior to your arrest own any
8            weapons?
9

10   WA:  No.
11

12   SP:  Were there guns in the house?
13

14   WA:  Yes.
15

16   SP:  What - what kind of - what kind of firearms were in the house?
17

18   WA:  I don't know, but Joe had a gun collections.
19

20   SP:  Did you ever - did you ever fire any of them?
21

22   WA:  I don't think - I think I would go with him, but I - no, I wasn't
23         interested in firing them.
24

25   SP:  Did you ever discharge a firearm?
26

27   WA:  Gosh.  I can't say for certain that I've never done it once or twice,
28         but I don't really remember.
29

30   **MEDICAL HISTORY PRIOR TO OCTOBER 8, 2000:**
31

32   SP:  Okay.  Before - before October 8, 2000, what types of medical
33         problems, if any, did you have?
34

35   WA:  None that I know of.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 135

1   SP:  Were you ever in the hospital overnight for anything?
2
3   WA:  Just to have my babies.
4
5   SP:  Were you ever - were they c-section or?
6
7   WA:  No.
8
9   SP:  Vaginal delivery?
10
11  WA:  Uh-huh.
12
13  SP:  Yes?
14
15  WA:  Yes.
16
17  SP:  Did you ever have any broken bones?
18
19  WA:  No.
20
21  SP:  Any stitches?
22
23  WA:  I don't think so, no.
24
25  SP:  Did you ever contract a sexually transmitted disease?
26
27  WA:  No.
28
29  SP:  Okay.  And you said you don't - you were never hospitalized for any
30       head injury or any head trauma?
31
32  WA:  No.
33
34  SP:  And you don't recall ever being - losing consciousness I believe,
35       correct?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 136

1   WA: Not that I know of.
2
3   **MEDICAL HISTORY SUBSEQUENT TO OCTOBER 8, 2000:**
4
5   SP:  What about since your arrest, since October 8, 2000, have you
6        encountered any medical problems?
7
8   WA: I don't think so.
9
10  SP:  Okay.  Have you been diagnosed with any medical conditions?
11
12  WA: Does that include the psychia -
13
14  SP:  No.
15
16  WA: Or the whatever?
17
18  SP:  But I'm - I'm glad you asked.  I'm glad you asked me.  No, other
19        than psychiatric.
20
21  WA: No.
22
23  **SUBSTANCE USE HISTORY:**
24
25  SP:  Okay.  You mentioned that sometimes - first of all you mentioned
26        two things earlier.  I think one was that you didn't do illegal or illicit
27        drugs, correct?
28
29  WA: Correct.
30
31  SP:  Did you ever smoke marijuana?
32
33  WA: No.
34
35  SP:  Used LSD?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 137

1    WA:  No.
2
3    SP:  PCP?
4
5    WA:  No.
6
7    SP:  Crystal meth?
8
9    WA:  No.
10
11   SP:  What about since you've been here, have you used -
12
13   WA:  No.
14
15   SP:  Well let me finish -
16
17   WA:  I don't - absolutely not.
18
19   SP:  Okay.  So let me just finish the question so that it's clear.  You're
20        saying that since you've been incarcerated you have not used any
21        illicit drugs?
22
23   WA:  Never.
24
25   SP:  Correct?
26
27   WA:  Correct.
28
29   SP:  Okay.  And then what about - now alcohol it sounds like you've
30        drank in the past?
31
32   WA:  Yes.
33
34   SP:  Okay.  What's your drink of choice?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 138

1    WA:  I would just - wine and wine coolers, that - anything fruity.
2
3    SP:  Did you used to drink to intoxication?
4
5    WA:  Yes, I would.
6
7    SP:  Did anyone ever ask you to cut down on your drinking?
8
9    WA:  No.
10
11   SP:  Did any - you ever wake up somewhere and not know how you got
12         there as a result of your drinking?
13
14   WA:  No.  Thankfully I always had somebody around me who looked out
15         for me.
16
17   SP:  Did anyone ever ask you to cut down on your drinking?
18
19   WA:  No, sir.
20
21   SP:  Did you ever drink in the morning -
22
23   WA:  No.
24
25   SP:  To take the edge off from the night before?
26
27   WA:  No.
28
29   SP:  Did you used to drink alone?
30
31   WA:  I have, yes.
32
33   /////////////////////////////////////////////////////////////////
34   /////////////////////////////////////////////////////////////////
35   /////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 139

## PSYCHIATRIC HISTORY SUBSEQUENT TO OCTOBER 8, 2000 - PART II:

SP:  Okay.  We talked about your psychiatric history before October 8, 2000.  Since you've been - since your arrest, since October 8, 2000, I asked you this earlier but I - I want to kind of come back to it.  What is it that - but - what is it that you understand your psychiatric condition or conditions to be?  One thing you said earlier was bipolar.

WA:  Right.

SP:  Do you believe you have any other psychiatric conditions?

WA:  Do I believe I do?

SP:  Yes.

WA:  Well, I can't diagnose myself.  So I'm not sure what you - I mean I've been told that I do.

SP:  Fair enough.  I thank you for the clarification.

WA:  Yeah, I - I -

SP:  What - what have - what have you been told?

WA:  And I don't remember what they were, I just remember there was a list of some things.

SP:  But as you sit here today you don't know what your other conditions are?

WA:  No, I've never tried to memorize what they are.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 140

1    SP:  Okay.
2
3    WA:  I don't know.
4
5    SP:  I think something I've seen is that some people say you have
6         Posttraumatic Stress Disorder?
7
8    WA:  Oh, I have heard that, yes.
9
10   SP:  What is - what is that?  What do you know that condition to be?
11
12   WA:  Well, I only - I know from - from hearing about it with the military
13        people, that they go through something traumatic and then they
14        have trauma from it.
15
16   SP:  And do you believe you have that condition?
17
18   WA:  I don't - I would - I don't know.
19
20   SP:  But you've been told you do?
21
22   WA:  Yes, I have been told that.
23
24   SP:  What - what do you believe the trauma was that you went through?
25
26   WA:  I don't know that either.
27
28   SP:  What do you believe the diagnosis is based on?
29
30   WA:  I don't - I've never asked, so I don't know.
31
32   SP:  Okay.  Now, earlier you talked about how before October 8, 2000,
33        there were times when you felt like you just needed to sleep and
34        I'm going to use this word, kind of almost to recharge yourself.  You
35        didn't say that word, but I - I - I'm using it.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 141

1   WA: Uh-huh.
2
3   SP:  Okay?  Remember?
4
5   WA: Right.
6
7   SP:  And you would have someone else take the kids to school or -
8
9   WA: No, they -
10
11  SP:  Or not to school.  You would have someone else watch the kids.
12
13  WA: My mother, yes.
14
15  SP:  Your - yeah, right.  So - so - and since you've been here, and when
16       I say "here" in prison, I think what I heard you tell me is that you
17       now notice that if you find yourself - if your mood kind of cycling
18       down, that you do some self-help types of things whether it's
19       meditation or self-healing books or what have you.  Do I have that
20       correct?
21
22  WA: That's correct.
23
24  SP:  Okay.   What about just - just the opposite since you've been
25       incarcerated where your mood is elevated, where you feel like you
26       can go a couple days without sleep and your mind is just kind of
27       working over time and your speech might be kind of rapid or fast?
28
29  WA: I haven't had too many of those I don't think.
30
31  SP:  Have you had any of those?
32
33  WA: I always have - okay, so this is - when I'm having periods of - of
34       like anxiety that doesn't have a basis in reality, it's not attached to
35       something, like I hardly ever go a whole night - sleeping the whole

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 142

1        night.  I wake up with panic attacks and don't even know why, like
2        what - why am I feeling this way with my heart racing and - and
3        then I can't go back to sleep and then I'm agitated and I'm pacing
4        the floor and all that.  So -
5

6  SP:  So you have that now?
7

8  WA:  I do.
9

10  SP:  So you have panic attacks?
11

12  WA:  I do.
13

14  SP:  But you didn't have them before?
15

16  WA:  I did have them before and I remember Joe's doctor had given me
17        something to help me with that, but I don't remember what it was.
18        So I was taking some little medication that would help me with that.
19

20  SP:  Okay.  So I want to make sure I'm hearing you right.  Because
21        earlier I could've sworn I asked you about panic attacks and you're
22        saying that prior to October 8, 2000, you did have episodes of
23        panic?
24

25  WA:  Uh-huh.
26

27  SP:  Correct?
28

29  WA:  Yes, sir.
30

31  SP:  Okay.  And what were the symptoms that you experienced?
32

33  WA:  Just that - where my mind's racing and my heart's racing and I
34        can't sleep and I pace the floor and -
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 143

1   SP:  So you had that before?
2
3   WA: Yes, I have.
4
5   SP:  And you've had it since?
6
7   WA: Yes.
8
9   SP:  While you've been incarcerated?
10
11  WA: Yes.
12
13  SP:  Okay.  When was the last time you had that?
14
15  WA: Just this weekend.  I have it frequently.
16
17  SP:  When was the last time before that?
18
19  WA: Well I don't keep a - a thing, but I would say every week I have
20      this.
21
22  SP:  Okay.
23
24  WA: It's really hard when you're incarcerated, the concept of time, it all
25      meshes together.
26
27  SP:  Right.
28
29  WA: So when you're asking me for time, I have a hard time telling you.
30
31  **TYPICAL DAY:**
32
33  SP:  Okay.  What is a typical day like for you right now?
34
35  ////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 144

1  WA:  Well, I'm in my room.  It's a little room.  And I - I live around very
2       loud people and so I try to sleep when I can sleep and I read as
3       much as I can.  I eat whenever I get hungry.  I clean my - I like to
4       clean my room because that gives me something to do, so I
5       frequently scrub down the walls and the floor and hand wash
6       laundry and -
7
8  SP:  What - what time do you typically get up?
9
10 WA:  Probably - well we have to be out of our beds by 7:30 with our bed
11      made, so by 7:30 I'm -
12
13 SP:  And what time do you get to bed?
14
15 WA:  I don't have a regular schedule so it's just - I know that I sleep a
16      little bit in the early evening and then I tend to wake up for a while
17      and then it - I usually have to keep my TV on all night long so I
18      don't - it's almost as if the noise of the TV distracts me so then I
19      can try to fall back asleep.  But I - it's very erratic.
20
21 **ISSUE RE: NIGHTMARES AND SLEEP DISTURBANCE PRIOR AND**
22      **SUBSEQUENT TO OCTOBER 8, 2000:**
23
24 SP:  Do you have nightmares?
25
26 WA:  I did, and that's when I learned to just keep the TV on and that
27      would help it.
28
29 SP:  Well, what kind of nightmares?  What were you having nightmares
30      of?
31
32 WA:  Like I remember just - probably the biggest theme is like I always
33      feel like somebody was trying to attack me and sometimes I would
34      have one where I'd feel like somebody was trying to rape me.  Just
35      weird -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 145

1    SP:  Are those -
2
3    WA:  Waking up just afraid.
4
5    SP:  And those are nightmares since you've been incarcerated?
6
7    WA:  I feel like I've had them always, but I try to - when I was out there
8         I had the option of working and keeping myself busy.  And so when
9         I would finally go to bed I would be exhausted and I would have -
10        then I could sleep.  But in here I don't have anything to exhaust
11        me.
12
13   SP:  So are the nightmares the same then that you had -
14
15   WA:  Yeah, I've always had pretty much the same theme.  I wouldn't tell
16        you - I can't really remember that, you know, the specifics of the
17        nightmare or dreams but I just know waking up feeling really afraid
18        like - of whatever was -
19
20   SP:  Okay.  So - so the nightmares that you're having since you've been
21        arrested are the same as the nightmare - since you've been
22        incarcerated are the same as the nightmares you've had before you
23        were incarcerated?
24
25   WA:  I - yes, I would say so.
26
27   SP:  Thematically.
28
29   WA:  Thematic - yes.
30
31   SP:  And the themes are again what?
32
33   WA:  I've had like two - two that I can really latch onto that happen more
34        regularly is I - this one where I always feel - and I don't know who
35        it is or what it is but I wake up afraid as if somebody was just

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 146

1        getting ready to attack me.  And this other one I've had is more of
2        a - in a sexual nature where I feel like somebody's trying to grope
3        me and touch me or rape me or something like that.
4
5    SP:  I see.
6
7    WA:  And then I wake up out of it.
8
9    SP:  So now it sounds like you have a problem falling asleep, correct?
10
11   WA:  Sometimes.  And unless I'm - unless I'm in this really depressed
12       mood and then it seems like I can just go to sleep and then sleep
13       for a really long time.
14
15   SP:  What a "really long time"?
16
17   WA:  Without even getting up and having to get water or anything for
18       almost - well a little bit less than 24 hours, but still probably a full
19       cycle, unless officers wake me up.
20
21   SP:  Well how - how can you sleep a full cycle if your bed has to be
22       made at 7:30?
23
24   WA:  The officers will wake me up and then I tell them I'm not feeling
25       well and since they know this is how I am they'll leave me alone
26       and let me -
27
28   SP:  Okay.  And then - but for those times when you kind of catch up on
29       the sleep, so to speak, it sounds like there's a problem then falling
30       asleep -
31
32   WA:  Yeah.
33
34   SP:  Staying asleep, and then do you wake up earlier than you wish if
35       you're able to fall asleep?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 147

1   WA:  Yes.
2
3   SP:  And then what about before -
4
5   WA:  My mind is busy and so then my - it seems like my busy mind
6        wakes me up.
7
8   SP:  What about before your - before your arrest?  What was your sleep
9        - and it sounds like you had the nightmares?
10
11  WA:  Yeah, I had - and - and like I - well, out - I remember just being out
12       there, being - by the time it was night time to go to sleep, being so
13       exhausted that I could lay down and go to sleep.
14
15  SP:  And would you wake up feeling rested?
16
17  WA:  No.
18
19  SP:  Would you wake up in the middle of the night?
20
21  WA:  I don't remember really waking up in the middle of the night, but I
22       always felt tired as if I did not sleep well.
23
24  SP:  Did you wake up earlier in the morning than you wished?
25
26  WA:  I don't remember.
27
28  **MILITARY HISTORY:**
29
30  SP:  Okay.  You - you have not been in the military, correct?
31
32  WA:  No.
33
34
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 148

1    **<u>SOURCE OF INCOME:</u>**
2
3    SP:  What was your source of income before October 8, 2000?
4
5    WA:  I was working.
6
7    SP:  Doing what?
8
9    WA:  I was a property manager at an apartment complex.
10
11   SP:  And what was the name of that complex?
12
13   WA:  San Re - Rivas - Rivas.
14
15   SP:  San Rivas?
16
17   WA:  I think so, yeah.
18
19   SP:  And how long had you been working there?
20
21   WA:  Okay, so I don't know - it was under two years.  I'll just say that.
22
23   SP:  How much money were you making?
24
25   WA:  I don't remember.
26
27   SP:  Were you getting paid hourly or was it like a salary?
28
29   WA:  No, that - I think that was a salaried position.
30
31   SP:  And you don't remember how much?
32
33   WA:  I don't.
34
35   /////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 149

1    **HABITS:**
2
3    SP:  Are you allowed to get caffeinated beverages here?  Like coffee?
4
5    WA:  Yes.
6
7    SP:  Coca-Cola?
8
9    WA:  No, they don't sell that.  They -
10
11   SP:  Pepsi?
12
13   WA:  They don't sell that.
14
15   SP:  Do you - do you -
16
17   WA:  I don't know.  I don't buy soda, so I don't know.
18
19   SP:  Do you drink coffee?
20
21   WA:  One cup a day, yes.
22
23   SP:  Okay.  Do you smoke?
24
25   WA:  No.
26
27   SP:  I mean did you used to smoke?
28
29   WA:  No.
30
31   **MEDICATIONS TAKEN PRIOR TO THE INSTANT EVALUATION:**
32
33   SP:  Did you take your medicine today before visiting with me, the
34        BuSpar®?
35

P-App. 004281

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 150

1  WA:  No.  I get it - they give me my meds once a day and it's in the early
2        evening every day.
3
4  SP:  Okay.  And then - and then I think earlier I was asking you about
5        allergies.  I'm losing the thread.  Maybe I didn't ask.  Are you
6        allergic to any medication?
7
8  WA:  Oh, you did ask me that.
9
10  SP:  Yeah, that's what I thought.  You were allergic - it came back to
11        me.
12
13  WA:  I don't - right.
14
15  SP:  You were aller -
16
17  WA:  I -
18
19  SP:  There was something they gave you that you were allergic to.
20
21  WA:  I know that there are some psych meds that they tried to give me
22        that really had the opposite affect on me than what it was supposed
23        to do.
24
25  SP:  Got it.  It just came - just came back to me.
26
27  WA:  But I don't know if it's allergic or what you want to call it.
28
29  SP:  Got it.  But you're not - to your knowledge you're not - no one's told
30        you you're allergic to a medication?
31
32  WA:  No.
33
34  /////////////////////////////////////////////////////////////////////////////
35  /////////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 151

1   **ISSUE RE: WHAT MS. ANDRIANO HOPES TO GAIN FROM HER**
2       **APPEAL:**
3
4   SP:   Okay.  What - what - you have this - this appeal going on.  What -
5           what do you hope to gain from it?  What's the end game for you?
6
7   WA:   I actually don't - I haven't put an expectation on it so I don't have
8           a hope of an end game.  So I -
9
10  SP:   If you were a king, what would you -
11
12  WA:   If what?
13
14  SP:   Or queen.  If you were a queen and you could wave -
15
16  WA:   But I actually - I don't - my mind doesn't - I don't actually think
17          about that.  I just am trying to - I think more than anything I would
18          just like the whole story to be out there and even if the end results
19          don't change, that's not what's in my mind.  It's more for Nicholas
20          and Ashlee to know everything.
21
22  SP:   I see.
23
24  WA:   So that way when they grow up they can just see or read the whole
25          story and have all the facts.
26
27  SP:   Now, you - while we were talking earlier about the offense and -
28          and that was upsetting, that seemed stressful for you to kind of be
29          going back over some of that information.
30
31  WA:   Yes.  I don't like - it - yeah.
32
33  SP:   True?
34
35  WA:   Very true.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 152

1
2
3    **ISSUE RE: STRESS ASSOCIATED WITH APPEAL:**
4
5    SP:  How stressful has this process been itself, the actual appeal
6         process?
7
8    WA:  It's very - I don't even like to participate in it.
9
10   SP:  Okay.  And - and why is that?
11
12   WA:  Because all the things that I have to talk about are painful and I -
13        it's - I don't enjoy doing this.
14
15   **EMPLOYMENT HISTORY:**
16
17   SP:  Okay.  And again, it's not my intent to upset you here but there's
18        certain questions that I just have to ask you.  So you talked about
19        that prior to the offense you were working at a - as a property
20        manager at an apartment complex, correct?
21
22   WA:  Uh-huh, yes sir.
23
24   SP:  Is that the same complex you were living at?
25
26   WA:  Yes.
27
28   SP:  Okay.  And then let - let's work backwards.  Let's start - what's the
29        first job you ever had going back to when you were a kid?
30
31   WA:  Oh, I grew up working.  I didn't have like an official job, but we -
32        families in the church would always hire me to come do odd and
33        end jobs for them and babysitting and that sort of thing.  And my
34        first real job was - I think I worked for a man that was in our church
35        and he had a business and I worked there for a little while.

     SP:  What - what kind of work was it that you did?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 153

1    WA: Secretarial.
2
3    SP:  Okay.  And then what was the next job you had?
4
5    WA: As a leasing agent at an apartment.
6
7    SP:  And how old were you when you did that job?
8
9    WA: 21.
10
11   SP:  Okay.  And what was the name of that complex?
12
13   WA: That one was Quail Gardens.
14
15   SP:  Okay.  And how long did you work there?
16
17   WA: I don't remember the length of time.
18
19   SP:  Okay.  And then what was the next job you had?
20
21   WA: The hospital.
22
23   SP:  And that's where you did - you worked where in the hospital?
24
25   WA: In the accounting department.
26
27   SP:  And that's where you - the issue came up with the money being
28        taken?
29
30   WA: Yes, sir.
31
32   SP:  And what was the name of that hospital again?
33
34   WA: The Casa Grande Hospital.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 154

1   SP:  Okay.  And how - and then so you were let go?
2
3   WA: Yes, sir.
4
5   SP:  How long did you work there again?  I'm sorry.
6
7   WA: I don't remember.
8
9   SP:  Okay.  And then what was the next job you had?
10
11  WA: For another apartment place at Courtyard Apartments.
12
13  SP:  Courtyard Apartments.  And how long did you work there?
14
15  WA: I don't remember that either.  I -
16
17  SP:  Okay.  And then what was the next job you had?
18
19  WA: Then to San Rivas.
20
21  SP:  Okay.  So there's - there's San Rivas, there's the hospital, and it
22       sounds like there's two other apartment complex jobs.  Am I right?
23
24  WA: I think so.
25
26  SP:  And - so San Rivas, the hospital, so there's four - do I have it right
27       that there's four jobs?
28
29  WA: Oh, I don't know.  I'm -
30
31  SP:  Four jobs of - of any length as well?
32
33  WA: Sure.
34
35  SP:  You would agree?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 155

1    WA: Yes.  I agree.
2
3    SP: And am I right in that two out of the four while you were working
4         there, there were problems with money being taken or issues
5         regarding your management of the money?
6
7    WA: Yes, sir.
8
9    SP: Was - was San Rivas one of them?  No?
10
11   WA: No.  It was Courtyard and then the hospital.
12
13   SP: Okay.  What kind of employee do you think you were?
14
15   WA: Oh gosh.  I don't know.  That's hard to label.
16
17   SP: Okay.  Well, if you were to like give a letter grade?  "A," "B," "C,"
18        "D" or "F"?
19
20   WA: Well, as I am today I would look at it and give myself an "F"
21        because I, you know, I didn't - was not - I didn't keep my
22        employment and I actually hurt my employers.
23
24   SP: So letter grade for San Rivas would be?
25
26   WA: I would just say for all of it because it just - I don't know.
27
28   SP: What did you do at San Rivas?
29
30   WA: What do you mean?
31
32   SP: Well, why would you flunk yourself at San Rivas?
33
34   WA: Oh gosh, I couldn't get the place filled up with people the way they
35        wanted.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 156

1   SP:  Were you giving people free rooms as well?
2
3   WA:  Well, I did give some concessions that I was not allowed to give,
4        yes.
5
6   SP:  Why did you do that?
7
8   WA:  I was trying to help them.
9
10  SP:  Why?
11
12  WA:  Because they were in really bad situations and I felt bad for them.
13        But it wasn't my place and I did it anyway.
14

**MS. ANDRIANO'S DESCRIPTION OF HERSELF IN THE 30 DAYS PRIOR TO THE INSTANT OFFENSE:**

17
18  SP:  How do you - how do you - how would you describe yourself in the -
19        in the month prior to the offense?  In other words, how would you
20        describe yourself between September 8, 2000, and October 8,
21        2000?
22
23  WA:  Very, very, very stressed out.  Just - I - I don't - just - I - I couldn't
24        get a grip on anything.  It was very stressful.  Everything was very
25        stressful.
26
27  SP:  What about your - your constitutional makeup, the person - your
28        being, who you are, would you consider yourself at that time an
29        honest person?
30
31  WA:  Oh I don't know.  I - I - so sitting here today and reviewing my
32        behavior from back then would I call myself honest?  No.
33
34  SP:  Trustworthy?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 157

1   WA: No.
2
3   SP:  Reliable?
4
5   WA: No.
6
7   SP:  How would your friends describe you during that time period?
8
9   WA: I don't know.  You would have to ask them.
10
11  SP:  How do you think they would describe you?
12
13  WA: I don't know because you have different opinions.  You know, some
14       people understood what was going on, some people didn't, and I
15       don't know what - you'd have to ask them.
16
17  **MS. ANDRIANO'S PRESENT DAY DESCRIPTION OF HERSELF:**
18
19  SP:  How do you describe yourself now?
20
21  WA: I feel like I have a much better understanding and I've learned a lot
22       of things that help me make better decisions, so -
23
24  SP:  How have you learned these things?
25
26  WA: I've really done a lot of reading and studying and really trying to be
27       honest with myself.  Excuse me.  And try to figure out who I am as
28       a person and why I do what I do and why I made decisions that I
29       make.  And that's helped me just get better knowledge and - and
30       understanding about how to not make a wreck of my life the way I
31       did before.
32
33  SP:  So what have you learned about yourself that helps you understand
34       the financial issues that arose when you were working at the
35       hospital?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 158

1   WA: That it's really not okay - even if you have good intentions and
2        you're trying to help somebody else, it is not okay to do bad things
3        for right reasons. That's been a really big - and that I am - I am
4        not responsible for everybody that I'm around. It - it's - I take on
5        more than what I think that was healthy and so sometimes I - it's
6        not up to me to fix everything.
7
8   SP: What have you learned about yourself that helps you understand
9        the money situation that went down at - was it Courtyard?
10
11  WA: Right.
12
13  SP: What - how do you understand that?
14
15  WA: Just like what I said. It's not okay to do wrong things for the right
16       reasons.
17
18  **ISSUE RE: WHAT MS. ANDRIANO HAS LEARNED ABOUT HERSELF**
19  **AS IT RELATES TO HER ROLE IN THE INSTANT OFFENSE:**
20
21  SP: Okay. And then same question, what have you learned about
22       yourself as it relates to your behavior on October 8, 2000?
23
24  WA: That at that - in October of 2000, is - how do I explain this? I think
25       today that I know how to say "no." I know to have boundaries.
26       Back then I didn't. I was - I - I didn't want to reach out for help.
27       I didn't want to talk about problems. I didn't know how to. I
28       couldn't communicate. I didn't even really understand everything
29       that was going on. It was - it was - I don't know. There was a very
30       big lack of awareness of how to handle situations and - yeah.
31
32  SP: You almost make it sound like as an adult you were like emotionally
33       immature.
34
35  WA: Very much so.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 159

1   SP:  There was a - the door is -
2
3   WA:  Very much so.
4
5   SP:  You're saying "very much so."
6
7   WA:  Yes.  I can say that today just because of experiences that I've had
8        in the 13 years it's been.
9
10  SP:  Right.
11
12  WA:  I can look back then and say today I wouldn't make that decision
13       because now I know better.  I know how I work and how my mind
14       was and how I was trained to be and I wouldn't be - I just am - I
15       just am way different.
16
17  SP:  Do - do you - do you think being emotionally immature is a -
18       another explanation for what happened on October 8, 2000?
19
20  WA:  I think it could be a piece of it, sure.   Well, I don't know if
21       emotionally immature would be something I would call it.  I don't
22       know.  It's - I don't know, I don't feel comfortable with that label.
23
24  SP:  Okay.  Well, let me - let me ask you this question and see if - see
25       how this plays out in terms of if I can conceptualize this the way I
26       want.  If you were a model builder and you could reconstruct you,
27       what would you have changed about yourself prior to October 8,
28       2000?  If you could put different pieces in, what - what - what do
29       you think the big - the big changes would be?
30
31  WA:  That it's okay to be upset.  It's okay to have a backbone and it's
32       okay to ask people for help.  That it's okay to say "no."  And it's
33       okay that even if you love somebody, that you can't fix everything
34       for them.   That it's not okay to be dishonest or to take from

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 160

1         somebody else just to help somebody that you love.  There's just -
2         that - well that's a start.
3
4    SP:  Do - do - do - do you think that you were unaware of - of what
5         represented legal and illegal behavior?
6
7    WA: I don't think I ever stopped to - to actually analyze it and think
8         about it.  Like I was just really reacting to everything.
9
10   SP:  Okay.
11
12   WA: See, I've had 13 years alone in a room and it really - you have to
13        make friends with yourself and figure out who you are, otherwise
14        you lose your mind.  And so I've really had to get to know myself
15        whereas before I don't think I ever even thought about doing that
16        or had time.  I know my parents didn't raise me that way.  It was
17        always - and if something was wrong, I - it just - it was a complete
18        - I don't - I don't know.  I don't even think there was a lot of
19        thinking going on.
20
21   SP:  Okay.
22
23   WA: Because compared to who I know I am today, I've really had to go
24        through a lot of analysis and just understand how - how - who -
25        why do I do what I do?  Why did I make the decisions I made?  You
26        know?  Those are tough questions to answer.
27
28   SP:  You were 30 at the time of the offense, correct?
29
30   WA: Right.
31
32   ///////////////////////////////////////////////////////////////
33   ///////////////////////////////////////////////////////////////
34   ///////////////////////////////////////////////////////////////
35   ///////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 161

1    **<u>FAMILY HISTORY - PART II</u>:**
2
3    **<u>Siblings</u>:**
4
5    SP:   You - do you have any biological siblings?
6
7    WA:   I think that I have half, but not full.
8
9    SP:   From who?
10
11   WA:   My father.
12
13   SP:   From Skip?
14
15   WA:   Yeah.
16
17   SP:   So do you - do you know them?
18
19   WA:   No.  She died in a car wreck.
20
21   SP:   Okay.
22
23   WA:   So I know that I had a sister.
24
25   SP:   But do you have any memory of her?
26
27   WA:   No.
28
29   SP:   No.  Do you have mem - do you have any other siblings, step-
30         siblings, half siblings?
31
32   WA:   I had a - well I think there's some half, but I don't know.  I don't
33         know them.
34
35   SP:   But they - you don't know them?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 162

1   WA:  No.
2
3   SP:  Is the bottom line.
4
5   WA:  Right.  And then I know that my cousin was adopted by my parents
6        and was raised in my house.
7
8   SP:  Right.  I remember this.  Hang on a sec.  It's your cousin - tell me
9        who that was?
10
11  WA:  My mom's sister's child.
12
13  SP:  Your mom's sister's child.  Right.
14
15  WA:  And we adopted him.
16
17  SP:  And he was how old?
18
19  WA:  "We," my parents adopted him.
20
21  SP:  He was - he was how old?  What's his name?
22
23  WA:  Brandon.
24
25  SP:  What's his last name?
26
27  WA:  Ochoa.
28
29  SP:  And how old is Brandon now?
30
31  WA:  He's - let me think.  He's 14 years younger than I am.  Or no, 15
32        years younger than I am.  So he's 27.
33
34  SP:  And do you - do you remember being raised with him or not?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 163

1    WA: Yes.  I -

2

3    SP:  Yeah?

4

5    WA: I do.

6

7    SP:  And -

8

9    WA: Because I was already like 16 or something when we got him.

10

11   SP:  And why did they take him in?

12

13   WA: Because he was in the custody of CPS.

14

15   SP:  Because?

16

17   WA: He and his two other brothers were abandoned by his mother and
18       left in a home alone and CPS took them.

19

20   SP:  And what is he doing now?

21

22   WA: I don't know.

23

24   SP:  When was the last time you had any communication with him?

25

26   WA: It's - gosh, like it's been a while.   I haven't had regular
27       communication with him.

28

29   SP:  Has it been - have you had any communication since you've been
30       incarcerated?

31

32   WA: I have.

33

34   SP:  Okay.

35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 164

1    WA:  Brief.
2
3    SP:  So you don't know what he's doing with his life?
4
5    WA:  I don't.  I know where - I know he's in Tucson and I know that he's
6         not having a very good life right now.
7
8    SP:  Why?
9
10   WA:  I don't - well, he just - well, I don't know why but I just know that
11        he's - he's 27 and I know that he's unable to keep a job and he just
12        has a lot of issues going on.
13
14   SP:  What kind of issues?
15
16   WA:  Just with trying to be an adult.
17
18   SP:  So does he have a drug problem?
19
20   WA:  I don't know.
21
22   SP:  Psychiatric problem?
23
24   WA:  Yeah, I don't - I don't know because I'm not around him.
25
26   SP:  Okay.
27
28   WA:  I just know that he has - he's not -
29
30   **FAMILY PSYCHIATRIC HISTORY:**
31
32   SP:  Okay.  The - on your - your mom's side of the family, I think you
33        said your maternal aunt has some depression?
34
35   ////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 165

1   WA:  So I don't know what her clinical diagnosis was but I know that she
2        had a lot of problems.
3
4   SP:  Emotional problems?
5
6   WA:  Yeah.
7
8   SP:  What about on the -
9
10  WA:  I feel like she was hospitalized.  I know that she took a lot of psych
11       meds.  I don't really know what the details are though.
12
13  SP:  What about any other psychiatric issues in the immediate or
14       extended family, other than what we've already talked about?  Did
15       anyone like aunts, uncles, cousins, grandparents, did anyone else
16       have a history of first of all substance use that you know of?
17
18  WA:  I don't know.  I don't know.  You know, I don't really know.
19
20  SP:  Okay.  That's okay.
21
22  WA:  Yeah.
23
24  SP:  What about - what about psychiatric or emotional problems?
25
26  WA:  I know my cousin, which would be my aunt's daughter has problems
27       but I can't tell you specifics because I - I don't really know.
28
29  SP:  The - the same aunt that we already talked about?
30
31  WA:  Uh-huh.
32
33  SP:  Your mom's sister?
34
35  WA:  Uh-huh.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 166

1   SP:  That's a "yes," right?
2
3   WA:  Yes.  Her daughter I know has a bunch of psychiatric issues and her
4        son, but I can't tell you what they are.
5
6   SP:  You don't know what they are.  And then mom had some - some
7        issue too, am I right or no?
8
9   WA:  Well, I don't know - oh gosh, see, I don't know.  I just know that
10       she's taking something.
11
12  SP:  She's taking something.  Biological dad, Skip -
13
14  WA:  Right.
15
16  SP:  Had some emotional issues, correct?
17
18  WA:  Yeah, he did.
19
20  SP:  And then you have on your maternal aunt, and then your maternal
21       aunt's -
22
23  WA:  Children.
24
25  SP:  Children, a boy and a girl.
26
27  WA:  Yes.
28
29  SP:  Which is - okay.  Anyone else in the family have any emotional or
30       psychiatric -
31
32  WA:  So I don't know my father's family very well.
33
34  SP:  Right.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 167

1    WA:  But I've heard -
2
3    SP:  Right.
4
5    WA:  That a lot of them had a lot of psychiatric - or psychological issues
6         or whatever.
7
8    SP:  And I - and I think - I think what you're telling me resonates with
9         some - some stuff that I read.
10
11   WA:  I just don't remember the details.
12
13   SP:  Okay.  So did you - do you know if anyone has suicided?   Or
14        successfully complete - successfully took their life?
15
16   WA:  I don't know.
17
18   **FAMILY MEDICAL HISTORY:**
19
20   SP:  Okay.  What about med - medical history in the family?
21
22   WA:  Oh gosh.  I don't - gosh.
23
24   SP:  Well here - let me - let me try and - and I'm not looking to
25        overwhelm you so let me just try and break it down for you.  Do
26        you know anything about your biological father's parents?
27
28   WA:  I don't.
29
30   SP:  Okay.  What about your mom - are your mom's parents still alive?
31
32   WA:  No.  My grandma -
33
34   SP:  Yeah.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 168

1   WA: That I remember as my mom, she died of emphysema, I believe.
2
3   SP: Okay.
4
5   WA: And -
6
7   SP: So she must - was she a smoker?
8
9   WA: Yes.
10
11  SP: Okay.
12
13  WA: And my grandfather I think died of a heart attack.
14
15  SP: Okay.  Do you know about how old both of them were?
16
17  WA: Well -
18
19  SP: When they passed?
20
21  WA: I don't.  I know I was around 18 when my grandma passed away,
22      but I don't know how old she was.
23
24  SP: Okay.  What about in the extended family; cousins, other family
25      members, biological family members, is there - like some families
26      have a history for example of high blood pressure.
27
28  WA: Right.
29
30  SP: Some families have a history of cancer, diabetes, things of that
31      sort.
32
33  WA: And I probably should know this, but I actually don't.
34
35  SP: That's okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 169

1    WA:  I've - I -
2
3    SP:  That's all right.
4
5    WA:  I feel like I know maybe something about heart disease, but I - I
6         don't really know.
7
8    **RELATIONSHIP HISTORY:**
9
10   **Menarche:**
11
12   SP:  Okay.  Let's talk about your - your relationship history.  First of all,
13        how old were you when you started having your periods?
14
15   WA:  I don't know.
16
17   SP:  Okay.  Who educated you about that?
18
19   WA:  Well, probably more my dad.  I don't really remember talking about
20        it with my mom.
21
22   SP:  What did your dad tell you?
23
24   WA:  And I don't remember that either.
25
26   SP:  How old - how old were you when you started?
27
28   WA:  I don't know.
29
30   SP:  You don't know?  Okay.
31
32   WA:  Yeah, I just don't even know.
33
34   SP:  Are you still having your menstrual cycle?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 170

1    WA: Yes.

2

3    **Sexual Orientation:**

4

5    SP:  Okay.  What do you consider your sexual orientation?

6

7    WA: What does that mean?

8

9    SP:  Well, do you - are you exclusively with - your relationships been

10        exclusively with men, have you had sexual relations with women?

11

12   WA: Oh.

13

14   SP:  Do you consider yourself to like both men and women?

15

16   WA: Well, I don't know.  I think - well, I guess - I don't know, I've never

17        stopped to think about it.  Yeah, I don't know.

18

19   SP:  Have you had sexual relations with women?

20

21   WA: Yes.

22

23   SP:  And has that been while you've been - was that before October 8,

24        2000?

25

26   WA: No.  That was in jail.

27

28   SP:  In jail.

29

30   WA: Yes.

31

32   SP:  Okay.  How many -

33

34   WA: But I live by myself, so I'm not -

35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 171

```
1    SP:  How - what types of relations did you have at the jail?
2
3    WA:  I had a relationship with a - a girl in the jail.
4
5    SP:  Okay.
6
7    WA:  Yeah.
8
9    SP:  More than one or just one?
10
11   WA:  Just one.
12
13   SP:  Okay.
14
15   WA:  And it's weird because I - I don't - I wouldn't say like I look at a
16        female and am attracted to them.  It was like a companionship type
17        of thing.
18
19   SP:  Okay.
20
21   WA:  And more of a - the person.
22
23   SP:  Okay.  Was it sexually gratifying?
24
25   WA:  I think for me it was way more of an emotional thing.
26
27   SP:  Okay.  And you haven't had any other relations since you've been -
28
29   WA:  No, I - I live alone.  I'm secluded, isolated from everybody.
30
31   /////////////////////////////////////////////////////////////////
32   /////////////////////////////////////////////////////////////////
33   /////////////////////////////////////////////////////////////////
34   /////////////////////////////////////////////////////////////////
35   /////////////////////////////////////////////////////////////////
```

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 172

1   **Issue Re: Whether or Not Ms. Andriano Believes That She Was the**
2   **Victim of Childhood Emotional Abuse, Sexual Abuse or**
3   **Physical Abuse:**
4
5   SP:   Okay.  We - we - we touched on this before but I'm going to - I'm
6         going to circle back now.  Do you believe that as a - as a child you
7         were physically abused?
8
9   WA:   Yes, I do.
10
11  SP:   Do you believe as a child you were emotionally abused?
12
13  WA:   Yes.
14
15  SP:   And do you believe as a child you were sexually abused?
16
17  WA:   I think so, yeah.
18
19  SP:   Who - who perpetrated the sexual abuse?
20
21  WA:   I think there was several different men growing up that I feel
22        treated me in a sexually inappropriate way.
23
24  SP:   And who would those be?
25
26  WA:   One would be Alejo and one would be - I can't remember, but his
27        name was Rick and he was one of the ministers that we traveled
28        with.  And another one was - would've been a principal that was at
29        the Christian school that I went to.
30
31  SP:   What did - what did Rick the traveling minister do?
32
33  WA:   Well, I feel like it was just more of inappropriate touching and I
34        remember him showing me his private parts one time.  And I don't
35        know that I even understood what was - I don't know.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 173

1    SP:  How - how -
2

3    WA:  But I just - it's so - it's really not a - just - because I remember him
4              playing the guitar all the time and then he would want to try to
5              teach me play the guitar but it made me very uncomfortable, like
6              there was something not good about it.  So that's what I can -
7

8    SP:  How old were you when you think he showed you his genitals or
9              penis?
10

11   WA:  I don't know.  That was when we were traveling around in the
12             vehicles.
13

14   SP:  Okay.
15

16   WA:  So I don't know.
17

18   SP:  So there's Rick the - the - the traveling minister, there's Alejo.
19

20   WA:  Uh-huh.
21

22   SP:  Did - have we covered everything with Alejo already or were there
23             some specific sexual acts?
24

25   WA:  I can't really think of specifics.  I - I - I just know that -
26

27   SP:  He was just a sexualized - very sex - everything was sexual.
28

29   WA:  Yeah.  And - and I know that, you know, I can't - see, it's hard for
30             me because I don't know if it was on purpose or if it's not.  It's
31             really - I don't like to make accusations.
32

33   SP:  Okay.
34

35   WA:  But - yeah.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 174

1   SP:  And then there was a third -

2

3   WA:  Yeah.  There was a principal at the school that was - was kind of
4        inappropriate with me too.

5

6   SP:  How?

7

8   WA:  Just in hugging and the touching and the talking and all that sort of
9        stuff.

10

11  SP:  Did - did - do you have any independent recollection of being
12       sexually violated in any way as a - as a child?

13

14  WA:  I don't.

15

16  SP:  Okay.  Do you have any independent recollection as a child of being
17       asked to perform certain sexual acts on a male or female?

18

19  WA:  I don't.

20

21  SP:  That was an adult.

22

23  WA:  I don't remember.

24

25  SP:  Okay.  What was the - I think you may have discussed this already
26       but I just want to make sure.   What was the nature of the
27       emotional abuse?

28

29  WA:  I would - I would say the expectation of me to behave as an adult
30       and to fulfill adult needs would - and not - like always having to
31       play the peacemaker and the caretaker and the - it's like I had to
32       be the adult and my parents were more the children.

33

34  SP:  Okay.  And the physical abuse thing again, we've covered that?

35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 175

1    WA: Uh-huh.
2
3    SP:  Yes?
4
5    WA: Yes.
6
7    **Issue Re: Whether or Not Ms. Andriano Believes She Was the**
8    **Victim of a Sexual Assault:**
9
10   SP:  Okay.  Have you ever been sexually assaulted?  Child or adult.
11
12   WA: Not that I physically remember.  It just come - but I have that -
13        those nightmares, that - of - of it, and so I don't know.
14
15   SP:  Who - who - who -
16
17   WA: And I don't know who.
18
19   **Age of Interest in Sex:**
20
21   SP:  Okay.  How many - when did you start getting interested in sex?
22
23   WA: I don't - I can't even - I - I couldn't even tell you.  I don't know.
24        It's always just been in part of the awareness for as long as I can
25        ever remember.
26
27   **First Serious Heterosexual Relationship:**
28
29   SP:  Who was your first relationship, serious relationship with?
30
31   WA: The pastor's son.  But we never had physic - or had actual sex.  So
32        I don't know.
33
34   SP:  You were how old when that happened?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 176

1   WA:  21.
2
3   SP:  And he was how old?
4
5   WA:  No, I didn't have sex with him.  I was - I had a - we had - we were
6        boyfriend/girlfriend when I was like a teenager.
7
8   SP:  Right.  So you were a teenager and he was how old?
9
10  WA:  Same - same age as I am.
11
12  SP:  Which was what?
13
14  WA:  A - as a teenager.  I can't tell you exact date.
15
16  SP:  Okay.  Was there no - just so we're clear about terms here, was
17       there any - you didn't have intercourse is what you're saying?
18
19  WA:  No, sir.
20
21  SP:  Correct?
22
23  WA:  Correct.
24
25  SP:  Was there any - was there any foreplay or sexual relations of any
26       kind?
27
28  WA:  We did later when we were probably like 19 or 20.
29
30  SP:  And what was - what happened there?
31
32  WA:  I don't really remember details, but I know we - I don't know.
33
34  SP:  Well you - was - were you a consensual participant?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 177

1   WA: Yes.
2
3   SP:  Okay.  So he was your first serious relationship?
4
5   WA: Yes.
6
7   SP:  How long did that last for?
8
9   WA: Maybe four years.
10
11  SP:  Did you live together?
12
13  WA: No.
14
15  SP:  And was there oral sex in this relationship?
16
17  WA: Maybe when I was around 20.
18
19  SP:  Okay.  Is - did he want to have intercourse?
20
21  WA: Okay, so yes but no.  And I say that because he did but our
22      religious beliefs said that that was a sin and so we never did.
23
24  SP:  Okay.  So you didn't have any vaginal intercourse?
25
26  WA: No.
27
28  SP:  Was - did it allow for anal intercourse?
29
30  WA: No.
31
32  SP:  Okay.  But it allowed for you two to - to be involved - to - to have
33      other types of sexual relations?
34
35  /////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 178

1   WA:  Well no, it didn't allow, but there's always these grey areas and so
2        then you think technically if you don't have sex then it's okay.
3
4   SP:  And by "sex" you mean intercourse?
5
6   WA:  Yes.
7
8   SP:  Okay.  What was the next serious relationship you had?
9
10  WA:  Serious?  Well, the person that I did have sex with I did not have a
11       relationship with.  I just chose to do that.  And then - I don't even
12       know.  There was - there was some - like a six month to a year
13       time there that I was out partying and I know I slept with a couple
14       of people and it wasn't a relationship and then so my next
15       relationship would've been with Joe.
16
17  **Issue Re: Number of Lifetime Serious Heterosexual Relationships:**
18
19  SP:  Okay.  So let's - so let's break this down.  So there were - it sounds
20       like - how many serious relationships have you had in your life?
21
22  WA:  Two.
23
24  **Issue Re: Number of Lifetime Heterosexual Partners:**
25
26  SP:  Okay.  And how many sexual partners would you say you've had in
27       your life?
28
29  WA:  Let me think.
30
31  SP:  And when I'm talking about sex, I'm talking about how many people
32       you've had intercourse with.
33
34  WA:  Right.  Maybe like five or six.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 179

1  SP:  Okay.  So there was a - when was this time period before Joe when
2       you were with other men?  How old were you when that was?
3
4  WA:  21.
5
6  SP:  And where were you meeting these men?
7
8  WA:  At the bar.
9
10 SP:  And what was going on in your life at that time that you just
11      decided here I am?
12
13 WA:  Yeah.  I'm not really sure.  I - I don't know if it was - I had lived
14      under - with my parents and in that religious very secluded - and I
15      think that when I got my first apartment job they gave me an
16      apartment and my cousin who is several years younger than I kind
17      of moved in with me and she went to public school and knew
18      everybody.  And that was very fun to me and so I started going out
19      with her.  And I - I like just - I - I don't know.  I'm going out and
20      I'm drinking and I'm meeting people and then I had sex and it was
21      just a craziness.  And then I met Joe and -
22
23 SP:  So how - for what period of time did this go on?  This -
24
25 WA:  Just -
26
27 SP:  You were 21, from 21 to?
28
29 WA:  Like only for six, eight months.
30
31 SP:  And how many partners would you say you had?
32
33 WA:  I will just say three.  I don't really recall.
34
35 ////////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 180

1   SP:  Did you - so what - how - so where did you lose your - not "where,"
2         but how old were you when you lost your virginity?
3
4   WA:  21.
5
6   SP:  It was with one of these -
7
8   WA:  Yeah.  I - I - I didn't - I know it sounds weird, but I didn't want to
9         be a virgin and I wasn't in a relationship with somebody and I went
10        out with this person like twice and then slept with him and then
11        didn't - he called me back and I never would return his calls
12        because I felt really bad.
13
14  SP:  Okay.  And so - so there's these at least three relationships that you
15        had that were pretty short lived, correct?
16
17  WA:  Well, I guess if you want to call it a relationship.   It was just
18        probably just having sex and it was - that was it.
19
20  **Second Serious Relationship - Joe Andriano:**
21
22  SP:  Okay.  And then you meet Joe?
23
24  WA:  Uh-huh.
25
26  SP:  And how old are you when you meet him?
27
28  WA:  I'm still 21.
29
30  SP:  And how long do you guys date?
31
32  WA:  Like a year and a half, maybe.
33
34  SP:  He was how old?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 181

1   WA:  Three years older than I, so -
2
3   SP:  He was 24?
4
5   WA:  Right.
6
7   SP:  Where did you meet?
8
9   WA:  At a bar.
10
11  SP:  Okay.  And how soon after you met did - did you start having sexual
12       relations with him?
13
14  WA:  Now we didn't have - well, gosh let me think.  I don't know, five or
15       six months.
16
17  SP:  And what - why did you wait - or maybe I have that - maybe I
18       made a wrong assumption there.  Did - did you want to have sexual
19       relations and he wanted to wait or was - what was going on?
20
21  WA:  So because I cared about him, it was different.  I don't know how
22       to explain it.  It just was different.  I - it was just a different thing
23       than just going to the bar and partying.  It was a relationship and
24       so I was trying to reconcile my not sinning and not having sex with
25       - it was - yeah, I - so that's why we waited.
26
27  SP:  Okay.  So you date - so - so you date about five or - five months or
28       so or six months or so and then you have -
29
30  WA:  Excuse me.
31
32  SP:  You have sexual relations?
33
34  WA:  Yes.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 182

1    SP:  And how was that for you?
2
3    WA:  It was - I think in my mind it's more - it was more I participate in
4         it but it's not because I enjoy it, it was more because I want to
5         make him happy.  That was pretty much my mentality about having
6         sex.  And that's just the way it was even through my marriage.
7
8    SP:  You get married in what year?
9
10   WA:  January of '94.
11
12   SP:  And what kind of - what kind of wedding was it?
13
14   WA:  At a church.
15
16   SP:  And how many - how many folks were there?
17
18   WA:  I don't remember.
19
20   SP:  Was there a honeymoon or a -
21
22   WA:  Well, I was working and couldn't get away from work but we did go
23         to Vegas.  His sister sent us to Vegas for the weekend.
24
25   SP:  How did he propose?
26
27   WA:  He didn't really - he didn't really ever have like an official "marry
28         me" type of thing or an engagement ring or any of that kind of
29         stuff.  It was just - he ended up moving into my apartment and I
30         don't know, it just happened.  It just -
31
32   SP:  How soon after you started dating did he move in?
33
34   WA:  Well, he moved in just as - as needing somewhere to live and so it
35         wasn't because we wanted to have a relationship.  It was a matter

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 183

1   of necessity.  He needed somewhere to live.  So he slept on my
2   couch for a while.  And -
3
4   SP:  How soon after you met did that start happening?
5
6   WA:  Like within a month.
7
8   SP:  Okay.
9
10  WA:  Yeah.  So he slept on my couch for a while and then later when we
11       started - I don't know, it just developed into a relationship, a sexual
12       relationship.  So then he moved from the couch to my bedroom.
13       And then my dad wouldn't speak to me for a long time because I
14       was living in sin.  So that was not - and I think that's more of - of
15       why we both felt we needed to make our families happy and so to
16       do the marriage.  Even though we loved each other, but I mean as
17       far as - yeah.
18
19  SP:  Talk - talk to me about Joe.  How far in school did he go?
20
21  WA:  I know he graduated and I know that he took some classes at the
22       community college.
23
24  SP:  And what - what kind of work did he do?
25
26  WA:  He was a welder and a farmer.
27
28  SP:  And did he have any drug or alcohol problems?
29
30  WA:  He liked to drink.
31
32  SP:  Was drinking an issue though for him?  Or a problem, I should say?
33
34  WA:  I think so.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 184

1  SP:  What would he get like when he had been drinking?
2
3  WA:  Well, as long as he was drinking beer he was lots and lots and lots
4       of fun.  And - but he can't drink - he couldn't drink hard alcohol
5       because then he would get very mean.
6
7  SP:  Okay.  What would he do?
8
9  WA:  Break everything and throw things and want to argue.
10
11  SP:  Okay.  Was he in trouble with the - had he ever been in trouble with
12       the law?
13
14  WA:  I don't know.
15
16  SP:  What - what was your early relationship like with him, in the first
17       couple years?
18
19  WA:  We actually got along really good.
20
21  SP:  So - so you're - you're how old when you get married?
22
23  WA:  I'm 23.
24
25  SP:  You're 23 at the time you get married?
26
27  WA:  Yes.
28
29  SP:  And the - what - what's that make him, like 20 -
30
31  WA:  26.
32
33  SP:  26.  Okay.  And so the - the first part of the marriage, how's that
34       going?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 185

1   WA: I liked it because we got along great.  I mean - and - and he liked
2       it because I was different than the girls he had grown up around
3       and that made me feel good.  And I - you know, I could provide for
4       him.
5
6   SP: So where were you living at the time?
7
8   WA: In my apartment that came along with my job.
9
10  SP: The - which one?
11
12  WA: The Quail Gardens.
13
14  SP: Quail Gardens.
15
16  WA: Uh-huh.
17
18  SP: So Quail Gardens is - that's the one before the hospital job, correct?
19
20  WA: Right.
21
22  SP: So it goes Quail Gardens, hospital job, then the Courtyard?
23
24  WA: Right.
25
26  SP: And then San Rivas?
27
28  WA: Right.
29
30  SP: And so he ends up living with you at all three, correct?
31
32  WA: Yes.
33
34  SP: Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 186

1   WA: Uh-huh.
2
3   SP:  So - so everything is going along well?
4
5   WA: Yes.
6
7   SP:  Were you -
8
9   WA: We got along really good.  More - more like friends than romantic
10        oh I'm in love type of thing, but we really got along very well.
11
12  SP:  So was there a change at some point do you think in the
13        relationship?
14
15  WA: No.  No, just - he was already - it's interesting now because the
16        same sort of environment that I had grown up with my parents was
17        the same thing with Joe.
18
19  SP:  How so?
20
21  WA: He loved for me to take care of him and be responsible and be the
22        one that always had work and that could pay the bills and if he got
23        upset about something then I could calm him down and fix it.  And
24        I could nurture him and take care of him, and he liked that.  And
25        that felt very comfortable to me.
26
27  SP:  So when did things change?
28
29  WA: They never did change.
30
31  SP:  So that was the relationship?
32
33  WA: Yeah, absolutely.
34
35  /////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 187

1   SP:   So how would - overall, how would you describe like - how would
2         you describe, like, if you were talking about your relationship to -
3         to someone you were just meeting in a social kind of context and
4         they were asking you about your - your husband and the
5         relationship, what would you say?
6
7   WA:   We were great friends.  We loved to do things together.  We're - did
8         we have romantic love?  No, but we - we really - we bonded and we
9         really got along well.  We liked to do the same things and he made
10        me feel very good about myself.
11
12  SP:   Did he?
13
14  WA:   As far as I could take care of him, any problem he had I could fix it,
15        and if he was upset, you know, I knew how to calm him down and
16        make it better.
17
18  SP:   So he made you feel good about yourself?
19
20  WA:   Well, every problem I could - every problem I could solve, that
21        made me feel like I had some worth and that I was contributing.
22
23  **Issue Re: Alleged Domestic Violence - Part I:**
24
25  SP:   Was he ever demeaning to you?
26
27  WA:   Yeah, if I couldn't - if I wasn't quick enough or fast enough or if I
28        didn't - if there was some lack in our household then it was my
29        fault.
30
31  SP:   And how would he let you know that?
32
33  WA:   Because he would yell and throw things and break things and - just
34        like my dad would.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 188

1  SP:  But -
2
3  WA:  And then instead of me getting upset, it - all it does is pressure me
4       to try to figure out a way to fix it.
5
6  SP:  But you still say the relationship was terrific?
7
8  WA:  Well, I - that's - in my sickness and in his sickness it worked for us.
9
10 SP:  So basically what you're saying is -
11
12 WA:  Do you understand today I wouldn't be in that?  Back then, that's
13      what suited my behavior.
14
15 SP:  So you're saying that if that relationship was abnormal, that
16      abnormalness was what you knew?
17
18 WA:  It was very normal to me.
19
20 SP:  Got it.  Okay.  So -
21
22 WA:  That's what I was familiar with and what I knew.
23
24 SP:  Did he ever force you to have sex?
25
26 WA:  Yes.
27
28 SP:  How often?
29
30 WA:  Well, most of the time I would just concede because I also feel like
31      that was just part of making him happy.  So would I really make
32      him force me?  A few times there were.  Like after I had Nicholas I
33      remember him wanting really to have sex right away and I
34      physically could not and that turned into a not comfortable

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 189

1    situation.  But there are many, many, many times that I had to
2    have sex and I did not feel like I had the option to say "no."
3
4    SP:  Did the police ever come out to the house?
5
6    WA:  No, I would never tell anybody.
7
8    SP:  Did he ever tie you down?
9
10   WA:  No.
11
12   SP:  He ever -
13
14   WA:  No, I wouldn't fight him and I wouldn't even argue back with him
15   because I didn't feel like that was my place to do that.
16
17   SP:  Did he ever hold a gun to your head to have sex?
18
19   WA:  I remember we had an altercation that had a gun but I don't
20   remember if sex was involved in it or not.
21
22   SP:  Did he ever videotape your sexual relations?
23
24   WA:  I don't think so.  I hope not.
25
26   SP:  Did he ever say, "Hey, we need to have a third person in this sexual
27   relations"?
28
29   WA:  I don't think so.
30
31   SP:  Did you ever have a third person?
32
33   WA:  No.
34
35   SP:  Did - did he threaten you?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 190

1    WA:  Yeah, I was threatened by him.
2
3    SP:  How often?
4
5    WA:  Not very often because most of the time I could keep the peace.
6
7    SP:  So give me an example of how he would threaten you.
8
9    WA:  Well, I remember one night he had been out drinking tequila and I
10         remember I was with him and he started getting really mean and
11         I called my dad to take me home from the bar.  And he didn't want
12         me to go home and I left anyway and went home and went to -
13         tried to go to sleep.  Oh no, I didn't even go to sleep because I was
14         - I didn't - anyway, he came home drunk and I remember him
15         breaking through the door, breaking the coffee table, throwing me
16         up against the wall, punching a hole through the wall and all kinds
17         of things.  So yeah, there - we had - we had a few little -but they
18         weren't consistent.  Not enough for me to like - to me that was
19         okay.  It's like -
20
21    SP:  Were you hit by him?
22
23    WA:  He never took his fist and punched me, no.  But did he try to choke
24         me or push me up against walls or hold me down?  Yes.
25
26    SP:  Slap you?
27
28    WA:  No.
29
30    SP:  How did he try to choke you?
31
32    WA:  With his hands.
33
34    SP:  Okay.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 191

1   WA: But it wasn't - I think what I was telling myself is that it wasn't
2        anything different than what I had grown up with and it wasn't
3        severe that I thought. Today I would think so. Back then it wasn't
4        - I don't know, it was okay.
5
6   SP: Was he - was he running around on you?
7
8   WA: I don't think so. I don't think so. But there got to be a point where
9        he - see this was after - I felt like we were always in it together
10       because he got that tumor like six months into our marriage.
11
12  SP: Right.
13
14  WA: So that was something that we just lived with.  But it was us
15       together trying to get him better, get him healthy, and we were
16       always doing it together.  Always trying to find him employment
17       together, find him a job that he would like. It just - so I was always
18       part of the process.  And it wasn't until like after he learned about
19       the cancer being everywhere that he just started pulling away from
20       me and Nicholas and Ashlee.  And so he started leaving us and try -
21       just going to do his own thing.  And that's when we really just
22       started having - where we weren't connected anymore.
23
24  SP: So how long do you think it went that you guys weren't connected
25       before October 8th of 2000?
26
27  WA: It's really hard to say time, but I mean it was a chunk of time.  I
28       don't know.
29
30  SP: Three years?  Four years?
31
32  WA: Oh no, less than a year probably.
33
34  SP: Okay. So - so -
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 192

1    WA: I can't remember - I mean I could tell you if I knew the time when
2         he - when we went to Mayo Clinic and - and then after - found out
3         about - he had a MRI done or a CAT scan done and saw the - the
4         cancer all over. And that really freaked him out. It freaked me out.
5
6    SP:  You - you've been pregnant how many times?
7
8    WA: Twice.
9
10   **Children:**
11
12   SP:  And you have two children?
13
14   WA: Uh-huh.
15
16   SP:  Correct?
17
18   WA: Yes.
19
20   ***Nicholas Andriano:***
21
22   SP:  And the - we talked about this earlier, but the oldest one is
23        Nicholas?
24
25   WA: Yes.
26
27   SP:  And Nicholas is now, what, 16?
28
29   WA: Oh my goodness, yes.
30
31   SP:  And have you had any contact with Nicholas?
32
33   WA: No.
34
35   SP:  Who - who - was he adopted?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 193

1    WA:  I don't even know.
2
3    SP:  You don't - you don't know where he is?  Put in foster care?  You
4         don't know?
5
6    WA:  No.  I know that my husband's sister has my children.
7
8    SP:  Okay.  So your sister-in-law, correct?
9
10   WA:  Yes.
11
12   SP:  And was Nicholas - was he a healthy child?
13
14   WA:  Yes.
15
16   SP:  He was a term baby?
17
18   WA:  Yes.
19
20   SP:  Any problems or complications with the delivery?
21
22   WA:  No.
23
24   SP:  Did you - did you experience -
25
26   WA:  He was just late.  He didn't want to be delivered and so we had to
27        make him come out.
28
29   SP:  Did - were - did you have any depression following his birth?
30
31   WA:  I did not.
32
33   SP:  Okay.  Did he reach his developmental milestones appropriately?
34
35   WA:  Yes.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 194

1    SP:  And then was he a planned pregnancy?
2
3    WA:  Yes.
4
5    ***Ashlee Andriano*:**
6
7    SP:  And then what about Ashlee?
8
9    WA:  Yes.
10
11   SP:  She was planned pregnancy?
12
13   WA:  More or less, yes.
14
15   SP:  And was she - any problems with her birth or delivery?
16
17   WA:  No.
18
19   SP:  Any problems with her reaching her developmental milestones?
20
21   WA:  No.
22
23   **Issue Re: Joe Andriano's Cancer - Part I:**
24
25   SP:  So - so talk to me about Joe's - about Joe's - Joe's cancer.  What
26        type of cancer was it?
27
28   WA:  It was salivary gland cancer.
29
30   SP:  Okay.
31
32   WA:  And that's where it started.  And the first few surgeries that he had
33        had, we didn't even know it was cancer.  We were always told that
34        it was a benign tumor.  So - yeah.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 195

1
2
3  SP:  And then when do you find out that it's a malignant tumor?

3  WA:  The last surgery that he had - oh no, what had happened?  I'm - I
4       just haven't thought about this stuff in a long time.  He was getting
5       ready to have a surgery for the benign tumor.  And as part of the
6       process of getting ready for surgery you have to have a chest X-ray.
7       They did a chest X-ray and that's when all these nodules showed up
8       on his lungs.  And that was our first clue that something more was
9       going on and so then he ended up having a needle biopsy done in
10      his lungs and they sent it to the lab and it still came back that
11      benign stuff and you're like this is impossible.  So then we ended up
12      having his uncle, who was part of the - I don't know if he's the Air
13      Force or the Army or something, and he made arrangements for us
14      to send the - the pathology stuff to Walter Reed Hospital and that's
15      who finally gave him a diagnosis.
16

17  SP:  And what was the diagnosis?
18

19  WA:  Of the salivary gland cancer.  I can't remember the exact words, but
20       that's what it was.
21

22  SP:  When - when was he given that diagnosis, what year, do you
23       remember?
24

25  WA:  I was at Courtyard Apartments and pregnant with Ashlee.  I had her
26       in September of '98, so in '98 some time.
27

28  SP:  And what was the response to him finding out that he had this
29       malignancy, what did he do next?
30

31  WA:  It was a kind of shock because like you can't even - it doesn't seem
32       real.  Yeah, it - we - like you just can't even wrap your brain around
33       it.  It just didn't seem real.
34

35  SP:  Did he go for treatment?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 196

1   WA:  Well, that's when we tried to find somewhere better for him to go,
2         since the first doctors had missed it so much.  And so that's how we
3         ended up at the Mayo Clinic.  And he did agree to have surgery and
4         they wanted him to have radiation and chemotherapy and he said
5         "No" to those.
6
7   SP:  Right.   He - he said - he said that he wasn't going to take
8         conventional treatments, correct?
9
10  WA:  That's correct.
11
12  SP:  But at some point then he changes his mind?  Do I have that right?
13
14  WA:  Right.  Later on in the thing.  We tried lots of like holistic therapies
15        first.
16
17  SP:  Right.  So is he working during this time?
18
19  WA:  No.
20
21  **Source of Income While Married:**
22
23  SP:  What's the - what's the longest job he ever had while you two were
24        together?
25
26  WA:  Well, I think his longest one would've been working for a place
27        called Accuglass, and he worked for them as a subcontractor.  And
28        he learned how to replace windshields and repair little cracks in
29        windshields.
30
31  SP:  So how long did he work for them?
32
33  WA:  I don't think it was very long because I had been fired from
34        Courtyard - no.  That's not right.  I had been fired from the hospital

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 197

1          and that's when he got the job with Accuglass.  And I don't even -
2          I don't know, maybe six months at the most.
3
4   SP:  Who was the - who was the person that during the course of your
5          relationship brought in the lion's share of the money?
6
7   WA:  I did.
8
9   SP:  What do you think the most amount of money he made in a year
10         was?
11
12  WA:  I don't know because I don't even think he ever filed taxes.
13
14  SP:  Okay.
15
16  WA:  So I never - I - I don't know.
17
18  SP:  Did you guys have a lot of debt?
19
20  WA:  Lots and lots of debt.
21
22  SP:  How much?
23
24  WA:  I don't know, but a lot.
25
26  SP:  Tell me a number that you recall, ballpark.
27
28  WA:  I never added it up because we just maxed out credit card after
29         credit card.
30
31  SP:  Did you have debt collectors calling you?
32
33  WA:  No.
34
35  SP:  Did you file for bankruptcy at any point?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 198

1    WA:  No.
2
3    SP:  Did you think about doing that?
4
5    WA:  No.
6
7    SP:  So it was - you were having a tough -
8
9    WA:  We always - we really - okay, so he had grown up within a family
10        of farmers.  Excuse me.  Excuse me.
11
12   SP:  Go ahead.
13
14   WA:  And in a environment with friends who were self employed.  And he
15        had always told me he liked to be self employed.  So when I met
16        him he had a - welding equipment.
17
18   SP:  Right.
19
20   WA:  And he used to do odd and end jobs for people doing welding.
21
22   SP:  Right.
23
24   WA:  And so that's how he had income coming in and part of the reason
25        why he moved in with me is because he did not have the money to
26        pay rent to somebody and his parents wanted him to pay rent at
27        home and he couldn't do that and so I told him he could move into
28        my house.
29
30   **Issue Re: Alleged Domestic Violence - Part II:**
31
32   SP:  Did you tell people that he was physically rough with you?
33
34   WA:  I don't think so.  I don't know.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 199

1  SP:  I - I asked you this before and I'm going to ask you - I think I
2       [inaudible], did - did he ever force you to have sex with him?
3
4  WA:  You - yeah, you did ask me that.
5
6  SP:  Right.  And I'm asking again, did - did - did he ever force you to
7       have sex with him?
8
9  WA:  There were a few times that yes he employed force.
10
11 SP:  And did any of those times occur in the year 2000?
12
13 WA:  I don't remember.
14
15 SP:  Did - when you had sexual relations, would he have an orgasm?
16
17 WA:  Yes.
18
19 SP:  Would you?
20
21 WA:  No.
22
23 SP:  Did you ever have orgasm with him?
24
25 WA:  No.
26
27 SP:  Did you ever have an orgasm with any other man - wait, let me
28       finish the question, before him?
29
30 WA:  No.
31
32 SP:  Okay.  Did he ever try to anally rape you?
33
34 WA:  No.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 200

1   SP:  And you're saying he never tied you down or -
2
3   WA:  No.
4
5   SP:  Did he introduce sex toys into the relationship?
6
7   WA:  He - yes.
8
9   SP:  What - what kinds of things did he introduce?
10
11  WA:  Oh goodness.  I don't even remember what, but I remember him
12       coming home with some things and - I don't know.
13
14  SP:  What kinds of things?
15
16  WA:  Do we have to talk about that?
17
18  SP:  Well, I -
19
20  WA:  I don't -
21
22  SP:  I wouldn't be asking if -
23
24  WA:  I mean gosh, I don't know.  I don't - I don't really remember.  It
25       was some - some thing in a styrofoam kit and it had all sorts of
26       different things in it.  I don't know.  I don't even -
27
28  SP:  Okay.
29
30  WA:  I don't know.
31
32  SP:  How often did he introduce sexual toys or -
33
34  WA:  He just did that a couple of times and that was when we were at
35       San Rivas.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 201

1   SP:  Okay.  This was - was this -
2
3   WA:  And I don't know where that came - like I don't know where that
4        came from.  I - I feel like - I feel like - I don't know, I - I don't
5        know.
6
7   SP:  Did he ever threaten to kill you?
8
9   WA:  Yes.
10
11  SP:  How many times?
12
13  WA:  Just a couple.
14
15  SP:  When was the last time before October 8, 2000?
16
17  WA:  Gosh, I don't remember the time but it was like within the year and
18       - because he had broken - well he put his fist through the dresser
19       in my room and had broken our bed too.  Yeah.  That was the last
20       time.
21
22  SP:  So what do you - he threatened you?
23
24  WA:  Yes.
25
26  SP:  Why?  What was going on?
27
28  WA:  I don't remember what the cause of that one was.
29
30  SP:  What - typically what would your fights be about?
31
32  WA:  Money.
33
34  SP:  Anything else?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 202

1    WA:  No, mostly money.
2
3    SP:   Did he ever used to follow you?
4
5    WA:  Oh, I don't know.
6
7    SP:   Did he ever stalk you?
8
9    WA:  I don't know.
10
11   **Issue Re: Extramarital Relationships:**
12
13   SP:   Okay.  Were you completely faithful to him in the relationship?
14
15   WA:  Up until the last year I was.
16
17   SP:   Okay.  And what happened in the last year?
18
19   WA:  Then I had two affairs.
20
21   SP:   With - with who and who?
22
23   WA:  Gosh, oh I don't even remember.  Rick and then somebody else.
24        No.
25
26   SP:   Who was the first one?
27
28   WA:  Rick.
29
30   SP:   What was Rick's last name, do you remember?
31
32   WA:  I can't remember right now.
33
34   SP:   And how did you two meet?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 203

1    WA:  At the apartments.
2
3    SP:  And was he living there?
4
5    WA:  He had come to rent an apartment there and then he rented an
6         apartment there.
7
8    SP:  And how soon after you met did you and him start up having an
9         affair?
10
11   WA:  A couple months.  I don't know.
12
13   SP:  And that affair became sexual?
14
15   WA:  Yes.
16
17   SP:  And you had intercourse?
18
19   WA:  Yes.
20
21   SP:  How - how often would you -
22
23   WA:  It didn't last very long.  It wasn't - it was - I would - I can't put a
24        time on it, but maybe like a six month time or under.  I don't know.
25
26   SP:  And - and - and who ended it?
27
28   WA:  He did.
29
30   SP:  Why?
31
32   WA:  Because he felt bad that - he just felt bad that he was interfering in
33        a marriage.
34
35   SP:  Did he know you were married?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 204

1    WA: Yes, he did.
2
3    SP:  From the outset?
4
5    WA: Yes.
6
7    SP:  Okay.
8
9    WA: I know he says he didn't, but that's not true.
10
11   SP:  Oh, so you're aware of that?
12
13   WA: I'm aware of that because that really just surprised me.
14
15   SP:  How did you know that, that he says that?
16
17   WA: Because I remembered him saying that.  That just shocked me.
18
19   SP:  Where do you remember him saying that?
20
21   WA: At court.
22
23   SP:  And then who was the other affair with?
24
25   WA: I can't remember his name.
26
27   SP:  How long did that last?
28
29   WA: That was just like a week or two thing.  It wasn't -
30
31   SP:  I want to say his first name was Eric, does that sound right?
32
33   WA: No.  Eric was Rick's friend.  I did not have an affair with him.
34
35   SP:  Oh, okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 205

1   WA: I don't - I can't remember.
2
3   SP: Did you - did you - were these relationships sexually satisfying?
4
5   WA: No.
6
7   SP: You didn't have orgasms with these relationships either?
8
9   WA: Nope.
10
11  SP: What about with this relationship you had at the jail?
12
13  WA: I did there and that's how come I know that I didn't before, because
14      that was my first time and I didn't even - I was - it was a shock to

        me.
16
17  SP: Okay.
18
19  WA: So that's how I learned what the difference was.
20
21  SP: Got it.
22
23  WA: Sorry for the - how embarrassing.
24
25  **Issue Re: Disclosure of Extramarital Affairs to Spouse:**
26
27  SP: So - so who - so do you tell - ultimately tell your - your husband
28      about these relationships?
29
30  WA: I did.
31
32  SP: One or both?
33
    WA: I don't know.  I think just one.  I don't think I put a name to it and
35      said, but I just admitted that "yes", I had cheated on him.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 206

1   SP:  When did you do that?
2
3   WA:  That night.
4
5   SP:  October 8th?
6
7   WA:  Yes.
8
9   SP:  But you don't remember which one you told him about?
10
11  WA:  I don't.
12
13  SP:  Why did you tell him?
14
15  WA:  Out of guilt and just need to confess.  I don't know, I just - I just
16       felt like I just had to tell.  I still do that.  I always feel like I have to
17       tell.  I don't know.  That's what got me one of my tickets.  I
18       wouldn't have had a ticket but I went and told on myself.  I don't
19       know why I do that.
20
21  **Issue Re: Medical Malpractice Litigation:**
22
23  SP:  You and your - your husband had a - a malpractice litigation going,
24       right?
25
26  WA:  Well, I don't know if it really officially started but I know they were
27       investigating it, yeah.  Because I don't know - I know there was
28       some sort of time limit before you have to file and all sorts of stuff
29       so I don't even know if we reached that point or not.
30
31  SP:  Did you meet with lawyers?
32
33  WA:  Yes.  Yeah.
34
35  SP:  But you don't know if the suit had been filed?



Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 207

1  WA:  Well, right.  And the reason I say that, technically I know that they
2       were - there's a lot of investigation stuff that has to happen and
3       then there's a time limit on it before it officially gets file and I don't
4       know if it ever officially got filed.
5
6  **Defendant's Description of Her Relationship With Her Spouse**
7  **During the Week Leading Up to the Instant Offense:**
8
9  SP:  So what was your relationship like with your husband in the week
10      leading up to October 8th?
11
12 WA:  Well, we weren't really having one too much.   I don't really
13      remember.
14
15 SP:  What I'm going to do is I'm just going to stop this recording for a
16      second and I'm going to restart it.  So just hold your thoughts
17      there.
18
19 [Break]
20
21 SP:  It's back recording.  Do you - you would agree we didn't have any
22      conversation, correct?
23
24 WA:  I agree.
25
26 **Issue Re: Joe Andriano's Cancer - Part II:**
27
28 SP:  So - so walk me through this part.  I'm - I'm - I'm just confused on
29      this.  Okay.  And I - and I - I want to understand this.  So - so help
30      me understand this, if you can.  Your husband - first of all, was his
31      cancer terminal?
32
33 WA:  Yes.
34
35 SP:  Who told you that?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 208

1    WA:  Dr. Green at the Mayo Clinic.

2

3    SP:   That he said it was terminal?

4

5    WA:  Yes.

6

7    SP:   And you're sure about that?

8

9    WA:  Well yes.

10

11   **ISSUE RE: SODIUM AZIDE - PART I:**

12

13   SP:   Okay.  And so whose idea is it to get this - this chemical?

14

15   WA:  Well that specific one is - it wasn't like we knew.  The idea was to
16         find something that he could take that would just stop his heart.
17         And the first thing that is so well known was cyanide and I know
18         that that's what we had discussed, so that's what the beginning of
19         the conversation was.

20

21   SP:   When did you have that conversation?

22

23   WA:  He had had a couple of incidents where it was kind of scary where
24         he couldn't breathe and he felt like his body was seizing up.  And he
25         had been told that pretty much the tumors would take over his
26         lungs and he would suffocate to death, is how - what happens when
27         you have lung cancer.  And so when he had those episodes and he
28         couldn't catch his breath and like my mom was a respiratory
29         therapist and she would come - because he didn't want to call the
30         doctor and do all that, so my mom would come up and check and
31         try to listen for his breathing and help calm him down.  And so
32         that's - that's what prompted the discussions to start happening,
33         because he really didn't want to go to the hospital and get hooked
34         up to machines.

35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 209

1    SP:  How long before October 8th did these conversations start?
2
3    WA:  I don't know.  It's hard for me to say.
4
5    SP:  Were - were you seeing the second person you were having the
6         relationship with right up to October 8th?
7
8    WA:  No, I think it might've been like a month before or something.  I
9         don't really remember.
10
11   SP:  Were you seeing anyone at that time?
12
13   WA:  No.  And I wasn't really seeing the other one.  It just was a - I don't
14        know what it was.  I can't explain it.  I don't even know.  I don't
15        know why I was doing that.  I don't know.
16
17   **ISSUE RE: DEFENDANT'S EFFORT TO SECURE LIFE INSURANCE**
18        **POLICY FOR JOE ANDRIANO:**
19
20   SP:  There was something I recall about life insurance.
21
22   WA:  Uh-huh.
23
24   SP:  Correct?
25
26   WA:  Yes.
27
28   SP:  And do - am I correct that you tried to talk to a friend about being
29        your husband and applying - and showing up for the exam for life
30        insurance?
31
32   WA:  Well, what I remember is that Joe wanted life insurance because of
33        him getting ready to die.  And I tried every which way to get life
34        insurance and it just didn't work.  And so then we dropped it.  So I
35        guess I don't - I don't know.  And I know when we went to trial like

P-App. 004341

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 210

1   they tried to make that some big deal with - that it had something
2   to do with this, but it - I don't know.
3
4   SP:   Well, did it?
5
6   WA:   No, not in my mind.  So I don't understand why, what that has to
7         do with it but - I tried to fix it, it didn't work and so it was a non-
8         issue.
9
10  SP:   So if your husband wants to die, why doesn't he just take a gun and
11        just kill himself?
12
13  WA:   I don't know that.
14
15  **ISSUE RE: SODIUM AZIDE - PART II:**
16
17  SP:   And - and why - why this whole elaborate thing of having to put -
18        by the way it's - I believe it's sodium azide.  Does that sound
19        familiar?
20
21  WA:   That - that's right, yes.
22
23  SP:   Why - why - why go through this whole exercise of putting these
24        things in a capsule?
25
26  WA:   Well, that you can't - you had to put it in something for him to
27        swallow it.  He - you can't just put the powder in your mouth and
28        try to swallow it, that was the point.
29
30  SP:   Okay.  And you're saying he - he knowingly - you're - you're saying
31        that he knowingly took these capsules -
32
33  WA:   Yeah.
34
35  SP:   Completely aware that sodium azide was in them?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 211

1    WA: Yes.
2
3    **ISSUE RE: DEFENDANT'S ASSESSMENT OF THE STATE'S VERSION**
4    **OF THE INSTANT OFFENSE:**
5
6    SP:  So - so what - so how do you reconcile this - this - the state's
7         version of this - of this case that you - you actively set out to poison
8         him?
9
10   WA: Well, I don't - I don't know.  I don't know why.  I don't know.
11        Because I thought I had told my lawyers about what had happened
12        and then when we went to trial it just seemed to be all different and
13        so I don't really know.  And I think it was here that I actually
14        started becoming more aware of everything that the state had
15        really said against me because I - I don't know.  Like my mom
16        would tell me things or I would read an article in the - in a
17        magazine and I guess it was maybe for - I don't know how many
18        months it took me to get off all my psych pills and then I started
19        reading this stuff and I'm like well why are they saying this and why
20        are they saying that?  And that's when I became more aware of the
21        details of what the state was saying against me.
22
23   SP:  What - so what is it that you think as you sit here today, what is it
24        that you think the state has - what was - what was wrong about
25        their version?
26
27   WA: I don't know because I don't have it memorized about everything.
28        But I know -
29
30   SP:  But -
31
32   WA: I heard - I heard that they said I killed him because I wanted to be
33        with somebody.  Well, that's not true.  And somebody said, "Oh,
34        you wanted to kill him for life insurance." Well, that's not true.  And
35        so I don't know.  I don't - I don't know.  I get - I don't know.  I

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 212

1   don't have an answer for that.  I just know what I know.  But I
2   don't even think that that's what we're having an appeal about so
3   I don't know why I'm even discussing this.  Because I don't think
4   any of that's - the judge didn't allow any of that stuff in to be
5   renegotiated.
6
7   SP:  Well, that may be but I - that doesn't mean I can't ask you about -
8
9   WA:  Oh no, you can.  I'm just saying I didn't know -
10
11  **DEFENDANT'S VERSION OF THE INSTANT OFFENSE - PART VI:**
12
13  SP:  Okay.  So - so - so I want to make sure I heard your version right
14       earlier.  Okay.  Tell me if I - I have this correct.  And this is going
15       to be in a summary kind of fashion.  But the gist is that you and
16       your husband get the idea that it's time for him to - to die.
17
18  WA:  Right.
19
20  SP:  He want - he wants to die.
21
22  WA:  Well, he wants to die how he wants to die and not how it's going to
23       happen.
24
25  SP:  And he - what you're claiming is he enlists your services to secure
26       some type of poison for him to take?
27
28  WA:  Yes.
29
30  SP:  Do I have that part right?
31
32  WA:  Yes.
33
34  SP:  And then you find the - the appropriate poison and you order it,
35       correct?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 213

1   WA: Right.
2
3   SP: And you order it using a - you set up a fake business name as well
4       as a fake person that's going to receive it, correct?
5
6   WA: Right.
7
8   SP: Okay.  Then the - the poison comes and you and he, together,
9       empty out some capsules of whatever and - to go and put the
10      sodium azide in, correct?
11
12  WA: Yes.
13
14  SP: And then - then on this one particular night, October 8, 2000, he
15      proceeds to take the sodium azide.
16
17  WA: Yes.
18
19  SP: Knowing full well what he's doing?
20
21  WA: Yes.
22
23  SP: Okay.  But then somehow it doesn't work as well as you all had
24      allegedly planned and he ends up getting sick.
25
26  WA: Right.
27
28  SP: And it - it's not going well.
29
30  WA: No.
31
32  SP: And then at some point after it's not going well, that's when you
33      share with him that you've been seeing someone else?
34
35  ////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 214

1    WA:  No.  He was - we - there - because of - I don't know what
2         happened, but he just was starting to get really agitated and mad
3         and then he - of course he starts yelling at me because that's what
4         he does.
5
6    SP:  Okay.  So what was he doing?
7
8    WA:  So - always accusing me of having an affair.
9
10   SP:  So -
11
12   WA:  Which was true, but I had up to that point always told him "no,"
13        and I was lying to him.
14
15   SP:  So - so why on -
16
17   WA:  And -
18
19   SP:  So - so what - what get - so here you are -
20
21   WA:  I know.
22
23   SP:  You're this pretty sophisticated person when it comes to calming
24        him down and the one thing that's going to set him off beyond, is
25        you admitting this.  That doesn't make sense to me.  Here - you're
26        this polished problem solver.
27
28   WA:  Yeah.
29
30   SP:  How does that go?  Here you are, you've got your life's work with -
31        between your - your dad and your mom and others as being the
32        problem solver, the peacemaker.
33
34   WA:  Yeah.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 215

1   SP:   Bringing people together.  So why on that night do you go ahead
2         and - and spill the beans?
3
4   WA:  I don't know.  I just did.
5
6   SP:   Explain that one.
7
8   WA:  I can't give you a rational explanation.
9
10  SP:   Give me any explanation.
11
12  WA:  Oh, I mean - I - no, see it's not funny.  It really is not funny.
13
14  SP:   I - I know it's not, but I'm - I'm looking for - for - for any
15        explanation.  I guess what I'm really getting at is why - why then?
16
17  WA:  I don't know.  I just felt really, really bad and I just did it.  I don't
18        know.
19
20  SP:   Well, what - what - what - surely you knew that he was going to get
21        upset, right?
22
23  WA:  Well, yes I think that if I had been sitting there thinking rationally
24        and considering everything, then I would've made a better decision.
25        But I didn't.  So I don't have a rational explanation for it.
26
27  SP:   Okay.  So - so now you tell him this, right?
28
29  WA:  That what?
30
31  SP:   You tell him?
32
33  WA:  Yeah.
34
35  SP:   That you've been having this affair.  And then what does he do?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 216

1  WA: It just - like everything just went to a whole other level of - of rage
2      and being very, very pissed off.
3
4  SP: And what is he doing?  Is there -
5
6  WA: And I don't - I - that part of it, it's -
7
8  SP: That's the part that doesn't run like a film for you.
9
10 WA: No.  I'm like - I just remember this explosive thinking oh my God
11     what did I just do type of thing and freaking out because it was just
12     -
13
14 SP: So is he - so - so why don't you leave the - the apartment?
15
16 WA: I never left.  I would never leave him.
17
18 SP: But you somehow get a hold of a knife?
19
20 WA: I don't know.
21
22 SP: Well, he ends up getting stabbed, right?
23
24 WA: He does.
25
26 SP: He didn't stab himself, did he?
27
28 WA: I don't know.
29
30 SP: You think he may have?
31
32 WA: No, I don't know.  That's why - I - I don't know.  I don't - I can't
33     answer that question.
34
35 //////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 217

1   SP:  Okay.  So you - you don't have a memory of what happened right
2        then?
3
4   WA:  No, I don't.
5
6   SP:  Well, what if there's information in some other statements that you
7        made where it shows your memory was actually pretty good around
8        that time?
9
10  WA:  Well, I - and I would sit here today knowing how I am and tell you
11       I don't know if I was telling the truth or not, if I really remembered
12       at that time and I'm not remembering now.  That's what I would tell
13       you.
14
15  SP:  I think I got it.
16
17  WA:  Do you?
18
19  SP:  I do.
20
21  WA:  Okay.
22
23  **INTERVIEW CONDUCTED BY KIRAN AMIN, PH.D.:**
24
25  SP:  It's 1:37.  Dr. Amin, do you have any questions?
26
27  KA:  Yeah, I just have some straightforward questions.
28
29  SP:  What I'm going to do is I'm going to switch seats with Dr. Amin.
30
31  WA:  Okay.
32
33  SP:  To make sure that the sound is picked up.
34
35  WA:  Okay.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 218

1   SP:  Okay.
2
3   KA:  Some of these -
4
5   SP:  Excuse me.  I'm sorry.
6
7   KA:  Sure.  Some of these questions have already been over but the
8        ques - first question, have you ever been hospitalized?  And if I
9        understand correctly you said to your knowledge you have only
10       been hospitalized twice when you had your children?
11
12  WA:  Yes.
13
14  KA:  Right?
15
16  WA:  Yes.
17
18  KA:  Have you ever had to go to emergency department for, you know,
19       medical attention or anything like that?  Either for yourself or your
20       children or anybody else?
21
22  WA:  Yeah.  Yes, yes.  I remember one time, I don't recall my age, but I
23       was younger and I - I remember my parents had been praying for
24       me because I had something wrong in my ear, over here,
25       something going on.  And they had been praying for God to heal
26       me.  And it finally got to a point where they were scared I was
27       going to die, I guess, and they took me to the emergency room.
28       But I don't remember what happened or whatever.
29
30  KA:  Rough - roughly how old were you then, can you remember?
31
32  WA:  I don't know.
33
34  KA:  Were you still in school or?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 219

1   WA:  Yeah.  I was not a teenager.
2
3   KA:  You were?
4
5   WA:  I was not.
6
7   KA:  Oh.
8
9   WA:  I was under my teens.
10
11  KA:  Okay.
12
13  WA:  I know that -
14
15  KA:  And what you can remember was they took you there and then that
16       was it?  You came back home, they gave you some medicine or
17       something?  What happened?
18
19  WA:  I - I don' t know.
20
21  KA:  You can't remember?
22
23  WA:  I think so.  Yeah, because I don't -
24
25  KA:  Okay.
26
27  WA:  I don't know.
28
29  KA:  All right.  Any other times that you've been in an ER for whatever
30       reason?
31
32  WA:  I know once as an adult I had to go to the ER for myself and then
33       I've been to the ER twice with Nicholas.  I think that was it.
34
35  KA:  And what was the reason you had to go as an adult?

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 220

1  WA:  Oh gosh.  I was having stomach pains really bad.  I don't remember
2       what it was.  And I know they sent me home with medication and
3       I took it and it was better.
4
5  KA:  And does - as an adult, meaning?
6
7  WA:  I was working at the hospital, in fact.
8
9  KA:  Okay.
10
11 WA:  And I just went - I had them come get me from the emergency
12      room.
13
14 KA:  Okay.  Okay, thank you.  Now, we asked you this question again,
15      have you ever passed out or lost consciousness or blacked out to
16      your knowledge of any time - at any time?
17
18 WA:  I don't know.  Not that I'm aware of.
19
20 KA:  Okay.  So no loss of consciousness, blackouts that you can
21      remember?
22
23 WA:  Not that I remember.
24
25 KA:  Okay.  All right.  Now, what about accidents like falling down stairs
26      or falling off a swing or falling off a tree or anything like that, have
27      you had accidents of that kind at all when you were growing up or
28      later as an adult?
29
30 WA:  Not that I remember.
31
32 KA:  What about - you said you had been given some speeding tickets?
33
34 WA:  Uh-huh.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 221

1   KA:  So how many speeding tickets are we talking?
2
3   WA:  I don't know.  I don't know if I had two or three, but something like
4        that.
5
6   KA:  What age did you learn to drive?
7
8   WA:  Well, my dad used to take me and my friends out driving in the
9        desert when we were young, so pretty young.
10
11  KA:  So by 16 or 17 you had your license?
12
13  WA:  Yes.
14
15  KA:  So what about motor vehicle accidents?
16
17  WA:  Well, the one with my mom.  I think that's it.
18
19  KA:  And what I remember you saying is that you were in the car with
20       her and you got T-boned by another vehicle on your side?
21
22  WA:  Yes.
23
24  KA:  You were the passenger?
25
26  WA:  Yes.
27
28  KA:  Were both of you wearing seatbelts?  Can you remember or was
29       that long before seatbelts -
30
31  WA:  Oh.  Yeah, I don't remember.
32
33  KA:  Were mandatory?
34
35  WA:  I just don't remember.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 222

1    KA:  So this would've been when you were what, a teenager?
2
3    WA:  I don't - I don't know, maybe 11-12.
4
5    KA:  Oh, okay.
6
7    WA:  13. I don't know.
8
9    KA:  You mentioned that when you did have alcohol, like wine coolers
10        and stuff -
11
12   WA:  Yes.
13
14   KA:  That you would get to the point where you would get intoxicated?
15
16   WA:  Yes.
17
18   KA:  So at that time can you recall any instance where you fell down on
19        your face or anything like that?
20
21   WA:  I don't know.  I don't know.
22
23   KA:  And along the same lines, what would happen after you got
24        intoxicated?  Did you drive home or walk home?  What was -
25
26   WA:  No, I was always with somebody.
27
28   KA:  So -
29
30   WA:  I guess, who - yeah, because I didn't drive home.
31
32   KA:  Okay.
33
34   ////////////////////////////////////////////////////////////////////////
35   ////////////////////////////////////////////////////////////////////////

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 223

1   WA:  Joe would always laugh and make fun of me because I would always
2          pass out or throw up or something.  They would get me home.  I
3          don't know.
4
5   KA:  Growing up no hits to the head, falling back on the back of your
6          head or anything like that on steps, stuff like that?  Hitting the
7          concrete with your head?
8
9   WA:  Not that I know of.
10
11  KA:  Okay.  And currently today you are on BuSpar®, right?
12
13  WA:  Yes, sir.
14
15  KA:  That's the only medication you are on?
16
17  WA:  Yes.
18
19  KA:  Okay.  Do you take any other medications as needed like aspirin or
20          Tylenol or whatever?
21
22  WA:  Yes.
23
24  KA:  And what do you take those for?
25
26  WA:  For headaches.
27
28  KA:  So what kind of headaches do you get?
29
30  WA:  I just get really bad headaches up the back of my head and then
31          sometimes like even right now it's the whole front of my head hurts.
32          So I take them quite a bit.
33
34  KA:  So how frequently do you get these headaches?
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 224

1    WA:  I don't know.  Not - I don't -
2
3    KA:  Once a week?  Once ever two weeks?
4
5    WA:  Maybe ever two weeks, say.
6
7    KA:  Yeah.
8
9    WA:  It's - I don't know, it's really hard to keep track of time here.  I
10        don't know.
11
12   KA:  I understand.  And how bad are they, are they pretty bad?
13
14   WA:  Yeah.
15
16   KA:  So on a zero to ten scale, "zero" means no pain -
17
18   WA:  Probably like an "eight."
19
20   KA:  An "eight."  And how long do they last?
21
22   WA:  For several hours.
23
24   KA:  Okay.  Have you been to the medical people here for these
25        headaches?
26
27   WA:  No.  I just - because medical here always just tells you drink water
28        and take IBU's.  Unless you're bleeding, they don't really want to
29        deal with it.
30
31   KA:  Now, have you always had these kinds of headaches or this is
32        something new?
33
34   WA:  No, I've always had headaches.
35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 225

1    KA:  Of this type?

2

3    WA:  Yeah.

4

5    KA:  Back of the head kind of idea?

6

7    WA:  Yeah.

8

9    KA:  Okay.  Where else did you say?  Back of the head and?

10

11   WA:  Sometimes it's right here.  Like right now, I - it's -

12

13   KA:  On the front?

14

15   WA:  Yeah.  It hurts on the front of my head.

16

17   KA:  You used to have these headaches when you were a kid?  Or it's
18        more when you were a little older?

19

20   WA:  Maybe when I was older.  I don't really - yeah.  I've never stopped
21        to think about when.  They - I've just lived with it.

22

23   KA:  So the only motor vehicle accidents you can - accident you can
24        remember is the one with your mother?

25

26   WA:  Yes.

27

28   KA:  All right.  I think I'm done.

29

30   **FOLLOW-UP INTERVIEW CONDUCTED BY STEVEN E. PITT, D.O.:**

31

32   SP:  Okay.  I just have a couple more questions.  The time is 1:46.

33

34   KA:  Do you want me to move?

35

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 226

1   **PSYCHIATRIC HISTORY PRIOR TO OCTOBER 8, 2000 - PART II:**
2
3   SP:  No, I'm okay right here.   Did - did - have you ever had an
4        experience whereby like you felt like you were almost out of your
5        body?  You're shaking your head "yes."
6
7   WA:  Yes.
8
9   SP:  Explain that to me.
10
11  WA:  Okay.  So I think I'm more aware of it because I'm by myself, but
12       I've had times where I feel like I'm watching myself.  Yes.  It's hard
13       to describe it.
14
15  SP:  And what are you doing when you're watching yourself?
16
17  WA:  Well it could just be random.  I could be - it makes me sound crazy.
18       Like I could be watching TV and just feel like I'm out of my body
19       seeing myself watch TV.
20
21  SP:  Okay.  Is that -
22
23  WA:  Which is - now, I want to say that sometimes when I'm meditating,
24       I can have that feeling too.
25
26  SP:  Okay.  Have you had - did you ever have that feeling though before
27       October 8, 2000?
28
29  WA:  Yes.
30
31  SP:  Okay.  How often?
32
33  WA:  There was one time when I'd first gone to Mexico to do the
34       missionary trip and it was right - I was placed in a home with
35       somebody I didn't know and I remember feeling outside of myself

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 227

1        for the first few days that I was there.  It was - I couldn't - and it
2        was very weird.
3
4   SP:  What about in the year leading up to the offense?  How often did it
5        happen, if at all?
6
7   WA:  I don't know that I ever felt outside of my body because at that
8        time I was feeling like I couldn't grab a hold of my thoughts.
9
10  SP:  Okay.
11
12  WA:  I felt like it was all racing everywhere crazy, like, I don't know.
13
14  SP:  Sometimes I talk to people and they - they believe that in addition
15      to being out of their body but that they take on different
16      personalities.
17
18  WA:  I can't say that.  It's more - no, because I still feel like I'm me, but
19      I just don't feel attached.
20
21  SP:  So prior to October 8, 2000, when do you think the last time you
22      had one of these out-of-body-like experiences?
23
24  WA:  I don't know.
25
26  SP:  A year?
27
28  WA:  I don't think they were frequently.  Like just - just every once in a
29      while.  Just -
30
31  SP:  Okay.  So -
32
33  WA:  I don't know.
34
35  */////////////////////////////////////////////////////////////////////////*

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 228

1   SP:  Do you think in the year before, can you give me a - a sense?  Are
2        we talking one, ten, 100?
3
4   WA:  Oh, no.  I would say in my lifetime I think probably under 12 to 15.
5
6   SP:  Okay.  And of the 12 to 15, in the year - can you give me a sense
7        in that year, or even two years before October 8?
8
9   WA:  I know, it's so hard.  I really can't.
10
11  SP:  Do you think it was more than one?
12
13  WA:  I don't - okay, so I'm going to say this is a deductive reasoning type
14       of thing.  When I'm under - I don't know.  I don't know.  I don't
15       even want to answer it because I just don't know.
16
17  SP:  Well, what were you going to say though?  You were going to say
18       when you're under -
19
20  WA:  I notice myself from my experience here that under moments of
21       extreme stress or like if -
22
23  SP:  Right.
24
25  WA:  I feel like everything is just craziness, and I sit down trying to pull
26       myself back together is probably when I am more likely to have that
27       feeling.
28
29  SP:  Got it.  But as you sit here today you don't know when that last -
30
31  WA:  I can't - yeah, I can't -
32
33  SP:  Episode was before October 8?
34
35  WA:  I really can't say.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 229

1  SP: Do you think it happened on October 8?
2
3  WA: I don't know.
4
5  SP: Okay.
6
7  WA: I wish I could say.
8
9  SP: Okay.  We - we've asked you a bunch of questions.  Is there
10     anything else that you think we need to know that we haven't
11     talked about here?
12
13 WA: I don't - I don't know because I don't know what information you
14     need to know.  I don't know.  I don't know.  Because even like you
15     asked me about all this - these people I've talked to getting ready
16     for the appeal.  They just had endless amounts of questions for me.
17     So you know, then I'm - I don't know what it is you need to know
18     from me.
19
20 SP: I see.  Well, surely you - you knew that we were coming today,
21     correct?
22
23 WA: I did.
24
25 SP: Okay.  So were there certain things in ad -
26
27 WA: And I had this - I didn't even want to come because I knew what we
28     were going to have to talk about and I really thought over the
29     weekend to try to refresh and I couldn't even make myself think
30     about what I know you were going to ask me.  Because I wanted to
31     be more prepared.
32
33 SP: Okay.  Were there any things though that you thought about in
34     advance of this meeting where you're like "wow," I really want the

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 230

1       doctors to know this or I hope that I make this point.  Anything like
2       that?

4  WA:  Well, I know for me just I know that when I was finally told the
5       things about my mood swings and the - and the getting the
6       depression and the - not being able to gather my thoughts and just
7       this - this stuff that I was going through helped explain my behavior
8       to me.  I know that's brought me peace because at least I have a
9       reason for why I am the way I am.  And I don't know - to you that
10      probably means nothing, but for me that's helped me be more
11      accepting of myself.

13  SP:  So - so let me see if I get this right.  What you're saying is you now
14      better understand your actions?

16  WA:  I do, and why - why - why in that moment couldn't I do something
17      different or whatever.

19  SP:  Yeah, so why couldn't you?

21  WA:  I was not able.  My -

23  SP:  Why?

25  WA:  My brain wouldn't even process it.  I can't even - I don't know.

27  SP:  So your brain can't - let's just assume that the - that the pathology
28      reports says that there is a - a knife wound.

30  WA:  Sure.

32  SP:  Your - your - your - you can't process why it is you - you -

34  WA:  Yes.  So I - look - look, the same -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 231

1   SP:  Wait, I didn't finish.
2
3   WA:  Oh, I'm so sorry.
4
5   SP:  You - you - you can't process why you - why - what - why you
6        couldn't do that?
7
8   WA:  No.  I - I sit in my room reading this stuff, the same things that
9        you've looked at and have to have all this knowledge that look you
10       did this, this and this and I'm sitting here - I know who I am, how
11       did that happen?  How did I arrive at that point?
12
13  SP:  So how did you arrive at that point?
14
15  WA:  I don't know.  That's what I'm saying.  It's - it had - it had to be
16       this - this - not being able to - to process things when I'm under
17       extreme stress or not being able to make good decisions, that sort
18       of thing.
19
20  **ISSUE RE: DEFENDANT'S APPRECIATION OF WRONGFULNESS -**
21  **PART IV:**
22
23  SP:  Even when you're under extreme stress and not make good
24       decisions, do you acknowledge that you could appreciate that
25       decisions are still wrong?
26
27  WA:  In that moment I don't know.
28
29  SP:  Okay.
30
31  WA:  Sitting here today, absolutely.
32
33  SP:  So you don't know if in that moment you -
34
35  WA:  I don't.

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 232

1  SP:  You can't tell me if in that moment what you were doing you knew
2        was wrong?
3
4  WA:  Yeah, I can't tell you that.  Sitting here today, yes I can tell you
5        that because I'm looking at it and I know - I - I know.
6
7  SP:  I - I could be wrong about this, but I think there's some things that
8        you did after the offense that would actually speak to your - the fact
9        that you appreciated that some of the things you were doing were
10       wrong.
11
12 WA:  Yeah, I don't know.
13
14 SP:  You wouldn't quibble with that if it's in the records?
15
16 WA:  No, I can't - I'm not trying to - yeah.
17
18 **CONCLUDING REMARKS:**
19
20 SP:  Okay.  All right.  Well, I appreciate you answering all of our
21       questions and I wish you the best of luck.
22
23 WA:  Thank you.
24
25 SP:  Thank you.  I think - let me go - I'm going to keep the equipment
26       on and then -
27
28 WA:  That's fine.
29
30 SP:  Do you want to - what's the protocol?  Do you want us to get her?
31       I don't -
32
33 WA:  Oh.
34
35 SP:  I don't know if she's -

Transcript of Forensic Psychiatric Evaluation
*Re: Wendi Elizabeth Andriano*
November 26, 2013
Page 233

1   WA: Yeah, I should -
2
3   SP:  Why don't you have a seat there, I'll just look for her.
4
5   WA: Okay.
6
7   SP:  If she's -
8
9   WA: She should be in that office.
10
11  SP:  Okay.
12
13  WA: Oh, I am so sorry.  I just saw her right there.
14
15  SP:  Okay.  I'm just going to go ahead and - it's 1:56.  I'm going to shut
16       this equipment off because the -
17
18  WA: Yeah.
19
20  SP:  Correctional officer appears that she is coming in.

# State of Arizona
# v.
# Wendi Elizabeth Andriano

# Report
# of
# Forensic Psychiatric
# Evaluation
# of
# Wendi Elizabeth Andriano
# (Volume II of II)

**Steven E. Pitt, D.O.**

**Steven Pitt & Associates**

**4**

**EXHIBIT "C"**

State of Arizona v. Andriano, Wendi Elizabeth
Case #2000-096032-A

TRANSCRIPT

WENDI ELIZABETH ANDRIANO

POLICE INTERVIEW

LEGEND

WA    :    WENDI ANDRIANO

DB    :    DETECTIVE DAVE BELLISARO

SD    :    DETECTIVE SALLY DILLIAN

FO    :    FEMALE OFFICER (JOSIE)

MO    :    MALE OFFICER (PHIL)

HC    :    HOMER CHALIS

UI    :    UNINTELLIGIBLE

_____

DB:    HERE YOU GO MAAM.

WA:    OK THANKS.

DB:    WENDI I'M DAVE BELLASARO.

WA:    CAN YOU, CAN YOU OPEN THAT.

1

000011500

DB:     YEAH YOU BET.

WA:     I MEAN MY HANDS ARE ALL LIKE MESSED UP.

DB:     OK, MY NAMES DAVE.

WA:     OK.

DB:     OKAY.  I'M A DETECTIVE HERE WITH THE PHOENIX POLICE.

WA:     OK.

DB:     LET ME START WITH MAKING SURE I GOT ALL OF YOUR CORRECT INFORMATION.  IT'S WENDI, WITH AN "I"?  W-E-N-D-I?

WA:     YEAH.

DB:     ELIZABETH.

WA:     YEAH.

DB:     AND IT'S A-N-D-R-I-A-N-D-O?

WA:     NO JUST "O".

DB:     OK, LET'S SEE, A-N-D

WA:     D-R-I-A-N-O

DB:     UI, A-N-D-R-

WA:     I-A-N-O

DB:     N-O.  WENDI.  OKAY AND YOUR BIRTHDAY IS 8/26/70.

2

000011501

WA:     YUP.

DB:     SOCIAL, 5-2-7-6-5-9-7-0-3?

WA:     YEAH.

DB:     AND WE GOT YOU AT 5 FOOT 6, 120, BLUE AND BROWN.

WA:     NO.

DB:     NO?

WA:     HOW FUNNY, I'M 5'4".

DB:     OKAY.  5 FOOT 4

WA:     110 SOMETIMES.

DB:     110

WA:     BROWN AND BROWN, I GUESS EYES.

DB:     BROWN AND BROWN, OKAY.  THAT'S WHY I NEED TO CONFIRM ALL OF THIS STUFF.  YOU LIVE IN

APARTMENT 132?

WA:     UH HUH.

DB:     AND IT'S 4806592630?

WA:     YEAH.

DB:     AND YOU'RE THE MANAGER OF THE APARTMENTS?

WA:     YEAH.

3

000011502

DB:     AND UH PHONE NUMBER FOR THE MANAGEMENT I'VE GOT IS 480-283-8488?

WA:     YES.

DB:     AND IT'S SAND RIVA, R-I-V-A?

WA:     JUST S-A-N AND THEN R-I-V-A.

DB:     S-A-N

WA:     UH HUH.

DB:     R-I-V-A.  TWO WORDS OR ONE?

WA:      UH HUH, TWO WORDS.

DB:     APARTMENTS.  HOW LONG, HOW LONG YOU BEEN MANAGER THERE?

WA:     A YEAR.

DB:     OK.  WENDI UM UNTIL WE GET THINGS FIGURED OUT WHAT I'M GOING TO DO IS, I, I NEED TO

TALK TO YOU ABOUT WHAT'S GOING ON OKAY?

WA:     YEAH.  I WOULD LOVE, I'M LIKE PLEASE.

DB:     OKAY.

WA:     MY HEAD IS JUST KILLING ME AND I'M NOT SURE WHAT'S GOING ON.  WHAT'D I DO?

DB:     OH WERE TRYING TO GET THAT FIGURED OUT.

WA:     OKAY.

DB:     UM LET ME JUST GET A....UM

000011503

WA:   AND I KNOW, I, I HAD TO ANSWER QUESTIONS BEFORE AND I WANT TO COOPERATE AS MUCH

AS POSSIBLE.  UM I'M JUST WONDERING, I'M SITTING HERE JUST THINKING AND THINKING AND MY

DAD ASKED ME IF I NEEDED AN ATTORNEY.  DO I NEED AN ATTORNEY OR IS THIS JUST NORMAL STUFF?

DB:   THAT'S STRICTLY UP TO YOU, MAAM.

WA:   WELL.....

DB:   UM I CAN'T GIVE YOU LEGAL ADVICE.

WA:   OKAY.

DB:   UM I DO WANT TO QUESTION YOU.

WA:   SURE.

DB:   TRY AND GET EVERYTHING....

WA:   ME TOO, YEAH....

DB:   BUT IT'S STRICTLY UP TO YOU, YOU DON'T, IF YOU WANT TO CALL AN ATTORNEY YOU HAVE

THAT RIGHT.

WA:   YEAH I KNOW.

DB:   WHAT I HAVE TO DO ...

WA:   I DON'T KNOW....

DB:   CAUSE WE DON'T KNOW WHAT HAPPENED OUT THERE YET.

WA:   SURE.  YOU'RE JUST TRYING TO FIGURE IT OUT NOW.

5

000011504

DB:   IS I NEED TO ADVISE YOU OF YOUR RIGHTS,

WA:   OKAY, THAT'S FINE.

DB:   OKAY.  FIND MY LITTLE CARD HERE....

WA:   WHERE EVER THEY ARE.

DB:   UM,

WA:   AM I UNDER ARREST THEN?

DB:   WELL,

WA:   WHAT'S GOING ON?

DB:   WERE TRYING TO FIGURE OUT WHAT'S GOING ON, OKAY.

WA:   OKAY.

DB:   BASICALLY YOU ARE NOT FREE TO LEAVE AT THIS POINT CAUSE WERE TRYING TO FIGURE
EVERYTHING OUT.

WA:   SURE.

DB:   OKAY.

WA:   OKAY.

DB:   OKAY, BECAUSE YOU'RE NOT FREE TO LEAVE I'M GONNA ADVISE YOU OF YOUR RIGHTS.

WA:   OKAY.

DB:   OKAY?

6

000011505

WA:    OKAY.

DB:    OKAY, UNTIL WE CAN GET EVERYTHING FIGURED OUT.

WA:    OKAY.

DB:    DECIDE WHAT WE'RE GOING TO DO.

WA:    OKAY.

DB:    OKAY, YOU HAVE THE RIGHT TO REMAIN SILENT, ANYTHING YOU SAY CAN BE USED AGAINST YOU IN A COURT OF LAW.  YOU HAVE THE RIGHT TO THE PRESENCE OF AN ATTORNEY TO ASSIST YOU PRIOR TO QUESTIONING AND BE WITH YOU DURING QUESTIONING, IF YOU SO DESIRE.  IF YOU CANNOT AFFORD AN ATTORNEY YOU HAVE THE RIGHT TO HAVE AN ATTORNEY APPOINTED FOR YOU PRIOR TO QUESTIONING.  DO YOU UNDERSTAND THESE RIGHTS?

WA:    UM HUH.

DB:    I NEED A YES OR NO?

WA:    YEAH.

DB:    YES?

WA:    YES.

DB:    OKAY.  OKAY. UM, I'M SORRY?

WA:    I'M, I'M TRYING TO THINK.  IT'S HARD FOR ME TO FOCUS RIGHT NOW.  I'M SORRY.

DB:    OKAY WELL, IF YOU NEED A BREAK OR SOMETHING ….

7

000011506

WA:     NO.

DB:     ...YOU LET ME KNOW, OKAY.

WA:     ALRIGHT.

DB:     OKAY, WENDI, WELL LET'S DO THIS, UM I WANT TO SEE IF YOU HAVE ANY, ANY INJURIES ON

YOU...

WA:     OH SURE.

DB:     ...OKAY, SO WHAT I'M GONNA HAVE TO DO IS I'M GONNA HAVE TO KIND OF RECORD THEM

HERE ON MY NOTES.

WA:     OH OKAY.

DB:     AND I'M ALSO GONNA HAVE THEM PHOTOGRAPHED, OKAY?

WA:     OH OKAY.

DB:     LET ME GO GRAB MY PHOTOGRAPHER AND WELL GO OVER THEM OKAY?

WA:     OKAY.

DB:     WHY DON'T YOU JUST SIT TIGHT FOR JUST A SECOND.

WA:     OKAY.

DB:     ALRIGHT.

DB:     WENDI

WA:     YEAH

8

000011507

DB: WE'LL LOOK AND SEE WHAT KIND OF INJURIES YOU GOT HERE, OKAY? UI OKAY LET'S SEE

WA: UI, IT'S HURTS, MY HAND HURTS, MY HANDS HURT.

DB: ALRIGHT, UM LET'S SEE YOUR HANDS. LET'S START WITH YOUR RIGHT HAND. ALRIGHT JUST OKAY. OKAY WHAT ELSE WE GOT ON THIS HAND, A SMALL CUT, INDEX FINGER. OKAY AND THEN YOU GOT SOME BRUISING? LET ME SEE YOUR HAND.

WA: (UI) SHAKING.

DB: OKAY. MIDDLE FINGER YOU'VE GOT BROKEN NAIL. OKAY AND TURN YOUR HAND BACK OVER FOR ME. OKAY ONE MORE TIME TURN YOUR HAND.

WA: THESE WERE HERE EARLIER TODAY.

DB: THOSE WERE THERE EARLIER...

WA: YEAH I DON'T KNOW WHAT IT IS FROM BUT...

DB: OKAY, RIGHT HAND

WA: TWO LITTLE KIDS YOU DON'T KNOW WHAT....

DB: (LAUGHING) YEAH. OAKY LET ME SEE YOUR, IS THERE ANY OTHER INJURIES ON THIS ARM AT ALL?

WA: I, I DON'T KNOW.

DB: NOT THAT YOU SEE?

WA: I MEAN I CAN....

9

000011508

DB:     OKAY.

WA:     I DON'T KNOW.

DB:     LET ME SEE YOUR LEFT HAND.

WA:     I KNOW MY PINK...

DB:     PARDON ME?

WA:     ... JUST (UI) AROUND MY RIBS, MY NECK.

DB:     OKAY AND YOU GOT, IS THAT A CUT THERE?

WA:     (UI)

DB:     LOOK LIKE YOU CUT THIS?

WA:     (UI) YEAH.

DB:     OKAY.

WA:     IT'S ALL SWOLLEN.

DB:     OKAY, LET'S SEE, YOU HAVE BRUISING...

WA:     I CAN'T, YEAH I CAN'T OPEN THAT FINGER ALL OF THE WAY.

DB:     OKAY TURN IT OVER FOR ME, BRUISING TOO.

WA:     RIGHT THIS JUST ALL HURTS.  LIKE MY FINGERS BROKEN.

DB:     OKAY. OKAY ANY, ANY OTHER INJURIES ON THE ARM HERE?  OKAY.

10

000011509

WA:     NOT THAT I KNOW, YOU KNOW I MEAN...

DB:     OKAY HOW ABOUT YOUR LEGS?  WELL LETS SEE, LET ME SEE YOUR NECK.  OKAY.

WA:     I KNOW HE HAD ME AROUND MY NECK.

DB:     CAN YOU KIND OF PULL YOUR HAIR BACK FOR A MINUTE?

WA:     SORRY.

DB:     OKAY

WA:     I DON'T BRUISE VERY EASY. (LAUGHS)

DB:     OKAY, HOW ABOUT YOUR LEGS?  LET ME TAKE A LOOK AT YOUR LEGS THERE.

WA:     LOOKS LIKE SOMETHING, I HAVE NO IDEA.

DB:     OKAY. LET'S SEE..

WA:     LIKE I SCRAPED IT ON SOMETHING.

DB:     RIGHT SIDE.

WA:     MY LEGS DON'T HURT THOUGH.

DB:     YOUR LEGS AREN'T HURTING AT ALL?

WA:     JUST RIGHT HERE ON THIS SIDE.

DB:     OKAY, HOW ABOUT YOUR LEFT LEG?

WA:     YEAH I DON'T' SEE ANYTING ON THAT LEFT SIDE.

11

000011510

DB:     OKAY.  OKAY, UM YOU, YOU SAID YOUR RIBS HURT?

WA:     MY RIBS HURT REALLY BAD ACTUALLY.

DB:     WHEREABOUTS?

WA:     PROBABLY LIKE RIGHT WHERE HE, HE SQUEEZES ME TOGETHER.

DB:     OKAY.

WA:     AND THAT'S WHERE THEY HURT.

DB:     OKAY. WELL WHAT I CAN DO IS I CAN HAVE A FEMALE OFFICER ...

WA:     YEAH SHE CAN LOOK (UI)

DB:     I'LL HAVE ONE OF MY FEMALE DETECTIVES COME IN AND TAKE A LOOK AS WELL.

WA:     OKAY.

DB:     TAKE A LOOK AT YOUR, YOU CAN PULL UP YOUR SHIRT AND TAKE A LOOK AT YOUR RIBS.

WA:     OKAY.

DB:     OKAY? LET'S UH, LET'S GO AHEAD (UI) START WITH OVERALLS.  GO AHEAD AND STAND RIGHT

HERE MAAM.

WA:     OH GREAT.

DB:     JUST, YEAH BEST YOU CAN JUST LAY RIGHT (UI) BEST YOU CAN.  IF YOU CAN'T YOU CAN'T.

WA:     OKAY.

FO:     TURN TO THE SIDE.

12

000011511

DB: PARDON?

FO: DID YOU WANT HER ON HER SIDE THERE?

DB: YEAH.

FO: GO AHEAD AND FACE THE WALL. OKAY, TURN TO THE OTHER SIDE. OKAY.

DB: OKAY, UM LET'S GO AHEAD AND GET SOME OF HER HANDS.

FO: OKAY, LAY STILL.

WA: OKAY.

DB: (UI)

FO: (UI) FLIP THEM OVER AND THEN DO ONE AT A TIME (UI)

DB: OKAY, OKAY, OKAY.

FO: (UI)

DB: WE'LL DO THEM WITH A COLOR CHART IN WITH YOUR SCALE.

FO: OKAY, WHICH HAND DO YOU WANT TO DO FIRST?

DB: DOESN'T MATTER.

FO: OKAY, JUST UM

DB: LET'S START WITH THIS (UI) KIND OF HAVE TO LEAVE IT UP, THE BEST YOU CAN.

FO: CAN YOU HAVE HE SIT DOWN ?

13

000011512

DB:     OKAY, YOU BET. YOU BET. WHATEVER'S BEST FOR YOU.

FO:     OKAY (UI) OKAY THEN (UI)

WA:     WHERE AT THIS WAY?

DB:     THIS WAY.

FO:     UM HUH.

DB:     OKAY GIVE ME ONE WITH THE SCALE.

FO:     (UI) OKAY (UI) WITH YOU.

WA:     (UI)

DB:     OKAY, UM

FO:     DO YOU WANT TO KIND OF DO THIS AREA (UI)

DB:     (UI) OKAY.

FO:     GO AHEAD YOU'RE OKAY.

DB:     OKAY TURN YOUR HAND OVER FOR ME.

WA:     MY HAND'S JUST KILLING ME.

DB:     I KNOW I'M SORRY.

FO:     (UI)

DB:     OKAY, I'LL COME MEET YOU DOWN THERE. I'M TRYING TO ROTATE IT THE OTHER WAY.

14

000011513

FO:    THERE YOU GO.

DB:    NOW THE OTHER.

WA:    MY HANDS ARE SHAKING.

DB:    YEAH.  OKAY ON THAT HAND TOO, THERE'S A BROKEN NAIL.  OKAY TURN, TURN YOUR HAND, OOPS.  LET ME SEE THESE.  I'M TRYING TO ROTATE YOUR HAND...

FO:    (UI)

DB:    YEAH.  JUST ABOUT RIGHT THERE.  THAT SHOULD SHOW BOTH OF THOSE RIGHT?

FO:    RIGHT.

DB:    MY HEAD IN YOUR WAY?

FO:    NO.

DB:    OKAY.

FO:    (UI)

WA:    OKAY.

FO:    (UI) LET ME GET THE (UI) CHART WITH YOU, RIGHT HERE.

DB:    OKAY, OKAY.

WA:    OKAY.

FO:    WELL GO AHEAD AND LEAVE YOUR HAND THERE.

WA:    OH, OKAY.

15

000011514

DB:    DO YOU WANT IT WITH THIS?

FO:    (UI)

DB:    WAS THIS UM NAIL BROKEN TONIGHT ?

WA:    NO ALL OF MY NAILS WERE FINE..

DB:    OKAY, RIGHT THUMB NAIL BROKEN TOO.

FO:    OKAY WERE ALMOST DONE WITH YOUR HAND.

WA:    THAT'S FINE.

FO:    OKAY.

DB:    OKAY.

FO:    DO YOU WANT TO DO HER THUMB AGAIN?  TO SHOW THAT THERES NO NAIL?

DB:    OKAY, THUMB NAIL, OKAY YEAH. . THAT'S FINE.  JUST TO SHOW THAT YOU....,.

WA:    WHY DO YOU DO ALL OF THIS STUFF?

DB:    WELL TWO THINGS, YOU KNOW YOU HAVE OBVIOUS  INJURIES FROM WHAT OCCURRED

TONIGHT.

WA:    UH HUH.

DB:    SO WE WANT TO SHOW ALL OF THAT, WE WANT TO PROPERLY DOCUMENT ALL OF THAT.

WA:    OKAY.

DB:    OKAY AND

16

000011515

P-App. 004384

FO:     (UI)

DB:     GET AROUND OKAY.  COLOR CHART HELPS US UH WERE JUST MAKING SURE WE GOT THE RIGHT COLOR ON YOUR BRUISING. (UI)

FO:     (UI)

WA:     FOR WHAT?

DB:     WELL YOU HAVE ALL OF THESE INJURIES FROM WHAT OCCURRED TONIGHT AND MY UNDERSTANDING IS, WHAT YOU AH WHAT YOU TOLD THE PATROLMAN ...

FO:     OKAY.

DB:     WAS THAT UH, THAT THIS WAS BASICALLY YOU THAT YOU WERE ATTACKED AND SO WE NEED TO DOCUMENT THAT.  TO SHOW THAT, THAT YOU....

FO:     (UI) YOUR HAND LIKE THAT.

WA:     OH OKAY.

FO:     GO AHEAD AND DO THE BITE MARK OVER THERE.

DB:     OKAY.

FO:     THE WAY HER FINGER IS BENT....

WA:     I CAN'T.

FO:     YEAH I KNOW, THAT'S WHY WE'LL DO IT THIS WAY.

DB:     LIKE THIS?

17

000011516

FO:     THAT WAY. OKAY.

DB:     OKAY. YOU WANT TO TURN YOUR HAND THE OTHER WAY.

FO:     OKAY.

DB:     OKAY. (UI)

FO:     ON THE ONE WITHOUT THE COLOR CHART?

WA:     UM HUH.

DB:     YEAH.

FO:     I NEED TO DO IT WITH THAT. (UI)

DB:     PARDON ME?

FO:     (UI) AND PHOTOGRAPH?

DB:     YEAH.

FO:     OKAY. (UI)

DB:     ROTATE. YEAH ROTATE. DID YOU WANT THIS ONE?

FO:     YEAH.

DB:     OKAY.

FO:     WELL WILL DO THIS FIRST THOUGH.

DB:     OKAY. COLOR CHART.

18

000011517

FO:     OKAY.

DB:     OKAY.  ALRIGHT AND LET ME SEE, WE'VE GOT THE FRONT OF HER LEG.

FO:     OKAY.

DB:     DO YOU NEED THE ONE...

FO:     YEAH I JUST WANT TO DO THIS NEXT ONE.  GO AHEAD PUT YOUR HAND ON YOUR SIDE...

WA:     OH OKAY.

FO:     AND THEN I WANT TO DO THIS FINGER.  TRY AND STRAIGHTEN IT OUT AS MUCH AS YOU CAN, I KNOW IT HURTS.

WA:     OH PLEASE DON'T PUSH IT.

DB:     OKAY WE WON'T PUSH IT.

FO:     OKAY I'M SORRY I DIDN'T MEAN TO.

WA:     UM LIKE I THINK IT'S BROKEN.

FO:     OK, (UI)  TURN IT THIS WAY, THAT WAY, KIND OF LIKE THAT.

DB:     OKAY.

FO:     THERE YOU GO.

DB:     OKAY.

FO:     (UI) THE ARMS?

DB:     UH NO NOT YET.  HER RIB CAGE. (UI)

19

000011518

FO:     OKAY. I NEED THE COLOR CHART RIGHT HERE.

DB:     COLOR CHART RIGHT IN THE MIDDLE? WE'LL DO A COUPLE OF YOUR NECK AND THEN UM, WHAT I'M GONNA DO IS HAVE MY PARTNER SALLY DELANE COME IN HERE.

WA:     OKAY.

DB:     THAT WAY YOU CAN LIFT YOUR SHIRT UP AND TAKE A LOOK AT YOUR RIBS. HOW LONG HAVE YOU BEEN THE APARTMENT MANAGER THERE?

WA:     SINCE LAST OCTOBER.

DB:     THIS LAST OCTOBER? (UI) NECK. UM LET'S DO IT STRAIGHT ON AND THEN FROM EACH SIDE AS WELL.

FO:     OKAY.

DB:     SO, OKAY (UI) THERE YOU GO.

FO:     I'M GONNA TAKE ANOTHER ONE.

WA:     (UI) ABOUT TO FALL OFF.

FO:     YEAH (UI).

DB:     OKAY, I DON'T WANT TO GET MY HAND IN THERE. HOW'S THAT?

FO:     OKAY. (UI)

DB:     YEAH.

FO:     OKAY.

20

000011519

DB:     OKAY, MAAM IF YOU'LL TURN TOWARDS ME, JUST A LITTLE BIT.

WA:     RIGHT HERE?

DB:     AND KIND OF, YEAH KIND OF LIFT YOUR UP A LITTLE BIT. THANK YOU. HOW ABOUT IF WE GO ABOVE HER, RIGHT THERE?

FO:     THAT'S NEXT. PROBABLY BETTER IF WE DID IT ....

DB:     OKAY.

FO:     THE CENTER HAS TO BE LIKE RIGHT AGAINST THIS THING.

DB:     OKAY.

FO:     WE'LL TRY IT LIKE THIS.

DB:     OKAY. LET ME KNOW IF THAT POKES YOU THERE OR NOT.

WA:     OKAY.

DB:     OKAY YOU CAN TURN. (UI) CHAIR BACK THERE. OKAY.OKAY LET ME GET ONE OF THE BACK OF YOUR NECK TOO MAAM.  I'M JUST GONNA PULL DOWN YOUR SHIRT HERE FIRST, RIGHT THERE.

WA:     (UI)

DB:     OKAY. OKAY MAAM GO AHEAD AND HAVE A SEAT, I'LL GET DETECTIVE DELANE AND SHE'LL BE RIGHT IN.

WA:     OKAY. I HAVE A BIG OL KNOT ON THE BACK OF MY HEAD.

DB:     YOU HAVE A KNOT ON THE BACK OF YOUR HEAD?  IS IT SWOLLEN?

21

000011520

WA:    WELL IT JUST HUR....IT, I DON'T KNOW.  IT JUST HURTS.

DB:    CAN YOU FEEL IT AND SEE IF YOU CAN FEEL ANY SWELL.

WA:    YEAH I CAN FEEL IT.

DB:    OKAY, WHAT I CAN DO IS I CAN PUT ON RUBBER GLOVES AND FEEL THE BACK AND SEE IF I FEEL

KNOTS.

WA:    THAT'S FINE.

DB:    OKAY.

WA:    MY DAD'S A PHOTOGRAPHER.

FO:    OH YEAH.

WA:    UM HUH.  AAH MAN.  THIS FINGER FEELS LIKE IT'S GOING TO EXPOLDE.

FO:    WHAT FINGER HURTS?

SD:    HEY WENDI?

WA:    YEAH.

SD:    HI I'M SALLY DELANE.

WA:    OKAY.

SD:    AND I WORK WITH DAVE.

WA:    ALRIGHT.

SD:    NOW HE SAYS YOU HAVE SOME INJURIES

22

000011521

WA:     WELL I DON'T KNOW IF THERE'S BRUISING, I JUST

SD:     OKAY WELL COME ON JUST STAND OVER HERE FOR ME AND JUST UM CAN YOU JUST LIFT UP YOUR BLOUSE FOR RIGHT NOW?

WA:     IT'S JUST ALL RIGHT HERE IT HURTS AND I JUST TAKE IT SO THEN I CAN:....

SD:     ANY PLACE SPECIFIC THAT

WA:     YOU KNOW WHAT I JUST FEEL IT LIKE RIGHT HERE ONE THE SIDES.

SD:     OKAY LET ME JUST TURN YOU AROUND HERE.

WA:     OKAY.

SD:     OKAY, WHAT I WANT TO DO IS, I WANT, LET'S HAVE, HAVE YOU HOLD IT RIGHT THERE AND JOSIE IF YOU COULD JUST TAKE A COUPLE OF PICTURES OF THE, OF THE

WA:     LOOK I DON'T BRUISE.  I DON'T KNOW IF THEIR JUST SORE.

SD:     OKAY.

FO:     (UI) IT'S FROM HER WAIST UP TO THE SHIRT LINE?

SD:     RIGHT.

FO:     LET ME GET A QUICKY WITH A COLOR CHART THERE.

SD:     (UI) WHY DON'T YOU GO AHEAD AND THEN DO HERE TO HERE AND THEN DO THERE TO THERE.

FO:     OKAY.  YOU DON'T BRUISE EASILY?

WA:     NO.

23

000011522

P-App. 004391

FO:     OKAY.

SD:     OKAY AND NOW I JUST, JUST LET ME PULL THAT UP FOR JUST A SECOND CAUSE I DON'T SEE.

SD:     JOSIE CAN YOU JUST, ACTUALLY DO ME A FAVOR JUST TAKE THAT OFF.

WA:     I WOULD LOVE TO THROW IT IN THE TRASH.

SD:     ALRIGHT.  OKAY.

WA:     MY NECK AND HEAD HURTS.

SD:     AND THEN UM JOSIE WHY DON'T WE JUST DO THIS AND JUST TAKE AN UPPER...

FO:     OKAY.

SD:     SHOT FOR US.

FO:     OKAY.

SD:     AND THEN WE JUST DO (UI).  FROM HERE TO THERE

FO:     UH HUH.

SD:     AND THEN THE TOP HALF.

FO:     YEAH.

SD:     AND THEN WE'LL DO.  WELL I WANT BOTH....

FO:     RIGHT

SD:     BUT JUST RIGHT NOW.

24

000011523

FO:     UM HUH.

SD:     THAT'S OKAY, GO AHEAD AND PUT YOUR BLOUSE BACK ON.

FO:     (UI)

SD:     YOU ONLY GOT ONE SIDE?

FO:     RIGHT, CAUSE I JUST DID (UI)

SD:     LOWER, WE JUST NEED TO DO LOWER?

FO:     NO I DID FROM HERE TO THERE

SD:     OKAY

FO:     AND THERE TO THERE, AND THEN

SD:     OH OKAY. OKAY.  YOU CAN KIND OF LIKE, I WISH I HAD ANOTHER BLOUSE FOR YOU OR

SOMETHING ELSE TO PUT ON UM UH YOU KNOW HANG ON JUST A SECOND LET ME SEE IF I CAN GET A

BUNNY SUIT.  I MIGHT HAVE A BUNNY SUIT OUT HERE.  THEIR JUST, THEIR LIKE LITTLE BROWN RABBIT

SUITS BUT AT LEAST IT WOULD MAKE YOU FEEL BETTER.  LET ME SEE WHAT I GOT.

WA:     OK, THANKS.

SD:     WENDI I CHECKED OUT TO GET A BUNNY SUIT, OKAY

WA:     THAT'S OKAY.

SD:     SO WE'LL AT LEAST GET YOU OUT OF THOSE CLOTHES ANYWAY.

25

000011524

FO:    I WAS WONDERING DID YOU WANT ANYMORE CLOSE UPS OF HER WITH THE SHIRT ON OR DO YOU WANT....

SD:    HAVE YOU TAKEN ANY OFCLOSE....

FO:    I JUST TOOK OVERALL (UI) WITH THE SHIRT ON.

SD:    OKAY

FO:    (UI) YOU KNOW TO GET, YOU KNOW THE FRONT OF THE SHIRT BECAUSE....

SD:    YEAH WE'LL DO THAT FIRST SO.  OKAY LET'S DO YOUR (UI) WE SHOULD BE ABLE TO GET YA ....

FO:    WENDI GO AHEAD AND STEP TO YOUR LEFT PLEASE.  THAT WAY.

WA:    OKAY.

FO:    GO AHEAD.

SD:    OKAY WENDI WE NEED, I NEED YOU TO TAKE YOUR GLASSES OFF AND PUT YOUR SHIRT ON FOR JUST A SECOND IF YOU WANT TO DO IT WITH YOUR GLASSES ON AND THEN WE'LL TAKE A COUPLE OF PICTURES OF YOUR SHIRT AND THEN I'LL GET A BUNNY SUIT FOR YA.

WA:    OKAY.

FO:    THIS WAY.  JUST THE SHIRT RIGHT?

SD:    YEAH, JUST...

SD:    OKAY AND THEN TURN AND JUST LIFT UP YOUR AND THEN TURN THIS WAY.  THERE YOU GO. SO THAT SHE CAN GET (UI) YOUR ARM IS WHAT I'M INTERESTED IN AND THEN PUT YOUR ARM DOWN AND JUST TAKE AH.  OKAY NOW FLIP AROUND TOWARDS THE WALL.  (UI)  OKAY (UI)

26

000011525

FO:     AM I GETTING CLOSE UPS OF THE ONE SHOULDER?

SD:     YEAH (UI)  OKAY NOW IF YOU CAN FACE THIS WALL FOR ME AND (UI)

FO:     OKAY LIFT UP YOUR HAND SO THAT I GET UNDERNEATH HERE.

SD:     OKAY.

(KNOCK ON DOOR) (UI)

SD:     COOL.  THANK YOU.  OKAY YOUR NOT GOING TO LOOK GLAMOROUS OKAY BUT I'LL AT LEAST BE

ABLE TO GET YOU CLEAN.  UM I'M ALSO GONNA NEED YOU TO TAKE YOUR SHORTS, OKAY? OFF FOR

AND THEN THIS IS

WA:     YOU KNOW WHAT THOUGH I AM ON MY PERIOD AND I NEED TO KEEP MY SHORTS ON.

SD:     DO YOU, I MEAN DO YOU HAVE PANTIES OR?

WA:     NON VERBAL RESPONSE.

SD:     WELL WERE GONNA EVENTUALLY GONNA NEED TO TAKE YOUR SHORTS SO...

WA:     OH.

SD:     IF, IF YOU WANT RIGHT NOW AND YOU FEEL MORE COMFORTABLE DOING THAT YOU CAN BUT

WA:     AND THEN CAN I GIVE THEM TO YOU BEFORE I LEAVE?

SD:     AND THEN, YEAH THAT'S FINE.

WA:     I JUST DON'T (UI)

SD:     OKAY THAT'S FINE.  I UNDERSTAND WHAT YOU'RE SAYING.

27

000011526

WA:     I DON'T WANT TO MAKE A MESS.

SD:     DO YOU NEED A TAMPAX OR ANYTHING?

WA:     I DON'T KNOW.

SD:     OKAY CAUSE IF YOU NEED SOMETHING I PROBABLY COULD FIND IT AT MY DESK SO.

WA:     I JUST REALLY COULD USE AN ASPIRIN RIGHT NOW.

SD:     YOU KNOW I DON'T (UI)

WA:     NOBODY SEEMS TO HAVE ANY.

SD:     YOU KNOW

FO:     I THINK I HAVE SOME MOTRIN OR TYLENOL DOWN STAIRS.

SD:     MAYBE WHEN, WHEN WERE THROUGH HERE

FO:     OKAY

WA:     YEAH

SD:     (UI)

FO:     WHICH ONE YOU WANT TO PUT IN AN (UI)

SD:     NO I DON'T THINK SO.  UM DID YOU GUYS TAKE FEET PHOTOS?

FO:     NO FEET PHOTOS.  JUST ONE LEG WHERE SHE HAS

SD:     OKAY THAT'S FINE JUST DO A QUICKY ON THE FEET.

28

000011527

FO:     (UI) TOGETHER THEN.

SD:     AH THIS IS GONNA SOUND ODD BUT WHAT I NEED YOU TO DO IS JUST TURN YOUR HEAD AND DO THAT FOR ME, SO THAT SHE CAN ...

WA:     (UI)

SD:     WELL THAT'S, THAT'S OKAY.

WA:     OKAY.

JO:     DO YOU WANT ME TO GET (UI)

SD:     YEAH AND WHEN DO YOU A FRONT SHOT THERE YOU GO.

WA:     (UI)

SD:     YEAH I'LL TRY AND HELP YOU,

WA:     OKAY.

SD:     OKAY AND THE SAME THING WITH THE OTHER FOOT FOR ME PLEASE.  OKAY AND LOOK TO YOUR SIDE HERE, THERE YOU GO.

FO:     WHAT ABOUT HER HEEL?

SD:     FLASH DIDN'T GO ON THAT ONE.

FO:     YEAH I KNOW.  HANG ON.  OKAY.  DO YOU WANT HER HEEL TOO?

SD:     YEAH LET'S GO AHEAD AND DO THE HEEL.

FO:     WAIT A SECOND.

29

000011528

SD:     YOU KNOW WHAT YOU CAN PUT IT DOWN IF YOU'RE MORE COMFORTABLE, SURE.  SURE.

WA:     AH THAT'S MUCH BETTER.  I THINK EVERY MUSCLE IN MY BODY HURTS RIGHT NOW.

SD:     OKAY.  I THINK THAT'S GONNA DO IT FOR RIGHT NOW.  I'LL AH GO TELL DAVID BACK THERE.

YOU LOOK DASHING.

WA:     IT'S WARM.

SD:     YOU KNOW THAT'S RIGHT.

WA:     I WAS FREEZING COLD.

SD:     OKAY THERE YOU GO.

FO:     (UI)

SD:     SURE WHY DON'T WE GO AHEAD AND

WA:     OKAY

FO:     (UI)

WA:     IS MY NECK BRUISED?

FO:     IT HAS LIKE SCRATCH MARKS, RED MARKS. OKAY TURN (UI) CAN YOU TRY AND PUT YOUR HAIR

BEHIND YOUR EARS PLEASE.

WA:     OKAY.

FO:     OKAY, THANK YOU.

WA:     UH HUH

30

000011529

P-App. 004398

DB:   OKAY WENDI THEY ALL DONE WITH YOU?

WA:   YEAH. SHE GOT ME THING TO WEAR.

DB:   SHE HAD TO CHANGE YOU HUH?

WA:   YEAH.

DB:   ALRIGHT IS THAT A LITTLE BETTER?

WA:   AT LEAST IT'S WARMER, YEAH.

DB:   OKAY. ALRIGHT WENDI WHAT I WANT TO DO IS START GETTING SOME BACKGROUND ON YOU OKAY? NOW LET'S SEE, IS IT JOE OR JOSEPH?

WA:   JOE.

DB:   JOE?

WA:   YEAH.

DB:   UM HOW LONG HAVE YOU AND JOE BEEN MARRIED?

WA:   SINCE '94.

DB:   SINCE 1994?

WA:   YEAH.

DB:   SO IT'S BEEN SIX YEARS?

WA:   YEAH, THIS WOULD BE SEVEN IN JANUARY.

DB:   SEVEN IN JANUARY. HOW, HOW LONG DID YOU DATE BEFORE YOU GOT MARRIED?

31

000011530

WA:   TWO YEARS.

DB:   TWO YEARS.

WA:   YEAH.

DB:   DID YOU LIVE TOGETHER OR..

WA:   UM MMMM WE DID BEFORE WE GOT MARRIED, YEAH.

DB:   YEAH, HOW LONG?

WA:   JUST FOR A LITTLE WHILE.  UM UM I MET HIM IN MARCH OF OF 92 WE GOT MARRIED IN
JANUARY OF 94 AND HE MOVED IN WITH ME LIKE IN 93 SOMETIME.

DB:   OKAY.

WA:   I DON'T EVEN REMEMBER.

DB:   OKAY.

WA:   SO MAYBE NOT A FULL YEAR.

DB:   NOT A FULL YEAR?

WA:   YEAH.

DB:   OKAY, UM YOU HAVE TWO CHILDREN TOGETHER?

WA:   UM HUH.

DB:   AND I JUST WANT TO MAKE SURE I GOT THEIR CORRECT BIRTH DATES.

WA:   ONE BORN IN 97 AND ONE IN 98.

32

000011531

P-App. 004400

DB:     YOU HAVE NICKOLAS

WA:     UH HUH.

DB:     JUNE 20, 97

WA:     RIGHT.

DB:     AND HE'S UM 3?

WA:     YEAH HE'S 3.

DB:     AND IS HE VERBAL?

WA:     OH VERY MUCH SO.

DB:     OKAY HE TALKS PRETTY WELL?

WA:     YEAH, SO DOES SHE.

DB:     UM AN ASHLEY IS 9/16 OF 98?

WA:     RIGHT

DB:     SO SHE TWO?

WA:     RIGHT

DB:     AND SHE'S PRETTY VERBAL TOO.

WA:     YEAH.

DB:     OKAY.  UM AND THESE ARE YOUR ONLY TWO CHILDREN?

33

000011532

P-App. 004401

WA:    UM HUH.

DB:    HE DOESN'T HAVE ANY FROM ANY, ANOTHER PRIOR RELATIONSHIP OR

WA:    NOT THAT I'M AWARE OF.

DB:    OKAY

WA:    I MEAN NO.  THOSE ARE MY ONLY TWO.

DB:    OKAY.  UM HOW LONG HAVE YOU GUYS BEEN LIVING IN THAT APARTMENT?

WA:    UM A YEAR.

DB:    A YEAR?

WA:    I THINK WE MOVED IN LAST OCTOBER, NOVEMBER.

DB:    LAST OCTOBER?

WA:    SOMETHING LIKE THAT YEAH.

DB:    HAD YOU BEEN DRINKING AT AT LAST NIGHT?

WA:    NO.

DB:    OKAY.  USE ANY TYPE OF STREET DRUGS?

WA:    NO

DB:    OKAY.  UM ARE YOU ON ANY PRESCRIPTION MEDICATION?

WA:    NO.

34

000011533

DB:     NO.

WA:     NO.

DB:     OKAY.  NOW MY UNDERSTANDING IS JOE WOULD'NT HAD SOME MEDICAL PROBLEMS?

WA:     YEAH.  SOME MAJOR ONE TOO.

DB:     OKAY, TELL ME ABOUT THOSE.

WA:     IT'S A LONG STORY.  UM WE GOT MARRIED IN 94 AND THAT SPRING OR COUPLE MONTHS OR

COUPLE MONTHS AFTER WE GOT MARRIED HE STARTED.  YOU WANT ALL DETAILS?  I MEAN HOW

DETAILED DO YOU WANT ME TO GET?

DB:     YEAH, NO HIS MEDICAL CONDITION?  OR ARE YOU TALKING ABOUT PRIOR ..

WA:     HISTORY, JURY WHAT, WHAT HE WANTS.

DB:     LET'S START WITH HIS MEDICAL CONDITION.

WA:     OK.

DB:     OKAY AND THEN WE'LL GO INTO THE HISTORY OF EVERYTHING.

WA:     OH OKAY HIS MEDICAL CONDITION CURRENTLY IS UM HAS ADNOIDCYSTICCARCINOMA, IS THE

NAME OF IT AND IT'S A SALIVARY GLAND CANCER THAT MATASIZED TO HIS LUNGS AND UM HE'S

CURRENTLY TAKING CHEMO TREATMENTS FOR IT.

DB:     WHEN DID THAT PROBLEM START?

WA:     IN 94.

35

000011534

DB:    IN 94?

WA:    BUT WE DIDN'T KNOW IT WAS CANCER IN 94. WE FOUND OUT ABOUT IT IN 97.

DB:    97?

WA:    98, I DON'T REMEMBER. 97 I THINK.

DB:    AND HE'S BEEN GOING, UNDER GOING CANCER TREATMENT SINCE THEN?

WA:    NO HE, WELL HMMM, HE UM THOUGHT HE WOULD TRY THE HOMEOPATHIC WAY AND SO HE TRIED THAT TREATMENT AND JUST UM FOUR MONTHS AGO DECIDED BECAUSE IT, IT WAS STARTING TO BECOME A PROBLEM. HE COULDN'T BREATHE AND HE WAS STARTING TO FEEL THE EFFECTS OF THE CANCER IN HIS LUNGS UM TO GO AHEAD AND TRY CHEMO. SO HE JUST UM I, I KNOW HE'S HAD FOUR TREATMENTS OF CHEMO.

DB:    FOUR TREATMENTS?

WA:    AND THOSE ARE EVERY 3 WEEKS OR SO.

DB:    OKAY.

WA:    SOON AS HIS IMMUNE SYSTEM UP HIGH ENOUGH TO TAKE ANOTHER DOSE.

DB:    ANY IDEA WHEN HIS LAST TREATMENT WAS?

WA:    UMM JUST LIKE A WEEK AGO.

DB:    OKAY, IS HE TAKING ANY AH PRESCRIPTION MEDICATION AS WELL?

WA:    YEAH.

36

000011535

DB:   OKAY. WHO HAD ALL OF THAT?

WA:   I GUESS IT'D BE IN THE HOUSE.

DB:   SHOULD BE IN THE HOUSE?

WA:   YEAH.

DB:   IS THERE QUITE A FEW DIFFERENT THINGS OR?

WA:   UMMM NO I THINK JUST TWO.

DB:   DO YOU RECALL WHAT THOSE ARE?

WA:   SOMETHING FOR NAUSEA. I D ON'T KNOW THE NAMES OF THEM. I KNOW ONE WAS ZOFRAN. I DO KNOW THAT.

DB:   ZOFRAN?

WA:   UH HUH AND WHAT ELSE DID HE TAKE, UM HE HAD TO GO IN EVERY DAY AND GET SHOTS.

DB:   SHOTS EVERYDAY?

WA:   AND I DON'T KNOW WHAT THOSE ARE EITHER.

DB:   OKAY. UM

SD:   TWO ADVIL.

WA:   OH YOUR SUCH A DOLL. THANK YOU.

SD:   THERE YOU GO. OKAY.

WA:   THANKS.

37

000011536

P-App. 004405

SD:     YOU BET.

DB:     OKAY, WHO'S HIS DOCTOR?

WA:     KELLOGG.

DB:     K-E-L-L-O-G-G?

WA:     JUST LIKE THE CEREAL, YEAH.

DB:     (UI)

WA:     OH SEE I DON'T KNOW.

DB:     WE'LL TAKE A GUESS.  YOU KNOW WHERE HE'S OUT OF?

WA:     CHANDLER REGIONAL.

DB:     OKAY.  ANY OTHER TYPE OF MEDICAL PROBLEMS HE'S HAVING?

WA:     UM I KNOW THAT HE SAYS HIS HEART HURTS A LOT.

DB:     (UI)

WA:     HIS HEART.

DB:     OKAY.

WA:     I'M SORRY.

DB:     OH IT'S OKAY.  I DON'T HEAR REAL WELL SO....

WA:     OH I'M SO SORRY.  OKAY.

38

000011537

P-App. 004406

DB:     UM HEART PROBLEM, HEART ACHES.

WA:     YEAH, HEART.  I DON'T KNOW WHAT YOU WANT TO CALL IT.

DB:     HEART PAIN.  OKAY. OKAY. UM OKAY YOU STARTED TO TELL ME THERE WAS SOME HISTORY

THERE...

WA:     YEAH.

DB:     START BACK AT THE BEGINNING WHAT WAS THAT?  TELL ME ABOUT THAT?

WA:     UM

DB:     WHAT'D, WHAT KIND OF SYMPTOMS?

WA:     UM THIS IS THE SOURCE OF THE FRUSTRATION.  UM IN 94 RIGHT AFTER WE GOT MARRIED UM

UM HE STARTED GETTING A PAIN IN HIS JAW AND STARTED FEELING LIKE A LUMP SO WE GO, WENT TO

UM A DOCTOR UM AND THE DOCTOR SAID THAT HE JUST HAD A SOME KIND OF GROWTH SO LET'S

OPERATE AND TAKE IT OUT.  THEY DO AN OPERATION ON HIM AND UM UM MY HUSBAND ALWAYS HAD

HIS OWN BUSINESS SO GOING THROUGH AN OPERATION KIND OF PUT A LOT OF STRESS ON THINGS SO

HE UM GOES THROUGH THIS OPERATION THEY DO A BIOPSY ON IT AND TELL HIM IT'S A BENIGN MIXED

TUMOR DON'T WORRY ABOUT SHOULDN'T NEVER GROW BACK AND LIKE A YEAR LATER IT'S BACK

AGAIN.  I THINK IT WAS 95 WAS HIS NEXT SURGERY.  WE GO TO U OF A OR UMC DOWN IN TUCSON,

WENT AND  SAW A SPECIALIST AND THEN THEY UM HE OPERATED ON JOE AND UM UM DID LIKE THE

SAME SURGERY, RIGHT IN THE SAME SPOT AND HE SAID WELL THE FIRST SURGEON PROBABLY LEFT

SOME OF THAT TUMOR IN HIS JAW SO LET, I CLEANED IT ALL OUT REALLY WELL AND UM KIND OF

SCOOPED OUT A LITTLE HOLLOW IN HIS NECK AND EVERYTHING AND UM UM I THINK IT WAS IN 96 WAS

HIS NEXT SURGERY BY THE SAME DOCTOR WHO SAID THIS TIME HE HAD ABSOLUTELY NO IDEA WHY IT

39

000011538

KEEPS GROWING BACK, IT JUST MUST BE VERY UM STUBBORN OR YOU KNOW WHATEVER THE DEAL IS

UM SO THEIR PLANNING TO OPERATE AGAIN ON OR THEY DID OPERATE, I CAN'T EVEN REMEMBER

NOW SORRY, UM OKAY THEY DID THE THIRD OPERATION.  THEN THE YEAR THAT I WAS PREGNANT

WITH ASHLEY UM HE'S BACK IN PAIN AGAIN, GO BACK TO THE SAME DOCTOR HE SENDS HIM TO A

DIFFERENT SPECIALIST AND THEY DO UM SOME TESTS ON HIM AND WHATEVER.  THEN THEY SEND HIM

A CAN, THE CANCER CENTER DOWN IN AT U OF A, WHICH IS SUPPOSE TO BE REALLY GOOD AND THE

ONCOLOGYST THERE JUST LOOKS AT HIS STUFF, HIS RECORDS, DIDN'T DO ANY TESTS ON JOE AND TOLD

HIM THAT SOMETHING WAS REALLY WRONG AND THAT HE NEEDED TO GO UM SEND ALL OF HIS UM

PATHOLOGY SLIDES FROM ALL OF THE SURGERIES TO WALTER REED HOSPITAL IN WASHINGTON.

WHOSE LIKE THE BEST FOR DIAGNOSING THINGS AND UM I REMEMBER BEING AT WORK AND THEY

GAVE ME A PHONE CALL AT WORK AND SAID THAT UM HE HAD ADNOIDCYSTICCARCINOMA AND THE

CAT SCAN SHOWED THAT IT HAD SPREAD ALL OVER HIS LUNGS.  I MEAN IT WAS JUST ALL OVER THE

PLACE AND SO UM WE BEGAN OUR MISSION OF TRYING TO FIND WHO COUL, WHO WOULD BE THE

PEOPLE TO TREAT ADNOIDCYSTICCARCINOMA.  WHAT IS ...YOU KNOW WHAT IS IT?  YOU KNOW JUST

GOING THROUGH THE WHOLE PROCESS.  WELL IN AUGUST OF UM 98 HE HAD SURGERY BY UM UP AT

DONE THE MAYO CLINIC, UP HERE AND THE DOCTOR'S THERE TOLD HIM HE BETTER SEEK LEGAL ADVICE

BECAUSE UM UM SINCE DAY ONE IT HAD BEEN CANCER AND IF THEY WOULD HAVE CAUGHT IT AND

TREATED IT CORRECTLY IT WOULDN'T HAVE TRAVELED TO HIS LUNGS AND THIS JUST WOULD HAVE

BEEN A YOU KNOW LOCALIZED.  THEY COULD HAVE KEPT IT JUST TO HERE AND UM UM AFTER SURGERY

AND THEY WANTED TO START RADIATION ON HIM AND START GIVING HIM CHEMO RIGHT AWAY AND

JOE DIDN'T WANT TO AND WE BOTH GO TO CHURCH AND WERE VERY MUCH YOU KNOW BELIEVE THAT

UM IN HEALING.  I DON'T KNOW IF YOU HAVE ANY RELIGIOUS BACKGROUND.

DB:      UM HUH.

40

000011539

WA:     SO WE REALLY STARTED FOCUING OUR ENERGY ONT HAT AND PRAYING A LOT AND HE WENT

TO THIS UM UM PLACE UP IN COLORADO WHO UM THEY KIND OF LIKE DETOXIFY YOUR BODY OR

SOMETHING AND THEY PUT HIM ON A LOT OF HERBS AND THINGS LIKE THAT.

DB:     IS THIS THROUGH THE CHURCH OR?

WA:     WELL IT'S UM IT WAS HEALTH MINISTRIES, SO YEAH IT HAD SOME RELIGIOUS TONE TO IT OF

COURSE UM UM BUT BASCIALLY THEY FOCUS ON YOU EATING HEALTHY AND DRINKING FRUIT JUICIES,

TAKING LOTS OF VITAMINS AND MINERALS AND THINGS LIKE THAT UM AND HE DID THAT FOR AWHILE

AND THEN UM FOUND IT VERY HARD TO STAY ON THAT DIET AND THEN UM HE STARTED FEELING LIKE

A, A GROWTH RIGHT ABOVE HIS FRONT TEETH AND IT WAS PUSHING DOWN ON HIS FRONT TEETH SO

HE GOES TO THE DENTIST AND THEY TAKE AN X-RAY AND THEY SAID WELL IT'S A SMALL YOU KNOW

SOMETHING, YOU NEED TO GO TO A DOCTOR.  BECAUSE IT LOOKED LIKE THE ROUND THINGS THAT

WERE IN HIS LUNGS AND UM THAT REALLY SCARED AND HE DIDN'T GO BACK TO THE DOCTOR.  HE JUST

LIKE REFUSED TO DEAL WITH IT.  SO WE CONTINUE LIFE JUST LIKE NOTHINGS WRONG AND THAT WENT

AWAY.  THE, THE PAIN EVERYTHING WENT AWAY WHICH WAS AWESOME.  SO THEN WERE THINKING

YOU KNOW WHAT IF THIS WENT AWAY THEN MAYBE THIS WENT AWAY AND HE'S BETTER AND IT'S OK,

SO WE GO GET A CAT SCAN AND IT'S BIGGER AND IT'S ALL STILL THERE AND IT WAS REAL, LIKE A MAJOR

BLOW MENTALLY UM THEN LIKE 10 MONTHS LATER THEY DO ANOTHER CAT SCAN ON HIM AND UM

COMPARE THE TWO AND IT'S DOUBLED IN SIZE SO IT'S REALLY GROWING NOW AND THAT'S WHAT

MADE HIM DECIDE TO GO AHEAD AND TRY CHEMO.  EVEN THOUGH EVERYTHING WE'VE KIND OF

STUDIED SAID THAT THERE'S NO, NO LIKE PERCENTAGE THAT CHEMO WOULD WORK ON IT OR

WHATEVER.  SO WHEN I GUESS THAT WOULD BE ABOUT THE TIME THAT WE STARTED UM IT JUST

ADDS, IT ADDS STRESS, YOU HAVE I MEAN I DON'T, I DON'T EVEN KNOW HOW TO EXPLAIN.  HERE YOU

HAVE TWO BABIES THAT YOUR TRYING TO TAKE CARE OF, HE CAN NO LONGER WORK BECAUSE UM THE

41

000011540

MAYO CLINIC WHEN THEY DID THAT SURGERY THEY REMOVED SOME OF HIS MUSCLES HERE AND HE

ALWAYS USED TO INSTALL AUTO GLASS SO HE WAS, I MEAN A BIG STRONG GUY AND HE'S PICK UP

THESE WINDSHIELDS AND SET THEM IN CARS AND NOW HAVING THE SURGERY COULDN'T DO IT

ANYMORE.

DB:     WHEN DID HE QUIT WORKING?

WA:     UM WELL RIGHT WHEN HE HAD SURGERY.

DB:     OKAY.

WA:     UM IF ASHLEY WAS BORN IN, IT WOULD HAVE BEEN AUGUST OF 98.

DB:     OKAY.

WA:     I THINK, YEAH I THINK LIKE THAT WAS THE LAST TIME. I MEAN BESIDES HE HAS A BOAT AND

PIDDLES AROUND WITH THAT AND YOU KNOW TRIES TO STAY BUSY JUST FOR MENTAL REASONS BUT

UM UM HE LOVES TO GO TO THE LAKE. UM SO UM DURING THE COURSE OF ALL THAT UM WE LIVED IN

CASA GRANDE AND UM THE APARTMENT PLACE THAT I WAS MANAGING UM SWITCHED MANAGEMENT

COMPANIES AND SO THEY DIDN'T RETAIN ME AS MANAGER AND I THINK IT WAS BECAUSE OF A LOT

OUR MEDICAL PROBLEMS. UM SO THAT'S WHEN I FOUND EMPLOYMENT UP HERE AT SAN RIVA AND

UM WE MOVED UP INTO AWATOKI AND THAT'S WHY HE CHOSE CHANDLER REGIONAL TO START DOING

ALL OF HIS TREATMENT.

DB:     SO YOU MOVED THERE ABOUT TWO YEARS AGO YOU SAID?

WA:     A YEAR AGO.

DB:     YEAR AGO?

000011541

WA:   YEAH.

DB:   AND YOU WERE MANAGER AT ANOTHER APARTMENT COMPLEX?

WA:   YEAH I'VE BEEN A MANAGER FOR AWHILE AT YOU KNOW DIFFERENT..

DB:   WHICH ONE WAS THAT, YOU MANAGING?

WA:   COURT YARD APARTMENTS.

DB:   OKAY.  HOW LONG WERE YOU THERE?

WA:   UMMM MAYBER TWO YEARS.

DB:   TWO YEARS.

WA:   YEAH I CAN'T REMEMBER.

DB:   DO THE CUFFS HURT?

WA:   NO IT'S OK.  OKAY UM WHAT WAS I SAYING.  MY MIND KEEPS WONDERING I'M SORRY UM

WHAT ELSE DO YOU WANT ME TO SAY?

DB:   YOU SAID THE UM WHEN YOU CAME UP HERE YOU (UI) WHEN YOU CAME UP HERE.

WA:   OH, SO, SO UM I THINK WHEN WE, HE FOUND THE RESULTS OF THAT LAST CAT SCAN, IT JUST,

AH THAT'S WHEN I NOTICED IT JUST STARTED GETTING HARD.  HE JUST WAS MAD ABOUT EVERYTHING.

DB:   THAT WAS 98?

WA:   NO, WELL THIS 99.

DB:   99. (UI)

43

000011542

WA:     UM HAD TO BEEN IN THE SPRING OR SO.

DB:     OKAY YOU SAID HE STARTED GETTING MAD?

WA:     YEAH.

DB:     WHY DON'T YOU TELL ME ABOUT THAT?

WA:     HE JUST.  WELL HE WOULD BE UM HIS, HIS TEMPER JUST GOT, LIKE THE FUSE ON HIS TEMPER

GOT SHORT.  UM JUST BECAUSE SEE WENT AND RETAINED UM THIS, THESE ARE THE THINGS THAT HE

WAS ALWAYS UPSET ABOUT.  WE UM UM RETAINED A MEDICAL MALPRACTICE ATTORNEY AND UM IT

TOOK THEM TWO YEARS TO FILE A CASE AND JOE'S RUNNING OUT OF TIME AND HE KNOWS IT AND

HERE HE FEELS LIKE THEIR DRAGGING THEIR FEET AND THEIR NOT THEIR DOING WHAT THEY NEED TO

DO BUT HE WANTS IT DONE NOW.

DB:     OKAY.

WA:     SO UM I'M THE ONLY ONE WORKING SUPPORTING US AND HE IS COLLECTING YOU KNOW LIKE

A $500.00 DISABILITY CHECK AND HE LOVES TO BUILD UM UM HIGH PERFORMANCE ENGINES FOR

BOATS.

DB:     UH HUH.

WA:     HE HAS A BOAT.  COSTS LOTS OF MONEY (LAUGHS) AND SO HE UM I THINK WAS FRUSTRATED

BECAUSE HE ONLY HAD $500.00 A MONTH YOU KNOW TO DO WHAT HE WANTED TO DO AND THAT,

YOU KNOW WHAT I MEAN AND HERE I'M, I WORK MY BUTT OFF AND I UM HAVE TO PAY FOR A SITTER,

THE CAR PAYMENTS AND THE BILLS AND THE FOOD AND WHATEVER AND UM UM IT WAS LIKE HE, HE

WAS MAD THAT I DON'T IT'S LIKE HE KNEW, HE WANTED TO BE THE ONE.  YOU KNOW WHAT I MEAN,

HE WANTED TO BE THE ONE DOING ALL OF THAT AND HE COULDN'T AND IT WAS VERY FRUSTRATING

44

000011543

TO HIM. CAUSE IT, IT WOULD SEEM LIKE HE WAS ALWAYS JELOUS OF MY JOB OR I DON'T, I DON'T,

THAT'S I, WE WANTED, WE NEEDED TO GO TALK TO A COUNSELOR SO BADLY. BECAUSE WHAT

HAPPENED IS IT'S A ROLE REVERSAL WHERE NOW I BECOME THE INCOME EARNER AND HE I DON'T

KNOW.

DB:     DID HE MAKE PRETTY DECENT MONEY BEFORE?

WA:     DO YOU KNOW WHAT I MEAN. YEAH HE DID.

DB:     DID HE? BEFORE HE STARTED HAVING MEDICAL PROBLEMS.

WA:     YEAH, MADE GREAT MONEY. I'VE ALWAYS WORKED TOO, SO I HAD MINE, KEEP AND WHAT.

IT'S WEIRD HOW OUR RELATIONSHIP WENT FROM UM US BEING HUSBAND AND WIFE TO ME BEING HIS

CARETAKER AND I REALLY FELT VERY UM AND MOTHERLY IS NOT THE WORD BUT I TOOK CARE OF HIM

LIKE I TOOK CARE OF CHILDREN AND I, I KNOW HE ....

DB:     WHEN YOU SAY YOU TAKE CARE OF HIM, IS IT PHYSICALLY, MENTALLY, EMOTIONALLY OR

WHAT?

WA:     ANYWAY HE, YEAH ANYWAY HE NEEDED ME TO BE THERE I, YOU KNOW UM ANYTHING I COULD

FOR HIM. YOU KNOW WHAT I MEAN, I'M BECAUSE WHEN YOU SIT HERE AND YOU THINK OF A MAN

WHOSE 33 YEARS OLD, IS FACED WITH, HAS 2 KIDS, LOVES HIS CHILDREN, HAS 2 KIDS THAT HE'S NOT

GOING TO SEE GROW UP. IT PUTS A WHOLE UM I DON'T KNOW IT, IT, IT WAS JUST VERY HARD FOR ME

AND I CAN ONLY IMAGINE HOW HE FELT ALTHOUGH HE NEVER, HE'S NOT ONE TO COMMUNICATE AND

I THINK THAT HURT THINGS A LOT.

DB:     PHYSICALLY HOW WAS HE? I MEAN DID THE CHEMO AFFECT HIM?

45

000011544

WA:    IT DID UM HE SL.. HE WOULD UM SLEEP A LOT, HOWEVER, UM THIS LAST TIME THE NURSE

TOLD HIM IF HE DIDN'T GET UP A LOT UM AND START MOVING AROUND THAT THIS STUFF WAS GOING

TO HURT HIS KIDNEYS CAUSE IT'S VERY DAMAGING TO YOUR HEART AND YOUR KIDNEYS.

DB:    WHEN DID HE HAVE THAT CHEMO?

WA:    UH A WEEK AGO.  SO LIKE SATURDAY HE WENT TO THE LAKE WITH HIS BOAT AND HE WAS UP

AND AROUND UM HE HAD ACTUALLY HAD I THINK A FOUR WEEK BREAK IN BETWEEN THESE LASTS, THE

NUMBER 3 AND NUMBER 4.  SO NUMBER 4 DIDN'T HIT HIM AS HARD A NUMBER 3 DID.

DB:    OKAY.  SO HE'S ABLE TO GET UP AND GET AROUND PRETTY WELL?

WA:    OH YEAH VERY MUCH SO.  HE PLAYS WITH THE KIDS AND DOES WHATEVER.  UM ....

DB:    DOES THE CHEMO MAKE HIM WEAK?

WA:    I KNOW THAT .....TO GO TO MEETINGS YOU HAVE TO DO BUDGETS AND YOU HAVE TO DO

THINGS.  SO ANYTIME THAT UM I DIDN'T COME HOME AND DINNER READY FOR HIM, CAUSE I'D HAVE

TO COME HOME AND MAKE DINNER CAUSE HE DIDN'T LIKE TO COOK OR CLEAN OR DO ANYTHING.  SO

I'D COME HOME AND UM UM MAYBE ASK HIM TO ORDER PIZZA AND THEN HE WOULDN'T , HE'D DO IT

AND THEN THAT NIGHT HE'D START COMPLAINING.  SEE WE DIDN'T ARGUE IN FRONT OF THE KIDS JUST

BECAUSE THAT'S NOT YOU KNOW.  I MEAN OCCASSIONALLY HE WOULD YELL AND NICHOLAS AND

ASHLEY WOULD START CRYING AND THEY'D GET REALLY UPSET ABOUT IT BUT UM HE'D WAIT UNTIL

THEY WENT TO BED CAUSE THEY ALWAYS GO TO BED ABOUT 8:00 OR SO AND THAT'S WHEN HE JUST

AND IT'S LIKE HE WOULD JUST PICK AND PICK AND PICK, IT WAS, I DON'T KNOW AND UM YOU KNOW

I'D, I'D ASK HIM WELL WHAT YOU KNOW, WHAT ELSE TO DO YOU WANT ME TO DO.  YOU KNOW I

WORK ALL DAY AND WHEN I COME HOME, SOMETIMES I GET HOME AT 7:00, 7:30.  I DON'T HAVE TIME

46

000011545

P-App. 004414

TO COOK UM AND YOU KNOW WHY DO YOU CARE IF WE ORDER PIZZA OR WHATEVER AND UM UM I

TURNED 30 IN AUGUST AND UM THE GIRLS IN THE OFFICE TOOK ME OUT AND THAT NIGHT OH WE GOT

HOME I GUESS AT 1:30 OR SOMETHING AND HE JUST ACCUSSED ME OF ALL KINDS OF STUFF AND JUST

WENT BIZERK, BROKE THE BED, BROKE THE DRESSERS.

DB:     HOW'D HE, WHAT DID HE ACCUSE YOU OF?

WA:     (LAUGHS) OH JUST BEING OUT WITH GUYS AND

DB:     HAVING AN AFFAIR WITH SOMEBODY?

WA:     OH SURE, SURE AND I'M LIKE YOU KNOW WHAT I DON'T HAVE ENOUGH ENERGY OR TIME TO BE

YOU KNOW, I DON'T AND I, AND I, I TRY TO, LIKE I WAS TALKING TO MY MOM ABOUT IT AND MAYBE

IT'S BECAUSE UM, I'M, I'M LIKE EMBARASSED SAYING THIS BUT YOU NEED TO KNOW.  YOU WANT TO

KNOW DETAILS RIGHT?  I'M LIKE

DB:     YOUR (UI) LET ME TELL YOU, YOUR NOT GOING TO SAY ANYTHING THAT I HA...YEAH

WA:     I JUST WANT YOU TO UNDERSTAND.

DB:     THAT I HAVEN'T HEARD BEFORE, OKAY.

WA:     OH I KNOW BUT I JUST WANT YOU TO UNDERSTAND WHAT, WHAT, WHAT IT WAS LIKE IN THE

HOUSE BECAUSE I TOOK ON A CARETAKER ROLE UM UM AND I HAD A LOT OF MY ENERGY FOCUSED ON

MY JOB, WHEN I CAME HOME I DID NOT WANT TO BE ROMANTIC, OKAY.

DB:     UM HUH.

000011546

WA:    UM AND THAT WAS A VERY BIG ISSUE WITH HIM. UM ANYTIME HE THOUGHT I SHOULD JUST

BE AVAILABLE TO HIM EVERY MOMENT OF THE DAY. THAT I SHOULD COME HOME AT LUNCH FROM

WORK AND BE AVAILABLE. WELL I DON'T HAVE TIME TO TAKE LUNCHES. I NEVER TAKE LUNCHES. UM

AT COURT YARD YES I COULD TAKE LUNCHES AND THAT WAS GREAT BUT UP HERE THIS WAS A LOT

DIFFERENT JOB AND IT'S DIFFERENT ENVIRONMENT, EVERYTHINGS JUST DIFFERENT AND HE JUST TOOK

THAT KIND OF LIKE A PERSONAL INSULT THAT I DIDN'T LOVE HIM ANYMORE. HE ALWAYS, YOU DON'T

LOVE ME ANYMORE. HONEY YOU HAVE NO IDEA HOW MUCH I LOVE YOU OR I WOULDN'T BE BUSTING

MY BUTT DOING ALL OF THIS AND TRYING TO YOU KNOW MAKE OUR LIFE NORMAL UNTIL THIS

LAWSUIT SETTLES OR WHAT EVER HAPPENS HAPPENS. UM SO UM WHEN I GOT HOME THAT NIGHT

FROM LIKE THE BIRTHDAY PARTY THAT'S JUST, HE JUST EVEN THOUGH HE HAS STILL TO THIS DAY

HAVING FITS ABOUT IT. I MEAN HE WOULD STILL JUST LIKE WHATEVER AND I HAVE ALL THESE

PICTURES, LIKE CAUSE WE ALL CAMERAS AND IT'S ALWAYS ME AND A BUNCH OF GIRLS. I MEAN I'M

LIKE HONEY LOOK AND THEN HE STARTS IN WELL YOU WEREN'T WEARING YOUR WEDDING RING AND

I'M LIKE LOOK RIGHT, YOU KNOW  IT, IT, IT BECAME VERY, LIKE HE WAS PARANOID OR I, I DON'T KNOW.

DB:    LET ME ASK YOU DID, DID YOU GUYS COMPLETELY STOP YOUR SEX LIFE?

WA:    NO SEE IF IT WAS UP TO ME I WOULD HAVE JUST BECAUSE UM, UM I DON'T IT'S A WEIRD

MENTAL THING THAT YOU GO THROUGH AND WHEN YOU KNOW YOUR HUSBAND IS GOING TO DIE.

THE DOCTORS ARE TELLING YOU HE YOU KNOW THIS AIN'T WORKING IT GROWING, IT'S DOUBLING IN

SIZE YOU START PREPARING, I MEAN THAT'S JUST SOMETHING THAT YOU UM I DON'T KNOW HOW TO

EXPLAIN IT. YOU KNOW THAT THIS IS WHAT'S HAPPENING AND AND AND YOU HAVE TO DEAL WITH IT.

NO IDEA UM I, I DON'T KNOW, I CAN'T, AH I'M SITTING IN THE POLICE CAR GOING I CAN'T BELIEVE THIS

IS HAPPENING LIKE THIS BECAUSE IN YOUR HEAD WHEN YOUR PREPARING YOURSELF FOR SOMETHING

48

000011547

LIKE THAT, YOU YOU KNOW YOU IMAGINE BEING IN A HOSPITAL ROOM AND UM HOLDING HIS HAND

AND UM SO UM SORRY I DON'T MEAN TO CRY.

DB:     SO DID THE AH, HE, HE WAS UPSET BECAUSE YOU GUYS WEREN'T SEXUALLY ACTIVE?

WA:     WELL

DB:     AS ACTIVE AS YOU HAD BEEN.

WA:     AS ACTIVE, EXACTLY.

DB:     OKAY.

WA:     YOU KNOW IT'S LIKE ONCE EVERY TWO DAYS IS STILL PRETTY ACTIVE TO ME YOU KNOW WHAT I

MEAN. I'M LIKE UM AND THAT'S WHAT STARTED THE ARGUMENT TONIGHT. I MEAN I HAVE TO GO TO

WORK TOMORROW, TODAY, WHATEVER AND I'M TIRED WE HAD A LONG DAY UM ON SATURDAYS YOU

KNOW YOU HAVE THE KIDS AT HOME AND YOUR DOING THINGS WITH THEM. WE HAD GONE TO THE

SWAP MEET AND GONE SHOPPING AND JUST YOU KNOW STUFF AND UM

DB:     WE'LL GET TO THAT IN JUST ONE SECOND

WA:     I'M SORRY I'M RATTALING.

DB:     IT'S OKAY, IT'S FINE. PRIOR TO TONIGHT HAD THERE EVER BEEN ANY HISTORY OF VIOLENCE

BETWEEN YOU GUYS?

WA:     YEAH, YEAH.

DB:     WHEN DID THAT START?

49

000011548

WA:     UM FIRST MONTH WE WERE MARRIED, TWO MONTHS I DON'T EVEN REMEMBER. WE WERE AT

ONE OF HIS FRIENDS WEDDINGS AND UM BOTH DRINKING AN WHATEVER AND HIS UM EX GIRLFRIEND

AND HER SISTER WERE AT THE WEDDING AND I DON'T, DIDN'T REALLY HANG AROUND THAT CROWD OF

PEOPLE BUT I KNEW WHO THEY WERE AND UM SHE WAS LIKE STILL IN LOVE WITH HIM OR WHATEVER

AND CAUSED THIS BIG OL SCENE.

DB:     IN LOVE WITH YOUR HUSBAND?

WA:     YEAH. SO CHILDISH YOU KNOW WHAT I MEAN BUT WHATEVER I'M LIKE UM WHEN I TALK

ABOUT IT NOW BUT WHEN YOUR IN THE MOMENT OF IT, IT'S A WHOLE DIFFERENT STORY. UM UM SO I

OF COURSE WAS HAVING A LITTLE FIT OR WHATEVER AND WAS MAD AT HIM BECAUSE HE WAS DOING

WHATEVER HE WAS DOING AND UM UM I CALLED MY DAD HAD HIM COME PICK ME UP TAKE ME

HOME. I WENT HOME AND JOE WALKS IN LIKE 2 HOURS LATER, IT'S LIKE YOU KNOW I DON'T KNOW

1:30, 2:00 IN THE MORNING AND HE'S DRUNK AS CAN BE AND STARTS TO PASS OUT ON THE BED. WELL

I'M MAD SO I UM START ARGUING WITH YOU KNOW I'M LIKE NO, YOU, I WANT TO KNOW WHY YOU

DID WHAT YOU JUST DID AND HERE WERE JUST MARRIED AND WHAT'S GOING ON AND WHATEVER

AND HE JUST GOT IN THIS RAGE AND WE HAD WOOD DOORS AND HE JUST THREW HIS BODY THROUGH

IT. I MEAN HE HAD CUTS ALL OVER HIS CHEST AND ARMS AND UM GRABBED ME AND THREW ME UP

AGAINST THE WALL TOOK A STONE POT AND WAS GOING TO HIT ME IN THE HEAD WITH AND I MOVED

MY HEAD AND IT JUST SMASHED LIKE A PERFECT HOLE IN THE WALL. UM UM JUST IT WAS

HORENDOUS. I MEAN

DB:     THAT OCCURRED AT YOUR DAD'S HOUSE?

WA:     NO IT WAS AT OUR HOUSE, I MEAN OUR HOUSE.

DB:     OKAY. WHERE WERE YOU LIVING BACK THERE, IN CASA GRANDE?

50

000011549

WA:     GOSH IS WAS ON AUTO ROAD. IT'S ONE OF HIS DAD'S UM

DB:     AUTO. A-U-T-O.

WA:     OTTER, JUST LIKE THE ANIMAL. O-T-T-E-R AND IT WAS ONE OF HIS DAD'S FARM HOUSES IF THAT HELPS AT ALL.

DB:     OKAY.

WA:     SO I UM ACTUALLY WENT IN THE BATHROOM AND LOCKED THE DOOR AND HE BROKE WHATEVER ELSE HE BROKE. I DON'T EVEN REMEMBER NOW BUT UM AND WENT TO BED AND AFTER IT WAS QUIET I CAME OUT AND UM WENT AND SLEPT ON THE COUCH AND IN THE MORNING HE NEVER SAID A WORD ABOUT IT AND I NEVER SAID A WORD ABOUT IT AND WE JUST WENT ABOUT OUR OWN BUSINESS LIKE IT NEVER HAPPENED AND UM THEN NOTHING HAD HAPPENED FOR QUITE AWHILE CAUSE THERE WAS NOTHING TO BE STRESSFUL ABOUT YOU KNOW IT WAS JUST LIKE WE WERE FINE. UM NEXT TIME IT WOULD'VE HAPPENED WOULD BE AT COURT YARD. WE LIVED IN AN APARTMENT THERE.

DB:     WHERE, DO YOU RECALL WHERE COURT YARDS AT?

WA:     2060 N. TREKELL.

DB:     NORTH TREKEL. SPELL TREKELL?

WA:     T-R-E-K-E-L-L.

DB:     WHAT APARTMENT DID YOU LIVE IN?

WA:     UM I DON'T REMEMBER THE APARTMENT, OH NO HMM

51

000011550

DB:     THAT'S ALRIGHT.

WA:     I'M SORRY DON'T KNOW.

DB:     AND YOU LIVED THERE FROM WHEN TO WHEN? UP TIL LAST YEAR I KNOW THAT.

WA:     YEAH, SO I CAN'T

DB:     COUPLE YEARS?

WA:     YEAH, AT THE MOST.

DB:     OKAY. OKAY WHAT HAPPENED THERE?

WA:     GOT INTO AN ARGUMENT AND HE UM HMM HE ACTUALLY HIT ME THAT TIME BUT HE

ACTUALLY ALWAYS TRIES TO STRANGLE ME. IT'S REALLY WEIRD AND THEN HE DOES THIS BEAR HUG

STUFF WHERE HE TRIES TO SQUEEZE TIL I CAN'T BREATHE, THAT'S HOW HE, HE'LL PUNCH THE WALL,

HE'LL THROW HIMSELF YOU KNOW LIKE I DON'T KNOW I DON'T UNDERSTAND BUT IT'S LIKE HE KNOWS

YOUR NOT SUPPOSE TO PUNCH A GIRL SO HE SQUEEZES ME INSTEAD UNTIL I CAN'T BREATHE AND I

JUST SCRATCH AND SCRATCH UNTIL, YOU KNOW I'M JUST LIKE GOD LET ME OUT OF HERE AND THEN

UM

DB:     IS THAT WHAT HE DID BACK THERE ON TREKELL?

WA:     YEAH AND THEN HE GRABS ME AROUND THE NECK AND UM UM I USUALLY JUST KICKED HIM

OFF OF ME IS WHAT WOULD HAPPEN. UM AND HE'D STOP. YOU KNOW IT'S LIKE HE WOULD CATCH

HIMSELF AND THEN HE'D LEAVE.

DB:     OKAY. HOW OFTEN DID THAT OCCUR WHEN (UI)?

52

000011551

WA:     THAT ONLY HAPPENED TWO TIMES WHEN WE WERE AT COURT YARD. UM

DB:     DID YOU CALL THE POLICE?

WA:     I DIDN'T. I'M THE MANAGER OF THE PLACE AND I, YOU KNOW WHAT I MEAN. IT'S A SMALL

TOWN YOU CAN'T DO THAT.

DB:     DID AH DID YOU HAVE ANY INJURIES FROM THAT?

WA:     JUST UM JUST MAYBE MY UM PROBABLY NOT BESIDES MY HANDS AND MY NECK. I DON'T

EVEN REMEMBER.

DB:     DID YOU EVER TELL ANYBODY ABOUT THAT?

WA:     MY DAD KNOWS.

DB:     YOU DAD KNOWS?

WA:     YEAH. I DIDN'T SAY ANYTHING. WELL MY MOM KNOWS THAT WE FOUGHT BUT I DIDN'T

REALLY GO INTO DETAILS WITH HER.

DB:     OKAY. YOU DIDN'T TELL ANYBODY WHO WORKED THERE OR ANYTHING LIKE THAT?

WA:     NO.

DB:     SHARE IT WITH YOUR FRIENDS?

53

000011552

WA:    ARE YOU KIDDING ME. NO I DIDN'T, SEE THAT WAS I DON'T HAVE LIKE REALLY, I DON'T HAVE CLOSE GIRLFRIENDS THAT I TALK TO. I WENT TO A PRIVATE SCHOOL AND I WAS THE ONLY ONE WHO GRADUATED IN MY CLASS. I YOU KNOW WAS ONE OF THOSE WHERE THERE'S 12 PEOPLE IN THE WHOLE HIGH SCHOOL AND UM UM SO WHEN I MET JOE I HUNG AROUND HIM AND ALL OF HIS FRIENDS. SO PUTS JUST A DIFFERENT LIGHT ON THINGS YOU KNOW.

DB:    ONCE YOU MOVED UP HERE DID YOU HAVE ANY OTHER FIGHTS UP HERE PRIOR TO WHAT HAPPENED TONIGHT?

WA:    YEAH WE FOUGHT ALL THE TIME OVER HERE.

DB:    PHYSICAL?

WA:    WELL HMM

DB:    TELL ME ABOUT THAT WHAT WENT ON?

WA:    WELL EVERYTIME I  YOU KNOW HE'S ALWAYS JUST THINKING  I WAS CHEATING ON HIM. WE'D HAVE A POOL PARTY AT THE, AT THE UM APARTMENTS AND UM AFTER I CLEAN UP FROM THE POOL PARTY AND COME, SEE HE'D ALWAYS HAVE TO STAY HOME AND WATCH THE KIDS, SO WHEN I GET HOME HE WOULD JUST BE IN THIS MOOD THAT, THAT I WASN'T, I WAS SPENDING TOO MUCH TIME AT WORK AND HE DON'T LOVE ME AND THE KIDS AND WHATEVER AND I'M LIKE OH MY GOD  AND HE WOULD JUST RAGE. I DON'T KNOW IT WAS LIKE IT'S A RAGE IT'S LIKE HIM THROWING HIMSELF THROUGH THIS DOOR AND HE HAS THIS CRAZY LOOK IN HIS EYES THAT'S THE ONLY WAY. I KNOW WHEN HE WAS A TEENAGER HE TRIED TO KILL HIS DAD. I REMEMBER HIS FRIENDS TELLING ME THAT HE HAD TO PULL HIM OFF OF HIS DAD AND I'M, THAT IS THE LOOK THAT I WOULD SEE IN HIS EYES WHEN

54

000011553

HE'D GET TO THIS POINT WHERE IT WAS JUST LIKE BEYOND, I HAVE NO IDEA.  AHH IT WAS CRAZINESS.

UM

DB:     THESE FIGHTS THAT OCCURRED HERE WERE THEY PHYSICAL AT ALL OR?

WA:     YEAH ALWAYS PHYSICAL.

DB:     TELL ME ABOUT THAT?

WA:     I MEAN JUST THE SAME THING...

DB:     WHAT HAPPENED TO YOU?

WA:     ...HE WOULD ALWAYS JUST GRAB ME AND IT WAS JUST LIKE HE WAS JUST SQUEEZING ME UNTIL
I COULDN'T BREATHE.  I MEAN THAT'S JUST WHAT HE WOULD DO AND UM....

DB:     DID HE EVER PUNCH YOU OR KICK YOU OR?

WA:     SEE NO HE DOESN'T DO THAT.

DB:     OKAY DO YOU EVER PUNCH OR KICK HIM?

WA:     UMM YEAH, WELL I WOULD, WELL YEAH I'D HAVE TO TO GET OFF.

DB:     UM HUH.

WA:     GET HIM OFF OF ME.  HE'S MUCH BIGGER THAN I AM.

DB:     OKAY.  OTHER THAN SQUEEZING YOU WHAT ELSE DID HE DO?

WA:     THAT'S WHAT HE, OR HE WOULD, HE TRIED TO WRAP SOMETHING AROUND MY NECK.

DB:     OKAY.

55

000011554

WA:    ALWAYS AND I'D ALWAYS HAVE TO GRAB IT WITH MY HANDS.  THAT'S WHY I'M WONDERING, I CAN'T REMEMBER, BUT I DON'T KNOW.

DB:    WHAT WOULD HE WRAP AROUND YOUR NECK?

WA:    WHATEVER WAS HANDY.

DB:    (UI)

WA:    UM UM ALL THESE IMAGES GOING THROUGH MY HEAD, UM I KNOW ONE TIME A CLOTHES HANGER CAUSE WE WERE IN THE BATHROOM.  MY CLOSETS IN THE BATHROOM.  UM HE'S DONE THE BELT THING BEFORE UM JUST HIS HANDS.

DB:    DID HE EVER LEAVE ANY MARKS?

WA:    UM I DON'T, I DON'T, I DON'T MARK, I DON'T BRUISE UM ...

DB:    HOW WOULD YOU....

WA:    I NEVER HAVE REALLY BRUISED TOO MUCH SO UM UM THAT'S NEVER BEEN AN ISSUE.  IF I EVER HAD A RED MARK OR LIKE YOU KNOW FROM HIM DOING WHATEVER UM UM I USED TO WEAR A SHIRT WITH COLLARS NO BIG DEAL.  YOU KNOW WHAT I MEAN.  PUT POWDER ON YOUR NECK.

DB:    HOW OFTEN.  WELL LET ME SEE, WHAT WOULD HAP, WHY WOULD HE STOP CHOKING YOU?

WA:    THE MAIN REASON WOULD BE ME TALKING ABOUT NICHOLAS AND ASHLEY.

DB:    WHAT WOULD YOU SAY?

WA:    YOU'VE GOT TO STOP BEFORE THEY SEE YOU.

DB:    UM HUH.

56

000011555

P-App. 004424

WA:     AND THAT WOULD ALWAYS GET TO HIM.  IT WAS LIKE UM IT WAS LIKE BRING HIM BACK TO

REALITY OR SOMETHING, I DON'T KNOW YOU COULD SEE YOU KNOW BUT I'D HAVE TO YELL IT AND YELL

IT AND YELL IT AND STOP YOUR HURTING ME, YOUR GOING TO KILL ME AND HE'D YELL AT ME, HE

WANTED TO KILL ME, WANTS TO KILL ME AND THEN IT'S SO CRAZY CAUSE THE NEXT YOU KNOW HOUR

OR TWO WELL I TRUST YOU I DON'T KNOW WHY I DO THIS AND HE'D BE SO SORRY.  ALWAYS SORRY.

POOR GUY I MEAN HERE HE'S GOING THROUGH ALL OF THIS....

DB:     YOU WOULDN'T HAVE TO KICK HIM OR HIT HIM TO GET HIM TO STOP HE WOLD JUST STOP?

WA:     OH YEAH, OH YEAH, NO I HAD, I HAD TO GET HIM OFF OF ME.  ALWAYS HAD TO GET HIM OFF

OF ME.  I'D GRAB SHOES, I'D GRAB WHATEVER I COULD GRAB AND GET HIM OFF OF ME.

DB:     OKAY DID HE EVER CHOKE YOU TO WHERE YOU WERE UNCONCIOUS OR ANYTHING?

WA:     I HAD PASSED OUT A COUPLE OF TIMES.

DB:     OKAY.  DID AH WELL DID YOU EVER CONTACT THE POLICE?

WA:     NO I CAN'T AFFORD TO.

DB:     OKAY, BECAUSE...

WA:     I'M THE ONLY ONE WORKING, I CAN'T, I CAN'T, I MEAN LOOK WHAT WOULD HAPPEN.  I MEAN

IT, I MEAN I WISH I WOULD HAVE NOW BUT WHEN YOUR IN IT OH.

DB:     YOU MENTIONED THAT YOU GUYS GO TO CHURCH QUITE A BIT?

WA:     WHAT DO YOU DO?  YEAH.

DB:     WHAT KIND CHURCH DO YOU ATTEND?

57

000011556

WA:     UM THEIR NON DENOMINATIONAL, LIKE MOUTAIN PARK UM THE ONE RIGHT ACROSS THE STREET THERE.  IT'S A BIG COMMUNITY CHURCH.

DB:     MOUNTAIN PARK?

WA:     MOUNTAIN PARK COMMUNITY CHURCH.  UM WENT TO HARVEST FAMILY CHURCH, IS KIND OF OUR HOME CHURCH WHICH IS IN CASA GRANDE.

DB:     DID, DID YOU EVER SEEK ANY KIND OF COUNSELING THROUGH THE CHURCH OR ANYTHING?

WA:     UM NOT REALLY.

DB:     NOT REALLY?

WA:     NO.

DB:     OKAY.

WA:     CUASE IT'S EMBARRASING TO TELL PEOPLE ABOUT YOUR PROBLEMS AND JOE DIDN'T WANT TO TALK ABOUT IT.  HE WOULDN'T TALK TO ME ABOUT IT, HE WOULDN'T TALK ANYBODY.  I JUST KNOW HE'S INCREDIBLY FRUSTRATED.

DB:     OKAY.  UM LET'S GO TO SATURDAY MORNING.  DID YOU WORK SATURDAY?

WA:     NO, I DON'T WORK ON SATURDAYS.

DB:     OKAY.  WHEN DID THIS START, IT WAS ON SATURDAY OR WAS IT PRIOR TO SATURDAY?

WA:     WAS IS?

DB:     WHAT, WHAT LED UP TO WHAT OCCURRED LAST NIGHT.

58

000011557

WA:   OH, IT'S BEEN AN ONGOING THING.  IT'S BEEN THE LAST, SINCE MY BIRTHDAY.

DB:   AND THAT WAS BACK IN ....

WA:   AUGUST 26TH.

DB:   AUGUST 26TH?

WA:   RIGHT, SO A MONTH, IS THAT A LITTLE OVER A MONTH.

DB:   CAN YOU TELL ME ABOUT THAT, WHAT'S BEEN GOING ON FOR THE LAST MONTH?

WA:   WELL HE JUST ARGUES WITH ME EVERYTIME I TURN AROUND.  I MEAN IT'S JUST LIKE NON STOP

AND UM I MEAN I'D DO EVERYTHING I COULD DO TO CALM HIM DOWN.  I'M LIKE YOUR GOING TO GIVE

YOURSELF A HEART ATTACK.  UM AND SEVERAL TIMES, THERE'S A LADY THAT UM I GUESS SHE'S A

THERAPIST OR COUNSELOR OR SOMETHING AT THAT CHEMO CENTER, THE ONCOLOGY CENTER AND

UM THAT'S, I JUST ASKED HIM TODAY UM, I THINK HE, WE HAD MADE TWO DIFFERENT APPOINTMENTS

UM MY PROPERTIES UP FOR SALE AND WHEN INVESTORS COME TO TOUR I HAVE TO BE THERE TO TOUR

THEM, SO I CANCELLED TWO OF THEM THAT HE HAD MADE DURING WORKING HOURS, I WASN'T ABLE

TO GO.

DB:   I'M SORRY THEY (UI)?

WA:   TWO SESSIONS WITH THIS THERAPIST .

DB:   THE THERAPIST?

WA:   YEAH.

DB:   AND IT'S A COUNSELOR OR?

59

000011558

WA:    I DON'T KNOW WHAT SHE IS I'VE NEVER MET HER.  I DON'T REALLY KNOW ANYTHING ABOUT IT BUT HE SAID, HE WOULD BE COMFORTABLE GOING TO TALK TO HER AND I SAID THAT WOULD BE GREAT, LET'S GO TALK TO SOMEBODY.  EXCUSE ME.  SO UM I HAD TO CANCEL THE FIRST TWO CAUSE I COULD NOT LEAVE WORK AND THEN UM HE SCHEDULED ONE FOR FRIDAY, WHICH ARE MY DAY, I HAVE FRIDAY AND SATURDAYS OFF.  SCHEDULED ONE FOR FRIDAY AND UM UM WHEN HE DECIDED OH IT'S TIME HE WANTED TO GO TO THE MOVIES INSTEAD AND I DON'T PUSH HIM.  I DON'T TELL HIM WHAT TO DO SO IT'S TOTALLY UP TO HIM AND IF THAT'S WHAT YOU WANT TO DO LET'S GO TO THE MOVIE YOU KNOW IF THAT'S WHAT YOU FEEL LIKE DOING TODAY.  SO UM WE WENT TO THE MOVIES INSTEAD AND THEN UM UM HE HE WOULD LIKE TRY TO BE GOOD FOR AWHILE AND THEN HE STARTED GETTING NASTY AGAIN AND SO I ASKED HIM, I SAID, IN FACT IT WAS THE BEGINNING OF THIS WEEK, I SAID WHY DON'T YOU MAKE AN APPOINTMENT FOR FRIDAY AND HE WAS LAUGHING CAUSE HE SAID ON THURSDAY OR SUNDAY UM HE WENT TO GO GET HIS SHOT AT THE ONCOLOGY CENTER AND THAT LADY CAUGHT HIM IN THE HALLWAY AND ASKED HIM HOW COME HE DIDN'T SHOW UP FOR THOSE APPOINTMENTS AND UM SO HE SAID WHATEVER HE SAID AND THAT WE WOULD SEE HER ON FRIDAY. WELL HE DIDN'T WANT TO GO AGAIN SO...

DB:    DID HE EVER GO DO YOU KNOW?

WA:    I DON'T KNOW.  MAYBE HE DID I HAVE NO IDEA BUT I KNOW WE DIDN'T EVER GO TOGETHER.  I DON'T THINK HE DID OR WOULD, HE SHOULD HAVE SAID SOMETHING TO ME OR I DON'T KNOW HE, I DON'T KNOW.

DB:    UM OVER THE LAST MONTH WHEN ALL OF THIS STUFF STARTED, HAD THERE BEEN ANY, ANY TYPE OF VIOLENCE BETWEEN YOU TWO?

WA:    YEAH I MEAN EVERYTIME WE ARGUED THERE USUALLY IS.

60

000011559

DB:     AND HOW, HOW OFTEN IS THAT?

WA:     UM WELL WE'VE PROBABLY ONLY HAD ONE VIOLENT ONE SINCE MY BIRTHDAY.  SO ONCE

EVERY TWO WEEKS, THREE WEEKS.

DB:     DO YOU RECALL WHAT HAPPENED THAT LAST TIME?

WA:     UM GOD I'M JUST TRYING TO THINK WHAT, I MEAN WE JUST STARTED ARGUING AND UM I'M

RUNING HIS TIME.  I WAS WALKING HOME FROM WORK AND JOE WAS HOME WATCHING THE TWO

KIDS.  HE LOCKED THE TWO KIDS, THAT'S WHAT STARTED THE ARGUMENT, HE LEFT THE TWO KIDS TO

WALK UP TO WORK, TO MY OFFICE TO MAKE SURE I WAS COMING STRAIGHT HOME.  YOU KNOW IT

WAS LIKE ONE OF THOSE THINGS.  SO ALL OF THE WAY HOME I ARGUED, I CAN'T BELIEVE YOU JUST LEFT

THE TWO KIDS AT HOME AND HE GOES WELL I LOCKED THE DOOR.  I'M LIKE THAT DOESN'T MATTER

YOU DON'T' LEAVE THE KIDS BY THEMSELVES YOU KNOW I RIGHT, I'M WALKING, I JUST TALKED TO YOU

ON THE PHONE, I'M WALKING STRAIGHT HOME FROM WORK YOU KNOW WHAT UM UM SO THE BABIES

ARE ASLEEP AND WE CHECK ON THEM AND THEN UM HE JUST STARTS, YOU KNOW JUST STARTS

GETTING MAD.  STARTS HITTING THINGS, STARTS JUST BEING WHATEVER AND UM STARTS....

DB:     WHEN YOU SAY BEING WHATEVER, WHAT DO YOU MEAN?

WA:     I DON, I DON'T KNOW, THAT'S WHEN HE JUST STARTS GRABBING AND JUST START, HE LOVES TO

YANK MY HAIR.  OH MY GOD I CAN'T STAND IT.  AH HE'D JUST HOLD ME BY THE HEAD AND THEN HIT

MY HEAD ON THE WALL THAT'S, I MEAN AND THEN HE'LL JUST GRAB  ME IN A BEAR HUG AND THEN

HE'LL TRY TO, IT'S LIKE HE'S LOOKING AROUND FOR SOMETHING, TO TO STRANGLE YOU WITH.  I MEAN

IT'S WEIRD HOW HE JUST SITS THERE AND GOES I WANT TO KILL YOU, I JUST WANT TO KILL YOU, YOU

HAVE NO IDEA.  I'M LIKE YOU KNOW I'M SITTING THERE FREAKING OUT CAUSE I'M GOING OKAY WHAT,

WHAT AM I DOING TO YOU.  YOU KNOW I, I DON'T KNOW.  I HAVE NO IDEA.

61

000011560

DB:     DID HE BANG YOUR HEAD THIS LAST TIME?

WA:     OH YEAH MY HEAD HURTS.  THAT'S WHY I NEEDED AN ASPIRIN.  I'M LIKE IT HURTS BAD.

DB:     NO NO NOT LAST NIGHT BUT THIS TIME WERE TALKING ABOUT?

WA:     OH YEAH MY HEAD GETS HIT...

DB:     WHAT PART OF YOUR HEAD GOT BANGED?

WA:     IT'S ALWAYS THE BACK.  SO HOLD MY HEAD RIGHT HERE AND JUST LIKE SLAM IT RIGHT AGAINST

THE BACK OF THE WALL.  IT'S AWFUL.  THAT'S WHAT HE WOULD DO.

DB:     WHAT ELSE HAPPENED THAT TIME?

WA:     UMM THAT WAS PROBABLY THE EXTENT OF IT.  MY HEAD WAS HURTING AND

DB:     HE JUST, HE HIT YOUR HEAD AGAINST THE WALL....

WA:     YEAH.

DB:     DID HE DO ANYTHING ELSE TO YOU?

WA:     I KNOW I HIT HIM.  UM I MEAN NOT THAT, NOT THAT I RECALL.

DB:     WELL LET'S TALK ABOUT THAT?

WA:     UM OH I TOLD HIM I WAS GOING TO CALL HIS SISTER AND THAT MADE HIM STOP.  HE DIDN'T

WANT HIS FAMILY TO KNOW HE WAS THIS WAY.

DB:     OKAY.  UM NOW SATURDAY, YESTERDAY, WERE THERE PROBLEMS ALL DAY OR...

WA:     NO THAT'S WHAT

62

000011561

DB:    LET'S START WITH THE MORNING

WA:    YEAH

DB:    WHEN YOU GOT UP IN THE MORNING.

WA:    WHAT'D WE DO UM ASHLEY ALWAYS WAKES UP FIRST AND SO I GO GET HER OUT OF BED, TAKE

HER OUT TO THE LIVING ROOM AND WATCH CARTOONS AND FEED HER AND THAT KIND OF STUFF AND

NICHOLAS AND JOE USUALLY SLEEP IN AN HOUR OR TWO LATER THAN, THAN WE DO.  SO THEN UM

NICHOLAS GETS UP AND WERE ALL PLAYING AND JOE'S STILL SLEEPING AND THEN UM UM WE WANT

TO GO EAT BREAKFAST.  SO JOE WAKES UP AND HE SAYS WELL LETS GO EAT BREAKFAST MY MOM'S

GOING TO BE HERE AT 10:00 IN THE MORNING UM.

DB:    HIS MOM WAS COMING OVER?

WA:    YEAH HIS MOM LIVES IN CASA GRANDE AND OUR PRESCHOOL TEACHER UM FOR NICHOLAS

WANTED TO LOOK AT SOME STUFF THAT SHE SELLS, SOME FELT STUFF OR WHATEVER.  SO SHE WAS

GOING TO BE BRINGING ALL OF THAT STUFF UP AND UM GO SHOW MIS SUE AND UM, SO WE WERE

GOING TO TRY TO EAT BEFORE UM HIS MOM GOT THERE.  WELL I STILL HAD TO TAKE AND SHOWER

AND GET THE KIDS DRESSED AND ALL THAT GOOD STUFF AND WE RAN OUT OF TIME AND UM HIS MOM

SHOWS UP, I DON'T KNOW WHAT TIME 10:30 – 11:00.  WE DRIVE TO THE PRESCHOOL TEACHERS

HOUSE,  SHE'S NOT HOME SO THEN UM WE COME BACK TO THE HOUSE AND HE GOES INSIDE TO CALL

HER, CAUSE HE DIDN'T HAVE HER PHONE NUMBER AND LEFT A VOICE MAIL OR WHATEVER AND JUST

SAID IF YOU UM WHENEVER YOU GET HOME CALL HIS CELL PHONE AND THEY CAN UM GO BACK OVER

THERE AND SHOW HER THESE WHATEVER.

DB:    CALL JOE'S CELL PHONE?

63

000011562

P-App. 004431

WA:     CALL JOE'S YEAH, CELL PHONE. SO JOE GETS BACK IN THE CAR AND WERE ALL WAITING IN THE

CAR FOR HIM AND HE AH UM NICHOLAS HAS THESE BIKES THAT WE BUY FROM THE SWAP MEET AND

HAVE THIS LITTLE CART THAT YOU CAN CARRY ASHLEY AROUND ON, WELL THE BABYSITTER HAD

BROKEN IT OR WHATEVER THE OLDER KIDS THERE SO WE WANTED TO GO BUY HIM ANOTHER ONE SO

UM WE ALL GO TO THE SWAP MEET AND BUY HIM A NEW BIKE AND ASHLEY THIS LITTLE CUTE STROLLER

FOR HER DOLLY'S AND YOU KNOW WHATEVER AND UM THEN WE LEAVE THERE AND JOE'S MOM

WANTS EVERYBODY TO COME EAT DINNER AT HER HOUSE SO WE GO STOP AT SAM'S CLUB TO BUY

STEAKS AND WHATEVER AND I MEAN EVERYTHINGS NORMAL. SO WE UM LEAVE SAM'S CLUB AND UM

COME BACK TO, START TO COME BACK TO OUR HOUSE AND MY MOM CALLS JOE'S CELL PHONE AND

THEIR JUST GETTING BACK FROM CALIFORNIA FROM VACATION, WANTS TO KNOW IF SHE CAN STOP BY,

BLAH BLAH BLAH AND I SAID SURE. WELL THEN MY PAR, MY PARENTS STOP BY AND JOE'S MOM....

DB:     AT YOUR HOUSE, YOUR APARTMENT?

WA:     MY APARTMENT.

DB:     WHAT TIME DID THEY COME OVER?

WA:     I DON'T KNOW WHAT TIME, I, I DON'T KNOW I DIDN'T HAVE MY WATCH ON.

DB:     DAYTIME, NIGHTTIME?

WA:     THE DAYTIME.

DB:     AFTERNOON, MORNING ?

WA:     HAD TO BE AFTERNOON, HAD TO BE 2:00 TO 3:00 OR SOMETHING LIKE THAT.

DB:     OKAY.

64

000011563

WA:     SO THEN WE UM UM WHAT HAPPENED,,,

DB:     EVERYTHING WAS FINE UP TO THAT POINT?

WA:     OH YEAH. I MEAN IT'S WHAT EVER, YOU KNOW WEWERE JUST LIKE, LIKE EVERYDAY, NORMAL WHATEVER AND UM MY DAD'S IN A MOOD. HE'S MAD CAUSE MY MOM WON'T HURRY UP AND LEAVE THE HOUSE CAUSE HE FILM IN, HE'S A PHOTOGRAPHER AND HE HAS FILM IN THE CAR UM TAKES PICTURES OF WILDLIFE OR WHATEVER AND UM UM SO HE STARTS HONKING THE HORN WANTS MY MOM TO HURRY AND JOE STARTS GETTING REAL IRRITATED ABOUT THAT.

DB:     OKAY.

WA:     SO THEN THEY LEAVE AND JOE'S MOM HAD ALREADY LEFT AWHILE BEFORE AND WE GO INSIDE AND PUT THE KIDS DOWN FOR A NAP.

DB:     ABOUT 3:00 OR SO?

WA:     YEAH IT HAD TO BE ABOUT 3:00 UM SO THEY BOTH GO DOWN FOR A NAP AND JOE LAYS DOWN TO TAKE A NAP AND I READ A BOOK. I HAVE THIS BOOK THAT I READ UM I LIKE TO READ ALL KINDS OF BOOKS SO I'M SITTING THERE READING A BOOK AND UM UM THEY ALL WAKE UP ABOUT 5:00 OR 5:30, GET DRESSED GO TO HIS MOMS TO HAVE DINNER.

DB:     WHAT TIME DID YOU GET TO HIS MOM'S?

WA:     HMMM 6:30. THAT'S WHAT TIME DINNER WAS.

DB:     HOW LONG OF A DRIVE IS IT BETWEEN...

WA:     30 MINUTES, 40 MINUTES.

65

000011564

DB:     30 MINUTES ONE WAY?

WA:     MMM YEAH . I GUESS 40, IT JUST DEPENDS...

DB:     (UI)

WA:     IT JUST DEPENDS YEAH.  DEPENDS ON TRAFFIC AND WHATEVER BUT UM MORE OR LESS.  SO WE
WERE THERE TIL UM

DB:     I'M SORRY YOU GOT TO HIS MOM'S HOUSE AT WHAT TIME?

WA:     YEAH AND HAD DINNER.

DB:     WHAT TIME DID YOU HAVE DINNER?

WA:     DINNER WAS AT 6:30.

DB:     6:30 DINNER?

WA:     YEAH.

DB:     OKAY.

WA:     LEFT HER HOUSE 10:30 OR 11:00, I DON'T REMEMBER AND DROVE HOME.

DB:     WERE THERE ANY CALLS AT HIS MOMS HOUSE WHILE YOU WERE THERE?

WA:     UM I WASN'T AROUND HIM MUCH SO I DON'T KNOW.  I MEAN WHEN YOUR YOU KNOW I
WASN'T FOCUSING ON ON HIM WHAT WAS WRONG UM UM WHAT ELSE.

DB:     SO YOU LEFT AROUND 10:30?

WA:     I THINK SO YEAH.

66

000011565

DB:   10:30 OR 11:00 YOU SAID?

WA:   CAUSE I KNOW THE FOOTBALL GAME WAS JUST GETTING OVER.

DB:   WHICH GAME WAS THAT?

WA:   I DON'T KNOW, I DON'T WATCH FOOTBALL BUT SOME FOOTBALL GAME WAS GETTING OVER.
UM

DB:   SO DO YOU DRIVE STRAIGHT BACK TO YOUR APARTMENT?

WA:   YEAH WE DID.  GOT HOME PUT THE KIDS IN BED.  HE TOOK ASHLEY PUT HER IN BED AND I PUT

NICHOLAS IN AND PRAYED WITH HIM AND HELD HIS JUICE CUP UM WENT TO OUR ROOM AND I PUT MY

JAMMIES ON AND HE CRAWLED INTO BED.  I TURNED THE LIGHT ON, HE TURNS THE TV ON WHICH IS

NORMAL YOU KNOW WHATEVER.

DB:   WHERE'S THE TV AT?

WA:   UM IN OUR BEDROOM.

DB:   IN YOUR BEDROOM?

WA:   YEAH AND HE STARTS FLIPPING THE CHANNELS AND I START READING MY BOOK AND UM HE

STARTS QUESTIONING ME AGAIN ABOUT MY BIRTHDAY NIGHT, JUST WON'T STOP UM

DB:   WHAT'S HE SAYING?

000011566

WA:   JUST WANTS TO KNOW WHY I DIDN'T HAVE MY WEDDING RINGS ON AND I'M LIKE I DID HAVE

THEM ON. I HAVE THE PICTURES TO SHOW, YOU KNOW IT'S JUST THE SAME OL WHATEVER. UMMM

OH WHAT HAPPENED, SO THEN AFTER GETTING IRRITATED HE WANTS TO HAVE SEX BECAUSE HE CAN'T

SLEEP AND YOU KNOW HE'S FRUSTRATED AND WHATEVER AND

DB:   WERE YOU GUYS ARGUING AT THIS POINT?

WA:   WELL IT'S NOT ARGUING IT'S JUST AH I DON'T KNOW, IT'S JUST THE NORMAL YOU KNOW, HE

ASKS THESE ACCUSING QUESTIONS AND I'M LIKE ALL IRRITATED THAT HE'S BRINGING IT UP AGAIN AND

I'M LIKE CAN'T YOU DROP IT AND YOU KNOW IF YOU CAN'T LET GO OF IT YOU NEED TO GO GET HELP.

GO TALK TO SOMEBODY CAUSE I DIDN'T DO ANYTHING AND I DON'T KNOW WHAT YOUR PROBLEM IS.

UM SO UM OH HE KEEPS BEING ON AND ON ABOUT IT.

DB:   ABOUT WANTING TO HAVE SEX?

WA:   UM HUH.

DB:   OKAY.

WA:   AND I'M SORRY, BLAH, BLAH, BLAH, BLAH AND I SAID OK FINE UM LET'S GO TAKE, WE LIKE TO

TAKE BATHS TOGETHER. I SAID LETS GO TAKE A BATH UM I PULLED OUT ALL OF THE CANDLES AND I LIT

THE CANDLES AND THAT WHOLE THING AND UM I TRY TO BE, I DO TRY YOU KNOW WHAT I MEAN, I'M

LIKE ALWAYS TRY TO BE NICE. I'M LIKE WHATEVER I CAN DO TO MAKE HIS LIFE EASIER UM SO I LIT THE

CANDLES FILL UP THE BATHTUB PUT BUBBLE BATH IN THE BATHTUB AND UM WE SIT THERE AND START

TO TALK AGAIN AND THAT'S WHEN IT JUSTAND HE'S LIKE....

DB:   YOU WERE SITTING IN THE BATHTUB TALKING?

68

000011567

P-App. 004436

WA:     UM HUH, UM HUH, WE DO THAT I MEAN THAT'S KIND OF WHAT WE DO.  AND THEN IT JUST

GOT INTO THIS HUGE ARGUMENT.  (UI) WHY DID YOU BUY A NEW PAIR OF UNDERWARE, WHY I DON'T

KNOW...

DB:     THIS IS WHAT YOUR ARGUMENT ....

WA:     OH YEAH (UI)

DB:     THIS IS WHAT YOU WERE ARGUING ABOUT IN THE BATHTUB?

WA:     UH HUH IT'S JUST QUESTIONS YOU KNOW AND UM I WENT AND BOUGHT TWO NEW SUITS FOR

WORK BECAUSE OCTOBER 1ST WE HAVE TO GO BACK IN OUR WINTER CLOTHES AND HE WANTS TO

KNOW WHY.  LIKE I'M WEARING THESE OUT ON A DATE AND I'M LIKE THEIR FOR WORK YOU KNOW I, I, I

DON'T WHAT YOU WANT ME TO SAY UM SO THEN HE BUILDS HIMSELF AND I COULD SEE IT COMING,

BUILDS HIMSELF INTO THIS RAGE.

DB:     HOW LONG DID THIS ARGUMENT GO ON?

WA:     I DON'T, UM I DON'T KNOW.

DB:     HOW LONG....

WA:     SO THEN HE STARTS FEELING LIKE HIS HEARTS HURTING

DB:     WE'LL GET BACK TO THAT.

WA:     OKAY SORRY.

DB:     ABOUT WHAT TIME DO YOU THINK IT IS THAT YOU GOT IN THE BATHTUB?

WA:     1:00

69

000011568

DB:     ONE AM?

WA:     YEAH,

DB:     WHAT'D YOU GUYS DO BETWEEN

WA:     I REALLY DON'T KNOW.  I WAS READING MY BOOK AND HE WAS WATCHING TV.

DB:     SO IF YOU LEFT AROUND 11:00 YOU'D BE BACK AT 11:45

WA:     OR SO

DB:     OR SO?

WA:     YEAH.

DB:     SO TWELVE O'CLOCK?

WA:     YEAH, YEAH

DB:     AND SO FOR ABOUT THAT HOUR WHAT'D YO GUYS DO?

WA:      I READ A BOOK AND HE WATCHED TV AND WE TALKED A LITTLE BIT AND THEN HE UH WANTED

TO ARGUE AND YOU KNOW THE NORMAL SNIPPY CONVERSATION

DB:     UM HUH

WA:     AND THEN APOLOGIZE AND THEN WANTS TO BE ROMANTIC, SO I OK LET'S TRANSFER THIS TO

THE BATHROOM AND MAYBE WE CAN BE NICE THERE.

DB:     OKAY.  HOW LONG WERE YOU IN THE BATHTUB BEFORE YOU GOT OUT?

70

000011569

WA:    NOT TOO LONG.  MAYBE 10 MINUTES AND THEN I WAS LIKE I, OK WERE ARGUING IN THE

BEDROOM, WERE ARGUING IN THE BATHROOM, I'M JUST GONNA GO TO BED FORGET THIS.

DB:    YOU GOT DRESSED?

WA:    I PUT SOME CLOTHES ON YEAH.

DB:    OKAY.  ISTHAT THE CLOTHES YOU'RE WEARING NOW OR DID YOU GO BACK INTO YOUR

PAJAMAS?

WA:    NO ACTUALLY I PUT, YEAH I PUT SHORTS ON AND AH I DIDN'T PUT MY JAMMIES BACK ON.

DB:    OKAY.

WA:    I'M LIKE HON WHAT DID I DO?  I HAVE NO IDEA.

DB:    YOU PUT SHORTS ON?

WA:    YEAH.

DB:    YEAH.  TEE SHIRT?

WA:    YEAH I GRABBED THEM OFF OF THE FLOOR I REMEMBER THAT.  I FOUND MY DIRTY CLOTHES ON

THE FLOOR OF THE CLOSET AND I GRABBED CLOTHES AND JUST STUCK THEM ON.

DB:    SHOES AND EVERYTHING OR ...

WA:    NO I HAVEN'T, I DON'T HAVE SHOES ON.

DB:    OKAY.

WA:    WISH I HAD SHOES ON.

71

000011570

DB:     SO YOU GRABBED YOUR SHORTS AND TEE SHIRT?

WA:     UM HUH.

DB:     DOES HE CONTINUE TO SIT IN THE BATHTUB OR WHAT?

WA:     JUST FOR A MINUTE AND THEN AH HE GOT OUT.

DB:     OKAY.  AND THEN WHAT HAPPENED?

WA:     WELL THEN I WON'T ARGUE CAUSE THAT MAKES HIM EVEN MORE MAD AND HE KEPT

WANTING TO ARGUE AND I JUST WOULDN'T ARGUE AND THEN I STARTED GETTING IRRITATED.  THEN

HE STARTS PUSHING ME AND I'M LIKE YOU KNOW WHAT DON'T YOU KNOW DON'T START THIS AGAIN.

DON'T DO THIS AGAIN.

DB:     AND HOW, WHAT'D YOU SAY HE PUSHED YOU?

WA:     HE'S MAD, HE'S JUST PUSHING, PUSHING.

DB:     JUST PUSHES YOU?

WA:     OH YEAH HE JUST PUSHED ME INTO THE DRESSER, PUSHED ME INTO THE BED, PUSHED ONTO

THE BED JUST JUST PUSHING.  IT'S LIKE HE JUST TRIES TO MAKE MAD CAUSE I DON'T HAVE, I'M NOT AN

ANGRY PERSON.  I DON'T HAVE A TEMPER I'M LIKE WHAT AND HE JUST PUSHES ME SO IT'S LIKE WHY

DO YOU DO THIS TO ME?

DB:  HOW LONG DID THAT GO ON?

72

000011571

WA:   I, I DON'T KNOW THEN CAUSE NOW I'M YOU KNOW DEALING WITH THIS SEEING HIM, CAUSE I

KNOW WHAT'S GONNA HAPPEN.  I KNOW HE'S WORKING INTO IT, I KNOW, I SEE IT COMING.  CAN JUST

SEE IT COMING.  SO THEN WE GO OUT TO THE LIVING ROOM, CAUSE I'M LIKE YOU KNOW WHAT IF

YOUR GOING TO START ARGUING I DON'T WANT THE KIDS TO HEAR IT, GO TO THE LIVING ROOM.

DON'T WANT THE UPSTAIRS NEIGHBORS TO HEAR US.  YOU IN THE BEDROOM THEY'LL HEAR

EVERYTHING.  IT'S YOU KNOW THAT'S PART OF APARTMENTS, IT'S SOMETHING WE KNOW.  OH I HAVE

TO GO TO THE BATHROOM.

DB:   YOU NEED TO GO TO THE BATHROOM?

WA:   I'M LIKE SICK TO MY STOMACH I'M SORRY.

DB:   OKAY, LET ME UH GO GRAB SALLY AND I'LL HAVE HER TAKE YOU.

WA:   THAT'S FINE.  I JUST NEED TO GO AND THEN I'LL BE MORE THAN HAPPY TO FINISH.

DB:   OKAY.

WA:   OHHH, THIS IS EXHAUSTING.  OHHH.

SD:   READY?

WA:   YEAH.

SD:   LET'S GO.

WA:   OH WOW (UI)

SD:   (UI) (UI) OK I'LL GO TRACK DOWN DAVID AND TELL HIM THAT YOUR BACK, OKAY?

WA:   THANK YOU

73

000011572

P-App. 004441

SD:     AND I'LL SEE IF I CAN FIND (UI)

WA:     OKAY.

SD:     OH YEAH, THERE'S YOUR (UI) AND THEIR LIKE FOR LIKE 32 FEET?

WA:     NO KIDDING.

SD:     SO

WA:     OKAY THANKS.

SD:     BUT THAT AT LEAST KEEP YOUR FEET WARM.

DB:     OKAY YOU ALL SET?

WA:     YEAH THANKS.

DB:     YOUR WELCOME.  LET'S GO BACK, OKAY.  ONCE YOU GUYS ARE OUT OF THE BATHROOM YOU START UP, YOU GO TO THE LIVING ROOM?

WA:     RIGHT.

DB:     AND YOU SAY HE PUSHES YOU AROUND?

WA:     RIGHT.

DB:     DO YOU RECALL ANYTHING HE PUSHED YOU INTO?

WA:     I KNOW HE PUSHED  ME RIGHT INTO MY VEIL AND THAT REALLY MADE ME MAD.

DB:     YOUR VEIL?

74

000011573

WA:     WE HAVE THIS UM FROM WHEN WE GOT MARRIED WE HAVE THIS UM LIKE DISPLAY CASE I

GUESS YOU WANT TO CALL IT. I DON'T KNOW THAT GILDA MADE FOR US AND (UI) VEIL IN THERE AND

LITTLE WEDDING THINGS IN THERE SO THAT YOU DON'T HAVE TO PUT THEM AWAY IN A BOX YOU

KNOW IT WAS REALLY NICE AND UM HE JUST LIKE RAMMED ME INTO IT.

DB:     OKAY. DID IT KNOCK IT OVER OR ANYTHING?

WA:     UM YEAH IT SHATTERED IT. I COULDN'T I AND THEN I WAS MAD.

DB:     WHAT PART OF YOUR BODY HIT THAT?

WA:     THE, MY BACK.

DB:     YOUR BACK?

WA:     YEAH.

DB:     DID IT CAUSE ANY PROBLEMS WITH YOUR BACK OR?

WA:     I DON'T THINK SO, I JUST KNOW. I DON'T, I DON'T REMEMBER IF MY HEAD HIT THAT OR NOT. I

DON'T KNOW.

DB:     (UI) THE WHOLE WALL OR?

WA:     NO IT JUST WAS SITTING ON A STAND.

DB:     OKAY.

WA:     SO IT FELL OVER. THAT'S WHY I'M WONDERING IF THAT'S WHAT HIT, I DON'T KNOW. I CAN'T

REMEMBER.

DB:     NOW WHAT ELSE WENT ON WHILE YOUR IN THE LIVING ROOM ARGUING?

75

000011574

P-App. 004443

WA:    AHHH, UM SO UM WE WERE JUST WRESTLING AROUND, YOU KNOW. JUST JUST THE

WRESTLING. CAUSE HE TRIES TO GET A GRIP ON ME AND I KNOW IT AND I'M WRESTLING AROUND

DOING WHATEVER.

DB:    WHERE DOES HE TRY TO GRAB YOU?

WA:    HE TRIES TO GRAB ME RIGHT AROUND THE RIBS AND SQUEEZE THE CRAP OUT OF ME.

DB:    LIKE THIS OR A BEAR HUG?

WA:    A BEAR HUG. HE DOES A BEAR HUG. UM SO HE STARTS TO DO THAT AND UM UM AND I KNOW

FROM EXPERIENCE THAT THE NEXT THING IS MY NECK AND I'M LIKE HERE WE GO. UM

DB:    WHAT ARE YOU DOING?

WA:    I'M FREAKING OUT. I'M GOING WHAT IN THE WORLD , YOU KNOW WHAT DO I DO, WHAT DO I

DO. UM FOR HIM TO BREAK THAT WEDDING THING, I THINK WAS UM SCARED ME BECAUSE THAT'S UM

NO MATTER WHAT'S HAPPENED BETWEEN US WE'VE ALWAYS NEVER SAID WE WOULD GET A DIVORCE.

I MEAN THIS WAS JUST YOU KNOW WE'LL GET THROUGH ALL THIS THIS HARD TIMES. WE'LL MAKE IT

AND AND UM AND IT JUST FREAKED ME OUT THAT HE WOULD EVEN THINK ABOUT BREAKING THAT.

WHY NOT THE TV OR YOU KNOW SOMETHING, I DON'T KNOW. AHHH I'M TRYING TO THINK WHAT

HAPPENED NEXT. HE UM WENT TO GRAB I BELIEVE I HAD A BELT OR HIS BELT, THERE WAS SOME BELT, I

REMEMBER. CAUSE I CAN SEE HIM YOU KNOW LOOKING, LOOKING FOR SOMETHING TO GRAB. SEE IT I

GET OUT OF HIS GRASP.

DB:    HOW DO YOU DO THAT?

76

000011575

WA:     I WIGGLED OUT CAUSE HE'S LOOKING NOW. HIS ATTENTIONS NOT ON ME. GET OUT OF HIS

GRASP AND I GRAB A UM BAR STOOL THAT WE HAVE. MY MY THOUGHTS AT THAT POINT WERE KNOCK

HIM UNCONCIOUS SO HE CAN LEAVE ME ALONE CAUSE HE'S IN A RAGE. I DON'T KNOW WHAT TO DO.

UM OH THIS JUST LIKE MAKES ME SICK TO MY STOMACH. UM SO AS HE BENDS OVER TO PICK UP THE

BELT I CONKED HIM IN THE HEAD.

DB:     WITH WHAT?

WA:     THE BAR STOOL. AND HE BELLOWED. OH MY GOD AND WAS SO PISSED IT WAS NOT EVEN

FUNNY.

DB:     HE YELLS (UI)

WA:     OH NO HE YELLED CUSS WORDS AND I SAID OH MY GOD.

DB:     WHAT DOES HE SAY?

WA:     HE'S JUSTS I DON'T EVEN KNOW WHAT, WHAT EVER CUSS WORDS HE CAN THINK OF AND

LOOKED UP AT ME AND JUST HAD LIKE FIRE IN HIS EYES. LEANS OVER TO PICK UP THAT THING AGAIN

AND I POPPED HIM AGAIN, CAUSE NOW I'M SCARED TO DEATH. I'M LIKE HE'S GONNA GET THAT BELT

AND HE'S GONNA OH MY GOD.

DB:     POPPED HIM WITH WHAT?

WA:     SAME THING THAT, I HAD THAT BAR STOOL IN MY HAND AND IT OH MY GOD.

DB:     WHERE'D YOU HIT HIM THAT TIME?

WA:     IN THE BACK OF THE HEAD. WHEN HE BENDS OVER I HIT HIM AGAIN. UM AND I HIT HIM

AGAIN.

77

000011576

DB:     THREE TIMES?

WA:     I DON'T KNOW, I DON'T, SEE THAT'S I DON'T KNOW NOW BECAUSE I, I'M LIKE I DON'T KNOW, I

DON'T KNOW HOW MANY TIMES I HIT HIM.  BUT I KNOW, I KNOW THE BAR STOOL BROKE IN MY HANDS

BECAUSE I REMEMBER FREAKING OUT CAUSE THEN HE STANDS UP AND HE HAS THAT BELT AND

THERE'S BLOOD AND I'M FREAKING OUT CAUSE I'M GOING I DIDN'T MEAN TO MAKE HIM BLEED, I JUST

MEANT...

DB:     SO HE, HE'S BLEEDING AT THAT POINT?

WA:     RIGHT UM HE JUST HAD.

DB:     WHAT, WHERE ARE YOU AT?

WA:      IN THE LIVING ROOM.  HE FALLS ON THE GROUND.

DB:     AFTER WHICH, FIRST, SECOND?

WA:     I DON'T HAVE ANY CLUE.  SO NOW I'M PANICKING, I'M JOSEPH ARE YOU OK I DIDN'T, YOU

KNOW I, I, I DIDN'T I DIDN'T MEAN THAT.  I JUST WANTED HIM TO STOP, I JUST WANTED HIM TO STOP

AND JUST LEAVE ME, STOP IT, LEAVE ME ALONE.  SO HE'S LYING ON THE GROUND AND I GET A PILLOW

AND I GET A BLANKET AND I'M TRYING TO MAKE HIM BETTER AND I'M NOT SURE WHAT TO DO AND I

KNOW I NEED TO TAKE HIM TO THE HOSPITAL.  SO I CALL UM THE BOOKKEEPER THAT WORKS AT THE

APARTMENTS AND I CALL HER OVER AND I SAID TO HER BECAUSE I DON'T HER TO KNOW WHAT'S

GOING IN MY LIFE, I SAID I THINK JOE'S HAVING A HEART ATTACK AND WILL YOU COME SIT WITH KIDS

WHILE I TAKE HIM TO THE HOSPITAL?  SO I WAIT AND I WAIT AND SHE'S NOT COMING.

DB:     YOU CALLED HER ON THE PHONE?

78

000011577

P-App. 004446

WA:   YEAH I DID. I'M SURE I DID.

DB:   YOUR IN THE LIVING ROOM WHEN YOU, WHEN HE GETS HIT WITH THE BAR STOOL?

WA:   UH HUH.

DB:   OKAY AND HE FALLS ON THE FLOOR?

WA:   UH HUH.

DB:   IN THE LIVING ROOM?

WA:   UH HUH. YEAH HE DID. I SEE HIM ON THE RUG, OH I CAN SEE HIM ON THE RUG AND IT JUST

FREAKED ME OUT.  SO UM I DIDN'T WANT CHRIS TO SEE WHAT HAD HAPPENED SO I TOOK A TOWEL

AND I LAID IT OVER WHERE THE BLOOD WAS.

DB:   WHERE WAS THE BLOOD AT?

WA:   I DON'T, IT WAS ON THE LIVING ROOM FLOOR, BY HIM, OKAY.  I HAVE THE PILLOW THERE AND

WHATEVER AND I'M LIKE OH GOD WHAT DO I DO.  JUST LET ME GET HIM TO A HOSPITAL AND WE CAN

FIX HIM AND HE'S LIKE DAZED.  I DON'T KNOW HOW TO, HE WAS FREAKING ME OUT.  I DON'T KNOW,

CHRIS GETS THERE AND SHE'S LIKE YOU BETTER CALL 911 RIGHT NOW.  SO I DID AND THAT'S WHEN I

TOLD THEM THE SAME THING I TOLD CHRIS.

DB:   WHICH WAS WHAT?

WA:   HE'S HAVING HEART ATTACK AND THEY ASKED ME ABOUT HIS COLOR AND I MEAN ALL OF

THESE QUESTIONS AND I'M LOOKING AT HIM AND HIS COLOR IS FINE.  I'M CHRIS IS HELPING ME YOU

KNOW, THERE'S NO, I DON'T KNOW.  HE LOOKED, HE LOOKED FINE BUT HE LIKE, HE COULDN'T FOCUS

ON ME.

79

000011578

P-App. 004447

DB:     UM HUH.

WA:     AND THAT LIKE SCARED THE CRAP OUT OF ME CAUSE NOW I'M LIKE OH I HURT HIM. SO THEN

UM, I WANNA CRY I'M SORRY. UM JOE STARTS COMING TO AND HE SAYS TO ME, CHRIS WALKS

OUTSIDE TO WAIT FOR THE AMBULANCE AND HE SAYS TO ME YOU GET HER OUT OF HERE CAUSE I SAID

WELL CHRIS IS HERE AND THE FIRE DEPARTMENT IS COMING. HE GOES YOU GET HER OUT OF HERE WE

DON'T NEED ANYMORE PROBLEMS BLAH, BLAH, BLAH, BLAH AND I'M LIKE I GOTTA GET YOU TO THE

HOSPITAL. NO I'M NOT GOING TO THE HOSPITAL AND HE JUST STARTS GETTING MAD THAT HIS HEAD.

YOU KNOW HE SEES WHAT GOING ON AND HE'S PISSED OFF AT ME. SO WHAT I'M LIKE WELL WHAT DO

I DO WITH AMBULANCE, YOU'LL MAKE THEM GO AWAY. I'M NOT GOING TO THE HOSPITAL AND I'M

LIKE OH GREAT YOU KNOW WHAT, WHAT DO I DO. DO I KEEP HIDING THIS, WHAT DO I, WHAT DO I DO

AND UM I JUST DON'T KNOW WHAT TO DO. UM HE'S LAYING THERE ON THE FLOOR AND I'M GOING

SHIT. SO I GO OUTSIDE UM THROUGH THE PATIO DOOR, THROUGH OUR, MY BEDROOM DOOR AND

UM I GO OUTSIDE AND CAUSE THE LADY ON THE PHONE TOLD ME YOU HAVE TO GO TELL THE FIRE

CHIEF IF YOU WANT THEM TO GO AWAY.

DB:     WHAT DID YOU TELL THEM?

WA:     SO I TOLD THEM HE'S REFUSING, SHE, THE MAN, SOME MAN SAID TO ME SO ARE YOU

REFUSING SERVICE AND I SAID NO MY HUSBAND DOES NOT WANT YOU HERE. LEAVE HIM ALONE HE'S

SICK ALREADY, HE'S YOU KNOW, WE HAVE PROBLEMS, HE DOESN'T WANT, DOESN'T WANT TO DEAL

WITH THIS. HE DOESN'T WANT YOU HERE SO GO AWAY.

DB:     OKAY

80

000011579

P-App. 004448

WA:     CHRIS IS STANDING THERE AND I SAID GO HOME AND I'LL CALL YOU LATER. SHE GOES HONEY PLEASE CALL ME AND I'M LIKE I'LL CALL YOU LATER. I'M FINE DON'T WORRY ABOUT IT. SO UM I GO BACK INSIDE THE HOUSE AND HE'S UP OFF THE FLOOR STANDING THERE JUST MAD. WHY'D YOU HIT, YOU MADE, YOU MADE ME BLEED AND HE'S JUST MAD NOW THAT I ACTUALLY DID SOMETHING BACK TO HIM.

DB:     IS HE TALKING, YELLING?

WA:     OH YEAH, HE WAS.

DB:     WAS HE YELLING OR?

WA:     I DON'T THINK HE WAS ALL THERE. I DON'T KNOW WHAT'S GOING ON HE'S, HE'S I DON'T KNOW, I DON'T KNOW HOW TO EXPLAIN IT BECAUSE I'M SCARED TO DEATH.

DB:     UM HUH.

WA:     I'M NOT, I DON'T KNOW WHAT'S GOING ON. SO THEN HE GRABS HIS CELL PHONE LIKE HE'S GONNA CALL SOMEBODY AND IT HAS THE CHARGER HOOKED UP FOR IT AND THAT WHEN HE WRAPPED THAT THING AROUND MY NECK.

DB:     WHAT'S THAT?

WA:     THE CORD TO THE CELL PHONE HE WRAPPED IT AROUND MY NECK. OH MY GOD WE HAD BEEN STANDING BY THE UM WHERE HE KEEPS HIS THING CHARGED OR WHATEVER I DON'T EVEN KNOW. I HADN'T NOTICED IT, IF I WOULD'VE SEEN IT, YOU KNOW I WOULD HAVE THOUGHT SOMETHING FIRST.

DB:     WHICH ROOM WAS THAT IN?

81

000011580

WA:     SO WERE BACK IN THE LIVING ROOM  THAT'S WHERE HE, WE NEVER, DON'T GO BACK TO THE

BEDROOM JUST BECAUSE PEOPLE, YOU CAN HEAR YELLING AND WE DON'T WANT PEOPLE TO HEAR

YOU YELL CAUSE I'M THE MANAGER OF THE PLACE AND I'M NOT SUPPOSE TO BE CAUSING ALL THESE

PROBLEMS, UM HE GRABBED, SO HE'S, HE'S LIKE HAS THAT AROUND MY NECK THAT I, THAT WAS KIND

OF STRETCHY SO I COULD PULL IT AND HE JUST KEPT TRYING TO SQUEEZE IT TIGHTER AND TIGHTER UM

AND I START MOVING OUR WAY INTO THE KITCHEN AND UM UM THAT'S WHEN I THOUGHT I NEED A

KNIFE, I'VE GOT TO CUT THIS.  I'VE GOT TO CUT IT, I'VE GOT TO CUT IT UM UM OH MY GOD.  I

REMEMBER REACHING INTO THE DRAWER AND TRYING AND GETTING, GRABBING A KNIFE, I

REMEMBER AND HE'S TRYING TO PULL ME AWAY FROM THE KNIFE AND I, I THINK I TRIED TO GRAB

ONTO THE REFRIGERATOR ANYTHING I COULD DO TO YOU KNOW I'M LIKE DON'T, DON'T PULL ME

AWAY.  LET ME HOLD ON TO SOMETHING AND UM OH I DON'T KNOW.

DB:     WHEN AH

WA:     I'M TRY...

DB:     WHEN YOU WERE IN THE LIVING ROOM WITH THE CORD AROUND YOUR NECK, YOU SAID IT

WAS STRETCHY?

WA:     NO I, YEAH.

DB:     COULD YOU, WERE YOU HAVING TROUBLE BREATHING OR WERE YOU .....

WA:     OH VERY MUCH SO I WAS VERY MUCH READY TO BLACK OUT AND I THINK THAT'S WHAT MADE

ME SO PANICKY AND SCARED, BECAUSE I THOUGHT IF I LOSE CONSIOUNESS HE'S GONNA KILL ME

CAUSE THAT'S WHAT HE'S BEEN YELLING AT ME.  HE WANTED TO KILL ME CAUSE I HURT HIM.

DB:     OKAY,  SO HOW DO YOU GET FROM THE LIVING TO THE KITCHEN?

82

000011581

WA:   WALKING, WALKING

DB:   WHAT IS HE DOING?

WA:   HE'S JUST WALKING, I MEAN WERE JUST, WERE JUST STRUGGLING TOGETHER. I'M JUST TRYING TO GET AWAY FROM HIM.

DB:   WHERE'D YOU GET THE KNIFE FROM?

WA:   I GOT THE KNIFE OUT OF THE KITCHEN.

DB:   WHERE AT IN THE KITCHEN?

WA:   IN THE KITCHEN DRAWER WHERE WE KEEP ALL

DB:   (UI)

WA:   YEAH, HAVE ALL OF OUR SILVERWARE AND STUFF ALL IN ONE DRAWER.

DB:   WHAT HAPPENS ONCE YOU GET TO THAT POINT?

WA:   OH FUCK , I REMEMBER CUTTING THE CORD.

DB:   WHILE IT'S AROUND YOUR NECK?

WA:   YEAH. MY BRAIN WON'T LET ME THINK. I AM IN SUCH A PANICK AT THAT MOMENT I DON'T KNOW, I KNOW I GOT THE CORD OFF THE, OFF MY NECK. THE NEXT LIKE ABSOLUTE MEMORY THAT I HAVE RIGHT NOW, I MEAN I HOPE, I HOPE IT WILL COME BACK, I DON'T KNOW. BEING IN THE LIVING ROOM AGAIN, ME STRUGGLING WITH HIM, I HAVE THE KNIFE IN MY HAND. I DON'T KNOW THE NEXT THING I KNOW I HAVE BLOOD ALL OVER ME. I HAVE IT ON MY GLASSES, I HAVE IT ON MY FACE, MY HANDS ALL OVER, ALL OVER ME. I DON'T, I DON'T KNOW I CAN'T EVEN ALL I CAN SEE IS RED.

83

000011582

DB:    HOW DID YOU GET FROM

WA:    SHIT

DB:    BEING IN THE KITCHEN AND GETTING THE KNIFE OUT OF THE DRAWER AND BACK INTO THE

LIVING ROOM?

WA:    I HAVE NO IDEA.

DB:    WHAT'S GOING ON AT THAT POINT?

WA:    I JUST KNOW WERE FIGHTING, I JUST KNOW, I JUST CAN SEE STRUGGLING UM IS THIS NORMAL?

I CAN'T, I CAN'T THINK, I DON'T KNOW, I HAVE NO IDEA.  HAVE ABSOLUTELY NOW IDEA.  I TOLD THE

OFFICER EARLIER IT'S LIKE THE NEXT THING I KNOW, I'M BLOODY AND I'M GOING OH MY GOD, OH MY

GOD.

DB:    WHEN AH

WA:    OH JESUS.

DB:    WHERE, WHERE IS HE AT AT THAT POINT?

WA:    HE'S LAYING FACE DOWN ON THE FLOOR IN THE LIVING ROOM.

DB:    WHAT'S HE DOING?

WA:    BLEEDING.  THERE IS BLOOD EVERYWHERE.  THAT'S ALL I CAN SEE.  I HAD TO TAKE OFF MY

GLASSES AND I DON'T SEE WELL WITHOUT MY GLASSES.  I WENT TO THE BATHROOM.  I'M GOING OH

MY GOD, I RINSE MY GLASSES OFF SO I CAN SEE WHAT'S GOING ON.  I RINSE MY HANDS, I GO BACK OUT

THERE AND HE'S JUST, OH I EVEN, I EVEN STOOD IN THE BATHTUB.  I'M SURE I STOOD IN THE BATHTUB

84

000011583

AND RINSED OFF MY LEGS.  YEAH NO I HAD BLOOD EVERYWHERE.  YOU HAVE NO IDEA I WAS JUST

DISGUSTED.  OH.

DB:     HOW LONG?

WA:     CAUSE I REMEMBER DOING THAT.

DB:     GOING INTO YOUR BATHROOM AND (UI)

WA:     YEAH I KNOW I

DB:     IN YOUR BEDROOM OR SOME WHERE ELSE IN THE HOUSE?

WA:     I WENT INTO MY BATHROOM CAUSE I HAD TO SEE.  I COULDN'T SEE.  I COULD NOT SEE.

DB:     SO YOU WASHED OFF YOUR HANDS AND YOUR LEGS?

WA:     UM HUH I DID.

DB:     AND THEN WHAT?

WA:     AND THEN I CALLED MY DAD.  AS I'M CALLINGMY, CAUSE I'M AFRAID TO GO OUT IN THE LIVING

ROOM NOW.  I DON'T KNOW, I DIDN'T KNOW

DB:     IS HE STILL ALIVE AT THIS POINT?

WA:     I HAVE NO IDEA.

DB:     IS HE MOVING?

85

000011584

WA:   I DON'T KNOW. I COULDN'T TELL YA. I'M IN THE BATHROOM. I'M FREAKED OUT I KNOW THAT. I NEVER, I NEVER FELT SO SCARED IN MY ENTIRE LIFE AND ALL I CAN THINK OF IS I HOPE TO GOD NICHOLAS DOES NOT WAKE UP. IMAGINE IF YOUR 3 YEAR OLD SAW THAT. ASHLEY CAN'T GET OUT OF HER CRIB BUT NICHOLAS AND I'M JUST LIKE OH GOD HELP ME. WHAT DO I DO.

DB:   SO YOUR CALLING YOUR DAD?

WA:   I CALL MY DAD, THERE'S NO ANSWER. I GET HIS ANSWERING MACHINE. I CALL HIM BACK THERE'S STILL NO ANSWER. I TRIED HIS CELL PHONE UM AND I KNOW SOMETIME IN BETWEEN CALLING IS WHEN I DID GO OUT THERE AND REMEMBER TIP TOEING DOWN THE HALLWAY AND PEEKING INTO THE LIVING ROOM CAUSE I DON'T KNOW IF HE'S GONNA BE STANDING THERE WAITING FOR ME. I DON'T, YOU KNOW I DON'T KNOW WHAT'S HAPPENING AND HE'S STILL JUST LAYING THERE ON THE FLOOR AND HE'S NOT MOVING AND HE LOOKS BLUE.

DB:   HOW LONG (UI)? HOW MANY TIMES DID YOU CALL YOUR DAD?

WA:   I DON'T KNOW. COULD N'T TELL YOU.

DB:   DID YOU CALL ANYBODY ELSE OTHER THAN YOUR DAD?

WA:   YEAH I CALLED MY, I HAD TO CALL MY AUNT AND COUSIN, THEY LIVE IN THE SAME HOUSE TO GO GET MY DAD CAUSE I DIDN'T KNOW WHAT TO DO. I HAD NO IDEA WHAT TO DO.

DB:   YOU CALLED YOUR AUNT?

WA:   UH HUH.

DB:   WHAT'S YOUR AUNT NAME?

WA:   UM LUPE. GARCIA IS HER LAST NAME.

86

000011585

P-App. 004454

DB:     OKAY.

WA:     BUT I KNOW HER AND CARMEN ANSWERED THE PHONE AND I ASKED THEM TO GO GET MY DAD RIGHT AWAY CAUSE I HAD A HUGE EMERGENCY.

DB:     IS THAT ALL YOU TOLD THEM?

WA:     YEP.

DB:     DID THEY GET YOUR DAD?

WA:     AND THEN I WAITED AND WAITED AND WAITED AND WAITED AND WAITED AND THEN MY DAD FINALLY CALLED ME.

DB:     HOW LONG WAS IT?

WA:     I DON'T KNOW. IT JUST, I DON'T KNOW.  COULD NOT EVEN, I HAVE NO CONCEPT OF WHAT, DON'T KNOW.

DB:     WHAT'D YOU TELL YOUR DAD?

WA:     I TOLD MY DAD THAT JOE WAS DEAD ON THE LIVING FLOOR.  I SAID WE JUST GOT IN A FIGHT. WHAT DO I DO AND HE SAID WENDI YOU NEED TO HANG UP THE PHONE AND CALL 911 RIGHT NOW. WHY I COULDN'T THINK TO DO THAT I DON'T KNOW I WAS JUST FREAKED OUT.  IT'S A HA, I ALWAYS, I ALWAYS CALL MY DAD ANYTIME I HAVE A, I ALWAYS DO.  I DON'T KNOW.

DB:     HOW LONG DID YOU TALK TO YOUR DAD BEFORE YOU HUNG AND CALLED 911?

87

000011586

WA:    I DON'T KNOW. I KNOW MY MOM ANSWERED, MY MOM CALLED ME AND I DON'T WANNA

TELL MY MOM, MY MOM WOULD'VE JUST I DON'T KNOW. SHE'S JUST NOT AND I SAID I NEED TO TALK

TO DAD NOW, I REMEMBER TELLING HER THAT AND I DON'T WAITING IT SEEMED LIKE FOREVER AND

I'M LIKE ANSWER THE PHONE PLEASE, WHAT DO I DO, WHAT DO I DO, WHAT DO I DO. UM CAUSE NOW

I DON'T WANT TO CALL CHRIS BACK TO WATCH MY KIDS WHILE I HAVE TO TAKE CARE OF ALL YOU

KNOW WHAT I MEAN. I'M JUST LIKE WHAT DO I DO, I DON'T, I DON'T KNOW WHAT TO DO. OH MY

GOD. SO HE FINALLY GETS ON THE PHONE AND THAT'S WHEN WE HAD THAT CONVERSATION AND HE'S

LIKE CALL. YOU NEED TO CALL.

DB:    HOW LONG DID YOU AND YOUR DAD TALK?

WA:    I DON'T KNOW. I KNOW HE ASKED ME FIFTY MILLION QUESTIONS. I DON'T KNOW. I HAVE NO

IDEA.

DB:    AFTER YOU AND YOUR DAD TALKED DID YOU CALL? WHAT'D YOU DO?

WA:    I HUNG UP THE PHONE AND I ACTUALLY WENT AND THREW UP IN THE BATHROOM.

DB:    IN THE TOILET OR WHAT?

WA:    IN THE TOILET, YEAH. I, I WAS JUST THE WHOLE THING JUST MADE ME SICK. UM I DON'T

KNOW, I JUST COULDN'T, I DON'T KNOW I COULDN'T. I KNOW I CRIED, THREW UP, WALKED BACK OUT

TO THE LIVING ROOM CAUSE I COULDN'T BELIEVE AND THAT'S WHEN I CALLED 911.

DB:    WHAT'D YOU TELL THEM?

88

000011587

WA:     AND I GOT SOME  YOU KNOW WHATEVER SOME LITTLE SOME LITTLE (UI) AND IS WHATEVER

AND I'M GOING AND I'M SITTING RIGHT BESIDE HIM BECAUSE NOW I DON'T, I DON'T KNOW WHAT TO

DO WITH HIM AND I DON'T KNOW.  THIS GUY GETS ON THE PHONE AND IT WAS SO HORRENDOUS

BECAUSE I TOLD HIM SPECIFICALLY MY HUSBAND IS DEAD ON THE FLOOR.  WELL HOW DO YOU KNOW

HE'S DEAD?  I'M LIKE SOMETHING ABOUT BLOOD AND I DON'T KNOW WHAT.  I DON'T REMEMBER

EXACTLY WHAT I SAID BUT THE HE SAID ROLL HIM OVER.   OH MY GOD TO YOU KNOW HOW, I'M LIKE

AND HE, I DIDN'T, I SAID NO I WASN'T GOING TO AND HE SAID YOU HAVE TO HELP ME OUT YOU HAVE

TO ROLL HIM OVER.  I SAID HE IS BLEEDING OUT OF HIS NECK.  YOU HAVE TO ROLL HIM OVER AND PUT

A RAG ON HIS NECK.  THE MAN IS JUST INSANE.  I'M LIKE YOU HAVE NO IDEA WHAT I'M LOOKING AT.

YOU KNOW WHAT I MEAN, I'M LIKE OH MY GOD DON'T, PLEASE DON'T ASK ME TO TOUCH THIS.

PLEASE DON'T DO THIS TO ME.  SO I GRAB HIM I KNOW I HELD THE PHONE ON MY SHOULDER, TOUCH

JOE ON SHORTS AND HIS BUTT AND HIS LEG AND I ROLLED HIM (UI).

DB:     HE WAS LAYING FACE DOWN?

WA:     HE WAS LAYING FACE DOWN.

DB:     AND YOU ROLLED HIM?

WA:     I ROLLED HIM ONTO, THE MAN SAID ROLL HIM ONTO HIS BACK.

DB:     DID YOU?

WA:     SO I ROLLED HIM ONTO HIS BACK.

DB:     OKAY.  WHAT'D YOU DO AT THAT POINT?

89

000011588

WA:     THEN HE GOES YOU NEED TO SHOVE A TOWEL WHERE IT'S BLEEDING AND THERE'S NO TOWEL,
THERE'S A BLANKET LAYING ON THE FLOOR CAUSE WE ALWAYS HAVE BLANKETS AROUND AND I TRIED
TO DO THAT.  I'M LIKE THIS IS JUST SO GROSS, I PUT THE BLANKET RIGHT THERE AND I THINK THAT'S
WHEN I HAD THE DOOR OPEN AND I THINK THAT'S WHEN EVERYBODY CAME, CAME INTO THE LIVING
ROOM.

DB:     EVERYBODY BEING WHO?

WA:     I, I REALLY THINK.  WHOEVER IT WAS, I DON'T EVEN KNOW.

DB:     POLICE OFFICERS?

WA:     COULD NOT TELL YOU ACTUALLY.  FIREFIGHTERS, POLICEMEN, SOMEBODY CAME INTO THE
APARTMENT AND I DON'T EVEN KNOW WHO.  I WANTED OUT OF THAT ROOM, THAT MAN WAS SITTING
THERE MAKING ME AND I'M LIKE YOU HAVE NO IDEA.

DB:     DID YOU EVER (UI)

WA:     HE WAS LIKE MAD AT ME.  HE'S LIKE YOU HAVE HELP.

DB:     DID YOU EVER PUT SOMETHING ON HIS NECK?

WA:     YEAH I KNOW I PUT THAT BLANKET RIGHT THERE.  I'M SUR, YEAH.

DB:     (UI)

WA:     I AM JUST GROSSED OUT SORRY.  I CAN'T BELIEVE THIS.

DB:     HOW MANY TIMES DO YOU THINK HE WAS CUT WITH THE KNIFE?

90

000011589

P-App. 004458

WA:    OH I HAVE NO IDEA.  I MEAN I JUST KNOW HOLDING IT THE ONE TIME AND THEN I KNOW THAT'S IT.  I, I KNOW I DID STAB HIM WITH THE KNIFE, IF THAT'S WHAT YOUR ASKING ME.

DB:    YOU DID NOT STAB HIM WITH IT?

WA:    I DID NOT STAB HIM WITH THE KNIFE, NO.

DB:    HOW DID HE GET CUT?

WA:    NO.  I DON'T KNOW.  THAT'S WHY I'M LIKE I DON'T KNOW.  I DON'T KNOW WHAT HAPPENED ALL I KNOW IS ALL OF THE SUDDEN THERE IS BLOOD EVERYWHERE AND I'M LIKE WHAT JUST HAPPENED. I DON'T KNOW.

DB:    DO YOU GOT THE KNIFE IN YOUR HAND AT THAT POINT?

WA:    I HAD THE KNIFE IN MY HAND AND HE FALLS.  OH GOD.  I DON'T KNOW HOW, I DON'T KNOW HOW.

DB:    WERE YOU IN THE LIVING ROOM OR THE KITCHEN?

WA:    THE LIVING ROOM.  THE LIVING ROOM.

DB:    WHERE WERE YOU AT WHEN YOU TOOK THE, THE AH CORD OFF YOUR NECK?

WA:    THAT'D BE IN THE KITCHEN.  I'M SURE.  I DON'T KNOW.  I THINK IT WAS THE KITCHEN.

DB:    HOW MANY BEDROOMS IN YOUR PLACE?

WA:    THREE.

DB:    THREE?

91

000011590

WA:    YEAH.

DB:    PRETTY GOOD SIZE APARTMENT. (UI)

WA:    (UI) I'M LIKE WHAT?

DB:    I'M JUST TRYING TO PICTURE IT IN MY MIND.

WA:    OKAY.  THERE UM 1475 SQUARE FEET.

DB:    WOW.

WA:    (UI)

DB:    DID HE CHOKE YOU WITH ANYTHING OTHER THAN THE CORD?

WA:    A BELT AND A, AND A UM THAT CORD THING.

DB:    YOU DIDN'T TELL ME THAT HE CHOCKED YOU WITH A BELT.  WHERE WAS THAT AT?

WA:    OH YEAH THAT HAPPENED BEFORE THE KITCHEN THING BEFORE HE EVEN.  THAT IS WHEN I RAN,

AS SOON AS I GOT AWAY TO GET SOMETHING TO STOP HIM WITH.

DB:    (UI)

WA:    UH HUH I'M SORRY.  ACTUALLY AS HE'S CHOKING ME WITH THE BELT, I GET OUT OF THAT,

START RUNNING TO THE KITCHEN AND THAT'S WHEN HE GRABS ME AGAIN AND MUST HAVE GRABBED

THE CELL PHONE THING.  I DON'T KNOW AND THAT'S WHEN I GRABBED THE KNIFE.

DB:    WHERE'S THIS CELL PHONE THING AT?

WA:    I HAVE NO IDEA.  I, I DIDN'T SEE IT.

92

000011591

DB:     WHERE'S HE PLUG IT IN AT?

WA:     UM I DON'T KNOW JUST WHEREVER. HE HAS A CAR PLUG IN, HE HAS HOUSE PLUG INS, I DON'T KNOW, COULDN'T TELL YA.

DB:     FROM THE TIME HE AH, HE GOES DOWN TO THE GROUND...

WA:     I'M SORRY THIS IS MAKING ME ILL.

DB:     WHEN HE FALLS DOWN,

WA:     OKAY.

DB:     AFTER HE'S CUT WITH THE KNIFE, HOW LONG IS IT BEFORE YOU CALL YOUR DAD?

WA:     I DON'T KNOW. I HAVE NO IDEA. I REMEMBER NOT BEING ABLE TO SEE, GOING TO THE BATHROOM AND TRYING TO CLEAN MY GLASSES.

DB:     WHAT'D YOU CLEAN YOUR GLASSES WITH?

WA:     WATER, JUST IN THE SINK. I'M LIKE OH MY GOD.

DB:     DID YOU DRY THEM.

WA:     YOU KNOW WHAT, THERE MIGHT BE A WASH CLOTH SITTING THERE BUT NOT VERY MUCH CAUSE MY GLASSES ARE STILL FILTHY DIRTY. I CAN'T EVEN SEE OUT OF THEM.

DB:     CAN I SEE THEM?

WA:     YOU SURE CAN. CAUSE I NEED TO CLEAN THEM THEIR REALLY DIRTY.

DB:     THE UH

93

000011592

WA:     THEIR SCRATCHED.

DB:     HOW LONG, HOW LONG DO YOU THINK IT WAS?  I NEED TO KIND OF GET AN IDEA?

WA:     I

DB:     ABOUT HOW LONG IT IS BEFORE YOU CALL?  I MEAN IS IT

WA:     I DON'T KNOW.

DB:     10 MINUTES, IS IT AN HOUR, IS IT 2 HOURS?

WA:     I DON'T KNOW, CAUSE I KNOW I SAT IN THE BATHROOM JUST FREAKING OUT NOT KNOW ING
WHAT TO DO.  THEN BY THE TIME I GOT HOLD OF MY DAD.  I DON'T KNOW.  I MEAN I HAVE NO, AN
HOUR.

DB:     AN HOUR BEFORE YOU GOT AHOLD OF YOUR DAD?

WA:     MAYBE, MAYBE SO.  I DON'T KNOW. I, I DON'T REMEMBER.

DB:     WHAT DID YOU DO DURING THAT TIME?

WA:     I SAT IN THE BATHROOM LISTENING.

DB:     LISTENING FOR WHAT?

WA:     HIM.

DB:     WHAT'S HE DOING?

WA:     HUH?

DB:     WHAT'S HE DOING?

94

000011593

WA:     I DON'T KNOW THAT'S WHY I'M JUST LISTENING TO, I HEAR HIM.

DB:     WHAT'S, YOU, YOU CAN HEAR (UI)

WA:     I JUST HEAR, I DON'T KNOW, I JUST HEAR MOVEMENT, I JUST NOISES AND I'M LIKE OH MY GOD

HE'S GOING TO GET ME.  SO I'M SITTING IN THE BATHROOM AND I SHUT THE BEDROOM DOOR AND I

SHUT THE BATHROOM DOOR.

DB:     THE BATHROOM'S IN THE BEDROOM?

WA:     THINKING HE'S GONNA.  YEAH.  THINKING HE WAS GONNA COME GET ME THAT'S WHAT I WAS

WAITING FOR.

DB:     WHY DIDN'T YOU CALL 911 AT THAT POINT?

WA:     I DIDN'T HAVE THE PHONE.

DB:     WHERE WAS THE PHONE?

WA:     UM OUT IN THE BEDROOM OR OUT IN THE LIVING ROOM AND I WASN'T GOING TO COME OUT

OF THE BATHROOM.

DB:     OUT THROUGH THE BEDROOM OR?

WA:     YEAH WE HAVE A PHONE IN, IN THE MASTER BEDROOM AND WE HAVE A PHONE OUT IN THE

UM LIVING ROOM.  CAUSE I KNOW WHEN I FIN, WHEN MY DAD CALLED ME BACK I HAD TO WALK OUT

TO THE LIVING ROOM AND PICK UP THE PHONE ON THE COUCH.

DB:     YOU COULD HEAR HIM MOVING AT THAT POINT?

WA:     YEAH.

95

000011594

P-App. 004463

DB:     WHAT'S IT SOUND LIKE?

WA:     I DON'T KNOW.  I HAVE NO IDEA.  I JUST HEAR MOVING.  IT'S HARD TO HEAR BECAUSE THE AIR

CONDITIONER IS ON AND I'M JUST FREAKING OUT.  I, I DON'T KNOW

DB:     IS IT BECAUSE HE MOVED OR IS IT HIM UP WALKING AROUND?

WA:     I HAVE NO IDEA.

DB:     WAS HE MAKING OTHER NOISES?

WA:     HE'S MAKING NOISES OH I DON'T KNOW.  I DON'T KNOW WHAT I HEAR.  I'M JUST SIT, I'M SIT

AT, I DON'T KNOW.

DB:     IS HE TALKING OR?

WA:     SOUNDED LIKE HE WAS TALKING.

DB:     WHAT WAS HE SAYING?

WA:     I DON'T KNOW.

DB:     BUT YOU COULD HEAR HIM VERBALIZING SOMETHING?

WA:     I COULD HEAR, YES AND THAT'S WHY I'M THINKING HE'S GONNA COME GET ME.  THAT'S WHEN

I SHUT THE BATHROOM DOOR AND SAT THERE AND I DON'T KNOW HOW LONG I SAT.  I HAVE

ABSOLUTELY NO IDEA AND THAT'S AFTER THAT AS WHEN I WENT AND WHEN IT GOT QUIET I WENT TO

THE PHONE IN OUR MASTER BEDROOM.

DB:     WHICH IS AND THAT'S WHEN YOU START CALLING YOUR DAD?

WA:     YEAH.

96

000011595

DB:     AND THAT'S APPROXIMATELY AN HOUR LATER?

WA:     I GUESS, I DON'T, I DON'T KNOW, I MEAN I DON'T, I DON'T KNOW HOW LONG I WAITED FOR THE NOISE, I DON'T KNOW.

DB:     OKAY.

WA:     OH GOD THAT IS SO

DB:     DID YOU TALK TO HIM?

WA:     JOE?

DB:     YEAH, WHEN HE'S MAKING THESE NOISES?

WA:     NO I WAS SITTING AS QUIET AS I COULD CAUSE I DIDN'T WANT HIM TO FIND ME.  OH MY GOD.

DB:     HOW LONG AFTER YOU GOT, YOU SAID ROUGHLY AN HOUR UNTIL YOU GOT AHOLD OF YOUR DAD.  HOW LONG AFTER YOU FIRST GOT HOLD OF YOUR DAD UNTIL.  WELL LET'S SEE YOU WAITED AN HOUR.  HOW LONG DO YOU THINK YOU WAITED?

WA:     I MEAN IT COULD HAVE BEEN AN HOUR.  YOU KNOW, I, I DON'T KNOW.  I'M JUST TRYING ...

DB:     I, I KNOW I'M JUST TRYING

WA:     I'M SORRY.

DB:     IT'S OKAY.  IT'S OKAY.

WA:     UM.

DB:     YOU SAID YOU, HE GETS CUT HE GOES DOWN

97

000011596

WA:    YEAH.

DB:    YOU GO STRAIGHT INTO THE BATHROOM?

WA:    WELL I GET, I GET (UI) OW, HOW DO I EVEN EXPLAIN TO YOU.   I FELT LIKE I GOT DRENCHED IN BLOOD.  IT WAS IN MY HAIR.

DB:    ŬM HUH.

WA:    I MEAN IT'S ON MY FACE.  IT'S ALL OVER MY GLASSES.  I GO TO THE BATHROOM AND MY HANDS, I'M LIKE WHAT IN THE WORLD HAS HAPPENED.  IT'S LIKE SOMETHING, I DON'T KNOW, I FELT LIKE IT JUST SQUIRT, IT'S OH JESUS HELP ME.  I THINK, I THINK BLOOD SQUIRTED ON ME.  THAT'S WHAT I THINK.  I DON'T KNOW, I HAVE NO IDEA.  UM ALL I KNOW IS I RUN TO THE BATHROOM AND I GOT TO GET IT OFF MY GLASSES.  THAT WAS MY FIRST, I'VE GOT TO SEE.  I'VE GOT TO SEE WHAT'S GOING ON.  I, I TURN ON THE BATHROOM SINK, I DUMP MY GLASSES IN THE SINK, I'M RUNNING WATER OVER THEM, I'M LOOKING AT MY HANDS.  I'M LIKE TRYING TO WASH MY HANDS.  I'M LIKE OH MY GOD THIS IS JUST SO HORRENDOUS.  CAN'T YOU KNOW, YOU KNOW I, IT'S LIKE A CRAZY WHATEVER.  I DON'T KNOW, I'M TRYING TO REMEMBER.  SO I'M CLEANING AND I'M LIKE OH MY GOD, OH MY GOD AND NOT, I WAS NOT THINKING OF WHAT WAS GOING ON WITH HIM IN THE LIVING ROOM AT THAT POINT.  I'M JUST FREAKING OUT.  I'M LIKE OH MY GOD WHAT AM I DOING AND I LOOK DOWN, I HAVE BLOOD ALL OVER MY LEGS.  I'M LIKE OH SHIT, I STEPPED INTO THE BATHROOM, I'M LIKE RINSING OFF MY LEGS AND THAT'S WHEN UM I'M LIKE, I KNOW I

DB:    INTO THE BATH, BATH TUB?

WA:    I GOT INTO THE BATH TUB.

DB:    OKAY.

                                                            98

000011597

WA:     CAUSE IT WAS, OH MY GOD IT WAS JUST SO ABSOLUTELY GROSS.

DB:     NOW DID YOU TURN ON THE SHOWER HEAD OR

WA:     UMM NOW WHAT'D I DO. NO CAUSE I KNOW I DUNKED MY HEAD INTO THE BATHROOM SINK

WITH MY GLASSES CAUSE I SMASHED MY GLASSES. I DON'T REMEMBER. I DON'T THINK I TURNED THE

SHOWER HEAD ON.

DB:     SO YOU WASHED YOUR HAIR OUT?

WA:     OH I TRIED TO RINSE IT OUT RIGHT HERE. I'M PROBABLY STILL HAVE IT IN MY HAIR. I DON'T

KNOW, IT'S REALLY DISGUSTING.   OH I'M GONNA BE SICK.

DB:     HOW LONG IS IT, I KNOW I'VE GONE OVER THIS A COUPLE OF TIMES, BUT YOU SAY IT'S

ROUGHLY AN HOUR BEFORE YOU GET AHOLD OF YOUR DAD?

WA:     SO THAT'S MY FIRST THOUGHT. I YOU KNOW

DB:     UM HUH.

WA:     I'M, I GOT TO, I GOT TO GET AHOLD OF MY DAD, I'VE GOT TO CALL HIM.

DB:     UM HUH. NOW FROM THE TIME YOU TALKED TO YOUR DAD TIL YOU CALL

WA:     UM HUH.

DB:     911, HOW LONG IS THAT?

WA:     IT COULD HAVE EVEN BEEN ANOTHER HOUR. I HAVE NO IDEA. CAUSE I KNOW I TALKED TO MY

DAD. I SAT IN THE BATHROOM.

DB:     WHERE WERE YOU AT WHEN YOU TALKED TO YOUR DAD?

99

000011598

WA:    ONE TIME WAS FROM THE BEDROOM AND WHEN HE CALLED ME BACK, CAUSE HE, THEN HE GETS IN THE CAR AND IS GONNA COME UP, UP HERE

DB:    UM HUH.

WA:    AND UM I WENT OUT TO CHECK ON JOE AND UM

DB:    WHILE YOUR DAD'S ON THE PHONE WITH YOU?

WA:    NO. UM AFTER ME, I, I DON'T KNOW MAYBE WE HUNG UP FROM THE HOUSE PHONE AND THEN LATER I TALKED TO HIM ON HIS CELL PHONE. I DON'T REMEM, I DON'T REMEMBER EXACTLY BUT I KNOW I TALKED TO MY DAD A COUPLE OF TIMES WHILE HE WAS DRIVING UP HERE OR WHATEVER, OR WHATEVER WAS GOING WAS ON AND I DON'T KNOW.

DB:    AT WHAT POINT DID YOU....

WA:    CAUSE I'M LIKE DAD I CAN'T, I CAN'T DO THIS. WHAT, WHAT DO I DO, HELP ME. I CAN'T, I CAN'T THINK.

DB:    UM HUH.

WA:    IT'S REALLY, I FELT REALLY INCAPCITATED. IT WAS, IT WAS AN ODD UM I COULDN'T MOVE.

DB:    HOW AH WHEN DID YOU CHECK, YOU SAID YOU CHECKED ON JOE. WHEN DID YOU CHECK ON HIM?

WA:    UM HUH. I THINK I CHECKED ON HIM TWO TIMES AND THEN THE LAST TIME WHEN I WAS CALLING 911, WHEN I SAT RIGHT THERE WITH HIM.

DB:    WHEN WAS THE FIRST TIME YOU CHECKED ON HIM?

100

000011599

WA:    UM AFTER I STOPPED HEARING THE NOISES OUT IN THE LIVING AND THE TALKING AND THE WHATEVER WAS GOING ON, I DON'T KNOW UM

DB:    TELL ME ABOUT THAT?  WHEN YOU GO TO CHECK ON HIM IS HE LAYING FACE DOWN STILL?

WA:    HE'S LAYING FACE DOWN.

DB:    AND WHAT'S HE DOING?

WA:    HE'S LAYING THERE.

DB:    IS HE MAKING ANY NOISES?

WA:    NO THEN, I DIDN'T WALK OUT OF THE BATHROOM TIL IT WAS QUIET.

DB:    OKAY.

WA:    AND THEN I COULD, I'M LIKE OH WHAT'S GOING ON NOW AND I WAITED AND WAITED AND THEN I COULDN'T HELP IT, I HAD TO GO SEE WHAT WAS GOING ON.  UM OH AND HE WAS AND I JUST PEEKED AT HIM.  I DIDN'T, I COULDN'T EVEN...

DB:    WHAT'D YOU SEE?

WA:    HE WAS JUST LAYING FACE FORWARD.  JUST LAYING THERE.

DB:    HOW CLOSE DID YOU GET TO HIM?

WA:    I DIDN'T GET VERY CLOSE.  I JUST PEEKED AT HIM.

DB:    WHAT (UI)?

WA:    I DIDN'T WANT TO SEE.  MAYBE THREE FEET AWAY FROM, FOUR FEET AWAY.

101

000011600

DB:     THREE FEET.  OKAY.  DID YOU …

WA:     I MEAN IT WAS HARD, I WAS, I STOOD IN THE HALLWAY AND KIND OF LOOKED AROUND THE

LAZY BOY CHAIR IS RIGHT THERE.

DB:     UM HUH.

WA:     AND HE WAS JUST LAYING THERE AND I'M LIKE OH MY GOD HELP ME.

DB:     HOW LONG DID THE NOISES GO ON AFTER HE'S CUT?

WA:     I DON'T KNOW.  SEE I DON'T KNOW, I JUST WAITED AND WAITED.  OH.  I DON'T THINK VERY

LONG.  I DON'T KNOW.

DB:     OKAY.  SO YOU CHECKED ON HIM, HE'S NOT DOING ANYTHING.  YOU DON'T TOUCH HIM OR

ANYTHING?

WA:     NO.

DB:     THEN WHAT DO YOU DO FROM THERE?

WA:     THAT'S WHEN I, I UH CALL, KEEP CALLING.  I'M LIKE WHAT DO I DO.

DB:     TRYING TO GET AHOLD OF YOUR DAD?

WA:     (UI) CAUSE NOW I'M DESPERATE.  I'M GOING OH MY GOD WHAT DO I DO.  CAUSE HE LOOKS

VERY DEAD TO ME ON THE LIVINGROOM FLOOR AND I'M GOING OH MY GOD.  I JUST KILLED MY

HUSBAND AND I DIDN'T MEAN TO AND I DON'T KNOW WHAT'S GOING ON AND WHAT DO I DO.  YOU

KNOW I'M LIKE OH MY GOD DAD WHAT DO I DO.

DB:     WHAT DOES YOUR DAD TELL YOU?

102

000011601

WA:   HE MA, AH WELL FIRST MY MOM'S TALKING TO ME AND I'M LIKE I WANNA TALK TO MY DAD

NOW! SO SHE GETS MY DAD AND HE'S LOOK, DOING WHATEVER HE'S DOING TRYING TO FOCUS CAUSE

I'M SURE I WOKE HIM UP AND I SAID EXACTLY TO HIM. I'M LIKE JOE IS DEAD ON THE LIVING ROOM

FLOOR AND HE'S LIKE, WHAT, WHAT, WHAT DO YOU, YOU KNOW LIKE I FREAKED HIM OUT AND THEN I

TRY TO, I START BLABERING.   I COULDN 'T, I'M JUST LIKE THIS IS WHAT HAPPENED AND WHATEVER

AND HE SAYS WENDI YOU NEED TO HANG UP AND CALL 911 AND I'M LIKE OH MY GOD.  THEN I TAKE,

SEE THEN I START, MY KIDS, WHAT DO I DO WITH MY KIDS.  YOU KNOW I HAVE NICHOLAS AND ASHLEY,

SAID YOU NEED TO GET UP HERE AND GET MY KIDS.  YOU KNOW I, YOU, YOU HAVE TO, I CANNOT HAVE

THEM SEE THIS.  IT'S, I'M LIKE PUKING IN THE BATHROOM.  I CAN IMAGINE WHAT IT WOULD DO TO

THEM TO SEE SOMETHING LIKE THIS.  OH MY GOD.  SO THAT WAS MY NEXT, MY NEXT TOUGHT WAS

FOR THEM.

DB:   OKAY.

WA:   SO I'M LIKE

DB:   DID YOU EVER GET THEM UP?

WA:   NO, NO, I DIDN'T.  THE POLICE MEN TOOK THEM OUT OR SOMEONE TOOK THEM OUT.

DB:   UM HUH.

WA:   CAUSE I ASKED THEM, I SAID PLEASE DON'T LET THEM SEE IT AND THE NEXT THING, I'M SITTING

OUT ON THE SIDEWALK, THE NEXT THING I KNOW SOMEONE'S CARRYING THEM OUT, OUT THE, LIKE AH

MAYBE OUT THE BACK ENTRANCE OR SOMETHING.  SO I HOPE THEY DIDN'T TAKE THEM THROUGH THE

LIVINGROOM.  I MEAN I DON'T KNOW.  I'D BE REALLY UPSET IF THEY DID.

DB:   WHAT'S JOE'S MOMS NAME?

103

000011602

WA:     UM JEANETTE.

DB:     JEANETTE, J?

WA:     UM YEAH.  I DON'T KNOW EXACTLY HOW TO SPELL IT BUT.

DB:     YOU KNOW HER NUMBER?

WA:     UM YEAH, 520-836-5331.

DB:     OKAY.  DO YOU KNOW WHERE THEY LIVE AT, THEIR ADDRESS?

WA:     1998 THORTON ROAD.

DB:     THORTON?

WA:     YEAH.

DB:     AND THAT'S IN CASA GRANDE?

WA:     YEAH.

DB:     THEY LIVE IN CASA GRANDE?

WA:     UM YEAH.  OH MY GOD.

DB:     WHAT'S HIS DADS NAME?

WA:     JOE.

DB:     YOU MENTIONED A BABYSITTER, WHO'S YOUR BABYSITTER?

WA:     UM GIA.

104

000011603

DB:     GIA?

WA:     GIA, YEAH.

DB:     G-I-A?

WA:     UH HUH.

DB:     WHAT'S HER LAST NAME?

WA:     IT'S LIKE POLOWSKY OR SOMETHING, I DON'T KNOW HOW TO SAY IT.

DB:     POLOWSKY.  WHERE DOES SHE LIVE AT?

WA:     AT RIGHT KIND OF BY US.  OVER ON RAY ROAD.  I DON'T KNOW HER ADDRESS.

DB:     YOU KNOW HER PHONE NUMBER?

WA:     ISN'T THAT TERRIBLE.  UM 83, 8, NO UM 759-1320.

DB:     WHAT IS THAT?

WA:     480.

DB:     4-8-0?  HOW OLD IS GIA?

WA:     SHE'S OLDER THAN ME.

DB:     OKAY.

WA:     THIRTY SIX MAYBE.  SHE HAS TWO LITTLE GIRLS.

DB:     YOU MENTION CHRIS?

105

000011604

WA:     YEAH CHRIS.

DB:     WHAT'S CHRIS' LAST NAME?

WA:     UM HASHISAKI.

DB:     ANY IDEAS?

WA:     H-A-S-H-

DB:     S, H-A-S-H

WA:     S-H AND THEN I, AND THE S-A-K-I.  SORRY UM.

DB:     OKAY, DO YOU KNOW CHRIS' PHONE NUMBER?

WA:     YEAH, UM SHE'S UM

DB:     480?

WA:     659.  YEAH.

DB:     659.

WA:     8070.

DB:     AND SHE LIVES THERE IN THE COMPLEX?

WA:     UM HUH.

DB:     WHAT NUMBER?

WA:     I DON'T KNOW THE NUMBER, I KNOW WHERE IT'S LOCATED UM.  SHE'S IN BUILDING TWELVE THE TOP UM LET ME SEE IT'D BE THE SOUTHWEST CORNER.  BUILDING THE VERY THIRD FLOOR.

106

000011605

P-App. 004474

DB:     THIRD FLOOR. I NEED TO CHECK ON MY PARTNER FOR A FEW MINUTES ABOUT SOMETHING.

WA:     OKAY.

DB:     CAN I HAVE YOU TO DO ME A FAVOR?

WA:     SURE.

DB:     CAN I HAVE YOU DRAW KIND OF THE INSIDE OF YOUR APARTMENT? SO I'LL (UI)

WA:     SURE.

DB:     (UI)

WA:     SO DO I NEED AN ATTORNEY YET?

DB:     THAT'S UP TO YOU.

WA:     AH YOU'RE GOING TO KEEP TELLING ME THAT.

DB:     I CAN'T GIVE YOU LEGAL ADVICE.

WA:     I KNOW BUT IF YOU WERE IN MY SHOES. I JUST WANT TO DO WHATS BEST.

DB:     OKAY, I'LL BE BACK IN JUST A MOMENT, OKAY.

WA:     OH GOD (UI).

DB:     OKAY. SORRY TO KEEP YOU WAITING SO LONG.

WA:     UM YEAH.

DB:     OKAY LETS SEE.

107

000011606

WA:     IT'S MORE OR LESS, I CAN'T REALLY DRAW BUT.

DB:     IT'S OKAY.  MY ART WORK IS TERRIBLE AS WELL.

WA:     LIKE HERE'S THE FRONT DOOR

DB:     UM HUH.

WA:     LIKE WHEN YOU FIRST COME IN OUR FRONT DOOR YOUR ACTUALLY LOOKING DOWN A LONG

HALLWAY.

DB:     UM HUH.

WA:     SO THERE'S OUR LIVINGROOM AND THERE'S A WALL RIGHT HERE AND INSIDE THE WALL IS THE

KITCHEN.

DB:     SO THE KITCHENS RIGHT THERE?

WA:     YEAH AND THEN RIGHT HERES OUR DINING ROOM.  IF YOU GO DOWN THE HALL

DB:     YEAH.

WA:     I'M SORRY.

DB:     LR'S FOR LIVING ROOM?

WA:     LIVING ROOM.

DB:     DR'S FOR

WA:     DINING ROOM AND THERE'S THE KITCHEN.

DB:     WHERE WAS THE KNIFE AT?

000011607

WA:     IN THE KITCHEN BY THE FRIG.

DB:     BY THE FRIG?  SO

WA:     WE HAVE A DRAWER RIGHT HERE THAT HAS ALL OF OUR SILVERWARE IN IT.

DB:     OKAY, I'M GONNA WRITE KNIFEIF IT'S OKAY?

WA:     SURE THAT'S FINE.

DB:     OKAY AND HE ENDS UP DROPPING WHERE?  WHERE HE FALLS DOWN?

WA:     OH AFTER WERE STRUGGLING?

DB:     YEAH.  AFTER, ONCE HE'S STABBED, WHERE DOES HE FALL?

WA:     OH GOD, THAT JUST SOUNDS SO DISGUSTING.  WELL LIKE IN THE LIVING ROOM, RIGHT BY THE

HALLWAY IS A LAZY BOY AND I, IT WAS RIGHT, HE WAS LAYING RIGHT THERE.

DB:     WRITE HIS NAME WHERE YOU THINK HE IS?

WA:     OH I DON'T KNOW, I THINK RIGHT THERE.

DB:     OKAY.

WA:     I MEAN.

DB:     OKAY, THAT'D BE "X"?  OKAY.

WA:     I HAVE NO IDEA.

DB:     THIS IS THE MASTER BATHROOM?

WA:     YEAH.

109

000011608

DB:    THIS IS YOUR MASTER BEDROOM?

WA:    YEAH IT'S KIND OF LIKE A DOOR THAT GO, YOU GO INTO AND THEN THERE'S A DOOR TO THE

MASTER BEDROOM.

DB:    OKAY.  SO THIS IS A HALLWAY HERE?

WA:    UM HUH.

DB:    NICHOLAS' BEDROOM?

WA:    UM HUH.

DB:    THAT'S A VACANT BEDROOM?

WA:    NO IT'S A BATHROOM.

DB:    BATHROOM.

WA:    SECOND BATHROOM.

DB:    OKAY WHERE DO YOU GO IN AFTER HE FALLS DOWN?

WA:    AFTER

DB:    WHICH BATHROOM.

WA:    OH MASTER.

DB:    MASTER BATHROOM?

WA:    YEAH.

DB:    OKAY.

110

000011609

WA:   I'VE NEVER GONE INTO THE KIDS BATHROOM.

DB:   YOU NEVER GO INTO THE KID. AFT, WHEN THIS OCCURRED, IT WAS THE MASTER BATHROOM THAT YOU SAT IN?

WA:   YEAH.

DB:   OKAY.

WA:   THAT'S WHERE I WAITED.

DB:   OKAY. HOW DO YOU, NOW HOW DO YOU GET TO THAT MASTER BATHROOM, IT'S DOWN THE HALLWAY?

WA:   UH HUH.

DB:   DO YOU COME TO THE BATHROOM BEFORE THE BEDROOM?

WA:   NO THERE'S A DOOR, THERE'S A, YOU OP, THERE'S A DOOR FIRST, THAT GOES INTO THE BEDROOM AND THEN IMMEDIATELY TO YOUR LEFT IS THE DOOR THAT GOES INTO THE BATHROOM.

DB:   OKAY.

WA:   DOES THAT MAKE SENSE?

DB:   YEAH. SO..

WA:   IT'S JUST A QUICK LITTLE JOG YOU KNOW...

DB:   OKAY.

WA:   YOU KNOW WHAT I MEAN. IT'S LIKE AH ....

111

000011610

P-App. 004479

DB:     DID....

WA:     LIKE WHEN YOUR STANDING HERE THE SINKS ARE RIGHT HERE, WHEN YOUR STANDING HERE THE MIRRORS HERE, YOU CAN SEE INTO THE HALLWAY.

DB:     OKAY. (UI)

WA:     DOES THAT MAKE SENSE?

DB:     UM HUH.

WA:     OKAY.

DB:     WHEN, WHEN YOU GUYS WERE IN THE BATHROOM

WA:     UM HUH.

DB:     IN THE BATH TUB, EXCUSE ME.

WA:     RIGHT.

DB:     AND BEFORE EVERYTHING GOT REAL HEATED.

WA:     RIGHT.

DB:     OKAY. DID YOU GUYS SHOWER BEFORE THEN?

WA:     YEAH. HE ALWAYS TAKES A SHOWER BEFORE TAKING A BATH.

DB:     DID YOU?

WA:     DO I?

DB:     DID YOU?

112

000011611

WA:    OH YEAH, WE DO, SHOWER WASH OUR HAIR AND THEN GET IN THE BATH.

DB:    OKAY IS THAT WHAT HAPPENED THAT NIGHT?

WA:    YEAH WE ALWAYS DO.

DB:    ALRIGHT.  OKAY.

WA:    CAUSE YOU CAN'T WASH YOUR HAIR IN THE BATH TUB IT'S KIND OF.

DB:    OKAY.  SO IT WAS MORE THAN JUST AH GOING IN THERE TO MAKE LOVE, IT WAS, IT, YOU WERE
GOING IN THERE....

WA:    NO, IT'S A WHOLE PROCESS, YEAH, SORRY.

DB:    OKAY.  OKAY.  UM

WA:    I USUALLY GET THE CANDLES OUT AND LIGHT THE CANDLES AND ALL THAT KIND OF STUFF AND
WHATEVER.  YEAH WE USUALLY WASH FIRST AND THEN.

DB:    I HAD A QUESTION, I CAN'T BELIEVE WHAT IT WAS.  HOW LONG AFTER THE FIRE DEPARTMENT
GOT HERE AND LEFT DO YOU THINK HE WAS CUT?  HOW LONG AFTERWARDS?

WA:    OUT OF THE WHOLE PROCESS?

DB:    UNTIL HE WAS CUT AND FELL DOWN?

WA:    I HAVE NO IDEA.

DB:    DOES HE, MY UNDERSTANDING IS HE TELLS YOU TO HAVE, TELL THE FIRE DEPARTMENT TO
LEAVE..

113

000011612

WA:     UM HUH.

DB:     THEY DO.

WA:     WHICH I DID.

DB:     AND YOU TELL CHRIS TO LEAVE?

WA:     I DID.

DB:     AND THEN YOU COME BACK IN THE APARTMENT....

WA:     UM HUH.

DB:     AND

WA:     SEE I HAVE NO CONCEPT OF TIME AND YOU KEEP ASKING ME ALL THESE TIMES AND I DON'T KNOW.  I HONESTLY DON'T KNOW.

DB:     DO, DOES HE IMMEDIATELY START FIGHTING AND IS THAT WHEN YOU'RE BEING CHOKED?

WA:     PRETTY MUCH WHEN WE START, WHEN I COME BACK IN THERE HE'S PISSED, YEAH.

DB:     UM HUH.

WA:     I MEAN IT'S, IT'S

DB:     AND HOW LONG IS IT TIL THE CHOKING STARTS?

WA:     WELL THAT'S ONE OF HIS FIRST THINGS HE DOES.

DB:     NORMALLY, BUT, BUT IN THIS CASE?

WA:     YEAH, NO THAT'S WHAT I'M SAYING.

114

000011613

DB:     IT STARTED IMMEDIATELY?

WA:     OH YEAH.  WELL YEAH WITHIN I DON'T KNOW AH I DON'T KNOW, I DON'T, I DON'T, I HATE

SAYING THINGS CAUSE I DON'T KNOW.  I REALLY DON'T KNOW AND YOUR PRESSING ME FOR A TIME

AND I DON'T HAVE ANY CLUE.

DB:     ALRIGHT, IS IT A MATTER OF MINUTES, TWENTY, THIRTY MINUTES?

WA:     OH I DON'T KNOW, FIFTEEN, TWENTY MINUTES.

DB:     TIL HE STARTS CHOKING YOU?

WA:     I GUE, I'M...

DB:     OKAY, I'M JUST TRYING TO MAKE SURE...

WA:     I'M SORRY: (UI)

DB:     I HAVE ALL OF THE FACTS DOWN IN MY MIND, OKAY?  WHEN UH AFTER YOU GUYS GET OUT OF

THE BATH TUB...

WA:     OKAY

DB:     AND YOU GO IN, YOU DRY OFF, GO IN THE LIVING ROOM.

WA:     I ONLY HUNG AROUND THE BEDROOM FOR A MINUTE.

DB:     OKAY AND ARGUED, RIGHT?

WA:     YEAH.

DB:     AND YOU END UP IN ...

115

000011614

WA:     AND THEN WE ENDED UP IN THE LIVING ROOM.

DB:     OKAY AND HOW LONG IS IT, OKAY YOU GOT HOME AROUND MIDNIGHT RIGHT?

WA:     UM HUH.

DB:     SO YOU WATCH TV TIL AROUND 1:00 YOU THOUGHT?

WA:     YEAH, I THINK SO.

DB:     OKAY AND THEN YOU GOT IN THE BATH TUB AROUND 1:00?

WA:     I GUESS SO.

DB:     AND SHOWERED GOT IN THE BATH TUB AND THAT'S WHEN THE ARGUMENT STARTED?

WA:     YES.  WELL THE ARGUMENT STARTED IN THE BEDROOM BUT WE TRIED TO STOP IT.

DB:     IN THE BEDROOM.  OKAY.

WA:     YOU KNOW, MAKE IT BETTER AND IT JUST DIDN'T HAPPEN.

DB:     OKAY.  OKAY BUT YOU WERE ALREADY OUT OF THE BATH TUB AT THAT POINT?

WA:     I WAS, YEAH.

DB:     HE WASN'T BUT YOU WERE?

WA:     UH HUH.

DB:     OKAY AND THAT'S, SO THAT'S ABOUT 1:00 AM WHEN YOU GET IN THE BATH TUB?

WA:     (LAUGHS) I DON'T KNOW, I DON'T KNOW.

116

000011615

DB:     OKAY.

WA:     I MEAN PROBABLY...

DB:     OKAY.

WA:     YOU KNOW JUST LIKE I'M READING A LITTLE BIT AND I GUESS SO, I MEAN.

DB:     OKAY.  DID CHRIS HAVE ANY CONVERSATION WITH JOE?

WA:     YEAH SHE TALKED TO HIM A LITTLE BIT.  I KNOW AND HE, THAT'S WHEN HE WAS LIKE OUT OF IT

AND THAT'S WHEN I KNEW I, YOU KNOW I HAD HIT HIM HARD OR SOMETHING.  I DON'T KNOW WHAT

HAPPENED.  CAUSE HE COULDN'T FOCUS ON ME AND HAD ME FREAKED OUT.

DB:     BUT SHE DID TALK TO HIM?

WA:     YEAH.

DB:     OKAY.

WA:     OH YEAH.

DB:     WAS CHRIS STILL THERE WHEN THE FIRE DEPARTMENT GOT THERE?

WA:     YEAH, SHE WAS OUTSIDE IN, CAUSE SHE WAS OUTSIDE WAITING FOR THEM TO COME THAT

WAY SHE COULD SHOW HIM, THEM WHERE WE LIVE AND WHEN I WENT OUT TO TELL THEM, NO GO

AWAY, I'M SU, I THINK SHE WAS STILL STANDING THERE WITH THE FIRE DEPARTMENT.

DB:     OKAY.  OKAY.  DID SHE TALK TO THEM OR DID YOU?

WA:     TALK TO WHO?

117

000011616

DB:     THE FIRE DEPARTMENT AND TELL THEM TO LEAVE.

WA:     OH I DID.

DB:     OKAY.  OKAY.

WA:     NO CAUSE SHE KEPT ASKING ME ARE YOU SURE AND I'M LIKE THAT'S WHAT HE WANTS YOU KNOW I ...

DB:     OKAY.  ALRIGHT I THINK I NEEDED TO ASK SALLY ONE QUESTION (UI), OKAY?

WA:     OKAY.

DB:     IS THERE ANYTHING ELSE YOU CAN THINK OF?

WA:     ONLY, THE ONLY THING I THINK IS WHEN I WENT TO THE BATHROOM YOU GUYS NEED GUYS NEEDED MY SHORTS AND I THINK THAT THE ORIGINAL SHORTS I HAVE ON ARE IN THE BATHROOM.

DB:     THERE IN THE BATHROOM?

WA:     I THINK SO.  I'M NOT SURE.

DB:     WHAT (UI) DID YOU CHANGE?

WA:     WHEN I WAS SITTING THERE WAITING CAUSE THEY WERE YUK,

DB:     UM HUH.

WA:     AND I KNOW AND I MEANT TO CHANGE MY SHIRT AND I GUESS I JUST DIDN'T, I DON'T KNOW WHAT THAT WAS ALL ABOUT BUT I'M

DB:     WHERE DID YOU GET THE SHORTS THAT YOU PUT ON?

118

000011617

P-App. 004486

WA:     THEY'RE ALL IN MY DIRTY CLOTHES PILE RIGHT THERE.  I MEAN I JUST GRABBED.

DB:     IN THE BATHROOM?

WA:     IN THE BATHROOM, WHERE I WAS SIT, HANGING OUT, SO UM I'M SU, SO THEY MIGHT BE BUT I'M NOT SURE, I DON'T EXACTLY REMEMBER BUT IT COULD BE.  I DON'T KNOW.

DB:     UM

WA:     I DON'T RECALL, I JUST CAN'T EVEN THINK.  CAUSE I KNOW, I WAS GOING TO CHANGE MY CLOTHES AND I DON'T KNOW IF I DID HALF OF THEM OR NONE OF THEM OR I DON'T EVEN KNOW.  SO I JUST WANTED TO SHARE WITH YOU THAT ONE LITTLE PIECE.

DB:     OKAY, SIT TIGHT FOR JUST A MINUTE, I'LL BE RIGHT BACK.

WA:     OKAY.  (SIGHS)  OH JESUS CHRIST.

DB:     OKAY, I'VE GOT THREE QUESTIONS THEN WERE DONE.

WA:     OKAY.

DB:     OKAY.

WA:     MY BODY JUST KEEPS WANTING TO SHUT DOWN, SORRY.

DB:     UH I BET YOUR TIRED?

WA:     NO I THINK IT'S ALL THE ..

DB:     STRESS?

WA:     UM HUH.

119

000011618

P-App. 004487

DB: YOU, YOU KNOW I BELIEVE, I JUST WANT TO CLAIRIFY IN MIND, UM YOU TOLD ME AFTER HE, AFTER HE, YOU HIT HIM WITH A CHAIR AND HE GOES DOWN TO THE GROUND. YOU GOT HIM OUT COLD, RIGHT?

WA: UM, AH

DB: I'M SURE THAT'S WHAT YOU TOLD ME EARLIER.

WA: YEAH, I, I'M SURE I DID BECAUSE YES I REMEMBER.

DB: WHERE'D YOU GET THE PILLOW FROM?

WA: UM WE HAVE PILLOWS AND BLANKETS ALL OVER THE PLACE, SO I DON'T KNOW.

DB: OKAY BUT YOU GAVE HIM THAT AFTER HE GOT HIT WITH THE CHAIR?

WA: YEAH I THINK SO.

DB: OKAY. DID YOU EVER HIT HIM WITH THE CHAIR ONCE HE'S ON THE GROUND?

WA: I KNOW I HIT, UM YEAH THAT'S WHY I MEAN.

DB: WHILE HE'S ON THE GROUND?

WA: NO WHEN HE KEPT TRYING TO GET UP.

DB: OKAY SO YOU HIT HIM WITH A CHAIR DOES HE...

WA: YOU KNOW WHAT I MEAN, CAUSE I HIT, I KNOW, OH THIS IS MAKING ME SICK TO MY STOMACH, BUT HE KEPT YELLING AT ME TO COME GET ME AND I KEPT HITTING HIM.

DB: WAS HE ON THE GROUND AT THAT POINT?

120

000011619

WA:    WELL HE WAS LIKE ON ALL FOURS.

DB:    KIND OF SHOW ME. SO HE'S ON ALL FOURS?

WA:    YEAH, HE'S GONNA STILL GET ME.

DB:    ON HIS KNEES?

WA:    YEAH.

DB:    AND YOU HIT HIM AGAIN? HOW MANY TIMES DO YOU THINK YOU HIT WHILE HE'S ON ALL
FOURS?

WA:    I HAVE NO IDEA.

DB:    OKAY.

WA:    I JUST KNOW I HIT HIM AND HIT HIM AND HE KEPT, KEPT TRYING TO GET UP AND I'M LIKE OH
MY GOD. I MEAN IT WAS JUST FREAKING ME OUT. HE WOULDN'T STOP AND HE KEPT YELLING AT ME,
HE WAS GONNA GET ME AND I'M LIKE STOP. YOU KNOW WHAT I MEAN, IT WAS JUST, I HAVE NO IDEA.

DB:    DID YOU, DID YOU TELL ME EARLIER THAT AH HE, HE WAS TALKING ABOUT DIVORCE?

WA:    NO THAT WAS ONE THING WE WOULD NEVER DISCUSS. I MEAN WE MADE AN AGREEMENT
THAT WE WOULD ALWAYS FIGURE OUT A WAY TO WORK IT OUT.

DB:    UM HUH.

WA:    YOU KNOW WE, WELL I AND IT'S PROBABLY CAUSE OF OUR CHURCH BACKGROUND AND STUFF.
I MEAN THAT'S JUST, THAT'S JUST NOT THE, IT, IT'S TOO MUCH OF AN EASY OUT OR WHATEVER YOU
WANT TO CALL IT.

121

000011620

DB:     HOW LONG DID YOU EXPECT HIM TO AH LIVE BEFORE, DID THEY GIVE HIM ANY TYPE OF

ESTIMATE ON TIME?

WA:     WELL THE DOCTOR THE LAST TIME TOLD HIM THAT UM UM HE COULD HAVE NINE MONTHS

WITH THE CHEMOTHERAPY, KAY AND AFTER NINE MONTHS HE COULD NOT HAVE ANY MORE AND SO

THEN THE DISEASE WITHIN A COUPLE MONTHS AFTER THAT WOULD PUT HIM IN THE HOSPITAL NOT

ABLE TO BREATHE.

DB:     OKAY.

WA:     SO IN MY HEAD I'M THINKING SOON AND THEN I JUST HAD FRIEND ELAINE, WHOSE FATHER

HAS ADNOIDCYSTICCARCINOMA, WHO STARTED CHEMO AND AFTER SO MANY TREAT, THREE MONTHS

WORTH OF TREATMENTS DIED FROM THE CHEMO.  SO I REALLY HAD NO IDEA.  OBVIOUSLY, YOU KNOW,

I DIDN'T KNOW.

DB:     DID YOU EVER USE YOUR HUSBAND'S CELL PHONE FROM YOUR HOUSE OR ANYTHING?

WA:     DID I?

DB:     YEAH.

WA:     NO.

DB:     DO YOU HAVE YOUR OWN CELL PHONE?

WA:     I DO BUT THE BATTERIES BEEN DEAD FOR LIKE TWO DAYS.

DB:     OKAY.  WHAT'S YOUR CELL NUMBER?

WA:     UM 602-UM 826-UM 0997.

122

000011621

P-App. 004490

DB:     AND JOES IS?

WA:     UM 602-618-9177.

DB:     OKAY.  YOU GUYS HAVE ANY VEHICLES THERE?

WA:     YEAH.

DB:     OKAY. HOW MANY VEHICLES DO YOU HAVE?

WA:     TWO.  WELL MMM THREE RIGHT NOW.  ONE WAS HIS UM VAN THAT HE WAS WORKING ON THE AIR CONDITIONING.

DB:     WHAT KIND OF VAN?

WA:     IT'S LIKE A CHEVY ASTRO VAN.  IT'S JUST WHITE.

DB:     OKAY.  ASTRO VAN.

WA:     I HAVE NO IDEA WHAT YEAR IT IS, IT'S A WORK VAN.

DB:     WHITE?

WA:     UH HUH.

DB:     IS THERE ANYTHING THAT STANDS OUT ABOUT IT?

WA:     IT'S JUST WHITE WITH NO WINDOWS.  IT'S CARGO VAN TYPE THING.

DB:     CARGO VAN.  IS IT REGISTERED TO HIM?

WA:     UM HUH, SHOULD BE.

DB:     OKAY AND WHAT ELSE?

123

000011622

WA:   AH WE HAVE A GMC YUKON.

DB:   GMC YUKON, WHAT YEAR IS THAT?

WA:   UH IT'S A '98.

DB:   '98, WHAT COLOR IS IT?

WA:   UM IT'S LIKE A PEWTER, PEWTER THAT'S EXACTLY WHAT IT'S CALLED.

DB:   PEWTER GREY?

WA:   UM HUH.

DB:   OKAY AND FOUR DOOR, TWO DOOR?

WA:   FOUR DOOR.

DB:   FOUR DOOR.  YOU KNOW THE LISCENSE PLATE ON THAT?

WA:   NO BUT IT SAYS SCORPION BOATS ACROSS THE BACK WINDOW.

DB:   I'M GETTING TIRED HERE.  SCORPION.

WA:   IT'S SCOR

DB:   SCOR

WA:   SCOR-PI, YEAH

DB:   PIN.  I REMEMBER IT FROM THE GROUP.

WA:   OH.

124

000011623

DB:     SCORPION BOATS ON BACK. OKAY AND WHAT ELSE?

WA:     THEN WE HAVE HIS MOM'S CAR RIGHT NOW, SINCE HIS VAN WASN'T WORKING AND IT'S UM, IS

IT A PONTIAC. IT'S A LIGHT BLUE PONTIAC. SOMETHING I DON'T EVEN KNOW OR NO IS IT A BUICK.

BUICK REG, BUICK, I HAVE NO IDEA, IT'S A LITTLE GRANDMA LOOKING CAR.

DB:     OKAY. DO YOU GUYS HAVE ASSIGNED PARKING SPOTS?

WA:     UM HUH.

DB:     DO YOU KNOW WHAT PARKING SPOTS THESE ARE IN?

WA:     I DON'T BECAUSE I USUALLY PARK IN THE ONES THAT ARE OPEN. I GIVE MY SPOTS AWAY TO

EVERYBODY.

DB:     OKAY. DO YOU HAVE QUESTION OF ME?

WA:     UM WHAT, YEAH I DO ACTUALLY. UM YOU'VE LIKED ASKED ME ALL OF THESE QUESTIONS AND

NOW WHAT, WHAT IS GOING, WHAT DO WE DO, WHAT IS GOING ON?

DB:     WELL WERE TRYING TO FIGURE OUT WHAT HAPPENED OUT THERE.

WA:     I KNOW.

DB:     OKAY. WE NOT ONLY HAVE TO GET YOUR SIDE BUT WE HAVE TO DECIDE BASED ON THE

PHYSICAL EVIDENCE WE SEE, TO SEE WHAT'S GOING TO HAPPEN FROM HERE.

WA:     SURE.

DB:     AND THAT'S WHAT WERE IN THE PROCESS OF DOING NOW.

WA:     OKAY.

000011624

DB:     SO IT'S GOING TO BE A LITTLE WHILE.  WERE TRYING TO PUT EVERYTHING TOGETHER.

WA:     WHICH MEANS WHAT?

DB:     GIVEN THE

WA:     I'VE NEVER BEEN INVOLVED IN ANYTHING...

DB:     YEAH IT'S MY UNDERSTANDING THAT....

WA:     I'VE HAD MY, MY LICENSE REVOKED.

DB:     HOW DO YOU THINK YOU HURT YOUR FINGER?

WA:     I DON'T KNOW.  THAT'S WHY I KEEP, I HAVE ABSOLUTELY NO IDEA.

DB:     OKAY.  UM

WA:     DO YOU KNOW?  I GUESS NOT.

DB:     NO I DON'T.

WA:     AND I DIDN'T EVEN NOTICE IT WAS HURTING TIL AFTER UM SITTING OUT ON THE SIDEWALK.

DB:     OKAY.

WA:     I MEAN.

(KNOCK ON DOOR)

DB:     COME IN.

WA:     IT'S LIKE THE BLOODS BUILDING UP IN THERE.

126

000011625

DB:     SO LET ME ASK YOU A FEW THINGS.

WA:     OKAY.

DB:     I THINK I'VE ALREADY COVERED.

WA:     OKAY.

DB:     YOU WEREN'T USING ANY DRUGS OR ALCOHOL TONIGHT RIGHT?

WA:     NO.

DB:     DO YOU?

WA:     I DRINK SOCIALLY, YEAH.

DB:     SOCIALLY DRINK?

WA:     YEAH.

DB:     OKAY BUT NOT TONIGHT.

WA:     NO.

DB:     OKAY WHAT ABOUT JOE?

WA:     NO.  WELL NOT THAT I'M AWARE OF NO.

DB:     NOT THAT YOUR AWARE OF?

WA:     NO CAUSE I THINK EVERY SINCE...

DB:     HE HAVE MEDICATION OR SOMETHING OR?

127

000011626

WA: NO. WELL

DB: THIS IS THE TIME TO TELL ME IF YOU DO.

WA: NO CAUSE I DON'T, I DON'T REALLY KNOW BUT I KNOW THAT, I JUST THINK THAT HE MIGHT BE TAKING DRUGS BUT I DON'T KNOW.

DB: YOU THINK IT'S STREET DRUGS?

WA: I THINK, I DON'T KNOW.

DB: WHAT MAKES YOU THINK THAT?

WA: JUST CAUSE OF HIS PERSONALITY CHANGES, CAUSE I'M LIKE HOW CAN HE GO FROM BEING JUST EVERYDAY DAD AND THEN ALL OF THE SUDDEN JUST BE IN THIS CRAZED MOOD. I GUESS THAT'S, BUT I DON'T HAVE ANY EVIDENCE OF IT OR YOU KNOW WHAT I MEAN, I'VE NEVER....

DB: NEVER SEEN ANY PARAPHANELIA OR ANYTHING?

WA: NO.

DB: DOES HE HAS A DRINKING PROBLEM OR?

WA: NO HE ACTUALLY DID ST, WELL STOP DRINKING WHEN HE STARTED CHEMO.

DB: UM HE THINKS THAT YOUR WERE HAVING AN AFFAIR OR SOMETHING?

WA: OH SURE.

DB: ARE YOU?

WA: NO.

128

000011627

DB:     WHY WOULD...

WA:     WELL

DB:     WHY DOES HE THINK,

WA:     UM

DB:     DO YOU HAVE MALE FRIENDS THAT YOU ARE CLOSE TO?

WA:     I DO, I DO ACTUALLY.  UM I HAVE A COUPLE AND HE JUST LIKE CAN'T HANDLE IT.  IT'S REAL,

WELL AND I THINK IT'S JUST BECAUSE OF THE WAY HE IS RIGHT NOW.  HE'S VERY INSECURE ABOUT

HIMSELF.

DB:     SURE.

WA:     AND IN ORDER FOR ME TO HAVE NORMALICY IN MY LIFE YOU KNOW.

DB:     OKAY.  DO YOU DO THINGS OUTSIDE OF WORK WITH THESE MALE FRIENDS?

WA:     YEAH IN FACT UM UM LIKE SOME OF THE GIRLS IN THE OFFICE AND MYSELF WILL GO OUT AND

UM MY MALE FRIENDS WILL MEET ME THERE OR SOMETHING, YOU KNOW WHAT I MEAN.  IT'S JUST

PRETTY WHATEVER.  UM

DB:     WHO, WHO ARE THESE GUYS?

WA:     UM GOSH UM ERIC'S ONE OF THEM.

DB:     ERIC?

WA:     UM

000011628

DB:    WHAT'S ERIC'S LAST NAME?

WA:    UM VALENT.

DB:    V-A-L-E-N-T?

WA:    RIGHT.  THEIR PART OF A SOFTBALL TEAM.

DB:    OKAY.  YOU PLAY SOFTBALL WITH THEM?

WA:    I DON'T WE SPONSOR THEM ....

DB:    OKAY.

WA:    ....AND  SO THAT'S WHY WE HANG AROUND THEM.

DB:    OKAY.  ANYBODY ELSE?

WA:    UM

DB:    YOU SAID THERE WERE A COUPLE OF THEM?

WA:    UM SEAN.

DB:    WHAT'S SEAN'S LAST NAME?

WA:    SEAN KING.

DB:    OKAY.

130

000011629

WA:     AND HE ACTUALLY GOT IN AN ACCIDENT A YEAR AGO AND HAD BOTH OF HIS LEGS CHOPPED

OFF AND UM THEY HAD PUT THEM BACK ON AND HE'S GOING THROUGH REHABILITATION NOW AND I

KNOW JOE GETS REALLY UM UPSET WHEN I TALK WITH HIM AND BUT I TALK WITH HIM A LOT CAUSE I

WAS RAISED WITH HIM AND WERE LIKE JUST BEST FRIENDS.  UM GOSH AND THEN JUST IF WERE OUT

DANCING OR WHATEVER I JUST DANCE WITH PEOPLE AND HE JUST YOU KNOW HAS A FIT ABOUT IT BUT

I (UI).

DB:     HE DOESN'T GO WITH YOU WHEN YOU GO OUT?

WA:     NO HE DOESN'T LIKE TO GO TO BARS UM SO USUALLY I GO WITH MY GIRLFRIENDS OR

SOMETHING AND UM HE JUST GETS REALLY INSECURE ABOUT THAT.

DB:     OKAY.  WELL UM SIT TIGHT AND WERE GONNA WRAP THINGS UP HERE OKAY?

WA:     OKAY.

DB:     LAST QUESTION, ARE YOU RIGHT OR LEFT HANDED?

WA:     I'M RIGHT HANDED.

DB:     RIGHT HAND, OKAY.  SALLY'S GOING TO COME TALK TO YOU REAL QUICK.

WA:     OKAY.

DB:     I'VE GOTTA GET GOING ON SOME OTHER STUFF, OKAY?

WA:     OKAY.

DB:     AND SHE'LL, SHE'LL TALK TO YOU FOR A COUPLE OF MINUTES, OKAY?

WA:     OKAY.

131

000011630

DB:     ALRIGHT, THANK YOU MAAM.

WA:     OH MY GOD HELP ME.

SD:     HELLO, I'M BACK.  OKAY LET ME GET JUST A COUPLE OF QUESTIONS.  FIRST OF ALL (UI) (LAUGHS).

WA:     I'M BETTER.

SD:     AND UH WERE GONNA DO ANOTHER SET OF PHOTOS OKAY?

WA:     OH.

SD:     IT'S, IT JUST KIND OF...

WA:     OH MY GOSH.

SD:     I KNOW, I KNOW IT SEEMS KIND OF SILLY ALL OF THE THINGS THAT WE DO.  UM COUPLE OF QUESTIONS, DID YOU BLEED AT ALL?  I MEAN DID YOU GET A CUT OR A BLOODY NOSE OR ANYTHING THAT ANY OF YOUR BLOOD WOULD BE THERE IN THE HOUSE?

WA:     UM I MEAN I HAVE, NO, I MEAN NOTHING MAJOR.

SD:     OKAY, SO YOU DON'T HAVE ANY CUTS, THAT'S WHAT, AND YOU DIDN'T GET A BLOODY NOSE OR A SPLIT?

WA:     NO.

SD:     OKAY I JUST KIND OF WANTED TO MAKE SURE THAT THE BLOOD THAT WE'VE GOT THERE IS GONNA BE JOE'S?

WA:     YEAH.

132

000011631

SD:   OKAY. UM

WA:   YEAH CAUSE I KNOW HE HIT MY HEAD BUT IT DIDN'T, IT DIDN'T BREAK THE SKIN.

SD:   BUT IT DIDN'T BREAK THE SKIN?

WA:   NO.

SD:   WHERE DID, WHERE DID....

WA:   RIGHT, I HAD IT RIGHT HERE ON THE BACK OF MY HEAD. IT'S PROBABLY RIGHT THERE I GUESS IS WHERE HE JUST POPPED ME RIGHT ON THE WALL. BE CAREFUL.

SD:   OKAY. I JUST DON'T FEEL ANY BUMP.

WA:   (UI)

SD:   I'M TRYING TO SEE IF THERE'S A ....

WA:   IT WAS EARLIER AND IT'S FEELING MUCH BETTER.

SD:   LET ME TAKE A LOOK, LET ME TAKE A LOOK. HANG ON, I NEED TO PUT GLASSES ON SO THAT I REALLY CAN TAKE A LOOK. CAN YOU TILT YOUR HEAD FORWARD FOR ME?

WA:   SURE. MY NECK'S JUST REALLY SORE.

SD:   POINT, POINT, OKAY POINT TO WHERE IT IT HURTS?

WA:   IT HURT RIGHT HERE.

SD:   OKAY LET ME JUST...

WA:   IT'S REAL JUST TENDER RIGHT HERE.

133

000011632

P-App. 004501

SD:     OKAY.

WA:     BE CAREFUL.

SD:     I KNOW IT, IT, I DON'T FEEL IT, A GOOSE OR ANYTHING THERE BUT THAT DOESN'T MEAN THAT IT'S NOT TENDER.

WA:     YEAH, YEAH IT'S JUST REAL SORE.

SD:     OKAY UM THE GUY SAID SOMETHING ABOUT A PILLOW AND A BLANKET?

WA:     OKAY.

SD:     WHERE DID THEY COME FROM?

WA:     THEY WOULD HAVE BEEN OUT IN THE LIVING ROOM.  WE LAY AROUND AND WATCH TV.

SD:     OKAY SO YOU DIDN'T GO AND GET THEM ANY WHERE, THEY WERE ALREADY THERE?

WA:     SURE.

SD:     OKAY.

WA:     YEAH.

SD:     DID YOU PUT A PILLOW UNDER HIS HEAD AT ANY POINT OR

WA:     UM I TRIED TO....

SD:     OKAY.

WA:     BUT I DON'T, IT WOU, I, I DON'T THINK I MADE IT UNDER HIS HEAD.

SD:     OKAY.  OKAY UM AND HE ASKED ANOTHER QUESTION, IS THERE A BELT SOMEWHERE THERE?

134

000011633

WA:     UM THERE WAS, I MEAN THERE, THERE WAS ONE.

SD:     OKAY.  DID HE HAVE THE BELT?  WHERE DID THE BELT COME FROM?

WA:     YEAH, WELL I HAVE A TWO AND A THREE YEAR OLD

SD:     OKAY.

WA:     THEIR JUST LAYING AROUND AND THAT'S WHAT HE GRABBED.

SD:     ARE THEY ONE OF THE BABIES BELTS OR THEY?

WA:     I DON'T KNOW WHOSE BELT IT WAS.  I DON'T, I DON'T REMEMBER.  I JUST KNOW IT WAS A

BELT.

SD:     OKAY AND HE HAD THAT IN HIS HAND?

WA:     UM HUH.

SD:     OKAY.  DO YOU KNOW WHAT HAPPENED TO IT OR WHERE IT WENT TOO?

WA:     NO.

SD:     OKAY.

WA:     IS IT NOT IN THE HOUSE?

SD:     I DON'T KNOW.  THEY, I, AND THEY SAID SOMETHING ABOUT A BELT SO THAT IT PROBABLY IS

THERE.

WA:     YEAH, CAUSE I WOULD SAY I DON'T KNOW, IT SHOULD, IT SHOULD BE.  I MEAN I DON'T KNOW

WHERE IT WOULD.

135

000011634

SD:      OKAY LET'S GET THESE PHOTOS OUT OF THE WAY.  SHOW ME YOUR HANDS.

WA:      HE ASKED ME WHAT HAPPENED TO IT AND I JUST DON'T KNOW.  I DON'T RECALL WHAT

HAPPENED, ISN'T THAT ODD?

SD:      WOW.

WA:      THIS ONE AND THEN THIS ONE.

SD:      CAN YOU BEND IT?

WA:      THIS ONE HURTS REALLY BAD.

SD:      OKAY.

WA:      THIS ONE I CAN STRAIGHTEN.

SD:      OKAY.

WA:      YOU KNOW, I DON'T KNOW, I'M LIKE AND IT'S MY LEFT HAND WHICH IS REALLY ODD.

SD:      AND THEN YOU HAVE JUST WHAT A LITTLE CUT RIGHT THERE?

WA:      UM HUH.

SD:      WHAT ABOUT CUTS ON THIS HAND?

WA:      I HAVE ONE CUT RIGHT THERE.

SD:      OKAY.

WA:      (UI)

SD:      YOU GOT SOME BRUISING THERE TOO.

136

000011635

WA:     UM HUH.

SD:     OKAY.  OKAY LET'S GO AHEAD AND JUST, I'M GONNA TAKE THIS CAUSE IT WILL BE A LIGHT SOURCE.  THERE WE GO.

WA:     (UI)

SD:     LET'S START WITH THE HANDS AND THEN WERE GONNA DO AN OVERALL AND THEN I WANNA DO UM BUT LET'S JUST GO AHEAD AND ...

WA:     I'LL TRY TO STRAIGHTEN IT BUT.

SD:     WHEN'S THE LAST TIME YOU HAD YOUR NAILS DONE?

WA:     UM A WEEK AGO MAYBE.

SD:     OKAY AND WHEN DID...

WA:     I DIDN'T (UI)

SD:     WHEN DID THIS NAIL BREAK?

WA:     JUST UM

SD:     TONIGHT?

WA:     UM HUH.

SD:     OKAY.

WA:     I HAD NO BROKEN NAILS.

SD:     OKAY THAT'S KIND OF WHAT I WAS TRYING TO ASK.

137

000011636

WA:    OKAY.

SD:    OKAY NOW CAN YOU FLIP, FLIP THE (UI) FOR ME?  THERE YOU GO.

WA:    I'M TRYING TO STRAIGHTEN IT OUT (UI).  I CAN DO THIS FINGER.

SD:    AND LET'S DO ONE MORE OVER HERE WITH THE COLOR CHART OVER HERE.  OKAY.  OKAY LET'S DO YOUR OTHER HAND.  OKAY LET'S START ON THIS SIDE.

WA:    OH.

SD:    JUST SO WE KEEP EVERYTHING AND SO THIS ONE IS TONIGHT TOO?

WA:    AND THIS ONE YEAH.

SD:    OKAY.  OKAY NOW FLIP HER OVER.  OKAY HAND.

WA:    THAT'S SORE OW.

SD:    OKAY.  WOW YOU REALLY, YOU REALLY TOOK IT DOWN LOW.

WA:    UM HUH.

SD:    OH GOSH.

WA:    SEE THAT'S WHAT (UI).

SD:    I HATE THOSE BIG NAILS.

WA:    (UI) WHOLE THING.  I'M LIKE MAYBE THAT'S WHAT, I DON'T KNOW.  IT JUST HURTS SO BAD.

SD:    I KNOW.  OKAY ANY OTHER BRUISES ON YOUR ARMS OR IS THAT...

WA:    I DON'T THINK SO.  I, I DON'T BRUISE.

138

000011637

SD:     UM HUH.  OKAY.

WA:     NO.  I DON'T THINK I SEE ANY BRUISES.

SD:     OKAY.  OKAY LET'S....

WA:     UM HUH.

SD:     LET'S GO AHEAD AND STAND UP AGAINST THERE AND WE'LL DO THE QUICK ....

WA:     OH OW, SORRY MY BODIES JUST GETTING SORE.

SD:     UM HUH, OKAY.  STAND UP AGAINST THERE.  FACE HER, UM HUH AND GONNA GIVE YOU A

LITTLE CLEVAGE HERE OKAY?  WERE NOT GONNA DO TOO MUCH BUT WERE JUST GONNA DO A LITTLE

BIT THAT WAY.

WA:     OKAY.

SD:     OKAY AND LET'S COME AND DO THE SIDES HERE AND JUST (UI).  DO THE OTHER SIDE SAME

WAY.  (UI) LET'S DO RIGHT UNDER HERE.  OKAY TRY TO STAND UP OKAY AND LET'S FLIP YOU AROUND

AND DO RIGHT BACK HERE IF YOU CAN.  OKAY AND I, AGAIN

WA:     OH I'M SURE YOU CAN'T TAKE A PICTURE.

SD:     I KNOW RIGHT JUST TRYING TO SEE IF I COULD ACTUALLY SEE SOMETHING.  CAUSE OFTEN

TIMES WHEN SOMEBODY GETS A BUMP THERE'S A RED SPOT RIGHT, USUALLY IN THE MIDDLE OF IT.

WA:     HMMM.

SD:     BUT I DON'T SEE ANYTHING DIRECTLY.  OKAY UM GONNA NEED YOUR SHORTS.

WA:     OH NO.

139

000011638

SD:     WHY DON'T WE GET, LET'S OKAY JUST COME ON OVER HERE AND GRAB YOUR, GRAB YOUR, YEAH.

WA:     OW MAN MY LEGS ARE SO STIFF.

SD:     I'VE NEVER SEEN ANYBODY THAT'S BEEN ABLE TO HALF WAY OUT OF A BANANA SUIT.  THAT'S IMPRESSIVE.  NOW DO YOU HAVE ANY BRUISING HERE ON YOUR STOMACH OR ON YOUR....

WA:     I DON'T THINK SO.

SD:     LET ME JUST, OKAY SO WE DON'T HAVE ANYTHING, OKAY.

WA:     (UI)

SD:     OKAY, OKAY AND NOTHING ON THE BACK?

WA:     I DON'T KNOW.

SD:     LET ME LOOK.  TAKE A GOOD LOOK.  OKAY I DON'T HAVE ANYTHING BACK THERE, OKAY.  YOU HAVE A LIKE A LITTLE BIRTH MARK HERE?

WA:     I DO.

SD:     OKAY, THAT'S WHAT IT, IT DIDN'T LOOK LIKE A BRUISE BUT I JUST KIND OF WANTED TO DOUBLE CHECK.  OKAY, THAT'S COOL.  I KNOW THERE'S FEET IN THERE..

WA:     I KNOW.

SD:     OKAY.  OKAY ALRIGHT I THINK THAT WILL DO IT.  UM DO YOU THINK, WOULD YOUR HAND BE OKAY THAT I COULD TAKE FINGERPRINTS OR ARE THEY PRETTY TOO BADLY (UI)?

WA:     NO YOU COULD.

140

000011639

SD:     YOU THINK SO?

WA:     BE SOMEWHAT CAREFUL WITH THIS ONE.

SD:     OKAY, OKAY.  THEN WHAT I'M GOING TO DO IS I'M GONNA HAVE ONE OF THE OFFICER'S TAKE YOU DOWN AND ....

WA:     AM I GETTING ARRESTED?

SD:     UM AT THIS POINT WERE GOING TO CALL THE COUNTY ATTORNEY AND WE'LL

WA:     UM HUH.

SD:     REVIEW EVERYTHING WITH HIM.

WA:     OKAY.

SD:     UM

WA:     I DON'T KNOW, YOU HAVE TO EXPLAIN BECAUSE I DON'T UNDERSTAND WHAT YOUR SAYING.

SD:     WHAT WE'LL DO IS WE'LL REVIEW IT WITH THE ATTORNEY....

WA:     OKAY.

SD:     UM I THINK IT, AT THIS POINT UM BASED ON SOME OF THE CIRCUMSTANCES ESPECIALLY WITH THE DELAY IN YOU CONTACTING UM

WA:     UH HUH.

SD:     THE, THE POLICE

WA:     UM HUH.

141

000011640

SD: THE CHANCES ARE PROBABLY VERY GOOD AT THIS POINT THAT WE WILL GO AHEAD AND BOOK

YOU, AT THIS POINT.

WA: OH.

SD: UM AH YOU KNOW

WA: THAT'S TO BAD. SO I SHOULD CALL AN ATTORNEY?

SD: THAT'S TOTALLY UP TO YOU. AGAIN

WA: I'M SORRY.

SD: YOU KNOW UM THAT'S TOTALLY UP TO YOU UM I THINK THERE'S SOME DEFINITE ISSUES TO BE

ADDRESSED UM BUT I THINK, I THINK SOME DELAY ISSUES ARE GONNA BE,

WA: UH HUH.

SD: ARE GONNA BE A LITTLE BIT DIFFICULT UM BUT LET ME CALL THE COUNTY ATTORNEY...

WA: OKAY.

SD: AND THEN I WILL LET YOU KNOW UM WHETHER OR NOT AND IF THE BOOKING PROCESS IS

GOING TO TAKE PLACE UM AS I SAY AT THIS POINT THAT WOULD BE THAT I WOULD THINK, IS THAT

WE'LL GO AHEAD AND TAKE YOU OVER.

WA: WOW.

SD: UM WHAT I NEED TO FIND OUT FROM YOU IS DO YOU WANT US TO TAKE YOU FOR MEDICAL

ATTENTION ON YOUR HANDS BEFORE WE TAKE YOU OVER TO THE JAIL, IF YOU END UP GOING OVER TO

THE JAIL?

142

000011641

WA:     I'M LIKE IN SHOCK, SORRY.

SD:     I KNOW.

WA:     UM NO, I DON'T, I MEAN

SD:     OKAY SO YOU DON'T THINK ANYTHING'S BROKEN, ANYTHING LIKE THAT?

WA:     I DON'T THINK SO.

SD:     OKAY, OKAY THAT'S KIND OF WHAT I NEEDED TO KNOW BECAUSE IF, IF....

WA:     I DON'T HAVE ANY IDEA.

SD:     OKAY UM ...

WA:     WOW.

SD:     OKAY LET ME UM I'M GONNA HAVE THE YOUNG PATROL OFFICER THAT WAS OUT AT THE

SCENE ...

WA:     OH POOR GUY.

SD:     HE'S A NICE MAN.  PHIL IS A NICE GUY.  I'M GONNA HAVE HIM TAKE YOU DOWN STAIRS..

WA:     UM HUH.

SD:     AND THEN WHEN YOU COME BACK UP BY THEN DAVE THE DETECTIVE THAT HAS SPOKEN TO

YOU, WILL BE ABLE TO TELL YOU EXACTLY WHAT'S GOING ON ....

WA:     OKAY.

SD:     AS TO WHETHER OR NOT YOUR GOING OVER, OKAY, BUT AT THIS POINT ....

143

000011642

WA:     YOU THINK SO?

SD:     I THINK SO.

WA:     WOW.

SD:     UM HUH.

WA:     OKAY.

SD:     OKAY? OKAY.

WA:     CAN I WALK AROUND HERE (UI)?

SD:     YEAH, YEAH IT'S OK YOU LOOK BETTER THAN MOST PEOPLE, TRUST ME, YOU KNOW.  DO YOU

WANT SOMETHING TO EAT?  LIKE I'VE GOT A BAG OF POTATO CHIPS OR CANDY BAR OR SOMETHING.

WA:     I'M NOT HUNGRY.  I CAN'T EAT NOTHING.

SD:     OKAY I DIDN'T KNOW.  I JUST FIGURED AT LEAST I'D OFFER IT AND YOUR STILL SET WITH YOUR

WATER?

WA:     YEAH, I'M FINE.

SD:     WOULD YOU RATHER HAVE A SODA OR ANYTHING?

WA:     NO.

SD:     OKAY.  SIT I'LL GET DAVE, THE AH YOUNG LITTLE PATROLMAN.  OH I'M SORRY PHIL.  PHIL WILL

TAKE YOU DOWN AND WE'LL DO A QUICK SET OF PRINTS...

WA:     OKAY.

144

000011643

SD:     AND THEN WE'LL KNOW WHAT'S GOING ON FROM THERE.

WA:     OKAY.  HMM AREN'T THOSE FUNNY.  HI.

MO:     OKAY WENDI, YOU READY?

WA:     I SUPPOSE SO.

MO:     (UI)

WA:     YEAH I DON'T...

SD:     THIS IS MY FAVORITE BLOOD MAN.

WA:     OKAY.

SD:     THIS IS HOMER CHALIS.

WA:     OKAY.

SD:     HOMER THIS IS WENDI.

HC:     HI.

SD:     AND I'VE EXPLAINED TO WENDI THAT WE HAVE A SEARCH WARRANT BUT SHE'S SAID THAT SHE

WILFULLY COULD GIVE (UI) BLOOD, SO IT'S NOT A PROBLEM.

HC:     OKAY, WENDI DO ME A FAVOR AND HAVE SEAT IN THIS CHAIR RIGHT OVER HERE.

SD:     HOMER IS PROBABLY THE FIRST (UI) PAINLESS AS YOU GET.

WA:     OH GOOD.

HC:     OKAY (UI) ONE OF THOSE.  (UI)

                                    145

000011644

SD:     MIGHT AS WELL JUST POKE THIS ONE.

HC:     LET'S (UI).  HOLD THIS FOR ME.  KEEP IT NICE AND STRAIGHT.  I LIKE THAT ONE RIGHT THERE IF YOU KEEP YOUR ARM RIGHT LIKE THAT, WE SHOULD BE FINE, THAT'D BE GREAT.

SD:     YOU DON'T HAVE LOOK.

WA:     I KNOW I'LL PASS OUT.

HC:     WELL WE DON'T WANT YOU TO DO THAT.  SO JUST DON'T WATCH ME.  ALRIGHT A LITTLE PINCH.

SD:     HOMER (UI) GET IT THE FIRST TIME EVERY TIME DON'T YA?

HC:     WE TRY.  OKAY.

SD:     AND HE DOES IT THE FIRST TIME THAT'S WHAT'S NICE.

WA:     YEAH.

SD:     WOOPS.

HC:     THAT WAS THE END OF THAT ROLL.  KEEP THIS ON FOR ABOUT TEN MINUTES AND IT SHOULD MINIMIZE THE BRUISING HERE.

WA:     OKAY.

SD:     HOMER I TALKED TO WENDI UM SHE'S GOT A COUPLE BRUISES ON HER FINGERS SHE DIDN'T WANT TO GO OVER TO THE THE HOSPITAL.  (UI) CAN YOU JUST TAKE A LOOK AT UM AND

HC:     SURE.

146

000011645

WA:    (UI) HERE.

HC:    LET ME SEE.  YEP THAT'S BROKE AND THAT'S BROKE.

SD:    BOTH?

HC:    BROKE.

WA:    OH MY.

HC:    YEAH THIS IS PROBABLY A TOUGH FRACTURE.  IT'S PROBABLY THE END OF IT BROKE.

WHENEVER THEY TURN BLACK AND BLUE LIKE THAT AROUND THE JOINT YOU GOT A REAL GOOD

POSSIBILITY OF HAVING A BREAK.  THAT THERE IS CALLED SUBUNGAL HEMATOMA AND IF YOU HAVE A

LOT OF PAIN THERE...

WA:    IT IS HURTING A LOT.

HC:    THEY NEED TO PUT A LITTLE HOLE THERE TO RELIEVE THAT BLOOD AND I KID YOU NOT IT'S LIKE

INSTANT RELIEF WHEN THEY, WHEN THEY DO THAT.

WA:    YEAH.

SD:    SO SHE NEEDS TO GO TO THE DOCTOR.

HC:    SHE NEEDS TO GET AN X-RAY.

SD:    OKAY.  TWENTY FORTY THREE TIME OF THE DRAW.

HC:    TWENTY FORTY THREE.

WA:    OH WOW.

147

000011646

SD:     YEAH

HC:     OKAY WHAT THE DR GONNA BE?

SD:     OKAY THE DR NUMBER 01797849.

HC:     AND YOUR LAST NAME?

WA:     ANDRIANO.

HC:     SPELL THAT?

WA:     A-N-D-R-I-A-N-O.

HC:     AND FIRST NAME IS?

WA:     WENDI WITH AN "I".

SD:     W, NO W-E-N-D-I.

HC:     W-E-N-D-I.

WA:     AH E.

HC:     AND YOUR DATE OF BIRTH?

WA:     8/26/70.

HC:     MINE'S THE 27TH. 8/26/70?

WA:     UM HUH.

SD:     I DON'T THINK YOU'RE QUITE THAT YOUNG HOMER.

148

000011647

HC:     NO, I JUST HIT THE BIG 41 THIS YEAR.

SD:     LET ME UM I'M GONNA GO, I'M GONNA GO LET SOMEBODY KNOW WE NEED TO TAKE HER

OVER TO (UI).

HC:     OKAY.  AND LAST NAME DETECTIVE?

SD:      IS D AS IN DAVID –I-L-L-I-A-N.

HC:     FIRST INITIAL?

SD:     S.

HC:     AND NUMBER?

SD:     4689.

HC:     4-6-8-9 AND SUPERVISOR?

SD:     UM SMALLMAN, M. SMALLMAN.  S-M-A-L-L-M-A-N.

HC:     M. SMALLMAN?

SD:     UM HUH.

HC:     AND YOU KNOW HIS NUMBER?

SD:     3142.

HC:     3142?

SD:     UM HUH.

HC:     AND YOU ALSO WANT HEAD HAIR RIGHT?

149

000011648

SD:      PLEASE.

HC:      OKAY AND THIS IS GONNA BE A FAX WARRANT RIGHT?

SD:      I, ACTUALLY IT'S A SIGNED WARRANT.

HC:      YOU DIDN'T DO IT?  OH OKAY.

SD:      WE TOOK IT TO THE JUDGE.  WE DID IT (UI).

HC:      OKAY WHAT JUDGE?

SD:      LET ME UM FIND OUT.

HC:      OKAY.

SD:      HANG ON LET ME GO GET DAVE.

HC:      YEAH I'D BE VERY SURPRISED IF AH YOU DIDN'T HAVE ANY FRACTURES.

WA:      OH.

HC:      YEAH WHEN THEY TURN BLACK AND BLUE THAT IT'S ALMOST DEFNITE IT'S A FRACTURE.

WA:      OH MY GOD.  CAUSE I CAN MOVE IT.

HC:      YEAH.  DOESN'T MEAN IT'S NOT BROKEN.

WA:      NOT BROKEN.

HC:      THE ONLY BONE I EVER BROKE IN MY BODY WAS MY THUMB AND UH BROKE IT ON A FRIDAY
AND I THOUGHT I JAMMED IT AND I JUST PULLED ON IT AND PULLED ON IT AND BY SUNDAY IT TURNED
BLACK AND BLUE RIGHT AROUND THE JOINT AND I WENT AND HAD IT X-RAYED AND IT WAS BROKE.

150

000011649

WA:     OH NO.  WOW.  THEN WHAT'D THEY DO, NOTHING?

HC:     PUT A CAST ON IT.

WA:     OH.

HC:     DEPENDS ON WHERE THE BREAK IS UH UH WHAT THEIR GONNA DO TO IT.  ARE YOU CURRENT ON YOUR TETNUS SHOT?

WA:     UM I THINK SO.

HC:     OKAY.  I SHOULDN'T HAVE TO GIVE YOU ONE OF THOSE THEN.

WA:     IS IT SEVEN YEARS?  IS THAT WHAT THE NUMBER?

HC:     TEN.

WA:     OH.

HC:     BUT USUALLY IT'S SIX YEARS AND SEVEN YEARS WHEN THEY LIKE TO GIVE ANOTHER ONE DEPENDING ON WHAT TYPE OF AH INJURY IT IS.  OKAY I NEED TO TAKE SOME HAIR FROM THE FRONT AND FROM THE BACK, FROM EACH SIDE.

WA:     OH, OKAY.

HC:     YEAH I NEED TO TAKE, I NEED, I NEED TO PULL IT OUT SO I NEED TO HAVE THE ROOT SO YOU MIGHT FEEL A LITTLE TUG.

WA:     OKAY.  CAN'T BE ANY WORSE THAN COLORING IT.  WOW.

151

000011650

HC:   YEAH THE FIRST ONE OF THESE I DID I, I HAD A HARD TIME GETTING IT OUT AND THE GUY WAS SPANISH AND I PUT MY TWEEZER'S DOWN AND WRAPPED IT AROUND MY FINGER AND PULLED IT. HE SAID OH I DON'T THIS AND (UI)....

WA:   WOW.

HC:   HE DIDN'T LIKE THAT YOU KNOW I COULD TELL.

WA:   HMM.

HC:   AND JUST LEAN YOUR HEAD OVER TO ONE SIDE.

WA:   (UI)

HC:   YEAH JUST LIKE THAT.

WA:   OW. THERE'S A DIFFERENCE IN HOW YOUR, WHY YOUR HAIR GOES?

HC:   NO THEY, WE JUST TAKE FROM RANDOM SPOTS.

WA:   OH.

HC:   BETTER THAN ALL FROM ONE AREA. IT USED TO BE WE'D TAKE ABOUT EIGHTY HAIRS. WE DON'T TAKE THAT MANY ANY MORE BUT WE STILL DO THE RANDOM SPOTS.

WA:   (UI) OH GOD.

HC:   THAT'S THE ONE THAT USUALLY HURTS THE MOST. BACK OF THE NECK.

SD:   DID HE GET THE HAIRS?

WA:   UM HUH.

152

000011651

SD:     DIDN'T THAT HURT, OW?  HOMER, WHAT TIME DID YOU DO THAT?

HC:     I USED MY WATCH AND I PUT AH TWELVE FIFTY SEVEN.

SD:     OKAY AND WHERE DID YOU YANK THEM FROM?

HC:     FRONT, BACK AND EACH SIDE.

SD:     OKAY.

HC:     AND I HAVE THEM ALL IN THIS BAG SO THERE IT IS AND THAT'S ALL YOU NEED?

SD:     UM HUH.

HC:     OKAY.

SD:     WELL I'M SAD THAT HE LEFT.

HC:     (UI)

SD:     (UI)

HC:     YEAH I'D BE VERY SURPRISED IF SHE DIDN'T HAVE ANY (UI) BUT I THINK SHE'S GOT A COUPLE OF

THEM. COUPLE OF FRACTURES.

SD:     OKAY.

HC:     THE ONE THAT'S MOST SERIOUS IS AT THE JOINT.

SD:     YOU MEAN RIGHT HERE?

HC:     YEAH HOPEFULLY IF IT'S NOT DISPLACED UH THEY'LL JUST SPLINT IT.  IF IT IS DISPLACED THEY

MIGHT HAVE TO PIN IT DEPENDING ON HOW BAD IT IS.

153

000011652

WA:     OH.

HC:     NEED SURGERY.  ALRIGHT.

SD:     OKAY.

HC:     SEE YOU LATER.

WA:     I DON'T THINK IT'S BROKE.

SD:     WELL I HOPE YOU'RE RIGHT GIRL.

WA:     WELL LOOK I MEAN IT'S JUST, I CAN MOVE IT ALL OF THE WAY.

SD:     UM HUH.

WA:     AND THIS ONE DOESN'T HURT.  IT'S THING THAT HURTS.

SD:     WELL AND WHAT HE, HE'S SAYING IS THAT YOUR HAVING ALL OF THAT PRESSURE AND THEY JUST POKE IT.  I'VE HAD IT BEFORE.

WA:     I KNOW, I'VE HEARD ABOUT IT.

SD:     IT DOESN'T HURT.  IT REALLY DOESN'T HURT WHEN THEY POKE IT.

WA:     AND I HAVE TO GO TO THE HOSPITAL?  I REALLY DON'T TO.  I'M LIKE IT'S JUST SOME FINGERS IT'S NOT.

SD:     WELL I DON'T KNOW, I DON'T KNOW

WA:     I KNOW.

SD:     I DON'T KNOW IF OUR JAIL WILL ACCEPT YOU.  I MEAN IT'S YOUR DECISION.

154

000011653

WA:    OH.

SD:    I MEAN IF WE PICK, EXCUSE ME I'M EATING A MINT.

WA:    NO IT'S OKAY.

SD:    IF WE TAKE YOU TO THE HOSPITAL AND YOU GET TO THE HOSPITAL AND YOU REFUSE MEDICAL

TREATMENT....

WA:    SURE.

SD:    AND IT'S NOT A LIFE THREATENING THING, WHICH THIS ISN'T..

WA:    NO.

SD:    THEY'LL SIGN A MEDICAL RELEASE AND SEND YOU ON TO THE JAIL.

WA:    OH.

SD:    BUT IT MIGHT NO T BE A BAD IDEA....

WA:    YOU THINK?

SD:    TO HAVE SOMEBODY TAKE A LOOK AT IT.

WA:    IS THAT YOU?

SD:    HANG ON JUST A SEC LET ME SEE WHAT....

DB:    WENDI.

WA:    YEAH.

DB:    I HAVE A COUPLE OF QUESTIONS, OKAY?

000011654

WA:   OKAY.

DB:   YOU KNOW MY OTHER DETECTIVE THAT I WORK WITH, THEY'VE BEEN OUT THERE TRYING TO GET EVERYTHING FIGURED OUT.

WA:   OKAY.

DB:   SOME OF THE THINGS YOU TELL, BEEN TELLING ME. I KNOW YOUR FINGERS MESSED UP.

WA:   SHE JUST TOLD, WELL THAT GUY SAID THAT I, THEIR BROKE AND I'M LIKE AH.

DB:   LOOKS LIKE THEY MIGHT BE.

WA:   WOW.

DB:   I WON'T KEEP YOU VERY LONG.

WA:   NO THAT'S OKAY.

DB:   SOME OF THE THINGS YOU'VE BEEN TELLING AREN'T ADDING UP.

WA:   OKAY.

DB:   OKAY.  I KNOW THAT WHEN WE, WE TALKED TO YOUR FRIEND CHRIS WHO CAME OVER....

WA:   RIGHT.

DB:   AND CHRIS SAID THAT AH WHEN SHE CAME OVER THAT UH SHE SAW JOE ON THE GROUND ....

WA:   OKAY.

DB:   AND HE, HE WASN'T BLEEDING.

WA:   WELL HE WAS.  I HAD A TOWEL OVER HIM.

156

000011655

DB:     SHE SAID THERE WAS A LITTLE WASH CLOTH ON THE GROUND, THAT WAS IT.

WA:     I HAD TWO TOWELS.

DB:     HE'S GOT HUGE GASHES IN THE BACK OF HIS HEAD.

WA:     RIGHT.

DB:     SO SHE SHOULD'VE SEEN BLOOD.

WA:     YEAH.  WELL SEE WHEN I CAME BACK IN THE HOUSE FROM AFTER TELLING THE PARAMEDICS, IS WHEN HE GOT BACK UP....

DB:     UM HUH.

WA:     AND THAT'S WHEN I HIT HIM WITH THAT THING, ENOUGH TO BREAK THE BAR STOOL.

DB:     OKAY

WA:     OR WHATEVER IT'S CALLED.

DB:     WHY WAS HE DOWN THEN BEFORE?

WA:     CAUSE I HAD HIT HIM ONE TIME ON THE HEAD AND I'M LIKE STOP AND THAT'S WHEN HE, YOU KNOW TELL THEM TO GO AWAY, LET'S, I'M DONE AND THEN HE WASN'T DONE.

DB:     OKAY.

WA:     THAT'S WHY.  YOU KNOW.

DB:     OKAY.

000011656

WA:     SO THAT'S WHY I WENT OUT THERE AND AND DID WHAT HE ASKED ME TO DO.  CAME BACK

IN....

DB:     WHAT DO YOU MEAN DO?

WA:     TO SEND THE FIRE PEOPLE OR WHOEVER AWAY.

DB:     OKAY.  LISTEN, LET ME, LET ME TELL YOU SOMETHING OKAY?

WA:     OKAY.

DB:     CHRIS SAYS IT HAPPENED IN A DIFFERENT SEQUENCE...

WA:     OH.

DB:     OKAY.

WA:     OKAY.

DB:     AND SHE SAID THE AH HE WAS AH, HE WAS ASKING WHY FIRE WASN'T THERE.

WA:     OH, WELL.

DB:     NO, NO LET ME TALK SOME MORE AND UH SHE SAID THAT HE WAS ASKING THAT YOU THREW

HER OUT OF THE HOUSE BASICALLY, TOLD HER TO LEAVE.  SHE GOES OUT FRONT

WA:     CAUSE I DON'T WANT HER TO SEE THIS.

DB:     LET ME TALK OKAY?  AND THAT YOU ACTUALLY THROW OUT HER PURSE TO HER.  THAT'S HOW

MUCH IN A HURRY YOU WANTED HER OUT.

WA:     OKAY.

158

000011657

DB:     SHE SAYS THAT SHES OUT FRONT FOR ABOUT TEN MINUTES

WA:     UH HUH.

DB:     AND THAT AH WHEN YOU COME BACK OUT, ONCE FIRE'S THERE

WA:     RIGHT.

DB:     YOU'VE ALREADY SHOWERED AND CHANGED.

WA:     NO.

DB:     YEAH.

WA:     WOW.

DB:     WENDI LIS, LISTEN TO ME

WA:     I WILL.

DB:     OKAY LISTEN TO WHAT I HAVE TO SAY?

WA:     OKAY.

DB:     WE INVESTIGATE ALL KINDS OF THINGS THAT HAPPEN OKAY?

WA:     SURE.

DB:     I DON'T THINK IT HAPPENED QUITE THE WAY YOUR TELLING ME.

WA:     OKAY.

DB:     I THINK YOU REALLY, REALLY NEED TO BE HONEST WITH ME HERE.

159

000011658

WA:   OKAY.

DB:   YOUR GONNA GET YOURSELF IN A LOT OF TROUBLE IF CONTINUE TO LIE.  WHY DON'T YOU TELL ME THE TRUTH WHAT HAPPENED.

WA:   YEAH.  WELL THAT IS, THAT IS THE TRUTH.

DB:   THAT'S NOT THE TRUTH WENDI AND...

WA:   YEAH.

DB:   AND I THINK WE CAN PROVE THAT IT'S NOT THE TRUTH..

WA:   OKAY.

DB:   OKAY.  WE HAVE ONE, ONE OF OUR DETECTIVES WHOSE AN EXPERT IN BLOOD SPATTER.

WA:   OKAY.

DB:   AND HE'S TELLING ME IT'S NOT ADDING UP BY WHAT YOUR TELLING ME.

WA:   WELL I DON'T KNOW WHAT YOU WANT ME TO SAY ABOUT THAT.

DB:   I DON'T THINK IT HAPPENED QUITE THE WAY YOU TOLD ME IT DID.  YOU REALLY NEED TO BE HONEST WITH ME.  THIS IS WHAT I THINK...

WA:   OKAY.

DB:   THIS IS WHAT I THINK...

WA:   OKAY.

DB:   I THINK YOU WERE HAVING AN AFFAIR WITH SOMEBODY.

160

000011659

WA:     OH.

DB:     OKAY.

WA:     OKAY.

DB:     AND I THINK YOUR HUSBAND FOUND OUT ABOUT IT...

WA:     OKAY.

DB:     AND IT CREATED A BIG FIGHT...

WA:     OKAY.

DB:     ISN'T THAT THE TRUTH?

WA:     THAT IS NOT THE TRUTH.  (UI) I MEAN

DB:     THAT'S WHAT, THAT'S WHAT YOUR FRIEND SAID AND TELLING US.

WA:     WELL JOE HAD, MY HUSBAND, I HAD BEEN OUT WITH A COUPLE GUYS OR WHATEVER AND JOE

HASN'T FOUND OUT SO.

DB:     YOU'VE BEEN HAVING AN AFFAIR WITH SOME OTHER GUYS?

WA:     WELL AH I DON'T KNOW IF YOU WANT TO CALL IT AN AFFAIR.  I DON'T KNOW WHAT YOU WANT

TO CALL IT.

DB:     YOU'VE BEEN HAVING SEXUAL RELATIONSHIP WITH SOMEBODY?

WA:     I DID YES.

DB:     OKAY.

161

000011660

WA:     I DID.

DB:     HE FOUND OUT OBVIOUSLY AND I KNOW THAT

WA:     HE, NO HE HADN'T FOUND OUT ABOUT IT.

DB:     THE REASON HE KNOWS THAT IS BECAUSE YOU TOLD CHRIS HE KNEW.

WA:     NO.

DB:     UM HUH, WHEN YOU CALLED HER TONIGHT YOU TOLD CHRIS HE KNEW.

WA:     NO, WELL I DIDN'T SAY THAT BUT...

DB:     OKAY AND WHAT I'M TRYING TO FIND OUT WENDI IS WHY THIS HAPPENED THE WAY IT DID?

WA:     OKAY.

DB:     CAUSE IT DIDN'T HAPPEN THE WAY YOU TOLD ME TONIGHT.

WA:     OKAY.

DB:     YOU NEED TO BE HONEST WITH ME.

WA:     YEAH.

DB:     ALL LYINGS GONNA DO IS DIG A BIGGER HOLE FOR YOU.

WA:     RIGHT.  RIGHT.

DB:     OKAY.

WA:     WELL BUT WHEN CHRIS CAME IN THERE, I REALLY DID HAVE THE TOWELS COVERING CAUSE I

DIDN'T WANT HER TO SEE WHAT HAD HAPPENED, OKAY.

162

000011661

DB:     HOW MANY TOWELS?

WA:     THERE WAS TWO.

DB:     HOW BIG WERE THEY?

WA:     THEY WERE, I DON'T KNOW LIKE UM, THERE WAS ONE THAT WAS LIKE AH DISH TOWEL SIZE

AND ONE THAT WAS LIKE A WASH CLOTH SIZE.

DB:     UM HUH.

WA:     SO.

DB:     YOU KNOW ALL OF THE STRIKES TO HIS HEAD...

WA:     YEAH.

DB:     SHE WOULD HAVE SEEN BLOOD ELSE WHERE IN THE HOUSE.

WA:     BUT SEE ALL THAT DIDN'T HAPPEN TIL AFTER SHE LEFT.  THAT'SWHAT I WAS, THAT'S WHAT I

WAS TRYING TO TELL YOU AND I CAME BACK IN THE HOUSE...

DB:     OKAY FROM, FROM A TEN MINUTE PERIOD

WA:     RIGHT.

DB:     YOU HAD CHANGED, YOU HAD SHOWERED.

WA:     NO I HADN'T.

DB:     I THINK

WA:     I REALLY HADN'T DONE THAT THOUGH.

163

000011662

DB:    NO, IT DID, IT DID.

WA:    NO.

DB:    I THINK YOU DID.

WA:    WELL IT'S A LIE.

DB:    OKAY THE PROBLEM IS IF YOUR GONNA CONTINUE TO LIE TO ME ...

WA:    RIGHT.

DB:    YOU I'LL, WERE GONNA BE ABLE TO PROVE WHAT OCCURRED.

WA:    OKAY.

DB:    YOU KNOW WHAT USUALLY HAPPENS IS WHEN THINGS LIKE THIS HAPPEN AT THE END OF IT PEOPLE WANT TO SAY WELL I'M SORRY IT HAPPENED.  IT DOESN'T MEAN ANYTHING THEN.

WA:    RIGHT.

DB:    AND YOUR SORRY FOR WHAT HAPPENED.

WA:    RIGHT.

DB:    THIS IS THE TIME TO BE HONEST WITH ME AND TELL ME ABOUT WHAT HAPPENED.

WA:    RIGHT.

DB:    BECAUSE ANYBODY CAN GET UP IN FRONT OF PEOPLE LATER ON AND SAY YOU KNOW JUDGE, JURY OR WHOEVER IT MIGHT BE, I'M SORRY FOR WHAT I DID.  IT DOESN'T MEAN ANYTHING THEN.

WA:    RIGHT.

164

000011663

DB:     IT MEANS SOMETHING NOW.

WA:     RIGHT.

DB:     YEAH YOUR NOT COMPLETELY HONEST WITH ME.

WA:     AH, I, WELL I, I WAS TELLING MY DAD THAT YOU GUYS WERE ASKING ME ALL OF THESE

QUESTIONS AND AND I'M REALLY, REALLY TRYING TO...

DB:     UM HUH.

WA:     REMEMBER BUT I HAVE THIS LIKE, I DON'T KNOW , I DON'T KNOW,  I KNOW, AH I MEAN I

KNOW.

DB:     WHO ARE THESE GUYS

WA:     WE WERE FIGHTING AND I'M YOU KNOW, I MEAN IT WAS THIS WHOLE CRAZY THING BUT I FEEL

LIKE UM YOU GUYS ARE ARRESTING ME AND IT'S MY FAULT AND IT'S NOT MY FAULT AND YOU KNOW

UM...

DB:     WENDI WHO ARE THESE GUYS YOU'RE HAVING AN AFFAIR WITH?

WA:     THEIR JUST SOME...

DB:     ARE THOSE THE TWO GUYS YOU TOLD ME.

WA:     NO ACTUALLY I DON'T EVEN (LAUGHS) SOME, ERIC IS MY FRIEND AND GOES OUT WITH ME AND

DOES WHATEVER.  SEAN DOES THE SAME THING AND UM THE ONE THAT I GOT, I DID HAVE AN AFFAIR

WITH, I HAVEN'T SEEN HIM IN A VERY LONG TIME UM WE, WE BROKE IT OFF WHEN JOE GOT YOU

KNOW, IT WAS JUST LIKE UM

165

000011664

DB:     I CAN

WA:     SO YOU KNOW WHAT I MEAN

DB:     I CAN UNDERSTAND

WA:     AH

DB:     I CAN UNDERSTAND THE POSITION YOUR IN.  YOU KNOW YOUR HUSBAND'S ILL.  BEEN ILL FOR A

LONG TIME AND I DON'T DOUBT YOU THAT IT'S CREATED A LOT OF PROBLEMS IN YOUR RELATIONSHIP.

WA:     IT HAS.

DB:     I DON'T DOUBT THAT A BIT.

WA:     RIGHT.

DB:     AND I CAN ONLY IMAGINE THE STRESS YOU GUYS WERE IN.

WA:     RIGHT.

DB:     OKAY BUT THINGS DIDN'T HAPPEN THE WAY YOU TOLD ME THEY DID.  THEY DIDN'T AND I'M

GONNA BE ABLE TO PROVE THAT AND AND THE ONLY THING THAT'S GONNA DO IS MAKE YOU LOOK

LIKE A LIAR.

WA:     RIGHT.

DB:     OKAY.

WA:     RIGHT.

DB:     DON'T MAKE YOURSELF LOOK LIKE A LIAR.

166

000011665

WA:     OKAY.

DB:     BE HONEST WITH ME.

WA:     SURE.

DB:     WHY, WHY IS IT THAT IT HAPPENED IN THAT TEN MINUTE FRAM, TIME FRAME WHEN CHRIS

WAS OUT FRONT AND WAITING FOR THE FIRE DEPARTMENT?

WA:     I HAD THE FRONT D, THAT'S WHAT I DON'T UNDERSTAND.

DB:     CHRIS, NO YOU LOCKED THE DOOR BEHIND YOU.

WA:     WHEN THE FIRE TRUCK GOT HERE, I DID.

DB:     CHRIS SAID WHEN YOU THREW HER OUT OF YOUR APARTMENT...

WA:     RIGHT, RIGHT.

DB:     BEFORE THE FIRE DEPARTMENT GOT THERE...

WA:     RIGHT BECAUSE JOE....

DB:     YOU LOCKED THE DOOR BEHIND YOU.

WA:     JOE WANTED ME TO LOCK THE DOOR.  HE DID, CAUSE HE HEARD UM.

DB:     JOE WANTED THE FIRE DEPARTMENT TO HELP HIM.

WA:     NO HE DIDN'T.

DB:     HE TOLD CHRIS HE DID.

167

000011666

WA:    I KNOW FOR AWHILE CAUSE THAT'S WHY I CALLED. I WAS LIKE WE GOTTA CALL, CALLED AND THEN, THEN ALL OF THE SUDDEN HE'S LIKE NO I DON'T WANT TO.

DB:    WENDI DO YOU UNDERSTAND THAT ONCE EVERYTHING'S DONE AND SAID, IT DOESN'T MATTER AT THAT POINT.

WA:    RIGHT.

DB:    IF YOUR SORRY. YOUR NOT TELLING ME THE TRUTH. YOUR NOT BEING HONEST WITH ME. I'VE SAT HERE AND I'VE TALKED TO A LOT OF PEOPLE.

WA:    RIGHT.

DB:    WHO WERE IN, IN YOUR SHOES.

WA:    RIGHT.

DB:    IT DOESN'T ADD UP AND PHYS, PHYSICAL EVIDENCE WISE WERE GONNA BE ABLE TO PROVE IT DOESN'T ADD UP.

WA:    RIGHT.

DB:    BE HONEST WITH ME. THIS IS YOUR ONLY CHANCE TO BE HONEST WITH ME. I THINK THAT, I DON'T, I DON'T DOUBT THAT A FIGHT OCCURRED BETWEEN YOU AND JOE.

WA:    RIGHT.

168

000011667

DB:   OKAY BUT I, IT DIDN'T HAPPEN THE WAY YOU TOLD ME. I THINK IT HAPPENED RIGHT THERE WHEN CHRIS WALKED OUT OF THE APARTMENT AND I THINK YOU WERE ANGRY. I THINK THAT JOE'S BEEN (UI) HE'S, HE'S GONE THROUGH THIS A LOT, HE'S CREATING A LOT OF PROBLEMS FOR YA. YOUR NOT LIVING THE LIFE YOU WANNA BE LIVING RIGHT NOW.

WA:   NO.

DB:   AND I UNDERSTAND THAT. I DO, IT'S TOUGH, WHEN SOMEBODY IN YOUR FAMILY IS ILL FOR A LONG TIME BUT I THINK THAT'S WHAT HAPPENED DIDN'T IT?

WA:   NO.

DB:   AND I'M GONNA BE ABLE TO PROVE THAT IT HAPPENED THAT WAY....

WA:   RIGHT.

DB:   YOU NEED TO BE HONEST WITH ME ABOUT WHAT HAPPENED WHEN CHRIS WALKED OUT THE DOOR.

WA:   RIGHT.

DB:   WHY DON'T YOU TELL ME ABOUT IT?

WA:   I'M, I'M SERIOUSLY GOING I ...

DB:   WE TALK TO PEOPLE WHO WERE IN TRAUMATIC SITUATIONS ALL OF THE TIME.

WA:   RIGHT.

DB:   YOU KNOW ....

WA:   WHY CAN'T I THINK THEN?

169

000011668

DB:     WELL IT'S, IT'S ABOUT YOU DON'T WANNA THINK. THESE THINGS ARE HARD BUT YOU NEED TO BE HONEST HERE. YOU KNOW WHAT HAPPENED THERE. I'M GONNA BE ABLE TO PROVE WHAT HAPPENED.

WA:     OKAY.

DB:     YOU, YOU KNOW DON'T MAKE YOURSELF INTO A LIAR.

WA:     RIGHT.

DB:     YOU KNOW YOU'VE GOT YOUR KIDS TO WORRY ABOUT THERE...

WA:     I DO, I DO.

DB:     THINK ABOUT THEM.

WA:     I LOVE MY BABIES.

DB:     I'M SURE YOU DO. I'M SURE YOU LOVE THEM A LOT BUT EVERYBODY NEEDS TO KNOW THE TRUTH ABOUT WHAT HAPPENED AND WHAT YOU TOLD ME IS NOT THE TRUTH. I KNOW IT'S NOT AND I'M GOING TO BE ABLE TO PROVE IT'S NOT.

WA:     SURE. UM

DB:     YOU NEED TO HELP US OUT HERE. IF, IF THINGS WERE GOING SIDEWAYS ON YOU, FOR WHATEVER REASON TELL US SO WE CAN...

WA:     WHAT DOES THAT MEAN?

DB:     IF THINGS GOT OUT OF HAND.

WA:     (UI)

170

000011669

DB:     I KNOW THINGS GOT OUT OF HAND BUT THINGS DIDN'T HAPPEN THE WAY YOU TOLD ME THEY

DID. IN THE SEQUENCE YOU TOLD ME THERE'S NO WAY IT COULD'VE HAPPENED. YOU KNOW MAYBE

HE HAS BEEN ABUSIVE TO YOU FOR A LONG TIME, I DON'T KNOW. YOU KNOW I, I, I DON'T KNOW. I'M

NOT CALLING YOU A LIAR.

WA:     NO I KNOW YOUR NOT.

DB:     OKAY. I YOU KNOW THERE'S NO RIGHT FOR HIM TO ACT THAT WAY TOWARDS YOU AND TREAT

YOU LIKE THAT BUT YOU NEED TO BE HONEST WITH US HERE.

WA:     RIGHT.

DB:     WHY DID THIS HAPPEN? ISN'T THAT WHY THE FIGHT HAPPENED BECAUSE HE THINKS YOUR

OUT MESSING AROUND?

WA:     NO AC, WELL HE IT'S ALWAYS ABOUT EVERYTHING I DO. I MEAN IT'S EVERYTHING THAT I DO. IT

DOESN'T MATTER WHAT IT IS.

DB:     OKAY. TONIGHT WHAT HAPPENED ONCE CHRIS WENT OUTSIDE?

WA:     I KNOW I LOCKED THE DOOR AND I KNOW I WENT TO JOE AND I SAID THE FIRE DEPARTMENTS

HERE. DO YOU WANT THEM TO SEE THIS? YOU KNOW AND I'M LIKE YOU HAVE TO LISTEN TO ME, DO

YOU WANT THEM TO SEE THIS AND HE DIDN'T WANT THEM TO SEE THAT. I MEAN AS, AS GOD AS MY

WITNESS HE DID NOT WANT THEM TO SEE THAT.

DB:     WHY, WHY DID YOU HIT HIM AT THAT POINT?

171

000011670

WA:    THEN HE STARTS GETTING MAD AT ME, OKAY. SO NOW I'M JUST, I'M, I'M BEING ABSOLUTELY

HONEST. SO I SAT THERE WITH HIM FOR AWHILE AND WE SAT THERE AND SAT THERE AND THAT'S

WHEN IT JUST, I DON'T KNOW IF HE STARTED FEELING BETTER, I DON'T KNOW WHAT HAPPENED AND

THAT'S, I MEAN, HE, HE YOU, YOU DON'T UNDERSTAND THAT'S WHEN HE GRABS ME AND I HAD TO,

WHEN HE GRABBED ME I HAD TO GO WASH MY HAND, MY HAIR. I HAD TOO. SO AND I'M GOING

WHAT THE HELL DO I DO, WHAT DO I DO. I DON'T KNOW WHAT TO DO. YOU KNOW HOW CRAZY YOU

ARE WHEN YOUR, I MEAN YOUR IN THAT SITUATION. SO I GO TO GO OUT THE BACK DOOR TO TELL

THEM TO LEAVE AND I HAVE BLOOD ON MY GLASSES AND I HAVE BLOOD RIGHT HERE AND I'M LIKE

SHIT. SO THAT'S WHEN I DUNKED MY, I DUNKED MY HEAD RIGHT IN THE SINK, IN THE BATHROOM SINK

AND RAN OUT THE DOOR.

DB:    BUT YOU CHANGED YOUR CLOTHES ALSO.

WA:    ACTUALLY I HAD ONLY HAD CHANGED MY UM UM SHORTS. I KNOW THAT I CHANGED MY

SHORTS.

DB:    OKAY.

WA:    CAUSE, I, I KNOW I HAD SOME LIKE UM

DB:    BUT HE, HE WAS DEAD RIGHT?

WA:    NO, NO.

DB:    YEAH HE WAS.

WA:    OH NO HE WASN'T. HE REALLY WASN'T.

DB:    WELL MORBID HAD OCCURRED THEN.

172

000011671

P-App. 004540

WA:    WELL HE REALLY WASN'T.

DB:    OKAY WELL MORBID OCCURRED...

WA:    WHAT DOES THAT MEAN?

DB:    WELL

WA:    HOW DID HE FOLLOW ME INTO THE KITCHEN?

DB:    OKAY LISTEN TO ME, LISTEN TO WHAT I'M SAYING.

WA:    YOU KNOW WHAT I MEAN.

DB:    BETWEEN THE TIME CHRIS WALKED OUT

WA:    OKAY.

DB:    EVEN THE TIME THE FIRE DEPARTMENT THERE..

WA:    NO.

DB:    IS WHEN HE DIED.

WA:    NO HE DIDN'T THOUGH.

DB:    OKAY I THINK HE DID AND I THINK I'M GONNA BE ABLE TO PROVE IT.

WA:    WELL HE REALLY DIDN'T BECAUSE....

DB:    HOW WOULD HE GRAB YOU AND GET BLOOD IN YOUR HAIR?

WA:    HE DID.

173

000011672

DB:    HOW?

WA:    WITH HIS HANDS.  HE WAS UNDERNEATH THE BLANKET WHEN CHRIS WENT IN THERE SO SHE DIDN'T SEE HIS HANDS.  WHEN HE GOES TO GRAB MY HAIR THAT'S HOW I GET BLOOD ON ME AND I'M LIKE, I, I GO TO WALK OUTSIDE, I CAN'T WALK OUTSIDE LIKE THAT.  WHAT DO I DO.  I'M STILL TRYING TO MAKE IT BETTER.  YOU KNOW I DON'T KNOW WHAT TO DO BUT HE, I, HE WASN'T DEAD WHEN I WALKED BACK IN THE APARTMENT.  HE REALLY WASN'T.  I DON'T WHAT TO, I MEAN.

DB:    WENDI.

WA:    WHAT'S UP.

DB:    THE INJURIES TO YOUR NECK....

WA:    UM HUH.

DB:    THEY'RE NOT CONSISTENT WITH WHAT YOU TOLD ME.

WA:    WELL THAT'S WHAT HAPPENED.  HE WRAPPED THAT CELL PHONE CORD AROUND ME.

DB:    THE PROBLEM I HAVE WITH THAT IS HOW CAN YOU CUT A CORD OFF YOUR NECK WITHOUT CUTTING YOURSELF?

WA:    CAUSE I HAD IT, I HAD IT ON MY HANDS.  I WAS HOLDING IT TRYING TO GET HIM OFF.  WELL I DON'T UNDERSTAND.

DB:    WHAT, WHAT I'M SAYING WENDI, IS THINGS DIDN'T HAPPEN THE WAY YOU SAID.  I DON'T DOUBT YOU GUYS WERE IN A FIGHT.

WA:    YEAH.

174

000011673

DB:     I DON'T DOUBT THAT AT ALL.

WA:     YEAH.

DB:     AND I DON'T AND IF YOU TELL ME THAT HE WAS COMING AFTER YOU, I, YOU KNOW I DON'T

HAVE ANY REASON NOT TO BELIEVE YOU.

WA:     RIGHT.

DB:     BUT IT DID NOT HAPPEN THE WAY YOU TOLD ME IT DID AND I'M GOING TO BE ABLE TO PROVE

IT.  I DON'T THINK, I THINK HE WAS, HE DIED WHILE YOU WERE WAITING FOR THE FIRE DEPARTMENT.

WA:     MMM.

DB:     OKAY.  WITH THE AMOUNT OF BLOOD HE HAD ON THE BACK OF HIS HEAD CHRIS WOULD HAVE

SEEN IT.

WA:     UH HUH.

DB:     YEAH AND THE AMOUNT

WA:     WELL I'M, I'M...

DB:     AND...

WA:     JUST TELLING YOU, CAUSE I KNOW WHEN I WAS CALLING MY FATHER HE WAS NOT DEAD,

CAUSE HE WAS MOVING AROUND IN THE LIVING ROOM.

DB:     YEP.  WELL

WA:     I MEAN AH...

175

000011674

P-App. 004543

DB:    HE MAY NOT HAVE BEEN DEAD AT THAT POINT, WHAT I'M SAYING IS THE INJURIES THAT OCCURRED TO HIM, HIM GETTING STRUCK REPEATEDLY IN THE HEAD WITH THE BARSTOOL …

WA:    RIGHT.

DB:    AND HIM GETTING STABBED, OCCURRED BETWEEN THE TIME CHRIS WALKED OUT THE DOOR AND THE TIME THE FIRE DEPARTMENT GOT THERE.

WA:    NO, IT DIDN'T.

DB:    YEAH I THINK IT DID. I DON'T THINK YOU HAD A REASON TO CHANGE OTHERWISE. I DON'T THINK YOU HAD A REASON TO WASH OUT YOUR HAIR….

WA:    WHY?

DB:    CLEAN YOUR GLASSES OTHERWISE. I THINK THAT WHEN HE, WHEN HE GOT CUT ON THE NECK…

WA:    RIGHT.

DB:    THE BLOOD SPRAYED ON YOU….

WA:    IT DID.

DB:    LIKE YOU SAID.

WA:    IT DID.

DB:    AND THAT'S WHY YOU WASHED YOUR HAIR AND THAT'S WHY YOU CHANGED YOUR CLOTHES AND YOU, YOU WENT OUT AND TOLD THE FIRE DEPARTMENT.

WA:    OH, UM.

176

000011675

DB:     OKAY.  YEAH.

WA:     THAT'S NOT WHAT HAPPENED.

DB:     YOU HAVEN'T TOLD ME THE TRUTH WENDI.

WA:     NO I WANNA TELL, I'M YOU KNOW I CAME BACK INSIDE OF THE HOUSE THE MAN WAS NOT

DEAD HE WAS STILL VERY UPSET AT ME.  I DON'T KNOW HOW TO, I DON'T, I DON'T DISPROVE IT TO YOU

AND TO TELL YOU THAT I'M NOT TELLING YOU A LIE.

DB:     UM HUH.

WA:     SO YEAH I WAS VERY PANICKY AND LIKE I TOLD THEN I HIT REPEATEDLY.  I MEAN I WAS LIKE

FREAKING OUT.

DB:     WHAT DID HE DO, WHAT DID HE DO TO GET YOU TO HIT HIM?

WA:     WHAT'S THAT?

DB:     WHAT DID HE DO TO GET YOU TO HIT HIM REPEATEDLY?

WA:     HE WAS AFTER ME WITH THE CELL PHONE CORD AGAIN.  I'M LIKE YOU KNOW WHAT THIS

RIDICULOUS.

DB:     OKAY AND THAT'S WHEN YOU HIT HIM WITH THE BAR STOOL?

WA:     YEAH AND HE WENT DOWN ON ALL FOURS AND THEN I HIT HIM AGAIN AND I DON'T KNOW

HOW MANY TIMES I HIT HIM.

DB:     OKAY.

WA:     I MEAN.

177

000011676

DB:     THE BAR STOOL BROKE.

WA:     RIGHT.

DB:     OKAY AND THEN WHAT HAPPENED?

WA:     HUH, SO THEN HE GETS UP, HE'S IN THE LIVING ROOM. I CAN'T EVEN THINK RIGHT NOW. YOU HAVE ME JUST LIKE ALL FREAKED OUT. I CAN'T BELIEVE CHRIS IS SAYING THAT. WHAT DO I DO HERE?

DB:     YOU BE HONEST. THAT'S WHAT YOU NEED TO DO CAUSE I'M GONNA BE ABLE TO PROVE WHAT HAPPENED THERE AND YOU HAVEN'T BEEN HONEST WITH US. DON'T MAKE THIS MAKE YOU INTO A LIAR.

WA:     RIGHT.

DB:     AND THAT'S WHAT YOUR DOING, PUTTING US IN THAT POSITION WHERE YOUR MAKING US PUTTING, MAKING YOU OUT TO BE A LIAR, OKAY. IT'S BETTER TO GET THE TRUTH OUT THERE AND GET THINGS EXPLAINED FOR WHAT THEY ARE AND YOU DEAL WITH IT. WENDI YOU NEED TO BE HONEST WITH US THAT'S ALL THERE IS TO IT.

WA:     RIGHT.

DB:     YOU KNOW, YOU HIT HIM REPEATEDLY IN THE HEAD WITH THE BAR STOOL...

WA:     BAR STOOL.

DB:     AND THEN HE GOT CUT ON THE NECK BUT IT DIDN'T HAPPEN WHEN YOU TOLD ME IT DID. I KNOW THAT BECAUSE OF HOW THE BLOOD LOOKED WHEN THE OFFICERS GOT THERE. HE'D BEEN DOWN FOR A LONG TIME.

178

000011677

WA:     I KNOW IT COULD'VE BEEN AN HOUR.

DB:     IT WAS MORE THAN AN HOUR I'M SURE.

WA:     NO. I DON'T, I HAVE NO CONCEPT OF TIME RIGHT NOW.

DB:     WHY DON'T YOU BE HONEST WITH ME AND TELL ME WHAT REALLY HAPPENED?  LET'S EXPLAIN THIS NOW....

WA:     OKAY.

DB:     BECAUSE....

WA:     SORRY, I CAN'T, I CAN'T EVEN....

DB:     YOU NEED TO EXPLAIN THINGS TO US NOW CAUSE LATER ON YOU CAN'T.  LATER ON THERE WILL BE NO REASON TO BELIEVE YOU.

WA:     SURE.

DB:     YOU KNOW WHAT I'M SAYING?

WA:     SURE.

DB:     I'M GONNA BE ABLE TO PROVE THAT....

WA:     WELL

DB:     WHEN CHRIS CAME OUT....

WA:     WHEN CHRIS CAME OUT AND I LOCKED THE DOOR HE WAS NOT DEAD, OKAY.

DB:     OKAY.

179

000011678

WA:     I, I DON'T KNOW WHY YOU KEEP SAYING THAT TO ME CAUSE....

DB:     OKAY CAUSE I THINK

WA:     I KNOW THAT

DB:     BETWEEN THE TIME, BETWEEN THE TIME CHRIS WENT OUT THE DOOR AND THE TIME THAT THE FIRE DEPARTMENT ARRIVED....

WA:     UM HUH.

DB:     IS WHEN YOU HIT HIM IN THE HEAD WITH THE CHAIR.

WA:     OH THAT'S NOT TRUE.

DB:     YEAH IT IS.

WA:     CAUSE I KNOW ....

DB:     THEN YOU HAVE NO REASON TO CHANGE.

WA:     WELL, I KNOW BUT, BUT THIS IS THE HONEST TO GOD TRUTH, WHEN I CAME BACK INTO THE APARTMENT IS WHEN I HIT HIM WITH THE CHAIR.

DB:     FROM FIRE, SENDING THE FIRE DEPARTMENT?

WA:     FROM SENDING THE FIRE DEPARTMENT, WHEN I CAME BACK IN IS WHEN I HIT HIM THE SECOND TIME WITH THE CHAIR.

DB:     (UI)

WA:     NO (UI)

180

000011679

DB:    WHY'D, WHY'D YOU HIT HIM?

WA:    NO CAUSE HE WAS GETTING UP. I MEAN HE WAS GONNA. I DON'T KNOW IF YOU UNDERSTAND.

DB:    WHAT I UNDERSTAND WENDI IS....

WA:    THE ANGER THAT HE HAD TOWARDS ME RIGHT THEN.

DB:    I UNDERSTAND THAT BUT I ALSO THINK THERE WAS A LOT OF ANGER ON YOUR PART TOO.

WA:    I WAS VERY ANGRY CAUSE HE JUST KEPT ON AND WOULDN'T STOP.

DB:    OKAY. I'VE GOT NO DOUBT HE WAS VERBALLY ABUSIVE TO YOU.

WA:    HE WAS VERY PHYSICALLY ABUSIVE TO ME TOO.

DB:    BUT AT THAT TIME I THINK HE'S ALREADY ON THE GROUND WHEN YOU TOOK THE, YOU HIT HIM WITH THE CHAIR, ISN'T THAT TRUE? HE'S STILL ON THE GROUND, YOU START HITTING HIM WITH THE CHAIR AND THAT'S WHAT THE BLOOD SPATTER SHOWS US?

WA:    NO CAUSE, HE, HE WAS UP ON ALL FOURS GETTING UP TO GET ME.

DB:    HE WAS ON ALL FOURS WHY DID YOU HIT HIM?

WA:    CAUSE I DIDN'T WANT HIM TO GET UP AND GET ME. YOU DON'T UNDERSTAND. HE WAS GONNA KILL ME....

DB:    I UNDERSTAND...

WA:    THAT'S ALL HE WAS YELLING AT ME IS THAT HE COULD KILL ME.

181

000011680

P-App. 004549

DB:    WHY DIDN'T YOU LEAVE?  WHY DIDN'T YOU LEAVE WHEN THE FIRE DEPARTMENT WAS THERE?

WHY DIDN'T YOU ASK THEM FOR HELP?

WA:    CAUSE I DON'T, I THOUGHT IT WOULD STOP.  I THOUGHT HE WOULD STOP.  THAT'S WHY, I

ALWAYS THINK HE'LL STOP.

DB:    THEN IF YOU BELIEVED HE STOPPED, WHY DID YOU HAVE TO START HITTING HIM WITH THE

CHAIR ONCE HE WAS ON ALL FOURS?

WA:    CAUSE HE WAS STILL GETTING UP.  YOU DON'T, HE WAS STILL YELLING AND GETTING UP ON ALL

FOURS TO GET ME.

DB:    BUT BY WHAT CHRIS SAYS HE COULD BARELY MOVE AT THAT POINT.

WA:    OH NO.  WELL I DON'T KNOW WHAT, WHAT, YOU KNOW I DON'T KNOW BUT I'M JUST, I'M

TELLING YOU WHEN I CAME BACK IN FROM TALKING TO THE FIRE DEPARTMENT HE WAS GONNA GET

ME.  HE WAS PISSED, OKAY.  HE WAS JUST IN A RAGE THAT JUST WOULDN'T EVEN, I DON'T...

DB:    WHY DID YOU THROW CHRIS OUT?

WA:    CAUSE I DIDN'T WANT HER TO SEE THE MESS.  I'M LIKE YOU KNOW WHAT I WORK WITH HER

AND I DON'T, I DON'T, HERE I'M HER BOSS AND I, I CAN'T HAVE HER, YOU KNOW WHAT I MEAN.  THAT

WAS JUST, IT'S JUST TOO MUCH INTO MY PERSONAL LIFE.  AFTER HIDING IT FOR SO MUCH TIME HOW

DO YOU LET SOMEBODY SEE YOU, YOU KNOW WHAT I MEAN, I'M LIKE OH I, I CAN'T.  THAT'S WHY I SAID

JUST GO AWAY.  I KNOW FIRST IMPULSE WAS TO CALL HER CAUSE I WANTED SOMEBODY TO HELP ME...

DB:    WENDI

WA:    AND THEN I HAD TO SEND HER, I'M LIKE GO AWAY.  IT'S NOT GONNA

182

000011681

DB:     ONCE YOU HIT HIM WITH THAT CHAIR

WA:     YEAH.

DB:     I DON'T THINK HE'D OF BEEN ABLE TO GET BACK UP TO GET AFTER YOU.

WA:     OH YEAH.

DB:     WHEN A MAN IN HIS CONDITION, WHOSE GOING THROUGH CHEMO, HE CAN'T EVEN GET UP TO

GET INTO A CAR WHEN CHRIS WAS THERE.

WA:     RIGHT.

DB:     THEN YOU HIT HIM AGAIN A COUPLE TIMES WITH THE CHAIR.

WA:     SEE AND I, WELL  I

DB:     HOLD UP, LET ME FINISH

WA:     OKAY GO AHEAD.

DB:     HE WANTED, HE CAN'T EVEN GET UP WITH YOU AND CHRIS COAXING HIM TO GET UP

WA:     RIGHT.

DB:     TO GO GET IN THE CAR

WA:     RIGHT.

DB:     TEN MINUTES LATER YOU HIT HIM A COUPLE IN THE HEAD WITH THE CHAIR

WA:     RIGHT.

DB:     SPLITTING HIS HEAD WIDE OPEN.  I DON'T THJINK HE COULD'VE GOTTEN UP.

183

000011682

P-App. 004551

WA:     HE WAS.  YOU SHOULD OF, I WISH...

DB:     I THINK...

WA:     I WISH THERE WAS A VIDEO.

DB:     I THINK THAT YOU HIT HIM A COUPLE OF TIMES AND WHETHER HE WAS STILL SCREAMING AT YOU OR WHAT....

WA:     UM HUH

DB:     BUT I DON'T THINK HE EVER PUT THE CORD AROUND YOUR NECK.

WA:     HE DID.

DB:     OKAY.  YOUR, YOUR INJURIES

WA:     (UA)

DB:     YOUR INJURIES

WA:     HE DID.

DB:     YOUR INJURIES DON'T MATCH THAT.

WA:     OKAY WELL.

DB:     AT ALL.  YOU KNOW WHAT THEY MATCH?

WA:     NO.

DB:     THEY MATCH YOU SCRATCHING YOUR OWN NECK.

184

000011683

WA:     NO I DIDN'T SCRATCH MY OWN NECK.  HE PUT THE CORD AROUND, WELL MAYBE HE, YOU

KNOW I DON'T KNOW HOLDING ONTO THE CORD IT PROBABLY WOULD HAVE, I DON'T KNOW.  WHEN, I

DON'T, WHEN YOUR

DB:     THAT'S THE CORD YOUR ABLE TO PULL FORWARD.

WA:     RIGHT (UI)

DB:     IT DOESN'T MAKE SENSE TO ME.  THE SCENE DOESN'T MAKE SENSE.  DOESN'T MAKE SENSE TO

ME, DOESN'T MAKE SENSE TO MY PARTNER, DOESN'T MAKE SENSE TO CHRIS.  THERE'S NO REASON

WHY YOU'D HAVE TO GO OUT AND CHANGE YOUR CLOTHES, COME BACK OUT ONCE FIRE IS THERE

WITH YOUR HAIR WET AND EVERYTHING ELSE UNLESS THAT STUFF OCCURRED WHILE CHRIS WAS

OUTSIDE IN BETWEEN THE FIRE, THERE'S NO REASON WHATSOEVER.

WA:     RIGHT.

DB:     OKAY.

WA:     WELL WHEN I WAS BENDING OVER THAT'S WHEN HJE GOT BLOOD ON ME AND THAT IS WHY I

WENT AND DUNKED MY HEAD IN THE SINK, PUT CLOTHES ON, WENT OUTSIDE.

DB:     I THINK HE WAS ALREADY DEAD.

WA:     NO.

DB:     I THINK HE'D ALREADY BEEN HIT OVER THE HEAD, I THINK HE'D BEEN STABBED BY A, MAYBE

NOT STABBED BUT HE'D BEEN HIT OVER THE HEAD A COUPLE MORE TIMES BY THEN.

WA:     NO.  (UI) I DID THAT WHEN I GOT BACK.  I MEAN I DON'T, HONESTLY I MEAN I JUST....

185

000011684

DB:     OKAY WELL I'M, I'M TRYING TO GIVE YOU YOUR CHANCE TO EXPLAIN WHAT HAPPENED

WA:     RIGHT

DB:     AND YOUR CONTINUED TO LIE TO ME ABOUT WHAT HAPPENED.

WA:     NO CAUSE IT WAS WHEN I GOT BACK IN WHEN HE WAS STILL GETTING UP, YELLING AT ME THAT

I HIT HIM OVER THE HEAD AND I KNOW I HIT HIM MORE THAT I SHOULD HAVE. I MEAN I KNOW I DID

BUT I WAS LIKE FREAKED OUT. I DON'T, I DON'T, I DON'T KNOW HOW TO EXPLAIN IT.

DB:     WELL I THINK, I DON'T THINK, I DON'T THINK HE COULD'VE GOTTEN UP AFTER YOU HIT HIM

REPEATEDLY IN THE HEAD.

WA:     HE WAS TRYING LET ME TELL YOU.

DB:     HE WAS, WAS HE TRYING TO GET UP WHEN YOU STABBED HIM?

WA:     YEAH. YES HE WAS THAT'S THE ONLY REASON. I WAS LIKE OH MY GOD HE IS STILL GONNA GET

AND AFTER ALL OF THAT THEN I'M, I AM, I DON'T KNOW...

DB:     IS THAT WHEN YOU TOOK THE KNIFE?

WA:     I'M LIKE SOMETHING, SOMETHING. NO WE HAD THE KNIFE FROM BEFORE.

DB:     WHAT DO YOU MEAN BEFORE?

WA:     WHEN WE WERE ARGUING.

DB:     OKAY WHEN DID YOU PULL OUT THE KNIFE WHEN YOU WERE ARGUING?

WA:     THAT WOULD'VE BEFORE CHRIS WAS EVEN THERE CAUSE IT (UI) LIVING ROOM.

DB:     WHAT HAPPENED? WHERE WAS IT IN THE LIVING ROOM?

186

000011685

WA:     UM IT HAD BEEN SITTING BEHIND THE LAZY BOY CHAIR OR ON THE COUCH, I DON'T

REMEMBER.

DB:     OKAY, YOU'VE HIT HIM ON....

WA:     BECAUSE HE THREATENS AND IT'S JUST A, AND I GRABBED A KNIFE AND I TOLD HIM IF YOU

COME NEAR ME I'M GONNA GET YOU AND THEN I,  AND THEN I YOU KNOW I WASN'T SERIOUS.  I'M

SO...

DB:     HE'S STILL ON THE GROUND THOUGH....

WA:     RIGHT.

DB:     WHEN HE GETS HIS NECK CUT.

WA:     WHAT'S THAT?

DB:     WHEN, WHEN HE GETS THE CUT ON HIS NECK HE IS STILL ON THE GROUND?

WA:     HE WAS SITTING UP AND THEN FELL FORWARD, YES.  YEAH

DB:     WHERE ARE YOU AT THAT POINT?

WA:     I AM SITTING RIGHT WITH HIM.  WE WERE BOTH ON THE GROUND.  SO THAT UM

DB:     DID YOU, WHEN DID YOU GET THE KNIFE BACK FROM THE LIVING ROOM, WHEREVER IT WAS IN

THE LIVING ROOM?

WA:     WHEN HE WAS STILL YELLING AT ME.

DB:     OKAY, WHY DID YOU CUT HIM AT THAT POINT?

187

000011686

WA:    CAUSE HE WOULD, HE WOULDN'T, I MEAN HE, IT, IT IS LIKE, I FELT LIKE I WAS WATCHING A

ZOMBIE STILL TRYING TO GET ME, THAT IS WHY BECAUSE THEN I JUST THAT WAS THE CLOSEST THING

TO GRAB BECAUSE I AM STILL GOING. I DON'T KNOW IF, HAVE YOU EVER BEEN IN FEAR AND YOU CAN'T

MOVE, YOUR JUST LIKE AND I'M LIKE CAN'T BELIEVE ALL OF THIS IS HAPPENING AND THAT'S WHEN I

PICKED UP THE KNIFE.

DB:    OKAY AND WHAT...

WA:    AND THAT IS (UI)

DB:    YOUR SITTING DOWN?

WA:    YEAH WE ARE BOTH. HE HAS ME PINNED DOWN, WERE BOTH AND HE STARTS TO STAND UP,

THAT'S WHEN I'M HOLDING THE KNIFE, HE'S STANDING UP, I'M STANDING AND THEN HE JUST FALLS

FLAT ON HIS FACE AND THAT'S WHEN I MEAN BLOOD JUST WENT LIKE EVERYWHERE.

DB:    WHAT HAND DID YOU HAVE THE KNIFE IN?

WA:    I WOULD'VE HAD IT IN MY LEFT HAND. CAUSE IF I REACHED OUT TO GRAB IT. I'M PRETTY SURE.

DB:    HOW MANY TIMES DID YOU STAB HIM?

WA:    I DID, THAT I DID NOT, I MEAN THAT WAS IT, THEN WHEN THAT BLOOD SQUIRTED EVERYWHERE

THAT'S WHEN I WENT. I MEAN

DB:    SO ONE TIME?

WA:    YEAH. I DID NOT, I MEAN HE JUST AND IT WAS LIKE HE FELL FORWARD ON IT. I MEAN IT WAS

JUST A WEIRD...

188

000011687

DB:     FELL FORWARD ON WHAT?

WA:     ON THE KNIFE. CAUSE YOU KNOW HOW, WHEN YOUR HOLDING IT, I DON'T KNOW YOU CAN

CHECK THAT OUT, I MEAN YOU SHOULD BE ABLE TO TELL AND JUST THE WAY HE FELL, I DON'T KNOW.

HE JUST FELL FORWARD AND BLOOD JUST WENT EVERYWHERE AND I DON'T, I JUST KNOW I HAD

BLOOD ALL OVER MY GLASSES AND ALL OVER EVERYWHERE.

DB:     AND THEN YOU WASHED UP (UI) FIRE DEPARTMEN?

WA:     OH NO NO NO, THIS IS AFTER THE FIRE DEPARTMENT HAD LEFT. I WENT TO THE BATHROOM

AND THAT'S WHEN I DROPPED MY GLASSES IN THERE AND I, I'M CLEANING UP AGAIN AND MY HAIR

HAD BEEN WET, PROBABLY ALL NIGHT LONG UM AND I TRIED TO CALL MY DAD CAUSE I'M LIKE WHAT

DO I DO. I DIDN'T MEAN TO, I DIDN'T MEAN TO STAB HIM. I MEAN YES I HIT HIM OVER THE BACK OF

THE HEAD BECAUSE I WANTED HIM TO STOP AND HE WOULDN'T STOP.

DB:     WHEN DID YOU CUT THE A CORD?

WA:     THAT WAS EARLIER IN THE NIGHT.

DB:     IT WASN'T WHEN, THAT HE GOT STABBED?

WA:     NO.

DB:     OKAY.

WA:     NO I DIDN'T, I DIDN'T TOUCH HIM, I DIDN'T TOUCH ANYTHING UNTIL AFTER THE PARAMEDIC

TOLD ME TO ROLL HIM.

DB:     WENDI WHEN DID YOU PUT THE, PUT THE BELT IN THERE?

189

000011688

WA:    BELT IN WHERE?

DB:    AROUND HIS BODY.

WA:    I DIDN'T PUT A BELT AROUND HIS BODY.

DB:    YOU TOLD ME HE CHOKED YOU EARLIER WITH A BELT?

WA:    UM HUH.  THAT'S WHAT WE'D BEEN FIGHTING WITH EARLIER BECAU AND THE LADY ASKED ME

WELL WHY, WHOSE BELT WAS IT AND I...

DB:    WHAT LADY?

WA:    YOUR, YOUR PARTNER, I'M SORRY I DON'T KNOW HER NAME.

DB:    LISTEN

WA:    OKAY

DB:    THE BELT IS THROWN THERE ON TOP OF THE KNIFE.  YOU KNOW WHAT, YOU KNOW WHAT

THAT IS CALLED?

WA:    NO, NO.

DB:    IT'S CALLED STAGING A SCENE.

WA:    WELL I DIDN'T DO THAT AT ALL BECAUSE ONCE HE FELL ON THE KNIFE I LIKE LEFT AND WENT

AWAY.  I, I COULDN'T EVEN, I PEEKED AT HIM FROM A LITTLE WAYS AWAY AND THEN WHEN I CALLED

911 AND THEY SAID WELL YOU HAVE TO ROLL HIM OVER.

DB:    DOES HE HAVE ANY STAB WOUNDS ANYWHERE ELSE ON HIS BODY?

190

000011689

WA:     NOT THAT I'M...

DB:     JUST ON THE NECK?

WA:     I MEAN NOT FROM ME, NO.

DB:     WHY DIDN'T YOU TRY TO HELP HIM AFTER HE WAS CUT ON THE NECK?

WA:     CAUSE BLOOD WENT EVERYWHERE.  I MEAN IT WAS JUST LIKE GROSS.

DB:     WHY DIDN'T YOU TRY AND HELP HIM?

WA:     I COULDN'T IT WAS JUST EVERYWHERE.  I FREAKED OUT, I COULDN'T SEE, I GOT, I HAD BLOOD

ALL OVER ME.

DB:     DID YOU WANT HIM TO DIE, WENDI?

WA:     NO I DON'T WANT HIM TO DIE.  HE WAS GONNA DIE ANYWAY, WHY WOULD I WANT HIM TO

DIE.

DB:     BECAUSE OF THE ABUSE YOU WERE UNDER?

WA:     NO.  I WOULD NEVER WANT HIM TO DIE.  THAT'S WHY I WOULD NEVER LEAVE HIM.  I, YOU

KNOW WHAT I MEAN.  I'M, I ALWAYS HAD A PART OF ME....

DB:     SOMETIMES PEOPLE GET TO A POINT WHETHER IT'S BECAUSE OF PRIOR VIOLENCE YOU GUYS

HAD BETWEEN YOU WITH HIM BEING VERBALLY ABUSIVE, YOU KNOW AND COMPOUND THAT WITH ALL

OF THE OTHER STRESSES YOUR UNDER (UI).

WA:     RIGHT.  I WASN'T, I WASN'T, I WASN'T LIKE THAT, I DON'T THINK.  I KNOW, I KNOW WHEN I HIT

HIM ON THE HEAD I WAS VERY ANGRY.

191

000011690

DB:     YEAH YOU HIT HIM REAL HARD AND AT THAT POINT HE NEVER GOT UP OFF THE GROUND AFTER YOU HIT HIM ON THE HEAD.

WA:     BUT HE DID.

DB:     I DON'T THINK HE COULD HAVE.

WA:     HMM HE DID UM CAUSE IT FREAKED ME OUT. I COULDN'T BELIEVE STILL COULD STAND UP, CAUSE I THOUGHT FOR SURE I'D KNOCKED HIM OUT. I WAS TRYING TO KNOCK HIM OUT AND HE WOULDN'T STOP YELLING. I MEAN, YOU HAVE NO IDEA.

DB:     WHY IS THE, WHY IS YOUR FAMILY PICTURE, IS IT YOUR FAMILY PICTURE OR SOMETHING THAT'S LAYING ON THE GROUND WITH A POT ON TOP OF IT?

WA:     HE SMASHED IT. HE WAS MAD.

DB:     THAT'S CAUSE HE THINKS YOU WERE MESSING AROUNG?

WA:     RIGHT, RIGHT HE ALWAYS THOUGHT THAT.

DB:     I WANT YOU TO THINK ABOUT IT REAL HARD FOR A COUPLE MINUTES, I'LL BE BACK OKAY?

WA:     THINK ABOUT WHAT?

DB:     THE REST OF WHAT WE NEED TO TALK ABOUT.

WA:     JUST, OKAY.

DB:     CAUSE WERE NOT DONE.

WA:     OKAY.

192

000011691

DB:     I DON'T THINK YOU'VE TOLD ME EVERYTHING.

WA:     OKAY.

DB:     WENDI?

WA:     YEAH.

DB:     I THINK THAT, I TALKED TO MY PARTNER AGAIN, THAT'S THERE AT THE SCENE.

WA:     OKAY.

DB:     AND I, I THINK WHAT HAPPENED IS ONCE HE'S DOWN ON THE GROUND, AFTER YOU'VE HIT HIM

ON THE HEAD.  LET ME TELL YOU WHAT I THINK, OKAY?

WA:     OKAY.

DB:     JUST LISTEN.

WA:     OKAY.

DB:     I THINK THAT, I THINK THAT THERE'S A COUPLE THINGS GOING ON, I THINK THAT YOUR TIRED

OF THE BULLSHIT THAT'S BEEN GOING ON AND THE ANTICS HE'S PULLING.  (UI) IT'S REALLY ROUGH

DEALING WITH PEOPLE WHO ARE DYING.  I'VE BEEN THROUGH IT WITH FAMILY MEMBERS, NOT MY

SPOUSE BUT FAMILY MEMBERS, SO I, I KNOW HOW YOU MUST BE FEELING.  HE'S VERBALLY ABUSIVE TO

YA, YOU KNOW YOU GOT OTHER THINGS GOING ON IN YOUR LIFE.  I THINK THAT IT GOT TO THIS POINT

TONIGHT BUT ONCE THINGS GOT CARRIED AWAY, THAT YOU WERE IN SUCH A RAGE AFTER YOU HIT

HIM THAT I THINK YOU GOT THINGS TURNED AROUND AND I THINK YOU GOT THE KNIFE, IN A, IN A

RAGE AND I THINK YOU CUT HIM.

193

000011692

WA:     OH.

DB:     OKAY. I'M GONNA BE ABLE TO PROVE THAT, MY ONLY QUESTION IS THIS OF YOU, IS WHEN I

PROVE EVERYTHING, MY ONLY QUESTION IS THIS, DID THIS HAPPEN CAUSE YOU GUYS WERE FIGHTING

AND YOU WERE IN A RAGE ABOUT WHAT HAPPENED...

WA:     UH HUH

DB:     WHAT'S BEEN GOING ON, THE ASSAULT ON YOU TONIGHT OR DID YOU INTENTIONALLY DO IT

CAUSE YOU WANTED HIM TO DIE AT THAT POINT?  THOSE ARE MY ONLY TWO QUESTIONS OF YOU.  I

CAN EXPLAIN THINGS IF YOUR IN A FIT OF RAGE AND ALL OF THIS HAS BEEN GOING ON AND IT'S

BUILDING AND BUILDING AND IT COMES TO A HEAD AT THIS POINT, YOUR JUST SO PISSED OFF ABOUT

IT, SO MAD THAT YOU TAKE THE KNIFE AND YOU STAB HIM.  WE CAN UNDERSTAND THAT AND WE CAN

EXPLAIN THAT.  THE ONLY OTHER THING I CAN THINK OF IS IT GOT TO THAT POINT WHERE YOU JUST

SAID I'VE HAD ENOUGH AND IT'S A COLD CALCULATED DECISION YOU MADE....

WA:     OH GOD NO.

DB:     AND YOU STABBED HIM.  IT'S ONE OF THE TWO AND I'M GONNA BE ABLE TO PROVE IT.  OKAY

YOU TELL ME WHEN EVERYTHING IS SAID AND DONE, WHAT PERSON DO YOU WANT STANDING IN

FRONT OF THE JUDGE SAYING, I'M SORRY JUDGE.  DO YOU WANT THE PERSON WHO CAME IN HERE

AND SAID LOOK I MESSED UP, I MADE THESE MISTAKES, I DID THIS IN A FIT OF RAGE OR DO YOU WANT

THE PERSON WHOSE A COLD CALCULATED KILLER?  CAUSE I DON'T THINK THAT'S WHAT YOU ARE.

WA:     NO NOT AT ALL.

DB:     BUT I THINK THAT'S WHAT HAPPENED.  I THINK THAT AFTER YOU KNOCKED HIM IN THE HEAD

WITH THE CHAIR....

194

000011693

WA:     YOU KNOW WHAT CAN I SAY SOMETHING TO YOU THOUGH, HE NEVER, HE NEVER, HE NEVER

PASSED OUT. HE NEVER...

DB:     NO. I DON'T THINK HE EVER DID. YEAH I THINK YOUR RIGHT...

WA:     BUT HE JUST KEPT GOING. I DON'T KNOW.

DB:     BUT I DON'T THINK HE EVER GOT UP OFF THE GROUND ONCE YOU HIT HIM IN THE HEAD.

WA:     OKAY.

DB:     OKAY AND I THINK THAT YOU HAD ALL OF THE CHANCES IN THE WORLD AT THAT POINT TO

LEAVE. I THINK THAT YOU WERE JUST SO PISSED OFF AND SO TIRED OF ALL THE GARBAGE THAT'S GONE

ON THAT YOU GOT THE KNIFE.....

WA:     NO.

DB:     AND YOU STABBED HIM. IN A FIT OF RAGE, I'M NOT SAYING THAT YOU INTENTIONALLY DID IT

BUT IT'S ONE OF TWO THINGS AND WERE GONNA BE ABLE TO PROVE THAT.

WA:     SURE AND I, AND I HEAR WHAT YOUR SAYING BUT WHEN, WHEN I PICKED UP THE KNIFE IS

WHEN HE WAS STILL GOING BECAUSE ...

DB:     HE COULDN'T OF BEEN GOING.

WA:     WHY, WHY?

DB:     I THINK, I THINK WHAT THE MEDICAL EXAMINER'S GONNA COME IN HERE AND SAY IS THERE IS

ABSOLUTELY NO WAY IN HIS PHYSICAL CONDITION THAT HE COULD'VE BEEN GETTING UP OFF THE

GROUND PERIOD.

195

000011694

WA:    OKAY.

DB:    AND, AND I THINK THAT, THAT'S GONNA MAKE YOU LOOK LIKE A LIAR IN FRONT OF
EVERYBODY.

WA:    YEAH.

DB:    THAT'S WHAT I THINK.

WA:    CAUSE THAT, I MEAN THAT IS JUST WHAT I, I REMEMBER GRABBING IT.

DB:    BUT HE WASN'T GOING ANYWHERE AT POINT.  I'M NOT SAYING THAT HE WAS UNCONCIOUS ...

WA:    CAUSE HE WASN'T, HE WAS STILL YELLING.

DB:    HE MAY HAVE BEEN SITTING THERE YELLING, THREATENING YOU BUT HE WASN'T GETTING UP
OFF THE GROUND AT THAT POINT.

WA:    HE WAS.

DB:    NO HE WASN'T.

WA:    HE, YOU SHOULD SEE, YOU, HE WAS HE WAS GETTING READY TO GET UP.  I'M LIKE NO.

DB:    OKAY WENDI I'VE TRIED TO GIVE YOU EVERY OPPORTUNITY TO TELL ,.....

WA:    HOW, YOU KNOW WHAT I MEAN.

DB:    ...ME AND BE HONEST WITH ME.  I'VE TRIED, I'VE, I'VE TRIED BUT...

WA:    I DON'T UNDERSTAND WHY YOU, WHY YOU.....

DB:    BECAUSE THE PHYSICAL EVIDENCE AND WHAT YOUR OWN FRIENDS ARE TELLING ME....

196

000011695

WA:     RIGHT

DB:     DOESN'T MATCH YOUR STORY THAT'S WHY.  PEOPLE GET IN THESE SITUATIONS AND THEY

WANT TO MINIMIZE WHAT HAPPENED.  YOU CAN'T MINIMIZE WHAT HAPPENED OUT THERE.

WA:     RIGHT.

DB:     YOU COULD BE HONEST ABOUT IT OR YOU CAN LIE ABOUT IT.

WA:     RIGHT.

DB:     AND YOUR LYING TO ME.

WA:     I'M NOT LYING TO YOU CAUSE I'M, I KEPT HIT, I HIT HIM AND HE WOULDN'T, HE WOULDN'T, HE

WOULDN'T STOP, I, YOU DON'T KNOW, WHEN SOMEONES SITTING THERE THREATENING YOU AND

HOW MANY TIMES I'VE GONE THROUGH THIS BEFORE AND I'VE HIT HIM AND I'VE HIT HIM AND HE STILL

IS NOT STOPPING.

DB:     WITH THE BAR STOOL?

WA:     YEAH, OH MY GOD.

DB:     IN THE PAST?

WA:     NO I'M SAYING TONIGHT AND HE WON'T, HE WOULD STOP.  YOU DON'T UNDERSTAND.

DB:     NO CAUSE I, I DON'T BELIEVE YOU, I DON'T THINK HE COULD'VE GOTTEN UP OFF THE FLOOR.

WA:     OKAY.  WELL HE DID.  I WAS, I WAS JUST IN SHOCK BECAUSE I'M LIKE WHY DON'T YOU GO

UNCONCIOUS PLEASE JUST STOP FOR AWHILE.  YOU KNOW WHAT I MEAN, IS THAT.

197

000011696

DB:     YEAH I CAN UNDERSTAND THAT, BUT WHEN HE IS, AFTER YOU HAVE HIT REPEATEDLY IN THE

HEAD, HE IS, WHETHER HE'S LAYING DOWN OR STANDING UP OR SITTING. LAYING DOWN OR SITTING

UP, HE IS UNABLE TO GET UP AT POINT AND THEN YOU CUT HIM.

WA:     HE NO.

DB:     YEAH AND I'M GONNA BE ABLE TO PROVE THAT WENDI.

WA:     OKAY. I, I DIDN'T BECAUSE I KNOW I WAS SITTING RIGHT THERE WITH HIM AND HE WAS STILL

MOVING AND YELLING AT ME AND THAT IS WHEN I GRABBED THE KNIFE.

DB:     AND HE'S SITTING THERE YELLING AT YOU AND WHAT IS HE DOING?

WA:     THEN HE FALLS OVER. I MEAN IT WAS JUST..

DB:     THERE WAS NO REASON TO CUT HIM AT THAT POINT.

WA:     NO THAT WHAT I SAID I, I DID NOT.

DB:     CAUSE HE'S SITTING THERE AND YELLING THERE'S NO REASON TO CUT HIM.

WA:     I KNOW THAT.

DB:     BUT THAT'S WHAT HAPPENED.

WA:     I KNOW THAT.

DB:     ISN'T IT?

WA:     NO CAUSE I'M LIKE IT, I, I KEPT, WELL I DON'T KNOW, KEEP THINKING OVER AND OVER WHEN I,

WHEN I OPEN MY EYES I HAVE BLOOD ALL OVER THE PLACE AND HE'S LAYING FLAT ON HIS FACE. SO I

DON'T KNOW. HOW CAN I, CAN YOU....

198

000011697

DB:     I THINK WHEN HE'S SITTING THERE....

WA:     WHY, I'M, I'M SITTING HERE GOING I CAN'T, I CAN'T TELL YOU WHAT, I DON'T EVEN KNOW WHERE HE WAS CUT.  I KNOW I DID NOT....

DB:     HE WAS CUT IN THE NECK.

WA:     YOU KNOW WHAT I MEAN.  I'M LIKE I DON'T KNOW.

DB:     HE, HE HAS SLASHED WOUND ACROSS HIS NECK.

WA:     I DON'T EVEN KNOW CAUSE I'M, I'M YELLING AND HE'S YELLING AND ALL I KNOW IS THEN THERE'S BLOOD EVERYWHERE.  I'M LIKE WHAT, THAT'S WHEN I FREAKED OUT.  I'M LIKE WHAT HAPPENED.

DB:     OKAY WHAT DID HAPPEN?

WA:     OH HE WAS UP.  SEE....

DB:     NO HE WAS, HE WASN'T UP.  HE MAY HAVE BEEN SITTING ON HIS BUTT BUT HE WASN'T STANDING UP.

WA:     NO THAT'S WHAT I SAID WE WERE BOTH SITTING ON THE FLOOR (UI) AND THAT'S WHEN I REACHED OVER AND GRABBED THE KNIFE.

DB:     AND THEN .....

WA:     CAUSE I'M LIKE STOP.

DB:     THEN WHAT WAS THE REASON FOR CUTTING HIM?

WA:     I DON'T THINK I, SEE I DON'T THINK I CUT HIM.  I REALLY DON'T.

199

000011698